**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>                  Debtors.[1] | PROMESA<br>Title III<br><br>No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>                  Debtor. | PROMESA<br>Title III<br><br>No. 17-BK-4780-LTS<br><br>(Jointly Administered) |

**NOTICE OF FILING SPANISH TRANSLATION OF DISCLOSURE
STATEMENT FOR THE TITLE III PLAN OF ADJUSTMENT
OF THE PUERTO RICO ELECTRIC POWER AUTHORITY**

    **PLEASE TAKE NOTICE** that, on December 16, 2022, the Financial Oversight and

Management Board for Puerto Rico (the "Oversight Board"), as sole Title III representative of the

Puerto Rico Electric Power Authority ("PREPA" or the "Debtor") pursuant to section 315(b) of

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19- BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2] filed the *Disclosure Statement for the Title III Plan of Adjustment for the Puerto Rico Electric Power Authority* [Case No. 17-3283, ECF No. 23097; Case No. 17-4780, ECF No. 3111] (the "PREPA Disclosure Statement").

PLEASE TAKE FURTHER NOTICE that, a Spanish translation[3] of the PREPA Disclosure Statement, including exhibits (other than Exhibits D and K) to the PREPA Disclosure Statement, is attached hereto as **Exhibit A**.

PLEASE TAKE FURTHER NOTICE that all documents filed in these Title III cases are available (a) free of charge by visiting https://cases.ra.kroll.com/puertorico/ or by calling +1 (844) 822-9231, and (b) on the Court's website at http://www.prd.uscourts.gov, subject to the procedures and fees set forth therein.

*[Remainder of page intentionally left blank]*

---

[2] PROMESA is codified at 48 U.S.C. §§ 2101-2241.
[3] To the extent the Spanish translation of the PREPA Disclosure Statement, including any exhibit thereto, is inconsistent with any part of the English version of the PREPA Disclosure Statement, including any exhibit thereto, the English version of the PREPA Disclosure Statement shall control.

Dated: January 20, 2023
　　　　 San Juan, Puerto Rico

Respectfully submitted,


/s/ Martin J. Bienenstock
Martin J. Bienenstock
Paul V. Possinger
Ehud Barak
Margaret A. Dale
Michael T. Mervis
Daniel S. Desatnik
(Admitted *Pro Hac Vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900
Email: mbienenstock@proskauer.com
　　　　 ppossinger@proskauer.com
　　　　 ebarak@proskauer.com
　　　　 ddesatnik@proskauer.com


*Attorneys for the Financial*
*Oversight and Management Board*
*as representative for PREPA*


/s/ Hermann D. Bauer
Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944
Email: hermann.bauer@oneillborges.com


*Co-Attorney for the Financial Oversight and*
*Management Board as representative for*
*PREPA*

## **EXHIBIT A**

Spanish Translation of PREPA Disclosure Statement and Supporting Exhibits (Other Than Exhibits D And K)

**TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS
PARA EL DISTRITO DE PUERTO RICO**

| | |
|---|---|
| En el asunto de:<br><br>JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN FINANCIERA PARA PUERTO RICO,<br><br>como representante del<br><br>ESTADO LIBRE ASOCIADO DE PUERTO RICO y otros,<br><br>Deudores.[1] | PROMESA<br>Título III<br><br>Núm. 17-BK-3283-LTS<br><br>(Administrado de manera conjunta) |
| En el asunto de:<br><br>JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN FINANCIERA PARA PUERTO RICO,<br><br>como representante de<br><br>LA AUTORIDAD DE ENERGÍA ELÉCTRICA DE PUERTO RICO,<br><br>Deudor. | PROMESA<br>Título III<br><br>Núm. 17-BK-4780-LTS<br><br>(Administrado de manera conjunta) |

**DECLARACIÓN DE DIVULGACIÓN CORRESPONDIENTE AL PLAN
DE AJUSTE DEL TÍTULO III DE LA AUTORIDAD DE ENERGÍA ELÉCTRICA DE
PUERTO RICO**

| | |
|---|---|
| **PROSKAUER ROSE LLP**<br>Eleven Times Square<br>Nueva York, Nueva York 10036 | **O'NEILL & BORGES LLC**<br>250 Avenida Muñoz Rivera, Suite 800<br>San Juan, Puerto Rico 00918-181 |

*Abogados de la Junta de Supervisión y Administración Financiera de Puerto Rico, en su calidad de representantes de la AEEPR*

Fecha:  16 de diciembre de 2022.

---

[1] Los Deudores de estos Casos del Título III, conjuntamente con los números de casos del Título III de los respectivos Deudores y los cuatro (4) últimos dígitos del número de identificación tributaria federal de cada Deudor, según proceda, son (i) el Estado Libre Asociado de Puerto Rico (Caso de quiebra núm. 17-BK-3283- LTS) (cuatro últimos dígitos del número de identificación tributaria federal: 3481); (ii) Corporación del Fondo de Interés Apremiante de Puerto Rico ("COFINA") (Caso de quiebra núm. 17-BK-3284-LTS) (Caso de quiebra núm. 17 BK 3284-LTS) (últimos cuatro dígitos de la identificación tributaria federal: 8474); (iii) Autoridad de Carreteras y Transportación de Puerto Rico ("ACT") (Caso de quiebra núm. 17-BK-3567-LTS) (Caso de quiebra núm. 17 BK 3284-LTS) (últimos cuatro dígitos de la identificación tributaria federal: 3808); (iv) Sistema de Retiro de los Empleados del Estado Libre Asociado de Puerto Rico ("SRE") (Caso de quiebra núm. 17-BK-3566-LTS) (últimos cuatro dígitos de la identificación tributaria federal: 9686); (v) Autoridad de Energía Eléctrica de Puerto Rico ("AEEPR") (Caso de quiebra núm. 17-BK-4780-LTS) (Caso de quiebra núm. 17- BK-4780-LTS) (últimos cuatro dígitos de la identificación tributaria federal: 3747); y (vi) Autoridad de Edificios Públicos de Puerto Rico ("AEP") (Caso de quiebra núm. 19-BK-5233-LTS) (Caso de quiebra núm. 17 BK 3284-LTS) (últimos cuatro dígitos de la identificación tributaria federal: 3801) (los números de casos del Título III están enumerados como números de Casos de quiebra debido a las limitaciones del software).

i

Las consultas relativas a esta Declaración de divulgación deben dirigirse al Agente de convocatoria, Kroll Restructuring Administration LLC ("Kroll"):

**Teléfono** (disponible desde 10:00 a.m. hasta 7:00 p.m., AST): (844) 822-9231 (gratuito en EE.UU. y Puerto Rico)

(646) 486-7944 (para llamadas internacionales)

**Correo electrónico**: puertoricoballots@ra.kroll.com (referencia "PREPA Plan of Adjustment/Plan de ajuste de la AEEPR" en el Asunto)

Tenga en cuenta que Kroll no está autorizado para prestar asesoramiento jurídico, y que no lo prestará.

---

**ESTA NO ES UNA CONVOCATORIA DE VOTOS SOBRE EL PLAN DE AJUSTE. LAS VOTACIONES NO PODRÁN CONVOCARSE HASTA QUE EL TRIBUNAL DEL TÍTULO III NO HAYA APROBADO LA DECLARACIÓN DE DIVULGACIÓN. ESTA DECLARACIÓN DE DIVULGACIÓN SE ENVÍA PARA SU APROBACIÓN, PERO TODAVÍA NO HA SIDO APROBADA POR EL TRIBUNAL DEL TÍTULO III. LA INFORMACIÓN DE ESTA DECLARACIÓN DE DIVULGACIÓN ESTÁ SUJETA A MODIFICACIONES. ESTA DECLARACIÓN DE DIVULGACIÓN NO ES UNA OFERTA DE VENTA DE VALORES NI SOLICITA UNA OFERTA DE COMPRA DE VALORES.**

---

**NINGUNA OTRA INFORMACIÓN HA SIDO JUDICIALMENTE APROBADA.**

**LA JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN FINANCIERA PARA PUERTO RICO (LA "JUNTA DE SUPERVISIÓN"), EN SU CALIDAD DE REPRESENTANTE DEL DEUDOR EN EL PRESENTE CASO DEL TÍTULO III, DE CONFORMIDAD CON LA SECCIÓN 315(b) DE LA LEY DE SUPERVISIÓN, ADMINISTRACIÓN Y ESTABILIDAD ECONÓMICA DE PUERTO RICO ("PROMESA"), NO HA AUTORIZADO A PARTE ALGUNA FACILITAR NINGUNA INFORMACIÓN RELATIVA AL PLAN O AL DEUDOR, NI SOBRE EL VALOR DE LOS BIENES DEL DEUDOR, CON LA EXCEPCIÓN DE LO CONTENIDO EN ESTA DECLARACIÓN DE DIVULGACIÓN O EN LA ORDEN DE LA DECLARACIÓN DE DIVULGACIÓN.[2] LOS TITULARES DE RECLAMACIONES DEBEN ENTENDER QUE EL TRIBUNAL DEL TÍTULO III NO HA APROBADO NINGUNA INFORMACIÓN, MANIFESTACIÓN, GARANTÍAS O INCENTIVOS EXPRESADOS CON EL OBJETO DE CONSEGUIR LA ACEPTACIÓN O RECHAZO, U OBTENER UNA ELECCIÓN PARA RESOLVER DETERMINADAS RECLAMACIONES ((SI PROCEDIERA), CON RESPECTO AL PLAN. ASIMISMO, LOS TITULARES DE RECLAMACIONES NO DEBERÍAN FIARSE DE NINGUNA INFORMACIÓN DISTRIBUIDA A TRAVÉS DE LAS REDES SOCIALES, INCLUYENDO, ENTRE OTRAS, FACEBOOK, TWITTER E INSTAGRAM.**

---

**LA JUNTA DE SUPERVISIÓN Y TODAS LAS PARTES DEL ACUERDO DE APOYO AL PLAN (CONJUNTAMENTE, LAS "PARTES FAVORABLES") CONSIDERAN QUE EL PLAN CONSTITUYE UN DESENLACE JUSTO Y FAVORABLE PARA TODOS LOS ACREEDORES DEL DEUDOR Y QUE, POR CONSIGUIENTE, LA CONFIRMACIÓN DEL PLAN ES LO MÁS CONVENIENTE PARA LOS INTERESES DEL DEUDOR Y DE SUS ACREEDORES. LA JUNTA DE SUPERVISIÓN Y LAS PARTES FAVORABLES RECOMIENDAN QUE VOTE POR ACEPTAR EL PLAN.**

**A EFECTOS DE DISIPAR CUALQUIER DUDA, ESTA DECLARACIÓN DE DIVULGACIÓN FUE REDACTADA POR LA JUNTA DE SUPERVISIÓN, Y**

---

[2] Los términos en mayúsculas utilizados, pero no definidos, en esta Declaración de divulgación tendrán los significados adscritos a los mismos en el Plan (tal como se define a continuación).

**ALGUNAS DE LAS MANIFESTACIONES AQUÍ CONTENIDAS PUEDEN SER OBJETADAS POR DETERMINADOS ACREEDORES O POR EL GOBIERNO, INCLUYENDO, ENTRE OTROS, LAS AFIRMACIONES RELATIVAS A LA INTERPRETACIÓN DE LA LEY PROMESA Y A LOS DERECHOS Y RECURSOS DEL DEUDOR Y DE SUS ACREEDORES. CON LA EXCEPCIÓN DE LO QUE AQUÍ ESTÉ EXPRESAMENTE ESTIPULADO, LOS PUNTOS DE VISTA EXPRESADOS EN ESTA DECLARACIÓN DE DIVULGACIÓN SON EXCLUSIVAMENTE LAS OPINIONES DE LA JUNTA DE SUPERVISIÓN Y DEL DEUDOR, Y NO PUEDEN ATRIBUIRSE A NINGUNA DE LAS PARTES FAVORABLES NI A NINGUNA OTRA PARTE.**

## INFORMACIÓN IMPORTANTE

**AUTORIDAD DE LA JUNTA DE SUPERVISIÓN. LA JUNTA DE SUPERVISIÓN PODRÁ ADOPTAR CUALQUIER MEDIDA NECESARIA PARA EMPRENDER UNA ACTUACIÓN JUDICIAL EN EL MARCO DEL TÍTULO III DE LA LEY PROMESA DE UN DEUDOR, INCLUYENDO LA PRESENTACIÓN DE UNA PETICIÓN DEL TÍTULO III, LA PRESENTACIÓN DE UN PLAN DE AJUSTE PARA UN DEUDOR Y, EN GENERAL, LA PRESENTACIÓN DE UNA DEMANDA VINCULADA CON EL CASO DEL TÍTULO III. LA LEY PROMESA CONTEMPLA ADEMÁS QUE SOLAMENTE LA JUNTA DE SUPERVISIÓN PODRÁ PRESENTAR UN PLAN DE AJUSTE DE LAS DEUDAS DE UN DEUDOR. LA LEY PROMESA REQUIERE QUE EL PLAN DE AJUSTE PARA UN DEUDOR ENCUADRADO EN EL TÍTULO III SEA PRESENTADO EN EL PROPIO CASO DEL TÍTULO III, CONJUNTAMENTE CON UN DOCUMENTO DENOMINADO DECLARACIÓN DE DIVULGACIÓN.**

**OBJETO DE LA DECLARACIÓN DE DIVULGACIÓN. EL PRESENTE DOCUMENTO ES LA DECLARACIÓN DE DIVULGACIÓN (LA "DECLARACIÓN DE DIVULGACIÓN") PARA EL PLAN DE AJUSTE DEL TÍTULO III DE LA AUTORIDAD DE ENERGÍA ELÉCTRICA DE PUERTO RICO ("AEEPR", O EL "DEUDOR"), AQUÍ DESCRITO (EL "PLAN"). LA FUNCIÓN DE UNA DECLARACIÓN DE DIVULGACIÓN ES PROPORCIONAR A UN INVERSIONISTA HIPOTÉTICO, REPRESENTATIVO DE LOS DEMANDANTES DEL CASO, INFORMACIÓN RAZONABLEMENTE VIABLE A LA LUZ DE LA NATURALEZA Y EL HISTORIAL DEL DEUDOR, Y A LAS CONDICIONES DE SUS LIBROS Y REGISTROS, CON EL OBJETO DE QUE DICHO INVERSIONISTA HIPOTÉTICO ADOPTE UNA DECISIÓN FUNDAMENTADA DE ACEPTAR O RECHAZAR EL PLAN.**

**FUENTE DE LOS DATOS. ESTA DECLARACIÓN DE DIVULGACIÓN INCLUYE DETERMINADOS ANEXOS, CADA UNO DE LOS CUALES QUEDA INCORPORADO A ESTA DECLARACIÓN COMO SI FUESE PLENAMENTE PARTE DE LA MISMA. ESTA DECLARACIÓN DE DIVULGACIÓN HA SIDO PREPARADA Y PRESENTADA POR LA JUNTA DE SUPERVISIÓN EN NOMBRE DEL DEUDOR.**

**EL GOBIERNO DE ESTADOS UNIDOS CREÓ LA JUNTA DE SUPERVISIÓN EL 30 DE JUNIO DE 2016. EL PRESIDENTE DE ESTADOS UNIDOS (A LA SAZÓN, BARACK OBAMA) DESIGNÓ A LOS SIETE MIEMBROS CON DERECHO A VOTO DE LA JUNTA DE SUPERVISIÓN EL 31 DE AGOSTO DE 2016. EN EL MOMENTO DE SU CREACIÓN, LA JUNTA DE SUPERVISIÓN CARECÍA DE INFORMACIÓN O BASES DE DATOS PROPIAS, PERO LE ASISTÍA EL DERECHO LEGAL DE PROCURARSE INFORMACIÓN Y DATOS DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO "EL ESTADO LIBRE ASOCIADO").**

**ORIGEN DE LA INFORMACIÓN FINANCIERA. TODA LA INFORMACIÓN FINANCIERA AQUÍ CONTENIDA ESTÁ BASADA EN LOS DATOS QUE LA JUNTA DE SUPERVISIÓN HA RECIBIDO DEL ESTADO LIBRE ASOCIADO Y DE SUS INSTRUMENTALIDADES (INCLUYENDO LA AEEPR), LUMA ENERGY[3], O ES DE DOMINIO PÚBLICO. A LA FECHA DE PUBLICACIÓN DE ESTA DECLARACIÓN DE DIVULGACIÓN, EL ESTADO LIBRE ASOCIADO TODAVÍA NO HABÍA PUBLICADO LOS ESTADOS FINANCIEROS AUDITADOS DE LOS AÑOS FISCALES 2021 O 2022. LA AEEPR TODAVÍA NO HA PUBLICADO LOS ESTADOS FINANCIEROS AUDITADOS CORRESPONDIENTES A SUS AÑOS 2021 Y 2022. EN ALGUNOS CASOS, COMO EL DE LOS PASIVOS DE PENSIONES Y LA DETERMINACIÓN DEL LÍQUIDO DISPONIBLE, LA JUNTA DE SUPERVISIÓN HA CONTRATADO EXPERTOS PARA QUE LA AYUDEN A VERIFICAR Y A ENTENDER LOS DATOS. EN CONSECUENCIA, AUNQUE LA JUNTA DE SUPERVISIÓN HA HECHO TODO LO POSIBLE POR OBTENER INFORMACIÓN EXACTA Y COMPLETA, TIENE LIMITACIONES PARA EL USO DE LOS SISTEMAS DEL ESTADO LIBRE ASOCIADO Y DE LA AEEPR COMO FUENTES, Y NO PUEDE GARANTIZAR DE MANERA INDEPENDIENTE QUE DICHOS DATOS SEAN CORRECTOS. ESTA DECLARACIÓN DE DIVULGACIÓN, ASÍ COMO LA INFORMACIÓN ECONÓMICA Y FINANCIERA QUE CONTIENE, NO HA SIDO APROBADA POR EL AGENTE FISCAL DEL ESTADO LIBRE ASOCIADO, LA AGENCIA FISCAL DE PUERTO RICO, LA ASESORÍA FINANCIERA Y AGENCIA FISCAL ("AAFAF") DE PUERTO RICO NI EL COMITÉ OFICIAL DE ACREEDORES NO ASEGURADOS (EL "CANA").**

**REVISIÓN DEL TRIBUNAL. EL TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS PARA EL DISTRITO DE PUERTO RICO (EL "TRIBUNAL DEL TÍTULO III") HA REVISADO ESTA DECLARACIÓN DE DIVULGACIÓN, Y HA DETERMINADO QUE CONTIENE INFORMACIÓN ADECUADA, DE CONFORMIDAD CON LA SECCIÓN 1125(b)[4] DEL CÓDIGO DE QUIEBRAS, Y QUE PUEDE ENVIÁRSELE PARA SOLICITAR SU VOTO O ELECCIÓN CON EL OBJETO DE RESOLVER DETERMINADAS DEMANDAS (SI PROCEDIERA) EN EL MARCO DEL PLAN. SIN EMBARGO, EL TRIBUNAL DEL TÍTULO III NO HA**

---

[3]  "LUMA Energy" hace referencia conjuntamente a LUMA Energy, LLC, una sociedad mixta entre Quanta Services y Canadian Utilities Limited, una compañía de ATCO Ltd., o bien a su filial LUMA Energy ServCo, LLC.

[4]  Todas las cláusulas del Título 11 del Código de Estados Unidos (el "Código de Quiebras") aquí citadas son de aplicación a estos casos del Título III en virtud de la Sección 301(a) de la Ley PROMESA.

**DETERMINADO QUE LA INFORMACIÓN AQUÍ CONTENIDA SEA CORRECTA O COMPLETA.**

**VOTE DESPUÉS DE CONSIDERAR LOS FACTORES DE RIESGO. SE INSTA A TODOS LOS TITULARES DE RECLAMACIONES CON DERECHO A VOTAR SOBRE EL PLAN, O A HACER UNA ELECCIÓN EN VIRTUD DEL MISMO (SI PROCEDIERA), A LEER Y CONSIDERAR DETENIDAMENTE LA TOTALIDAD DE ESTA DECLARACIÓN DE DIVULGACIÓN, INCLUYENDO LOS FACTORES DE RIESGO AQUÍ CITADOS Y EL PLAN ADJUNTO, ANTES DE VOTAR POR ACEPTAR O RECHAZAR EL PLAN, O A HACER UNA ELECCIÓN VINCULADA CON EL MISMO. CONSULTE LA SECCIÓN VIII DE ESTA DECLARACIÓN DE DIVULGACIÓN, TITULADA "CIERTOS FACTORES DE RIESGO A CONSIDERAR".**

**DECLARACIONES PROSPECTIVAS. EL PRESENTE DOCUMENTO CONTIENE MANIFESTACIONES QUE SON "DECLARACIONES PROSPECTIVAS", A TENOR DEL SIGNIFICADO DE DETERMINADAS LEYES FEDERALES DE VALORES. TODAS LAS DECLARACIONES AQUÍ CONTENIDAS QUE NO SEAN CLARAMENTE DE NATURALEZA HISTÓRICA SON PROSPECTIVAS, COMO "CONJETURAN", "CREEN", "PODRÍAN", "DEBERÍAN", "ESPERAN", "ESTIMAN", "PREVÉN", "PRETENDEN", "POTENCIAL", "PROYECTO/PROYECTAN", "OBJETIVO" Y SIMILARES APUNTAN, EN GENERAL, A IDENTIFICAR DECLARACIONES PROSPECTIVAS. TODAS LAS DECLARACIONES CONTENIDAS EN ESTE DOCUMENTO, A EXCEPCIÓN DE LAS DECLARACIONES DE HECHOS HISTÓRICOS (INCLUYENDO LAS RELATIVAS AL PLAN, A ESTRATEGIAS, A PERSPECTIVAS Y A EXPECTATIVAS EN MATERIA DE EVENTOS FUTUROS Y DE LA SITUACIÓN FINANCIERA DEL DEUDOR) SON DECLARACIONES PROSPECTIVAS QUE IMPLICAN DETERMINADOS RIESGOS E INCERTIDUMBRES. AUNQUE DICHAS DECLARACIONES REPRESENTAN LAS OPINIONES ACTUALES DE LA JUNTA DE SUPERVISIÓN O DEL DEUDOR SOBRE LO QUE EL FUTURO PODRÍA DEPARAR, Y AUNQUE LA JUNTA DE SUPERVISIÓN CONSIDERA QUE DICHAS OPINIONES ESTÁN FUNDAMENTADAS EN HIPÓTESIS RAZONABLES SEGÚN LAS CIRCUNSTANCIAS, NO SON GARANTÍA DE NINGÚN EVENTO O RESULTADO FINANCIERO, Y LOS RESULTADOS REALES DEL DEUDOR PODRÍAN SER SUSTANCIALMENTE DIFERENTES. LA INFORMACIÓN CONTENIDA EN ESTA DECLARACIÓN DE DIVULGACIÓN, INCLUYENDO LAS DECLARACIONES PROSPECTIVAS Y PROYECCIONES DE DETERMINADOS DATOS FINANCIEROS TRAS LA CONSUMACIÓN DEL PLAN, SE PRESENTA ACTUALIZADA SOLAMENTE A LA FECHA DE PUBLICACIÓN DE ESTE DOCUMENTO, A MENOS QUE SE ESPECIFIQUE ALGO DISTINTO. EL DEUDOR NO ASUME NINGUNA OBLIGACIÓN DE ACTUALIZAR PÚBLICAMENTE LOS DATOS CONTENIDOS EN ESTA DECLARACIÓN DE DIVULGACIONES, INCLUYENDO LAS DECLARACIONES PROSPECTIVAS, PARA QUE REFLEJEN NUEVA INFORMACIÓN, FUTUROS EVENTOS U OTRAS COSAS, CON LAS EXCEPCIONES EXIGIDAS POR IMPERATIVO LEGAL. TODAS LAS DECLARACIONES PROSPECTIVAS IMPLICAN RIESGOS E INCERTIDUMBRES, MUCHOS DE LOS**

v

CUALES ESTÁN FUERA DEL CONTROL DEL DEUDOR, SUSCEPTIBLES DE QUE PROVOCAR QUE LOS RESULTADOS, EL RENDIMIENTO O LOS LOGROS REALES SEAN SUSTANCIALMENTE DIFERENTES DE LOS RESULTADOS, EL RENDIMIENTO O DE LOS LOGROS PREVISTOS. EL DEUDOR NO PUEDE GARANTIZAR QUE VAYAN A LOGRARSE LOS RESULTADOS O EVENTOS PROYECTADOS. ENTRE LOS FACTORES SUSCEPTIBLES DE CAUSAR QUE LOS RESULTADOS REALES DEL DEUDOR SEAN SUSTANCIALMENTE DIFERENTES LAS EXPECTATIVAS DE LA JUNTA DE SUPERVISIÓN O DEL DEUDOR INCLUYEN AQUELLOS DESCRITOS EN LA SECCIÓN Error! Reference source not found. DE ESTE DOCUMENTO, EL DEUDOR INSTA A LOS TITULARES DE RECLAMACIONES QUE CONSIDEREN DETENIDAMENTE ESTOS FACTORES A LA HORA DE EVALUAR LAS DECLARACIONES PROSPECTIVAS, Y A NO BASAR SUS DECISIONES EN LAS MISMAS.

LOS HECHOS PUEDEN CAMBIAR. LAS DECLARACIONES Y OTROS DATOS CONTENIDOS EN ESTA DECLARACIÓN DE DIVULGACIÓN HAN SIDO EXPRESADAS EN LA FECHA INDICADA EN LA PORTADA, SALVO QUE SE HAYA ESPECIFICADO ALGO DISTINTO. LOS TITULARES DE RECLAMACIONES QUE EXAMINEN ESTA DECLARACIÓN DE DIVULGACIÓN NO DEBERÍAN INFERIR DE QUE LOS HECHOS AQUÍ CONTENIDOS NO VARIARÁN DESDE LA FECHA INDICADA EN LA PORTADA DE ESTE DOCUMENTO. CADA TITULAR DE UNA RECLAMACIÓN CON DERECHO A VOTAR, O A HACER UNA DECLARACIÓN, SOBRE EL PLAN DEBERÁN FIARSE DE SUS PROPIAS EVALUACIONES SOBRE EL DEUDOR Y SU ANÁLISIS DE LOS TÉRMINOS Y CONDICIONES DEL PLAN A LA HORA DE DECIDIR SI ACEPTAR O RECHAZAR, O REALIZAR UNA ELECCIÓN RELATIVA A, EL PLAN.

SUPLEMENTO DEL PLAN. EN CUANTO SEA VIABLE (AUNQUE NO MÁS TARDE DE SIETE (7) DÍAS ANTES DE LA FECHA LÍMITE DE VOTACIÓN[5], O BIEN EN CUALQUIER OTRA FECHA QUE SE DETERMINE) SE PRESENTARÁ UN SUPLEMENTO DEL PLAN QUE INCLUIRÁ UN BORRADOR O LAS VERSIONES FINALES DE LOS DOCUMENTOS PRINCIPALES NECESARIOS PARA CONSUMAR LAS TRANSACCIONES CONTEMPLADAS EN EL PLAN ANTE EL TRIBUNAL DEL TÍTULO III. EL SUPLEMENTO DEL PLAN, QUE PODRÁ SER MODIFICADO, SE CONSIDERARÁ INCORPORADO A ESTE DOCUMENTO Y PARTE DEL PLAN COMO SI ESTUVIERA INCLUIDO ÍNTEGRAMENTE EN EL MISMO.

LA DECLARACIÓN DE DIVULGACIÓN SE HA PREPARADO EXCLUSIVAMENTE A EFECTOS DE VOTACIÓN Y/O ELECCIONES. EL DEUDOR PRESENTA LA INFORMACIÓN CONTENIDA EN ESTA DECLARACIÓN DE DIVULGACIÓN EXCLUSIVAMENTE A EFECTOS DE SOLICITAR A LOS TITULARES DE RECLAMACIONES CON DERECHO A VOTO PARA QUE ACEPTEN O RECHACEN, U OPTEN POR RESOLVER DETERMINADAS

---

[5] Por "Fecha límite de votación" se entenderán las 5:00 pm (Hora estándar del Atlántico) del [_____] de 2023, a menos que se prorrogue.

RECLAMACIONES DE CONFORMIDAD CON, EL PLAN (SI PROCEDIERA). NADA DE LO CONTENIDO EN ESTA DECLARACIÓN DE DIVULGACIÓN PODRÁ SER UTILIZADO POR NINGUNA PERSONA PARA NINGUNA OTRA FINALIDAD. NO PODRÁ CONSIDERARSE QUE EL CONTENIDO DE ESTA DECLARACIÓN DE DIVULGACIÓN CONSTITUYE ASESORAMIENTO JURÍDICO, FINANCIERO, BURSÁTIL, FISCAL, COMERCIAL O DE OTRA ÍNDOLE. EL DEUDOR INSTA A CADA TITULAR DE UNA RECLAMACIÓN A CONSULTAR A SUS PROPIOS ASESORES CON RESPECTO A DICHOS ASPECTOS JURÍDICOS, FINANCIEROS, BURSÁTILES, FISCALES, COMERCIALES O DE OTRA ÍNDOLE A LA HORA DE EVALUAR ESTA DECLARACIÓN DE DIVULGACIÓN Y EL PLAN.

<u>LA APROBACIÓN JUDICIAL NO IMPLICA QUE TODOS LOS HECHOS SON CORRECTOS</u>. ESTA DECLARACIÓN DE DIVULGACIÓN Y EL HECHO DE QUE EL TRIBUNAL DEL TÍTULO III APRUEBE QUE ES ADECUADA NO CONSTITUYEN UNA ADMISIÓN DE HECHOS NI DE RESPONSABILIDADES COMO TAMPOCO UN ACUERDO DE LAS PARTES NI UNA DISPENSA, NI SE INTERPRETARÁN COMO TALES. ADEMÁS, EL HECHO DE QUE EL TRIBUNAL DEL TÍTULO III APRUEBE QUE ESTA DECLARACIÓN DE DIVULGACIÓN ES ADECUADA NO DEBE INTERPRETARSE COMO QUE DICHO TRIBUNAL HA DETERMINADO QUE LA INFORMACIÓN AQUÍ CONTENIDA SEA CORRECTA O COMPLETA, NI SIGNIFICA QUE EL TRIBUNAL VAYA A CONFIRMAR EL PLAN. EL TRIBUNAL DEL TÍTULO III HA CONVOCADO UNA VISTA PARA EL [___], CON EL OBJETO DE CONSIDERAR LA CONFIRMACIÓN DEL PLAN EN VIRTUD DE LA LEY PROMESA Y DE LAS CLÁUSULAS ESPECÍFICAS DEL CÓDIGO DE QUIEBRAS APLICABLES A LOS CASOS DEL TÍTULO III DE CONFORMIDAD CON LAS SECCIONES 301 Y 314 DE LA LEY PROMESA.

<u>NO TIENE APROBACIÓN GUBERNAMENTAL</u>. NI LA COMISIÓN DEL MERCADO DE VALORES (SECURITIES AND EXCHANGE COMMISSION, LA "<u>SEC</u>") DE ESTADOS UNIDOS, NI NINGUNA COMISIÓN O SEMEJANTE DE AUTORIDADES EXTRANJERAS O ESTATALES HAN APROBADO O DESAPROBADO LOS VALORES DESCRITOS AQUÍ, NI LA DECLARACIÓN DE DIVULGACIÓN. TAMPOCO HAN EXPRESADO NINGUNA OPINIÓN ACERCA DE LA EXACTITUD O ADECUACIÓN DE LAS MANIFESTACIONES AQUÍ CONTENIDAS. TODA MANIFESTACIÓN EN SENTIDO CONTRARIO PODRÍA SER UN DELITO PENAL.

<u>VALORES NO REGISTRADOS</u>. NINGUNO DE LOS VALORES QUE VAN A EMITIRSE A LOS TITULARES DE RECLAMACIONES PERMITIDAS EN EL MARCO DEL PLAN SERÁ REGISTRADO ANTE LA SEC DE CONFORMIDAD CON LA LEY DE VALORES DE 1933, CON SUS CORRESPONDIENTES MODIFICACIONES, NI A TENOR DE NINGUNA LEGISLACIÓN ESTATAL PARA REGULAR LA EMISIÓN Y VENTA DE LOS MISMOS. DICHOS VALORES SERÁN EMITIDOS A CONDICIÓN DE LAS EXENCIONES DE LOS REQUISITOS DE REGISTRO DE LA LEY DE VALORES Y DE LEYES ESTATALES EQUIVALENTES.

**CONSECUENCIAS DE POSEER VALORES EMITIDOS DE CONFORMIDAD CON EL PLAN DE AJUSTE.** EL DEUDOR RECOMIENDA A LOS POTENCIALES DESTINATARIOS DE LOS NUEVOS BONOS O IVC QUE VAYAN A EMITIRSE EN VIRTUD DEL PLAN QUE CONSULTEN A SUS PROPIOS ASESORES SOBRE CUALESQUIERA RESTRICCIONES SOBRE LA TITULARIDAD O TRANSFERIBILIDAD DE DICHOS VALORES, O ACERCA DE CUALQUIER POTENCIAL CONSECUENCIA DE POSEERLOS.

**CONSIDERACIONES TRIBUTARIAS.** LAS CONSECUENCIAS TRIBUTARIAS DEL PLAN PARA LOS TITULARES DE LAS RECLAMACIONES SON COMPLEJAS Y DEPENDEN, EN PARTE, TANTO DEL TIPO DE RECLAMACIÓN COMO DE LAS CIRCUNSTANCIAS INDIVIDUALES DE CADA TITULAR. EL DEUDOR RECOMIENDA A TODOS LOS TITULARES DE RECLAMACIONES CONSULTAR A SUS PROPIOS ASESORES FISCALES TODO LO RELATIVO A LAS CONSECUENCIAS TRIBUTARIAS FEDERALES, ESTATALES, TERRITORIALES (INCLUYENDO PUERTO RICO), LOCALES Y EXTRANJERAS DEL PLAN PARA SUS RESPECTIVAS CIRCUNSTANCIAS INDIVIDUALES.

**ESTA DECLARACIÓN DE DIVULGACIÓN ESTÁ SUPEDITADA AL PLAN DE AJUSTE.** ESTA DECLARACIÓN DE DIVULGACIÓN RESUME DETERMINADAS CLÁUSULAS DEL PLAN, CIERTOS OTROS DOCUMENTOS Y CIERTA INFORMACIÓN FINANCIERA RELACIONADA CON EL DEUDOR. EL DEUDOR CONSIDERA QUE ESTOS RESÚMENES SON IMPARCIALES Y CORRECTOS. NINGUNA OTRA PARTE, INCLUYENDO LAS PARTES DE UN PLAN O DE UN ACUERDO DE APOYO AL PLAN, PUEDE GARANTIZAR LA IMPARCIALIDAD O PRECISIÓN DE DICHOS RESÚMENES NI DE LAS DESCRIPCIONES DE LOS DERECHOS Y RECURSOS LEGALES DE LAS PARTES AQUÍ CONTENIDOS. EN CASO DE INCONGRUENCIA O DISCREPANCIA ENTRE UNA DESCRIPCIÓN CONTENIDA EN ESTA DECLARACIÓN DE DIVULGACIÓN Y LOS TÉRMINOS Y CLÁUSULAS DEL PLAN O DE CUALESQUIERA OTROS DOCUMENTOS O INFORMACIÓN FINANCIERA AQUÍ MENCIONADOS, PARA TODOS LOS EFECTOS PREVALECERÁN LOS TÉRMINOS Y CLÁUSULAS DEL PLAN, O DE DICHO OTRO DOCUMENTO O INFORMACIÓN FINANCIERA, SEGÚN PROCEDA.

**EL PLAN DE AJUSTE PUEDE SER MODIFICADO.** LA JUNTA DE SUPERVISIÓN SE RESERVA EN TODO MOMENTO EL DERECHO DE ENMENDAR, MODIFICAR O RETIRAR EL PLAN O EL SUPLEMENTO DEL PLAN, DE CONFORMIDAD CON LOS TÉRMINOS DE LOS ACUERDOS DE APOYO AL PLAN, DEL PLAN Y DEL TÍTULO III DE LA LEY PROMESA.

[*El resto de la página se ha dejado intencionadamente en blanco*]

## <u>Índice</u>

**Página**

I.      Prefacio ...........................................................................................................13

        A.  Descripción general de la recuperación del Plan ...........................................13

        B.      Apoyo a los ingresos del Plan y la Carga heredada ................................14

        C.          Resumen y antecedentes.............................................................15

II.     Introducción ....................................................................................................24

        A.      Plan de Ajuste del Título III de la Ley PROMESA: Descripción general............26

        B.      Resumen de los principales componentes del Plan de ajuste .............................27

        C.      Titulares de Reclamaciones con derecho a votar por el Plan de Ajuste ...............48

        D.      Procedimientos de solicitud y de votación.........................................................50

        E.      Vista de confirmación y fecha límite para las objeciones a la confirmación........51

III.    Descripción general del Deudor......................................................................52

        A.      Información general .....................................................................................52

        B.      Obligaciones financieras del Deudor a la Fecha de la petición .........................62

        C.      Sistema de gestión de Tesorería de la AEEPR ................................................82

        D.      Cuentas de caja de la AEEPR ......................................................................84

        E.      Análisis de la liquidez y del capital circulante de la AEEPR .............................91

        F.      Planificación y transformación de recursos de la AEEPR..................................98

IV.     Eventos significativos que conllevaron el inicio del Caso del Título III de la
        AEEPR...........................................................................................................125

        A.      El deterioro operativo y financiero de la AEEPR ..............................................125

        B.      Negociaciones con los acreedores antes del Título III.......................................127

        C.      Legislación promulgada por el Estado Libre Asociado para abordar la
                crisis fiscal y de la deuda .................................................................................130

        D.      PROMESA................................................................................................132

        E.      Adopción de los planes fiscales y de los presupuestos anuales de la
                AEEPR .........................................................................................................156

V.      Descripción general del Caso del Título III de la AEEPR..............................173

VI.     Plan de ajuste del Título III.............................................................................271

        A.      Generalidades................................................................................................271

        B.      Descripción general del plan de ajuste.............................................................272

ix

C.      Acuerdo mutuo y conciliación de disputas / Reestructuración de AEE ..............274

D.      Disposiciones para el pago de reclamaciones de gastos administrativos ...........278

E.      Clasificación y tratamiento de las reclamaciones .................................................280

F.      Disposiciones relativas a la emisión y distribución de los Nuevos Bonos .........290

G.      Tratamiento de contratos a ejecutarse y arrendamientos no vencidos ................298

H.      Fideicomiso de GUC.............................................................................................302

I.       Fideicomiso de Acciones de Anulación................................................................308

J.       Disposiciones que rigen las distribuciones ..........................................................316

K.      Procedimientos de tratamiento de reclamaciones bajo disputa............................325

L. Gobernanza y disposiciones sobre el fideicomiso PayGo de la AEE y el sistema
de pensiones ...........................................................................................................328

M.      Efecto de la confirmación del Plan ......................................................................329

N.      Modificación, revocación o desistimiento del Plan .............................................334

O.      Gobernanza corporativa y manejo del Deudor Reorganizado ..............................335

P.      Identificación de reclamaciones afectadas por el Plan y no afectadas por el
Plan .......................................................................................................................336

Q.      Condiciones previas a la confirmación del Plan ...................................................336

R.      Condiciones previas a la Fecha de Entrada en Vigencia......................................339

S.       Disposiciones sobre el comité ..............................................................................341

T.      Disposiciones con respecto a la Junta de Supervisión y el cumplimiento de
PROMESA..............................................................................................................341

U.      Retención de jurisdicción......................................................................................342

V.      Disposiciones varias ..............................................................................................345

VII.     Confirmación del plan de ajuste .......................................................................................352

A.      Vista de confirmación ...........................................................................................352

B.      Fechas límite para objetar la confirmación...........................................................352

C.      Requisitos para la confirmación del Plan de Ajuste .............................................352

VIII.    Ciertos factores de riesgo a considerar .............................................................................358

A.  Riesgos relacionados con los Casos del Título III ....................................................358

B.      Riesgos relacionados con la AEE ..........................................................................362

C.      Riesgos relacionados con la transformación.........................................................364

D.      Riesgos relacionados con las proyecciones de ingresos y gastos en el Plan
Fiscal Certificado ..................................................................................................366

E. Riesgos relacionados con los Nuevos Bonos ..................................................372

F. Riesgos relacionados con los CVI .....................................................................377

G. Riesgos relacionados con la recaudación de ingresos necesarios para el pago de los Nuevos Bonos y CVI ...........................................................................381

H. Factores de riesgo relacionados con futuras acciones judiciales .......................382

I. Factores de riesgo relacionados con la Legislación ...........................................383

J. Factores de riesgo relacionados con el tratamiento tributario de los Nuevos Bonos ...................................................................................................................384

IX. Consideraciones materiales a efectos del impuesto federal sobre ingresos de EE.UU. .........................................................................................................................386

A. Generalidades .....................................................................................................386

B. Tenedores de EE.UU. .........................................................................................387

C. Personas físicas y jurídicas de Puerto Rico.......................................................397

D. Tenedores No Estadounidenses .........................................................................400

X. Consideraciones materiales a efectos del impuesto sobre ingresos de Puerto Rico ........403

A. Generalidades .....................................................................................................403

B. Tenedores de Puerto Rico ..................................................................................404

C. Tenedor no de Puerto Rico .................................................................................408

XI. Aplicabilidad de ciertas leyes de valores federales y estatales .......................................410

A. Nuevos Bonos .....................................................................................................410

XII. Información financiera y proyecciones..............................................................................412

A. Información financiera histórica .........................................................................412

B. Plan Fiscal Certificado y Proyecciones de la AEE .............................................412

XIII. Información adicional ........................................................................................................414

XIV. Conclusión .........................................................................................................................415

**Tabla de Anexos**

**Anexo A** – Plan de Ajuste del Título III de la Autoridad de Energía Eléctrica de Puerto Rico

**Anexo B** – Acuerdo de Conciliación y descargo, de fecha 26 de agosto de 2022, por y entre (i) la Junta de Supervisión y Administración Financiera para Puerto Rico, en calidad de representante de la AEEPR, y (ii) Vitol Inc. y Vitol S.A. (conjuntamente, "Vitol")

**Anexo C** – Acuerdo de Conciliación y descargo, de fecha 11 de febrero de 2022, por y entre (i) Whitefish Energy Holdings, LLC, (ii) la AEEPR, y (iii), la Junta de Supervisión y Administración Financiera para Puerto Rico, en calidad de representante de la AEEPR en el Título III

**Anexo D** – Previsiones de comisión y flujo de caja ilustrativo de nuevos bonos

**Anexo E** – Plan Fiscal certificado de la AEEPR

**Anexo F** – Presupuesto certificado de la AEEPR

**Anexo G** – Resumen de la reforma de pensiones

**Anexo H** – Resumen de los bonos en circulación de la AEEPR

**Anexo I** – Lista de las cuentas bancarias, saldos y categorización de restricciones preliminares de la AEEPR al 1 de noviembre de 2022

**Anexo J** – Últimos estados financieros auditados del Deudor

**Anexo K** – Informes de pruebas de mejores intereses

**Anexo L** – Acciones a transferir al Fideicomiso de Acciones de Anulación

**Anexo M** – Acuerdo de Apoyo al Plan y de Conciliación, de fecha 1 de diciembre de 2022, entre la Junta de Supervisión, en su calidad de representante del Título III de la AEEPR, y los titulares de Préstamos de la Línea de combustible (el "AAP de los Prestamistas de la Línea de combustible")

> **LAS DECLARACIONES CONTENIDAS EN ESTAS <u>SECCIONES I Y II</u> HAN QUEDADO ÍNTEGRAMENTE CUALIFICADAS POR LA INFORMACIÓN MÁS DETALLADA CONTENIDA EN ESTA DECLARACIÓN DE DIVULGACIÓN, EN EL PLAN Y EN LOS RESPECTIVOS ANEXOS.**

## I. <u>Prefacio</u>

Como se describirá con mayor detalle más adelante, el Congreso ha facultado a la Junta de Supervisión para que reestructure la deuda y las operaciones del Estado Libre Asociado de Puerto Rico y sus instrumentalidades, incluyendo la AEEPR, con el objeto de cumplir la misión confiada a la Junta de Supervisión de restablecer la responsabilidad fiscal y el acceso a los mercados. La Junta de Supervisión aspira a reestructura la deuda y las operaciones de la AEEPR con el objetivo de generar energía limpia y asequible a un costo lo suficientemente bajo como para propiciar el crecimiento de la economía, alcanzar la responsabilidad fiscal y acceder a los mercados de capitales a tasas razonables, y para el cumplimiento de tales objetivos presentó el caso del Título III de la AEEPR (este "<u>Caso del Título III</u>"). Con sujeción al cumplimiento de sus mandatos legales, el objetivo de la Junta de Supervisión es proporcionar a los acreedores rentabilidad por sus reclamaciones permitidas, reflejando los méritos legales de la situación, las prioridades y las reclamaciones establecidas de los acreedores. La Junta de Supervisión considera que el Plan permite alcanzar estos objetivos. Cuenta con el apoyo de al menos dos clases importantes de acreedores de la AEEPR, toma en cuenta potenciales resultados de los pleitos pendientes, ofrece recobros significativos a los acreedores manteniendo tarifas asequibles para los usuarios de la AEEPR, y sitúa a la entidad en camino hacia la salida del Título III.

### A. Descripción general de la recuperación del Plan

La Junta de Supervisión ha recibido la orientación y la dedicación del Juez de Quiebras de EE.UU. Brendan L. Shannon, y de los antiguos Jueces de Quiebras Shelley C. Chapman y Robert D. Drain (en conjunto, el "<u>Equipo de Mediación</u>"). La Junta de Supervisión ha negociado con los Prestamistas de la Línea de combustible,[6] titulares de reclamaciones no aseguradas de más de $700 millones, la conciliación consensuada pactada en el AAP de los Prestamistas de la Línea de combustible. Como plena satisfacción de estas reclamaciones y para liquidar los pleitos pendientes relativos a la prioridad de dichas reclamaciones entre los acreedores de la AEEPR, según se describe con mayor detalle más adelante los Prestamistas de la Línea de combustible recibirán, entre otras contrapartidas, Bonos Serie A por una cuantía equivalente al ochenta y cuatro por ciento (84.00%) de lo que reclamaban antes de la petición. Además, y al igual que otras clases de acreedores, los Prestamistas de la Línea de combustible tienen la posibilidad de que se les pague íntegramente en concepto de sus reclamaciones previas a la petición si la Junta de Supervisión gana el caso de la Impugnación del Gravamen y del Recurso contra los titulares de los Bonos de Ingresos de la AEEPR (los "<u>Bonos</u>", y los titulares de los mismos, los "<u>Bonistas</u>"). La base del ochenta y cuatro por ciento (84.00%) que retorna a las reclamaciones

---

[6] Por "<u>Prestamistas de la Línea de combustible</u>" se entenderán a todos los titulares de reclamaciones derivadas de (i) el Contrato de Crédito formalizado el 4 de mayo de 2012 por y entre la AEEPR, Scotiabank de Puerto Rico y ciertos prestamistas, y (ii) el Contrato de Línea de crédito de financiación comercial, firmado el 20 de julio de 2012 por y entre la AEEPR y Citibank, N.A., tal como consta en las pruebas de reclamación números 44342, 44358, 44378, 44388, 45816, 44378, 45816 presentadas contra la AEEPR en este Caso del Título III.

de la Línea de combustible refleja diversos factores, incluyendo un acuerdo de su demostrada prevalencia sobre las Reclamaciones de Bonos, ya que la documentación que rige las reclamaciones de Bonos estipula el pago de los gastos corrientes, como los costos de combustibles, antes de transferir los ingresos netos al pago del servicio de deuda de los Bonos.

Asimismo, el Plan está apoyado por un acuerdo con una clase compuesta por la reclamación de Vitol Inc., que aceptó, como resolución de su Reclamación autorizada de aproximadamente $41 millones, recibir el cincuenta por ciento (50.00%) de la compensación otorgada a ciertas otras reclamaciones generales no garantizadas (tal como se describe a continuación, el Recobro de las Reclamaciones generales no garantizadas). Cada uno de estos acuerdos indemniza a una clase de aceptación afectada, un requisito para la confirmación del Plan.

En este momento, no existe una indemnización consensuada para las reclamaciones de bonos. Significativamente, la mediación incluye a varios Bonistas y aseguradoras monolínea de dichos bonos (las "Aseguradoras monolínea")[7], pero no ha incluido a muchos otros Bonistas. Por consiguiente, la Junta de Supervisión ha formulado el Plan para intentar promover una resolución de las reclamaciones de Bonos y ofrecer una oportunidad de conciliación a todos los Bonistas, incluyendo a aquellos que no han participado en la mediación. Existen pleitos pendientes que objetan dos aspectos de las reclamaciones de Bonos. En general, los Bonistas sostienen que los Bonos están garantizados mediante los futuros ingresos de a AEEPR, en tanto que la Junta de Supervisión alegan que están garantizados solamente por unos $16 millones depositados en determinados fondos. Además, los Bonistas afirman que sus reclamaciones derivadas de los Bonos son reclamaciones permitidas contra la AEEPR, mientras que la Junta de Supervisión y el CANA consideran que solamente son admisibles contra dichos fondos citados. El que los Bonos estén vinculados a una reclamación permitida de más de $8,500 millones contra la totalidad de los bienes de la AEEPR o solamente contra unos fondos que ascienden a unos $16 millones supone una diferencia muy sustancial en cuanto a la cuantía del valor disponible para otros acreedores.

El Plan pretende promover una conciliación de las reclamaciones de Bonos mediante su inclusión en dos clases diferentes de reclamaciones de Bonos: una para los Bonistas y las Aseguradoras Monolínea que desean llegar a un acuerdo conforme a los términos explicados a continuación, y otra para los Bonistas que desean reivindicar sus derechos mediante pleito. Los Bonistas y las Aseguradoras Monolínea que opten por resolver sus reclamaciones recibirán un pago fijo y dos tipos de pagos dependientes (es decir, contingentes) en función de los resultados. El pago fijo serán los Bonos Serie B por un valor nominal del cincuenta por ciento (50.00%) de sus reclamaciones a la fecha de admisión de sus peticiones. Si la Junta de Supervisión hace valer sus argumentos en las causas de la Impugnación del Gravamen y del Recurso, los Bonistas que no acepten el acuerdo recibirán solamente su parte proporcional de la cuantía depositada en el Fondo de amortización. Por el otro lado los Bonistas que acepten el acuerdo recibirán Bonos Serie B adicionales como primer tipo de pago contingente. En tal caso, los Bonistas que acepten el acuerdo podrían recibir hasta un cien por ciento (100.00%) de su reclamación previa a la

---

[7] Las Aseguradoras Monolínea incluyen a Assured Guaranty Corp. y Assured Guaranty Municipal Corp. (conjuntamente, "Assured"), National Public Finance Guarantee Corporation ("National") y Syncora Guarantee, Inc. ("Syncora").

petición en forma de Bonos Serie B, que de otro modo se pagarían a los Bonistas contrarios al acuerdo.[8]  Por el contrario, cuantos más Bonistas acepten el acuerdo, se reducirá la cantidad de Bonistas que no lo acepten, y ello a su vez reducirá la cuantía de los Bonos Serie B que, de otro modo, se pagarían a los Bonistas contrarios al acuerdo.  Así, a medida que se consiga liquidar más Bonos, los Bonos Serie B disponibles para los Bonistas que acepten el acuerdo sobre una base de contingencia disminuirán hasta cero.  Además, los Bonistas que se avengan al acuerdo recibirán un segundo tipo de pago contingente, IVC, en concepto de la parte restante de sus reclamaciones tras las distribuciones de Bonos Serie B.

Debido a que tantos Bonistas no participaron en la mediación, no teniendo así la posibilidad aceptar el acuerdo, la Junta de Supervisión pretende enviar a todos los Bonistas, como más tardar el 28 de diciembre de 2022, una oferta de conciliación con un acuerdo de apoyo a la reestructuración que contenga dichos términos, poniendo el plazo del 15 de febrero de 2023 para la recepción de las respuestas a la oferta. Esto permitirá a todos los Bonistas elegir si ser parte de la clase de los que aceptan o que no aceptan el acuerdo.

Con respecto a los retirados de la AEEPR, el Sistema de Retiro de los Empleados de la Autoridad de Energía Eléctrica (el "SRE de AEE", o "PREPA ERS", por sus siglas en inglés) recibirá el mismo tratamiento ofrecido a otros pensionistas a través de los planes de ajuste confirmados del Título III del Estado Libre Asociado:  El sistema de pensiones de beneficios definidos de la AEEPR se congelará a partir de la Fecha de entrada en vigor, y se eliminarán los Ajustes por costo de la vida (COLA, por sus siglas en inglés.  La AEEPR depositará los fondos en un "Fideicomiso PayGo de la AEEPR", suficiente para pagar a los retirados todos los beneficios de las pensiones que hayan acumulado hasta la Fecha de entrada en vigor, en concepto de las pensiones devengadas. Se hará puntualmente, en lugar de aportar fondos al patrimonio del fideicomiso para invertirlos.  Además, si en las causas de la Impugnación del Gravamen y del Recurso se da la razón a la Junta de Supervisión, el Fideicomiso PayGo de la AEEPR recibirá el veinte por ciento (20.00%) de los Bonos Serie B que resten, en su caso, tras contabilizar las distribuciones iniciales a los Bonistas que aceptan el acuerdo, los Bonistas contrarios a aceptarlo y los titulares de Reclamaciones generales no garantizadas.  Si quedasen Bonos Serie B tras pagar íntegramente lo debido a los Bonistas que aceptan el acuerdo, a los Prestamistas de la Línea de combustible y a los titulares de reclamaciones generales no garantizadas, dichos bonos sobrantes se considerarán no emitidos por la AEEPR, o bien irán al Fideicomiso PayGo de la AEEPR.

Por último, los titulares de reclamaciones generales no garantizadas percibirán una parte de los Bonos Serie B que resten tras contabilizar las distribuciones a los Bonistas que aceptan y que no aceptan el acuerdo, permitiéndoles la posibilidad de recuperación íntegra, o casi íntegra, si en las causas de Impugnación del Gravamen y del Recurso se da la razón a la Junta de Supervisión (en función del volumen del conjunto de reclamaciones no garantizadas y la proporción de Bonistas que acepten el acuerdo).  En esta situación, y sobre la base de la estimación realizada por la Junta de Supervisión del número total de reclamaciones generales no garantizadas admitidas, la Junta de Supervisión considera que a dichas reclamaciones se les pagará entre un 13.09% y un 100% de lo que demandan, en función de la proporción de Bonistas

---

[8]  Las recuperaciones reales variarán en función de diversos factores, entre ellos la proporción de bonistas que acepten el acuerdo y el volumen de Reclamaciones generales no garantizadas.

3

que opten por el acuerdo. Sin embargo, si en la impugnación al gravamen se da la razón a los
Bonistas que no aceptan el acuerdo, los titulares de reclamaciones generales no garantizadas
percibirán distribuciones muy pequeñas, ya que se habrá determinado que prácticamente todos
los fondos disponibles corresponderán a los Bonistas que no acepten el acuerdo.

**B.    Apoyo a los ingresos del Plan y la Carga heredada**

Para financiar los Nuevos bonos emitidos en el marco del Plan se sumará una carga de
transición híbrida y temporal (la "Carga heredada") a las tarifas de la AEEPR. Debido a que las
actuales tarifas de la AEEPR, a pesar de contarse entre las más altas de América del Norte, son
insuficientes para costear el servicio de la deuda heredada ni los gastos operativos de la AEEPR,
se incluirá la Carga histórica en las tarifas de la AEEPR con el objeto de generar suficientes
Ingresos netos que aporten fondos para reembolsar los Nuevos bonos emitidos por la AEEPR en
el marco del Plan.

La Carga heredada, que se describe de manera más detallada en la Sección II.B.2(c),
podrá incorporar tanto un componente volumétrico basado en la clase de cliente y en el uso de la
electricidad por parte del mismo, y/o un cargo fijo mensual en concepto de conexión a la red
eléctrica de la AEEPR, también en función de la clase de cliente. El componente fijo tiene por
objeto obtener un flujo de efectivo relativamente más homogéneo y predecible, y cobrar a los
clientes por acceder a la red eléctrica de la AEEPR no está basado en el consumo eléctrico. Está
previsto que los ingresos procedentes del componente volumétrico disminuyan con el tiempo, a
medida de descienda la demanda de electricidad en la isla. La cuantificación de la Carga
heredada agregada a la factura de los clientes se determinará en función de diversos factores,
como por ejemplo la categoría de tarifa del cliente. Por ejemplo, no está previsto cobrar ningún
cargo de conexión a los clientes más vulnerables (es decir, los clientes residenciales
subvencionados), y se les aplicará el cargo volumétrico solamente si su consumo excede de
aproximadamente los 500 kWh mensuales. Otras cuentas de clientes (como los clientes
residenciales generales y los clientes comerciales e industriales) estarán sujetos a un cargo de
conexión, al cargo volumétrico por consumo de hasta unos 500 kWh, y un cargo volumétrico
equivalente o superior para consumos superiores a los 500 kWh.

Según las proyecciones de demanda eléctrica contenidas en el plan fiscal certificado de
2022 de la AEEPR (el "Plan fiscal certificado"), está previsto que la Carga heredada genere unos
ingresos de unos $5,400 millones de dólares en los próximos 35 años, fondos con los que podrán
reembolsarse íntegramente los Nuevos bonos emitidos en el marco del Plan. Se espera que la
Carga heredada podrá suprimirse transcurridos 35 años, cuando los Nuevos bonos hayan sido
pagados íntegramente y el IVC hayan vencido o dejen de circular. Si la demanda de electricidad
excediera de las proyecciones del Plan fiscal certificado y los Nuevos bonos pudieran
reembolsarse antes de transcurridos 35 años, la Carga heredada se mantendrá vigente y los
Ingresos netos, hasta el importe de la Carga heredada, se aplicarán a financiar el CVI distribuido
a los titulares de las reclamaciones, según el Plan. Por el contrario, si la demanda real fuese
inferior a las proyecciones del Plan fiscal certificado de 2022, la Carga heredada seguirá vigente
hasta (a) el pago íntegro de los Bonos Serie B, o bien (b) el vencimiento del IVC.

La Junta de Supervisión considera que el Plan es un plan de ajuste viable que equilibra
adecuadamente los intereses de diversos acreedores, el futuro de la AEEPR (y de Puerto Rico en

general) y —quizá lo más importante— establece el camino para que el pueblo de Puerto Rico cuente con un sistema eléctrico confiable. La Junta de Supervisión ruega encarecidamente a los acreedores que voten a favor del Play y permitan que la AEEPR salga del Título III.

## C.    Resumen y antecedentes

*Establecimiento de la AEEPR.*    La AEEPR se constituyó en 1941 como compañía pública e instrumentalidad gubernamental de Puerto Rico en virtud de la Ley núm. 83 de la Asamblea Legislativa de Puerto Rico (la "Asamblea Legislativa"), aprobada el 2 de mayo de 1941. La AEEPR genera, transmite y distribuye prácticamente toda la energía eléctrica consumida en Puerto Rico. La AEEPR, en calidad de instrumentalidad del Estado Libre Asociado, es "tiene el deber de proveer energía eléctrica de forma confiable, aportando al bienestar general y al futuro sostenible del Pueblo de Puerto Rico, maximizando los beneficios y minimizando los impactos sociales, ambientales y económicos". 22 L.P.R.A. § 196.

La AEEPR es uno de los servicios públicos municipales más grandes de Estados Unidos, ocupando el primer lugar en número de clientes e ingresos entre todas las compañías eléctricas públicas. Desde 1981 hasta 2021, la AEEPR fue el único prestador de servicios de energía de Puerto Rico. Hasta el 1 de junio de 2021,[9] la AEEPR prestaba servicios a 1 millón y medio de clientes (91% residenciales, 9% comerciales y <1% industriales). La AEEPR presta servicios a sus clientes a través de una amplia infraestructura de transmisión y distribución, con aproximadamente 2,600 millas de tendidos de transmisión y subtransmisión (230 kV/115 kV/38 kV), más de 16,000 millas de tendidos de distribución de tensión principales y secundarios (13 kV, 8 kV, 4 kV), y unas 340 subcentrales de su propiedad (el "Sistema de TyD"). La electricidad la suministran las centrales generadoras de propiedad de la AEEPR, y también se adquiera a productores independientes en el marco de contratos de compra de energía (el "Sistema de generación").

*La decadencia del Estado Libre Asociado y de la AEEPR.*    En las últimas décadas, diversos factores contribuyeron a una abrupta desaceleración económica del Estado Libre Asociado de Puerto Rico y, a su vez, en el debilitamiento de la AEEPR, incluyendo la contracción de la economía, el aumento de la estructura burocrática, el retroceso demográfico y los cambios en la situación fiscal y de las desgravaciones del código tributario de EE.UU. Desde principios del siglo XXI hasta 2016, la deuda pública de Puerto Rico se incrementó rápidamente, en parte de la toma de préstamos para cubrir los déficits (incluyendo el pago del servicio de la deuda), y por las perspectivas de continua contracción de la economía nacional.

En 2016, Puerto Rico se encontraba "en medio de una crisis fiscal".[10] A la sazón, el Estado Libre Asociado estaba "aplastado bajo el peso de una deuda pública mayor" que su PIB, "había comenzado a incumplir sus obligaciones de deuda" y había perdido el acceso al

---

[9]   A partir de esta fecha, la operación y el mantenimiento del sistema de transmisión y distribución de la AEEPR está a cargo de LUMA Energy LLC. A partir de esa fecha, la AEEPR sigue siendo responsable de la operación y mantenimiento de su flota de generación habitual, que suministra electricidad a la red operada por LUMA Energy LLC.

[10]   *Puerto Rico contra Franklin California Tax–Free Trust.*, 579 U.S. 115, 118 (2016).

financiamiento exterior.[11] El Estado Libre Asociado sumaba más de 120.000 millones de dólares en deuda y pasivos de pensiones descubiertos. Para peor, esta calamitosa situación financiera amenazaba con sumir en una crisis humanitaria a los más de 3 millones de ciudadanos estadounidenses residentes en Puerto Rico. Como señaló el Secretario del Tesoro de EE.UU., la capacidad del Estado Libre Asociado de proporcionar "servicios sanitarios, legales y educativos básicos" era muy dudosa.[12]

Durante el mismo período, la AEEPR sufrió un retroceso igualmente agudo en sus condiciones financieras y operativas. La recesión global de 2008 y el debilitamiento económico del Estado Libre Asociado conllevaron la degradación de las infraestructuras de la AEEPR (un problema que se vio todavía más exacerbado por las devastadoras consecuencias de los huracanes Irma, María y Fiona (como se detalla más adelante), y numerosos terremotos de elevada magnitud en 2020). Aparte de infraestructuras inadecuadas, la AEEPR sufrió una significativa caída de las ventas de energía, la obligación legal de suministrar electricidad a ciertos clientes a tarifas subvencionadas, niveles relativamente altos de robos y pérdidas no técnicas, reinversiones inadecuadas que provocaron la obsolescencia, la ineficiencia y la falta de confiabilidad de sus instalaciones de transmisión, distribución y generación, sistemas informáticos y tecnológicos obsoletos, elevada dependencia de combustibles fósiles e incapacidad para diversificarlos, inexistencia de un plan estratégico de cumplimiento ambiental, infraestructura de atención al cliente desorganizada e ineficaz, contratos colectivos por encima de los niveles de mercado y con cláusulas onerosas, obligaciones de pensiones infradotadas, pasivos operativos sustanciales y una significativa carga de deuda propia acumulada que provocó una crisis. La crisis de deuda de la AEEPR ha conllevado, en gran medida, que la entidad tuviera que financiar sus déficits operativos con fondos generados por bonos, lo cual provocó infraestructuras infradotadas y una estructura de deuda insostenible.

La crisis fiscal de la AEEPR le impidió pagar sus deudas a su vencimiento. El mayor tramo de la deuda de la AEEPR consta de aproximadamente $8,500 millones en reclamaciones de titulares de sus bonos. Además, debía aproximadamente $700 millones en préstamos que había tomado para financiar la adquisición de combustible. Además, la AEEPR no pudo cumplir sus obligaciones de pensiones, y tenía un pasivo actuarial superior a los $3,000 millones. Otros acreedores de la AEEPR han presentado demandas en su contra por miles de millones de dólares.

***Promulgación de PROMESA.*** El 30 de junio de 2016, y con el objeto de abordar la crisis financiera y fiscal del Estado Libre Asociado y de sus instrumentalidades el Presidente confirmó la promulgación de la Ley PROMESA, 48 U.S.C. § 2101 y ss., con el objeto de remediar la creciente crisis fiscal y humanitaria de Puerto Rico. El objetivo de PROMESA fue atender a la necesidad inmediata de prestar a servicios eficaces a sus ciudadanos, formular una reestructuración de la deuda e implementar la reforma fiscal que conlleve una economía sostenible, responsabilidad fiscal y acceso a los mercados.

---

[11] *Wal-Mart Puerto Rico, Inc. contra Zaragoza-Gómez*, 174 Suplemento 3d 585, 602 (D.P.R. 2016); *declaración jurada*, 834 F.3d 110 (1er. Cir. 2016); H.R. Rep. núm. 114- 602, en 40 (2016).

[12] Carta de Jacob L. Lew, Secretario del Tesoro, a Paul Ryan, Presidente de la Cámara de Representantes de Estados Unidos (15 de enero de 2016), https://www.treasury.gov/connect/blog/Pages/Secretary-Lew-Sends-Letter-to-Congress-on-Puerto-Rico.aspx.

***Principales componentes de la Ley PROMESA.*** PROMESA establece dos mecanismos fundamentales para restablecer la responsabilidad fiscal. En primer lugar, los Títulos I, II, IV y V de la Ley PROMESA establecen la constitución de la Junta de Supervisión, y determinan las facultades y obligaciones que rigen la supervisión y aceptación de los planes fiscales multianuales, los presupuestos anuales, la revitalización de las infraestructuras y la agilización del seguimiento de los principales proyectos de infraestructuras. En segundo lugar, los Títulos III y VI de PROMESA contemplaban reestructuraciones de la deuda, similares a casos de quiebras y reestructuraciones extrajudiciales, respectivamente, de Puerto Rico y sus organismos.[13] Al incorporar muchas disposiciones del Título 11 del Código de Quiebras de Estados Unidos en el Título III de PROMESA, que estipula reestructuraciones similares a las previstas por los Capítulos 9 y 11 del Código de Quiebras, la ley también protege a los deudores contra las actuaciones judiciales de los acreedores[14], que de otra manera podrían absorber miles de millones de dólares del Estado Libre Asociado e infligir daños irreparables a la economía puertorriqueña. La ley incluye atributos singulares, como la activación de una paralización automática una vez que la propuesta se convirtiera en ley. El Título VI de la Ley PROMESA prevé un proceso de reestructuración alternativa y extrajudicial sujeto a umbrales de votación.

***Problemas históricos que llevaron a la creación de la Junta de Supervisión.*** Con el objeto de superar varias décadas de grave retroceso económico, déficits de operativos, falta de transparencia fiscal, ineficacia de gestión y excesivo endeudamiento,[15] la Ley PROMESA estableció una entidad autónoma dentro del gobierno de Puerto Rico: la Junta de Supervisión.[16] La Junta de Supervisión es "una entidad dentro del gobierno territorial", más que un "departamento, agencia, institución u organismo del Gobierno Federal".[17] La Junta de Supervisión está encargada por ley de restablecer la responsabilidad fiscal y el acceso a los mercados del Estado Libre Asociado.[18] Para cumplir su obligación legal, la Junta de Supervisión está facultada para supervisar la reestructuración de la deuda del Estado Libre Asociado y de sus organismo, y para exigir reformas fiscales. Algunos elementos de esta autoridad han sido objetados,[19] aunque posteriormente confirmados por el Tribunal del Título III y la Corte de Apelaciones de los Estados Unidos para el Primer Circuito (el "Primer Circuito").[20]

---

[13]  48 U.S.C. § 2161.

[14]  11 U.S.C. § 362(a) (incorporado al caso del Título III por 48 U.S.C. § 2161(a)).

[15]  PROMESA § 405(m)(1).

[16]  48 U.S.C. § 2121(b)(1).

[17]  *Ibídem.* § 2121(c)(2); *véase asimismo* 48 U.S.C. § 2194(i)(2) (donde se define el término "Gobierno de Puerto Rico" para incluir a la Junta de Supervisión para todos los efectos de esa sección); 48 U.S.C. § 2127(b) (estipulando que la Junta de Supervisión es financiada exclusivamente por el gobierno territorial de Puerto Rico).

[18]  PROMESA § 101(a).

[19]  Los resúmenes de las radicaciones judiciales de esta Declaración de Divulgación han sido plenamente cualificados por los documentos radicados públicamente.

[20]  Como se describe con mayor detalle en la sección IV.D.4, el 5 de julio de 2018, el entonces Gobernador Ricardo Rosselló Nevares ("Gobernador Rosselló") demandó a la Junta de Supervisión alegando, entre otras cosas, que "todos los asuntos que constituyan recomendaciones (tanto si se presentan como tales como si no) en el marco del Plan Fiscal que el Gobierno haya rechazado o pudiera rechazar [sic] en el futuro (tal como se definen aquí o de otra manera) no son vinculantes para el Gobierno, que no está obligado a implementarlas". Demanda del Gobernador

**Actuaciones iniciales de la Junta de Supervisión para cumplir el mandato de la Ley PROMESA.** El 31 de agosto de 2016, el Presidente Obama designó a los siete integrantes con derecho a voto de la Junta de Supervisión que, en virtud de la Ley PROMESA, prestarían sus servicios sin remuneración, aunque tendrían derecho al reintegro de los gastos razonables y necesarios incurridos en el desempeño de sus funciones.[21] Cuando fue designada, la Junta de Supervisión carecía de personal, de instalaciones y de datos. Sus primeros pasos consistieron en conseguir instalaciones y en captar expertos para cumplir su cometido. A la sazón, el Estado Libre Asociado tenía unos $74.000 millones de dólares en deuda consolidada, un pasivo de pensiones estimado en $51.500 millones y recursos insuficientes para cumplir estas obligaciones. Asimismo, la AEEPR tenía un pasivo entonces estimado en $11,400 millones de dólares, incluyendo más de $9.000 millones en deuda consolidada. El 30 de septiembre de 2016, la Junta de Supervisión (i) anunció un proceso para la elaboración, presentación, aprobación y certificación de planes fiscales para el Estado Libre Asociado y los organismos territoriales correspondientes, (ii) designó un grupo inicial de 63 entidades sujetas a la Ley PROMESA,[22] incluyendo la AEEPR, (iii) solicitó al Gobernador un volumen significativo de información financiera y presupuestaria como primer paso para elaborar mejoras de la gobernanza tributaria

---

contra la Junta de Supervisión, 5 de julio de 2018, Proc. abr. núm. 18-00080, ECF núm. 1 en 17-bk-3283 (D.P.R.), en ¶ 83. Por dictamen y orden del 7 de agosto de 2018, el Tribunal del Título III dictaminó en contra del entonces Gobernador sobre ese asunto, explicando: "Los poderes otorgados a la Junta de Supervisión por la Sección 205(b)(1)(K) de la Ley PROMESA permiten a la Junta de Supervisión establecer políticas vinculantes para el Estado Libre Asociado, a pesar del rechazo del Gobernador de las recomendaciones basadas en la Sección 205 . . . ." *Rosselló Nevares contra la Junta de Supervisión y Administración Financiera para Puerto Rico* [Proc. abr. núm. 18-00080-LTS ECF núm. 33], en 25. En la apelación presentada por el entonces Gobernador Rosselló, el Primer Circuito confirmó la sentencia del Tribunal de Distrito, manifestando que nada de lo contenido en la Sección PROMESA "sugiera que, por el hecho de solicitar en primera instancia la conformidad del Gobernador en algún asunto, la Junta pierda de algún modo las facultades que tenga para actuar unilateralmente con respecto al mismo", y que la Junta de Supervisión está empoderada para adoptar "una recomendación rechazada si tuviera la facultad para adoptarla por sí misma". *Vázquez-Garced contra la Junta de Supervisión y Administración Financiera para Puerto Rico (En el asunto Junta de Supervisión y Administración Financiera para Puerto Rico)*, 945 F.3d 3, 6-7 (1er. Cir. 2019), *certificación rechazada*, 141 S. Ct. 241 (2020). También la Asamblea Legislativa objetó las facultades presupuestarias de la Junta de Supervisión. Sostuvo que "la decisión de la Junta de autorizar su presupuesto por encima de la Asamblea Legislativa fue una 'intrusión ilícita en las potestades legislativas exclusivas de la Asamblea Legislativa en virtud de la Constitución de Puerto Rico'" *Méndez-Núñez contra la Junta de Supervisión y Administración Financiera para Puerto Rico (En el asunto Junta de Supervisión y Administración Financiera para Puerto Rico)*, 916 F.3d 98, 116 (1er. Cir. 2019) (las alteraciones en el original). El Tribunal del Título III falló contra la Asamblea Legislativa, y el Primer Circuito lo confirmó, dictaminando: "En virtud de la cláusula de prioridad de §§ 201 y 202 la Ley PROMESA, la potestad de la Junta de aprobar Planes fiscales y Presupuestos 'tiene precedencia sobre cualesquiera disposiciones generales o específicas del derecho territorial', incluyendo las disposiciones de la Constitución de Puerto Rico que sean 'incompatibles con [PROMESA]'". *Ibíd.* (cita confirmada). Más recientemente, el Tribunal del Título III confirmó las facultades de la Junta de Supervisión de obtener autorización judicial para anular y dejar sin vigor y efecto la legislación de Puerto Rico incongruente con el plan fiscal certificado pertinente. *véase Junta de Supervisión y Administración Financiera para Puerto Rico contra Pierluisi Urrutia y otros (En el asunto Junta de Supervisión y Administración Financiera para Puerto Rico)* [Proc. abr. núm. 21-00072, ECF núm. 78], en 17-bk-3283 (D.P.R.), en 5 (admitiendo la moción de la Junta de Supervisión de sentencia sumaria, y autorizando la "anulación [de] actuaciones ejecutivas y legislativas del Estado Libre Asociado que sean incongruentes con los planes fiscales y presupuestos certificados . . ." (citando a *Junta de Supervisión y Administración Financiera para Puerto Rico contra Vázquez-Garced (En el asunto Junta de Supervisión y Administración Financiera para Puerto Rico)*, 403 F. Suplemento 3d 1, 5 (D.P.R. 2019))).

[21] PROMESA § 101(g).

[22] El 9 de mayo de 2019, la Junta de Supervisión designó asimismo a 78 municipios como entidades cubiertas.

del gobierno del Estado Libre Asociado (el "<u>Gobierno</u>"), la rendición de cuentas, los controles internos y los asuntos financieros del Gobierno, e (iv) inició el proceso de proyectos críticos autorizados por el Título V de la Ley PROMESA estableciendo criterios y procesos de selección para agilizar ciertos proyectos de energía e infraestructura críticos.    Además, la Junta de Supervisión inició reuniones con representantes de diversos grupos de acreedores, desde Bonistas y Aseguradoras Monolínea, hasta jubilados, prestamistas de líneas de crédito, proveedores de combustibles, sindicatos y muchos otros.

***Inicio de los casos del Título III.***    Antes de la promulgación de la Ley PROMESA, la AEEPR había negociado un acuerdo de apoyo a la reestructuración inicial (el "<u>AAR previo a la petición</u>") con algunos de sus acreedores que, aunque nunca se formalizó ni fue legalmente exigible, tenía por objeto establecer una reestructuración convenida.    Finalmente resultó que el AAR previo a la petición contenía diversos requisitos que no pudieron satisfacerse, como por ejemplo que la deuda emitida en el marco del plan de reestructuración de la AEEPR tuviera una calificación de grado de inversión, por lo que sus tipos de interés serían más bajos que los de grado de no inversión.    Cuando se promulgó la Ley PROMESA, estableció una paralización automática temporal para proteger al Estado Libre Asociado y a sus organismos contra actuaciones de acreedores para cobrar sus deudas hasta el 1 de mayo de 2017.[23]    Por otra parte, la Ley PROMESA dispuso también que los acuerdos como el AAR previo a la petición pudiera servir como base de una modificación calificada de conformidad con el Título VI de la Ley PROMESA. Sin embargo, en última instancia las partes no pudieron alcanzar un acuerdo debido a numerosas cuestiones sustanciales, incluyendo, entre otras, cómo podrían las aseguradoras monolínea aportar los necesarios aplazamientos de capital y el establecimiento de una nueva estructura de tarifas eléctricas.    Al mismo tiempo, la AEEPR no consiguió obtener los centenares de millones de dólares en liquidez a corto plazo que hubieran sido necesarios para la implementación del AAR previo a la petición.    El 28 de junio de 2017, la Junta de Supervisión rechazó certifica el AAR previo a la petición, y no autorizó a la AEEPR invocar el Título VI de la Ley PROMESA.    El 3 de julio de 2017, a instancias del Gobernador, la Junta de Supervisión emitió un certificado de reestructuración a tenor de las Secciones 104(j) y 206 de la Ley PROMESA, y presentó una petición voluntaria de quiebra para la AEEPR, de conformidad con la Sección 304(a), iniciándose así el Caso del Título III.    El 6 de octubre de 2017, el Tribunal del Título III dictó una orden otorgando la administración conjunta de los Casos del Título III del Estado Libre Asociado, la ACT, el SRE y COFINA, así como el presente Caso del Título III, exclusivamente a efectos procesales [ECF núm. 340].[24]    El comienzo de este Caso del Título III activó la paralización automática prevista por la Sección 362 del Código de Quiebras, protegiendo así a la AEEPR contra acciones ejecutivas.[25]

***Reestructuraciones vinculadas.***    En el transcurso de los Casos del Título III, la Junta de Supervisión ha encabezado las conversaciones tendentes a la reestructuración de la deuda, sobre la base del paradigma de que las negociaciones consensuadas suelen ser mejores que las

---

[23] PROMESA §§ 5(11), 405(b).    Inicialmente, estaba previsto que la paralización impuesta por la Ley PROMESA se extinguiera el 15 de febrero de 2017, aunque la Junta de Supervisión la prorrogó 75 días más, como lo permite la sección 405(d)(1)(B) de la Ley Promesa.

[24] Salvo que se especifique algo distinto, las referencias a los registros corresponden al Caso núm. 17-BK-04780-LTS.

[25] PROMESA § 301(a).

resoluciones objetadas. Para ello, la Junta de Supervisión y el Gobierno negociaron con los involucrados de COFINA la cuestión de si ciertos fondos procedentes del Impuesto sobre Ventas y Uso ("IVU") eran propiedad del Estado Libre Asociado o de COFINA. Estas negociaciones desembocaron en una asignación consensuada de los ingresos del IVU y, en última instancia, a la confirmación de un plan de ajuste para COFINA (el 5 de febrero de 2019), con lo que la deuda de COFINA se redujo desde unos 17.000 millones a aproximadamente 12.000 millones de dólares. Con el problema del IVU ya resuelto, el Estado Libre Asociado avanzó un paso más en la reestructuración de su deuda por el hecho de saber con qué parte de la recaudación de ese impuesto podría contar. Esto eliminó la incertidumbre acerca de miles de millones de dólares reclamados tanto por el Estado Libre Asociado como por COFINA.

Tras la resolución de esta cuestión, la Junta de Supervisión volvió a centrar sus esfuerzos en obtener apoyo para el marco de un plan de ajuste para el Estado Libre Asociado. Para tales fines, la Junta de Supervisión participó en sesiones de mediación y negociaciones dirigidas por, y bajo los auspicios de, el equipo de mediación designado por el Tribunal del Título III, dirigido por Barbara J. Houser, Jueza Principal del Tribunal de Quiebras de Estados Unidos para el Distrito Norte de Texas. Estas sesiones de mediación culminaron con la ejecución de ciertos acuerdos de apoyo al plan de acreedores que, en última instancia, llevó a la Junta de Supervisión a presentar la *Octava enmienda modificada al Plan de Ajuste conjunto del Título III del Estado Libre Asociado de Puerto Rico, y otros* [Caso núm. 17-bk-3283, ECF núm. 19784] (el "Plan del Estado Libre Asociado") y la correspondiente declaración de divulgación. El Plan del Estado Libre Asociado fue confirmado por el Tribunal del Título III el 18 de enero de 2022, y entró en vigencia el 15 de marzo de 2022. Entre otras cosas, el Plan del Estado Libre Asociado (i) resuelve determinadas cuestiones relativas a impuestos y tasas recaudados por el Estado Libre Asociado, históricamente transferidos a ciertas instrumentalidades, y (ii) conjuntamente con la reestructuración de la deuda de COFINA, reduce la deuda del Estado Libre Asociado en aproximadamente un sesenta y dos por ciento (62%), desde $90,400 millones a $34,100 millones.

Más recientemente, habiendo resuelto las diferencias pendientes más significativas entre las partes interesadas de la ACT, la Junta de Supervisión presentó la *Quinta enmienda modificada al Plan de Ajuste del Título III de la Autoridad de Carreteras y Transportación de Puerto Rico* [Caso núm. 17-3567, ECF núm. 1404] (el "Plan de la ACT") y la correspondiente declaración de divulgación, basada en un amplio consenso. El 12 de octubre de 2022, el Tribunal del Título III confirmó el Plan de la ACT. Dicho Plan entró en vigor el 6 de diciembre de 2022.

Además, la Junta de Supervisión y el Gobierno han reestructurado diversas instrumentalidades del Estado Libre Asociado de conformidad con el Título VI de la Ley PROMESA. En noviembre de 2018, el Gobierno y la Junta de Supervisión concluyeron la reestructuración del Banco Gubernamental de Fomento de Puerto Rico ("BGF"), de conformidad con el Título VI de la Ley PROMESA (la "Modificación cualificada del BGF"). El BGF había heredado una deuda de bonos de más de $4,000 millones, y cargaba con un pasivo total de unos $8,000 millones. Estas reclamaciones se resolvieron con la emisión de $2,600 millones en nuevos bonos, de conformidad con el procedimiento del Título VI de la Ley PROMESA. Mayormente, estos bonos están garantizados por los flujos de efectivo procedentes de los préstamos que el BGF había otorgado anteriormente a municipios de Puerto Rico, así como por

10

otros activos del BGF. Los objetivos de la política de la Junta de Supervisión y del Gobierno en la reestructuración del BGF fueron garantizar que estos nuevos bonos pudieran reembolsarse exclusivamente con cargo a los activos del BGF, sin tener que recurrir a ninguna futura aportación general del Gobierno del Estado Libre Asociado, y amortiguar los efectos financieros de la reestructuración del BGF sobre los numerosos municipios del país que también eran acreedores del banco.

Por otra parte, la Junta de Supervisión y el Gobierno han obtenido autorización judicial para dos reestructuraciones adicionales a través de modificaciones cualificadas conformes al Título VI de la Ley PROMESA, a través de acuerdos con la mayoría de los acreedores de la deuda de bonos de (i) la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico, y (ii) la Autoridad del Distrito del Centro de Convenciones de Puerto Rico. Ambos se encuentran en trámite de obtención de la aprobación de una reestructuración acorde con el Título VI para la Corporación para el Financiamiento Público (CFP) de Puerto Rico.

***Primer Plan fiscal certificado de la AEEPR.*** De conformidad con la Sección 201 de la Ley PROMESA, el 13 de marzo de 2017 la AEEPR ante la Junta de Supervisión un plan fiscal para su revisión y certificación. Entre otros requisitos, el plan fiscal exponía un método mediante el cual la AEEPR alcanzaría un equilibrio fiscal y accedería a los mercados de capitales dentro del período (no inferior a cinco años) allí establecido. El 28 de abril de 2017, la Junta de Supervisión certificó el primer plan fiscal de la AEEPR, con sujeción a ciertas enmiendas propuestas por la Junta.[26] El primer plan fiscal de la AEEPR exigía a la institución implementar una política de responsabilidad fiscal y una urgentemente necesaria modernización de sus infraestructuras, e incluía tanto Autoridad de Alianzas Público-privadas como reducciones de gastos concretas y mejoras de eficiencia operativa y de otra índole, e incrementos específicos de ingresos, con el objetivo último de que la AEEPR lograra (i) estabilidad fiscal, (ii) precios de energía eficientes y competitivos mediante una estructura de tarifas basada en fórmulas (estructura que fue rechazada por la Comisión de Energía de Puerto Rico, CEPR), (iii) cumplimiento de las normas sanitarias y ambientales, y (iv) ser un agente del crecimiento económico.

***La creación del NEPR y la promulgación de la Ley 17.*** El 27 de mayo de 2014, el Gobernador de Puerto Rico refrendó la Ley de Transformación y Alivio Energético de Puerto Rico ("Ley 57-2014"). La Ley 57-2014 pretendía que el sistema energético del país fuese más eficiente y menos dependiente de los combustibles fósiles mediante la reforma del marco regulatorio de la AEEPR. La Ley 57-2014 buscó cumplir este objetivo mediante la creación de la Oficina Estatal de Política Pública Energética ("OEPPE"), la Comisión de Energía de Puerto Rico ("CEPR") y la Oficina Independiente de Protección al Consumidor ("OIPC"). La OEPPE, hoy denominada Programa de Política Pública Energética del Departamento de Desarrollo Económico y Comercio, tiene como misión desarrollar políticas públicas en materia de energía, lo cual incluye la identificación y la evaluación de fuentes energéticas alternativas. Tal como se explica más adelante, la CEPR, hoy Negociado de Energía de Puerto Rico ("NEPR"), es un organismo oficial independiente responsable de regular, supervisar y garantizar el cumplimiento de la política pública de energía del país. Según la Ley 57-2014, la principal función de la CEPR

---

[26] Se adjunta una copia del primer plan fiscal de la AEEPR en forma de Anexo E a la *Declaración de la Junta de Supervisión sobre el Caso del Título III de la AEEPR* [ECF núm. 2].

era evaluar el Plan de ALIVIO Energético y el Plan integrado de recursos ("PIR") de la AEEPR, los cuales deben detallar las estrategias de la AEEPR para cumplir la Ley 57-2014. Por último, la CEPR también era responsable de revisar y aprobar las tarifas de la energía.  La OIPC es un organismo oficial cuyo principal objetivo es defender a los consumidores de energía ante la AEEPR y el NEPR en asuntos tales como diferencias vinculadas a las facturas de electricidad.

El 11 de abril de 2019, en cumplimiento de los objetivos de transformación y modernización del sector energético establecidos por la Ley 57-2014, se promulgó la Ley de Política Pública Energética de Puerto Rico ("Ley 17-2019").  Para cumplir estos objetivos, la Ley 17-2019 prohíbe la continuidad del monopolio verticalmente integrado del sistema eléctrico de Puerto Rico, y exige la desagregación del mismo mediante la transferencia a operadores privados de las responsabilidades de la operación, administración y/o mantenimiento del Sistema de TyD y del Sistema de Generación de la AEEPR.

Además, la Ley 17-2019 confirmó las funciones del NEPR como regulador independiente y apolítico, y amplió su autoridad para (a) establecer mecanismos de imposición de incentivos/penalizaciones, (b) ejercitar un alto grado de escrutinio del mantenimiento de la red eléctrica, (c) exigir la presentación de informes, y (d) emplear mecanismos alternativos para regular las tarifas en función de los costos de servicio.  Para garantizar la independencia del NEPR de toda influencia política que pudiera poner en peligro las actividades de la AEEPR, la Ley 17-2019 también delineó el presupuesto anual de $20 millones del NEPR, dejando claro que dicho presupuesto no está sujeto a aprobaciones ejecutiva o legislativa.  Además, el NEPR recibió el mandato de implementar una transición hacia una estructura de empleados con no menos de un setenta y cinco por ciento (75%) de funcionarios públicos, y no más de un veinticinco por ciento (25%) de empleados de confianza.

Por último, la Ley 17-2019 promovió la transición del perfil energético de Puerto Rico hacia fuentes de energías renovables y la generación distribuida.  Actualiza los estándares de la Cartera de Energía Renovable ("CER"), al exigir un cuarenta por ciento (40%) de generación de energía renovable hasta 2025, sesenta por ciento (60%) hasta 2040, y cien por ciento (100%) hasta 2050, incluyendo el mandato de eliminación de la generación alimentada por carbón el 1 de enero de 2028. Para impulsar estos objetivos, la Ley 17-2019 impone a la AEEPR preparar y presentar al NEPR un PIR que abarque un período de planificación de veinte (20) años, que se revisará cada tres (3) años.  La Ley 17-2019 define al PIR como un plan que considere todos los recursos razonables, incluyendo aquellos relacionados a la oferta energética (es decir, generación a nivel de centrales) y a la demanda de energía (o sea, eficiencia energética, respuesta a la demanda y generación distribuida), con el objeto de satisfacer de manera confiable las actuales y futuras necesidades previstas del sistema energético de Puerto Rico y de sus clientes al menor costo razonable.  Por otra parte, la Ley 57-2014 establece que el PIR incluya evaluaciones del Sistema de TyD (es decir, capacidad y confiabilidad) y de impacto ambiental de todo el sistema de energía.  El actual PIR fue aprobado por el NEPR en agosto de 2020, y mantendrá su vigencia durante (3) años.  El actual PIR requiere que la AEEPR, LUMA Energy (que se define a continuación) y cualesquiera sucesores de la AEEPR en el segmento de la generación, sigan un Plan de acción modificado (el "Plan de Acción Modificado") y el Plan de Recursos Preferidos Modificado (el "Plan de Recursos Preferidos Modificado") hasta que se apruebe un PIR actualizado, con las siguientes modificaciones en la red eléctrica y en la generación para conformar los tres elementos fundamentales del PIR aprobado:

12

**Aumento del porcentaje de generación y almacenamiento de renovables**, incluyendo las adiciones de nueva generación de energías renovables, almacenamiento de energía, retirada o conversión de la totalidad de la generación existente de carbón y combustibles pesados, y modificaciones del sistema por ejemplo, condensadores síncronos) para posibilitar la integración de la generación basada en inversores:

**Refuerzo de la resiliencia de la red**, incluyendo inversiones de capital en el Sistema de TyD para posibilitar una mayor resiliencia y confiabilidad, y procedimientos de optimización adicional para determinar las inversiones óptimas en el Sistema de TyD para reforzarlo; y

**Ampliar las posibilidades de elección del cliente**, incluyendo cambios en el sistema para fomentar la incorporación de la generación distribuida ("GD", como por ejemplo paneles solares fotovoltaicos en los techos) y programas de eficiencia energética ("EE") recomendada y de respuesta a la demanda ("RD"), que permitan al cliente jugar un papel significativo en la red eléctrica de Puerto Rico.

*Una nueva situación: los huracanes Irma y María.*  En septiembre de 2017 empeoraron las perspectivas de mejorar la situación financiera de la isla cuando Puerto Rico resultó devastada por los huracanes Irma y María en un lapso de dos semanas.  El María fue el más fuerte de los huracanes que sacudieron Puerto Rico en 1932, y el quinto más fuerte en la historia de EE.UU.  Estos fenómenos meteorológicos arrasaron gran parte de las infraestructuras de la isla y trastocaron las vidas de todos los puertorriqueños, así como el trabajo de la Junta de Supervisión.  A consecuencia de los huracanes resultó dañado aproximadamente el ochenta por ciento (80%) de la infraestructura de transmisión eléctrica de la AEEPR.

Inmediatamente después de los huracanes, la Junta de Supervisión ofreció al Gobierno la posibilidad de reasignar hasta 1.000 millones de dólares en gastos presupuestados para cubrir los desembolsos vinculados con los desastres.  Tras varias reuniones, testimonios ante el Congreso y otras interacciones con el gobierno federal y las autoridades de Puerto Rico, la Junta de Supervisión abogó activamente por la obtención de los recursos necesarios para sustentar la recuperación de Puerto Rico, las iniciativas de reconstrucción críticas y la liquidez necesaria.

En torno a 1.5 millones de clientes perdieron el acceso a la energía y a la electricidad, mientras la AEEPR se enfrentaba al mayor apagón de la historia de EE.UU.  La AEEPR se abocó inmediatamente a restablecer la electricidad a los residentes de Puerto Rico, enfrentándose a significativos obstáculos, incluyendo la caída de la infraestructura de comunicaciones, que frenaba los esfuerzos para distribuir materiales y coordinar las tareas de reparación, terrenos montañosos y llenos de escombros que impedía a la AEEPR y a sus contratistas acceder fácilmente a las estructuras dañadas, el vasto alcance de las obras necesarias para reparar miles de millas de tendidos y postes eléctricos, y mucho más.  El 14 de agosto de 2018, tras 11 meses de trabajos ininterrumpidos para reconstruir las infraestructuras críticas de generación y transmisión eléctrica de Puerto Rico, la AEEPR anunció que había restablecido el acceso a la electricidad del cien por ciento (100%) de la población de la isla.  Aunque restablecer la electricidad fue un logro significativo, continuar actualizando y modernizando la red eléctrica de la AEEPR sigue siendo una prioridad fundamental.  Al 6 de diciembre de 2021, la Agencia Federal de Gestión de Emergencias ("FEMA") y otros organismos y departamentos del gobierno

federal habían comprometido colectivamente casi $60,000 millones en fondos de recuperación de los daños de los huracanes, y en la misma fecha desembolsaron $18,500 millones de dólares a Puerto Rico. De estas cuantías, se garantizaron aproximadamente $12,700 millones, y a la AEEPR se le desembolsaron unos $1,500 millones para contribuir a reconstruir y reforzar la red eléctrica de Puerto Rico como parte de las iniciativas de recuperación de los huracanes.

*Nuevos Planes fiscales.* Dado que los huracanes propiciaron una nueva realidad para el país, la Junta de Supervisión inició un proceso de reelaboración de los planes fiscales del Estado Libre Asociado y sus instrumentalidades cubiertas, incluyendo la AEEPR. Durante los nueve meses posteriores a los huracanes Irma y María, la Junta de Supervisión colaboró con el Gobierno para definir nuevos Planes fiscales, con el objetivo fundamental de cumplir los mandatos de la Ley Promesa. Para ello, los planes fiscales requerirían de una serie de ambiciosas reformas estructurales y de medidas fiscales para restablecer el crecimiento y abrir oportunidades a las personas y empresas de Puerto Rico.

*Financiamiento de la AEEPR con posterioridad a la petición.* Como consecuencia de la devastación sufrida por el Sistema de TyD debido a los huracanes Irma y María, el 27 de enero de 2018 la Junta de Supervisión y la AAFAF presentaron una moción conjunta urgente para que la AEEPR obtuviera un financiamiento posterior a la petición de $1,300 millones garantizado por un gravamen de primer rango. *Véase* ECF núm. 549 ("Moción de financiamiento de la AEEPR"). El 16 de febrero de 2018, la Junta de Supervisión y la AAFAF presentaron una solicitud conjunta urgente [ECF núm. 722] pidiendo el dictado de una propuesta de orden revisada que aprobara una línea de crédito de $300 millones y que otorgara al prestamista una reclamación de gastos administrativo súper-prioritaria. El 19 de febrero de 2018, el Tribunal del Título III dictó una orden aprobando la Moción de financiamiento de la AEEPR revisada [ECF núm. 744] (la "Orden de financiamiento de la AEEPR"). El 8 de marzo de 2019, la AEEPR devolvió todas las cuantías pendientes dentro del marco del financiamiento aprobado.

*Pleitos que afectan a la reestructuración de la deuda de la AEEPR.*

Las mociones de sindicatura

El 18 de julio de 2017, algunos Bonistas y las Aseguradoras Monolínea presentaron una moción solicitando el levantamiento de la paralización automática prevista por la Ley PROMESA para promover el nombramiento de un síndico en un tribunal distinto del Título III [ECF núm. 74] (la "Moción de sindicatura inicial"). El 14 de septiembre de 2017, el Tribunal del Título III rechazó la Moción de sindicatura inicial porque, entre otras cosas, consideró que el remedio solicitado por los solicitantes estaba prohibido por la Sección 305 de la Ley PROMESA, que limita las competencias y facultades del Tribunal del Título II sobre determinados asuntos. *Véase* ECF núm. 299 (el "Dictamen de sindicatura del Tribunal de Distrito").

El 8 de agosto de 2018, el Primer Circuito revirtió la sentencia fundamentándolo en la Sección 305 y determinó que, dado que los hechos habían cambiado como consecuencia de los huracanes, podría celebrarse un nuevo juicio sobre la paralización si los acreedores así lo deseasen. *véase Junta de Supervisión y Administración Financiera para Puerto Rico contra Grupo Ad Hoc de Bonistas de la AEEPR (En el asunto Junta de Supervisión y Administración Financiera para Puerto Rico), 899 F.3d 13 (1er. Cir. 2018).*

El 3 de octubre de 2018, algunas Aseguradoras Monolínea presentaron una moción renovada para levantar la paralización con el objeto de que se nombrara un síndico [ECF núm. 975] (la "<u>Moción de sindicatura renovada</u>").  De conformidad con varias órdenes del Tribunal del Título III, el calendario de presentación de escritos para la Moción de sindicatura renovada se prolongó durante varios meses.  *Véase* ECF núm. 1176, 1183 y 1204.

Tras la extinción del AAR de 2019 y la conclusión de la mediación, el 19 de septiembre de 2022, el Grupo Ad Hoc de Bonistas de la AEEPR (el "<u>Grupo Ad Hoc</u>") y las Aseguradoras Monolínea presentaron conjuntamente la *Moción del Grupo Ad Hoc de Bonistas de la AEEPR, Assured Guaranty Corp., Assured Guaranty Municipal Corp., National Public Finance Guarantee Corporation y Syncora Guarantee, Inc. para desestimar el Caso del Título III de la AEEPR, o bien para levantar la paralización automática y hacer valer su derecho a un síndico* [ECF núm. 2973] (la "<u>Moción para desestimar el Caso de la AEEPR</u>").  La Moción para desestimar el Caso de la AEEPR alega que, el hecho de que la AEEPR ha omitido proponer y confirmar un plan de ajuste centrado en el AAR previo a la petición o el AAR de 2019, o bien cualquier otro plan de ajuste, justifica desestimar el Caso del Título III del AEEPR o levantar la paralización automática para nombrar un síndico y subir más las tarifas de electricidad para los particulares y empresas de Puerto Rico.  El 29 de septiembre de 2022, el Tribunal del Título III dictó la *Orden (A) aceptando parcialmente  rechazando parcialmente la moción urgente de la Junta de Supervisión y Administración para el dictado de una Orden (I) estableciendo un señalamiento para continuar las negociaciones durante el litigio de cuestiones determinantes en virtud del calendario del pleito (II) otorgando el amparo pertinente (B) paralizando ciertas mociones presentadas por los Bonistas de la AEEPR* [ECF núm. 3013] (la "<u>Orden de señalamiento del litigio</u>").  De conformidad con la Orden de señalamiento del litigio, el Tribunal del Título (i) ordenó a la Junta de Supervisión presenta un plan de ajuste para la AEEPR como más tardar el 1 de diciembre de 2022, y (ii) paralizar la Moción para desestimar el Caso de la AEEPR hasta (a) el día después de la fecha límite establecida por el Tribunal del Título III para presentar un plan de ajuste si dicho plazo no se cumpliese, y (b) la conclusión del proceso de confirmación del Plan, lo que antes se produzca.  El 1 de diciembre de 2022, el Tribunal del Título III dictó la *Orden relativa a la Segunda notificación e informe del Equipo de mediación* [ECF núm. 3092], prorrogando la fecha límite para que la Junta de Supervisión presente un plan de ajuste para a AEEPR hasta el 8 de diciembre de 2022.

Procedimiento contencioso de los Prestamistas de la Línea de combustible

El 9 de julio de 2019, los Prestamistas de la Línea de combustible presentaron una queja
e incoaron un procedimiento contencioso contra la AEEPR, la Junta de Supervisión, la AAFAF y
la US Bank National Association (el "Fideicomisario de los Bonos"). *Véase* proc. abr. 19-00396.
La queja alegaba que las cuantías adeudadas a los Prestamistas de la Línea de combustible
en virtud de sus acuerdos de crédito constituían "Gastos corrientes" según la definición del Contrato
de fideicomiso del 1 de enero de 1974, formalizado entre la AEEPR y el First National City
Bank en su calidad de Fideicomisario de los bonos (conjuntamente con las correspondientes
enmiendas y modificaciones, el "Contrato de fideicomiso"), que regía las emisiones de bonos de
la AEEPR y que, en consecuencia, tenía derecho al pago íntegro y por adelantado de cualquier
recobro de los Bonistas de la AEEPR.

Como consecuencia de la Orden de señalamiento del litigio, el Tribunal del Título III
rechazó la moción de desestimar la queja y mantuvo la paralización del Procedimiento
contencioso de los Prestamistas de la Línea de combustible hasta "si fuese necesario, después de
haberse resuelto las cuestiones de garantías y recursos o, si fuese necesario, en relación con el
proceso de confirmación del plan". Orden de señalamiento del litigio, ¶ 3. Como ya se ha
explicado, los Prestamistas de la Línea de combustible y la Junta de Supervisión están
negociando la cuestión de prelación de los términos establecidos en el Plan.

***Cambios en el Gobierno.*** El 2 de agosto de 2019, el entonces Gobernador Rosselló y
varios miembros de su gabinete renunciaron a sus cargos a consecuencia del clamor público.
Tras su dimisión, y la dimisión del Secretario de Estado de Puerto Rico, Luis G. Rivera Marín, la
entonces Secretaria de Justicia Wanda Vázquez Garced, tomó juramento como Gobernadora. El
3 de noviembre de 2020, al igual que en el resto del país, el Estado Libre Asociado celebró
elecciones territoriales para el Ejecutivo, el Senado y la Cámara de Representantes. Los
ciudadanos de Puerto Rico eligieron Gobernador a Pedro Pierluisi, del Partido Nuevo
Progresista, y otorgaron mayoría en el Senado y en la Cámara de Representantes al Partido
Popular Democrático. El nuevo Gobierno tomó posesión el 2 de enero de 2021.

***Consecuencias de, y respuesta a, la COVID-19.*** El 11 de marzo de 2020, la
Organización Mundial de la Salud declaró pandemia global al coronavirus 2019 ("COVID-19").
Como resultado de la amenaza sanitaria, y con el objeto de contener la propagación del virus en
Puerto Rico, la entonces Gobernadora Vázquez-Garced emitió una orden ejecutiva (el 12 de
marzo de 2020), declarando el estado de emergencia en el país e imponiendo medidas para la
protección de la salud, el bienestar y la seguridad pública de los ciudadanos, incluyendo la
imposición de aislamiento social, confinamientos y toques de queda. Como consecuencia, las
operaciones y los resultados financieros de la AEEPR cayeron drásticamente.

Se canalizaron fondos federales y locales a particulares, familias, empresas, ONG y
demás organizaciones de todo EE.UU., incluyendo Puerto Rico. Como se explicará con mayor
detalle en la Sección V.B.4, el Gobierno, la Junta de Supervisión y las autoridades federales
implementaron diversas medidas para contener y mitigar la COVID-19.

A medida que evolucione la pandemia de la COVID-19, será fundamental una evaluación
continua de la capacidad de los directivos de la AEEPR y de LUMA Energy para hacer frente a

16

cambios imprevistos en las previsiones.  Una evaluación de la respuesta de la AEEPR y de LUMA Energy a la pandemia aportará la información necesaria para que los planes de emergencia y de contingencia de ambas puedan responder mejor y más eficazmente a futuros eventos imprevistos.

*La guerra en Ucrania y el aumento de los precios de los combustibles.*  El 24 de febrero de 2022, Rusia invadió Ucrania, iniciándose una guerra que, desde entonces, se ha cobrado miles de vidas y que continúa librándose ferozmente hasta hoy en día.  Además de la crisis humanitaria, el conflicto ha provocado un aumento de los precios de la energía y una volatilidad que ha afectado a consumidores de todo el mundo.  Tras la invasión rusa de Ucrania, Estados Unidos y otros países americanos y de Europa Occidental han impuesto sanciones financieras para evitar la canalización de los pagos por el petróleo ruso a través de los bancos occidentales. El petróleo ruso suma aproximadamente el diez por ciento (10%) de la oferta global, y su exclusión de la cadena de suministro ha provocado una significativa disminución de la principal fuente de combustible de la AEEPR.  En consecuencia, el costo de los combustibles empleados por la AEEPR y otros generadores se incrementó en aproximadamente un treinta por ciento (30%) entre el primer y segundo trimestre de 2022.  El 15 de junio de 2022, LUMA Energy presentó al NEPR sus cálculos trimestrales de ajuste del costo de combustibles para generación, y solicitó un aumento de 4.1 ¢/kWh en las tarifas de electricidad para clientes particulares, con lo cual el precio para este sector alcanzó los 33.3 ¢/kWh, la tarifa más alta del país, y un aumento significativo desde los 21 ¢/kWh de 2019.

*Huracán Fiona.*  El 18 de septiembre de 2022, el huracán Fiona tocó tierra en la costa sudoccidental de Puerto Rico, y las lluvias caídas superaron las treinta (30) pulgadas en algunas zonas.  El fenómeno provocó una destrucción catastrófica en el país, dejándolo totalmente sin electricidad, inundando numerosas calles y carreteras, y causando daños significativos en la red eléctrica de la AEEPR.[27]  Inmediatamente, la AEEPR, LUMA Energy y FEMA comenzaron a evaluar los daños causados por el huracán e iniciaron procedimientos para restablecer la generación y la electricidad a los clientes de la AEEPR.

El huracán Fiona dañó el treinta por ciento (30%) de las líneas de transmisión y el cincuenta por ciento (50%) de los alimentadores de distribución, sumergiendo siete (7) subestaciones y afectando a las instalaciones de generación.[28]  Todavía continúa la evaluación de los daños, aunque LUMA Energy ha estimado que su costo será de "miles de millones".

*Acuerdo en apoyo de la reestructuración posterior a la petición.*  El 30 de julio de 2018, la Junta de Supervisión y la AAFAF anunciaron haber convenido un Acuerdo en apoyo de la reestructuración preliminar (el "AAR preliminar") con miembros del Grupo Ad Hoc.  El AAR preliminar contemplaba la inclusión de diversos términos y condiciones de reestructuración en

---

[27] Nicole Acevedo, Marlene Lenthang y Tim Stelloh, *Puerto Rico Reels From Fiona as Hurricane Plows Into Dominican Republic*, NBC News (19 de septiembre de 2022), https://www.nbcnews.com/news/latino/puerto-rico-reels-fiona-13m-power-deluge-flash-floods-rcna48309.

[28] Nicole Acevedo, *Lawmakers Question LUMA Energy's Ability to Improve Puerto Rico's Fragile Power Grid*, NBC News (5 de octubre de 2022), https://www.nbcnews.com/news/latino/lawmakers-question-luma-energys-ability-improve-puerto-ricos-fragile-p-rcna50896.

un eventual plan de ajuste, así como la negociación y formalización de un plan en apoyo de la reestructuración definitivo.

Tras el AAR preliminar, la Junta de Supervisión y la AAFAF continuaron negociando con el Grupo Ad Hoc los contenidos de un Acuerdo en apoyo de la reestructuración definitivo. Con posterioridad, Assured se incorporó a las negociaciones. El 3 de mayo de 2019, estas negociaciones culminaron con la formalización de un Acuerdo en apoyo de la reestructuración definitivo (el "AAR de 2019"), que disponía la resolución de las reclamaciones y derechos del Grupo Ad Hoc, de Assured y de otros tenedores de bonos no garantizados de la AEEPR que se incorporaran al AAR de 2019. Entre otras cosas, el AAR de 2019 estipulaba que los bonistas que se incorporasen al mismo apoyarían un plan de ajuste para la AEEPR, posibilitando un cierto grado de recuperación económica. El 9 de septiembre de 2019, las partes del AEEPR convinieron enmendar el AAR de 2019 para estipular la adhesión de Syncora y de National.

El AAR de 2019 contemplaba la promulgación de legislación para implementar las transacciones de reestructuración. Las cláusulas del AAR de 2019 requerirían que la Asamblea Legislativa promulgara instrumentos que autorizasen la emisión de bonos mediante un vehículo de titulización contemplado por el AAR de 2019, aplicando un cargo de transición fijo que garantizara dichos bonos, y aprobando protecciones de demanda y otros componentes de la estructura de titulización.

El AAR de 2019 requería que la Junta de Supervisión, en un plazo de diez (10) días laborables de la formalización, presentara una moción y propuesta de orden para que el Tribunal aprobara ciertas conciliaciones incorporadas en el AAR de 2019. El 10 de mayo de 2019, la Junta de Supervisión y la AAFAF presentaron una moción a tenor de la Regla de Quiebra 9019 (la "Moción 9019"), solicitando la aprobación de ciertas conciliaciones y compromisos incorporados al AAR de 2019. Además, la Sección 9(d)(iii) del AAR de 2019 estipulaba derechos de resolución para la Junta de Supervisión y el Gobierno en determinadas circunstancias, como por ejemplo que la Moción 9019 no se presentara como más tardar el 30 de septiembre de 2019. Dicho plazo no se cumplió. Aunque el Grupo Ad Hoc pidió a la Junta de Supervisión que dispensara dicha omisión, la Junta de Supervisión se negó a hacerlo.

Durante varios meses, las partes interesadas del Caso del Título III de la AEEPR se dedicaron a significativas actividades de indagación y negociación acerca de la aprobación de la Moción 9019. La Junta de Supervisión y la AAFAF iniciaron el proceso legislativo necesario para la aprobación de las transacciones contempladas en el AAR. Sin embargo, en diciembre de 2019 las partes del Gobierno solicitaron aplazar la vista de la Moción 9019 y de los plazos vinculados, con el objeto de disponer de "tiempo suficiente para concluir el proceso legislativo necesario para obtener la aprobación de determinados aspectos del AAR [de la AEEPR]". ECF núm. 1844. Ninguna de las partes objetó estas prórrogas.

Tras varias prórrogas por otros motivos, incluyendo la serie de terremotos que afectaron a las operaciones de la AEEPR y el inicio de la pandemia de la COVID-19, en abril de 2020 el Tribunal paralizó los plazos aplicables a la Moción 9019, y ordenó a las partes del Gobierno que presentaran un nuevo informe de situación. Orden, ECF núm. 1954. En consecuencia, la Moción 9019 fue siendo sucesivamente aplazada.

18

Desde la decisión de adoptar el AAR de 2019, los significativos cambios en el panorama político, legal y económico han conllevado que el mismo resulte demasiado costoso para la AEEPR y sus clientes, y demasiado difícil, o incluso imposible, de implementar. En primer lugar, el apoyo de la Junta de Supervisión al AAR de 2019 se apoyó, en gran medida, en ventajas estructurales fundamentales que serían posibles gracias a medidas legislativas. Estos beneficios singulares y sin precedentes incluían entre otras cosas, i) una estructura de titulización blindada que redujese el riesgo de que la AEEPR volviera a acogerse al Título III, (ii) la imposición de una carga de transición fija, predecible y a largo plazo para financiar la deuda contemplada por el AAR, que no estaría sujeta a la aprobación o modificación reguladora, (iii) "protecciones contra demandas", susceptibles de ralentizar las pérdidas de ingresos de la AEEPR (y su supervivencia económica) como consecuencia de la transición de los consumidores hacia la energía solar. Sin embargo, las cambiantes dinámicas de control y partidarias en la Asamblea Legislativa, conllevaron que la legislación necesaria no pudiera promulgarse, lo cual comprometió la posibilidad de conseguir las ventajas estructurales que hacían tan atractivo el AAR de 2019. Entretanto, el NEPR impidió que la AEEPR trasladara íntegramente sus costos de combustibles a los usuarios, provocando que tuviera que asumir un sustancial déficit.

La pandemia global de la COVID-19, el aumento de los precios de los combustibles, la rápida penetración y disponibilidad de la energía solar, sumados al incremento de la inflación, han transformado la realidad económica de Puerto Rico y de la AEEPR con respecto a la situación de 2019. La AEEPR está sujeta a una pesada dependencia de combustibles fósiles para generar electricidad, y el reciente y rápido aumento de los precios del petróleo han provocado que la tarifa promedio de la electricidad residencial suba desde unos 21 ¢/kwh en 2019 a unos 33 ¢/kwh en 2022.

El 8 de marzo de 2022, debido a las inquietudes relativas a la no implementación de la legislación y a una amplia conciliación de las obligaciones heredadas de la AEEPR, además de los problemas relativos a la asequibilidad del costo de la electricidad y a la sostenibilidad del sistema eléctrico como consecuencia del aumento de la inflación y de los picos de los precios del crudo, la AAFAF ejerció su derecho unilateral de resolver el AAR de 2019.  [ECF núm. 2747]. De conformidad con la Sección 9(d)(vii) del AAR de, la rescisión por parte de la AAFAF constituye una Terminación del tratamiento estipulado (como lo define el AAR de 2019), que deja al AAR de 2019 nulo y sin vigor ni efecto para todas las partes, con la excepción de aquellas cláusulas que expresamente sobreviven a la rescisión.

Durante un período de varios años, el CANA solicitó al Tribunal del Título III autorización para objetar a las reclamaciones de Bonos, alegando que eran reclamaciones no recursivas y solamente admisibles contra determinados fondos, titulares de unos $16 millones. En última instancia, la Junta de Supervisión modificó su demanda objetando la alegación de los Bonistas de un derecho de garantía sobre todos los futuros ingresos de la AEEPR para incluir una objeción a la admisión de la reclamación de recurso de los Bonistas.  Esta reclamación está pendiente de resolución, y las partes han presentado mociones enfrentadas de sentencias sumarias para resolverla.

***Moción de mediación y avance***.  En febrero de 2022, frustrado por el retraso en la implementación del AAR de 2019, el Grupo Ad Hoc y ciertas aseguradoras monolínea

19

presentaron una moción solicitando la designación de un mediador para negociar una estructura alternativa que pudiera implementarse sin necesidad de apoyo legislativo.  [ECF núm. 2718].

El 8 de abril de 2022, el Tribunal del Título III dictó una orden [ECF núm. 2772] (la "Orden de designación"), nombrando el Equipo de mediación.  La Orden de designación nombró a la Junta de Supervisión, a la AAFAF, al Grupo Ad Hoc, a las Aseguradoras Monolínea, a la Unión de Trabajadores de la Industria Eléctrica y Riego, Inc. ("UTIER"), al SRE de la AEEPR, al CANA y a los Prestamistas de la Línea de combustible como partes de la mediación (en conjunto, las "Partes de la mediación").  Simultáneamente con la Orden de designación, el Tribunal del Título III dictó una orden estableciendo determinados términos y condiciones para regir la mediación, incluyendo una fecha de conclusión inicial de la mediación para el 1 de junio de 2022.  [ECF núm. 2773] (la "Orden de Términos y condiciones").  La fecha de conclusión de la mediación fue prorrogada varias veces, y conllevó la incorporación de ciertos acuerdos dentro del Plan.

### *Transformación del sistema de transmisión y distribución de la AEEPR.*

Desde hace mucho tiempo, el Gobierno de Puerto Rico y la Junta de Supervisión han coincidido en su determinación de la necesidad de una transformación completa de la AEEPR — incluyendo la separación de los activos asociados con la generación de electricidad en Puerto Rico (los "Activos de generación") y el Sistema de TyD, mediante el aprovechamiento de la especialización y las eficiencias de costos del sector privado— para conseguir unos servicios seguros, confiables y modernos del Sistema de TyD para beneficio de los clientes de la AEEPR y posibilitar el avance del sistema eléctrico y de la economía del país.  El 21 de junio de 2018, el Gobierno promulgó la Ley 120-2018 ("Ley 120"), también conocida como Ley para Transformar el Sistema Eléctrico de Puerto Rico.  La Ley 120 autoriza el marco legal necesario para la venta, enajenación y/o traspaso de los activos, operaciones, funciones y servicios de la AEEPR, incluyendo una transacción en virtud de la cual las actividades del Sistema de TyD serían asumidas por un gestor privado, aunque la AEEPR seguiría siendo la propietaria.

La Ley 120 designa a la Autoridad de Alianzas Público-Privadas de Puerto Rico (la "Autoridad P3") como entidad oficial responsable de las funciones, servicios o instalaciones para los cuales se establecerán las alianzas público-privadas del sector eléctrico.  La Autoridad P3 ha establecido el Comité de Alianza, de conformidad con la Ley 120, para evaluar y seleccionar candidatos cualificados y negociar los términos y condiciones de cualesquiera alianzas público-privadas en el sector eléctrico.

El 5 de junio de 2018, la Autoridad P3 lanzó un proceso de contratación, de conformidad con la legislación vigente, para contratar un prestador cualificado de servicios de operación y mantenimiento a largo plazo del Sistema de TyD.  Los candidatos efectuaron el procedimiento de debida diligencia y evaluaron la oportunidad de ser elegidos operadores del Sistema de TyD de Puerto Rico.  El Comité de Alianzas evaluó las ofertas recibidas de conformidad con los requisitos legales, incluyendo la política energética exhaustiva establecida por la Ley 17-2019. El 31 de octubre de 2018, la Autoridad P3 presentó una solicitud de cualificación ("SDC") a las entidades interesadas, tras lo cual se seleccionaron cuatro candidatos experimentados y reputados para participar en la siguiente fase del proceso.  En última instancia, el 11 de enero de 2020, y sobre la base de su experiencia y capacidad en la gestión de grandes proyectos financiados con

fondos federales y de su capacidad de gestión de los proyectos asociados necesarios para ejecutar importantes trabajos de reconstrucción en el Sistema de TyD de Puerto Rico, el Comité de Alianzas eligió a LUMA como candidata preferente para iniciar negociaciones exclusivas con la Autoridad P3, de conformidad con la Ley 120.

El 22 de junio de 2020, y tras obtener las aprobaciones exigibles, se formalizó el Contrato de TyD[29]. En virtud de dicho contrato, la AEEPR sigue siendo la propietaria de los activos de su Sistema de TyD, y LUMA Energy no gestionará el sistema de generación de energía de la AEEPR, que está sujeto a su propio proceso de transformación independiente. El Contrato de TyD tiene un plazo de 15 años desde el Comienzo del servicio, período durante el cual LUMA Energy continuará prestando los servicios de OyM.

El 1 de junio de 2021, LUMA Energy concluyó el Período de transición inicial y se produjo el Inicio de servicio provisional, tras lo cual LUMA Energy asumió oficialmente el control del Sistema de TyD, a tenor de los términos del Contrato complementario. [ECF núm. 2503]. Desde entonces, LUMA Energy viene encargándose de los servicios de gestión, operación, mantenimiento, reparaciones, restablecimiento, sustitución y otros servicios afines del Sistema de TyD, incluyendo la transmisión y distribución de electricidad, los servicios de carga, la planificación a largo plazo, la gestión de activos, las relaciones con la comunidad y los medios, la seguridad pública y de los empleados, la facturación y el cobro, la preparación de informes y mantenimiento de registros, las finanzas y la contabilidad, la respuesta de emergencia y la atención al cliente (conjuntamente, los "Servicios de OyM").

En el primer año desde que se hizo cargo de la gestión del Sistema de TyD, desde la conclusión del Período de transición inicial, LUMA Energy ha conseguido significativos avances en todos los aspectos de la administración, como por ejemplo (a) Atención al cliente (LUMA Energy reabrió los veinticinco (25) centros de atención al cliente y respondió a unos 2.5 millones de llamadas de aproximadamente 2 millones de clientes, con un tiempo de espera promedio inferior a 1 minuto); (b) Seguridad y capacitación (reducción del ochenta y cinco por ciento (85% del grado de gravedad de las lesiones, y de un sesenta y ocho por ciento (68%) del Índice total de lesiones registrables, sin que se registrasen lesiones graves, y más de 100,000 horas de orientación y capacitación en seguridad); (c) Proyectos con financiamiento federal (lanzó una iniciativa de iluminación de alumbrado público en las comunidades de $1,000 millones con la aprobación de la FEMA; además, la FEMA aprobó el gasto para diez (10) proyecto adicionales, que representan $94 millones en fondos federales, y el comienzo de la modernización de

---

[29] El Contrato de TyD hará referencia al *Contrato de Operación y Mantenimiento del Sistema de Transmisión y Distribución de Puerto Rico*, *de fecha 22 de junio de 2020, entre la Autoridad de Energía Eléctrica de Puerto Rico, en calidad de Propietaria, la Autoridad de Alianzas Público-Privadas de Puerto Rico, en calidad de Administradora, LUMA, LCC como compañía gestora, y LUMA Servco, LLC como compañía de servicios*, con los suplementos y enmiendas pertinentes. Puede consultarse una copia del Contrato de TyD en el registro de la AEEPR, en ECF núm. 2053-4. Como parte de la aprobación del Contrato de TyD, se formalizó un Contrato complementario (el "Contrato complementario") que contemplaba el inicio de la prestación de los Servicio de TyD si se satisfacían o se dispensaban las Condiciones de la Fecha de comienzo, salvo la salida de la AEEPR del Título III y la aportación de una carta de dictamen y cumplimiento fiscal (la "Fecha provisional de la Fecha de inicio"). El Contrato complementario contemplaba que sería una condición para la Fecha de inicio del servicio que se hubiera producido la salida del Título III, y de que el Plan del Título III y la orden del Tribunal del Título III para confirmarlo sean razonablemente aceptables para el Operador. Véase el Contrato de TyD en el Anexo A.

trescientas (300) subestaciones); (d) Confiabilidad y resiliencia del sistema (reducción de más de 3,000 postes de transmisión averiados y/o caídos, y disminución de un treinta por ciento (30%) de los cortes de suministro a los clientes); (e) Transformación energética sostenible (se conectaron más de 25,000 clientes a los sistema de medición y generación distribuida); y (f) Preparativos para emergencias (capacitación de más de 1,000 trabajadores de campo en respuestas a emergencias, y mantenimiento de un inventario inmediato de materiales de transmisión y distribución valorado en $130 millones).

A pesar de estos prometedores avances hacia un servicio eléctrico seguro, confiable y asequible, todavía queda mucho camino por andar antes de que la AEEPR pueda ser el servicio público que se merece el pueblo de Puerto Rico. Entre otras cosas, las consecuencias del huracán Fiona demuestran la necesidad de refuerzo adicional del Sistema de TyD para asegurar de que futuros fenómenos meteorológicos no vuelva a dejar otra vez a Puerto Rico sin suministro.

El 30 de noviembre de 2022, la Autoridad P3 votó por prorrogar el Período provisional contemplado en el Contrato suplementario, prórroga que fue aprobada por la Junta de Supervisión el mismo día y, el 30 de noviembre de 2022, por la Junta de Gobierno de la AEEPR y por el Gobierno del Estado Libre Asociado, evitándose así la potencial resolución del Contrato de TyD debido a la omisión de la AEEPR de salir del Título III con un plan confirmado en un plazo de dieciocho (18) meses desde la conclusión del Período de transición inicial. LUMA Energy mantiene el derecho de resolver el Contrato de TyD si se nombrara un síndico para administrar los activos de la AEEPR o si se desestima el Caso del Título III.

### *Transformación del Sistema de generación de la AEEPR*

Al igual de lo que ocurre con el Sistema de TyD, en virtud de la Ley 120, la Autoridad P3 es la entidad gubernamental responsable de las funciones, servicios o instalaciones para los cuales se establecerán alianzas público-privadas en el sector eléctrico, incluyendo la transformación de los Activos de generación de la AEEPR. La Autoridad P3 ha establecido el Comité de Alianza, de conformidad con la Ley 120, para evaluar y seleccionar candidatos cualificados y negociar los términos y condiciones de cualesquiera alianzas público-privadas en el sector eléctrico.

El 10 de agosto de 2020, la Autoridad P3 publicó una Solicitud de cualificación para empresas o consorcios interesados en la prestación de servicios de administración, operación, mantenimiento, gestión de activos y retirada de servicio, según proceda, de uno o más Activos de generación. Los objetivos de la transformación de los Activos de generación incluyen (a) entrada de especialistas en operaciones del sector privado, (b) mejora de la seguridad, la confiabilidad, la resiliencia, la calidad de la electricidad y la eficiencia de las operaciones de los Activos de generación, (c) facilitar la transición de Puerto Rico hacia la "Visión para el Futuro Energético de Puerto Rico", como se describe en el PIR de 2019, (d) implementación de la excelencia operativa en las instalaciones de generación de electricidad, congruente con las prácticas prudentes del sector, como la mejora de la seguridad y el cumplimiento de los requisitos ambientales y otras normas de regulación vigentes, y (e) mejora de la eficiencia de costos mientras se logra el objetivo operativo mencionado en coordinación con el operador del Sistema de TyD.

El 20 de noviembre de 2020, la Autoridad de P3 seleccionó ocho candidatos y les envió Solicitudes de ofertas.  La Autoridad P3 se encuentra en una fase avanzada con el candidato preferido para que asuma la operación de los Activos de generación, y prevé formalizar un acuerdo a 10 años antes de terminar el año natural 2022. Si se alcanzara un acuerdo de operación y gestión serán necesarias varias autorizaciones antes de formalizar el contrato, como por ejemplo del NEPR, de las Juntas de Gobierno de la Autoridad P3 y de la AEEPR, y de la Junta de Supervisión.  Además de la transformación de los Activos de generación, la Autoridad P3 ha convocado cuatro licitaciones simultáneas para la AEEPR, vinculadas con sus centrales hidroeléctricas, las unidades de distribución flexible de los picos de generación, nueva capacidad de generación en el emplazamiento de Palo Seco de la AEEPR, y sistemas de almacenamiento de energía.

[*El resto de la página se ha dejado intencionadamente en blanco*]

## II.  Introducción

EL SIGUIENTE RESUMEN DESTACA ALGUNAS DE LAS DISPOSICIONES FUNDAMENTALES DEL PLAN, AUNQUE NO ES —NI PRETENDE SER— UNA DESCRIPCIÓN COMPLETA NI UN SUSTITUTO DE UNA RESEÑA PLENA Y COMPLETA DEL PLAN.  EL SIGUIENTE RESUMEN ESTÁ PLENAMENTE CUALIFICADO POR LOS TÉRMINOS Y CONDICIONES DEL PLAN.

EL DEUDOR INSTA A TODOS LOS TITULARES DE RECLAMACIONES A LEER Y ESTUDIAR DETENIDAMENTE EL PLAN A LA HORA DE CONSIDERAR SU VOTO POR LA ACEPTACIÓN O RECHAZO DEL MISMO, DEL CUAL SE ADJUNTA AQUÍ COPIA EN FORMA DE ANEXO A.

*Inicio del Casos del Título III.*  El 2 de julio de 2017 (la "Fecha de la petición"), la Junta de Supervisión publicó un certificado de reestructuración en nombre de la AEEPR de conformidad con las secciones 104(j) y 206 de la Ley PROMESA, y presentó una petición voluntaria de quiebra de AEEPR (de acuerdo con la sección 304(a) de la Ley PROMESA), ante el Tribunal del Título III, iniciándose así un caso al amparo del Título III de dicha Ley (el "Caso del Título III").  Tal como lo prevé la sección 315 de la Ley PROMESA, la Junta de Supervisión es la representante exclusiva del Deudor[30] en sus Casos del Título III.

*Certificación del Plan de ajuste.*  El 7 de diciembre de 2022, a tenor de lo dispuesto por la Sección 104(j) de la Ley PROMESA, la Junta de Supervisión certificó la presentación del plan de ajuste para la AEEPR.  El 16 de diciembre de 2022, la AEEPR presentó (a) el *Plan de Ajuste del Título III de la Autoridad de Energía Eléctrica de Puerto Rico* [ECF núm. [_____]], y (b) la presente declaración de divulgación [ECF núm. [_____]].

*Aprobación de la Declaración de divulgación y Fecha de confirmación.*  El [_____], el Tribunal del Título III dictó la Orden de Declaración de divulgación, aprobando la misma (la "Orden de Declaración de divulgación").  **SIN EMBARGO, LA APROBACIÓN DE ESTA DECLARACIÓN DE DIVULGACIÓN NO CONSTITUYE UNA DETERMINACIÓN, POR PARTE DEL TRIBUNAL DEL TÍTULO III, SOBRE LOS MÉRITOS DEL PLAN. EL TRIBUNAL DEL TÍTULO III CONSIDERARÁ LA CONFIRMACIÓN DEL PLAN EN LA VISTA DE CONFIRMACIÓN PREVISTA PARA EL [_____ de 2023]** (la "Vista de confirmación").

La Vista de confirmación podrá ser aplazada o continuada en cada momento.  Por consiguiente, las partes interesadas deberían consultar el registro en línea https://cases.ra.kroll.com/puertorico para confirmar la fecha y hora programadas más recientes de la Vista de confirmación.

[El Tribunal del Título III ha establecido el siguiente calendario en relación con los procedimientos de confirmación:

---

[30] A la Junta de Supervisión, en su calidad de representante de la AEEPR, se la denomina "Deudor".

- **_____ de 2023:** Vista para considerar la idoneidad de la información contenida en la Declaración de divulgación;
- **_____ de 2023:** Inicio de la indagatoria de confirmación;
- **_____ de 2023:** Fecha límite para el envío del paquete de solicitud aprobado;
- **_____ de 2023 hasta el _____ de 2023:** Fecha límite para radicar objeciones a la confirmación del plan y a la indagatoria de confirmación;
- **_____ de 2023:** Vista previa al juicio de confirmación del Plan;
- **_____ de 2023:** Fecha límite de votación y elección; y
- **_____ de 2023:** Vista de confirmación.

La AEEPR presenta esta Declaración de divulgación en calidad de proponente del Plan, de conformidad con la Sección 1125 del Código de Quiebras y en relación con la solicitud de votos para aceptar o rechazar, o elecciones (si procediera) para conciliar ciertas reclamaciones vinculadas con el Plan, según pueda modificarse o complementarse en cada momento, de acuerdo con el Título III de la Ley PROMESA y el Reglamento Federal de Procedimientos de Quiebra (el "Reglamento de Quiebras"), según corresponda al Título III de conformidad con la sección 310 de la Ley PROMESA.

Esta Declaración de divulgación aporta la información exigida por la sección 1125 del Código de Quiebras y resume el Plan, las operaciones del Deudor, sus condiciones financieras (incluyendo las proyecciones financieras) y otros asuntos relacionados, como el tratamiento de los titulares de Reclamaciones contra el Deudor. Asimismo, esta Declaración de divulgación describe ciertas potenciales consecuencias tributarias a nivel federal y de Puerto Rico para los titulares de las Reclamaciones, los procedimientos de votación y de elección de la resolución y el proceso de confirmación. En la medida en que se observen incongruencias entre la presente Declaración de divulgación y el Plan se estará a lo dispuesto por las cláusulas del Plan.

***Formularios de elección y votación.*** A la copia de esta Declaración de divulgación distribuida a los titulares de Reclamaciones de las clases con derecho a voto se les adjunta una papeleta (una "Papeleta") y/o una notificación de las elecciones previstas en el Plan (una "Notificación de elecciones"), si procediera, para aceptar o rechazar el Plan, optar por resolver determinadas reclamaciones de conformidad con el Plan y/o elegir la forma de las distribuciones previstas por el Plan. La Papeleta incluye información relativa a los plazos de votación e instrucciones detalladas para votar por aceptar o rechazar el Plan. La Notificación de elecciones, si acaso, incluye información acerca de la fecha límite de las mismas e instrucciones detalladas para elegir resolver ciertas reclamaciones y/o la forma de distribución de conformidad con el Plan. Antes de votar y/o realizar la elección pertinente, todo titular de una Reclamación con derecho a votar y/o elegir debería leer esta Declaración de divulgación (incluyendo los anexos y documentos que por la presente quedan incorporados por referencia a la misma), así como las instrucciones adjuntas a la Papeleta y a la Notificación de elecciones. Estos documentos contienen, entre otras cosas, información importante acerca de la clasificación de las Reclamaciones a efectos de votación y contabilización de los votos. No será posible solicitar votos en relación con el Plan, salvo como lo estipule la Declaración de divulgación, con sus correspondientes enmiendas, la Orden de Declaración de divulgación y la sección 1125 del Código de Quiebras.

*Anexos a la Declaración de divulgación.* La presente Declaración de divulgación incluye los siguientes anexos y suplementos:

- **Anexo A** – Plan de Ajuste del Título III de la Autoridad de Energía Eléctrica de Puerto Rico

- **Anexo B** – Acuerdo de Conciliación y descargo, de fecha 26 de agosto de 2022, por y entre (i) a Junta de Supervisión y Administración Financiera para Puerto Rico en su calidad de representante de la AEEPR en el Título III, (ii) Vitol

- **Anexo C** – Acuerdo de Conciliación y descargo, de 11 de febrero de 2022, por y entre (i) Whitefish Energy Holdings, LLC, (ii) la AEEPR, y (iii), la Junta de Supervisión y Administración Financiera para Puerto Rico, en su calidad de representante de la AEEPR en el Título III

- **Anexo D** – Previsiones de comisión y flujo de caja ilustrativo de los Nuevos bonos

- **Anexo E** – Plan Fiscal certificado de la AEEPR

- **Anexo F** – Presupuesto certificado de la AEEPR

- **Anexo G** – Resumen de la reforma de pensiones

- **Anexo H** – Calendario de los bonos de la AEEPR

- **Anexo I** – Lista de las cuentas bancarias, saldos y categorización de restricciones preliminares de la AEEPR al 1 de noviembre de 2022

- **Anexo J** – Últimos estados financieros auditados del Deudor

- **Anexo K** – Informes de pruebas de mejores intereses

- **Anexo L** – Acciones a transferir al Fideicomiso de Acciones de Anulación

- **Anexo M** – AAP de los Prestamistas de la Línea de combustible

## A. Plan de Ajuste del Título III de la Ley PROMESA: Descripción general

La confirmación de un Plan de ajuste a tenor del Título III por un Tribunal del Título III vincula al deudor, a cualquier emisor de valores de conformidad con el plan de ajuste, a toda persona que adquiera bienes con arreglo al plan de ajuste y a todo acreedor de un deudor. Con las salvedades previstas en la Ley PROMESA, el plan de ajuste o la orden de confirmación, la confirmación de un plan de ajuste dispensa a un deudor de cualquier deuda que se produjese antes de la fecha de conformación del plan, y las sustituye por las obligaciones específicas asumidas en virtud del plan de ajuste confirmado.

El Tribunal del Título III confirmará un plan de ajuste si satisface lo estipulado por la Sección 314(b) de la Ley PROMESA y las subsecciones incorporadas de la Sección 1129 del

Código de Quiebras, que se exponen con mayor detalle en la Sección VII.C. de esta Declaración de divulgación. Entre otras cosas, la Sección 314(b) de la Ley PROMESA estipula que (i) el plan de ajuste cumpla lo dispuesto por la Ley PROMESA y las cláusulas pertinentes del Código de Quiebras, (ii) se habrán obtenido todas las aprobaciones legislativas, reglamentarias o electorales necesarias para llevar a cabo cualquier disposición del plan de ajuste, o bien dicha disposición estará condicionada a la citada aprobación, (iii) el plan de ajuste deberá ser viable y favorecer los mejores intereses de los acreedores, y (iv) el plan de ajuste será congruente con el plan fiscal pertinente certificado por la Junta de Supervisión de conformidad con el Título II de la Ley PROMESA.

Aunque el Deudor considera que todas las clases de Reclamaciones tienen derecho a votar para aceptar el Plan, este podrá ser confirmado sin la aceptación de todas las clases. La Sección 1129(b)(1) del Código de Quiebras estipula que, si se cumplieran todos los requisitos aplicables de la Sección 1129(a) (incluyendo el requisito de que al menos una clase afectada aceptara el plan de ajuste) salvo la aceptación por todas las clase (en virtud de la Sección 1129(a)(8)) con respecto a un plan de ajuste, el Tribunal del Título III, a solicitud de los proponentes, confirmará el plan de ajuste si no discrimina injustamente, y resulta justo y equitativo para cada una de las clases de reclamaciones perjudicadas que no haya aceptado el plan de ajuste.

**B. Resumen de los principales componentes del Plan de ajuste**

Con la excepción de las Reclamaciones administrativas y las Reclamaciones profesionales, que no están clasificadas y no votan en el Plan, de conformidad con el mismo todas las Reclamaciones existentes están divididas en clases. Según el Código de Quiebras, un plan puede categorizar una reclamación dentro de una determinada clase solamente si es sustancialmente similar a las demás reclamaciones de dicha clase. Según la Sección 301(e) de la Ley PROMESA, para determinar si las reclamaciones son "sustancialmente similares" entre sí, la Junta de Supervisión considerará si están o no garantizadas, y si tienen o no prioridad sobre otras reclamaciones. La siguiente tabla muestra las clases de reclamaciones contra el Deudor, la cuantía estimada aproximada de cada una y estimaciones del porcentaje, o intervalo porcentual, de recuperación que se propone pagar a las reclamaciones de cada clase.

El importe que un acreedor podrá realmente recobrar y la forma de contrapartida que pueda recibir dependerán, entre otros, del porcentaje de Bonistas y Aseguradoras monolínea que opten por llegar a un acuerdo en sus Reclamaciones de bonos y del resultado de las Impugnaciones al Gravamen y al Recurso, como se describe en la Sección I de esta Declaración de divulgación. La cuantía que un acreedor consiga efectivamente recobrar podrá variar sustancialmente del siguiente resumen.

| Reclamación | Clase | Importe estimado de la reclamación | Recuperación aproximada (%) | Forma de contrapartida |
|---|---|---|---|---|

| Reclamación | Clase | Importe estimado de la reclamación | Recuperación aproximada (%) | Forma de contrapartida |
|---|---|---|---|---|
| Reclamaciones de Bonistas y Aseguradoras monolínea que aceptan el acuerdo | Clase 1 | [Desconocido][31] | 50.00–100.00% | Participación proporcional de: Efectivo depositado en el Fondo de amortización, Bonos Serie B, IVC |
| Reclamaciones de Bonistas y Aseguradoras monolínea que no aceptan el acuerdo | Clase 2 | [Desconocido][32] | 0.19–55.07% [33] | Participación proporcional de: (i) Efectivo depositado en el Fondo de amortización, (ii) Bonos Serie B, (i) si existe una Reclamación deficiente, un Recobro de las Reclamaciones generales no garantizadas, y/o (ii) si la Clases 2 vota por aceptar el Plan y los Bonos de ingresos de la AEEPR son recurribles solamente al Fondo de amortización, IVC |
| Reclamación de pensiones | Clase 3 | $[a determinar] | [a determinar] % | Efectivo, Bonos Serie B |
| Reclamaciones de Préstamos de Línea de combustible | Clase 4 | $700,887,093.58 | 84.00–100.00% | Bonos Serie A, Bonos Serie A adicionales o efectivo, Nuevos bonos restantes |
| Reclamaciones generales no garantizadas | Clase 5 | $800,000,000 | 0.10–100.00% | Recobro de las Reclamaciones generales no garantizadas[34] |

---

[31] El importe permitido de Bonistas y Aseguradoras monolínea que aceptan el acuerdo se determinará una vez establecida la Fecha límite de la Clase de acuerdo.

[32] El importe permitido de Bonistas y Aseguradoras monolínea que no aceptan el acuerdo se determinará una vez establecida la Fecha límite de la Clase de acuerdo y resueltas definitivamente las Impugnaciones al Gravamen y al Recurso.

[33] Los recobros de los Bonistas que no acepten el acuerdo podrán alcanzar el 100% si (i) los Bonistas que no aceptan el acuerdo ganan las causas del gravamen y del recurso en las Impugnaciones al Gravamen y al Recurso, y (ii) el porcentaje de Bonistas que acepten el acuerdo supera el 97.47%.

[34] La recuperación de las Reclamaciones generales no garantizadas se pagará con cargo a los Activos del Fideicomiso de Reclamaciones generales no garantizadas (RGNG, o GUC por sus siglas en inglés), comprendidos por (a) las

| Reclamación | Clase | Importe estimado de la reclamación | Recuperación aproximada (%) | Forma de contrapartida |
|---|---|---|---|---|
| Reclamación de Vitol | Clase 6 | $41,457,382.88 | 0.05–50.00% | Recobro de las Reclamaciones generales no garantizadas |
| Reclamaciones de Swaps de tipos de interés aseguradas por Assured | Clase 7 | [a determinar] | **Si la Clase 7 acepta el acuerdo: 50.00–100.00%** | Tratamiento aplicado a la Clase 1 |
| | | | **Si la Clase 7 no acepta el acuerdo: 0.19–55.07%** | Tratamiento aplicado a la Clase 2 |
| Reclamaciones ordinarias de clientes | Clase 8 | $235,309 | 100.00% | Efectivo |
| Reclamaciones de Dominio eminente/Expropiación forzosa inversa | Clase 9 | $2,437,556 | **Si se requiere el pago íntegro: 100.00%[35]** | Efectivo |
| | | | **Si las reclamaciones son condonables: 0.10–100.00%** | Recobro de las Reclamaciones generales no garantizadas |
| Reclamaciones federales | Clase 10 | $16,859,577 | **Si se requiere el pago íntegro de conformidad con la Sección 304(h) de la Ley PROMESA: 100.00%[36]** | Tratamiento requerido por la Sección 304(h) de la Ley PROMESA |
| | | | **Si no se requiere el pago íntegro: 0.10–100.00%** | Recobro de las Reclamaciones generales no garantizadas |
| Reclamaciones de conveniencia | Clase 11 | Desconocido | 100.00%[37] | Efectivo |
| Reclamaciones subordinadas de la Sección 510(b) | Clase 12 | Desconocido | 0.00% | N/A |

A continuación presentamos una tabla detallando los potenciales recobros de los Bonistas y las Aseguradoras monolínea que aceptan el acuerdo, los Bonistas y las Aseguradoras

---

recaudaciones del Fideicomiso de Acciones de Anulación, (b) los Nuevos bonos de RGNG, en su caso, el (c) el IVC de RGNG.

[35] Si la Orden de confirmación y la Orden de confirmación del Estado Libre Asociado disponen que las Reclamaciones de Dominio eminente/Expropiación forzosa inversa deben pagarse íntegramente, los titulares de dichas Reclamaciones recobrarán el 100%. No obstante, si hubiera una sentencia favorable en la apelación de la Junta de Supervisión a la Orden de confirmación del Estado Libre Asociado con respecto a la no cancelación de las Reclamaciones de Dominio eminente/Expropiación forzosa inversa contra el Estado Libre Asociado, los titulares de dichas Reclamaciones recibirán su Parte proporcional del Recobro de las Reclamaciones generales no garantizadas.

[36] Si se requiriera que una Reclamación federal se pague íntegramente a tenor de la Sección 304(h) de la Ley PROMESA, el titular de dicha reclamación recobrará un 100%. De lo contrario, el titular recibirá su Parte proporcional del Recobro de las Reclamaciones generales no garantizadas.

[37] Si las Reclamaciones de conveniencia superasen el Tope de conveniencia de $1,000,000.00, los titulares de las Reclamaciones de conveniencia permitidas recibirán su Parte proporcional del Tope de conveniencia.

monolínea que no aceptan el acuerdo, los Prestamistas de la Línea de combustible, los titulares de Reclamaciones generales no garantizadas y Vitol, en función de los diferentes resultados de la cantidad de Bonistas y las Aseguradoras monolínea que aceptan el acuerdo, y de las Impugnaciones al Gravamen y al Recurso. Además, la tabla refleja el número de Nuevos bonos sobrantes que restarán tras haberse pagado íntegramente todas las reclamaciones permitidas. A discreción de la AEEPR reorganizada, se considerarán que dichos bonos no han sido emitidos por la AEEPR, o bien que han sido emitidos y distribuidos al Fideicomiso PayGo de la AEEPR.

[*La tabla empieza en la página siguiente*]

## Recobros indicativos del Plan de ajuste de la AEEPR[1]

| | | La JSAF gana las causas del Gravamen y del Recurso | | La JSAF gana en la causa del Gravamen y pierde en la del Recurso | | La JSAF pierde en las causas del Gravamen[2] y del Recurso | |
|---|---|---|---|---|---|---|---|
| **Acuerdo del 0% de los Bonos** | Bonos que aceptan el acuerdo | N/A | Bonos que aceptan el acuerdo | N/A | Bonos que aceptan el acuerdo | N/A |
| | Bonos que no aceptan el acuerdo | 0.19% | Bonos que no aceptan el acuerdo | 46.74% | Bonos que no aceptan el acuerdo | 51.27% |
| | PLC | 100.00% | PLC | 84.00% | PLC | 84.00% |
| | RGNG | 100.00% | RGNG | 46.74% | RGNG* | 0.10%+ |
| | Vitol | 50.00% | Vitol | 23.37% | Vitol* | 0.05%+ |
| | SRE de la AEEPR | $787 m | SRE de la AEEPR | $0 | SRE de la AEEPR | $0 |
| | Nuevos bonos sobrantes | $2,600 m | Nuevos bonos sobrantes | $0 | Nuevos bonos sobrantes | $0 |
| **Acuerdo del 25% de los bonos** | Bonos que aceptan el acuerdo | 100% | Bonos que aceptan el acuerdo | 50.00% | Bonos que aceptan el acuerdo | 50.00% |
| | Bonos que no aceptan el acuerdo | 0.25% | Bonos que no aceptan el acuerdo | 45.78% | Bonos que no aceptan el acuerdo | 51.69% |
| | PLC | 100.00% | PLC | 84.00% | PLC | 84.00% |
| | RGNG | 100.00% | RGNG | 45.78% | RGNG* | 0.10%+ |
| | Vitol | 50.00% | Vitol | 22.89% | Vitol* | 0.05%+ |
| | SRE de la AEEPR | $607 m | SRE de la AEEPR | $0 | SRE de la AEEPR | $0 |
| | Nuevos bonos sobrantes | $666 m | Nuevos bonos sobrantes | $0 | Nuevos bonos sobrantes | $0 |
| **Acuerdo del 50% de los bonos** | Bonos que aceptan el acuerdo | 71.96% | Bonos que aceptan el acuerdo | 50.00% | Bonos que aceptan el acuerdo | 50.00% |
| | Bonos que no aceptan el acuerdo | 0.38% | Bonos que no aceptan el acuerdo | 44.01% | Bonos que no aceptan el acuerdo | 52.54% |
| | PLC | 100.00% | PLC | 84.00% | PLC | 84.00% |
| | RGNG | 100.00% | RGNG | 44.01% | RGNG* | 0.10% |
| | Vitol | 50.00% | Vitol | 22.01% | Vitol* | 0.05% |
| | SRE de la AEEPR | $406 m | SRE de la AEEPR | $0 | SRE de la AEEPR | $0 |
| | Nuevos bonos sobrantes | $0 | Nuevos bonos sobrantes | $0 | Nuevos bonos sobrantes | $0 |
| **Acuerdo del 75% de los bonos** | Bonos que aceptan el acuerdo | 56.75% | Bonos que aceptan el acuerdo | 50.00% | Bonos que aceptan el acuerdo | 50.00% |
| | Bonos que no aceptan el acuerdo | 0.57% | Bonos que no aceptan el acuerdo | 39.70% | Bonos que no aceptan el acuerdo | 55.07% |
| | PLC | 89.40% | PLC | 84.00% | PLC | 84.00% |
| | RGNG | 66.87% | RGNG | 39.70% | RGNG | 0.10%+ |
| | Vitol | 33.44% | Vitol | 19.85% | Vitol | 0.05%+ |
| | SRE de la AEEPR | $259 m | SRE de la AEEPR | $0 | SRE de la AEEPR | $0 |
| | Nuevos bonos sobrantes | $0 | Nuevos bonos sobrantes | $0 | Nuevos bonos sobrantes | $0 |
| **Acuerdo del 100% de los bonos** | Bonos que aceptan el acuerdo | 50.00% | Bonos que aceptan el acuerdo | N/A | Bonos que aceptan el acuerdo | N/A |
| | Bonos que no aceptan el acuerdo | N/A | Bonos que no aceptan el acuerdo | N/A | Bonos que no aceptan el acuerdo | N/A |
| | PLC | 84.00% | PLC | N/A | PLC | N/A |
| | RGNG | 13.09% | RGNG | N/A | RGNG | N/A |
| | Vitol | 6.55% | Vitol | N/A | Vitol | N/A |
| | SRE de la AEEPR | $0 m | SRE de la AEEPR | N/A | SRE de la AEEPR | N/A |
| | Nuevos bonos sobrantes | $0 | Nuevos bonos sobrantes | N/A | Nuevos bonos sobrantes | N/A |

\* Recobro superior a cero para los destinatarios de la recaudación del Fideicomiso de RGNG para reflejar los recobros por cuenta de las recaudaciones de acciones de anulación.

1 Las cifras de este Anexo se presentan exclusivamente a título ilustrativo. Ni la Junta de Supervisión ni la AEEPR ni sus respectivos asesores asumen compromiso alguno en relación con la exactitud de estas cifras, que en todos los aspectos están sujetas a los términos y condiciones del Plan. Los reclamantes deberían consultar a sus respectivos asesores todo lo relativo a potenciales recobros.

2 Solamente a los efectos de esta ilustración, se parte del supuesto de que las garantías de los Bonistas están valoradas igual que los Bonos Serie B restantes disponibles para distribución.

El Deudor considera que la reestructuración prevista por el Plan es viable y defiende los mejores intereses de los acreedores del Deudores. Si se rechazara la confirmación del Plan, las opciones del Deudor serían que, o bien (i) la Junta de Supervisión proponga un plan de ajuste alternativo al amparo del Título III, o bien (ii) que los Casos del Título III sean desestimados, en cuyo caso la paralización automática terminaría y se iniciaría un pleito de múltiples partes y facetas (incluyendo los incoados por los Bonistas y otras partes contra la AEEPR), por cuanto los titulares de las reclamaciones competirán por los limitados recursos disponibles para pagarlas.

La siguiente descripción general resume algunos de los principales componentes del Plan. Esta descripción es totalmente compatible con el texto completo del Plan.

1. **AAP de los Prestamistas de la Línea de combustible**

El 1 de diciembre de 2022, la Junta de Supervisión —en su calidad de representante de Título III de la AEEPR— y los Prestamistas de la Línea de combustible pactaron el AAP de los Prestamistas de la Línea de combustible, que resolvió en general las reclamaciones de estos últimos y estableció el tratamiento prioritario como "Gastos corrientes" en el marco del Contrato de fideicomiso, y en virtud del cual los Prestamistas de la Línea de combustible daban su apoyo al Plan. De conformidad con el AAP de los Prestamistas de la Línea de combustible, estos últimos recibirán Bonos Serie A, que serán bonos de interés corriente con un cupón del 6.0%, a un coeficiente de cambio del 84% de las Reclamaciones de Préstamos de Línea de combustible permitidas (tal como las define el Plan).

Los Bonos Serie A tendrán un vencimiento definitivo de quince (15) años desde la Fecha de entrada en vigor, con una devolución prevista de cinco (5) años desde dicha fecha, sobre la base de las proyecciones del Plan fiscal de 2022. Los Bonos Serie A se emitirán en la Fecha de entrada en vigor, aunque devengarán intereses desde la fecha considerada de emisión del 1 de diciembre de 2022, a efectos del cálculo de devengo de intereses, aunque en el bien entendido de que el devengo de intereses antes de la Fecha de entrada en vigor tendrá un límite de un (1) año. Dichos intereses se abonarán en efectivo, o bien en forma de Bonos Serie A adicionales, a discreción de la Junta de Supervisión.

Además, los Prestamistas de la Línea de combustible tendrán el derecho de recibir, por cuenta de su Reclamación restante[38], una Participación proporcional de los Nuevos bonos netos restantes, en su caso, disponible para su distribución al conjunto de reclamaciones de Bonos Serie B (en cada caso, tal como lo define el Plan). Por último, los Prestamistas de la Línea de combustible recibirán el reembolso de ciertas tasas de consumación y honorarios profesionales, por importe de $15,000,000 y de hasta $11,000,000, respectivamente, que podrán abonarse en efectivo o en forma de Bonos Serie A adicionales, a discreción de la Junta de Supervisión.

---

[38] Por "*Reclamación restante*", en lo que respecta a las Reclamaciones de Préstamos de la Línea de combustible, se entenderán las Reclamaciones Préstamos de la Línea de combustible <u>menos</u> la cantidad de Bonos Serie A recibidos a cuenta de las Reclamaciones de Préstamos de Línea de combustible permitidas (con excepción de los Bonos Serie A recibidos, en su caso, por cuenta del pago de los intereses devengados antes de la Fecha de entrada en vigor).

Como contrapartida, los Prestamistas de la Línea de combustible han aceptado apoyar la confirmación del Pla y, a partir de la Fecha de entrada en vigor, actuarán para que se desestime el Proc. abr. 19-00396, sin perjuicio.

2. **Formas de contrapartidas en el marco del Plan**

Las contrapartidas a distribuir a los acreedores en el marco del Plan constan de las siguientes, que se describen con mayor detalle más adelante:

    i.    dinero depositado en el Fondo de amortización;

    ii.    hasta aproximadamente $5,400 millones en Nuevos bonos, que se emitirán en la Fecha de entrada en vigor;

    iii.    el IVC, que se emitirá en la Fecha de entrada en vigor por una cantidad nominal equivalente a la suma de los IVC de RGNG, los IVC que aceptan el acuerdo y los IVC que no lo aceptan;

    iv.    Las Recaudaciones del Fideicomiso de Acciones de anulación, consistentes en las contrapartidas netas en efectivo recibidas por la AEEPR en relación con las Acciones de anulación; y

    v.    los flujos de efectivo presupuestados anualmente exclusivamente para el pago al SRE de la AEEPR por cuenta de la Reclamación de pensiones.

a) **Descripción general de los Nuevos bonos a emitir en la Fecha de entrada en vigor**

En la Fecha de entrada en vigor, la AEEPR reorganizada emitirá dos series de Nuevos bonos: los Bonos Serie A y los Bonos Serie B.

Los Bonos Serie A tendrán un vencimiento definitivo de quince (15) años desde la Fecha de entrada en vigor, con una devolución prevista de cinco (5) años desde dicha fecha, sobre la base de las proyecciones del Plan fiscal de 2022. Los Bonos Serie A devengarán intereses a un tipo del 6.00%, que se pagarán semestralmente en efectivo. Los Bonos Serie A se emitirán en la Fecha de entrada en vigor, aunque devengarán intereses desde la fecha considerada de emisión del 1 de diciembre de 2022, a efectos del cálculo de devengo de intereses; *aunque en el bien entendido* de que el devengo de intereses antes de la Fecha de entrada en vigor no excederá de un (1) año, y de que los intereses devengados antes de la Fecha de entrada en vigor se pagarán, a partir de esa fecha, en forma de Bonos Serie A o en efectivo, a la exclusiva discreción de la Junta de Supervisión. Los Bonos Serie A se emitirán en una cuantía de capital suficiente para cumplir los términos y condiciones del AAP de los Prestamistas de la Línea de combustible.

Los Bonos Serie B tendrán un vencimiento definitivo de cincuenta (50) años desde la Fecha de entrada en vigor, con una devolución prevista de treinta y cinco (35) años desde dicha fecha, sobre la base de las proyecciones del Plan fiscal de 2022. Los Bonos Serie B podrán emitirse en forma de bonos de interés corriente, bonos de apreciación de capital, bonos convertibles y/o bonos convertibles de apreciación de capital en una o más series de bonos, y

devengarán tipos de interés desde el 5.625% hasta el 6.50%. Los Bonos Serie B se datarán en la Fecha de entrada en vigor.

Los Nuevos bonos tendrán un capital original global de hasta aproximadamente $5,400 millones. Los Bonos Serie A se emitirán por una cuantía de capital suficiente para cumplir los términos y condiciones del AAP de los Prestamistas de la Línea de combustible. Los Bonos Serie B se emitirán con una cuantía de capital equivalente al capital global de los Nuevos bonos, menos la cuantía de capital global de los Bonos Serie A.

Los Nuevos bonos estarán garantizados por los Ingresos netos de la AEEPR reorganizada y por el derecho de percibir Ingresos netos. Todos los ingresos se depositarán en el "Fondo general" mantenido por la AEEPR reorganizada. El primer día laborable de cada mes, la AEEPR reorganizada aplicará las cuantías en el siguiente orden de prioridad (la "Cascada de pagos"):

- *En primer lugar*, al pago de los Gastos operativos;

- *En segundo lugar*, a los honorarios y gastos del Nuevo Fideicomisario principal, que no excederán de los $100,000 anuales;

- *En tercera instancia*, al "Fondo del Servicio de la Deuda" mantenido por el Nuevo fideicomisario principal (i) hasta la cuantía de los Ingresos por la Carga heredada, y desde y hasta después de la Fecha de revocación de los Nuevos bonos y hasta la Fecha de vencimiento del ICV, hasta el importe de los Ingresos restantes por la Carga heredada, y (ii) hasta la cuantía de otros Ingresos netos, con el objeto de pagar el servicio de la deuda por Bonos adicionales, según lo permita y disponga la Nueva Escritura maestra

- *En cuarto lugar*, al pago de los gastos de capital;

- *Quinto*, al pago de la deuda subordinada (en su caso), y

- *Sexto*, para fines corporativos generales.

No habrá ningún evento de mora de los Nuevos bonos (antes del vencimiento final declarado de los Bonos Serie A, exclusivamente con respecto a los Bonos Serie A y, en generar, con respecto a los Bonos Serie B) por impago del servicio de la deuda programado, toda vez que la AEEPR reorganizada (a) adopte medidas razonables para (i) cobrar y recaudar la Carga heredada, (ii) recaudar los Ingresos generados por la Carga heredada, y (iii) deposite íntegramente los Ingresos netos hasta la cuantía de los Ingresos de la Carga heredada en el Fondo de Servicio de la Deuda, tras practicar las distribuciones realizadas de conformidad con la Cascada de pagos, y (b) cumpla el Convenio de Tipos de interés.

Con respecto a cada serie de Nuevos bonos, todo servicio de la deuda que no se pague puntualmente, tanto en la fecha de vencimiento final programada como con anterioridad, se mantendrá pendiente hasta que sea pagado íntegramente. Los Nuevos bonos no devengarán intereses sobre las obligaciones pendientes al tipo ordinario del cupón tras sus respectivos vencimientos declarados: tras la fecha de vencimiento definitiva se pagará solamente capital si en ese momento queda algo pendiente.

En la Sección VI.F de esta Declaración de divulgación presentamos una descripción detallada de los Nuevos bonos.

b) **Descripción general de los ICV a emitir en la Fecha de entrada en vigor**

En la Fecha de entrada en vigor, la AEEPR reorganizada emitirá los ICV con un cupón del 0.00%, una fecha de vencimiento final de treinta y cinco (35) años a contar desde la Fecha de entrada en vigor, que solamente será pagadero si los Nuevos bonos y cualesquiera Bonos de refinanciamiento han sido pagados íntegramente antes de su plazo de devolución de 35 años. Los ICV se pagarán solamente con cargo a, y estarán garantizados exclusivamente por, los Ingresos netos que constituyan los Ingresos restantes por Carga heredada depositada para su abono en el Fondo de Servicio de deuda, de conformidad con la Cascada de pagos. No habrá evento de impago de los IVC toda vez que la AEEPR reorganizada adopte medidas razonables para recaudar los ingresos generados por la Carga del Servicio de deuda restante, y deposite dichos fondos en el Fondo de Servicio de deuda.

Dado que, según las proyecciones del Plan fiscal certificado, se prevé que los Nuevos bonos se devuelvan solamente transcurridos treinta y cinco (35) años, los IVC son "genuinamente contingentes" debido a que solamente generarán algún pago si la carga materializada de la AEEPR supera las proyecciones del Plan fiscal certificado.

c) **Descripción general de la Carga heredada**

**<u>Carga heredada</u>**

Las actuales tarifas de la AEEPR son insuficientes para la devolución de la deuda heredada o reestructurada tras el pago de los gastos operativos de la entidad. En consecuencia, para disponer de Ingresos netos suficientes para el pago de los Nuevos bonos que la AEEPR va a emitir según el Plan, este obliga al Deudor a implementar la Carga heredada, que será un cargo adicional a las actuales tarifas de la AEEPR.

La Carga heredada consta de dos componentes: una tarifa plana mensual fija (la "<u>Tarifa plana</u>") y una tarifa volumétrica ("<u>Carga volumétrica</u>"), establecida a niveles determinados para cada categoría de clientes, que se incluirá en las tarifas de conformidad con el Plan y la Orden de confirmación. Esta estructura híbrida tiene como meta cumplir importantes objetivos, incluyendo ofrecer una recompensa adecuada a los acreedores históricos de la AEEPR y, al mismo tiempo: (i) el impacto del aumento de las tarifas en clientes vulnerables y de rentas bajas, (ii) pérdidas de ingresos debido a la transición de los clientes hacia energías alternativas, y (iii) el riesgo de que las tarifas volumétricas incentiven antieconómicamente las fuentes de energía alternativas y/o un descenso del uso. La implementación de la Carga heredada está siendo negociada con LUMA Energy, en su calidad de prestadora del servicio, y está sujeta a modificación, ya que en este momento la Junta de Supervisión colabora con el Gobierno y con LUMA Energy para resolver cuestiones de implementación.

La Carga heredada tendrá diferentes escalas, que se determinarán para cada categoría existente de clientes de la AEEPR en función de diversos factores, como la respectiva capacidad de tolerar incrementos tarifarios. Exclusivamente a efectos de evaluar la Carga heredada, el Plan

también contemplará la creación de una nueva exención de la Tarifa plana y del tramo de la Carga volumétrica para otros clientes residenciales de baja renta que todavía no están incluidos dentro de la categoría de clientes exentos (véase a continuación).

El aumento de los Ingresos netos generados por la inclusión de la Carga heredada aportará fondos para el servicio de la deuda de los Nuevos bonos tras el pago de los Gastos operativos de la AEEPR, tal como se especifica en el Plan. La Carga heredada se calcula de tal modo que está previsto que el aumento de los Ingresos podrá cubrir la deuda heredada en el marco del Plan en su período de 35 años. La Carga heredada seguirá vigente hasta (i) el vencimiento de los ICV, o bien (ii) hasta el pago íntegro de los Bonos Serie B, lo que más tarde se produzca. Dado que el incremento de los Ingresos netos que generará la Carga heredada es necesario, según el Plan para pagar el servicio de la deuda, y que además es necesario para apoyar la devolución de los Nuevos bonos emitidos en el marco del Plan, la Junta de Supervisión sostiene que, según la ley de Puerto Rico, el NEPR debe aprobar el incremento de la Carga heredada, siempre y cuando la AEEPR, con la aprobación del NEPR, pueda modificar la Carga heredada con sujeción a la Prueba de modificación (tal como se define en el Plan). Si la devolución integral del capital de los Nuevos bonos se produce antes del vencimiento de los ICV, los ingresos de la Carga heredada obtenidos con posterioridad se destinarán a dotar las distribuciones a los titulares de los ICV hasta el vencimiento de los mismos.

Aplicación de la Carga heredada: En primer lugar, la AEEPR cargará la Tarifa plana a todos los clientes, cada mes, salvo que el cliente tenga derecho a una exención de dicha Tarifa plana. El importe pagado en concepto del tramo de Tarifa plana de la Carga heredada es un cargo por conexión determinado para cada cliente no exento conectado a la red eléctrica de la AEEPR. En segundo lugar, la AEEPR cobrará una Carga volumétrica basada en el consumo de cada cliente de la electricidad suministrada por la AEEPR. La Carga volumétrica se cobrará sobre la base de centavos por kilovatio hora, cuantía que podrá variar según la categoría de los clientes, en concepto de la electricidad consumida en cada ciclo de facturación. Reflejando la actual estructura de tarifas de la AEEPR, se cobrará una Carga volumétrica distinta para el consumo de hasta 500 kWh mensuales, y para el consumo superior a ese nivel, a todas las categorías de clientes industriales y a algunas categorías comerciales.[39]

Los clientes con derecho a la exención de la Tarifa plana también estarán exentos de pagar la Carga volumétrica hasta aproximadamente 500 kWh de consumo mensual medido. Si el consumo de un cliente exento superara dicho umbral, se le cobrará la Carga volumétrica aplicable a su categoría por el consumo que exceda el umbral, sobre una base de kilovatio-hora.

El Deudor tiene previsto aplicar a ciertos clientes una nueva exención de la Tarifa plana y de la Carga volumétrica elevándola hasta aproximadamente 500 kWh. Dicha exención tiene por objeto proteger a los clientes residenciales de bajas rentas, que son más vulnerables a costos adicionales. Para asegurarse de que los clientes más vulnerables no resulten excesivamente afectados por la Carga heredada, la AEEPR creará una nueva exención para aquellos clientes particulares que no estén acogidos al *Servicio Residencial Especial* (la tarifa del SeRE)[40] o a las

---

[39] En la actualidad, la AEEPR aplica un umbral de 425 kWh.

[40] Los clientes que cumplen los criterios para acogerse al Programa de Asistencia Nutricional pueden acogerse a la tarifa del SeRE.

actuales tarifas de subsidio público a la vivienda (las tarifas RH3 y RFR). Estas tres modalidades también están exentas y ya perciben ciertas subvenciones. Los clientes residenciales de la AEEPR tendrán derecho a esa nueva excepción si sus Ingresos brutos ajustados modificados (MAGI) se sitúan por debajo de un determinado umbral, similar a los niveles de MAGI necesarios para la obtención de las prestaciones sanitarias de Medicaid en Puerto Rico. Se prevé que la nueva categoría de exención se solapará con las actuales categorías de tarifas de la AEEPR ya enumeradas que están exentas de la Carga heredada. No obstante, incluirá a nuevos clientes que en este momento no están incluidos en las categorías exentas actuales.

Los clientes de la AEEPR que actualmente están acogidos a algunas de las categorías de clientes subvencionados de la AEEPR, como personas de edad avanzada, estudiantes, clientes conectados a equipos médicos, clientes con discapacidades y participantes del Programa de Asistencia Nutricional, entre otros, continuarán beneficiándose ininterrumpidamente de sus actuales subsidios de la AEEPR, y podrán o no estar exentos de la Carga heredada en función de si se les engloba o no dentro de las categorías de clientes exentos ya mencionadas.

La Carga heredada será recaudada como parte de la tarifa de la AEEPR por los prestadores de servicios de la misma manera en que actualmente se cobran las facturas.

Con el tiempo se irán determinando los detalles de la Carga heredada, incluyendo los niveles de Tarifa plana y Carga volumétrica que se aplicarán a las diferentes categorías de clientes para sustentar el pago de los Nuevos bonos. Sin embargo, es de destacar que la AEEPR, con la aprobación del NEPR y con sujeción a la Prueba de modificación, estará facultada para modificar la Tarifa plana y la Carga volumétrica si lo hace de una manera que resulte económicamente neutra, con un mecanismo y unas cuantías que no retrasen ni prorroguen las fechas de devolución ni la duración promedio ponderada de los Bonos Serie A, tal y como se estipula en el AAP de los Prestamistas de la Línea de combustible, y que resulten razonables para dichos prestamistas, y que no disminuyan los ingresos proyectados atribuibles a la Carga heredada según está proyectado en los cálculos del Plan fiscal de 2022.[41]

## Segmentación de los clientes de la AEEPR[42]

La AEEPR mantiene una estructura de tarifas diferenciadas para sus clientes, en función de sus categorías. Las siguientes descripciones, conjuntamente con cualesquiera otras caracterizaciones de clientes utilizadas en la actualidad por la AEEPR, identifican las categorías

---

[41] La Carga heredada se aplicará a todos los clientes de la AEEPR, salvo en los casos en los que el Plan exima específicamente la totalidad o parte de la Tarifa plana o la Carga volumétrica. Aunque todas las categorías de tarifas están sujetas a la Carga heredada, algunas pueden ser actualmente categorías "vacías" que no tienen ningún cliente. A efectos de disipar toda duda, toda categoría tarifaria no identificada en el Plan o en este documento, así como toda categoría que se cree en lo sucesivo o toda categoría existente actualmente vacía que con posterioridad incorpore clientes, estará sujeta a la Carga heredada, y estará clasificada de tal modo que no disminuya los ingresos proyectados atribuibles a la Carga heredada, salvo que la AEEPR —con la aprobación del NEPR y con sujeción a la Prueba de modificación— modifique la Carga heredada de manera económicamente neutral; es decir, que no disminuya los ingresos proyectados atribuibles a la Carga heredada.

[42] Libro de tarifas de la AEEPR, a mayo de 2019. Accesible desde: https://lumapr.com/wp-content/uploads/2021/07/Tariff-Book-Electric-Service-Rates-and-Riders-Revised-by-Order-05172019-Approved-by-Order-05282019.pdf.

de la base de clientes de la entidad que podrán emplearse de qué manera se aplicará la Carga heredada a cada cliente de la AEEPR.

**Categorías residenciales**

1. SERVICIO RESIDENCIAL GENERAL (GRS) **-** Esta tarifa se aplica a clientes residenciales para uso doméstico en una vivienda, salvo que encaje en alguna de las otras categorías descritas a continuación. Además, esta tarifa también puede aplicarse a casas, apartamentos y otras estructuras dedicadas principalmente a fines residenciales, con no más de dos habitaciones y en las que la carga total conectada no exceda de los 500 vatios, utilizadas por inquilinos para fines comerciales o profesionales.

2. SERVICIO RESIDENCIAL LIFELINE (LRS) **-** Esta tarifa se aplicará a clientes residenciales que cumplan los criterios del Programa de Asistencia Nutricional, para todos los usos domésticos de una residencia o apartamento.

3. SERVICIO RESIDENCIAL PARA PROYECTOS DE VIVIENDA PÚBLICA (RH3) **-** Esta tarifa será de aplicación a clientes residenciales de Proyectos de vivienda pública sostenidos o subvencionados total o parcialmente por préstamos, subsidios, aportaciones o asignaciones de las autoridades federales, estatales o municipales.

4. TARIFA RESIDENCIAL FIJA PARA VIVIENDA PÚBLICA DE PROPIEDAD DE LA ADMINISTRACIÓN DE VIVIENDA PÚBLICA (RFR) **-** La tarifa RFR ha sido establecida de conformidad con lo dispuesto por la Ley 22-2016, y pueden acogerse a la misma, para uso doméstico, clientes residentes en una unidad de vivienda situada físicamente dentro de un proyecto de vivienda de propiedad de la Administración de Vivienda Pública.

**Categorías comerciales e industriales**

1. SERVICIO GENERAL A DISTRIBUCIÓN SECUNDARIA (GSS) **-** Esta tarifa será de aplicación a todos los servicios no residenciales con una carga inferior a los 50 kVA. Además, será aplicable a servicios de energía eléctrica temporales para uso limitado en calles, festejos y otros.

2. SERVICIO GENERAL A DISTRIBUCIÓN PRIMARIA (GSP) **-** Esta tarifa será de aplicación a clientes industriales y comerciales. El servicio se prestará a través de un único punto de conexión y un único medidor.

3. SERVICIO GENERAL A VOLTAJE DE TRANSMISIÓN (GST) **-** Esta tarifa se aplicará a clientes comerciales industriales, conectados al sistema de transmisión, que tengan una demanda de 250 kVA o superior, para usos generales, como por ejemplo fuerza motriz, calefacción, refrigeración e iluminación inherente de industrias, hoteles y otros establecimientos.

4. <u>TARIFA HORA DE USO A VOLTAJE DE DISTRIBUCIÓN PRIMARIA (TOU-P)</u> - Esta tarifa se aplicará a clientes comerciales e industriales con una demanda de 1,000 kVA o superior, que: 1. Transfieran cargas desde las horas pico a las horas valle 2. Agreguen cargas durante las horas valle 3. Retiren cargas de las horas pico

5. <u>TARIFA HORA DE USO A VOLTAJE DE TRANSMISIÓN (TOU-T)</u> - Esta tarifa se aplicará a clientes comerciales e industriales con una demanda de 1,000 kVA o superior, que: 1. Transfieran cargas desde las horas pico a las horas valle 2. Agreguen cargas durante las horas valle 3. Retiren cargas de las horas pico

6. <u>SERVICIO INDUSTRIAL ALTO USO DE ENERGÍA -115 kV (LIS)</u> - Esta tarifa es exclusivamente para industrias con una demanda equivalente a 12,000 kW o superior, un factor de carga equivalente al 80% o superior, y un factor de potencia promedio mensual equivalente al 95% o superior.

7. <u>SERVICIO AGRÍCOLA GENERAL Y BOMBAS DE ACUEDUCTOS DE COMUNAS RURALES (GAS)</u> - Esta tarifa se aplica a granjeros y clientes dedicados a la cría de animales. El servicio se prestará para fuerza motriz, alumbrado, bombas de riego, refrigeración y calefacción. Además, esta tarifa se aplicará a clientes que operen bombas para alimentar acueductos exclusivamente en comunidades rurales; dentro de este concepto se incluye el alumbrado inherente a estas actividades.

8. <u>ALUMBRADO DE INSTALACIONES DEPORTIVAS AL AIRE LIBRE PARA PARQUES EN LOS CUALES SE COBRAN DERECHOS DE ADMISIÓN (LP-13)</u> - Esta tarifa se aplicará a campos deportivos en los que se cobran derechos de admisión que tengan una carga conectada de 500 kilovatios o más para alumbrado exterior

9. <u>SERVICIO DE REPETIDORES DE TV POR CABLE (CATV)</u> - Esta tarifa se aplica a todo el suministro eléctrico para TV por cable.

10. <u>SERVICIO NO MEDIDO PARA CARGAS PEQUEÑAS (USSL)</u> - Esta tarifa se aplicará a los servicios de equipos eléctricos instalados en postes o estructuras de la AEEPR que funcionen ininterrumpidamente, salvo aquellos equipos para los cuales la AEEPR disponga de otras tarifas (por ejemplo: TV por cable).

11. <u>PRODUCTORES DE ELECTRICIDAD CONECTADOS A LA BARRA COLECTORA DE LA AEEPR</u> - Esta tarifa será de aplicación a los grandes productores de electricidad conectados a la barra colectora de 230 kV que requieran alimentación eléctrica de la AEEPR durante el arranque, el mantenimiento programado y las caídas de sus equipos generadores.

12. <u>ALUMBRADO PÚBLICO GENERAL (PLG)</u> - Esta tarifa se aplicará al alumbrado de calles, campos deportivos y otros parques de acceso libre, plazas, cabinas telefónicas, paradas de autobuses y luces estroboscópicas de tráfico y de policía.

d) **Descripción general del Fideicomiso de Acciones de Anulación**

La AEEPR ha identificado una serie de Acciones de Anulación, enumeradas en el <u>Anexo L</u>, que serán transferidas al Fideicomiso de Acciones de Anulación en la Fecha de entrada en vigor. Como más tardar en la Fecha de entrada en vigor, la AEEPR formalizará un Contrato de Fideicomiso de Acciones de Anulación para constituir dicho fideicomiso. Los Activos del Fideicomiso de Acciones de Anulación consistirán en las Acciones de Anulación y en el efectivo mantenidos por el Fideicomisario de Acciones de Anulación. El Fideicomiso de Acciones de Anulación estará regido por una junta de tres miembros que se designará en la Fecha de entrada en vigor, seleccionada por la Junta de Supervisión. Dicho organismo designará al Fideicomisario de Acciones de Anulación como más tardar en la Fecha de entrada en vigor.

El Fideicomisario de Acciones de Anulación estará facultado para litigar, negociar o resolver las Acciones de Anulación. Cada mes, el Fideicomisario de Acciones de Anulación distribuirá al Fideicomiso de RGNG todos los excedentes de efectivo, que pasarán a ser parte del Recobro de las Reclamaciones generales no garantizadas.

3. **Tratamiento de las categorías y potenciales variaciones en función de los litigios contingentes**

En este momento, la AEEPR está implicada en diversos contenciosos con partes tales como los Bonistas y el SRE de la AEEPR. Según el Plan, la resolución de estos procedimientos sea por sentencia o por acuerdo, tendrá efectos sustanciales para los recobros de determinados acreedores. En primer lugar, la siguiente sección resume dichos procedimientos y sus implicaciones individuales para, a continuación, describir los efectos que los resultados de los mismos podrán tener para los recobros de determinados acreedores.

a) **pleitos que afectan a las distribuciones previstas por el Plan**

*Impugnaciones al Gravamen y al Recurso*

En la actualidad, la Junta de Supervisión es parte del pleito *Junta de Supervisión y Administración para Puerto Rico contra U.S. Bank Nat'l Ass'n*, Proc. abr. núm. 19-00391 (D.P.R., 1 de julio de 2019) (las "<u>Impugnaciones al Gravamen y al Recurso</u>"), en virtud del cual la Junta de Supervisión solicita (i) desestimar cualquier reclamación garantizada sostenida por los Bonistas más allá de los fondos efectivamente depositados en el Fondo de amortización (las "<u>Causas del ámbito del Gravamen</u>"); y (ii) limitar cualquier potencial recurso, garantizado o no, a los depósitos en los citados fondos (las "<u>Causas del Recurso</u>").

Si el Tribunal del Título III determinara que la prenda y los recursos del Fideicomisario de bonos están limitados al Fondo de amortización, la AEEPR podrá satisfacer las reclamaciones de bonos que suman aproximadamente $8,500 millones aportando los depósitos actualmente existentes en el Fondo de amortización, lo cual incrementaría significativamente los recobros de muchos otros acreedores de la AEEPR.

Si el Tribunal del Título III determinara que la prenda está limitada de la manera antes descrita, pero que el Fideicomisario de bonos tiene una reclamación deficiente no garantizada

contra la AEEPR por la cuantía no satisfecha con los depósitos del Fondo de amortización, dicha reclamación podría compartirse proporcionalmente con otras Reclamaciones generales no garantizadas de la AEEPR, diluyendo así significativamente tales recobros de los reclamantes.

Por último, si el Tribunal del Título III determinara que el Fideicomisario de bonos tiene una prenda sobre los actuales o futuros ingresos netos o brutos de la AEEPR, los Bonistas recibirán Bonos Serie B por un importe nominal equivalente al valor de sus garantías, hasta el total de los Bonos Serie B disponibles para distribución en virtud del Plan, con sujeción a los Bonos Serie B entregados a los Bonistas que aceptan el acuerdo. En la medida en que los Bonos Serie B fuesen insuficientes para pagar al Fideicomisario de bonos el valor de su garantía, el Fideicomisario podrá alegar en el momento de la confirmación que la AEEPR está obligada a emitir Bonos Serie B adicionales, o de lo contrario abonar al Fideicomisario de bonos un pago adicional actualmente no contemplado por el Plan. En tales circunstancias, el Plan podría no poder confirmarse ni ser viable sin sustanciales enmiendas. Por otra parte, en este escenario el Fideicomisario de bonos podría plantear una reclamación deficiente no garantizada contra la AEEPR que, en la medida en que no pudiera satisfacerse con la emisión de Bonos Serie B, habría que compartir proporcionalmente con otras Reclamaciones generales no garantizadas de la AEEPR.

*Pleito de los gastos corrientes del SRE de la AEEPR*

El 30 de octubre de 2019, el SRE de la AEEPR presentó una reclamación enmendada contra la AEEPR y otras partes, solicitando que se determinara que todas las cuantías que se les adeudaba eran "Gastos corrientes" de conformidad con el Acuerdo de fideicomiso, y que debían abonarse antes de realizar pagos adicionales al Fideicomisario de bonos o a los Bonistas. Además, el SRE de la AEEPR alegó que se trata de un beneficiario tercero del Acuerdo de fideicomiso, y que este constituye un acuerdo de subordinación válido a tenor del Código de Quiebras.

El SRE de la AEEPR mantiene una importante reclamación contra la AEEPR. Si el Tribunal del Título III determinara que las reclamaciones del SRE de la AEEPR fuesen "Gastos corrientes" y que tiene derecho a su plena devolución antes de cualquier recobro de las reclamaciones de bonos, las distribuciones del Plan tendrían que modificarse, aunque la cuantía de la contrapartida general se mantuviera invariable.

**b) Tratamiento de la categoría en función de los resultados de los pleitos**

*Reclamaciones de Bonistas y Aseguradoras monolínea que aceptan el acuerdo*

Independientemente de los resultados de los procedimientos descritos, los Bonistas y Aseguradoras monolínea que aceptan el acuerdo recibirán de la AEEPR un recobro del 50.00% de sus respectivas reclamaciones permitidas en forma de participación proporcional en el Fondo de amortización y de una distribución de Series de la Serie B. Sin embargo, la cantidad recobrada de los tramos restantes de sus reclamaciones permitidas dependerán del resultado de las Impugnaciones al Gravamen y al Recurso. Si se da la razón a la AEEPR y a la Junta de Supervisión en las causas del ámbito del Gravamen y del Recurso, los recobros de los Bonistas y las Aseguradoras monolínea que no aceptan el acuerdo podrán quedar limitados al Fondo de

amortización, por lo cual habrá más Bonos Serie B disponibles para la distribución a los Bonistas y Aseguradoras monolínea que aceptan el acuerdo. Si, por el contrario, se da la razón a los Bonistas y a las Aseguradoras monolínea que no aceptan el acuerdo en algunas o en todas las causas citadas, los Bonistas y a las Aseguradoras monolínea que acepten el acuerdo recibirán ICV por una cuantía equivalente al resto de sus reclamaciones admitidas.

<u>*Reclamaciones de Bonistas y Aseguradoras monolínea que no aceptan el acuerdo*</u>

Los recobros de los Bonistas y a las Aseguradoras monolínea que no aceptan el acuerdo estarán determinados, parcialmente, por el resultado de las Impugnaciones al Gravamen y al Recurso y por si votan por aceptar el Plan presentado. Sin embargo, independientemente del resultado, los Bonistas y a las Aseguradoras monolínea que no acepten el acuerdo recibirán su participación proporcional del Fondo de amortización.

Si en la causa del Recurso se da la razón a los Bonistas que no aceptan el acuerdo, toda reclamación deficiente no garantizada permitida recibirá una parte proporcional del Recobro de las Reclamaciones generales no garantizadas, conjuntamente con todas las demás reclamaciones del conjunto de reclamaciones no garantizadas.

Si se da la razón a los Bonistas y a las Aseguradoras monolínea que no aceptan el acuerdo en las causas del ámbito del gravamen, recibirán Bonos Serie B por una cuantía nominal equivalente al valor de sus garantías más allá de las cantidades del Fondo de amortización, hasta la cantidad de Bonos Serie B disponibles tras la distribución a los Bonistas que aceptan el acuerdo.

Si los Bonistas y a las Aseguradoras monolínea que no aceptan el acuerdo votan por aceptar el Plan y se da la razón a la Junta de Supervisión en las causas del Recurso, recibirán IVC por la cuantía nominal de aquellas Reclamaciones que no aceptan el acuerdo no permitidas restantes, definidas como capital e intereses devengados y no desembolsados en concepto de sus reclamaciones de Bonos de ingresos de la AEEPR hasta la Fecha de la petición, <u>menos</u> el efectivo procedente del Fondo de amortización distribuido a dicho bonista.

*Reclamaciones de Préstamos de Línea de combustible*

Para resolver sus reclamaciones, incluyendo su derecho prioritario sobre las Reclamaciones de bonos y a percibir intereses con posterioridad a la fecha de la petición, los Prestamistas de la Línea de combustible recibirán el siguiente tratamiento: (i) Bonos Serie A por un valor nominal equivalente al 84.00% de su reclamación previa a la petición, (ii) Bonos Serie A o efectivo, a discreción de la Junta de Supervisión, por un valor nominal equivalente al de los intereses que deberían haber devengado sobre cualquier participación proporcional de Bonos Serie A a distribuir durante el período desde el 1 de diciembre de 2022 hasta la Fecha de entrada en vigor, o un (1) año (el que más corto resulte), y (iii) el 16.00% restante de su reclamación, una participación proporcional en los Bonos Serie B restantes después de su distribución a los Bonistas que aceptan y no aceptan el acuerdo, y la distribución inicial al Fideicomiso de RGNG, para beneficio de los titulares de reclamaciones del conjunto de reclamaciones generales no garantizadas, hasta el 50.00% de sus reclamaciones permitidas.

Como contrapartida por su contribución a la consumación del acuerdo y a la confirmación del Plan, y no en concepto de sus reclamaciones, los Prestamistas de la Línea de combustible recibirán los honorarios de acreedores del AAP de los Prestamistas de la Línea de combustible, que constan de $15 millones en costos de consumación, y hasta $11 millones en concepto de reembolso de honorarios profesionales.

*Reclamaciones generales no garantizadas*

De manera bastante semejante a la del recobro de los Bonistas y las Aseguradoras monolínea que no aceptan el acuerdo, el recobro de las Reclamaciones generales no garantizadas variará sustancialmente en función del resultado de las Impugnaciones al Gravamen y al Recurso.

Si se da la razón a los Bonistas y las Aseguradoras monolínea que no aceptan el acuerdo en todas las causas, los titulares de las Reclamaciones generales no garantizadas recibirán su parte proporcional de los Bonos Serie B disponibles para su distribución, si los hubiere, tras la distribución de los mismos a los Bonistas que aceptan y que no aceptan el acuerdo (hasta la cuantía del valor de sus garantías). Si se determinara que la garantía de los Bonistas que no aceptan el acuerdo tuviera un valor igual o superior al de los Bonos Serie B disponibles para distribución, los titulares de las Reclamaciones generales no aseguradas no recibirán Nuevos bonos en el marco del Plan, sino una participación proporcional en los recursos del Fideicomiso de Acciones de Anulación y de los IVC.

Si a los Bonistas y las Aseguradoras monolínea que no aceptan el acuerdo no se les da la razón en las causas del ámbito del Gravamen, pero ganan en las causas del Recurso, sus reclamaciones de deficiencia recibirán percibirán el recobra de las Reclamaciones generales no garantizadas. Este resultado podría diluir sustancialmente el recobro de otros titulares de las Reclamaciones generales no garantizadas.

Si a los Bonistas y las Aseguradoras monolínea que no aceptan el acuerdo no se les da la razón en las Impugnaciones al Gravamen y al Recurso, los titulares de las Reclamaciones generales no garantizadas percibirán su participación proporcional en los Bonos Serie B, de hasta

el 50% de sus reclamaciones, suponiendo una estimación de $800,000,000 en Reclamaciones generales no garantizadas. Si a continuación restan Bonos Serie B disponibles para su distribución, el 20% de los mismos irán al SRE de la AEEPR. El 80% restante de los Bonos Serie B serán compartidos proporcionalmente entre (i) las Reclamaciones restantes de las Reclamaciones generales no garantizadas, (ii) el 40.00% de las reclamaciones restantes de los Bonistas y las Aseguradoras monolínea que aceptan el acuerdo, y (iii) las reclamaciones restantes de los Prestamistas de la Línea de combustible. Si, y solamente si, (a) los Nuevos bonos de RGNG equivalen al 100% de las Reclamaciones restantes de la estimación del conjunto de Reclamaciones no garantizadas, y (b) se paga íntegramente el 100% de las Reclamaciones de los Prestamistas de la Línea de combustible, los Bonistas y las Aseguradoras monolínea que aceptan el acuerdo recibirán un 60% de su participación proporcional en los Nuevos bonos restantes, si los hubiera.

En todos los casos, los Titulares de Reclamaciones generales no garantizadas percibirán, con cargo al Fideicomiso de RGNG, su participación proporcional en las Recaudaciones de Acciones de anulación. También recibirán ICV por el importe nocional de sus restantes reclamaciones tras las distribuciones de Bonos Serie B, en su caso.

4. **Oferta de canje a los Bonistas, Aseguradoras monolínea y Swaps de tipos de interés asegurados por Assured**

Con el objeto de permitir a los titulares de Reclamaciones de Bonos de ingresos de la AEEPR y de Swaps de tipos de interés asegurados por Assured a resolver sus reclamaciones contra la AEEPR, la Junta de Supervisión les ofrecerá la posibilidad de firmar un acuerdo de plan de apoyo en el momento de extinguirse el Período de Oferta de canje (tal como se define a continuación), en virtud del cual dichos reclamantes aceptan ser tratados como Bonistas o Aseguradoras monolínea que aceptan el acuerdo, según proceda, de conformidad con el Plan. Todo reclamante que firme recibirá un contra-CUSIP a cambio de sus actuales valores. Todo titular que no firme y envíe su acuerdo de apoyo al Plan será tratado como Bonista o Aseguradora monolínea que no acepta el acuerdo, según el caso, y no podrá adherirse a las categorías Bonista o Aseguradora monolínea que acepta el acuerdo, salvo que la Junta de Supervisión acuerde prorrogar la citada ficha límite, aunque bajo ninguna circunstancia podrá prorrogarse tras una sentencia del Tribunal del Título III en las causas de Impugnaciones al Gravamen y al Recurso.

La Junta de Supervisión tiene previsto iniciar el período dentro del cual los titulares de Reclamaciones de Bonos de ingresos de la AEEPR y de Swaps de tipos de interés asegurados por Assured podrán firmar el acuerdo de apoyo al plan (el "Período de la Oferta de canje") en torno al 28 de diciembre de 2022, y estima que concluirá en torno al 15 de febrero de 2023. Cada titular elegible recibirá tanto el acuerdo de apoyo al plan como el memorando de oferta de acuerdo correspondiente, explicando, entre otras cosas, el tratamiento propuesto para sus reclamaciones si firma el acuerdo de apoyo al plan. El no enviar el acuerdo de apoyo a la reestructuración firmado antes de la extinción del Período de la Oferta de canje impedirá que dicho titular opte por ser incluido en la clase de acuerdo, así como de recibir el tratamiento asignado a la misma en caso de que se apruebe y confirme la Declaración de divulgación.

5. **Distribución ilustrativa de los Nuevos bonos de conformidad con el Plan**

Exclusivamente a título ilustrativo, lo siguiente resume las distribuciones de los Nuevos bonos en el marco del Plan:

1. Cuatrocientos millones ($400,000,000) en Bonos Serie B se venderán al Estado Libre Asociado, a su valor nominal y en efectivo, para financiar los pagos de las Reclamaciones de Gastos administrativos.

2. Los titulares de las Reclamaciones de Préstamos de la Línea de combustible recibirán Bonos Serie A por un 84.00% de sus Reclamaciones permitidas. Los Bonos Serie A devengarán el valor de los intereses de 1 año desde la fecha de entrada en vigor del AAP de Prestamistas de la Línea de combustible, pagaderos en Bonos Serie A o en efectivo. También percibirán efectivo o Bonos Serie A en concepto de las tasas de consumación de los acreedores de los Prestamistas de la Línea de combustible y del reembolso de los Honorarios profesionales del AAP de los Prestamistas de la Línea de combustible. Además, obtendrán distribuciones de sus Reclamaciones restantes (16.00%) en función del resultado, o de un dictamen favorable, en las Impugnaciones al Gravamen y al Recurso (*véase* el punto 7 siguiente).

3. Los Bonistas y las Aseguradoras monolínea que acepten el acuerdo percibirá entre el 50.00% de sus Reclamaciones permitidas en Bonos Serie B. Además, obtendrán distribuciones de sus Reclamaciones restantes en función del resultado, o de un dictamen favorable, en la Impugnaciones al Gravamen y al Recurso (*véase* el punto 7 siguiente).

4. Los Bonistas y las Aseguradoras monolínea que no acepten el acuerdo recibirán Bonos Serie B en función de los recobros de sus pleitos. Esto podría no ser nada si pierden las causas del Gravamen y del Recurso, o podría alcanzar la totalidad de los Bonos de Serie B que queden para distribución si ganan dichas causas y el Tribunal determina que sus garantías valen tanto como los Bonos Serie B disponibles para distribución después de las distribuciones prioritarias a los Bonistas y las Aseguradoras monolínea que acepten el acuerdo. Si los Bonistas y las Aseguradoras monolínea que no aceptan el acuerdo perdieran la causa del Gravamen, pero ganasen la del Recurso, tendrán una reclamación deficiente que recibirá el mismo tratamiento que las Reclamaciones generales no garantizadas.[43]

5. Las Reclamaciones generales no garantizadas recibirán hasta el 50.00% de sus reclamaciones, suponiendo que la cuantía de las Reclamaciones generales garantizadas sume $800,000,000, así como los Bonos Serie B restantes

---

[43] Los titulares de Reclamaciones de Swaps de tipos de interés aseguradas por Assured recibirán el mismo tratamiento que los Bonistas y Aseguradoras monolínea que acepten el acuerdo si envían dentro del plazo la página de firma de la Elección de Clase de acuerdo, o bien el tratamiento de los Bonistas y las Aseguradoras monolínea que no aceptan el acuerdo si no la envían.

después de las distribuciones a los Bonistas que acepten y no acepten el acuerdo. Además, obtendrán distribuciones de sus Reclamaciones restantes (50.00%) en función del resultado, o de un dictamen favorable, en las Impugnaciones al Gravamen y al Recurso (*véase* el punto 7 siguiente).

6.  Si quedasen Bonos Serie B tras pagar las Reclamaciones generales no garantizadas y las Reclamaciones deficientes (si las hubiere) de hasta el 50.00% de sus reclamaciones; en segunda instancia, el SRE del AEEPR recibirán el 20.00% de los Nuevos bonos restantes brutos, que se depositará en el Fideicomiso PayGo de la AEEPR.

7.  El otro 80.00% de los Nuevos bonos brutos restantes se distribuirá proporcionalmente entre las Reclamaciones restantes de (i) las Reclamaciones generales no garantizadas (50.00%), (ii) los Prestamistas de la Línea de combustible (16.00%), y (iii) el 40.00% de las Reclamaciones restantes de los Bonistas que acepten el acuerdo (es decir, el 20.00% (40.00% del 50.00%)).

8.  Si, y solamente si, (a) los Nuevos bonos de RGNG equivalen al 100% de las Reclamaciones restantes de la estimación del conjunto de Reclamaciones no garantizadas, y (b) se paga íntegramente el 100% de las Reclamaciones de los Prestamistas de la Línea de combustible, los Bonistas y las Aseguradoras monolínea que aceptan el acuerdo recibirán un 60% de su participación proporcional en los Nuevos bonos restantes, si los hubiera.

9.  Los Nuevos bonos sobrantes disponibles después de que los acreedores recuperen íntegramente sus Reclamaciones permitidas se considerarán no emitidos por la AEEPR, o bien serán emitidos y distribuidos al Fideicomiso PayGo de la AEEPR, a discreción de la AEEPR.

6.  **Conciliación de controversias pendientes**

a)          **Conciliación de controversias pendientes con los Bonistas y las Aseguradoras monolínea que aceptan el acuerdo**

De conformidad con los términos del Memorando de Oferta de acuerdo, y a cambio de las contrapartidas previstas por el Plan, los Bonistas y las Aseguradoras monolínea que aceptan el acuerdo están de acuerdo en resolver, dispensar, eximir y renunciar a todas las reclamaciones contra la AEEPR, incluyendo, entre otras, las siguientes controversias (que se resumen en la Sección V de esta Declaración de divulgación):

*   Impugnaciones al Gravamen y al Recurso:

    o  Todas las contrademandas y defensas afirmativas vinculadas a *La Junta de Supervisión y Administración Financiera para Puerto Rico contra U.S. Bank Nat'l Ass'n*, Proc. abr. núm. 19-00391 (D.P.R., 1 de julio de 2019).

    o  Todas las demás reclamaciones, teorías, derechos y defensas vinculados con, entre otras cosas, sus evidencias de reclamaciones y/o la Reclamación de

Bonos principal de la AEEPR, incluyendo, entre otros, el alcance de la prenda estimada en los bienes, activos o ingresos de la AEEPR, tanto si las reclamaciones tienen recursos más allá de los fondos depositados en el Fondo de amortización y otros derechos estimados relacionados con ciertos convenios contractuales o derechos legales, como por ejemplo solicitar la designación de un síndico, aumentar las tarifas eléctricas de la AEEPR o la ejecución del cobro de facturas de los clientes.

- <u>Moción de nombramiento de un síndico y desestimación del Caso del Título III</u>:

  - o Moción de desestimar el Caso del Título III de la AEEPR.

  - o Todas las demás mociones, objeciones, acumulaciones a las mismas o a otras mociones o impugnaciones que puedan presentarse en relación con los remedios solicitados, incluyendo, entre otros, la solicitud de levantar la paralización automática, la designación de un síndico para la AEEPR y la desestimación del Caso del Título III de la AEEPR.

b) **Conciliación de las controversias pendientes con los Prestamistas de la Línea de combustible**

De conformidad con los términos del AAP de los Prestamistas de la Línea de combustible, y a cambio de las contrapartidas previstas por el Plan, si los Prestamistas de la Línea de combustible aceptan el Plan y están de acuerdo en resolver, dispensar, eximir y renunciar a todas las reclamaciones contra la AEEPR y los Bonistas que aceptan el acuerdo, incluyendo, las siguientes controversias (que se resumen en la Sección V.G.3 de esta Declaración de divulgación):

- *Cortland Capital Market Services LLC contra la Junta de Supervisión y Administración Financiera para Puerto Rico*, Proc. abr. núm. 19-00396 (D.P.R., 9 de julio de 2019).

- Todas las demás reclamaciones o derechos vinculados a los Préstamos de la Línea de combustible, incluyendo, entre otros, las alegadas prioridad y antigüedad sobre los Bonos de los Prestamistas de la Línea de combustible, de conformidad con cualquier acuerdo.

c) **Conciliación de las controversias pendientes con Vitol**

De conformidad con el Acuerdo de Conciliación con Vitol, y a cambio de las contrapartidas previstas por el Plan, se alcanzará un compromiso y se resolverán las siguientes controversias con Vitol de conformidad con el Plan (controversias resumidas en la Sección V.G.21 de la presente Declaración de divulgación):

- <u>Descargos de Vitol</u>:

  - o A la fecha de entrada en vigor del Plan, Vitol ha convenido descargar a la AEEPR y a la Junta de Supervisión de todas y cada una de las reclamaciones

y causas de acción de algún modo derivadas de, o relacionadas con, *AEEPR contra Vitol Inc. y otros*, Proc. abr. núm. 19-00453 (D.P.R., 14 de noviembre de 2019).

    o  A efectos de disipar toda duda, el Acuerdo de conciliación con Vitol mantiene todas y cada una de las reclamaciones, derechos y defensas de Vitol en relación con la acción de anulación caratulada *Comité Especial de Reclamaciones contra Inspectorate America Corp.*, Proc. abr. núm. 19-00388, en el Caso núm. 17-bk-3283-LTS, D.P.R.

- <u>Descargos de la AEEPR:</u>

    o  A la fecha de entrada en vigor del Plan, la AEEPR ha convenido descargar a Vitol de todas y cada una las reclamaciones y causas de acción de algún modo derivadas de, o relacionadas con, *AEEPR contra Vitol Inc. y otros*, Proc. abr. núm. 19-00453 (D.P.R., 14 de noviembre de 2019).

    o  A efectos de disipar toda duda, el Acuerdo de conciliación con Vitol mantiene todas y cada una de las reclamaciones, derechos y defensas de la AEEPR en relación con la acción de anulación caratulada *Comité Especial de Reclamaciones contra Inspectorate America Corp.*, Proc. abr. núm. 19-00388, en el Caso núm. 17-bk-3283-LTS, D.P.R.

## C. Titulares de Reclamaciones con derecho a votar por el Plan de Ajuste

De conformidad con el Título III de la Ley PROMESA y del Código de Quiebras, solamente los titulares de Reclamaciones admitidas de las clases afectadas y que no se considere automáticamente que han aceptado o rechazado una propuesta de Plan de Ajuste del Título III, tendrán derecho a votar si aceptan o rechazan dicho Plan de Ajuste. Se considerará que las clases de reclamaciones cuyos titulares no están afectados en virtud del Plan han aceptado el mismo y no tienen derecho a votar para aceptarlo o rechazarlo. Se considerará que las clases de reclamaciones cuyos titulares no percibirán ningún recobro según el plan de ajuste han rechazado el mismo y, por consiguiente, no tienen derecho a votar.

A continuación presentamos un resumen de las clases de reclamaciones con y sin derecho a votar por la aceptación o rechazo del Plan:

| Clase | Reclamación | Estado | Derechos de voto |
|-------|-------------|--------|------------------|
| 1 | Reclamaciones de Bonistas y Aseguradoras monolínea que aceptan el acuerdo | Afectada | Con derecho a voto |
| 2 | Reclamaciones de Bonistas y Aseguradoras monolínea que no aceptan el acuerdo | Afectada | Con derecho a voto |

| Clase | Reclamación | Estado | Derechos de voto |
|---|---|---|---|
| 3 | Reclamación de pensiones | Afectada | Con derecho a voto |
| 4 | Reclamaciones de Préstamos de Línea de combustible | Afectada | Con derecho a voto |
| 5 | Reclamaciones generales no garantizadas | Afectada | Con derecho a voto |
| 6 | Reclamaciones de Vitol | Afectada | Con derecho a voto |
| 7 | Reclamaciones de Swaps de tipos de interés aseguradas por Assured | Afectada | Con derecho a voto |
| 8 | Reclamaciones ordinarias de clientes | No afectada | Sin derecho a voto (Se considera que acepta) |
| 9 | Reclamaciones de Dominio eminente/Expropiación forzosa inversa | Afectada | Con derecho a voto |
| 10 | Reclamaciones federales | Afectada | Con derecho a voto |
| 11 | Reclamaciones de conveniencia | No afectada | Sin derecho a voto (Se considera que acepta) |
| 12 | Reclamaciones subordinadas de la Sección 510(b) | Afectada | Sin derecho a voto (Se considera que rechaza) |

Los titulares de las Reclamaciones permitidas de la Clase 12 no recibirán ninguna distribución en virtud del Plan, y se considerará que han rechazado el Plan y que no tienen derecho a votar.

Los titulares de las Reclamaciones permitidas de las Clases 8 y 11 no están Afectados en virtud del Plan, y se considerará que han aceptado el Plan y que no tienen derecho a votar.

La sección 1126 del Código de Quiebras define "aceptación" de un plan de ajuste por una clase de reclamaciones como la aceptación por parte de los acreedores de dicha categoría titulares de al menos dos tercios de la cuantía y más de la mitad del número de reclamaciones admitidas de esa clase que votan por aceptar o rechazar el Plan. Por consiguiente, la aceptación del Plan por las Reclamaciones de cada clase con derecho a votar se producirá solamente si al menos las dos terceras partes de la cuantía, y una mayoría de los titulares de las Reclamaciones admitidas de esa clase, votan a favor del Plan. Una votación podrá ser desestimada si el Tribunal del Título III determina, tras una notificación y una vista, que la aceptación o el rechazo no han

sido solicitados o procurados de buena fe, o de acuerdo o las cláusulas aplicables de la Ley PROMESA o del Código de Quiebras.

Es importante que los titulares de Reclamaciones de las clases indicadas en la tabla precedente con derecho a voto ejerciten dicho derecho de votar o rechazar el Plan. **INCLUSO SI NO VOTA, O NO TIENE DERECHO DE VOTAR, LA ACEPTACIÓN DEL PLAN, ESTARÁ LEGALMENTE VINCULADO POR EL MISMO SI ES CONFIRMADO POR EL TRIBUNAL DEL TÍTULO III.** La cuantía de las reclamaciones y el número de votos requeridos para la aceptación o el rechazo del Plan por una determinada categoría se calcularán sobre la base de las Reclamaciones que efectivamente voten por cualquiera de ambas opciones. No existen requisitos de quórum con respecto al número de Reclamaciones de una Clase que efectivamente voten.

Si al menos una clase de Reclamaciones afectadas acepta el plan de ajuste del Título III (sin contar los votos de personas internas), en aplicación de la Sección 1129(b) del Código de Quiebras previsto por la sección 301(a) del Título III de la Ley PROMESA, se entenderá que el plan de ajuste ha sido aceptado bajo ciertas condiciones, a pesar de que sea rechazado por una o más de las demás clases de reclamaciones afectadas. De conformidad con dicha sección, un plan de ajuste podrá ser confirmado por un tribunal si no "discrimina de manera injusta" y es "justo y equitativo" con respecto a cada clase que lo rechace. *Véase* información más detallada en la sección VII.C de esta Declaración de divulgación.

La decisión del Deudor sobre si solicitar o no la confirmación del Plan de conformidad con la sección 1129(b) del Código de Quiebras se anunciará como más tardar en la Vista de confirmación.

**D. Procedimientos de solicitud y de votación**

El 16 de diciembre de 2022, el Deudor presentó la *Moción de la Autoridad Eléctrica de Puerto Rico solicitando una Orden para (I) aprobar la Declaración de divulgación, (II) establecer una Fecha de registro de votación, (III) aprobar la Notificación de la Vista de confirmación y el calendario de confirmación, (IV) aprobar los paquetes de convocatoria y los procedimientos de distribución, (V) aprobar los formularios de Papeletas y los procedimientos de votación y elección, (VI) aprobar la Notificación de Miembro sin derecho a voto, (VII) estableciendo las Fechas límite de votación, elección y confirmación, y (VIII) aprobar los procedimientos de recuento de votos* (la "Moción de aprobación de la Declaración de divulgación") [ECF núm. _____], solicitando al Tribunal del Título III una orden (i) aprobando la idoneidad de la información contenida en la Declaración de divulgación propuesta, (ii) estableciendo una Fecha de registro de votación del Plan (tal como se define a continuación), (iii) aprobando la Notificación de la Vista de confirmación y el calendario de confirmación, (iv) aprobando el contenido propuesto del Paquete de convocatoria (tal como se define en este documento) los procedimientos para la distribución del mismo, (v) aprobando los formatos de las Papeletas de votación y estableciendo los procedimientos de convocatoria, votación y recuento, (vi) aprobando la forma y manera de la Notificación de Condición de miembro sin derecho a voto (tal como aquí se define), (vii) estableciendo la Fecha límite de votación (como se define en este documento), y (viii) aprobando los procedimientos para contabilizar los votos de los

50

acreedores. El [_____ de 2023], el Tribunal del Título III dictó la Orden de Declaración de divulgación.

Si desea información más detallada acerca de los procedimientos de solicitud y de divulgación relativos al Plan, *consulte* la Orden de la Declaración de divulgación.

### E. Vista de confirmación y fecha límite para las objeciones a la confirmación

En virtud de la Sección 1128 del Código de Quiebras, el Tribunal del Título III ha señalado la Vista de confirmación para determinar si el Deudor ha satisfecho los requisitos de confirmación de la Sección 314 de la Ley PROMESA, y las subsecciones incorporadas de la Sección 1129 de Código de Quiebras para el [_____ de 2023] (Hora estándar del Atlántico), ante la Honorable Laura Taylor Swain, Jueza de Distrito de Estados Unidos designada por el Presidente del Tribunal Supremo de los Estados Unidos, John Roberts, para presidir el Caso del Título III del Estado Libre Asociado ante el Tribunal de los Estados Unidos Clemente Ruiz Nazario, Avenida Carlos Chardón 150, San Juan de Puerto Rico, P.R. 00918, en la sala que se determinará oportunamente. La Vista de confirmación podrá ser aplazada en cada momento sin previo aviso, salvo el comunicado en la propia Vista de confirmación o en cualquier Vista posteriormente aplazada.

El Tribunal del Título III (i) estableció como Fecha límite de votación y Fecha límite de elección las 5:00 p.m. (Hora estándar del Atlántico) del [_____ de 2023], y (ii) ordenó que todas las objeciones, en su caso, a la confirmación del Plan sean radicadas y cursadas como más tardar a las [___ del_____ de 2023] (Hora estándar del Atlántico).

[*El resto de la página se ha dejado intencionadamente en blanco*]

### III.    Descripción general del Deudor

**A.    Información general**

    1.    **Descripción general de la AEEPR**

La Autoridad de Fuentes Fluviales de Puerto Rico ("AFF"), cuya denominación se cambió oficialmente por Autoridad de Energía Eléctrica de Puerto Rico en 1979, se fundó el 2 de mayo de 1941. La AEEPR se constituyó con el objetivo fundamental de velar por la electrificación total de la isla.[44] Este proceso quedó en gran medida cumplido hacia 1981, cuarenta años después de la creación de la AEEPR.[45] Como única prestadora de servicios eléctricos minoristas en la isla, la AEEPR venía suministrando prácticamente toda la electricidad utilizada en Puerto Rico desde su creación. Hoy, la AEEPR opera un sistema eléctrico obsoleto, con equipos de generación que han sufrido sustanciales daños como consecuencia de desastres naturales. En consecuencia, los clientes de la AEEPR experimentan frecuentes cortes prolongados del servicio, lo cual ha impulsado una demanda de mejores servicios eléctricos para Puerto Rico.

    a)    **Legislación fundamental**

La Asamblea Legislativa ha promulgado numerosos instrumentos legales centrados en las actividades de la AEEPR desde su fundación. A continuación, resumimos la legislación fundamental vinculada con la AEEPR.

    (i)    **Ley habilitadora (Ley 83-1941)**

Antes de 1941, la electricidad de Puerto Rico era producida y distribuida mayormente por compañías privadas. En 1927, la Asamblea Legislativa creó el Sistema de Utilización de las Fuentes Fluviales, predecesora de la AFF y la AEEPR, "con la idea de que el uso generalizado de la energía eléctrica generada a bojo costo, suministrada a un precio razonable y en cantidades suficientes, sería crítico para el desarrollo industrial y para la promoción de una mejor calidad de vida en Puerto Rico".[46] Hasta 1941, la demanda de electricidad aumentó. Debido a ello, la Asamblea Legislativa promulgó la Ley 83-1941 (con sus enmiendas, la "Ley Habilitadora de la AEE"), y constituyó una instrumentalidad oficial responsable de un sistema eléctrico unificado, la AFF, hoy conocida como AEE. En consecuencia, Puerto Rico se convirtió en la "primera región autónoma de Estados Unidos atendida enteramente por un sistema eléctrico de propiedad pública".[47]

Con la constitución de la AEE, la Asamblea Legislativo pretendió racionalizar el funcionamiento del sistema eléctrico de Puerto Rico. En resumen, la Ley Habilitadora de la

---

[44] Ley 57-2014, *Exposición de motivos*.

[45] *Ibídem*.

[46] Ley 120-2018, *Exposición de motivos*.

[47] *Memoria anual del año fiscal 1941-1942 de la Autoridad de Fuentes Fluviales de Puerto Rico*, 3 (7 de diciembre de 1942).

AEEPR facultó a la entidad para seguir desarrollando e implementando los servicios eléctricos de la isla para beneficio de sus ciudadanos. La Ley Habilitadora de la AEEPR estableció un organismo rector (la "Junta Directiva de la AEEPR") para supervisar las actividades de la entidad, y se designó al Gobernador de Puerto Rico como Presidente de dicha Junta, y a otros altos funcionarios como miembros de la misma. En calidad de corporación pública, la AEEPR fue facultada para, entre otras cosas, producir y distribuir agua y energía eléctrica, establecer las tarifas pertinentes y emitir bonos para sus fines corporativos.

La AEEPR, en calidad de instrumentalidad del Estado Libre Asociado, "tiene el deber de proveer energía eléctrica de forma confiable, aportando al bienestar general y al futuro sostenible del Pueblo de Puerto Rico, maximizando los beneficios y minimizando los impactos sociales, ambientales y económicos". Leyes de P.R. 22, 196.

(i)      **Ley de Transformación y Alivio Energético de Puerto Rico (Ley 57-2014)**

El 27 de mayo de 2014, el Gobernador de Puerto Rico firmó la Ley 57-2014. La Ley 57-2014 pretendía que el sistema energético del país fuese más eficiente y menos dependientes de los combustibles fósiles mediante la reforma del marco regulatorio de la AEEPR. Además, la Ley 57-2014 pretendía alcanzar este objetivo con la creación de la OEPPE, la CEPR y la OIPC. La OEPPE, hoy denominado Programa de Política Pública Energética del Departamento de Desarrollo Económico y Comercio, tiene como misión desarrollar políticas públicas en materia de energía, lo cual incluye la identificación y la evaluación de fuentes energéticas alternativas. Como se explica con mayor detalle a continuación, la CEPR era un organismo público independiente responsable de regular, supervisar y velar por el cumplimiento de las políticas públicas nacionales en materia energética. Según la Ley 57-2014, la principal función de la CEPR era evaluar el Plan de ALIVIO Energético y el Plan integrado de recursos ("PIR") de la AEEPR, los cuales deben detallar las estrategias de la AEEPR para cumplir la Ley 57-2014. Por último, la CEPR también era responsable de revisar y aprobar las tarifas de la energía. La OIPC es un organismo oficial cuyo principal objetivo es defender a los consumidores de energía ante la AEEPR o la CEPR en asuntos tales como diferencias vinculadas a las facturas de electricidad.

(ii)     **Ley para Transformar el Sistema Eléctrico de Puerto Rico (Ley 120-2018)**

La Ley 120, aprobada el 21 de junio de 2018, representa otra iniciativa de la Asamblea Legislativa para seguir reformando las operaciones y servicios de la AEEPR. La Ley 120 pretende facilitar la transformación del sistema eléctrico de Puerto Rico recurriendo a las alianzas público-privadas. Según prevé la Ley 120, una asociación público-privada consiste en un acuerdo entre una entidad privada y la AEEPR para prestar servicios en Puerto Rico por un determinado período de tiempo. Estas alianzas se consideran como "un método de implementación de proyectos que no es privatización".[48]   Para posibilitar y promover estas alianzas público-privadas, la Ley 120 establece un marco legal que permite a la AEEPR delegar sus operaciones y vender sus activos. Sin embargo, este marco contiene limitaciones. Por ejemplo, si la AEEPR vende un activo vinculado con la generación de energía eléctrica, para que

---

[48] *Véase* https://www.p3.pr.gov/faq/.

el contrato pertinente sea finalmente aprobado deberá ser ratificado tanto por el Gobernador como por la Asamblea Legislativa. La Ley 120 pretende priorizar un prestador servicios eléctricos más confiable y financieramente viable, centrado en el bienestar de los consumidores.

(iii)   **Ley de Política Pública Energética de Puerto Rico (Ley 17-2019)**

La Ley 17-2019, promulgada el 11 de abril de 2019, establece parámetros para el cumplimiento de los objetivos de transformación de instrumentos legales anteriores. Al igual que la legislación anterior, la Ley 17-2019 se puso como objetivo reformar la AEEPR y modernizar el sistema eléctrico de Puerto Rico. Con estas metas, la Ley 17-2019 prohíbe la monopolización del sistema eléctrico Puerto Rico, y establece que ninguna compañía de servicios eléctricos podrá controlar más del cincuenta por ciento (50%) de la capacidad de activos de generación del país. Además, la Ley 17-2019 prioriza las energías renovables a través de diversos mecanismos, como agilización del proceso de autorización de proyectos residenciales energías renovables, y la obligación de eliminar la generación de electricidad mediante carbón a partir de enero de 2028. Con el objeto implementar los mandatos contenidos en la Ley 17-2019 y cumplir sus objetivos, tal como se detalla a continuación la Ley 17-2019 amplió las competencias de la CEPR, hoy NEPR, para incluir, entre otras, la capacidad de establecer incentivos en función de los resultados y mecanismos de penalización.

b)  **Servicios energéticos de la AEEPR**

Al 11 de abril de 2019, el sistema de generación de energía eléctrica de Puerto Rico constaba de dos mil setecientas cuarenta y ocho (2,748) millas de líneas de transmisión, treinta y un mil cuatrocientos ochenta y cinco (31,485) millas de líneas de distribución, y trescientos treinta y cuatro(334) subestaciones.[49] La AEEPR genera aproximadamente los dos tercios de la potencia de Puerto Rico, y adquiere electricidad adicional para satisfacer la demanda del país.[50] A junio de 2022, la AEEPR prestaba servicios a un total de aproximadamente 1.5 millones de clientes, de los cuales el noventa y uno por ciento (91%) eran residenciales, ocho por ciento (8%) comerciales y menos del uno por ciento (1%) industriales.[51]  Tomando como base el número de clientes a los que presta servicio, la AEEPR es una de las mayores compañías de servicios eléctricos de EE.UU.[52]  Los clientes comerciales de la AEEPR consumen casi la mitad de la demanda eléctrica de Puerto Rico, los residenciales el cuarenta y dos por ciento (42%), y los industriales el doce por ciento (12%).[53]  Mientras que los clientes industriales de la AEEPR están dispersos por la isla, la mayoría de sus clientes residenciales y comerciales se concentran en el área metropolitana de San Juan.[54]

---

[49] Ley 17-2019, *Exposición de motivos*.

[50] *Ibídem*

[51] *Plan Fiscal Certificado 2022 para la Autoridad de Energía Eléctrica de Puerto Rico*, 32 (28 de junio de 2022).

[52] *Ibíd.*, en 19.

[53] *Ibíd.*, en 32.

[54] *Ibídem*

Aunque la AEEPR es una de las mayores compañías públicas de electricidad de Estados Unidos, sus estadísticas de confiabilidad están bastante por detrás de los niveles de sus pares.[55] Por ejemplo, "[u]n cliente promedio de la AEEPR sufre cortes al menos una vez cada 5 a 6 semanas, frente a los 1 hasta 2 anuales de los clientes del resto del país".[56] En 2020, "la duración promedio de los cortes de suministro era casi 10 veces más prolongada para los clientes de la AEEPR que los del resto de EE.UU.".[57] Estos cortes, que se producen con frecuencia y a menudo durante períodos prolongados, tienen repercusiones significativas para los particulares y las empresas de Puerto Rico.[58] En una encuesta a los clientes de la AEEPR realizada en junio de 2020, la mayoría de los encuestados indicaron sentirse insatisfechos con la confiabilidad de los servicios eléctricos de Puerto Rico.[59]

La escasa confiabilidad de los servicios eléctricos de Puerto Rico puede atribuirse principalmente a la obsolescencia del sistema y a los daños sufridos por los sistemas de generación y de TyD como consecuencia de diversos desastres naturales. La AEEPR opera un sistema de generación que es aproximadamente "treinta (30) años más antiguo que el promedio del sector eléctrico de Estados Unidos".[60] A pesar de las medidas de reforma legislativa promulgadas en los últimos años, la AEEPR ha fracasado en modernizar su sistema operativo.[61] Sin embargo, desde que LUMA Energy asumió el control del Sistema de TyD, en junio de 2021, se ha registrado modernos avances hacia la modernización del sistema.[62] Además, aunque LUMA Energy ha propuesto numerosas iniciativas tendientes a mejorar la capacidad de la red eléctrica de resistir situaciones meteorológicas extremas, todavía no han sido implementadas.[63]

En los últimos años, los sistemas de generación y de TyD de Puerto Rico han resultado gravemente dañados por varios huracanes y terremotos. Recientemente, en septiembre de 2022, el Sistema de generación de la AEEPR sufrió los embates del huracán Fiona, una tormenta de Categoría 1. El huracán Fiona provocó el corte de suministro en toda la isla, y se estima que ha dañado aproximadamente al cincuenta por ciento (50%) de la estructura de la red eléctrica de Puerto Rico.[64] En enero de 2020, la red eléctrica de la AEEPR quedó dañada por sendos terremotos de magnitud 5.4 y 6.4, que se produjeron con un solo día de diferencia. Tras los sismos, casi las dos terceras partes de los habitantes de la isla no tuvieron electricidad durante varios días.[65] Para complicar todavía más la obsolescencia del Sistema de generación y las

---

[55] *Ibíd.*, en 20.

[56] *Ibídem*

[57] *Ibídem*

[58] *Plan Fiscal Certificado 2020 para la Autoridad de Energía Eléctrica de Puerto Rico*, 20 (29 de junio de 2020).

[59] *Ibíd.*, en 20–21.

[60] Ley 17-2019, *Exposición de motivos*.

[61] *Plan Fiscal Certificado 2020 para la Autoridad de Energía Eléctrica de Puerto Rico*, 89 (29 de junio de 2020).

[62] *Plan Fiscal Certificado 2022 para la Autoridad de Energía Eléctrica de Puerto Rico*, 184 (28 de junio de 2022).

[63] *Ibíd.*, en 68.

[64] *Véase* https://lumapr.com/news/luma-actively-responding-and-restoring-power-following-island-wide-outage-caused-by-hurricane-fiona/?lang=en; https://lumapr.com/news/damage-3/?lang=en.

[65] *Plan Fiscal Certificado 2020 para la Autoridad de Energía Eléctrica de Puerto Rico*, 59 (29 de junio de 2020).

catastróficas consecuencias de los desastres naturales en la red eléctrica, destaca la omisión histórica de la empresa de ejecutar las tareas de mantenimiento de rutina y las prácticas de la "gestión de la vegetación".[66]  Esta omisión ha expuesto a la red eléctrica de la AEEPR no solamente a eventos climatológicos extremos, sino también a trastornos más rutinarios. Por ejemplo, en 2016 entre "el 35 y el 45% de todos los cortes de servicio fueron consecuencia de condiciones de poda de árboles".[67]  En 2018, un árbol cayó sobre una línea eléctrica importante, provocando que aproximadamente 900,000 clientes quedasen sin suministro.[68]  Sin embargo, LUMA Energy ha implementado un Plan de gestión de vegetación para mitigar los riesgos vinculados a la vegetación, y ha concluido un despeje inicial de vegetación.[69]  Los ya lentos progresos de la AEEPR en la mejora de sus servicios se vieron obstaculizados todavía más por la pandemia de la COVID-19.[70]

### c)  Fuentes de ingresos y estructura de tarifas de la AEEPR

Las fuentes de ingresos de la AEEPR proceden de sus ventas de energía, que han disminuido en la última década. Aunque la AEEPR es una de las mayores compañías eléctricas públicas de Estados Unidos, en comparación con sus homólogas sus ventas a clientes son menores.[71]  La pandemia de la COVID-19 exacerbó todavía más la bajada de ventas de la empresa.[72]  Por otra parte, está previsto que las ventas de la AEEPR seguirán disminuyendo en los próximos años como consecuencia del descenso demográfico de Puerto Rico que, según las estimaciones, reducirá el consumo global de electricidad.[73]  Por otra parte, también es probable que los ingresos de la compañía disminuyan como resultado dela eventual implementación de las medidas de eficiencia energética impuestas por la reciente legislación.

Desde 2004, la AEEPR "viene operando en condiciones de déficit financiero estructural".[74]  Este déficit financiero es el resultado de, entre otras cosas, la imposibilidad de la AEEPR de ajustar sus tarifas a precios que pudieran cubrir sus costos operativos.[75]  A pesar de que la AEEPR no incrementó sus tarifas, la mayoría de los clientes de la compañía participantes de la encuesta de junio de 2020 manifestaron su insatisfacción por el costo de la electricidad.[76]

---

[66] *Plan Fiscal Certificado 2021 para la Autoridad de Energía Eléctrica de Puerto Rico*, 16 (mayo 27, 2021).

[67] *Ibídem*

[68] *Plan Fiscal Certificado 2020 para la Autoridad de Energía Eléctrica de Puerto Rico*, 58 (29 de junio de 2020).

[69] *Plan Fiscal Certificado 2022 para la Autoridad de Energía Eléctrica de Puerto Rico*, 68 (28 de junio de 2022).

[70] *Ibíd.*, en 17.

[71] *Ibíd.*, en 19.

[72] *Plan Fiscal Certificado 2021 para la Autoridad de Energía Eléctrica de Puerto Rico*, 39 (mayo 27, 2021).

[73] *Plan Fiscal Certificado 2022 para la Autoridad de Energía Eléctrica de Puerto Rico*, 29–30 (28 de junio de 2022).

[74] *Ibíd.*, en 33.

[75] *Ibíd.*, en 33–34.

[76] *Plan Fiscal Certificado 2020 para la Autoridad de Energía Eléctrica de Puerto Rico*, 20 (29 de junio de 2020).

En promedio, los clientes de la AEEPR "pagan más por la electricidad, en relación con sus ingresos, que los consumidores de cualquier otro estado de EE.UU.".[77]

La Ley 57-2014, según enmendada, requiere que el NEPR revise y apruebe las tarifas y cargos de la AEEPR por sus servicios eléctricos. La estructura actual de las tarifas de la AEEPR fue aprobada por el NEPR en 2017. Sin embargo, dicha estructura no fue implementada sino hasta el 1 de mayo de 2019 debido a los retrasos provocados por los huracanes.[78] Según los requisitos de la actual estructura de tarifas, las facturas a los clientes deben incluir una pormenorización detallada de los componentes de la tarifa.[79] Las facturas pormenorizan, entre otras categorías, la tarifa base para cubrir costos fijos, combustibles, impuestos sobre la compra de electricidad y subvenciones a municipios ( es decir Contribuciones en Lugar de Impuestos ("CELI")).[80] Para el año fiscal 2023, está previsto que los componentes de la tarifa consten de "un 5% de CELI y otros subsidios, un 24% de la tarifa básica (incluyendo costos operativos y de mantenimiento) y un 71% en concepto de costos de generación eléctrica".[81]

d) **Estructura reguladora**

(i) *Establecimiento de la CEPR*

La CEPR se constituyó en virtud de la Ley 57-2014 como entidad independiente responsable de regular, supervisar y garantizar el cumplimiento de las políticas públicas de Puerto Rico en materia de energía. De conformidad con la Ley 57-2014, la CEPR iba a estar compuesta por dos comisionados asociados y un presidente, todos nombrados por el Gobernador de Puerto Rico con el asesoramiento y consentimiento del Senado de Puerto Rico. La Ley 57-2014 requiere que los comisionados de la CEPR sean ingenieros profesionales, con licencia de Puerto Rico, abogados con licencia de Puerto Rico, o bien profesionales de la economía, la planificación o las finanzas con grados de maestría o doctorado, y con al menos cinco (5) años de experiencia en asuntos vinculados con la energía y diez (10) años de experiencia en sus respectivas profesiones.

La CEPR se estableció para facilitar la reforma del mercado energético de Puerto Rico, con el hincapié en la regulación, supervisión y aplicación de las políticas públicas del sector, y desarrollar un servicio de energía confiable, asequible, eficiente y transparente. La Ley 57-2014 requería que la CEPR priorizase una generación de energía eficiente para disminuir los costos de producción y las facturas de los clientes. En consecuencia, la CEPR quedó facultada para desarrollar e implementar estrategias que puedan reducir y estabilizar los costos de la energía. Además, la CEPR era responsable de evaluar los planes que la AEEPR venía obligada a presentar de conformidad con la Ley 57-2014 en lo relativo a los requisitos de mejorar la eficiencia energética, promover las energías renovables y abordar diversas cuestiones operativas. Como mecanismo para garantizar la bajada del costo de la electricidad, la Ley 57-2014 requería

---

[77] *Plan Fiscal Certificado 2022 para la Autoridad de Energía Eléctrica de Puerto Rico*, 32 (28 de junio de 2022).

[78] *Plan Fiscal Certificado 2020 para la Autoridad de Energía Eléctrica de Puerto Rico*, 39 (29 de junio de 2020).

[79] *Ibídem*

[80] *Ibídem*

[81] *Plan Fiscal Certificado 2022 para la Autoridad de Energía Eléctrica de Puerto Rico*, 132 (28 de junio de 2022).

que la AEEPR y otras compañías eléctricas de Puerto Rico presentasen a la CEPR sus propuestas de cambios de tarifas y cargos en concepto de sus servicios para su aprobación antes de ponerlos en vigor.

(ii) *El NEPR y las recientes revisiones de las competencias reguladoras.*

En 2018, dentro del marco del Plan de Reorganización de la Junta Reglamentadora del Servicio Público de Puerto Rico, la Comisión de Servicio Público, la Junta Reglamentadora de las Telecomunicaciones y la CEPR se consolidaron bajo el paraguas de la Junta Reglamentadora de Servicios Públicos, y el nombre de la CEPR se cambió por el de Negociado de Energía de Puerto Rico, o NEPR. La consolidación de las tres entidades no tuvo consecuencias para el estatus de la CEPR, hoy NEPR, como organismo regulador independiente ni en sus competencias de supervisión. Tal como la caracterizó el entonces Gobernador de Puerto Rico, la consolidación tuvo fines puramente administrativos.

El NEPR es el actual organismo regulador independiente, responsable de regular, supervisar y hacer valer las políticas energéticas de Puerto Rico. Mantiene una función de supervisión de los servicios energéticos de Puerto Rico, hasta el punto en que las facultades de supervisión no entren dentro de las competencias de la Junta de Supervisión establecidas por la Ley PROMESA. En la actualidad, el NEPR está compuesto por cuatro comisionados asociados y un comisionado presidente. En general, la misión general del NEPR es idéntica a la de la CEPR. Sus responsabilidades incluyen, entre otras, establecer directrices de compra de energía, definir normas para los contratos pertinentes, crear programas de respuesta a la demanda, establecer incentivos basados en los resultados y mecanismos de penalización, así como supervisar el cumplimiento de los programas de prácticas de gestión de la vegetación.

2.   **Descripción general de las filiales de la AEEPR**

El 18 de agosto de 2003, la Asamblea Legislativa promulgó la Ley 189-2003, que autoriza a la AEEPR a, entre otras cosas, (i) establecer, desarrollar o adquirir estructuras administrativas diligentes y flexibles, como corporaciones subsidiarias, filiales o asociadas con y sin fines de lucro en Puerto Rico o en el extranjero, que preparen a la AEEPR para competir en el sector, con objetivos como, entre otros, desarrollar, financiar, construir y operar proyectos industriales y otras infraestructuras directamente vinculadas con la maximización de la infraestructura eléctrica de la AEEPR, y (ii) adquirir, poseer y enajenar participaciones, contratos, bonos o intereses en otras empresas, entidades u organizaciones.

La AEEPR ha utilizado estas competencias y ha creado varias subsidiarias bajo la siguiente estructura:



| PREPA | AEEPR |
|-------|-------|
| Formerly: | Anteriormente: |

De conformidad con la legislación vigente, los Planes fiscales certificados del Estado Libre Asociado y de la AEEPR, así como con el Contrato de TyD, la AEEPR comenzó a ejecutar un plan de reorganización que sienta las bases y el calendario necesarios para reorganizar jurídica y corporativamente a empresa en diversas entidades corporativas para dividir limpiamente sus activos y funciones. La creación de las entidades corporativas, detallada con mayor detalle más adelante, debe ser aprobada por los organismos gubernamentales correspondientes.

De conformidad con la Ley Habilitadora de la AEEPR, cuando la compañía finalice toda la documentación necesaria para la creación de las subsidiarias, los documentos serán enviados a la Junta Directiva de la AEEPR para su aprobación. Seguidamente, la AEEPR deberá enviar la documentación al NEPR para su aprobación. Estos pasos deberán considerarse para cualquier calendario que se elabore para completar la reorganización de la AEEPR.



| Contribution of Generation Assets | Aportación de activos de generación |
|---|---|
| PREPA | AEEPR |
| Contribution of Hydropower and Irrigation Assets | Aportación de los activos hidroeléctricos y de regadío |
| Contribution of Those Assets Unrelated to T&D | Aportación de los activos no relacionados con T&D |
| Formerly: | Anteriormente: |

A continuación presentamos una descripción de las diversas entidades que componen la estructura de la AEEPR:

a)     **PREPA Holdings, LLC**

El 26 de octubre de 2009, la AEEPR constituyó PREPA Holdings, LLC ("PREPA Holdings") como sociedad de responsabilidad limitada domiciliada en Delaware. PREPA Holdings es una filial participada al 100% por la AEEPR, que se creó para actuar como compañía tenedora.[82] PREPA Holdings es la sociedad matriz de HUB Advanced Networks LLC ("HUB Advanced Networks"), InterAmerican Energy Sources, LLC ("InterAmerican Energy"), Consolidated Telecom of Puerto Rico, LLC ("Consolidated Telecom") e International Network Operations, LLC ("International Network Operations").

b)     **HUB Advanced Networks LLC**

HUB Advanced Networks, constituida originalmente con el nombre de PREPA Networks, LLC ("PREPA Networks"), se creó el 13 de noviembre de 2008 como sociedad de responsabilidad limitada domiciliada en Delaware. En el momento de su constitución, HUB Advanced Networks era responsable de comercializar el excedente de capacidad de

---

[82] *Informe de los Estados financieros auditados por auditores independientes de la Autoridad de Energía Eléctrica de Puerto Rico, Información complementaria adicional requerida y Calendarios suplementarios correspondientes al Año fiscal cerrado el 30 de junio de 2020*, 29 (30 de septiembre de 2022).

comunicación procedente del sistema de fibra óptica de la AEEPR.[83]   Desde su constitución, PREPA Networks se ha esforzado por ampliar su misión y sus servicios. En diciembre de 2020, PREPA Networks cambió su denominación social por HUB Advanced Networks, con el objeto de reflejar su nuevo enfoque en prestar servicios tecnológicos avanzados y de infraestructuras de telecomunicaciones.[84]

c)      **InterAmerican Energy Sources, LLC**

InterAmerican Energy se constituyó el 25 de mayo de 2007 como sociedad de responsabilidad limitada domiciliada en Delaware. InterAmerican Energy se formó para promover el desarrollo de la infraestructura eléctrica de la AEEPR.[85]   Como parte de este cometido, InterAmerican se encargaba de "invertir, desarrollar, financiar, construir y operar proyectos de energías renovables".[86]   A la fecha de publicación de esta Declaración de divulgación, InterAmerican Energy no está operativa.

d)      **Consolidated Telecom of Puerto Rico, LLC**

Consolidated Telecom se constituyó el 26 de octubre de 2009 como sociedad de responsabilidad limitada domiciliada en Delaware. Consolidated Telecom se constituyó para formar y explotar negocios de telecomunicaciones, tanto dentro como fuera de Puerto Rico.[87]   El 1 de junio de 2018, las operaciones de Consolidated Telecom fueron transferidas a PREPA Networks, hoy HUB Advanced Networks.[88]   Por cuanto el año fiscal se cerró el 30 de junio de 2021, Consolidated Telecom tuvo operaciones limitadas con un solo cliente.

e)      **International Network Operations, LLC**

International Network Operations se constituyó el 15 de junio de 2017 como sociedad de responsabilidad limitada domiciliada en Delaware. International Network Operations se formó para crear un nuevo negocio de fibra óptica y otras tecnologías de telecomunicaciones, incluyendo servicios vinculados directa o indirectamente a la infraestructura de la AEEPR.[89] International Network Operations inició sus actividades durante el año fiscal cerrado el 30 de junio de 2018.

---

[83] *Informe de los Estados financieros auditados por auditores independientes de la Autoridad de Energía Eléctrica de Puerto Rico, Información complementaria adicional requerida y Calendarios suplementarios correspondientes al Año fiscal cerrado el junio 30 de junio de 2017*, 20 (28 de junio de 2019).

[84] *Véase* Caribbean Business, *PREPA Networks changes name to HUB Advanced Networks*, 2 de diciembre de 2020, https://caribbeanbusiness.com/prepa-networks-changes-name-to-hub-advanced-networks/?cn-reloaded=1.

[85] *Informe de los Estados financieros auditados por auditores independientes de la Autoridad de Energía Eléctrica de Puerto Rico, Información complementaria adicional requerida y Calendarios suplementarios correspondientes al Año fiscal cerrado el 30 de junio de 2017*, 23 (28 de junio de 2019).

[86] *Ibíd.*, en 20.

[87] *Ibídem*

[88] *Ibídem*

[89] *Ibíd.*, en 21.

25

f)      **PREPA PropertyCo, LLC**

La creación de PREPA PropertyCo, LLC ("PropertyCo") fue aprobada por la Junta Directiva de la AEEPR el 15 de diciembre de 2021. PropertyCo es la persona jurídica que asumirá la propiedad y las operaciones de los activos de la AEEPR no vinculados al Sistema de TyD ni con las antiguas instalaciones de generación y riego. La AEEPR es la propietaria exclusiva de PropertyCo. La AEEPR ha aportado ciertos activos a PropertyCo, incluyendo activos no vinculados al Sistema de TyD ni a las antiguas instalaciones de generación y riego, así como vehículos, software y contratos.

Los asuntos de PropertyCo son gestionados y manejados por su consejo de administración, formado por integrantes de la Junta Directiva de la AEEPR. El presidente y vicepresidente del consejo de administración de PropertyCo son el presidente y el vicepresidente de la Junta Directiva de la AEEPR.

**B.      Obligaciones financieras del Deudor a la Fecha de la petición**

1.      **El Contrato de fideicomiso y los Bonos de ingresos de la AEEPR circulantes**

La 22 L.P.R.A. § 196(o) autoriza a la AEEPR "[t]omar dinero a préstamo, hacer y emitir bonos de la Autoridad para cualquiera de sus fines corporativos, y garantizar el pago de sus bonos y de todas y cualesquiera de sus otras obligaciones mediante gravamen o pignoración de todos o cualesquiera de sus contratos, rentas e ingresos solamente". 22 L.P.R.A. § 196(o).

De conformidad con aquella autorización de la Ley Habilitadora de la AEEPR, la entidad formalizó el Contrato de fideicomiso. Entre los años 1974 y 2016, la AEEPR emitió varias series[90] de Bonos, a tenor del Contrato de fideicomiso, que devengaban tasas de interés efectivas de entre el 3.9% y el 10%, con vencimiento entre 2018 y 2043.

La evidencia de reclamación presentada por U.S. Bank National Association —exclusivamente en su calidad de fideicomisario— contra la AEEPR, y registrada por Prime Clerk LLC (hoy Kroll Restructuring Administration LLC) como Evidencia de reclamación núm. 18449 (la "Reclamación de bonos principal"), afirma que, a la Fecha de petición la AEEPR tenía una deuda pendiente global de $8,258,614,148 correspondientes a sus bonos. A la Fecha de la petición, aproximadamente $843,430,000 de los Bonos estaban asegurados por Assured,[91] aproximadamente $1,245,785,000 por National[92] y aproximadamente $276,185,000 por Syncora, aunque estas cifras han cambiado como consecuencia de que, durante el Caso del Título III, las Aseguradoras monolínea abonaron pagos de conformidad con sus pólizas de seguro.[93]   La

---

[90] Según la evidencia de reclamación presentada  por la U.S. Bank National Association —exclusivamente en su calidad de Fideicomisario de bonos, contra la AEEPR, registrada por Prime Clerk LLC (hoy Kroll Restructuring Administration LLC) como Evidencia de reclamación núm. 18449, los Bonos de ingresos circulantes de la AEEPR constan de los siguientes: Serie JJ, Serie LL, Serie MM, Serie NN, Serie PP, Serie QQ, Serie RR, Serie SS, Serie TT, Serie UU, Serie VV, Serie WW, Serie XX, Serie YY, Serie ZZ, Serie AAA, Serie BBB, Serie CCC, Serie DDD, Serie EEE, Serie 2012A, Serie 2013A, Serie 2016A, Serie 2016B, Serie 2016C, Serie 2016D, Serie 2016E.

[91] *Véanse* las Evidencias de reclamación núm. 29020 y 32829.

[92] *Véanse* las Evidencias de reclamación núm. 22078 y 23396.

[93] *Véase* la Evidencia de reclamación núm. 49143.

Reclamación de la Deuda de bonos principal lleva adjunta una lista de los Bonos de ingresos circulantes de la AEEPR.

El Contrato de fideicomiso prevé la aportación de una garantía prendaria al Fideicomisario de bonos para beneficio de los Bonistas, en "Ingresos" específicos depositados en una serie de cuentas que constituyen el "Fondo de amortización,", así como en una serie de cuentas de depósito descritas aquí como "Fondos subordinados". Contrato de fideicomiso, §§ 401, 701. El Contrato de fideicomiso especifica asimismo que los Bonos de ingresos solamente serán pagaderos con cargo a los "Ingresos" prendados para garantizar los Bonos (es decir, los Ingresos depositados para su abono al Fondo de amortización y los Fondos subordinados). 22 L.P.R.A. § 207 otorga a los titulares de Bonos de ingresos el derecho a solicitar el nombramiento de un síndico para dirigir la AEEPR en caso de incumplimiento de las obligaciones asumidas a través del Contrato de fideicomiso.

Tal como se describe en la Sección V.G.2 de esta Declaración de divulgación, la prenda y el recurso del Fideicomisario de bonos están sujetos a un pleito vigente.

2.     **Préstamos de Línea de combustible**

El 4 de mayo de 2012, la AEEPR formalizó un Contrato de crédito (el "Contrato de crédito de Scotiabank") con Scotiabank de Puerto Rico ("Scotiabank") y otros prestamistas, en virtud del cual los prestamistas acordaron adelantar a la AEEPR hasta $500,000,000 (el "Préstamo de Línea de combustible de Scotiabank"). Posteriormente, la línea de crédito disponible se amplió hasta los $550,000,000, de los cuales a la Fecha de la petición había pendientes de pago $549,950,000. A partir del 17 de mayo de 2019, Cortland Capital Market Services LLC ("Cortland") sustituyó a Scotiabank como agente administrativo de los prestamistas del Contrato de crédito de Scotiabank.

El 20 de julio de 2012, la AEEPR formalizó un Contrato de Línea de crédito de financiación comercial (el "Contrato de crédito de Citibank"), en virtud del cual Citibank, N.A. ("Citibank") aceptaba adelantar hasta $250,000,000 (el "Préstamo de Línea de combustible de Citibank" que, conjuntamente con el Préstamo de Línea de combustible de Scotiabank, constituye los "Préstamos de la Línea de combustible"), de los cuales a la Fecha de la petición tenían un capital pendiente de pago de $146,042,000. Citibank era el prestamista original del Contrato de crédito de Citibank, aunque posteriormente los cedió a SOLA LTD, Solus Opportunities Fund 5 LP, Ultra Master LTD y Ultra NB LLC (conjuntamente, "Solus"), que siguen manteniendo la mayoría de dichos préstamos.

Los Préstamos de la Línea de combustible se tomaron para financiar la compra de combustibles. Ninguno de los Préstamos de Línea de combustible está garantizado.

El Contrato de crédito de Scotiabank requería que los adelantos a la AEEPR se devolvieran en un plazo de 180 días. El Contrato de crédito de Citibank requería que los adelantos a la AEEPR se devolvieran en un plazo de 270 días.

a)     **Los Acuerdos de indulgencia**

En 2014, cuando la AEEPR tuvo que enfrentarse a una crisis de liquidez, formalizó unos acuerdos de indulgencia (los "Acuerdos de indulgencia") con los Prestamistas de la Línea de combustible, el Grupo Ad Hoc y algunas aseguradoras monolínea (conjuntamente, los "Acreedores indulgentes"). En virtud de los citados acuerdos, los Acreedores indulgentes aceptan condonar la ejercitación de determinados derechos y recursos que les otorgan sus correspondientes instrumentos de deuda. Originalmente, estaba previsto que los Acuerdos de indulgencia caducasen el 31 de marzo de 2015, aunque fueron prorrogados varias veces por determinados Acreedores indulgentes; la última vez, hasta el 5 de noviembre de 2015. Los Acuerdos de indulgencia caducaron en esa fecha, pero la anuencia de los Acreedores indulgentes de abstenerse de ejercitar ciertos derechos y recursos fue prorrogada en el marco del AAR previo a la petición. Según los Acuerdos de indulgencia con los Bonistas indulgentes, se requería que la AEEPR continuara abonando todos y cada uno de los pagos de capital e intereses sobre los Bonos; sin embargo, los Bonistas indulgentes aceptaron que la AEEPR no estaba obligada a realizar transferencias a un "Fondo de ingresos" o al Fondo de amortización, de conformidad con las Secciones 506 y 507 del Contrato de Fideicomiso mientras que el mismo se mantuviera en vigor.

La AEEPR estaba autorizada, hasta el 5 de noviembre de 2015, para retrasar determinados pagos que devinieron en pagaderos a los Acreedores indulgentes en julio y agosto de 2014. De conformidad con el AAR previo a la petición, se permitió a la AEEPR retrasar todavía más dichos pagos hasta el 30 de junio de 2016. Sin embargo, la AEEPR siguió pagando intereses mientras dichos acuerdos siguieron vigentes. En relación con los Acuerdos de indulgencia, y con el objeto de abordar los problemas de liquidez de la AEEPR, el 27 de agosto de 2014 el Contrato de fideicomiso fue modificado para permitir a la AEEPR utilizar $280 millones que mantenía en su fondo de construcción para pagar los datos corrientes, así como a mejoras de capital. Esta modificación también contemplaba una subida de los umbrales requeridos para la ejercitación de los recursos previstos por el Contrato de fideicomiso. Tales enmiendas caducaron el 31 de marzo de 2015. En relación con la prórroga de los Acuerdos de indulgencia formalizada el 30 de junio de 2015, y con la anuencia de la AEEPR de pagar aproximadamente $415.8 millones de capital e intereses exigibles el 1 de julio 2015 en concepto de los Bonos de la AEEPR, el Contrato de fideicomiso volvió a enmendarse para elevar los umbrales para la ejercitación de los recursos del Contrato de fideicomiso, y para permitir la emisión de $130.7 millones en Bonos a las Aseguradoras monolínea (los "Bonos 2015A"), con vencimiento el 1 de enero de 2016. Estas enmiendas se extinguieron el 1 de septiembre de 2015. El 15 de diciembre de 2015, la AEEPR resolvió los requisitos pendientes de capital e intereses de los Bonos 2015A, los cuales fueron pagados íntegramente el primer día laborable de enero de 2016 (4 de enero de 2016), de conformidad con sus términos y condiciones.

3.   **Cuentas por cobrar**

Las cuentas por cobrar operativas de la AEEPR consisten fundamentalmente en cinco subconjuntos de clases de clientes: (i) residenciales, (ii) comerciales, (iii) industriales, (iv) entidades gubernamentales no municipales, y (v) municipios. Estas cuentas por cobrar consisten en facturaciones mensuales o bimensuales en concepto de servicios eléctricos prestados a los clientes, basadas en lecturas de medidores, y en la acumulación de ingresos por servicios eléctricos prestados a clientes no facturados al cierre de mes correspondiente. La AEEPR acumula ingresos no facturados sobre la base del promedio de consumo no facturado por cliente.

Las cuentas por cobrar auditadas de la AEEPR se contabilizan netas de provisiones para cuentas incobrables, lo cual se determinar tras considerar, entre otros, la probabilidad de posteriores cobros y las condiciones económicas reinantes. La AEEPR establece provisiones generales o específicas para cada grupo de clientes (es decir, residenciales, comerciales, industriales y gubernamentales). Como consecuencia de las incertidumbres inherentes al proceso de estimación, las pérdidas crediticias en las actuales cuentas por cobrar y en las provisiones correspondientes pueden cambiar en el futuro. Además, la AEEPR tiene significativas cuentas por cobrar al Estado Libre Asociado, a sus unidades componentes y a los municipios. Al evaluar la antigüedad del saldo de las cuentas por cobrar pendientes de la AEEPR en cualquier momento determinado, es importante tener en cuenta que los calendarios de las cuentas por cobrar incorporan importes adeudados por los municipios de Puerto Rico, que normalmente se compensa con la obligación de la AEEPR de pagar la CELI. Existe incertidumbre en cuanto al cobro de dichas cuentas debido a las dificultades que deben enfrentar las citadas entidades. La AEEPR ha considerado esta situación en sus estimaciones de las provisiones gubernamentales específicas para cuentas incobrables.

Al 30 de septiembre de 2022, la AEEPR tenía pendientes las siguientes cuentas por pagar no auditadas brutas correspondientes a sus clases de clientes más importantes: (i) $829,447,560.15 de clientes residenciales, (ii) $655,286,793 de clientes comerciales, (iii) $83,365,358.38 de clientes industriales, y (iv) $2,418,794,329.13 de clientes gubernamentales, parte de los cuales pueden estar sujetos a compensación con la CELI que la AEEPR debe pagar a los municipios.

4.      **Cuentas a pagar y pasivos acumulados**

Las cuentas por cobrar y los pasivos acumulados de la AEEPR constan de: aportaciones acumuladas al plan de pensiones y retenciones a los empleados, otras obligaciones de beneficios al extinguirse el empleo, compensaciones acumuladas, obligaciones con proveedores de combustibles y cogeneración, obligaciones con proveedores no de combustible/cogeneración ( es decir, honorarios profesionales, alquileres, seguridad, flota y almacenamiento, y gastos vinculados con el gobierno), e importantes obligaciones con proveedores de servicios de construcción.

El total de las cuentas a pagar y pasivos acumulados no auditados de la AEEPR ascendía, al 30 de septiembre de 2022, a $1,524,787,000.

5.      **Obligaciones de los convenios colectivos de trabajo de la AEEPR**

Antes del traspaso de las operaciones y de la gestión del Sistema de TyD de la AEEPR a LUMA Energy, existían cuatro sindicatos activos que representaban a los empleados de la AEEPR: la Unión Insular de Trabajadores Industriales y Construcciones Eléctricas, Inc. ("UITICE"), la Unión de Pilotos de la Autoridad de Energía Eléctrica ("UPAEE"), la Unión de Empleados Profesionales Independiente de la AEE ("UEPI" y la UTIER, conjuntamente los "Sindicatos)". Al producirse la transición, todos los empleados representados por la UITICE y la UPAEE fueron transferidos a otros cargos en el Estado Libre Asociado o en LUMA Energy. En consecuencia, la UITICE y la UPAEE ya no tienen miembros, y la UTIER y la UEPI son los únicos sindicatos de trabajadores activos que representan a los empleados de la AEEPR. A mayo

de 2022, los Sindicatos representan a más de 773 empleados de a AEEPR (los "Empleados representados"): la UTIER representa a aproximadamente 709 empleados, y la UEPI a unos 64.

Los términos y condiciones de empleo entre los Empleados representados y la AEEPR se rigen por los convenios colectivos de trabajo: uno entre la AEEPR y la UTIER (el "CCT de la UTIER") y otro entre la AEEPR y la UEPI (el "CCT de la UEPI"), conjuntamente los "CCT"). Los CCT imponen obligaciones a la AEEPR, muchas de las cuales la Junta de Supervisión ha determinado que ya no son sostenibles y que son incompatibles con el Plan Fiscal Certificado.

De conformidad con los CCT, la AEEPR proporciona diversas prestaciones laborales a los Empleados representados, incluyendo, entre otros, vacaciones pagadas, licencias, bonificaciones, horas extras y seguro de salud. Todos los convenios colectivos de trabajo con la AEEPR se han extinguido, aunque contienen cláusulas permanentes que, por consiguiente, se mantienen en pleno vigor y efecto, salvo que sean modificadas mediante una ley (como la Ley 26-2017, promulgada el 29 de abril de 2017 (la "Ley 26-2017")). El Plan contempla la modificación de dichos beneficios para ajustarlos al contenido de la Ley 26-2017, que estandariza temporalmente los beneficios —en el Estado Libre Asociado, sus agencias y corporaciones públicas— que se ofrecen a los empleados además de sus salarios. Entre otras cosas, la Ley 26-2017 (i) reduce los beneficios de días libres y de bajas por enfermedad; (ii) reduce el número de festivos públicos; (iii) reduce la bonificación de Navidad de los empleados de las corporaciones públicas a $600, prohíbe el pago de otras bonificaciones económicas, y requiere que los empleados presten sus servicios durante al menos seis (6) meses al año para percibir la bonificación de Navidad; (iv) sustituye el pago de horas extras a los empleados públicos por tiempo de compensación hasta determinados topes; (v) elimina los pagos en efectivo por los días de baja laboral acumulados y limita la liquidación de días libres acumulados a sesenta (60) días; y (vi) anula toda cláusula de los convenios colectivos de trabajo que proporcione a los empleados públicos que superen los establecidos en la Ley 26-2017.

La obligación más significativa en los CCT que van a reestructurarse de conformidad con el Plan es el requisito de que la AEEPR seguirá financiando plenamente un sistema de pensiones de los Empleados representados y de los empleados jubilados de la AEEPR. El CCT de la UTIER estipulaba la constitución de un sistema de retiro de empleados de la AEEPR. Seguidamente, la Junta Directiva de la AEEPR creó el SRE de la AEE, la entidad responsable de la administración y el pago de las obligaciones de pensiones de la empresa, de conformidad con la Resolución núm. 200, adoptada el 25 de junio de 1945. Artículo XXXVIII del CCT de la UTIER y Artículo XLII del CCT de la UEPI contiene cláusulas relativas al funcionamiento del SRE de la AEE.[94] El Artículo XXXVIII, § 1 del CCT de la UTIER estipula que el SRE de la AEE, creado a "solicitud" de antiguos convenios colectivos de trabajo, "debe continuar operando con sujeción a las propuestas de mejora que [la AEEPR o UTIER] puedan presentar los fideicomisarios del SRE de la AEE, o que estos acepten, o bien que dichos fideicomisarios consideren adecuadas".[95] El Artículo XLII del CCT de la UEPI contiene el requisito similar de que el SRE de la AEE continúe operando.[96] El Artículo XXXVIII, § 2 del CCT de la UTIER y

---

[94] CCT de la UTIER, Artículo XXXVIII, 108–9; CCT de la UEPI, Artículo XLII, 60.

[95] CCT de la UTIER, Artículo XXXVIII, en 108.

[96] CCT de la UEPI, Artículo XLII, en 60.

el Artículo XLII, § 2 del CCT de la UEPI estipulan que la AEEPR tiene que hacer ciertas aportaciones al SRE de la AEE.[97]   Específicamente, de conformidad con § 2.A del CCT de la UTIER, la AEEPR debe aportar un fondo especial del SRE de la AEE "las cantidades actuarialmente calculadas necesarias para pagar un beneficio a los trabajadores ordinarios, a los trabajadores especiales y a los trabajadores ordinarios con designaciones especiales".[98]

a)      **Reclamaciones en materia laboral previas a la petición**

        Las siguientes son demandas en materia laboral previas a la petición, presentadas por los sindicatos y que quedaron paralizadas por el Caso del Título III de la AEEPR:

        (1)      El 23 de julio de 1999, la UTIER presentó una demanda contra la AEEPR ante la Oficina de Mediación y Arbitraje del Departamento del Trabajo y Recursos Humanos de Puerto Rico ("DTRHPR") por más de 450 horas de vacaciones acumuladas en el período de 10 años iniciado el 24 de julio de 1989. El 17 de abril de 2015, el árbitro del DTRHPR dictó un laudo ordenando a la AEEPR que pagara: (i) el doble del salario correspondiente a los empleados que tuvieran vacaciones impagadas desde el 1 de agosto de 1995; (ii) una cuantía equivalente como penalización, más los intereses legales a partir de la fecha de dictado del laudo; y (iii) un 10% del total en concepto de honorarios de los abogados. El 18 de mayo de 2015, la AEEPR presentó un pleito para revocar el laudo arbitral del DTRHPR ante el Tribunal Superior de San Juan. El 18 de abril de 2016, el tribunal falló en contra de la AEEPR y desestimó el caso. El 20 de mayo de 2016, la AEEPR apeló contra la desestimación ante el Tribunal de Apelaciones de Puerto Rico. Dicha apelación quedó automáticamente paralizada como resultado de la presentación del Caso del Título III y, el 17 de noviembre de 2017, el Tribunal de Apelaciones de Puerto Rico emitió una resolución confirmando la paralización del procedimiento.

        (2)      El 17 de diciembre de 2014, la UTIER presentó una demanda contra la AEEPR ante la Junta de Relaciones Laborales de Puerto Rico ("JRLPR") debido a la decisión de la AEEPR de reducir a $600 las bonificaciones de Navidad que debían pagarse a los empleados en diciembre de 2014, a tenor de lo dispuesto por el Artículo 11(c)(iii) de la Ley 66-2014. La UTIER alegó que, al 30 de junio de 2014, la bonificación de la Navidad de 2014 ya había sido devengada. El 31 de mayo de 2017, el consejero auditor envió una notificación a la JRLPR recomendando que se ordenara a la AEEPR la cuantía en la cual se había reducido la bonificación de Navidad en diciembre de 2014. El 31 de julio de 2017, la AEEPR informó a la JRLPR que estaba en efecto la paralización debida a la presentación del Caso del Título III.

        También un grupo de empleados gerenciales de la AEEPR presentó una reclamación contra la empresa ante la Comisión de Apelaciones del Servicio Público, relacionada con la reducción de las bonificaciones de la Navidad de 2014. El asunto se paralizó como resultado de la presentación del Caso del Título III de la AEEPR.

        Otro grupo de empleados gerenciales de la AEEPR presentó dos casos ante el Tribunal de Primera Instancia de San Juan, también vinculados a reducción de las bonificaciones de la Navidad de 2014: (i) *Marie Serrano Algarín, y otros contra AEE*, Caso núm. KPE 2014-3736,

---

[97]  CCT de la UTIER, Artículo XXXVIII, en 108; CCT de la UEPI, XLII, en 61.

[98]  CCT de la UTIER, Artículo XXXVIII, en 108.

correspondiente a los empleados gerenciales jubilados, y (ii) *Antonsanti Colón, Luz Jannette y otros contra AEE,* Caso núm. KPE-2014-3737, correspondiente a los empleados gerenciales en activo. El Caso núm. KPE 2014-3736 se paralizó como resultado de la presentación del Caso del Título III de la AEEPR. El 18 de marzo de 2015, la AEEPR presentó una moción para desestimar el Caso núm. KPE-2014-3737 alegando que el tribunal no era competente y/o abstención judicial a tenor de la doctrina de agotamiento de los recursos administrativos. El Tribunal de Primera Instancia de San Juan admitió la moción y dictó una sentencia desestimando la reclamación del 10 de agosto de 2015. El Tribunal de Apelaciones de Puerto Rico confirmó dicha sentencia el 29 de enero de 2016, y el 15 de abril de 2016 el Tribunal Supremo de Puerto Rico rechazó la petición de mandamiento de avocación de los empleados gerenciales.

(3)     En mayo de 2010, la UTIER presentó ante la Oficina de Mediación y Arbitraje del DTRHPR un total de 171 reclamaciones contra la AEEPR por supuestas vulneraciones del CCT de la UTIER. A la sazón, la AEEPR había contratado nuevos empleados, y la UTIER sostenía que los empleados de emergencias previamente desplazados no estaban siendo considerados para esos cargos, como lo estipula el CCT de la UTIER. El arbitraje se celebró el 14 de mayo de 2010. El 18 de junio de 2013, el arbitraje llegó a la conclusión de que la AEEPR había vulnerado el CCT de la UTIER porque no priorizó a los empleados desplazados antes de contratar empleados nuevos. Se ordenó a la AEEPR que pagara todos los salarios que los empleados previamente desplazados hubieran devengado a partir de la fecha de contratación de los empleados nuevos. El caso ha quedado paralizado debido al Caso del Título III.

(4)     La UITICE presentó una reclamación contra la AEEPR ante la Oficina de Mediación y Arbitraje del DTRHPR por haber omitido la primera pagar las penalizaciones por no respetar los horarios de comidas durante un período prolongado. El 7 de julio de 2000, el DTRHPR dictó un laudo arbitral a favor de la UITICE. La AEEPR apeló ante el Tribunal Superior de Puerto Rico, que dictó sentencia confirmando el laudo arbitral. Con posterioridad, la UITICE solicitó al tribunal que dictara un auto ordenando a la AEEPR cumplir el laudo arbitral. El tribunal designó al contador José Luis García como comisionado especial contratado para preparar un informe que detallara las cuantías debidas a los empleados de la UITICE, así como un plan de pagos para satisfacer las cuantías adeudadas por la AEEPR de conformidad con el laudo arbitral.

Según el informe presentado por el comisionado especial, la reclamación ha sido valorada como se indica seguidamente:

| Descripción | Repercusión económica |
|---|---|
| a.  La omisión de pagar las penalizaciones por no respetar los horarios de comidas y por las horas extraordinarias trabajadas por los demandantes (incluyendo las penalizaciones, el impacto de la bonificación de Navidad, los intereses convenidos al 5% más los honorarios de abogados (7.5%)). | $2,799,323.16 |
| b.  Penalización adicional a pagar a la UITICE, más honorarios de abogados | $3,299,175.00 |

| | |
|---|---|
| (7.5%). | |
| Total | **$6,098,498.16** |

El 30 de junio de 2017, las partes presentaron un acuerdo relativo a los pagos debidos a la UITICE. En este momento, el caso está paralizado como resultado de la presentación del Caso del Título III de la AEEPR.

(5) En 2007, la UTIER presentó ante el tribunal responsable del Reglamento Local de Quiebras de Puerto Rico (RLQPR), una reclamación contra la AEEPR alegando diversas vulneraciones de su parte de las cláusulas del CCT de la UTIER entre el 11 de diciembre de 2006 y el 23 de agosto de 2008. Estas supuestas vulneraciones incluyen asuntos relativos a horarios de trabajo, tiempo de descanso de los empleados en servicio y publicación de puestos de trabajo vacantes dentro de la AEEPR. El 23 de abril de 2014, el RLQPR determinó que las cláusulas relevantes del CCT de la UTIER deberían haberse implementado durante el período en cuestión y que, en consecuencia, la AEEPR había incumplido el CCT de la UTIER. El 16 de julio de 2014, la AEEPR apeló contra esta sentencia ante el Tribunal de Apelaciones de Puerto Rico. Sin embargo, el asunto se paralizó como resultado de la presentación del Caso del Título III de la AEEPR.

6.    **Obligaciones de pensiones de la AEEPR**

a)    **Antecedentes y situación de dotación**

El SRE de la AEEPR se presenta como fideicomiso independiente "de facto" que es, no obstante, un sistema público de pensiones, establecido para recibir las aportaciones de empleador y empleados e invertirlas para sostener las obligaciones de pago del plan de pensiones de beneficios definidos de la AEEPR. El SRE de la AEEPR cubre a los actuales empleados de la AEEPR ("Participantes activos") y a los antiguos empleados jubilados que cobran mensualmente sus pensiones ("Participantes retirados"), conjuntamente los "Participantes").

En la actualidad, todos los empleados permanentes y de tiempo completo de la AEEPR tienen derecho a participar en el plan de pensiones de beneficios definidos del SRE de la AEEPR. Por lo general, el SRE de la AEEPR publica una memoria financiera anual de dominio público, que incluye estados financieros y la información complementaria correspondiente. Si el empleo de un miembro termina antes de ser elegible para cobrar cualesquiera de los beneficios del SRE de la AEEPR, tiene derecho a que se reintegren sus aportaciones más intereses compuestos anualmente. El SRE de la AEEPR no está sujeto a los requisitos de la Ley de Seguridad de Ingresos por Jubilación (ERISA) de 1974.

El SRE de la AEEPR presta diversos tipos de beneficios de jubilación, incluyendo pensiones en función de la edad y años de servicio, basadas en un porcentaje del promedio del último salario del participante, pensiones actuariales y pensiones basadas en la edad. Por lo general, los beneficios adicionales que presta el SRE de la AEEPR incluyen, entre otros:

Pensión por jubilación del servicio:

- La pensión por jubilación del servicio está basada en el promedio de la paga final del Participante. El promedio de la paga final es el promedio de los tres salarios básicos anuales más altos. En el caso de los Participantes activos que empezaron a trabajar en la AEEPR a partir del 1 de enero de 1993, el salario básico anual está limitado a $50,000.

- En el caso de los Participantes contratados antes del 30 de septiembre de 1990, los beneficios de la pensión se coordinan opcionalmente con la Seguridad Social.

Ajuste por costo de vida:

- Los incrementos por costo de vida de las pensiones se aplicaron a partir del 1 de julio de 1992 a todas las pensiones otorgadas hasta el 30 de junio de 1990, a saber:

  - Ocho por ciento (8%) de aumento de la pensión mensual hasta $300
  - Cuatro por ciento (4%) de la pensión mensual entre $300 y $600
  - Dos por ciento (2%) de la pensión mensual de más de $600

- El incremento mínimo mensual es de $25, y el máximo, de $50. A las pensiones actuariales se les aplica el incremento mínimo de $25 mensuales si se concedieron hasta el 30 de junio de 1990.

- Los futuros incrementos automáticos del costo de vida se aplican bajo los mismos términos y condiciones cada tres años a partir del 1 de julio de 1992, o bien desde la fecha de jubilación a todos quienes se retiraron después del 30 de junio de 1990.

Pensión de viudedad:

- Los cónyuges supervivientes de los Participantes retirados que perciben una pensión recibirán un beneficio equivalente al treinta por ciento (30%) de la pensión anual pagadera a los Participantes retirados en el momento de su fallecimiento, con sujeción a una serie de condiciones:

Prestación por discapacidad:

- Con sujeción a determinadas condiciones, un Participante activo podrá retirarse con una pensión de discapacidad solicitada por la AEEPR si dicha persona tiene al menos cinco (5) años de servicio acreditado en caso de haber sido contratada antes del 1 de enero de 1993, o bien al menos diez (10) años de servicio acreditado si fue contratada a partir del 1 de enero de 1993, siempre y cuando su discapacidad no esté relacionada con un accidente laboral certificado por la Corporación del Fondo del Seguro del Estado (CFSE) de Puerto Rico.

Bonificaciones y otros beneficios:

70

- Los retirados perciben una bonificación de Navidad de $400

- Los retirados perciben una bonificación de Verano de $100

- Una prestación de hasta $1,000 para gastos funerarios

En abril de 2022 había aproximadamente 12,336 Participantes retirados que percibían una pensión mensual de $1,815; en mayo de 2022 había 3,592 Participantes activos[99] en el sistema de pensión.[100] Estas cifras incluyen a los Transferidos movilizados de la AEEPR, que fueron transferidos al Estado Libre Asociado y a otras entidades gubernamentales (los "Transferidos movilizados"), aunque no a los antiguos empleados de la AEEPR que hoy trabajan para LUMA Energy. Hoy en día, unos 1,000 exempleados de la AEEPR trabajan para LUMA Energy y participan en un plan de beneficios definidos patrocinado por LUMA Energy. En la fecha en que LUMA Energy empezó a prestar sus servicios, aproximadamente unos 2,000 empleados de la AEEPR fueron transferidos al Estado Libre Asociado y a otros organismos gubernamentales de conformidad con los requisitos de la Ley 120-2018, enmendada por la Ley 17-2019. A la fecha de publicación de esta Declaración de divulgación, a los Transferidos movilizados se les siguen deduciendo de sus salarios las aportaciones al SRE de la AEEPR. El SRE de la AEEPR sostiene la posición de que los Trasladados movilizados tienen derecho de acumular años de servicio adicionales y a beneficios de pensiones de la AEEPR más elevados dentro del marco del SRE de la AEEPR, incluso si han sido transferidos a otras entidades gubernamentales. Los beneficios de los Participantes del SRE de la AEEPR se determinan en función de los años de servicio y niveles de remuneración antes de la fecha de jubilación. Los Participantes elegibles perciben un porcentaje de sus salarios en forma de pensión definida vitalicia.

A pesar de lo establecido en los CCT en materia de aportación de fondos al SRE de la AEEPR, este se encuentra materialmente infradotado. Al 30 de junio de 2020, el SRE de la AEEPR mantenía un pasivo actuarial con los Participantes de aproximadamente $4,300 millones, cuantía avalada por solamente $762 millones en activos.[101] Esto representa una ratio de financiación del 18%, que baja al 12% cuando se excluyen los activos ilíquidos.[102] Esto implica que los activos del SRE de la AEEPR cubren solamente el 18% de su pasivo actuarial acumulado.[103] A junio de 2022 se estimaba que los activos del SRE de la AEEPR se agotarán a comienzos del Año fiscal 2024, momento en el cual el organismo no tendrá fondos para pagar los beneficios de pensiones.[104]

---

[99]  *Plan Fiscal Certificado 2022 para la Autoridad de Energía Eléctrica de Puerto Rico*, 173 (junio 28, 2022). ("Los 3,592 incluyen a más de 2,000 antiguos empleados de la AEEPR que fueron transferidos a organismos del Estado Libre Asociado en el momento de la formación de LUMA.  [SRE de la AEEPR] y la Junta de Supervisión mantienen conversaciones relativas a la continuidad de la acumulación de beneficios de pensiones adicionales en [el SRE de la AEEPR] para estos empleados".).

[100]  *Ibídem*

[101]  *Ibíd.*, en 175.

[102]  *Ibídem*

[103]  *Ibíd.*, en 176.

[104]  *Véase ibíd.* en 176.

La significativa situación infradotada del SRE de la AEEPR despierta inquietudes por la solvencia del fideicomiso y de su capacidad de seguir abonando pagos a los Participantes retirados. Para garantizar que los Participantes perciban sus prestaciones mensuales, el Plan prevé aportar fondos para los retirados en el marco de un sistema de pago a medida que se avanza ("PayGo"), financiado con las tarifas de electricidad básicas de la AEEPR, según se describe en el Plan fiscal certificado.

Tras exhaustivas negociaciones con el SRE de la AEEPR, incluyendo a través de mediadores, la Junta de Supervisión ha determinado que es necesario rechazar los convenios colectivos de trabajo que exigen a la AEEPR seguir manteniendo al SRE de la AEEPR como plan de beneficios definidos. La Junta de Supervisión ha determinado que las siguientes medidas son esenciales para aportar el financiamiento adecuado de las obligaciones de las futuras pensiones del SRE de la AEEPR: (a) cerrar el sistema de pensiones a futuro participantes; (b) a partir de la Fecha de entrada en vigor, congelar los beneficios de los actuales Participantes activos, incluyendo —para evitar cualquier duda— a los Transferidos movilizados; (c) eliminar los ajustes de costo de vida para los Participantes a partir de la Fecha de entrada en vigor; (d) convertir la financiación al SRE del AEEPR desde aportaciones actualmente determinadas o basadas en algún otro porcentaje del salario anual, en un sistema PayGo que financie los beneficios anuales; y (e) establecer un Fideicomiso PayGo de la AEEPR para sustentar el pago de las pensiones. Estas medidas, que incluyen detalles adicionales relacionados con el congelamiento de los beneficios de pensiones, están incorporadas en el Resumen de la Reforma de pensiones y del Fideicomiso PayGo de la AEEPR, adjunto al presente documento en forma de Anexo G.

b)    **Reclamaciones del SRE de la AEEPR**

A junio de 2019, el SRE de la AEEPR mantenía una reclamación contra la AEEPR por un total de $3,600 millones, correspondientes a (i) aproximadamente $600 millones en concepto de aportaciones exigibles al empleador, y (ii) $3,000 millones en concepto de pasivos no dotados.[105]  A diferencia del Caso del Título III del Estado Libre Asociado, las obligaciones de pensiones son debidas al SRE de la AEEPR, y no a los propios Participantes (que, en cambio, mantienen reclamaciones contra el SRE de la AEEPR).

El 6 de agosto de 2019, el SRE de la AEEPR presentó una reclamación contra la AEEPR y otras partes [Proc. abr. núm. 19-405, ECF núm. 1]. El SRE de la AEEPR solicitaba que el Tribunal del Título III determinara que todas las cuantías adeudadas al SRE de la AEEPR eran "Gastos corrientes" a tenor del Contrato de Fideicomiso, alegando que las aportaciones a las pensiones y al sistema de retirados están calificadas como "Gastos corrientes" en dicho Contrato. El SRE de la AEEPR sostiene que dichos "Gastos corrientes" deben pagarse antes de abonar pagos adicionales al Fideicomisario de bonos o los bonistas de la AEEPR. Consulte un resumen del Proc. abr. núm. 19-405 en la Sección V.G.4 de esta Declaración de divulgación.

---

[105] La Junta de Supervisión y sus asesores no han realizado un cálculo independiente de la cuantía de esta reclamación.

7.    **Otras obligaciones de beneficios posteriores al empleo**

Entre otros beneficios (no jubilatorios) posteriores al empleo ("OPEB", por sus siglas en inglés) que la AEEPR proporciona a sus empleados retirados se incluyen las prestaciones médicas.[106] Estas prestaciones no se pagan con cargo al Fideicomiso del SRE de la AEEPR.[107] Los empleados retirados con al menos treinta (30) años de servicios son elegibles para recibir las prestaciones médicas.[108]   A junio de 2022, aproximadamente 8,200 empleados jubilados disfrutaban de las prestaciones de OPEB.[109]   Dichos beneficios carecen totalmente de dotación.[110]  En la actualidad, las prestaciones médicas englobadas en OPEB están incluidas en el presupuesto operativo de la AEEPR y cuestan unos $12 millones anuales.[111]

8.    **Combustible, compra de energía y obligaciones de los Contratos de Energías renovables**

La AEEPR suministra electricidad empleando energía procedente de las centrales de generación de su propiedad y adquirida a productores de energía independientes ("PEI") en el marco de Contratos de compraventa de energía ("PPOA", por sus siglas en inglés). El suministro de los PEI durante el año fiscal 2022 constó de 984 megavatios ("MW") de capacidad de generación de dos centrales eléctricas convencionales, y 254 MW de electricidad generada por diversos proveedores de energía renovables. Antes de presentar la petición del Título III, la AEEPR tenía formalizados más de sesenta (60) PPOA para proyectos de energías renovables, en virtud de los cuales la AEEPR aceptaba adquirir las energías renovables generadas por sus contrapartes. La AEEPR formalizó PPOA después de que el Estado Libre Asociado promulgara los Estándares de la cartera de energía renovable. Hasta 2018 se habían desarrollado y estaban operativos solamente once (11) de los sesenta (60) PPOA originales. Considerando la necesidad de agilizar el desarrollo de recursos energéticos renovables de bajo costo y bajas tarifas eléctricas, en 2018 la AEEPR determinó que era menester evaluar y renegociar los PPOA vigentes con el objeto de conseguir bajos precios acordes con las tendencias del mercado.

De conformidad con el Plan fiscal certificado de la AEEPR, la empresa ha renegociado varios PPOA para procurar una reducción de sus actuales precios. Hasta la fecha, los progresos en estas iniciativas incluyen enmiendas del (i) PPOA con EcoEléctrica, L.P. ("ECO"); (ii) Contrato de compraventa de gas natural ("CCVG") con Naturgy Aprovisionamientos S.A. ("Naturgy"); (iii) PPOA con CIRO; y (iv) PPOA con Xzerta-Tec Solar I, LLC ("Xzerta"). La AEEPR también negoció con nueve contrapartes para enmendar los PPOA operativos existentes con el objeto de conseguir un objetivo de un 10% de ahorro durante el resto de la vigencia de los mismos. La AEEPR alcanzó un acuerdo con siete de las nueve. La Junta de Supervisión aprobó las modificaciones el 30 de septiembre de 2020, tras lo cual el NEPR hizo lo

---

[106] *Ibíd.*, en 173.

[107] *Ibídem*

[108] *Ibídem*

[109] *Ibídem*

[110] *Ibídem*

[111] *Ibídem*

propio el 16 y el 19 de octubre de 2020. Por su parte, la Autoridad P3 los aprobó el 5 de noviembre de 2020. Los contratos modificados entraron en vigor en enero y febrero de 2021.

a)      **contratos modificados con EcoEléctrica y Naturgy**

ECO y la AEEPR son partes del contrato operativo de compra de energía formalizado el 10 de marzo de 1995 (el "<u>PPOA de ECO</u>"). Naturgy y la AEEPR son parte de un contrato de servicios de tarificación y del CCVG del 31 de octubre de 1997 y del 10 de marzo de 2014 (el "<u>CCVG con Naturgy</u>"), respectivamente. El PPOA de ECO y el CCVG sirvieron como base contractual para el programa (el "<u>Programa GNL a energía</u>"), en virtud del cual (i) Naturgy importaba gas  natural licuado ("<u>GNL</u>") a un terminal de regasificación de Puerto Rico, propiedad de ECO y situado en Peñuelas (el "<u>Terminal de GNL de ECO</u>"), se convertía el GNL en gas natural y se vendía este a la AEEPR para alimentar las instalaciones de generación de Costa de conformidad con los términos y condiciones del CCVG con Naturgy, y (ii) ECO importaba GNL a Puerto Rico, lo convertía en gas natural en el Terminal de GNL de ECO para alimentar las instalaciones de generación de ECO, y vendía la capacidad de generación y la energía de dichas instalaciones a la AEEPR de conformidad con los términos y condiciones del PPOA de ECO. Históricamente, la AEEPR ha obtenido hasta el cuarenta por ciento (40%) de la potencia de carga básica a través del Programa GNL a energía. Estaba previsto que el CCVG con Naturgy se extinguiera en diciembre de 2020, y el PPOA de ECO en marzo de 2022.

A finales de 2018, la AEEPR inició el proceso de renegociación de los términos del PPOA de ECO y del CCVG con Naturgy con el objeto de reducir costos de una manera congruente con los planes fiscales certificados de la AEEPR de 2018 y 2019. Dicho proceso de negociación conllevó la formalización del Contrato de compraventa de energía y operativo reformulado y enmendado del 27 de marzo de 2020 (el "<u>PPOA de ECO enmendado</u>"), y el Contrato de compraventa de gas natural reformulado y enmendado del 23 de marzo de 2020 (ECF núm. 12579-3, el "<u>CCVG con Naturgy enmendado</u>"), conjuntamente los "<u>Contratos enmendados</u>").

Los Contratos enmendados (i) prorrogan el Programa GNL a energía hasta el 30 de septiembre de 2032; (ii) reestructuran los acuerdos de suministro de combustible, de manera que (a) Naturgy importa GNL, lo convierte en gas natural en la Terminal de GNL de ECO, y vende el producto a la AEEPR para su distribución a cada una de las instalaciones de generación, y (b) la AEEPR suministra (pero no vende) gas natural a las instalaciones de generación de ECO; y (iii) reestructuran el PPOA de ECO, de tal manera que ECO facilita capacidad de generación desde sus instalaciones para su despacho, utilizando el gas natural suministrado por la AEEPR, a cambio de un pago mensual a la AEEPR (tal y como a continuación se define en el Nuevo PPOA de ECO, el Pago por capacidad). El cumplimiento por las partes de un contrato depende del cumplimiento de las partes del otro contrato.

La capacidad de la AEEPR de disponer de electricidad de bajo costo compatible con las normas de la Agencia de Protección de Medio Ambiente de EE.UU. (Environmental Protection Agency, "<u>EPA</u>"), de una manera segura para los consumidores desde las instalaciones de generación depende de un suministro ininterrumpido y a largo plazo de gas natural. Los Contratos enmendados son la única opción económica de despachar fuentes de generación de gas natural en la región meridional de Puerto Rico tras la extinción del PPOA de ECO y del CCVG

con Naturgy. Naturgy controla la totalidad de la capacidad existente de la terminal de importación de ECO para recibir y gasificar GNL para alimentar gas natural a los centros de generación. Los proveedores externos de GNL no tienen derecho de acceso a esta terminal. Los bajos costos y los derechos usufructuarios de ECO en el sector eléctrico de Puerto Rico, así como el monopolio de facto de Naturgy sobre el suministro de gas a la zona meridional de Puerto Rico limitan las alternativas de la AEEPR para un proveedor de gas natural y energía.

La renegociación de los Contratos enmendado a las tarifas de mercado actuales, que son significativamente inferiores que las pactadas en los contratos originales, supone un ahorro para los usuarios. Históricamente, la AEEPR pagaba 12.4 centavos/kWh en concepto de generación desde las instalaciones de ECO (fijos, más costos variables), aunque de conformidad con los contratos renegociados posiblemente pagará 10.7 centavos/kWh. La AEEPR ha determinado que dicha reducción en costos de generación conllevará un sustancial ahorro para los usuarios de Puerto Rico. Además, el CCVG con Naturgy enmendado eliminó un mecanismo que actuaba como una cobertura integrada al petróleo. La AEEPR proyecta que dicha supresión y la reducción de la tasa de suplemento conllevarán un ahorro promedio para la AEEPR de aproximadamente $29.1 millones anuales para la central generadora de 820 MW de la AEEPR en Costa Sur (la "Central generadora de Costa Sur"). El ahorro se basa en las previsiones de precios de los combustibles, que apuntan a que los precios del gas natural se mantendrán muy por debajo de los del petróleo en la próxima década.

La AEEPR determinó que los Contratos enmendados supondrán un significativo ahorro de costos para la empresa, que serán fundamentales para sus operaciones y sus posibilidades de atender sus obligaciones de deuda mientras continúa su Caso del Título III, gracias a lo cual dispondrá de una fuente confiable y continua de energía y gas natural en condiciones razonables. El 26 de diciembre de 2019, la Junta de Supervisión aprobó tanto el PPOA de ECO enmendado como el CCVG con Naturgy enmendado de conformidad con la política de revisión de contratos (la "Política de revisión de contratos") establecida de conformidad con la Sección 204(b)(2) de la Ley PROMESA, confirmando que la AEEPR cumple el Plan fiscal 2020 de la AEEPR.

También el NEPR aprobó los Contratos enmendados, a través de un proceso mediante el cual confirmó que la AEEPR había aportado un sólido análisis de los mismos, y confirmó que los términos y condiciones de esos contratos eran favorables. Sin embargo, la UTIER y algunas organizaciones ambientales han presentado solicitudes al NEPR para que reconsidere su decisión. El NEPR todavía no ha tomado una decisión. Además, el 22 de junio de 2020, el Tribunal de Título III aprobó la hipótesis de los contratos enmendados. La UTIER, diversas organizaciones ambientales y una contraparte de otro PPOA apelaron al Primer Circuito. El 12 de agosto de 2021, el Primer Circuito confirmó la decisión del Tribunal del Título III.

b)      **Renegociación de los PPOA no operativos.**

De los sesenta (60) PPOA que la AEEPR formalizó para energías renovables, consiguió progresos sustanciales en el desarrollo de aproximadamente diecinueve (19), aunque no llegaron a una fase operativa. Durante 2019 y 2020, la AEEPR y las contrapartes de dieciséis (16) del total de diecinueve (19) PPOA no operativos alcanzaron acuerdos para reducir los precios contractuales previamente pactados. Los contratos renegociados comprendían la generación de más de 590 MW de energías renovables que, se estimaba, permitirían a la AEEPR ahorrar más

de $1,000 millones durante su vigencia, siempre y cuando alcanzasen la fase de explotación comercial.

La Junta de Supervisión limitó su aprobación de nuevos contratos de energía solar de hasta 150 MW, determinando que la aprobación de los prácticamente 600 MW de nueva generación solar propuestos en los 16 PPOA conllevarían tarifas superiores a las proyectadas en el plan fiscal de la AEEPR. El 20 de septiembre de 2020, la AEEPR notificó a las contrapartes de los 16 PPOA que seguiría adelante solamente en los contratos que comprendían la generación de hasta 150 MW de energías renovables. Tras un posterior proceso de evaluación y renegociación para ajustarse a otros requisitos de la Junta de Supervisión, y tras obtener la aprobación definitiva de este organismo y del NEPR, en junio y en julio de 2021 la AEEPR formalizó los PPOA enmendados y reformulados con Xzerta y con CIRO One Salinas, LLC ("CIRO One") para proyectos de energía solar fotovoltaica de 60 MW y 90 MW, respectivamente.

El 2 de agosto de 2021, la AAFAF, la Junta de Supervisión y la AEEPR presentaron sendas notificaciones de subrogación de los contratos de compra de energía entre la AEEPR y Xzerta,[112] y entre la AEEPR y CIRO One.[113]  El 10 de agosto de 2021, Windmar Renewable Energy, Inc. ("Windmar") presentó una objeción a la subrogación de los citados PPOA.[114]  El Tribunal del Título III desestimó la objeción de Windmar por falta de fundamentos, y aprobó la subrogación de los PPOA por parte de la AEEPR.[115]  El 8 de diciembre de 2021, el Tribunal del Título III dictó una orden de subrogación de los PPOA con CIRO One y Xzerta.[116]  En este momento, CIRO One y Xzerta están colaborando con LUMA Energy en los estudios de interconexión y en los procesos de planificación.

c)     **Renegociación de los PPOA operativos**

La AEEPR y las contrapartes de seis PPOA operativos que se formalizaron entre los años 2011 y 2013 alcanzaron acuerdos para modificar el precio por kW/h pactado con la AEEPR. Estos contratos comprenden la generación de más de 250 MW de energías renovables y redujeron sus precios entre un 10 y un 15%, lo cual conllevó un ahorro estimado de $200 millones (no descontados) durante el resto de la vigencia de los contratos enmendados, con posibles incrementos de la capacidad de 5 a 10 MW y prórrogas contractuales de 5 a 10 años. La mayoría de estas transacciones incluyeron tanto moderadas prórrogas y posibles aumentos de la capacidad de generación de energías renovables en las centrales afectadas por los PPOA y, por consiguiente, se esperaba un refuerzo de las iniciativas de la AEEPR para cumplir el requisito de cartera de energías renovables impuesto por la Ley 17-2019 y el PIR operativo.

La AEEPR envió los PPOA modificados a la revisión y aprobación del NEPR y de la Junta de Supervisión. El 30 de septiembre de 2020, la Junta de Supervisión aprobó dichas enmiendas mediante una carta que identificaba un ahorro de entre $495 y $525 millones durante

---

[112] *Véase* el Caso núm. 17-bk-4780, ECF 2577.

[113] *Véase* el Caso núm. 17-bk-4780, ECF 2578.

[114] *Véase* el Caso núm. 17-bk-4780, ECF 2591.

[115] *Véase* el Caso núm. 17-bk-4780, ECF 2629.

[116] *Véase* el Caso núm. 17-bk-4780, ECF 2667.

los Años fiscales de 2021 a 2049. El NEPR aprobó los PPOA modificados entre septiembre y octubre de 2020, y el Tribunal del Título III autorizó la subrogación el 2 de diciembre de 2020.[117]

d)   **Rechazo de los PPOA**

La AEEPR presentó diversas mociones ante el Tribunal del Título III, solicitando rechazar 27 PPOA no operativos, o contratos prácticamente equivalentes, mociones que se describen más adelante, en la Sección V.I.2(f) de la Declaración de divulgación.

9.   **Contingencias y obligaciones ambientales**

Contingencias ambientales

Las instalaciones y operaciones de la AEEPR están sujetas a las normativas de las leyes ambientales federales y puertorriqueñas, incluyendo la Ley de Aire Limpio, la Ley de Aguas Limpias, la Ley de Contaminación por Petróleo, la  Ley de Conservación y Recuperación de Recursos, la Ley de Agua Potable Segura, la Ley de Planificación de Emergencia y Derecho a la Información de la Comunidad y la Ley Integral de Respuesta, Compensación y Responsabilidad Ambiental ("CERCLA, por sus siglas en inglés"). La AEEPR supervisa continuamente su cumplimiento de leyes y reglamentos, y revisa sus obligaciones de subsanación.

Decreto de Consentimiento de 1999

En 1993, los Estados Unidos de América, a través de su Departamento de Justicia (el "DOJ") y de la EPA, presentaron una reclamación contra la AEEPR ante el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico (Acción civil núm. 93-2527 CCC). En la misma se alegaban vulneraciones ambientales por parte de la AEEPR a tenor de diversos estatutos ambientales federales, incluyendo los relativos al aire, las aguas y los residuos en las instalaciones de generación de Palo Seco, San Juan, Aguirre y Costa Sur, y el centro de transmisión de Monacillos. En 1999, el Tribunal dictó un auto de consentimiento en el caso (el "Decreto de consentimiento"). El Decreto de consentimiento obliga a la AEEPR a mejorar e implementar programas y operaciones para garantizar el cumplimiento de las leyes y normas ambientales.

En 2004, el Tribunal dictó una Modificación del Decreto de consentimiento (la "Modificación de 2004"). La Modificación de 2004 obligaba a la AEEPR a reducir el contenido de sulfuro del fueloil núm. 6 empleado en ciertas unidades generadoras de las centrales eléctricas de Costa Sur, Aguirre, Palo Seco y San Juan. Además, la Modificación de 2004 exigía que la AEEPR implementase un programa de reducción de emisiones de nitróxido en determinadas unidades, y que modificara los rangos operativos óptimos de las unidades citadas en el Decreto de Consentimiento.

A la fecha de esta Declaración de divulgación, los Estados Unidos están revisando el Decreto de consentimiento revisado. Una vez que concluyan estas negociaciones, el Decreto de

---

[117] *Véase* el Caso núm. 17-bk-4780, ECF 2317.

consentimiento modificado deberá registrarse en el tribunal y pasar por los procesos de notificación pública y comentarios antes de su aprobación. La AEEPR todavía no ha informado de cualesquiera costos correspondientes que se considerarían una responsabilidad contingente.

### Cumplimiento de las normativas de calidad del aire y de las aguas

La AEEPR viene obligada a cumplir en todo momento los requisitos de calidad del aire (opacidad incluida) y de las aguas. De conformidad con el Decreto de consentimiento, la AEEPR está sujeta a las penalizaciones previstas en caso de incumplimientos o desviaciones. En el año fiscal 2020, la AEEPR ha pagado penalizaciones estipuladas de unos $37,000. La empresa sigue desarrollando e implementando un exhaustivo programa para mejorar el cumplimiento de la normativa ambiental. Este programa ha sido, y continúa siendo, actualizado continuamente para ajustarlo a los nuevos requisitos.

### Normas de Mercurio y Tóxicos de Aire

Las Normas de Mercurio y Tóxicos de Aire ("MATS", por sus siglas en inglés) establecen estándares nacionales de emisiones de contaminantes aéreos peligrosos, incluyendo límites de emisiones y normas de prácticas laborales, aplicables a unidades generadoras de vapor alimentadas por petróleo y carbón ("UGE") en áreas continentales y no continentales. La AEEPR es propietaria y opera catorce (14) UGE alimentadas por petróleo afectadas por la normativa.

Dado que las MATS entraron en vigor el 16 de abril de 2015 (en Aguirre, el 16 de abril de 2016), las unidades de la AEEPR han experimentado diversos períodos de incumplimiento de las normas. En consecuencia, las AEEPR y los Estados Unidos están negociando la manera de abordar los eventos de incumplimiento. Si la AEEPR alcanzara un acuerdo con los Estados Unidos en lo relativo al incumplimiento de las MATS, el decreto de consentimiento resultante casi seguramente requerirá que la AEEPR asuma diversos gastos relacionados con el cumplimiento, así como el pago de multas.

El 24 de agosto de 2020, el NEPR publicó su orden final relativa al PIR de la AEEPR. Está previsto que el PIR aprobado constituya la base de un potencial plan de cumplimiento de las MATS. También está previsto que el Plan de implementación estatal ("PIS") para el dióxido de azufre que está desarrollando el Departamento de Recursos Naturales y Ambientales ("DRNA"), que se describe más adelante, aporte información a dicho decreto. La AEEPR no ha identificado ninguna pérdida contingente que tenga probabilidades de producirse en relación con el incumplimiento de las MATS y del PRI.

### Cumplimiento de la Norma Nacional de Calidad del Aire Ambiental (NAAQS) del SO2

El 9 de enero de 2018, la EPA publicó en el Registro Federal la tercera ronda de las delimitaciones definitivas de áreas de conformidad con la Norma Nacional de Calidad del Aire Ambiental ("NAAQS", por sus siglas en inglés) de dióxido de nitrógeno ("SO2"), que incluye las definiciones de incumplimiento, que entró en vigor el 9 de abril de 2018. La EPA identificó en Puerto Rico dos (2) zonas en las que se incumplían los límites de SO2: las regiones de San Juan y de Guayama-Salinas. La Ley del Aire Limpio requiere que los organismos correspondientes adopten medidas para controlar la contaminación del aire en las áreas en que se incumplen los límites de SO2. Estas medidas pueden incluir controles más estrictos sobre las

instalaciones industriales. Los gobiernos estatales y locales detallan dichas medidas en planes que demuestran cómo cumplirán la norma del SO2. Dichos planes estatales se denominan PIS. Desde la fecha de entrada en vigor de las delimitaciones definitivas, los estados tienen dieciocho (18) meses para preparar y presentar su PIS ante la EPA. El PIS de Puerto Rico debía haberse entregado a la EPA hasta el 9 de octubre 2019. El PIS debe demostrar cómo las áreas afectadas van a cumplir la norma lo más rápidamente posible, pero no más tarde del 9 de abril de 2023. Puerto Rico no cumplió el plazo inicial, 9 de octubre de 2019, de presentación de su SIP, y lo hizo el 22 de noviembre de 2022. La EPA consideró dicha presentación cumplida el 3 de diciembre de 2022. En este momento, Puerto Rico espera los comentarios de la EPA sobre el PIS presentado el 22 de noviembre de 2022.[118]

El DRNA ha estado colaborando con la EPA para la presentación de un PIS adecuado para evitar sanciones (que pueden incluir que Puerto Rico no perciba determinados fondos federales). El 11 de marzo de 2022, el DRNA publicó una propuesta de PIS para comentarios públicos, y celebró una audiencia pública sobre el mismo el 11 de abril de 2022. Según el DRNA y la EPA, las centrales eléctricas de las AEEPR son las principales emisoras de SO2 en las áreas identificadas. Las instalaciones afectadas de la AEEPR en las áreas afectadas son las centrales de San Juan, Palo Seco y Aguirre. Desde la identificación de incumplimiento, la AEEPR y el DRNA han estado en comunicación, de modo que el PIS aprobado considere la situación de la implementación del PIR y de los proyectos de la AEEPR, aprobados por el NEPR en agosto de 2020, así como otras consideraciones en materia de confiabilidad. El DRNA no ha comunicado a la AEEPR nada sobre la prevista presentación a la EPA del PIS del DRNA.

Obligaciones de subsanación de contaminación

Tras las actuaciones iniciadas por la EPA, tres emplazamientos de la AEEPR requieren un análisis de las obligaciones de subsanación de la contaminación ("OSC") de la empresa: el emplazamiento de Protección Técnica Ecológica en Peñuelas (el "Emplazamiento de Proteco"), el emplazamiento de gestión de residuos sólidos en Vega Baja (el "Emplazamiento de Vega Baja") y el emplazamiento situado en Toa Baja que incluye la central eléctrica de Palo Seco (el "Emplazamiento de Palo Seco").

El Emplazamiento de Proteco

El 28 de marzo de 2019, y de conformidad con lo dispuesto por la CERCLA, la EPA cursó a la AEEPR una notificación de potencial responsabilidad y solicitud de información en relación con el Emplazamiento de Proteco. La EPA sostiene que la AEEPR es parte potencialmente responsable ("PPR") del Emplazamiento de Proteco, en calidad de tramitador, que por contrato o acuerdo, concertó el vertido o tratamiento de sustancias peligrosas en el Emplazamiento de Proteco. El 28 de junio de 2019, la AEEPR recibió de la EPA una carta de notificación especial solicitándole que formalizara un acuerdo de conciliación administrativo y una orden de consentimiento ("ASAOC", por sus siglas en inglés) para la realización de una investigación subsanadora y un estudio de viabilidad ("IS/EV")[119] del Emplazamiento de

---

[118] https://www.elnuevodia.com/english/news/story/poor-air-quality-no-new-sanctions-for-puerto-rico/

[119] Una IS/EV (RI/FS, por sus siglas en inglés) es un proceso regulatorio para la recogida de datos para caracterizar las condiciones de un emplazamiento, determinar la naturaleza de los residuos, evaluar los riesgos para la salud humana

Proteco. La AEEPR considera que se envió una carta de notificación especial también a otras PPR.

En septiembre de 2020, la AEEPR y otras PPR (el "Grupo de PPR") formalizó un ASAOC (CERCLA- 02-2020-2010) con la EPA para realizar la IS/EV. El ASAOC requiere que el Grupo de PPR pague a la EPA una cuantía de aproximadamente $444,708 en concepto de costos de respuesta tardía. Además, estipula que el Grupo de PPR aporte garantías financieras, inicialmente por unos $5 millones (según el costo estimado de la obra), con la EPA como beneficiaria.

La parte de la AEEPR se aplicará al pago de las tareas de la IS/EV realizados en el vertedero y considerados partes de la responsabilidad, así como el pago y asunción de futuros pasivos que puedan imponerse por incumplimiento del ASAOC. La IS/EV se encuentra actualmente en sus primeras fases. La Junta Directiva de la AEEPR autorizó una inversión inicial de aproximadamente $1.5 millones para pagar la parte de la empresa en los costos totales de la IS/EV.

El Emplazamiento de Vega Baja

En 2002, la AEEPR recibió una Notificación especial relativa a una Investigación subsanadora /Estudio de viabilidad del suelo del Emplazamiento de Vega Baja. La EPA identificó a la AEEPR y a otras seis entidades como PPR.

El 25 de abril de 2013, se presentó la acción civil de Decreto de consentimiento (núm. 12 1988 (ADC)) ante el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico. Se formalizó un Contrato de plica ambiental ("CPA") entre GDB, en calidad de agente de custodia, la Autoridad de Tierras de Puerto Rico ("ATPR"), el Departamento de Vivienda y Desarrollo Urbano ("DVDU") de Puerto Rico y los Estados Unidos. El CPA tiene por objeto servir como garantía financiera del cumplimiento de las obligaciones del Decreto de consentimiento. El 24 de junio de 2013, la AEEPR depositó aproximadamente $400,000 en una cuenta de plica, tal y como lo estipulaban el Decreto de consentimiento y el CPA. Si el saldo de la cuenta de plica se reduce por debajo de los $250,000, la AEEPR, la ATPR y el DVDU deben constituir y mantener una fianza de cumplimiento para beneficio de la EPA equivalente a la diferencia entre el saldo de la cuenta de plica y $250,000. Los organismos públicos pueden optar por satisfacer este requisito de fianza de cumplimiento aportando fianzas de cumplimiento separadas que, en total, asciendan a la cuantía requerida indicada, sea individual o colectivamente. La principal acción correctiva de eliminar el plomo del área residencial y trasladarlo un emplazamiento no residencial concluyó en 2015. Los costos en los que se incurra en el futuro están restringidos a una evaluación anual operativa, y si se considerara necesario otra acción correctiva en áreas residenciales y no residenciales, las responsables serán la AEEPR, la ATPR y el DVDU. Por el momento no se han identificado actuaciones correctivas.

---

y el medio ambiente (en su caso), y evaluar las opciones de subsanación sobre la base de los datos recogidos. *Véase* EPA, *Superfund Remedial Investigation/Feasibility Study (Site Characterization)*, https://www.epa.gov/superfund/superfund-remedial-investigationfeasibility-study-site-characterization (visitado por última vez el 28 de noviembre de 2022).

La AEEPR, en nombre de la ATPR y el DVDU, ha solicitado el cargo de desembolsos contra la cuenta de plica, y dichos pagos han sido procesados. Todos los pagos que se carguen contra la cuenta de plica son para cubrir los proyectos exigidos por el Decreto de consentimiento. Si dichos pagos no se materializan, los contratistas podrían suspender los servicios, lo cual conllevaría la aplicación de multas por incumplimiento, como lo estipula el Decreto de consentimiento.

El Decreto de consentimiento puede quedar resuelto mediante moción de cualquiera de las partes, siempre y cuando todos los demandados públicos hayan satisfecho los pagos de ciertos "Costos de respuesta y penalizaciones estipuladas". La extinción del Decreto de consentimiento no afectará a ciertos "Convenios de no demandar", incluyendo todas las reservas correspondientes, ni afectará a ninguna obligación de continuo cumplimiento de parte de la AEEPR, la ATPR y el DVDU.

En este momento está en curso el proceso de designación del Contratista supervisor. Las tareas de inspección y preparación de informes estipuladas en el CPA están siendo realizadas por un coordinador de proyectos designado por la AEEPR, en coordinación con los representantes nombrados por la ATPR y el DVDU. En septiembre de 2020, la EPA realizó una reseña quinquenal para evaluar si las actuaciones de subsanación protegen o no la salud humana y el medio ambiente. Como parte de esta evaluación, el contratista de la EPA inspeccionó una serie de propiedades no subsanadas porque la concentración de plomo detectada era inferior a las 450 partes por millón. La información recogida fue evaluada por la EPA, y se determinó que la AEEPR, la ATPR y el DVDU no habían omitido ejecutar y mantener las actuaciones de subsanación requeridas, y que por el momento no era necesario implementar acciones de respuesta adicionales en el Emplazamiento de Vega Baja. La AEEPR pagará a la EPA todos los futuros costos correspondientes al plan de contingencia requerido para el Emplazamiento de Vega Baja.

Hasta la fecha, la AEEPR no ha identificado ninguna OSC que existieran probabilidades de que se produzcan.

<u>El Emplazamiento de Palo Seco</u>

El Emplazamiento de Palo Seco está situado en Toa Baja, Puerto Rico (cerca de San Juan), e incluye a la central eléctrica del mismo nombre, un área de depósito y el antiguo canal del río Bayamón.

En 1997, como resultado de una inspección de la EPA y de la Junta de Calidad Ambiental de Puerto Rico (la "<u>JCA</u>") en la central eléctrica de Palo Seco de la AEEPR, la EPA expidió una Orden administrativa (CERCLA- 97-0302) para la investigación y posible subsanación de siete áreas de interés identificadas por la agencia en el Emplazamiento de Palo Seco. La Orden administrativa imponía a la AEEPR la realización de una IS/EV.

Tras la IS/EV, se adoptaron medidas adicionales para abordar el proceso de separación de hidrocarburos en dos áreas de interés. El 6 de noviembre de 2008, la EPA y la AEEPR pactaron una Orden administrativa sobre consentimiento ("<u>AOC</u>", por sus siglas en inglés) para abordar la separación de hidrocarburos (núm. CERCLA-02-2008- 2022). Seguidamente, la AEEPR ejecutó

una actuación de extracción de fases de hidrocarburos en una de las áreas de interés. En julio de 2012, la EPA publicó, para recabar comentarios públicos, un plan en el que proponía que no se llevaran a cabo actuaciones adicionales. En septiembre de 2012, la EPA publicó su Registro de decisión sobre el emplazamiento, seleccionando la opción "Sin actuaciones adicionales".

La AOC incluía varias condiciones para que la AEEPR reintegrara a la EPA los costos incurridos por esta en relación con el emplazamiento. El 4 de diciembre de 2015 y el 11 de mayo de 2016, la EPA envió a la AEEPR un paquete de partidas de costos de respuesta. El paquete incluía dos componentes: (i) $62,077.31, que la EPA pagó para la supervisión de las actuaciones de remoción realizadas de conformidad con la AOC; y (ii) $1,473,061.62 en costos que no entraban en la citada categoría es decir, los no directamente relacionados con la AOC), incluyendo gastos de investigación y otros costos de respuesta que la EPA había pagado (de conformidad con la CECLA) hasta el 31 de julio de 2015 con respecto al emplazamiento.

En lo tocante a la primera categoría de costos, el 7 de marzo de 2016 la EPA envió a la AEEPR una notificación de cobro de factura por $62,077.31. La AEEPR pagó esta suma el 8 de marzo de 2016.

En cuanto a la segunda categoría de costos, el 10 de julio de 2017 se firmó un acuerdo de conciliación (CERCLA-02- 2017-2014) que estipulaba que la AEEPR pagaría a la EPA un capital de $1 millón, más intereses, en tres plazos anuales. El primer plazo, de $333,333.33, debía pagarse el 9 de agosto de 2017. El segundo, de $337,838.01, debía pagarse el 29 de mayo de 2018. Y el tercero y último, de $339,779.36, tenía que abonarse el 19 de julio de 2019. Con el abono del tercer pago se extinguieron los compromisos financieros asumidos por la AEEPR a través del acuerdo de conciliación.

El 20 de septiembre de 2020, la AEEPR preparó una solicitud de propuestas para la instalación de un sistema de recuperación de productos libres de los pozos de monitorización de aguas subterráneas que se construyeron durante la citada IS/EV por $100,000. Las obras de instalación concluyeron en abril de 2021.

## C.   Sistema de gestión de Tesorería de la AEEPR

### 1.   Ingresos operativos y flujos de efectivo de clientes[120]

Antes del comienzo provisional de los servicios de LUMA Energy, la AEEPR transmitía y distribuía la práctica totalidad de la energía eléctrica consumida en Puerto Rico.[121]   En la actualidad, produce la mayor parte de la electricidad generada en el país. Las principales fuentes de ingresos operativos y recaudaciones vinculadas con los clientes de la AEEPR se derivan de la

---

[120] Las cifras reflejadas en esta sección están basadas en los informes financieros no auditados provisionales publicados por la AEEPR.  Consulte los estados financieros auditados más recientes de la AEEPR en el Anexo J.

[121]  Desde el 1 de junio de 2021, LUMA Energy viene encargándose de los servicios de gestión, operación, mantenimiento, reparaciones, restablecimiento, sustitución y otros servicios afines del Sistema de TyD, incluyendo la transmisión y distribución de electricidad, los servicios de carga, la planificación a largo plazo, la gestión de activos, las relaciones con la comunidad y los medios, la seguridad pública y de los empleados, la facturación y el cobro, la preparación de informes y mantenimiento de registros, las finanzas y la contabilidad, la respuesta de emergencia y la atención al cliente.

venta de servicios eléctricos a clientes residenciales, comerciales, industriales y gubernamentales. No obstante, la AEEPR también obtiene ingresos operativos en actividades de telecomunicaciones y riesgo. Otros ingresos incluyen cargos vinculados con multas o penalizaciones administrativas, irregularidades en el consumo de energía eléctrica y recargos por retrasos en los pagos.

Las tarifas en concepto de servicios eléctricos incluyen un recobro de costos por combustible y energía adquirida, que fue diseñado para posibilitar la recuperación total de estos gastos, siguiendo las órdenes del NEPR. A partir del 1 de mayo de 2019, y como resultado de la nueva estructura de tarifas aprobadas de conformidad con la Ley 4-2016, se implementaron los siguientes anexos de recobro de costos: CELI, y dos elementos adicionales previstos para cubrir los costos asociados con subvenciones, alumbrado público y otras iniciativas del NEPR, tal y como lo estableció la orden de NEPR (CEPR-AP_2015-001) del 10 de enero de 2017.[122]

Los ingresos consolidados totales no auditados de la AEEPR durante el año fiscal 2022 se aproximaron a los $4,100 millones.[123]

2.    **Gastos y desembolsos operativos[124]**

Los principales componentes de los gastos operativos y desembolsos en efectivo afines de la AEEPR incluyen los gastos en combustible y adquisición de energía, y los gastos operativos y de gestión. En el año fiscal 2022, los gastos operativos de la AEEPR totalizaron unos $4,100 millones. Esta cifra está basada en los informes financieros no auditados provisionales publicados por la AEEPR.[125]

Combustibles y energía adquirida

Los gastos de combustible consisten fundamentalmente en fueloil, diésel y subproductos, y gas natural licuado. Los gastos en concepto de energía adquirida incluyen los costos asociados con los PPOA y diversos proyectos de energías renovables. Durante el año fiscal 2022, los gastos por combustibles y energía alcanzaron, respetivamente, los $2,100 y los $840 millones, respectivamente.

Gastos operativos y de mantenimiento

Los tipos de gastos incluidos en el rubro "operaciones y mantenimiento" incluyen, entre otros, los salarios y sueldos de los empleados, las horas extraordinarias, materiales y suministros, transporte, dietas y kilometraje, servicios públicos y alquileres, y servicios profesionales y técnicos subcontratados, además de la tarifa de servicio de LUMA Energy. Durante el año fiscal 2022, los gastos operativos y de mantenimiento de la AEEPR alcanzaron aproximadamente los $1.200 millones.

---

[122] https://energia.pr.gov/wp-content/uploads/sites/7/2017/01/Final-Resolution-and-Order.pdf.

[123] https://www.aafaf.pr.gov/wp-content/uploads/prepa-b2a-fy2022-q4-aug-15-2022.pdf.

[124] Las cifras reflejadas en esta sección están basadas en los informes financieros no auditados provisionales publicados por la AEEPR. Consulte los estados financieros auditados más recientes de la AEEPR en el Anexo J.

[125] https://www.aafaf.pr.gov/wp-content/uploads/prepa-b2a-fy2022-q4-aug-15-2022.pdf.

## D.    Cuentas de caja de la AEEPR

La lista de cuentas bancarias del Deudor, con sus saldos al 30 de septiembre de 2022 y las categorizaciones preliminares de restricciones, se adjuntan al presente documento en forma de <u>Anexo I</u>. La lista está basada en la información más actualizada a la que pudieron acceder los profesionales de la Junta de Supervisión, y en los análisis legales y dictámenes relativos a las categorizaciones de restricciones.

### 1.    Informe del equipo independiente de análisis forense

El 31 de enero de 2018, la Junta de Supervisión —actuando mediante su Comité de Investigaciones Especiales[126]— encargó a un equipo independiente de análisis forenses (el "<u>EIAF</u>"), a través de la contratación de Duff & Phelps LLC ("<u>Duff & Phelps</u>"), la realización de una investigación de las cuentas bancarias de las entidades gubernamentales, incluyendo las que están incluidas en el plan fiscal del Estado Libre Asociado, la UPR, la ACT, el SRE y la AEEPR. El alcance del encargo incluyó (i) un inventario del efectivo, los equivalentes de efectivo y las inversiones del Gobierno de Puerto Rico, (ii) un análisis de los orígenes y usos previstos de dichos fondos, y (iii) cualesquiera restricciones legales sobre dichos fondos.

El principal objetivo del EIAF era la publicación de un informe que describiera los procesos empleados, los resultados obtenidos y un dictamen del grupo sobre si los procedimientos efectuados validaban, entre otras cosas, las cuentas bancarias y de inversiones de la AEEPR identificadas, y los saldos de cuentas divulgados. La investigación partió de los supuestos, entre otros, de que la AEEPR aportaría voluntariamente a la Junta de Supervisión información financiera específica. El diseño de la investigación se concibió con el objeto de recoger y elaborar información sobre si, entre otros, las cuentas identificadas por la AEEPR contenían fondos restringidos, las cuantías y la naturaleza de los mismos.

### a)    Procedimientos de investigación

A todos los efectos del informe, el EIAF identificó una como fecha de medición el 30 de junio de 2018 (la "<u>Fecha de medición de junio de 2018</u>"). La investigación constó de tres componentes: (i) un proceso de recopilación de información; (ii) un proceso de indagatoria y recogida de datos; y (iii) un proceso de análisis y preparación del informe.

***Recopilación de información.*** La recopilación de información fue un proceso secuencial. Se creó una base de datos maestra de las entidades gubernamentales, incluida la AEEPR, y de sus respectivas cuentas bancarias a la Fecha de medición de junio de 2018. La información se obtuvo fundamentalmente del Departamento de Hacienda (el "<u>Departamento de Hacienda</u>") y la AAFAF, además de información gubernamental de dominio público.

***Proceso de indagatoria y recogida de datos.*** Una vez creada la base de datos maestra, se estableció contacto con cada una de las entidades gubernamentales, incluida la AEEPR,

---

[126] El Comité de Investigaciones Especiales de la Junta de Supervisión estaba a la sazón formado por Ana J. Matosantos, David A. Skeel y el juez (retirado) Arthur J. González. Se le encargó realizar sus investigaciones en virtud de la autoridad otorgada a la Junta de Supervisión por la Sección 104(o) de la Ley PROMESA, y de todas aquellas facultades conferidas por dicha ley a la Junta de Supervisión.

empleando un formato estandarizado. Se estableció contacto con las entidades para obtener información relevante de las cuentas bancarias y la autorización de dichas entidades para que las instituciones financieras en las que estaban radicadas las cuentas facilitaran datos directamente al EIAF.

*Proceso de análisis y preparación del informe.* El último paso consistió en contactar a las instituciones financieras identificadas para confirmar y verificar los datos facilitados por las entidades gubernamentales, incluyendo la AEEPR.

b)  **Medidas adicionales sugeridas en el Informe del EIAF**

El EIAF publicó su informe el 12 de marzo de 2019. Dicho informe sugería tareas y actividades adicionales para desarrollar más plenamente los datos expuestos en el informe, e incluían la actualización de la Fecha de medición de junio de 2018 por otra más próxima, en consideración de la posibilidad de que las cuantías pudieran haber cambiado sustancialmente entre ambas fechas. A continuación se exponen las variaciones en los saldos en las nuevas Fechas de medición, así como los procedimientos adicionales para conciliar los saldos y categorizar las restricciones.

2.  **Análisis continuo de las cuentas bancarias**

Tras la publicación del informe del EIAF, la Junta de Supervisión —con la asistencia de sus asesores, aparte de Duff & Phelps— siguió ampliando la investigación del EIAF y realizando análisis periódicos de las cuentas de caja del Estado Libre Asociado y sus instrumentalidades, incluyendo la AEEPR, el más reciente el 30 de septiembre de 2022 (la "<u>Fecha de medición de septiembre de 2022</u>").

Tal como se describe a continuación, los análisis continuos de las cuentas de la AEEPR por parte de la Junta de Supervisión incluyeron la recopilación, procesamiento y revisión de la documentación aportada por instituciones financieras, agencias y otras entidades gubernamentales. La recopilación de documentos incluyó los estados de cuenta (corrientes y de valores, certificados de depósito o cartas de confirmación de saldos, en función del tipo de cuenta y de la disponibilidad de datos), información sobre restricciones (como contratos y legislación federal y local) y de signatarios. Además, esta información se obtuvo por correo electrónico, por teléfono, reuniones personales y revisión de información contable y legal.

a)  **Resumen de procedimientos efectuados**

La Junta de Supervisión se centró, entre otras cosas, (i) en confirmar el universo de cuentas bancarias y determinar sus saldos, y (ii) en evaluar, sobre la base de la información y de los análisis legales disponibles, la cuantía de cualesquiera fondos restringidos dentro de dichas cuentas.

La Junta de Supervisión aprovechó y optimizó los procedimientos descritos en el informe del EIAF para determinar los saldos, más recientemente la Fecha de medición de septiembre de 2022. Específicamente, además de obtener información de los saldos de una serie definida de cuentas a través de solicitudes a las entidades gubernamentales, los procedimientos de la Junta de Supervisión incluyeron credenciales para acceder a las plataformas en línea de cada una de ellas,

incluyendo la AEEPR, para obtener la mayoría de los saldos de cuenta. El acceso a las cuentas en línea permite el seguimiento de los saldos y la identificación de la masa de cuentas de cada entidad gubernamental (incluyendo la AEEPR) en cada institución financiera. Además, en los casos en los que no era posible el acceso en línea, se enviaron solicitudes de información financiera a las entidades gubernamentales e instituciones financieras. Se implementaron procedimientos adicionales para cotejar los datos de las instituciones financieras con la información aportada por las entidades gubernamentales con el objeto de conciliar las diferencias.

Simultáneamente, la Junta de Supervisión solicitó documentación relativa a las clasificaciones de restricciones comunicadas por las entidades gubernamentales. Se implementaron procedimientos adicionales para prestar apoyo continuo para que las entidades gubernamentales puedan aportar la documentación necesaria para las evaluaciones de debida diligencia. En el caso de la AEEPR, la abrumadora mayoría (99.1%) del valor de los saldos se concentraba en 23 de las 82 cuentas. Los asesores jurídicos de la Junta de Supervisión efectuaron análisis de debida diligencia de estas 23 cuentas, en las cuales había saldos superiores a los $2 millones, para obtiene una cobertura del 95% del total del efectivo mantenido en las cuentas de la AEEPR en la Fecha de medición de septiembre de 2022. En las 59 cuentas restantes había $11.6 millones, equivalentes al 0.9% del saldo total en efectivo de las cuentas de la AEEPR en a Fecha de medición de septiembre de 2022.

(i)    *Identificación del universo de las cuentas bancarias y determinación de sus saldos*

La Junta de Supervisión envió cartas solicitando los saldos de las cuentas de la AEEPR en la Fecha de medición de septiembre de 2022 a las instituciones financieras ("IF"). Las cartas se enviaron conjuntamente con una lista de cuentas conocidas mantenidas por la AEEPR en las respectivas IF, solicitando que estas enviaran lo siguiente a la Junta de Supervisión:

- estados de cuentas corrientes o de valores, con saldos de efectivo y/o inversiones de las cuentas de la AEEPR en las IF, o bien acceso en línea para que la Junta de Supervisión pueda obtener los datos relevantes de cada cuenta;

- una lista de signatarios autorizados de cada cuenta;

- información relativa cargas, gravámenes o reclamaciones de terceros que se conozcan; y

- detalles de cuentas adicionales mantenidas por a AEEPR no incluidas en el informe del EIAF.

Simultáneamente, se enviaron cartas a la AEEPR solicitando los siguientes datos de una lista de cuentas identificadas:

- estados de cuentas corrientes o de valores con saldos de efectivo y/o inversiones mantenidas por al AEEPR, o un formulario de consentimiento completado que

autoriza el acceso en línea para obtener los datos relevantes de cada cuenta en cada IF;

- el estado de cada cuenta (abierta, cerrada, suspendida, etc.);

- una lista de signatarios autorizados de cada cuenta;

- datos detallados de cualesquiera otras cuentas de la AEEPR (es decir, cuentas no identificadas en la lista enviada a la AEEPR); y

- si los fondos de cada cuenta pueden categorizarse como restringidos, irrestrictos o combinados.[127]

*(ii)* ***Determinación de si las cuentas y saldos incluyen fondos legalmente restringidos***

Como se ha explicado, las solicitudes enviadas a las entidades gubernamentales, incluida la AEEPR, incluían el pedido de clasificar sus cuentas como restringidas, irrestrictas o combinadas. A efectos orientativos, se les enviaron descripciones de diversas caracterizaciones de cuentas restringidas e irrestrictas. Si la entidad gubernamental consideraba una cuenta como restringida, se le pedía a dicha entidad, incluida la AEEPR, que seleccionara la categoría de restricción pertinente y que aportara a la Junta de Supervisión la documentación que justificara la supuesta restricción, incluyendo datos acerca del origen y del uso de los fondos. Si la entidad gubernamental, AEEPR incluida, consideraba una cuenta como irrestricta, se le pedía que detallara los orígenes y usos de los fondos de la misma.

Los asesores jurídicos de la Junta de Supervisión realizaron un exhaustivo examen de la documentación aportada por las entidades gubernamentales, incluyendo la AEEPR, para investigar y evaluar las alegadas restricciones legales, incluyendo:

- revisión de la documentación recopilada como parte del informe del EIAF;

- revisión de la documentación obtenida desde el informe del EIAF en materia de clasificación de las cuentas; y

- colaboración con otras partes, como el Departamento de Hacienda y la AAFAF, para obtener y revisar documentación adicional relevante para las clasificaciones de las restricciones legales de las cuentas bancarias.

Seguidamente, las cuentas fueron clasificadas en las siguientes categorías, en función de las revisiones y análisis legales antes descritos (la denominación preliminar de cada cuenta por encima del umbral de revisión de $2 millones, en la Fecha de medición de septiembre de 2022, puede consultarse en el <u>Anexo I</u>):

- **Cuentas no revisadas**: Salvo si se indica otra cosa, las cuentas con un saldo inferior a los $2 millones en la Fecha de medición de 2022 han sido clasificadas como "No

---

[127] Por cuentas combinadas se entienden aquellas que contienen tanto fondos restringidos como irrestrictos.

revisadas" en el <u>Anexo I</u>.

- **Fondos federales restringidos**: Fondos recibidos del gobierno federal, o bien restringidos por leyes o reglamentos federales, para usos específicos (por ejemplo, subvenciones o fondos de apoyo de la FEMA para proyectos de reparación de huracanes y terremotos). Dichos fondos deben devolverse al gobierno federal si no se utilizan para los fines especificados.
- **Restringidos por contratos con terceros**: Fondos mantenidos para costos y gastos de transmisión, distribución, operación y mantenimiento a tenor del Contrato de TyD.
- **Restringidos por orden judicial**: Una cuenta que mantiene ingresos de seguros que deben aplicarse a la reparación, sustitución o reconstrucción de propiedades dañadas o destruidas por orden judicial (Caso núm. 17-bk-4780, ECF núm. 514).
- **Restringidos por contratos con Bonistas**: Fondos mantenidos por el Fideicomisario de bonos en virtud del Contrato de fideicomiso.
- **Propensos a restricciones**: Una cuenta que mantiene fondos sujetos a un pleito activo relativo al alcance de la garantía prendaria del Fideicomisario de bonos.
- **Fondos irrestrictos**: Fondos no sujetos a restricciones legales.

b) **Resumen de las conclusiones preliminares**[128]

En tanto que los análisis de la Junta de Supervisión continúan, la investigación preliminar demuestra que la AEEPR contaba, en la Fecha de medición de septiembre de 2022, con $1,236 millones en 82 cuentas mantenidas en diversas IF. La lista de dichas cuentas se adjunta como <u>Anexo I</u>, y a continuación presentamos un resumen de las mismas:

| Agencia | Cantidad de cuentas | Saldo al 30/09/2022 | No revisada | Restringida | Irrestricta[129] |
|---|---|---|---|---|---|
| AEEPR | 82 | $ 1,023,508,811 | $ 11,593,909 | $ 1,006,590,359 | $ 200,622,052 |

La revisión de debida diligencia legal correspondiente a la clasificación de restricciones se realizó en $1,224 millones de los $1,236 millones en saldos a la Fecha de medición de septiembre de 2022. En las demás cuentas, con un total de aproximadamente $11.6 millones, no se revisaron las clasificaciones de restricciones debido al volumen de los saldos individuales. Cada uno de los saldos de estas cuentas eran inferiores a los $2 millones a la Fecha de medición de septiembre de 2022 y, por consiguiente, ha sido clasificadas como no revisadas. El proceso de

---

[128] La información aquí incluida está actualizada a la fecha de esta Declaración de divulgación, y debe considerarse preliminar y sujeta a cambios sustanciales. Las cuantías detalladas en esta Declaración de divulgación con respecto a las cuentas del Deudor están sujetas a modificaciones en función de la información adicional recibida y revisada por los asesores jurídicos.

[129] De los $229.1 millones en cuentas irrestrictas o saldos no revisados, $1.3 millones los mantiene el Fideicomisario de bonos en un banco de EE.UU.

revisión de debida diligencia continúa. Sin embargo, de los $1,224 millones en saldos analizados, aproximadamente $1,024 fueron clasificados como restringidos (algunos podrían quedar restringidos si algunas partes ganan los pleitos relativos a sus garantías prendarias reclamadas), y $200.6 millones se clasificaron como irrestrictos.

Además, la Junta de Supervisión ha obtenido información actualizada de los saldos de las cuentas a 1 de noviembre de 2022,[130] como se expone a continuación:

| Agencia | Cantidad de cuentas | Saldo al 01/11//2022 | No revisada | Restringida | Irrestricta[131] |
|---------|--------------------|--------------------|------------|-----------|--------------|
| AEEPR | 65 | $ 1,219,101,622 | $ 10,252,817 | $ 1,097,058,386 | $ 111,790,418 |

La revisión de debida diligencia legal de la clasificación de restricción se realizó en $1,209 millones de los $1,219 millones en saldos al 1 de noviembre de 2022. En las demás cuentas, con un total de aproximadamente $10.3 millones, no se revisaron las clasificaciones de restricción debido al volumen de los saldos individuales. Cada uno de los saldos de estas cuentas eran inferiores a los $2 millones al 1 de noviembre de 2022 y, por consiguiente, han sido clasificadas como no revisadas. El proceso de revisión de debida diligencia continúa. Sin embargo, de los $1.209 millones en saldos analizados, aproximadamente $1.097 fueron clasificados como restringidos (algunos podrían quedar restringidos si algunas partes ganan los pleitos relativos a sus garantías prendarias reclamadas), y $111.8 millones se clasificaron como irrestrictos. Los saldos de cuentas al 1 de noviembre de 2022, en su caso, se incluyen también en el Anexo I.

### c) Actualización de la información referenciada en el Informe del EIAF

A continuación, presentamos un resumen que destaca los progresos realizados desde la Fecha de medición de junio de 2018:

- Desde la Fecha de medición de junio de 2018 se identificaron y aportaron documentos financieros de veintinueve (29) nuevas cuentas de la AEEPR. Estas 29 cuentas se identificaron sobre la base de la información aportada por las entidades gubernamentales y las IF.

- Desde la Fecha de medición de junio de 2018 se identificaron diez (10) cuentas de la AEEPR, que habían sido incluidas en el Informe del EIAF, como cerradas, duplicadas o inexistentes, lo cual fue confirmado por las IF o las entidades gubernamentales. El Informe del EIAF incluía una (1) cuenta con un saldo declarado de $1.1 millón que se consideró duplicada, y nueve (9) cuentas con

---

[130] De las 82 cuentas bancarias con saldos al 30 de septiembre de 2022, la AEEPR ha facilitado los saldos actualizados, al 1 de noviembre de 2022, de 65 cuentas.  La clasificación preliminar de restricciones legales no se ha visto afectada por los saldos actualizados al 1 de noviembre de 2022. De las 17 cuentas restantes, 15 tenían al 30 de septiembre de 2022 un saldo de $0, otra tenía un saldo de $1.6 millón y una tercera de $1,421.

[131] De los $139.0 millones en cuentas irrestrictas o saldos no revisados, $1.3 millones los mantiene el Fideicomisario de bonos.

saldos declarados de unos $13 millones que se cerraron con posterioridad a la Fecha de medición de junio de 2018.

### d) Continuación de las tareas y actividades referenciadas en el Informe del EIAF

El Informe del EIAF sugería nueve (9) tareas y actividades adicionales para desarrollar más plenamente la información relevante. La Junta de Supervisión ha adoptado las sugerencias y continuó los procedimientos para mejorar la información con posterioridad a la publicación del Informe de EIAF. En consecuencia, a continuación presentamos una actualización de las nueve sugerencias aplicadas al caso específico de la AEEPR:

- La Junta de Supervisión continuó y actualizó sus procedimientos de revisión y actualización de los saldos de cuentas y clasificaciones de las restricciones legales, más recientemente en la Fecha de medición de septiembre de 2022.

- La Junta de Supervisión actualizó sus procedimientos de revisión de las clasificaciones de restricciones legales del conjunto de cuentas de la AEEPR, que conllevó una revisión de más del 95% de los saldos totales combinados de las cuentas.

- Los procedimientos de revisión y actualización de los saldos de cuentas y las clasificaciones de restricciones legales incluyeron la recogida de documentación adicional, que se utilizó para actualizar y reforzar los procedimientos de evaluación financiera y de debida diligencia. Específicamente, se establecieron contactos con la AEEPR y con las respectivas IF en relación con las cuentas, y se les pidió que aportaran información adicional sobre cuentas cerradas, suspendidas, potencialmente duplicadas, inexistentes o nuevas. Se concertaron llamadas y reuniones de seguimiento para aclarar y formular preguntas acerca de los datos aportados.

- Se realizaron procedimientos analíticos adicionales para la revisión de las clasificaciones de las restricciones legales, para obtener descripciones de la AEEPR de las diversas categorías de restricciones formuladas por esta y la revisión de los orígenes y aplicaciones de los fondos de las cuentas.

- Se aplicaron procedimientos actualizados para obtener de la AEEPR la documentación justificativa correspondiente para fundamentar la evaluación de las clasificaciones de las cuentas.

- Se aplicaron procedimientos actualizados para identificar fondos federales en las cuentas de la AEEPR. Estos procedimientos incluyeron la obtención de información del Departamento de Hacienda, la AAFAF y la AEEPR.

- Las discrepancias observadas entre las conclusiones del Informe del EIAF y la información posteriormente obtenida de las agencias, incluyendo la AEEPR y las

IF, fueron conciliadas mediante procedimientos adicionales, como la obtención de datos directamente de las IF, y aclarando el estado actual de una cuenta bancaria. De manera similar, las discrepancias observadas entre las conclusiones del Informe del EIAF y la información aportada por la AAFAF y el Departamento de Hacienda, se conciliaron mediante procedimientos adicionales, como la identificación y conciliación de las diferencias entre el ámbito y el período de tiempo cubierto por el Informe del EIAF y lo comunicado por la Oficina del Principal Oficial Financiero ("OPOF") del Gobierno de Puerto Rico. En este momento, las diferencias no conciliadas entre los saldos de la AEEPR comunicados por la OPOF y los saldos de la AEEPR declarados por las IF son inferiores al cinco por ciento (5%) del saldo total, a la Fecha de medición de septiembre de 2022.

e)   **Estado de la revisión**

A la Fecha de medición de septiembre de 2022, la AEEPR mantenía 82 cuentas en cinco IF, de todas las cuales la Junta de Supervisión ha recibido documentación justificativa de los saldos. Además, la AEEPR permitió el acceso en línea a las cuentas bancarias, a través de las IF, a los $293.3 millones depositados en 68 de las 82 cuentas bancarias (aproximadamente el 83% de las cuentas y el 24% de los saldos del conjunto total). Los estados de las cuentas bancarias correspondientes a los $942.4 millones restantes mantenidos en 14 de las 82 cuentas bancarias (aproximadamente el 17% del total) se obtienen directamente de las IF y de la AEEPR, debido a limitaciones para el acceso en línea a dichas cuentas.

Los saldos precedentes comunicados a la Fecha de medición de septiembre de 2022 han sido sustancialmente conciliados con el Informe de Saldos de cuentas bancarias de la OPOF a 30 de septiembre de 2022 (el "Informe de la OPOF").[132]

La lista de cuentas bancarias del Deudor, con sus saldos a la Fecha de medición de septiembre de 2022, así como las categorizaciones preliminares de restricciones, se adjuntan al presente documento en forma de Anexo I. La información aquí presentada incluye cuentas cuyos saldos han sido confirmados con la información de las IF a la Fecha de medición de septiembre de 2022. La Junta de Supervisión y sus asesores siguen analizando las evaluaciones de restricciones legales de las cuentas, y todas las clasificaciones contenidas en el Anexo I son preliminares y, en todos sus aspectos, están sujetas a cambios en función de los datos nuevos y adicionales a medida que estén disponibles. La Junta de Supervisión actualizará esta Declaración de divulgación en una nueva fecha de medición que se determine.

E.   **Análisis de la liquidez y del capital circulante de la AEEPR**

Monitorización de la liquidez

Históricamente, la AEEPR ha sufrido graves desfases de tesorería, que conllevaron crisis de liquidez y que, en última instancia, llevaron a la AEEPR a acogerse a la protección del Título III de la Ley PROMESA. Los flujos de efectivo operativos de la AEEPR cayeron desde un

---

[132] *Resumen de los saldos de cuentas bancarias del Gobierno de Puerto Rico y sus instrumentalidades. Información actualizada al 30 de septiembre de 2022*, publicado por la OPOF el 31 de octubre de 2022.

déficit de $188 millones en el año fiscal 2000, a uno superior a los $800 millones ocho años después: su peor momento de la historia. Esto ha llevado a la AEEPR a recurrir a financiamiento para hacer frente a sus quebrantos. Hacia el año fiscal 2014, la situación financiera de la AEEPR se había deteriorado hasta el punto en que tuvo que pactar acuerdos de indulgencia con sus acreedores, después de hacerse evidente de que no contaba con fondos suficientes para pagar el servicio de la deuda. Entre los años fiscales 2014 y 2017, los resultados operativos anuales y los ajustes contables extraordinarios de la AEEPR reflejan una situación financiera cada vez más deteriorada. Es de destacar especialmente que, en los años fiscales 2014 y 2015, el déficit operativo de la AEEPR se incrementó desde $58 millones a $489 millones, con el reconocimiento del sustancial pasivo neto de sus pensiones. Como resultado de las hipótesis contables de las pensiones y de la valoración del pasivo, en el año fiscal 2015 la AEEPR se enfrentó a un pasivo de pensiones sin fondos de $1,600 millones. Aunque los gastos operativos fueron bajando continuamente entre los años fiscales 2014 y 2017, los ingresos disminuyeron a un ritmo más rápido, con el consiguiente aumento del déficit.

Desde la Fecha de la petición, la AEEPR ha mejorado su supervisión, informes, controles y comunicaciones en materia de flujos de efectivo y de liquidez. Estas mejoras han sido fundamentales para reforzar la estabilidad financiera de la empresa ante los significativos trastornos causados por los huracanes Irma, María y Fiona, los terremotos de enero de 2020, la pandemia de la COVID-19 y la actual situación geopolítica, que afecta al suministro y a los precios de los combustibles.

Aunque las medidas implementadas por la AEEPR han sido efectivas para mantener la estabilidad financiera, existen varios factores significativos que repercutirán en la futura liquidez de la empresa, como por ejemplo los continuos requisitos de dotación de fondos del Contrato de TyD; el financiamiento para la transformación de los activos de generación antiguos; el capital circulante operativo; la reestructuración de las obligaciones de deuda heredada de la AEEPR; las obligaciones de pensiones infradotadas; los requisitos de capital y de mantenimiento (incluyendo financiamiento para proyectos de obras permanentes);[133] la resolución de los fondos federales, los ingresos de los seguros y el resto de las obligaciones pendientes asociados a los huracanes de 2017 y el terremoto de 2020;[134] y los costos requeridos para salir del Título III.

---

[133] En octubre de 2020, la FEMA aprobó aproximadamente $9,600 millones en subvenciones federales para aproximadamente un total de costos de proyectos de $10,500 millones, con el objeto de posibilitar a la AEEPR reparar los daños de la red eléctrica causados por los huracanes Irma y María. Los fondos federales están dirigidos a reparar y sustituir miles de millas de transmisión y distribución, subestaciones eléctricas, sistemas de generación de energía y otras mejoras de la red. Dichos fondos federales están sujetos a que la AEEPR aporte una participación del 10% de los costos. Los fondos de la FEMA ayudarán a proteger al sistema eléctrico contra futuros eventos catastróficos.

[134] El 19 de septiembre de 2022, el huracán Fiona tocó tierra en el municipio puertorriqueño de Cabo Rojo. El Fiona llegó a la isla como huracán de categoría 1, con vientos de 85 mph y ráfagas de hasta 103 mph. A pesar de estos potentes vientos, la mayoría de los daños que sufrió Puerto Rico fueron causados por las copiosas lluvias. La mayoría de estas precipitaciones se concentraron en las regiones del sur y del sudeste de Puerto Rico. El huracán Fiona causó un apagón general en Puerto Rico como consecuencia de los daños sufridos por el sistema eléctrico. La AEEPR y LUMA Energy todavía están evaluando los daños, que LUMA Energy estima que se situarán en torno a los $4,000 millones.

Al 1 de noviembre de 2022, la AEEPR disponía de un saldo líquido irrestricto de unos $112 millones. El huracán Fiona y los precios mundiales de los combustibles han tenido importantes repercusiones negativas en la liquidez de la empresa, que podrían continuar, e incluso empeorar, en función de diversos factores actualmente evaluados por la AEEPR y LUMA Energy. Como resultado de la cada vez más negativa confluencia de factores que afectan a la liquidez, es posible que la actual posición de tesorería de la AEEPR no sea suficiente para hacer frente a los gastos necesarios para salir del Título III, o a las cuantías que posiblemente sean necesarias para ejecutar la transición de las operaciones y el mantenimiento de los activos de generación históricos y de los empleados de la AEEPR a un operador privado (la "Transacción de generación") en el futuro próximo.

La AEEPR continúa manteniendo una estrecha monitorización de su posición de tesorería, mientras se prepara para afrontar los citados gastos y, al mismo tiempo, mantener una reserva suficiente de capital circulante.

1.      **Necesidades de liquidez**

Además de las cuantías necesarias para sostener los gastos administrativos y otros costos de salida del Título III, las operaciones de la AEEPR requieren mantener una liquidez suficiente para (i) cumplir las obligaciones asumidas en el Contrato de TyD, para dotar y reaprovisionar las Cuentas del servicio de TyD (que se definen más adelante,[135] y (ii) mantener las operaciones de generación, lo cual incluye cumplir las potenciales obligaciones hasta que se formalice un contrato asociado con la Transacción de generación, y (iii) atender cualesquiera otras necesidades de liquidez de la organización AEEPR original, incluyendo las filiales de reciente creación.

El Contrato de TyD requiere que la AEEPR mantenga varias cuentas restringidas de reservas operativas (las "Cuentas del servicio de TyD"). Los fondos depositados en dichas cuentas son utilizados exclusivamente por LUMA Energy para el mantenimiento y las operaciones del Sistema de TyD, así como para la ejecución de proyectos de mejora de capital, incluyendo los proyectos financiados por la FEMA, tal y como dichas funciones aparecen descritas y contempladas en el Contrato de TyD. A continuación detallamos las Cuentas del servicio de TyD que deben reaprovisionarse de conformidad con el Contrato de TyD. Con sujeción a determinadas excepciones y períodos de subsanación, si la AEEPR omitiera reaprovisionar estas cuentas estaría vulnerando el Contrato de TyD.

| Descripción del Contrato de TyD | Cuenta bancaria | Saldo al 1 de noviembre de 2022 | Requisito de reaprovisionamiento |
|---|---|---|---|
| Cuenta operativa | FirstBank -2350 | $185,011,204.86 | La AEEPR debe mantener un nivel de dotación equivalente a la suma de los Gastos de transferencia del Sistema de TyD previstos para los cuatro meses y medio (4,5) subsiguientes, de conformidad con el Presupuesto operativo o el Presupuesto predeterminado relevante vigente, y la Tarifa de servicio prevista durante el citado período. |

---

[135] Todos los términos en mayúsculas utilizados, pero no definidos en esta sección, tendrán los significados atribuidos a los mismos en el Contrato de TyD.

| Descripción del Contrato de TyD | Cuenta bancaria | Saldo al 1 de noviembre de 2022 | Requisito de reaprovisionamiento |
|---|---|---|---|
| Cuenta de capital – Sin fondos federales | FirstBank -2361 | $29,644,578.79 | La AEEPR debe mantener un nivel de dotación equivalente a la suma de los Costos de capital previstos - sin fondos federales, para los cuatro meses y medio (4,5) subsiguientes, de conformidad con el Presupuesto de capital – Sin fondos federales, o bien el Presupuesto predeterminado a la sazón vigente. |
| Cuenta de capital – Con fondos federales | FirstBank -4468 | $200,786,595.80 | La AEEPR debe mantener un nivel de dotación, o bien asegurarse la disponibilidad de una línea de crédito, por una cantidad equivalente o superior a la suma de los Costos de capital – Con fondos federales, para las Mejoras de capital financiadas federalmente a las que se ha comprometido y que ha programado de conformidad con los Requisitos de financiación federal, para los cuatro meses y medio (4,5) subsiguientes dentro del Presupuesto de capital – Con fondos federales, o bien el Presupuesto predeterminado a la sazón vigente. |
| Cuenta de reserva de evento de interrupción | FirstBank -2372 | $30,072,963.19 | Tras una retirada de fondos, la AEEPR deberá reponerlos para mantener un importe equivalente a $30,000,000. |
| Gastos de generación – Cuenta de compra de energía | FirstBank -2383 | $61,828,695.53 | La AEEPR debe mantener un nivel de dotación equivalente a la suma prevista de los Gastos de transferencia de generación para los dos (2) meses subsiguientes, de conformidad con el Presupuesto de generación o con el Presupuesto predeterminado relevante a la sazón vigente. |
| Gastos de generación – Cuenta de combustibles | FirstBank -2394 | $76,564,357.52 | La AEEPR debe mantener una dotación acorde con el nivel mínimo de capital circulante establecido en el PPOA de GridCo-GenCo y con el acuerdo de suministro entre GridCo y GenCo. |
| Cuenta de reserva de contingencia | FirstBank -2405 | $52,193,282.79 | La AEEPR debe mantener una cuantía equivalente a 1/24 del Importe de reserva de contingencia, hasta el momento en que se aporten a esta cuenta fondos hasta el nivel del Importe de reserva de contingencia. |

En caso de que a la AEEPR le sea asignada una clasificación de Grado de inversión por dos o más agencias de calificación crediticia, el nivel de predotación de los Gastos operativos, las tarifas de servicio del operado, el Capital con financiamiento federal, el Capital sin financiamiento federal se reducirán de 4.5 a 3 meses de gastos, y desaparecerá la obligación de depositar fondos en la Cuenta de reserva de contingencia.

94

Además de la liquidez necesaria para estar en posición de reaprovisionar las Cuentas de servicio de TyD, la AEEPR debe mantener suficiente liquidez para atender a los gastos de generación. El Contrato de TyD permite a la AEEPR abrir cuentas de Gastos de generación para abonar los Gastos de transferencia de generación efectivos. La AEEPR abrió una tercera cuenta de Gastos de generación como reserva para los gastos operativos de mano de obra y no de mano de obra, de GenCo. Esta cuenta (FirstBank -2515) se mantiene en un nivel de dotación equivalente a la suma de los gastos operativos de mano de obra y no de mano de obra para los dos (2) meses subsiguientes, de conformidad con el Presupuesto de generación. Sobre la base del Presupuesto de generación del actual año fiscal 2023, la AEEPR mantiene esta cuenta a un nivel de dotación de aproximadamente $40 millones. Además, en caso de que la AEEPR formalizara un acuerdo de colaboración vinculado con la Transacción de generación, tendrá obligaciones de dotación adicionales en materia de generación.

Inicialmente, las Cuentas de servicio de TyD recibieron fondos el 1 de junio de 2021: $750 millones[136] del Estado Libre Asociado, y $122.6 millones de caja de la AEEPR, un total de $872.6 millones.[137] Tras la dotación inicial, las Cuentas del servicio de TyD tienen que ser reaprovisionadas por la AEEPR como más tardar hasta el décimo día laborable de cada mes. De conformidad con los términos y condiciones del Contrato de TyD y con los requisitos del presupuesto fiscal de 2023, al décimo día laborable de noviembre de 2022 para estar debidamente dotadas las Cuentas de servicio de TyD requerirían un saldo combinado de aproximadamente $727 millones (excluyendo los Gastos de generación – Cuenta de combustibles, aunque incluyendo la cuenta -2515 del FirstBank). Al 1 de noviembre de 2022, el saldo de las Cuentas de servicio de TyD sumaban un total de unos $601 millones[138] (excluyendo los Gastos de generación – Cuenta de combustibles, aunque incluyendo la cuenta -2515 del FirstBank), lo cual conllevaba una solicitud de dotación de unos $126 millones.

Además, la AEEPR debe reservar fondos suficientes necesarios para mantener una reserva operativa adicional adecuada. Esta reserva es necesaria para: (i) garantizar que la AEEPR mantenga en todo momento un nivel prudente de recursos financieros para mitigar actuales y futuros riesgos de liquidez (por ejemplo, caídas de ingresos, desastres naturales y gastos imprevistos); e (ii) evitar recortes o paradas forzadas, lo cual podría ser catastrófico para los ciudadanos y la economía de Puerto Rico. Aunque en los últimos meses la AEEPR ha podido operar con aproximadamente $100–$125 millones de efectivo fuera de las Cuentas de Servicio de TyD, necesitará liquidez adicional para mitigar actuales y futuros riesgos de liquidez y para pagar los gastos administrativos y las tasas de salida del Título III, así como los pagos asociados con la Transacción de generación. En consecuencia, además de los importes de las Cuentas de servicio de TyD, de conformidad con el Plan la AEEPR venderá $400 millones en Bonos Serie B

---

[136] En caso de resolución del Contrato de TyD, la AEEPR debe devolver de inmediato al Estado Libre Asociado su aportación de $750 millones. La AEEPR no puede emplear estos fondos salvo para sus fines previstos, y no está facultada para transferir los fondos a ninguna otra cuenta, ni para usarlos sin la previa autorización por escrito de la Junta de Supervisión.

[137] Los $872.6 millones incluyen los aproximadamente $128 millones de Gastos de generación – Cuenta de combustibles. Excluyendo los Gastos de generación – Cuenta de combustibles, la dotación inicial fue de aproximadamente $745 millones.

[138] Al 1 de noviembre de 2022, las Cuentas de servicio de TyD, incluyendo los Gastos de generación – Cuenta de combustibles, mantenían un total de unos $677 millones.

al Estado Libre Asociado a su valor nominal, con el objeto de abonar las reclamaciones de gastos administrativos estimados.

2.    **Fondos federales para desastres naturales**

El 20 de septiembre de 2017, el huracán María tocó tierra en Puerto Rico, trayendo consigo vientos sostenidos de 155 millas por hora, y abundantes lluvias durante 30 horas. El María cruzó Puerto Rico diagonalmente, entrando por el sudeste y saliendo por el noroeste. El huracán causó una destrucción catastrófica en la isla, incluyendo graves daños en el sistema de energía eléctrica. Dos semanas antes, el huracán Irma había pasado al norte de Puerto Rico, dañando sustancialmente tramos de la ya débil infraestructura de la AEEPR.

El 28 de diciembre de 2019, la isla de Puerto Rico fue sacudida por el primero de numerosos terremotos. El 8 de enero de 2020, el Presidente de Estados Unidos publicó una Declaración de emergencia para Puerto Rico, en virtud de la cual se proporcionó asistencia federal directa a la isla con el objeto de realizar evaluaciones preliminares de los gastos. Puerto Rico experimentó un sismo de una magnitud de 5.8 el 6 de enero de 2020, y de 6.4 al día siguiente.

El 18 de septiembre de 2022, el Fiona tocó tierra como huracán de Categoría 1. El Fiona trajo vientos de más de 100 millas por hora y más de 30 pulgadas de lluvia, que provocaron graves lluvias, deslizamientos de tierras y rotura de carreteras y puentes en todo el país. Según LUMA Energy, el Fiona causó daños valorados en más de $4,000 millones solamente en el Sistema de TyD.[139]

Tras todos estos desastres naturales, la AEEPR incurrió en significativos gastos y recibió ciertas aportaciones federales e indemnizaciones de seguros. La infraestructura del sistema de energía eléctrico de Puerto Rico sufrió graves daños en los últimos años debido a los citados desastres naturales. En consecuencia, la AEEPR adquirió el derecho de adherirse a los siguientes programas federales que financian trabajos de emergencia y proyectos permanentes:

1. Programa de Asistencia Pública ("PA") de la FEMA: Este programa aporta fondos a las comunidades para recuperarse de desastres o emergencias declarados federalmente, de conformidad con las Secciones 428 y 406 de la Ley de Asistencia de Emergencia y Socorro en Casos de Desastre de Robert T. Stafford (la "Ley Stafford"). Los fondos se aportan tanto para ayuda de emergencia como para el restablecimiento permanente de las infraestructuras. En determinadas circunstancias también pueden canalizarse fondos más allá del restablecimiento de infraestructuras y para cubrir futuras mitigaciones de riesgos. Por ejemplo, pueden financiarse medidas que reduzcan directamente el potencial de futuros daños por desastres similares. La AEEPR debe cumplir el requisito de compartir entre el 10 y el 25% de los costos (en función del tipo de proyecto) del total de los fondos percibidos en el marco del programa de PA.

2. Programa de Subvención para Mitigación de Riesgos 404 de la FEMA ("FEMA 404 HMGP"): Este programa financia la protección de las partes no dañadas de

---

[139] https://lumapr.com/fiona/?lang=en.

las instalaciones, o puede emplearse para prevenir o reducir daños causados por futuros desastres. A tenor de la Sección 404 de la Ley Stafford, la AEEPR deben cumplir el requisito de compartir el veinticinco por ciento (25%) del costo de este financiamiento, que hasta la fecha ha sido satisfecho por el programa Subvención en Bloque para el Desarrollo Comunitario ("CDBG"). Sin embargo, no existe garantía de que la futura participación en los gastos vaya a ser financiada por fondos del programa CDBG.

3. Programas CDBG federal del Departamento de Vivienda y Desarrollo Urbano ("HUD") – CBDG de Recuperación de desastres ("CBDG-DR") y de Mitigación ("MIT"): Los fondos procedentes de los programas CDBG deben canalizarse hacia impactos vinculados con los daños en áreas de desastre así declaradas por la presidencia, así como cumplir una serie de criterios adicionales. La AEEPR pretende aplicar los fondos de este programa para cubrir los requisitos de participación en los gastos de los programas FEMA PA y FEMA 404 HMGP

Como parte de estas subvenciones, se asignó a la AEEPR una obligación de financiamiento de $10,700 millones (incluyendo desembolsos de seguros y participación en los gastos), con el objeto de reparar o sustituir sistemas eléctricos, como miles de millas de tendidos de transmisión y distribución, subestaciones eléctricas, sistemas de generación, edificios de oficinas y otras mejoras de la red. De estos $10,700 millones, el gobierno federal aporta $9,500 millones. La AEEPR tiene la intención de utilizar los fondos del CBDG-DR para cubrir, al menos en parte, el requisito de costo compartido local. El total de la obligación de financiamiento de $10,700 millones asignados a la AEEPR[140] se denomina "Transacción global".

Además, hasta el 18 de noviembre de 2022, la AEEPR ha recibido aproximadamente $2,100 millones en fondos de emergencia para mitigar las consecuencias de los huracanes María e Irma, los terremotos de 2020 y la pandemia de la COVID-19, aportados por la FEMA y otros organismos federales. También, hasta la misma fecha, recibió $227 millones de diversas aseguradoras como consecuencia de los daños resultantes del huracán María y de los terremotos de enero de 2020.

La AEEPR publicó un informe detallando los proyectos que acometerá aplicando los nuevos fondos de la FEMA.[141]  Las principales prioridades de la AEEPR incluyen la protección de las cargas de las infraestructuras críticas, las líneas de transmisión y distribución y las grandes cargas industriales esenciales para la economía de la isla. Para atender a las prioridades de la AEEPR se han identificado cinco áreas de enfoque de las inversiones: (i) confiabilidad y resiliencia del sistema; (ii) integración de las renovables; (iii) cumplimiento de códigos, normas y reglamentos; (iv) automatización y modernización; y (v) mitigación de riesgos.

---

[140] LUMA Energy es responsable de aplicar los fondos federales a la reconstrucción de las infraestructuras vinculadas con la transmisión y la distribución.  A su vez, la AEEPR es responsable de utilizar los fondos federales asignados en la reconstrucción de las infraestructuras relacionadas con la generación.

[141]   https://energia.pr.gov/wp-content/uploads/sites/7/2021/02/Response-to-Resolution-and-Order-Entered-on-Jan-25-2021-and-Request-for-Approval-of-Revised-10-Year-Infrastructure-Plan-NEPR-MI-2021-0002-1.pdf.

F.      **Planificación y transformación de recursos de la AEEPR**

1.      **Plan integrado de recursos (PIR)**

Antes de 2014 y de la promulgación de la Ley 57-2014, la AEEPR operaba sustancialmente como servicio público eléctrico no regulado. Con la promulgación de la Ley 57-2014, el NEPR asumió la responsabilidad de establecer medidas apuntadas a transformar completamente la red eléctrica de Puerto Rico. La Ley 57-2014, con sus correspondientes enmiendas, conocida como Ley de Transformación y ALIVIO Energético de Puerto Rico, permite a la AEEPR convertirse en instrumentalidad de Puerto Rico, responsable de suministrar energía eléctrica al país al costo más bajo posible y, al tiempo, ajustarse a las más altas normas ambientales, bajo la supervisión del NEPR.[142]   Para ello, la Ley 57-2014 requiere que el Negociado de Energía de la Junta Reglamentadora de Servicio Público adopte las medidas necesarias para la presentación, evaluación y aprobación del PIR de la AEEPR.[143]   En general, un PIR es un documento de planificación que utilizan las compañías de servicios públicos de todo el país, que define cómo dicha entidad suministrará recursos energéticos a una determinada región geográfica durante un período de entre cinco (5) y veinte (20) años.

Al igual que otros servicios públicos, la planificación de recursos de generación de la AEEPR se efectúa empleando un PIR. El PIR, también definido por la Ley 57-2014, es un plan de recurso que considerará globalmente todos los recursos razonables, incluyendo tanto la oferta como la demanda de electricidad, para satisfacer las actuales y futuras necesidades del sistema eléctrico de Puerto Rico al menor precio posible.[144]   La Ley 57-2014 estipula que el PIR de la AEEPR debe evaluar el impacto ambiental del sistema de energía contemplado por el plan de acción propuesto dentro del PIR.[145]   Al menos cada tres (3) años, la AEEPR debe preparar y presentar al NEPR un PIR revisado, que abarque un período de veinte (20) años, que se ajuste a lo dispuesto tanto por la Ley 57-2014 como por el Reglamento 9021. Ambos instrumentos exigen que la AEEPR incluya, entre otros, (i) una evaluación del entorno de planificación; (ii) un estudio detallado de las futuras previsiones de carga, los actuales recursos de generación, los recursos de la demanda presente, las actuales inversiones en tecnologías de conservación de la electricidad, instalaciones de TyD[146] existentes; y (iii) las previsiones y análisis d escenarios relevantes sobre los que se sustenta el plan de recursos seleccionado por la AEEPR. Por otra parte, el PIR debe contener una propuesta de plan de acción. El plan de acción del PIR contiene las actuaciones recomendadas que el NEPR deberá aprobar, y la AEEPR implementar, para

---

[142] Ley 57-2014, Ley de Transformación y ALIVIO Energético de Puerto Rico, aprobada el 27 de mayo de 2014.

[143] Ley 57-2014, Ley de Transformación y ALIVIO Energético de Puerto Rico, aprobada el 27 de mayo de 2014.

[144] Siemens Industry, Plan Integrado de Recursos de Puerto Rico 2018-2019, RPT-015-19, rev. 2 (Schenectady, 7 de junio de 2019), 7-3, PREPA Ex. 1.0 IRP 2019 PREPA IRP Report.pdf (aeepr.com). .

[145] Ley 57-2014, Ley de Transformación y ALIVIO Energético de Puerto Rico, aprobada el 27 de mayo de 2014.

[146] La transmisión es el movimiento de electricidad de alta tensión entre centrales eléctricas, en tanto que el proceso de distribución hace referencia al movimiento de la electricidad a los consumidores.   El sistema de transmisión y distribución de Puerto Rico consta de tres importantes bucles de transmisión que transportan la electricidad generada desde las centrales de la costa sur hasta los centros de carga concentrados en el noreste.

reestructurar el sistema del servicio eléctrico de la compañía durante los años cubiertos por el PIR relevante (en la actualidad, 2019-2023).[147]

El PIR más reciente fue propuesto el 7 de junio de 2019. LUMA Energy deberá presentar el próximo PIR propuesto como más tardar el 1 de marzo de 2024. El objetivo del PIR más reciente es cumplir, en general, la política pública energética del gobierno de Puerto Rico, y más específicamente todo lo relativo a la transformación y desarrollo del sector eléctrico de la isla. Un elemento central del desarrollo de la visión del gobierno ha sido el hincapié en la transformación del sector eléctrico como factor indispensable para su exitosa transformación a largo plazo. Tras el huracán María, el Gobierno de Puerto Rico, en coordinación con la Junta de Supervisión, hizo pública su visión para la transformación del sector energético, denominada "Visión para el Futuro Energético de Puerto Rico". La Visión para el Futuro Energético de Puerto Rico destaca la necesidad de un servicio de suministro eléctrico que establezca un ejemplo global de costos, resiliencia, sostenibilidad, participación y empoderamiento del cliente, compatible con los requisitos ambientales, regulatorios y legales.[148]  Durante la preparación del PIR propuesto por a AEEPR, uno de los principales objetivos fue que el instrumento se ajuste a los cinco (5) pilares siguientes:

1) <u>Centrado en el cliente:</u> el PIR propuesto contempla una mayor participación de los clientes mediante su empoderamiento y alentar su participación en las soluciones de seguridad y asequibilidad de la energía.

2) <u>Viabilidad financiera</u>: el PIR propuesto minimiza el coste de suministro y reduce sustancialmente la dependencia de combustibles fósiles importados. Esto posibilita tarifas asequibles que promueven la viabilidad financiera, tanto de la AEEPR como de sus clientes.

3) <u>Confiable y resiliente</u>: el PIR propuesto está centrado en el concepto de implementar minirredes, con el objetivo de reforzar la resiliencia y confiabilidad de la red eléctrica de Puerto Rico, posibilitando su refuerzo para resistir la fuerza de los desastres naturales. Las minirredes dividen la red eléctrica de la isla en ocho (8) redes eléctricas diferentes, capaces de funcionar de manera independiente, durante y después de importantes eventos meteorológicos, con el objeto de seguir sosteniendo el suministro eléctrico con un mínimo de trastornos durante y después de los desastres naturales.

4) <u>Modelo de sostenibilidad</u>: la implementación del PIR propuesto marcará la transición del sistema eléctrico nacional desde una estructura previamente centrada en combustibles fósiles a otra en la cual las energías renovables jueguen un papel central y predominante. La implementación del PIR propuesto reducirá drásticamente las emisiones, profundizará la integración de la generación renovable, permitirá cumplir

---

[147] Siemens Industry, Plan Integrado de Recursos de Puerto Rico 2018-2019, RPT-015-19, rev. 2 (Schenectady, 7 de junio de 2019), 7-3, <u>PREPA Ex. 1.0 IRP 2019 PREPA IRP Report.pdf (aeepr.com)</u>.

[148] Comunicado de prensa del Gobernador de Puerto Rico, La Junta de Gobierno de la AEE adopta la nueva visión para la transformación anunciada por el Gobernador de Puerto Rico, Autoridad de Energía Eléctrica de Puerto Rico (1 de febrero de 2018).

toda la normativa vigente y preparará a Puerto Rico para los futuros cambios regulatorios.

5) <u>Motor de crecimiento económico</u>: se espera que la naturaleza de los nuevos recursos de generación que deben desarrollarse, los altos niveles de participación de los clientes en la producción de energía y la reducción global de los costos del sistema conlleven oportunidades de empleo y un sustancial crecimiento económico para Puerto Rico. El PIR propuesto sustentará un sistema económico confiable que, a su vez, atraerá el desarrollo económico a la isla.

Como resultado de los numerosos estudios realizados para elaborar el PIR, las recomendaciones del último que se ha propuesto —y que se presentó el 7 de junio de 2019— apuntaban a alinearse con los cinco (5) pilares fundamentales adoptados por la Junta de Gobierno de la AEEPR en su Visión para el Futuro Energético de Puerto Rico. El PIR propuesto actualizado pretende ser la piedra fundamental para posibilitar la prosperidad del sistema eléctrico de Puerto Rico.

## 2.  **Información general del PIR aprobado**

El primer PIR de la AEEPR se presentó en 2015, y seguidamente fue aprobado por la CEPR, la predecesora del NEPR, en 2016.[149]  Sin embargo, aquel PIR pronto demostró no ser propicio para el sistema energético del país como consecuencia de la destrucción sembrada por los desastres naturales. Esto obligó a la AEEPR a reevaluar a fondo su concepto de la oferta de energía y la estructura de la red eléctrica, para asegurarse de que su infraestructura esté mejor preparada para futuros eventos similares. Esos desastres naturales llevaron a la AEEPR a centrarse en la necesidad de (i) reforzar la resiliencia y capacidad de supervivencia de sus sistemas; (ii) reducir su dependencia del fueloil; y (iii) aumentar su adopción de recursos energéticos renovables.

Una vez concluido una exhaustiva reevaluación sobre las medidas más convenientes para la transformación del sistema energético de Puerto Rico, el 13 de febrero de 2019, la AEEPR presentó su propuesta inicial de PIR a la aprobación del NEPR (el "<u>PIR inicial</u>"). Tras revisar el PIR inicial, el NEPR llegó a la conclusión de que era "incompatible", y solicitó a la AEEPR que volviera a presentarlo después de abordar una serie de puntos enumerados y detallados en una resolución que publicó el 4 de marzo de 2019.[150]  El 7 de junio de 2019, la AEEPR volvió a presentar su propuesta de PIR después de una serie de revisiones estipuladas por el NEPR (el "<u>PIR propuesto</u>").[151] El NEPR publicó su Resolución final y orden sobre el PIR propuesto por la AEEPR el 24 de agosto de 2020 (la "<u>Resolución final y orden</u>"), aprobando parcialmente en PIR

---

[149]  Resolución final y Orden. En el asunto: Plan Integrado de Recursos para la Autoridad de Energía Eléctrica de Puerto Rico, Caso núm. CEPR-AP-2015-0002, 23 de septiembre de 2016.

[150]  Resolución y Orden, Presentación del Plan de Recursos Integrados de la Autoridad de Energía Eléctrica de Puerto Rico Completada, Tratamiento Confidencial de Porciones del Plan de Recursos Integrados y Solicitud de Dispensas, Caso núm. CEPR-AP-2018-0001, 14 de marzo de 2019.

[151]  Resolución final y Orden. En el asunto: Plan Integrado de Recursos para la Autoridad de Energía Eléctrica de Puerto Rico, Caso núm. CEPR-AP-2015-0002, 23 de septiembre de 2016.

propuesto, y rechazándolo parcialmente.[152] En consecuencia, en última instancia el NEPR ordenó la adopción e implementación de un Plan de acción modificado y de un Plan de recursos preferente modificado en lugar del plan de acción propuesto (el "Plan de acción") y del plan de recursos preferente (el "Plan de recursos preferente") establecidos en el PIR propuesto por la AEEPR.[153]

La propuesta de PIR más reciente preparada por la AEEPR, parcialmente aprobada el 24 de agosto de 2020,[154] tuvo como objetivos:

a) Abordar las consecuencias de una flota de generación no confiable, inflexible y obsoleta, que quema combustibles fósiles de alto costo e incumple la normativa ambiental, mediante el desarrollo y la incorporación de recursos renovables al sistema eléctrico de Puerto Rico;

b) Conseguir una reducción de los costos de suministro incorporando recursos renovables en la transformación eléctrica de Puerto Rico, lo cual posibilitará una reducción permanente de los altos y volátiles costos de los combustibles;

c) Cumplir los mandatos de la Ley 17-2019 (es decir, obtener el 40% de la generación desde fuentes renovables en 2025; el 60% en 2040; 100% en 2050), e intentar la posibilidad de trascender los mandatos actuales; y

d) Pasar desde la generación centralizada ubicada en el sur de Puerto Rico a recursos más descentralizados distribuidos por toda la isla.[155]

Entre las recomendaciones finales que en última instancia se sugirieron al NEPR, dentro del Plan de acción del PIR propuesto para la AEEPR, a implementarse entre 2019 y 2023, se incluían las siguientes:

a) Recursos de suministro: integrar a la interconexión la máxima capacidad de generación de renovables que resulte práctica, incluyendo recursos de generación nuevos y existentes, almacenamiento de la energía adquirida e infraestructura de combustibles;

b) Sistema de transmisión y distribución: incorporar recursos distribuidos y reforzar la red de transmisión y distribución de modo que pueda separarse en ocho (8) islas eléctricas mayormente autosuficientes; y

[152] Resolución final y Orden. En el asunto: Revisión del Plan Integrado de Recursos de la Autoridad de Energía Eléctrica de Puerto Rico, Caso núm. CEPR-AP-2018-0001, 24 de agosto de 2020.

[153] Resolución final y Orden. En el asunto: Revisión del Plan Integrado de Recursos de la Autoridad de Energía Eléctrica de Puerto Rico, Caso núm. CEPR-AP-2018-0001, 24 de agosto de 2020.

[154] Resolución final y Orden. En el asunto: Revisión del Plan Integrado de Recursos de la Autoridad de Energía Eléctrica de Puerto Rico, Caso núm. CEPR-AP-2018-0001, 24 de agosto de 2020.

[155] Siemens Industry, Plan Integrado de Recursos de Puerto Rico 2018-2019, RPT-015-19, rev. 2 (Schenectady, 7 de junio de 2019), 7-3, PREPA Ex. 1.0 IRP 2019 PREPA IRP Report.pdf (aeepr.com).

c) <u>Eficiencia energética y respuesta a la demanda</u>: mejorar la eficiencia energética y la respuesta a la demanda, retirar unidades obsoletas alimentadas por combustibles fósiles, modernizar los activos de generación con turbinas de doble combustible de gas e hidrocarburos.[156]

3.     **Procedimiento de actuación recomendado**

El Plan de acción es el plan finalmente aprobado por el NEPR tras revisar el PIR propuesto enviado por la AEEPR en 2019. LUMA Energy, la AEEPR y el futuro operador de los Activos de generación de la AEEPR utilizarán e implementarán, en la mayor medida posible, el Plan de acción modificado y el Plan de recursos preferentes modificado como guía para las reparaciones, actualizaciones y sustituciones de los actuales recursos de generación, así como para la adquisición y desarrollo de nuevos recursos. A un nivel superior, la implementación del Plan de acción modificado para la red eléctrica de Puerto Rico contribuirá a (i) promover un mayor uso de fuentes de energía renovables, principalmente la solar fotovoltaica ("<u>FV</u>"); (ii) perfeccionar los objetivos de eficiencia energética, el almacenamiento en baterías, la generación alimentada con gas natural y la infraestructura de suministro; y (iii) concluir la transición para abandonar los actuales métodos de generación con carbón e hidrocarburos pesados. Además el Plan de acción modificado promueve la reducción y estabilización de los actuales costos energéticos y la incorporación de recursos renovables.

El NEPR aprobó las tres (3) notables modificaciones de la red eléctrica, que constituyen el marco básico del Plan de acción modificado y del Plan de recursos preferentes modificado de la AEEPR.

1.  Aumentar la cuota de generación y almacenamiento de renovables, mientras se retira o convierte la actual generación con carbón e hidrocarburos, y se modifican los sistemas para posibilitar la generación basada en inversores;

2.  Posibilitar la elección del usuario mediante inversiones en programas de generación distribuida ("<u>GD</u>"), eficiencia energética ("<u>EE</u>") y respuesta a la demanda ("<u>RD</u>"), con lo que se promoverá una participación mayor y significativa de los clientes en la red eléctrica de Puerto Rico; y

3.  Refuerzo de la resiliencia de la red, incluyendo inversiones de capital en el Sistema de TyD para posibilitar una mayor resiliencia y confiabilidad, y procedimientos de optimización adicional para determinar las inversiones óptimas en el Sistema de TyD para reforzarlo.

La AEEPR ha colaborado con la Autoridad P3 para implementar una reorganización de la red eléctrica de la compañía que sea compatible con estas políticas. La Autoridad P3, en colaboración con la AEEPR y la Junta de Supervisión, seleccionó a LUMA Energy para asumir la responsabilidad de operar y mantener el Sistema de TyD de la AEEPR. Desde junio de 2021,

---

[156] Siemens Industry, Plan Integrado de Recursos de Puerto Rico 2018-2019, RPT-015-19, rev. 2 (Schenectady, 7 de junio de 2019), 7-3, <u>PREPA Ex. 1.0 IRP 2019 PREPA IRP Report.pdf (aeepr.com)</u>.

LUMA Energy, en calidad de operadora privada seleccionada para el Sistema de TyD, viene siendo responsable de la implementación del Plan de acción modificado. Además, LUMA Energy actúa como representante de la AEEPR ante el NEPR y otras agencias gubernamentales locales, estatales o federales, y es responsable de la preparación y propuestas de un nuevo PIR, para su revisión y aprobación por el NEPR, cada tres (3) años.

a)      **Aumento de la cuota de generación y almacenamiento de renovables**

En la Resolución y Orden final dictada el 24 de agosto de 2020, el NEPR ordenó a la AEEPR preparar un plan para obtener 3,750 MW de energía renovable y 1,500 MW de almacenamiento en baterías para 2025.[157]  Además, el NEPR aprobó la instalación de hasta 81 MW de capacidad pico local, adquirida a través de un concurso de ofertas competitivas, abierto a todas las opciones únicas o agregadas de la demanda y la oferta. Además, el NEPR aprobó la conversión de ocho (8) centrales de vapor retiradas en condensadores síncronos, para estabilizar la tensión tras la instalación de la generación de renovables basada en inversores y su almacenamiento en baterías. La Resolución y Orden final se aclaraba que el plan de conversión estará sujeto a estudios adicionales, y se coordinará con calendarios de retirada de equipos.

El NEPR rechazó el desarrollo y construcción de la mayoría de los nuevos recursos de generación con combustibles fósiles propuestos, incluyendo la retirada y sustitución generalizada de las dieciocho (18) unidades de pico de turbinas de gas, cualquier nueva infraestructura de GNL y las iniciativas de desarrollo a gran escala de una nueva unidad de turbinas de ciclo combinado a gas en Palo Seco.

*(i)      Sustitución de la central eléctrica de Palo Seco*

En 2019, la AEEPR inspeccionó diversas instalaciones de la isla para presentar un informe de daños a la FEMA, describiendo el impacto de los huracanes en las centrales eléctricas de todo el país. Al mismo tiempo, la AEEPR estudiaba oportunidades de reforzar la región norte de San Juan, lo cual incluía la propuesta de una central eléctrica en Palo Seco, que en última instancia fue incluida en la propuesta del PIR. Al explicar el rechazo de cualquier iniciativa de desarrollo a gran escala de una nueva unidad de turbinas de ciclo combinado a gas en Palo Seco, el NEPR concluyó que la AEEPR no contemplaba la inclusión de una nueva central eléctrica en Palo Seco hacia 2025 en un plan de menores costos, sino solamente en 2028, como temprano. En la Resolución y Orden final del 24 de agosto de 2020, el NEPR ordenó a la AEEPR que cesara cualquier inversión en el desarrollo de la nueva central de Palo Seco, salvo para efectos preliminares y requisitos de ingeniería limitados.[158]  De conformidad con la Resolución y Orden final, el NEPR autorizó $5 millones para un análisis preliminar económico, de ubicación, de obtención de permisos y de viabilidad en el emplazamiento de Palo Seco para una nueva unidad alimentada con combustibles fósiles y su infraestructura de combustible, toda vez que no interfiriera con, ni retrasara, la adquisición de energías renovables o el almacenamiento en

---

[157] Resolución y Orden final. En el asunto: Revisión del Plan Integrado de Recursos de la Autoridad de Energía Eléctrica de Puerto Rico, Caso núm. CEPR-AP-2018-0001, 24 de agosto de 2020.

[158] Resolución y Orden final. En el asunto: Revisión del Plan Integrado de Recursos de la Autoridad de Energía Eléctrica de Puerto Rico, Caso núm. CEPR-AP-2018-0001, 24 de agosto de 2020.

baterías.[159]   Asimismo, el NEPR ordenó a la AEEPR que comenzara a presentar informes trimestrales, a partir del 1 de enero de 2021, describiendo las actividades realizadas, los recursos de personal o de consultores empleados para efectuarlas, y la situación general de las iniciativas preliminares vinculadas con los fondos autorizados para la unidad de Palo Seco. Si la AEEPR hubiera determinado que las iniciativas preliminares requerirían más de los $5 millones que asignó el NEPR en la Resolución y Orden final, la AEEPR tendría que haber presentado una petición solicitando más fondos. Así, el NEPR no aprobó directamente incluir una nueva central eléctrica en Palo Seco, aunque autorizó la realización de un estudio de viabilidad para determinar si el proyecto era posible y viable para Puerto Rico.

La AEEPR presentó el estudio de viabilidad el 15 de julio de 2022.[160]   En el marco de dicho trabajo, Sargent & Lundy Puerto Rico, LLC, ("Sargent & Lundy"), señalaron que una nueva central eléctrica en San Juan utilizará tecnología probada para (i) aportar un nuevo nivel de resiliencia a la red eléctrica para hacer frente a futuros desastres naturales; (ii) incrementar la flexibilidad para reaccionar ante la demanda de la red; y (iii) elevar la confiabilidad hasta los niveles habituales de América del Norte. Sin embargo, en última instancia Sargent & Lundy concluyó que el emplazamiento de Palo Seco no era la mejor propuesta ni la ubicación más adecuada para la nueva central. Sargent & Lundy recomendó finalmente lo siguiente: (i) una nueva central eléctrica en el tramo norte de la red, adyacente a las cargas críticas de San Juan, para prestar servicios de generación de emergencia; (ii) equipos de generación, con capacidad de arranque autónomo, para casos de emergencia; (iii) reparaciones de las centrales existentes y los depósitos de combustibles fósiles a efectos de que resistan las tormentas y puedan seguir funcionando a pleno rendimiento durante siete (7) días sin reabastecerse; y (iv) pleno cumplimiento de la normativa de la EPA. Esto proporcionará a la AEEPR equipamiento de generación confiable, y contribuirá a atender a las necesidades de la AEEPR de integrar los proyectos de energías renovables y de almacenamiento. La fecha propuesta de entrada en servicio comercial de la central eléctrica sería en torno a 2032. No obstante, esa fecha dependerá de los siguientes factores: (i) adquisición de terrenos en las proximidades de la central eléctrica de San Juan para el desarrollo del nuevo proyecto; (ii) relocalización de las instalaciones existentes; y (iii) solicitud de permisos y obras de demolición.

El 3 de agosto de 2022, el NEPR aprobó una resolución y orden determinando que, debido a la falta de un emplazamiento para la nueva central eléctrica propuesta (según los informes de estado y las recomendaciones de viabilidad), "por abundancia de prudencia es necesario determinar los costos y el calendario de disponibilidad de una nueva turbina de gas de ciclo combinado, evaluar las actuales tendencias del mercado en costos de recursos, y cotejarlos con los costos de la continua implementación de recursos de energía FV y almacenada en baterías, aunque se retrasen, para alcanzar los objetivos del PIR aprobado y de las políticas públicas energéticas, para servir a los mejores intereses de los consumidores de electricidad".[161]

---

[159] Resolución y Orden final. En el asunto: Revisión del Plan Integrado de Recursos de la Autoridad de Energía Eléctrica de Puerto Rico, Caso núm. CEPR-AP-2018-0001, 24 de agosto de 2020.

[160] Moción para presentar Estudio de viabilidad e Informe de estatus de agosto 2022. En el asunto de: Estudios preliminares para el Nuevo Ciclo Combinado de la Planta de Energía de Palo Seco, Caso núm. NEPR-MI-2021-0003, 15 de julio de 2022.

[161] Resolución y Orden final. En el asunto: Estudios preliminares para el Nuevo Ciclo Combinado de la Planta de Energía de Palo Seco, Caso núm. NEPR-MI-2021-0003, 3 de agosto de 2022.

El NEPR razonaba que nada de lo contenido en el PIR aprobado limitaba el desarrollo de la central eléctrica a un determinado lugar, y que quedaba a discreción del NEPR evaluar los costos y el desarrollo de dicha central en otros puntos de Puerto Rico para determinar la ubicación óptima de la misma. Por consiguiente, el NEPR ordenó a la AEEPR que notificara a la Autoridad P3, en el plazo de cinco (5) días laborables, la resolución y orden de que convocaran ofertas públicas para una nueva central eléctrica, la cual deberá ser capaz de combustión dual para gas natural e hidrógeno o para ser convertida para quemar hidrógeno, ubicada en cualquier lugar de Puerto Rico.[162] Asimismo, el NEPR confirmó la orden a la AEEPR de que continuara presentando los informes de estado mensuales acerca del desarrollo de los estudios de una nueva central eléctrica en el área de San Juan, y que incluyese las actuaciones de la AEEPR para modificar las solicitudes de fondos federales estipulando que se destinarían a un nuevo proyecto de almacenamiento de energía, y no a una central eléctrica, en Palo Seco.[163]

(ii)   <em><strong>Desarrollo de nuevas unidades flexibles de generación distribuida</strong></em>

Históricamente, las unidades de generación de Puerto Rico han sido alimentadas principalmente con combustibles fósiles. En el año fiscal 2021, casi el 40% de la electricidad de Puerto Rico se generaba en centrales eléctricas alimentadas con petróleo, y más del 97% de la electricidad se generaba a partir de recursos no renovables.[164] Más recientemente, la AEEPR ha progresado hacia la diversificación de su combinación de combustibles, incluyendo (i) conclusión de la conversión de la central eléctrica de San Juan para el doble uso de combustible con gas natural y diésel; (ii) selección de ofertas para el desarrollo de los 150 MW de recursos renovables no operacionales; y (iii) convocatoria de una licitación para hasta 1000 MW de generación renovable y 500 MW de almacenamiento en baterías. La adición total planificada de 3,750 MW de capacidad de generación renovable incrementará significativamente la capacidad actual de Puerto Rico. Las estimaciones actuales prevén que, hacia 2027, las fuentes renovables generarán más del 45% del total de la electricidad de Puerto Rico.

El 22 de febrero de 2021, la AEEPR convocó un concurso de ofertas para la producción de 1,000 MW de energía renovable y 500 MW de almacenamiento en baterías, incorporando las recomendaciones del NEPR y de la Junta de Supervisión para continuar la implementación del Plan de acción modificado.[165] La convocatoria de ofertas solicita propuestas para el diseño, construcción, titularidad, operación y mantenimiento de recursos de energías renovables, recursos de almacenamiento de energía y centrales eléctricas virtuales en diversas ubicaciones de Puerto Rico. Esta convocatoria inicial fue la primera de seis (6) tramos de convocatorias que se publicarán en los próximos tres (3) años, para obtener 3,750 MW de recursos de energías renovables y 1,500 MW de recursos de almacenamiento de energía. El 15 de junio de 2021, la AEEPR presentó una *Moción para presentar una actualización del Plan de compras para abordar los planes del Segundo tramo de adquisición de recursos renovables y de*

---

[162] *Ibídem*

[163] *Ibídem*

[164] Plan Fiscal Certificado de 2022 para la Autoridad de Energía Eléctrica de Puerto Rico, Capítulo 2, "Contexto histórico y desafíos actuales".

[165] AEEPR, RFP núm. 112648, 22 de febrero de 2021.

*almacenamiento de energía,* con una propuesta de plan para la implementación del segundo tramo y revisiones sugeridas basadas en la experiencia adquirida durante la implementación del primer tramo.[166]   La AEEPR ha seguido presentando mociones de diversas actualizaciones vinculadas con los proyectos que desea incluir en cada tramo para su aprobación por el NEPR.

El 16 de diciembre de 2021, la AEEPR presentó la *Moción presentando el borrador de los Contratos de compra de energía y operativos para 733 MW de energía FV ofrecidos en el Tramo 1 de la evaluación y aprobación.*[167]   En dicha moción, la AEEPR mencionó quince (15) proyectos de energía solar FV que sumaban un total de 732.7 MW, y presentó el borrador de PPOA para nueve (9) de esos proyectos a la evaluación y aprobación del NEPR. En la presentación, la AEEPR identificó también tres (3) proyectos de almacenamiento de energía, por un total de 220 MW, e incluyó los contratos de servicios de almacenamiento de energía y los seis (6) borradores restantes de los PPOA de energía FV a publicarse como más tardar el 23 de diciembre de 2021.

Con posterioridad, el 23 de diciembre de 2021, la AEEPR presentó la *Moción complementaria presentando los borradores de los contratos de compra y operación de energía (PPOA) de energía FV renovable, así como la convocatoria de ofertas de recursos de generación y almacenamiento a la evaluación y aprobación del NEPR.* En dicha moción, la AEEPR presentó tres (3) contratos por un total de 220 MW y seis (6) borradores de PPOA para energía FV, reflejando los proyectos presentados en la moción de la AEEPR del 16 de diciembre de 2021.[168] Además, la AEEPR incluyó tres (3) borradores de PPOA para un total de 112.1 MW de energía solar FV. En su respuesta del 28 de diciembre de 2021, el NEPR dictó una resolución y orden solicitando información adicional. La AEEPR pidió varias prórrogas para responder a las preguntas planteadas por el NEPR en su resolución y orden del 28 de diciembre de 2021. Tras el envío de dichos datos, el NEPR dictó una resolución y orden el 2 de febrero de 2022, aprobando tanto los dieciocho proyectos de energía solar fotovoltaica, por un total de 844.8 MW, y tomando nota de la solicitud de aprobación de los tres (3) proyectos de almacenamiento de energía en baterías debido a la necesidad de información adicional, como parte del primer tramo del proceso de adquisición de generación y almacenamiento de energías renovables.

Debido a los retrasos del primer tramo del proceso de convocatoria de ofertas, en adelante el NEPR determinará los plazos para la publicación de los cinco (5) tramos restantes, y

---

[166] Moción para presentar una actualización del Plan de compras para abordar los planes del Segundo tramo de adquisición de recursos renovables y de almacenamiento de energía, en el asunto: Implementación del Plan Integrado de Recursos de la Autoridad de Energía Eléctrica de Puerto Rico y del Plan de Acción Modificado, Caso núm. NEPR MI-2020-0012, 15 de junio de 2021.

[167] Moción presentando el borrador de los Contratos de compra de energía y operativos para 733 MW de energía FV ofrecidos en el Tramo 1 de la evaluación y aprobación. En el asunto: Implementación del Plan Integrado de Recursos de la Autoridad de Energía Eléctrica de Puerto Rico y del Plan de Acción Modificado, Caso núm. NEPR MI-2020-0012, 16 de diciembre de 2021.

[168] Moción complementaria presentando los borradores de los contratos de compra y operación de energía (PPOA) de energía FV renovable, así como la convocatoria de ofertas de recursos de generación y almacenamiento a la evaluación y aprobación del NEPR. En el asunto: Implementación del Plan Integrado de Recursos de la Autoridad de Energía Eléctrica de Puerto Rico y del Plan de Acción Modificado, Caso núm. NEPR MI-2020-0012, 23 de diciembre de 2021.

asumirá la responsabilidad principal de proceso de compra de nueva capacidad de generación de renovables. El 29 de octubre de 2021, siguiendo las instrucciones del NEPR, la AEEPR envió el conjunto completo de los documentos del segundo tramo de convocatoria de ofertas. El 27 de enero de 2022, el NEPR dictó una resolución y orden estableciendo un coordinador independiente para gestionar todas las futuras compras de energías renovables, y describiendo las funciones y responsabilidades de dicho coordinador. La adquisición de generación y almacenamiento en baterías de energías renovables, tal y como se estipula en el PIR propuesto, tiene como objetivo que Puerto Rico consiga hacia 2050 emplear un 100% de energías renovables.

b)      **Propiciar la elección del cliente**

La participación de los clientes es fundamental para conseguir en el futuro un funcionamiento y una reestructuración adecuados del sistema eléctrico de Puerto Rico. El Plan de acción modificado del PIR aprobado posibilita la elección del cliente a través de diversos programas, como GD, EE y RD. El NEPR ordenó a la AEEPR que posibilitara la GD asegurándose de que todas las planificaciones de, e inversiones en, sistemas de distribución sean compatibles con la GD. En cuanto a la RD, el Plan de acción modificado requiere que la AEEPR desarrolle sistemas internos, programas externos y ofertas disponibles para todas las clases de clientes, con el objeto de propiciar que los agregadores de recursos de RD ofrezcan y suministren recursos de RD económicos, y sean compensados por ello. Por lo que respecta a la EE, el NEPR ordenó a la AEEPR que adoptara todas las medidas necesarias para apoyar el objetivo del 30% de ahorro hacia 2040, como lo estipula la Ley 17-2019, incluyendo la prestación de asistencia para la implementación, análisis, dotación y financiamiento de programas.

LUMA Energy es responsable de garantizar que la red esté preparada para la integración e implementación de la GD, lo cual incluye la activación de la conexión a la red y medición de la energía generada para los clientes que lo soliciten. Un cliente podrá solicitar que se le abone la energía enviada a la red si instala un equipo de medición de la generación. De esta manera, los clientes devuelven electricidad a la red a cambio de un abono en su factura de electricidad. De conformidad con la Ley 17-2019, este abono será equivalente a la tarifa de electricidad minorista. Originalmente se produjo un retraso en la gestión de más de 8,000 solicitudes de suministro de generación a la red. No obstante, desde que el 1 de junio de 2021 LUMA Energy asumiera el control del Sistema de TyD, ha activado este servicio para más de 21.000 clientes generadores de energía solar, que representan en torno a los 100 MW de energía renovable.

Además, la Ley 57-2014 requiere que el NEPR establezca la normativa que rija los programas de EE y RD. El NEPR adoptó un reglamento para la RD el 10 de diciembre de 2020[169], y otro para la EE el 21 de enero de 2022.[170]  Dichos reglamentos utilizan conceptos similares para el desarrollo, administración y dotación, que requieren que la AEEPR desarrolle e implemente programas de RD y de EE. La implementación de los programas está centrada en

---

[169] Adopción de Reglamento para Respuesta a la Demanda. En el asunto: Reglamento para Eficiencia Energética y Respuesta a la Demanda, Caso núm. NEPR-MI-2019-0015, 10 de diciembre de 2020.

[170] Notificación de los reglamentos propuestos y solicitud de comentarios públicos. En el asunto: Reglamento para Eficiencia Energética, Caso núm. NEPR-MI-2021-0005, 21 de abril de 2021.

períodos de tres años y en planes trienales preparados por LUMA Energy, en nombre de la AEEPR, que en última instancia deben ser aprobados por el NEPR. Cada plan identificará las propuestas de programas de RD o de EE, con sus presupuestos y objetivos para el período de tres años. A LUMA Energy se le pedirá que prepare y presente planes trienales separados tanto para RD como para EE. Tras la implementación de los dos (2) primeros años de los programas, se pedirá a LUMA Energy que presente al NEPR una actualización anual para su aprobación, que describa en detalle propuestas de cambios en las ofertas del programa, parámetros de rendimiento, objetivos y/o presupuestos.

Los presupuestos de los programas de RD y EE aprobados serán recuperados mediante las tarifas de los clientes. Además, el reglamento de RD permite a LUMA Energy establecer e implementar tarifas en función de los horarios y/o las variaciones de la demanda, sobre la base de los costos de la infraestructura de distribución o transmisión, así como de la oferta y capacidad energética, toda vez que la estructura de tarifas no disuada de la electrificación beneficiosa, según lo apruebe el NEPR.

El 1 de febrero de 2022, el NEPR adoptó una resolución y orden detallando las actuaciones siguientes a la adopción del reglamento para EE, que incluye: (1) establecimiento de un calendario para la presentación del primer plan trienal para que coincida con la puesta en marcha de otros programas de eficiencia energética; (2) invitación a diversos interesados a un taller, el 28 de febrero de 2022, dedicado al proceso de desarrollo e implementación del plan trienal; y (3) preparación de una plantilla para el plan del período de transición, de conformidad con la Sección 2.02(C)(4) del reglamento para EE. Según el reglamento para EE, LUMA Energy puede combinar los procesos de planificación y la documentación para EE y RD. El NEPR ordenó a LUMA Energy que propusiera un plan para el período de transición como más tardar el 6 de junio de 2022. La fecha límite para el primer plan trienal de EE es el 1 de marzo de 2024.

Además, LUMA Energy ha apoyado la nueva iniciativa del NEPR para el lanzamiento de vehículos eléctricos en Puerto Rico, previsto originalmente para octubre de 2021. El lanzamiento y uso de vehículos eléctricos en Puerto Rico tiene el potencial de incrementar la demanda como consecuencia de que más usuarios conecten sus vehículos a la red, lo cual podría compensar las pérdidas de carga de otros conductores. LUMA Energy ya ha realizado mejoras en la red eléctrica para mejorar la confiabilidad cotidiana del sistema y, en los próximos años, hará actualizaciones adicionales que posibilitarán una energía más limpia y la adopción de vehículos eléctricos. Tal y como lo destacó en su informe al NEPR de noviembre de 2021, LUMA Energy sigue trabajando en:

- Incrementar la conexión de renovables y almacenamiento en baterías simplificando los procesos para los clientes;

- Reparar y modernizar la red eléctrica de Puerto Rico para garantizar energía confiable y sostenible que posibilite la transición al uso de vehículos eléctricos en la isla; y

- Propiciar la adquisición y almacenamiento de energías renovables a escala de servicio público para contribuir a garantizar que los futuros vehículos eléctricos se carguen con energía más limpia.

c)      **Refuerzo de la resiliencia de la red**

La Resolución y orden final llegó a la conclusión de que el PIR propuesto establecía adecuadamente la necesidad de (1) mejoras del Sistema de TyD; (2) inversiones de hasta $2,000 millones para el refuerzo y mejora de la infraestructura de transmisión y distribución ("TyD"); y (3) la inversión de $911 millones en mejoras del sistema de distribución para reforzar la resiliencia y apoyar la generación distribuida. Uno de los principales objetivos de la Resolución y orden final fue reforzarla resiliencia y sostenibilidad de la red eléctrica de Puerto Rico mediante el establecimiento de minirredes y microrredes, en especial tras producirse algún desastre natural en la isla. Sin embargo, el NEPR ordenó a la AEEPR que, antes de proceder a cualquier planificación o inversión, solicitara su aprobación para los gastos en TyD. Por otra parte, la AEEPR anunció la puesta en marcha de un procedimiento de optimización que determinará las inversiones adecuadas en transmisión para garantizar un sistema eléctrico más resiliente, incluyendo la evaluación de la capacidad de los recursos distribuidos a pequeña escala —como las minirredes— de contribuir a la resiliencia.

LUMA Energy es responsable de la planificación e implementación de las medidas de resiliencia de la red en su calidad de operadora de TyD de Puerto Rico. Como parte de su Transición inicial, LUMA Energy elaboró planes de capital, que estarían dotados por fondos federales y no federales, para reparar, reconstruir y modernizar el actual Sistema de TyD, y reforzar la resiliencia contra eventos extremos, como los desastres naturales. En el presupuesto anual propuesto, presentado el 1 de abril de 2022, LUMA Energy presupuestó unos $2,600 millones para proyectos de reparación, modernización y refuerzo de la infraestructura de TyD entre los años fiscales 2023 y 2025. En relación con esta propuesta de presupuesto, LUMA Energy viene obligada a presentar informes mensuales que incorporen una descripción general de los principales proyectos de inversión que la AEEPR está considerando para mejorar la red eléctrica del país.

4.      **Desarrollo de futuros Planes integrados de recursos en Puerto Rico a partir de 2023**

En la Resolución y orden final dictada por el NEPR el 24 de agosto de 2020 se incluía una sección titulada "Preparación para el próximo ciclo de PIR". El NEPR ordenó a la AEEPR que convocara ofertas para seleccionar al próximo consultor que colaborara en la preparación del siguiente PIR.[171]  El NEPR explicó que la elaboración de la próxima propuesta de PIR debería llevar menos tiempo, asegurar un mayor valor y permitir al NEPR aprobar el siguiente PIR sin tantas modificaciones como fueron necesarias con el actual y su Plan de acción modificado. Para ello, el NEPR enumeró una serie de puntos que deberían incorporarse al próximos PIR propuesto por la AEEPR. Estos puntos pueden dividirse en ocho (8) categorías, a saber:

1.  Eficiencia energética y respuesta a la demanda: la AEEPR debería asegurarse de que los programas de eficiencia energética contenidos en el PIR actualmente aprobado se

---

[171]  Resolución y Orden final. En el asunto: Revisión del Plan Integrado de Recursos de la Autoridad de Energía Eléctrica de Puerto Rico, Caso núm. CEPR-AP-2018-0001, 24 de agosto de 2020.

caractericen por la mejor relación calidad-precio y por las buenas prácticas profesionales, en comparación con otras jurisdicciones de fuera de Puerto Rico.

2. <u>Generación y almacenamiento distribuidos</u>: la AEEPR debería evaluar el mercado actual y determinar los precios actualizados de la energía FV para el desarrollo de Puerto Rico, así como incorporar recursos de almacenamiento distribuido para garantizar los mejores servicios de red optimizados para el país.

3. <u>Previsiones de carga</u>: la AEEPR debería considerar las mejoras realizadas en las cargas eléctricas y emprender estudios para explorar variables independientes susceptibles de afectar al costo y al rendimiento de las cargas, que incluyan, entre otros, el viento, la meteorología y la demografía.

4. <u>Recursos eólicos</u>: la AEEPR debería realizar estudios adaptados a los recursos eólicos y a la red eléctrica de Puerto Rico para evaluar el perfil de generación de costos empleando la información más actualizada existente.

5. <u>Necesidad de evaluación de los recursos</u>: dentro del contexto de la próxima propuesta de PIR, la AEEPR debería incluir un balance anual de recursos de carga y capacidad que cubra todos los años cubiertos por el próximo PIR, así como una previsión de la "posición neta anual" del sistema eléctrico de la AEEPR durante dicho período.

6. <u>Salvedades y limitaciones</u>: si la AEEPR optara por emplear un sistema de puntuación, debería incluir ponderaciones cuantitativas específicas para cualquier atributo incluido en el próximo PIR, con las explicaciones y fundamentos pertinentes de dichas ponderaciones.

7. <u>Transmisión y distribución</u>: la AEEPR debería examinar cómo la planificación de recursos podría afectar a los requisitos de inversión en TyD, así como la manera de optimizar el desarrollo de un plan de recursos tomando en cuenta dichas inversiones.

8. <u>Plan de acción modificado</u>: por lo que respecta al actual Plan de acción modificado, en el próximo PIR la AEEPR podría considerar como posible alternativa la conversión de la central de carbón de AES Puerto Rico para que funcione con gas natural.

Además de las ocho (8) categorías que el NEPR propone incorporar en la elaboración del próximo PIR, la entidad también ordenó a la AEEPR que mejorara su organización y procesos internos para que el sistema eléctrico nacional funcione de manera más eficiente. Para ello, dentro de la Resolución y orden final, el NEPR solicitó a la AEEPR que, como más tardar un año después de la fecha de notificación de dicha Resolución (el 24 de agosto de 2020) presentara un informe detallando cómo mejoraría sus procesos de planificación de recursos. El informe de revisión del proceso del PIR debía incluir la siguiente información: (i) las medidas que el AEEPR tiene previsto adoptar para abordar todas las deficiencias de la anterior propuesta de PIR de la AEEPR, y el correspondiente calendario de implementación de tales medidas; (ii) las identidades de los responsables de garantizar que las citadas medidas se adopten efectivamente;

110

(iii) una descripción del marco de modelado a emplear en el próximo PIR propuesto; (iv) qué grupos internos participarían en la elaboración del próximo PIR; (v) el proceso y las medidas que la AEEPR adoptará para garantizar que todo el personal involucrado en la elaboración de la próxima propuesta de PIR tenga la capacitación y experiencia adecuadas; y (vi) una descripción de cómo tiene previsto la AEEPR mejorar sus procesos de mantenimiento de registros.

El 1 de junio de 2021, LUMA Energy comenzó a operar el Sistema de TyD de la AEEPR, de conformidad con el Contrato de TyD. Como representante de la AEEPR, LUMA Energy viene obligada a cumplir la Resolución y orden final como parte del proceso de preparación del próximo PIR.

El 5 de noviembre de 2021, LUMA Energy presentó una *Moción informativa sobre el estado de las actividades vinculadas con el próximo ciclo del PIR, solicitud de prórroga de presentación de documentación y solicitud de programación de una conferencia técnica.*[172] En dicha moción, LUMA Energy reconoció su papel en lo relativo a la preparación del próximo PIR. Además, LUMA Energy solicitaba prorrogar el plazo para presentar el informe interno de revisión del proceso del PIR estipulado en la Resolución y orden final del 24 de agosto de 2020. Por otra parte, LUMA Energy solicitó al NEPR programar una conferencia técnica para debatir en detalle el proceso de preparación del PIR. LUMA Energy facilitó asimismo al NEPR actualizaciones de sus tareas en curso vinculadas con la preparación del próximo PIR, a saber: definición de necesidades en materia de procesos, personal y consultoría, y colaboración con el Departamento de Energía ("DOE") de EE.UU. para determinar qué se requiere de LUMA Energy para el siguiente PIR, incluyendo la preparación de un estudio relativo a la resiliencia de la red y la transición de Puerto Rico al uso de un cien por ciento (100%) de energías renovables.

El 30 de noviembre de 2021, LUMA Energy presentó la *Moción informativa sobre extensión de tiempo para presentar el Informe sobre el proceso de planificación de recursos para el próximo ciclo del PIR, borrador de Solicitudes de Cualificaciones y Propuestas para el Consultor del PIR, y Solicitud de plazo adicional.*[173] LUMA Energy comunicó al NEPR que había preparado un borrador preliminar del informe de revisión interna del proceso del PIR, así como un borrador para satisfacer los requisitos del concurso de cualificaciones y propuestas para convocar una licitación para elegir al próximo consultor que colabore en la preparación del próximo PIR. Sin embargo, LUMA Energy comunicó al NEPR que dichos informes todavía no estaban preparados para su revisión y aprobación por parte de la entidad. En consecuencia, LUMA Energy solicitaba una prórroga, hasta el 17 de diciembre de 2021, para presentar los citados informe y borradores.

---

[172] Moción informativa sobre el estado de las actividades vinculadas con el próximo ciclo del PIR, solicitud de prórroga de presentación de documentación y solicitud de programación de una conferencia técnica. En el asunto: Implementación del Plan Integrado de Recursos de la Autoridad de Energía Eléctrica de Puerto Rico y del Plan de Acción Modificado, Caso núm. NEPR MI-2020-0012, 5 de noviembre de 2021.

[173] Moción informativa sobre extensión de tiempo para presentar el Informe sobre el proceso de planificación de recursos para el próximo ciclo del PIR, borrador de Solicitudes de Cualificaciones y Propuestas para el Consultor del PIR, y Solicitud de plazo adicional. En el asunto: Implementación del Plan Integrado de Recursos de la Autoridad de Energía Eléctrica de Puerto Rico y del Plan de Acción Modificado, Caso núm. NEPR MI-2020-0012, 30 de noviembre de 2021.

El 15 de diciembre de 2021, el NEPR atendió a las solicitudes de LUMA Energy del 5 y del 30 de noviembre, ordenándole que presentara el informe como más tarde el 17 de diciembre de 2021.[174] Asimismo, el NEPR aceptó la solicitud de LUMA Energy de convocar una conferencia técnica para tratar el siguiente PIR, que debía celebrarse el 25 de enero de 2022.

El 17 de diciembre de 2021, LUMA Energy presentó la *Moción para presentar el Informe sobre el proceso de planificación de recursos para el próximo ciclo del PIR y el borrador de Solicitudes de Cualificaciones y Propuestas para el Consultor del PIR y Solicitud de trato confidencial.*[175] En el marco de la moción, LUMA Energy presentó el informe interno de revisión del proceso del PIR, cumpliendo así la resolución y orden del NEPR del 15 de diciembre de 2021. Además, LUMA Energy aportó un resumen simplificado del proceso propuesto por LUMA Energy para elegir al consultor que colaborara en la preparación del próximo PIR, sujeto a la aprobación del NEPR.

LUMA Energy solicitó al NEPR que no demorara la aprobación del proceso propuesto por LUMA Energy para la contratación de un consultor para el siguiente PIR, pendiente de la conferencia técnica programada para enero de 2022.

Además, la moción aportaba el informe interno de revisión del proceso del PIR, como lo exigía la Resolución del 24 de agosto de 2020. El informe interno de revisión del proceso del PIR exponía las actividades a corto y medio plazo de preparación del PIR, y el estado de evolución de las mismas. El 25 de enero de 2022, el NEPR celebró la conferencia técnica, en el transcurso de la cual LUMA Energy realizó una presentación relativa a (i) el proceso de preparación del próximo PIR y estado de la actividad, y (ii) el desarrollo y propuesta de un proceso de aprobación de una solicitud de cualificaciones y un contrato para un consultor técnico para el PIR. Durante la conferencia técnica se confirmó el plazo para presentar el nuevo PIR propuesto, hasta el 3 de enero de 2024. Sin embargo, tras la conferencia técnica LUMA Energy presentó al NEPR una moción informativa destacando que, considerando el estado actual del proceso del próximo PIR, dicha fecha era demasiado limitadora. En consecuencia, el NEPR dictó una resolución y orden solicitando a LUMA Energy que presentara un PIR como más tarde el 1 de marzo de 2024, y aprobando el plan y el consultor técnico propuestos por LUMA Energy.

5.    **Plan decenal de infraestructuras, PIR y Plan de acción modificado de la AEEPR**

Uno de los principales objetivos del PIR aprobado y del Plan de acción modificado es reforzar la resiliencia de la red eléctrica de Puerto Rico mediante el establecimiento de minirredes y microrredes. El proceso de reforzar la resiliencia del Sistema de TyD se materializará durante la próxima década mediante las subvenciones reconstrucción federales

---

[174] Resolución final y Orden. En el asunto: Implementación del Plan Integrado de Recursos de la Autoridad de Energía Eléctrica de Puerto Rico y del Plan de Acción Modificado, Caso núm. NEPR MI-2020-0012, 15 de diciembre de 2021.

[175] Moción para presentar el Informe sobre el proceso de planificación de recursos para el próximo ciclo del PIR y el borrador de Solicitudes de Cualificaciones y Propuestas para el Consultor del PIR y Solicitud de trato confidencial. En el asunto: Implementación del Plan Integrado de Recursos de la Autoridad de Energía Eléctrica de Puerto Rico y del Plan de Acción Modificado, Caso núm. NEPR MI-2020-0012, 17 de diciembre de 2021.

aportadas por la FEMA. Gracias a los fondos federales de esta agencia, la AEEPR elaboró un plan de infraestructuras decenal (el "<u>Plan decenal</u>"), que concluyó el 7 de diciembre de 2020 y que presento a la FEMA en torno al 30 de diciembre de 2020. El Plan decenal incluye la evaluación más reciente de la AEEPR de sus iniciativas de planificación de capital, y aporta un panorama general de lo siguiente:

- Estrategia de inversiones en infraestructuras de la AEEPR;

- El contexto para la selección de los proyectos incluidos en el Plan decenal;

- Una lista priorizada de los proyectos de infraestructuras propuestos;

- Las ventajas previstas y los costos proyectados asociados con los proyectos priorizados;

- Principales hitos y plazos estimados de cada proyecto; y

- Una breve descripción del concepto de la AEEPR para gestionar la ejecución del programa y la cartera propuesta de proyectos.

La estrategia de inversiones del Plan decenal está basada en cinco (5) componentes fundacionales, dos (2) de los cuales incluyen la Declaración de visión de la Junta de Gobierno y PIR aprobado de la AEEPR. La Declaración de visión de la Junta de Gobierno de la AEEPR pretende alinear y motivar a todos los involucrados en la transformación del sistema eléctrico de Puerto Rico en los futuros planes, infraestructuras y objetivos de la compañía eléctrica. Asimismo, dicha visión reconoce y aborda la necesidad de transformar el sistema eléctrico de Puerto Rico sobre la base de cinco principios fundamentales: (1) centrado en el cliente; (2) financieramente viable; (3) confiable y resiliente; (4) modelo de sostenibilidad; y (5) motor del crecimiento económico de Puerto Rico, que también son los fundamentos del PIR aprobado y del Plan de acción modificado de la AEEPR. PIR aprobado y del Plan de acción modificado de la AEEPR incorporan una hoja de ruta para atender a la demanda de electricidad prevista mediante el futuro desarrollo de la infraestructura eléctrica de la compañía, con planes específicos para reforzar la resiliencia y confiabilidad de sus sistemas de generación y transmisión, la reducción del costo de la energía para los usuarios; y la limitación de la futura dependencia de combustibles fósiles en el marco de una transición hacia un sistema más basado en la generación mediante renovables.

El Plan decenal inicial detallaba 256 proyectos propuestos para mejorar la red eléctrica de Puerto Rico para beneficio de sus clientes. El Plan decenal categorizaba los 256 proyectos propuestos en ocho (8) grupos diferentes, a saber:

1. <u>Generación</u>: esta categoría incluye, por ejemplo, los nuevos centros de soporte a la red de generación de energía térmica y renovable, la retirada de centrales térmicas, la generación eléctrica móvil de emergencia y las mejoras de las centrales.

2. <u>Presas y energía hidroeléctrica</u>: esta categoría incluye, por ejemplo, sistemas de protección y alerta temprana en presas, embalses, instalaciones hidroeléctricas y canales de riego.

3. <u>Transmisión</u>: esta categoría incluye, por ejemplo, el restablecimiento, refuerzo y reconfiguración de las líneas de transmisión.

4. <u>Distribución:</u> esta categoría incluye, por ejemplo, sustitución de alimentadores, postes y conductores, instalación de dispositivos inteligentes y automatización de la distribución, e instalación de medición inteligente.

5. <u>Subestaciones</u>: esta categoría incluye, por ejemplo, subestaciones de distribución, centros de transmisión y separación de transmisión/generación.

6. <u>TI/telecomunicaciones</u>: esta categoría incluye, por ejemplo, sistemas de microondas y de fibra óptica, y sistemas de radio inalámbricos bidireccionales.

7. <u>Edificios</u>: esta categoría incluye, por ejemplo, edificios inundados y gravemente dañados, así como daños menores.

8. <u>Medio ambiente</u>: esta categoría incluye, por ejemplo, proyectos de demolición, estabilización de suelos y restauración.

Una vez identificadas las categorías precedentes, la AEEPR priorizó los proyectos sobre la base de la secuenciación necesaria para posibilitar la materialización de la Visión de la Junta de Gobierno y el PIR aprobado de la AEEPR. Los proyectos se categorizaron en función de uno de tres horizontes temporales, a saber: (i) proyectos a corto plazo; (ii) proyectos a medio plazo; y (iii) proyectos a largo plazo. Los proyectos a corto plazo son los que deben ponerse en marcha entre 2021 y 2023; los de medio plazo son los que tienen fecha de inicio entre 2024 y 227; y los de largo plazo son aquellos que se prevé iniciar a partir del octavo año del Plan decenal. El Plan decenal aborda directamente su alineación con el PIR actualmente aprobado, con referencia a las secciones del PIR correspondientes a cada proyecto expuesto en el Plan decenal. Sin embargo, el Plan decenal no se ajustó automáticamente al PIR aprobado y al Plan de acción modificado, tal como se había propuesto originalmente.

Originalmente, a pesar de que el Plan decenal debe alinearse con el PIR aprobado y el Plan de acción modificado, la AEEPR no presentó el Plan decenal al NEPR, sino solamente a la FEMA. En consecuencia, el 30 de diciembre de 2020, el NEPR pidió a la AEEPR que le enviara el Plan decenal para revisarlo y confirmar que se ajusta al PIR aprobado.[176] Mediante resolución y orden del 25 de enero de 2021, el NEPR observó que ciertos elementos del Plan decenal eran incongruentes con el PIR aprobado y el Plan de acción modificado, y que podría interpretarse

---

[176] Moción en cumplimiento de la orden dictada el 30 de diciembre de 2020. En el asunto: Procedimientos de optimización de inversiones en transmisión y distribución de minirredes, Caso núm. NEPR-MI-2020-0016, 31 de diciembre de 2020.

razonablemente como alegato de nulidad de los mismos.[177]   La AEEPR alegó que las
incongruencias entre el PIR aprobado y el Plan decenal se debían a los requisitos de aportación
de fondos de la FEMA. Sin embargo, en última instancia el NEPR pidió a la AEEPR que
presentara un plan revisado congruente con el PIR aprobado y el Plan de acción modificado.
Además, ordenó a la AEEPR que se abstuviera inmediatamente de:

1. Excederse del presupuesto asignado, según el PIR aprobado y el Plan de
   acción modificado, a los estudios preliminares de la central de Palo Seco;

2. Realizar cualquier tipo de inversión de capital en el Sistema de TyD o en la
   flota de generación sin la previa aprobación del NEPR; y

3. Utilizar cualquier estudio o plan como alegato de nulidad del PIR aprobado y
   del Plan de acción modificado.

El 16 de febrero de 2021, la AEEPR presentó su Plan decenal revisado a la aprobación
del NEPR.[178]  Las revisiones de febrero se centraban en los proyectos previstos para iniciarse a
corto plazo, entre 2021 y 2023, y se solicitó al NEPR que agilizara su revisión del Plan decenal
para realizar las inversiones necesarias para completar el proyecto, con la inclusión de solicitud
de fondos federales.

El 26 de marzo de 2021, el NEPR dictó una resolución y orden mediante la cual aceptaba
ciertos elementos del Plan decenal revisado de la AEEPR, considerándolos congruentes con el
PIR aprobado y el Plan de acción modificado.[179] En cuanto a los elementos incongruentes con el
PIR aprobado y el Plan de acción modificado, el NEPR ordenó a la AEEPR seguir modificando
en consecuencia el Plan decenal revisado. Además, el NEPR ordenó a la AEEPR que le
presentara para su evaluación y aprobación todos los proyectos de inversión de capital que la
compañía ya haya presentado a la FEMA o a cualquier otro organismo federal o local.

Al encargarse LUMA Energy del mantenimiento del Sistema de TyD de Puerto Rico, la
AEEPR centró sus esfuerzos en proyectos de activos de generación, presas y energía
hidroeléctricas, en tanto que se inició la transición a la responsabilidad de Luma Energy de los
proyectos de las categorías de activos de TyD, subestaciones, TI/telecomunicaciones y
ambientales. El 6 de julio de 2021, LUMA Energy presentó el Plan decenal actualizado,
adjuntándose la actualización de junio de 2021 como Anexo A, en cumplimiento de la resolución

---

[177] Resolución y orden, Decisión sobre la alineación con el Plan Integrado de Recursos aprobado y el Plan de acción
modificado. En el asunto: Revisión del Plan decenal de infraestructuras de la Autoridad de Energía Eléctrica de
Puerto Rico – diciembre de 2020, Caso núm. NEPR-MI-2021-0002, 25 de enero de 2021.

[178] Respuesta a la Resolución y orden dictada el 15 de enero de 2021, y Solicitud de aprobación del Plan decenal de
infraestructuras revisado. En el asunto: Revisión del Plan decenal de infraestructuras de la Autoridad de Energía
Eléctrica de Puerto Rico – diciembre de 2020, Caso núm. NEPR-MI-2021-0002, 16 de febrero de 2021.

[179] Resolución y orden, Evaluación del Plan decenal revisado de la AEEPR. En el asunto: Revisión del Plan decenal de
infraestructuras de la Autoridad de Energía Eléctrica de Puerto Rico – diciembre de 2020, Caso núm. NEPR-MI-
2021-0002, 26 de marzo de 2021.

y orden del NEPR del 26 de marzo de 2021.[180] Esta versión del Plan decenal incluyen unos $12,800 millones en inversiones necesarias para que la AEEPR y LUMA Energy reconstruyan y transformen colectivamente el sistema eléctrico de Puerto Rico, cifra mayormente cubierta con fondos de la FEMA.

Como consecuencia de los requisitos asociados con los fondos de la FEMA, la AEEPR sigue obligada a presentar una actualización del Plan decenal cada 90 días. En consecuencia, presentó una actualización del Plan decenal el 17 de junio de 2022,[181] en la cual se detallaban las medidas que adoptarían la AEEPR y LUMA Energy en los siguientes 90 días. La actualización continúa detallando las obras ya terminadas de LUMA Energy y la AEEPR para empezar a reconstruir y transformar el sector y la red eléctrica de Puerto Rico. Sin embargo, la actualización del 17 de junio de 2022 detallaba solamente el plan a 90 días vinculado con el Sistema de TyD y no con la Transacción de generación, que estaba previsto incluir. Algunas de las principales áreas de enfoque detalladas por LUMA Energy en la actualización de junio de 2022 hacían referencia a proyectos vinculados con el sistema de TyD, que fueron mejorados con respecto a la versión anterior, incluyendo los siguientes:

- La AEEPR y LUMA Energy tienen previsto continuar celebrando reuniones periódicas para coordinar todas las decisiones de mejora de la red eléctrica de Puerto Rico en el marco del Contrato de TyD.

- En el último período de 90 días, la AEEPR y LUMA Energy presentaron a la aprobación del NEPR 20 proyectos. En la actualidad, 14 de ellos han sido aprobados por el NEPR y enviados al FEMA para obtener los fondos pertinentes.

- La AEEPR y LUMA Energy han establecido un nuevo procedimiento para la solicitud de fondos federales, que posteriormente presentaron al NEPR, que LUMA Energy ya ha comenzado a utilizar e implementar.

La actualización más reciente del Plan decenal se presentó el 16 de septiembre de 2022.[182]   Algunas de las principales áreas de enfoque detalladas por LUMA Energy en la actualización de septiembre de 2022 hacían referencia a proyectos vinculados con el sistema de TyD, que fueron mejorados con respecto a la versión anterior, incluyendo los siguientes:

---

[180] Moción conjunta presentando la actualización del Plan decenal de obras de infraestructura. En el asunto: Revisión del Plan decenal de infraestructuras de la Autoridad de Energía Eléctrica de Puerto Rico – diciembre de 2020, Caso núm. NEPR-MI-2021-0002, 6 de julio de 2021.

[181] Moción presentando la actualización de junio de 2022 al Plan de 90 días de PREPA-LUMA. En el asunto: Revisión del Plan decenal de infraestructuras de la Autoridad de Energía Eléctrica de Puerto Rico – diciembre de 2020, Caso núm. NEPR-MI-2021-0002, 17 de junio de 2022.

[182] Moción presentando la actualización de septiembre de 2022 al Plan de 90 días de PREPA-LUMA. En el asunto: Revisión del Plan decenal de infraestructuras de la Autoridad de Energía Eléctrica de Puerto Rico – diciembre de 2020, Caso núm. NEPR-MI-2021-0002, 16 de septiembre de 2022.

- En el último período de 90 días, la AEEPR y LUMA Energy presentaron a la aprobación del NEPR 20 proyectos. En la actualidad, 19 de ellos han sido aprobados por el NEPR y enviados al FEMA para obtener los fondos pertinentes.

- La AEEPR y LUMA Energy han completado cuatro (4) proyectos de construcción que se presentaron con el Plan decenal, y han concluido las actividades de construcción relacionadas con un (1) proyecto adicional.

- La AEEPR y LUMA Energy mantienen su compromiso de colaborar con la Oficina Central de Recuperación, Reconstrucción y Resiliencia ("COR3") y con la FEMA en asuntos de importancia, y seguir haciendo progresos en la implementación del plan y de los proyectos afines.

En conjunto, la AEEPR y LUMA Energy han conseguido progresos en la reconstrucción de la red y las infraestructuras eléctricas de Puerto Rico de conformidad con el Plan decenal, obras que se ajustan al PIR aprobado y al Plan de acción modificado. El NEPR ha calificado al PIR como "eje central de la materialización de la intención legislativa de modernizar el sistema eléctrico, de modo que dependa menos de los combustibles fósiles, utilice y distribuya más energías renovables a escala de servicio público, y promueva la eficiencia y conservación para mejorar el medio ambiente, cumpla las leyes federales relativas al aire limpio y gestione el costo de la electricidad".[183]   En última instancia, el PIR sirve para desarrollar el plan más económico para satisfacer las necesidades de los usuarios de Puerto Rico. El Plan decenal detalla las propuestas de inversiones de la AEEPR en los sistemas eléctricos de Puerto Rico durante los próximos diez (10) años. En consecuencia, ambas deben seguir en sintonía para lograr la transformación exitosa de la red eléctrica de Puerto Rico.

a)        **El Contrato de LUMA Energy**

El 17 de enero de 2020, el Comité de Alianzas constituido por la Autoridad P3 aprobó la propuesta final de LUMA Energy y el formato del Contrato de TyD. El 3 de marzo de 2020, la Autoridad P3 presentó dicho formato del Contrato de TyD para la aprobación de la JSAF. En virtud de la Política de revisión de contratos y de conformidad con el Plan fiscal de la AEEPR, la JSAF revisó el Contrato de TyD conjuntamente con la Autoridad P3 y sugirió una serie de modificaciones, incluyendo un suplemento del Contrato de TyD que contempla que, en la medida en que sea necesaria, LUMA Energy asumía los servicios de operación y mantenimiento durante un plazo limitado antes de que se hiciera efectivo un plan de ajuste. El 14 de abril de 2020, la JSAF votó por aprobar el Contrato de TyD actualizado.

El 18 de mayo de 2020, la Autoridad P3 presentó el Contrato de TyD definitivo al NEPR para la obtención de la aprobación reglamentaria obligatoria. El 17 de junio de 2020, el NEPR dictó una resolución y orden (la "Resolución y orden del NEPR") aprobando el Contrato de TyD. La Resolución y orden del NEPR determinó que "el Contrato propuesto (con sus modificaciones) es compatible con la Política Pública Energética y con el marco regulatorio de Puerto Rico".

---

[183] Resolución y orden, Decisión sobre la alineación con el Plan Integrado de Recursos aprobado y el Plan de acción modificado. En el asunto: Revisión del Plan decenal de infraestructuras de la Autoridad de Energía Eléctrica de Puerto Rico – diciembre de 2020, Caso núm. NEPR-MI-2021-0002, 25 de enero de 2021.

El 22 de junio de 2020, la Junta de Gobierno de la AEEPR y el Gobierno de Puerto Rico, de conformidad con los procedimientos establecidos por la Ley 29-2009 (con sus enmiendas) aprobaron el Contrato de TyD. Tras dichas aprobaciones, las partes firmaron el Contrato de TyD el 22 de junio de 2020.

Según lo estipulado en el Contrato de TyD, LUMA Energy asume la responsabilidad de los Servicios de OyM. LUMA Energy es responsable de todas las actividades de transmisión y distribución eléctrica, servicio de carga y actividades afines para una operación y un mantenimiento seguros y confiables del Sistema de TyD, incluyendo: (i) ampliaciones y sustituciones para ajustarse a las normas contractuales, incluyendo flotas, gestión, adquisición y abastecimiento de activos, e infraestructura de TI, tal como se estipula en el Contrato de TyD, y preparación e implementación de los componentes requeridos en el PIR de la AEEPR, priorizando en todo momento los proyectos de expansión y sustitución que refuercen la operación segura, confiable y económica de las unidades generadoras conectadas al Sistema de TyD; (ii) administración y construcción de mejoras en el mismo, incluyendo el cumplimiento del ámbito de obras aprobado por la FEMA para proyectos elegibles para la obtención de fondos federales, y el correspondiente mantenimiento; (iii) suministro de electricidad a los clientes; (iv) implementación y optimización de las actividades de facturación y recaudación; (v) mantenimiento y mejora del sistema de alumbrado público; (vi) mantenimiento de la infraestructura de cable de fibra óptica, como se estipula en el contrato de arrendamiento entre la AEEPR y PREPA Networks; (vii) cumplimiento de las actividades de interconexión de renovables de conformidad con la legislación vigente; (viii) gestión de los principios operativos del sistema para cumplir con los requisitos de seguridad y confiabilidad a tenor de las prácticas de prudencia y los principios operativos del sistema; y (ix) mantenimiento de registros y preparación de informes de conformidad con la legislación vigente y/o los métodos prudentes de gestión de servicios públicos.

El Contrato de TyD estará en vigor durante quince (15) años desde el comienzo del servicio (la "Fecha de comienzo del servicio"), salvo que sea prorrogado o rescindido de conformidad con sus términos y condiciones.

Antes de asumir el pleno control operativo de la AEEPR y comenzar a prestar los Servicios de OyM, el Contrato de TyD contemplaba un Período de transición inicial, durante el cual LUMA Energy prestaría "Servicios de transición iniciales", tal como se define en el Contrato de TyD, para asegurar un traspaso ordenado de la responsabilidad por los Servicios de OyM. El Contrato de TyD estipula el pago por la AEEPR a LUMA Energy de la "Tarifa del Servicio de transición inicial", compuesta por: (i) un importe fijo, por una única vez, de $60 millones (a pagar en doce plazos mensuales de $5 millones desde el comienzo del Período de transición inicial); más (ii) (a) la tarifa horaria de cada categoría de empleados de LUMA Energy que preste Servicios de transición iniciales, como se estipula en el Anexo V del Contrato de TyD, multiplicada por (b) el número de horas trabajadas por cada empleado para la prestación de los citados servicios; más (iii) todos los demás costos y gastos razonables incurridos por LUMA Energy que sean necesarios y justificados para la prestación de los Servicios de transición iniciales y para satisfacer ciertas condiciones precedentes para el traspaso de las operaciones del Sistema de TyD a LUMA Energy; y (iv) cualesquiera obligaciones de indemnización y otras

cuantías acumuladas[184] que la AEEPR debe pagar a LUMA Energy, de conformidad con el Contrato de TyD, durante el Período de transición inicial (en conjunto, las "Obligaciones de la transición inicial").

El comienzo de la prestación plena de los servicios pactados en el Contrato de TyD requiere que la AEEPR obtenga las autorizaciones necesarias del Tribunal del Título III. La Junta de Supervisión consideró que, a la luz de la situación del caso del Título III de la AEEPR, esta podría no poder confirmar y consumar el Plan de ajuste de Título III antes de la Fecha de comienzo del servicio. Considerando la importancia de las reformas energéticas contempladas en el Contrato de TyD, la Junta de Supervisión deseaba evitar el retraso de la Fecha de comienzo del servicio si la confirmación del Plan de ajuste del Título III de la AEEPR no se producía cuando sí se habían cumplido todas las demás condiciones. Así, la Junta de Supervisión solicitó que se realizaran modificaciones del Contrato de TyD para abordar el calendario previsto. Estas enmiendas se plasmaron en el "Contrato complementario".

El Contrato complementario prevé que los Servicios de OyM comenzarán a prestarse tanto si se satisfacen como si se dispensan las condiciones para el comienzo pleno de los servicios, salvo la salida de la AEEPR del Título III y la obtención de una carta de dictamen y cumplimiento fiscal (la "Fecha provisional de comienzo del servicio").[185] La Fecha provisional de comienzo del servicio se produjo el 1 de junio de 2021, cuando se inició un período (el "Período provisional"), durante el cual entró en vigor el Contrato complementario y LUMA Energy asumió el pleno control del Sistema de TyD hasta la Fecha de comienzo del servicio (que sería cuando se confirmara el plan de ajuste de la AEEPR) o hasta la "Fecha de terminación del período provisional", prevista para el 1 de diciembre de 2022, lo que antes se produjese.[186] El 29 de noviembre de 2022, la Junta de Supervisión y la Autoridad P3 aprobaron una prórroga del Contrato complementario. El 30 de noviembre de 2022, también la Junta de Gobierno de la AEEPR y el Gobierno de Puerto Rico autorizaron la prórroga del Contrato complementario. En consecuencia, la Fecha de terminación del período provisional se ha prorrogado hasta la salida de la AEEPR del Título III.

El Contrato complementario estipula, como condición para la Fecha de comienzo del servicio profesional, que el Tribunal del Título III dicte una Orden Final e inapelable[187] otorgando el tratamiento de gastos administrativos a las Obligaciones provisionales (como se

---

[184]    Dichas otras obligaciones incluyen fundamentalmente los intereses devengados por los pagos retrasados debidos a LUMA Energy (a una tasa preferencial más el 2%) (Contrato de TyD § 20.7), y los gastos vinculados con la desmovilización de LUMA Energy si el Contrato de TyD quedase resuelto durante el Período de transición inicial (Contrato de TyD § 4.8(b)(vi)(B)). Tales obligaciones, conjuntamente con las obligaciones de indemnización de la AEEPR, son contingentes para que la compañía cumpla puntualmente todas las obligaciones asumidas en virtud del Contrato de TyD.

[185]  Contrato complementario §§ 2.2 y 2.3.

[186]  Contrato complementario § 7.1.

[187]    Luma Energy puede dispensar el requisito de que la orden sea inapelable. LUMA Energy dispensó la condición paralela relacionada con la Orden de gastos administrativos iniciales.

definen a continuación).[188]    Los pleitos vinculados al dictado de dicha orden se exponen en detalle en la Sección V.D.5 de esta Declaración de divulgación.

De conformidad con el Contrato complementario, las Obligaciones provisionales constan fundamentalmente de: (i) remuneración por los Servicios de OyM durante el período provisional por una cuantía anual fija de $115 millones (a pagar en plazos mensuales);[189] (ii) indemnización a LUMA Energy y a sus filiales fundamentalmente por todas las demandas o daños en su contra derivados de la operación del servicio por parte de la AEEPR, similar a la obligación de indemnización durante el Período de transición inicial;[190] y (iii) una comisión de rescisión de $115 millones, en su caso.[191]

Los Servicios de OyM benefician a Puerto Rico y a sus residentes, así como a la AEEPR y a sus clientes comerciales e industriales, al iniciar un proceso de modernización, sostenibilidad, confiabilidad, eficiencia, economía y resiliencia del Sistema de TyD de la red eléctrica de la AEEPR. La transición del control sobre el Sistema de TyD a LUMA Energy se encuentra en un crucial primer paso de la transformación global del sector energético de Puerto Rico.

b) **Transformación del sistema de generación de la AEEPR**

El Gobierno desea establecer una alianza público-privada para la gestión, operación, mantenimiento y retirada de servicio, según proceda, de parte o de la totalidad de las centrales de generación de carga básica y de carga pico de turbinas de gas de la AEEPR. Los términos y condiciones de dicha colaboración se determinarán en un contrato entre la AEEPR y cualquier proponente que sea seleccionado mediante un proceso de licitación pública.

La Ley 120 estableció el "marco legal para la venta, enajenación y/o traspaso de los activos, operaciones, funciones y servicios [de la AEEPR]" mediante, entre otros, enmendando la legislación existente para facilitar dichas transacciones. Tal como se expone seguidamente, algunas de las cláusulas de la Ley 120, incluyendo las relacionadas con los empleados de la AEEPR, fueron enmendadas por la Ley 17-2019.

El 10 de agosto de 2020, la AEEPR publicó una Solicitud de Cualificaciones (RFQ, por sus siglas en inglés) para la Transacción de generación. Tras un proceso de licitación, la AEEPR seleccionó ocho (8) empresas (los "Candidatos cualificados").[192] Los Candidatos cualificados fueron:

1. NAES Corp.

2. NRG Energy Services Group LLC

---

[188] Contrato complementario § 2.3(b).

[189] Contrato complementario § 3.3.

[190] Contrato de TyD, en § 18.2.

[191] Contrato complementario § 7.2(c) ((a)–(c), conjuntamente las "Obligaciones provisionales").

[192] https://www.theweeklyjournal.com/business/p3-authority-announces-qualified-companies-for-prepa-generation-project/article_d3367048-2fee-11eb-a2bb-bf66e98d0893.html.

3. ProEnergy Services LLC

4. Siemens Energy Inc.

5. Empresa Generadora de Electricidad Haina S.A. (EGE Haina)

6. EthosEnergy Group Ltd.

7. EcoEléctrica L.P.

8. Encanto Power LLC

La evaluación de las entidades estuvo basada en diversos criterios: sus respectivos antecedentes y equipos, capacidades financieras, desempeño técnico y operativo, e historial de seguridad.

El 10 de noviembre de 2020, la Autoridad P3, en colaboración con la AEEPR, publicó una Solicitud de propuestas (RFP, por sus siglas en inglés) para la Transacción de generación. La convocatoria invitó a los Candidatos cualificados a preparar y presentar propuestas para la Transacción de generación (el "Contrato de generación"). El proceso de formalización del Contrato de generación está en este momento negociándose.

> (i) ***Suministro de gas natural y conversión de las unidades 5 y 6 de la central eléctrica de ciclo combinado de San Juan, y propuesta de conversión de las unidades 7 a 10 de la central eléctrica de ciclo combinado de San Juan***

Históricamente, las unidades de generación de Puerto Rico han sido alimentadas principalmente con combustibles fósiles. En el año fiscal 2021, casi el 40% de la electricidad de Puerto Rico se generaba en centrales eléctricas alimentadas con petróleo, y más del 97% de la electricidad se generaba a partir de recursos no renovables.[193] Una de las aplicaciones del PIR de la AEEPR es la planificación de recursos de generación (que ahora está a cargo de LUMA Energy, en calidad de operadora del Sistema de TyD). En consecuencia, uno de los proyectos más importantes del lado de la oferta incluido en el PIR propuesto fue la conversión de las unidades 5 y 6 de la central eléctrica de ciclo combinado de San Juan para que dejen de usar exclusivamente gas generado mediante diésel y quemen también gas natural. Esta iniciativa se incluyó también como una de las principales iniciativas de transformación, a partir del Plan fiscal de la AEEPR de agosto de 2018, y continuó con el Plan fiscal de junio de 2019 (cada uno de ellos definido más adelante), como uno de los primeros pasos para que la empresa se centre en el cliente y se convierta en un servicio público financieramente sostenible, capaz de prestar servicios eléctricos asequibles, confiables y resilientes a los usuarios de Puerto Rico, tal como se estipuló en la declaración de Visión del Gobierno y en el PIR propuesto. El objetivo de la conversión de las unidades 5 y 6 de San Juan fue modernizar la combinación de combustibles de generación de la AEEPR, reducir los costos y la volatilidad de precios de dichos combustibles, y conseguir eficiencias operativas. La adopción de gas natural en la central de San Juan pretendió

---

[193] Plan fiscal certificado 2020 de la AEEPR, Capítulo 2, "Contexto histórico y desafíos actuales".

obtener un significativo ahorro de costos tanto para la empresa como para los clientes puertorriqueños. Las obras de conversión al gas natural de las unidades 5 y 6 de la central de San Juan se iniciaron en 2019 con la formalización de un contrato con New Fortress Energy, LLC ("New Fortress"), para trabajar conjuntamente con un equipo de gestión de la AEEPR para sustituir el diésel por el gas natural. En el año fiscal 2020, la central eléctrica de San Juan concluyó la conversión de las unidades 5 y 6, que ahora queman gas natural además del diésel, un significativo paso adelante en la diversificación del equipamiento de generación de la AEEPR.

La confiabilidad y la disponibilidad de las unidades 5 y 6 de San Juan es fundamental para que la AEEPR mantenga una red eléctrica estable y eficiente, por cuanto son las unidades de carga básica más modernas de la compañía debido a su capacidad de funcionar tanto con diésel como con gas natural una vez concluido correctamente el proyecto de conversión. Las unidades 5 y 6 de San Juan suministran aproximadamente el 35% de la carga necesaria de la región norte de Puerto Rico, y el 15% del resto de la isla, empleando energía eficiente, confiable y ambientalmente responsable.[194] La conversión al gas natural de las unidades 5 y 6 de las instalaciones de San Juan permitirá una reducción del 90& de las emisiones de $SO_2$ en comparación con el combustible diésel, además de otros contaminantes como PM, PM10, PM2.5, $H_2SO_4$, $NO_x$ y $CO$[195]. El uso de gas natural para el funcionamiento de las unidades 5 y 6 de San Juan ha permitido a la AEEPR reducir su dependencia de otras unidades generadoras, que consumen combustibles pesados, consiguiendo reducciones adicionales de las emisiones. Con las unidades transformadas, la empresa ha reducido tanto las emisiones a la atmósfera como los costos de generación.

Ahora que ha concluido la conversión de las unidades 5 y 6 de San Juan, la AEEPR está evaluando la posibilidad de utilizar fondos federales para aumentar la capacidad de diversas unidades de utilizar gas natural. En consecuencia, el 11 de febrero de 2022, la AEEPR presentó la *Petición de licencia para realizar obras en las unidades de vapor de la AEEPR para conseguir el cumplimiento normativo ambiental*,[196] solicitando la autorización del NEPR para proceder a la conversión de las unidades 7, 8, 9 y 10 al gas natural, como medio para conseguir el cumplimiento de ciertas normas ambientales y de calidad del aire en el distrito de San Juan, a efectos de evitar costosas sanciones por no hacerlo. El plan de la AEEPR es convertir las unidades 7 a 10 para uso con dos combustibles para posibilitarles funcionar con combustibles alternativos en caso de emergencia. El 12 de octubre de 2022, el NEPR dictó una resolución y orden informando a la AEEPR que no consideraría la solicitud de modificar el PIR para permitir el inicio de las obras en las unidades 7 a 10 de San Juan, manifestando que la petición es incongruente con las cláusulas del Contrato de TyD, que requiere que sea LUMA Energy la que presente ante el NEPR las solicitudes de enmienda del PIR aprobado y realice otras tareas afines,

---

[194] Plan fiscal certificado 2020 de la AEEPR, Capítulo 9, "Medidas operativas".

[195] Plan fiscal certificado 2020 de la AEEPR, Capítulo 9, "Medidas operativas".

[196] Petición de licencia para realizar obras en las unidades de vapor de la AEEPR para conseguir el cumplimiento normativo ambiental. En el asunto: Revisión del Plan decenal de infraestructuras de la Autoridad de Energía Eléctrica de Puerto Rico – diciembre de 2020, Caso núm. NEPR-MI-2021-0002, 11 de febrero de 2022.

recordando a la AEEPR de que debe cumplir lo dispuesto en el Contrato de OyM para plantear modificaciones o dispensas relativas al PIR.[197]

(ii)     *Contrato de NFEnergía LLC*

El 5 de marzo de 2019, tras un proceso de licitación, la AEEPR formalizó un contrato con NFEnergía LLC ("NFEnergía"), la filial puertorriqueña de New Fortress, para el suministro de gas natural y la conversión de las unidades 5 y 6 de la central eléctrica de San Juan al uso de dos combustibles (gas natural y diésel). Los proyectos de construcción y conversión concluyeron sustancialmente el primer trimestre de 2020. Las instalaciones de recepción y vaporización de gas natural licuado (GNL), así como las unidades 5 y 6 de San Juan fueron capaces de funcionar a plena carga con gas natural ya en junio de 2020. El GNL se recibía en las instalaciones de NFEnergía procedente de buques que atracaban en el buque de San Juan. Desde allí era transportado para alimentar las unidades 5 y 6. Desde entonces, las citadas unidades han estado funcionando principalmente con gas natural.

El 18 de junio de 2020, la Comisión Reguladora Federal de Energía ("FERC, por sus siglas en inglés") de EE.UU. emitió una "Orden de presentar explicaciones", pidiendo a New Fortress que fundamentara por las instalaciones de procesamiento de GNL de NFEnergía no estaban sujetas a las competencias de la FERC, de conformidad con la Sección 3 de la Ley de Gas natural (la "Ley de Gas natural"). La AEEPR formalizó son contrato con NFEnergía suponiendo que no era necesaria la aprobación de la FERC para el emplazamiento y la construcción de las instalaciones de procesamiento de GNL. Tras considerar las alegaciones presentadas por New Fortress y la AEEPR sobre por qué dichas instalaciones no deberían estar sujetas a la jurisdicción de la FERC, haciendo hincapié en las ventajas económicas y ambientales asociadas con el uso de gas natural en lugar de diésel por las unidades 5 y 6 de San Juan, la FERC, en una orden publicada el 19 de marzo de 2021, llegó a la conclusión de que dichas instalaciones son un "terminal de GNL", sujeto a su jurisdicción a tenor de la Sección 3 de la citada ley. La orden fue confirmada en apelación ante la Corte Federal de Apelaciones del Circuito de Columbia el 14 de junio de 2022. La FERC instruyó a NFEnergía que presentara una solicitud de autorización de conformidad con la Sección 3 de la Ley de Gas natural, con el objeto de poder operar su estación de recepción de GNL en el puerto de San Juan, pero no ordenó la suspensión de sus actividades. NFEnergía presentó la solicitud pertinente a la FERC el 15 de septiembre de 2021, en ECF núm. CP21-496-000. La FERC cursó una notificación manifestando que las mociones para intervenir en el procedimiento y presentar comentarios sobre la solicitud debían presentarse como más tardar el 20 de octubre de 2021. Desde entonces, la FERC ha a NFEnergía diversas solicitudes de datos; las últimas respuestas complementarias se registraron en febrero de 2022. En este momento, la solicitud presentada ante la FERC está pendiente de consideración. Entretanto, las instalaciones de recepción de GNL de NFEnergía siguen operativas y suministran gas natural a las unidades 5 y 6 de la central de San Juan.

El 11 de noviembre de 2020, las organizaciones defensoras del medio ambiente Sierra Club y El Puente de Williamsburg Inc. (los "Grupos ambientalistas") presentaron una demanda contra la AEEPR ante el Tribunal de Primera Instancia de San Juan, solicitando interdictos preliminares y permanentes, así como una sentencia declaratoria, para suspender el funcionamiento de las instalaciones de procesamiento de GNL de NFEnergía. En su demanda, los Grupos ambientalistas sostiene que las instalaciones de tratamiento de GNL de NFEnergía fueron construidas ilegalmente.

El 2 de diciembre de 2020, el Tribunal de Primera Instancia desestimó la demanda por infundada. El 16 de diciembre de 2020, los Grupos ambientalistas solicitaron que se

---

[197] Resolución final y Orden. En el asunto: Revisión del Plan decenal de infraestructuras de la Autoridad de Energía Eléctrica de Puerto Rico – diciembre de 2020, Caso núm. NEPR-MI-2021-0002, 12 de octubre de 2022.

reconsiderara la sentencia que desestimó el caso. El Tribunal rechazó la moción el 12 de enero de 2021. El 1 de febrero de 2021, los Grupos ambientalistas apelaron la sentencia desestimando el caso ante el Tribunal de Apelaciones de Puerto Rico. El 20 de mayo de 2021, el Tribunal de Apelaciones confirmó el dictamen del Tribunal de Primera Instancia. No se presentó ninguna apelación ante el Tribunal Supremo de Puerto Rico.

*[El resto de la página se ha dejado intencionadamente en blanco]*

124

## IV. Eventos significativos que conllevaron el inicio del Caso del Título III de la AEEPR

### A.  El deterioro operativo y financiero de la AEEPR

Históricamente, el funcionamiento deficiente de la AEEPR, sumado al deterioro de sus infraestructuras y a la omisión de ajustar las tarifas para cubrir sus costos, conllevaron la acumulación de una deuda y de obligaciones de pensiones insostenibles. La AEEPR venía operando con déficit desde los primeros años del siglo XXI, y no incrementó su tarifa básica entre 1989 y 2016. Históricamente, las tarifas de la AEEPR nunca han sido suficiente para cubrir sus costos operativos, sus costos de pensiones y sus obligaciones de deuda. En lugar de subir las tarifas para cubrir los costos, la AEEPR tomó préstamos del BGF, aplicando los fondos de estas fuentes de financiamiento para cubrir sus déficits presupuestarias y pagar su servicio de deuda, en lugar de emplearlos para el mantenimiento y la mejora de sus infraestructuras. Además, la AEEPR infradotó sistemáticamente su sistema de pensiones. A la Fecha de petición, la AEEPR tenía una deuda de bonos y otras obligaciones de bonos de aproximadamente $8,500 millones, y un pasivo de pensiones de unos $3,600 millones.

A continuación exponemos los factores más significativos que contribuyeron al deterioro financiero y operativo de la AEEPR en los años anteriores al momento de acogerse al Título III.

***Problemas de la infraestructura de la AEEPR.*** La AEEPR es la única compañía de electricidad de Puerto Rico. Explotar un sistema eléctrico en una isla tropical aislada y montañosa supone retos que requieren significativas tareas de mantenimiento de sistemas de TyD alejados. La limitada liquidez de la AEEPR conllevó que su infraestructura se deteriorara, tornándose obsoleta, como consecuencia de la falta de inversiones en mantenimiento, reparaciones, mejoras de capital y modernización. Por su limitada liquidez, la compañía no pudo aportar fondos suficientes para el mantenimiento del sistema y las mejoras de capital necesarias para reforzar la seguridad y confiabilidad de su red, y para reducir futuros costos. En consecuencia, la AEEPR se abstuvo de invertir en mantenimiento de rutina, por lo cual en los años inmediatamente precedentes a acogerse al Título III, el gasto en su sistema de TyD se limitó principalmente a proyectos urgentes, más que a mejores que hubieran reforzado y estabilizado el sistema.

Como resultado de la continua infradotación de fondos a su infraestructura, la AEEPR función históricamente muy por debajo de las normas del sector. La AEEPR fue incapaz de actualizar y modernizar sus obsoletas instalaciones de generación o de adoptar energías renovables y gas natural, de menor costo, debido a su escasa liquidez y a las influencias políticas sobre los proyectos de conversión a gas natural. Antes de acogerse al Título III, aproximadamente el 45% de los recursos de generación de la AEEPR utilizaban hidrocarburos, frente al promedio nacional del 4%; las energías renovables suponían solamente el 4% de sus recursos de generación, en comparación con la media nacional del 15%.[198] En consecuencia, el Sistema de generación de la AEEPR es más antiguo y costoso que la norma: en promedio, sus recursos de generación tienen una antigüedad de cuarenta y cuatro (44) años, frente a la medida

---

[198] Plan Fiscal de abril de 2018, en 19.

nacional de solamente dieciocho (18) años.[199]  Además, debido a las infrainversiones, el sistema de la AEEPR carece de las medidas de seguridad básicas: su índice de incidencias de seguridad es cinco veces superior a la media del sector, lo cual conlleva costos insostenibles en concepto de seguros, indemnizaciones y salarios. Antes de que el sistema de la AEEPR resultara gravemente dañado por los huracanes y los terremotos de los últimos años, tanto la frecuencia como la duración de los apagones —causados fundamentalmente por la falta de un mantenimiento de rutina y por la obsolescencia de los equipos— superaban de lejos la media del sector. La AEEPR experimentaba apagones en un porcentaje más de un 50% mayor que los promedios nacionales.[200]

*Elevados costos de mano de obra y de pensiones.* Hacia la Fecha de petición, aproximadamente el 70% de los 6,400 empleados de la empresa estaban sindicalizados, y la AEEPR tenía convenios colectivos de trabajo con cuatro sindicatos.[201]  En virtud de estos convenios, la masa salarial anual y los costos de los beneficios pagaderos a los empleados activos ascendía a unos $530 millones.[202]  La AEEPR pagaba todos los gastos médicos, un gasto de aproximadamente $9,600 por empleado y año, significativamente superior al de cualquier otro organismo gubernamental.[203]  Además, la AEEPR era responsable de las obligaciones de pensiones de beneficios definidos de sus empleados activos y retirados, Además los activos, tenía unos 10,000 empleados jubilados.[204]  En 2018, el SRE de la AEEPR estaba infradotado en aproximadamente $3,600 millones.[205]

*Problemas de gestión.* Por otra parte, históricamente las decisiones de gestión de la AEEPR han estado sujetas a influencias políticas: centenares de empleados abandonaban la empresa cada vez que se elegía un nuevo gobernador, e incluso con mayor frecuencia. Este grado de rotación, sobre todo del personal clave, conllevó una ausencia de conocimientos institucionales, una escasez de trabajadores cualificados y la incapacidad de ejecutar proyectos de mejora de capital, lo cual exacerbó sus ya graves problemas por el deterioro de su infraestructura y la ineficiencia de sus operaciones. Aparte de la elevada rotación de empleados clave, también se produjo una significativa reducción del personal: entre 2012 y 2017, la AEEPR perdió aproximadamente el 30% de sus trabajadores.[206]

*Problemas de recaudación de ingresos.* Históricamente, la AEEPR nunca consiguió recaudar una parte significativa de sus cuentas por cobrar de determinados usuarios. Algo que exacerbó los problemas de recaudación de ingresos fue el hecho de que el Estado Libre Asociados y sus instrumentalidades son clientes importantes de la AEEPR. Debido a sus propias

---

[199] Plan Fiscal de abril de 2017, en 10.

[200] *Declaración de la Junta de Supervisión relativa al Caso del Título III de la AEEPR* [ECF núm. 2] (la "Declaración"), ¶ 9.

[201] *Ibídem.* ¶ 3.

[202] *Ibídem.* ¶ 7.

[203] Plan Fiscal de abril de 2018, en 35.

[204] Declaración ¶ 7.

[205] Plan Fiscal de abril de 2018, en 28.

[206] *Ibíd.*, en 25.

dificultades financieras, con frecuencia estas entidades no podían pagar puntualmente sus facturas, y con frecuencia financiaban sus propios déficits presupuestarios retrasando los pagos a la AEEPR. A la Fecha de petición, la AEEPR acumulaba $255 millones en saldos deudores de los organismos gubernamentales.[207] En cuanto a los clientes residenciales y comerciales, la AEEPR solía retrasar los cortes del servicio y era incapaz de cobrar las cuentas morosas.[208]

Además, sufría altos niveles de robo de energía en comparación con la media del sector, otro factor que reducía el cobro de ingresos. Además, la ineficacia de la atención al cliente, el bajo índice de facturación en línea y un sistema informático poco fiable contribuían a esta incapacidad de cobro de las facturas.

*Problemas de cumplimiento ambiental.* Por otra parte, la AEEPR tenía problemas para cumplir la normativa ambiental federal. La compañía estuvo sujeta a dos decretos de consentimiento de la EPA, que le exigía pagar sustanciales penalizaciones.[209] Por otra parte, el cumplimiento permanente de la normativa ambiental exige onerosas mejoras infraestructurales, y el incumplimiento podría conllevar multas y penalizaciones federales adicionales, así como restricciones operativas y repercusiones en la salud pública y en el medio ambiente.

*Problemas macroeconómicos.* Sumado a todo, la AEEPR se vio afectada por las dificultades macroeconómicas que afectaron a Puerto Rico, como el decrecimiento demográfico, que redujo su base de clientes, con la consiguiente caída de la demanda y de los ingresos. También la demanda se vio afectada por la crisis económica generalizada de Rico. En los diez años precedentes a la Fecha de petición, la demanda de electricidad retrocedió un 18%.[210]

## B. Negociaciones con los acreedores antes del Título III

### 1. El AAR previo a la petición

En 2014, con una carga de deuda cada vez más insostenible, la AEEPR comenzó a negociar con sus acreedores, incluyendo a los Bonistas, las aseguradoras de bonos y los prestamistas de sus líneas de crédito renovables, la potencial reestructuración de su deuda.

El 14 de agosto de 2014, la AEEPR formalizó tres acuerdos de indulgencia con (i) algunas Aseguradoras monolínea y Bonistas que controlaban más del 60% de sus bonos; (ii) los Prestamistas de la Línea de combustible; y (iii) el BGF. Entre otras cosas, estos acuerdos requerían que la AEEPR adoptara algunas medidas hacia una reestructuración, incluyendo el nombramiento de un Director de Reestructuración, la contratación de un asesor financiero y la elaboración de un plan de negocio, medidas que la AEEPR implementó en los meses siguientes. Por otra parte, los acuerdos exigían que la AEEPR presentase un plan de reestructuración como más tardar el 2 de marzo de 2015. Originalmente, estaba previsto que los acuerdos se extinguieran en 31 de marzo de 2015, pero se prorrogaron varias veces mientras proseguían las

---

[207] Declaración ¶ 10.

[208] *Ibídem*.

[209] *Ibídem*. ¶ 7.

[210] *Véase* Plan Fiscal de abril de 2018, en 23.

negociaciones entre la AEEPR y sus interlocutores. Algunas de esas prórrogas contenían también condiciones económicas, que aportaban a la compañía liquidez adicional. Por ejemplo, la provisión, por parte de las aseguradoras de bonos, de financiamiento puente para que la AEEPR pudiera hacer frente a un inminente pago de bonos, en julio de 2015.

El 1 de septiembre de 2015, la AEEPR y un grupo ad hoc de bonistas (el "Grupo ad hoc previo a la petición") titulares de aproximadamente el 40% de los bonos circulantes de la AEEPR, llegaron a un acuerdo de principio sobre el contenido de un acuerdo de apoyo a la reestructuración, y se acordó prorrogar la indulgencia. También mayoría de las Aseguradoras monolínea, los Prestamistas de la Línea de combustible y el BGF aceptaron prorrogar sus acuerdos, aunque todavía no habían pactado nada con la AEEPR. De conformidad con lo convenido, el Grupo ad hoc previo a la petición (i) canjearía todos los bonos pendientes por el 85% de sus actuales reclamaciones de bonos por nuevos bonos de titulización; y (ii) tendrían la opción de recibir (a) bonos de titulización que pagarían intereses en efectivo solamente durante los primeros cinco (5) años, o bien (b) bonos de apreciación de capital convertibles que devengarían intereses en especie durante los primeros cinco (5) años, e intereses en efectivo transcurrido ese tiempo. Los tipos de interés dependerían de la calificación de inversión asignada a los bonos. Por otra parte, todos los Bonistas no asegurados de la AEEPR tendrían la oportunidad de participar en este canje. Las negociaciones con las Aseguradoras monolínea y los Prestamistas de la Línea de combustible continuaron.

El 22 de septiembre de 2015, la AEEPR anunció un acuerdo de principio con los Prestamistas de la Línea de combustible, en virtud del cual se reestructurarían aproximadamente $700 millones de deuda. Según lo convenido, los Prestamistas de la Línea de combustible tendrían la opción (i) de convertir sus actuales líneas de crédito renovables en préstamos a 6 años, con un interés fijo del 5.75%, o bien (ii) de canjear la totalidad o parte del capital adeudado en virtud de los contratos de crédito existentes por nuevos bonos de titulización, con las mismas condiciones que los emitidos según el acuerdo con el Grupo ad hoc previo a la petición. Más adelante, el Grupo ad hoc previo a la petición y los Prestamistas de la Línea de combustible aceptaron varias veces prorrogar sus indulgencias mientras la AEEPR seguía negociando con las Aseguradoras monolínea.

El 5 de noviembre de 2015, la AEEPR anunció la formalización del AAR previo a la petición con el Grupo ad hoc previo a la petición y los Prestamistas de la Línea de combustible. Los términos y condiciones del AAR previo a la petición eran sustancialmente los mismos que los de los acuerdos previamente anunciados con el Grupo ad hoc previo a la petición y los Prestamistas de la Línea de combustible, y según el mismo el BGF recibiría sustancialmente el mismo trato que los Prestamistas de la Línea de combustible. Lo convenido en el AAR previo a la petición estaban sujetos a (i) que la AEEPR alcanzara también un acuerdo de apoyo a la reestructuración con las Aseguradoras monolínea como más tardar el 12 de noviembre de 2015, y (ii) la aprobación legislativa, como más tardar el 202 de noviembre de 2015, de la Ley de Revitalización de la AEEPR propuesta (la "Ley de Revitalización de la AEEPR"), que se describe con mayor detalle más adelante, que posibilitaría algunos aspectos esenciales de la reestructuración. Ambos plazos, así como otros hitos establecidos en el AAR previo a la petición, fueron prorrogados varias veces mientras la AEEPR seguía negociando con las Aseguradoras monolínea y esperaba la aprobación legislativa.

El 23 de diciembre de 2015, la AEEPR pactó una enmienda del AAR previo a la petición
con las Aseguradoras monolínea, el Grupo ad hoc previo a la petición, los Prestamistas de la
Línea de combustible y el BGF. El documento así modificado ofrecía a los Prestamistas de la
Línea de combustible y al Grupo ad hoc previo a la petición prácticamente los mismos términos
que el AAR previo a la petición. La diferencia fue que el AAR enmendado ahora disponía la
emisión de bonos a las Aseguradoras monolínea, en las mismas condiciones económicas que los
bonos asegurados, cuyo servicio de la deuda sería aplicado por las Aseguradoras monolínea para
dotar el servicio de la deuda de los bonos asegurados existentes de la AEEPR, librando así a las
Aseguradoras de realizar los pagos estipulados en sus pólizas. Un componente fundamental del
AAR previo a la petición fue determinar un tramo de los cargos cobradas a los usuarios como
"Cargo de transición propuesto" y la transferencia del mismo a una entidad instrumental
especial, o "EIE", de quiebra, que emitiría los bonos de titulización. El EIE aplicaría lo
recaudado mediante el Cargo de transición propuesto al endeudamiento de los bonos de
titulización. Además, las Aseguradoras monolínea aportarían $462 millones en fianzas como
apoyo adicional a los bonos de titulización. Por otra parte, el AAR previo a la petición también
definía elementos adicionales de la reestructuración propuesta de la AEEPR, incluyendo una
nueva estructura de gobernanza y un plan de inversiones de capital.

El AAR previo a la petición requería la aprobación legislativa de la propuesta Ley de
Revitalización de la AEEPR para constituir la EIE y posibilitar la emisión de los bonos de
titulización. El 23 de enero de 2016, una vez agotado el plazo del 22 de enero para la obtención
de la aprobación legislativa y tras negarse el Grupo ad hoc previo a la petición a prorrogarlo, el
AAR previo a la petición se extinguió. Sin embargo, el 27 de enero de 2016, la AEEPR y sus
interlocutores reformularon el AAR previo a la petición con prácticamente los mismos términos
y condiciones, prorrogando el plazo para la aprobación legislativa de la Ley de Revitalización de
la AEEPR hasta el 16 de febrero de 2016. Dicha ley se promulgó en esa fecha, tras lo cual se
creó la Corporación para la Revitalización de la Autoridad de Energía Eléctrica de Puerto Rico
("PREPARC", por sus siglas en inglés), estableciéndose como EIE que recaudaría el Cargo de
transición propuesto y emitiría los bonos de titulización.

De conformidad con la Ley de Revitalización de la AEEPR, el AAR previo a la petición
también requería (i) la presentación de una petición ante la CEPR solicitando la aprobación de un
cargo de titulización y un mecanismo de ajuste de tarifas, y que (ii) la AEEPR iniciara un
proceso de aprobación de tarifas ante la CEPR.

Tras la promulgación de la Ley de Revitalización de la AEEPR, el AAR previo a la
petición fue enmendado varias veces, fundamentalmente para prorrogar los hitos.

En diciembre de 2016, el recientemente elegido Gobernador Roselló anunció que su
administración emprendía una exhaustiva revisión de la propuesta reestructuración de la AEEPR
con el objetivo de conseguir un mejor resultado para la empresa. Además, como consecuencia de
la promulgación de la Ley PROMESA, era necesario implementar cambios en el AAR previo a
la petición, que no podría entrar en vigor sin la determinación de la Junta de Supervisión de que
era viable y favorable para los mejores intereses de los acreedores. En consecuencia, a finales de
2016 y principios de 2017 se mantuvieron exhaustivas negociaciones entre la AEEPR, sus
principales interlocutores y el Gobierno del Estado Libre Asociado acerca de posibles enmiendas
del AAR previo a la petición.

El 6 de abril de 2017, el Gobernador Roselló anunció un acuerdo de principio sobre enmiendas del AAR previo a la petición que, según manifestó, posibilitaría un ahorro adicional de $1,500 millones. El 26 de abril de 2017 se formalizó un suplemento al AAR previo a la petición, que documentaba los términos y condiciones de este acuerdo. Con dicho suplemento, el AAR previo a la petición contemplaba una reestructuración de conformidad con el Título VI de la Ley PROMESA, aunque manteniendo la posibilidad de que la AEEPR se acogiera a la protección del Título III. El nuevo acuerdo tenía que ser aprobado por la Junta de Supervisión, pero esta se abstuvo de entrar en la materia hasta que no se hubieran implementado los cambios solicitados en el Plan Fiscal de abril de 2017 (explicado más adelante), descritos en la Sección IV.E.1(a) siguiente. En última instancia, no fue posible elaborar un plan fiscal que se ajustara a los cambios solicitados por la Junta de Supervisión. El 27 de junio de 2017, la Junta de Supervisión votó por no aprobar el AAR previo a la petición y, además, manifestó que lo más probable es que la reestructuración de la AEEPR se ejecutaría al amparo del Título III, y no del Título VI. Algunos acreedores se negaron a prorrogar los plazos relevantes del AAR previo a la petición, y el 29 de junio de 2017 este instrumento quedó extinguido. Poco tiempo más tarde se inició el Caso del Título III de la AEEPR.

## C. Legislación promulgada por el Estado Libre Asociado para abordar la crisis fiscal y de la deuda[211]

El Estado Libre Asociado promulgó leyes para abordar la crisis financiera de Puerto Rico, varias de las cuales se describen a continuación.

### 1. La Ley de Moratoria y la creación de la AAFAF[212]

El 6 de abril de 2016, el Gobierno promulgó la Ley de Moratoria (la "Ley de Moratoria"), que facultaba al Gobernador para, entre otras cosas, (i) decretar una moratoria de los pagos del servicio de la deuda; (ii) redirigir ciertos fondos histórica y condicionalmente asignados por las entidades públicas al pago de sus obligaciones al pago de servicios esenciales; y (iii) paralizar los recursos de los acreedores correspondientes. Para implementar la Ley de Moratoria, el exgobernador Alejandro García Padilla dictó una serie de órdenes ejecutivas.

Además, de conformidad con la Ley de Moratoria se creó la AAFAF, como corporación pública independiente e instrumentalidad del Estado Libre Asociado, con su Junta Directiva designada por el Gobernador. La AAFAF fue creada con el objeto de actuar como agente fiscal, asesora financiera y agente de comunicación del Estado Libre Asociado y sus corporaciones, instrumentalidades, autoridades, municipios y subdivisiones políticas, y para asistir a dichas

---

[211] La legislación promulgada por el Estado Libre Asociado antes y después de la entrada en vigor de la Ley PROMESA, el 30 de junio de 2016, queda invalidada por la Sección 4 de PROMESA en la medida en que sea incongruente con este instrumento. Además, vulnera la Sección 204 de la Ley PROMESA por cuanto no se han seguido los procedimientos de evaluación de la congruencia de la legislación con el plan fiscal certificado; vulnera la Sección 207 de la Ley PROMESA por cuanto modifica la deuda sin autorización de la Junta de Supervisión; y vulnera la Sección 108(a)(2) de la ley en la medida en que perjudica o frustra la finalidad de la Ley PROMESA según lo determine la Junta de Supervisión. Por el hecho de describir la legislación en la presente sección de la Declaración de divulgación, la Junta de Supervisión no dispensa de la aplicación de la Ley PROMESA a cualquier parte de la misma.

[212] https://sutra.oslpr.org/osl/sutra/anejos_conv/2013-2016/%7B1937f638-bcc9-4991-9dc3-2dd4995eeb04%7D.pdf.

entidades en hacer frente a la grave emergencia fiscal y económica. Asimismo, la AAFAF supervisa todos los asuntos vinculados a la reestructuración o el ajuste de cualesquiera obligaciones, o coordina e implementa las transacciones de gestión de pasivos de las obligaciones cubiertas.

## 2. Ley 2-2017[213]

El 18 de enero de 2017, la Asamblea Legislativa del Estado Libre Asociado aprobó la Ley de la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico, Ley 2-2017 ("Ley 2"), firmada por el Gobernador ese mismo día. La Ley 2 ampliaba las funciones de la AAFAF y la designaba como única entidad oficial autorizada para reestructurar la deuda emitida por el gobierno o sus instrumentalidades, así como negociar con sus titulares. También la autorizaba a obligar a cualquier entidad oficial a adoptar medidas para cumplir los planes fiscales certificados por la Junta de Supervisión.

## 3. Ley 5-2017[214]

El 29 de enero de 2017, el Estado Libre Asociado promulgó la Ley 5-2017 ("Ley 5"), conocida como Ley de Emergencia Financiera y Responsabilidad Fiscal de Puerto Rico de 2017, para derogar partes de la Ley de Moratoria y declarar la emergencia financiera. Aunque se derogaron ciertas cláusulas de la Ley de Moratoria, las órdenes de moratoria de la deuda dictadas en virtud de la misma siguieron en vigor de conformidad con la Ley 5. Además, este instrumento establecía un período durante el cual el Gobernador podría dictar órdenes ejecutivas determinado la prioridad de uso de los recursos disponibles. Además, otorgaba amplios poderes de sindicatura al Gobernador sobre los organismos gubernamentales con el objeto de rectificar la emergencia financiera.

La Ley 5 fue enmendada mediante la Ley 46-2017, con el objeto de autorizar al Gobernador a prorrogar la declaración del período de emergencia en 6 meses adicionales toda vez que existiera la Junta de Supervisión. En este momento, el período de emergencia debería extinguirse el 31 de diciembre de 2022,[215] salvo que vuelva a ser prorrogado por el Gobernador.

## 4. Ley 26-2017[216]

El 29 de abril de 2017, el Estado Libre Asociado promulgó la Ley 26-2017, conocida como Ley de Cumplimiento del Plan Fiscal, con el objeto de implementar una amplia batería de medidas fiscales para reducir costos del Estado Libre Asociado y sus corporaciones públicas, y apoyar el cumplimiento por su parte del plan fiscal certificado por la Junta de Supervisión. Algunas de las medidas implementadas por la Ley 26-2017 relativas a la estandarización de las prestaciones complementarias no monetarias en los organismos del Estado Libre Asociado y en las corporaciones públicas. Entre otras cosas, las medidas adoptadas por la Ley 26-2017: (i)

---

[213] https://sutra.oslpr.org/osl/sutra/anejos/124364/a-002-2017.pdf.

[214] https://sutra.oslpr.org/osl/sutra/anejos/123147/ley%205-2017.pdf.

[215] https://www.estado.pr.gov/en/executive-orders/.

[216] https://sutra.oslpr.org/osl/sutra/anejos/127857/a-026-2017.pdf.

redujeron los días libres y bajas por enfermedad; (ii) redujeron el número de festivos públicos; (iii) redujeron las bonificaciones de Navidad de los empleados de corporaciones públicas a $600, y las supeditaron a seis (6) meses de servicio anuales como mínimo; (iv) sustituyeron las pagas por horas extraordinarias a los empleados públicos por tiempo compensatorio; (v) eliminaron la paga por días de baja por enfermedad acumulados, y pusieron un tope a las liquidaciones por vacaciones acumuladas de sesenta (60) días; (vi) anularon las cláusulas de los convenios colectivos de trabajo que proporcionaban prestaciones complementarias no monetarias superiores a las estipuladas en la Ley-2017; (vii) impusieron un impuesto universal a los dividendos de las Asociación de Suscripción Conjunta; (viii) ordenaron que todas las corporaciones e instrumentalidades públicas transfirieran sus excedentes de ingresos al Fondo General del Departamento de Hacienda; (ix) establecieron un proceso para la venta de bienes inmobiliarios del Gobierno; (x) recortaron la vigencia de la mayoría de las asignaciones plurianuales; (xi) aumentaron los impuestos sobre los cigarrillos y productos del tabaco; (xii) redujeron la aportación de fondos al Conservatorio de Música y a la Escuela de Artes Plásticas; y (xiii) redujeron, hasta el año fiscal 2021, los fondos anuales apartados para el fondo de emergencia del Estado Libre Asociado.

La Ley 26-2017 estipulaba que, una vez estabilizada la situación fiscal y cuando las condiciones del erario público lo permitieran, el "Comité de Cumplimiento del Plan Fiscal" establecido por dicha ley podría suspender sus funciones. El Comité consta de tres miembros, cada uno elegido por el Gobernador, el Presidente de la Cámara de Representantes y el Presidente del Senado, respectivamente.

### D.   PROMESA[217]

#### 1.  Promulgación de PROMESA

El 30 de junio de 2016, el Congreso promulgó la Ley PROMESA, que establece, entre otras cosas, un marco para que el Estado Libre Asociado y sus instrumentalidades cubiertas reestructuren su endeudamiento.  El 30 de septiembre de 2016, la Junta de Supervisión incluyó a la AEEPR como instrumentalidad cubierta.

#### 2.  Creación de la Junta de Supervisión

La Sección 101(a) de la Ley PROMESA estableció la Junta de Supervisión con el objeto de "proveer un método para que un territorio cubierto pueda lograr la responsabilidad fiscal y acceder a los mercados de capital".  En este momento, la Junta de Supervisión consta de siete miembros con derecho a voto designados por el Presidente de los Estados Unidos de una lista bipartita de candidatos, y de un miembro *ex officio* sin derecho a voto nombrado por el Gobernador de Puerto Rico.[218]  El 31 de agosto de 2016, el Presidente Obama nombró a los siete miembros de la Junta de Supervisión con derecho a voto: (1) José B. Carrión III, (2) Carlos M.

---

[217] Esta sección resume algunas cláusulas de la Ley PROMESA.  Aunque el Deudor considera que esta descripción cubre las disposiciones más importantes de la Ley PROMESA, no pretende ser exhaustivo y está sujeto a, y vinculado con, el contenido de la ley.

[218] Consulte en la Sección V.H. de esta Declaración de divulgación una exposición del litigio relativo a los problemas de la cláusula de nombramientos.

García, (3) David A. Skeel, Jr., (4) Andrew G. Biggs, (5) Arthur J. González, (6) José R. González y (7) Ana J. Matosantos.

El 31 de agosto de 2020 se hicieron efectivas las dimisiones de Carlos M. García y de José R. González, y el 5 de octubre de 2020 entró en vigor la renuncia de José B. Carrión III, Presidente de la Junta de Supervisión. El 6 de octubre de 2020, David A. Skeel, Jr. fue nombrado Presidente del organismo. El 7 de octubre de 2020, el Presidente Trump designó a Justin Peterson para sustituir a Arthur J. González como miembro de la Junta de Supervisión. En diciembre de 2020, el Presidente Trump volvió a designar a Andrew G. Biggs y nombró a Antonio L. Medina, John E. Nixon y Betty E. Rosa como miembros de la Junta. En enero de 2021, el Presidente Trump volvió a nombrar a David A. Skeel, Jr., y nombró a Arthur J. González, como integrantes de la Junta de Supervisión. Actualmente, los siete miembros con derecho a voto de la Junta de Supervisión son: (1) David A. Skeel, Jr., (2) Andrew G. Biggs, (3) Arthur J. González, (4) Antonio L. Medina, (5) John E. Nixon, (6) Justin M. Peterson y (7) Betty E. Rosa. El Gobernador de Puerto Rico, Pedro Pierluisi Urrutia, es hoy el miembro sin derecho a voto *ex officio* de la Junta de Supervisión.

Cada integrante de la Junta de Supervisión ocupa su cargo durante un período de 3 años, sin ninguna compensación, y podrá ser nombrado por un número ilimitado de términos consecutivos. Al concluir su mandato, los miembros de la Junta seguirán sirviendo en ella hasta ser sustituidos. El Presidente de los Estados Unidos podrá destituir a cualquier miembro por causas justificadas.

Además de los siete miembros con derecho a voto el miembro *ex officio* sin derecho a voto, la Junta de Supervisión incluye a Jaime A. El Koury como su Asesor legal general. Antiguamente, Natalie A. Jaresko se desempeñó como Directora ejecutiva y Coordinadora de Revitalización interina de la Junta de Supervisión. La Sra. Jaresko dimitió de la Junta el 1 de abril de 2022. El 17 de noviembre de ese mismo año, la Junta de Supervisión anuncio el nombramiento de Robert F. Mujica Jr. como Director ejecutivo, a partir del 1 de enero de 2023. De conformidad con los estatutos de la Junta, el Director ejecutivo actúa como director general de la Junta de Supervisión, encargado de la supervisión general y la dirección de sus asuntos (con la facultad de formalizar contratos en nombre dela Junta de Supervisión), con sujeción a la supervisión y control de la Junta. El Asesor legal general actúa como director jurídico de la Junta de Supervisión. El Coordinador de Revitalización es responsable de ejecutar las tareas prescritas por la Sección 503 de la Ley PROMESA, relativa a la identificación, priorización e implementación de proyectos críticos de infraestructuras en el Estado Libre Asociado.

A tenor de la Sección 108(a) de la Ley PROMESA, la Junta de Supervisión actúa como una entidad autónoma, de manera que ni el Gobernador ni la Asamblea Legislativa podrán ejercitar ningún control sobre la misma ni sus actividades, ni podrán emprender actuaciones susceptibles de menoscabar o anular los propósitos de la Ley PROMESA. Aunque creada por un estatuto federal, la Junta de Supervisión no es un "departamento, agencia, establecimiento o instrumentalidad del Gobierno Federal". En su lugar, como lo establece la Sección 101(c)(1) de la Ley, la Junta de Supervisión está considerada como "entidad dentro del gobierno del territorio" del Estado Libre Asociado. La Junta de Supervisión sigue siendo una organización pequeña, con una jerarquía plana, que actúa desde sus oficinas sitas en San Juan de Puerto Rico en la ciudad de Nueva York. Uno de sus objetivos organizativos durante el año fiscal 2019 fue

aprovechar el increíble talento de Puerto Rico para propiciar su solidez organizativa mediante la contratación de personal local, reduciendo así gastos y la necesidad de recurrir a consultores externos. La abrumadora mayoría de los nuevos contratados de la Junta de Supervisión son puertorriqueños, muchos de los cuales han regresado desde EE.UU. para contribuir a la recuperación de la isla.

Según lo estipula la Sección 209 de la Ley PROMESA, la Junta de Supervisión continuará existiendo hasta que ella misma certifique que: (i) el Estado Libre Asociado tiene el acceso adecuado a los mercados de crédito de corto y largo plazo y a intereses razonables para satisfacer sus necesidades crediticias, y (ii) durante por lo menos por 4 años fiscales consecutivos: (a) el Estado Libre Asociado ha elaborado sus presupuestos en conformidad con los estándares modificados de contabilidad de valores devengados, y (b) los gastos efectuados por el Estado Libre Asociado durante cada año fiscal no excedan de los ingresos de ese año, de acuerdo con los estándares modificados de contabilidad de valores devengados.

3.    **Facultares y responsabilidades de la Junta de Supervisión**

*Certificación de los planes fiscales y de los presupuestos*

Una de las piedras angulares de la Ley PROMESA es la preparación, certificación y cumplimiento de planes fiscales y presupuestos del Estado Libre Asociado y de sus instrumentalidades cubiertas. Dichos planes fiscales y presupuestos sirven como marco para alcanzar la responsabilidad fiscal y acceder a los mercados de capitales. Los planes fiscales son herramientas de planificación a corto y largo plazo, que abarcan un período de al menos cinco años fiscales, en tanto que los presupuestos cubren al menos un año. Los presupuestos deben ser congruentes con el plan fiscal a la sazón vigente.

La Ley PROMESA prevé que la Junta de Supervisión y el gobierno electo del Estado Libre Asociado colaboren para adoptar un plan fiscal, aunque otorga a la Junta la facultad para preparar y certificar su propio plan fiscal si el gobierno no le presenta ningún plan fiscal a su certificación. El proceso se inicia cuando la Junta de Supervisión notifica al Gobernador un cronograma para la preparación, presentación y certificación de los planes fiscales del Estado Libre Asociado y/o cualquiera de sus instrumentalidades. El Gobernador viene obligado a presentar el plan fiscal propuesto de conformidad con dicho cronograma. Tras la presentación, la Junta de Supervisión podrá certificar el plan fiscal propuesto si determina que el mismo cumple los 14 requisitos establecidos en la Sección 201(b) de la Ley PROMESA, previstos para proponer "un método para lograr la responsabilidad fiscal y el acceso a los mercados de capital". El plan fiscal deberá:

- indicar las estimaciones de ingresos y gastos de conformidad con las normas contables convenidas, y estar basado en (i) la legislación vigente, o bien (ii) proyectos de ley específicos que requieren ser promulgadas para poder cumplir razonablemente las proyecciones del plan fiscal;

- garantizar el financiamiento necesario para los servicios públicos esenciales;

- proveer fondos adecuados para los sistemas de pensiones públicas;

- disponer la eliminación de los déficits estructurales;

- en el caso de los años fiscales cubiertos por un plan fiscal en el que no proceda una suspensión de pagos a tenor de los Títulos III y IV, dispondrá de una carga de la deuda que resulte sostenible;

- mejorar la administración fiscal, la rendición de cuentas y los controles internos;

- posibilitar el logro de las metas fiscales;

- elaborar pronósticos de ingresos independientes correspondientes al período cubierto por el plan fiscal;

- incluir un análisis de sostenibilidad de la deuda;

- estipular los gastos e inversiones de capital necesarios para promover el crecimiento económico;

- adoptar las recomendaciones pertinentes sugeridas por la Junta de Supervisión;

- incluir toda aquella información adicional que la Junta de Supervisión considere necesaria;

- asegurar que los bienes, fondos o recursos de una instrumentalidad territorial no sean prestados, transferidos o utilizados de ningún otro modo para beneficiar a un territorio o a otra instrumentalidad territorial de un territorio cubierto, salvo que esté permitido por la Constitución del territorio, por un plan de ajuste aprobado bajo el Título III, o por una Modificación elegible aprobada bajo el Título VI de la Ley PROMESA; y

- respetar las prioridades legítimas relativas o gravámenes legítimos, según proceda, de la Constitución, de otras leyes o de acuerdos de un territorio cubierto o instrumentalidad territorial cubierta vigentes antes de la fecha de promulgar la presente Ley PROMESA.

Los planes fiscales deberán garantizar el financiamiento necesario para los servicios públicos esenciales. La Junta de Supervisión adopta la opinión de que "servicios esenciales" es un concepto empleado para hacer referencia a, como mínimo, aquellos servicios que, debido al poder policial, un tribunal competente puede autorizar que se pague con cargo a los ingresos sobre los cuales un acreedor tiene una reclamación prioritaria o una reclamación válida, garantizada e inevitable. La presente Declaración de divulgación y el Plan no define los "servicios esenciales" ni los "gastos esenciales" debido a, entre otros, los siguientes motivos:

*En primer lugar*, el Título II de la Ley PROMESA requiere que un plan fiscal "garantice el financiamiento necesario para los servicios públicos esenciales". Este lenguaje establece un suelo mínimo de gasto, e implica que el plan fiscal debe financiar los servicios esenciales. En la confirmación, el Tribunal del Título III evalúa el Plan. Según la Sección 106(e) de la Ley PROMESA, la certificación del plan fiscal está fuera de las competencias del Tribunal del Título

III.  La Sección 314(b)(7) requiere que el Plan sea congruente con el plan fiscal, pero no impone ninguna verificación del mismo.  Por consiguiente, los servicios esenciales no son un problema.

*Segundo*, el concepto "servicios esenciales" no es conducente a la elaboración de un listado de cuáles servicios o gastos son esenciales y cuáles no, dado que los servicios esenciales pueden variar bastante en el transcurso del tiempo y dependiendo de las circunstancias posteriores a la confirmación. El Plan fiscal certificado de la AEEPR abarca períodos de crecimiento de retroceso. En consecuencia, el análisis de los mejores intereses para la AEEPR analiza el recobro de los acreedores fuera del Título III suponiendo diferentes porcentajes de recortes de gastos del Plan fiscal certificad y del presupuesto (aparte de los recortes ya previstos en el plan fiscal), en lugar de entrar en un debate de cada gasto. Así, a tenor de la Ley PROMESA la definición de servicios esenciales no es obligatoria ni relevante para el análisis de mejores intereses.

Tras la certificación del plan fiscal, la Junta de Supervisión comunicará al Gobernador y a la Asamblea Legislativa un cronograma para la preparación y certificación de los presupuestos del Estado Libre Asociado y de sus instrumentalidades cubiertas. Si la Junta de Supervisión determina que el presupuesto propuesto de la AEEPR presentado por el Gobernador se ajusta al plan fiscal aprobado, lo certificará.  Si, por el contrario, decide que el presupuesto propuesto incumple el Plan fiscal certificado, lo notificará al Gobernador junto con una descripción de las correcciones necesarias, dando una posibilidad de subsanar los defectos mediante la presentación de un presupuesto revisado compatible con el Plan fiscal certificado.  El Gobernador podrá presentar tantos presupuestos revisados como lo permita el cronograma establecido por la Junta de Supervisión.  No obstante, si no presenta un presupuesto compatible con el Plan fiscal certificado dentro del plazo establecido, la Junta de Supervisión estará facultada para preparar y enviar al Gobernador un presupuesto que cumpla el Plan fiscal certificado.  Dicho presupuesto se considerará aprobado por el Gobernador y entrará en vigor el primer día del año fiscal.

Al final de cada trimestre fiscal, el Gobernador deberá enviar a la Junta de Supervisión un informe financiero de la AEEPR, detallando los ingresos, gastos y flujos de efectivo reales de dicho trimestre. Si la Junta de Supervisión determinase que los ingresos, gastos y flujos de efectivo reales son incongruentes con las proyecciones de ingresos, gastos y flujos de efectivo incorporadas al presupuesto certificado de dicho trimestre, la Junta de Supervisión establecerá un plazo para que el Gobierno presente una explicación del desfase que la Junta considere admisible, o bien el Gobierno deberá implementar las medidas correctivas para abordar dicha incongruencia.  Si el Gobierno omitiera aportar una explicación razonable o corregir el desfase, la Junta de Supervisión deberá certificar al Presidente y al Congreso de EE.UU., y al Gobernador y a la Asamblea de Puerto Rico, que la AEEPR incumple el presupuesto certificado e indicar la cuantía del desfase.  Tras la citada certificación y confirmación de que el Gobierno ha omitido corregir el desfase, la Junta de Supervisión podrá (i) practicar las reducciones pertinentes en gastos distintos de la deuda para garantizar que los ingresos y gastos se ajusten al presupuesto certificado; (ii) imponer congelamientos de contratación; y (iii) prohibir a la AEEPR contratar personal.

Desde la promulgación de la Ley PROMESA el 20 de junio de 2016, la Junta de Supervisión ha certificado los presupuestos de la AEEPR correspondientes a los años fiscales 2018, 2019, 2020, 2021, 2022 y 2023.

En cumplimiento de las citadas responsabilidades, la Junta de Supervisión tiene la autoridad para imponer el cumplimiento de los planes fiscales y de los presupuestos certificados revisando las actividades del Gobierno del Estado Libre Asociado y de sus instrumentalidades. En consecuencia, las actuaciones legislativas propuestas por el Estado Libre Asociado deben enviarse a la Junta de Supervisión, acompañadas de una estimación de las repercusiones de la nueva ley en los gastos y en los ingresos.

Desde su creación, la Junta de Supervisión y el Gobernador han discrepado en numerosas ocasiones sobre si los informes del gobierno se han ajustado o no a la Ley PROMESA, y sobre si algunas órdenes ejecutivas y leyes de reciente promulgación han vulnerado o no dicha ley y/o planes fiscales y presupuestos certificados.

Además, la Junta de Supervisión está facultada para revisar el impacto económico sobre los planes y presupuestos certificados de cualquiera de los contratos, normas, reglamentos y órdenes del Estado Libre Asociado y de sus instrumentalidades. Si la Junta de Supervisión determinase que cualquiera de las mencionadas actividades es incompatible con un plan fiscal o presupuesto certificado, podrá adoptar cualquier medida necesaria para garantizar que la promulgación de una nueva ley o la formalización de un nuevo contrato no perjudicarán el cumplimiento de dicho plan o presupuesto. Por otra parte, la Junta de Supervisión podrá, en cualquier momento, enviar al Gobernador o a la Asamblea Legislativa, recomendaciones de actuaciones que garanticen el cumplimiento de los planes fiscales o que, de algún otro modo, promuevan la estabilidad fiscal y la responsabilidad de gestión de las corporaciones públicas del Estado Libre Asociado, incluyendo la AEEPR. El Estado Libre Asociado podrá adoptar o rechazar dichas recomendaciones, con sujeción a la presentación de un informe al Presidente y al Congreso de los Estados Unidos justificando el rechazo de las mismas. Sin embargo, en su plan fiscal certificado, la Junta de Supervisión podrá adoptar e imponer recomendaciones que el Gobernador rechace adoptar.[219]

También la Sección 207 de la Ley PROMESA estipula que el Estado Libre Asociado y sus instrumentalidades cubiertas no podrán emitir deuda sin la aprobación de la Junta de Supervisión.

### *Responsabilidades estipuladas por el Título III de la Ley PROMESA*

Si no se alcanza una reestructuración consensuada, el Título III de la Ley PROMESA permite acceder a un proceso de quiebra federal para el ajuste del endeudamiento del Estado Libre Asociado de sus instrumentalidades cubiertas. Para que el Estado Libre Asociado o alguna de sus instrumentalidades puedan ser admitidos como deudores a tenor del Título III, deben satisfacer una serie de requisitos, como lo establece la Sección 302 de la ley. A tenor de la Sección 304(b) de la Ley PROMESA, la vista para considerar una objeción a una petición del Título III no puede iniciarse hasta el 120.mo día a contar desde la presentación de la petición. En dicha vista, el Tribunal del Título III considerará los requisitos de la Sección 302 si: (i) la entidad ha sido clasificada por la Junta de Supervisión como instrumentalidad territorial cubierta; y (ii) la Junta de Supervisión ha dictado una certificación de reestructuración, certificando que (a) la

---

[219] En la Sección IV.D.4 presentamos una explicación relativa a las discrepancias sobre las facultades de la Junta de Supervisión.

entidad se ha esforzado de buena fe para lograr una reestructuración consensuada con los acreedores, (b) la entidad ha presentado estados financieros que son de dominio público, (c) la entidad ha adoptado previamente un plan fiscal, y (iii) la entidad desea implementar un plan para ajustar sus deudas.   Según las Secciones 314 y 312 de la Ley PROMESA, la Junta de Supervisión tiene la autoridad exclusiva de presentar una solicitud voluntaria de acogerse a la protección del Título III, de presentar un plan de ajuste para el deudor y de aplicar modificaciones al mismo.   Además, la Sección 315 de la Ley PROMESA otorga a la Junta de Supervisión el derecho de emprender "cualquier acción necesaria en nombre del deudor para juzgar el caso del deudor", estipulando que la Junta de Supervisión "es la representante del deudor" en el caso del Título III.

### *Otras facultades y responsabilidades*

De conformidad con la Sección 208 de la Ley PROMESA, como más tardar a los treinta (30) días a contar desde el último día de cada año fiscal del Estado Libre Asociado, la Junta de Supervisión deberá presentar un informe anual ante el Presidente y al Congreso de los Estados Unidos, el Gobernador y la Asamblea Legislativa.   Dicho informe anual deberá describir los progresos logrados por el Estado Libre Asociado en alcanzar los objetivos de la Ley PROMESA y en qué medida la Junta de Supervisión ha contribuido a dichos progresos.   Por otra parte, la Junta de Supervisión deberá describir la manera exacta en que los fondos asignados fueron gastados durante el año fiscal.   Asimismo, dicho informe deberá incluir las recomendaciones de la Junta de Supervisión sobre otras actuaciones federales, como la enmienda de la Ley PROMESA o la promulgación de otras leyes, para contribuir al cumplimiento del plan fiscal certificado

Junto con las responsabilidades básicas citadas, a la Junta de Supervisión se le han atribuido otros significativos poderes para ayudarla a cumplir sus objetivos.   Estas facultades adicionales incluyen, entre otras cosas:

- celebrar vistas y sesiones;

- obtener datos oficiales del Estado Libre Asociado, del gobierno federal y de los acreedores;

- ordenar e implementar citaciones de comparecencia;

- formalizar contratos;

- certificar acuerdos voluntarios de reestructuración y proteger ciertos acuerdos de reestructuración preexistentes entre el Estado Libre Asociado y sus acreedores;

- certificar modificaciones de la deuda a tenor del Título VI de la Ley PROMESA;

- emprender acciones civiles para hacer valer la autoridad otorgada por la Ley PROMESA;

- investigar las prácticas de divulgación y de venta del Estado Libre Asociado relacionadas con sus bonos;

- garantizar el pronto pago y gestión de los impuestos del Estado Libre Asociado mediante la adopción de tecnologías de notificación, pago y auditoría electrónica;

- analizar cualesquiera pensiones materialmente subfinanciadas del sistema de pensiones del Estado Libre Asociado; y

- intervenir en cualesquiera litigios entablados contra el Estado Libre Asociado o sus instrumentalidades cubiertas.

***Implementación de las políticas de la Junta de Supervisión***

En sus esfuerzos por cumplir los objetivos de la Ley PROMESA, la Junta de Supervisión implementó diversas iniciativas, entre otras:

a) **Mejora de la administración fiscal, la rendición de cuentas, los controles internos y los asuntos financieros del Gobierno**

Una de las responsabilidades básicas de la Junta de Supervisión es mejorar la administración fiscal, la rendición de cuentas y los controles internos del Gobierno. Tras comenzar los Casos del Título III, la Junta de Supervisión siguió identificando e implementando mejoras estructurales y de procesos a efectos de cumplir el mandato establecido por la Ley PROMESA.

Además, la Junta creó un requisito de preparación de informes de evolución de la ejecución presupuestaria ("B2A") para el Gobierno central, las veinte principales unidades que lo componen, las corporaciones públicas (como la AEEPR) la Autoridad de Acueductos y Alcantarillados de Puerto Rico ("AAA"), lo cual ha conllevado que las autoridades aumentasen los recursos y la capacidad de sus departamentos presupuestarios y contables. Los informes B2A han permitido al gobierno ofrecer a los interesados una mayor visibilidad de sus patrones de gasto reales y sirven como mecanismo de alerta temprana para avisar al Gobierno y a la Junta de Supervisión si el gasto real de AEEPR se desvía de las cuantías presupuestadas. El gobierno publica mensualmente los informes B2A.

Entre otros requisitos de información implementados por la Junta de Supervisión se incluyen: (i) informes públicos mensuales de los saldos de obligaciones de pensiones del Gobierno y de la AEEPR; (ii) informes públicos mensuales de la masa salarial, número y datos de asistencia de los empleados públicos; (iii) informes trimestrales de previsiones de ingresos; y (iv) publicación de los textos completos de todos los contratos del Gobierno en el sitio web de la Oficina del Contralor.

Además, en el año fiscal 2020, la Junta de Supervisión eliminó la posibilidad de que la AEEPR aplicase las asignaciones del año anterior en el nuevo año fiscal, salvo las presupuestadas para la adquisición de combustibles y de energía necesarias para el mantenimiento del sistema eléctrico, con el objeto de obligar a la entidad a cerrar puntualmente el año fiscal anterior.

b)    **Recomendaciones de la Sección 205**

A tenor de la Sección 205 de la Ley PROMESA, la Junta de Supervisión podrá en cualquier momento enviar al Gobernador o a la Asamblea Legislativa recomendaciones sobre las medidas que podrían adoptarse para el cumplimiento del plan fiscal certificado o promover de otro modo la estabilidad financiera, el crecimiento económico, la responsabilidad administrativa y la eficiencia en la prestación de servicios de parte del Gobierno.

El 28 de agosto de 2017, la Junta de Supervisión envió al Gobierno una Recomendación de la Sección 205 para sugerir la creación de una junta directiva independiente para la AEEPR, con el objeto de reforzar su gobernanza, incrementar su credibilidad y atraer inversiones.

c)    **Proceso de proyectos críticos del Título V**

El 20 y 21 de abril de 2017, la Junta de Supervisión convocó un debate sobre P3 y los proyectos críticos del Título V.  Durante todo el año fiscal 2017, la Junta de Supervisión y la Coordinadora de Revitalización interina elaboraron los criterios y procesos para la selección, implementación y supervisión de proyectos críticos de infraestructuras, en especial para el sector energético.  En el Plan fiscal de 2017, la Junta de Supervisión determinó que la AEEPR necesitaba mejorar sus infraestructuras y emprender proyectos de capital, denominados en general "Proyectos críticos" a tenor del Título V, que se vincularon a un estado de emergencia por cuanto eran relativos a "un grave problema de deterioro de las infraestructuras físicas para la prestación de servicios a la gente . . . incluyendo problemas en la infraestructura física del sector de la energía".

Tras los huracanes Irma y María, el Coordinador de Revitalización reinició el proceso de proyectos críticos, contratando al personal adecuado, recurriendo a las firmas locales para obtener apoyo adicional y actualizando el sitio web de presentación de proyectos.

El 31 de julio de 2018, la Junta de Supervisión adoptó una política del Título V que contribuyó a especificar mejor los requisitos procedurales que debe seguir el Coordinador de Revitalización a la hora de considerar potenciales proyectos críticos.  Dicha política aclara los requisitos para proyectos que implican hacer negocios con agencias gubernamentales o corporaciones públicas, en especial los proyectos energéticos que requieran un PPOA.  Todos los proyectos que requieran formalizar un contrato o convocar ofertas de agencias gubernamentales o corporaciones públicas deben formalizar ese contrato o convocar las ofertas antes de presentar el proyecto a través del Título V. En el caso de proyectos energéticos, aquellos que requieran un PPOA deberán suponerse válidamente formalizados bajo el Título III para satisfacer el requisito de adjudicación.

La política del Título V del 31 de julio de 2018 permitió al Coordinador de Revitalización centrar sus esfuerzos en proyectos que habían sido válidamente convocados o adjudicados, así como en proyectos entre partes privadas o con gobiernos municipales.

Hasta principios del año fiscal 2019, el Coordinador de Revitalización había evaluado 55 proyectos, por un total de aproximadamente $9,000 millones.  Tras la adopción de la política del Título V desde el 31 de julio de 2019, los proyectos activos tuvieron que dejar de ser

140

participados o puestos en espera (a discreción del patrocinador del mismo), ya que aproximadamente el 80% estaban relacionados con la energía y requerían un PPOA formalizado a tenor del Título III, y el 19% restante requería una convocatoria oficial o similar. Un 1% de los 55 proyectos evaluados eran un proyecto de cualificación y una propuesta rechazada que no satisfacía los requisitos iniciales. No obstante, muchos patrocinadores de proyectos energéticos siguieron negociando sus contratos con la AEEPR a través de sus respectivos procesos, y demostraron interés en reactivar la presentación de los mismos cumpliendo la política del Título V de la Junta de Supervisión.

d)      **Revisión de proyectos legislativos y determinadas normas, reglamentos y órdenes administrativas y ejecutivas**

La Sección 204(a) de la Ley PROMESA estipula que el Gobierno debe presentar ante la Junta de Supervisión todas las nuevas leyes como más tardar siete (7) días hábiles a contar desde su debida promulgación. Además, el gobernador deberá enviar ciertas normas, reglamentos y órdenes ejecutivas a la revisión y aprobación de la Junta de Supervisión, de conformidad con las Secciones 204(b)(2) y (b)(4) de la Ley PROMESA y con las políticas establecidas por la Junta de Supervisión. El objetivo es garantizar que tanto todas las leyes promulgadas como las normas, reglamentos y órdenes ejecutivas y administrativas propuestas no tengan repercusiones negativas para el plan fiscal certificado ni para el presupuesto. El Gobierno ha incumplido sistemáticamente las obligaciones impuestas por la Sección 204(a) de enviar los proyectos de ley como más tardar siete (7) días hábiles a contar desde su promulgación. Más de 100 leyes firmadas y resoluciones conjuntas no fueron enviadas a la Junta de Supervisión, como lo exige la Ley PROMESA.

El 3 de julio de 2019, la Junta de Supervisión inició una actuación al amparo de las Secciones 108(a)(2), 204(a)(5), 204(c) y 207 de PROMESA para impedir la implementación de la Ley 29-2019 y de numerosas resoluciones conjuntas, debido a que dichos instrumentos eran significativamente incongruentes con el plan fiscal certificado vigente, reprogramaban fondos y modificaban deuda sin la aprobación de la Junta de Supervisión o de otro modo no fueron debidamente presentados a la Junta de Supervisión de conformidad con la Sección 204(a) de la Ley PROMESA. Esta fue la primera actuación emprendida en a tenor de la Sección 204 de PROMESA. Tras emprenderla, el 25 de octubre de 2019, el Gobernador Vázquez firmó la Orden ejecutiva 2019-057, que creaba un procedimiento con el expreso propósito de cumplir la Sección 204(a) de la Ley PROMESA. Dicho procedimiento requiere, entre otras cosas, que la OMB y el Departamento de Hacienda preparen y envíen a la AAFAF, en un plazo de siete (7) días laborables desde la fecha en que el Gobernador firme una nueva ley, un análisis certificado de las repercusiones financieras y presupuestarias de dicha ley.

El 12 de junio de 2020, el Gobernador y la AAFAF incoaron seis demandas contenciosas solicitando sentencias declaratorias de que determinadas leyes y sus correspondientes certificaciones satisfacían los requisitos de las Secciones 204(a) y 108(a) de la Ley PROMESA. En general, el Tribunal del Título III falló a favor de la Junta de Supervisión, sentencias confirmadas por el Tribunal del Primer Circuito. *Véase* en la sección IV.D.4(h) de esta Declaración de divulgación un resumen de dichas actuaciones.

141

e)       **Revisión de contratos**

El 6 de noviembre de 2017 (y posteriormente modificada el 30 de abril de 2020), la Junta de Supervisión estableció la Política de Revisión de contratos, de conformidad con la Sección 204(b)(2) de la Ley PROMESA, para requerir la previa aprobación por parte de la Junta de Supervisión de contratos por un valor global a partir de $10 millones formalizados por el Estado Libre Asociado o cualquiera de sus instrumentalidades cubiertas.  Los objetivos de la Política de Revisión de contratos es promover la competencia de libre mercado y garantizar que los contratos gubernamentales se ajustan al plan fiscal certificado y al presupuesto vigentes.  En consecuencia, la Junta de Supervisión centra su revisión en si el contrato es compatible con el plan fiscal y, en caso de gastos de ayuda para desastres, aporta observaciones relativas al cumplimiento de los requisitos para la obtención y/o reembolso de fondos federales.

Con el objeto de que la política de contratos sea más transparente, la Junta de Supervisión publica un informe de estado de cada contrato en revisión, que incluye el nombre de la parte contratante, la fecha de supervisión, la fecha de cualquier respuesta de la Junta de Supervisión o de la parte contratante, y copia de todas las respuestas formales de la Junta de Supervisión.  La Política de Revisión de contratos exige que la entidad gubernamental contratante envíe a la Unta de Supervisión un certificado mediante el cual su principal directivo declara que ninguna persona ha intervenido indebidamente, ofrecido nada de valor o aplicado cualquier influencia en relación con la formalización del Contrato.  La Política de Revisión de contratos requiere que los contratistas presenten a la Junta de Supervisión una certificación similar, y que comuniquen si han compartido con terceros cualquier parte de su remuneración.  Desde la entrada en vigor de la Política de Revisión de contratos, la Junta de Supervisión ha revisado 160 contratos de los cuales es parte la AEEPR, por un valor total superior a los $38,000 millones.

Además, la Junta de Supervisión incluyó en el plan fiscal del Estado Libre Asociado el requisito de que, a partir del 30 de septiembre de 2018, el texto de todos los contratos gubernamentales sea hecho público en el sitio web de la Oficina del Contralor, y formalizó con la misma un protocolo de intenciones para promover la transparencia en estos contratos.

f)       **Aprobaciones de transacciones de deuda**

En diciembre de 2017, la Junta de Supervisión estableció una política, de conformidad con la Sección 207 de la Ley PROMESA, para requerir la aprobación por parte de la Junta de Supervisión de cualquier transacción de deuda de la cual sea parte el Estado Libre Asociado o cualquiera de sus instrumentalidades cubiertas.  Los objetivos de esta política son promover la prudencia fiscal y garantizar que las transacciones de deuda sean compatibles con el plan fiscal certificado vigente.  Durante el año fiscal 2018, la Junta de Supervisión aprobó, entre otras transacciones, un préstamo del Estado Libre Asociado a la AEEPR.

**4.   Controversias relativas a los poderes de la Junta de Supervisión**

a)       ***Rosselló Nevares contra la Junta de Supervisión y Administración Financiera para Puerto Rico, Proc. abr. núm. 18-00080***

El 5 de julio de 2018, el entonces Gobernador Ricardo Rosselló y la AAFAF presentaron una demanda [Proc. abr. núm. 18-00080, ECF núm. 1] contra la Junta de Supervisión, contra

cada uno de sus miembros y contra su director ejecutivo, solicitando sentencias declarando que
(i) la Junta de Supervisión carecía de autoridad para imponer iniciativas políticas al Gobierno del
Estado Libre Asociado mediante un plan fiscal y/o presupuesto, incluyendo el Plan fiscal del
Estado Libre Asociado de junio de 2018 y el presupuesto certificado del Estado Libre Asociado
para el año fiscal 2019; (ii) los mandatos políticos sustantivos contenidos en el Plan fiscal del
Estado Libre Asociado de junio de 2018, que fueron rechazados por el Gobernador de
conformidad de la Sección 205 de la Ley PROMESA, eran nulos y sin efecto; y (iii) los
mandatos políticos sustantivos contenidos en el presupuesto para el año fiscal 2019 de la Junta
de Supervisión excedían de sus facultades y eran nulos y sin efecto. Además, los demandantes
solicitaron un interdicto prohibiendo a los demandados la implementación y cumplimiento de
ciertas cláusulas contenidas en el Plan fiscal del Estado Libre Asociado de junio de 2018 que los
demandados caracterizaron como recomendaciones.

El 12 de julio de 2018, la Junta de Supervisión presentó una moción para desestimar la
demanda [Proc. abr. núm. 18-00080, ECF núm. 17]. El Tribunal del Título III aceptó la moción
para desestimar las demandas de los demandantes relativas a (i) la consolidación de agencias y
las reducciones de remuneraciones/congelamientos de contrataciones porque no eran un caso o
controversia a decidir judicialmente; ni (ii) reprogramación presupuestaria, dado que dicha
reprogramación por parte de los demandantes sería incongruente con la declaración de la Ley
PROMESA de que el presupuesto certificado por la Junta de Supervisión estaba en pleno vigor y
efecto, estando así previsto por la Sección 4 de la Ley PROMESA. El Tribunal del Título III no
desestimó las demandas relativas a las reducciones presupuestarias y a las medidas correctivas
automáticas. En su dictamen, el Tribunal del Título III sostuvo que "[l]os poderes otorgados a la
Junta de Supervisión por la Sección 201(b)(1)(K) de la Ley PROMESA permiten a la Junta de
Supervisión establecer políticas vinculantes para el Estado Libre Asociado, a pesar del rechazo
del Gobernador de las recomendaciones basadas en la Sección 205". *Nevares contra Junta de
Supervisión y Administración Financiera para Puerto Rico* (*En el asunto Junta de Supervisión y
Administración Financiera para Puerto Rico)*, 330 F. Supp. 3d 685, 700 (D.P.R. 2018),
*declaración jurada y reconsideración*, 945 F.3d 3 (1er. Cir. 2019), *certificación denegada,* 141
S. Ct. 241 (2020). El Tribunal del Título III rechazó el argumento de los demandantes de que los
fondos no gastados de los presupuestos de años anteriores podían gastarse fuera de las
limitaciones del presupuesto del ejercicio en curso, a pesar de la prohibición de reprogramación
no autorizada de la Sección 204(c). El Tribunal del Título III dictaminó: "Carece de sentido, y
sería contrario a los mandatos de confiabilidad y transparencia de la Ley PROMESA, supone que
un presupuesto para un año fiscal podría elaborarse para hacer algo menos que abarcar todos los
ingresos y recursos financieros proyectados de dicho año. Dado que un presupuesto certificado
está en pleno vigor y efecto del período cubierto, ello significa que los medios y recursos del
gasto gubernamental dejan necesariamente de estar disponibles si no están previstos dentro del
presupuesto." *Ibíd.*, en 704.

El 10 de septiembre de 2018, los demandantes presentaron una moción urgente
solicitando la certificación del dictamen y orden del Tribunal del Título III del 7 de agosto de
2018, con el objeto de presentar una apelación a tenor de las Secciones 306(e)(3)-(4) de la Ley
PROMESA [Proc. abr. núm. 18-00080, ECF núm. 43]. El 9 de octubre de 2018, el Tribunal del
Título III dictó un memorando certificando ciertos aspectos del dictamen y orden del Tribunal
del Título III del 7 de agosto de 2018 a efectos de una apelación de una sentencia interlocutoria
[Proc. abr. núm. 18-00080, ECF núm. 54].

143

El 18 de diciembre de 2019, el Primer Circuito confirmó la sentencia del Tribunal del Título III, manifestando que no hay nada en la Sección 205 de la Ley PROMESA "que sugiera que, por el hecho de buscar primero el acuerdo del Gobernador sobre algún asunto, la Junta pierde de alguna manera la facultad que, de otro modo, le asiste de actuar unilateralmente en la cuestión", y que la Junta de Supervisión tenía el poder de adoptar "una recomendación rechazada si, de otro modo, está facultada a adoptarla por sí misma". *Vázquez-Garced contra la Junta de Supervisión y Administración Financiera para Puerto Rico (En el asunto Junta de Supervisión y Administración Financiera para Puerto Rico)*, 945 F.3d 3, 6-7 (1er. Cir. 2019), *certificación rechazada* 141 S. Ct. (2020). Asimismo, el Primer Circuito confirmó la sentencia del Tribunal del Título III sobre la reprogramación, señalando que "(la Ley) PROMESA prohíbe el Gobernador gastar cualesquiera fondos que no estén presupuestados, independientemente de si la recomendación había o no sido adoptada", e "independientemente de lo dispuesto por cualesquiera leyes territoriales". *Ibíd.* en 8.

El 5 de octubre de 2020, el Tribunal Supremo rechazó la petición de mandamiento de avocación del Gobernador. El 25 de agosto de 2021, como consecuencia de la sentencia del Primer Circuito, las partes presentaron una estipulación desestimando voluntariamente el resto de las reclamaciones del procedimiento contencioso. [Proc. abr. núm. 18-00080, ECF núm. 71].

b) ***Rivera-Schatz y otros contra la Junta de Supervisión y Administración Financiera para Puerto Rico y otros, Proc. abr. núm. 18-00081***

El 9 de julio de 2018, el Honorable Thomas Rivera-Schatz, en su calidad de Presidente del Senado de Puerto Rico y en nombre del Senado de Puerto Rico, y el Honorable Carlos J. Méndez-Núñez, en su calidad de Presidente de la Cámara de Representantes y en nombre de la Cámara de Representantes, presentaron colectivamente una demanda solicitando un remedio declaratorio e interdictal contra la Junta de Supervisión, cada uno de sus miembros y su director ejecutivo, en su calidad de tales, alegando que la Junta de Supervisión "se excedió en su facultades" al "intentar obligar" a los demandantes aprobar un proyecto de ley derogando retroactivamente la Ley 80 (la Ley sobre Despidos injustificados de Puerto Rico) como condición para que la Junta de Supervisión certificara el presupuesto del Estado Libre Asociado aprobado por los demandantes [Proc. abr. núm. 18-00081, ECF núm. 1]. Por otra parte, la demanda también solicitaba un interdicto prohibiendo a los demandados la implementación del presupuesto del año fiscal de 2019 de la Junta de Supervisión, y ordenando a esta que certificara el presupuesto del año fiscal aprobado por los demandantes el 30 de junio de 2018.

El 17 de julio de 2018, los demandados presentaron una moción para desestimar la demanda [Proc. abr. núm. 18-00081, ECF núm. 27]. El 7 de agosto de 2018, el Tribunal del Título III desestimó la demanda en todos sus aspectos, manifestando que no era competente para revisar las decisiones de certificación de la Junta de Supervisión, por cuanto dicha revisión "directamente excluida por la Sección 106(e)." *Rivera-Schatz contra la Junta de Supervisión y Administración Financiera para Puerto Rico (En el asunto Junta de Supervisión y Administración Financiera para Puerto Rico)*, 327 F. Supp. 3d 364, 371 (D.P.R. 2018), *declaración jurada*, 916 F.3d 98 (1er. Cir. 2019). Además, confirmó que la Junta de Supervisión podía usar "sus facultades de la manera prevista para incentivar su asentimiento a los objetivos políticos sostenidos por la Junta". *Ibíd.*, en 373.

144

El 22 de febrero de 2019, el Primer Circuito confirmó la sentencia del Tribunal del Título III, dictaminando, entre otras cosas, que "[d]e conformidad con la cláusula de prioridad de la Ley Promesa, la potestad de la Junta de aprobar Planes fiscales y presupuestos, a tenor de las Secciones 201 y 202, 'tiene precedencia sobre cualesquiera disposiciones generales o específicas del derecho territorial', incluyendo las cláusulas de la Constitución de Puerto Rico que sean 'incompatibles con [PROMESA]'". Además, manifestó que "[c]uando la Junta certificó el Plan fiscal y el Presupuesto de 2019 … ejerció [adecuadamente] la autoridad otorgada por la Ley PROMESA".*Méndez-Núñez contra la Junta de Supervisión y Administración Financiera para Puerto Rico (En el asunto  Junta de Supervisión y Administración Financiera para Puerto Rico)*, 916 F.3d 98, 116 (1er. Cir. 2019).

c)      ***Municipio Autónomo de San Juan contra la Junta de Supervisión y Administración Financiera para Puerto Rico y otros, Caso núm. 19-cv-1474***

El 19 de mayo de 2019, el Municipio de San Juan presentó una demanda contra la Junta de Supervisión ante el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico, alegando que (i) la designación, por parte de la Junta de Supervisión, de San Juan como entidad cubierta a efectos de supervisión a tenor de la Ley PROMESA carecía de fundamento; (ii) la Ley PROMESA era inconstitucional, por cuanto no estipulaba suficientes límites para la discrecionalidad de la Junta y, por consiguiente, vulneraba la doctrina de no delegación, y (iii) la designación no era válida porque los integrantes de la Junta de Supervisión fueron designados vulnerando la Cláusula de Nombramientos [Caso núm. 19-cv-1474, ECF núm. 1]. El 1 de julio de 2019, la Junta de Supervisión presentó una demanda para trasladar el caso al Tribunal del Título III [Caso núm. 19-cv-1474, ECF No. 36], lo cual aceptó el Tribunal de Distrito [Caso núm. 19-cv-1474, ECF núm. 40]. El 9 de agosto de 2019, la Junta de Supervisión presentó una moción de desestimación [Caso núm. 19-cv-1474, ECF núm. 46, 51, 52], admitida el 5 de diciembre de 2019 por el Tribunal del Título III con respecto a las imputaciones I y II de la demanda. La imputación III se mantuvo pendiente de la sentencia del Tribunal Supremo sobre el pleito de la Cláusula de Nombramientos, descrita en la Sección V.H de esta Declaración de divulgación [Caso núm. 19-cv-1474, ECF núm. 61].

Una vez concluido el caso de la Cláusula de Nombramientos, el 21 de septiembre de 2020, el Tribunal del Título III desestimó la tercera imputación sin perjuicio [Caso núm. 19-cv-1474, ECF núm. 64].

El 25 de septiembre de 2020, San Juan presentó una notificación de apelación a la orden del Tribunal del Título III aceptando la moción de desestimación de los demandados [Case núm. 19-cv-1474, ECF núm. 65]. El 27 de abril de 2021, San Juan presentó una moción voluntaria para desestimar la apelación, que fue admitida el 29 de abril de 2021.

d)      ***La Junta de Supervisión y Administración para Puerto Rico contra la Honorable Vázquez Garced y otros, Proc. abr. núm. 19-00393***

El 3 de julio de 2019, la Junta de Supervisión presentó una demanda contra el entonces Gobernador Rosselló y la AAFAF impugnando la Ley 29-2019 ("Ley 29"), que elimina la obligación de los municipios de reembolsar al Estado Libre Asociado los pagos de pensiones a

145

los jubilados municipales y de aportar pagos al plan de salud del Estado Libre Asociados, así como otras 23 resoluciones conjuntas. Específicamente, la demanda alegaba que (i) la Ley 29, incluyendo su promulgación y cumplimiento, vulneraba las Secciones 204(a), 204(c) y 207 de la Ley PROMESA; (ii) la Junta de Supervisión estaba facultada para dictar un interdicto permanente prohibiendo a los demandados implementar la Ley 29; (iii) la Junta de Supervisión estaba facultada para dictar un interdicto obligando al Gobernador a obtener las certificaciones estipuladas por la Sección 204(a) de la Ley PROMESA para la Ley 29 y otras leyes y resoluciones conjuntas de reciente promulgación que todavía no habían sido certificadas; (iv) la Ley 29 y las resoluciones conjuntas vulneraban la Sección 108(a) de la Ley PROMESA, no eran de obligatorio cumplimiento y carecían de validez y efecto, por cuanto menoscababan y/o anulaban la finalidad de la Ley PROMESA, según determinaba la Junta de Supervisión; y (v) la supuesta política del Gobernador de no someter las leyes recientemente promulgadas a las certificaciones exigibles por la Sección 204 de la Ley PROMESA vulneraban la Sección 108(a) de dicha ley, ya que menoscababan y/o anulaban la finalidad de la Ley PROMESA, según determinaba la Junta de Supervisión.

El 15 de julio de 2019, los demandados presentaron una moción para desestimar la demanda [Proc. abr. núm. 19-00393, ECF núm. 17]. El 22 de agosto de 2019, el Tribunal del Título III dictó una orden y dictamen rechazando la moción del Gobernador de desestimar todos los cargos, sosteniendo que (i) el Tribunal era compatible, ya que las medidas impugnadas no habían sido plenamente implementadas y, por consiguiente, existía un caso o controversia pendientes de resolución; (ii) la Junta de Supervisión podía impugnar el cumplimiento de las certificaciones de Estado Libre Asociado de conformidad con la Sección 204(a) de la Ley Promesa; (iii) la Junta de Supervisión había alegado de manera plausible que la Ley 29 era una modificación no aprobada de las obligaciones previas de deuda y de garantía con los pensionistas del Estado Libre Asociado contempladas en la Ley 106; (iv) las medidas impugnaban reprogramaban fondos sin la autorización de la Junta de Supervisión; y (v) la Junta de Supervisión había alegado de manera plausible que las medidas impugnadas menoscababan los fines de la Ley PROMESA [Proc. abr. núm. 19-00393, ECF núm. 66]. Los demandados respondieron a la demanda el 10 de septiembre de 2019 [Proc. abr. núm. 19-00393, ECF núm. 73].

El 13 de diciembre de 2019, la Junta de Supervisión presentó una moción solicitando sentencia sumaria [Proc. abr. núm. 19-00393, ECF núm. 77]. El 15 de abril de 2020, el Tribunal del Título III aceptó la moción de sentencia sumaria de la Junta de Supervisión en cinco de ocho cargos [Proc. abr. núm. 19-00393, ECF núm. 107]. El Tribunal del Título III admitió la solicitud de la Junta de Supervisión de interdictos permanentes para la Ley 29 y las resoluciones conjuntas en virtud de las Secciones 204(c), 204(a) y 108(a)(2) de la Ley PROMESA, sosteniendo que la Ley 29 y las restricciones conjuntas constituían reprogramaciones del plan fiscal y del presupuesto sin aprobación de la Junta de Supervisión, vulnerando la Sección 204(c) de la Ley PROMESA, siendo en consecuencia inaplicables y carentes de toda validez y efecto. Además, el Tribunal del Título III sentenció que los demandados no habían cumplido los procedimientos estipulados por la Sección 204(a) de la Ley PROMESA en lo tocante a nueva legislación, y que la estimación formal de los demandados planteando detallar los costos de la Ley 29 era a primera vista incompatible. Asimismo, el Tribunal del Título III dictaminó que la Ley 29 y las resoluciones conjuntas carecían de validez también de conformidad con la Sección 108(a)(2) de la Ley PROMESA, concluyendo que la determinación de la Junta de Supervisión de

146

que las leyes menoscababan y/o perjudicaban los objetivos de la Ley PROMESA tenía derecho a ser respetada frente a una norma de revisión arbitraria y caprichosa. El Tribunal del Título III rechazó dictar una sentencia sumaria sobre la solicitud de la Junta de Supervisión de interdicto permanente de otras leyes para los cuales los demandados no habían solicitado las certificaciones de la Sección 204(a), basándose en las alegaciones de los demandados que demostraban que, en la mayoría de esas leyes, se había solicitado las certificaciones después de presentada la demanda. Además, el Tribunal del Título III rechazó dictar sentencia sumaria sobre la demanda de que el Gobernador mantenía una política de incumplimiento de la Sección 204(a) de la Ley PROMESA, a la luz de las objeciones presentadas por los demandados relativas a los motivos de pasados incumplimientos y a los esfuerzos de la entonces Gobernadora Vázquez Garced de mejorar el grado de cumplimiento. Por último, el Tribunal del Titulo III rechazo abordar la moción de sentencia sumaria de la Junta de Supervisión relativa a la reclamación de la Sección 207 de la Ley PROMESA, manifestando que el segundo cargo era irrelevante dado que dicha reclamación ya había sido admitida en otras sentencias del Tribunal del Título III.

El 1 de octubre de 2021, las partes presentaron un informe de estado conjunto, informando al Tribunal del Título III que habían convenido solicitar la desestimación de las restantes demandas del procedimiento contencioso y aceptar las decisiones de las sentencias sumarias [Proc. abr. núm. 19-00393, ECF núm. 116]. El 13 de octubre de 2021, el Tribunal del Título III dictó una sentencia desestimando el procedimiento contencioso y cerrando el caso [Proc. abr. núm. 19-00393, ECF núm. 119].

e)   ***La Liga de Ciudades de Puerto Rico contra la Junta de Supervisión y Administración Financiera para Puerto Rico y otros., Proc. abr. núm. 21-00026***

El 14 de marzo de 2021, la Liga de Ciudades de Puerto Rico ("La Liga"), una entidad sin fines de lucro que sostiene tener como miembros a los alcaldes de los municipios de Puerto Rico, presentó una demanda contra la Junta de Supervisión, la AAFAF, el Centro de Recaudación de Ingresos Municipales ("CRIM"), la Administración de Seguros de Salud ("ASES") y Luis M. Collazo Rodríguez, en su calidad de administrador del SRE [Proc. abr. núm. 21-00026, ECF núm. 1]. La demanda alega que el CRIM, la ASES y el SRE recaudan y retienen fondos de los municipios de Puerto Rico basándose en una interpretación incorrecta de una orden dictada por el Tribunal del Título III en un pleito anterior relativo a la Ley 29, Proc. abr. núm. 19-00393, ECF núm. 1 (el "Litigio de la Ley 29"), ya descrito anteriormente en la Sección IV.D.4(d).

Una vez decidido el Litigio de la Ley 29, el CRIM retuvo fondos que, de otro modo, debería haber desembolsado a los municipios para abonar a la ASES y al SRE las aportaciones de atención sanitaria y a las pensiones que, de no ser por la Ley 29, deberían haber pagado. En la demanda, La Liga solicitó (i) una sentencia declaratoria "decretando que las deudas reclamadas por el CRIM, la ASES y [el SRE] . . . son 'inexistentes'", y que las retenciones practicadas por el CRIM para supuestamente compensar dichas deudas inexistentes son "ilegales"; (ii) un interdicto "prohibiendo a los demandados recaudar de los [m]unicipios cualesquiera fondos que la Ley 29 les eximió" de pagar; (iii) una orden exigiendo al CRIM desembolsar de inmediato cualesquiera fondos retenidos para pagar las deudas relacionadas con la Ley 29; y (iv) una orden exigiendo al SRE y a la ASES devolver al CRIM "todos los fondos" recibidos para pagar las supuestas deudas.

147

El 14 de mayo de 2021, los demandados presentaron mociones de desestimación [Proc. abr. núm. 21-00026, ECF núm. 14, 15, 18], que el Tribunal del Título III admitió [Proc. abr. núm. 21-00026, ECF núm. 40]. El Tribunal del Título III señaló la falta de fundamentos de La Liga para demandar a la AAFAF, a la ASES y al Administrador del SRE, a tenor de la Regla 12(b)(1) del Reglamento Federal de Procedimiento Civil, ya que La Liga no podía alegar de manera plausibles que el perjuicio era atribuible a ellos, ni que cualquier remedio que se les otorgarse podría reparar el perjuicio alegado por La Liga. Asimismo, el Tribunal del Título III admitió las mociones de desestimación de la Junta de Supervisión y del CRIM, señalando que las alegaciones de La Liga se basaban en una interpretación errónea de la orden que dictaba la sentencia sumaria de la Junta de Supervisión en el Litigio de la Ley 29 de "una manera insalvable para la Demanda", ya que la orden anulaba la Ley 29 *ab initio* y, por consiguiente, dicha Ley "nunca fue válida para excusar las obligaciones de los municipios de pagar las aportaciones a las pensiones y a los beneficios".

El 18 de enero de 2022, La Liga presentó una notificación de apelación [Proc. abr. núm. 21-00026, ECF núm. 42]. Tras la presentación del caso, el argumento oral fue oído el 5 de diciembre de 2022.

f)   ***Hernández-Montañez contra Pierluisi, Proc. abr. núm. 21-00042***

El 21 de abril de 2021, el Presidente de la Cámara de Represents de Puerto Rico, actuando en representación de dicha Cámara, presenta una demanda contra el Gobernador, la AAFAF, presidente de la Comisión Electoral Estatal de Puerto Rico y el Departamento de Hacienda, solicitando un remedio declaratorio e interdictal prohibiendo a los demandados distribuir ciertos fondos relacionados con las elecciones [Proc. abr. núm. 21-00042, ECF núm. 1].

Este caso se originó en una discrepancia vinculada con la Ley 167-2020, que convocaba a una Elección especial (la "Elección especial") el 16 de mayo de 2021 para elegir a una delegación de seis miembros que viajaría a Washington, D.C. para presionar por la admisión de Puerto Rico como estado. Dado que el presupuesto certificado de Puerto Rico para el año fiscal 2020-2021 no asignaba fondos para esta Elección especial, el Gobernador solicitó la autorización de la Junta de Supervisión para reprogramar fondos. La Junta de Supervisión comunicó al Gobernador que, por las singulares circunstancias alegadas, la solicitud de reprogramación debía dirigirse tanto a la Junta de Supervisión como a la Asamblea Legislativa. Con posterioridad, el Gobernador solicitó una enmienda presupuestaria para asignar fondos a la Elección especial, y la envió a la Junta de Supervisión, de conformidad con la Sección 202 de la Ley PROMESA. La Junta de Supervisión determinó que la propuesta de enmienda presupuestaria del Gobernador era compatible con la Sección 202(c)(1) de la Ley PROMESA, y la envió a la Asamblea Legislativa. A renglón seguido, la Asamblea Legislativa comunicó a la Junta de Supervisión que una propuesta idéntica a la de la enmienda presupuestaria del Gobernador había sido derrotada en una sesión parlamentaria de análisis formal, y que no sería compatible con el proceso de enmienda presupuestaria. Como resultado, la Junta de Supervisión publicó una resolución manifestando, entre otras cosas, que (i) el Gobernador y la Asamblea Legislativa se encontraban en un impasse en lo relativo de la asignación de fondos para cubrir el costo de la Elección especial; (ii) la Sección 402 de la Junta de Supervisión restringía a la Junta de Supervisión para adoptar una interpretación de la Ley PROMESA susceptible de restringir la decisión de Puerto

148

Rico de su situación política; (iii) la Junta de Supervisión deseaba permitir que el Gobierno del Estado Libre Asociado adoptara o no adoptara la propuesta enmienda presupuestaria tal como sería de no existir la Ley PROMESA; y (iv) que, por consiguiente, el presupuesto original del Estado Libre Asociado seguiría vigente sin revisión. Con posterioridad, la AAFAF comunicó a la Junta de Supervisión que el Gobernador había autorizado el desembolso de fondos para financiar a Elección especial.

El demandante solicitó órdenes que declararan que las cláusulas presupuestarias de la Ley PROMESA eran de aplicación a todos los gastos presupuestarios, incluyendo los relativos a los fondos relacionados con la controvertida reasignación, y que la Sección 402 no eximía a la propuesta de reasignación de fondos de cumplir las disposiciones presupuestarias de la Ley PROMESA. Además, el demandante solicitó una orden prohibiendo al Gobernador y al Secretario de Hacienda cualquier supuesta apropiación y distribución indebida de dichos fondos.

El 22 de abril de 2021, el demandante presentó una moción solicitando una orden de restricción temporal o un interdicto preliminar prohibiendo a los demandados distribuir fondos relacionados con elecciones hasta tanto se resolviera la demanda [Proc. abr. núm. 21-00042, ECF núm. 3].

El 4 de junio de 2021, los demandados presentaron mociones de desestimar la demanda del demandante [Proc. abr. núm. 21-00042, ECF núm. 47, 49]. Después de que el demandante solicitara varias prórrogas del plazo para oponerse a las mociones de desestimación, finalmente omitió responder a las mismas. En consecuencia, el 27 de agosto de 2021, el Tribunal del Título III dictó una orden admitiendo las mociones de desestimación de los demandados, señalando que cualquier controversia relativa a la validez de las actuaciones de los demandados o al papel de la Junta de Supervisión apoyando o financiando la Elección especial era irrelevante, ya que la Elección especial se había celebrado y los fondos correspondientes habían sido gastados [Proc, abr. núm. 21-00042, ECF núm. 63].

g)   *La Junta de Supervisión y Administración para Puerto Rico contra la Honorable Vázquez Garced y otros, Proc. abr. núm. 20-00078*

El 8 de junio de 2020, la Junta de Supervisión presentó una demanda contra la Gobernadora y la AAFAF, solicitando un remedio interdictal y un mandato judicial en relación con la omisión de la Gobernadora y de la AAFAF de presentar a la Junta de Supervisión determinados documentos e información relativos a la tramitación y negociación de contratos del Gobierno del Estado Libre Asociado para comprar equipos de pruebas de la COVID-19 y otros suministros médicos [Proc. abr. núm. 20-00078, ECF núm. 1]. El 23 de junio de 2020, la Gobernadora y la AAFAF presentaron una moción de desestimación, alegando que el Tribunal del Título III no era competente para tratar el asunto, que la Junta de Supervisión carecía de fundamento y que la demanda omitía plantear un amparo contra el mandato [Proc. abr. núm. 20-00078, ECF núm. 11].

El 24 de julio de 2020, la Junta de Supervisión presentó una moción para desestimar voluntariamente la actuación [Proc. abr. núm. 20-00078, ECF núm. 18]. El 3 de agosto de 2020, el procedimiento contencioso quedó cerrado.

149

h)   ***Honorable Vázquez Garced y otros contra la Junta de Supervisión y Administración Financiera para Puerto Rico, Proc. abr. núm. 20-00080, 20-00081, 20-00082, 20-00083, 20-00084, 20-00085; Caso núm. 21-1071 (1er Cir.)***

El 12 de junio de 2020, el Gobernador y la AAFAF presentaron seis contenciosos solicitando sentencias declaratorias de que las Leyes 47, 82, 90, 138, 176 y 181, así como las correspondientes certificaciones a tenor de la Sección 204(a) de la Ley PROMESA, satisfacen los requisitos de dicha ley. La Ley 47 amplía el grupo de profesionales sanitarios con derecho a ventajas fiscales conforme a Código de Incentivos de Puerto Rico, reduciendo los ingresos sin ninguna compensación mediante ahorros de costos. La Ley 82 establece un nuevo organismo dentro de Departamento de Salud de Puerto Rico para regular más a fondo diversas entidades que contratan servicios a farmacias del país. Además, la Ley 82 impide que los Administradores de Beneficios de farmacia, (tal como se definen más adelante) controlen el costo de los medicamentos bajo receta. La Ley 138 obliga a las compañías de seguros de salud públicos, como las Organizaciones de Servicios de Salud ("OSS") a dar acceso a sus redes de salud a todos los proveedores, independientemente del precio. Además, la Ley 138 prohíbe que tanto las organizaciones de seguros sanitarios, las aseguradoras y otros planes médicos incluyan en cualquier contrato o convenio con un prestador de servicios sanitarios el derecho de rescindir el contrato de manera unilateral. La Ley 176 incrementa el derecho de devengo de licencias de vacaciones y bajas médicas pagadas para los empleados públicos. La Ley 181 dispone un incremento salarial de los bomberos que asciende a casi $3 millones anuales.

El 16 de julio de 2020, los demandantes presentaron una moción para desestimar voluntariamente la demanda contenciosa [Proc. abr. núm. 20-00081, ECF núm. 5]. El 17 de julio de 2020, la Junta de Supervisión presentó las respuestas y contrarreclamaciones vinculadas a los cinco contenciosos restantes, vinculados con las Leyes 47, 82, 138, 176 y 181 (las "Cinco leyes") [Proc. abr. núm. 20-00080, ECF núm. 5; Proc. abr. núm. 20-00082, ECF núm. 5; Proc. abr. núm. 20-00083, ECF núm. 6; Proc. abr. núm. 20-00084, ECF núm. 5; Proc. abr. núm. 20-00085, ECF núm. 5]. Las contrademandas de la Junta de Supervisión pretendían anular y prohibir las Cinco leyes, a tenor de las Secciones 204(a) y 108(a) de la Ley PROMESA y, con respecto a las Leyes 82 y 181, también por vulnerar la Sección 204(c). Específicamente, la Junta de Supervisión impugnó la Ley 47 alegando que era significativamente incongruente con el Plan fiscal certificado del Estado Libre Asociado (por ser neutro en cuanto a ingresos), y que la certificación del Gobernador, según la Sección 204(a) de PROMESA carecía de la especificidad suficiente necesaria para una estimación formal de las repercusiones de la Ley 47 sobre los gastos e ingresos, como lo exige la Ley PROMESA. La Junta de Supervisión impugnó la Ley 82 alegando que era significativamente incongruente con el plan fiscal certificado del Estado Libre Asociado y que reduciría el mercado competitivo de servicios sanitarios de calidad en el país. La Junta de Supervisión impugnó la Ley 138 alegando que era significativamente incongruente con el plan fiscal certificado del Estado Libre Asociado, que inhibiría el control de los costos sanitarios por parte de las OSS y que privaría a Puerto Rico de un mercado competitivo de servicios sanitarios de calidad y aumentará los costos al eliminar los incentivos para que los médicos compitan en precio y calidad. La Junta de Supervisión objetó la Ley 176 con el argumento de que era significativamente incongruente con el plan fiscal certificado del Estado Libre Asociado porque, entre otras cosas, perjudicaba las medidas de racionalización contempladas en dicho plan. La Junta de Supervisión impugnó la Ley 181 alegando que era

significativamente incongruente con el plan fiscal certificado del Estado Libre Asociado y que el
Gobernador nunca demostró a la Junta de Supervisión cómo el incremento salarial de los
bomberos se financiaría, o podría ser financiado, mediante un nuevo impuesto.

El 30 de julio de 2020, la Junta de Supervisión presentó una moción para consolidar el
procedimiento de los cinco otros contenciosos [Proc. abr. núm. 20-00080, ECF núm. 8], y el
Tribunal del Título III dictó un orden admitiendo la moción [Proc. abr. núm. 20-00080, ECF
núm. 9]. El 3 de agosto de 2020, el Gobierno presentó las respuestas a las contrademandas de la
Junta de Supervisión relacionadas con las Cinco leyes [Proc. abr. núm. 20-00080, ECF núm. 11;
Proc. abr. núm. 20-00082, ECF núm. 9; Proc. abr. núm. 20-00083, ECF núm. 10; Proc. abr. núm.
20-00084, ECF núm. 10; Proc. abr. núm. 20-00085, ECF núm. 9].

El 28 de septiembre de 2020, el Gobierno presentó mociones de sentencia sumaria en
relación con las Leyes 138 y 176 [Proc. abr. núm. 20-00082, ECF núm. 12; Proc. abr. núm. 20-
00083, ECF núm. 13]. El 5 de octubre de 2020, la Junta de Supervisión presentó demandas de
sentencia sumaria en relación con las Leyes 47, 82 y 181 [Proc. abr. núm. 20-00080, ECF núm.
14, 16; Proc. abr. núm. 20-00084, ECF núm. 13, 15; Proc. abr. núm. 20-00085, ECF núm. 12,
13].

El 23 de diciembre de 2020, el Tribunal del Título III dictó una orden: (i) rechazando la
moción de sentencia sumaria del Gobierno en relación con las Leyes 138 y 176 [Proc. abr. núm.
20-00082, ECF No. 52; Proc. abr. núm. 20-00083, ECF núm. 53]; y (ii) admitiendo parcialmente
las mociones de la Junta de Supervisión (a) de sentencia sumaria en relación con las Leyes 47, 82
y 181, y (b) las mociones cruzadas de sentencia sumaria en relación con las demandas y
contrademandas relacionadas con las Leyes 138 y 176 [Proc. abr. núm. 20-00080, ECF núm.. 72;
Proc. abr. núm. 20-00084, ECF núm.. 61; Proc. abr. núm. 20-00085, ECF núm.. 60]. Con
respecto a la Ley 47, el Tribunal del Título III inadmitió la imputación II de la demanda contra la
Ley 47, que solicitaba remedio declaratorio con respecto a la Sección 108(a)(2) de la Ley
PROMESA, y admitió sentencia declaratoria para la imputación III de la contrademanda, que
solicitaba interdictos prohibiendo la implementación de las leyes pertinentes a tenor de la
Sección 108(a)(2) de la Ley PROMESA. El Tribunal del Título III llegó a la conclusión de que la
determinación de la Junta de Supervisión de que la Ley 47 vulneraba la Sección 108(a)(2) de la
Ley PROMESA está sustentada por un fundamento racional y por sustanciales evidencias. Con
respecto a la Ley 82, el Tribunal del Título III desestimó la imputación I de la demanda contra la
Ley 82, que solicitaba remedio declaratorio relativo a la Sección 204(a) de la Ley PROMESA, y
admitió sentencia sumaria sobre la imputación II de dicha contrarreclamación, solicitando
interdictos a tenor de la Sección 104(k) de dicha Ley. El Tribunal del Título III determinó que las
conclusiones de la Junta de Supervisión de que la implementación de la Ley 82 debía impedirse
por cuanto implicaría significativos gastos no claramente estipulados en el plan fiscal no son
arbitrarias ni caprichosas. Con respecto a la Ley 138, el Tribunal del Título III desestimó la
imputación I de la demanda contra la Ley 138, que solicitaba remedio declaratorio relativo a la
Sección 204(a) de la Ley PROMESA, y admitió sentencia sumaria sobre la imputación II de
dicha contrarreclamación, solicitando interdictos a tenor de la Sección 104(k) de dicha Ley. El
Tribunal del Título III razonó que las impugnaciones a la Ley 138 de parte de la Junta de
Supervisión estaba apoyada por una inquietud racional, considerando la omisión del Gobierno de
cumplir las directivas de la Junta de Supervisión, de conformidad con la Sección 204(a)(4)(A) de

la Ley PROMESA, de corregir las deficiencias del certificado de la Ley 138. Con respecto a la Ley 176, el Tribunal del Título III desestimó la imputación II de la demanda contra la Ley 176, que solicitaba remedio declaratorio relativo a la Sección 108(a)(2) de la Ley PROMESA, y admitió sentencia sumaria sobre la imputación III de dicha contrarreclamación, solicitando interdictos que prohibieran a implementación de las leyes relevantes a tenor de la Sección 108(k) de la Ley PROMESA. El Tribunal del Título III llegó a la conclusión que la determinación de la Junta de Supervisión de que la Ley 176 menoscabaría o anularía los propósitos de la Ley PROMESA era racional y se apoyaba en sustanciales evidencias. En cuanto a la Ley 181, el Tribunal del Título III admitió sentencia sumaria sobre la imputación IV de la contrarreclamación contra la Ley 181, que solicitaba un interdicto a tenor de la Sección 104(k) de la Ley PROMESA, prohibiendo la implementación de la 181 de conformidad con la Sección 204(c) de la Ley PROMESA. El Tribunal del Título III dictaminó que la Ley 181 vulneraba la Sección 204(c) de la Ley PROMESA porque creaba una deficiencia de ingresos que el Gobierno habría tenido que remediar mediante una reprogramación que no había sido ni solicitada y autorizada.

Además, el 23 de diciembre de 2020, el Tribunal del Título III dictó una orden exigiendo a las partes que explicaran por qué el Tribunal del Título III no debería desestimar las demás reclamaciones y contrarreclamaciones [Proc. abr. núm. 20-00080, ECF núm. 73; Proc. abr. núm. 20-00082, ECF núm. 53; Proc. abr. núm. 20-00083, ECF núm. 54; Proc. abr. núm. 20-00084, ECF núm. 62; Proc. abr. núm. 20-00085, ECF núm. 61]. El 4 de enero de 2021, las partes presentaron una estipulación conjunta pidiendo la desestimación de las demás demandas, sin perjuicio [Proc. abr. núm. 20-00080, ECF núm. 74; Proc. abr. núm. 20-00082, ECF núm. 54; Proc. abr. núm. 20-00083, ECF núm. 55; Proc. abr. núm. 20-00084, ECF núm. 63; Proc. abr. núm. 20- 00085, ECF núm. 62].

El 4 de febrero de 2021, las partes presentaron una moción conjunta para el dictado de una orden aprobando una estipulación conjunta modificando el interdicto relativo a la Ley 181 [Proc. abr. núm. 20-00084, ECF núm. 72]. Las partes convinieron que, en la medida en que los ingresos obtenidos del impuesto sobre las primas de seguros y de las inspecciones de seguridad de las propiedades comerciales cubrieran el incremento salarial de $125 mensuales de los bomberos, la Junta de Supervisión no objetaría el incremento estipulado por la Ley 181. Las partes comunicaron al Tribunal del Título III que el incremento salarial entraría en vigor. El 5 de febrero de 2021, el Tribunal del Título III dictó una orden aprobando la estipulación [Proc. abr. núm. 20-00084, ECF núm. 73].

El 21 de enero de 2021, el Gobierno presentó una notificación de apelación a las órdenes del Tribunal del Título III del 23 de diciembre de 2020 sobre las mociones de sentencias sumarias [Proc. abr. núm. 20-00080, ECF núm. 78; Proc. abr. núm. 20-00082, ECF núm. 58; Proc. abr. núm. 20-00083, ECF núm. 60; Proc. abr. núm. 20-00084, ECF núm. 67; Proc. abr. núm. 20-00085, ECF núm. 66].

El 22 de junio de 2022, el Primer Circuito confirmó las órdenes del Tribunal del Título III, del 23 de diciembre de 2020, sobre las mociones de sentencia sumaria de las partes. El tribunal razonó que determinar si era apropiado que durante el litigio la Junta de Supervisión ampliara sus explicaciones de por qué rechazaba la legislación del Estado Libre Asociado sería un tema que se juzgaría caso por caso, y determinó que sí lo era, llegando a la conclusión de que

la Junta de Supervisión no había ejercitado de manera arbitraria y caprichosa las facultades que la Ley PROMESA le otorga de anular medidas impugnadas. El Primer Circuito dictó su mandato el 14 de julio de 2022.

i) *La Junta de Supervisión y Administración para Puerto Rico contra el Honorable Pierluisi Urrutia y otros, Proc. abr. núm. 21-00072*

El 2 de julio de 2021, la Junta de Supervisión presentó ante el Tribunal del Título III una querella contra el Gobernador Pedro Pierluisi Urrutia en su calidad de tal; la AAFAF; y el Honorable José Luis Dalmau, en su calidad de Presidente de la Cámara de Representantes de Puerto Rico, para prohibir la aplicación y anular la Ley 7-2021 [Proc. abr. núm. 21-00072, ECF núm. 1]. Como se expuso en la demanda, la Ley 7-2021 pretendía sustituir los sistemas de pensiones reformados del Estado Libre Asociado por un nuevo sistema de pensiones de beneficios definidos, facultaba al Gobierno para repudiar cualquier plan de ajuste que requiriera reducciones de pensiones, recortes presupuestarios o nuevas reestructuraciones de bonos, y prohibía el uso al Gobierno de cualesquiera recursos para materializar y posibilitar el plan de ajuste a la sazón propuesto por la Junta de Supervisión. La demanda alegaba que (i) la Ley 7-2021 vulneraba la Sección 108(a) de la Ley PROMESA porque menoscababa y/o anulaba los objetivos de la misma, según lo determinaba la Junta de Supervisión; (ii) la Ley 7-2021 vulneraba las Secciones 204(a), 204(c) y 207 de la Ley PROMESA; (iii) la Ley 7-2021 vulneraba la Cláusula de Supremacía de la Constitución de EE.UU. y la Sección 4 de la Ley PROMESA; y (iv) la Junta de Supervisión estaba facultada para dictar una orden prohibiendo y anulando la Ley 7-2021 y cualesquiera medidas adoptadas para implementarla. El 23 de julio de 2021, los demandados presentaron sus respuestas a la demanda [Proc. abr. núm. 21-00072, ECF núm. 13, 14, 15].

El 15 de agosto de 2021, la Junta de Supervisión presentó una moción solicitando sentencia sumaria [Proc. abr. núm. 21-00072, ECF núm. 17]. El 13 de octubre de 2021, el Tribunal del Título III dictó una orden aceptando parcialmente la moción de sentencia sumaria de la Junta de Supervisión [Proc. abr. núm. 21-00072, ECF núm. 78]. El Tribunal del Título III determinó que (i) la Junta de Supervisión tenía autoridad para solicitar remedio a tenor de la Sección 204(a) de la Ley PROMESA porque la Ley 7-2021 era significativamente incongruente con el Plan fiscal certificado del Estado Libre Asociado y el Gobernador había omitido cumplir las instrucciones de la Junta de Supervisión de corregir las incongruencias; y (ii) la Ley 7-2021 vulneraba la Sección 108(a) de la Ley PROMESA por menoscabar o anular los objetivos de la Ley PROMESA, según lo determinó la Junta de Supervisión. En cuanto a las imputaciones IV, V y VI, el Tribunal del Título III desestimó dictar sentencia sumaria con respecto a las reclamaciones basadas en las Secciones 204(c) y 207, y se negó a llegar a una conclusión sobre la cuestión de prioridad de la Sección 4 de la Ley PROMESA y de la Cláusula de Supremacía. Sobre la base de estos dictámenes, el Tribunal del Título III, a tenor de la Sección 204(a)(5) de la Ley PROMESA, anuló íntegramente la Ley 7-2021 y prohibió a los demandados implementarla y ponerla en vigor. Además, el Tribunal del Título III, de conformidad con la Sección 108(a)(2) de la Ley PROMESA declaró nulas, inaplicables y sin efecto la Sección 1.02, la Sección 5.02, el Capítulo 2, el Capítulo 3, el Capítulo 4 y la última frase de la Sección 5.01 de la Ley 7-2021, prohibiendo a los demandados implementar o poner en vigor las citadas cláusulas.

El 9 de diciembre de 2021, las partes presentaron una estipulación de desestimación voluntaria, sin perjuicio, de las demás imputaciones del caso (las imputaciones IV, V y VI). [Proc. abr. núm. 21-00072, ECF núm. 79].

j)   ***R&D Master Enterprises, Inc. y otros contra la Junta de Supervisión y Administración Financiera para Puerto Rico y otros, Caso núm. 21-cv-1317***

El 8 de julio de 2021, R&D Master Enterprises, Inc., Pro Pave Corp., Matrix Transport, Inc., José A. Rovira González y María Magdalena Díaz Vila presentaron, ante el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico, una demanda contra la Junta de Supervisión y contra Natalie Jaresko, en su calidad de Directora ejecutiva de la Junta [Caso núm. 21-cv-1317, ECF No. 1]. En dicha demanda, los demandantes solicitaron una orden exigiendo a la Junta de Supervisión que revisase el contrato con el Banco de Desarrollo Económico, mediante el cual se vendía una cartera de préstamos de $384,269,047 a un inversionista, PR Recovery and Development JV, LLC, invocando la política de revisión de contratos de la Junta y la Sección 204(b) de la Ley PROMESA. Los demandantes alegaron que la supuesta omisión de la Junta de Supervisión de revisar el contrato vulneraba la Ley PROMESA, las cláusulas de Debido proceso y de Protección equitativa de la Constitución de los Estados Unidos, y la política de revisión de contratos de la propia Junta de Supervisión.

El 27 de julio de 2021, los demandados presentaron una moción para trasladar el caso al Tribunal del Título III por estar vinculado al Caso del Título III del Estado Libre Asociado [Caso núm. 21-cv-1317, ECF núm. 8].

El 3 de septiembre de 2021, los demandados presentaron una moción de desestimación, planteando que (i) los demandantes carecían de fundamento para presentar la demanda; (ii) sus demandas estaban prescritas; y (iii) la demanda no planteaba una reclamación viable de remedio [Caso núm. 21-cv-1317, ECF núm. 19].

El 25 de octubre de 2021, el juez Arias-Marxuach dictó una orden rechazando la moción de los demandados de trasladar el caso al Tribunal del Título III [Caso núm. 21-cv-1317, ECF núm. 25].

El 12 de abril de 2022, en juez Arias-Marxuach firmó un dictamen y orden aceptando la moción de desestimación de la Junta de Supervisión, sosteniendo que las demandas de los demandantes habían prescrito. [Caso núm. 21-cv-1317, ECF núm. 33]. El 25 de abril de 2022, los demandantes presentaron una notificación apelando la orden del tribunal de desestimar su demanda [Caso núm. 21-cv-1317, ECF núm. 35].

El 24 de mayo de 2022, el Primer Circuito registró la apelación como Caso núm. 22-1342. El 20 de julio de 2022, los demandantes presentaron su alegato inicial. El 19 de agosto de 2022, la Junta de Supervisión presentó su alegato de respuesta. Las partes están a la espera de una orden adicional del Primer Circuito sobre la vista oral.

k)   ***La Junta de Supervisión y Administración Financiera de Puerto Rico contra el Honorable Pierluisi Urrutia y otros, Proc. abr. núm. 21-00119***

154

El 20 de diciembre de 2021, la Junta de Supervisión presentó una demanda contra el
Gobernador de Puerto Rico, la AAFAF, el Administrador del SRE, el Director Ejecutivo de la
Junta de Retiro del Gobierno de Puerto Rico y el Director de la OGP, solicitando a nulidad y la
prohibición de la entrada en vigor de la Ley 80-2020, la Ley 81-2021, la Ley 82-2020 y la
Resolución conjunta 33 ("RC 33"), una medida que requería que el Estado Libre Asociado
implementase, al menos parcialmente, la Ley 80 [Proc. abr. núm. 21-0119, ECF núm. 1]. Las
Leyes proponían modificar ciertos beneficios de pensiones de algunos empleados
gubernamentales permitiéndoles jubilarse anticipadamente y/o proporcionándoles prestaciones
mejoradas. La Junta de Supervisión alegó que las Leyes y la RC 33 imponían un tratamiento
específico a determinadas reclamaciones de pensiones anteriores a la petición que era
incongruente con el Plan de ajuste, lo cual vulneraba las Secciones 312 y 313 de la Ley
PROMESA, y conllevaba que el tratamiento de ciertos reclamantes les posibilitaba recobrar más
de la cuantía íntegra de sus demandas, contrariamente a lo estipulado por la Sección 301(a) de la
Ley PROMESA y la Sección 1129(b) del Código de Quiebras. Además, la Junta de Supervisión
argumentó que: (i) cada una de las Leyes y la RC 33 vulneraban la Sección 207 de la Ley
PROMESA por modificar la deuda sin la previa autorización de la Junta de Supervisión, y
menoscababan y anulaban los objetivos de la Ley PROMESA, según determinaba la Junta,
específicamente su propósito de conseguir la responsabilidad fiscal, vulnerando la Sección
108(a) de la Ley PROMESA; (ii) el Gobernador y la AAFAF incumplieron lo dispuesto por la
Sección 204(a) de la Ley PROMESA con respecto a cada Ley; y (iii) la Ley 80 y la RC 33
reprogramaron los fondos sin certificación de la Junta de Supervisión, contrariamente al espíritu
de la Sección 204(c) de la Ley PROMESA.

El 27 de diciembre de 2021, la Junta de Supervisión, el Gobernador de Puerto Rico, la
AAFAF y la OGP presentaron una estipulación y orden reflejando su resolución de la demanda
de la Junta de Supervisión [Proc. abr. núm. 21-00119, ECF núm. 5]. Las partes estipularon que
(i) negociarían un acuerdo para alcanzar varios de los objetivos de las Leyes, (ii) dictarían una
orden aprobando que la estipulación invalide las Leyes y la RC 33, y (iii) tras el dictado de una
orden aprobando la estipulación, la demanda de la Junta de Supervisión quedaría desestimada,
sin perjuicio [Proc. abr. núm. 21-00119, ECF núm. 5]. El 28 de diciembre de 2021, el Tribunal
del Título III dictó la estipulación y orden [Proc. abr. núm. 21-00119, ECF núm. 6]. A
consecuencia de la orden del Tribunal del Título III, las Leyes y la RC 33 quedaron invalidadas,
y la demanda de la Junta de Supervisión quedó desestimada, sin perjuicio [Proc. abr. núm. 21-
00119, ECF núm. 6].

El 16 de febrero de 2022, la Junta de Supervisión, el Gobernador de Puerto Rico y la
AAFAF presentaron una moción conjunta (i) para informar al Tribunal del Título III que las
partes habían llegado a acuerdos con respecto a la Ley 81 y la Ley 82, como se contemplaba en
la estipulación y orden, resolviendo la demanda de la Junta de Supervisión; y (ii) para prorrogar
el plazo en que las partes debían satisfacer sus respectivas obligaciones impuestas por la orden
del Tribunal del Título III con respecto a la Ley 80 [Proc. abr. núm. 21-00119, ECF núm. 8].
Tras varias prórrogas, el 26 de agosto de 2022 el Tribunal del Título III dictó una orden
admitiendo una moción de prórroga de la fecha límite hasta el 22 de septiembre de 2022 [Proc.
abr. núm. 21-00119, ECF núm. 15].

**E.**      **Adopción de los planes fiscales y de los presupuestos anuales de la AEEPR**

1.      **Planes fiscales**

La Junta de Supervisión tiene la responsabilidad de interactuar con el Gobernador para negociar los planes fiscales, y con la Asamblea Legislativa para negociar los presupuestos, en lo relativo a la preparación, presentación, aprobación y certificación de los planes y presupuestos. La Junta de Supervisión debe determinar, a su absoluta discreción, si los planes fiscales son compatibles con la Sección 201(b) de la Ley PROMESA. Algunos de los objetivos de la Ley PROMESA son que los planes fiscales aporten a Puerto Rico y a sus instrumentalidades reformas permanentes que favorezcan el crecimiento, y un método para conseguir la responsabilidad fiscal y acceder a los mercados de capitales.[220]

Mediante un proceso colaborativo con el Gobierno del Estado Libre Asociado, la Junta de Supervisión ha certificados planes fiscales de la AEEPR que aspiran a transformarla en un servicio público rentable, seguro y confiable. Por ejemplo, las medidas de los planes fiscales certificados se centran en las mejoras de capital de la infraestructura de la AEEPR, la búsqueda de métodos de generación de electricidad más rentables, reducciones de los costos de mano de obra y de pensiones, y la privatización de la compañía mediante transacciones con prestadores experimentados de servicios públicos.

A continuación presentamos un resumen de los planes fiscales certificados.

a)      **La certificación del Plan fiscal de abril de 2017**

El 14 de octubre de 2016, la Junta de Supervisión designó a la AEEPR como entidad que, de conformidad con la Ley PROMESA, estaba obligada a presentar planes fiscales. Poco tiempo después, el Director Ejecutivo de la AEEPR, Javier Quintana, anunció que se había iniciado el proceso de preparación del primer plan fiscal de la compañía. El 21 de febrero de 2017, la AEEPR presentó un plan fiscal a la Junta de Supervisión. En las semanas siguientes, la Junta de Supervisión colaboró estrechamente con el Gobierno y con la AEEPR para afinar el contenido del plan fiscal. El 21 de abril de 2016, la AEEPR envió a la Junta de Supervisión un plan fiscal revisado. La Junta de Supervisión aprobó el Plan fiscal de abril de 2017 el 28 de abril de ese mes, con algunas enmiendas que se describen a continuación (el "Plan fiscal de abril de 2017").

El Plan fiscal de abril de 2017 fue el primero de la AEEPR preparado a tenor de la Ley PROMESA, y constituyó todo un hito en el compromiso de la compañía para con la responsabilidad fiscal y sostenibilidad de la AEEPR y sus vinculados. El Plan fiscal de abril de 2017 incluía proyecciones de superávits presupuestarios hacia 2022, y contemplaba que a finales de ese año la AEEPR podía volver a los mercados de bonos.

El Plan fiscal de abril de 2017 se basó en los supuestos del AAR previo a la petición, descrito en detalle en la Sección IV.B.1 de esta Declaración de divulgación, e incorporaba

---

[220] PROMESA § 701 ("Es la intención del Congreso que cualquier solución duradera para la crisis fiscal y económica de Puerto Rico debe incluir reformas fiscales permanentes que fomenten el crecimiento y que se caractericen, entre otras cosas, por el libre flujo de capitales entre las posesiones de los Estados Unidos y el resto de los Estados Unidos".).

reformas apuntadas a transformar a la AEEPR en un servicio público eficiente, seguro, confiable y rentable. Entre dichas reformas se incluía un programa decenal de inversiones de capital de $4,660 millones, dirigido a modernizar la red eléctrica de la compañía. El programa de inversiones a largo plazo de la AEEPR contemplaba (i) inversiones de capital de $2,500 millones para mejorar la infraestructura de TyD de la AEEPR; (ii) inversión de $1,680 millones en alianzas público-privadas que modificarían la cartera de métodos de generación eléctrica para incrementar el uso de energías renovables y gas natural, y permitir que las centrales cumplieran la normativa ambiental; y (iii) aproximadamente $400 millones en financiamiento externo para un puerto marítimo de descarga de gas. Además de las mejoras de infraestructuras, el Plan fiscal de abril de 2017 establecía diversas reformas operativas llamadas a mejorar la eficiencia y reducir costos, incluyendo, entre otras, medidas para la mejora de la productividad laboral, buenas prácticas de gestión de recursos humanos, seguridad, administración y atención al cliente.

Aparte de delinear la reestructuración prevista por el AAR previo a la petición y de destacar las principales reformas infraestructurales y operativas, el Plan fiscal de abril de 2017 contemplaba (i) cambios en el tratamiento de las CELI, que reducirían en la mayor medida posible los costos de las CELI para la AEEPR sin necesidad de legislación; y (ii) cambios en el marco de administración corporativa de la compañía que contribuirían a impulsar su transformación.

La Junta de Supervisión certificó el Plan fiscal de abril de 2017 en una reunión pública celebrada el 28 de abril de 2017, con algunas modificaciones que tuvieron que hacerse. Específicamente, la Junta de Supervisión determinó que el Plan fiscal de abril de 2017, tal como había sido originalmente redactado, no permitía generar electricidad a bajo costo lo bastante confiable. La Junta de Supervisión pidió que el Plan fiscal de abril de 2017 fuese modificado para, entre otras cosas, estipular la transmisión de electricidad a un precio proyectado de 21 centavos por kilovatio-hora hacia 2023 (la "Tarifa objetivo"). Para que la AEEPR pudiera alcanzar la Tarifa objetivo, la Junta de Supervisión recomendó modificaciones del Plan fiscal de abril de 2017 que disminuyesen en costo de generar energía y mejoraran la red de distribución eléctrica. Además, pidió modificaciones que garantizaran que la Junta de Gobierno de la AEEPR incluyese miembros independientes y con experiencia en el sector, y que estableciera un mecanismo para la aprobación de las tarifas con la CEPR, que reflejara las estructuras de tarifas necesarias para cumplir la Tarifa objetivo. La Junta de Supervisión pidió que el plan fiscal revisado que incorporara dichas modificaciones fuese presentado como más tardar el 13 de mayo de 2017, y que los consiguientes plazos de implementación de las políticas se reflejaran en tales enmiendas.

La Junta de Supervisión siguió colaborando estrechamente con la AEEPR y con el Gobierno para implementar las modificaciones solicitadas en el Plan fiscal de abril de 2017. Sin embargo, en última instancia no fue posible elaborar un plan fiscal que alcanzara la Tarifa objetivo, lo cual conllevó la rescisión del AAR previo a la petición y a que la AEEPR se acogiera al amparo del Título III.

b)     **La certificación del Plan fiscal de abril de 2018**

El 31 de octubre de 2017, como consecuencia de la devastación provocada por el huracán María, la Junta de Supervisión estableció un cronograma para la certificación de un nuevo plan

fiscal de la AEEPR que reflejara la realidad económica posterior al desastre. El Plan fiscal revisado de la AEEPR debía presentarse hasta el 22 de diciembre de 2017. Este plazo fue posteriormente prorrogado, y el Gobernador presentó su propuesta de plan fiscal el 24 de enero de 2018.

Tras revisar esta propuesta, el 5 de enero de 2018 la Junta de Supervisión comunicó una notificación de vulneración de la Sección 201(c)(3)(B)(i) de la Ley PROMESA, e informó al Gobernador que el plan fiscal propuesto requeriría una serie de revisiones para poder ser certificado. Específicamente, la Junta de Supervisión pidió, entre otras cosas, que el plan fiscal implementara medidas para (i) elaborar un plan quinquenal de sostenibilidad financiera; (ii) definir medidas realistas para reducir costos; (iii) estipular requisitos para potenciales licitaciones vinculadas con el recientemente anunciado plan del Gobernador de privatizar la AEEPR, y (iv) abordar el servicio de la deuda.

El 21 de marzo de 2018, el Gobernador presentó un plan fiscal revisado. Tras analizar la revisión, la Junta de Supervisión canceló la reunión pública que había programado para certificar el plan con el objeto de seguir colaborando con el Gobierno en la elaboración de un plan fiscal admisible. El 28 de marzo de 2018, la Junta de Supervisión comunicó al Gobierno revisiones adicionales del plan que serían necesarias para su certificación, incluyendo, entre otras, (i) proyecciones de tarifas por debajo de los 20 centavos por kilovatio-hora hacia 2023; (ii) reforma de pensiones, con sus informes financieros correspondientes; e (iii) información adicional relativa a la propuesta de privatización de la AEEPR. El 5 de abril de 2018, el Gobernador presentó una nueva versión revisada del plan.

Tras prolongadas negociaciones entre el Gobierno, la Junta de Supervisión, sus expertos y consultores, la Junta de Supervisión elaboró su propio plan fiscal revisado para la AEEPR, que publicó el 18 de abril de 2018, y que certificó en una reunión pública el 19 de abril de 2018 (el "Plan fiscal de abril de 2018").

El Plan fiscal de abril de 2018 estuvo basado en un marco para la transformación de la AEEPR en un sistema eléctrico eficiente, asequible, confiable, mediante las mejoras de infraestructuras y operaciones, reformas que posibilitarían tarifas por debajo de los 20 centavos el kilovatio-hora, y la reestructuración de ciertos pasivos. Este marco incluía (i) una transición a fuentes de generación de menor costo y a energías renovables; (ii) la reconstrucción y modernización de la red de la AEEPR después de los huracanes; (iii) mejoras operativas en áreas como la facturación, la recaudación, la gestión de combustibles, la preparación de presupuestos y la mano de obra; (iv) aproximadamente $12,000 millones en inversiones de capital para la mejora de las infraestructuras, incluyendo unos $8,000 millones necesarios para reconstruir y mejorar la infraestructura dañada por los huracanes; (v) reforma de pensiones, que conllevaría un ahorro de $58 millones anuales mediante la conversión a un sistema de aportaciones definidas y la reducción de las prestaciones en un 10%; y (vi) la transformación de la estructura y la gestión de la AEEPR mediante una transacción que la privatizaría en un período de aproximadamente dieciocho (18) meses.

Aunque los detalles de la transacción de la privatización todavía no se habían decidido, el Plan fiscal de abril de 2018 marcó los hitos generales del proceso: (i) preparación de los materiales de debida diligencia y de los requisitos de cualificación; (ii) determinación de las

partes cualificadas para participar en el proceso; (iii) un proceso de convocatoria de ofertas; y (iv) la eventual formalización de una transacción. Además, el Plan fiscal de abril de 2018 definió los pilares de una estructura de tarifas mejorada y de un proceso regulatorio para futuros participantes privados en el mercado energético que debería desarrollarse en conexión con la transacción propuesta.

El Plan fiscal de abril de 2018 proyectaba que sería posible establecer tarifas inferiores a los 20 centavos por kilovatio-hora hacia el año fiscal 2023 mediante la implementación de significativas mejoras en el sistema eléctrico a través de una completa transformación de la AEEPR, por debajo de los 30 centavos si la AEEPR mantuviera el statu quo. Estas proyecciones de reducción de tareas estarían impulsadas en gran medida por la transición a fuentes de generación de menor costo y a energías renovables. El proceso de privatización y transformación de la AEEPR se describe en detalle en la Sección III.F de esta Declaración de divulgación.

c)      **La certificación del Plan fiscal de agosto de 2018**

El 31 de mayo de 2018, la AEEPR solicitó la Junta de Supervisión que actualizara ciertas proyecciones del plan fiscal y prorrogara el plazo para presentar la propuesta de presupuesto del año fiscal 2019. La Junta de Supervisión accedió a este pedido el 7 de junio de 2018, y estableció el 13 de junio de 2018 como fecha límite para la presentación de un plan fiscal revisado. A renglón seguido, la Junta de Supervisión anunció que el Plan fiscal de abril de 2018 debía ser revisado para incorporar las proyecciones macroeconómicas contenidas en el plan fiscal más reciente del Estado Libre Asociado, que fue certificado el 29 de junio de 2018. La Junta de Supervisión, en colaboración con la AEEPR y el Gobierno, revisó en consecuencia el Plan fiscal de abril de 2018, y el 1 de agosto de 2018 certificó un plan fiscal revisado (el "Plan fiscal de agosto de 2018"). Este Plan fiscal de agosto de 2018 sustituyó al Plan fiscal de abril de 2018.

En gran medida, el espíritu del Plan fiscal de agosto de 2018 era el mismo que el del Plan fiscal de abril de 2018, en sentido que propiciaba la transformación y privatización de la AEEPR, alcanzar una tarifa objetivo de 20 centavos por kilovatio-hora hacia 2023, y emprender un programa de inversiones de capital para mejorar y modernizar los sistemas de la AEEPR.

Los siguientes fueron los principales cambios en las proyecciones contenidos en el Plan fiscal de agosto de 2018, impulsados por las modificaciones del plan fiscal del Estado Libre Asociado, y abarcan los años fiscales desde 2017 hasta 2023: (i) un retroceso demográfico adicional del 1%; (ii) un retroceso económico del 3.1%, en lugar del 0%, como consecuencia de los huracanes; (iii) una mejora adicional de la eficiencia energética del 1%; (iv) un incremento del 56% en los precios de los combustibles, en lugar de solamente el 10%; y (v); una disminución adicional del 1% de las ventas y el consumo. También los cambios en las políticas del Estado Libre Asociado reducirían las aportaciones de la AEEPR a la atención sanitaria de sus empleados, lo cual conllevaría un ahorro de hasta $44.3 millones anuales.

Por otra parte, el Plan fiscal de agosto de 2018 también abordaba ciertas reformas que no habían sido anteriormente descritas en detalle en el Plan fiscal de abril de 2018, como, por ejemplo, (i) reformas para reducir los costos de abastecimiento de combustibles, y (ii) una evaluación de la capacidad de la mano de obra que podría aplicarse para mejorar la dotación y la productividad del personal. Además, el Plan fiscal de agosto de 2018 destacaba la importancia de

obtener financiamiento federal para alcanzar los objetivos de la AEEPR de establecer un sistema seguro, confiable y rentable. Por último, el Plan fiscal de agosto de 2018 incluía una estimación de las repercusiones de implementar las medidas propuestas en el mismo, considerando que, en relación con las medidas planteadas, había en juego unos $1,5 millones.

d)      **La certificación del Plan fiscal de junio de 2019**

También el 1 de agosto de 2018, la Junta de Supervisión anunció que se incorporaría información adicional al plan fiscal del Estado Libre Asociado, incluyendo los datos reales del año fiscal 2018 y las estimaciones revisadas del gasto federal para paliar los desastres que, se preveía, mejorarían las proyecciones de ingresos del plan fiscal. En consecuencia, la Junta de Supervisión pidió a la AEEPR que preparara un nuevo plan fiscal revisado que incorporara los citados cambios, y que se lo presentara como más tardar el 12 de octubre de 2018. Más tarde, la Junta de Supervisión prorrogó este plazo para centrarse en el proceso de certificación de un plan fiscal revisado del Estado Libre Asociado. Tras varias prórrogas adicionales, la AEEPR presentó un plan fiscal el 28 de abril de 2019.

Tras revisar esta propuesta, el 3 de mayo de 2019 la Junta de Supervisión comunicó una notificación de vulneración de la Sección 201(c)(3)(B)(i) de la Ley PROMESA, e informó al Gobernador que el plan fiscal propuesto requeriría una serie de revisiones para poder ser certificado. El 30 de mayo de 2019, el Gobernador presentó una propuesta de plan fiscal revisada y, tras exhaustivas negociaciones entre la Junta de Supervisión, el Gobierno y la AEEPR, la Junta de Supervisión preparó un nuevo plan fiscal revisado para la AEEPR. La Junta de Supervisión certificó dicho plan fiscal el 27 de junio de 2019 (el "Plan fiscal de junio de 2019").

Además, el Plan fiscal de junio de 2019 detallaba un marco para la privatización de la AEEPR, en virtud del cual los servicios de generación y de TyD que actualmente prestaba serían separados en dos entidades distintas y operados por prestadores de servicios públicos experimentados. El Plan fiscal de junio de 2019 detallaba la evolución hasta el momento del proceso de privatización, y describía los siguientes pasos que serían necesarios.

Además, el Plan fiscal de junio de 2019 estaba basado en el AAR de 2019, formalizado el 3 de mayo de 2019, cuyo contenido se describe en detalle en la Sección V.C.2 de esta Declaración de divulgación. El Plan fiscal de junio de 2019 indicaba que con el AAR se conseguiría una disminución global de la deuda del orden de los $3,000 millones, lo cual permitiría una reducción de las tarifas proyectadas para el año fiscal 2024 desde los 30 a los 25 centavos por kilovatio-hora, sin incluir reducciones adicionales que podrían conseguirse gracias a la modernización y mejora de la eficiencia de la AEEPR.

Al igual que los planes fiscales anteriores, el Plan fiscal de junio de 2019 también hacía hincapié en la transformación de la AEEPR en una compañía pública financieramente sostenible, que prestara servicios eléctricos asequibles, seguros y confiables gracias a una serie de reformas infraestructurales y operativas. El Plan fiscal de junio de 2019 detallaba las reformas que se habían implementado hasta la fecha, y describía el PIR proyectado para establecer las estrategias necesarias para atender a la demanda de electricidad y mejorar los sistemas de la AEEPR en los próximos veinte (20) años).

Por otra parte, el Plan fiscal de junio de 2019 detallaba numerosas iniciativas previstas para el año fiscal 2020, llamadas a mejorar los costos, la seguridad y la confiabilidad del sistema de la AEEPR. Estas iniciativas incluían, entre otras: (1) la implementación de reformas de pensiones para deducir su infradotación y mejorar la viabilidad a largo plazo del plan de pensiones; (2) la modernización de la red mediante la gestión de la vegetación, el establecimiento de minirredes capaces de operar de forma autónoma en caso de caída sistémica de la red para evitar apagones generalizados, y diversos proyectos adicionales identificados para reforzar la red; (3) renegociación de los contratos de compra de electricidad para conseguir ahorros a corto y largo plazo, así como para mejorar la confiabilidad; (4) finalización y desarrollo de proyectos de generación adicionales, dirigidos a la transición hacia el gas natural y las energías renovables; (5) implementación de reformas laborales para optimizar la productividad y minimizar los costos de mano de obra; y (6) elaborar una estrategia de abastecimiento de combustibles que conlleve ahorros adicionales.

Por último, el Plan fiscal de junio de 2019 definía la situación de los reembolsos por parte de la FEMA de los gastos de emergencia incurridos por la AEEPR como consecuencia de los huracanes. La AEEPR había solicitado aproximadamente $2,500 millones, de los cuales $1,7 millones habían sido asignados a la AEEPR, y $1,300 millones desembolsados. Asimismo, el Plan fiscal de junio de 2019 proyectaba que el financiamiento federal inadecuado podría conllevar en aumentos de tarifa de hasta 13 centavos por kilovatio-hora hacia 2029.

<strong>e)   La certificación del Plan fiscal de junio de 2020</strong>

En una carta del 23 de enero de 2020, algunos miembros del Congreso de los Estados Unidos instaron a la Junta de Supervisión a revisar el plan fiscal de la AEEPR como consecuencia de las repercusiones de los terremotos que sacudieron Puerto Rico a principios de 2020 y que tanto dañaron los sistemas de la AEEPR. La Junta de Supervisión prorrogó varias veces el plazo para que la AEEPR presentara un plan fiscal actualizado como respuesta a la pandemia de la COVID-19, y finalmente la compañía lo presentó a la Junta el 22 de mayo de 2020.

Tras revisar este plan fiscal, en una carta del 5 de junio de 2020 la Junta de Supervisión destacó algunas mejoras significativas realizadas por la AEEPR el año anterior, aunque también señaló las ineficacias que seguían conllevando un servicio oneroso y carente de confiabilidad. Específicamente, el gasto de la AEEPR en mantenimiento crítico era insuficiente, y no empleó los presupuestos que tenía asignados para ello en los años fiscales 2019 y 2020. Además, el proceso de abastecimiento de combustibles de la compañía seguía imponiéndole altos costos, sus niveles de seguridad eran inadecuados y se había retrasado la implementación de diversas iniciativas, como las conversiones a gas natural, reparaciones y renegociaciones de contratos que, en suma, contribuían a un desempeño ineficiente y a costos elevados.

Para abordar estos y otros problemas estructurales, la Junta de Supervisión pidió que, de cara al año 2021, el plan fiscal contemplara la implementación de las siguientes iniciativas: (i) mejora de la gestión de la vegetación; (ii) preparación de un programa de mantenimiento proactivo; (iii) expansión de la facturación en línea a al menos el 40% de los clientes; (iv) implementación de un programa de sustitución de medidores dañados, (v) gestión del costo de las horas extraordinarias del personal; y (vi) mejora de la seguridad pública y de los empleados.

La Junta de Supervisión también pidió cambios adicionales en el plan fiscal, incluyendo, entre muchos otros: (a) conciliación de las proyecciones financieras del plan fiscal con los modelos financieros que reflejaban un mayor déficit para el mismo período; (b) abordaje de los costos del sistema de pensiones de la AEEPR; (c) incorporación de proyecciones a 30 años para lograr una sostenibilidad a largo plazo; (d) incorporación de las proyecciones macroeconómicas incluidas en el plan fiscal certificado del Estado Libre Asociado de mayo de 2020; (e) actualización de las proyecciones de cobro de tarifas como consecuencia de la incertidumbre y disminución de la recaudación provocadas por la pandemia de la COVID-19; (f) exposición en detalle de las iniciativas de recuperación de los terremotos y de la COVID-19; y (g) eliminación de los contenidos del AAR de 2019 debido a la incertidumbre de su materialización.

La Junta de Supervisión pidió que se le enviara un plan fiscal revisado hasta el 15 de junio de 2020, y el Gobernador así lo hizo. Tras exhaustivas negociaciones entre los expertos y consultores del Gobierno y de la Junta de Supervisión, esta última preparó un plan fiscal revisado para la AEEPR. El 29 de junio de 2020, la Junta de Supervisión certificó dicho plan fiscal revisado (el "Plan fiscal de junio de 2020").

También el Plan fiscal de junio de 2020 se centraba en la transformación de la AEEPR en un servicio público seguro, confiable y asequible, destacando los progresos de la compañía en el año fiscal 2020, aunque señalando iniciativas que debían materializarse, como la mejora de las operaciones, la modernización del Sistema de TyD, el refuerzo de la seguridad, la reestructuración de la deuda y la reforma de las pensiones. En consecuencia, el Plan fiscal de junio de 2020 detallaba una serie de iniciativas llamadas a implementarse en el año fiscal 2021, incluyendo, entre otras, la renegociación de ciertos PPOA, la reparación de los daños causados por los terremotos y tareas adicionales de mantenimiento, mejoras en los costos de suministro de combustibles, modernización de la red eléctrica, medidas para reducir los costos de mano de obra, reformas de pensiones y otras medidas para subsanar las ineficiencias operativas.

Por otra parte, el Plan fiscal de junio de 2020 seguía centrado en los continuos esfuerzos por privatizar la AEEPR, y detallaba tanto las medidas en tal sentido adoptadas hasta la fecha como los próximos pasos, incluyendo el previsto traspaso de la gestión del Sistema de TyD de la AEEPR a LUMA Energy, que se describe en la Sección III.F de esta Declaración de divulgación. Estaba previsto que LUMA Energy redujese costos incorporando personal experimentado, modernizando la red, mejorando las ineficiencias operativas, adoptando decisiones con mínimas interferencias políticas y emprendiendo proyectos de capital eficientes. Los servicios de generación de la AEEPR serían gestionados de manera independiente por la compañía hasta seleccionar un operador privado. Asimismo, el Plan fiscal de junio de 2020 detallaba cuestiones legislativas y reglamentarias fundamentales que debían abordarse en relación con la privación de la AEEPR.

Las reformas previstas en el Plan fiscal de junio de 2020 reducirían las tarifas desde los 27 a 30 centavos por kilovatio-hora hasta los 20 a 22 centavos entre 2021 y 2025.

Por último, el Plan fiscal de junio de 2020 exponía la situación de los fondos federales para la AEEPR, destacando que, de un total de $20,200 millones en fondos de los programas CDBG-DR y CDBG-MIT asignados a Puerto Rico, unos $1,900 millones irían dirigidos a proyectos energéticos. Además, la AEEPR había recibido unos $1,400 millones de fondos de la

162

FEMA. El Plan fiscal de junio de 2020 señalaba que un financiamiento federal inadecuado podría conllevar aumentos de tarifas para canalizar fondos hacia reparaciones y mejoras de capital.

### f)    La certificación del Plan fiscal de mayo de 2021

El 25 de febrero de 2021, la Junta de Supervisión estableció un cronograma para la certificación del nuevo plan fiscal de la AEEPR, estipulando que debía ser presentado como más tardar el 21 de abril de 2021. La Junta de Supervisión solicitó que fuese coherente con los planes, objetivos e iniciativas establecidos por LUMA Energy a tenor del Contrato de operación y mantenimiento (el "Contrato de OyM") entre LUMA Energy, la AEEPR y la Autoridad P3. Dicho plazo fue posteriormente prorrogado hasta el 20 de abril de 2021, fecha en la cual el Gobernador presentó su propuesta de plan fiscal.

Tras revisar esta propuesta, el 3 de mayo 2021 la Junta de Supervisión comunicó una notificación de vulneración de la Sección 201(c)(3)(B)(i) de la Ley PROMESA, e informó al Gobernador que el plan fiscal propuesto requeriría una serie de revisiones, además de información justificativa adicional, para poder ser certificado. La Junta de Supervisión destacó los progresos conseguidos hasta la fecha hacia la transformación del sistema energético de Puerto Rico, incluyendo la selección de LUMA Energy y la identificación de los proyectos prioritarios de mejora de capital, aunque señaló problemas significativos pendientes para que los residentes de Puerto Rico pudieran beneficiarse de un sector energético confiable y asequible. Específicamente, la AEEPR seguía manteniendo un desempeño insatisfactorio en las áreas de confiabilidad y seguridad, en comparación con los parámetros del sector. Por otra parte, la AEEPR seguía dependiendo de las centrales eléctricas alimentadas con petróleo, que son caras, generan demasiadas emisiones y tienen una infraestructura obsoleta: una antigüedad media de cuarenta y dos (42) años, frente a la media nacional de dieciocho (18) años. Por consiguiente, sus costos de mantenimiento son mayores y existen mayores riesgos de desperfectos mecánicos e ineficiencias. En consecuencia, la Junta de Supervisión manifestó que la AEEPR debía centrarse en seguir apoyando el traspaso del Sistema de TyD y de los Activos de generación a operadores privados, la transición a energías renovables y el cumplimiento de los requisitos normativos, la implementación de medidas operativas para mejorar la eficiencia y la confiabilidad, y llegar a la sostenibilidad financiera reestructurando y reformando las obligaciones heredadas de deuda y pensiones.

Para abordar estos retos y áreas de interés, la Junta de Supervisión pidió que los planes fiscales incluyan lo siguiente: (i) con respecto a la transición a un operador privado, planificación de la transición de los empleados y costos asociados, transparencia en el financiamiento del capital circulante destinado a las cuentas de reserva operativas de la compañía, y medidas y cronograma para concluir la reorganización de la AEEPR; (ii) detalle del servicio de la deuda y de la transición del mismo y, por separado, proyecciones de las tarifas eléctricas; (iii) una propuesta para la reforma y dotación de las pensiones; (iv) transparencia en la planificación y dotación de inversiones de capital, incluyendo la relación entre el plan de infraestructuras de la AEEPR y el programa de subsanación del Sistema de TyD de LUMA Energy; (v) aplicación y fuentes de fondos federales; (vi) detalles de las medidas operativas, incluyendo las vinculadas con la generación y otras no transferidas a LUMA Energy, indicando el consiguiente ahorro; (vii) cumplimiento de las decisiones y normativa en materia de recursos del NEPR; (viii)

actualización de las proyecciones financieras en función del plan fiscal del Estado Libre Asociado certificado en abril de 2021; y (ix) discusión adicional acerca de los riesgos para el sistema de la AEEPR.

La Junta de Supervisión pidió que se le enviara un plan fiscal revisado hasta el 7 de mayo de 2021, y el Gobernador así lo hizo. Tras exhaustivas negociaciones entre los expertos y consultores del Gobierno y de la Junta de Supervisión sobre las cuestiones planteadas para el plan fiscal propuesto, la Junta de Supervisión elaboró un plan fiscal revisado para la AEEPR. El 27 de mayo de 2021, la Junta de Supervisión certificó dicho plan fiscal revisado (el "<u>Plan fiscal de mayo de 2021</u>").

También el Plan fiscal de mayo de 2021 se centraba en transformar la AEEPR en un servicio público seguro, confiable y asequible. En consecuencia, el Plan fiscal de mayo de 2021 detallaba una serie de reformas a implementar para reforzar el marco regulador de la AEEPR y promover una mayor transparencia y rendición de cuentas. Por otra parte, el Plan fiscal de mayo de 2021 seguía centrado en la privatización de la compañía y detallaba las iniciativas de privatización emprendidas hasta la fecha, así como el comienzo de la prestación de servicios de LUMA Energy, la elección de un operador privado de los Activos de generación y la colaboración con operadores privados para reconstruir el sistema de la AEEPR. Además, el Plan fiscal de mayo de 2021 priorizaba los programas de mantenimiento y de mejoras de capital, la incorporación de capacidad de energías renovables y la necesidad de reestructurar la deuda y reformar las pensiones.

Específicamente el Plan fiscal de mayo de 2021 disponía que LUMA Energy reconstruiría el Sistema de TyD implementando diversos proyectos de mejoras centrados en la rehabilitación, reparación y modernización del sistema, la seguridad y la capacitación de los empleados, y el servicio de atención al cliente, con un costo total de unos $3,850 millones entre los años fiscales 2022 y 2024. En el año fiscal 2022, la AEEPR debía centrarse en el traspaso de los Activos de generación a un operador privado, en las necesarias mejoras del mantenimiento y de otros aspectos operativos, en la racionalizar el abastecimiento y las condiciones de suministro de combustible, y en la reestructuración de las obligaciones de deuda y de pensiones.

Otros aspectos proyectados por el Plan fiscal de mayo de 2021 fueron la estabilidad de las tarifas y facturas de electricidad, frente a significativos incrementos de las mismas si no se abordaba la reestructuración de la deuda y la transformación de la compañía.

Además, el Plan fiscal de mayo de 2021 resaltaba la importancia de optimizar el uso de los fondos federales para mejorar los sistemas de la AEEPR. Aproximadamente $14,400 millones han sido afectados a la reconstrucción de la infraestructura energética durante los próximos años. Hasta la fecha, la AEEPR ha recibido unos $1,600 millones en fondos de FEMA, vinculados fundamentalmente a los daños de los huracanes. La AEEPR, LUMA Energy y la Autoridad P3 han sido llamados a cooperar para asegurar un uso efectivo y eficiente de los fondos federales en el marco del Contrato de OyM.

g)     **La certificación del Plan fiscal de junio de 2022**

El 22 de febrero de 2022, la Junta de Supervisión estableció un cronograma para la certificación del nuevo plan fiscal de la AEEPR, estipulando que debía ser presentado como más tardar el 25 de marzo de 2022. La Junta de Supervisión solicitó que fuese coherente con los planes, objetivos e iniciativas establecidos por LUMA Energy a tenor del Contrato de OyM entre LUMA Energy, la AEEPR y la Autoridad P3. Dicho plazo fue posteriormente prorrogado hasta el 11 de mayo de 2022, fecha en la cual el Gobernador presentó su propuesta de plan fiscal.

Tras revisar esta propuesta, el 25 de mayo de 2022 la Junta de Supervisión comunicó una notificación de vulneración de la Sección 201(c)(3)(B)(i) de la Ley PROMESA, e informó al Gobernador que el plan fiscal propuesto requeriría una serie de revisiones, además de información justificativa adicional, para poder ser certificado. La Junta de Supervisión destacó los progresos realizados para la transformación del sistema energético de Puerto Rico, incluyendo la asunción de LUMA Energy de las responsabilidades de operación y mantenimiento del Sistema de TyD de la AEEPR, y solicitó a ambas empresas que colaboraran para presentar puntualmente una propuesta de plan fiscal revisado. Además, la Junta de Supervisión señaló los significativos retos pendientes de enfrentar antes de que los residentes de Puerto Rico pudieran beneficiarse de un sector energético confiable y asequible. Específicamente, se señalaba el hecho de que las AEEPR seguía dependiendo de recursos no renovables, incluyendo carbón y gas natural, caros y con proceso sujetos a una elevada volatilidad. Además, a pesar de la selección de nuevos contratos de generación de renovables, el proceso de modernización de los recursos de generación marchaba con retraso. En consecuencia, la Junta de Supervisión manifestó que la AEEPR debía centrarse en seguir apoyando la transición de las operaciones de generación a operadores privados, la transición a energías renovables y el cumplimiento de los requisitos normativos, la implementación de medidas operativas para mejorar la eficiencia y la confiabilidad, y llegar a la sostenibilidad financiera reestructurando y reformando las obligaciones heredadas de deuda y pensiones, además de cooperar con LUMA Energy en servicios compartidos.

Para abordar estos retos y áreas de interés, la Junta de Supervisión pidió que el plan fiscal incluyese, entre otras cosas, lo siguiente: (i) el cronograma para concluir la Transacción de generación y sus empleados al sector privado, y detalles sobre la propuesta de reorganización corporativa de la AEEPR, incluyendo información acerca de cada una de sus subsidiarias y filiales; (ii) explicación en detalle del servicio de la deuda suponiendo una reestructuración libre de deuda, y las repercusiones de la deuda irrestricta sobre la factura mensual promedio de un usuario residencial; (iii) una propuesta de reforma de pensiones y su financiamiento; (iv) transparencia en la planificación y dotación de los planes de inversión de capital, incluyendo la relación entre el plan de infraestructuras de la AEEPR y el plan de subsanación del Sistema de TyD de LUMA; (v) aplicación y fuentes de fondos federales; (vi) detalles de las medidas operativas y costos afines, incluyendo estrategia de compras y suministro de combustibles, gestión de la vegetación y mantenimiento necesario; (vii) cumplimiento de las decisiones y normativa en materia de recursos del NEPR; y (viii) actualización de las proyecciones financieras sobre la base del presupuesto y de la asignación presupuestaria de LUMA Energy.

La Junta de Supervisión solicitó que el plan fiscal revisado se presentara como más tardar el 31 de mayo de 2022, y el Gobernador lo hizo a día siguiente, 1 de junio de 2022. El 7 de junio

de 2022, la Junta de Supervisión cursó una notificación de vulneración de la Sección 201(c)(3)(B)(i) de la Ley PROMESA, comunicando al Gobernador que el plan fiscal propuesto requería una serie de revisiones y de información justificativa adicional para poder ser certificado. Específicamente, la Junta de Supervisión pidió que el plan fiscal se revisara para reflejar un presupuesto equilibrado, ya que incluía un total de gastos superior a los ingresos debido a la asignación de ingresos propuesta de LUMA Energy. La Junta de Supervisión instó a la AEEPR a colaborar con LUMA Energy para presentar un plan fiscal revisado, como más tardar el 17 de junio de 2022.

El 16 de junio de 2022, la AEEPR solicitó una prórroga, hasta el 22 de junio de 2022, para presentar el plan fiscal, lo cual la Junta de Supervisión aceptó el 20 de junio. La AEEPR presentó el plan fiscal revisado el 22 de junio, y lo complementó con datos adicionales al día siguiente. Tras exhaustivas negociaciones entre los expertos y consultores del Gobierno y de la Junta de Supervisión por las reservas de esta última acerca del plan fiscal propuesto, la Junta de Supervisión elaboró el plan fiscal revisado de la AEEPR. El 28 de junio 2022, la Junta de Supervisión certificó dicho plan fiscal revisado (el "Plan fiscal de junio de 2022").

También el Plan fiscal de junio de 2022 se centraba en transformar la AEEPR en un servicio público seguro, confiable y asequible. Así, el Plan fiscal de junio de 2022 detallaba las medidas necesarias para concluir el traspaso de las operaciones y mantenimiento de los Activos de generación de la AEEPR a operadores privados, para modernizar los recursos de generación eléctrica e incrementar la generación de energías renovables. El Plan fiscal de junio de 2022 contempla el apoyo de la AEEPR a las iniciativas del NEPR para la adopción de energías renovables, y también establece la existencia de casi $11,000 millones en fondos federales para mejorar el sistema eléctrico.

El Plan fiscal de junio de 2022 prevé que el consumo eléctrico seguirá cayendo debido a la falta de crecimiento económico y al retroceso demográfico. Las previsiones del Plan fiscal de junio de 2022 apuntan a que la AEEPR realizará considerables procesos hacia el cumplimiento de los objetivos de eficiencia energética y recursos renovables. Sin embargo, por primera vez el Plan fiscal de junio de 2022 incluye una previsión alternativa que refleja las proyecciones del consumo eléctrico basadas en las condiciones de mercado, incluyendo los retrasos en la adopción de medidas energéticas más eficientes, con el objeto de reflejar las incertidumbres de la futura demanda de energía.

Por otra parte, Plan fiscal de junio de 2022 indica que las aportaciones al plan de pensiones de la AEEPR son insuficientes, que los activos de dicho plan disminuyen rápidamente y que se requiere una reforma de las pensiones para atender a las continuas necesidades de los pensionistas, ajustada a las futuras reducciones de la demanda de electricidad.

2.   **Presupuestos**

La Sección 202(c)(1) de la Ley PROMESA enuncia un proceso para la aprobación de presupuestos anuales que debe ajustarse al plan fiscal certificado. En primera instancia, la Sección 202(c)(1) ofrece al Gobernador la oportunidad inicial de preparar y presentar a la Junta de Supervisión un presupuesto aplicable al año fiscal. Seguidamente, la Junta de Supervisión efectúa una revisión detallada del presupuesto propuesto para asegurarse de que los gastos son

congruentes con el plan fiscal certificado. Si la Junta de Supervisión determina que el presupuesto no es compatible con el plan fiscal, notifica la vulneración al Gobernador, que deberá corregirla. Si el Gobernador omite elaborar un presupuesto compatible, la Junta de Supervisión se encarga de hacerlo y lo presenta al Gobernador.

Mediante un proceso colaborativo con el Gobierno del Estado Libre Asociado, la Junta de Supervisión ha certificado presupuestos de la AEEPR que se ajustan a los objetivos de los planes fiscales ya descritos, con el objeto de asegurarse de que la AEEPR va en camino de convertirse en un servicio público asequible, seguro y confiable.

a)      **La certificación del Presupuesto del año fiscal 2018**

El 19 de junio de 2017, el Gobernador envió a la Junta de Supervisión una propuesta de presupuesto para el año fiscal 2018, relacionada con el Plan fiscal de abril de 2017. Tras exhaustivas negociaciones entre la Junta de Supervisión, el Gobernador y la AEEPR, la Junta determinó que el presupuesto propuesto se ajustaba al Plan fiscal de abril de 2017. La Junta de Supervisión certificó dicho presupuesto el 30 de junio de 2017 (el "Presupuesto del año fiscal 2018").

Sin embargo, como ya se ha descrito, el Plan fiscal de abril de 2017 siguió sujeto a revisión, y la Junta de Supervisión solicitó que se presentara un plan fiscal revisado, conjuntamente con un presupuesto compatible, en un plazo de cuarenta y cinco (45) días desde la certificación del Presupuesto del año fiscal 2018. Con todo, cuando no fue posible conseguir las modificaciones del Plan fiscal de abril de 2017 solicitadas por la Junta de Supervisión, el Presupuesto del año fiscal 2018 siguió vigente. El Presupuesto del año fiscal 2018 estipulaba gastos del orden de los $1,070 millones, de los cuales $471 eran costos laborales, $265 millones gastos operativos no laborales y $332 millones en gastos de mantenimiento.

b)      **La certificación del Presupuesto del año fiscal 2019**

El 12 de diciembre de 2017, la Junta de Supervisión envió una carta al Gobernador definiendo seis principios directrices y estableciendo un cronograma en virtud de los cuales el Gobernador debería presentar una propuesta de presupuesto para el año fiscal 2019. Los seis principios directrices eran: (i) todos los presupuestos debían ajustarse al plan fiscal correspondiente, y prepararse de conformidad con las normas contables de devengo modificadas; (ii) las previsiones de ingresos debían ser proporcionadas por la Junta de Supervisión al Gobernador, a la Asamblea Legislativa y a los organismos directivos para ser utilizadas en la preparación de los presupuestos pertinentes; (iii) los gastos presupuestados debían ser debidamente justificados; (iv) el Gobernador, la Junta de Supervisión y el Gobierno pactarían modelos de plantillas para presentar sus informes; (v) era fundamental una clara responsabilidad en la implementación de todas las partidas del presupuesto; y (vi) todos los gastos, incluyendo las inversiones de capital, del Estado Libre Asociado y de sus instrumentalidades se realizarían exclusivamente de conformidad con el presupuesto certificado por la Junta de Supervisión.

El cronograma para la presentación de la propuesta de presupuesto se prorrogó varias veces, la última vez hasta el 18 de junio de 2018. El Gobernador presentó la propuesta de presupuesto vinculada al Plan fiscal de abril de 2018 el día 13 de junio de 2018. El 26 de junio

de 2018, la Junta de Supervisión comunicó al Gobernador que el presupuesto propuesto no se ajustaba al Plan fiscal de abril de 2018.

La Junta de Supervisión preparó un presupuesto revisado compatible con el Plan fiscal de abril de 2018, y lo certificó el 30 de junio de 2018 (el "<u>Presupuesto original del año fiscal 2019</u>"). Dicho Presupuesto original del año fiscal 2019 contemplaba unos ingresos totales del orden de los $2,900 millones, y gastos de aproximadamente $3,100 millones, con un déficit presupuestario de unos $164 millones. Además, la Junta de Supervisión señaló que, dado que el Plan fiscal de abril de 2018 sería revisado en el futuro para ajustarlo con el plan fiscal más reciente del Estado Libre Asociado, también el Presupuesto original del año fiscal 2019 tendría que ser revisado.

En una carta del 1 de agosto de 2018, la Junta de Supervisión solicitó que el Presupuesto original del año fiscal 2019 se ajustara como resultado de las revisiones practicadas en el Plan fiscal de agosto de 2018, lo cual resultó en una disminución de los ingresos de la AEEPR de aproximadamente $7 millones. La Junta de Supervisión pidió que se enviarse un presupuesto revisado como más tardar el 6 de agosto de 2018, y la AEEPR así lo hizo.

El 12 de agosto de 2018, la Junta de Supervisión cursó una notificación de vulneración de la Sección 202(c)(1)(B) de la Ley PROMESA en relación con el borrador de presupuesto, señalando que no cumplía con el Plan fiscal de agosto de 2018 porque (i) los gastos eran incongruentes con los establecidos en el plan fiscal, (ii) no se ajustaba a algunas de las directrices de preparación de presupuestos de la Junta de Supervisión, y (iii) no incluía un desglose de los gastos de mano de obra y de mantenimiento. La Junta de Supervisión solicitó que se le enviara un presupuesto revisado como más tardar el 15 de agosto de 2018.

Como no se envió un presupuesto compatible, la Junta de Supervisión elaboró un presupuesto revisado acorde con el Plan fiscal de agosto de 2018, y lo certificó el 28 de septiembre de 2018 (el "<u>Presupuesto revisado del año fiscal 2019</u>"), que se consideró vigente a partir del 1 de julio de 2018. El Presupuesto revisado del año fiscal 2019 contemplaba ingresos totales del orden de los $3,010 millones y gastos de unos $2,980 millones, con un superávit presupuestario de aproximadamente $17 millones.

### c)   La certificación del Presupuesto del año fiscal 2020

El 12 de marzo de 2019, la Junta de Supervisión anunció el cronograma del presupuesto del año fiscal 2020, en virtud del cual la propuesta de presupuesto debía presentarse hasta el 22 de mayo de 2019. Dicha propuesta, vinculado al Plan fiscal de junio de 2019 (que originalmente había sido enviado en mayo), fue entregada el 24 de mayo de 2019. La Junta de Supervisión certificó el Plan fiscal de junio de 2019 el 27 de junio de 2019, y la Junta de Supervisión y el Gobierno iniciaron exhaustivas negociaciones sobre la propuesta de presupuesto. El 29 de junio de 2019, el Gobernador envió un presupuesto revisado.

La Junta de Supervisión determinó que el presupuesto revisado no se ajustaba al Plan fiscal de junio de 2019 y, por consiguiente, preparó un presupuesto revisado compatible y lo certificó el 30 de junio de 2019 (el "<u>Presupuesto del año fiscal 2020</u>"). El Presupuesto del año fiscal 2020 contemplaba ingresos totales del orden de los $3,200 millones y gastos de

aproximadamente $3,000 millones, además del cargo de los $158 millones del AAR, con lo que se generaba un superávit presupuestario de unos $3.6 millones.

Además, el Presupuesto del año fiscal 2020 restringía a la AEEPR de reasignar cualesquiera cuantías presupuestadas durante el año fiscal 2020, salvo las presupuestadas para la compra de combustibles y energía, gastos susceptibles de fluctuar debido a factores del mercado, o incrementarse lo necesario para mantener el sistema eléctrico. El resto de los gastos contenidos en el Presupuesto del año fiscal 2020, incluyendo cualquiera de sus partidas, solamente podrían ser reasignados con la previa aprobación de la Junta de Supervisión. Además, el Presupuesto del año fiscal 2020 estipulaba la presentación de informes trimestrales explicando cualesquiera variaciones. La Junta de Supervisión se reservó el derecho de establecer un cronograma para la revisión del Presupuesto del año fiscal 2020 a su absoluta discreción.

### d)    La certificación del Presupuesto del año fiscal 2021

El 19 de junio de 2020, la AEEPR presentó una propuesta de presupuesto para el año fiscal 2021, vinculado al Plan fiscal de junio de 2020. El 29 de junio de 2020, tras haber certificado el Plan fiscal de junio de 2020 en esta misma fecha, la Junta de Supervisión cursó una notificación de vulneración de la Sección 202(c)(1)(B) de la Ley PROMESA, estableciendo que el presupuesto propuesto era incompatible con el Plan fiscal de junio de 2020 debido a que no incluía suficientes datos justificativos de algunos gastos. La Junta de Supervisión solicitó recibir un presupuesto revisado como más tardar el 30 de junio de 2020, y el Gobernador así lo hizo en esa misma fecha.

La Junta de Supervisión determinó que el presupuesto revisado no se ajustaba al Plan fiscal de junio de 2020 y, por consiguiente, preparó un presupuesto revisado compatible y lo certificó el 30 de junio de 2020 (el "Presupuesto original del año fiscal 2021"). Dicho Presupuesto original del año fiscal 2021 contemplaba unos ingresos totales del orden de los $2,700 millones, y gastos de aproximadamente $2,900 millones, con un déficit presupuestario de unos $126 millones.

Además, el Presupuesto original del año fiscal 2021 incluía disposiciones que suprimían la ejecución de cualesquiera gastos autorizados para un año fiscal anterior, exigiendo a la AEEPR que certificara si existían cuantías no utilizadas del año fiscal 2020 en determinadas partidas, y prohibiendo la utilización de dichas cuantías salvo que la Junta de Supervisión lo autorizara expresamente. Además, el Presupuesto original del año fiscal 2021 impedía a la AEEPR reasignar importes presupuestados contenidos en el presupuesto sin la previa autorización de la Junta de Supervisión. Sin embargo, con respecto a los gastos presupuestados para la compra de combustibles y energía, la aprobación de la Junta de Supervisión podría obtenerse en un plazo de cinco (5) días desde la reasignación. Además, el Presupuesto original del año fiscal 2021 estipulaba la presentación de informes mensuales explicando cualesquiera variaciones. La Junta de Supervisión se reservó el derecho de establecer un cronograma para la revisión del Presupuesto original del año fiscal 2020 a su absoluta discreción.

El 27 de abril de 2021, la Junta de Supervisión un cronograma para la revisión del presupuesto del año fiscal 2021, con el objeto de financiar un Programa de Transición Voluntario ("PTV") para los empleados de la AEEPR, que reflejaba una aportación de fondos del Estado

Libre Asociado a la AEEPR, así como una dotación de fondos para cuentas de reserva operativas para garantizar el capital circulante necesario para el contrato mediante el cual LUMA Energy asumiría la operación y gestión del Sistema de TyD de la AEEPR. La Junta de Supervisión pidió que se le propusiera un presupuesto revisado como más tardar el 29 de abril de 2021. Además, la Junta estimó que el total de los fondos que requerían las cuentas de reserva ascendía a aproximadamente $1,000 millones, $750 millones de los cuales los aportaría el Estado Libre Asociado, y $250 millones procederían del efectivo de la AEEPR. Además, la Junta de Supervisión solicitó a la AEEPR que identificara fondos para el PTV.

La Junta de Supervisión y el Gobernador prepararon conjuntamente el presupuesto revisado del año fiscal 2021, que la Junta de Supervisión certificó el 11 de mayo de 2021 (el "Presupuesto revisado del año fiscal 2021"). Dicho Presupuesto revisado del año fiscal 2021 preveía unos ingresos de aproximadamente $2,700 millones, y gastos de operación y mantenimiento por un total de $2,900 millones, al igual que el Presupuesto original del año fiscal 2021. Además, incorporaba gastos de $1,000 millones para dotar las cuentas de reserva y de $85 millones para el PTV, así como una aportación de $750 millones del Estado Libre Asociado, con lo cual el déficit presupuestario ascendía a unos $461 millones.

Por otra parte, el Presupuesto revisado del año fiscal 2021 estipulaba que las cuantías aportadas por el Estado Libre Asociado para dotar las cuentas de reserva se mantuvieran bajo la custodia del Departamento de Hacienda y no se transfirieran a la AEEPR hasta que LUMA Energy comenzara a prestar sus servicios. Una vez que se extinga el contrato con LUMA Energy, la AEEPR vendrá obligada a devolver los fondos al Estado Libre Asociado.

El Presupuesto revisado del año fiscal 2021 contenía las mismas restricciones de uso de los fondos sobrantes de años fiscales anteriores, de reasignación de gastos presupuestados y de informes mensuales. Se consideró que el Presupuesto revisado del año fiscal 2021 entró en vigor el 1 de julio de 2020.

### e)   La certificación del Presupuesto del año fiscal 2022

El 25 de febrero de 2021, la Junta de Supervisión anunció el cronograma para el presupuesto del año fiscal 2022, en virtud del cual la propuesta de presupuesto debía enviarse hasta el 12 de abril de 2021, fecha que posteriormente se prorrogó hasta el 20 de abril de 2021.

El 25 de mayo de 2021, la Junta de Supervisión cursó una notificación de vulneración de la Sección 202(c)(1)(B) de la Ley PROMESA, por cuanto no se había presentado ninguna propuesta de presupuesto. La Junta de supervisión pidió que se le enviara una propuesta de presupuesto como más tardar el 27 de mayo de 2021, y adjuntó directrices para su preparación. Específicamente, la Junta de Supervisión estipuló que el presupuesto propuesto reflejara, entre otras cosas, una propuesta para la reforma y dotación del sistema de pensiones, aportara suficiente información justificativa de ciertas partidas de gastos laborales, e incluyese los gastos vinculados con la transición a LUMA Energy. El 27 de mayo de 2021, el Gobernador envió una propuesta de presupuesto.

La Junta de Supervisión determinó que el presupuesto propuesto no se ajustaba al Plan fiscal de mayo de 2021 y, por consiguiente, preparó un presupuesto revisado compatible y lo

170

certificó el 31 de mayo de 2021 (el "<u>Presupuesto original del año fiscal 2022</u>"). Dicho
Presupuesto original del año fiscal 2022 contemplaba unos ingresos totales del orden de los
$3,100 millones, y gastos de aproximadamente $3,100 millones, con un déficit presupuestario de
unos $6 millones.

El 17 de junio de 2021, tras consultar a la AEEPR ciertos ajustes técnicos del Dicho
Presupuesto original del año fiscal 2022, la Junta de Supervisión solicitó al Gobernador que
presentara un presupuesto revisado como más tardar el 21 de junio de 2021. El Gobernador envió
un presupuesto revisado en tal fecha, y el 24 de junio de 2021 la Junta de Supervisión cursó una
notificación de vulneración de la Sección 202(c)(1)(B) de la Ley PROMESA, pidiendo que el
presupuesto propuesto fuese corregido para (i) reflejar una reducción de los costos laborales por
los empleados que se jubilarían o que se cesarían de sus cargos por otros motivos durante el año
fiscal 2022, (ii) no reflejar el pago de la bonificación de Navidad, a tenor del Plan fiscal de mayo
de 2021, (iii) actualizar el presupuesto de servicios compartidos, que estaba basado en
información desfasada, y (iv) corregir la metodología de los servicios compartidos por ser
diferente de la utilizada por LUMA Energy y el NEPR. El 25 de junio de 2021, el Gobernador
envió una propuesta de presupuesto.

La Junta de Supervisión determinó que el presupuesto revisado no se ajustaba al Plan
fiscal de mayo de 2021 y, por consiguiente, preparó un presupuesto revisado compatible y lo
certificó el 30 de junio de 2021 (el "<u>Presupuesto revisado del año fiscal 2022</u>"). Dicho
Presupuesto revisado del año fiscal 2022 contemplaba unos ingresos totales del orden de los
$3,100 millones, y gastos de aproximadamente $3,100 millones, con un superávit presupuestario
de unos $6.5 millones.

Los presupuestos original y revisado del año fiscal 2022 contenían las mismas
restricciones de uso de los fondos sobrantes de años fiscales anteriores y de reasignación de
gastos presupuestados que en años anteriores, aunque estipulaba la presentación de informes
trimestral, en lugar de mensual. Se consideró que el Presupuesto revisado del año fiscal 2022
entró en vigor el 1 de julio de 2021.

f)   **La certificación del Presupuesto del año fiscal 2023**

El 22 de febrero de 2022, la Junta de Supervisión anunció el cronograma para el
presupuesto del año fiscal 2023, en virtud del cual la propuesta de presupuesto debía enviarse
hasta el 1 de junio de 2022. Esta fecha posteriormente se prorrogó hasta el 22 de junio de 2022,
fecha en la cual el Gobernador envió la propuesta de presupuesto.

El 28 de junio de 2022, la Junta de Supervisión cursó una notificación de vulneración de
la Sección 202(c)(1)(B) de la Ley PROMESA, por cuanto no se había presentado ninguna
propuesta de presupuesto. La Junta de supervisión pidió que se le enviara una propuesta de
presupuesto como más tardar el 29 de junio de 2022, y adjuntó directrices para su preparación.
Específicamente, la Junta de Supervisión solicitó, entre otras cosas, que la propuesta eliminara
los déficits operativos y priorizara el mantenimiento necesario, reasignara ciertos gastos a otras
filiales de la AEEPR, disminuyese las rebajas de ingresos de ventas de electricidad de los gastos
de impagados y asignara gastos de manera transparente en lugar de agruparlos.

El Gobernador no envió una propuesta de presupuesto en plazo, por lo cual la Junta de Supervisión preparó un presupuesto revisado y lo certificó el 30 de junio de 2022 (el "Presupuesto del año fiscal 2023"). Dicho Presupuesto del año fiscal 2023 prevé ingresos totales del orden de los $4,600 millones, y unos gastos de unos $4,600 millones.

[*El resto de la página se ha dejado intencionadamente en blanco*]

## V.  Descripción general del Caso del Título III de la AEEPR

**A.      Inicio del Caso del Título III de la AEEPR**

1.       **Presentación de la Petición del Título III de la AEEPR**

Antes de la promulgación de la Ley PROMESA, la AEEPR había negociado el AAR previo a la petición con algunos de sus acreedores que, aunque no fue definitivo ni entró en vigor, tuvo por objetivo culminar en un acuerdo que constituyera la base de una modificación cualificad a tenor del Título VI de la Ley PROMESA. En el marco del AAR previo a la petición, los Bonistas aceptaron una reducción del 15% de la cuantía de capital de los bonos circulantes de la AEEPR. A cambio, las reclamaciones de los Bonistas se convertirían en reclamaciones garantizadas. Además, el AAR previo a la petición protegía a los Bonistas imponiendo una titulación de las tarifas, en virtud de la cual la AEEPR podría implementar aumentos automáticos de las tarifas como respuesta a la caída de la demanda. Tras asumir su cargo en enero de 2017, el Gobernador Rosselló supervisó las negociaciones con los Bonistas. Desde el comienzo de las negociaciones del AAR previo a la petición hasta el comienzo del Caso del Título III, la AEEPR y al Junta de Supervisión continuaron estudiante un ajuste exhaustivo de la deuda, y en varias ocasiones convinieron prorrogar el plazo y modificar las cláusulas del AAR previo a la petición. Sin embargo, en última instancia las partes no pudieron alcanzar un acuerdo debido a numerosas cuestiones sustanciales, incluyendo, entre otras, cómo podrían las Aseguradoras monolínea aportar los necesarios aplazamientos de capital y el establecimiento de una nueva estructura de tarifas eléctricas. Al mismo tiempo, la AEEPR no consiguió obtener los centenares de millones de dólares en liquidez a corto plazo que hubieran sido necesarios para la implementación del AAR previo a la petición.

El 28 de junio de 2017, la Junta de Supervisión rechazó certifica el AAR previo a la petición, y no autorizó a la AEEPR invocar el Título VI de la Ley PROMESA. En consecuencia, el 2 de julio de 2017 la Junta de Supervisión emitió un certificado de reestructuración a tenor de las Secciones 104(j) y 206 de la Ley PROMESA, y presentó una petición voluntaria de quiebra para la AEEPR, de conformidad con la Sección 304(a), iniciándose así el Caso del Título III de la AEEPR. El 6 de octubre de 2017, el Tribunal del Título III dictó una orden otorgando la administración conjunta de los Casos del Título III del Estado Libre Asociado, la ACT, el SRE y COFINA, así como el presente Caso del Título III, exclusivamente a efectos procesales [ECF núm. 340]. El comienzo de este Caso del Título III activó la paralización automática prevista por la Sección 362 del Código de Quiebras, protegiendo así a la AEEPR contra acciones ejecutivas mientras durara este Caso del Título III.[221]

2.       **Designación de los Comités Estatutarios**

El 15 de junio de 2017 fueron designados el CANA (UCC, por sus siglas en inglés) y el comité de retirados (el "Comité de Retirados") [Caso núm. 17-bk-3283, ECF núm. 338, 340]. Los actuales miembros del CANA son (i) la American Federation of Teachers ("AFT"); (ii) Baxter Sales and Distribution Puerto Rico Corp.; (iii) Drivetrain, LLC, en calidad de fideicomisario de los acreedores de Doral Financial Corporation; (iv) Genesis Security Services,

---

[221] PROMESA § 301(a).

Inc.; (v) la Service Employees International Union; (vi) Tradewinds Energy Barceloneta, LLC.; y (vii) The Unitech Engineering Group, S.E. [Caso núm. 17-bk-3283, ECF núm. 20691]. Los actuales miembros del Comité de Retirados son (i) Blanca Paniagua; (ii) Carmen Núñez; (iii) José Marín; (vi) Juan Ortiz; (v) Lydia Pellot; (vi) Marcos A. López; (vii) Miguel Fabre; (viii) Milagros Acevedo; y (ix) Rosario Pacheco [Caso núm. 17-bk-3283, ECF núm. 1062].

## B.     Los desastres naturales y la respuesta de la Junta de Supervisión

### 1.     Huracanes Irma y María

Poco después del comienzo del Caso del Título III de la AEEPR, en septiembre de 2017, los huracanes Irma y María sacudieron Puerto Rico, provocando daños generalizados en toda la isla y exacerbando los problemas económicos más descritos. El huracán María tocó tierra en Puerto Rico el 20 de septiembre de 2017, trayendo consigo vientos sostenidos de 155 millas por hora, y abundantes lluvias durante 30 horas. El María cruzó Puerto Rico diagonalmente, entrando por el sudeste y saliendo por el noroeste. El huracán causó una desastrosa destrucción en Puerto Rico, que se quedó completamente a oscuras y con numerosas calles y carreteras inundadas. Solamente dos semanas antes del María, el huracán Irma —uno de los más fuertes jamás registrados en la historia del Atlántico— pasó por la costa norte de Puerto Rico.

Los huracanes Irma y María provocaron daños catastróficos en el Sistema de TyD de la AEEPR, afectaron gravemente a los activos de generación y arrasaron infraestructuras críticas de comunicaciones y control, lo cual se tradujo en el apagón más prolongado de la historia de EE.UU.[222] Resultaron dañados más de 2,700 postes de transmisión, y quedaron afectadas el 92% de las subestaciones inspeccionadas. El 41% de ellas sufrieron importantes daños.[223] La AEEPR estimó un lucro cesante total de aproximadamente $1,200 millones en recaudación durante los primeros seis meses posteriores a los huracanes.[224]

Como resultado del masivo impacto de los huracanes, el Gobierno y la Junta de Supervisión emprendieron una serie de actuaciones para abordar la crisis. La Junta de Supervisión (a través de sus integrantes y de su personal ejecutivo) estuvo muy activa en Washington D.C. para promover la obtención de los recursos necesarios para la recuperación, las iniciativas de reconstrucción críticas y la liquidez requerida para mantener los servicios. La Junta de Supervisión se unió a Gobernador para solicitar dispensas de costos compartidos, eliminar topes de financiamiento, incrementar la asistencia financiera y, lo más importante, agilizar las respuestas a las peticiones del Gobernador.[225] Numerosos funcionarios de la Junta de Supervisión comparecieron ante diversos comités del Congreso para testificar.[226] Además, la

---

[222] *Véase* Moción de financiamiento de la AEEPR, en ¶ 17.

[223] *Plan Fiscal Certificado 2022 para la Autoridad de Energía Eléctrica de Puerto Rico*, 67 (28 de junio de 2022).

[224] *Véase* Moción de financiamiento de la AEEPR, ¶ 19.

[225] Comunicado de presa, Junta de Supervisión y Administración financiera para Puerto Rico, La Junta de Supervisión reclama el máximo apoyo para Puerto Rico a funcionarios de la Administración Trump y al Congreso (30 de septiembre de 2017), https://drive.google.com/file/d/1kD5kywyNexMkbEdtjQynZax5gcnYPhSV/view.

[226] *Véase* Testimonio escrito de Natalie Jaresko, Directora Ejecutiva, Junta de Supervisión y Administración Financiera ante el Comité de Recursos Naturales de la Cámara de Representantes, "Análisis de los retos de la recuperación de Puerto Rico y papel de la Junta de Supervisión y Administración Financiera" (7 de noviembre de 2017),

Junta de Supervisión escribió al Presidente, al Secretario del Tesoro de los Estados Unidos y a los líderes políticos del Congreso solicitando formalmente apoyo.[227] La Junta de Supervisión mantuvo reuniones con autoridades federales y territoriales de Puerto Rico desde pocas horas después de los huracanes hasta hoy en día, incluyendo decenas de encuentros con funcionarios de la FEMA en sus centrales locales, y otras tantas con funcionarios territoriales.

El 21 de septiembre de 2017, la Junta de Supervisión autorizó al Gobierno a "reasignar" hasta $1,000 millones de su presupuesto a fondos de emergencia para la recuperación de los efectos de los huracanes, y garantizar de disponer de recursos para iniciar inmediatamente las iniciativas de respuesta y recuperación de emergencia en espera de los fondos federales. Esto permitiría al Gobierno actuar rápidamente para reasignar (reprogramar) fondos según fuera necesario, sin la previa autorización para mover fondos por parte de la Junta de Supervisión.

El 4 de octubre de 2017, tomando en cuenta la necesidad de centrarse en la situación de los residentes para restablecer los servicios básicos, así como la naturaleza de la destrucción sufrida por el país, la Junta de Supervisión (a) retiró la demanda que había iniciado para forzar al Gobierno a implementar ciertos cambios en el plan fiscal certificado, y (b) retrasó la implementación de cualesquiera medidas de autorización durante al menos un año.

Además, el 28 de agosto de 2018, la Junta de Supervisión certificó el plan de recuperación (el "Plan de recuperación"), siguiendo las instrucciones del Congreso en el marco de la Ley de Presupuesto Bipartito, aunque incluyó dos salvedades en la certificación. En primer lugar, la Junta de Supervisión expresó su preocupación por el hecho de que el Plan de recuperación no detallara de manera suficiente las fuentes de financiamiento, y estimó que se requerirían muchos más fondos federales de lo que proyectaba el plan fiscal certificado para Puerto Rico. En segundo lugar, la Junta de Supervisión señaló que el Plan de recuperación no abordaba las medidas de supervisión de los fondos federales ni del proceso de recuperación. El Plan de recuperación no fue puesto a consideración de la Junta de Supervisión hasta después de que el Gobierno lo presentara al Congreso.

---

https://drive.google.com/file/d/1prDID1QmnX_nD2XwZmRl2AzAZzgIDsMA/view; Testimonio escrito de Noel Zamot, Director Ejecutivo, Junta de Supervisión y Administración Financiera ante el Comité de Recursos Naturales de la Cámara de Representantes, "Análisis de los retos de la recuperación de Puerto Rico y papel de la Junta de Supervisión y Administración Financiera" (7 de noviembre de 2017), https://drive.google.com/file/d/1p9zv_86gXQ7XeD1o9Gopw_xs5c-5KrGp/view.

[227] *Véase* Carta de José B. Carrión, Junta de Supervisión y Administración Financiera para Puerto Rico a los líderes del Congreso de Estados Unidos, 3 de octubre de 2017, https://drive.google.com/file/d/1XkrMHCDxl-eiDbAcnjt8RFHrri7jAoCj/view; Carta de José B. Carrión, Junta de Supervisión y Administración Financiera para Puerto Rico al Presidente Trump (6 de octubre de 2017), https://drive.google.com/file/d/1gkGAw4WcH9kIBNOsANsnTw7-yKoiCDkx/view; Carta de José B. Carrión, Junta de Supervisión y Administración Financiera para Puerto Rico a Steven Mnuchin, Secretario del Tesoro de Estados Unidos (10 de octubre de 2017), https://drive.google.com/file/d/1dHC0i3yiggV_5aDXG-Lmy0IkLR1tCih6/view; Comunicado de prensa, Junta de Supervisión y Administración Financiera para Puerto Rico. El Gobernador y la Junta de Supervisión y Administración Financiera para Puerto Rico piden a la Administración Trump que aborde los problemas de liquidez tras el huracán María (10 de octubre de 2017), https://drive.google.com/file/d/1gJmhmQMusQDTo2dh6Bdh-0jYJHrU5aQH/view.

2.     **Huracán Dorian**

El 27 de agosto de 2019, el Presidente Trump publicó una declaración de emergencia para abordar el huracán Dorian, que tocó tierra en Puerto Rico el 26 de agosto de 2019. En su declaración, autorizaba a la FEMA a coordinar las iniciativas de recuperación de desastres. El 28 de agosto de 2019, la Junta de Supervisión autorizó el uso de $260 millones en fondos de reserva para emergencias de los años fiscales 2019 y 2020 para abordar las consecuencias del Dorian.

3.     **Terremotos de enero de 2020**

A partir del 28 de diciembre de 2019, Puerto Rico se vio sacudida por una serie de terremotos y réplicas. Desde entonces, la isla ha sufrido más de 2,000 sismos o temblores, el mayor de los cuales se produjo el 7 de enero de 2020 y que alcanzó una magnitud máxima de 6.4.

Tras el terremoto del 7 de enero de 2020, la FEMA anunció que había puesto a disposición de Puerto Rico ayuda federal de emergencia para complementar las tareas locales de respuesta, tras una petición de la Gobernadora Vázquez. Además, la Junta de Supervisión aprobó la solicitud del Gobierno de disponer a los fondos de reserva para emergencias de los años fiscales 2019 y 2020, por una cuantía de unos $260 millones, para hacer frente a los gastos de emergencia a corto plazo relacionados con los terremotos. Estos fondos de reserva habían sido incluidos y certificados por la Junta de Supervisión en los presupuestos de los años fiscales 2019 y 2020, con el objeto de que el Estado Libre Asociado estuviera preparado para atender emergencias en caso de otro desastre natural después del huracán María. El 16 de enero de 2020, el Presidente Trump firmó una declaración sobre grandes desastres (la "Declaración de desastre mayor"), autorizando el acceso a recursos de socorro federales de las Categorías A y B, con una proporción de aportaciones del 75% de fondos federales y 25% de fondos locales. La Declaración de desastre mayor complementa las iniciativas locales de recuperación tras la serie continuada de terremotos. En este momento, dieciséis (16) municipios están cubiertos por la Declaración de desastre mayor, lo cual les da acceso a diversos instrumentos de asistencia federal, incluyendo ciertas disposiciones de la Ley Stafford. Entre los municipios acogidos actualmente a la Declaración de desastre mayor se incluyen: Adjuntas, Cabo Rojo, Corozal, Jayuya, Lajas, Lares, Maricao, San Germán, San Sebastián, Villalba, Guánica, Guayanilla, Peñuelas, Ponce, Utuado y Yauco.

Además, el 16 de enero de 2020, el Comité de Asignaciones de la Cámara de Representantes de EE.UU. aprobó un proyecto de gastos complementarios que proporcionaría a Puerto Rico $3,350 millones adicionales para hacer frente a los daños causados por los continuos terremotos y actividad sísmica. Ese paquete de $3,350 millones incluía $100 millones para educación, $1,250 para la reconstrucción de carreteras y $2,000 millones adicionales en el marco de los programas CDBG-DR.

4.     **Consecuencias de, y respuesta a, la COVID-19.**

Como consecuencia de la amenaza sanitaria, y a efectos de contener la propagación del virus en Puerto Rico, el 12 de marzo de 2020 la entonces Gobernadora Vázquez-Garced dictó una orden ejecutiva declarando el estado de emergencia en la isla, con el objeto de concentrar

176

todos los esfuerzos e implementar todas las medidas necesarias para proteger la salud, el bienestar y la seguridad pública de los ciudadanos del país. A resultas de las protecciones sociales y del confinamiento, que incluyeron toques de queda, para contener el virus, las operaciones y los resultados financieros de la AEEPR sufrieron una brusca caída. Las medidas requirieron que la AEEPR paralizara todas las obras no esenciales, incluyendo la gestión de la vegetación y los proyectos de mantenimiento, y conllevaron un deterioro de los niveles de generación y de las ventas. Hacia finales de marzo de 2020, la recaudación diaria había caído en un 50%, obligando a la AEEPR a implementar estrictos controles financieros para mantener la liquidez, Hacia finales de junio de 2020, la recaudación diaria promedio había vuelto a niveles normales en relación con las previsiones.

Para contribuir a luchar contra los efectos económicos de los confinamientos de la COVID-19, la orden ejecutiva de la Gobernadora autorizó al Secretario de Hacienda y al Director de la Oficina de Gestión y Presupuesto ("OGP") del Estado Libre Asociado a preparar un presupuesto con todos los fondos disponibles, incluyendo la Reserva de emergencia, para cubrir todos los costos necesarios de contención de la COVID-19 en todo Puerto Rico y para compartir información con los municipios.

Se canalizaron fondos federales y locales a particulares, familias, empresas, ONG y demás organizaciones de todo EE.UU., incluyendo Puerto Rico. El 3 de marzo de 2020, la Junta de Supervisión liberó al Gobierno $5 millones iniciales de los fondos de la Reserva de emergencia para contener y mitigar la COVID-19. El 13 de marzo de 2020, la Junta de Supervisión liberó los $260 millones restantes de la Reserva de emergencia para responder a la pandemia. El 23 de marzo de 2020, el Gobierno y la Junta de Supervisión convinieron aportar $787 millones en asistencia financiera (Paquete de Apoyo de Medidas de Emergencia) a quienes estaban en primera línea de lucha contra la pandemia y a los más afectados por las medidas de emergencia.

El 27 de marzo de 2020, el entonces Presidente Donald J. Trump ratificó la Ley de Ayuda, Alivio y Seguridad Económica por Coronavirus, Ley Pública núm. 116-136 (la "Ley CARES"). La Ley CARES creó el Fondo de Alivio del Coronavirus ("CRF"), que dispuso $150,000 millones de asistencia general para los gobiernos locales. En el marco del CRF, se canalizaron $2,200 millones de ayuda hacia Puerto Rico. Inicialmente, el plazo para gastar los fondos de CRF fue el 30 de diciembre de 2020, aunque se prorrogó hasta el 31 de diciembre de 2021, mediante la Ley de Asignaciones Consolidadas de 2021, Ley pública núm. 116-260, promulgada el 27 de diciembre de 2020. Además de la prórroga, la Ley combinaba estímulos de $900,000 millones para aliviar la pandemia en Estados Unidos, con una partida de gasto de $1,400,000,000,000 para el año fiscal federal 2021. De los aproximadamente $900,000 millones en estímulos, se estima que Puerto Rico recibió $7,000 millones. El 11 de marzo de 2021, el Presidente Biden ratificó el Plan de Rescate Americano de 2021 ("ARP"). El ARP asigna $1,900,000,000,000 en fondos, cambios de programas y políticas tributarias dirigidos a mitigar la continuidad de los efectos de la pandemia. Además, el ARP asignó $350,000 millones en ayuda a los gobiernos estatales y locales, de los cuales está previsto que Puerto Rico (incluyendo sus municipios) $4,000 millones.

5.       **Huracán Fiona**

El 18 de septiembre de 2022, el huracán Fiona tocó tierra en el sudoeste de Puerto Rico
como huracán de Categoría 1, provocando la caída de hasta treinta y dos (32) pulgadas de lluvia
en algunas regiones de la isla. Como resultado del Fiona, Puerto Rico sufrió graves
inundaciones, corrimientos de tierras y un apagón generalizado en toda la isla. Aunque todavía
prosiguen las evaluaciones, se estima que el Fiona ha provocado daños superiores a los $1,000
millones.[228]

6.       **Fondos federales de asistencia para desastres**

a)       **Alcance de los daños**

Existen diversas opiniones sobre cómo medir las repercusiones y el alcance de los daños
sufridos por la infraestructura de la AEEPR como consecuencia de los huracanes Irma y María, y
los recientes terremotos. Las siguientes fuentes aportan diversos métodos para medir las
repercusiones y el alcance de los daños de los huracanes Irma y María:

- El plan Reconstruir Mejor de Puerto Rico, publicado en noviembre de 2017, estimaba los
  costos de la reconstrucción en $94,400 millones, $17,800 millones de los cuales se
  solicitaban para las reparaciones de la red eléctrica.[229]

- "Transformación e innovación tras la devastación", plan certificado por la Junta de
  Supervisión en agosto de 2018, define la perspectiva del Gobierno de Puerto Rico sobre
  el conjunto de inversiones de capital necesarias para que el país se recupere de los
  huracanes Irma y María. Financiar íntegramente sus 270 actuaciones requeriría
  aproximadamente $139,000 millones distribuidos entre los años 2018 y 2028.[230]

- La Administración Oceánica y Atmosférica Nacional estima que los daños sufridos por
  Puerto Rico y las Islas Vírgenes estadounidenses como consecuencia del María suman
  $90,000 millones, con un margen de confianza del 90% de +/- $25,000 millones, o
  $65,000 a $115,000 millones.[231]

- En diciembre de 2018, la Junta de Planificación de Puerto Rico publicó un informe
  señalando que el impacto de la tormenta sobre la economía era de $43,135 millones,[232]

---

[228] *Véase* Administración Oceánica y Atmosférica Nacional, Desastres meteorológico y climatológicos de 1,000
millones de dólares, https://www.ncei.noaa.gov/access/billions/events/PR/2022?disasters[]=all-disasters.

[229] Gobernador de Puerto Rico, *Reconstruir mejor Puerto Rico* (noviembre de 2017),
http://www.documentcloud.org/documents/4198852-Build-Back-Better-Puerto-Rico.html.

[230] Oficina Central de Recuperación, Reconstrucción y Resiliencia, *Transformación e innovación tras la devastación:
un plan de recuperación económica y de desastres para. Puerto Rico* (8 de agosto de 2018), https://pr-
transformation-innovation-plan.pdf (prsciencetrust.org).

[231] Richard J. Pasch, Andrew B. Penny y Robbie Berg, *National Hurricane Center Tropical Cyclone Report:
Hurricane Maria* (National Hurricane Center) (14 de febrero de 2019),
https://www.nhc.noaa.gov/data/tcr/AL152017_Maria.pdf.

[232] *Véase* Antonio R. Gómez, *Junta de Planificación revisa sus números y reporta un alza,* Negocios, 4 de diciembre
de 2018.

que incluían tanto los daños físicos como la interrupción de la actividad económica (es decir, pérdidas por la caída de sistemas, etc.).

Además, los terremotos causaron no solamente significativos daños en hogares y edificios de la costa meridional de Puerto Rico, sino también en la central eléctrica de Costa Sur de la AEEPR, una instalación alimentada por gas natural que genera 820 MW, normalmente hasta el 25% de la electricidad de la isla.[233] Se estima que las reparaciones en la central de Costa Sur cuestan unos $39 millones.[234]

### b)   Asistencia federal aportada y pendiente de aportar

El Plan fiscal certificado proyectaba que se había comprometido un total de unos $14,000 millones de fondos de alivio a desastres procedentes de fuentes federales y estatales, para la reconstrucción de la infraestructura energética de la isla.[235]

A continuación se detallan las principales fuentes de fondos:

- **Programas de Asistencia Pública 426 y 408 de la FEMA:** La FEMA está autorizada, por las Secciones 406 y 428 de la Ley Stafford, para prestar asistencia a las administraciones locales a través de su Programa de Asistencia Pública ("Programa PA") en sus iniciativas de recuperación, en caso de desastres o emergencias declarados federalmente. En septiembre de 2020, la FEMA anunció sus planes de asignar aproximadamente $9,500 millones a la AEEPR para la reparación y/o sustitución de sistemas eléctricos, incluyendo miles de millas de líneas de TyD, subestaciones eléctricas, sistemas de generación de energía y edificios de oficinas, así como otras mejoras de la red eléctrica en el marco del Programa PA.[236] Hasta febrero de 2022, la AEEPR había recibido aproximadamente $1,800 en fondos del Programa PA de la FEMA.[237] Los fondos recibidos van destinados a gastos de contratistas, asistencia de ayuda mutua, costos incrementales incurridos por la AEEPR relacionados con el aumento del uso de las unidades de picos de generación, además de otros costos elegibles. Además, la AEEPR está cualificada para recibir fondos adicionales de conformidad con la Sección 406 de la Ley Stafford, que financia medidas de mitigación conjuntamente con la reparación de instalaciones dañadas por los desastres. Hasta febrero de 2022, la AEEPR había recibido fondos del Programa PA del orden de los $1,600 millones, vinculados con los huracanes Irma y María.[238] Además, la AEEPR recibió $238 millones del total asignado de $317 millones del Programa PA para los daños causados por los miles de terremotos que se produjeron desde 2019 hasta ahora.[239]

---

[233] *Plan Fiscal Certificado 2022 para la Autoridad de Energía Eléctrica de Puerto Rico*, 41 (28 de junio de 2022).

[234] *Ibídem*

[235] *Plan Fiscal Certificado 2022 para la Autoridad de Energía Eléctrica de Puerto Rico*, 81 (28 de junio de 2022).

[236] *Ibíd.*, en 90.

[237] *Ibídem* en 88, Anexo 32.

[238] *Ibíd.*, en 87.

[239] *Ibídem*.

- **Programa de Subvención para Mitigación de Riesgos 404 de la FEMA:** La Sección 404 de la Ley Stafford autoriza a la FEMA a prestar asistencia, a través del programa "FEMA 404 HMGP", para la reducción de riesgos a largo plazo tras un gran desastre. Los fondos del "FEMA 404 HMGP" también contribuyen a la reducción y eliminación de riesgos durante las tareas de recuperación inmediatas de un desastre. Hasta la fecha, la AEEPR no ha recibido fondos del "FEMA 404 HGMP".[240]

- **Recuperación de Desastres con Subsidios al Desarrollo Comunitario (CDBG-DR) del Departamento de Vivienda y Desarrollo Urbano (CDBG-DR):** Sobra la base del plan de acción presentado por el Departamento de Vivienda de Puerto Rico,[241] el Departamento de Vivienda y Desarrollo Urbano federal (HUD, por sus siglas en inglés) aporta los fondos del programa CDBG-DR, que pueden aplicarse a la asistencia a particulares (por ejemplo, reparaciones de viviendas) y a la asistencia pública (por ejemplo, desarrollo de infraestructuras), o bien por el Gobierno para ciertos costos operativos (por ejemplo, cubrir la equiparación de sus costos en el alivio a desastres). Hasta la fecha, la AEEPR ha recibido $1.8 millones en fondos de CDBG, relacionados con las unidades de pico tras el huracán Irma.[242]

### C.    Acuerdo en Apoyo de la Reestructuración de 2019

#### 1.    El AAR preliminar

El 30 de julio de 2018, tras meses de negociaciones, la Junta de Supervisión y la AAFAF anunciaron haber convenido un Acuerdo en apoyo de la reestructuración preliminar (el "AAR preliminar") con miembros del Grupo Ad Hoc. El AAR preliminar contemplaba la inclusión de diversos términos y condiciones de reestructuración en un eventual plan de ajuste, y estipulaba que las partes cooperarían para negociar un acuerdo en apoyo de la reestructuración definitivo.

#### 2.    El AAR de 2019

Tras el AAR preliminar, al Junta de Supervisión y la AAFAF continuaron negociando con el Grupo Ad Hoc los contenidos de un Acuerdo en apoyo de la reestructuración definitivo. Con posterioridad, Assured se incorporó a las negociaciones. El 3 de mayo de 2019, los esfuerzos por alcanzar una resolución consensuada culminaron con la formalización de un Acuerdo en apoyo de la reestructuración definitivo (el "AAR de 2019"), que disponía la resolución de las reclamaciones y derechos del Grupo Ad Hoc, de Assured y de otros tenedores de bonos no garantizados de la AEEPR que se incorporaran al AAR de 2019. El 9 de septiembre de 2019, el AAR de 2019 se modificó para permitir la incorporación de Syncora y de National.

---

[240] *Ibíd.*, en 88.

[241] El Gobernador de Puerto Rico designó al Departamento de Vivienda de la isla como responsable para administrar el programa de subvenciones CDBG-DR, en estrecha colaboración con la COR3. El HUD aprobó el Plan de acción correspondiente a la primera asignación de $1,500 millones el 29 de julio de 2018. El 28 de febrero de 2019, el HUD aprobó la Enmienda sustancial 1 del Plan de acción. En agosto de 2019 se envió al HUD la Enmienda no sustancial 2. El Plan de acción y posteriores enmiendas pueden consultarse en https://www.cdbg-dr.pr.gov/en/action-plan/.

[242] *Plan Fiscal Certificado 2022 para la Autoridad de Energía Eléctrica de Puerto Rico*, 89 (28 de junio de 2022).

El AAR de 2019 fue un acuerdo de conciliación complicado que abordaba los problemas económicos que afectaban a sus partes. El AAR de 2019 disponía convertir las reclamaciones de las Aseguradoras monolínea y del Grupo Ad Hoc (conjuntamente, los "Bonistas conciliadores") en reclamaciones garantizadas por las cuantías reducidas descritas a continuación. A cambio, el AAR de 2019 estipulaba la conciliación de todos los pleitos que los Bonistas conciliadores podrían emprender por sus reclamaciones de bonos, incluyendo su derecho a nombrar un síndico de conformidad con la Ley Habilitadora de la AEEPR.

Para resolver las garantías prendarias reclamadas del Grupo Ad Hoc sobre los ingresos de la AEEPR, así como otros derechos y reclamaciones, el AAR de 2019 debería haber proporcionado a las partes del AAR de 2019 bonos de titulización del Tramo A con una relación de canje del 67.5%, y bonos de titulización contingentes del Tramo B con una relación de canje del 10%. Además, el AAR de 2019 contenía una estructura de titulización en virtud de la cual (i) los bonos del Tramo A y del Tramo serían emitidos por una entidad instrumental especial independiente, en lugar de la propia AEEPR, y (ii) los bonos del Tramo A o del Tramo B no entrarían en mora si la carga de transición generara suficientes fondos para pagar el servicio de la deuda.

El AAR de 2019 contemplaba que la Asamblea Legislativa promulgara leyes para implementar la transacción de reestructuración de la AAR. Específicamente, el AAR de 2019 contemplaba legislación: (i) que impusiera una carga de transición no evitable; (ii) que otorgara a los titulares de nuevos bonos un gravamen sobre la "Propiedad reestructurada"; y (iii) que dispusiera la promulgación de ciertas protecciones de la demanda previstas para ofrecer garantías razonables de que la carga de transición habrá de ser pagada por los clientes que permanezcan en la red pero que hayan instalado equipos de generación de energía solar, y que las futuras políticas del Gobierno en materia de energía renovable o solar no supongan una reducción de los ingresos por la carga de transición contemplado por las partes del AAR 2019.

Aunque la Junta de Supervisión realizó numerosos intentos por conseguir la legislación requerida, no lo consiguió. El 8 de marzo de 2022, la AAFAF anunció su decisión de rescindir el AAR de 2019 a tenor de su derecho a hacerlo de conformidad con las Secciones 9(d)(iii) y 27 del AAR de 2019. El Gobierno llegó a la conclusión de que la implementación del AAR de 2019 no era viable ni defendía los mejores intereses de Puerto Rico, por cuanto las circunstancias prevalecientes en 2019, cuando se negoció originalmente, habían cambiado significativamente, incluyendo la situación económica mundial: la inflación galopante y escalamiento de los precios del crudo como consecuencia de la guerra en Ucrania.

3.      **Pleitos relacionados con el AAR**

a)   *Moción* **9019**

El 10 de mayo de 2019, la Junta de Supervisión, la AAFAF y la AEEPR presentaron la Moción 2019, solicitando la aprobación de ciertos acuerdos englobados en el AAR de 2019. La Moción 9019 pedía que el Tribunal aprobara determinados aspectos de los acuerdos contenidos en el AAR de 2019, incluyendo, entre otros, (i) admitir ciertas reclamaciones en cuantías reducidas; (ii) proporcionar a las partes que apoyan el AAR de 2019 ciertas contrapartidas y distribuciones en forma de reclamaciones de gastos administrativos; (iii) aprobar los términos del

acuerdo que requieren que la AEEPR presente y confirme un plan de ajuste a tenor de lo pactado en el AAR de 2019; y (iv) aprobar los términos del acuerdo que requieren que las partes que lo apoyan voten a favor del citado plan. El 30 de octubre de 2019, numerosas partes, incluyendo el CANA, la UTIER, el SRE de la AEE y los Prestamistas de la línea de combustibles presentaron objeciones a la Moción 9019, alegando, entre otros, que el acuerdo no era razonable ya que los Bonos de la AEEPR estaban garantizados exclusivamente por, y podían recurrir solamente a, las cuantías acreditadas a ciertas cuentas de depósito. *Véanse*, por ejemplo los [ECF núm. 1697, 1700, 1701]. En marzo de 2020, mientras la Junta de Supervisión se preparaba para procesar la Moción 9019 tras numerosos aplazamientos, la pandemia de la COVID-19 llegó con toda su fuerza a las costas de Puerto Rico y de Estados Unidos. El 27 de marzo de 2020, en respuesta a la amenaza de la COVID-19 y a sus potenciales efectos a largo plazo para la población y la economía de Puerto Rico, la Junta de Supervisión, la AEEPR y la AAFAF presentaron conjuntamente una moción solicitando el aplazamiento indefinido de todos los plazos vinculados con la Moción 9019 [ECF núm. 1947] (la "Moción de aplazamiento"). El 2 de abril de 2020, el Tribunal del Título III admitió la Moción de aplazamiento. [ECF núm. 1954]. Con sujeción a una única excepción, los bonistas de la AEEPR y las Aseguradoras monolínea aceptaron, o no objetaron, la Moción de aplazamiento o cualquiera de sus prórrogas. Durante todo este tiempo, la Moción 9019 no fue objeto de ninguna vista, no se resolvió y siguió pendiente.

El 18 de agosto del 2020, el CANA presentó una moción solicitando que el Tribunal del Título III extinguiera la Moción 9019 [Caso núm. 17-bk-4780, ECF núm. 2144] (la "Moción de extinción"). El CANA alegó que el Tribunal del Título III no era competente para decidir sobre la Moción 9019 dado que el AAR de 2019 ya no constituía un acuerdo efectivo ni viable. El 1 de septiembre de 2020, la Junta de Supervisión, la AAFAF y la AEEPR presentaron una objeción conjunta a la moción del CANA. La objeción destacaba que el AAR de 2019 seguía en vigor, que el CANA no aportaba ningún fundamento para justificar que el Tribunal del Título III ejercitara su discreción y extinguiera la Moción 9019, y que incluso si existiera dicho fundamento, el CANA no explicaba por qué el Tribunal del Título III debería ejercitar su discrecionalidad de esa manera. Tras considerar unas alegaciones adicionales, el 4 de noviembre de 2020 el Tribunal del Título III rechazó la Moción de extinción, sin perjuicio de renovarla después del 21 de abril de 2021, ya que el AAR de 2019 no se había rescindido y que la paralización prolongada no perjudicaba al CANA.

El 4 de diciembre de 2020, el CANA apeló la orden del Tribunal del Título III ante el Primer circuito. Más tarde, el 2 de febrero de 2021, el Primer circuito dictó una orden pidiendo al CANA que fundamentara por qué la apelación no debería ser desestimada por no ser un foro competente. El 21 de mayo de 2021, el Primer circuito desestimó la apelación por no ser competente, y el 11 de junio de 2021 hizo público su mandato.

Tras la extinción del AAR de 2019, el 1 de abril de 2022, el Tribunal del Título III dictó una orden requiriendo a determinadas partes someterse a una mediación acerca de la reestructuración de la AEEPR. Dicha mediación continuó hasta el 15 de septiembre de 2022, cuando el Equipo de mediación se negó a prorrogar nuevamente el período de mediación. El 29 de septiembre de 2022, el Tribunal del Título III dictó una orden convocando a la AEEPR y a las partes relevantes a continuar la mediación mientras seguían adelante las Impugnaciones al Gravamen y al Recurso.

b)   *Procedimientos contenciosos de "Gastos corrientes"*

(i)     *Prestamistas de la Línea de combustible*

El 9 de julio de 2019, los Prestamistas de la línea de combustible presentaron una demanda contra el Deudor y contra otras partes, solicitando que el Tribunal del Título III dictara sentencia (i) declarando que todas las cuantías que supuestamente se les adeuda son "Gastos corrientes" a tenor del Acuerdo de Fideicomiso; (ii) declarando asimismo que el Fideicomisario de bonos no mantiene ningún gravamen sobre los ingresos de la AEEPR, aparte del dinero depositado en el "Fondo de amortización", y que dicho gravamen no es ejecutable hasta que se paguen íntegramente las deudas a los Prestamistas de la línea de combustible, supuestamente "Gastos corrientes" en virtud del Acuerdo de Fideicomiso; y (iii) desestimando la "reclamación del Fideicomisario de bonos" en la medida en que pide recobrar dinero de fuera del Fondo de amortización antes de los Prestamistas de la línea de combustible.

El 11 de noviembre de 2019, la Junta de Supervisión y la AAFAF presentaron mociones para desestimar la demanda modificada. La Junta de Supervisión alegó que la desestimación se fundamentaba en que (i) los Prestamistas de la línea de combustible son partes de beneficiarios no externos del Acuerdo de Fideicomiso; (ii) el Acuerdo de Fideicomiso no es un acuerdo subordinado exigible de conformidad a tenor de la Sección 510(a) del Código de Quiebras; (iii) la demanda constituye una objeción a la demanda contra el Fideicomisario de bonos, y los Prestamistas de la línea de combustible carecen de fundamento para plantear dicha objeción; y (iv) el AAR de 2019 no perjudica los derechos de los Prestamistas de la línea de combustible. Con posterioridad, el Tribunal del Título III aplazó todos los plazos y vistas relacionados con el aplazamiento de la Moción 2019.

Tras la extinción del AAR de 2019, el Tribunal del Título III, en su orden del 29 de septiembre de 2022, resolvió, sin perjuicio, las diversas mociones de desestimación. Por otra parte, la orden también suspendió el litigio del asunto de los "Gastos corrientes" hasta después de la resolución ahora pendiente de las Impugnaciones al Gravamen y al Recurso, o bien durante el proceso de confirmación del plan, según sea necesario.

El 1 de diciembre de 2022, la AEEPR y los Prestamistas de la línea de combustible pactaron el AAP de los Prestamistas de la Línea de combustible, en virtud del cual dichos prestamistas aceptaban resolver la Acción prioritaria de los Prestamistas de la línea de combustible a cambio del tratamiento como Reclamaciones de Préstamos de Línea de combustible permitidas descrito en esta Declaración de divulgación y en el Plan. *Véase* la Sección VI.C más adelante.

(ii)    *SRE de la AEE*

El 30 de octubre de 2019, el SRE de la AEE presentó una demanda modificada contra el Deudor y otras partes. De manera similar a los Prestamistas de la línea de combustible, el SRE de la AEE solicitaba que el Tribunal del Título III sentenciara que todas las cuantías que se les adeudaban eran "Gastos corrientes" a tenor del Acuerdo de Fideicomiso. El SRE de la AEE sostuvo que dichos "Gastos corrientes" debían abonarse antes de efectuar pagos adicionales al Fideicomisario de bonos o los bonistas del Deudor. Además, el SRE de la AEE alegó que se

trataba de un beneficiario tercero del Acuerdo de Fideicomiso, y que este constituía un acuerdo de subordinación válido a tenor del Código de Quiebras.

La Junta de Supervisión y la AAFAF presentaron conjuntamente una moción de desestimación de la demanda modificada (la "Moción conjunta de desestimación"). La Moción conjunta de desestimación describía a la demanda del SRE de la AEE como "ataque colateral" al AAR de 2019 y a la Moción 9019 de la AEEPR. La Junta de Supervisión plantea prácticamente los mismos argumentos que en su moción para desestimar la demanda modificada de los Prestamistas de la línea de combustible, con las alegaciones adicionales de que (i) la deuda pendiente al SRE de la AEE no constituye un "Gasto corriente" a tenor del Acuerdo de Fideicomiso, y que (ii) el Tribunal del Título III no es competente para revisar el plan fiscal certificado de la AEEPR (implicado por la demanda del SRE de la AEE). El Tribunal del Título III aplazó todos los plazos y vistas sobre el particular como consecuencia de la pandemia de la COVID-19. Como parte de su orden del 29 de septiembre de 2022, el Tribunal del Título III resolvió, sin perjuicio, la Moción conjunta de desestimación. La orden también suspendió el litigio de la cuestión de los "Gastos corrientes" hasta después de la resolución ahora pendiente de las Impugnaciones al Gravamen y al Recurso, o bien durante el proceso de confirmación del plan, según sea necesario.

### D.    Proceso de reclamaciones y Fecha límite

#### 1.    Listas de las Secciones 924/925

La Sección 924 del Código de Quiebras requiere que los deudores presenten una lista de acreedores (la "Lista de acreedores"). La Sección 925 del Código de Quiebras estipula que "[a] se considerará presentada una evidencia de reclamación" en los casos de las reclamaciones enumeradas en la Lista de Acreedores prevista por la Sección 924 del Código de Quiebras, excepto aquellas "enumeradas como impugnadas, contingentes o no liquidadas". 11 U.S.C. § 925.[243]

#### 2.    Órdenes de fecha límite (los Deudores, aparte de la AEP)

De conformidad con la *Orden (A) estableciendo Fechas límite y procedimientos para la presentación de evidencias de reclamación, y (B) aprobando en tiempo y forma su Notificación* [Caso núm. 17-bk-3283, ECF núm. 2521] (la "Orden de fecha límite inicial") y la *Orden (A) prorrogando las fechas límite para la presentación de evidencias de reclamación, y (B) aprobando en tiempo y forma su Notificación* [Caso núm. 17-bk-3283, ECF núm. 3160] (conjuntamente con la Orden de fecha límite inicial, las "Órdenes de fecha límite"), el Tribunal del Título III estableció las siguientes fechas límite para presentar evidencias de reclamación en el Caso del Título III de la AEEPR:

- 29 de junio de 2018 a las 4:00 p.m., Hora Estándar del Atlántico, como fecha límite general para la presentación de todas las evidencias de reclamación (la "Fecha límite general"), salvo en el caso de las reclamaciones mantenidas por clientes de la AEEPR

---

[243] *Véase Notificación de presentación de la Lista de acreedores de la Autoridad de Energía Eléctrica de Puerto Rico* [Caso núm. 17-bk-4780, ECF núm. 520] (la "Lista de acreedores").

en relación con la disposición de sus depósitos y controversias individuales por facturación o servicio, u otras que se indiquen a continuación;

- (i) la Fecha límite general, o bien (ii) las 4:00 p.m., Hora Estándar del Atlántico, de la fecha que sea el primer día hábil que caiga treinta y cinco (35) días después del registro de la orden rechazando un contrato ejecutorio o un arrendamiento no extinguido como fecha de límite de cualesquiera reclamaciones derivadas de dicho contrato o arrendamiento, lo que más tarde se produzca; y

- (i) la Fecha límite general, o bien (ii) las 4:00 p.m., Hora Estándar del Atlántico, de la fecha que sea el primer día hábil que caiga treinta y cinco (35) días después la fecha en que se curse la notificación de una modificación de la Lista de acreedores sobre un demandante como fecha límite para cualesquiera reclamaciones relacionadas con tal modificación de la Lista de acreedores, lo que más tarde se produzca.

Las Órdenes de fecha límite autorizaban a las siguientes partes a presentar evidencias principales de reclamación en nombre de los siguientes grupos:

- Los administradores fiduciarios, agentes fiscales o representantes o designados similares (cada uno de ellos, un "Representante de bonos") de cada una de las respectivas series de bonos emitidos por un deudor o no deudor (en la medida en que exista dicho Representante de bonos) a quienes se permita presentar una evidencia principal de reclamación contra el deudor correspondiente en nombre de sí mismos y de todos los titulares de reclamaciones de bonos de las series pertinentes, por las obligaciones derivadas de los respectivos acuerdos de fideicomisos, resoluciones o documentación similar;

- A cada sindicato se le permitió presentar una evidencia de reclamación principal separada en nombre de sus respectivos integrantes contra el deudor pertinente por cuenta de todas las obligaciones asumidas en virtud de sus respectivos CCT de trabajo o estatutos aplicables; y

- Se permitió a cada agente de cualquier contrato de crédito presentar una evidencia principal de reclamación (cada una de ellas, una "Evidencia principal de reclamación de contrato de crédito") contra el deudor pertinente, en nombre de sí mismos y de todos los prestamistas incluidos en dicho contrato.

3. **Procedimientos alternativos de resolución de disputas**

El 5 de junio de 2019, los Deudores presentaron la *Moción para el dictado de una Orden (A) autorizando procedimientos alternativos de resolución de disputas, (B) aprobando el formulario de notificación adicional, (C) aprobando el envío propuesto, y (D) otorgando el amparo pertinente* [Caso núm. 17-bk-3283, ECF núm. 7224], solicitando una orden estableciendo un procedimiento alternativo para la resolución de disputas ("Procedimientos ARD") para la resolución de algunas reclamaciones generales no garantizadas, incluyendo algunas reclamaciones de litigios no liquidadas, presentadas contra la AEEPR (así como contra otros Deudores del Título III), y aprobando el envío propuesto a los acreedores cuyas

185

reclamaciones no aportan información suficiente para permitir a los Deudores conciliar sus reclamaciones.

Por orden del 13 de agosto de 2019, el Tribunal del Título III aprobó el envío propuesto, y aplazó la consideración de los Procedimientos ARD y los formularios de notificación hasta la entrega de los procedimientos y formularios de notificación propuestos acordes con las directrices comunicadas por el Tribunal del Título III [ECF núm. 8453].

El 7 de enero de 2020, los Deudores presentaron su *Moción modificada para el dictado de una Orden (A) autorizando procedimientos alternativos de resolución de disputas, (B) aprobando el formulario de notificación adicional, (C) aprobando el envío propuesto, y (D) otorgando el amparo pertinente* [Caso núm. 17-bk-3283, ECF núm. 9718] (la "Moción modificada de ARD"). El 1 de abril de 2020, el Tribunal del Título III dictó una orden autorizando los procedimientos ARD modificados (los "Procedimientos ARD modificados"), y aprobando los formularios de notificación adicionales [Caso núm. 17-bk-3283, ECF núm. 12576]. Los Procedimientos ARD modificados establecen un proceso a través del cual los Deudores y demandantes pueden intentar resolver la cuantía de las reclamaciones alegadas mediante un intercambio de ofertas y contraofertas y, en caso de no resolverlo, aplicar un procedimiento de mediación simplificado. Si tras estos procesos la reclamación sigue sin resolverse, los Procedimientos ARD modificados disponen asimismo que el demandante podrá elegir la manera de resolver su reclamación mediante alguno de los tres métodos siguientes: (1) pleitear en los tribunales del Estado Libre Asociado (con sujeción a determinadas restricciones); (2) un arbitraje vinculante; o bien (3) pleitear ante el Tribunal del Título III.

El 29 de diciembre de 2020, el Tribunal del Título III dictó una orden modificando los Procedimientos ARD [Caso núm. 17-bk-3283, ECF núm. 15505]. Hasta la fecha, los Deudores han cursado veintiséis notificaciones de transferencia, transfiriendo más de 1,000 reclamaciones a procedimientos ARD.

4.    **Conciliación de reclamaciones administrativas**

El 8 de octubre de 2019, los Deudores presentaron su *Moción modificada para el dictado de una Orden (A) autorizando la conciliación administrativa de ciertas reclamaciones, (B) aprobando formularios de notificación adicionales, (C) aprobando el envío propuesto, y (D) otorgando el amparo pertinente* [Caso núm. 17-bk-3283, ECF núm. 8827] (la "Moción de CRA"). La Moción de CRA solicitaba la aprobación de ciertos procedimientos de CRA (los "Procedimientos de CRA"), que permitirían que el Estado Libre Asociado, el SER, la ACT, la AEEPR y la AEP, a través de la Junta de Supervisión y el Tribunal del Título III determinen cuáles reclamaciones se resolverán mediante conciliaciones de reclamaciones administrativas ("CRA"). Los Procedimientos de CRA establecen un proceso para que el Tribunal del Título III permita ciertos tipos de reclamaciones de naturaleza administrativa —incluyendo reclamaciones de devolución de impuestos, reclamaciones de agravios de sindicatos, reclamaciones de empleados públicos y reclamaciones de pensiones— puedan ser resueltas mediante los actuales procesos administrativos del Estado Libre Asociado.

En la vista ómnibus del 30 de octubre de 2019, el Tribunal del Título III aprobó provisionalmente la Moción de CRA, pendiente de la presentación de las propuestas revisadas de

186

Procedimientos de CRA. El 12 de marzo de 2020, el Tribunal del Título III dictó una orden probando la orden propuesta revisada [Caso núm. 17-bk-3283, ECF núm. 12274]. Hasta la fecha, el Estado Libre Asociado, el SRE y la AEP han presentado veintiséis notificaciones de transferencia, transfiriendo 44,866 reclamaciones a procedimientos de CRA, de los cuales 27,000 ya han sido registrados como resueltos. La AEEPR no ha cursado ninguna notificación transfiriendo reclamaciones a Procedimientos de CRA.

Como se estipula en la Orden de CRA, todas las reclamaciones transferidas a CRA quedarán identificadas como "Sujetas a conciliación administrativa" en el registro de reclamaciones del Título III. Las reclamaciones transferidas a CRA no tendrán derecho a votar por la aceptación del Plan, sino que percibirán el pago íntegro en el transcurso normal del proceso, de conformidad con la Orden de CRA.

5.    **Mociones de gastos administrativos de LUMA Energy**

Como parte del Contrato de TyD, la AEEPR venía obligada a solicitar la autorización del tribunal para determinar que todo tramo devengado e impagado de los Servicios de transición iniciales (tal como los define el Contrato de TyD), conjuntamente con otras cuantías que la AEEPR debía pagar por contrato durante el período de tiempo entre la fecha de entrada en vigor de la prestación de servicios (el Período de transición inicial), y las tasas correspondientes (las "Tasas de la transición inicial"), que constituirían las reclamaciones de gastos administrativos del caso del Título III de la AEEPR. Para cumplir las obligaciones asumidas por la AEEPR en virtud del Contrato de TyD, el 7 de julio de 2020 las Partes del Gobierno presentaron la *Moción para el dictado de una Orden aprobando la reclamación de gastos administrativos para compensar los Servicios de transición iniciales en virtud del Contrato de operación y mantenimiento del Sistema de Transmisión y distribución con LUMA Energy* [ECF núm. 2053] (la "Moción administrativa inicial").

El 19 de octubre de 2020, el Tribunal del Título III comunicó un dictamen y orden aprobando parcialmente, y rechazando parcialmente, la Moción administrativa inicial. El Tribunal del Título III determinó que las ofertas de las Partes del Gobierno eran suficientes para "fundamentar una decisión" de que las Tasas de transición inicial, con la excepción de ciertas multas por retrasos, tenían derechos prioritarios de gastos administrativos. Sin embargo, el Tribunal del Título III rechazó, sin perjuicio, la prioridad de gastos administrativos en concepto de multas por retrasos, dictaminando que las Partes del Gobierno no habían demostrado que dichas cuantías satisfacían los requisitos para ser consideradas gastos administrativos. *Véase* [ECF núm. 2258].

El 26 de octubre de 2020, la UTIER y el SRE de AEE presentaron una notificación de apelación a la orden y dictamen de la Jueza Swain admitiendo parcialmente la Moción de gastos administrativos inicial. [ECF núm. 2269]. La apelación quedó registrada como Caso núm. 20-2041 en el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito el 9 de noviembre de 2020.

Para fundamentar la apelación, los apelantes alegaron que no existía un "patrimonio" a tenor de la Ley PROMESA y que, en consecuencia, no podían existir "costos y gastos necesarios para conservar el patrimonio", en el sentido de la Sección 503(b)(1)(A) del Código de Quiebras.

Los apelantes citaron un precedente relacionado con el contexto del Capítulo 9, sosteniendo que ciertas cláusulas del Código de Quiebras que hacen referencia al "patrimonio" de un deudor no son aplicables al Capítulo 9 que, al igual que la Ley PROMESA, no incorpora lo dispuesto por la Sección 541 del Código de Quiebras, que define "patrimonio" y "propiedad del patrimonio". Como alternativa, los apelantes alegaron que las Partes del Gobierno habían omitido satisfacer la carga de la prueba de que las tasas en cuestión puedan ser calificadas como gasto administrativo prioritario. En su oposición, la Junta de Supervisión sostuvo que el Tribunal del Título III había dictaminado correctamente que "la letra y la estructura de la Ley PROMESA obligan a llegar a la conclusión de que los gastos operativos de la AEEPR pueden ser clasificados como gasto administrativo prioritario de conformidad con la Sección 503(b)(1)(A) del Código de Quiebras". Además, la Junta de Supervisión alegó que, como lo había determinado el Tribunal del Título III, la decisión del Congreso de escindir ciertas subsecciones de determinadas cláusulas del Código de Quiebras, aunque incorporaban íntegramente la Sección 503, eran un sólido indicio de que el Congreso no pretendía impedir la aplicabilidad de la Sección 503(b)(1)(A) al contexto del Título III. Para reforzar esta conclusión, la Junta de Supervisión observó que la Sección 301(c)(5) de la Ley PROMESA alude a las referencias del Código de Quiebras sobre "propiedad del patrimonio" como a referencias a la propiedad del deudor. Por último, la Junta de Supervisión manifestó que el Tribunal del Título III había sostenido que las Partes del Gobierno aportaron la carga de demostrar que las tasas podían ser tratadas como gastos administrativos.

Mediante un dictamen del 12 de agosto de 2021, el Primer Circuito confirmó la decisión del Tribunal del Título III.

Simultáneamente con la apelación a la orden que aprobaba la Moción administrativa inicial, y a medida que la AEEPR y LUMA Energy se aproximaban al traspaso de los Servicios de OyM del Sistema de TyD a LUMA Energy, las Partes del Gobierno presentaron la *Moción de las Partes del Gobierno para una orden que admita la reclamación de gastos administrativos por las cuantías a pagar a LUMA Energy por la AEEPR durante el Período provisional en el marco del Contrato complementario y el Contrato de TyD* [ECF núm. 2417] (la "Moción administrativa del Período provisional", conjuntamente con la Moción administrativa inicial, las "Mociones administrativas de LUMA Energy"). Alegando prácticamente las mismas razones que en la Moción administrativa inicial, las Partes del Gobierno solicitaban al Tribunal del Título III que aceptara priorizar como gastos administrativos ciertos costos de operar el Sistema de TyD (las "Tasas de servicios del Período provisional"), incluyendo (i) la compensación por la prestación de los servicios de operación y mantenimiento en el marco del Contrato de TyD, por una cuantía anual fija de $115 millones; (ii) indemnización a LUMA Energy y a sus filiales por las reclamaciones o daños presentados en su contra como consecuencia de la operación del servicio público por parte de la AEEPR; y (iii) una tasa de resolución de $115 millones, ajustados a la inflación, pagadera si concurrieran determinadas circunstancias. También la Moción administrativa del Período provisional fue objeto de diversas objeciones y respuestas. *Véanse* ECF núm. 2435, 2436, 2437, 2438 y 2439].

El 3 de mayo de 2021, el Tribunal del Título III dictó una orden otorgando el remedio solicitado por la Moción administrativa del Período provisional, fundamentándola en gran medida en las mismas razones que la orden aprobando la Moción administrativa inicial [ECF núm. 2473]. Una vez más, la UTIER y el SRE de la AEE solicitaron impedir la implementación de la orden, solicitando cada uno un remedio interdictal para que no se produjese la Fecha de

entrada en vigor de los Servicios. *Véanse* Proc. abr. núm. 21-00041 y 21-00049. Consulte información detallada sobre los procedimientos contenciosos solicitando remedio interdictal en la Sección V.G.24 – 25 de esta Declaración de divulgación.

6.     **Moción de gastos administrativos de Cobra Acquisitions**

El 19 de octubre de 2017, después de que los huracanes Irma y María golpearan Puerto Rico, la AEEPR y Cobra Acquisitions LLC ("Cobra") formalizaron el *Contrato maestro de servicios de emergencia para las reparaciones de la red eléctrica de la AEEPR – Huracán María*, de octubre de 2017 (el "Primer contrato") para que Cobra prestara "servicios de reparación de emergencia" por $200 millones. Tras cinco sucesivas enmiendas, la cuantía del Primer contrato se incrementó hasta los $945 millones.

El 26 de mayo de 2018, la AEEPR y Cobra formalizaron el *Contrato maestro de servicios para las reparaciones de la red eléctrica de la AEEPR - Huracán María*, de fecha 26 de mayo de 2018 (el "Segundo contrato" que, con el Primer contrato, son los "Contratos de Cobra"), para que Cobra prestara servicios de restauración y reconstrucción, además de los de reparaciones de emergencia pactados en el Primer contrato, por una cuantía adicional de hasta $900 millones.

El 30 de septiembre de 2019, Cobra presentó una moción solicitando (i) una asignación de aproximadamente $216 millones en concepto de una reclamación de gastos administrativos posteriores a la petición, derivados de diversos servicios prestados en relación con los Contratos de Cobra, más los intereses devengados, y (ii) el pago inmediato de dichos gastos administrativos reclamados. [Caso núm. 17-bk-3283, ECF núm. 8789] (la "Moción administrativa de Cobra"). A 21 de junio de 2022, Cobra reclamaba aproximadamente $123 millones en concepto de intereses devengados por el impago de las cuantías adeudadas en virtud de los Contratos de Cobra. [Caso núm. 17-bk-3283, ECF núm. 21286].

El de octubre de 2019, las Partes del Gobiernos presentaron una moción urgente solicitando la suspensión de todos los plazos aplicables vinculados con la Moción administrativa de Cobra hasta el 29 de enero de 2020, debido a (i) una investigación penal en curso y un juicio pendiente relacionado con determinadas actuaciones de parte del expresidente de Cobra en conexión con las obras de Cobra en la red eléctrica de la AEEPR, incluyendo denuncias de sobornos cometidos por esa persona para la obtención de la adjudicación de dichas obras; y (ii) una investigación de la FEMA sobre la plausibilidad de las tarifas cobradas por Cobra por sus obras en la red eléctrica de la AEEPR. [ECF núm. 1653] (la "Moción urgente de suspensión de Cobra").

El 17 de octubre de 2019, el Tribunal del Título III dictó una orden admitiendo la Moción urgente de suspensión de cobra, suspendiendo la Moción administrativa de Cobra y estableciendo el estado de la causa de la moción.

El 25 de marzo de 2020, Cobra presentó una moción urgente solicitando modificar la suspensión impuesta por el Tribunal del Título III y pidiéndole que autorizara reclamaciones de impuestos supuestamente "incuestionables" derivadas de las obras de COBRA en la red eléctrica de la AEEPR. [Caso núm. 17-bk-3283, ECF núm. 12531] (la "Moción urgente de Cobra para

<u>modificar la suspensión</u>"). Las Partes del Gobierno se opusieron a la Moción urgente de Cobra para modificar la suspensión. [ECF núm. 1959]. Tras una vista, el Tribunal del Título III rechazó la Moción urgente de Cobra para modificar la suspensión. [ECF núm. 2004].

El 6 de abril de 2021, Cobra presentó una moción para levantar la suspensión. [Caso núm. 17-bk-3283-LTS, ECF núm. 16328] (la "<u>Moción de levantamiento de la suspensión de Cobra de abril de 2021</u>"). El 7 de junio de 2021, las Partes del Gobierno presentaron un informe de situación, comunicando al Tribunal del Título III que no se habían producido cambios sustanciales que justificaran la modificación de la suspensión. [Caso núm. 17-bk-3283, ECF núm. 16893]. Mediante orden del 4 de junio de 2021, el Tribunal del Título III (i) prorrogó la suspensión; (ii) ordenó a las partes reunirse y conferenciar, y presentar un informe de estado como más tarde el 20 de julio de 2021; y (iii) aplazó la vista sobre la Moción de levantamiento de la suspensión de Cobra de abril de 202 hasta una vista ómnibus a celebrarse el 4 de agosto de 2021. [Caso núm. 17-bk-3283, ECF núm. 16970].

El 4 de agosto de 2021, el Tribunal del Título III oyó el argumento oral relativo a la Moción de levantamiento de la suspensión de Cobra de abril de 2021. *Véase* [Caso núm. 17-bk-3283, ECF núm. 17691] El Tribunal del Título III rechazó la Moción de levantamiento de la suspensión de Cobra de abril de 2021 debido a que, entre otras cosas, la investigación en marcha de la FEMA reduciría la necesidad de indagar para resolver las cuantías en disputa solicitadas por Cobra como gastos administrativos, y ordenó a las partes que presentaran otro informe conjunto de estado como más tarde el 19 de enero de 2022. Transcripción de la vista del 4 de agosto de 2021, en 68-71.

El 7 de junio de 2022, Cobra presentó otra moción para levantar la suspensión. [ECF núm. 2841] (la "<u>Moción de levantamiento de la suspensión de Cobra de junio de 2022</u>"). El 14 de junio de 2022, las Partes del gobierno presentaron una objeción a la Moción de levantamiento de suspensión de Cobra de junio de 2022. [ECF núm. 2848]. El mismo día, el Tribunal dictó una orden rechazando la Moción de levantamiento de suspensión de Cobra de junio de 2022. *Ibídem*. Además, de conformidad con un dictamen oral expedido durante la vista del 29 de junio de 2022, el Tribunal del Título III ordenó a las partes que presentaran otro informe de estado conjunto como más tarde el 6 de enero de 2023, o, si fuera antes, treinta (30) días después de que la FEMA comunicara sus conclusiones relativas al Segundo Contrato. Transcripción de la vista del 29 de junio de 2022, en 41:15-19.

7.   **Moción y acuerdo de conciliación de los gastos administrativos de Whitefish Energy**

Como consecuencia de los huracanes Irma y María, la AEEPR recurrió a varios contratistas para prestar servicios de reparación de emergencia del sistema eléctrico, entre ellos a Whitefish Energy Holdings, LLC ("<u>Whitefish</u>" o "<u>WEH</u>"), que fue el primer contratista de líneas de transmisión contratado por la AEEPR para colaborar en la reparación del apagón general de la isla.

El 26 de septiembre de 2017, la AEEPR formalizó un contrato con Whitefish (el "<u>Contrato de WEH</u>") para la reparación de las principales estructuras del sistema eléctrico de Puerto Rico (la columna vertebral del sistema), compuestas por unas 200 millas de líneas y torres

de transmisión, en su mayoría situadas en el interior de la región montañosa de Puerto Rico y, por consiguiente, accesibles solamente mediante helicópteros. Las obras solicitadas por la AEEPR y ejecutadas por Whitefish en el marco del Contrato de WEH incluyeron, entre otros proyectos: (1) despeje de los derechos de paso, vías de acceso y áreas de aterrizaje de helicópteros para poder transportar a los equipos y personal de reparaciones a los emplazamientos de obras y comenzar los trabajos; (2) sustitución de más de 50 torres eléctricas, desmantelamiento de una cantidad similar de torres y conclusión de las actuaciones correctivas de más de 200 otras estructuras de transmisión; y (3) restablecimiento de la electricidad a los clientes de las principales zonas residenciales e industriales de Puerto Rico, incluyendo San Juan, Calguas, Manatí y Juntos. El 31 de octubre de 2017, la AEEPR resolvió el Contrato de WEH de conformidad con sus términos y condiciones, una vez que Whitefish concluyera todas las obras solicitadas por la compañía en relación con las obras de reparación del apagón general, extinción que se produjo el 30 de noviembre de 2017.

El 30 de octubre de 2020, Whitefish presentó la *Moción de Whitefish Energy Holdings, LLC para la asignación de la reclamación de gastos administrativos* [ECF núm. 2281] (la "Moción administrativa de Whitefish"), solicitando la adjudicación de una reclamación de gastos administrativos derivados de diversos servicios prestados a la AEEPR para responder a los daños causados por los huracanes Irma y María a la red eléctrica. [ECF núm. 2281]. Seguidamente, las partes comenzaron a negociar una resolución consensuada de las reclamaciones solicitadas en la moción. Para facilitar la continuidad de estas negociaciones, los plazos fueron prorrogados varias veces de mutuo acuerdo. [ECF núm. 2334, 2351, 2371, 2413, 2451, 2489, 2527, 2543, 2585, 2613, 2626, 2648, 2662, 2682, 2707 y 2749].

Aunque la AEEPR sigue siendo la principal responsable del pago del Contrato de WEH, pero el gobierno federal autorizó medidas de protección de emergencia financiadas al cien por ciento (100%) con fondos federales, incluyendo asistencia directa, durante 180 días, a contar desde el 17 de septiembre de 2017 para el Contrato de WEH, con sujeción a su revisión y aprobación por la FEMA. Esto deja a la AEEPR como responsable solamente de las cuantías restantes no aprobadas y pagadas por la FEMA. Whitefish concluyó todas las obras solicitadas por la AEEPR dentro del período de 180 días estipulado por las autoridades federales. Una vez concluidas las obras, Whitefish presentó a la AEEPR por un total de $144,249,543.00.

Antes de formalizar el Acuerdo de conciliación con Whitefish (definido más adelante), la AEEPR realizó pagos a cuenta de las facturas del Contrato de WEH (las "Facturas de WEH") por un importe de $37,056,105.00. Además, se devengaron gastos financieros, a una tasa del 1% mensuales, en concepto de todas las Facturas de WEH impagadas (los "Cargos financieros de WEH"). Al 11 de febrero de 2022, Whitefish declaraba que el total de los Cargos financieros de WEH devengados hasta la fecha ascendían a $51,887,962.60.

El 29 de junio de 2018, la AEEPR presentó al Representante autorizado del Gobernador (el "RAG") la documentación justificando su solicitud de reembolso por la FEMA (la "Documentación de WEH para la FEMA"). En torno al 24 de agosto de 2018, el RAG envió a la FEMA la Documentación de WEH para la FEMA, solicitando el reembolso de aproximadamente $144.3 millones. El 19 de agosto de 2021, la FEMA expidió el Memorando de determinación número FEMA-4339-DR-PR, mediante el cual la FEMA determinaba que, de los $144,249,543.53 cuyo reembolso solicitaba la AEEPR en concepto de las Facturas de WEH,

$111,352,417.00 eran elegibles para su reembolso, pero que la AEEPR no había demostrado de manera suficiente que los $32,897,126.53 tenían derecho a reembolso (los "Importes rechazados por la FEMA"). El 18 de octubre de 2021, la AEEPR presentó una primera apelación contra la determinación de la FEMA que sostenía que los Importes rechazados por la FEMA no eran elegibles para ser reembolsados. El 17 de diciembre de 2021, el Representante autorizado del Gobierno de Puerto Rico, la COR3, presentó esta primera apelación a la FEMA.

El 1 de marzo de 2022, la Junta de Supervisión, en calidad de representante de la AEEPR ante el Tribunal del Título III, formalizó un acuerdo de conciliación (adjunto a este documento como Anexo C) con Whitefish (el "Acuerdo de conciliación con Whitefish"), y presentó una moción para que el tribunal lo aprobara [ECF núm. 2281]. El Acuerdo de conciliación con Whitefish dispone, entre otras cosas, la asignación de una reclamación de gastos administrativos por una cuantía total de $133,369,078.00, de los cuales se han pagado $127,345,388.00, y que el resto de la reclamación de gastos administrativos de $6,023,690.00 se pagará en la fecha de entrada en vigor del Plan, aunque como más tarde el 31 de diciembre de 2023. Además, el Acuerdo de conciliación con Whitefish requiere (i) que la Junta de Supervisión, la AEEPR y Whitefish colaboren en el proceso de apelación administrativa para el reembolso de los Importes rechazados por la FEMA, y (ii) que se reduzca el total de los cargos por intereses devengados en $19,004,808.50, sin devengo adicional de intereses a partir de la fecha de formalización del Acuerdo de conciliación con Whitefish, siempre y cuando todos los pagos que la AEEPR deba abonar de conformidad con el acuerdo se efectúen puntual e íntegramente. El 21 de marzo de 2022, el Tribunal del Título III dictó la orden aprobando el Acuerdo de conciliación con Whitefish, resolviendo así la Moción administrativa de Whitefish [ECF núm. 2763].

8.    **Objeciones a las reclamaciones presentadas hasta la fecha**

A la fecha de preparación de esta Declaración de divulgación, se habían presentado contra la AEEPR unas 4,687 evidencias de reclamaciones en el Caso del Título III, por un total aproximado de $27,400 millones en pasivos, más cuantías no liquidadas. De conformidad con lo estipulado por las Órdenes de Fecha límite, la AEEPR considera que muchas de estas reclamaciones no se hubieran presentado en absoluto, o sufren de otros defectos o vicios, como el haber sido subsiguientemente modificadas o ser duplicados de otras evidencias, incluyendo evidencias principales de reclamación presentadas contra la AEEPR en nombre de determinados bonistas.

En virtud de la *Orden (A) aprobando procedimientos limitados de objeciones ómnibus, (B) dispensando del requisito de la Regla de Quiebras 3007(e)(6), y (c) otorgando el amparo pertinente* [Caso núm. 17-bk-3283, ECF núm. 4230, 4230-1] (los "Procedimientos de objeciones iniciales"), y la *Orden (A) aprobando la enmienda de los procedimientos de objeciones ómnibus, (B) dispensando del requisito de la Regla de Quiebras 3007(e)(6), (C), aprobando formularios de notificación adicionales, y (D) otorgando el amparo pertinente* [Caso núm. 17-bk-3283, ECF núm. 7440], la AEEPR —a través de la Junta de Supervisión— ha presentado 54 objeciones a las reclamaciones. Con estas objeciones ómnibus se pretendía la desestimación de un total de 2,552 reclamaciones, alegando que carecían de información suficiente para permitir a la Junta de Supervisión conciliarlas, iban dirigidas contra el deudor incorrecto, fueron posteriormente modificadas, eran duplicados de otras evidencias o bien reclamaban cuantías de las cuales el

deudor señalado no era responsable, Hasta la fecha han sido expurgadas, retiradas o resueltas 463 reclamaciones, o bien fueron registradas erróneamente.

Asimismo, se presentaron significativas objeciones a las reclamaciones de determinados bonistas, que se describen en la Sección V.G de esta Declaración de divulgación.

### E.      Acuerdo de conciliación con Vitol

*Antecedentes.* Antes del comienzo del Caso del Título III de la AEEPR, la compañía formalizó diversos contratos de compras de combustible con Vitol, en virtud de los cuales Vitol suministró combustible para las diversas centrales y estaciones de generación de la AEEPR de la red eléctrica de esta, en diversos puntos de Puerto Rico.

El 4 de noviembre de 2009 y el 28 de noviembre de 2012, la AEEPR inició dos pleitos contra Vitol ante el Tribunal de Primera Instancia del Estado Libre Asociado de Puerto Rico (el "Tribunal del Estado Libre Asociado"): (i) *Autoridad de Energía Eléctrica de Puerto Rico contra Vitol Inc. y otros*, Caso núm. K AC2009-1376 (901) y (ii) *Autoridad de Energía Eléctrica de Puerto Rico contra Vitol Inc. y otros*, Caso núm. 2012-1174 (905) (en conjunto, las "Actuaciones en el Tribunal del Estado Libre Asociado"). A través de las Actuaciones en el Tribunal del Estado Libre Asociado, el AEEPR pretendió anular seis (6) contratos de combustible formalizados entre la compañía y Vitol entre 2005 y 2008, valorados en \$3,890 millones porque, entre otras cosas, Vitol había supuestamente vulnerado la Ley 458 ("Ley 458"), uno de los principales instrumentos legales anticorrupción de Puerto Rico. Las acusaciones de la AEEPR contra Vitol relacionadas con la Ley 458 desembocaron en que Vitol S.A. se declarara culpable de supuestos sobrepagos abonados por Vitol S.A. a ciertos funcionarios iraquíes durante su participación en el programa Petróleo por Alimentos de la Organización de Naciones Unidas. Los pagos realizados por Vitol S.A. fueron objeto de investigaciones realizadas por Naciones Unidas (en 2004) y por la Fiscalía de Distrito del Estado de Nueva York (a partir de 2005–2006). El 20 de noviembre de 2007, Vitol S.A. se declaró culpable de los cargos ante un tribunal del Estado de Nueva York, y fue sentenciada el 10 de diciembre de 2007. La AEEPR alegó que el hecho de que Vitol S.A. le ocultara dicha la declaración de culpabilidad conllevó la vulneración de la Ley 458 en relación con los seis (6) contratos de combustible, motivo por el cual la compañía exigió la devolución de los aproximadamente \$3,890 millones que había pagado en virtud de aquellos contratos. Como respuesta, Vitol presentó contra la AEEPR una contrademanda por aproximadamente \$28.4 millones de facturas supuestamente impagadas por el combustible suministrado en el marco de aquellos contratos. Además, Vitol sostuvo que la AEEPR se hubiera enriquecido injustamente de haber recibido íntegros los \$3,890 millones, y que el recurso de devolución de ganancias mal habidas solicitado por la AEEPR vulneraba las cláusulas de Multas excesivas, de Proceso debido y de Expropiaciones de la Constitución de los Estados Unidos.

El 23 de mayo de 2018, Vitol presentó una evidencia de reclamación en el Caso del Título III de la AEEPR, registrado por Kroll como Evidencia de reclamación núm. 14537, alegando una reclamación general, no garantizada y previa a la petición contra la AEEPR por una cuantía total de \$41,472,771.43, como consecuencia de haber omitido supuestamente el pago y entrega de combustible suministrado por Vitol antes del comienzo del Caso del Título III de la AEEPR, en virtud de los contratos de suministro pactados entre ambas, más intereses.

El 14 de noviembre de 2019, las Actuaciones en el Tribunal del Estado Libre Asociado fueron trasladadas al Tribunal del Título III [Proc. abr. núm. 19-00453, ECF núm. 1]. El 13 de diciembre de 2019, la AEEPR presentó una moción para devolver las Actuaciones en el Tribunal del Estado Libre Asociado a la competencia de este [Proc. abr. núm. 19-00453, ECF núm. 8], pero el 13 de marzo de 2020, el Tribunal del Título III dictó una orden rechazando la moción de la AEEPR [Proc. abr. núm. 19-00453, ECF núm. 27]. El 31 de julio de 2020, Vitol presentó una moción de sentencia sumaria, alegando que: (i) la Ley 458 no es aplicable a los contratos de Vitol con la AEEPR, por lo cual esta no puede demostrar ninguna de sus demandas afirmativas; (ii) la AEEPR no tiene derecho al remedio solicitado; y (iii) el remedio es, además, anticonstitucional porque vulneraría las cláusulas de Multas excesivas, de Proceso debido y de Expropiaciones [Proc. abr. núm. 19-00453, ECF núm. 37]. El 9 de noviembre de 2020, la AEEPR presentó en respuesta una oposición y moción cruzada a la sentencia sumaria, alegando que (i) los contratos eran nulos como consecuencia de la condena de Vitol y además se apoyaban en contrapartidas ilícitas; y que (ii) la AEEPR tenía derecho al reembolso de los aproximadamente $3,890 millones que la AEEPR pagó a Vitol, como ya se ha mencionado. [Proc. abr. núm. 19-00453, ECF núm. 48, 53].

El 27 de septiembre de 2021, el Tribunal del Título III dictó un dictamen y orden aceptando parcialmente las mociones de sentencia sumaria de Vitol y de la AEEPR [Proc. abr. núm. 19-00453, ECF núm. 77]. El Tribunal del Título III llegó a las siguientes conclusiones: (i) los contratos de la AEEPR con Vitol no eran nulos a tenor de la Ley 458, ni tampoco como resultado de contrapartidas ilícitas; (ii) Vitol tenía derecho a reclamar $28,489,560.16 de las facturas impagadas en concepto del combustible suministrado a la AEEPR en el marco de los contratos celebrados entre ambas; pero (iii) aceptaba la moción de la AEEPR de sentencia sumaria con respecto a ciertas defensas afirmativas y contrarreclamaciones planteadas por Vitol.

El 2 de noviembre de 2021, el Tribunal del Título III dictó sentencia, cerrando el contencioso, fallando a favor de Vitol contra la AEEPR por el importe de $41,457,382.88 (incluyendo intereses) en la contrarreclamación de Vitol, y rechazando todos los demás recursos no otorgados en la sentencia. [Proc. abr. núm. 19-00453, ECF núm. 82]. El 2 de diciembre de 2021, la Junta de Supervisión apeló la sentencia del Tribunal del Título III del 2 de noviembre de 2021 ante el Primer Circuito (la "Apelación de la Ley 458"). *Véase Junta de Supervisión y Administración Financiera contra Vitol S.A., y otros*, núm. 21-1987 (1er. Cir. 2021), que ahora ha sido desestimada.

***El Acuerdo de conciliación con Vitol.*** Desde la presentación de la Apelación de la Ley 458, la AEEPR inició negociaciones de conciliación con Vitol. Estas negociaciones entre las Partes conllevaron el Acuerdo de conciliación con Vitol, que se formalizó el 26 de agosto de 2022, y que se explica con mayor detalle más adelante.

De conformidad con el Acuerdo de conciliación con Vitol, la AEEPR se comprometía a retirar la Apelación de la Ley 458, sin perjuicio, presentando una estipulación de desestimación ante el Primer Circuito. La AEEPR presentó dicha estipulación, sin perjuicio, el 31 de agosto de 2022, cuatro (4) días después de la firma del Acuerdo de conciliación con Vitol, por lo cual la Apelación de la Ley 458 quedó desestimada el 13 de septiembre de 2022. En relación con ello, tras la presentación de la estipulación de desestimación de la Apelación de la Ley 458 ante el Primer Circuito, se pidió a la AEEPR que, en el plazo de dos (2) días hábiles, diera instrucciones

a Kroll par que ajustara la demanda de Vitol en el registro de reclamaciones a efectos de que quedara constancia de la misma por un valor total de $41,457,382.88.

Además, el Acuerdo de conciliación con Vitol establece el tratamiento de las reclamaciones de Vitol de conformidad con el Plan de ajuste propuesto de la AEEPR. Según dicho Plan de ajuste, la reclamación de Vitol se considerará admitida por una cuantía total de $41,457,382.88, y será separada de las demás reclamaciones generales no garantizadas planteadas contra la AEEPR. En la fecha de entrada en vigor del Plan, la reclamación de Vitol será incluida en una categoría en virtud de la cual a Vitol de le pagará una distribución equivalente a la que reciban la mitad de las reclamaciones de la categoría de reclamaciones generales no garantizadas no vinculadas con bonos ni con fondos tomados en préstamo, en un porcentaje por determinar. Sin embargo, si el Plan de la AEEPR contuviera más de una categoría de reclamaciones generales no garantizadas no vinculadas con bonos ni con dinero tomado en préstamo, Vitol recibirá una distribución equivalente a la mitad de las distribuciones porcentuales promedio pagadas a las citadas categorías, siempre que para el cálculo de las distribuciones porcentuales promedio no se incluyan las líneas de crédito de combustibles ni las obligaciones relacionadas con pensiones anteriores a la petición. Además, la AEEPR incluirá a Vitol como parte exculpada en cualquier propuesta de Plan de ajuste de la AEEPR, aunque en el bien entendido de que dicha exculpación no será de aplicación a las reclamaciones de Vitol relacionadas con la acción caratulada *Comité Especial de Reclamaciones contra Inspectorate America Corp.*, Proc. abr. núm. 19-00388 del Caso núm. 17-bk-3283, D.P.R. A cambio del tratamiento convenido de la reclamación de Vitol a tenor del Plan de ajuste propuesto de la AEEPR, Vitol no se opondrá a la aprobación de esta Declaración de divulgación ni a la confirmación del Plan propuesto, ni interferirá en modo alguno con la administración y confirmación del Plan. Además, Vitol enviará puntualmente un voto de aceptación del Plan cuando se le solicite.

En la Fecha de entrada en vigor, la AEEPR y la Junta de Supervisión quedarán automáticamente exoneradas de todas y cada una de las causas de acción, demandas o reclamaciones de algún modo derivadas de, o vinculadas con, las Actuaciones en el Tribunal del Estado Libre Asociado. A cambio, en la Fecha de entrada en vigor del Plan, Vitol también quedará automáticamente exonerada de todas y cada una de las causas de acción, demandas o reclamaciones de algún modo derivadas de, o vinculadas con, las Actuaciones en el Tribunal del Estado Libre Asociado. Sin embargo, quedan expresamente reservados los derechos, reclamaciones y defensas de la AEEPR relacionados con la acción de anulación caratulada *Comité Especial de Reclamaciones contra Inspectorate America Corp.*, Proc. abr. núm. 19-00388 del Caso núm. 17-bk-3283, D.P.R.).

## F.   Rechazo o asunción de arrendamientos no extinguidos de bienes raíces no residenciales

### 1.   Arrendamientos no extinguidos de bienes raíces no residenciales

La AEEPR es parte de unos cincuenta (50) arrendamientos inmobiliarios no residenciales (los "Arrendamientos inmobiliarios"). La decisión de asumir o de rechazar los Arrendamientos inmobiliarios ("Arrendamientos inmobiliarios") implica considerar una serie de factores, aunque no es posible abordarlos de manera expeditiva. A pesar de contactar con cada arrendador, era

poco probable que la AEEPR recibiera un consentimiento afirmativo del mismo como consecuencia directa de la destrucción generalizada y de los apagones masivos en la isla tras el huracán María, que dificultaba enormemente que las partes pudieran comunicarse durante un período prolongado. A su vez, el Deudor y sus asesores no han podido conseguir el consentimiento escrito de todos los propietarios para obtener las prórrogas solicitadas por el Deudor para asumir o rechazar los Arrendamientos inmobiliarios. En consecuencia, la AEEPR solicitó prorrogar la Fecha límite de la Sección 365(d)(4) (la "Fecha límite de 365(d)(4)") en los arrendamientos a otras entidades que hubieran otorgado su consentimiento afirmativo, o bien que no lo hayan rechazado expresamente. Quedaron reservados los derechos de las partes cuyo consentimiento se haya "considerado" otorgado porque no fue expresamente rechazado [ECF núm. 546]. Ninguna parte rechazó expresamente su consentimiento.

El 24 de octubre de 2017, la Junta de Supervisión presentó una moción solicitando la aprobación de una prórroga para asumir o rechazar cualesquiera Arrendamientos inmobiliario no extinguidos a tenor de la Sección 365(d)(4) del Código de Quiebras, aplicable a estos casos en virtud de la Sección 301(a) de la Ley PROMESA [Caso núm. 17-bk-3283, ECF núm. 1518]. El 26 de enero de 2018, el Tribunal del Título III dictó un orden complementario prorrogando para la AEEPR la Fecha límite de 365(d)(4) hasta (i) el 1 de enero de 2019; (ii) la fecha de extinción o de caducidad de tales arrendamientos, en virtud de sus propios términos y condiciones: o bien (iii) la fecha de confirmación del Plan de ajuste de la AEEPR, lo primero que se produjese [ECF núm. 546].

Posteriormente, el Tribunal del Título III prorrogó la Fecha límite de 365(d)(4) en varias ocasiones. *Véase* [Caso núm. 17-bk-3283, ECF núm. 4977 y 9670]. La actual Fecha límite de 365(d)(4) es (i) el 1 de enero de 2022; (ii) la fecha de extinción o de caducidad de tales arrendamientos, en virtud de sus propios términos y condiciones; o bien (iii) la fecha de confirmación del Plan de ajuste de cada Deudor, lo que antes se produzca [Caso núm. 17-bk-3283, ECF núm. 15574].

2.      **Contratos de compra de energía y operativos (PPOA) de la AEEPR**

a)      **Procedimientos de asunción en el Tribunal del Título III**

Para simplificar el proceso de evaluación y renegociación de los PPOA, la AEEPR estableció procedimientos para la asunción de los PPOA usufructuarios. El 2 de abril de 2019, la AEEPR presentó una moción solicitando una orden que aprobara los procedimientos para asumir los PPOA, con el objeto de evitar los costos de mociones separadas para asumir individualmente cada uno sin privar a las partes interesadas de sus derechos de proceso debido. [ECF núm. 1162]. El 16 de abril de 2019, la AEEPR presentó los procedimientos de asunción enmendados (los "Procedimientos de asunción"). [ECF núm. 1194]. El 22 de abril de 2019, el Tribunal del Título III dictó una orden aprobando los Procedimientos de asunción, tal como fueron modificados, y ordenando —pero no exigiendo— a la AEEPR que asuma los PPOA mediante los Procedimientos de asunción. [ECF núm. 1199].

b)   **Contratos de compra de energía y operativos con EcoEléctrica y Naturgy**

Históricamente, la AEEPR ha obtenido hasta el 40% de la carga eléctrica básica de Puerto Rico a partir de GNL convertido en electricidad, en un mecanismo conocido como "Programa GNL a energía".[244] Hay dos compañías energéticas que históricamente han jugado un papel fundamental en este programa: ECO y Naturgy. Ambas empresas importaban gas natural licuado y lo convertían en gas natural en una terminal de propiedad de ECO, controlada por Naturgy mediante un contrato de servicios.

La relación de la AEEPR con ambas empresas está recogida en dos contratos. El primero —el PPOA entre la AEEPR y ECO (el "PPOA original")— se formalizó el 10 de marzo de 1995, y estaba previsto que caducara en marzo de 2022. El segundo —el Contrato de compraventa de gas natural enmendado y reformulado entre la AEEPR y Naturgy (el "CCVG original" que, conjuntamente con el PPOA original, se denominan los "Contratos originales")— firmado el 28 de marzo de 2012 y que debía extinguirse en diciembre de 2020.

La AEEPR decidió que era de importancia crítica asegurarse el suministro continuo de gas natural a la central de Costa Sur, así como asegurar la disponibilidad de capacidad a ECO. En consecuencia, la Junta de Supervisión certificó los planes fiscales de 2018 y 2019, que contemplaban a renegociación de los Contratos originales. La AEEPR inició renegociaciones bilaterales separadas de los contratos con Naturgy y ECO, con el objeto de prorrogar su plazo y materializar ahorros de costos. Tras prolongadas negociaciones, la AEEPR firmó los Contratos modificados el 23 y el 27 de marzo de 2020, respectivamente. Presentamos una descripción más detallada de los términos y condiciones de los Contratos modificados en la Sección III.B.8 de esta Declaración de divulgación.

Los Contratos modificados fueron sometidos a un exhaustivo proceso de revisión por parte de la Junta de Gobierno de la AEEPR, la Junta de Supervisión, el NEPR y, en última instancia, el Tribunal del Título III. La AEEPR hizo pública su aprobación definitiva de los Contratos modificados el 29 de octubre de 2019. El 26 de diciembre de 2019, la Junta de Supervisión aprobó tanto el PPOA modificado como el CCVG, de conformidad con la política de revisión de contratos establecida por la Sección 204(b)(2) de la Ley Promesa y por 48 U.S.C. § 2144, confirmando su compatibilidad con el Plan fiscal de la AEEPR. El NEPR aprobó los Contratos modificados el 11 de marzo de 2020. *Véase* Resolución y orden del NEPR, Caso núm. NEPR-AP-2019-0001, en 13 (11 de marzo de 2020).

El 1 de abril de 2020, la Junta de Supervisión, en calidad de representante de la AEEPR, presentó una moción para asumir los Contratos modificados. [ECF núm. 1951]. Puede consultarse una descripción detallada de esta moción, así como del litigio correspondiente, en la Sección V.G.10 de esta Declaración de divulgación*.*

---

[244] Declaración de Padilla ¶ 5 [Caso núm. 17-bk-4780, ECF núm. 1952].

c)     **Contrato de suministro de gas natural con Freepoint**

En 2015, la AEEPR formalizó un contrato de compra de combustible (el "Contrato de suministro de combustible") con Freepoint Commodities LLC ("Freepoint") para el suministro del combustible utilizado en las centrales de vapor de la AEEPR sitas en Aguirre, Costa Sur, San Juan y Palo Seco. El 10 de abril de 2017, la AEEPR y Freepoint pactaron una enmienda del Contrato de suministro de combustible (la "Enmienda de 2017"), que prorrogaba la vigencia del Contrato de suministro de combustible hasta el 31 de octubre de 2018 (incluido), con una prórroga automática de un año, salvo que alguna de las partes indicara su intención de no aceptar dicha prórroga automática. La Enmienda de 2017 eliminó además ciertas cláusulas de impago, incorporó un método de certificación alternativo que contemplaba un posible Caso del Título III, y obligó a la AEEPR a solicitar la admisión del Contrato de suministro de combustible el primer día posterior al inicio del Caso del Título III, así como a obtener una orden que admitiera la solicitud de admisión en un plazo de cuarenta (40) días a contar desde esa fecha.

El 2 de julio de 2017, simultáneamente con la presentación de la petición del Caso del Título III de la AEEPR, la Junta de Supervisión presentó una moción solicitando la aprobación del Contrato de suministro de combustible. [ECF núm. 3]. El 1 de agosto de 2017, el Tribunal del Título III aprobó la asunción del Contrato de suministro de combustible por parte de la AEEPR. [ECF núm. 154]. Se implementó la prórroga automática de un año, tras lo cual la fecha de extinción del Contrato de suministro de combustible sería el 1 de octubre de 2019. La AEEPR y Freepoint negociaron enmiendas adicionales (la "Enmienda de 2019") al Contrato de suministro de combustible, que incluyeron, (i) una prórroga de dos años del contrato, hasta el 31 de octubre de 2021; (ii) variaciones de precios para reflejar los costos impuestos por el proveedor de combustible; (iii) una reducción de la línea de crédito; y (iv) un convenio, en virtud del cual si la AEEPR fuera a vender cualquiera de sus centrales, el nuevo propietario, operador, administrador o parte que actuara en calidad de tal, aceptara quedar vinculado por los términos y condiciones del Contrato de suministro de combustible hasta su extinción. El 20 de agosto de 2019, la Junta de Supervisión presentó una moción solicitando una orden aprobando la Enmienda de 2019 del Contrato de suministro de combustible. [ECF núm. 1600]. El 4 de septiembre de 2019, el Tribunal del Título III aprobó la Enmienda de 2019. [ECF núm. 1624]. El Contrato de suministro de combustible caducó el 31 de octubre de 2021, y no fue renovado.

d)     **PPOA operativos**

Como se explica en la Sección III.B.8 precedente, once (11) de los proyectos de energías renovables llegaron a la fase operativa comercial, y actualmente venden energía y Certificados de energías renovables (los "CER") a la AEEPR (los "PPOA operativos").

Para ajustar mejor las finanzas de la AEEPR con su plan fiscal, en 2019 sus directivos decidieron emprender la renegociación de nueve (9) de los once (11) PPOA operativos. La AEEPR inició las negociaciones con los propietarios/patrocinadores de estos proyectos operativos a finales de 2019. La compañía optó por no renegociar los PPOA de dos pequeños proyectos de generación a partir de residuos, ya que los precios de los mismos ya habían cumplido los objetivos de generación de nuevas renovables.

198

La AEEPR alcanzó acuerdos de principios con las respectivas contrapartes de (6) PPOA operativos sobre las modificaciones de sus contratos. La Junta de Supervisión aprobó los PPOA, a tenor de su política de revisión de contratos y, el 17 de noviembre de 2020, presentó una moción solicitando una orden para la aprobación de la asunción, por parte de la AEEPR, de los seis (6) PPOA operativos enmendados (los "PPOA asumidos"). [ECF núm. 2299]. No hubo oposición a la moción de la AEEPR, y el 2 de diciembre de 2020, el Tribunal del Título III dictó una orden autorizando los PPOA asumido por la AEEPR. [ECF núm. 2317].

Uno de los PPOA operativo objeto de renegociación está vinculado con la central eólica de Punta Lima, sita en Naguabo, que sufrió importantes daños causados por el huracán María. La AEEPR llegó a un acuerdo de principio con la contraparte, y el 27 de mayo de 2021 la Junta de Supervisión aprobó un PPOA renegociado, así como las correspondientes compras de activos, para posibilitar la reanudación del funcionamiento de estas instalaciones.

Después de exhaustivas negociaciones, la AEEPR no consiguió pactar modificaciones aceptables de los dos (2) PPOA restantes (los "PPOA operativos con Windmar") con Windmar, Inc. y Windmar Renewable Energy, LLC (conjuntamente, "Windmar"). El 17 de noviembre de 2020, la Junta de Supervisión presentó una moción solicitando la aprobación por parte de la AEEPR de determinados PPOA, incluyendo los PPOA operativos con Windmar. [ECF núm. 2296] (la "Segunda moción ómnibus de rechazo"). Sin embargo, tras la presentación de dicha moción, la AEEPR y Windmar reiniciaron las negociaciones de las modificaciones de los PPOA operativos con Windmar. Por el momento, la moción de rechazo de estos PPOA está aplazada, pendiente del resultado de la renegociación. [ECF núm. 2623].

e)     **PPOA renegociados**

Como ya se ha explicado en la Sección III.B.8(b) precedente, la AEEPR presentó a la Junta de Supervisión dieciséis (16) PPOA renegociados, con una capacidad de 593 MW. La AEEPR seleccionó renegociar estos proyectos porque cumplían algunos de los siguientes criterios, o todos: (i) previamente, la Junta de Planificación de Puerto Rico, la Oficina de Gerencia de Permisos y/o el personal de la AEEPR habían determinado que habían completado prácticamente sus actividades de desarrollo; (ii) se mostraron dispuestas a renegociar los precios para reflejar los cambios en el sector, admitiendo modificar sus contratos en torno a 2013–2014, tiempo en el cual fueron evaluadas y aprobadas por una o más Junta(s) de Gobierno anteriores de la AEEPR; y/o (iii) más recientemente confirmaron su disposición y potencial capacidad de iniciar proyectos de construcción en un plazo relativamente corto.

Tras revisar las condiciones modificadas de los PPOA, la Junta de Supervisión determinó que las mismas eran incompatibles con el plan fiscal de la AEEPR, por cuanto conllevaban costos de la electricidad que excedían en mucho las proyecciones de precios de la propia AEEPR. Además, los PPOA no promovían la competencia del mercado, porque no fueron procurados mediante un proceso competitivo. Las respuestas de la AEEPR reflejaron que el factor determinante para la selección fue la aceptación por los proponentes de un precio determinado por la AEEPR, y no que el precio propuesto fuera el más bajo posible. Además, la AEEPR no consideró si los proponentes poseían la capacidad financiera y técnica necesaria para formalizar los PPOA. Sin embargo, para promover el desarrollo de capacidad adicional de generación de energías renovables sin repercutir significativamente en las proyecciones de los

costos de energía, la Junta de Supervisión resolvió autorizar a la AEEPR a formalizar diversos PPOA para el desarrollo de 150 MW de capacidad, aunque la selección debía hacerse tras evaluar las capacidades técnicas y financiera de cada candidato.

La AEEPR selección y propuso dos (2) PPOA para seguir negociando las enmiendas, y el 26 de febrero de 2021, la Junta de Supervisión aprobó los PPOA renegociados con CIRO One y Xzerta para desarrollar 90 MW y 60 MW, respectivamente, de capacidad renovable. El 2 de agosto de 2021, la Junta de Supervisión presentó notificaciones relativas a la asunción de los PPOA con CIRO One y con Xzerta, a tenor de los Procedimientos de asunción. [ECF núm. 2577, 2578]. Windmar fue la única objetora de los PPOA, alegando que no cumplían las leyes de Puerto Rico. [ECF núm. 2591]. El 8 de diciembre de 2021, el Tribunal del Título III dictó una orden desestimando la objeción de Windmar y aprobando la asunción de los PPOA con CIRO One y Xzerta por parte de la AEEPR. [ECF núm. 2667].

f) **PPOA rechazados**

El 7 de julio de 2020, la Junta de Supervisión presentó una moción ómnibus para rechazar veintisiete (27) PPOA (los PPOA rechazados) que, según la AEEPR, no valía la pena renegociar. [ECF núm. 2050, modificado por el ECF núm. 2055] (la "Primera moción ómnibus de rechazo"). Muchos de los PPOA rechazados no habían iniciado la fase de construcción, o bien, en el mejor de los casos, se encontraban en las primeras etapas. Además, las tarifas pactadas para venta de energía en los PPOA estaban muy por encima de las de mercado, en ocasiones en más de un 30%, con escalamiento ilimitado y cargos adicionales por los CER. Tradewinds Energy, LLC, GS Fajardo Solar y GG Alternative Energy Corp., contrapartes de los diversos PPOA rechazados, presentaron objeciones a la Primera moción ómnibus de rechazo. [ECF núm. 2067, 2100, 2117]. El 16 de septiembre de 2020, el Tribunal del Título III oyó las alegaciones orales de la Primera moción ómnibus de rechazo, y el 17 de septiembre de 2020 dictó una orden aprobando los PPOA rechazados por la AEEPR. [ECF núm. 2198].

Por otra parte, la AEEPR mantuvo exhaustivas negociaciones con las contrapartes de los PPOA renegociados. La AEEPR no consiguió renegociar condiciones aceptables con las contrapartes de tres (3) de los PPOA renegociados: con Windmar, con M Solar Generating, LLC ("M Solar") y con YFN Yabucoa Solar, LLC ("YFN"). Windmar se encontró con dificultades en su proyecto, lo cual la llevó a solicitar un nuevo emplazamiento, con el consiguiente y significativo retraso de sus fechas de puesta en servicio. La AEEPR negoció durante un tiempo con YFN y con M Solar, pero no pudieron aceptar las reducciones de precios propuestos por la AEEPR. La compañía determinó que los (3) PPOA no estaban preparados para suministrar energía rentable a corto plazo, y solicitó el rechazo de los mismos en la Segunda moción ómnibus de rechazo (la "Segunda moción ómnibus de rechazo").

YFN y M Solar objetaron el rechazo de sus PPOA renegociados, alegando que (i) la decisión de rechazar los PPOA de YFN y M Solar era precipitada, en ausencia de una decisión del NEPR sobre la autoridad de la AEEPR y de la Junta de Supervisión para rechazar los PPOA; (ii) la moción de la AEEPR rechazando los PPOA constituía una predeterminación ilícita de fijación de precios; (iii) la moción de la AEEPR era contraria al interés público; (iv) la AEEPR proponía una norma de revisión incorrecta para el rechazo de los PPOA; (v) la moción de la AEEPR no estaba suficientemente fundamentada para rechazar la revisión de los PPOA; (vi) la

200

decisión de la AEEPR de rechazar los PPOA carecía de la necesaria participación pública; y (vii) la moción de la AEEPR era extemporánea. [ECF núm. 2360, 2361]. El 16 de septiembre de 2021, el Tribunal del Título III dictó una orden aprobando el rechazo de los PPOA de YFN y de M Solar por parte de la AEEPR. [ECF núm. 2622]. El Tribunal del Título III dictaminó que (i) ninguna norma obligaba a la AEEPR a solicitar la aprobación del NEPR antes de rechazar PPOA; (ii) la AEEPR satisfizo la norma relevante en materia de rechazo de los PPOA de YFN y de M Solar; y (iii) las alegaciones de YFN y de M Solar en materia de políticas públicas sobre medio ambiente y energía eran irrelevantes para revisar la moción de rechazar un contrato. *Ibídem*

El 17 de noviembre de 2020, la Junta de Supervisión presentó la Segunda moción ómnibus de rechazo, que incluyó cuatro (4) PPOA no operativos formalizados entre la AEEPR y Windmar que fueron resueltos por la Junta de Gobierno de la AEEPR el 25 de marzo de 2020. [ECF núm. 2296]. Nadie se opuso al rechazo de estos PPOA ni al PPOA de rápida implementación con Windmar, y el Tribunal del Título III dictó una orden aprobando el rechazo de los mismos el 2 de diciembre de 2020. [ECF núm. 2318]

El 16 de julio de 2022, la Junta de Supervisión presentó una moción solicitando la aprobación de la decisión de la AEEPR de rechazar quince (15) PPOA adicionales. [ECF núm. 2893] (la "Tercera moción ómnibus de rechazo"). Entre los PPOA rechazados en esta Tercera moción ómnibus de rechazo se contaban (i) trece (13) PPOA renegociados que la Junta de Supervisión no aprobó; y (ii) ciertos PPOA no operativos cuyos precios de energía hubieran impuesto significativas cargas financieras sobre la AEEPR y los consumidores de Puerto Rico. El 8 de agosto de 2022, el Tribunal del Título III aprobó la Tercera moción ómnibus de rechazo.

**G.      Procedimientos contenciosos y asuntos impugnados significativos**

1.      **Moción del Grupo Ad Hoc de Bonistas de la AEEPR, National Public Finance Guarantee Corporation, Assured Guaranty Corp., Assured Guaranty Municipal Corp. y Syncora Guarantee Inc. en apoyo de la moción de remedio de la paralización automática para permitir a los recurrentes de hacer valer su derecho legal de que se designe un síndico, Caso núm. 17-bk-4780, ECF núm. 74;** *Autoridad de Energía Eléctrica de Puerto Rico contra el Grupo Ad Hoc de Bonistas de la AEEPR,* **(1er. Cir. 17-2079)**

El 18 de julio de 2017, el Grupo Ad Hoc y las Aseguradoras monolínea presentaron la Moción de sindicatura inicial para remediar la paralización automática y designar un síndico para la AEEPR. Según los solicitantes, su derecho de nombrar un síndico era parte de su pretendido "paquete de garantías", y manifiestan que el Tribunal debería levantar la paralización para permitirles solicitar dicho nombramiento que, en calidad de tal, propiciará la generación de ingresos netos en cantidades suficientes para pagar puntualmente el servicio de la deuda de los Bonos de la AEEPR [Caso núm. 17-bk-4780, ECF núm. 74]. Los solicitantes adujeron que existían fundamentos para levantar la paralización, dado que la AEEPR incumplía el convenio de tarifas, que seguía siendo mal administrada y que durante la paralización el valor de su garantía había disminuido. También alegaban que la decisión favorecería a los bonistas porque los aumentos de tarifas permitirían a la AEEPR dejar de endeudarse para financiar sus operaciones,

así como reducir la carga de la deuda. El 26 de julio de 2017, el Fideicomisario de bonos presentó un escrito de adhesión a la Moción de sindicatura inicial.

El 31 de julio de 2017, los Prestamistas de la línea de combustible presentaron una respuesta a la Moción de sindicatura inicial, solicitando que el Tribunal del Título III ordenara a las partes someterse a una mediación [Caso núm. 17-bk-4780, ECF núm. 146].

En la misma fecha, el Instituto de Competitividad y Sostenibilidad Económica de Puerto Rico ("ICSE") presentó una objeción a la Moción de sindicatura inicial, y la Junta de Supervisión, conjuntamente con la AAFAF, presentaron una objeción separada a la Moción de sindicatura inicial [Caso núm. 17-bk-4780, ECF núm. 147, 149, 150]. El ICSE alegó que era demasiado pronto para nombrar un síndico y que, a tenor de la Sección 362(b)(4), la CEPR podría, y supuestamente continuaría, seguir supervisando la AEEPR bajo su autoridad regulatoria [Caso núm. 17-bk-4780, ECF núm. 147]. La Junta de Supervisión sostuvo que la paralización automática era esencial para un plan de ajuste adecuado, y que la acusación de supuesta mala gestión carecía de fundamento. Además, la Junta de Supervisión, conjuntamente con la AAFAF, destacó que a los solicitantes no les faltaba suficiente protección porque las garantías prendarias que reclamaban sobre los ingresos netos (negativos) de la AEEPR carecían de todo valor (Caso núm. 17-bk-4780, ECF núm. 149, 150].

El 1 de agosto de 2017, el CANA presentó una adhesión limitada a la respuesta de los Prestamistas de la línea de combustible [Caso núm. 17-bk-4780, ECF núm. 153]. El CANA se adhirió a la respuesta de los Prestamistas de la línea de combustible solamente en la medida en que pedía que los asuntos relacionados con la AEEPR quedaran sujetos a un proceso de mediación global, y que la moción debía mantenerse en espera mientras avanzara la mediación. El 4 de agosto de 2017, el Fideicomisario de bonos presentó una respuesta limitada a la objeción de la Junta de Supervisión [Caso núm. 17-bk-4780, ECF núm. 175], alegando que el organismo se equivocaba cuando señalaba que la prenda del Fideicomisario de bonos se aplicaba solamente a los ingresos netos del sistema de la AEEPR, sino a todos los ingresos brutos de la compañía. El 5 de agosto de 2017, los recurrentes presentaron una respuesta en apoyo de su moción [Caso núm. 17-bk-4780, ECF núm. 177].

El 15 de agosto de 2017, el Tribunal del Título III dictó una orden solicitando un escrito complementario para abordar las Secciones 305 y 306 de la Ley PROMESA [Caso núm. 17-bk-4780, ECF núm. 232]. El 22 de agosto de 2017, los recurrentes presentaron un escrito complementario en apoyo de su moción, alegando que el nombramiento de un síndico no implicaría que la Sección 305 o la Sección 306, y para el caso ninguna sección, de la Ley PROMESA impedía que el Tribunal del Título III levantara la paralización automática [Caso núm. 17-bk-4780, ECF núm. 249]. El 29 de agosto de 2017, la AAFAF y la Junta de Supervisión presentaron escritos complementarios oponiéndose a la Moción de sindicatura inicial, argumentando que admitir la misma vulneraría las Secciones 305 y 306 de la Ley PROMESA, que limita expresamente las competencias y los poderes del tribunal de distrito sobre determinados asuntos [Caso núm. 17-bk-4780, ECF núm. 258, 260].

El 14 de septiembre de 2017, el Tribunal del Título III dictó una orden rechazando la Moción de sindicatura inicial [Caso núm. 17-bk-4780, ECF núm. 299]. El Tribunal del Título III

sostuvo que la medida solicitada por los recurrentes estaba, de hecho prohibida, "o de otro modo" no permitida por la Sección 305 de la Ley PROMESA. Ese lenguaje, además de otras disposiciones del Título III que limita las facultades para formular un plan de ajuste de la deuda al deudor gubernamental, protege la autoridad de los funcionarios electos para dirigir las iniciativas de reestructuración. Además, el Tribunal del Título III razonó que el Congreso negó al Tribunal del Título III la facultad de desplazar a los directivos de la AEEPR, incluso en caso de conducta impropia, omitiendo la Sección 1104 del Código de Quiebras del encuadre jurídico de la Ley PROMESA.

El 28 de septiembre de 2017, los recurrentes presentaron una notificación de apelación ante el Primer Circuito, que quedó registrada como Caso núm. 17-2079 [Caso núm. 17-bk-4780, ECF núm. 324]. En un dictamen de fecha 8 de agosto de 2018, el Primer Circuito revocó el rechazo de la Moción inicial de sindicatura por parte del Tribunal del Título III, sosteniendo que la Sección 305 de la Ley PROMESA no prohíbe a dicho tribunal levantar la paralización para permitir que los bonistas de la AEEPR soliciten el nombramiento de un síndico. Según el Primer Circuito, el concepto "o de otro modo" de la Sección 305 define de manera amplia dónde no puede intervenir el Tribunal del Título III: "en el caso o de otro modo". Además, la Sección 362(d)(1) del Código de Quiebras, incorporada en la Ley PROMESA, dice que el tribunal "podrá" remediar la paralización automática "si existe una causa, incluyendo la falta de protección adecuada de los intereses [de un acreedor] sobre los bienes". Se recomendó que, en una moción de sindicatura renovada, el Tribunal del Título III debía determinar el valor (si acaso) de la garantía de los Bonistas antes de la petición, si los bonistas se enfrentaban a una amenaza de disminución no compensada de dicho valor, si los bonistas solicitaban la protección de la garantía existente o, en cambio, la creación de una nueva, y cuál sería la protección que la AEEPR podría ofrecer, si acaso, para evitar el nombramiento de un síndico para administrarla si se otorgara dicha protección. El 30 de agosto de 2018, el Primer Circuito dictó su mandato.

2. ***La Junta de Supervisión y Administración para Puerto Rico contra U.S. Bank National Association*, Proc. abr. núm. 19-00391**

El 1 de julio de 2019, la AEEPR, mediante la Junta de Supervisión y la AAFAF, presentó una demanda contra el Fideicomisario de bonos en relación a la existencia y aplicabilidad de ciertas supuestas prendas sobre los ingresos de la AEEPR y alegados en la Reclamación de Bonos principal de la AEEPR [Proc. abr. núm. 19-00391, ECF núm. 1]. La demanda alegaba que el Contrato de fideicomiso limitaba expresamente la prenda del Fideicomisario de bonos sobre los ingresos de la AEEPR solamente a los fondos depositados en el Fondo de amortización y algunos otros Fondos subordinados, que se pretendía desautorizar. La reclamación de Fideicomisario de bonos, en la cual había sostenido mantener una prenda válida sobre los actuales y futuros ingresos de la AEEPR en nombre de los tenedores de bonos emitidos por la AEEPR, los Bonistas, y que los convenios de la AEEPR en el Contrato de fideicomiso constituyen parte de la garantía mediante la cual la AEEPR otorgó una prenda para garantizar la deuda de bonos de la AEEPR. Los demandantes pidieron un remedio declaratorio estableciendo debidamente la garantía prendaria del demandado sobre los ingresos de la AEEPR, de conformidad con el Contrato de fideicomiso; estableciendo que no existían prenda sobre los convenios de la AEEPR; y evitando las prendas imperfectas del Fideicomisario de bonos sobre cualesquiera bienes de la AEEPR más allá de los ingresos depositados a cuenta del Fondo de

amortización, y manteniendo dichas prendas imperfectas para beneficio de la AEEPR, de conformidad con la Sección 551 del Código de Quiebras, aplicable en virtud de la Sección 301(a) de la Ley PROMESA.

Además, el 1 de julio de 2019, los demandantes presentaron una moción conjunta para paralizar el procedimiento contencioso [Proc. abr. núm. 19-00391, ECF núm. 2]. Los demandantes solicitaron la paralización de todos los plazos y procedimientos ulteriores hasta (i) sesenta (60) días a contar desde la fecha en que el Tribunal del Título III rechace la moción pendiente solicitando su aprobación de un acuerdo en apoyo de la reestructuración con titulares y aseguradoras de Bonos de la AEEPR (la Moción de 9019, que se describe con mayor detalle en la Sección V.C.3, precedente); (ii) la consumación de un plan de ajuste para la AEEPR; (iii) sesenta (60) días a contar de la fecha en que los demandantes cursen una notificación para reanudar el litigio; o bien (iv) el dictado de una orden adicional del Tribunal del Título III, lo que antes se produzca. La Junta de Supervisión y la AAFAF sostuvieron que la paralización de este procedimiento contencioso evitaría que todas las partes se involucraran en un pleito costoso y engorroso, que podría ser resuelto por la Moción 9019.

El 8 de julio de 2019, el Tribunal del Título III dictó una orden derivando el asunto a la Jueza magistrada Dein [Proc. abr. núm. 19-00391, ECF núm. 6]. El 16 de julio de 2019, el Tribunal del Título III admitió la moción conjunta de paralización [Proc. abr. núm. 19-00391, ECF núm. 10].

El 17 de septiembre de 2022, la Junta de Supervisión presentó una moción para el dictado de una orden estableciendo un cronograma para la continuación de ciertos procedimientos contenciosos no resueltos relacionados con el plan de ajuste de la AEEPR [Proc. abr. núm. 19-00391, ECF núm. 11]. La moción fue plenamente fundamentada [Proc. abr. núm. 19-00391, ECF núm. 14, 15, 19]. El 29 de septiembre de 2022, el Tribunal del Título III dictó una orden admitiendo parcialmente y rechazando parcialmente la moción de la Junta de Supervisión del dictado de una orden estableciendo un cronograma del litigio, y ordenando a la Junta de Supervisión que presentara una demanda modificada como más tardar el 30 de septiembre de 2022 [Proc. abr. núm. 19-00391, ECF núm. 22].

El 30 de septiembre de 2022, la Junta de Supervisión presentó una demanda modificada (la "Demanda modificada") contra el Fideicomisario de bonos, solicitando una sentencia desestimando la Reclamación de Bonos principal de la AEEPR, salvo la reclamación garantizada contra el Fondo de amortización y el Fondo de autoseguro [Proc. abr. núm. 19-00391, ECF núm. 24]. El 3 de octubre de 2022, la Junta de Supervisión volvió a presentar la Demanda modificada, con una página de epígrafes enmendada [Proc. abr. núm. 19-00391, ECF núm. 26].

El 6 de octubre de 2022, la Junta de Supervisión presentó una moción (i) solicitando la aprobación de las estipulaciones conjuntas permitiendo a los Bonistas, a los Prestamistas de la línea de combustible, a la UTIER y al SRE de la AEE interviniendo en el procedimiento contencioso, y (ii) declarando la intención de las partes de presentar estipulaciones conjuntas autorizando a la AAFAF y al CANA a intervenir en el procedimiento contenciosos [Proc. abr. núm. 19-00391, ECF núm. 29]. En esa misma fecha, el CANA presentó una moción informativa y la AAFAF presentó una moción de permiso de intervención en relación con la misma [Proc. abr. núm. 19-00391, ECF núm. 30, 31]. El 7 de octubre de 2022, la UTIER y el SRE de la AEE

presentaron sus reservas de derechos en relación con las estipulaciones conjuntas de las partes permitiéndoles intervenir [Proc. abr. núm. 19-00391, ECF núm. 32, 33]. En la misma fecha, la Jueza Dein dictó órdenes aprobando las estipulaciones conjuntas de las partes, permitiendo que el SRE de la AEE, la UTIER y los Bonistas intervinieran en el procedimiento contencioso [Proc. abr. núm. 19-00391, ECF núm. 34, 35, 36]. También el 7 de octubre de 2022, la Junta de Supervisión presentó una moción solicitando la aprobación de la estipulación conjunta permitiendo a los Prestamistas de la línea de combustible intervenir en el procedimiento contencioso [Proc. abr. núm. 19-00391, ECF núm. 37]. El 10 de octubre de 2022, la Junta de Supervisión presentó una moción solicitando la aprobación de la estipulación conjunta permitiendo al CANA intervenir en el procedimiento contencioso [Proc. abr. núm. 19-00391, ECF núm. 38].

El 11 de octubre de 2022, la Jueza Dein dictó órdenes aprobando la estipulación conjunta de las partes, permitiendo que los Prestamistas de la línea de combustible intervinieran en el procedimiento contencioso [Proc. abr. núm. 19-00391, ECF núm. 39]. El 12 de octubre de 2022, la Jueza Dein dictó órdenes aprobando la estipulación conjunta de las partes, permitiendo que el CANA interviniera en el procedimiento contencioso [Proc. abr. núm. 19-00391, ECF núm. 40]. Ese mismo día, las partes presentaron una moción solicitando el dictado de una orden aprobando su estipulación, estableciendo la fecha límite para que los Bonistas y el Fideicomisario de bonos presentaran su respuesta a la Demanda modificada [Proc. abr. núm. 19-00391, ECF núm. 42]. El 13 de octubre de 2022, la Jueza Dein dictó una orden admitiendo la moción [Proc. abr. núm. 19-00391, ECF núm. 43]. El mismo día, la Junta de Supervisión presentó una moción solicitando una orden aprobando la estipulación de las partes permitiendo a la AAFAF intervenir en el procedimiento contencioso [Proc. abr. núm. 19-00391, ECF núm. 44].

El 14 de octubre de 2022, la Junta de Supervisión presentó una moción solicitando una orden aprobando la estipulación de las partes permitiendo a la AAFAF intervenir en el procedimiento contencioso [Proc. abr. núm. 19-00391, ECF núm. 44]. El 17 de octubre de 2022, la Jueza Dein dictó una orden aprobando la estipulación [Proc. abr. núm. 19-00391, ECF núm. 46].

El 17 de octubre de 2022, los Bonistas y U.S Bank presentaron sus respuestas, defensas afirmativas y contrademandas [Proc. abr. núm. 19-00391, ECF núm. 47]. En las contrademandas, los demandados solicitaron sentencias declaratorias (i) de que mantienen recursos sobre los actuales y futuros ingresos de la AEEPR (cargo I); (ii) de que mantienen gravámenes válidos y perfeccionados sobre los ingresos de la AEEPR y sobre otros ingresos no sujetos a anulación a tenor de la Sección 544(a) del Código de Quiebras (cargo II); (iii) de que la AEEPR ha vulnerado el Contrato de fideicomiso (cargo III); (iv) de que la AEEPR ha vulnerado sus obligaciones en tanto que fideicomisaria de los fondos mantenidos en fideicomiso para los bonistas (cargo IV); (v) de que tienen derecho a remedio por mor de ciertos argumentos en equidad (cargo V); (vi) de que si a la AEEPR se le diera la razón en sus reclamaciones, que el Fideicomisario de bonos reciba una reclamación autorizada de rescisión en nombre de todos los Bonistas (cargo VI); y (vii)de que si a la AEEPR se le diera la razón en sus reclamaciones, ello debería dar lugar a una demanda irrenunciable de justa compensación (cargo VII).

El mismo día, los demandados presentaron una moción solicitando autorización para proceder a una sentencia sumaria en los cargos I y II de las contrademandas y, al mismo tiempo,

proceder a sentencia sumaria en los cargos I–VII de la Demanda modificada, así como una moción para la agilización del trámite [Proc. abr. núm. 19-00391, ECF núm. 48, 49]. El 18 de octubre de 2022, la Jueza Dein dictó una orden admitiendo la moción y solicitando fundamentar el autorizar la moción de sentencia sumaria de los Bonistas y del Fideicomisario de bonos [Proc. abr. núm. 19-00391, ECF núm. 50]. El 20 de octubre de 2022, el Tribunal del Título III dictó una orden admitiendo la moción de licencia, y autorizando a las partes a proceder a sentencias sumarias sobre la Demanda modificada y los cargos I y II de las contrademandas [Proc. abr. núm. 19-00391, ECF núm. 59].

El 24 de octubre de 2022, la Junta de Supervisión presentó su moción de sentencia sumaria de la Demanda modificada y los cargos I y II de las contrademandas. En la moción, la Junta de Supervisión sostiene que la Reclamación de Bonos principal de la AEEPR debería inadmitirse porque (i) alega una reclamación garantizada sobre los ingresos más allá de los depositados en el Fondo de amortización y el Fondo de autoseguro, a pesar del hecho de que el Contrato de fideicomiso no otorga al Fideicomisario una prenda sobre nada más que el Fondo de amortización y Fondos subordinados, y que el Fideicomisario de bonos solamente perfeccionó su gravamen sobre el Fondo de amortización y el Fondo de autoseguro; (ii) el Fideicomisario de bonos omitió perfeccionar cualesquiera prendas sobre los ingresos de la AEEPR más allá del Fondo de amortización y del Fondo de autoseguro en la medida en que existan tales prendas; (iii) de conformidad con la Sección 22 L.P.R.A. § 2267, toda prenda no perfeccionada debería estar subordinada a los intereses de la AEEPR en la propiedad; (iv) la AEEPR no podría haber otorgado prendas en ciertos convenios y recursos del Contrato de fideicomiso, por cuanto no son propiedad de la AEEPR; (v) dichas prendas sobre los convenios y recursos deberían anularse y mantenerse para beneficio de la AEEPR porque no fueron perfeccionados; (vi) cualesquiera prendas sobre aquellos convenios y recursos deberían estar subordinadas a los intereses de la AEEPR porque no fueron perfeccionadas; y (vii) los términos inequívocos de los Bonos de la AEEPR y del Contrato de fideicomiso limitan el derecho de los Bonistas al Fondo de amortización y el Fondo de autoseguro [Proc. abr. núm. 19-00391, ECF núm. 63]. Además, la Junta de Supervisión alegó que tenía derecho a sentencia sumaria en los cargos I y II de las contrademandas sustancialmente por los mismos motivos.

El mismo día, los demandados presentaron su moción de sentencia sumaria de la Demanda modificada y los cargos I y II de las contrademandas [Proc. abr. núm. 19-00391, ECF núm. 67]. En esta moción, los demandados sostienen que tienen derecho a sentencia sumaria porque (i) el Contrato de fideicomiso permite al Fideicomisario de bonos recurrir a todos los ingresos y demás fondos, tanto acreditados como si no, del Fondo de amortización, y este recurso no está limitado por la Sección 927 del Código de Quiebras; (ii) el Fideicomisario de bonos mantiene un gravamen perfeccionado sobre los fondos acreditados al Fondo de amortización y sobre todos los ingresos especiales futuros; y (iii) el Contrato de fideicomiso otorga gravámenes sobre todos los ingresos de la AEEPR, con sus convenios, derechos y remedios garantizando su pago a los bonistas, gravámenes que no están sujetos a nulidad, limitación ni subordinación. El 31 de octubre de 2022, el SRE de la AEE presentó un memorando en apoyo de la moción de sentencia sumaria de la Junta de Supervisión, alegando además que el Contrato de fideicomiso es un contrato de subordinación [Proc. abr. núm. 19-00391, ECF núm. 74].

El 18 de noviembre de 2022, la Junta de Supervisión presentó su respuesta a la moción de sentencia sumaria de los demandados [Proc. abr. núm. 19-00391, ECF núm. 89]. En la moción, la Junta de Supervisión alega que los argumentos de los demandados en el sentido de que tienen pleno recurso sobre todos los actuales y futuros ingresos de la AEEPR se contradicen con las cláusulas de Contrato de fideicomiso, de que el único derecho a pago de los demandantes es con cargo al Fondo de amortización y el Fondo de autoseguro, y de que los convenios y remedios contenidos en el Contrato de fideicomiso no amplían los derechos a pagos de los demandados. Además, la Junta de Supervisión argumenta que el Fideicomisario de bonos tiene un gravamen perfeccionado solamente sobre los ingresos depositados a crédito del Fondo de amortización y el Fondo de autoseguro. Por otra parte, la Junta de Supervisión argumenta que las demandas de las partes están maduras y que el tribunal es competente porque su actuación para desestimar la reclamación del Fideicomisario de bonos deberá ser vista en algún momento.

El mismo día, los demandados presentaron su respuesta a la moción de sentencia sumaria de la Junta de Supervisión [Proc. abr. núm. 19-00391, ECF núm. 90]. En dicha respuesta, los demandados afirman que la moción de la Junta de Supervisión debería rechazarse, porque (i) el Contrato de fideicomiso impone prenda sobre todos ingresos de la AEEPR; (ii) la reclamación del Fideicomisario de bonos no puede inadmitirse sobre la base de nulidad o subordinación del gravamen; y (iii) el Fideicomisario de bonos tiene un derecho ejecutable de pago sobre todos los ingresos de la AEEPR. Además, los demandados alegan que las reclamaciones no están maduras porque cualquier alteración permanente de los derechos y recursos del Fideicomisario de bonos y de los Bonistas solamente puede producirse en el contexto del plan de ajuste.

3.    ***Cortland Capital Market Services LLC contra la Junta de Supervisión y Administración Financiera para Puerto Rico*, Proc. abr. núm. 19-00396**

El 9 de julio de 2019, los Prestamistas de la línea de combustible presentaron una demanda contra la Junta de Supervisión, la AEEPR, la AAFAF y el Fideicomisario de bonos [Proc. abr. núm. 19-00396, ECF núm. 1]. Tal como se ha expuesto en la Sección V.C.3(b)(i) precedente, esencialmente los Prestamistas de la línea de combustible reivindican un derecho prioritario ejecutable sobre los Bonos de la AEEPR, porque sus demandas son de "Gastos corrientes" a tenor del Contrato de fideicomiso, y que las prendas y recursos de los Bonistas de la AEEPR están limitados a unas cuentas de depósito específicos de la AEEPR en las cuales se supone que deberían depositarse los ingresos *netos* de la AEEPR (es decir, ingresos después del pago de los Gastos corrientes). Así, los Prestamistas de la línea de combustible solicitaron una orden desestimando la reclamación del Fideicomisario de bonos en la medida en que pide más de las cuantías que debidamente se determinó que deberían estar en el Fondo de amortización, a menos que la AEEPR haya pagado todos sus Gastos corrientes, así como una orden subordinando la reclamación del Fideicomisario de bonos a las reclamaciones de los Prestamistas de la línea de combustible. El 11 de julio de 2019, el Tribunal del Título III dictó una orden derivando el asunto a la Jueza magistrada Dein [Proc. abr. núm. 19-00396, ECF núm. 5].

El 26 de agosto de 2019, las Aseguradoras monolínea y el Grupo Ad Hoc presentaron una moción de autorización para intervenir [Proc. abr. núm. 19-00396, ECF núm. 10]. El 29 de agosto de 2019, también el CANA solicitó una intervención limitada [Proc. abr. núm. 19-00396, ECF núm. 19].

El 9 de septiembre de 2019, la Junta de Supervisión, la AEEPR y la AAFAF presentaron una moción de desestimación, alegando que: (i) los demandantes omiten reclamar que tienen prelación en virtud del Contrato de fideicomiso sobre los Gastos corrientes; (ii) los demandantes carecen de legitimación procesal para reivindicar una reclamación de subordinación equitativa; y (iii) además los demandantes carecen de fundamento para objetar las reclamaciones garantizadas de los Bonistas de la AEEPR, por lo cual su demanda debería ser desestimada o, alternativamente, paralizarse durante al menos sesenta (60) días tras la adjudicación de la Moción 9019 expuesta en la Sección V.C.3 precedente [Proc. abr. núm. 19-00396, ECF núm. 24].

También el Fideicomisario de bonos presentó una moción de desestimación el 9 de septiembre de 2019, alegando que: (i) ninguno de los cargos está en fase de ser decidido, por lo cual el Tribunal del Título III carece de competencia; (ii) el Tribunal del Título III debería desestimar la solicitud de los demandantes de una declaración de que, en virtud del Contrato de fideicomiso, tienen prioridad sobre los Bonistas de la AEEPR, tanto por falta de legitimación procesal como por omitir plantear una demanda; (iii) el Tribunal del Título III debería desestimar la reclamación de subordinación equitativa de los demandantes, por omitir planear una demanda, por cuanto no alegan la existencia de ningún acuerdo de subordinación, un prerrequisito necesario cuando se alega subordinación equitativa; y (iv) el Tribunal del Título III debería desestimar o paralizar los demás cargos por deferencia a las Impugnaciones al Gravamen y al Recurso, y a la Moción 9019 [Proc. abr. núm. 19-00396, ECF núm. 25].

El 12 de septiembre de 2019, los demandantes respondieron, sin objetar, la moción del CANA solicitando una intervención limitada, y presentaron una oposición a la moción de los intervinientes de licencia para intervenir [Proc. abr. núm. 19-00396, ECF núm. 32-33]. El 16 de septiembre de 2019, el Tribunal del Título III aprobó la moción de intervención limitada del CANA [Proc. abr. núm. 19-00396, ECF núm. 34]. El 18 de septiembre de 2019, los intervinientes presentaron una respuesta, reforzando su apoyo a su moción de licencia para intervenir [Proc. abr. núm. 19-00396, ECF núm. 35].

El 30 de septiembre de 2019, los Prestamistas de la línea de combustible presentaron una demanda modificada, agregando a los intervinientes como demandados y solicitando sentencias adicionales que impongan un gravamen en equidad contra la garantía del Fideicomisario de bonos; solicitando a los demandados cumplir específicamente ciertos acuerdos de indulgencia previos a la petición mediante la retirada de cualquier alegación de que las cuantías debidas en concepto de los Préstamos de la línea de combustible no son Gastos corrientes; y declarando al AAR de 2019 nulo y sin efecto, en la medida en que sus cláusulas fueron aprobadas con "contrapartidas ilícitas" a tenor del derecho de Puerto Rico [Proc. abr. núm. 19-00396, ECF núm. 36]. El mismo día, los Prestamistas de la línea de combustible presentaron una moción informativa relativa a la demanda modificada, manifestando que las mociones pendientes de los demandados para la desestimación de la demanda inicial eran irrelevantes, y dado que la demanda modificada agregaba intervinientes como demandados, también la moción de los mismos para intervenir era irrelevante [Proc. abr. núm. 19-00396, ECF núm. 37]. El 4 de octubre de 2019, el Tribunal del Título III dictó una orden rechazando por irrelevante la moción de intervenir de los intervinientes [Proc. abr. núm. 19-00396, ECF núm. 38]. Además, el Tribunal

del Título III emitió una orden declarando irrelevantes las mociones de desestimación de los demandantes del 15 de octubre de 2019 [Proc. abr. núm. 19-00396, ECF núm. 43].

El 11 de noviembre de 2019, la Junta de Supervisión y la AEEPR presentaron una moción de autorización para intervenir en la Segunda, Tercera y Cuarta reclamaciones de remedio de la demanda modificada [Proc. abr. núm. 19-00396, ECF núm. 49]. El mismo día, la Junta de Supervisión, la AEEPR y la AAFAF presentaron una moción de desestimación de la demanda modificada, alegando que: (i) los cargos I y IV omiten plantear una reclamación de que los demandantes tienen prelación sobre la reclamación de bonos; (ii) los cargos IV omiten plantear una reclamación a tenor de la Sección 510 del Código de Quiebras; (iii) los demandantes carecen de legitimación procesal para presentar los cargos II y III; (iv) no puede admitirse el cargo VI, que pretende actuaciones específicas por vulneración de contrato, ya que la ejecución específica de los contratos de los Prestamistas de la línea de combustible no es un remedio viable de conformidad con el Código de Quiebras, los derechos de las contraparte antes de la petición, los contratos no asumidos no son exigibles y están sujetos a la paralización automática, así como al tratamiento y descargo en virtud del plan de ajuste, y el cumplimiento específico contra la AEEPR está vetado por la Sección 305 de la Ley PROMESA; y (v) el cargo VII omite plantear una demanda debido a que los derechos legales de los demandantes no se ven perjudicados por el AAR de 2019 [Proc. abr. núm. 19-00396, ECF núm. 50].

También el 11 de noviembre de 2019, el Fideicomisario de bonos y los intervinientes presentaron una moción de desestimación de la demanda modificada, argumentando que: (i) los cargos I, II, III, IV, V y VII no están aún en fase de ser decididos; (ii) los demandantes carecen de legitimación procesal, y omiten plantear una demanda, de remedio declaratorio en el cargo I; (iii) el Tribunal del Título debería desestimar el cargo IV, por cuanto los demandantes omiten alegar la existencia de algún contrato de subordinación; (iv) los demandantes omiten plantear una demanda por enriquecimiento injusto en el cargo V; (v) el Tribunal del Título III debería desestimar o paralizar los cargos II y III en deferencia a la Moción 9019; (vi) la demanda del cargo VI de cumplimiento específico debería desestimarse, porque los intervinientes no han adoptado ninguna medida vulnerando algún acuerdo de indulgencia con los demandantes; y (vii) el cargo VII debería desestimarse por omisión de plantear una reclamación porque el AAR de 2019 no es un contrato que vulnere los derechos de los demandantes [Proc. abr. núm. 19-00396, ECF núm. 51].

El 19 de noviembre de 2019, los Prestamistas de la línea de combustible presentaron una respuesta a la moción de intervención de la Junta de Supervisión y de la AEEPR [Proc. abr. núm. 19-00396, ECF núm. 58]. El 26 de noviembre de 2019, el Tribunal del Título III dictó una orden aceptando parcialmente, y rechazando parcialmente, la moción de intervención de la Junta de Supervisión y de la AEEPR [Proc. abr. núm. 19-00396, ECF núm. 59].

El 5 de diciembre de 2019, los Prestamistas de la línea de combustible presentaron un escrito de oposición ómnibus a ambas mociones de desestimación de la demanda modificada, alegando que (i) existe una controversia justiciable y madura entre las partes; (ii) la demanda modificada plantea una reclamación de sentencias declaratoria de que los Prestamos de la línea de combustible son gastos corrientes; (iii) los Prestamistas de la línea de combustible tienen una legitimación procesal independiente; (iv) los Prestamistas de la línea de combustible tienen

reclamaciones de subordinación válidas; (v) la demanda modificada plantea una reclamación de enriquecimiento injusto; y (vi) la demanda modificada plantea una reclamación de vulneración de los acuerdos de indulgencia, lo cual impide la desestimación del cargo VI [Proc. abr. núm. 19-00396, ECF núm. 62]. Al día siguiente, el CANA presentó un escrito de adhesión a la oposición ómnibus de los Prestamistas de la línea de combustible [Proc. abr. núm. 19-00396, ECF núm. 63].

El 3 de febrero de 2020, la Junta de Supervisión, la AEEPR, la AAFAF, el Fideicomisario de bonos y los intervinientes presentaron respuestas en apoyo de sus mociones de desestimación, alegando que (i) las reclamaciones no son derechos de propiedad exigibles; (ii) no son gastos corrientes; (iii) no plantean una reclamación de subordinación, enriquecimiento injusto, cumplimiento específico o prejuicio injusto; y (iv) que los demandantes careces de legitimación procesal [Proc. abr. núm. 19-00396, ECF núm. 79, 80]. Al día siguiente, el CANA presentó un escrito de adhesión limitada a la respuesta presentada por la Junta de Supervisión, la AEEPR y la AAFAF [Proc. abr. núm. 19-00396, ECF núm. 81].

El 11 de febrero de 2020, los Prestamistas de la línea de combustible, la UTIER y el SRE de la AEE presentaron una moción urgente para aplazar la vista del 4 de marzo de 2020 sobre las mociones a desestimar, alegando que el estado de la Moción 9019 era incierta y que, en caso de no prosperar, varias causas de acción devendrían en irrelevantes [Proc. abr. núm. 19-00396, ECF núm. 82]. El 14 de febrero de 2020, el CANA presentó un escrito de adhesión a la moción de los Prestamistas de la línea de combustible [Proc. abr. núm. 19-00396, ECF núm. 84]. También el 14 de febrero de 2020, los Bonistas que aceptan el acuerdo, la Junta de Supervisión y la AAFAF presentaron sus respuestas a la moción de los Prestamistas de la línea de combustible [Proc. abr. núm. 19-00396, ECF núm. 85, 86, 87]. El 19 de febrero de 2020, el Tribunal del Título III admitió la moción de los Prestamistas de la línea de combustible y aplazó la vista sobre las mociones de desestimación hasta la vista ómnibus del 3 de junio 2020 [Proc. abr. núm. 19-00396, ECF núm. 89]. El 2 de abril de 2020, como consecuencia de la pandemia de la COVID-19, el Tribunal del Título III volvió a aplazar *sine die* la vista de las mociones de desestimación.

Este procedimiento contencioso quedó resuelto en virtud del AAP de los Prestamistas de la línea de combustible.

4.   ***Sistema de Retiro de los Empleados de la Autoridad de Energía Eléctrica contra la Junta de Supervisión y Administración Financiera para Puerto Rico*, Proc. abr. núm. 19-00405**

El 6 de agosto de 2019, el SRE de la AEE presentó una demanda contra la Junta de Supervisión, la AEEPR, la AAFAF, el Estado Libre Asociado, el Gobernador de Puerto Rico, el Director Ejecutivo de la AAFAF y el Fideicomisario de bonos, argumentando que el AAR de 2019 vulnera sus supuestos derechos de prioridad de pago sobre los Bonistas de la AEEPR [Proc. abr. núm. 19-00405, ECF núm. 1]. El SRE de la AEE solicita una declaración manifestando que (i) las cuantías adeudadas al SRE de la AEE son Gastos corrientes a tenor del Contrato de fideicomiso; (ii) los Bonistas no mantienen ninguna prenda sobre los ingresos de la AEEPR a menos y hasta tanto que se paguen íntegramente los Gastos corrientes, y (iii) al SRE de la AEE debería pagársele íntegramente el pasivo actual y heredado antes de que la AEEPR pague, o

agregue pagar, a cualquier Bonista. El 26 de agosto de 2019, el Tribunal del Título III dictó una
orden derivando el asunto a la Jueza magistrada Dein para la tramitación general previa al juicio
[Proc. abr. núm. 19-00405, ECF núm. 8].

El 17 de septiembre de 2019, las Aseguradoras monolínea y el Grupo de Ad Hoc
presentaron una moción de licencia para intervenir, afirmando que se les debería permitir
intervenir como demandados con plenos derechos de participación, de conformidad con Regla
Federal de Procedimiento Civil 24(a–b). [Proc. abr. núm. 19-00405, ECF núm. 12]. El 7 de
octubre de 2019, el demandante presentó un escrito de oposición a la moción de licencia para
intervenir [Proc. abr. núm. 19-00405, ECF núm. 19]. El 18 de octubre de 2019, los Bonistas que
aceptan el acuerdo presentaron una respuesta, reforzando su apoyo a su moción de licencia para
intervenir [Proc. abr. núm. 19-00405, ECF núm. 24]. El 7 de noviembre de 2019, el Tribunal del
Título III dictó una orden admitiendo la moción de licencia para intervenir de los Bonistas que
aceptan el acuerdo, permitiéndoles ejercitar plenamente sus derechos de participación [Proc. abr.
núm. 19-00405, ECF núm. 30].

El demandante presentó una demanda modificada el 30 de octubre de 2019, señalando a
Wanda Vázquez-Garced (a la sazón Gobernadora de Puerto Rico) y a Omar Marrero (el entonces
director de la AAFAF) como demandados, y agregando reclamaciones adicionales de remedio,
incluyendo: (i) pedido de una orden desestimando la reclamación del Fideicomisario de bonos
porque el supuesto derecho de pago de este supera la cuantía del Fondo de amortización; (ii)
declaración de que el SRE de la AEE es un beneficiario tercero con derecho a hacer valer las
disposiciones de Contrato de fideicomiso que lo benefician; (iii) pedido de una orden
subordinando la prenda y la recomendación del Fideicomisario sobre las reclamaciones del SRE
de la AEE; y (iv) solicitud de una orden declarando que las reclamaciones de los Bonistas no
están garantizadas [Proc. abr. núm. 19-00405, ECF núm. 25].

El 13 de noviembre de 2019, la Junta de Supervisión, la AEEPR y el Estado Libre
Asociado presentaron una moción de autorización para intervenir en la segunda reclamación de
remedio de la demanda modificada [Proc. abr. núm. 19-00405, ECF núm. 34]. El 22 de
noviembre de 2019, la Junta de Supervisión, la AEEPR y el Estado Libre Asociado presentaron
una respuesta en apoyo de su moción de autorización para intervenir en la segunda reclamación
de remedio de la demanda modificada [Proc. abr. núm. 19-00405, ECF núm. 40]. El 26 de
noviembre de 2019, el Tribunal del Título III dictó una orden aceptando parcialmente, y
rechazando parcialmente, la moción de intervención de la Junta de Supervisión, la AEEPR y el
Estado Libre Asociado [Proc. abr. núm. 19-00405, ECF núm. 41].

El 13 de noviembre de 2019, la Junta de Supervisión, la AEEPR, la AAFAF, el Estado
Libre Asociado de Puerto Rico y Wanda Vázquez-Garced presentaron una moción para
desestimar la demanda modificada, argumentando que (i) los cargos I, III, IV y V omiten
plantear una demanda porque el SRE de la AEE no es ni parte y beneficiario tercer del Contrato
de fideicomiso, el Contrato de fideicomiso no es un contrato de subordinación, y las cuantías
supuestamente adeudadas al SRE de la AEE no son "Gastos corriente" a tenor del Contrato de
fideicomiso; (ii) el Tribunal del Título III no es competente para ver el cargo III debido a que la
Sección 106(e) ha desposeído de jurisdicción al Tribunal del Título III; (iii) el demandante
carece de legitimación procesal y omite plantear una demanda para los cargos II y VI; y (iv) la

Sección 105 de la Ley PROMESA prohíbe toda reclamación contra la Junta de Supervisión [Proc. abr. núm. 19-00405, ECF núm. 35].

El mismo día, también los Bonistas que aceptan el acuerdo y el Fideicomisario de bonos presentaron una moción de desestimación, argumentando que: (i) las demandas del demandante no están en fase de ser decididas; (ii) el cargo IV omite plantear una demanda porque el demandante no es parte ni beneficiario tercero del Contrato de fideicomiso; (iii) el demandante carece de legitimación procesal para reivindicar una reclamación, y omite hacerlo en el cargo I; (iv) el demandante omite plantear una demanda en los cargos III y V porque no existe ningún acuerdo de subordinación aplicable; y (v) el Tribunal del Título III debería desestimar o paralizar los cargos II y VI en deferencia a las Impugnaciones al Gravamen y al Recurso, y a la Moción 9019 [Proc. abr. núm. 19-00405, ECF núm. 36].

El 4 de diciembre de 2019, el demandante presentó un escrito de oposición a ambas mociones de desestimación de la Demanda modificada [Proc. abr. núm. 19-00405, ECF núm. 42]. El 3 de febrero de 2020, la Junta de Supervisión, la AEEPR, la AAFAF, el Estado Libre Asociado de Puerto Rico, la Gobernadora Wanda Vázquez-Garced, los Bonistas que apoyan el acuerdo y el Fideicomisario de bonos presentaron respuestas en apoyo de sus mociones de desestimación, reiterando en gran medida sus argumentos originales [Proc. abr. núm. 19-00405, ECF núm. 53-54]. El 11 de febrero de 2020, los Prestamistas de la línea de combustible, la UTIER y el SRE de la AEE presentaron una moción urgente para aplazar la vista del 4 de marzo de 2020, para tratar sobre las mociones de desestimación [Proc. abr. núm. 19-00396, ECF núm. 82]. El 14 de febrero de 2020, la Junta de Supervisión presentó una respuesta a la

moción de los Prestamistas de la línea de combustible [Proc. abr. núm. 19-0405, ECF núm. 59]. El 19 de febrero de 2020, el Tribunal del Título III admitió la moción de los Prestamistas de la línea de combustible y aplazó la vista sobre las mociones de desestimación hasta la vista ómnibus del 3 de junio 2020. [Proc. abr. núm. 19-00405, ECF núm. 60]. El 2 de abril de 2020, como consecuencia de la pandemia de la COVID-19, el Tribunal del Título III volvió a aplazar *sine die* la vista de las mociones de desestimación.

5.   **Moción urgente para el dictado de una orden confirmando el nombramiento y la autoridad del Oficial Principal de Transformación, Caso núm. 17-bk-4780, ECF núm. 361**

El 26 de octubre de 2017, la Junta de Supervisión presentó una moción (la "Moción del OPT") solicitando el dictado de una orden confirmando el nombramiento de Noel Zamot como Oficial Principal de Transformación (el "OPT") de la AEEPR, dotado de todos los poderes de un director ejecutivo subordinado a la Junta de Supervisión, de conformidad con las Secciones 305 y 306 de la Ley PROMESA [Caso núm. 17-bk-4780, ECF núm. 361]. Como consecuencia de los efectos de los huracanes Irma y María sobre Puerto Rico, así como de los retos operativos históricos de la AEEPR, la Junta de Supervisión nombró al Sr. Zamot para el cargo de OPT, a tenor de la Sección 315 de la Ley PROMESA, para supervisar las iniciativas de recuperación de la AEEPR. Según la Moción del OPT, las responsabilidades del cargo incluirían la preparación de un plan de restauración exhaustivo y secuenciado, la dirección de las iniciativas de recuperación de desastres y de reconstrucción conjuntamente con las agencias del gobierno federal, velar por que la AEEPR funcione de manera compatible con el proceso general de

recuperación de Puerto Rico, y comunicarse con la Junta de Supervisión y con el Gobierno de Puerto Rico en nombre de la dirección de la AEEPR.

El 3 de noviembre de 2017, la CEPR presentó una moción manifestando que no tomó ninguna posición en la elección de los directivos de la AEEPR, aunque solicitando (i) una declaración de que la aprobación por parte del Tribunal del Título III de la Moción del OPT no invade la autoridad de la CEPR, y (ii) una orden instruyendo al asesor jurídico de la Junta de Supervisión y a la CEPR para establecer una serie de protocolos para garantizar que las actuaciones de cada entidad no entren en conflicto, estén coordinadas y se respalden mutuamente [Caso núm. 17-bk-4780, ECF núm. 376]. La CEPR argumentó que reducir la autoridad del organismo perjudicaría la reinstauración del rigor reglamentario una vez que la Junta de Supervisión cesara en sus funciones. También el 3 de noviembre de 2017, el Grupo Ad Hoc, National, Scotiabank y la AAFAF presentaron oposiciones a la Moción del OPT [Caso núm. 17-bk-4780, ECF núm. 377, 379, 380, 381].

El Grupo Ad Hoc alegó que la Ley PROMESA no autorizaba a la Junta de Supervisión a nombrar a un OPT fuera del marco del derecho del Estado Libre Asociado. Argumentó asimismo que las facultades que la Ley PROMESA otorga a la Junta de Supervisión no incluyen el control de las actividades cotidianas de la AEEPR. National sostuvo que la Ley PROMESA no otorgaba a la Junta de Supervisión una autoridad tan amplia, aunque propuso autorizar al Sr. Zamot a supervisar provisionalmente las reparaciones inmediatas de la red eléctrica, durante un período de 120 días, a tenor de la Sección 105 del Código de Quiebras, incorporado a la Ley PROMESA en su Sección 301. Scotiabank sostuvo que el nombramiento de un nuevo oficial principal no entraba dentro de la autoridad de la Junta de Supervisión, aunque no objetó el nombramiento de un OPT para contribuir a apoyar las iniciativas de reparaciones, dentro de las funciones estatutarias de la Junta de Supervisión. La AAFAF se opuso a la Moción del OPT, sosteniendo que la Ley PROMESA no da a la Junta de Supervisión el derecho de asumir el control operativo cotidiano de la AEEPR.

El mismo día, 3 de noviembre de 2017, el Fideicomisario presentó una adhesión a la oposición del Grupo Ad Hoc, el ICSE presentó una moción a la Moción del OPT, Assured presentó una adhesión a la oposición de National, y la Junta de Gobierno de la AEEPR presentó una adhesión a la oposición de la AAFAF [Caso núm. 17-bk-4780, ECF núm. 382, 383, 384, 390].

El 8 de noviembre de 2017, la Junta de Supervisión presentó su respuesta ómnibus y una propuesta de orden revisada que incorporaba los comentarios que había recibido del Departamento de Justicia de Estados Unidos [Caso núm. 17-bk-4780, ECF núm. 414]. La Junta de Supervisión alegó que, a cambio de la autoridad de solicitar protección ante la quiebra, el Congreso convirtió a la Junta de Supervisión en representante del Deudor, y le otorgó muchas de facultades de un fideicomisario de quiebra del Deudor. Además, la Junta de Supervisión alegó que la Sección 305 de la Ley PROMESA permite a la Junta de Supervisión solicitar al Tribunal del Título III que confirme sus poderes sobre la propiedad y los asuntos de la AEEPR.

El 11 de noviembre de 2017, la AAFAF presentó una tríplica para confirmar su oposición a la Moción del OPT, manifestando que la Ley PROMESA no había otorgado a la Junta de Supervisión la facultad de designar un OPT [Caso núm. 17-bk-4780, ECF núm. 445].

El 13 de noviembre de 2017 se celebró una vista sobre la Moción del OPT, y el 16 de noviembre de 2017, el Tribunal del Título III expidió un dictamen y orden rechazando la Moción del OPT [Caso núm. 17-bk-4780, ECF núm. 471]. El Tribunal del Título III llegó a la conclusión de que la Ley PROMESA no permitía a la Junta de Supervisión imponer unilateralmente cambios en una estructura directiva creada estatutariamente mediante la designación de un OPT, para dirigir las funciones ejecutivas de un deudor del Título III (es decir, la AEEPR), ni para delegar dicha autoridad a un agente de la Junta de Supervisión. En su lugar, la estructura establecida por los Títulos I y II de la Ley PROMESA, así como la reserva de poder territorial de la Sección 303, requieren que la Junta de Supervisión y el Gobierno de Puerto Rico colaboren para establecer una hoja de ruta fiscalmente responsable que sea aceptable para la Junta de Supervisión.

6.   **Moción urgente para el dictado de una orden autorizando financiamiento garantizado posterior a la petición, Caso núm. 17-bk-4780, ECF núm. 549**

El 27 de enero de 2018, la Junta de Supervisión y la AAFAF presentaron la Moción de financiamiento de la AEEPR, con el objeto de obtener financiamiento posterior a la petición del orden de los $1,300 millones, garantizados por un gravamen de primer rango [Caso núm. 17-bk-4780, ECF núm. 549]. El Tribunal del Título III programó para el 7 de febrero de 2018 una vista ómnibus sobre la Moción de financiamiento de la AEEPR [Caso núm. 17-bk-4780, ECF núm. 548]. El 31 de enero de 2018, la Junta de Supervisión presentó una moción solicitando una orden aclaratoria del alcance de la vista [Caso núm. 17-bk-4780, ECF núm. 557], a lo cual se opuso el Grupo Ad Hoc [Caso núm. 17-bk-4780, ECF núm. 558], oposición a la que se adhirió National [Caso núm. 17-bk-4780, ECF núm. 561]. El 1 de febrero de 2018, Assured, el Fideicomisario de bonos y Syncora también presentaron adhesiones a la oposición del Grupo Ad Hoc [Caso núm. 17-bk-4780, ECF núm. 564, 578, 581], y National presentó un suplemento a dicha adhesión [Caso núm. 17-bk-4780, ECF núm. 582]. El 2 de febrero de 2018, el Tribunal del Título III dictó una orden rechazando la moción de aclaración del alcance de la vista [Caso núm. 17-bk-4780, ECF núm. 616].

El 1 de febrero de 2018, Arc American, el Grupo Ad Hoc de Bonistas de Obligaciones generales (el "Grupo de OG"), el Fideicomisario de bonos, el Grupo Ad Hoc, Whitefish, Scotiabank, National, Ambac, Assured y Syncora presentaron sus oposiciones a la Moción de financiamiento de la AEEPR [Caso núm. 17-bk-4780, ECF núm. 563, 566, 568, 570, 571, 572, 580, 583, 585]. En general, las oposiciones apoyaban el que la AEEPR pidiera financiamiento posterior a la petición para atender a sus necesidades de liquidez, pero o bien objetaban los términos en que se ofrecía dicho financiamiento (incluyendo primar las prendas existentes) y el mecanismo procesal en virtud del cual se negoció, o bien pedían modificar los términos del financiamiento para posibilitar el pago de ciertas reclamaciones de gastos administrativos.

El 1 de febrero de 2018, Solus presentó una declaración en apoyo de la Moción de financiamiento de la AEEPR [Caso núm. 17-bk-4780, ECF núm. 576]. El 2 de febrero de 2018,

también el CANA presentó una declaración en apoyo de la Moción de financiamiento de la
AEEPR [Caso núm. 17-bk-4780, ECF núm. 597]. El 3 de febrero de 2018, la Junta de
Supervisión presentó su respuesta en apoyo de la Moción de financiamiento de la AEEPR [Caso
núm. 17-bk-4780, ECF núm. 617]. En su respuesta, la Junta de Supervisión alegaba que (i) la
AEEPR no podría obtener financiamiento en condiciones más favorables; (ii) los titulares de
determinados bonos de la AEEPR quedarían adecuadamente protegidos (en el supuesto caso de
que tuvieran prendas); (iii) el Financiamiento al DIP era equitativo, defendía los mejores
intereses de la AEEPR y de sus acreedores, y era necesario para proteger las finanzas de la
AEEPR; y (iv) sus términos y condiciones eran equitativos y razonables. El 5 de febrero de 2018,
la AAFAF presentó su adhesión a la respuesta de la Junta de Supervisión [Caso núm. 17-bk-
4780, ECF núm. 623].

El 9 de febrero de 2018, Whitefish, el Fideicomisario de bonos, el Grupo Ad Hoc,
Assured, National y Syncora complementaron sus oposiciones a la Moción de financiamiento de
la AEEPR [Caso núm. 17-bk-4780, ECF núm. 648, 649, 650, 652, 655, 656, 663]. También el 9
de febrero de 2018, Knighthead Capital Management, LLC presentó su oposición a la Moción de
financiamiento de la AEEPR, y además se adhirió a varias oposiciones a la misma de parte de
algunos acreedores [Caso núm. 17-bk-4780, ECF núm. 653]. El 12 de febrero de 2018,
Scotiabank y Solus presentaron una respuesta en apoyo de la Moción de financiamiento de la
AEEPR [Caso núm. 17-bk-4780, ECF núm. 687].

El 14 de febrero de 2018, el Grupo Ad Hoc y Syncora presentaron una propuesta
conjunta para ofrecer a la AEEPR financiamiento posterior a la petición sin prima, y la Junta de
Supervisión y la AAFAF presentaron una moción informativa señalando que la propuesta
competidora no era una propuesta financiera válida ni un motivo por el cual el Tribunal del
Título III debería rechazar la Moción de financiamiento de la AEEPR [Caso núm. 17-bk-4780,
ECF núm. 707, 714]. El 15 de febrero de 2018, el Grupo Ad Hoc presentó una respuesta a la
moción informativa de la Junta de Supervisión y de la AAFAF [Caso núm. 17-bk-4780, ECF
núm. 715].

La vista de la Moción de financiamiento de la AEEPR se celebró el 15 de febrero del
2018. Tras su argumentación por ambas partes, el Tribunal del Título III determinó que no
aprobaría el financiamiento en los términos propuestos en la Moción de financiamiento de la
AEEPR, sino que mantendría la moción en suspenso, sin perjuicio, hasta que las partes
presentaran una propuesta modificada con una cuantía disponible más pequeña y una súper-
prioridad administrativa, a tenor de la Sección 364(c) del Código de Quiebras (pero sin los
gravámenes primados previstos por la Sección 364(d)) y, sin perjuicio, las posible futuras
solicitudes de financiamiento adicional y/o gravámenes primados. Transcripción de la vista del
15 de febrero de 2018, en 232:10-14 [Caso núm. 17-bk-4780, ECF núm. 754].

En consecuencia, el 16 de febrero de 2018, la Junta de Supervisión y la AAFAF
presentaron una solicitud conjunta urgente [Caso núm. 17-4780, ECF núm. 722], solicitando el
registro de una propuesta de orden revisada aprobando una línea de crédito de $300 millones, y
otorgando al prestamista una reclamación de gastos administrativos superprioritaria (el
"Financiamiento revisado"). Además, el 17 de febrero de 2018, la Junta de Supervisión y la
AAFAF volvieron a revisar la propuesta [Caso núm. 17-bk-4780, ECF núm. 729].

El 19 de febrero de 2018, el Tribunal del Título III dictó la Orden de financiamiento de la AEEPR aprobando el Financiamiento revisado, y determinando que el financiamiento propuesto era necesario, esencial y adecuado para la continuidad de las actividades de la AEEPR, y que esa justificación ha sido demostrada para otorgar una reclamación de gastos administrativos superprioritaria al prestamista a cambio de la línea de crédito [Caso núm. 17-bk-4780, ECF núm. 744]. El 8 de marzo de 2019, la AEEPR devolvió todas las cuantías pendientes dentro del marco del Financiamiento revisado.

7.      **Moción renovada de National Public Finance Guarantee Corporation, Assured Guaranty Corp., Assured Guaranty Municipal Corp. y Syncora Guarantee Inc. para el levantamiento de la paralización automática para permitir a los recurrentes hacer valer su derecho legal de que se designe un síndico, Caso núm. 17-bk-4780, ECF núm. 975**

El 3 de octubre de 2018, las Aseguradoras monolínea presentaron la Moción de sindicatura renovada para que se levante la paralización y poder solicitar el nombramiento de un síndico para la AEEPR [Caso núm. 17-bk-4780, ECF núm. 975]. Las Aseguradoras monolínea alegaron que existían motivos para levantar la paralización como consecuencia de la supuesta mala gestión histórica y continuada de la AEEPR. Además, argumentaron que los Bonos estaban garantizados por los ingresos de la AEEPR y por determinados convenios contenidos en el Contrato de fideicomiso, y que dichos intereses no estaban adecuadamente protegidos porque la mala gestión de la entidad redujo los ingresos de la AEEPR.

El 5 de diciembre de 2018, las Aseguradoras monolínea, la Junta de Supervisión, la AEEPR, AAFAF y el CANA presentaron una estipulación solicitando el dictado de una orden disponiendo la participación del CANA en la indagatoria y presentación en relación con la Moción de sindicatura renovada [Caso núm. 17-bk-4780, ECF núm. 1038]. El 6 de diciembre de 2018, el Tribunal del Título III dictó una orden trasladando la Moción de sindicatura renovada a la Jueza Dein para la indagatoria de todos los asuntos relacionados, y la estipulación de las partes se aprobó conjuntamente con dicho traslado. [Caso núm. 17-bk-4780, ECF núm. 1039, 1040]. El 26 de diciembre de 2018, las partes estipularon una orden de protección en relación con la Moción de sindicatura renovada [Caso núm. 17-bk-4780, ECF núm. 1051]. En consecuencia, el 27 de diciembre de 2018 el Tribunal del Título III dictó una orden de protección [Caso núm. 17-bk-4780, ECF núm. 1052].

El 27 de marzo de 2019, el CANA presentó un escrito de oposición a la Moción de sindicatura renovada [Caso núm. 17-bk-4780, ECF núm. 1151]. En el mismo, el CANA alegaba que las Aseguradoras monolínea no tienen derecho al levantamiento de la paralización automática debido a que, a tenor de lo dispuesto por el Contrato de fideicomiso, no mantienen un interés en ninguna garantía que requiera una protección adecuada. El 29 de marzo de 2019, también la UTIER presentó un escrito de oposición a la Moción de sindicatura renovada [Caso núm. 17-bk-4780, ECF núm. 1158]. El 30 de abril de 2019, Scotiabank y Solus presentaron un escrito de oposición y de reserva de derechos en respuesta a la Moción de sindicatura renovada [Caso núm. 17-bk-4780, ECF núm. 1207].

El 7 de mayo de 2019, las Partes del Gobierno presentaron una moción solicitando una orden para paralizar la presentación de escritos en la Moción de sindicatura renovada hasta después de la sentencia del Tribunal del Título III tanto sobre la Moción 9019 como sobre la moción de desestimación de la Moción de sindicatura renovada [Caso núm. 17-bk-4780, ECF núm. 1214, 1233]. También Assured presentó una adhesión a la moción [Caso núm. 17-bk-4780, ECF núm. 1219]. El 8 de mayo de 2019, National y Syncora presentaron oposiciones a la moción [Caso núm. 17-bk-4780, ECF núm. 1221, 1222]. El 9 de mayo de 2019, el Tribunal del Título III dictó una orden admitiendo la Moción de paralización y paralizando la presentación de alegaciones sobre la Moción de sindicatura renovada hasta después de que el Tribunal del Título III se expidiera sobre (i) la Moción 9019 de la AEEPR, y (ii) la moción de desestimación de la Moción de sindicatura renovada previamente presentada por la Junta de Supervisión [Caso núm. 17-bk-4780, ECF núm. 1230].

El 10 de mayo de 2019, el Gobierno de Puerto Rico presentó una moción de desestimación de la Moción de sindicatura renovada [Caso núm. 17-bk-4780, ECF núm. 1233]. Las Partes del Gobierno argumentaban, entro otros, que debido a que los recurrentes habían formalizado el AAR de 2019 con Assured y el Grupo Ad Hoc, que en conjunto eran titulares y/o aseguradores de aproximadamente el 48% del capital de los Bonos de la AEEPR circulantes, de aprobarse el AAR de 2019 Assured vendría contractualmente obligada a retirarse de la Moción de sindicatura renovada. Además, las Partes del Gobierno sostenían que si se aprobara el AAR de 2019, la Moción de sindicatura renovada quedaría resuelta y desestimada en cuanto a los Bonistas que aceptaban el acuerdo, y estos últimos ya no podrían solicitar el levantamiento de la paralización para que se nombrara un síndico. De manera similar, las Partes del Gobierno alegaron que National y Syncora estaban impedidas de emprender o mantener cualquier actuación apoyada por menos de una quinta parte de los citados bonistas.

Tras otorgar diversas prórrogas, el 13 de septiembre de 2019, el Tribunal del Título III dictó una orden paralizando la presentación de alegaciones sobre la moción a desestimar hasta tanto se resolviera la Moción 9019 [Caso núm. 17-bk-4780, ECF núm. 1638].

El 8 de marzo de 2022, la AAFAF rescindió el AAR de 2019 [Caso núm. 17-bk-4780, ECF núm. 2747]. Al producirse la extinción, el Tribunal del Título III dictó una orden requiriendo a la Junta de Supervisión que mediara con todos los principales involucrados y partes interesadas para pactar un plan de ajuste adecuado para la AEEPR [Caso núm. 17-bk-4780, ECF núm. 2748]. Durante el período de mediación quedaba paralizada la moción de desestimación de las Partes del Gobierno. El 19 de septiembre de 2022, al agotarse el plazo de mediación estipulado, los Bonistas presentaron una moción de desestimación del Caso del Título III de la AEEPR o, como alternativa, el levantamiento de la paralización automática para designar un síndico para la compañía [Caso núm. 17-bk-4780, ECF núm. 2973, 2974]. El 29 de septiembre de 2022, el Tribunal del Título III dictó una orden paralizando la moción de desestimación del Caso de la AEEPR, que subsume la Moción de sindicatura renovada [Caso núm. 17-bk-4780, ECF núm. 3013].

8.   **Moción conjunta de la AEEPR y de la AAFAF a tenor de la Regla 9019 del Código de Quiebras para la obtención de una orden aprobando las conciliaciones incorporadas en el AAR, Caso núm. 17-bk-4780, ECF núm.**

**1235;** ***Comité Oficial de Acreedores No Asegurados contra Junta de
Supervisión y Administración Financiera para Puerto Rico,*** **(1er. Cir. 20-2162)**

El 10 de mayo de 2019, la Junta de Supervisión, la AAFAF y la AEEPR presentaron la
Moción 9019, solicitando la aprobación de ciertas conciliaciones y compromisos englobados en
el AAR de 2019 [Caso núm. 17-bk-4780, ECF núm. 1235]. En la Moción 9019, los recurrentes
alegaban que las conciliaciones propuestas representaban un hito significativo en el Caso del
Título III de la AEEPR porque, entre otras cosas, el AAR de 2019 permitiría resolver las
reclamaciones de los bonistas por menos de las cuantías nominales de sus títulos. Además, a
tenor del AAR de 2019, se requería que la AEEPR propusiera un plan en virtud del cual todas las
personas que fuesen propietarias o controladoras usufructuarias de bonos no asegurados y que
participaran en el AAR o formalizaran su adhesión al mismo, canjearían sus bonos por bonos de
titulización garantizados mediante un cargo de transición fijo y previsible. El 22 de mayo de
2019, el Tribunal del Título III dictó una orden derivando la moción a la Jueza magistrada Dein
[Caso núm. 17-bk-4780, ECF núm. 1252].

El 17 de junio de 2019, la Junta de Supervisión y la AAFAF presentaron mociones
conjuntas *in limine* para excluir los testimonios ofrecidos por la UTIER, el SRE de la AEE,
Windmar y algunos pates ambientalistas [Caso núm. 17-bk-4780, ECF núm. 1300]. El 11 de
junio de 2019, dichas pares presentaron una respuesta a las mociones *in limine* para excluir
testimonios, alegando que los intervinientes ambientalistas cumplían los criterios de intervención
autorizada y tenían legitimación procesal para comparecer [Caso núm. 17-bk-4780, ECF núm.
1319]. El 12 de julio de 2019, el Tribunal del Título III admitió las mociones *in limine* y excluyó
los testimonios proferidos. [Caso núm. 17-bk-4780, ECF núm. 1457].

La AAFAF presentó una moción para el dictado de una orden para el señalamiento de las
mociones conjunta *in limine* [Caso núm. 17-bk-4780, ECF núm. 1302]. El 18 de junio de 2019,
los recurrentes y ciertos previstos objetores presentaron un informe de estado conjunto
complementario, conjuntamente con una propuesta de orden modificada (la "Propuesta de orden
9019 modificada") para limitar y aclarar el alcance del recurso solicitado en la Moción 9019
[Caso núm. 17-bk-4780, ECF núm. 1361]. El 2 de julio de 2019, los recurrentes presentaron un
memorando complementario de antecedentes de hecho y de derecho en apoyo de la Moción 9019
[Caso núm. 17-bk-4780, ECF núm. 1425]. En el memorando complementario, los recurrentes
sostenían que la conciliación lograba tres objetivos fundamentales: (i) limitaba la cuantía del
aumento de los precios de electricidad para pagar la deuda; (ii) transformaba la deuda existente
sin recurrir a una sindicatura, sin ningún convenio de tarifas y sin recursos por impago del
servicio de la deuda toda vez que se pagaran a los Bonistas los ingresos de las cargas de
transición; y (iii) suponía un descuento de la deuda original que permitiría a la AEEPR ahorrarse
entre $2,000 y $3,000 millones en flujos de efectivo. Además, alegaban que el Tribunal del
Título III estaba facultado para aprobar los términos y condiciones del AAR de 2019.

El 11 de julio de 2019 se celebró una conferencia preliminar sobre la Moción 9019. En
dicha conferencia, el Tribunal del Título III reiteró el alcance limitado de la Propuesta de orden
9019 modificada, destacando que en ese momento las Partes del Gobierno solicitaban solamente
la aprobación de determinadas cláusulas del AAR que (i) admitirían las reclamaciones
garantizadas de los Bonistas que aprobaban el acuerdo en cuantías descontadas; (ii) admitirían el

218

devengo de ciertas reclamaciones administrativas; (iii) admitirían ciertos pagos de protección y conciliación adecuados antes de la confirmación del plan; (iv) exculparían a los Bonistas que aceptaban el acuerdo y al Fideicomisario de bonos de las acciones y omisiones por la formalización del AAR; (v) requerirían que los Bonistas que aceptaban el acuerdo favorecieran un plan congruente con el AAR de 2019; y (vi) desestimaría la Moción de sindicatura renovada para los recurrentes que aceptaban el acuerdo. Con el alcance más limitado, el Tribunal del Título III destacó que ya no se le pedía que aprobara cláusulas del AAR de 2019 que, por ejemplo, implementaran aumentos de tarifas, impusieran cargas de conciliación o de transición, ni implementaran protecciones de demanda o de titulización. Además, en la Propuesta de orden 9019 modificada, las Partes del Gobierno ya no pedían al Tribunal del Título III que determinara si el tratamiento de las reclamaciones garantizadas en disputa propuestas en el AAR debía o no confirmarse en el contexto del eventual plan de ajuste de la AEEPR.

Siguiendo las instrucciones dictadas por el Tribunal del Título III en la conferencia del 11 de julio, el 19 de julio de 2019 los recurrentes presentaron un segundo memorando complementario de antecedentes de hecho y de derecho [Caso núm. 17-bk-4780, ECF núm. 1486]. En ese segundo memorando, los recurrentes sostuvieron que el Tribunal del Título III podría otorgar el remedio solicitado sin eliminar la capacidad de la AEEPR de compensar íntegramente las reclamaciones de los Prestamistas de la línea de combustible si en última instancia se les daba la razón en su argumento de que sus reclamaciones eran prioritarias sobre las reclamaciones de los bonistas de la AEEPR. Asimismo, sostenían que los reclamantes de gastos no tenían derechos de propiedad ejecutables.

El 20 de septiembre de 2019, Whitefish presentó una objeción a la Moción 9019, argumentando que la conciliación perjudicaría indebidamente a los acreedores menores [Caso núm. 17-bk-4780, ECF núm. 1641]. El 25 de octubre de 2019, Cobra presentó una objeción a la Moción 9019, argumentando que la conciliación no debería ser aprobada antes de que se pagaran a Cobra los servicios que había prestado con posterioridad a la petición [Caso núm. 17-bk-4780, ECF núm. 1682]. El 30 de octubre de 2019, la UTIER, el SRE de la AEE, los Prestamistas de la línea de combustible y el CANA presentaron objeciones a la Moción 9019 [Caso núm. 17-bk-4780, ECF núm. 1697, 1698, 1700, 1701], argumentando que la conciliación discriminaría injustamente entre los acreedores, subvertiría los derechos de los prestamistas y afectarían indebidamente las reclamaciones de los demás acreedores.

El 27 de marzo de 2020, en respuesta a la creciente amenaza de la COVID-19 y de sus efectos para el pueblo y la economía de Puerto Rico, los recurrentes presentaron conjuntamente la Moción de aplazamiento, solicitando aplazar *sine die* todos los plazos vinculados con la Moción 2019 [Caso núm. 17-bk-4780, ECF núm. 1947]. El 2 de abril de 2020, el Tribunal del Título III admitió la Moción de aplazamiento [Caso núm. 17-bk-4780, ECF núm. 1954]. A tenor de la orden del Título III, los recurrentes aportaron informes de estado periódicas sobre la situación de la AEEPR y de la Moción 9019. *Véase* [Caso núm. 17-bk-4780, ECF núm. 1992, 2111, 2220, 2330, 2394, 2404, 2476]. El 18 de mayo de 2020, el CANA presentó una respuesta a un informe de estado de los recurrentes, en la cual se pedía al Tribunal del Título III que suprimiera la Moción 9019 debido a que, según el CANA, el AAR de 2019 ya no existía en su forma actual [Caso núm. 17-bk-4780, ECF núm. 1996]. El Tribunal del Título III rechazó la solicitud del CANA [Caso núm. 17-bk-4780, ECF núm. 2006]. El 18 de agosto del 2020, el

CANA presentó una moción mediante la cual volvía a solicitar que el Tribunal del Título III extinguiera la Moción 9019, con los mismos fundamentos [Caso núm. 17-bk-4780, ECF núm. 2144]. El 4 de noviembre de 2020, el Tribunal del Título III rechazó la moción de extinción, sin perjuicio de que pudiera repetirse después del 21 de abril de 2021 [Caso núm. 17-bk-4780, ECF núm. 2287].

El 4 de diciembre de 2020, el CANA apeló el rechazo de su moción de extinción por parte del Tribunal del Título III [Caso núm. 17-bk-4780, ECF núm. 2320]. El 22 de diciembre de 2020, la apelación quedó registrada como Caso núm. 20-02162 en el Primer Circuito. El 2 de febrero de 2021, el Primer Circuito dictó una orden pidiendo al apelante que desestimara voluntariamente la apelación, o bien que justificara por qué la apelación no debería ser desestimada por no ser dicho tribunal competente. El 16 de febrero de 2021, el apelante presentó una respuesta a la orden del Primer Circuito de fundamentar la causa, alegando que la orden del Tribunal del Título III era apelable y que el Primer Circuito era entonces competente. El 25 de febrero de 2021, con la venia del tribunal, la Junta de Supervisión presentó una respuesta, en la que alegaba que la orden del Tribunal del Título III rechazando la moción del CANA no era definitiva, por lo cual el Primer Circuito no era competente. El 21 de mayo de 2021, el Primer Circuito dictó una sentencia, desestimando la apelación por no ser competente. El 11 de junio de 2021, el Primer Circuito dictó su mandato.

Después de la desestimación del Primer Circuito, todas las vistas y presentaciones de escritos sobre la Moción 9019 siguieron aplazados, y a partir de ese momento la Junta de Supervisión comunicó al Tribunal del Título III las actualizaciones de situación periódicas. Por cuanto el AAR de 2019 se había extinguido, la Moción 9019 cayó en la irrelevancia. [Caso núm. 17-bk-4780, ECF núm. 2745].

9.     **Objeción del Comité Oficial de Acreedores No Asegurados a la evidencia de reclamación número 18449, Caso núm. 17-bk-04780, ECF núm. 1691;** *Comité Oficial de Acreedores No Asegurados contra Autoridad de Energía Eléctrica de Puerto Rico y otros***, (1er. Cir. 20-1122)**

El 30 de octubre de 2019, mientras la Moción 9019 seguía pendiente, el CANA presentó una objeción (la "Objeción a la reclamación") a la Evidencia de reclamación número 18449 de la Reclamación de Bonos principal de la AEEPR, presentada por el Fideicomisario de bonos [Caso núm. 17-bk-4780, ECF núm. 1691]. El CANA alegaba que los Bonos, regidos por el Fideicomisario de bonos, estaban garantizados por, y eran solamente pagaderos con cargo a, las cuantías efectivamente depositadas en las cuentas de depósito que comprometían el Fondo de amortización y ciertas cuentas subordinadas. En consecuencia, la Objeción a la reclamación argumentaba que el Fideicomisario de bonos y los titulares usufructuarios de los Bonos de la AEEPR, los Bonistas, carecían de todo derecho de recobro contra la AEEPR o sus activos más allá de su derecho de recurrir a los importes depositados en las citadas cuentas.

El 13 de noviembre de 2019, el Tribunal del Título III emitió una orden pidiendo a las partes que aportaran escritos adicionales relativos a si el CANA tenía o no legitimación procesal para objetar la Reclamación de Bonos principal de la AEEPR sin anuencia del Tribunal, y si el Tribunal del Título III debía ver y resolver la Objeción a la reclamación considerando que la

Moción 9019 seguía pendiente [Caso núm. 17-bk-4780, ECF núm. 1734]. *Véase* la Sección
V.C.3. El 21 de noviembre de 2019, el CANA de una parte, y la Junta de Supervisión, la AAFAF
y las Partes del Gobierno de la otra, presentaron sus escritos complementarios [Caso núm. 17-bk-
4780, ECF núm. 1767, 1769]. El CANA alegó que tenía legitimación procesal para presentar su
objeción a pesar de que la Moción 9019 estaba pendiente, mediante la cual se pretendía resolver
las impugnaciones que estaba presentando el CANA. Por su parte, las Partes del Gobierno
argumentaron que el CANA carecía de legitimación procesal para presentar su objeción, y que el
Tribunal del Título III no venía obligado a, y no debería, admitir la objeción del CANA antes de
que se resolviera la Moción 9019. También los Prestamistas de la línea de combustible, las
Partes replicantes de los Bonistas,[245] la UTIER y el SRE de la AEE presentaron escritos
suplementarios, el 25 de noviembre de 2019 [Caso núm. 17-bk-4780, ECF núm. 1782, 1783,
1784]. En gran medida, los Prestamistas de la línea de combustible, la UTIER y el SRE de la
AEE mostraron su acuerdo con la objeción del CANA, en tanto que los Bonistas replicantes
apoyaron la posición de las Partes del Gobierno.

El 4 de diciembre de 2019, el CANA y las Partes del Gobierno presentaron escritos de
respuesta complementarios [Caso núm. 17-bk-4780, ECF núm. 1800, 1801]. También las Partes
replicantes de los Bonistas y los Prestamistas de la línea de combustible presentaron escritos de
respuesta suplementarios, el 6 de diciembre de 2019, reiterando en gran medida sus
argumentaciones originales [Caso núm. 17-bk-4780, ECF núm. 1811, 1812]. El 3 de enero de
2020, el Tribunal del Título III dictó una orden extinguiendo la Objeción a la reclamación, sin
perjuicio, hasta la resolución de la Moción 9019, destacando que pedir a los tribunales que
resolvieran objeciones antes de la aprobación de un acuerdo conllevaría que los "casos de
quiebras quedarían [habitualmente] . . . estancados".[Caso núm. 17-bk-4780, ECF núm. 1855, en
6].

El 27 de enero de 2020, el CANA presentó una notificación de apelación a la orden del
Tribunal del Título III extinguiendo la Objeción a la reclamación [Case núm. 17-bk-4780, ECF
núm. 1878]. El 22 de febrero de 2020, la apelación quedó registrada como Caso núm. 20-1122 en
el Primer Circuito. El 3 de marzo de 2020, las Partes del Gobierno presentaron una moción de
desestimación de la apelación por ausencia de competencia para apelación, alegando que la
orden del Título III no era definitiva y, por consiguiente, no apelable. El 23 de marzo de 2020, el
CANA presentó su respuesta a la moción de desestimación de las Partes del Gobierno,
argumentando que la orden era definitiva y apelable, motivo por el cual el Primer Circuito era
competente, agregando una moción cruzada adicional de mantener la apelación en espera hasta la
resolución de la Moción 9019. El 8 de abril de 2020, las Partes del Gobierno presentaron una
notificación de no oposición a la moción cruzada del CANA de mantener la apelación en espera.
El 2 de junio de 2020, el Primer Circuito emitió una orden admitiendo la moción cruzada del
CANA de mantener la apelación en espera hasta la resolución de la Moción 9019. Desde
entonces, el CANA ha presentado periódicamente informes de estado, y la apelación sigue en
espera.

---

[245] Por Partes replicantes de los Bonistas se entienden el Fideicomisario de bonos, el Grupo Ad Hoc y las Aseguradoras
monolínea.

221

Desde entonces, el Tribunal del Título III ha ordenado a la Junta de Supervisión que presenta una Impugnación modificada al gravamen, que la Junta de Supervisión presentó el 3 de octubre de 2022. [Proc. abr. núm. 19-00391, ECF núm. 22, 26.] El CANA es parte interviniente en esa causa. [Proc. abr. núm. 19-00391, ECF núm. 40.] Sustancialmente, la Impugnación modificada al gravamen y al Recurso solicitan el mismo remedio que la Objeción a la reclamación del CANA.

10. **Moción de dictado de una orden autorizando a la AEEPR a asumir determinados contratos PPOA, Caso núm. 17-bk-4780, ECF núm. 1951;** *Unión de Trabajadores de la Industria Eléctrica y Riego, Inc. (UTIER) contra Autoridad de Energía Eléctrica de Puerto Rico y otros***, (1er. Cir. 20-1685, 20-1709, 20-1710)**

El 1 de abril de 2020, la Junta de Supervisión, en su calidad de representante de la AEEPR, presentó una moción solicitando autorización para asumir (i) el PPOA de ECO, entre la AEEPR y ECO, relativo a la actual instalación de cogeneración de ciclo combinado de Peñuelas; y (ii) el CCVG con Naturgy enmendado, relativo al suministro de gas natural a las Unidades 5 y 6 de la Central de generación de Costa Sur [Caso núm. 17-bk-4780, ECF núm. 1951]. La Junta de Supervisión argumentó que la decisión de la AEEPR de asumir los contratos, en virtud de la Sección 365 de la Ley PROMESA, entraba dentro de las competencias de la Política de revisión de contratos de la Junta de Supervisión y era una ejercitación sensata de su criterio. Según la AEEPR, los contratos reducirían los costos netos de compra de energía y combustible de la compañía en unos $100 millones anuales hasta septiembre de 2032. Este significativo ahorro de costos para la AEEPR ayudaría en última instancia a la empresa a cumplir sus obligaciones de servicio de la deuda durante el proceso del Título III, además de asegurarse de una fuente continua y confiable de energía y gas natural. La asunción de los contratos por parte de la AEEPR supondría ventajas económicas en comparación con las condiciones anteriores, y beneficiaría a la compañía, considerando la falta de alternativas razonablemente disponibles para sustituir la energía y los combustibles suministrados a tenor de los contratos.

El 27 de abril de 2020, Windmar presentó un escrito de oposición a la moción [Caso núm. 17-bk-4780, ECF núm. 1973]. Además, el 27 de abril de 2020, la UTIER y diversos grupos ambientalistas presentaron un escrito de oposición a la moción en tanto que acreedores y partes supuestamente interesadas [Caso núm. 17-bk-4780, ECF núm. 1974]. Las partes opositoras argumentaron que los contratos fueron negociados a puerta cerrada y sin el beneficio del escrutinio público o de una licitación competitiva. Además, alegaron que los contratos no fueron avalados con datos convincentes como ventajosos para los gastos de reestructuración operativos de la AEEPR, que no beneficiaban a los usuarios ni a las necesidades de estabilidad económica y energética de Puerto Rico, y que serían perjudiciales para la transformación sostenible de la compañía.

El 18 de mayo de 2020, la Junta de Supervisión presentó una respuesta ómnibus en apoyo de la moción, y el 27 de mayo de 2020 las partes opositoras presentaron tríplicas a la respuesta ómnibus de la Junta de Supervisión [Caso núm. 17-bk-4780, ECF núm. 1997, 2010, 2012]. Por otra parte, el 27 de mayo de 2020, la UTIER presentó una moción solicitando la venia para presentar una tríplica [Caso núm. 17-bk-4780, ECF núm. 2013]. El 29 de mayo de 2020, la Junta

de Supervisión presentó una moción de anulación de la tríplica de Windmar y un escrito de oposición a la moción de la UTIER de obtener la venia para presentar una tríplica [Caso núm. 17-bk-4780, ECF núm. 2018, 2019]. También el 29 de mayo de 2020, el Tribunal del Título III dictó una orden admitiendo la moción de anulación de la Junta de Supervisión, y rechazando la moción de la UTIER de obtener la venia para presentar una tríplica [Caso núm. 17-bk-4780, ECF núm. 2020].

El Tribunal del Título III celebró una vista oral sobre la moción el 3 de junio de 2020. Tras la misma, el Tribunal del Título III dictó una orden y dictamen autorizando a la AEEPR a asumir el PPOA de ECO enmendado y el CCVG con Naturgy enmendado [Caso núm. 17-bk-4780, ECF núm. 2038, 2039]. En su dictamen, el Tribunal del Título III rechazó las alegaciones presentadas por las pares opositoras sobre que la ejecución de los contratos por parte de la AEEPR con posterioridad a la petición creaba nuevas obligaciones posteriores a la petición, y determinó que los contratos se limitaban a modificar los términos y condiciones de contratos preexistentes antes de la petición entre las mismas partes. En consecuencia, el Tribunal del Título III sostuvo que los contratos constituían contratos ejecutorios previos a la petición que podían asumirse de conformidad con la Sección 365(a) del Código de Quiebras. El Tribunal del Título III también falló que la asunción de los contratos por parte de la AEEPR era una ejercitación sensata del buen criterio comercial de la compañía, y no producto de mala fe, veleidad o capricho. En consecuencia, el Tribunal del Título III rechazó cuestionar las decisiones adoptadas por la AEEPR en su negociación y ejecución de los contratos.

El 3 de julio de 2020, las partes opositoras presentaron sendas notificaciones de apelación a la orden del Tribunal del Título III [Case núm. 17-bk-4780, ECF núm. 2041, 2042, 2044]. Las tres apelaciones quedaron registradas como Casos núm. 20-1685, 20-1709 y 20-1710 en el Primer Circuito, y en última instancia fueron consolidadas a efectos de presentación del caso y de la vista oral el 3 de noviembre de 2020. Los escritos de las apelaciones se presentaron y el caso fue visto el 4 de mayo de 2021. El 20 de mayo de 2021, los apelantes presentaron una carta 28(j) aclarando un asunto que surgió durante la vista oral. El 22 de mayo 2021, la parte apelada presentó una carta en respuesta a la carta 28(j) de los apelantes. El 12 de agosto de 2021, el Primer Circuito expidió su dictamen y sentencia confirmando la orden del Tribunal del Título III autorizando a la AEEPR a asumir los Contratos PPOA. El Primer Circuito sostuvo que la decisión de asumir contratos a tenor del Código de Quiebras es revisada de conformidad con la norma deferencial de buen criterio comercial y no con la norma más onerosa para el rechazo de los convenios colectivos de trabajo, según el precedente de *NLRB contra Bildisco & Bildisco,* 465 U.S. 513 (1984), y, por separado, que el Tribunal del Título III no erró en sus conclusiones de que los contratos renegociados eran un ejercicio de buen criterio comercial por arte de la AEEPR. El 3 de septiembre de 2021, el Primer Circuito dictó su mandato.

11.     **Moción urgente del Grupo Ad Hoc de Bonistas de la AEEPR a tenor de la Sección 312 de la Ley PROMESA y de la Sección 105 del Código de Quiebras para nombrar un mediador e imponer plazos para un Plan de ajuste de la AEEPR, Caso núm. 17-bk-4780, ECF núm. 2716**

El 18 de febrero de 2022, el Grupo Ad Hoc y algunas Aseguradoras monolínea presentaron una moción para obligar a una mediación e imponer plazos para que la Junta de

Supervisión presentara y propusiera un Plan de ajuste para la AEEPR [Caso núm. 17-bk-4780, ECF núm. 2718]. En la misma, el Grupo Ad Hoc instó al Tribunal del Título III a implementar tales requisitos debido a los retrasos en la implementación del AAR de 2019.

El 28 de febrero de 2018, la Junta de Supervisión presentó una objeción a la moción del Grupo Ad Hoc [Caso núm. 17-bk-4780, ECF núm. 2735]. En la misma, la Junta de Supervisión admitía que una mediación podía beneficiar a las partes en la elaboración de una hoja de ruta hacia un plan de ajuste de la AEEPR y hacia su salida del Título III, y apoyó una mediación global con todas las partes bajo la dirección de un equipo de mediación judicial. No obstante, de la moción del Grupo Ad Hoc, la Junta de Supervisión objetó (i) los plazos propuestos, por inflexibles y poco realistas, y (ii) la solicitud de excluir a otras partes interesadas de la mediación, en lugar de considerarlas a todas involucradas con la AEEPR.

El 8 de marzo de 2022, el Tribunal del Título III dictó la Orden de avance, rechazando la Moción del Grupo Ad Hoc y estableciendo un Plazo de avance, hasta la cual la Junta de Supervisión debía emprender ciertas actuaciones [Caso núm. 17-bk-4780, ECF núm. 2748]. La Orden de avance estipuló que, hasta el Plazo de avance, inicialmente establecida para el 2 de mayo de 2022, la Junta de Supervisión debía presentar: (i) una propuesta de plan de ajuste de la AEEPR; (ii) una hoja de plazos del plan de ajuste; (iii) una propuesta de calendario para el litigio de los asuntos significativos del Caso del Título III de la AEEPR; o bien (iv) una declaración o memorando que explique la causa por la cual el Tribunal del Título III no debería considerar la desestimación del Caso del Título III de la AEEPR por omitir emprender alguna de las citadas actuaciones. El 8 de abril de 2022, el Tribunal del Título III dictó (i) la Orden de nombramiento, designando a los Jueces Chapman, Drain y Shannon como Equipo de mediación, y (ii) la Orden de los Términos y condiciones, estableciendo los términos y condiciones de la mediación, incluyendo como fecha inicial de terminación de la mediación el 1 de junio de 2022.

El 25 de abril de 2022, la Junta de Supervisión presentó una moción para prorrogar el Plazo de avance para coincidir con la fecha de terminación de la mediación, con el fin de permitir a la Junta de Supervisión continuar progresando en la mediación antes de presentar prematuramente una demanda, de conformidad con los requisitos de la Orden de avance [Caso núm. 17-bk-4780, ECF núm. 2784]. El mismo día, el Tribunal del Título III dictó una orden admitiendo la moción y prorrogando el plazo hasta el 1 de junio de 2022 [Caso núm. 17-bk-4780, ECF núm. 2785].

El 17 de septiembre de 2022, de conformidad con la Orden de avance y tras producirse la fecha de terminación de la mediación, la Junta de Supervisión presentó un calendario de litigios con el objeto de resolver ciertos asuntos relacionados con las reclamaciones de los bonistas [Caso núm. 17-bk-4780, ECF núm. 2956]. El 19 de septiembre de 2022, el Equipo de mediación presentó un informe notificando al Tribunal del Título III que no había ejercitado su discrecionalidad de prorrogar la fecha de terminación, aunque instando al Tribunal del Título III que dictara una orden para revisar los Términos y condiciones con el objeto de prorrogar la mediación con el requisito adicional de presentar informes provisionales e incrementar la transparencia de las negociaciones entre las partes [Caso núm. 17-bk-4780, ECF núm. 2975]. El 20 de septiembre de 2022, el Tribunal del Título III dictó una orden confirmando que los Jueces

Chapman, Drain y Shannon se mantendrían como el Equipo de mediación designado [Caso núm. 17-bk-4780, ECF núm. 2987].

El 29 de septiembre de 2022, el Tribunal del Título III dictó una orden reiniciando la mediación y estableciendo como fecha de terminación el 31 de diciembre de 2022, con sujeción a una prórroga hasta el 31 de enero de 2023, a la exclusiva discreción del Equipo de mediación [Caso núm. 17-bk-4780, ECF núm. 3011]. Además, la orden autorizada al Equipo de mediación a presentar informes provisionales, así como informes puntuales, recomendando si algún litigio pendiente debería suspenderse para posibilitar la continuación de negociaciones, y exigiendo a las partes la presentación de determinados datos y análisis no privilegiados fundamentando sus respectivas posiciones.

12. ***PV Properties, Inc. contra Autoridad de Energía Eléctrica y otros**, Proc. abr. núm. 20-00142; Moción de levantamiento de la paralización automática de PV Properties, Inc., Caso núm. 17-bk-4780, ECF núm. 2779*

El 29 de diciembre de 2020, PV Properties presentó una demanda contra la AEEPR, la Junta de Supervisión y Natalie Jaresko, solicitando una declaración manifestando que: (i) la AEEPR venía obligada a adquirir los CER de PV Properties; y que (ii) la AEEPR venía obligada a pagar por los CER generados por PV Properties después de la presentación de la petición del Título III de la AEEPR como gasto administrativo, a tenor de la Sección 507(a)(2) del Código de Quiebras [Proc. abr. núm. 20-00142, ECF núm. 1]. El 4 de enero de 2021, PV Properties presentó una demanda modificada que incorporaba pequeñas correcciones al texto original [Proc. abr. núm. 20-00142, ECF núm. 3].

El 15 de marzo de 2021, los demandados presentaron una moción para desestimar la demanda modificada [Proc. abr. núm. 20-00142, ECF núm. 12]. En la moción de desestimación, los demandados alegaban que toda la demanda debía ser desestimada porque PV Properties carecía de legitimación procesal por no haber sufrido ningún perjuicio. Además, los demandados argumentaban que las demandas contra la Junta de Supervisión y contra la Sra. Jaresko debían ser desestimadas porque PV Properties omitían alegar una conducta reprochable de parte de la Junta de Supervisión o de la Sra. Jaresko, y porque además la Sección 105 de la Ley PROMESA prohibía cualquier actuación judicial contra ambos. Asimismo, los demandados sostenían que (i) PV Properties había omitido fundamentar una declaración de que la AEEPR venía obligada a comprar los CER, y que (ii) PV Properties había omitido fundamentar la existencia de cualquier transacción cualificada con la AEEPR posterior a la petición, imprescindible para tener derecho a una reclamación de gastos administrativos.

El 13 de abril de 2021, PV Properties presentó un escrito de oposición a la moción de desestimación de los demandados, argumentando que (i) PV Properties tenía legitimación procesal por haber perdido el derecho de que la AEEPR tuviera que obtener los CER; (ii) que la Junta de Supervisión y la Sra. Jaresko eran los demandados debidos, en su calidad de representantes del deudor; (iii) que la Sección 105 de la Ley PROMESA no era de aplicación porque PV Properties no presentaba una demanda contra la Junta de Supervisión y contra la Sra. Jaresko relacionada con el cumplimiento de la Ley PROMESA; (iv) que PV Properties había alegado hechos suficientes para demostrar que tenía derecho al remedio; y (v) que los CER de

225

PV Properties entraban dentro de la categoría de costos y gastos "reales y necesarios" [Proc. abr. núm. 20-00142, ECF núm. 17].

El 27 de septiembre de 2021, el Tribunal del Título III emitió un dictamen y orden admitiendo la moción de desestimación de los demandados [Proc. abr. núm. 20-00142, ECF núm. 20]. En dicha orden, el Tribunal del Título III desestimaba las demandas contra la Junta de Supervisión y contra la Sra. Jaresko porque PV Properties había omitido alegar adecuadamente legitimidad constitucional con respecto a sus reclamaciones al no argumentar que cualquiera de los demandados tuviera la obligación, o incluso la autoridad, de ordenar a la AEEPR que adquiriera los CER a PV Properties. Con respecto a las demandas contra la AEEPR, el Tribunal del Título III llegó a la conclusión de que PV Properties había omitido plantear suficientes hechos para sostener sus alegaciones, de que (i) la adquisición de los CER fuese el único método a disposición de la AEEPR para cumplir la Ley 82-2010, que requiere que cierto porcentaje de la electricidad distribuida por la AEEPR se genere a partir de fuentes renovables, y que (ii) la AEEPR debía adquirir los CER a PV Properties para cumplir la norma. El Tribunal del Título III razonó que, incluso si PV Properties pudiera aducir hechos suficientes, todavía no podría demostrar que le asistiera un derecho de actuación privado para imponer el cumplimiento de las obligaciones de la AEEPR. En consecuencia, el procedimiento contencioso quedó cerrado.

El 20 de abril de 2022, PV Properties presentó una moción para el levantamiento de la paralización automática [Caso núm. 17-bk-4780, ECF núm. 2779] con el objeto de proceder a demandar a la AEEPR ante los tribunales del Estado Libre Asociado por la pretendida expropiación inversa de los CER de PV Properties. El 9 de junio de 2022, la Junta de Supervisión presentó un escrito oponiéndose a la moción, argumentado que PV Properties no presentaba una demanda amparada por la Cláusula de Expropiaciones de la Quinta Enmienda, y que había omitido fundamentar el levantamiento de la paralización automática [Caso núm. 17-bk-4780, ECF núm. 2843].

El 17 de junio de 2022, el Tribunal del Título III dictó una orden pidiendo que las partes se reunieran y conferenciaran para presentar escritos complementarios en relación con la moción de PV Properties de levantar la paralización automática, lo cual las partes hicieron el 26 de junio de 2022 [Caso núm. 17-bk-4780, ECF núm. 2856, 2868]. La moción conjunta describía diversos aspectos de fundamentos de hecho y de derecho en los cuales las partes discrepaban. El 29 de junio de 2022, el Tribunal del Título III dictó una orden rechazando la moción de levantamiento de la paralización automática de PV Properties debido a que esta empresa no había demostrado que la aceptación de la demanda conllevaría una resolución completa de los asuntos, y que permitir esa demanda distraería recursos del Caso del Título III de la AEEPR [Caso núm. 17-bk-4780, ECF núm. 2876].

13.   ***Assured Guaranty Corporation y otros contra la Autoridad de Energía Eléctrica de Puerto Rico*, Proc. abr. núm. 17-00232**

El 7 de agosto de 2017, Assured, National, el Grupo Ad Hoc y Syncora presentaron una demanda contra la AEEPR, la Junta de Supervisión, la AAFAF, Nelson Morales Rivera y José Roque Torres [Proc. abr. núm. 17-00232, ECF núm. 1]. La demanda argumentaba que la AEEPR había omitido cumplir sus obligaciones afirmativas de dirigir los actuales y futuros ingresos, recibos y otros ingresos obtenidos por la compañía, como "Ingresos" a los titulares o

aseguradoras de bonos de ingresos, de conformidad con Contrato de fideicomiso entre la AEEPR y el Fideicomisario de bonos.

Los demandantes solicitaron que se declarara (i) que la presentación del Caso del Título III de la AEEPR no paralizaba la aplicación de los "Ingresos" al pago del servicio de la deuda derivada de los Bonos; (ii) que la omisión de remitir los "Ingresos" que avalaban los Bonos para aplicarlos al servicio de la deuda durante el Caso del Título III de la AEEPR vulneraba las Secciones 922(d) y 928(a) del Código de Quiebras; (iii) que las mejoras e inversiones de capital, así como todos los demás gastos no corrientes que no fuesen razonables y necesarios, estaban subordinados al pago del servicio de la deuda derivada de los Bonos; y (iv) que la retención, o uso, de los "Ingresos" por parte de los demandados para inversiones de capital, futuros gastos y todos los demás gastos no corrientes que no fuesen razonables y necesarios vulneraban los derechos de los demandantes a tenor de las Cláusulas de Expropiación y de Proceso debido de la Constitución de los Estados Unidos.

Asimismo, los demandantes solicitaron prohibir a los demandados emprender cualquier actuación que, a juicio de los demandantes, fuese susceptible de seguir vulnerando las Secciones 922(d) y 928(a) del Código de Quiebras, y abstenerse de utilizar los "Ingresos" para financiar gastos de capital y todos los demás gastos que o fuesen razonables y necesarios, antes de cumplir con las supuestas obligaciones impuestas por la Sección 507 del Contrato de fideicomiso. Por último, los demandantes también solicitaron órdenes exigiendo a los demandados que remitieran a la mayor brevedad y periódicamente los "Ingresos" que avalaban los Bonos, y que cada mes enviaran a los demandantes y al Fideicomisario informes pormenorizando los gastos operativos corrientes que los demandados priorizaban por encima de los Bonos, así como los saldos de cada cuenta creada a tenor del Contrato de fideicomiso.

El 18 de agosto de 2017, el Tribunal del Título III dictó una orden derivando el asunto a la Jueza magistrada Dein [Proc. abr. núm. 17-00232, ECF núm. 16]. El 1 de septiembre de 2017, el CANA presentó una moción solicitando licencia para intervenir [Proc. abr. núm. 17-00232, ECF núm. 18]. El 12 de septiembre de 2017, también Scotiabank y Solus (en conjunto, los "Intervinientes de la línea de combustible") presentaron una moción solicitando licencia de intervención [Proc. abr. núm. 17-00232, ECF núm. 24]. El 19 de septiembre de 2017, el CANA presentó una respuesta limitada a la moción de licencia de intervención de los Intervinientes de la línea de combustible, mientras que Assured, National, el Grupo Ad Hoc y Syncora presentaron un escrito de oposición a dicha moción [Proc. abr. núm. 17-00232, ECF núm. 33, 36]. En la misma fecha, también la Junta de Supervisión y la AEEPR presentaron una respuesta a la moción solicitando licencia para intervenir del CANA [Proc. abr. núm. 17-00232, ECF núm. 37].

El 2 de octubre de 2017, el CANA presentó un escrito complementario en apoyo de su solicitud de participación limitada [Proc. abr. núm. 17-00232, ECF núm. 43]. El 9 de octubre de 2017, tanto la Junta de Supervisión y la AAFAF como Assured y National, presentaron sus respuestas al escrito complementario del CANA [Proc. abr. núm. 17-00232, ECF núm. 46-7].

El 13 de octubre de 2017, los demandantes desestimaron voluntariamente el procedimiento contencioso, sin perjuicio [Proc. abr. núm. 17-00232, ECF núm. 49]. El 17 de octubre de 2017, el Tribunal del Título III dictó una orden desestimando el procedimiento

contencioso y decretando la irrelevancia de las mociones pendientes [Proc. abr. núm. 17-00232, ECF núm. 50].

14. ***Unión de Trabajadores de la Industria Eléctrica y Riego contra la Autoridad de Energía Eléctrica de Puerto Rico y otros*, Proc. abr. núm. 17-00229**

El 7 de agosto de 2017, la UTIER presentó una demanda contra la AEEPR, el Estado Libre Asociado, la Junta de Supervisión, Natalie A. Jaresko y otros varios demandados individuales, incluyendo a los Honorables Ricardo Rosselló Nevares, Ricardo Ramos Rodríguez, Gerardo Portela Franco, Raúl Maldonado Gautier y José Iván Marrero Rosado (los "Demandados individuales") [Proc. abr. núm. 17-00229, ECF núm. 1]. En la demanda se alegaba que el CCT entre la UTIER y la AEEPR había sido inconstitucionalmente deteriorado por la aprobación y promulgación de la Ley núm. 66-2014, la Ley núm. 3-2017, la Ley núm. 8-2017 y la Ley núm. 26-2017 (las "Leyes impugnadas"). Específicamente, la UTIER sostenía que la promulgación de las Leyes impugnadas deterioraba su CCT, vulnerando las Cláusulas de Contratos y de Expropiaciones de la Constitución de los Estados Unidos. Asimismo, la UTIER argumentaba que el Plan fiscal de la AEEPR era inconstitucional porque implementaba tanto la Ley núm. 66-2014 como la Ley núm. 3-2017; que el Plan fiscal de Estado Libre Asociado era inconstitucional, específicamente por haber adoptado una política de movilización de empleados, por uniformar los beneficios marginales y por eliminar la liquidación de vacaciones y bajas por enfermedad; y que los Presupuestos y Planes fiscales del Estado Libre Asociado y de la AEEPR del año fiscal 2017-2018 vulneraban las Secciones 201(b)(1)(A), 201(b)(1)(B), 201(b)(1)(G) y 201(b)(1)(N) de la Ley PROMESA. En consecuencia, la UTIER solicitó declaraciones de que la AEEPR era un "servicio esencial protegido"; que las Leyes impugnadas vulneraban las Cláusulas de Contratos y de Expropiaciones; y que los Presupuestos 2017-2018 del Estado Libre Asociado y de la AEEPR eran arbitrarios, carentes de fundamento racional y vulneraban las Cláusulas de Contratos y de Expropiaciones de la Constitución. Además, la UTIER pidió un interdicto que obligara a la Junta de Supervisión a "refundir" el Plan fiscal de la AEEPR, el Plan fiscal del Estado Libre Asociado y los Presupuestos de 2017-2018 con el objeto de cumplir la Sección 201(b) de la Ley PROMESA, y otro interdicto impidiendo a los demandados presentar cualquier plan de ajuste hasta haber implementado las modificaciones solicitadas. El 6 de septiembre de 2017, el Tribunal del Título III dictó una orden derivando el asunto a la Jueza magistrada Dein [Proc. abr. núm. 17-00229, ECF núm. 17].

El 31 de octubre de 2017, la Junta de Supervisión, en nombre y representación de sí misma, de la Sra. Jaresko, de la AEEPR y del Estado Libre Asociado, presentó una moción de desestimación, alegando que: (i) por cuanto la conducta impugnada no había conllevado ningún perjuicio, la UTIER carecía de legitimación procesal, y el Tribunal del Título III no era competente; (ii) el Tribunal del Título III tampoco era competente para tratar ciertas imputaciones a tenor de la Sección 106(e) de la Ley PROMESA, que desposeía al Tribunal del Título III de competencia para tratar las demandas de la UTIER en la medida en que impugnen las decisiones de la Junta de Supervisión para certificar planes fiscales y presupuestos; (iii) la Sección 305 de la Ley PROMESA impide el remedio interdictal solicitado por la UTIER; (iv) el remedio vulneraría la autoridad y el mandato de la Junta de Supervisión establecidos a tenor de las Secciones 312 y 315 de la Ley PROMESA; (v) la UTIER omitió plantear una demanda al amparo de las Cláusulas de Contratos y de Expropiaciones; y (vi) la Sección 105 de la Ley

PROMESA prohíbe todas las demandas contra la Junta de Supervisión y contra la Sra. Jaresko
[Proc. abr. núm. 17-00229, ECF núm. 31]. El 31 de octubre de 2017, también los Demandados
individuales presentaron una moción de desestimación argumentando que: (i) ninguna de las
personas nombradas era parte interesada del caso; (ii) las demandas de la UTIER no estaban en
fase de ser decididas; (iii) la UTIER omitió plantear una demanda al amparo de la Cláusula de
Contratos; y (iv) la UTIER omitió plantear una demanda al amparo de la Cláusula de
Expropiaciones [Proc. abr. núm. 17-00229, ECF núm. 34].

El 12 de diciembre de 2017, la UTIER presentó una demanda modificada, describiendo
cómo se habían deteriorado presuntamente las cláusulas del CCT, y cómo los Demandados
individuales habían implementado y aplicado los planes fiscales y presupuestos [Proc. abr. núm.
17-00229, ECF núm. 38]. Como resultado de esa enmienda, el Tribunal del Título III dictó una
orden anulando por irrelevantes las mociones de desestimación de la demanda original, sin
perjuicio [Proc. abr. núm. 17-00229, ECF núm. 39].

El 12 de enero de 2018, la AEEPR, el Estado Libre Asociado, la Junta de Supervisión y
la Sra. Jaresko presentaron una moción de desestimación de la demanda modificada, en gran
medida por los mismos motivos planteados en su moción anterior [Proc. abr. núm. 17-00229,
ECF núm. 44]. También los demás Demandados individuales presentaron una moción de
desestimación de la demanda modificada, el 12 de enero de 2018, con los mismos fundamentos
que antes [Proc. abr. núm. 17-00229, ECF núm. 46].

El 26 de septiembre de 2018, el Tribunal del Título III emitió un dictamen y orden
admitiendo parcialmente, y rechazando parcialmente, las mociones de desestimación de la
demanda modificada [Proc. abr. núm. 17-00229, ECF núm. 62]. Para desestimar la mayoría de
las reclamaciones de la UTIER, el Tribunal del Título III sostuvo que: (i) los cargos I y X
solicitaban dictámenes consultivos inadmisibles; (ii) el Tribunal del Título III carecía de
competencias para ver los cargos I, X y XI, porque en el caso I se omitía sustanciar una
controversia justiciable, porque la Sección 106(e) de la Ley PROMESA impedía que los
Tribunales de Distrito Federales revisaran las impugnaciones a las decisiones de la Junta de
Supervisión en materia de certificaciones, y la Sección 305 impedía el remedio interdictal
solicitado por la UTIER en el cargo XI; (iii) los cargos III, V, VII y IX no estaban en fase de ser
decididos; y (iv) el cargo IV y parte del cargo VIII, que objetaban la constitucionalidad de los
Planes fiscales, consistían en afirmaciones concluyentes, por lo cual no se les podía otorgar
ningún amparo [Proc. abr. núm. 17-00229, ECF núm. 62]. El Tribunal del Título III rechazó las
mociones de desestimación por carecer de legitimación procesal y vinculadas a las demandas
aludiendo a la Cláusula de Contratos contenidas en los cargos II, VI y VIII, aunque admitió las
mociones relativas a los cargos II, VI y VIII contra la Junta de Supervisión y la Sra. Jaresko, a
tenor de la Sección 105 de la Ley PROMESA. Como consecuencia de ese dictamen, se
mantuvieron las reclamaciones fundamentadas en la Cláusula de Contratos contra los
demandados, a excepción de la Junta de Supervisión y la Sra. Jaresko.

El 17 de diciembre de 2018, la AEEPR y el Estado Libre Asociado respondieren a las
reclamaciones restantes de la demanda modificada [Proc. abr. núm. 17-00229, ECF núm. 76]. El
mismo día, también varios Demandados individuales presentaron respuestas a la demanda
modificada [Proc. abr. núm. 17-00229, ECF núm. 72-75, 77]. El 30 de agosto de 2019, la UTIER

presentó su segunda demanda modificada, agregando alegaciones relativas a las alternativas que el Estado Libre Asociado y la AEEPR supuestamente podrían haber implementado en lugar de promulgar las Leyes impugnadas, actualizando la lista de Demandados individuales para reflejar los cambios en los cargos, y exigiendo aproximadamente $589 millones en concepto de daños y honorarios de abogados [Proc. abr. núm. 17-00229, ECF núm. 89]. El 15 de octubre de 2019, tanto la AEEPR y el Estado Libre Asociado como varios Demandados individuales, presentaron sus respuestas a la segunda demanda modificada de la UTIER [Proc. abr. núm. 17-00229, ECF núm. 92-97].

El 21 de marzo de 2021, la UTIER presentó su tercera demanda modificada, reduciendo su demanda de daños hasta aproximadamente $276 millones, aunque en otros aspectos solicitando el mismo remedio que en la segunda demanda modificada [Proc. abr. núm. 17-00229, ECF núm. 131]. El 20 de abril de 2021, las partes presentaron una estipulación abordando las nuevas alegaciones de ciertas demandas previamente desestimadas, y aclarando que las únicas reclamaciones restantes de este procedimiento contencioso eran las 2, la 6, la 8 y la 12, relacionadas con supuestas vulneraciones de la Cláusula de Contratos y los daños afines (aunque no en la medida de impugnar los planes fiscales) [Proc. abr. núm. 17-00229, ECF núm. 137]. El Tribunal del Título III aprobó la estipulación el 21 de abril de 2021 [Proc. abr. núm. 17-00229, ECF núm. 138].

El 26 de abril de 2021, los demandados respondieron a la tercera demanda modificada [Proc. abr. núm. 17-00229, ECF núm. 140, 149-53]. Además, el 26 de abril de 2021, la AEEPR y los Demandados individuales presentaron mociones para desestimar las restantes demandas contra ellos, argumentando que no son legisladores estatales, no hacen leyes y, por consiguiente, no pueden haber vulnerado la Cláusula de Contratos en el contexto de las Leyes impugnadas ni de los presupuestos. Además, sostuvieron que la Cláusula de Contratos no era de aplicación a individuos que emprendían actuaciones para hacer valer su autoridad legislativamente otorgada [Proc. abr. núm. 17-00229, ECF núm. 144]. El 26 de abril de 2021, la UTIER presentó mociones para excluir el testimonio de los peritos de los demandados (Dr. Andrew Wolfe, Dr. Henry S. Farber, Dr. James R. Hines Jr. y Michael Nadol) [Proc. abr. núm. 17-00229, ECF núm. 145, 146, 147, 148]. El 10 de junio de 2021, la UTIER presentó un escrito de oposición a la moción de desestimación de la AEEPR y de los Demandados individuales, argumentando que eran responsables del deterioro del CCT de la UTIER y de la vulneración de la Cláusula de Contratos porque implementaron la legislación impugnada y tenían medios alternativos para bordar la crisis fiscal sin perjudicar al CCT [Proc. abr. núm. 17-00229, ECF núm. 175].

El 19 de julio de 2021, la Junta de Supervisión presentó una respuesta en apoyo de su moción de desestimación, reiterando que la AEEPR no disponía de facultades legislativas, que la implementación de las leyes no implicaba a la Cláusula de Contratos y que la UTIER no planteaba ninguna demanda fundamentada en la Cláusula de Contratos contra ella [Proc. abr. núm. 17-00229, ECF núm. 183]. El 19 de julio de 2021, algunos demandados presentaron una adhesión a la respuesta de la AEEPR en apoyo de la moción de la compañía de desestimar la tercera demanda modificada de la UTIER. Argumentaban que el Tribunal del Título III nunca decidió si los Demandados individuales eran los demandados debidos y que, en cualquier caso, nunca se planteó contra ellos una demanda relacionada con la Cláusula de Contratos [Proc. abr. núm. 17-00229, ECF núm. 184].

El 4 de febrero de 2022, el Tribunal del Título III admitió la moción de la AEEPR y de los Demandados individuales para desestimar la tercera demanda modificada de la UTIER, sosteniendo que el sindicato no alegaba que fuesen una legislatura o legisladores individuales, ni que ejercitaran ningún poder legislativo. Además, el Tribunal del Título III determinó que la aplicación o implementación de leyes no daba lugar a una demanda al amparo de la Cláusula de Contratos [Proc. abr. núm. 17-00229, ECF núm. 218].

El 2 de marzo de 2022, la UTIER apeló la desestimación de sus demandas contra la AEEPR y los Demandados individuales. La notificación de apelación quedó registrada en el Primer Circuito el 8 de marzo de 2022 como Caso núm. 22-1164 [Proc. abr. núm. 17-00229, ECF núm. 219, 222]. El 16 de marzo de 2022, el apelante presentó una moción voluntaria de desestimación de la apelación porque todavía no existía competencia de apelación por el hecho de que no se había dictado una sentencia definitiva a tenor de 28 U.S.C. § 1291. En la moción, el apelante se reservaba el derecho de apelar la desestimación una vez dictada una sentencia definitiva en el Proc. abr. núm. 17-00229. El 18 de marzo de 2022, el Primer Circuito dictó una sentencia y mandato admitiendo la desestimación voluntaria del apelante [Proc. abr. núm. 17-00229, ECF núm. 223-24].

El 1 de junio de 2021, las partes presentaron mociones cruzadas de sentencia sumaria. La UTIER alegó que (i) las Leyes impugnadas perjudicaban sustancialmente el CCT, y (ii) dicho deterioro no fue razonable ni necesario para cumplir un propósito gubernamental importante, debido a la disponibilidad de alternativas políticas [Proc. abr. núm. 17-00229, ECF núm. 170]. En su moción, los Demandados alegaron que (i) las Leyes impugnadas sirvieron fines públicos importantes; (ii) cada una de las Leyes impugnadas era razonable y necesaria para alcanzar los fines; y (iii) las políticas alternativas propuestas por la UTIER eran insuficientes para crear una genuina controversia de hechos sobre la razonabilidad y la necesidad de las Leyes impugnadas [Proc. abr. núm. 17-00229, ECF núm. 163]. El 2 de julio de 2021, la UTIER presentó un memorando de ley modificado en apoyo de su moción de sentencia sumaria, con una demanda de daños reducida de aproximadamente $102 millones [Proc. abr. núm. 17-00229, ECF núm. 180].

El 20 de septiembre de 2022, el Tribunal del Título III rechazó la moción cruzada de sentencia sumaria de la UTIER, y admitió la moción de los demandados, resolviendo plenamente todas las demandas restantes. El Tribunal del Título III sostuvo que la UTIER no había conseguido establecer que la promulgación de las Leyes impugnadas por parte del Estado Libre Asociado, y sus repercusiones sobre el CCT de la UTIER con la AEEPR, no eran razonables ni necesarios para lograr un propósito público importante y que, por consiguiente, no había lugar para las demandas de la UTIER al amparo de la Cláusula de Contratos [Proc. abr. núm. 17-00229, ECF núm. 226]. Además, el 20 de septiembre, el Tribunal del Título III rechazó las mociones de la UTIER de excluir el testimonio de los cuatro peritos de los demandados [Proc. abr. núm. 17-00229, ECF núm. 225]. El 29 de septiembre de 2022 se dictó sentencia y se cerró el caso [Proc. abr. núm. 17-00229, ECF núm. 227]. La UTIER no presentó ningún recurso de apelación.

15.   ***Autoridad de Energía Eléctrica de Puerto Rico y otros contra la Comisión de Energía de Puerto Rico***, **Proc. abr. núm. 17-00256**

El 5 de septiembre de 2017, los casos del *Instituto de Conservación y Competitividad Económica de Puerto Rico contra la Comisión de Energía de Puerto Rico y la Autoridad de Energía Eléctrica de Puerto Rico*, núm. KLRA201700444 (la "Acción civil de ICSE") y de la *Autoridad de Energía de Puerto Rico y el Instituto de Conservación y Competitividad Económica de Puerto Rico contra la Comisión de Energía Eléctrica de Puerto Rico*, núm. KLRA20170446 (la "Acción civil de la AEEPR" y, conjuntamente con la Acción civil de la ICSE, las "Acciones civiles") fueron trasladados al Tribunal del Título III [Proc. abr. núm. 17-00256, ECF núm. 1]. Las Acciones civiles fueron actuaciones para revisar la orden de tarifas (la "Orden de tarifas") emitida por la CEPR. En las Acciones civiles, la AEEPR impugnó la Orden de tarifas por diversos motivos, entre ellos el que infringía la autoridad de la Junta de Supervisión y la autoridad de la Junta de Gobierno y los directivos de la AEEPR para controlar los negocios y operaciones de la empresa. Específicamente, la AEEPR sostenía que la Orden de tarifas excedía de la autoridad regulatoria de la CEPR al pretender establecer un proceso en virtud del cual los presupuestos, las inversiones y el gasto de la AEEPR quedaban sujetos a un proceso de autorización previo, que no estaba vinculado al Plan fiscal aprobado, y que procesalmente era incongruente con el proceso fiscal y presupuestario ordenado por la Junta de Supervisión a tenor de los poderes otorgados por la Ley PROMESA. El 6 de septiembre de 2017, el Tribunal del Título III dictó una orden derivando el asunto a la Jueza magistrada Dein [Proc. abr. núm. 17-00256, ECF núm. 6].

El 10 de noviembre de 2017, el ICSE presentó una moción para revocar y levantar la paralización automática porque la CEPR estaba más cualificada para resolver la discrepancia, y estaba autorizada para ello de conformidad con la Ley PROMESA y el derecho del Estado Libre Asociado [Proc. abr. núm. 17-00256, ECF núm. 16]. El 24 de noviembre de 2017, la AAFAF presentó un escrito de oposición a la moción de revocación, argumentando (i) que el Tribunal del Título III era el más adecuado para resolver asuntos vinculados con la Ley PROMESA, y (ii) que la controversia tenía que ver con el alcance de la autoridad de la CEPR, no con la propia Orden de tarifas [Proc. abr. núm. 17-00256, ECF núm. 18]. El ICSE presentó una respuesta a la oposición de la AAFAF el 1 de diciembre de 2017, sosteniendo que estaban solicitando la revocación del Caso de las tarifas (que la AAFAF afirmaba que no quería anular), y que el asunto se regía exclusivamente por el derecho local. Además, el ICSE manifestó que no se trataba de una demanda válida de que la CEPR pretendía limitar las facultades de la Junta de Supervisión [Proc. abr. núm. 17-00256, ECF núm. 21].

El 6 de diciembre de 2017, el Tribunal del Título III rechazó, sin perjuicio, el tramo de la moción del ICSE relativo a la paralización automática porque dicha moción se había combinado indebidamente con la moción de revocación sin autorización del tribunal. Además, la petición relativa a la paralización automática era prematura, ya que el Tribunal del Título III primero debía determinar si la revocación era o no apropiada [Proc. abr. núm. 17-00256, ECF núm. 25]. El mismo día, el Tribunal del Título III dictó una orden solicitando escritos complementarios relativos a si en las Acciones civiles se habían o no alegado, y hasta qué punto, "cuestiones de la Ley PROMESA" [Proc. abr. núm. 17-00256, ECF núm. 26].

El 19 de diciembre de 2017, la CEPR presentó una respuesta a las alegaciones de prioridad de la AAFAF en apoyo de la notificación de anulación. La CEPR argumentó que el proceso de revisión del presupuesto era necesario como protección contra costos imprudentes de

232

la AEEPR, y que no existía ningún conflicto entre la Junta de Supervisión y la CEPR porque la AEEPR podía cumplir con las órdenes de ambos organismos [Proc. abr. núm. 17-00256, ECF núm. 29]. El 19 de enero de 2018, la AAFAF presentó su escrito complementario, sosteniendo que el conflicto relativo al alcance de la autoridad de la Junta de Supervisión y de la CEPR requería de la interpretación de la Ley PROMESA por parte del Tribunal del Título III [Proc. abr. núm. 17-00256, ECF núm. 36]. El 26 de enero de 2018, el ICSE presentó su respuesta, argumentando que la AAFAF no había demostrado que las actuaciones anuladas implicaban cuestiones de la Ley PROMESA basados en ningún fundamento no teórico, y que solamente solicitaba un dictamen consultivo sobre el alcance de los poderes de la Junta de Supervisión y de la CEPR [Proc. abr. núm. 17-00256, ECF núm. 39]. El 22 de febrero de 2018, el Tribunal del Título III dictó una orden pidiendo a la AAFAF que presentara una tríplica, lo cual la AAFAF hizo el 28 de febrero de 2018. Allí, la AAFAF aclaraba que (i) no había retirado un procedimiento administrativo o legislativo de establecimiento de tarifas; (ii) el Tribunal del Título III era competente para entender las Acciones civiles a tenor de 48 U.S.C. § 2166(d); (iii) no estaba solicitando un dictamen consultivo; y (iv) solicitaba la anulación de solamente dos Acciones civiles específicas [Proc. abr. núm. 17-00256, ECF núm. 41-42].

El 28 de marzo de 2018, el Tribunal del Título III rechazó la moción de revocación del ICSE porque (i) según la Ley PROMESA, las Acciones civiles recaían dentro de la competencia del Tribunal del Título III; (ii) no existían fundamentos para una revocación equitativa de las Acciones civiles; y (iii) no existían fundamentos para una abstención, considerando el alcance limitado de las Acciones civiles dentro de los procedimientos administrativos subyacentes de determinación de tarifas (es decir, la revisión estaba limitada a asuntos legales discretos de conformidad con la Ley PROMESA) [Proc. abr. núm. 17-00256, ECF núm. 46].

El 22 de octubre de 2018, el Tribunal del Título III dictó una orden instando a las partes a presentar un informe de estado conjunto relativo a sus respectivas posiciones en la gestión del procedimiento [Proc. abr. núm. 17-00256, ECF núm. 51]. Con posterioridad, las partes presentaron una serie de informes de estado relativos a sus iniciativas para resolver las cuestiones pertinentes del caso [Proc. abr. núm. 17-00256, ECF núm. 52, 55, 57, 59, 61, 63, 65, 67, 70, 72, 74, 76, 78, 80, 83, 86, 89, 92, 94, 98, 101, 104, 106, 109, 112, 115, 118, 120, 123, 126, 129]. De acuerdo con la orden del Tribunal del Título III del 24 de octubre de 2022, el próximo informe de estado conjunto debe presentarse como más tardar el 12 de diciembre [Proc. abr. 17-00256, ECF núm. 130].

16.   ***Comisión de Energía de Puerto Rico contra la Junta de Supervisión y Administración Financiera para Puerto Rico*, Proc. abr. núm. 18-00021**

El 4 de marzo de 2018, la CEPR presentó una demanda contra la Junta de Supervisión y la AEEPR solicitando (i) una declaración de que la Junta de Supervisión no puede ordenar ni autorizar a la AEEPR emprender "actuaciones eléctricas sustantivas" que estén sujetas a las competencias de la CEPR pero que la CEPR no haya autorizado; e (ii) interdictos preliminares y permanentes prohibiendo a la Junta de Supervisión ordenar o autorizar a la AEEPR emprender "actuaciones eléctricas sustantivas" que estén sujetas a las competencias de la CEPR pero que la CEPR no haya autorizado, y prohibir a la AEEPR cumplir dichos mandatos o autorizaciones. La demanda sostenía que, cuando la Junta de Supervisión ejercita sus poderes fiscales sobre la AEEPR, debe hacerlo a tenor de las actuaciones, órdenes y normas de la CEPR en materia de

"asuntos eléctricos sustantivos". Además, la demanda afirmaba que toda vez que un plan propuesto para la AEEPR repercutiera en asuntos "sustantivos del sector eléctrico", la evaluación y aprobación puntual de la CEPR son un prerrequisito para la certificación de dicho Plan fiscal por parte de la Junta de Supervisión [Proc. abr. núm. 18-00021, ECF núm. 1]. Según la demanda, por "actuaciones eléctricas sustantivas" se entienden, entre otras, las que afectan a la combinación de recursos; a la propiedad de los activos; a las operaciones, al mantenimiento y a la retirada; a la estructura del mercado; a las microrredes; a la planificación integrada de recursos; y a las tarifas.

El 12 de marzo de 2018, el Tribunal del Título III dictó una orden derivando el procedimiento contencioso a la Jueza magistrada Dein [Proc. abr. núm. 18-00021, ECF núm. 19] El mismo día, el Tribunal del Título III dictó una orden admitiendo la moción de intervención limitada del CANA [Proc. abr. núm. 18-00021, ECF núm. 22]. El 16 de marzo de 2018, el Tribunal del Título III dictó una orden admitiendo los derechos de intervención limitada de las Aseguradoras monolínea y de los Bonistas [Proc. abr. núm. 18-00021, ECF núm. 36].

El 16 de marzo de 2018, los demandados presentaron un escrito de oposición a la moción de interdicto preliminar de la CEPR, mientras que el CANA presentó una adhesión a la oposición [Proc. abr. núm. 18-00021, ECF núm. 37, 39]. Los demandados argumentaron que era poco probable que la CEPR obtuvieran una resolución favorable porque: (i) la CEPR no puede restringir las decisiones de la Junta de Supervisión en materia de planes fiscales; (ii) la CEPR solicitaba que el Tribunal del Título III emitiera un dictamen consultivo; (iii) la Sección 305 de la Ley PROMESA prohíbe el remedio interdictal; y (iv) el remedio interdictal solicitado no se ajustaba a la Regla 65(d) del Reglamento Federal de Procedimiento Civil. Además, los demandados argumentaron que la CEPR no sufriría daños irreparables, dado que los planes fiscales no son autocumplidos, que la CEPR no tiene un papel sustantivo en el proceso del plan fiscal y que las decisiones de la Junta de Supervisión con respecto a dicho papel no perjudicarán a la CEPR. Asimismo, toda urgencia en el caso era resultado del retraso de la CEPR. Por último, los demandantes alegaron que un interdicto no serviría al interés público, ya que la recuperación económica de la AEEPR depende de la capacidad de la Junta de Supervisión de supervisar de manera eficiente sus iniciativas de reestructuración.

El 21 de marzo de 2018, la CEPR presentó una respuesta a las diversas oposiciones a su moción de interdicto preliminar. La CEPR alegó que los demandados inflaban su alcance estatutario a tenor de la Ley PROMESA, y que la Junta de Supervisión carecía de autoridad para dirigir las operaciones de la AEEPR o controlar las políticas eléctricas de Puerto Rico.

El 28 de marzo de 2018, el Tribunal del Título III rechazó la moción de interdicto preliminar de la CEPR [Proc. abr. núm. 18-00021, ECF núm. 73]. El Tribunal del Título III dictaminó que la CEPR no identificó un mandato o autorización específica de la Junta de Supervisión que la CEPR considerara que invadiera su supuesta esfera de control sobre la política energética sustantiva. Dado que la CEPR no había identificado una controversia concreta, y por cuanto el Tribunal del Título III no era competente para emitir el dictamen consultivo solicitado por la CEPR, la petición de interdicto preliminar quedaba rechazada. El 10 de abril de 2018, la CEPR presentó una moción de desestimación preliminar, sin perjuicio, [Proc.

234

abr. núm. 18-00021, ECF núm. 78] y, en consecuencia, el Tribunal del Título III dictó una orden desestimando el caso [Proc. abr. núm. 18-00021, ECF núm. 79].

17. ***Rivera Rivera y otros contra la Autoridad de Energía Eléctrica de Puerto Rico y otros*, Adv. Proc. No. 18-00047; *Rivera Rivera y otros contra la Autoridad de Energía Eléctrica de Puerto Rico y otros*, (1er. Cir. 20-1797)**

El 27 de abril de 2018, el caso *José Ramón Rivera Rivera y otros contra el Estado Libre Asociado de Puerto Rico y otros*, Caso civil núm. SJ2018cv01670, un procedimiento presentado originalmente ante el Tribunal de Estado Libre Asociado, fue trasladado al Tribunal del Título III [Proc. abr. núm. 18-00047, ECF núm. 1]. En el mismo, los demandantes José Ramón Rivera Rivera, Ralphie Dominicci Rivera, Ángel R. Figueroa Jaramillo y Erasto Zayas López, cada uno de los cuales era miembro de la Junta de Síndicos del SRE de la AEE, solicitaron una declaración de que el SRE de la AEE es un organismo separado e independiente de la AEEPR y del Estado Libre Asociado y que, por consiguiente, no estaba bajo el alcance competencial del Poder Ejecutivo ni del Gobernador. La demanda también solicitó prohibir la Orden Ejecutiva OE-2018-012 ("EO-2018-012"). La EO-2018-012 designaba a la Junta de Gobierno de la AEEPR como síndicos del SRE de la AEE para finalizar y enviar la información financiera del SRE de la AEE correspondiente al año fiscal 2017, y enviar a la AAFAF cualquier información acerca del SRE de la AEE "necesaria o conveniente" para la elaboración del plan fiscal y el presupuesto del año fiscal 2019 de la AEEPR. La EO-2018-012 estipulaba que este nombramiento limitado se extinguiría automáticamente cuando (i) el SRE de la AEE presentara los informes actuariales y los estados financieros correspondientes a los años fiscales 2015 hasta 2017; (ii) la Junta de Supervisión aprobara el Plan fiscal 2019 de la AEEPR; y (iii) la Junta de Supervisión certificara el Presupuesto del año fiscal 2019 de la AEEPR. El 2 de mayo de 2018, el Tribunal del Título III dictó una orden derivando el asunto a la Jueza magistrada Dein [Proc. abr. núm. 18-00047, ECF núm. 4].

El 28 de mayo de 2018, los demandantes presentaron una moción de revocación [Proc. abr. núm. 18-00047, ECF núm. 12]. El 22 de junio de 2018, la Junta de Supervisión y la AEEPR presentaron un escrito de oposición a la moción de revocación, y el 2 de julio de 2018, los demandantes presentaron una respuesta en apoyo de su moción de revocación [Proc. abr. núm. 18-00047, ECF núm. 18, 20].

El 2 de julio de 2018, el SRE de la AEE presentó una moción para intervenir como "parte interesada" en el procedimiento contencioso, por cuanto se trataba de la entidad directamente afectada por la EO-2018-012 [Proc. abr. núm. 18-00047, ECF núm. 21]. El 3 de agosto de 2018, el Tribunal del Título III dictó una orden admitiendo la moción de intervención del SRE de la AEE [Proc. abr. núm. 18-00047, ECF núm. 31]. El 12 de octubre de 2018, el Tribunal del Título III dictó una orden rechazando la moción de revocación de los demandantes [Proc. abr. núm. 18-00047, ECF núm. 33].

El 6 de febrero de 2019 se presentó una demanda modificada, agregando al SRE de la AEE, a la Junta de Síndicos de la AEEPR y a Juan Carlos Adrover, Sammy Rodríguez y Alvin Román como demandantes, y a Elí Díaz Atienza, Ralph A. Kreil, Christian Sobrino Vega, David K. Owns, Charles Bayles, Robert Pou, María Palou Abasolo y José Ortiz como demandados

[Proc. abr. núm. 18-00047, ECF núm. 38]. El 25 de abril de 2019, la Junta de Supervisión presentó una respuesta a la demanda modificada, y planteó una contrademanda solicitando una declaración de que el SRE de la AEE es una instrumentalidad del AEEPR y, por tanto, entra dentro de las competencias del Tribunal del Título III [Proc. abr. núm. 18-00047, ECF núm. 49-50]. Los demandados respondieron a la contrademanda el 16 de mayo de 2019 [Proc. abr. núm. 18-00047, ECF núm. 53].

El 17 de enero de 2020, los demandantes presentaron una segunda demanda modificada, que indicaba que la EO-2018-012 fue retirada el 24 de noviembre de 2019 [Proc. abr. núm. 18-00047, ECF núm. 68]. En la segunda demanda modificada, los demandantes sostenían que, a pesar de la retirada de la Orden ejecutiva, persistía el riesgo inminente de que se dictara otra orden similar, repitiendo los perjuicios para los demandantes. Por este motivo, los demandantes argumentaban que la retirada de la EO-2018-012 no reducía el riesgo de que el Gobernador dictara una orden similar que también vulnerara los derechos de los demandantes.

El 24 de febrero 2020, los demandados presentaron una moción para desestimar la segunda demanda modificada [Proc. abr. núm. 18-00047, ECF núm. 74]. En dicha moción de desestimación, los demandados sostenían que, por cuanto el Gobernador había rescindido la EO-2018-012, que era el único objeto de las demandas de amparo del os demandantes, no existía caso ni controversia que el Tribunal del Título III debiera resolver. Además, los demandados alegaban que, incluso de existir un caso o controversia real, la segunda demanda modificada debería de todos modos ser desestimada, ya que, según la doctrina de funcionario *de facto*, las actuaciones de la Junta de Gobierno de la AEEPR deberían considerarse válidas ya que fueron emprendidas al amparo de un cargo oficial.

El 18 de marzo de 2020, los demandantes presentaron un escrito de oposición a la moción de desestimación, arguyendo que la segunda demanda modificada no era irrelevante y que la doctrina de funcionario *de facto* no era de aplicación, ya que los demandantes no estaban cuestionando el nombramiento de la Junta de Gobierno de la AEEPR [Proc. abr. núm. 18-00047, ECF núm. 76].

El 30 de julio de 2020, el Tribunal del Título III admitió la moción de desestimación de los demandados, sosteniendo que la segunda demanda modificada era irrelevante por cuanto solicitaba una declaración relativa a la validez legal de la ya retirada EO-2018-012, y constituía una petición no justiciable de un dictamen consultivo en la medida en que solicitaba una declaración general de que todas las medidas adoptadas en virtud de la EO-2018-012 eran nulas y sin efecto [Proc. abr. núm. 18-00047, ECF núm. 80]. El 11 de agosto de 2020, los demandantes apelaron al Primer Circuito, quedando dicha apelación registrada como Caso núm. 20-01797 [Proc. abr. núm. 18-00047, ECF núm. 82].

El 27 de octubre de 2021, el Primer Circuito emitió un dictamen y orden confirmando la desestimación del caso por parte del Tribunal del Título III por no ser competente. El 17 de noviembre de 2021, el Primer Circuito dictó su mandato.

18.     ***Unión de Trabajadores de la Industria Eléctrica y Riego contra Ortiz Vázquez y
otros*, Proc. abr. núm. 19-00298; *Unión de Trabajadores de la Industria
Eléctrica y Riego contra Ortiz Vázquez y otros*, (1er. Cir. 20-1332)**

El 8 de mayo de 2019, el caso caratulado *Unión de Trabajadores de la Industria
Eléctrica y Riego (UTIER) contra el Ing. José F. Ortiz Vázquez y la Autoridad de Energía
Eléctrica*, núm. SJ2019cv03986, una demanda presentada originalmente ante el Tribunal de
Primera Instancia de Puerto Rico, fue trasladado al Tribunal del Título III [Proc. abr. núm. 19-
00298, ECF núm. 1]. En dicha demanda, la UTIER solicitando un mandato judicial ordenando a
la AEEPR y al Ingeniero José F. Ortiz Vázquez, a la sazón Director Ejecutivo de la entidad, que
identificara ahorros y recursos adicionales suficientes para permitir a la AEEPR evitar el
incremento de las aportaciones de los empleados al plan de salud y para mantener las
aportaciones al seguro de salud de las personas dependientes de los empleados que sufrieran de
una dolencia preexistente durante el período en que el empleado se mantuviera "vinculado al
servicio público". Según los demandados, otorgar dicho mandato exigiría a la AEEPR aumentar
los gastos en atención sanitaria de sus empleados por encima de los niveles estipulados en el Plan
fiscal certificado de la AEEPR de fecha 1 de agosto de 2018, y en Presupuesto certificado de la
AEEPR correspondiente al año fiscal 2019. El 9 de mayo de 2019, el Tribunal del Título III dictó
una orden derivando el asunto a la Jueza magistrada Dein [Proc. abr. núm. 19-00298, ECF núm.
5].

El 12 de julio de 2019, la Junta de Supervisión, en tanto que representante única de la
AEEPR en el Título III, presentó una moción de desestimación de petición de mandato de la
UTIER [Proc. abr. núm. 19-00298, ECF núm. 13]. Allí, la Junta de Supervisión argumentó que
(i) el mandato judicial solicitado no era procedente, ya que no implicaba obligaciones puramente
ministeriales y por cuanto el remedio podía canalizarse mediante un litigio vinculado al Plan de
ajuste de la AEEPR; (ii) la Sección 305 de la Ley PROMESA prohibía al Tribunal del Título III
dictar cualquier paralización, orden o decreto susceptible de interferir con los bienes o ingresos
de la AEEPR, o con sus poderes políticos o gubernamentales; (iii) la Sección 106(e) de la Ley
PROMESA prohibía al Tribunal del Título III asumir competencias sobre impugnaciones a las
determinaciones de certificación de la Junta de Supervisión; y (iv) una ley que estipulara gastos
presupuestarios usurparía los poderes de control sobre los gastos presupuestarios que el
Congreso había otorgado a la Junta de Supervisión, y estaría vedada a tenor de las Secciones 4,
108, 202 y 207 de la Ley PROMESA.

El 23 de enero de 2020, el Tribunal del Título III dictó una orden admitiendo la moción
de desestimación de la Junta de Supervisión, fallando que la UTIER no había demostrado la
existencia de remedios alternativos adecuados para obtener el amparo solicitado por el sindicato,
lo cual era un prerrequisito para la obtención del mandato [Proc. abr. núm. 19-00298, ECF núm.
19]. El 18 de febrero de 2020, la UTIER apeló.

El 15 de enero de 2021, el Primer Circuito emitió un dictamen y orden confirmando la
desestimación de la petición de mandato judicial de la UTIER por parte del Tribunal del Título
III por no plantear una demanda. El 5 de febrero de 2021, el Primer Circuito dictó su mandato.

19.    ***Sciemus Limited contra la Junta de Supervisión y Administración Financiera
para Puerto Rico*, Proc. abr. núm. 19-00369**

El 3 de junio de 2019, Sciemus Limited; Markel Europe; Lloyd's Syndicates MSP 318,
WRB 1967 y AGM 2488; Lloyd's Syndicates MIT 3210, KLN 510, MMX 2010, CSL 1084,
TMK 1880, AML 2001 y BRT 2987; Indian Harbor Insurance Company; y PartnerRe Ireland
Insurance DAC (en conjunto, las "Aseguradoras") presentaron una demanda contra la Junta de
Supervisión y la AEEPR [Proc. abr. núm. 19-00369, ECF núm. 1]. En dicha demanda, las
Aseguradoras argumentaban haber asegurado ciertos activos de la AEEPR de conformidad con
ciertas pólizas de seguro (las "Pólizas"). La Demanda solicitaba que el Tribunal del Título III
determinara los derechos, obligaciones y responsabilidades de las partes a tenor de las Pólizas,
por las pérdidas reclamadas por la AEEPR derivadas del curvado y posterior hundimiento del
techo de un depósito de almacenamiento de reserva de combustible en la central de Costa Sur de
la AEEPR. Específicamente, las Aseguradoras solicitaban un remedio declaratorio manifestando:
(i) que la cuantía calculada por las Aseguradoras, $1,726,000, era el importe correcto adeudado a
la AEEPR; y (ii) que el Tribunal del Título III aprobara el pago de dicha cuantía y que ordenara a
la AEEPR ejecutar una evidencia de siniestro. El 4 de junio de 2019, el Tribunal del Título III
dictó una orden derivando el asunto a la Jueza magistrada Dein para la tramitación general previa
al juicio [Proc. abr. núm. 19-00369, ECF núm. 5].

El 11 de junio de 2019, las Aseguradoras presentaron una demanda modificada,
agregando a Swiss National Insurance Co. Ltd. como demandante y Aseguradora [Proc. abr.
núm. 19-00369, ECF núm. 9]. El 19 de noviembre de 2019, la Junta de Supervisión y la AEEPR
solicitaron el registro de una orden que estipulara que: (i) la AEEPR podría aceptar de las
aseguradoras el abono inmediato de $1,726,000 (el "Pago no objetado") en concepto de
indemnización en virtud de las Pólizas; (ii) no se admitirían gravámenes, prendas, prioridades ni
otras reclamaciones de acreedores preexistentes de la AEEPR con cargo al Pago no objetado;
(iii) no se permitiría a terceros interferir en la transferencia del Pago no objetado a la AEEPR ni
en el uso de dicho pago por parte de la AEEPR; (iv) las Aseguradoras no sería objeto de ninguna
demanda de parte de los actuales acreedores de la AEEPR ni de terceros con respecto al Pago no
objetado; (v) las Aseguradoras no exigirán ningún reintegro, reembolso o recuperación del Pago
no objetado ni de parte del mismo; (vi) las Aseguradoras mantendrán todos los derechos, recurso
y defensas de sus Pólizas y de derecho, y sostendrán que no se debe ningún pago adicional; y
(vii) los demandantes mantendrán todos los derechos, recurso y defensas de sus Pólizas,
incluyendo, entre otros, el derecho de reclamar importes adicionales a tenor de las pólizas (la
"Moción del Pago no objetado") [Proc. abr. núm. 19-00369, ECF núm. 24]. En la vista ómnibus
del 11 de diciembre de 2019, el Tribunal del Título III informó a las partes de que la orden
propuesta vincularía indebidamente a potenciales acreedores existentes y a terceros, cuyo debido
proceso no permitiría. Las partes notificaron al Tribunal del Título III que presentarían una
moción modificada.

La Junta de Supervisión y la AEEPR renovaron su Moción de Pago no objetado el 26 de
diciembre de 2019, presentando un certificado de no objeción en relación con la moción
renovada el 17 de enero de 2020 [Proc. abr. núm. 19-00369, ECF núm. 32, 38]. El 21 de enero de
2020, el Tribunal del Título III dictó una orden solicitando a la Junta de Supervisión y a la
AEEPR que presentara una propuesta de orden revisada para limitar el alcance del remedio

solicitado en la moción renovada, o que se preparara en la siguiente vista ómnibus para identificar los fundamentos de hecho y de derecho que permitieran al Tribunal del Título III otorgarlo plenamente [Proc. abr. núm. 19-00369, ECF núm. 40]. El 24 de enero de 2020, la Junta de Supervisión y la AEEPR presentaron una propuesta de orden revisada mediante notificación de comparecencia, limitando el alcance del remedio solicitado en la moción renovada [Proc. abr. núm. 19-00369, ECF núm. 41]. El 30 de enero de 2020, los demandantes presentaron una objeción a la notificación de comparecencia [Proc abr. núm. 19-00369, ECF núm. 42]. El 4 de febrero de 2020, el Tribunal del Título III dictó una orden rechazando la moción renovada, dictaminando que la misma —que limitaba derechos de terceros solamente si se les hubiera notificado la moción— ya no reflejaban una resolución consensuada con las Aseguradoras [Proc. abr. núm. 19-00369, ECF núm. 46].

El 26 de febrero 2020, las Aseguradoras presentaron una moción de autorización para presentar una segunda demanda modificada [Proc. abr. núm. 19-00369, ECF núm. 47]. El 2 de marzo de 2020, el Tribunal del Título III dictó una orden instando a las partes a reunirse y conferenciar con respecto a la moción, y que presentaran un informe de estado conjunto, lo cual las partes hicieron el 5 de marzo de 2020 [Proc. abr. núm. 19-00369, ECF núm. 48-49]. Al día siguiente, el Tribunal del Título III autorizó la moción de autorización para presentar una segunda demanda modificada de las Aseguradoras [Proc. abr. núm. 19-00369, ECF núm. 50].

El 6 de octubre de 2020, la Junta de Supervisión presentó una moción, al amparo de la Regla 9019 del Código de Quiebras, solicitando la aprobación de acuerdos de conciliación con las Aseguradoras, en virtud de los cuales la AEEPR percibiría un pago de $3.5 millones para satisfacer las obligaciones de las Aseguradoras en virtud de las Pólizas, y descargando a estas de cualesquiera reclamaciones en su contra [Proc. abr. núm. 19-00369, ECF núm. 92]. El 23 de octubre de 2020, el Tribunal del Título III dictó una orden admitiendo la moción y aprobando los acuerdos [Proc. abr. núm. 19-00369, ECF núm. 98]. El 4 de diciembre de 2020, las partes presentaron una estipulación conjunta de desestimación, a la luz de los acuerdos aprobados [Proc. abr. núm. 19-00369, ECF núm. 99]. Ese mismo día, el Tribunal del Título III desestimó el procedimiento contencioso, sin perjuicio [Proc. abr. núm. 19-00369, ECF núm. 100].

20.   ***Comité Especial de Reclamaciones contra Inspectorate America Corporation,*** **Proc. abr. núm. 19-00388**

El 30 de junio de 2019, el Comité Especial de Reclamaciones ("CES"), en calidad de representante de la AEEPR, y el CANA, presentaron una demanda conjunta contra Trafigura Trading LLC, Trafigura Beheer B.V., Trafigura Limited, Trafigura Argentina S.A. (conjuntamente, "Trafigura"), Vitol y Carlos R. Méndez & Associates (conjuntamente con Trafigura, los "Proveedores demandados") e Inspectorate America Corporation ("Inspectorate America"), Saybolt LP, Altol Chemical Environmental Laboratory Inc. y Altol Environmental Services, Inc. ("Alchem") (conjuntamente con Inspectorate America, Saybolt LP, Altol Chemical Environmental Laboratory Inc., y Alchem, los "Laboratorios demandados") [Proc. abr. núm. 19-00388, ECF núm. 1]. La demanda sostiene que los Proveedores demandados vendieron a la AEEPR combustible de calidad inferior a los precios más altos de combustibles de mejor calidad y más refinados, y que los Laboratorios demandados certificaron indebidamente que el combustible incompatible cumplía todas las especificaciones. Como resultado de estas

vulneraciones, los demandantes plantearon demandas de incumplimiento de contrato contra los Proveedores demandados y los Laboratorios demandados, así como reclamaciones de anulación y recobro de las transferencias realizadas a los demandados a tenor del Código de Quiebras. El 8 de julio de 2019, el Tribunal del Título III dictó una orden derivando el asunto a la Jueza magistrada Dein [Proc. abr. núm. 19-00388, ECF núm. 2].

El 17 de septiembre de 2019, los demandantes de una demanda colectiva pendiente, *Marrero-Rolón y otros contra la Autoridad de Energía Eléctrica y otros*, Caso núm. 15-01167 (JAG) (D.P.R.) (la "*Acción de Marrero*") presentaron una moción de intervención [Proc. abr. núm. 19-00388, ECF núm. 9]. La *Acción de Marrero*, presentada en nombre de supuestos clientes de la AEEPR el 24 de febrero de 2015, alegaba que la AEEPR (i) había conspirado con ciertos proveedores y laboratorios de combustible para que la compañía adquiriera combustible de menor calidad al costo de combustible de mayor calidad, y (ii) trasladaron el costo del combustible a los usuarios de la AEEPR a través de un recargo en sus facturas eléctricas. Se planteó una demanda colectiva conocida como *Acción de Marrero*, actualmente paralizada, que presentó una evidencia de reclamación contra la AEEPR en su Caso del Título III. El 25 de octubre de 2019, el CES, el CANA, Inspectorate America, Saybolt LP y los Proveedores demandados presentaron objeciones a los demandantes de la moción de intervención de *Marrero* (los "*Demandantes de Marrero*") (Proc. abr. núm. 19-00388, ECF núm. 29-31]. El 1 de noviembre de 2019, los demandantes presentaron una demanda modificada [Proc. abr. núm. 19-00388, ECF núm. 33]. El 4 de noviembre de 2019, Vitol presentó una respuesta y contrademandas [Proc. abr. núm. 19-00388, ECF núm. 37].

El 15 de noviembre de 2019, el CES presentó una moción de paralización del procedimiento contenciosos, toda vez que la *Acción de Marrero* se mantuviera pendiente en virtud de la paralización automática por quiebra [Proc. abr. núm. 19-00388, ECF núm. 38]. El 10 de diciembre de 2019, el Tribunal del Título III dictó una orden admitiendo la moción de paralización del procedimiento contencioso del CES, y estableciendo un plazo para que las partes presentara un informe de estado conjunto sobre la coordinación entre este caso y la *Acción de Marrero* [Proc. abr. núm. 19-00388, ECF núm. 61].

El 17 de agosto de 2020, los demandantes presentaron un informe de situación conjunto, manifestando que las partes no habían podido llegar a un acuerdo acerca de la potencial intervención limitada de los Demandantes de *Marrero* y, que por siguiente, insistían en su opinión a la moción de los Demandantes de *Marrero* de intervenir en nombre de los demandados [Proc. abr. núm. 19-00388, ECF núm. 69]. El 14 de diciembre de 2020, el Tribunal del Título III dictó una orden aceptando parcialmente, y rechazando parcialmente, la moción de intervención de los Demandantes de *Marrero* [Proc. abr. núm. 19-00388, ECF núm. 85].

El 14 de septiembre de 2020, el CANA presentó una moción informativa comunicando al Tribunal del Título III que había presentado una demanda, por dos cargos, contra los Demandantes de *Marrero*, Proc. abr. núm. 20-00114, solicitando (i) una declaración de que las demandas que los Demandantes de *Marrero* pretendían plantear correspondían a la AEEPR, y no a los Demandantes de *Marrero*, y (ii) un interdicto prohibiendo la continuación de la *Acción de Marrero* [Proc. abr. núm. 19-00388, ECF núm. 79]. El 21 de septiembre de 2020, los Demandantes de *Marrero* presentaron su propia moción informativa, comunicando al Tribunal

del Título III que habían emprendido un procedimiento contencioso adicional contra la AEEPR, Proc. abr. núm. 20-00115, solicitando una declaración de que las demandas de la *Acción de Marrero* no correspondían a activos de la AEEPR, así como el levantamiento de la paralización automática de los Demandantes de *Marrero* para emprender una demanda conjunta contra la AEEPR, los Proveedores demandados y los Laboratorios demandados [Proc. abr. núm. 19-00388, ECF núm. 84]. Como consecuencia de los procedimientos contenciosos relacionados, el Tribunal del Título III paralizó también este hasta que se resolvieran ciertos asuntos pertinentes a la titularidad de las reclamaciones contra los Proveedores demandados y los Laboratorios demandados del Proc. abr. núm. 20-00115.

El 29 de octubre de 2021, Vitol presentó una moción de sentencia de las demandas, alegando que (i) las demandas de los demandantes estaban prescritas, y que (ii) el escrito omitía plantear una demanda [Proc. abr. núm. 19-00388, ECF núm. 93]. También en esa fecha, Carlos Méndez & Associates e Inspectorate America presentaron sendas mociones de desestimación de la demanda modificada [Proc. abr. núm. 19-00388, ECF núm. 94, 96]. En una de ellas, Carlos Méndez & Associates argumentan fundamentalmente no ser una parte debidamente demandada, porque los demandados no alegaron, ni podían alegar, que eran un proveedor de combustible ni un beneficiario inicial de transferencias realizadas por la AEEPR [Proc. abr. núm. 19-00388, ECF núm. 94]. Inspectorate America planteó que la desestimación se justificaba debido a defectos de forma en los planteamientos relativos a las demandas de vulneración de contrato [Proc. abr. núm. 19-00388, ECF núm. 96]. Además, Trafigura, Inspectorate America, Saybolt LP y Carlos Méndez & Associates presentaron una moción ómnibus de desestimación de la demanda modificada [Proc. abr. núm. 19-00388, ECF núm. 98].

El 15 de noviembre de 2021, las partes presentaron una moción conjunta para el levantamiento parcial de la paralización de las contrademandas de Vitol en su respuesta a la demanda modificada del CANA [Proc. abr. núm. 19-00388, ECF núm. 107], que fue admitida el 7 de diciembre de 2021. El 14 de diciembre de 2021, Vitol presentó su respuesta y sus contrademandas contra los demandantes y la AEEPR, alegando incumplimiento de contrato, solicitando una sentencia declarativa y reivindicando ciertas reclamaciones constitucionales [Proc. abr. núm. 19-00388, ECF núm. 120].

El mismo día, el 25 de abril de 2022, Alchem presentó una respuesta a la segunda demanda modificada del CES [Proc, abr. núm. 19-00388, ECF núm. 159]. También el 25 de abril de 2022, el Laboratorio demandado Inspectorate America y los Proveedores demandados Saybolt LP, Vitol y Trafigura presentaron una moción ómnibus para desestimar la segunda demanda modificada del CES [Proc. abr. núm. 19-00388, ECF núm. 162]. En la misma fecha, el Laboratorio demandado Alchem presentó su adhesión a la moción ómnibus de desestimación [Proc. abr. núm. 19-00388, ECF núm. 166]. También el 25 de abril de 2022, Inspectorate America y Vitol presentaron mociones individuales de desestimación [Proc. abr. núm. 19-00388, ECF núm. 161, 165]. El 26 de abril de 2022, Saybolt LP presentó una moción de desestimación [Proc. abr. núm. 19-00388, ECF núm. 172].

El 6 de mayo de 2022, el CANA y el CES presentaron una moción para inadmitir la adhesión de Alchem a la moción ómnibus de desestimación [Proc. abr. núm. 19-00388, ECF núm. 175]. El 16 de junio de 2022, el Tribunal del Título III dictó una orden rechazando (i) la

moción del CANA y del CES para inadmitir la adhesión de Alchem a la moción ómnibus; y (ii) la moción del CES de inadmitir las defensas afirmativas de Alchem en su respuesta a la segunda demanda modificada del CES [Proc. abr. núm. 19-00388, ECF núm. 188].

El 24 de junio de 2022, el CANA y el CES presentaron oposiciones a las mociones de Saybolt LP, Inspectorate America y Vitol para desestimar la moción ómnibus de desestimación [Proc. abr. núm. 19-00388, ECF núm. 189, 190, 193, 192]. El 1 de julio de 2022, Alchem presentó una moción para el dictado de una orden para determinar la renuncia a las objeciones de los demandantes a sus adhesiones, y admitiendo la desestimación de todas las demandas contra [Proc. abr. núm. 19-00388, ECF núm. 198]. En su moción, Alchem alegaba que la respuesta de los demandantes a la objeción ómnibus de desestimación no podía considerarse una oposición a la moción de desestimación de Alchem y, en consecuencia, alegaba que el Tribunal del Título III debería considerar que los demandantes habían renunciado a sus objeciones a la moción. El CANA y el CES presentaron una moción para aclarar que oposición a la moción ómnibus de desestimación era aplicable a la adhesión de Alchem [Proc. abr. núm. 19-00388, ECF núm. 199]. El 6 de julio de 2022, la Jueza magistrada Dein dictó una orden (i) rechazando la moción de Alchim solicitando una orden determinando la renuncia de las objeciones a su adhesión de parte de los demandantes; (ii) admitiendo parcialmente la moción del CANA y del CES de aclarar su oposición a la moción ómnibus; e (iii) instruyendo al CANA y al CES que presentaran una respuesta modificada [Proc. abr. núm. 19-00388, ECF núm. 200]. El 7 de julio de 2022, el CANA y el CES presentaron su oposición modificada a la moción ómnibus de desestimación [Proc. abr. núm. 19-0388, ECF núm. 200].

El 25 de julio de 2022, Vitol presentó una respuesta en apoyo a su moción de desestimación [Proc. abr. núm. 19-00388, ECF núm. 211]. El 25 de julio de 2022, Saybolt LP presentó una moción en apoyo a su moción de desestimación, acompañada por una moción para sellar determinados documentos [Proc. abr. núm. 19-00388, ECF núm. 212, 213]. El mismo día, Inspectorate America presentó una respuesta en apoyo de su moción de desestimación [Proc. abr. núm. 19-00388, ECF núm. 214]. También el 25 de julio de 2022, los demandados Saybolt LP, Inspectorate America, Vitol y Trafigura presentaron (i) una respuesta en apoyo de la moción ómnibus de desestimación, y (ii) una respuesta en apoyo de la solicitud de notificación judicial en relación con la moción ómnibus [Proc. abr. núm. 19-00388, ECF núm. 215, 216]. En la misma fecha, Alchem presentó una respuesta en apoyo de su adhesión a la moción ómnibus de desestimación, y una moción de adhesión a la respuesta de los demandados Saybolt LP, Inspectorate America, Vitol y Trafigura en apoyo de la moción ómnibus de desestimación [Proc. abr. núm. núm. 19-00388, ECF núm. 217]. El 28 de julio de 2022, la Jueza Dein dictó una orden admitiendo la moción de Saybolt LP de sellar ciertos documentos en relación con su respuesta en apoyo a la moción de desestimación [Proc. abr. núm. 19-00388, ECF núm. 218].

21.  *Autoridad de Energía Eléctrica de Puerto Rico contra Vitol Inc. y otros,* **Proc. abr. núm. 19-00453**

El 14 de noviembre, los expedientes de *Autoridad de Energía Eléctrica de Puerto Rico contra Vitol Inc. y otros*, núm. K AC2009-1376 (901) y *Energía Eléctrica de Puerto Rico contra Vitol Inc. y otros*, núm. 2012-1174 (905), dos casos consolidados a la sacón pendientes en el Tribunal del Estado Libre Asociado, fueron trasladados al Tribunal del Título III [Proc. abr. núm.

19-00453, ECF núm. 1]. PREPA plantea varias demandas contra Vitol, alegando que los contratos de suministro de combustibles de la AEEPR con Vitol, Inc. eran nulos y sin efecto legal a tenor de las leyes de Puerto Rico, porque en noviembre de 2007 Vitol S.A. había sido condenada de un delito en un tribunal del Estado de Nueva York. Como resultado de dicha condena, la AEEPR sostenía que todos los contratos entre las partes en el momento de la condena quedaron automáticamente rescindidos, y todos los contratos formalizados entre las partes a partir de esa fecha eran nulos *ab initio*. Además, la AEEPR exigía la devolución de los aproximadamente $3,890 millones pagados por la AEEPR en virtud de los citados contratos. Vitol S.A. y Vitol, Inc. plantearon una contrademanda contra la AEEPR, exigiendo unos $28.4 millones en concepto de facturas supuestamente impagadas. El 3 de diciembre de 2019, el Tribunal del Título III dictó una orden derivando el asunto a la Jueza magistrada Dein para la tramitación general previa al juicio [Proc. abr. núm. 19-00453, ECF núm. 6].

El 13 de diciembre de 2019, la Junta de Supervisión presentó una moción de revocación conforme a equidad [Proc. abr. núm. 19-00453, ECF núm. 8]. El 14 de enero de 2020, los demandados presentaron una respuesta a la moción de revocación [Proc. abr. núm. 19-00453, ECF núm. 10]. El 5 de febrero de 2020, la Junta de Supervisión presentó una respuesta a las respuestas de los demandados a la moción de revocación, y el 20 de febrero de 2020, los demandados presentaron una tríplica a la respuesta [Proc. abr. núm. 19-00453, ECF núm. 15, 18]. La moción de revocación fue defendida el 5 de marzo de 2020 [Proc. abr. núm. 19-00453, ECF núm. 21]. El 13 de marzo de 2020, el Tribunal del Título III dictó una orden rechazando la moción de revocación de la AEEPR, tras llegar a la conclusión de que (i) tenía competencia federal sobre el asunto; (ii) la AEEPR renunció a toda objeción por prescripción; (iii) la AEEPR renunció a la cláusula de selección operativo al presentar una demanda por vulneración de contrato contra los demandantes en la *Acción de Marrero*; y (iv) la notificación de retirada no vulneraba la paralización automática [Proc. abr. núm. 19-00453, ECF núm. 27]. El 14 de mayo de 2020, las partes presentaron un informe de estado conjunto estableciendo un calendario para la presentación de escritos y argumentar las mociones dispositivas [Pro. abr. núm. 19-00453, ECF núm. 33].

El 31 de julio de 2020, los demandados presentaron una moción de sentencia sumaria, argumentando que: (i) Ley 458 no era aplicable a los contratos de Vitol Inc. con la AEEPR, por lo cual esta no podía demostrar ninguna de sus demandas afirmativas; (ii) la AEEPR no tenía derecho al remedio solicitado; y (iii) el remedio era, además, anticonstitucional porque vulneraría las cláusulas de Multas excesivas, de Proceso debido y de Expropiaciones [Proc. abr. núm. 19-00453, ECF núm. 37].

El 9 de noviembre de 2020, la Junta de Supervisión presentó un escrito de oposición y una moción cruzada de sentencia sumaria, alegando que (i) los contratos de la AEEPR con Vitol, Inc. eran nulos en virtud de la Ley 458 como resultado de la condena de Vitol S.A.; (ii) los contratos de la AEEPR con Vitol, Inc. también eran nulos por estar viciados por contrapartidas ilícitas; y (iii) la AEEPR tenía derecho al reembolso de los aproximadamente $3,890 millones pagados a Vitol, Inc. y a Vitol S.A. durante la vigencia de los contratos, no obstante las alegaciones de constitucionalidad de Vitol, Inc. y de Vitol S.A. [Proc. abr. núm. 19-00453, ECF núm. 48, 53].

El 8 de febrero de 2021, los demandados presentaron una réplica consolidada a la respuesta de la Junta de Supervisión a su moción de sentencia sumaria, y su oposición a la moción cruzada de la Junta de Supervisión de sentencia sumaria, argumentando que (i) las reclamaciones de responsabilidad de la AEEPR adolecían de defectos de derecho; (ii) la AEEPR no podía obtener una confiscación a tenor del derecho de Puerto Rico; y (iii) el recurso de confiscación reclamado por la AEEPR era inconstitucional [Proc. abr. núm. 19-00453, ECF núm. 54].

El 12 de marzo de 2021, la Junta de Supervisión presentó una réplica en apoyo de su moción cruzada de sentencia sumaria, argumentando que (i) la AEEPR estableció una vulneración de la Ley 458; (ii) la AEEPR tenía el derecho a la devolución de ganancias mal habidas a tenor del derecho de Puerto Rico; (iii) la AEEPR tenía derecho al recurso de rescisión previsto por los Artículos 1257 y 1258; y (iv) el recurso de la AEEPR a la devolución de ganancias mal habidas era constitucional [Proc. abr. núm. 19-00453, ECF núm. 61]. El 28 de abril de 2021, el Tribunal del Título III oyó las argumentaciones de las partes sobre las mociones cruzadas de sentencia sumaria, y el 30 de abril de 2021, el Tribunal del Título III ordenó a los demandados presentar evidencias adicionales citadas por ellos en la vista [Proc. abr. núm. 19-00453, ECF núm. 67]. Además, el 30 de abril de 2021, los demandados aportaron la evidencia adicional solicitada por el Tribunal del Título III [Proc. abr. núm. 19-00453, ECF núm. 68]. El 10 de mayo de 2021, el Tribunal del Título III dictó una orden pidiendo a las partes que realizaran una presentación conjunta de las repercusiones que tendrían sobre cada parte la aportación de la documentación complementaria de los demandados [Proc. abr. núm. 19-00453, ECF núm. 73]. El 11 de mayo de 2021, las partes registraron la presentación conjunta [Proc. abr. núm. 19-00453, ECF núm. 74].

El 27 de septiembre de 2021, el Tribunal del Título III emitió un dictamen y orden aceptando parcialmente las mociones de sentencia sumaria de las partes [Proc. abr. núm. 19-00453, ECF núm. 77]. El Tribunal del Título III dictaminó que los contratos de la AEEPR con Vitol, Inc. no eran nulos en virtud de la Ley 458 ni como resultado de contrapartidas ilícitas, y que los demandados tenían derecho a una sentencia sumaria en su contrademanda. Además, el Tribunal del Título III admitió la moción de sentencia sumaria de la AEEPR con respecto a ciertas defensas afirmativas planteadas por los demandados. El 1 de noviembre de 2021, las partes presentaron un informe de estado conjunto sobre los demás asuntos pendientes de resolución en el procedimiento contencioso [Proc. abr. núm. 19-00453, ECF núm. 81]. Además, el 2 de noviembre de 2021, el Tribunal del Título III dictó una sentencia contra la AEEPR por la suma de $41,457,382.88 solicitada en la contrademanda de Vitol, y rechazando todo remedio no otorgado en la sentencia. De este modo, el procedimiento contencioso quedó cerrado [Proc. abr. núm. 19-00453, ECF núm. 82].

El 2 de diciembre de 2021, la Junta de Supervisión presentó una notificación de apelación [Proc. abr. núm. 1900453, ECF núm. 83]. El 7 de diciembre de 2021, la apelación quedó registrada como Caso núm. 21-1987 en el Primer Circuito. El 2 de mayo de 2022, el apelante presentó su escrito inicial. El 20 de julio de 2022, las partes presentaron una moción conjunta para mantener la apelación en espera y paralizar todos los plazos, pendiente de una conciliación del caso. El 25 de julio de 2022, el Primer Circuito dictó una orden (i) admitiendo la moción conjunta de las partes de mantener la apelación en espera y paralizar todos los plazos, pendiente

de una conciliación del caso, y (ii) pidiendo a las partes que presentaran un informe de estado conjunto. El 31 de agosto de 2022, las partes presentaron una notificación de desestimación voluntaria, sin perjuicio. El 13 de septiembre de 2022, el Primer Circuito dictó una sentencia y mandato desestimando la apelación.

22. ***Comité Oficial de Acreedores No Asegurados contra Catesby Jones,*** **Proc. abr. núm. 20-00114**

EL 14 de septiembre de 2020, el CANA presentó una demanda contra Anne Catesby Jones y Jorge Valdés Llauger [Proc. abr. núm. 20-00114, ECF núm. 1]. El CANA solicitó una declaración de que la AEEPR tenía el derecho exclusivo de presentar demandas contra ciertos proveedores de combustibles (los "Proveedores de combustibles") y laboratorios de combustibles (los "Laboratorios de combustibles"), que tanto el CANA como los demandados alegaban que participaron en un plan para vender a la AEEPR combustibles de menor calidad como combustibles de mayor calidad. Los demandantes habían presentado una demanda colectiva por separado, núm. 15-cv-02267, en nombre de los usuarios de la AEEPR, contra los Proveedores de combustibles, los Laboratorios de combustibles y la AEEPR, argumentando que los dos primeros habían participado en un plan para suministrar a la AEEPR combustible de menor calidad. Además, el CANA solicitó un interdicto prohibiendo a los demandados continuar con esas demandas, alegando que interferirían con el proceso centralizado de resolución de reclamaciones del Título III, frustraría la confirmación de un plan de ajuste viable y conllevaría una merma sustancial de los recobros para acreedores similarmente situados. En consecuencia, el 14 de septiembre de 2020 el CANA presentó una moción para el dictado de un interdicto preliminar [Proc. abr. núm. 20-00114, ECF núm. 2].

El 15 de septiembre de 2020, el Tribunal del Título III dictó una orden derivando el asunto a la Jueza magistrada Dein [Proc. abr. núm. 20-00114, ECF núm. 3] El 9 de octubre de 2020, el CANA presentó una notificación de desestimación voluntaria, sin perjuicio [Proc. abr. núm. 20-00114, ECF núm. 11].

23. ***Catesby Jones contra Comité Especial de Reclamaciones***, **Proc. abr. núm. núm. 20-00115**

El 17 de septiembre de 2020, Anne Catesby Jones y Jorge Valdés Llauger presentaron una demanda contra la AEEPR, el CES y el CANA, solicitando: (i) un remedio declaratorio estipulando que las reclamaciones reivindicadas por la Junta de Supervisión y el CANA en la acción de anulación del Proc. abr. núm. 19-00388 no son activos del patrimonio; y (ii) levantamiento de la paralización automática [Proc. abr. núm. 20-00115, ECF núm. 1]. El 16 de octubre de 2020, el Tribunal del Título III dictó una orden derivando el asunto a la Jueza magistrada Dein para la tramitación general previa al juicio [Proc. abr. núm. 20-00115, ECF núm. 11]. El 26 de octubre de 2020, los demandantes presentaron una demanda modificada, nombrando solamente a la AEEPR como demandada [Proc. abr. núm. 20-00115, ECF núm. 14]. El 12 de noviembre de 2020, el CANA presentó una moción convenida de intervención [Proc. abr. núm. 20-00115, ECF núm. 19]. El 16 de noviembre de 2020, el Tribunal del Título III aprobó la moción de intervención limitada del CANA [Proc. abr. núm. 20-00115, ECF núm. 21].

El 22 de enero de 2021, los demandantes presentaron una moción de licencia para presentar una segunda demanda modificada, que el Tribunal del Título III otorgó el 25 de enero de 2021 [Proc. abr. núm. 20-00115, ECF núm. 33-34]. El 2 de febrero de 2021, los demandantes presentaron una segunda demanda modificada [Proc. abr. núm. 20-00115, ECF núm. 36]. El 30 de marzo de 2021, la Junta de Supervisión presentó una moción de desestimación de los cargos I y II de la segunda demanda modificada de los demandantes, alegando que las demandas cualesquiera otros recobros alegados en la acción de anulación eran bienes de la AEEPR, y el CANA presentó un escrito de adhesión a la moción de la AEEPR [Proc. abr. núm. 20-00115, ECF núm. 41, 43]. El 27 de abril de 2021, los demandantes presentaron su oposición a la moción desestimación de la AEEPR [Proc. abr. núm. 20-00115, ECF núm. 44].

El 25 de mayo de 2021, la Junta de Supervisión presentó una réplica en apoyo de su moción de desestimación de la segunda demanda modificada de los demandantes, y el CANA presentó un escrito de adhesión a la respuesta de la Junta de Supervisión [Proc. abr. núm. 20-00115, ECF núm. 48, 49]. El 24 de junio de 2021, el Tribunal del Título III dictó una orden admitiendo la moción de desestimación de la Junta de Supervisión, dado que los demandantes no pudieron argumentar un caso o controversia justiciables, carecían de legitimación procesal para obtener una declaración relativa a si la AEEPR era una demandante válida en la acción de anulación, y el Tribunal del Título III no era competente para ver ciertas demandas [Proc. abr. núm. 20-00115, ECF núm. 53]. El 17 de septiembre de 2021, el Tribunal del Título III ordenó a las partes reunirse y conferenciar para presentar un informe de estado conjunto a efectos de comunicar al Tribunal del Título III la situación del pleito y las posiciones de las partes en la tramitación del proceso como más tardar el 1 de octubre de 2021 [Proc. abr. núm. 20-00115, ECF núm. 54].

El 30 de septiembre de 2021, los demandantes presentaron una notificación voluntaria de desestimación [Proc. abr. núm. 20-00115, ECF núm. 55]. El 18 de noviembre de 2021 se dictó sentencia y se cerró el procedimiento contencioso [Proc. abr. núm. 20-00115, ECF núm. 56].

24.   ***Unión de Trabajadores de la Industria Eléctrica y Riego y otros contra Pierluisi y otros*, Proc. abr. núm. 21-00041**

El 20 de abril de 2021, la UTIER, conjuntamente con otros actuales y antiguos miembros, presentaron una demanda iniciando el procedimiento. El 26 de abril de 2021, los demandantes presentaron (i) una demanda modificada solicitando una sentencia declaratoria anulando el Contrato de TyD de la AEEPR con LUMA Energy y el remedio interdictal correspondiente, y (ii) una moción de interdicto preliminar para prohibir temporalmente la entrada en vigor del Contrato de TyD [Proc. abr. núm. 21-00041, ECF núm. 7, 8]. En la demanda modificada, los demandantes alegaron (i) que el Contrato de TyD favorecía solamente a LUMA Energy; (ii) que el Contrato de TyD contenía cláusulas contrarias a la ley y al orden público; (iii) que el Contrato de TyD era una transacción torticera que perjudicaba a terceros; y (iv) que el Contrato de TyD y la Ley 29-2009 eran inconstitucionales, tanto con respecto a la Constitución de los Estados Unidos como a la de Puerto Rico.

El 5 de mayo de 2021, los demandados presentaron un escrito de oposición a la moción de los demandantes [Proc. abr. núm. 21-00041, ECF núm. 19]. En su oposición, los demandados

alegaron que era de interés público rechazar la moción. Asimismo, los demandados argumentaron (i) que los demandantes carecían de legitimación procesal para presentar sus demandas; (ii) que era poco probable que los demandantes pudieran ver admitida su demanda a tenor de la Sección 305 de la Ley PROMESA; y (iii) que los demandantes omitieron plantear una demanda válida de que el Contrato de TyD vulneraba el derecho de Puerto Rico. El 11 de mayo de 2021, los demandantes presentaron una réplica en apoyo de su moción [Proc. abr. núm. 21-00041, ECF núm. 30]. La moción fue vista el 18 de mayo de 2021.

El 21 de mayo de 2021, el Tribunal del Título III dictó una orden rechazando al moción de los demandantes, señalando (i) la falta de legitimación procesal de los demandantes de incoar sus demandas de que el Contrato de TyD es nulo o inaplicable; (ii) la omisión de los demandantes de demostrar que el Contrato de TyD vulnera la ley y el orden público; (iii) la omisión de los demandantes que demostrar que el TyD constituye una transacción torticera; y (iv) la omisión de los demandantes de demostrar que el Contrato de TyD es inconstitucional a tenor de las Constituciones de los Estados Unidos o de Puerto Rico [Proc. abr. núm. 21-00041, ECF núm. 56].

El 28 de mayo de 2021, los demandantes presentaron una moción de reconsideración de la Orden del Tribunal del Título III [Proc. abr. núm. 21-00041, ECF núm. 57]. El 1 de junio de 2021, el Tribunal del Título III dictó una orden rechazando la moción, determinando que (i) el Tribunal del Título III había aplicado correctamente la Ley 120 sin considerar ciertas enmiendas de la misma efectuadas en virtud de la Ley 17-2019; (ii) las conclusiones del Tribunal del Título III en materia de falta de legitimación procesal para impugnar la validez del Contrato de TyD en lo relativo a política pública eran correctas; y (iii) el Tribunal del Título III no erró al determinar las pocas probabilidades de admisión de las reclamaciones de interferencia torticera planteada por los demandantes [Proc. abr. núm. 21-00041, ECF núm. 61].

El 4 de junio de 2021, los demandantes presentaron su segunda demanda modificada, solicitando una sentencia declaratoria anulando el Contrato de TyD de la AEEPR con LUMA Energy y el remedio interdictal correspondiente [Proc. abr. núm. 21-00041, ECF núm. 64]. El 19 de julio de 2021, los demandados presentaron una moción para desestimar la segunda demanda modificada de los demandantes [Proc. abr. núm. 21-00041, ECF núm. 71]. En la moción de desestimación, los demandados alegaron (i) la falta de legitimación procesal de los demandantes para plantear su impugnación al Contrato de TyD; (ii) la omisión de los demandantes de plantear una demanda objetando la validez del Contrato de TyD; (iii) la omisión de los demandantes de plantear una demanda válida a tenor del derecho de Puerto Rico; (iv) la omisión de los demandantes de alegar cualquier vulneración federal de la Ley de Seguridad de Ingresos de Jubilación Laboral ("ERISA"), de la Sección 201 de la Ley PROMESA o de la Cláusula de Contratos de la Constitución de los Estados Unidos; y (v) que los demandantes demandaron erróneamente a demandados individuales en su "calidad oficial" sin argumentar ninguna actuación de su parte. El 1 de septiembre de 2021, los demandantes presentaron un escrito de oposición a la moción de los demandados [Proc. abr. núm. 21-00041, ECF núm. 75].

El 12 de octubre de 2021, Cortland presentó una moción de protección en calidad de *amicus curiae*, relacionada con la moción de los demandados de desestimar la segunda demanda modificada [Proc. abr. núm. 21-00041, ECF núm. 85]. Cortland sostuvo que la moción de

desestimación de los demandados implicaba ciertas controversias relacionadas con beneficiarios terceros a tenor del Contrato de fideicomiso.

El 29 de octubre de 2021, Assured, National, el Grupo Ad Hoc y US Bank presentaron (i) una respuesta a la moción de protección de Cortland para ser oído como *amicus curiae* en relación con la moción de los demandados de desestimar la segunda demanda modificada, y (ii) una moción de protección cruzada para ser oídos como *amicus curiae* en relación con la moción de los demandados de desestimar la segunda demanda modificada de los demandantes [Proc. abr. núm. 21-00041, ECF núm. 88].

Además, el 29 de octubre de 2021, el Gobernador de Puerto Rico, el Estado Libre Asociado, la Junta de Supervisión, la AEEPR, el Presidente de la Junta de Gobierno de la AEEPR, el Director Ejecutivo de la AEEPR, la Autoridad de Alianzas Público-Privadas de Puerto Rico, el Director Ejecutivo de la Autoridad de Alianzas Público-Privadas de Puerto Rico, la AAFAF y el Director Ejecutivo de la AAFAF presentaron una respuesta a la moción de protección de Cortland para ser oído como *amicus curiae* en relación con la moción de los demandados de desestimar la segunda demanda modificada [Proc. abr. núm. 21-00041, ECF núm. 89].

El 30 de diciembre de 2021, el Tribunal del Título III dictó una orden rechazando (i) la moción de protección de Cortland para ser oído como *amicus curiae* en relación con la moción de los demandados de desestimar la segunda demanda modificada de los demandantes; y (ii) la moción de protección cruzada de Assured, National, el Grupo Ad Hoc y US Bank de ser oídos como *amicus curiae* en relación con la misma (la "Orden de rechazo de amicus") [Proc. abr. núm. 21-00041, ECF núm. 96]. El Tribunal del Título III manifestó no estar persuadido de que las partes recurrentes que pedían ser oídas como amicus curiae hubieran demostrado un interés especial en el caso que justificara ser oídas como *amicus curiae*.

El 13 de enero de 2022, Cortland presentó una objeción a la Orden de rechazo de amicus del Tribunal del Título III [Proc. abr. núm. 21-00041, ECF núm. 98]. El 28 de enero de 2022, el Gobernador de Puerto Rico, el Estado Libre Asociado, la Junta de Supervisión, la AEEPR, el Presidente de la Junta de Gobierno de la AEEPR, el Director Ejecutivo de la AEEPR, la Autoridad de Alianzas Público-Privadas de Puerto Rico, el Director Ejecutivo de la Autoridad de Alianzas Público-Privadas de Puerto Rico, la AAFAF, el Director Ejecutivo de la AAFAF, Assured, National, el Grupo Ad Hoc, Syncora y US Bank presentaron respuestas a la objeción de Cortland a la Orden de rechazo de amicus del Tribunal del Título III [Proc. abr. núm. 21-00041, ECF núm. 99, 100]. El 3 de febrero de 2022, Cortland presentó una réplica en apoyo de su objeción [Proc. abr. núm. 21-00041, ECF núm. 101]. La objeción de Cortland y las mociones de desestimación de los demandados siguen pendientes de resolución.

25.     ***Sistema de Retiro de los Empleados de la Autoridad de Energía Eléctrica (SREAEE) contra Pierluisi y otros***, **Proc. abr. núm. 21-00049**

El 6 de mayo de 2021, el SRE de la AEE y varios integrantes de la Junta de Síndicos de la entidad presentaron una demanda, solicitando una sentencia declaratoria anulando el Contrato de TyD de la AEEPR con LUMA Energy y el remedio interdictal correspondiente [Proc. abr.

núm. 21-00049, ECF núm. 1]. El 4 de junio de 2021, los demandantes presentaron una demanda modificada [Proc. abr. núm. 21-00049, ECF núm. 7]. En la demanda modificada alegaban que (i) el Contrato de TyD favorecía solamente a LUMA Energy; (ii) el Contrato de TyD contenía cláusulas contrarias a la ley y al orden público; (iii) el Contrato de TyD era una transacción torticera; (iv) el Contrato de TyD vulneraba la Sección 201(b) de la Ley PROMESA; (v) el Contrato de TyD privaba a los demandantes de sus derechos adquiridos en virtud del Reglamento del SRE de la AEE y del CCT; y (vi) la Ley 29-2009 era inconstitucional a tenor de la Cláusula de Contratos de las Constituciones de los Estados Unidos y de Puerto Rico.

El 19 de julio de 2021, los demandados presentaron una moción de desestimación de la demanda modificada de los demandantes [Proc. abr. núm. 21-00049, ECF núm. 13]. La moción de los demandados sostenía que los demandantes carecían de legitimidad procesal a tenor del Título III para plantear impugnaciones basadas en "políticas legales y públicas" contra el Contrato de TyD. Asimismo, los demandados alegaban que (i) los demandantes omitían plantear reclamaciones válidas para objetar la validez del Contrato de TyD; (ii) los demandantes no habían identificado ningún derecho otorgado o legalmente protegido que supuestamente fuese menoscabado por el Contrato de TyD a tenor del derecho de Puerto Rico; (iii) los demandantes no señalaron ninguna vulneración de ERISA, de la Sección 201 de la Ley Promesa ni de la Cláusula de Contratos de la Constitución de los Estados Unidos; y (iv) los demandantes demandaron erróneamente a demandados individuales en su "calidad oficial" sin argumentar ninguna actuación de su parte.

El 7 de septiembre de 2021, los demandantes presentaron un escrito de oposición a la moción de desestimación de la demanda modificada de los demandados, alegando que (i) los demandantes tenían legitimidad procesal para impugnar el Contrato de TyD; (ii) habían argumentado de manera plausible que el Contrato de TyD era ilícito; y (iii) habían alegado de manera plausible que el Contrato de TyD vulneraba el derecho federal y las Constituciones de los Estados Unidos y de Puerto Rico [Proc. abr. núm. 21-00049, ECF núm. 19].

El 4 de octubre de 2021, los demandados presentaron su réplica en apoyo de su moción de desestimar la demanda modificada de los demandantes, reiterando que no tenían legitimidad procesal y que habían omitido alegar de manera plausible cualquier vulneración del derecho y/o las Constituciones de los Estados Unidos y Puerto Rico [Proc. abr. núm. 21-00049, ECF núm. 23]. El asunto sigue pendiente de resolución en el Tribunal del Título III.

26.    ***Senado de Puerto Rico contra Paredes-Maisonet y otros,*** **Proc. abr. núm. 21-00059**

El 4 de junio de 2021, la AEEPR y la AAFAF presentaron una notificación de traslado desde el Tribunal del Estado Libre Asociado al Tribunal del Título III una causa civil solicitando remedio interdictal para prohibir la ejercitación de autoridad de LUMA Energy en el marco del Contrato de TyD, y revertir las medidas implementadas para otorgar validez al Contrato de TyD con LUMA Energy [Proc. abr. núm. 21-00059, ECF núm. 1]. El 10 de junio de 2021, el Senado de Puerto Rico presentó una moción de revocación del caso ante el Tribunal del Estado Libre Asociad, alegando que las cuestiones fundamentales de la demanda no planteaban una cuestión federal independientemente de la que recaía en el ámbito de la Ley PROMESA [Proc. abr. núm.

21-00059, ECF núm. 9]. La moción de revocación fue plenamente fundamentada [Proc. abr. núm. 21-00059, ECF núm. 15, 16, 18].

El 24 de junio de 2021, la Junta de Supervisión presentó una moción para el dictado de una orden instruyendo al Senado de Puerto Rico para retirar la demanda, alegando que la misma vulneraba la paralización automática [Caso núm. 17-bk-4780, ECF núm. 2530], ya que pretendía ejercitar el control sobre bienes de la AEEPR, específicamente el Contrato de TyD con LUMA Energy, al declararlo nulo y sin efecto, e interferir con las operaciones de la AEEPR revirtiendo el traspaso de las operaciones de TyD de la AEEPR. La moción fue plenamente argumentada [Caso núm. 17-bk-4780, ECF núm. 2530, 2572].

El 7 de febrero de 2022, el Tribunal del Título III dictó una orden instruyendo al Senado de Puerto Rico para retirar la demanda, razonando que el Contrato de TyD constituía un bien afectado por la paralización automática, y que por ello el remedio solicitado de anular efectivamente el Contrato de TyD hubiera repercutido en los derechos contractuales de la AEEPR y vulnerado la paralización automática [Proc. abr. núm. 21-00059, ECF núm. 20]. La Secretará del Tribunal emitió una sentencia cerrando el caso, con lo cual también se cerró el procedimiento contencioso [Proc. abr. núm. 21-00059, ECF núm. 21].

27.  ***Honorable Luis Raúl Torres Cruz contra LUMA Energy, LLC y LUMA Energy Servco, LLC*, Proc. abr. núm. 21-00067**

El 25 de junio de 2021, LUMA Energy presentó una notificación de traslado desde el Tribunal del Estado Libre Asociado al Tribunal del Título III de una demanda civil solicitando la divulgación de información financiera y operativa relacionada con el Contrato de TyD entre la AEEPR y LUMA Energy [Proc. abr. núm. 21-00067, ECF núm. 1].

El 26 de junio de 2021, el demandante presentó una moción para devolver el caso al Tribunal del Estado Libre Asociado, argumentando que era impropio que un Tribunal del Título III se convirtiera en árbitro de una disputa entre un ciudadano privado y una Comisión de la Cámara de Representantes en materia de supervisión legislativa [Proc. abr. núm. 21-00067, ECF núm. 3]. El 28 de junio de 2021, el Tribunal del Título III dictó una orden derivando el asunto a la Jueza magistrada Dein para la tramitación general previa al juicio [Proc. abr. núm. 21-00067, ECF núm. 6].

El 30 de junio de 2021, los demandados presentaron un escrito de oposición a la moción de devolución, argumentando que el Tribunal del Título III era competente porque el caso estaba relacionado con el Caso del Título III de la AEEPR [Proc. abr. núm. 21-00067, ECF núm. 9]. El 1 de julio de 2021, el demandante presentó una réplica en apoyo de su moción, reiterando las alegaciones de que la controversia se centraba en la ejercitación adecuada de una facultad legislativa y no estaba relacionado con bienes de la AEEPR [Proc. abr. núm. 21-00067, ECF núm. 15].

El 7 de julio de 2021, el Tribunal del Título III dictó una orden admitiendo la moción del demandante de devolver el caso al Tribunal del Estado Libre Asociado, sosteniendo que LUMA Energy no había demostrado que el traslado del caso involucrara a bienes o a ingresos de la

AEEPR, por lo cual el Tribunal del Título III no era competente [Proc. abr. núm. 21-00067, ECF núm. 16], con lo cual se cerró el procedimiento contencioso.

28. ***Herrero Domenech contra LUMA Energy, LLC,*** **Proc. abr. núm. 22-00050**

El 29 de julio de 2022, LUMA Energy presentó una notificación de traslado desde el Tribunal del Estado Libre Asociado al Tribunal del Título III de una demanda colectiva relacionada con la prestación de los Servicios de OyM y la operación del Sistema de TyD por parte de LUMA Energy [Proc. abr. núm. 22-00050, ECF núm. 1]. La demanda colectiva fue trasladada en relación con las obligaciones de indemnización a LUMA Energy, en el marco del Contrato de TyD, por parte de la AEEPR. El 2 de agosto de 2022, el Tribunal del Título III dictó una orden derivando el asunto a la Jueza magistrada Dein para la tramitación previa al juicio [Proc. abr. núm. 22-00050, ECF núm. 5].

El 29 de agosto de 2022, los demandantes de la demanda colectiva presentaron una moción de revocación, alegando que el Tribunal del Título III debería ejercitar su discreción equitativa de abstenerse de oír el caso y devolverlo porque Luma no era parte de la reestructuración de la AEEPR ni se consideraba parte de los bienes de la AEEPR [Proc. abr. núm. 22-00050, ECF núm. 12].

El 13 de septiembre de 2022, LUMA Energy presentó su oposición a la moción de devolución del caso, argumentando que LUMA Energy tenía legitimación como parte de la demanda colectiva, y que el Tribunal del Título III era competente porque la controversia estaba relacionada con el Caso del Título III de la AEEPR [Proc. abr. núm. 22-00050, ECF núm. 14]. El 12 de octubre de 2022, el Tribunal del Título III derivó la moción de devolución del demandante a la Jueza magistrada Dein para la tramitación previa al juicio [Proc. abr. núm. 22-00050, ECF núm. 15].

El 28 de octubre de 2022, la Jueza magistrada Dein recomendó que el Tribunal del Título III declinara ejercitar su competencia sobre las cláusulas de abstención y de revocación equitativa de la Ley PROMESA, porque las reclamaciones de la demanda colectiva estaban basadas plenamente en el derecho de Puerto Rico y no implicaban a la AEEPR ni a ningún otro Deudor del Título III [Proc. abr. núm. 22-000050, ECF núm. 16].

El 14 de noviembre de 2022, Luma Energy presentó su oposición al informe y a las recomendaciones de la Jueza magistrada Dein, argumentando que no existía ningún fundamento para la abstención de la Ley PROMESA, y que el caso repercutiría necesariamente en el Caso del Título III de la AEEPR, por lo cual era lógico que fuese visto por el Tribunal del Título III. El 9 de diciembre de 2022, los demandantes de la demanda colectiva presentaron un escrito de oposición alegando que el análisis de los factores de equidad y abstención de la Jueza magistrada Dein era correcto, y justificaba que el caso fuese devuelto a los Tribunales del Estado Libre Asociado. Por el momento, sigue pendiente una decisión sobre la moción de devolución.

### H.  Litigio sobre la Cláusula de Designaciones

1.   ***Aurelius Investments, LLC y otros c. el Estado Libre Asociado de Puerto Rico y otros, Casos Núm. 18- 01671; 18- 08014 (1er Cir.)***

El 7 de agosto de 2017, Aurelius Investments, LLC, Aurelius Opportunities Fund, LLC y Lex Claims, LLC (colectivamente, "Aurelius"), presentaron una moción para que se desestimara la petición de Título III del ELA [Caso Núm. 17-Bk-3283, ECF Núm. 913].  Aurelius alegó que la Junta de Supervisión carecía de autoridad para iniciar el Caso de Título III porque sus miembros habían sido designados infringiendo la Cláusula de  Designaciones de la Constitución de Estados Unidos, el art. II, § 2 de la Constitución de EE.UU. y el principio de división de poderes.   En respuesta, la Junta de Supervisión argumentó que sus miembros no eran "Funcionarios de los Estados Unidos" en virtud de la Cláusula de Designaciones, y que las facultades de la Junta de Supervisión eran puramente locales, y no federales, por lo que la Cláusula de Designaciones no se aplica [Caso Núm. 17-bk-3283, ECF Núm. 1622].  La Junta de Supervisión argumentó que, incluso si los miembros fueran funcionarios federales, la Cláusula de Designaciones no se había violado porque los miembros de la Junta de Supervisión ejercían autoridad en Puerto Rico, donde la Cláusula Territorial le otorga al Congreso plenos poderes. Con carácter subsidiario, la Junta de Supervisión argumentó que la designación de sus miembros no requiere la recomendación y el consentimiento del Senado porque son "funcionarios de rango inferior".

El 13 de julio de 2018, el Tribunal del Título III denegó la moción de Aurelius para desestimar el Caso del Título III del ELA [Caso Núm. 17-bk-3283, ECF Núm. 3503].  Aurelius apeló la decisión.  El 7 de septiembre de 2018, el Primer Circuito unificó la apelación de Aurelius con apelaciones similares que involucraban impugnaciones en base a la Cláusula de Designaciones a la Junta de Supervisión (que se analizan a continuación) presentadas por UTIER y Assured Guaranty Corp.

El 15 de febrero de 2019, el Primer Circuito determinó que la designación de los miembros de la Junta de Supervisión era inconstitucional.  Sin embargo, el Primer Circuito ratificó la decisión del Tribunal del Título III de denegar la desestimación de los Casos del Título III y sostuvo que las acciones adoptadas por la Junta de Supervisión anteriores a la sentencia del Primer Circuito eran válidas bajo la doctrina de funcionario *de facto*.  El Primer Circuito dejó en suspenso su decisión durante noventa (90) días para permitir al Presidente y al Senado subsanar las designaciones defectuosas.

La Junta de Supervisión presentó una petición de elevación de causa a un tribunal superior (*certiorari*) el 23 de abril de 2019, que se registró como Caso de la Corte Suprema de EE.UU. Núm.18-1334.  El 24 de abril de 2019, la Junta de Supervisión presentó una moción ante el Primer Circuito para paralizar el mandato supeditado a la decisión de su petición de certiorari. El 6 de mayo de 2019, el Primer Circuito prorrogó la paralización del mandato por sesenta (60) días hasta el 15 de julio de 2019.

El 24 de mayo de 2019, Aurelius presentó una petición de certiorari impugnando la decisión del funcionario *de facto* del Primer Circuito, que se registró como Caso de la Corte Suprema de EE.UU. Núm.18-1475.  CANA, que compareció como parte contraria a la apelación en la apelación ante el Primer Circuito, presentó una petición de certiorari el 28 de mayo de 2019, que se registró como Caso de la Corte Suprema de EE.UU. Núm.18-1496.  Estados Unidos presentó una petición de certiorari el 28 de mayo de 2019, que se registró como Caso de la Corte Suprema de EE.UU. Núm.18-1514.  UTIER presentó una petición de certiorari el 5 de junio de 2019, que se registró como Caso de la Corte Suprema de EE.UU. Núm.18-1521.

El 18 de junio de 2019, la Junta de Supervisión solicitó al Primer Circuito que prorrogara la paralización del mandato, hasta que se resolvieran los casos anteriores en la Corte Suprema. El 19 de junio de 2019, la Corte Suprema concedió todas las peticiones de certiorari y unificó los casos.  El Caso Núm. 18-1334 de la Corte Suprema de EE.UU. fue designado como el caso principal.  El 2 de julio de 2019, el Primer Circuito concedió la moción de la Junta de Supervisión para paralizar el mandato supeditado a una decisión de fondo de la Corte Suprema.

El 25 de julio de 2019, la Junta de Supervisión, la AAFAF, el Comité de Retirados, los Estados Unidos y CANA presentaron escritos ante la Corte Suprema impugnando la decisión de la Cláusula de Designaciones del Primer Circuito.  El 22 de agosto de 2019, UTIER y Aurelius presentaron sus escritos iniciales unificados, apoyando la decisión del Primer Circuito sobre la Cláusula de Designaciones e impugnando su decisión sobre la doctrina de funcionario *de facto.* El 19 de septiembre de 2019, la Junta de Supervisión, la AAFAF, el Comité de Retirados, los Estados Unidos y CANA presentaron respuestas en apoyo de sus impugnaciones a la decisión de la Cláusula de Designaciones del Primer Circuito y en apoyo de la decisión del Primer Circuito sobre la doctrina de funcionario *de facto*.  La Coalición de Tenedores de Bonos de COFINA Prioritarios (Senior) presentó un escrito que se limitaba a apoyar la decisión del Primer Circuito sobre la doctrina de funcionario *de facto*.  El 4 de octubre de 2019 y el 8 de octubre de 2019, UTIER y Aurelius presentaron sendos escritos de contestación.  Los alegatos orales se presentaron el 15 de octubre de 2019.

El 1 de junio de 2020, la Corte Suprema de los Estados Unidos revocó la decisión del Primer Circuito del 15 de febrero de 2019.  La Corte sostuvo que la Cláusula de Designaciones no se aplica a la designación de los miembros de la Junta de Supervisión.  Dado que las responsabilidades legales de la Junta de Supervisión consisten en "deberes principalmente locales" —a saber, representar a Puerto Rico "en procedimientos de quiebra y supervisar aspectos de las políticas fiscales y presupuestarias de Puerto Rico"— los miembros de la Junta de Supervisión no son "Funcionarios de los Estados Unidos" y, por lo tanto, no están sujetos a la Cláusula de Designaciones.  La Corte Suprema se negó a considerar la aplicación de la doctrina de funcionario *de facto*, ya que sostuvo que los miembros de la Junta de Supervisión habían sido designados válidamente.  Los jueces Sotomayor y Thomas emitieron dictámenes concurrentes en la sentencia.  La juez Sotomayor se manifestó "a regañadientes" de manera concurrente en la sentencia, pero se pronunció a favor de sostener la autonomía de Puerto Rico.  El juez Thomas coincidió en que la designación de los miembros de la Junta de Supervisión no violaba la Constitución de EE.UU., pero discrepó de la prueba "amorfa" de la mayoría, que distingue entre las funciones locales y federales de un funcionario.

2. ***Assured Guaranty Corp. y otros c. Junta de Supervisión y Administración Financiera para Puerto Rico y otros*, Proc. Cont. Núm. 18-00087**

El 23 de julio de 2018, los demandantes Assured, al igual que Aurelius, presentaron una demanda donde se cuestionaba la constitucionalidad de la designación de los miembros de la Junta de Supervisión. Assured solicitaba que se declare que la designación de los miembros de la Junta de Supervisión viola la Cláusula de Designaciones y que las acciones de la Junta de Supervisión son nulas. Assured también solicitó que se prohíba a la Junta de Supervisión y a sus miembros con derecho al voto que tomen cualquier otra medida hasta que sus miembros hayan sido designados lícitamente.

El 3 de agosto de 2018, el Tribunal del Título III dictó una sentencia estipulativa para la Junta de Supervisión sobre la base de que las reclamaciones planteadas en la demanda de Assured ya habían sido consideradas defectuosas por el Tribunal del Título III en el caso Aurelius. *En el caso Junta de Supervisión y Administración Financiera para P.R.*, 318 F. Sup. 3d 537 (D.P.R. 2018), *confirmada parcialmente, anulada parcialmente,* 915 F.3d 838 (1er Cir. 2019), *anulada y remitida,* 140 S. Ct. 1649 (2020). Assured presentó una notificación de apelación ante el Primer Circuito, que se registró como Caso Núm. 18-1746. Esa apelación se unificó con la apelación de Aurelius (mencionada anteriormente) y se resolvió por los mismos motivos.

3. ***Unión de Trabajadores de la Industria Eléctrica y Riego c. la Autoridad de Energía Eléctrica de Puerto Rico y otros*, Proc. Cont. Núm. 17-00228 (D.P.R. 7 de agosto de 2017) (1er Cir. 18-1787)**

El 6 de agosto de 2017, el demandante UTIER presentó una impugnación casi idéntica de la Cláusula de Designaciones contra la designación de los miembros de la Junta como Aurelius y Assured. UTIER solicitó (i) una sentencia declaratoria que determine que PROMESA violaba la Cláusula de Designaciones y que todos los actos de la Junta de Supervisión hasta la fecha eran inválidos, y (ii) y una orden que prohibiera que la Junta de Supervisión ejerza la autoridad que le sea concedida por PROMESA. El 10 de noviembre de 2017, UTIER amplió su demanda [Proc. Cont. Núm. 17-00228, ECF Núm. 75].

El 20 de noviembre de 2017, la Junta de Supervisión presentó una moción de desestimación de la demanda enmendada [Proc. Cont. Núm. 17-00228, ECF Núm. 88].

El 15 de agosto de 2018, el Tribunal del Título III aceptó la moción de la Junta de Supervisión por considerar que no se había vulnerado la Cláusula de Designaciones. *En el caso Junta de Supervisión y Administración Financiera para P.R.*, 318 F. Sup. 3d 537, 557 (D.P.R. 2018).

El 16 de agosto de 2018, UTIER apeló ante el Primer Circuito (que se registró como Caso Núm. 18-1787). El 7 de septiembre de 2018, el Primer Circuito unificó la apelación de UTIER con las apelaciones presentadas por Aurelius y Assured mencionadas anteriormente. La apelación de UTIER se resolvió del mismo modo que las apelaciones de Aurelius y Assured. *Vea* la sección V.H.1–2.

4. ***Hernandez-Montañez y otros. c. la Junta de Supervisión y Administración Financiera para Puerto Rico y otros*, Proc. Cont. Núm. 18-00090**

El 25 de julio de 2018, ciertos miembros del minoritario Partido Popular Democrático que integran la Asamblea Legislativa presentaron una demanda donde se solicitan sentencias declarativas de que (i) los miembros de la Junta de Supervisión fueron designados de una manera que viola la Cláusula de Designaciones de la Constitución de EE.UU., (ii) la delegación de la autoridad ejecutiva y legislativa a la Junta de Supervisión constituye una violación de la doctrina de la división de poderes, y (iii) que el uso que haga la Junta de Supervisión de sus poderes presupuestarios para fomentar supuestamente la adopción de sus políticas preferidas constituye una "interferencia inadmisible" con la autonomía de la Asamblea Legislativa.  Los Demandantes también solicitaron órdenes que prohibieran a la Junta de Supervisión ejercer su autoridad en virtud de PROMESA y que prohibieran que la Junta de Supervisión ejerciera su supuesta interferencia en el proceso legislativo.

El 27 de agosto de 2018, las partes presentaron un informe conjunto sobre la situación en el que los demandantes acordaron (i) paralizar su reclamación sobre la Cláusula de Designaciones mientras la apelación de Aurelius con respecto a la Cláusula de Designaciones estuviera pendiente y (ii) desestimar su reclamación de autonomía legislativa [Proc. Cont. Núm. 18-00090, ECF Núm. 18].  Las partes discreparon en cuanto a si la reclamación restante de los demandantes de que PROMESA viola la doctrina de la división de poderes debería quedar en suspenso a la espera de resolución de la apelación de la Cláusula de Designaciones de Aurelius. El 20 de noviembre de 2018, la magistrado Dein dictó una orden [Proc. Cont. Núm. 18-00090, ECF Núm. 32] de paralización del caso en espera de una resolución de las apelaciones unificadas en *Aurelius Investments, LLC c. el Estado Libre Asociado de Puerto Rico*, Núm. 18-1671, *Assured Guaranty Corp. c. la Junta de Supervisión y Administración Financiera para Puerto Rico*, Núm. 18-1746, y *UTIER c. la Autoridad de Energía Eléctrica de Puerto Rico y otros,* Núm. 18-1787.  Para obtener más información sobre esas apelaciones, vea la Sección V.H.1–3 que aparece anteriormente.

El 19 de agosto de 2020, tras la decisión de la Corte Suprema en *Aurelius*, los demandantes solicitaron el levantamiento de la paralización [Proc. Cont. Núm. 18-00090, ECF Núm. 33].  El 11 de septiembre de 2020, los Estados Unidos y la Junta de Supervisión presentaron notificaciones de no oposición a la moción de los demandantes [Proc. Cont. Núm. 18-00090, ECF Núm. 35, 36].  El 14 de septiembre de 2020, el Tribunal del Título III levantó la paralización [Proc. Cont. Núm. 18-00090, ECF Núm. 37].

El 30 de noviembre de 2020, la Junta de Supervisión solicitó que se desestimara la demanda del demandante, alegando que no se había formulado una reclamación de reparación [Proc. Cont. Núm. 18-00090, ECF Núm. 45].  Asimismo, el 30 de noviembre de 2020, Estados Unidos presentó un escrito en apoyo de la constitucionalidad de PROMESA [Proc. Cont. Núm. 18-00090, ECF Núm. 47].  El 26 de febrero de 2021, los demandantes presentaron una oposición a la moción de desestimación de la Junta de Supervisión [Proc. Cont. Núm. 18-00090, ECF Núm. 52].  El 29 de marzo de 2021, la Junta de Supervisión presentó su contestación en apoyo a su moción [Proc. Cont. Núm. 18-00090, ECF Núm. 53].

255

El 7 de mayo de 2021, el Tribunal del Título III emitió una orden que concedía la moción de desestimación de la Junta de Supervisión, en relación con la causa I de la demanda [Proc. Cont. Núm. 18-00090, ECF Núm. 54]. El 14 de mayo de 2021, las partes presentaron una estipulación conjunta de desestimación sin derecho a nueva acción en relación con la causa III de la demanda [Proc. Cont. Núm. 18-00090, ECF Núm. 55]. El 7 de julio de 2021, los demandantes presentaron una moción para que se dictara sentencia [Proc. Cont. Núm. 18-00090, ECF Núm. 57]. El 8 de julio de 2021, el Tribunal del Título III emitió una orden que aprueba la estipulación conjunta de desestimación de las partes [Proc. Cont. Núm. 18-00090, ECF Núm. 58]. El 9 de julio de 2021, el Tribunal del Título III dictó una sentencia que desestima el caso sin derecho a nueva acción, y el procedimiento contencioso se cerró [Proc. Cont. Núm. 18-00090, ECF Núm. 59]. El 25 de julio de 2021, los demandantes presentaron una notificación de apelación en relación con la sentencia del Tribunal del Título III que desestimaba el caso sin derecho a nueva acción [Proc. Cont. Núm. 18-00090, ECF Núm. 60].

El 2 de agosto de 2021, el Primer Circuito registró la apelación como Caso No. 21-1581. El 11 de octubre de 2021, todos los demandantes, excepto el Presidente de la Cámara, presentaron una notificación de desestimación voluntaria parcial. El 13 de mayo de 2022, el Primer Circuito emitió una orden que desestima la apelación en cuanto a todos los demandantes excepto el Presidente de la Cámara y Pedro García-Figueroa. El 24 de mayo de 2022, Pedro García-Figueroa presentó una notificación de desestimación voluntaria. El 27 de mayo de 2022, el Primer Circuito emitió una orden que desestima la apelación en cuanto a Pedro García-Figueroa. El 1 de agosto de 2021, el Presidente de la Cámara presentó su escrito inicial. El 30 de septiembre de 2022, los Estados Unidos y la Junta de Supervisión presentaron sendos escritos de respuesta. El alegato oral está actualmente programado para el 5 de diciembre de 2022.

## I.    Investigación de la Junta de Supervisión sobre potenciales causas de acción

La Junta de Supervisión dispone de amplios poderes de investigación. Conforme a la sección 104(o) de PROMESA, que faculta a la Junta de Supervisión para investigar las prácticas de divulgación y venta en relación con la adquisición de bonos emitidos por el Deudor, y las secciones relacionadas, la Junta de Supervisión, a través de su Comité Especial de Investigación, investigó potenciales causas de acción relacionadas con la crisis fiscal de Puerto Rico.

### 1.    Informe del Investigador Independiente

#### a)    Proceso y mandato

El 1 de septiembre de 2017, la Junta de Supervisión, por y a través del Comité Especial de Investigación, contrató a Kobre & Kim LLP (el "Investigador Independiente") para que llevara a cabo una investigación sobre ciertos asuntos relacionados con la crisis fiscal de Puerto Rico en cumplimiento del mandato de la Junta de Supervisión conforme a PROMESA.

Específicamente, se le pidió al Investigador Independiente que investigara: (i) los factores que contribuyen a la crisis fiscal de Puerto Rico, entre ellos cambios en la economía, expansión de los compromisos de gasto y los programas de prestaciones, cambios en el financiamiento federal que recibe y la dependencia de la deuda para financiar un déficit presupuestario estructural; (ii) la deuda de Puerto Rico, el uso general de los ingresos, la relación entre la deuda

y el déficit presupuestario estructural de Puerto Rico, la gama de sus instrumentos de deuda y así como la manera en que se comparan las prácticas de la deuda de Puerto Rico con las prácticas de deuda de los estados y las grandes jurisdicciones municipales; y (iii) las prácticas de emisión, divulgación y venta de deuda de Puerto Rico, incluida su interpretación del límite constitucional de la deuda de Puerto Rico.  En consulta con el Comité Especial de Investigación y el Consejero General de la Junta de Supervisión, el Investigador Independiente centró su investigación en los siguientes ámbitos específicos: BGF; Servicios Públicos de Puerto Rico[246]; COFINA; SRE; Funciones de Elaboración de presupuestos de Puerto Rico, Presentación de informes externos y Contabilidad de Puerto Rico; cálculo del límite constitucional de la deuda; las agencias de calificación crediticia; prácticas de venta de bonos relacionados con Puerto Rico; el marco de ética del gobierno de Puerto Rico; uso de swaps de tipo de interés por parte del emisor; falta de un mecanismo claro en Puerto Rico para validar los bonos relacionados con Puerto Rico antes de que se emitan; y el crédito fiscal por posesión.

Los objetivos principales de la investigación del Comité Especial de Investigación fueron: (i) identificar políticas (o falta de salvaguardias) que contribuyeron a la crisis de deuda de Puerto Rico, entre ellas factores que permitieron que Puerto Rico y algunas de sus instrumentalidades emitieran cantidades significativas de deuda sin fuentes adecuadas de reembolso; e (ii) identificar posibles recuperaciones de valor de partes culpables y determinar las cuestiones que requieren atención reglamentaria, todo ello para ayudar a la Junta de Supervisión en su misión de restablecer el equilibrio fiscal y las oportunidades económicas y promover el acceso de Puerto Rico a los mercados de capitales.  Específicamente, con respecto a las empresas de Servicios Públicos, el Investigador Independiente examinó cómo las estructuras de gobierno de las empresas de Servicios Públicos, el grado de dependencia y supervisión de Puerto Rico, la fijación de tarifas y la recaudación de ingresos, la emisión de bonos, los proyectos de mejoras de capital y las operaciones generales se combinaron para afectar sus fuentes de ingresos y contribuir a la crisis fiscal de Puerto Rico.

b)    **Procedimientos de investigación**

En mayo de 2017, la Junta de Supervisión adoptó los Procedimientos de Investigación de PROMESA ("Procedimientos de Investigación de PROMESA") para establecer el marco procesal de la investigación.[247]  Los procedimientos de investigación de PROMESA autorizan a la Junta de Supervisión a iniciar dos investigaciones, una informal (la "Investigación Informal") y una formal ( "la Investigación Formal" para investigar las actividades o conductas que la Junta de Supervisión tiene autoridad para investigar en virtud de PROMESA.  La principal diferencia de procedimiento entre los dos tipos de investigaciones es que la Junta de Supervisión solo está autorizada a ordenar la tramitación de la presentación de testigos y material de investigación tras el inicio de una Investigación Formal.[248]  El Investigador Independiente utilizó técnicas de

---

[246] Los "Servicios Públicos" se definieron como la AEE y la AAA.

[247] Los Procedimientos de Investigación de PROMESA están disponibles en https://oversightboard.pr.gov/documents/.

[248] Procedimientos de investigación de PROMESA, §§ 3.1(b), 3.2(b)(2).  La sección 104 de PROMESA confiere a la Junta de Supervisión la facultad de emitir citaciones legales que "exigen la comparecencia y el testimonio de los testigos y la presentación de libros, registros, correspondencia, memorandos, documentos, papeles, archivos electrónicos, metadatos, cintas, y materiales de cualquier naturaleza relacionados con cualquier asunto investigado por la Junta de Supervisión". 48 U.S.C. § 2124(f)(1).

investigación tanto formales como informales para cumplir el mandato establecido por el Comité Especial de Investigación.

El 18 de octubre de 2017, el Comité Especial de Investigación, en nombre de la Junta de Supervisión, aprobó una resolución de inicio de una investigación formal con el fin de emitir citaciones legales de investigación (la "Resolución de Citaciones Legales de Investigación").[249] En términos generales, en virtud de la Resolución sobre Citaciones Legales de Investigación, una Investigación Formal se considera iniciada con el fin de autorizar al Investigador Independiente a emitir Citaciones Legales de Investigación[250] en determinadas circunstancias.[251]

A partir de septiembre de 2017, en el marco de la Investigación Informal, el Investigador Independiente envió cartas a más de 90 entidades (colectivamente, las "Cartas de Conservación y Solicitud de Documentos").   Las Cartas de Conservación y Solicitud de Documentos identificaron diversas categorías de documentos que el Investigador Independiente consideró pertinentes para la Investigación Informal y pidió que los destinatarios de las cartas preserven y presenten cualquier documento de respuesta que esté en su posesión, custodia o bajo su control. Después de que se enviaron las Cartas de Conservación y Solicitud de Documentos, el Investigador Independiente programó y llevó a cabo conferencias con los destinatarios (la mayoría por teléfono, algunas en persona) para reiterar las solicitudes y discutir un proceso de identificación y entrega de documentos al Investigador Independiente.

Los testigos, en general, cooperaron con el Investigador Independiente, y el Investigador Independiente utilizó las herramientas disponibles a través de la Investigación Informal.  Esa cooperación, que se vio facilitada por el uso del poder citatorio del Investigador Independiente solo cuando fue necesario, permitió al Investigador Independiente completar la investigación de manera eficiente y oportuna, coherente con los objetivos de PROMESA y según lo solicitado por el Comité Especial de Investigación.  El Investigador Independiente fue especialmente cuidadoso de evitar la demora y el costo de litigar citaciones legales.

En el curso de la investigación, el Investigador Independiente recibió un total de aproximadamente 260,800 documentos de aproximadamente 2,740,000 páginas, de 32 partes. Esas partes incluyen, entre otras, varias entidades, instituciones financieras, agencias de calificación, asesores financieros, profesionales y reguladores de Puerto Rico.

El Investigador Independiente también obtuvo acceso directo, de solo lectura a los archivos de custodia de correo electrónico de decenas de empleados y ex empleados de BGF a

---

[249] La Resolución de Citaciones Legales de Investigación está disponible en https://oversightboard.pr.gov/documents/.

[250] Una "Citación Legal de Investigación" se define en la sección 1.3(a)(16) de los Procedimientos de Investigación de PROMESA y se refiere a una citación legal emitida por la Junta de Supervisión o su agente autorizado conforme a la sección 104(f)(i) de PROMESA, sustancialmente en forma de anexo adjunto a la Resolución sobre Citaciones Legales de Investigación.

[251] Esas circunstancias se producirían cuando un testigo no hubiera cooperado voluntariamente con las solicitudes de documentos del Investigador Independiente o un interrogatorio, cuando el testigo haya comunicado que no puede cooperar voluntariamente con las solicitudes del Investigador Independiente, o cuando el testigo haya respondido un interrogatorio, pero el Investigador Independiente, en consulta con el Consejero General de la Junta de Supervisión determina que sería apropiado que el testigo ofrezca su testimonio bajo juramento.

  
través de su representante, AAFAF.[252]  En nombre del BGF, AAFAF presentó al Investigador Independiente unos 36,000 documentos de esa base de datos.

De conformidad con la Resolución sobre Citaciones Legales de Investigación, el Investigador Independiente emitió doce (12) citaciones legales de investigación ("Citaciones Legales de Investigación") (cinco de las cuales se desistieron tras la expedición sobre la base del acuerdo posterior de los beneficiarios de cooperar voluntariamente con el Investigador Independiente).[253]  Sin excepción, los destinatarios de las Citaciones Legales de Investigación presentaron documentos al Investigador Independiente en respuesta a esas citaciones legales.

Desde diciembre de 2017 hasta agosto de 2018, el Investigador Independiente realizó un total de aproximadamente 120 entrevistas voluntarias a testigos, sondeando una amplia gama de temas relevantes para la investigación.  Entre las personas entrevistadas se encontraban cuatro ex gobernadores de Puerto Rico, antiguos y actuales altos funcionarios del Gobierno, suscriptores de seguros, agencias de calificación crediticia, auditores, profesionales externos y asesores.

A lo largo de la investigación, el Investigador Independiente colaboró estrechamente y mantuvo consultas con CANA y el Comité de Retirados. A partir de noviembre de 2017, el Investigador Independiente mantuvo contactos periódicos con CANA y el Comité de Retirados en relación con la investigación.  En concreto, además de la cooperación y la comunicación mediante llamadas y correos electrónicos cuando fuera necesario, el Investigador Independiente participó en conferencias telefónicas semanales con el abogado de CANA y del Comité de Retirados, respectivamente.    Durante esas conferencias, el Investigador Independiente proporcionó información sobre los testigos que serían entrevistados en la semana siguiente, solicitó información sobre preguntas a los testigos, proporcionó asesoramiento a CANA y al Comité de Retirados con sus observaciones preliminares sobre los resultados de la investigación en ámbitos en los que CANA y el Comité de Retirados habían expresado interés, y también proporcionó a CANA y al Comité de Retirados acceso a los materiales proporcionados al Investigador Independiente.

c)    <strong>Principales conclusiones de la investigación independiente sobre AEE</strong>

El 20 de agosto de 2018, el Investigador Independiente publicó su Informe Final de Investigación ("Informe Final de Investigación").  Esta Declaración de Divulgación incluye un resumen de las principales conclusiones del Investigador Independiente relacionadas únicamente con AEE.  El resumen incluido en esta Declaración de Divulgación no debe interpretarse como

---

[252] Este acceso se obtuvo a través de la sección 104(c)(2) de PROMESA, que establece lo siguiente: "Sin perjuicio de cualquier otra disposición legal, la Junta de Supervisión tendrá derecho a obtener copias protegidas, impresas o electrónicas, de dichos registros, documentos, información, datos o metadatos del gobierno territorial que sean necesarias para que la Junta de Supervisión pueda desempeñar sus funciones en virtud de la presente Ley.  A petición de la Junta de Supervisión, la Junta de Supervisión tendrá acceso directo a dichos sistemas de información, registros, documentos, información o datos que permitan a la Junta de Supervisión cumplir sus responsabilidades en virtud de la presente Ley".  48 U.S.C. § 2124(c)(2).

[253] Los destinatarios de las Citaciones Legales de Investigación (aparte de las que fueron desistidas) fueron Banco Popular de Puerto Rico, Mesirow Financial Inc., Popular Inc., Popular Securities LLC, Santander Asset Management LLC, Santander Bancorp y Santander Securities LLC.

un sustituto de la presentación de informes, recomendaciones y análisis de reclamaciones exhaustivos incluidos en el Informe Final de Investigación.[254]

(i)      *La AEE y los Servicios Públicos*

La Parte V del Informe Final de Investigación presenta los hallazgos de la investigación sobre las empresas de Servicios Públicos, entre ellas la AEE.

El Investigador Independiente encontró evidencia de que la influencia política tuvo un impacto directo en las tarifas de la AEE de manera que, simultáneamente, mantuvieron las tarifas altas y, sin embargo, insuficientes para cubrir los gastos operativos y los proyectos de mejoras de capital.  La tarifa eléctrica base de la AEE no había aumentado desde 1989 hasta 2016.  Para compensar su tarifa base insuficiente, la AEE pasó a depender de la financiación del BGF, como se explica a continuación.  La AEE recurrió a menudo a los ingresos de los bonos destinados al mantenimiento y las mejoras de capital para pagar la amortización de la deuda.

El Investigador Independiente atribuyó estos problemas a: (i) la falta de voluntad política para aumentar la tarifa básica de la AEE; (ii) los obstáculos políticos para reducir las tarifas mediante la conversión a gas natural; y (iii) los pagos requeridos a los municipios que redujeron los ingresos recaudados por la AEE.  Específicamente, el Investigador Independiente señaló que la AEE tenía la autoridad para aumentar las tarifas sin la aprobación gubernamental—previamente a través de su junta, y a través del PREC desde 2014.  Sin embargo, en la práctica, la AEE no cambiaría sus tarifas sin el permiso del gobernador, y los gobernadores se han opuesto históricamente a subir las tarifas.  Además, el desacuerdo político sobre el cambio del petróleo al gas natural de bajo costo contribuyó a la elevada carga de la deuda de la AEE y a su incapacidad para completar proyectos de capital, con múltiples proyectos de gasoductos aprobados por el gobierno y posteriormente cancelados.  La AEE emitió deuda para financiar la construcción de gasoductos que finalmente no se completaron tras la cancelación de los proyectos, al tiempo que recurría a líneas de crédito para seguir comprando petróleo.  Los subsidios ordenados por el gobierno que la AEE debe pagar a los municipios, conocidos como CILT, también tuvieron un impacto en el balance de la AEE.  Dado que la AEE no paga impuestos sobre la propiedad a los municipios, las CILT están destinadas a compensar a los municipios mediante la reducción de sus costos de electricidad.  Sin embargo, en lugar de recaudar los ingresos por suministro eléctrico de los municipios y reembolsar las CILT, como lo exige la ley, la AEE compensó el importe de las CILT con sus créditos pendientes y no cobró sus facturas.

Además, el gran número de empleados de la AEE designados por el Gobernador y las altas tasas de rotación de personal llevaron a la AEE a la toma de decisiones deficientes y a la falta de conocimiento institucional.  El Investigador Independiente determinó que, en los últimos años, seis de los nueve puestos de la Junta de la AEE, que tiene la facultad exclusiva de aprobar o rechazar todos los préstamos y la fijación de tarifas de la AEE, aprobar presupuestos y elegir a su Director Ejecutivo, cambiaban de manos cada vez que se elegía un nuevo gobernador, cuando no con mayor frecuencia.  Los empleados designados por el gobierno estaban presentes en todos

---

[254] Puede consultarse un resumen integral de todo el Informe Final de Investigación en el Resumen Ejecutivo, que está disponible en el sitio web de la Junta de Supervisión https://drive.google.com/open?id=19-lauVo3w9MPS03xYVe0SWhQin-Q6FEf.

los niveles de la AEE, incluso en cargos de alto nivel y cargos operativos, y con cada nuevo gobernador cientos de empleados abandonaban la AEE.  En el transcurso de veinte (20) años, el plazo promedio durante el cual un director ejecutivo de la AEE permaneció en su cargo fue de aproximadamente dieciséis (16) meses.

Además, la AEE incluía sistemáticamente los ingresos no recaudados cuando calculaba y presentaba al público su capacidad para pagar sus costos operativos y la amortización de la deuda, y por lo tanto podía emitir más deuda a pesar de no tener la capacidad para cubrir la amortización de la deuda.  Con respecto a las emisiones de bonos de la AEE, ni el BGF ni los suscriptores de seguros supervisaron el uso real de los ingresos de los bonos por parte de la AEE ni compararon el uso real de los ingresos por parte de la AEE con el uso representado de dichos ingresos por parte de la AEE.

(ii)    *El papel del BGF*

Como se indica en la Parte IV del Informe Final de Investigación, el doble papel del BGF como agente fiscal y prestamista para algunas instrumentalidades y corporaciones públicas del ELA, incluso la AEE, estaba en tensión, y esa tensión se hizo insostenible con el tiempo.  La tensión se vio agravada por deficiencias estructurales que permitieron que las consideraciones políticas de varias administraciones del Gobierno afectaran la toma de decisiones del BGF en su calidad de prestamista y agente fiscal.

Un ejemplo de la labor del BGF como agente fiscal es una solicitud de julio de 2011 de la AEE a la Junta del BGF para obtener una línea de crédito de 260 millones de dólares de un banco privado.  La AEE enfatizó que cualquier demora en la aprobación pondría a la AEE en riesgo de que se interrumpiera su suministro de petróleo porque la AEE ya tenía un sobregiro de 86 días con uno de sus proveedores más grandes.  Apenas un mes antes, sin embargo, la AEE había propuesto obtener otra línea de crédito por un monto de 150 millones de dólares, que se obtendría de un banco privado diferente.  Esa propuesta anterior no mencionaba ningún sobregiro existente o necesidad potencial de una cantidad significativa de liquidez adicional en un futuro previsible.  Algunos funcionarios del BGF se mostraron sorprendidos por la posterior solicitud de la línea de crédito de $260 millones, pero aun así el BGF la aprobó.  El Investigador Independiente no encontró ninguna evidencia que demostrara que se explicó la discrepancia, que el BGF tomó medidas para resolverla o que el BGF impuso alguna consecuencia a la AEE.

El BGF era también un prestamista de la AEE y de otras empresas públicas y, como lo informó el Investigador Independiente, a menudo concedía préstamos para cubrir déficits operativos y cuando las entidades no podían acceder a los mercados de capitales.  La AEE no aumentó sus tarifas en absoluto entre 1989 y 2016.  En cambio, pidió prestado al BGF para cubrir sus costos operativos.  Con el tiempo, el financiamiento del BGF se convirtió en un método para que la AEE equilibrara sus presupuestos: los presupuestos anuales de la AEE se establecían con el supuesto de que la AEE recibiría financiamiento del BGF. Una vez decidido el presupuesto, la AEE solicitaba el financiamiento.

Según el Informe Final de Investigación, las consideraciones políticas a menudo influían en la toma de decisiones del BGF.  Cerca del final de 2013, el BGF y la AEE solicitaron la aprobación de un aumento de tarifa de un centavo por kilovatio hora a corto plazo, que permitiría

a la AEE disminuir los costos con el tiempo mediante la inversión en mejoras a su sistema.  El
Gobernador rechazó la petición y, en su lugar, ordenó a la AEE que recortara gastos.

### d)      Análisis de los ingresos de los bonos

De 1994 a 2013, la AEE emitió cerca de $13,500 millones en bonos.  Ni el BGF, en su
calidad de agente fiscal, ni los suscriptores de seguros de los bonos de los Servicios Públicos
supervisaron el uso real de los ingresos por parte de los Servicios Públicos en relación con los
usos representados identificados en los documentos de oferta pertinentes.  Por tal razón, el
Investigador Independiente trabajó con la firma de asesoría financiera Duff & Phelps para
analizar el uso que le dio la AEE a los ingresos de los bonos emitidos entre el 2010 y el 2013.
Este análisis se adjunta al Informe Final de Investigación como Apéndice B.

La AEE obtuvo deuda a través de diez emisiones de bonos durante este tiempo, por un
monto total de aproximadamente $4,430 millones que, combinados con fuentes adicionales de
financiamiento relacionadas con bonos, resultaron en ingresos disponibles de aproximadamente
$4,720 millones.  Según los documentos de oferta, de esa cantidad, aproximadamente $1,310
millones debían depositarse en un "Fondo de Construcción" destinado a mejoras de
infraestructura y proyectos de capital, $1,240 millones al reembolso de líneas de crédito, $1,330
millones al reembolso de otras deudas y $841 millones a fines diversos.

El análisis concluyó que el importe de los bonos destinados al Fondo de Construcción
superaba en unos $430 millones el importe realmente utilizado para proyectos relacionados con
la construcción durante el período de referencia.

### e)      Resumen de potenciales causas de acción pertinentes para la AEE

En su Informe Final de Investigación, el Investigador Independiente evaluó si sus
hallazgos fácticos apoyan la opinión de que cualquiera de las partes involucradas en la crisis
fiscal de Puerto Rico cometió acciones que pueden ser objeto de procesos legales bajo ciertas
leyes federales, estatales y locales de EE.UU.  El Investigador Independiente discutió su
consideración de ciertas, pero no todas, potenciales reclamaciones disponibles para Deudores del
Título III (o sus patrimonios) e inversores, entre otros interesados, bajo la ley federal aplicable de
los EE.UU. (incluso las leyes de valores y el Código de Quiebras, tal como son hechas aplicables
por PROMESA), la ley en Puerto Rico, y la ley de otras jurisdicciones de EE.UU. como se
indica por análisis de elección de ley.  Esta discusión se llevó a cabo con los propósitos legales
esbozados en PROMESA y no para ayudar a ningún litigante específico.  La visión general y la
aplicación de la ley por parte del Investigador Independiente no es asesoramiento jurídico y sus
conclusiones fácticas no constituyen evidencia admisible en ningún litigio pendiente o futuro.

El siguiente es un resumen de las potenciales causas de acción en relación con la AEE
identificadas por el Investigador Independiente en el Informe Final de Investigación.  El resumen
incluido en esta Declaración de Divulgación no debe interpretarse como un sustituto de la

presentación de informes, recomendaciones y análisis de reclamaciones exhaustivos incluidos en el Informe Final de Investigación.[255]

De 1994 a 2013, la AEE emitió más de $13,500 millones en bonos.  Los Bonos de la AEE están sujetos al Contrato de Fideicomiso, que impone ciertos requisitos legales a la AEE, sus Directores Ejecutivos y su ingeniero consultor relacionados con la fijación y cobro de tarifas.  En virtud del Contrato de Fideicomiso de la AEE, para emitir bonos y mientras los bonos permanezcan en circulación, la AEE acordó un "requisito de cobertura de deuda" por el cual está obligada a "fijar, cobrar y recaudar tarifas y cargos razonables para que los ingresos sean suficientes para pagar los gastos corrientes [entonces y en el futuro] y para proporcionar una cantidad de al menos el 120% de las necesidades de capital total e intereses para el [entonces] próximo año fiscal".  Los Directores Ejecutivos y el ingeniero consultor de la AEE son responsables de calcular si los ingresos netos de la AEE cumplieron con el requisito de cobertura de deuda y presentar un certificado junto con una declaración oficial que atestigüe que la AEE puede cumplir con el requisito de amortización de la deuda.  Además, varios de los Directores Ejecutivos de la AEE firmaron los bonos y las declaraciones en los estados de cuenta oficiales, el BGF supervisó las emisiones de bonos y las aprobó como agente fiscal, y el ingeniero consultor hizo varias manifestaciones sobre el estado de la infraestructura y las finanzas de la AEE.

Basándose en estos hechos, el Investigador Independiente identificó en el Informe Final de Investigación que los Directores Ejecutivos y el ingeniero consultor de la AEE, el BGF y los suscriptores de seguros de los Bonos de la AEE podrían estar sujetos a responsabilidad potencial por tres categorías de posibles declaraciones materiales erróneas u omisiones en los estados de cuenta oficiales que podrían ser motivo de acciones bajo la ley de valores de los Estados Unidos.

La primera categoría de posibles declaraciones erróneas se refería a si la AEE satisfacía su requisito de cobertura de deuda.  A pesar de no aumentar su tarifa base por casi treinta (30) años, la AEE constantemente afirmó al público en declaraciones oficiales, firmadas por los Directores Ejecutivos de la AEE, que las tarifas de la AEE eran suficientes para cubrir los gastos operativos.  Además, desde al menos 1994 hasta 2013, los estados de cuenta contenían textos similares del ingeniero consultor de la AEE.  Por el contrario, existe ahora un consenso entre los profesionales externos de la AEE—y la propia AEE—de que las tarifas de la AEE eran insuficientes para cubrir sus gastos operativos.  En particular, el Investigador Independiente consideró improbable que cualquiera de estos demandados potenciales pudiera fundamentar una defensa de que no sabían y no debían haber sabido al momento de las emisiones que las tarifas de la AEE no eran, de hecho, suficientes para cubrir los gastos operativos.

La segunda categoría de posibles declaraciones erróneas se refería a la capacidad para cobrar los ingresos que la AEE declaró que recaudaría en sus presentaciones públicas.  El Investigador Independiente encontró evidencia de que la AEE aumentó sus cifras de ingresos al incluir cuentas por cobrar que tenía razones para creer que nunca cobraría, y que tanto la AEE como el BGF sabían en 2012, a más tardar, que si la AEE hubiera utilizado una cifra de ingresos que reflejara con exactitud la cantidad de ingresos que esperaba cobrar, y que cobró, entonces la

---

[255] La discusión de las potenciales causas de acción abarca casi 100 páginas del informe final de investigación.  El resumen que figura en el presente está limitado en su totalidad por el Informe Final de Investigación, que las partes deben consultar en caso de ambigüedad o conflicto.

AEE no podría satisfacer el requisito de cobertura de deuda necesario para emitir los Bonos de Ingresos de Energía de la Serie 2013A.  También hay evidencia de que la AEE sobreestimó sus ingresos para una emisión de bonos de 2013 en $25 millones adicionales por ser demasiado optimista con respecto al éxito de sus programas de prevención de robo de electricidad.  Sin embargo, los Directores Ejecutivos y el ingeniero consultor de la AEE aprobaron los cálculos de cobertura de deuda con las cifras de ingresos infladas y declararon que la cobertura de deuda cumplía con los requisitos bajo el Contrato de Fideicomiso de la AEE.

La tercera categoría de posibles declaraciones erróneas se refería a la utilización de los ingresos procedentes de los bonos de la AEE.  El Investigador Independiente, en colaboración con una empresa de asesoría financiera, identificó una diferencia de varios cientos de millones de dólares entre los ingresos de los Bonos de la AEE emitidos entre 2010 y 2013 que se representaban en los documentos de oferta pertinentes de la AEE como destinados al Fondo de Construcción de la AEE, por un lado, y los usos reportados de los fondos para proyectos relacionados con la construcción, por el otro.  El Investigador Independiente obtuvo evidencia adicional de que ni el BGF, en su calidad de agente fiscal, ni los suscriptores de seguros de los Bonos de la AEE, supervisaron el uso real de los ingresos por parte de la AEE.

f)     **Resumen de las recomendaciones relativas a la AEE**

El Informe Final de Investigación incluye recomendaciones relativas a cada uno de los temas investigados por el Investigador Independiente.  El siguiente es un resumen de las principales recomendaciones del Investigador Independiente relacionadas únicamente con AEE.  El resumen incluido en esta Declaración de Divulgación no debe interpretarse como un sustituto de la presentación de informes, recomendaciones y análisis de reclamaciones exhaustivos incluidos en el Informe Final de Investigación.

Basándose en los hallazgos expuestos en las Partes IV y V del Informe Final de Investigación, el Investigador Independiente propuso las siguientes recomendaciones para su consideración por los poderes políticos de Puerto Rico:

- Recomponer las juntas directivas de las empresas de Servicios Públicos para incluir una mezcla de miembros designados por el Gobernador e independientes, con mandatos más largos y escalonados entre administraciones;

- Establecer un comité de auditoría compuesto por una mayoría de miembros independientes de las juntas directivas de las empresas de Servicios Públicos, para verificar los estados financieros y el cumplimiento de las tarifas pactadas.  El comité debería recibir instrucciones para excluir los ingresos no recaudados de los cálculos de los pactos de tarifas, incluidas las CILT;

- Adoptar requisitos específicos para que las empresas de Servicios Públicos divulguen el uso real que hacen de los ingresos de los bonos;

- Establecer juntas de tarifas independientes para ambas empresas de Servicios Públicos, que se encargarán de fijar y respetar los cambios de tarifas según un calendario predecible y adaptado al mercado;

- Facultar a un agente fiscal independiente para que aplique los respectivos acuerdos de supervisión fiscal de las empresas de servicios públicos, que dan acceso al BGF a la información financiera, de forma que se exija el cumplimiento de las tarifas pactadas; y

- Eliminar las CILT.

El Investigador Independiente también recomendó que los poderes políticos de Puerto Rico evalúen medidas para separar las funciones de agente fiscal y de prestamista para el sucesor del BGF, y consideren reformas para cada función que incluyan, entre otras cosas, (i) mandatos escalonados o que abarquen cambios en la administración gubernamental para los miembros de la junta, (ii) mejor supervisión de las instrumentalidades y corporaciones públicas, y (iii) mejores políticas y evaluación de riesgos.

2.    **Nombramiento del Comité de Reclamaciones Especiales y contratación de abogados**

En los pocos días siguientes a la recepción del Informe Final de Investigación publicado, la Junta de Supervisión emitió un consentimiento unánime por escrito por el que nombraba al SCC independiente para que tramitara las reclamaciones resultantes de las conclusiones de la Investigación.  A continuación, la Junta de Supervisión realizó una RFP para asesorar al comité recién constituido.

El 28 de noviembre de 2018, la Junta de Supervisión, actuando por y a través de su SCC, contrató a Brown Rudnick LLP como asesor del SCC para ayudar al SCC en la investigación, el inicio de la negociación y/o el enjuiciamiento de posibles reclamaciones que puedan surgir de la conducta descrita en el Informe Final de Investigación ("Asesor de Reclamaciones").  Además, en febrero de 2019, el SCC contrató a una empresa de servicios de asesoramiento financiero para que ayudara al Asesor de Reclamaciones en la investigación de potenciales reclamaciones.

En el Informe Final de Investigación no se abordaban las Acciones de Anulación[256] y no se determinaban las reclamaciones o causas concretas que el ELA y sus instrumentalidades

---

[256] Causas de acción derivadas de los artículos 544, 545, 547 y 548 del Código de Quiebras.  Existen esencialmente dos teorías jurídicas diferentes para estas acciones de anulación: la preferencia y la transferencia fraudulenta.  Una *preferencia* es un pago en los 90 días previos a la quiebra a un acreedor "preferido", es decir, alguien que recibió un pago mayor que lo habitual cuando otros en situaciones similares no estaban siendo pagados debido a la insolvencia de Puerto Rico.  (Para las partes con relaciones familiares con funcionarios electos, y otros con relaciones "internas" con el gobierno, el período pertinente es de un año, no de 90 días).  11 U.S.C. § 547.  Una *transferencia fraudulenta* es, lo más importante, un pago hecho por el cual Puerto Rico no recibió "valor razonablemente equivalente" a cambio.  Si no es así, incluso si la transferencia no fue intencionalmente errónea o fraudulenta, Puerto Rico puede recuperar los fondos porque el dinero debe beneficiar por derecho a todos los acreedores y ciudadanos.  11 U.S.C. §§ 544, 548.  Las preferencias y transferencias fraudulentas pueden ser "evitadas" y los fondos recuperados por Puerto Rico de los cesionarios; de la misma manera o como alternativa, la responsabilidad de reintegración puede hacer que las reclamaciones del cesionario contra Puerto Rico puedan ser compensadas o denegadas.  *Vea* 11 U.S.C. §§ 502, 545, 550, 553.

Las acciones de reintegración son muy comunes en los grandes procedimientos de quiebra, incluidos los que afectan a entidades públicas.  Permiten a los deudores garantizar que el dinero transferido a terceros en el período anterior a la quiebra se gastó de manera adecuada y justa, y si no, recuperar ese dinero en beneficio de los acreedores y los contribuyentes.  Es importante señalar que las acciones de anulación de este tipo no tienen por objeto transmitir que

podían tener contra las personas y entidades que participaban en sus transacciones financieras. Por el contrario, en el Informe Final de Investigación se esbozaban los antecedentes informativos y analíticos necesarios que servirían de base para que el SCC identifique las reclamaciones judiciables que los Deudores, entre ellos la AEE, podrían tener.

Así, inmediatamente después de su contratación, el Abogado de Reclamaciones comenzó a investigar y analizar las conclusiones del Informe Final de Investigación para determinar y recomendar si había causas viables de acción que la Junta de Supervisión pudiera alegar en beneficio de los contribuyentes y acreedores legítimos del ELA.

3.    **Investigación del abogado y cuestiones de prescripción**

El Abogado de Reclamaciones examinó los documentos relacionados con el Informe Final de la Investigación para determinar las causas de acción que tuvieran mérito.  Además, como se describe más adelante, el SCC realizó frecuentes y numerosas consultas a otros profesionales involucrados en los Casos del Título III, así como a posibles demandados y otras partes para obtener informes, datos financieros, presentaciones, y otros materiales necesarios para que la Junta de Supervisión haga valer sus causas de acción.  En suma, el Abogado de Reclamaciones revisó, entre otras cosas:

- El Informe Final de Investigación de 600 páginas;

- Aproximadamente 100,000 documentos presentados hasta la fecha en apoyo de los hechos y el análisis jurídico que figuran en el Informe Final de Investigación;

- Registro de millones de transferencias efectuadas por los Deudores del Título III a terceros durante el período de anulación de cuatro años anterior a la Fecha de Petición del ELA; y

- Miles de documentos que identifican a los receptores de supuestos pagos de capital e intereses sobre bonos supuestamente inválidos, mediante registros de decenas de miles de transacciones.

La actividad de investigación del SCC y de la Junta de Supervisión y el inicio de los litigios se han basado en gran medida en los plazos de prescripción aplicables.  En particular, el plazo de prescripción para acciones de anulación conforme al artículo 546(a)(1) del Código de Quiebras expiró el 2 de mayo de 2019 para acciones interpuestas en nombre del ELA, el 20 de mayo de 2019 para ACT y SRE, y el 1 de julio de 2019 para AEE.  La expiración del plazo de prescripción podría, en muchos casos, impedir que la Junta de Supervisión enjuicie muchas de las reclamaciones descritas en el presente.

---

un tercero proveedor haya cometido una infracción.  Por el contrario, las acciones de anulación garantizan que ningún acreedor se vea favorecido por los pagos efectuados antes de la declaración de quiebra y que la distribución justa de los bienes de un deudor se haga de conformidad con la ley aplicable.  Como con cualquier otra demanda civil, el demandante (es decir, la Junta de Supervisión, en algunos casos junto con CANA) tiene la carga de probar cada elemento de la acción de anulación por una preponderancia de las evidencias para que el tercero vendedor sea declarado responsable y tenga que devolver el dinero al estado.

La Junta de Supervisión ha adoptado una serie de medidas para proteger sus reclamaciones contra defensas por prescripción. La principal de estas es que la Junta de Supervisión inició cientos de procesos contenciosos antes de que expirara el plazo de prescripción aplicable. En algunos casos, la Junta de Supervisión ha iniciado litigios con la intención explícita de preservar derechos, no obstante, de que el enjuiciamiento de sus reclamaciones no sería una asignación óptima de recursos en el momento actual, y, en consecuencia, ha solicitado que se paralicen los litigios por el momento. Entre las medidas adicionales para preservar las reclamaciones figuran los esfuerzos por suspender la prescripción de manera consensuada mediante acuerdos en este sentido con las partes potencialmente responsables ante los Deudores del ELA, que se describen a continuación.

4.      **Litigios sobre fuel oil**

El Informe Final de Investigación identificó ciertos litigios presentados por pagadores de tarifas de la AEE contra ciertas partes de un supuesto esquema ilegal para entregar fuel oil a la AEE a precios inflados y en violación de, entre otros requisitos, especificaciones contractuales sobre la presencia de contaminantes ambientales. El SCC identificó ciertas reclamaciones derivadas del supuesto esquema de fuel oil que correspondían a la AEE en el procedimiento del Título III. En colaboración con CANA, el SCC inició posteriormente el Proceso Contencioso Núm. 19-388, donde se alega que ciertos proveedores de fuel oil y laboratorios habían, entre otras cosas, incumplido contratos con la AEE y cobrado en exceso a la AEE por fuel oil y servicios de laboratorio. El SCC y CANA han demandado aproximadamente $4 mil millones en daños en nombre de la AEE en relación con el supuesto esquema, y además han firmado acuerdos de suspensión de la prescripción con cuatro posibles demandados en relación con respecto a reclamaciones con otros $2.88 mil millones en daños potenciales. Este litigio se describe con más detalle en la sección V.G.19 anterior.

5.      **Acciones de anulación contra proveedores**

El Informe Final de Investigación se centró en transacciones de financiamiento de la deuda a gran escala y en gran medida no se refería a posibles acciones de anulación relativas a los miles de millones de dólares en pagos de los Deudores del Título III a partes que presuntamente proveen bienes y servicios a los Deudores conforme a supuestos contratos (los "Pagos de Proveedores" a los "Proveedores").[257] En consecuencia, el SCC comenzó a investigar los Pagos a los Proveedores para asegurarse de que esos pagos se ajustaran al derecho aplicable.

En colaboración con CANA, la Junta de Supervisión obtuvo de AAFAF registros de todos los pagos a los proveedores en los cuatro años anteriores al comienzo de los respectivos casos del Título III. La Junta de Supervisión, en colaboración con CANA, examinó los registros de millones de pagos individuales a cientos de miles de proveedores únicos, por un total de más de $12,000 millones. Tras examinar los contratos registrados y excluir a los órganos gubernamentales y las organizaciones sin fines de lucro, entre otros, la Junta de Supervisión identificó los pagos a unos 345 proveedores por valor de más de $4 mil millones como

---

[257] Por "Proveedores" y "Pagos a los Proveedores" se entienden los contratistas y los pagos efectuados con arreglo al contrato, respectivamente, en contraposición a los destinatarios de pagos efectuados conforme a asignaciones legislativas.

potencialmente recobrables con arreglo a las teorías de anulación, que incluyen $3,010 millones en pagos hechos por la AEE a 14 proveedores.  De esta cantidad, aproximadamente $2,880 millones fueron recibidos por cuatro proveedores que también fueron identificados como demandados en litigios sobre fuel oil, como se mencionó anteriormente.  Por consiguiente, los daños reclamados coincidirían con los solicitados en dicho litigio.

a)   **Acuerdos de suspensión de la prescripción y litigios**

Después de concluir su examen y de identificar a las partes potencialmente responsables, la Junta de Supervisión ofreció a los proveedores la oportunidad de suspender el plazo de prescripción para la presentación de acciones de anulación del proveedor, es decir, prorrogar de manera acordada el plazo previsto para que la Junta de Supervisión presente una acción de anulación.  Como tal, en las semanas previas a la respectiva prescripción, el Abogado de Reclamaciones envió a cada proveedor una carátula y un acuerdo de suspensión de la prescripción que los proveedores podían firmar y devolver para evitar la presentación de una demanda y preservar los derechos de los Deudores del Título III con respecto a sus reclamaciones de anulación.  Esta iniciativa dio lugar a la negociación de aproximadamente 85 acuerdos de suspensión de la prescripción con proveedores que supuestamente tenían contratos con los Deudores, entre ellos seis que supuestamente tenían contratos con la AEE.

Después de excluir a las partes de los acuerdos de suspensión de la prescripción, la Junta de Supervisión presentó aproximadamente 250 acciones de anulación para recobrar aproximadamente $3 mil millones en pagos a proveedores.[258]  Ocho de estas acciones de anulación buscan recobrar aproximadamente $55 millones en pagos hechos por la AEE.  La gran mayoría de las acciones de anulación restantes se refieren al ELA.  La Junta de Supervisión anunció su preferencia por conciliar estas acciones, y las posibles reclamaciones sujetas a acuerdos de suspensión de la prescripción, conforme a un procedimiento voluntario de resolución de litigios extrajudicial que se describe más detalladamente a continuación.

b)   **Procedimientos informales de resolución**

El 7 de junio de 2019, la Junta de Supervisión y CANA presentaron una moción general en los casos del Título III de la AEE, el ELA, la ACT y el SRE, solicitando la aprobación de procedimientos de administración de casos en el procedimiento de anulación presentado contra proveedores.[259]  La Moción de Procedimientos de Acción para los Proveedores solicitó específicamente la aprobación de los procedimientos que rigen (i) los procedimientos y fechas límite de los litigios; (ii) la mediación voluntaria y (iii) la conciliación (los "Procedimientos de Acción para los Proveedores").  El 12 de julio de 2019, el Tribunal del Título III dictó una orden de aprobación de los Procedimientos de Acción para los Proveedores, que luego se notificaron a

---

[258] CANA se unió a algunas, pero no todas estas acciones de anulación.

[259] *Vea la Moción General de la Junta de Supervisión y Administración Financiera de Puerto Rico, actuando por y a través de los Miembros del Comité de Reclamaciones Especiales, y el Comité Oficial de Acreedores No Asegurados para (I) Establecer procedimientos de administración de casos de litigio y (II) Establecer procedimientos para la aprobación de conciliaciones*, [Caso Núm. 17-bk-3283, ECF Núm. 7325] (la "Moción de Procedimientos de Acción para los Proveedores").

todos los demandados de las acciones de anulación del proveedor junto con la citación y la demanda.[260]

Con respecto a los procedimientos de litigio y las fechas límite, los Procedimientos de Acción para los Proveedores disponen que los documentos judiciales deben presentarse de conformidad con las órdenes de administración de casos dictadas por el Tribunal del Título III en el caso de Título III del ELA. *Vea Décima Notificación Enmendada, Administración de Casos y Procedimientos Administrativos* [Caso Núm. 17-bk-3283, ECF Núm. 20190- 1]. Los procedimientos requieren además la notificación de los procedimientos y la orden de aprobación a los Demandados, y especificar formas y domicilios de notificación compatibles con las normas aplicables. Además, los Procedimientos de Acción para los Proveedores disponen la aplicación menos estricta de las fechas límite para la presentación de escritos de contestación y de disposición, la presentación de evidencia y otras presentaciones, sujeto a que se modifiquen a petición de cualquiera de las partes. El 24 de mayo de 2021, el Tribunal del Título III dictó una orden por la que se aplicaban sustancialmente los mismos procedimientos de conciliación establecidos en los Procedimientos de Acción para los Proveedores a los proveedores que eran parte en los acuerdos de suspensión de la prescripción [ECF Núm. 16791].[261]

Estas fechas límite previstas en los Procedimientos de Acción para los Proveedores por lo general continúan todas las fechas límite de litigio. Durante el período de aplazamiento, prorrogado desde entonces por órdenes judiciales, la Junta de Supervisión y CANA han participado en un proceso de resolución informal que se describe como el "Intercambio de información" por el que la Junta de Supervisión y los proveedores actúan con diligencia adicional dentro de los parámetros especificados y luego comienzan las negociaciones para llegar a una conciliación.

Los Procedimientos de Acción para los Proveedores describen un proceso de mediación por el cual la Junta de Supervisión y cualquier Demandado(s) puede(n) seleccionar mediadores, programar la mediación y mantener informado al tribunal sobre el progreso de la mediación. El proceso de mediación es por sus propios términos totalmente voluntario y no vinculante y ajustable por acuerdo de las partes; los Procedimientos de Acción para los Proveedores simplemente esbozan el proceso de mediación y proporcionarían su aprobación anticipada, evitando la necesidad de que las partes soliciten la aprobación judicial de una paralización del litigio mientras la mediación esté en curso.

En este momento, se han identificado varias decenas de demandados en acciones de anulación y partes con acuerdos de suspensión de la prescripción para su potencial compensación monetaria debido a los intercambios de información que sugieren responsabilidad de anulación.

---

[260] *Vea la Orden que otorga la Moción General de la Junta de Supervisión y Administración Financiera de Puerto Rico, actuando por y a través de los Miembros del Comité de Reclamaciones Especiales, y el Comité Oficial de Acreedores No Asegurados para (I) Establecer procedimientos de administración de casos de litigio y (II) Establecer procedimientos para la aprobación de los acuerdos,* [Caso Núm. 17-bk-3283, ECF Núm. 7941] (orden con Procedimientos de Acción para los Proveedores revisados adjuntos).

[261] *Vea la Orden que otorga la Moción de la Junta de Supervisión y Administración Financiera de Puerto Rico, actuando por y a través de los Miembros del Comité de Reclamaciones Especiales, y el Comité Oficial de Acreedores No Asegurados para Establecer procedimientos para la aprobación de las conciliaciones* [Caso Núm. 17-bk-3283, ECF Núm. 16791].

La SCC y la UCC celebraron numerosos acuerdos de resolución antes de la Fecha de Vigencia del Plan de Ajuste del ELA, momento en el que los fondos de liquidación y los activos relacionados, junto con las reclamaciones pendientes contra los proveedores en relación con el ELA, la AEP y el SRE se transfirieron a un fideicomiso de acciones de anulación ("Fideicomiso de Acciones de Anulación").

El SCC y CANA también han solicitado que se dictaran sentencias en rebeldía contra diez proveedores, uno de los cuales está relacionado con la AEE La sentencia en rebeldía ha sido concedida y, en cuanto al demandado relacionado con la AEE, es retenida por el SCC y CANA como un activo de la AEE.  Otras reclamaciones están paralizadas indefinidamente debido a que el proveedor ha iniciado un procedimiento de quiebra y ha obtenido la protección de la paralización automática, o debido a paralizaciones de litigios similares impuestas por orden judicial.

El SCC y CANA han estado trabajando para resolver los acuerdos de suspensión de la prescripción y las acciones de anulación concertadas con los proveedores o presentadas contra ellos.  En la fecha de vigencia del Plan de Ajuste del ELA de 15 de marzo de 2022, aproximadamente 240 de las 350 reclamaciones planteadas inicialmente por SCC y CANA habían sido desestimadas o, en el caso de las reclamaciones suspendidas, no habían dado lugar a ninguna acción ulterior.  De las aproximadamente 110 reclamaciones restantes, la gran mayoría se transfirieron a un Fideicomiso de Acciones de Anulación en virtud de los planes de ajuste del ELA, la AEP, el SRE y la ACT.  Seis permanecen como propiedad de la AEE, afirmadas por el SCC y CANA al 17 de octubre de 2022.  Estas incluyen una reclamación en un proceso contencioso en el que los demandantes han recibido una sentencia en rebeldía por un importe de $4,8 millones, y cuatro reclamaciones suspendidas y un proceso contencioso cuyos daños coinciden con el litigio sobre fuel oil antes mencionado, que se transferirán al Fideicomiso de Acciones de Anulación conforme al Plan.

[*El resto de la página se deja intencionalmente en blanco*]

# VI. Plan de ajuste del Título III

## A.   Generalidades

### 1.   Presentación de un plan de ajuste

Un plan de ajuste dispone el tratamiento y el cumplimiento de las obligaciones de deuda del Deudor del Título III.   Únicamente la Junta de Supervisión puede presentar un plan de ajuste, que puede ser simultáneo a la petición, en un momento posterior a su exclusivo criterio, o para el momento estipulado por el Tribunal del Título III, y solo puede hacerlo si determina, según su exclusivo criterio, que el Plan es acorde al plan fiscal certificado aplicable.[262]   La Junta de Supervisión puede modificar el Plan en cualquier momento antes de la confirmación, siempre que el plan modificado cumpla los requisitos del Título III de PROMESA.[263]

### 2.   Contenido de un plan de ajuste

No obstante la ley no vinculada a quiebras aplicable de otro modo, entre otras cosas, un plan de ajuste (i) designa clases de reclamaciones (las reclamaciones en una clase deben ser "sustancialmente similares"),[264] (ii) especifica cualquier clase de reclamación que no esté afectada por el plan de ajuste y especifica el tratamiento asignado a clases de reclamaciones o intereses que están afectados, (iii) dispone el mismo tratamiento para cada reclamación de una clase particular a menos que el tenedor de una reclamación de una reclamación en particular acepte un tratamiento menos favorable, y (iv) dispone medios adecuados para la implementación del plan de ajuste, a través de, por ejemplo, la retención de bienes por parte del Deudor del Título III, la transferencia o venta de bienes a otra entidad, la satisfacción o modificación de cualquier gravamen o escritura, y la subsanación o renuncia a cualquier incumplimiento.[265]

Una clase de reclamaciones se ve afectada bajo un plan de ajuste, a menos que el plan de ajuste (i) deje sin cambios los derechos legales y contractuales a los cuales dicha reclamación o interés da derecho al tenedor de dicha reclamación o dicho interés; o (ii) no obstante la ley no vinculada a quiebras aplicable que conceda derechos al tenedor de la reclamación o interés a exigir o recibir el pago acelerado después del incumplimiento el plan de ajuste subsana el incumplimiento, reinstaura la fecha de vencimiento de la reclamación o interés, compensa al tenedor por daños incurridos como resultado de una confianza razonable por parte de dicho tenedor en dicha ley no vinculada a quiebras aplicable y (para el incumplimiento de obligaciones no monetarias) compensa al tenedor por cualquier pérdida pecuniaria real incurrida por dicho tenedor y no altera de otra manera los derechos legales o contractuales de los que goza el tenedor en virtud de dicha reclamación o dicho interés.[266]

---

[262] PROMESA §§ 312(a)-(b), 104(j)(3).

[263] PROMESA § 313.

[264] Al determinar si las reclamaciones son "sustancialmente similares", la Junta de Supervisión debe considerar si dichas reclamaciones son garantizadas y si dichas reclamaciones tienen prioridad sobre otras reclamaciones. PROMESA § 301(e).

[265] 11 U.S.C. §§ 1123(a)(1)-(5), 1122(a).

[266] 11 U.S.C. § 1124.

3.      **Aceptación de un plan de ajuste**

El tenedor de una Reclamación Permitida puede votar para aceptar o rechazar un plan de ajuste. PROMESA excluye específicamente de la definición de "tenedor de una reclamación o un interés" para tales fines a cualquier "Emisor" o "Instrumentalidad autorizada del Emisor del Gobierno del Territorio", tal como lo define el Título VI de PROMESA) o una corporación, fideicomiso u otra entidad legal que esté controlada por el Emisor o una Instrumentalidad Territorial Autorizada del Emisor del Gobierno del Territorio, siempre que los demás beneficiarios de dichas reclamaciones no se excluyan, y siempre que, con respecto a los bonos asegurados, dicho "tenedor de una reclamación o un interés" sea la aseguradora monolínea que asegura dichos bonos, en la medida en que se conceda a dicha aseguradora el derecho al voto de los bonos asegurados para fines de aplicar remedios o consentir a las enmiendas o modificaciones propuestas, según se dispone en los documentos aplicables.[267]

Se presume de manera concluyente que una clase que no se ve afectada conforme al plan de ajuste ha aceptado el plan, y se considera que una clase que no tiene derecho conforme al plan de ajuste a recibir o retener cualquier bien por cuenta de las reclamaciones de los tenedores no ha aceptado el plan de ajuste.[268] Una clase de reclamaciones acepta un plan de ajuste si este ha sido aceptado por acreedores que poseen por lo menos dos tercios del monto y más de la mitad del número de las reclamaciones permitidas de dicha clase (salvo las que se designan como reclamaciones que no son de buena fe de conformidad a la sección 1126(e)) del Código de Quiebras.[269]

4.      **Solicitación de aceptaciones del plan de ajuste**

Antes de solicitar aceptaciones o rechazos de los tenedores de reclamaciones, la Junta de Supervisión debe emitir, y hacer que el Tribunal del Título III apruebe, una declaración de divulgación que proporcione información adecuada a los tenedores de reclamaciones e intereses con el fin de solicitar aceptaciones al Plan.[270] El tipo de información adecuada provista debe permitir que un hipotético inversionista de la clase pertinente realice un juicio informado acerca del Plan. La misma declaración de divulgación debe ser transmitida a cada tenedor de una reclamación de una clase particular, pero pueden transmitirse declaraciones de divulgación alternativas con diferentes montos o tipos de información a diferentes clases.[271]

B.      **Descripción general del plan de ajuste**

EL SIGUIENTE RESUMEN RESALTA CIERTAS DISPOSICIONES SUSTANTIVAS DEL PLAN, Y NO ES, NI ESTÁ DESTINADO A SER, UNA DESCRIPCIÓN COMPLETA O UNA SUSTITUCIÓN DE UNA VERSIÓN COMPLETA DEL PLAN. EL DEUDOR EXHORTA A TODOS LOS TENEDORES DE RECLAMACIONES A QUE LEAN Y

---

[267] PROMESA § 301(c)(3).

[268] 11 U.S.C. §§ 1126(f)-(g).

[269] 11 U.S.C. § 1126(c).

[270] 11 U.S.C. §§ 1125, 1126(b).

[271] 11 U.S.C. § 1126(c).

ESTUDIEN ATENTAMENTE EL PLAN, UNA COPIA DEL CUAL SE ADJUNTA AL
PRESENTE COMO **ANEXO A**.

La sección 1123 del Código de Quiebras, que se hace aplicable al Caso del Título III
conforme a PROMESA, dispone que, salvo en el caso de reclamaciones administrativas, un plan
de ajuste debe categorizar las reclamaciones contra un deudor en clases individuales.  Si bien
PROMESA y el Código de Quiebras conceden al Deudor una flexibilidad significativa a la hora
de clasificar reclamaciones, la sección 1122 del Código de Quiebras determina que un plan de
ajuste solo puede colocar una reclamación en una clase que contenga reclamaciones que son
sustancialmente similares a ella.

El Plan identifica doce (12) Clases de Reclamaciones (algunas de las cuales abarcan
numerosas series individuales de la deuda pertinente, como se estipula en los Anexos del Plan).
Dichas Clases tienen en cuenta la naturaleza y prioridad diversa de las Reclamaciones contra el
Deudor.  Las Reclamaciones Administrativas no se clasifican para los fines de votación o de
recepción de distribuciones conforme al Plan (como lo requiere la sección 1123(a)(1) del Código
de Quiebras) sino que se tratan por separado como Reclamaciones no clasificadas.

El Plan dispone un tratamiento específico para cada Clase de Reclamaciones.
Únicamente ciertos tenedores de Reclamaciones que están afectadas conforme al Plan tienen
derecho a votar y a recibir Distribuciones conforme al Plan. *Vea* la Orden de Declaración de
Divulgación para obtener un resumen de los procedimientos de votación y elección en relación
con la solicitud del Plan.

Para los fines del Plan, lo que incluye, entre otros, para fines de distribuciones conforme
a los términos y disposiciones del Artículo XXI del Plan, el Tenedor de una Reclamación es
cualquier Entidad que, directa o indirectamente, tiene facultades de inversión con respecto a
cualquier Reclamación, lo que incluye la facultad de disponer o de dirigir la disposición de dicha
Reclamación; *teniendo en cuenta, sin embargo, que* únicamente con respecto a los Bonos de
Ingresos de la AEE Asegurados y la sección 1126 del Código de Quiebras, el Tenedor de
cualquier Reclamación de Bonos de Ingresos de la AEE Asegurados se determinará de acuerdo
con la Sección 301(c)(3) de PROMESA y cualquier ley o documento aplicable a dichas
Reclamaciones de Bonos de Ingresos de la AEE Asegurados.

A menos que se disponga de otra manera en el Plan o en la Orden de Confirmación, el
tratamiento de cualquier Reclamación conforme al Plan deberá satisfacer, resolver, exonerar y
dar por cumplida en su totalidad dicha Reclamación, y deberá intercambiarse por dicha
Reclamación.  En el momento de la Confirmación, el Plan será vinculante para todos los
tenedores de una Reclamación, independientemente de que dichos tenedores hayan votado el
Plan o hayan votado para aceptar el Plan.

La siguiente discusión establece la clasificación y el tratamiento de todas las
Reclamaciones contra el Deudor.  Se califica en su totalidad conforme a los términos del Plan,
que se adjunta al presente como Anexo A, y que debe ser leído atentamente por usted al
considerar si debe votar para aceptar o rechazar el Plan.

Case:17-03283-LTS   Doc#:23302   Filed:01/20/23   Entered:01/20/23 23:35:43   Desc: Main
                    Document      Page 290 of 983

**C.     Acuerdo mutuo y conciliación de disputas / Reestructuración de AEE**

1.     **Resolución de litigios**

El Plan estipula los términos y condiciones del acuerdo mutuo y la conciliación de las siguientes disputas con las siguientes partes:

- Todas las mociones, objeciones o acumulaciones a las mociones u objeciones de los tenedores de Reclamaciones de Bonos de Ingresos y Reclamaciones de Swaps de Tasas de Interés Asegurados por Assured que decidan resolver sus Reclamaciones contra la AEE con el fin de levantar la paralización automática, nombrar un síndico en la AEE y/o desestimar el Caso del Título III de la AEE, incluidos, entre otros, todos los derechos relacionados con la Moción para Desestimar el Caso del Título III de la AEE.[272]

- Todas las reconvenciones y defensas afirmativas mantenidas por los tenedores de Reclamaciones de Bonos de Ingresos y Reclamaciones de Swaps de Tasas de Interés Asegurados por Assured que opten por resolver sus Reclamaciones contra la AEE relacionadas con la Impugnación de Gravámenes y Recursos Enmendada.[273]

- Todas las disputas relacionadas y descritas en el AAP de los Prestamistas de la Línea de Crédito de Combustible, que incluyen, entre otras, las reclamaciones u otros derechos de los Prestamistas de la Línea de Crédito de Combustible contra la AEE, la prioridad y antigüedad de los Prestamistas de la Línea de Combustible sobre los Bonos en virtud de cualquier acuerdo, y las reclamaciones subyacentes a la Acción de Prioridad de los Prestamistas de la Línea de Crédito de Combustible.[274]

- Todas las disputas relacionadas con y descritas en el Acuerdo de Transacción de Vitol, que incluyen, entre otras, la disputa caratulada *PREPA c. Vitol Inc. y otros.*, Proc. Cont. Núm. 19-00453 (D.P.R. 14 de noviembre de 2019). Para evitar cualquier duda, el Acuerdo de Transacción de Vitol preserva expresamente las reclamaciones, los derechos y las defensas de la AEE, la Junta de Supervisión y Vitol relacionados con la acción de anulación caratulada *Comité Especial de Reclamaciones. c. Inspectorate America Corp.*, Proc. Cont. Núm. 19-00388 en el Caso Núm. 17-bk-3283-LTS, D.P.R. (el "Procedimiento Contencioso (AP) Vitol-SCC").

2.     **Recobro de los acreedores basado en la resolución de litigios[275]**

El Plan incluye variaciones en el recobro para los siguientes acreedores en función del resultado y/o la resolución de determinadas disputas en curso:

---

[272] *Vea* las secciones V.I(1) y (7) de esta Declaración de Divulgación para obtener un resumen de dicha disputa.

[273] *Vea* la sección V.I (2) de esta Declaración de Divulgación para obtener un resumen de dicha disputa.

[274] *Vea* la sección V.E de esta Declaración de Divulgación para obtener un resumen de dichas disputas.

[275] *Vea* la Sección II.B(3) de esta Declaración de Divulgación para obtener más información sobre el efecto de los litigios en curso sobre recobros de los acreedores.

- ***Bonistas que llegan a un acuerdo y Aseguradoras Monolínea que llegan a un acuerdo***

  o  Los Bonistas que llegan a un acuerdo y las Aseguradoras Monolínea que llegan a un acuerdo recibirán un recobro mínimo del 50% de sus respectivas Reclamaciones Permitidas, en forma de su participación prorrateada del Fondo de Amortización y una distribución de Bonos Serie B.

  o  Si la AEE y la Junta de Supervisión prevalecen en los Recuentos de Alcance del Gravamen y los Recuentos de Recurso de la Impugnación Enmendada de Gravamen y Recurso, entonces las Reclamaciones Restantes de los Bonistas que llegan a un acuerdo y las Aseguradoras Monolínea que llegan a un acuerdo recibirán, después de que (i) se hagan las distribuciones iniciales de los Bonos Serie B a los Bonistas y las Aseguradoras Monolínea que llegan a un acuerdo y que no llegan a un acuerdo, (ii) el Fideicomiso de GUC reciba la próxima distribución de Bonos Serie B por un monto nominal suficiente para proporcionar a las Reclamaciones Generales Sin Garantía el 50% del valor estimado de sus Reclamaciones y (iii) el Fideicomiso PayGo de la AEE reciba el 20% de los Bonos Serie B restantes después de las distribuciones de Bonos Serie B en (i) y (ii), (A)  inicialmente el 40% de su participación prorrateada de Bonos Serie B restantes disponibles y luego, (B) si y solo si el Fideicomiso de GUC y los Prestamistas de la Línea de Crédito de Combustible reciben Bonos Serie B por un monto nominal suficiente para pagarles en su totalidad, hasta el 60% restante de su participación prorrateada de Bonos Serie B.

  o  Los Bonistas que llegan a un acuerdo y las Aseguradoras Monolínea que llegan a un acuerdo recibirán un CVI por un importe igual a sus Reclamaciones Restantes, si las hubiera, después de las distribuciones anteriores.

- ***Bonistas que no llegan a un acuerdo y Aseguradoras Monolínea que no llegan a un acuerdo***

  o  Si los Bonistas que no llegan a un acuerdo y las Aseguradoras Monolínea que no llegan a un acuerdo pierden en los Recuentos de Alcance del Gravamen y los Recuentos de Recurso de la Impugnación Enmendada de Gravamen y Recurso, entonces solo recibirán su parte prorrateada del dinero depositado en el Fondo de Amortización y no tendrán ninguna reclamación por garantía insuficiente contra el Deudor. Sin embargo, si la Clase de Bonistas que no llegan a un acuerdo y las Aseguradoras Monolínea que no llegan a un acuerdo vota a favor del plan, recibirán un CVI igual a la diferencia entre el capital y los intereses devengados de sus Bonos de Ingresos de la AEE y las distribuciones que se les hagan del Fondo de Amortización.

  o  Si los Bonistas que no llegan a un acuerdo y las Aseguradoras Monolínea que no llegan a un acuerdo pierden en los Recuentos de Alcance del Gravamen, pero prevalecen en los Recuentos de Recurso, entonces recibirán una

275

participación prorrateada de los fondos depositados en el Fondo de Amortización, y cualquier posible reclamación por garantía insuficiente no garantizada compartirá, en forma prorrateada, el Recobro de Reclamaciones Generales Sin Garantía con todas las demás Reclamaciones Permitidas en el Fondo de Reclamaciones Sin Garantía.

o   Si los Bonistas que no llegan a un acuerdo y las Aseguradoras Monolínea que no llegan a un acuerdo prevalecen en los Recuentos de Alcance del Gravamen, pero pierden los Recuentos de Recurso, entonces sus reclamaciones recibirán una participación prorrateada de Bonos Serie B por un monto nominal igual al valor de su Garantía de Bonos (menos el Fondo de Amortización), hasta todos los Bonos Serie B disponibles para distribución según el Plan, después de las distribuciones de Bonos Serie B proporcionadas a los Bonistas que llegan a un acuerdo, y no tendrán ninguna reclamación por garantía insuficiente contra la AEE.

o   Si los Bonistas que no llegan a un acuerdo y las Aseguradoras Monolínea que no llegan a un acuerdo prevalecen en los Recuentos de Alcance del Gravamen y Recursos, entonces su Reclamación recibirá una participación prorrateada de Bonos Serie B por un monto nominal igual al valor de su Garantía de Bonos (menos el Fondo de Amortización), hasta todos los Bonos Serie B disponibles para distribución según el Plan y sujeto a los Bonos Serie B proporcionados a los Bonistas que llegan a un acuerdo, y su reclamación por garantía insuficiente compartirá, de manera prorrateada, el Recobro de Reclamaciones Generales Sin Garantía con todas las demás Reclamaciones en el Fondo de Reclamaciones Sin Garantía.

- *Prestamistas de la Línea de Crédito de Combustible*

  o   Los Prestamistas de la Línea de Crédito de Combustible recibirán (i) Nuevos Bonos Serie A por un monto nominal igual al 84% de sus Reclamaciones de Préstamos de la Línea de Combustible, y (ii) para el 16% restante de sus Reclamaciones, una participación prorrateada de los Bonos Serie B disponibles después que (a) se realicen las distribuciones iniciales de dichos bonos a los Bonistas y las Aseguradoras Monolínea que llegan a un acuerdo y que no llegan a un acuerdo, (b) el Fideicomiso de GUC reciba la próxima distribución de Bonos Serie B por un monto nominal suficiente para proporcionar a las Reclamaciones Generales Sin Garantía el 50% del valor estimado de sus Reclamaciones y (c) el Fideicomiso PayGo de la AEE reciba el 20% de los Bonos Serie B restantes después de las distribuciones de Bonos Serie B en (a) y (b).

- *Reclamaciones Generales Sin Garantía*

  o   Si los Bonistas que no llegan a un acuerdo y las Aseguradoras Monolínea que no llegan a un acuerdo prevalecen en Recuentos de Alcance del Gravamen y los Recuentos de Recurso de la Impugnación Enmendada de Gravamen y

276

Recurso, los tenedores de Reclamaciones Generales Sin Garantía compartirán, de forma prorrateada, los ingresos del Fideicomiso de Acciones de Anulación y del CVI.

o  Si la AEE y la Junta de Supervisión prevalecen en los Recuentos de Alcance del Gravamen y los Recuentos de Recurso de la Impugnación Enmendada de Gravamen y Recurso, entonces los tenedores de Reclamaciones Generales Sin Garantía recibirán su participación prorrateada con todas las demás Reclamaciones en el Fondo Común de Reclamaciones Sin Garantía del Efectivo recibido por el Fideicomiso GUC a cuenta de (i) Bonos Serie B iniciales distribuidos al Fideicomiso GUC, que se prevé que proporcionen a las Reclamaciones Generales Sin Garantía el 50% del monto nominal de sus Reclamaciones (sobre la base de un fondo de reclamaciones estimado en $800 millones), y una participación prorrateada adicional de los Bonos Serie B restantes después de que el Fideicomiso PayGo de la AEE reciba el 20% de los Bonos Serie B restantes tras las distribuciones iniciales de Bonos Serie B al Fideicomiso GUC, (ii) los Ingresos de la Acción de Anulación, y (iii) CVI en el importe nocional de su Reclamación Restante, si la hubiere.

o  Si los Bonistas que no llegan a un acuerdo y las Aseguradoras Monolínea que no llegan a un acuerdo pierden en los Recuentos de Alcance del Gravamen, pero prevalecen en los Recuentos de Recurso, entonces sus reclamaciones por garantía insuficiente también tendrán derecho a su participación prorrateada del Recobro de Reclamaciones Generales Sin Garantía con todas las demás Reclamaciones del Fondo de Reclamaciones Sin Garantía.

3.  **Asignación de reclamaciones**

Para fines de confirmación y perfeccionamiento del Plan, y las distribuciones a realizarse conforme al Plan, y de acuerdo con el AAP de los Prestamistas de la Línea de Crédito de Combustible, el Memorando y AAP de Oferta de Transacción, y el Acuerdo de Transacción de Vitol, en la Fecha de Vigencia, se permitirán las siguientes reclamaciones por los siguientes montos:

• Se permitirán las Reclamaciones por Préstamos de la Línea de Combustible por un monto total de $700,887,093.58, y no estarán sujetos a impugnación, objeción o revocación.

• Se permitirán las Reclamaciones de Vitol por un monto total de $41,457,382.88.

• Se permitirá cada Reclamación de Bonos de Ingresos de la AEE en poder de un Bonista que llega a un acuerdo o una Aseguradora Monolínea que llega a un acuerdo por un monto total igual al monto del capital de los Bonos de Ingresos de la AEE en poder de dicho Tenedor, más los intereses devengados y no pagados sobre dichos Bonos sobre Ingresos de la AEE hasta la Fecha de Petición.

- Se permitirá que cada Reclamación de Swaps de Tasas de Interés Asegurados por Assured en poder de una Aseguradora Monolínea que llega a un acuerdo por un importe que acordarán la Junta de Supervisión y el Tenedor de dicha Reclamación; *teniendo en cuenta* que, si no se llega a un acuerdo sobre el importe de la Reclamación de Swaps de Tasas de Interés Asegurados por Assured que debe ser permitida, la Junta de Supervisión y el Tenedor de la Reclamación someterán dicha disputa al Tribunal del Título III (o a otra Persona o Entidad de mutuo acuerdo entre la Junta de Supervisión y el Tenedor) para determinar el importe de dicha Reclamación que debe ser permitida, importe que se determinará de conformidad con la ley aplicable.

4. **Descargos, interdictos y exculpación**

Los descargos, interdictos y exculpación provistos en el Artículo XXIV del Plan forman parte integral de la obtención del valor provisto confirme a las transacciones del Plan. Los descargos, interdictos y exculpación conforme al Plan constituyen un componente esencial de los acuerdos mutuos alcanzados y no pueden separarse de las demás disposiciones del Plan.

**D.    Disposiciones para el pago de reclamaciones de gastos administrativos**

Las Reclamaciones de Gastos Administrativos y Reclamaciones Profesionales no están clasificadas y por lo tanto se excluyen de las clases estipuladas en el Artículo III del Plan.

1. **Reclamaciones de gastos administrativos**

En (i) la Fecha de Entrada en Vigencia y (ii) la fecha en que la Reclamación de Gastos Administrativos se convierta en una Reclamación Permitida, lo que ocurra más tarde, el Deudor Reorganizado (a) pagará a cada tenedor de una Reclamación de Gastos Administrativos Permitida, en Efectivo, el monto total de dicha Reclamación de Gastos Administrativos o (b) satisfará y liberará dicha Reclamación de Gastos Administrativos Permitida de conformidad con otros términos no más favorables al reclamante que los que se puedan haber acordado entre el tenedor de estos y el Deudor Reorganizado; *siempre y cuando*, las Reclamaciones de Gastos Administrativos Permitidas que representen endeudamiento incurrido en el curso ordinario de los negocios antes de la Fecha de Entrada en Vigencia por el Deudor sean pagadas en su totalidad y ejecutadas por el Deudor Reorganizado de acuerdo con los términos y sujetos a las condiciones de cualquier acuerdo que rija, inversión que evidencie u otros documentos relacionados con dichas transacciones; *y siempre y cuando, además*, que, si dicho gasto de curso ordinario no se factura, o una solicitud por escrito del pago no se hace, dentro de ciento veinte (120) días después de la Fecha de Entrada en Vigencia, dicho gasto de curso ordinario debe limitarse y el Tenedor de este no tendrá derecho a, ni recibirá, una distribución conforme al Plan.

2. **Fecha límite de reclamaciones de gastos administrativos**

Salvo lo dispuesto en el Artículo II.B del Plan u ordenado de otro modo por el Tribunal del Título III, a menos que se hayan presentado previamente, las solicitudes de pago de Reclamaciones de Gastos Administrativos deberán presentarse y notificarse a la AEE a más tardar noventa (90) días después de la Fecha de Entrada en Vigencia.  Los tenedores de

Reclamaciones de Gastos Administrativos que deban presentar y notificar una solicitud de pago de dichas Reclamaciones de Gastos Administrativos y que no presenten y notifiquen dicha solicitud antes de la Fecha Límite aplicable quedarán excluidos para siempre de hacer valer dichas Reclamaciones de Gastos Administrativos contra la AEE o sus bienes, y dichas Reclamaciones de Gastos Administrativos se considerarán exoneradas a partir de la Fecha de Entrada en Vigencia. Las objeciones a dichas solicitudes deberán presentarse y notificarse a la AEE y a la parte solicitante antes de que transcurran (i) 180 días a partir de la Fecha de Entrada en Vigencia, o (ii) cualquier otro plazo de prescripción que pueda fijarse específicamente mediante una Orden Final para la objeción a dichas Reclamaciones de Gastos Administrativos. Los procedimientos anteriores se especificarán en la Orden de Confirmación y en la notificación de la Orden de Confirmación y se notificarán a todas las partes interesadas.

3.   **Reclamaciones de compensación profesional y reembolsos**

Todas las Entidades a las que el Tribunal del Título III les concede compensación, incluyendo, entre otros, en la mayor medida prevista en las respectivas cartas de compromiso o instrumentos o acuerdos similares, o reembolso de gastos recibirán el pago total, en Efectivo, por los montos permitidos por el Tribunal del Título III (i) ni bien sea razonablemente practicable después de (a) la Fecha de Vigencia y (b) la fecha en que la orden del Tribunal del Título III que permite dicha Reclamación se considere Orden Final, lo que ocurra más tarde, o (ii) bajo otros términos no más favorables al reclamante que los que se acuerden mutuamente entre dicho reclamante y las Partes del Gobierno; *siempre y cuando* que, salvo según se disponga en el presente, cada Profesional debe presentar su solicitud de asignación final de compensación por servicios profesionales prestados y reembolso de gastos en o antes de la fecha que sea ciento veinte (120) días posterior a la Fecha de Entrada en Vigencia. El Deudor Reorganizado pagará la compensación por servicios profesionales prestados y reembolso de gastos incurridos después de la Fecha de Entrada en Vigencia en el curso ordinario y sin la necesidad de la aprobación del Tribunal del Título III.

A partir de la Fecha de Confirmación, cualquier requisito de que los Profesionales cumplan con las Secciones 316 y 317 de PROMESA al solicitar compensación por servicios prestados después de dicha fecha terminará, y la AEE podrá emplear y pagará a cualquier Profesional sin necesidad de notificación o acción, orden o aprobación ulterior del Tribunal del Título III.

4.   **Reclamaciones de gastos administrativos de LUMA**

Conforme a (i) *la Orden de Memorando que otorga en parte y deniega en parte la moción de la AEE para el registro de una orden que permita la Reclamación de Gastos Administrativos por compensación por servicios de transición iniciales bajo el Acuerdo de Operación y Mantenimiento del Sistema de Transmisión y Distribución de Puerto Rico con LUMA Energy* [ECF Núm. 2258], y (ii) la *Orden de Memorando que concede la moción de las Partes Gubernamentales para que se ordene permitir la Reclamación de Gastos Administrativos por cantidades a ser pagadas a LUMA Energy por la AEE durante el período provisional en virtud del Acuerdo Complementario y el Contrato de T&D* [ECF Núm. 2473] (conjuntamente con [ECF Núm. 2258], las "Órdenes de Gastos Administrativos de LUMA"), y de conformidad con los términos del Contrato de T&D y sus complementos, todos los importes no impugnados

279

que deban pagarse en virtud del Contrato de Transmisión y Distribución (T&D) y sus suplementos durante el Período Provisional (según se define en las Órdenes de Gastos Administrativos de LUMA), únicamente en la medida en que se hayan devengado y no se hayan pagado, serán (a) pagados en su totalidad en Efectivo en (1) la Fecha de Entrada en Vigencia, o (2) la fecha en que dicha cantidad sea pagadera y exigible según los términos y condiciones del Contrato de T&D y sus suplementos, lo que ocurra más tarde, o (b) satisfechas y liquidadas de conformidad con otras condiciones que no sean más favorables para LUMA Energy que las que puedan acordar LUMA Energy y el Deudor Reorganizado.

5.   **Reclamaciones de gastos administrativos de Whitefish**

Conforme al Acuerdo de Transacción de Whitefish, Whitefish tendrá una reclamación de gastos administrativos permitida por un importe total de $133,369,078.00, de los cuales se han pagado $127,345,388.00 y el resto del pago estará compuesto por el importe restante de la reclamación de gastos administrativos de $6,023,690.00, pagadero en la Fecha de Entrada en Vigencia del Plan, pero en ningún caso después del 31 de diciembre de 2023.

6.   **Reclamaciones administrativas pendientes**

En la Fecha de Entrada en Vigencia, para hacer frente al pago de las Reclamaciones de Gastos Administrativos Permitidas, la AEE Reorganizada venderá, cederá, transferirá y traspasará al ELA un monto de capital original total de cuatrocientos millones de dólares ($400,000,000) de Bonos Serie B (los "Bonos de Gastos Administrativos") a cambio de cuatrocientos millones de dólares ($400,000,000) en Efectivo.

Como se explica en la Sección V.D.6 anterior, está pendiente ante el Tribunal del Título III la Moción Administrativa de Cobra.  En un escrito reciente, Cobra estimó su Reclamación de Gastos Administrativos en aproximadamente $350 millones.  Moción de Levantamiento de la Paralización de Cobra de junio de 2011 en 1.  Si el Tribunal del Título III permite a COBRA una Reclamación de Gastos Administrativos, la AEE satisfará dicha Reclamación a través del Fondo de Reserva de Reclamaciones, pero solo en la medida en que no sea satisfecha por los fondos que la AEE reciba de FEMA.  La AEE cree que la FEMA reembolsará a la AEE al menos parte de las cantidades poseídas en virtud de los acuerdos con Cobra.  Sin embargo, la AEE se reserva expresamente todos los derechos relacionados con la Reclamación de Cobra, incluyendo, entre otras cosas, los argumentos sobre la responsabilidad, la cantidad y la responsabilidad sobre los intereses adeudados sobre la Reclamación Permitida de Cobra (si los hubiere).

E.   **Clasificación y tratamiento de las reclamaciones**

| Clase 1: | *Clasificación:* La Clase 1 consiste en todas las reclamaciones contra la AEE por cuenta de las Reclamaciones de Bonos de Ingresos de la AEE en poder de los Bonistas y Aseguradoras Monolínea que hayan presentado oportunamente un Formulario de Elección al Agente de la Convocatoria antes de la Fecha Límite del Acuerdo de Demanda Colectiva. |
|---|---|
| Reclamaciones de Bonistas que llegan a un acuerdo y Aseguradoras Monolínea que llegan | |

| a un acuerdo | **Tratamiento:** En la Fecha de Entrada en Vigencia, cada uno de los Bonistas que llegan a un acuerdo y Aseguradoras Monolínea que llegan a un acuerdo recibirá el Tratamiento de Bonista que llega a un acuerdo por cuenta de su Reclamación Permitida, que consiste en: |
|---|---|
| | (i) la Participación Prorrateada de dicho Tenedor en los importes depositados en el Fondo de Amortización; |
| | (ii) Bonos Serie B por un monto nominal igual al cincuenta por ciento (50.00%) del monto de la reclamación de Bonos de Ingresos de la AEE permitida de dicho tenedor <u>menos</u> el monto distribuido a dicho tenedor conforme a la cláusula (i) inmediatamente precedente; |
| | (iii) con respecto a la Reclamación Restante de dicho Tenedor después de que se efectúen las distribuciones colectivas conforme a las cláusulas (i) y (ii) inmediatamente precedentes: (A) el cuarenta por ciento (40.0%) de la Participación Prorrateada de dicho Tenedor en los Nuevos Bonos Netos Restantes, si los hubiere, disponibles para su distribución, al Fondo Común de Reclamaciones de Bonos Serie B Restantes; y (B) hasta un sesenta por ciento (60.0%) adicional de la Participación Prorrateada de dicho Tenedor en los Nuevos Bonos Netos Restantes, si los hubiere, disponibles para su distribución, al Fondo Común de Reclamaciones de Bonos Serie B Restantes, si y solo si (I) el monto nominal de los nuevos bonos GUC es equivalente al cien por ciento (100.0%) de la Estimación del Fondo de Reclamaciones Sin Garantía y (II) las Reclamaciones Restantes de los Prestamistas de la Línea de Crédito de Combustible descritas en **Error! Reference source not found..Error! Reference source not found.Error! Reference source not found.** del Plan reciben Nuevos Bonos Netos Restantes por un monto nominal equivalente al cien por ciento (100.0%) de dichas Reclamaciones Restantes; y |
| | (iv) con respecto a la Reclamación Restante de dicho tenedor tras contabilizar las distribuciones colectivas efectuadas conforme a las cláusulas (i), (ii) y (iii) inmediatamente precedentes, un CVI por el importe nocional de la Reclamación Restante de dicho tenedor. |
| | **Votación:** La Clase 1 está afectada por el Plan. La Clase 1 y cada Tenedor que llega a un acuerdo y Aseguradora Monolínea que llega a un acuerdo tienen derecho a votar por la aceptación o el rechazo del Plan. |
| | **Montos permitidos de reclamaciones:** Se determinará una vez |

| | |
|---|---|
| | transcurrida la Fecha Límite del Acuerdo de Demanda Colectiva.<br><br>***Recobros proyectados de la AEE:*** 50% – 100.00% |
| **Clase 2:**<br><br>Reclamaciones de Bonistas que no llegan a un acuerdo y Aseguradoras Monolínea que no llegan a un acuerdo | ***Clasificación:*** La Clase 2 consiste en todas las reclamaciones contra la AEE por cuenta de las Reclamaciones de Bonos de Ingresos de la AEE en poder de los Bonistas y las Aseguradoras Monolínea que no hayan presentado oportunamente un Formulario de Elección al Agente de la Convocatoria antes de la Fecha Límite del Acuerdo de Demanda Colectiva.<br><br>***Tratamiento:*** En la Fecha de Entrada en Vigencia, cada uno de los Bonistas que no llegan a un acuerdo y Aseguradoras Monolínea que no llegan a un acuerdo recibirá el Tratamiento de Bonista que no llega a un acuerdo por cuenta de su Reclamación Permitida, que consiste en:<br>(i) la Participación Prorrateada de dicho Tenedor en los fondos depositados en el Fondo de Amortización;<br><br>(ii) el menor de los siguientes importes: a) la Participación Prorrateada de dicho Tenedor en los Bonos Serie B por un monto nominal igual al valor de la Garantía de Bonos (según se determine en relación con la Vista de Confirmación o cualquier otro procedimiento apropiado), si la hubiere, menos el monto distribuido a dicho Tenedor conforme a la cláusula (i) inmediatamente precedente y (b) la Participación Prorrateada de dicho Tenedor en los Bonos Serie B disponible después de que se efectúen las distribuciones de Bonos Serie B conforme al Artículo IV.A(ii) del Plan;<br><br>(iii) con respecto a la Reclamación por Garantía Insuficiente de dicho Tenedor que sea una Reclamación Restante, si la hubiera, después de que se efectúen las distribuciones colectivas conforme a las cláusulas (i) y (ii) inmediatamente precedentes, la Participación Prorrateada de dicho Tenedor del Recobro de Reclamaciones Generales Sin Garantía; y<br><br>(iv) si la Clase 2 vota a favor de aceptar el Plan y se dicta una Orden Final en la Impugnación Enmendada de Gravamen y Recurso que determine que los Bonos de Ingresos de la AEE son recurribles únicamente ante el Fondo de Amortización, con respecto al capital y los intereses devengados y no pagados sobre dichos Bonos de Ingresos de la AEE hasta la Fecha de Petición, los intereses devengados que posea dicho Tenedor menos las distribuciones de Efectivo efectuadas a dicho Tenedor conforme a la cláusula (i) precedente (la "Reclamación restante no liquidada"), de CVI por el importe |

| | |
|---|---|
| | nocional de la Reclamación Restante No Liquidada de dicho Tenedor.<br><br>*Votación:* La Clase 2 está afectada por el Plan. La Clase 2 y cada Bonista que no llega a un acuerdo y Aseguradora Monolínea que no llega a un acuerdo tienen derecho a votar por la aceptación o el rechazo del Plan.<br><br>*Montos permitidos de reclamaciones:* Se determinará tras la Fecha Límite del Acuerdo de Demanda Colectiva y la Resolución Definitiva de la Impugnación de Gravamen y Recurso Enmendada<br><br>*Recobros proyectados de AEE:* 0.19% – 55.07% |
| **Clase 3:**<br>Reclamación de pensiones | *Clasificación:* La Clase 3 consiste en la reclamación que mantiene el SRE de la AEE a cuenta de las contribuciones adeudadas (incluyendo los importes a pagar en el futuro) por la AEE al SRE de la AEE para pagar los beneficios a los jubilados de acuerdo con los Reglamentos del SRE de la AEE, los contratos de negociación colectiva, las resoluciones y la ley aplicable.<br><br>*Tratamiento:* El Fideicomiso de Reserva de Pensiones reembolsará al SRE de la AEE los beneficios de retiro pagados y los costos administrativos incurridos en el Año Fiscal anterior que termina el 30 de junio; disponiéndose que los pagos de beneficios por los cuales el SRE de la AEE tiene derecho a reembolso en virtud del Plan se limitarán a (i) los beneficios pagaderos a cualquier Participante que sea Retirado en la Fecha de Entrada en Vigencia, sin ningún otro ajuste del costo de vida a partir de la Fecha de Entrada en Vigencia, y (ii) beneficios pagaderos a los Participantes que son Participantes Activos del SRE de la AEE a la Fecha de Entrada en Vigencia, (A) con los beneficios devengados congelados a partir de la Fecha de Entrada en Vigencia en la forma establecida en el Anexo C del Plan, y (B) no sujetos a ningún ajuste por costo de vida a partir de la Fecha de Entrada en Vigencia.<br><br>El Fideicomiso de Reserva de Pensiones se financiará mediante una combinación de Bonos Serie B y mediante gastos operativos de la AEE según se detalla en la Sección VI.M a continuación.<br><br>*Votación:* La Clase 3 está afectada por el Plan. La Clase 3 y cada tenedor de la Reclamación de Pensiones tienen derecho a votar por la aceptación o el rechazo del Plan.<br><br>*Montos permitidos de reclamaciones:* A determinar |

| | |
|---|---|
| | *Recobros proyectados de AEE:* A determinar |
| **Clase 4:**<br><br>Reclamaciones por Préstamos de la Línea de Combustible | *Clasificación:* La Clase 4 consiste en todas las reclamaciones contra la AEE a cuenta de los Préstamos de la Línea de Combustible o que de otro modo sean emergentes de o estén relacionadas con las Instalaciones de la Línea de Combustible.<br><br>*Tratamiento:* En la Fecha de Entrada en Vigencia, cada tenedor de una Reclamación por Préstamos de Línea de Combustible Permitida tendrá derecho a recibir:<br><br>(i) Bonos Serie A por un monto nominal igual al ochenta y cuatro por ciento (84.0%) del monto de la Reclamación por Préstamos de Línea de Combustible Permitida de dicho tenedor;<br><br>(ii) Bonos Serie A o Efectivo, a exclusivo criterio de la Junta de Supervisión, por el monto nominal de los intereses a una tasa del seis por ciento (6.0%) anual que se consideren devengados por cuenta de la Participación Prorrateada de cada tenedor de los Bonos Serie A que se distribuirán conforme a la cláusula (i) inmediatamente precedente durante un período igual a aquel entre (a) el 1 de diciembre de 2022 y la Fecha de Entrada en Vigencia, y (b) un (1) año, lo que sea menor; y<br><br>(iii) con respecto a la Reclamación Restante de dicho tenedor después de contabilizar las distribuciones realizadas conforme a la cláusula (i) inmediatamente precedente, la Participación Prorrateada de dicho Tenedor en los Nuevos Bonos Netos Restantes, si los hubiera, disponibles para su distribución, con el Fondo Común de Reclamaciones de Bonos Serie B Restantes.<br><br>*Comisiones de perfeccionamiento de los acreedores de los Prestamistas de la Línea de Crédito de Combustible*<br><br>En la Fecha de Entrada en Vigencia, los Acreedores del AAP del Prestamista de la Línea de Crédito de Combustible recibirán, para compensar a ciertas partes por el costo de la negociación, confirmación y perfeccionamiento del AAP del Prestamista de la Línea de Crédito de Combustible y del Plan, una participación prorrateada de quince millones de dólares ($15,000,000.00), en forma de Bonos Serie A adicionales o Efectivo, a criterio exclusivo de la Junta de Supervisión.<br><br>*Honorarios de reembolso de los profesionales de los acreedores del AAP de los Prestamistas de la Línea de Crédito de Combustible*<br><br>En la Fecha de Entrada en Vigencia, los Acreedores del AAP |

del Prestamista de la Línea de Crédito de Combustible recibirán el reembolso de sus honorarios y gastos profesionales razonables incurridos con el fin de compensar a los Acreedores del AAP del Prestamista de la Línea de Crédito de Combustible por el costo de la negociación, confirmación y perfeccionamiento del AAP del Prestamista de la Línea de Crédito de Combustible y del Plan, hasta un monto total de once millones de dólares ($11,000,000.00), en forma de Bonos Serie A adicionales o Efectivo, a criterio exclusivo de la Junta de Supervisión; *siempre que* el diez por ciento (10%) de los Honorarios de Reembolso de los Profesionales de los Acreedores del AAP del Prestamista de la Línea de Crédito de Combustible se asigne al Acreedor del AAP del Prestamista de la Línea de Crédito de Combustible registrado en la Fecha de Entrada en Vigencia del Acuerdo (según se define en el AAP del Prestamista de la Línea de Crédito de Combustible) en virtud de la Instalación Citi de la Línea de Combustible y el noventa por ciento (90%) de los Honorarios de Reembolso de los Profesionales de los Acreedores del AAP del Prestamista de la Línea de Combustible se asignará a los Acreedores del AAP del Prestamista de la Línea de Crédito de Combustible (parte del AAP del Prestamista de la Línea de Crédito de Combustible a la Fecha de Entrada en Vigencia del Acuerdo) en virtud de la Instalación Scotia de la Línea de Combustible (y proporcionalmente entre dichos Acreedores del AAP del Prestamista de Crédito de la Línea de Combustible).

*Votación:* La Clase 4 está afectada por el Plan. La Clase 4 y cada tenedor de una Reclamación por Préstamos de la Línea de Combustible tienen derecho a votar por la aceptación o el rechazo del Plan.

*Montos permitidos de reclamaciones:* $700,887,093.58

*Recobros proyectados de AEE de las reclamaciones permitidas:* 84.00% – 100.00%

| | |
|---|---|
| **Clase 5:**<br><br>Reclamaciones Generales Sin Garantía | *Clasificación:* La Clase 5 consiste en todas las reclamaciones sin garantía contra la AEE que no sean una Reclamación de Gastos Administrativos, una Reclamación Federal, una Reclamación Profesional, una Reclamación de Dominio Eminente/Expropiación forzosa inversa, una Reclamación de Pensiones, una Reclamación de Préstamo de Línea de Combustible, una Reclamación de Bonos de Ingresos de la AEE (incluida una Reclamación por Garantía Insuficiente), una Reclamación de Vitol, una Reclamación de Swaps de Tasas de Interés Asegurados, una Reclamación Garantizada, una Reclamación de Cliente de Curso Ordinario o una Reclamación Subordinada de la Sección 510(b). Para evitar dudas, cada Reclamación por Daños debido a Rechazo del Convenio Colectivo es |

| | una "Reclamación General Sin Garantía". |
|---|---|
| | *Tratamiento:* En la Fecha de Entrada en Vigencia, cada tenedor de una Reclamación General Sin Garantía Permitida recibirá su Participación Prorrateada del Recobro de la Reclamación General Sin Garantía. El Recobro de Reclamaciones Generales sin Garantía es el recobro total por los tenedores de Reclamaciones Permitidas en el Fondo Común de Reclamaciones Generales sin Garantía, pagadera de los Activos del Fideicomiso de GUC. Los Activos del Fideicomiso GUC consisten en (i) los Ingresos de la Acción de Anulación, (ii) los Nuevos Bonos GUC, y (iii) el CVI de GUC. |
| | *Votación:* La Clase 5 está afectada por el Plan. La Clase 5 y cada tenedor de una Reclamación General Sin Garantía tienen derecho a votar por la aceptación o el rechazo del Plan. |
| | *Montos estimados permitidos de reclamaciones:* $800,000,000 |
| | *Recobros proyectados de AEE:* 0.10% – 100.00% |
| **Clase 6:** <br><br> Reclamación de Vitol | *Clasificación:* El Grupo 6 consiste en la reclamación contra la AEE en poder de Vitol por cuenta del Acuerdo de Transacción de Vitol. |
| | *Tratamiento:* En la Fecha de Entrada en Vigencia, Vitol recibirá el cincuenta por ciento (50%) de su Participación Prorrateada del Recobro de la Reclamación General Sin Garantía. |
| | *Votación:* La Clase 6 está afectada por el Plan. La Clase 6 y cada tenedor de la Reclamación de Vitol tienen derecho a votar por la aceptación o el rechazo del Plan. |
| | *Montos permitidos de reclamaciones:* $41,457,382.88 |
| | *Recobros proyectados de AEE:* 0.05% – 50.00% |
| **Clase 7:** <br><br> Reclamaciones de Swaps de Tasas de Interés Asegurados por Assured | *Clasificación:* La Clase 7 consiste en todas las reclamaciones contra la AEE por cuenta del Swap de Tasas de Interés Asegurado por Assured. |
| | *Tratamiento:* En la Fecha de Entrada en Vigencia, cada tenedor de una Reclamación Permitida de Swap de Tasas de Interés Asegurado por Assured recibirá su Participación Prorrateada del Recobro de la Reclamación Permitida de Swap de Tasas de Interés Asegurado por Assured, que consiste en (a) el Tratamiento de Bonista que llega a un acuerdo, si el tenedor de la Reclamación de Swap de Tasas de Interés Asegurado por Assured presentó oportunamente un Formulario de Elección al Agente de la Convocatoria antes de la Fecha Límite del Acuerdo de Demanda Colectiva o (b) el Tratamiento de Bonista que no |

|  | llega a un acuerdo. |
|---|---|
|  | ***Votación:*** La Clase 7 está afectada por el Plan.  La Clase 8 y cada tenedor de una Reclamación de Swaps de Tasas de Interés Asegurados por Assured tienen derecho a votar por la aceptación o el rechazo del Plan. |
|  | ***Montos permitidos de reclamaciones:*** A determinar |
|  | ***Recobros proyectados de AEE si el Tenedor llega a un acuerdo:*** 0.19% – 100.00% |
|  | ***Recobros proyectados de AEE si el Tenedor no llega a un acuerdo:*** 0.19% – 55.07% |
| **Clase 8:** Reclamación de Cliente en Curso Ordinario | ***Clasificación:***  La Clase 8 consiste en todas las reclamaciones contra la AEE en poder de un cliente de la AEE por asuntos de clientes en curso ordinario, incluido el pago en exceso de facturas de clientes. |
|  | ***Tratamiento:***  En la Fecha de Entrada en Vigencia, cada tenedor de una Reclamación de Cliente en Curso Ordinario Permitida recibirá el pago íntegro de dicha Reclamación de Cliente en Curso Ordinario en el curso ordinario de los negocios. |
|  | ***Votación:*** La Clase 8 no está afectada por el Plan.  Se considera que la Clase 9 y cada tenedor de una Reclamación de Cliente en Curso Ordinario han aceptado el Plan. |
|  | ***Montos estimados permitidos de reclamaciones:*** $235,309 |
|  | ***Recobros proyectados de AEE:*** 100.00% |
| **Clase 9:** Reclamaciones de Dominio eminente/Expropiación forzosa inversa | ***Clasificación:***  La Clase 9 consiste en todas las reclamaciones contra la AEE que surjan de o estén relacionadas con una acción o procedimiento de expropiación iniciado antes de la petición por la AEE o una agencia o entidad de esta en el Tribunal de Primera Instancia de conformidad con 32 L.P.R.A. § 2905 para obtener el título de propiedad sobre bienes inmuebles ubicados en Puerto Rico, y se haya emitido una Orden Final por una cantidad en exceso de la cantidad depositada por el expropiante. |
|  | ***Tratamiento:***  En la Fecha de Entrada en Vigencia, a) en la medida en que no se haya modificado previamente, la paralización automática conforme al artículo 362 del Código de Quiebras y el interdicto de exoneración conforme al artículo XXIV del Plan se considerarán modificados para permitir al |

| | |
|---|---|
| | tenedor de una Reclamación de Dominio Eminente/Expropiación forzosa inversa (i) liquidar dicha Reclamación de Dominio Eminente/Expropiación forzosa inversa y (ii) hacer que la Secretaría del Tribunal de Primera Instancia distribuya a dicho tenedor el importe de los fondos depositados en el Tribunal de Primera Instancia con respecto a la propiedad objeto de expropiación; y<br><br>b) sujeto al registro de la Orden de Confirmación y la Orden de Confirmación del ELA que establezcan que dichas reclamaciones deben pagarse en su totalidad en la medida en que sean Reclamaciones Permitidas para una compensación justa, cuando cada una de dichas órdenes se convierta en una Orden Final, y en el momento en que se dicte otra Orden Final que determine la validez y el importe de la compensación justa atribuible a una Reclamación de Dominio Eminente/Expropiación forzosa inversa, el tenedor de una Reclamación de Dominio Eminente/Expropiación forzosa inversa tendrá derecho a recibir el 100% de dicho saldo no pagado en efectivo.<br><br>No obstante, si prospera el recurso de apelación de la Junta de Supervisión contra la Orden de Confirmación del ELA y los Antecedentes de Hecho y Conclusiones de Derecho emitidas con respecto a la no liberación de la deuda por parte del deudor de las Reclamaciones de Dominio Eminente/Expropiación forzosa inversa contra el ELA tiene éxito y dicha Orden de Confirmación del ELA es revocada en esa medida, el tenedor de dicho saldo impago recibirá, como total contraprestación, satisfacción, liberación e intercambio por este, la Participación Prorrateada de dicho tenedor en el Recobro de la Reclamación General Sin Garantía.<br><br>*Votación:* La Clase 10 está afectada por el Plan.  La Clase 10 y cada tenedor de una Reclamación de Dominio Eminente/Expropiación forzosa inversa tienen derecho a votar por la aceptación o el rechazo del Plan.<br><br>***Montos estimados permitidos de reclamaciones:*** $2,437,556<br><br>***Recobros proyectados de AEE:*** 100.00% si así se dispone en una Orden Final; en caso contrario, aproximadamente 0.10%-100.00% del saldo pendiente de la Demanda de Dominio Eminente/Expropiación Forzosa Inversa Permitida tras la aplicación de cualquier depósito. |
| **Clase 10:**<br>Reclamaciones | *Clasificación:* La Clase 10 consiste en todas las reclamaciones contra la AEE en poder de los Estados Unidos de América, sus agencias, |

| federales | departamentos o agentes, incluyendo, entre otros, el HUD, el Departamento de Seguridad Nacional de los Estados Unidos, la EDPA y el Departamento de Trabajo de los Estados Unidos. |
|---|---|
| | *Tratamiento:* En la Fecha de Entrada en Vigencia, cada tenedor de una Reclamación Federal Permitida recibirá (i) su Participación Prorrateada del Recobro de la Reclamación General Sin Garantía, y (ii) el tratamiento de dicha Reclamación Federal Permitida según lo requerido por la Sección 304(h) de PROMESA, lo que sea mayor. |
| | *Votación:* La Clase 11 está afectada por el Plan. La Clase 11 y cada tenedor de una Reclamación Federal Permitida tienen derecho a votar por la aceptación o el rechazo del Plan |
| | *Montos estimados permitidos de reclamaciones:* $16,859,577 |
| | *Recobros proyectados de AEE:* 100.00% si se exige el pago íntegro en virtud de la Sección 304(h) de PROMESA; en caso contrario, 0.10%–100.00%. |
| **Clase 11:** Reclamaciones de conveniencia | *Clasificación:* La Clase 11 consiste en (a) todas las Reclamaciones Generales Sin Garantía Permitidas (a) que sean iguales o inferiores a diez mil dólares ($10,000.00) o (b) reclamaciones en poder de tenedores de Reclamaciones Generales Sin Garantía Permitidas, según corresponda, que hayan optado por reducir el importe de dicha Reclamación General Sin Garantía Permitida a diez mil dólares ($10,000.00). Además, la Clase 11 incluye las reclamaciones de los tenedores de múltiples Reclamaciones Generales Sin Garantía cuyo monto total supere los veinte mil dólares ($20,000.00) que han optado por reducir todas esas Reclamaciones a un importe total de veinte mil dólares ($20,000.00). El importe total de la contraprestación que se pondrá a disposición de las Reclamaciones de Conveniencia es el tope de conveniencia de un millón de dólares ($1,000,000.00) y, en caso de que se supere dicho Tope de Conveniencia, los tenedores de Reclamaciones de Conveniencia Permitidas recibirán su Participación Prorrateada del Tope de Conveniencia. |
| | *Tratamiento:* En la Fecha de Entrada en Vigencia y la fecha en que la Reclamación de Conveniencia se convierta en una Reclamación Permitida, lo que ocurra más tarde, cada tenedor de una Reclamación de Conveniencia Permitida recibirá el monto total de dicha Reclamación de Conveniencia Permitida, en efectivo, del Fideicomiso de GUC. |
| | *Votación:* La Clase 12 no está afectada por el Plan. Se considera que la Clase 12 y cada tenedor de una Reclamación de Conveniencia |

| | |
|---|---|
| | aceptan el Plan.<br><br>***Montos estimados permitidos de reclamaciones:*** Se desconoce<br><br>***Recobros proyectados de AEE:*** 100.00%, siempre que no se supere el Límite de Conveniencia |
| **Clase 12:**<br><br>Reclamos Subordinados de la Sección 510(b) | ***Clasificación:*** La Clase 12 consiste en todas las reclamaciones, en la medida en que se determine conforme a una Orden Final, contra la AEE o sus activos emergentes de o relacionados con (a) la rescisión de una compra o venta de un título valor existente de un Deudor o una filial de un Deudor, (b) la compra, venta o retención de dicho título valor, o (c) el reembolso, la indemnización o la contribución permitida conforme a la sección 502 del Código de Quiebras por cuenta de dicha reclamación.<br><br>***Tratamiento:*** Las Reclamaciones Subordinadas de la Sección 510(b) Permitidas no recibirán una distribución conforme al Plan.<br><br>***Votación:*** La Clase 12 está afectada por el Plan. Se considera que la Clase 12 y cada tenedor de una Reclamación Subordinada de la Sección 510(b) han rechazado el Plan.<br><br>***Montos estimados permitidos de reclamaciones:*** Se desconoce<br><br>***Recobros proyectados de AEE:*** 0.00% |

**F.       Disposiciones relativas a la emisión y distribución de los Nuevos Bonos**

1.   **Emisión y distribución**

a)       Nuevos Bonos

Los Nuevos Bonos se emitirán conforme a los términos y disposiciones del Nuevo Contrato Marco de Emisión de Deuda y se distribuirán como se estipula en el Plan. La documentación definitiva que rige a los Nuevos Bonos de modo general dispondrá los términos establecidos en el presente, sujeto a los resultados de cualquier opción permitida por el Plan y otros ajustes permitidos o requeridos por el Plan.

b)       CVI

Los CVI se emitirán conforme a los términos y disposiciones del Nuevo Contrato Marco de Emisión de Deuda y se distribuirán como se estipula en el Plan. La documentación definitiva que rige a los CVI de modo general dispondrá los términos establecidos en el Plan.

2. **Términos generales**

a)   Nuevos Bonos

En la Fecha de Entrada en Vigencia, la AEE Reorganizada emitirá dos series de Nuevos Bonos:  Bonos Serie A; y Bonos Serie B.

(i)   *Bonos Serie A*

Los Bonos de la Serie A se emitirán por un importe del capital suficiente como para cumplir los términos del AAP del Prestamista de la Línea de Crédito de Combustible y el Artículo VII del Plan.  Tendrán un vencimiento final declarado de quince (15) años a partir de la Fecha de Entrada en Vigencia, con un reembolso previsto de cinco (5) años a partir de la Fecha de Entrada en Vigencia basado en las Proyecciones del Plan Fiscal 2022.  Los Bonos Serie A se emitirán en la Fecha de Entrada en Vigencia, pero devengarán intereses a partir de la fecha de Emisión prevista del 1 de diciembre de 2022 a efectos del cálculo de los intereses devengados; no obstante, el período de devengo de intereses anterior a la Fecha de Entrada en Vigencia no excederá un (1) año y los intereses devengados antes de la Fecha de Entrada en Vigencia serán pagaderos en la Fecha de Entrada en Vigencia en forma de Bonos Serie A o en Efectivo, a criterio exclusivo de la Junta de Supervisión.  Los Bonos Serie A devengarán un interés del seis por ciento (6.00%) anual pagadero semestralmente en Efectivo.

(ii)   *Bonos Serie B*

Los Bonos Serie B se emitirán por un monto de capital equivalente al monto de capital total de los Nuevos Bonos menos el monto de capital total de los Bonos Serie A.  Los Bonos Serie B tendrán un vencimiento final declarado de cincuenta (50) años a partir de la Fecha de Entrada en Vigencia, con un reembolso previsto de treinta y cinco (35) años a partir de la Fecha de Entrada en Vigencia en base a las Proyecciones del Plan Fiscal 2022.  Los Bonos Serie B estarán fechados a la Fecha de Entrada en Vigencia.  Los Bonos Serie B pueden emitirse en forma de bonos de interés corriente, bonos de apreciación de capital, bonos convertibles y/o bonos convertibles de apreciación de capital en una o varias series de bonos.  Los Bonos Serie B devengarán intereses a una tasa comprendida entre el cinco punto seiscientos veinticinco milésimos por ciento (5.625%) y el seis y medio por ciento (6.50%).

b)   CVI

En la Fecha de Entrada en Vigencia, la AEE Reorganizada emitirá el CVI por el monto del Importe Nocional del CVI con un cupón de cero por ciento (0.00%) y una fecha de vencimiento final de la Fecha de Vencimiento del CVI.  El CVI no será pagadero a menos que y hasta que el capital y los intereses de los Nuevos Bonos y de los Bonos de Refinanciamiento, si los hubiere, sean pagados íntegramente y de forma irrevocable en Efectivo por la AEE Reorganizada o que se considere que no están en circulación de conformidad con los términos del Nuevo Contrato Marco de Emisión de Deuda antes de la Fecha de Vencimiento del CVI.  Si los Nuevos Bonos y los Bonos de Refinanciamiento se satisfacen en su totalidad de acuerdo con sus términos antes de la Fecha de Vencimiento del CVI, el CVI será pagadero con respecto a la parte de los Ingresos Netos que constituyan los Ingresos por Cargos Preexistentes Restantes depositados en el haber del Fondo de Amortización de la Deuda de acuerdo con la Cascada de

291

Pagos hasta: (a) la fecha en que el Importe Nocional del CVI haya sido pagado en su totalidad y (b) la Fecha de Vencimiento del CVI, lo que ocurra primero.

En la Fecha de Vencimiento del CVI, se considerará que se renuncia a cualquier monto de capital pendiente por cuenta del CVI y será totalmente inaplicable.

El CVI no tendrá una tasa de interés por incumplimiento.  El CVI se emitirá en denominaciones a especificarse en el Nuevo Contrato Marco de Emisión de Deuda.

3.     **Nuevos Bonos Excedentes**

En la Fecha de Entrada en Vigencia, la AEE Reorganizada, a su exclusivo criterio, emitirá algunos, todos o ninguno de los Nuevos Bonos Excedentes al Fideicomiso PayGo de la AEE.  Cualquier monto en Nuevos Bonos Excedentes que esté disponible para su distribución al Fideicomiso PayGo de la AEE, pero que la AEE Reorganizada determine no emitir al Fideicomiso PayGo de la AEE, se considerará no emitido, y el monto en Nuevos Bonos emitidos conforme al Plan se reducirá dólar por dólar por el monto de capital total de dichos Nuevos Bonos Excedentes no emitidos.

4.     **Disposiciones relativas al pago**

Los intereses de los Nuevos Bonos se pagarán el 1 de enero o el 1 de julio siguientes a la Fecha de Entrada en Vigencia y cada 1 de enero y 1 de julio en adelante hasta que los Nuevos Bonos (a) alcancen su respectivo vencimiento o (b) sean pagados o satisfechos en su totalidad de acuerdo con sus términos, lo que suceda primero.

Todo el capital no pagado sobre los Nuevos Bonos que no se pague en su vencimiento, ya sea en o antes del vencimiento final programado, seguirá siendo pagadero y estando en circulación hasta que se pague en su totalidad.  No se devengarán intereses sobre ninguna de las obligaciones en circulación en virtud de los Nuevos Bonos después del respectivo vencimiento establecido de los Nuevos Bonos; solo será pagadero el capital no pagado tras las respectivas fechas de vencimiento final.  El interés de los Nuevos Bonos se calculará sobre la base de un año de 360 días compuesto por doce meses de 30 días.  Los Nuevos Bonos no tendrán una tasa de interés por incumplimiento.

5.     **Garantía**

a)     Nuevos Bonos

Los Nuevos Bonos estarán garantizados por los Ingresos Netos de la AEE Reorganizada hasta un monto equivalente igual a los Ingresos por Cargos Heredados Restantes y el derecho a recibir dichos Ingresos Restantes Netos hasta un monto equivalente a los Ingresos por Cargos Heredados, según se describe con mayor detalle en el Nuevo Contrato Marco de Emisión de Deuda.  Para evitar cualquier duda, el Gravamen que garantiza los Nuevos Bonos no se limita a los Ingresos Netos depositados en el Fondo de Amortización de la Deuda.

b)     CVI

El CVI estará garantizado por los Ingresos Restantes Netos de la AEE Reorganizada hasta un monto equivalente igual a los Ingresos por Cargos Heredados restantes y el derecho a recibir dichos Ingresos Restantes Netos hasta un monto equivalente a los Ingresos por Cargos Heredados, según se describe con mayor detalle en el Nuevo Contrato Marco de Emisión de Deuda.

6.    **Disposiciones sobre opción de compra**

a)    <u>Nuevos Bonos</u>

Los Nuevos Bonos están sujetos a amortización antes del vencimiento, según la opción o las instrucciones de la AEE Reorganizada, en su totalidad o en parte (y si fuera en parte, en una denominación autorizada dispuesta conforme al Nuevo Contrato Marco de Emisión de Deuda), en cualquier fecha que sea en o después de diez (10) años a partir de la Fecha de Entrada en Vigencia, con treinta (30) días de notificación previa por escrito, a un precio de amortización equivalente al monto a la par de este, más el interés devengado hasta la fecha de amortización.

Si se liquida antes de la fecha de vencimiento menos que la totalidad de los Nuevos Bonos de un tenor en particular, la AEE Reorganizada seleccionará el vencimiento o los vencimientos de dicho tenor de los Nuevos Bonos a ser amortizados, y DTC, en nombre del Fideicomisario del Contrato Marco, seleccionará los Nuevos Bonos dentro del mismo vencimiento de las series a amortizarse por medio de una lotería aleatoria.

Los Nuevos Bonos no están sujetos a amortización antes del vencimiento a elección de los tenedores de estos.

b)    <u>CVI</u>

El CVI está sujeto a amortización antes del vencimiento, según la opción o las instrucciones de la AEE Reorganizada, en su totalidad o en parte (y si fuera en parte, en una denominación autorizada dispuesta conforme al Nuevo Contrato Marco de Emisión de Deuda), en cualquier fecha que sea en o después de diez (10) años a partir de la Fecha de Entrada en Vigencia, con treinta (30) días de notificación previa por escrito. El precio de amortización será equivalente al Precio de Amortización del CVI.

7.    **Cuentas y cascada de pagos**

Todos los Ingresos se depositarán en el "Fondo General" de la AEE Reorganizada. El primer Día Laborable de cada mes, la AEE Reorganizada transferirá los siguientes montos de dichos Ingresos en el orden de prioridad que se indica a continuación y según se establece con mayor detalle en el Nuevo Contrato Marco de Emisión de Deuda (la "<u>Cascada de Pagos</u>"):

-    *En primer lugar*, al pago de los Gastos Operativos;

-    *En segundo lugar*, al pago de los honorarios y gastos del Fideicomisario del Contrato Marco que no superen los cien mil dólares ($100,000) anuales;

- *En tercer lugar*, al Fondo de Amortización de la Deuda en poder del Fideicomisario del Contrato Marco (i) hasta el importe de los Ingresos por Cargos Heredados, y a partir de la Fecha de Cancelación de los Nuevos Bonos y hasta la Fecha de Vencimiento del CVI, hasta el importe de los Ingresos por Cargos Heredados Restantes, y (ii) hasta el importe de otros Ingresos Netos con el fin de pagar la amortización de la deuda de los Bonos Adicionales según lo permitido y previsto en el Nuevo Contrato Marco de Emisión de Deuda;

- *En cuarto lugar*, al pago de los gastos de capital;

- *En quinto lugar*, al pago de deuda subordinada (si la hubiere); y

- *En sexto lugar*, para fines corporativos generales.

8.    **Pactos clave para los Nuevos Bonos**

Los Documentos Definitivos, entre ellos el Nuevo Contrato Marco de Emisión de Deuda y la Orden de Confirmación contendrán los términos, condiciones y pactos habituales, lo que incluye, entre otros, pactos de la AEE Reorganizada que, entre otras cosas:

a)    realizará esfuerzos razonables para (a) seguir imponiendo y recaudando tasas, comisiones y cargos, incluidos, entre otros, el Cargo Heredado y el Cargo Heredado Restante y (b) depositar los Ingresos Netos recaudados de dichas tasas, comisiones y cargos en el Fondo de Amortización de la Deuda de conformidad con la Cascada de Pagos;

b)    no actuará de una manera que (a) limite o altere los derechos adquiridos por la AEE o la AEE Reorganizada de acuerdo con el Plan y la Orden de Confirmación para cumplir los términos de cualquier acuerdo con los tenedores de los Nuevos Bonos o del CVI o (b) limite o afecte los derechos y remedios de los tenedores de los Nuevos Bonos o del CVI;

c)    tomará todas las medidas razonables para que los Bonos Serie A estén exentos de impuestos en la medida permitida por la ley (incluida la búsqueda de cualquier no acción, determinación de autorización o decisión favorable del IRS);

d)    realizará y ejecutará todos los actos y cosas permitidas por la ley y razonablemente necesarios o deseables para garantizar que el interés pagado a los tenedores de cualquier Nuevo Bono exento de impuestos federales sea y permanezca excluible de los ingresos brutos para fines del impuesto federal a la renta; y

e)    no creará ningún Gravamen, prenda o cargo sobre los Ingresos Netos hasta el importe de los Ingresos por Cargos Heredados, ni derecho a recibirlos, excepto en relación con la emisión de Bonos Adicionales según lo permitido en virtud del Nuevo Contrato Marco de Emisión de Deuda.

9.  **Aplicación de las sumas de dinero del Fondo de Amortización de la Deuda**

Desde y después de la Fecha de Vigencia, hasta que los Nuevos Bonos, los Bonos de Refinanciamiento y/o el CVI hayan sido pagados o satisfechos en su totalidad de acuerdo con sus términos, la AEE Reorganizada depositará, de acuerdo con la Cascada de Pagos, los Ingresos Netos hasta el monto de los Ingresos por Cargos Heredados con respecto a los Nuevos Bonos y hasta el monto de los Ingresos por Cargos Heredados Restantes con respecto al CVI al crédito del Fondo de Amortización de la Deuda que será mantenido por el Fideicomisario del Contrato Marco.  Dichos montos depositados en el Fondo de Amortización de la Deuda serán aplicados, en la medida en que estén disponibles, por el Fideicomisario del Contrato Marco, de la siguiente forma:

      a)     <u>Nuevos Bonos</u>

-  *En primer lugar*, al pago de los intereses declarados vencidos y pagaderos de los Nuevos Bonos;

-  *En segundo lugar*, al pago del capital de los Bonos Serie A y de cualquier Bono de Refinanciamiento emitido para reembolsar los Bonos Serie A hasta que sean reembolsados de forma irrevocable en su totalidad en Efectivo o hasta que, de otro modo, se considere que no están pendientes de pago de conformidad con los términos del Nuevo Contrato Marco de Emisión de Deuda; y

-  *En tercer lugar*, al pago del capital de los Bonos Serie B y de cualquier Bono de Refinanciamiento (salvo los Bonos de Refinanciamiento descritos en el apartado *En segundo lugar* anterior) hasta que sean reembolsados de forma irrevocable en su totalidad en Efectivo o hasta que, de otro modo, se considere que no están en circulación de conformidad con los términos del Nuevo Contrato Marco de Emisión de Deuda.

      b)     <u>CVI</u>

-  *A continuación*, al pago del Importe Nocional del CVI

      c)     <u>Bonos Adicionales</u>

-  Los Ingresos Netos distintos de los Ingresos por Cargos Heredados, si los hubiere, se depositarán en el haber del Fondo de Amortización de la Deuda para pagar la amortización de la deuda de cualquier Bono Adicional de conformidad con los términos del Nuevo Contrato Marco de Emisión de Deuda.

10.    **Pacto sobre tasas de interés**

Hasta el reembolso de los Bonos Serie A o el vencimiento final de los Bonos de la Serie A, lo que ocurra primero, si, en un año determinado, los Ingresos Netos hasta el importe de los Ingresos por Cargos Heredados depositados en el Fondo de Amortización de la Deuda son insuficientes para satisfacer los intereses vencidos y adeudados de los Nuevos Bonos en ese Año Fiscal, la AEE Reorganizada deberá (y en ausencia de la acción de la AEE Reorganizada, el

Fideicomisario del Contrato Marco deberá) (a) ejercer sus poderes en el mayor grado posible para implementar un aumento en el Cargo Heredado suficiente para reembolsar dicho interés adeudado y pagadero sobre los Nuevos Bonos en el año fiscal subsiguiente y/o (b) iniciar un procedimiento tarifario ante el PREB o cualquier otro procedimiento para obligar al PREB a aplicar un aumento del Cargo Heredado suficiente para reembolsar los intereses adeudados y pagaderos sobre los Nuevos Bonos en el año fiscal siguiente (el "Pacto sobre Tasas de Interés"). El Fideicomisario del Contrato Marco tendrá derecho a exigir el cumplimiento específico del Pacto sobre Tasas de Interés.

11.   **Ausencia de Derechos de aceleración**

Los Nuevos Bonos y el CVI no estarán sujetos a aceleración.

12.   **Incumplimiento limitado**

a)   Nuevos Bonos

No se producirá ningún caso de incumplimiento de los Nuevos Bonos (antes del vencimiento final declarado de los Bonos Serie A, únicamente con respecto a los Bonos Serie A, y en general con respecto a los Bonos Serie B) por falta de pago de la amortización de la deuda programada, siempre y cuando la AEE Reorganizada (a) cobre y emplee sus mejores esfuerzos razonables para (i) recaudar el Cargo Heredado, (ii) recaudar los Ingresos generados por el Cargo Heredado y (iii) depositar el importe total de los Ingresos Netos hasta el importe de los Ingresos por Cargos Heredados en el Fondo de Amortización de la Deuda después de prever las distribuciones realizadas de acuerdo con la Cascada de Pagos, y (b) cumpla con el Pacto sobre Tasas de Interés.

b)   CVI

No se producirá ningún caso de incumplimiento del CVI siempre y cuando la AEE Reorganizada tome medidas razonables para recaudar los Ingresos generados por el Cargo Heredado Restante y deposite el dinero recibido en el Fondo de Amortización de la Deuda.

13.   **Remedios limitados**

En caso de incumplimiento de los Nuevos Bonos o del CVI, los únicos remedios del Fideicomisario del Contrato Marco serán: (a) procurar el cumplimiento de la obligación de la AEE Reorganizada de tomar medidas razonables para imponer tasas, tarifas y cargos, incluyendo, entre otros, el Cargo Heredado y el Cargo Heredado Restante y recaudar los Ingresos generados por el Cargo Heredado y el Cargo Heredado Restante y depositar los Ingresos Netos hasta el importe de los Ingresos por Cargos Heredados con respecto a los Nuevos Bonos y hasta el importe de los Ingresos por Cargos Heredados Restantes con respecto al CVI, en el Fondo de Amortización de la Deuda de conformidad con la Cascada de Pagos; y/o (b) antes de la Fecha de Cancelación de los Bonos Serie A, según proceda, a petición del veinticinco por ciento (25.0%) o más de los Bonos Serie A, hacer cumplir el Pacto sobre Tasas de Interés.   Todas las disposiciones de la Constitución del ELA, las legislaciones del ELA, las órdenes ejecutivas, las reglas, los reglamentos y las políticas que establecen el "Derecho a sindicatura en caso de

incumplimiento", codificado en 22 L.P.R.A. § 207, están excluidas por ser incompatibles con PROMESA.

14. **Bonos Adicionales y bonos de Refinanciamiento**

La AEE Reorganizada podrá emitir Bonos de Refinanciamiento para reembolsar, refinanciar o cancelar Nuevos Bonos pendientes autorizados bajo el Nuevo Contrato Marco de Emisión de Deuda, siempre y cuando dichos Bonos de Refinanciamiento sean emitidos (i) a un cupón promedio igual o inferior al de los Nuevos Bonos a ser reembolsados, (ii) sin aumento en el monto del capital, y (iii) con una fecha de vencimiento no posterior a la de los Nuevos Bonos a ser reembolsados. Dichos Bonos de Refinanciamiento estarán garantizados por los Ingresos Netos, tal y como se establece más específicamente en el Nuevo Contrato Marco de Emisión de Deuda.

La AEE Reorganizada podrá emitir Bonos Adicionales para cualquier propósito legal de conformidad con la prueba de bonos adicionales y otros términos del Nuevo Contrato Marco de Emisión de Deuda. Dichos Bonos Adicionales estarán garantizados por los Ingresos Netos, tal y como se establece más específicamente en el Nuevo Contrato Marco de Emisión de Deuda; *siempre y cuando* los Bonos Adicionales no sean pagaderos con el Cargo Heredado mientras permanezcan en circulación los Nuevos Bonos, los Bonos de Refinanciamiento o el CVI.

15. **Fuerza mayor**

   a)   Nuevos Bonos

En caso de un desastre declarado a nivel federal como resultado de una tormenta u otro evento catastrófico que interrumpa las operaciones de la AEE Reorganizada de tal manera que la AEE Reorganizada no pueda recaudar los Ingresos necesarios para cubrir los Gastos Operativos y depositar los Ingresos Netos hasta el monto de los Ingresos por Cargos Heredados con respecto a los Nuevos Bonos de acuerdo con la Cascada de Pagos para un año fiscal determinado, la AEE Reorganizada podrá elegir, a su exclusivo criterio, aplazar hasta dos (2) pagos semestrales consecutivos de la amortización de la deuda.

Para evitar dudas, si la AEE Reorganizada ejerce dicha opción, los intereses de los Nuevos Bonos seguirán devengándose hasta su pago. Todo el capital y los intereses diferidos de los Bonos Serie A afectados por dicha opción se pagarán en o antes de la fecha de vencimiento final de los Bonos Serie A o de la primera fecha de pago programada cinco (5) años después del final del período de aplazamiento de la amortización de la deuda, lo que ocurra primero.

   b)   CVI

En caso de un desastre declarado a nivel federal como resultado de una tormenta u otro evento catastrófico que interrumpa las operaciones de la AEE Reorganizada de tal manera que la AEE Reorganizada no pueda recaudar los Ingresos necesarios para cubrir los Gastos Operativos y depositar los Ingresos Netos hasta el monto de los Ingresos por Cargos Heredados con respecto al CVI en el Fondo de Amortización de la Deuda de acuerdo con la Cascada de Pagos para un año fiscal determinado, la AEE Reorganizada no estará obligada a hacer pagos del CVI por cualquier monto faltante en los Ingresos por Cargos Heredados Restantes.

16.     **Derecho directo de acción**

Conforme al Nuevo Contrato Marco de Emisión de Deuda y sujeto a los derechos adicionales que se estipulan en este, el Fideicomisario del Nuevo Contrato Marco tendrá un derecho directo de acción para aplicar los términos del Nuevo Contrato Marco de Emisión de Deuda, lo que incluye, entre otros, con respecto a los depósitos de financiación del Fondo de Amortización de la Deuda para buscar remedios de ejecución específicos en caso de cualquier incumplimiento de los pactos en el Nuevo Contrato Marco de Emisión de Deuda.

17.     **Nuevo Contrato Marco de Emisión de Deuda**

Las disposiciones que requieren que el Cargo Heredado se añada a las facturas emitidas por la AEE Reorganizada a sus clientes para pagar el capital y los intereses de los Nuevos Bonos, realizar pagos sobre el CVI, y que rigen, entre otras cosas, las enmiendas o suplementos a los Nuevos Bonos, el CVI o el Nuevo Contrato Marco de Emisión de Deuda, los eventos de incumplimiento, los remedios, la prioridad de los pagos después del incumplimiento bajo el Nuevo Contrato Marco de Emisión de Deuda, y la cancelación bajo el Nuevo Contrato Marco de Emisión de Deuda se establecerán en el Nuevo Contrato Marco de Emisión de Deuda.  El Nuevo Contrato Marco de Emisión de Deuda se firmará y entregará en o antes de la Fecha de Entrada en Vigencia.

18.     **Derecho aplicable**

El Nuevo Contrato Marco de Emisión de Deuda, y los Nuevos Bonos y CVI emitidos en virtud de este, según proceda, estarán regidos por las leyes del Estado de Nueva York y, para ciertos asuntos limitados, por las leyes del Estado Libre Asociado, sin dar efecto a los aspectos principales de los conflictos de leyes.

**G.     Tratamiento de contratos a ejecutarse y arrendamientos no vencidos**

1.     **Rechazo o asunción de contratos a ejecutarse y arrendamientos no vencidos**

Conforme a la sección 365(b)(2) del Código de Quiebras y con sujeción a las disposiciones del **Error! Reference source not found..Error! Reference source not found.** y **Error! Reference source not found..Error! Reference source not found.** del Plan, todos los Contratos a Ejecutarse y Arrendamientos No Vencidos que existan entre el Deudor y cualquier Entidad, y que no hayan vencido por sus propios términos en la Fecha de Entrada en Vigencia o con anterioridad a esta, se considerarán rechazados por el Deudor a partir de la Fecha de Entrada en Vigencia, a excepción de cualquier Contrato a Ejecutarse o Arrendamiento No Vencido (a) que haya sido asumido, asumido y cedido, o rechazado conforme a una orden del Tribunal del Título III dictada con anterioridad a la Fecha de Entrada en Vigencia, (b) que se designe específicamente como contrato o arrendamiento que se asumirá o asumirá y cederá en el Anexo de Contratos y Arrendamientos Asumidos del Suplemento del Plan, o (c) que haya sido registrado en la Oficina del Contralor de Puerto Rico o que haya sido aprobado por la Junta de Supervisión o autorizado por el Tribunal del Título III, a menos que se designe específicamente como un contrato a ser rechazado en el Suplemento del Plan; *teniendo en cuenta, sin embargo, que* el Deudor se reserva el derecho, en o antes de la Fecha de Confirmación, de modificar dichas listas para eliminar cualquier Contrato a Ejecutarse y Arrendamiento No Vencido de estas o

añadir cualquier Contrato a Ejecutarse y Arrendamiento No Vencido a estas, en cuyo caso dicho(s) Contrato(s) a Ejecutarse y Arrendamiento(s) No Vencido(s) se considerará(n), según sea el caso, rechazado(s), asumido(s), o asumido(s) y cedido(s) a la Fecha de Entrada en Vigencia. El Deudor notificará (y) cualquier Contrato a Ejecutarse y Arrendamiento No Vencido que deba ser asumido o asumido y cedido a través de la operación del **Error! Reference source not found..Error! Reference source not found.** del Plan, incluyendo un anexo de dichos contratos y arrendamientos en el Suplemento del Plan y (z) cualquier Contrato de Ejecución y Arrendamiento No Vencido que vaya a ser rechazado mediante la aplicación del **Error! Reference source not found..Error! Reference source not found.** del Plan, notificándolo por separado a las contrapartes pertinentes de dichos acuerdos.  En la medida en que se produzcan modificaciones en dichos anexos, el Deudor notificará dichas modificaciones a las partes del Contrato a Ejecutarse y del Arrendamiento No Vencido afectados por estas.  La inclusión de un documento en los anexos del Suplemento del Plan o en cualquier notificación separada no constituirá una admisión por parte del Deudor de que dicho documento es un Contrato a Ejecutarse y Arrendamiento No Vencido o que el Deudor tiene alguna responsabilidad en virtud de este.

Salvo que se disponga lo contrario en el presente documento o que el Deudor y la contraparte aplicable lo acuerden, cada Contrato a Ejecutarse o Arrendamiento No Vencido asumido incluirá todas las modificaciones, enmiendas, suplementos, replanteamientos u otros acuerdos relacionados con ellos, y todos los derechos relacionados con ellos, si los hubiere, lo que incluye la totalidad de las servidumbres, las licencias, los permisos, los derechos, los privilegios, las inmunidades, las opciones, los derechos de preferencia y cualesquiera otros intereses.  No se considerará que las modificaciones, enmiendas, suplementos y replanteamientos a los Contratos a Ejecutarse y Arrendamientos No Vencidos anteriores a la petición que hayan sido ejecutados por la AEE durante el Caso de Título III alteren la naturaleza previa a la petición del Contrato a Ejecutarse o Arrendamiento No Vencido o la validez, prioridad o cuantía de cualquier Reclamación que pueda surgir en relación con estos.

2.     **Aprobación de rechazo o asunción de contratos a ejecutarse y arrendamientos no vencidos**

El registro de la Orden de Confirmación por el Tribunal del Título III constituirá la aprobación, conforme a las secciones 365(a) y 1123(b)(2) del Código de Quiebras, del rechazo, asunción, o asunción y cesión, según sea el caso, de un Contrato a Ejecutarse y un Arrendamiento No Vencido conforme al **Error! Reference source not found..Error! Reference source not found.** del Plan.

3.     **Inclusión**

A menos que se especifique lo contrario en los anexos del Suplemento del Plan, cada Contrato a Ejecutarse y Arrendamiento No Vencido enumerado o que se enumerará en ellos incluirá todas y cada una de las modificaciones, enmiendas, suplementos, replanteamientos u otros acuerdos realizados directa o indirectamente por cualquier acuerdo, instrumento u otro documento que afecte de algún modo a dicho Contrato a Ejecutarse y Arrendamiento No Vencido, independientemente de si dicho acuerdo, instrumento u otro documento se enumera en dicho anexo.

4.      **Subsanación de incumplimientos y objeciones a la subsanación y asunción**

En la medida en que la parte o partes no Deudoras hayan acordado un tratamiento diferente para cualquier Contrato a Ejecutarse y Arrendamiento No Vencido que deba asumirse o asumirse y cederse conforme al **Error! Reference source not found..Error! Reference source not found.** del Plan, el Deudor deberá, de conformidad con las disposiciones de la sección 1123(a)(5)(G) y 1123(b)(2) del Código de Quiebras y de acuerdo con los requisitos de la sección 365 del Código de Quiebras, en un plazo de al menos veinte (20) días antes de la Vista de Confirmación, presentar ante el Tribunal del Título III y notificar por correo de primera clase a cada una de las partes no Deudoras de los Contratos a Ejecutarse y Arrendamientos No Vencidos que deban asumirse conforme al **Error! Reference source not found..Error! Reference source not found.** del Plan, una notificación, en la que se enumerará el monto de subsanación de cada Contrato a Ejecutarse o Arrendamiento No Vencido que se vaya a asumir o asumir y ceder.  Las partes de dichos Contratos a Ejecutarse y Arrendamientos No Vencidos dispondrán de (20) días a partir de la fecha de notificación para presentar y notificar cualquier objeción a los montos de subsanación enumerados por el Deudor.  Si hay objeciones presentadas, el Tribunal del Título III realizará una vista en la fecha que fije el Tribunal del Título III.  **Se considerará que cualquier contraparte de un Contrato a Ejecutarse o Arrendamiento No Vencido que no se oponga oportunamente a la propuesta de asunción o asunción y cesión de cualquier Contrato a Ejecutarse o Arrendamiento No Vencido ha consentido dicha asunción o asunción y cesión.** No obstante, los términos y disposiciones del **Error! Reference source not found..Error! Reference source not found.** del Plan, el Deudor conservará sus derechos a rechazar cualquiera de sus Contratos a Ejecutarse y Arrendamientos no Vencidos que estén sujetos a una disputa relativa a los importes necesarios para subsanar cualquier incumplimiento hasta la Fecha de Entrada en Vigencia.

Cualquier Reclamación de Subsanación se considerará totalmente satisfecha, exonerada y condonada al momento del pago de la Reclamación de Subsanación por parte de la AEE; *teniendo en cuenta, sin embargo*, que nada de lo aquí estipulado impide que la AEE pague cualquier Reclamación de Subsanación a pesar de que la contraparte pertinente no haya presentado dicha solicitud de pago de dicha Reclamación de Subsanación.  La AEE también podrá llegar a un acuerdo sobre cualquier Reclamación de Subsanación sin necesidad de notificación adicional o acción, orden o aprobación del Tribunal del Título III.  Si existe alguna disputa en relación con cualquier Reclamación de Subsanación, la capacidad de la AEE o de cualquier cesionario para proporcionar "garantía adecuada de cumplimiento futuro" en el sentido de la sección 365 del Código de Quiebras, o cualquier otro asunto relativo a la asunción, entonces el pago de la Reclamación de Subsanación se producirá tan pronto como sea razonablemente posible después del registro de una Orden Final que resuelva dicha disputa, apruebe dicha asunción (y, en su caso, cesión), o según lo acordado por la AEE y la contraparte del Contrato a Ejecutarse o Arrendamiento No Vencido.

La asunción de cualquier Contrato a Ejecutarse o Arrendamiento No Vencido conforme al Plan o de otro modo dará lugar a la plena liberación y satisfacción de cualquier Reclamación de Subsanación, Reclamación o incumplimiento, ya sea monetario o no monetario, incluidos los incumplimientos de las disposiciones que restringen el cambio de control o la composición del interés de propiedad u otros incumplimientos relacionados con la quiebra, que surjan en virtud de cualquier Contrato a Ejecutarse o Arrendamiento No Vencido asumido en cualquier momento

300

anterior a la fecha de entrada en vigencia de la asunción. **Todas y cada una de las Evidencias de Reclamación (pero, para evitar dudas, sin incluir las Reclamaciones de Subsanación) basadas en Contratos a Ejecutarse o Arrendamientos No Vencidos que hayan sido asumidas en el Caso de Título III, incluso conforme a la Orden de Confirmación, se considerarán Rechazadas y anuladas a partir de la Fecha de Entrada en Vigencia sin necesidad de ninguna objeción al respecto ni de ninguna otra notificación o acción, orden o aprobación del Tribunal del Título III.**

5.      **Contratos y arrendamientos celebrados después de la Fecha de Petición**

Los contratos, arrendamientos y otros acuerdos celebrados por la AEE con posterioridad a la Fecha de Petición, así como los Contratos a Ejecutarse o Arrendamientos No Vencidos asumidos por la AEE, podrán ser celebrados por la AEE en el curso ordinario de sus operaciones.

6.      **Pólizas de Seguros**

Sujeto a los términos y disposiciones del **Error! Reference source not found..Error! Reference source not found.** del Plan, cada una de las Pólizas de Seguro del Deudor y cualquier acuerdo, documento o instrumento relacionado con ellas, se tratan como Contratos a Ejecutarse en virtud del Plan y se asumirán a partir de la Fecha de Entrada en Vigencia; *teniendo en cuenta, sin embargo*, que dicho tratamiento no exime, ni se interpreta que exime, a ninguna Aseguradora Monolínea con respecto a sus respectivas obligaciones para con los Tenedores de Reclamaciones en virtud de las pólizas de seguro y las leyes y los documentos rectores aplicables con respecto a ellas, según corresponda, en virtud del Plan.

7.      **Reclamaciones por Daños debido a Rechazo**

Si el rechazo de un Contrato a Ejecutarse y Arrendamiento No Vencido por parte del Deudor en virtud del presente da como resultado daños a la otra parte u otras partes de dicho contrato o arrendamiento, si no se hubiere demostrado hasta entonces mediante la presentación de una Evidencia de Reclamación, quedará prohibido a perpetuidad y no se podrá hacer valer contra el Deudor, o sus bienes o representantes, sucesores o cesionarios, incluso, entre otros, el Deudor Reorganizado, a menos que se presente una Evidencia de Reclamación ante el Tribunal del Título III y se notifique a los abogados de la Junta de Supervisión y del Deudor Reorganizado, según sea el caso, antes de que transcurran treinta (30) días de (i) la Fecha de Confirmación, y (ii) la fecha de emisión de una orden por parte del Tribunal del Título III autorizando el rechazo de un Contrato a Ejecutarse y Arrendamiento No Vencido en particular, lo que ocurra más tarde.

8.      **Obligaciones de indemnización y reembolso**

A los efectos del Plan, (i) en la medida en que sean de naturaleza ejecutiva, las obligaciones del Deudor, incluyendo, entre otras, las Pólizas de Seguro de directivos y funcionarios, de indemnizar y reembolsar a sus directivos y funcionarios que eran directivos y funcionarios, respectivamente, en o antes de la Fecha de Petición, según sea el caso, serán asumidas a partir de la Fecha de Entrada en Vigencia, y (ii) cualquier obligación de indemnización del Deudor emergente de la conducta de funcionarios y directivos durante el período comprendido entre la Fecha de Petición y después de esta, según sea el caso, serán

Reclamaciones de Gastos Administrativos; *teniendo en cuenta, sin embargo*, que bajo ninguna circunstancia el Deudor o el Deudor Reorganizado, según sea el caso, será responsable de cualquier obligación de indemnización, costo o gasto asociado con negligencia grave, fraude intencional o conducta dolosa de sus respectivos funcionarios o directivos.

9.     **Inexistencia de Fecha de Entrada en Vigencia**

Si no se produce la Fecha de Entrada en Vigencia, el Tribunal del Título III mantendrá la jurisdicción con respecto a cualquier solicitud de prórroga de la fecha límite para asumir o rechazar Contratos a Ejecutarse y Arrendamientos no Vencidos conforme a la sección 365(d)(4) del Código de Quiebras, a menos que dicha(s) fecha(s) límite haya(n) vencido.

10.     **Reserva de derechos**

Ninguna de las disposiciones del Plan o el Suplemento del Plan constituirá una admisión por parte del Deudor, el Deudor Reorganizado o cualquier otra parte de que cualquiera de dichos contratos o arrendamientos es de hecho un Contrato a Ejecutarse y Arrendamiento No Vencido o que el Deudor tiene alguna responsabilidad en virtud de estos. Si existe disputa con respecto a si un contrato o arrendamiento es o era pendiente de cumplimiento o no vencido en el momento de la asunción, el Deudor o el Deudor Reorganizado tendrá cuarenta y cinco (45) días a partir del registro de una Orden Final que resuelva dicha disputa o altere su tratamiento de dicho contrato o arrendamiento.

**H.     Fideicomiso de GUC**

1.     **Ejecución del Contrato de Fideicomiso del Fideicomiso de GUC**

En o antes de la Fecha de Entrada en Vigencia, la AEE y el Fideicomisario de GUC ejecutarán el Contrato de Fideicomiso de GUC, y tomarán todas las demás medidas necesarias para establecer el Fideicomiso de GUC y los Intereses del Fideicomiso de GUC en este, que redundarán en beneficio de los Beneficiarios del Fideicomiso de GUC, ya sea que sus Reclamaciones sean Admitidas antes, en o después de la Fecha de Entrada en Vigencia. El Contrato de Fideicomiso del Fideicomiso de GUC puede disponer facultades, deberes y potestades adicionales a las que se estipulan explícitamente en el presente, pero solo si dichas facultades, deberes y potestades no afectan la condición del Fideicomiso de GUC como "fideicomiso de liquidación" para fines del impuesto federal sobre la renta de EE.UU.

2.     **Propósito del Fideicomiso de GUC**

El Fideicomiso de GUC se establecerá con el exclusivo propósito de recibir y distribuir los Activos del Fideicomiso de GUC de conformidad con la sección 301.7701-4(d) del Reglamento del Tesoro, sin el objetivo de continuar o participar en la realización de un comercio o negocio, excepto en la medida razonablemente necesaria y coherente con el propósito de liquidación del Fideicomiso de GUC.

3.       **Activos del Fideicomiso de GUC**

El Fideicomiso de GUC consistirá de los Activos del Fideicomiso de GUC.  En la Fecha de Entrada en Vigencia, la AEE transferirá todos los Activos del Fideicomiso de GUC al Fideicomiso de GUC.  Los Activos del Fideicomiso de GUC pueden transferirse con sujeción a ciertas responsabilidades, según se disponga en el Plan o en el Contrato de Fideicomiso de GUC. Dicha transferencia estará exenta de impuestos de sellos, transferencia de bienes inmuebles, informes hipotecarios, ventas, uso, u otros Impuestos similares, conforme a la sección 1146(a) del Código de Quiebras.  Al entregarse los Activos del Fideicomiso de GUC al Fideicomiso de GUC, la AEE y sus predecesores, sucesores y cesionarios y cada una de las demás Entidades exoneradas conforme al **Error! Reference source not found.** del Plan, quedará relevada y exonerada de cualquier responsabilidad con respecto a la entrega de dichas distribuciones.

4.       **Administración del Fideicomiso de GUC**

El Fideicomiso de GUC será administrado por el Fideicomisario de GUC conforme al Contrato de Fideicomiso de GUC y el Plan.  Si hay incongruencias entre el Plan y el Contrato de Fideicomiso de GUC, el Contrato de Fideicomiso de GUC tendrá preferencia.

5.       **El Fideicomisario de GUC**

En caso de fallecimiento, incapacidad, despido o renuncia por cualquier motivo del Fideicomisario de GUC, la Junta del Fideicomiso de GUC designará a un sucesor; *teniendo en cuenta, sin embargo*, que bajo ninguna circunstancia, el Fideicomisario de GUC puede ser un directivo o funcionario de alguna subsidiaria del Fideicomiso de GUC.

6.       **Funciones del Fideicomisario de GUC**

En cumplimiento de y de conformidad con la finalidad del Fideicomiso de GUC y del Plan, y sujeto a los términos de la Orden de Confirmación, el Plan y el Contrato de Fideicomiso de GUC, así como a la supervisión de la Junta del Fideicomiso de GUC, el Fideicomisario de GUC tendrá, entre otros, los siguientes derechos, facultades y obligaciones: (i) mantener los Activos del Fideicomiso de GUC en beneficio de los Beneficiarios del Fideicomiso de GUC, ya sea que sus Reclamaciones sean Admitidas en la Fecha de Entrada en Vigencia o con posterioridad a esta; (ii) preparar y presentar (o hacer que se preparen y presenten), en y a partir de la Fecha de Entrada en Vigencia, todos los formularios, declaraciones, informes impositivos y regulatorios y otros documentos que se requieran, o que el Fideicomisario de GUC considere apropiados con respecto al Fideicomiso de GUC; (iii) mantener, administrar y distribuir oportunamente el Efectivo obtenido mediante el ejercicio de su poder y autoridad a los Beneficiarios del Fideicomiso de GUC; y (iv) no prolongar indebidamente la duración del Fideicomiso de GUC.  En todas las circunstancias, el Fideicomisario de GUC actuará teniendo en cuenta lo mejor para los intereses de los Beneficiarios del Fideicomiso de GUC y con el fin de promover el propósito del Fideicomiso de GUC.  El Fideicomisario de GUC estará obligado a responder por escrito y con prontitud a las preguntas que le formule periódicamente la Junta de Supervisión sobre los progresos realizados por el Fideicomiso de GUC en la administración de sus Activos y distribuciones y sus finanzas.

7.      **Potestad tributaria del fideicomisario de GUC para la AEE reorganizada**

En y a partir de la Fecha de Entrada en Vigencia, el Fideicomisario de GUC preparará y presentará (o hará que se preparen y presenten), en nombre de la AEE Reorganizada, todas las declaraciones de impuestos u otras declaraciones de información impositiva que deban presentarse o que el Fideicomisario del GUC considere adecuadas por otros motivos.

8.      **Transferibilidad de intereses del Fideicomiso de GUC**

Los Intereses del Fideicomiso de GUC no podrán transferirse ni cederse salvo por testamento, sucesión intestada o de pleno derecho.

9.      **Efectivo**

El Fideicomisario de GUC podrá invertir el Efectivo (incluidos los beneficios o ingresos derivados de este) tal como lo permite la sección 345 del Código de Quiebras; *teniendo en cuenta, sin embargo*, que dichas inversiones sean inversiones que se permitan hacer a un fideicomiso de liquidación tal como se define la sección 301.7701-4(d) del Reglamento del Tesoro, como se refleja en esta, o conforme a las pautas, decisiones u otras potestades de control del IRS aplicables.

10.     **Distribución de activos del Fideicomiso de GUC**

El Fideicomisario de GUC efectuará las distribuciones a los Tenedores de Reclamaciones en el Fondo de Reclamaciones No Garantizadas de conformidad con el **Error! Reference source not found.** del Plan.

11.     **Financiamiento, costos y gastos del Fideicomiso de GUC**

En la Fecha de Entrada en Vigencia, el Fideicomiso de GUC se financiará por única vez con un monto de un millón de dólares ($1,000,000). Los costos y gastos razonables del Fideicomiso de GUC, que incluyen los honorarios y gastos del Fideicomiso de GUC y los profesionales que contrate, se pagarán con los Activos del Fideicomiso de GUC, incluido el cincuenta por ciento (50.0%) de la Participación Prorrateada del Tenedor de la Reclamación de Vitol Permitida de la Recuperación de la Reclamación General sin Garantía no distribuida al Tenedor de la Reclamación de Vitol Permitida conforme al **Error! Reference source not found.** del Plan, que será retenida por el Fideicomiso de GUC. El Fideicomisario de GUC estará autorizado a utilizar el producto de los Activos del Fideicomiso de GUC para financiar el Fideicomiso de GUC, si fuera necesario.

12.     **Compensación del Fideicomisario de GUC**

La persona o personas que actúen como Fideicomisario de GUC o que lo integren tendrán derecho a una compensación razonable por un monto congruente con la de funcionarios similares en funciones similares, cuyo pago no estará sujeto a la aprobación del Tribunal del Título III.

13.     **Contratación de profesionales/empleados por el Fideicomisario de GUC**

Sujeto a la aprobación y consentimiento de la Junta del Fideicomiso de GUC, el Fideicomiso de GUC puede contratar y compensar abogados, otros profesionales y empleados para brindar asistencia a la Junta del Fideicomiso de GUC en los términos que el Fideicomisario de GUC considere apropiados sin la aprobación del Tribunal del Título III.

14.     **Tratamiento del impuesto federal sobre la renta aplicable al Fideicomiso de GUC**

a)      **Activos del Fideicomiso de GUC tratados como de propiedad de los Acreedores.** Para los fines del impuesto federal sobre la renta de EE.UU., todas las partes (incluidos, entre otros, el Deudor, el Fideicomisario de GUC y los Beneficiarios del Fideicomiso de GUC) tratarán la transferencia de los Activos del Fideicomiso de GUC al Fideicomiso de GUC como (1) una transferencia de los Activos del Fideicomiso de GUC (sujeta a cualquier obligación relacionada con dichos Activos) directamente a los Beneficiarios del Fideicomiso de GUC, seguida de (2) la transferencia por parte de dichos beneficiarios al Fideicomiso de GUC de los Activos del Fideicomiso GUC a cambio de los Intereses del Fideicomiso de GUC.  En consecuencia, los Beneficiarios del Fideicomiso de GUC recibirán el mismo tratamiento a efectos del impuesto federal sobre la renta de EE.UU. que el de los concedentes y propietarios de su participación respectiva de los Activos del Fideicomiso de GUC.  El tratamiento anterior también se aplicará a los impuestos sobre la renta estatales y locales, dentro de lo permitido por la ley aplicable.

b)      **Informes de impuestos.**

(i)      El Fideicomisario de GUC preparará y presentará (o hará que se preparen y presenten) declaraciones de impuestos para el Fideicomiso de GUC tratando al Fideicomiso de GUC como un fideicomiso concedente conforme a la sección 1.671-4(a) del Reglamento del Tesoro y conforme al **Error! Reference source not found..Error! Reference source not found.** del Plan.  El Fideicomisario de GUC también *enviará* anualmente una declaración por separado con respecto a los ingresos y gastos del Fideicomiso de GUC según corresponda a efectos del impuesto federal sobre la renta de EE.UU. a cada Tenedor de Intereses en el Fideicomiso de GUC e instruirá a todos esos Tenedores para que utilicen dicha información en la preparación de sus declaraciones del impuesto federal sobre la renta de EE.UU. o para que reenvíen la información correspondiente a los beneficiarios efectivos subyacentes de dicho Tenedor con instrucciones para que utilicen dicha información en la preparación de sus declaraciones del impuesto federal sobre la renta de EE.UU.  El Fideicomisario de GUC también presentará (o hará que se presente) cualquier otra declaración o divulgación relacionada con el Fideicomiso de

305

Acciones de Reintegración que sea requerida por cualquier unidad gubernamental.

(ii) El Fideicomisario de GUC tasará entonces de buena fe todos los demás Activos del Fideicomiso de GUC, y dará a conocer todos esos valores periódicamente, en la medida en que sea pertinente, y dichos valores serán utilizados de manera coherente por todas las partes del Fideicomiso de GUC (lo que incluye, ***entre otros***, el Deudor, el Fideicomisario de GUC y los Beneficiarios del Fideicomiso de GUC) para todos los efectos del impuesto sobre la renta federal de EE.UU.

(iii) Las asignaciones del Fideicomiso de GUC que sean ingresos tributables entre los Beneficiarios del Fideicomiso de GUC serán determinadas por referencia a la manera en que se distribuya un monto de Efectivo que represente el ingreso tributable (si se permitiera distribuir dicho Efectivo en ese momento) si, inmediatamente antes de la distribución, el Fideicomiso de GUC hubiera distribuido todos sus activos a los tenedores de los Intereses del Fideicomiso de GUC, ajustado por ingresos y pérdidas tributables anteriores y tomando en cuenta todas las distribuciones anteriores y concurrentes del Fideicomiso de GUC. Del mismo modo, la pérdida imponible del Fideicomiso de GUC se asignará por referencia a la manera en que una pérdida económica será soportada inmediatamente después de una hipotética distribución de liquidación de los Activos remanentes del Fideicomiso de GUC. El valor impositivo en libros de los Activos del Fideicomiso de GUC a los efectos de este párrafo será equivalente a su valor justo de mercado en la Fecha de Entrada en Vigencia, ajustada según los principios contables impositivos del Código de Rentas Internas, los Reglamentos del Tesoro aplicable y otras autoridades y pronunciamientos administrativos y judiciales aplicables.

(iv) Sujeto a la orientación del IRS o un tribunal con jurisdicción competente que disponga lo contrario (lo que incluye la recepción por parte del Fideicomisario de GUC de una declaración del IRS sobre un tema de legislación impositiva ("private letter ruling") si el Fideicomisario de GUC solicita una, o la recepción de una decisión adversa del IRS en una auditoría si no es objetada por el Fideicomisario de GUC), el Fideicomisario de GUC deberá (A) optar oportunamente por tratar cualquier reserva para los Activos del Fideicomiso de GUC como un "fondo de propiedad en litigio" regido por la sección 1.468B-9 del Reglamento del Tesoro, y (B) dentro de lo permitido por la ley aplicable, las declaraciones de impuestos sobre la renta estatales y locales deben seguir las indicaciones anteriores. Todas las demás partes (lo que incluye el

Fideicomisario de GUC y los Beneficiarios del Fideicomiso de GUC) deben hacer declaraciones de impuestos federales, estatales y locales sobre la renta de EE.UU. de manera congruente con lo anterior.

(v)     El Fideicomisario de GUC será responsable del pago, con cargo a los Activos del Fideicomiso de GUC, de cualquier impuesto gravado sobre el fideicomiso o sus Activos. En caso, y en la medida en que cualquier Efectivo retenido por cuenta de las Reclamaciones en Disputa fuera insuficiente para pagar la parte de los Impuestos atribuible a los ingresos tributables emergentes de los activos asignables a, o retenidos por cuenta de, las Reclamaciones en Disputa, los impuestos pueden (i) reembolsarse a partir de cualquier monto en Efectivo subsiguiente retenido por cuenta de las Reclamaciones en Disputa, o (ii) en caso de que las Reclamaciones en Disputa se hayan resuelto, deducirse de los montos que de otra manera serían distribuibles por el Fideicomisario de GUC como resultado de la resolución de las Reclamaciones en Disputa.

c)     **Retenciones impositivas del Fideicomisario de GUC.** El Fideicomisario de GUC podrá retener y pagar a la autoridad fiscal competente todos los montos que deban retenerse conforme al Código de Rentas Internas o cualquier disposición de cualquier ley tributaria extranjera, estatal o local con respecto a cualquier pago o distribución a los tenedores de Intereses del Fideicomiso de GUC. Todos los montos retenidos y pagados a la autoridad fiscal correspondiente (o depositados en una cuenta de plica pendientes de resolución de la necesidad de la retención) serán tratados como montos distribuidos a los tenedores de los Intereses del Fideicomiso de GUC para todos los fines del Contrato de Fideicomiso de GUC, en el entendimiento de que cualquier monto retenido reducirá el monto efectivamente materializado por el tenedor correspondiente al momento de la distribución. El Fideicomisario de GUC estará autorizado a reunir información impositiva de los tenedores de los Intereses del Fideicomiso de GUC (incluso, entre otros, sus números del seguro social u otros números de identificación impositiva) que, a su exclusivo criterio, el Fideicomisario de GUC considere necesario para ejecutar el Plan, la Orden de Confirmación, y el Contrato de Fideicomiso de GUC. Para recibir distribuciones de conformidad con el Plan, todos los tenedores de Intereses del Fideicomiso de GUC deberán identificarse ante el Fideicomisario de GUC y proporcionar información impositiva y los aspectos específicos de sus participaciones en la medida en que el Fideicomisario de GUC lo considere oportuno, en la forma y de conformidad con los procedimientos que en cada momento establezca el Fideicomisario de GUC a estos efectos. Este requisito de identificación se aplica en general a todos los tenedores de Intereses del Fideicomiso de GUC, incluso aquellos que tienen sus títulos valores depositados en formato electrónico en las cuentas de sus corredores. El Fideicomisario de GUC puede rehusarse a realizar una distribución a cualquier tenedor de un Interés del Fideicomiso de GUC que no

le proporcione la información de manera oportuna, y hasta que se proporcione dicha información, y puede tratar los Intereses del Fideicomiso de GUC como en disputa; teniendo en cuenta, sin embargo, que si el Fideicomisario de GUC no recibe la información dentro de los seis (6) meses de la petición original para entregarla, no se harán distribuciones adicionales al tenedor del Interés del Fideicomiso de GUC; y, asimismo, ante la entrega de la información por parte de un tenedor de un Interés del Fideicomiso de GUC, el Fideicomisario de GUC hará una distribución a la que el tenedor del Interés del Fideicomiso de GUC tenga derecho, sin intereses adicionales ocasionados por la demora de dicho tenedor en la entrega de la información impositiva; y, además, si el Fideicomisario de GUC no retiene montos recibidos o distribuibles con respecto al tenedor y el Fideicomisario de GUC más tarde es hallado responsable del monto de la retención, dicho tenedor reembolsará al Fideicomisario de GUC dicho pasivo (en la medida en que los montos hayan sido realmente distribuidos a dicho tenedor).

15.   **Disolución del Fideicomiso de GUC**

El Fideicomisario de GUC y el Fideicomiso de GUC serán relevados o disueltos, según sea el caso, cuando ocurra una de las siguientes opciones: (i) todos los Activos del Fideicomiso de GUC hayan sido distribuidos conforme al Plan y el Contrato de Fideicomiso de GUC, y (ii) todas las distribuciones que el Fideicomisario de GUC debe realizar de conformidad con el Plan y el Contrato de Fideicomiso de GUC hayan sido realizadas, lo que ocurra primero.  Tras la disolución del Fideicomiso de GUC, todos los activos restantes del fideicomiso de GUC, si los hubiera, revertirán a la AEE.

16.   **Indemnización del Fideicomisario de GUC y de los miembros de la Junta del Fideicomiso de GUC**

El Fideicomisario de GUC o la(s) persona(s) que lo compongan, según el caso, la Junta del Fideicomiso de GUC, los miembros de la Junta del Fideicomiso de la GUC y sus respectivos y sus empleados, agentes y profesionales no serán legalmente responsables ante los Beneficiarios del Fideicomiso de GUC por acciones ejecutadas u omitidas en su carácter de, o en nombre de, el Fideicomisario de GUC o de la Junta del Fideicomiso de GUC, según corresponda, salvo actos emergentes de su propia negligencia grave o conducta dolosa, y cada uno de ellos tendrá derecho a indemnización y reembolso por el Fideicomiso de GUC de honorarios y gastos emergentes de la defensa de acciones u omisiones en su carácter de, o en nombre del Fideicomisario de GUC o de la Junta del Fideicomiso de GUC, según corresponda, salvo acciones u omisiones que involucren negligencia grave o conducta dolosa.  Cualquier reclamación de indemnización del Fideicomisario de GUC, la Junta del Fideicomiso de GUC, los miembros de la Junta del Fideicomiso de GUC y las otras partes con derecho a indemnización bajo esta subsección será pagada únicamente a partir de los Activos del Fideicomiso de GUC y tendrá derecho a una distribución prioritaria de estos, antes de los Intereses del Fideicomiso de GUC y cualquier otra reclamación o interés en dichos activos.  El Fideicomisario de GUC, la Junta del Fideicomiso de GUC y los miembros de la Junta del Fideicomiso de GUC tendrán derecho a actuar, de buena fe, en base al asesoramiento de sus profesionales contratados.

I.      **Fideicomiso de Acciones de Anulación**

1.      **Celebración del Contrato de Fideicomiso de Acciones de Anulación**

En o antes de la Fecha de Vigencia, la AEE y el Fideicomisario de Acciones de Anulación ejecutarán el Contrato de Fideicomiso de Acciones de Anulación, y tomarán todas las demás medidas necesarias para establecer el Fideicomiso de Acciones de Anulación y los Intereses del Fideicomiso de Acciones de Anulación en este, que serán para el beneficio de los Beneficiarios del Fideicomiso de Acciones de Anulación, ya sea que sus Reclamaciones sean Admitidas antes, en o después de la Fecha de Entrada en Vigencia.  El Contrato de Fideicomiso de Acciones de Anulación puede disponer facultades, deberes y potestades adicionales a las que se estipulan explícitamente en el presente, pero solo si dichas facultades, deberes y potestades no afectan la condición del Fideicomiso de Acciones de Anulación como "fideicomiso de liquidación" para fines del impuesto federal sobre la renta de EE.UU.

2.      **Propósito del Fideicomiso de Acciones de Anulación**

El Fideicomiso de Acciones de Anulación se establecerá con el exclusivo propósito de ejercer las Acciones de Anulación y distribuir sus activos, de conformidad con la sección 301.7701-4(d) del Reglamento del Tesoro, sin el objetivo de continuar o participar en la realización de un comercio o negocio, excepto en la medida razonablemente necesaria y coherente con el propósito de liquidación del Fideicomiso de Acciones de Anulación.

3.      **Activos del Fideicomiso de Acciones de Anulación**

El Fideicomiso de Acciones de Anulación consistirá de los Activos del Fideicomiso de Acciones de Anulación.  En la Fecha de Entrada en Vigencia, la AEE transferirán todos los Activos del Fideicomiso de Acciones de Anulación al Fideicomiso de Acciones de Anulación. Los Activos del Fideicomiso de Acciones de Anulación pueden transferirse con sujeción a ciertas responsabilidades, según se disponga en el Plan o en el Contrato de Fideicomiso de Acciones de Anulación.  Dicha transferencia estará exenta de impuestos de sellos, transferencia de bienes inmuebles, informes hipotecarios, ventas, uso, u otros Impuestos similares, conforme a la sección 1146(a) del Código de Quiebras.  Al entregarse los Activos del Fideicomiso de Acciones de Anulación al Fideicomiso de Acciones de Anulación, la AEE y sus predecesores, sucesores y cesionarios y cada una de las demás Entidades exoneradas conforme al **Error! Reference source not found.** del Plan, quedará relevada y exonerada de cualquier responsabilidad con respecto a la entrega de dichas distribuciones.

4.      **Administración del Fideicomiso de Acciones de Anulación**

El Fideicomiso de Acciones de Anulación será administrado por el Fideicomisario de Acciones de Anulación conforme al Contrato de Fideicomiso de Acciones de Anulación y el Plan.  Si hay incongruencias entre el Plan y el Contrato de Fideicomiso de Acciones de Anulación, el Contrato de Fideicomiso de Acciones de Anulación tendrá preferencia.

5.      **Fideicomisario de Acciones de Anulación**

En caso de fallecimiento, incapacidad, despido o renuncia por cualquier motivo del Fideicomisario de Acciones de Anulación, la Junta del Fideicomiso de Acciones de Anulación designará a un sucesor; *teniendo en cuenta, sin embargo*, que bajo ninguna circunstancia, el Fideicomisario de Acciones de Anulación puede ser un directivo o funcionario de alguna subsidiaria del Fideicomiso de Acciones de Anulación.

6.      **Funciones del fideicomisario de acciones de anulación**

En cumplimiento de y de conformidad con la finalidad del Fideicomiso de Acciones de Anulación y del Plan, y sujeto a los términos de la Orden de Confirmación, el Plan y el Contrato de Fideicomiso de Acciones de Anulación, así como a la supervisión de la Junta del Fideicomiso de Acciones de Anulación, el Fideicomisario de Acciones de Anulación tendrá, entre otros, los siguientes derechos, facultades y obligaciones: (i) retener, administrar, convertir en Efectivo y distribuir los Activos del Fideicomiso de Acciones de Anulación al Fideicomiso de GUC, lo que incluye el litigio y la resolución de las reclamaciones correspondientes al Fideicomiso de Acciones de Anulación; (ii) retener los Activos del Fideicomiso de Acciones de Anulación para beneficio de los Beneficiarios del Fideicomiso de Acciones de Anulación, independientemente de que sus Reclamaciones sean Permitidas en o después de la Fecha de Entrada en Vigencia; (iii) según el criterio comercial razonable del Fideicomisario de las Acciones de Anulación, investigar, litigar, resolver y/o abandonar derechos, Causas de Acción o litigios del Fideicomiso de las Acciones de Anulación; (iv) preparar y presentar (o hacer que se preparen y presenten), en o a partir de la Fecha de Entrada en Vigencia, todos los formularios, declaraciones, informes impositivos y regulatorios y otros documentos requeridos, o que el Fideicomisario de las Acciones de Anulación considere apropiados en relación con el Fideicomiso de las Acciones de Anulación; (v) según el criterio comercial razonable del Fideicomisario de las Acciones de Anulación, controlar, procesar y/o resolver en nombre del Fideicomiso de las Acciones de Anulación, las objeciones a las Reclamaciones de las que será responsable el Fideicomisario de las Acciones de Anulación; (vi) retener, administrar y distribuir oportunamente al Fideicomisario de GUC los Activos del Fideicomiso de Acciones de Anulación, en efectivo o de otra forma, obtenidos a través de ejercicio de sus facultades y su potestad; y (vii) no prolongar indebidamente la duración del Fideicomiso de Acciones de Anulación.     En todas las circunstancias, el Fideicomisario de Acciones de Anulación actuará teniendo en cuenta lo mejor para los intereses de los Beneficiarios del Fideicomiso de Acciones de Anulación y con el fin de promover el propósito del Fideicomiso de Acciones de Anulación.     El Fideicomisario de Acciones de Anulación estará obligado a responder por escrito y con prontitud a las preguntas que le formule periódicamente la Junta de Supervisión sobre los progresos realizados por el Fideicomiso de Acciones de Anulación en la administración de sus activos y distribuciones y sus finanzas.

7.      **Potestad tributaria del Fideicomisario de Acciones de Anulación para la AEE Reorganizada**

En y a partir de la Fecha de Entrada en Vigencia, el Fideicomisario de Acciones de Anulación preparará y presentará (o hará que se preparen y presenten), en nombre de la AEE Reorganizada, todas las declaraciones de impuestos u otras declaraciones de información

impositiva que deban presentarse o que el Fideicomisario del Acciones de Anulación considere adecuadas por otros motivos.

8.   **Transferibilidad de intereses del Fideicomiso de Acciones de Anulación**

Los Intereses del Fideicomiso de Acciones de Anulación no podrán transferirse ni cederse salvo por testamento, sucesión intestada o de pleno derecho.

9.   **Efectivo**

El Fideicomisario de Acciones de Anulación podrá invertir el Efectivo (incluidos los beneficios o ingresos derivados de este) tal como lo permite la sección 345 del Código de Quiebras; *teniendo en cuenta, sin embargo*, que dichas inversiones sean inversiones que se permitan hacer a un fideicomiso de liquidación tal como se define la sección 301.7701-4(d) del Reglamento del Tesoro, como se refleja en esta, o conforme a las pautas, decisiones u otras potestades de control del IRS aplicables.

10.   **Distribución de activos del Fideicomiso de Acciones de Anulación**

El Fideicomisario de Acciones de Anulación distribuirá mensualmente al Fideicomiso de GUC todo el Efectivo sin restricciones disponible (incluido cualquier Efectivo recibido de la AEE en la Fecha de Entrada en Vigencia), excepto (i) Efectivo reservado conforme al Contrato de Fideicomiso de Acciones de Anulación para financiar las actividades del Fideicomiso de Acciones de Anulación, (ii) las cantidades asignables o retenidas para pagar gastos razonables incurridos o previstos (incluidos, entre otros, los impuestos que graven o que deba pagar el Fideicomiso de Acciones de Anulación con respecto a los Activos del Fideicomiso de Acciones de Anulación); *teniendo en cuenta, sin embargo*, que el Fideicomisario de Acciones de Anulación no estará obligado a realizar una distribución conforme al **Error! Reference source not found.**.**Error! Reference source not found.**  del Plan si el monto neto total del Efectivo sin restricciones disponible para distribución (teniendo en cuenta las exclusiones anteriores) haría que la distribución sea impracticable según lo determine razonablemente el Fideicomisario de Acciones de Anulación, con el consentimiento de la Junta del Fideicomiso de Acciones de Anulación, de acuerdo con la ley aplicable, y siempre que dicho monto total sea inferior a un millón de dólares ($1,000,000).

11.   **Financiamiento, costos y gastos del Fideicomiso de Acciones de Anulación**

En la Fecha de Entrada en Vigencia, el Fideicomiso de Acciones de Anulación se financiará por única vez con un monto de un millón de dólares ($1,000,000).  Los costos y gastos razonables del Fideicomiso de Acciones de Anulación, que incluyen los honorarios y gastos del Fideicomisario de Acciones de Anulación y los profesionales que contrate, se pagará con fondos obtenidos de los Activos del Fideicomiso de Acciones de Anulación.  Los honorarios y gastos incurridos en relación con el enjuiciamiento y conciliación de cualquier Acción de Anulación se considerarán costos y gastos del Fideicomiso de Acciones de Anulación.  El Fideicomisario de Acciones de Anulación estará autorizado a utilizar el producto de los activos del fideicomiso para financiar el Fideicomiso de Acciones de Anulación, si fuera necesario.

12.      **Compensación del Fideicomisario de Acciones de Anulación**

La persona o personas que actúen como Fideicomisario de Acciones de Anulación o que lo integren tendrán derecho a una compensación razonable por un monto congruente con la de funcionarios similares en funciones similares, cuyo pago no estará sujeto a la aprobación del Tribunal del Título III.

13.      **Contratación de profesionales/empleados por el Fideicomisario de Acciones de Anulación**

Sujeto a la aprobación y consentimiento de la Junta del Fideicomiso de Acciones de Anulación, el Fideicomiso de Acciones de Anulación puede contratar y compensar abogados, otros profesionales y empleados para brindar asistencia a la Junta del Fideicomiso de Acciones de Anulación en los términos que el Fideicomisario de Acciones de Anulación considere apropiados sin la aprobación del Tribunal del Título III.

14.      **Tratamiento del impuesto federal a la renta aplicable al Fideicomiso de Acciones de Anulación**

a)      **Activos del Fideicomiso de Acciones de Anulación tratado como de propiedad de los Acreedores.** Para todos los fines del impuesto federal sobre la renta de EE.UU., todas las partes (incluidos, entre otros, el Deudor, el Fideicomisario de Acciones de Anulación y los Beneficiarios del Fideicomiso de Acciones de Anulación) tratarán la transferencia de los Activos del Fideicomiso de Acciones de Anulación al Fideicomiso de Acciones de Anulación como (1) una transferencia de los Activos del Fideicomiso de Acciones de Anulación (sujeta a cualquier obligación relacionada con dichos Activos) directamente a los Beneficiarios del Fideicomiso de Acciones de Anulación, seguida de (2) la transferencia por parte de dichos beneficiarios al Fideicomiso de Acciones de Anulación de los Activos del Fideicomiso de Acciones de Anulación a cambio de los Intereses del Fideicomiso de Acciones de Anulación. En consecuencia, los Beneficiarios del Fideicomiso de Acciones de Anulación recibirán el mismo tratamiento a efectos del impuesto federal sobre la renta de EE.UU. que el de los concedentes y propietarios de su participación respectiva de los Activos del Fideicomiso de Acciones de Anulación. El tratamiento anterior también se aplicará a los impuestos sobre la renta estatales y locales, dentro de lo permitido por la ley aplicable.

b)      **Informes de impuestos.**

(i)      El Fideicomisario de Acciones de Anulación preparará y presentará (o hará que se preparen y presenten) declaraciones de impuestos para el Fideicomiso de Acciones de Anulación tratando al Fideicomiso de Acciones de Anulación como un fideicomiso concedente conforme a la sección 1.671-4(a) del Reglamento del Tesoro y conforme al **Error! Reference source not found..Error! Reference source not found.** del Plan. El Fideicomisario de

312

Acciones de Anulación también enviará anualmente una declaración por separado con respecto a los ingresos y gastos del Fideicomiso de Acciones de Anulación según corresponda a efectos del impuesto federal sobre la renta de EE.UU. a cada Tenedor de Intereses en el Fideicomiso de Acciones de Anulación e instruirá a todos esos Tenedores para que utilicen dicha información en la preparación de sus declaraciones del impuesto federal sobre la renta de EE.UU. o para que reenvíen la información correspondiente a los beneficiarios efectivos subyacentes de dicho Tenedor con instrucciones para que utilicen dicha información en la preparación de sus declaraciones del impuesto federal sobre la renta de EE.UU. El Fideicomisario de Acciones de Anulación también presentará (o hará que se presente) cualquier otra declaración o divulgación relacionada con el Fideicomiso de Acciones de Anulación que sea requerida por cualquier unidad gubernamental.

(ii) El Fideicomisario de Acciones de Anulación tasará entonces de buena fe todos los demás Activos del Fideicomiso de Acciones de Anulación, y dará a conocer todos esos valores periódicamente, en la medida en que sea pertinente, y dichos valores serán utilizados de manera coherente por todas las partes del Fideicomiso de Acciones de Anulación (lo que incluye, entre otros, el Deudor, el Fideicomisario de Acciones de Anulación y los Beneficiarios del Fideicomiso de Acciones de Anulación) para todos los efectos del impuesto sobre la renta federal de EE.UU.

(iii) Las asignaciones del Fideicomiso de Acciones de Anulación que sean ingresos tributables entre los Beneficiarios del Fideicomiso de Acciones de Anulación serán determinadas por referencia a la manera en que se distribuya un monto de Efectivo que represente el ingreso tributable (si se permitiera distribuir dicho Efectivo en ese momento) si, inmediatamente antes de la distribución, el Fideicomiso de Acciones de Anulación hubiera distribuido todos sus activos a los tenedores de los Intereses del Fideicomiso de Acciones de Anulación, ajustado por ingresos y pérdidas tributables anteriores y tomando en cuenta todas las distribuciones anteriores y concurrentes del Fideicomiso de Acciones de Anulación. Del mismo modo, la pérdida imponible del Fideicomiso de Acciones de Anulación se asignará por referencia a la manera en que una pérdida económica será soportada inmediatamente después de una hipotética distribución de liquidación de los Activos remanentes del Fideicomiso de Acciones de Anulación. El valor impositivo en libros de los Activos del Fideicomiso de Acciones de Anulación a los efectos de este párrafo será equivalente a su valor justo de mercado en la Fecha de Entrada en Vigencia, ajustada según los principios

contables impositivos del Código de Rentas Internas, los
Reglamentos del Tesoro aplicables y otras autoridades y
pronunciamientos administrativos y judiciales aplicables.

(iv)  Sujeto a la orientación del IRS o un tribunal con jurisdicción
competente que disponga lo contrario (lo que incluye la recepción
por parte del Fideicomisario de Acciones de Anulación de una
declaración del IRS sobre un tema de legislación impositiva
("private letter ruling") si el Fideicomisario de Acciones de
Anulación solicita una, o la recepción de una decisión adversa del
IRS en una auditoría si no es objetada por el Fideicomisario de
Acciones de Anulación), el Fideicomisario de Acciones de
Anulación deberá (A) optar oportunamente por tratar cualquier
reserva para los Activos del Fideicomiso de Acciones de
Anulación como un "fondo de propiedad en litigio" regido por la
sección 1.468B-9 del Reglamento del Tesoro, y (B) dentro de lo
permitido por la ley aplicable, las declaraciones de impuestos sobre
la renta estatales y locales deben seguir las indicaciones anteriores.
Todas las partes (lo que incluye el Fideicomisario de Acciones de
Anulación y los Beneficiarios del Fideicomiso de Acciones de
Anulación) deben hacer declaraciones de impuestos federales,
estatales y locales sobre la renta de EE.UU. de manera congruente
con lo anterior.

(v)  El Fideicomisario de Acciones de Anulación será responsable del
pago, con cargo a los Activos del Fideicomiso de Acciones de
Anulación, de cualquier impuesto gravado sobre el fideicomiso o
sus Activos.  En caso, y en la medida en que cualquier Efectivo
retenido por cuenta de las Reclamaciones en Disputa fuera
insuficiente para pagar la parte de los Impuestos atribuible a los
ingresos tributables emergentes de los activos asignables a, o
retenidos por cuenta de, las Reclamaciones en Disputa, los
impuestos pueden (i) reembolsarse a partir de cualquier monto en
Efectivo subsiguiente retenido por cuenta de las Reclamaciones en
Disputa, o (ii) en caso de que las Reclamaciones en Disputa se
hayan resuelto, deducirse de los montos que de otra manera serían
distribuibles por el Fideicomisario de Acciones de Anulación como
resultado de la resolución de las Reclamaciones en Disputa.

c)  **Retenciones impositivas del Fideicomisario de Acciones
de Anulación.**  El Fideicomisario de Acciones de Anulación podrá retener y
pagar a la autoridad fiscal competente todos los montos que deban retenerse
conforme al Código de Rentas Internas o de cualquier disposición de cualquier ley
tributaria extranjera, estatal o local con respecto a cualquier pago o distribución a
los tenedores de Intereses del Fideicomiso de Acciones de Anulación.  Todos los
montos retenidos y pagados a la autoridad fiscal correspondiente (o depositados
en una cuenta de plica pendientes de resolución de la necesidad de la retención)

314

serán tratados como montos distribuidos a los tenedores de los Intereses del
Fideicomiso de Acciones de Anulación para todos los fines del Contrato de
Fideicomiso de Acciones de Anulación, en el entendimiento de que cualquier
monto retenido reducirá el monto efectivamente materializado por el tenedor
correspondiente al momento de la distribución. El Fideicomisario de Acciones de
Anulación estará autorizado a reunir información impositiva de los tenedores de
los Intereses del Fideicomiso de Acciones de Anulación (incluso, entre otros, sus
números del seguro social u otros números de identificación impositiva) que, a su
exclusivo criterio, el Fideicomisario de Acciones de Anulación considere
necesaria para ejecutar el Plan, la Orden de Confirmación, y el Contrato de
Fideicomiso de Acciones de Anulación.   Para recibir distribuciones de
conformidad con el Plan, todos los tenedores de Intereses del Fideicomiso de
Acciones de Anulación deberán identificarse ante el Fideicomisario de Acciones
de Anulación y proporcionar información impositiva y los aspectos específicos de
sus participaciones en la medida en que el Fideicomisario de Acciones de
Anulación lo considere oportuno, en la forma y de conformidad con los
procedimientos que en cada momento establezca el Fideicomisario de Acciones
de Anulación a estos efectos. Este requisito de identificación se aplica en general
a todos los tenedores de Intereses del Fideicomiso de Acciones de Anulación,
incluso aquellos que tienen sus títulos valores depositados en formato electrónico
en las cuentas de sus corredores. El Fideicomisario de Acciones de Anulación
puede rehusarse a realizar una distribución a cualquier tenedor de un Interés del
Fideicomiso de Acciones de Anulación que no le proporcione la información de
manera oportuna, y hasta que se proporcione dicha información, y puede tratar los
Intereses del Fideicomiso de Acciones de Anulación como en disputa; teniendo en
cuenta, sin embargo, que si el Fideicomisario de Acciones de Anulación no recibe
la información dentro de los seis (6) meses de la petición original para entregarla,
no se harán distribuciones adicionales al tenedor del Interés del Fideicomiso de
Acciones de Anulación; y, asimismo, ante la entrega de la información por parte
de un tenedor de un Interés del Fideicomiso de Acciones de Anulación, el
Fideicomisario de Acciones de Anulación hará una distribución a la que el
tenedor del Interés del Fideicomiso de Acciones de Anulación tenga derecho, sin
intereses adicionales ocasionados por la demora de dicho tenedor en la entrega de
la información impositiva; y, además, si el Fideicomisario de Acciones de
Anulación no retiene montos recibidos o distribuibles con respecto al tenedor y el
Fideicomisario de Acciones de Anulación más tarde es hallado responsable del
monto de la retención, dicho tenedor reembolsará al Fideicomisario de Acciones
de Anulación dicho pasivo (en la medida en que los montos hayan sido realmente
distribuidos a dicho tenedor).

15.   **Disolución del Fideicomiso de Acciones de Anulación**

El Fideicomisario de Acciones de Anulación y el Fideicomiso de Acciones de Anulación
serán relevados o disueltos, según sea el caso, cuando ocurra una de las siguientes opciones, la
que ocurra primero: (i) todos los Activos del Fideicomiso de Acciones de Anulación hayan sido
distribuidos conforme al Plan y al Contrato de Fideicomiso de Acciones de Anulación, (ii) el
Fideicomisario de Acciones de Anulación determina, con el consentimiento de la Junta del

Fideicomiso de Acciones de Anulación, que es improbable que la administración de cualquier Activo del Fideicomiso de Acciones de Anulación remanente rinda productos adicionales suficientes del Fideicomiso de Acciones de Anulación para justificar trámites adicionales, entre otras cosas porque el gasto de la administración del Fideicomiso de Acciones de Anulación para hacer una distribución final a sus beneficiarios probablemente supere el valor de los activos remanentes en el Fideicomiso de Acciones de Anulación, y (iii) todas las distribuciones que el Fideicomisario de Acciones de Anulación debe realizar de conformidad con el Plan y el Contrato de Fideicomiso de Acciones de Anulación hayan sido realizadas.   Tras la disolución del Fideicomiso de Acciones de Anulación, todos los activos restantes del Fideicomiso de Acciones de Anulación, si los hubiera, se transferirán al Fideicomiso de GUC.

16.   **Indemnización del Fideicomisario de Acciones de Anulación y de los miembros del Fondo del Fideicomisario de Acciones de Anulación**

El Fideicomisario de Acciones de Anulación o la(s) persona(s) que lo compongan, según el caso, la Junta del Fideicomiso de las Acciones de Anulación, los miembros de la Junta del Fideicomiso de Acciones de Anulación y sus respectivos empleados, agentes y profesionales no serán legalmente responsables ante los Beneficiarios del Fideicomiso de Acciones de Anulación por acciones ejecutadas u omitidas en su carácter de, o en nombre del, Fideicomisario de Acciones de Anulación o de la Junta del Fideicomiso de Acciones de Anulación, salvo actos emergentes de su propia negligencia grave o conducta dolosa, y cada uno de ellos tendrá derecho a indemnización y reembolso por el Fideicomiso de Acciones de Anulación de honorarios y gastos emergentes de la defensa de acciones u omisiones en su carácter de, o en nombre del, Fideicomisario de Acciones de Anulación o de la Junta del Fideicomiso de Acciones de Anulación, según corresponda, salvo acciones u omisiones que involucren negligencia grave o conducta dolosa.   Cualquier reclamación de indemnización del Fideicomisario de Acciones de Anulación, la Junta del Fideicomiso de Acciones de Anulación, los miembros de la Junta del Fideicomiso de Acciones de Anulación y las otras partes con derecho a indemnización bajo esta subsección será pagada únicamente a partir de los Activos del Fideicomiso de Acciones de Anulación y tendrá derecho a una distribución prioritaria de estos, antes de los Intereses del Fideicomiso de Acciones de Anulación y cualquier otra reclamación o interés en dichos activos. El Fideicomisario de Acciones de Anulación, la Junta del Fideicomiso de Acciones de Anulación y los miembros de la Junta del Fideicomiso de Acciones de Anulación tendrán derecho a actuar, de buena fe, en base al asesoramiento de sus profesionales contratados.

**J.   Disposiciones que rigen las distribuciones**

1.   **Designación del Agente de Distribución**

La AEE, la AEE Reorganizada, el Fideicomisario de GUC y/o el Agente de Convocatoria actuarán como Agente de Distribución o podrán emplear o contratar a otras Entidades, para actuar como Agente de Distribución o para asistir o realizar las distribuciones requeridas por el Plan.   Cualquier Agente de Distribución designado por la AEE o el Fideicomisario de GUC actuará sin prestar fianza.   Aparte de lo específicamente establecido en el Plan, el Agente de Distribución hará todas las distribuciones requeridas en virtud del Plan.   Salvo que se disponga lo contrario en el presente documento, todas las distribuciones en virtud del Plan serán efectuadas por el Agente de Distribución.

2.    **Distribuciones por cuenta de las Reclamaciones Permitidas a la Fecha de Entrada en Vigencia**

Salvo que se disponga lo contrario en este documento, en una Orden Final, o según lo acuerden la AEE y el Tenedor de la Reclamación correspondiente, en la primera Fecha de Distribución, el Agente de Distribución hará las distribuciones iniciales en virtud del Plan a cuenta de las Reclamaciones Permitidas en la Fecha de Entrada en Vigencia o tan pronto como sea posible después de esta, sujeto al derecho de la AEE a objetar las Reclamaciones; *teniendo en cuenta, sin embargo*, que las Reclamaciones de Gastos Administrativos Permitidas con respecto a responsabilidades incurridas por la AEE en el curso ordinario de sus operaciones durante el Caso de Título III o asumidas por la AEE con anterioridad a la Fecha de Entrada en Vigencia se paguen o ejecuten en el curso ordinario de sus operaciones de conformidad con los términos y condiciones de cualquier acuerdo de control, curso ordinario de los negocios, curso de las operaciones o práctica del sector; *teniendo en cuenta, sin embargo*, que el Agente de Distribución pueda distribuir las Comisiones de los Acreedores del AAP de los Prestamistas de la Línea de Crédito de Combustible a la parte con derecho a ello de la forma que acuerden mutuamente dicha parte y el Agente de Distribución, y en la medida en que las Comisiones de los Acreedores del AAP de los Prestamistas de la Línea de Crédito de Combustible sean pagaderas en efectivo, dichas Comisiones de los Acreedores del AAP de los Prestamistas de la Línea de Crédito de Combustible se pagarán a más tardar diez (10) Días Laborables después de la Fecha de Entrada en Vigencia.  Salvo que se disponga lo contrario en el Plan, los Tenedores de Reclamaciones no tendrán derecho a intereses, dividendos o devengos sobre las distribuciones previstas en el Plan, con independencia de que dichas distribuciones se entreguen en la Fecha de Entrada en Vigencia o en cualquier momento posterior a esta. No obstante cualquier disposición en contrario del Plan, ningún Tenedor de una Reclamación Permitida recibirá, por cuenta de dicha Reclamación Permitida, una distribución superior al importe Permitido de dicha Reclamación.

3.    **Derechos y facultades del Agente de Distribución**

a)    **Facultades del Agente de Distribución**

Salvo que se disponga lo contrario en el presente documento, el Agente de Distribución estará facultado para (a) tomar todas las medidas y firmar todos los instrumentos y documentos necesarios para aplicar el Plan, (b) hacer distribuciones contempladas por el Plan, (c) cumplir el Plan y las obligaciones del Plan, y (d) ejercer cualquier otra facultad atribuida al Agente de Distribución por una orden del Tribunal del Título III, conforme al Plan o según sea considerado por el Agente de Distribución como necesario y correcto para implementar las disposiciones del Plan.

b)    **Honorarios y gastos incurridos en y a partir de la Fecha de Entrada en Vigencia**

Salvo que el Tribunal del Título III ordene lo contrario, el importe de los honorarios y gastos razonables incurridos por el Agente de Distribución en o a partir de la Fecha de Entrada en Vigencia, y cualquier compensación razonable y reclamaciones de reembolso de gastos, incluidos, entre otros, los honorarios y gastos razonables de asesoramiento jurídico incurridos

por el Agente de Distribución, se pagarán en Efectivo sin orden adicional del Tribunal del Título III.

4.   **Normas especiales para la distribución a los tenedores de Reclamaciones en Disputa**

No obstante cualquier disposición en contrario del Plan y salvo acuerdo en contrario de las partes pertinentes: (a) no se efectuarán pagos parciales ni distribuciones parciales con respecto a una Reclamación en Disputa hasta que todas las disputas relacionadas con dicha Reclamación en Disputa hayan sido resueltas mediante acuerdo u Orden Final; y (b) cualquier Entidad que sea tenedora tanto de una Reclamación Permitida como de una Reclamación en Disputa no recibirá ninguna distribución sobre la Reclamación Permitida a menos y hasta que todas las objeciones a la Reclamación en Disputa hayan sido resueltas mediante acuerdo u Orden Final o las Reclamaciones hayan sido Permitidas o eliminadas.  Todos los dividendos u otras distribuciones derivados de bienes distribuidos a los Tenedores de Reclamaciones Permitidas de una Clase y pagados a dichos Tenedores en virtud del Plan también se pagarán, en las cantidades aplicables, a cualquier Tenedor de una Reclamación en Disputa de dicha Clase que se convierta en una Reclamación Permitida después de la fecha o fechas en que dichos dividendos u otras distribuciones se pagaron anteriormente a los Tenedores de Reclamaciones Permitidas de dicha Clase.

En el momento en que una Reclamación en Disputa se convierta, en su totalidad o en parte, en una Reclamación Permitida, el Deudor Reorganizado distribuirá al Tenedor de esta las distribuciones, si las hubiera, a las que dicho Tenedor tenga derecho en ese momento en virtud del Plan, junto con cualquier ganancia que se haya acumulado sobre esta (neta de cualquier gasto, incluidos los impuestos, relacionados con esta), pero solo en la medida en que dichas ganancias sean atribuibles al importe de la Reclamación Permitida. Dicha distribución, de haberla, se efectuará tan pronto como sea posible después de la fecha en que la orden o sentencia del Tribunal del Título III que admita dicha Reclamación en Disputa se convierta en una Orden Final.

5.   **Entrega de distribuciones**

a)   **Puntualidad de las distribuciones**

Toda distribución que deba efectuarse en virtud del Plan se considerará efectuada de manera oportuna si se realiza dentro de los diez (10) Días Hábiles siguientes a la fecha especificada en el Plan.  Cuando alguna distribución a realizar en virtud del Plan deba efectuarse en un día que no sea Día Laborable, dicha distribución se efectuará, sin intereses, en el Día Laborable inmediatamente posterior, pero se considerará efectuada en la fecha de vencimiento.

b)   **Fecha de Registro para Distribuciones**

Con sujeción a las disposiciones de la Regla de Quiebras 9010, y salvo lo dispuesto en la Orden de Confirmación o en el presente documento, las distribuciones y entregas a los Tenedores de Reclamaciones Permitidas se realizarán a través del DTC o en la dirección de cada uno de dichos Tenedores según se establece en los Anexos presentados ante el Tribunal, a menos que sea sustituida por la dirección que figura en las Evidencias de Reclamación presentadas por

dichos Tenedores, o en la última dirección conocida de dicho Tenedor si no se presenta ninguna Evidencia de Reclamación o si se ha notificado por escrito al Deudor un cambio de dirección; *teniendo en cuenta, sin embargo*, que las distribuciones iniciales por parte del Agente de Distribución en beneficio de los Tenedores de Reclamaciones Permitidas de Bonos de Ingresos de la AEE se realicen al Fideicomisario de Bonos, según corresponda, para dicha obligación de conformidad con los respectivos documentos rectores de dichas obligaciones.  Ni la AEE ni ningún Agente de Distribución, incluyendo el Fideicomisario de GUC, tendrá obligación alguna de reconocer la transferencia de, o la venta de cualquier participación en, cualquier Reclamación que ocurra después del cierre de operaciones en la Fecha de Registro de Distribución, y tendrá derecho, para todos los propósitos del presente, a reconocer y distribuir únicamente a aquellos Tenedores de Reclamaciones Permitidas (incluyendo Tenedores de Reclamaciones que se conviertan en Permitidas después de la Fecha de Registro de Distribución) que sean Tenedores de dichas Reclamaciones, o participantes en ellas, al cierre de operaciones en la Fecha de Registro de Distribución.  En su lugar, la AEE y cualquier Agente de Distribución tendrán derecho a reconocer y tratar, a todos los efectos del Plan, únicamente con aquellos Tenedores registrados que figuren en el Registro de Reclamaciones oficial al cierre de operaciones de la Fecha de Registro de Distribución.

c) **Proceso de Distribución**

El Agente de Distribución realizará todas las distribuciones requeridas en virtud del Plan, salvo que las distribuciones a los Tenedores de Reclamaciones Permitidas regidas por un acuerdo independiente y administradas por un Recaudador se depositen con el Recaudador correspondiente, momento en el que dichas distribuciones se considerarán completas, y el Recaudador entregará dichas distribuciones de conformidad con el Plan y los términos del acuerdo rector.  Salvo que se disponga lo contrario en el presente documento, y  sin perjuicio de cualquier autoridad que disponga lo contrario, las distribuciones a los Tenedores de Reclamaciones Permitidas, incluidas las Reclamaciones que pasen a ser Permitidas después de la Fecha de Entrada en Vigencia, serán efectuadas a los Tenedores registrados a la Fecha de Entrada en Vigencia por el Agente de Distribución o un Recaudador, según corresponda: (1) a la dirección de dicho Tenedor que conste en los libros y registros del Deudor (o si el Deudor ha sido notificado por escrito, en o antes de la fecha que es diez (10) días antes de la Fecha de Entrada en Vigencia, de un cambio de dirección, a la dirección modificada); (2) de conformidad con la Regla 4 de las Reglas  Federales de Procedimiento Civil, modificada y hecha aplicable por la Regla de Quiebra 7004, si no existe una dirección en los libros y registros del Deudor, no se ha presentado ninguna Evidencia de Reclamaciones y el Agente de Distribución no ha recibido una notificación por escrito de un cambio de dirección en o antes de la fecha que es diez (10) días antes de la Fecha de Entrada en Vigencia; o (3) a cualquier abogado que haya comparecido en el Caso de Título III en nombre del Tenedor.  El Deudor y el Agente de Distribución, según corresponda, no incurrirán en responsabilidad alguna en relación con las distribuciones previstas en el Plan.

d) **Tipo de cambio de divisas**

Salvo que se disponga lo contrario en una Orden Final, a la Fecha de Entrada en Vigencia, cualquier Reclamación presentada en una divisa distinta del dólar estadounidense se considerará automáticamente convertida al valor equivalente en dólares estadounidenses

319

utilizando el tipo de cambio de la divisa aplicable publicado en The Wall Street Journal, Edición Nacional, en la Fecha de Entrada en Vigencia.

e) **Distribuciones De Minimis, Fraccionarias, No Entregables y No Reclamadas**

(i) *Distribuciones de minimis y fraccionarias.* El Agente de Distribución no distribuirá (i) Nuevos Bonos por cuenta de una Reclamación Permitida si el importe a distribuir al Tenedor específico de una Reclamación Permitida en la Fecha de Distribución correspondiente tiene un valor económico inferior a $1,000.00 y (ii) Efectivo por el Agente de Distribución por cuenta de una Reclamación Permitida si el importe a distribuir al Tenedor específico de un Reclamación Permitida en la Fecha de Distribución correspondiente tiene un valor económico inferior a $100.00. No se distribuirán Nuevos Bonos fraccionarios. En caso de que se solicitara una parte fraccionaria de un Nuevo Bono en virtud del Plan, la emisión efectiva reflejará un redondeo a la baja hasta el Nuevo Bono entero más próximo.

(ii) *Distribuciones no entregables.* Si alguna distribución a cualquier Tenedor se devuelve al Agente de Distribución como no entregable, no se harán distribuciones adicionales a dicho Tenedor mientras no se notifique al Agente de Distribución, por escrito, sobre el domicilio actualizado del Tenedor. Sujeto a los términos y las disposiciones del **Error! Reference source not found.**.**Error! Reference source not found.**.**Error! Reference source not found.Error! Reference source not found.** del Plan, las distribuciones no entregables permanecerán en poder del Agente de Distribución hasta el momento en que una distribución sea entregable. Todas las Entidades que en definitiva reciben Efectivo previamente no entregable no tendrán derecho a ningún interés o devengo de ningún tipo sobre ellos. Ninguna de las disposiciones del Plan obligará al Agente de Distribución a intentar localizar a ningún Tenedor de una Reclamación Permitida.

(iii) *Reversión de distribuciones no reclamadas.* Si (i) el Agente de Distribución envía un cheque a un Tenedor en relación con las distribuciones y dicho cheque no se cobra dentro de los ciento veinte (120) días siguientes a la fecha en que se emitió dicho cheque. o (ii) cualquier otra forma de distribución a un Tenedor no puede entregarse o se ha convertido en una Distribución No Reclamada, el Agente de Distribución (o su agente debidamente autorizado) deberá, en o antes de la fecha en que se cumplan ciento ochenta (180) días a partir de (i) la Fecha de Entrada en Vigencia, con respecto a todas las Reclamaciones Permitidas a la Fecha de Entrada en Vigencia, y (ii) la fecha en que se realice una

320

distribución con respecto a cualquier Reclamación en Disputa que se convierta en una Reclamación Permitida con posterioridad a la Fecha de Vigencia, presentar una lista ante el Tribunal del Título III en la que se establezcan los nombres de aquellas Entidades para las que se hayan realizado distribuciones en virtud del presente que no hayan sido negociadas o hayan sido devueltas como no entregables en la fecha de estas.   Cualquier Tenedor de una Reclamación Permitida que figure en dicha lista y que no se identifique y haga valer sus derechos en virtud del Plan para recibir una distribución dentro de los seis (6) meses siguientes a la fecha en que figure en dicha lista, quedará exonerado de su derecho a dicha distribución no entregada y quedará excluido a perpetuidad de hacer valer cualquier derecho en virtud del Plan, contra el Deudor Reorganizado o el Fideicomisario de GUC, o sus respectivos profesionales, agentes o bienes, y cualquier (1) Efectivo en posesión del Agente de Distribución o del fideicomisario con respecto a los valores existentes, según sea el caso, se entregará al Deudor Reorganizado para que lo utilice para sufragar los gastos operativos del Deudor Reorganizado y (2) los Nuevos Bonos en posesión del Agente de Distribución con respecto a los valores existentes, serán entregados al Deudor Reorganizado para su cancelación o depósito en la tesorería del Deudor Reorganizado, según lo determine el Deudor Reorganizado a su exclusivo y absoluto criterio.

f)      **Entrega de Instrumentos Cancelados**

Como condición para participar en virtud del Plan, el Tenedor de un pagaré, obligación u otra evidencia de endeudamiento de la AEE que desee recibir los bienes que se distribuirán por cuenta de una Reclamación Permitida basada en dicho pagaré, obligación u otra evidencia de endeudamiento deberá entregar dicho pagaré, obligación u otra evidencia de endeudamiento a la AEE o a su designatario (a menos que la Reclamación de dicho Tenedor no se vea Afectada por el Plan, en cuyo caso no se requerirá dicha entrega), y firmar y entregar los demás documentos que sean necesarios para aplicar el Plan; *teniendo en cuenta, sin embargo*, que, si un demandante es Tenedor de un pagaré, obligación u otra prueba de endeudamiento para la que no se haya emitido un certificado físico al Tenedor, sino que se mantenga en forma de registro en libros de conformidad con una tenencia global de títulos valores por parte del DTC u otro depositario de valores o custodio de estos, no se exigirá la entrega.   A criterio exclusivo de la AEE, si no se produce la entrega de un pagaré, obligación u otra evidencia de endeudamiento y el Tenedor de una Reclamación no proporciona una declaración jurada y un acuerdo de indemnización, en forma y sustancia razonablemente satisfactorias para la AEE, de que dicho pagaré, obligación u otra evidencia de endeudamiento se perdió, entonces no se podrá realizar ninguna distribución a dicho Tenedor con respecto a la Reclamación basada en dicho pagaré, obligación u otra evidencia de endeudamiento.

g)      **Cancelación de pagarés, instrumentos, certificados y otros documentos**

Salvo (a) lo dispuesto en cualquier contrato, instrumento u otro acuerdo o documento suscrito o entregado en relación con el Plan, (b) a efectos de acreditar un derecho a distribución en virtud del Plan, o (c) lo dispuesto específicamente de otro modo en el Plan (incluido cualquier rechazo de Contratos a Ejecutarse o Arrendamientos no Vencidos conforme al **Error! Reference source not found..Error! Reference source not found.** del Plan), en la Fecha de Entrada en Vigencia, los Bonos de Ingresos de la AEE y las Instalaciones de la Línea de Combustible y todos los instrumentos y documentos relacionados con ellos se considerarán automáticamente cancelados, rescindidos y no tendrán vigencia ulterior contra el Deudor sin ningún otro acto o acción en virtud de cualquier acuerdo, ley, reglamento, orden o norma aplicable, con el Deudor y el fideicomisario, agente pagador o agente fiscal aplicable, según sea el caso, sin tener obligaciones continuas o deberes y responsabilidades en virtud de estos y las obligaciones de las partes con el Deudor, según corresponda, en virtud de los Bonos de Ingresos de la AEE y las Instalaciones de la Línea de Combustible y todos los instrumentos y documentos relacionados con ellos serán cancelados; *teniendo en cuenta, sin embargo,* que, no obstante cualquier disposición en contrario contenida en el presente documento, los Bonos de Ingresos de la AEE y las Instalaciones de la Línea de Combustible, así como los demás instrumentos y documentos, continúen en vigencia únicamente (i) para permitir que el Agente de Distribución realice cualquier distribución según lo establecido en el Plan y para llevar a cabo cualquier otra función administrativa o de otro tipo necesaria con respecto a ellos, (ii) para permitir a los Tenedores de Reclamaciones Permitidas de Bonos de Ingresos de la AEE y Reclamaciones Permitidas por Préstamos de la Línea de Combustible recibir distribuciones de acuerdo con los términos y disposiciones del Plan, (iii) para cualquier fideicomisario, agente, administrador de contratos o entidad similar en virtud de todos los instrumentos y documentos relacionados con ellos, para desempeñar las funciones necesarias, incluida la realización de distribuciones, de conformidad con el Plan y tener el beneficio de todos los derechos y protecciones y otras disposiciones de dichos instrumentos y documentos, según corresponda, y todos los demás acuerdos relacionados, (iv) para establecer los términos y condiciones aplicables a las partes de dichos documentos e instrumentos que no sean el Deudor, o (v) según sea necesario para preservar cualquier reclamación en virtud de las respectivas Pólizas de Seguro y documentos relacionados emitidos por una Aseguradora Monolínea. No obstante lo anterior, y salvo que se disponga expresamente lo contrario en el Plan, dichos bonos o documentos de bonos que permanezcan en circulación no constituirán la base para hacer valer ninguna Reclamación contra el Deudor o Deudor Reorganizado, según sea el caso.

6.     **Reclamaciones pagadas o a pagar por terceros**

a)     **Reclamaciones pagadas por terceros**

Una Reclamación se reducirá en su totalidad, y dicha Reclamación será Rechazada sin que tenga que presentarse una objeción a dicha Reclamación y sin ninguna otra notificación o acción, orden o aprobación del Tribunal del Título III, en la medida en que el Tenedor de dicha Reclamación reciba el pago en su totalidad a cuenta de dicha Reclamación de una parte que no sea el Agente de Distribución. En la medida en que un Tenedor de una Reclamación reciba una distribución por cuenta de dicha Reclamación y reciba un pago de una parte que no sea el Agente de Distribución por cuenta de dicha Reclamación, dicho Tenedor reembolsará, devolverá o entregará cualquier distribución en poder del Tenedor o transferida al Tenedor al Agente de Distribución aplicable en la medida en que la recuperación total del Tenedor por cuenta de dicha

322

Reclamación del tercero y en virtud del Plan supere el importe de dicha Reclamación a la fecha de cualquier distribución en virtud del Plan.

<b>b)</b>    <b><u>Reclamaciones Pagaderas por Aseguradoras</u></b>

No se harán distribuciones en virtud del Plan por cuenta de una Reclamación Permitida que sea pagadera conforme a una de las Pólizas de Seguro de la AEE hasta que el Tenedor de dicha Reclamación Permitida haya agotado todos los remedios con respecto a dicha póliza de seguro.  En la medida en que una o más de las aseguradoras de la AEE acuerden satisfacer en su totalidad una Reclamación, inmediatamente después del acuerdo de dichas aseguradoras, dicha Reclamación podrá ser eliminada en la medida de cualquier satisfacción acordada en el Registro de Reclamaciones por el Agente de la Convocatoria sin que se tenga que presentar una objeción de Reclamaciones y sin ninguna otra notificación o acción, orden o aprobación del Tribunal del Título III.

<b>c)</b>    <b><u>Aplicabilidad de las pólizas de seguro</u></b>

Salvo que se disponga lo contrario en el presente documento, las distribuciones a los Tenedores de Reclamaciones Permitidas se realizarán de conformidad con las disposiciones de una póliza de seguro aplicable.  Salvo que se disponga expresamente lo contrario en el presente, ninguna de las disposiciones del Plan constituirá o se considerará una renuncia a cualquier Causa de Acción que la AEE o cualquier Entidad pueda tener contra cualquier otra Entidad, incluidas las aseguradoras en virtud de cualquier póliza de seguro, ni ninguna de las disposiciones en el presente constituirá o se considerará una renuncia por parte de dichas aseguradoras a cualquier defensa, incluidas las defensas de cobertura, mantenidas por dichas aseguradoras.

<b>7.</b>    <b>Requisitos de retención e informe</b>

Cualquier parte que emita cualquier instrumento o realice cualquier distribución en virtud del Plan deberá cumplir con todos los requisitos de retención e informe aplicables impuestos por cualquier ley o autoridad impositiva federal, estatal o local de los Estados Unidos, y todas las distribuciones en virtud del Plan estarán sujetas a dichos requisitos de retención o informe.  No obstante lo anterior, cada Tenedor de una Reclamación Permitida que vaya a recibir una distribución conforme al Plan tendrá la responsabilidad única y exclusiva de satisfacer y pagar cualquier impuesto que cualquier Unidad Gubernamental imponga a dicho Tenedor, incluidas las obligaciones en materia de ingresos, retenciones y otros impuestos, por cuenta de dicha distribución.  Cualquier parte que emita un instrumento o haga alguna distribución conforme al Plan tiene el derecho, pero no la obligación, de no hacer una distribución hasta que el Tenedor haya tomado las medidas necesarias, a satisfacción de dicha parte emisora o distribuidora, para el pago de cualquier obligación de retención de impuestos y si alguna parte que emite un instrumento o hace una distribución conforme al Plan no retiene impuestos con respecto a la distribución de dicho Tenedor y posteriormente es considerada responsable por el monto de dicha retención, el Tenedor deberá reembolsar a dicha parte. El Agente de Distribución puede requerir, como condición para recibir una distribución, que el Tenedor complete el Formulario W-8 o el Formulario W-9 correspondiente, según corresponda a cada Tenedor.  Si el Tenedor no cumple dicha solicitud dentro de un año, dicha distribución será considerada como una Distribución No Reclamada.  La AEE se reserva el derecho de asignar todas las distribuciones

323

efectuadas en virtud del Plan de conformidad con todos los embargos de salarios, pensiones alimenticias, manutención de hijos y otras adjudicaciones conyugales y gravámenes aplicables.

8.     **Límite de tiempo para el pago en efectivo**

Los cheques emitidos por el Agente de Distribución por cuenta de Reclamaciones Permitidas serán nulos si no se cobran dentro de ciento veinte días (120) desde y a partir de la fecha de emisión de estos.  Los pedidos de reemisión de cualquier cheque deben hacerse directamente al Agente de Distribución por el tenedor de la Reclamación Permitida con respecto a la cual se emitió originalmente el cheque.  Cualquier reclamación con respecto a un cheque invalidado debe hacerse en o antes de (i) el primer (1er) aniversario de la Fecha de Entrada en Vigencia o (ii) noventa (90) días después de la fecha de emisión del cheque, si el cheque representa una distribución final en virtud del presente Reglamento a cuenta de dicha Reclamación.  Después de dicha fecha, todas las Reclamaciones con respecto a cheques invalidados se desestimarán y prohibirán a perpetuidad y el Agente de Distribución retendrá todo el dinero relacionado con ellas con el único fin de redistribuirlo entre los Tenedores de Reclamaciones Permitidas de acuerdo con los términos y disposiciones del Plan.

9.     **Distribuciones después de la Fecha de Vigencia**

Las distribuciones hechas después de la Fecha de Vigencia a los Tenedores de Reclamaciones que no son Reclamaciones Permitidas a la Fecha de Vigencia, pero que se convierten más tarde en Reclamaciones Permitidas se considerarán hechas de acuerdo con los términos y disposiciones del **Error! Reference source not found..Error! Reference source not found.** del Plan.

10.    **Compensaciones**

Salvo que se disponga lo contrario en el Plan o en la Orden de Confirmación, el Agente de Distribución podrá, conforme a la ley de quiebras o no de quiebras aplicable, compensar cualquier Reclamación Admitida y las distribuciones que deban realizarse conforme al Plan por cuenta de esta (antes de que el Agente de Distribución realice cualquier distribución por cuenta de dicha Reclamación), las reclamaciones, derechos y Causas de Acción de cualquier naturaleza que el Deudor o Deudor Reorganizado pueda tener contra el Tenedor de dicha Reclamación Permitida; *teniendo en cuenta, sin embargo*, que ni la falta de efectivización de dicha compensación ni la asignación de cualquier Reclamación constituirá una renuncia o relevo por parte del Deudor o Deudor Reorganizado de dichas reclamaciones, derechos y Causas de Acción que el Deudor o el Deudor Reorganizado pueda tener contra dicho Tenedor; y, *asimismo*, que ninguna de las disposiciones del presente pretende limitar la capacidad de cualquier Acreedor para efectuar derechos de compensación o recobro preservados o permitidos por las disposiciones de los artículos 553, 555, 559 o 560 del Código de Quiebras o de conformidad con el derecho consuetudinario de recobro; y, *además*, que ninguna de las disposiciones en el **Error! Reference source not found..Error! Reference source not found.** del Plan afectará a las exoneraciones y los interdictos previstos en el **Error! Reference source not found.** del  Plan.

11.    **Asignación entre capital e intereses devengados**

En la medida en que cualquier Reclamación Permitida que tenga derecho a una distribución conforme al Plan consista en endeudamiento y otros montos (como intereses devengados pero no pagados sobre ella), dicha distribución se asignará *en primer lugar*, a los intereses devengados y no pagados a la fecha inmediatamente anterior a la Fecha de Petición, *en segundo lugar*, al monto del capital de la Reclamación (según se determine para fines de impuestos federales a la renta), y *en tercer lugar,* siempre que la contraprestación supere el monto del capital de la Reclamación, a otros montos; *teniendo en cuenta, sin embargo*, que el tratamiento por parte del Deudor o Deudor Reorganizado de cualquier distribución para sus fines impositivos no será vinculante para ningún Acreedor con respecto al tratamiento de dichas distribuciones para cualquier fin regulatorio, impositivo o de otro tipo.

12.    **Tenedor de una reclamación**

Para todos los fines del Plan, lo que incluye, entre otros, para fines de distribuciones conforme a los términos y disposiciones del **Error! Reference source not found.** del Plan, el Tenedor de una Reclamación es cualquier Entidad que, directa o indirectamente, tiene facultades de inversión con respecto a cualquier Reclamación, lo que incluye la facultad de disponer o de dirigir la disposición de dicha Reclamación; *teniendo en cuenta, sin embargo, que* únicamente con respecto a los Bonos de Ingresos de la AEE Asegurados y la sección 1126 del Código de Quiebras, el Tenedor de cualquier Reclamación de Bonos de Ingresos de la AEE Asegurados se determinará de acuerdo con la Sección 301(c)(3) de PROMESA y cualquier ley o documento aplicable a dichas Reclamaciones de Bonos de Ingresos de la AEE Asegurados.

13.    **Exculpación**

En y a partir de la Fecha de Entrada en Vigencia, el Agente de Distribución será exculpado por todas las Entidades, incluidos, entre otros, los Tenedores de Reclamaciones y otras partes interesadas, de todas y cada una de las reclamaciones, Causas de Acción y otras aseveraciones de responsabilidad legal emergentes del relevamiento de las facultades y deberes conferidos a dicho Agente de Distribución por el Plan o por cualquier orden del Tribunal del Título III dictada conforme al Plan o en su desarrollo, o por la ley aplicable, excepto en el caso de acciones u omisiones derivadas de negligencia grave o conducta dolosa de dicho Agente de Distribución.  Ningún Tenedor de una Reclamación u otra parte interesada pueden tener o llevar adelante una reclamación o causa de acción contra el Agente de Distribución por hacer pagos de acuerdo con el Plan o por implementar las disposiciones del Plan.

**K.    Procedimientos de tratamiento de reclamaciones bajo disputa**

1.    **Objeciones a reclamaciones y enjuiciamiento de reclamaciones en disputa**

Excepto con respecto a las Reclamaciones Permitidas, y con sujeción a los términos y condiciones de los Procedimientos de RAD y la Orden de RAD, el Deudor Reorganizado, por y a través de la Junta de Supervisión, se opondrá a, y asumirá cualquier objeción pendiente presentada por el Deudor o la Junta de Supervisión con respecto a, la admisión de Reclamaciones presentadas ante el Tribunal del Título III con respecto a las cuales dispute la responsabilidad, prioridad o cuantía, lo que incluye, entre otras, objeciones a Reclamaciones que hayan sido cedidas y la aplicación de la doctrina de

subordinación equitativa con respecto a estas. Todas las objeciones, defensas afirmativas y reconvenciones se litigarán hasta la Orden Final; *teniendo en cuenta, sin embargo*, que el Deudor Reorganizado, por y a través de la Junta de Supervisión, tendrá la autoridad para presentar, conciliar, transigir o desistir de cualquier objeción a las Reclamaciones, sin que sea necesaria la aprobación del Tribunal del Título III. A menos que el Tribunal del Título III ordene lo contrario, en la medida en que el Deudor no haya presentado objeciones, el Deudor Reorganizado presentará y notificará todas las objeciones a las Reclamaciones tan pronto como sea posible, pero, en cada caso, a más tardar en la Fecha Límite de Objeción a las Reclamaciones. No obstante cualquier disposición en contrario contenida en el Plan, en la Fecha de Entrada en Vigencia, cualquier (i) Reclamación de Bonos de Ingresos de la AEE o Reclamación de Préstamo de Línea de Combustible presentada por cualquier Entidad por cantidades adeudadas en virtud de títulos valores existentes y (ii) Evidencia de Reclamaciones incluida en una lista del Suplemento del Plan, si la hubiera, se considerará satisfecha y eliminada y la Junta de Supervisión dará instrucciones al Agente de Convocatoria, su representante designado por el tribunal, para que elimine dichas Reclamaciones del Registro de Reclamaciones mantenido en beneficio del Tribunal del Título III.

Salvo que se disponga lo contrario en el presente documento, ninguna Reclamación se convertirá en Reclamación Permitida a menos que y hasta que dicha Reclamación se considere Permitida en virtud del Plan o PROMESA, o el Tribunal del Título III haya dictado una Orden Final que permita dicha Reclamación. Para evitar cualquier duda, no es necesario presentar una Evidencia de Reclamaciones (o solicitar su admisión al Tribunal del Título III) para ser Reclamaciones Permitidas en virtud del Plan. **Salvo que se disponga lo contrario en el presente documento, todas las Evidencias de Reclamaciones presentadas después de la Fecha de Entrada en Vigencia serán Rechazadas y prohibidas, impedidas e inhabilitadas para siempre, y no serán exigibles contra la AEE o la AEE Reorganizada, sin necesidad de ninguna objeción por parte de la AEE o la AEE Reorganizada ni de ninguna otra notificación o acción, orden o aprobación del Tribunal del Título III.**

2.    **Estimación de reclamaciones**

Excepto con respecto a las Reclamaciones Permitidas, en y después de la Fecha de Entrada en Vigencia, y a menos que esté limitado de otro modo por una orden del Tribunal del Título III, lo que incluye, entre otras, la Orden de ACR y la Orden de RAD, el Deudor Reorganizado, por y a través de la Junta de Supervisión, podrá en cualquier momento solicitar al Tribunal del Título III que estime a efectos de su distribución final cualquier reclamación contingente, no liquidada o en Disputa de conformidad con la sección 502(c) del Código de Quiebras, independientemente de si el Deudor se opuso previamente o intentó estimar dicha Reclamación, y el Tribunal del Título III conservará la jurisdicción para considerar cualquier solicitud de estimación de cualquier Reclamación en cualquier momento durante el litigio relativo a cualquier objeción a cualquier Reclamación, lo que incluye, entre otros, mientras siga pendiente cualquier apelación relativa a cualquier objeción. Salvo que se disponga lo contrario en una orden del Tribunal del Título III, en caso de que el Tribunal del Título III estime cualquier Reclamación contingente, no liquidada o en disputa, el monto estimado constituirá el monto permitido de dicha Reclamación o una limitación máxima de esta, según determine el Tribunal del Título III; *teniendo en cuenta, sin embargo*, que si la estimación constituye la limitación máxima de dicha Reclamación, el Deudor Reorganizado, por y a través de la Junta de

326

Supervisión, pueda optar por iniciar procedimientos complementarios para objetar cualquier asignación final de dicha Reclamación; y *teniendo en cuenta, sin embargo*, que lo anterior no pretende limitar los derechos otorgados por la sección 502(j) del Código de Quiebras. Todos los procedimientos de objeción, estimación y resolución de reclamaciones mencionados anteriormente son acumulativos y no necesariamente excluyentes entre sí.

3.        **Responsabilidades de administración de reclamaciones**

Salvo que se disponga específicamente lo contrario en el Plan, después de la Fecha de Entrada en Vigencia, la AEE tendrá la potestad exclusiva de:  (1) presentar, retirar o litigar hasta sentencia, objeciones a las Reclamaciones; (2) resolver o conciliar cualquier Reclamación en Disputa sin necesidad de notificación ni acción, orden o aprobación adicionales por parte del Tribunal del Título III; y (3) administrar y ajustar el Registro de Reclamaciones para reflejar tales acuerdos o transacciones sin necesidad de notificación, acción, orden o aprobación adicionales por parte del Tribunal del Título III. Para evitar cualquier duda, salvo que se disponga lo contrario en el presente documento, en y a partir de la Fecha de Entrada en Vigencia, la AEE tendrá y conservará todos los derechos y defensas que tenía inmediatamente antes de la Fecha de Entrada en Vigencia con respecto a cualquier Reclamación en Disputa.

4.        **Ajuste de las reclamaciones sin objeciones**

Cualquier Reclamación duplicada o cualquier Reclamación que haya sido pagada, satisfecha, enmendada o sustituida podrá ser ajustada o eliminada del Registro de Reclamaciones por la AEE sin que la AEE tenga que presentar una solicitud, moción, queja, objeción o cualquier otro procedimiento legal para objetar dicha Reclamación y sin necesidad de notificación o acción, orden o aprobación adicionales del Tribunal del Título III.

5.        **Prórroga de la Fecha límite para objetar reclamaciones**

Previa petición de la AEE Reorganizada al Tribunal de Título III, la AEE Reorganizada podrá solicitar, y el Tribunal de Título III podrá conceder, una prórroga de la Fecha Límite para Objetar Reclamaciones en general o con respecto a Reclamaciones específicas. Cualquier prórroga concedida por el Tribunal del Título III no se considerará una modificación del Plan en virtud de la Sección 313 de PROMESA.

6.        **Potestad para enmendar la lista de acreedores**

La AEE tendrá la potestad de enmendar la Lista de Acreedores con respecto a cualquier Reclamación y hacer distribuciones basadas en dicha Lista enmendada de Acreedores sin que sea necesaria la aprobación del Tribunal del Título III. Si cualquier enmienda a la Lista de Acreedores reduce el monto de una Reclamación o cambia la naturaleza o la prioridad de una Reclamación, la AEE notificará al Tenedor de dicha Reclamación sobre la enmienda y dicho Tenedor tendrá veinte (20) días para presentar una objeción a dicha enmienda ante el Tribunal del Título III. Si no se presenta ninguna objeción, el Agente de Distribución podrá proceder con las distribuciones basadas en dicha Lista de Acreedores modificada sin que sea necesaria la aprobación del Tribunal del Título III.

7.      **Sin devengación de intereses**

A menos que se disponga específicamente lo contrario en el presente documento o por orden del Tribunal del Título III, no se devengarán ni pagarán intereses posteriores derivados de la declaración de quiebra sobre las Reclamaciones, y ningún Tenedor de una Reclamación tendrá derecho a intereses devengados en la Fecha de Petición o con posterioridad a esta sobre cualquier Reclamación o derecho. Además, y sin perjuicio de lo anterior, no se devengarán ni pagarán intereses sobre ninguna Reclamación en Disputa con respecto al período a partir de la Fecha de Entrada en Vigencia hasta la fecha en que se efectúe una distribución final por cuenta de dicha Reclamación en Disputa, si y cuando dicha Reclamación en Disputa se convierta en una Reclamación Permitida.

8.      **Denegación de reclamaciones**

Todas las Reclamaciones de cualquier Entidad a la que la AEE reclame bienes en virtud de las secciones 550 o 553 del Código de Quiebras o que la AEE alegue que es cesionaria de una transferencia que es anulable en virtud de las secciones 544, 545, 547, 548 o 549 del Código de Quiebras serán Denegadas si: (a) la Entidad, por un lado, y la AEE, por el otro, acuerdan o el Tribunal del Título III ha determinado mediante Orden Final que dicha Entidad o cesionario es responsable de entregar cualquier bien o dinero conforme a cualquiera de las antes mencionadas secciones del Código de Quiebras; y (b) dicha Entidad o cesionario no ha entregado dicho bien en la fecha establecida en dicho acuerdo u Orden Final.

**L. Gobernanza y disposiciones sobre el fideicomiso PayGo de la AEE y el sistema de pensiones**

1.      **Formación y responsabilidades del Fideicomiso PayGo de la AEE**

En o antes de la Fecha de Entrada en Vigencia, la AEE tomará todas las medidas necesarias para establecer el Fideicomiso PayGo de la AEE, lo que incluye, entre otras, la ejecución y la entrega del Contrato de Fideicomiso PayGo de la AEE.

2.      **Financiamiento del Fideicomiso PayGo de la AEE**

a)      **Financiamiento inicial**

En la Fecha de Entrada en Vigencia, la AEE aportará, o hará que se aporte al Fideicomiso PayGo de la AEE, un millón de dólares ($1,000,000) para financiar los honorarios administrativos, costos y gastos iniciales del Fideicomiso PayGo de la AEE.

b)      **Financiamiento continuo del Fideicomiso PayGo de la AEE**

La AEE Reorganizada efectuará los pagos de la amortización de la deuda con respecto a la Distribución de Nuevos Bonos PayGo de la AEE y los Nuevos Bonos Excedentes, si los hubiere, mantenidos por el Fideicomiso PayGo de la AEE de conformidad con el Nuevo Contrato Marco de Emisión de Deuda. Además, en y a partir del Año Fiscal en el que se produzca la Fecha de Entrada en Vigencia, la AEE Reorganizada realizará, o hará que se

realicen, contribuciones anuales (pero en ningún caso después del 30 de septiembre siguiente a la conclusión de cada Año Fiscal) al Fideicomiso PayGo de la AEE de forma que:

      (i)      los pagos combinados por cuenta de la Distribución de Nuevos Bonos PayGo de la AEE y los Nuevos Bonos Excedentes y esta cláusula (i) sean suficientes para que el Fideicomiso PayGo de la AEE reembolse al SRE de la AEE los beneficios de retiro pagados y los gastos administrativos incurridos en el Año Fiscal anterior que finaliza el 30 de junio, y

      (ii)     la contribución en la cláusula (i) inmediatamente anterior se aumentará o limitará de tal manera que, después de dicha contribución, los activos del Fideicomiso PayGo de la AEE equivalgan a dos (2) veces los beneficios de retiro previstos que se pagarán y los gastos administrativos en que se incurrirá durante el Año Fiscal en curso, con cualquier aumento resultante a la cantidad pagada conforme a la cláusula (i) inmediatamente anterior sin exceder cincuenta millones de dólares ($50,000,000) en un Año Fiscal dado.

3.     **Administración del Fideicomiso PayGo de la AEE**

El Fideicomiso PayGo de la AEE será administrado por una entidad independiente cuyos miembros deberán cumplir con los estándares de independencia, profesionalismo, experiencia y cualificación establecidos en el Contrato de Fideicomiso PayGo de la AEE.

4.     **Pacto de no afectación**

La AEE se compromete en este documento, y lo hará en el Contrato de Fideicomiso de PayGo de la AEE, para beneficio de todos los Participantes que, con respecto a los pagos y otras obligaciones adeudadas al SRE de la AEE conforme al Plan, todas estas obligaciones permanecerán vigentes y no se alterarán, modificarán o enmendarán de otro modo hasta que todas estas obligaciones hayan sido satisfechas en su totalidad de acuerdo con las disposiciones del Plan y los Documentos Definitivos, aplicables por la Junta de Supervisión, el Fideicomiso de PayGo de la AEE, y el SRE de la AEE y cada uno de ellos y, con respecto a cualquier disposición de este tipo, el Contrato de Fideicomiso de PayGo de la AEE no será enmendado ni modificado por la AEE Reorganizada excepto (i) con el consentimiento expreso previo por escrito de la Junta de Supervisión (si existe), y del SRE de la AEE, o (ii) conforme a un caso nuevo o reabierto del Título III para la AEE Reorganizada y un plan de ajuste nuevo o modificado, confirmado y en vigencia.

5.     **Mantenimiento de la Pensión**

Antes del décimo (10mo) aniversario de la Fecha de Entrada en Vigencia, tanto el Gobierno del Estado Libre Asociado de Puerto Rico como la AEE Reorganizada, lo que incluye, entre otros, por cualquier Entidad o Persona que actúe para o en nombre de ellos, no (a) implementarán leyes existentes, promulgarán nuevas leyes, ni suscribirán nuevos contratos de negociación colectiva u otros contratos para crear o aumentar cualquier pago u obligación de

pensión de beneficios definidos a jubilados actuales o futuros de o relacionados con cualquier plan de beneficios definidos por encima de los beneficios provistos por el Plan, independientemente de la fuente de financiamiento, ni (b) deshacer (en su totalidad o en parte) las eliminaciones del Plan de los devengos del plan de beneficios definidos y los ajustes por costo de vida para los Participantes del SRE de la AEE.

**M.      Efecto de la confirmación del Plan**

      1.      **Exoneración y descargo de reclamaciones y causas de acción**

            a)      **Completa satisfacción, exoneración y descargo**

Salvo que se disponga expresamente en el Plan o en la Orden de Confirmación, todas las distribuciones y derechos otorgados en virtud del Plan serán, y se considerarán, a cambio de, y en completa satisfacción, liquidación, exoneración y descargo de, todas las Reclamaciones o Causas de Acción contra la AEE y la AEE Reorganizada que surgieron, en todo o en parte, antes de la Fecha de Entrada en Vigencia, en relación con el Caso del Título III, el Deudor o el Deudor Reorganizado o cualquiera de sus respectivos Activos, bienes o intereses de cualquier naturaleza, incluidos los intereses devengados por dichas Reclamaciones en o a partir de la Fecha de Petición, e independientemente de que se hayan distribuido o retenido bienes conforme al Plan a causa de dichas Reclamaciones o Causas de Acción. En la Fecha de Entrada en Vigencia, el Deudor y el Deudor Reorganizado se considerarán exonerados y eximidos de toda y cualquier Reclamación, Causas de Acción y cualquier otra deuda emergente, en su totalidad o en parte, antes de la Fecha de Entrada en Vigencia (lo que incluye antes de la Fecha de Petición), y todas las Deudas del tipo especificado en las secciones 502(g), 502(h) o 502(i) del Código de Quiebras, ya sea o no (a) una Evidencia de Reclamación basada en la cual se presente o se considere que se ha presentado dicha Deuda en virtud de la sección 501 del Código de Quiebras, (b) que se permita una Reclamación basada en dicha Deuda conforme a la sección 502 del Código de Quiebras (o que se resuelva de otro modo), o (c) que el Tenedor de una Reclamación basada en dicha deuda haya votado para aceptar el Plan.

            b)      **Preclusión de la formulación de reclamaciones contra el Deudor**

Todas las Entidades se verán impedidas de hacer valer todas y cada una de las Reclamaciones u otras obligaciones, demandas, juicios, sentencias, daños, Deudas, derechos, remedios, Causas de Acción, o responsabilidades, de cualquier naturaleza, lo que incluye cualquier interés devengado sobre dichas Reclamaciones en y a partir de la Fecha de Petición, contra el Deudor y el Deudor Reorganizado y cada uno de sus respectivos Activos, bienes y derechos, en relación con el Caso del Título III, independientemente de si algún bien se haya distribuido o retenido conforme al Plan por cuenta de tales Reclamaciones u otras obligaciones, demandas, sentencias, daños, Deudas, derechos, remedios, Causas de Acción, o responsabilidades. De acuerdo con lo anterior, salvo que se disponga expresamente en el Plan o en la Orden de Confirmación, la Orden de Confirmación constituirá una determinación judicial, a la Fecha de Entrada en Vigencia, de la exoneración y descargo de todas esas Reclamaciones, Causas de Acción o Deuda de o contra el Deudor y el Deudor Reorganizado conforme a las secciones 524 y 944 del Código de Quiebras, aplicable al Caso de Título III conforme a la Sección 301 de PROMESA, y dicha exoneración anulará y extinguirá cualquier sentencia

obtenida contra el Deudor o Deudor Reorganizado y sus respectivos Activos, y bienes en cualquier momento, en la medida en que dicha sentencia esté relacionada con una Reclamación, Deuda o responsabilidad que sea objeto de dicha exoneración. A la Fecha de Entrada en Vigencia, y como contraprestación por el valor proporcionado en virtud del Plan, se considera que cada Tenedor de una Reclamación de cualquier Clase en virtud del Plan libera, renuncia y exonera para siempre, y liberará, renunciará y exonerará para siempre, al Deudor y al Deudor Reorganizado, y a sus respectivos Activos y bienes, y a todas esas Reclamaciones.

c)   **Interdicto relativo a la exoneración de reclamaciones**

Salvo que se disponga expresamente lo contrario en el **Error! Reference source not found.** del Plan, en la Orden de Confirmación o en cualquier otra Orden Final del Tribunal del Título III que pueda ser aplicable, todas las Entidades que hayan tenido, tengan o puedan tener Reclamaciones o cualquier otra Deuda o responsabilidad que se exonere o renuncie conforme al **Error! Reference source not found.** del Plan o que hayan tenido, tengan o puedan tener Reclamaciones o cualquier otra Deuda o responsabilidad que se exonere o renuncie conforme al **Error! Reference source not found.** del Plan tienen permanentemente prohibido, en o a partir de la Fecha de Entrada en Vigencia, (a) comenzar o continuar, directa o indirectamente, de cualquier manera, cualquier acción u otro procedimiento (lo que incluye, entre otros, cualquier procedimiento judicial, arbitral, administrativo u otro) de cualquier índole sobre cualquier Reclamación u otra Deuda o responsabilidad que se exonere o libere conforme al Plan contra cualquiera de las Partes Exoneradas o cualquiera de sus respectivos Activos o bienes, (b) la ejecución, el embargo, el cobro o la recuperación por cualquier forma o medio de cualquier sentencia, laudo, decreto u orden contra cualquiera de las Partes Exoneradas o cualquiera de sus respectivos activos o bienes por cuenta de cualquier Reclamación u otra Deuda o responsabilidad que se exonere o libere conforme al Plan, (c) crear, perfeccionar o aplicar cualquier gravamen de cualquier tipo contra cualquiera de las Partes Exoneradas o cualquiera de sus respectivos activos o bienes por cuenta de cualquier Reclamación u otra Deuda o responsabilidad que se exonere o libere conforme al Plan; y (d) salvo en la medida en que se disponga, permita o preserve en las secciones 553, 555, 556, 559 o 560 del Código de Quiebras o conforme al derecho de recuperación del derecho consuetudinario, hacer valer cualquier derecho de compensación, subrogación o recuperación de cualquier tipo contra cualquier obligación debida de cualquiera de las Partes Exoneradas o cualquiera de sus respectivos activos o bienes, con respecto a cualquier Reclamación y otra Deuda o responsabilidad que se exonere o libere conforme al Plan. Este interdicto se extenderá a todos los sucesores y cesionarios de las Partes Exoneradas y sus respectivos activos y bienes.

2.   **Descargos de los Deudores y Deudores Reorganizados**

**Salvo que se disponga expresamente lo contrario en el Plan o en la Orden de Confirmación, en la Fecha de Entrada en Vigencia, y por una contraprestación válida y susceptible de apreciación pecuniaria, el Deudor y el Deudor Reorganizado, el Agente de Distribución y cada una de las Personas Relacionadas del Deudor y el Deudor Reorganizado, se considerará que ha, y por la presente lo hace de manera irrevocable e incondicional, plenamente, definitivamente y a perpetuidad, renunciado, exonerado, absuelto y relevado a las Partes Exoneradas de toda y cualquier Reclamación o Causa de Acción que el Deudor, el Deudor Reorganizado y el Agente de Distribución o cualquiera de**

331

ellos, o cualquiera que reclame a través de ellos, en su nombre o para su propio beneficio, tengan o pudieran tener o reclamaran tener, ahora o en el futuro, contra cualquier Parte Exonerada que sean Reclamaciones Exoneradas o que de otro modo se basen en, se relacionen con, o surjan de o en conexión con, en su totalidad o en parte, cualquier acto, omisión, transacción, evento u otra circunstancia relacionada con los Casos del Título III, el AAP de los Prestamistas de la Línea de Crédito de Combustible, el Deudor que tengan lugar o existan en o antes de la Fecha de Entrada en Vigencia, y/o cualquier Reclamación, acto, hecho, transacción, ocurrencia, declaración u omisión en relación con, o alegada, o que podría haber sido alegada, lo que incluye, entre otros, cualquier Reclamación, demanda, derecho, responsabilidad, o causa de acción para la indemnización, contribución u otro fundamento, según la ley escrita o el derecho consuetudinario, por daños, costos u honorarios.

3.      Descargos de los tenedores de reclamaciones

No obstante cualquier disposición en contrario contenida en el Plan, a la Fecha de Entrada en Vigencia, por una contraprestación válida y susceptible de apreciación pecuniaria, se considera que cada Parte Exonerante ha liberado y exonerado al Deudor y al Deudor Reorganizado de todas y cada una de las Causas de Acción, ya sean conocidas o desconocidas, lo que incluye cualquier reclamación derivada, hecha valer en nombre del Deudor, que dicha Entidad hubiera estado legalmente facultada para hacer valer (ya sea individual o colectivamente), sobre la base o en relación con, o de cualquier forma derivada de, en su totalidad o en parte, el Deudor (lo que incluye la administración, propiedad o explotación de este), los esfuerzos de reestructuración judicial o extrajudicial del Deudor, las transacciones entre empresas, el Caso del Título III, la formulación, preparación, difusión, negociación o presentación de la Declaración de Divulgación, el Plan, las Transacciones de Reestructuración, el AAP de los Prestamistas de la Línea de Crédito de Combustible, o cualquier contrato, instrumento, descargo u otros Documentos Definitivos, acuerdo o documento creado o suscrito en relación con la Declaración de Divulgación, o el Plan, la presentación del Caso del Título III, las acciones tendientes a lograr la Confirmación o el perfeccionamiento, la administración e implementación del Plan, incluida la emisión o distribución de títulos valores en virtud del Plan, o la distribución de bienes en virtud del Plan o cualquier otro acuerdo relacionado o sobre cualquier otro acto u omisión, transacción, acuerdo, evento u otro suceso relacionado que tenga lugar en o antes de la Fecha de Entrada en Vigencia. No obstante cualquier disposición en contrario en lo anterior, las exoneraciones establecidas anteriormente no representan un descargo de ninguna obligación posterior a la Fecha de Entrada en Vigencia de cualquier parte o Entidad según el Plan, las Transacciones de Reestructuración o cualquier documento, instrumento o acuerdo (incluidos los establecidos en el Suplemento del Plan) ejecutados para implementar el Plan.

4.      Exculpación

Salvo que se disponga específicamente lo contrario en el Plan, ninguna Parte Exculpada tendrá ni incurrirá, y cada Parte Exculpada queda liberada y exonerada de cualquier Causa de Acción por cualquier reclamación relacionada con cualquier acto u omisión con respecto a, en relación con, o emergente de, el Caso del Título III, la

**formulación, preparación, difusión, negociación o presentación del AAP de los Prestamistas de la Línea de Crédito de Combustible, la Declaración de Divulgación, el Plan, o cualquier Transacción de Reestructuración, contrato, instrumento, descargo u otro Documento Definitivo, acuerdo o documento creado o suscrito en relación con la Declaración de Divulgación o el Plan, la presentación del Caso de Título III, la búsqueda de la Confirmación, la búsqueda del perfeccionamiento, la administración e implementación del Plan, incluida la emisión de títulos valores en virtud del Plan, o la distribución de bienes en virtud del Plan o cualquier otro acuerdo relacionado, excepto en el caso de reclamaciones relacionadas con cualquier acto u omisión que se determine en una Orden Final que haya constituido fraude real o negligencia grave, pero en todos los aspectos dichas Entidades tendrán derecho a confiar razonablemente en el asesoramiento de un abogado con respecto a sus deberes y responsabilidades en virtud del Plan. Las Partes Exculpadas han participado, y se considerará que lo han hecho una vez finalizado el Plan, de buena fe y de conformidad con las leyes aplicables en lo que respecta a la convocatoria a votación y la distribución de contraprestaciones en virtud del Plan y, por lo tanto, no son responsables, ni lo serán en ningún momento, de la infracción de cualquier ley, norma o reglamento aplicable que rija la convocatoria a aceptar o rechazar el Plan o las distribuciones realizadas en virtud del Plan.**

5.     **Interdicto**

**A la Fecha de Entrada en Vigencia, todas las Entidades que tengan, hayan tenido o puedan tener una Reclamación Exonerada que es tal conforme al** Error! Reference source not found. **del Plan, están, y estarán, permanentemente, para siempre y completamente suspendidas, restringidas, prohibidas, vetadas e inhabilitadas para llevar a cabo cualquiera de las siguientes acciones, ya sea directa o indirectamente, de forma derivada o de otra manera, a causa o en base al objeto de dichas Reclamaciones Exoneradas: (i) iniciar, realizar o continuar de cualquier manera, ya sea directa o indirecta, cualquier juicio, acción u otro procedimiento (lo que incluye, entre otros, cualquier procedimiento judicial, arbitral, administrativo o de otro tipo) en cualquier foro; (ii) aplicar, embargar (lo que incluye, entre otros, cualquier embargo previo a la sentencia), cobrar o intentar de cualquier manera recobrar cualquier sentencia, laudo, decreto u otra orden; (iii) crear, perfeccionar o de cualquier manera aplicar en cualquier cuestión, directa o indirectamente, cualquier Gravamen; (iv) compensar, buscar reembolsos o contribuciones de o subrogación contra, o recuperar de cualquier otra manera, directa o indirecta, cualquier monto contra cualquier pasivo u obligación adeudados a cualquier Entidad exonerada conforme al** Error! Reference source not found. **del Plan; e (v) iniciar y continuar de cualquier manera, en cualquier lugar, cualquier procedimiento judicial, de arbitraje o administrativo en cualquier foro, que no cumpla o no sea compatible con las disposiciones del Plan o de la Orden de Confirmación.**

6.     **Indivisibilidad de descargos, interdictos y exculpaciones**

Sin perjuicio de cualquier otra disposición contenida en el Plan, los descargos, los interdictos y exculpaciones previstas en el **Error! Reference source not found.** del Plan forman parte integral de la obtención del valor previsto en el presente y constituyen un componente

esencial de los acuerdos mutuos alcanzados, por lo que no son divisibles de las demás disposiciones del Plan.

### 7.    Conservación de documentos

En y a partir de la Fecha de Entrada en Vigencia, el Deudor puede conservar documentos de acuerdo con su política estándar de conservación de documentos, que puede ser alterada, enmendada, modificada o complementada por el Deudor.

### 8.    Reembolso o contribución

Si el Tribunal de Quiebras desestima una reclamación de reembolso o contribución de una Entidad de conformidad con la sección 502(e)(1)(B) del Código de Quiebras, en la medida en que dicha reclamación sea contingente en el momento de la admisión o desestimación, dicha Reclamación será Desestimada y anulada para siempre sin perjuicio de lo dispuesto en la sección 502(j) del Código de Quiebras, a menos que antes de la Fecha de Confirmación:  (1) dicha Reclamación haya sido declarada no contingente; o (2) el correspondiente Tenedor de una Reclamación haya presentado una Evidencia de Reclamación no contingente por cuenta de dicha Reclamación y se haya dictado una Orden Final antes de la Fecha de Confirmación que determine que dicha Reclamación ya no es contingente.

### 9.    Descargo de gravámenes

Excepto (a) con respecto a los Gravámenes que garantizan los Nuevos Bonos y CVI, o (b) según se disponga de otro modo en el presente o en cualquier contrato, instrumento, descargo u otro acuerdo o documento creado de conformidad con el Plan, en la Fecha de Entrada en Vigencia, todas las hipotecas, contratos de fideicomiso, Gravámenes, prendas u otras garantías prendarias sobre cualquier bien del Deudor quedarán totalmente descargadas y exoneradas, y los Tenedores de dichas hipotecas, contratos de fideicomiso, Gravámenes, prendas u otras garantías prendarias suscribirán los documentos que razonablemente pueda solicitar el Deudor, según proceda, para reflejar o hacer efectivos dichos descargos, y todos los derechos, títulos e intereses de cualquier tenedor de dichas hipotecas, contratos de fideicomiso, Gravámenes, prendas u otras garantías prendarias revertirán al Deudor y a sus sucesores y cesionarios.

## N.    Modificación, revocación o desistimiento del Plan

### 1.    Modificación del Plan

Sujeto a las Secciones 104(j) y 313 de PROMESA y a las Secciones 942 y 1127(d) del Código de Quiebras, aplicables a los Casos del Título III conforme a la Sección 301 de PROMESA, la AEE podrá alterar, enmendar o modificar el Plan o los Anexos en cualquier momento antes o después de la Fecha de Confirmación, pero antes de la Fecha de Entrada en Vigencia. Se considerará que el Tenedor de una Reclamación ha aceptado el Plan con sus alteraciones, enmiendas o modificaciones, siempre que la alteración, enmienda o modificación no cambie de manera material y adversa el tratamiento de la Reclamación de dicho Tenedor.

2.      **Revocación o desistimiento**

La Junta de Supervisión podrá revocar o desistir del Plan antes de la Fecha de Confirmación. Si se revoca o se desiste del Plan antes de la Fecha de Confirmación, o si el Plan no entra en vigencia por cualquier motivo, entonces el Plan será nulo y sin valor. En tal caso, nada de lo aquí contenido se considerará una renuncia o un descargo de dicha reclamación por parte del Deudor o cualquier otra Entidad, ni perjudicará los derechos del Deudor o de cualquier otra Entidad en cualquier procedimiento adicional que involucre al Deudor.

3.      **Enmienda de los documentos del Plan**

En y a partir de la Fecha de Entrada en Vigencia, la potestad para enmendar, modificar o complementar el Suplemento del Plan, los anexos y apéndices del Suplemento del Plan y los anexos y apéndices del Plan, así como cualquier documento adjunto a cualquiera de los anteriores, será la establecida en dicho Suplemento del Plan, anexos y apéndices del Suplemento del Plan, o anexos y apéndices del Plan y sus respectivos documentos adjuntos, según sea el caso.

4.      **Sin admisión de responsabilidad legal**

La presentación del Plan no está destinada a ser y no se interpretará como una admisión o evidencia en cualquier acción legal, juicio, procedimiento o disputa pendientes o posteriores con respecto a cualquier responsabilidad legal, acto ilícito u obligación de ninguna clase (lo que incluye los méritos de cualquier reclamación o defensa) por cualquier Entidad con respecto a cualquiera de las cuestiones abordadas en el Plan.

Ninguna parte del Plan (incluidos, entre otros, sus anexos y apéndices), ni cualquier conciliación celebrada, acto desempeñado o documento firmado en relación con el Plan: (i) se considerará o podrá considerarse o utilizarse como una admisión o prueba de la validez de cualquier reclamación, o de cualquier acto ilícito o responsabilidad legal de cualquier Entidad; (ii) se considerará o podrá considerarse o utilizarse como admisión o prueba de cualquier responsabilidad legal, falta u omisión de cualquier Entidad en cualquier procedimiento civil, penal o administrativo en cualquier tribunal, agencia administrativa u otro tribunal; y (iii) se considerará o podrá considerarse o utilizarse como admisión o prueba contra el Deudor Reorganizado, el Deudor o cualquier otra Entidad con respecto a la validez de cualquier Reclamación. Ni el Plan ni cualquier conciliación celebrada, acto desempeñado o documento firmado en relación con el Plan serán admisibles en ningún procedimiento para ningún propósito, salvo para ejecutar los términos del Plan, y con la salvedad de que, una vez confirmado, cualquier Entidad podrá presentar el Plan en cualquier acción para cualquier propósito, lo que incluye, entre otros, para apoyar una defensa o reconvención basada en los principios de cosa juzgada, impedimento de garantía, descargo, conciliación de buena fe, prohibición de sentencia o reducción o cualquier otra teoría de preclusión de reclamaciones o cuestiones o defensa similar en reconvención.

**O.   Gobernanza corporativa y manejo del Deudor Reorganizado**

    1.       **Acción corporativa**

En la Fecha de Entrada en Vigencia, todas las cuestiones previstas en el Plan que de otro modo requerirían la aprobación de los directivos del Deudor o del Deudor Reorganizado, lo que incluye, entre otras, en la medida en que sea aplicable, la autorización para emitir o hacer que se emitan los Nuevos Bonos, la autorización para celebrar los Documentos Definitivos, la adopción de los Estatutos del Deudor Reorganizado, y la elección o designación, según sea el caso, de los directivos y los funcionarios del Deudor Reorganizado conforme al Plan, según corresponda, serán autorizados y aprobados en todos los aspectos, en cada caso, de acuerdo con el Nuevo Contrato Marco de Emisión de Deuda y los nuevos documentos de  gobernanza corporativa, según corresponda, y sin acción adicional por cualquier Entidad conforme a cualquier otra ley, regulación, orden o regla aplicable. Las demás cuestiones dispuestas conforme al Plan relativas a la estructura corporativa del Deudor Reorganizado, o a la acción corporativa del Deudor Reorganizado, se considerarán que han ocurrido, se autorizarán y entrarán en vigencia de conformidad con el Nuevo Contrato Marco de Emisión de Deuda y los nuevos documentos de gobernanza corporativa, según corresponda, y sin que se requieran acciones adicionales por parte de cualquier Entidad conforme a cualquier otra ley, regulación, orden o regla aplicable. Sin perjuicio de lo anterior, en y a partir de la Fecha de Confirmación, el Deudor y el Deudor Reorganizado ejecutarán toda y cualquier acción considerada adecuada para perfeccionar las transacciones contempladas en el presente documento conforme al Nuevo Contrato Marco de Emisión de Deuda y los nuevos documentos de gobernanza corporativa, según sea aplicable.

    2.       **Estatutos del Deudor Reorganizado**

En la medida en que sea aplicable, los estatutos del Deudor Reorganizado se enmendarán a la Fecha de Entrada en Vigencia para disponer sustancialmente como se estipula en los Estatutos del Deudor Reorganizado.

    3.       **Funcionarios del Deudor Reorganizado**

Los funcionarios y directivos del Deudor Reorganizado seguirán siendo los mismos a la Fecha de Entrada en Vigencia, a menos que se indique lo contrario en el Suplemento del Plan.

**P.   Identificación de reclamaciones afectadas por el Plan y no afectadas por el Plan**

    1.       **Clases afectadas**

Las Reclamaciones de las Clases 1-7, y 9-10 están Afectadas y reciben distribuciones conforme al Plan, y por lo tanto tienen derecho a votar para aceptar o rechazar el Plan. Las Reclamaciones de la Clase 12 están Afectadas y no reciben una distribución conforme al Plan y, por lo tanto, se considera que la Clase 12 ha rechazado el Plan.

    2.       **Clases no afectadas**

Las Reclamaciones de las Clases 8 y 11 no están Afectadas conforme al Plan, se considera que han aceptado el Plan y no tienen derecho a votar para aceptar o rechazar el Plan.

**Q.**   **Condiciones previas a la confirmación del Plan**

1.   **Condiciones previas a la Fecha de Confirmación**

Será condición previa a la Confirmación del Plan que se hayan cumplido o renunciado a las siguientes condiciones conforme al Artículo XXVIII.B del Plan:

     a.   **Certificación del Plan Fiscal:**   La Junta de Supervisión habrá certificado un Plan Fiscal congruente con el Plan y habrá certificado la presentación del Plan, y cualquier modificación del Plan hasta la Fecha de Confirmación, de conformidad con las Secciones 104(j) y 313 de PROMESA.

     b.   **Órdenes requeridas:**   El Tribunal del Título III habrá dictado una orden u órdenes (incluidas, entre otras, la Orden de Declaración de Divulgación y la Orden de Confirmación de conformidad con la Sección 314 de PROMESA y la Sección 1129 del Código de Quiebras, aplicable a los Casos de Título III conforme a la Sección 301 de PROMESA) que dispongan lo siguiente:

        (i)   Aprobación de que la Declaración de Divulgación contenga "información adecuada" conforme a la sección 1125 del Código de Quiebras;

        (ii)   Autorización de la convocatoria a la votación y elecciones con respecto al Plan;

        (iii)   Determinación de que todos los votos y elecciones o elecciones declaradas sean vinculantes y se haya realizado el recuento de votos de forma adecuada;

        (iv)   Confirmación y aplicación de los términos y disposiciones del Plan, incluso los descargos que se estipulan en el **Error! Reference source not found.** del Plan;

        (v)   Determinación de que los acuerdos mutuos y conciliaciones estipulados en el Plan sean adecuados, razonables y aprobados y que autoricen las transacciones contempladas en ellos;

        (vi)   Determinación de que la Junta de Supervisión, el Deudor y el Plan hayan satisfecho y cumplido todas las pruebas, estándares y cargas en relación con el Plan;

        (vii)   Determinación de la cuantía, en su caso, de la Reclamación por Garantía Insuficiente;

        (viii)   Determinación de que se requiere que el NEPR apruebe el Cargo Heredado como una tasa, tarifa y/o cargo necesario para garantizar

337

que la AEE Reorganizada cumpla con sus obligaciones con los tenedores de Nuevos Bonos;

(ix)     Aprobación de los documentos del Suplemento del Plan y determinación de que dichos documentos son válidos y vinculantes para las partes con respecto a ellos; y

(x)      Autorización para que el Deudor Reorganizado firme, celebre y entregue los documentos en el Suplemento del Plan, y que firme, implemente y ejecute todas las acciones necesarias o adecuadas para que tengan efecto las transacciones contempladas por el Plan, y los documentos en el Suplemento del Plan;

(xi)     Autorización al Deudor para ejecutar todas las acciones necesarias para celebrar, implementar y perfeccionar los contratos, instrumentos, títulos valores, descargos, arrendamientos, escrituras y otros acuerdos o documentos creados en relación con el Plan; incluida la fijación, implementación y ejecución del Cargo Heredado;

(xii)    Decretar que las disposiciones de la Orden de Confirmación y el Plan no son divisibles y son mutuamente dependientes;

(xiii)   Autorizar al Deudor y al Deudor Reorganizado a: (1) realizar todas las distribuciones y emisiones requeridas por el Plan; y (2) celebrar todos los acuerdos y transacciones establecidos en el Suplemento del Plan;

(xiv)    Autorizar la aplicación del Plan de conformidad con sus términos;

(xv)     El NEPR aprobará las tasas, tarifas y cargos, incluyendo el Cargo Heredado, necesarios para garantizar que la AEE Reorganizada cumpla con sus obligaciones hacia los tenedores de Nuevos Bonos;

(xvi)    Determinar que los Nuevos Bonos y los pactos del Deudor Reorganizado, para beneficio de los tenedores de los Nuevos Bonos, según lo dispuesto en el Nuevo Contrato Marco de Emisión de Deuda o la Orden de Confirmación, cuando proceda, constituyen obligaciones válidas, vinculantes, legales y aplicables, conforme a la ley federal, la de Nueva York y la de Puerto Rico;

(xvii)   Determinar que el CVI y los pactos del Deudor Reorganizado, para beneficio de los tenedores de CVI, según lo dispuesto en el Nuevo Contrato Marco de Emisión de Deuda o la Orden de Confirmación constituyen obligaciones válidas, vinculantes, legales y aplicables, conforme a la ley federal y la de Puerto Rico;

338

(xviii)  Determinar que el Gravamen y la garantía prendaria sobre los Ingresos Netos hasta el importe de los Ingresos del Cargo Heredado, y el derecho a recibir Ingresos Netos hasta el importe de los Ingresos del Cargo Heredado, y todas las demás disposiciones para pagar los Nuevos Bonos, son válidos, vinculantes, legales y aplicables;

(xix)  Determinar que el Gravamen y la garantía prendaria sobre los Ingresos Netos Restantes hasta el importe de los Ingresos del Cargo Heredado Restantes, y el derecho a recibir Ingresos Netos Restantes hasta el importe de los Ingresos del Cargo Heredado, y todas las demás disposiciones para pagar el CVI, son válidos, vinculantes, legales y aplicables;

(xx)  Determinar que el Gravamen y la garantía prendaria sobre los Ingresos Netos hasta el importe de los Ingresos por Carga de Deuda se considerarán automáticamente perfeccionados en la Fecha de Entrada en Vigencia, con sujeción únicamente a los Gravámenes y garantías prendarias permitidos en virtud del Nuevo Contrato Marco de Emisión de Deuda, y no estarán sujetas a recalificación o subordinación equitativa a ningún efecto y no constituirán transferencias preferentes o transmisiones fraudulentas en virtud de PROMESA o de cualquier ley excluida la ley de quiebras aplicable, en la máxima medida permitida por la ley;

(xxi)  Disponer que ninguna parte, Persona o Entidad promulgará, adoptará ni implementará ninguna ley, norma, reglamento o política que impida, financieramente o de otro modo, el perfeccionamiento y la implementación de las transacciones contempladas en el Plan; y

(xxii)  Determinar que el Plan es congruente con los Planes Fiscales del Deudor y satisface la sección 314(b)(7) de PROMESA.

c.  **Forma de las órdenes**:  Tanto la Orden de Confirmación como el Plan son aceptables en su forma y fondo para la Junta de Supervisión y razonablemente aceptables para los Prestamistas Requeridos de la Línea de Crédito de Combustible.

d.  **Orden de Confirmación**:  La Orden de Confirmación incluye (i) determinaciones de que todas las conciliaciones y acuerdos mutuos contenidos en el Plan satisfacen la norma aplicable conforme a las secciones 365, 1123(b)(3) y 1129 del Código de Quiebras y la Regla de Quiebras 9019, en la medida en que sea aplicable, (ii) los descargos, las exculpaciones y los interdictos estipulados en el **Error! Reference source not found.** del Plan, y (iii) las disposiciones estipuladas en este **Error! Reference source not found.**.

2.     **Renuncia a las condiciones previas a la confirmación**

En la medida en que sea posible y legalmente permisible, la Junta de Supervisión podrá renunciar, total o parcialmente, a cada una de las condiciones previas del **Error! Reference source not found.**.**Error! Reference source not found.** del Plan. La renuncia a una condición previa podrá efectuarse en cualquier momento mediante la presentación de una notificación de dicha renuncia ante el Tribunal del Título III firmada por la Junta de Supervisión.

R.     **Condiciones previas a la Fecha de Entrada en Vigencia**

1.     **Condiciones previas a la Fecha de Entrada en Vigencia**

Será condición previa a la Fecha de Entrada en Vigencia que se hayan cumplido o renunciado a las siguientes condiciones conforme al **Error! Reference source not found.**.**Error! Reference source not found.** del Plan:

a.     **Certificación del Plan Fiscal:**    La Junta de Supervisión habrá determinado que el Plan es congruente con el Plan Fiscal del Deudor y habrá certificado la presentación del Plan, y cualquier modificación del Plan hasta la Fecha de Confirmación, de conformidad con las Secciones 104(j) y 313 de PROMESA.

b.     **Orden de Confirmación:**    Todas las condiciones previas a la Confirmación, incluida la emisión de la Orden de Confirmación, se habrán cumplido o se habrá renunciado a ellas de conformidad con el Artículo XXVIII.B del Plan.

c.     **Orden Final; Sin interdictos:** La Orden de Confirmación será una Orden Final, y no se paralizará en ningún aspecto.

d.     **Autorizaciones:** Todas (1) las autorizaciones, los consentimientos, las aprobaciones regulatorias, las decisiones o los documentos, si los hubiere, que sean necesarios para implementar y ejecutar el Plan, lo que incluye que el NEPR apruebe las tarifas, tasas y cargos necesarios para garantizar que la AEE Reorganizada cumpla con sus obligaciones para con los tenedores de Nuevos Bonos, han sido obtenidos o promulgados o celebrados y no se han revocado ni anulado, y (2) salvo en la medida expresamente prevista en el presente y que no sea incompatible con ninguna otra disposición del Plan, a menos que PROMESA u otra autoridad similar lo permita o exija, la realización de cualquier otra acción legislativa o gubernamental necesaria para perfeccionar el Plan.

e.     **Firma de documentos; Otras acciones:** Todas las acciones y todos los contratos, instrumentos, conciliaciones, descargos y otros acuerdos o documentos, incluidos los Documentos Definitivos, que sean necesarios para implementar los términos y disposiciones del Plan, incluidos los Documentos Definitivos, se ejecutan y entregan, según corresponda,

tienen pleno vigor y efecto y tienen la forma y el fondo satisfactorios para la Junta de Supervisión.

    f.    **Suplemento del Plan:** La versión final del Suplemento del Plan y todos los anexos, documentos y pruebas incluidas en él se habrán presentado de forma compatible en todos los aspectos materiales con el Plan y el AAP de los Prestamistas de la Línea de Crédito de Combustible y tendrán una forma y contenido aceptables para la AEE.

    2.    **Renuncia a las condiciones previas**

La Junta de Supervisión puede renunciar a cualquiera de las condiciones hasta la Fecha de Entrada en Vigencia establecidas en el **Error! Reference source not found.**.**Error! Reference source not found.** del Plan en cualquier momento sin notificar a ninguna otra parte interesada y sin ninguna otra notificación o acción, orden o aprobación del Tribunal del Título III, y sin ninguna acción formal que no sea proceder a confirmar y perfeccionar el Plan.

    3.    **Efecto de que no se cumplan las condiciones en la Fecha de Entrada en Vigencia**

Si antes de la Fecha de Entrada en Vigencia, la Orden de Confirmación es anulada conforme a una Orden Final, entonces, salvo lo dispuesto en cualquier orden del Tribunal del Título III que anule la Orden de Confirmación, el Plan será nulo y sin valor en todos los aspectos, y nada de lo contenido en el Plan o en la Declaración de Divulgación: (a) constituirá una renuncia o descargo de cualquier Reclamación o Causa de Acción; (b) perjudicará en modo alguno los derechos del Deudor o de cualquier otra Entidad; o (c) constituirá una admisión, reconocimiento, oferta o compromiso de ningún tipo por parte del Deudor o de cualquier otra Entidad.

**S.    Disposiciones sobre el comité**

    1.    **Disolución del comité**

En la Fecha de Entrada en Vigencia, el Comité de Acreedores será (a) disuelto y se considerará que ha satisfecho todos sus respectivos deberes y obligaciones, y (b) liberado y exonerado de cualquier acción o actividad realizada, o que se requiera realizar, en relación con el Caso del Título III. En la medida en que, a la fecha inmediatamente previa a la Fecha de Entrada en Vigencia, el Comité de Acreedores fuera parte en una cuestión controvertida o proceso contencioso en relación con el Caso del Título III o cualquier objeción a las reclamaciones, en y a partir de la Fecha de Entrada en Vigencia, y en la medida en que no sea ya parte en estos, se considerará que el Deudor Reorganizado ha asumido dicha función y responsabilidad en relación con dicha cuestión controvertida o proceso contencioso y, tras dicha asunción, el Comité de Acreedores quedará relevado de cualquier función, responsabilidad u obligación con respecto a este.

**T.**        **Disposiciones con respecto a la Junta de Supervisión y el cumplimiento de PROMESA**

1.        **Efecto de la confirmación**

Ninguna disposición del Plan o de la Orden de Ratificación liberará, reemplazará, alterará o modificará de otra manera las potestades y responsabilidades de la Junta de Supervisión conforme a PROMESA o las obligaciones del Deudor Reorganizado conforme a PROMESA. En y a partir de la Fecha de Entrada en Vigencia, el Deudor Reorganizado continuará teniendo todas sus obligaciones conforme a PROMESA, lo que incluye, entre otros, los términos y condiciones de los Títulos I y II de dicha ley.

2.        **Función continua de la Junta de Supervisión**

Ninguna disposición del Plan o de la Orden de Confirmación exonerará ninguna de las obligaciones de cada Deudor conforme a PROMESA y, en y a partir de la Fecha de Entrada en Vigencia, la potestad y las responsabilidades de la Junta de Supervisión conforme a PROMESA continuarán y los deberes y las obligaciones del Deudor continuarán y no se verán afectados por el Plan y su perfeccionamiento.

3.        **Prioridad de las leyes**

A la Fecha de Entrada en Vigencia, y en la medida en que no hayan sido previamente excluidas conforme a una orden del Tribunal del Título III, las disposiciones de las leyes, reglas o reglamentos del Estado Libre Asociado que afecten a la AEE o a la AEE Reorganizada y que sean incompatibles con PROMESA serán excluidas por las siguientes razones y en la medida que se establece en el Anexo "A" a la Averiguación de Hechos y Conclusiones de Derecho, dichas leyes, normas y reglamentos excluidos incluyen, entre otros, (a) conforme a la Sección 4 de PROMESA, todas las leyes, normas y reglamentos (o las partes de ellos) del Estado Libre Asociado de Puerto Rico en la medida en que den lugar a obligaciones del Deudor canceladas por el Plan y la Orden de Confirmación conforme a PROMESA, y dicha cancelación prevalecerá sobre cualquier disposición general o específica de las leyes, normas y reglamentos del territorio, y (b) las leyes promulgadas antes del 30 de junio de 2016, en la medida en que dispongan transferencias u otras asignaciones después de la promulgación de PROMESA, lo que incluye transferencias de la AEE o la AEE Reorganizada al ELA o a cualquier agencia o instrumentalidad, ya sea para permitir que dicha agencia o instrumentalidad pague o satisfaga su endeudamiento o para cualquier otro fin, están excluidas en la medida en que sean incompatibles con la exoneración del Plan de las obligaciones del Deudor, y todas esas leyes no serán aplicables en la medida en que sean incompatibles con la exoneración de las obligaciones del Deudor o con cualquiera de las transacciones contempladas en el Plan. Sin limitar en modo alguno lo anterior, (y) las leyes del ELA sobre las que PROMESA tiene prioridad que afectan al Deudor incluyen, entre otras, las que figuran en el **Apéndice D** del Plan por las razones y en la medida establecidas en el Anexo "A" de la Averiguación de Hechos y Conclusiones de Derecho, y (z) todos los litigios en los que una Parte Gubernamental sea demandada, sobre si la ley del ELA que figura en el **Apéndice D** del Plan está excluida por PROMESA, serán desestimados, sin derecho a nueva acción, a partir de la Fecha de Entrada en Vigencia y las partes en dichos litigios notificarán sin demora a la Junta de Supervisión dicha desestimación. Para evitar

cualquier duda, la no inclusión de una obligación de pago derivada de una ley válida en un Plan Fiscal Certificado o en un presupuesto de la AEE no constituye una base para la denegación de dicha obligación en la medida en que la reclamación derivada de ella satisfaga los requisitos para la admisión de una reclamación en virtud de las disposiciones pertinentes del Código de Quiebras.

**U.    Retención de jurisdicción**

El Tribunal del Título III retendrá jurisdicción exclusiva y concurrente en razón de la materia, según sea el caso, sobre cualquier cuestión emergente en virtud de PROMESA, emergente de o relacionado con, los Casos del Título III y el Plan, o que se relacione con lo siguiente:

1.    permitir, no permitir, determinar, liquidar, clasificar, estimar o establecer la prioridad, situación garantizada o no garantizada o monto de cualquier Reclamación no acordada o conciliada por el presente, lo que incluye la resolución de la petición de pago de cualquier Reclamación y la resolución de todas y cada una de las objeciones a la situación garantizada o no garantizada, prioridad, monto o concesión de Reclamaciones no acordadas o conciliadas por el presente;

2.    resolver cualquier cuestión relacionada con Contratos a Ejecutarse o Arrendamientos no Vencidos, lo que incluye: (a) la asunción o asunción y cesión de cualquier Contrato a Ejecutarse o Arrendamiento no Vencido del que la AEE sea parte o con respecto al cual la AEE pueda ser responsable y para escuchar, determinar y, si fuera necesario, liquidar, cualquier Reclamación de Subsanación, incluso conforme a la sección 365 del Código de Quiebras; (b) cualquier obligación contractual potencial conforme a cualquier Contrato a Ejecutarse o Arrendamiento no Vencido que se asuma o se asuma y ceda; y (c) cualquier disputa con respecto a si un contrato o arrendamiento es o fue a ejecutarse o vencido;

3.    garantizar que las distribuciones a los Tenedores de Reclamaciones Permitidas se logren conforme a las disposiciones del Plan y adjudiquen todas y cualquier disputa emergente de o relacionada con las distribuciones conforme al Plan;

4.    adjudicar, decidir o resolver cualquier moción, procedimiento contencioso, cuestiones controvertidas o litigadas, y cualquier otra cuestión, y conceder o denegar cualquier solicitud que involucre a la AEE o al Deudor Reorganizado que pueda estar pendiente en la Fecha de Entrada en Vigencia o que se presente después de la Fecha de Entrada en Vigencia;

5.    decidir y resolver todas las cuestiones relacionadas con la concesión y denegación, en su totalidad o en parte, de cualquier solicitud para la concesión de compensación o reembolso de gastos a Profesionales autorizados conforme a PROMESA, el Plan o las ordenes registradas por el Tribunal del Título III;

6.      registrar e implementar las órdenes que sean necesarias o adecuadas para ejecutar, implementar, perfeccionar o aplicar las disposiciones de (a) contratos, instrumentos, descargos, escrituras y otros acuerdos o documentos aprobados por la Orden Final en los Casos del Título III y (b) el Plan, la Orden de Confirmación y cualquier otro contrato, instrumento, títulos valores, descargos, escrituras y otros acuerdos o documentos creados en relación con el Plan;

7.      adjudicar, decidir o resolver cualquier caso, controversia, juicio, disputa u otras impugnaciones de cualquier tipo que puedan surgir en relación con el perfeccionamiento, la interpretación o la aplicación del Plan, la Orden de Confirmación o cualquier contrato, instrumento, título valor, descargo o cualquier acuerdo o documento que se celebre o entregue en virtud del Plan o de los derechos de cualquier Entidad derivados del Plan o de dichos documentos o de las obligaciones contraídas en relación con el Plan o con dichos documentos, lo que incluye, para evitar cualquier duda, cualquier cuestión relativa a la fijación, implementación y ejecución del Cargo Heredado y el pacto tarifario y cualquier modificación del Cargo Heredado y el pacto tarifario, así como la autorización del NEPR sobre el Cargo Heredado y cualquier modificación del Cargo Heredado.

8.      aprobar cualquier modificación del Plan, o aprobar cualquier modificación de la Orden de Confirmación o cualquier contrato, instrumento, título valor, descargo u otro acuerdo o documento creado en relación con el Plan o la Orden de Confirmación, o subsanar cualquier defecto u omisión o conciliar cualquier incongruencia en cualquier orden, el Plan, la Orden de Confirmación o cualquier contrato, instrumento, título valor, descargo o cualquier acuerdo o documento creado en relación con el Plan o la Orden de Confirmación, o registrar cualquier orden en apoyo de la confirmación conforme a las secciones 945 y 1142(b) del Código de Quiebras, de una manera según sea necesario o adecuado para perfeccionar el Plan;

9.      adjudicar, decidir o resolver cualquier cuestión relacionada con el cumplimiento por parte de la AEE del Plan y la Orden de Confirmación de conformidad con la sección 945 del Código de Quiebras;

10.     determinar cuestiones que puedan surgir en relación con o vinculadas al Plan, la Declaración de Divulgación, la Orden de Confirmación o cualquier contrato, instrumento, título valor, descargo u otro acuerdo o documento celebrado o entregado en relación con el Plan, la Declaración de Divulgación o la Orden de Confirmación, en cada caso, únicamente en la medida en que dicho documento no disponga que otro tribunal o tribunales tienen jurisdicción exclusiva;

11.     emitir interdictos, dictar y ejecutar otras órdenes, o tomar otras medidas que puedan ser necesarias o apropiadas para hacer cumplir o impedir la interferencia de cualquier Entidad con el Perfeccionamiento o la aplicación del Plan o de la Orden de Confirmación;

344

12. adjudicar todas las controversias, juicios o cuestiones que puedan surgir con respecto a la validez de cualquier acción ejecutada por cualquier entidad conforme a o para promover el Plan o la Orden de Confirmación, incluso, entre otras, la emisión de Nuevos Bonos, y registrar cualquier orden o medida que sea necesaria o apropiada en relación con dicha adjudicación;

13. determinar cuestiones que puedan surgir en relación con o relacionadas con el Plan, la Declaración de Divulgación, la Orden de Confirmación, los Documentos Definitivos o cualquier contrato, instrumento, título valor, descargo u otro acuerdo o documento creado en relación con el Plan, en cada caso, únicamente en la medida en que dicho documento no disponga que otro tribunal o tribunales tienen jurisdicción exclusiva;

14. hacer cumplir los Nuevos Bonos y el Nuevo Contrato Marco de Emisión de Deuda, lo que incluye, entre otros, el Pacto sobre Tasas de Interés, o, en el caso de que el Tribunal del Título III rechace dicha retención de jurisdicción o el Caso del Título III haya sido cerrado de acuerdo con los términos y disposiciones de PROMESA, el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico queda por la presente designado para hacer cumplir los Nuevos Bonos y el Nuevo Contrato Marco de Emisión de Deuda, lo que incluye, entre otros, el Pacto sobre Tasas de Interés;

15. registrar e implementar las órdenes que sean necesarias o adecuadas si la Orden de Confirmación se modifica, paraliza, revierte, revoca o anula por cualquier motivo;

16. registrar una orden o un decreto final que concluya o cierre el Caso de Título III conforme a la sección 945(b) del Código de Quiebras;

17. aplicar y aclarar cualquier orden previamente registrada por el Tribunal del Título III en el Caso de Título III; y

18. atender cualquier otra cuestión sobre la que el Tribunal del Título III tenga jurisdicción en virtud de las disposiciones de PROMESA, sin perjuicio de los límites a la jurisdicción y facultades del Tribunal del Título III en virtud de las Secciones 305 y 306 de PROMESA.

## V.   Disposiciones varias

### 1.   **Titularidad de los activos**

Salvo que se disponga lo contrario en la Orden de Confirmación o en el Plan, en la Fecha de Entrada en Vigencia, la titularidad de todos los Activos y bienes del Deudor comprendidos en el Plan corresponderá al Deudor Reorganizado, libres de todo Gravamen (salvo los Gravámenes otorgados conforme al Plan y a la Orden de Confirmación).

2.    **Sin renuncia**

No obstante cualquier disposición en contrario contenida en el presente, las exoneraciones y los interdictos establecidos en el Plan no limitarán, restringirán ni afectarán de otro modo, ni se interpretará que limitan, restringen o afectan, los derechos de la Junta de Supervisión, la AAFAF, o el Deudor Reorganizado, o los Acreedores del AAP de los Prestamistas de la Línea de Crédito de Combustible (de conformidad con el AAP de los Prestamistas de la Línea de Crédito de Combustible) de hacer valer, entablar acciones legales, transigir o acordar los derechos, las reclamaciones y otros asuntos expresamente retenidos por cualquiera de ellos.

3.    **Interdicto complementario**

No obstante cualquier disposición en contrario en el presente, salvo dentro de los límites que se estipulan en el Plan, todas las Entidades, incluidas las Entidades que actúan en su propio nombre, que actualmente tienen o afirman, han tenido o afirmado, o pueden tener o afirmar cualquier Reclamación Exonerada en contra de cualquiera de las Partes Exoneradas basada en, atribuible a, emergente de o relacionada con el Caso del Título III o cualquier Reclamación contra el Deudor, cuando quiera y dondequiera que se plantee o se afirme, ya sea en los EE. UU. o en cualquier otra parte del mundo, basada en contrato, derecho extracontractual, garantía, ley o cualquier otra teoría del derecho escrito o consuetudinario o de otra índole, estará y se considerará que está permanentemente paralizada, restringida y prohibida de iniciar cualquier acción contra cualquiera de las Partes Exoneradas con el fin de cobrar, recuperar o recibir, directa o indirectamente, cualquier pago o recuperación con respecto a cualquier Reclamación Exonerada emergente con anterioridad a la Fecha de Entrada en Vigencia (incluso con anterioridad a la Fecha de la Petición), lo que incluye, entre otros:

A.  Iniciar o continuar de cualquier manera acciones u otros procedimientos de cualquier clase con respecto a dichas Reclamaciones Exoneradas contra cualquiera de las Partes Exoneradas o los activos o los bienes de cualquier Parte Exonerada;

B.  Hacer valer, embargar, cobrar o recobrar, de cualquier manera y por cualquier medio, sentencias, laudos, decretos u órdenes en contra de cualquiera de las Partes Exoneradas o los activos o los bienes de cualquiera de las Partes Exoneradas, con relación a dicha Reclamación Exonerada;

C.  Crear, perfeccionar o ejecutar un Gravamen de cualquier tipo contra cualquiera de las Partes Exoneradas o los activos o bienes de cualquiera de las Partes Exoneradas con respecto a dicha Reclamación Exonerada;

D.  Salvo que se disponga expresamente en el Plan o en la Orden de Confirmación, hacer valer, implementar o efectuar cualquier compensación, derecho de subrogación, indemnización, contribución o recuperación de cualquier tipo contra cualquier obligación exigible a cualquiera de las Partes Exoneradas o contra los activos o bienes de cualquiera de las Partes Exoneradas con respecto a dicha Reclamación Exonerada; y

346

E. Tomar cualquier medida, de cualquier manera, en cualquier lugar, que no se ajuste a, o cumpla con, las disposiciones del Plan o la Orden de Confirmación; disponiéndose, sin embargo, que el cumplimiento del Deudor de los requisitos formales de la Regla de Quiebras 3016 no constituirá una admisión de que el Plan contempla cualquier interdicto en contra de una conducta que no esté de otro modo prohibida por el Código de Quiebras.

4. **Efecto vinculante inmediato**

En virtud de la sección 944(a) del Código de Quiebras aplicable a los Casos del Título III conforme a la Sección 301 de PROMESA, y no obstante las Reglas de Quiebras 3020(e), 6004(h) o 7062, o en cualquier otra disposición, una vez transcurrida la Fecha de Entrada en Vigencia, los términos del Plan y del Suplemento del Plan se harán efectivos y ejecutables de inmediato, y se considerarán vinculantes para todos los Tenedores de Reclamaciones y sus respectivos sucesores y cesionarios, ya sea que la Reclamación de cualquiera de los Tenedores se haya visto o no afectada en razón del Plan, y ya sea que el Tenedor hubiere o no aceptado dicho Plan. Los descargos, exculpaciones y transacciones realizados en virtud del Plan serán operativos y podrán ser ejecutados por el Tribunal del Título III a partir de la Fecha de Entrada en Vigencia, incluso en virtud de las disposiciones sobre interdictos del Plan. Una vez aprobadas, los acuerdos y arreglos incorporados en el Plan, junto con el tratamiento de cualquier Reclamo Permitido asociado, no estarán sujetos a la impugnación colateral o a cualquier otra impugnación por parte de ninguna Entidad, en ningún tribunal u otro foro. Por lo tanto, toda Entidad que se oponga a los términos de cualquier acuerdo mutuo y transacción establecidos en el Plan deberá (a) impugnar dicho acuerdo mutuo y transacción antes de la confirmación del Plan, y (b) demostrar que tiene un derecho apropiado para objetar y que el acuerdo mutuo y la transacción en cuestión no cumplen las normas que rigen los arreglos en virtud de la Regla de Quiebras 9019 y otra ley aplicable.

5. **Documentos adicionales**

En o antes de la Fecha de Entrada en Vigencia, la Junta de Supervisión puede presentar ante el Secretario del Tribunal del Título III los acuerdos y otros documentos que sean necesarios o apropiados para dar pleno vigor y efecto y presentar evidencia adicional sobre los términos y condiciones del Plan y del AAP de los Prestamistas de la Línea de Crédito de Combustible. El Deudor y todos los Tenedores de Reclamaciones que reciban distribuciones conforme al Plan y todas las otras partes interesadas, podrán periódicamente preparar, ejecutar y formalizar acuerdos o documentos, y realizar otras acciones que sean necesarias o recomendables para dar pleno vigor y efecto a las disposiciones y la intención del Plan.

6. **Reserva de derechos**

Salvo lo expresamente establecido en el presente, el Plan no tendrá vigencia hasta que el Tribunal del Título III dicte la Orden de Confirmación. Ninguna presentación del Plan, o declaración o disposición contenida en dicho Plan, o la realización de cualquier acción por parte del Deudor con respecto al Plan, la Declaración de Divulgación o el Suplemento del Plan será ni se considerará una admisión o renuncia a ninguno de los derechos del Deudor con respecto a los Tenedores de Reclamaciones antes de la Fecha de Entrada en Vigencia. Con excepción de lo

expresamente establecido en el presente, los derechos y facultades del gobierno del ELA conforme a la Constitución de Puerto Rico y a PROMESA, incluidos, entre otros, en virtud de las Secciones 303 y 305 de PROMESA, quedan expresamente reservados (sujetos a cualquier limitación sobre ellos impuesta por la Constitución de Puerto Rico, la Constitución de EE.UU. o PROMESA), y ninguna disposición del presente se considerará como una renuncia a ninguno de tales derechos y facultades.

7.    **Sucesores y cesionarios**

A menos que se indique expresamente lo contrario en el Plan, los derechos, los beneficios y las obligaciones de cualquier Entidad designada o a la que se haga referencia en el Plan o la Orden de Confirmación tendrá carácter vinculante, y redundará en beneficio de cualquier heredero, albacea, administrador, sucesor o cesionario, filial, funcionario, director, agente, representante, abogado, beneficiarios o custodio, si lo hubiere, de dicha Entidad.

8.    **Honorarios y gastos posteriores a la Fecha de Entrada en Vigencia**

En y a partir de la Fecha de Entrada en Vigencia, el Deudor Reorganizado deberá, en el curso ordinario de sus actividades y sin necesitar ninguna aprobación del Tribunal del Título III, contratar profesionales y pagar los honorarios y gastos profesionales razonables incurridos por el Deudor Reorganizado vinculados a la implementación y el perfeccionamiento del Plan, sin requerir una aprobación adicional del Tribunal del Título III. Sin perjuicio de lo anterior, en y a partir de la Fecha de Entrada en Vigencia, el Deudor Reorganizado deberá, en el curso ordinario de sus negocios y sin necesidad de ninguna aprobación del Tribunal del Título III, pero en ningún caso más de cuarenta y cinco (45) días después de haber presentado las facturas o liquidaciones con respecto a los honorarios y gastos incurridos al Deudor Reorganizado, abonar los honorarios razonables y documentados y reembolsar los gastos a la Junta de Supervisión y sus profesionales relacionados con la implementación y el perfeccionamiento del Plan y en relación con sus deberes y responsabilidades conforme a PROMESA y los términos y las disposiciones del Plan.

9.    **Exención en virtud de la Ley de Valores**

En virtud de la sección 1145 del Código de Quiebras y/o la sección 3(a)(2) de la Ley de Valores, el ofrecimiento, la emisión y la distribución de los Nuevos Bonos conforme a los términos del Plan, quedarán exentos del registro conforme a la Ley de Valores, y a toda ley de un estado o local que exija el registro para la oferta, emisión o distribución de títulos valores, incluidos, entre otros, los requisitos de registro de la Sección 5 de la Ley de Valores y cualquier otra ley de un estado o federal aplicable que exija el registro y/o la entrega del prospecto de emisión o calificación con anterioridad a la oferta, emisión, distribución o venta de títulos valores.

10.    **Derecho aplicable**

Salvo en la medida en que se aplique otra ley federal, o si un apéndice al presente o cualquier documento que deba suscribirse en relación con el presente dispusiera lo contrario, los derechos, deberes y obligaciones derivados del Plan se regirán, se interpretarán y se exigirán de conformidad con la ley PROMESA (incluidas las disposiciones del Código de Quiebras hechas

aplicables en virtud de la sección 301 de PROMESA) y, siempre que no resulten incompatibles con dicha ley, con las leyes del Estado Libre Asociado de Puerto Rico que dan lugar a los principios de conflictos entre leyes.

11.    **Cierre del caso**

La Junta de Supervisión deberá, inmediatamente después de la administración total de los Casos del Título III, presentar ante el Tribunal del Título III todos los documentos requeridos por la Regla de Quiebras 3022 y cualquier orden aplicable del Tribunal del Título III. No obstante el cierre de los Casos del Título III, el Tribunal del Título III conservará la jurisdicción sobre todos los asuntos establecidos en el **Error! Reference source not found.** del Plan.

12.    **Encabezados de las secciones**

Los encabezados de las secciones del presente Plan se incluyen a modo de referencia exclusivamente, y no afectarán en modo alguno el significado o la interpretación de dicho Plan.

13.    **Conservación de documentos**

En y a partir de la Fecha de Entrada en Vigencia, el Deudor Reorganizado puede conservar documentos de acuerdo con su política estándar de conservación de documentos, que puede ser alterada, enmendada, modificada o complementada por el Deudor Reorganizado.

14.    **Notificación de documentos**

Para que surtan efecto, todas las notificaciones, solicitudes, demandas u otros documentos exigidos por el Plan o la Orden de Confirmación que sean notificados y entregados a la Junta de Supervisión, a la AEE o a la AAFAF deberán hacerse por escrito, lo que incluye transmisión por fax, y a menos que se exprese lo contrario en el presente, se considerará que han sido debidamente entregados cuando efectivamente se entreguen o, en el caso de transmisión por fax, cuando efectivamente sean recibidos y confirmados telefónicamente, a los siguientes domicilios:

**AEE o la Junta de Supervisión**        Financial Oversight and Management
Board for Puerto Rico
268 Muñoz Rivera Ave, Suite 1107
San Juan, PR 00918-1813
Atención:  Director Ejecutivo

– con copia a –

PROSKAUER ROSE LLP
Eleven Times Square
Nueva York, NY 10036
Atención:  Martin J. Bienenstock, Esq.
       Paul V. Possinger, Esq.
       Ehud Barak, Esq.
       Daniel S. Desatnik, Esq.

Tel:  (212) 969-3000
Fax:  (212) 969-2900

**AAFAF**

Fiscal Agency and Financial Advisory Authority
Roberto Sánchez Vilella (Minillas) Government Center
De Diego Ave. Parada 22
San Juan, Puerto Rico 00907

– con copia a –

O'MELVENY & MYERS LLP
Seven Times Square
Nueva York, NY 10036
Atención:  John Rapisardi, Esq.
              Peter Friedman, Esq.
              Maria J. DiConza, Esq.
Tel:  (212) 326-2000
Fax:  (212) 326-2061

15.    **Plazo de los interdictos o paralizaciones**

    **Salvo que se establezca lo contrario en el presente o en la Orden de Confirmación, todos los interdictos o las paralizaciones vigentes con respecto al Caso del Título III (de conformidad con las secciones 105, 362 o 922 del Código de Quiebras, o con cualquier orden del Tribunal del Título III) y en vigor a la Fecha de Confirmación (salvo los interdictos o las paralizaciones incluidos en el Plan o en la Orden de Confirmación) continuarán plenamente vigentes hasta la Fecha de Entrada en Vigencia. Todos los interdictos o las paralizaciones incluidos en el Plan o en la Orden de Confirmación continuarán plenamente vigentes de conformidad con sus términos.**

16.    **Totalidad del acuerdo**

    Salvo que se indique lo contrario, el Plan reemplaza toda negociación, promesa, convenio, acuerdo, entendimiento y declaración anteriores y contemporáneos sobre su materia, y todos ellos se fusionarán e integrarán en el Plan.

17.    **Anexos del Suplemento del Plan**

    Todos los anexos y documentos en el Suplemento del Plan se incorporan en el Plan y forman parte de él, como si figuraran en su totalidad en el Plan. Al presentar el Suplemento del Plan en la Secretaría del Tribunal del Título III, se pondrán a disposición copias de los documentos incluidos en ese suplemento a solicitud por escrito del asesor de la Junta de Supervisión, en el domicilio que se indica más arriba o se podrán descargar tales documentos de https://dm.epiq11.com/case/prepa/info o del sitio web del Tribunal del Título III, disponible a través de PACER. Tras la presentación de los anexos y documentos, copias de dichos anexos y documentos se pondrán a disposición mediante solicitud por escrito al asesor de la Junta de Supervisión, enviada al domicilio que se indica más arriba o se podrán descargar tales

350

documentos de https://dm.epiq11.com/case/prepa/info o del sitio web del Tribunal del Título III, disponible a través de PACER. A menos que el Tribunal del Título III ordene lo contrario, en la medida en que cualquier anexo o documento del Suplemento del Plan sea incompatible con los términos de cualquier parte del Plan que no constituya el Suplemento del Plan, prevalecerá la parte del Plan que no constituya el Suplemento del Plan.

18.     **Sin divisibilidad**

Excepto en la medida en que se especifique expresamente lo contrario en el Plan, si el Tribunal del Título III considera que algún término o disposición del Plan es inválido, nulo o inaplicable, el Tribunal del Título III, en cada caso a elección de la AEE y con su consentimiento, tendrá la facultad de modificar e interpretar dicho término o disposición de modo que sea válido o aplicable en la máxima medida que resulte posible, de modo compatible con el propósito original del término o la disposición declarada inválida, nula o inaplicable, y dicho término o disposición será entonces aplicable tal como se lo haya modificado o interpretado. No obstante, dicha consideración, alteración o interpretación, los términos y disposiciones restantes del Plan permanecerán en pleno vigor y efecto y no se verán afectados, limitados ni invalidados en modo alguno por dicha consideración, alteración o interpretación. Las disposiciones del Plan, incluidas las de descargo, interdicto, exculpación y acuerdos mutuos, son mutuamente dependientes e indivisibles. La Orden de Confirmación constituirá una determinación judicial y establecerá que cada término y disposición del Plan es: (i) válido y ejecutable conforme a sus términos; (ii) parte integral del Plan y no pasible de eliminación o modificación sin el consentimiento de la AEE; y (iii) indivisible y mutuamente dependiente.

19.     **Votación convocada de buena fe**

Tras el registro de la Orden de Confirmación, se considerará que la AEE ha convocado a la votación sobre el Plan de buena fe y en cumplimiento con el Código de Quiebras, y conforme a la sección 1125(e) del Código de Quiebras, se considerará que la AEE y sus agentes, representantes, miembros, directores, accionistas, funcionarios, directivos, empleados, asesores y abogados han participado de buena fe y de conformidad con el Código de Quiebras en la oferta, emisión, venta y compra de títulos valores ofrecidos y vendidos conforme al Plan y cualquier plan anterior y, por lo tanto, ni ninguna de dichas partes o individuos ni la AEE tendrán responsabilidad alguna por la violación de cualquier ley, norma o reglamento aplicable que rija la convocatoria a la votación sobre el Plan o la oferta, emisión, venta o compra de los títulos valores ofrecidos y vendidos conforme al Plan y cualquier plan anterior.

20.     **Renuncia o impedimento legal**

Se considerará que cada Tenedor de una Reclamación ha renunciado a cualquier derecho a hacer valer cualquier argumento, incluso el derecho a argumentar que su Reclamación debe ser Permitida en una cierta cantidad, en una cierta prioridad, garantizada o no subordinada en virtud de un acuerdo hecho con la AEE o su abogado, o cualquier otra Entidad, si dicho acuerdo no fue divulgado en el Plan, la Declaración de Divulgación, o los documentos presentados ante el Tribunal del Título III antes de la Fecha de Confirmación.

*[El resto de la página se deja intencionalmente en blanco]*

# VII.   Confirmación del plan de ajuste

## A.   Vista de confirmación

PROMESA y el Código de Quiebras requieren que el Tribunal del Título III, después de la notificación, celebre una Vista de Confirmación en la cual escuchará los argumentos en apoyo del Plan, cualquier objeción al Plan, y analizará las evidencias con respecto a si se debe confirmar el Plan. En la Vista de Confirmación, el Tribunal del Título III confirmará el Plan solo si se cumplen todos los requisitos establecidos en la Sección 314 de PROMESA, que se describen a continuación.

El _____, el Tribunal del Título III registró el _____ [ECF Núm. ____] (la "Orden de Programación de Vistas"). Entre otras cosas, la Orden de Programación de Vistas dispone que la Vista de Confirmación comenzará el _____, _____ (Hora Estándar del Atlántico) ante la Honorable Laura Taylor Swain, Juez de Distrito de los Estados Unidos, en el Tribunal del Título III, Clemente Ruiz Nazario United States Courthouse, 150 Carlos Chardón Avenue, San Juan, P.R. 00918 en una sala de vistas que será determinada posteriormente. La Vista de Confirmación puede ser aplazada cuando proceda por el Tribunal del Título III o por el Deudor sin previo aviso, salvo el anuncio de la fecha de reanudación que se fije en la Vista de Confirmación.

## B.   Fechas límite para objetar la confirmación

La Orden de Declaración de Divulgación establece la fecha límite para presentar objeciones a la confirmación del Plan, que será el _____ a las _____ (Hora Estándar del Atlántico). Las objeciones a la confirmación del Plan deben: (1) realizarse por escrito; (2) indicar el nombre y la dirección de la parte que formula la objeción y la naturaleza del Reclamo de dicha parte; (3) indicar con precisión los fundamentos y la naturaleza de cualquier objeción; y (4) ser presentadas ante el Tribunal del Título III, y notificarse a las siguientes partes de modo tal que las reciban, a más tardar, en la fecha límite correspondiente estipulada anteriormente:

- la Oficina del Fideicomisario de Estados Unidos para el Distrito de Puerto Rico, Edificio Ochoa, 500 Tanca Street, Suite 301, San Juan, P.R. 00901 (ref: En el caso: La Autoridad de Energía Eléctrica de Puerto Rico);

A los fines de presentación de objeciones en estos casos, la dirección del Tribunal del Título III: Oficina del Secretario del Tribunal de Distrito de los Estados Unidos, 150. Carlos Chardon Ste. 150, San Juan, P.R. 00918-1767.

## C.   Requisitos para la confirmación del Plan de Ajuste

En la Vista de Confirmación, el Tribunal del Título III determinará si el Plan satisface los requisitos de la Sección 314 de PROMESA. El Deudor considera que el Plan cumplirá todos los requisitos legales aplicables de PROMESA y del Código de Quiebras. Entre los requisitos para la confirmación se incluyen que el Plan: (1) sea aceptado por los Tenedores requeridos de las Clases de Reclamaciones afectadas o, si no fuera aceptado por ellos, que sea "justo y equitativo" y no discrimine injustamente a la clase que no lo acepte, (2) sea "en el mejor interés" de los

353

acreedores, (3) sea viable, y (4) cumpla con las disposiciones aplicables de PROMESA y del Código de Quiebras.

1.    **Aceptación o imposición del plan concursal por el Tribunal**

Un plan es aceptado por una clase de reclamaciones afectada si los tenedores de dos tercios del monto en dólares y la mayoría numérica de las reclamaciones permitidas de esa clase votan por aceptar el plan. Solo aquellos tenedores de reclamaciones que efectivamente voten por aceptar o rechazar el plan se computan a los efectos del recuento de votos. Todas las clases afectadas deben aceptar el plan para que este se confirme sin que se aplique la prueba del "cramdown", o imposición de Plan Concursal por el Tribunal incluida en las secciones 1129(b)(1), (b)(2)(A) y (b)(2)(B) del Código de Quiebras.

a)    **imposición del plan concursal por el Tribunal ("cramdown")**

La Ley PROMESA y el Código de Quiebras estipulan que el Tribunal del Título III puede confirmar un plan de ajuste que no sea aceptado por todas las clases afectadas si al menos una de las clases de reclamaciones afectadas acepta el plan, y se satisfacen las disposiciones del así llamado "cramdown" (la autoridad de tribunal de imponer un plan concursal) establecidas en las secciones 1129(b)(l), (b)(2)(A) y (b)(2)(B) del Código de Quiebras. El plan de ajuste puede confirmarse en virtud de las disposiciones de "cramdown" si, además de satisfacer los demás requisitos de la sección 943(b) del Código de Quiebras, (i) es "justo y equitativo", y (ii) no discrimina indebidamente a las clases de reclamaciones afectadas que no hayan aceptado el plan. El Deudor considera que el Plan y el tratamiento de todas las Clases de Reclamaciones en virtud del Plan cumplen con los siguientes requisitos para la confirmación no consensual del Plan.

b)    **"Justo y equitativo"**

No existe certidumbre acerca del contenido exacto del requisito de que un plan sea "justo y equitativo" establecido en el Título III. Fuera del contexto del Título III, el requisito de que el plan sea "justo y equitativo" suele comprender, entre otras cosas, que, salvo que una clase de reclamaciones no garantizada disidente reciba el pago total de sus reclamaciones permitidas, ningún tenedor de reclamaciones permitidas en una clase menos privilegiada que esa clase pueda recibir o retener bienes por cuenta de esas reclamaciones. Esto se conoce como la "regla de la absoluta prioridad". Pocas opiniones publicadas han abordado el significado del requisito de que el plan sea "justo y equitativo" en los casos del Capítulo 9. Los tribunales que han abordado este requisito en el contexto de un caso del capítulo 9 han indicado que, debido a que no hay accionistas en los casos del capítulo 9 (quienes, en teoría, serían menos privilegiados en cuanto a prioridad para los acreedores no garantizados generales de un deudor) la regla de la absoluta prioridad no se puede aplicar en los casos del capítulo 9 y, por lo tanto, en dichos casos, el requisito de que el plan sea "justo y equitativo" no se debe interpretar como sinónimo de la regla de la absoluta prioridad. En cambio, los tribunales han sostenido que se entiende que el requisito de que un plan sea "justo y equitativo" en los casos del capítulo 9 requiere que, cuando un deudor intenta obtener una confirmación no consensual de un plan de ajuste, los acreedores afectados de ese deudor recibirán, en virtud del plan de ajuste propuesto, todo lo que pueden esperar razonablemente en virtud de las circunstancias.

354

El Deudor considera que el Plan es "justo y equitativo" con respecto a los Tenedores de Reclamaciones contra los Deudores ya que brinda a esos Tenedores de Reclamaciones todo aquello que pueden esperar razonablemente en virtud de las circunstancias de los Casos de Título III. La presentación de los Casos del Título III se precipitó, entre otras cosas, por la insostenible carga de la deuda de los Deudores, una grave escasez de efectivo y el deterioro económico y la emigración que erosionaban los ingresos del Deudor. El Deudor considera que el Plan es "justo y equitativo" porque los recobros de los acreedores allí propuestos han sido calculados —y, en ciertos casos, negociados— para compensar razonablemente a los Tenedores de Reclamaciones y al mismo tiempo, permitir al Deudor, entre otras cosas, (A) evitar la recurrencia de las dificultades financieras que llevaron al inicio del Caso del Título III, (B) instituir iniciativas de reinversión desesperadamente necesarias para garantizar la continuidad de la operación del Deudor; (C) mantener tarifas de electricidad que estén dentro del rango de asequibilidad para los clientes de la AEE; (D) evitar expulsar a los clientes de la red; y (E) asegurar que el Deudor es capaz de proporcionar servicios eficaces y está en condiciones de cumplir con los mandatos de energía bajo la ley de Puerto Rico.

c)   **Discriminación injusta**

Un plan de ajuste no "discrimina injustamente" si se trata a una clase disidente de manera sustancialmente igual que a otras clases en situación similar, y si ninguna clase recibe más que aquello que tiene derecho legal a recibir por sus reclamaciones. El Deudor considera que el Plan de Ajuste no discrimina injustamente contra ninguna Clase de Reclamaciones afectadas.

**EN CASO DE RECHAZO DEL PLAN POR UNA O MÁS CLASES AFECTADAS, LA JUNTA DE SUPERVISIÓN SE RESERVA EL DERECHO DE SOLICITAR AL TRIBUNAL DEL TÍTULO III QUE CONFIRME EL PLAN DE CONFORMIDAD CON LA LEY PROMESA Y CON LAS SECCIONES 1129(b)(1), (b)(2)(A) Y (b)(2)(B) DEL CÓDIGO DE QUIEBRAS. LA JUNTA DE SUPERVISIÓN SE HA RESERVADO EL DERECHO DE MODIFICAR EL PLAN DE AJUSTE EN LA MEDIDA, SI EXISTIERA, QUE LA CONFIRMACIÓN DEL PLAN EN VIRTUD DE LA SECCIÓN 314 DE PROMESA Y DE LA SECCIÓN 1129(b) DEL CÓDIGO DE QUIEBRAS NECESITE UNA MODIFICACIÓN.**

d)   **La prueba del "mejor interés de los acreedores"**

El Tribunal del Título III también debe determinar que el Plan satisface la prueba del mejor interés de los acreedores conforme a la sección 314(b)(6) de la ley PROMESA. La prueba del "mejor interés de los acreedores" en virtud de PROMESA solo exige que el tribunal "*considere* si los remedios disponibles en virtud de las leyes excluida la ley de quiebras y la constitución del territorio darían como resultado una mayor recuperación para los acreedores que la proporcionada por [el] plan". *Antecedentes de Hecho y Conclusiones de Derecho en relación con la Confirmación del Octavo Plan de Ajuste Conjunto Enmendado Modificado de Título III del Estado Libre Asociado de Puerto Rico, el Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico y la Autoridad de Edificios Públicos de Puerto Rico* [Caso Núm. 17-bk-3283, ECF Núm. 19812, ¶ 211] (alteración en el original) (énfasis en el original). A diferencia de la prueba del mejor interés del capítulo 11, la prueba del mejor interés de PROMESA (i) no es una prueba de liquidación, porque el Deudor no puede ser liquidado, y

355

(ii) se aplica a los acreedores colectivamente, no individualmente. *Id.* (observando que "la prueba [del mejor interés] del capítulo 9 no es una prueba de liquidación (porque los municipios no pueden ser liquidados) y se centra en la recuperación **colectiva** de los acreedores en conjunto"). (énfasis en el original).[276]   En consecuencia, el Tribunal del Título III ha concluido que "la prueba del mejor interés de PROMESA *no* impone una prueba decisiva ni establece un límite mínimo para los recobros de los acreedores". *Id.* en 135.

El análisis de la prueba de los mejores intereses (el "Informe de la Prueba del Mejor Interés") que el Tribunal del Título III considera se adjunta al presente como Anexo K.[277]   El Informe de la Prueba del Mejor Interés analiza los recobros que los acreedores del Deudor podrían esperar basándose en los recursos disponibles en virtud de las leyes excluida la ley de quiebra y la Constitución del ELA y el plan fiscal certificado de la AEE.

El Deudor cree que el Plan satisface la prueba del mejor interés de los acreedores establecida en la Sección 314(b)(6) de PROMESA porque, entre otras cosas, la falta de confirmación del plan y la desestimación del caso de Título III del Deudor darían lugar a una carrera hacia el juzgado que dejaría a muchos acreedores sin posibilidad alguna de recobro, que eliminaría la capacidad de la AEE para descargar la deuda necesaria para recuperar el acceso al mercado, y podría dar lugar a aumentos desenfrenados de tarifas que podrían amenazar la generación y entrega confiable de energía y expulsar a los clientes de la red.

e)   **Viabilidad**

La sección 314(b)(6) de PROMESA también exige que el plan de ajuste sea en el mejor interés de los acreedores y sea viable. Aunque la ley explica que el requisito de que el plan sea en el mejor interés de los acreedores significa que el Tribunal del Título III debe evaluar qué es lo que recuperarían los acreedores en virtud de los remedios disponibles fuera del Título III, la ley no proporciona orientación sobre lo que se considera "viable", más allá de la palabra en sí. El Capítulo 9 del Código de Quiebras es el capítulo que está disponible para los municipios de los Estados. También impone un requisito de viabilidad en su sección 943(b)(7) sin proporcionar mayor orientación. Los tribunales han interpretado que el requisito de viabilidad en el capítulo 9 significa que la municipalidad será viable, y que el plan ofrece una perspectiva de éxito razonable y es factible. El deudor debe demostrar que puede cumplir las obligaciones de su plan. A diferencia del capítulo 9, el Título III también contiene un requisito de que el Plan de Ajuste de Título III sea compatible con el plan fiscal certificado. Significativamente, conforme a la Sección 201(b)(1)(I) de PROMESA, el plan fiscal certificado debe contener un análisis de sostenibilidad de la deuda. Como consecuencia, la viabilidad del Plan de Ajuste de Título III se puede determinar al menos parcialmente en función de si el plan dispone una cantidad de deuda continua dentro del rango del análisis de sostenibilidad de la deuda en el plan fiscal certificado.

---

[276] La interpretación de este Tribunal es coherente con el enfoque adoptado por los tribunales en los casos del capítulo 9, donde la sección 943(b)(7) del Código de Quiebras que exige que el plan sea "en el mejor interés de los acreedores", utilizando también el plural "acreedores"   *Vea En el caso City of Detroit*, 524 B.R. 147, 217 (Bankr. E.D. Mich. 2014). *Vea también En el caso City of Stockton*, 542 B.R. 261, 283 (B.A.P. 9th Cir. 2015) (según estos términos, la prueba del "mejor interés" en el capítulo 9 es colectiva y no individualizada).

[277] El informe de la prueba del mejor interés se presentará en una fecha posterior.

Basándose en las proyecciones del Plan Fiscal Certificado, la AEE Reorganizada debería poder pagar sus deudas en virtud del Plan cuando estas estén por vencer y debería ser viable. Si fuese necesario, el Deudor actualizará el análisis cuando el nuevo plan fiscal sea certificado, aunque espera que en el marco de un nuevo plan fiscal, la AEE Reorganizada pueda pagar sus deudas incluidas en el Plan en sus fechas de vencimiento.

Como consecuencia, el Deudor considera que el Plan cumple el requisito de viabilidad de la sección 314(b)(6) de PROMESA.

f) **Cumplimiento de las disposiciones aplicables de PROMESA y del Código de Quiebras**

Además de lo anterior, el Plan debe cumplir con otras disposiciones aplicables de PROMESA y del Código de Quiebras, de la siguiente manera:

- El Plan debe cumplir con las disposiciones del Código de Quiebras establecidas por la Sección 301 de PROMESA (PROMESA § 314(b)(1));

- El Plan debe cumplir con las disposiciones del Título III de PROMESA (PROMESA § 314(b)(2));

- La ley no debe prohibir a los Deudores tomar cualquier medida necesaria para ejecutar el Plan (PROMESA § 314(b)(3));

- Salvo en la medida en que un tenedor de una reclamación específica haya acordado un tratamiento distinto por dicha reclamación, el Plan debe establecer que, en la Fecha de Entrada en Vigencia, cada tenedor de una reclamación de alguno de los tipos descritos en la sección 507(a)(2) del Código de Quiebras recibirá, por esa reclamación, una cantidad en efectivo equivalente a la permitida por dicha reclamación (PROMESA § 314(b)(4));

- Debe obtenerse cualquier aprobación legislativa, reglamentaria o electoral que sea necesaria en virtud del derecho aplicable con el fin de llevar adelante cualquiera de las disposiciones del Plan, o tal disposición debe estar expresamente condicionada a que se obtenga dicha aprobación (PROMESA § 314(b)(5));

- El Plan debe ser compatible con el Plan Fiscal certificado por la Junta de Supervisión en virtud del Título III (PROMESA § 314(b)(7));

- El Deudor, como proponente del Plan a través de la Junta de Supervisión, deben haber cumplido con todas las disposiciones del Código de Quiebras (11 U.S.C. § 1129(a)(2); PROMESA § 301(a)); y

- El Plan debe haberse propuesto de buena fe y de ninguna manera estar prohibido por la ley (11 U.S.C. § 1129(a)(3); PROMESA § 301(a)).

2.    **Alternativas a la confirmación y el perfeccionamiento del Plan**

El Deudor ha evaluado varias alternativas al Plan, entre ellas, estructuras y términos alternativos del Plan y la demora en su adopción. Si bien el Deudor ha llegado a la conclusión de que el Plan es la mejor alternativa y que maximizará los recobros de los tenedores de Reclamaciones Permitidas contra el Deudor, si el Plan no se confirma, el Deudor podría intentar formular y proponer un plan de ajuste distinto. El Deudor (o cualquier otra parte interesada) también podría obrar para conseguir que los casos de Título III sean desestimados de conformidad con 11 U.S.C. § 930 (incorporada en PROMESA § 301(a).

El Plan se formuló después de que el Tribunal del Título III ordenara a la Junta de Supervisión presentar un Plan tras la conclusión de meses de difíciles negociaciones, incluso en relación con numerosas sesiones de mediación ordenadas por el Tribunal del Título III, que no se materializaron en un acuerdo con los principales grupos de acreedores de la AEE. Dadas las circunstancias, la Junta de Supervisión ha formulado un Plan que ofrece a determinados grupos de acreedores la oportunidad de obtener mayores recobros como solución a sus derechos en litigio. El Deudor considera que el Plan establece disposiciones que permitirían a los Acreedores obtener los mayores recobros lo antes posible, y que la aceptación y confirmación del Plan son en el mejor interés del Deudor y de todos los Acreedores. El Deudor también considera que cualquier alternativa al Plan, incluso la desestimación del caso de Título III o el levantamiento de la paralización automática para la designación de un síndico, producirá demoras innecesarias, incertidumbre, litigios prolongados y gastos, cuyo efecto neto será que los Acreedores recuperarán menos que lo que se les distribuiría en virtud del Plan. Por lo tanto, el Deudor considera que es preferible la confirmación y el perfeccionamiento del Plan a las posibles alternativas.

*[El resto de la página se deja intencionalmente en blanco]*

## VIII.   Ciertos factores de riesgo a considerar

**COMO OCURRE CON CUALQUIER INVERSIÓN, LOS RECOBROS SOBRE LOS NUEVOS BONOS Y CVI INVOLUCRAN RIESGOS. DEBE ANALIZAR CUIDADOSAMENTE LOS FACTORES DE RIESGO QUE SE DESCRIBEN A CONTINUACIÓN CON RESPECTO AL PLAN, LOS NUEVOS BONOS Y EL CVI, ADEMÁS DE TODA LA INFORMACIÓN QUE CONTIENE O INCORPORA POR REFERENCIA ESTA DECLARACIÓN DE DIVULGACIÓN. LOS SIGUIENTES FACTORES DE RIESGO NO SON LOS ÚNICOS RIESGOS A LOS QUE SE ENFRENTA EL DEUDOR, NO SE SUPONE QUE CONSTITUYAN UNA LISTA EXHAUSTIVA DE RIESGOS ASOCIADOS CON EL PLAN O LOS NUEVOS BONOS, Y NO REFLEJAN NECESARIAMENTE LA IMPORTANCIA RELATIVA DE LOS DIVERSOS RIESGOS. LOS RIESGOS E INCERTIDUMBRES ADICIONALES QUE NO SEAN ACTUALMENTE CONOCIDOS PARA EL DEUDOR O QUE EL DEUDOR NO CONSIDERE COMO DE IMPORTANCIA EN ESTE MOMENTO, O QUE SON GENERALMENTE APLICABLES A TODAS LAS INSTRUMENTALIDADES DEL GOBIERNO, TAMBIÉN PUEDEN AFECTAR DE MANERA MATERIAL Y ADVERSA AL DEUDOR Y LA CAPACIDAD DEL DEUDOR PARA PERFECCIONAR EL PLAN Y HACER PAGOS SOBRE LOS NUEVOS BONOS Y EL CVI. SE RECOMIENDA QUE TENGA EN CUENTA LOS SIGUIENTES FACTORES DE RIESGO, ENTRE OTROS, Y QUE REVISE LA INFORMACIÓN ADICIONAL CONTENIDA O INCORPORADA POR REFERENCIA EN ESTA DECLARACIÓN DE DIVULGACIÓN ANTES DE TOMAR CUALQUIER DECISIÓN CON RESPECTO AL PLAN. UNO O VARIOS DE LOS FACTORES QUE SE ANALIZAN EN EL PRESENTE, Y OTROS FACTORES QUE NO SE DESCRIBEN EN EL PRESENTE, PODRÍAN AFECTAR LOS RECOBROS CONFORME AL PLAN O PRODUCIR UNA REDUCCIÓN EN EL VALOR DE MERCADO Y LA LIQUIDEZ DE LOS NUEVOS BONOS O CVI. NO PUEDE HABER GARANTÍAS DE QUE OTROS FACTORES DE RIESGO NO ANALIZADOS A CONTINUACIÓN NO SE VUELVAN DE IMPORTANCIA EN EL FUTURO.**

**NI EL DEUDOR, NI NINGUNA COMISIÓN DE VALORES O AUTORIDAD REGULATORIA FEDERAL, DE UN ESTADO O DEL ESTADO LIBRE ASOCIADO HA APROBADO NI DESAPROBADO LOS NUEVOS BONOS Y EL CVI U OTROS TÍTULOS VALORES A EMITIRSE CONFORME AL PLAN, NI SE HA EXPRESADO SOBRE LA ADECUACIÓN O EXACTITUD DE ESTA DECLARACIÓN DE DIVULGACIÓN.**

### A.   Riesgos relacionados con los Casos del Título III

***El Tribunal del Título III puede no confirmar el Plan.***

La Sección 314(b) de PROMESA y la Sección 1129 del Código de Quiebras (en sus partes incorporadas) estipulan los requisitos de confirmación de un plan de ajuste del Título III, y requieren que el Tribunal del Título III haga una serie de hallazgos independientes especificados. Los interesados que tengan legitimidad para hacerlo tendrán una oportunidad de objetar la confirmación del Plan y el Tribunal del Título III puede hacer lugar a varias de estas objeciones. No hay garantías de que el Tribunal del Título III determine que el Plan cumple todos estos

requisitos y confirme el Plan. Si el Plan no se confirma, existe incertidumbre con respecto a qué recobros, de haberlos, recibirán los tenedores con respecto a sus Reclamaciones en virtud de un plan de ajuste alternativo u otra ley aplicable si el Tribunal del Título III desestima los Casos del Título III. Para obtener información adicional, *vea* la Sección 0 de esta Declaración de Divulgación.

***El Tribunal del Título III puede considerar que el Plan no es acorde al Plan Fiscal Certificado correspondiente.***

Conforme a la Sección 314(b)(7) de PROMESA, el Plan debe ser acorde al Plan Fiscal Certificado, tal como lo haya certificado la Junta de Supervisión. Aunque la Junta de Supervisión ha certificado que el Plan es acorde al Plan Fiscal Certificado conforme a la Sección 104(j)(3) de PROMESA, la Sección 314(b) de PROMESA requiere que el Tribunal del Título III tome una decisión independiente con respecto a si el Plan es acorde al Plan Fiscal Certificado. No puede haber garantías de que el Tribunal del Título III determine que el Plan sea acorde al Plan Fiscal Certificado. Para ser acorde al plan fiscal certificado aplicable, el Plan no puede disponer que se emita más deuda que la que el plan fiscal certificado aplicable determine, según su análisis de sostenibilidad de la deuda, que resulta sostenible para la AEE Reorganizada.

***Si algún demandante tiene éxito en el litigio y la obtención de una (i) reclamación de gastos administrativos permitida; (ii) reclamación prioritaria permitida; (iii) reclamación garantizada permitida; o (iv) reclamación no descargable permitida, y cualquier otra reclamación que el Plan no contemple que sea pagada, es posible que el Plan no sea confirmable.***

Varias partes han presentado reclamaciones contra el Deudor que pueden considerarse como reclamaciones de gastos administrativos, reclamaciones prioritarias, reclamaciones garantizadas o no descargables y cuyo pago conforme al Plan no está contemplado. Si reclamaciones de este tipo y similares son finalmente permitidas, es posible que el Plan no sea confirmable sin enmiendas que pueden introducir cambios materiales en sus distribuciones propuestas.

Ciertos litigios vinculados a la permisibilidad de dichas reclamaciones están en curso. Si este litigio no se resuelve antes de la Vista de Confirmación, la Vista de Confirmación y la Fecha de Entrada en Vigencia pueden posponerse para permitir que se resuelvan esas reclamaciones en disputa. Como alternativa, es posible que la Junta de Supervisión esté obligada a establecer una reserva adecuada para garantizar que se rechacen los recobros correspondientes sobre las reclamaciones demandadas si la Junta de Supervisión no tiene éxito. Es posible que la AEE deba pedir un préstamo, o una asignación del ELA, para disponer de efectivo suficiente para pagar las reclamaciones permitidas de gastos administrativos en la Fecha de Entrada en Vigencia. Si dichas reclamaciones y otras similares se permiten finalmente, o si la Junta de Supervisión se ve obligada a establecer una reserva adecuada con respecto a dichas reclamaciones en disputa que estén pendientes de resolución, es posible que el Plan no pueda confirmarse sin enmiendas que pueden introducir cambios materiales en sus distribuciones propuestas, y dichos cambios materiales estarían sujetos a nuevas votaciones por los tenedores de reclamaciones afectadas.

***El Tribunal del Título III puede determinar, en relación con la Impugnación Enmendada de Gravamen y Recurso que el Fideicomisario de Bonos posee garantías prendarias válidas y perfeccionadas sobre los ingresos de la AEE o parte de ellos.***

El Fideicomisario de Bonos afirma que posee garantías prendarias válidas, perfeccionadas y prioritarias sobre todos los ingresos pasados, presentes y futuros de la AEE, y que dichas garantías prendarias no están sujetas a anulación ni a subordinación. Si el Tribunal del Título III determina que el Fideicomisario de Bonos tiene una garantía prendaria sobre todos o algunos de los ingresos de la AEE, dichos ingresos pueden no estar disponibles para su distribución a los acreedores de la AEE que no sean tenedores de bonos, y el Plan puede no ser confirmable o factible sin enmiendas materiales.

***El Tribunal del Título III puede determinar, en relación con la Impugnación Enmendada de Gravamen y Recurso, que el Fideicomisario de Bonos posee una reclamación aparte del Fondo de Amortización y los Fondos Subordinados, y que dicha reclamación no es descargable.***

La Impugnación Enmendada de Gravamen y Recurso busca impedir la Reclamación Marco de la Deuda en Bonos, al punto de invocar un derecho al pago más allá de los fondos en el Fondo de Amortización y los Fondos Subordinados. Incluso si el Tribunal del Título III determina que el Contrato de Fideicomiso limita el recurso del Fideicomisario de Bonos al Fondo de Amortización y los Fondos Subordinados, el Fideicomisario de Bonos ha invocado ciertas defensas afirmativas que pueden (i) impedir que la AEE aplique disposiciones contractuales que limiten su recurso, o (ii) proporcionarles recursos más allá de esos fondos. Además, esas partes han invocado una serie de defensas, que incluso si la AEE obtiene una sentencia que limite su recurso al Fondo de Amortización y los Fondos Subordinados, el incumplimiento por parte de la AEE de ciertos pactos da lugar a una Reclamación de Incautación conforme a la Quinta Enmienda de la Constitución de EE.UU., que, conforme al precedente actual del Primer Circuito, puede ser no descargable y deba pagarse en su totalidad. Bajo tales circunstancias, el Plan puede no ser confirmable o viable sin enmiendas materiales.

***El Tribunal del Título III puede determinar que la AEE no puede rechazar los contratos de negociación colectiva***

El Plan contempla el rechazo de los contratos de negociación colectiva que exijan que la AEE mantenga el SRE de la AEE como un plan de beneficios definidos. Si el Tribunal del Título III determina que la AEE no puede rechazar estos contratos de negociación colectiva, es posible que el Plan no sea confirmable ni viable sin enmiendas materiales.

***El Tribunal del Título III puede no aprobar las transacciones y acuerdos mutuos en el Plan.***

El Plan contiene ciertas transacciones y ciertos acuerdos mutuos, además de transacciones y acuerdos mutuos propuestos, que el Deudor considera justos, equitativos y razonables. Dichas transacciones y dichos acuerdos mutuos forman parte integral del Plan, y proporcionan valor y certidumbre para el Deudor y todos los acreedores al eliminar riesgos de litigio y gastos significativos, y al proporcionar un marco para que el Deudor salga del Título III de manera expeditiva.

El Plan también puede depender de la aprobación de otras transacciones y otros acuerdos mutuos resueltos conforme al Plan. Si las transacciones y los acuerdos mutuos que contiene el Plan requieren aprobación, pero no se aprueban, es posible que el Deudor no pueda confirmar el Plan.

**La Fecha de Entrada en Vigencia puede no producirse.**

El Artículo XXIX del Plan dispone que ciertas condiciones deben satisfacerse (o que se debe renunciar a ellas) antes de que se produzca la Fecha de Entrada en Vigencia. Muchas de estas condiciones se encuentran fuera del control del Deudor. A la fecha de esta Declaración de Divulgación, no puede haber garantías de que todas estas condiciones para la vigencia del Plan, o cualquiera de ellas, se vean satisfechas (o se renuncie a ellas). Como consecuencia, incluso si el Plan es confirmado por el Tribunal del Título III, no puede haber garantías de que el Plan se perfeccione y el ajuste de las deudas del Deudor se complete. *Vea* la Sección VI.S de esta Declaración de Divulgación (descripción de las condiciones para la vigencia del Plan). Además, ciertos acuerdos contemplados en el Plan imponen condiciones que deben satisfacerse a la Fecha de Entrada en Vigencia. No puede haber garantía de que dichas condiciones sean satisfechas o se renuncie a ellas oportunamente.

**Si se rescinden el AAP del Prestamista de la Línea de Crédito de Combustible o el Acuerdo de Transacción de Vitol, la capacidad del Deudor para confirmar el Plan puede verse afectada adversamente de manera material.**

El Acuerdo de Transacción de Vitol y el AAP del Prestamista de la Línea de Crédito de Combustible contienen una serie de pactos relacionados con el Plan. Por ejemplo, entre otras cosas, Vitol y los Prestamistas de la Línea de Crédito tienen obligación de votar por la aceptación del Plan y de no oponerse a la confirmación del Plan. El incumplimiento de cualquiera de estos pactos o la rescisión del Acuerdo de Transacción de Vitol y el AAP del Prestamista de la Línea de Crédito de Combustible pueden tener un efecto adverso material sobre la capacidad del Deudor para confirmar el Plan.

**Si el Deudor no puede confirmar el Plan, el Tribunal del Título III puede desestimar el Caso del Título III o levantar la paralización automática para permitir que los Tenedores de Bonos de la AEE designen a un síndico.**

Como se analiza en la Sección I.C de esta Declaración de Divulgación, a partir de la expiración de la mediación, ciertos Tenedores de Bonos y Aseguradoras Monolínea presentaron una moción para desestimar el Caso de Título III de la AEE, o, como alternativa, levantar la paralización automática para designar a un síndico. El Tribunal del Título III paralizó la moción hasta (i) el día después de la fecha límite estipulada por el Tribunal del Título III para presentar una propuesta de plan de ajuste y sus materiales relacionados, si dicha fecha límite no se cumple, o (ii) la terminación del proceso de confirmación del plan, lo que ocurra primero. En caso de que la AEE no pueda confirmar el Plan, el Tribunal del Título III puede considerar y conceder la Moción para Desestimar el Caso de la AEE. Si se designa un síndico para la AEE, LUMA Energy tendría la opción de rescindir el Contrato de T&D. La rescisión del Contrato de T&D dejaría a la AEE sin operador para su red eléctrica y causaría trastornos significativos en los esfuerzos en curso para transformar los Activos de Generación de la AEE. Un síndico también

362

podría procurar un aumento significativo de las tarifas de la AEE para que sean suficientes como para cubrir las obligaciones de capital e intereses sobre los Bonos. El aumento brusco y sustancial en las tarifas eléctricas podría hacer que los clientes abandonen la red, se acelere la emigración, se reduzca la carga y se produzcan otros impactos negativos adicionales sobre la economía de Puerto Rico.

## B.      Riesgos relacionados con la AEE

*La información financiera que contiene el presente se basa en los libros y registros del Deudor y la información del dominio público a la fecha del presente, o la fecha con la que se relaciona dicha información, según corresponda; no se realizó ninguna auditoría ni examen independiente de dicha información.*

A menos que se estipule lo contrario, la información financiera que contiene el presente no ha sido, ni será, auditada ni revisada por ninguna firma contable ni ningún tercero independiente, y su alcance es limitado. Aunque el Deudor considera que ha aplicado esfuerzos razonables para garantizar la exactitud de la información financiera que se proporciona en el presente, no hay garantías de que la información financiera contenida en el presente carezca de inexactitudes o irregularidades materiales. Ni la Junta de Supervisión ni el Gobierno puede garantizar la exactitud ni la exhaustividad de dicha información. Como resultado, se le advierte que no debe depositar excesiva confianza en la información financiera contenida en el presente.

*La AEE no tiene la obligación de actualizar las declaraciones contenidas en esta Declaración de Divulgación.*

Las declaraciones que contiene esta Declaración de Divulgación son hechas por el Deudor a la fecha de la presente, a menos que se especifique de otra manera en la presente, y la entrega de esta Declaración de Divulgación después de esta fecha no implica que no ha habido cambios en la información estipulada en la presente desde esa fecha. El Deudor no tiene la obligación de actualizar esta Declaración de Divulgación a menos que el Tribunal del Título III le ordene hacerlo, o si lo exige el Código de Quiebras o las Reglas de Quiebra.

*La Junta de Supervisión se disolverá antes de que las obligaciones conforme al Plan se satisfagan en su totalidad.*

Después de certificar que el gobierno ha cumplido los requisitos de la Sección 209 de PROMESA, que incluyen, entre otras cosas, el desarrollo de presupuestos en conformidad con las normas modificadas de contabilidad en valores devengados y la certificación de que los gastos hechos por el gobierno territorial durante cada año fiscal no han superado los ingresos, la Junta de Supervisión se disolverá, y se pondrá fin a los requisitos asociados de publicación de planes fiscales y otras medidas de transparencia fiscal. Esto puede ocurrir muchos años antes de que las obligaciones conforme al Plan se vean plenamente satisfechas.

*Cuando la Junta de Supervisión sea disuelta, el Gobierno puede eliminar controles, protecciones y la transparencia creados por la Junta de Supervisión.*

Sujeto a ciertas limitaciones constitucionales, cada legislatura puede cambiar leyes previas. No hay garantía de que las protecciones y sistemas de la Junta de Supervisión sean

mantenidas por los gobiernos futuros, y el Gobierno puede objetar las medidas impuestas por la Junta de Supervisión y puede continuar haciéndolo después de que la Junta de Supervisión ya no exista para aplicar las reformas que ha impuesto. Sin embargo, los pactos y las obligaciones en el Plan y el Nuevo Contrato Marco de Emisión de Deuda, incluso las obligaciones que afectan a los poderes gubernamentales o políticos conforme a la Sección 305 de PROMESA, pueden ser aplicados por partes interesadas que estén facultadas para hacerlo.

***Una vez que se disuelva la Junta de Supervisión, la AEE y/o el NEPR pueden no tomar medidas para garantizar el pago de los Nuevos Bonos o el CVI.***

Los Nuevos Bonos requieren la implementación del Cargo Heredado, y los Nuevos Bonos y el CVI requieren que se cobren y apliquen los ingresos generados por el Cargo Heredado para su pago. Cuando la Junta de Supervisión se disuelva, ya no puede haber garantías de que el NEPR seguirá cobrando el Cargo Heredado, o de que la AEE o su agente seguirá cobrando el Cargo Heredado y aplicándolo al pago de los Nuevos Bonos de acuerdo con la cascada de pagos correspondiente. Sin embargo, los pactos y las obligaciones en el Plan y el Nuevo Contrato Marco de Emisión de Deuda, incluso las obligaciones que afectan a los poderes gubernamentales o políticos conforme a la Sección 305 de PROMESA, pueden ser aplicados por partes interesadas que estén facultadas para hacerlo.

***Los informes financieros en el futuro pueden no completarse de manera oportuna.***

Los estados financieros auditados básicos más recientes preparados por la AEE son del Año Fiscal 2020. No pueden ofrecerse garantías sobre la disponibilidad de estados financieros auditados actualizados o la capacidad del Deudor de proporcionar informes financieros de manera oportuna.

***Los eventos futuros y los resultados actuales pueden presentar diferencias materiales con respecto a estimaciones, proyecciones o declaraciones contenidas en el presente.***

Cualquier declaración y supuestos contenidos en el presente, ya sea con respecto al futuro o históricas, no constituyen garantías del rendimiento futuro e involucran ciertos riesgos, incertidumbres, estimaciones y otras suposiciones hechas en este documento. La condición económica y financiera de la AEE se ve afectada por diversos factores legales, financieros, sociales, económicos, ambientales, gubernamentales y políticos. Estos factores pueden ser muy complejos, pueden variar de un año fiscal al siguiente, y son frecuentemente el resultado de medidas tomadas u omitidas, no solo por el Gobierno, la AEE y la Junta de Supervisión sino también por entidades externas, como el gobierno de los Estados Unidos. Ninguna disposición de este documento puede considerarse como una garantía expresa o implícita de hechos o eventos futuros.

***El Deudor puede no implementar, o ser incapaz de implementar de manera exitosa las reformas propuestas por la Junta de Supervisión en las recomendaciones de la Sección 205(a) del Plan Fiscal Certificado.***

Para lograr la sostenibilidad a largo plazo, el Gobierno, la AEE y otros organismos pueden necesitar implementar reformas adicionales para abordar los numerosos desafíos del sistema actual. La Junta de Supervisión ha propuesto, entre otras, las siguientes reformas: (1)

transicionar los activos de generación preexistentes de la AEE a operadores privados; (2) reducir la dependencia de la AEE de los combustibles fósiles, diversificando las fuentes de energía de la AEE, y priorizando la energía renovable y limpia; (3) aumentar la confiabilidad del servicio; y (4) expandir y desarrollar la infraestructura estructuralmente rígida para soportar los eventos meteorológicos extremos. Sin embargo, muchas de estas reformas no pueden implementarse sin el apoyo del Gobierno electo de Puerto Rico. La falta de implementación por parte de la AEE o el Gobierno de estas medidas puede afectar materialmente los ingresos o las operaciones futuros de la AEE.

## C.     Riesgos relacionados con la transformación

### *La rescisión del Contrato de T&D puede afectar materialmente las operaciones de la AEE.*

Conforme al Contrato de T&D, LUMA Energy puede rescindir el contrato si se producen ciertos eventos, entre ellos, si la AEE no sale del Título III para el 1 de diciembre de 2022. El 29 de noviembre de 2022, la Junta de Supervisión y la Autoridad P3 votaron por la prórroga del Período Transitorio del Contrato de T&D. El 30 de noviembre, el Gobierno y el Directorio de la AEE aprobaron la prórroga del Contrato de T&D. En relación con esta prórroga, los dos miembros de "interés público" del directorio de la Autoridad P3 anunciaron que están pensando en presentarse a juicio, para determinar si la prórroga se aprobó de manera indebida. En un litigio, un tribunal competente puede determinar que la prórroga del Período Transitorio conforme al Contrato de T&D fue inválida. Si la prórroga del Período Transitorio se invalida antes de la salida de la AEE del Título III, LUMA Energy puede decidir rescindir el Contrato de T&D.

Además, como condición para el inicio del plazo de 15 años del Contrato de T&D, se requiere que el Plan del Título III y la orden de confirmación sean razonablemente aceptables para LUMA Energy. En la medida en que este Plan o la orden de confirmación presentada por el Tribunal del Título III no resulten razonablemente satisfactorios para LUMA Energy, el Contrato de T&D puede rescindirse. Además, el Contrato de T&D puede extinguirse automáticamente si no se satisfacen ciertas condiciones para el comienzo del servicio completo, o si se renuncia a ellas. Finalmente, LUMA Energy puede rescindir el Contrato de T&D si un síndico, fideicomisario, custodio u otro funcionario similar es designado para la AEE o una parte sustancial de sus activos, un proceso que ya ha sido iniciado por el Ad Hoc Group y las Aseguradoras Monolínea. La extinción del Contrato de T&D dejaría a la AEE sin un operador para el Sistema de T&D, lo que tendría como resultado que la AEE incurra en el pago de comisiones por un monto de por lo menos $115 millones en comisiones de rescisión permitidas como una reclamación de gastos administrativos, además de costos adicionales relacionados con la operación de transición del Sistema de T&D de vuelta a la AEE, lo que trastornaría de manera significativa los esfuerzos en curso para transformar los activos de generación de la AEE, y puede afectar materialmente los ingresos o las operaciones futuras de la AEE.

### *La Asamblea Legislativa puede continuar intentando interferir con el Contrato de T&D y la Transformación de la AEE.*

La Asamblea Legislativa ha intentado promulgar legislación que podría impedir, obstaculizar o interferir con o controlar materialmente la transformación de la AEE y el Contrato

de T&D. No existe certidumbre con respecto a si la Asamblea Legislativa no intentará interferir con el Plan ya sea antes o después de la Fecha de Entrada en Vigencia. Estas acciones podrían tener un efecto materialmente adverso sobre las operaciones, ingresos o la capacidad de cumplir con el Plan Fiscal Certificado.

Además, la Autoridad de P3 tiene potestad regulatoria sobre ciertas transacciones entre públicos y privados, lo que incluye el Contrato de T&D y la Transacción de Generación. La Asamblea Legislativa designa dos representantes del "interés público" para el directorio de la Autoridad de P3, cada uno de los cuales debe dar su aprobación afirmativa para cualquier Transacción de la AEE, entre ellas, la transformación de la AEE, la celebración y el cumplimiento del Contrato de T&D, y la celebración, perfeccionamiento y cumplimiento de cualquier Transacción de Generación. En tal carácter, la Asamblea Legislativa y sus representantes asignados pueden tener un impacto material sobre los procesos de aprobación de la Autoridad de P3, entre otras cosas, en relación con la transformación de la AEE. De hecho, la Asamblea Legislativa ya ha manifestado públicamente su intención de desaprobar cualquier transformación o acuerdo de operación y administración para las instalaciones de generación.

Mientras que la Junta de Supervisión podría buscar ejercer sus facultades conforme a PROMESA para prohibir las acciones legislativas que considere incompatibles con los propósitos de PROMESA, lo que incluye el párrafo 108 de PROMESA, no existe certidumbre de que el Tribunal del Título III conceda la antedicha reparación judicial, o que esta se sostendrá en una apelación.

***Es posible que la Transacción de Generación no se apruebe o perfeccione.***

Si se celebra un acuerdo de operación y administración de generación y si este es aprobado por la Junta de Supervisión y la Autoridad de P3, las condiciones previas al cierre de la Transacción de Generación están fuera del control de la AEE. La AEE no puede predecir cuándo o si se satisfarán estas condiciones. La AEE o la Autoridad de P3 pueden decidir no proceder con la transacción o no tomar las medidas necesarias para que la transacción entre en vigencia. La falta de perfeccionamiento de la Transacción de Generación puede poner en riesgo la capacidad de generación a largo plazo de la AEE, precipitar una crisis de liquidez para la AEE, y hacer que la AEE sea de otra manera incapaz de cumplir con su Plan Fiscal Certificado o sus obligaciones conforme al derecho aplicable.

***La AEE y LUMA Energy pueden verse imposibilitados de alcanzar el pleno cumplimiento del PIR.***

La AEE y LUMA Energy pueden no lograr la implementación plena del PIR. Por ejemplo, la AEE y LUMA Energy pueden no lograr, entre otras cosas, (i) aumentar la porción de generación y almacenamiento renovables, retirando o convirtiendo al mismo tiempo la generación actual con carbón o fuel oil pesado y las modificaciones en el sistema para permitir la integración de la generación basada en inversores; (ii) aumentar la flexibilidad de la red a través de la inversión de capital óptima en el Sistema de T&D para permitir una mayor confiabilidad; o (iii) habilitar la opción del cliente a través de la inversión en generación distribuida, eficiencia energética y programas de respuesta a pedido, a los niveles exigidos por el PIR. La falta de cumplimiento pleno del PIR podría afectar los ingresos y las tarifas de la AEE en el futuro.

*El Contrato de T&D y la Transacción de Generación pueden no alcanzar sus metas establecidas.*

La transformación de la AEE ha sido meticulosamente planificada. Se trata de un emprendimiento ambicioso y a gran escala, que es el producto de innumerables horas de coordinación entre la Junta de Supervisión y numerosas partes del Gobierno. Se espera que la transformación de la AEE alcance muchas metas diversas y proporcione beneficios significativos para Puerto Rico y sus residentes. Entre estas metas, se celebró el Contrato de T&D con los objetivos de producir electricidad a bajo costo, aprovechar la experiencia de LUMA Energy para optimizar la aplicación y el uso de los fondos federales, aumentar la flexibilidad y la confiabilidad del Sistema de T&D, implementar nuevas tecnologías e implementar las mejores prácticas de la industria y la excelencia operativa mediante la continuidad de la gestión y la planificación a largo plazo. Con tal fin, el Contrato de T&D requiere que LUMA Energy elabore una hoja de ruta para un Sistema de T&D seguro y confiable, entre otras cosas, desarrollando un plan de recuperación del sistema, planes de respuesta de emergencia, planes de seguridad y planes de manejo de la vegetación para reconstruir y mantener el Sistema de T&D.

Además está previsto que, si se perfecciona la Transacción de Generación, podrá asistir a la AEE con el cumplimiento de los objetivos de eficiencia energética y energía renovable correspondientes establecidos en la Ley 17-2019 y el PIR, incluso la transición de la combinación actual de combustibles de la AEE a recursos de energía renovable y Gas Natural Licuado como las principales fuentes de generación. Se espera que la transformación de la AEE lleve décadas en realizarse totalmente, y existen innumerables variables, conocidas y desconocidas, que podrían afectar a la capacidad de la AEE para alcanzar sus metas de transformación, que incluyen factores fuera del control de la Junta de Supervisión.

**D.   Riesgos relacionados con las proyecciones de ingresos y gastos en el Plan Fiscal Certificado**

*Numerosos riesgos internos y externos podrían afectar de manera material los resultados esperados del Plan Fiscal Certificado.*

Las declaraciones y supuestos contenidos en esta Declaración de Divulgación, ya sea con respecto al futuro o históricos, no constituyen garantías del rendimiento futuro e involucran ciertos riesgos, incertidumbres, estimaciones y otras suposiciones.

Las suposiciones subyacentes a la información no son necesariamente subjetivas. No puede haber garantías de que estas suposiciones sean actualmente correctas en esta Declaración de Divulgación o que seguirán siendo correctas o exactas en el futuro. Como consecuencia, no puede haber garantías de que esta información demuestre de manera completa o correcta las relaciones entre los factores económicos que componen esta información. No hay declaraciones ni garantías de que las proyecciones carezcan de defectos de lógica o de mecánica, aunque se aplicaron los mejores esfuerzos para diseñar y construir la información financiera para demostrar las operaciones financieras pronosticadas y el desempeño financiero basado en las suposiciones declaradas. La situación económica y financiera del Gobierno y sus instrumentalidades representada en las proyecciones se ve afectada por diversos factores legales, financieros, sociales, de salud pública, ambientales, gubernamentales y políticos. Estos factores pueden ser

muy complejos, pueden variar de un año fiscal al siguiente, y son frecuentemente el resultado de medidas tomadas u omitidas, no solo por el Gobierno, sino también por la Junta de Supervisión y otras entidades externas, como el gobierno de los Estados Unidos. Entre los ejemplos de estos factores se incluyen, entre otros:

- El efecto de COVID-19 sobre la salud y el bienestar del pueblo de Puerto Rico;

- Los efectos económicos a corto plazo de COVID-19 sobre la economía global y las economías de los Estados Unidos y Puerto Rico en lo que se refiere a los ingresos tributarios y el presupuesto de Puerto Rico;

- Las ramificaciones económicas a más largo plazo de los cambios en el comportamiento causados por COVID-19 (es decir, menos viajes, más trabajo desde el hogar, actividad reducida en grandes lugares de reunión, etc.);

- El monto de la ayuda del gobierno federal a los estados y territorios de EE.UU. (entre ellos Puerto Rico), la eficacia y la rapidez del desembolso de dicha ayuda;

- La necesidad de trasladar recursos para crear una estructura más flexible para prevenir o mitigar futuras pandemias;

- Cualquier acción futura tomada o no tomada por el gobierno de Estados Unidos con respecto a Medicaid;

- El monto y la oportunidad de la recepción de las distribuciones de los programas de FEMA, HUD y CDBG-DR y las compañías de seguros privadas para reparar los daños causados por los huracanes Irma, María y Fiona y los miles de terremotos ocurridos desde 2019 hasta hoy;

- El monto y la oportunidad de la recepción de importes adicionales asignados por el gobierno de Estados Unidos para cubrir la brecha de financiación que se describe en el presente;

- La línea temporal para completar el trabajo desarrollado por la AEE para reparar su sistema e infraestructura eléctricos y el impacto de cualquier acontecimiento o problema futuro relacionado con la reconstrucción y modernización del Sistema e infraestructura de T&D por LUMA Energy y el proceso preexistente de compras de O&M sobre el crecimiento económico de Puerto Rico;

- El impacto de la emigración y la disminución de la población;

- La oportunidad y el impacto de la resolución de los Casos del Título III de la AEE y de Puerto Rico y los litigios conexos;

- Las altas tarifas de electricidad que pueden hacer que los clientes comerciales y residenciales usen menos electricidad o no puedan pagar sus facturas de electricidad en su totalidad o en parte;

- Las reducciones de la carga podrían causar menores ingresos, que, a su vez, podrían interferir con la capacidad de la AEE para pagar los costos operativos y prestar servicios; y

- Factores que podrían afectar la demanda de electricidad en todo Puerto Rico, que incluyen, entre otros, las tendencias en la eficiencia energética (EE) y la generación distribuida (GD), la adopción de vehículos eléctricos, las fluctuaciones en el precio de los combustibles fósiles y los avances en tecnologías solares o los cambios en el precio de dichas tecnologías.

***El modelo del Plan Fiscal Certificado depende de datos históricos para la proyección del PNB y la inflación y no tiene en cuenta potenciales trastornos externos que no se hayan experimentado aun.***

El Plan Fiscal Certificado depende de datos históricos sobre un conjunto clave de variables económicas (p. ej., precios del petróleo, precios de los alimentos, brecha en los resultados, crecimiento de capital, transferencias federales netas) para proyectar el PNB y la inflación, y se ve afectado por los efectos de los huracanes María e Irma, los miles de terremotos ocurridos desde 2019 hasta ahora, la pandemia de COVID-19, además del financiamiento resultante de reparación por desastres que se proyecta que recibirá Puerto Rico. No tiene en cuenta el impacto del huracán Fiona y posibles acontecimientos negativos externos futuros, como crisis económicas no previstas, desastres naturales u otros cambios en la actividad global (o local) que no se encuentran actualmente proyectados. Dado que las proyecciones futuras tienen en cuenta el desempeño pasado, si el crecimiento económico (o la inflación) para los Estados Unidos fuera sustancialmente superior o inferior a lo proyectado, esto afectaría significativamente la exactitud de las proyecciones subsiguientes del PNB y la inflación en el Plan Fiscal Certificado y por ende la exactitud de las proyecciones de ingresos y gastos. Además, la implementación demorada o ineficaz de las reformas estructurales sobre el trabajo, la energía, la facilidad para hacer negocios y la educación podrían afectar el crecimiento del PNB y, como consecuencia, el rendimiento global de sus ingresos.

La predicción del volumen de referencia de la AEE también se basa en parte en el pronóstico del PNB del ELA. Existe un riesgo significativo futuro de que el PNB actual difiera del PNB proyectado, dado que la exactitud de las proyecciones del PNB se ve afectada significativamente por la proyección subestimada o sobreestimada del crecimiento económico. La inexactitud de las proyecciones del PNB reducen la confiabilidad de las proyecciones. Por lo tanto, el crecimiento del PNB y el rendimiento global de los ingresos de la AEE pueden verse significativamente afectados.

***El modelo del Plan Fiscal Certificado no incorpora cambios demográficos importantes que no sean actualmente aparentes.***

Las proyecciones de población en el Plan Fiscal Certificado están basadas en el crecimiento económico futuro proyectado, además de varios factores demográficos, como las tasas proyectadas de fertilidad y mortalidad y la emigración neta, basadas en los datos disponibles más recientes (a la fecha de certificación) de los Centros de Control y Prevención de las Enfermedades (CDC), el Departamento de Estadísticas de Transporte y el Departamento del

Censo de EE.UU., entre otros. Los cambios demográficos no aparentes actualmente (p. ej., cambios importantes en las tasas de fertilidad, mezcla etaria de la población, patrones de migración) podrían producir cambios significativos en la exactitud de las estimaciones de la población en las que se basa el modelo del plan fiscal. Dado que la población sirve como dato para las proyecciones macroeconómicas globales (p. ej., el PNB de Puerto Rico) en las que a su vez se basan las proyecciones de las partidas de ingresos y gastos (p. ej., carga, generación distribuida, costos laborales), los cambios en las proyecciones de población podrían afectar la exactitud del superávit proyectado.

***El Plan Fiscal Certificado usa datos y políticas actuales para la proyección de fondos federales para reparación de desastres y otros programas federales de importancia.***

Históricamente, la AEE ha sufrido como resultado de la falta de un proceso claro para la implementación de programas de capital. Las proyecciones en el Plan Fiscal Certificado dependen de la implementación eficiente y oportuna de la recepción y el desembolso de los fondos federales y privados para reparación de desastres. Esto supone que los procesos de los gobiernos federales y locales para solicitar y desembolsar fondos continuarán a su ritmo actual y que las proyecciones federales más recientes son exactas. Las proyecciones también dependen de la legislación y las políticas federales que rigen actualmente el uso de esos fondos. Si los niveles de eficiencia o los procesos de los gobiernos locales o federales cambian, o si hay cambios en las políticas de asignaciones o aplicación (es decir, cambios hechos por el Congreso, FEMA, HUD, USDA u otros organismos federales), podría haber impactos directos sobre la exactitud de las proyecciones de ingresos y gastos, dado que los fondos de reparación de desastres afectan las estimaciones de crecimiento del PNB (que a su vez afectan las proyecciones de población), además de las estimaciones con respecto a la participación en los costos de los gobiernos locales.

Los niveles proyectados de financiación para programas y transferencias federales estándar (p. ej., TANF, NAP, Financiamiento del Título I) se basan en la más reciente legislación federal, además de las fórmulas de financiación para cada programa. Tal como ocurre con los fondos de reparación de desastres y los fondos federales de atención médica, si las fórmulas o los niveles de financiamiento federal para otros programas sociales de importancia cambian, la exactitud de los ingresos y los gastos proyectados podrían sufrir cambios materiales.

También existe un riesgo a nivel del financiamiento federal que recibe la AEE, que se basa en su capacidad para cumplir con los requisitos y las pautas federales. Por ejemplo, si la AEE incumple ciertos requisitos de participación en los costos, puede haber consecuencias para el nivel y las limitaciones del financiamiento federal. El Plan Fiscal Certificado supone la coherencia histórica reciente del cumplimiento de estos requisitos por parte de la AEE.

Sin la recepción y el desembolso oportunos de los fondos, la AEE podría no ser capaz de reparar y modernizar el sistema de la red. Por lo tanto, los cambios en la financiación eficiente y confiable tendrían un impacto negativo en la implementación exitosa de las medidas que se describen en el Plan Fiscal Certificado.

***El Plan Fiscal Certificado supone la implementación de la ley fiscal actual de Puerto Rico y los EE.UU. y medidas eficaces de ingresos.***

Las proyecciones del Plan Fiscal Certificado tienen en cuenta las leyes fiscales actuales de EE.UU. y Puerto Rico y suponen la implementación oportuna y eficaz de las medidas de ingresos, lo que incluye el establecimiento de nuevos flujos de ingresos de impuestos y aranceles y un mayor cumplimiento fiscal.

Los cambios en la ley fiscal de Puerto Rico y los EE.uu. afectarían por lo tanto a los ingresos, así como las decisiones que las grandes empresas (como las multinacionales) tomarían con respecto a su escala de operaciones en Puerto Rico, y su planificación fiscal global. Además, si no se implementan medidas de ingresos de manera efectiva, o si superan el rendimiento esperado de los ingresos, los ingresos serían sustancialmente diferentes de lo que figuran en las proyecciones del Plan Fiscal Certificado.

***El Plan Fiscal Certificado supone que las tarifas se ajustan para cumplir las necesidades de gastos operativos y de capital de la AEE.***

Las proyecciones del Plan Fiscal Certificado tienen en cuenta la implementación de los ajustes de tarifas necesarios para cumplir las necesidades de gastos operativos y de capital de la AEE. Por ejemplo, durante los primeros 10 años, la AEE necesitará proporcionar aproximadamente 500 millones de dólares adicionales (o 5% de los aproximadamente 10 mil millones de dólares pagados a lo largo de 10 años) en participación en los costos para acceder a la financiación de FEMA que no se incluyó en el Plan Fiscal Certificado. Además, la evaluación comparativa de la AEE con empresas de servicios comparables sugiere que puede ser necesario gastar unos 93 millones de dólares adicionales, aumentando a 125 millones de dólares en gastos de capital anualmente entre los Años Fiscal 2035 y 2051. La implementación de los ajustes de tarifas y los aumentos necesarios para pagar esos montos, sin embargo, pueden ser determinados por NEPR y, por lo tanto, no pueden ser garantizados por la AEE. Además, dado que los ajustes de tarifas contemplados en el Plan Fiscal Certificado se vinculan a la inflación, las fluctuaciones en la inflación afectarán en definitiva los ingresos.

La falta de implementación de los ajustes de tarifas alineados con la inflación en el Plan Fiscal Certificado tendrían por lo tanto un impacto significativo en los ingresos proyectados. Si los ajustes de tarifas no se implementan de manera correcta y eficaz, los ingresos de la AEE presentarían diferencias sustanciales con respecto a aquellos proyectados en el Plan Fiscal Certificado.

***Los cobros de la AEE pueden ser peores que los proyectados.***

Los cobros a los clientes podrían ser inferiores a los actualmente pronosticados en el Plan Fiscal Certificado. Si la AEE no puede cobrar los montos adeudados por los clientes con las tarifas proyectadas en el plan fiscal, la reducción en los ingresos podría afectar su capacidad de pagar los gastos operativos y prestar servicios.

***El Plan Fiscal Certificado supone que las medidas de eficiencia de los organismos se implementan para lograr ahorros sin un impacto adverso sobre las condiciones económicas.***

Las medidas de gastos suponen que los ahorros se lograrán en general a través de reformas que mejoren la eficiencia del gobierno, manteniendo al mismo tiempo un nivel de servicios acorde con las necesidades de la población y que faciliten el crecimiento económico. Sin embargo, si dichos ahorros se capturan simplemente con la reducción de personal o con programas costosos de adquisiciones, puede haber un mayor riesgo de que no se logren las eficiencias y que el menor nivel de gastos ponga en riesgo la prestación de servicios de la AEE.

***El Plan Fiscal Certificado supone la implementación eficaz y oportuna de medidas de ingresos y gastos.***

Las proyecciones del Plan Fiscal Certificado suponen la implementación eficaz y oportuna de diversas medidas de ingresos y gastos. Esto supone que cualquier cambio posterior en las políticas o los desvíos de las metas y los objetivos del Plan Fiscal Certificado estarán de acuerdo con la neutralidad de los ingresos y los límites globales en los gastos contemplados por el Plan Fiscal Certificado y los presupuestos certificados relacionados. Para garantizar la implementación eficaz y la credibilidad de los objetivos y las proyecciones del Plan Fiscal Certificado, la Junta de Supervisión requiere que el gobierno proporcione informes periódicos sobre el desempeño financiero y el progreso de la implementación. La Junta de Supervisión también ha desarrollado un mecanismo de monitoreo en su sitio web, que puede proporcionar una transparencia y rendición de cuentas adicionales ante el público sobre los esfuerzos del Gobierno en relación con los hitos y los logros del Plan Fiscal Certificado. Las demoras o los desvíos en los objetivos, hitos e informes sobre las medidas de ingresos y gastos especificados en el Plan Fiscal Certificado podrían alterar de manera sustancial las proyecciones del Plan Fiscal Certificado.

***El modelo del Plan Fiscal Certificado se basa en datos históricos informados por el ELA o la AEE, gran parte de los cuales no han sido auditados ni revisados independientemente.***

El Plan Fiscal Certificado se basa en el aporte de datos de ingresos y gastos históricos macroeconómicos, informados por el ELA, la AEE y/o LUMA Energy. La AEE ha recibido impugnaciones en el pasado con respecto a la presentación de datos completos y exactos, y gran parte de la información financiera no ha sido revisada ni auditada por una firma contable o un tercero independiente. Cualquier inexactitud o incongruencia sustancial en los datos podría afectar la exactitud de las proyecciones en las que se basan esos datos.

***El modelo del Plan Fiscal Certificado se basa en datos e información actuales para proyectar las necesidades y el impacto del programa de mejoras de capital.***

Las proyecciones del Plan Fiscal Certificado incorporan gastos de capital: basados en la estimación actual y proyectada futura de las necesidades del programa de gastos de capital. Los planes de gastos de capital pueden necesitar una revisión periódica debido a diversos factores, entre ellos, sin limitación, cambios en la política legislativa, cambios en las operaciones del sector público, necesidad de aceleración o prórrogas de mejoras planificadas, interacción con otros organismos gubernamentales, instrumentalidades, municipios e inversionistas y fuentes de

financiamiento privado, y otros factores macroeconómicos. Las necesidades de cuantificación o aumento en las reformas estructurales relacionadas con la infraestructura pública también pueden afectar las proyecciones de gastos de capital en el Plan Fiscal Certificado. Los cambios en estas proyecciones de gastos, además de los desvíos con respecto al impacto proyectado de dichas mejoras de capital también podrían afectar la oportunidad y el logro de otras proyecciones financieras que son interdependientes del logro efectivo y la existencia de un marco y una infraestructura subyacentes.

***El Plan Fiscal Certificado no supone cambios importantes en el clima político actual en Puerto Rico o en los Estados Unidos posteriormente a su certificación.***

Las políticas y las proyecciones financieras del Plan Fiscal se basan en el compromiso ejecutivo y las políticas legislativas en el clima político existente en los Estados Unidos y en Puerto Rico en el momento de la certificación del Plan Fiscal Certificado. Gran parte de las proyecciones financieras están estrechamente vinculadas a la disponibilidad de financiamiento federal y el compromiso de los políticos locales. El Plan Fiscal Certificado no tiene en cuenta cambios futuros en el ambiente político, como en el gobierno de Puerto Rico, la dirección legislativa y regulatoria de Puerto Rico, las políticas de financiamiento y asignaciones federales, las exenciones impositivas federales o la calidad de estado o la relación de Puerto Rico con el gobierno federal.

E.    **Riesgos relacionados con los Nuevos Bonos**

***Los Nuevos Bonos son pagaderos únicamente con los Ingresos Netos depositados a favor del Fondo de Amortización de la Deuda.***

Los Nuevos Bonos son pagaderos únicamente con los Ingresos Netos depositados a favor del Fondo de Amortización de la Deuda y los tenedores de los Nuevos Bonos no tendrán ninguna otra garantía o recurso para el pago que no sean los Ingresos Netos.

Los Nuevos Bonos no son obligaciones generales de la AEE Reorganizada y están limitados al flujo de caja neto del Cargo Heredado según se detalla en esta Declaración de Divulgación, el Plan, el Nuevo Contrato Marco de Emisión de Deuda y tampoco son endeudamiento ni pasivos del ELA o cualquiera de las otras instrumentalidades públicas o subdivisiones políticas del ELA. Los Nuevos Bonos no están avalados por la buena fe, el crédito y el poder impositivo del ELA, ni son pagaderos ni están garantizados por, ninguna instrumentalidad pública o subdivisión política del ELA. Los Nuevos Bonos no estarán asegurados ni garantizados por el Fideicomisario del Nuevo Contrato Marco de Emisión de Deuda, por ningún otro proveedor de servicios contratado en virtud del Nuevo Contrato Marco de Emisión de Deuda ni por ninguna de sus respectivas filiales, ni por ninguna otra persona. La AEE Reorganizada no tiene autoridad fiscal.

***Es posible que los Nuevos Bonos no coticen a su valor nominal y que su limitada liquidez los haga menos atractivos para los inversionistas.***

Como consecuencia de las inquietudes por las circunstancias financieras actuales y futuras de la AEE, es posible que los tenedores de los Nuevos Bonos se encuentren con una aceptación limitada en el mercado cuando intenten venderlos. Las ventas de los Nuevos Bonos a

su valor nominal o en torno al mismo pueden ser difíciles. Es posible que, después de la Fecha de Entrada en Vigencia, los tenedores de los Nuevos Bonos se encuentren con que, durante un tiempo, no puedan venderlos a ningún precio. Alternativamente, los potenciales compradores podrán exigir descuentos sobre el valor nominal de dichos instrumentos antes de mostrarse dispuestos a adquirirlos. No es seguro que pueda existir algún mercado secundario para los Nuevos Bonos. La ausencia de un mercado secundario para los Nuevos Bonos, o la falta de liquidez en los mercados secundarios, podría limitar las posibilidades de los tenedores de revender los Nuevos Bonos, o bien perjudicar su valor de mercado.

Los Nuevos Bonos y las transacciones descritas en este documento estarán sujetos a las exenciones de registro previstas por la Ley de Valores de 1933, con sus enmiendas. Los Nuevos Bonos no han sido aprobados, ni desaprobados, por la SEC ni organismos homólogos del Estado Libre Asociado o de ningún estado, ni por otras autoridades reguladoras. Estas entidades tampoco han evaluado la exactitud o idoneidad de esta Declaración de Divulgación. Toda afirmación en sentido contrario constituye un delito. Por consiguiente, es posible que el mercado secundario para los Nuevos Bonos sea limitado y que sus tenedores no puedan venderlos cuando deseen, u obtener el precio que deseen recibir por ellos, con las consiguientes pérdidas significativas.

Considerando la singular naturaleza del Plan, ciertas condiciones y documentos de formalización (incluyendo dictámenes jurídicos) con respecto al Plan podrán ser diferentes, en tipo y alcance, de los normalmente requeridos en transacciones de oferta de deuda municipal que se producen fuera de un proceso de reestructuración con supervisión judicial. Al adoptar sus decisiones de inversión, los inversionistas deberían considerar que ciertas actuaciones, procedimientos o requisitos de asesores jurídicos u otros terceros en relación con el Plan pueden ser sustancialmente diferentes, y mucho más limitados, que los requisitos típicos.

En los últimos años, varios trastornos importantes en los mercados financieros globales han causado una significativa reducción de la liquidez de los mercados secundarios para títulos valores. Aunque las condiciones de los mercados financieros y de los mercados secundarios han mejorado, los períodos de iliquidez pueden volver a producirse y afectar al mercado secundario, afectando sustancialmente de manera adversa el valor de los Nuevos Bonos y limitando la capacidad de los tenedores para venderlos. También la preocupación por las perspectivas económicas del ELA puede tener efectos adversos sobre el valor de mercado y la liquidez de los Nuevos Bonos.

***Los derechos de los tenedores de los Nuevos Bonos son de naturaleza limitada y pueden verse afectados negativamente por cuestiones generalmente asociadas a la ejecución de gravámenes sobre garantías.***

En caso de declaración de incumplimiento en virtud del Nuevo Contrato Marco de Emisión de Deuda, el pago de los Nuevos Bonos no puede acelerarse. Los Nuevos Bonos no están sujetos a amortización antes de su vencimiento a elección de sus tenedores, y estos no podrán recurrir contra la AEE Reorganizada en caso de incumplimiento. Además, los Nuevos Bonos no tendrán una tasa de interés por incumplimiento o rendimiento por acumulación, según proceda.

Las garantías prendarias sobre los Ingresos Netos y el derecho a percibirlos, estarán sujetos a problemas prácticos generalmente asociados a la realización de garantías prendarias sobre garantías. Por ejemplo, la ejecución de la garantía prendaria sobre los Ingresos Netos requiere una resolución favorable del Tribunal del Título III. No existe garantía alguna de que el Fideicomisario del Nuevo Contrato Marco de Emisión de Deuda obtenga una sentencia favorable y, como consecuencia, es posible que el Fideicomisario del Nuevo Contrato Marco de Emisión de Deuda no pueda ejecutar los Ingresos Netos. Además, el gravamen de los Ingresos Netos o el derecho a recibirlo puede ser anulado por el deudor prendario (como deudor en posesión), por su fideicomisario en quiebra, o potencialmente por otros acreedores en una futura quiebra de la AEE Reorganizada si existen o se producen ciertos eventos o circunstancias, que pueden incluir, entre otros, que la prenda o perfeccionamiento permita a los tenedores de Nuevos Bonos recibir una mayor recuperación en un hipotético caso futuro del Título III (o Capítulo 7 o equivalentes) que si no se hubiera dado dicha prenda o perfeccionamiento. En la medida en que la concesión o el perfeccionamiento de dichos Ingresos Netos se evite como preferencia o de otro modo, los titulares de Nuevos Bonos perderían el beneficio de la garantía prendaria y podrían tener que devolver pagos a la AEE Reorganizada.

***Naturaleza limitada de las calificaciones; rebajas, suspensión o retiro de una calificación.***

En la medida en que las Partes del Gobierno, cada una de ellas actuando según su exclusivo y absoluto criterio, decidan solicitar la calificación crediticia de los Nuevos Bonos, deberán hacer todos los esfuerzos comercialmente razonables para obtener la calificación crediticia de los Nuevos Bonos a la mayor brevedad razonable, según lo determinen las Partes del Gobierno, según su exclusivo criterio, y realizar posteriormente los mejores esfuerzos comercialmente razonables para obtener la mejor calificación posible. El Nuevo Contrato Marco de Emisión de Deuda no incluirá un pacto de las Partes del Gobierno de mantener una calificación crediticia específica para los Nuevos Bonos en circulación.

Toda futura calificación asignada a los Nuevos Bonos por una agencia de calificación reflejará la evaluación de dicha agencia de la probabilidad de pago de los intereses cuando sean pagaderos y del capital de los Nuevos Bonos en sus respectivas fechas de vencimiento. Una calificación de los Nuevos Bonos no es una recomendación de comprar, conservar o vender los Nuevos Bonos, y dicha calificación no abordará su comerciabilidad, su precio en el mercado ni su idoneidad para inversionistas específicos. No existe garantía de que una calificación se mantendrá durante un determinado período, ni que no vaya a ser rebajada, suspendida o totalmente retirada por una agencia de calificación si, en opinión de esta, las circunstancias lo justifican, basándose en los factores que prevalezcan en el momento, que incluyen, entre otros, las perspectivas financieras de la AEE  Reorganizada o de la economía del Estado Libre Asociado en opinión de la agencia. Si se produjese dicha rebaja, suspensión o retiro de una calificación, podría perjudicar a la disponibilidad de un mercado o los precios de mercado de los Nuevos Bonos.

***Una calificación adversa de los Nuevos Bonos podría afectar adversamente su precio de mercado.***

No obstante el hecho de que inicialmente las Partes del Gobierno no podrán solicitar una calificación, una agencia de calificación podrá publicar una calificación no solicitada de los

Nuevos Bonos, empleando factores cuantitativos y cualitativos, como, por ejemplo, la solvencia financiera real o percibida de la AEE Reorganizada, las perspectivas de pago del capital y de los intereses de los Nuevos Bonos, las repercusiones de la crisis fiscal del Estado Libre Asociado y otras condiciones macroeconómicas reinantes en el ELA. Asimismo, las calificaciones reflejan las diversas metodologías e hipótesis empleadas por las agencias de calificación, que están sujetas a modificación sin previo aviso. Las medidas adoptadas por las agencias de calificación pueden incluir el inicio, el mantenimiento, la subida, la rebaja o el retiro de una calificación actual de la deuda de la AEE Reorganizada, o bien ponerla en una perspectiva negativa para una posible rebaja futura. Estas actuaciones pueden llevar algún tiempo, y están fuera del control de la AEE Reorganizada. La rebaja o el retiro de una calificación crediticia de la deuda de la AEE Reorganizada, lo que incluye los Nuevos Bonos, o poner a la AEE Reorganizada en perspectiva negativa para una posible futura rebaja pueden tener efectos negativos para el valor de los Nuevos Bonos.

***Los Nuevos Bonos no estarán sujetos a la Ley de Contrato de Fideicomisos.***

Los Nuevos Bonos no se emitirán, ni se requerirá que se emitan, en virtud de un contrato calificado según la Ley de Contrato de Fideicomisos de 1939, con sus correspondientes modificaciones (la "LCF"). Como consecuencia, los tenedores de los Nuevos Bonos no estarán amparados por las protecciones previstas por la LCF con respecto a sus inversiones en los Nuevos Bonos.

***La amortización anticipada de los Nuevos Bonos puede perjudicar sustancialmente la rentabilidad de los Nuevos Bonos.***

Los Nuevos Bonos son amortizables total o parcialmente antes de su vencimiento. Consulte la Sección VI.F.6 de esta Declaración de Divulgación. El precio de amortización que se pagará a los tenedores de Nuevos Bonos ante dicha amortización anticipada será equivalente a su monto de capital más los intereses devengados sobre ellos hasta la fecha fijada para la amortización. La AEE Reorganizada podrá optar por amortizar los Nuevos Bonos en momentos en que las tasas de interés vigentes sean inferiores a la tasa de interés pagada sobre los Nuevos Bonos. En este caso, los tenedores de dichos Nuevos Bonos podrían no ser capaces de reinvertir el producto de la amortización con un valor comparable a una tasa de interés efectiva tan alta como la de los Nuevos Bonos que se amortizan.

***La emisión de los Nuevos Bonos y la implementación del Cargo Heredado pueden estar sujetas a la aprobación del NEPR.***

El Tribunal del Título III puede determinar que el NEPR debe aprobar la emisión de los Nuevos Bonos. La Ley 57-2014, con sus enmiendas, contiene una disposición que otorga al NEPR facultades de aprobación con respecto a las emisiones de deuda de la AEE. No obstante, la Ley 57-2014, con sus enmiendas, dispone que este requisito de aprobación no se aplica a la deuda emitida conforme al Título III de PROMESA. No obstante, si el Tribunal del Título III determina que la obligación del NEPR de aprobar las emisiones de deuda de la AEE sí se aplica a los bonos emitidos conforme al Título III de PROMESA, la emisión de los Nuevos Bonos podría estar sujeta a la aprobación del NEPR.

El Tribunal del Título III también puede determinar que el NEPR debe aprobar el aumento en las tarifas eléctricas de la AEE requerido por los Nuevos Bonos, lo que incluye la implementación del Cargo Heredado. Conforme a la Ley 57-2014, con sus enmiendas, los cambios a las tarifas de electricidad de la AEE deben ser aprobados por el NEPR antes de que las tarifas propuestas puedan entrar en vigencia.

Además, bajo la Ley de Habilitación de la AEE, con sus enmiendas, las transferencias de bienes de la AEE requieren la aprobación del NEPR. Aunque la Junta de Supervisión considera que PROMESA tiene prioridad sobre la autoridad del PREB en lo que respecta a la aprobación de dichas transferencias, si un tribunal con jurisdicción competente determina que se requiere la aprobación del NEPR, el Plan puede estar condicionado a la aprobación del NEPR.

Si el Tribunal del Título III determina que el NEPR debe aprobar (i) la emisión de los Nuevos Bonos y (ii) el Cargo Heredado, y/o (iii) las transferencias de bienes de la AEE, y no se puede obtener la aprobación del NEPR, esto puede tener un efecto sustancial adverso sobre la capacidad del Deudor para confirmar el Plan y el Plan puede no ser confirmable sin enmiendas sustanciales.

***Los Nuevos Bonos pueden estar sujetos a restricciones impuestas por la AAFAF.***

Conforme a la Ley de Responsabilidad en la Emisión de Deuda de Puerto Rico ("Ley 101-2020"), la AAFAF puede establecer una Política de Administración de Deuda (según se define en la Ley 101-2020) para regir la emisión de deuda por parte del Gobierno de Puerto Rico y sus corporaciones e instrumentalidades públicas. Aunque la Junta de Supervisión considera que PROMESA tiene prioridad sobre la autoridad de AAFAF en lo que respecta a las emisiones de deuda bajo PROMESA, en la medida en que AAFAF haya adoptado una Política de Administración de la Deuda que abarque la nueva Deuda emitida por la AEE, el Tribunal del Título III puede determinar que la emisión de los Nuevos Bonos debe cumplir con cualquier restricción pertinente impuesta por dicha Política de Administración de la Deuda. Si los Nuevos Bonos no cumplen con dichas restricciones, pueden tener un efecto sustancial adverso en la capacidad del Deudor para confirmar el Plan y el Plan puede no ser confirmable sin enmiendas sustanciales.

***Es posible que el Cargo Heredado no genere ingresos suficientes para hacer frente a todos los pagos de intereses y capital de los Nuevos Bonos.***

Los Nuevos Bonos son pagaderos únicamente con los Ingresos Netos de la AEE depositados a favor del Fondo de Amortización de la Deuda. Los futuros Ingresos Netos generados, en parte, por el Cargo Heredado, dependen en gran medida de la realización del uso de la electricidad, la recaudación electrónica de tarifas, las multas de aplicación y otros ingresos. Además, dichos ingresos dependerán de la continuación del funcionamiento del sistema eléctrico. No existe garantía alguna de que la AEE Reorganizada continuará operando el sistema de acuerdo con los estándares actuales o de la industria, o que no se requerirá un aumento significativo en las contribuciones para la operación general y mantenimiento del sistema. Además, el aumento de las tarifas debido al Cargo Heredado también puede reducir la demanda, lo que a su vez reducirá los Ingresos Netos y la capacidad de hacer frente a los pagos de los Nuevos Bonos.

El sistema también puede ser vulnerable a un evento de fuerza mayor (p. ej., huracanes y otras catástrofes naturales, incendios, pandemias, epidemias, estrés térmico, inundaciones, catástrofes provocadas por el hombre, guerras, disturbios) y otras circunstancias e incidentes imprevistos, y los daños causados por un evento de este tipo pueden afectar negativamente al rendimiento de dichos activos hasta que se hayan subsanado los daños. En determinadas circunstancias, el cumplimiento por parte de la AEE Reorganizada de ciertos términos del Nuevo Contrato Marco de Emisión de Deuda puede ser suspendido ante un evento de fuerza mayor. La AEE no ha completado planes para mejorar la flexibilidad del sistema y fortalecer el sistema energético contra futuros eventos climáticos extremos, que solo aumentarán en frecuencia y magnitud. Los terremotos pueden causar graves daños a la infraestructura de la AEE, así como daños a las líneas de transmisión. El Servicio Geológico de Estados Unidos prevé que la probabilidad anual de que se produzca un terremoto de magnitud superior a 5 supera actualmente el 99%, y se mantendrá por encima del 50% durante los próximos tres a diez años en Puerto Rico. La AEE no ha realizado una evaluación exhaustiva de los riesgos de su infraestructura para determinar las mejoras estructurales necesarias para limitar los daños causados por futuros terremotos.

## F.     Riesgos relacionados con los CVI

### *Los CVI son pagaderos únicamente con los Ingresos Netos Restantes depositados en el haber del Fondo de Amortización de la Deuda de CVI.*

Los CVI son pagaderos únicamente con los Ingresos Netos Restantes depositados en el haber del Fondo de Amortización de la Deuda de CVI y los tenedores de los CVI no tendrán ninguna otra garantía o recurso para el pago que no sean los Ingresos Netos Restantes.

Los CVI no son obligaciones generales de la AEE Reorganizada y están limitados al flujo de caja neto del Cargo Heredado Restante según se detalla en esta Declaración de Divulgación, el Plan, el Nuevo Contrato Marco de Emisión de Deuda y tampoco son endeudamiento o pasivos del ELA o cualquiera de las otras instrumentalidades públicas o subdivisiones políticas del ELA. Los CVI no están avalados por la buena fe, el crédito y el poder impositivo del ELA, ni son pagaderos ni están garantizados por, ninguna instrumentalidad pública o subdivisión política del ELA. Los CVI no estarán asegurados ni garantizados por el Fideicomisario del Nuevo Contrato Marco de Emisión de Deuda, por ningún otro proveedor de servicios contratado en virtud del Nuevo Contrato Marco de Emisión de Deuda ni por ninguna de sus respectivas filiales, ni por ninguna otra persona. La AEE Reorganizada no tiene autoridad fiscal.

### *Es posible que los CVI no coticen a la par o a su valor nominal, y la liquidez limitada puede hacer que el CVI resulte menos atractivo para los inversionistas.*

Como consecuencia de la inquietud por las circunstancias financieras actuales y futuras de la AEE, es posible que los tenedores de los CVI se encuentren con una aceptación limitada en el mercado cuando intenten venderlos. Las ventas de CVI a la par o a su valor nominal o en torno a él pueden ser difíciles. Es posible que, después de la Fecha de Entrada en Vigencia, los tenedores de los CVI se encuentren con que, durante un tiempo, no puedan venderlos a ningún precio. Alternativamente, los potenciales compradores podrán exigir descuentos sobre el valor a la par o nominal de dichos instrumentos antes de mostrarse dispuestos a adquirirlos. No es

seguro que pueda existir algún mercado secundario para los CVI. La ausencia de un mercado secundario para los CVI, o la falta de liquidez en los mercados secundarios, podría limitar las posibilidades de los tenedores de revender los CVI, o bien perjudicar su valor de mercado.

Los CVI y las transacciones descritas en este documento estarán sujetos a las exenciones de registro previstas por la Ley de Valores de 1933, con sus correspondientes enmiendas. Los CVI no han sido aprobados, ni desaprobados, por la SEC ni organismos homólogos del Estado Libre Asociado o de ningún estado, ni por otras autoridades reguladoras. Estas entidades tampoco han evaluado la exactitud o idoneidad de esta Declaración de Divulgación. Toda afirmación en sentido contrario constituye un delito. Por consiguiente, es posible que el mercado secundario para los CVI sea limitado y que sus tenedores no puedan venderlos cuando deseen, u obtener el precio que deseen recibir por ellos, con las consiguientes pérdidas significativas.

Considerando la singular naturaleza del Plan, ciertas condiciones y documentos de formalización (incluyendo dictámenes jurídicos) con respecto al Plan podrán ser diferentes, en tipo y alcance, de los normalmente requeridos en transacciones de oferta de deuda municipal que se producen fuera de un proceso de reestructuración con supervisión judicial. Al adoptar sus decisiones de inversión, los inversionistas deberían considerar que ciertas actuaciones, procedimientos o requisitos de asesores jurídicos u otros terceros en relación con el Plan pueden ser sustancialmente diferentes, y mucho más limitados, que los requisitos típicos.

En los últimos años, varios trastornos importantes en los mercados financieros globales han causado una significativa reducción de la liquidez de los mercados secundarios para títulos valores. Aunque las condiciones de los mercados financieros y de los mercados secundarios han mejorado, los períodos de iliquidez pueden volver a producirse y afectar al mercado secundario, afectando sustancialmente de manera adversa al valor de los CVI y limitando la capacidad de los tenedores para venderlos. También la preocupación por las perspectivas económicas del ELA puede tener efectos adversos sobre el valor de mercado y la liquidez de los CVI.

***Los derechos de los tenedores de los CVI son de naturaleza limitada y pueden verse afectados negativamente por cuestiones generalmente asociadas a la ejecución de gravámenes sobre garantías.***

En caso de declaración de incumplimiento en virtud del Nuevo Contrato Marco de Emisión de Deuda, el pago de los CVI no puede acelerarse. Los CVI no están sujetos a amortización antes de su vencimiento a elección de sus tenedores, y estos no podrán recurrir contra la AEE Reorganizada en caso de incumplimiento. Además, los CVI no tendrán una tasa de interés por incumplimiento o rendimiento por acumulación, según proceda.

Las garantías prendarias sobre los Ingresos Netos Restantes y el derecho a percibirlos, estarán sujetos a problemas prácticos generalmente asociados a la realización de garantías prendarias sobre garantías. Por ejemplo, la ejecución de la garantía prendaria sobre los Ingresos Netos Restantes requiere una resolución favorable del Tribunal del Título III. No existe garantía alguna de que el Fideicomisario del Nuevo Contrato Marco de Emisión de Deuda obtenga una sentencia favorable y, como consecuencia, es posible que el Fideicomisario del Nuevo Contrato Marco de Emisión de Deuda no pueda ejecutar los Ingresos Netos Restantes. Además, el gravamen de los Ingresos Netos Restantes o el derecho a recibirlo puede ser anulado por el

deudor prendario (como deudor en posesión), por su fideicomisario en quiebra, o potencialmente por otros acreedores en una futura quiebra de la AEE Reorganizada si existen o se producen ciertos eventos o circunstancias, que pueden incluir, entre otros que la prenda o perfeccionamiento permita a los tenedores de CVI recibir una mayor recuperación en un hipotético caso futuro del Título III (o Capítulo 7 o equivalentes) que si no se hubiera dado dicha prenda o perfeccionamiento. En la medida en que la concesión o el perfeccionamiento de dichos Ingresos Netos Restantes se evite como preferencia o de otro modo, los titulares de CVI perderían el beneficio de la garantía prendaria y podrían tener que devolver pagos a la AEE Reorganizada.

**Los CVI no estarán sujetos a la Ley de Contrato de Fideicomisos**.

Los CVI no se emitirán, ni se requerirá que se emitan, en virtud de un contrato calificado según la Ley de Contrato de Fideicomisos de 1939, con sus correspondientes modificaciones (la "LCF"). Como consecuencia, los tenedores de los CVI no estarán amparados por las protecciones previstas por la LCF con respecto a sus inversiones en los CVI.

**La amortización anticipada de los CVI puede perjudicar sustancialmente la rentabilidad de los CVI.**

Los CVI son amortizables total o parcialmente antes de su vencimiento. *Vea* la sección V.F.1 de esta Declaración de Divulgación. La AEE Reorganizada puede optar por amortizar los CVI. En este caso, es posible que los tenedores de dichos CVI no puedan reinvertir el producto de la amortización en un título valor comparable.

**La emisión de los CVI y la implementación del Cargo Heredado Restante pueden estar sujetas a la aprobación del NEPR.**

El Tribunal del Título III puede determinar que el NEPR debe aprobar la emisión de los CVI. La Ley 57-2014, con sus correspondientes modificaciones, contiene una disposición que otorga al NEPR poderes de aprobación con respecto a las emisiones de deuda de la AEE. No obstante, la Ley 57-2014, con sus enmiendas, dispone que este requisito de aprobación no se aplica a la deuda emitida conforme al Título III de PROMESA. No obstante, si el Tribunal del Título III determina que la obligación del NEPR de aprobar las emisiones de deuda de la AEE sí se aplica a los CVI emitidos conforme al Título III de PROMESA, la emisión de los CVI podría estar sujeta a la aprobación del NEPR.

El Tribunal del Título III también puede determinar que el NEPR debe aprobar el aumento en las tarifas eléctricas de la AEE requerido por los CVI, lo que incluye la implementación del Cargo Heredado. Conforme a la Ley 57-2014, con sus enmiendas, los cambios a las tarifas de electricidad de la AEE deben ser aprobados por el NEPR antes de que las tarifas propuestas puedan entrar en vigencia.

Si el Tribunal del Título III determina que el NEPR debe aprobar (i) la emisión de los CVI y (ii) el Cargo Heredado Restante, y no se puede obtener la aprobación del NEPR, esto puede tener un efecto sustancial adverso sobre la capacidad del Deudor para confirmar el Plan y el Plan puede no ser confirmable sin enmiendas sustanciales.

380

***Los CVI pueden estar sujetos a restricciones impuestas por la AAFAF.***

Conforme a la Ley de Responsabilidad en la Emisión de Deuda de Puerto Rico ("Ley 101-2020"), la AAFAF puede establecer una Política de Administración de Deuda (según se define en la Ley 101-2020) para regir la emisión de deuda por parte del Gobierno de Puerto Rico y sus corporaciones e instrumentalidades públicas. Aunque la Junta de Supervisión considera que PROMESA tiene prioridad sobre la autoridad de AAFAF en lo que respecta a las emisiones de deuda bajo PROMESA, en la medida en que AAFAF haya adoptado una Política de Administración de la Deuda que abarque la nueva Deuda emitida por la AEE, el Tribunal del Título III puede determinar que la emisión de CVI debe cumplir con cualquier restricción pertinente impuesta por dicha Política de Administración de la Deuda. Si los CVI no cumplen con dichas restricciones, pueden tener un efecto sustancial adverso en la capacidad del Deudor para confirmar el Plan y el Plan puede no ser confirmable sin enmiendas sustanciales.

***Los tenedores de los CVI pueden no recibir pago alguno sobre los CVI.***

Los CVI son pagaderos únicamente con los Ingresos Netos Restantes de la AEE depositados en el haber del Fondo de Amortización de la Deuda de CVI. Los futuros Ingresos Netos Restantes generados, en parte, por el Cargo Heredado, dependen en gran medida de la realización del uso de la electricidad, la recaudación electrónica de tarifas, las multas de aplicación y otros ingresos, y por las razones estipuladas en la Sección IX.D. Además, dichos ingresos dependerán de la continuación del funcionamiento del sistema eléctrico. No existe garantía alguna de que la AEE Reorganizada continuará operando el sistema de acuerdo con los estándares actuales o de la industria, o que no se requerirá un aumento significativo en las contribuciones para la operación general y mantenimiento del sistema. Además, el aumento de las tarifas debido al Cargo Heredado Restante también puede reducir la demanda, lo que a su vez reducirá los Ingresos Netos Restantes y la capacidad de hacer frente a los pagos de los CVI.

El sistema también puede ser vulnerable a un evento de fuerza mayor (p. ej., huracanes y otras catástrofes naturales, incendios, pandemias, epidemias, estrés térmico, inundaciones, catástrofes provocadas por el hombre, guerras, disturbios) y otras circunstancias e incidentes imprevistos, y los daños causados por un evento de este tipo pueden afectar negativamente al rendimiento de dichos activos hasta que se hayan subsanado los daños. En determinadas circunstancias, el cumplimiento por parte de la AEE Reorganizada de ciertos términos del Nuevo Contrato Marco de Emisión de Deuda puede ser suspendido ante un evento de fuerza mayor. La AEE no ha completado planes para mejorar la flexibilidad del sistema y fortalecer el sistema energético contra futuros eventos climáticos extremos, que solo aumentarán en frecuencia y magnitud. Los terremotos pueden causar graves daños a la infraestructura de la AEE, así como daños a las líneas de transmisión. El Servicio Geológico de Estados Unidos prevé que la probabilidad anual de que se produzca un terremoto de magnitud superior a 5 supera actualmente el 99%, y se mantendrá por encima del 50% durante los próximos tres a diez años en Puerto Rico. La AEE no ha realizado una evaluación exhaustiva de los riesgos de su infraestructura para determinar las mejoras estructurales necesarias para limitar los daños causados por futuros terremotos.

**G.** **Riesgos relacionados con la recaudación de ingresos necesarios para el pago de los Nuevos Bonos y CVI**

La red eléctrica de Puerto Rico y sus operadores pueden estar sujetos a futuras crisis y recesiones económicas adicionales que pueden ser provocadas por causas distintas a una pandemia mundial, como crisis bancarias, interrupciones del comercio y del combustible, y crisis políticas, entre otras. Para mitigar futuros trastornos causados por el toque de queda o las condiciones económicas adversas en el sector de los servicios públicos, deben considerarse medidas operativas para aumentar el control remoto de la red (p. ej., tecnologías de automatización de la distribución, instalación de medidores inteligentes), además de aplicar medidas para mejorar la confiabilidad y flexibilidad del sistema. En caso de crisis económica, la disminución de la recaudación reduciría el saldo de caja, lo que incrementaría la necesidad de una administración eficaz de la liquidez a corto plazo.

*Los desastres naturales pueden afectar la capacidad de la AEE y de LUMA Energy para recaudar ingresos.*

Los desastres naturales pueden perjudicar la capacidad de la AEE y de LUMA Energy de recaudar los ingresos según lo previsto y podrían provocar una emigración adicional y daños al sistema eléctrico que también podrían reducir potencialmente los ingresos.

*Brote de una enfermedad; COVID-19.*

El impacto que la pandemia de COVID-19 está teniendo y tendrá sobre el comercio, los mercados financieros y Puerto Rico, y la naturaleza del impacto probablemente evolucionará en los próximos años. El Gobierno ha experimentado reducciones en sus fuentes de ingresos. La información contenida en esta Declaración de Divulgación describe los impactos actuales que la pandemia de COVID-19 y las órdenes relacionadas han tenido en las finanzas y operaciones de Puerto Rico, y describe algunas de las medidas que Puerto Rico está tomando en respuesta. No se puede predecir ni la duración ni el alcance de la emergencia de salud pública de COVID-19, ni la magnitud del impacto en Puerto Rico, en la economía regional o en la recaudación de impuestos. El brote de COVID-19 está en curso y su naturaleza dinámica da lugar a incertidumbres, entre ellas: (i) la propagación geográfica del virus; (ii) la severidad de la enfermedad; (iii) la duración del brote; (iv) las medidas que las autoridades gubernamentales puedan adoptar para contener o mitigar el brote; (v) el desarrollo y la distribución de terapias médicas y vacunas; (vi) restricciones de viaje adicionales o modificadas; (vii) el impacto del brote en la economía local o mundial, o en el sector de la aviación en general; (viii) si Puerto Rico puede decretar medidas adicionales de salud pública y en qué grado; y (ix) el impacto del brote y de las medidas tomadas en respuesta al brote sobre la recaudación de ingresos fiscales, los gastos y la situación financiera. Debe suponerse que las restricciones y limitaciones implementadas en relación con COVID-19 pueden continuar, que el actual trastorno sobre las economías nacional y mundial y de los mercados financieros puede continuar y/o agravarse, al menos a corto plazo, y que la recuperación puede prolongarse. Es posible que se produzcan epidemias locales o pandemias adicionales y que estas ocurran con mayor frecuencia dadas las tendencias de la globalización.

*Reducción de clientes residenciales y domésticos de la AEE debido a la disminución de la población.*

El Plan Fiscal Certificado prevé una reducción de la población de aproximadamente el once por ciento (11%) entre los años fiscales 2024 y 2038 y el correspondiente descenso de la carga bruta. Sin embargo, el PIR no proyecta una disminución en el número de clientes residenciales. Es probable que la disminución de la población cause una disminución en el número de clientes residenciales y domésticos de la AEE. Esta disminución de la clientela aumentaría aún más el costo global de los clientes debido a la brecha de costos fijos relativos más elevados que se trasladan a la base de clientes en disminución.

## H.    Factores de riesgo relacionados con futuras acciones judiciales

*Los Nuevos Bonos y el CVI se emiten en relación con el Plan que está sujeto a confirmación conforme al Título III de PROMESA, que solo se ha utilizado para la reestructuración financiera en otros tres casos.*

El Plan se efectúa conforme al Título III de la Ley PROMESA. PROMESA es una nueva legislación federal promulgada en 2016, y un plan de ajuste conforme al Título III solo ha sido confirmado por un tribunal en tres instancias: con respecto a la ACT (confirmado el 12 de octubre de 2022), el ELA (confirmada el 18 de enero de 2022), y COFINA (confirmado el 4 de febrero de 2019). En consecuencia, existen incertidumbres sobre la confirmación y el perfeccionamiento de un plan de ajuste en virtud del Título III de la Ley PROMESA. Por ejemplo, no queda claro en qué medida una orden que confirme el Plan del Tribunal del Título III podrá ser apelada, o su entrada en vigencia pospuesta. Mientras los tribunales posiblemente recurran a precedentes existentes de los capítulos 9 y 11 del Código de Quiebras, no existen garantías de que vayan a hacerlo o que no consideren otros factores a la hora de interpretar las cláusulas de la Ley PROMESA. Dichas incertidumbres podrían afectar, entre otros, a la percepción del mercado y, por consiguiente, al valor comercial de los Nuevos Bonos.

Además, existe incertidumbre asociada al perfeccionamiento de un plan de ajuste conforme al Título III de PROMESA porque la experiencia judicial en la interpretación de las disposiciones de un plan de ajuste confirmado conforme al Título III de PROMESA es limitada. Las interpretaciones judiciales de un plan de ajuste confirmado conforme al Título III de la Ley PROMESA, incluso las vinculadas al perfeccionamiento satisfactorio de un plan de ajuste, podrían afectar al valor de los Nuevos Bonos emitidos conforme al Plan.

*La Ley PROMESA está sujeta a impugnaciones en cuanto a su constitucionalidad.*

Algunas partes han impugnado la constitucionalidad de PROMESA sobre el supuesto de que viola el requisito de la Cláusula de Quiebra de la Constitución de los Estados Unidos de que las leyes de quiebra sean uniformes. *Vea Ambac Assurance Corporation c. la Junta de Supervisión y Administración Financiera para Puerto Rico y otros*, Proc. Cont. Núm. 20-00068. Dicha impugnación fue retirada posteriormente en virtud de una transacción, pero otras partes no vinculadas por la transacción pueden plantear impugnaciones similares a la constitucionalidad de PROMESA.

*La AEE puede estar expuesta a futuras demandas y acciones judiciales.*

La AEE puede estar sujeta a diversas reclamaciones y acciones judiciales derivadas del curso ordinario de sus actividades después de la Fecha de Entrada en Vigencia. El Deudor no puede predecir la naturaleza y el alcance de dichas reclamaciones y acciones, y no puede garantizar que la resolución definitiva de estas no vaya a tener efectos adversos materiales para el Deudor después de salir del procedimiento del Título III.

*La tutela de los derechos de conformidad con los Nuevos Bonos y CVI y el Nuevo Contrato Marco de Emisión de Deuda puede estar limitada en la medida en que la AEE Reorganizada esté sujeta a un nuevo caso conforme al Título III de la Ley PROMESA.*

Los tenedores de los Nuevos Bonos y del CVI podrían verse imposibilitados de hacer valer sus derechos conforme a los Nuevos Bonos o el CVI, según corresponda, y el Nuevo Contrato Marco de Emisión de Deuda en la medida en que la AEE Reorganizada esté sujeta a un caso posterior bajo el Título III de PROMESA como resultado de la aplicación de la paralización automática de la aplicación de remedios que entraría en vigencia tras la presentación de la petición de Título III.

*Ciertas condiciones y documentos de formalización con respecto al Plan pueden diferir, en tipo y alcance, de los aquí descritos.*

Ciertas condiciones y documentos de formalización con respecto al Plan pueden diferir, en tipo y alcance, de los aquí descritos si el Tribunal del Título III dicta una Orden de Confirmación diferente de la prevista.

## I.    Factores de riesgo relacionados con la Legislación

*La Asamblea Legislativa puede aprobar legislación que interfiera con, obstaculice, impida o intente controlar la capacidad de la AEE para reestructurarse y los términos de cualquier emisión de bonos o para alcanzar las metas de transformación de la AEE.*

El Plan depende de la legislación actual de Puerto Rico para autorizar las transacciones contempladas en el Plan, lo que incluye la emisión de los Nuevos Bonos y el CVI. Históricamente, la Asamblea Legislativa ha intentado aprobar legislación que puede interferir con, obstaculizar, impedir o intentar controlar la capacidad de la AEE para reestructurar y los términos de cualquier emisión de bonos o para lograr las metas de transformación de la AEE. No existe certidumbre con respecto a si la Asamblea Legislativa no intentará interferir con el Plan ya sea antes de la Fecha de Entrada en Vigencia o después de la salida de la AEE del Título III. Estas acciones podrían tener un efecto sustancial adverso sobre el valor de los Nuevos Bonos y del CVI y sobre los recobros sobre dichos instrumentos.

Aunque la Junta de Supervisión trataría de ejercer sus facultades conforme a PROMESA para prohibir tales acciones legislativas, incluso en virtud de PROMESA § 108, no hay certeza de que el Tribunal del Título III conceda la reparación judicial que antecede, o de que se mantendría en una apelación.

La acción futura de la Asamblea Legislativa podría cambiar la legislación que autoriza las transacciones contempladas por el Plan de manera que afecte a los Nuevos Bonos y al CVI. Cualquier acción del Gobierno para modificar la legislación, así como los litigios que probablemente se producirían, podrían afectar negativamente al valor de los Nuevos Bonos o del CVI, y a los recobros sobre ellos.

***Algunas disposiciones del Plan pueden requerir la aprobación de la AAFAF.***

Conforme a la Ley 101-2020, la AAFAF puede establecer una Política de Administración de Deuda (según se define en la Ley 101-2020). Según se explica en la Ley 101-2020, la Política de Administración de Deuda rige la emisión de "Deuda"[278] por parte del Gobierno de Puerto Rico y sus corporaciones e instrumentalidades públicas. Conforme a la Ley 101-2020, la AAFAF puede tener la facultad de incluir cualquier Deuda de cualquier instrumentalidad o corporación pública dentro de su Política de Administración de Deuda, la cual puede incluir nueva Deuda de la AEE emitida después de la fecha de vigencia del Plan del ELA. Aunque la Junta de Supervisión considera que PROMESA tiene prioridad sobre la autoridad de la AAFAF en lo que respecta a las emisiones de deuda conforme a PROMESA, en la medida en que la AAFAF haya adoptado una Política de Administración de Deuda que abarque la nueva Deuda emitida por la AEE, existe el riesgo de que un tribunal de jurisdicción competente determine que el Plan está sujeto a la obtención de dichas aprobaciones.

**J.      Factores de riesgo relacionados con el tratamiento tributario de los Nuevos Bonos**

***La proporción de Nuevos Bonos que estarán exentos de impuestos a efectos del impuesto federal sobre la renta de EE.UU. es incierta.***

Está previsto que los Nuevos Bonos se emitan como Nuevos Bonos exentos de impuestos, tal y como se definen en la Sección IX de esta Declaración de Divulgación. No obstante, si se determina que los Nuevos Bonos, o parte de ellos, no están exentos de impuestos, se tratarán como Nuevos Bonos tributables, tal y como se definen en la Sección IX de esta Declaración de Divulgación. La AEE Reorganizada se compromete a que, hasta que todas las obligaciones con respecto a ellos hayan sido pagadas o se hayan satisfecho en su totalidad de acuerdo con sus términos, llevará a cabo todos los actos y gestiones permitidas por ley y razonablemente necesarias o deseables para garantizar que los intereses pagados a los tenedores de cualquier Nuevo Bono exento de impuestos serán y seguirán siendo excluibles de los ingresos brutos para fines del impuesto federal sobre la renta. El estatus tributario de los Nuevos Bonos todavía no ha sido determinado a la fecha de esta Declaración de Divulgación, lo que incluye (i) si una parte de los intereses de los Nuevos Bonos podrá ser excluida a efectos de los ingresos brutos para el Impuesto federal sobre la renta de EE.UU., o (ii) si se determina que dicho interés, o una parte de él, no cumple los requisitos para ser excluido, la relación entre el importe total de todos los Nuevos Bonos tributables que se emitirán en la Fecha de Entrada en Vigencia y el importe total global de todos los Nuevos Bonos  *Vea* la Sección IX.B.2.

---

[278] La Ley 101-2020 define la Deuda en sentido amplio para incluir "bonos, pagarés, préstamos y otras evidencias de endeudamiento por dinero prestado".

***La forma en que los intereses devengados deben calcularse con respecto a los Nuevos Bonos a efectos del impuesto federal sobre la renta de EE.UU. es incierta.***

El Deudor no tiene intención de tratar los Nuevos Bonos como "instrumentos de deuda de pago contingente" en virtud de los Reglamentos del Tesoro aplicables, tal y como se definen en la Sección IX de esta Declaración de Divulgación. No obstante, la autoridad para el tratamiento de los Nuevos Bonos es limitada, y no está garantizado que el IRS vaya a respetar dicho tratamiento. Los tenedores de EE.UU. deberían consultar a sus asesores fiscales acerca del tratamiento de los Nuevos Bonos en calidad de instrumentos de deuda de pago contingente, lo que incluye las limitaciones que pudiesen aplicarse a la cuantía de los intereses exentos de impuestos de los Nuevos Bonos exentos de impuestos que podrán excluirse de los ingresos brutos a efectos del Impuesto federal sobre la renta de EE.UU. *Vea* la Sección IX.B.2.

***Es posible que, en algunos ejercicios, se exija a los tenedores estadounidenses declarar sus ingresos superiores al dinero en efectivo que hayan percibido en esos años, lo cual supondría "ingresos fantasma" a efectos del impuesto federal sobre la renta de EE.UU.***

Si a efectos del impuesto federal sobre la renta de EE.UU., los Nuevos Bonos tributables (tal como se definen en la Sección IX) se emiten con más de un importe *de minimis* de descuento original de emisión (generalmente, el 0.25% del precio de amortización estipulado al vencimiento, multiplicado por el número de años enteros hasta el vencimiento), entonces un Tenedor de EE.UU. de dichos bonos deberá incluir el descuento original de emisión en sus ingresos cuando lo devengue (independientemente del método habitual de contabilización tributaria del tenedor) utilizando un método de rentabilidad constante de conformidad con las reglas de devengo. Si en algún ejercicio los devengos de intereses superasen los pagos en efectivo en concepto de los Nuevos Bonos tributables, un Tenedor estadounidense habrá percibido ese año una "renta fantasma" en ese año, es decir, ingresos tributables por encima del efectivo recibido, que podría ser sustancial.

En caso de venta u otra enajenación tributable de un Nuevo Bono con el descuento de mercado devengado, un Tenedor de EE.UU. deberá declararlo como renta ordinaria (en lugar de rentas de capital) en función del descuento de mercado devengado, salvo que previamente haya optado por incluir el descuento de mercado de la renta en el momento de devengarlo. Vea "*Consideraciones materiales a efectos del Impuesto federal sobre la renta de EE.UU.— Tenedores de EE.UU.—Tratamiento tributario de las Reclamaciones permitidas*".

TODOS LOS TENEDORES SUJETOS A LA TRIBUTACIÓN ESTADOUNIDENSE DEBERÍAN LEER EL ANÁLISIS DE LAS CONSECUENCIAS, A EFECTO DEL IMPUESTO FEDERAL SOBRE LA RENTA DE ESTADOS UNIDOS, DE LA COMPRA, POSESIÓN Y ENAJENACIÓN DE LOS NUEVOS BONOS CONTENIDA EN ESTA DECLARACIÓN DE DIVULGACIÓN, BAJO EL ENCABEZADO "CONSIDERACIONES MATERIALES A EFECTOS DEL IMPUESTO FEDERAL SOBRE LA RENTA DE EE.UU.".

[*El resto de la página se deja intencionalmente en blanco*]

## IX.   Consideraciones materiales a efectos del impuesto federal sobre ingresos de EE.UU.

### A.  Generalidades

A continuación se presenta una descripción general de ciertas consecuencias materiales del Plan a efectos del impuesto federal sobre ingresos de EE.UU. Esta descripción está basada en el Código de Rentas Internas de EE.UU. de 1986, con sus enmiendas (el "IRC"), las reglas (incluso las temporales y propuestas) promulgadas de conformidad con el IRC (los "Reglamentos del Tesoro"), las sentencias judiciales y decisiones administrativas, tal y como estén vigentes en la fecha de presentación esta Declaración de Divulgación, todos los cuales están sujetos a cambios, posiblemente con efectos retroactivos. Los cambios de cualquiera de estas potestades o de su interpretación podría hacer que algunas, o todas, las consecuencias tributarias del Plan a efectos del impuesto sobre ingresos de EE.UU. resulten sustancialmente distintas de las aquí descritas.

Las consecuencias tributarias del Plan a efectos del impuesto sobre ingresos de EE.UU. son complejas, y pueden variar en función de la Clase de la Reclamación de un titular. A la fecha de esta Declaración de Divulgación, no se ha solicitado ninguna resolución del IRS en relación con ningún aspecto del Plan; no se ha solicitado ninguna opinión a los letrados de los Deudores sobre las consecuencias fiscales del Plan, salvo las específicamente aquí expuestas, y esta Declaración de Divulgación no presenta ninguna opinión tributaria.

La siguiente descripción no cubre todos los aspectos de la tributación federal estadounidense que puede ser pertinente para los titulares de Reclamaciones. Por ejemplo, la descripción no aborda cuestiones de especial interés para determinados tipos de contribuyentes (por ejemplo, compañías de inversiones reguladas, fondos de inversión inmobiliaria, bancos y algunas otras instituciones financieras, aseguradoras, entidades exentas de impuestos, planes de pensiones, cuentas individuales de jubilación y otras sujetas a tributación diferida, titulares que son, o que canalizan sus Reclamaciones a través de, sociedades mercantiles de tratamiento fiscal simplificado, asociaciones u otras entidades interpuestas a efectos tributarios federales estadounidenses, personas cuyas divisas funcionales no sean el dólar estadounidense, intermediarios de valores o de divisas, intermediarios que ajustan sus títulos al mercado, personas sujetas al impuesto mínimo alternativo, personas que reciben beneficios del Seguro Social o del Sistema de Jubilación para Ferroviarios, y personas cuyas reclamaciones sean parte de transacciones de compraventa simultánea, cobertura, venta constructiva o conversión). Además, la descripción no aborda otros impuestos federales aparte de los impuestos sobre ingresos, ni se aplica a las personas que adquieran Nuevos Bonos en el mercado secundario. Además, la descripción no contempla las consecuencias tributarias relativas a otros impuestos estatales, territoriales (incluido Puerto Rico), locales o no estadounidenses (incluso los impuestos patrimoniales o a las donaciones). Por último, este documento no aborda las consecuencias a efectos del impuesto federal de Estados Unidos sobre ingresos para los tenedores de reclamaciones que se considere que han rechazado el Plan.

Por estos motivos, esta descripción no sustituye a una detenida planificación tributaria ni a un asesoramiento fiscal profesional basado en las circunstancias individuales de cada tenedor de una Reclamación. Los tenedores de Reclamaciones deberían consultar a sus propios asesores

fiscales acerca de las consecuencias tributarias de los impuestos federales, estatales, territoriales (Puerto Rico incluido), locales y no estadounidenses.

**Esta sección no aborda las consecuencias fiscales del Plan en Puerto Rico para los titulares residentes de buena fe del Estado Libre Asociado ni para otros que pudieran estar sujetos a impuestos, sobre una base bruta o neta, del Estado Libre Asociado. Dichos tenedores deben consultar la Sección X a continuación.**

B.     **Tenedores de EE.UU.**

1.     **Definición de Tenedor de EE.UU.**

A menos que se indique algo distinto, lo siguiente es de aplicación solamente a Tenedores de EE.UU. Tal como se utiliza aquí, por "Tenedor de EE.UU." se entenderá a un tenedor beneficiario de Bonos de Ingresos de la AEE (los "Valores Existentes") a la Fecha de Entrada en Vigencia del Plan, a efectos del impuesto federal sobre ingresos de EE.UU.:

- un particular que es ciudadano o residente de los Estados Unidos;

- una corporación u otra entidad sujeta a impuestos federales sobre ingresos de EE.UU., constituida u organizada en, o de acuerdo con, las leyes de los Estados Unidos, cualquiera de sus estados o el Distrito de Columbia;

- una sucesión, cuyos ingresos están sujetos al impuesto federal sobre ingresos de EE.UU., independientemente de su procedencia; o bien

- un fideicomiso, si un tribunal de los Estados Unidos puede ejercitar su competencia sobre su administración y una o más personas estadounidenses tienen la facultad de controlar todas sus decisiones sustanciales, o bien si el fideicomiso tiene en vigor una elección válida, de conformidad con el reglamento del Tesoro de EE.UU., para ser tratado como persona estadounidense.

Si una asociación u otra entidad o concierto que paga impuestos como asociación a efectos del impuesto federal sobre ingresos de EE.UU. es tenedor de Valores Existentes, el tratamiento fiscal de un socio de dicha asociación dependerá en general de la situación del socio y de las actividades de la asociación. Se recomienda a los socios de la citada entidad que sean tenedores de Valores Existentes que consulten a sus asesores fiscales.

El término "Tenedor de EE.UU." no incluye a personas físicas ni jurídicas de Puerto Rico, cada una de ellas como se define en la Sección IX.C a continuación. Las personas físicas y jurídicas de Puerto Rico deberían consultar las consecuencias del Plan sobre el impuesto federal sobre ingresos de EE.UU. que se explican en la Sección IX.C a continuación.

Un tenedor de EE.UU. que posea Reclamaciones Permitidas de más de una clase puede tener diferentes consecuencias con respecto al impuesto federal sobre ingresos de EE.UU. para cada Clase de Reclamaciones Permitidas. Los Tenedores de EE.UU. deberían consultar detenidamente las secciones de esta exposición aplicables a cada Clase de Reclamaciones Permitidas de las que sean tenedores y los Tenedores de EE.UU. de más de una Clase de

Reclamaciones Permitidas deberían consultar a sus propios asesores fiscales acerca de la potencial interacción de las consecuencias con respecto al impuesto sobre ingresos de EE.UU. de cada Clase de Reclamación Permitida de las que pudiera ser tenedor.

En general, a ciertos Tenedores de EE.UU. que utilizan el método contable en valores devengados a efectos del impuesto federal sobre ingresos se les exigirá que reconozcan determinadas cantidades como parte de los ingresos percibidos en concepto de las Reclamaciones Permitidas a más tardar en el momento en que estas aparezcan reflejadas en sus estados financieros. Dichos Tenedores de EE.UU. deberían consultar a sus asesores fiscales acerca de las consecuencias tributarias del Plan con respecto al impuesto sobre ingresos de EE.UU., en función de sus circunstancias personales.

2.    **Tratamiento fiscal de Reclamaciones Permitidas**

a)    **Reclamaciones de Bonistas que llegan a un acuerdo y Aseguradoras Monolínea que llegan a un acuerdo (Clase 1), Reclamaciones de Bonistas que no llegan a un acuerdo y Aseguradoras Monolínea que no llegan a un acuerdo (Clase 2) (si procede), Reclamaciones por Préstamos de la Línea de Combustible (Clase 4), Reclamaciones Generales sin Garantía (Clase 5), Reclamación de Vitol (Clase 6), Reclamaciones de Swaps de Tasas de Interés Asegurados por Assured (Clase 7) (si procede), Reclamaciones de Dominio Eminente/Expropiación forzosa inversa (Clase 9), Reclamaciones federales (Clase 10)**

El Deudor prevé que, conforme al Plan, cada Tenedor de EE.UU. de cualquiera de las siguientes: (i) Reclamaciones de Bonistas que llegan a un acuerdo y Aseguradoras Monolínea que llegan a un acuerdo (Clase 1); (ii) Reclamaciones de Bonistas que no llegan a un acuerdo y Aseguradoras Monolínea que no llegan a un acuerdo (Clase 2); (iii) Reclamaciones por Préstamos de la Línea de Combustible (Clase 4); (iv) Reclamaciones Generales sin Garantía (Clase 5); (v) Reclamación de Vitol (Clase 6); (vi) Reclamaciones de Swaps de Tasas de Interés Asegurados por Assured (Clase 7) (si procede), (vii) Reclamaciones de Dominio Eminente/Expropiación forzosa inversa (Clase 9), y (viii) Reclamaciones federales (Clase 10) serán tratadas, o en el caso de las Clases 2, 5, 6, 7, 9 y 10, podrán ser tratadas, como un canje de los Bonos de Ingresos de la AEE de dicho Tenedor de EE.UU. objeto de estas Clases de Reclamaciones Permitidas por Nuevos Bonos, CVI y Efectivo a efectos del impuesto federal sobre ingresos de EE.UU.  El Deudor pretende declarar estas transacciones de manera acorde con este tratamiento al IRS, y en el resto de este análisis supone que cada Tenedor de EE.UU. seguirá el tratamiento previsto.

(i)    *Tratamiento tributario del canje*

La oferta de Bonos de Ingresos de la AEE por Nuevos Bonos, CVI y Efectivo, según proceda, prevista por el Plan será considerada un canje, de conformidad con la Sección 1001 del IRC. Un Tenedor de EE.UU. declarará resultados por una cantidad equivalente a la diferencia entre (i) la suma de cualquier Efectivo percibido (salvo el atribuible a intereses devengados e impagados en concepto de los Bonos de Ingresos de la AEE) más el "precio de emisión" a

efectos del impuesto federal sobre ingresos de EE.UU. (que se determinará de la manera descrita en la Sección IX.B.2(a)(iv)(1) a continuación) en concepto de Nuevos Bonos y CVI recibidos, y (ii) la base tributable ajustada del Tenedor de EE.UU. sobre los Bonos de Ingresos de la AEE así ofrecidos (base tributable ajustada calculada como se describe más adelante). En general, y con sujeción a lo expuesto en la Sección IX.B.2(a)(iii), todo beneficio o pérdida que un Tenedor de EE.UU. declare en concepto del canje de los Bonos de Ingresos de la AEE por los Nuevos Bonos, los CVI y Efectivo, según proceda, conforme al canje, se considerarán plusvalías o minusvalías de capital, que serán de largo plazo si el período de retención de Bonos de Ingresos de la AEE del Tenedor de EE.UU. es superior a un año. Normalmente, las plusvalías de capital a largo plazo de los Tenedores de EE.UU. no corporativos se gravan a tasas preferentes. Las deducciones de minusvalías de capital están sujetas a limitaciones.

El período de retención por parte de un Tenedor de EE.UU. de Nuevos Bonos y CVI recibidos comenzará a contabilizarse al día siguiente al día de su canje. En general, la base tributaria de los Nuevos Bonos y los CVI recibidos en el canje por el Tenedor de EE.UU. será equivalente al precio de emisión de los Nuevos Bonos y los CVI (que se determinará como se explica en la Sección IX.B.2(a)(iv)(1) más adelante).

(ii)     *Tratamiento tributario de la percepción de efectivo*

(1)     **Efectivo**

Está previsto que, a efectos del impuesto federal sobre ingresos de EE.UU., el efectivo se trate como pago por los Bonos de Ingresos de la AEE, salvo el efectivo percibido atribuible a los intereses devengados pero no pagados. El Plan prevé que, en la medida de lo posible, las distribuciones al concepto de una Reclamación se aplicarán en primer lugar a los intereses devengados pero no pagados a la fecha inmediatamente anterior a la Fecha de Petición, según proceda; en segundo lugar, al importe del capital de la Reclamación (tal como se determine a efectos del impuesto federal sobre ingresos) y, a continuación, en la medida en que la contrapartida supere al capital de la Reclamación, a aquellas otras cantidades (como intereses devengados pero no pagados distintos de los descritos en las cláusulas precedentes). La historia legislativa de la Ley de Tributación en casos de Quiebra de 1980 indica que el Congreso pretendía que la diferenciación entre capital e intereses en ciertas reorganizaciones efectuadas en virtud del Código de Quiebras de EE.UU. fuera vinculante a efectos del Impuesto federal sobre ingresos estadounidense. De manera acorde con dicha distribución en el marco del Plan, en general el Reglamento del Tesoro considera que los pagos en concepto de endeudamiento deben asignarse primero a los intereses devengados pero no pagados. Aunque el Deudor pretende asignar las distribuciones a un Tenedor de EE.UU. de conformidad con el Plan, y considera que ello es acorde a la legislación vigente y las intenciones de los legisladores, no existen garantías de que el IRS vaya a respetarlas en lo que respecta a los pagos por los Bonos de Ingresos de la AEE. Recomendamos a los Tenedores de EE.UU. consultar a sus asesores fiscales para determinar la caracterización correcta de los pagos percibidos.

Con sujeción a lo tratado en el apartado precedente, si parte del efectivo percibido fuera atribuible a los intereses devengados pero no pagados de los Bonos de Ingresos de la AEE, el tratamiento de ese efectivo abonado a un Tenedor de EE.UU. dependerá de si dichos intereses devengados pero no pagados por su Reclamación están o no exentos de pago a efectos tributarios

federales estadounidenses. En general, un Tenedor de EE.UU. que anteriormente no hubiera estado obligado a incluir en sus ingresos tributables los intereses devengados pero no pagados de una Reclamación no exenta de impuestos posiblemente deba declarar el efectivo percibido como ingreso por intereses a efectos del impuesto federal sobre ingresos de EE.UU. en caso de recibir una distribución de tales intereses. Un Tenedor de EE.UU. que anteriormente estuviera obligado a incluir en los ingresos tributables intereses devengados pero no pagados de una Reclamación no exenta de impuestos tendrá derecho a que se le reconozca una pérdida deducible, en la medida en que dichos intereses no sean satisfechos de conformidad con el Plan. Sin embargo, el Tenedor de EE.UU. de una Reclamación exenta de impuestos no tendrá derecho a deducir las pérdidas por intereses no pagados si nunca antes había incluido dichos intereses en sus ingresos brutos en EE.UU. Por otra parte, un Tenedor de EE.UU. que perciba una distribución de intereses devengados y no pagados en concepto de una Reclamación exenta de impuestos no tendrá que incluir esa cantidad como ingresos por intereses a efectos del impuesto federal sobre ingresos estadounidense por percibir dicha distribución en concepto de intereses. Aunque en general los Tenedores de EE.UU. no estarán obligados a incluir las mencionadas sumas en el cálculo de su ingreso tributable en EE.UU., lo más probable es que tengan que declararlas al IRS.

En el caso de los Bonos de Ingresos de la AEE que sean bonos de apreciación de capital, si los hubiera, en los cuales el devengo del descuento de emisión original está tratado como intereses exentos de impuestos, el monto de dicho devengo podría haber incrementado la base tributaria de la inversión de un bonista en dicho bono de apreciación de capital. En general, tal aumento de la base tributaria se considera un incremento del capital del bono de apreciación de capital. Los Tenedores de Reclamaciones de EE.UU. que hayan devengado dichos intereses deberían consultar a sus propios asesores fiscales acerca del tratamiento tributario de las distribuciones previstas por el Plan y sobre las deducciones de los impuestos devengados pero no pagados a efectos del impuesto federal sobre ingresos de EE.UU.

(2)   **Costos de perfeccionamiento**

El tratamiento del impuesto federal sobre ingresos de EE.UU. de los Costos de Perfeccionamiento de los Acreedores del AAP del Prestamista de la Línea de Crédito de Combustible y de los Honorarios de Reembolso de los Profesionales de los Acreedores del AAP del Prestamista de la Línea de Crédito de Combustible en virtud del AAP del Prestamista de la Línea de Crédito de Combustible es poco claro. El Deudor tiene la intención de tratar la percepción de dichos costos y honorarios de la misma manera que se expone en la Sección IX.B.2(a)(ii)(1) anterior. Sin embargo, existe la posibilidad de que los costos de perfeccionamiento y los honorarios de los profesionales pudieran ser tratados como un derecho independiente declarable como ingreso ordinario, en lugar de una cantidad percibida de conformidad con los Nuevos Bonos. En general, dicho ingreso ordinario no estaría exento de impuestos a efectos del impuesto federal sobre ingresos de EE.UU., independientemente de si los Nuevos Bonos subyacentes lo estuvieran. Estos derechos también podrían ser considerados contrapartidas adicionales pagadas a los tenedores que deberían tenerse en cuenta a la hora de calcular los beneficios o pérdidas de un tenedor. Se recomienda a los Tenedores de EE.UU. consultar a sus propios asesores fiscales sobre el tratamiento tributario federal de estos costos y honorarios.

(iii)    *Descuento de mercado*

Si un Tenedor de EE.UU. adquirió los Bonos de Ingresos de la AEE por menos del "precio de emisión ajustado" de estos, y la diferencia entre el costo para dicho Tenedor y el "precio de emisión ajustado" excediera de un umbral de *minimis* (equivalente al 0.25% de la suma del total de los pagos pendientes a abonar por el instrumento de deuda, excluyendo los intereses declarados cualificados, multiplicado por el número de años completos restantes hasta el vencimiento), en general dicha diferencia será tratada como "descuento de mercado".

En general, toda ganancia declarada en el canje será tratada como ingreso ordinario en la medida de cualquier descuento de mercado no devengado no incluido en el ingreso ordinario con respecto a los Bonos de Ingresos de la AEE. En la medida en que se reconociera el beneficio en virtud del canje de los Bonos de Ingresos de la AEE por Nuevos Bonos y CVI, el Tenedor de EE.UU. deberá incluir como ingreso ordinario todo beneficio que, de otra manera, hubiera sido tratado como plusvalía de capital derivada del descuento de mercado devengado por los Bonos de Ingresos de la AEE, salvo que dicho Tenedor de EE.UU. previamente hubiera optado por incluir el descuento de mercado en el ingreso en el momento de devengarlo. Vea la Sección IX.B.2(a)(iv)(5) más adelante para obtener más información sobre la elección de incluir el descuento de mercado en los ingresos a medida que se devenga. Recomendamos a los Tenedores de EE.UU. consultar a sus propios asesores fiscales acerca del tratamiento tributario del descuento de mercado derivado del canje, incluso la interacción entre el descuento de mercado, el descuento de emisión original ("OID") y las normas de primas de adquisición.

(iv)    *Tributación de los Nuevos Bonos*

Los Nuevos Bonos se emitirán como bonos cuyos intereses estarán excluidos del ingreso bruto para propósitos del impuesto federal sobre ingresos de EE.UU. (los "Nuevos Bonos exentos de impuestos"), o bien como bonos cuyos intereses no estarán excluidos del ingreso bruto por dicha normativa fiscal (los "Nuevos Bonos tributables"). El estatus tributario de los Nuevos Bonos todavía no ha sido determinado a la fecha de esta Declaración de Divulgación, lo que incluye (i) si algún tramo de los Nuevos Bonos tendrá o no derecho a ser excluidos a efectos de los ingresos brutos para fines del impuesto federal sobre ingresos de EE.UU., o bien (ii) la relación de la cuantía total de todos los Nuevos Bonos tributables y CVI que se emitirán en la Fecha de Entrada en Vigencia y la cuantía total de todos los Nuevos Bonos y CVI. No se espera que los CVI sean instrumentos financieros cuyos ingresos estén excluidos de los ingresos brutos a efectos del impuesto federal sobre ingresos de EE.UU. o exentos de otro modo del impuesto federal sobre ingresos de EE.UU.

(1)    **Precio de emisión**

El Deudor prevé que el precio de emisión de los Nuevos Bonos sea equivalente al valor justo de mercado de dichos bonos a la fecha de su canje. Esta determinación está basada en las conclusiones del Deudor de que tanto los Bonos de Ingresos de la AEE como los Nuevos Bonos deberían ser tratados como "cotizados en Bolsa", con el significado de este concepto según los Reglamentos del Tesoro. El valor justo de mercado de los Nuevos Bonos se determinará según su "precio de cotización" en la fecha del canje o en torno a ella. No existen directrices específicas sobre cómo determinar el precio de cotización en un determinado momento. Sin

392

embargo, las Reglas del Tesoro pertinentes sugieren que un contribuyente podrá utilizar un método razonable y aplicado de manera congruente para determinar el justo valor de mercado si existe más de un precio de venta o precio cotizado. La determinación del Deudor de que los Bonos de Ingresos de la AEE "coticen en Bolsa" será vinculante para todos los tenedores, salvo que alguno exprese su posición en sentido contrario según lo estipulen los Reglamentos del Tesoro aplicables. La normativa en materia de determinación del precio de emisión es compleja, y los Tenedores de EE.UU. deberían consultar a sus propios asesores fiscales acerca de la determinación del precio de emisión de los Nuevos Bonos a efectos del impuesto federal sobre ingresos estadounidense.

(2)    <strong>Intereses, incluyendo el OID</strong>

La normativa tributaria federal estadounidense empleada para determinar qué fondos son tratados como intereses es compleja. Se recomienda a los Tenedores de EE.UU. consultar a sus propios asesores fiscales acerca de los importes que serán tratados como intereses a efectos del impuesto federal sobre ingresos de EE.UU. en función de sus circunstancias individuales.

(i)    <strong>Nuevos Bonos exentos de impuestos</strong>

El IRC impone ciertos requisitos que deben satisfacerse tras la emisión y entrega de los Nuevos Bonos exentos de impuestos, con el objeto de que los intereses que generen estén, y sigan estando, excluidos de los ingresos brutos para fines del impuesto federal sobre ingresos estadounidense, conforme a la Sección 103 del IRC. El incumplimiento de dichos requisitos podría conllevar que los intereses de los Nuevos Bonos exentos de impuestos queden incluidos en el ingreso bruto a efectos del impuesto federal sobre ingresos estadounidense con retroactividad a la fecha de emisión de los Nuevos Bonos exentos de impuestos. Cuando los Nuevos Bonos exentos de impuestos se emitan en la Fecha de Entrada en Vigencia, la AEE Reorganizada, conforme a los Documentos Definitivos, se compromete a hacer todo lo posible que la ley permita y que fuera razonablemente necesario o deseable para garantizar que los intereses pagados a los tenedores de Nuevos Bonos exentos de impuestos estén, y sigan estando excluidos, del ingreso bruto para fines del impuesto federales sobre ingresos estadounidense, conforme a la Sección 103 del IRC. Sin embargo, como se ha indicado anteriormente, el estatus tributario de los Nuevos Bonos todavía no se ha determinado a la fecha de esta Declaración de Divulgación.

Las cantidades asignables a los intereses devengados antes de la emisión de los Nuevos Bonos exentos de impuestos no serán tratadas como intereses exentos de impuestos de conformidad con la Sección 103 del IRC.

(ii)    <strong>Nuevos Bonos tributables y CVI</strong>

Si los intereses devengados por los Nuevos Bonos o los pagos en concepto de CVI (o parte de ellos) no son tratados como exentos de ingresos brutos a efectos del impuesto federal sobre ingresos estadounidense, los pagos o devengos de "intereses declarados calificados" (según se define más adelante) sobre los Nuevos Bonos o CVI (o un tramo relevante de ellos) serán tributables a dicho Tenedor de EE.UU. en calidad de ingresos ordinarios por intereses en el

393

momento de percibirlos o devengarlos, de acuerdo con el método habitual de contabilización del Tenedor de EE.UU. a efectos del impuesto federal sobre ingresos estadounidense. En general, el concepto "intereses declarados calificados" significa aquellos intereses declarados que se pagarán incondicionalmente en efectivo o en especie (salvo instrumentos de deuda del emisor) al menos anualmente durante el plazo de dicho instrumento, a una tasa fija de interés simple o, con sujeción a ciertas condiciones, sobre la base de uno o más índices de intereses. Está previsto que, en general, los pagos de los intereses pactados sobre los Nuevos Bonos se consideren intereses pactados a estos efectos.

(iii)   <strong>OID</strong>

El importe del OID de los Nuevos Bonos, si lo hay, será equivalente al excedente de la suma de todo el capital y de los pagos de intereses declarados (si los hubiera, salvo el interés declarado calificado) de dichos Nuevos Bonos (tomando inicialmente en cuenta el calendario de pagos descrito más adelante) sobre el precio de emisión (determinado de la manera descrita previamente en la Sección IX.B.2(a)(iv)(1) anterior) de los citados Nuevos Bonos. Además, los Nuevos Bonos tributables devengarán OID solamente si el precio de emisión de los Nuevos Bonos, según proceda, fuera menor que el importe del capital en más de la cantidad *de minimis*. El OID se considerará *de minimis* si es menos del 0.25% del precio de amortización pactado al vencimiento multiplicado por el número de años enteros restante hasta el vencimiento de tales Nuevos Bonos. Los Tenedores de EE.UU., tanto si fuera en efectivo o aplicando el método contable de devengo a efectos del impuesto federal sobre ingresos estadounidense, deberán incluir el OID de los Nuevos Bonos tributables en los ingresos brutos como ingreso ordinario al devengo, sobre una base de rendimiento constante hasta el vencimiento, independientemente de si el efectivo atribuible a dicho OID se percibe en ese momento o no. Sin embargo, los Nuevos Bonos pueden estar sujetos a las normas de prima de adquisición (descritas más adelante en la Sección IX.B.2(a)(iv)(3)), lo cual podría reducir el monto de OID que puede incluirse en el ingreso bruto.

En el caso de los Nuevos Bonos tributables, el monto del OID susceptible de inclusión en el ingreso bruto por un Tenedor de EE.UU. en cualquier año fiscal es, en general, la suma de los tramos diarios de OID con respecto a un Nuevo Bono tributable, según proceda, por cada día de ese año o parte de ese año en que el Tenedor de EE.UU. conserve el Nuevo Bono tributable. El tramo diario se determina asignando a cada día de un período de devengo un tramo prorrateado del OID asignable a dicho período. El período de devengo de un Nuevo Bono tributable podrá tener cualquier duración durante el plazo, y podrá variar en duración dentro del plazo del Nuevo Bono tributable, cuando proceda, siempre y cuando cada período de devengo no sea superior a un año, y cada pago programado de capital o de intereses se produzca el primer o el último día de un período de devengo. El importe del OID asignable a cualquier período de devengo, con sujeción a los posibles ajustes descritos más adelante, será un monto equivalente al producto del precio de emisión ajustado del Nuevo Bono tributable al principio del período de devengo y su rendimiento al vencimiento (menos los pagos de los intereses declarados calificados asignables a dicho período). El rendimiento hasta el vencimiento de los Nuevos Bonos tributables es la tasa de descuento que, cuando se utiliza para calcular el valor actual (a la fecha de emisión) del total de pagos de capital e intereses en concepto de dichos bonos, según proceda, genera un importe equivalente al precio de emisión de dichos bonos. El importe del OID asignable al período de devengo final es la diferencia entre el importe a pagar al vencimiento (salvo el pago de los

intereses declarados calificados) y el precio de emisión ajustado al principio del último período de devengo. El precio de emisión ajustado de un Nuevo Bono tributable al principio de cualquier período de devengo es equivalente a su precio de emisión, incrementado por el OID devengado en cada período de devengo anterior, y reducido por los pagos efectuados sobre el Nuevo Bono tributable durante los períodos de devengo anteriores (excepto los pagos de los intereses declarados calificados).

En cuanto a los Nuevos Bonos exentos de impuestos, el importe del OID se excluye del ingreso bruto a efectos del impuesto federal sobre ingresos estadounidense en la misma medida que se prevé que se excluyan los intereses de los Nuevos Bonos exentos de impuestos, según proceda. Los devengos del OID se calculan de la misma manera antes descrita para los Nuevos Bonos tributables, aunque dichos devengos se sumarán a la base tributable del Tenedor de los Nuevos Bonos exentos de impuestos, según proceda. Es posible que el devengo del OID se considere como un incremento en el monto del ingreso exento de impuestos a efectos de determinar varias otras consecuencias fiscales de poseer Nuevos Bonos exentos de impuestos, según proceda, aunque no se produzca el pago en efectivo correspondiente. Los Tenedores de los Nuevos Bonos exentos de impuestos con OID deberían consultar a sus asesores fiscales con respecto a las consecuencias tributarias de poseer dichos instrumentos.

Las normas relativas al OID son complejas, y las anteriormente descritas pueden no aplicarse en todos los casos. Si se aplicase otra normativa, los Tenedores de EE.UU. que reciban los Nuevos Bonos podrían ser tratados de manera diferente de la descrita anteriormente. Los Tenedores de EE.UU. que reciban los Nuevos Bonos deberían consultar a sus asesores fiscales acerca de la potencial aplicación del OID y de la normativa sobre el impuesto federal sobre ingresos de EE.UU. a los Nuevos Bonos y CVI.

Esta Declaración de Divulgación parte del supuesto de que los Nuevos Bonos no serán considerados instrumentos de deuda de pago contingente de conformidad con la definición del Reglamento del Tesoro aplicable. No obstante, la autoridad para el tratamiento de los Nuevos Bonos es limitada, y no está garantizado que el IRS vaya a respetar dicho tratamiento. Los tenedores de EE.UU. deberían consultar a sus asesores fiscales acerca del tratamiento de los Nuevos Bonos en calidad de instrumentos de deuda de pago contingente, lo que incluye las limitaciones que pudieran aplicarse a la cuantía de los intereses exentos de impuestos de los Nuevos Bonos exentos de impuestos que podrán excluirse de los ingresos brutos a efectos del Impuesto federal sobre ingresos de EE.UU.

(3)      **Prima de adquisición**

Un Nuevo Bono será tratado como adquirido con una prima de adquisición si la base inicial del Tenedor de EE.UU. en el Nuevo Bono es (a) igual o menor que la suma de todos los importes a pagar en concepto del Nuevo Bono (salvo los pagos de los intereses declarados calificados), y (b) mayor que el precio de emisión ajustado de dicho bono a efectos del impuesto federales sobre ingresos de EE.UU. Si un Nuevo Bono tributable fue adquirido con una prima de adquisición, en general un Tenedor de EE.UU. podría reducir el importe del OID que, de otro modo, se incluiría en el ingreso de cada período de devengo en una cantidad equivalente a (i) el monto del OID que de otro modo se incluiría en el ingreso, multiplicado por (ii) una fracción cuyo numerador es el excedente de la base tributable ajustada del Nuevo Bono tributable, según

395

proceda, inmediatamente después de su adquisición por el Tenedor de EE.UU. sobre el precio de
emisión ajustado de dicho bono, según proceda, y cuyo denominador es el excedente de la suma
de todos los importes a pagar sobre el Nuevo Bono tributable, según proceda, tras la fecha de
compra, salvo los pagos de los intereses declarados calificados, sobre el precio de emisión
ajustado de dicho bono, según proceda. Si el Nuevo Bono exento de impuestos se adquirió con
una prima de adquisición, el Tenedor de EE.UU. reduciría la base tributable del Nuevo Bono
exento de impuestos, según proceda, durante cada período de devengo utilizando el mismo
método descrito anteriormente para los Nuevos Bonos tributables.

Como alternativa para reducir el importe del OID que, de otro modo, se incluiría en el
ingreso durante un período de devengo, o para reducir la base tributable del Nuevo Bono exento
de impuestos, el Tenedor de EE.UU. podrá optar por calcular los devengos del OID aplicando el
método de rentabilidad constante descrito anteriormente. No obstante, si opta por ello, su
decisión también se aplicará a todos los demás bonos que obren en su poder al comienzo del año
fiscal en el cual se aplique su elección, así como a todos los bonos que adquiera a partir de ese
momento. Normalmente, esta elección no podrá ser revocada. Los Tenedores de EE.UU. que
adquieran Nuevos Bonos con prima de adquisición deberían consultar a sus asesores fiscales
acerca de las consecuencias de dicha elección en función de sus circunstancias personales.

(4)     **Tributación de los pagos sobre el CVI**

El tratamiento de un instrumento financiero con los términos del CVI es incierto en virtud
de las actuales leyes federales del impuesto sobre ingresos de EE.UU., y el Emisor no recibirá
ninguna opinión de un abogado o decisión de las autoridades fiscales de EE.UU. en cuanto a
dicho tratamiento. Un tenedor de EE.UU. que tenga CVI en su poder debe consultar con sus
propios asesores sobre el tratamiento del impuesto federal sobre ingresos de EE.UU. de la
recepción de pagos en relación con los CVI.

(5)     **Venta, retiro u otras enajenaciones de Nuevos Bonos y
CVI**

En general, un Tenedor de EE.UU. declarará un beneficio o pérdida gravable sobre la
venta, canje, retiro (incluso amortización) u otra enajenación imponible de un Nuevo Bono o
CVI equivalente a la diferencia, en su caso, de (i) el importe materializado por dicha enajenación
(salvo el efectivo percibido atribuible a intereses devengados pero no pagados), y (ii) la base
imponible ajustada de dicho Nuevo Bono o CVI. En general, la base imponible ajustada de un
Tenedor de EE.UU. sobre un Nuevo Bono o CVI será equivalente a la base imponible de dicho
tenedor sobre el citado Nuevo Bono o CVI en la fecha en que el Tenedor de EE.UU. haya
adquirido ese instrumento, incrementada en cualquier OID previamente devengado por el
Tenedor, y disminuida en la cuantía de los pagos de efectivo (salvo los pagos de los intereses
pactados) previamente percibidos en concepto de aquel Nuevo Bono o CVI por ese Tenedor de
EE.UU. Recomendamos a los Tenedores de EE.UU. consultar con sus asesores fiscales sobre la
base imponible de sus Nuevos Bonos o CVI en la fecha de adquisición, así como las
consecuencias fiscales específicas de la venta, canje o retiro (incluida la amortización) de un
CVI.

Con sujeción a lo expuesto más adelante sobre el descuento de mercado, en general todo beneficio o pérdida que un Tenedor de EE.UU. declare por la venta u otra enajenación gravable de un Nuevo Bono constituirá generalmente una plusvalía o una minusvalía de capital a largo plazo si dicho tenedor conserva el Nuevo Bono durante un plazo de más de un año. El plazo de conservación por parte de un Tenedor de EE.UU. de Nuevos Bonos recibidos en virtud del canje comenzará a contabilizarse al día siguiente del canje. Normalmente, las plusvalías de capital a largo plazo de los Tenedores de EE.UU. no corporativos se gravan a tasas preferentes. Las deducciones de minusvalías de capital están sujetas a limitaciones. Tras una enajenación gravable del Nuevo Bono, un Tenedor de EE.UU. deberá declarar una renta ordinaria (en lugar de una plusvalía) equivalente al descuento de mercado devengado, salvo que previamente haya optado por incluir el descuento de mercado en la renta al devengarlo. Un Tenedor de EE.UU. podrá optar por incluir el descuento de mercado en la renta en el momento de devengarlo, en cuyo caso dicha renta será tratada como ingresos ordinarios por intereses en el momento de declararlos, incrementando el importe de este modo su base en los Nuevos Bonos según proceda, en la cuantía del descuento de mercado declarado. Dicha elección se realiza incluyendo el descuento de mercado en la renta en una declaración de impuestos federales sobre ingresos de EE.UU. presentada puntualmente, y adjuntando una declaración donde se señale la opción elegida.

Si se opta por esa elección, esta se aplicará a todos los bonos con descuento de mercado adquiridos por el Tenedor de EE.UU. durante el ejercicio en que hizo esa elección, y en todos los ejercicios siguientes.

b)    de Reclamaciones de Pensiones (Clase 3)

En general, este análisis no se aplica a la reclamación de pensiones (Clase 3). Todo tenedor de alguna de esas Reclamaciones que presente una declaración de impuestos federales sobre ingresos estadounidense debería consultar a su asesor fiscal acerca de las consecuencias tributarias federales de mantener dicha Reclamación.

3.    **Impuesto de Medicare**

Un Tenedor de EE.UU. de Nuevos Bonos tributables que sea persona física, sucesión o fideicomiso no incluido en una clase especial de fideicomisos exenta de dicho impuesto, está sujeto al recargo por Medicare del 3.8% sobre la menor de las siguientes cuantías (1) la "renta de inversión neta" del Titular de EE.UU. (o "la renta de inversión neta no distribuida" en el caso de una sucesión o fideicomiso) correspondiente al ejercicio gravable, lo cual incluye, entre otros, intereses (incluso el descuento de emisión original) sobre la deuda y las plusvalías de la venta u otra enajenación gravable de deuda, y (2) el excedente de la renta bruta ajustada modificada del Titular de EE.UU. (o de la renta bruta ajustada en el caso de una sucesión o fideicomiso) del ejercicio gravable por encima de determinado umbral (que, en el caso de las personas físicas se sitúa entre los $125,000 y los $250,000, en función de las circunstancias individuales). Un Tenedor de EE.UU. que sea persona física, sucesión o fideicomiso debería consultar a su asesor fiscal acerca de la aplicabilidad del recargo de Medicare a sus ingresos y beneficios con respecto a los canjes y titularidad de los Nuevos Bonos, así como sobre la aplicabilidad del recargo de Medicare al CVI en general.

4. **Deducción por deudas incobrables y/o títulos sin valor**

Un Tenedor de EE.UU. que, en virtud del Plan, percibiera con respecto a una
Reclamación Admitida una cuantía inferior a la base imponible de dicho Tenedor en concepto de
tal Reclamación, puede tener derecho, en el año de la percepción (o en un ejercicio anterior o
posterior) a practicar una deducción por incobrables o por títulos sin valor. Las normas que rigen
el carácter, la oportunidad y el importe de las deducciones por incobrables o por títulos sin valor
ponen considerable énfasis en las realidades y circunstancias del Tenedor de EE.UU., del deudor
y del instrumento con respecto al cual se aplica la deducción. Los Tenedores de EE.UU. de
Reclamaciones Permitidas deberían consultar a sus asesores fiscales con respecto a las
posibilidades de practicar tales deducciones y en qué año fiscal.

5. **Declaración de información y retención adicional de impuestos**

En general, la declaración de información será de aplicación a (i) los pagos en concepto
del canje; (ii) los pagos de capital, intereses y OID, en su caso, en concepto de los Nuevos Bonos
y CVI; y (iii) los pagos del producto de la venta u otra enajenación de los Nuevos Bonos y CVI.

Además, es posible que sea de aplicación la retención adicional de impuestos a los pagos
si dicho Tenedor de EE.UU. (a) omite aportar un número de identificación de contribuyente
correcto, (b) proporciona un número de identificación de contribuyente incorrecto, (c) recibe una
notificación del IRS de que no ha declarado todos los intereses y dividendos que deben reflejarse
en las declaraciones de impuestos federales sobre los ingresos estadounidenses, o bien (d) omite
certificar, bajo pena de perjurio, que el Tenedor de EE.UU. ha facilitado un número de
identificación de contribuyente correcto y que el IRS no le ha notificado que está sujeto a la
retención adicional de impuestos. La solicitud de exención puede solicitarse aportando un
Formulario W-9 del IRS debidamente completado (o el formulario que lo sustituya).

La retención adicional de impuestos no es un impuesto adicional. En general, un Tenedor
de EE.UU. podrá obtener un reintegro de las cuantías retenidas de conformidad con la normativa
específica, que exceda su responsabilidad a fines del impuesto federal sobre ingresos de EE.UU.
mediante la presentación puntual de una reclamación de reintegro ante el IRS.

Ciertos Tenedores de EE.UU. no están sujetos a las obligaciones de declaración y
retención adicional de impuestos, siempre y cuando puedan establecer debidamente su carácter
de exentos. Recomendamos a los Tenedores de EE.UU. que consulten a sus asesores fiscales
sobre si están exentos de las obligaciones de retención adicional de impuestos y sobre los
procedimientos para obtener dicha exención.

C. **Personas físicas y jurídicas de Puerto Rico**

1. **Definición de personas físicas y jurídicas de Puerto Rico**

Tal como se utiliza aquí, por "persona física de Puerto Rico" se entenderá al propietario
beneficiario de una Reclamación de bonos, de Nuevos Bonos y de CVI que sea un particular y
residente de buena fe del Estado Libre Asociado, conforme a la definición de la Sección 937 del
IRC y de los Reglamentos del Tesoro, durante la totalidad del año fiscal que incluya a la Fecha
de Entrada en Vigencia. Tal como se utiliza aquí, por "persona jurídica de Puerto Rico" se

entenderá al propietario beneficiario de Reclamación de bonos, de Nuevos Bonos y de CVI que sea una entidad comercial o una corporación constituida de conformidad con las leyes del Estado Libre Asociado.

La siguiente exposición incluye solo algunas consecuencias del impuesto federal sobre ingresos estadounidense del Plan para personas físicas y jurídicas de Puerto Rico. No incluye consideraciones tributarias no estadounidenses (lo que incluye las de Puerto Rico). Recomendamos a toda persona física o jurídica de Puerto Rico consultar la Sección X a continuación para conocer las consecuencias tributarias del Plan en Puerto Rico.

Las normas que rigen las consecuencias del impuesto federal sobre ingresos estadounidense para las personas físicas y jurídicas de Puerto Rico son complejas. Recomendamos a las personas físicas y jurídicas de Puerto Rico que consulten a sus asesores fiscales acerca de las consecuencias tributarias federales, estatales, locales y extranjeras del perfeccionamiento del Plan en función de sus circunstancias particulares.

2.      **Tratamiento tributario del canje**

En general, una persona física de Puerto Rico no estará sujeta al impuesto federal sobre ingresos estadounidense con respecto a los beneficios materializados por el canje de una Reclamación Admitida en virtud del Plan. En general, una persona jurídica de Puerto Rico no estará sujeta al impuesto federal sobre impuestos estadounidense con respecto a los beneficios materializados por el canje de una Reclamación Permitida en virtud del Plan, salvo que dichos beneficios estén efectivamente relacionados con las actividades comerciales o los negocios de la persona jurídica de Puerto Rico en Estados Unidos, en cuyo caso los beneficios estarán sujetos a impuestos de la misma manera que los ingresos efectivamente relacionados como se describe más adelante en la Sección IX.C.3(b).

3.      **Tributación de los Nuevos Bonos**

a)      **Tratamiento de los intereses**

En general, los pagos de intereses en concepto de un Nuevo Bono, incluyendo el OID, a una persona física o jurídica de Puerto Rico no están sujetos a impuestos federales sobre ingresos de EE.UU. salvo que, en el caso de una persona jurídica de Puerto Rico, se considere que esta ha realizado actividades comerciales o hecho negocios en EE.UU., y dichos ingresos estén efectivamente relacionados con dichas actividades o negocios.

Si se considera que una persona jurídica de Puerto Rico se dedica a actividades comerciales o hace negocios en Estados Unidos, y los intereses (incluso el OID) sobre los Nuevos Bonos tributables están "efectivamente relacionados" con dichas actividades o negocios, la persona jurídica de Puerto Rico estará sujeta al impuesto federal sobre ingresos de EE.UU. sobre dichos intereses (incluso el OID), normalmente sobre una base de ingresos netos, de la misma manera que un Tenedor de EE.UU. Además, una persona jurídica de Puerto Rico puede estar sujeta a un impuesto sobre los beneficios de las sucursales con respecto a dichos ingresos efectivamente relacionados.

b)      **Venta, retiro u otras enajenaciones de Nuevos Bonos y CVI**

En general, los beneficios obtenidos por la venta, retiro u otra enajenación de un Nuevo Bono o CVI por una persona física o jurídica de Puerto Rico no están sujetos a impuestos federales sobre ingresos de EE.UU. salvo que, en el caso de una persona jurídica de Puerto Rico, se considere que esta ha realizado actividades comerciales o hecho negocios en EE.UU., y dichos ingresos estén efectivamente relacionados con dichas actividades o negocios.

Si se considera que una persona jurídica de Puerto Rico se dedica a actividades comerciales o hace negocios en Estados Unidos y obtiene un beneficio de la venta, retiro u otra enajenación de un Nuevo Bono o de un CVI, "efectivamente relacionado" con dichas actividades comerciales o negocios, la persona física de Puerto Rico estará sujeta al impuesto federal sobre ingresos estadounidense que grava dichos beneficios sobre una base de ingresos netos, en general de la misma manera que si fuera un Tenedor de EE.UU. Además, una persona jurídica de Puerto Rico puede estar sujeta a un impuesto sobre los beneficios de las sucursales con respecto a dichos ingresos efectivamente relacionados.

**No existe certeza acerca de las consecuencias tributarias del Plan para personas físicas y jurídicas de Puerto Rico. Recomendamos a estas personas consultar a sus asesores fiscales acerca de las consecuencias tributarias específicas de las transacciones previstas por el Plan.**

4.      **Declaración de información y retención adicional de impuestos**

En general, la declaración de información será de aplicación a (i) los pagos en concepto del canje; (ii) los pagos de capital, intereses y OID, en su caso, sobre los Nuevos Bonos y CVI; y (iii) los pagos del producto de la venta u otra enajenación de los Nuevos Bonos y los CVI.

En general, una persona física de Puerto Rico no estará sujeta a retenciones adicionales de impuestos con respecto a los pagos derivados de los Nuevos Bonos y los CVI si presenta el Formulario W-9 del IRS debidamente completado (o un documento de sustitución adecuado), salvo si dicha persona física de Puerto Rico (a) omite aportar un número de identificación de contribuyente correcto, (b) proporciona un número de identificación de contribuyente incorrecto, (c) recibe una notificación del IRS de que no ha declarado todos los intereses y dividendos que deben reflejarse en las declaraciones de impuestos federales sobre ingresos estadounidenses, o bien (d) omite certificar, bajo pena de perjurio, que el Tenedor de EE.UU. ha facilitado un número de identificación de contribuyente correcto y que el IRS no le ha notificado que el Tenedor de EE.UU. está sujeto a la retención adicional de impuestos.

En general, una persona jurídica de Puerto Rico no estará sujeta a retención adicional de impuestos con respecto a los pagos del canje, capital e intereses y el OID, en su caso, vinculados a los Nuevos Bonos y los CVI, siempre y cuando haya presentado un Formulario W-8BEN-E del IRS debidamente completado (u otro formulario pertinente), donde se manifieste que no es una persona estadounidense tal como lo define el IRC (o si satisface ciertos requisitos de pruebas documentales para demostrar que no lo es). La declaración de información y, según las circunstancias, la retención adicional de impuestos será de aplicación al producto de la venta u otra enajenación de los Nuevos Bonos y los CVI realizada dentro de Estados Unidos o a través

de ciertos intermediarios financieros relacionados con Estados Unidos, salvo que la persona jurídica de Puerto Rico manifieste, bajo pena de perjurio, que no es una persona de EE.UU. (y que el pagador no sepa, o tuviera motivos para saber, que dicha persona jurídica de Puerto Rico es una persona de EE.UU.), o bien que pueda demostrar una exención.

La retención adicional de impuestos no es un impuesto adicional. En general, una persona física o jurídica de Puerto Rico, según proceda, podrá obtener un reintegro de las cuantías retenidas de conformidad con la normativa específica, que exceda de su responsabilidad vinculada al impuesto federal sobre ingresos estadounidense mediante la presentación puntual de una solicitud de reintegro ante el IRS.

Ciertas personas físicas y jurídicas de Puerto Rico no están sujetas a las obligaciones de declaración y retención adicional de impuestos en circunstancias específicas, siempre y cuando pueda establecer debidamente que están exentas. Recomendamos a las personas físicas y jurídicas de Puerto Rico que consulten a sus asesores fiscales sobre si están exentos de las obligaciones de retención adicional de impuestos y sobre los procedimientos para obtener dicha exención.

**D.      Tenedores No Estadounidenses**

1.      **Definición de Tenedor No Estadounidense**

Salvo que se indique algo distinto, lo siguiente es de aplicación solamente a Tenedores No Estadounidenses. Tal como se utiliza aquí, por "Tenedor No Estadounidense" se entenderá al propietario beneficiario de valores existentes que no sea (i) Tenedor de EE.UU., o bien (ii) una asociación u otra entidad considerada como tal o bajo tratamiento fiscal simplificado a efectos del impuesto federal sobre ingresos de Estados Unidos, o bien (iii) una persona física o jurídica de Puerto Rico.

La siguiente exposición incluye solo algunas consecuencias del impuesto federal sobre ingresos estadounidense del Plan para Tenedores No Estadounidenses. No incluye consideraciones tributarias no estadounidenses. Las normas que rigen las consecuencias del impuesto federal sobre ingresos estadounidense para Tenedores No Estadounidenses son complejas. Los Tenedores No Estadounidenses deberían consultar a sus asesores fiscales acerca de las consecuencias tributarias federales, estatales, locales del Plan, en Estados Unidos y en el extranjero, en función de sus circunstancias personales.

2.      **Tratamiento del canje**

En general, un Tenedor No Estadounidense no estará sujeto al impuesto federal sobre ingresos estadounidense con respecto a los beneficios obtenidos por el canje en el marco de una Reclamación Permitida conforme al Plan, salvo que (i) dicho beneficio esté efectivamente relacionado con el hecho de que el Tenedor No Estadounidense realice actividades comerciales o haga negocios en Estados Unidos (y, si fuera de aplicación un tratado para evitar la doble imposición, dicho beneficio sea atribuible a un establecimiento permanente o a una base fija en Estados Unidos del Tenedor No Estadounidense), en cuyo caso estará sujeto al impuesto de la misma manera que los ingresos efectivamente relacionados descritos en la Sección IX.C.3(b) anterior, o bien (ii) si ese Tenedor No Estadounidense es una persona física extranjera no

residente que tiene los Nuevos Bonos y los CVI en su poder como activos de capital y está presente en Estados Unidos durante más de 183 días del año fiscal del canje, y dichos beneficios se derivan de fuentes de dentro de Estados Unidos.

3.   **Tributación de los Nuevos Bonos**

a)   *Tratamiento de los intereses*

En general, los pagos de intereses sobre los Nuevos Bonos, incluidos los OID, a un Tenedor No Estadounidense, que se consideran fuente de ingresos extranjera a efectos del impuesto federal sobre ingresos de EE.UU., no están sujetos al impuesto federal sobre ingresos estadounidense toda vez que se considere que el Tenedor No Estadounidense no se dedica a actividades comerciales o hace negocios en EE.UU., y dichos ingresos no estén efectivamente relacionados con las citadas actividades o negocios dentro de EE.UU.

Si se considera que un Tenedor No Estadounidense se dedica a actividades comerciales o hace negocios en Estados Unidos, y los intereses (incluso el OID) de los Nuevos Bonos y los CVI tributables están "efectivamente relacionados" con dichas actividades o negocios, el Tenedor No Estadounidense estará sujeto al impuesto federal sobre ingresos estadounidense en concepto de dichos intereses (incluso el OID), normalmente sobre una base de ingresos netos, de la misma manera que un Tenedor de EE.UU., salvo si algún tratado de doble imposición estipule algo distinto. Además, si el Tenedor No Estadounidense es una persona jurídica, podrá estar sujeto a los impuestos de beneficios de filiales con respecto a los ingresos efectivamente relacionados, a menos que un tratado de doble imposición aplicable permita reducir el porcentaje.

b)   *Venta, retiro u otras enajenaciones de Nuevos Bonos y CVI*

En general, los beneficios materializados por la venta, retiro u otra enajenación de Nuevos Bonos o CVI por un Tenedor No Estadounidense no estarán sujetos al impuesto federales sobre ingresos estadounidense, toda vez que se considere que el Tenedor No Estadounidense no se dedica a actividades comerciales o hace negocios en EE.UU., y dichos ingresos no estén efectivamente relacionados con las citadas actividades o negocios.

Si se considera que un Tenedor No Estadounidense se dedica a actividades comerciales o hace negocios en Estados Unidos y que los beneficios obtenidos por la venta, retiro u otra enajenación de Nuevos Bonos o CVI están "efectivamente relacionados" con las citadas actividades o negocios, en general el Tenedor No Estadounidense estará sujeto al impuesto federal sobre ingresos estadounidense en concepto de dichos intereses, normalmente sobre una base de ingresos netos, de la misma manera que si fuera Tenedor de EE.UU., salvo si algún tratado de doble imposición estipule algo distinto. Además, si el Tenedor No Estadounidense es una persona jurídica, podrá estar sujeto a los impuestos de beneficios de filiales con respecto a los ingresos efectivamente relacionados, a menos que un tratado de doble imposición aplicable permita reducir el porcentaje.

No existen certidumbres acerca de las consecuencias tributarias del Plan para Tenedores No Estadounidenses. Recomendamos a estas personas consultar a sus asesores fiscales acerca de las consecuencias tributarias específicas de las transacciones previstas por el Plan.

4.    **Cumplimiento de la ley FATCA (Ley de Cumplimiento Tributario de Cuentas en el Extranjero)**

Conforme a la FATCA, en general las instituciones financieras extranjeras (concepto que incluye a la mayoría de fondos de cobertura, fondos de capital privado, fondos mutuos, vehículos de titulización y otros vehículos de inversión), así como ciertas otras entidades extranjeras deben cumplir obligaciones de declaración con respecto a sus tenedores de cuentas e inversionistas estadounidenses, o bien practicar retenciones impositivas a los pagos de fuentes estadounidenses que se les abonan (tanto si son propietarios beneficiarios como intermediarios de terceros). En general, la institución financiera u otra entidad extranjera que no cumpla las obligaciones de declaración de la FATCA estarán sujetas a retenciones con respecto a "pagos sujetos a retención". Para tales efectos, por "<u>pagos sujetos a retención</u>" se entenderán todos los pagos fijos o determinables, anuales o periódicos de beneficios e ingresos y ciertos "pagos extranjeros en tránsito" procedentes de fuentes estadounidenses. En general, las retenciones estipuladas por la FATCA no serán de aplicación a los pagos de intereses (incluso el OID) de los Nuevos Bonos o CVI porque normalmente se tratará de ingresos generados en el extranjero. Las instituciones financieras extranjeras radicadas en jurisdicciones con las que existen acuerdos intergubernamentales con Estados Unidos en relación con la FATCA pueden estar sujetas a una normativa diferente. Los titulares deberían consultar a sus asesores fiscales si la FATCA se aplica a sus circunstancias específicas.

[*El resto de la página se deja intencionalmente en blanco*]

X.    **Consideraciones materiales a efectos del impuesto sobre ingresos de Puerto Rico**

A.    **Generalidades**

A continuación se presenta una descripción general de ciertas consecuencias materiales del Plan a efectos del impuesto sobre ingresos de Puerto Rico. Esta descripción está basada en el Código de Rentas Internas de Puerto Rico de 2011, con sus enmiendas (el "Código de P.R."), los reglamentos promulgados en virtud del Código de P.R., los pronunciamientos administrativos y las sentencias judiciales, todos en vigencia a la fecha de esta Declaración de Divulgación y todos los cuales están sujetos a modificaciones, posiblemente con efecto retroactivo (colectivamente, la "Legislación tributaria vigente de Puerto Rico"). Los cambios de la Legislación tributaria vigente de Puerto Rico o de su interpretación podría hacer que algunas, o todas, las consecuencias del Plan a efectos del impuesto sobre ingresos de Puerto Rico resulten sustancialmente distintas de las descritas a continuación.

Las consecuencias del Plan a efectos del impuesto sobre ingresos de Puerto Rico son complejas. A la fecha de esta Declaración de Divulgación, no se ha solicitado formalmente ninguna resolución al Departamento de Hacienda; no se ha solicitado ninguna opinión a los letrados del Deudor sobre las consecuencias fiscales del Plan, excepto las específicamente establecidas en este, y esta Declaración de Divulgación no presenta ninguna opinión tributaria.

La siguiente descripción no cubre todos los aspectos del impuesto sobre ingresos de Puerto Rico que pueden ser relevantes para los Tenedores de Reclamaciones. Por ejemplo, la descripción no aborda cuestiones de especial interés para determinados tipos de contribuyentes (por ejemplo, compañías de inversiones reguladas, fondos de inversión inmobiliaria, bancos y algunas otras instituciones financieras, aseguradoras, entidades exentas de impuestos, planes de pensiones, cuentas individuales de jubilación y otras sujetas a tributación diferida, titulares que son, o que canalizan sus Reclamaciones a través de, sociedades mercantiles de tratamiento fiscal simplificados, asociaciones u otras entidades interpuestas a efectos del impuesto sobre ingresos de Puerto Rico, y personas cuyas reclamaciones sean parte de transacciones de compraventa simultánea, cobertura, venta constructiva o conversión). Además, la descripción parte del supuesto de que el Tenedor posee valores Existentes, Nuevos Bonos y CVI solamente como "activos de capital", tal como estos se definen en la Sección 1034.01(a)(1) del Código de Puerto Rico. Esta descripción no aborda los impuestos de Puerto Rico distintos de los impuestos sobre ingresos del Estado Libre Asociado, ni se aplica a las personas que adquieran Nuevos Bonos o CVI en el mercado secundario. Por último, este documento no aborda las consecuencias a efectos del impuesto sobre ingresos de Puerto Rico para los Tenedores de Reclamaciones que se considere que han rechazado el Plan.

Por estos motivos, esta descripción no sustituye a una detenida planificación tributaria ni a un asesoramiento fiscal profesional basado en las circunstancias individuales de cada Tenedor de una Reclamación. Se recomienda que los Tenedores de Reclamaciones consulten sus propios asesores fiscales en relación con las consecuencias tributarias del Plan en Puerto Rico.

**B.**     **Tenedores de Puerto Rico**

1.     **Definición de Tenedor de Puerto Rico**

Salvo que se indique algo distinto, lo siguiente es de aplicación solamente a Tenedores de Puerto Rico. Tal como se utiliza en este documento, el término "Tenedor de Puerto Rico" significa un propietario beneficiario de valores Existentes en la Fecha de Entrada en Vigencia del Plan que es, a efectos del impuesto sobre ingresos de Puerto Rico:

- Una persona física que durante todo el año fiscal sea residente de buena fe de Puerto Rico a efectos de la Sección 933 del Código de Rentas Internas de los Estados Unidos de 1986, con sus enmiendas (como lo determina la Sección 937(a) de este), y residente de Puerto Rico a efectos del Código de Puerto Rico;

- una sociedad u otra entidad constituida con arreglo a las leyes de Puerto Rico con tratamiento de persona jurídica a efectos del impuesto sobre ingresos de Puerto Rico, excluyendo las sociedades u otros tipos de entidades sujetas a transparencia fiscal u otro tratamiento fiscal especial de acuerdo con el Código de Puerto Rico;

- una sucesión, cuyas rentas están sujetas al impuesto sobre ingresos de Puerto Rico, independientemente de su procedencia; o bien

- un fideicomiso (salvo un fideicomiso comercial), todos cuyos beneficiarios sean personas físicas residentes de Puerto Rico, como ya se ha descrito.

Si una asociación u otra entidad o concierto que tributa como asociación a efectos del impuesto sobre ingresos de Puerto Rico es titular de valores Existentes, el tratamiento del impuesto sobre ingresos de un socio de dicha asociación dependerá en general del estatus del socio y de las actividades de la asociación. Se recomienda a los socios de una entidad de este tipo que sean tenedores de valores Existentes que consulten a sus asesores fiscales.

Un Tenedor de Puerto Rico que posea Reclamaciones Permitidas de más de una Clase puede tener diferentes consecuencias a efectos del impuesto sobre ingresos de Puerto Rico por cada Clase de Reclamaciones Permitidas. Los Tenedores de Puerto Rico deberían leer atentamente las secciones de esta exposición aplicables a cada Clase de Reclamaciones Permitidas de las que fueran tenedores y los Tenedores de Puerto Rico de más de una Clase de Reclamaciones Permitidas deberían consultar a sus asesores fiscales en cuanto a la interacción potencial de las consecuencias a efectos del impuesto sobre ingresos de Puerto Rico de cada Clase de Reclamaciones Permitidas que dicho Tenedor de Puerto Rico posea.

2.    **Tratamiento tributario de Reclamaciones Permitidas**

a)    **Reclamaciones de Bonistas que llegan a un acuerdo y Aseguradoras Monolínea que llegan a un acuerdo (Clase 1); (ii)Reclamaciones de Bonistas que no llegan a un acuerdo y Aseguradoras Monolínea que no llegan a un acuerdo (Clase 2) (si procede); y Reclamaciones de Swaps de Tasas de Interés Asegurados por Assured (Clase 7) (si procede)**

El Deudor prevé que, en virtud del Plan, cada Tenedor de Puerto Rico de cualquiera de las siguientes: (i) Reclamaciones de Bonistas que llegan a un acuerdo y Aseguradoras Monolínea que llegan a un acuerdo (Clase 1); (ii) Reclamaciones de Bonistas que no llegan a un acuerdo y Aseguradoras Monolínea que no llegan a un acuerdo (Clase 2) (si procede); y (iii) Reclamaciones de Swaps de Tasas de Interés Asegurados por Assured (Clase 7) (si procede), se tratarán, o en el caso de las Clases 2 y 7, podrán tratarse, como un canje de los Bonos de Ingresos de la AEE del Tenedor de Puerto Rico que son objeto de estas Clases de Reclamaciones Permitidas por Nuevos Bonos, CVI y Efectivo (según proceda).

(i)    *Tratamiento tributario del canje*

El Deudor espera que, y tiene la intención de adoptar la posición de que, el canje de una parte de los Bonos de Ingresos de la AEE para los Nuevos Bonos, Efectivo y CVI se considerará un canje tributable en virtud del Código de Puerto Rico. Por lo tanto, un Tenedor de Puerto Rico reconocerá una ganancia o pérdida igual a la diferencia entre el importe materializado en el canje y la base imponible ajustada del Tenedor de Puerto Rico en los Bonos de Ingresos de la AEE en la fecha del canje. La cuantía materializada al canjear los Bonos de Ingresos de la AEE será equivalente al valor de mercado de cada Nuevo Bono, CVI y Efectivo percibido (salvo cualquier tramo atribuible a intereses devengados y no pagados).

La ganancia o pérdida por el canje de Bonos de Ingresos de la AEE por Nuevos Bonos, CVI y Efectivo será una plusvalía o minusvalía y puede ser una plusvalía o minusvalía a largo plazo si el período de conservación de los Bonos de Ingresos de la AEE por parte del Tenedor de Puerto Rico es superior a un año. Las plusvalías a largo plazo declaradas por Tenedores de Puerto Rico que sean personas físicas, sucesiones y fideicomisos podrán estar sujetas a la tasa máxima del impuesto sobre ingresos de Puerto Rico del 15% (o un máximo del 24% si fuera aplicable el impuesto básico alternativo). Las plusvalías a largo plazo declaradas por Tenedores de Puerto Rico que tributen como personas jurídicas podrán estar sujetas a la tasa máxima del impuesto sobre ingresos de Puerto Rico del 20%.

Los Tenedores de Puerto Rico pueden deducir las minusvalías realizadas en el canje de los Bonos de Ingresos de la AEE por Nuevos Bonos contra las plusvalías realizadas durante el año fiscal, y los Tenedores no corporativos de Puerto Rico pueden deducir cualquier minusvalía neta en exceso de hasta $1,000 de los ingresos ordinarios. El exceso de minusvalías netas puede trasladarse como minusvalías a corto plazo durante siete años fiscales y puede utilizarse para compensar hasta el 90% de las plusvalías materializadas durante cualquiera de esos años fiscales.

En la medida en que cualquier contraprestación (es decir, Nuevos Bonos, CVI o parte de ellos, más cualquier pago en Efectivo) recibida por un Tenedor de Puerto Rico a cambio de Bonos de Ingresos de la AEE sea atribuible a intereses devengados y no pagados sobre los Bonos de Ingresos de la AEE, el monto de dicha contraprestación se considerará ingresos derivados de intereses exentos a efectos del impuesto sobre ingresos de Puerto Rico. En tal caso, la parte asignada a los intereses devengados y no pagados reducirá el importe materializado por el Tenedor de Puerto Rico para calcular la ganancia o pérdida en el canje.

El Plan prevé que, en la medida de lo posible, las distribuciones a un tenedor de una Reclamación se aplicarán en primer lugar a los intereses devengados pero no pagados a la fecha inmediatamente anterior a la Fecha de Petición; en segundo lugar, al importe del capital de la Reclamación (tal como se determine a efectos del impuesto sobre ingresos federal) y, a continuación, en la medida en que la contraprestación supere al capital de la Reclamación, a cualquier otro monto (como intereses devengados y no pagados distintos de los descritos en las cláusulas precedentes). La historia legislativa de la Ley de Tributación en casos de Quiebra de 1980 indica que el Congreso pretendía que la diferenciación entre capital e intereses en ciertas reorganizaciones efectuadas en virtud del Código de Quiebras de EE.UU. fuera vinculante a efectos del impuesto federal sobre ingresos estadounidense. Congruentes con dicha distribución en el marco del Plan, en general el Reglamento del Tesoro considera que los pagos en concepto de endeudamiento deben asignarse primero a los intereses devengados pero no pagados. No existe ninguna ley tributaria de Puerto Rico vigente que considere cómo deben aplicarse los pagos en nuestra situación. Aunque el Deudor pretende declarar las distribuciones a un Tenedor de Puerto Rico de conformidad con el Plan, y considera que ello es congruente con la legislación vigente y las intenciones de los legisladores, no existen garantías de que el Departamento de Hacienda vaya a respetarlas en lo que respecta a los pagos por los Bonos de Ingresos de la AEE.

Recomendamos a los Tenedores de Puerto Rico consultar a sus asesores fiscales acerca del tratamiento tributario de las distribuciones percibidas de conformidad con el Plan.

(ii)     ***Tributación de los Nuevos Bonos y los CVI***

*Intereses de los Nuevos Bonos*. Los intereses pagados a, o devengados por, los Tenedores de Puerto Rico en concepto de los Nuevos Bonos no estarán sujetos al impuesto sobre ingresos de Puerto Rico, lo que incluye el impuesto básico alternativo. La plusvalía de capital de los Nuevos Bonos a pagar en el vencimiento por encima de su precio de emisión inicial, de haberlo, no estará sujeta al impuesto sobre ingresos de Puerto Rico, incluso el impuesto básico alternativo.

La titularidad de los Nuevos Bonos podría conllevar que una parte de los intereses pagados a, o devengados por, un Tenedor de Puerto Rico, así como otros gastos incurridos por el Tenedor de Puerto Rico y atribuibles a los intereses sobre los Nuevos Bonos, no fueran permitidos como deducciones a efectos del impuesto sobre ingresos de Puerto Rico.

*Venta, canje o retiro de los Nuevos Bonos*. La ganancia o pérdida por la venta o el canje de Nuevos Bonos será una plusvalía o minusvalía y puede ser una plusvalía o minusvalía a largo plazo si el período de conservación de los Nuevos Bonos por parte del Tenedor de Puerto Rico es superior a un año. Las plusvalías a largo plazo declaradas por Tenedores de Puerto Rico que sean

personas físicas, sucesiones y fideicomisos podrán estar sujetas a la tasa máxima del impuesto sobre ingresos de Puerto Rico del 15% (o un máximo del 24% si fuera aplicable el impuesto básico alternativo). Las plusvalías a largo plazo declaradas por Tenedores de Puerto Rico que tributen como personas jurídicas podrán estar sujetas a la tasa máxima del impuesto sobre ingresos de Puerto Rico del 20%.

Los Tenedores de Puerto Rico pueden deducir las minusvalías realizadas en el venta o canje de los Nuevos Bonos contra las plusvalías realizadas durante el año fiscal, y los Tenedores no corporativos de Puerto Rico pueden deducir cualquier minusvalía neta en exceso de hasta $1,000 de los ingresos ordinarios. El exceso de minusvalías netas puede trasladarse como minusvalías a corto plazo durante siete años fiscales y puede utilizarse para compensar hasta el 90% de las plusvalías materializadas durante cualquiera de esos años fiscales.

*Pagos del CVI.* El tratamiento del CVI es incierto en virtud de la legislación fiscal aplicable de Puerto Rico, y el Emisor no recibirá ninguna opinión de un abogado o resolución del Departamento de Hacienda en cuanto a dicho tratamiento. Los Tenedores de Puerto Rico que posean CVI deben consultar con sus propios asesores sobre el tratamiento del impuesto sobre ingresos de Puerto Rico de la recepción de pagos en relación con los CVI.

*Venta, canje o retiro de los CVI.* Por lo general, un Tenedor de Puerto Rico reconocerá una ganancia o pérdida imponible por la venta, canje, retiro (incluida la amortización) u otra enajenación sujeta a impuestos de un CVI igual a la diferencia entre el importe realizado en el canje y la base imponible ajustada del Tenedor de Puerto Rico en los CVI en la fecha del canje. Recomendamos a los Tenedores de Puerto Rico consultar con sus asesores fiscales sobre la base imponible de sus CVI en la fecha de adquisición, así como las consecuencias fiscales específicas de la venta, canje o retiro (incluida la amortización) de un CVI.

b)     **Tenedores de Reclamaciones de Pensiones (Clase 3)**

En general, este análisis no se aplica al tenedor de la Reclamación de Pensiones (Clase 3). El tenedor de dicha Reclamación debe consultar a su asesor fiscal acerca de las consecuencias del impuesto a los ingresos de Puerto Rico de conservar dicha Reclamación.

c)     **Reclamaciones de Bonistas que no llegan a un acuerdo y Aseguradoras Monolínea que no llegan a un acuerdo (Clase 2) (si procede); Reclamaciones por Préstamos de la Línea de Combustible (Clase 4); Tenedores de Reclamaciones Generales sin Garantía (Clase 5); Reclamación de Vitol (Clase 6); Reclamaciones de Swaps de Tasas de Interés Asegurados por Assured (Clase 7) (si procede); Reclamaciones de Cliente de Curso Ordinario (Clase 8); Reclamaciones de Dominio Eminente/Expropiación forzosa inversa (Clase 9); Reclamaciones federales (Clase 10); y Reclamaciones de Conveniencia (Clase 11)**

El Deudor prevé que, en virtud del Plan, cada Tenedor de Puerto Rico de cualquiera de las siguientes: (i) Reclamaciones por Préstamos de la Línea de Combustible (Clase 4); (ii) Reclamaciones de Bonistas que no llegan a un acuerdo y Aseguradoras Monolínea que no llegan

a un acuerdo (Clase 2) (si procede); (iii) Reclamaciones Generales sin Garantía (Clase 5), (iv) Reclamación de Vitol (Clase 6); (v) Reclamaciones de Swaps de Tasas de Interés Asegurados por Assured (Clase 7) (si procede); (vi) Reclamaciones de Cliente de Curso Ordinario (Clase 8); (vii) Reclamaciones de Dominio Eminente/Expropiación forzosa inversa (Clase 9); (viii) Reclamaciones federales (Clase 10); y (ix) Reclamaciones de Conveniencia (Clase 11) serán tratados, o en el caso de las Clases 2 y 7, podrán ser tratados, como si recibieran una distribución en plena contraprestación, satisfacción, exoneración y canje de las Reclamaciones de dicho tenedor que son objeto de estas Clases de Reclamaciones Permitidas. Las consecuencias de la percepción de la citada distribución variarán en función de las circunstancias particulares de los Tenedores de Puerto Rico y de la naturaleza de las Reclamaciones y activos que se distribuyan. Se insta a los Tenedores de Puerto Rico a consultar a sus asesores fiscales las consecuencias tributarias de la percepción de esa distribución considerando sus circunstancias individuales.

**C.   Tenedor no de Puerto Rico**

    1.    **Definición de Tenedores no de Puerto Rico**

        Salvo que se indique algo distinto, lo siguiente es de aplicación solamente a Tenedores no de Puerto Rico. Tal como se utiliza en este documento, el término "Tenedor no de Puerto Rico" significa el propietario beneficiario de valores Existentes, Nuevos Bonos o CVI que no sea (i) un Tenedor de Puerto Rico o (ii) una asociación u otra entidad considerada como tal u otra entidad interpuesta a efectos del impuesto sobre ingresos de Puerto Rico.

        Si una asociación u otra entidad o concierto que tributa como asociación a efectos del impuesto sobre ingresos de Puerto Rico es titular de valores Existentes, Nuevos Bonos o CVI, el tratamiento del impuesto sobre ingresos de Puerto Rico de un socio de dicha asociación dependerá en general del estatus del socio y de las actividades de la asociación. Se recomienda a dichas entidades consultar a sus asesores fiscales.

        La siguiente exposición incluye solo algunas consecuencias del Plan en el impuesto sobre ingresos de Puerto Rico para Tenedores No de Puerto Rico. Esta exposición no incluye consideraciones tributarias no puertorriqueñas. Los Tenedores no de Puerto Rico deberían consultar a sus asesores fiscales acerca de las consecuencias tributarias del Plan, en Puerto Rico y en el extranjero, en función de sus circunstancias personales.

    2.    **Tratamiento tributario del canje**

        Un Tenedor no de Puerto Rico que no realice actividades económicas ni haga negocios en Puerto Rico no estaría sujeto al impuesto sobre ingresos de Puerto Rico con respecto a cualquier beneficio materializado por el canje de una Reclamación Permitida conforme al Plan, incluso aquellas cuantías asignadas a intereses devengados y no pagados. Por otra parte, a efectos del impuesto sobre ingresos, los Tenedores no de Puerto Rico que sean corporaciones (o estén tratados como tales por el Código de Puerto Rico) y los extranjeros no residentes dedicados a actividades comerciales o que hagan negocios en Puerto Rico, estarán sujetos al impuesto sobre ingresos de Puerto Rico igual que un Tenedor de Puerto Rico, en concepto de cualquier beneficio si está efectivamente relacionado con sus actividades o negocios en Puerto Rico.

3.      **Tributación de los Nuevos Bonos y los CVI**

   a)      **Tratamiento tributario de los intereses sobre los Nuevos Bonos**

Los intereses pagados a, o devengados por, los Tenedores no de Puerto Rico en concepto de los Nuevos Bonos no estarán sujetos al impuesto sobre ingresos de Puerto Rico, lo que incluye el impuesto básico alternativo. La plusvalía de capital de los Nuevos Bonos a pagar en el vencimiento por encima de su precio de emisión inicial, de haberlo, no estará sujeta al impuesto sobre ingresos de Puerto Rico, incluso el impuesto básico alternativo.

Es posible que, a efectos del impuesto sobre ingresos de Puerto Rico, no se admitan las deducciones de un Tenedor no de Puerto Rico que se dedique a actividades comerciales o haga negocios en Puerto Rico, relacionadas con los intereses pagados o devengados y otros gastos incurridos atribuibles a los intereses de los Nuevos Bonos.

   b)      **Tratamiento de los pagos de los CVI**

El tratamiento del CVI es incierto en virtud de la legislación fiscal aplicable de Puerto Rico, y el Emisor no recibirá ninguna opinión de un abogado o resolución del Departamento de Hacienda en cuanto a dicho tratamiento. Los Tenedores no de Puerto Rico que posean CVI deben consultar a sus propios asesores fiscales sobre las consecuencias del impuesto sobre los ingresos de Puerto Rico al recibir cualquier pago de los CVI.

   c)      **Venta, retiro u otras enajenaciones de Nuevos Bonos y CVI**

Los beneficios materializados en concepto de la venta, retiro u otras enajenaciones de Nuevos Bonos GO o CVI por un Tenedor no de Puerto Rico que no se dedique a actividades comerciales ni haga negocios en Puerto Rico no estarán sujetos al impuesto sobre ingresos de Puerto Rico, sea mediante retenciones o de otras maneras. Por otra parte, los Tenedores no de Puerto Rico que sean corporaciones (o estén tratados como tales por el Código de Puerto Rico) y los extranjeros no residentes dedicados a actividades comerciales o que hagan negocios en Puerto Rico, estarán sujetos al impuesto sobre ingresos de Puerto Rico si dichos beneficios están efectivamente conectados con dichas actividades o negocios en Puerto Rico del mismo modo que un Tenedor de Puerto Rico. Además, una corporación puede estar sujeta a un impuesto sobre los beneficios de las sucursales con respecto a dichos ingresos efectivamente relacionados.

410

## XI.   Aplicabilidad de ciertas leyes de valores federales y estatales

**A.   Nuevos Bonos**

1.   **Registro de los valores**

En general, los valores emitidos por la AEE Reorganizada, como los Nuevos Bonos y los CVI, están exentos de los requisitos de registro estipulados por la Ley de Valores en la sección 3(a)(2) de la Ley de Valores.

Además de las exenciones que la Ley de Valores otorga a las entidades gubernamentales, como la AEE Reorganizada y sus organismos gubernamentales e instrumentalidades, la sección 1145(a)(1) del Código de Quiebras, aplicable a los Casos del Título III de conformidad con la sección 301 de la Ley PROMESA, prevé una exención de los requisitos de registro de la Ley de Valores y de todos los requisitos derivados de leyes homólogas estatales para la oferta o venta en el marco de un plan de ajustes de valores del deudor, una filial del deudor participante en un plan de ajuste conjunto con el deudor, o un sucesor del deudor. El Código de Quiebras estipula que ciertos acreedores, denominados "suscriptores" en el lenguaje del Código de Quiebras, no podrán revender dichos valores sin registrarlos de acuerdo con la Ley de Valores o de una exención de esta. Dado que las obligaciones de la AEE están exentas de registro por las leyes de valores generalmente aplicables, esta excepción no es relevante para los valores de la AEE Reorganizada, aunque es posible que lo dispuesto por la sección 1145 del Código de Quiebras (que suspende la vigencia de las leyes de valores) no surta efecto para los "suscriptores" conforme al Código de Quiebras. Los acreedores del Deudor que consideren que satisfacen la definición de "suscriptores" de conformidad con el Código de Quiebras deberían consultar a un profesional calificado acerca de las obligaciones que les imponen las leyes de valores federales y estatales de EE.UU.

Al igual que la exención de registro concedida a la AEE Reorganizada en virtud de la sección 3(a)(2) de la Ley de Valores, las leyes de valores de aplicación general admiten exenciones de calificación de ciertos contratos de fideicomiso formalizados por entidades gubernamentales. Por consiguiente, cada contrato, ordenanza, resolución y otros instrumentos escritos de fideicomiso de la AEE o de la AEE Reorganizada relacionados con los Nuevos Bonos estarán exentos de la calificación prevista por la sección 304(a)(4) de la LCF.

Normalmente, las leyes estatales sobre valores prevén exenciones de registro para las transferencias posteriores realizadas por un propietario de buena fe por cuenta propia y las transferencias posteriores a inversores institucionales o acreditados. Por lo general, se espera que dichas exenciones estén disponibles para posteriores transferencias de los Nuevos Bonos y CVI.

2.   **Información al mercado**

a)   **Oferta inicial y venta**

Aunque están exentos de registro, los valores emitidos por la AEE Reorganizada están sujetos a las disposiciones antifraude de las leyes federales sobre valores. En general, las secciones 10(b) y 17(a) de la Ley del Mercado de Valores de 1934 (la "Ley del Mercado de Valores") y la Regla 10b-5 promulgada por la SEC en el marco de la Ley del Mercado de

Valores prohíben el fraude en la compraventa de valores. Por lo tanto, cada oferta pública de venta de obligaciones de una entidad pública suele ir acompañada de un documento de oferta denominado "Declaración oficial", que contiene información sustancial sobre el emisor y los valores que se venden, de modo que los inversionistas puedan tomar una decisión de inversión informada sobre la compra de los valores ofertados. La sección 1125(d) del Código de Quiebras, que ha sido incorporada a la Ley PROMESA, estipula que la idoneidad de cualquier divulgación a los acreedores e hipotéticos inversionistas típicos de tenedores de Reclamaciones de este caso no está sujeta a los principios de otras leyes, normas o reglamentos excluida la ley de quiebras que se aplicarían de otro modo, lo cual incluye a las leyes federales de valores. En su lugar, la sección 1125(b) del Código de Quiebras, que ha sido adoptada por la Ley PROMESA, regula la divulgación exigiendo que se aporte información adecuada a las diversas clases de acreedores del Deudor y a los hipotéticos inversionistas en obligaciones del Deudor a través de una declaración de divulgación como la presente.

<blockquote>b)</blockquote>    **Divulgación continua**

En general, los valores ofertados en el mercado de la AEE Reorganizada están sujetos a la Regla 15c2-12 de la Ley del Mercado de Valores (a efectos de esta Sección XI.A.2(b), la "<u>Regla</u>"), a menos que dichos valores cumplan ciertas exenciones previstas en la Regla. Entre otras condiciones, la Regla requiere que los suscriptores que participen en una oferta obtengan un acuerdo que imponga requisitos de divulgación continua del mercado a un emisor de valores municipales, como la AEE Reorganizada.

La entrega de los valores conforme al Plan no está cubierta por la Regla, ya que la propuesta es que estos valores se emitan a cambio de la Reclamación de un tenedor de reclamación sin la participación de un suscriptor, como lo define la Regla.

[*El resto de la página se deja intencionalmente en blanco*]

## XII.     Información financiera y proyecciones

**A.     Información financiera histórica**

1.     **Estados financieros de la AEE**

La AEE publica periódicamente información financiera y datos operativos de los años fiscales anteriores, entre ellos: (1) estados financieros auditados y (2) un Informe Anual sobre Información Financiera y Datos Operativos (el "Informe Anual"), que ha proporcionado información financiera y datos operativos sobre ingresos, gastos, operaciones financieras y endeudamiento del tipo que generalmente se encuentra en los estados oficiales de la AEE preparados en relación con sus emisiones de bonos.

Los estados financieros auditados básicos más recientes preparados por la AEE corresponden al Año Fiscal que finalizó el 30 de junio de 2020. Estos estados financieros fueron presentados por la AEE ante la Junta de Reglamentación de Valores Municipales (Municipal Securities Rulemaking Board, "MSRB"), por medio de su Sistema Electrónico de Acceso al Mercado Municipal (Electronic Municipal Markets Access System, "EMMA"), el 12 de octubre de 2022. El Informe Anual más reciente tiene fecha del 23 de enero de 2020 y recoge información financiera no auditada al 30 de junio de 2015.

Los estados financieros para el Año Fiscal que finaliza en 2020 fueron auditados por KPMG LLP ("KPMG"), que informa y expresa dictámenes calificados, modificados y no modificados[279] e incluye párrafos de énfasis sobre consideraciones de empresa en funcionamiento relacionadas con la AEE. KPMG no auditó los estados financieros de PREPA Holdings, una unidad componente combinada de la AEE, que representa 0.6% y 0.3%, respectivamente, de los activos totales e ingresos totales de la AEE. Dichos estados fueron auditados por otros auditores, cuyo informe ha sido facilitado a KPMG, y en cuya opinión, en lo que se refiere a los importes incluidos para PREPA Holdings se basa únicamente en el informe de otros auditores. Los estados financieros auditados del Año Fiscal 2021 están en curso.

Desde la Fecha de Petición, la AEE también ha presentado estados financieros auditados de la AEE para los Años Fiscales que terminan en 2015, 2016, 2017, 2018 y 2019. Los estados financieros auditados para el Año Fiscal 2015 fueron auditados por Ernst & Young LLP, para los Años Fiscales 2016 y 2017, por BDO Puerto Rico, P.S.C., y para los Años Fiscales 2018 y 2019, por KPMG. Los estados financieros auditados del Año Fiscal 2017 fueron retirados y reexpresados en un estado financiero consolidado para el Año Fiscal 2018.

**B.     Plan Fiscal Certificado y Proyecciones de la AEE**

Adjunto a esta Declaración de Divulgación como Anexo E hay una copia del Plan Fiscal Certificado de la AEE para 2022, certificado por la Junta de Supervisión el 28 de junio de 2022.

---

[279] Una opinión calificada es una declaración emitida una vez finalizada la auditoría en la que se sugiere que la información proporcionada tiene un alcance limitado; una opinión no modificada es aquella en la que el auditor expresa su opinión de que los estados financieros se presentan, en todos sus aspectos significativos, de conformidad con el marco de información financiera aplicable.

El Plan Fiscal Certificado provee detalles sobre las operaciones proyectadas de la AEE bajo el Plan, sujeto a las suposiciones y salvedades establecidas en el Plan Fiscal Certificado.[280]

Es importante señalar que las proyecciones descritas en el Plan Fiscal Certificado pueden diferir del desempeño real y dependen en gran medida de suposiciones significativas sobre la futura condición económica y financiera del Estado Libre Asociado y sus instrumentalidades, entre ellos la AEE, que se ven afectadas por diversos factores legales, financieros, sociales, económicos, ambientales, gubernamentales y políticos. Estos factores pueden ser muy complejos, pueden variar de un año fiscal al siguiente, y son frecuentemente el resultado de medidas tomadas u omitidas, no solo por el gobierno del Estado Libre Asociado de Puerto Rico, la Junta de Supervisión y otras entidades externas, como el gobierno de los Estados Unidos.

Las proyecciones financieras incluidas en el Plan Fiscal Certificado deben revisarse conjuntamente con las suposiciones, notas y salvedades incluidas en el Plan Fiscal Certificado y las suposiciones, salvedades y explicaciones expuestas en la presente Declaración de Divulgación, incluidas las Secciones III, VI, VIII, IX, X y XI.

El Plan Fiscal Certificado no constituye una auditoría realizada de conformidad con las normas de auditoría generalmente aceptadas, un examen de los controles internos u otros servicios de atestación o revisión de conformidad con las normas establecidas por el Instituto Americano de Contables Públicos Certificados o cualquier otra organización. Por consiguiente, la Junta de Supervisión no puede expresar una opinión o cualquier otra forma de garantía sobre los estados financieros o cualquier información financiera o de otro tipo o los controles internos del gobierno del Estado Libre Asociado de Puerto Rico o de la AEE y la información contenida en el presente.

Al decidir si les conviene votar para aceptar o rechazar el Plan, los tenedores de Reclamaciones deberán hacer sus propias determinaciones sobre la razonabilidad de los supuestos y la confiabilidad de las proyecciones financieras, y deben consultar con sus propios asesores.

[*El resto de la página se deja intencionalmente en blanco*]

---

[280] El Análisis de Sostenibilidad de Deuda ("DSA") en el Plan Fiscal Certificado proporciona un marco para evaluar la capacidad a largo plazo de la AEE para pagar la amortización de la deuda. El ASD señala que los niveles de deuda de la AEE deben alinearse con el objetivo de recuperar el acceso al mercado de capitales para financiar inversiones de capital en infraestructura actuales y futuras y/o ahorros de reembolso, y asegurar precios de energía asequibles para el Estado Libre Asociado y sus residentes. El ASD ilustra la capacidad de endeudamiento implícita de la AEE a distintos niveles de cupones y niveles hipotéticos de ingresos netos.

## XIII.   **Información adicional**

Las afirmaciones contenidas en esta Declaración de Divulgación sobre las disposiciones de cualquier documento no son necesariamente completas, y en cada caso se hace referencia a dicho documento para que se pueda consultar su texto completo. Ciertos documentos descritos o mencionados en esta Declaración de Divulgación no se han adjuntado como Anexos, debido a la imposibilidad de proporcionar copias de estos documentos a todos los destinatarios de esta Declaración de Divulgación. Todos los anexos del Plan se presentarán ante el Tribunal del Título III y estarán disponibles para su consulta, de forma gratuita, en el sitio web de documentación en https://cases.ra.kroll.com/puertorico antes de la Fecha Límite de Votación. También se pueden obtener copias de todos los anexos del Plan, de forma gratuita, poniéndose en contacto con el agente de convocatoria, Kroll Restructuring Administration LLC, por teléfono al (844) 822-9231 (llamada gratuita para EE.UU. y Puerto Rico) o al (646) 486-7944 (para llamadas internacionales), disponible de 10:00 a.m. a 7:00 p.m. (hora estándar del Atlántico) (disponible en español), o por correo electrónico a puertoricoinfo@ra.kroll.com, haciendo referencia a "Anexos del Plan de Ajuste de la AEE" en la línea de asunto. Tenga en cuenta que Kroll Restructuring Administration LLC no está autorizado a proporcionar asesoramiento jurídico y no lo hará.

*[El resto de la página se deja intencionalmente en blanco]*

415

## XIV.   <u>Conclusión</u>

La Junta de Supervisión y el Deudor creen que el Plan es en el mejor interés de todos los acreedores e instan a los Tenedores de Reclamaciones Afectadas con derecho a votar sobre el Plan a que voten para aceptar el Plan y a que demuestren su aceptación devolviendo a tiempo sus papeletas marcadas para aceptar el Plan antes de la Fecha Límite de Votación.

*[El resto de la página se deja intencionalmente en blanco]*

## **ANEXO A**

PLAN DE AJUSTE DEL TÍTULO III DE LA AUTORIDAD DE ENERGÍA ELÉCTRICA DE
PUERTO RICO

**TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS**
**DISTRITO DE PUERTO RICO**

| | |
|---|---|
| *In re*:<br><br>LA JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN FINANCIERA PARA PUERTO RICO<br><br>como representante del<br><br>ESTADO LIBRE ASOCIADO DE PUERTO RICO, *et al*.,<br><br>Deudores.[1] | PROMESA<br>Título III<br><br>Núm. 17-BK-3283-LTS<br><br>(Administrado en conjunto) |
| *In re*:<br><br>LA JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN FINANCIERA PARA PUERTO RICO<br><br>como representante de la<br><br>AUTORIDAD DE ENERGÍA ELÉCTRICA DE PUERTO RICO<br><br>Deudor. | PROMESA<br>Título III<br><br>Núm. 17-BK-4780-LTS<br><br>(Administrado en conjunto) |

**PLAN DE AJUSTE DE TÍTULO III DE LA**
**AUTORIDAD DE ENERGÍA ELÉCTRICA DE PUERTO RICO**

**PROSKAUER ROSE LLP**
Eleven Times Square
Nueva York, Nueva York 10036
Teléfono: (212) 969-3000
Fax: (212) 969-2900

**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Teléfono: (787) 764-8181
Fax: (787) 753-8944

*Abogados para la Junta de Supervisión y Administración Financiera como representante de la AEE*

Fechado: 16 de diciembre de 2022

---

[1]  Los Deudores en estos Casos del Título III, junto con el respectivo número de Caso del Título III de cada Deudor y los últimos 4 (cuatro) dígitos del número federal del contribuyente de cada Deudor, según corresponda, son el (i) Estado Libre Asociado de Puerto Rico (el «Estado Libre Asociado») (núm. de caso de quiebra 17-BK-3283-LTS) (últimos cuatro dígitos del número federal del contribuyente: 3481); (ii) Corporación del Fondo de Interés Apremiante («COFINA») (núm. de caso de quiebra 17-BK-3284-LTS) (últimos cuatro dígitos del número federal del contribuyente 8474); (iii) Autoridad de Carreteras y Transportación de Puerto Rico («ACT») (núm. de caso de quiebra 17-BK-3567-LTS) (últimos cuatro dígitos del número federal del contribuyente 3808); (iv) Sistema de Retiro de Empleados del Gobierno del Estado Libre Asociado de Puerto Rico («SRE») (núm. de caso de quiebra 17-BK-3566-LTS) (últimos cuatro dígitos del número federal del contribuyente 9686); (v) Autoridad de Energía Eléctrica de Puerto Rico («AEE») (núm. de caso de quiebra 17- BK-4780-LTS) (últimos cuatro dígitos del número federal del contribuyente 3747); y (vi) Autoridad de Edificios Públicos de Puerto Rico («AEP») (núm. de caso de quiebra 19-BK-5523-LTS) (últimos cuatro dígitos del número federal del contribuyente 3801) (los números de caso del Título III se enumeran como números de Caso de Quiebra debido a limitaciones de software).

# ÍNDICE

**Página**

INTRODUCCIÓN ......................................................................................................1

**SECCIÓN I** TÉRMINOS DEFINIDOS, REGLAS DE INTERPRETACIÓN,
CÁLCULO DEL TIEMPO, LEY APLICABLE Y OTRAS REFERENCIAS ..................1
    A.    Términos Definidos ................................................................1
    B.    Reglas de Interpretación .....................................................23
    C.    Cálculo del tiempo ..............................................................24
    D.    Ley Aplicable .....................................................................24
    E.    Referencia a cifras monetarias ...........................................24
    F.    Documento de control .........................................................24

**SECCIÓN II** RECLAMACIONES ADMINISTRATIVAS Y PROFESIONALES....................25
    A.    Reclamaciones de Gastos Administrativos ..........................25
    B.    Desestimación de Reclamaciones presentadas después de la Fecha Límite
de Reclamaciones Administrativas .......................................25
    C.    Reclamaciones de Reembolso y Compensación Profesional.................25

**SECCIÓN III** CLASIFICACIÓN DE RECLAMACIONES ........................................26
    A.    Clasificación de Reclamaciones .........................................26
    B.    Disposición especial que rige las Reclamaciones no Afectadas.................27
    C.    Eliminación de Clases vacantes ..........................................27
    D.    Clases con derecho a voto; Presunta aceptación por Clases sin derecho a
voto ....................................................................................27
    E.    Reclamaciones subordinadas ..............................................27
    F.    Confirmación de acuerdo con el artículo 314 de PROMESA .............28
    G.    Confirmación de acuerdo con el artículo 1129(b) del Código de Quiebras .........28

**SECCIÓN IV** DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES
DE BONISTAS DE TRANSACCIÓN O MONOLÍNEAS DE TRANSACCIÓN
(CLASE 1) ..............................................................................................28
    A.    Tratamiento de Reclamaciones de Clase 1 ..........................28

**SECCIÓN V** DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES
DE BONISTAS DE NO TRANSACCIÓN O MONOLÍNEAS DE NO
TRANSACCIÓN (CLASE 2) .....................................................................29
    A.    Tratamiento de Reclamaciones de Clase 2 ..........................29

**SECCIÓN VI** DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES
DE PENSIÓN (CLASE 3)..........................................................................29
    A.    Tratamiento de Reclamaciones de Clase 3 ..........................29

**SECCIÓN VII** DISPOSICIONES PARA EL TRATAMIENTO DE
RECLAMACIONES DE PRÉSTAMO DE LÍNEA DE COMBUSTIBLE
(CLASE 4) ...................................................................................................30
    A.    Tratamiento de Reclamaciones de Clase 4 ........................................30
    B.    Tarifas de Acreedores del Acuerdo de Apoyo al Plan de Prestamista de
        Línea de Combustible ........................................................................31

**SECCIÓN VIII** DISPOSICIONES PARA EL TRATAMIENTO DE
RECLAMACIONES SIN GARANTÍA GENERALES (CLASE 5)................31
    A.    Tratamiento de Reclamaciones de Clase 5 ........................................31
    B.    Elección a tratarse como una Reclamación de Conveniencia..............31

**SECCIÓN IX** DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES
DE VITOL (CLASE 6).................................................................................32
    A.    Tratamiento de Reclamaciones de Clase 6 ........................................32

**SECCIÓN X** DISPOSICIONES PARA EL TRATAMIENTO DE SWAPS DE TASAS
DE INTERÉS ASEGURADOS DE ASSURED (CLASE 7)..........................32
    A.    Tratamiento de Reclamaciones de Clase 7 ........................................32

**SECCIÓN XI** DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES
DE CLIENTE DE EJERCICIO HABITUAL (CLASE 8) ............................32
    A.    Tratamiento de Reclamaciones de Clase 8 ........................................32

**SECCIÓN XII** DISPOSICIONES PARA EL TRATAMIENTO DE
RECLAMACIONES DE EXPROPIACIÓN/EXPROPIACIÓN INVERSA
(CLASE 9) ...................................................................................................33
    A.    Tratamiento de Reclamaciones de Clase 9 ........................................33

**SECCIÓN XIII** DISPOSICIONES PARA EL TRATAMIENTO DE
RECLAMACIONES FEDERALES (CLASE 10)..........................................33
    A.    Tratamiento de Reclamaciones de Clase 10 ......................................33

**SECCIÓN XIV** DISPOSICIONES PARA EL TRATAMIENTO DE
RECLAMACIONES DE CONVENIENCIA (CLASE 11)..............................34
    A.    Tratamiento de Reclamaciones de Clase 11 ......................................34

**SECCIÓN XV** DISPOSICIONES PARA EL TRATAMIENTO DE
RECLAMACIONES SUBORDINADAS DEL ARTÍCULO 510(b) (CLASE 12) ..........34
    A.    Tratamiento de Reclamaciones de Clase 12 ......................................34

**SECCIÓN XVI** DISPOSICIONES PARA LA IMPLEMENTACIÓN DEL PLAN ..................34
    A.    Admisión de Reclamaciones...............................................................34
    B.    Exenciones, interdictos y exculpaciones............................................34
    C.    Acción prioritaria de desestimación del Prestamista de Línea de
        Combustible .......................................................................................35
    D.    Documentos en vigor; otras transacciones.........................................35

E.    Inscripción de Participantes Activos del SRE de la AEE en el Plan de la
Ley 106 ........................................................................................................35
F.    Cargo Heredado ........................................................................................35
G.    Reestructuración operativa de la AEE .....................................................36
H.    Compra y venta de Bonos de Gastos Administrativos...............................36

**SECCIÓN XVII** DISPOSICIONES RELATIVAS A LA EMISIÓN Y DISTRIBUCIÓN
DE LOS NUEVOS BONOS ................................................................................36
A.    Emisión y distribución ..............................................................................36
B.    Términos generales ...................................................................................37
C.    Nuevos Bonos en Exceso ...........................................................................38
D.    Disposiciones de pago ...............................................................................38
E.    Garantía ....................................................................................................38
F.    Disposiciones de redención.......................................................................38
G.    Cuentas y cascada de pago .......................................................................39
H.    Pactos clave para Nuevos Bonos ..............................................................40
I.    Aplicación de dinero en el Fondo de Amortización de la Deuda .........40
J.    Convenio de Tasas de Interés ....................................................................41
K.    Sin derechos de aceleración .....................................................................41
L.    Incumplimiento limitado............................................................................41
M.    Remedios limitados....................................................................................42
N.    Bonos Adicionales y Bonos de Refinanciamiento......................................42
O.    Fuerza mayor .............................................................................................42
P.    Derecho directo de acción.........................................................................43
Q.    Nuevo Contrato de Emisión Principal ......................................................43
R.    Ley Aplicable..............................................................................................43

**SECCIÓN XVIII** TRATAMIENTO DE CONTRATOS A EJECUTARSE Y
ARRENDAMIENTOS NO VENCIDOS ...............................................................43
A.    Rechazo o asunción de Contratos a Ejecutarse y Arrendamientos No
Vencidos ....................................................................................................43
B.    Aprobación del Rechazo o Asunción de Contratos a Ejecutarse y de
Arrendamientos No Vencidos.....................................................................44
C.    Carácter incluyente....................................................................................44
D.    Subsanación de incumplimientos y objeciones a la subsanación y asunción ........44
E.    Contratos y arrendamientos celebrados después de la Fecha de Petición ............45
F.    Pólizas de seguros .....................................................................................46
G.    Reclamaciones por Daños debido a Rechazo ...........................................46
H.    Obligaciones de Indemnización y Reembolso ...........................................46
I.    Inexistencia de Vigencia ...........................................................................46

v

J.      Reserva de Derechos ...................................................................................46

**SECCIÓN XIX** Fideicomiso de GUC ...........................................................................47
A.      Firma de la Escritura Fiduciaria del Fideicomiso de GUC ....................47
B.      Propósito del Fideicomiso de GUC ........................................................47
C.      Activos del Fideicomiso de GUC ...........................................................47
D.      Administración del Fideicomiso de GUC ...............................................47
E.      El Fideicomisario de GUC......................................................................47
F.      Rol del Fideicomisario de GUC..............................................................47
G.      Poder tributario del Fideicomisario de GUC para la AEE Reorganizada.............48
H.      Transferibilidad de los Intereses del Fideicomiso de GUC ...................48
I.      Efectivo ...................................................................................................48
J.      Distribución de Activos del Fideicomiso de GUC .................................48
K.      Financiamiento, Costos y Gastos del Fideicomiso de GUC ...................48
L.      Compensación del Fideicomisario de GUC.............................................49
M.      Contratación de Profesionales/Empleados por parte del Fideicomisario de GUC ....................................................................................................49
N.      Tratamiento del Impuesto Federal a la Renta del Fideicomiso de GUC .............49
O.      Disolución del Fideicomiso de GUC ......................................................51
P.      Indemnización del Fideicomisario de GUC y miembros de la Junta del Fideicomiso de GUC...............................................................................51

**SECCIÓN XX** FIDEICOMISO DE ACCIONES DE ANULACIÓN .........................................51
A.      Celebración de Contrato de Fideicomiso de Acciones de Anulación.................51
B.      Finalidad del Fideicomiso de Acciones de Anulación ...........................52
C.      Activos del Fideicomiso de Acciones de Anulación ..............................52
D.      Administración del Fideicomiso de Acciones de Anulación ..................52
E.      El Fideicomisario de Acciones de Anulación .........................................52
F.      Función del Fideicomisario de Acciones de Anulación .........................52
G.      Poder Fiscal del Fideicomisario de Acciones de Anulación respecto a la AEE Reorganizada.................................................................................53
H.      Transferibilidad de los Intereses del Fideicomiso de Acciones de Anulación ................................................................................................53
I.      Efectivo ...................................................................................................53
J.      Distribución de Activos del Fideicomiso de Acciones de Anulación.................53
K.      Financiamiento, Costos y Gastos del Fideicomiso de Acciones de Anulación ................................................................................................54
L.      Compensación del Fideicomisario de Acciones de Anulación..............................54
M.      Contratación de Profesionales/Empleados por parte del Fideicomisario de Acciones de Anulación ........................................................................54

N.      Tratamiento del Impuesto Federal a la Renta del Fideicomiso de Acciones
        de Anulación ...........................................................................................54

O.      Disolución del Fideicomiso de Acciones de Anulación ..........................................56

P.      Indemnización del Fideicomisario de Acciones de Anulación y miembros
        del Fideicomiso de Acciones de Anulación por Bonos ..........................................57

**SECCIÓN XXI** DISPOSICIONES QUE RIGEN LAS DISTRIBUCIONES ............................57

A.      Designación del Agente de Distribución ..................................................................57

B.      Distribuciones a causa de Reclamaciones Permitidas a partir de la
        Vigencia ....................................................................................................................57

C.      Derechos y facultades del Agente de Distribución .................................................58

D.      Reglas especiales para distribuciones a Tenedores de Reclamaciones
        Controvertidas ..........................................................................................................58

E.      Entrega de Distribuciones ........................................................................................59

F.      Reclamaciones pagadas o pagaderas por terceros .................................................62

G.      Requisitos de Retención y Presentación de Informes ...........................................63

H.      Tiempo Límite para Pagos en Efectivo ...................................................................63

I.      Distribuciones después de la Vigencia ...................................................................63

J.      Compensaciones .......................................................................................................64

K.      Asignación entre capital e interés devengado ........................................................64

L.      Tenedor de Reclamaciones ......................................................................................64

M.      Exculpación ...............................................................................................................64

**SECCIÓN XXII** PROCEDIMIENTOS PARA RESOLVER RECLAMACIONES
CONTROVERTIDAS ...................................................................................................................65

A.      Objeciones a Reclamaciones y seguimiento de Reclamaciones
        Controvertidas ..........................................................................................................65

B.      Estimación de Reclamaciones ..................................................................................65

C.      Responsabilidades de administración de Reclamaciones ......................................66

D.      Ajuste para Reclamaciones sin objeciones .............................................................66

E.      Extensión de la Fecha Límite de Objeción de Reclamaciones ..............................66

F.      Autoridad para modificar la Lista de Acreedores ...................................................66

G.      Sin Interés ................................................................................................................66

H.      Denegación de Reclamaciones .................................................................................67

**SECCIÓN XXIII** GOBERNANZA Y DISPOSICIONES RELATIVAS AL
FIDEICOMISO DE PAYGO DE LA AEE Y EL SISTEMA DE PENSIONES ..............67

A.      Formación y responsabilidades del Fideicomiso de PayGo de la AEE ...............67

B.      Financiamiento del Fideicomiso de PayGo de la AEE ..........................................67

C.      Gestión del Fideicomiso de PayGo de la AEE ........................................................68

D.      Pacto de no Afectación .............................................................................................68

E.     Mantenimiento de la Pensión ...................................................................68

**SECCIÓN XXIV** EFECTO DE LA CONFIRMACIÓN DEL PLAN ........................................68
A.     Extinción y Descargo de Reclamaciones y Causas de Acción ...............68
B.     Exenciones por parte del Deudor y el Deudor Reorganizado ................70
C.     Liberaciones por parte de los Tenedores de Reclamaciones ..................70
D.     Exculpación .............................................................................................71
E.     Interdicto ................................................................................................ 71
F.     No independencia de liberaciones, órdenes judiciales y exculpaciones ...............72
G.     Conservación de documentos ..................................................................72
H.     Reembolso o contribución ......................................................................72
I.     Liberación de gravámenes ......................................................................72

**SECCIÓN XXV** MODIFICACIÓN, REVOCACIÓN O DESISTIMIENTO DEL PLAN .........72
A.     Modificación del plan ..............................................................................72
B.     Revocación o Desistimiento ....................................................................73
C.     Modificación de los Documentos del Plan .............................................73
D.     No Admisión de Responsabilidad ...........................................................73

**SECCIÓN XXVI** GOBERNANZA CORPORATIVA Y GESTIÓN DEL DEUDOR
REORGANIZADO ..........................................................................................74
A.     Acción Corporativa .................................................................................74
B.     Estatutos del Deudor Reorganizado .......................................................74
C.     Funcionarios del Deudor Reorganizado ..................................................74

**SECCIÓN XXVII** IDENTIFICACIÓN DE RECLAMACIONES AFECTADAS POR
EL PLAN Y NO AFECTADAS POR EL PLAN ...........................................74
A.     Clases Afectadas .....................................................................................74
B.     Clases No Afectadas ...............................................................................75

**SECCIÓN XXVIII** CONDICIONES PRECEDENTES A LA CONFIRMACIÓN DEL
PLAN ..............................................................................................................75
A.     Condiciones precedentes a la Fecha de Confirmación ...........................75
B.     Renuncia a las Condiciones Precedentes a la Confirmación ..................77

**SECCIÓN XXIX** CONDICIONES PRECEDENTES A LA VIGENCIA ...............................78
A.     Condiciones Precedentes a la Vigencia ..................................................78
B.     Renuncia a las Condiciones Precedentes ................................................78
C.     Efecto de la no incidencia de las Condiciones a la Vigencia .................79

**SECCIÓN XXX** DISPOSICIONES RELATIVAS AL COMITÉ ............................................79
A.     Disolución del Comité .............................................................................79

**SECCIÓN XXXI** DISPOSICIONES RELATIVAS A LA JUNTA DE SUPERVISIÓN
Y EL CUMPLIMIENTO DE PROMESA ........................................................................79
    A.     Efecto de la Confirmación ...............................................................79
    B.     Función permanente de la Junta de Supervisión.................................79
    C.     Preferencia de Leyes .......................................................................80

**SECCIÓN XXXII** CONSERVACIÓN DE JURISDICCIÓN....................................80

**SECCIÓN XXXIII** DISPOSICIONES VARIAS......................................................82
    A.     Titularidad de los Activos .................................................................82
    B.     Sin Renuncia ......................................................................................83
    C.     Interdicto Complementario ...............................................................83
    D.     Efecto Vinculante Inmediato ............................................................84
    E.     Documentos Adicionales ..................................................................84
    F.     Reserva de Derechos .........................................................................84
    G.     Sucesores y Cesionarios....................................................................84
    H.     Gastos y Honorarios posteriores a la Vigencia .................................85
    I.     Exención de la Ley de Valores .........................................................85
    J.     Ley Aplicable ....................................................................................85
    K.     Cierre de Caso ...................................................................................85
    L.     Títulos de secciones .........................................................................85
    M.     Conservación de documentos ...........................................................86
    N.     Entrega de documentos .....................................................................86
    O.     Duración de los Interdictos o Paralizaciones ...................................87
    P.     Totalidad del acuerdo ........................................................................87
    Q.     Pruebas del Complemento del Plan ..................................................87
    R.     No Independencia ..............................................................................87
    S.     Votos solicitados de buena fe ...........................................................88
    T.     Renuncia o Impedimento ..................................................................88

# INTRODUCCIÓN

La Junta de Supervisión, como representante del Título III de la AEE de acuerdo con el artículo 315(b) de PROMESA, propone este plan de ajuste de acuerdo con el Título III de PROMESA.

En la Declaración de Divulgación se incluye una discusión de la historia, las operaciones y los eventos de la AEE que condujeron al comienzo del Caso del Título III, así como un resumen y análisis del Plan, los factores de riesgo y otros asuntos relacionados. Otros acuerdos y documentos, que han sido o serán presentados ante el Tribunal del Título III, son referenciados en el Plan o la Declaración de Divulgación y están disponibles para su revisión.

## SECCIÓN I

## TÉRMINOS DEFINIDOS, REGLAS DE INTERPRETACIÓN, CÁLCULO DEL TIEMPO, LEY APLICABLE Y OTRAS REFERENCIAS

**A.** **Términos Definidos**

Los términos en mayúscula utilizados en el Plan tendrán los significados establecidos en esta Sección I.A. Cualquier término utilizado en mayúsculas que no esté definido de otra manera pero que se use en PROMESA (y en la medida en que resulten aplicables en virtud de PROMESA, el Código de Quiebra y las Normas de Quiebra) tendrá el significado asignado a dicho término en PROMESA, el Código de Quiebra o las Normas de Quiebra, según corresponda y según las modificaciones de PROMESA.

1. *«Proyecciones del Plan Fiscal 2022»* significa el *Pronóstico de Carga a 30 Años con los Efectos Individuales de Tres Conductores que Causan Reducción de Carga* establecido en el Documento de Prueba 55 del Plan Fiscal 2022 para la AEE certificado por la Junta de Supervisión el 28 de junio de 2022.

2. *"AAFAF"* significa la Autoridad de Asesoría Financiera y Agencia Fiscal, una empresa pública e instrumentalidad del Estado Libre Asociado, cuyo nombre en inglés es Puerto Rico Fiscal Agency and Financial Advisory Authority.

3. *"Orden de la ACR"* significa *la Orden específica (A) que autoriza la conciliación administrativa de reclamaciones, (B) que aprueba formas adicionales de notificaciones y (C) que otorga medidas relacionadas* con fecha 12 de marzo de 2020 [Caso núm. 17-BK-3283-LTS, ECF núm. 12274].

4. *«Participante Activo del SRE de la AEE»* significa un Participante que, como se refleja en los registros del SRE de la AEE, no está recibiendo una pensión o anualidad a partir de la Vigencia.

5. *«Bonos Adicionales»* significa, si corresponde, cualquier nuevo bono u otra forma de endeudamiento incurrido por la AEE Reorganizada que no sea los Nuevos Bonos ni los Bonos de Refinanciamiento y pagaderos de fuentes distintas del Fondo de Amortización de la Deuda, donde los Bonos Adicionales (a) no afectarán de ninguna manera los términos de los Bonos de la

Serie A tal como se establecen en el presente documento, (b) estarán garantizados y serán pagaderos de los Ingresos Netos en la medida permitida por el Nuevo Contrato de Emisión Principal, y (c) de otro modo se emitan de acuerdo con el Nuevo Contrato de Emisión Principal.

6.      "*Fecha Límite de Reclamación Administrativa*" significa, a menos que el Tribunal del Título III ordene lo contrario, la fecha establecida por el Tribunal del Título III y establecida en la Orden de Confirmación como el último día para presentar evidencias de Reclamaciones de Gastos Administrativos conforme al artículo 503(b) del Código de Quiebras, cuya fecha no será superior a 90 (noventa) días después de la Vigencia.

7.      "*Bonos de Gastos Administrativos*" significa los Bonos de la Serie B que serán emitidos por la AEE Reorganizada conforme al Plan en la Vigencia y vendidos al Estado Libre Asociado para el pago de Reclamaciones de Gastos Administrativos Permitidas, que será en un monto de capital original acumulado del Monto de los Bonos de Gastos Administrativos.

8.      "*Monto de los Bonos de Gastos Administrativos*" significa cuatrocientos millones de dólares ($ 400,000,000).

9.      "*Reclamación de Gastos Administrativos*" significa una reclamación contra el Deudor o sus Activos que constituye un costo o gasto de administración del Caso del Título III presentado o autorizado a ser presentado, en o antes de la Fecha Límite de Reclamación Administrativa, de acuerdo con los artículos 503(b) y 507(a)(2) del Código de Quiebras que surjan durante el período hasta la Vigencia inclusive.

10.     "*Orden de la ADR*" significa *la Orden específica (A) que autoriza procedimientos de resolución alternativa de litigios, (B) que aprueba formas adicionales de notificaciones, (C) que aprueba envíos propuestos y (D) que otorga medidas relacionadas*, con fecha 1 de abril de 2020 [Caso núm. 17-BK-3283-LTS, ECF núm. 12576].

11.     «Procedimientos de la ADR» significa los procedimientos de resolución alternativa de litigios autorizados de acuerdo con la Orden de la ADR.

12.     «Filial» tiene el significado establecido en el artículo 101(2) del Código de Quiebras y el artículo 301(c)(1) de PROMESA.

13.     «Permitida» con respecto a cualquier Reclamación, tal Reclamación o parte de esta (a) de la cual se radicó evidencia en o antes de la Fecha Límite aplicable o (b) si no se radicó Evidencia de Reclamación de manera oportuna, la cual se haya enumerado (o se enumere de aquí en adelante) por parte del Deudor en la Lista de Acreedores y no se enumera posteriormente como «controvertida», «condicional» o «no determinada» o (c) concedida de acuerdo con (i) el artículo 502(h) del Código de Quiebras, aplicable al Caso del Título III de acuerdo con el Artículo 301 de PROMESA, (ii) los términos del Plan o (iii) una Orden Final, disponiéndose, sin embargo, que, con respecto a cualquier Reclamación descrita en la cláusula (a) o (b) que precede, tal Reclamación se considerará Concedida solo si, y en la medida en que, no se haya interpuesto ninguna objeción a su admisión, ni acción de subordinar de manera equitativa o limitar de otro modo la recuperación con respecto a esta, dentro del plazo de prescripción aplicable establecido en el Plan, el Código de Quiebras, las Normas de Quiebras o una Orden Final, o respecto a la cual se interpone una objeción y tal Reclamación se concedió en su totalidad o en parte mediante una Orden Final. A los efectos

2

de determinar el monto de una «Reclamación Permitida» con respecto a las distribuciones dentro de una Clase, se deducirá de esta un monto igual al monto de cualquier descuento sobre el valor de la emisión original no devengado a la fecha inmediatamente anterior a la Fecha de Petición y cualquier reclamación que el Deudor pueda tener contra un tenedor de esta, en la medida en que tal Reclamación se pueda compensar de acuerdo con la legislación de quiebra y no quiebra aplicable. Sin perjuicio de cualquier disposición que indique lo contrario en el presente (x) las Reclamaciones concedidas únicamente con el fin de votar para aceptar o rechazar el Plan de acuerdo con una orden del Tribunal del Título III no se considerará como «Permitida» según el presente a menos que se especifique lo contrario en la presente o por orden del Tribunal del Título III, (y) para cualquier fin de acuerdo con el Plan, excepto con respecto a los montos que se determinen por una Orden Final como «compensación justa» atribuible en relación con la concesión de una Reclamación de Expropiación/Expropiación Inversa y el tratamiento de estas de acuerdo con los términos y disposiciones de la Sección XII del presente documento, «Concedida» no incluirá intereses, sanciones ni cargos por mora que surjan de o se relacionen al período desde y posterior a la Fecha de Petición y (z) «Permitida» no incluirá ninguna Reclamación sujeta a desaprobación de acuerdo con el artículo 502(d) del Código de Quiebras.

14.   «*Impugnación del Recurso y Gravamen Modificado*» significa el litigio denominado *The Financial Oversight and Management Board for Puerto Rico v. U.S. Bank National Association*, procedimiento contencioso núm. 19-00391-LTS, actualmente pendiente en el Tribunal del Título III.

15.   «*Resolución Final de la Impugnación del Recurso y Gravamen Modificado*» significa la inscripción de (a) una Orden Final en la Impugnación del Recurso y Gravamen Modificado o (b) un acuerdo de transacción vinculante celebrado entre las partes en la Impugnación del Recurso y Gravamen Modificado y aprobada por una Orden Final.

16.   «*Prueba de Modificación*» tendrá el significado que se le da en la Sección XVI.F del Plan.

17.   «*Activos*» significa, con respecto al Deudor, (a) todos los «bienes» del Deudor, lo que incluye, de manera no taxativa, los bienes que figuran en los libros contables y registros y la Orden de Confirmación del Deudor a la Vigencia y (b) todas las Causas Radicadas, y cualquier ganancia ulterior de estas, que haya o pueda haber iniciado el Deudor o un representante autoriza a beneficio del Deudor y sus Acreedores, a menos que se modifique o se exima de acuerdo con el Plan o una Orden Final.

18.   «*Assured*» significa, colectivamente, Assured Guaranty Corp. y Assured Guaranty Municipal Corp.

19.   «*Swaps de Tasas de Interés Asegurados por Assured*» significa (a) ciertos *Acuerdos Principales de ISDA*, incluido el *Anexo* relacionado y el *Apoyo Crediticio Adjunto al Anexo*, cada uno con fecha de 18 de abril de 2007, por y entre la AEE y JPMorgan Chase Bank, N.A., y una transacción realizada de acuerdo con dichos documentos y reflejada en esa confirmación de Transacción Swap con fecha 27 de abril de 2007 con núm. de ref. de JPMorgan 2000005090781, asegurado por Assured de acuerdo con esa Póliza de Seguro de Garantía Financiera, núm. 218491A-SWP, emitida el 3 de mayo de 2007 y asegurada por el «Fondo de Obligaciones

3

Subordinadas» de la AEE establecido y regido por el Contrato de Fideicomiso; y (b) ciertos *Acuerdos Principales de ISDA*, incluido el *Anexo* relacionado y el *Apoyo Crediticio Adjunto al Anexo*, cada uno con fecha de 18 de abril de 2007, por y entre la AEE y UBS AG, y una transacción realizada de acuerdo con dichos documentos y reflejada en esa confirmación de Transacción Swap con fecha 18 de abril de 2007 con núm. de ref. de UBS 37638915, y asegurado por Assured de acuerdo con esa *Póliza de Seguro de Garantía Financiera*, núm. 208491B-SWP, emitida el 3 de mayo de 2007 y asegurada por el «Fondo de Obligaciones Subordinadas» de la AEE establecido y regido por el Contrato de Fideicomiso.

20.     «*Reclamación de Swaps de Tasas de Interés Asegurados de Assured*» significa una reclamación a causa de los Swaps de Tasas de Interés Asegurados de Assured.

21.     «*Recuperación de Reclamación de Swaps de Tasas de Interés Asegurados de Assured*» significa, según corresponda, (a) el Tratamiento de Monolíneas de Transacción, si el Tenedor de las Reclamaciones de Swaps de Tasas de Interés Asegurados de Assured presenta oportunamente al Agente del Solicitante a la Fecha Límite de la Oferta de Transacción una Página de Firmas de Elección de Clase de Transacción emitida para dicho Tenedor de acuerdo con el Memorando de Oferta de Transacción y el Acuerdo de Apoyo al Plan, o (b) el Tratamiento de Monolíneas de No Transacción, si el Tenedor de las Reclamaciones de Swaps de Tasas de Interés Asegurados de Assured no presentó oportunamente al Agente del Solicitante antes de la Fecha Límite de Solicitud de Transacción una Página de Firmas de Elección de Clase de Transacción.

22.     «*Acciones de Anulación*» significa acciones de anulación, recuperación y subordinación identificadas en el **Anexo A** del presente documento, incluidos los cambios y modificaciones al **Anexo A** hasta la Vigencia inclusive, contra cualquier Entidad que haya sido interpuesta por o en nombre del Deudor contra una Entidad en virtud de los artículos 510, 544, 545, 547, 548, 549, 550, 551, 552 o 553 del Código de Quiebras, aplicable al Caso del Título III de acuerdo con el artículo 301 de PROMESA, o la ley que no sea de quiebras aplicable incorporada por el artículo 544 del Código de Quiebras.

23.     «*Procedimientos de Acciones de Anulación*» significa la contraprestación neta en Efectivo recibida por la AEE en relación con las Acciones de Anulación.

24.     «*Fideicomiso de Acciones de Anulación*» significa el fideicomiso a crear en o antes de la Vigencia en la cual la Vigencia se transferirá a la autoridad para litigar o conciliar y transigir las Acciones de Anulación.

25.     «*Contrato de Fideicomiso de Acciones de Anulación*» significa el acuerdo a celebrar y cumplir en o antes de la Vigencia que proporciona, entre otras cosas, el litigio continuado de Acciones de Anulación.

26.     «*Activos de Fideicomiso de Acciones de Anulación*» significa, colectivamente, las (a) Acciones de Anulación y (b) cualquier Efectivo en poder del Fideicomisario de Acciones de Anulación ocasionalmente.

27.     «*Beneficiarios del Fideicomiso de Acciones de Anulación*» significa, colectivamente, los Tenedores de Reclamaciones en el Fondo de Reclamaciones sin Garantía.

28.     «*Junta de Fideicomiso de Acciones de Anulación*» significa la junta de tres (3) miembros nombrados a partir de la Vigencia para gobernar el Fideicomiso de Acciones de Anulación, seleccionado por la Junta de Supervisión.

29.     «*Intereses de Fideicomiso de Acciones de Anulación*» significa los intereses beneficiosos en el Fideicomiso de Acciones de Anulación asignados de acuerdo con los términos y disposiciones del Plan a la Recuperación General de Reclamaciones sin Garantía para el beneficio de los Tenedores de Reclamaciones en el Fondo de Reclamaciones sin Garantía.

30.     «*Fideicomisario de Acciones de Anulación*» significa el fideicomisario designado por la Junta de Fideicomiso de Acciones de Anulación, por mayoría simple de votos de dicha junta, de manera contemporánea con la Vigencia de acuerdo con los términos y disposiciones del Contrato de Fideicomiso de Acciones de Anulación, lo que incluye, de manera no taxativa, cualquier sucesor de este.

31.     «*Fecha de Votación*» significa la o las fechas límite establecidas por el Tribunal del Título III y establecidas en la Orden de Declaración de Divulgación para la presentación de papeletas conforme a los términos y disposiciones del Plan.

32.     «*Código de Quiebras*» significa el título 11 del Código de los Estados Unidos, los artículos 101–1532 del título 11 del U.S.C., en la medida aplicable al Caso del Título III de acuerdo con el artículo 301(a) de PROMESA.

33.     «*Reglas de Quiebras*» significa las Reglas Federales de Procedimiento de Quiebra, tal como fueron promulgadas por el Tribunal Supremo de los Estados Unidos conforme al artículo 2075 del título 28 del Código de los Estados Unidos, artículo 2075 del título 28 del U.S.C., según se aplica al Caso del Título III de acuerdo con el artículo 310 de PROMESA.

34.     «*Fecha límite*» significa las fechas respectivas establecidas por el Tribunal del Título III antes de las cuales deben radicarse las evidencias de la Reclamación con respecto a tales Reclamaciones contra el Deudor, conforme a (a) las Órdenes de Fecha Límite, (b) una Orden Final del Tribunal del Título III o (c) del Plan.

35.     «*Órdenes de Fecha límite*» significa las órdenes del Tribunal del Título III que establecen las fechas límite para la radicación de evidencias de Reclamaciones contra el Deudor o sus Activos, lo que incluye, de manera no taxativa, la (a) *Orden (A) que establece fechas límites y procedimientos para radicar evidencia de Reclamaciones y (B) aprueba el modo y forma de notificación de estas* [Caso núm. 17-BK-3283-LTS, EFC núm. 2521], y (b) la *Orden (A) que establece la extensión de fechas límite para radicar evidencias de Reclamaciones y (B) aprueba el modo y forma de notificación de estas* [Caso núm. 17-3283-BK-LTS, ECF núm. 3160].

36.     «*Garantía de Bonos*» se refiere a los activos de la AEE, si los hubiera, sujetos a una garantía prendaria pre-petición válida, perfeccionada y exigible a favor del Fideicomisario de Bonos a causa de los Bonos de Ingresos de la AEE, según se determine de acuerdo con la Resolución Final de la Impugnación del Recurso y Gravamen Modificado.

37.     «*Fideicomisario de Bonos*» significa la U.S. Bank National Association, en su calidad de fideicomisario sucesor en virtud del Contrato de Fideicomiso.

38.     «*Día Hábil*» significa cualquier día, que no sea un sábado, domingo o un «día festivo legal» (como tal término se define en la Regla de Quiebras 9006(a)(6)); *disponiéndose* que a los efectos de la definición de Tasa del Tesoro, Día Hábil excluya también, en la medida en que no esté ya excluido, (i) un día en el que se exija o autorice por ley el cierre de los bancos comerciales en el estado, o (ii) un día en el que la Bolsa de Valores de Nueva York esté cerrada durante todo el día o los bancos de la reserva federal estén cerrados.

39.     «*Efectivo*» significa la moneda de curso legal de los Estados Unidos, lo que incluye, de manera no taxativa, depósitos bancarios, cheques con fondos suficientes y sus equivalentes legales.

40.     «*Causas de Acción*» significa toda reclamación, acción, causa de acción, derecho de pago, derechos de acción, demanda, Deuda, cuota, suma de dinero, cuenta, consideración, bono, factura, especialidad, pacto, contrato, controversia, acuerdo, promesa, variación, transgresión, daño y perjuicio, sentencia, remedio, derecho de compensación, reclamación de terceros, reclamación de subrogación, reclamación de contribuciones, reclamación de reembolso, reclamación de indemnización, reconvención y reclamación contra parte (lo que incluye, de manera no taxativa, toda reclamación por incumplimiento de deberes fiduciarios, negligencia, mala praxis, incumplimiento de contrato, complicidad, fraude, inducción, evasión, recuperación, subordinación y toda Acción de Anulación) que esté pendiente o pueda presentarse contra cualquier Persona o Entidad que surja en o antes de la Vigencia, en base al derecho o la equidad, lo que incluye, de manera no taxativa, de acuerdo con el Código de Quiebras, conocido, desconocido, sometido a sentencia, no sometido a sentencia, saldado, no saldado, estipulado, condicional, vencido, no vencido, objeto de controversia o no, con garantía o sin garantía y ya sea presentada o presentable de manera directa o derivada, en derecho, equidad o de otra forma y ya sea presentada o no presentada a la Vigencia.

41.     «*Reclamación de Daños debidos a Rechazo de CBA*» significa una reclamación, si la hubiera, que surja contra la AEE del rechazo, de acuerdo con el artículo 365(d) del Código de Quiebras, o de acuerdo con una transacción, de cualquier Acuerdo de Negociación Colectiva, excluyendo cualquier Reclamación contra la AEE y/o la SRE de la AEE que surja del rechazo de la AEE de cualquier Acuerdo de Negociación Colectiva con respecto a las obligaciones de jubilación, incluidas las Reclamaciones de Pensión, que se tratan de acuerdo con la Sección III del Plan.

42.     «*Reclamación*» significa cualquier reclamación, como tal término se define en el artículo 101(5) del Código de Quiebras, contra la AEE.

43.     «*Fecha Límite de Objeción de Reclamaciones*» significa ciento ochenta (180) días después de la Vigencia o la fecha posterior que pueda ser aprobada por el Tribunal del Título III.

44.     «*Registro de Reclamaciones*» significa el registro oficial de Reclamaciones mantenido por los Agentes del Solicitante.

45.     «*Clase*» significa una categoría de Tenedores de Reclamaciones conforme el artículo 1122(a) del Código de Quiebras.

46.  «*Contratos de Negociación Colectiva*» significa, colectivamente, el CBA de la UEPI y el CBA de la UTIER.

47.  «*Estado Libre Asociado (ELA)*» significa el Estado Libre Asociado de Puerto Rico.

48.  «*Orden de Confirmación del ELA*» significa *la Orden y Sentencia que Confirma la Octava Modificación del Plan de Ajuste en Conjunto de Título III Modificado del Estado Libre Asociado de Puerto Rico, el Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico y la Autoridad de Edificios Públicos de Puerto Rico*, fechadas el 18 de enero de 2022 [Caso núm. 17-BK-3283-LTS, ECF núm. 19813].

49.  «*Constitución del ELA*» significa la Constitución del Estado Libre Asociado de Puerto Rico.

50.  «*Confirmación*» significa la entrada de la Orden de Confirmación en el expediente del Caso del Título III.

51.  «*Fecha de Confirmación*» significa la fecha en que el Tribunal del Título III ingresa la Orden de Confirmación en el expediente del Caso del Título III dentro del significado de las Reglas de Quiebras 5003 y 9021.

52.  «*Vista de Confirmación*» significa la vista ante el Tribunal del Título III de acuerdo con el artículo 1128 del Código de Quiebras en la cual la AEE busca el ingreso de la Orden de Confirmación.

53.  «*Orden de Confirmación*» significa la orden del Tribunal del Título III que confirma el Plan de acuerdo con el artículo 314 de PROMESA, y sus modificaciones, complementaciones o alteraciones posteriores.

54.  «*Tope de Conveniencia*» significa un millón de dólares ($1,000,000), el monto acumulado de la contraprestación que se pondrá a disposición de los Tenedores de Reclamaciones de Conveniencia Permitidas.

55.  «*Reclamación de Conveniencia*» significa una Reclamación General sin Garantía Permitida (a) que sea igual o inferior a diez mil dólares ($10,000) o (b) el Tenedor de la cual, a discreción de dicho Tenedor, ha elegido reducir el monto de dicha Reclamación General sin Garantía Permitida a diez mil dólares ($10,000) de acuerdo con los términos y disposiciones establecidos en la Sección XIV del presente documento; *disponiéndose, sin embargo*, que, sin perjuicio de lo anterior, un tenedor de múltiples Reclamaciones Generales sin Garantía que acumuladas superen veinte mil dólares ($20,000) puede optar por reducir todas esas Reclamaciones a un monto acumulado de veinte mil dólares ($20,000) y optar por que todas esas Reclamaciones reciban tratamiento como Reclamaciones de Conveniencia; y, *disponiéndose, además*, que el importe total de la contraprestación que se pondrá a disposición de las Reclamaciones de Conveniencia será el Tope de Conveniencia, *disponiéndose, además*, que, en caso de que se exceda dicho Tope de Conveniencia, los Tenedores de Reclamaciones de Conveniencia Permitidas recibirán una Participación a Prorrata del Tope de Conveniencia.

56.     *«Acreedor»* significa una Entidad con una Reclamación Permitida contra el Deudor o los Activos del Deudor, conforme al artículo 102(2) del Código de Quiebras, contra cualquier otro bien del Deudor, lo que incluye, de manera no taxativa, una Reclamación contra el Deudor de un tipo especificado en el artículo 502(g), 502(h) o 502(i) del Código de Quiebras, en cada caso, únicamente en la calidad de tal Entidad como tal.

57.     *«Lista de Acreedores»* significa la lista de acreedores (junto con todos los resúmenes, notas y listas) adjunta como Anexo A de la *Notificación de Presentación de Lista de Acreedores para la Autoridad de Energía Eléctrica de Puerto Rico* [Caso núm. 17-BK-4780-LTS, ECF núm. 520], conforme a los artículos 924 y 925 del Código de Quiebras, y las posibles enmiendas, replanteamientos, complementos o modificaciones de otro modo realizadas a dicha lista, resúmenes, notas o enumeraciones por la AEE.

58.     *«Comité de Acreedores»* significa el Comité Oficial de Acreedores sin Garantía designado por el U.S. Trustee en el Caso del Título III.

59.     *«Reclamación de Subsanación»* significa una Reclamación (a menos que sea renunciada o modificada por la contraparte aplicable) basada en los incumplimientos de la AEE de acuerdo con un Contrato a Ejecutarse o un Arrendamiento No Vencido asumido por la AEE de acuerdo con el artículo 365 del Código de Quiebras, excepto un incumplimiento para el que no se requiera una subsanación de acuerdo con el artículo 365(b)(2) del Código de Quiebras.

60.     *«CVI»* significa, colectivamente, los valores que serán emitidos en la Vigencia por la AEE Reorganizada como se describe en la Sección XVII del presente y emitidos de acuerdo con los términos y condiciones del Plan, la Orden de Confirmación y el Nuevo Contrato de Emisión Principal.

61.     *«Fecha de Vencimiento del CVI»* significa la fecha que es treinta y cinco (35) años después de la Vigencia.

62.     *«Monto Teórico del CVI»* significa el monto del CVI de GUC, el CVI de Transacción y el CVI de no Transacción.

63.     *«Precio de Amortización de CVI»* significa el cálculo del valor actual del CVI pendiente a partir de la fecha de compra aplicable, que será la suma de los valores actuales de cuotas anuales iguales del saldo de CVI pendiente a partir del fin del Año Fiscal desde la fecha de convocatoria aplicable hasta el vencimiento final del CVI, descontada hasta la fecha de amortización del CVI sobre una base anual (suponiendo un año de 360 días que consta de doce meses de 30 días) a la Tasa del Tesoro más dos por ciento (2.00%).

64.     *«Deuda»* tendrá el significado que se le da en el artículo 101(12) del Código de Quiebras.

65.     *«Fondo de Amortización de la Deuda»* significa el fondo mantenido por el Fideicomisario de Nuevos bonos en el que la AEE Reorganizada depositará, de acuerdo con la Cascada de Pagos, dinero hasta el monto de los Ingresos por Cargos Heredados.

66.     *«Deudor»* significa la AEE.

67.     «*Reclamación por Deficiencia*» significa una Reclamación de Bonos de Ingresos de la AEE Permitida o una Reclamación de Swaps de Tasa de Interés Asegurada de Assured Permitida en poder de un Bonista de no Transacción o una Monolínea de no Transacción que no sea una Reclamación Garantizada y constituya una Reclamación sin Garantía contra la AEE de acuerdo con el artículo 506(a)(1) del Código de Quiebras, según lo determinado por la Resolución Final de la Impugnación del Recurso y Gravamen Modificado.

68.     «*Documentos Definitivos*» significa, colectivamente, los documentos y acuerdos definitivos contemplados por el Plan, incluidos, de forma no taxativa, (a) la Declaración de Divulgación (incluyendo cualquier alteración, modificación y suplemento a esta) y cualquier documentación o acuerdo relacionado con esta, que será razonablemente satisfactorio para los Prestamistas de Línea de Combustible Requeridos, (b) el Plan (incluyendo cualquier alteración, modificación y suplemento a este) y cualquier documentación o acuerdo relacionado con este, que no será incompatible con el Acuerdo de Apoyo al Plan del Prestamista de Línea de Combustible y que será razonablemente satisfactorio para los Prestamistas de Línea de Combustible Requeridos, (c) la Orden de Confirmación, que no será incompatible con el Acuerdo de Apoyo al Plan del Prestamista de Línea de Combustible y que será razonablemente satisfactoria para los Prestamistas de Línea de Combustible Requeridos, (d) el Nuevo Contrato de Emisión Principal y documentos y acuerdos relacionados con este, que no será incompatible con el Acuerdo de Apoyo al Plan del Prestamista de Línea de Combustible y que será razonablemente aceptable para los Prestamistas de Línea de Combustible Requeridos, (e) el formulario de bonos para los Nuevos Bonos, que no será incompatible con el Acuerdo de Apoyo al Plan del Prestamista de Línea de Combustible y que será razonablemente aceptable para los Prestamistas de Línea de Combustible Requeridos, (f) el formulario del CVI, (g) la Escritura del Fideicomiso de PayGo de la AEE y los documentos o acuerdos relacionados con esta, (h) la Escritura Fiduciaria del Fideicomiso de GUC y los documentos o acuerdos relacionados con esta, (i) el Contrato de Fideicomiso de Acciones de Anulación y los documentos o acuerdos relacionados con este, y (j) todo otro documento que comprenda el Complemento del Plan, en todos los casos, excepto en los casos que se establezcan de otra manera en el presente documento, cuya forma y sustancia serán aceptables para la Junta de Supervisión a su exclusiva y absoluta discreción.

69.     «*No Permitida*» significa, con respecto a cualquier Reclamación, una Reclamación o cualquier parte de esta que no sea Permitida y (a) que no sean permitidas por una Orden Final, (b) se designa como cero, condicional, objeto de controversia o no en la Lista de Acreedores y con respecto a la cual no se haya radicado Evidencia de Reclamaciones o solicitud de pago de una Reclamación de Gastos Administrativos de manera oportuna o que no se consideró radicada de manera oportuna con el Tribunal del Título III, (c) se ha retirado por acuerdo del Deudor y el Tenedor de esta o (d) se ha retirado por el Tenedor de esta.

70.     «*Declaración de Divulgación*» significa la declaración de divulgación para el Plan, incluidas todas las pruebas y anexos de esta, y aprobada por el Tribunal del Título III de acuerdo con el artículo 1125 del Código de Quiebras.

71.     «*Orden de Declaración de Divulgación*» significa la orden del Tribunal del Título III que aprueba la Declaración de Divulgación.

72.     «*En Disputa*» significa, con respecto a cualquier Reclamación, una Reclamación que aún no está Permitida, lo que incluye (a) cualquier Evidencia de Reclamación que, a primera vista, sea contingente o no liquidada, (b) cualquier Evidencia de Reclamación o solicitud de pago de una Reclamación de Gastos Administrativos presentada después de la Vigencia, fecha límite aplicable o la fecha límite para presentar Evidencias de Reclamación basadas en el rechazo de la AEE de Contratos a Ejecutarse o Arrendamientos no Vencidos, según corresponda, y (c) cualquier Reclamación que esté sujeta a una objeción o una moción de estimación, en cada caso que no se haya desistido, resuelto o dictaminado por una Orden Final del Tribunal del Título III.

73.     «*Agente de Distribución*» significa, según corresponda, la AEE, la AEE Reorganizada, el Fideicomisario de GUC, o tal Entidad o Entidades designadas por la Junta de Supervisión, cada una de las cuales debe hacer o facilitar las distribuciones de acuerdo con las disposiciones del Plan.

74.     «*Fecha de Distribución*» significa, salvo que se establezca lo contrario en el presente, la fecha o fechas determinadas por el Consejo de Supervisión o el Fideicomisario de GUC, según corresponda, en o después de la Vigencia, en las que el Agente de Distribución efectuará las distribuciones a los Titulares de Reclamaciones Permitidas con derecho a recibir distribuciones en virtud del Plan.

75.     «*Fecha de Registro de Distribución*» significa la Fecha de Votación o cualquier otra fecha establecida mediante una Orden Final del Tribunal del Título III, lo que incluye la Orden de Confirmación; *disponiéndose, sin embargo*, que la «Fecha de Registro de Distribución» no aplique a ningún valor público que recibirá distribución conforme al Plan mediante DTC.

76.     «*DTC*» significa The Depository Trust Company.

77.     «*Vigencia*» significa la fecha que es el primer Día Hábil después de la Fecha de Confirmación en la que todas las condiciones que preceden a la ocurrencia de la Vigencia establecida en la Sección XXIX.A del Plan se han cumplido o renunciado de acuerdo con la Sección XXIX.B del Plan.

78.     «*Página de firmas de la Elección de Clase de Resolución*» significa la página de firmas adjunta al Memorando de Oferta de Transacción y Acuerdo de Apoyo al Plan, de acuerdo con la cual un Tenedor de Reclamaciones de Bonos de Ingresos de la AEE o un Titular de Reclamaciones de Swaps de Tasa de Interés Asegurados de Assured puede elegir ser un Bonista de Transacción o Monolínea de Transacción al devolver dicha página de firmas completada a la Junta de Supervisión antes de la Fecha Límite de la Oferta de Transacción y de otra manera de acuerdo con los términos del Memorando de Oferta de Transacción.

79.     «*Reclamación de Expropiación/Expropiación Inversa*» significa una Reclamación derivada o relacionada con (a) un Procedimiento de Expropiación y una Orden Final ingresados en este por un monto superior al monto depositado por la autoridad de expropiación de conformidad con los términos y disposiciones de 32 L.P.R.A., artículo 2907, lo que incluye, sin limitación, los intereses devengados con respecto a este o (b) una expropiación inversa declarada de los bienes causada por una asunción de propiedad para uso público por el deudor sin el debido

10

proceso legal y sin haber recibido una compensación justa, lo que incluye, sin limitación, mediante la imposición de restricciones de desarrollo o limitaciones de uso.

80.       «*Procedimiento de Expropiación*» significa una acción o procedimiento de condena iniciado por la AEE en el Tribunal de Primera Instancia de acuerdo con los términos y disposiciones de 32 L.P.R.A. artículo 2905, para obtener el título de bienes inmuebles ubicados en Puerto Rico.

81.       «*Entidad*» tiene el significado establecido en el artículo 101(15) del Código de Quiebras.

82.       «*Excedente de Nuevos Bonos*» significa los Nuevos Bonos Restantes Netos, si los hubiere, disponibles para su distribución, después de realizar las distribuciones de Nuevos Bonos Restantes Netos previstas por el Plan (a) al Fideicomiso de GUC, (b) Tenedores de Reclamaciones de Bonos de Ingresos de la AEE Permitidas o Tenedores de Reclamaciones de Swaps de Tasas de Interés Asegurados de Assured que sean Bonistas de Transacción o Monolíneas de Transacción, y (c) Tenedores de Reclamaciones de Préstamos de Líneas de Combustible Permitidas.

83.       «*Parte Exculpada*» significa, colectivamente, y en cada caso en su calidad de tal: (a) la AEE; (b) la Junta de Supervisión; (c) la AAFAF; (d) el Comité de Acreedores; (e) las Partes de Vitol, excepto con respecto a Vitol-SCC AP; (f) los Acreedores del Acuerdo de Apoyo al Plan del Prestamista de Línea de Combustible; y (g) con respecto a cada uno de los anteriores, las Personas Relacionadas actuales y anteriores de dicha Entidad.

84.       «*Contrato a Ejecutarse*» significa un contrato o arrendamiento del que la AEE es parte y que está sujeto a asunción, rechazo o asunción y cesión de acuerdo con el artículo 365 del Código de Quiebras, excepto lo dispuesto en el artículo 311 de PROMESA.

85.       «*Reclamaciones Federales*» significa, en su conjunto, todas y cada una de las Reclamaciones de los Estados Unidos de América, sus agencias, departamentos o agentes, incluidos, sin limitación, el Departamento de Vivienda y Desarrollo Urbano de los Estados Unidos, el Departamento de Seguridad Nacional de los Estados Unidos, la Agencia de Protección Ambiental de los Estados y el Departamento de Trabajo de los Estados Unidos.

86.       «*Orden Final*», si corresponde, significa una orden o sentencia de un tribunal de jurisdicción competente que se ingresó en el expediente llevado por el actuario de tal tribunal y que no se ha revocado, anulado o suspendido y con respecto a la cual (a) ha caducado el período de apelación, petición de revisión o petición de nuevo proceso, presentación de nuevos alegatos o nueva vista y con respecto al cual no se encuentre pendiente ninguna apelación, petición de revisión, procedimientos de remisión u otros procesos para solicitar un nuevo proceso, presentar de nuevos alegatos o nueva vista o (b) de haberse presentado una apelación, mandamiento de revisión, nuevo proceso, presentación de nuevos alegatos o nueva vista, (i) tal orden o sentencia se habrá ratificado o remitido en parte o en su totalidad, sin procesos adicionales en remisión, por el tribunal de máxima instancia ante la cual se apeló, se haya negado la revisión o se hayan negado un nuevo proceso, la presentación de nuevos alegatos o nueva vista o que no resultó en modificaciones a tal orden y (ii) el período para realizar cualquier apelación, petición de revisión, nuevo proceso, presentación de nuevos alegatos o nueva vista adicionales haya caducado;

*disponiéndose, sin embargo*, que, la posibilidad de que una moción de acuerdo con la Norma 60 de las Normas Federales de Procedimientos Civiles, o cualquier norma análoga de acuerdo con las Normas de Quiebra o las Normas de Quiebras Locales, pueda radicarse con respecto a tal orden no impedirá que tal orden sea una Orden Final, salvo según dispongan las Normas Federales de Procedimiento de Apelación, las Normas de Quiebra o las Normas de Quiebra Locales.

87.    «*Conclusiones de Hecho y Conclusiones de Ley*» significa las conclusiones de hechos y conclusiones de Ley del Tribunal del Título III, ingresadas en el Caso de Titulo III en conexión con la confirmación del Plan conforme al artículo 314 de PROMESA y el artículo 1129 del Código de Quiebras, aplicable para los Casos de Título III conforme al artículo 301 de PROMESA.

88.    «*Plan Fiscal*» significa un «Plan Fiscal» tal como se define en el artículo 5(10) de PROMESA.

89.    «*Año Fiscal*» significa un ejercicio fiscal de la AEE, que comienza el 1 de julio y finaliza el 30 de julio del siguiente año calendario.

90.    *Servicio de Citi de Línea de Combustible*» significa el *Acuerdo de Servicio de Financiamiento del Comercio*, con fecha 20 de julio de 2012, por y entre la AEE y Citibank, N.A., y sus modificaciones, alteraciones y reformulaciones, complementos o modificaciones realizadas de otro modo ocasionalmente.

91.    «*Servicio de Línea de Combustible*» significa, colectivamente, el servicio de crédito extendido a la AEE de acuerdo con el Servicio de Scotia de Línea de Combustible y el Servicio de Citi de Línea de Combustible.

92.    «*Acción Prioritaria de Prestamista de Línea de Combustible*» significa el litigio denominado *Cortland Capital Market Services LLC, et al., v. The Financial Oversight and Management Board for Puerto Rico, et al.*, Caso núm. 19-00396-LTS, actualmente pendiente en el Tribunal del Título III, en el que los prestamistas de los Préstamos de Línea de Combustible afirmaron, entre otras cosas, que los préstamos de la Línea de Combustible constituyen «Gastos Actuales» de acuerdo con el Contrato de Fideicomiso y tienen prioridad sobre los bonistas de la AEE.

93.    «*Acuerdo de Apoyo al Plan de Prestamista de Línea de Combustible*» significa el *Acuerdo de Apoyo al Plan y Transacción*, con fecha 1 de diciembre de 2022, entre la Junta de Supervisión y los Acreedores del Acuerdo de Apoyo al Plan de Prestamista de Línea de Combustible, y sus modificaciones, alteraciones y complementos realizados ocasionalmente de acuerdo con sus términos.

94.    «*Acreedores del Acuerdo de Apoyo al Plan del Prestamista de Línea de Combustible*» se refiere, colectivamente, a las partes del Acuerdo de Apoyo al Plan del Prestamista de Línea de Combustible, que no sean la Junta de Supervisión, según cambien ocasionalmente: de conformidad con el Acuerdo de Apoyo al Plan del Prestamista de Línea de Combustible.

95.     «*Tarifas de Perfeccionamiento de Acreedores del Acuerdo de Apoyo al Plan de Línea de Combustible*» significa los costos de perfeccionamiento de quince millones de dólares

($15,000,000) que se pagarán a los Acreedores del Acuerdo de Apoyo al Plan de Línea de Combustible.

96.     «*Tarifas de Acreedores del Acuerdo de Apoyo al Plan del Prestamista de Línea de Combustible*» significa, colectivamente, las Tarifas de Perfeccionamiento de Acreedores del Acuerdo de Apoyo al Plan del Prestamista de Línea de Combustible y las Tarifas de Reembolso de Profesionales de Acreedores del Acuerdo de Apoyo al Plan del Prestamista de Línea de Combustible.

97.     «*Tarifas de Reembolso de Profesionales de Acreedores del Acuerdo de Apoyo al Plan de Línea de Combustible*» significa el reembolso de hasta once millones de dólares ($11,000,000) en honorarios profesionales documentados incurridos por los Acreedores del Acuerdo de Apoyo al Plan del Prestamista de Línea de Combustible.

98.     «*Reclamación de Préstamo de Línea de Combustible*» se refiere a una Reclamación a causa de Préstamos de Línea de Combustible o de otra manera que surja de o esté relacionada con el Servicio de Línea de Combustible (incluidos los intereses devengados hasta la Fecha de Petición).

99.     «*Préstamos de Línea de Combustible*» significa los préstamos o anticipos realizados conforme al Servicio de Línea de Combustible.

100.     «*Servicio de Scotia de Línea de Combustible*» significa el *Contrato de Crédito*, con fecha del 4 de mayo de 2012, por y entre la AEE, Scotiabank de Puerto Rico, y ciertos prestamistas, y sus modificaciones y replanteamientos, complementos o alteraciones que se realicen ocasionalmente.

101.     «*Reclamación General sin Garantía*» significa cualquier Reclamación sin Garantía contra la AEE que no sea una Reclamación de Gastos Administrativos, una Reclamación Federal, una Reclamación Profesional, una Reclamación de Expropiación/Expropiación Inversa, una Reclamación de Pensión, una Reclamación de Préstamo de Línea de Combustible, una Reclamación de Bonos de Ingresos de la AEE (incluida una Reclamación de Deficiencia), una Reclamación de Vítol, una Reclamación de Swaps de Tasa de Interés Asegurados de Assure, una Reclamación Garantizada, una Reclamación de Cliente de Ejercicio Habitual o una Reclamación Subordinada del artículo 510(b). Para evitar dudas, cada Reclamación por Daños debidos a Rechazo de CBA será una «Reclamación General sin Garantía».

102.     «*Recuperación de Reclamaciones General sin Garantía*» significa la recuperación total por parte de los titulares de Reclamaciones en el Fondo de Reclamaciones sin Garantía, pagadera de los Activos del Fideicomiso de GUC, compuesto por (a) los Procedimientos de Acciones de Anulación, (b) los Nuevos Bonos de GUC, si los hubiere, y (c) los CVI de GUC.

103.     «*Partes del Gobierno*» significa colectivamente, (a) la Junta de Supervisión, (b) la AEE, y (c) la AAFAF.

104.     «*Unidad del Gobierno*» tiene el significado establecido en el artículo 101(27) del Código de Quiebras.

105. «*Nuevos Bonos Brutos Restantes*» significa los Bonos de la Serie B, si los hubiere, disponibles para su distribución después de la Distribución Obligatoria de Nuevos Bonos y la Distribución Inicial de Nuevos Bonos de GUC.

106. «*CVI de GUC*» significa CVI en el monto nominal teórico igual al Fondo de Reclamaciones sin Garantía <u>menos</u> la <u>suma</u> de (a) el monto de los Procedimientos de Acciones de Anulación a partir de la Vigencia y (b) el monto de los Nuevos Bonos de GUC.

107. «*Porcentaje de Recuperación de Nuevos Bonos de Inicial de GUC*» significa cincuenta por ciento (50.0%).

108. «*Nuevos Bonos de GUC*» significa, colectivamente, la Distribución Inicial de Nuevos Bonos de GUC y la Distribución Secundaria de Nuevos Bonos de GUC.

109. «*Distribución Inicial de Nuevos Bonos de GUC*» significa el monto principal acumulado de los Bonos de la Serie B que se distribuirán inicialmente al Fideicomiso de GUC para el beneficio de los Tenedores de Reclamaciones en el Fondo de Reclamaciones sin Garantía, igual a la menor de (a) la Estimación del Fondo de Reclamaciones sin Garantía <u>multiplicada por</u> el Porcentaje Inicial de Recuperación de Nuevos Bonos de GUC y (b) todos los Nuevos Bonos Restantes de GUC.

110. «*Distribución Secundaria de Nuevos Bonos de GUC*» significa el monto principal acumulado de Nuevos Bonos Restantes Netos distribuidos al Fideicomiso de GUC para el beneficio de los Tenedores de Reclamaciones en el Fondo de Reclamaciones sin Garantía, después de la Distribución Inicial de Nuevos Bonos de GUC, igual a la Estimación del Fondo de Reclamaciones sin Garantía <u>menos</u> la Distribución Inicial de Nuevos Bonos de GUC <u>dividida entre</u> el Fondo de Reclamaciones de Bonos de la Serie B restantes, cuya fracción resultante se <u>multiplicará por</u> los Nuevos Bonos Netos Restantes; *disponiéndose, sin embargo*, que la <u>suma</u> de la Distribución Inicial de Nuevos Bonos de GUC <u>más</u> la Distribución Secundaria de Nuevos Bonos de GUC no exceda el cien por ciento (100.0%) de la Estimación del Fondo de Reclamaciones sin Garantía.

111. «*Nuevos Bonos Restantes de GUC*» significa los Bonos de la Serie B, si los hubiere, disponibles para su distribución después de la Distribución Obligatoria de Nuevos Bonos.

112. «*Fideicomiso de GUC*» significa una Entidad que se establecerá en o antes de la Vigencia para el beneficio de los Tenedores de Reclamaciones en el Fondo de Reclamaciones sin Garantía, cuya Entidad será un fideicomiso de liquidación administrado de acuerdo con la Escritura Fiduciaria del Fideicomiso de GUC.

113. «*Activos del Fideicomiso de GUC*» significa, colectivamente, (a) los Procedimientos de Acción de Anulación, (b) los Nuevos Bonos de GUC, si los hubiere, y (c) CVI de GUC.

114. «*Beneficiarios del Fideicomiso de GUC*» significa, colectivamente, los Tenedores de Reclamaciones en el Fondo de Reclamaciones sin Garantía.

115.    «*Junta de Fideicomiso de GUC*» significa la junta de tres (3) miembros nombrados a partir de la Vigencia para gobernar el Fideicomiso de GUC, seleccionado por la Junta de Supervisión.

116.    «*Escritura Fiduciaria del Fideicomiso de GUC*» significa la escritura fiduciaria que se firmará y entregará en o antes de la Vigencia que establece, entre otras cosas, la distribución de la Recuperación de Reclamaciones Generales sin Garantía a los Tenedores de Reclamaciones en el Fondo de Reclamaciones sin Garantía.

117.    «*Intereses del Fideicomiso GUC*» significa los intereses beneficiosos en el Fideicomiso de GUC asignados de acuerdo con los términos y disposiciones del Plan para el beneficio de los Tenedores de Reclamaciones en el Fondo de Reclamaciones sin Garantía.

118.    «*Fideicomisario de GUC*» significa el fideicomisario designado por la Junta de Fideicomiso de GUC, por mayoría simple de votos de dicha Junta, de manera contemporánea con la Vigencia de acuerdo con los términos y disposiciones de la Escritura Fiduciaria del Fideicomiso de GUC, incluido, de forma no taxativa, cualquier sucesor de esta.

119.    «*Tenedor*» significa una Entidad que posee una Reclamación, excepto lo dispuesto en el artículo 301(c)(3) de PROMESA.

120.    «*Afectada*» significa una Reclamación que no está No Afectada.

121.    «*Pólizas de Seguro*» significa, colectivamente, todas las pólizas de seguro del Deudor, excluyendo cualquier póliza de seguro emitida por las Aseguradoras Monolíneas con respecto a los Bonos de Ingresos Asegurados de la AEE.

122.    «*Bonos de Ingresos Asegurados de la AEE*» significa los Bonos de Ingresos de la AEE asegurados de acuerdo con las pólizas de seguro emitidas por las Aseguradoras Monolíneas.

123.    «*Pacto de Tasas de Interés*» tendrá el significado que se le da en la Sección XVII.J del Plan.

124.    «*IRC*» significa el Código Tributario Interno de los Estados Unidos de 1986 y sus ocasionales modificaciones.

125.    «*SII*» significa el Servicio de Impuestos Internos, una agencia del Departamento del Tesoro de los Estados Unidos.

126.    «*Acción según la Ley 458*» significa el litigio denominado *PREPA v. Vitol Inc. et al.*, procedimiento contencioso núm. 19-00453 en [Caso núm. 17-BK-3283-LTS].

127.    «*Cargo Heredado*» significa la tarifa fija mensual híbrida y el cargo volumétrico por la AEE reorganizada que se incluirá en las tarifas, tasas y cargos de la AEE reorganizada a sus clientes, como se describe más detalladamente en el **Anexo B** del presente documento, incluidos los cambios y modificaciones al **Anexo B** hasta la Vigencia inclusive, para pagar el capital y los intereses sobre los Nuevos Bonos y cualquier Bonos de Refinanciamiento, en la estructura y los montos que no retrasen o extiendan la fecha de reembolso esperada de los Bonos de la Serie A y

la vida promedio ponderada esperada como se establece en el Acuerdo de Apoyo al Plan del
Prestamista de Línea de Combustible, y que de otro modo sean razonablemente aceptables para
los Prestamistas de la Línea de Combustible Requeridos.

128.    «*Ingresos por Cargos Heredados*» significa, durante el período aplicable, la parte,
expresada en dólares, de todos los Ingresos atribuibles al Cargo Heredado, según lo calculado por
un Prestador de Servicios y certificado por un funcionario de este al Nuevo Fideicomisario
Principal.

129.    «*Gravamen*» tiene el significado establecido en el artículo 101(37) del Código de
Quiebras.

130.    «*Reglas de Quiebra Locales*» significa las Reglas de Quiebra Locales del Tribunal
de Quiebras de los Estados Unidos para el Distrito de Puerto Rico y, en la medida que sea aplicable
al Caso de Título III; las Normas del Tribunal del Distrito para el Distrito de Puerto Rico y todas
sus modificaciones ocasionales.

131.    «*Distribución Obligatoria de Nuevos Bonos*» significa los Nuevos Bonos que se
emitirán de acuerdo con este Plan y se distribuirán de acuerdo con las siguientes disposiciones del
Plan: Sección IV.A(ii); Sección V.A(ii); Sección VII.A(i); Sección VII.A(ii); Sección VII.B;
Sección X.A; y Sección XVI.H.

132.    «*Aseguradoras Monolíneas*» significa Assured, National y Syncora.

133.    «*National*» significa National Public Finance Guarantee Corporation.

134.    «*Bonos Nuevos Netos Restantes*» significa los Bonos de la Serie B, si los hubiere,
disponibles para su distribución después de la Distribución Obligatoria de Nuevos Bonos, la
Distribución Inicial de Nuevos Bonos de GUC y la Distribución de Nuevos Bonos de PayGo de la
AEE.

135.    «*Ingresos Netos*» significa Ingresos menos Gastos Operativos.

136.    «*Fecha de Resolución de Nuevos Bonos*» significa la fecha en la que el capital y
los intereses adeudados sobre los Bonos de la Serie B (y cualquier Bono de Refinanciamiento
emitido de acuerdo con el Nuevo Contrato de Emisión Principal) se pagan indefectiblemente en
su totalidad en efectivo, o se considera de otro modo que no están pendientes de acuerdo con los
términos del Nuevo Contrato de Emisión Principal.

137.    «*Nuevos Bonos*» significa, colectivamente, los Bonos de la Serie A y los Bonos de
la Serie B que serán emitidos por la AEE Reorganizada de acuerdo con el Plan en la Vigencia, con
un monto total de capital original de hasta aproximadamente cinco mil cuatrocientos millones de
dólares ($5,400,000,000).

138.    «*Nuevo Contrato de Emisión Principal*» significa el contrato de emisión fiduciario
principal que se firmará y entregará en o antes de la Vigencia de acuerdo con el cual la AEE
Reorganizada emitirá los Nuevos Bonos y los CVI, e incluye todos los términos y disposiciones
en relación con estos, que no será incompatible con el Acuerdo de Apoyo al Plan del Prestamista

de Línea de Combustible y que será razonablemente aceptable para los Prestamistas de Línea de Combustible Requeridos, con sus modificaciones, complementos o alteraciones realizadas ocasionalmente:, de acuerdo con sus términos y condiciones, un formulario del cual se adjuntará al Complemento del Plan.

139.    «*Nuevo Fideicomisario Principal*» significa el fideicomisario o fideicomisario sustituto, según el caso, designado conforme a los términos y condiciones del Nuevo Contrato de Emisión Principal.

140.    «*Bonista de no Transacción*» significa un Tenedor de Reclamaciones de Bonos de Ingresos de la AEE que no es una Aseguradora Monolínea que no presentó oportunamente al Agente del Solicitante antes de la Fecha Límite de Oferta de Liquidación la Página de Firmas de Elección de Clase de Transacción emitida a dicho Tenedor.

141.    «*CVI de no Transacción*» significa, (a) si se cumplen las Condiciones de CVI de no Transacción, CVI en el monto nominal teórico igual a la suma de las Reclamaciones de no Transacción no Permitidas Restantes de todos los Tenedores de Reclamaciones de Bonos de Ingresos de la AEE que son un Bonista de no Transacción o una Monolínea de no Transacción como se calcula en la Sección V.A(iv) del Plan, o (b) si no se cumplen las Condiciones de CVI de no Transacción, CVI en el monto nominal teórico de cero dólares ($0.00).

142.    «*Condiciones de CVI de no Transacción*» se refiere a si (a) la Clase 2 vota para aceptar el Plan y (b) se introduce una Orden Final en la Impugnación del Recurso y Gravamen Modificado que determina que los Bonos de Ingresos de la AEE recurren únicamente al Fondo de Amortización.

143.    «*Monolínea de no Transacción*» significa (a) un Tenedor de Reclamaciones de Bonos de Ingresos de la AEE que es una Aseguradora Monolínea o (b) un Tenedor de Reclamaciones de Swaps de Tipos de Interés Asegurados de Assured que no presentaron oportunamente al Agente del Solicitante antes de la Fecha Límite de Oferta de Liquidación una Página de Firmas de Elección de Clase de Transacción emitida a dicho Tenedor.

144.    «*Tratamiento de Monolínea de no Transacción*» significa el tratamiento proporcionado a los Tenedores de Reclamaciones Permitidas en la Clase 2.

145.    «*Gastos Operativos*» significa los gastos actuales razonables y necesarios de la AEE Reorganizada para mantener, reparar y operar el sistema e incluirá, sin limitar la generalidad de lo anterior, todos los gastos administrativos, primas de seguros, gastos de estudios preliminares no imputables a gastos de capital, gastos de ingeniería relacionados con la operación y mantenimiento, gastos legales, cualquier pago de pensiones, fideicomiso de pensiones o fondos de jubilación, y todos los demás gastos que deban ser pagados por la AEE Reorganizada en virtud de las disposiciones de la documentación definitiva que rige los Nuevos Bonos, en virtud de sus obligaciones contractuales (incluso en virtud de cualquier contrato relacionado con una «Transacción de la AEE» según se define en la Ley 120-2018), o por ley, o permitido por las prácticas estándar para los sistemas de servicios públicos, más una reserva de hasta dos (2) meses de gastos para lo anterior, según se estime razonablemente por la AEE Reorganizada ocasionalmente.

146.    «*Reclamación de Cliente de Ejercicio Habitual* » significa una Reclamación, que no sea una Reclamación en Disputa, mantenida por un cliente de la AEE relacionada con asuntos de cliente de ejercicio habitual, incluida una Reclamación relacionada con el pago excesivo de facturas de clientes o depósitos de clientes mantenidos por la AEE.

147.    «*Junta de Supervisión*» significa la Junta de Supervisión y Administración Financiera para Puerto Rico establecida conforme al Artículo 101 de PROMESA, como representante de Título III del Deudor en el Caso de Título III conforme al artículo 315(b) de PROMESA.

148.    «*Participante*» significa un empleado actual, antiguo, activo, inactivo, jubilado o discapacitado que tiene una reclamación devengada contra el SRE de la AEE por uno o más beneficios de jubilación a causa de ser o haber sido participante en el SRE de la AEE, junto con sus beneficiarios, si los hubiere.

149.    «*Cascada de Pagos*» tendrá el significado que se le da en la Sección XVII.G del Plan.

150.    «*Reclamación de Pensión*» significa la reclamación del SRE de la AEE a cause de las contribuciones adeudadas (incluidos los montos pagaderos en el futuro) por la AEE al SRE de la AEE para pagar los beneficios de pensión de jubilados de acuerdo con las Regulaciones del SRE de la AEE, acuerdos de negociación colectiva, resoluciones y la ley aplicable, que incluye cualquier Reclamación por daños debidos a rechazo con respecto al rechazo de la AEE de cualquier obligación pre-petición de pagar beneficios de pensión de jubilado de acuerdo con cualquier Contrato a Ejecutarse.

151.    «*Persona*» tiene el significado establecido en el artículo 101(41) del Código de Quiebras.

152.    «*Fecha de Petición*» significa el 2 de julio de 2017, la fecha en que se inició el Caso de Título III.

153.    «*Plan*» significa este plan de ajuste, incluido el Complemento del Plan y todas las pruebas, complementos, apéndices y anexos.

154.    «*Complemento del Plan*» significa cualquier compilación de documentos y formularios de documentos, acuerdos, anexos y pruebas del Plan, lo que incluye, entre otros documentos, el Nuevo Contrato de Emisión Principal, la Escritura Fiduciaria del Fideicomiso de GUC, el Contrato de Fideicomiso de Acciones de Anulación, la Escritura del Fideicomiso de PayGo de la AEE, y el Anexo de Contratos y Arrendamientos Asumidos que se presentarán ante el Tribunal del Título III a más tardar siete (7) días antes de la Fecha de la Votación o la fecha posterior que pueda ser aprobada por el Tribunal del Título III tras la notificación a las partes interesadas, y los documentos adicionales presentados ante el Tribunal del Título III antes de la Vigencia como modificaciones al Complemento del Plan, cada uno de los cuales deberá ser compatible en todos los aspectos con, y contendrá de otra manera, los términos y condiciones establecidos en las pruebas y anexos adjuntos al presente, cuando corresponda, y que no será incompatible con el Acuerdo de Apoyo al Plan del Prestamista de Línea de Combustible. El

Complemento del Plan se considerará incorporado al Plan y parte de este como si estuviese contenido en el presente en su totalidad.

155.    «*PREB*» significa la Oficina de Energía de Puerto Rico o su sucesor o cesionario.

156.    «*AEE*» significa la Autoridad de Energía Eléctrica de Puerto Rico, una empresa pública del Estado Libre Asociado de Puerto Rico establecida de acuerdo con la Ley núm. 83 de 1941, y sus modificaciones.

157.    «*SRE de la AEE*» significa el Sistema de Retiro de los Empleados de la Autoridad de Energía Eléctrica de Puerto Rico («SREAEE»), entidad responsable de la administración y pago de las obligaciones de pensión de la AEE, en virtud de la Resolución núm. 200, adoptada el 25 de junio de 1945.

158.    «*Acción Prioritaria del SRE de la AEE*» significa el litigio denominado *Sistema de Retiro de los Empleados de la Autoridad de Energía Electrica v. The Financial Oversight and Management Board for Puerto Rico, et al.*, Caso núm. 19-00405-LTS, actualmente pendiente en el Tribunal del Título III.

159.    «*Regulaciones del SRE de la AEE*» se refiere a las regulaciones adoptadas por la AEE de acuerdo con la Resolución núm. 200 de la AEE, adoptada el 25 de junio de 1945, que establecen la gobernanza, el financiamiento y la operación del SRE de la AEE, y sus modificaciones realizadas ocasionalmente.

160.    «*Escritura del Fideicomiso de PayGo de la AEE*» significa la escritura fiduciaria que se firmará y entregará en o antes de la Vigencia, sustancialmente en la forma incluida en el Complemento del Plan, que proporciona, entre otras cosas, la creación del Fideicomiso de PayGo de la AEE y los términos para el depósito de fondos por la AEE y el retiro de dinero para reembolsar al SRE de la AEE para el pago de beneficios a los Participantes según lo ajustado por este Plan.

161.    «*Distribución de Nuevos Bonos de PayGo de la AEE*» significa el monto principal acumulado de los Bonos de la Serie B que se distribuirán inicialmente al Fideicomiso de PayGo de la AEE para el beneficio del SRE de la AEE, igual al producto de (a) veinte por ciento (20.0%) multiplicado por (b) los Nuevos Bonos Brutos Restantes.

162.    «*Fideicomiso de PayGo de la AEE*» significa el fideicomiso de reserva que se creará de acuerdo con los términos y condiciones del presente documento, donde el fideicomiso de reserva se utilizará para reembolsar al SRE de la AEE sobre una base anual para el pago de beneficios de jubilación a los Participantes según lo ajustado por este Plan.

163.    «*Reclamación de Bonos de Ingresos de la AEE*» significa una reclamación contra la AEE a causa de cualquier Bonos de Ingresos de la AEE, incluidos tanto Bonos de Ingresos Asegurados de la AEE como Bonos de Ingresos no Asegurados de la AEE.

164.    «*Bonos de Ingresos de la AEE*» significa bonos emitidos por la AEE de acuerdo con el Contrato de Fideicomiso.

165.    «*Participación a Prorrata*» significa, con respecto a las Reclamaciones Permitidas, (i) dentro de la misma Clase, la proporción que una Reclamación Permitida tiene con respecto a la suma de todas las Reclamaciones Permitidas dentro de dicha Clase, y (ii) entre las clases múltiples, la proporción que las Reclamaciones Permitidas en cualquiera de esas Clases corresponde a la suma de las Reclamaciones Permitidas en todas esas Clases.

166.    «*Profesional*» significa una Entidad: (a) cuya compensación por los servicios prestados antes o en la Vigencia está sujeta a las secciones 316 y 317 de PROMESA, y (i) empleado en el Caso del Título III por el Deudor (a la sola discreción del Deudor), (ii) empleado en el Caso del Título III por la Junta de Supervisión (a la sola discreción de la Junta de Supervisión) o AAFAF (a la sola discreción de la AAFAF), o (iii) empleado en el Caso del Título III de acuerdo con una Orden Final de acuerdo con el artículo 1103 del Código de Quiebras; o (b) para el cual la compensación y el reembolso ha sido permitido por el Tribunal de Quiebras de acuerdo con el artículo 503(b)(4) del Código de Quiebras.

167.    «*Reclamación de Profesional*» significa una Reclamación de un Profesional que procura, por parte del Tribunal del Título III, una asignación de compensación por los servicios realizados o el reembolso de los gastos realizados hasta la Fecha de Confirmación inclusive conforme a los artículos 316 y 317 de PROMESA.

168.    «PROMESA» significa la *Ley de Supervisión, Gestión y Estabilidad Económica de Puerto Rico, Pub.* L. núm. 114-187, 130 Stat. 549 (2016), artículo 2101 del Título 48 del U.S.C. y siguientes, y sus alteraciones o modificaciones.

169.    «*Evidencia de Reclamación*» significa una evidencia de Reclamación presentada contra la AEE en el Caso del Título III.

170.    «*Bonos de Refinanciamiento*» significa, si corresponde, cualquier bono o financiamiento de reemplazo incurrido por la AEE Reorganizada para refinanciar los (a) Nuevos Bonos o (b)(i) Bonos de Refinanciamiento incurridos por la AEE Reorganizada para refinanciar los Bonos de Refinanciamiento descritos en la cláusula inmediatamente anterior (a) o (ii) cualesquiera refinanciamientos adicionales de Bonos de Refinanciamiento, según corresponda, donde los Bonos de Refinanciamiento estarán garantizados por los Ingresos Netos hasta el monto de los Ingresos por Cargo Heredado, y el derecho a recibir dichos Ingresos Netos en cada caso hasta el importe de los Ingresos por Cargo Heredado prometidos para asegurar los Nuevos Bonos, y que se emitan de otro modo de acuerdo con la Nuevo Contrato de Emisión Principal; *disponiéndose que*, si algún bono de la Serie A sigue pendiente al emitir Bonos de Refinanciamiento, dichos Bonos de Refinanciamiento (a) estarán subordinados en la prioridad de pago principal a los Bonos de la Serie A, y (b) no afectarán de ninguna manera los términos de los Bonos de la Serie A, tal como se establece en el presente documento.

171.    «*Personas Relacionadas*» significa, con respecto a cualquier Entidad (lo que incluye, para evitar dudas, el ELA, las Partes del Gobierno y el Comité de Acreedores), sus predecesores, sucesores y cesionarios (de pleno derecho o de otra forma) y sus empleados, gerentes, oficiales designados o electos, directores, funcionarios, directivos, mandantes, miembros, accionistas (sean sus participaciones directas o indirectas), socios, asesores financieros, abogados, contadores, banqueros inversores, consultores, agentes y profesionales (lo que incluye,

de manera no taxativa, todo Profesional contratado por el Deudor, la Junta de Supervisión, la AAFAF y el Comité de Acreedores) actuales o pasados u otros representantes, apoderados o gestores de inversión de tal Entidad o sus Empresas asociadas actuales y pasadas respectivas, cada uno actuando en tal calidad, y cualquier Entidad que realice una reclamación mediante cualquier de ellos (lo que incluye sus funcionarios, directores, gerentes, accionistas, socios, empleados, miembros y profesionales respectivos), cada uno en su calidad respectiva; *disponiéndose, sin embargo*, que «Personas Relacionadas» no se pretende que incluya ni se interprete como que incluye al ELA.

172.    «*Reclamaciones Eximidas*» significa, colectivamente, (a) Reclamaciones y Causas de Acción que surgen en, están relacionadas con, o han sido o podrían haber sido declaradas contra la AEE o sus activos en el Caso del Título III, incluidas todas las Reclamaciones mantenidas por los Participantes, (b) Reclamaciones y Causas de Acción que han sido o podrían haber sido afirmadas por la AEE, la Junta de Supervisión, y/o la AAFAF (con respecto a las liberaciones dadas por la AEE) y por los Acreedores (con respecto a las liberaciones dadas por las Partes que Eximen), (c) todas las Reclamaciones formuladas por el SRE de la AEE en relación con la Acción Prioritaria del SRE de la AEE, y (d) Reclamaciones que de otro modo surjan o se relacionen con el Caso del Título III, el Plan, las Transacciones de Reestructuración y los compromisos y acuerdos establecidos en el presente; *disponiéndose, sin embargo*, que las «Reclamaciones Eximidas» no tengan la intención de incluir, ni tendrán el efecto de incluir, Reclamaciones o Causas de Acción no relacionadas con el Deudor; *siempre que, además*, las «Reclamaciones Eximidas» no tengan la intención de eximir, ni tendrán el efecto de eximir, a ninguna parte del cumplimiento de sus obligaciones de acuerdo con la Orden de Confirmación o el Plan, incluido, de forma no taxativa, el cumplimiento de las obligaciones derivadas de o relacionadas con los Nuevos Bonos.

173.    «*Parte Eximida*» significa, colectivamente, y en cada caso en su calidad de tal:  (a) AEE; (b) la Junta de Supervisión; (c) la AAFAF; (d) las Partes de Vitol, únicamente con respecto a la Acción de la Ley 458; (e) cada Bonista de Transacción que vote para aceptar el Plan; (f) cada Monolínea de Transacción que vote para aceptar el Plan; (f) Acreedores del Acuerdo de Apoyo al Plan del Prestamista de Línea de Combustible; (g) con respecto a cada uno de los anteriores, cada una de sus respectivas Personas Relacionadas actuales y anteriores.

174.    «*Partes que Eximen*» significa, colectivamente: (a) todos los Tenedores de Reclamaciones contra el Deudor o sus Activos que tenían derecho a votar sobre el Plan y votaron para aceptar el Plan; (b) las Filiales actuales y anteriores de dichos Tenedores; y (c) con respecto a las cláusulas anteriores (a) y (b), las Personas Relacionadas actuales y anteriores de cada una de dichas Entidades.

175.    «*Reclamación Restante*» significa, con respecto a cualquier Reclamación Permitida, el monto de dicha Reclamación Permitida menos el total en Efectivo y el valor nominal de los Nuevos Bonos, si dicho Tenedor ha recibido a causa de dicha Reclamación Permitida, en el momento en que se calcula la Reclamación Restante.

176.    «*Reclamación de no Transacción no Permitida Restante*» tendrá el significado que se le da en la Sección V.A(iv) del Plan.

177.   «*Cargo Heredado Restante*» significa el Cargo Heredado, desde y después de la Fecha de Resolución de Nuevos Bonos, hasta la Fecha de Vencimiento del CVI.

178.   «*Ingresos por Cargos Heredados Restantes*» significa, durante el período aplicable, la parte, expresada en dólares, de todos los Ingresos atribuibles al Cargo Heredado Restante, según lo calculado por la AEE y certificado por un funcionario de este al Nuevo Fideicomisario Principal.

179.   «*Ingresos Netos Restantes*» se refiere a los Ingresos Netos desde y después de la Fecha de Resolución de Nuevos Bonos hasta la Fecha de Vencimiento del CVI.

180.   «*Fondo de Reclamaciones de Bonos de la Serie B Restantes*» significa, en el momento inmediatamente después de la Distribución Obligatoria de Nuevos Bonos, la Distribución Inicial de Nuevos Bonos de GUC y la Distribución de Nuevos Bonos de PayGo de la AEE, la <u>suma</u> de (a) los Reclamaciones Restantes de los Bonistas de Transacción y Monolíneas de Transacción, (b) las Reclamaciones Restantes de los Prestamistas de Línea de Combustible, que serán de $112,141,934.97, y (c) la Estimación del Fondo de Reclamaciones sin Garantía menos la Distribución Inicial de Nuevos Bonos de GUC.

181.   «*Deudor Reorganizado*» o «*AEE Reorganizada*» significa la AEE, desde y después de la Vigencia.

182.   «*Estatutos del Deudor Reorganizado*» significa los estatutos de la AEE Reorganizada, en la medida aplicable, a partir de la Vigencia.

183.   «*Prestamistas de Línea de Combustible Requeridos*» significa los Prestamistas de Línea de Combustible que poseen o controlan beneficiosamente, en conjunto, al menos una mayoría en el monto principal de los Préstamos de Línea de Combustible que son propiedad o controlados beneficiosamente, en conjunto, por los Prestamistas de Línea de Combustible en ese momento.

184.   «*Transacciones de Reestructuración*» significa la reestructuración del Deudor, incluidas, de forma no taxativa, las transacciones descritas en este Plan.

185.   «*Retirado*» significa una persona que, como se refleja en los registros del SRE de la AEE a partir de la Vigencia, recibe una pensión o anualidad del SRE de la AEE.

186.   «*Ingresos*» significa todo el dinero recibido por la AEE Reorganizada, incluidos los ingresos derivados de la AEE Reorganizada por la venta de electricidad generada o distribuida, cualquier producto del seguro de uso y ocupación o cualquier parte de este, y los ingresos de las inversiones realizadas por la AEE Reorganizada.

187.   «*Anexo de Contratos y Arrendamientos Asumidos*» significa el anexo de Contratos a Ejecutarse y Arrendamientos no Vencidos que asumirá la AEE de acuerdo con el Plan, presentado como parte del Complemento del Plan, que puede ser modificado por la AEE ocasionalmente antes de la Fecha de Confirmación.

188.    «*Reclamación Subordinada al Artículo 510(b)*» significa toda Reclamación, en la medida determinada conforme a una Orden Final, contra el Deudor o sus Activos derivados o relacionados con: (a) la rescisión de una compra o venta de un valor existente del Deudor o de una Empresa asociada al Deudor, (b) la compra, venta o retención de dicho valor o (c) el reembolso, la indemnización o la contribución permitida conforme al artículo 502 del Código de Quiebras a causa de dicho crédito.

189.    «*Reclamación Garantizada*» significa una Reclamación: (a) garantizada por un Gravamen válido sobre cualquiera de los activos del Deudor en la medida del valor de dicha garantía, según se determine de acuerdo con el artículo 506(a) del Código de Quiebras; o (b) sujeto a un derecho válido de compensación de acuerdo con el artículo 553 del Código de Quiebras.

190.    «*Ley de Valores*» significa la *Ley de Valores de 1933*, artículos 77a-77aa del título 15 del U.S.C., y sus modificaciones, o cualquier ley federal, estatal o local similar.

191.    «*Fecha de Resolución de Bonos de la Serie A*» significa la fecha en la que el capital y los intereses adeudados sobre los Bonos de la Serie A se pagan indefectiblemente en su totalidad en efectivo, o se considera de otro modo que no están pendientes de acuerdo con los términos del Nuevo Contrato de Emisión Principal.

192.    «*Bonos de la Serie A*» significa la serie de Bonos Nuevos conocidos como Bonos de la Serie A que se distribuirán a los Tenedores de Reclamaciones de Préstamo de Línea de Combustible Permitidas, con los términos principales como se describen en la Sección XVII, y se emiten de otro modo de acuerdo con los términos y condiciones del Plan, la Orden de Confirmación y el Nuevo Contrato de Emisión Principal.

193.    «*Bonos de la Serie B*» significa la serie de Nuevos Bonos conocidos como Bonos de la Serie B que se distribuirán de acuerdo con el Plan, que pueden emitirse en forma de bonos de interés corriente, bonos de apreciación de capital, bonos convertibles, o bonos de apreciación de capital convertibles, con los términos principales como se describen en la Sección XVII, y se emiten de otro modo de acuerdo con los términos y condiciones del Plan, la Orden de Confirmación y el Nuevo Contrato de Emisión Principal.

194.    «*Prestador de Servicios*» significa la Entidad con control sobre el funcionamiento del sistema de transmisión y distribución de la AEE y el cobro de Ingresos ocasionalmente.

195.    «*Límite de Oferta de Transacción*» significa el 15 de febrero de 2023, a las 5:00 p.m. (hora estándar del este), o cualquier otra fecha y hora que determine la Junta de Supervisión a su entera discreción.

196.    «*Memorando de Oferta de Transacción y Acuerdo de Apoyo al Plan*» significa que cierto memorando de oferta de transacción y acuerdo de apoyo del plan, que se distribuirá a todos los Tenedores de Reclamaciones de Bonos de Ingresos de la AEE y Reclamaciones de Swaps de Tasas de Interés Aseguradas de Assured, que describen los términos de la oferta de transacción que se está haciendo a dichos Tenedores de acuerdo con estas, lo que incluye el tratamiento propuesto de las Reclamaciones de Bonos de Ingresos de la AEE de acuerdo con la Sección IV y la Sección V del Plan y el tratamiento propuesto de las Reclamaciones de Swaps de Tasas de Interés Aseguradas de Assured d acuerdo con la Sección X del Plan, y que distribuyen la Página

de Firmas de Elección de Clase de Transacción, de acuerdo con la cual un Tenedor de Reclamaciones de Bonos de Ingresos de la AEE o Reclamaciones de Swaps de Tasa de Interés Asegurados de Assured puede aceptar la transacción propuesta para dicha Reclamación, y tiene, entre otras cosas, dicha (a) Reclamación del Tenedor tratada como un Bonista de Transacción de acuerdo con la Sección IV del Plan o como una Monolínea de Transacción de acuerdo con la Sección V del Plan, y (b) el Tenedor exime y descarta todas y cada una de las Reclamaciones, Causas de Acción y/o contrademandas en o relacionadas con la Impugnación del Recurso y Gravamen Modificado o cualquier procedimiento relacionado con este.

197.   «*Bonista de Transacción*» significa un Tenedor de Reclamaciones de Bonos de Ingresos de la AEE que no es una Aseguradora Monolínea que presentó oportunamente al Agente del Solicitante antes de la Fecha Límite de Oferta de Liquidación la Página de Firmas de Elección de Clase de Transacción emitida a dicho Tenedor de acuerdo con el Memorando de Oferta de Transacción y el Acuerdo de Apoyo al Plan.

198.   «*Liquidación de CVI*» significa CVI en el monto nominal teórico igual a la <u>suma</u> de las Reclamaciones Restantes de todos los Tenedores de Reclamaciones de Bonos de Ingresos de la AEE que son un Bonista de Transacción o una Monolínea de Transacción, según se calcula en la Sección IV.A(iv) del Plan.

199.   «*Monolínea de Transacción*» significa (a) un Tenedor de Reclamaciones de Bonos de Ingresos de la AEE que es una Aseguradora Monolínea o (b) un Tenedor de Reclamaciones de Swaps de Tipos de Interés Asegurados de Assured que presentaron oportunamente al Agente del Solicitante antes de la Fecha Límite de Oferta de Liquidación una Página de Firmas de Elección de Clase de Transacción emitida a dicho Tenedor de acuerdo con el Memorando de Oferta de Transacción y el Acuerdo de Apoyo al Plan.

200.   «*Tratamiento de Monolínea de Transacción*» significa el tratamiento proporcionado a los Tenedores de Reclamaciones Permitidas en la Clase 1.

201.   «*Fondo de Amortización*» significa las cuentas de depósito en poder del Fideicomisario de Bonos que están sujetos a un interés de garantía perfeccionado a favor del Fideicomisario de Bonos, en beneficio de los Tenedores de Bonos de Ingresos de la AEE.

202.   «*Agente del Solicitante*» significa Kroll Restructuring Administration LLC, la notificación, reclamaciones y agente del solicitante mantenidos por la AEE en el Caso del Título III por orden del Tribunal del Título III.

203.   «*Syncora*» significa Syncora Guarantee Inc.

204.   «*Victoria ante el Tribunal Supremo de los Estados Unidos sobre Clausula sobre Expropiaciones*» significa una decisión a favor de la apelación de la Junta de Supervisión de la Orden de Confirmación del ELA y las Conclusiones de Hecho y Conclusiones de Ley presentadas con respecto a esta en relación con la naturaleza no descargable de las Reclamaciones de Expropiación/Expropiación Inversa contra el ELA.

205.   «*Título III*» significa el Título III de PROMESA.

206.   «*Caso del Título III*» significa el caso de Título III bajo PROMESA pendiente para la AEE en el Tribunal del Título III, bajo el epígrafe *In re Financial Oversight & Management Board for Puerto Rico as representative of Puerto Rico Electric Power Authority* [Caso núm. 17-BK-4780-LTS (D.P.R.)].

207.   «*Tribunal del Título III*» significa el Tribunal de Distrito de los Estados Unidos del Distrito de Puerto Rico o cualquier otro tribunal que tenga jurisdicción sobre el Caso del Título III.

208.   «*Tasa del Tesoro*» significa, con respecto a cualquier fecha de redención para el CVI, el rendimiento al vencimiento de los valores del Tesoro de los Estados Unidos (excluyendo los valores indexados por inflación) con un vencimiento constante (según lo compilado y publicado en la versión estadística de la Reserva Federal H.15 (519) que se ha puesto a disposición pública no menos de dos (2) Días Hábiles ni más de cuarenta y cinco (45) días calendario antes de la fecha de amortización (o, si dicha publicación estadística ya no se publica, cualquier fuente disponible públicamente de datos de mercado similares)), casi igual al período comprendido entre la fecha de amortización y la fecha de vencimiento promedio ponderado de cuotas anuales iguales de CVI pendiente de amortización, según lo determinado por una empresa de contabilidad independiente, una empresa de banca de inversión o asesor financiero contratado por la AEE o el ELA a expensas de la AEE o del ELA; *disponiéndose, sin embargo*, que el período comprendido entre la fecha de amortización y dicha fecha de vencimiento sea inferior a un (1) año, se utilizará la rentabilidad media semanal de los valores del Tesoro de los Estados Unidos realmente negociados y ajustados a un vencimiento constante de un (1) año.

209.   «*Contrato de Fideicomiso*» significa el Contrato de Fideicomiso con fecha del 1 de enero de 1974, y sus modificaciones, por y entre la AEE y la U.S. Bank National Association, como fideicomisario sucesor.

210.   «*CBA de UEPI*» significa los acuerdos de negociación colectiva entre la Autoridad de Energía Eléctrica de Puerto Rico y el Sindicato de Empleados Profesionales Independientes.

211.   «*Distribución no Reclamada*» significa cualquier distribución de acuerdo con el Plan a causa de una Reclamación Permitida a un Tenedor que no haya: (a) aceptado una distribución determinada o, en el caso de las distribuciones efectuadas mediante control, no haya negociado dicho control, (b) no haya notificado a la AEE de la intención de aceptar una distribución determinada, (c) no haya respondido a las solicitudes de información de la AEE necesarias para facilitar una distribución determinada o (d) haya adoptado cualquier otra medida necesaria para facilitar dicha distribución.

212.   «*Arrendamiento no Vencido*» significa un arrendamiento de bienes inmuebles no residenciales de los que la AEE sea parte que esté sujeto a asunción o rechazo conforme al artículo 365 del Código de Quiebras, excepto según lo dispuesto en el artículo 311 de PROMESA.

213.   «*No Afectada*» se utiliza para describir una Clase de Reclamaciones que no está afectada dentro del significado del artículo 1124 del Código de Quiebras.

214.   «*Bono de Ingresos de la AEE no Asegurado*» significa un Bono de Ingresos de la AEE que no está asegurado por una Aseguradora Monolínea.

25

215. «*Fondo de Reclamaciones sin Garantía*» significa la <u>suma</u> de todas las Reclamaciones Permitidas de los Tenedores de:

(a) las Reclamaciones sin Garantía Generales;

(b) la Reclamación de Vitol;

(c) las Reclamaciones de Deficiencia, si las hubiere;

(d) si hay una Victoria ante el Tribunal Supremo de los Estados Unidos sobre Clausula sobre Expropiaciones, las Reclamaciones Restantes con respecto a las Reclamaciones de Expropiación/Expropiación Inversa después de que el Tenedor de dicha Reclamación Permitida haya hecho que el Secretario del Tribunal de Primera Instancia distribuya a dicho Tenedor el monto de las cantidades depositadas en el Tribunal de Primera Instancia con respecto a la propiedad expropiada; y

(e) las Reclamaciones Federales, si las hubiere, que puedan verse No Afectadas de acuerdo con la Sección XIII del Plan.

216. «*Estimación del Fondo de Reclamaciones sin Garantía*» significa el monto estimado del Fondo de Reclamaciones sin Garantía, que será la suma de:

(a) ochocientos millones de dólares ($800,000,000);

(b) la Reclamación de Vitol; y

(c) las Reclamaciones de Deficiencia, si las hubiere.

217. «*CBA de UTIER*» significa los acuerdos de negociación colectiva entre la Autoridad de Energía Eléctrica de Puerto Rico y el Sindicato de Trabajadores de la Industria de Energía Eléctrica y Riego.

218. «*Vitol*» significa Vitol Inc.

219. «*Reclamación de Vitol*» significa la reclamación contra la AEE a causa del Acuerdo de Transacción de Vitol.

220. «*Partes de Vitol*» significa, colectivamente, Vitol y Vitol S.A.

221. «*Vitol-SCC AP*» significa la acción legal denominada *Special Claims Comm. v. Inspectorate America Corp.*, procedimiento contencioso núm. 19-00388 en [Caso núm. 17-BK-4780-LTS].

222. «*Acuerdo de Transacción de Vitol*» significa determinado *Acuerdo de Transacción y Liberación* de fecha 26 de agosto de 2022, por y entre la Junta de Supervisión, Vitol, y Vitol S.A.

## B.    Reglas de Interpretación

Para los fines del Plan: (a) en el contexto apropiado, cada término, ya sea en singular o en plural, incluirá tanto el singular como el plural, y los pronombres establecidos en el género masculino, femenino o neutro incluirán el género masculino, femenino y neutro; (b) a menos que se especifique lo contrario, cualquier referencia en el presente a un contrato, arrendamiento, instrumento, liberación, contrato de emisión u otro acuerdo o documento que se encuentre en una forma particular o en términos y condiciones particulares significa que dicho documento deberá estar sustancialmente en dicha forma o sustancialmente en dichos términos y condiciones; (c) a menos que se especifique lo contrario, cualquier referencia en el presente a un documento, anexo o prueba existente, significará dicho documento, anexo o prueba, así como sus posibles modificaciones, alteraciones o complementos; (d) a menos que se especifique lo contrario, todas las referencias contenidas en el presente a «Secciones» y «Artículos» son referencias a Secciones y Artículos , respectivamente, del presente o al presente; (e) las palabras «en el presente», «del presente» y «al presente» se refieren al Plan en su totalidad en lugar de a cualquier parte particular del Plan; (f) los epígrafes y títulos de los Artículos y Secciones se insertan solo por conveniencia de referencia y no tienen la intención de contradecir el texto; (g) a menos que se especifique lo contrario en el presente, se aplicarán las reglas de construcción establecidas en el artículo 102 del Código de Quiebras; (h) las referencias a los números de expediente de los documentos presentados en el Caso del Título III son referencias a los números de expediente bajo el sistema CM/ECF del Tribunal del Título III; (i) las palabras «incluir» e «incluye", y sus variaciones, no se considerarán términos de limitación, y se considerarán seguidas por las palabras «sin limitación"; (j) cualquier disposición inmaterial efectiva puede ser interpretada por la AEE de tal manera que sea compatible con el propósito general y la intención del Plan, todo ello sin previo aviso o acción, orden o aprobación del Tribunal del Título III o cualquier otra Entidad; y (k) a menos que el contexto exija otra cosa, todo término en mayúsculas utilizado y no definido en este o en otro lugar del Plan que se define en PROMESA o en el Código de Quiebras tendrá, si se define en PROMESA, el significado asignado a dicho término en PROMESA o, si no se define en PROMESA, pero se define en el Código de la Quiebras, tendrá el significado atribuido al mismo en el Código de Quiebras.

## C.    Cálculo del tiempo

A menos que se indique específicamente lo contrario en el presente, las disposiciones de la Regla de Quiebra 9006(a) se aplicarán en la computación de cualquier período de tiempo prescrito o permitido en el presente. Si la fecha en la que puede ocurrir una transacción de acuerdo con el Plan se produce en un día que no sea un Día Hábil, entonces dicha transacción se producirá en su lugar el siguiente Día Hábil.

## D.    Ley Aplicable

Salvo en la medida en que sea aplicable otra ley federal, o en la medida en que un documento de prueba del presente o cualquier documento que se concierte en relación con la presente disponga otra cosa, los derechos, deberes y obligaciones que surgen del presente Plan se regirán por y se interpretarán y ejecutaran de acuerdo con PROMESA (lo que incluye las disposiciones del Código de Quiebras aplicables en virtud del artículo 301 de PROMESA) y, en

27

la medida en que no sean incompatibles con ellas, las leyes del Estado Libre Asociado de Puerto Rico sin dar efecto a los principios de conflictos de leyes.

## E.   Referencia a cifras monetarias

Todas las referencias en el Plan a las cifras monetarias se refieren a la moneda de los Estados Unidos de América, a menos que se disponga expresamente lo contrario.

## F.   Documento de control

En caso de incompatibilidad entre el Plan y la Declaración de Divulgación, los términos del Plan prevalecerán en todos los aspectos. En caso de incompatibilidad entre el Plan y el Complemento del Plan, el Plan prevalecerá. En caso de incompatibilidad entre el Plan y la Orden de Confirmación, la Orden de Confirmación prevalecerá y se considerará una modificación del Plan; *disponiéndose, sin embargo*, que la Orden de Confirmación no modifique materialmente los términos económicos establecidos en el presente sin el consentimiento de la Junta de Supervisión.

## SECCIÓN II

## RECLAMACIONES ADMINISTRATIVAS Y PROFESIONALES

De acuerdo con el artículo 1123(a)(1) del Código de Quiebras, que se hace aplicable a este Caso del Título III de acuerdo con el artículo 301(a) de PROMESA, las Reclamaciones de Gastos Administrativos y Reclamaciones Profesionales no han sido clasificadas como Clases con derecho a voto.

## A.   Reclamaciones de Gastos Administrativos

En la posterior de (i) la Vigencia y (ii) la fecha en que una Reclamación de Gastos Administrativos se torne una Reclamación Permitida, el Deudor Reorganizado deberá (a) pagar a cada Tenedor de una Reclamación de Gastos Administrativos Permitida, en Efectivo, el monto total de tal Reclamación de Gastos Administrativos o (b) satisfacer y cumplir tal Reclamación de Gastos Administrativos Permitida conforme a los términos que no sean más favorables para el reclamante que lo que se acuerde entre el tenedor de esta y el Deudor Reorganizado; *disponiéndose, sin embargo*, que las Reclamaciones de Gastos Administrativos Permitidas que representan el endeudamiento padecido en el ejercicio habitual a la Vigencia por parte de los Deudores deberá pagarse en su totalidad por parte del Deudor Reorganizado conforme a los términos y sujeto a las condiciones de cualquier acuerdo aplicable, inversión que evidencie u otro documento relacionado a tales transacciones; y, *disponiéndose, además*, que, si tal gasto de ejercicio normal no se factura o no se realiza una solicitud por escrito para su pago en los ciento veinte (120) días posteriores a la Vigencia, tal gasto de ejercicio normal se excluirá y el Tenedor de este no tendrá derecho a ni recibirá una distribución conforme al Plan.

## B.   Desestimación de Reclamaciones presentadas después de la Fecha Límite de Reclamaciones Administrativas

Después de la Fecha Límite de Reclamación Administrativa, cualquier Reclamación de Gastos Administrativos para la cual no se haya radicado evidencia se considerará excluida para

siempre y el Deudor y el Deudor Reorganizado no tendrán obligación alguna con respecto a estas; disponiéndose, sin embargo, que no se requiera radicar evidencia de Reclamación de Gastos Administrativos si tal Reclamación de Gastos Administrativos (a) se incurrió (i) conforme a una orden del Tribunal del Título III o (ii) con la autorización por escrito de las Partes del Gobierno relevantes que otorga tal Reclamación de Gastos Administrativos de manera expresa, (b) es una Reclamación Profesional, (c) es una Reclamación de Gastos Administrativos del SII por el pago de impuestos incurridos por el Deudor durante el período desde y después de la fecha de Petición, o (d) es objeto de una moción pendiente que busca la concesión de un gasto administrativo.

## C.     Reclamaciones de Reembolso y Compensación Profesional

Todas las Entidades a las que se haya concedido una compensación, lo que incluye, de manera no taxativa, en la mayor medida prevista en las respectivas cartas de compromiso o en instrumentos o acuerdos similares, o el reembolso de gastos por el Tribunal del Título III se abonarán íntegramente, en Efectivo, en los montos permitidos por el Tribunal del Título III (a) tan pronto como sea razonablemente posible después de que se produzca lo posterior de (a) la Vigencia y (b) la fecha en que se considere que la orden del Tribunal del Título III que concede tales Reclamaciones es una Orden Final, o (ii) en otros términos que no sean más favorables para el reclamante que los que se establezcan de común acuerdo entre tal reclamante y las Partes del Gobierno; disponiéndose, sin embargo, que, salvo lo dispuesto en el presente, cada Profesional debe radicar su solicitud de indemnización definitiva de compensación por servicios profesionales prestados y reembolso de gastos a la fecha ciento veinte (120) días después de la Vigencia, o antes de esa fecha. El Deudor Reorganizado pagará compensación por los servicios profesionales ampliados y el reembolso de los gastos efectuados después de la Vigencia en el ejercicio habitual y sin necesidad de la aprobación del Tribunal del Título III.

Desde y después de la Fecha de Confirmación, cualquier requisito de que los Profesionales cumplan con los artículos 316 y 317 de PROMESA para solicitar una compensación por los servicios prestados después de dicha fecha se rescindirá y la AEE podrá emplear y pagar a cualquier Profesional sin previo aviso o a acción, orden o aprobación del Tribunal del Título III.

## SECCIÓN III

## CLASIFICACIÓN DE RECLAMACIONES

## A.     Clasificación de Reclamaciones

A excepción de las Reclamaciones tratadas en la Sección II del Plan, todas las reclamaciones se clasifican en las Clases establecidas a continuación de acuerdo con el artículo 1122 del Código de Quiebras. Una Reclamación se clasifica en una Clase particular solo en la medida en que la Reclamación califique dentro de la descripción de esa Clase y se clasifica en otras Clases en la medida en que cualquier parte de la Reclamación califique dentro de la descripción de esas otras Clases. Una Reclamación también se clasifica en una Clase particular con el fin de recibir distribuciones de acuerdo con el Plan solo en la medida en que sea una

29

Reclamación Permitida en esa Clase y no haya sido pagada, liberada o cumplida de otra manera antes de la Vigencia.

Las reclamaciones se clasifican de la manera siguiente:

| Clase | Reclamación | Estado | Derechos de Voto |
|---|---|---|---|
| 1 | Reclamaciones de Bonista de Transacción y Monolínea de Transacción | Afectada | Con derecho a voto |
| 2 | Reclamaciones de Bonista de no Transacción y Monolínea de no Transacción | Afectada | Con derecho a voto |
| 3 | Reclamación de Pensión | Afectada | Con derecho a voto |
| 4 | Reclamaciones de Préstamo de Línea de Combustible | Afectada | Con derecho a voto |
| 5 | Reclamaciones sin Garantía Generales | Afectada | Con derecho a voto |
| 6 | Reclamaciones de Vitol | Afectada | Con derecho a voto |
| 7 | Reclamaciones de Swaps de Tasas de Interés Asegurados de Assured | Afectada | Con derecho a voto |
| 8 | Reclamaciones de Cliente de Ejercicio Habitual | No afectada | No tiene derecho a voto (se considera que acepta) |
| 9 | Reclamaciones de Expropiación/Expropiación Inversa | Afectada | Con derecho a voto |
| 10 | Reclamaciones Federales | Afectada | Con derecho a voto |
| 11 | Reclamaciones de Conveniencia | No afectada | No tiene derecho a voto (se considera que acepta) |
| 12 | Reclamaciones Subordinada al Artículo 510(b) | Afectada | No tiene derecho a voto (se considera que rechaza) |

**B.**   **Disposición especial que rige las Reclamaciones no Afectadas**

Salvo que se estipule lo contrario en el Plan, nada de acuerdo con el Plan afectará los derechos de la AEE con respecto a cualquier Reclamación no Afectada, incluidos todos los

derechos con respecto a las defensas legales y equitativas, o las compensaciones o recuperaciones contra cualquier Reclamación no Afectada.

**C.     Eliminación de Clases vacantes**

Cualquier Clase de Reclamaciones que no tenga un Tenedor de una Reclamación Permitida o una Reclamación Permitida temporalmente por el Tribunal del Título III a partir de la fecha de la Vista de Confirmación se considerará eliminada del Plan a los efectos de votar para aceptar o rechazar el Plan y a los efectos de determinar la aceptación o rechazo del Plan por parte de dicha Clase de acuerdo con el artículo 1129(a)(8) del Código de Quiebras.

**D.     Clases con derecho a voto; Presunta aceptación por Clases sin derecho a voto**

Se considerará que una Clase Afectada de Tenedores de Reclamaciones habrá aceptado el Plan si el Plan es aceptado por al menos dos tercios (2/3) en monto en dólares y más de la mitad (1/2) en cantidad de Reclamaciones Permitidas de tal clase que hayan votado para aceptar o rechazar del Plan. Si una Clase contiene Reclamaciones elegibles para votar y ningún Tenedor de Reclamaciones elegible para votar en dicha Clase vota para aceptar o rechazar el Plan, se considerará que esa Clase acepta el Plan; *disponiéndose, sin embargo*, que dicha clase no se utilizará como una Clase de aceptación Afectada de acuerdo con el artículo 1129(a)(10) del Código de Quiebras.

**E.     Reclamaciones subordinadas**

La asignación, clasificación y tratamiento de todas las Reclamaciones Permitidas y las respectivas distribuciones y tratamientos en virtud del Plan tienen en cuenta y se ajustan a la prioridad relativa y los derechos de las Reclamaciones en cada Clase en relación con cualquier derecho contractual, legal o equitativo relacionado con estas, ya sea que surjan conforme a los principios generales de subordinación equitativa, artículo 510(b) del Código de Quiebras, o de otra manera. De conformidad con el artículo 510 del Código de Quiebras, la Junta de Supervisión se reserva el derecho de volver a clasificar cualquier Reclamación Permitida de acuerdo con cualquier subordinación contractual, legal o equitativa relacionada con esta.

**F.     Confirmación de acuerdo con el artículo 314 de PROMESA**

La Junta de Supervisión deberá solicitar la Confirmación del Plan de acuerdo con el artículo 314 de PROMESA con respecto a cualquier Clase de Reclamaciones de rechazo. La Junta de Supervisión se reserva el derecho de modificar el Plan de acuerdo con la Sección XVI del Plan en la medida en que, si la hubiera, dicha Confirmación de acuerdo con el artículo 314 de PROMESA requiere modificación, incluida la modificación del tratamiento aplicable a una Clase de Reclamaciones para que dicha Clase de Reclamaciones se vuelva no Afectada en la medida permitida por PROMESA, el Código de Quiebras y las Reglas de Quiebras.

**G.     Confirmación de acuerdo con el artículo 1129(b) del Código de Quiebras**

En caso de que cualquier Clase de Reclamaciones No Permitidas no acepte, o se considere que rechaza, el Plan de conformidad con el artículo 1129(a) del Código de Quiebras, el Deudor se reserva el derecho a (i) solicitar que el Tribunal de Quiebras confirme el Plan de conformidad con

el artículo 1129(b) del Código de Quiebras o (ii) modificar el Plan, de acuerdo con el Acuerdo de Apoyo al Plan del Prestamista de la Línea de Combustible.

## SECCIÓN IV

### DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES DE BONISTAS DE TRANSACCIÓN O MONOLÍNEAS DE TRANSACCIÓN (CLASE 1)

**A.** **Tratamiento de Reclamaciones de Clase 1**

En la Vigencia, cada Bonista de Transacción o Monolínea de Transacción que sea Tenedor de una Reclamación de Bono de Ingresos de la AEE Permitida recibirá, en total contraprestación, satisfacción, liberación, transacción y a cambio de la Reclamación de Bonos de Ingresos de la AEE Permitida de dicho Tenedor, hasta el monto total de la Reclamación Permitida de dicho Tenedor, a menos que dicho Tenedor acepte un trato menos favorable, en el siguiente orden:

(i) la Participación a Prorrata de dicho Tenedor de los fondos depositados en el Fondo de Amortización;

(ii) Bonos de la Serie B en el monto nominal igual al <u>producto</u> de (A) cincuenta por ciento (50.00%) <u>multiplicado por</u> (B) el monto de la Reclamación de Bonos de Ingresos de la AEE Permitida por dicho Tenedor <u>menos</u> (C) el monto distribuido a dicho Tenedor de acuerdo con la cláusula inmediatamente anterior (i);

(iii) con respecto a la Reclamación Restante de dicho Tenedor después de que las distribuciones colectivas se realicen de conformidad con las cláusulas inmediatamente anteriores (i) y (ii): (A) el cuarenta por ciento (40.0%) de la Participación a Prorrata de dicho Tenedor de Nuevos Bonos Restantes Netos, si los hubiere, disponibles para distribución, al Fondo de Reclamaciones de Bonos de la Serie B Restantes; y (B) hasta un sesenta por ciento (60.0%) adicional de la Participación a Prorrata de dicho Tenedor de Nuevos Bonos Netos Restantes, si los hubiere, disponible para distribución, al Fondo de Reclamaciones de Bonos de la Serie B Restantes, si y solo si (I) el monto nominal de los Bonos Nuevos de GUC es igual al cien por ciento (100.0%) de la Estimación del Fondo de Reclamaciones sin Garantía y (II) las Reclamaciones Restantes de los Prestamistas de la Línea de Combustible descritos en la Sección VII.A(iii) del Plan reciben Nuevos Bonos Netos Restantes en el monto nominal igual al cien por ciento (100.0%) de dichas Reclamaciones Restantes; y

(iv) con respecto a la Reclamación Restante de dicho Tenedor después de que las distribuciones colectivas se realicen de conformidad con las cláusulas inmediatamente anteriores (i), (ii) y (iii), la Participación a Prorrata de dicho Tenedor de CVI junto con todos los demás Acreedores de la AEE con derecho a recibir CVI de conformidad con el Plan.

## SECCIÓN V

## DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES DE BONISTAS DE NO TRANSACCIÓN O MONOLÍNEAS DE NO TRANSACCIÓN (CLASE 2)

A.      **Tratamiento de Reclamaciones de Clase 2**

En la Vigencia, cada Bonista de no Transacción o Monolínea de no Transacción que sea Tenedor de una Reclamación de Bono de Ingresos de la AEE Permitida recibirá, en total contraprestación, satisfacción, liberación y a cambio de la Reclamación de Bonos de Ingresos de la AEE Permitida de dicho Tenedor, hasta el monto total de la Reclamación Permitida de dicho Tenedor, a menos que dicho Tenedor acepte un trato menos favorable, en el siguiente orden:

(i)      la Participación a Prorrata de dicho Tenedor de los montos en el Fondo de Amortización;

(ii)     el menor de (A) la Participación a Prorrata del Tenedor de los Bonos de la Serie B en el monto nominal igual al valor de la Garantía de Bonos (según se determine en relación con la Vista de Confirmación o cualquier otro procedimiento apropiado), si los hubiere, menos el monto distribuido a dicho Tenedor de conformidad con la cláusula inmediatamente anterior (i) y (B) la Participación a Prorrata de dicho Tenedor de los Bonos de la Serie B disponibles después de que las distribuciones de los Bonos de la Serie B se realice de acuerdo con la Sección IV.A(ii);

(iii)    con respecto a la Reclamación por Deficiencia de dicho Tenedor que sea una Reclamación Restante, si la hubiere, después de que las distribuciones colectivas se hayan realizado de conformidad con las cláusulas inmediatamente anteriores (i) y (ii), la Participación a Prorrata de dicho Tenedor de la Recuperación de Reclamaciones sin Garantía Generales; y

(iv)     si se cumplen las Condiciones de CVI de no Transacción, cada Tenedor recibirá, en base al monto del capital principal y los intereses devengados y no pagados a través de la Fecha de Petición con respecto a los Bonos de Ingresos de la AEE de dicho Tenedor menos las distribuciones en Efectivo hechas a dicho Tenedor de conformidad con la cláusula anterior (i) (la «Reclamación de no Transacción No Permitida Restante»), la Participación a Prorrata del Tenedor de CVI junto con todos los demás Acreedores de la AEE con derecho a recibir CVI de acuerdo con el Plan.

## SECCIÓN VI

## DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES DE PENSIÓN (CLASE 3)

A.      **Tratamiento de Reclamaciones de Clase 3**

Desde y después de la Vigencia, en plena contraprestación, satisfacción, liberación y a cambio de la Reclamación de Pensión en poder del SRE de la AEE, la AEE Reorganizada pagará al Fideicomiso de PayGo de la AEE, en beneficio del SRE de la AEE, los montos descritos en la

Sección XXIII.B, suficientes para satisfacer las reclamaciones de los Participantes contra el SRE de la AEE en la medida descrita en la Sección VI.

1.   **Reembolso de pagos de beneficios por parte del SRE de AEE a los Participantes del SRE de AEE**

a)   El Fideicomiso de PayGo de la AEE reembolsará al SRE de la AEE los beneficios de jubilación pagados y los costos administrativos incurridos en el Año Fiscal anterior que finaliza el 30 de junio; *disponiéndose* que los pagos de beneficios para los que el SRE de la AEE tenga derecho al reembolso en virtud del presente se limiten a (i) los beneficios pagaderos a cualquier Participante que sea un Retirado a partir de la Vigencia, sin ningún ajuste adicional del costo de vida a partir de la Vigencia y después de esta, y (ii) beneficios pagaderos a los Participantes que sean Participantes Activos del SRE de la AEE a partir de la Vigencia, (A) con los devengamientos de beneficios congelados a partir de la Vigencia de la manera establecida en el **Anexo C** del presente documento, y (B) no sujeto a ningún ajuste de costo de vida a partir de la Vigencia y después de esta.

b)   Las obligaciones contractuales de la AEE al SRE de la AEE a partir de la Fecha de Petición, incluida, sin limitación, la obligación de pagar contribuciones del empleador suficientes para financiar beneficios como se establece en el Reglamento del SRE de la AEE, serán rescindidas o consideradas rechazadas de conformidad con el artículo 365(a) del Código de Quiebras, y, aparte de las obligaciones establecidas en el Sección VI y la Sección XXIII.B, no surgirá ninguna otra obligación de la AEE o de la AEE Reorganizada con respecto al SRE de la AEE en relación con dicho rechazo.

2.   **Prioridad.**

Todas las disposiciones de la Constitución del ELA, estatutos del ELA, órdenes ejecutivas, reglas, reglamentos y las políticas que crean, requieren o hacen cumplir la pensión del empleado y otros beneficios relacionados con la pensión que se modifican y/o se conservan en su totalidad o en parte en el presente documento, en la medida en que no sea compatible con el tratamiento de la Reclamación de Pensión Permitida en virtud del presente, la inclusión de cualquier disposición que prohíba la inscripción de los Participantes Activos del SRE de la AEE y los empleados contratados posteriormente de la AEE en el plan de aportación definido para los empleados del ELA conforme a la Ley 106-2017 como se establece en la Sección XVI, se consideran incompatibles con PROMESA.

## SECCIÓN VII

## DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES DE PRÉSTAMO DE LÍNEA DE COMBUSTIBLE (CLASE 4)

**A.   Tratamiento de Reclamaciones de Clase 4**

En la Vigencia, cada Tenedor de una Reclamación de Préstamo de Línea de Combustible Permitida recibirá, a menos que dicho Tenedor acuerde un trato menos favorable, en plena contraprestación, satisfacción, transacción, liberación y a cambio de la Reclamación de Préstamo

de la Línea de Combustible Permitida de dicho Tenedor, hasta el monto total de la Reclamación Permitida de dicho Tenedor, en el siguiente orden:

(i)     Bonos de la Serie A en el monto nominal igual al ochenta y cuatro por ciento (84.0%) del monto de dicha Reclamación de Préstamo de Línea de Combustible Permitida del Tenedor;

(ii)    Bonos de la Serie A o Efectivo, a la sola discreción de la Junta de Supervisión, en el monto nominal de los intereses a una tasa del seis por ciento (6.0%) anual que se considera devengado a cuenta de la Participación a Prorrata de cada Tenedor de los Bonos de la Serie A que se distribuirán de conformidad con la cláusula inmediatamente anterior (i), durante un período igual al más corto de (a) el 1 de diciembre de 2022 hasta la Vigencia, y (b) un (1) año; y

(iii)   con respecto a la Reclamación Restante de dicho Tenedor después de que las distribuciones colectivas se realicen de conformidad con la cláusula anterior (i), la Participación a Prorrata de dicho Tenedor de los Nuevos Bonos Restantes Netos, si los hubiere, disponible para su distribución al Fondo de Reclamaciones de Bonos de la Serie B Restantes.

## B.   Tarifas de Acreedores del Acuerdo de Apoyo al Plan de Prestamista de Línea de Combustible

En la Vigencia, cada Acreedor del Acuerdo de Apoyo al Plan de Prestamista de Línea de Combustible también recibirá, en forma de Bonos de la Serie A adicionales o en Efectivo, a la sola discreción de la Junta de Supervisión, y no a causa de su Reclamación Permitida, (i) la Participación a Prorrata de las Tasas de Perfeccionamiento de los Acreedores del Acuerdo de Apoyo al Plan de Prestamista de Línea de Combustible en contraprestación por su asistencia en la formulación del Plan y (ii) la participación a prorrata de las Tarifas de Reembolso de Profesionales de Acreedores del Acuerdo de Apoyo al Plan de Prestamista de Línea de Combustible de dichos Acreedores del Acuerdo de Apoyo al Plan de Prestamistas de Línea de Combustible para compensar los honorarios razonables y gastos incurridos en relación con el Caso del Título III y la negociación y celebración del Acuerdo de Apoyo al Plan de Prestamista de Línea de Combustible; *disponiéndose* que el diez por ciento (10%) de las Tarifas de Reembolso de Profesionales de Acreedores del Acuerdo de Apoyo al Plan de Prestamista de Línea de Combustible se asignarán al Acreedor del Acuerdo de Apoyo al Plan de Prestamistas de Línea de Combustible de registro a partir de la Vigencia del Acuerdo (según se define en el Acuerdo de Apoyo al Plan de Prestamista de Línea de Combustible) en virtud del Servicio de Citi de Línea de Combustible y el noventa por ciento (90%) de las Tarifas de Reembolso de Profesionales de Acreedores del Acuerdo de Apoyo al Plan de Prestamista de Línea de Combustible se asignarán a los Acreedores del Acuerdo de Apoyo al Plan de Prestamistas de Línea de Combustible (parte del Acuerdo de Apoyo al Plan de Prestamista de Línea de Combustible a partir de la Vigencia del Acuerdo) en virtud del Servicio de Scotia de Línea de Combustible (y a prorrata entre los Acreedores del Acuerdo de Apoyo al Plan de Prestamista de Línea de Combustible). Las Tarifas de Acreedores del Acuerdo de Apoyo al Plan de Prestamista de Línea de Combustible compensan a los Acreedores del Acuerdo de Apoyo al Plan de Prestamista de Línea de Combustible por el valor recibido y constituyen un componente esencial de las conciliaciones y resoluciones que se enuncian en el presente y no pueden separarse de los demás términos y disposiciones establecidos en el presente.

# SECCIÓN VIII

## DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES SIN GARANTÍA GENERALES(CLASE 5)

**A.**     <u>Tratamiento de Reclamaciones de Clase 5</u>

En la Vigencia, cada Tenedor de una Reclamación General sin Garantía Permitida recibirá en total contraprestación, satisfacción, liberación y a cambio de la Reclamación General sin Garantía Permitida de dicho Tenedor, la Participación a Prorrata del Tenedor de la Recuperación de Reclamación General sin Garantía, hasta el monto total de la Reclamación Permitida de dicho Tenedor, a menos que dicho Tenedor acepte un trato menos favorable.

**B.**     <u>Elección a tratarse como una Reclamación de Conveniencia.</u>

Sin perjuicio de las disposiciones de la Sección VIII.A del Plan, todo Tenedor de una Reclamación sin Garantía General de la ACT Permitida, que no sea Reclamación sin Garantía General de la ACT que sea un componente de una Reclamación sin Garantía General mayor, cuyas partes puedan estar en poder de dicho Tenedor o de cualquier otro tenedor de una Reclamación Permitida, cuya Reclamación sin Garantía General Permitida sea superior a diez mil dólares ($10,000), y que opte por reducir el monto de esa Reclamación sin Garantía General Permitida a diez mil dólares ($10,000) y (ii) múltiples Reclamaciones sin Garantía Generales Permitidas que sean superiores a veinte mil dólares ($20,000) en total y que elija reducir el monto total de tales Reclamaciones sin Garantía Generales Permitidas a veinte mil dólares ($20,000), a elección de ese Tenedor, tendrá derecho a recibir, sobre la base de tal Reclamación sin Garantía General Permitida en su forma reducida, distribuciones conforme a la Sección XIV del presente. Esa elección debe realizarse por Papeleta y ser recibida por la Junta de Supervisión en o antes de la Fecha de Votación. Toda elección realizada después de la Fecha de Votación no será vinculante para la AEE, a menos que la Junta de Supervisión renuncie expresamente, por escrito, a la Fecha de Votación; <u>disponiéndose, sin embargo,</u> que bajo ninguna circunstancia la Junta de Supervisión pueda renunciar a ella en la Vigencia o después de esta.

# SECCIÓN IX

## DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES DE VITOL (CLASE 6)

**A.**     <u>Tratamiento de Reclamaciones de Clase 6</u>

En la Vigencia, el Tenedor de la Reclamación de Vitol Permitida recibirá en plena contraprestación, satisfacción, liberación, liquidación y a cambio de la Reclamación de Vitol Permitida de dicho Tenedor, el cincuenta por ciento (50.0%) de la Participación a Prorrata del Tenedor de la Recuperación de Reclamación General sin Garantía, hasta el monto igual al cincuenta por ciento (50.0%) de la Reclamación Permitida de dicho Tenedor, a menos que dicho Tenedor acepte un trato menos favorable.

## SECCIÓN X

### DISPOSICIONES PARA EL TRATAMIENTO
### DE SWAPS DE TASAS DE INTERÉS ASEGURADOS DE ASSURED (CLASE 7)

**A.**   **Tratamiento de Reclamaciones de Clase 7**

En la Vigencia, cada Tenedor de una Reclamación de Swap de Tasa de Interés Asegurado de Assured Permitida recibirá en total contraprestación, satisfacción, liberación y a cambio de la Reclamación de Swaps de Tasa de Interés Asegurados de Assured Permitida de dicho Tenedor, la Participación a Prorrata de dicho Tenedor de la Recuperación de Reclamación de Swaps de Tasa de Interés Asegurados de Assured, hasta el monto total de la Reclamación Permitida de dicho Tenedor, a menos que dicho Tenedor acepte un trato menos favorable.

## SECCIÓN XI

### DISPOSICIONES PARA EL TRATAMIENTO
### DE RECLAMACIONES DE CLIENTE DE EJERCICIO HABITUAL (CLASE 8)

**A.**   **Tratamiento de Reclamaciones de Clase 8**

En la Vigencia, cada Tenedor de una Reclamación de Cliente de Ejercicio Habitual Permitida recibirá en total contraprestación, satisfacción, liberación y a cambio de la Reclamación del Cliente de Ejercicio Habitual Permitida de dicho Tenedor, el pago completo de la Reclamación del Cliente de Ejercicio Habitual Permitida de dicho Tenedor en el ejercicio habitual comercial, a menos que dicho Tenedor acepte un trato menos favorable.

## SECCIÓN XII

### DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES
### DE EXPROPIACIÓN/EXPROPIACIÓN INVERSA (CLASE 9)

**A.**   **Tratamiento de Reclamaciones de Clase 9**

A partir de la Vigencia, (a) en la medida en que no se haya modificado antes de esta, la paralización automática existente conforme al artículo 362 del Código de Quiebras y el interdicto de descarga conforme a la Sección XXIV del presente se considerará modificada para permitirle al Tenedor de una Reclamación de Expropiación/Expropiación Inversa (i) liquidar dicha Reclamación de Expropiación/Expropiación Inversa en el Procedimiento de Expropiación del Tenedor y (ii) hacer que el Actuario del Tribunal de Primera Instancia distribuya a dicho Tenedor el monto de dinero depositado en el Tribunal de Primera Instancia con respecto a la propiedad expropiada, y (b) sujeto a la entrada de la Orden de Confirmación y la Orden de Confirmación del ELA que proporciona que tales Reclamaciones deben ser pagadas en su totalidad en la medida en que sean Reclamaciones Permitidas por una compensación justa, cuando cada orden se convierta en una Orden Final, y cuando se produzca otra Orden Final que determine la validez y el monto de la compensación justa atribuible a una Reclamación de Expropiación/Expropiación Inversa, el Tenedor de una Reclamación de Expropiación/Expropiación Inversa Permitida tendrá derecho a recibir, en contraprestación, satisfacción, liberación, e intercambio total del saldo impagado de tal

Tenedor de su Reclamación de Expropiación/Expropiación Inversa Permitida, en Efectivo, cien por ciento (100.0%) de dicho saldo impago, a menos que dicho Tenedor acuerde un tratamiento menos favorable; *disponiéndose, sin embargo*, que, en caso de que una Victoria ante el Tribunal Supremo de los Estados Unidos sobre Clausula sobre Expropiaciones, el Tenedor de dicho saldo impago de una Reclamación de Expropiación/Expropiación Inversa Permitida deberá recibir, en contraprestación, satisfacción, liberación y a cambio total de estas, la Participación a Prorrata del Tenedor de la Recuperación de Reclamación sin Garantía General, hasta el monto total de la Reclamación de Expropiación/Expropiación Inversa de dicho Tenedor.

## SECCIÓN XIII

## DISPOSICIONES PARA EL TRATAMIENTO
## DE RECLAMACIONES FEDERALES (CLASE 10)

**A.      Tratamiento de Reclamaciones de Clase 10**

En la Vigencia, cada Tenedor de una Reclamación Federal Permitida recibirá en total contraprestación, satisfacción, liberación y a cambio de la Reclamación Federal Permitida de dicho Tenedor, lo que sea mayor de (i) la Participación a Prorrata del Tenedor de la Recuperación de Reclamación General sin Garantía, hasta el monto total de la Reclamación Permitida de dicho Tenedor, y (ii) el tratamiento de tales Reclamaciones Federales Permitidas según lo requerido por el artículo 304(h) de PROMESA, a menos que dicho Tenedor acepte un trato menos favorable.

## SECCIÓN XIV

## DISPOSICIONES PARA EL TRATAMIENTO DE RECLAMACIONES DE
## CONVENIENCIA (CLASE 11)

**A.      Tratamiento de Reclamaciones de Clase 11**

A más tardar en la Vigencia y en la fecha en que dicha Reclamación de Conveniencia Permitida pase a ser una Reclamación Permitida, o tan pronto como sea posible después de esto, el Fideicomisario de GUC pagará a cada tenedor de una Reclamación de Conveniencia Permitida, en Efectivo, a partir de la AEE Reorganizada, la cantidad total de dicha Reclamación de Conveniencia Permitida, en plena satisfacción, resolución, liberación y extinción, y a cambio de dicha Reclamación de Conveniencia Permitida, a menos que dicho Tenedor haya acordado un trato menos favorable.

## SECCIÓN XV

## DISPOSICIONES PARA EL TRATAMIENTO DE
## RECLAMACIONES SUBORDINADAS DEL ARTÍCULO 510(b) (CLASE 12)

**A.      Tratamiento de Reclamaciones de Clase 12**

Las Reclamaciones Subordinadas del Artículo 510(b) no recibirán una distribución de acuerdo con el Plan y se considerará que cada Tenedor de una Reclamación Subordinada del

Artículo 510(b) Permitida ha rechazado el Plan con respecto a tal Reclamación Subordinada del Artículo 510(b).

## SECCIÓN XVI

## DISPOSICIONES PARA LA IMPLEMENTACIÓN DEL PLAN

A.   **Admisión de Reclamaciones**

A efectos de confirmación y perfeccionamiento del Plan y las distribuciones que se realizarán en virtud del presente, a menos que se Permita lo contrario de acuerdo con una orden del Tribunal del Título III, en la Vigencia: (a) las Reclamaciones de Préstamo de Línea de Combustible se considerarán Permitidas en el monto total de $700,887,093.58, y no estarán sujetas a impugnación, objeción o revocación; (b) las Reclamaciones de Vitol se considerarán Permitidas en el monto total de $41,457,382.88; (c) cada Reclamación de Bonos de Ingresos de la AEE mantenida por un Bonista de Transacción o una Monolínea de Transacción se considerará Permitida en el monto acumulado igual al monto principal de los Bonos de Ingresos de la AEE mantenidos o asegurados por dicho Tenedor a partir de la Fecha Límite de la Oferta de Liquidación más los intereses devengados y no pagados en tales Bonos de Ingresos de la AEE hasta la Fecha de Petición; y (d) cada Reclamación de Swaps de Tasa de Interés Asegurados de Assured en poder de una Monolínea de Transacción será permitida en un monto que será acordado entre la Junta de Supervisión y el Titular de dicha Reclamación; *disponiéndose* que, si no se puede llegar a un acuerdo sobre el monto de la Reclamación de Swaps de la Tasa de Interés Asegurados de Assured que se Permitirá, la Junta de Supervisión y el Titular de la Reclamación someterán dicha disputa al Tribunal del Título III (o cualquier otra persona o entidad con acuerdo mutuo de la Junta de Supervisión y el Titular) para determinar el monto de dicha Reclamación que se Permitirá, cuyo monto se determinará de acuerdo con la ley aplicable.

B.   **Exenciones, interdictos y exculpaciones**

Las exenciones, interdictos y exculpaciones previstas en la Sección XXIV del presente son esenciales para obtener el valor que se indica según el presente y constituyen un componente esencial de las conciliaciones alcanzadas y no pueden separarse de las demás disposiciones del presente Plan.

C.   **Acción prioritaria de desestimación del Prestamista de Línea de Combustible**

A más tardar diez (10) días después de la Vigencia, los Acreedores del Acuerdo de Apoyo al Plan de Prestamista de Línea de Combustible deberán presentar todas las notificaciones, alegaciones y mociones apropiadas necesarias para desestimar, con perjuicio, la Acción Prioritaria del Prestamista de Línea de Combustible.

D.   **Documentos en vigor; otras transacciones**

En y después de la Vigencia, la AEE, y los funcionarios y miembros de los consejos de administración y gerentes de esta, están autorizados a emitir, firmar, entregar, presentar o registrar dichos contratos, valores, instrumentos, liberaciones y otros acuerdos o documentos y realizar las acciones necesarias o apropiadas para efectuar, implementar y demostrar adicionalmente los

términos y condiciones del Plan, y cualquier otro valor emitido de acuerdo con el Plan en nombre y en representación de la AEE, sin perjuicio de cualquier requisito de la ley, reglamentos u órdenes ejecutivas del ELA, y sin la necesidad de ninguna aprobación, autorización o consentimiento, excepto aquellos expresamente requeridos conforme al Plan o requeridos por PROMESA.

E.     **Inscripción de Participantes Activos del SRE de la AEE en el Plan de la Ley 106**

A partir de la Vigencia, se establecerán nuevas cuentas de contribuciones definidas en el plan de jubilación establecido para los empleados del ELA conforme a la Ley 106-2017 para todos los Participantes Activos del SRE de la AEE, con aportaciones mínimas de los empleados de ocho y medio por ciento (8.5%) de su nómina de acuerdo con los requisitos de aportación de la Ley 106-2017. Después de la Vigencia, los empleados recién contratados de la AEE Reorganizada también participarán en el mismo programa definido de aportación.

F.     **Cargo Heredado**

En la Vigencia, el Cargo Heredado será implementado por el Deudor Reorganizado y aprobado por la PREB, tal como se detalla en el **Anexo B** del presente y requerido por el Nuevo Contrato de Emisión Principal; *disponiéndose, además*, que con la aprobación de la Junta de Supervisión (mientras exista), la AEE Reorganizada y/o la PREB, puede modificar la tarifa fija y el cargo volumétrico que comprende el Cargo Heredado de una manera económica neutral, en estructura y cantidades que no retrasen o extiendan la fecha de pago esperada de los Bonos de la Serie A y la vida promedio ponderada esperada como se establece en el Acuerdo de Apoyo al Plan de Prestamista de Línea de Combustible, y que de otro modo sean razonablemente aceptables para los Prestamistas de Línea de Combustible Requeridos, que no disminuirán los ingresos proyectados atribuibles al Cargo Heredado según lo proyectado utilizando las proyecciones del Plan Fiscal 2022 (la «Prueba de Modificación»). La Junta de Supervisión como representante del Deudor y/o Deudor Reorganizado está autorizada a realizar todas las acciones necesarias para ingresar, implementar y hacer cumplir el Cargo Heredado.

Según lo requerido por el Plan, de conformidad con el Plan Fiscal de la AEE, ordenado por el artículo 1142(b) del título 11 del U.S.C. y la Orden de Confirmación, la PREB aprobará e implementará el Cargo Heredado según lo requerido por el artículo 6.3(p) y (q) de la Ley 17-2019 y el Nuevo Contrato de Emisión Principal (sujeto a su derecho, de acuerdo con la Prueba de Modificación, para modificar la cuota fija y el cargo volumétrico que componen el Cargo Heredado de una manera económica neutral), hasta que los Nuevos Bonos, Bonos de Refinanciamiento (si los hubiere), y los CVI son anulados en su totalidad o han expirado de acuerdo con sus términos y se abstendrán de realizar cualquier acción que frustre, disminuya o de otra manera deteriore el valor del Cargo Heredado o la capacidad de la AEE para cobrar el Cargo Heredado.

G.     **Reestructuración operativa de la AEE**

Antes o tan pronto como sea posible después de la Vigencia, el Deudor y el Deudor Reorganizado, según corresponda, serán reestructurados operativamente, lo que incluye que la AEE, según lo requiera el Plan Fiscal y la ley aplicable:

(a)     realice todas las medidas necesarias para (i) completar el proceso de adquisición competitiva para sustancialmente todos los activos de generación de la AEE y (ii) complete los esfuerzos continuos para transferir la operación y el mantenimiento de los activos de generación de la AEE existentes a operadores privados profesionales e independientes; y

(b)     mantenga contratos de operación y mantenimiento con operadores privados para el sistema de transmisión y distribución; *disponiéndose* que tales contratos no afecten negativamente la exención de impuestos sobre los Nuevos Bonos, Bonos de Refinanciamiento o Bonos Adicionales exentos de impuestos de la AEE Reorganizada pendientes.

**H.     Compra y venta de Bonos de Gastos Administrativos**

En la Vigencia, con el fin de proporcionar el pago de las Reclamaciones de Gastos Administrativos Permitidas, el Estado Libre Asociado comprará, y la AEE Reorganizada venderá, asignará, transferirá y transmitirá al Estado Libre Asociado los Bonos de Gastos Administrativos por Efectivo en un precio de compra acumulado igual al Monto de los Bonos de Gastos Administrativos.

## SECCIÓN XVII

## DISPOSICIONES RELATIVAS A LA EMISIÓN Y DISTRIBUCIÓN DE LOS NUEVOS BONOS

**A.     Emisión y distribución**

1.     Nuevos Bonos

Los Nuevos Bonos se emitirán de conformidad con los términos y disposiciones del Nuevo Contrato de Emisión Principal y se distribuirán según lo establecido en el Plan. La documentación definitiva que rige los Nuevos Bonos generalmente deberá proporcionar los términos establecidos en el presente, sujeto a los resultados de cualquier elección permitida por el Plan y otros ajustes permitidos o requeridos por el Plan.

2.     CVI

El CVI se emitirá de conformidad con los términos y disposiciones del Nuevo Contrato de Emisión Principal y se distribuirá según lo establecido en este Plan. La documentación definitiva que rige el CVI generalmente deberá proporcionar los términos establecidos en el Plan.

**B.     Términos generales**

1.     Nuevos Bonos

En la Vigencia, la AEE Reorganizada emitirá dos series de Nuevos Bonos: Bonos de la Serie A; y Bonos de la Serie B.

a)   *Bonos de la Serie A*

Los bonos de la Serie A se emitirán en un monto principal suficiente para cumplir con los términos del Acuerdo de Apoyo al Plan de Prestamista de Línea de Combustible y la Sección VII del presente. Tendrán un vencimiento definitivo declarado de quince (15) años a partir de la Vigencia, con un reembolso esperado de cinco (5) años a partir de la Vigencia basado en las proyecciones del Plan Fiscal 2022. Los Bonos de la Serie A se emitirán en la Vigencia, pero devengarán intereses a partir de la fecha de emisión prevista del 1 de diciembre de 2022 a efectos del cálculo de los intereses devengados; *disponiéndose, sin embargo*, que el período de devengamiento de intereses antes de la Vigencia no excederá de un (1) año y que los intereses devengados antes de la Vigencia serán pagaderos en la Vigencia en forma de Bonos de la Serie A o Efectivo, a discreción exclusiva de la Junta de Supervisión. Los bonos de la Serie A tendrán intereses a una tasa del seis por ciento (6.00%) anual pagaderos semestralmente en Efectivo.

b)   *Bonos de la Serie B*

Los Bonos de la Serie B se emitirán en un monto principal igual al monto principal acumulado de Nuevos Bonos menos el monto principal agregado de los Bonos de la Serie A. Los Bonos de la serie B tendrán un vencimiento definitivo declarado de cincuenta (50) años a partir de la Vigencia, con un reembolso esperado de treinta y cinco (35) años a partir de la Vigencia basado en las proyecciones del Plan Fiscal 2022. Los Bonos de la Serie B se fecharán a partir de la Vigencia. Los Bonos de la Serie B pueden emitirse en forma de bonos de interés corriente, bonos de apreciación de capital, bonos convertibles y/o bonos de apreciación de capital convertibles en una o varias series de bonos. Los Bonos de la Serie B tendrán intereses a una tasa de interés de o entre un intervalo de cinco y seiscientas veinticinco milésimas por ciento (5.625%) a seis y medio por ciento (6.50%).

2.   CVI

En la Vigencia, la AEE Reorganizada emitirá el CVI por el monto del Monto Teórico de CVI con un cupón de cero por ciento (0.00%) y una fecha de vencimiento final de la Fecha de Vencimiento de CVI. El CVI no será pagadero a menos que y hasta que el capital principal y los intereses sobre los Nuevos Bonos y los Bonos de Refinanciamiento, si los hubiere, sean pagados indefectiblemente en su totalidad en Efectivo por la AEE Reorganizada o se considere que no están pendientes de acuerdo con los términos del Nuevo Contrato de Emisión Principal antes de la Fecha de Vencimiento de CVI. Si los Bonos Nuevos y los Bonos de Refinanciamiento se satisfacen en su totalidad de acuerdo con sus términos antes de la Fecha de Vencimiento de CVI, el CVI será pagadero a partir de esa parte de los Ingresos Netos que constituyan los Ingresos de Cargo Heredado Restantes depositados a crédito del Fondo de Amortización de la Deuda de acuerdo con la Cascada de Pago hasta la fecha anterior de (a) la fecha en que el Monto Teórico de CVI haya sido pagado en su totalidad y (b) la fecha de Vencimiento de CVI.

En la Fecha de Vencimiento de CVI, cualquier monto de capital pendiente a cuenta de CVI se considerará renunciado y totalmente inexigible.

El CVI no llevará ninguna tasa de interés por incumplimiento. El CVI se emitirá en denominaciones que se especificarán en el Nuevo Contrato de Emisión Principal.

C.     **Nuevos Bonos en Exceso**

En la Vigencia, la AEE Reorganizada emitirá, a su entera discreción, algunos, todos o ninguno de los Nuevos Bonos en Exceso al Fideicomiso de PayGo de la AEE. Cualquier cantidad de los Nuevos Bonos en Exceso que estén disponibles para su distribución al Fideicomiso de PayGo de la AEE, pero que la AEE Reorganizada determine no emitir al Fideicomiso de PayGo de la AEE, se considerará que no ha sido emitida, y la cantidad de Nuevos Bonos emitidos de conformidad con el Plan se reducirá en base dólar por dólares por el monto de d capital acumulado de dichos Nuevos Bonos en Exceso no emitidos.

D.     **Disposiciones de pago**

Los intereses sobre los Nuevos Bonos se pagarán el próximo 1 de enero o 1 de julio después de la Vigencia y cada 1 de enero y 1 de julio a partir de entonces hasta lo que ocurra primero de que los Nuevos Bonos (a) alcancen su vencimiento respectivo o (b) su pago o cumplimiento en su totalidad de acuerdo con sus términos.

Todo el capital de Nuevos Bonos que no se pague en el momento de su vencimiento, ya sea al vencimiento final previsto o antes de su vencimiento final, permanecerá pendiente y vencido y pagadero hasta que se pague completamente. Los intereses no se acumularán en ninguna obligación pendiente conforme a los Nuevos Bonos después del vencimiento declarado respecto de los Nuevos Bonos; solo el capital no pagado será pagadero después de las respectivas fechas de vencimiento finales. Los intereses sobre los Nuevos Bonos se calcularán sobre la base de un año de 360 días que consta de doce meses de 30 días. Los Nuevos Bonos no portarán ninguna tasa de interés por incumplimiento.

E.     **Garantía**

1.     Nuevos Bonos

Los Nuevos Bonos estarán garantizados por los Ingresos Netos de la AEE Reorganizada hasta un importe igual a los Ingresos de Cargo Heredado y el derecho a recibir dichos Ingresos Netos hasta un monto igual a los Ingresos de Cargo Heredado, como se describe más particularmente en el Nuevo Contrato de Emisión Principal. Para evitar dudas, el Gravamen que garantiza los nuevos bonos no se limita a los ingresos netos depositados en el Fondo de Amortización de la Deuda.

2.     CVI

El CVI estará garantizado por los Ingresos Netos Restantes de la AEE Reorganizada hasta un importe igual a los Ingresos de Cargo Heredado Restantes y el derecho a recibir dichos Ingresos Netos Restantes hasta un monto igual a los Ingresos de Cargo Heredado Restantes, como se describe más particularmente en el Nuevo Contrato de Emisión Principal.

F.     **Disposiciones de redención**

1.     Nuevos Bonos

Los Nuevos Bonos están sujetos a redención antes del vencimiento, a elección o dirección de la AEE Reorganizada, en su totalidad o en parte (y, si es en parte, en una denominación autorizada prevista en virtud del Nuevo Contrato de Emisión Principal), en cualquier fecha que sea en o después de diez (10) años después de la Vigencia, con treinta (30) días de antelación por escrito, a un precio de redención igual al monto nominal de estos, más los intereses acumulados a la fecha de redención.

Si menos de todos los Nuevos Bonos de un tenor particular son redimidos para amortización antes de su vencimiento, la AEE Reorganizada seleccionará el vencimiento o vencimientos de dicho tenor de los Nuevos Bonos a ser amortizados, y DTC, en nombre del Nuevo Fideicomisario Principal, seleccionará los Nuevos Bonos dentro del mismo vencimiento de dicha serie a ser amortizados por medio de una lotería aleatoria.

Los Nuevos Bonos no están sujetos a redención antes del vencimiento a la elección de los tenedores de estos.

   2. <u>CVI</u>

El CVI está sujeto a redención antes del vencimiento, a elección o dirección de la AEE Reorganizada, en su totalidad o en parte (y, si es en parte, en una denominación autorizada prevista en virtud del Nuevo Contrato de Emisión Principal), en cualquier fecha que sea en o después de diez (10) años después de la Vigencia, con treinta (30) días de antelación por escrito.  El precio de redención será igual al Precio de Redención de CVI.

**G.** **<u>Cuentas y cascada de pago</u>**

Todos los ingresos se depositarán en el «Fondo General» en poder de la AEE Reorganizada. En el primer Día Hábil de cada mes, la AEE Reorganizada transferirá dichos Ingresos en los siguientes montos y en el orden de prioridad establecido a continuación y como se establece más particularmente en el Nuevo Contrato de Emisión Principal (la «<u>Cascada de Pago</u>»):

- *En primer lugar*, al pago de los Gastos Operativos;

- *En segundo lugar*, al pago de los honorarios y gastos del Nuevo Fideicomisario Principal que no excedan cien mil dólares ($100,000) por año;

- *En tercer lugar*, al Fondo de Amortización de la Deuda en poder del Nuevo Fideicomisario Principal (i) hasta el importe de los Ingresos por Cargos Heredados, y desde y después de la Fecha de Resolución de Nuevos Bonos y hasta la Fecha de Vencimiento de CVI, hasta el importe de los Ingresos Restantes de Cargos Heredados, y (ii) hasta el monto de otros Ingresos Netos con el propósito de pagar la amortización de la deuda sobre Bonos Adicionales según lo permitido y proporcionado en el Nuevo Contrato de Emisión Principal;

- *En cuarto lugar*, al pago de los gastos de capital;

- *En quinto lugar*, al pago de la deuda subordinada (si la hubiere); y

- *En sexto lugar*, para fines corporativos generales.

**H.    Pactos clave para Nuevos Bonos**

Los Documentos Definitivos, que incluyen el Nuevo Contrato de Emisión Principal y la Orden de Confirmación, contendrán términos, condiciones y pactos habituales, lo que incluye, sin limitación, pactos de la AEE Reorganizada de que, entre otras cosas, deberá:

1.      hacer esfuerzos razonables para (a) continuar imponiendo y cobrando tasas, tarifas y cargos, lo que incluye, de forma no taxativa, el Cargo Heredado y el Cargo Heredado Restante y (b) depositar los Ingresos Netos recaudados de dichas tasas, tarifas y cargos en el Fondo de Amortización de la Deuda de acuerdo con la Cascada de Pago;

2.      no realizar ninguna acción que (a) limite o altere los derechos conferidos a la AEE o a la AEE Reorganizada de acuerdo con el Plan y la Orden de Confirmación para cumplir con los términos de cualquier acuerdo con los Tenedores de los Nuevos Bonos o CVI o (b) limite o menoscabe los derechos y remedios de los Tenedores de los Nuevos Bonos o de CVI;

3.      realizar todas las medidas razonables para hacer que los Bonos de la Serie A estén exentos de impuestos en la medida permitida por la ley (lo que incluye buscar cualquier decisión apropiada de no acción, determinación de liquidación o decisión favorable del SII);

4.      hacer y realizar todos los actos y acciones permitidos por la ley y razonablemente necesarios o deseables para asegurar que los intereses pagados a los Tenedores de cualquier Nuevo Bono exento de impuestos federales sean y sigan siendo excluibles de los ingresos brutos para fines del impuesto federal sobre la renta; y

5.      no crear ningún gravamen, compromiso o cargo sobre los ingresos netos hasta el monto de los ingresos por cargos heredados, o el derecho a recibirlos, excepto en relación con la emisión de Bonos Adicionales según lo permitido por el Nuevo Contrato de Emisión Principal.

**I.    Aplicación de dinero en el Fondo de Amortización de la Deuda**

Desde y después de la Vigencia, hasta que los Nuevos Bonos, Bonos de Refinanciamiento y/o CVI hayan sido pagados o satisfechos en su totalidad de acuerdo con sus términos, la AEE Reorganizada depositará, de acuerdo con la Cascada de Pago, Ingresos Netos hasta el monto de los Ingresos de Cargos Heredados con respecto a los Nuevos Bonos y hasta el monto de los Ingresos de Cargos Heredados Restantes con respecto a CVI al crédito del Fondo de Amortización de la Deuda, que será mantenido por el Nuevo Fideicomisario Principal. Dicho dinero depositado en el Fondo de Amortización de la Deuda será aplicado, en la medida en que esté disponible, por el Nuevo Fideicomisario Principal, de la siguiente manera:

1.      Nuevos Bonos

- *En primer lugar*, al pago de los intereses declarados adeudados y pagaderos sobre los Nuevos Bonos;

- *En segundo lugar*, al pago del capital de los Bonos de la Serie A y de cualquier Bono de Refinanciamiento emitido para reembolsar los Bonos de la Serie A hasta que se reembolsen en su totalidad en efectivo o se considere que no están pendientes de pago de acuerdo con los términos del Nuevo Contrato de Emisión Principal; y

- *En tercer lugar*, al pago del capital de los Bonos de la Serie B y de cualquier Bono de Refinanciamiento (excepto los Bonos de Refinanciamiento descritos en *segundo lugar* anterior) hasta que se reembolsen en su totalidad en efectivo o se considere que no están pendientes de pago de acuerdo con los términos del Nuevo Contrato de Emisión Principal.

2.    CVI

- *A continuación*, hasta el pago del monto teórico de CVI.

3.     Bonos Adicionales:

Los Ingresos Netos distintos de los Ingresos de Cargos Heredados, si los hubiere, se depositarán a crédito del Fondo de Amortización de la Deuda para pagar la amortización de la deuda sobre cualquier Bono Adicional de conformidad con los términos del Nuevo Contrato de Emisión Principal.

**J.    Convenio de Tasas de Interés**

Hasta lo que ocurra antes del reembolso de los Bonos de la Serie A o el vencimiento final de los Bonos de la Serie A, si, en un año determinado, los Ingresos Netos hasta el monto de los Ingresos de Cargo Heredado depositados en el Fondo de Amortización de la Deuda son insuficientes para satisfacer los intereses adeudados y debidos sobre los Nuevos Bonos en ese Año Fiscal, la AEE Reorganizada deberá (y en ausencia de la acción de la AEE Reorganizada, el Nuevo Fideicomisario Principal deberá) (a) ejercer sus facultades en la máxima medida de la ley para implementar un aumento en el Cargo Heredado suficiente para reembolsar los intereses adeudados y pagaderos sobre los Nuevos Bonos en el año fiscal siguiente y/o (b) iniciar un caso de tasas ante la PREB o cualquier otro procedimiento para obligar a la PREB a implementar un aumento en el Cargo Heredado suficiente para reembolsar dichos intereses adeudados y pagaderos sobre los Nuevos Bonos en el año fiscal siguiente (el "Pacto de Tasa de Interés"). El Nuevo Fideicomisario Principal tendrá el derecho de exigir el cumplimiento específico del Pacto de Tasa de Interés.

**K.    Sin derechos de aceleración**

Los Nuevos Bonos y CVI no estarán sujetos a aceleración.

**L.    Incumplimiento limitado**

1.     Nuevos Bonos

No habrá ningún caso de incumplimiento de los Nuevos Bonos (antes del vencimiento final declarado de los Bonos de la Serie A, únicamente con respecto a los Bonos de la Serie A, y generalmente con respecto a los Bonos Serie B) por falta de pago de la amortización de la deuda programada, siempre y cuando la AEE Reorganizada (a) cargue y emplee sus mejores esfuerzos razonables para (i) cobrar el Cargo Heredado, (ii) cobrar los Ingresos generados por el Cargo

Heredado, y (iii) deposite el monto total de los Ingresos Netos hasta el monto de los Ingresos de Cargo Heredado en el Fondo de Amortización de la Deuda después de proporcionar las distribuciones realizadas de acuerdo con la Cascada de Pago, y (b) cumpla con el Pacto de Tasa de Interés.

2. CVI

No habrá ningún caso de incumplimiento en el CVI, siempre y cuando la AEE Reorganizada tome medidas razonables para cobrar los Ingresos generados por el Cargo Heredado Restante y deposite dicho dinero recibido en el Fondo de Amortización de la Deuda.

**M.   Remedios limitados**

Al ocurrir un evento de incumplimiento de los Nuevos Bonos o CVI, los únicos remedios del Nuevo Fideicomisario Principal serán: (a) procurar hacer cumplir la obligación de la AEE Reorganizada de tomar medidas razonables para imponer tarifas, tasas y cargos, lo que incluye, de forma no taxativa, el Cargo Heredado y el Cargo Heredado Restante y cobrar los Ingresos generados por el Cargo Heredado y el Cargo Heredado Restante y depositar los Ingresos Netos hasta el monto de los Ingresos del Cargo Heredado con respecto a los Nuevos Bonos y hasta el monto de los Ingresos del Cargo Heredado Restantes con respecto al CVI en el Fondo de Amortización de la Deuda de acuerdo con la Cascada de Pago; y/o (b) antes de la Fecha de Negociación de Bonos de la Serie A, según corresponda, a petición del veinticinco por ciento (25.0%) o más de los Bonos de la Serie A, hacer cumplir el Pacto de Tasa de Interés. Todas las disposiciones de la Constitución del ELA, estatutos del ELA, órdenes ejecutivas, reglas, reglamentos y políticas que proporcionan el «derecho a sindicatura en caso de incumplimiento», codificadas en el artículo 207 de 22 L.P.R.A., se consideran incompatibles con PROMESA.

**N.   Bonos Adicionales y Bonos de Refinanciamiento**

La AEE Reorganizada puede emitir Bonos de Refinanciamiento para reembolsar, refinanciar o anular Nuevos Bonos Pendientes autorizados bajo el Nuevo Contrato de Emisión Principal, siempre y cuando dichos Bonos de Refinanciamiento se emitan (i) a un cupón promedio igual o inferior a los Nuevos Bonos que se reembolsan, (ii) sin aumento en el monto del capital, y (iii) con una fecha de vencimiento no más tarde que la de los Nuevos Bonos que se están reembolsando. Dichos Bonos de Refinanciamiento estarán garantizados por Ingresos Netos como se establece más específicamente en el Nuevo Contrato de Emisión Principal.

La AEE Reorganizada puede emitir Bonos Adicionales para cualquier propósito legal de acuerdo con la prueba de bonos adicionales y otros términos del Nuevo Contrato de Emisión Principal. Dichos Bonos Adicionales estarán garantizados por Ingresos Netos como se establece más específicamente en el Nueva Contrato de Emisión Principal; *disponiéndose* que los Bonos Adicionales no sean pagaderos del Cargo Heredado mientras los Nuevos Bonos o cualquier Bono de Refinanciamiento o CVI permanezcan pendientes.

**O.   Fuerza mayor**

1. Nuevos Bonos

47

En el caso de un desastre declarado por el gobierno federal como resultado de una tormenta u otro evento catastrófico que interrumpa las operaciones de la AEE Reorganizada de tal manera que la AEE Reorganizada no pueda recaudar los ingresos necesarios para cubrir los Gastos Operativos y depositar los Ingresos Netos hasta el monto de los Ingresos de Cargos Heredados con respecto a los Nuevos Bonos de acuerdo con la Cascada de Pagos para un año fiscal dado, la AEE Reorganizada puede elegir, a su sola discreción, diferir hasta dos (2) pagos semestrales consecutivos de la amortización de la deuda.

Para evitar dudas, si la AEE Reorganizada ejerce tal elección, los intereses sobre los Nuevos Bonos continuarán acumulándose hasta que se paguen. Todo el capital diferido y los intereses sobre los Bonos de la Serie A afectados por dicha elección se pagarán en o antes de lo que suceda primero de la fecha de vencimiento final de los Bonos de la Serie A o la primera fecha de pago programada cinco (5) años después del final del período de aplazamiento de la amortización de la deuda.

2.    CVI

En el caso de un desastre declarado por el gobierno federal como resultado de una tormenta u otro evento catastrófico que interrumpa las operaciones de la AEE Reorganizada de tal manera que la AEE Reorganizada no pueda recaudar los ingresos necesarios para cubrir los Gastos Operativos y depositar los Ingresos Netos Restantes hasta el monto de los Ingresos de Cargos Heredados Restantes con respecto a CVI en el Fondo de Amortización de la Deuda de conformidad con la Cascada de Pagos para un año fiscal determinado, la AEE Reorganizada no tendrá obligación de realizar pagos de CVI por cualquier déficit en los Ingresos de Cargos Heredados Restantes.

**P.    Derecho directo de acción**

Conforme al Nuevo Contrato de Emisión Principal, y sujeto a los derechos adicionales que se estipulan en este, el Nuevo Fideicomisario Principal tendrá derecho directo de acción para hacer cumplir los términos del Nuevo Contrato de Emisión Principal, lo que incluye, de manera no taxativa, con respecto al financiamiento de depósitos en el Fondo de Amortización de la Deuda y buscar remedios de rendimiento específico para cualquier incumplimiento de los pactos del Nuevo Contrato de Emisión Principal.

**Q.    Nuevo Contrato de Emisión Principal**

Disposiciones que requieren que el Cargo Heredado se agregue a las facturas emitidas por la AEE Reorganizada a sus clientes para pagar el capital principal y los intereses sobre los Nuevos Bonos, hacer pagos sobre el CVI y regir, entre otras cosas, las modificaciones o complementos a los Nuevos Bonos, el CVI, o el Nuevo Contrato de Emisión Principal, los eventos de incumplimiento, los remedios, la prioridad de los pagos después del incumplimiento conforme al Nuevo Contrato de Emisión Principal y la resolución conforme al Nuevo Contrato de Emisión

Principal se establecerá en el Nuevo Contrato de Emisión Principal. El Nuevo Contrato de Emisión Principal se celebrará y entregará en la Vigencia o antes de ella.

**R.   Ley Aplicable**

El Nuevo Contrato de Emisión Principal, y los Nuevos Bonos y CVI emitidos en virtud de este, según corresponda, se regirán por las leyes del Estado de Nueva York y, para determinados asuntos limitados, las leyes del Estado Libre Asociado, sin dar efecto a los principios de conflictos de leyes.

## SECCIÓN XVIII

## TRATAMIENTO DE CONTRATOS A EJECUTARSE Y ARRENDAMIENTOS NO VENCIDOS

**A.   Rechazo o asunción de Contratos a Ejecutarse y Arrendamientos No Vencidos**

Conforme al artículos 365(b)(2) del Código de Quiebras y sujeto a las disposiciones de la Sección XVIII.F y la Sección XVIII.H del presente, todos los Contratos a Ejecutarse y Arrendamientos no Vencidos que existan entre el Deudor y cualquier Entidad, que no hayan vencido según sus propios términos en la Fecha de Confirmación o antes de esta, se considerarán rechazados por el Deudor a la Vigencia, salvo por cualquier Contrato a Ejecutarse o Arrendamiento no Vencido (a) que se han asumido y han sido cedidos o rechazados conforme a una orden del Tribunal del Título III ingresada antes de la Vigencia, (b) que está designada específicamente como un contrato o contrato de arrendamiento a asumir o asumido y cedido en el Anexo de los Contratos Asumidos y Arrendamientos del Complemento del Plan o (c) que se ha registrado con la Oficina del Contralor de Puerto Rico o fue aprobado por la Junta de Supervisión o autorizado por el Tribunal del Título III, a menos que se designe específicamente como contrato a ser rechazado en el Complemento al Plan; *disponiéndose, sin embargo*, que el Deudor reserve el derecho, en la Fecha de Confirmación o antes de esta, de modificar tales programas para eliminar cualquier Contrato a Ejecutarse y Arrendamiento no Vencido de este o agregar cualquier Contrato a Ejecutarse y Arrendamiento no Vencido a este, en cuyo caso tal o tales Contratos a Ejecutarse y Arrendamientos no Vencidos se considerarán, según el caso, rechazados, asumidos o asumidos y cedidos a la Vigencia. El Deudor (y) notificará cualquier Contrato a Ejecutarse y Arrendamiento no Vencido que deba asumirse o asumirse y cederse a través de la aplicación de la presente Sección XVIII.A, al incluir una lista de tales contratos y arrendamientos en el Complemento del Plan y (z) notificará cualquier Contrato a Ejecutarse y Arrendamiento no Vencido a rechazar mediante la aplicación de la presente Sección XVIII.A, mediante una notificación por separado a las contrapartes pertinentes de dichos acuerdos. En la medida en que se introduzcan modificaciones a dichos anexos, el Deudor notificará a las partes del Contrato a Ejecutarse y Arrendamiento no Vencido afectados por estas cualquier modificación de esa índole. La inclusión de un documento en los anexos del Complemento del Plan o en cualquier notificación separada no constituirá una admisión por parte del Deudor de que tal documento es un Contrato a Ejecutarse y Arrendamiento no Vencido o de que el Deudor tenga responsabilidad alguna en virtud de ello.

Salvo que se disponga lo contrario en el presente o se acuerde entre el Deudor y la contraparte aplicable, cada Contrato a Ejecutarse o Arrendamiento no Vencido asumido incluirá

todas las modificaciones, alteraciones, complementos, replanteamientos u otros acuerdos relacionados con estos, y todos los derechos relacionados con estos, si los hubiera, incluidas todas las servidumbres, licencias, permisos, derechos, privilegios, inmunidades, opciones, derechos de primera negativa y cualquier otro interés. Las modificaciones, alteraciones, complementos y replanteamientos a los Contratos a Ejecutarse y Arrendamientos no Vencidos de pre-petición que hayan sido firmados por la AEE durante el Caso del Título III no se considerarán que alteran la naturaleza de pre-petición del Contrato a Ejecutarse o del Arrendamiento no Vencido o la validez, prioridad o monto de cualquier Reclamación que pueda surgir en relación con estos.

**B.    Aprobación del Rechazo o Asunción de Contratos a Ejecutarse y Arrendamiento no Vencidos**

El ingreso de la Orden de Confirmación por parte del Tribunal del Título III constituirá la aprobación, conforme a los artículos 365(a) y 1123(b)(2) del Código de Quiebras, del rechazo, asunción o la asunción y la cesión, según el caso, de un Contrato a Ejecutarse y un Arrendamiento no Vencido conforme a la Sección XVIII.A del Plan.

**C.    Carácter incluyente**

A menos que se especifique lo contrario en los anexos del Complemento del Plan, cada Contrato a Ejecutarse y Arrendamiento no Vencido enumerado o que se enumerará en estos incluirá todas las modificaciones, cambios, ampliaciones, replanteamientos u otros acuerdos celebrados directa o indirectamente por cualquier acuerdo, instrumento u otro documento que de alguna manera afecte a dicho Contrato a Ejecutarse y Arrendamiento no Vencido, sin tener en cuenta si dicho acuerdo, instrumento u otro documento está incluido en dicho programa.

**D.    Subsanación de incumplimientos y objeciones a la subsanación y asunción**

Salvo en la medida en que la parte no Deudora o las partes en un Contrato a Ejecutarse y Arrendamiento no Vencido hayan acordado un tratamiento diferente a asumirse o asumirse y cederse conforme a la Sección XVIII.A del Plan, el Deudor deberá, conforme a las disposiciones del artículo 1123(a)(5)(G) y 1123(b)(2) del Código de Quiebras y de conformidad con los requisitos del artículo 365 del Código de Quiebras, en un plazo mínimo de veinte (20) días antes de la Vista de Confirmación, radicar ante el Tribunal del Título III y entregar por correo de servicios prioritarios a cada parte no Deudora de dichos Contratos a Ejecutarse y Arrendamientos no Vencidos a asumir conforme a la Sección XVIII.A del Plan, una notificación convocatoria, en la que se enumerará el monto de corrección para cada Contrato a Ejecutarse o Arrendamiento no Vencido a asumir o asumir y ceder. Las partes en tales Contratos a Ejecutarse y Arrendamientos no Vencidos dispondrán de veinte (20) días a partir de la fecha de entrega de dicha notificación para radicar y entregar cualquier objeción a los montos de corrección enumerados por el Deudor. En caso de que se presenten objeciones, el Tribunal del Título III celebrará una vista en una fecha establecida por el Tribunal del Título III. **Cualquier contraparte de un Contrato a Ejecutarse o de un Arrendamiento no Vencido que no objete oportunamente la asunción o asunción propuesta y la asignación de cualquier Contrato a Ejecutarse o Arrendamiento no Vencido se considerará que ha consentido dicha asunción o asunción y asignación.** Sin perjuicio de lo dispuesto en los términos y disposiciones de la Sección XVIII.A del Plan, el Deudor conservará su derecho a rechazar cualquiera de sus Contratos a Ejecutarse y Arrendamientos no Vencidos que

estén sujetos a una controversia sobre los montos necesarios para corregir cualquier incumplimiento hasta la Vigencia.

Cualquier Reclamación de Subsanación se considerará plenamente satisfecha, liberada y descargada tras el pago por parte de la AEE de la Reclamación de Subsanación; *disponiéndose, sin embargo*, que nada de lo expuesto en la presente impida a la AEE pagar una Reclamación de Subsanación a pesar de que la contraparte pertinente no haya presentado dicha solicitud de pago de dicha Reclamación de Subsanación. La AEE también puede resolver cualquier Reclamación de Subsanación sin previo aviso o acción, orden o aprobación del Tribunal del Título III. Si hay alguna disputa con respecto a cualquier Reclamación de Subsanación, la capacidad de la AEE o cualquier cesionario para proporcionar «garantía adecuada de cumplimiento futuro» dentro del significado del artículo 365 del Código de Quiebras, o cualquier otro asunto relacionado con la asunción, entonces el pago de la Reclamación de Subsanación se producirá tan pronto como sea razonablemente posible después de la entrada de una Orden Final que resuelva dicha disputa, al aprobar dicha asunción (y, si corresponde, cesión), o según lo acuerden la AEE y la contraparte del Contrato a Ejecutarse o del Arrendamiento no Vencido.

La asunción de cualquier Contrato a Ejecutarse o Arrendamiento no Vencido de acuerdo con el Plan o de otra manera dará lugar a la liberación y cumplimiento completos de cualquier Reclamación de Subsanación, Reclamaciones o incumplimientos, ya sean monetarios o no monetarios, incluidos los incumplimientos de las disposiciones que restringen el cambio en la composición de intereses de control o propiedad u otros incumplimientos relacionados con la quiebra, que surjan en virtud de cualquier Contrato a Ejecutarse o Arrendamiento no Vencido asumido en cualquier momento anterior a la vigencia de la asunción. **Todas y cada una de las Evidencias de Reclamación (pero, para evitar dudas, sin incluir las Reclamaciones de Subsanación) basadas en Contratos a Ejecutarse o Arrendamientos no Vencidos que se hayan asumido en el Caso del Título III, incluso de acuerdo con la Orden de Confirmación, se considerará No Permitida y eliminada a partir de la Vigencia sin la necesidad de ninguna objeción a esta o cualquier otra notificación a o acción, orden o aprobación del Tribunal del Título III.**

E.    <u>Contratos y arrendamientos celebrados después de la Fecha de Petición</u>

Los contratos, arrendamientos y otros acuerdos celebrados después de la Fecha de Petición por la AEE y cualquier Contrato a Ejecutarse y Arrendamiento no Vencido asumidos por la AEE pueden ser cumplidos por la AEE en el ejercicio habitual de sus operaciones.

F.    <u>Pólizas de seguros</u>

Sujeto a los términos y disposiciones de la Sección XVIII.H del presente, cada una de las Pólizas de Seguros del Deudor y cualquier acuerdo, documento o instrumento relacionado con estas se considerarán Contratos a Ejecutarse según el Plan y se asumirán a partir de la Vigencia; *disponiéndose, sin embargo*, que tal trato no podrá liberar ni eximir ninguna Aseguradora Monolínea con respecto a sus respectivas obligaciones con respecto a los Tenedores de Reclamaciones conforme a las pólizas de seguros y la ley aplicable y los documentos que rijan con respecto a ellos, ni se interpretará de tal forma, según corresponda, conforme a este Plan.

G.      **Reclamaciones por Daños debidos a Rechazo**

Si el rechazo de un Contrato a Ejecutarse y Arrendamiento no Vencido por parte del Deudor según el presente da lugar a daños y perjuicios a la o las otras partes en dicho contrato o arrendamiento, toda Reclamación por tales daños y perjuicios, si hasta ahora no ha quedado demostrada por una Evidencia de Reclamación radicada, será excluida para siempre y no será ejecutable contra el Deudor, ni sus bienes o agentes, sucesores o causahabientes, lo que incluye, de manera no taxativa, el Deudor Reorganizado, a menos que se radique una Evidencia de Reclamación ante el Tribunal del Título III y se comunique a los abogados de la Junta de Supervisión y el Deudor Reorganizado, según el caso, treinta (30) o más días después de la última de (i) la Fecha de Confirmación y (ii) la fecha de ingreso de una orden por parte del Tribunal del Título III que autoriza el rechazo de un Contrato a Ejecutarse y Arrendamiento no Vencido en particular.

H.      **Obligaciones de Indemnización y Reembolso**

A los efectos del Plan, (i) en la medida en que sean de carácter ejecutorio, las obligaciones del Deudor, lo que incluye, de manera no taxativa, las Pólizas de Seguro de directores y funcionarios, de indemnizar y reembolsar a sus directores o funcionarios que fueran directores o funcionarios, respectivamente, en o antes de la Fecha de Petición, según el caso, se considerarán asumidas a partir de la Vigencia y (ii) las obligaciones de indemnización del Deudor que surgen de la conducta de funcionarios y directores durante el período desde la Fecha de Petición, serán Reclamaciones de Gastos Administrativos; disponiéndose, sin embargo, que, bajo ninguna circunstancia, el Deudor o el Deudor Reorganizado, según el caso, sean responsables de cualquier obligación de indemnización, costo o gasto asociado a la negligencia grave, el fraude intencional o la conducta dolosa intencional de sus respectivos funcionarios o directores.

I.      **Inexistencia de Vigencia**

En caso de que no se produzca la Vigencia, el Tribunal del Título III conservará la jurisdicción con respecto a toda solicitud de extensión de la fecha límite para asumir o rechazar Contratos a Ejecutarse y Arrendamientos no Vencidos conforme al artículo 365(d)(4) del Código de Quiebras, a menos que tal o tales plazos hayan vencido.

J.      **Reserva de Derechos**

Nada de lo dispuesto en el Plan o en el Complemento del Plan constituirá una admisión por parte del Deudor, el Deudor Reorganizado o de cualquier otra parte de que dicho contrato o arrendamiento es, de hecho, un Contrato a Ejecutarse o Arrendamiento no Vencido o que el Deudor tiene responsabilidad alguna en virtud de estos. Si existe una controversia con respecto a si un contrato o arrendamiento es o fue ejecutorio o no había vencido al momento de la asunción, el Deudor o Deudor Reorganizado dispondrá de cuarenta a cinco (45) días después del ingreso de una Orden Final que resuelva dicha controversia para alterar su tratamiento de tal contrato o arrendamiento.

## SECCIÓN XIX

## FIDEICOMISO DE GUC

**A.**    **Firma de la Escritura Fiduciaria del Fideicomiso de GUC**

En o antes de la Vigencia, la AEE y el Fideicomisario de GUC celebrarán la Escritura Fiduciaria del Fideicomiso de GUC y tomarán todas las demás medidas necesarias para establecer el Fideicomiso de GUC y los Intereses del Fideicomiso de GUC en este, que serán en beneficio de los Beneficiarios del Fideicomiso de GUC, tanto si sus Reclamaciones se Permiten antes, en o después de la Vigencia. La Escritura Fiduciaria del Fideicomiso de GUC puede otorgar facultades, obligaciones y autoridades además de los expresamente enunciados en el presente, pero solo en la medida en que esas facultades, obligaciones y autoridades no afecten la condición del Fideicomiso de GUC como «fideicomiso de liquidación» a efectos del impuesto federal a la renta de los Estados Unidos.

**B.**    **Propósito del Fideicomiso de GUC**

El Fideicomiso de GUC se establecerá solamente con el fin de recibir y distribuir los Activos del Fideicomiso de GUC, de acuerdo con el artículo 301.7701-4(d) del Reglamento del Tesoro, sin ningún objetivo de continuar o participar en la realización de un comercio o negocio, salvo en la medida en que sea razonablemente necesario y coherente con el propósito de liquidar el Fideicomiso de GUC.

**C.**    **Activos del Fideicomiso de GUC**

El Fideicomiso de GUC consistirá en los Activos del Fideicomiso de GUC. En la Vigencia, la AEE transferirá todos los Activos del Fideicomiso de GUC al Fideicomiso de GUC.  Los Activos del Fideicomiso de GUC pueden transferirse sujeto a determinadas obligaciones, según lo dispuesto en el Plan o en la Escritura Fiduciaria del Fideicomiso de GUC. Dicha transferencia estará exenta de todo impuesto de timbre, transferencia inmobiliaria, información hipotecaria, ventas, uso u otro impuesto similar, de acuerdo con el artículo 1146(a) del Código de Quiebras. Tras la entrega de los Activos del Fideicomiso de GUC al Fideicomiso de GUC, la AEE y sus predecesores, sucesores y causahabientes, y cada una de las Entidades liberadas conforme a la Sección XXIV del presente, se liberarán de toda responsabilidad con respecto a la entrega de tales distribuciones.

**D.**    **Administración del Fideicomiso de GUC**

El Fideicomiso de GUC será administrado por el Fideicomisario de GUC de acuerdo con la Escritura Fiduciaria del Fideicomiso de GUC y el Plan. En caso de cualquier incompatibilidad entre el Plan y la Escritura Fiduciaria del Fideicomiso de GUC, la Escritura Fiduciaria del Fideicomiso de GUC prevalecerá.

**E.**    **El Fideicomisario de GUC**

Si el Fideicomisario de GUC fallece, queda incapacitado, se rescinde su contrato, o renuncia por cualquier razón, la Junta del Fideicomiso de GUC designará a un sucesor;

<u>disponiéndose, sin embargo</u>, que bajo circunstancia el Fideicomisario de GUC sea un director o funcionario de cualquier Empresa asociada al Fideicomiso de GUC.

**F.    Rol del Fideicomisario de GUC**

En cumplimiento y compatibilidad con el propósito del Fideicomiso de GUC y el Plan, y sujeto a los términos de la Orden de Confirmación, el Plan y la Escritura Fiduciaria del Fideicomiso de GUC, y la supervisión de la Junta de Fideicomiso de GUC, el Fideicomisario de GUC tendrá, entre otras cosas, los siguientes derechos, poderes y deberes: (i) mantener los Activos Fiduciarios de GUC para el beneficio de los Beneficiarios del Fideicomiso de GUC, ya sea que sus Reclamaciones sean Permitidas en o después de la Vigencia; (ii) preparar y presentar (o hacer que se preparen y presenten), desde y después de la Vigencia, todos los formularios, declaraciones, informes y otros documentos tributarios y reglamentarios requeridos, o que el Fideicomisario de GUC considere apropiado con respecto al Fideicomiso de GUC; (iii) mantener, administrar y distribuir oportunamente el Efectivo obtenido a través del ejercicio de su poder y autoridad a los beneficiarios del Fideicomiso de GUC; y (iv) no prolongar indebidamente la duración del Fideicomiso de GUC. En toda circunstancia, el Fideicomisario de GUC actuará en el interés superior de todos los Beneficiarios del Fideicomiso de GUC y con vistas del propósito del Fideicomiso de GUC. El Fideicomisario de GUC estará obligado a proporcionar respuestas rápidas por escrito a las preguntas de la Junta de Supervisión, ocasionalmente, sobre el progreso del Fideicomiso de GUC en la administración de sus Activos y distribuciones y sus finanzas.

**G.    Poder tributario del Fideicomisario de GUC para la AEE Reorganizada**

A partir de la Vigencia, el Fideicomisario de GUC preparará y radicará (o dispondrá que se prepare y radique), en nombre de la AEE Reorganizada, toda declaración de impuestos u otras declaraciones de información fiscal que deban radicarse o que el Fideicomisario de GUC considere apropiado de otro modo.

**H.    Transferibilidad de los Intereses del Fideicomiso de GUC**

Los Intereses del Fideicomiso de GUC no serán transferibles o cedibles salvo mediante testamento, sucesión intestada o de pleno derecho.

**I.    Efectivo**

El Fideicomisario de GUC podrá invertir Efectivo (lo que incluye ganancias o ingresos de este) conforme a lo permitido en el artículo 345 del Código de Quiebras; *disponiéndose, sin embargo*, que tales inversiones sean inversiones autorizadas por un fideicomiso de liquidación en el sentido de la del artículo 301.7701-4(d) del Reglamento del Tesoro, tal como se refleja en este, o según las directrices o resoluciones del SII u otras autoridades de control aplicables.

**J.    Distribución de Activos del Fideicomiso de GUC**

El Fideicomisario de GUC realizará distribuciones a los Tenedores de Reclamaciones en el Fondo de Reclamaciones sin Garantía de acuerdo con la Sección XXI del Plan.

**K.**      **Financiamiento, Costos y Gastos del Fideicomiso de GUC**

En la Vigencia, el Fideicomiso de GUC se financiará una única vez por un monto de hasta un millón de dólares ($1,000,000). Los costos y gastos razonables del Fideicomiso de GUC, incluidos los honorarios y gastos del Fideicomiso de GUC y sus profesionales contratados, se pagarán de los Activos del Fideicomiso de GUC, incluido el cincuenta por ciento (50.0%) de la Participación a Prorrata del Tenedor de Reclamaciones de Vitol Permitidas de la Recuperación de Reclamación General sin Garantía no distribuida al Tenedor de la Reclamación de Vitol Permitida de acuerdo con la Sección IX del Plan, que será retenida por el Fideicomiso de GUC. El Fideicomisario de GUC estará autorizado a utilizar los ingresos de los Activos del Fideicomiso de GUC para financiar el Fideicomiso de GUC, de ser necesario.

**L.**      **Compensación del Fideicomisario de GUC**

La o las personas físicas que cumplan funciones o comprendan el Fideicomisario de GUC tendrán derecho a una compensación razonable por un monto coherente con el de funcionarios similares que desempeñen funciones similares, cuyo pago no estará sujeto a la aprobación del Tribunal del Título III.

**M.**      **Contratación de Profesionales/Empleados por parte del Fideicomisario de GUC**

Sujeto a la aprobación y el consentimiento de la Junta del Fideicomiso de GUC, el Fideicomiso de GUC podrá contratar y compensar a abogados, otros profesionales y empleados para que asistan a la Junta del Fideicomiso de GUC conforme los términos que el Fideicomisario de GUC considere apropiados sin la aprobación del Tribunal del Título III.

**N.**      **Tratamiento del Impuesto Federal a la Renta del Fideicomiso de GUC**

1.      *Activos del Fideicomiso de GUC tratados como propiedad de los Acreedores.* Para todos los propósitos del impuesto federal sobre la renta de los Estados Unidos, todas las partes (incluidos, sin limitación, el Deudor, el Fideicomisario de GUC y los Beneficiarios del Fideicomiso de GUC) tratarán la transferencia de los Activos del Fideicomiso de GUC al Fideicomiso de GUC como (1) una transferencia de los activos del Fideicomiso de GUC (sujeto a cualquier obligación relacionada con esos Activos) directamente a los Beneficiarios del Fideicomiso de GUC, seguido de (2) la transferencia por parte de dichos beneficiarios al Fideicomiso de GUC de los Activos del Fideicomiso de GUC a cambio de los intereses del Fideicomiso de GUC. En consecuencia, los Beneficiarios del Fideicomiso de GUC serán tratados para propósitos del impuesto federal sobre la renta de los Estados Unidos como los otorgantes y propietarios considerados de su respectiva parte de los Activos del Fideicomiso de GUC. El tratamiento anterior se aplicará también, en la medida en que lo permita la ley aplicable, a efectos de impuestos a la renta estatales y locales.

2.      *Presentación de Informes Fiscales.*

a)      El Fideicomisario de GUC preparará y radicará (o dispondrá que se preparen y radique) declaraciones de impuestos para el Fideicomiso de GUC que traten al Fideicomiso de GUC como fideicomiso de otorgante conforme al artículo 1.671-4(a) del Reglamento del Tesoro y conforme a la presente Sección XIX.N. El Fideicomisario de GUC

también enviará anualmente a cada Tenedor de un Interés del Fideicomiso de GUC una declaración separada sobre los recibos y gastos del Fideicomiso de GUC según se requiere acorde a los impuesto federales a la renta de los Estados Unidos y ordenará a todos esos Tenedores que utilicen esa información al preparar sus declaraciones federales del impuesto a la renta de los Estados Unidos o que remitan la información relevante a los Tenedores beneficiarios de tales tenedores con instrucciones de utilizar tal información en la preparación de sus declaraciones de impuestos federales a la renta de los Estados Unidos. El Fideicomisario de GUC también radicará (o dispondrá que se radique) cualquier otro informe, declaración o divulgación relacionados con el Fideicomiso de GUC que sean requeridos por cualquier Unidad Gubernamental.

b)       El Fideicomisario de GUC valorará entonces de buena fe todos los demás Activos del Fideicomiso de GUC y pondrá todos los valores disponibles ocasionalmente, en la medida en que sea pertinente, y tales valores serán utilizados sistemáticamente por todas las partes del Fideicomiso de GUC (lo que incluye, de manera no taxativa, el Deudor, el Fideicomisario de GUC y los Beneficiarios de GUC) para todo fin de impuestos federales a la renta de los Estados Unidos.

c)       Las asignaciones de rentas imponibles del Fideicomiso de GUC entre los Beneficiarios del Fideicomiso de GUC se determinarán en función de la forma en que se distribuiría un monto de Efectivo que represente tales rentas imponibles (si se permitiera distribuir ese Efectivo en ese momento) si, inmediatamente antes de tal distribución considerada, el Fideicomiso de GUC hubiese distribuido todos sus activos a los tenedores de los Intereses del Fideicomiso de GUC, ajustados acorde a las rentas imponibles previas y pérdidas y tomando en cuenta todas las distribuciones anteriores y simultáneas del Fideicomiso de GUC. De manera similar, las pérdidas imponibles del Fideicomiso de GUC se asignarán por referencia a la forma en que una pérdida económica se asumiría inmediatamente después de una distribución liquidada hipotética de los Activos del Fideicomiso de GUC restantes. El valor contable de los Activos del Fideicomiso de GUC a efectos del presente apartado será igual a su valor justo de mercado en la Vigencia, ajustado de acuerdo con los principios de contabilidad fiscal prescritos por el IRC, los Reglamentos del Tesoro aplicables y otras autoridades y pronunciamientos administrativos y judiciales aplicables.

d)       Sujeto a la orientación definitiva del SII o un tribunal de jurisdicción competente en sentido contrario (lo que incluye la recepción por el Fideicomisario de GUC de una carta en respuesta a consulta si el Fideicomisario de GUC así lo solicita, o la recepción de una determinación adversa por el SII tras la auditoría si no es impugnada por el Fideicomisario de GUC), el Fideicomisario de GUC deberá (A) elegir oportunamente tratar cualquier reserva de Activos del Fideicomiso de GUC como un «fondo de propiedad controvertida» regido por el artículo 1.468B-9 del Reglamento del Tesoro y (B) en la medida en que lo permita la ley aplicable, realizar informes de manera coherente con lo que precede con fines de impuesto a la renta locales y estatales. Todas las partes (lo que incluye el Fideicomisario de GUC y los Beneficiarios del Fideicomiso de GUC) deberán informar a efectos de impuestos federales, estatales y locales a la renta de los Estados Unidos de conformidad con lo anterior.

e)       El Fideicomisario de GUC será responsable del pago, de los Activos del Fideicomiso de GUC, de cualquier impuesto gravado sobre el fideicomiso o sus Activos. En el caso de que, y en la medida en que, cualquier Efectivo retenido a causa de Reclamaciones

Controvertidas sean insuficientes para pagar la parte de tales impuestos atribuibles a las rentas imponibles derivadas de los activos asignables o retenidos a causa de las Reclamaciones Controvertidas, talen impuestos podrán ser (i) reembolsados con a partir de cualquier monto en Efectivo posterior retenido a causa de Reclamaciones Controvertidas, o (ii) en la medida en que dichas Reclamaciones Controvertidas se hayan resuelto posteriormente, deducido de cualquier monto que pueda distribuirse de otro modo por el Fideicomisario de GUC como resultado de la resolución de tales Reclamaciones Controvertidas.

3.     Retención de impuestos por parte del Fideicomisario de GUC. El Fideicomisario de GUC podrá retener y pagar a la autoridad fiscal relevante todos los montos que deban retenerse de acuerdo con el IRC o cualquier disposición de cualquier ley fiscal extranjera, estatal o local con respecto a cualquier pago o distribución a los tenedores de Intereses del Fideicomiso de GUC. Todas esas cantidades retenidas y pagadas a la autoridad tributaria correspondiente (o colocada en cuenta de garantía hasta que se resuelva la necesidad de retenerlas) se tratarán como montos distribuidos a tales tenedores de Intereses del Fideicomiso de GUC a todos los efectos de la Escritura Fiduciaria del Fideicomiso de GUC y se entenderá de que tal monto retenido reducirá la cantidad efectivamente realizada por el tenedor aplicable en el momento de la distribución. El Fideicomisario de GUC estará autorizado a recopilar la información fiscal de los tenedores de acciones de impugnación Intereses Fideicomisos (lo que incluye, de manera no taxativa, números de seguridad social u otros números de identificación fiscal) según el Fideicomisario de GUC considere necesario a su entera discreción para llevar a cabo el Plan, la Orden de Confirmación y la Escritura Fiduciaria del Fideicomiso de GUC. Para recibir distribuciones en el marco del Plan, todos los tenedores de Intereses del Fideicomiso de GUC deberán identificarse a sí mismos ante el Fideicomisario de GUC y proporcionar información fiscal y los detalles específicos de sus activos, en la medida en que el Fideicomisario de GUC considere apropiado de la manera y de acuerdo con los procedimientos establecidos ocasionalmente por el Fideicomisario de GUC a estos efectos. Este requisito de identificación se aplica generalmente a todos los tenedores de Intereses del Fideicomiso de GUC, lo que incluye aquellos que mantienen sus valores a nombre del corredor. El Fideicomisario de GUC puede rehusarse a realizar la distribución a cualquier tenedor de un Interés del Fideicomiso de GUC que no proporcione tal información de manera oportuna y hasta que tal información sea proporcionada y puede tratar los Intereses del Fideicomiso de GUC de tal tenedor como controvertidos; disponiéndose, sin embargo, que si tal información no se proporciona al Fideicomisario de GUC en el plazo de seis (6) meses a partir de la solicitud original de proporcionar tal información, no se realizarán más distribuciones a tal tenedor de tal Interés del Fideicomiso de GUC; y disponiéndose, además, que cuando un tenedor de un Interés del Fideicomiso de GUC entregue tal información el Fideicomisario de GUC realizará la distribución a la que el tenedor del Interés del Fideicomiso de GUC tiene derecho, sin interés adicional ocasionado por la demora de tal tenedor de proporcionar la información taxativa; y disponiéndose, además, que si el Fideicomisario de GUC no realiza retenciones con respecto a los montos recibidos o distribuibles con respecto a tal tenedor y el Fideicomisario de GUC se considera responsable posteriormente por el monto de tal retención, tal tenedor deberá reembolsar al Fideicomisario de GUC tal pasivo (en la medida en que tales montos hayan sido realmente distribuidos a tal tenedor).

O.    **Disolución del Fideicomiso de GUC**

Al Fideicomisario de GUC y al Fideicomiso de GUC se les retirará el cargo o se disolverán, según sea el caso, en el momento en que ocurra lo primero de: (i) todos los Activos del Fideicomiso de GUC hayan sido distribuidos de acuerdo con el Plan y la Escritura Fiduciaria del Fideicomiso de GUC, y (ii) se hayan realizado todas las distribuciones que es necesario que el Fideicomisario de GUC haga de acuerdo con el Plan y la Escritura Fiduciaria del Fideicomiso de GUC. Tras la disolución del Fideicomiso de GUC, todos los Activos del Fideicomiso de GUC restantes, si los hubiere, volverán a la AEE.

P.    **Indemnización del Fideicomisario de GUC y miembros de la Junta del Fideicomiso de GUC**

El Fideicomisario de GUC o las personas que lo integran, según sea el caso, la Junta del Fideicomiso de GUC, los miembros de la Junta del Fideicomiso de GUC y sus respectivos empleados, agentes y profesionales, no serán responsables ante los Beneficiarios del Fideicomiso de GUC por las acciones tomadas u omitidas en su capacidad de, o en nombre de, el Fideicomisario de GUC o la Junta del Fideicomiso de GUC, según sea el caso, y cada uno de ellos tendrá derecho a ser indemnizado y reembolsado por el Fideicomiso de GUC por los honorarios y gastos en la defensa de todas y cada una de las acciones o inacciones en su capacidad de, o en nombre de, el Fideicomisario de GUC o la Junta del Fideicomiso de GUC, según corresponda, a excepción de las acciones o inacciones que impliquen mala conducta intencional o negligencia grave. Cualquier reclamación de indemnización del Fideicomisario de GUC, la Junta del Fideicomiso de GUC, los miembros de la Junta del Fideicomiso de GUC y las demás partes con derecho a indemnización en virtud de esta subsección se satisfará únicamente con los Activos del Fideicomiso de GUC y tendrá derecho a una distribución prioritaria de estos, por delante de los Intereses del Fideicomiso de GUC y cualquier otra reclamación o interés en dichos activos. El Fideicomisario de GUC, la Junta del Fideicomiso de GUC y los miembros de la Junta del Fideicomiso de GUC tendrán derecho a confiar, de buena fe, en el asesoramiento de sus profesionales contratados.

## SECCIÓN XX

## FIDEICOMISO DE ACCIONES DE ANULACIÓN

A.    **Celebración de Contrato de Fideicomiso de Acciones de Anulación**

En o antes de la Vigencia, la AEE y el Fideicomisario de Acciones de Anulación celebrarán el Contrato de Fideicomiso de Acciones de Anulación y tomarán todas las demás medidas necesarias para establecer el Fideicomiso de Acciones de Anulación y los Intereses del Fideicomiso de Acciones de Anulación en este, que serán en beneficio de los Beneficiarios del Fideicomiso de Acciones de Anulación, tanto si sus Reclamaciones se Permiten antes, en o después de la Vigencia. El Contrato de Fideicomiso de Acciones de Anulación puede otorgar facultades, obligaciones y autoridades además de los expresamente enunciados en el presente, pero solo en la medida en que esas facultades, obligaciones y autoridades no afecten la condición del Fideicomiso de Acciones de Anulación como «fideicomiso de liquidación» a efectos del impuesto federal a la renta de los Estados Unidos.

B.      **Finalidad del Fideicomiso de Acciones de Anulación**

El Fideicomiso de Acciones de Anulación se establecerá con el único propósito de realizar seguimiento de Acciones de Anulación y distribuir sus activos, de acuerdo con el artículo 301.7701-4(d) del Reglamento del Tesoro, sin ningún objetivo de continuar o participar en la realización de un comercio o negocio, salvo en la medida en que sea razonablemente necesario y coherente con el propósito de liquidar el Fideicomiso de Acciones de Anulación.

C.      **Activos del Fideicomiso de Acciones de Anulación**

El Fideicomiso de Acciones de Anulación consistirá en los Activos del Fideicomiso de Acciones de Anulación. En la Vigencia, la AEE transferirá todos los Activos del Fideicomiso de Acciones de Anulación al Fideicomiso de Acciones de Anulación. Los Activos del Fideicomiso de Acciones de Anulación pueden transferirse sujeto a determinadas obligaciones, según lo dispuesto en el Plan o en el Acuerdo del Fideicomiso de Acciones de Anulación. Dicha transferencia estará exenta de todo impuesto de timbre, transferencia inmobiliaria, información hipotecaria, ventas, uso u otro impuesto similar, conforme al artículo 1146(a) del Código de Quiebras. Tras la entrega de los Activos del Fideicomiso de Acciones de Anulación al Fideicomiso de Acciones de Acciones de Anulación, la AEE y sus predecesores, sucesores y causahabientes, y cada una de las Entidades liberadas conforme a la Sección XXIV del presente, se liberarán de toda responsabilidad con respecto a la entrega de tales distribuciones.

D.      **Administración del Fideicomiso de Acciones de Anulación**

El Fideicomiso de Acciones de Anulación será administrado por el Fideicomisario de Acciones de Anulación de acuerdo con Contrato de Fideicomiso de Acciones de Anulación y el Plan. En caso de cualquier incongruencia entre el Plan y el Contrato de Fideicomiso de Acciones de Anulación, regirá el Contrato de Fideicomiso de Acciones de Anulación.

E.      **El Fideicomisario de Acciones de Anulación**

Si el Fideicomisario de Acciones de Anulación fallece, queda incapacitado, se rescinde su contrato, o renuncia por cualquier razón, la Junta del Fideicomiso de Acciones de Anulación designará a un sucesor; *disponiéndose, sin embargo*, que bajo ninguna circunstancia el Fideicomisario de Acciones de Anulación sea un director o funcionario de cualquier Empresa asociada al Fideicomiso de Acciones de Anulación.

F.      **Función del Fideicomisario de Acciones de Anulación**

En cumplimiento y compatibilidad con el propósito del Fideicomiso de Acciones de Anulación y el Plan, y sujeto a los términos de la Orden de Confirmación, el Plan y el Contrato de Fideicomiso de Acciones de Anulación, y la supervisión de la Junta de Fideicomiso de Acciones de Anulación, el Fideicomisario de Acciones de Anulación tendrá, entre otras cosas, los siguientes derechos, poderes y deberes: (i) mantener, gestionar y convertir a Efectivo y distribuir oportunamente los Activos del Fideicomiso de Acciones de Anulación al Fideicomiso de GUC, lo que incluye seguir y resolver las Reclamaciones pertenecientes al Fideicomiso de Acciones de Anulación; (ii) mantener los Activos del Fideicomiso de Acciones de Anulación en beneficio de los Beneficiarios del Fideicomiso de Acciones de Anulación, ya sea si las Reclamaciones son

Permitidas en la Vigencia o después de esta; (iii) bajo el criterio de negocios razonable del Fideicomisario de Acciones de Anulación, investigar, seguir, resolver y/o abandonar Causas de Acción o litigios del Fideicomiso de Acciones de Anulación; (iv) preparar y radicar (o disponer que se preparen y radiquen), a partir de la Vigencia, todo formulario, declaración e informe regulatorio e impositivo y cualquier otro documento relacionado necesario o que el Fideicomisario de Acciones de Anulación considere apropiado con respecto al Fideicomiso de Acciones de Anulación; (v) bajo el criterio de negocios razonable del Fideicomisario de Acciones de Anulación, controlar, seguir y/o resolver en nombre del Fideicomiso de Acciones de Anulación, objeciones a Reclamaciones de las cuales el Fideicomisario de Acciones de Anulación será responsable; (vi) mantener, gestionar y distribuir oportunamente Ingresos del Fideicomiso de Acciones de Anulación en Efectivo u otro mediante el ejercicio se sus facultades y autoridad al Fideicomisario de GUC; y (vii) no prolongar indebidamente la duración del Fideicomiso de Acciones de Anulación. En toda circunstancia, el Fideicomisario de Acciones de Anulación actuará en el interés superior de todos los Beneficiarios del Fideicomiso de Acciones de Anulación y con vistas del propósito del Fideicomiso de Acciones de Anulación. El Fideicomisario de Acciones de Anulación estará obligado a proporcionar respuestas rápidas por escrito a las preguntas de la Junta de Supervisión, ocasionalmente, sobre el progreso del Fideicomiso de Acciones de Anulación en la administración de sus activos y distribuciones y sus finanzas.

## G.   Poder Fiscal del Fideicomisario de Acciones de Anulación respecto a la AEE Reorganizada

A partir de la Vigencia, el Fideicomisario de Acciones de Anulación preparará y radicará (o dispondrá que se prepare y radique), en nombre de la AEE Reorganizada, toda declaración de impuestos u otras declaraciones de información fiscal que deban radicarse o que el Fideicomisario de Acciones de Anulación considere apropiado de otro modo.

## H.   Transferibilidad de los Intereses del Fideicomiso de Acciones de Anulación

Los Intereses del Fideicomiso de Acciones de Anulación no serán transferibles o cedibles salvo mediante testamento, sucesión intestada o de pleno derecho.

## I.   Efectivo

El Fideicomisario de Acciones de Anulación podrá invertir Efectivo (lo que incluye ganancias o ingresos de este) conforme a lo permitido en el artículo 345 del Código de Quiebras; *disponiéndose, sin embargo*, que tales inversiones sean inversiones autorizadas por un fideicomiso de liquidación en el sentido de la del artículo 301.7701-4(d) del Reglamento del Tesoro, tal como se refleja en este, o según las directrices o resoluciones del SII u otras autoridades de control aplicables.

## J.   Distribución de Activos del Fideicomiso de Acciones de Anulación

El Fideicomisario de Acciones de Anulación distribuirá al Fideicomiso de GUC mensualmente todo el Efectivo disponible sin restricciones (incluido cualquier Efectivo recibido de la AEE en la Vigencia), excepto (i) Efectivo reservado de acuerdo con el Contrato de Fideicomiso de Acciones de Anulación para financiar las actividades del Fideicomiso de Acciones de Anulación, (ii) los montos que se puedan asignar o retener para pagar gastos razonables

incurridos o anticipados (lo que incluye, de forma no taxativa, cualquier impuesto gravado o pagadero por el Fideicomiso de Acciones de Anulación con respecto a los Activos del Fideicomiso de Acciones de Anulación); *disponiéndose, sin embargo*, que el Fideicomisario de Acciones de Anulación no esté obligado a realizar una distribución de conformidad con la Sección XX.J si el monto neto acumulado de Efectivo sin restricciones disponible para la distribución (teniendo en cuenta las exclusiones enumeradas anteriormente) es tal que haría que la distribución fuera impracticable según lo determine razonablemente el Fideicomisario de Acciones de Anulación, con el consentimiento de la Junta del Fideicomiso de Acciones de Anulación, de acuerdo con la legislación aplicable, y siempre y cuando tal monto acumulado sea inferior a un millón de dólares ($1,000,000).

**K.      Financiamiento, Costos y Gastos del Fideicomiso de Acciones de Anulación**

En la Vigencia, el Fideicomiso de Acciones de Anulación se financiará una única vez por un monto de hasta un millón de dólares ($1,000,000). Los costos y gastos razonables del Fideicomiso de Acciones de Anulación, lo que incluye los honorarios y gastos del Fideicomisario de Acciones de Acciones de Anulación y sus profesionales contratados, se pagarán con cargo a los Activos del Fideicomiso de Acciones de Anulación. Las tasas y gastos incurridos en relación con el seguimiento y la resolución de cualquier Acción de Anulación se considerarán costos y gastos del Fideicomiso de Acciones de Anulación. El Fideicomisario de la Acción de Anulación estará autorizado a utilizar los ingresos de los activos del fideicomiso para financiar el Fideicomiso de Acciones de Anulación, de ser necesario.

**L.      Compensación del Fideicomisario de Acciones de Anulación**

La o las personas físicas que cumplan funciones o comprendan el Fideicomisario de Acciones de Anulación tendrán derecho a una compensación razonable por un monto coherente con el de funcionarios similares que desempeñen funciones similares, cuyo pago no estará sujeto a la aprobación del Tribunal del Título III.

**M.      Contratación de Profesionales/Empleados por parte del Fideicomisario de Acciones de Anulación**

Sujeto a la aprobación y el consentimiento de la Junta del Fideicomiso de Acciones de Anulación, el Fideicomiso de Acciones de Anulación podrá contratar y compensar a abogados, otros profesionales y empleados para que asistan a la Junta del Fideicomiso de Acciones de Anulación conforme los términos que el Fideicomisario de Acciones de Anulación considere apropiados sin la aprobación del Tribunal del Título III.

**N.      Tratamiento del Impuesto Federal a la Renta del Fideicomiso de Acciones de Anulación**

1.      *Activos del Fideicomiso de Acciones de Anulación tratados como propiedad de los Acreedores.* Para todos los propósitos del impuesto federal sobre la renta de los Estados Unidos, todas las partes (incluidos, sin limitación, el Deudor, el Fideicomisario de Acciones de Anulación y los Beneficiarios del Fideicomiso de Acciones de Anulación) tratarán la transferencia de los Activos del Fideicomiso de Acciones de Anulación al Fideicomiso de Acciones de Anulación como (1) una transferencia de los activos del Fideicomiso de Acciones de

Anulación (sujeto a cualquier obligación relacionada con esos Activos) directamente a los Beneficiarios del Fideicomiso de Acciones de Anulación, seguido de (2) la transferencia por parte de dichos beneficiarios al Fideicomiso de Acciones de Anulación de los Activos del Fideicomiso de Acciones de Anulación a cambio de los intereses del Fideicomiso de Acciones de Anulación. En consecuencia, los Beneficiarios del Fideicomiso de Acciones de Anulación serán tratados para propósitos del impuesto federal sobre la renta de los Estados Unidos como los otorgantes y propietarios considerados de su respectiva parte de los Activos del Fideicomiso de Acciones de Anulación. El tratamiento anterior se aplicará también, en la medida en que lo permita la ley aplicable, a efectos de impuestos a la renta estatales y locales.

2.      Presentación de Informes Fiscales.

a)      El Fideicomisario de Acciones de Anulación preparará y radicará (o dispondrá que se preparen y radique) declaraciones de impuestos para el Fideicomiso de Acciones de Anulación que traten al Fideicomiso de Acciones de Anulación como fideicomiso de otorgante conforme al artículo 1.671-4(a) del Reglamento del Tesoro y conforme a la presente Sección XX.N. El Fideicomisario de Acciones de Anulación también enviará anualmente a cada tenedor de un Interés del Fideicomiso de Acciones de Anulación una declaración separada sobre los recibos y gastos del Fideicomiso de Acciones de Anulación según se requiere acorde a los impuesto federales a la renta de los Estados Unidos y ordenará a todos esos tenedores que utilicen esa información al preparar sus declaraciones federales del impuesto a la renta de los Estados Unidos o que remitan la información relevante a los Tenedores beneficiarios de tales tenedores con instrucciones de utilizar tal información en la preparación de sus declaraciones de impuestos federales a la renta de los Estados Unidos. El Fideicomisario de Acciones de Anulación también radicará (o dispondrá que se radique) cualquier otro informe, declaración o divulgación relacionada con el Fideicomiso de Acciones de Anulación que sea requerido por cualquier Unidad Gubernamental.

b)      El Fideicomisario de Acciones de Anulación valorará entonces de buena fe todos los demás Activos del Fideicomiso de Acciones de Anulación y pondrá todos los valores disponibles ocasionalmente, en la medida en que sea pertinente, y tales valores serán utilizados sistemáticamente por todas las partes del Fideicomiso de Acciones de Anulación (lo que incluye, de manera no taxativa, el Deudor, el Fideicomisario de Acciones de Anulación y los Beneficiarios de Acciones de Anulación) para todo fin de impuestos federales a la renta de los Estados Unidos.

c)      Las asignaciones de rentas imponibles del Fideicomiso de Acciones de Anulación entre los Beneficiarios del Fideicomiso de Acciones de Anulación se determinarán en función de la forma en que se distribuiría un monto de Efectivo que represente tales rentas imponibles (si se permitiera distribuir ese Efectivo en ese momento) si, inmediatamente antes de tal distribución considerada, el Fideicomiso de Acciones de Anulación hubiese distribuido todos sus activos a los tenedores de los Intereses del Fideicomiso de Acciones de Anulación, ajustados acorde a las rentas imponibles previas y pérdidas y tomando en cuenta todas las distribuciones anteriores y simultáneas del Fideicomiso de Acciones de Anulación. De manera similar, las pérdidas imponibles del Fideicomiso de Acciones de Anulación se asignarán por referencia a la forma en que una pérdida económica se asumiría inmediatamente después de una distribución liquidada hipotética de los Activos del Fideicomiso de Acciones de Anulación restantes. El valor

contable de los Activos del Fideicomiso de Acciones de Anulación a efectos del presente apartado
será igual a su valor justo de mercado en la Vigencia, ajustado de acuerdo con los principios de
contabilidad fiscal prescritos por el IRC, los Reglamentos del Tesoro aplicables y otras autoridades
y pronunciamientos administrativos y judiciales aplicables.

        d)     Sujeto a la orientación definitiva del SII o un tribunal de jurisdicción
competente en sentido contrario (lo que incluye la recepción por el Fideicomisario de Acciones de
Anulación de una carta en respuesta a consulta si el Fideicomisario de Acciones de Anulación así
lo solicita, o la recepción de una determinación adversa por el SII tras la auditoría si no es
impugnada por el Fideicomisario de Acciones de Anulación), el Fideicomisario de Acciones de
Anulación deberá (A) elegir oportunamente tratar cualquier reserva de Activos del Fideicomiso de
Acciones de Anulación como un «fondo de propiedad controvertida» regido por el artículo
1.468B-9 del Reglamento del Tesoro y (B) en la medida en que lo permita la ley aplicable, realizar
informes de manera coherente con lo que precede con fines de impuesto a la renta locales y
estatales. Todas las partes (lo que incluye el Fideicomisario de Acciones de Anulación y los
Beneficiarios del Fideicomiso de Acciones de Anulación) deberán informar a efectos de impuestos
federales, estatales y locales a la renta de los Estados Unidos de conformidad con lo anterior.

        e)     El Fideicomisario de Acciones de Anulación será responsable del
pago, de los Activos del Fideicomiso de Acciones de Anulación, de cualquier impuesto gravado
sobre el fideicomiso o sus activos. En el caso de que, y en la medida en que, cualquier Efectivo
retenido a causa de Reclamaciones Controvertidas sean insuficientes para pagar la parte de tales
impuestos atribuibles a las rentas imponibles derivadas de los activos asignables o retenidos a
causa de las Reclamaciones Controvertidas, talen impuestos podrán ser (i) reembolsados con a
partir de cualquier monto en Efectivo posterior retenido a causa de Reclamaciones Controvertidas,
o (ii) en la medida en que dichas Reclamaciones Controvertidas se hayan resuelto posteriormente,
deducido de cualquier monto que pueda distribuirse de otro modo por el Fideicomisario de
Acciones de Anulación como resultado de la resolución de tales Reclamaciones Controvertidas.

        3.     Retención de impuestos por parte del Fideicomisario de Acciones de
Anulación. El Fideicomisario de Acciones de Anulación podrá retener y pagar a la autoridad fiscal
relevante todos los montos que deban retenerse de acuerdo con el IRC o cualquier disposición de
cualquier ley fiscal extranjera, estatal o local con respecto a cualquier pago o distribución a los
tenedores de Intereses del Fideicomiso de Acciones de Anulación. Todas esas cantidades retenidas
y pagadas a la autoridad tributaria correspondiente (o colocada en cuenta de garantía hasta que se
resuelva la necesidad de retenerlas) se tratarán como montos distribuidos a tales tenedores de
Intereses del Fideicomiso de Acciones de Anulación a todos los efectos del Acuerdo del
Fideicomiso de Acciones de Anulación y se entenderá de que tal monto retenido reducirá la
cantidad efectivamente realizada por el tenedor aplicable en el momento de la distribución. El
Fideicomisario de Acciones de Anulación estará autorizado a recopilar la información fiscal de los
tenedores de acciones de impugnación Intereses Fideicomisos (lo que incluye, de manera no
taxativa, números de seguridad social u otros números de identificación fiscal) según el
Fideicomisario de Acciones de Anulación considere necesario a su entera discreción para llevar a
cabo el Plan, la Orden de Confirmación y el Acuerdo del Fideicomiso de Acciones de Anulación.
Para recibir distribuciones en el marco del Plan, todos los tenedores de Intereses del Fideicomiso
de Acciones de Anulación deberán identificarse a sí mismos ante el Fideicomisario de Acciones
de Anulación y proporcionar información fiscal y los detalles específicos de sus activos, en la

medida en que el Fideicomisario de Acciones de Anulación considere apropiado de la manera y de acuerdo con los procedimientos establecidos ocasionalmente por el Fideicomisario de Acciones de Anulación a estos efectos. Este requisito de identificación se aplica generalmente a todos los tenedores de Intereses del Fideicomiso de Acciones de Anulación, lo que incluye aquellos que mantienen sus valores a nombre del corredor. El Fideicomisario de Acciones de Anulación puede rehusarse a realizar la distribución a cualquier tenedor de un Interés del Fideicomiso de Acciones de Anulación que no proporcione tal información de manera oportuna y hasta que tal información sea proporcionada y puede tratar los Intereses del Fideicomiso de Acciones de Anulación de tal tenedor como controvertidos; _disponiéndose, sin embargo_, que si tal información no se proporciona al Fideicomisario de Acciones de Anulación en el plazo de seis (6) meses a partir de la solicitud original de proporcionar tal información, no se realizarán más distribuciones a tal tenedor de tal Interés del Fideicomiso de Acciones de Anulación; y _disponiéndose, además_, que cuando un tenedor de un Interés del Fideicomiso de Acciones de Anulación entregue tal información el Fideicomisario de Acciones de Anulación realizará la distribución a la que el tenedor del Interés del Fideicomiso de Acciones de Anulación tiene derecho, sin interés adicional ocasionado por la demora de tal tenedor de proporcionar la información taxativa; y _disponiéndose, además_, que si el Fideicomisario de Acciones de Anulación no realiza retenciones con respecto a los montos recibidos o distribuibles con respecto a tal tenedor y el Fideicomisario de Acciones de Anulación se considera responsable posteriormente por el monto de tal retención, tal tenedor deberá reembolsar al Fideicomisario de Acciones de Anulación tal pasivo (en la medida en que tales montos hayan sido realmente distribuidos a tal tenedor).

O.   **Disolución del Fideicomiso de Acciones de Anulación**

Al Fideicomisario de Acciones de Anulación y al Fideicomiso de Acciones de Anulación se les retirará el cargo o se disolverán, según sea el caso, en el momento en que ocurra lo primero de: (i) todos los Activos del Fideicomiso de Acciones de Anulación se han distribuido de acuerdo con el Plan y el Contrato de Fideicomiso de Acciones de Anulación, (ii) el Fideicomisario de Acciones de Anulación determina, con el consentimiento de la Junta de Fideicomiso de Acciones de Anulación, que la administración de los Activos del Fideicomiso de Acciones de Anulación restantes no es probable que produzca suficientes fondos adicionales del Fideicomiso de Acciones de Anulación para justificar su seguimiento adicional, incluso porque el gasto de administrar el Fideicomiso de Acciones de Anulación para hacer una distribución final a sus beneficiarios es probable que exceda el valor de los Activos restantes en el Fideicomiso de Acciones de Anulación, y (iii) se hayan realizado todas las distribuciones que es necesario que el Fideicomisario de Acciones de Anulación haga de acuerdo con el Plan y el Contrato de Fideicomiso de Acciones de Anulación. Tras la disolución del Fideicomiso de Acciones de Anulación, todos los Activos del Fideicomiso de Acciones de Anulación restantes, si los hubiere, se transferirán al Fideicomiso de GUC.

P.   **Indemnización del Fideicomisario de Acciones de Anulación y miembros del Fideicomiso de Acciones de Anulación por Bonos**

El Fideicomisario de Acciones de Anulación o las personas que lo integran, según sea el caso, la Junta del Fideicomiso de Acciones de Anulación, los miembros de la Junta del Fideicomiso de Acciones de Anulación y sus respectivos empleados, agentes y profesionales, no serán responsables ante los Beneficiarios del Fideicomiso de Acciones de Anulación por las acciones

tomadas u omitidas en su capacidad de, o en nombre de, el Fideicomisario de Acciones de Anulación o la Junta del Fideicomiso de Acciones de Anulación, según sea el caso, y cada uno de ellos tendrá derecho a ser indemnizado y reembolsado por el Fideicomiso de Acciones de Anulación por los honorarios y gastos en la defensa de todas y cada una de las acciones o inacciones en su capacidad de, o en nombre de, el Fideicomisario de Acciones de Anulación o la Junta del Fideicomiso de Acciones de Anulación, según corresponda, a excepción de las acciones o inacciones que impliquen mala conducta intencional o negligencia grave. Cualquier reclamación de indemnización del Fideicomisario de Acciones de Anulación, la Junta del Fideicomiso de Acciones de Anulación, los miembros de la Junta del Fideicomiso de Acciones de Anulación y las demás partes con derecho a indemnización en virtud de esta subsección se satisfará únicamente con los Activos del Fideicomiso de Acciones de Anulación y tendrá derecho a una distribución prioritaria de estos, por delante de los Intereses del Fideicomiso de Acciones de Anulación y cualquier otro reclamación o interés en dichos activos. El Fideicomisario de Acciones de Anulación, la Junta del Fideicomiso de Acciones de Anulación y los miembros de la Junta del Fideicomiso de Acciones de Anulación tendrán derecho a confiar, de buena fe, en el asesoramiento de sus profesionales contratados.

## SECCIÓN XXI

## DISPOSICIONES QUE RIGEN LAS DISTRIBUCIONES

A.   **Designación del Agente de Distribución**

La AEE, la AEE Reorganizada, el Fideicomisario de GUC y/o el Agente del Solicitante actuarán como Agente de Distribución o podrán emplear o contratar con otras entidades, para actuar como Agente de Distribución o para asistir o hacer las distribuciones requeridas por el Plan. Cualquier Agente de Distribución designado por la AEE o el Fideicomisario de GUC actuará sin garantía. Aparte de lo específicamente establecido en el Plan, el Agente de Distribución deberá hacer todas las distribuciones requeridas de acuerdo con el Plan. A menos que se disponga otra cosa en el presente, todas las distribuciones de acuerdo con el Plan serán realizadas por el Agente de Distribución.

B.   **Distribuciones a causa de Reclamaciones Permitidas a partir de la Vigencia**

Salvo que se disponga lo contrario en el presente, una Orden Final, o según lo acordado de otra manera por la AEE y el Tenedor de la Reclamación aplicable, en la primera Fecha de Distribución, el Agente de Distribución realizará las distribuciones iniciales conforme al Plan a causa de las Reclamaciones Permitidas en la Vigencia o tan pronto como sea posible a partir de entonces, sujeto al derecho de la AEE a oponerse a las Reclamaciones; *disponiéndose, sin embargo*, que las Reclamaciones de Gastos Administrativos Permitidas con respecto a las responsabilidades incurridas por la AEE en el ejercicio habitual de sus operaciones durante el Caso del Título III o asumidas por la AEE antes de la Vigencia se pagarán o se ejecutarán en el ejercicio habitual de sus operaciones de acuerdo con los términos y las condiciones de cualquier acuerdo de control, transcurso de negociación, transcurso de operaciones o práctica de la industria; *disponiéndose, además*, que el Agente de Distribución puede hacer distribuciones de las Tarifas del Acreedor del Acuerdo de Apoyo al Plan del Prestamista de Línea de Combustible a una parte con derecho a estas de una manera mutuamente acordada entre dicha parte y el Agente de

65

Distribución y en la medida en que las Tarifas del Acreedor del Acuerdo de Apoyo al Plan del Prestamista de Línea de Combustible serán pagaderas en efectivo, dichas Tarifas del Acreedor del Acuerdo de Apoyo al Plan del Prestamista de Línea de Combustible se pagarán a más tardar diez (10) Días Hábiles después de la Vigencia. Salvo que se disponga lo contrario en el Plan, los Tenedores de Reclamaciones no tendrán derecho a intereses, dividendos o devengamientos sobre las distribuciones previstas en el Plan, independientemente de si dichas distribuciones se entregan en o en cualquier momento después de la Vigencia. Sin perjuicio de cualquier disposición en contrario en el Plan, ningún Tenedor de una Reclamación Permitida recibirá, a causa de dicha Reclamación Permitida, una distribución que exceda el monto Permitido de dicha Reclamación.

**C.**      **Derechos y facultades del Agente de Distribución**

      1.      Facultades del Agente de Distribución

Salvo que se disponga de otro modo según el presente, el Agente de Distribución estará facultado para (a) adoptar todas las medidas y ejecutar todos los instrumentos y documentos necesarios para llevar a cabo el Plan, (b) hacer las distribuciones contempladas en el Plan, (c) cumplir con el Plan y las obligaciones que este impone; y (d) ejercer las demás facultades que se confieran al Agente de Distribución de acuerdo con una orden del Tribunal del Título III, de acuerdo con el Plan, o que el Agente de Distribución considere necesario y adecuado para implementar las disposiciones del Plan.

      2.      Honorarios y gastos incurridos en y a partir de la Vigencia

Salvo que el Tribunal del Título III disponga de otro modo, el monto de los honorarios y gastos razonables en que incurra el Agente de Distribución a partir de la Vigencia, y cualquier reclamación razonable de compensación y reembolso de gastos, lo que incluye, de manera no taxativa, honorarios y gastos razonables de abogado, en que incurra el Agente de Distribución, se abonarán en Efectivo sin órdenes adicionales por parte del Tribunal del Título III.

**D.**      **Reglas especiales para distribuciones a Tenedores de Reclamaciones Controvertidas**

Sin perjuicio de cualquier disposición en contrario en el Plan y salvo que las partes pertinentes acuerden lo contrario: (a) no se realizarán pagos parciales ni distribuciones parciales con respecto a una Reclamación Controvertida hasta que todas las controversias en relación con dicha Reclamación Controvertida hayan sido resueltas mediante una transacción o una Orden Final; y (b) ninguna Entidad que tenga tanto una Reclamación Permitida como una Reclamación Controvertida recibirá ninguna distribución sobre la Reclamación Permitida a menos que y hasta que todas las objeciones a la Reclamación Controvertida hayan sido resueltas por una transacción o una Orden Final o las Reclamaciones hayan sido Permitidas o eliminadas. Los dividendos u otras distribuciones que surjan de bienes distribuidos a los Tenedores de Reclamaciones Permitidas en una Clase y pagados a dichos Tenedores en virtud del Plan también se pagarán, en los montos aplicables, a cualquier Tenedor de una Reclamación Controvertida en dicha Clase que se convierta en Reclamación Permitida después de la fecha o fechas en que dichos dividendos u otras distribuciones se pagaron anteriormente a los Tenedores de Reclamaciones Permitidas en dicha Clase.

En el momento en que una Reclamación Controvertida se convierta, total o parcialmente, en una Reclamación Permitida, el Deudor Reorganizado distribuirá al Tenedor de esta las distribuciones, si las hubiere, a las que tal Tenedor tenga derecho según el Plan, junto con cualesquiera ganancias que se hayan acumulado al respecto (el neto de cualquier gasto, lo que incluye impuestos, correspondientes), pero solo en la medida en que esas ganancias sean atribuibles al monto de la Reclamación Permitida. Tal distribución, en su caso, se hará tan pronto como sea posible después de la fecha en que la orden o sentencia del Tribunal del Título III que permite tal Reclamación Controvertida se convierta en una Orden Final.

**E.    Entrega de Distribuciones**

1.    Puntualidad de las distribuciones

Cualquier distribución que deba efectuarse de acuerdo con el Plan se considerará oportuna si se realiza dentro de los diez (10) Días Hábiles siguientes a la fecha establecida en el Plan. Cuando la distribución que deba efectuarse según el presente Plan deba realizarse en un día que no sea un Día Hábil, dicha distribución se efectuará, sin intereses, en el Día Hábil inmediatamente posterior, pero se considerará que se ha efectuado en la fecha de vencimiento.

2.    Fecha de Registro para distribuciones

Sujeto a las disposiciones de la Regla de Quiebra 9010, y salvo según se dispone en la Orden de Confirmación o el presente, las distribuciones y entregas a Tenedores de Reclamaciones Permitidas se realizarán mediante DTC o en el domicilio de cada Tenedor según se establece en los Anexos radicados con el Tribunal, a menos que lo sustituyan por domicilios establecidos en las Evidencias de Reclamación radicadas por tales Tenedores, o en el último domicilio conocido de tal Tenedor si no se radica Evidencia de Reclamación o si notificó por escrito al Deudor de un cambio de domicilio; *disponiéndose, sin embargo*, que las distribuciones iniciales por parte del Agente de Distribución a beneficio de Tenedores de Reclamaciones de Bonos de Ingresos de la AEE Permitidas se realicen al Fideicomisario de Bonos, según corresponda, de tal obligación conforme a los documentos que rigen tales obligaciones. Ni la AEE ni ningún Agente de Distribución, incluido el Fideicomisario de GUC, tendrán obligación alguna de reconocer la transferencia o la venta de cualquier participación en cualquier Reclamación que ocurra después del cierre de la actividad comercial en la Fecha de Registro de Distribución, y tendrá derecho a todos los efectos del presente a reconocer y distribuir solo a aquellos Tenedores de Reclamaciones Permitidas (incluidos los Tenedores de Reclamaciones Permitidas después de la Fecha de Registro de Distribución) que sean Tenedores de dichas Reclamaciones, o participantes en estas, a partir del cierre de las actividades comerciales en la Fecha de Registro de Distribución. La AEE y cualquier Agente de Distribución tendrán derecho a reconocer y tratar a todos los efectos de acuerdo con el Plan solo a aquellos Tenedores de registro establecidos en el Registro de Reclamaciones oficial al cierre de las actividades comerciales en la Fecha del Registro de Distribución.

3.    Proceso de distribución

El Agente de Distribución realizará todas las distribuciones requeridas en virtud del Plan, excepto que las distribuciones a los Tenedores de Reclamaciones Permitidas regidas por un acuerdo separado y administradas por un Prestador de Servicios se depositarán con el Prestador de

Servicios apropiado, momento en el que dichas distribuciones se considerarán completadas, y el Prestador de Servicios entregará dichas distribuciones de acuerdo con el Plan y los términos del acuerdo de gobierno. Salvo que se disponga lo contrario en el presente, y sin perjuicio de cualquier autoridad en contrario, las distribuciones a los Tenedores de Reclamaciones Permitidas, incluidas las Reclamaciones Permitidas después de la Vigencia, se realizarán a los Tenedores de registro a partir de la Vigencia por el Agente de Distribución o un Prestador de Servicios, según corresponda: (1) a la dirección de dicho Tenedor según se establece en los libros y registros del Deudor (o si el Deudor ha sido notificado por escrito, en o antes de la fecha que es diez (10) días antes de la Vigencia, de un cambio de dirección, a la dirección cambiada); (2) de acuerdo con la Regla Federal de Procedimiento Civil 4 y sus modificaciones, y hecha aplicable por la Regla de Quiebras 7004, si no existe dirección en los libros y registros del Deudor, no se ha presentado ninguna Evidencia de Reclamación y el Agente de Distribución no ha recibido una notificación por escrito de un cambio de dirección en o antes de la fecha que es diez (10) días antes de la Vigencia; o (3) a cualquier asesor que haya comparecido en el Caso del Título III en nombre del Tenedor. El Deudor y el Agente de Distribución, según corresponda, no incurrirán en responsabilidad alguna por las distribuciones del Plan.

     4.     Tasa de cambio de moneda extranjera

Salvo que se disponga lo contrario en una Orden Final, a partir de la Vigencia, cualquier Reclamación presentada en moneda distinta a los dólares estadounidenses se considerará automáticamente convertida al valor equivalente en dólares estadounidenses utilizando la tasa de cambio para la moneda aplicable, tal como se publicó en el Wall Street Journal, edición nacional, en la Vigencia.

     5.     Distribuciones de minimis, fraccionarias, no entregables y no reclamadas

     (a)     *Distribuciones de minimis y fraccionarias*. El Agente de Distribución no realizará ninguna distribución de (i) Nuevos Bonos a causa de una Reclamación Permitida si el monto que se distribuirá al Tenedor específico de un Reclamación Permitida en la Fecha de Distribución aplicable tiene un valor económico inferior a $1,000.00 ni (ii) de Efectivo por parte del Agente de Distribución a causa de una Reclamación Permitida si el monto que se distribuirá al Tenedor específico de una Reclamación Permitida en la Fecha de Distribución aplicable tiene un valor económico inferior a $100.00. No se distribuirán Nuevos bonos fraccionarios. Cuando una parte fraccionaria de un Nuevo Bono de otro modo se redimiría de acuerdo con el Plan, la emisión real reflejará un redondeo a la baja al Nuevo Bono entero más cercano.

     (b)     *Distribuciones no entregables*. Si cualquier distribución a cualquier Tenedor es devuelta al Agente de Distribución como no entregable, no se hará ninguna otra distribución a dicho Tenedor a menos y hasta que se notifique por escrito al Agente de Distribución de la dirección actual de tal Tenedor. Sujeto a los términos y disposición de la Sección XXI.E.5(c) del presente, las distribuciones no entregables permanecerán en posesión del Agente de Distribución hasta el momento en que una distribución se torne

entregable. Todas las Entidades que, en última instancia, reciban Efectivo no entregable no tendrán derecho a ningún interés u otros montos devengados sobre ellos de ningún tipo. Nada de lo dispuesto en el Plan requerirá que el Agente de Distribución intente localizar a cualquier Tenedor de una Reclamación Permitida.

(c)   *Reversión de distribuciones no reclamadas*. Si (i) el Agente de Distribución envía un cheque a un Tenedor con respecto a las distribuciones y tal cheque no se hace efectivo en un plazo de ciento veinte (120) días después de la fecha en que se expidió dicho cheque o (ii) cualquier otra forma de distribución a un Tenedor es de otro modo imposible de entregar o se ha convertido de otro modo en una Distribución no Reclamada, el Agente de Distribución (o su agente debidamente autorizado) deberá, en o antes de la fecha ciento ochenta (180) días posterior a (i) la Vigencia, con respecto a todas las Reclamaciones Permitidas a partir de la Vigencia, (ii) la fecha en que se haga una distribución con respecto a cualquier Reclamación Controvertida que se convierta en Reclamación Permitida después de la Vigencia, radicar una lista en el Tribunal del Título III en la que se indiquen los nombres de las Entidades para las cuales se hayan efectuado distribuciones según el presente que no se hayan hecho efectivas o que hayan sido devueltas como no entregables en la fecha de su entrega. Cualquier Tenedor de una Reclamación Permitida en tal lista que no se identifique y haga valer sus derechos conforme al Plan para recibir una distribución dentro de los seis (6) meses posteriores a la fecha establecida en la lista se le finiquitará el derecho a tal distribución no entregable y quedará excluido para siempre de hacer valer cualquier derecho conforme al Plan contra el Deudor Reorganizado, o el fideicomisario de GUC, o sus profesionales, agentes o bienes correspondientes y todo (1) Efectivo en posesión del Agente de Distribución o el fideicomisario con respecto a valores existentes, según el caso, se liberará al Deudor Reorganizado para su uso en la liquidación de gastos de operación del Deudor Reorganizado y (2) los Nuevos Bonos en posesión del Agente de Distribución con respecto a los valores existentes se liberarán al Deudor Reorganizado para cancelación o depósito en el tesoro del Deudor Reorganizado, según determine el Deudor Reorganizado a su criterio exclusivo y absoluto.

6.   Entrega de instrumentos cancelados

Como condición para la participación conforme a este Plan, el Tenedor de un pagaré, obligación u otra evidencia de deuda de la AEE que desee recibir los bienes que se distribuirán a causa de una Reclamación Permitida basada en dicho pagaré, obligación u otra evidencia de deuda deberá entregar dicho pagaré, obligación u otra evidencia de deuda a la AEE o a su designado (a menos que la Reclamación de dicho Tenedor no se vea Impedida por el Plan, en cuyo caso no se requerirá dicha entrega), y firmará y entregará los demás documentos que sean necesarios para llevar a cabo el Plan; *disponiéndose, sin embargo*, que si un demandante es Tenedor de un pagaré, obligación u otra evidencia de deuda para la que no se ha emitido un certificado físico al Tenedor, sino que se mantiene en forma de anotación en cuenta de acuerdo con una garantía global

mantenida por parte de DTC u otro depositario de valores o custodio de estos, no se exigirá la entrega. A discreción exclusiva de la AEE, si no se produce la entrega de un pagaré, obligación u otra evidencia de deuda y el Tenedor de una Reclamación no proporciona una declaración jurada y acuerdo de indemnización, en forma y sustancia razonablemente satisfactorias para la AEE, que dicho pagaré, obligación u otra evidencia de deuda se perdió, entonces, no se podrá hacer ninguna distribución a dicho Tenedor con respecto a la Reclamación basada en dicho pagaré, obligación u otra evidencia de deuda.

7.     Cancelación de Pagarés, Instrumentos, Certificados y Otros documentos

Salvo (a) según se disponga en cualquier contrato, instrumento u otro acuerdo o documento celebrado u otorgado con relación al Plan , (b) para fines de probar el derecho de distribución conforme al Plan o (c) según se disponga de otro modo específicamente en el Plan (lo que incluye cualquier rechazo de Contratos a Ejecutarse o Arrendamientos no Vencidos conforme a la Sección XVIII.A del presente), en la Vigencia, los Bonos de Ingresos de la AEE, los Servicios de Línea de Combustible y todo instrumento y documento relacionado con estos se considerará automáticamente cancelado, rescindido y sin validez ni vigencia alguna contra el Deudor sin acto o acción adicional conforme a cualquier acuerdo, ley, regulación, orden o norma aplicable, y el Deudor y el fideicomisario aplicable, el agente pagador o agente fiscal, no tendrán obligaciones ni deberes y responsabilidades continuas según estos y las obligaciones de las partes del Deudor, si corresponde, conforme a los Bonos de Ingresos de la AEE y los Servicios de Línea de Combustible, todo instrumento y documento relacionado con estos se relevarán; *disponiéndose, sin embargo*, que, sin perjuicio de lo dispuesto en el presente al contrario, los Bonos de Ingresos de la AEE, los Servicios de Línea de Combustible y tales instrumentos y documentos relacionados seguirán siendo válidos únicamente (i) para permitir que el Agente de Distribución realice las distribuciones establecidas en el Plan y realice toda otra función administrativa u otra con respecto a este, (ii) para permitir que los Tenedores de Reclamaciones de Bonos de Ingresos de la AEE Permitidas y Reclamaciones de Préstamo de Línea de Combustible Permitidas reciban distribuciones conforme a los términos y disposiciones del Plan, (iii) para que cualquier fideicomisario, agente, administrador de contratos o entidad similar de todo instrumento y documento relacionado a esto, realice la funciones necesarias, lo que incluye realizar distribuciones, conforme al Plan, y para tener el beneficio de todos los derechos y protecciones y otras disposiciones de tales instrumentos y documentos, según corresponda, y todo otro acuerdo relacionado, (iv) para establecer los términos y condiciones aplicables a las partes de tales documentos e instrumentos que no sea el Deudor, o (v) según sea necesario para conservar cualquier reclamación en las Pólizas de Seguros respectivas y documentos relacionados emitidos por una Aseguradora Monolínea. Sin perjuicio de lo que antecede, y salvo disposición expresa en contrario en el Plan, tales bonos o documentos de bonos que queden pendientes no constituirán la base para la afirmación de ninguna Reclamación contra el Deudor o Deudor Reorganizado, según el caso.

**F.     Reclamaciones pagadas o pagaderas por terceros**

1.     Reclamaciones pagadas por terceros

Una Reclamación será reducida en su totalidad, y dicha Reclamación será rechazada sin que se tenga que presentar una objeción a tal Reclamación y sin ningún otro aviso a o acción, orden o aprobación del Tribunal del Título III, en la medida en que el Tenedor de dicha Reclamación

reciba el pago completo a cuenta de dicha Reclamación de una parte que no sea el Agente de Distribución. En la medida en que un Tenedor de una Reclamación reciba una distribución a causa de dicha Reclamación y reciba el pago de una parte que no sea el Agente de Distribución a causa de dicha Reclamación, dicho Tenedor reembolsará, devolverá o entregará cualquier distribución mantenida o transferida al Tenedor al Agente de Distribución aplicable en la medida en que la recuperación total del Tenedor a causa de dicha Reclamación por parte del tercero y de acuerdo con el Plan exceda el monto de dicha Reclamación a la fecha de dicha distribución conforme al Plan.

    2.      <u>Reclamaciones pagaderas por empresas de seguros</u>

Ninguna distribución de acuerdo con el Plan se hará a causa de una Reclamación Permitida que sea pagadera de acuerdo con una de las Pólizas de Seguro de la AEE hasta que el Tenedor de dicha Reclamación Permitida haya agotado todos los recursos con respecto a dicha póliza de seguro. En la medida en que una o más de las aseguradoras de la AEE acuerden satisfacer en su totalidad una Reclamación, entonces, inmediatamente después del acuerdo de dichas aseguradoras, dicha Reclamación puede ser eliminada en la medida de cualquier satisfacción acordada en el Registro de Reclamaciones por el Agente del Solicitante sin que sea necesario presentar una objeción de Reclamación y sin ninguna otra notificación a o acción, orden o aprobación del Tribunal del Título III.

    3.      <u>Aplicabilidad de las pólizas de seguros</u>

Salvo que se estipule lo contrario en el presente, las distribuciones a los Tenedores de Reclamaciones Permitidas deberán estar de acuerdo con las disposiciones de una póliza de seguros aplicable. Salvo que se disponga expresamente lo contrario en el presente documento, nada de lo contenido en el Plan constituirá o se considerará una renuncia a cualquier Causa de Acción que la AEE o cualquier Entidad pueda mantener contra cualquier otra Entidad, incluidas las Aseguradoras conforme cualquier póliza de seguros, tampoco lo contenido en el presente constituirá o se considerará una renuncia por parte de dichas aseguradoras de ninguna defensa, incluidas las defensas de cobertura, en poder de dichas aseguradoras.

## G.    **Requisitos de Retención y Presentación de Informes**

Cualquier parte que emita cualquier instrumento o realice cualquier distribución según el Plan deberá cumplir con todos los requisitos aplicables de retención y presentación de informes impuestos por cualquier ley fiscal o autoridad fiscal federal, estatal o local de los Estados Unidos, y todas las distribuciones según el Plan estarán sujetas a tales requisitos de retención o presentación de informes. Sin perjuicio de lo anterior, cada tenedor de una Reclamación Permitida que vaya a recibir una distribución según el Plan tendrá la responsabilidad única y exclusiva de satisfacción y pago de los impuestos gravados a ese Tenedor por cualquier Unidad Gubernamental, lo que incluye los impuestos de rentas, retención y otras obligaciones fiscales, a causa de tal distribución. Cualquier parte que emita cualquier instrumento o haga cualquier distribución según el Plan tiene derecho, pero no la obligación, a no hacer una distribución hasta que tal Tenedor haya tomado las disposiciones satisfactorias para dicha parte emisora o distribuidora para el pago de tales obligaciones de retención de impuestos y, si cualquiera de las partes que emite cualquier instrumento o realiza cualquier distribución según el Plan no realiza las retenciones con respecto

a la distribución de tal Tenedor, y más tarde es considerada responsable por el monto de dicha retención, el Tenedor reembolsará a dicha parte. El Agente de Distribución podrá exigir, como condición para la recepción de una distribución, que el Tenedor complete el Formulario W-8 o el Formulario W-9 correspondiente, según sea aplicable a cada Tenedor. Si el Tenedor no cumple dicha solicitud en el plazo de un año, dicha distribución se considerará una Distribución no Reclamada. La AEE se reserva el derecho de asignar todas las distribuciones hechas de acuerdo con el Plan en cumplimiento de todos los embargos salariales aplicables, pensión alimenticia, manutención de los hijos y otras indemnizaciones conyugales, Gravámenes y embargos.

## H.   Tiempo Límite para Pagos en Efectivo

Los cheques expedidos por el Agente de Distribución a causa de las Reclamaciones Permitidas serán nulos si no se hacen efectivos en un plazo de ciento veinte (120) días a partir de la fecha de emisión de estos. El tenedor de la Reclamación Permitida con respecto a la cual se expidió inicialmente dicho cheque presentará directamente las solicitudes de reexpedición de cualquier cheque al Agente de Distribución. Toda reclamación con respecto a tal cheque anulado se efectuará en o antes del posterior del (i) primer (1.er) aniversario de la Vigencia o (ii) noventa (90) días después de la fecha de emisión de dicho cheque, si dicho cheque representa una distribución final según la presente a causa de dicha Reclamación. Después de tal fecha, todas las Reclamaciones con respecto a los cheques anulados deberán finiquitarse y quedar excluidas para siempre y el Agente de Distribución conservará todos los fondos relacionados con estas con el único fin de redistribuirlos a los tenedores de Reclamaciones Permitidas de acuerdo con los términos y disposiciones del presente.

## I.   Distribuciones después de la Vigencia

Se considerará que las distribuciones efectuadas después de la Vigencia a Tenedores de Reclamaciones que no son Reclamaciones Permitidas a la Vigencia, pero que posteriormente pasan a ser Reclamaciones Permitidas, se han realizado conforme a los términos y disposiciones de la Sección XXI.E del Plan.

## J.   Compensaciones

Salvo que se disponga de otro modo en el Plan o en la Orden de Confirmación, el Agente de Distribución puede, conforme a la legislación de quiebras o que no sea de quiebras, compensar contra cualquier Reclamación Permitida y las distribuciones a realizar conforme al Plan a causa de estas (antes de que se realice ninguna distribución conforme a tal Reclamación por parte del Agente de Distribución), las reclamaciones, derechos y Causas de Acción de cualquier naturaleza que el Deudor o el Deudor Reorganizado puedan tener contra el Tenedor de tal Reclamación Permitida, disponiéndose, sin embargo, que ni la falta de realizar tal compensación ni la asignación de ninguna Reclamación según el presente constituirá una renuncia o descargo por parte del Deudor o el Deudor Reorganizado de tales reclamaciones, derechos y Causas de Acción que el Deudor o el Deudor Reorganizado puedan poseer contra tal Tenedor, y disponiéndose, además, que nada en el contenido del presente pretende limitar la capacidad de cualquier Acreedor de dar pleno vigor y efecto a derechos de compensación o recuperación conservados o permitidos por las disposiciones de los artículos 553, 555, 559 o 560 del Código de Quiebras o conforme al derecho consuetudinario de recuperación; y   disponiéndose, además, que nada de lo contenido en la

presente Sección XXI.J afectará los descargos y medidas cautelares dispuestas en la Sección XXIV del Plan.

## K.    Asignación entre capital e interés devengado

En la medida en que cualquier Reclamación Permitida con derecho a una distribución según el Plan de la ACT consista en endeudamiento y otros montos (tal como intereses devengados pero impagos sobre estos), dicha distribución se asignará *en primer lugar*, a los intereses devengados e impagos a partir de la fecha inmediatamente anterior a la Fecha de Petición, *en segundo lugar*, al capital de la Reclamación (según se determine a efectos del impuesto federal a la renta) y, *en tercer lugar*, en la medida en que la contraprestación exceda el capital de la Reclamación, a esos otros montos; *disponiéndose, sin embargo*, que el tratamiento por parte del Deudor y el Deudor Reorganizado de cualquier distribución para sus fines fiscales no sea vinculante para ningún Acreedor en cuanto al tratamiento de tales distribuciones con fines reglamentarios, fiscales o de otro tipo.

## L.    Tenedor de Reclamaciones

A todos los efectos del Plan, lo que incluye, de manera no taxativa, a los efectos de las distribuciones conforme a los términos y disposiciones de la Sección XXI, Tenedor de una Reclamación significa cualquier Entidad que, directa o indirectamente, tenga poder de inversión respecto de cualquier Reclamación, lo que incluye la facultad de enajenar o dirigir la enajenación de tal Reclamación; *disponiéndose, sin embargo*, que solamente con respecto a los Bonos de Ingresos de la AEE Asegurados y el artículo 1126 del Código de Quiebras, el Tenedor de cualquier Bono de Ingresos de la AEE Asegurado se determinará de acuerdo con el artículo 301(c)(3) de PROMESA y cualquier ley o documentos de control aplicables a tales Reclamaciones de Bonos de Ingresos de la AEE Asegurados.

## M.    Exculpación

A partir de la Vigencia, el Agente de Distribución será exculpado por todas las Entidades, lo que incluye, de manera no taxativa, los Tenedores de Reclamaciones y otras partes interesadas, de toda reclamación, Causa de Acción y otros alegatos de responsabilidad derivados del cumplimiento de las facultades y obligaciones que le confieren al Agente de Distribución el Plan o cualquier orden del Tribunal del Título III que se haya dictado conforme al Plan o en cumplimiento de este, o de la ley aplicable, excepto en el caso de acciones o falta de acción derivados de negligencia grave o de mala conducta intencional de tal Agente de Distribución. Ningún Tenedor de una Reclamación u otra parte interesada tendrá o iniciará ninguna reclamación o causa de acción contra el Agente de Distribución porque este realice pagos de acuerdo con el Plan o implemente las disposiciones del Plan.

## SECCIÓN XXII

### PROCEDIMIENTOS PARA RESOLVER RECLAMACIONES CONTROVERTIDAS

**A.**     **Objeciones a Reclamaciones y seguimiento de Reclamaciones Controvertidas**

       Salvo en lo que respecta a las Reclamaciones Permitidas, y sujeto a los términos y condiciones de los Procedimientos de ADR y la Orden de ADR, el Deudor Reorganizado, a través de la Junta de Supervisión, objetarán y asumirán toda objeción pendiente radicada por el Deudor a la admisión de Reclamaciones radicadas ante el Tribunal del Título III con respecto a las cuales dispute la responsabilidad, prioridad o monto, lo que incluye, de manera no taxativa, las objeciones a Reclamaciones que se hayan cedido y la afirmación de la doctrina de subordinación equitativa con respecto a estas. Todas las objeciones, defensas afirmativas y contrademandas serán litigadas hasta obtener una Orden Final; *disponiéndose, sin embargo*, que el Deudor Reorganizado, a través de la Junta de Supervisión, estará facultado para radicar, resolver, conciliar o retirar toda objeción a Reclamaciones, sin necesidad de aprobación por parte del Tribunal del Título III. A menos que el Tribunal del Título III disponga otra cosa, en la medida en que no sea ya objeto de objeciones por parte del Deudor, el Deudor Reorganizado radicará y presentará todas las objeciones a Reclamaciones lo antes posible, pero, en cada caso, a más tardar en la Fecha Límite de Objeción de Reclamaciones. Sin perjuicio de cualquier disposición en contrario contenida en el Plan, en la Vigencia, cualquier (i) Reclamación de Bonos de Ingresos de la AEE o Reclamación de Préstamo de Línea de Combustible presentada por cualquier Entidad por montos adeudados en virtud de valores existentes y (ii) Evidencias de Reclamación incluidas en un anexo del Complemento del Plan, si las hubiere, se considerarán satisfechas y eliminadas y la Junta de Supervisión dará instrucciones al Agente del Solicitante, su representante designado por el tribunal, para que elimine dichas Reclamaciones del Registro de Reclamaciones mantenido en beneficio del Tribunal del Título III.

       Salvo que se disponga lo contrario en el presente, ninguna Reclamación se convertirá en una Reclamación Permitida a menos que dicha Reclamación se considere Permitida de acuerdo con el Plan o PROMESA, o el Tribunal del Título III haya ingresado una Orden Final que permita dicha Reclamación. Para evitar dudas, no hay ningún requisito de presentar una Evidencia de Reclamaciones para (o moción ante el Tribunal del Título III para permitir) que sea una Reclamación Permitida de acuerdo con el Plan. **Salvo que se estipule lo contrario en el presente, todas las Evidencias de Reclamación presentadas después de la Vigencia serán rechazadas y se restringirá, excluirá y prohibirá para siempre la afirmación, y no será exigible contra la AEE o la AEE Reorganizada, sin la necesidad de ninguna objeción por la AEE o la AEE Reorganizada o cualquier otra notificación a o acción, orden o aprobación del Tribunal del Título III.**

**B.**     **Estimación de Reclamaciones**

       Salvo en lo que respecta a las Reclamaciones Permitidas, en la Vigencia de y después de esta, y a menos que una orden del Tribunal del Título III lo límite de otro modo, lo que incluye, de manera no taxativa, la Orden de la ACR y la Orden de la ADR, el Deudor Reorganizado, a través de la Junta de Supervisión, podrá en cualquier momento pedir al Tribunal del Título III que calcule a efectos de distribución final cualquier Reclamación contingente, por liquidar o Controvertida

conforme al artículo 502(c) del Código de Quiebras, independientemente de si el Deudor se opuso previamente a dicha Reclamación o trató de estimarla, y el Tribunal del Título III retendrá la jurisdicción para considerar cualquier solicitud de estimación de cualquier Reclamación durante el litigio con respecto a cualquier objeción a cualquier Reclamación, lo que incluye, de manera no taxativa, durante la pendencia de cualquier apelación con respecto a tal objeción. A menos que se disponga otra cosa en una orden del Tribunal del Título III, en caso de que el Tribunal del Título III estimase cualquier reclamación contingente, por liquidar o Controvertida, el monto estimado constituirá el monto permitido de dicha Reclamación o una limitación máxima de dicha Reclamación, según determine el Tribunal del Título III; disponiéndose, sin embargo, que, si la estimación constituye la limitación máxima de dicha Reclamación, el Deudor Reorganizado, a través de la Junta de Supervisión, podrá optar por iniciar procedimientos suplementarios para objetar a cualquier admisión definitiva de tal Reclamación; y, disponiéndose, además, que lo que antecede no pretende limitar los derechos concedidos por el artículo 502(j) del Código de Quiebras. Todos los procedimientos de objeción, estimación y resolución de Reclamaciones antes mencionados son acumulativos y no se excluyen necesariamente entre sí.

**C.      Responsabilidades de administración de Reclamaciones**

Salvo que se disponga específicamente lo contrario en el Plan, después de la Vigencia, la AEE tendrá la autoridad exclusiva para: (1) presentar, retirar o litigar a juicio, objeciones a reclamaciones; (2) resolver o conciliar cualquier Reclamación Controvertida sin previo aviso o acción, orden o aprobación del Tribunal del Título III; y (3) administrar y ajustar el Registro de Reclamaciones para que refleje dichos acuerdos o compromisos sin previo aviso a o acción, orden o aprobación por parte del Tribunal del Título III. Para evitar dudas, salvo que se disponga lo contrario en el presente, a partir de la Vigencia y después de esta, la AEE tendrá y conservará todos los derechos y defensas que la AEE tuviera inmediatamente antes de la Vigencia con respecto a cualquier Reclamación Controvertida.

**D.      Ajuste para Reclamaciones sin objeciones**

Cualquier Reclamación duplicada o cualquier Reclamación que haya sido pagada, satisfecha, modificada o reemplazada puede ser ajustada o eliminada del Registro de Reclamaciones por la AEE sin que la AEE tenga que presentar una solicitud, moción, queja, objeción o cualquier otro procedimiento legal que pretenda objetar dicha Reclamación y sin previo aviso a o acción, orden o aprobación del Tribunal del Título III.

**E.      Extensión de la Fecha Límite de Objeción de Reclamaciones**

A petición de la AEE Reorganizada al Tribunal del Título III, la AEE Reorganizada puede solicitar, y el Tribunal del Título III puede conceder, una extensión a la Fecha Límite de Objeción de Reclamaciones en general o con respecto a Reclamaciones específicas. Cualquier extensión otorgada por el Tribunal del Título III no se considerará una modificación del Plan conforme el artículo 313 de PROMESA.

**F.      Autoridad para modificar la lista de acreedores**

La AEE estará facultada para modificar la Lista de Acreedores con respecto a cualquier Reclamación y para efectuar distribuciones basadas en tal Lista de Acreedores modificada sin

75

aprobación por parte del Tribunal del Título III. Si tal modificación a la Lista de Acreedores reduce el monto de una Reclamación o cambia la naturaleza o prioridad de una Reclamación, la AEE notificará al Tenedor de tal Reclamación de tal modificación y tal Tenedor dispondrá de veinte (20) días para presentar una objeción a tal modificación ante el Tribunal del Título III. Si no se presenta tal objeción, el Agente de Distribución podrá proceder con las distribuciones en base a tal Lista de Acreedores modificada sin aprobación por parte del Tribunal del Título III.

**G.**    **Sin interés**

A menos que se disponga de otro modo en el presente o por orden del Tribunal del Título III, los intereses posteriores a la petición con respecto a Reclamaciones no se devengarán ni pagarán, y ningún Tenedor de una Reclamación tendrá derecho a intereses devengados en o después de la Fecha de Petición sobre cualquier Reclamación o derecho. Además, y sin limitar lo anterior, no se devengarán ni se pagarán intereses sobre ninguna Reclamación Controvertida con respecto al período comprendido entre la Vigencia y la fecha en que se realice una distribución final a causa de tal Reclamación Controvertida, siempre y cuando dicha Reclamación Controvertida se convierta en una Reclamación Permitida.

**H.**    **Denegación de Reclamaciones**

Se denegarán todas la Reclamaciones de cualquier Entidad a la que la AEE solicite bienes conforme a los artículos 550 o 553 del Código de Quiebras o que la AEE alegue sea cesionaria de una transferencia evitable conforme a los artículos 544, 545, 547, 548 o 549 del Código de Quiebras si: (a) la entidad, por una parte, y la AEE, por otra parte, acuerdan o el Tribunal del Título III haya determinado mediante Orden Final que dicha Entidad o cesionario está obligado a entregar cualquier bien o fondos en virtud de cualquiera de los artículos antes mencionados del Código de Quiebras y (b) tal Entidad o cesionario no ha entregado esos bienes en la fecha establecida en tal acuerdo u Orden Final.

## SECCIÓN XXIII

## GOBERNANZA Y DISPOSICIONES RELATIVAS AL FIDEICOMISO DE PAYGO DE LA AEE Y EL SISTEMA DE PENSIONES

**A.**    **Formación y responsabilidades del Fideicomiso de PayGo de la AEE**

En la Vigencia o antes de esta, la AEE adoptará todas las medidas necesarias para establecer el Fideicomiso de PayGo de la AEE, lo que incluye, de manera no taxativa, ejecutar y otorgar la Escritura del Fideicomiso de PayGo de la AEE.

**B.**    **Financiamiento del Fideicomiso de PayGo de la AEE**

1.    Financiamiento inicial

A la Vigencia, la AEE contribuirá, o provocará que se contribuya al Fideicomiso de PayGo de la AEE, un millón de dólares ($1,000,000) para financiar las tasas, costos y gastos administrativos iniciales del Fideicomiso de PayGo de la AEE.

2.     Financiamiento continuo del Fideicomiso de PayGo de la AEE

La AEE Reorganizada efectuará pagos por la amortización de la deuda con respecto a la Distribución de Nuevos Bonos de PayGo de la AEE y los Nuevos Bonos en Exceso, si los hubiere, mantenidos por el Fideicomiso de PayGo de la AEE de acuerdo con el Nuevo Contrato de Emisión Principal. Además, a partir y después del Año Fiscal en el que se produzca la Vigencia, la AEE Reorganizada hará, o provocará que se hagan, contribuciones anuales (pero en ningún caso después del 30 de septiembre siguiente a la conclusión de cada Año Fiscal) al Fideicomiso de PayGo de la AEE de tal manera que:

(a)    los pagos combinados a causa de la Distribución de Nuevos Bonos de PayGo de la AEE y los Nuevos Bonos en Exceso y esta cláusula (a) serán suficientes para que el Fideicomiso de PayGo de la AEE reembolse al SRE de la AEE por los beneficios de jubilación pagados y los gastos administrativos incurridos en el Año Fiscal anterior que finaliza el 30 de junio, y

(b)    la contribución en la cláusula inmediatamente anterior (a) se incrementará o limitará de tal manera que, después de dicha aportación, los activos del Fideicomiso de PayGo de la AEE equivaldrán a dos (2) veces los beneficios de jubilación previstos que se pagarán y los gastos administrativos que se incurrirán durante el Año Fiscal en curso, donde cualquier aumento resultante del monto pagado de acuerdo con la cláusula inmediatamente anterior (a) no excederá de cincuenta millones de dólares ($50,000,000) en un Año Fiscal determinado.

C.     **Gestión del Fideicomiso de PayGo de la AEE**

El Fideicomiso de PayGo de la AEE será administrado por una entidad independiente cuyos miembros deberán cumplir con los estándares de independencia, profesionalismo, experiencia y calificación establecidos en la Escritura del Fideicomiso PayGo de la AEE.

D.     **Pacto de no Afectación**

La AEE acuerda en el presente documento, y se comprometerá en la Escritura del Fideicomiso de PayGo de la AEE, para el beneficio de todos los participantes que, con respecto a los pagos y otras obligaciones adeudadas al SRE de la AEE de acuerdo con el Plan, todas esas obligaciones permanecerán en su lugar y no serán alteradas o modificadas hasta que todas estas obligaciones hayan sido satisfechas en su totalidad de acuerdo con las disposiciones del Plan y los Documentos Definitivos, exigibles por cualquiera y cada uno de los miembros de la Junta de Supervisión, el Fideicomiso de PayGo de la AEE, y el SRE de la AEE y, con respecto a cualquier disposición de este tipo, la Escritura del Fideicomiso de PayGo de la AEE no será alterada o modificada por la AEE Reorganizada excepto (i) con el consentimiento previo expreso por escrito de la Junta de Supervisión (si existe), y el SRE de la AEE, o (ii) de acuerdo con un caso nuevo o reabierto del Título III para la AEE Reorganizada y un plan de ajuste nuevo o modificado, confirmado y vigente.

E.     **Mantenimiento de la Pensión**

Antes del décimo (10.º) aniversario de la Vigencia, tanto el Gobierno del Estado Libre Asociado de Puerto Rico como la AEE Reorganizada, lo que incluye, sin limitación, por cualquier Entidad o Persona que actúe para o en nombre de esta, no (a) implementarán la legislación existente, promulgarán nueva legislación ni celebrarán nuevos acuerdos de negociación colectiva u otros contratos para crear o aumentar cualquier pago de pensión de beneficios definidos u obligación para los jubilados actuales o futuros de o relacionados con cualquier plan de beneficios definidos sobre los beneficios proporcionados por el Plan, independientemente de la fuente de financiamiento, ni (b) desharán (total o parcialmente) las eliminaciones del Plan de los devengamientos del plan de beneficios definidos y los ajustes del costo de vida para los participantes del SRE de la AEE.

## SECCIÓN XXIV

## EFECTO DE LA CONFIRMACIÓN DEL PLAN

A.     **Extinción y Descargo de Reclamaciones y Causas de Acción**

1.     **Satisfacción completa, descarga y liberación**

Salvo lo expresamente dispuesto en el Plan o en la Orden de Confirmación, todas las distribuciones y derechos otorgados bajo el Plan serán, y se considerarán, a cambio de y por la completa satisfacción de la liquidación, la descarga y la liberación de todas las Reclamaciones o causas de Acción contra la AEE y la AEE Reorganizada que surgieran, total o parcialmente, antes de la Vigencia, en relación con el Caso de Título III, el Deudor o el Deudor Reorganizado o cualquiera de sus respectivos activos, bienes o intereses de cualquier naturaleza, lo que incluye cualquier interés acumulado en tales Reclamaciones desde y después de la Fecha de Petición, y sin importar si cualquier propiedad ha sido distribuida o retenida de acuerdo con el Plan a causa de tales Reclamaciones o Causas de Acción. En la Vigencia, toda reclamación, causa de acción y cualquier otra deuda que surja se considerará extinguida y descargada, total o parcialmente, antes de la Vigencia (incluso antes de la Fecha de Petición) contra los Deudores y Deudores Reorganizados, así como toda deuda del tipo especificado en los artículos 502(g), 502(h) o 502(i) del Código de la Quiebra, independientemente de que (a) se radique o no una Evidencia de Reclamación en base a tal Deuda, o se considere radicada en virtud del artículo 501 del Código de Quiebras, (b) una Reclamación en base a tal deuda esté permitida en virtud del artículo 502 del Código de Quiebras (o se resuelve de otro modo), o (c) el Tenedor de una Reclamación basada en tal deuda votó para aceptar el Plan.

2.     **Prohibición de la afirmación de Reclamaciones contra el Deudor**

Se prohibirá que todas las entidades hagan valer cualesquiera y todas las Reclamaciones u otras obligaciones, demandas, juicios, daños y perjuicios, Deudas, derechos, remedios, Causas de Acción o responsabilidades, de cualquier naturaleza, lo que incluye cualquier interés devengado en tales reclamaciones desde y después de la Fecha de Petición, contra el Deudor y el Deudor Reorganizado y cada uno de sus respectivos activos, bienes y derechos, relacionados con el Caso del Título III, independientemente de si algún bien se hubiera distribuido o retenido de acuerdo con el Plan a causa de tales Reclamaciones u otras obligaciones, demandas, juicios, daños, Deudas, derechos, remedios, Causas de Acción o responsabilidades. De acuerdo con lo anterior, salvo

según se dispone expresamente en el Plan o en la Orden de Confirmación, la Orden de Confirmación constituirá una determinación judicial, a partir de la Vigencia, de la extinción y descarga de todas esas Reclamaciones, Causas de Acción o Deudas de o contra el Deudor y el Deudor Reorganizado conforme a los artículos 524 y 944 del Código de Quiebras, aplicables al Caso del Título III conforme al Artículo 301 de PROMESA, y tal extinción anulará y extinguirá toda sentencia obtenida contra el Deudor o el Deudor Reorganizado y sus respectivos Activos y bienes, en cualquier momento, en la medida en que tal sentencia se relacione con una Reclamación, Deuda o responsabilidad extinguida. A la Vigencia, y en contraprestación al valor previsto en el Plan, cada Tenedor de una Reclamación de cualquier Clase en virtud del presente Plan habrá y por la presente se considerará que extinguirá y descarará para siempre al Deudor y al Deudor Reorganizado, y sus respectivos Activos y bienes y todas esas Reclamaciones.

3.   **Interdicto relacionado con la descarga de Reclamaciones**

Salvo que se disponga de manera expresa de otro modo en la presente Sección XXIV del Plan, la Orden de Confirmación de la ACT o tal otra Orden Final del Tribunal del Título III que sea aplicable, todas las Entidades que hayan mantenido o mantengan Reclamaciones o cualquier otra Deuda o responsabilidad que se extinga o exima conforme a la Sección XXIV del presente o que hayan mantenido, mantengan o puedan mantener Reclamaciones o cualquier otra Deuda o responsabilidad que se extinga o exima conforme a la Sección XXIV del presente tienen permanentemente prohibido, a partir de la Vigencia, (a) comenzar o continuar, directa o indirectamente, de cualquier forma, cualquier acción u otro procedimiento (lo que incluye, de manera no taxativa, cualquier procedimiento judicial, de arbitraje, administrativo u otro) de cualquier tipo en tal Reclamación u otra Deuda o responsabilidad que se extinga o libere conforme al Plan contra cualquier de las Partes Eximidas o cualquiera de sus activos o bienes correspondientes, (b) la ejecución, embargo, cobro o recuperación de cualquier forma o por cualquier medio de cualquier sentencia, adjudicación, decreto u otra orden contra cualquier de las Partes Eximidas o cualquiera de sus Activos o bienes correspondientes a causa de cualquier Reclamación u otra Deuda o responsabilidad extinta o liberada conforme al Plan, (c) crear, perfeccionar o hacer cumplir cualquier gravamen de cualquier tipo contra cualquiera de las Partes Eximidas o cualquiera de sus activos o bienes correspondientes a causa de cualquier Reclamación u otra deuda o responsabilidad extinta conforme al Plan de la ACT y (d) salvo en la medida dispuesta, permitida o ponderada en los artículos 553, 555, 556, 559, o 560 del Código de Quiebras o conforme al derecho consuetudinario de recuperación, haciendo valer cualquier derecho a compensación, subrogación o recuperación de cualquier tipo con respecto a cualquier obligación debida por cualquiera de las Partes Eximidas o cualquiera de sus activos o bienes correspondientes a causa de cualquier Reclamación u otra Deuda o responsabilidad extinta o liberada conforme al Plan. Tal interdicto se extenderá a todos los sucesores y causahabientes de las Partes Eximidas y sus respectivos activos y bienes.

B.   **Exenciones por parte del Deudor y el Deudor Reorganizado**

**Salvo que se disponga expresamente de otro modo en el Plan o en la Orden de Confirmación, en la Vigencia, y por contraprestación suficiente, se considerará que cada uno del Deudor y el Deudor Reorganizado, el Agente de Distribución y cada una de las Personas Relacionadas al Deudor y el Deudor Reorganizado ha y por el presente renuncia, exime, exonera y extingue por siempre, finalmente, íntegramente, de manera incondicional e**

irrevocable a las Partes Eximidas de toda Reclamación o Causa de Acción que el Deudor y el Deudor Reorganizado y el Agente de Distribución o cualquier de estos, o cualquiera que reclame mediante estos, en su nombre o en su beneficio, tenga o puede tener o afirma que tiene, ahora o en el futuro, contra cualquier Parte Eximida que sean Reclamaciones Eximidas o que se relacionen, estén conectadas, surjan o estén basadas de otro modo, total o parcialmente, en cualquier acción, omisión, transacción, evento u otra circunstancia relacionada a los Caso del Título III, el Acuerdo de Apoyo al Plan del Prestamista de Línea de Petróleo, el Deudor que existan en la Vigencia y/o cualquier Reclamación acción, hecho, transacción, incidencia, declaración u omisión supuesta o que se podría haber supuesto o relacionada, lo que incluye, de manera no taxativa, cualquier Reclamación, intimación, derecho, responsabilidad o causa de acción por indemnización, contribución o cualquier otra base legal o de equidad por daños y perjuicios, costos o tasas.

C.      Liberaciones por parte de los Tenedores de Reclamaciones

Sin perjuicio de cualquier disposición en contrario contenida en este Plan, a partir de la Vigencia, por contraprestación suficiente y onerosa, se considerará que cada Parte que Exime ha eximido y exonerado al Deudor y al Deudor Reorganizado de cualesquiera y todas las Causas de Acción, ya sean conocidas o desconocidas, incluyendo cualquier reclamación derivada, afirmada en nombre del Deudor, que dicha Entidad hubiera tenido derecho legal a hacer valer (ya sea individual o colectivamente), sobre la base o en relación con, o de cualquier manera derivada, en su totalidad o en parte, del Deudor (incluida la administración, la propiedad o la gestión de este), los esfuerzos de reestructuración extrajudicial o presenciales del Deudor, las transacciones inter-compañías, el Caso del Título III, la formulación, preparación, difusión, negociación o presentación de la Declaración de Divulgación, el Plan, las Transacciones de Reestructuración, el Acuerdo de Apoyo al Plan del Prestamista de Línea de Combustible, o cualquier contrato, instrumento, liberación u otros Documentos Definitivos, acuerdo o documento creado o celebrado en relación con la Declaración de Divulgación, o el Plan, la presentación del Caso del Título III, la búsqueda de la Confirmación, la búsqueda del perfeccionamiento, la administración e implementación del Plan, lo que incluye la emisión o distribución de valores de acuerdo con el Plan, o la distribución de bienes en virtud del Plan o cualquier otro acuerdo relacionado, o cualquier otro acto u omisión, transacción, acuerdo, evento u otro acontecimiento relacionados que tenga lugar en o antes de la Vigencia. Sin perjuicio de cualquier disposición en contrario en lo anterior, las exenciones establecidas anteriormente no liberan ninguna obligación posterior a la Vigencia de ninguna parte o Entidad de acuerdo con el Plan, las Transacciones de Reestructuración, o cualquier documento, instrumento o acuerdo (incluidos los establecidos en el Complemento del Plan) firmado para implementar el Plan.

D.      Exculpación

Salvo que se disponga específicamente lo contrario en el Plan, ninguna Parte Exculpada tendrá o incurrirá, y cada Parte Exculpada será eximida y exculpada de cualquier Causa de Acción por cualquier Reclamación relacionada con cualquier acto u omisión en conexión con, en relación con o que surja del Caso del Título III, la formulación, preparación, difusión, negociación o presentación del Acuerdo de Apoyo al Plan del Prestamista de Línea de Combustible, la Declaración de Divulgación, el Plan, o cualquier Transacción de

**Reestructuración, contrato, instrumento, liberación u otro Documento Definitivo, acuerdo o documento creado o firmado en relación con la Declaración de Divulgación o el Plan, la presentación del caso Título III, la búsqueda de la Confirmación, la búsqueda del perfeccionamiento, la administración y la implementación del Plan, incluida la emisión de valores de acuerdo con el Plan, o la distribución de bienes de acuerdo con el Plan o cualquier otro acuerdo relacionado, excepto para reclamaciones relacionadas con cualquier acto u omisión que en una Orden Final se determine que haya constituido fraude real o negligencia grave, pero en todos los aspectos, dichas Entidades tendrán derecho a confiar razonablemente en el asesoramiento de un asesor legal con respecto a sus deberes y responsabilidades de acuerdo con el Plan. Las Partes Exculpadas han participado, y se considerará que lo han hecho una vez completado el Plan, de buena fe y en cumplimiento de las leyes aplicables en relación con la solicitud de votos y la distribución de contraprestaciones en virtud del Plan y, por lo tanto, no son, y en razón de dichas distribuciones no serán, responsables en ningún momento por la violación de cualquier ley, norma o reglamento aplicable que rija la solicitud de aceptaciones o rechazos del Plan o dichas distribuciones realizadas en virtud del Plan.**

E.     <u>**Interdicto**</u>

**A partir de la Vigencia, todas las Entidades que mantengan, hayan mantenido o puedan mantener una Reclamación Eximida que haya sido eximida conforme a la presente Sección XXIV del Plan, están y estarán paralizadas, restringidas, prohibidas y excluidas permanentemente, para siempre y por completo de adoptar cualquiera de las siguientes medidas, directa o indirectamente, derivadas de o de otra índole, a causa o en base al del objeto de tales Reclamaciones Eximidas extintas: (i) iniciar, conducir o continuar de cualquier manera, directa o indirectamente, cualquier demanda, acción u otro procedimiento (lo que incluye, de manera no taxativa, cualquier procedimiento judicial, de arbitraje, administrativo o de otro tipo) en cualquier foro, (ii) ejecutar, embargar (lo que incluye, de manera no taxativa, cualquier embargo previo), recaudar, o de cualquier manera tratar de recuperar cualquier sentencia, laudo, decreto u otra orden, (iii) crear, perfeccionar o de cualquier manera ejecutar en cualquier asunto, cualquier Gravamen, (iv) compensar o procurar reembolsos o contribuciones de o subrogación contra, o reembolsar de cualquier manera, directa o indirectamente, cualquier monto contra cualquier responsabilidad u obligación debida a cualquier Entidad eximida en virtud de la Sección XXIV del presente y (v) iniciar o continuar de cualquier manera, en cualquier lugar de cualquier procedimiento judicial, de arbitraje o administrativo en cualquier foro, que no cumpla o sea incompatible con las disposiciones del Plan o la Orden de Confirmación.**

F.     <u>**No independencia de liberaciones, órdenes judiciales y exculpaciones**</u>

Sin perjuicio de cualquier cosa contenida en el Plan, las exenciones, interdictos y exculpaciones proporcionadas en la Sección XXIV son esenciales para obtener el valor que se indica según el presente y constituyen un componente esencial de las conciliaciones alcanzadas y no pueden separarse de las demás disposiciones del presente Plan.

G.     <u>**Conservación de documentos**</u>

81

En la Vigencia, el Deudor podrá mantener documentos conforme a su política estándar de conservación de documentos, y las alteraciones, enmiendas, modificaciones o complementos de estos realizados por el Deudor.

**H.     Reembolso o contribución**

Si el Tribunal de Quiebras no permite una Reclamación de reembolso o contribución de una Entidad de acuerdo con el artículo 502(e)(1)(B) del Código de Quiebras, entonces, en la medida en que dicha Reclamación esté supeditada a partir del momento de la concesión o desestimación, dicha Reclamación será considerada No Permitida para siempre y será borrada sin perjuicio del artículo 502(j) del Código de Quiebras, a menos que antes de la Fecha de Confirmación: (1) dicha Reclamación se ha adjudicado como no contingente; o (2) el Tenedor pertinente de una Reclamación ha presentado una Evidencia de Reclamación no contingente a causa de dicha Reclamación y se ha ingresado una Orden Final antes de la Fecha de Confirmación que determina que dicha Reclamación ya no es contingente.

**I.     Liberación de gravámenes**

Excepto (a) con respecto a los Gravámenes que garantizan los Nuevos Bonos y CVI, o (b) según se disponga de otra manera en el presente documento o en cualquier contrato, instrumento, liberación u otro acuerdo o documento creado de acuerdo con el Plan, en la Vigencia, todas las hipotecas, escrituras de fideicomiso, Gravámenes, promesas, u otras garantías prendarias contra cualquier propiedad del Deudor serán eximidos y liberados completamente, y los Tenedores de tales hipotecas, escrituras de fideicomiso, Gravámenes, promesas, u otros intereses de seguridad firmarán los documentos que razonablemente solicite el Deudor, según corresponda, para reflejar o efectuar dichas liberaciones, y todos los derechos, títulos e intereses de cualquier Tenedor de dichas hipotecas, escrituras de fideicomiso, Gravámenes, promesas, u otras garantías prendarias se revertirán al Deudor y a sus sucesores y cesionarios.

**SECCIÓN XXV**

**MODIFICACIÓN, REVOCACIÓN O DESISTIMIENTO DEL PLAN**

**A.     Modificación del plan**

Sujeto a los artículos 104(j) y 313 de PROMESA y los artículos 942 y 1127(d) del Código de Quiebras, aplicables al Caso de Título III conforme al Artículo 301 de PROMESA, la AEE podrá alterar, modificar o cambiar el Plan o los Anexos en cualquier momento antes o después de la Fecha de Confirmación, pero antes de la Vigencia. Se considerará que un Tenedor de una Reclamación que ha aceptado el Plan ha aceptado el Plan según se altere, modifique o cambie, siempre que la alteración, modificación o cambio propuesto no modifique de manera significativa y negativa el tratamiento de la Reclamación de tal Tenedor.

**B.     Revocación o Desistimiento**

El Plan puede ser objeto de revocación o desistimiento antes de la Fecha de Confirmación por la Junta de Supervisión. Si el Plan se revoca o si se desiste de él antes de la Fecha de Confirmación, o si el Plan no entra en vigor por cualquier motivo, el Plan será considerado nulo.

En tal caso, nada de lo dispuesto en el presente se considerará como una renuncia o liberación de cualquier reclamación por parte del Deudor o de cualquier otra Entidad, o que perjudique de ninguna manera los derechos del Deudor o de cualquier otra Entidad en cualquier otro procedimiento que afecte al Deudor.

**C.**    **Modificación de los Documentos del Plan**

A partir de la Vigencia, la autoridad para modificar, cambiar o complementar el Complemento del Plan, los anexos y pruebas del Complemento del Plan y los anexos y pruebas del Plan, así como cualquier documento adjunto a cualquiera de los anteriores, será la prevista en tal Complemento del Plan, los anexos y pruebas del Complemento del Plan o los anexos y pruebas del Plan y sus respectivos adjuntos, según el caso.

**D.**    **No Admisión de Responsabilidad**

La presentación del presente Plan no pretende ser, ni se interpretará como, una admisión o prueba en cualquier demanda, acción, procedimiento o controversia pendiente o posterior de cualquier responsabilidad, infracción u obligación alguna (lo que incluye los fundamentos de cualquier reclamación o defensa) por parte de cualquier Entidad con respecto a cualquiera de los asuntos abordados en el presente Plan.

Ninguna parte del presente Plan (lo que incluye, de manera no taxativa, los anexos y pruebas adjuntos al presente), ni ninguna resolución concertada, hecho realizado o documento otorgado en relación con el presente Plan: (i) es o puede considerarse que es o puede utilizarse como admisión o prueba de la validez de cualquier reclamación o de cualquier infracción o responsabilidad de cualquier Entidad, (ii) es o puede considerarse que es o puede utilizarse como admisión o prueba de cualquier responsabilidad, culpa u omisión de cualquier Entidad en cualquier procedimiento civil, penal o administrativo en cualquier tribunal, organismo administrativo u otro tribunal (iii) es o puede considerarse que es o puede utilizarse como admisión o prueba contra el Deudor Reorganizado, el Deudor o cualquier otra Entidad con respecto a la validez de cualquier Reclamación. Ninguna parte del presente Plan o cualquier resolución concertada, hecho realizado o documento otorgado en relación con el presente Plan será admisible en ningún procedimiento para ningún fin, salvo para llevar a cabo los términos del presente Plan, y salvo que, una vez confirmado, cualquier Entidad podrá presentar este Plan en cualquier acción con cualquier propósito, lo que incluye, de manera no taxativa, para respaldar una defensa o contrademanda en base a los principios de *res judicata,* doctrina de actos propios colateral, liberación, resolución de buena fe, inadmisión o reducción de sentencia o cualquier otra teoría de la preclusión de reclamación o preclusión de asunto o defensa de contrademanda similar.

## SECCIÓN XXVI

## GOBERNANZA CORPORATIVA Y GESTIÓN DEL DEUDOR REORGANIZADO

**A.**    **Acción Corporativa**

En la Vigencia, se autorizarán y aprobarán en todo sentido, todos los asuntos previstos en el Plan que de otro modo requerirían la aprobación de los directores del Deudor o el Deudor Reorganizado, lo que incluye, de manera no taxativa, en la medida en que proceda, la autorización

para expedir o disponer que se expidan los Nuevos Bonos, la autorización para incluir en los Documentos Definitivos, la adopción de los Estatutos del Deudor Reorganizado, y la elección o designación, según el caso, de directores y funcionarios del Deudor Reorganizado conforme al Plan, según proceda, conforme al Nuevo Contrato de Emisión Principal y los nuevos documentos de gobernanza corporativa, según proceda, y sin ninguna medida adicional por parte de ninguna Entidad según cualquier otra ley, reglamento, orden o norma aplicable. Se considerará que los otros asuntos previstos en el Plan que impliquen la estructura corporativa del Deudor Reorganizado o la acción corporativa por parte del Deudor Reorganizado, habrán ocurrido, estarán autorizados y estarán en vigor conforme a el Nuevo Contrato de Emisión Principal y los nuevos documentos de gobernanza corporativa, según proceda, y sin exigir la adopción de nuevas medidas por parte de ninguna Entidad según cualquier otra ley, reglamento, orden o norma aplicable. Sin limitar lo anterior, a partir de la Fecha de Confirmación, el Deudor y el Deudor Reorganizado tomarán todas las medidas que se consideren apropiadas para consumar las transacciones contempladas en el presente de acuerdo con el Nuevo Contrato de Emisión Principal de la ACT y los nuevos documentos de gobernanza corporativa, según proceda.

**B.      Estatutos del Deudor Reorganizado**

En la medida en que sea aplicable, los estatutos del Deudor Reorganizado se modificarán a partir de la Vigencia para disponer sustancialmente según se establece en los Estatutos del Deudor Reorganizado.

**C.      Funcionarios del Deudor Reorganizado**

Los funcionarios del Deudor Reorganizado y los directores rectores seguirán siendo los mismos a partir de la Vigencia, a menos que se indique lo contrario en el Complemento del Plan.

## SECCIÓN XXVII

## IDENTIFICACIÓN DE RECLAMACIONES AFECTADAS POR EL PLAN Y NO AFECTADAS POR EL PLAN

**A.      Clases Afectadas**

Las Reclamaciones en las Clases 1-7 y 9-10 están Afectadas y reciben distribuciones conforme al Plan y, por lo tanto, tienen derecho a voto para aceptar o rechazar el Plan. Las Reclamaciones de la Clase 12 están Afectadas y no reciben una distribución conforme al Plan y, por lo tanto, se considera que la Clase 12 ha rechazado el Plan.

**B.      Clases no Afectadas**

Las Reclamaciones de las Clases 8 y 11 no están Afectadas conforme al Plan y se considera que han aceptado el Plan y no tienen derecho a votar para aceptar o rechazar el Plan.

## SECCIÓN XXVIII

## CONDICIONES PRECEDENTES A LA CONFIRMACIÓN DEL PLAN

**A.** **Condiciones precedentes a la Fecha de Confirmación**

Será una condición previa a la Confirmación del Plan que las siguientes condiciones se hayan cumplido o renunciado de acuerdo con la Sección XXVIII.B del plan:

(a) **Certificación del Plan Fiscal:** la Junta de Supervisión deberá haber certificado un Plan Fiscal coherente con el Plan y haber certificado la presentación del Plan, así como cualquier modificación del Plan hasta la Fecha de Confirmación, conforme a los artículos 104(j) y 313 de PROMESA.

(b) **Órdenes Requeridas:** el Tribunal del Título III deberá haber ingresado una orden u órdenes (incluyendo, sin limitación, la Orden de Declaración de Divulgación y la Orden de Confirmación de acuerdo con el artículo 314 de PROMESA y el artículo 1129 del Código de Quiebras, que se aplican a los Casos del Título III de acuerdo con el artículo 301 de PROMESA), que proporcionen lo siguiente:

(i) Aprobar la Declaración de Divulgación en el sentido de que contiene «información adecuada» conforme al artículo 1125 del Código de Quiebras;

(ii) Autorizar la solicitud de votos y elecciones con respecto al Plan;

(iii) Determinar que todos los votos y elecciones o las elecciones consideradas sean vinculantes y hayan sido debidamente tabulados;

(iv) Confirmar y dar efecto a los términos y disposiciones del Plan, lo que incluye las liberaciones establecidas en la Sección XXIV del Plan;

(v) Determinar que las conciliaciones y resoluciones establecidas en el Plan son apropiadas, razonables y aprobadas y que autorizan las transacciones previstas en este;

(vi) Determinar que todas las pruebas, normas y cargas aplicables con respecto al Plan han sido debidamente satisfechas y cumplidas por la Junta de Supervisión, el Deudor y el Plan;

(vii) Determinar el monto, si lo hubiere, de la Reclamación de Deficiencia;

(viii) Determinar que la PREB está obligada a aprobar el Cargo Heredado como una tasa, tarifa y/o cargo necesario para garantizar que la AEE

Reorganizada cumple con sus obligaciones con los Tenedores de Nuevos Bonos;

(ix)    Aprobar los documentos en el Complemento del Plan y determinar que tales documentos son válidos y vinculantes para las partes con respecto a estos;

(x)    Autorizar al Deudor Reorganizado a firmar, celebrar y otorgar los documentos en el Complemento del Plan, así como a ejecutar, implementar y tomar todas las medidas que sean necesarias o apropiadas de otro modo para dar efecto a las transacciones contempladas en el Plan, así como a los documentos del Complemento del Plan;

(xi)    Autorizar al Deudor a realizar todas las acciones necesarias para celebrar, implementar y consumar los contratos, instrumentos, valores, liberaciones, arrendamientos, contratos de emisión y otros acuerdos o documentos creados en relación con el Plan, lo que incluye la configuración, implementación y aplicación del Cargo Heredado;

(xii)    Decretar que las disposiciones de la Orden de Confirmación y del Plan no son divisibles y son mutuamente dependientes;

(xiii)    Autorizar al Deudor y al Deudor Reorganizado a: (1) realizar todas las distribuciones y emisiones que se requieran según el Plan y (2) celebrar cualquier acuerdo y transacción, según se establece en el Complemento del Plan;

(xiv)    Autorizar la implementación del Plan de acuerdo con sus términos;

(xv)    La PREB aprobará las tasas, tarifas y cargos, incluido el Cargo Heredado, necesarios para garantizar que la AEE Reorganizada cumpla con sus obligaciones con los Tenedores de Nuevos Bonos;

(xvi)    La determinación de los Nuevos Bonos, y los pactos del Deudor reorganizado, en beneficio de los Tenedores de Nuevos Bonos, según lo dispuesto en el Nuevo Contrato de Emisión Principal o en la Orden de Confirmación, según corresponda, constituye una norma válida, vinculante, legal y exigible, conforme a la ley de Puerto Rico, Nueva York y a la ley federal;

(xvii)    La determinación del CVI, y los pactos del Deudor reorganizado, en beneficio de los Tenedores de CVI, según lo dispuesto en el Nuevo Contrato de Emisión Principal o en la Orden de Confirmación, según corresponda, constituye una norma válida, vinculante, legal y exigible, conforme a la ley de Puerto Rico y a la ley federal;

(xviii) Determinar que el Gravamen y la garantía prendaria en los Ingresos Netos hasta el monto de los Ingresos por Cargos Heredados, y el derecho a recibir Ingresos Netos hasta el monto de los Ingresos por Cargos Heredados, y todas las demás disposiciones para pagar los Nuevos Bonos, son válidos, vinculantes, legales y exigibles;

(xix) Determinar que el Gravamen y la garantía prendaria en los Ingresos Netos Restantes hasta el monto de los Ingresos por Cargos Heredados Restantes, y el derecho a recibir Ingresos Netos Restantes hasta el monto de los Ingresos por Cargos Heredados, y todas las demás disposiciones para pagar los CVI, son válidos, vinculantes, legales y exigibles;

(xx) Determinar que el Gravamen y la garantía prendaria en los Ingresos Netos hasta el monto de los Ingresos por Cargos de Deuda se considerarán perfeccionados automáticamente en la Vigencia, sujeto solo a los Gravámenes y las garantías prendarias permitidas en virtud del Nuevo Contrato de Emisión Principal, y no estará sujeto a una recaracterización o subordinación equitativa para ningún propósito y no constituirá transferencias preferenciales o transferencias fraudulentas conforme a PROMESA o cualquier ley aplicable que no sea de quiebra, en la máxima medida permitida por la ley;

(xxi) Disponiéndose que ninguna parte, Persona o Entidad promulgará, adoptará o implementará ninguna ley, regla, regulación o política que impida, financieramente o de otra manera, el perfeccionamiento e implementación de las transacciones contempladas por el Plan; y

(xxii) Determinar que el Plan es compatible con el Plan Fiscal del Deudor y que satisface el artículo 314(b)(7) de PROMESA.

(c) **Forma de la Órdenes:** la Orden de Confirmación y el Plan se encuentra cada uno en forma y sustancia aceptables para la Junta de Supervisión, y razonablemente aceptables para los Prestamistas de Línea de Combustible Requeridos.

(d) **Orden de Confirmación:** la Orden de Confirmación incluye (i) determinaciones de que todas las resoluciones y conciliaciones contenidas en el Plan cumplen las normas aplicables según los artículos 365, 1123(b)(3) y 1129 del Código de Quiebras y la Regla de Quiebras 9019, en la medida en que sea aplicable, (ii) las liberaciones, exculpaciones y medidas cautelares establecidas en la Sección XXIV del Plan y (iii) las disposiciones aplicables establecidas en la Sección XXVIII.

B. **Renuncia a las Condiciones Precedentes a la Confirmación**

En la medida en que sea factible y legalmente permisible, cada una de las condiciones precedentes a la Sección XXVIII.A del presente puede ser renunciada, en su totalidad o en parte por la Junta de Supervisión. Toda renuncia a una condición precedente podrá efectuarse en cualquier momento mediante la presentación de una notificación ante el Tribunal del Título III ejecutado por la Junta de Supervisión.

## SECCIÓN XXIX

## CONDICIONES PRECEDENTES A LA VIGENCIA

**A.**   **Condiciones Precedentes a la Vigencia**

Será una condición previa a la Vigencia que las siguientes condiciones se hayan cumplido o renunciado de acuerdo con la Sección XXIX.B del plan:

1.  **Certificación del Plan Fiscal:** la Junta de Supervisión deberá haber determinado que el Plan es coherente con el Plan Fiscal del Deudor y haber certificado la presentación del Plan, así como cualquier modificación del Plan hasta la Fecha de Confirmación, conforme a los artículos 104(j) y 313 de PROMESA.

2.  **Confirmación:** todas las condiciones anteriores a la Confirmación, incluida la entrada de la Orden de Confirmación, se habrán cumplido o renunciado de acuerdo con la Sección XXVIII.B del Plan.

3.  **Orden Final; sin orden judicial:** la Orden de Confirmación deberá ser una Orden Final y no se paralizará en ningún caso.

4.  **Autorizaciones:** toda (1) autorización, consentimiento, aprobación regulatoria, resolución o documento, si los hubiere, que sean necesarios para implementar y dar pleno vigor y efecto al Plan, lo que incluye que la PREB apruebe tasas, taridas y cargos necesarios para garantizar que la AEE Reorganizada cumpla sus obligaciones con los tendedores de Nuevos Bonos, ha sido obtenido o promulgado o ingresado y no revocado o revertido y (2) salvo en la medida expresamente estipulada en el presente y no incompatible con ninguna otra disposición del Plan, a menos que PROMESA o una autoridad similar lo permitan o exijan de otro modo, el cumplimiento de cualquier otra acción legislativa u otra acción gubernamental necesaria para consumar el Plan.

5.  **Otorgamiento de Documentos; otras Acciones:** todas las acciones y todos los contratos, instrumentos, acuerdos, liberaciones y otros acuerdos o documentos, incluidos los Documentos Definitivos, necesarios para implementar los términos y disposiciones del Plan, incluidos los Documentos Definitivos, se realizan o celebran y entregan, según corresponda, y están en plena vigencia y efecto y se encuentran en la forma y sustancia satisfactorias para la Junta de Supervisión.

6.  **Complemento del Plan:** la versión final del Complemento del Plan y todos los anexos, documentos y pruebas contenidos en este deberán haber sido presentados de una manera compatible en todos los aspectos materiales con el Plan y el Acuerdo

de Apoyo al Plan del Prestamista de Línea de Combustible y deberán ser aceptables en forma y sustancia para la AEE.

**B.      Renuncia a las Condiciones Precedentes**

La Junta de Supervisión podrá renunciar a cualquiera de las condiciones de la Vigencia establecidas en la Sección XXIX.A del Plan en cualquier momento sin notificación alguna a otras partes interesadas, y sin ninguna notificación adicional, o acción, orden o aprobación por parte del Tribunal del Título III, y sin otra acción oficial que la de proceder a confirmar y consumar el Plan.

**C.      Efecto de la no ocurrencia de las Condiciones a la Vigencia**

Si antes de la Vigencia, la Orden de Confirmación es anulada de acuerdo con una Orden Final, entonces, salvo lo dispuesto en cualquier orden del Tribunal del Título III que anule la Orden de Confirmación, el Plan será nulo en todos los aspectos, y nada de lo que figure en el Plan o Declaración de Divulgación: (a) constituirá una renuncia o liberación de cualquier Reclamación, o Causa de Acción, (b) perjudicará de cualquier manera los derechos del Deudor o cualquier otra Entidad o (c) constituirá una admisión, reconocimiento, oferta o compromiso de cualquier tipo por parte del Deudor o cualquier otra Entidad.

## SECCIÓN XXX

## DISPOSICIONES RELATIVAS AL COMITÉ

**A.      Disolución del Comité**

En la Vigencia, el Comité de Acreedores se (a) disolverá y se considerará que ha cumplido todas sus funciones y obligaciones respectivas y (b) liberará y extinguirá de cualquier medida o actividad que se haya adoptado o deba adoptarse en relación con el Caso del Título III. En la medida en que, a la fecha inmediatamente anterior a la Vigencia, el Comité de Acreedores fuera parte en un asunto impugnado o procedimiento contencioso en relación con el Caso de Título III, o cualquier objeción a reclamar, a partir de la Vigencia y en la medida en que aún no sea parte en ella, se considerará que la ACT Reorganizada habrá asumido tal función y responsabilidad en cuanto a tal asunto impugnado o procedimiento contencioso y, conforme a tal asunción, el Comité de Acreedores quedará exento de cualquier función, responsabilidad u obligación al respecto.

## SECCIÓN XXXI

## DISPOSICIONES RELATIVAS A LA JUNTA DE SUPERVISIÓN Y EL CUMPLIMIENTO DE PROMESA

**A.      Efecto de la Confirmación**

Nada de lo dispuesto en el presente Plan ni en la Orden de Confirmación extinguirá, sustituirá, alterará o modificará de otro modo las facultades y responsabilidades de la Junta de Supervisión conforme a PROMESA ni las obligaciones del Deudor Reorganizado según PROMESA. A partir de la Vigencia, el Deudor Reorganizado seguirá teniendo todas sus

obligaciones conforme a PROMESA, lo que incluye, de manera no taxativa, los términos y condiciones de los Títulos I y II de esta.

**B.    Función permanente de la Junta de Supervisión**

Nada de lo dispuesto en el Plan ni en la Orden de Confirmación extinguirá ninguna de las obligaciones de cada Deudor según PROMESA y, a partir de la Vigencia, continuarán las facultades y responsabilidades de la Junta de Supervisión según PROMESA, y las funciones y obligaciones del Deudor continuarán y no se verán afectadas por el Plan y su consumación.

**C.    Preferencia de Leyes**

A partir de la Vigencia, y en la medida en que no tenga preferencia previamente de conformidad con una orden del Tribunal del Título III, las disposiciones de las leyes o regulaciones que afecten a la AEE o la AEE Reorganizada y sean incompatibles con PROMESA serán prioritarias por las razones y en la medida en que se expone en el Anexo «A» a las Conclusiones de los Hechos y las Conclusiones de la Ley, tales leyes, reglas y reglamentos de preferencia incluyen, sin limitación, (a) de conformidad con el Artículo 4 de PROMESA, todas las leyes, reglas y las regulaciones (o tales porciones de estas) del Estado Libre Asociado de Puerto Rico en la medida en que den lugar a obligaciones del Deudor que son descargadas por el Plan y la Orden de Confirmación conforme a PROMESA, y tal descargo prevalecerá sobre cualquier disposición general o específica de las leyes, reglas y regulaciones territoriales, y (b) leyes promulgadas antes del 30 de junio de 2016, en la medida en que prevean transferencias u otras asignaciones después de la promulgación de PROMESA, incluidas las transferencias de la AEE o la AEE Reorganizada al ELA o cualquier agencia o instrumentalidad, ya sea para permitir que dicha agencia o instrumentalidad pague o satisfaga el endeudamiento o para cualquier otro fin, serán de preferencia en la medida en que sea incompatible con el cumplimiento por parte del Plan de las obligaciones del Deudor y todas estas leyes no serán aplicables en la medida en que sean incompatibles con el cumplimiento por parte del Plan de las obligaciones del Deudor o cualquiera de las transacciones contempladas por el Plan. Sin limitar en modo alguno lo anterior, (y) las leyes del ELA no preferentes debido a PROMESA que afectan al Deudor incluyen, de manera no taxativa, las enumeradas en el **Listado D** del presente por razones y en la medida establecida en el Anexo «A» de las Conclusiones de Hechos y las Conclusiones de Ley, y (z) todo litigio en los que cualquier Parte del Gobierno sea el demandado, sobre si la legislación del ELA enumerada en el **Listado D** del presente es considerada no preferente frente a PROMESA será desestimada, con perjuicio, a partir de la Vigencia, y las partes de esta deberán notificar sin demora a la Junta de Supervisión de dicha desestimación. Para evitar dudas, la no inclusión de una obligación de pago derivada de una ley válida en un Plan Fiscal certificado o en un presupuesto de la AEE no es una base para el desaprobar dicha obligación en la medida en que la reclamación derivada de esta satisfaga de otra manera los requisitos de admisión de una reclamación en virtud de las disposiciones pertinentes del Código de Quiebras.

## SECCIÓN XXXII

## CONSERVACIÓN DE JURISDICCIÓN

El Tribunal del Título III retendrá toda su jurisdicción exclusiva y concurrente, según sea el caso, sobre cualquier asunto que surja en virtud de PROMESA, que surja en o esté relacionado con, los Casos del Título III y el Plan, o que se relacione con lo siguiente:

1.      permitir, denegar, determinar, liquidar, clasificar, estimar o establecer la prioridad, la situación de garantía o no garantía, o el monto de cualquier Reclamación no controvertida o resuelta por el presente, lo que incluye la resolución de toda solicitud de pago de cualquier Reclamación y la resolución de toda objeción a la situación de garantía o no garantía, prioridad, monto o admisión de Reclamaciones no controvertidas o resueltas por el presente;

2.      Resolver cualquier asunto relacionado con Contratos a Ejecutarse o Arrendamientos no Vencidos, lo que incluye: (a) la asunción o asunción y cesión de cualquier Contrato a Ejecutarse o Arrendamiento no Vencido en el que sea parte la AEE o respecto de los cuales la AEE pueda ser responsables y dar vista, determinar y, en caso necesario, liquidar, cualquier Reclamación de Subsanación, lo que incluye conforme al artículo 365 del Código de Quiebras, (b) cualquier obligación contractual potencial en virtud de cualquier Contrato a Ejecutarse o Arrendamiento no Vencido que se asume y asuma y ceda y (c) cualquier controversia con respecto a si un contrato o arrendamiento es o era condicional o ha caducado;

3.      velar por que las distribuciones a los Tenedores de Reclamaciones Permitidas se lleven a cabo de acuerdo con las disposiciones del Plan y resolver todas las controversias derivadas o relacionadas con las distribuciones en el marco del Plan;

4.      resolver, decidir o solucionar toda moción, procedimiento contencioso, cuestiones impugnadas o litigadas, y cualquier otro asunto, y conceder o denegar cualquier solicitud relativas a la AEE o el Deudor Reorganizado que puedan estar pendientes en la Vigencia o que se presenten posteriormente;

5.      decidir y resolver todos los asuntos relacionados con la concesión y denegación, total o parcial, de las solicitudes de compensación o reembolso de gastos a los Profesionales autorizados de acuerdo con PROMESA, el Plan o las órdenes dictadas por el Tribunal del Título III;

6.      incluir e implementar las órdenes que sean necesarias o apropiadas para ejecutar, implementar, consumar o hacer cumplir las disposiciones de (a) contratos, instrumentos, liberaciones y otros acuerdos o documentos aprobados por Orden Final en el Caso del Título III y (b) el Plan, la Orden de Confirmación y cualquier otro contrato, instrumento, valor, liberación y otros acuerdos o documentos creados en relación con el Plan,

7.      adjudicar, decidir o resolver cualquier caso, controversia, demanda, disputa u otra impugnación de cualquier tipo que pueda surgir en relación con el perfeccionamiento, interpretación o cumplimiento del Plan, la Orden de Confirmación, o cualquier otro contrato, instrumento, garantía, liberación o cualquier otro acuerdo o documento que se suscriba o entregue de acuerdo con el Plan o los derechos de cualquier Entidad derivados u obligaciones incurridas en

91

relación con el Plan o dichos documentos, lo que incluye, para evitar dudas, cualquier asunto relacionado con el establecimiento, la implementación o el cumplimiento del Cargo Heredado y el convenio de tarifa y cualquier modificación al Cargo Heredado y convenio de tarifa, así como la autorización de la PREB sobre el Cargo Heredado y cualquier modificación al Cargo Heredado;

8.     aprobar cualquier modificación del Plan o aprobar cualquier modificación de la Orden de Confirmación o cualquier otro contrato, instrumento, valor, liberación u otro acuerdo o documento creado en relación con el Plan o la Orden de Confirmación, o remediar cualquier defecto u omisión o conciliar cualquier inconsistencia en cualquier orden, el Plan, la Orden de Confirmación o cualquier otro contrato, instrumento, valor, liberación u otro acuerdo o documento creado en relación con el Plan o la Orden de Confirmación, o introducir cualquier orden en apoyo de la confirmación de acuerdo con los artículos 945 y 1142(b) del Código de Quiebras, de la manera que sea necesaria o apropiada para consumar el Plan;

9.     resolver, decidir o solucionar cualquier asunto relacionado con el cumplimiento por parte de la AEE del Plan y la Orden de Confirmación de conformidad con el artículo 945 del Código de Quiebras;

10.    determinar cualesquiera otros asuntos que puedan surgir en relación o en conexión con el Plan, la Declaración de Divulgación, la Orden de Confirmación o cualquier otro contrato, instrumento, garantía, liberación u otro acuerdo o documento celebrado u otorgado en relación con el Plan, la Declaración de Divulgación o la Orden de Confirmación, en cada caso, únicamente en la medida en que dicho documento no prevea que otro tribunal o tribunales tengan jurisdicción exclusiva;

11.    emitir interdictos, incluir e implementar otras órdenes, o adoptar las demás medidas que sean necesarias o apropiadas para hacer cumplir o restringir la injerencia de cualquier entidad en el Perfeccionamiento o ejecución del Plan o la Orden de Confirmación;

12.    adjudicar todas y cada una de las controversias, demandas o asuntos que puedan surgir con respecto a la validez de cualquier acción realizada por cualquier Entidad de acuerdo con o en cumplimiento del Plan o la Orden de Confirmación, lo que incluye, sin limitación, la emisión de los Nuevos Bonos e ingresar cualquier orden o medida necesaria o apropiada en relación con dicha adjudicación;

13.    determinar cualesquiera otros asuntos que puedan surgir en relación o en conexión con el Plan, la Declaración de Divulgación, la Orden de Confirmación o cualquier otro contrato, instrumento, garantía, liberación u otro acuerdo o documento creado en relación con el Plan, en cada caso, únicamente en la medida en que dicho documento no prevea que otro tribunal o tribunales tengan jurisdicción exclusiva;

14.    hacer cumplir los Nuevos Bonos, y el Nuevo Contrato de Emisión Principal, lo que incluye, sin limitación, el Convenio de Tarifas de Interés o, en el caso de que el Tribunal de Título III rechace tal conservación de jurisdicción o el Caso de Título III haya sido cerrado de acuerdo con los términos y disposiciones de PROMESA, se designa al Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico para hacer cumplir los Nuevos Bonos y el Nuevo Contrato de Emisión Principal, lo que incluye, sin limitación, el Convenio de Tarifas de Interés.

15.     incluir e implementar las órdenes que sean necesarias o apropiadas si la Orden de Confirmación es modificada, paralizada, revertida, revocada o anulada por cualquier motivo;

16.     incluir una orden o un decreto definitivo que concluyan o cierren el Caso de Título III conforme al artículo 945(b) del Código de Quiebras;

17.     hacer cumplir y aclarar toda orden dictada anteriormente por el Tribunal del Título III en el Caso de Título III; y

18.     dar vista a cualquier otro asunto sobre el cual el Tribunal del Título III tenga jurisdicción conforme las disposiciones de PROMESA sujeto a los límites de la jurisdicción y facultades del Tribunal del Título III conforme los artículos 305 y 306 de PROMESA.

## SECCIÓN XXXIII

## DISPOSICIONES VARIAS

**A.     Título de los Activos**

Salvo según se dispone de otro modo en la Orden de Confirmación o este Plan, en la Vigencia, la titularidad de todos los Activos y bienes del Deudor incluidos en el Plan se otorgarán al Deudor Reorganizado, libres de cargas y Gravámenes (salvo por Gravámenes concedidos conforme al Plan y la Orden de Confirmación).

**B.     Sin Renuncia**

Sin perjuicio de cualquier disposición que indique lo contrario en el presente, las descargas y medidas cautelares establecidas en el Plan no limitarán, reducirán ni afectarán de ningún otro modo los derechos de la Junta de Supervisión, la AAFAF, el Deudor Reorganizado o los Acreedores del Acuerdo de Apoyo al Plan de Prestamista de Línea de Combustible (compatible con el Acuerdo de Apoyo al Plan de Prestamista de Línea de Combustible) para ejecutar, demandar, resolver o conciliar los derechos, reclamaciones y otros asuntos expresamente retenidos por cualquiera de ellos, ni se considerará que lo hagan.

**C.     Interdicto Complementario**

Sin perjuicio de cualquier disposición del presente, salvo en la medida limitada prevista en el Plan, todas las Entidades, lo que incluye las Entidades que actúen en su nombre, que en la actualidad posean o presenten, hayan poseído o presenten, o puedan poseer o presentar, cualquier Reclamación Eximida contra cualquiera de las Partes Eximida en base a, atribuible a derivado o relacionado con el Caso del Título III o cualquier Reclamación contra el Deudor, cuando sea y dondequiera que surja o se presente, ya sea en los Estados Unidos o en cualquier otro lugar del mundo, ya sea en forma contractual, extracontractual, de garantía, estatuto o cualquier otra teoría de derecho, equidad o de otra índole será y se considerará paralizada, restringida y prohibida en cuanto a la adopción de cualquier medida contra cualquiera de las Partes Eximidas con el fin de recaudar, recuperar o recibir directa o indirectamente cualquier pago o recuperación con respecto a cualquier Reclamación Eximida que surja antes a la Vigencia (lo que incluye antes de la Fecha de Petición), lo que incluye, de manera no taxativa:

1.   Iniciar o continuar de cualquier manera cualquier acción u otro procedimiento de cualquier tipo con respecto a cualquier Reclamación Eximida contra cualquiera de las Partes Eximidas o los activos o bienes de cualquier Parte Eximida;

2.   Ejecutar, adjuntar, recaudar o recuperar, por cualquier medio o forma, cualquier sentencia, laudo, decreto u orden contra cualquiera de las Partes Eximidas o los activos o bienes de cualquier Parte Eximida con respecto a cualquier Reclamación Eximida;

3.   Crear, perfeccionar o hacer cumplir cualquier Gravamen de cualquier tipo contra cualquiera de las Partes Eximida o los activos o bienes de cualquier Parte Eximida con respecto a cualquier Reclamación Eximida;

4.   A menos que se disponga expresamente lo contrario en el Plan o en la Orden de Confirmación, presentar, implementar o hacer efectiva cualquier compensación, derecho de subrogación, indemnización, contribución o reembolso de cualquier tipo contra cualquier obligación debida a cualquiera de las Partes Eximidas o contra los bienes de cualquier Parte Eximida respecto de cualquier Reclamación Eximida; y

5.   Tomar cualquier acción, de cualquier forma, en cualquier lugar, que no se ajuste o cumpla con las disposiciones del Plan o la Orden de Confirmación, *disponiéndose, sin embargo*, que el cumplimiento por parte de los Deudores de los requisitos formales de la Norma de Quiebras 3016 no constituirá una admisión de que el Plan proporciona ningún interdicto contra una conducta no prohibida de otro modo en virtud del Código de Quiebras.

**D.   Efecto Vinculante Inmediato**

Conforme al artículo 944(a) del Código de Quiebras, aplicable a los Casos de Título III conforme al Artículo 301 de PROMESA, y sin perjuicio de las Reglas de Quiebras 3020(e), 6004(h) o 7062 o cualquier otra disposición, al producirse la Vigencia, los términos del Plan y del Complemento del Plan serán inmediatamente efectivos y exigibles y se considerarán vinculantes para todos los Tenedores de Reclamaciones y sus respectivos sucesores y causahabientes, independientemente de que la Reclamación de dicho Tenedor se vea afectada en virtud del Plan y de que dicho tenedor haya aceptado o no el Plan. Las descargas, exculpaciones y resoluciones efectuados en virtud del Plan serán operativos y estarán sujetos a ejecución por el Tribunal del Título III, a partir de la Vigencia, lo que incluye de acuerdo con las disposiciones cautelares del Plan. Una vez aprobadas, las conciliaciones y resoluciones incorporadas en el Plan, junto con el tratamiento de cualquier Reclamación Permitida asociada, no serán objeto de impugnación de garantías u otra impugnación por parte de ninguna Entidad en ningún tribunal u otro foro. Como tal, toda Entidad que se oponga a los términos de cualquier conciliación y resolución establecidas en el Plan debe (a) impugnar dicha conciliación y resolución antes de la confirmación del Plan y (b) demostrar la legitimidad adecuada para objetar y que la conciliación y resolución de que se trate no cumplen las normas que rigen resoluciones en virtud de la Norma de Quiebras 9019 y otras leyes aplicable.

E.    **Documentos Adicionales**

En la Vigencia o antes de esta, la Junta de Supervisión podrá radicar ante un Actuario del Tribunal del Título III los acuerdos y otros documentos que sean necesarios o apropiados para poner en práctica y aportar más anexos de los términos y condiciones del Plan y el Acuerdo de Apoyo al Plan del Prestamista de Línea de Combustible. El Deudor y todos los Tenedores de Reclamaciones que reciban distribuciones de acuerdo con el Plan y todas las demás partes interesadas, ocasionalmente, podrán preparar, celebrar y otorgar cualquier acuerdo o documento y adoptar cualquier otra medida que sea necesaria o aconsejable para poner en práctica las disposiciones y la intención del Plan.

F.    **Reserva de Derechos**

Salvo lo dispuesto expresamente en el presente, el Plan no tendrá validez ni vigor a menos que el Tribunal del Título III dicte la Orden de Confirmación. Ninguna radicación del Plan, ninguna declaración o disposición contenida en el Plan, ni la adopción de ninguna medida por parte del Deudor con respecto al plan, la Declaración de Divulgación, o el Complemento del Plan será o se considerará como una admisión o renuncia a ningún derecho del Deudor con respecto a los Tenedores de Reclamaciones antes de la Vigencia. Salvo lo dispuesto expresamente en el presente, los derechos y facultades del gobierno del ELA en virtud de la Constitución de Puerto Rico y PROMESA, lo que incluye, de manera no taxativa, en virtud de los artículos 303 y 305 de PROMESA, están expresamente reservados (sujetos a cualquier limitación al respecto impuesta por la Constitución de Puerto Rico, la Constitución de los Estados Unidos o PROMESA), y nada de lo dispuesto en el presente se considerará una renuncia a ninguno de tales derechos y facultades.

G.    **Sucesores y Cesionarios**

Salvo que se disponga expresamente de otro modo contrario en el Plan, los derechos, beneficios y obligaciones de cualquier Entidad nombrada o mencionada en el Plan o la Orden de Confirmación serán vinculantes para cualquier heredero, albacea, administrador, sucesor o cesionario, Empresa asociada, funcionario, director, agente, representante, abogado, beneficiarios o tutor, en su caso, de cada entidad y será para beneficio de estos.

H.    **Casos y Honorarios posteriores a la Vigencia**

A partir de la Vigencia, el Deudor Reorganizado contratará, en el ejercicio habitual de la actividad y sin necesidad de aprobación por parte del Tribunal del Título III, profesionales y pagará los honorarios y gastos profesionales razonables incurridos por el Deudor Reorganizado en relación con la implementación y consumación del Plan sin aprobación adicional por parte del Tribunal del Título III. Sin limitar lo anterior, a partir de la Vigencia, el Deudor Reorganizado deberá, en el ejercicio habitual de la actividad y sin necesidad de aprobación por parte del Tribunal del Título III, pero en ningún caso más tarde de cuarenta y cinco (45) días a partir de la presentación de facturas o declaraciones con respecto a la incurrencia de honorarios y gastos al Deudor Reorganizado, pagar los honorarios razonables y documentados y reembolsar los gastos de la Junta de Supervisión y de sus profesionales relacionados con la implementación y consumación del Plan

y en relación con sus funciones y responsabilidades de acuerdo con PROMESA y los términos y disposiciones del Plan.

**I.      Exención de la Ley de Valores**

Conforme al artículo 1145 del Código de Quiebras y/o al Artículo 3(a)(2) de la Ley de Valores, la oferta, emisión y distribución de los Nuevos Bonos conforme a los términos del presente estarán exentas del registro en virtud de la Ley de Valores y cualquier ley estatal o local que exija el registro para la oferta, emisión o distribución de valores, lo que incluye, de manera no taxativa, los requisitos de registro del Artículo 5 de la Ley de Valores y cualquier otra ley estatal o federal aplicable que exija el registro y/o la entrega o calificación de prospecto antes de la oferta, emisión, distribución o venta de valores.

**J.      Ley Aplicable**

Salvo en la medida en que sea aplicable otra ley federal, o en la medida en que un documento de prueba del presente o cualquier documento que se concierte en relación con la presente disponga otra cosa, los derechos, deberes y obligaciones que surgen del presente Plan se regirán por y se interpretarán y ejecutaran de acuerdo con PROMESA (lo que incluye las disposiciones del Código de Quiebras aplicables en virtud del artículo 301 de PROMESA) y, en la medida en que no sean incompatibles con ellas, las leyes del Estado Libre Asociado de Puerto Rico que dan efecto a los principios de conflictos de leyes.

**K.      Cierre de Caso**

La Junta de Supervisión, inmediatamente después de la plena administración de los Casos de Título III, radicará ante el Tribunal del Título III todos los documentos exigidos por la Regla de Quiebras 3022 y cualquier orden aplicable del Tribunal del Título III. Sin perjuicio del cierre de los Casos de Título III, el Tribunal del Título III conservará la jurisdicción de todas las cuestiones establecidas en la Sección XXXII del Plan.

**L.      Títulos de secciones**

Los títulos de las secciones contenidos en el presente Plan son solamente para referencia y no afectarán de ningún modo el significado o interpretación del Plan.

**M.      Conservación de documentos**

A partir de la Vigencia, el Deudor Reorganizado podrá mantener documentos conforme a su política estándar de conservación de documentos, según sean alterados, modificados, cambiados o complementados por el Deudor Reorganizado.

**N.      Entrega de documentos**

Todas las notificaciones, solicitudes, intimaciones u otros documentos exigidos por el Plan o la Orden de Confirmación que deban notificarse o entregarse a la Junta de Supervisión, a la AEE o a la AAFAF para que surtan efecto se harán por escrito, incluso mediante transmisión por fax y, a menos que se disponga expresamente de otro modo en el presente, se considerará que se han

entregado o realizado debidamente en el momento de la entrega efectiva o, en caso de notificación
por transmisión por fax, cuando se reciban y confirmen telefónicamente, dirigidas de la siguiente
manera:

**AEE o la Junta de Supervisión**   Junta de Supervisión y Administración
Financiera para Puerto Rico
268 Muñoz Rivera Ave, Suite 1107
San Juan, PR 00918-1813
A la atención de:  Director Ejecutivo

– con copia a –

PROSKAUER ROSE LLP
Eleven Times Square
Nueva York, NY 10036
A la atención de:  Martin J. Bienenstock
Paul V. Possinger
Ehud Barak
Daniel S. Desatnik
Tel:  (212) 969-3000
Fax:  (212) 969-2900

**AAFAF**   La Autoridad de Asesoría Financiera y Agencia Fiscal
Roberto Sánchez Vilella (Minillas) Government Center
De Diego Ave. Stop 22
San Juan, Puerto Rico 00907

– con copia a –

O'MELVENY & MYERS LLP
Seven Times Square
Nueva York, NY 10036
A la atención de:  Señor John Rapisardi
Peter Friedman,
Maria J. DiConza,
Tel:  (212) 326-2000
Fax:  (212) 326-2061

## O.   Duración de los Interdictos o Paralizaciones

**A menos que se disponga otra cosa en el presente o en la Orden de Confirmación,
todos las medidas cautelares o paralizaciones en vigor en el Caso del Título III (conforme a
los artículos 105, 362 o 922 del Código de Quiebras o cualquier orden del Tribunal del Título
III) y que existen a la Fecha de Confirmación (lo que excluye cualquier interdicto o
paralización contenida en el Plan o en la Orden de Confirmación) permanecerán en pleno**

**vigor hasta la Vigencia. Todos los interdictos o paralizaciones contenidos en el Plan o en la
Orden de Confirmación permanecerán en pleno vigor de acuerdo con sus condiciones.**

**P.     Totalidad del acuerdo**

Salvo que se indique de otro modo, el Plan sustituye a todas las negociaciones, promesas,
pactos, acuerdos, entendimientos y representaciones anteriores y contemporáneos sobre tales
temas, todos los cuales se han fusionado e integrado al Plan.

**Q.     Pruebas del Complemento del Plan**

Todos los anexos y documentos incluidos en el Complemento del Plan se incorporan al
Plan y forman parte de él, como si se establecieran íntegramente en el Plan. Una vez radicado el
Complemento del Plan ante el Actuario del Tribunal del Título III, se distribuirán copias de los
documentos que en él figuran, previa solicitud por escrito al abogado de la Junta de Supervisión
en el domicilio que precede o descargando esos documentos de
https://dm.epiq11.com/case/prepa/info o del sitio web del Tribunal del Título III, disponible a
través de PACER. Después de presentar las pruebas y documentos, se distribuirán copias de tales
pruebas y documentos previa solicitud por escrito al abogado de la Junta de Supervisión en el
domicilio que precede o descargando esas pruebas y documentos de
https://dm.epiq11.com/case/prepa/info o del sitio web del Tribunal del Título III, disponible a
través de PACER. A menos que el Tribunal del Título III ordene lo contrario, en la medida en que
cualquier prueba o documento en el Complemento del Plan sea incompatible con los términos de
cualquier parte del Plan que no constituya el Complemento del Plan, la parte del Plan que no
constituya el Complemento del Plan prevalecerá.

**R.     No Independencia**

Excepto en la medida de lo especificado expresamente de otro modo en este Plan, si
cualquier término o disposición del Plan es considerado inválido, nulo o inaplicable por el Tribunal
del Título III, el Tribunal del Título III, en cada caso a elección y con el consentimiento de la AEE,
tendrá la facultad de alterar e interpretar tal término o disposición para que sea válido o ejecutable
en la mayor medida posible, de conformidad con el propósito original del término o disposición
que se considere inválida, nula o inaplicable, y tal término o disposición será aplicable en su forma
alterada o interpretada. Sin perjuicio de dicha conservación, alteración o interpretación, el resto de
los términos y disposiciones del Plan permanecerán en pleno vigor y efecto y de ninguna manera
se verán afectados, menoscabados o invalidados por dicha conservación, alteración o
interpretación. Las disposiciones del Plan, incluidas sus disposiciones de liberación, mandato
judicial, exculpación y compromiso, son mutuamente dependientes y no son independientes. La
Orden de Confirmación constituirá una determinación judicial y establecerá que cada término y
disposición del Plan es: (a) válido y exigible de acuerdo con sus términos; (b) integral al Plan y no
puede ser eliminado o modificado sin el consentimiento de la AEE; y (c) no es independiente y es
mutuamente dependiente.

**S.     Votos solicitados de buena fe**

Al ingresar la Orden de Confirmación, se considerará que la AEE ha solicitado votos sobre
el Plan de buena fe y de acuerdo con el Código de Quiebras, y de acuerdo con el artículo 1125(e)

del Código de Quiebras, la AEE y sus agentes, representantes, miembros, directores, accionistas, funcionarios, directores, empleados, asesores y abogados han participado de buena fe y en cumplimiento con el Código de Quiebras en la oferta, emisión, venta y compra de valores ofrecidos y vendidos de acuerdo con el Plan y cualquier plan anterior, y, por lo tanto, ninguna de estas partes o individuos o la AEE tendrá responsabilidad alguna por la violación de cualquier ley, regla o regulación aplicable que rija la solicitud de votos en el Plan o la oferta, emisión, venta o compra de los valores ofrecidos y vendidos de acuerdo con el Plan y cualquier plan anterior.

**T.**     **Renuncia o Impedimento.**

Se considerará que cada Tenedor de una Reclamación ha renunciado a cualquier derecho de hacer valer cualquier argumento, incluido el derecho a argumentar que su Reclamación debe ser Permitida en cierto monto, en una cierta prioridad, garantizada o no subordinada en virtud de un acuerdo hecho con la AEE o su asesor legal, o cualquier otra Entidad, si dicho acuerdo no fue revelado en el Plan, la Declaración de Divulgación, o documentos presentados ante el Tribunal del Título III antes de la Fecha de Confirmación.

Presentado respetuosamente,

**LA AUTORIDAD DE ENERGÍA ELÉCTRICA DE PUERTO RICO**, a través de la Junta de Supervisión y Administración Financiera para Puerto Rico como su único representante del Título III

Por:     */s/ David A. Skeel*_____
Nombre: David A. Skeel
Cargo:   Presidente

**Apéndice A**

**Acciones a transferir al Fideicomiso de Acciones de Anulación**[1]

| NOMBRE DEL PROVEEDOR | Núm. DEL PROCEDIMIENTO CONTENCIOSO |
|---|---|
| Core Laboratories N.V. d/b/a Saybolt | 19-381 |
| Puerto Nuevo Security Guards, Inc. | 19-384 |

---

[1] Las acciones a transferir al Fideicomiso de Acciones de Anulación incluyen, entre otras, las enumeradas en este Anexo.

## **<u>Apéndice B</u>**

### **Carga heredada**

| Plazo | Descripción[1] |
|---|---|
| Carga heredada | La "Carga heredada" consistirá, conjuntamente, de todas las Tarifas planas y Cargas volumétricas aplicables a todos los niveles de cada clase de clientes, tal y como se indica en el Anexo 1 adjunto, con sujeción a la Prueba de modificación y a la cláusula de variación establecidas en el Plan, y se incluirá en las tarifas de los clientes de conformidad con el Plan y de la Orden de confirmación.<br><br>La implementación de la Carga heredada está siendo negociada con LUMA Energy[2], en su calidad de prestadora del servicio, y está sujeta a modificación, ya que en este momento la Junta de Supervisión colabora con el Gobierno y con LUMA Energy para resolver cuestiones de implementación. |
| Objeto de la Carga heredada | La Carga heredada se recaudará para garantizar los flujos de efectivo suficientes para el servicio de la deuda de la AEEPR en concepto de los Nuevos bonos emitidos en virtud del Plan. |
| Aplicabilidad | La Carga heredada se aplicará a todos los clientes de la AEEPR, salvo en los casos en los que el Plan exima específicamente la totalidad o parte de la Tarifa plana o la Carga volumétrica.  La Carga heredada será de aplicación a las actuales y futuras clases de clientes de la AEEPR establecidas por la AEEPR y/o LUMA Energy, en nombre de la AEEPR, como asunto a modificar con sujeción a la Prueba de modificación establecida en el Plan. El Anexo 1 refleja determinadas categorías de la base de clientes de la AEEPR que determinarán cómo se cobrará a cada cliente de la AEEPR la Carga heredada, con sujeción a la Prueba de modificación establecida en el Plan.<br><br>Los nombres y descripciones de determinadas categorías de tarifas existentes establecidas por la AEEPR, a algunas de las cuales es posible que se haga referencia en el Anexo 1, se adjuntan al presente documento en forma de Anexo 2.  A efectos de disipar cualquier duda, todas las categorías de tarifas que se establezcan a continuación, todas las categorías de tarifas actualmente existentes que no tengan clientes pero que los tengan más adelante, o todas las categorías de tarifas no referenciadas explícitamente en el Anexo 1 o el Anexo 2, estarán sujetas a la Carga heredada, y se clasificarán en función de la Prueba de modificación y de la cláusula de variación establecidas en el Plan. |

---

[1] Todos los términos en mayúsculas utilizados pero no definidos en este documento tendrán los significados atribuidos a los mismos en el Plan al cual se adjunta este Apéndice B.

[2] Tal como aquí se utiliza, "LUMA Energy" hará referencia conjuntamente a LUMA Energy, LLC y LUMA Energy ServCo, LLC, que se constituyó mediante el consorcio de ARCO Ltd. (sucedida por su filial, Canadian Utilities Limited), Quanta Services, Inc. e Innovative Emergency Management, Inc.

| Plazo | La Carga heredada estará vigente a partir de la Fecha de entrada en vigor del Plan de la AEEPR, y se mantendrá hasta su cancelación (i) al vencimiento del IVC, y (ii) una vez pagados íntegramente los Bonos de Serie B, lo que más tarde se produzca. |
|---|---|
| Tarifa plana | La AEEPR cobrará una tarifa plana (la "Tarifa plana"), sumada a cualesquiera tarifas y tasas de la AEEPR, en la cuantía determinada para la categoría de cliente correspondiente enumeradas en el Anexo 1, a cada cliente y cada mes a menos que el cliente tenga derecho a una exención de la Tarifa plana. El importe cobrado en concepto de Tarifa plana se determinará en dólares de EE.UU. y no está vinculado al consumo de energía del cliente, sino que se aplicará a cada cliente o exento conectado a la red eléctrica de la AEEPR. |
| Carga volumétrica | La AEEPR cobrará una tarifa mensual (la "Carga volumétrica"), sumada a cualesquiera tarifas y tasas de la AEEPR, en la cuantía determinada para la categoría de cliente correspondiente enumeradas en el Anexo 1, en función del consumo mensual de electricidad del cliente. Con sujeción a la Prueba de modificación y a la cláusula de variación establecidas en el Plan, la Carga volumétrica se aplicará sobre la base de centavos por kilovatio-hora de electricidad suministrada por la AEEPR durante el ciclo de facturación tal y como se detalla a continuación:<br><br>• Por cada kWh (o fracción) consumido, según lo indique la lectura de medidor, durante cada mes natural, *hasta, e incluyendo,* el Umbral de la Carga volumétrica, en una cuantía equivalente a la tarifa aplicable, detallada en el Anexo 1 adjunto.<br><br>• Por cada kWh (o fracción) consumido, según lo indique la lectura de medidor, durante cada mes natural, que *supere* el Umbral de la Carga volumétrica, en una cuantía equivalente a la tarifa aplicable, detallada en el Anexo 1 adjunto. |
| Umbral de la Carga volumétrica | Aproximadamente 500 kWh (el "Umbral de la Carga volumétrica"). |
| Exención | En un determinado ciclo de facturación, la AEEPR aplicará una exención de la Tarifa plana y de la Carga volumétrica correspondientes al consumo mensual hasta el, o por debajo del, Umbral de la Carga volumétrica, tal como se expone en el Anexo 1, a los clientes residenciales que durante dicho ciclo de facturación estén clasificados como LRS, RH3 o RFR (en cada caso, como lo define el Anexo 2).<br><br>Exclusivamente a efectos de aplicar la Carga heredada, también los siguientes clientes estarán exentos de la Tarifa plana y de la Carga |

| | volumétrica correspondientes al consumo mensual hasta el, o por debajo del, Umbral de Carga volumétrica, en cada caso como se establece en el <u>Anexo 1</u>:<br><br>• Clientes residenciales de la AEEPR cuyos Ingresos brutos ajustados modificados (MAGI) se sitúan por debajo de un determinado umbral, similar a los niveles de MAGI necesarios para la obtención de las prestaciones sanitarias de Medicaid en Puerto Rico.<br><br>Los criterios para las exenciones están sujetos a la Prueba de modificación y a la cláusula de variación establecidas en el Plan. |
|---|---|
| Facturación | La Carga heredada será recaudada como parte de la tarifa de la AEEPR por los prestadores de servicios de la misma manera en que actualmente se cobran las facturas. |
| Aplicación de los ingresos de la Carga heredada | Hasta el pago íntegro del capital de los Nuevos bonos, el incremento de los Ingresos netos generados por la inclusión de la Carga heredada servirá para financiar el servicio de la deuda de dichos Bonos tras el pago de los gastos operativos de la AEEPR, tal como se especifica en el Plan.  Si la devolución íntegra del capital de los Nuevos bonos se produce antes del vencimiento de los IVC, los ingresos de la Carga heredada obtenidos con posterioridad se destinarán a dotar las distribuciones a los titulares de los IVC hasta el vencimiento de los mismos. |
| Modificación | La modificación de la Carga hereda podrá realizarse solamente si se cumple lo estipulado en la Prueba de modificación. |

## **Anexo 1**

(al Apéndice B)

[Pendiente de determinar]

## Anexo 2

(al Apéndice B)

## Segmentación de los clientes de la AEEPR[1]

La AEEPR mantiene una estructura de tarifas diferenciadas para sus clientes, en función de sus categorías. Las siguientes descripciones, conjuntamente con cualesquiera otras caracterizaciones de clientes utilizadas en la actualidad por la AEEPR, identifican las categorías de la base de clientes de la entidad que podrán emplearse de qué manera se aplicará la Carga heredada a cada cliente de la AEEPR.

## Categorías residenciales

1. SERVICIO RESIDENCIAL GENERAL (GRS) - Esta tarifa se aplica a clientes residenciales para uso doméstico en una vivienda, salvo que encaje el alguna de las otras categorías descritas a continuación. Además, esta tarifa también puede aplicarse a casas, apartamentos y otras estructuras dedicadas principalmente a fines residenciales, con no más de dos habitaciones y en las que la carga total conectada no exceda de los 500 vatios, utilizadas por inquilinos para fines comerciales o profesionales.

2. SERVICIO RESIDENCIAL LIFELINE (LRS) - Esta tarifa se aplicará a clientes residenciales que cumplan los criterios del Programa de Asistencia Nutricional, para todos los usos domésticos de una residencia o apartamento.

3. SERVICIO RESIDENCIAL PARA PROYECTOS DE VIVIENDA PÚBLICA (RH3) - Esta tarifa será de aplicación a clientes residenciales de Proyectos de vivienda pública sostenidos o subvencionados total o parcialmente por préstamos, subsidios, aportaciones o asignaciones de las autoridades federales, estatales o municipales.

4. TARIFA RESIDENCIAL FIJA PARA VIVIENDA PÚBLICA DE PROPIEDAD DE LA ADMINISTRACIÓN DE VIVIENDA PÚBLICA (RFR) - La tarifa RFR ha sido establecida de conformidad con lo dispuesto por la Ley 22-2016, y pueden acogerse a la misma, para uso doméstico, clientes residentes en una unidad de vivienda situada físicamente dentro de un proyecto de vivienda de propiedad de la Administración de Vivienda Pública.

## Categorías comerciales e industriales

1. SERVICIO GENERAL A VOLTAJE DE DISTRIBUCIÓN SECUNDARIA (GSS) - Esta tarifa será de aplicación a todos los servicios no residenciales con una carga inferior a los 50 kVA. Además, será aplicable a servicios de energía eléctrica temporales para uso limitado en calles, festejos y otros.

---

[1] Libro de tarifas de la AEEPR, a mayo de 2019. Accesible desde:  https://lumapr.com/wp-content/uploads/2021/07/Tariff-Book-Electric-Service-Rates-and-Riders-Revised-by-Order-05172019-Approved-by-Order-05282019.pdf.

2. <u>SERVICIO GENERAL A VOLTAJE DE DISTRIBUCIÓN PRIMARIA (GSP)</u> **-** Esta tarifa será de aplicación a clientes industriales y comerciales. El servicio se prestará a través de un único punto de conexión y un único medidor.

3. <u>SERVICIO GENERAL A VOLTAJE DE TRANSMISIÓN (GST)</u> **-** Esta tarifa se aplicará a clientes comerciales industriales, conectados al sistema de transmisión, que tengan una demanda de 250 kVA o superior, para usos generales, como por ejemplo fuerza motriz, calefacción, refrigeración e iluminación inherente de industrias, hoteles y otros establecimientos.

4. <u>TARIFA HORA DE USO A VOLTAJE DE DISTRIBUCIÓN PRIMARIA (TOU-P)</u> **-** Esta tarifa se aplicará a clientes comerciales e industriales con una demanda de 1,000 kVA o superior, que: 1. Transfieran cargas desde las horas pico a las horas valle 2. Agreguen cargas durante las horas valle 3. Retiren cargas de las horas pico

5. <u>TARIFA HORA DE USO A VOLTAJE DE TRANSMISIÓN (TOU-T)</u> **-** Esta tarifa se aplicará a clientes comerciales e industriales con una demanda de 1,000 kVA o superior, que: 1. Transfieran cargas desde las horas pico a las horas valle 2. Agreguen cargas durante las horas valle 3. Retiren cargas de las horas pico

6. <u>SERVICIO INDUSTRIAL ALTO USO DE ENERGÍA -115 kV (LIS)</u> **-** Esta tarifa es exclusivamente para industrias con una demanda equivalente a 12,000 kW o superior, un factor de carga equivalente al 80% o superior, y un factor de potencia promedio mensual equivalente al 95% o superior.

7. <u>SERVICIO AGRÍCOLA GENERAL Y BOMBAS DE ACUEDUCTOS DE COMUNIDADES RURALES (GAS)</u> **-** Esta tarifa se aplica a granjeros y clientes dedicados a la cría de animales. El servicio se prestará para fuerza motriz, alumbrado, bombas de riego, refrigeración y calefacción. Además, esta tarifa se aplicará a clientes que operen bombas para alimentar acueductos exclusivamente en comunidades rurales; dentro de este concepto se incluye el alumbrado inherente a estas actividades.

8. <u>ALUMBRADO DE INSTALACIONES DEPORTIVAS AL AIRE LIBRE PARA PARQUES EN LOS CUALES SE COBRAN DERECHOS DE ADMISIÓN (LP-13)</u> **-** Esta tarifa se aplicará a campos deportivos en los que se cobran derechos de admisión que tengan una carga conectada de 500 kilovatios o más para alumbrado exterior

9. <u>SERVICIO DE REPETIDORES DE TV POR CABLE (CATV)</u> **-** Esta tarifa se aplica a todo el suministro eléctrico para TV por cable.

10. <u>SERVICIO NO MEDIDO PARA CARGAS PEQUEÑAS (USSL)</u> **-** Esta tarifa se aplicará a los servicios de equipos eléctricos instalados en postes o estructuras de la AEEPR que funcionen ininterrumpidamente, salvo aquellos equipos para los cuales la AEEPR disponga de otras tarifas (por ejemplo: TV por cable).

11. <u>PRODUCTORES DE ELECTRICIDAD CONECTADOS A LA BARRA COLECTORA DE LA AEEPR</u> **-** Esta tarifa será de aplicación a los grandes productores de electricidad conectados a la barra colectora de 230 kV que requieran alimentación eléctrica de la

AEEPR durante el arranque, el mantenimiento programado y las caídas de sus equipos generadores.

12. <u>ALUMBRADO PÚBLICO GENERAL (PLG)</u> **-** Esta tarifa se aplicará al alumbrado de calles, campos deportivos y otros parques de acceso libre, plazas, cabinas telefónicas, paradas de autobuses y luces estroboscópicas de tráfico y de policía.

**<u>APÉNDICE C</u>**

**TÉRMINOS DE MODIFICACIÓN DE LAS OBLIGACIONES DEL SRE DE LA AEEPR**

A efectos de crear futuras responsabilidades en materia de pensiones y de estabilizar el sistema para los futuros retirados y contribuyentes, el devengo de prestaciones del plan del SRE de la AEEPR se congelará en la Fecha de entrada en vigor del Plan de ajuste (la "Fecha de entrada en vigor del PdA").

A continuación presentamos un resumen de las condiciones tentativas para el congelamiento de ulteriores beneficios definidos del SRE de la AEEPR.

Las modificaciones aquí enumeradas modifican las obligaciones de la AEEPR y de cualquier otro empleador gubernamental cuyos empleados continúen participando en el plan de beneficios definidos del SRE de la AEEPR para financiar los beneficios proporcionados por el SRE de la AEEPR, tal como se estableció en la normativa de la Junta de Gobierno de la Autoridad de Energía Eléctrica de Puerto Rico el 1 de julio de 1945 y en sucesivas enmiendas, hasta la Fecha de entrada en vigor del PdA, y que habrán de regir para la administración de los beneficios del SRE de la AEEPR por parte del SRE.  Los procedimientos administrativos no abordados a continuación (como los de redondeo para determinar las edades y aportaciones de los participantes) serán congruentes en prácticas pasadas.

Los empleados de la AEEPR participan de conformidad con una fórmula de BD que es complementaria de, o está coordinada con, la Seguridad Social. Esto es de aplicación a todos los participantes activos del SRE de la AEEPR ("Miembro" o "Miembros"), independientemente de su cargo, clasificación laboral o empleador.  Los Miembros mantendrán los beneficios adquiridos hasta la Fecha de entrada en vigor del PdA, aunque en el bien entendido de que, de conformidad con el PdA se eliminarán los futuros ajustes del costo de la vida, ya que el derecho a los futuros ajustes no es un beneficio adquirido y no lo será a partir de la Fecha de entrada en vigor del PdA.  Los beneficios adquiridos a partir de la Fecha de entrada en vigor del PdA estarán basados en las aportaciones e ingresos en las nuevas cuentas de retiro de DC segregadas, financiadas por las aportaciones de los empleados.  En consecuencia, los empleados tendrán la certidumbre de que sus aportaciones e inversiones estarán protegidas de cara al futuro, garantizando la seguridad de sus jubilaciones.

| Definiciones | |
|---|---|
| **Participantes cubiertos** | Los términos y condiciones de esta propuesta tienen por objeto congelar las acumulaciones de BD de todos los participantes activos del SRE de la AEEPR (incluyendo los Empleados movilizados, tal como se describe a continuación). |
| **Edad de elegibilidad para el retiro** | La Edad de elegibilidad para el retiro es aquella en la que un miembro puede comenzar a recibir una pensión mensual. |
| **Beneficio de retiro** | El Beneficio de retiro es la cuantía del beneficio pagadera a un miembro cada mes. |
| **Servicio acreditable** | Total de los servicios previos de un miembro que se acreditan para una pensión. |
| **Empleados movilizados** | Antiguos empleados de la AEEPR que fueron transferidos, o actuales empleados de la AEEPR que serán transferidos a instrumentalidades del Estado Libre Asociado en relación con una transacción con una Asociación público-privada ("P3").  Los Empleados movilizados recibirán Servicio acreditable solamente por los períodos de empleo en el Estado Libre Asociado, en la medida en que dichos servicios se presten de conformidad con la legislación vigente. |

| Compensación promedio | El promedio de los tres salarios básicos anuales más altos, limitado a $50,000 en el caso de los miembros contratados después del 1/1/1993. |
|---|---|

| **Plazo** | |
|---|---|
| Fecha de congelamiento | El congelamiento de la acumulación del beneficio de pensión del SRE de la AEEPR surtirá efecto en la Fecha de entrada en vigor del PdA |

| **Disposiciones de la propuesta** | |
|---|---|
| Tratamiento de las aportaciones acumuladas del empleado | Los participantes mantienen un derecho adquirido de recibir las aportaciones acumuladas del empleado de conformidad con el documento del plan del SRE de la AEEPR, en lugar de los beneficios de retiro, fallecimiento, discapacidad o cese, aplicables de conformidad con el SRE de la AEEPR. |
| Elegibilidad para el retiro antes de la Fecha de congelamiento | Antes de la Fecha de congelamiento, los participantes mantendrán las siguientes elegibilidades de retiro de conformidad con el SRE de la AEEPR:<br>• Participantes contratados antes del 1 de enero de 1993: 60 años de edad o 20 años de servicio<br>• Participantes contratados a partir del 1 de enero de 1993: 60 años de edad con 5 años de servicio; 65 años de edad con 20 años de servicio; o 50 años con 30 años de servicio |
| Elegibilidad para retiro después de la Fecha de congelamiento | A partir de la Fecha de congelamiento, los participantes serán elegibles para retiro, dentro del plan del SRE de la AEEPR, al alcanzar las siguientes combinaciones de edad/servicio:<br>• Participantes contratados antes del 1 de enero de 1993:<br>   ○ Los participantes que hayan alcanzado los 60 años de edad o hayan prestado 20 años de servicios acreditados a la Fecha de congelamiento serán elegibles para retirarse en cualquier momento.<br>   ○ Los participantes que no hayan alcanzado la edad de 60 años ni hayan cumplido 20 años de servicios acreditados a la Fecha de congelamiento serán elegibles para retirarse en función de la edad que tengan a la Fecha de congelamiento de conformidad con la siguiente tabla:<br><br>_(ver tabla)_<br><br>• Participantes contratados a partir del 1 de enero de 1993:<br>   ○ Los participantes que hayan alcanzado los 60 años de edad con 5 años de servicios acreditables; los 65 años de edad o los 20 años de servicios acreditados a la Fecha de congelamiento serán elegibles para retirarse en cualquier momento<br>   ○ Todos los demás participantes serán elegibles para retirarse una vez que a) hayan alcanzado los 65 años de edad; o bien b) en la fecha en que el participante hubiese alcanzado i) tanto los 5 años de servicio suponiendo que el congelamiento no se hubiese producido, y ii) la edad, en función de la siguiente tabla:<br><br>_(ver tabla)_ |

| ▪ Edad alcanzada a la Fecha de congelamiento | ▪ Edad de elegibilidad para retiro después de la Fecha de congelamiento |
|---|---|
| ▪ A partir de 57 | ▪ 61 |
| ▪ 56 | ▪ 62 |
| ▪ Menor de 55 años | ▪ 63 |

| ▪ Edad alcanzada a la Fecha de congelamiento | ▪ Edad de elegibilidad para retiro después de la Fecha de congelamiento |
|---|---|
| ▪ A partir de 57 | ▪ 61 |
| ▪ 56 | ▪ 62 |
| ▪ Menor de 55 años | ▪ 63 |

| | |
|---|---|
| **Eliminación del beneficio mínimo** | El beneficio mínimo mensual de $180 será eliminado en el caso de los participantes que se retiren a partir de la Fecha de congelamiento. |
| **Eliminación del uso de licencias por enfermedad para adquirir acreditación para una pensión meritoria** | En el caso de las separaciones de servicio o retiros que se produzcan a partir de la Fecha de congelamiento, el Servicio acreditables se determinará a la Fecha de congelamiento y no se incrementará en el futuro. Antes de la Fecha de congelamiento, las licencias por enfermedad podían convertirse, al retirarse del servicio, en una anualidad meritoria calculada como 1 mes por cada 15 días acumulados de licencia por enfermedad. A partir de la Fecha de congelamiento, el tiempo acumulado por enfermedad no se acreditará para el beneficio de pensiones, ni será posible implementarlo para adquirir días de servicio. Se respetarán las solicitudes de retiro presentadas antes de la Fecha de confirmación del Plan solicitando la aplicación de los días de licencia por enfermedad para adquirir días de servicio. |
| **Pagos de bonificaciones** | Las bonificaciones de verano y de vacaciones serán eliminadas de los retiros después de la Fecha de congelamiento. Solamente se mantendrán las bonificaciones únicas por funeral.<br><br>Los pagos de las bonificaciones no se verán afectados en los retiros que se produzcan antes de la Fecha de congelamiento. |
| **Aportaciones de empleados** | Las aportaciones de los empleados al Plan del SRE de la AEEPR cesarán en la Fecha de congelamiento. |
| **Implementación de Cuentas de aportaciones definidas** | Los Empleados movilizados participarán en las cuentas de Aportaciones definidas (DC), de conformidad con la Ley 106-2017 (Ley 106). Para los actuales empleados de la AEEPR se establecerán nuevas cuentas de DC, encuadradas en el Plan de DC, con las mismas cláusulas estipuladas por la Ley 106. |
| **Eliminación de los ajustes por costo de la vida (COLA)** | Históricamente, los ajustes por costo de la vida (COLA, por sus siglas en inglés) que se otorgaban cada tres años no continuarán después de la Fecha de congelamiento. Quedarán eliminados los futuros COLA. Los COLA previamente otorgados serán respetados.<br><br>Los beneficios que previamente se incrementaban mediante los COLA históricos no se verán reducidos, y se respetarán los COLA anteriores a la Fecha de congelamiento. |
| **Beneficios por fallecimiento** | Los ceses como consecuencia de fallecimiento recibirán un reintegro de las aportaciones acumuladas del empleado. |
| **Beneficios por fallecimiento posteriores al retiro** | En concepto de los retiros que se produzcan a partir de la Fecha de congelamiento, el beneficio se pagará en forma de anualidad vitalicia. Si al retirarse el participante opta por recibir una anualidad con un beneficio de supervivencia del 30% a su fallecimiento, la cuantía pagada durante la vida del empleado será el equivalente actuarial de la anualidad vitalicia. La equivalencia actuarial del plan (es decir, tasa de mortalidad y tipo de interés) se determinará de conformidad con otras formas opcionales de pago en el marco del plan. |
| **Beneficios por discapacidad** | A partir de la Fecha de congelamiento, los participantes que queden discapacitados tendrán derecho a:<br>a. Percibir un beneficio de retiro si se cumplen los demás criterios de elegibilidad para el retiro,<br>b. Percibir una pensión diferida si se han acumulado más de 10 años de servicio (a pagar de igual modo que los beneficios a los que tenga derecho un participante cesado), o bien<br>c. Recibir un reintegro de las aportaciones acumuladas por el empleado |

| Implicaciones específicas del beneficio de retiro | Los beneficios de retiro se mantendrán sin cambio con respecto a los actualmente prestados por el SRE de la AEEPR hasta la Fecha de congelamiento.  Las disposiciones en el caso de los retiros que se produzcan después de la Fecha de congelamiento son las siguientes: |
|---|---|

    a.   Los beneficios mínimos ya no serán de aplicación a futuros retirados

    b.   El congelamiento elimina la posibilidad de adquirir períodos de servicio adicionales aplicando los períodos de licencia por enfermedad o por vacaciones no aprovechados, o cualquier otro medio. Se respetarán las solicitudes de retiro presentadas antes de la Fecha de entrada en vigor del PdA solicitando la aplicación de los días de licencia por enfermedad o de vacaciones para adquirir días de servicio.

    c.   Los participantes contratados antes del 1 de enero de 1993 que hayan cumplido 25 años de Servicio acreditable a la Fecha de congelamiento percibirán una anualidad vitalicia equivalente al 2.5% de la Compensación promedio determinada a la Fecha de congelamiento, multiplicada por el número de años de servicio a la Fecha de congelamiento (hasta un máximo de 30 años).  Si los beneficios se coordinan con la Seguridad Social, se ajustarán desde los 65 a los 80 años de edad, reduciéndose en $40 por cada año de Servicio acreditable a la Fecha de congelamiento (hasta un máximo de 30 años).

    d.   Los participantes contratados antes del 1 de enero de 1993 que no hayan alcanzado 25 años de Servicio acreditable a la Fecha de congelamiento percibirán un beneficio del 1.5% de la Compensación promedio determinada a la Fecha de congelamiento por año de Servicio acreditable hasta dicha fecha, más un 0.5% adicional de la Compensación promedio determinada a la Fecha de congelamiento por año de Servicio acreditable a la Fecha de congelamiento por encima de los 20 años.  Si la fecha de comienzo del beneficio del participante se produce antes de los 60 años de edad, el beneficio será el equivalente actuarial del beneficio de los 60 años.

    e.   Los participantes contratados a partir del 1 de enero de 1993 que hayan alcanzado los 30 años de servicio a la Fecha de congelamiento percibirán un beneficio equivalente al 75% de la Compensación promedio determinada a dicha fecha.  El factor del 75% se verá adicionalmente reducido en el caso de los retiros anteriores a los 55 años de edad tal y como detalla a continuación:

| Edad de retiro | Multiplicador del beneficio |
|---|---|
| 50 | 62.5% |
| 51 | 65.0% |
| 52 | 67.5% |
| 53 | 70.0% |
| 54 | 72.5% |

    f.   Los participantes contratados a partir del 1 de enero de 1993 que no hayan alcanzado 30 años de Servicio acreditable a la Fecha de congelamiento percibirán un beneficio del 1.5% de la Compensación promedio determinada a la Fecha de congelamiento por año de Servicio acreditable hasta dicha fecha, más un 0.5% adicional de la Compensación promedio determinada a la Fecha de congelamiento por año de Servicio acreditable a la Fecha de congelamiento por encima de los 20 años. Si la fecha de comienzo del beneficio del participante se produce antes de los 60 años de edad, el beneficio será el equivalente actuarial del beneficio de los 60 años.

| Estructura de financiamiento | Las pensiones seguirán siendo pagadas con cargo al fideicomiso de pensión actual (es decir, SRE de la AEEPR). La estructura de financiamiento del SRE de la AEEPR pasará a ser un modelo financiado a un sistema de reparto (PayGo). El SRE de la AEEPR se le reembolsará en concepto de los pagos del sistema de reparto con los ingresos recaudados por un nuevo fideicomiso que se constituirá de conformidad con el Plan de ajuste de la AEEPR (el "Fideicomiso de PayGo de la AEEPR"), tal como se explica en el Apéndice I de la presente Ficha de condiciones. Los activos del Fideicomiso PayGo de la AEEPR serán mantenidos en custodia para el beneficio exclusivo de los actuales y futuros retirados del sistema del SRE de la AEEPR. |
|---|---|
| | El Plan de ajuste dispondrá la emisión al Fideicomiso PayGo de bonos garantizados por los ingresos, cuya estructura, volumen y precio —como el capital anual y el pago de los intereses— serán suficientes para reembolsar al SRE de la AEEPR las pensiones y los costos administrativos pagados durante el ejercicio fiscal precedente, fondos suficiente para cubrir los gastos operativos tanto del SRE de la AEEPR como del Fideicomiso PayGo de la AEEPR, más una cuantía anual adicional que se mantendrá como reserva y que se acumulará durante un período de al menos 2 años de pagos previstos. Estos bonos estarán subordinados a los bonos de ingresos de la deuda reestructurada, y tendrán convenido un tipo tanto de intereses como de pagos de capital. |
| | Los activos del Fideicomiso PayGo de la AEEPR, incluyendo la rentabilidad de las inversiones, se aplicarán al reembolsar al SRE de la AEEPR los pagos anuales de PayGo pertinentes. Las retiradas de fondos del Fideicomiso PayGo de la AEEPR requerirán la aprobación de la Junta de Fideicomisarios del Fideicomiso PayGo de la AEEPR, y el SRE de la AEEPR solamente podrá aplicarlos a financiar el pago de los repartos, de conformidad con el Plan de DB modificado en virtud de esta Ficha de condiciones. |

### Beneficios negociados además de los beneficios del SRE de la AEEPR

| Descripción de los beneficios negociados | Los beneficios se pagarán a los participantes si su cese del servicio activo en la AEEPR es consecuencia de alguno de los siguientes motivos: <br>• Discapacidad física o mental <br>• Jubilación o cese cumpliendo los requisitos de edad o de servicio del SRE de la AEEPR <br>• Fallecimiento de un miembro activo <br><br> Los beneficios serán pagadero solamente en una única instancia, y un participante que vuelva al trabajo no tendrá derecho a percibir ningún beneficio adicional por los mismos supuestos |
|---|---|
| Importe de los beneficios negociados | • Retiro, discapacidad o fallecimiento ordinario: $7,000 <br>• Fallecimiento vinculado con las obligaciones de su empleo: $20,000 <br>• Fallecimiento vinculado con las obligaciones de empleo de un técnico de líneas eléctricas o en cargos identificados específicamente como elegibles para una compensación anual de riesgo especial: $50,000 <br>• Discapacidad física resultante de obligaciones laborales: $8,000 |
| Repercusiones del congelamiento en los importes de los beneficios negociados | Los beneficios pagaderos en una sola vez descritos en esta fórmula no se verán afectados por el congelamiento de las pensiones |

APÉNDICE I
PROPUESTA DE TÉRMINOS DE CREACIÓN DEL FIDEICOMISO PAYGO DE LA AEEPR

Para crear un tope retroactivo de financiamiento de futuras obligaciones de pensiones durante períodos de demanda restringida, como más tardar en la Fecha de entrada en vigor del PdA se constituirá el Fideicomiso PayGo de la AEEPR.

A continuación presentamos un resumen de los términos y condiciones tentativos propuestos para la constitución y administración de un Fideicomiso PayGo de la AEEPR para el SRE de la AEEPR.

De conformidad con el PdA de la AEEPR, el financiamiento del pago de los beneficios del SRE de la AEEPR se convertirá en un sistema de reparto, lo cual incluirá la creación del nuevo Fideicomiso PayGo de la AEEPR para pagar los beneficios de las pensiones, ajustados como aquí se especifica. El Fideicomiso PayGo de la AEEPR será regido por una Junta de Fideicomisarios (la "Junta del Fideicomiso PayGo"). En consecuencia, los empleados tendrán la certidumbre de que sus aportaciones e inversiones estarán protegidas de cara al futuro, garantizando la seguridad de sus jubilaciones.

| Definiciones | |
| --- | --- |
| **Fideicomiso PayGo de la AEEPR** | El Fideicomiso PayGo de la AEEPR será un fideicomiso con sede en Puerto Rico, existente exclusivamente para el fin público de prestar beneficios a los pensionistas de la AEEPR, que no tributará en Puerto Rico. La JSAF hará todo lo posible para que el Fideicomiso PayGo de la AEEPR pueda acogerse a la exclusión tributaria de la Sección 115 del Código Tributario del IRS a efectos de inversiones. |
| **Escritura de fideicomiso del Fideicomiso PayGo de la AEEPR** | La Escritura de fideicomiso del Fideicomiso PayGo de la AEEPR ("Escritura de fideicomiso") constituirá al Fideicomiso PayGo de la AEEPR como entidad jurídica independiente e irrevocable, en el sentido del Capítulo III de la Ley de Fideicomisos (32 L.P.R.A §33534 y ss.). Incorporará las disposiciones expuestas en esta Ficha de términos y un Apéndice (pendiente de ultimar tras alcanzar un acuerdo), que por referencia queda aquí incorporado, y que definirá los mecanismos de gestión y operativos del Fideicomiso PayGo de la AEEPR. |
| **Junta de Fideicomisarios del Fideicomiso PayGo de la AEEPR** | La Junta del Fideicomiso PayGo de la AEEPR será creada mediante una Escritura de fideicomiso, en calidad de organismo rector del Fideicomiso. La composición y responsabilidades de la Junta del Fideicomiso PayGo serán congruentes con las disposiciones de la propuesta y definidas en el Apéndice. |
| **Periodo de transición** | El período entre la confirmación del PdA de la AEEPR y la fecha en que la Junta esté plenamente operativa se denominará Período de transición. Para que se la considere plenamente operativa, la Junta del Fideicomiso PayGo deberá tener designados a todos sus integrantes, habrá puesto en marcha sus funciones administrativas, tendrá nombrados sus responsables y conformados sus subcomités. Las funciones y responsabilidades de la AEEPR, del SRE de la AEEPR, del Estado Libre Asociado y de la JSAF en los aspectos operativos del Fideicomiso PayGo de la AEEPR durante el Período de transición se establecerán en la Escritura de fideicomiso. |

## <u>Apéndice D</u>

**Lista de los principales estatutos sustituidos por la Ley PROMESA**

## Lista de los principales estatutos sustituidos por la Ley PROMESA[1]

**Disposiciones estatutarias sobre derechos y recursos de los bonistas**

1. 22 L.P.R.A. § 207 (otorgando a los bonistas un derecho de administración judicial en determinadas circunstancias)

2. 22 L.P.R.A. § 208 (otorgando a los bonistas ciertos derechos y recursos contra la AEEPR)

**Disposiciones estatutarias relativas a la emisión y condiciones de bonos**

1. 22 L.P.R.A. § 195a-1(o), modificada mediante la Ley 17-2019, exigiendo la aprobación del NEPR para las emisiones de bonos bajo determinadas circunstancias.

2. Ley 101-2020 (otorgando a la AAFAF determinados derechos de aprobación de las emisiones de bonos por parte de las instrumentalidades de Puerto Rico)

**Estatutos relativos a los medios de implementación del Plan**

1. 22 L.P.R.A. § 195a-1(u), modificado por la Ley 17-2019, para exigir al NEPR la aprobación de, entre otras cosas, la venta o transferencia de bienes de la AEEPR, que puede incluir limitaciones para la creación de filiales, o fideicomisos, o el emprendimiento de actuaciones o medidas necesarias o convenientes para ejercitar los poderes de la AEEPR otorgados de conformidad con esta ley habilitadora.

**Estatutos relativos a las contribuciones en lugar de impuestos y subsidios**

1. 22 L.P.R.A. § 212(b), para establecer el mecanismo de Contribución en Lugar de Impuesto (CELI), mediante el cual la AEEPR compensará a los municipios.[2]

2. 22 L.P.R.A. § 814, para establecer limitaciones a la futura creación de cualquier nuevo subsidio, crédito o subvención al servicio eléctrico.[3]

**Estatutos relativos al retiro**

1. Ley 106-2017 (en la medida en que no permite a los participantes del SRE de la AEEPR participar en el plan de aportaciones definido por la Ley 106).

---

[1]   Los estatutos aquí enumerados han sido sustituidos por los motivos estipulados (y solamente en la medida indicada) en el Anexo "A" de las Propuestas de antecedentes de hecho y conclusiones de derecho.

El Deudor se reserva el derecho de modificar esta lisa antes del dictado de la Orden de confirmación de la AEEPR.

[2]   Esta cláusula solamente será sustituida en la medida en que pueda interpretarse como una exención a los municipios del pago de la Carga heredada.

[3]   Esta cláusula solamente será sustituida en la medida en que pueda interpretarse como una restricción a la creación de un nuevo subsidio para usuarios de bajas rentas, relacionado con la Carga heredada.

**Estatutos promulgados antes de la Ley PROMESA relativos a la reestructuración de la deuda de la AEEPR**

1.  22 L.P.R.A § 1054x-1 (estableciendo el procedimiento mediante el cual el NEPR tuvo que determinar y revisar los cargos de transición y los mecanismos de ajuste).

2.  22 L.P.R.A § 1054b(q) (en la medida, en su caso de que otorga al NEPR ciertas facultades de revisión y aprobación de las emisiones de bonos de la AEEPR bajo el Título III).

## ANEXO B

ACUERDO DE CONCILIACIÓN Y DESCARGO, DE FECHA 26 DE AGOSTO DE 2022, POR Y ENTRE (I) LA JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN FINANCIERA PARA PUERTO RICO, EN CALIDAD DE REPRESENTANTE DE LA AEEPR, Y (II) VITOL INC.

**ACUERDO DE CONCILIACIÓN Y DESCARGO**

El presente Acuerdo de Conciliación y descargo (el "Acuerdo") queda formalizado hoy, 26 de agosto de 2022, entre la Junta de Supervisión y Administración Financiera para Puerto Rico (la "Junta de Supervisión"), en calidad de única representante bajo el Título III de la Autoridad de Energía Eléctrica de Puerto Rico ("AEEPR"), de conformidad con la Sección 315(b) de la *Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico* ("PROMESA")[1], Vitol Inc. ("VIC") y Vitol S.A. ("VSA", y conjuntamente con VIC, "Vitol"), (colectivamente, las "Partes").

CONSIDERANDO que el 23 de mayo de 2018, VIC presentó una prueba de reclamación en el Caso del Título III de AEEPR[2], registrado por Kroll Restructuring Administration, LLC ("Kroll") como Prueba de reclamación Núm.14537 alegando una petición de reclamación previa no garantizada contra la AEEPR por una cuantía de $41,472,771.43 (la "Reclamación").

CONSIDERANDO que el 27 de septiembre de 2021, el Tribunal del Caso del Título III (el "Tribunal del Título III") expidió una opinión y una orden [ECF Núm.77, (la "Opinión y Orden")] que admitía y rechazaba parcialmente las mociones cruzadas de las Partes solicitando una sentencia sumaria del pleito caratulado *AEEPR contra Vitol Inc. y otros*, Proc. abr. Núm.19-00453 del Caso Núm.17-BK-3283- LTS, D.P.R. (la "Acción de la Ley 458").

CONSIDERANDO que el 2 de noviembre de 2021, el Tribunal del Título III dictó una sentencia final a favor de VIC contra la AEEPR por una cuantía de $41,457,382.88 (la "Sentencia") por cuenta de las mismas responsabilidades alegadas en la Reclamación. [ECF Núm.82 en Proc. abr. Núm.19-00453.]

CONSIDERANDO que la Sentencia y la Reclamación constituyen reclamaciones generales no aseguradas previas contra la AEEPR.

CONSIDERANDO que el 2 de diciembre de 2021, la Junta de Supervisión, en calidad de representante única bajo el Título III de la AEEPR, apeló la Opinión y la Orden ante el Primer Circuito (la "Apelación"). *véase Junta Sup. y Adm. Financ. contra Vitol S.A., y otros*, Núm. 21-1987 (1er Cir.).

CONSIDERANDO que ahora las Partes desean resolver plena y definitivamente todas y cada una de las diferencias existentes entre ellas, conocidas y desconocidas, observadas u ocultas, devengadas y no devengadas, existentes hasta la fecha en que se formaliza el presente Acuerdo (incluida) relacionado con la Acción de la Ley 458.

Considerando los convenios expuestos a continuación, por la presente y en la primera fecha indicada arriba, las Partes de este Acuerdo formalizan, aceptan y pactan, a sabiendas y deliberada, voluntaria y libremente, con el asesoramiento de letrados y sin ningún tipo de coacción, lo que a continuación se expone:

1.    Acuerdos del Plan. A partir del día de la fecha, cada una de las Partes cumplirá las respectivas obligaciones que asume y que se especifican a continuación:

a. La Junta de Supervisión dispondrá que la AEEPR presente su propuesta de plan de

---

[1]    PROMESA está codificada en 48 U.S.C. §§ 2101–2241.
[2]    Caso de quiebra Núm.17- BK-4780-LTS.

ajuste (el "<u>Plan de la AEEPR</u>") y declaración de divulgación de la AEEPR (la "<u>Declaración de divulgación</u>") de conformidad con los términos y condiciones aquí pactados.

b.  La Reclamación de VIC se considerará debidamente admitida (no sujeta a ningún recurso, objeción o revocación) por el importe total de $41,457,382.88 y, en la fecha de entrada en vigor del Plan de la AEEPR, la Reclamación de VIC estará en una clase en la cual Vic (a) percibirá una distribución a cuenta de la Reclamación equivalente a la mitad (50%), sobre una base porcentual, de lo que perciben las reclamaciones de la clase de reclamaciones generales no aseguradas no de bonos ni por dinero prestado, y (b) automáticamente (sin necesidad de presentar documentación adicional) recibirá de la AEEPR y otorgará a esta los respectivos descargos establecidos en la Sección 4 siguiente. Si el Plan de la AEEPR contuviese más de una clase de reclamaciones generales no garantizadas no de bonos ni por dinero prestado, VIC percibirá una distribución a cuenta de la Reclamación que será equivalente a la mitad (50%) del promedio de las distribuciones porcentuales abonadas en concepto de las reclamaciones de dichas clases. A efectos de disipar cualquier duda, las clases de reclamaciones de líneas de crédito previas a la petición y relacionadas con pensiones no se incluirán en el cálculo del citado porcentaje promedio.

c.  El Plan de la AEEPR clasificará la Reclamación de manera separada de las demás reclamaciones no aseguradas generales contra la AEEPR.

d.  La AEEPR incluirá a Vitol como parte exculpada en cualquier Plan de la AEEPR, aunque en el bien entendido de que dicha exculpación no exculpará a Vitol de las reclamaciones relacionadas con la acción caratulada *Comité Especial de Reclamaciones contra Inspectorate America Corp.*, Proc. abr. Núm.19-00388 del Caso Núm.17-BK-3283-LTS, D.P.R.

e.  Vitol no se opondrá a la aprobación de la Declaración de divulgación, que en su forma y contenido será congruente con este Acuerdo y de ninguna manera sustancialmente perjudicial para Vitol;

f.  Vitol no se opondrá a la confirmación del Plan de la AEEPR, que incorporará cláusulas relativas al tratamiento de la Reclamación razonablemente aceptables para Vitol, congruentes con este Acuerdo y de ninguna manera sustancialmente perjudiciales para Vitol;

g.  Tras serle solicitado de conformidad con lo dispuesto por la Ley PROMESA, Vitol emitirá puntualmente un voto de aceptación del Plan de la AEEPR (o de cualquier plan de ajuste consiguiente congruente con, y no económica o materialmente peor que, los términos y condiciones de este Acuerdo, y de ninguna manera sustancialmente perjudicial para Vitol); y

h.  Bajo ninguna circunstancia Vitol podrá emprender acciones, ni alentar a ninguna otra persona a hacer lo propio, que vulnerase, o que razonablemente pudiese vulnerar, o ser incongruente con los términos y condiciones aquí pactados, o que impidiese o imposibilitase la presentación de cualquier Plan de la AEEPR ( de cualquier plan de ajuste consiguiente congruente con, y no económica o materialmente peor que, los términos y condiciones de este Acuerdo, y de ninguna manera sustancialmente perjudicial

2

para Vitol), la administración del Plan de la AEEPR (o de cualquier plan de ajuste consiguiente congruente con, y no económica o materialmente peor que, los términos y condiciones de este Acuerdo, y de ninguna manera sustancialmente perjudicial para Vitol), el dictado de una orden confirmando el Plan de la AEEPR ( de cualquier plan de ajuste consiguiente congruente con, y no económica o materialmente peor que, los términos y condiciones de este Acuerdo, y de ninguna manera sustancialmente perjudicial para Vitol), y el señalamiento de la fecha de entrada en vigor del Plan de la AEEPR; aunque siempre en el bien entendido de que dicha documentación sea congruente con los términos y condiciones aquí pactados en relación con la Reclamación y que no resulten sustancialmente perjudiciales para Vitol.

2.     Sentencia; Apelación de la AEEPR.  La Sentencia se mantendrá en pleno vigor y efecto. En un plazo de cinco (5) días laborables a contar desde la fecha de este documento, la AEEPR retirará, sin perjuicio, la Apelación mediante la presentación ante el Primer Circuito, de la estipulación de desestimación, sustancialmente en la forma adjunta al presente documento en forma de **Anexo A**.

3.     Ajuste de la reclamación.  En un plazo de dos (2) días laborables tras el dictamen de la estipulación desestimación de la apelación de la AEEPR por parte del Primer Circuito, la AEEPR notificará a Kroll el hecho de la existencia de este Acuerdo, con copia a Vitol, y se indicará a Kroll que liquide la Reclamación en el registro de reclamaciones al valor correcto de la Sentencia, por una cuantía de $41,457,382.88.

4.     Descargos.

     a.   En la fecha de entrada en vigor del Plan de la AEEPR, por la presente Vitol (y cualesquiera partes que demanden a través de, o junto con Vitol) descargarán irrevocable e incondicionalmente a la AEEPR (y a todos los actuales pasados directivos, consejeros, empleados, agentes, sucesores, cesionarios, accionistas, propietarios, aseguradoras, reaseguradoras, letrados, compradores y vendedores de la AEEPR, y a todas las entidades matrices, subsidiarias y filiales de la misma) y a la Junta de Supervisión (y a sus miembros y director ejecutivo, empleados y asesores) de todas y cada una de las causas de acción, demandas o reclamaciones, conocidas o desconocidas, devengadas o no devengadas, derivadas de o relacionadas de alguna manera con la Acción de la Ley 458, así como de todas las reclamaciones, conocidas o desconocidas, que Vitol alegase o pudiese haber alegado en el marco de la Acción de la Ley 458; aunque en el bien entendido de que el descargo de Vitol no se extenderá a, ni incluirá, reclamaciones, derechos o defensas (tanto ordinarios como afirmativos) de Vitol en relación con la acción caratulada *Comité Especial de Reclamaciones contra Inspectorate America Corp.*, Proc. abr. Núm.19-00388 en el Caso Núm.17-BK-3283-LTS, D.P.R.  De conformidad con este Acuerdo, Vitol no descarga —y, en su lugar, mantiene expresamente— todas sus reclamaciones, derechos o defensas vinculados con dicha acción.

     b.   Por la presente, y automáticamente en la fecha de entrada en vigor del Plan de la AEEPR, la AEEPR (y cualquier parte que reclame por y a través de la misma) descargará irrevocable e incondicionalmente a Vitol (y a todos los pasados y actuales directivos, consejeros, empleados, agentes, sucesores, cesionarios, accionistas, propietarios, aseguradoras, reaseguradoras, letrados, compradores y vendedores de Vitol, y a todas las entidades matrices, subsidiarias y filiales de la misma) de todas y cada una de las causas de acción,

3

demandas o reclamaciones, conocidas o desconocidas, devengadas o no devengadas, derivadas de o relacionadas de alguna manera con la Acción de la Ley 458, y de todas y cada una de las reclamaciones, conocidas o desconocidas, que fueron o pudiesen ser alegadas por la AEEPR en la Acción de la Ley 458. A efectos de disipar cualquier duda, el descargo de la AEEPR no se extenderá a, ni incluirá, reclamaciones, derechos o defensas de la AEEPR relacionados con la acción caratulada *Comité Especial de Reclamaciones contra Inspectorate America Corp.*, Proc. abr. Núm.19-00388 del Caso Núm.17- BK-3283-LTS, D.P.R. De conformidad con este Acuerdo, la AEEPR no descarga —y, en su lugar, mantiene expresamente— todas sus reclamaciones, derechos o defensas vinculados con dicha acción.

5.    Todas las Partes de este Acuerdo garantizan expresamente que no han transferido, cedido, hipotecado, traspasado ni otorgado de ningún otro modo ningún interés en la Reclamación ni en ninguna reclamación descargada de conformidad con este Acuerdo, y que de ninguna manera transferirán, cederán, hipotecarán, traspasarán ni otorgarán ningún interés en las mismas.

6.    Este Acuerdo constituye el convenio íntegro y completo entre las Partes con respecto al asunto de referencia, y sustituye cualesquiera otras acciones o alegaciones verbales o escritas previas. Este Acuerdo no podrá ser revisado, modificado ni revocado sin el previo consentimiento por escrito de todas las Partes del mismo.

7.    Este Acuerdo se interpretará íntegramente de conformidad con su significado manifiesto. El presente Acuerdo se interpretará como producto de negociaciones en igualdad de condiciones entre personas igualmente sofisticadas, asesoradas por letrados, lo cual no irá en detrimento contra aquella Parte que haya aportado o preparado un borrador del Acuerdo o cualquier cláusula del mismo.

8.    Ninguna de las Partes renuncia a, ni descarga de, ningún derecho, salvo tal y como aquí se dispone.

9.    Cada Parte realizará aquellas actuaciones y firmará aquellos documentos que sean razonablemente necesarios para el cumplimiento de este Acuerdo.

10.    Este Acuerdo se regirá, interpretará y ejecutará de conformidad con las leyes del Estado de Nueva York.

11.    Este Acuerdo podrá formalizarse en dos o más copias, cada una de las cuales será considerada un original.

12.    Todas las demandas, notificaciones, consentimientos y demás comunicaciones aquí previstos serán por escrito y se considerarán debidamente cursados (i) cuando se entreguen en mano mediante servicio de mensajería, (ii) en el momento de su recepción efectiva (tal y como se establezca mediante confirmación de recepción o de otra manera) durante el horario comercial normal o, en su caso, el primer día laborable posterior si se transmite electrónicamente (por correo electrónico), por fax o telecopiadora, con confirmación de recepción, o bien (iii) tres (3) días laborables después de ser debidamente depositado en oficinas de correos, mediante correo certificado con franqueo prepagado y acuse de recibo, a las siguientes direcciones o a aquellos otros domicilios que se comunicarán mediante notificación por escrito, a las siguientes Partes:

    a.  Si se envía a la Junta de Supervisión o a la AEEPR, a::

**PROSKAUER ROSE LLP**
Eleven Times Square New York, NY
10036 Attn: Margaret A. Dale
Correo electrónico: mdale@proskauer.com
Martin J. Bienenstock, Esq.
Correo electrónico: mbienenstock@proskauer.com

    b.  Si se envía a Vitol. a:

**SUSMAN GODFREY, LLP**
1000 Louisiana Street, Suite 5100
Houston, Texas 77002 Attn: Neal S.
Manne
Correo electrónico: nmanne@susmangodfrey.com
Alexander L. Kaplan
Correo electrónico:
akaplan@susmangodfrey.com Michael C. Kelso
Correo electrónico: mkelso@susmangodfrey.com

13.     Cada persona que firma debajo manifiesta estar autorizada para formalizar este Acuerdo y para vincular a la Parte a los términos y condiciones del mismo.

14.     Cada Parte manifiesta que ha tenido la posibilidad de consultar al letrado de su elección antes de formalizar este Acuerdo, y que lo formaliza de manera voluntaria.

15.     La formalización de este Acuerdo no tiene por objeto ser considerada, ni deberá interpretarse como tal, una admisión o prueba de cualquier pleito, acción, procedimiento o disputa pendiente o consiguiente, de alguna responsabilidad, infracción u obligación de cualquier índole (incluyendo en lo que respecta a los méritos de cualquier demanda o defensa) por cualquiera de las Partes de cara a la otra con respecto a cualquiera de los asuntos objeto de este Acuerdo. Nada de lo contenido en este Acuerdo (incluyendo los considerandos y anexos del mismo), la conciliación o cualquier actuación realizada o documento formalizado en virtud o en cumplimiento del mismo o de lo aquí pactado, será admisible en ningún procedimiento para ninguna finalidad, salvo para (1) hacer valer los términos y condiciones de este Acuerdo, (2) solicitar la aprobación de la Declaración de divulgación, y (3) solicitar la confirmación del Plan de la AEEPR.

**EN FE DE LO CUAL**, las Partes formalizan este Acuerdo en la fecha indicada arriba.

**JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN FINANCIERA PARA PUERTO RICO**

Por: *David Skeel*

Nombre: David A. Skeel, Jr.

Cargo:  Junta de Supervisión, Presidente

**LA AUTORIDAD DE ENERGÍA ELÉCTRICA DE PUERTO RICO**

Por:  Junta de Supervisión y Administración Financiera de Puerto Rico, como representante de la Autoridad de Energía Eléctrica de Puerto Rico

Por: *David Skeel*

Nombre: David A. Skeel, Jr.

Cargo:  Junta de Supervisión, Presidente

**VITOL INC.**

Por:

Nombre: Richard J. Evans

Cargo:  VPS y Director Financiero

**VITOL S.A.**

Por:

Nombre: Gerald Delsad

Cargo:  Director Ejecutivo

**JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN
FINANCIERA PARA PUERTO RICO**

Por: _____

Nombre:  David A. Skeel, Jr.

Cargo:      Junta de Supervisión, Presidente


**LA AUTORIDAD DE ENERGÍA ELÉCTRICA DE
PUERTO RICO**

Por: Junta de Supervisión y Administración Financiera para Puerto
Rico, como representante de la Autoridad de Energía Eléctrica de
Puerto Rico

Por: _____

Nombre:  David A. Skeel, Jr.

Cargo:      Junta de Supervisión, Presidente


**VITOL INC.**

Por: _____

Nombre:  Richard J. Evans

Cargo:      VPS y Director Financiero


**VITOL S.A.**

Por: _____

Nombre:  Gerald Delsad

Cargo:      Director Ejecutivo

6

# **Anexo A**

# Tribunal de Apelaciones de los Estados Unidos
## para el Primer Circuito

Núm.21-1987

EN EL ASUNTO DE: LA JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN
FINANCIERA PARA PUERTO RICO, COMO REPRESENTANTE DEL ESTADO
LIBRE ASOCIADO DE PUERTO RICO; LA JUNTA DE SUPERVISIÓN Y
ADMINISTRACIÓN FINANCIERA PARA PUERTO RICO, COMO REPRESENTANTE
DE LA AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO;
LA JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN FINANCIERA PARA PUERTO
RICO, COMO REPRESENTANTE DE LA AUTORIDAD DE ENERGÍA ELÉCTRICA
DE PUERTO RICO (AEEPR); LA JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN
FINANCIERA PARA PUERTO RICO, COMO REPRESENTANTE DE LA
CORPORACIÓN DEL FONDO DE INTERÉS URGENTE DE PUERTO RICO, conocida
como Cofina; LA JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN FINANCIERA
PARA PUERTO RICO COMO REPRESENTANTE DEL SISTEMA DE RETIRO DEL
LOS EMPLEADOS DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO; LA JUNTA
DE SUPERVISIÓN Y ADMINISTRACIÓN FINANCIERA PARA PUERTO RICO,
COMO REPRESENTANTE DE LA AUTORIDAD DE EDIFICIOS PÚBLICOS DE
PUERTO RICO.

Deudores.

LA JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN FINANCIERA PARA PUERTO
RICO, COMO REPRESENTANTE DE LA AUTORIDAD DE ENERGÍA ELÉCTRICA
DE PUERTO RICO

Demandante – Apelante,

contra

VITOL S.A.; VITOL, INC.,

Demandados – Apelados.

## ESTIPULACIÓN DE DESESTIMACIÓN CON PREJUICIO

De conformidad con el Procedimiento de Apelación 42(b) del Reglamento Federal, POR LA PRESENTE QUEDA ESTIPULADO Y CONVENIDO, por y entre las partes, que la presente apelación quede voluntariamente desestimada íntegramente con prejuicio.  Cada Parte asumirá sus propios honorarios y costas judiciales.

Fecha:  [XX] de agosto de 2022                  Presentado respetuosamente,

*/s/ ~~BORRADOR~~*

TIMOTHY W. MUNGOVAN                         MARTIN J. BIENENSTOCK
JOHN E. ROBERTS                             MARK D. HARRIS
LAURA E. STAFFORD                           MARGARET A. DALE
PROSKAUER ROSE LLP                          PROSKAUER ROSE LLP
One International Place                     Eleven Times Square
Boston, MA  02110                           New York, NY 10036
Tel: (617) 526-9600                         Tel: (212) 969-3000
tmungovan@proskauer.com                     mbienenstock@proskauer.com
jroberts@proskauer.com                      mharris@proskauer.com
lstafford@proskauer.com                     mdale@proskauer.com


JOSEPH S. HARTUNIAN                          LARY ALAN RAPPAPORT
PROSKAUER ROSE LLP                           PROSKAUER ROSE LLP
1001 Pennsylvania Ave. N.W.                  2029 Century Park East
Suite 600 South                             Suite 2400
Washington, D.C. 20004                       Los Angeles, CA 90067
jhartunian@proskauer.com                     lrappaport@proskauer.com

*Letrado de la Junta de Supervisión y Administración Financiera para Puerto Rico, como representante de la Autoridad de Energía Eléctrica de Puerto Rico*


*/s/ ~~BORRADOR~~*

EDUARDO A. ZAYAS-MARXUACH                    MICHAEL C. KELSO
MCCONNELL VALDÉS LLC                         NEAL S. MANNE
270 Muñoz Rivera Avenue                      ALEXANDER L. KAPLAN
Hato Rey, Puerto Rico 00918                  WESTON L. O'BLACK
P.O. Box 364225                             FLORENCE T. CHEN
San Juan, Puerto Rico 00936                  SUSMAN GODFREY, LLP
Tel: (787) 250-5608                         1000 Louisianne Street
ezm@mcvpr.com                               Suite 5100
                                            Houston, TX 77002
*Letrado de Vitol Inc.*                      Tel: (713) 651-9366
                                            mkelso@susmangodfrey.com

ANDRÉS W. LÓPEZ
THE LAW OFFICES OF ANDRÉS W.
LÓPEZ, P.S.C.
P.O. Box 13909
San Juan, Puerto Rico 00908
andres@awllaw.com

*Letrado de Vitol S.A.*

nmanne@susmangodfrey.com
akaplan@susmangodfrey.com
woblack@susmangodfrey.com
fchen@susmangodfrey.com

*Letrado de Vitol Inc.*

## CERTIFICADO DE CUMPLIMIENTO

De conformidad con el Procedimiento de Apelación 32(g) del Reglamento Federal, el letrado infrascrito certifica que el presente documento cumple los siguientes requisitos:

1.     Este documento cumple con el límite de tipo-volumen del Procedimiento de Apelación 27(d)(2)(A) del Reglamento Federal porque, excluyendo aquellas partes del mismo eximidas por el Procedimiento de Apelación 32(f) del Reglamento Federal, contiene 48 palabras.

2.     El documento cumple con los requisitos de tipo de letra del Procedimiento de Apelación 32(a)(5) del Reglamento Federal, así como los requisitos de estilo de letra del Procedimiento de Apelación 32(a)(6) del Reglamento Federal, debido a que ha sido preparado con un tipo proporcionalmente espaciado utilizando Microsoft Word 2010 una fuente Times New Roman de 14 puntos. Tal y como lo permite el Procedimiento de Apelación 32(g)(1) del Reglamento Federal, para la preparación de este certificado el infrascrito se ha fiado de la función de recuento de palabras del sistema de procesamiento de textos.

Fecha:  [XX] de agosto de 2022

/s/ *BORRADOR*
Timothy W. Mungovan

## CERTIFICADO DE SERVICIO

Por la presente certifico que en esta misma fecha, he presentado electrónicamente el documento precedente ante el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito, utilizando el sistema CM/ECF, que ha cursado electrónicamente una copia a todos los letrados registrados.

Fecha:  [XX] de agosto de 2022 23 de agosto de
2022                                                  /s/ *BORRADOR*
                                                      Timothy W. Mungovan

## **ANEXO C**

ACUERDO DE CONCILIACIÓN Y DESCARGO, DE FECHA 11 DE FEBRERO DE 2022,

POR Y ENTRE (I) WHITEFISH ENERGY HOLDINGS, LLC, (II) LA AEEPR, Y (III), LA

JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN FINANCIERA PARA PUERTO RICO,

EN CALIDAD DE REPRESENTANTE DE LA AEEPR EN EL TÍTULO III

## <u>ACUERDO DE CONCILIACIÓN Y DESCARGO</u>

El presente Acuerdo de conciliación (este **"Acuerdo")** se formaliza entre Whitefish Energy Holdings, LLC **("WEH")**, de una parte, y la Autoridad de Energía Eléctrica de Puerto Rico **("AEEPR")** conjuntamente con la Junta de Supervisión y Administración Financiera para Puerto Rico **("JSAF")** en su calidad de representante de la AEEPR de la otra. WEH, AEEPR, y JSAF se denominarán en adelante colectivamente las "Partes", y cada una de ella, una "Parte".

## <u>CONSIDERANDOS</u>

**CONSIDERANDO** que el 3 de mayo de 2017 la JSAF presentó una petición voluntaria de quiebra del Estado Libre Asociado de Puerto Rico (el **"Estado Libre Asociado")**, de conformidad con la Sección 304(a) de la Ley PROMESA. Con posterioridad a ello, la Junta de Supervisión presentó casos al amparo del Título III para diversas instrumentalidades del Estado Libre Asociado, incluyendo la AEEPR el 2 de julio de 2017 (el **"Caso del Título III de la AEEPR");**

[*firma*]

**CONSIDERANDO** que el 26 de septiembre de 2017, tras sufrir Puerto Rico dos huracanes que dañaron gravemente su red eléctrica, la AEEPR formalizó un contrato con WEH, posteriormente enmendado, para la reparación de las principales estructuras del sistema eléctrico (la columna vertebral del sistema, compuestas por unas 200 millas de líneas y torres de transmisión, muchas de las cuales estaban situadas en la región montañosa del interior de Puerto Rico (el "**Contrato de WEH**");

**CONSIDERANDO** que el 31 de octubre de 2017, la AEEPR rescindió el Contrato de WEH con arreglo a sus términos y condiciones, rescisión que entró en vigor el 30 de noviembre de 2017 y que no fue consecuencia del desempeño de WEH en el marco del citado Contrato;

**CONSIDERANDO** que antes de la rescisión del 30 de noviembre de 2017 WEH concluyó todas las obras que la AEEPR había solicitado, incluyendo, entre otros, la reparación de cinco (5) segmentos de líneas de transmisión asignados por la AEEPR a WEH, que constituyen parte de la columna vertebral del sistema de transmisión en la región;

1

**CONSIDERANDO** que WEH presentó a la AEEPR facturas en concepto de: (i) obras ejecutadas (**"Facturas por obras ejecutadas"**); y (ii) actividades de movilización y desmovilización (**"Facturas por mov/desmov"**), que en total sumaban $144,249,543.00 (en adelante las Facturas por obras ejecutadas y las Facturas por mov/desmov se denominan conjuntamente las **"Facturas de WEH"**);

**CONSIDERANDO** que, además de las Facturas de WEH, WEH facturó a la AEEPR en concepto de pagos adelantados por movilización y desmovilización y la AEEPR pagó un importe de $17,722,267.00 (**"Pagos adelantados"**), los cuales se aplicarán a las Facturas por mov/desmov tal y como aquí se estipula;

**CONSIDERANDO** que, a la fecha de formalización del presente Acuerdo, además de los Pagos adelantados, la AEEPR ha abonado Facturas de WEH, consistentes en $6,275,699.00 en concepto de Facturas por mov/desmov, y $13,058,139.00 en concepto de Facturas por obras ejecutadas.

[*firma*]     **CONSIDERANDO** que, a la fecha del presente Acuerdo de conciliación, la AEEPR no ha pagado a WEH las cuantías pendientes de las Facturas de WEH (**"Importes facturados restantes"**);

**CONSIDERANDO** que, de conformidad con el Contrato de WEH, se han devengado y se continúan devengando cargos financieros a una tasa del 1% mensual sobre todas las Facturas de WEH vencidas (los **"Cargos financieros"**), cuantías con respecto a las cuales WEH ha presentado una serie de facturas; el 14 de enero de 2022, WEH presentó a la AEEPR una factura actualizada, en concepto de todos Cargos financieros acumulados hasta al fecha, por un total de $51,887,962.60;

**CONSIDERANDO** que el 19 de agosto de 2021, la Agencia Federal de Gestión de Emergencias (Federal Emergency Management Agency, **"FEMA"**) publicó el Memorándum de determinación número FEMA-4339-DR-PR, en el cual la FEMA determinaba que, de los $144,249,543.53 transferidos por AEEPR para el reembolso de las Facturas de WEH, $111,352,417.00 eran elegibles para reembolso (los **"Importes aprobados por la FEMA"**),

pero que la AEEPR no había demostrado de manera suficiente que los $32,897,126.53 eran elegibles para reembolso (los **"Importes rechazados por la FEMA");**

CONSIDERANDO que el 18 de octubre de 2021 la AEEPR presentó una primera apelación en la cual se apelaba a la decisión de la FEMA de que los Importes rechazados por la FEMA no eran elegibles para reembolso;

CONSIDERANDO que el 17 de diciembre de 2021 el Representante autorizado del Gobierno de Puerto Rico, la Oficina Central de Recuperación, Reconstrucción y Resiliencia **("COR3")** presentó la primera apelación ante la FEMA ;

CONSIDERANDO que el 30 de octubre de 2020, WEH presentó su Moción de admisión de reclamación administrativa (la **"Moción de reclamación administrativa")** [Exp. nº 2281], planteando una reclamación prioritaria de gastos administrativos de conformidad con la Sección 503 del Título 11 del Código de Estados Unidos, incorporada en el Título III de la Ley PROMESA y aplicable al Caso del Título III de la AEEPR en concepto de los Importes facturados restantes y los Cargos financieros incurridos hasta la fecha de pago de la reclamación;

[*firma*]

CONSIDERANDO que, desde que WEH presentó su Moción de reclamación administrativa, la AEEPR y WEH han pactado prórrogas para que la AEEPR respondiese a la Moción de reclamación administrativa; y

CONSIDERANDO que las Partes han llegado a la conclusión de que responde a sus mejores intereses resolver todos los asuntos en disputa encuadrados en el Contrato de WEH y en la Moción de reclamación administrativa.

**EN CONSECUENCIA,** en atención de los compromisos aquí asumidos y de las contrapartidas cuya recepción y suficiencia quedan por la presente reconocidas, las Partes han pactado lo que a continuación se expone:

## TÉRMINOS Y CONDICIONES

1. **Términos de la conciliación**

   a.  La AEEPR pagará a WEH $90,289,283.00 en concepto de las Facturas por obras ejecutadas cuyo reembolso fue aprobado por la FEMA pero que todavía están pendientes de pago (el **"Pago en efectivo"**). El Pago en efectivo se abonará en dos (2) plazos: (i)  el primero, por un importe de $63,800,717.17 (el **"Primer pago"**), a cuenta de Facturas por obras ejecutadas específicas impagadas que se abonarán como más tardar el décimo quinto (15$^{to}$) día laborable a contar desde la formalización de este Acuerdo; y (ii) el segundo plazo, de una cuantía de $26,488,565.83 (el **"Segundo pago"**), que se abonarán como más tardar el (15$^{to}$) día laborable a contar desde la aprobación judicial de este Acuerdo. En cada plazo del Pago en efectivo, en el momento de cursar el pago, la AEEPR proporcionará a WEH documentación escrita identificando el número de factura y el importe de cada Factura por obras ejecutadas abonada en relación con cada Pago en efectivo.

   b.   Por la presente, la AEEPR y la JSAF admiten y estipulan que WEH mantiene y mantendrá una reclamación de gastos administrativos por un importe inicial de $133,369,078.00 (la **"Reclamación administrativa inicial"**), conformada por: (i) Facturas por obras ejecutadas en concepto de las cuales la FEMA ha asignado fondos por una cuantía de $103,347,417.00; (ii) pagos en concepto de movilización y desmovilización, que la FEMA ha aceptado reembolsar a AEEPR, por una cuantía de $8,005,000.00, y que constan de Facturas por mov/desmov de $6,275,699.00, y Pagos adelantados por $1,729,301.00;

[*firma*]

4

(iii) los Pagos adelantados abonados a WEH en concepto de los servicios de movilización y desmovilización que la FEMA todavía no ha aceptado reembolsar a la AEEPR, por una cuantía de $15,992,966.00; y (iv) $6,023,695.00, importe que representa el 50% de las cantidades pendientes adeudadas a WEH en concepto de las Facturas por mov/desmov impagadas (tras la plena aplicación de los Pagos adelantados), que la FEMA todavía no ha aceptado reembolsar a la AEEPR. Las Partes reconocen y aceptan que $37,056,105.00 de la Reclamación administrativa inicial ya han sido abonados a WEH (en forma de pagos de Facturas por mov/desmov de $6,275,699.00, Pagos adelantados de $17,722,267.00, y Facturas por obras ejecutadas de $13,058,139.00). Las Partes reconocen y aceptan que $90,289,283.00 de la Reclamación administrativa inicial se abonarán a WEH mediante un Pago en efectivo de la AEEPR a WEH, de conformidad con el Apartado 1(a) de este Acuerdo. Asimismo, las Partes reconocen y aceptan que el saldo impagado restante de la Reclamación administrativa inicial ($6,023,690.00) será autorizado y pagado íntegramente como una reclamación de gastos administrativos, y se abonará en la fecha de entrada en vigor del plan de ajuste de la AEEPR estipulado en el Caso del Título III de la AEEPR, aunque en ningún caso más tarde del 31 de diciembre de 2023, incluso si hasta entonces no ha entrado en vigor ningún plan de ajuste, a menos que se abone antes de conformidad con el Apartado 1(e) de este Acuerdo.

[*firma*]

5

c. Las Partes convienen cooperar entre sí para conseguir, a través del proceso de **apelación** administrativa de la FEMA (incluyendo, si fuese necesario, recurrir a un arbitraje ante la **Junta Civil de Apelaciones Contractuales**), el reembolso de los Importes rechazados por la FEMA (la **"Apelación de la FEMA").** WEH acepta no publicar (mediante posts públicos en Internet o de otra manera), ni facilitar a terceros con fines políticos o de publicidad, ningún documento presentado por la AEEPR en la Apelación de la FEMA sin la previa autorización por escrito de la AEEPR y de la JSAF. La AEEPR deberá facilitar a WEH actualizaciones por escrito de la situación de la Apelación de la FEMA, con una frecuencia no inferior a la bisemanal, a partir de las dos (2) semanas posteriores a la formalización de este Acuerdo.

[*firma*]

La AEEPR deberá recibir la autorización previa y por escrito de WEH antes de resolver cualquier parte de la Apelación de la FEMA; siempre en el bien entendido de que, una vez que a WEH se le abonen íntegramente las Facturas por obras ejecutadas rechazadas y los $12,047,390.00 restantes de las Facturas por mov/desmov rechazadas, la AEEPR ya no estará obligada a solicitar el consentimiento de WEH antes de resolver la Apelación de la FEMA. Si la AEEPR retirase o abandonase la Apelación de la FEMA antes de que a WEH se le paguen íntegramente las Facturas por obras ejecutadas rechazadas y los $12,047,390.00 restantes de las Facturas por mov/desmov rechazadas, la reclamación de gastos administrativos admitida de WEH se verá incrementada en $10,880,460.00 por encima de la cuantía de la Reclamación administrativa inicial, y dicho importe de la reclamación de gastos administrativos aumentada se abonará en la fecha de entrada en vigor del plan de ajuste de la AEEPR,

aunque en ningún caso más tarde del 31 de diciembre de 2023, incluso si hasta

entonces no ha entrado en vigor ningún plan de ajuste. A efectos de disipar

cualquier duda, el incremento citado no se producirá si la Apelación de la

FEMA es rechazada tras el procedimiento debido.

d.   Si la FEMA acepta afectar fondos para cualquier tramo de los $4,856,765.00

en Facturas por obras ejecutadas que inicialmente la FEMA rechazó como parte

de los Importes de facturas rechazadas **("Facturas por obras ejecutadas**

**rechazadas"),** la reclamación de gastos administrativos admitida de WEH se

*[firma]*          incrementará dólar por dólar sobre la cuantía de la Reclamación administrativa

inicial en el importe de los fondos así afectados. La AEEPR remitirá a WEH el

importe de las Facturas por obras ejecutadas rechazadas para las cuales la

FEMA aceptó afectar fondos en un plazo de treinta (30) días naturales a contar

desde la fecha en que la FEMA afecte los fondos.

e.   Si la FEMA acepta afectar fondos para cualquier tramo de los

$28,040,356.00 en Facturas por mov/desmov que la FEMA rechazó

inicialmente como parte de los Importes de facturas rechazadas **("Facturas**

**por mov/desmov rechazadas"),** los primeros $6,023,695.00 en Facturas por

mov/desmov rechazadas adicionales para los cuales la FEMA acepte afectar

fondos incrementarán dólar por dólar la reclamación de gastos administrativos

admitida de WEH, por sobre el importe de la Reclamación administrativa

inicial, **independientemente de cuales** Facturas por mov/desmov sean

identificadas como reembolsables por la FEMA o incluidas en la afectación de

fondos. Los segundos $6,023,695.00 en Facturas por mov/desmov rechazadas

adicionales para los cuales FEMA acepte afectar fondos se aplicarán a

satisfacer $6,023,695.00 de la Reclamación administrativa inicial. La AEEPR

pagará a WEH las Facturas por mov/desmov rechazadas reembolsables por

FEMA en un plazo de treinta (30) días naturales desde la afectación de fondos

por parte de la FEMA, hasta los $12,047,390.00. Aquellos importes de las

Facturas por mov/desmov rechazadas afectados por la FEMA por encima de los

$12,047,390.00 serán retenidos por la AEEPR y aplicados a las Facturas por

mov/desmov que fueron abonados a WEH a través de los Pagos adelantados.

f.   Las Partes aceptan no aplicar los Pagos adelantados a Facturas por

mov/desmov específicas hasta después de que el procedimiento de

apelación administrativa de la FEMA haya quedado plena y definitivamente

resuelto, incluyendo el agotamiento de todas las apelaciones posibles. Una

vez que la AEEPR haya agotado el proceso de apelaciones administrativas

ante la FEMA, si la FEMA no ha aprobado el reembolso íntegro de los

Importes por mov/desmov rechazados, la AEEPR y WEH colaborarán para

asignar los Pagos adelantados a las Facturas por mov/desmov impagadas.

*[firma]*

g.   Aparte de lo pactado en este Acuerdo, WEH renuncia al derecho de incoar

reclamaciones de gastos administrativos adicionales contra la AEEPR en

concepto de las Facturas de WEH que, en última instancia, la FEMA no

admita reembolsar a la AEEPR. Ningún importe pagadero o pagado a WEH

por AEEPR a tenor de este Acuerdo, o ratificado por el mismo, estará sujeto

a ninguna retención, compensación o penalización, y los importes del Pago

en efectivo (tanto los totales como respectivos pagos del mismo) no se

reducirán por motivo alguno, incluso si en posteriores conciliaciones de

facturas se identificasen errores o discrepancias en favor de cualquiera de

8

las Partes.

h.   Por la presente, WEH acepta reducir en $19,004,808.50 los Cargos financieros devengados que puedan haberse acumulado hasta la fecha de formalización de este Acuerdo. La AEEPR y la JSAF aceptan y estipulan que los $33,884,282.57 resultantes de dichos cargos financieros devengados (la **"Reclamación administrativa de intereses"**) serán autorizados y pagados íntegramente en forma de reclamación de gastos administrativos, además de la Reclamación administrativa inicial y de cualesquiera incrementos de la misma, tal y como se estipula en las Secciones 1.c., 1.d. y 1.e de este Acuerdo, exigibles a la fecha de entrada en vigor del plan de ajuste de la AEEPR, aunque en ningún caso con posterioridad al 31 de diciembre de 2023, incluso si para entonces no ha entrado en vigor ningún plan de ajuste.

[*firma*]

i.   Con sujeción a la aprobación de este Acuerdo por parte del Tribunal del Título III, si los pagos exigibles en virtud de este Acuerdo se efectúan puntual e íntegramente como aquí se especifica, WEH no podrá devengar ni reclamar cargos financieros adicionales después de la formalización del Acuerdo; aunque siempre en el bien entendido de que si no se obtiene aprobación del Tribunal hasta el 1 de mayo de 2022, a partir de esa fecha se devengarán cargos financieros al porcentaje estipulado en el Contrato de WEH sobre todos los importes de la Reclamación administrativa inicial que estén pendientes de pago a dicha fecha, cargos financieros que se devengarán como reclamación de gastos administrativos admitida (la **"Reclamación**

9

**administrativa de intereses contingente")**. Además, si los pagos no se abonan puntual o íntegramente como se estipula en este Acuerdo, se aplicará un cargo financiero del 1% sobre las citadas cuantías impagadas, que se devengarán en forma de reclamación de gastos administrativos admitida. Además, se restablecerá la reducción de $19,004,808.50 de los Cargos financieros devengados a la fecha de este Acuerdo, también en forma de reclamación de gastos administrativos admitida **("Reclamación de gastos administrativos restablecida")**. Las citadas Reclamación administrativa de intereses, Reclamación administrativa de intereses contingente y Reclamación de gastos administrativos restablecida serán exigibles a la fecha de entrada en vigor del plan de ajuste de la AEEPR, aunque en ningún caso con posterioridad al 31 de diciembre de 2023, incluso si para entonces no ha entrado en vigor ningún plan de ajuste.

[*firma*]

j.   La AEEPR, aplicando debida diligencia, intentará obtener de la FEMA el reembolso de cualesquiera impuestos municipales a los que WEH venga obligado en concepto de sus trabajos para la AEEPR en el marco del Contrato de WEH. La AEEPR remitirá a WEH todos y cada uno de los pagos que la AEEPR reciba de FEMA en concepto de los citados impuestos municipales en un plazo de treinta (30) días naturales a contar desde al fecha en que la AEEPR reciba los pagos de COR3 o de FEMA, según proceda.

k.   Por la presente, WEH renuncia al derecho, otorgado por el Contrato de WEH, de presentar una propuesta de resolución de rescisión, que de otro modo conllevaría los costos jurídicos, de consultoría y de otra índole que WEH tuviese que incurrir para conseguir el pago de la AEEPR y los

10

reembolsos de la FEMA.

l.   Como más tardar el 1 de marzo de 2022, la AEEPR presentará una moción (la **"Moción de aprobación"**) ante el Tribunal del Título III solicitando la aprobación de este Acuerdo, e intentará que dicha Moción de aprobación se trate en la siguiente vista global programada. Asimismo, la AEEPR acepta que, en caso de que el Tribunal del Título III desestimase la citada Moción de aprobación, abonará de todos modos el Segundo pago a la recepción de los fondos correspondientes de parte de COR3, a cuenta de las Facturas por obras ejecutadas. La AEEPR no intentará recobrar de WEH ningún tramo del Pago en efectivo, ni practicará ninguna compensación o retención sobre futuros pagos sobre la base del abono de los Pagos en efectivo a WEB.

[*firma*]

m.   Tras la aprobación de la Moción de aprobación por parte del Tribunal del Título III, la Moción de reclamación administrativa se considerará satisfecha, Si, en cambio, el Tribunal del Título III desestimase la Moción de aprobación, WEH tendrá derecho a proseguir la Moción de reclamación administrativa; aunque siempre en el bien entendido de que la cuantía de cualquier Pago en efectivo a WEH se acreditará a cualquier reclamación administrativa otorgada a WEH, a cuenta de cualquier otra orden aprobando la Moción de reclamación administrativa.

2.   **Autoridad y sin incongruencias con el Plan.** La JSAF y la AEEPR han obtenido y aportado las aprobaciones necesarias para poder formalizar este Contrato. La JSAF y la AEEPR reconocen y acepta que cualquier plan de ajuste presentado y/o confirmado en el Caso del Título III de la AEEPR no podrá contener cláusulas contrarias a, ni que reduzcan, limiten o retrasen, el cumplimiento por parte de la AEEPR de las obligaciones

que asume mediante el presente Acuerdo, ni contrarias a, o incongruentes con, los demás términos y condiciones de este Acuerdo.

3. **Descargo de WEH por parte de la AEEPR y la JSAF.** A partir de la completa formalización y aprobación de este Acuerdo por parte del Tribunal del Título III, este Acuerdo se entenderá como pleno descargo, aceptación y satisfacción, de parte de WEH, sus filiales, sucesoras y predecesoras, así como de sus respectivos directivos, agentes y empleados, de la totalidad de las responsabilidades civiles, obligaciones, reclamaciones, apelaciones, demandas y causas de acción que la AEEPR o la JSAF tuviesen, tengan o en el futuro pudiesen tener, tanto conocidas como desconocidas, y tanto administrativas como judiciales, legales o en equidad, vinculadas de cualquier otro modo con el Contrato de WEH, las Facturas de WEH, los Cargos financieros, la Moción de reclamación administrativa, y relativas de cualquier otra manera con las actividades, acciones u omisiones de WEH.

4. **Descargo de la AEEPR y de la JSAF por parte de WEH.** Una vez que este Acuerdo sea completamente formalizado y tras su aprobación por el Tribunal del Título III, se entenderá como pleno descargo, aceptación y satisfacción, de parte de la AEEPR y la JSAF, sus filiales, sucesoras y predecesoras, así como de sus respectivos directivos, agentes y empleados, de la totalidad de las responsabilidades civiles, obligaciones, reclamaciones, apelaciones, demandas y causas de acción que WEH tuviese, tenga o en el futuro pudiese tener, tanto conocidas como desconocidas, y tanto administrativas como judiciales, legales o en equidad, vinculadas de cualquier otro modo con el Contrato de WEH, las Facturas de WEH, los Cargos financieros, la Moción de reclamación administrativa, y relativas de cualquier otra manera con las actividades, acciones u omisiones de la AEEPR o la JSAF.

[*firma*]

5. **No admisión.** Este Acuerdo no es, y no implica, una admisión de responsabilidad o culpa de parte de WEH, la AEEPR o la JSAF. En cambio, este Acuerdo es una

conciliación negociada entre las Partes.

6. **Honorarios y costas judiciales.** Las Partes correrán con sus propios honorarios, gastos y costas judiciales.

7. **Actuaciones adicionales.** Cada Parte acepta asumir todas y cada una de las actuaciones adicionales razonablemente necesarias o adecuadas para la plena implementación y cumplimiento de las cláusulas de este Acuerdo, incluyendo, entre otros, la formalización de la documentación adicional necesaria para su debida implementación.

8. **Obligatoriedad.** Si alguna de las cláusulas de este Acuerdo, o si la aplicación del mismo, se considerasen no válidos o inaplicables, dicha falta de validez no afectará al resto del Acuerdo, que surtirá efecto sin las cláusulas o aplicación no válidas. Para tales efectos, las cláusulas de este Acuerdo se declaran separables. Este Acuerdo podrá formalizarse en copias separadas que, en su totalidad, constituirán uno y el mismo Acuerdo íntegro.

9. **Naturaleza vinculante.** Una vez formalizado íntegramente, el Acuerdo será vinculante para, y redundará en beneficio de, las Partes signatarias y sus respectivos agentes, empleados, representantes, directivos, consejeros, filiales, cesionarios, herederos, predecesores y sucesores.

*[firma]*

10. **Copias y ejemplares.** Este Acuerdo podrá firmarse en ejemplares por todas y cada una de las Partes, y cada uno de dichos ejemplares se considerará un original. Las Partes convienen que las firmas en faxes electrónicos o con PDF tendrán el mismo pleno vigor y efecto que las firmas originales.

11. **Manifestaciones y garantías.** Cada Parte manifiesta y garantiza lo que a continuación se expone:

13

a.  Para la formalización de este Acuerdo, no se fía ni se ha fiado de ninguna manifestación, declaración, omisión o promesa de la otra Parte (o de cualquier directivo, agente, empleado, representante o apoderado de la otra Parte), como tampoco para pactar la conciliación aquí prevista, con las excepciones de las expresamente manifestadas en este Acuerdo. No obstante, se fía de todos los térmicos, condiciones y cláusulas de este Acuerdo;

b.  Ha investigado los hechos vinculados a esta conciliación y a este Acuerdo, así como todos los asuntos vinculados al mismo, en la máxima medida que ha considerado necesario;

c.  Ha leído detenidamente, y conoce y entiende todo el contenido de este Acuerdo, y lo formaliza voluntariamente; y

d.  Entiende expresamente que este Acuerdo representa el acuerdo definitivo entre las Partes, y que no podrá ser contradicho por acuerdos o entendimientos verbales anteriores, contemporáneos o posteriores entre las Partes.

12. **Acuerdo íntegro.** Este Acuerdo constituye el convenio y entendimiento íntegro entre las Partes acerca del asunto de referencia, y sustituye y anula cualesquiera otras negociaciones previas, propuestas y acuerdos, tanto verbales como escrito, sobre el particular, y las obligaciones aquí asumidas no podrán ser alteradas, modificadas o enmendadas en ninguno de sus aspectos si no fuese por escrito, debidamente refrendado por las Partes, No existen acuerdos, reservas o convenios colaterales entre las Partes, ni explícitos ni implícitos, ni verbales ni escritos, con la excepción de los específicamente aquí pactado. Ninguna modificación de este Acuerdo será vinculante, salvo que se estipule por escrito y esté firmada por las Partes de este

[*firma*]

14

Acuerdo.

13.   **Coautoría.** Los términos y condiciones de este Contrato son contractuales y no una mera enumeración expositiva. Este Acuerdo existe de manera independiente de cualquier Contrato de WEH y lo sobrevivirá. Este Acuerdo es el producto conjunto de las Partes, y no podrá interpretarse contra ninguna de ellas aduciendo autoría exclusiva.

14.   **Competencia.** Las Partes convienen que el Acuerdo formalizado podrá ser hecho valer por cualquiera de las Partes ante un tribunal de jurisdicción competente. Por la presente, las Partes se someten a la jurisdicción de dicho tribunal para todos los efectos de ejecución e interpretación del Acuerdo formalizado.

15.   **Autorización.** Por la presente, las Partes declaran que este Acuerdo ha sido debidamente autorizado por cada una de ellas tras consultarlo con sus letrados, que los infrascritos entienden plenamente los términos y condiciones del mismo, y que tienen autorización expresa para formalizarlo.

·····························   El resto de la página se ha dejado intencionalmente  en blanco   ······································

[*firma*]

15

**EN FE DE LO CUAL,** las Partes han formalizado este Acuerdo, que entrara en vigor

en la última fecha indicada a continuación.

**POR WHITEFISH ENERGY HOLDINGS, LLC:**


**Nombre:**
**Cargo:  Director Ejecutivo**

FECHA: ....................................

POR LA AUTORIDAD DE ENERGÍA ELÉCTRICA DE PUERTO RICO:

 [firma]
**Nombre: Josué A. Colón Ortiz**
**Cargo:  Director Ejecutivo**

FECHA: 11 de febrero de 2022


POR LA JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN FINANCIERA PARA
PUERTO RICO:


_____
Nombre:
Cargo:

FECHA: _____

*Copia confirmada*

**EN FE DE LO CUAL**, las Partes han formalizado este Acuerdo, que entrara en vigor en la última fecha indicada a continuación.

**POR WHITEFISH ENERGY HOLDINGS, LLC:**


**Nombre:**
**Cargo:  Director Ejecutivo**

**FECHA: _____**


**POR LA AUTORIDAD DE ENERGÍA ELÉCTRICA DE PUERTO RICO:**


**Nombre:**
**Cargo:**

**FECHA: _____**


**POR LA JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN FINANCIERA PARA PUERTO RICO:**

   [firma]
**Nombre:  Natalie A. Jaresko**
**Cargo:  Directora Ejecutiva**

**FECHA:  2/11/22_____**

## **ANEXO D**

PREVISIONES DE COMISIÓN Y FLUJO DE CAJA ILUSTRATIVO DE NUEVOS BONOS

Anexo que se proporcionará en un momento posterior.

**<u>ANEXO E</u>**

PLAN FISCAL CERTIFICADO DE 2022 DE LA AEEPR



Autoridad de
Energía Eléctrica

# Plan Fiscal Certificado de 2022 para la Autoridad de Energía Eléctrica de Puerto Rico

Según lo certificado por la Junta de Supervisión y
Administración Financiera para Puerto Rico el 28 de junio de 2022

# Relevo de responsabilidad

La Autoridad de Asesoría Financiera y Agencia Fiscal (AAFAF), la Autoridad de Energía Eléctrica (AEE) de Puerto Rico, el Gobierno de Puerto Rico, sus organismos y agencias (en conjunto, el Gobierno), la Junta de Supervisión y Administración Financiera para Puerto Rico (Junta de Supervisión) y cada uno de sus respectivos oficiales, directores, funcionarios, agentes, abogados, asesores, miembros, socios o afiliados (colectivamente, junto a la AAFAF y el Gobierno, las Partes) no suponen ninguna declaración o garantía, expresa o implícita, a terceros con respecto a la información aquí contenida y todas las Partes renuncian expresamente a tales declaraciones o garantías. El Gobierno ha tenido que basarse en la información preliminar y en los estados financieros no auditados para 2018, 2019 y 2020, facilitados a la Junta de Supervisión. Por esa razón, la AAFAF, el Gobierno y la Junta de Supervisión, según corresponda, han hecho ciertas suposiciones que podrían cambiar significativamente luego de que los estados financieros mencionados se auditen por completo.

Las Partes no tienen ni aceptan ninguna obligación o responsabilidad hacia ningún lector o receptor de esta presentación, sea por contrato o de forma extracontractual, y no serán responsables de ninguna pérdida, daño o perjuicio (incluidos los daños consecuentes o el lucro cesante) o gasto de cualquier naturaleza de los citados terceros que pueden ser causados, o supuestamente causados por, el uso de esta presentación o que sea consecuencia del acceso a este documento por parte de estos terceros. Las Partes no asumen ningún deber de actualizar la información contenida en el presente documento.

Este documento no constituye una auditoría realizada de acuerdo con las normas de auditoría generalmente aceptadas, un examen de los controles internos ni otro servicio de certificación o revisión según las normas establecidas por el Instituto Americano de Contadores Públicos Certificados (AICPA) o cualquier otra empresa. En consecuencia, las Partes no expresan una opinión ni otra forma de garantía sobre los estados financieros o cualquier información financiera o de otro tipo ni sobre los controles internos del Gobierno y la información contenida en este documento.

Todas las declaraciones y suposiciones contenidas en este documento ya sean prospectivas o históricas, no son garantías de desempeño futuro e implican ciertos riesgos, incertidumbres, estimados y otras suposiciones formuladas en este documento. La condición económica y financiera del Gobierno y de sus entidades se ve afectada por diversos factores legales, financieros, sociales, de salud pública, económicos, ambientales, gubernamentales y políticos. Estos factores son muy complejos, pueden variar de un año fiscal al siguiente y, con frecuencia, son el resultado de acciones tomadas o no tomadas, no solo por el Gobierno sino también por la Junta de Supervisión y otras entidades terceras, como el gobierno de los Estados Unidos. Los ejemplos de estos factores incluyen, pero no se limitan a:

- El efecto de la enfermedad del coronavirus de 2019 ("COVID-19") en la salud y bienestar de los puertorriqueños;
- Los efectos económicos a corto plazo del COVID-19 sobre la economía global y las economías de los Estados Unidos y Puerto Rico en lo que se refiere a los ingresos y presupuestos fiscales de Puerto Rico;
- Las ramificaciones económicas a largo plazo de los cambios de comportamiento causados por el COVID-19 (es decir, la reducción de los viajes, el aumento del trabajo desde casa, la reducción de actividades en grandes lugares de encuentro, etc.);
- La cantidad de ayuda brindada por el gobierno federal a los estados y territorios estadounidenses (incluido Puerto Rico) y la eficacia y velocidad en el desembolso de la ayuda indicada;
- La necesidad de reasignar los recursos para crear una estructura más resiliente para prevenir o mitigar futuras pandemias;
- Cualquier acción futura tomada a no por el gobierno de los Estados Unidos relacionada con Medicaid;
- La cantidad y el momento de la recepción de cualquiera de las distribuciones de la Agencia Federal para el Manejo de Emergencias (FEMA), el Programa de Subvención en Bloque para el Desarrollo Comunitario para la Recuperación ante Desastres (CDBG-DR) del Departamento de la Vivienda y Desarrollo Urbano de los EE. UU. (HUD) y las compañías de seguro privado para reparar el daño causado por los huracanes Irma y María y por los principales terremotos ocurridos en enero de 2020;
- La cantidad y el momento de recepción de cualquier monto adicional consignado por el gobierno de los Estados Unidos para abordar el déficit de financiamiento descrito en este documento;
- El término para completar el trabajo que realiza la AEE para reparar el sistema eléctrico y la infraestructura de la AEE y el impacto que provoca en el crecimiento económico de Puerto Rico cualquier desarrollo o problema futuro relacionado con la reconstrucción y la modernización por parte de LUMA del sistema eléctrico de trasmisión y distribución (T&D) y la infraestructura de la AEE y el proceso de contratación de operación y mantenimiento (O&M) de activos de generación existentes;
- El impacto de la emigración y de la disminución poblacional; y
- El término y el impacto de la resolución de los casos de la AEE y de Puerto Rico vinculados con el Título III y los litigios relacionados.

Debido a la incertidumbre e imprevisibilidad de estos factores, su impacto no puede incluirse en las suposiciones contenidas en este documento. Los eventos futuros y los resultados reales pueden ser sustancialmente diferentes de los estimados, proyecciones o declaraciones contenidas en este documento.

Ninguna parte de este documento debe considerarse como un compromiso explícito o implícito de la AAFAF, el Gobierno o cualquier entidad o corporación pública dentro del Gobierno o la Junta de Supervisión, de tomar o no alguna medida, ni como la admisión de ningún hecho o evento futuro. Ninguna parte de este documento debe considerarse como una solicitud, recomendación o consejo para que una persona participe, siga o apoye un proceso o una transacción determinada, compre o venda cualquier valor o tome decisiones de inversión.

Al recibir este documento, se considerará que el destinatario ha reconocido y está de acuerdo con los términos de estas limitaciones. El presente documento puede contener términos en mayúscula que no se definen en este documento o puede contener términos que se analizan en otros documentos o que son fácilmente comprensibles. No debe hacer suposiciones sobre el significado de los términos en mayúscula que no están definidos y debe remitir sus preguntas a la AAFAF (fiscalplanforpuertorico@aafaf.pr.gov) o a la Junta de Supervisión (comments@promesa.gov) si necesita alguna aclaración.

El Plan Fiscal Certificado de la AEE incorpora las proyecciones macroeconómicas y demográficas elaboradas y presentadas en el Plan Fiscal de 2022 para Puerto Rico, certificado por la Junta de Supervisión y Administración Financiera para Puerto Rico el 27 de enero de 2022, a fin de cumplir con la Sección 201 de la Ley PROMESA. La incorporación de dichas proyecciones no implica una declaración de la AEE respecto de la validez ni la razonabilidad de los resultados o los supuestos subyacentes.

# Lista de acrónimos y términos clave

| | |
|---|---|
| A/C | Aire acondicionado (por sus siglas en inglés) |
| A&E | Arquitectura e Ingeniería (por sus siglas en inglés) |
| AAFAF | Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico |
| AAPP | Autoridad para las Alianzas Público Privadas de Puerto Rico |
| ACD | Distribución automática de llamadas (por sus siglas en inglés) |
| ADC | Aportación determinada actuarialmente (por sus siglas en inglés) |
| ADMS | Sistema avanzado de manejo de distribución (por sus siglas en inglés) |
| AEE | Autoridad de Energía Eléctrica de Puerto Rico |
| AES | AES Puerto Rico, compañía matriz: AES Corporation, productor independiente de energía |
| AICPA | Instituto Americano de Contadores Públicos Certificados (por sus siglas en inglés) |
| AMI | Infraestructura de Medición Avanzada (por sus siglas en inglés) |
| AP | Cuentas por pagar (por sus siglas en inglés) |
| AP | Asistencia pública, programa de FEMA |
| AP FEMA 404 | Programa para la Mitigación de Riesgos de FEMA |
| AP FEMA 428 | Programa de Asistencia Pública de FEMA |
| APP | Alianzas Público Privadas |
| AR | Cuentas por cobrar (por sus siglas en inglés) |
| BBA | Ley de Presupuesto Bipartidista de 2018 (por sus siglas en inglés) |
| BGF | Banco Gubernamental de Fomento para Puerto Rico |
| CAA | Ley de Aire Limpio (por sus siglas en inglés) |
| CAIDI | Índice de duración promedio de interrupción para el cliente (por sus siglas en inglés) |
| CDBG | Subvención en Bloque para el Desarrollo Comunitario (por sus siglas en inglés) |
| CDBG-DR | Subvención en Bloque para el Desarrollo Comunitario - Recuperación por Desastres (por sus siglas en inglés) |
| CDI | Carta de intención |
| CELI | Contribución en lugar de impuestos |
| CEMIN | Clientes que experimentan múltiples interrupciones (por sus siglas en inglés) |
| CHP | Energía y calor combinados (por sus siglas en inglés) |
| CI del NEPR | Coordinador Independiente del Negociado de Energía de Puerto Rico |
| COR3 | Oficina Central de Recuperación, Reconstrucción y Resiliencia (por sus siglas en inglés) |
| COVID-19 | Enfermedad de coronavirus 2019 |
| DART | Días sin trabajar, con restricción o traslado (por sus siglas en inglés) |
| DER | Fuente de energía distribuida (por sus siglas en inglés) |
| DHS | Departamento de Seguridad Nacional (por sus siglas en inglés) |
| DRNA | Departamento de Recursos Naturales y Ambientales de Puerto Rico |
| DOE | Departamento de Energía (por sus siglas en inglés) |
| DR | Respuesta a la demanda (por sus siglas en inglés) |
| DSO | Días de ventas pendientes de cobro (por sus siglas en inglés) |
| DV | Departamento de la Vivienda de Puerto Rico |
| EE | Eficiencia energética |
| EHP | Planificación ambiental y conservación histórica (por sus siglas en inglés) |
| EMS | Sistema de manejo de energía (por sus siglas en inglés) |
| EOC | Centros de Operaciones de Emergencia (por sus siglas en inglés) |
| EPA | Agencia de Protección Ambiental (por sus siglas en inglés) |
| EPM | Manejo de los proyectos de la empresa (por sus siglas en inglés) |
| EPP | Equipos de protección personal |
| ETR | Tiempo estimado de restauración (por sus siglas en inglés) |
| EV | Vehículos eléctricos (por sus siglas en inglés) |
| FAASt | Estrategia de adjudicación anticipada de FEMA (por sus siglas en inglés) |

| | |
|---|---|
| FCR | Resolución en la primera llamada (por sus siglas en inglés) |
| FEMA | Agencia Federal para el Manejo de Emergencias (por sus siglas en inglés) |
| FERC | Comisión Federal Reguladora de Energía (por sus siglas en inglés) |
| FFS | Conclusiones de la falta de presentación (por sus siglas en inglés) |
| FV | Fotovoltaico |
| AF | Año Fiscal |
| GASB | Junta de Normas de Contabilidad Gubernamental (por sus siglas en inglés) |
| GD | Generación distribuida |
| GenCo | Comprende los recursos de generación existentes, propiedad de la AEE, que serán operados y mantenidos por uno o más operadores privados |
| GGHOA | Acuerdo de explotación de GridCo-GenCo-HydroCo (por sus siglas en inglés) |
| GNL | Gas natural licuado |
| GridCo | Comprende transmisión y distribución, servicio al cliente y funciones administrativas de la AEE; será operado por LUMA |
| GW | Gigavatios |
| GWh | Gigavatio-hora |
| HMGP | Programa de Subvención para la Mitigación de Riesgos (por sus siglas en inglés) |
| HoldCo | Sucesor de la AEE que será responsable de la entidad que se ocupará de ciertas funciones no operacionales |
| HUD | Departamento de Vivienda y Desarrollo Urbano (por sus siglas en inglés) |
| HydroCo | Activos hidroeléctricos que serán aportados por la AEE a HydroCo en virtud de un acuerdo de aportación de capital |
| IEEE | Instituto de Ingenieros en Electricidad y Electrónica (por sus siglas en inglés) |
| IoT | Internet de las cosas (por sus siglas en inglés) |
| IPP | Productor independiente de energía (por sus siglas en inglés) |
| IT | Sistemas de Información |
| JRSP | Junta Reglamentadora de Servicio Público |
| JSF | Junta de Supervisión y Administración Financiera para Puerto Rico |
| JSF | Junta de Supervisión y Administración Financiera para Puerto Rico |
| kV | Kilovoltios |
| kWh | Kilovatio-hora |
| LED | Diodo emisor de luz (por sus siglas en inglés) |
| Ley Núm. 120 de 2018 | Ley para Transformar el Sistema Eléctrico de Puerto Rico |
| Ley Núm. 17 de 2019 | Ley de Política Pública Energética de Puerto Rico |
| Ley Núm. 211 de 2018 | Ley de Ejecución del Plan de Reorganización de la Junta Reglamentadora de Servicio Público de Puerto Rico |
| Ley Núm. 57 de 2014 | Ley de Transformación y Alivio Energético de Puerto Rico |
| Ley Núm. 83 | Ley habilitadora de la AEE |
| LUMA | LUMA Energy, LLC y LUMA Energy ServCo, LLC |
| MAIFI | Índice de la frecuencia de interrupción promedio momentánea (por sus siglas en inglés) |
| MATS | Estándares de Emisión de Mercurio y Tóxicos de Aire (por sus siglas en inglés) |
| MMBTU | Millones de unidades térmicas británicas (por sus siglas en inglés) |
| MRP | Margen de reserva de planificación |
| MW | Megavatios |
| MWh | Megavatio-hora |
| NAAQS | Estándar Nacional para la Calidad de Aire Ambiental (por sus siglas en inglés) |
| NEPR | Negociado de Energía de Puerto Rico |
| NME | Gastos necesarios de mantenimiento (por sus siglas en inglés) |
| NTE | No debe exceder (por sus siglas en inglés) |
| NYSE | Bolsa de Valores de Nueva York (por sus siglas en inglés) |
| O&M | Operación y mantenimiento |
| OIG | Oficina del Inspector General (Departamento de Seguridad Nacional) |
| OIPC | Oficina Independiente de Protección al Consumidor |

5

| | |
|---|---|
| AOM para T&D | Acuerdo de operación y mantenimiento para la transmisión y distribución |
| OMS | Sistema de manejo de interrupciones (por sus siglas en inglés) |
| OPEB | Otros beneficios posteriores al empleo (por sus siglas en inglés) |
| OSHA | Administración de Seguridad y Salud Ocupacional (por sus siglas en inglés) |
| OT | Tecnología operacional (por sus siglas en inglés) |
| PIR | Plan Integrado de Recursos |
| PMO | Oficina de Gerencia de Proyectos |
| PNB | Producto nacional bruto |
| PPA | Acuerdo de compra de energía (por sus siglas en inglés) |
| PPOA | Acuerdo operacional y de compra de energía (por sus siglas en inglés) |
| PROMESA | Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico de 2016 (por sus siglas en inglés) |
| PropertyCo | Comprende los activos existentes que son propiedad de la AEE y que no están directamente relacionados con las operaciones de generación, T&D o riego |
| PTV | Programa de Transición Voluntaria |
| PW | Hoja de trabajo del proyecto (por sus siglas en inglés) |
| RPS | Estándar de cartera renovable (por sus siglas en inglés) |
| RR. HH. | Recursos Humanos |
| SAIDI | Índice de la duración promedio de interrupción del sistema (por sus siglas en inglés) |
| SAIFI | Índice de la frecuencia promedio de las interrupciones del sistema (por sus siglas en inglés) |
| SC | Solicitud de cotización |
| SCADA | Sistema de control de supervisión y adquisición de datos (por sus siglas en inglés) |
| SOQ | Declaraciones de cualificaciones (por sus siglas en inglés) |
| SOW | Alcance del trabajo (por sus siglas en inglés) |
| SP | Solicitud de propuesta |
| SR | Solicitud de reembolso |
| SRE de la AEE | Sistema de Retiro de Empleados de la Autoridad de Energía Eléctrica de Puerto Rico |
| SRP | Plan de Remediación del Sistema (por sus siglas en inglés) de LUMA |
| T&D | Transmisión y distribución |
| Transición inicial | Periodo comprendido entre la fecha de vigencia del acuerdo de operación y mantenimiento (AOM) para T&D (incluida) hasta la fecha de comienzo de los servicios (excluida) |
| TRC | Costo total de recursos (por sus siglas en inglés) |
| TWh | Teravatio-hora |
| UAAL | Pasivo actuarial acumulado no financiado (por sus siglas en inglés) |
| USD | Dólar estadounidense |
| USGS | Servicio Geológico de los EE. UU. (por sus siglas en inglés) |
| UTIER | Unión de Trabajadores de la Industria Eléctrica y Riego de Puerto Rico |
| WTI | West Texas Intermediate |
| YTD | Año hasta la fecha (por sus siglas en inglés) |

# CONTENIDO

**Relevo de responsabilidad** ................................................................................................. 2

**Lista de acrónimos y términos clave** .......................................................................... 4

**Listado de gráficas** ................................................................................................. 11

**Listado de tablas** ................................................................................................. 14

**Capítulo 1. Resumen ejecutivo** ................................................................................ 15

**Capítulo 2. Contexto histórico y desafíos actuales** .......................................... 19

*2.1    Datos clave sobre la AEE* ........................................................................ 19

*2.2    Desafíos históricos que llevaron a la obligación de transformarse* ........................ 21

*2.3    Estructura de gobernanza* ........................................................................ 23

*2.4    Estado actual del sistema de T&D* ............................................................ 26

*2.5    Estado actual de la generación* ................................................................ 28

*2.6    Asequibilidad e información demográfica de los clientes* ............................ 33

*2.7    Resumen del rendimiento financiero histórico* .......................................... 36

*2.8    Efectos adversos de los principales desastres del año fiscal 2020* .............. 41

2.8.1 Impacto de los terremotos de 2019-2020 .................................................. 42

2.8.2 Impacto de la pandemia de COVID-19 ...................................................... 42

**Capítulo 3. Transformación** .................................................................................. 44

*3.1    Introducción y contexto de la transformación del sector energético de Puerto Rico* 44

*3.2    Visión, objetivos y marco de la transformación del sector energético* .................... 45

3.2.1 Reforma y supervisión de la regulación del sector energético ........................ 48

*3.3    Transición a operadores privados* .......................................................... 48

3.3.1 Objetivos de la transición a operadores privados ...................................... 49

3.3.2 Estructura futura del sistema energético y de la AEE, así como sus funciones y
responsabilidades ........................................................................................ 50

3.3.3 Transición de los activos de T&D a un operador privado ............................ 53

3.3.4 Transición de los activos de generación existentes a un operador privado ...... 62

*3.4    Implementación de la transformación del sector energético de Puerto Rico* .......... 66

**Capítulo 4. Riesgos y resiliencia del sistema** .................................................... 68

*4.1    Riesgo climático* ................................................................................ 68

*4.2    Terremotos* ........................................................................................ 71

*4.3    Impactos económicos (por ejemplo, el COVID-19)* .................................... 72

**Capítulo 5. Planificación de los recursos y resiliencia** .................................. 75

*5.1    Resumen del PIR aprobado* ..................................................................................*76*

5.1.1 Antecedentes de la evaluación del NEPR y aprobación del PIR .............................76
5.1.2 Plan de Recursos Preferido Modificado y Plan de Acción Modificado del NEPR ...76

*5.2    Implementación del Plan de Acción Modificado para el PIR* ..................................*79*

5.2.1 Generación renovable y almacenamiento ................................................................79
5.2.2 Medidas de resiliencia de la red................................................................................ 80
5.2.3 Permitir que el cliente decida ................................................................................... 81

*5.3    Función del PIR en los planes de mejoras capitales* ...............................................*82*

**Capítulo 6. Planes de mejoras capitales y financiamiento federal....................85**

*6.1    Planes de mejoras capitales*..................................................................................*85*

6.1.1 Resumen del Plan de Infraestructura a 10 años de la AEE, según enmendado.......85
6.1.2 Colaboración y coordinación en el plan de mejoras capitales del año fiscal 2022 . 88
6.1.3 Mejores prácticas para la ejecución de proyectos de capital ...................................89
6.1.4 Frecuencia de los informes ....................................................................................... 90

*6.2    Fondos federales* ................................................................................................. *90*

6.2.1 Resumen............................................................................................................. 90
6.2.2 Impacto del financiamiento federal ........................................................................98
6.2.3 Distribución de responsabilidades de fondos federales para el sistema de T&D....99
6.2.4 Desafíos y medidas de mitigación ...........................................................................99
6.2.5 Resumen de la frecuencia de los informes y nivel de detalle ................................100

**Capítulo 7. Carteras de mejoras de LUMA ........................................................101**

*7.1    Antecedentes de las carteras y los programas de mejoras de LUMA* ...................*102*

7.1.1 Desarrollo de las carteras y los programas de mejoras ......................................... 102
7.1.2 Resumen de las carteras de mejoras ......................................................................104
7.1.3 Resumen de los gastos previstos por cartera de mejoras hasta el año fiscal 2025 105

*7.2    Metas y hoja de ruta de los programas de mejoras*...............................................*105*

*7.3    Carteras de mejoras*...........................................................................................*107*

7.3.1 Cartera de servicio al cliente ................................................................................. 107
7.3.2 Cartera de distribución ..........................................................................................109
7.3.3 Cartera de transmisión .......................................................................................... 110
7.3.4 Cartera de subestación ...........................................................................................112
7.3.5 Cartera de edificios y centro de control .................................................................113
7.3.6 Cartera habilitadora................................................................................................114
7.3.7 Cartera de servicios de asistencia ..........................................................................116

*7.4    Proyección del impacto de las carteras de mejoras de LUMA* ..............................*118*

**Capítulo 8. Métricas de rendimiento de LUMA..................................................119**

*8.1    Resumen de las métricas de rendimiento del AOM para T&D*..............................*120*

8.1.1 Métricas de rendimiento del AOM para T&D durante la operación normal .........120
8.1.2 Métricas de rendimiento del AOM para T&D durante una interrupción del servicio
        importante ..........................................................................................................123
8.1.3 Frecuencia de revisión de las métricas de rendimiento del AOM para T&D.........125

*8.2    Método de cálculo de la tarifa de incentivo*......................................................... *125*

**Capítulo 9. Medidas operacionales** ...................................................................**127**

*9.1    Medidas operacionales de la AEE* ............................................................ *127*

9.1.1 Resumen ................................................................................................ 127
9.1.2 Logros clave para el año fiscal 2022 .................................................... 127
9.1.3 Resumen de las iniciativas de la AEE para el año fiscal 2023 ............. 128

*9.2    Medidas operacionales de LUMA* ........................................................... *134*

**Capítulo 10. Estructura legal y reglamentaria** ................................................**137**

*10.1    Resumen de la estructura reglamentaria y de la legislación fundamental* ........... *137*

*10.2    Aspectos reglamentarios clave* ............................................................. *139*

10.2.1 Principios rectores para la creación de tarifas ...................................141
10.2.2 Estructura tarifaria actual de la AEE ................................................ 142

*10.3    Resumen de la reforma de la CELI* ........................................................ *143*

*10.4    Función del NEPR y estructura reglamentaria después de la transformación del sistema de T&D* .............................................................................. *144*

*10.5    Requisitos y cumplimiento de la ley ambiental federal* ........................ *145*

**Capítulo 11. Resumen de proyecciones financieras** ........................................ **148**

*11.1    Requisitos de ingresos y tarifa de referencia* ....................................... *148*

*11.2    Ingresos y gastos futuros y de referencia para el año fiscal 2022* ........................*150*

11.2.1 Proyecciones financieras para los años fiscales 2022 y 2023 ............. 150
11.2.2 Ingresos proyectados ........................................................................ 150
11.2.3 Gastos proyectados ............................................................................151

**Capítulo 12. Ingresos** ......................................................................................**153**

*12.1    Ingresos reales del año fiscal 2022 en comparación con el presupuesto* .............. *153*

*12.2    Resumen de las proyecciones de la carga* ............................................. *154*

12.2.1 Demografía y proyecciones macroeconómicas................................. 156
12.2.2 Eficiencia energética ......................................................................... 158
12.2.3 Generación distribuida (GD) ............................................................ 159
12.2.4 Vehículos eléctricos (por sus siglas en inglés) ..................................160
12.2.5 Simulaciones de proyección de carga.................................................161

***Resumen*** ........................................................................................................*161*

*12.3    Otras suposiciones que impactan en los ingresos* ................................*166*

12.3.1 Resumen del combustible y la energía adquirida..............................166
12.3.2 Elasticidad en el precio .................................................................... 167
12.3.3 Estructura tarifaria............................................................................ 167
12.3.4 Transformación.................................................................................. 167

*12.4    Comparación con Planes Fiscales Certificados anteriores* ...................*168*

**Capítulo 13. Gastos** ........................................................................................ **169**

*13.1    Resumen de las proyecciones de gastos* ............................................... *170*

*13.2    Resumen de gastos por entidad* ............................................................*171*

*13.3 Resumen de las proyecciones de gastos de GenCo*................................................. *174*

*13.4 Resumen de las proyecciones de gastos de GridCo*............................................... *175*

*13.5 Visión general de HoldCo* ..................................................................................... *176*

**Capítulo 14. Servicio de la deuda**............................................................... **178**

*14.1 Resumen de la deuda de la AEE* ............................................................................ *178*

*14.2 Consecuencias de una deuda sin reestructurar en las proyecciones de las tarifas 179*

*14.3 Análisis de sostenibilidad de la deuda*................................................................... *180*

**Capítulo 15. Reforma de pensiones** ............................................................ **182**

*15.1 Antecedentes históricos y estructura organizacional* ........................................... *182*

*15.2 Antecedentes de los beneficios de pensión*............................................................ *183*

    15.2.1 Otros beneficios posteriores al empleo (OPEB) .................................................184

    15.2.2 Distribución de participantes activos por edad y años de servicio ......................184

*15.3 Estado financiado* .................................................................................................. *185*

*15.4 Consecuencias del financiamiento total de la ADC en comparación con el financiamiento de PayGo* ......................................................................................... *187*

*15.5 Consideraciones sobre la reforma estructural de pensiones*.................................. *188*

    15.5.1 Consideraciones sobre el financiamiento de pensiones a corto plazo.................188

    15.5.2 Consideraciones sobre el financiamiento de pensiones a más largo plazo..........189

**Capítulo 16. Informes posteriores a la certificación** ........................................ **190**

*16.1 Informes no operacionales* .................................................................................... *191*

*16.2 Medidas operacionales vinculadas con la transmisión y la distribución* .............. *193*

*16.3 Informes y métricas operacionales vinculadas con la generación* ........................ *193*

**Capítulo 17. Conclusión** ............................................................................ **195**

# Listado de gráficas

Gráfica 1: Estadísticas clave de la AEE en comparación con empresas similares en el año fiscal 2020......................................................................................................................... 20

Gráfica 2: Métricas de confiabilidad en comparación con la media del grupo .............................21

Gráfica 3: Composición de la Junta de Gobierno de la AEE ....................................................... 24

Gráfica 4: Estructura corporativa ilustrativa de la AEE reorganizada ........................................ 26

Gráfica 5: Circuitos de transmisión de la AEE ........................................................................... 27

Gráfica 6: Activos de generación de la AEE.................................................................................31

Gráfica 7: Consumo y cantidad de clientes de la AEE en el año fiscal 2021, por municipio ........ 33

Gráfica 8: Participación en el gasto de electricidad de Puerto Rico en comparación con regiones similares ..................................................................................................................... 34

Gráfica 9: Déficits operacionales de la AEE desde el año fiscal 2000 hasta el año fiscal 2016 ....37

Gráfica 10: Ingresos brutos mensuales del año fiscal 2022 (millones de dólares) ...................... 39

Gráfica 11: Ingresos de la tarifa base por mes en el año fiscal 2022 (en millones de dólares)..... 39

Gráfica 12: Ventas facturadas por mes en el año fiscal 2022 (GWh) ........................................... 40

Gráfica 13: Ingresos y gastos presupuestados y reales para el año fiscal 2022, proyección de operaciones recurrentes...............................................................................................................41

Gráfica 14: Variación en las ventas trimestrales en el año fiscal 2022 (GWh)............................ 43

Gráfica 15: Variación en las ventas trimestrales en el año fiscal 2022 por tipo de cliente (GWh) ........................................................................................................................................ 43

Gráfica 16: Transformación del sector energético: estado actual y futuro ...................................51

Gráfica 17: Estructura actual de la AEE...................................................................................... 52

Gráfica 18: Estructura futura de la AEE ..................................................................................... 52

Gráfica 19: Principales metas cruciales en el proceso de transición del operador de T&D.......... 53

Gráfica 20: Cargos del AOM para T&D por periodos contractuales .............................................57

Gráfica 21: Calendario proyectado de instalación de la capacidad de generación renovable encargada por el NEPR................................................................................................................ 65

Gráfica 22: Plan de Acción Modificado del NEPR para el PIR..................................................... 66

Gráfica 23: Mezcla de generación proyectada ............................................................................. 66

Gráfica 24: Metas cruciales cumplidas en la reforma del sector energético ............................... 67

Gráfica 25: Metas cruciales pendientes en la reforma del sector energético ............................... 67

Gráfica 26: Impacto de los efectos climáticos en la AEE............................................................. 70

Gráfica 27: Combinación de combustible durante el año fiscal y calendario 2021..................... 72

Gráfica 28: Comparación de la carga diaria de marzo a junio entre el año fiscal 2019 y el año fiscal 2020 (Wh)...........................................................................................................................73

Gráfica 29: Casos de COVID-19 desde marzo de 2020 hasta marzo de 2022.............................. 74

Gráfica 30: Guías del NEPR para la adquisición de capacidad de generación de energía renovable y de almacenamiento en baterías................................................................................ 80

Gráfica 31: Financiamiento total para la reconstrucción y transformación de la red y la generación .................................................................................................................................. 88

Gráfica 32: Resumen de los reembolsos de FEMA recibidos hasta el 25 de febrero de 2022 ..... 93

Gráfica 33: Definiciones de las calificaciones de la condición de salud de los activos físicos.....103

Gráfica 34: Criterios de calificación para evaluar la madurez de la salud de la organización.....103

Gráfica 35: Gastos estimados anuales de la cartera de mejoras propuesta por LUMA entre el año fiscal 2023 y el año fiscal 2025 (en millones de dólares nominales)....................................105
Gráfica 36: Hoja de ruta de recuperación y transformación propuesta por LUMA.................. 106
Gráfica 37: Gastos estimados de la cartera de servicio al cliente por programa (en millones de dólares reales).....................................................................................................................107
Gráfica 38: Gastos estimados de la cartera de distribución por programa (en millones de dólares nominales)....................................................................................................................109
Gráfica 39: Gastos estimados de la cartera de transmisión por programa (en millones de dólares nominales)....................................................................................................................111
Gráfica 40: Gastos estimados de la cartera de subestaciones por programa (en millones de dólares reales).......................................................................................................................... 112
Gráfica 41: Gastos estimados de la cartera de edificios y centros de control por programa (en millones de dólares reales) .................................................................................................. 114
Gráfica 42: Gastos estimados de la cartera habilitadora por programa (en millones de dólares reales)..............................................................................................................................115
Gráfica 43: Gastos estimados de la cartera de servicios de asistencia por programa (en millones de dólares nominales) ........................................................................................... 117
Gráfica 44: Mejoras acumulativas en las métricas de rendimiento proyectadas por LUMA......118
Gráfica 45: Calendario de mantenimiento revisado y actualizado .............................................130
Gráfica 46: Estructura reglamentaria del NEPR .......................................................................139
Gráfica 47: Composición total de la tarifa para el año fiscal 2023 .............................................142
Gráfica 48: Tasa de requerimientos de ingresos que incluye pensiones PAYGO y gastos operacionales y deuda no reestructurada (c/kWh) frente a la carga (GWh)...............................150
Gráfica 49: Proyecciones de ingresos y ventas a 30 años (GWh y millones de dólares) ............ 151
Gráfica 50: Gastos proyectados consolidados hasta el final del PIR, sin incluir el servicio de la deuda (en millones de dólares nominales) ......................................................................152
Gráfica 51: Presupuesto hasta la fecha (marzo) del año fiscal 2022 en comparación con los datos reales (en millones de dólares)..........................................................................................153
Gráfica 52: Variación en los ingresos hasta la fecha del año fiscal 2022 en comparación con el presupuesto por tipo de cliente (en millones de dólares)..........................................................154
Gráfica 53: Variación y ventas del año fiscal 2022 en comparación con el presupuesto (GWh, %) ...........................................................................................................................................154
Gráfica 54: Factores determinantes históricos en la facturación (GWh, MW) ..........................156
Gráfica 55: Proyección de la carga a 30 años con las consecuencias individuales de tres factores que llevan a la disminución de la carga (TWh) ...........................................................156
Gráfica 56: Proyecciones de la población del Estado Libre Asociado de Puerto Rico (en miles) 157
Gráfica 57: Proyecciones del PNB del Estado Libre Asociado de Puerto Rico ...........................157
Gráfica 58: Ahorros acumulados producto de la eficiencia energética por programa (GWh) ....159
Gráfica 59: Proyección de la generación distribuida a 30 años por tipo de cliente (TWh) ........ 160
Gráfica 60: Proyección de la generación distribuida a 30 años por fuente (TWh) ................... 160
Gráfica 61: Proyección del precio del combustible (USD/MMBtu)............................................167
Gráfica 62: Ventas de servicio público netas del Plan Fiscal Certificado de la AEE en GWh .....168
Gráfica 63: Desglose proyectado de requerimientos de ingresos AF2023 vs. AF2027 por categoría (incluye los pagos de las pensiones del SRE, excepto los pagos de la deuda) ............ 171
Gráfica 64: Desglose de los gastos consolidados de la AEE (en millones de dólares)................172
Gráfica 65: Proyección de gastos a cinco años para GenCo (en millones de dólares)................ 175

Gráfica 66: Proyección de gastos a cinco años para GridCo (en millones de dólares)................176
Gráfica 67: Proyección de gastos a cinco años para HoldCo (en millones de dólares) ...............177
Gráfica 68: Tarifa con deuda no reestructurada añadida (en c/kWh nominales de 2022) ....... 180
Gráfica 69: Número de participantes y salario total...................................................................185
Gráfica 70: Activos de pensiones al 31 de marzo de 2022 ..........................................................186
Gráfica 71: Estado del financiamiento de las pensiones al 30 de junio de 2020........................186
Gráfica 72: Costos proyectados de PAYGO después del agotamiento proyectado de los activos
del SRE de la AEE ......................................................................................................................187

# Listado de tablas

Tabla 1: Estado de posición neta de la AEE desde el año fiscal 2014 hasta el año fiscal 2021 ...... 37

Tabla 2: Objetivos de transformación ........................................................................... 45

Tabla 3: Objetivos y metas detallados ........................................................................... 60

Tabla 4: Mejoras acumulativas en las métricas de rendimiento proyectadas por LUMA ............ 62

Tabla 5: Financiamiento total obligatorio por programa para la transformación y reconstrucción de la generación y la red ......................................................... 92

Tabla 6: Resumen de las métricas de rendimiento del AOM para T&D .................................. 120

Tabla 7: Resumen de las métricas de rendimiento del AOM para T&D durante una interrupción del servicio importante ............................................................... 124

Tabla 8: Iniciativas del año fiscal 2023 ......................................................................... 128

Tabla 9: Adquisición de energía renovable - calendario potencial revisado .............................. 129

Tabla 10: Plan de acción para el suministro de combustible ................................................ 129

Tabla 11: Plan de reorganización y transición inicial de la generación ................................... 133

Tabla 12: Estudio sobre la medición neta y la generación distribuida ..................................... 134

Tabla 13: Programas de eficiencia energética .................................................................. 158

Tabla 14: Suposiciones de los gastos de GenCo, GridCo y HoldCo ....................................... 172

Tabla 15: Sensibilidad de la capacidad de la deuda ilustrativa (valores en $000's) .................. 181

Tabla 16: Disposiciones clave sobre el retiro .................................................................. 183

Tabla 17: Frecuencia de los informes ............................................................................ 191

Tabla 18: Informes no operacionales ............................................................................ 192

Tabla 19: Informes sobre medidas operacionales relacionadas con la generación .................... 194

# Capítulo 1. Resumen ejecutivo

**El Plan Fiscal Certificado de 2022 establece un camino para completar la reorganización operacional y financiera de la Autoridad de Energía Eléctrica (AEE) y para finalizar de manera satisfactoria la transformación del sector energético de Puerto Rico.**

**La recuperación económica de Puerto Rico depende de una esperada transformación integral de su sector energético para brindar el servicio seguro, confiable y asequible que merecen los residentes y los negocios de Puerto Rico.** Al igual que los Planes Fiscales Certificados anteriores, el Plan Fiscal Certificado de 2022 establece un conjunto de acciones continuas para seguir avanzando y acelerar el progreso de esta transformación, incluyendo la mejora y modernización del sistema de transmisión y distribución (T&D), así como de la flota generatriz de la AEE, el aprovechamiento de la experiencia y los conocimientos del sector privado para potenciar las operaciones del sistema de T&D y de generación, la diversificación de los recursos energéticos de la isla, como el despliegue de recursos de energía renovable, y la reestructuración de las obligaciones preexistentes. Cuando se implementen en su totalidad, estas iniciativas de transformación posicionarán a Puerto Rico en un lugar que le permitirá tener una red eléctrica segura, fiable, asequible, resiliente y moderna, lo que mejorará la calidad de vida de sus residentes y apoyará el crecimiento económico a largo plazo de la actividad de la isla, a través de la experiencia del sector privado e independiente de la interferencia política.

Durante el año fiscal 2022, la AEE y el Gobierno avanzaron con respecto a varias iniciativas:

- Finalizaron un proceso de adquisición competitivo para obtener los mejores precios disponibles en el mercado para los principales contratos de suministro de combustible (diésel y búnker C), lo que supuso un ahorro en los costos de combustible en comparación con los contratos anteriores.

- Apoyaron el proceso de adquisición de la alianza público privada (P3) de generación existente mediante la elaboración de materiales y el soporte a la administración de la solicitud de propuestas (SP) y el proceso de diligencia debida de los licitadores para la P3 de generación existente.

- Completaron la adquisición de 18 PPOA solares que suman aproximadamente 845 MW de capacidad instalada del Tramo 1 de la SP de energías renovables.

- Presentaron más de $200 millones en proyectos de generación a la FEMA.

Como operador del sistema de T&D, LUMA avanzó en las siguientes áreas:

- Redujo los tiempos de espera de los clientes en más de un 95%, hasta menos de un minuto, y aumentó la accesibilidad de los clientes a las plataformas de facturación electrónica con más de un millón de clientes que se registraron en el portal electrónico o se descargaron la aplicación LUMA.

- Redujo la tasa de DART de la OSHA y la tasa de días perdidos por lesiones de la OSHA en más de un 80%.

- Resolvió las solicitudes de interconexión de proyectos de GD atrasados, aprobando más de 130 MW de nuevos sistemas solares en tejados y otros sistemas de GD.

- Consiguió la aprobación reglamentaria de 190 alcances de trabajo iniciales que representan $7.8 mil millones en fondos federales.

**A pesar de estos esfuerzos y de los avances logrados hasta la fecha, todavía queda mucho por hacer.** Estas responsabilidades se comparten ahora con el operador de T&D, LUMA. Completar la transformación integral del sistema energético de Puerto Rico, que incluye tanto la separación de la propiedad de transmisión y distribución como la de generación, alcanzar los objetivos de energía renovable de la política pública, reducir la frecuencia y la duración de apagones, permitir la asequibilidad de las tarifas, mejorar la fiabilidad del servicio y la satisfacción de los clientes, y garantizar la resiliencia del sistema y la preparación frente a eventos imprevistos, requiere la implementación diligente y la coordinación entre LUMA y la AEE, junto con el apoyo y la cooperación de la AAPP y el NEPR, de múltiples iniciativas clave, entre las que destacan:

- **Mejorar las operaciones de T&D y de generación:** Mejorar el manejo de programas para garantizar que las iniciativas operacionales clave se completen según el término y el presupuesto previstos, incluidos los programas de mantenimiento proactivo.

- **Modernizar y reconstruir el sistema de transmisión y distribución:** Elaborar y ejecutar oportunamente un plan de inversiones de capital a fin de modernizar y fortalecer la red eléctrica.

- **Contratar nueva generación para cumplir los objetivos del RPS:** Implementar el Plan de Acción Modificado para el PIR aprobado por el NEPR para modernizar los recursos de generación de energía y aumentar la generación de energía renovable.

- **Utilizar los fondos federales con eficacia y eficiencia:** Optimizar los fondos federales disponibles y demás fondos obligados relacionados para permitir la transformación de la cartera de generación y de los sistemas de T&D.

- **Mejorar la fuerza laboral y la seguridad pública:** Continuar con la formación sanitaria, de seguridad y técnica de los empleados para desarrollar una fuerza laboral segura y competente y seguir fomentando la concienciación de los clientes y del público sobre los riesgos de la electricidad.

- **Finalizar el proceso de adquisición competitivo a cargo de la AAPP para uno o más operadores de los activos de generación existentes en la AEE:** Completar los esfuerzos de adquisición restantes para implementar la transferencia de la operación y el mantenimiento de los activos de generación existentes de la AEE a operadores privados profesionales e independientes.

- **Reestructurar las obligaciones preexistentes de la deuda:** Apoyar los esfuerzos en curso de la JSF y la AAFAF para reestructurar la carga de deuda existente e insostenible de la AEE y recuperar el acceso a los mercados de créditos, sin afectar indebidamente a las tarifas eléctricas y a la carga de los clientes y la economía de Puerto Rico.

- **Reforma de las pensiones:** Para equilibrar los objetivos de asequibilidad de las tarifas con las obligaciones de la AEE en materia de pensiones con los empleados y retirados, la AEE debe apoyar a la JSF y a la AAFAF para abordar las pensiones en un plan de ajuste que garantice una reforma sostenible.

**Los retrasos en la ejecución de los proyectos de energía renovable y de las medidas de eficiencia energética suponen un grave riesgo para la capacidad de Puerto Rico de cumplir con sus aspiraciones en estos asuntos.** Estos retrasos también ponen de manifiesto la necesidad de que el Gobierno, el NEPR, la AEE y LUMA tomen medidas urgentes para permitir y apoyar la transición y la transformación del sistema energético. El NEPR y LUMA también deben trabajar para actualizar el Plan Integrado de Recursos existente para que refleje el ritmo actual de despliegue, así como las condiciones macroeconómicas vigentes, a fin de garantizar que sirva de hoja de ruta adecuada para las acciones y decisiones que deben tomarse a corto y mediano plazo. Si no se abordan las causas profundas de estos retrasos y no se toman las medidas correctivas necesarias para garantizar un servicio energético fiable, Puerto Rico puede poner en riesgo los progresos realizados en los últimos años, dejando a los residentes y a los negocios de la isla permanentemente a merced de un sistema energético poco fiable, caro e ineficiente.

**La infraestructura energética de Puerto Rico está atrasada con respecto a las normas nacionales debido a décadas de mal manejo operacional y financiero.** Las demoras en los proyectos de capital han hecho que el sistema sea vulnerable a las interrupciones y que las tarifas aumenten. La falta de planificación histórica a largo plazo ha llevado a que el sistema de la AEE esté desactualizado desde el punto de vista tecnológico y que sea ineficaz a nivel operacional. Además, este depende en gran medida de una flota generatriz que funciona con petróleo y que es sumamente contaminante, con un costo muy elevado y que no resulta confiable. La dependencia de la generación anticuada y la baja eficiencia operacional de toda la organización han dado lugar a unas tarifas eléctricas elevadas y a una baja fiabilidad del servicio. Los abonados de Puerto Rico gastan una mayor porción de sus ingresos que la mayoría de los abonados de los Estados Unidos por un servicio eléctrico cuya confiabilidad se encuentra en el cuarto cuartil inferior en comparación con otras empresas de servicios públicos similares. Si bien LUMA ha aportado servicios profesionales y especializados a la operación del sistema de transformación y distribución de la AEE y ha mitigado el impacto de décadas de toma de decisiones politizadas en relación con el mantenimiento y las operaciones de la red, estos problemas del sistema de la AEE son el resultado de fallos a largo plazo en la inversión y el mantenimiento de su red.

**Los problemas operacionales previos de la AEE y su incapacidad para implementar ajustes tarifarios modestos para cubrir sus costos crecientes condujeron a déficits operacionales sostenidos y a la acumulación de deudas preexistentes y obligaciones de pensiones importantes.** En mayo de 2017, la AEE tenía aproximadamente $9 mil millones en obligaciones de deuda financiera, el equivalente a $6,000 por cliente, mientras que el pasivo de pensiones de la AEE superaba los $4.3 mil millones, de los cuales $3.6 mil millones no estaban financiados, el equivalente a $2,400 por cliente.[1] En otras palabras, por cada dólar que se debía a los retirados actuales y futuros, el plan de pensiones de la AEE tenía menos de $0.20 disponibles para pagar a los pensionados. Estos pasivos llevaron a la AEE a intentar reestructurar sus obligaciones preexistentes por medio de una petición voluntaria contemplada en el Título III de la Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico (PROMESA) en 2017.

**La AEE y los residentes de Puerto Rico también han enfrentado efectos negativos graves producto de factores externos.** En septiembre de 2017, los huracanes Irma y María

---

[1]   De acuerdo con un estudio actuarial independiente realizado por Aon Hewitt, resultados de la valoración al 30 de junio de 2020.

devastaron la red eléctrica. En enero de 2020, activos de generación importantes de la AEE sufrieron daños causados por un terremoto de magnitud 6.4. Poco después de ese desastre, comenzó la pandemia de la enfermedad por coronavirus 2019 ("COVID-19"), que retrasó aún más el mantenimiento y las mejoras del sistema, que eran muy necesarias. Más recientemente, los precios globales del petróleo han aumentado significativamente debido, entre otras cosas, a la invasión rusa en Ucrania en febrero de 2022, lo que ha impulsado las tarifas por encima de los 28 centavos por kWh, aunque las tarifas actuales de la AEE no contemplan el pago de los servicios de la deuda o las pensiones. Este nivel de costos de combustible y electricidad plantea serios desafíos financieros a la AEE, a sus clientes y a la economía general de la isla.

**Durante los próximos treinta años, se proyecta que la carga total del sistema eléctrico de Puerto Rico disminuya como resultado de una reducción en la población y una caída en la actividad económica ajustada por inflación**. La tasa de disminución aumenta a medida que los clientes aprovechan la eficiencia energética (EE) y la generación distribuida (GD) para reducir la dependencia en la red. En este contexto, en el que se proyecta la disminución de la carga, se requerirá la implementación de medidas de eficiencia para limitar la necesidad de aumentar las tarifas con tal de cubrir los costos fijos del sistema.

**Para ejecutar el Plan Fiscal Certificado de manera satisfactoria y garantizar avances continuos hacia la transformación del sector energético, la AEE y LUMA deben manejar varias contingencias y riesgos de manera efectiva.** Se espera que los efectos actuales de la pandemia de COVID-19 disminuyan durante el próximo año fiscal. Se prevé que LUMA comience a ejecutar los grandes proyectos de capital financiados por FEMA y otras agencias federales. La AEE también debe resolver los asuntos relacionados con la transición a LUMA para que esta última pueda mantener y preparar el sistema para que resista huracanes y otros eventos climáticos que puedan ocurrir en el futuro. Otras contingencias incluyen la culminación exitosa de la reestructuración de deuda y trabajar para garantizar el despliegue y reembolso oportunos de los fondos federales para los proveedores de reconstrucción de emergencia y mitigación. La AEE continuará colaborando con las contrapartes clave del Gobierno, incluyendo la Junta de Supervisión, la AAPP, la AAFAF, el NEPR y la Oficina Central de Recuperación, Reconstrucción y Resiliencia (COR3) para asegurar una transformación exitosa de forma conjunta.

Si se implementa con éxito, el Plan Fiscal Certificado de 2022 para la AEE acelerará la transformación del sector energético de la isla hacia una red eléctrica segura, resistente y moderna, proporcionando un servicio fiable a los clientes con tarifas predecibles y asequibles, lo que permitirá el crecimiento económico y laboral a largo plazo. En los próximos cinco años, esta transformación se traducirá en el acceso a un sistema energético seguro, fiable, limpio y eficiente que el pueblo de Puerto Rico merece.

# Capítulo 2. Contexto histórico y desafíos actuales

## 2.1   Datos clave sobre la AEE

La AEE, anteriormente conocida como la "Autoridad de las Fuentes Fluviales de Puerto Rico"
hasta 1979, se creó por medio de la Ley Núm. 83 del 2 de mayo de 1941 (ley habilitadora de la
AEE). A lo largo de su historia, la AEE ha sido el único proveedor habilitado para prestar servicios
eléctricos en Puerto Rico. Hasta el 2014, la AEE era una empresa autorregulada que operaba sin
que ningún organismo regulador independiente garantizara la responsabilidad con respecto a la
planificación a largo plazo y la fijación de precios. Para finales del año fiscal 2021, la AEE les
prestaba servicios a alrededor de 1.5 millones de clientes y generaba unos $3.2 mil millones de
ingresos producto de la venta de 16 teravatios-hora (TWh) de electricidad.[2]

**La AEE en comparación con empresas de servicios públicos similares**

La AEE es la empresa pública de servicios eléctricos más grande de los EE. UU. por la cantidad de
clientes a los que satisface; sin embargo, la producción y la venta de energía por cliente son
relativamente bajas (Gráfica 1). La AEE produce actualmente una generación neta anual de unos
12 megavatios-hora (MWh) de electricidad por cliente, lo que significa que la AEE ofrece menos
de la mitad de energía por cliente que otras empresas de servicios públicos similares de los EE.
UU. continentales. La carga máxima anual por hora de la AEE también es mucho menor que la de
empresas de servicios públicos similares de los EE. UU. continentales, ya que los clientes de
Puerto Rico no generan aumentos considerables en la carga durante los meses de invierno.[3]

---

[2]   Informe mensual para la Junta de Gobierno de la AEE, junio de 2021 (resultados financieros provisionales sin auditar).
[3]   En Puerto Rico, la demanda máxima anual suele ser entre agosto y octubre.

GRÁFICA 1: ESTADÍSTICAS CLAVE DE LA AEE EN COMPARACIÓN CON EMPRESAS SIMILARES EN EL AÑO FISCAL 2020[4]



En términos de confiabilidad del servicio, el pueblo de Puerto Rico ha experimentado históricamente un servicio de menor calidad que el que se ofrece y exige en otras jurisdicciones. El cliente promedio de la AEE pierde energía al menos una vez cada 5 a 6 semanas, mientras que los clientes en el continente pierden energía 1 a 2 veces por año. Este impacto negativo en la calidad de vida y la actividad económica de los residentes y los negocios de Puerto Rico suele ser motivo de preocupación en las encuestas económicas y también representa un riesgo subyacente para los residentes en relación con los servicios esenciales.

Según los puntos de referencia de la industria y la evaluación de LUMA durante el periodo de transición inicial, en 2020 los clientes de la AEE experimentaron casi 8 veces más interrupciones del servicio que los clientes de la empresa de servicios públicos promedio de los Estados Unidos dentro de los puntos de referencia del IEEE. Del mismo modo, en 2020, las interrupciones de energía duraron en promedio casi 10 veces más para los clientes de la AEE que para los clientes de los EE. UU. continentales (vea la Gráfica 2).  Si bien la AEE había mostrado una modesta mejora desde el 2017, las métricas evaluadas para el 2020 colocaron a la AEE en el cuartil inferior de las empresas de servicios públicos pares; además, los residentes y negocios de Puerto Rico

---

[4]   Según datos disponibles al público obtenidos del formulario EIA 412 o de informes anuales y de los archivos del formulario EIA 861 para el año fiscal 2020. Entre las empresas de servicios públicos analizadas se incluyen las siguientes: Departamento de Agua y Energía de Los Ángeles; Autoridad de Energía de Long Island; Salt River Project; City Public Service de San Antonio, Distrito Municipal de Servicios Públicos de Sacramento; Austin Energy; Autoridad de Energía Eléctrica de Jacksonville; Seattle City Light; Memphis Light, Gas and Water; Omaha Public Power District, Autoridad de Energía de Nueva York, Nashville Electric Service, Distrito de Energía Pública de Nebraska, Colorado Springs Utilities. La generación neta incluye las compras de energía, así como la energía generada neta.

experimentaron muchas más interrupciones durante periodos mucho más largos. Las métricas de confiabilidad de la AEE que utilizan los métodos estándar del sector se muestran en la Gráfica 2.[5]

GRÁFICA 2: MÉTRICAS DE CONFIABILIDAD EN COMPARACIÓN CON LA MEDIA DEL GRUPO[6]

| Métrica | AEE CY 2019 | AEE CY 2020 | Media del IEEE, 2020 |
|---|---|---|---|
| Índice de duración promedio de interrupción del sistema (SAIDI) <br> Minutos por año | 1,097 | 1,257 | 127 |
| Índice de frecuencia de interrupción promedio del sistema (SAIFI) <br> Número de interrupciones por año | 9.8 | 8.3 | 1.06 |

## 2.2    Desafíos históricos que llevaron a la obligación de transformarse

La AEE es la única empresa de electricidad de Puerto Rico que opera un sistema de energía sumamente complejo. Operar una red eléctrica en una isla montañosa, aislada, tropical y con vegetación densa es todo un desafío, ya que las líneas de transmisión y distribución, que suelen ser remotas, necesitan mucho mantenimiento. Además, el sistema no puede depender del acceso a una red eléctrica interconectada regional y más amplia para la generación de energía, como la mayor parte del continente estadounidense. La complejidad de operar el sistema de energía de Puerto Rico ha empeorado debido a décadas de problemas operacionales, económicos y de mantenimiento que hacen que el sistema esté muy atrasado con respecto a las normas nacionales. Desde el punto de vista económico, los problemas operacionales de la AEE y la imposibilidad histórica de ajustar las tarifas de modo tal que cubran el aumento de los costos a lo largo del tiempo han llevado a la acumulación significativa de deuda preexistente y de obligaciones de pensión, además de infraestructura antigua que carece de mantenimiento adecuado.

Son varios los problemas estructurales que existen desde hace tiempo y que han llevado a la AEE a la posición financiera y operacional en la que se encuentra actualmente:

▪ **Influencia política y falta de continuidad en la toma de decisiones:** Históricamente, las decisiones administrativas han estado sujetas a los cambios y la influencia política, motivo por el cual había mucha rotación del personal directivo, discontinuidad en los planes de inversión de capital y las tarifas por servicio eléctrico para los clientes que no eran suficientes para cubrir los costos operacionales, de mantenimiento y del servicio de la deuda. En última instancia, la toma de decisiones politizada llevó a la AEE a emitir más deuda para cubrir el servicio de la deuda actual en lugar de fijar tarifas suficientes. Por esa razón, los clientes han tenido que experimentar un nivel de confiabilidad cada vez peor dado que la infraestructura es antigua, el rendimiento financiero y administrativo no es óptimo y las tarifas son volátiles, ya que históricamente se depende en demasía de la generación que funciona con petróleo con sus fluctuantes precios de mercado, entre otras cosas.

▪ **Falta de ajustes tarifarios para cubrir costos:** La AEE ha operado con un déficit fiscal desde principios de la década de 2000 debido, entre otras cosas, a su incapacidad para

---

[5]    Presentaciones de LUMA ante el NEPR en relación con las métricas de rendimiento y el Plan de Remediación del Sistema. https://energia.pr.gov/wp-content/uploads/sites/7/2021/03/Request-for-Leave-to-File-Amended-Exhibit-2-NEPR-MI-2019-0007.pdf

[6]    Punto de referencia del IEEE: https://cmte.ieee.org/pes-drwg/wp-content/uploads/sites/61/2021-IEEE-DRWG-Benchmarking-Results.pdf

implementar ajustes modestos de la tarifa base para los gastos de operación y mantenimiento (O&M) no relacionados con combustible.[7]

- **Desafíos macroeconómicos.** La AEE se ha visto afectada por los desafíos macroeconómicos en los últimos años. La economía de Puerto Rico comenzó a deteriorarse, ya que sufrió una caída del 20% en el producto nacional bruto (PNB) real desde el 2007, mientras que el aumento de la emigración hizo que la población disminuyera en más del 15% desde el 2004, lo cual redujo la base de ingresos de la AEE. Por esa razón, antes del 2021, las ventas de energía disminuyeron un 21% desde su pico máximo en 2007 y los ingresos operacionales se redujeron en un 31% durante el mismo periodo. Con menos clientes y una base de ingresos más baja, los clientes existentes han tenido que pagar tarifas más altas para cubrir los costos fijos del sistema.

- **Dependencia excesiva de los combustibles fósiles, con su fluctuación de precios, para la generación de energía.** Si bien la AEE redujo su dependencia tanto del petróleo para la generación de energía haciendo que ciertas unidades clave generen energía con gas natural, los clientes de la AEE siguen estando sujetos a una mezcla de generación que depende de manera excesiva de unidades antiguas que funcionan con petróleo y a una estructura tarifaria que transfiere los fluctuantes costos de combustible, lo que da origen a tarifas históricamente volátiles. Esta situación afecta a su vez la capacidad de pago de los clientes y genera presión de asequibilidad para todos los tipos de clientes.  Entre 2009 y 2014, el complemento de ajuste de combustible de la AEE aumentó alrededor de un 45% cuando el precio del petróleo se duplicó de $60 a $120 por barril.[8] El impacto combinado de las menores ventas y los mayores precios del combustible contribuyó a que las tarifas medias de los clientes fueran altas y también volátiles, oscilando entre 20 y 30 c/kWh. En el año fiscal 2021, alrededor del 43% de la generación dependía del gas natural, el 37% funcionaba con petróleo, el 17% usaba carbón y el 3% provenía de fuentes de energía renovable. A modo de comparación, el promedio nacional en los EE. UU. para la generación que funciona con petróleo es actualmente menor al 1% de la generación total. Si no se hacen más inversiones en fuentes de energía renovable más económicas y en almacenamiento en baterías, los residentes y los negocios de Puerto Rico seguirán siendo vulnerables a los cambios en el precio del petróleo y el gas.[9]

- **Deuda insostenible y obligaciones de pensiones:** La AEE acumuló aproximadamente $9 mil millones en deuda y más de $4 mil millones en pasivos de pensiones. Las tarifas no se ajustaron para cubrir estos pasivos crecientes. Sin la reestructuración de la deuda, los aumentos de la tarifa eléctrica de entre 6 y 8 c/kWh en dólares reales para pagar la deuda preexistente harían que las tarifas a partir de la fecha de certificación de este Plan Fiscal se incrementaran por encima de los 35 c/kWh y las elevaran significativamente a largo plazo. Además, para financiar completamente los beneficios de las pensiones después de que se agoten los activos del plan, lo que se estima que ocurrirá durante el año fiscal 2024, la AEE

---

[7] La AEE ha ajustado las tarifas relacionadas con el combustible y la energía adquirida de forma mensual o trimestral para conciliar los costos reales, pero no ajustó la tarifa base para los costos de O&M no relacionados con combustible durante más de 25 años, antes de la presentación sobre tarifas y el ajuste tarifario del 2016.

[8] Informe mensual de la AEE del año fiscal 2009 (resultados financieros provisionales sin auditar). Informe mensual de la AEE del año fiscal 2014 (resultados financieros provisionales sin auditar).

[9] Siemens Industry, Plan Integrado de Recursos de Puerto Rico 2018-2019, RPT-015-19, rev. 2 (Schenectady, 7 de junio de 2019), 7-3, http://energia.pr.gov/wp-content/uploads/2019/02/PREPA-Ex.-1.0-PIR-2019-PREPA-PIR-Report.pdf; Administración de Información Energética de EE. UU., Puerto Rico: Profile Overview, modificado por última vez el 21 de noviembre de 2019, https://www.eia.gov/state/?sid=RQ.

tendrá que contribuir con más de $250 millones por año en promedio. Esto representaría un aumento de la tarifa eléctrica mensual de 1.5 a 2.1 c/kWh en las próximas dos décadas. Por ejemplo, en 2020 las tarifas bajaron a aproximadamente 21 c/kWh y luego aumentaron exponencialmente en 2022 a unos 26 c/kWh, debido a las limitaciones de la cadena de suministro y a la invasión rusa en Ucrania.

▪ **Falta de inversión en el mantenimiento y modernización de la red:** Dada la insuficiencia de ingresos y la incapacidad de implementar ajustes tarifarios para cubrir los sustanciales pasivos mencionados anteriormente, la administración de la AEE históricamente redujo, o eliminó por completo, las inversiones prudentes y necesarias en el mantenimiento a largo plazo y los programas de mejoras. En los últimos años, las inversiones de capital en el sistema de T&D estuvieron limitadas a los proyectos más urgentes para evitar fallas inminentes en el sistema o responder ante averías en los equipos en lugar de mejorar la red de forma proactiva. La falta histórica de inversión en el manejo de la vegetación y en otras tareas de mantenimiento ha resultado en un sistema de T&D muy susceptible a los daños que provocan los huracanes, los terremotos y otros eventos imprevistos.

▪ **Flota generatriz antigua e ineficiente:** Los intentos fallidos de diversificar y mantener los recursos de generación han tenido como consecuencia una flota generatriz antigua e ineficiente. La AEE posee una capacidad instalada de aproximadamente 4,500 MW con otros 1,000 MW contratados mediante los PPOA de AES y EcoEléctrica. Las plantas de la AEE tienen una edad media aproximada de más de 40 años, frente a una media nacional de 18 años.[10] El envejecimiento de los activos conlleva retos operacionales, como una menor flexibilidad operacional debido a un aumento más lento, una mayor probabilidad de interrupciones, un aumento de los costos por megavatio-hora generado, así como el incumplimiento de los reglamentos medioambientales y de salud. Además, las plantas de generación propiedad de la AEE tienen una alta indisponibilidad debido a las reducciones de potencia en curso, así como a las interrupciones forzadas y planificadas que resultan en menos del 50% de la generación propia de la AEE disponible para el servicio en promedio durante los últimos 12 meses cuando se consideran las 8,760 horas completas del periodo.

Teniendo en cuenta estos desafíos operacionales y financieros de larga data, el Plan Fiscal Certificado para Puerto Rico de 2022, que la Junta de Supervisión certificó el 27 de enero de 2022, confirma y actualiza el camino continuo hacia la transformación total del sector energético de Puerto Rico, tal como lo exige la política pública de Puerto Rico[11] y lo establecen los planes fiscales anteriores. El sistema eléctrico de Puerto Rico necesita una transformación integral para brindar el servicio seguro, confiable, limpio y asequible que los residentes y los negocios de Puerto Rico necesitan desesperadamente y merecen.  Este proceso de transformación se describe con más detalle en el Capítulo 3.

## 2.3   Estructura de gobernanza

La ley habilitadora de la AEE estableció a la AEE como una corporación pública con existencia legal separada e independiente de la del Gobierno de Puerto Rico. La Junta de Gobierno de la AEE

---

[10]   Congreso de los EE. UU., Exploring Energy Challenges and Opportunities. Excluye la capacidad instalada por los IPP de 961 MW: todas las plantas de energía renovable son de propiedad independiente y se contratan a través de PPA.

[11]   Definido en la Ley Núm. 17 de 2019, la Ley Núm. 120 de 2018 y la Ley Núm. 57 de 2014, entre otras.

goza de la autoridad para designar al director ejecutivo o al principal oficial ejecutivo, así como al resto de los cargos ejecutivos.

La Junta de Gobierno de la AEE está compuesta por siete miembros (Gráfica 3).

1. Tres miembros son designados por el gobernador de Puerto Rico, con el asesoramiento y el consentimiento del Senado; dichos miembros son seleccionados de una lista de candidatos preparada por una empresa de contratación profesional.

2. Tres miembros son designados por el gobernador según su propio criterio; uno de ellos debe ser independiente y no puede ser empleado de ninguna entidad gubernamental.

3. Un miembro es elegido por los clientes de la AEE para que represente sus intereses.

Asimismo, el Artículo 16 de la ley habilitadora de la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico (AAFAF) establece que el director ejecutivo de la AAFAF debe ser un miembro de la Junta Directiva de cualquier organismo del Gobierno de Puerto Rico que esté designado como un organismo territorial cubierto de conformidad con la Ley PROMESA mientras dicha designación esté vigente. Dado que la AEE está designada como un organismo territorial cubierto, el director ejecutivo de la AAFAF o su delegado también es miembro de la Junta de Gobierno de la AEE.[12]

Los miembros de la Junta de Gobierno designados por el gobernador con el asesoramiento y el consentimiento del Senado de Puerto Rico desempeñan sus funciones en términos escalonados; mientras que los miembros designados según el propio criterio del gobernador se consideran empleados a voluntad, con excepción del miembro independiente que desempeña su función durante un término de cinco años. El representante de los intereses de los clientes también ejerce su cargo por un término de cinco años.[13]

GRÁFICA 3: COMPOSICIÓN DE LA JUNTA DE GOBIERNO DE LA AEE



---

12   Ley Núm. 2 de 2017, según enmendada (3 L.P.R.A. Sec. 9376).
13   Sección 4 de la ley habilitadora de la AEE (22 L.P.R.A. Sec. 194).

La AEE y su Junta de Gobierno están reguladas por el Negociado de Energía de Puerto Rico (NEPR). La Junta de Gobierno de la AEE también está sujeta a la fiscalización de la Junta de Supervisión desde la promulgación de la Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico (PROMESA) en 2016. Se incluye más información sobre la estructura reguladora, incluida la función del NEPR, en el Capítulo 4: "Estructura legal y reguladora".

Como lo requiere la Ley Núm. 17 de 2019,[14] la AEE ha dejado de operar como un monopolio verticalmente integrado y ha transferido las responsabilidades operacionales de los servicios de O&M de T&D a LUMA, según se establece en el Acuerdo de operación y mantenimiento para transmisión y distribución (AOM para T&D) con LUMA. La AEE sigue manteniendo la propiedad de los activos del sistema eléctrico.

La prioridad y la finalidad constantes de la Junta de Gobierno de la AEE es respaldar e implementar las numerosas medidas de transformación detalladas en los Planes Fiscales Certificados de 2022 para la AEE y Puerto Rico, entre las que se incluyen las siguientes:

1. Cumplir con las obligaciones de la AEE bajo el AOM para T&D;

2. Respaldar la finalización del proceso de adquisición competitiva que tiene la AAPP para la selección de uno o más operadores para los activos de generación existentes de la AEE y la transferencia futura de responsabilidades de O&M;

3. Respaldar a LUMA, cuando sea necesario, para administrar y utilizar eficientemente la cantidad máxima de fondos federales asignados por diversas agencias federales para la reparación, la reconstrucción y el fortalecimiento de la infraestructura energética de Puerto Rico y los activos relacionados, de un modo coherente con el AOM para T&D y, en la medida que corresponda, con cualquier acuerdo que resulte del proceso de adquisición de generación que tiene la AEE;

4. Seguir implementando reformas operacionales y de gestión a corto plazo que aumenten la estabilidad financiera, la calidad del servicio (de generación de energía mientras esté en control de la AEE), mejoren la eficiencia operacional y el cumplimiento ambiental, aumenten la transparencia y la responsabilidad y reduzcan la intervención política; y

5. Respaldar los esfuerzos para reestructurar las obligaciones de pensión y las deudas preexistentes de la AEE.

**Reorganización corporativa**

La AEE ha trabajado y coordinado con la AAPP para perfeccionar e implementar una reorganización de la AEE que sea consistente con la política pública establecida en la Ley Núm. 17 de 2019 y que cumpla con todos los requisitos legales y reglamentarios adicionales, incluyendo impuestos, FEMA, NEPR y los requisitos pertinentes bajo el AOM para T&D. El Capítulo 3 de este Plan Fiscal Certificado esboza la futura estructura organizacional de la AEE, luego de completar las iniciativas de transformación pertinentes.

---

[14]  Ley de Política Pública Energética de Puerto Rico, Ley Núm. 17 del 11 de abril de 2019.

GRÁFICA 4: ESTRUCTURA CORPORATIVA ILUSTRATIVA DE LA AEE REORGANIZADA



## 2.4   Estado actual del sistema de T&D

El sistema de T&D de Puerto Rico está formado por tres circuitos de transmisión principales que llevan la generación eléctrica de las plantas de energía concentradas en la costa sur a los centros de carga concentrados en la región noreste. El hecho de que el sistema dependa de la transmisión norte-sur genera ineficacia operacional y vulnerabilidad de la red. El impacto del huracán María fue especialmente devastador para las mencionadas líneas norte-sur, que atraviesan densos terrenos forestales.

El circuito de transmisión original del sistema es el circuito central, que conecta las centrales Costa Sur, EcoEléctrica y Aguirre ubicadas en el sur con la Central San Juan, que está en el norte, por medio de los centros de transmisión de Aguas Buenas, Manatí y Bayamón. El circuito occidental, que comenzó a funcionar en el 2002, conecta las centrales Costa Sur y EcoEléctrica ubicadas en el sur con la Central Mayagüez de la AEE ubicada en el oeste y la Central Cambalache en el norte. El circuito oriental, que comenzó a funcionar en el 2006, conecta la Central Aguirre y la planta de AES ubicadas en el sur por medio de los centros de transmisión de Yabucoa en el este y Aguas Buenas y Sabana Llana en el norte.

GRÁFICA 5: CIRCUITOS DE TRANSMISIÓN DE LA AEE



## Resumen del sistema de transmisión

LUMA opera 178 centros de transmisión que funcionan a 230 kV, 115 kV y 38 kV. Estos centros conectan más de 1,100 millas de líneas de transmisión (230/115 kV) y más de 1,500 millas de líneas de subtransmisión (38 kV). El 96% de dichas líneas son aéreas, mientras que el 4% restante son soterradas. LUMA también opera alrededor de 44,000 estructuras de transmisión, repartidas entre los tres circuitos de 230 kV ubicadas en las zonas oeste, este y central de la isla. Las líneas de 115 kV abastecen a todos los centros de carga más importantes, mientras que el sistema de subtransmisión de 38 kV presta servicios a las regiones más remotas del interior, así como a la mayoría de los clientes industriales y comerciales.

## Resumen del sistema de distribución

El sistema de distribución de Puerto Rico presta servicios a unos 1.5 millones de clientes por medio de 1,200 circuitos aproximadamente. Hay un poco menos de 32,000 millas de líneas de distribución, que incluyen casi 17,000 millas de líneas de voltaje primarias y alrededor de 15,000 millas de líneas secundarias y acometidas. El sistema conecta alrededor de 60 subestaciones de 115 kV, unas 280 subestaciones de 38 kV y casi 825 subestaciones privadas. Hay alrededor de 298,000 postes de distribución y aproximadamente 213,000 transformadores de distribución. La mayor parte del sistema de distribución está formada por líneas aéreas; alrededor del 20% de las líneas soterradas se encuentran principalmente en centros urbanos. Los postes de distribución son de acero galvanizado, concreto y madera.

## Desafíos del sistema de transmisión y distribución

El sistema de T&D enfrenta importantes desafíos geográficos dado que su centro de carga principal está en el norte (el área metropolitana de San Juan y el distrito industrial de Humacao, alrededor del 70% de la carga total), mientras que la mayoría de los recursos de generación más económicos y eficientes están en el sur (alrededor del 70% de la capacidad de generación operacional). Los tres circuitos de transmisión de 230 kV que conectan la generación de la región sur con la demanda de la región norte atraviesan un terreno montañoso y densamente forestado, lo cual limita el acceso para realizar tareas de reparación o reconstrucción.

Tras los huracanes Irma y María en el 2017, los esfuerzos de recuperación se vieron demorados por el acceso limitado a estas líneas de transmisión. El daño provocado por los huracanes se

exacerbó debido a la falta de manejo de la vegetación y de las tareas de mantenimiento de rutina. Según un informe de la Oficina de Responsabilidad Gubernamental que evalúa el impacto de los huracanes en la red eléctrica, "[La AEE] canceló su programa de manejo de la vegetación" antes de los huracanes, lo que "[contribuyó] a la destrucción de la red".[15] Las prácticas de mantenimiento y manejo de T&D de la AEE habían quedado por debajo de los estándares de la industria, lo que provocaba mayores costos y menor confiabilidad para los clientes.

A fin de abordar estos problemas y mejorar el rendimiento operacional y el servicio al cliente, apoyar la ejecución de proyectos de capital rigurosos y asegurar el equilibrio y el control fiscal de manera continua, la AAPP, junto con la AEE y la Junta de Supervisión, ha seleccionado a LUMA Energy (LUMA) para que asuma la responsabilidad de operar y mantener el sistema de T&D de la AEE. Además, los programas y carteras de mejoras para la modernización de la red eléctrica esbozados en los Presupuestos Iniciales de LUMA y el Plan de Remediación del Sistema (SRP), junto con las iniciativas que ya han comenzado, serán fundamentales para fortalecer la red eléctrica de Puerto Rico. Se ofrecen más detalles en el Capítulo 6 y el Capítulo 7.

**Resultados de la evaluación de T&D de LUMA**

Como parte de las tareas de transición inicial de LUMA antes del 1 de junio de 2021, y de acuerdo con las exigencias del Acuerdo de operación y mantenimiento para T&D (AOM para T&D),[16] LUMA realizó una evaluación inicial de la AEE, su organización y sus activos. La evaluación preliminar de LUMA en ese momento indicaba que los sistemas y procesos organizacionales requerían una mejora significativa, y que los activos físicos estaban en mal estado por los daños causados por las tormentas, la antigüedad y el mantenimiento postergado. Ambas categorías de deficiencias tienen sus correspondientes efectos negativos en el servicio al cliente, el rendimiento del sistema, la resiliencia y la fiabilidad. Se puede encontrar más información sobre el método de evaluación y los resultados en Capítulo 7: Carteras de mejoras de LUMA. LUMA, como operador seleccionado para el sistema de T&D, comenzó a operar y mantener el sistema de T&D de forma efectiva a partir del 1 de junio de 2021.

## 2.5   Estado actual de la generación

La electricidad es suministrada por plantas de generación que posee la AEE y comprada a productores independientes de energía (IPP) por medio de acuerdos operacionales y de compra de energía (PPOA). Las plantas de energía de la AEE tienen 4,961 MW de capacidad de generación instalada. Sin embargo, la generación de la AEE experimenta índices de interrupción forzada por encima del promedio del sector debido a la antigüedad promedio de las unidades, que supera los 40 años. Entre el 30% y el 40% aproximadamente de esta capacidad suele estar fuera de servicio, incluidas las unidades que se encuentran indefinidamente fuera de servicio y que necesitan reparaciones significativas. Como resultado, en promedio, solo alrededor del 60-70% (3,000 a 3,500 MW) de la capacidad de generación de la AEE está disponible para distribución. Además de los activos de generación que posee la AEE, el suministro eléctrico de los IPP consiste en 984 MW de dos plantas de energía convencionales y 254 MW de varios

---

[15]   "2017 Hurricane Season: Federal Support for Electricity Grid Restoration in the U.S. Virgin Islands and Puerto Rico", Oficina de Responsabilidad Gubernamental de los EE. UU. Abril de 2019. https://www.gao.gov/assets/700/698626.pdf.

[16]   "O&M" se refiere al Acuerdo de operación y mantenimiento (AOM para T&D) con fecha de 22 de junio de 2020, celebrado entre la AEE, LUMA Energy, LLC, LUMA Energy Servco, LLC y la AAPP. Todo el lenguaje y las declaraciones de este capítulo son meramente ilustrativos y deben interpretarse en virtud del AOM para T&D y están sujetos a dicho AOM, incluidos los términos, tal como allí se definen.

proveedores de energía renovable. Dadas las interrupciones frecuentes de la AEE, suele ser necesario despachar las unidades de generación con costos de combustible más altos. Por ejemplo, la explosión del transformador relacionada con el mantenimiento en abril de 2019 y la consiguiente pérdida de la unidad 2 de la Central Aguirre durante aproximadamente 12 meses (con un costo promedio de combustible de unos $130/MWh) se compensó con el aumento de la generación de las plantas de pico de diésel de baja eficiencia (con un costo promedio de combustible de unos $200/MWh).[17]

En Puerto Rico, las unidades de generación funcionan principalmente con combustibles fósiles: en el año fiscal 2021, casi el 40% de la electricidad de Puerto Rico era generada por plantas de energía que funcionaban con petróleo, y más del 97% de la electricidad total era generada con recursos de energía no renovable.

Como parte de los esfuerzos para diversificar y modernizar la flota generatriz de la isla y reducir la dependencia de los recursos de generación a base de petróleo, la AEE ha renegociado o completado la adquisición de hasta 1,000 MW de nueva capacidad de generación renovable. Sin embargo, al cierre del primer trimestre de 2022, ninguno de estos proyectos ha comenzado su construcción, lo que ha provocado retrasos significativos en comparación con los términos de adquisición y desarrollo establecidos por el NEPR (vea la Gráfica 21). Debido a los retrasos iniciales en el proceso de adquisición de estos recursos, el NEPR ha determinado que la adquisición del segundo tramo para la generación de energía renovable y la SP de recursos de almacenamiento será gestionada por el NEPR y un contratista externo de adquisiciones, con el fin de avanzar en la integración de la energía renovable en la red de acuerdo con el PIR y el Plan de Acción Modificado aprobados por el NEPR.

En virtud del AOM para T&D, la planificación de los recursos de generación de la AEE la realiza ahora LUMA e incluye estudios de adecuación de recursos y planificación integrada de recursos. Cada tres años, LUMA, como agente de la AEE, debe preparar y presentar al NEPR un Plan Integrado de Recursos (PIR) para un periodo de planificación de 20 años. La Ley Núm. 57 de 2014 define el PIR como un plan de recursos que deberá considerar todos los recursos razonables, incluyendo tanto la oferta de energía (por ejemplo, la generación a escala de servicios públicos) como la demanda de energía (por ejemplo, la eficiencia energética, la respuesta a la demanda y la generación distribuida), para satisfacer las necesidades actuales y futuras proyectadas del sistema energético de Puerto Rico y de sus clientes al menor costo razonable.[18] Además, la Ley Núm. 57 de 2014 ordena que el PIR incluya también el impacto medioambiental del sistema energético.[19] El 24 de agosto de 2020, el NEPR aprobó una parte y rechazó el resto del PIR propuesto más reciente de la AEE y ordenó la adopción e implementación de un Plan de Acción Modificado y un Plan de Recursos Preferido Modificado.

LUMA, la AEE y el futuro operador de los activos de generación de la AEE utilizarán el Plan de Acción Modificado y el Plan de Recursos Preferido Modificado como una hoja de ruta para las reparaciones, mejoras y reemplazos de los recursos de generación existentes, así como los nuevos recursos de generación que deben ser adquiridos y desarrollados.[20] El PIR aprobado y el Plan de

---

17  Informe de la AEE presentado ante la Junta de Supervisión que compara los datos reales con los presupuestados para el segundo trimestre del año fiscal 2021.

18  Ley Núm. 17 de 2019, Ley de Política Pública Energética de Puerto Rico, aprobada el 11 de abril de 2019, Sección 5.2(ll).

19  Ley Núm. 57 de 2014, Ley de Transformación y Alivio Energético de Puerto Rico, aprobada el 27 de mayo de 2014, Sección 6C(h).

20  Expediente del NEPR Núm. NEPR-MI-2020-0012 sobre el cumplimiento del PIR y el Plan de Acción Modificado: https://energia.pr.gov/expedientes/?docket=nepr-mi-2020-0012.

Acción Modificado prevén una transformación del sector energético de Puerto Rico mediante el aumento de la cuota de generación renovable y de almacenamiento, el retiro de toda la generación existente de carbón y fuelóleo pesado, la mejora de la resiliencia de la red a través del fortalecimiento del sistema de transmisión y distribución, y la habilitación de la elección del cliente mediante el apoyo a la incorporación de la generación distribuida (GD) y la implementación de programas de respuesta a la demanda (DR) y de eficiencia energética (EE). Se puede encontrar más información sobre el PIR y el Plan de Acción Modificado en el Capítulo 5.

**Adecuación de los recursos**

Como se indica en la Sección 2.2 del Capítulo 2, el consumo de energía y la demanda máxima del sistema han estado en declive durante 16 años. A pesar de los aumentos de los últimos meses, se espera que el descenso del consumo de energía y de la demanda máxima continúe durante los próximos años y décadas, debido principalmente a (1) el descenso de la población y las proyecciones macroeconómicas más débiles, (2) el aumento de las medidas de eficiencia energética y (3) la mayor adopción de la generación distribuida, en la que los clientes generan su propia energía, utilizan menos energía de la red y la inyectan de nuevo en la red.

Sin embargo, se espera que la antigüedad y el estado de las unidades generadoras de la AEE sigan siendo susceptibles de sufrir eventos de interrupción forzada que requieran el relevo de carga, lo que limitará aún más la capacidad de LUMA para dar servicio a sus clientes. Se espera que los retos asociados a una flota generatriz poco fiable continúen hasta que se ponga en marcha un programa de mantenimiento adecuado y proactivo y se sustituyan las unidades antiguas e ineficientes por recursos más nuevos. LUMA está desarrollando actualmente su Estudio de

Adecuación de Recursos, que supondrá una revisión de los recursos en Puerto Rico, de cara a su presentación ante el NEPR en junio de 2022.

GRÁFICA 6: ACTIVOS DE GENERACIÓN DE LA AEE



## Desafíos para el sistema de generación

Como sistema insular, la red eléctrica de Puerto Rico está geográficamente aislada, por lo que no puede importar energía adicional para atender a los clientes de Puerto Rico. Asimismo, las unidades de generación de carga base de la AEE son relativamente grandes como un porcentaje de la carga máxima del sistema, de modo tal que la interrupción de una sola unidad puede provocar un corte en toda la isla, como ocurrió en 2016, 2018 y 2022. Para evitar que esto suceda, las unidades de generación tienen que destinar muchas horas de trabajo a la carga parcial a fin de mantener la confiabilidad, lo cual reduce la eficacia de la generación y aumenta los costos totales.

La mayor parte de la flota generatriz actual de la AEE utiliza tecnología de generación de vapor antigua y desactualizada, con tiempos de rampa prolongados. Esto significa que las plantas más antiguas (como las turbinas de vapor) necesitan más tiempo para llegar a la carga máxima y tienen una flexibilidad operacional limitada para cambiar la carga debido a que tienen sistemas de control con menor reacción y necesitan más tiempo para calentarse. Aunque estas plantas de vapor más antiguas suelen ser más económicas que otras unidades de la AEE debido a que el costo de combustible es más bajo, su funcionamiento es limitado por los Estándares de Emisión de Mercurio y Tóxicos de Aire (MATS) y el decreto de consentimiento de la Agencia de Protección Ambiental (EPA) de los EE. UU. correspondiente. La EPA calificó de "uso limitado" a muchas de las plantas de vapor más antiguas de la AEE que utilizan combustible de menor costo por tener

un factor de capacidad de entrada de calor anual inferior al 8% durante un periodo de 24 meses. Los MATS imponen estrictas limitaciones a las emisiones tanto de partículas como de gases ácidos, además de exigir estándares de prácticas de trabajo aplicables durante el arranque y la parada de las centrales eléctricas y el ajuste periódico de los quemadores y los controles de combustión.[21] Hasta la fecha, la AEE ha pagado cantidades relativamente menores en multas estipuladas por 528 desviaciones de opacidad establecidas en la sección de aire del Decreto de Consentimiento, que ocurren durante los procesos de arranque y parada, pero podrían evaluarse penalidades mucho más sustanciales conforme a la autoridad jurisdiccional de la EPA.

Las pocas plantas de energía renovable que hay en Puerto Rico representan los recursos de generación más limpios del sistema y se consideran "must-run".[22] Durante el año fiscal 2021 se negociaron los PPOA de los proyectos de energía renovable existentes y operacionales para reducir los precios en más de un 10%, hasta un costo promedio de 17 c/kWh. A pesar de la reciente volatilidad de los precios del combustible y de los fuertes aumentos de los costos del fuelóleo y del GNL durante el año fiscal 2022, estas instalaciones siguen siendo algunas de las fuentes de generación más caras para Puerto Rico,[23] ya que, en el momento de la adquisición, la capacidad de generación renovable tenía un precio mucho más alto que el precio de mercado disponible en la actualidad.

Los activos de generación preexistentes y antiguos de la AEE comenzaron a experimentar frecuentes eventos de interrupciones forzadas durante los meses de julio, agosto y septiembre de 2021. Estos eventos de interrupción se debieron a varios factores, incluyendo una combinación de picos de demanda y uso de energía elevados, con interrupciones forzadas imprevistas de los generadores que dieron lugar a márgenes de reserva muy ajustados, y en ocasiones, a déficits de generación que produjeron fluctuaciones (o bajones) de voltaje, así como largos eventos de relevo de carga.

La condición y el rendimiento de las plantas antiguas de la AEE siguen deteriorándose. La disponibilidad de las unidades generadoras del sistema se redujo en un 17% de 2015 a 2020 y ha tenido un rendimiento constante por debajo de sus pares. Las interrupciones forzadas de las unidades de generación también han experimentado un aumento del 15% durante el mismo periodo y han tenido un rendimiento inferior al de las unidades homólogas, lo que ejemplifica la falta de fiabilidad de la flota generatriz preexistente de la AEE. El índice de rendimiento térmico de las unidades de generación también ha experimentado un aumento de 377 Btu/kWh de 2016 a 2020. Estas tendencias apuntan a una creciente ineficacia y falta de fiabilidad a medida que estas unidades siguen deteriorándose. La causa subyacente de las interrupciones en las plantas de generación preexistentes de la AEE está relacionada con su antigüedad y la necesidad de un programa de mantenimiento (preventivo y proactivo) bien desarrollado y ejecutado de manera efectiva.

La flota generatriz antigua, ineficiente y poco confiable que posee la AEE debe ser reemplazada y modernizada. La hoja de ruta para esta modernización se define en el PIR aprobado por el NEPR, donde se describen las medidas y las inversiones en nueva generación que deben tomarse para

---

[21]  "White Paper on Environmental Compliance Issues at Puerto Rico Electric Power Authority Generation Facilities", Hogan Lovells US LLP, 25 de marzo de 2021.

[22]  Las plantas que no pueden interrumpir su funcionamiento, conocidas como "must-run", exigen que la AEE pague por la energía producida con la capacidad contratada, incluso si no es necesaria para satisfacer la demanda del sistema.

[23] El costo promedio de generación para el año fiscal 2022 hasta marzo fue de aproximadamente $170 para los PPOA renovables en comparación con $110 para el GNL, $160 para el residual y $210 para el diésel. Para los años fiscales 2020 y 2021, los costos de generación térmica de la AEE fueron de $100 a $130 por MWh en promedio.

reducir los costos de generación y alcanzar mayor confiabilidad y resiliencia. Se incluye más
información en el Capítulo 3.

## 2.6    Asequibilidad e información demográfica de los clientes

En la actualidad, la AEE presta servicios a alrededor de 1.5 millones de clientes de los cuales el
91% son residenciales, el 8% son comerciales y menos del 1% son industriales. El consumo de casi
la mitad de la carga de la AEE corresponde a los clientes comerciales, quienes representaron el
44% de la demanda total de 16 TWh del año fiscal 2021. Los clientes residenciales ocupan el
segundo lugar, ya que representan el 42% de la demanda de electricidad, mientras que los clientes
industriales representan el 12%.[24] La mayoría de los clientes residenciales y comerciales de la AEE
están ubicados en el área metropolitana de San Juan (Gráfica 7A y Gráfica 7C). Por su parte, los
clientes industriales están distribuidos por toda la isla, ubicados principalmente en el área
metropolitana de San Juan, el distrito de Humacao (al sureste de San Juan), la costa centro-norte
(Arecibo, Manatí y Vega Baja) y el municipio de Ponce (costa sur) (Gráfica 7E y Gráfica 7F).

GRÁFICA 7: CONSUMO Y CANTIDAD DE CLIENTES DE LA AEE EN EL AÑO FISCAL 2021, POR
MUNICIPIO



En promedio y en relación con sus ingresos, los consumidores de Puerto Rico pagan más en
electricidad que los consumidores de cualquier estado de los EE. UU. Según las tarifas del Plan
Fiscal Certificado de 2021 de 21 c/kWh de 2019, en los hogares que ganan el ingreso medio de

---

24    La carga adicional se atribuye a la iluminación pública y la agricultura.

Puerto Rico, la factura de electricidad anual representaba el 5.6% de la participación en el gasto,[25] independientemente de los subsidios. Con el aumento de las tarifas desde el Plan Fiscal Certificado de 2021, esta carga solo ha empeorado.  El promedio de participación en el gasto en Puerto Rico es significativamente mayor en comparación con los estados continentales de los EE. UU., donde los hogares con ingresos medios pagan el 2.4% de sus ingresos anuales por la electricidad (Gráfica 8). Los hogares con bajos ingresos se ven afectados de manera desproporcionada por la estructura tarifaria actual.

GRÁFICA 8: PARTICIPACIÓN EN EL GASTO DE ELECTRICIDAD DE PUERTO RICO EN COMPARACIÓN CON REGIONES SIMILARES[26]



Varias iniciativas de mejora del rendimiento y objetivos en curso sobre la política tendrán un efecto sobre la asequibilidad en Puerto Rico. El mandato legislativo de Puerto Rico que exige un aumento drástico en la generación de energía renovable debe mejorar la estabilidad tarifaria y las tarifas que pagan los clientes si los costos combinados de la energía solar con el almacenamiento en baterías necesario son menores que el costo de generación promedio actual y a largo plazo de la AEE. Si se administra adecuadamente, la adquisición competitiva de recursos de generación

---

[25] La "participación en el gasto" es el porcentaje del gasto que representa el servicio eléctrico por hogar en relación con los ingresos medios por hogar.

[26] Basado en los datos más recientes disponibles, detallados a continuación:
FUENTES: Población: Banco Mundial (CY20)
Tarifa media para clientes residenciales: Informe de LUMA disponible en indicadores.pr (CY21) para Puerto Rico; Administración de Información Energética (EIA) (CY19) para Hawái, los estados del sureste de los EE. UU. y EE. UU.; informe anual de Jamaica Public Service Company (CY20) para Jamaica; Laboratorio Nacional de Energía Renovable (NREL) (CY20) para la República Dominicana
Consumo de los hogares: Censo (CY19) de la Encuesta sobre la Comunidad Estadounidense para el número de hogares de Puerto Rico, Hawái, los estados del sureste de los EE. UU. y los EE. UU.; Instituto de Estadística de Jamaica (CY11) para el tamaño de los hogares de Jamaica; Encuesta Nacional de Gastos e Ingresos de los Hogares (CY18) para el número de hogares de la República Dominicana; informe de LUMA disponible en indicadores. pr (CY21) para la demanda residencial de Puerto Rico; Administración de Información Energética (EIA) (CY19) para la demanda residencial de Hawái, los estados del sureste de los EE. UU. y los EE. UU.; informe del Laboratorio Nacional de Energía Renovable (NREL) (CY20) para la demanda energética de Jamaica y la República Dominicana; ingresos medios: Censo (CY19) de la Encuesta sobre la Comunidad Estadounidense para Puerto Rico, Hawái, la media del sureste de los EE. UU. y la media de los EE. UU.; Banco Mundial (CY18) para el ingreso nacional bruto (INB) per cápita como aproximación a los ingresos para Jamaica; Encuesta Nacional de Gastos e Ingresos de los Hogares (CY18) para la República Dominicana.

renovable y almacenamiento a escala de servicios públicos ofrece una oportunidad única para abordar y mitigar los problemas de estabilidad y asequibilidad de las tarifas.

Probablemente, el impacto de la eficiencia energética programática también tendrá un efecto positivo en la asequibilidad de los clientes, ya que se reducirá el consumo de energía de un cliente promedio y, como consecuencia, las facturas de electricidad serán más bajas. Desde una perspectiva general del sistema, el impacto en las tarifas puede variar. Es posible que los costos acumulados del sistema, y por lo tanto las tarifas, disminuyan debido a que la reducción en el consumo de los clientes y la demanda máxima reducirá la cantidad de inversión necesaria en materia de generación y recursos para satisfacer la demanda máxima. Al mismo tiempo, las tarifas pueden aumentar, ya que los costos del sistema se distribuyen entre menos kWh generados y vendidos por año. El Plan de Acción Modificado del PIR reconoce el beneficio de la eficiencia energética como un "recurso con el costo más bajo" y contempla estudios adicionales y la implementación de programas para lograr mayor eficiencia energética por medio de iniciativas programáticas. Sin embargo, si las medidas de eficiencia se demoran o no se alcanzan, habrá una disminución más gradual en la demanda de electricidad que afectaría las tarifas y la asequibilidad general.

Otra política que podría afectar la asequibilidad de los clientes es el marco de medición neta actual, conforme a la Ley Núm. 17 de 2019, que busca un sistema de generación distribuida que ofrezca resiliencia y una mayor reducción de la dependencia de los combustibles importados. En virtud de esta misma ley, los clientes que utilizan la generación distribuida (es decir, la energía solar en los techos) en determinadas circunstancias tienen derecho a compensar la energía que compran a la AEE con la energía que exportan a la red sobre una base individual, a la tarifa minorista vigente. Esta política aumentará el total de la generación renovable residencial en el sistema de Puerto Rico, pero a medida que se instalen más sistemas de medición neta con crédito de tarifa minorista completa, los clientes de medición neta podrán eludir los cargos que cubren elementos como los servicios de red. Esta política debe permanecer en vigor durante al menos cinco (5) años a partir de la promulgación de la Ley Núm. 17 de 2019, después de lo cual el NEPR tiene el mandato de realizar un estudio para determinar la política de medición neta de cara al futuro.

Además, tanto las inversiones de capital de LUMA en el sistema financiadas con fondos federales (por ejemplo, el fortalecimiento de la línea de T&D para reducir las interrupciones y el costo asociado) como las iniciativas de mejora operacional que ha planificado (por ejemplo, mitigar de inmediato los riesgos relacionados con la vegetación en las áreas más críticas para reducir las interrupciones) deben mejorar la resiliencia y los servicios y aumentarán la productividad, lo que a su vez reducirá los costos para los clientes de la AEE. Del mismo modo, la transformación de la flota generatriz de la AEE con una combinación variada de combustibles y una reducción en los costos de combustible tendrá un impacto positivo en los costos, reducirá la volatilidad y las tarifas y, a su vez, hará que la electricidad sea más asequible para los clientes de la AEE.

## 2.7    Resumen del rendimiento financiero histórico[27]

Los déficits financieros persistentes de la AEE son, entre otras cosas, el resultado de décadas de mala administración fiscal y operacional, y de una incapacidad histórica para ajustar las tarifas energéticas a un nivel que garantice que la AEE pueda cubrir los costos y las inversiones de capital necesarias para modernizar el sistema energético. La AEE funciona con déficit fiscal estructural desde el 2004, situación que ha empeorado con el paso del tiempo. Para reducir costos, la AEE históricamente redujo las inversiones o dejó de invertir en actualizaciones del sistema, lo cual dio origen a un sistema energético vulnerable y propenso a sufrir interrupciones frecuentes y prolongadas y fluctuaciones de voltaje. Además, la AEE no ha financiado su plan de pensiones por completo y, desde 2014, no ha pagado su servicio de la deuda, excepto por medio de la emisión de bonos adicionales.

Durante la última década, los ingresos han disminuido debido a la emigración y el declive económico, así como a una mayor adopción de medidas de eficiencia energética y generación distribuida. Con la reducción de la base de ingresos, el aumento de las tarifas y la volatilidad asociada provocaron un incremento en las deudas pendientes e incobrables, lo que hizo que los clientes invirtieran más en eficiencia energética y dejaran de depender tanto de la red; toda esa situación afectó de manera negativa los ingresos de la AEE. En respuesta a estos problemas de liquidez, la AEE financió la compra de combustible con líneas de crédito, que contribuyeron aún más a la deuda insostenible de la AEE.

Las tarifas de la AEE tampoco han sido suficientes para cubrir los costos operacionales, los costos de pensiones y las obligaciones de deuda. La liquidez operacional de la AEE pasó de tener un déficit de $188 millones en el año fiscal 2000 a su peor momento, con un déficit excesivo de $800 millones durante el año fiscal 2008, lo que llevó a que la AEE dependiera del financiamiento para compensar el déficit de ingresos (Gráfica 9). Para el año fiscal 2014, la situación financiera de la AEE se había deteriorado tanto que tuvo que firmar acuerdos de indulgencia con los acreedores, ya que era evidente que no había fondos suficientes para pagar el servicio de la deuda. El 2 de julio de 2017, la Junta de Supervisión presentó, en nombre de la AEE, una petición de alivio de la bancarrota bajo el Título III de PROMESA ante el Tribunal Federal para el Distrito de Puerto Rico.

---

[27]  Todas las referencias a años corresponden a años fiscales (es decir, del 1 de julio al 30 de junio); las cifras que se utilizan no son consolidadas, ya que corresponden solamente a la AEE y no incluyen la división de irrigación; los subsidios de alumbrado público, combustible y turismo (hotelería) se presentan como reducciones de ingresos en lugar de gastos.

GRÁFICA 9: DÉFICITS OPERACIONALES DE LA AEE DESDE EL AÑO FISCAL 2000 HASTA EL AÑO
FISCAL 2016



Del año fiscal 2014 al año fiscal 2017, los ajustes contables que se realizan por única vez y los
resultados operacionales anuales de la AEE representan una situación financiera cada vez más
complicada. Entre los años fiscales 2014 y 2015, el déficit operacional aumentó de $58 millones a
$489 millones, con el reconocimiento del sustancial pasivo neto por pensiones de la AEE debido
a cambios en las normas contables sobre pensiones de la Junta de Normas de Contabilidad
Gubernamental (GASB). Asimismo, debido a los cambios en los supuestos de contabilidad de las
pensiones y en la valuación de los pasivos, la AEE enfrentó $1.6 mil millones adicionales en
pasivos de pensiones no financiados durante el año fiscal 2015. El reconocimiento constante del
pasivo de pensiones neto y el interés devengado ha aumentado la posición neta negativa de la AEE
a más del 70% de los activos del balance general. A pesar de que los gastos operacionales han
disminuido en los últimos años, los ingresos han disminuido a un ritmo más acelerado y, por
tanto, se ha producido un aumento del déficit.

TABLA 1: ESTADO DE POSICIÓN NETA DE LA AEE DESDE EL AÑO FISCAL 2014 HASTA EL AÑO
FISCAL 2021

| (millones de dólares) | FY2014 | FY2015 | FY2016 | FY2017 | FY2018 | FY2019 | FY2020 | FY2021 |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Información sin auditar, sujeta a cambios sustanciales | |
| Ingresos operacionales | 4,469 | 3,865 | 2,995 | 3,265 | 2,552 | 3,612 | 3,325 | 3,058 |
| Gastos operacionales: | | | | | | | | |
| Combustible | (2,345) | (1,887) | (1,215) | (1,218) | (1,052) | (1,408) | (1,470) | (1,253) |
| Energía adquirida | (808) | (790) | (687) | (729) | (586) | (682) | (734) | (778) |
| Gasto de O&M | (752) | (1,129) | (1,241) | (1,394) | (2,564) | (1,271) | (738) | (1,059) |
| Depreciación | (342) | (382) | (517) | (519) | (343) | (367) | (381) | (374) |
| Gastos operacionales totales | (4,246) | (4,189) | (3,661) | (3,860) | (4,544) | (3,728) | (3,323) | (3,463) |
| Ingresos operacionales/(pérdidas) | 223 | (323) | (666) | (595) | (1,992) | (116) | 2 | (405) |
| Gasto por intereses, neto | (410) | (424) | (425) | (447) | (484) | (463) | (438) | (414) |
| Pérdida por disminución de valor de depósitos del Banco Gubernamental de Fomento (BGF) | | (145) | | | | | | |
| (Pérdida)/ganancia antes de la CELI y otros | (187) | (892) | (1,091) | (1,043) | (2,476) | (579) | (436) | (820) |
| CELI y otros subsidios | (278) | (273) | (172) | (178) | (192) | (169) | (115) | (67) |
| Capital aportado | 45 | 21 | 8 | 7 | 35 | 73 | (2) | (750) |
| Cambio en la posición neta | (420) | (1,144) | (1,255) | (1,213) | (2,633) | (676) | (552) | (1,673) |
| Posición neta al comienzo del año | (847) | (1,267) | (3,578) | (4,838) | (6,141) | (8,008) | (8,609) | (9,161) |
| Cambio en la contabilidad de los costos de pensiones y correcciones | | (1,644) | | (124) | 799 | 74 | | |
| Efecto neto del estado actualizado del 2015 | | 477 | | | | | | |
| Posición neta al final del año | (1,267) | (3,578) | (4,833) | (6,175) | (8,008) | (8,609) | (9,161) | (10,799) |

Desde que solicitó el alivio de la bancarrota bajo el Título III de PROMESA en julio de 2017, la AEE ha mejorado su monitoreo de flujo de efectivo y liquidez, los informes, los controles y las comunicaciones. Estas mejoras han sido fundamentales para preservar la estabilidad financiera de la AEE a través de las importantes interrupciones causadas por los huracanes Irma y María, el terremoto de enero de 2020, la pandemia del COVID-19 y la actual situación geopolítica que impacta el suministro y los precios de los combustibles. Al 30 de abril de 2022, la posición total de efectivo operacional de la AEE era de aproximadamente $1.1 mil millones. De los $1.1 mil millones, $760 millones estaban en varias cuentas operacionales requeridas por el AOM para T&D y $337 millones estaban en otras cuentas de efectivo no restringidas de la AEE.[28]Aunque las medidas implementadas por la AEE han sido efectivas para mantener la estabilidad financiera, hay varios factores significativos que impactarán la liquidez futura de la AEE incluyendo, entre otras cosas, el financiamiento para la transformación de los activos de generación preexistentes de la AEE, los requisitos de capital de trabajo operacional, la reestructuración de las obligaciones de deuda preexistentes, las obligaciones de pensiones subfinanciadas, los requisitos de capital y mantenimiento (que contemplan el financiamiento de los proyectos de obras permanentes aportado por el Gobierno Federal) y los costos para salir del Título III.

**Cobros y liquidación de deudas entre empresas públicas y agencias del Gobierno**

Las cuentas de Gobierno y las empresas públicas son un factor clave para los ingresos de la AEE por la venta total de electricidad. Sin embargo, también son una base de clientes de bajo rendimiento histórico con respecto a los cobros y los ingresos pendientes. Independientemente de los problemas con los ingresos municipales y la reforma de la CELI (vea la subsección sobre la reforma de la CELI en el Capítulo 10), las agencias y las corporaciones públicas del Estado Libre Asociado tienen cuentas por pagar a la AEE por más de $200 millones para servicios energéticos. Tras la fecha de inicio del servicio, el 1 de junio de 2021, el Directorado de Servicio al Cliente de LUMA asumió la responsabilidad de los cobros, incluso con respecto a las cuentas del Gobierno y de las empresas públicas. La AEE trabajará con LUMA durante el nuevo año fiscal 2023 en un proceso de conciliación de las cuentas atrasadas con los deudores en los próximos años.

**Resumen de los ingresos presupuestados frente a los ingresos reales para el año fiscal 2022**[29]

Durante los primeros nueve meses del año fiscal 2022, los ingresos brutos mensuales de la AEE estuvieron aproximadamente un 20% por encima de las proyecciones, impulsados principalmente por un aumento en el precio del combustible, lo que condujo a tarifas más altas. Los ingresos de la tarifa base se situaron aproximadamente un 2% por debajo de las proyecciones para los nueve primeros meses del año fiscal 2022, debido en gran parte a que la demanda real de electricidad fue un 3% inferior a la proyectada.

---

[28]   La posición total de efectivo operacional de $1.1 mil millones excluye aproximadamente $134 millones de efectivo en otras cuentas de efectivo restringidas.

[29]   Los ingresos brutos incluyen los ingresos obtenidos por el consumo de los clientes, mientras que los ingresos consolidados incluyen los ingresos obtenidos por el consumo de los clientes, los ingresos provenientes de otras fuentes y demás ajustes (gasto por deuda incobrable, CELI y subsidios, etc.).

GRÁFICA 10: INGRESOS BRUTOS MENSUALES DEL AÑO FISCAL 2022 (EN MILLONES DE DÓLARES)



GRÁFICA 11: INGRESOS DE LA TARIFA BASE POR MES EN EL AÑO FISCAL 2022 (EN MILLONES DE DÓLARES)



GRÁFICA 12: VENTAS FACTURADAS POR MES EN EL AÑO FISCAL 2022 (GWH)



Las variaciones clave en el informe consolidado de gastos presupuestados frente a gastos reales a la fecha hasta el tercer trimestre del año fiscal 2022 (que incluye los datos de gastos presupuestados frente a gastos reales de T&D/Experiencia del Cliente, Despacho del Sistema de Energía y Servicios Compartidos de LUMA) comprenden (1) costos de combustible más altos que los presupuestados debido a una generación más alta que la esperada, los precios del combustible y el despacho de diésel, y (2) gastos más altos que los presupuestados por parte de GridCo (LUMA) que deben alinearse con los montos presupuestados para fines del año fiscal 2022.

Costos de combustible

La diferencia negativa más importante en el rendimiento de la AEE en lo que va del año hasta la fecha en comparación con el presupuesto hasta el tercer trimestre se debe a los costos del combustible. Para complicar los precios del combustible que fueron más altos de lo proyectado, las unidades de Costa Sur y San Juan de la AEE, más eficientes en cuanto a costos, solo tuvieron una capacidad operacional limitada durante la primera mitad del año fiscal. Como resultado de los marcados aumentos en el precio mundial del petróleo, se prevé que los costos de combustible en el cuarto trimestre serán más altos que en periodos anteriores.

GenCo y HoldCo

La AEE observó diferencias positivas mínimas en las partidas de mano de obra debido a los retiros constantes y las limitadas contrataciones para los reemplazos. La falta de inversión en el mantenimiento relacionado con la generación hasta la fecha refleja una combinación de retrasos en la ejecución de los proyectos que la AEE está abordando y planea tener resueltos para el último trimestre del año fiscal 2022. Por otro lado, como se refleja en la Gráfica 13, a partir de marzo de 2022, HoldCo ha sobrepasado sustancialmente su presupuesto en un 120%.

GRÁFICA 13: INGRESOS Y GASTOS PRESUPUESTADOS Y REALES PARA EL AÑO FISCAL 2022, PROYECCIÓN DE OPERACIONES RECURRENTES

| (millones de dólares) | Trimestre 3 - Hasta la fecha Presupuesto | Trimestre 3 - Hasta la fecha Real | Variación, $ | Variación, % |
|---|---|---|---|---|
| *Información preliminar, sujeta a cambios sustanciales* | | | | |
| **Ingresos** | | | | |
| Ingresos brutos totales | $ 2,614 | $ 3,131 | $ 517 | 20% |
| Gasto por deuda incobrable | (48) | (48) | - | 0% |
| Subsidios y CELI | (198) | (190) | 8 | -4% |
| **Total de ingresos consolidados** | **$ 2,368** | **$ 2,893** | **$ 525** | **22%** |
| | | | | |
| **Gastos** | | | | |
| ***A. Combustible y energía adquirida*** | $ 1,495 | $ 2,064 | $ 569 | 38% |
| | | | | |
| ***B. GenCo:*** | | | | |
| Gastos operacionales de mano de obra de GenCo | $ 58 | $ 51 | $ (7) | -12% |
| Gastos operacionales no relacionados con la mano de obra/otro tipo de GenCo | 39 | 40 | (0) | -1% |
| Impacto del Acuerdo de Servicios Compartidos | 42 | 10 | (32) | -76% |
| Total de gastos de proyectos de mantenimiento de GenCo | 80 | 59 | (21) | -26% |
| **Total de gastos operacionales y de mantenimiento de GenCo** | **$ 219** | **$ 159** | **$ (59)** | **-27%** |
| | | | | |
| ***C. HoldCo:*** | | | | |
| Gastos operacionales de mano de obra de HoldCo | $ 13 | $ 10 | $ (3) | -24% |
| Gastos operacionales no relacionados con la mano de obra/otro tipo de HoldCo | 65 | 85 | 20 | 31% |
| **Total de gastos operacionales de HoldCo** | **$ 78** | **$ 95** | **$ 17** | **22%** |
| | | | | |
| ***D. GridCo:*** | | | | |
| Gastos operacionales de mano de obra de GridCo | $ 158 | $ 210 | $ 53 | 34% |
| Gastos operacionales no relacionados con la mano de obra/otro tipo de GridCo | 266 | 263 | (2) | -1% |
| Tarifas de servicio del operador | 86 | 88 | 1 | 2% |
| 2% de reserva para gastos extraordinarios | 8 | - | (8) | -100% |
| Proyectos de mantenimiento | 69 | 65 | (4) | -6% |
| Impacto del Acuerdo de Servicios Compartidos | (41) | (44) | (3) | 7% |
| **Total de gastos operacionales y de mantenimiento de GridCo** | **$ 544** | **$ 582** | **$ 38** | **7%** |
| | | | | |
| **Gastos totales** | **$ 2,336** | **$ 2,900** | **$ 564** | **24%** |
| | | | | |
| **Superávit / (Déficit)** | **$ 33** | **$ (7)** | **$ (39)** | **-120%** |

## 2.8   Efectos adversos de los principales desastres del año fiscal 2020

Además de los históricos retos operacionales y financieros de la AEE, la condición operacional y fiscal de la corporación se vio afectada además por una serie de eventos catastróficos. En septiembre de 2017, los huracanes Irma y María provocaron daños significativos en el sistema de T&D en toda la isla. Además, en enero de 2020, un terremoto de 6.4 grados de magnitud, que ocurrió cerca de la costa suroeste de Puerto Rico, causó daños significativos en la Central Costa Sur de la AEE y dejó a la mayor parte de Puerto Rico sin servicio eléctrico durante horas. A los efectos del terremoto le siguió rápidamente el impacto de la histórica pandemia mundial de COVID-19. En Puerto Rico, la implementación de medidas y directivas estrictas para proteger la salud y la economía tuvieron consecuencias negativas en la actividad comercial de la isla y hubiera afectado gravemente la situación de liquidez de la AEE si el consumo residencial no hubiera registrado un aumento comparable y compensado durante los periodos de cuarentena.

Las siguientes secciones resumen las consecuencias de los terremotos y de la pandemia de COVID-19 en la situación financiera y operacional de la AEE.

### 2.8.1 *Impacto de los terremotos de 2019-2020*

Del 28 de diciembre de 2019 al 15 de enero de 2020, Puerto Rico sufrió más de 300 terremotos de magnitud 3 o más, de los cuales 10 fueron de una magnitud de 5 o más.[30] El terremoto más fuerte fue el 7 de enero de 2020 y alcanzó una magnitud máxima de 6.4 grados. Este terremoto provocó daños significativos en la Central Costa Sur, una planta de gas natural de 820 MW. En lo que respecta a toda la isla, la AEE necesitó varias horas para restablecer el servicio, lo que demostró que el sistema no tiene capacidad de reinicio rápido y que es vulnerable a la pérdida repentina de las unidades de generación.

Las reparaciones de las unidades 5 y 6 de Costa Sur terminaron de manera satisfactoria antes de mediados de agosto de 2020 y enero de 2021, respectivamente, con un costo total estimado de $39 millones.  Como consecuencia, sin embargo, durante el periodo de interrupción del servicio, la AEE tuvo que depender de la capacidad de generación con diésel y fuelóleo para compensar la pérdida de generación con gas natural en Costa Sur. Se prevé que el seguro de la AEE y FEMA reembolsarán los costos relacionados con dicha generación con diésel y petróleo.

### 2.8.2 *Impacto de la pandemia de COVID-19*

A partir del 16 de marzo de 2020, Puerto Rico comenzó a implementar medidas económicas, sanitarias y de distanciamiento social en virtud de la Orden Ejecutiva 2020-023 para enfrentar la propagación del COVID-19. El impacto de la pandemia de COVID-19 en la salud pública y la economía ha tenido un efecto dominó en el sector energético. El distanciamiento social y la cuarentena obligaron a la AEE a detener todas las actividades no esenciales, incluidos los proyectos de mantenimiento y manejo de la vegetación, lo cual provocó una disminución en los niveles de generación y las ventas. Antes de que terminara marzo de 2020, el promedio de cobros diarios había caído en un 50%, lo que obligó a la AEE a implementar controles financieros estrictos para preservar la liquidez.[31] A finales de junio de 2020, el promedio de cobros diario había vuelto a los niveles normales en relación con las proyecciones y las expectativas de cobro.

El primer trimestre del año fiscal 2022 muestra ventas trimestrales superiores a las previstas, impulsadas en gran medida por un aumento del consumo de los clientes residenciales. Las ventas de los tipos de clientes comerciales e industriales en el segundo trimestre fueron inferiores a las esperadas, lo que provocó una variación desfavorable. Los tres tipos de clientes mostraron variaciones desfavorables en el tercer trimestre del año fiscal 2022. (Gráfica 14 y Gráfica 15).

---

[30]   "As Aftershocks Continue in Puerto Rico, USGS Supports Quake Recovery", Servicio Geológico de los Estados Unidos (USGS), 17 de enero de 2020, https://www.usgs.gov/news/aftershocks-continue-puerto-rico-usgs-supports-quake-recovery.

[31]   Varios factores influyeron en la decisión de los clientes de no pagar las facturas del servicio, especialmente la promulgación de la Ley Núm. 39 de 2020, que, entre otras cosas, prohibía que se cortara el servicio eléctrico por falta de pago.

Gráfica 14: Variación en las ventas trimestrales en el año fiscal 2022 (GWh)



Gráfica 15: Variación en las ventas trimestrales en el año fiscal 2022 por tipo de cliente [32](GWh)



A medida que la pandemia de COVID-19 evolucione, la evaluación constante será fundamental para que las administraciones de la AEE y de LUMA estén preparadas para cambios inesperados en las proyecciones. Una evaluación de la respuesta de la AEE y LUMA a la pandemia de COVID-19 informará acerca de los planes de emergencia y contingencia de la AEE y LUMA para responder de un mejor modo y con más eficacia a eventos imprevistos futuros.

---

[32]    Se excluye la iluminación pública, la agricultura y otros tipos de clientes; por esa razón, no se agregarán a los totales incluidos en la Gráfica 14.

# Capítulo 3. Transformación

El Gobierno, junto con la AEE y la AAPP, en cumplimiento de la política pública del Estado Libre Asociado y según lo estipulado en el Plan Fiscal Certificado, está en vías de completar la transformación del sector energético de Puerto Rico en un sistema moderno, eficiente, confiable y sostenible. La transformación del sector energético mejorará la vida cotidiana de los residentes de Puerto Rico, permitirá que los negocios creen puestos de trabajo y prosperen de forma sostenible, y ayudará a atraer y mantener la inversión en Puerto Rico. Este capítulo ofrece una introducción y un contexto para la transformación del sector energético (Sección 3.1), seguido de la visión, los objetivos y el marco para la transformación (Sección 3.2), incluidas las reformas reguladoras correspondientes (Sección 3.2.1) y la transición en curso a operadores privados (Sección 3.3). La Sección 3.3.3 ofrece una visión general de la finalización de la transición de operaciones y mantenimiento (O&M) del Sistema de Transmisión y Distribución (T&D) a LUMA. Esta visión general incluye una explicación de las obligaciones de LUMA relacionadas con el sistema de T&D en virtud del acuerdo de O&M (AOM), así como la estructura de compensación de LUMA, que se compone de una tarifa fija y una tarifa variable vinculada a las mejoras de rendimiento determinadas por métricas objetivas, transparentes y cuantitativas que está desarrollando el NEPR. Este capítulo también ofrece información actualizada sobre el proceso en curso para transferir los activos de generación existentes de la AEE a un operador privado (Sección 3.3.4  ). El capítulo finaliza con información sobre el estado de cada una de las metas cruciales en la transformación del sector energético de Puerto Rico (Sección 3.4).

## 3.1   Introducción y contexto de la transformación del sector energético de Puerto Rico

El 22 de enero de 2018, tras el huracán María, el Gobierno de Puerto Rico, en colaboración con la Junta de Supervisión, elaboró una visión de política pública para la transformación del sector energético. La visión señala la necesidad de ofrecer un servicio de energía eléctrica seguro, confiable, resiliente, sostenible, rentable, enfocado en el cliente y que cumpla con los requerimientos ambientales, reglamentarios y estatutarios. Este desarrollo será posible gracias a operadores externos competentes y experimentados para el sistema de generación y T&D, junto con una mejor supervisión reglamentaria independiente y el aislamiento de la interferencia política.

Los Planes Fiscales Certificados anteriores para la AEE y Puerto Rico han detallado una transformación integral del sector energético de Puerto Rico a fin de abordar los problemas operacionales y económicos de la AEE. Durante los últimos tres años, la AEE ha tomado numerosas medidas para abordar estos desafíos, incluyendo el apoyo a la selección de LUMA como operador de T&D y la transferencia de las operaciones del sistema de T&D a LUMA el 1 de junio de 2021. La AEE continúa apoyando los esfuerzos de adquisición competitiva en curso de la AAPP para seleccionar uno o más operadores que se encarguen de mantener y operar los activos de generación preexistentes de la AEE. Además, la AEE concluyó y seleccionó 18 proyectos de energía renovable (equivalentes a unos 850 MW de energía renovable) como parte del proceso de SP del tramo 1.

El tramo 2 depende de la actuación del NEPR a través de un coordinador independiente designado para la adquisición para añadir 500 MW adicionales de generación renovable y 250 MW de capacidad de almacenamiento en baterías.

## 3.2   Visión, objetivos y marco de la transformación del sector energético

La visión del Gobierno de Puerto Rico de transformar el sector energético tiene los siguientes objetivos:

TABLA 2: OBJETIVOS DE TRANSFORMACIÓN

| Objetivos de transformación[33] | |
|---|---|
| **Enfoque en el cliente** | <ul><li>Enfocarse en el servicio al cliente y en la experiencia del cliente en la planificación y las operaciones del sistema energético</li><li>Mejorar la relación con los clientes como partes interesadas y ofrecer opciones que les permitan a los clientes satisfacer sus necesidades individuales</li></ul> |
| **Asequibilidad** | <ul><li>Garantizar la prestación del servicio eléctrico de un modo rentable, que sea consecuente con la supervisión y las órdenes del NEPR</li><li>Mejorar el rendimiento operacional</li></ul> |
| **Confiabilidad** | <ul><li>Establecer un nivel de calidad y confiabilidad del servicio que sea razonable y adecuado con el fin de mejorar la satisfacción del cliente y el desarrollo económico</li></ul> |
| **Resiliencia** | <ul><li>Ampliar y desarrollar infraestructura estructuralmente sólida que permita que todo el sistema se recupere de manera adecuada y rápida después del impacto que provocan los desastres naturales catastróficos (huracanes, terremotos, etc.) y otros eventos adversos</li><li>Monitorear y evaluar constantemente la capacidad de preparación ante emergencias</li></ul> |
| **Sostenibilidad** | <ul><li>Diversificar los recursos energéticos priorizando el uso de energía renovable limpia, y reducir la intensidad de carbono del sector energético</li><li>Incentivar a los clientes para que usen la energía con prudencia y eficacia</li></ul> |

Para lograr la visión y los objetivos explicados más arriba, así como establecer un marco legal que obligue a la AEE a separar sus funciones de generación y T&D y a transferir las tareas de operación y mantenimiento a operadores profesionales externos para aprovechar el manejo, la experiencia y los conocimientos del sector privado y ofrecerles a los residentes de Puerto Rico un servicio eléctrico confiable y eficaz, el Gobierno tomó las siguientes medidas:

- **20 de junio de 2018:** Promulgación de la Ley para Transformar el Sistema Eléctrico de Puerto Rico (Ley Núm. 120 de 2018) para brindar la autoridad legal (conforme a la ley de Puerto Rico) y los mecanismos necesarios para la venta, transferencia u operación y mantenimiento en forma privada de los activos, los servicios y las funciones vinculados con el T&D y la generación de la AEE por medio de alianzas público-privadas.

- **11 de abril de 2019:** Promulgación de la Ley de Política Pública Energética de Puerto Rico (Ley Núm. 17 de 2019), que establece un marco reglamentario para atraer inversiones privadas y garantizar la supervisión profesional e independiente de los participantes del mercado energético. Asimismo, la Ley Núm. 17 de 2019 prohíbe específicamente que la AEE

---

[33]   Vea el "Plan Fiscal Certificado de 2020 para la Autoridad de Energía Eléctrica de Puerto Rico", según certificado por la Junta de Supervisión y Administración Financiera para Puerto Rico el 29 de junio de 2020.

siga funcionando como un monopolio vertical y exige la desagregación de las operaciones del sistema de T&D y de generación para que funcionen como entidades distintas y separadas.

▪ **22 de junio de 2020:** La AEE y la AAPP ejecutaron el AOM para T&D con LUMA como operador privado para las operaciones del sistema de T&D de la AEE.[34]

▪ **10 de noviembre de 2020:** La AAPP lanzó la SP para identificar y seleccionar uno o más operadores privados para los activos de generación existentes de la AEE.

▪ **1 de junio de 2021**: LUMA comenzó el inicio del servicio interino bajo el Acuerdo Suplementario del AOM para T&D, que dispone que LUMA asuma las operaciones de T&D mientras la AEE permanece en el Título III.

▪ **22 de diciembre de 2021**: La AAPP recibió propuestas de varios proponentes para operar y mantener los activos de generación preexistentes de la AEE.

La AEE o los organismos de Gobierno correspondientes deben seguir fomentando y respaldando la transformación y la modernización del sistema energético, en especial con respecto a la implementación de los siguientes elementos clave:

1. **Reorganización de la AEE:** Uno de los principios y requisitos clave de los anteriores Planes Fiscales Certificados y de la política energética del Estado Libre Asociado para la transformación es la desvinculación del sistema eléctrico de una estructura monopólica verticalmente integrada a una en la que las funciones y responsabilidades se reasignan entre múltiples entidades y son operadas por diferentes partes. Con ese fin, el AOM para T&D entre la AEE, AAPP y LUMA fue ejecutado el 22 de junio de 2020. El 1 de junio de 2021, LUMA se hizo cargo de las operaciones. En diciembre de 2021, la Junta de Gobierno de la AEE aprobó la creación legal de las subsidiarias previstas de la AEE. El enfoque en los próximos meses será; (i) crear las subsidiarias aprobadas de la AEE (GenCo, GridCo, HydroCo y PropertyCo); y (ii) asignar por separado los activos, funciones y responsabilidades de la AEE en cada una de las subsidiarias.

2. **Aplicación de la reforma reguladora:** Es esencial contar con un regulador del sector energético fuerte e independiente para así garantizar seguridad y estabilidad en el mercado de la energía, promoviendo las tan necesarias inversiones y haciendo cumplir los objetivos de transformación de este sector. El marco de la reforma reguladora fue aprobado por el Gobierno y la Ley Núm. 57 de 2014 estableció un ente regulador independiente, el Negociado de Energía de Puerto Rico (NEPR). El enfoque en los próximos años estará en mantener el respaldo a la independencia del regulador y permitirle ejecutar su mandato. Este proceso se llevará a cabo apoyando el desarrollo de un marco regulador reforzado, que incluya procedimientos eficientes, claros, transparentes, justos y responsables.

3. **Transición de la operación y gestión de los activos de generación y de T&D preexistentes de la AEE a operadores privados, a la vez que se apoya la transición responsable de la generación de energía de la isla a un sistema**

---

[34] "O&M" se refiere al Acuerdo de operación y mantenimiento (AOM para T&D) con fecha de 22 de junio de 2020, celebrado entre la AEE, LUMA Energy, LLC, LUMA Energy Servco, LLC y la AAPP. Todo el lenguaje y las declaraciones de este capítulo son meramente ilustrativos y deben interpretarse en virtud del AOM para T&D y están sujetos a dicho AOM, incluidos los términos, tal como allí se definen.

**fiable basado en energías 100% renovables:** La incorporación de un operador privado para gestionar y operar los activos de generación preexistentes de la AEE mejorará la asequibilidad, la eficiencia, la resiliencia operacional y el rendimiento, mientras se desarrolla una nueva capacidad de generación moderna. En cuanto al sistema de T&D, la AEE ha hecho una transición exitosa de las funciones de operación y mantenimiento a LUMA el 1 de junio de 2021, junto con las responsabilidades de servicio al cliente y del centro de operación energético. Este esfuerzo debería producir una mejora de la experiencia del cliente, apoyar una ejecución rigurosa de los proyectos de capital para modernizar el sistema de T&D, reforzar la resiliencia de la red, garantizar la independencia política, permitir la integración de la capacidad de generación renovable y garantizar el equilibrio y la supervisión fiscal permanentes. La AEE, como responsable de los activos, continuará apoyando a LUMA según sea necesario, de acuerdo con el AOM para T&D. La AAPP es la única administradora del AOM para T&D con respecto al desempeño de LUMA. Del mismo modo, para los operadores privados de sus activos de generación preexistentes, la AEE ha estado apoyando el proceso de SP dirigido por la AAPP, que también será la administradora única del AOM de generación y trabajará para asegurar una transición oportuna y exitosa una vez que la AAPP complete el proceso de selección.[35]

4. **Reestructuración de las deudas preexistentes:** Uno de los objetivos de la transformación y reestructuración de la AEE en el marco de PROMESA es recuperar el acceso a los mercados de créditos a precios razonables. Dadas las significativas deudas preexistentes de la AEE, se necesita un plan de reestructuración sostenible para que la AEE abandone el Título III y recupere el acceso a los mercados de créditos tradicionales. Sin la reestructuración, los clientes acabarán teniendo unas tarifas más elevadas, como consecuencia, entre otras cosas, del pago de una mayor obligación preexistente y de las primas de riesgo asociadas al caso del Título III. En última instancia, la reestructuración exitosa de bonos y obligaciones de deuda pendientes reducirá la deuda preexistente de la AEE, lo cual ayudará a sostener tarifas más asequibles que las que se requerirían de otro modo, y permitirá el acceso a los mercados de créditos para futuras necesidades de capital, de acuerdo con las prácticas estándar de las empresas de servicios públicos. Esto permitirá a la AEE, a través de los operadores privados seleccionados para el sistema de T&D y los activos de generación preexistentes, alcanzar y mantener sus objetivos de transformación a fin de modernizar la red eléctrica de Puerto Rico y trasladar las eficiencias subsiguientes a los usuarios finales. La reestructuración de las deudas preexistentes se analiza más detalladamente en la Sección **Error! Reference source not found.**4 y en el Capítulo 14.

El Plan Fiscal Certificado de la AEE y la política pública energética y el marco legal establecidos por el Gobierno[36] proporcionan la hoja de ruta para completar la transformación del sistema energético de la isla. Si se aplica de manera acertada, un sistema de electricidad reformado dará lugar a unos servicios energéticos modernos y fiables en todo Puerto Rico: una combinación variada de combustibles y costos de combustible y energía adquirida más estables, sustentada en recursos de generación de energía renovable de bajo costo; una mayor eficiencia operacional y

---

[35] El Departamento de Energía (DOE) y varios laboratorios nacionales están trabajando en las iniciativas incluidas en el Estudio PR100 ("Estudio de resiliencia de la red eléctrica de Puerto Rico y la transición a energía 100% renovable"), que fue coordinado con el gobernador de Puerto Rico.

[36] Ley para Transformar el Sistema Eléctrico de Puerto Rico, Ley Núm. 120 de 2018; Ley de Política Pública Energética de Puerto Rico, Ley Núm. 17 de 2019.

una compañía de servicios públicos bien financiada y sostenible desde el punto de vista financiero. Estos resultados beneficiarán a los clientes y negocios de Puerto Rico mediante un servicio eléctrico más confiable, limpio y seguro.

### 3.2.1 *Reforma y supervisión de la regulación del sector energético*

Es imperativo completar la transformación del sistema energético de Puerto Rico, avanzar en los cambios actuales de las funciones y responsabilidades históricas de la AEE y asignar dichas responsabilidades a operadores privados, calificados y seleccionados. El primer paso en este proceso de reestructuración se dio con la promulgación de la Ley Núm. 57 de 2014, que estableció el regulador energético de Puerto Rico, el NEPR. La Ley Núm. 57 de 2014 eliminó la autoridad previa de la AEE para la autorregulación y transfirió dichas autoridades y responsabilidades al NEPR. En el sistema energético transformado de Puerto Rico, esos roles y responsabilidades reglamentarias permanecen en el NEPR. El NEPR tiene la responsabilidad de "reglamentar, supervisar y hacer cumplir la política pública energética del Gobierno de Puerto Rico". A medida que el sector energético de Puerto Rico continúa su transformación en un sistema dinámico y moderno, el NEPR continuará siendo responsable del desarrollo y la adhesión a un marco regulador sólido que promueva inversiones prudentes por parte de las compañías de servicios públicos reguladas, aumente la calidad del servicio al cliente y garantice que las tendencias de la industria y los avances tecnológicos se incorporen de forma adecuada y sostenible al sistema energético de Puerto Rico. Para ello, la supervisión normativa del NEPR de todos los actores energéticos regulados tendrá un impacto directo en el sector energético transformado y una influencia significativa en los servicios de electricidad de Puerto Rico.

El Capítulo 10 (Reforma del sector energético) del Plan Fiscal Certificado para Puerto Rico describe las medidas necesarias para garantizar que el NEPR se convierta en el mejor regulador de su clase, proporciona una descripción de las funciones y responsabilidades que tendrá el NEPR a corto y largo plazo, y establece las responsabilidades compartidas entre el NEPR y la Junta de Supervisión.

## 3.3   Transición a operadores privados

Como lo requiere la Ley Núm. 17 de 2019 y como se señala en los Planes Fiscales Certificados de la AEE para el 2020 y 2021, la AEE está obligada a separar sus operaciones verticalmente integradas en funciones de generación y sistema de T&D, GenCo y GridCo, respectivamente. GridCo comprende el sistema de transmisión y distribución y las operaciones asociadas, la experiencia del cliente, las operaciones y la planificación del sistema y las funciones administrativas, ahora operadas por LUMA.[37] GenCo comprende los recursos de generación existentes propiedad de la AEE que serán operados y mantenidos por uno o más operadores privados hasta su retiro, según lo establecido en el PIR aprobado por la AEE.[38] Las responsabilidades de GenCo también incluirán el cumplimiento de las normas medioambientales, la seguridad y el retiro y desmantelamiento de plantas. Además, GenCo y LUMA serán responsables de trabajar en estrecha colaboración para garantizar la planificación adecuada del sistema a corto, mediano y largo plazo, y la ejecución oportuna y eficiente de las mejoras de capital en todo el sistema.

---

[37]   AOM para T&D en la Sección 5.

[38]   Vea el Artículo 1.8 de la Ley de Política Pública Energética de Puerto Rico; Ley Núm. 17 de 2019.

Además de GridCo y GenCo, la AEE creará dos subsidiarias adicionales: (1) HydroCo, que poseerá y operará los activos de generación hidroeléctrica y de riego de la AEE; (2) HoldCo, que será responsable de ciertas funciones no operacionales; y (3) PropertyCo, que poseerá el resto de los activos de la AEE que no estén directamente relacionados con la generación, T&D u operaciones de riego.[39]

Por último, las funciones y responsabilidades cotidianas actuales de la AEE se limitarán a las estrictamente necesarias para garantizar el cumplimiento de los requisitos de inversión de capital con fondos federales, el financiamiento a corto y largo plazo, los requisitos de divulgación y auditoría financiera, el mantenimiento de registros y otras obligaciones establecidas por las leyes federales y del Estado Libre Asociado.

### 3.3.1 *Objetivos de la transición a operadores privados*

La operación privada de los activos de generación y del sistema de T&D de la AEE es una parte esencial de la transformación y la implementación de la modernización del sistema, la actualización de los recursos de generación, la confiabilidad, la eficacia, los fondos federales y las iniciativas de proyectos de capital. El objetivo general de los diversos operadores privados es abordar y corregir muchas de las deficiencias operacionales y de infraestructura que han afectado los servicios de generación y de T&D de la AEE durante las últimas décadas, mejorar la calidad del servicio y ofrecer un servicio seguro y confiable a tarifas asequibles, tal como lo determina el NEPR dentro de su autoridad para fijar tarifas. Como tal, los operadores deben ofrecer mejoras en el rendimiento financiero y operacional en las siguientes seis dimensiones:[40]

- **Mejorar el rendimiento operacional mediante reformas sistemáticas y la introducción y el aprovechamiento de personal experimentado**. LUMA y el operador de GenCo seleccionado de aquí en adelante por la AAPP deben centrarse en reducir la dependencia histórica de la AEE de contratos externos por medio de la internalización de las actividades, el empoderamiento y la capacitación de la mano de obra local y el logro de economías de escala. En lo que respecta específicamente a T&D, a través del AOM para T&D, se incentiva a LUMA para que mejore el rendimiento del sistema de T&D a lo largo del tiempo basándose en las métricas de rendimiento revisadas y aprobadas por el NEPR.

- **Actualizar la tecnología para aumentar la confiabilidad y mejorar la resiliencia y la eficacia del sistema.** Mientras que la AEE tenía una experiencia limitada con la tecnología estándar de la industria, LUMA y los operadores de GenCo deben ser competentes y deben estar calificados y enfocados en la implementación de tecnologías modernas, capacidades digitales e infraestructura para mejorar la eficiencia operacional y la confiabilidad, contribuyendo a mejorar el desempeño del sistema.

- **Mejorar los procesos y procedimientos.** Aprovechando su experiencia operacional, LUMA y los operadores de GenCo se centrarán aún más en la racionalización y estandarización de los procesos de manejo y en la mejora de las eficiencias operacionales. Estas eficiencias también se traducirán en una mejora de las operaciones y de la experiencia del cliente.

---

[39]  Las iniciativas que abordan las necesidades de reestructuración a corto plazo se describen con más detalle en el Capítulo 9: Medidas operacionales.

[40]  Plan Fiscal Certificado para Puerto Rico, Capítulo 10: "Reforma del sector energético"

- **Tomar decisiones con interferencia política limitada.** LUMA y cualquier otro operador privado están sujetos a una supervisión reguladora independiente por parte del NEPR, con la fiscalización contractual de la AAPP relativa a su actuación en el marco del AOM para T&D, creando así un entorno que permite tomar decisiones libres del tipo de interferencia política que ha conducido a los innumerables problemas de funcionamiento de la compañía eléctrica descritos anteriormente. Esto conduce a la adopción de la práctica estándar de la industria, en la que los operadores experimentados de la compañía de servicios públicos toman las decisiones operacionales con la supervisión de un regulador independiente y libre del control sustantivo de la propia AEE, cuya junta de gobierno es designada a nivel político como se ha mencionado más arriba. Esto, a su vez, despolitizará el manejo del sistema, mejorará el rendimiento operacional, la utilización de la adquisición competitiva, el manejo y el mantenimiento del sistema de T&D y las instalaciones de generación, lo cual producirá mejoras tangibles en la calidad general del servicio y la asequibilidad. Las operaciones del sistema de T&D por parte de LUMA y, eventualmente, de los activos de generación por parte de un operador de generación, deben permanecer libres del control de la AEE, sujetos solo a la supervisión contractual de la AAPP y a la supervisión reglamentaria del NEPR.

- **Implementar proyectos de capital con eficacia y eficiencia.** LUMA y los operadores de GenCo están incentivados para establecer los mecanismos y procesos críticos que permitan la ejecución exitosa de los programas de infraestructura de capital esenciales para la transformación efectiva y oportuna del sistema energético y que garanticen que los fondos federales destinados a la modernización de la red y a la mejora de los activos de generación sean bien gastados, lo que a su vez aumentará la resiliencia, la fiabilidad, la sostenibilidad y la eficiencia de la red, y recuperará y mitigará las deficiencias de alto riesgo. Por ejemplo, las actividades de remediación y mitigación de la red de T&D[41] incluidas en el Plan de Remediación del Sistema, tal como lo exige el AOM para T&D, mejorarán la calidad del servicio y lograrán que el sistema energético de Puerto Rico esté al mismo nivel que el de empresas de servicios públicos similares en lo que respecta a confiabilidad y seguridad.[42]

- **Permitir la generación y transmisión de energías renovables.** LUMA, como operador del sistema de T&D, está ayudando a la integración de la red y el despacho de energías renovables, permitiendo la transición a un sector energético limpio, fiable y sostenible. Esto incluye el manejo de programas de energía renovable, la modernización del sistema de T&D y la programación y despacho de la generación de energías renovables. Estos esfuerzos son necesarios para cumplir con las metas establecidas por la Ley Núm. 17 de 2019, que ordena que Puerto Rico obtenga el 40% de su electricidad a partir de recursos renovables para el 2025, el 60% para el 2040 y el 100% para el 2050.

### 3.3.2 *Estructura futura del sistema energético y de la AEE, así como sus funciones y responsabilidades*

La Ley Núm. 17 de 2019 exige una "transición del monopolio verticalmente integrado existente en la AEE a un sistema energético con múltiples actores, además de cambios en las funciones y

---

[41] La reconstrucción de la infraestructura de la red de la AEE también será informada y guiada según el Plan de Infraestructura a 10 años que la AEE presentó ante FEMA en diciembre de 2020 y que fue actualizado en marzo de 2021, como parte del acuerdo global con FEMA para reconstruir la infraestructura energética de la isla. La reconstrucción también se guiará por la actualización de marzo de 2022 del Plan de 90 días de la AEE-LUMA, identificación del expediente: NEPR-MI-2021-0002

[42] SRP presentado el viernes 16 de abril de 2021, identificación del expediente: NEPR-MI-2020-0019, RFI-LUMA-MI-20-0019-210406-PREB-004

responsabilidades que han estado concentradas históricamente en la AEE y su redistribución entre distintos organismos". En consonancia con dichas prácticas clave en materia de energía descritas en el AOM para T&D, la AEE ha transferido las funciones y responsabilidades diarias sobre la operación del sistema de T&D y prevé transferir la operación y el mantenimiento de sus sistemas de generación, incluidos el despliegue de inversiones de capital financiadas con fondos federales y no federales y la planificación del sistema a corto, mediano y largo plazo. La Gráfica 16 proporciona una visión general del estado actual y futuro del sector energético de Puerto Rico.

GRÁFICA 16: TRANSFORMACIÓN DEL SECTOR ENERGÉTICO: ESTADO ACTUAL Y FUTURO





La AEE ha trabajado y coordinado con la AAPP para desarrollar un plan de reorganización que cumpla con las políticas energéticas del Gobierno de Puerto Rico y para atender sus obligaciones en virtud del AOM para T&D. La AEE actualmente está elaborando el plan de reorganización requerido y lo presentará al NEPR para su aprobación.

El AOM para T&D establece o confirma determinados derechos y responsabilidades de la AEE como propietario y de la AAPP como administrador, entre los que se incluye la exigencia de que la AEE o su sucesor: (1) cumpla con las leyes aplicables; (2) colabore con LUMA en sus esfuerzos por obtener y lograr la aprobación de cualquier organismo gubernamental; (3) formalice y entable juicios de expropiación forzosa; (4) se ocupe de los asuntos legales de la AEE, y (5) en coordinación con la AAPP, y cuando ello no suponga una duplicación de esfuerzos, audite el cumplimiento de LUMA de los requisitos de financiamiento federal.

Además, el AOM para T&D requiere que "[d]esde y después de la fecha de inicio del servicio, y en todo momento durante la vigencia [del AOM para T&D], [la AEE o su sucesor] y la [AAPP], incluyendo cualquiera de sus subcontratos, mantengan la dotación de personal en relación con los servicios de O&M [T&D] solo a los niveles estrictamente necesarios para que [la AEE] y [la AAPP] cumplan oportuna y eficientemente con sus obligaciones bajo [el] [AOM para T&D]".[43]

---

43   AOM para T&D en la Sección 6.4.

Basado en lo anterior, la AEE ha desarrollado y está implementando una reorganización de la estructura organizacional de la AEE, consistente con el AOM para T&D y la Ley Núm. 17 de 2019.

La Gráfica 17 y la Gráfica 18 incluyen un resumen de la estructura de la AEE antes y después de la reorganización, respectivamente. La Gráfica 18 refleja la estructura provisional antes de la creación de GridCo y HoldCo como entidades distintas y separadas, así como la creación de HydroCo y PropertyCo. A lo largo del tiempo, la AEE debe establecer una entidad GridCo que abarque solo las funciones y responsabilidades del sistema de T&D transferidas a LUMA. Cualquier otra operación adicional de la AEE se englobará dentro de HoldCo, o dentro de las demás subsidiarias restantes.

GRÁFICA 17: ESTRUCTURA ACTUAL DE LA AEE



GRÁFICA 18: ESTRUCTURA FUTURA DE LA AEE



### 3.3.3 *Transición de los activos de T&D a un operador privado*

El 22 de junio de 2020, LUMA ejecutó el AOM para T&D e inició la transición para convertirse en el operador privado de los activos del sistema de T&D de la AEE. Este acuerdo fue el resultado de un proceso competitivo dirigido por la AAPP. Tras la selección, LUMA y la AEE se embarcaron en el proceso de transición inicial requerido por el AOM para T&D, a fin de garantizar la transición de responsabilidades. La finalización de este proceso se produjo el 31 de mayo de 2021, y el inicio de la prestación de servicios de LUMA comenzó el 1 de junio de 2021.

Las siguientes secciones ofrecen un resumen de la transición del sistema de T&D a LUMA.

### 3.3.3.1. Proceso de transformación

La AAPP llevó a cabo el proceso de SP para seleccionar un proveedor de servicios de O&M cualificado para el sistema de T&D. El proceso cumplió con una serie de procedimientos de licitación y evaluación objetivos y transparentes. La evaluación de las licitaciones elegibles se realizó de conformidad con las exigencias legales del estatuto de la APP, la Ley Núm. 29 de 2009, según enmendada, y estuvo a cargo del Comité de Alianza de la AAPP, establecido por la AAPP en virtud de la Sección 5 de la Ley para Transformar el Sistema Eléctrico de Puerto Rico, la Ley Núm. 120 de 2018, según enmendada.

El 15 de mayo de 2020, el Comité de Alianza recomendó a la Junta de Directores de la AAPP que el contrato para el manejo, operación, mantenimiento, reparación, restauración y reemplazo del sistema eléctrico de T&D de Puerto Rico fuera asignado a LUMA.[44]

El 22 de junio de 2020, se anunció a LUMA como el proveedor de servicios de O&M para el sistema de T&D elegido, luego de la aprobación de la Junta de la AAPP, la Junta de Supervisión, la Junta de Gobierno de la AEE, el NEPR y el gobernador. Posteriormente, se firmó el AOM para T&D entre la AEE, la AAPP y LUMA, que fue aprobado por la Junta de Supervisión y que permite el comienzo del periodo de transición inicial contemplado en el acuerdo (Gráfica 19).

GRÁFICA 19: PRINCIPALES METAS CRUCIALES EN EL PROCESO DE TRANSICIÓN DEL OPERADOR DE T&D



Principales metas cruciales en el proceso de transición del operador de T&D

De acuerdo con el AOM para T&D, las responsabilidades de supervisión y cumplimiento de los contratos son, y para mantener la independencia de LUMA deben volver a ser, responsabilidad

---

[44]   LUMA es una entidad formada por ATCO Ltd. y Quanta Services Inc. https://www.atco.com/en-ca/about-us/news/2020/122897-atco-and-quanta-form-luma-to-transform-puerto-rico-s-electricity.html.

permanente del NEPR y de la AAPP, cada una dentro de sus respectivas áreas de autoridad y responsabilidad según la ley y las disposiciones contractuales aplicables. La Junta de Supervisión continuará su función de supervisión de la AEE mientras siga siendo una agencia territorial cubierta bajo PROMESA. Esta función incluye la certificación de los Planes Fiscales y Presupuestos Certificados de la AEE, y el ajuste de las deudas y pasivos de la AEE en su caso del Título III. Se incluye más información sobre la situación reglamentaria del sistema energético de Puerto Rico en el Capítulo 10 (Estructura legal y reg).

### 3.3.3.2. Resumen del AOM para T&D de LUMA

El AOM para T&D se celebró entre LUMA, la AEE y la AAPP. De conformidad con el AOM para T&D, LUMA deberá brindar servicios de O&M relacionados con el sistema de T&D por un término mínimo de 15 años. Se prefirió una estructura de O&M en lugar de una venta o concesión de los activos de T&D porque dichos activos siguen siendo propiedad de la AEE y, por lo tanto, permite a la AEE y al Gobierno mantener el acceso y la elegibilidad de los fondos federales para la reconstrucción y modernización de la red eléctrica después de los huracanes Irma y María, y cualquier desastre natural futuro que pueda causar daños a dicha infraestructura.

El AOM para T&D describe los requisitos, las responsabilidades, los costos y las metas cruciales para la transición de la operación del sistema de T&D por parte de LUMA. Estas diversas partidas se establecen a efectos del periodo de transición inicial, el periodo provisional, los servicios de O&M y el periodo de transición final. La siguiente sección incluye un resumen de los elementos clave contemplados en el AOM para T&D:

### a. Transición inicial

La finalidad del plan de transición inicial era garantizar el traspaso ordenado a LUMA de la responsabilidad sobre el manejo, operación, mantenimiento, reparación, restauración y reemplazo del sistema de T&D, de conformidad con la meta establecida para la fecha de comienzo de los servicios. El periodo de transición inicial comenzó el 22 de junio de 2020 y concluyó el 31 de mayo de 2021, momento en el que LUMA asumió la responsabilidad de la operación y el mantenimiento del sistema de T&D bajo un " periodo provisional" mientras la AEE contempla su caso del Título III, a partir del cual comenzará el término completo de 15 años del AOM para T&D.

Durante la transición inicial, LUMA, la AEE y la AAPP trabajaron conjuntamente en las actividades creadas para garantizar la transición ordenada a LUMA. Dichas actividades incluyeron, entre otras cosas, las siguientes:

- Desarrollo e implementación de planes para hacerse cargo de las operaciones
- Desarrollo y aprobación de planes de remediación del sistema
- Evaluación de instalaciones de servicio al cliente, activos, políticas y procedimientos
- Elaboración de planes de comunicación de tecnología de la información (IT)/tecnología operacional (OT), análisis de brechas, seguridad cibernética y planes de continuidad de negocio
- Introducción de cambios en los procesos de control, implementación de un sistema de contabilidad financiera y una estructura de cuentas, preparación de proyecciones y presupuestos iniciales
- Implementación de un marco de gobierno y de políticas y procedimientos relacionados con los fondos federales, y
- Elaboración de planes de transición final

Durante el periodo de transición inicial, y de conformidad con los términos del AOM para T&D, la AEE le pagó a LUMA una tasa de servicios de transición inicial y gastos reembolsables, tal como aparecen en la Gráfica 20.

### b. Acuerdo Suplementario y periodo provisional

El AOM para T&D estableció como condición previa para que LUMA asumiera las responsabilidades de operación y mantenimiento del sistema de T&D que la AEE completara su proceso de reestructuración de la deuda y existiera el Título III de PROMESA. En vista de que la AEE no podría salir del Título III para la fecha esperada de inicio del servicio (1 de junio de 2021) propuesta por LUMA, la Junta de Supervisión solicitó que LUMA, la AEE y la AAPP entablaran negociaciones con el propósito de que LUMA comenzara a prestar servicios de O&M antes de la salida de la AEE del Título III. Como resultado, la AEE, LUMA y la AAPP negociaron y ejecutaron un Acuerdo Suplementario al AOM para T&D, que preveía un periodo de servicio provisional de 18 meses bajo el cual LUMA podría comenzar a prestar servicios de T&D mientras el caso del Título III de la AEE seguía pendiente. El periodo de servicio provisional es independiente del término de servicio de 15 años que se señala en el AOM para T&D, que comenzaría en la fecha en que se logre la salida de la AEE del Título III.

### c. Servicios de O&M para el sistema de T&D

Después de haber logrado las metas cruciales contractuales para la transición de las operaciones de T&D, las responsabilidades de los aspectos de operación y mantenimiento del sistema de T&D de la AEE, incluyendo la facturación y otras funciones de servicio al cliente, fueron transferidas a LUMA durante el periodo provisional establecido en el Acuerdo Suplementario al AOM para T&D. Estos servicios y responsabilidades incluyen las operaciones diarias y el mantenimiento del sistema de T&D, los sistemas a largo plazo y la planificación de recursos, el despacho de la generación, el manejo de activos, la administración y el mantenimiento, las relaciones con la comunidad y los medios de comunicación, la presentación de informes y el mantenimiento de registros, las finanzas y la contabilidad, y la supervisión y ejecución de proyectos financiados por el Gobierno Federal, entre otros especificados en el Alcance de los servicios de AOM. Además, la respuesta ante emergencias, los informes de interrupciones y las conexiones también serán responsabilidad de LUMA como operador del sistema de T&D.

Por lo tanto, según el AOM para T&D, el alcance de los servicios de LUMA es el siguiente:[45]

1. **Servicios de operación del sistema de T&D:** Responsable de todas las actividades de transmisión eléctrica, distribución, carga y demás actividades relacionadas con la operación y el mantenimiento del sistema de T&D de forma segura y confiable. Estos servicios incluyen actividades del operador del sistema, tareas de ingeniería, mantenimiento de documentación técnica, actividades de eficiencia energética, planificación, medio ambiente y regulación, servicios legales, seguros y reclamaciones, cobro de facturas a los clientes de la AEE y demás actividades.

2. **Servicios de mantenimiento y manejo de activos:** Responsable de manejar y mantener todos los activos del sistema de T&D, incluyendo la maquinaria, los equipos, las estructuras, las mejoras y las evaluaciones de la condición de los componentes del sistema eléctrico. Estos servicios incluyen control de inventario, manejo de la flota y recarga de combustible, equipos

---

[45]  Apéndice I del AOM para T&D

y sistemas necesarios, tecnología de la información, alumbrado público e interconexión de generadores.

3. **Servicios de mejora continua:** Responsable de desarrollar y administrar tareas de investigación y desarrollo para aumentar la eficiencia y la eficacia operacionales mediante la implementación y la puesta en práctica de un programa de mejora continua creado para aumentar el rendimiento de LUMA y controlar los avances en el sector y los cambios tecnológicos.

4. **Relaciones con el Gobierno, la comunidad y los medios:** Responsable de las comunicaciones con los clientes y los funcionarios públicos; de coordinar y mantener comunicaciones con organizaciones y representantes locales, estatales y federales; de mantener relaciones con la comunidad y los medios; y de estar en contacto con los clientes.

5. **Pruebas, informes y registros:** Responsable de preparar el informe mensual sobre las operaciones, generar y entregar a la AAPP la información solicitada, y desarrollar y mantener un programa integral de manejo de documentos.

6. **Servicios reglamentarios, financieros y contables:** Responsable de los procedimientos reglamentarios, las finanzas, la contabilidad, los presupuestos, las proyecciones financieras a largo plazo y las operaciones de tesorería relacionadas con el sistema de T&D.

7. **Salud, seguridad, medio ambiente y calidad:** Responsable de garantizar que todo el sistema cumpla con los programas de seguridad estandarizados para evitar y reducir el riesgo de que haya lesiones en el lugar de trabajo por medio de actividades de identificación y reducción de peligros.

8. **Respuesta ante emergencias:** Responsable de aplicar restricciones y cierres, implementar el plan de respuesta ante emergencias que se ocupa de la recuperación ante desastres, la restauración y la respuesta cuando hay una emergencia, y llevar a cabo todas las tareas necesarias de continuidad de negocio, elaboración de informes y comunicaciones relacionados con el sistema de T&D.

9. **Mantenimiento:** Responsable de todas las tareas habituales de mantenimiento en todos los elementos que componen el sistema de T&D, incluida la maquinaria, las estructuras, las mejoras y los componentes del sistema eléctrico, a fin de mantener el sistema de T&D en buen estado de funcionamiento.

10. **Servicio al cliente:** Responsable de contar con personal que se dedique a ayudar a los clientes, ofrecer líneas directas gratuitas de atención al cliente, crear y mantener un sitio web para quejas y consultas de los clientes, realizar una campaña de educación y divulgación pública, garantizar la satisfacción del cliente y ocuparse de servicios relacionados con los contadores, incluyendo su reparación y reemplazo.

11. **Fondos federales:** Responsable (junto con la AEE y la AAPP) de elaborar un manual para la obtención de fondos federales[46] (sujeto a la aprobación de COR3, FEMA y la OIG del DHS),[47] garantizar que se cumpla con los requisitos de financiamiento federal de los contratos que involucran fondos federales, garantizar que se cumpla con la ley, la norma y la política aplicable en cualquier tarea financiada con fondos federales,[48] y desempeñarse como agente

---

[46] Presentado el 21 de enero de 2022. Moción en cumplimiento de la Resolución y Orden del 21 de enero de 2022 y presentación de las respuestas a las solicitudes sobre el Manual de Contratación de LUMA, Caso nº. NEPR-MI-2021-0004, 25 de febrero de 2022.

[47] Sección 4.5 j del AOM para T&D

[48] Sección 5.9 c del AOM para T&D

de la AEE (previo consentimiento por escrito de la AEE y la AAPP) en relación con cualquier
pedido de fondos federales relacionado con el sistema de T&D.[49]

### d. Cargos por servicio

De acuerdo con el AOM para T&D, la AEE pagó una compensación a LUMA durante la transición
inicial. Además, la AEE paga actualmente a LUMA por los servicios de O&M de T&D con base en
la estructura de tarifas mostrada en la Gráfica 20 durante el  periodo provisional. Aparte del
componente de la tarifa fija, LUMA tendrá derecho a recibir la tarifa de incentivo por los servicios
de O&M si es capaz de alcanzar o superar las métricas de rendimiento señaladas en el AOM para
T&D,[50] tal y como apruebe el NEPR una vez que el regulador emita una orden final sobre las
métricas para juzgar el rendimiento. Plan Fiscal Certificado

GRÁFICA 20: CARGOS DEL AOM PARA T&D POR PERIODOS CONTRACTUALES[51]



| Estructura de compensación | Transición inicial (FET) | Periodo provisional Operaciones conforme al Título III *Cargos anuales* | Plazo inicial (15 años) *Cargos anuales* | Transición final (BET)[1] |
|---|---|---|---|---|
| **Tarifa fija** Pagadero en cuotas mensuales de una doceava parte del cargo total | $60 millones *Cargo único* | $115 millones | $70 millones (Año 1) $90 millones (Año 2) $100 millones (Año 3) $105 millones (Año 4 en adelante) | Ninguno |
| **Tarifa de incentivo** Límite anual; la elegibilidad dependerá de la capacidad para lograr o superar las métricas de rendimiento. | Ninguno | | $13 millones (Año 1) $17 millones (Año 2) $19 millones (Año 3) $20 millones (Año 4 en adelante) | Ninguno |
| **Reembolso de costos** Facturado todos los meses de acuerdo con las horas laborales y los gastos razonables y documentados | Costos asociados con la provisión de servicios de FET: • Horas y costos laborales totalmente asignados • Gastos incurridos razonables y documentados | Ninguno | Ninguno | Costos asociados con la provisión de servicios de BET: • Horas y costos laborales totalmente asignados más un 10% adicional sobre los costos laborales totales • Gastos incurridos razonables y documentados |

1 Servicios de transición necesarios para completar el traspaso de los servicios de O&M de vuelta al Dueño o a otro operador posterior cuando el plazo caduque o termine de forma temprana

### e. Acuerdo de Servicios Compartidos

Antes de que la AEE transfiera GenCo y las funciones operacionales, administrativas y/o de
mantenimiento asociadas a uno o más operadores privados, el AOM para T&D contempló la
posibilidad de que GenCo necesitara determinados servicios administrativos y de otro tipo que
eran históricamente brindados por la AEE. Como tal, el AOM para T&D dispone que para asegurar
la continuidad de las operaciones de GenCo, LUMA, en calidad de agente de la AEE, proveerá
ciertos servicios (los "Servicios Compartidos") a la AEE. Para ello, la AEE y LUMA firmaron un
Acuerdo de Servicios Compartidos que establece los servicios que LUMA prestará durante el
tiempo previo a la transferencia de GenCo a uno o más operadores privados, y por un término no
superior a tres años a partir de su fecha de entrada en vigor, a menos que las partes lo prorroguen
por común acuerdo. El Acuerdo de Servicios Compartidos negociado incluye los servicios
operacionales, financieros, contables y de IT. De acuerdo con el AOM para T&D, los servicios
compartidos prestados por LUMA deben proporcionarse al costo. En otras palabras, LUMA no
obtiene un margen de beneficio o una ganancia. La cantidad y el alcance exactos de los servicios

---

49  Sección 5.9 e del AOM para T&D
50  Las métricas oficiales de rendimiento están sujetas a la aprobación del NEPR
51  Todas las cifras son en dólares de 2020 que se ajustarán por inflación cada año.

compartidos brindados, así como la compensación por dichos servicios, se detalla en el Acuerdo de Servicios Compartidos que fue ejecutado por la AEE y LUMA el 1 de junio de 2021.[52]

### f.   Transición final

Para garantizar una transición ordenada y estructurada de los servicios de T&D a favor del Gobierno o de un operador sucesor en el futuro, el AOM para T&D exige un plan detallado de transición final, que se actualizará anualmente, y LUMA lo preparó y presentó al NEPR y a la AAPP. Este plan incluye acuerdos razonables para la contratación de empleados de LUMA por parte del Gobierno de Puerto Rico o de un operador sucesor, el procesamiento de los costos de despido asociados con los empleados de LUMA que no sean contratados por un operador sucesor, y la transición y entrega de los servicios de O&M de T&D a favor del Gobierno de Puerto Rico o de un operador sucesor.

### g.   Impacto de la transformación en los empleados actuales de la AEE

Existen requisitos legales que rigen el tratamiento de los empleados anteriores de la AEE para protegerlos y garantizarles seguridad laboral durante la transformación. Estas disposiciones están incluidas en la Ley Núm. 120 de 2018, según enmendada por la Ley Núm. 17 de 2019, y establecen medidas de protección para el empleo actual y ciertos beneficios de retiro y derechos adquiridos aplicables para los empleados de la AEE. La Ley Núm. 120 de 2018 establece que los empleados regulares de la AEE tendrán empleo en LUMA (o en cualquier otro operador elegido mediante un proceso de la AAPP), en la AEE (siempre que el puesto en cuestión exista y sea necesario para que la AEE cumpla con sus obligaciones) o en el Gobierno de Puerto Rico, tal como lo estipula la Oficina de Administración y Transformación de los Recursos Humanos del Gobierno de Puerto Rico (OATRH).

De conformidad con la Ley Núm. 120 de 2018, la OATRH y la Oficina de Gerencia y Presupuesto de Puerto Rico (OMB) identificaron puestos vacantes en el Gobierno Central de Puerto Rico para garantizar que haya puestos de trabajo disponibles para todos los empleados de la AEE que quieran seguir trabajando en el Gobierno. Con esa finalidad, en abril de 2021, la AEE y la OATRH enviaron más de 4,000 avisos de traslado a empleados de la AEE. Por medio de los avisos de traslado, se informó a los empleados de la AEE, de acuerdo con la Ley Núm. 8 de 2017 y la Ley Núm. 120 de 2018, la agencia u organismo empleador sustituto del Gobierno de Puerto Rico para su empleo antes del 1 de junio de 2021 (a menos que acepten puestos en LUMA). Tras la fecha límite del 1 de junio de 2021, se estima que aproximadamente 2,900 empleados de la AEE ocuparon puestos en el Gobierno de Puerto Rico.

Además de tener la oportunidad de seguir trabajando para el Gobierno de Puerto Rico, los empleados tenían la opción de abandonar el servicio público y participar en un programa de transición voluntaria (PTV). La Junta de Supervisión aprobó la propuesta del Gobierno de emitir un PTV para los empleados de la AEE que no son de generación, con la enmienda del año fiscal 2021 de la AEE.

3.3.3.3. Manejo del desempeño y los objetivos de LUMA

Tal y como se contemplaba en los Presupuestos Iniciales de LUMA, esta completó la transición y la implementación del manejo y la operación del sistema de T&D manteniendo la máxima

---

[52]   Acuerdo de Servicios Compartidos, con fecha del 1 de junio de 2021 entre la Autoridad de Energía Eléctrica de Puerto Rico como responsable, la Autoridad para las Alianzas Público Privadas de Puerto Rico como administradora y LUMA Energy, LLC como ManagementCo y LUMA Energy SERVCO, LLC

continuidad del negocio. LUMA, como operador del sistema de T&D, aplicará nuevas políticas, procedimientos y planes (incluyendo el Plan de Respuesta ante Emergencias, el Plan de Manejo de la Vegetación y el Plan de Seguridad, entre otros) que mejorarán el estado y la operación efectiva del sistema de T&D, su confiabilidad y el servicio a los clientes de la AEE. Las actividades más importantes durante los próximos tres años de las operaciones de LUMA incluyen lo siguiente:

- **Operaciones**

  o   Continuar con el desarrollo y la puesta en marcha de nuevos métodos de trabajo y comunicar a las brigadas las normas de ingeniería, las nuevas metodologías y las prácticas de la industria, proporcionar los servicios seguros y fiables requeridos de forma continua a los clientes, y

  o   Optimizar el trabajo de las subestaciones y las líneas y el manejo de los materiales, la flota y la vegetación.

- **Servicio al cliente**

  o   Continuar proporcionando una comunicación profesional, cortés y receptiva al atender las necesidades de los clientes,

  o   Seguir expandiendo las personalizaciones del sistema y mejorar la atención al cliente y el sistema de facturación (incluida la instalación de sistemas de contadores eficaces que faciliten la facturación del consumo real frente al estimado), y

  o   Desarrollar informes sólidos en tiempo real e históricos para fundamentar las decisiones basadas en datos.

- **Transformación de los servicios públicos:** Proporcionar el marco técnico y programático necesario para prestar un servicio seguro y fiable a los clientes, que incluye:

  o   Finalizar los planes del NEPR relacionados con la eficiencia energética, la respuesta a la demanda y los vehículos eléctricos,

  o   Colaborar con el Departamento de Energía de los EE.UU. y los laboratorios nacionales, junto con la AEE y el Gobierno de Puerto Rico, en el Estudio de resiliencia de la red eléctrica de Puerto Rico y la transición a energía 100% renovable (PR100),

  o   Continuar evaluando y aplicando iniciativas clave que incluyan el establecimiento de estándares mejorados de T&D, la preparación de estudios de planificación, evaluaciones de campo y documentales y el despliegue de la automatización de la distribución, y

  o   Seguir implementando el sistema de manejo de proyectos para los programas de mejoras capitales.

- **Servicios de apoyo**: Mejorar las funciones necesarias para la gestión y el apoyo de los activos del sistema de T&D, lo que incluye seguir construyendo una cultura que dé prioridad a la seguridad, continuar desarrollando e implementando un marco general

de IT/OT y perfeccionar los procedimientos y procesos de los sistemas para las funciones que incluyen finanzas, regulación y recursos humanos.

De acuerdo con sus obligaciones en virtud del AOM para T&D y con las directivas del NEPR (concretamente las establecidas en la Resolución y Orden del 20 de noviembre de 2020, en el caso por el NEPR-MI-2020-0008 del NEPR), LUMA comenzó la ejecución de los trabajos de T&D financiados por FEMA, incluidos los trabajos de planificación e ingeniería crítica de los principales proyectos iniciales.

A través de las actividades y prioridades expuestas en este capítulo, así como el Capítulo 7 y Capítulo 8, LUMA debe perseguir los siguientes objetivos, que se explican con más detalle y se vinculan a métricas de rendimiento[53] específicas en la T a continuación:

- Priorizar la seguridad

- Mejorar la satisfacción del cliente

- Lograr la reconstrucción y resiliencia del sistema

- Perseguir la excelencia operacional, y

- Priorizar la transformación energética sostenible

TABLA 3: OBJETIVOS Y METAS DETALLADOS[54]

| Meta | Objetivo | Métrica de rendimiento |
|------|----------|------------------------|
| Priorizar la seguridad | <ul><li>Promover un lugar de trabajo seguro. Implementar procedimientos, controles y programas de capacitación; aumentar los equipos de protección personal (EPP) y la conciencia.</li><li>Implementar prácticas de seguridad pública eficaces. Reducir la exposición pública a riesgos de seguridad.</li></ul> | <ul><li>Tasa de incidentes registrables de la OSHA</li><li>Tasa de mortalidad de la OSHA</li><li>Tasa de días perdidos de la OSHA</li><li>Tasa de DART de la OSHA</li></ul> |
| Mejorar la satisfacción del cliente | <ul><li>Ofrecerles a los clientes una experiencia positiva. Mejorar la calidad del servicio al cliente, la accesibilidad y la confiabilidad.</li><li>Aumentar la confiabilidad del servicio. Reducir la frecuencia y la duración de las interrupciones del servicio eléctrico de los clientes.</li><li>Proporcionar electricidad a precios razonables. Reducir los costos operacionales, las pérdidas técnicas y no técnicas en la línea, y los días de ventas pendientes de cobro y las cancelaciones.</li></ul> | <ul><li>Cliente de J.D. Power Encuesta de satisfacción - Clientes residenciales</li><li>Cliente de J.D. Power Encuesta de satisfacción - Clientes comerciales</li><li>Velocidad promedio de respuesta</li><li>Índice de quejas de los clientes</li><li>Tasa de abandono</li><li>Índice de la frecuencia promedio de las interrupciones del sistema (SAIFI)</li><li>Índice de la duración promedio de interrupción del sistema (SAIDI)</li></ul> |

---

[53]   Las métricas de rendimiento están sujetas a la aprobación por parte del NEPR.

[54]   Presupuesto Inicial de LUMA, actualización de febrero de 2021, p. 510, Apéndice E

| | | |
|---|---|---|
| Reconstrucción y resiliencia del sistema | ▪ Utilizar los fondos federales con eficacia. Garantizar una administración eficiente de los fondos, de conformidad con las directrices de FEMA sobre los reembolsos.<br>▪ Restaurar/reconstruir la infraestructura de red dañada. Centrarse primero en las cargas críticas, la infraestructura gravemente averiada y los servicios esenciales vulnerables.<br>▪ Mejorar la resiliencia de la infraestructura vulnerable. Identificar y evaluar la infraestructura y los sistemas por cuestiones de vulnerabilidad y salud para centrar la inversión a corto plazo | ▪ Presupuesto de capital - con financiamiento federal<br>▪ Inspecciones en las líneas de distribución y correcciones específicas<br>▪ Inspecciones en las líneas de transmisión y correcciones específicas<br>▪ Inspecciones de subestaciones de T&D y correcciones específicas |
| Excelencia operacional | ▪ Permitir la administración sistemática del negocio. Mejorar los procesos y sistemas de información para permitir una administración eficiente, sistemática y basada en datos.<br>▪ Perseguir la excelencia en la realización de proyectos. Mejorar la ejecución de los proyectos de capital (término, presupuesto, alcance) y controlar minuciosamente los riesgos.<br>▪ Permitir que los empleados ejecuten las operaciones del negocio de forma sistemática. Aumentar la eficacia de los empleados (compromiso, productividad) y el aprendizaje (rapidez de adaptación, mejora del rendimiento) | ▪ Presupuesto operacional<br>▪ Presupuesto de capital - sin financiamiento federal<br>▪ Horas extras<br>▪ Días de ventas pendientes de cobro - Clientes generales<br>▪ Días de ventas pendientes de cobro - Clientes del Gobierno |
| Transformación energética sostenible | ▪ Modernizar la red. Incorporar tecnologías de red inteligentes en los esfuerzos de reconstrucción, aumentar la capacidad de alojamiento, reducir los eventos de relevo de carga, aumentar el uso de AMI y nuevas interconexiones de fuente de energía distribuida (DER).<br>▪ Permitir la transformación digital, actualizar la capacidad de IT/OT, mejorar la capacidad de seguridad cibernética, reemplazar todos los dispositivos que llegaron al final de su vida útil y actualizar el software para manejar el sistema de T&D y el despacho económico.<br>▪ Permitir la transformación energética sostenible. Garantizar la reconstrucción de la infraestructura del sistema para permitir una mayor incorporación de recursos de distribución intermitentes, aumentar la | |

|  | introducción de recursos de energía renovable y almacenamiento en baterías, reducir el consumo mediante programas de respuesta a la demanda y eficiencia energética |  |
|---|---|---|

LUMA tradujo sus prioridades y actividades en un conjunto de carteras de mejoras tangibles, que se describen con más detalle en el Capítulo 7 (Carteras de mejoras de LUMA). Como resultado de sus programas de mejoras, LUMA debe trabajar para conseguir las mejoras proyectadas en las métricas de rendimiento[55] que se muestran en la Tabla 3.

TABLA 3: MEJORAS ACUMULATIVAS[56] EN LAS MÉTRICAS DE RENDIMIENTO PROYECTADAS POR LUMA

| Métrica de rendimiento[57] | Año fiscal 2022 | Año fiscal 2023 | Año fiscal 2024 |
|---|---|---|---|
| Servicio al cliente | 11% | 26% | 31% |
| Seguridad | 22% | 36% | 48% |
| Índice de la frecuencia promedio de las interrupciones del sistema (SAIFI) | 7% | 20% | 30% |
| Índice de la duración promedio de interrupción del sistema (SAIDI) | 10% | 25% | 40% |

De acuerdo con la eficacia y el estado histórico de las operaciones de la red de la AEE, LUMA es consciente de los desafíos que tiene por delante; por eso, concentra sus esfuerzos en factores de éxito clave para mitigarlos, entre ellos se encuentran los siguientes:

1. Seguridad en primer lugar;
2. Toma de decisiones basada en datos;
3. Liderazgo con soluciones; y
4. Forma transparente y colaborativa de tomar decisiones.

Los riesgos de la transformación del sistema de T&D se analizan en detalle en las presentaciones reglamentarias de LUMA ante el NEPR. Específicamente, los Informes breves del programa presentados por LUMA relativos a los Presupuestos Iniciales y el SRP explican los riesgos de la inacción en la Sección 2.6 del SRP: Riesgos del programa.

### 3.3.4 *Transición de los activos de generación existentes a un operador privado*

Al igual que el sistema de T&D, el sistema de suministro de electricidad de Puerto Rico se encuentra en plena transición, ya que ha pasado de ser una entidad operada y mantenida por el sector público a un sistema de generación de propiedad y operación privada.  Esta transición será fundamental para impulsar la eficiencia y la productividad de la generación, así como el cumplimiento de las normas medioambientales, lo que se proyecta que tenga las siguientes consecuencias:

1. Mejor confiabilidad de los servicios

---

[55]  Plan de Remediación del Sistema, identificación del expediente: NERPPREB NEPR-MI-2020-0019; RFI-LUMA-MI-20-0019-210406-PREB-006, presentado el 16 de abril de 2021

[56]  Se muestran las mejoras acumulativas

[57]  Sujeto al proceso reglamentario y la aprobación del NEPR

2. Mejor calidad del suministro de electricidad
3. Cumplimiento de las normas de medio ambiente y sostenibilidad

Para ello, la operación y el mantenimiento de los activos de generación preexistentes de la AEE serán transferidos a uno o más actores privados calificados, mientras esos activos de generación son debidamente desmantelados y retirados, de acuerdo con el PIR y la Ley Núm. 17 de 2019. Para mejorar la flexibilidad, la confiabilidad, la resiliencia, la eficacia y la sostenibilidad del suministro eléctrico de Puerto Rico, la transformación de la flota generatriz incluirá lo siguiente:

1. **Transición de la operación y el mantenimiento de los activos de generación existentes de la AEE a uno o más operadores privados:** El operador privado será responsable de operar y mantener correctamente los activos de la AEE por medio de un Acuerdo de operación y mantenimiento de GenCo, similar al AOM para T&D, hasta que se retiren y reemplacen las unidades de generación existentes por recursos de generación nuevos y más eficientes que cumplan con todos los requisitos. Se espera que los activos de generación de la AEE ofrezcan mayor confiabilidad y eficiencia durante lo que resta del periodo de operación bajo la administración de operadores locales, que actualmente consigue la AAPP mediante un proceso competitivo.

2. **Reemplazo y modernización de la flota generatriz existente:** La flota generatriz antigua, ineficiente y poco confiable que posee Puerto Rico debe ser reemplazada y modernizada con urgencia a fin de reducir las interrupciones y los costos de generación y cumplir con los reglamentos ambientales. La hoja de ruta para esta modernización está en el PIR aprobado por el NEPR, donde se describen las medidas y las inversiones en nueva generación que deben efectuarse para reducir los costos de generación y lograr mayor confiabilidad y resiliencia. Estas inversiones incluyen aumentar la porción de generación de energía renovable por medio de un proceso de adquisición competitivo para que la nueva capacidad de generación, que cumple con los requisitos que corresponden, se obtenga mediante acuerdos de compra de energía. Este proceso evitará depender tanto de los combustibles fósiles y de su inestabilidad de precios y encaminará a Puerto Rico hacia el cumplimiento de los estándares de cartera renovable (RPS) contemplados en la Ley Núm. 17 de 2019. Además, el uso y la integración por parte de GridCo de almacenamiento de energía, generación distribuida y tecnologías de minired/microred generarán mayor flexibilidad y confiabilidad.

## 3.2.2.4.1. Proceso para la transición de los activos de generación existentes a un operador privado

Para transformar las operaciones de generación térmica preexistente de la AEE, la AAPP, en cumplimiento de la política pública y según se requiere en el Plan Fiscal Certificado, está liderando un proceso competitivo para identificar, calificar y seleccionar uno o más operadores privados que operen los activos de generación térmica preexistentes de la AEE y eventualmente desmantelen dichos activos, conforme a un AOM similar en estructura al AOM para T&D de LUMA que proveerá una supervisión independiente del operador privado por parte del NEPR y la AAPP. El proceso competitivo tiene un enfoque por fases similar al de la transacción de T&D que incluye, entre otras cosas, lo siguiente:

- Fase I: Preparación de la transacción (completada)
- Fase II: Solicitud de cotización (SC) (completada)
- Fase III: Solicitud de propuesta (SP) (completada)

- o  Preparación de la documentación sobre la SP y revelación a los participantes preseleccionados
- o  Minucioso proceso de debida diligencia de los participantes
- o  Divulgación y negociación de los documentos de la transacción
- o  Presentación de las propuestas (SP) por parte de los participantes
- Fase IV: Selección del proponente seleccionado por el Comité de Alianza de la AAPP (en proceso)
- Fase V: Cierre

## 3.2.2.4.2. Modernización de la flota generatriz existente: nueva capacidad de generación

La nueva capacidad de generación futura tendrá que cumplir con los modernos requisitos operacionales, de eficiencia, medioambientales y de política pública de energías renovables.  Con este objetivo, el NEPR emitió una Orden y Resolución Final sobre el PIR de la AEE en agosto de 2020. Esta Orden y Resolución Final llevó a que la AEE elaborara un Plan de Adquisiciones detallado (con el asesoramiento y la aprobación del NEPR) para recursos de energía renovable y un sistema de almacenamiento de energía en baterías (BESS) con el fin de cumplir con el estándar de cartera renovable (RPS) establecido en la Ley Núm. 82 de 2010, la Ley de Política Pública de Diversificación Energética por Medio de la Energía Renovable Sostenible y Alterna en Puerto Rico. Además del Plan de Adquisiciones, todos los acuerdos para proporcionar capacidad de generación de energía nueva deben negociarse de forma transparente pensando en la máxima flexibilidad y eficiencia para mejorar la capacidad de generación de la isla, en un proceso libre de interferencias políticas ni intereses en determinados sectores, sino en lo necesario para mejorar la capacidad de generación de la isla.

Además, tras meses de retrasos, en febrero de 2021, la AEE publicó el primer tramo (tramo 1) de una serie de SP para la provisión de energía renovable en apoyo a los objetivos de los RPS de la Ley Núm. 17, y para el sistema de almacenamiento de energía en baterías en apoyo de los requisitos de capacidad necesarios para satisfacer las necesidades de carga máxima de la AEE y los requisitos de integración para la generación de energía renovable. La orientación para los tramos de la SP de energía renovable y de almacenamiento de energía, así como el calendario de instalación proyectado, figuran en Gráfica 21[58] y la Gráfica 22. El 2 de febrero de 2022, el NEPR aprobó 18 de los PPOA solares recomendados por el Comité de Evaluación para el tramo 1.

En lo que respecta a los tramos adicionales de las SP de energía renovable, el NEPR, y no la AEE, establece el calendario para la publicación de estos tramos y tendrá la responsabilidad principal de ejecutar el proceso de adquisición de la nueva capacidad de generación renovable. La AEE presentó un conjunto completo de documentos de la SP del tramo 2 al NEPR el 29 de octubre de 2021, según la orden del NEPR. El 27 de enero de 2022, el NEPR emitió una resolución y una orden por las que se designaba a un coordinador independiente para gestionar todas las futuras adquisiciones de energía renovable y se describían las funciones y responsabilidades correspondientes del coordinador. Hasta el 6 de mayo de 2022, el NEPR no había emitido ninguna resolución ni orden que estableciera los roles respectivos de la AEE y LUMA en cualquier tramo futuro.

---

[58]  Las cantidades indicadas en los tramos de las SP se pueden ajustar para que se adapten a las instalaciones de generación distribuida (GD) que contribuyen a satisfacer las cantidades totales, así como a otros recursos que la AEE pueda identificar.

GRÁFICA 21: CALENDARIO PROYECTADO DE INSTALACIÓN DE LA CAPACIDAD DE GENERACIÓN RENOVABLE ENCARGADA POR EL NEPR



**Calendario proyectado de instalación de la capacidad de generación renovable encargada por el NEPR,** en MW

En total, con la incorporación de los cinco (5) tramos de las SP restantes,[59] Puerto Rico puede prever la adquisición de 3.75 GW de energía renovable y 1.5 GW de almacenamiento en baterías. Esta adquisición pretende encaminar a Puerto Rico hacia su objetivo de alcanzar el 100% de energía renovable en 2050. Sin embargo, la capacidad real de Puerto Rico para alcanzar los objetivos del RPS de la Ley 17 dependerá del ritmo al que se adquieran los recursos renovables, el calendario para la obtención de permisos y la construcción de esos recursos, la disponibilidad de alternativas de financiamiento razonables, la conveniencia de las condiciones de precios propuestas y los progresos realizados en la mejora del sistema de transmisión y distribución para permitir la integración segura y fiable de los recursos renovables.  La futura mezcla de generación proyectada por la AEE tiene previsto alcanzar el objetivo de los RPS del 100% de generación de energía renovable (es decir, el total de generación de energía renovable como una proporción del total de ventas) para el año fiscal 2050 (Gráfica 23). Sin embargo, como se mencionó anteriormente, el sistema no está actualmente encaminado hacia la consecución de las incorporaciones de energía renovable necesarias para apoyar el cumplimiento del RPS y, en consecuencia, está atrasado en la fecha prevista de retiro de los recursos de generación existentes. LUMA y el NEPR deben poner en marcha, tan pronto como sea posible, un nuevo proceso de PIR con el objetivo de desarrollar un Plan de Acción actualizado que tenga en cuenta las tendencias macroeconómicas y de la industria actuales, así como las condiciones que puedan limitar el cumplimiento del Plan de Acción Modificado vigente, y que ofrezca una perspectiva actualizada de la evolución del sector energético de la isla.

---

[59]  Las SP aceptan todas las formas de energía renovable: solar fotovoltaica, eólica, hidroeléctrica, almacenamiento de energía, centrales eléctricas virtuales (VPP) o cualquier combinación de esas tecnologías.

GRÁFICA 22: PLAN DE ACCIÓN MODIFICADO DEL NEPR PARA EL PIR



GRÁFICA 23: MEZCLA DE GENERACIÓN PROYECTADA



## 3.4   Implementación de la transformación del sector energético de Puerto Rico

Para lograr las proyecciones de ahorro de este Plan Fiscal Certificado, se deben implementar diversas reformas del sector energético de manera inmediata o, de lo contrario, continuar con ellas. Varias de las medidas recomendadas en Planes Fiscales Certificados anteriores han sido completadas y enumeradas en la Gráfica 24.

La Gráfica 25, a su vez, describe las reformas adicionales obligatorias necesarias para garantizar la transformación del sector energético y el cumplimiento de los Planes Fiscales Certificados de la AEE y de Puerto Rico, y para cumplir con las metas de crecimiento e ingresos de este Plan Fiscal Certificado.

GRÁFICA 24: METAS CRUCIALES CUMPLIDAS EN LA REFORMA DEL SECTOR ENERGÉTICO

| Área de enfoque | Acciones a tomar | Parte responsable | Completado |
|---|---|---|---|
| Implementar la reforma reglamentaria | Proporcionar respuesta provisional al Plan Integrado de Recursos (PIR) de la AEE | NEPR | Completado |
| | Eliminar la aprobación del gobierno del ELA necesaria para los nombramientos de personal del NEPR | Gobierno del ELA | Completado |
| | Revisar la legislación constitutiva para proporcionar fondos destinados a la regulación del sector energético que proporciona al regulador un presupuesto anual de $20 millones, en línea con el valor de referencia | Gobierno del ELA | Completado[1] |
| | Nombrar al comisionado del NEPR restante para que desempeñe sus funciones en periodos escalonados de seis años | NEPR | Completado |
| | Aumentar la cantidad de personal del NEPR en línea con los valores de referencia apropiados | NEPR | Completado |
| | Aprobar el PIR | NEPR | Completado |
| | Concluir y publicar un estudio referente a una estructura óptima de CELI y presentar una recomendación al Gobernador y a la Legislatura | NEPR | Completado |
| Transición a operadores privados | Realizar estudios de mercado para recopilar información sobre los intereses y las preocupaciones de las partes interesadas para privatizar los activos de generación | AAPP/Junta de Supervisión | Completado |
| | Seleccionar un proponente cualificado para administrar y operar el sistema de T&D de la AEE | AAPP | Completado |
| | Preparar y presentar una SC para la selección de un proponente para los activos de generación de la AEE | AAPP | Completado |
| | Preparar y presentar una SP para la selección de un proponente para los activos de generación de la AEE | AAPP | Completado |

1 Parcialmente completado. Se adoptó legislación (Ley Núm.17) que proporciona $20 millones en fondos. Sin embargo, los fondos no provenían de una fuente exclusiva; el NEPR deberá confirmar la finalización en un futuro cercano.

GRÁFICA 25: METAS CRUCIALES PENDIENTES EN LA REFORMA DEL SECTOR ENERGÉTICO

| Área de enfoque | Acciones a tomar | Parte responsable | Fecha límite |
|---|---|---|---|
| Implementar la reforma reglamentaria | Crear una división para la supervisión y el monitoreo del acuerdo de operación y mantenimiento con LUMA y otros acuerdo de la AAPP, con funcionarios públicos profesionales con experiencia y pocos empleados de confianza. | AAPP | Completado |
| | Proporcionar a la JSF un plan de personal y un organigrama que refleje la división de monitoreo y cumplimiento creada dentro de la AAPP y las fuentes de financiamiento necesarias. | AAPP / AAFAF / Legislatura | Completado |
| | Enmendar la ley habilitadora del NEPR (Ley 57-2014) para estipular que el presupuesto del NEPR se financiará por medio de las tarifas | Gobernador / Legislatura | Retrasado |
| | Presentar un plan de implementación para conseguir una fuerza laboral en la que los empleados de confianza no sean más del 10%. | NEPR | Retrasado |
| | Reducir el porcentaje de empleados de confianza al 15% del total de empleados | NEPR | Retrasado |
| | Reducir el porcentaje de empleados de confianza al 10% del total de empleados | NEPR | Retrasado |
| | Desarrollar un proceso de CELI en el que los municipios paguen por el consumo de electricidad no cubierto por CELI y puedan presentar quejas relacionadas con CELI* | NEPR | Retrasado |
| Transición a operadores privados | Seleccionar un proponente cualificado para administrar y operar los activos de generación existentes de la AEE | AAPP | Retrasado |
| | Implementar un plan de modernización de la red y el PIR aprobado para garantizar una red modernizada, resiliente y confiable | AEE | En curso |
| Reestructurar las deudas preexistentes | Confirmar el plan de ajuste del Título III | JSF | Por determinarse |
| | Implementar el plan de ajuste de la AEE | AEE | Por determinarse |

* Metas cruciales también recomendadas en el Plan Fiscal de junio de 2019

# Capítulo 4. Riesgos y resiliencia del sistema

En los últimos años, el sistema energético de Puerto Rico ha enfrentado daños significativos en su infraestructura como resultado de huracanes y terremotos graves. En el futuro, se prevé que la frecuencia e intensidad de los fenómenos meteorológicos aumenten aún más a medida que se acelere el cambio climático.[60] Estos riesgos naturales para la infraestructura energética de Puerto Rico se han visto agravados por la histórica infrautilización de los gastos de capital, el mantenimiento y el manejo de la vegetación, lo que agrava los daños y el impacto de los desastres naturales y, al mismo tiempo, hace que el sistema sea vulnerable a los disturbios habituales. A fin de mitigar estos riesgos y conseguir un sistema energético seguro, moderno, sostenible y fiable, se deben priorizar las medidas de resiliencia tanto para el sistema de transmisión y distribución (T&D) como para los activos de generación.

Para ello, la AEE y LUMA han desarrollado planes de mejoras capitales para reparar, remediar y modernizar el sistema existente y mejorar su resiliencia ante eventos extremos. Entre otras fuentes de financiamiento, los planes de mejoras capitales se basan en los $9.6 mil millones netos de costos compartidos en fondos asignados por FEMA a la AEE para modernizar y reforzar el sistema eléctrico contra los desastres naturales.[61] Para el sistema de T&D, LUMA ha presentado un presupuesto de casi $2.6 mil millones desde el año fiscal 2023 hasta el año fiscal 2025 para proyectos de reparación, modernización y fortalecimiento de la infraestructura. Se puede encontrar más información sobre los planes de mejoras capitales en el Capítulo 6 (Planes de mejoras capitales y financiamiento federal) y Capítulo 7 (Carteras de mejoras de LUMA) para la AEE y LUMA, respectivamente. El Capítulo 6 también incluye más información sobre los usos y las fuentes de financiamiento federal.

En las siguientes secciones se exponen de forma resumida los riesgos que enfrenta el sistema eléctrico de Puerto Rico: (1) el riesgo climático; (2) los terremotos; y (3) las crisis económicas (por ejemplo, el COVID-19). También se abordan las respuestas históricas y la preparación, así como las posibles acciones para reducir los riesgos mencionados.

## 4.1   Riesgo climático

Puerto Rico corre un riesgo muy alto en lo que respecta a la gran variedad de consecuencias que puede provocar el cambio climático. Los huracanes, los fuegos incontrolados, el estrés térmico y las inundaciones costeras representan peligros para Puerto Rico y su sistema eléctrico. Las proyecciones respecto del cambio climático sugieren que Puerto Rico podría sufrir eventos climáticos significativos en los próximos 30 años, incluidos los siguientes: (1) precipitaciones extremas de mayor intensidad, pero de menor frecuencia, y (2) posible aumento en el nivel del mar de uno a dos pies, lo que podría provocar riesgos de inundaciones e inundaciones costeras, especialmente en las zonas pobladas del noreste de la isla (por ejemplo, San

---

[60]   Instituto Cooperativo de Estudios Climáticos y Satelitales de Carolina del Norte y Centros Nacionales de Información Ambiental de la Administración Nacional Oceánica y Atmosférica de los Estados Unidos. Escenario intermedio de aumento del nivel del mar.

[61]   La cifra de $10.7 mil millones incluye costos compartidos y pagos de seguro.

Juan).[62],[63]Históricamente, la velocidad promedio del viento se ha mantenido bastante estable cuando se comparan datos estadísticos de 1979-1999 a 2000-2019, mientras que las velocidades máximas del viento han aumentado su intensidad y frecuencia durante varias de las últimas décadas.[64] Si estas tendencias continúan, Puerto Rico podría sufrir más fenómenos de vientos extremos en el futuro.

En septiembre de 2017, los huracanes Irma y María afectaron la ya vulnerable red de la AEE, lo cual provocó un apagón en toda la isla. La red de transmisión y distribución sufrió la mayor parte del daño. En el futuro, es probable que se produzcan con mayor frecuencia fenómenos meteorológicos graves y devastadores como el huracán María, ya que ahora es casi cinco veces más probable que se formen fenómenos de escala similar ahora casi cinco veces más probables que durante la década de 1950; este aumento se debe en gran medida a los efectos a largo plazo del cambio climático.[65]

El impacto operacional de los fenómenos climáticos es considerable. Después de los huracanes Irma y María, se dañaron más de 2,700 postes de transmisión; además, se vio afectado el 92% de las subestaciones inspeccionadas, de las cuales el 41% sufrió daños graves.[66] No se realizó el mantenimiento adecuado ni se modernizó el sistema de distribución para que pudiera resistir huracanes de categoría 4 o superior y, como resultado, el 75% de los circuitos resultaron dañados, mientras que algunas unidades de generación también sufrieron daños importantes.[67] El costo de respuesta a los eventos relacionados con el clima es elevado. Después de los huracanes de 2017, Puerto Rico recibió $3.2 mil millones en fondos federales de emergencia para ayudar a restaurar la electricidad en la isla.[68]

Si bien es difícil calcular y cuantificar la dimensión del riesgo que representa el cambio climático para las operaciones y la infraestructura del sistema eléctrico de Puerto Rico, se proyecta que el aumento en la intensidad de cada fenómeno de viento y lluvia se traducirá en mayores costos de reparación y en una reducción de la demanda debido a los apagones en función de cada evento (Gráfica 26). Se siguen realizando tareas adicionales para mejorar las prácticas operacionales – incluidas las tareas de mantenimiento preventivo de rutina (T&D y generación)– y de fortalecer

---

[62] Datos de un modelo climático a escala reducida del periodo histórico 1976-2005 y escenario futuro de trayectoria de concentración representativa (RCP) 4.5 para el periodo 2021-2050 de Earth Exchange (NEX) de la Administración Nacional de Aeronáutica y del Espacio de los Estados Unidos.

[63] Instituto Cooperativo de Estudios Climáticos y Satelitales de Carolina del Norte y Centros Nacionales de Información Ambiental de la Administración Nacional Oceánica y Atmosférica de los Estados Unidos. Escenario intermedio de aumento del nivel del mar.

[64] Datos de reanálisis históricos ERA5 (1979-2019) del Centro Europeo de Previsiones Meteorológicas a Plazo Medio.

[65] Keellings, D. y Hernández Ayala, J. J. (2019). Extreme rainfall associated with Hurricane Maria over Puerto Rico and its connections to climate variability and change. Geophysical Research Letters.

[66] Oficina Central de Recuperación, Reconstrucción y Resiliencia de la AEE, Plan de modernización del sistema energético, 3, 6.

[67] Grupo de trabajo para la resiliencia energética de Puerto Rico, Build Back Better, A-3, A-6, A-7, 21.

[68] "2017 Hurricane Season: Federal Support for Electricity Grid Restoration in the U.S. Virgin Islands and Puerto Rico". Oficina de Responsabilidad Gubernamental de los Estados Unidos. Abril de 2019.

la infraestructura para así evitar que fenómenos meteorológicos adversos provoquen daños de magnitud similar o mayor en el futuro.

GRÁFICA 26: IMPACTO DE LOS EFECTOS CLIMÁTICOS EN LA AEE

| Nivel de impacto | Efectos climáticos | Descripción | Impacto en la AEE |
|---|---|---|---|
| | Daños por vientos extremos | • **La frecuencia** de días con viento extremo ha **aumentado un 28%** desde 1980.<br>• Si bien la intensidad promedio se ha mantenido estable desde 1980, las **velocidades máximas del viento han aumentado.** | • **Pérdida de ingresos** debido a las interrupciones por tormentas<br>• **Costos más altos** para reparar daños causados por tormentas<br>• **El aumento en la intensidad** de los fenómenos climáticos individuales graves sugiere mayores costos para cubrir **la reparación y la demanda perdida** por fenómeno |
| | Daños por precipitaciones extremas | • Las proyecciones sugieren una disminución del 15% al 25% **en cuanto a los días de precipitación extrema.**<br>• **El aumento previsto en la intensidad** de los días de precipitación extrema sugiere un cambio hacia eventos meteorológicos **menos frecuentes, pero más graves** (como los huracanes). | |
| | Daños por inundaciones costeras | • Se prevé que la elevación proyectada de 1 a 2 pies en el nivel del mar antes del año 2050 **aumentará el riesgo de inundaciones y desbordamientos costeros.**<br>• **La región** del noreste **enfrenta** el mayor riesgo (es decir, San Juan). | |
| | Riesgo de fuegos incontrolados | • Los bosques **naturales** cubren una **porción significativa** de la masa terrestre de PR.<br>• El aumento en las temperaturas puede **incrementar la posibilidad de fuegos no controlados** y el posterior riesgo de **incendios y daños en el tendido eléctrico.** | |
| | Estrés térmico | • Las temperaturas por encima del promedio podrían **aumentar la demanda de unidades de aire acondicionado (que representa actualmente el 2% de la demanda total de energía en las zonas subtropicales).[1]**<br>• **No obstante, las olas de calor y las sequías** representan riesgos para la **infraestructura.** | • **Mayor demanda** de electricidad<br>• **Posible aumento de ingresos** debido al aumento de la demanda |
| | Disminución en la eficacia de transmisión | • **La pérdida de energía** en la transmisión y la distribución está **sumamente relacionada con la temperatura.** | • **El aumento en la generación exigió cumplir con una demanda equivalente** debido a una mayor pérdida de energía<br>• **Costos más altos** para aumentar la carga generada y la capacidad de generación |

4 Fuente: Encuesta sobre consumo de energía residencial 2015 de la Administración de Información Energética de EE. UU.; el 27% de la demanda de energía se le atribuye a las unidades de aire acondicionado de las viviendas de EE. UU. en zonas con clima subtropical.

LUMA y los operadores de GenCo son clave para abordar de forma adecuada y sostenible los retos que plantea el cambio climático y acelerar el acceso y el despliegue de los fondos federales.[69] El plan de mejoras capitales de la AEE para los activos de generación, así como el conjunto de programas de mejora de LUMA para el sistema de T&D, esbozan la cartera de proyectos que mejorarán de forma más eficiente y eficaz la resiliencia del sistema y reforzarán el sistema energético frente a futuros fenómenos meteorológicos extremos, que se prevé que aumenten en frecuencia y magnitud. LUMA ya ha identificado y propuesto numerosas iniciativas que contribuirán a que el sistema de energía eléctrica resista fenómenos meteorológicos extremos, incluso medidas de mitigación de inundaciones en activos esenciales de la red, como edificios y subestaciones de control, y fortalecimiento y reemplazo de estructuras de apoyo para la transmisión y la distribución. Por ejemplo, el programa de Reconstrucción de la línea de transmisión de LUMA garantizará que todas las torres de transmisión cumplan con la norma que establece la Ley Núm. 17 de 2019 sobre la resistencia a vientos de 150 mph. Según lo previsto actualmente, gran parte de ese trabajo se hará con capital financiado federalmente. LUMA también ha propuesto que se establezca un programa de manejo de la vegetación integral y proactivo para controlar la vegetación de manera sostenible y a largo plazo y que se restauren los derechos de paso del sistema de T&D.[70]

Las actividades de manejo de la vegetación que se están llevando a cabo, de acuerdo con el Plan de Manejo de la Vegetación (VMP) de LUMA, incluyen trabajos para disminuir o mitigar el riesgo inmediato de la vegetación en los lugares más críticos, junto con un programa continuo para

---

69   El Capítulo 3 incluye información adicional sobre la transformación del sector energético de Puerto Rico.

70   Se incluye más información sobre los planes de mejoras capitales en el Capítulo 6 (Planes de mejoras capitales y financiamiento federal) y en el Capítulo 7 (Carteras de mejoras de LUMA) para la AEE y LUMA, respectivamente.

despejar y restablecer los derechos de paso (ROW) a los anchos estándar. Esto incluye una respuesta inmediata para los lugares de mayor riesgo (aquellos que suponen un peligro para la seguridad pública o que experimentan habitualmente interrupciones del servicio provocadas por los árboles) y la recuperación de los corredores de ROW (especialmente los que afectan al sistema de T&D). Además, LUMA ha completado una limpieza inicial de la vegetación, un primer tratamiento con herbicidas y un segundo tratamiento con herbicidas en todos los emplazamientos de las subestaciones.

## 4.2   Terremotos

Según el Servicio Geológico de los Estados Unidos, en la actualidad, hay más de un 99% de probabilidad anual de sufrir un terremoto de más de 5 grados de magnitud en Puerto Rico, y esa probabilidad se mantendrá por encima del 50% durante los próximos tres a diez años.[71] Los terremotos han causado graves daños en las infraestructuras de los servicios públicos, así como daños en las líneas de transmisión debido a la caída de árboles. En planes de mejoras futuros, este riesgo debe ser considerado y abordado de forma correcta.

El 7 de enero de 2020, un terremoto de 6.4 grados de magnitud azotó la costa suroeste de la isla, lo que provocó daños significativos en la Central Costa Sur y daños menos graves, pero que vale la pena señalar, en la Central EcoEléctrica. Inmediatamente después de los terremotos, alrededor de dos tercios de la población de la isla se quedó sin luz durante varios días. La pérdida de estas dos plantas de energía de gas natural aumentó la dependencia del sistema en centrales de energía que funcionan con petróleo y son más costosas. En el corto plazo, se despacharon las plantas diésel de la AEE para demanda máxima con el fin de equilibrar la carga. Como resultado del terremoto del 7 de enero, la porción de generación mensual total con gas natural disminuyó alrededor de 70% de diciembre de 2019 a enero de 2020, mientras que la porción de generación con diésel y fuelóleo aumentó a casi el doble (Gráfica 27). La AEE logró que la unidad 5 de Costa Sur volviera a funcionar para agosto de 2020 y que la unidad 6 lo hiciera para enero de 2021, con un costo total estimado de reparación de $39 millones.

---

[71] van der Elst, N.J., Hardebeck, J.L., and Michael, A.J."Potential duration of aftershocks of the 2020 southwestern Puerto Rico earthquake". Servicio Geológico de los Estados Unidos, Informe de archivo abierto 2020–1009. https://doi.org/10.3133/ofr20201009.

GRÁFICA 27: COMBINACIÓN DE COMBUSTIBLE DURANTE EL AÑO FISCAL Y CALENDARIO DE 2021



La geografía de Puerto Rico es vulnerable a eventos sísmicos futuros y en curso; por esa razón, las medidas de resiliencia ante terremotos para fortalecer la infraestructura del sistema son esenciales para la protección contra las interrupciones del servicio. Para la mitigación futura, es necesario diversificar y distribuir los recursos de generación críticos para garantizar que el daño a algunas instalaciones de generación eléctrica no provoque escasez de energía a largo plazo; también es necesario fortalecer y reforzar las instalaciones existentes. Para el sistema de T&D, las inversiones en proyectos críticos de modernización de la infraestructura deben incluir iniciativas que busquen fortalecer el sistema ante los terremotos que haya en el futuro, específicamente los centros de control del sistema y otros edificios de apoyo importantes, torres de transmisión, plantas de distribución y subestaciones. En el caso de los activos de generación, la diversificación de la capacidad disponible mediante el desarrollo y la integración de energías renovables e instalaciones de almacenamiento mitigará el riesgo asociado a la pérdida de plantas de generación específicas. Cualquier instalación nueva debe diseñarse y construirse de acuerdo con estrictos códigos antisísmicos para mitigar el riesgo de futuros terremotos.[72] La AEE y LUMA continuarán evaluando los riesgos de la infraestructura y apuntando a las mejoras estructurales para limitar los daños causados por los terremotos como parte de la futura planificación y ejecución de proyectos de capital.[73]

## 4.3   Impactos económicos (por ejemplo, el COVID-19)

El impacto económico de las medidas tomadas en respuesta a la pandemia de COVID-19 ha tenido un efecto dominó en el sector energético. El 15 de marzo de 2020, Puerto Rico implementó medidas de distanciamiento social mediante la Orden Ejecutiva 2020-023 para controlar la

---

[72]   Preston, Benjamin L., et al. "Resilience of the U.S. Electricity System: A Multi-Hazard Perspective." Preparado para la Oficina de Política Energética y Análisis de Sistemas del Departamento de Energía de los Estados Unidos. 18 de agosto de 2016.

[73]   Se incluye más información sobre los planes de mejoras capitales en el Capítulo 6 (Planes de mejoras capitales y financiamiento federal) y en el Capítulo 7 (Carteras de mejoras de LUMA) para la AEE y LUMA, respectivamente.

propagación del virus de COVID-19. Después de que se implementó el toque de queda, los niveles de generación disminuyeron, al igual que las ventas.  En las cuatro semanas inmediatamente posteriores al anuncio del toque de queda, la generación diaria total disminuyó entre un 8% y un 12% en comparación con las cifras del año anterior.[74] Después de las cuatro semanas iniciales, los niveles de generación mostraron un retorno gradual a los niveles consistentes con los promedios del año fiscal 2019.[75] La Gráfica 28 muestra cómo la carga diaria de marzo a junio varió entre el año fiscal 2020 y el año fiscal 2021 debido a las medidas contra el COVID-19.

GRÁFICA 28: COMPARACIÓN DE LA CARGA DIARIA DE MARZO A JUNIO ENTRE EL AÑO FISCAL 2019 Y EL AÑO FISCAL 2020 (WH)



Después del anuncio del toque de queda, la AEE experimentó inicialmente una fuerte caída en los cobros. En el peor momento, el promedio de cobros diarios disminuyó a menos de la mitad de lo proyectado, situación que puso en riesgo la situación de liquidez de la AEE. Sin embargo, antes de junio de 2020, el saldo mensual de dinero en efectivo de la AEE había vuelto a los niveles que tenía antes del COVID-19. El éxito de la AEE a la hora de afrontar esta potencial crisis de liquidez fue el resultado de los procesos de manejo de liquidez y flujo de caja implementados desde 2017, así como de un esfuerzo de cobros estratégico. El 16 de marzo de 2020, cuando se anunció el toque de queda inicial, la AEE tenía $416 millones en su cuenta operacional. Desde marzo de 2019 hasta febrero de 2020, la AEE mantuvo un saldo promedio de dinero en efectivo operacional de $350 millones, a pesar de los problemas y los daños causados por los terremotos de enero de 2020.

Después de dos años de experiencia desde que el Gobierno aplicó las restricciones por el COVID-19, la AEE sigue controlando de cerca los saldos en efectivo, los cobros, el consumo de los clientes y las cuentas por pagar, a fin de mantener un nivel de liquidez sostenible para las operaciones en curso. Desde el 1 de junio de 2021, LUMA está a cargo de la Experiencia del Cliente (incluidos los cobros) y debe asegurar un esfuerzo de cobro adecuado y resultados en estrecha coordinación con la AEE para mantener suficiente liquidez. La gerencia y los asesores siguen analizando potenciales

---

[74]   Desde el domingo, 15 de marzo de 2020 hasta el sábado, 11 de abril de 2020. Esta cifra compara la generación neta del mismo día y la misma semana con la del año anterior, a partir de la primera semana completa de enero. Por ejemplo, el domingo, 5 de enero de 2020 se comparó con el domingo, 6 de enero de 2019, mientras que el lunes, 16 de marzo de 2020 se comparó con el lunes, 18 de marzo de 2019.

[75]   La carga promedio del sistema estaba dentro del 1% para el mismo periodo de cuatro semanas del año fiscal 2019 y apenas más de un 1% por encima del máximo para ese mismo periodo.

escenarios de proyección para entender los diversos impactos de los cambios en los cobros, los costos de combustible y otros gastos importantes. LUMA también debe continuar trabajando con otras agencias del Gobierno y grandes clientes para acelerar las cuentas por cobrar, obteniendo el apoyo de la AEE cuando sea necesario para colaborar en este importante esfuerzo.

El Estado Libre Asociado de Puerto Rico ha progresado significativamente desde que la Organización Mundial de la Salud declaró por primera vez al COVID-19 como una pandemia mundial el 11 de marzo de 2020, impulsado en gran parte por la administración de 6.9 millones de dosis de vacunas acumuladas (alrededor del 80% de la población totalmente vacunada). Aunque el Estado Libre Asociado presentaba un mayor riesgo de COVID-19 debido a factores como una población de edad avanzada y mayores niveles de pobreza, las muertes por COVID-19 sufridas en el territorio, de 1,291 por millón de habitantes, fueron más leves en comparación con las 2,897 por millón de habitantes en los Estados Unidos, en general.[76] El 2 de marzo de 2020, se registraron 186 nuevos casos de COVID-19, lo que supone un descenso respecto al pico de 6,617 nuevos casos alcanzado el 8 de enero de 2022.[77]

GRÁFICA 29: CASOS DE COVID-19 DESDE MARZO DE 2020 HASTA MARZO DE 2022



La red eléctrica de Puerto Rico y sus operadores deben estar preparados para más recesiones e impactos económicos que puedan ser provocados en el futuro por motivos que nada tengan que ver con una pandemia global, como crisis bancarias, interrupciones del comercio y de los combustibles, y crisis políticas, entre otras. Para mitigar interrupciones futuras durante el toque de queda o condiciones económicas adversas para el sector de servicios públicos, deben considerarse medidas operacionales para aumentar el control de la red de forma remota (por ejemplo, tecnologías para automatizar la distribución, instalación de contadores inteligentes), además de medidas para mejorar la confiabilidad y la resiliencia del sistema. Durante una crisis económica, la disminución en los cobros lleva a un menor saldo de dinero en efectivo, lo cual aumenta la necesidad de un manejo de liquidez eficaz a corto plazo. A más largo plazo, las medidas fiscales, como la reestructuración de obligaciones de deuda preexistentes, ayudarán a proteger, o a minimizar el riesgo para el sector de los servicios públicos de Puerto Rico de futuras crisis económicas.

---

[76]   Centro de Recursos de Coronavirus Johns Hopkins. https://coronavirus.jhu.edu/region/us/puerto-rico

[77]   Tablero diario del Coronavirus del New York Times. https://www.nytimes.com/interactive/2021/us/puerto-rico-covid-cases.html

# Capítulo 5. Planificación de los recursos y resiliencia

La Ley Núm. 57 de 2014 y la Ley Núm. 17 de 2019 requieren que LUMA, en nombre de la AEE, prepare y presente al NEPR un PIR para un período de planificación de 20 años, que deberá ser revisado cada tres años. La Ley Núm.17 de 2019 define el PIR como un plan de recursos que deberá considerar todos los recursos razonables, incluyendo tanto la oferta de energía (por ejemplo, la generación a escala de servicios públicos) como la demanda de energía (por ejemplo, la eficiencia energética, la respuesta a la demanda y la generación distribuida), para satisfacer de forma confiable las necesidades actuales y futuras proyectadas del sistema energético de Puerto Rico y de sus clientes al menor costo razonable.[78] La Ley Núm. 57 de 2014 también ordena que el PIR incluya evaluaciones del sistema de transmisión y distribución (por ejemplo, capacidad y fiabilidad) y el impacto medioambiental del sistema energético.[79]

El NEPR aprobó el PIR actual en agosto de 2020, y exige que la AEE, LUMA y cualquier operador de generación futuro siga un Plan de Acción Modificado y un Plan de Recursos Preferido Modificado hasta que se apruebe un PIR actualizado, con las siguientes modificaciones en la red y la generación a fin de conformar los tres elementos centrales del PIR aprobado:

1. **Aumentar la porción de generación de energía renovable y almacenamiento**: esto incluye la incorporación de nueva generación de energía renovable, el almacenamiento de energía, la eliminación o la conversión de toda la generación con carbón y fuelóleo pesado existente y las modificaciones del sistema (por ejemplo, condensadores sincrónicos) para permitir la integración de generación con inversor;

2. **Mejorar la resiliencia de la red**: esto incluye la inversión de capital en el sistema de transmisión y distribución para respaldar una mayor resiliencia y fiabilidad y nuevos procedimientos de optimización que determinen las inversiones óptimas en el sistema de transmisión y distribución a fin de mejorar la resiliencia; y

3. **Permitir que el cliente decida**: esto incluye cambios en el sistema para apoyar la incorporación de la generación distribuida (por ejemplo, la energía solar fotovoltaica en los techos) y los programas de respuesta a la demanda (DR) y eficiencia energética (EE) recomendados, lo que permite que el cliente desempeñe un papel significativo en la red eléctrica de Puerto Rico.

A partir del 1 de junio de 2021, LUMA es responsable de las operaciones del sistema de T&D y se encarga de aplicar varios aspectos del PIR aprobado. El NEPR ha emitido una orden en la que asume la responsabilidad directa de gestionar la adquisición de nuevos recursos de energía renovable, comenzando con el proceso de solicitud de propuestas del tramo 2 a través de un coordinador independiente, Acción Group, LLC (Acción Group).[80]

LUMA también actúa como representante de la AEE ante el NEPR y cualquier otra agencia del Gobierno local, estatal o federal, y por lo tanto, es responsable de preparar y proponer un nuevo PIR para su revisión y aprobación por parte del NEPR. Dada la situación actual de la geopolítica, las perturbaciones en la cadena de suministro por la pandemia de COVID-19, la invasión rusa en

---

[78]  Ley Núm. 17 de 2019, Ley de Política Pública Energética de Puerto Rico, aprobada el 11 de abril de 2019, Sección 5.2(ll).

[79]  Ley Núm. 57 de 2014, Ley de Transformación y Alivio Energético de Puerto Rico, aprobada el 27 de mayo de 2014, Sección 6C(h).

[80]  Vea la Orden y Resolución del NEPR del 29 de octubre de 2021 (Caso Núm. NEPR-MI-2020-0012).

Ucrania, los mercados energéticos y el aumento de la demanda de fuentes de energía renovables, LUMA y el NEPR deben considerar la revisión y actualización del PIR existente lo antes posible, adelantándose al calendario actualmente establecido.

## 5.1 Resumen del PIR aprobado

### 5.1.1 *Antecedentes de la evaluación del NEPR y aprobación del PIR*

El primer PIR fue presentado por la AEE en el 2015 y aprobado por el NEPR en septiembre de 2016.[81] Como resultado de los huracanes Irma y María en 2017, Puerto Rico no solo se enfrentó al reto sin precedentes de reconstruir el sistema eléctrico, sino que también tuvo que replantearse cómo reforzar y modernizar la red para equipar mejor a Puerto Rico contra futuras catástrofes naturales, al tiempo que diversificaba las fuentes de combustible y aumentaba la dependencia de la red de los recursos energéticos renovables.

El 13 de febrero de 2019, la AEE presentó su propuesta inicial del PIR para que el NEPR la apruebe (PIR inicial). Después de revisar el PIR inicial, el NEPR emitió una moción con conclusiones y solicitó a la AEE que volviera a presentar el PIR inicial después de abordar ciertos puntos.[82] El 7 de junio de 2019, la AEE volvió a presentar su propuesta de PIR tras realizar las revisiones requeridas por el NEPR (propuesta de PIR). El NEPR emitió su Orden y Resolución Final sobre el PIR propuesto de la AEE el 24 de agosto de 2020.

### 5.1.2 *Plan de Recursos Preferido Modificado y Plan de Acción Modificado del NEPR*

La Orden y Resolución Final del NEPR (Orden Final) aprobó una parte y rechazó otra del PIR propuesto y ordenó la adopción e implementación de un Plan de Acción Modificado y un Plan de Recursos Preferido Modificado en lugar del Plan de Acción y el Plan de Recursos Preferido propuestos por la AEE (PIR aprobado).[83] El NEPR aprobó las siguientes tres modificaciones notables de la red, que constituyen los elementos centrales del Plan de Acción Modificado y del Plan de Recursos Preferido Modificado de la AEE:

1. Aumentar la porción de almacenamiento y generación de energía renovable al mismo tiempo que se retira o convierte la generación con carbón y fuelóleo pesado existente;

2. Mejorar la resiliencia de la red fortaleciendo los proyectos de capital, incluidas las posibles minirredes y microrredes; y

3. Permitir que el cliente decida mediante programas de GD, EE y DR.

La Ley Núm. 17 de 2019 esboza la aspiración de Puerto Rico de generar el 100% de su electricidad con fuentes renovables para el año fiscal 2050. Lamentablemente, es poco probable que se cumplan los términos para la adquisición y el despliegue de recursos renovables establecidos originalmente en el PIR, dado que los procesos de adquisición ordenados por el NEPR han sufrido un retraso considerable (tres de los seis tramos, que abarcan al menos 2,000 MW de capacidad renovable y 1,000 MW de capacidad de almacenamiento, ya llevan un retraso de hasta 18 meses)

---

[81] Orden y Resolución Final, In Re: Plan Integrado de Recursos para la Autoridad de Energía Eléctrica de Puerto Rico, Caso Núm. CEPR-AP- 2015-0002, 23 de septiembre de 2016.

[82] Orden y Resolución, In Re: Finalización de la presentación del Plan Integrado de Recursos de la Autoridad de Energía Eléctrica, trato confidencial de partes del Plan Integrado de Recursos y exenciones solicitadas, Caso Núm. CEPR-AP-2018-0001, 14 de marzo de 2019.

[83] Orden y Resolución Final, In Re: Revisión del Plan Integrado de Recursos de la Autoridad de Energía Eléctrica, Caso Núm. CEPR-AP-2018-0001, 24 de agosto de 2020.

y los proyectos seleccionados como resultado del tramo 1 aún no se han finalizado ni ejecutado. Además, los costos de despliegue de energías renovables han aumentado de forma significativa, y los precios actuales de las energías renovables basados en el mercado ya son más altos que los proyectados en el PIR.  Como resultado, las proyecciones del caso base en este Plan Fiscal Certificado para la proporción de energías renovables en los años 2025, 2040 y 2050 solo alcanzan el 13%, el 53% y el 70%, respectivamente, en comparación con los objetivos del 40%, el 60% y el 100%.

La Ley Núm. 17 de 2019 también exige la eliminación progresiva de las centrales eléctricas de carbón para el 31 de diciembre de 2027. Por ello, está previsto que las actuales unidades de combustión de carbón de Guayama se retiren en el año fiscal 2028, lo que reducirá significativamente la capacidad de generación de carga base en Puerto Rico. Aunque se espera que la capacidad de generación de carbón existente sea sustituida por una proporción equivalente de recursos renovables, dados los retrasos señalados más arriba, no está claro si esos recursos renovables estarán disponibles cuando se necesiten. En caso de que no haya nuevos recursos renovables disponibles, y a falta de un plan exhaustivo para identificar los recursos necesarios, respetuosos con el medio ambiente y rentables, que garanticen un suministro continuado de generación fiable, existe un riesgo importante de que haya que recurrir a unidades de generación de petróleo más antiguas, menos eficientes, más caras y más contaminantes.

Las incertidumbres sobre la capacidad de alcanzar ciertos objetivos y las proyecciones de los principales impulsores de la carga suponen un riesgo importante de que el sistema energético de Puerto Rico se encuentre sin los recursos de generación necesarios para satisfacer una demanda potencialmente más alta y variable de lo proyectado, por ejemplo, debido a los aumentos de carga que requieren que las unidades obsoletas funcionen durante más tiempo, lo que aumenta los riesgos de fallas y cortes. Algunas de las incertidumbres que, si no se abordan de manera adecuada, representan riesgos para la fiabilidad del sistema a mediano y largo plazo son las siguientes:

- **Eficiencia energética**: La Ley Núm. 17 de 2019 establece el objetivo de alcanzar una reducción del 30% de la carga neta por debajo de la línea de referencia de 2019 para el año 2040 mediante medidas de eficiencia energética. Sin embargo, hasta la fecha no existe ningún plan de aplicación o financiamiento que sea típico de los programas de eficiencia energética con objetivos de esta envergadura, y no está claro cómo se aplicarán las medidas de eficiencia energética ni qué impacto tendrán en la carga.

- **Generación distribuida**: El Plan Fiscal Certificado actual cuenta con una proyección general del factor de crecimiento para que los clientes adopten soluciones de generación distribuida, pero carece de una modelización ascendente y detallada que incorpore supuestos sobre los futuros costos y beneficios para los abonados que incentiven la adopción. Por ello, el ritmo real de adopción de las tecnologías de GD en Puerto Rico puede variar con respecto a los supuestos actuales del NEPR y de LUMA.

- **Vehículos eléctricos**: Las proyecciones de adopción de vehículos eléctricos incluidas en el Plan Fiscal Certificado actual se basan en promedios históricos y hacen suposiciones amplias y descendentes sobre la adopción de vehículos eléctricos, lo que resulta en una elevada introducción de vehículos eléctricos en comparación con las proyecciones de otros lugares. Una tasa de crecimiento sobreestimada de vehículos eléctricos a largo plazo puede hacer que LUMA y el NEPR sobrevaloren las necesidades de generación más allá

77

de las realmente necesarias, lo que podría acarrear costos superiores a los requeridos para atender las necesidades energéticas de Puerto Rico.

Para mitigar el riesgo de llevar a cabo una política energética que no esté respaldada por planes de implementación factibles y que cree incertidumbre para la planificación de infraestructuras críticas, el NEPR y LUMA deben acelerar la revisión y actualización del PIR. Elaborado a lo largo de 2019, y aprobado finalmente en agosto de 2020, el proceso de revisión y actualización ordinaria de tres años debería estar ya en marcha. Lo más importante es que, independientemente del ciclo de actualización de 3 años, los acontecimientos macroeconómicos ocurridos desde entonces, así como el progreso real de la implementación, requieren una revisión urgente, exhaustiva y a corto plazo del PIR. Por ello, la AEE y LUMA deben aspirar a iniciar un nuevo proceso de revisión del PIR durante el primer trimestre del año fiscal 2023.

## Aumentar la porción de almacenamiento y generación de energía renovable

En la Orden Final, el NEPR ordenó a la AEE que desarrollara un plan para adquirir 3,750 MW de energía renovable y 1,500 MW de almacenamiento en baterías para 2025. Además, el NEPR aprobó la instalación de hasta 81 MW de capacidad de pico local adquirida a través de un proceso de SP de oferta competitiva y agnóstica que está abierto a todas las fuentes individuales o agregadas de demanda y opciones de oferta. El NEPR también aprobó la conversión de ocho (8) plantas de vapor retiradas en condensadores sincrónicos para permitir que el voltaje sea estable después de la instalación de almacenamiento en baterías y generación de energía renovable con inversor. La Orden Final aclara que el plan de reconversión será objeto de estudios adicionales y se coordinará con los calendarios de retiro, cuyo financiamiento está aún pendiente de determinar.

El NEPR rechazó el desarrollo y la construcción de la mayoría de los recursos nuevos de generación de combustible fósil propuestos, incluido el retiro y el reemplazo total de las dieciocho (18) plantas de pico con turbina de gas existentes, cualquier infraestructura de gas natural licuado nueva y los esfuerzos de desarrollo a gran escala de una nueva unidad con turbina de gas de ciclo combinado en Palo Seco. El NEPR sí autorizó hasta $5 millones para el análisis preliminar económico, de ubicación, de permisos y de viabilidad en Palo Seco para una nueva unidad alimentada por combustible fósil e infraestructura de combustible, siempre y cuando no interfiera o retrase la obtención de energía renovable o el almacenamiento en baterías. En cuanto a los PPOA que funcionan con combustibles fósiles, el NEPR aprobó tanto la extensión del contrato de EcoEléctrica hasta el año 2032 como la cesación del acuerdo para las unidades de AES que funcionan con carbón antes de que termine el 2027, en virtud de la Ley Núm. 17 de 2019.

Por último, el NEPR aprobó el retiro de aproximadamente 2.4 GW de unidades existentes de combustibles fósiles[84] sujetas al estándar MATS de la EPA.

## Mejorar la resiliencia de la red

La Orden Final determinó que el PIR propuesto establecía de manera adecuada la necesidad de (1) actualizar el sistema de transmisión, (2) gastar hasta $2 mil millones para fortalecer la infraestructura de transmisión, y (3) invertir $911 millones en actualizar el sistema de distribución a fin de mejorar la resiliencia y respaldar la generación distribuida. Sin embargo, el NEPR ordenó a que la AEE obtuviera la aprobación del NEPR para gastos específicos de T&D antes de hacer

---

[84]   Las unidades que serán retiradas son las siguientes: Aguirre 1 y 2; Costa Sur 3, 4, 5 y 6; Palo Seco 1, 2, 3 y 4; San Juan 7, 8, 9 y 10; y la planta de generación con carbón de AES.

cualquier inversión o planificación final. El NEPR también anunció el inicio de un procedimiento de optimización para determinar las mejores inversiones en transmisión a fin de garantizar un sistema de energía eléctrica más resistente, lo que incluye evaluar la capacidad para recursos de energía distribuida a pequeña escala –como las minirredes– para contribuir a la resiliencia.

**Permitir que el cliente decida**

El Plan de Acción Modificado del PIR aprobado permite que el cliente tenga más posibilidades de decidir mediante diversos programas, incluso GD, EE y DR. El NEPR le ordenó a la AEE que facilitara aún más la disponibilidad de GD garantizando que todos los gastos y la planificación respecto del sistema de distribución respalden la GD. Con respecto a la DR, el Plan de Acción Modificado exige que la AEE desarrolle sistemas internos, programas externos y ofertas disponibles para todos los tipos de clientes para lograr que los agregadores de DR ofrezcan y despachen recursos de DR rentables y sean compensados por dichos recursos. En cuanto a la EE, el NEPR le ordenó a la AEE tomar todas las medidas necesarias para respaldar la próxima Regulación sobre EE del NEPR y el objetivo subyacente de lograr un 30% de ahorro gracias a la EE para el 2040 (en comparación con las ventas del servicio público netas en el año fiscal 2019), tal como lo establece la Ley Núm. 17 de 2019, incluso brindar apoyo para la implementación, el análisis, los fondos y el financiamiento del programa.

## 5.2   Implementación del Plan de Acción Modificado para el PIR

La AEE y LUMA están obligadas a cumplir e implementar el Plan de Acción Modificado del PIR. LUMA es ahora responsable de desarrollar los PIR posteriores y sus enmiendas.

### 5.2.1 *Generación renovable y almacenamiento*

De acuerdo con el Plan de Acción Modificado, la AEE tenía la obligación de elaborar un plan detallado para la adquisición de recursos de energía renovable y un sistema de almacenamiento de energía en baterías para lograr cumplir con el RPS, sujeto al asesoramiento y la aprobación del Negociado de Energía. Luego, en consonancia con el plan de adquisiciones aprobado por el NEPR, la AEE tuvo que emitir una serie de SP para el suministro de (a) energía renovable en apoyo al mandato del RPS de la Ley Núm. 82, y (b) un sistema de almacenamiento de energía en baterías para respaldar (1) la capacidad necesaria para cumplir con los requisitos de carga máxima de la AEE y (2) los requisitos para la integración de la generación de energía renovable. Estos procesos de adquisición competitivos deben estar disponibles para todas las formas de energía renovable, incluso, entre otras, eólica, hidroeléctrica, solar fotovoltaica, centrales eléctricas virtuales (VPP) y almacenamiento. Los proponentes que tengan éxito en los proyectos de generación de energía renovable y almacenamiento de energía celebrarán con la AEE PPOA a largo plazo, acuerdos de servicios de almacenamiento de energía o acuerdos de servicios de red (en el caso de las VPP).

El 22 de febrero de 2021, como parte de los esfuerzos para implementar el Plan de Acción Modificado, la AEE emitió una SP[85] para 1,000 MW de producción de energía renovable y 500 MW de almacenamiento en baterías, incorporando las recomendaciones del NEPR y la Junta de Supervisión. Mediante la SP, se solicitan propuestas para diseñar, construir, instalar, poseer, operar y mantener recursos de energía renovable, recursos de almacenamiento de energía y VPP para lugares dentro de Puerto Rico, por un  periodo de servicio de hasta 25 años. La SP es el

---

[85]   SP de la AEE Núm. 112648, 22 de febrero de 2021.

primero de los seis (6) tramos de SP previstos que se publicarán a lo largo de los próximos tres
(3) años y que buscan un total de 3,750 MW de recursos de energía renovable y 1,500 MW de
recursos de almacenamiento de energía.[86] La cadencia de la SP de cada tramo y la respectiva
capacidad mínima requerida de energía renovable y de almacenamiento en baterías que debe
adquirirse por tramo, según lo ordenado por el NEPR en el Plan de Acción Modificado, se incluyen
en la Gráfica 30. El NEPR es responsable de revisar y aprobar cualquier proyecto recomendado y
los PPOA asociados que resulten del proceso de SP si se considera que son consistentes con el PIR
y la política pública energética de Puerto Rico.

Dados los retrasos que se produjeron durante el proceso de SP del tramo 1, el NEPR determinó
que nombraría a un coordinador independiente, Acción Group, para llevar a cabo las SP de los
tramos 2 y 3. Las funciones de Acción Group incluirán, sin limitaciones: (a) preparar los
documentos de la SP; (b) manejar todas las comunicaciones; (c) manejar los protocolos de
comunicación; (d) manejar el código de conducta; (e) hacer recomendaciones con respecto al
proceso de la SP; (f) desarrollar la metodología de evaluación, los modelos, los criterios y los
supuestos; (g) llevar a cabo las evaluaciones de las propuestas; (h) liderar las negociaciones de los
contratos; (i) informar al NEPR durante el proceso; y (j) asegurar que se logren los objetivos de
las SP de los tramos 2 y 3 y las disposiciones del Plan de Adquisiciones Actualizado relacionadas.

GRÁFICA 30: GUÍAS DEL NEPR PARA LA ADQUISICIÓN DE CAPACIDAD DE GENERACIÓN DE
ENERGÍA RENOVABLE Y DE ALMACENAMIENTO EN BATERÍAS

| Guías del NEPR para la adquisición de generación de energía renovable y de capacidad de almacenamiento en batería | | | | | | |
|---|---|---|---|---|---|---|
| Tramo | Fecha de publicación prevista de la SP | Fecha real o nueva de publicación | Energía solar fotovoltaica u otra energía equivalente, MW | | Equivalente a una batería de 4 horas de duración, MW | |
| | | | Mínimo | Acumulado | Mínimo | Acumulado |
| 1 | Dic. 2020 | Febrero 2021 | 1,000 | 1,000 | 500 | 500 |
| 2 | Jun. 2021 | Por determinar | 500 | 1,500 | 250 | 750 |
| 3 | Dic. 2021 | Por determinar | 500 | 2,000 | 250 | 1,000 |
| 4 | Jun. 2022 | Por determinar | 500 | 2,500 | 250 | 1,250 |
| 5 | Dic. 2022 | Por determinar | 500 | 3,000 | 125 | 1,375 |
| 6 | Jun. 2023 | Por determinar | 750 | 3,750 | 125 | 1,500 |

## 5.2.2 *Medidas de resiliencia de la red*

Como el operador del sistema de T&D, LUMA es responsable de planificar e implementar medidas
de resiliencia de la red. Como parte de la transición inicial, LUMA desarrolló planes de mejoras
capitales, que se financiarán con capital federal y no federal, a fin de reparar, reconstruir y
modernizar el sistema de transmisión y distribución existente y mejorar la resiliencia frente a
fenómenos extremos. En sus Presupuestos Anuales propuestos, presentados el 1 de abril de 2022,
LUMA presupuestó aproximadamente $2.6 mil millones desde el año fiscal 2023 hasta el año
fiscal 2025 para proyectos de reparación, modernización y fortalecimiento de la infraestructura
de T&D. Se puede encontrar más información sobre los planes de mejoras capitales en el Capítulo
6 (Planes de mejoras capitales y financiamiento federal) y Capítulo 7 (Carteras de mejoras de
LUMA) para la AEE y LUMA, respectivamente. El Capítulo 6 (Planes de mejoras capitales y

---

[86]   El Capítulo 3 incluye más información sobre el estado del proceso de SP.

financiamiento federal) incluye más información sobre los usos y las fuentes de los fondos federales.

### 5.2.3 *Permitir que el cliente decida*

El Plan de Acción Modificado del NEPR contempla que el cliente tenga más posibilidades de decidir mediante diversos programas, incluso GD, EE y DR. Desde el comienzo, el 1 de junio de 2021, LUMA ha realizado avances significativos con respecto a GD, EE y DR. Además, LUMA ha apoyado la nueva iniciativa del NEPR sobre vehículos eléctricos que se lanzó en octubre de 2021.

LUMA es responsable de la integración de la GD y de la activación de la medición neta de energía en las facturas de los clientes. Cuando un cliente instala generación detrás del contador, puede solicitar un crédito de medición de energía neta en su factura. Esto permite a los clientes devolver electricidad a la red a cambio de un crédito en su factura. De acuerdo con la Ley Núm. 17 de 2019, el crédito es igual a la tarifa minorista completa de la electricidad. Al comienzo, había un retraso de más de 8,000 solicitudes de medición de energía neta. Desde el 1 de junio de 2021, LUMA ha activado el servicio de medición de energía neta para más de 21,000 clientes de energía solar que representan alrededor de 100 MW de energía renovable.

La Ley Núm. 57 de 2014 exige que el NEPR establezca reglamentos que rijan los programas de EE y DR. El NEPR adoptó un reglamento para la DR[87] el 10 de diciembre de 2020 y para la EE[88] el 21 de enero de 2022. Los reglamentos de DR y EE adoptados utilizan enfoques de programa similares para el desarrollo, la administración, la aplicación y el financiamiento. Ambos documentos requieren que LUMA, o un administrador del programa (que será seleccionado por LUMA tras un proceso de licitación competitivo) desarrolle e implemente los programas de DR y EE. La implementación de los reglamentos adoptados y propuestos se centra en periodos de tres años impulsados por planes a tres años que elaborará LUMA, en nombre de la AEE, y que aprobará el NEPR. Cada plan a tres años identificará los programas de DR o EE propuestos, los presupuestos y las metas para el periodo de tres años. LUMA debe preparar y presentar planes trienales separados para DR y EE. Después de los primeros dos años de la implementación de cada plan a tres años, LUMA tendrá la obligación de presentar una actualización anual a ser aprobada por el NEPR, que describa de manera detallada cualquier cambio propuesto sobre la oferta de programas, las métricas de rendimiento, las metas y/o el presupuesto.

Todos los programas de EE y DR deben ser evaluados para determinar su rentabilidad por medio de una prueba de costo-beneficio personalizada, llamada "Prueba de Puerto Rico", que será desarrollada por el NEPR. Hasta tanto se defina la Prueba de Puerto Rico, la rentabilidad de los programas propuestos se determinará por medio de una prueba de costo-beneficio provisional estándar, que es actualmente la Prueba de Costos de Servicios Públicos estándar. Tanto para la EE como para la DR, es obligatorio realizar actividades de evaluación, medición y verificación (EM&V). De acuerdo con el reglamento de DR, el NEPR será responsable de evaluar los programas de DR, mientras que LUMA será responsable de medir y verificar los recursos de DR proporcionados por todos los proveedores del programa de DR mediante un conjunto de procedimientos formales aprobados por el NEPR. En el reglamento propuesto para la EE, el NEPR será responsable de las actividades de EM&V.

---

[87] Adopción de norma para la respuesta a la demanda, In Re: Norma para la eficiencia energética y la respuesta a la demanda, Caso Núm. NEPR-MI-2019-0015, 10 de diciembre de 2020.

[88] Adopción del Reglamento para la Eficiencia Energética, In Re: Reglamento para la Eficiencia Energética, Caso Núm. NEP-MI-2021-0005, 21 de enero de 2022.

Los reglamentos adoptados sobre DR y EE permiten que los presupuestos de los programas aprobados por el NEPR se recuperen con las tarifas de los clientes. Además, el reglamento de DR permite a LUMA desarrollar e implementar (con la aprobación del NEPR) tarifas variables en el tiempo o cargos por demanda basados en los costos de la infraestructura de distribución o transmisión y el suministro de energía y capacidad, siempre y cuando la estructura de tarifas no desaliente la electrificación beneficiosa.

Una Orden y Resolución[89] presentada por el NEPR el 1 de febrero de 2022 detallaba las acciones que se derivan del Reglamento de EE, que son: 1) establecer un calendario para la presentación del primer Plan Trienal de DR de modo que coincida con el Plan del Periodo de Transición y el inicio de los programas de eficiencia energética; 2) invitar a las partes interesadas a un taller el 28 de febrero de 2022 en relación con el proceso de desarrollo e implementación del Plan Trienal de DR y su asociación con el Plan del Periodo de Transición; y 3) proporcionar una plantilla para el Plan del Periodo de Transición según la Sección 2.02(C)(4) del Reglamento de EE. Según el Reglamento de EE, LUMA puede combinar los procesos y documentos de planificación de EE y DR, y LUMA ha manifestado su deseo de que se produzca dicha coordinación. Tras enmendar el término para el Plan del Periodo de Transición, el NEPR ordenó a LUMA que presentara una propuesta de este Plan antes del 6 de junio de 2022. El término para el primer Plan Trienal de EE sigue siendo el 1 de marzo de 2024.

## 5.3   Función del PIR en los planes de mejoras capitales

El Plan de Acción Modificado y el Plan de Recursos Preferido Modificado dentro del PIR son planes clave que, a su vez, configuran los planes de mejoras capitales estratégicos, las iniciativas operacionales y los programas basados en la oferta y la demanda de la flota generatriz y los sistemas de T&D. El Plan de Infraestructura a 10 años de la cartera de generación y los programas y carteras de mejoras del sistema de T&D, incluido el Plan de Remediación del Sistema (SRP)[90] de LUMA, deben cumplir con el PIR aprobado.

El Plan de Infraestructura a 10 años de la AEE es un plan de trabajo que fue elaborado a petición de FEMA y COR3 después de la obligación de FEMA de $9.6 mil millones destinados a la AEE para reparar o reemplazar los sistemas eléctricos y los sistemas de generación de energía y para hacer otras mejoras en la red. El desarrollo de este Plan de Infraestructura a 10 años por parte de la AEE precedió a la Fecha de Inicio del Servicio Provisional (1 de junio de 2021) cuando LUMA asumió las responsabilidades de operación y mantenimiento del sistema de T&D. El Plan de Infraestructura a 10 años describió las inversiones propuestas por la AEE para los sistemas eléctricos de Puerto Rico de cara a la próxima década. El 30 de diciembre de 2020, el NEPR le exigió a la AEE que presentara el Plan de Infraestructura a 10 años para que el NEPR lo revisara y confirmara que es coherente con el PIR aprobado. Mediante resolución y orden[91] de fecha 25 de enero de 2021, el NEPR determinó que ciertos elementos del Plan de Infraestructura a 10 años no eran consecuentes con el PIR aprobado ni con el Plan de Acción Modificado. La AEE presentó un plan revisado que aborda los comentarios del NEPR y solicitó la aprobación del mismo el 16 de

---

[89]   Notificación del Calendario del Plan del Periodo de Transición Revisado, Taller y Plantilla del Plan, In Re: Revisión, Implementación y Monitoreo del Plan de Respuesta a la Demanda, Caso Núm. NEPR-MI-2021-0006, 1 de febrero de 2022.

[90]   El Plan de Remediación del Sistema es un plan para remediar, reparar, reemplazar y estabilizar los equipos, las prácticas de los sistemas y los servicios, según sea necesario para permitir que LUMA realice sus servicios de O&M de acuerdo con los estándares del contrato.

[91]   Resolución y orden, Determinación respecto de la coherencia con el Plan de Recursos Integrado Aprobado y el Plan de Acción Modificado, In Re: Revisión del Plan de Infraestructura a 10 años por parte de la Autoridad de Energía Eléctrica, diciembre de 2020, Caso Núm. NEPR-MI-2021-0002, 25 de enero de 2021.

febrero de 2021. El 26 de marzo de 2021, el NEPR emitió una resolución y orden[92] en la que aceptaba aquellos elementos del Plan de Infraestructura a 10 años revisado de la AEE que eran consistentes con el PIR aprobado y el Plan de Acción Modificado. Para aquellos elementos que no eran consecuentes con el PIR aprobado y el Plan de Acción Modificado, el NEPR le ordenó a la AEE que siguiera modificando el Plan de Infraestructura a 10 años revisado. El NEPR también le indicó a la AEE que presentara todos los proyectos de inversión de capital que la AEE había presentado ante FEMA o ante cualquier agencia local o federal para que el Negociado pudiera evaluarlos y aprobarlos. Junto con el Plan de Infraestructura a 10 años, la AEE había presentado 88 Declaraciones de Trabajo para su aprobación, las cuales fueron aprobadas condicionalmente o clasificadas como proyecto diferido, y 7 de ellas recibieron la aprobación final del NEPR.[93]

LUMA elaboró un marco de planificación estratégica integral, el Marco de Recuperación y Transformación, que se basa en la política pública del Gobierno de Puerto Rico y en la ley aplicable al sistema eléctrico de Puerto Rico. El Marco de Recuperación y Transformación utilizó las políticas públicas y los planes elaborados previamente para establecer los principios rectores generales que permitieran priorizar y secuenciar todos los programas de mejoras de LUMA. Se utilizó el Marco de Recuperación y Transformación para asegurar:

- Que las prioridades de LUMA se alineen con los objetivos más amplios de la política pública de Puerto Rico y las necesidades de los clientes,
- Que los programas incluidos en el SRP se desarrollen y prioricen de forma coherente junto a los programas no incluidos en el SRP,
- Un equilibrio entre la inversión en programas que contribuyen directamente a la mejora de las métricas de rendimiento y los que no lo hacen, y
- Que los Presupuestos Iniciales de LUMA incluyan todos los gastos de capital y de O&M financiados por el Gobierno Federal en todos los programas y entregas y se mantengan dentro de los límites de la Orden Tarifaria de 2017 para evitar el aumento de las tarifas base de los clientes.

Desde la Fecha de Inicio del Servicio en junio de 2021, LUMA ha desarrollado un conjunto de carteras de mejoras para el sistema de T&D con el fin de alinearse con el Marco de Recuperación y Transformación. Estos programas de mejoras se presentan dentro del Presupuesto Anual de LUMA y de las presentaciones del SRP. Al desarrollar los objetivos y la misión del marco que guía estas carteras, LUMA hizo referencia a la política pública y a varios planes, incluidos el PIR aprobado y el Plan de Acción Modificado, para garantizar que las carteras de mejoras estén alineadas con ciertos aspectos del PIR aprobado y del Plan de Acción Modificado.[94] Además, LUMA afirma que el cumplimiento del PIR aprobado fue un objetivo a la hora de diseñar las

---

[92]   Resolución y orden, Evaluación del Plan a 10 años revisado de la AEE, In Re: Revisión del Plan de Infraestructura a 10 años por parte de la Autoridad de Energía Eléctrica, diciembre de 2020, Caso Núm. NEPR-MI-2021-0002, 26 de marzo de 2021.

[93]   Resolución y orden, Evaluación del Plan a 10 años revisado de la AEE, In Re: Revisión del Plan de Infraestructura a 10 años por parte de la Autoridad de Energía Eléctrica, diciembre de 2020, Caso Núm. NEPR-MI-2021-0002, 28 de febrero de 2022.

[94]   Consulta la Sección VI.A en Petición: Presentación del Plan de Remediación del Sistema en la Sección 4.1(d) del Acuerdo de Operación y Mantenimiento para la evaluación y aprobación del Negociado de Energía, In Re: Revisión del Plan de Remediación del Sistema por parte de la Autoridad de Energía Eléctrica, Caso Núm. NEPR-MI-2020-0019, 24 de febrero de 2021.

Document     Page 679 of 983

iniciativas individuales de mejora.[95] Los Presupuestos Iniciales y el SRP de LUMA fueron
aprobados por el NEPR el 31 de mayo de 2021.[96]

El Capítulo 7 (Carteras de mejoras de LUMA) incluye más información sobre el contenido de las
carteras de mejoras. Con la incorporación de LUMA, la AEE es ahora responsable solo de los
proyectos de capital relacionados con las operaciones bajo su control (es decir, la generación
preexistente, la hidroeléctrica y el riego).

---

[95]  Consulte la Sección 1.4.2 del SRP, que se adjunta a la Petición: Presentación del Plan de Remediación del Sistema en la
Sección 4.1(d) del Acuerdo de Operación y Mantenimiento para la evaluación y aprobación del Negociado de Energía, In Re:
Revisión del Plan de Remediación del Sistema por parte de la Autoridad de Energía Eléctrica, Caso Núm. NEPR-MI-2020-0019,
24 de febrero de 2021.

[96]  Resolución y Orden, In Re: Determinación de los Presupuestos Iniciales de LUMA, Caso Núm. NEPR-MI-2021-0004, 31 de
mayo de 2021.

# Capítulo 6. Planes de mejoras capitales y financiamiento federal

En los próximos años, se dispone de importantes recursos de financiamiento federal para la reconstrucción y transformación de los sistemas de generación de energía y de T&D de Puerto Rico. Se han destinado aproximadamente $14 mil millones de fondos federales y estatales a este esfuerzo. El ingreso de capital federal obligado, así como el compromiso de financiamiento estatal para los montos de costos compartidos, constituyen una oportunidad significativa para modernizar la infraestructura energética de Puerto Rico y posicionarla como un impulsor crucial de la recuperación económica general.

LUMA, como operador de T&D, es ahora responsable del despliegue de fondos para mejorar y reconstruir el sistema de T&D de la isla. Los proyectos de capital para las instalaciones de generación seguirán siendo responsabilidad de la AEE hasta que se complete la transición al nuevo operador privado. La AEE y LUMA han elaborados planes de mejoras capitales y hojas de ruta que reflejan sus perspectivas sobre la necesidad crítica de recuperar y reconstruir el sistema energético.

Las carteras de mejoras de LUMA, tal y como se recogen en los presupuestos de LUMA, definen el plan de mejoras capitales para los activos de T&D, las instalaciones, IT/OT, telecomunicaciones y sistemas de manejo de la red, entre otros.

Los proyectos de generación a corto plazo de la AEE incluyen la reparación de los daños sufridos durante los huracanes de 2017, mejoras en el control de emisiones, reposición de piezas de repuesto, modernización de equipos e inversiones en la continuidad del sistema.[97] Los proyectos hidroeléctricos y de embalses a corto plazo se centran en la mejora de la seguridad de los embalses, así como en la reparación de los daños causados por los sedimentos, los escombros de las tormentas y la erosión.

Por último, el NEPR debe aprobar todos los proyectos financiados con fondos federales y fondos asociados antes de que pueda comenzar una planificación y ejecución significativa, independientemente de la responsabilidad de la AEE o de LUMA.

## 6.1   Planes de mejoras capitales

### 6.1.1 Resumen del Plan de Infraestructura a 10 años de la AEE, según enmendado

Como parte de sus tareas relacionadas con los fondos federales y realizadas con FEMA y COR3, la AEE primero elaboró un Plan de Infraestructura a 10 años. Este plan, que se finalizó en diciembre de 2020 y se actualiza cada 90 días según las directrices de FEMA, ofrece un resumen de:

- Estrategia de inversión en infraestructura de la AEE,
- Contexto para la selección de proyectos incluidos en el plan,
- Lista de los proyectos de infraestructura propuestos ordenados según su prioridad,
- Beneficios esperados y costos proyectados vinculados con los proyectos priorizados,
- Metas cruciales clave y término estimado para cada proyecto, y

---

[97] Vea el Capítulo 5 para obtener más información sobre el proceso regulador en curso para garantizar que el Plan de Infraestructura a 10 años revisado sea coherente con el PIR y el Plan de Acción Modificado.

Resumen breve del enfoque de la AEE con respecto a la ejecución del programa y la cartera de proyectos propuesta.

Los planes y programas de mejoras capitales de LUMA se basan en el Marco de Recuperación y Transformación, que utilizó la política pública para establecer principios rectores generales que permitieran priorizar y secuenciar los programas de mejora. Como se describe con más detalle en el Capítulo 7 (Carteras de mejoras de LUMA), el Marco de Recuperación y Transformación, aprobado por el NEPR como parte de su procedimiento presupuestario inicial, se basa en la amplia revisión que ha hecho LUMA de los principales informes, planes, leyes y reglamentos para obtener una imagen completa del panorama político y de las partes interesadas.

COR3 y FEMA han identificado el Plan de Infraestructura a 10 años, según enmendado, como un "documento vivo" que requiere ser actualizado y reenviado cada 90 días. Se esperan actualizaciones a medida que la AEE y LUMA avanzan en sus planes preparatorios y presentaciones ante el NEPR. LUMA hizo referencia a las prioridades y los proyectos iniciales del sistema de T&D incluidos en el Plan de Infraestructura a 10 años de diciembre de 2020 de la AEE, a fin de desarrollar sus carteras de mejoras incluidas en el SRP y los Presupuestos Iniciales de LUMA, que están actualmente en proceso de revisión por parte del Negociado de Energía de Puerto Rico (NEPR).[98]

Al igual que los anteriores Planes Fiscales Certificados y el Plan de Infraestructura a 10 años, según enmendado, este Plan Fiscal Certificado hace referencia a los proyectos de capital independientemente de la fuente de financiamiento.  Este enfoque ofrece una perspectiva holística de las tareas que se realizarán en el sistema energético de Puerto Rico, tareas que serán posibles gracias a diversas fuentes de financiamiento, como se explica más detalladamente en este capítulo. Incluye capital financiado con fondos federales y no federales, además de financiamiento asignado por medio del proceso de establecimiento de presupuestos y tarifas para el programa de Gastos necesarios de mantenimiento (NME) de la AEE.

### 6.1.1.1  CRITERIOS DE PRIORIZACIÓN DEL PROYECTO

La priorización de proyectos de capital se basa en la política pública energética, específicamente el PIR, y la inclusión del asesoramiento del NEPR en respuesta al proceso de aprobación del PIR. Otros criterios de priorización generales incluyeron la seguridad, el impacto para la comunidad, la complejidad relativa del trabajo y los requisitos normativos.

Dada la existencia de ciertas limitaciones económicas y de otro tipo, no todos los proyectos de capital pueden implementarse al mismo tiempo. Por lo tanto, el desarrollo inicial y la metodología de priorización se fundamentaron en las consideraciones más relevantes para cada área de enfoque de la inversión, con algunos criterios en común para todos los proyectos de capital, que incluyen:

- Estado actual del activo (es decir, fuera de servicio, dañado),
- Necesidades de cumplimiento reglamentario, de seguridad y de medio ambiente,
- Necesidades de las operaciones del sistema y limitaciones de la red,
- Impactos del rendimiento de la fiabilidad y/o de la infraestructura de carga crítica, y
- Mitigación de riesgos ante tormentas graves.

---

[98]  El Capítulo 7 (Carteras de mejoras de LUMA) ofrece un resumen detallado de las carteras de mejoras de LUMA y de los proyectos de capital priorizados.

Los proyectos de capital identificados en el Plan de Infraestructura a 10 años están previstos en tres periodos: corto plazo (2021-2023), mediano plazo (2024-2027) y largo plazo (del 2028 en adelante). Se espera que una proporción de los proyectos comience en el corto plazo, ya que muchos ya han comenzado con el diseño de la arquitectura e ingeniería (A&E) o tienen previsto hacerlo durante 2022 o 2023. Hay varias razones operacionales y políticas para asignar este orden, entre las que se incluyen las siguientes:

- Brindarles a los clientes resultados operacionales lo más rápido posible.
- Respaldar la ejecución del PIR aprobado y del Plan de Acción Modificado.
- Algunos proyectos de reconstrucción ya han completado las tareas preliminares de ingeniería y están listos para avanzar con el 30% de la fase de diseño de A&E.
- El alcance de algunos proyectos de infraestructura es muy amplio, por lo que deben comenzar en el corto plazo para poder ser completados dentro de los últimos años del plan.
- En muchos casos, las tareas de demolición, la remediación ambiental, los derechos de paso, los permisos y las aprobaciones deben llevarse a cabo antes de que comience el verdadero proyecto de reconstrucción.

6.1.1.2 RESUMEN DE PROYECTOS PRIORIZADOS

El Plan de Infraestructura a 10 años incluyó ocho (8) categorías de activos dentro de su marco de evaluación de necesidades: (1) generación; (2) embalses e hidroeléctricas; (3) transmisión; (4) distribución; (5) subestaciones; (6) IT/telecomunicaciones; (7) edificios, y (8) medio ambiente. Como ya se ha mencionado, e incluyendo la transmisión, la distribución, las subestaciones, las IT/telecomunicaciones y los edificios, son proyectos asociados al sistema de T&D, así como a los sistemas de manejo de la red y de comunicación que serán planificados y ejecutados por LUMA.[99] El total de fondos obligados por programa y clasificación de activos se incluye en la Gráfica 31 a continuación.

---

[99] El Capítulo 7 (Carteras de mejoras de LUMA) incluye más información sobre las carteras de mejoras de LUMA.

GRÁFICA 31: FINANCIAMIENTO TOTAL PARA LA RECONSTRUCCIÓN Y TRANSFORMACIÓN DE LA
RED Y LA GENERACIÓN[100]



Todos los estimados de costos incluidas en el Plan de Infraestructura a 10 años, según
enmendado, eran de "clase 5", es decir que fueron calculadas en una etapa temprana del proceso
de desarrollo del proyecto. Se prevé que estos estimados de costos variarán, de conformidad con
las normas de la industria de un 50% por debajo a un 100% por encima de los costos finales reales
del proyecto. Hay una serie de factores —incluido el perfeccionamiento de costos específicos del
proyecto, las tendencias de inflación, los cambios con el tiempo en las demandas y las necesidades
de activos específicos y del sistema, y los requisitos y la idoneidad de los fondos del programa
identificados— que se espera que conduzcan a cambios en los proyectos que se implementen en
última instancia y sus respectivos costos.

### 6.1.2 *Colaboración y coordinación en el plan de mejoras capitales del año fiscal 2022*

La planificación y los análisis significativos a corto plazo que completó la AEE, su inversión en
planes integrales para los horizontes temporales de 10 y 20 años, y el análisis y el trabajo en curso
de LUMA (incluyendo el Marco de Recuperación y Transformación propuesto y las actividades
incluidas en los Presupuestos Iniciales y el SRP de LUMA), ayudarán a garantizar que cada
proyecto de capital completado contribuya a los objetivos estratégicos y de rendimiento
identificados para el sistema. Además, a mediano y largo plazo, la realización de proyectos de
capital adicionales debería mejorar y acelerar sustancialmente la transformación de la

---

[100] Incluye fondos federales, costos compartidos, pagos de seguro y montos del pareo estatal. Plan de Infraestructura a 10 años de
la AEE, actualización de marzo de 2021, pág. 13. Nota: Todos los costos, fuentes de financiamiento y subtotales son estimados
y están sujetos a cambios.

infraestructura eléctrica de la isla en un sistema moderno, centrado en el cliente, asequible, fiable, resistente y sostenible (cambio transformacional).[101]

En el futuro, LUMA y la AEE deben garantizar que su priorización de proyectos de capital permita sortear las posibles compensaciones que puedan surgir de las necesidades de mano de obra y capital requeridas para completar las metas cruciales seleccionadas. Tanto la AEE como LUMA deben seguir colaborando para asegurarse de que estos esfuerzos de planificación de mejoras capitales avancen al ritmo y a la escala que se necesiten para que la transformación y la recuperación alcancen las metas de la política pública mencionada.

## 6.1.3 *Mejores prácticas para la ejecución de proyectos de capital*

La AEE y LUMA deben seguir las mejores prácticas de la industria para la ejecución de su cartera de proyectos de capital a fin de evitar costosos desfases de términos y presupuesto. Para ello, la AEE ha implementado un programa de Manejo de Proyectos Empresariales (EPM) que apoyará las obras de capital a cargo de la AEE. Durante el  periodo de transición inicial a lo largo del año fiscal 2022, LUMA ha completado gran parte del desarrollo de su nuevo equipo de programas de mejoras capitales, diseñado específicamente para manejar grandes proyectos de capital.

A medida que la AEE y LUMA comienzan su despliegue de proyectos, deben asegurarse de que las operaciones se basen en las mejores prácticas de la industria en cuanto a:

- Concesión de permisos;
- Supervisión de contratistas;
- Planificación;
- Manejo del flujo de trabajo;
- Seguridad;
- Capacitación y calificaciones;
- Manejo del desempeño; y
- Requisitos de presentación de informes.

Asimismo, cada una debe desarrollar un método para abordar y mitigar las posibles restricciones en la cadena de suministros, generadas por los ingresos de fondos federales en las distintas entidades y por las condiciones macroeconómicas generales.

### 6.1.3.1 RIESGOS Y MEDIDAS DE MITIGACIÓN

Nunca se han llevado a cabo en Puerto Rico mejoras en la infraestructura energética de la magnitud descrita en las actuales etapas de planificación. Una ejecución exitosa que permita enfrentar los desafíos descritos anteriormente y, en definitiva, cumpla con las metas de la política deseadas, necesita la colaboración y la atención de todas las partes interesadas del sistema de suministro de energía, los reguladores, los funcionarios públicos y los encargados de formular políticas. Dado el historial de la AEE de bajo rendimiento en la ejecución de capital, la transición exitosa de las operaciones y del mantenimiento de la generación preexistente al nuevo operador privado seleccionado por el Comité de Alianza de la APP será quizás el paso más importante para enfrentar estos desafíos. En última instancia, la colaboración y la alineación en tiempo real entre la AEE, LUMA, AAPP, COR3, NEPR, la Junta de Supervisión y otras entidades gubernamentales y partes interesadas federales serán fundamentales para garantizar la implementación y la

---

[101] Ver el Plan de Infraestructura a 10 años, actualización de marzo de 2021, p. 26-28, y la versión preliminar del Plan de Remediación del Sistema de LUMA, 23 de febrero de 2021, p. 27-29, 50.

finalización exitosa y oportuna de los planes de proyectos de capital financiados principalmente con fondos de los programas de FEMA y CDBG. Los fallos a la hora de abordar las necesidades del proceso y de lograr la colaboración entre las partes interesadas tendrán repercusiones nefastas en la reestructuración del sistema eléctrico, ya que los retrasos afectarán a la integración de los recursos renovables, al refuerzo de la red, a los costos de la electricidad para los residentes y los negocios, etc.

### 6.1.4 *Frecuencia de los informes*

El proceso de gestión de proyectos de la AEE descrito anteriormente contempla requisitos sobre los informes del proyecto que no solo incluyen deliberadamente, sino que son transparentes con las partes interesadas clave (locales, federales, Junta de Supervisión, etc.) y los encargados de tomar decisiones. La magnitud de las mejoras capitales que se llevarán a cabo (ya sea por la AEE o por operadores privados), la unión histórica de la transformación del sector energético de la isla y el nuevo papel de LUMA como operador del sistema de T&D y de los próximos operadores de generación preexistente en el futuro exigen que todas las partes interesadas sean informadas plena y oportunamente de todos los cambios y desarrollos y que dichas partes trabajen en colaboración más allá de dirigir las prácticas de los servicios públicos. La transparencia y la colaboración son fundamentales para alcanzar los objetivos de la política pública y del Plan Fiscal Certificado.

Como parte de esa gran transparencia, la AEE (para la generación) y LUMA (para el sistema de T&D) tienen como objetivo elaborar y publicar informes de rutina y registros de proyecto específicos para que las partes interesadas puedan acceder a datos en tiempo real y participar y buscar información en cualquier intervalo que sea necesario, tanto en proyectos específicos como en el sistema. Los requisitos de presentación de informes establecidos por la Junta de Supervisión están disponibles en el Capítulo 16: Informes posteriores a la certificación.

## 6.2   Fondos federales

### 6.2.1 *Resumen*

Como resultado de los graves daños provocados por varios desastres naturales que azotaron a Puerto Rico entre el 2017 y el 2020, la AEE ha reunido los requisitos para recibir asistencia federal por medio de múltiples programas que financian trabajos de emergencia y proyectos permanentes elegibles. Entre los desastres naturales, se incluyen los huracanes Irma y María en 2017 y un importante terremoto a principios de enero de 2020 (el "terremoto de 2020"). Como ya se ha dicho, estos daños se vieron agravados por años de escasa inversión y prácticas de funcionamiento y mantenimiento deficientes que dieron lugar a una infraestructura energética vulnerable.

La cantidad de fondos federales que se espera ingresen en Puerto Rico, más específicamente la porción destinada a la infraestructura energética, representa una oportunidad única para modernizar y reconstruir su sistema actualmente vulnerable. Será crucial utilizar estos fondos de forma eficiente; los fondos federales solo pueden utilizarse para el propósito aprobado.

La AEE y LUMA disponen de fondos de varios programas federales distintos, cada uno con sus propias directrices de financiamiento y procesos de reembolso:

1.  **Programa de Asistencia Pública (AP) de FEMA:** Este programa ofrece fondos para que las comunidades se recuperen de situaciones declaradas por el gobierno federal como emergencias o desastres por medio de las Secciones 428 (AP FEMA 428) y 406 (AP FEMA

406). Los fondos se destinan tanto a la ayuda de emergencia como al restablecimiento permanente de las infraestructuras.[102] En determinadas circunstancias, el financiamiento puede extenderse más allá de la restauración de la infraestructura y cubrir la mitigación de peligros futuros. Por ejemplo, medidas que reduzcan directamente la posibilidad de que se produzcan daños similares en el futuro.[103] La AEE debe cumplir un requisito de 10-25% de costos compartidos (dependiendo del tipo de proyectos) para todo el financiamiento del programa de AP.[104]

2. **Programa de Subvención para la Mitigación de Riesgos de FEMA (FEMA 404 HMGP)**: Este programa financia la protección de las zonas de una instalación que no han sufrido daños. También puede usarse para evitar o reducir los daños causados por desastres futuros. En virtud de la Sección 404, la AEE debe cumplir un requisito del 25% de costos compartidos para esta fuente de financiamiento, que hasta la fecha se ha cubierto con fondos de CDBG. Sin embargo, no hay garantía de que el futuro financiamiento de costos compartidos se financie con los fondos de CDBG.[105]

3. **Subvención en Bloque para el Desarrollo Comunitario (CDBG) - Programas de Mitigación (MIT) y Recuperación ante Desastres (DR) del Departamento de Vivienda y Desarrollo Urbano (HUD) federal**: Los fondos de los programas CDBG tienen que ocuparse del impacto provocado por un desastre en un lugar declarado por el presidente como área de desastre y cumplir con varios criterios adicionales. El objetivo de la AEE es usar los fondos de este programa para cumplir con los requisitos de costos compartidos de los programas de AP y 404 HMGP.

Como se observa en la Tabla 4 a continuación, se han destinado más de $14 mil millones, incluidos los costos compartidos y los fondos del pareo estatal, a reconstruir la infraestructura energética durante la próxima década. Debe tenerse en cuenta que los fondos de FEMA vienen con un requisito de 10-25% de costos compartidos que la AEE, como subconcesionario, debe cubrir tanto para los proyectos de generación como para los del sistema de T&D. Para la mayoría de los proyectos, la AEE prevé usar los fondos de CDBG del HUD para cubrir los costos compartidos. Por esa razón, los fondos de CDBG del HUD no se muestran por separado en la Tabla 4.

---

[102] Procedimientos Alternativos de Asistencia Pública de FEMA (Sección 428), Guía para obras permanentes del 10 de febrero de 2020. Documento Núm.: FEMA-4339-DR-PR

[103] Comunicado de prensa de FEMA, actualizado por última vez el 18 de marzo de 2021, extraído de: https://www.fema.gov/press-release/20210318/fema-hazard- mitigation-grants-404-and-406

[104] Procedimientos Alternativos de Asistencia Pública de FEMA (Sección 428), Guía para obras permanentes del 10 de febrero de 2020. Documento Núm.: FEMA-4339-DR-PR

[105] El HMGP 404 para DR-4339 fue totalmente compensado por CDBG.

TABLA 4: FINANCIAMIENTO TOTAL OBLIGATORIO POR PROGRAMA PARA LA TRANSFORMACIÓN Y RECONSTRUCCIÓN DE LA GENERACIÓN Y LA RED[106]

| Clasificación de activos | FEMA 428 ($M) | FEMA 404 ($M) | FEMA 406 ($M) | Costo total estimado ($M) |
|---|---|---|---|---|
| Distribución | $5,500 | $0 | $0 | $5,500 |
| Transmisión | $2,642 | $0 | $0 | $2,642 |
| Generación | $109 | $853 | $0 | $962 |
| Subestaciones | $782 | $0 | $0 | $781 |
| Proyectos hidroeléctricos, embalses e irrigación | $861 | $659 | $0 | $1,519 |
| IT y telecomunicaciones | $686 | $0 | $0 | $686 |
| Edificios | $125 | $0 | $0 | $125 |
| **Total** | **$10,705** | **$1,512** | **$0** | **$12,216** |

Hasta la fecha, la AEE ha recibido alrededor de $1.8 mil millones en fondos por medio del Programa de Asistencia Pública de FEMA, relacionados principalmente con los daños causados por los huracanes Irma y María. Los fondos se han usado, entre otras cosas, para cubrir los gastos del contratista relacionados con las obras de reconstrucción, así como el aumento en los costos de las plantas de pico (en general, plantas de generación de baja utilización, sumamente flexibles y más costosas, creadas para brindar energía durante periodos de demanda máxima). La Sección 0 ofrece un resumen de los fondos del Programa de Asistencia Pública de FEMA recibidos hasta la fecha. Hasta el momento, la AEE ha recibido nuevas obligaciones sobre FEMA 404 que ascienden a $1.5 mil millones y $4.7 millones sobre fondos CDBG del HUD.

6.2.1.1  RESUMEN DE LOS DISTINTOS PROGRAMAS Y FUENTES

**FONDOS RECIBIDOS HASTA LA FECHA: PROGRAMA DE ASISTENCIA PÚBLICA SEGÚN SECCIÓN 428 Y 406 DE LA FEMA**

El financiamiento en efectivo que la AEE ha recibido hasta la fecha y que ha sido proporcionado a través del Programa de AP de FEMA está relacionado con los costos de emergencia elegibles asociados con los huracanes de 2017 y el terremoto de 2020, como se muestra en detalle en la Gráfica 32.

Hasta febrero de 2022, la AEE ha recibido $1.6 mil millones en fondos del Programa de AP de FEMA en relación con los huracanes Irma y María. Los fondos recibidos tienen que ver con los gastos del contratista, la ayuda mutua, el aumento en los costos incurridos por la AEE en relación con un mayor uso de las plantas de pico y otros costos elegibles de la AEE.  La AEE espera recibir reembolsos adicionales una vez que FEMA confirme y/o modifique varias PW y que la AEE pueda presentar las SR.

La AEE ha recibido $238 millones del total de $317 millones consignados por el Programa de AP de FEMA desde febrero de 2022 para cubrir el aumento en los costos relacionados con un mayor

---

[106] Incluye fondos federales, costos compartidos, pagos de seguro y montos del pareo estatal. Plan de Infraestructura a 10 años de la AEE, actualización de marzo de 2021, pág. 13. Nota: Todos los costos, fuentes de financiamiento y subtotales son estimados y están sujetos a cambios.

uso de las plantas de pico producto de los daños causados por el terremoto de 2020, de enero a junio de 2020. En diciembre de 2020, la AEE presentó una revisión de los costos a fin de aumentar los fondos obligados para el  periodo de julio de 2020 hasta enero de 2021 por un total de $515 millones. No obstante, la cantidad que se espera que financie FEMA se verá reducida por los ingresos del seguro y los requisitos de costos compartidos locales.

El 27 de febrero de 2022, el Presidente de los Estados Unidos presentó una notificación que modificaba la del 16 de enero de 2020, por la que se aumentaba la porción federal del 75% al 90%. Actualmente, FEMA está realizando enmiendas a los proyectos previamente obligados para que todos los subrecipientes puedan reclamar fondos adicionales.

GRÁFICA 32: RESUMEN DE LOS REEMBOLSOS DE FEMA RECIBIDOS HASTA EL 25 DE FEBRERO DE 2022

| Reembolsos de la AP de FEMA | |
| --- | --- |
| **Categoría** | (millones de dólares) |
| **Cobra** | $944.4 |
| **Ayuda mutua** | 304.5 |
| **O&M y combustible de las plantas de pico por huracanes** | 149.1 |
| **Personal propio** | 52.2 |
| **Costo de administración** | 15.5 |
| **Otros** | 20.0 |
| **XGL** | 6.4 |
| **Contratistas locales** | 13.6 |
| **Whitefish** | 76.3 |
| **Subtotal de huracanes** | **$1,582.0** |
| **O&M y combustible de las plantas de pico por terremotos** | $238.0 |
| **Reembolso de emergencia total** | **$1,820.0** |

**FONDOS RECIBIDOS HASTA LA FECHA: PROGRAMA DE SUBVENCIÓN PARA LA MITIGACIÓN DE RIESGOS SEGÚN LA SECCIÓN 404 DE FEMA (FEMA 404 HMGP)**[107]

A la fecha, la AEE aún no ha recibido ninguno de los fondos correspondientes a los proyectos de FEMA 404 HGMP.  Actualmente, COR3 y el gobernador están conversando sobre los proyectos de FEMA 404 HMGP relacionados con las obras permanentes elegibles; además, se ha aprobado un total de $953 millones[108] para la AEE vinculados con mejoras en las plantas de agua y generación. Los proyectos no forman parte del Acuerdo global; de hecho, son adicionales a dicho Acuerdo. Se ha presentado a COR3 un total de $1.4 millones para su reembolso, que están pendientes desde marzo de 2022. Se han recibido varias solicitudes de información y la AEE está trabajando junto a COR3 para cerrar los asuntos sin resolver.

---

[107] Fuente: https://www.epa.gov/sites/production/files/2015-10/documents/hmgp.pdf

[108] Fuente: Cartas de aprobación de FEMA, con fechas de 29 de septiembre de 2020, 15 de octubre de 2020 y 16 de octubre de 2020.

**FONDOS RECIBIDOS HASTA LA FECHA: PROGRAMAS DE MITIGACIÓN Y RECUPERACIÓN ANTE DESASTRES - CDBG DEL HUD**[109]

Hasta la fecha, la AEE ha recibido $1.8 millones en fondos CDBG relacionados con las plantas de pico del huracán Irma.

El objetivo del programa de CDBG-DR es cubrir el 25% de los costos compartidos locales asociados con las reparaciones de emergencia necesarias tras el huracán Irma y el 10% de los costos compartidos locales vinculados con las reparaciones de obras permanentes debido a los daños causados por el huracán María. La finalidad del programa de CDBG-DR no es cubrir el 25% de los costos compartidos locales relacionados con los daños provocados por el terremoto de 2020, que han sido financiados por la AEE.

El 28 de julio de 2021, la AEE ejecutó un acuerdo de subconcesión con el Departamento de la Vivienda de Puerto Rico para utilizar los fondos de CDBG-DR con el fin de aportar los costos compartidos no federales para el proyecto elegible que asciende a $4,687,041.54. Más recientemente, el 25 de marzo de 2022, el HUD emitió una aprobación parcial del Plan de Acción del Estado Libre Asociado para su programa de mejoras del sistema eléctrico. El 31 de marzo de 2022, el Plan de Acción para la Optimización de la Red Eléctrica de Puerto Rico de CDBG-DR parcialmente aprobado se publicó en la página web de CDBG-DR del DV.[110] Este plan confirma la disponibilidad inicial de $500,000,000 para el requisito del 10% de costos compartidos destinados a las obras permanentes por los daños del huracán María conforme a los fondos de AP de FEMA.[111]

En el caso de las obras permanentes que no están incluidas en el Acuerdo global, la AEE debe conseguir fondos federales de FEMA 404 HMGP para los costos compartidos federales y de CDBG-MIT para los costos compartidos locales.

6.2.1.2 PROCEDIMIENTO DE REEMBOLSO DE TRABAJOS DE EMERGENCIA

Todo el financiamiento en efectivo para los trabajos de emergencia que la AEE ha recibido hasta la fecha en relación con los huracanes de 2017 y el terremoto de 2020 ha sido proporcionado mediante el Programa de AP de FEMA.

Como subrecipiente, el procedimiento general para que la AEE obtenga los fondos del Programa de AP de FEMA relacionados con los trabajos de emergencia incluye lo siguiente: que la AEE incurra en costos elegibles y los registre, que se elabore una Hoja de trabajo del proyecto (PW) por medio del proceso de confirmación de FEMA, que se confirmen los fondos para el recipiente y que se envíe la Solicitud de Reembolso (SR) y el subsiguiente financiamiento en efectivo para el subrecipiente. Los pasos detallados son los siguientes:

- La AEE incurre en costos debido a los daños provocados por uno o más desastres;
- La AEE lleva un registro de dichos costos y trabajos con FEMA y COR3 para determinar si reúnen los requisitos;

---

[109] Fuente: https://www.hud.gov/hudprograms/disaster-recovery

[110] Vea:  https://cdbg-dr.pr.gov/en/download/cdbg-dr-action-plan-for-the-electrical-systems-enhancements-effective-on-march-25-2022/?ind=1648758532100&filename=2022%2003%2025_ADM_POLI_Action%20Plan_Energy%20Action%20Plan%20Draft.pdf&wpdmdl=25442&refresh=627c0f6e213681652297582

[111] Ibid, Programa de Distribución de Costos para Rehabilitación y Reconstrucción de la Red Eléctrica (ER1), Tabla 20, p. 116.

- FEMA crea una PW que luego pasa por distintos niveles de revisión hasta que se confirma;

- Una vez confirmada la PW, los fondos son asignados al recipiente (es decir, COR3);

- Entonces, la AEE puede enviar una SR a COR3;

- COR3 revisa la SR y retira fondos de FEMA relacionados con la PW confirmada, que luego serán enviados a la AEE como subrecipiente; y

- Los fondos luego se transfieren de COR3 a la AEE.

Como ya se ha dicho, la porción federal de la ayuda en el marco de AP de FEMA no es inferior al 75% de los costos elegibles. Respecto del huracán Irma, la porción federal de AP de FEMA cubre el 75% de los costos elegibles, y respecto del terremoto de 2020, se ha enmendado recientemente un 90% de los costos compartidos. Para el huracán María, la porción federal del Programa de AP de FEMA cubre el 100% de los costos incurridos por la AEE hasta el 16 de agosto de 2018. A partir de esa fecha, cubre el 90%. Para que la AEE reciba fondos para cubrir los costos compartidos locales vinculados con los huracanes de 2017, la AEE y el DV deben ejecutar el acuerdo de subvención correspondiente, que está pendiente de aprobación final.

La AEE ha presentado proyectos al DV para obtener fondos de CDBG-DR a fin de cubrir los costos compartidos locales relacionados con proyectos de emergencia debido a los huracanes Irma y María. El 28 de julio de 2021, la AEE ejecutó un acuerdo de subconcesión con el Departamento de la Vivienda de Puerto Rico para utilizar los fondos de CDBG-DR con el fin de aportar los costos compartidos no federales para el proyecto elegible que asciende a $4.7 millones. La AEE espera pagar los costos compartidos locales vinculados con el terremoto de 2020.

6.2.1.3 Procedimiento de reembolso de obras permanentes

6.2.1.3.1        AP FEMA 428

La AEE debe recibir un reembolso por la porción federal de las obras permanentes por medio de la AP FEMA 428. El financiamiento de los trabajos permanentes puede aplicarse a proyectos vinculados con rehabilitar instalaciones por medio de la reparación o la restauración al diseño, la función y la capacidad que tenían antes del desastre, de conformidad con códigos y estándares.[112] A través de la AP FEMA 428, FEMA financiará la porción federal del 90% de los costos elegibles relacionados con el Acuerdo global. Los procedimientos para retirar los fondos obligados forman parte del acuerdo aceptado, tal como se establece en la Estrategia de adjudicación anticipada de FEMA (FAASt).

En lo que respecta específicamente a los daños causados por los huracanes Irma y María, la Ley de Presupuesto Bipartidista (BBA) permite que FEMA brinde asistencia para restaurar instalaciones o sistemas dañados por desastres que ofrecen servicios críticos conforme al estándar de la industria, independientemente de las condiciones en las que estuvieran antes del desastre. Es posible que FEMA apruebe estándares ampliamente aceptados y usados, o mejores prácticas generalmente aceptadas por expertos de la industria, en la medida en que dichos estándares sean razonables. La BBA permite reparar o reemplazar componentes que no fueron dañados durante el desastre si el trabajo es necesario para restaurar el funcionamiento del servicio crítico de la instalación o del sistema conforme a uno o más estándares de la industria aprobados. El estado

---

[112] Fuente: Guía para Solicitantes de Asistencia Pública de FEMA a partir de marzo de 2010.

de los componentes antes del desastre, independientemente de que estuvieran o no dañados, no es un factor que determine la elegibilidad del alcance del trabajo.

La porción federal del Acuerdo global en virtud de la AP 428 FEMA es de $9.5 mil millones (o el 90% de los $10.7 mil millones después de deducir los ingresos esperados del seguro de $193 millones). Aunque la AEE ha asumido que el 10% de los costos compartidos locales del Acuerdo global (que son aproximadamente $1.05 mil millones) se espera que sean financiados por CDBG-DR. El DV solo presentó $500 millones de costos compartidos locales al HUD para su aprobación. La AEE debe trabajar con diligencia para identificar la fuente de fondos necesaria para cubrir el requisito restante de alrededor del 50% de los costos compartidos, que incluye la realización de los ajustes tarifarios pertinentes. La falta de identificación de una fuente de financiamiento adecuada puede poner en peligro la capacidad de acceder y desplegar una parte importante de los fondos de FEMA.

El Acuerdo global puede ser estructurado como un programa de reembolso, pero la administración de la AEE trabaja actualmente con COR3 para solicitar adelantos que contribuyan con la situación de liquidez de la AEE. La AEE puede solicitar un adelanto de COR3 si se cumple con los siguientes criterios:[113]

- La PW está confirmada por FEMA;

- Se completó la obtención del adelanto, y el subrecipiente le ha adjudicado el contrato al proveedor;

- El subrecipiente proporciona un conjunto completo de documentos sobre la obtención y la adjudicación para el contrato por el cual se solicita el adelanto de fondos;

- El subrecipiente proporciona un cronograma de cuándo está previsto que se incurran y paguen los costos.

- El subrecipiente no tiene pagos adelantados pendientes/no confirmados para el contrato por el cual se solicita el adelanto de fondos; y

- COR3 determina que el subrecipiente tiene necesidades inmediatas de dinero en efectivo.

Si la AEE, o su agente autorizado, tiene que solicitar reembolsos en lugar de recibir adelantos, se espera que el proceso sea similar al de los trabajos de emergencia (vea la Sección 6.2.2). Sin embargo, para las obras permanentes, debe cumplirse con las siguientes acciones adicionales antes de la entrega de la SR:

- La AEE, o su agente, presenta los alcances del trabajo (SOW) del proyecto propuesto;

- COR3 y FEMA revisan los SOW para determinar su elegibilidad; y

- La AEE, o su agente, no puede comenzar las obras hasta tanto no reciba la aprobación del Programa de AP de FEMA y de Planificación ambiental y conservación histórica (EHP) de FEMA. Comenzar la construcción antes de que el Programa de AP de FEMA y EHP de FEMA terminen las revisiones podría poner en peligro una parte o la totalidad de los fondos federales para el proyecto.

---

[113] Consulte la sección Manejo de dinero en efectivo y pagos del Capítulo 7 de la Guía sobre Administración de Fondos Federales para la Recuperación de Desastres de COR3.

6.2.1.3.2          FEMA 404 HMGP

La AEE prevé obtener fondos de FEMA 404 HMGP para varios proyectos de mitigación que consisten en obras permanentes que no forman parte del Acuerdo global. Los proyectos de FEMA 404 HMGP suelen financiarse con un costo compartido federal del 75%. Sin embargo, el 22 de octubre de 2018, FEMA aprobó la solicitud del gobernador del 26 de febrero de 2018 para utilizar el método de pareo global para cumplir con el requisito del 25% de costo compartido no federal del HMGP. Por lo tanto, el Gobierno de Puerto Rico destinó alrededor de $1 mil millones en fondos de la CDBG-DR para brindar el costo compartido necesario para proyectos del HMGP.

Esto significa que se prevé que todos los proyectos del HMGP serán plenamente financiados, sin necesidad de costo compartido local adicional de la AEE. Se prevé que el financiamiento de la CDBG-DR cubra proyectos de pareo elegibles que servirán como costo compartido para el HMGP.

El proceso previsto para, en última instancia, obtener estos fondos es el siguiente:

- COR3 le notificará a la AEE, como subrecipiente, que los fondos de FEMA 404 HMGP están disponibles;

- Después de dicha notificación, la AEE presentará ante COR3 una carta de intención (CDI) que describa el alcance general de todo proyecto de mitigación de riesgos;

- COR3 revisará la CDI, determinará qué proyectos son consecuentes con la estrategia del gobernador e informará a la AEE qué proyectos están aprobados;

- La AEE puede entonces preparar un paquete integral que incluya información adicional sobre el alcance, cualquier autorización necesaria y presupuesto/costos previstos relacionados con el proyecto que se presentará ante COR3 y FEMA para su revisión y aprobación;

- Después de la revisión, FEMA puede incluir condiciones para el subrecipiente necesarias para la aprobación;

- La AEE puede comenzar a incurrir en costos solamente para proyectos que han sido aprobados por COR3 y FEMA;

- Una vez que incurre en los costos, la AEE puede presentar las SR.

- COR3 revisará las SR para determinar si son consecuentes con el proyecto y si son elegibles antes del desembolso de los fondos a favor de la AEE; y

- Los fondos luego se transferirán de COR3 a la AEE.

6.2.1.4 FUENTES DE FINANCIAMIENTO PARA EL REQUISITO DE COSTOS COMPARTIDOS DEL 10%

En virtud del Acuerdo global, es necesario que la AEE, o su agente, cumpla con un requisito de costos compartidos locales del 10% para sus proyectos de obras permanentes financiados por FEMA. La AEE tiene previsto cumplir con su porción del costo compartido local por medio del programa CDBG-DR, a medida que esté disponible. - Si estos fondos no están disponibles, la AEE debe encontrar financiamiento en otra parte o ajustar las tarifas para cubrir la obligación de costos compartidos locales.[114] La falta de identificación de los fondos necesarios para los costos

---

[114] Las proyecciones financieras incluidas en este Plan Fiscal Certificado suponen que los fondos de CDBG cubren el costo compartido local necesario para el financiamiento federal.

compartidos puede impedir que la AEE tenga acceso a la parte del Acuerdo global aportada por FEMA.

El acceso a los fondos de CDBG-DR y CDBG-MIT está sujeto a diversas medidas del HUD de los EE. UU. La Ley de Asignaciones exige que el HUD destine casi $2 mil millones de fondos de CDBG-DR para optimizar o mejorar los sistemas de energía eléctrica en respuesta al huracán María. El HUD anunció la asignación de estos fondos al Estado Libre Asociado y estableció que la asignación al sistema de energía eléctrica se regirá por un aviso posterior. Por lo tanto, se le prohíbe al recipiente el uso de los fondos de CDBG-MIT para actividades de mitigación con el fin de reducir el riesgo de daños provocados por los desastres a los sistemas de energía eléctrica hasta tanto el HUD publique el aviso del Registro Federal que rige el uso de los casi $2 mil millones para optimizar o mejorar los sistemas de energía eléctrica.[115]

A fin de recibir los fondos de CDBG-DR y CDBG-MIT para los costos compartidos locales asociados a los proyectos de obras permanentes, el HUD debe presentar un aviso en el Registro Federal que regule el uso de los casi $2 mil millones de fondos CDBG-DR para la mejora de los sistemas de energía eléctrica.   El proceso de reembolso de CDBG-DR y CDBG-MIT respetará la "Guía de implementación para el uso de los fondos de la Subvención en Bloque para el Desarrollo Comunitario - Recuperación ante Desastres como costo compartido no federal" con fecha del 13 de octubre de 2020.  El 22 de junio de 2021, el HUD publicó el Registro Federal Vol. 86, Núm. 117 (22 de junio de 2021), 86 FR 32681, que regula el uso de la asignación de $2 mil millones de CDBG-DR para mejorar o potenciar los sistemas de energía eléctrica en Puerto Rico y las Islas Vírgenes estadounidenses. De esos $2 mil millones, $1.9 mil millones fueron asignados a Puerto Rico para mejorar el sistema de energía eléctrica, y quedaron solo $500 millones disponibles para el uso de la AEE como costos compartidos, ya que el resto se asigna para facilitar proyectos comunitarios y desarrollos del sector privado y sin fines de lucro. La AEE tendrá que identificar la fuente de financiamiento para el resto de sus responsabilidades de pareo, con el riesgo de no entregar los fondos disponibles de FEMA para la recuperación y reconstrucción del sistema energético.

### 6.2.2 *Impacto del financiamiento federal*

La transformación exitosa del sistema energético de Puerto Rico exigirá inversiones de capital significativas, al menos, durante los próximos diez (10) años. El financiamiento federal es fundamental para mitigar la carga que estos costos representan para los abonados. Con un financiamiento federal adecuado, el impacto general en las tarifas energéticas no sería tan oneroso en los próximos diez (10) años.

Los fondos federales asignados son necesarios para la implementación completa de los planes de modernización de la red de Puerto Rico. Si el financiamiento federal no se materializa, o los costos resultan ser más caros, Puerto Rico tendría que hacer una difícil elección entre aumentar las tarifas de energía para satisfacer las necesidades de inversión de capital no financiadas, o seguir sin poder implementar las reparaciones necesarias y la modernización del sistema de la red que se pide en la Política Pública de Puerto Rico y que se recoge en el PIR aprobado por el Negociado de Energía de Puerto Rico (NEPR), el Plan de Infraestructura a 10 años, los Planes Fiscales Certificados para la AEE y Puerto Rico, y el Marco de Recuperación y Transformación de LUMA tal y como se detalla en los Presupuestos Iniciales y el SRP.

---

[115] Consulte el Expediente Núm. FR-6109-N-04.

Más allá del impacto en dólares para los clientes, la falta de fondos federales tendría graves consecuencias en la resiliencia del sistema y en el logro de la visión energética a largo plazo de la AEE y del Marco de Recuperación y Transformación de LUMA. La falta de financiamiento federal disponible para la reconstrucción del sistema de T&D y las plantas de generación representa un riesgo significativo para la ejecución y la rentabilidad del servicio en general. Los fondos federales también son fundamentales para realizar las mejoras en el sistema que son necesarias para la resiliencia y el cumplimiento ambiental, incluido el uso de microrredes, los recursos de energía distribuida y los recursos renovables.

### 6.2.3 *Distribución de responsabilidades de fondos federales para el sistema de T&D*[116]

El sector energético de Puerto Rico continúa avanzando en su transformación, de conformidad con la política pública energética de Puerto Rico. Durante el año fiscal 2022, LUMA seguirá teniendo el control total de las funciones de operación y mantenimiento del sistema de T&D y proporcionará los servicios de O&M que se detallan y definen en el AOM para T&D, que incluyen la realización y supervisión de las mejoras de capital del sistema de T&D.

El AOM para T&D establece funciones y responsabilidades específicas para LUMA, la AEE y la AAPP en relación con el uso, el manejo, los registros y la supervisión de los fondos federales utilizados para las mejoras capitales al sistema de T&D (que comprenden la reconstrucción de la red). Las partes que integran el AOM para T&D colaborarán y trabajarán, tal como se establece en dicho AOM, para garantizar el cumplimiento legal, el uso eficaz y eficiente de los fondos federales, la máxima elegibilidad de los proyectos para fondos federales y el acceso y el mantenimiento de los registros adecuados con fines de auditoría de cumplimiento.

### 6.2.4 *Desafíos y medidas de mitigación*[117]

La AEE y LUMA trabajan en coordinación para evaluar los riesgos y las medidas de mitigación como parte del proceso más amplio de la planificación de mejoras capitales para los gastos de capital financiados por el Gobierno Federal bajo el AOM para T&D. Las áreas de riesgo clave incluyen permisos (locales y federales), cumplimiento de los requisitos de financiamiento federal y elegibilidad de los proyectos relacionados con el sistema de T&D para los fondos federales (maximizando la elegibilidad de los proyectos nuevos o adicionales, más allá de aquellos elegibles en virtud de FEMA 428).

LUMA ha creado una oficina de manejo de riesgos que se encarga de identificar los riesgos del proyecto, analizar la probabilidad, el impacto y la clasificación de los riesgos, planificar la mitigación de estos y calcular los niveles de contingencia necesarios para mitigar los riesgos inevitables. Además, LUMA sigue preparando una evaluación de riesgos y análisis en apoyo de la priorización y planificación de los proyectos de capital del sistema de T&D que tengan en cuenta el PIR, las proyecciones de carga y energía, la proyección del precio y la cantidad de combustible, los planes del sistema a largo y corto plazo y los planes anuales de operación y mantenimiento propuestos.

Como se establece en el AOM para T&D, la AEE y LUMA también deben cooperar con la AAPP para obtener y mantener todas las aprobaciones gubernamentales, tal como se define en el

---

[116] Esta sección hace referencia al Acuerdo de operación y mantenimiento (AOM para T&D) con fecha del 22 de junio de 2020, celebrado entre la AEE, LUMA Energy, LLC, LUMA Energy Servco, LLC y la AAPP. Todo el lenguaje y las declaraciones de esta sección son meramente ilustrativas, deben interpretarse en virtud del AOM para T&D y están sujetos a dicho AOM.

[117] Ibid.

acuerdo. En lo que respecta al financiamiento federal, así como a los asuntos de elegibilidad de los proyectos, LUMA es responsable de la obtención y administración de los fondos federales, con el apoyo de la AEE y la AAPP, según corresponda, y del cumplimiento de las leyes, reglamentos y políticas aplicables, según lo dispuesto en el AOM para T&D.[118]

### 6.2.5 *Resumen de la frecuencia de los informes y nivel de detalle*

Los informes de la AEE relacionados con los avances en la restauración, los avances en la reconstrucción, los gastos y los reembolsos para los trabajos de emergencia se han presentado en forma semanal y seguirán presentándose hasta completar el proyecto y pagar las cantidades pendientes. El informe breve sobre la restauración y la reconstrucción incluye información clave dividida en categorías principales de gastos, por ejemplo, cantidades presentadas ante FEMA, cantidades confirmadas por PW, fondos federales recibidos, dinero en efectivo pagado a los proveedores, montos de las facturas, cuentas por pagar pendientes, estado de las SR, etc. Si bien casi todas las actividades hasta la fecha han estado relacionadas con trabajos de emergencia, las obras permanentes futuras se informarán según lo acordado en el AOM para T&D. LUMA debe desarrollar su propia cadencia y estructura de presentación de informes del sistema de T&D para las partes interesadas pertinentes, incluida la AEE como responsable del sistema de T&D y subrecipiente de fondos federales según los reglamentos de FEMA.

---

[118] Consulte, por ejemplo, las Secciones 5.9 (a), (b) y (c) del AOM para T&D.

# Capítulo 7. Carteras de mejoras de LUMA

LUMA es responsable de supervisar las mejoras del sistema de T&D, incluyendo la planificación y ejecución de proyectos de capital. Se obligaron fondos por un valor de $10.7 mil millones para utilizarlos en la reconstrucción y transformación del sistema de generación de energía y de T&D de Puerto Rico.

Como requisito de la transición inicial, LUMA desarrolló un conjunto de programas de mejoras con el fin de restaurar y modernizar el sistema de T&D de Puerto Rico, incluidos los procesos y el sistema de manejo. Posteriormente, los programas se organizaron en siete carteras interdependientes sobre temas similares que, en forma conjunta, cubren todas las áreas funcionales del servicio público. Estas carteras de mejoras están descritas en los Presupuestos Iniciales de LUMA y en el SRP. El presupuesto inicial de LUMA fue revisado por la AAPP y aprobado por el NEPR el 31 de mayo de 2021, antes del inicio del servicio y de la implementación del programa.[119] Además, el SRP de LUMA fue revisado por la AAPP y aprobado por el NEPR el 23 de junio de 2021, antes del inicio del servicio y de la implementación del programa.[120] Posteriormente, LUMA presentó los Presupuestos Anuales para el año fiscal 2023 ante el NEPR el 1 de abril de 2022 y una actualización del SRP el 14 de abril de 2022. La relación entre los presupuestos de LUMA y el SRP es la siguiente:

- **Presupuestos de LUMA:** Los presupuestos de LUMA contienen los gastos operacionales y de capital del sistema de T&D para el próximo año fiscal y los presupuestos proyectados de los mismos para los dos años fiscales subsiguientes, en conjunto los próximos tres años de operación del sistema de T&D por parte de LUMA. Todas las carteras de mejoras y los gastos asociados para el periodo comprendido entre el año fiscal 2023 y el año fiscal 2025 se incluyen en la solicitud presupuestaria más reciente de LUMA.

- **Plan de Remediación del Sistema (SRP):** El SRP es un plan para "remediar, reparar, reemplazar y estabilizar los equipos, los sistemas, las prácticas y los servicios" en el sistema de T&D de modo tal que los procesos y los activos existentes que no cumplen con las normas de desempeño exigidas por el AOM para T&D comiencen a hacerlo. El SRP solo incluye las iniciativas para remediar las fallas en los procesos o los activos que resulten de alto impacto y alta probabilidad. Por eso, el SRP proyecta un *subconjunto* de programas de mejoras relacionados con el programa de T&D y los gastos operacionales y de capital correspondientes hasta el año fiscal 2029.

Al desarrollar los programas de mejoras para los activos del sistema físico y para los procesos y el sistema de manejo, LUMA utilizó un método dividido en tres etapas: (a) evaluar el estado actual del sistema; (b) analizar y comparar el estado actual con los estándares del sector y con los estándares del AOM para T&D, y desarrollar iniciativas para abordar las brechas identificadas; y (c) priorizar y ordenar las iniciativas según la importancia y los documentos de referencia. Los programas similares se compilaron en siete (7) carteras: (1) servicio al cliente; (2) distribución; (3) transmisión; (4) subestaciones; (5) edificios y centros de control; (6) habilitación; y (7) servicios de asistencia.

---

119 Determinación sobre la presentación de los Presupuestos Iniciales de LUMA el 31 de mayo de 2021, identificación del expediente: NERP-MI-2021-0004,
120 Resolución y orden por la que se aprueba la propuesta de Plan de Remediación del Sistema presentada el 23 de junio de 2021, identificación del expediente: NERP-MI-2020-0019

Las carteras de mejoras utilizan distintos tipos de fondos según el alcance de cada programa y las limitaciones con respecto al uso de los fondos (limitaciones sobre el uso de ciertos tipos de fondos federales). Los gastos operacionales relacionados con el programa, el capital financiado por el Gobierno Federal y el capital no financiado por el Gobierno Federal se asignan a los programas de mejoras. LUMA ha proyectado gastar alrededor de $3.5 mil millones en carteras de mejoras desde el año fiscal 2023 al año fiscal 2025.

A través de la implementación de sus carteras de mejoras, LUMA ya ha logrado importantes avances operacionales dentro de los primeros nueve meses del año fiscal 2022, entre ellos, la mejora de las métricas de seguridad en un promedio del 82%, la activación de más de 17,000 clientes de medición neta de energía que representan 95 MW de energía solar distribuida, y la habilitación de más de 1 millón de registros electrónicos o descargas de aplicaciones para permitir a los clientes conectarse con LUMA en línea. Además, LUMA ha atendido más de 2.7 millones de llamadas, con lo que ha reducido el tiempo de espera de las llamadas de los clientes a menos de 1 minuto, en lugar de más de 26 minutos, y ha demostrado una mejora de 80 puntos en la puntuación de satisfacción del cliente de J.D. Power. LUMA también ha desarrollado 190 alcances iniciales de trabajo que suponen $7.8 mil millones de financiamiento federal y han avanzado en 79 proyectos, que representan $1.2 mil millones en ingeniería preliminar. La Sección 7.4 ofrece un resumen de las mejoras continuas previstas.

## 7.1 Antecedentes de las carteras y los programas de mejoras de LUMA

### 7.1.1 Desarrollo de las carteras y los programas de mejoras

Para desarrollar las carteras y los programas de mejoras descritos a continuación, LUMA utiliza un método dividido en tres etapas: (1) evaluación; (2) análisis; y (3) planificación.

**Evaluación**

En la etapa de evaluación, LUMA hizo una evaluación de la brecha y determinó el estado de los activos del sistema de T&D existentes, y los procesos y sistemas de manejo de la AEE. Al evaluar los activos físicos, LUMA le asignó a cada activo una calificación de 0 a 4 según su condición de salud, tal como se define en la Gráfica 33. Respecto de los procesos y los sistemas de manejo existentes, la

Gráfica 34 incluye los criterios de calificación de la madurez de la organización que usó LUMA para calificar diferentes partes de la organización existente.

Al evaluar los activos, LUMA identificó que la falta de datos precisos para fundamentar las decisiones de negocios y de manejo de activos era especialmente frecuente. De acuerdo con la muestra de inspecciones de activos, la salud de los activos era sistemáticamente deficiente como consecuencia de los daños provocados por las tormentas y el mantenimiento postergado. Al evaluar la organización, se observaron niveles bajos de madurez, ya que la calificación en la mayoría de las áreas de la organización fue "Falta de atención" o "Atención básica". LUMA señaló en el SRP que la mayoría de las empresas de servicios eléctricos en América del Norte tienen una calificación de madurez que está entre "En desarrollo" y "Competente". De acuerdo con los resultados de su evaluación, LUMA señaló que los activos físicos y los procesos y sistemas de la organización necesitaban importantes recursos de mejora y capital.

GRÁFICA 33: DEFINICIONES DE LAS CALIFICACIONES DE LA CONDICIÓN DE SALUD DE LOS ACTIVOS FÍSICOS



GRÁFICA 34: CRITERIOS DE CALIFICACIÓN PARA EVALUAR LA MADUREZ DE LA SALUD DE LA ORGANIZACIÓN

## Análisis

En la etapa de análisis, LUMA comparó las condiciones que surgieron en la evaluación con las normas del sector y desarrolló más de 600 iniciativas para remediar los problemas identificados, recuperar la infraestructura, lograr mejoras en las operaciones y la satisfacción del cliente y cumplir con las obligaciones normativas (por ejemplo, estándares de cartera renovable). Se evaluaron todas las iniciativas para determinar su inclusión en el SRP. Aquellas iniciativas para remediar las fallas en los procesos o los activos que resulten de alto impacto y alta probabilidad se incluyeron como iniciativas del SRP.

## Planificación

En la etapa de planificación, LUMA utilizó un marco para priorizar y ordenar los programas, que se analiza con más detalle en la Sección 7.2. El proceso de planificación de LUMA se basó en varios documentos de referencia, tales como el Plan Integrado de Recursos (PIR) aprobado y el Plan de

Acción Modificado, los Planes Fiscales Certificados anteriores, el Plan de Modernización de la Red de COR3, la Ley Núm. 17 de 2019 y varios informes de ingeniería independientes, así como informes de evaluación de daños de FEMA. Los programas de mejoras se elaboraron teniendo presente la política pública de Puerto Rico.

### 7.1.2 *Resumen de las carteras de mejoras*

Las iniciativas se agruparon en programas, y esos programas se organizaron luego en siete (7) carteras interdependientes de tamaño similar que, en conjunto, cubren todas las áreas funcionales del servicio público:

1. La **cartera de servicio al cliente** incluye programas para mejorar el servicio al cliente con tecnología de servicio al cliente modernizada, mejorar los sistemas de facturación, implementar infraestructura de medición avanzada, establecer el programa "La voz del cliente" y actualizar y reemplazar la distribución de alumbrado público.

2. La **cartera de distribución** incluye mejoras en el sistema de distribución, incluso reconstrucción de líneas de distribución aéreas y soterradas, reparación de postes y conductores, inspecciones del sistema con reparaciones y reemplazos ad hoc que se atienden al momento, e implementación de tecnología que permita planificar.

3. La **cartera de transmisión** incluye mejoras en el sistema de transmisión, incluso reconstrucción y fortalecimiento de líneas, reemplazo de postes prioritarios, inspecciones del sistema con reparaciones y reemplazos ad hoc que se atienden al momento, mejoras en los sistemas de monitoreo de la transmisión e inversiones en telecomunicaciones para mejorar las comunicaciones con el personal de primera respuesta y de respuesta ante emergencias, además del control y monitoreo centralizado.

4. La **cartera de subestaciones** incluye inversiones para reconstruir, fortalecer y modernizar las subestaciones de transmisión y distribución, incluso actualizaciones de la seguridad física y estudios para eliminar las principales interrupciones en cascada y garantizar que el sistema cumpla con las leyes, los códigos y las normas que correspondan.

5. La **cartera de edificios y centro de control** incluye inversiones para reconstruir las instalaciones dañadas, actualizar los sistemas de seguridad e implementar sistemas avanzados de manejo de distribución y de energía que permitan la integración y el despacho de recursos de energía renovable, respuesta a la demanda y almacenamiento en baterías.

6. La **cartera habilitadora** incluye una serie de programas de seguridad y excelencia operacional, que incluyen brindar herramientas nuevas y equipos de protección personal (EPP), capacitaciones sobre seguridad y habilidades para todos los empleados, una nueva oficina de administración de programas para planificar y ejecutar proyectos de capital importantes, un nuevo sistema de datos para administrar la información sobre los activos de T&D y el manejo de la flota y la vegetación.

7. La **cartera de servicios de asistencia** incluye programas interdisciplinarios que abarcan a todos los departamentos, como Recursos Humanos, IT/OT y Finanzas. Esta cartera también incluye estudios sobre integración de recursos renovables y minirredes.

### 7.1.3 *Resumen de los gastos previstos por cartera de mejoras hasta el año fiscal 2025*

Los Presupuestos Iniciales diseñados por LUMA incluyen los gastos estimados anuales propuestos para cada cartera desde el año fiscal 2023 hasta el año fiscal 2025. Los estimados para el año fiscal 2025 incluyen programas con financiamiento federal, gastos de capital financiados con fondos no federales y gastos operacionales relacionados con el programa. En la Gráfica 35 se incluyen los gastos anuales estimados propuestos para cada cartera, tal como se presentaron al NEPR el 2 de abril de 2022.

GRÁFICA 35: GASTOS ESTIMADOS ANUALES DE LA CARTERA DE MEJORAS PROPUESTA POR LUMA ENTRE EL AÑO FISCAL 2023 Y EL AÑO FISCAL 2025 (MILLONES DE DÓLARES NOMINALES)

| Cartera | AF2023 | | | | AF2024 | AF2025 |
|---|---|---|---|---|---|---|
| | Capital financiado con fondos federales | Capital financiado con fondos no federales | Gastos operacionales | Gasto total estimado | Gasto total estimado | Gasto total estimado |
| Experiencia del cliente | 107 | 7 | 21 | 135 | 119 | 139 |
| Distribución | 151 | 15 | 13 | 179 | 306 | 577 |
| Transmisión | 126 | 0 | 0 | 127 | 279 | 374 |
| Subestaciones | 111 | 22 | 2 | 135 | 173 | 71 |
| Edificios y centro de control | 45 | 4 | 3 | 51 | 91 | 89 |
| Habilitación | 20 | 22 | 71 | 113 | 124 | 122 |
| Servicios de asistencia | 9 | 10 | 84 | 102 | 92 | 91 |
| **Suma total** | **569** | **78** | **195** | **842** | **1,185** | **1,463** |

## 7.2   Metas y hoja de ruta de los programas de mejoras

A fin de darles prioridad y orden a los trabajos de mejoras, LUMA elaboró un Marco de Recuperación y Transformación y una hoja de ruta que servirá de guía para planificar y tomar decisiones en todos los objetivos de la transición inicial, incluidos el SRP y las carteras de mejoras. LUMA señala que el marco contempla los objetivos de la política pública, las necesidades de las partes interesadas y los requisitos normativos y contractuales. El marco incluye cinco (5) metas clave en lo que respecta a cumplir con la misión de LUMA de ofrecer un servicio eléctrico sostenible, seguro, resistente, confiable y enfocado en el cliente, a precios razonables:

1.   **Priorizar la seguridad:** Reformar las actividades del servicio público a manera de fomentar una cultura de seguridad sólida que se centre en proteger a los empleados y a las personas de Puerto Rico;

2.   **Mejorar la satisfacción de los clientes:** Transformar las operaciones para ofrecerles a los clientes una experiencia positiva y un servicio eléctrico confiable a precios razonables;

3.  **Lograr la reconstrucción y resiliencia del sistema:** Utilizar los fondos federales de forma eficaz para restaurar la red y mejorar la resiliencia de la infraestructura vulnerable;

4.  **Perseguir la excelencia operacional:** Permitir que los empleados persigan la excelencia operacional por medio de nuevos sistemas, procesos y capacitaciones; y

5.  **Permitir la transformación energética sostenible:** Modernizar la red y el servicio público para permitir la transformación energética sostenible.

La fase de recuperación de la hoja de ruta comienza con la restauración de la infraestructura y los procesos de alto riesgo para lograr que sean seguros y funcionen. Durante esta etapa, LUMA completará las inversiones para remediar los sistemas y procesos, además de la red. Después de estabilizar la infraestructura y los procesos, LUMA implementará la fase de transformación, con el fin de volver a diseñar el servicio público para que cumpla con los políticas energéticas de Puerto Rico y satisfaga las necesidades para las décadas venideras. La recuperación y la transformación no son fases secuenciales distintas, ya que muchos programas de transformación comenzarán al mismo tiempo y en coordinación con los programas de recuperación. La hoja de ruta de la recuperación y la transformación se incluye en la Gráfica 36.

GRÁFICA 36: HOJA DE RUTA DE RECUPERACIÓN Y TRANSFORMACIÓN PROPUESTA POR LUMA[121]



---

121 Presentación del Plan de Remediación del Sistema en virtud de la Sección 4.1(d) del Acuerdo de operación y mantenimiento para la evaluación y aprobación del Negociado de Energía. In Re: Revisión del Plan de Remediación del Sistema por parte de la Autoridad de Energía Eléctrica. Caso Núm. NEPR-MI-2020-0019. 24 de febrero de 2021.

## 7.3    Carteras de mejoras

Después de desarrollar sus programas de mejoras como se explicó más arriba, LUMA los organizó posteriormente en siete (7) carteras interdependientes de tamaño similar que, en conjunto, cubren todas las áreas funcionales del servicio público: (1) servicio al cliente; (2) distribución; (3) transmisión; (4) subestaciones; (5) edificios y centro de control; (6) habilitadora; y (7) servicios de asistencia. Para cada uno de los programas incluidos en las carteras, LUMA elaboró un resumen del programa y desarrolló los beneficios, costos y metas cruciales principales. Los programas dentro de cada cartera se resumen a continuación, con los fondos anuales estimados y las fuentes de dichos fondos. Se incluyen beneficios y datos adicionales para uno o dos programas clave dentro de cada cartera.

En el Apéndice C de los Presupuestos Anuales de LUMA presentados al NEPR se pueden encontrar más detalles sobre todos los programas de mejoras.[122] A continuación, se resumen los principales programas de mejoras por cartera.

### 7.3.1 Cartera de servicio al cliente

El servicio al cliente se mejorará de diferentes maneras. El programa de LUMA "La voz del cliente" y el uso de tecnología mejorada de servicio al cliente mejorará la interacción con los clientes. Asimismo, se reparará el alumbrado público y se mejorarán los sistemas de facturación.  La Infraestructura de Medición Avanzada (AMI) extenderá la lectura remota de contadores, junto con una serie de capacidades de control, informe y vínculo con los clientes. La siguiente gráfica incluye un resumen de los gastos de cada uno de los programas más importantes de la cartera de servicio al cliente.

GRÁFICA 37: GASTOS ESTIMADOS DE LA CARTERA DE SERVICIO AL CLIENTE POR PROGRAMA (MILLONES DE DÓLARES REALES)

| Programas de experiencia del cliente | AF2023 | | | | AF2024 | AF2025 |
|---|---|---|---|---|---|---|
| | Capital financiado con fondos federales | Capital financiado con fondos no federales | Gastos operacionales | Gasto total estimado | Gasto total estimado | Gasto total estimado |
| Distribución de alumbrado público | 105 | - | - | 105 | 70 | 80 |
| Precisión de la facturación y sector administrativo | - | 1 | 12 | 13 | 12 | 11 |
| Programa de recuperación de pérdidas | - | - | 5 | 5 | 8 | 16 |
| Mantenimiento y reemplazo de contadores de distribución | 2 | 1 | 1 | 4 | 22 | 22 |
| Preparación de la tienda de contadores y medición estandarizada | - | 4 | 1 | 4 | 4 | 7 |

---

122  Presentación de los Presupuestos Anuales en el Caso Núm. NEPR-MI-2021-0004. 1 de abril de 2022.

| | | | | | |
|---|---|---|---|---|---|
| Tecnología de servicio al cliente modernizada | - | 2 | 1 | 3 | 2 | 3 |
| Facturación del alumbrado público | - | - | 1 | 1 | 1 | - |
| Programa de "La voz del cliente" | - | 0 | 1 | 1 | 1 | 1 |
| Programa de implementación de AMI | - | - | - | - | 0 | - |
| **Suma total** | **107** | **7** | **21** | **135** | **119** | **139** |

Un programa de mejoras clave en la cartera de servicio al cliente es el programa de precisión de la facturación y sector administrativo.

**Precisión de la facturación y sector administrativo**

Resumen del programa:

El programa de precisión de la facturación y sector administrativo incluye actualizaciones de la impresión y entrega de facturas (BP&D) y de otros sistemas administrativos para garantizar que LUMA pueda seguir emitiendo facturas a los clientes. La tecnología, las máquinas y los sistemas actuales han quedado obsoletos, lo que crea un pasivo financiero en ingresos retrasados de unos $12.5 millones por cada día que no se emiten facturas. Esta actualización incluye la adquisición de nuevo hardware y software para facilitar la facturación y los contratos con los clientes, junto con la eliminación de los equipos innecesarios de impresión y ensobrado de facturas. Además, el programa apoya la tramitación administrativa de las órdenes de servicio y moviliza recursos para resolver los atrasos de las cuentas estimadas y no facturadas. El programa también implementa un tablero de métricas de la experiencia del cliente y una tecnología de asignación de agentes para los servicios de facturación con el fin de reducir el tiempo de resolución y aumentar la satisfacción del cliente.

Beneficios del programa:

Los beneficios de este programa incluyen los siguientes:

- Proporcionar precios más razonables a los clientes gracias a la mejora de la eficiencia y la eliminación de los retrasos en la facturación;

- Ofrecer una experiencia más positiva a los clientes mediante el perfeccionamiento en el manejo de la facturación y las funciones administrativas asociadas, junto con un mayor uso de las plataformas digitales para relacionarse con los clientes;

- Mejorar el manejo sistemático del negocio a través de la eliminación de la gran cantidad de cuentas estimadas acumuladas, no facturadas y otras relacionadas con las excepciones, lo que aumentará la eficiencia del sector administrativo, mejorará las métricas de cobro y reducirá las cuentas por cobrar;

- Aumentar la productividad de los empleados y la calidad del trabajo al mejorar la distribución y el manejo automatizado del trabajo administrativo para los agentes de este sector;

- Fomentar la resiliencia del sistema de facturación mediante la asignación de la función de BP&D a un proveedor externo que cuente con un plan fiable de respuesta ante emergencias y un plan de continuidad de la actividad; y

- Habilitar la transformación digital reduciendo de forma activa los procesos manuales existentes y contribuir a la implementación de un sistema de manejo de la fuerza laboral.

## 7.3.2 *Cartera de distribución*

El sistema de distribución recibió reparaciones temporales de emergencia después de los huracanes Irma y María con el fin de restaurar rápidamente el servicio, y ha necesitado más obras de recuperación permanente. Por lo tanto, la mayor parte de los gastos de la cartera de distribución durante los próximos tres años se centrará en mejorar la resiliencia y la recuperación del sistema. Las inversiones para fomentar la confiabilidad también ayudarán a proporcionar una mejor experiencia al cliente; además, las inversiones para automatizar la distribución contribuirán a la transformación energética sostenible. La siguiente gráfica incluye un resumen de los gastos de los programas más importantes de la cartera de distribución.

GRÁFICA 38: GASTOS ESTIMADOS DE LA CARTERA DE DISTRIBUCIÓN POR PROGRAMA (MILLONES DE DÓLARES NOMINALES)

| Programas de distribución | AF2023 | | | | AF2024 | AF2025 |
|---|---|---|---|---|---|---|
| | Capital financiado con fondos federales | Capital financiado con fondos no federales | Gastos operacionales | Gasto total estimado | Gasto total estimado | Gasto total estimado |
| Reparación de conductores y postes de distribución | 54 | 1 | 11 | 66 | 71 | 81 |
| Reconstrucción de las líneas de distribución | 51 | 5 | 0 | 56 | 161 | 422 |
| Automatización de la distribución | 26 | 8 | 1 | 36 | 53 | 53 |
| Evaluación de las líneas de distribución | 20 | 0 | 1 | 21 | 20 | 20 |
| **Suma total** | **151** | **15** | **13** | **179** | **306** | **577** |

Un programa de mejoras clave dentro de la cartera de distribución es la reconstrucción de las líneas de distribución.

**Reconstrucción de las líneas de distribución**

Resumen del programa:

Este programa reemplaza las líneas de distribución aéreas y soterradas que están dañadas o no son eficaces. Este programa incluye las siguientes iniciativas, una mezcla de obras contempladas y no contempladas en el SRP:

- Actualizar las líneas de distribución para mejorar la confiabilidad y la resiliencia;

- Restaurar los circuitos que no funcionan en los casos en que se considere necesario;

- Completar la construcción de circuitos inconclusos actualmente abandonados según se considere necesario;

- Realizar conversiones de voltaje de los circuitos para mejorar la capacidad de distribución (no incluido en el SRP);

- Extender las líneas de distribución para conectar a clientes nuevos (no incluido en el SRP); y

- Instalar cables soterrados o una red en árbol para mejorar la fiabilidad y la resiliencia del servicio que reciben clientes críticos (no incluido en el SRP).

Beneficios del programa:

Los beneficios de este programa incluyen los siguientes:

- Ofrecer un lugar de trabajo seguro y mejorar la seguridad pública al reparar y/o reemplazar los activos que están dañados o en mal estado y que representan posibles riesgos para la seguridad;

- Aumentar la continuidad y la confiabilidad del servicio que reciben los clientes al reemplazar y actualizar las instalaciones que tienen un rendimiento deficiente en términos de fiabilidad y agregar y completar instalaciones que permitan ofrecer sistemas de alimentación eléctrica; y

- Permitir la modernización de la red cuando sea posible, ya que los activos reemplazados, como los interruptores, pueden incorporarse en esquemas futuros de automatización de la distribución.

### 7.3.3 *Cartera de transmisión*

Los activos de transmisión dañados por los huracanes Irma y María recibieron reparaciones de emergencia temporales a fin de restaurar el servicio rápidamente. FEMA ha asignado casi $2 mil millones para realizar más tareas permanentes de reparación o reemplazo de estos activos, a fin de actualizarlos de acuerdo con los códigos y las normas actuales. La cartera de transmisión de LUMA está formada por un conjunto de programas de "recuperación" para completar estas actualizaciones para fortalecer el sistema, que incluyen reconstruir torres, reforzar anclajes y reemplazar postes, así como hardware y conductores relacionados. La cartera de transmisión también incluye inversiones significativas en la modernización de la red central de telecomunicaciones, lo cual contribuirá a que la transformación sea posible. La siguiente gráfica incluye un resumen de los gastos de cada uno de los programas más importantes de la cartera de transmisión.

GRÁFICA 39: GASTOS ESTIMADOS DE LA CARTERA DE TRANSMISIÓN POR PROGRAMA (MILLONES DE DÓLARES NOMINALES)

| Programas de transmisión | AF2023 | | | | AF2024 | AF2025 |
|---|---|---|---|---|---|---|
| | Capital financiado con fondos federales | Capital financiado con fondos no federales | Gastos operacionales | Gasto total estimado | Gasto total estimado | Gasto total estimado |
| Reconstrucción de las líneas de transmisión | 85 | - | - | 85 | 232 | 314 |
| Red y sistemas de telecomunicaciones de IT/OT | 32 | - | 0 | 32 | 39 | 51 |
| Reemplazo de postes de transmisión prioritarios | 6 | - | - | 6 | 6 | 6 |
| Evaluación de las líneas de transmisión | 3 | 0 | - | 3 | 3 | 3 |
| Suma total | 126 | 0 | 0 | 127 | 279 | 374 |

Un programa de mejoras clave en la cartera de transmisión es el programa de la red y los sistemas de telecomunicaciones de IT/OT.

**Red y sistemas de telecomunicaciones de IT/OT**

Resumen del programa:

Este programa incluye inversiones en telecomunicaciones de IT/OT para mejorar y modernizar el sistema de radios portátiles de la AEE, los sistemas de telefonía y conmutación telefónica y los sistemas de radio enlace de microondas y fibra óptica. Estos sistemas se utilizan para transportar todos los datos de IT y OT de la AEE. Las mejoras en la capacidad incluirán mejor comunicación con el personal de primera respuesta y de respuesta ante emergencias, mayor resiliencia de la red de telecomunicaciones interna, una red de microfibra mejorada y un centro de control de redes para optimizar el control y el monitoreo centralizado de las instalaciones y el tráfico de IT.

Beneficios del programa:

Los beneficios de este programa incluyen los siguientes:

- Mejorar las comunicaciones entre los empleados y los centros de llamadas, los centros de control, los colegas o los clientes, incluso durante situaciones de emergencia, tales como accidentes de tránsito, fallas en los equipos y condiciones climáticas extremas;

- Permitir la implementación de Infraestructura de Medición Avanzada en la red de distribución y sus beneficios relacionados (consulte la Sección 7.3.1);

- Mejorar el control de los circuitos de protección, que protegen a las personas y los equipos de daños accidentales producto del contacto con una línea de alto voltaje, mediante la reparación de la red central de fibra y el radio enlace de microondas;

- Mejorar la confiabilidad mediante la reparación de los sistemas de telecomunicaciones y las redes de datos, y poder prever las interrupciones con más exactitud, detectarlas y remediarlas mediante la conexión de más contadores inteligentes;

- Tomar decisiones operacionales a partir de datos operacionales de mejor calidad gracias a redes de datos actualizadas y mejor integración de datos entre los sistemas;

- Permitir la transición a una red sostenible y moderna al actualizar el sistema para que sea compatible con sistemas energéticos sostenibles y modernos (por ejemplo, Internet, protocolos de IoT, etc.); y

- Mejorar la resiliencia del sistema al reducir el riesgo cibernético de las redes mediante la creación de sistemas por separado, configurados en redes distintas.

### 7.3.4 *Cartera de subestación*

LUMA prevé reconstruir, fortalecer y modernizar las subestaciones durante los próximos tres años. La idea es reparar, reconstruir y hacer más seguras las subestaciones, a la vez que se incrementa la mitigación contra futuros desastres. Estos programas se traducirán en mejoras significativas en cuanto a la resiliencia y la seguridad del sistema. La siguiente gráfica incluye un resumen de los gastos de cada uno de los programas más importantes de la cartera de subestaciones.

GRÁFICA 40: GASTOS ESTIMADOS DE LA CARTERA DE SUBESTACIONES POR PROGRAMA (MILLONES DE DÓLARES REALES)

| Programas de subestaciones | AF2023 | | | | AF2024 | AF2025 |
|---|---|---|---|---|---|---|
| | Capital financiado con fondos federales | Capital financiado con fondos no federales | Gastos operacionales | Gasto total estimado | Gasto total estimado | Gasto total estimado |
| Reconstrucción de las subestaciones | 95 | 7 | - | 102 | 139 | 49 |
| Seguridad de las subestaciones | 15 | 1 | 1 | 18 | 15 | 4 |
| Fiabilidad de las subestaciones | - | 14 | - | 14 | 19 | 18 |
| Seguridad de las plantas regionales y técnicas | - | 0 | 1 | 1 | 1 | 1 |
| **Suma total** | **111** | **22** | **2** | **135** | **173** | **71** |

Un programa de mejoras clave dentro de la cartera de subestaciones es la reconstrucción de subestaciones.

**Reconstrucción de las subestaciones**

Resumen del programa:

Este programa se centra en las mejoras de las subestaciones de transmisión y distribución (T&D) para reforzar la red eléctrica. Esto incluye (1) el fortalecimiento y la modernización de las subestaciones de T&D, (2) la actualización de los últimos códigos, normas y prácticas de la industria y (3) la sustitución de los relés electromecánicos y electrónicos. Para ello, LUMA llevará a cabo la evaluación, la reparación y la reconstrucción necesarias de las subestaciones dañadas de acuerdo con los últimos códigos, estándares y prácticas de la industria a fin de mejorar la fiabilidad a largo plazo, instalar una subestación encapsulada en SF6 (GIS), sustituir los relés

electromecánicos y electrónicos, y reparar o reconstruir las subestaciones afectadas por las inundaciones.

Este programa también se centrará en los requisitos de demarcación de activos de transmisión y generación (T&G), exigidos por el AOM para T&D, específicamente el Alcance de los Servicios, tal y como se establece en el Apéndice I. El programa también debe incluir la medición de alta precisión para calcular con exactitud la generación de energía en la red y facilitar la comunicación con el operador del sistema. Esta medición proporcionará transparencia a la generación total de energía neta y a las pérdidas de energía en la red. Esta demarcación también se definirá de forma sencilla para proporcionar a los operadores de LUMA y GenCo la suficiente claridad en cuanto a la separación de los activos a fin de evitar un mal funcionamiento y los consiguientes daños en los equipos o interrupciones del sistema. Esta iniciativa está sujeta a cambios en función de las recomendaciones del Estudio de Demarcación de Sargent y Lundy y de las proyecciones de retiro de las plantas previstas en el PIR.

Beneficios del programa:

Los beneficios de estos programas incluyen los siguientes:

- Mejorar el lugar de trabajo y la seguridad pública al abordar problemas críticos de las subestaciones (por ejemplo, falta de componentes de puesta a tierra, estructuras vencidas, etc.) y lograr que la mayoría de las subestaciones alcancen niveles óptimos de seguridad;

- Mejorar la fiabilidad del servicio al reemplazar los equipos dañados y lograr que la mayoría de las estaciones alcancen niveles óptimos de fiabilidad;

- Mejorar la resiliencia y los tiempos de restauración del sistema al reconstruir y actualizar los activos, usar una subestación encapsulada en SF6 y reducir la susceptibilidad de los equipos de alto voltaje a las inundaciones; y

- Mejorar la productividad y la eficacia de los empleados al recopilar datos para respaldar las operaciones del sistema, los modelos de red y las condiciones de los activos.

### 7.3.5 *Cartera de edificios y centro de control*

Los centros de control son instalaciones clave que tienen un papel fundamental en el desempeño seguro, confiable y económico de toda la red eléctrica. Es fundamental que los operadores de los centros de control tengan acceso a herramientas que permitan tener conocimiento de la situación y visibilizar de forma integral y completa todos los sistemas: generación, transmisión y distribución. Esta visibilidad permite que los operadores, con datos en tiempo real, minimicen el impacto que provocan en los clientes y en el sistema eléctrico las interrupciones y la inestabilidad del sistema, lo cual podría causar un colapso total del sistema y el consecuente corte de luz.

En cuanto a la cartera de edificios y centro de control, los gastos de LUMA a corto plazo incluyen una serie de mejoras en las políticas, los procedimientos y las tecnologías que permitirán que LUMA opere mejor el sistema de un modo más confiable y eficaz. LUMA también invertirá en la reconstrucción de instalaciones dañadas, en la actualización de sistemas de seguridad y en sistemas avanzados de manejo de distribución que permitan la integración y el despacho de energía renovable, respuesta a la demanda y almacenamiento en baterías. La siguiente gráfica incluye un resumen de los gastos de cada uno de los programas más importantes de la cartera de edificios y centro de control.

GRÁFICA 41: GASTOS ESTIMADOS DE LA CARTERA DE EDIFICIOS Y CENTROS DE CONTROL POR
PROGRAMA (MILLONES DE DÓLARES REALES)

| Programas de edificios y centro de control | AF2023 | | | | AF2024 | AF2025 |
|---|---|---|---|---|---|---|
| | Capital financiado con fondos federales | Capital financiado con fondos no federales | Gastos operacionales | Gasto total estimado | Gasto total estimado | Gasto total estimado |
| Actualizaciones críticas al sistema de manejo de energía | 25 | 0 | - | 26 | 20 | 6 |
| Implementación y desarrollo de plantas | 10 | 2 | 2 | 15 | 25 | 44 |
| Renovación y construcción del centro de control | 9 | 0 | - | 9 | 39 | 26 |
| Seguridad de almacenes | 0 | 1 | - | 1 | 1 | - |
| Equilibrio en la generación de carga y manejo de energía crítica | - | 0 | 0 | 0 | 7 | 13 |
| Procesos y estrategia de operación crítica del sistema | - | - | 0 | 0 | - | - |
| Suma total | 45 | 4 | 3 | 51 | 91 | 89 |

Las actualizaciones críticas al sistema de manejo de energía (EMS) constituyen uno de los
programas de mejoras clave en la cartera de edificios y centro de control.

**Actualizaciones críticas al sistema de manejo de energía**

Resumen del programa:

Este programa reemplazará un EMS obsoleto y desatendido e incorporará tecnología importante
para operar el sistema eléctrico de forma segura y confiable. Este programa también
implementará un sistema avanzado de manejo de distribución (ADMS). El EMS es un sistema
informático que usan los operadores para monitorear, controlar y optimizar el desempeño de los
sistemas de generación, transmisión y distribución.

Beneficios del programa:

Los beneficios de este programa incluyen los siguientes:

- Mejorar la confiabilidad al ofrecer herramientas modernas que contribuyan a una mayor
  visibilidad de las operaciones de los equipos; y

- Permitir la integración de nuevas fuentes de energía (como energía renovable, GD, etc.) y
  sistemas de almacenamiento energético por medio de la implementación de tecnologías
  digitales nuevas.

## 7.3.6 *Cartera habilitadora*

La cartera habilitadora está formada por programas de seguridad y excelencia operacional que
ofrecen un lugar de trabajo seguro por medio de procedimientos, herramientas y capacitaciones

nuevas. Los programas de inversión incluyen ofrecer herramientas y EPP nuevos (incluido su inventario y manejo), capacitar a todos los empleados en materia de habilidades y seguridad, crear una nueva oficina de administración de programas con el fin específico de manejar proyectos de capital importantes, e implementar sistemas de datos nuevos para almacenar y manejar con precisión los datos sobre los activos de T&D recopilados por medio de las inspecciones. LUMA implementará controles y procedimientos nuevos de gestión de negocios y proyectos para garantizar un manejo transparente y sistemático de los negocios y administrar con eficacia los fondos de la subvención federal. La siguiente gráfica incluye un resumen de los gastos de cada uno de los programas más importantes de la cartera habilitadora.

GRÁFICA 42: GASTOS ESTIMADOS DE LA CARTERA HABILITADORA POR PROGRAMA (MILLONES DE DÓLARES REALES)

| Programas habilitadores | Capital financiado con fondos federales | Capital financiado con fondos no federales | Gastos operacionales | Gasto total estimado | Gasto total estimado | Gasto total estimado |
|---|---|---|---|---|---|---|
| Manejo de la vegetación | - | - | 50 | 50 | 60 | 60 |
| Cumplimiento, estudios, tecnología y rendimiento | 16 | 2 | - | 18 | 9 | 8 |
| Capacitación técnica y en materia de salud, seguridad, medio ambiente y calidad (HSEQ) | - | - | 15 | 15 | 8 | 5 |
| Flota de T&D | 2 | 8 | 2 | 12 | 29 | 25 |
| Manejo y reparación de herramientas | - | 6 | - | 6 | 7 | 5 |
| Integridad de los datos de activos | - | 5 | 0 | 5 | 3 | 3 |
| Manejo y procesos para los permisos | - | - | 2 | 2 | 2 | - |
| Seguimiento y procesos para el flujo de trabajo | - | - | 1 | 1 | 1 | 10 |
| Manejo de materiales | 0 | 0 | 0 | 1 | 5 | 5 |
| Herramientas y software de manejo de proyectos | 1 | - | - | 1 | - | - |
| Oficina de manejo de construcción y contratación | 1 | - | - | 1 | - | - |
| Capacitación del operador | - | - | 0 | 0 | - | - |
| Preparación de respuesta a emergencias | - | 0 | - | 0 | 2 | 0 |
| Oficinas de estimado y manejo de riesgos, y controles de proyecto | 0 | - | - | 0 | - | - |
| Organización de la oficina de manejo de fondos, PMO y programas de mejoras capitales | 0 | - | - | 0 | - | - |
| Suma total | 20 | 22 | 71 | 113 | 124 | 122 |

Un programa de mejoras clave dentro de la cartera habilitadora es el manejo de la vegetación.

**Manejo de la vegetación**

Resumen del programa:

Este programa incluye tareas para reducir o mitigar los riesgos inmediatos relacionados con la vegetación en las áreas más críticas, además de un programa en curso para despejar y restablecer los derechos de paso y que vuelvan a tener un ancho estándar. Esto incluye ofrecer una respuesta

inmediata para los lugares de mayor riesgo (lugares que representan un peligro para la seguridad pública o que sufren interrupciones del servicio frecuentes provocadas por los árboles) y recuperar los derechos de paso, específicamente los que afectan a los sistemas de T&D. El programa también usará una herramienta de IT habilitada en el campo para abordar el programa de manejo de la vegetación; capacitación con respecto al manejo de la vegetación; y tareas constantes de limpieza de líneas, poda y eliminación de árboles, colocación de herbicidas, etc. Además, el programa evaluará y probará un avanzado proyecto de detección remota de inteligencia artificial para mejorar el manejo de la vegetación.

Beneficios del programa:

Los beneficios de este programa incluyen los siguientes:

- Mitigar los riesgos para la seguridad pública al corregir los retrasos con respecto a la poda de árboles;

- Mejorar la confiabilidad del sistema al reducir las fallas en las líneas que provoca la vegetación y que generan interrupciones (lo que contribuye significativamente a la poca fiabilidad del sistema);

- Aumentar la eficacia de la fuerza laboral y la confiabilidad del sistema al cortar la vegetación y ocuparse de ella de manera proactiva para reducir el tiempo y el desafío que representa evaluar el daño provocado por las tormentas y mejorar el acceso al lugar para realizar mantenimiento preventivo; y

- Mejorar la confiabilidad del sistema después de huracanes u otros eventos climáticos futuros mediante la limpieza de los escombros existentes y la vegetación que invade los derechos de paso.

### 7.3.7 *Cartera de servicios de asistencia*

La cartera de servicios de asistencia incluye programas interdisciplinarios clave que afectan o abarcan a todos los equipos y departamentos de LUMA. Incluye programas de Recursos Humanos para atraer y retener una base de empleados de buen desempeño mediante procesos estandarizados que permitan planificar la sucesión y manejar el desempeño, los talentos, la contratación y la incorporación de empleados, el aprendizaje y las compensaciones. Otros programas incluyen la implementación de procesos y herramientas para garantizar los recursos de información, sin dejar de permitirles a las partes interesadas que tengan autorización el acceso adecuado en cualquier momento y en cualquier lugar por medio de sistemas de información mantenidos de forma prudente. La cartera también incluye planes y estudios reguladores para informar acerca del desarrollo de una hoja de ruta más detallada para cumplir con las metas cruciales del PIR. La siguiente gráfica incluye un resumen de los gastos de cada uno de los programas más importantes de la cartera de servicios de asistencia.

GRÁFICA 43: GASTOS ESTIMADOS DE LA CARTERA DE SERVICIOS DE ASISTENCIA POR PROGRAMA (MILLONES DE DÓLARES NOMINALES)

| Programas de servicios de asistencia | AF2023 | | | | AF2024 | AF2025 |
|---|---|---|---|---|---|---|
| | Capital financiado con fondos federales | Capital financiado con fondos no federales | Gastos operacionales | Gasto total estimado | Gasto total estimado | Gasto total estimado |
| Programas de RR. HH. | - | 0 | 62 | 63 | 64 | 65 |
| Estudios de generación, miniredes e integración de energía renovable | - | 3 | 5 | 8 | 4 | 2 |
| Manejo de activos de IT/OT | 6 | 0 | 1 | 7 | 3 | 6 |
| Actualización de los procedimientos de facturación y contratos, auditoría y uso por parte de terceros | 3 | - | 3 | 6 | 4 | 4 |
| Programa de seguridad cibernética de IT/OT | - | 2 | 2 | 4 | 5 | 6 |
| Programa de habilitación de IT/OT | - | 1 | 2 | 3 | 3 | 4 |
| Sistemas económicos críticos | - | 3 | 0 | 3 | 3 | 1 |
| Controles económicos críticos | - | - | 2 | 2 | 1 | - |
| Manejo de registros de tierras | - | 1 | 2 | 2 | 2 | 2 |
| Procesos y planificación de recursos para mejorar la adecuación de recursos y el seguimiento de costos | - | - | 1 | 1 | - | - |
| Mejoras al despacho de los sistemas para mayor confiabilidad y resiliencia | - | - | 1 | 1 | - | - |
| Manejo de controversias y adquisición de terrenos | - | - | 1 | 1 | 1 | - |
| Funciones de manejo económico | - | - | 1 | 1 | 1 | 1 |
| Manejo de desperdicios | - | - | 0 | 0 | 0 | 0 |
| Analíticas y colaboración de IT/OT | - | 0 | - | 0 | 0 | 2 |
| Sistema integrado de manejo de seguridad y operaciones | - | 0 | 0 | 0 | 0 | 0 |
| Equipos de seguridad | - | 0 | 0 | 0 | 0 | 0 |
| Seguridad Pública | - | - | 0 | 0 | 0 | 0 |
| Suma total | 9 | 10 | 84 | 102 | 92 | 91 |

Los estudios de generación, miniredes e integración de energía renovable constituyen un programa clave dentro de la cartera de servicios de asistencia.

**Estudios de generación, miniredes e integración de energía renovable**

Resumen del programa:

Este programa implica la finalización de la planificación, los estudios técnicos, el desarrollo de programas y la implementación de proyectos piloto relacionados con el apoyo al cumplimiento del PIR y los requisitos reglamentarios vinculados a la integración de las energías renovables, los

recursos energéticos distribuidos y la generación. Las actividades realizadas dentro de este programa llevarán a un enfoque coordinado basado en datos para la transición de la energía.

Beneficios del programa:

Los beneficios de este programa incluyen los siguientes:

- Permitir la integración de energía renovable al guiar a clientes y desarrolladores a áreas, regiones y nodos en los que los recursos renovables le agregarán más valor a la red con costos totales contenidos;

- Mejorar la comprensión y la planificación de los impactos de la integración de fuentes de energía renovable con tecnologías nuevas y posibles opciones de mitigación; y

- Permitir la implementación de energías renovables, recursos de energía distribuida y posibles minirredes al garantizar la reconstrucción de la infraestructura del sistema existente para que se ajuste a estas nuevas fuentes.

## 7.4   Proyección del impacto de las carteras de mejoras de LUMA

Por medio de sus diversas carteras de mejoras, LUMA espera lograr mejoras significativas en métricas de rendimiento clave, tal como se observa a continuación.

GRÁFICA 44: MEJORAS ACUMULATIVAS EN LAS MÉTRICAS DE RENDIMIENTO PROYECTADAS POR LUMA[123]

| Métrica de rendimiento | Mejoras acumuladas previstas | | |
|---|---|---|---|
| | FY2022 | FY2023 | FY2024 |
| Servicio al cliente | 11% | 26% | 31% |
| Seguridad | 22% | 36% | 48% |
| Índice de la frecuencia promedio de interrupción del sistema (SAIFI) | 7% | 20% | 30% |
| Índice de la duración promedio de interrupción del sistema (SAIDI) | 10% | 25% | 40% |

---

[123] Las métricas de rendimiento están sujetas al proceso reglamentario y a la aprobación final del NEPR.

# Capítulo 8. Métricas de rendimiento de LUMA

Las compañías de servicios eléctricos operan infraestructura crítica y deben cumplir con estándares altos de transparencia y presentación de informes. Esto permite una supervisión reguladora eficaz, garantiza el rendimiento y genera confianza entre los proveedores de servicios, los reguladores, los clientes y las principales partes interesadas. Tener un conjunto de métricas de rendimiento es un requisito previo fundamental para cumplir con estas exigencias. LUMA, que ha asumido el rol pleno de proveedor de servicios de O&M para el sistema de T&D de la AEE a partir del 1 de junio de 2021, deberá cumplir con estos estándares de rendimiento.

LUMA será evaluada según un conjunto de métricas en tres categorías: 1) métricas de servicio al cliente; 2) métricas técnicas, de seguridad y reguladoras; y 3) métricas de rendimiento financiero. Estas métricas garantizan la transparencia y ayudan a evaluar si se han revertido las tendencias de rendimiento negativo observadas con la AEE (vea el Capítulo 2 para más información). Las métricas que LUMA empleará para presentar informes y utilizará como referencia para la medición se describen en detalle en su AOM para T&D.[124] Como parte de su trabajo durante el periodo de transición inicial, LUMA ha propuesto al Negociado de Energía de Puerto Rico (NEPR) cualquier revisión deseada de estas métricas de rendimiento, así como el desarrollo de líneas de referencia y objetivos de rendimiento para cada una de ellas. Cualquier modificación que LUMA proponga, incluidas las metas y los escenarios de referencia propuestos, está sujeta a la aprobación final del NEPR.

Para garantizar que los incentivos sean coherentes, la compensación de LUMA está ligada a alcanzar ciertos umbrales para cada una de las métricas de rendimiento. En otras palabras, las métricas de rendimiento de LUMA son estándares en función de los cuales se podrá evaluar su desempeño. Además, los incentivos se otorgarán si esta cumple con las metas establecidas. La forma de pago de los incentivos es una tarifa de incentivo variable y limitada (vea la Sección 8.2).

El siguiente resumen recoge las métricas de rendimiento de LUMA presentadas al NEPR en el Apéndice IX revisado del AOM para T&D.  El 24 de septiembre de 2021, LUMA presentó al NEPR el Apéndice IX revisado del AOM para T&D con un conjunto propuesto de métricas de rendimiento, líneas de referencia y objetivos de rendimiento para que el NEPR lo revise, lo modifique si procede y lo apruebe.[125] Al momento de la certificación de este Plan Fiscal Certificado, el Apéndice IX revisado propuesto del AOM para T&D no ha sido aprobado por el NEPR y, por lo tanto, puede cambiar en su totalidad o en parte. El procedimiento está actualmente en curso con la presentación de testimonios escritos y la realización de pruebas. El calendario de procedimiento del NEPR para la revisión de las métricas de rendimiento de LUMA ha cambiado muchas veces en los últimos 12 meses. El calendario de procedimiento más reciente que se fijó en la vista evidenciaria del 16 al 20 de mayo de 2022 se pospuso indefinidamente hasta que el NEPR emita una resolución sobre varios asuntos pendientes que afectarían al procedimiento.

---

[124] Apéndice IX. Métricas de rendimiento. Acuerdo de operación y mantenimiento para el sistema de transmisión y distribución de Puerto Rico. 22 de junio de 2020.

[125] Solicitud de autorización para presentar el testimonio revisado de Melanie Jeppesen, el segundo Apéndice IX revisado del AOM y la nueva redacción del segundo Apéndice IX revisado del AOM. In Re: Metas de desempeño para LUMA Energy ServCo, LLC. Caso Núm. NEPR-AP-2020-0025. = 24 de septiembre de 2021.

# 8.1   Resumen de las métricas de rendimiento del AOM para T&D

8.1.1 *Métricas de rendimiento del AOM para T&D durante la operación normal*

El desempeño de LUMA durante la operación normal será medido y evaluado en función de métricas de rendimiento divididas en tres categorías principales:

1. **Métricas de servicio al cliente** para garantizar que LUMA alcance un alto nivel de satisfacción para todos los tipos de clientes.

2. **Métricas técnicas, reguladoras y de seguridad** para verificar que LUMA utilice una red eléctrica segura y confiable, sin dejar de cumplir con los reglamentos ambientales, de seguridad y de cualquier otro tipo que correspondan.

3. **Métricas de rendimiento económico** para garantizar que LUMA se desempeñe de un modo sostenible dentro de los Presupuestos operacionales y de capital (con financiamiento tanto federal como no federal).

La Tabla 5 incluye las métricas de LUMA por categoría, además de una descripción. Este resumen refleja el Apéndice IX revisado del AOM para T&D tal y como se presentó al NEPR el 24 de septiembre de 2021. Como se mencionó anteriormente, el NEPR todavía no ha aprobado estas métricas de rendimiento propuestas.

TABLA 5: RESUMEN DE LAS MÉTRICAS DE RENDIMIENTO DEL AOM PARA T&D[126]

| | **Métrica** | **Descripción de LUMA** |
|---|---|---|
| **Métricas de servicio al cliente** | Encuesta de satisfacción del cliente de J.D. Power (clientes residenciales) | Medición de satisfacción del cliente por parte de terceros |
| | Encuesta de satisfacción del cliente de J.D. Power (clientes comerciales) | Medición de satisfacción del cliente por parte de terceros |
| | Velocidad promedio de respuesta (minutos) | Tiempo de espera promedio desde el momento en que la llamada del cliente ingresa en el sistema de distribución automática de llamadas (ACD) hasta el momento en que un agente la responde |
| | Índice de quejas de los clientes | Cantidad de quejas anuales registradas ante el NEPR dividida por la cantidad total de clientes y multiplicada luego por 100,000 |
| | Tasa de abandono | Porcentaje de personas que finalizan (abandonan) la llamada mientras está en el sistema de ACD esperando por ser atendidos |

---

126 Sujeto a la aprobación final del NEPR

| Métrica | Descripción de LUMA |
|---|---|
| **Métricas técnicas, reguladoras y de seguridad**[127] | |
| Tasa de incidentes registrables de la Administración de Seguridad y Salud Ocupacional (OSHA) | Cantidad total de incidentes registrables de la OSHA como resultado de lesiones relacionadas con el trabajo |
| Tasa de mortalidad de la OSHA | Todos los fallecimientos relacionados con el trabajo |
| Tasa de días perdidos de la OSHA | Cantidad total de lesiones relacionadas con el trabajo con días de gravedad (días con restricción y que representan tiempo perdido) |
| Tasa de días sin trabajar, con restricción o traslado (DART) de la OSHA | Cantidad total de casos registrables de la OSHA con días que representan tiempo perdido (sin trabajar, con restricción o traslado) |
| Índice de la frecuencia promedio de las interrupciones del sistema (SAIFI) | Indica la frecuencia con la que un cliente promedio experimenta una interrupción sostenida durante un período predeterminado |
| Índice de la duración promedio de interrupción del sistema (por sus siglas en inglés) (SAIDI) | Indica la duración total de la interrupción que sufre un cliente promedio durante período predeterminado |
| Inspecciones en la línea de distribución y correcciones específicas | La cantidad de inspecciones en las líneas de distribución completadas, con información registrada en una base de datos para su análisis. Los resultados de la categoría 0 y de la categoría 1 deben incorporarse a un plan para poder abordarlos en un término de 60 días desde su identificación. |
| Inspecciones en la línea de transmisión y correcciones específicas | La cantidad de inspecciones en las líneas de transmisión completadas, con información registrada en una base de datos para su análisis. Los resultados de la categoría 0 y de la categoría 1 deben incorporarse a un plan para poder abordarlos en un término de 60 días desde su identificación. |
| Inspecciones en la subestación de T&D y correcciones específicas | La cantidad de inspecciones en las subestaciones de distribución y transmisión completadas, con información registrada en una base de datos para su análisis. Los resultados de la categoría 0 y de la categoría 1 deben incorporarse a un plan para poder abordarlos en un término de 60 días desde su identificación. |
| **Métricas de rendimiento** | |
| Presupuesto operacional | Mide la capacidad de mantenerse dentro del presupuesto |
| Presupuesto de capital: con financiamiento federal | Mide la capacidad de mantenerse dentro del presupuesto |
| Presupuesto de capital: sin financiamiento federal | Mide la capacidad de mantenerse dentro del presupuesto |

---

127 Las descripciones de SAIFI y SAIDI corresponden a la Guía de índices de fiabilidad de distribución de energía eléctrica del Instituto de Ingenieros en Eléctricos y Electrónicos (IEEE) Std. 1366™-2012.

| Métrica | Descripción de LUMA |
|---|---|
| Horas extra | Mide la capacidad de administrar los costos de horas extra durante la operación normal (sin incluir situaciones de emergencia) |
| Días de ventas pendientes de cobro (DSO) - Clientes generales | Mide la capacidad de cobro de las facturas de los clientes generales |
| Días de ventas pendientes de cobro (DSO) - Clientes gubernamentales | Mide la capacidad de cobro de las facturas de los clientes gubernamentales |

El Apéndice IX revisado incluye modificaciones al proyecto de Apéndice IX dentro del AOM para T&D mediante propuestas de incorporaciones, aplazamientos y supresiones, que actualmente están siendo revisadas por el NEPR y que se detallan a continuación. La mayoría de los aplazamientos se deben a que los datos de la operación son limitados o no son lo suficientemente precisos para elaborar escenarios de referencia o metas de desempeño. El NEPR está analizando las modificaciones propuestas por LUMA. Debajo se explican algunos de los principales aplazamientos o supresiones para lograr una mayor claridad. Aplazamientos:

- Resolución en la primera llamada (FCR): Los sistemas de la AEE históricamente no tenían la capacidad de rastrear y reportar la FCR. LUMA propuso aplazar el cálculo y la presentación de informes de esta métrica hasta que se implemente por completo una nueva plataforma de centro de contacto basada en la nube y se pueda establecer el seguimiento del rendimiento de la FCR. Actualmente, este objetivo está previsto para el segundo año.

- Clientes que experimentan múltiples interrupciones (CEMIN): Debido a los problemas de calidad de los datos, incluida la falta de información precisa sobre los clientes y la falta de conectividad de los clientes al Sistema de Manejo de Interrupciones, LUMA propuso aplazar el CEMIN hasta que se pueda corregir la información y determinar con precisión una línea de referencia, que se estima será en el cuarto año.

- Índice de la frecuencia de interrupción promedio momentánea (MAIFI): Debido a problemas de disponibilidad y calidad de los datos, LUMA recomendó aplazar la métrica MAIFI hasta que se pueda medir con precisión. Para ello es necesario sustituir el sistema de manejo de la energía, que está previsto para el cuarto o quinto año.

- Reducción de pérdidas en las líneas de red: La AEE no asigna actualmente las pérdidas a los componentes del sistema. Esta asignación requiere el desarrollo de un modelo adecuado, así como medidas adicionales de contabilización y de otro tipo. Actualmente, este objetivo está previsto para el segundo año.

- Índice de duración promedio de interrupción para el cliente (CAIDI): Se propuso eliminarlo en función de la creciente preocupación del sector de que el CAIDI es muy limitado como métrica de rendimiento. Dado que el CAIDI es la relación entre SAIDI y SAIFI, el CAIDI puede ser engañoso porque puede mantenerse igual incluso cuando los valores de SAIDI y SAIFI disminuyen.

La mayoría de las métricas de rendimiento del Apéndice IX del AOM para T&D tienen tres (3) niveles de rendimiento calculados: (1) un nivel de referencia inicial basado en datos operacionales

históricos o en un análisis sujeto a la aprobación del NEPR; (2) un nivel objetivo que se espera alcanzar a lo largo del periodo inicial de tres años y que se determina teniendo en cuenta el rendimiento pasado, el esfuerzo y los recursos necesarios y disponibles para lograr mejoras en el rendimiento, incluyendo los presupuestos existentes; y (3) un nivel mínimo de elegibilidad para obtener créditos destinados a la tarifa de incentivo para esa métrica en particular. Por otro lado, habrá cuatro (4) métricas que serán binarias: tasa de mortalidad de la OSHA; presupuesto operacional; presupuesto de capital: con financiamiento federal; y presupuesto de capital: sin financiamiento federal. En el caso de las métricas binarias, el hecho de no alcanzar la métrica equivale a no cumplir con el nivel de desempeño mínimo; por lo tanto, LUMA no será elegible para obtener créditos para la tarifa de incentivo correspondiente a esa métrica en particular.

Hay un subconjunto de métricas de rendimiento llamadas "métricas de rendimiento clave". Si LUMA no cumple con el nivel de desempeño mínimo establecido para cualquiera de las tres métricas de rendimiento clave durante tres años de contrato consecutivos, y dicho incumplimiento no está justificado por un evento de fuerza mayor, una interrupción del servicio o una falla del responsable, entonces el incumplimiento de LUMA estará en el umbral de desempeño mínimo respecto del AOM para T&D. El AOM para T&D incluye una lista de métricas de rendimiento clave, las cuales también se detallan a continuación:

1. **Métricas de servicio al cliente:** Velocidad promedio de respuesta y tasa de abandono;

2. **Métricas técnicas, de seguridad y reguladoras:** Tasa de mortalidad de la OSHA, tasa de días perdidos de la OSHA, SAIFI, SAIDI e inspecciones de líneas de distribución y correcciones específicas;

3. **Métricas de rendimiento económico:** Presupuesto operacional, presupuesto de capital: con financiamiento federal y presupuesto de capital: sin financiamiento federal.

### 8.1.2 *Métricas de rendimiento del AOM para T&D durante una interrupción del servicio importante*

El AOM para T&D también incluye un conjunto de métricas de rendimiento durante una interrupción del servicio importante que sirven para medir el desempeño de LUMA cuando el servicio se interrumpe de manera significativa. Para los fines del AOM para T&D y las métricas de rendimiento durante una interrupción del servicio importante, la definición de "interrupción del servicio importante" es la siguiente:[128]

El término "interrupción del servicio importante" se refiere a cualquier situación que provoque lo siguiente: (i) durante más de 15 minutos, se interrumpe el servicio de al menos doscientos cinco mil (205,000) clientes de T&D, o bien (ii) en algún momento durante la situación, hay mil quinientas o más (≥1,500) interrupciones activas del sistema de T&D, las cuales se rastrean en el Sistema de manejo de interrupciones (OMS). La interrupción del servicio importante se considera "en curso" en la medida en que las interrupciones/cortes continúen estando por encima de las cantidades acumuladas establecidas, en cada caso por un periodo de veinticuatro horas o más (≥24) y sean resultado de un caso de fuerza mayor. Si

---

[128] Como se indica en la Sección 2.8 de la Solicitud de Autorización para presentar el testimonio revisado previo a la presentación de Melanie Jeppesen, el segundo Apéndice IX revisado enmendado del AOM, y la modificación del segundo Apéndice IX revisado del AOM In Re: Objetivos de rendimiento para LUMA Energy ServCo, LLC, Caso Núm. NEPR-MI-2020-0025, 24 de septiembre de 2021.

el caso de fuerza mayor es una tormenta, dicha tormenta debe ser calificada como tal por el Servicio Meteorológico Nacional de los Estados Unidos, o bien el Gobierno de Puerto Rico debe declarar el estado de emergencia. Se considerará que la interrupción del servicio importante ha finalizado cuando el número acumulado de clientes de T&D que permanecen sin servicio sea inferior a diez mil (10,000) durante un  periodo continuo de ocho (8) horas.

La Tabla 6 incluye las métricas del Apéndice IX del AOM para T&D durante una interrupción del servicio importante, además de una descripción de cada métrica.

TABLA 6: RESUMEN DE LAS MÉTRICAS DE RENDIMIENTO DEL AOM PARA T&D DURANTE UNA INTERRUPCIÓN DEL SERVICIO IMPORTANTE[129]

| Métrica | Descripción |
|---|---|
| 1. Fase de preparación | Concreción de las medidas para prepararse para una emergencia de manera oportuna y precisa después de recibir un aviso del Servicio Meteorológico Nacional de los Estados Unidos o del servicio meteorológico privado de la compañía, de conformidad con el Plan de Respuesta a Emergencias, con respecto a un hecho que se prevé afectará el área de servicio de la compañía. |
| 2. Cables caídos | Respuesta a las denuncias de cables caídos recibidas de funcionarios públicos municipales. |
| 3. Evaluación de daños | Finalización de la evaluación de daños preliminares. |
| 4. Brigadas | 50% de las brigadas proyectadas (de asistencia mutua) asignadas al servicio público. |
| 5. Tiempo estimado de restauración (ETR) para el 90% de las interrupciones en el servicio | Tiempo estimado de restauración para el 90% de las interrupciones en el servicio (puestas a disposición por la compañía de servicios públicos en la web, en el sistema de respuesta de voz interactiva [IVR], a los representantes del servicio de atención al cliente [CSR], etc.) |
| 6. Precisión del ETR para el 90% de la restauración del servicio | Exactitud del ETR regional Exactitud del ETR municipal |
| 7. Coordinación municipal | Coordinación con los municipios respecto de la limpieza de caminos, los cables caídos, los clientes críticos, etc. |
| 8. Coordinación con los Centros de Operaciones de Emergencia (EOC) municipales - Coordinación con los EOC del Estado Libre Asociado de Puerto Rico/Federales | Coordinación con los EOC municipales del Estado Libre Asociado y federales. |
| 9. Coordinación de servicios públicos | Coordinación con otros servicios públicos (comunicaciones, agua, etc.). |
| 10. Seguridad | Evaluación de cualquier empleado o contratista que sufra lesiones por hacer trabajos peligrosos durante una tormenta/interrupción y restauración. |
| 11. Asistencia mutua | Las solicitudes de las brigadas hechas a través de todas las fuentes de asistencia mutua u otros contratos negociados previamente con los proveedores de servicios públicos. |

---

[129] Sujeto a la aprobación final del NEPR.

| Métrica | Descripción |
|---|---|
| 12. Índice de respuesta a las llamadas | Llamadas de clientes atendidas por centros de atención telefónica con personal adecuado (el uso de IVR y otras tecnologías es una solución aceptable). |
| 13. Disponibilidad web | La página web de la compañía, específicamente la sección sobre impacto y restauración de las interrupciones debe estar disponible las 24 horas durante una tormenta importante; además, la información debe actualizarse cada hora hasta la restauración final del servicio. En caso de que no haya información nueva disponible, la página web debe indicar la fecha y hora de la última vez en que se actualizó la información. La página web o la sección sobre el impacto y la restauración de las interrupciones puede estar un  periodo breve sin conexión durante las horas de poca actividad para realizar tareas de mantenimiento del sistema. |
| 14. Presentación de informes al NEPR y al administrador (AAPP) | Proporcionar información sobre eventos de tormentas al NEPR y al administrador (AAPP) de acuerdo con los requisitos de las directrices del Sistema de Informes de Interrupciones Eléctricas que se establecerán en la ERP para LUMA. |
| 15. Comunicaciones con los clientes | Comunicados de prensa, mensajes de texto, correos electrónicos y redes sociales a disposición de los clientes. |
| 16. Mensaje saliente en la línea telefónica | El mensaje grabado que les brinda a los clientes información sobre la interrupción se actualiza dentro de las dos horas de publicado el comunicado de prensa. |

### 8.1.3 *Frecuencia de revisión de las métricas de rendimiento del AOM para T&D*

Dentro de la presentación del Apéndice IX revisado, LUMA propone que los parámetros de rendimiento tanto para el funcionamiento normal como para una interrupción del servicio importante, así como los niveles de referencia, objetivo y rendimiento mínimo, se mantengan hasta el tercer año de contrato. El borrador del Apéndice IX propone una cadencia de revisión de cinco años. Sin embargo, dada la calidad de los datos de la AEE y la velocidad de los cambios en los primeros años de contrato del AOM para T&D, LUMA propuso revisar las métricas antes del quinto año de contrato. Cualquier cambio en las métricas de rendimiento debe ser revisado y debe presentarse ante el NEPR para su aprobación.

## 8.2   Método de cálculo de la tarifa de incentivo

El desempeño de LUMA durante el año de contrato, según surja de las métricas de rendimiento durante la operación normal, determinará si LUMA es elegible para recibir la tarifa de incentivo contemplada en el AOM para T&D. A cada categoría de métricas se le asigna un porcentaje del conjunto de compensaciones de incentivos, y a cada métrica dentro de la categoría se le asigna una determinada cantidad de puntos básicos. A las métricas de atención al cliente y de rendimiento económico se les asigna un 25% del conjunto de compensaciones de incentivos a cada una, mientras que a las métricas técnicas, reguladoras y de seguridad se les asigna un 50%. Si LUMA supera el nivel de desempeño mínimo para una métrica en particular, puede obtener de un 25% a un 150% del valor del punto básico para esa métrica, según en qué medida LUMA supere el nivel mínimo mencionado. Cuanto más supere el nivel de desempeño mínimo, mayor será el multiplicador con respecto al valor del punto básico. Este proceso se repite para todas las métricas y categorías a fin de determinar la puntuación global de LUMA y la correspondiente tarifa de

incentivo.¹³⁰ Para el primer año de contrato, los niveles de rendimiento se ajustarán proporcionalmente si la fecha de inicio del servicio se produce después del comienzo del año fiscal.

Por último, si cualquier interrupción del servicio importante (incluso si es producto de un evento de fuerza mayor) impide que LUMA logre una o más de las métricas de rendimiento durante la operación normal, LUMA seguirá teniendo derecho a obtener la tarifa de incentivo correspondiente al periodo de la interrupción del servicio importante, siempre y cuando cumpla con las métricas de rendimiento durante una interrupción del servicio importante.

---

¹³⁰ Para obtener más información sobre este proceso y un ejemplo sobre cómo calcular la tarifa de incentivo, consulte el AOM en https://www.p3.pr.gov/wp-content/uploads/2020/06/executed-consolidated-om-agreement-td.pdf

# Capítulo 9. Medidas operacionales

## 9.1   Medidas operacionales de la AEE

### 9.1.1 *Resumen*

Las medidas operacionales definidas en Planes Fiscales Certificados anteriores de la AEE siguen siendo fundamentales para transformar el sector energético de Puerto Rico. En conjunto, estas medidas cubren todos los aspectos de la cadena de valor del servicio energético: generación, transmisión y distribución, y servicio al cliente; además, abordan los problemas crónicos del servicio eléctrico: confiabilidad, seguridad, sostenibilidad y asequibilidad.

En consonancia con los requisitos establecidos en la Sección 201(b) de la Ley PROMESA y el asesoramiento brindado por la Junta de Supervisión, la AEE, como entidad territorial cubierta, está obligada a identificar y describir las mejoras operacionales necesarias o beneficiosas para lograr sus objetivos fiscales y avanzar en los objetivos de transformación del sector energético descritos en Capítulo 3 (Transformación). El Plan Fiscal Certificado define de manera amplia las "medidas operacionales" como los grupos de proyectos o actividades que tienen un tema en común y buscan aumentos en los ingresos, ahorros en los gastos o mejoras en el rendimiento. La AEE debe continuar trabajando en la implementación de múltiples medidas para sus operaciones restantes, mientras trabaja con la AAPP para lograr la visión del Gobierno del Estado Libre Asociado y los requisitos del Plan Fiscal Certificado para el año fiscal 2022.

### 9.1.2 *Logros clave para el año fiscal 2022*

Durante el año fiscal anterior, la AEE avanzó en lo que respecta a varias medidas operacionales clave que forman parte de la transformación. Sin embargo, queda mucho por hacer en cuanto a otras medidas operacionales vinculadas con los activos de generación y el sistema de T&D de la AEE. A continuación, se presentan los aspectos más destacados de los principales logros.

- **Contratación de combustible:** A principios del año fiscal 2022, la AEE emitió una SP tanto para diésel como para búnker C y completó el proceso de evaluación y selección a finales de septiembre y octubre, respectivamente. Ambas SP atrajeron un considerable interés del mercado y permitieron mejorar las condiciones de la AEE en comparación con los acuerdos anteriores.

  - El 29 de octubre de 2021, la AEE ejecutó un contrato de combustible de $606 millones con Puma Energy Caribe LLC para combustible búnker C. El suplemento al precio del contrato (*contract price adder)* en el acuerdo de adquisición competitiva representa una reducción de precios del alrededor del 33% en comparación con el anterior contrato de suministro de combustible búnker C.

  - El 18 de noviembre de 2021, la AEE firmó un contrato de suministro de combustible diésel por un valor de $265.5 millones con Novum Energy Trading Inc. El suplemento al precio del contrato en los acuerdos de adquisición competitiva representa un ahorro del 19% en comparación con los términos proporcionados por el anterior proveedor de diésel, Puma Energy Caribe LLC, que era el único proveedor de combustible diésel de la AEE desde 2014.

- **Adquisición mediante el PPOA de energías renovables:** Aunque el proceso está retrasado, la AEE seleccionó 18 proyectos que representaban un ahorro en comparación con

las condiciones de precios anteriores logradas por medios no competitivos. Sin embargo, todos estos proyectos están todavía pendientes de las negociaciones finales y de la ejecución y no han comenzado la construcción.

### 9.1.3 *Resumen de las iniciativas de la AEE para el año fiscal 2023*

Mientras LUMA continúa avanzando en la remediación y transformación del sistema de T&D, y mientras el nuevo operador de la generación preexistente inicia su periodo de transición, la AEE debe seguir implementando iniciativas provisionales relacionadas con los activos de generación, los requisitos de implementación y presentación de informes financieros relativos al Título III, y el apoyo a la APP de generación preexistente y los esfuerzos de reorganización necesarios para completar los objetivos de transformación.

TABLA 7: INICIATIVAS DEL AÑO FISCAL 2023

| Categoría de iniciativa para el año fiscal 2023 | Lista de iniciativas |
| --- | --- |
| 1) Adquisición de energía renovable | 1.1 SP para generación renovable y almacenamiento en baterías |
| 2) Suministro de combustible | 2.1 Necesidades de combustible y análisis de los costos |
| | 2.2 Contrato de suministro de combustible diésel |
| | 2.3 Contrato de suministro de combustible Búnker |
| 3) Reparación y mantenimiento de la generación | 3.1 Capacidad de generación financiada por el Gobierno Federal |
| | 3.2 Reparaciones en San Juan |
| | 3.3 Programa de mantenimiento de la planta |
| | 3.4 Programa de cumplimiento reglamentario medioambiental |
| 4) Reforma de pensiones | 4.1 Implementación de la reforma del plan de pensiones |
| 5) Reorganización de la AEE y APP de generación existente | 5.1 Transición a APP de generación existente |
| | 5.2 Implementación de la reorganización de la AEE |
| 6) Programa de medición neta | 6.1 Estudio sobre la medición neta y la GD |

#### 9.1.3.1 ADQUISICIÓN DE ENERGÍA RENOVABLE

En su orden final sobre el PIR, el NEPR ordenó a la AEE desarrollar y ejecutar un plan para adquirir generación renovable y almacenamiento en baterías en una serie de seis (6) tramos. El 22 de febrero de 2021, la AEE emitió una SP para hasta 1,000 MW de producción de energía renovable y hasta 500 MW de almacenamiento en baterías, incorporando las recomendaciones del NEPR y de la Junta de Supervisión. Mediante la SP, se solicitan propuestas para diseñar, construir, instalar, poseer, operar y mantener recursos de energía renovable, recursos de almacenamiento de energía y VPP para lugares dentro de Puerto Rico, por un periodo de servicio de hasta 25 años. El 2 de febrero de 2022, el NEPR aprobó 18 de los PPOA solares recomendados por el Comité de Evaluación.

En lo que respecta a los tramos 2 a 6, el NEPR aún no ha aclarado el calendario de emisión de estos tramos ni ciertos detalles clave sobre el proceso. El 9 de junio de 2022, el NEPR emitió una resolución y orden en la que establece los roles respectivos de la AEE y de LUMA en cualquier tramo futuro. Algunas de las responsabilidades de la AEE incluyen, entre otras: (a) seleccionar a un (1) miembro de la Junta de Gobierno de la AEE, escogido de entre los miembros designados por el gobernador a su entera discreción para formar parte del Comité de Selección; (b) proporcionar orientación y aportes al Negociado de Energía y al CI del NEPR en relación con las

lecciones aprendidas del tramo 1 para asegurar que se incorporen en los tramos futuros; (c) brindar asesoría legal y recursos para asegurar los documentos de la SP, incluyendo los PPOA que se incluirán como parte de la SP y la ejecución de los contratos finales. Por otro lado, las funciones y obligaciones de LUMA incluyen, entre otras: (a) seleccionar a un (1) funcionario de LUMA, con conocimientos o experiencia en transacciones similares, para que forme parte del Comité de Selección; (b) proporcionar cualquier dato e información que requiera el CI del NEPR; (c) ofrecer orientación y aportes al Negociado de Energía y al CI del NEPR con respecto a las lecciones aprendidas del tramo 1 en relación con los estudios de interconexión, los impactos en el sistema y otros asuntos técnicos relacionados para garantizar que se incorporen en los tramos futuros. Por último, el NEPR también reiteró que cualquier decisión final que se requiera durante el proceso de la SP será determinada por el NEPR y que las funciones de la AEE y de LUMA no retrasarán en modo alguno el proceso de la SP.[131]

TABLA 8: ADQUISICIÓN DE ENERGÍA RENOVABLE - CALENDARIO POTENCIAL REVISADO

| Proyectos | # | Metas cruciales | Fecha límite propuesta |
|---|---|---|---|
| SP para generación renovable y almacenamiento en baterías | 1 | Ejecutar el PPOA del tramo 1 de la SP aprobado por el NEPR y la JSF | Trimestre 1 AF2023 |
| | 2 | Emitir la SP para el tramo 2 | Trimestre 1 AF2023 |
| | 3 | Emitir la SP para el tramo 3 | Trimestre 3 AF2023 |
| | 4 | Emitir la SP para el tramo 4 | Trimestre 1 AF2024 |
| | 5 | Emitir la SP para el tramo 5 | Trimestre 3 AF2024 |
| | 6 | Emitir la SP para el tramo 6 | Trimestre 1 AF2025 |

**9.1.3.2**      SUMINISTRO DE COMBUSTIBLE

Los contratos actuales de la AEE de suministro y entrega de fuelóleo ligero destilado núm. 2 (diésel) y de combustible búnker (HFO) expiran el 29 de octubre y el 18 de noviembre de 2022, respectivamente, pero incluyen una prórroga opcional de un año bajo los mismos términos y condiciones que los contratos actuales. A la luz de esto, antes de emitir una SP para futuros contratos de diésel y HFO, la AEE debe analizar si se espera que un proceso de adquisición competitivo produzca resultados más favorables que los que mantendría la AEE si eligiera extender los acuerdos existentes. En caso de que la AEE concluya que un proceso de adquisición competitivo sería lo más beneficioso, debe esforzarse por comenzar dicho proceso lo antes posible, como se refleja en la Tabla 10 a continuación.

TABLA: PLAN DE ACCIÓN PARA EL SUMINISTRO DE COMBUSTIBLE

| Proyectos | # | Metas cruciales | Fecha límite propuesta |
|---|---|---|---|
| Suministro de combustible diésel | 1 | Empezar a analizar las necesidades de combustible y los costos | Mayo de 2022 |
| | 2 | Comenzar un proceso competitivo para adjudicar un nuevo contrato de suministro de combustible diésel, si se determina que es lo mejor para la AEE. | Junio de 2022 |

---

[131] Resolución y Orden, Roles de la AEE y de LUMA en el proceso de adquisición de los próximos tramos, In Re: La implementación del Plan Integrado de Recursos de la Autoridad de Energía Eléctrica de Puerto Rico y el Plan de Acción Modificado, Caso Núm. NEPR-MI-2020-0012, 9 de junio de 2022

| Proyectos | # | Metas cruciales | Fecha límite propuesta |
|---|---|---|---|
| | 3 | Finalizar el proceso competitivo para adjudicar un nuevo contrato de suministro de combustible diésel, si se determina que es lo mejor para la AEE. | 15 septiembre de 2022 |
| | 4 | Finalizar el acuerdo con el proveedor seleccionado y buscar aprobación para ejecutar los contratos con la Junta de Gobierno de la AEE y la Junta de Supervisión | 31 octubre de 2022 |
| | 5 | Vencimiento del contrato actual | 18 noviembre de 2022 |
| | 6 | Dar inicio al nuevo contrato | 19 noviembre de 2022 |
| Suministro de combustible Búnker | 1 | Empezar a analizar las necesidades de combustible y los costos | Mayo de 2022 |
| | 2 | Comenzar un proceso competitivo para adjudicar un nuevo contrato para los proveedores de combustible búnker C, si se determina que es lo mejor para la AEE. | Junio de 2022 |
| | 3 | Finalizar el acuerdo con el proveedor seleccionado y buscar aprobación para ejecutar los contratos con la Junta de Gobierno de la AEE y la Junta de Supervisión | 31 agosto de 2022 |
| | 4 | Vencimiento del contrato actual | 29 octubre de 2022 |
| | 5 | Dar inicio al nuevo contrato | 30 octubre de 2022 |

### 9.1.3.3 PLANIFICACIÓN Y MANTENIMIENTO DE LA GENERACIÓN

Durante el año fiscal 2023, la AEE emprenderá medidas para ejecutar los trabajos de mantenimiento crítico de las plantas de generación e implementará proyectos de mejora del rendimiento. El plan de mantenimiento necesario de la AEE para el año fiscal 2023 se preparó en el contexto de las interrupciones forzadas y los consiguientes apagones durante 2021 que impactaron a casi todo Puerto Rico, junto con los apagones actuales, incluido el más reciente apagón en toda la isla a principios de abril de 2022, así como para asegurar que el sistema de generación existente pueda alcanzar un nivel mínimo de fiabilidad, estabilidad, cumplimiento y capacidad de mantener suficientes reservas para evitar incidentes de interrupciones graves.

La Junta de Gobierno de la AEE, aprobó una declaración de emergencia el 8 de octubre de 2021 que autorizaba el uso de los procedimientos de adquisición de emergencia para: (i) hacer frente a las reparaciones inmediatas; (ii) apoyar los programas de mantenimiento programado; y (iii) mantener las reservas necesarias para evitar futuras interrupciones importantes de la planta.

GRÁFICA 45: CALENDARIO DE MANTENIMIENTO REVISADO Y ACTUALIZADO

| Calendario de interrupciones de GenCo | | |
|---|---|---|
| Unidad | Capacidad | Término del calendario de interrupciones |
| SJ CC 5 | 2020 | ND |
| SJ CC 6 | 220 | ND |
| SJ 7 | 100 | Marzo 2023 - Junio 2023 |
| SJ 8 | 100 | Noviembre de 2022 - Enero de 2023 |
| SJ 9 | 100 | Octubre de 2022 - Noviembre de 2022 |
| SJ 10 | 100 | ND |
| PS 3 | 6216 | Enero 2023 - Abril 2023 |

| Calendario de interrupciones de GenCo | | |
|---|---|---|
| Unidad | Capacidad | Término del calendario de interrupciones |
| PS 4 | 216 | Mayo de 2023 - Junio de 2023 |
| CS 5 | 410 | Noviembre de 2022 – Febrero de 2023 |
| CS 6 | 410 | Mayo de 2023 - Junio de 2023 |
| AG 1 | 450 | ND |
| AG 2 | 450 | Marzo de 2023 - Abril de 2023 |

Una de las áreas clave de enfoque para el mantenimiento planificado para el año fiscal 2023 son los proyectos en la Central de Ciclo Combinado San Juan, unidades 5 y 6, que son las unidades de carga base más modernas de la AEE con capacidad para quemar diésel o gas natural. Ambas unidades suministran aproximadamente el 35% de la carga para la región norte y el 15% para el resto de la isla con energía eficiente, respetuosa con el medio ambiente y fiable. Estas unidades se alimentan con gas natural, que ofrece una reducción del 90% en los índices de emisiones de SO2 en comparación con el combustible diésel dentro de una zona clasificada por la Agencia de Protección Ambiental (EPA) de los EE. UU. como zona de no cumplimiento. Las emisiones potenciales de otros contaminantes como PM, PM10, PM2.5, H2SO4, NOx y CO también se redujeron debido a la implementación de la conversión a gas natural de las unidades 5 y 6 de San Juan, y a los límites de emisión acompañados de estos esfuerzos. La fiabilidad y disponibilidad de las unidades 5 y 6 de San Juan es fundamental para mantener un sistema eléctrico estable y eficiente. Al operar las unidades 5 y 6 de San Juan con factores de capacidad más altos gracias al gas natural, la AEE ha podido reducir su dependencia de otras unidades generadoras que consumen fuelóleo pesado, lo que ha supuesto una reducción adicional de las emisiones. Con estas unidades, la AEE puede lograr reducciones significativas de las emisiones a la atmósfera, con menores costos de generación.

La AEE planea realizar mantenimiento y reparaciones importantes en la unidad 6 de San Juan durante el año fiscal 2023, después de que hayan pasado los meses pico del verano. Además, la AEE tiene previsto completar la instalación necesaria de los módulos D y E, el generador de vapor de recuperación de calor y el suministro y la instalación (sustitución) del sistema de limpieza del condensador en línea de la unidad 5.

El plan de mantenimiento de la AEE también se ocupará de las plantas de energía de la División de Hidrogas y Cambalache, que incluye los 220 MW de capacidad en Mayagüez, 248 MW de capacidad en Cambalache (165 MW excluyendo la unidad 1), y 378 MW de capacidad de las 18 unidades de respaldo de emergencia y de pico del marco 5 distribuidas por toda la isla en varios complejos de plantas de energía e instalaciones de pico distribuidas. La AEE se enfrenta rutinariamente a limitaciones de capacidad y a una falta total de disponibilidad en estas centrales y unidades, que son responsables de la respuesta inmediata a las emergencias y del restablecimiento de la red eléctrica durante los relevos de carga y después de los apagones. Una mayor disponibilidad de estas unidades podría haber mitigado o evitado por completo el último apagón que se produjo a partir del 6 de abril de 2022. El presupuesto de NME de generación de la AEE para el año fiscal 2023 incluye la inspección, el mantenimiento y las reparaciones principales en la mayoría de las instalaciones de la División, incluidos los costos anuales de LTSA para Cambalache y los proyectos específicos para el mantenimiento de Mayagüez y de las 18 unidades de pico del marco 5. Los costos de mantenimiento y reparaciones en Mayagüez también

incluyen la ampliación de la capacidad de desmineralización del agua a fin de garantizar una disponibilidad de producción adecuada para el funcionamiento completo de la planta.

## Generación de gas natural

La AEE está evaluando el uso de fondos federales para instalar nueva generación de carga base con gas en el norte de la isla para mejorar la fiabilidad, permitir la integración ordenada de las energías renovables y reducir los costos generales de generación en beneficio de Puerto Rico. La AEE también está evaluando la ampliación de la capacidad de ciertas unidades para utilizar gas natural con fondos federales. Para ello, el 11 de febrero de 2022, la AEE presentó una moción ante el NEPR titulada *"Solicitud de permiso para realizar trabajos en las unidades de vapor de la AEE para lograr el cumplimiento reglamentario medioambiental"*, en el expediente del NEPR Núm. NEPR-MI-2021-0002.

La AEE está solicitando la autorización del NEPR para llevar a cabo la conversión de las unidades 7-10 de San Juan a gas natural como un paso potencialmente necesario para lograr el cumplimiento del Estándar Nacional para la Calidad de Aire Ambiental (NAAQS) de 2010 que fija 1 hora de SO2 en el distrito del aire de San Juan. Esto permitiría a la AEE evitar costosas sanciones y lograr el cumplimiento de los Estándares de Emisión de Mercurio y Tóxicos de Aire (MATS) requeridos por la EPA, 40 CFR 63, Subparte UUUUU: Estándares nacionales de emisiones para contaminantes peligrosos del aire. Los MATS entraron en vigor el 16 de abril de 2012 en el emplazamiento de San Juan, por si se retrasa el calendario de despliegue de energías renovables del PIR.

### 9.1.3.4 REFORMA DE PENSIONES

Consulte el Capítulo 15 (Reforma de pensiones) para ver un análisis detallado de los desafíos que enfrenta el sistema de retiro de empleados de la AEE

### 9.1.3.5 REORGANIZACIÓN DE LA AEE Y APP DE GENERACIÓN EXISTENTE

Para lograr la transformación del sistema energético de Puerto Rico, es necesario hacer un cambio en los roles y responsabilidades históricos de la AEE y su reasignación a través de múltiples entidades. En consecuencia, las operaciones verticalmente integradas de la AEE deben dividirse en funciones de generación y T&D de servicios públicos: GenCo y GridCo, respectivamente. GenCo comprende los recursos de generación existentes, propiedad de la AEE, que serán operados y mantenidos por uno o más operadores privados hasta su retiro, tal como lo exige la Ley Núm. 17 de 2019[132] y según lo dispuesto por el Plan Integrado de Recursos aprobado por la AEE. Además de la selección de LUMA como el operador de T&D, la transformación del sector energético de Puerto Rico también recae sobre el (los) operador(es) privado(s) de GenCo, como parte responsable, entre otras actividades, de la operación y el mantenimiento de los recursos de generación existentes, que son propiedad de la AEE, del cumplimiento ambiental, de la seguridad y del retiro y desmantelamiento de plantas. Además, el operador privado será responsable de trabajar en estrecha colaboración con LUMA para garantizar la planificación adecuada del sistema a corto, mediano y largo plazo, y la ejecución oportuna y eficiente de las mejoras de capital en todo el sistema. Con ese fin, el 10 de noviembre de 2020, la AAPP lanzó una SP para seleccionar uno o más operadores privados para los activos de generación existentes de la AEE (vea el Capítulo 3).

---

[132] Ley de Política Pública Energética de Puerto Rico, Ley Núm. 17 del 11 de abril de 2019.

Además de las medidas antes mencionadas, la AEE debe desempeñar una función integral en la transición inicial al proveedor de servicios de O&M de la APP de generación existente en el año fiscal 2022, de conformidad con las metas cruciales y los requisitos especificados en el acuerdo de O&M. En el año fiscal 2023, la AEE debe continuar avanzando y completar las actividades de reorganización corporativa (vea la Tabla 11 más abajo para conocer los objetivos y las metas cruciales).

TABLA 9: PLAN DE REORGANIZACIÓN Y TRANSICIÓN INICIAL DE LA GENERACIÓN

| Proyectos | # | Metas cruciales | Fecha límite propuesta |
|---|---|---|---|
| Transición inicial al proveedor de servicios de la APP de generación existente | 1 | Formar equipos y elaborar planes para preparar a la organización para la transición financiera, operacional y legal | 1 julio de 2022 |
| | 2 | Completar el resto de las condiciones y los requisitos antes de la fecha de comienzo de los servicios | Por determinar[133] |
| Implementación del Plan de Reorganización de la AEE | 1 | Someter las subsidiarias a la aprobación del NEPR | 31 julio de 2022 |
| | 2 | El NEPR emitirá su determinación sobre la creación de las subsidiarias | 30 agosto de 2022 |
| | 3 | Presentar un plan de trabajo actualizado con fechas y líneas de trabajo detalladas. | 30 agosto de 2022 |
| | 4 | Finalizar la creación de las subsidiarias: GenCo, GridCo, HydroCo, PropertyCo y HoldCo (incluyendo las funciones y responsabilidades definidas) | 30 agosto de 2022 |
| | 5 | Finalización y ejecución del GGHOA | 30 septiembre de 2022 |
| | 6 | Transferencia de activos (acuerdos de capital) | 28 febrero de 2023 |

9.1.3.6 ESTUDIO SOBRE LA MEDICIÓN NETA Y LA GENERACIÓN DISTRIBUIDA

Según lo dispuesto en la Ley Núm. 114 de 2007, según enmendada por la Ley Núm. 17 de 2017, los clientes existentes que hayan instalado sistemas de generación distribuida (es decir, energía solar en el techo) y que participen en el programa de medición neta tienen derecho a recibir un crédito por el exceso de energía exportada a la red que sea igual al costo de la energía comprada a la red. En otras palabras, LUMA compra la energía exportada a la red al mismo precio (la tarifa eléctrica minorista vigente) que la energía comprada por el cliente a LUMA. Bajo la Ley Núm. 17 de 2019, esta misma estructura de compensación y crédito se aplicará a los nuevos clientes de medición neta, al menos hasta el 11 de abril de 2024 (5 años desde la promulgación de la Ley Núm. 17 de 2019), y hasta que el NEPR concluya un estudio sobre medición neta y energía distribuida y emita una determinación que establezca una nueva estructura de compensación y crédito de medición neta.

Aunque la GD renovable proporciona beneficios incuestionables a los clientes de energía solar y al sistema en su conjunto, un programa de medición neta insuficiente puede tener efectos perjudiciales no deseados y se corre el riesgo de una distribución desigual de los costos en todo el sistema. Asimismo, al exigir que LUMA compre el exceso de energía producida por los clientes de medición neta a la tarifa energética vigente, el costo efectivo para los abonados de energía renovable generada por los clientes de medición neta puede ser mayor que el costo de comprar esa misma cantidad de electricidad de otros recursos. A partir de junio de 2022, LUMA tuvo que

---

[133] Sujeto a las metas cruciales para el inicio del servicio una vez firmado el AOM.

pagar $0.28 por cada kWh de energía que exportaron a la red los clientes de medición neta, un costo que luego se traslada, en todo o en parte, al resto de los clientes.

En consecuencia, tal como lo exige la Ley Núm. 17 de 2019, el NEPR debe iniciar el estudio de medición neta y generación distribuida contemplado en la Sección 4 de la Ley Núm. 114 de 2007, según enmendada por la Ley Núm. 17 de 2019, que deberá estar concluido antes del 30 de junio de 2023. A partir de entonces, el NEPR debe iniciar un proceso para aplicar las conclusiones y recomendaciones del estudio y actualizar una estructura de compensación y acreditación de la medición neta, proceso que debe concluirse el 11 de abril de 2024 o antes, de modo que la estructura de medición neta actualizada entre en vigor en esa misma fecha.

TABLA 10: ESTUDIO SOBRE LA MEDICIÓN NETA Y LA GENERACIÓN DISTRIBUIDA

| Proyectos | # | Metas cruciales | Fecha límite propuesta | Parte responsable |
|---|---|---|---|---|
| Estudio sobre la medición neta y la GD | 1 | Concluir el estudio sobre medición neta y generación distribuida requerido por la Sección 4 de la Ley Núm. 117 de 2007, según enmendada por la Ley Núm. 17 de 2019 | 30 junio 2023 | NEPR |
| | 2 | Concluir el procedimiento administrativo para establecer la estructura actualizada de compensación y acreditación de la medición neta | 11 de abril de 2024 o antes | NEPR |
| | 3 | Implementar la estructura actualizada de compensación y acreditación de la medición neta | 11 abril 2024 | NEPR |

## 9.2   Medidas operacionales de LUMA

En abril de 2022, LUMA presentó al NEPR sus Presupuestos Anuales y la actualización del SRP para su aprobación. Estas presentaciones están estrechamente interrelacionadas y se alinean a través del Marco de Recuperación y Transformación de LUMA. El Marco busca alinear los servicios de O&M del sistema de T&D con la actual política energética pública de Puerto Rico.

Las actividades propuestas en las presentaciones de LUMA tienen como finalidad mejorar la seguridad de los empleados del servicio público y de las personas de Puerto Rico (incluida una mejor capacitación y equipos de seguridad), mejorando la experiencia de los clientes, incluso menores tiempos de respuesta y resolución, mayor confiabilidad del servicio y, en general, prestación del servicio con más eficacia. LUMA también prevé que terminará trabajos importantes de remediación y mejora de la red en todo Puerto Rico y que las medidas vinculadas con el sistema contribuirán a la excelencia operacional. Además, las actividades descritas en las presentaciones de LUMA sentarán las bases para la modernización de la red, la transformación digital y la integración de la energía renovable que se requieren en la Ley Núm. 17 de 2019,[134] así como en este Plan Fiscal Certificado y en los anteriores, y que se describen en el Plan de Acción Modificado del Plan Integrado de Recursos (PIR) de la AEE.

La información presentada a continuación es un resumen de las iniciativas incluidas en los Presupuestos Anuales y el SRP de LUMA. Los programas de mejoras de LUMA han sido organizados en carteras de programas similares e interdependientes que, en conjunto, cubren

---

[134] Ley de Política Pública Energética de Puerto Rico, Ley Núm. 17 del 11 de abril de 2019.

todas las áreas funcionales del servicio público. El siguiente resumen describe las siete (7) carteras a grandes rasgos.

La **cartera de servicio al cliente** incluye un conjunto de programas para mejorar el servicio al cliente con tecnología de servicio al cliente modernizada, mejorar los sistemas de facturación, implementar infraestructura de medición avanzada, establecer un programa de "La voz del cliente" y actualizar y reemplazar la distribución de alumbrado público.

La **cartera de distribución** incluye mejoras en el sistema de distribución, incluso reconstrucción de líneas de distribución aéreas y soterradas, reparación de postes y conductores, inspecciones del sistema con reparaciones y reemplazos ad hoc que se atienden al momento, e implementación de tecnología que permita planificar mejor.

La **cartera de transmisión** incluye mejoras en el sistema de transmisión, incluso reconstrucción y fortalecimiento de líneas, reemplazo de postes prioritarios, inspecciones del sistema con reparaciones y reemplazos ad hoc que se atienden al momento, mejoras en los sistemas de monitoreo de la transmisión e inversiones en telecomunicaciones para mejorar las comunicaciones con el personal de primera respuesta y de respuesta ante emergencias, además del control y monitoreo centralizado.

La **cartera de subestaciones** incluye inversiones para reconstruir, fortalecer y modernizar las subestaciones de transmisión y distribución, incluso actualizaciones de la seguridad física y estudios para eliminar las principales interrupciones en cascada y garantizar que el sistema cumpla con los códigos y las normas.

La **cartera de edificios y centro de control** incluye inversiones para reconstruir las instalaciones dañadas, actualizar los sistemas de seguridad e implementar sistemas avanzados de manejo de distribución y de energía que permitan la integración y el despacho de recursos de energía renovable, respuesta a la demanda y almacenamiento en baterías.

La **cartera habilitadora** incluye una serie de iniciativas y programas de seguridad y excelencia operacional, que incluyen brindar herramientas nuevas y equipos de protección personal (EPP), capacitaciones sobre seguridad y habilidades para todos los empleados, una nueva oficina de administración de programas para planificar y ejecutar proyectos de capital importantes, un nuevo sistema de datos para administrar la información sobre los activos de T&D y el manejo de la flota y la vegetación.

La **cartera de servicios de asistencia** incluye programas interdisciplinarios que abarcan a todos los departamentos, como Recursos Humanos (RR. HH.), IT/OT y Finanzas. Esta cartera también incluye estudios sobre integración de recursos renovables y minirredes.

El Capítulo 7 (Carteras de mejoras de LUMA) incluye más información sobre las carteras de mejoras, incluido un resumen de los gastos estimados anuales de cada cartera entre los años fiscales 2022 y 2024.

Como parte de las obligaciones de LUMA en virtud del AOM para T&D, LUMA ha asumido la presentación de informes sobre ciertas estadísticas relacionadas con el sistema de T&D y la planificación del sistema. LUMA reporta estas estadísticas junto con las relacionadas con la generación de la AEE al NEPR trimestralmente como parte de la revisión que hace el NEPR del rendimiento de la Autoridad de Energía Eléctrica de Puerto Rico en el marco del expediente NEPR-MI-2019-0007. Desde su inicio, con la implementación de los programas de mejora

descritos en las siete carteras y en el Capítulo 7 (Carteras de mejoras), LUMA ha conseguido varias mejoras en las estadísticas del sistema, entre las que se incluye un servicio de atención al cliente más rápido con tiempos de espera tanto para los clientes que visitan uno de los 25 centros de servicio al cliente de LUMA como para los que llaman a uno de los centros de contacto con el cliente de la isla. LUMA respondió a las llamadas un 94% más rápido que en el primer trimestre del año fiscal 2022 y redujo los tiempos de espera en los centros de servicio al cliente en un 25%. Además, durante el segundo trimestre del año fiscal 2022, LUMA recibió un 44% menos de quejas de clientes, el número más bajo en Puerto Rico desde que se empezaron a registrar las quejas de la Ley Núm. 57 de 2017. LUMA también ha puesto en servicio más de 590 vehículos que permiten a las brigadas atender los apagones con mayor rapidez y ha proporcionado herramientas y equipos de protección personal modernos y funcionales a sus empleados, así como más de 50,000 horas de formación técnica y de seguridad a los empleados de LUMA para que puedan realizar el trabajo de forma segura y más eficaz.

# Capítulo 10. Estructura legal y reglamentaria

## 10.1  Resumen de la estructura reglamentaria y de la legislación fundamental

**Contexto histórico**

Durante gran parte de su historia, la AEE estuvo estructurada como un monopolio no regulado, no contaba con un regulador externo fuerte e independiente. La exitosa transformación del sector energético de Puerto Rico en un sistema seguro, confiable, asequible y moderno depende de la presencia y la participación activa de un organismo regulador sensato, profesional e independiente desde el punto de vista político. Desde hace mucho tiempo, la industria de los servicios públicos ha reconocido que es fundamental contar con un organismo regulador independiente que supervise el desempeño de los proveedores de servicios energéticos y que proteja los intereses de los consumidores. El organismo regulador desempeña una función esencial a la hora de garantizar: (i) que las tarifas energéticas sean justas y razonables, (ii) que se cumpla con las metas respecto de la calidad del servicio, las mejoras en la eficacia y los recursos de energía renovable, y (iii) que los programas de gastos de capital se implementen según el término y el presupuesto previstos.

La Ley Núm. 57 de 2014 estableció el Negociado de Energía de Puerto Rico (NEPR) como un organismo regulador profesional e independiente con el fin de promover y permitir la implementación transparente de la política energética de Puerto Rico. La Ley Núm. 57 de 2014 también estableció normas y procedimientos para que el NEPR evalúe y apruebe las tarifas eléctricas, siempre y cuando sean "justas y razonables y consistentes con prácticas fiscales y operacionales acertadas que proporcionen un servicio confiable, al menor costo razonable".[135]

A medida que el sector energético de Puerto Rico continúa su transformación en un sistema fiable, sostenible, moderno y eficiente, el NEPR se encargará de promover inversiones prudentes, asegurar una mayor calidad de servicio a los clientes y garantizar que las tendencias de la industria y los avances tecnológicos se incorporen adecuadamente al sistema energético.[136] Para lograr plenamente su propósito, el NEPR debe permanecer independiente del Gobierno del Estado Libre Asociado desde el punto de vista financiero y operacional y sus determinaciones deben estar libres de cualquier influencia o interferencia política directa o indirecta.

Varias medidas legislativas han fortalecido el marco reglamentario y dotado al NEPR de más autoridad y un presupuesto administrativo independiente, lo que permitió establecer metas ambiciosas para las operaciones del sector privado y la revitalización del sector energético.

**Ley Núm. 17 de 2019**

La Ley Núm. 17 de 2019 estableció una política energética integral que describe las aspiraciones con respecto a la transformación del sector eléctrico de Puerto Rico y las normas reglamentarias para el cumplimiento de dichos objetivos. Los principios y los requisitos más importantes de la Ley incluyen lo siguiente:

---

[135]  Ley Núm. 57 de 2014, según enmendada.
[136]  Ibid.

■ **Desagregación – Reorganización funcional:** La Ley exige la desagregación del sistema eléctrico mediante el traspaso de las responsabilidades de la AEE con respecto a la operación y el mantenimiento de los activos de generación y de transmisión y distribución (T&D) a operadores privados, poniendo fin al actual monopolio verticalmente integrado de la AEE.

■ **Modernización del sistema y energía renovable:** Además de fomentar la resiliencia de la red por medio del desarrollo de microrredes para las instalaciones y cargas críticas, la Ley promueve firmemente la energía renovable y la generación distribuida. Además, actualiza el estándar de cartera renovable (RPS) de Puerto Rico (por ejemplo, a un 40% para el año 2025, a partir del 20%; un 60% para el año 2040 y un 100% para el año 2050), garantiza más velocidad en la gestión de permisos y la interconexión para los proyectos residenciales de energía renovable, y ordena la eliminación de la generación con carbón antes del 1 de enero de 2028.

■ **Mayor autoridad del NEPR en virtud de la legislación de Puerto Rico:** La ley confirma la función del NEPR como un organismo regulador independiente y apolítico y amplía su autoridad de modo tal que pueda (i) establecer mecanismos para imponer incentivos o multas, (ii) ejercer un alto nivel de control respecto del mantenimiento de la red eléctrica, (iii) exigir la presentación de informes sobre el estado de los sistemas eléctricos, y (iv) usar mecanismos alternativos para la regulación de tarifas sobre la base de los costos del servicio. La ley también define el presupuesto anual del NEPR de $20 millones y deja claro que dicho presupuesto no está sujeto a aprobación ejecutiva ni legislativa. Además, el NEPR está en este momento obligado a pasar de su estructura actual de empleados a una con no menos del 75% de funcionarios públicos y no más del 25% de empleados de confianza.[137]

**Estructura organizacional del NEPR**

Si bien está ubicado administrativamente dentro de la Junta Reglamentadora de Servicio Público (JRSP), el NEPR es un organismo que funciona de manera independiente (Gráfica 46). El Negociado está integrado por cinco comisionados y toma decisiones con aprobación de la mayoría. Los comisionados son designados por el gobernador, con el asesoramiento y el consentimiento del Senado de Puerto Rico, y desempeñan sus funciones en  periodos escalonados.[138] Los comisionados deben cumplir con ciertos requisitos vinculados con la experiencia y la educación profesional a fin de poder ocupar su cargo y solo pueden ser removidos por justa causa.

---

137 Consultar la Sección 5.13 de la Ley Núm. 17 de 2019, que enmienda la Sección 6.7(k) de la Ley Núm. 57 de 2014.

138 El NEPR ya tiene su lista completa de cinco comisionados, incluido el presidente. De acuerdo con la Ley Núm. 57 de 2014, según enmendada, la duración de cada cargo es la siguiente: el presidente ocupará el cargo por seis (6)años, dos (2) de los comisionados ocuparán sus cargos por cuatro (4) años y los dos (2) comisionados restantes por dos (2) años. Los sucesores de todos los comisionados son designados por seis (6) años.

GRÁFICA 46: ESTRUCTURA REGLAMENTARIA DEL NEPR



## 10.2 Aspectos reglamentarios clave

La obligación estatutaria del NEPR como organismo regulador independiente es promover un sistema energético eficiente, confiable, resiliente y que satisfaga las necesidades del cliente. Como tal, las responsabilidades primarias del NEPR incluyen (1) la fijación de tarifas, (2) la aprobación y el cumplimiento del Plan Integrado de Recursos (PIR), (3) la protección de los intereses de los clientes y consumidores, y (4) la seguridad de la fuerza laboral.

De conformidad con su ley habilitadora, según enmendada, el NEPR es responsable de supervisar e implementar la política pública energética de Puerto Rico, incluso las diversas transformaciones que están actualmente en curso con el sistema de T&D y los activos de generación existentes de la AEE. Algunas de las responsabilidades más importantes del NEPR incluyen las siguientes:

■ **Supervisión y ejecución:** Ejercer responsabilidades de supervisión directa, además de asegurar la ejecución, de todos los participantes del mercado energético (incluso el operador de T&D, los operadores de activos de generación existentes, los productores energéticos independientes nuevos, etc.) para garantizar el cumplimiento pleno de los objetivos de la política pública energética, tal como lo establece la ley. Esto incluye (a) supervisar la calidad y confiabilidad de los servicios de energía eléctrica brindados por la AEE, LUMA y cualquier otra compañía energética certificada en Puerto Rico, y (b) formular e implementar estrategias para alcanzar los objetivos que establece la Ley Núm. 57 de 2014, según enmendada por la Ley Núm. 17 de 2019, incluso, entre otras cosas, reducir y estabilizar los costos de energía en forma permanente, controlar la volatilidad del precio de la electricidad en Puerto Rico y garantizar que los precios sean justos, razonables y consistentes con el interés público y que cumplan con los parámetros establecidos por el NEPR por medio de las regulaciones.

■ **Planificación de tarifas y recursos:** Revisar las tarifas y aprobar aquellas que sean justas y razonables, garantizar que los gastos en el sistema energético sean sensatos y coherentes con la política pública energética, y asegurar la correcta planificación de recursos a largo plazo por medio del análisis periódico y las actualizaciones de los PIR y demás planes de inversión de capital.

■ **Transparencia:** Exigir que toda compañía de servicios de energía eléctrica certificada en Puerto Rico conserve, mantenga y entregue periódicamente al NEPR aquellos registros, datos, documentos y planes que sean necesarios para alcanzar los objetivos de política pública de la Ley Núm. 57 de 2014, según enmendada por la Ley Núm. 17 de 2019.

■ **Estándares de cartera renovable:** Respaldar las inversiones en generación y en recursos relacionados que buscan cumplir con los RPS de Puerto Rico: 40% para el 2025, 60% para el 2040 y 100% para el 2050. Tras el retraso de la AEE en la conducción de los procesos de adquisición de recursos de energía renovable, el NEPR también ejecutará el segundo tramo y las futuras adquisiciones de generación renovable a través de un coordinador independiente.[139]

■ **Medición neta:** Establecer y actualizar periódicamente el programa de medición neta de Puerto Rico con el fin de promover la inversión rentable en sistemas de energía renovable y garantizar una recuperación de costos adecuada entre los distintos tipos de clientes.

■ **Transmisión de energía de un punto a otro y desagregación de costos:** Establecer y hacer cumplir las normas y los reglamentos para la desagregación de los costos de la AEE y la propuesta de estructuras industriales nueva con el fin de introducir la competencia entre los generadores para brindarles servicios, principalmente, a los grandes clientes industriales.

■ **Contribuciones en lugar de impuestos (CELI):** Garantizar que la AEE y los municipios cumplan por completo con los niveles de consumo elegibles para las CELI y con la facturación, la recaudación y el pago por parte de los municipios del consumo de electricidad que exceda los niveles elegibles para las CELI. El 22 de octubre de 2020, el NEPR completó y aprobó el estudio para la Legislatura de Puerto Rico sobre las alternativas dirigidas a optimizar el valor y los beneficios de la estructura de las CELI para los municipios y la AEE, tal como lo requiere la Ley Núm. 17 de 2019. El NEPR completó y aprobó el estudio para la Legislatura de Puerto Rico sobre las alternativas dirigidas a optimizar el valor y los beneficios de la estructura de las CELI para los municipios, tal como lo requiere la Ley Núm. 17 de 2019.[140]

■ **Eficiencia energética (EE):** Adoptar regulaciones para establecer un marco que promueva la adopción de medidas de eficiencia energética de manera que posibilite a Puerto Rico alcanzar la meta de un treinta por ciento (30%) de reducción acumulada en el uso de energía a partir de la eficiencia energética para el año 2040 en comparación con las ventas netas de servicios públicos de la AEE en el año fiscal 2019, utilizando una serie de programas de eficiencia energética que estarán disponibles para todas las clases de clientes, incluidos los municipios. El NEPR adoptó un reglamento para la respuesta a la demanda (DR) el 10 de diciembre de 2020 y para la EE el 21 de enero de 2022. Los reglamentos de DR y EE adoptados utilizan enfoques de programa similares para el desarrollo, la administración, la aplicación y el financiamiento. El NEPR ha resuelto que LUMA debe poner en marcha los programas piloto a más tardar el 1 de julio de 2022. Los primeros planes formales de EE trianuales se presentarán el 1 de marzo y cubrirán  periodos de tres años, a partir del 1 de marzo de 2024.

Actualmente, el NEPR es el organismo regulador del sector energético; y es la Legislatura quien le otorga sus facultades. En virtud de la Ley PROMESA, la Junta de Supervisión tiene la responsabilidad final en asuntos relacionados con el Plan Fiscal Certificado y el presupuesto

---

[139] Resolución y orden del NEPR emitida el 29 de octubre de 2021. Vea NEPR-MI-2020-0012.

[140] Investigación sobre la contribución en lugar de impuestos. Caso Núm. NEPR-IN-2019-0003, 22 de octubre de 2020.

del Estado Libre Asociado, la AEE y otros organismos territoriales cubiertos. La Ley PROMESA estipula que el gobernador y la Legislatura no pueden promulgar ni implementar ningún estatuto, norma, política o regla que afecte o frustre los propósitos de la mencionada Ley, según lo establecido por la Junta de Supervisión.  Dado que el NEPR es una entidad territorial, está sujeto a las mismas limitaciones que las agencias estatales y las corporaciones públicas. Por lo tanto, en caso de que las acciones del NEPR afecten o frustren los propósitos de la Ley PROMESA, según lo establecido por la Junta de Supervisión, dicha Junta puede exigir que se cumpla con las restricciones que establece la Ley PROMESA dirigiendo al NEPR y solicitando intervención judicial cuando sea necesario. Para garantizar que el NEPR se convierta en el mejor regulador de su categoría, la Junta de Supervisión ha incluido algunos cambios estructurales en el Plan Fiscal Certificado de 2022 para Puerto Rico.[141]

### 10.2.1 *Principios rectores para la creación de tarifas*

Con el propósito de lograr una estructura tarifaria óptima, por ley, el NEPR tiene la obligación de considerar el siguiente grupo no exhaustivo de principios rectores para la creación de tarifas:[142]

- **Tarifas justas y razonables:** El NEPR debe garantizar que las tarifas sean justas y razonables y consistentes con prácticas fiscales y operacionales acertadas que proporcionen un servicio confiable, al menor costo razonable.

- **Responsabilidad fiscal:** Las tarifas deben ser suficientes para cubrir el pago de, entre otras cosas, los costos por la compra de energía y combustible y los costos de las operaciones del servicio eléctrico, incluidos los costos operacionales, las exigencias de capital y otras obligaciones.

- **Asequibilidad:** El proceso de creación de tarifas debería tener en cuenta factores socioeconómicos vinculados con los clientes (por ejemplo, considerar los subsidios y otras medidas de distribución de costos).

- **Causalidad de costos/asignación del costo de servicio:** Las tarifas de electricidad que pagan los clientes se basan en el costo que representa prestarle el servicio a un tipo o una clase de cliente en particular, con excepción de los casos en que la ley disponga lo contrario (por ejemplo, subsidios por bajos recursos, hoteles, adultos mayores).

- **Transparencia:** Los componentes de la tarifa y la metodología de cálculo se deben comunicar de forma clara (consumo volumétrico y mensual fijos del cliente), brindándoles a los clientes información detallada sobre los costos cubiertos por los componentes de la tarifa.

- **Coherencia con la política:** Se incentiva a los clientes para que su conducta sea coherente con la política pública energética (por ejemplo, promover mejoras en la eficiencia energética, recompensar a los clientes con beneficios por confiabilidad asociados con los recursos que posee el cliente, alentar el cumplimiento de los estándares de cartera renovable).

---

[141]  Plan Fiscal Certificado de 2022 para Puerto Rico, Capítulo 10: "Reforma del sector energético"

[142]  La Sección 2.8 de la Ley Núm. 57 de 2014, que modifica la Sección 6(B) de la Ley Núm. 83 de 1941, le otorga al NEPR la autoridad para revisar tarifas y aprobar modificaciones o ajustes temporales.

### 10.2.2 *Estructura tarifaria actual de la AEE*

La estructura tarifaria actual fue establecida y aprobada mediante Resolución y Orden del NEPR, en el caso CEPR-AP-2015-0001 con fecha de 10 de enero de 2017[143]. Los Presupuestos Iniciales, y las propuestas de Presupuestos Anuales ahora presentadas por LUMA ante la AAPP y el NEPR el 1 de abril de 2022, estaban dentro de los límites de la tarifa base aprobada por el NEPR e implementan metodologías consistentes con las cláusulas adicionales asociadas a la Orden Tarifaria de 2017. LUMA no busca un aumento ni una revisión de la tarifa base en relación con los Presupuestos Anuales de LUMA ni con motivo de dichos presupuestos.  La proyección de gastos del Plan Fiscal Certificado de 2022 refleja los Presupuestos Anuales de LUMA tal y como fueron propuestos a la AAPP y al NEPR el 1 de abril de 2022.

**Resumen de las tarifas aprobadas por el NEPR**

La Orden Tarifaria de 2017 mediante la cual se estipuló la nueva estructura tarifaria de la AEE fue una medida importante hacia una mayor transparencia, ya que separó los cargos por concepto de la CELI y los subsidios de los componentes tarifarios correspondientes a la energía adquirida y el combustible. Para el año fiscal 2023, los componentes tarifarios proyectados son los siguientes: 5% para la CELI y demás subsidios, 24% para la tarifa base, incluidos los costos de operación y mantenimiento del servicio público, y 71% para los costos de generación de energía (

Gráfica 47).

Gráfica 47: Composición total de la tarifa para el año fiscal 2023



Queda mucho por hacer para lograr una estructura tarifaria que cubra gastos relevantes de capital, mantenimiento y operaciones para beneficiar a los clientes y consumidores y promover al mismo tiempo un desarrollo económico sostenible. La reforma reguladora que ha sido puesta en marcha

---

[143]  Enmendado y ratificado en parte el 8 de marzo de 2017.

permitirá que el sistema eléctrico de Puerto Rico les preste un mejor servicio a sus clientes, de manera confiable y rentable.

## 10.3  Resumen de la reforma de la CELI

El Gobierno de Puerto Rico ha realizado cambios significativos en el manejo de la CELI mediante la promulgación de la Ley Núm. 57 de 2014 y la Ley Núm. 4 de 2016. Según la estructura tarifaria modificada, la AEE recupera el costo de la CELI por medio de los cargos por concepto de la CELI y los subsidios incluidos en las facturas de los clientes. El cargo por concepto de la CELI garantiza mayor transparencia y responsabilidad para los clientes y establece incentivos para una mejor eficiencia energética municipal. Cualquier reducción o modificación adicional exigiría mayor legislación.

Las medidas tomadas para implementar la reforma de la CELI incluyen las siguientes:

- **Transparencia en la facturación:** Los costos de la CELI figuran como un ítem aparte en las facturas de los clientes.
- **Nueva forma de tratar a las cuentas de servicios que no reúnen los requisitos:** Los organismos con fines de lucro municipales y otros organismos que no reúnen los requisitos ya no pueden recibir un crédito por el servicio eléctrico de la CELI.
- **Límite en el consumo municipal:** Durante el año fiscal 2017, se estableció legalmente un límite en el consumo total (kWh) en la CELI municipal para cada municipio y se redujo en un 15% en el transcurso de los tres años fiscales siguientes (5% cada año).
- **Incentivos por eficiencia energética:** Se estableció un mecanismo que promueve la eficiencia energética y ahorros adicionales por encima del límite obligatorio de consumo total impuesto a los municipios por medio de la Ley Núm. 57 de 2014; los municipios recibirán un pago de la AEE por el valor equivalente a la diferencia entre el límite obligatorio de consumo total y el consumo real, el cual solo se pagará si todos los municipios, en su totalidad, cumplen con sus respectivos límites.

Durante el año fiscal 2021, el cargo por concepto de la CELI alcanzó alrededor del 2% de la tarifa promedio de los clientes.

- Consumo excluido y consumo por encima del límite: Durante el año fiscal 2017, el primer año en que se impuso el límite en el consumo de la CELI, el consumo por encima del límite elegible en los municipios y el consumo en las entidades que no reúnen los requisitos (por ejemplo, entidades con fines de lucro) fue de alrededor de $20 millones. Durante el año fiscal 2020, esta cifra bajó a $17.0 millones y disminuyó aún más en el año fiscal 2021, que fue de alrededor de $12.8 millones.
- Consumo elegible por debajo del límite de consumo: El costo total del consumo municipal elegible se redujo de $81.0 millones en el año fiscal 2017 a $63.9 millones en el año fiscal 2020. El consumo municipal real durante el año fiscal 2020 fue de 279 millones de kWh, un 23% por debajo del límite de 363 millones de kWh. Durante el año fiscal 2021, el consumo municipal elegible se redujo aún más hasta los $63.9 millones y 271 millones de kWh, un 25% por debajo del límite.

En virtud de la Ley Núm. 17 de 2019, el NEPR tiene la obligación de analizar "la implementación, la efectividad, el costo-beneficio, la razonabilidad y el impacto económico de la contribución en lugar de impuestos (CELI)" para determinar la necesidad de una reforma. Específicamente, en virtud de la Sección 1.18 de dicha Ley, el Negociado de Energía tenía la obligación de realizar un

estudio respecto a la implementación, efectividad, costo-beneficio, razonabilidad e impacto económico de la CELI para determinar la necesidad y conveniencia, si hubiera, de reformar este mecanismo y los subsidios. Los resultados de este estudio se completaron antes de octubre de 2020 y se publicaron[144] y se entregaron a ambas Cámaras de la Asamblea Legislativa para que se analice y considere cualquier legislación necesaria.[145]

Las metas cruciales más importantes completadas respecto de la reforma de la CELI se describen brevemente a continuación:

- **21 de octubre de 2020**: Tal como lo exige la ley, el NEPR completó el estudio respecto a la implementación, efectividad, costo-beneficio, razonabilidad e impacto económico de la CELI y otros subsidios, estudio que los comisionados del NEPR aprobaron.
- **15 de diciembre de 2020**: La AEE completó el desarrollo de un proceso para clasificar correctamente las cuentas municipales como elegibles o no elegibles para la CELI y ha implementado el proceso para que los municipios paguen el consumo eléctrico que no está cubierto por la CELI y presenten ante el NEPR quejas relacionadas con la CELI.

## 10.4 Función del NEPR y estructura reglamentaria después de la transformación del sistema de T&D

En virtud de la Ley Núm. 57 de 2014, según enmendada, el NEPR tiene jurisdicción sobre la AEE y todas las demás compañías de servicio eléctrico que operan en Puerto Rico. La Ley Núm. 17 de 2019 amplió la autoridad del NEPR y aumentó su presupuesto significativamente. Es de particular importancia para los esfuerzos de transformación en curso el hecho de que la Ley Núm. 17 de 2019 le confiere al NEPR la responsabilidad de supervisar la planificación y la operación del sistema eléctrico, incluso la evaluación y la aprobación de los PIR, así como de aprobar los acuerdos de compra de energía y los contratos de alianzas mediante los que se implementa el proceso de transformación que se define en la Ley Núm. 120 de 2018.

Según el AOM para T&D, LUMA es el agente de la AEE en los procedimientos reglamentarios ante el NEPR relacionados con los servicios de O&M y en la realización de todas las presentaciones y solicitudes pertinentes requeridas para las aprobaciones gubernamentales.[146] Para evitar cualquier duda, cabe destacar que LUMA no establece la política energética de Puerto Rico. Además, el AOM para T&D exige que LUMA cumpla con la política pública y el marco reglamentario para la transformación del sistema eléctrico de Puerto Rico. LUMA tiene la obligación de interactuar, respaldar, trabajar y cumplir con el NEPR en varios procesos y funciones que incluyen, entre otros, los siguientes: (1) evaluaciones de la estructura tarifaria, (2) PIR, (3) acuerdos de compra de energía (PPA), (4) cumplimiento ambiental, (5) órdenes de eficiencia energética, (6) estándares de cartera renovable, (7) adquisición de recursos (por ejemplo, apoyo mediante estudios de interconexión), y (8) quejas de los clientes.

---

[144] https://energia.pr.gov/wp-content/uploads/sites/7/2020/10/Resolucio%CC%81n-y-Orden-NEPR-IN-2019-0003.pdf

[145] Ley Núm. 17 de 2019, Sección 1.18

[146] Acuerdo de Operación y Mantenimiento del Sistema de Transmisión y Distribución de Puerto Rico, p. 66, Sección 5.6: Asuntos de Regulación del Sistema. (a) Generalidades. A partir de la Fecha de Inicio del Servicio y mientras dure la Vigencia, el Operador funcionará como agente del Responsable, y el Responsable por el presente autoriza irrevocablemente al Operador a (i) representar al Responsable ante el NEPR con respecto a cualquier asunto relacionado con el desempeño de cualquiera de los Servicios de O&M prestados por el Operador en virtud de este Contrato, (ii) preparar todas las presentaciones relacionadas y otros escritos ante el NEPR y (iii) representar al Responsable ante cualquier organismo gubernamental y cualquier otra institución u organización industrial o reguladora similar que tenga jurisdicción en materia de regulación.

El AOM para T&D garantiza además que el NEPR conserva todos los derechos, responsabilidades o autoridad sobre el sistema de T&D, el responsable o el operador.[147] La autoridad reguladora y la supervisión del NEPR, tal y como se ha esbozado y resumido en este capítulo, es y seguirá siendo muy relevante para LUMA, y para cualquier otro operador privado que pueda ser seleccionado como parte de la actual alianza público-privada de operación y mantenimiento de la generación existente de la AEE. Las salvaguardas ofrecidas por un fuerte regulador independiente, como el NEPR, seguirán existiendo firmemente después de la transformación del sistema de T&D.

## 10.5  Requisitos y cumplimiento de la ley ambiental federal

Como compañía eléctrica, la AEE debe cumplir con diferentes leyes y reglamentos ambientales, incluyendo la Ley de Aire Limpio (CAA), que es la ley federal integral que regula las emisiones de aire de fuentes estacionarias y móviles. Entre otras cosas, esta ley autoriza a la EPA a establecer el Estándar Nacional para la Calidad de Aire Ambiental (NAAQS) para proteger la salud y el bienestar públicos y para regular las emisiones de contaminantes atmosféricos, incluidos los peligrosos.

En virtud de la Sección 107(a) de la CAA, cada estado, territorio o distrito local del aire tiene la responsabilidad principal de presentar un plan de implementación estatal (SIP) que especifique la forma en que se cumplirá y mantendrá el NAAQS dentro de cada una de sus regiones de control de la calidad del aire. 42 U.S.C. § 7407(a).  La CAA también exige que la EPA revise y apruebe los SIP que cumplan los requisitos de la ley.  En el caso de Puerto Rico, el cumplimiento de la CAA requiere que el Departamento de Recursos Naturales y Ambientales de Puerto Rico (DRNA) presente un SIP para que sea aprobado por la EPA en relación con el NAAQS del 2010 que fija 1 hora de dióxido de azufre (SO2).

La EPA designó los distritos del aire de Guayama-Salinas y San Juan como áreas de no cumplimiento del NAAQS de SO2, a partir del 9 de abril de 2018.  La determinación de no cumplimiento de la EPA se basó en los resultados de la modelización de SO2 realizada en estos distritos del aire.  En mayo de 2016, el Gobierno de Puerto Rico decidió utilizar el modelo de dispersión del aire aprobado por la EPA (AERMOD) como estrategia para demostrar el cumplimiento del NAAQS relativo al SO2.

El distrito del aire de Guayama-Salinas incluye parte de los municipios de Guayama y Salinas. En el caso del distrito del aire de San Juan, incluye el municipio de Cataño y parte de los municipios de San Juan, Guaynabo, Bayamón y Toa Baja.  Estos distritos del aire cubren el área donde se encuentran las plantas de vapor de la AEE de Aguirre, San Juan y Palo Seco.

Dada la determinación de no cumplimiento por parte de la EPA en virtud de la CAA, el DRNA debe presentar un SIP definitivo para su aprobación por parte de la EPA, que deberá prever el cumplimiento del NAAQS del 2010 que fija 1 hora de SO2 en las áreas de no cumplimiento de Guayama-Salinas y San Juan antes del 9 de abril de 2023.  La fecha límite para presentar el SIP a la EPA era el 9 de octubre de 2019. El DRNA no cumplió el término del 9 de octubre de 2019, y el 3 de noviembre de 2020, la EPA emitió las conclusiones de la falta de presentación (FFS) del SIP requerido para el cumplimiento del NAAQS del 2010 que establece 1 hora de dióxido de azufre (SO2) primario, con fecha de entrada en vigor del 3 de diciembre de 2020. 85 Reg. Fed. 69,504

---

[147]  "[I]ndependientemente de cualquier disposición que establezca lo contrario (...), no se interpretará ni se considerará que ninguna cláusula de este Acuerdo limita, restringe, sustituye, reemplaza o afecta de algún otro modo, en cada caso de alguna forma, los derechos, las responsabilidades o las facultades otorgadas al NEPR conforme a la ley aplicable con respecto al sistema de T&D, el propietario o el operador". Sección 20.17, AOM, p. 165.

(3 de noviembre de 2020). Según RRS, hay ciertos términos que deben cumplirse para evitar las sanciones obligatorias impuestas por la EPA.

Según el actual proceso del SIP de Puerto Rico, la EPA debe determinar la integridad del SIP del DRNA antes del 3 de junio de 2022 para evitar la imposición de sanciones de compensación "2 a 1" en las áreas de no cumplimiento.  Si la EPA no determina que el DRNA ha realizado una presentación completa del SIP antes del 3 de junio, cada nueva tonelada de SO2 emitida por cualquier fuente nueva o modificada en las zonas de incumplimiento deberá compensarse con una reducción de dos toneladas. Además de las centrales eléctricas de la AEE, la sanción de compensación "2 a 1" se aplica a todas las instalaciones consideradas como fuentes de emisión en las áreas de no cumplimiento.  Para lograr el cumplimiento de los reglamentos de la EPA, la sanción de compensación "2 a 1" requerirá que todos los responsables y operadores de fuentes de emisión en las zonas de no cumplimiento apliquen medidas de control de emisiones, suponiendo una duplicación de sus emisiones reales.  Esta sanción incrementaría los costos operacionales y de mantenimiento para el funcionamiento de las instalaciones industriales y comerciales en las áreas de no cumplimiento, lo que afectaría el desarrollo económico en estas zonas.

Además, si la EPA determina que el SIP no se ha completado antes del 3 de diciembre de 2022, se aplicarán sanciones adicionales, que consistirán en una moratoria de los fondos destinados a carreteras y autopistas para todos los proyectos en las áreas de no cumplimiento (excepto los proyectos relacionados con la seguridad).  En general, estos proyectos incluyen nuevas carreteras o mejoras en las carreteras y autopistas existentes.  Puerto Rico depende de la obtención de fondos federales para desarrollar proyectos de carreteras y autopistas, que pueden superar los $144 millones anuales.  Estos fondos federales, o parte de ellos, entrarían en moratoria si el SIP presentado por el DRNA no se considera completo antes del 3 de diciembre de 2022.

Como parte del desarrollo del SIP, el DRNA ha modelado las emisiones de SO2 en los distritos del aire de Guayama-Salinas y San Juan, y ha descubierto que estas áreas no pueden cumplir con los objetivos si la AEE continúa utilizando combustibles búnker C y diésel regulares en las unidades de generación ubicadas en Aguirre, San Juan y Palo Seco.  Cuando se modelan las turbinas de combustión que utilizan diésel de muy bajo contenido en azufre (ULSD), las emisiones se reducen, pero no lo suficiente como para lograr el cumplimiento. De no retirarse las unidades de generación a corto plazo en cumplimiento total y oportuno del PIR aprobado por el NEPR, la AEE y el DRNA han indicado que lograr el cumplimiento en los distritos del aire pertinentes puede requerir la quema de gas natural en las unidades de vapor existentes ubicadas en Aguirre, San Juan y Palo Seco.

Teniendo en cuenta las prioridades conjuntas de proporcionar electricidad fiable y cumplir con el NAAQS relativo al SO2, el DRNA y la AEE han identificado los siguientes puntos de acción como estrategias factibles para lograr el cumplimiento:

- Integrar energías renovables según el PIR aprobado y el Plan de Acción Modificado.
- Sustituir los combustibles utilizados en las unidades de generación térmica existentes, como el ULSD.
- Desarrollar una red de vigilancia de SO2 dentro de las áreas de no cumplimiento designadas para demostrar el cumplimiento del NAAQS.
- En consonancia con estas acciones, a corto plazo, la AEE deberá:
  - Completar el proceso de adquisición del tramo 1 y seguir trabajando con diligencia para apoyar al NEPR con los tramos restantes previstos en el Plan de Acción Modificado del PIR.

- o Sustituir el diésel normal por combustible ULSD en las unidades de ciclo combinado, las turbinas de combustión y las máquinas aeroderivadas situadas en las centrales eléctricas de San Juan, Palo Seco y Aguirre.
- o Cumplir con los requisitos del DRNA para el desarrollo de una red de monitoreo de SO2.

La AEE tuvo una serie de retrasos en la realización del proceso de adquisición de energía renovable y almacenamiento del tramo 1 y en el lanzamiento de los tramos posteriores, lo que hizo que el NEPR asumiera la ejecución de los tramos futuros para facilitar el cumplimiento de los objetivos de RPS de Puerto Rico y del PIR. En concreto, los retiros de unidades de generación de combustibles fósiles pueden verse retrasados en caso de que se produzcan demoras en la integración de las fuentes de generación de energía renovable. Si estos retrasos continúan, en aras de mantener adecuadamente un servicio eléctrico seguro y confiable, la AEE podría tener que proponer la ejecución de ciertas acciones para mantener sus unidades de vapor en funcionamiento y de conformidad con las regulaciones ambientales aplicables.  Los resultados de la modelización del DRNA y de la AEE indican que para lograr el cumplimiento del NAAQS relativo al SO2 mientras se mantienen en funcionamiento las unidades de vapor actuales (en el caso de que se produzcan más retrasos en la integración de energías renovables) sería necesario quemar gas natural en las unidades de vapor existentes en lugar de combustible búnker C. Por lo tanto, a corto y mediano plazo, es posible que sea necesario sustituir el combustible búnker C por gas natural en las unidades de vapor ubicadas en San Juan, Palo Seco y Aguirre para lograr un SIP que cumpla con la EPA y evitar las sanciones mencionadas, manteniendo al mismo tiempo los niveles de carga de generación en servicio. Sin embargo, la ausencia de una enmienda al PIR aprobado por el NEPR y del financiamiento necesario para producir dicha conversión puede causar problemas de aplicación de estas iniciativas y, por lo tanto, el SIP se considerará incompleto y estará sujeto a posibles acciones adversas por parte de la EPA. Como tal, no debe contemplarse ninguna conversión de unidades sin la aprobación del NEPR en forma de autorización, exención o enmienda del PIR aprobado por el NEPR.

Para ello, el 11 de febrero de 2022, la AEE presentó ante el NEPR una moción titulada *"Solicitud de permiso para realizar trabajos en las unidades de vapor de la AEE para lograr el cumplimiento reglamentario medioambiental"*, en la que pedía permiso al NEPR para llevar a cabo la conversión de las unidades 7-10 de San Juan a gas natural con el fin de lograr el cumplimiento del NAAQS del 2010 relativo a 1 hora de SO2 y, en consecuencia, evitar costosas sanciones y lograr el cumplimiento de los MATS exigidos por la EPA, 40 CFR 63, Subparte UUUUU - Estándares nacionales de emisiones para contaminantes peligrosos del aire, que entraron en vigor el 16 de abril de 2012, en la instalación de San Juan. El NEPR aún no ha emitido una determinación sobre la moción de la AEE.

# Capítulo 11. Resumen de proyecciones financieras

Los siguientes capítulos del Plan Fiscal Certificado de 2022 ofrecen un resumen de las proyecciones financieras de la AEE a corto (próximos 5 años) y a largo plazo (próximos 30 años). Estas proyecciones reflejan el posible impacto no solo de factores externos (por ejemplo, los cambios proyectados en el precio del combustible y la perspectiva macroeconómica para Puerto Rico), sino también de desarrollos internos (por ejemplo, la SP de generación existente de la APP y la integración prevista e iniciada de la capacidad de generación renovable, entre otros). Las proyecciones muestran el impacto positivo esperado que tendrá la transformación en curso de la AEE, incluidas las iniciativas y las medidas operacionales que están implementándose o que están previstas por la AEE y LUMA. Por ejemplo, las proyecciones de gastos incluyen los presupuestos de LUMA presentados el 1 de abril de 2022, que detallan el aumento en la eficiencia y consideran las medidas de gastos adicionales, como las iniciativas para reducir el costo del combustible. Por esta razón, los próximos tres capítulos también muestran tres entidades que conformarán por separado que conformarán a la AEE en el futuro: HoldCo, GenCo y GridCo. Los gastos se dividirán según sus funciones y responsabilidades específicas. El Capítulo 3 (Transformación), así como el Capítulo 9 (Medidas operacionales) y Capítulo 7 (Carteras de mejoras de LUMA), explican el impacto de la transformación de la AEE y las medidas operacionales específicas. Las proyecciones que se incluyen en este capítulo y en los dos siguientes son coherentes con los supuestos macroeconómicos contemplados en el Plan Fiscal Certificado para Puerto Rico y suponen que se cumplirá plenamente con la Ley Núm. 17 de 2019 y con las exigencias sobre la planificación de los recursos del PIR.

## 11.1   Requisitos de ingresos y tarifa de referencia

Para proyectar y medir el impacto de la transformación en curso de la AEE y de las iniciativas operacionales y económicas adicionales y también para estimar las consecuentes mejoras en las tarifas, este capítulo describe una proyección de la tarifa de referencia. Esta proyección de referencia no supone la reestructuración de la deuda preexistente y de las obligaciones de pensiones, y en su lugar incluye el costo total de la deuda y las pensiones no reestructuradas. Como tal, la tarifa de referencia refleja el estado hipotético en que la AEE no procede a la transformación o reestructuración de la deuda.

Todas las tarifas de este Plan Fiscal Certificado se basan en las necesidades de ingresos. Esto significa que las tarifas aprobadas por el NEPR deben proporcionar a la AEE los ingresos correspondientes para pagar todos los costos proyectados que permitan brindar un servicio adecuado a los clientes. El año fiscal 2021 es el último año fiscal en el que se reportan los gastos consolidados de la AEE para la presentación de informes. A partir del año fiscal 2022, los Planes Fiscales y Presupuestos Certificados presentan las tres unidades constitutivas: GenCo, GridCo y HoldCo.

Las proyecciones de las tarifas de referencia se muestran en la Gráfica 48 a continuación. Muestran que, en ausencia de cualquier transformación de la AEE, y sin los beneficios de cualquier reestructuración financiera o iniciativas de mejora operacional, se proyecta que los clientes aumenten entre 11 y 16 c/kWh, en comparación con las tarifas del año fiscal 2021.[148] Durante los próximos treinta años, se espera que las tarifas de referencia, sin el impacto positivo de la transformación en curso de la AEE, aumenten hasta 42.5 c/kWh, en gran parte debido a la

---

[148] El año fiscal 2021 ha servido como año base para comparar las tarifas.

disminución de la demanda, ya que los gastos fijos se reparten entre un menor número de kilovatios-hora. Las tarifas de referencia cada vez más altas que se muestran a continuación ilustran la necesidad de una transformación integral de la AEE, como se explica en el Capítulo 3 (Transformación), así como en los Capítulos 9 (Medidas operacionales) y 7 (Carteras de mejoras de LUMA).

Además de las iniciativas y de la transformación antes mencionadas, hay varios factores adicionales importantes que podrían tener un efecto significativo en las tarifas futuras. Dichos factores pueden ser clasificados de manera amplia en factores relacionados con los gastos y factores relacionados con la demanda.

- **Factores relacionados con los gastos**: Como se explica arriba, dado que las tarifas se basan en los requisitos de ingresos, si los gastos de la AEE aumentan, tendrán que aumentar las tarifas para garantizar que la AEE tenga fondos suficientes para cubrir dichos gastos. La mayoría de los costos de operación del servicio público que tiene la AEE pueden proyectarse de manera predecible según los costos operacionales base de la AEE y LUMA considerando la inflación. Sin embargo, algunos costos dependen de los procesos y resultados políticos de terceros y de los factores del mercado, y esto no puede proyectarse de manera predecible. Estos incluyen, entre otros, los siguientes:
  - Un requisito de costos compartidos del 10% que la AEE debe cubrir para los gastos de capital financiados por el Gobierno Federal. Actualmente, la AEE presume que puede cubrir los requisitos de costos compartidos con fondos de CDBG del HUD (vea el Capítulo 6: Planes de mejoras capitales y financiamiento federal). Si los costos compartidos no pueden cubrirse con la CDBG, habrá que aumentar las tarifas.
  - El precio de mercado de los combustibles fósiles. A esta altura, la AEE sigue dependiendo mucho del diésel, el fuelóleo pesado y el carbón, que están sujetos a la volatilidad de los precios.

- **Factores relacionados con la demanda:** Si la demanda aumenta, los costos fijos de la AEE (como los costos administrativos, la deuda y las pensiones, entre otros) que no dependen de la cantidad de energía generada (por ejemplo, el combustible) se dividen entre una cifra mayor de kilovatios-hora, lo que reduce la tarifa por kWh. Por otro lado, si la demanda disminuye, las tarifas por kWh aumentan. Por lo tanto, hay varios factores relacionados con la demanda de electricidad que pueden tener un fuerte impacto en las tarifas futuras. Los factores más importantes incluyen, entre otros, el uso y la demanda de electricidad de vehículos eléctricos, la eficiencia energética y la generación distribuida. Es posible que los vehículos eléctricos aumenten la demanda, ya que más clientes cargan sus vehículos conectándose a la red eléctrica. Gracias a las iniciativas de eficiencia energética (por ejemplo, la transición a unidades de aire acondicionado y demás electrodomésticos más eficientes), se generará una menor demanda por cliente o se necesitará menos energía del sistema para hacer frente a las mismas actividades de los clientes. La instalación de generación distribuida (por ejemplo, sistemas solares en los techos de viviendas residenciales) reducirá la demanda del sistema, ya que esos clientes generarán su propia energía para, al menos, algunas de sus necesidades. Los vehículos eléctricos representan una nueva fuente de demanda que podría compensar parcialmente las pérdidas de carga de otros impulsores. El Capítulo 12 proporciona un análisis de la carga de Puerto Rico y el impacto de las tarifas de los factores.

GRÁFICA 48: TASA DE REQUERIMIENTOS DE INGRESOS QUE INCLUYE PENSIONES PAYGO Y GASTOS OPERACIONALES Y DEUDA NO REESTRUCTURADA (C/KWH) FRENTE A LA CARGA (GWH)



## 11.2  Ingresos y gastos futuros y de referencia para el año fiscal 2022

11.2.1 *Proyecciones financieras para los años fiscales 2022 y 2023*

El 1 de julio de 2021, la Junta de Supervisión aprobó una versión revisada del presupuesto de la AEE para el año fiscal 2022 que cumple con los requisitos correspondientes. El presupuesto certificado incluía los importes revisados de los gastos de mano de obra de GenCo y HoldCo, y en particular, incluía importes para el financiamiento de las pensiones que eran sustancialmente inferiores a las aportaciones patronales del año anterior. En los años previos al año fiscal 2022, la AEE presupuestaba, como era habitual, un importe de aportación patronal basado en un porcentaje de los salarios de los empleados, aproximadamente el 35% o entre $70 y $80 millones por año. Para el año fiscal 2022, la Junta de Supervisión aprobó $26.5 millones en aportaciones patronales para los empleados de GenCo y HoldCo, o un 65% de los salarios presupuestados.

Para el  periodo del año fiscal 2023, el Plan Fiscal Certificado no proyecta ningún déficit.

11.2.2 *Ingresos proyectados*

Se espera que los ingresos de la AEE sufran una disminución gradual en línea con la disminución proyectada en las ventas (Gráfica 49). Se espera que los efectos combinados de la eficiencia energética y la generación distribuida disminuyan aún más el consumo total de electricidad. El Capítulo 13 analiza con más detalle el impacto de la carga de la EE, la GD y los vehículos eléctricos.

GRÁFICA 49: PROYECCIONES DE INGRESOS Y VENTAS A 30 AÑOS (GWH Y MILLONES DE DÓLARES)



### 11.2.3 *Gastos proyectados*

Se prevé que los gastos generales disminuyan sustancialmente entre los años fiscales 2023 y 2024 debido a dos factores principales: la disminución proyectada de los precios del combustible y el enfoque de modelización del despacho, como se explica con más detalle en la tabla de supuestos del Capítulo 13.2.

A largo plazo, se espera que los gastos globales disminuyan en términos reales. Esto se debe, en parte, a una disminución en los costos operacionales de mano de obra y los no relacionados con la mano de obra. Asimismo, es probable que, después del año fiscal 2023, haya una disminución en partidas específicas del presupuesto, incluidos los costos y gastos del Título III, debido a la salida prevista de la AEE de la bancarrota contemplada bajo el Título III.

Sin embargo, lo que resulta más importante es que la disminución general en los gastos es impulsada por una reducción en los costos de generación, ya que la energía renovable reemplaza la ineficiente y antigua generación con petróleo, que está ligada a la volatilidad de los precios del petróleo y el gas. Como la capacidad de generación de energía renovable aumentará en los próximos años, se espera que el costo relacionado con la energía y el combustible no renovable disminuya rápidamente hasta el año fiscal 2027. Dado que está proyectado que la generación de carbón, barata pero contaminante, se elimine progresivamente en el año fiscal 2028 (Gráfica 50), se calcula que los gastos en combustibles no renovables volverán a aumentar. Sin embargo, a partir de entonces, se proyecta que los costos relacionados con los combustibles fósiles disminuirán de forma constante, ya que habrá más generación de energía renovable. Se proyecta que los gastos por PPA renovables aumentarán durante ese mismo periodo, de conformidad con el aumento en la porción de generación de energía renovable que establece la Ley Núm. 17 de

2019. El Capítulo 13 (Gastos) ofrece un análisis más detallado de las proyecciones de gastos de la AEE.

GRÁFICA 50: GASTOS PROYECTADOS CONSOLIDADOS HASTA EL FINAL DEL PIR, SIN INCLUIR EL SERVICIO DE LA DEUDA (MILLONES DE DÓLARES NOMINALES)



# Capítulo 12. Ingresos

Entender la carga, la venta de electricidad, los ingresos y los impulsores subyacentes es fundamental para los servicios públicos, ya que permite planificar correctamente las inversiones en generación y en el sistema de T&D. Este capítulo ofrece un resumen de los ingresos de la AEE en comparación con el presupuesto y explica las proyecciones de la carga, los impulsores subyacentes (incluidos los impulsores emergentes, como los vehículos eléctricos) y los supuestos clave que afectan las proyecciones de ingresos. Se espera que los ingresos de la AEE sufran una disminución gradual en línea con la disminución proyectada en las ventas (Gráfica 49).

## 12.1 Ingresos reales del año fiscal 2022 en comparación con el presupuesto

Según los últimos resultados financieros del año fiscal 2022 hasta marzo, los ingresos brutos de la AEE, es decir, los ingresos por la venta de electricidad sin otros ingresos u otros ajustes fueron de $3.1 mil millones frente a los ingresos brutos presupuestados de $2.6 mil millones. La diferencia responde a precios de combustible más elevados de lo proyectado y a los consiguientes cargos de combustible y energía comprada.

Durante los primeros tres trimestres del año fiscal 2022, los ingresos brutos de la AEE[149] fueron de alrededor del 20% más altos que lo proyectado (consulte la Gráfica 51). Las cifras de ventas/consumo del año fiscal 2022 hasta la fecha se sitúan aproximadamente un 2% por debajo del presupuesto global (consulte la

Gráfica 53), impulsadas principalmente por un consumo industrial inferior al presupuestado.

GRÁFICA 51: PRESUPUESTO HASTA LA FECHA (MARZO) DEL AÑO FISCAL 2022 EN COMPARACIÓN CON LOS DATOS REALES (MILLONES DE DÓLARES)



---

149 Los ingresos brutos incluyen los ingresos obtenidos por el consumo de los clientes, mientras que los ingresos consolidados incluyen los ingresos obtenidos por el consumo de los clientes, los ingresos provenientes de otras fuentes y demás ajustes (gasto por deuda incobrable, CELI y subsidios, etc.).

153

GRÁFICA 52: VARIACIÓN EN LOS INGRESOS HASTA LA FECHA DEL AÑO FISCAL 2022 EN COMPARACIÓN CON EL PRESUPUESTO POR TIPO DE CLIENTE (MILLONES DE DÓLARES)



GRÁFICA 53: VARIACIÓN Y VENTAS DEL AÑO FISCAL 2022 EN COMPARACIÓN CON EL PRESUPUESTO (GWH, %)



## 12.2 Resumen de las proyecciones de la carga

### Demanda histórica e impacto de las ventas

Como se señala en el Capítulo 2 (Contexto histórico y desafíos actuales), el consumo de electricidad en Puerto Rico sigue sufriendo el impacto de las dificultades económicas actuales y

de los cambios demográficos producto de un descenso en la población. El consumo de energía y la demanda máxima, que son los factores determinantes principales en la facturación de la AEE, han estado disminuyendo por alrededor de 16 años (

Gráfica 54). Según las últimas proyecciones económicas y demográficas incluidas por la Junta de Supervisión en su Plan Fiscal Certificado para Puerto Rico, se prevé que esta disminución continuará.

Gráfica 54 muestra que la proyección de ventas y la demanda máxima en Puerto Rico están por debajo de los niveles del año fiscal 2000, producto de varios factores clave que también afectan los patrones de consumo eléctrico futuro:

- **Indicadores macroeconómicos y demográficos**: El Plan Fiscal Certificado incorpora proyecciones macroeconómicas que son coherentes con las usadas en el Plan Fiscal Certificado de 2022 para Puerto Rico. Dichas proyecciones muestran una disminución sostenida de la población durante los próximos 5 años debido a una combinación de factores demográficos y de emigración. También indican que la recuperación de la actividad económica proyectada anteriormente e impulsada por fondos federales para tareas de restauración y puestos de empleo a corto plazo asociados que se vio en 2019 fue contrarrestada por los impactos relacionados con el COVID-19 en 2020. Sin embargo, se calcula que el estímulo fiscal relacionado con el COVID-19 conducirá a una reactivación y recuperación durante el año fiscal 2022, que se espera continúe en el año fiscal 2023.
- **Eficiencia energética (EE) y generación distribuida (GD)**: Varias partes interesadas y expertos del sector, incluidos los interventores del PIR y el NEPR, consideran que, a largo plazo, habrá más disminuciones en las ventas de servicio público debido a los impactos de la demanda a partir de tendencias seculares en EE y GD. Junto con el descenso de la población, estos factores representan los mayores impulsores del descenso de la carga durante el  periodo contemplado en el Plan Fiscal Certificado (Gráfica 55).

Un factor que podría reducir en el futuro la disminución en la carga es la adopción de **vehículos eléctricos (EV).** Debido a la disminución en el costo de la tecnología y al respaldo regulador, se espera que la venta de estos vehículos aumente durante las próximas 2 o 3 décadas y tenga un impacto potencialmente significativo en la carga. El Plan Fiscal, en su caso base, sí proyecta el impacto de los EV hasta el año fiscal 2038. Sin embargo, no prevé un mayor crecimiento más allá de ese punto.

GRÁFICA 54: FACTORES DETERMINANTES HISTÓRICOS EN LA FACTURACIÓN (GWH, MW)



GRÁFICA 55: PROYECCIÓN DE LA CARGA A 30 AÑOS CON LAS CONSECUENCIAS INDIVIDUALES DE TRES FACTORES QUE LLEVAN A LA DISMINUCIÓN DE LA CARGA (TWH)



### 12.2.1 *Demografía y proyecciones macroeconómicas*

El Plan Fiscal Certificado de 2022 incorpora las proyecciones macroeconómicas y demográficas elaboradas y presentadas en el Plan Fiscal Certificado para Puerto Rico. La proyección poblacional muestra una disminución constante debido a una combinación de factores demográficos y de emigración. El ritmo de disminución no es tan vertiginoso como en los supuestos del año anterior. La pandemia de COVID-19 ha afectado significativamente las proyecciones previas de recuperación económica. Las suposiciones vinculadas con la recuperación se sustentaban principalmente en los fondos federales para la restauración, lo cual permitiría crear oportunidades de empleo a corto plazo. No obstante, hoy en día, las tendencias generales proyectan un descenso en la población (Gráfica 56). Las proyecciones macroeconómicas incluyen una combinación de las consecuencias de la pandemia de COVID-19, la constante austeridad, la disminución de la población, la recuperación por desastres naturales y los fondos federales en todos los sectores de la economía de Puerto Rico (Gráfica 57). La proyección refleja el impacto

abrupto de la recesión inducida por el COVID-19 al final del año fiscal 2020, seguido de un repunte y recuperación en el año fiscal 2021 (respaldado por importantes fondos de estímulo locales y federales relacionados con el COVID-19 y con los desastres) que se espera que continúe en el año fiscal 2023. Se prevé que el crecimiento económico será limitado (en términos reales) entre los años fiscales 2024 y 2027.

GRÁFICA 56: PROYECCIONES DE LA POBLACIÓN DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO (EN MILES)



GRÁFICA 57: PROYECCIONES DEL PNB DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO



## 12.2.2 *Eficiencia energética*

La proyección de la carga del Plan Fiscal Certificado estima que la AEE logrará la meta establecida por mandato legislativo en la Ley Núm. 17 de 2019 de disminuir la carga en un 30% debido a la eficiencia energética antes del 2040 (en comparación con las ventas de servicio público netas de la AEE en el año fiscal 2019). La reducción anual de la carga es coherente con las proyecciones del PIR, con un ajuste en el año de comienzo del programa. Los programas de eficiencia energética enumerados en la siguiente tabla guardan relación con el PIR de la AEE, que incluye estos programas como opciones ilustrativas para lograr los resultados esperados en materia de eficiencia energética sobre la base de una evaluación de los programas usados en otras jurisdicciones.

TABLA 11: PROGRAMAS DE EFICIENCIA ENERGÉTICA

| Programa de EE | Descripción | Suposiciones | TRC[150] |
|---|---|---|---|
| *Aire acondicionado residencial* | Promueve el uso en los hogares de sistemas de aire acondicionado más eficientes | Tasas de participación, ahorros energéticos, costos del programa basados en programas comparables | 3 – 5 |
| *Iluminación residencial* | Proporciona luces LED gratuitas a los abonados residenciales | Las tasas de participación aumentan a 2.5% por año | 4 – 6 |
| *Aires acondicionados comerciales* | Promueve el uso de sistemas de aire acondicionado de alta eficiencia en los edificios comerciales | Se evalúa correctamente un aire acondicionado comercial de tamaño promedio a modo de referencia | 1 – 2 |
| *Iluminación comercial* | Promueve la iluminación de alta eficiencia en los edificios comerciales | Ahorros en kWh por año y por participante basados en programas comparables | 3 – 4 |
| *Alumbrado público* | Conversión total a luces LED | Se dispone de financiamiento público para apoyar este programa | n/a |

Gracias a la implementación de estos programas, se espera que los ahorros energéticos acumulados sean de alrededor de 1,200 GWh en el año fiscal 2026. La principal contribución a los ahorros proviene de las mejoras en la iluminación de los edificios comerciales, que se determinó que es el programa que podría implementar la AEE con mayor impacto y menor costo. Luego, hay ahorros adicionales que surgen de la conversión de las luces en las vías públicas a luces LED[151] y de la instalación de sistemas de aire acondicionado más eficientes en los hogares.

Como estos programas de eficiencia energética y las proyecciones de implementación son de carácter meramente ilustrativo, podrían implementarse muchas otras combinaciones y tipos de programas para lograr el resultado esperado. Los ahorros reales de energía a partir de la eficiencia

---

[150] El costo total de recursos (TRC) prevé la rentabilidad de los programas de eficiencia energética. El TRC se calcula como el valor actual del costo de energía evitado (ahorros energéticos x tarifa promedio) contra el valor actual de los costos del programa.

[151] Como operador del sistema de T&D, LUMA se ocupará de reparar el alumbrado público existente o de reemplazarlo con luces LED como parte de su Programa de Distribución de Alumbrado Público, tal como se explica en el PIR de LUMA.

energética dependen de que los clientes adopten estas medidas. Como las proyecciones del Plan Fiscal Certificado que cumplen con la Ley Núm. 17 se basan en escenarios optimistas respecto de las tasas de participación y los ahorros posibles, el impacto de dichas medidas podría ser menor.

Para cumplir con las metas de EE exigidas por ley, el 22 de abril de 2021, el NEPR comenzó un procedimiento nuevo y publicó la versión preliminar de una norma sobre EE con el fin de analizar mecanismos de financiamiento viables para la implementación de programas de eficiencia energética. Es importante mencionar que, en caso de que la implementación de estas medidas de eficiencia se retrase o no se logre, habrá una disminución más gradual de la demanda de electricidad.

GRÁFICA 58: AHORROS ACUMULADOS PRODUCTO DE LA EFICIENCIA ENERGÉTICA POR PROGRAMA (GWH)



### 12.2.3 *Generación distribuida (GD)*

Se espera que crezca el uso de la generación distribuida (es decir, como energía solar en los techos y generación combinada de energía y calor) y se proyecta con base en la misma metodología utilizada para el PIR. Las consecuencias de la GD son más significativas durante los últimos años de la proyección a 30 años, ya que el Plan Fiscal Certificado supone que la GD seguirá creciendo por la reducción en los costos de la tecnología de GD y el aumento en las tarifas de electricidad. Es probable que esta tendencia se mantenga, a medida que avanza el proceso de transformación del sistema energético.

Se espera que todos los tipos de clientes adopten la GD (Gráfica 59). Si bien es más probable que los clientes comerciales y residenciales adopten la generación de energía solar sobre los techos, hay más probabilidades de que los clientes industriales recurran a la generación combinada de energía y calor (CHP,

Gráfica 60). Los supuestos respecto de la CHP se basan en encuestas a los clientes y recopilaciones de datos utilizadas en el PIR y actualizadas por el personal de Planificación y T&D de la AEE. Como se espera que la CHP pertenezca al cliente y esté asociada a procesos industriales, no hay ciclos para estas unidades que permita incluir la generación de energía renovable en las proyecciones financieras. Se estima que los clientes-responsables se ocuparán del despacho económico de la generación de CHP, en comparación con los costos de generación del sistema

159

disponible (por ejemplo, cuando la generación del sistema resulta más económica que la CHP, los clientes-responsables usan esa generación).

GRÁFICA 59: PROYECCIÓN DE LA GENERACIÓN DISTRIBUIDA A 30 AÑOS POR TIPO DE CLIENTE (TWH)



GRÁFICA 60: PROYECCIÓN DE LA GENERACIÓN DISTRIBUIDA A 30 AÑOS POR FUENTE (TWH)



### 12.2.4 Vehículos eléctricos (por sus siglas en inglés)

Debido al desarrollo tecnológico y al respaldo regulador, se espera que la incorporación de los vehículos eléctricos aumente significativamente en las próximas décadas. Por ejemplo, algunos estimados proyectan que en 2040 los vehículos eléctricos podrían alcanzar casi el 60% de las ventas totales de vehículos en los EE.UU.[152] Si bien estas cifras dependen de diversos factores, como el costo del desarrollo de las baterías, los reglamentos y las preferencias de los clientes, un aumento significativo en la venta de EV tendrá un impacto en la demanda de electricidad, tanto en la carga promedio como en la máxima, y podrá compensar el efecto de la EE y la GD. Para entender los efectos que tendrá a nivel local en la carga promedio y la carga máxima y para identificar las posibles necesidades de inversión en T&D, es fundamental desarrollar una

---

[152] Bloomberg NEF, Perspectiva 2020 sobre los vehículos eléctricos

perspectiva detallada sobre la aceptación de los EV. De todas maneras, la AEE debe seguir las pautas del NEPR e incluir el impacto de los vehículos eléctricos en los PIR futuros.

## 12.2.5 *Simulaciones de proyección de carga*

### Resumen

El caso base del Plan Fiscal Certificado (el "caso base") desarrollado por la AEE y LUMA incluye un escenario de carga que se basa en suposiciones para los principales impulsores de la carga bruta (el PNB y las proyecciones de población consistentes con el Plan Fiscal Certificado para Puerto Rico) y para los principales impulsores de la carga neta relacionados con la eficiencia energética (EE), la adopción de la generación distribuida (GD) y la utilización de vehículos eléctricos (EV). Los supuestos de los impulsores de la carga neta en el caso base se apoyan en el cumplimiento de la Ley Núm. 17 (EE que alcanza el objetivo del 30% para el año fiscal 2040) y en los supuestos básicos de crecimiento futuro según el crecimiento histórico (GD y EV).

Los supuestos del caso base no reflejan plenamente las limitaciones y realidades reales de Puerto Rico ni el estado de los programas y planes actuales en vigor para apoyar tales supuestos. Esto tiene implicaciones en la planificación de los recursos. Consulte la Sección 5.1.2 para conocer las implicaciones asociadas.

Una proyección alternativa que se base en un enfoque ascendente, que utilice la situación actual de Puerto Rico como punto de partida, que no esté limitada por la Ley Núm. 17, que incorpore los últimos datos disponibles sobre los costos actuales y futuros, y que se apoye en modelos específicos de factores impulsores, proporciona una perspectiva sobre una proyección de carga potencialmente diferente (la "proyección alternativa"). Esta proyección alternativa está sujeta a cambios en la legislación y los reglamentos, en la trayectoria de los precios y los costos y en otros factores.

### 1.  Visión comparativa

En términos generales, la proyección alternativa proyecta que la carga neta sea 2.1 TWh más alta que el caso base para el año fiscal 2050. Esta diferencia es el resultado de una proyección diferente para EE, GD y EV. En términos de EE, la proyección alternativa prevé un ahorro de 1.5 TWh respecto del caso base para el año fiscal 2050. En cuanto a la GD, la proyección alternativa prevé que el impacto de la carga sea relativamente cercano a la proyección del caso base (0.1 TWh de aumento). Por último, en términos de EV, la proyección alternativa prevé que la carga de EV sea 0.6 TWh más alta que el caso base para el año fiscal 2050. La figura 1 muestra el resultado global del caso base y de la proyección alternativa.

Figura 1 - Proyección de carga neta AF2023-2050, TWh



## 2. Diferencias y supuestos clave

Fundamentalmente, las proyecciones del caso base se apoyan en supuestos descendentes, mientras que el enfoque de las proyecciones alternativas se basa en una perspectiva ascendente.

El caso base proyecta la carga de EE para alcanzar el objetivo de EE del 30% para el año fiscal 2040 establecido por la Ley Núm. 17, mientras que la proyección alternativa supone un crecimiento orgánico de la EE a través de eficiencias tecnológicas graduales año tras año, sin considerar la legislación o las inversiones en programas. En concreto, el caso base parte de un objetivo descendente y supone que la reducción del 30% para el año fiscal 2040 (tal y como se plantea en la Ley Núm. 17) se logra a tiempo. Además, el caso base supone un incremento anual constante de un 2% en la carga de EE para conseguirlo. Es importante destacar que actualmente no existen programas, planes de implementación o incentivos de financiamiento para apoyar un programa de eficiencia energética. Es poco probable que la disminución de la carga a través de la EE se consiga solo mediante la sustitución de la iluminación, los equipos y los electrodomésticos comerciales, industriales y residenciales. Por otro lado, la proyección alternativa calcula un ahorro de carga anual independiente de cualquier objetivo a través de un modelo ascendente que utiliza ciertas variables como los ciclos de vida naturales de los equipos, las ganancias anuales de eficiencia energética y la aceptación de los clientes.

En cuanto a la GD, el caso base proyecta la carga de GD basándose en las tasas de adopción históricas, mientras que la proyección alternativa estima la carga de GD basándose en las curvas de adopción para diferentes periodos de amortización, calculadas a partir de las proyecciones de instalación de GD y de los gastos de O&M.

El caso base proyecta la carga de EV en función de los supuestos de crecimiento histórico, mientras que la proyección alternativa contempla la adopción de EV en función del costo total de propiedad (TCO). El modelo de TCO incluye una comparación de costos de propiedad tanto para

162

los EV como para los vehículos con motor de combustión y las preferencias del cliente, como la facilidad de compra, el mantenimiento y la disponibilidad de estaciones de carga.

## 3. Supuestos específicos en la proyección alternativa - Eficiencia energética

La proyección de EE en la proyección alternativa se basa en los ciclos de vida de las sustituciones, el ahorro derivado del aumento de la eficiencia energética y la aceptación de los clientes. Se supone que cada tipo de equipo tiene una vida útil proyectada/ciclo de sustitución natural (por ejemplo, se espera que la iluminación residencial con lámparas fluorescentes compactas [CFL] se sustituya cada 4.7 años y la iluminación LED cada 14.8 años). Además, la proyección alternativa tiene en cuenta las ganancias anuales de eficiencia específicas de cada tipo de equipo gracias a la innovación tecnológica (por ejemplo, se espera que los aparatos de aire acondicionado residenciales tengan una ganancia de eficiencia anual del 0.3 al 0.4%), y se prevé que esta sea menor en Puerto Rico que en los EE. UU. Por último, la proyección alternativa también tiene en cuenta la aceptación anual de los clientes en función del nivel de cambio de comportamiento requerido y de las decisiones de compra (por ejemplo, una aceptación del 40% para los LED residenciales y del 60% para los LED comerciales debido al aumento de los costos de la tecnología). La figura 2 muestra la diferencia neta que generan estos supuestos en la proyección de la carga neta.

*Figura 2 - Proyección de carga de eficiencia energética para los AF2023-2050, en TWh*



## 4. Supuestos específicos en la proyección alternativa - Generación distribuida

En cuanto a la GD, los estimados de la proyección alternativa se basan en las curvas de adopción para diferentes periodos de recuperación, calculadas a partir de los costos previstos de la tecnología de GD. Por ejemplo, la proyección alternativa supone un periodo de recuperación que sigue mejorando debido a la disminución de los gastos de capital y de operación y mantenimiento, en línea con las proyecciones de Línea de Base Tecnológica Anual (ATB) del Laboratorio Nacional

de Energía Renovable (NREL) ajustadas para Puerto Rico. Como ejemplo, este escenario supone que el costo de la instalación de sistemas fotovoltaicos residenciales disminuya un 10% año tras año desde 2022 hasta 2040. También supone que los gastos de capital se reduzcan de $2.7k/kW en 2019 a $0.9k/kW en 2040, en términos reales. Además, se espera que los costos de O&M disminuyan de $27/kW/año a $12/kW/año durante el mismo  periodo. Al ajustar otros gastos en la isla, el escenario supone que los puertorriqueños se enfrentan a un costo más elevado (+16%) a la hora de instalar sistemas de GD en comparación con los EE. UU. debido a diversas limitaciones (por ejemplo, la Ley Jones).

La proyección alternativa también incluye varios supuestos adicionales. Supone una medición neta del 100% para los clientes que adopten la GD hasta 2024, seguida de políticas que cubran el costo marginal de la generación para los clientes nuevos después de 2024. También supone que las baterías no son necesarias para adoptar sistemas fotovoltaicos, como muestran los ejemplos de los EE. UU. continentales. Por ejemplo, Michigan tiene la mayor concentración de almacenamiento en baterías, ya que el 7% de los que adoptan la GD solar tienen también una unidad de almacenamiento de energía. Otro supuesto importante considera que la línea de base de los hogares elegibles está representada por el 85% de los clientes según un estimado del NREL. Las características de vivienda de Puerto Rico son más atractivas para la adopción de GD en comparación con los EE. UU. continentales, California y Hawái (por ejemplo, más unidades de vivienda de estructura única y menos inquilinos como proporción del total).

*Figura 3 - Proyecciones alternativas de GD para Puerto Rico, en TWh*



## 5.  Supuestos específicos en la proyección alternativa - Vehículos eléctricos

La previsión de EV en la proyección alternativa se basa en los incentivos económicos (costo total de propiedad) y en las preferencias de los clientes. Estima que el 33% de los automóviles en Puerto Rico serán EV para el año fiscal 2050. Estos supuestos se generaron aprovechando las tasas históricas de ventas y desecho para prever las cifras futuras y combinando estas proyecciones con el número histórico de automóviles en Puerto Rico para proyectar el número de automóviles registrados en la isla por año. Por ello, entiende que el número de automóviles se reducirá con el

tiempo a medida que disminuya la población. También supone que el número de vehículos per cápita se mantiene relativamente constante a lo largo del tiempo.

Otro conjunto fundamental de supuestos se generó a partir de los datos de la Encuesta Nacional de Viajes en los Hogares ("National Household Travel Survey") de la FHWA para conocer la distancia media conducida al año. Como tal, la proyección alternativa supone un costo tecnológico decreciente, sobre todo con respecto a las baterías. Tiene en cuenta el costo total de propiedad de los modelos de EV utilizando estimados específicos de Puerto Rico. Por ejemplo, incluye los precios de la gasolina propios de Puerto Rico, las tarifas eléctricas y el costo promedio de los EE. UU. ajustado por derechos y tarifas de importación de Puerto Rico. Además, la proyección alternativa incorpora el criterio de los clientes y evalúa la preparación de la red energética a través de las puntuaciones SAIDI y SAIFI de la AEE. La figura 4 destaca la diferencia en la introducción de EV en la proyección alternativa en contraste con el caso base. La figura 5 compara la diferencia global en las proyecciones de carga neta de la proyección alternativa y el caso base.

*Figura 4 - Estimados de incorporación de EV en Puerto Rico (en %)*



*Figura 5 - Proyecciones de carga de EV en Puerto Rico (en TWh)*



## 12.3  Otras suposiciones que impactan en los ingresos

### 12.3.1 *Resumen del combustible y la energía adquirida*

Las proyecciones se basan en el precio proyectado del combustible usando la metodología del PIR para el gas natural del centro de distribución Henry Hub, el crudo (West Texas Intermediate o WTI), los productos derivados del petróleo como el diésel (fuelóleo núm. 2) y el fuelóleo residual (fuelóleo núm. 6 con 0.5% de azufre). La proyección ha actualizado los precios del combustible refinado para el corto plazo con base en el precio de los futuros financieros a partir de marzo de 2022 y de los actuales suplementos al precio vigentes de la AEE. Se proyecta que los precios del petróleo crudo y de los productos petrolíferos refinados disminuirán sustancialmente desde el año fiscal 2023 hasta el año fiscal 2024, y que después suban de forma constante a tasas superiores a la inflación general.

GRÁFICA 61: PROYECCIÓN DEL PRECIO DEL COMBUSTIBLE[153] (USD/MMBTU)



### 12.3.2 *Elasticidad en el precio*

El Plan Fiscal Certificado y el PIR de la AEE no consideran la elasticidad en el precio del cliente como una variable única o de forma explícita por tipo de cliente. De cara al futuro, los efectos del aumento de los precios de la energía de las compañías eléctricas y el descenso de los costos de las fuentes alternativas de energía eléctrica en el comportamiento de los clientes se recogen a través de las hipótesis sobre la participación de los clientes en los programas de eficiencia energética, las mejoras de la eficiencia a largo plazo reflejadas en los macrocoeficientes y la selección y el cambio a las opciones de generación distribuida detrás del contador. La proyección a largo plazo de referencia supone la pérdida de la gran mayoría de la carga industrial restante en Puerto Rico a manos de la GD y la EE, junto con una parte significativa de las ventas residenciales y comerciales.

### 12.3.3 *Estructura tarifaria*

Se prevé que la estructura tarifaria aprobada por el NEPR en el 2017 y que fue implementada el 1 de mayo de 2019 se mantendrá durante el periodo proyectado. Las proyecciones incluyen ajustes anuales a las tarifas base, que se calculan teniendo en cuenta los correspondientes requisitos de ingresos por año. No obstante, cabe destacar que las tarifas proyectadas no incluyen ningún aumento necesario para el servicio de la deuda de los fondos de pensiones conforme a un plan de ajuste del Título III.

### 12.3.4 *Transformación*

Las proyecciones financieras del caso base del Plan Fiscal Certificado prevén que el periodo provisional de LUMA finalizará durante el año fiscal 2023 y que conseguirá iniciar el servicio durante el año fiscal 2021 al cumplir con todas las condiciones precedentes para llegar a la fecha de comienzo de los servicios o al menos a la fecha de comienzo de los servicios del periodo provisional contemplada en el Acuerdo Suplementario. Se espera que la desagregación o separación de las operaciones de generación y las operaciones de T&D se concrete durante el año

---

[153] Siemens Energy Business Advisory, precios futuros de materias primas al 26 de abril de 2022 para el periodo de abril de 2022 a septiembre de 2023. Proyección mixta de 18 meses a largo plazo a partir de abril de 2025

fiscal de 2022, y los activos de generación de la AEE pasarán a estar en manos de uno o más operadores externos.

## 12.4  Comparación con Planes Fiscales Certificados anteriores

La proyección de ventas de la AEE en el corto plazo prevé una disminución acelerada debido al impacto de la eficiencia energética y la generación distribuida. Desde el año fiscal 2023 hasta el final del periodo del Plan Fiscal Certificado, en el año fiscal 2027, se proyecta una reducción total de las ventas de aproximadamente el 10% (Gráfica 62).

GRÁFICA 62: VENTAS DE SERVICIO PÚBLICO NETAS DEL PLAN FISCAL CERTIFICADO DE LA AEE EN GWH



# Capítulo 13. Gastos

Este capítulo ofrece una visión general de los gastos proyectados para la compañía eléctrica, es decir, los costos que tendrán que cubrir los clientes. Los gastos generales de la AEE están formados por nueve (9) categorías de gastos:

- **Combustible no renovable**: Costo del combustible fósil; por ejemplo, carbón, diésel, fuelóleo pesado

- **Acuerdos operacionales y de compra de energía (PPOA) convencional**: Gastos por energía no renovable adquirida de proveedores externos (por ejemplo, EcoEléctrica y AES)

- **Acuerdos de compra de energía (PPOA) renovable**: Gastos por energía renovable adquirida de proveedores externos. En el futuro, esto incluirá energía desde los 3 GW de capacidad de energía renovable que el NEPR le ha pedido a la AEE que ponga en funcionamiento.

- **CELI y subsidios:** Gastos por "contribuciones en lugar de impuestos" y otros subsidios que benefician, por ejemplo, a los abonados de bajos ingresos

- **Costos operacionales y de capital del sistema de T&D:** Gastos de mano de obra, no relacionados con la mano de obra/otros gastos operacionales y gastos de mantenimiento necesarios, tal y como se definen en el AOM para T&D

- **Costos operacionales de mano de obra:** Gastos de mano de obra relacionados con la operación de los activos de generación y del sistema de T&D

- **Costos operacionales no relacionados con la mano de obra o de otro tipo:** Gastos que no sean de mano de obra, como suministros, alquileres, transportes, gastos por deuda incobrable, etc., relacionados con la operación, el mantenimiento y la administración de los activos de generación y del sistema de T&D

- **Gastos necesarios de mantenimiento:** Gastos para mantener los activos de generación y el sistema de T&D. Esto incluye reparaciones y materiales asociados, entre otras cosas

- **Cargo por pensiones del SRE de la AEE:** Gastos para financiar los beneficios de pensiones y otros beneficios posteriores al empleo (OPEB) para los retirados

- **Servicio de la deuda de la AEE**: Gastos para cubrir las obligaciones de deuda de la AEE

Como se explicó anteriormente, el NEPR, que es el regulador, utiliza los gastos de la AEE para determinar las tarifas. Es decir, las tarifas se basan en los requisitos de ingresos, de modo tal que la AEE cuente con los ingresos —o los fondos— que necesite para pagar todos los gastos previstos necesarios para pagar sus obligaciones y brindarles a los clientes un servicio adecuado. Este capítulo explica las nueve categorías de gastos más importantes que se describen más arriba y que conforman el requisito de ingresos de la AEE; además, detalla cómo está proyectado que estas categorías se desarrollen con el paso del tiempo. Este capítulo se centra en el corto plazo, es decir, en los próximos 5 años hasta el año fiscal 2027, ya que se espera que el primer impacto económico importante de la transformación en curso de la AEE se concrete dentro de este  periodo.

En términos generales, debido al impacto de la transformación en curso y también de la disminución en la carga, se prevé que los gastos de la AEE se reduzcan en los próximos 5 años:

- Se espera que el combustible no renovable, que es la principal categoría de gastos del año fiscal 2023, disminuya rápidamente durante los próximos años, a medida que la mezcla de generación de la AEE cambie de generación de energía con combustibles fósiles propios y operados a energía renovable proporcionada por terceros

- Se proyecta que los gastos de PPA convencionales disminuyan en términos absolutos, a medida que la generación pasa de las fuentes convencionales a las renovables

- Se espera que los gastos de PPOA renovables aumenten rápidamente, como se expuso más arriba, en medio del cambio de la mezcla de generación

- Se espera que la CELI y los subsidios disminuyan con el tiempo

- Se proyecta que los gastos operacionales de la mano de obra disminuyan en términos absolutos, a medida que los activos de generación pasen a manos de operadores privados de O&M, con los que se espera realizar eficiencias

- Del mismo modo, se espera que los costos operacionales no relacionados con la mano de obra disminuyan debido a mejoras futuras de operadores privados

- Se prevé que los gastos necesarios de mantenimiento se reduzcan un poco en términos absolutos, pero mantendrán su parte de los gastos totales

- Se calcula que los gastos de pensiones del SRE, que no se incluyen por separado en la tarifa del año fiscal 2023 ante la falta de una determinación de la reforma de pensiones, constituyan una porción más grande en el año fiscal 2026.

## 13.1  Resumen de las proyecciones de gastos

Para los años fiscales 2023 a 2027, la Gráfica 63 ofrece información sobre las categorías de gastos y la proyección de sus correspondientes porciones.

Las proyecciones de gastos se han elaborado a partir de un conjunto de supuestos y aportes, tales como proyecciones macroeconómicas, supuestos relacionados con la carga y aportes sobre categorías de gastos específicas; por ejemplo, contratos existentes para gastos que no están relacionados con la mano de obra, así como planes de mejoras capitales y el PIR de la AEE, entre otros. Asimismo, las siguientes proyecciones de gastos son "después de las medidas", lo que implica que ya incluyen las consecuencias previstas de ciertas iniciativas de mejora. Ellas incluyen las medidas descritas en los Capítulos 9 (Medidas operacionales) y 7 (Carteras de mejoras de LUMA). Por lo tanto, las proyecciones ya incluyen también los beneficios de traspasar los activos de generación y el sistema de T&D de la AEE a operadores privados. Sin estas consecuencias, los gastos —y, por lo tanto, las tarifas— serían más altos, como se explicó en la Sección 11.1 sobre las tarifas de referencia del Capítulo 11 (Resumen de proyecciones financieras).

El resumen de gastos también muestra donde se puede esperar que ocurran mejoras adicionales en el futuro. Mientras que LUMA y, en el futuro, uno o más operadores privados de los activos de generación de la AEE se espera que introduzcan mejoras en los costos de mano de obra y no relacionados con la mano de obra, la oportunidad restante más importante estará vinculada con el combustible y la energía adquirida. Los Capítulos 9 (Medidas operacionales) y 7 (Carteras de

mejoras de LUMA) incluyen más información sobre las iniciativas que abordan estas oportunidades que ya están en curso e incorporadas en las siguientes proyecciones de gastos, incluidas las medidas operacionales relacionadas con el combustible de la AEE y la adquisición de 3.75 GW en capacidad de generación de energía renovable.

GRÁFICA 63: DESGLOSE PROYECTADO DE REQUERIMIENTOS DE INGRESOS AF2023 VS. AF2027 POR CATEGORÍA (INCLUYE LOS PAGOS DE LAS PENSIONES DEL SRE, EXCEPTO LOS PAGOS DE LA DEUDA)



## 13.2  Resumen de gastos por entidad

Durante el  periodo proyectado de este Plan Fiscal Certificado, las operaciones verticalmente integradas de la AEE se dividirán, tal como estipula la ley, en operaciones de generación y sistema de T&D: GenCo y GridCo, respectivamente. Además, habrá una entidad que será responsable de ciertas funciones no operacionales y actividades de nómina asociadas, además del pago de los honorarios de asesoría y del Título III (HoldCo). El Capítulo 3 (Transformación) ofrece un resumen de la estructura futura de la AEE.

Como resultado de la transición a GenCo, GridCo y HoldCo, los gastos también se dividirán entre las tres entidades. La Gráfica 64 muestra el reparto de gastos posterior a la transición para los próximos años. Las aportaciones a las pensiones del SRE después del año fiscal 2023, así como la deuda incobrable, la CELI/los subsidios y los gastos por energía adquirida están separados. Estos gastos, incluida cualquier aportación patronal que deba hacerse al SRE de la AEE para los empleados de estas tres entidades, así como cualquier deuda incobrable, CELI/subsidios y energía adquirida, se traspasan y no pueden considerarse parte de los gastos de cada entidad.

Como se ilustra en la Sección 13.1, se espera que los gastos generales disminuyan para cumplir con la reducción de la carga y la eficiencia operacional. Además, se proyecta que los gastos de GenCo disminuyan con el tiempo a medida que las unidades de la AEE se retiren y la energía se adquiera a través de los PPOA, que se negociarán con procedimientos de energía independiente (consulte el Capítulo 3: Transformación, para obtener una visión general de las funciones y responsabilidades luego de la transición a operadores privados). Se proyecta que los gastos de HoldCo también disminuirán rápidamente, en especial después de apoyar la transición de GenCo

a operadores privados durante el año fiscal 2023. Se estima que los gastos de GridCo disminuirán lentamente, debido a la realización de eficiencias.

GRÁFICA 64: DESGLOSE DE LOS GASTOS CONSOLIDADOS DE LA AEE[154] (MILLONES DE DÓLARES)



Las suposiciones respecto de las proyecciones de gastos se incluyen en la siguiente tabla, de conformidad con las suposiciones subyacentes para las proyecciones de ingresos y carga incluidas en el capítulo anterior.

TABLA 12: SUPOSICIONES DE LOS GASTOS DE GENCO, GRIDCO Y HOLDCO

| Información | Suposiciones generales |
|---|---|
| **Costos de combustible y energía adquirida** | ■ Las proyecciones de costos de combustible y energía adquirida se basan en un modelo de despacho de generación por hora que utiliza el aumento de capacidad, de un modo coherente con el Plan de Acción Modificado y el PIR aprobados por el NEPR, y con los precios de mercado recientes y las proyecciones para los productos de combustible refinados. <br><br> ■ Para el año fiscal 2023, se utilizó una simulación PROMOD que permite estimar los gastos de combustible y de compra de energía. Las proyecciones para el año 2024 en adelante se basan en una simulación del modelo de expansión de la capacidad de Aurora que supone un despacho económico óptimo, sin la capacidad de considerar las restricciones de transmisión, lo que arroja proyecciones de combustible y energía comprada significativamente optimizadas en comparación con las proyecciones de PROMOD. Por lo tanto, en ausencia de cambios en los aportes, Aurora proporciona proyecciones de gastos que son significativamente más bajas que PROMOD. |

---

[154] No se incluyen los PPA entre GridCo y GenCo para evitar la duplicación. Se estima que la nueva estructura de informes para la AEE (dividida entre GridCo y GenCo) comenzará a utilizarse en el año fiscal 2022 con fines de presentación y discusión en el Plan Fiscal Certificado de 2021.

| Información | Suposiciones generales |
|---|---|
| **Gastos de GridCo relacionados con la mano de obra** | ■ Los años fiscales 2023, 2024 y 2025 se ajustan al presupuesto presentado por LUMA para GridCo<br>■ Se usan niveles de gastos presupuestados con un factor de inflación para las proyecciones del año fiscal 2026 en adelante.<br>■ Los gastos en beneficios se basan en niveles de gastos históricos y en el rendimiento. |
| **Gastos operacionales de GridCo no relacionados con la mano de obra o de otro tipo** | ■ Los años fiscales 2023, 2024 y 2025 se ajustan al presupuesto presentado por LUMA<br>■ Se usan niveles de gastos históricos con un factor de inflación para las proyecciones del año fiscal 2026 en adelante.<br>■ El costo de servicio incluye la tasa de administración del operador de T&D para el periodo proyectado. |
| **Gastos de GridCo para mantenimiento** | ■ Basados en el gasto histórico y como se indica en el presupuesto presentado por LUMA<br>■ Se espera que los costos de mantenimiento vuelvan a los promedios históricos a medida que se reduzcan las mejoras operacionales y se disponga de fondos para apoyar los gastos de capital. Se supone que el financiamiento federal está disponible para cubrir una cantidad sustancial de capital requerido para la reconstrucción y el mantenimiento del sistema. Puerto Rico solicita un ajuste de los costos compartidos para los montos futuros del programa de FEMA en virtud de la Ley Stafford. Las proyecciones de este Plan Fiscal Certificado suponen que el financiamiento de la Subvención en Bloque para el Desarrollo Comunitario - Recuperación por Desastres (CDBG-DR) estará disponible para cubrir cualquier requisito de pareo de conformidad con la Ley Stafford. |
| **Gastos de GenCo relacionados con la mano de obra** | ■ Los años fiscales 2023, 2024 y 2025 se ajustan al presupuesto presentado para GenCo<br>■ Se usan niveles de gastos presupuestados con un factor de inflación para las proyecciones del año fiscal 2026 en adelante.<br>■ Los gastos en beneficios se basan en niveles de gastos históricos y en el rendimiento. |
| **Gastos operacionales de GenCo no relacionados con la mano de obra o de otro tipo** | ■ Los años fiscales 2023, 2024 y 2025 se ajustan al presupuesto presentado<br>■ Se usan niveles de gastos históricos con un factor de inflación para las proyecciones del año fiscal 2026 en adelante. |
| **Gastos de GenCo para mantenimiento** | ■ Se espera que la salida del Título III resulte en un regreso a los mercados de capital para financiar las mejoras de capital y una mejora en el riesgo de contrapartida con el fin de atraer inversiones privadas al sistema de generación.<br><br>■ Se estima que los fondos federales estarán disponibles para cubrir una cantidad de capital significativa y necesaria para la reconstrucción y el mantenimiento del sistema. Puerto Rico solicita un ajuste de los costos compartidos para los montos futuros del programa de FEMA en virtud de la Ley Stafford. Las proyecciones de este Plan Fiscal Certificado suponen que el financiamiento de la Subvención en Bloque para el Desarrollo Comunitario - Recuperación por Desastres (CDBG-DR) estará disponible para cubrir cualquier requisito de pareo de conformidad con la Ley Stafford. |

## 13.3   Resumen de las proyecciones de gastos de GenCo

De 2012 a 2021, la mano de obra de generación de la AEE se redujo en más de un 50% debido a la pérdida de 871 empleados. Esta reducción se debió a varios factores, como las medidas de austeridad relacionadas con la Ley Núm. 66 de 2014 y la Ley Núm. 26 de 2017, entre otras. El liderazgo de la AEE está muy enfocado en asegurar que la AEE pueda retener y contratar a los empleados necesarios para operar responsablemente las unidades de generación existentes. Sin embargo, los patrones de retiro impredecibles sin sustitutos disponibles para asumir los roles del personal calificado elegible para el retiro están conduciendo a una situación crítica que potencialmente podría causar grandes interrupciones operacionales. En este sentido, el Directorado de Generación de la AEE se enfrenta actualmente a (i) una escasez de personal operacional clave y (ii) una alta proporción de personal clave elegible para el retiro.

Para atender los problemas mencionados anteriormente, el gasto proyectado de la AEE en mano de obra es coherente con la facilitación de la transición a la operación privada a través del proceso de APP actualmente en curso y está diseñado para retener y contratar/capacitar a los empleados necesarios a fin de permitir la operación y el mantenimiento continuo y seguro de los activos de generación existentes. Esto también es relevante y necesario para permitir la implementación y la transición ordenada a la energía renovable de la AEE, según lo dispuesto por la Ley Núm. 17 de 2019 y el Plan Integrado de Recursos aprobado.

La categoría de gastos no relacionados con la mano de obra incluye la compra de servicios no capitalizables, equipos y herramientas y materiales que son esenciales y críticos para llevar a cabo las actividades técnicas. Esto es esencial para garantizar un funcionamiento y un mantenimiento seguros y fiables de las unidades de generación que componen la flota generatriz existente, y para cumplir con los requisitos de despacho de energía y de reserva de carga necesarios durante las horas de demanda regular y máxima, así como en la temporada de huracanes.

El presupuesto para gastos no relacionados con la mano de obra fue desarrollado por el Directorado de Generación y la gerencia ejecutiva de la AEE para asegurar que las unidades de generación estén disponibles, sean confiables y cumplan con los requisitos de los Decretos de Consentimiento de la EPA, así como cualquier requisito operacional y de condición de la planta de energía bajo las pólizas de seguro de propiedad y accidentes, interrupción de negocios y otras[155]. El presupuesto del año fiscal 2023 de GenCo incluye cantidades suficientes para asegurar que la AEE pueda realizar las actividades de mantenimiento y reparación no capitalizables que se requieren para cumplir con los requisitos operacionales, ambientales y relacionados con los seguros.

Se proyecta que los gastos de GenCo disminuirán durante el  periodo del Plan Fiscal Certificado, a medida que se retiren las unidades de generación de la AEE y la mezcla cambie a generación de terceros, en especial la generación de energía renovable, que se contratará mediante PPA. Los gastos de combustible y PPA se consideran cargos de traspaso; por lo tanto, no se incluyen en los gastos de GenCo. De todas maneras, la AEE transferirá las actividades de O&M a uno o más operadores privados para sus unidades de generación existentes. Se prevé que esta transición se completará en el año fiscal 2023. Se espera que los gastos relacionados con la mano de obra, los gastos no relacionados con la mano de obra y los gastos de mantenimiento necesarios asociados con la operación y el mantenimiento de los activos de generación existentes de la AEE disminuyan

---

[155] Cabe destacar que el costo de las primas de seguro de las diversas pólizas mencionadas aquí se incluye en el costo de los servicios compartidos con LUMA, no en los gastos de generación no relacionados con la mano de obra.

con respecto a sus niveles actuales, ya que las unidades se están retirando. La Gráfica 65 muestra que las categorías de gastos más estrechamente correlacionadas con el número de unidades de generación existentes y su capacidad —los gastos de mano de obra y de mantenimiento necesario— deberían disminuir entre el año fiscal 2023 y el año fiscal 2027 en un 50% y un 70%, respectivamente. Los gastos no relacionados con la mano de obra y de otro tipo —que incluyen subcategorías de gastos, como el Acuerdo de Servicios Compartidos entre LUMA y GenCo— están menos correlacionados con la capacidad de generación existente que, por ejemplo, la mano de obra, ya que incluye costo de IT y seguros, y se espera que disminuya con menos velocidad (alrededor de un 21%) durante el mismo periodo.

GRÁFICA 65: PROYECCIÓN DE GASTOS A CINCO AÑOS PARA GENCO[156] (MILLONES DE DÓLARES)

Millones de dólares



## 13.4  Resumen de las proyecciones de gastos de GridCo

Se proyecta que los gastos de GridCo disminuirán levemente durante los próximos 5 años, a medida que se completa el proceso del Título III y se da inicio a la fase de ejecución, lo que genera eficiencias. Se proyecta que los costos de mano de obra aumentarán ligeramente entre los años fiscales 2022 y 2023, mientras se completa el proceso de contratación de la fuerza laboral de LUMA. Después del año fiscal 2023, se estima que los gastos de mano de obra se mantendrán estables en términos reales. Se espera que los gastos no relacionados con la mano de otra o de otro tipo disminuyan con el tiempo, a medida que surjan en el futuro las eficiencias producto de la transición a un operador privado. Estas eficiencias ya han sido reflejadas en las proyecciones de la Gráfica 66 incluida a continuación. Se proyecta un aumento de los gastos necesarios de mantenimiento durante el periodo proyectado, a medida que comiencen las tareas de ejecución de los proyectos de modernización y fortalecimiento de la red descritos en la hoja de ruta de T&D (vea el Capítulo 7 [Carteras de mejoras de LUMA] para más detalles).

---

[156]  Se espera que la transición por completo a operadores de generación privados se realice antes del año fiscal 2022. Se excluyen los gastos de pensiones del SRE después del 2022.

GRÁFICA 66: PROYECCIÓN DE GASTOS A CINCO AÑOS PARA GRIDCO (MILLONES DE DÓLARES)[157]



## 13.5  Visión general de HoldCo

La Gráfica 67 muestra las proyecciones de gastos de HoldCo durante los próximos 5 años. Se proyecta que los gastos disminuirán en alrededor de un 50% entre los años fiscales 2023 y 2027, ya que, en el año fiscal 2022, HoldCo todavía le ofrecerá a GenCo cierto apoyo durante la transición (por ejemplo, apoyo administrativo, etc.), pero transferirá estas tareas de apoyo a GenCo en el año fiscal 2023. Además, se espera que los costos relacionados con el Título III también disminuyan en este periodo, ya que se prevé que la AEE salga del estado de bancarrota del Título III durante el año fiscal 2023. Después del año fiscal 2024, se prevé que los gastos de HoldCo seguirán disminuyendo, ya que más y más actividades de GenCo se transferirán a operadores privados, lo cual reducirá más el apoyo que HoldCo tendrá que brindarle a GenCo. Como HoldCo no será responsable de ninguna tarea de O&M relacionada con el sistema de T&D y los activos de generación de la AEE, HoldCo no tendrá ningún gasto necesario de mantenimiento y solo tendrá que cubrir sus gastos de mano de obra y no relacionados con la mano de obra. Como se explicó arriba, los gastos no relacionados con la mano de obra incluyen los costos del Título III, los honorarios de asesoría y los costos de transacción de la AAPP, los cuales disminuirán entre los años fiscales 2023 y 2024 y entre los años fiscales 2026 y 2027, ya que la AEE saldrá del Título III.

---

[157] Se espera que la transición por completo a LUMA se realice para el año fiscal 2022.

GRÁFICA 67: PROYECCIÓN DE GASTOS A CINCO AÑOS PARA HOLDCO (MILLONES DE DÓLARES)[158]



Millones de dólares

■ Gastos no relacionados con mano de obra o de otro tipo  ■ Gastos de mano de obra

---

[158] Se espera que la transición por completo a LUMA se realice para el año fiscal 2022. Se excluyen los gastos de pensiones del SRE después del 2022.

# Capítulo 14. Servicio de la deuda

## 14.1  Resumen de la deuda de la AEE

Desde mayo de 2017, la AEE acumuló alrededor de $9 mil millones en bonos y otras obligaciones de deuda, además de un calendario de pagos insostenible. Para pagar la totalidad del servicio de la deuda sobre estas obligaciones, la AEE hubiera tenido que aumentar las tarifas aproximadamente entre 6 y 8 c/kWh en términos reales durante los próximos veinte años. La insostenible estructura de capital de la AEE refleja décadas de préstamos para financiar déficits operacionales. En febrero de 2014, tres agencias de calificación crediticia importantes degradaron la deuda pública de Puerto Rico por debajo del grado de inversión. A finales de junio de 2015, la deuda fue degradada por segunda vez, ya que se puso de manifiesto que era imposible pagar las deudas de la isla.[159]  Por último, en la primavera de 2016, cuando la comunidad de inversión advirtió que el incumplimiento del pago de casi toda la deuda de Puerto Rico era "prácticamente una certeza", la AEE perdió el acceso a los mercados de crédito, eliminando de ese modo la deuda como un medio para financiar los déficits operacionales y los gastos de capital necesarios. [160],[161]

En julio de 2017, a manera de garantizar la sostenibilidad financiera futura de la AEE, a pedido del Gobierno de Puerto Rico, la Junta de Supervisión presentó una petición voluntaria en nombre de la AEE con fines de protección en virtud del Título III de la Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico (PROMESA) ante el Tribunal Federal para el Distrito de Puerto Rico. Desde entonces, un grupo de acreedores de la AEE, la Junta de Supervisión, el Gobierno y la AEE negociaron un Acuerdo de Apoyo a la Reestructuración de la Deuda consensuado. Sin embargo, como resultado de los efectos inciertos e impredecibles del COVID-19 sobre la AEE y sus clientes, la Junta de Supervisión y Autoridad de Asesoría Financiera y Agencia Fiscal (AAFAF) de Puerto Rico solicitaron, y el tribunal concedió, una pausa en el proceso del Título III para evaluar y comprender las implicaciones del COVID-19.

El 8 de marzo de 2022, debido a la preocupación por la asequibilidad y la sostenibilidad del sistema eléctrico (entre otras razones), la AAFAF rescindió el Acuerdo de Apoyo a la Reestructuración de la AEE, una acción avalada por la Junta de Supervisión.  En la práctica, la Junta de Supervisión tenía el derecho contractual de rescindir el acuerdo por su cuenta.  La rescisión puso fin al acuerdo en lo que respecta a todas las partes, de modo que el Acuerdo de Apoyo a la Reestructuración ya no está en vigor.

Cualquier escenario de reestructuración futuro y exitoso depende de que se logre un compromiso con uno o varios grupos de acreedores antes de la petición, entre los que se encuentran los gestores de activos, las aseguradoras y otras instituciones financieras, que permita obtener tarifas sostenibles y un servicio de la deuda asequible. Esto último reforzará la capacidad de la AEE para

---

[159] D. Andrew Austin, Puerto Rico's Current Fiscal Challenges, (Biblioteca del Congreso de EE. UU., Servicio de Investigaciones del Congreso, R44095, 2016), 4, https://fas.org/sgp/crs/row/R44095.pdf.

[160] "Una obligación calificada como 'CC' es, en este momento, sumamente vulnerable a la falta de pago. La calificación 'CC' se utiliza cuando aún no ha habido incumplimiento de pago, pero S&P Global Ratings prevé el incumplimiento prácticamente como una certeza, sin importar el momento en que suceda", "Definiciones de S&P Global Ratings", S&P Global Ratings, modificado por última vez el 18 de septiembre de 2019, https://www.standardandpoors.com/en_US/web/guest/article/-/view/sourceId/504352.

[161] D. Andrew Austin, Puerto Rico's Current Fiscal Challenges, 4.

operar de manera financieramente viable, evitará una carga indebida a los abonados y proporcionará una recuperación justa a los acreedores.

## 14.2 Consecuencias de una deuda sin reestructurar en las proyecciones de las tarifas

Sin reestructurar su deuda y otros pasivos, la AEE tendría que pagar aproximadamente $3.2 mil millones en deudas preexistentes programadas en cinco años, desde el año fiscal 2023 hasta el año fiscal 2027, antes de considerar los casi $4.1 mil millones de montos vencidos y no pagados hasta el año fiscal 2022. Financiar por completo y en el corto plazo las obligaciones de servicio de la deuda de la AEE sin reestructurar exigirían un aumento de tarifas de alrededor de 6 a 8 c/kWh en dólares reales (Gráfica 68). A más largo plazo, la obligación del servicio de la deuda anual de la AEE se estima en aproximadamente $1 mil millones[162] por año, basándose en la amortización de todos los pasivos financieros a largo plazo con una tasa de interés del 5.25% durante 20 años. En ausencia de una reestructuración de la deuda, la AEE y sus clientes no pueden hacer frente a estas obligaciones a menos que se aumenten las tarifas hasta un 8 c/kWh y se recauden en consecuencia, lo que supone obstáculos como imponer tarifas más altas a una población pobre, incentivar a los usuarios para que opten por la energía solar, disuadir la inversión empresarial y estimular la emigración.

Los pagos de servicio de la deuda sin reestructurar se traducen directamente en facturas más altas para los clientes. Por ejemplo, en el caso de un cliente típico con un consumo eléctrico mensual de 500 kWh en el año fiscal 2022, incluidos los pagos de deuda sin reestructurar en la tarifa eléctrica (además de la tarifa antes de las medidas que no incluye el pago de ninguna deuda), la factura mensual promedio del cliente en el año fiscal 2025 aumentaría alrededor de un 30%, de $94.9 a $123.5. Este cálculo ilustrativo supone mejoras en la eficiencia energética, de conformidad con la Ley Núm. 17 de 2019 (tal como se incluyó en el PIR de la AEE), pensiones no reestructuradas y consecuencias que no generen un aumento en la demanda producto de, por ejemplo, el uso de vehículos eléctricos u otras tecnologías.

---

[162] Esto incluye el principal y los intereses de los bonos, el principal y los intereses de la línea de combustible y los pagos de UCC.

GRÁFICA 68: TARIFA CON DEUDA NO REESTRUCTURADA AÑADIDA (EN C/KWH NOMINALES DE 2022)



## 14.3  Análisis de sostenibilidad de la deuda

El análisis de la sostenibilidad de la deuda (DSA) incluido aquí proporciona un marco para evaluar la capacidad a largo plazo de la AEE para pagar el servicio de la deuda.[163] Los niveles de deuda de la AEE deben alinearse con el objetivo de recuperar el acceso al mercado de capital para financiar las inversiones en infraestructura actuales y futuras o disponer de ahorros de reembolso y asegurar un sistema eléctrico sostenible con precios de energía asequibles para el Estado Libre Asociado y sus residentes. El siguiente análisis de la sostenibilidad de la deuda describe la capacidad de la AEE para pagar la deuda actual y proyectada.

El DSA evalúa la capacidad a largo plazo de la AEE para pagar el servicio de la deuda. El análisis debe tener en cuenta que el aumento de las tarifas para pagar la deuda existente está sujeto a la capacidad de pago de las personas y los negocios, a las alternativas disponibles si las tarifas aumentan más allá de su capacidad o voluntad de pago, y al impacto negativo que tienen las tarifas más altas en una población mayoritariamente pobre y en la capacidad del Estado Libre Asociado de atraer nuevas inversiones para hacer crecer su economía y proporcionar puestos de trabajo a una población que tiene una alta tasa de desempleo. La Gráfica 8, la "participación en el gasto" de la electricidad para el hogar promedio de Puerto Rico está muy por encima de la media de los Estados Unidos y de los mercados insulares comparables, incluso sin el reciente aumento de los precios del combustible.  Los niveles de endeudamiento de la AEE también deben alinearse con el objetivo de recuperar el acceso a los mercados de capitales a tasas razonables para financiar las inversiones de capital esenciales actuales y futuras en infraestructura o los ahorros de reembolso,

---

[163]  La Sección 201(b)(1)(I) de la Ley PROMESA exige que el Plan Fiscal Certificado incluya un análisis de la sostenibilidad de la deuda.

lo que garantiza un sistema eléctrico sostenible con precios de energía asequibles para el Estado Libre Asociado y sus residentes, y evita las consecuencias que tendría para la AEE que se acelere la desviación de la carga hacia la energía solar y otros recursos energéticos alternativos, junto con el robo de electricidad. Este análisis de sostenibilidad de la deuda incorpora la capacidad de la AEE para pagar la deuda actual y proyectada a través de un aumento de tarifas que tenga en cuenta estas preocupaciones y la misión y los deberes estatutarios de la AEE.  Por lo tanto, el análisis, inevitablemente, incorpora juicios y preocupaciones objetivos y subjetivos en relación con la equidad para los residentes de Puerto Rico, la equidad para los acreedores, el cumplimiento de la misión estatutaria de la AEE y los riesgos de pérdida de la demanda por múltiples causas.

La matriz del DSA ilustra la capacidad de deuda implícita de la AEE con diversas tasas de cupón y niveles hipotéticos de ingresos netos (Tabla 15). El DSA supone un nivel y término del servicio de la deuda de 30 años (es decir, 1.0 veces de cobertura). La reestructuración es fundamental para lograr una solución sostenible para las obligaciones de deuda de la AEE y allanar el camino para recuperar su calificación de grado de inversión y garantizar un futuro sostenible desde el punto de vista fiscal para el sistema de energía y los residentes de Puerto Rico.

TABLA 13: SENSIBILIDAD DE LA CAPACIDAD DE LA DEUDA ILUSTRATIVA (Valores en $000's)

| Análisis de sensibilidad - Capacidad de deuda implícita | | | | | |
|---|---|---|---|---|---|
| **c/kWh** | | **1.500** | **2.000** | **2.500** | **3.000** |
| **Tasa de valor actual (%)** | 5.000% | 2,804,419 | 3,739,225 | 4,674,031 | 5,608,838 |
| | 5.500% | 2,673,610 | 3,564,813 | 4,456,016 | 5,347,219 |
| | 6.000% | 2,552,796 | 3,403,728 | 4,254,660 | 5,105,592 |
| | 6.500% | 2,441,019 | 3,254,692 | 4,068,365 | 4,882,038 |

# Capítulo 15.  Reforma de pensiones

## 15.1  Antecedentes históricos y estructura organizacional

El Sistema de Retiro de Empleados de la AEE (SRE de la AEE) fue creado originalmente por medio de la Resolución 200 de la Junta de Gobierno de la AEE, de conformidad con los términos de un convenio colectivo celebrado en 1942 entre la Unión de Trabajadores de la Industria Eléctrica y Riego de Puerto Rico (UTIER) y la Autoridad de las Fuentes Fluviales, ahora conocida como la "AEE". La Junta de Gobierno de la AEE adoptó la resolución que establece el SRE de la AEE a partir del 1 de julio de 1945. A lo largo de los años, el SRE de la AEE amplió su alcance para que cubra a otros empleados de la AEE.  Desde su creación, el SRE de la AEE se ha regido por sus estatutos, según enmendados, los cuales son de naturaleza contractual, conocidos como "Reglamentos del Sistema de Retiro de Empleados de la Autoridad de Energía Eléctrica" (Reglamentos del SRE).

El SRE de la AEE es un sistema público de pensiones.  Sus activos están destinados a beneficiar a los miembros activos, los miembros retirados y sus beneficiarios. La AEE es quien patrocina el plan, aporta al SRE de la AEE y paga todos los costos administrativos del SRE de la AEE, los cuales ascienden a un total de alrededor de $4.7 millones por año. Los Reglamentos del SRE establecen una Junta de Síndicos (la "Junta de Síndicos") para que administre el SRE de la AEE. Dicha Junta está formada por (8) miembros, de los cuales uno (1) es el Director Ejecutivo de la AEE, tres (3) son miembros activos del SRE de la AEE y son elegidos por miembros activos del SRE de la AEE, tres (3) son designados por la Junta de Gobierno de la AEE y uno (1) es elegido por los miembros retirados del SRE de la AEE.

El Artículo 7 de los Reglamentos del SRE establece que las facultades de la Junta de Síndicos están sujetas a las limitaciones que puede establecer la Junta de Gobierno de la AEE. Asimismo, el Artículo 11 de los Reglamentos del SRE estipula que la Junta de Síndicos puede modificar dichos Reglamentos, siempre y cuando le notifique a la Junta de Gobierno de la AEE, con treinta (30) días de antelación, su intención de modificar los Reglamentos del SRE. La Junta de Gobierno de la AEE podrá, dentro de dicho  periodo de treinta (30) días, vetar la propuesta de enmienda. Asimismo, el Artículo 9(2) de los Reglamentos del SRE le confiere a la Junta de Gobierno de la AEE, "por recomendación de la Junta de Síndicos", autoridad para modificar las aportaciones o para dar por terminado el SRE de la AEE "por razones que afectan su desarrollo y operación normal como entidad solvente, así como para descontinuar, suspender o reducir sus aportaciones". El Artículo 9(3) permite que la AEE dé por terminada la operación del SRE de la AEE "por causas o circunstancias que están fuera de su control".

Los Reglamentos del SRE estipulan que la AEE haga una aportación patronal al SRE de la AEE por la cantidad de la aportación determinada actuarialmente (ADC), que es una cifra que refleja el costo de los beneficios obtenidos durante el año ("costo normal") más la amortización del estado no financiado del plan durante una cantidad fija de años. Si se aporta sistemáticamente de acuerdo con el cálculo actuarial de cada año, la ADC es la cantidad que se necesita para financiar por completo todos los beneficios pagaderos por un plan, siempre y cuando se base en una serie de supuestos que representen con exactitud los costos futuros previstos para el plan. Los Reglamentos del SRE le imponen a la Junta de Síndicos la obligación de aprobar sus estados financieros e informes actuariales todos los años. Hasta la valoración actuarial del 30 de junio de 2016, el actuario del SRE de la AEE proporcionó a la AEE una ADC que se demostró, en

retrospectiva, que estaba basada en suposiciones demasiado optimistas con respecto a la nómina, la esperanza de vida y el rendimiento de los activos del sistema. Como consecuencia, la ADC, que históricamente contaba con la aprobación de la Junta de Síndicos, era demasiado baja para mantener la salud y el estado financiado del SRE de la AEE. En 2018, el actuario del SRE realizó un análisis actuarial, con la intervención de la Junta de Gobierno de la AEE, que permitió actualizar muchos supuestos demográficos y económicos clave y aumentar significativamente la ADC a partir de los informes de cálculo del 30 de junio de 2017 (es decir, la ADC del año fiscal 2019). Sin embargo, bajo su estatus de bancarrota, la AEE continuó financiando el plan del SRE a los niveles más bajos calculados a partir de la ADC, antes de que esta fuera revisada conforme a supuestos más realistas.

## 15.2  Antecedentes de los beneficios de pensión

En el año 1993, el SRE de la AEE llevó a cabo una reforma de pensiones significativa que incluyó, principalmente, un aumento en la edad mínima de retiro y la imposición de un límite en los beneficios de pensión por medio de un tope máximo de compensación anual de $50,000 como base para calcular los beneficios de pensión (en comparación con la situación de los empleados antes de 1993, que recibían una pensión basada en méritos del 75% de los tres años de compensación más alta sin límite alguno). Por lo tanto, el importe máximo del beneficio de pensión anual que podría obtener un empleado después del 1 de enero de 1993 es de $37,500 (75% de $50,000). Independientemente de la mencionada reforma, el ajuste por costo de vida (COLA) permaneció en vigencia y rige para todas las personas retiradas, quienes reciben un aumento en los beneficios cada tres años. Asimismo, desde el 30 de junio de 2002 y el 30 de junio de 2003, se agregaron a los beneficios de retiro un bono anual de Navidad de $400 y un bono de verano de $100. Desde el 30 de junio de 2004, también se estableció un pago único para servicios funerarios de $1,000.

En la siguiente tabla se detallan las disposiciones clave sobre el retiro, tanto para los empleados contratados antes del 1 de enero de 1993 como para los contratados después de esa fecha.

TABLA 14: DISPOSICIONES CLAVE SOBRE EL RETIRO

| Beneficio definido | Persona contratada antes del 1 de enero de 1993 | Persona contratada el 1 de enero de 1993 o después de esa fecha |
|---|---|---|
| Elegibilidad para el beneficio de retiro total | • 30 años de servicio | • 55 años de edad y 30 años de servicio |
| Compensación máxima | • Promedio de los tres salarios básicos anuales más altos | • Promedio de los tres salarios básicos anuales más altos, pero con un límite de $50,000 |
| Beneficios anuales | • La anualidad por mérito es del 2.5% de la compensación por la cantidad de años de servicio, hasta 30 años | |

| | | |
|---|---|---|
| | ▪ La anualidad por beneficios acumulados es del 1.5% de la compensación por cada año de servicio, más 0.5% de la compensación por cada año de servicio después de los 20 años<br><br>▪ El beneficio máximo al momento del retiro es de $37,500 para quienes fueron contratados el 1 de enero de 1993 o después de esa fecha | |
| Aportaciones del empleado | ▪ Las aportaciones del empleado suelen ser del 9.06% del salario | ▪ Las aportaciones del empleado son del 11% del salario |
| Ajuste por costo de vida | ▪ Cada tres años: 8% de aumento para las pensiones mensuales de hasta $300; 4% de aumento para las pensiones mensuales de entre $300 y $600; 2% de aumento para las pensiones mensuales de más de $600 | |
| Otros beneficios | ▪ Bonos anuales de $500 ($400 para Navidad y $100 para el verano); pago único de $1,000 como beneficio para servicios funerarios; pago único correspondiente al sueldo de un año en caso de muerte, independientemente de que la persona esté activa o retirada | |

Asimismo, las viudas o los viudos de personas retiradas tienen derecho a recibir una anualidad de por vida del 30% del nivel de la pensión anual al momento del fallecimiento.

### 15.2.1 *Otros beneficios posteriores al empleo (OPEB)*

Con respecto a otros beneficios posteriores al empleo (OPEB), la AEE ofrece beneficios médicos después del retiro fuera del SRE de la AEE (es decir que no se pagan con el fideicomiso de pensiones). El requisito para recibir los beneficios médicos es tener 30 años de servicio. Actualmente, la AEE ofrece cobertura médica a las personas retiradas por medio de un contrato con Triple-S. Dicho beneficio no tienen ningún tipo de financiamiento, está incluido en los presupuestos operacionales de la AEE y representa un costo aproximado de $12 millones por año de acuerdo con el contrato actual. Hay aproximadamente 8,200 retirados que reciben el beneficio médico de OPEB.

### 15.2.2 *Distribución de participantes activos por edad y años de servicio*

Al 30 de junio de 2020, había unos 12,480 retirados (12,336 al mes de abril de 2022) que reciben un beneficio de pensión mensual promedio de $1,815, y 5,524 participantes no retirados (3,592 al mes de mayo de 2022[164]) que se encuentran incluidos en el sistema de pensiones. La siguiente gráfica muestra la distribución de participantes activos por edad y años de servicio *(*al 30 de junio de 2020).

---

[164] Los 3,592 incluyen más de 2,000 antiguos empleados de la AEE que fueron transferidos a agencias del Estado Libre Asociado en el momento de la conformación de LUMA. El SRE de la AEE y la Junta de Supervisión mantienen conversaciones constantes relacionadas con la acumulación continua de beneficios de pensión adicionales en el SRE de la AEE para estos empleados.

GRÁFICA 69: NÚMERO DE PARTICIPANTES Y SALARIO TOTAL

**TABLA DE DATOS DE LOS MIEMBROS ACTIVOS
AL 30 DE JUNIO DE 2020**

| Edad | Años de servicio completados | | | | | | | Total | Nómina |
|---|---|---|---|---|---|---|---|---|---|
| | Menos de 5 | 5 a 9 | 10 a 14 | 15 a 19 | 20 a 24 | 25 a 29 | Más de 30 | | |
| Menos de 20 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 20 a 24 | 22 | 0 | 0 | 0 | 0 | 0 | 0 | 22 | 693,108 |
| 25 a 29 | 72 | 13 | 0 | 0 | 0 | 0 | 0 | 85 | 2,758,548 |
| 30 a 34 | 84 | 72 | 39 | 0 | 0 | 0 | 0 | 195 | 6,967,177 |
| 35 a 39 | 88 | 108 | 171 | 121 | 2 | 0 | 0 | 490 | 18,804,397 |
| 40 a 44 | 67 | 89 | 167 | 538 | 68 | 1 | 0 | 930 | 37,160,243 |
| 45 a 49 | 46 | 67 | 134 | 582 | 405 | 62 | 0 | 1,296 | 53,164,491 |
| 50 a 54 | 27 | 66 | 93 | 353 | 438 | 271 | 32 | 1,280 | 54,007,577 |
| 55 a 59 | 15 | 27 | 50 | 195 | 218 | 203 | 63 | 771 | 33,139,192 |
| 60 | 1 | 3 | 11 | 20 | 37 | 23 | 12 | 107 | 4,449,645 |
| 61 | 1 | 3 | 6 | 20 | 13 | 19 | 4 | 66 | 2,653,976 |
| 62 | 0 | 1 | 3 | 15 | 22 | 15 | 8 | 64 | 2,810,360 |
| 63 | 1 | 0 | 1 | 15 | 11 | 14 | 4 | 46 | 1,885,625 |
| 64 | 0 | 2 | 1 | 5 | 11 | 3 | 3 | 25 | 1,064,201 |
| 65 | 0 | 0 | 2 | 6 | 5 | 8 | 1 | 22 | 882,777 |
| 66 | 0 | 1 | 1 | 2 | 3 | 2 | 0 | 9 | 369,297 |
| 67 | 0 | 0 | 0 | 0 | 3 | 3 | 1 | 7 | 314,020 |
| 68 | 0 | 0 | 0 | 2 | 2 | 3 | 2 | 9 | 368,357 |
| 69 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 118,014 |
| Más de 70 | 1 | 0 | 1 | 5 | 2 | 3 | 3 | 15 | 602,821 |
| Total | 425 | 452 | 680 | 1,879 | 1,240 | 632 | 133 | 5,441 | 222,213,826 |

Promedio de edad de miembros activos: 48.0
Promedio de servicio: 17.6

# 15.3 Estado financiado

Al 31 de marzo de 2022, el valor total de los activos del SRE de la AEE era de $539 millones, de los cuales alrededor del 29% o $157 millones estaba invertido en "activos ilíquidos", como alianzas y capital de riesgo, además de hipotecas/préstamos de los empleados (es decir, otros activos). Las siguientes gráficas muestran el descenso rápido de los activos del sistema de pensiones debido principalmente a (a) egresos significativos producto de los pagos de beneficios, (b) aportaciones patronales insuficientes, y (c) una disminución significativa de personal, lo que llevó a una menor cantidad de aportaciones del empleado/patrono. Como también se muestra en la Gráfica 75, basada en la tasa de agotamiento del fideicomiso a partir del año fiscal 2022, quedan aproximadamente 19 meses hasta que se agoten los activos líquidos (o una fecha proyectada de agotamiento de los activos en octubre de 2023).  Cabe destacar que los rendimientos de las inversiones, los gastos administrativos y los retiros de las aportaciones de los empleados, incluidos los de los empleados que se han transferido a LUMA, podrían acelerar el tiempo hasta que se agoten los activos líquidos.

GRÁFICA 70: ACTIVOS DE PENSIONES AL 31 DE MARZO DE 2022

| Clase de activo | 6/30/19 | 6/30/20 | 3/31/22 | Porcentaje de asignación |
|---|---|---|---|---|
| **Activos líquidos** | | | | |
| Acciones | $491,936,787 | $378,104,233 | $271,118,314 | 50 |
| Ingresos fijos | 90,845,694 | 105,864,027 | 87,364,841 | 16 |
| Bienes raíces | 38,667,303 | 30,872,177 | 15,033,015 | 3 |
| Dinero en efectivo o su equivalente | 12,776,776 | 1,550,669 | 9,078,364 | 2 |
| *Subtotal de activos líquidos* | *$634,226,560* | *$516,391,106* | *$382,594,534* | 71 |
| **Activos ilíquidos** | | | | |
| Alianzas y capital de riesgo / capital privado | $63,614,127 | $42,278,970 | $16,076,079 | 3 |
| Otros activos / cartera manejada a nivel interno | 218,012,470 | 203,769,237 | 139,935,477 | 26 |
| Subtotal de activos ilíquidos | $281,626,597 | $246,048,207 | $156,011,556 | 29 |
| **Total de activos** | | | | |
| *Total* | *$915,853,157* | *$762,439,313* | *$538,606,090* | 100 |
| | | | | |
| Variación interanual anualizada | | -17% | -18% | |

**Nota**

| | | |
|---|---|---|
| Egresos mensuales previstos basados en el año fiscal 2022 Las tasas de proyección son las siguientes | Aportación de la AEE $4 millones | Según la tasa de proyección actual, suponiendo que no haya otras ganancias/pérdidas, los activos líquidos se agotarán en aproximadamente 19 meses |
| | Pago de beneficios -$24 millones | |
| | **Egresos netos[1]** **-$20 millones** | |

---

GRÁFICA 71: ESTADO DEL FINANCIAMIENTO DE LAS PENSIONES AL 30 DE JUNIO DE 2020



1 La tarifa de descuento se redujo de 6.30% como resultado de un supuesto sobre el mercado de capital actualizado

---

La gráfica anterior ilustra la proporción financiada del plan del SRE de la AEE desde el año fiscal 2016 hasta el año fiscal 2020. Históricamente, el índice de financiamiento del plan ha disminuido en forma constante desde el 2008, cuando tenía un 67% de financiamiento. Al 30 de junio de 2020, el pasivo de pensiones era de $4.3 mil millones en comparación con un valor de activos de $762 millones, lo que representa una proporción financiada del 18%, que se reduce al 12% si se excluyen los activos ilíquidos. Un índice de financiamiento del 18% significa que todos los activos de pensiones, incluidos aquellos que puedan no ser líquidos, cubren el 18% del pasivo actuarial acumulado vinculado con el plan del SRE de la AEE. La disminución sostenida en el estado financiado es un claro ejemplo de años de mal manejo de los costos de pensiones, lo que genera una escasez significativa de fondos para financiar el plan.

Desde el año fiscal 2017 hasta el año fiscal 2021, la AEE presupuestó y aportó un promedio aproximado de $80 millones por año como la porción de aportación patronal al sistema de pensiones, mientras que la aportación del año fiscal 2022 disminuyó a unos $27 millones. Para el año fiscal 2023, el Plan Fiscal Certificado refleja aportaciones de unos $18 millones.

## 15.4 Consecuencias del financiamiento total de la ADC en comparación con el financiamiento de PayGo

La política actual del SRE de la AEE para calcular la ADC se estableció desde el 30 de junio de 2010 para que el pasivo actuarial acumulado no financiado (UAAL) se amortice por completo en un periodo de 30 años de forma definitiva. El UAAL se amortiza como una cantidad uniforme en dólares y, desde el 30 de junio de 2021, el periodo de amortización restante es de 20 años.

La AEE prevé que, para el año fiscal 2023 (del 1 de julio de 2022 al 30 de junio de 2023), la ADC total será de $313 millones sobre la base del periodo de amortización restante de 20 años. Se estima que los pagos de beneficios previstos para el mismo periodo serán de $283 millones, lo que representa más de la mitad del valor de mercado de los activos (líquidos más ilíquidos) al 31 de marzo de 2022.

GRÁFICA 72: COSTOS PROYECTADOS DE PAYGO DESPUÉS DEL AGOTAMIENTO PROYECTADO DE LOS ACTIVOS DEL SRE DE LA AEE



Si los activos del SRE de la AEE se agotan y las aportaciones patronales de la AEE son insuficientes para cubrir los beneficios de pensión, será necesario que la AEE busque recursos para pagar las pensiones y el retiro de aportaciones de empleados mediante el sistema de pago "pay as you go" (PayGo); de lo contrario, peligrará el pago de los beneficios a los pensionados. Al ritmo actual de financiamiento, los activos del plan del sistema de pensiones de la AEE podrían agotar PayGo durante el año fiscal 2024, lo que requeriría un aumento de emergencia de la tarifa eléctrica para financiar las obligaciones de las pensiones sobre una base de PayGo. La Gráfica 72 muestra los pagos proyectados de PayGo y el costo asociado a los abonados una vez que se agoten los activos del SRE de la AEE bajo PayGo; la aportación patronal continuaría varias décadas después del año

2050 hasta que se paguen todos los beneficios. Las posibles soluciones para evitar dicho resultado incluyen, pero no se limitan a: (i) un pago futuro, potencialmente a través de la emisión de deuda, efectuado bajo el plan al SRE de la AEE; (ii) o un nuevo fideicomiso de pensiones de un cargo de transición establecido conforme al plan; (iii) una corriente separada de pagos de PayGo a los pensionados en forma directa (neto de cualquier distribución de los activos residuales del SRE de la AEE); o (iv) la distribución a prorrata de los acreedores no garantizados según el plan al SRE de la AEE, lo cual requiere que el SRE de la AEE reduzca los pagos de pensiones a los retirados a prorrata.

## 15.5  Consideraciones sobre la reforma estructural de pensiones

Dada la significativa escasez de fondos del fideicomiso del SRE de la AEE, debe adoptarse una reforma para respaldar de forma estructural las necesidades constantes de los pensionados, sin dejar de equilibrar el impacto en las tarifas eléctricas debido a las reducciones previstas en la demanda de electricidad de la red en los años venideros.  La AEE debe determinar el método por el que se financiarán estos beneficios y el nivel de beneficios que se proporcionará en el futuro (por ejemplo, si se aplica una congelación, la eliminación de COLA, un recorte, etc.). La decisión general que debe tomarse está relacionada con el medio de financiamiento de las pensiones. Actualmente, las aportaciones de las pensiones se hacen al fideicomiso del SRE de la AEE con beneficios y costos administrativos pagados a partir de los activos acumulados del fideicomiso. Las aportaciones actuales al plan son insuficientes y harán que el fideicomiso se vuelva insolvente en el futuro cercano.  Si los activos del SRE de la AEE se agotan, los pagos deberán convertirse al sistema PayGo.  Es necesario decidir si mantener una estructura de fideicomiso y reconstruir el estado financiado del plan para evitar la necesidad de conversión al sistema PayGo, o simplemente aceptar convertirse a dicho sistema.  En cualquiera de los casos, es necesario tomar decisiones adicionales en las áreas que se detallan a continuación para considerar no solo las aportaciones que hacen falta para financiar el plan de manera adecuada, sino también el impacto de esos costos en las tarifas de electricidad.

### 15.5.1 *Consideraciones sobre el financiamiento de pensiones a corto plazo*

Si los beneficios se financian a través de un fideicomiso de pensiones (ya sea el SRE de la AEE o un fideicomiso nuevo), la AEE considerará la mejor manera de reducir el impacto negativo que tendrán en los consumidores las variaciones en los cargos de un año a otro.  Si bien las tarifas deberán revisarse anualmente para adaptarlas a cualquier pérdida que haya habido durante el año, que podría afectar de forma negativa el adecuado financiamiento a largo plazo del fideicomiso (por ejemplo, la variación en los niveles de demanda reales en comparación con la demanda proyectada, los retornos de activos desfavorables, etc.), los beneficios de financiamiento por medio de un fideicomiso deberían permitir que la tarifa sea más uniforme y que, con el correr de los años, la estabilidad de las tarifas eléctricas sea cada vez mayor.

Si las pensiones se pagan por medio de PayGo, el riesgo de fluctuación de los ingresos del cargo de pensión en las tarifas eléctricas es todavía mayor. Idealmente, las personas retiradas deben poder contar con un ingreso mensual estable del SRE de la AEE. Por lo tanto, a diferencia de otros gastos que pueden retrasarse durante un  periodo de tiempo en condiciones comerciales difíciles, debe existir un plan del sistema de retiro, con confirmaciones todos los meses, para garantizar que los retirados reciban sus cheques de pensión mensuales de manera oportuna.  Esto podría exigir, por ejemplo, estructurar el cargo a fin de recaudar los ingresos por adelantado para cubrir los beneficios que deberán pagarse en algún momento en el futuro, de modo que si los ingresos

son menores de los esperados en el corto plazo (por ejemplo, menor demanda por desastres naturales o fluctuaciones generales de la temporada), hay tiempo suficiente para ajustar el cargo y generar el nivel de ingresos necesario para pagarles los beneficios a los retirados.

### 15.5.2 *Consideraciones sobre el financiamiento de pensiones a más largo plazo*

Si los beneficios se financian por medio de un fideicomiso, hay más flexibilidad respecto de cómo estructurar el cargo de pensión. Dada la disminución proyectada en la demanda de electricidad en el futuro y en la naturaleza a largo plazo de las obligaciones de pensiones, una práctica de financiamiento que genere un nivel de aportación relativamente estable cada año tendrá como consecuencia aumentos continuos en las tarifas eléctricas cuando se tengan en cuenta los niveles de demanda más bajos en los años posteriores. Como alternativa, podría establecerse una tarifa eléctrica fija que, si se cobrara en tarifas presentes y futuras, permitiría acumular un nivel de aportaciones suficiente para financiar el plan del sistema de retiro por completo antes de que finalice el periodo de amortización cerrada.

En cambio, si los gastos del sistema de pensión se financian por medio de PayGo, debe reconocerse que la extensión de los pagos de pensiones para participantes más jóvenes del plan superará en varias décadas la duración del Plan Fiscal Certificado. Por lo tanto, es necesario implementar un plan para garantizar que dichos participantes reciban las pensiones que se les prometieron en virtud de la reforma de pensiones de la AEE durante los años que sean necesarios, incluso cuando la demanda pueda seguir disminuyendo.

189

# Capítulo 16. Informes posteriores a la certificación

Los proveedores de energía y las empresas de servicios eléctricos operan infraestructura crítica, con frecuencia de manera monopólica. Para desempeñarse con transparencia e informar a los reguladores, empleados, clientes y demás partes interesadas, las empresas de energía y servicios públicos reguladas deben cumplir con requisitos estrictos de transparencia e informes exigidos por distintas entidades reguladoras federales, estatales y de otro tipo. Dichos requisitos sobre los informes son un estándar de la industria y se aplican a la AEE.

Históricamente, ha sido responsabilidad de la AEE presentar informes sobre sus indicadores económicos, operacionales y de confiabilidad. Como parte de la transformación del sector energético de Puerto Rico y de la función de LUMA como el operador del sistema de T&D, LUMA sigue cumpliendo con algunos de estos requisitos sobre los informes –y también con otros adicionales–, tal como se especifica en el AOM para T&D. El AOM para T&D autoriza a LUMA a representar a la AEE ante el NEPR "con respecto a cualquier situación relacionada con el desempeño de cualquiera de los servicios de O&M" brindados por LUMA. También establece que LUMA será responsable de todas las presentaciones y demás entregas relacionadas ante el NEPR. El Apéndice I del AOM para T&D establece los requisitos respecto de la presentación de informes contables y económicos de LUMA ante el NEPR y la AAPP y obliga a LUMA a colaborar con la AEE y la AAPP "en relación con la preparación de informes y demás documentación para cumplir con los requisitos sobre los informes de la AEE". Dichos requisitos incluyen, entre otros, los siguientes:

- Requisitos de presentación de informes económicos trimestrales y anuales (fin de año);
- Requisitos de presentación de informes mensuales y anuales de la agencia federal;
- Requisitos de presentación de informes del NEPR;
- Requisitos de presentación de informes de la Ley de Conciliación Presupuestaria de 2017 y otros programas de financiamiento o estímulo del Estado Libre Asociado; y
- Requisitos de presentación de informes del Departamento de Energía.

Para monitorear los avances de la reorganización operacional y económica de la AEE y la transformación del sector energético de Puerto Rico, así como la salud y el desempeño de su sistema eléctrico, la Junta de Supervisión le ha exigido históricamente a la AEE que presente de forma periódica ante dicha Junta información adicional sobre el desempeño y la implementación. La AEE debe seguir cumpliendo con estos requisitos sobre los informes hasta que deje de ser un instrumento territorial cubierto, según designación de la Junta de Supervisión en virtud de PROMESA.

De cara al futuro, tal como se establece en sus respectivos AOM, los operadores privados del sistema de T&D y de los activos de generación de la AEE serán responsables de ciertas medidas operacionales y no operacionales. Como consecuencia, la AEE tendrá que trabajar de forma estrecha con ambas entidades para implementar y completar plenamente la reorganización y la transformación del sector energético de Puerto Rico.

La Junta de Supervisión utilizará los informes que los operadores privados presenten al NEPR y a la AAPP sobre las métricas de resultados y el estado de ejecución para complementar la información proporcionada por la AEE y continuar supervisando la salud financiera y el rendimiento del sistema eléctrico de Puerto Rico, al tiempo que se reserva su derecho a solicitar algunos otros informes a LUMA, ya sea directamente o a través de la AEE.

Las siguientes secciones describen varios informes y métricas que debe presentar la AEE, LUMA y cualquier otro operador privado de los activos de generación que haya en el futuro. La Sección 16.1 incluida a continuación describe la información necesaria y la frecuencia de presentación de cada informe no operacional que la AEE tiene que presentar ante la Junta de Supervisión o que LUMA tiene que presentar ante la AAPP o el NEPR, y a los que la Junta de Supervisión tendrá acceso, de conformidad con el acuerdo con LUMA. En este contexto, "no operacional" significa que dichos informes no están ligados a medidas operacionales específicas, sino que son globales y hacen referencia al desempeño y la salud generales del sistema eléctrico. La Sección 16.2 incluye un resumen de las métricas relacionadas con el sistema de T&D que LUMA presenta ante la AAPP y el NEPR en virtud del AOM[165] y a las que la Junta de Supervisión tendrá acceso, de conformidad con el acuerdo con LUMA. La Sección 16.3 explica brevemente las métricas relacionadas con la generación y los informes que están ligados a medidas operacionales específicas y que la AEE debe presentar ante la Junta de Supervisión. Refleja las mejoras en el proceso de presentación de informes de la AEE que comenzó durante el año fiscal 2020. Una vez que haya terminado la transición de los activos de generación existentes de la AEE, las responsabilidades relativas a la presentación de informes relacionados con la generación pasará de la AEE al operador privado. Estos cambios se reflejarán más adelante.

La AEE y los operadores privados presentarán informes semanales, mensuales, trimestrales o anuales. La frecuencia y el proceso para la presentación de informes se describe en la siguiente tabla.

TABLA 15: FRECUENCIA DE LOS INFORMES

| Tipo de informe | Término de presentación |
| --- | --- |
| Semanal | Se presenta los miércoles de la semana siguiente a la semana que abarca el informe. |
| Mensual | Se espera 15 días después de que termina el mes. |
| Trimestral | Se espera 45 días después de que termina el trimestre y se presenta como un informe consolidado. |
| Anual | Se espera 120 días después de que termina el año fiscal y se presenta como un informe consolidado. |

## 16.1  Informes no operacionales

Los informes sobre asuntos no operacionales, es decir, sobre información que no está ligada a medidas operacionales específicas, sino sobre información que describe el desempeño y la salud del sistema eléctrico de un modo más general, se dividen en dos (2) categorías: (1) Informes sobre planificación de la resiliencia y los recursos, y (2) Informes económicos. Los informes de resiliencia y planificación de recursos proporcionan información actualizada sobre la aplicación del Plan Integrado de Recursos (PIR), la modernización de la red y los esfuerzos de financiamiento federal. La frecuencia de los informes económicos varía entre semanal y anual según la naturaleza de la métrica informada.

---

[165] Métricas finales sujetas a la aprobación del NEPR.

TABLA 16: INFORMES NO OPERACIONALES

| | Informe | Detalle | Frecuencia | Entidad responsable |
|---|---|---|---|---|
| **Planificación de la resiliencia y los recursos** | **Implementación del Plan de Acción Modificado y el PIR aprobado por el NEPR** | Presentación de todos los informes de estado del PIR exigidos por el NEPR, incluso una proyección a corto plazo (dos años) del balance del recurso de capacidad proyectado del sistema por temporada, así como su capacidad para cumplir con las necesidades de carga máxima y con los requisitos de reserva operacional con los recursos existentes y esperados en cada uno de los intervalos proyectados. | Según lo determine el NEPR | AEE / LUMA |
| | **Implementación de la modernización de la red** | El plan de modernización de la red debe incluir un resumen de los proyectos y las categorías de inversión más importantes que evalúa la AEE para ofrecer energía confiable y resistente, así como del estado de la implementación del proyecto en función de las metas cruciales. | Mensual | AEE / LUMA |
| | **Informe de financiamiento federal relacionado con las obras permanentes y de emergencia** | Actualizaciones sobre los programas de financiamiento de FEMA y CDBG-DR para las obras permanentes y de emergencia en los activos de generación y el sistema de T&D. Proporcionar lo siguiente por hoja de trabajo del proyecto (PW):<br>■ Uso previsto y descripción de la cartera de proyectos<br>■ Importe obligado<br>■ Importe recibido<br>■ Requisitos de aporte de costos<br>■ Financiamiento de aporte de costos (por fuente)<br>■ Cronograma del proyecto o metas cruciales | Mensual | AEE / LUMA |
| | **Informe de gastos presupuestados frente a gastos reales** (El requisito sobre los informes es independiente de cualquier requisito contemplado en la Sección 203 de la Ley PROMESA) | Seguimiento del informe certificado del presupuesto en comparación con los datos reales para GenCo y HoldCo sobre la base de un modelo que entregará la Junta de Supervisión:<br>■ Incluye explicación de variaciones significativas (mayor de 10% y $30 millones)<br>■ Incluye declaración de ingresos en el paquete de informes<br>■ Proporciona informes trimestrales de presupuesto | Mensual | AEE / LUMA |

| | Informe | Detalle | Frecuencia | Entidad responsable |
|---|---|---|---|---|
| | | Seguimiento del informe certificado del presupuesto en comparación con los datos reales para GridCo, GenCo y HoldCo sobre la base de un modelo que entregará la Junta de Supervisión:<br>■ Incluye explicación de variaciones significativas (mayor de 10% y $30 millones)<br>■ Incluye declaración de ingresos en el paquete de informes<br>■ Proporciona informes trimestrales de presupuesto | Trimestral | AEE / LUMA |
| | **Informe de liquidez de cuentas por cobrar (AR)/cuentas por pagar (AP)** | Informe constante de la liquidez, las cuentas por pagar y las cuentas por cobrar, por tipo de cliente o proveedor | Mensual | LUMA |

## 16.2 Medidas operacionales vinculadas con la transmisión y la distribución

De acuerdo con el AOM para T&D, LUMA presentará todos los años ante la AAPP y el NEPR métricas de rendimiento vinculadas con el sistema de T&D divididas en tres categorías: (1) métricas de satisfacción del cliente; (2) métricas técnicas, reguladoras y de seguridad; y (3) métricas de rendimiento económico. LUMA también presentará métricas de rendimiento sobre su desempeño durante una interrupción del servicio importante. Las métricas específicas dentro de cada categoría se incluyen en el Capítulo 8**.**

Además, LUMA le entregará a la Junta de Supervisión copias de cualquier informe mensual, trimestral o anual presentado ante la AEE, la AAPP o cualquier otro organismo gubernamental, hasta que la AEE deje de ser un organismo territorial cubierto, tal como lo establece la Junta de Supervisión de conformidad con la Ley PROMESA. Además, LUMA y la AEE complementarán sus actualizaciones del Plan de Remediación del Sistema al NEPR (NEPR-MI-2020-0019) con información relativa al manejo de la vegetación. En concreto, LUMA proporcionará información actualizada sobre la cantidad de kilómetros despejados, los municipios afectados y el número o porcentaje de interrupciones del servicio causadas por ello. La Junta de Supervisión usará estos informes para complementar la información proporcionada por la AEE y monitorear el desempeño y la salud económica del sistema eléctrico de Puerto Rico.

## 16.3 Informes y métricas operacionales vinculadas con la generación

Hasta que el operador privado asuma la responsabilidad de los activos de generación de la AEE, esta última tendrá la obligación de informar mensualmente sobre todas las medidas operacionales relacionadas con los activos de generación. Los requisitos exactos para los informes varían según la naturaleza de la medida, tal como se observa en la siguiente tabla.

TABLA 17: INFORMES SOBRE MEDIDAS OPERACIONALES RELACIONADAS CON LA GENERACIÓN

| | Informe | Detalle | Frecuencia |
|---|---|---|---|
| **Acuerdos de compra de energía y suministro de combustible** | **Contrato de suministro de combustible diésel** | El informe incluirá las compras de combustible diésel desde el comienzo del año hasta la fecha con comparaciones de los resultados respecto del año anterior. Los informes son necesarios en el proceso de renegociación o ampliación de la renovación. | Mensual |
| | **Contrato de suministro de combustible Búnker** | El informe incluirá las compras de combustible Búnker desde el comienzo del año hasta la fecha con comparaciones de los resultados respecto del año anterior. Los informes son necesarios en el proceso de renegociación o ampliación de la renovación. | Mensual |
| **Transformación y proyectos de APP** | **APP de generación existente** | Los requisitos sobre los informes incluirán información actualizada sobre el proceso de SP para operadores de generación, así como el subsiguiente proceso de transición inicial. | Mensual |
| | **Implementación del Plan de Reorganización de la AEE** | Los requisitos de presentación de informes deben incluir un plan de trabajo para la ejecución del Plan de Reorganización de la AEE, que incluya, entre otras cosas, lo siguiente:<br>• Una descripción clara de la estructura corporativa reorganizada de la AEE, que contemple la identificación de todas las subsidiarias que se espera establecer en relación con su reorganización (GridCo, GenCo, HoldCo, HydroCo y PropertyCo), así como cualquier otra subsidiaria restante (es decir, PREPA Holdings, PREPA Networks, LLC-ahora conocida como HUB Advanced Networks, etc.).<br>• Una descripción de cada entidad dentro de la estructura general, incluyendo el alcance operacional, las funciones, las responsabilidades y el tamaño de la lista de operaciones requerida a lo largo del tiempo (es decir, los organigramas).<br>• Un cronograma detallado con metas cruciales específicas que sea consistente con el objetivo de finalización oportuna de reorganización de la AEE.<br>• Una lista de descripciones claras de la transformación prevista por la AEE con respecto a cada entidad o subsidiaria (por ejemplo, los procesos contemplados para el manejo y la desinversión de activos, la transferencia de las operaciones a operadores externos, ya sean privados o públicos, según corresponda). | Mensual |

# Capítulo 17. Conclusión

**El Plan Fiscal Certificado de 2022 establece las acciones que el Gobierno de Puerto Rico debe llevar a cabo para acelerar y completar con éxito la transformación del sistema energético de Puerto Rico.** Tal como se expone en este Plan Fiscal Certificado, así como en el Plan Fiscal Certificado para Puerto Rico de 2022, la implementación total y completa de la Reforma del Sector Energético es un componente fundamental de la estrategia de Puerto Rico para promover el desarrollo económico, mejorar su atractivo como destino de inversión y, por último, mejorar la calidad de vida de sus residentes.

Los pequeños avances de la AEE a la hora de adquirir recursos renovables y la exitosa transición a LUMA como operador privado del sistema de T&D son logros importantes que, en conjunto, proporcionan a los clientes de la AEE una sensación de esperanza de que un sistema energético moderno, eficiente y fiable es posible. No obstante, los retrasos generales en muchas otras iniciativas, incluyendo el desarrollo de los 150 MW de recursos renovables no operacionales previamente aprobados por la Junta de Supervisión, la reorganización corporativa de la AEE, el despliegue de fondos federales y la adquisición de recursos renovables que exceden los adquiridos en el tramo 1, entre otros, suponen un riesgo claro y presente para el progreso visto hasta ahora. A menos que se tomen medidas urgentes, en particular por parte de la AEE, LUMA y el NEPR, los residentes de Puerto Rico pueden verse obligados a depender permanentemente de un sistema energético anticuado y poco fiable.

Además de asegurar la confiabilidad a corto plazo de su flota generatriz, se deben emplear los recursos y el enfoque de la AEE para permitir la transición exitosa de las operaciones de generación a uno o más operadores privados, según lo dispuesto por la Ley Núm. 17 de 2019. De igual forma, la AEE debe continuar enfocando y mejorando sus esfuerzos en facilitar el acceso y despliegue de fondos federales, tanto hacia la mejora de los recursos de generación como hacia las inversiones en el sistema de T&D, apoyando y sirviendo de socio a LUMA en sus iniciativas para mejorar la calidad y fiabilidad de los servicios energéticos en Puerto Rico.

A largo plazo, la actualización e implementación del PIR, el Plan de Infraestructura a 10 años y los programas de mejoras de LUMA serán esenciales para construir un sector eléctrico moderno, seguro, fiable y resiliente para Puerto Rico. El Plan Fiscal Certificado de 2022 sitúa a la AEE en el camino hacia la transformación total del sistema energético con conocimientos y tecnología operacionales de primer nivel.

## **ANEXO F**

PRESUPUESTO CERTIFICADO DE 2022  DE LA AEEPR

**JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN FINANCIERA
DE PUERTO RICO**

JUNTA DE
SUPERVISIÓN Y
ADMINISTRACIÓN
FINANCIERA DE
PUERTO RICO

Members
Andrew G. Biggs
Arthur J. González
Antonio L. Medina
John E. Nixon
Justin M. Peterson
Betty A. Rosa

David A. Skeel, Jr.
Presidente

## POR CORREO ELECTRÓNICO

30 de junio de 2022

Honorable Pedro Pierluisi Urrutia
Gobernador de Puerto Rico

Estimado Gobernador Pierluisi Urrutia:

De conformidad con una Resolución —copia de la cual se adjunta al presente documento en forma de **Anexo A** (la "Resolución")— adoptada por la Junta de Supervisión y Administración Financiera de Puerto Rico (la "Junta de Supervisión"), y de conformidad con la Sección 202(e)(4) de la Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico ("PROMESA"), por la presente la Junta de Supervisión expide al Gobernador el presente certificado que confirma que el presupuesto del ejercicio fiscal 2023 de la Autoridad de Energía Eléctrica de Puerto Rico ("AEEPR"), adjunto como **Anexo 1** a la Resolución (el "Presupuesto del ejercicio 2023 de la AEEPR"), es un presupuesto de conformidad, tal y como se especifica en la Resolución.

La Junta de Supervisión espera colaborar con usted y con la AEEPR para implementar plenamente el Presupuesto del ejercicio 2023 de la AEEPR para beneficio del pueblo de Puerto Rico.

Atentamente,


David A. Skeel, Jr.

Andrew G. Biggs
Arthur J. González
Antonio L. Medina
John E. Nixon
Justin M. Peterson
Betty A. Rosa

CC:   D. Jaime A. El Koury
      Hon. Omar Marrero Díaz
      Junta de Gobierno de la AEEPR

## ANEXO A

**JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN FINANCIERA DE PUERTO RICO**

**30 de junio de 2022**

**RESOLUCIÓN CERTIFICANDO EL PRESUPUESTO DEL EJERCICIO FISCAL 2023 DE LA AEEPR**

VISTO Y CONSIDERANDO QUE el 30 de junio de 2016 se promulgó la Ley federal de Supervisión, Administración y Estabilidad Económica de Puerto Rico ("PROMESA"); y

VISTO Y CONSIDERANDO QUE la Sección 101 de PROMESA dispuso la creación de la Junta de Supervisión y Administración Financiera de Puerto Rico ("la Junta de Supervisión"); y

VISTO Y CONSIDERANDO QUE la Sección 202(c) de PROMESA establece un procedimiento de múltiples pasos para la preparación, revisión y aprobación de un presupuesto de las instrumentalidades cubiertas del Estado Libre Asociado de Puerto Rico, como la Autoridad de Energía Eléctrica de Puerto Rico ("AEEPR"), estipulando que (i) el Gobernador debe presentar una propuesta de presupuesto ante la Junta de Supervisión; (ii) la Junta de Supervisión debe revisar la propuesta de presupuesto y determinar, a su exclusiva discreción, si dicho presupuesto cumple o no el plan fiscal vigente, siendo que en este último caso la Junta de Supervisión debe emitir un aviso de violación y recomendar revisiones, permitiendo al Gobernador corregir las citadas vulneraciones; (iii) a continuación, el Gobernador podrá presentar una propuesta de presupuesto revisada; y, por último, (iv) si el Gobernador omite presentar puntualmente una propuesta de presupuesto que la Junta de Supervisión determine, a su absoluta revisión, que es un presupuesto de conformidad, la Junta deberá elaborar y enviar al Gobernador su propio presupuesto de conformidad; y

VISTO Y CONSIDERANDO QUE, mediante su carta del 22 de febrero de, 2022, la Junta de Supervisión envió al Gobernador —de conformidad con la Sección 202(a) de PROMESA— un calendario para la elaboración, presentación, aprobación y certificación del Presupuesto del ejercicio 2023 de la AEEPR; y

VISTO Y CONSIDERANDO QUE, entre el 15 y el 17 de junio de 2022, los representantes de la AEEPR, el personal y los consultores de la Junta de Supervisión, el personal y los consultores de la Autoridad para las Alianzas Público-Privadas de Puerto Rico (P3A) y los letrados se reunieron para debatir el Presupuesto del ejercicio 2023 de la AEEPR y las inquietudes de la Junta de Supervisión con respecto al mismo; y

VISTO Y CONSIDERANDO QUE el 22 de junio de 2022 el Gobernador presentó la propuesta de Presupuesto del ejercicio 2023 de la AEEPR; y

VISTO Y CONSIDERANDO QUE la Junta de Supervisión y sus asesores debatieron con representantes del Gobernador la propuesta de Presupuesto del ejercicio 2023 de la AEEPR; y

VISTO Y CONSIDERANDO QUE, tras sustanciales deliberaciones, el 28 de junio de 2022, la Junta de Supervisión envió al Gobernador un aviso de violación de conformidad con la Sección 202(c)(1)(B) de la Ley PROMESA, relativo a la propuesta de Presupuesto del ejercicio 2023 de la AEEPR del Gobernador; y

VISTO Y CONSIDERANDO QUE el Gobernador no envió una propuesta revisada del Presupuesto del ejercicio 2023 de la AEEPR dentro del plazo establecido; y

VISTO Y CONSIDERANDO QUE, tras exhaustivas deliberaciones, la Junta de Supervisión determinó que la propuesta de Presupuesto del ejercicio 2023 de la AEEPR no refleja un presupuesto de conformidad, como lo requiere la Sección 202(c)(2) de PROMESA; y

VISTO Y CONSIDERANDO QUE la Junta de Supervisión ha elaborado un Presupuesto del ejercicio 2023 de la AEEPR de conformidad y revisado para enviarlo al Gobernador a tenor de las Secciones 202(c)(2) y 202(e)(4) de la Ley PROMESA, presupuesto que se adjunta al presente documento en forma de Anexo 1 (el "Presupuesto de conformidad 2023 de la AEEPR");

POR LA PRESENTE SE RESUELVE QUE, de conformidad con las Secciones 202(c)(2) y 202(e)(4) de la Ley PROMESA, la Junta de Supervisión enviará al Gobernador el Presupuesto de conformidad 2023 de la AEEPR, el cual (i) se considerará aprobado por el Gobernador, (ii) será objeto de una certificación de conformidad a enviar por la Junta de Supervisión al Gobernador, y (iii) entrará en plena vigencia y efecto a partir del 1 de julio de 2022.

**ANEXO 1**:        PRESUPUESTO DE CONFORMIDAD DEL EJERCICIO
2023 DE LA AUTORIDAD DE ENERGÍA ELÉCTRICA
DE PUERTO RICO Y CLÁUSULAS DE RESOLUCIONES
PRESUPUESTARIAS

I. **ANEXO 1 - PRESUPUESTO – INGRESOS DE LA AUTORIDAD DE ENERGÍA ELÉCTRICA DE PUERTO RICO**

| En miles de $ | | Presupuesto EF23 |
|---|---|---|
| **Ingresos básicos** | | |
| Residenciales | | 418,469 |
| Comerciales | | 585,076 |
| Industriales | | 101,425 |
| Alumbrado público | | 60,749 |
| Agrícolas | | 1,962 |
| Otros | | 2,217 |
| **Total** | $ | **1,169,899** |
| **Combustible y energía adquirida** | | |
| Residenciales | | 1,458,820 |
| Comerciales | | 1,543,555 |
| Industriales | | 377,871 |
| Alumbrado público | | 48,729 |
| Agrícolas | | 4,603 |
| Otros | | 7,838 |
| **Total** | $ | **3,441,415** |
| **CELI** | | |
| Residenciales | | 47,879 |
| Comerciales | | 50,660 |
| Industriales | | 12,402 |
| Alumbrado público | | 1,599 |
| Agrícolas | | 124 |
| Otros | | 257 |
| **Total** | $ | **112,950** |
| **Subsidios** | | |
| Residenciales | | 101,790 |
| Comerciales | | 107,702 |
| Industriales | | 26,366 |
| Alumbrado público | | 3,400 |
| Agrícolas | | 327 |
| Otros | | 547 |
| **Total** | $ | **240,132** |
| **Total ingresos brutos** | $ | **4,964,396** |
| Otros ingresos | | 37,358 |
| **Total ingresos no consolidados** | $ | **5,001,754** |
| Pérdidas por incobrabilidad | | (74,466) |
| CELI y Subsidios | | (353,082) |
| **Total ingresos consolidados** | $ | **4,574,206** |

2

II.    ANEXO 1 PRESUPUESTO - GASTOS (continuación)
AUTORIDAD DE ENERGÍA ELÉCTRICA DE PUERTO RICO

| En miles de $ | | Presupuesto EF23 |
|---|---|---|
| *A. Combustible y energía adquirida* | | |
| Fuel | | 2,889,990 |
| Energía adquirida – Convencional | | 472,207 |
| Energía adquirida – Renovable | | 79,217 |
| **Total gastos de combustible y energía adquirida** | **$** | **3,441,415** |
| | | |
| *B. GenCo - Gastos operativos y de mantenimiento* | | |
| **Gastos laborales** | | |
| Sueldos y salarios | | 45,511 |
| Pensiones y beneficios | | 28,904 |
| Pagos por horas extra | | 11,733 |
| Beneficios por horas extra | | 1,395 |
| **Total gastos operativos de mano de obra de GenCo** | | **87,543** |
| | | |
| **Gastos no laborales / Otros gastos operativos** | | |
| Materiales y suministros | | 19,795 |
| Transportes, dietas y millaje | | 1,527 |
| Seguridad | | 9,043 |
| Servicios públicos y arrendamientos | | 3,623 |
| Servicios jurídicos | | 7,405 |
| Servicios profesionales y técnicos subcontratados | | 2,392 |
| Inspecciones reglamentarias y ambientales | | 7,945 |
| Otros gastos varios | | 7,565 |
| **Total gastos no laborales / Otros gastos operativos de GenCo** | | **59,294** |
| **Impacto del Contrato de servicios compartidos** | | **59,748** |
| | | |
| **Total gastos operativos de GenCo** | | **206,585** |
| **Mantenimiento** | | |
| Generación | | 99,039 |
| **Total gastos de proyectos de mantenimiento de GenCo** | | **99,039** |
| Costos compartidos con fondos federales | | - |
| **Total gastos operativos y de mantenimiento de GenCo** | **$** | **305,624** |

3

**ANEXO 1 PRESUPUESTO - GASTOS (continuación)**

**AUTORIDAD DE ENERGÍA ELÉCTRICA DE**

**PUERTO RICO**

| En miles de $ | Presupuesto EF23 |
|---|---|
| *C. HoldCo - Gastos operativos* | |
| **Gastos laborales** | |
| Sueldos y salarios | 7,513 |
| Pensiones y beneficios | 4,508 |
| Pagos por horas extra | 439 |
| Beneficios por horas extra | 53 |
| **Total gastos operativos de mano de obra de HoldCo** | **12,513** |
| | |
| **Gastos no laborales / Otros gastos operativos** | |
| Materiales y suministros | 288 |
| Transportes, dietas y millaje | 242 |
| Beneficios médicos para jubilados | 9,000 |
| Contratos de servicios informáticos | 850 |
| Servicios públicos y arrendamientos | 36 |
| Gastos de comunicaciones | 81 |
| Servicios profesionales y técnicos subcontratados | 4,144 |
| Otros gastos varios | 1,825 |
| Reestructuración de la AEEPR y Título III | 25,100 |
| Costos de asesoramiento de la JSAF asignadas a la AEEPR | 24,400 |
| **Total Gastos no laborales / Otros gastos operativos de HoldCo** | **65,966** |
| **Total gastos operativos de HoldCo** | **$   78,479** |
| *D. GridCo – Gastos operativos y de mantenimiento* | |
| **Gastos operativos y de mano de obra de GridCo** | **246,471** |
| **Gastos no laborales / Otros gastos operativos de GridCo** | **289,926** |
| **Tasas de servicio de operadora** | **121,785** |
| **Reserva del 2%** | **10,728** |
| **Gastos de proyectos de mantenimiento** | **79,778** |
| **Total gastos operativos y de mantenimiento de GridCo** | **$   748,688** |
| | |
| **Total gastos operativos y de mantenimiento** | **$   4,574,206** |
| Superávit (déficit) antes de obligaciones de pensiones y deudas preexistentes | 0 |

## ANEXO 1 (continuación)

**III.   EJECUCIÓN DEL PRESUPUESTO DE 2023 DE LA
AUTORIDAD DE ENERGÍA ELÉCTRICA DE
PUERTO RICO**

**Sección 2.-** Todos los gastos autorizados en cualquier ejercicio fiscal anterior quedan finiquitados, y no podrán desembolsarse fondos públicos para cubrir dichas autorizaciones de gastos, con la excepción de: (1) gastos de ejecución de valorizaciones de capital desembolsados y contabilizados; (2) gastos de capital y de mantenimiento con ciclos de contratación que se extienden más allá del ejercicio fiscal en el cual se han contabilizado; (3) el tramo de cualesquiera otros gastos autorizados a la Autoridad de Energía Eléctrica de Puerto Rico ("AEEPR") en el Presupuesto certificado del ejercicio 2022; y (4) el tramo de las asignaciones autorizadas en el ejercicio 2022 que se haya destinado, transferido o destinado como más tardar el 30 de junio de dicho ejercicio. Esta restricción a los gastos autorizados en cualquier ejercicio no será de aplicación a: (i) programas financiados total o parcialmente con fondos federales; (ii) órdenes del Tribunal de Distrito de Estados Unidos competente para asuntos vinculados al Título III de la Ley PROMESA; y (iii) asuntos vinculados con cualquier decreto por consentimiento de las partes, medida cautelar, u orden o acto de conciliación administrativa convenido con alguna agencia federal con respecto a programas federales. Además, las excepciones citadas a las restricciones sobre gastos autorizados en cualquier ejercicio fiscal anterior están condicionadas a la previa autorización por escrito de la Junta de Supervisión.

**Sección 3.-** Como más tardar el 31 de agosto de 2022, el Director Ejecutivo de la AEEPR presentará a la Junta de Supervisión un certificado indicado si existen cuantías no ejecutadas del Presupuesto certificado del ejercicio 2022 correspondientes a las partidas (1), (2), (3) y (4) de la Sección 2 y, en caso afirmativo, una pormenorización de dichas cantidades.

**Sección 4.-** No obstante cualquier otra manifestación, la AEEPR no podrá utilizar ninguna asignación presupuestaria no ejecutada de ningún ejercicio fiscal anterior para financiar gastos del ejercicio fiscal actual, salvo que ello haya sido autorizado expresamente y por escrito por la Junta de Supervisión después del 30 de junio de 2022.

**Sección 5.-** Durante el ejercicio fiscal 2023, el Director Ejecutivo de la AEEPR será responsable de no gastar ni comprometer ninguna cuantía que exceda de los gastos autorizados a GenCo y HoldCo correspondientes al ejercicio fiscal 2022, salvo los importes superiores a los presupuestados en concepto de combustible y energía adquirida, que pueden fluctuar por las condiciones de mercado o incrementarse debido a gastos imprevistos necesarios para mantener la fiabilidad y seguridad del sistema eléctrico.

**Sección 6.-** Salvo por los gastos adicionales vinculados con combustible y energía adquirida, los gastos aprobados en este presupuesto —incluyendo sueldos y afines— solamente podrán ser reprogramados mediante la aprobación previa, expresa y por escrito de la Junta de Supervisión. A los efectos de disipar cualquier duda, esta prohibición incluye la reprogramación de cualquier cuantía, partida o gasto previstos en el presente presupuesto. En el caso de reprogramación del presupuesto de combustible y energía adquirida, el Director Ejecutivo de la AEEPR deberá notificar por escrito a la Junta de Supervisión cualquier variación de dichas cuantías en un plazo de 5 días a contar desde el momento en que surta efecto.

**Sección 7.-** De conformidad con la Sección 203 de la Ley PROMESA, la AEEPR deberá presentar a la Junta de Supervisión —como más tardar 15 días después del último día de cada trimestre del ejercicio fiscal 2023— un informe de la ejecución del presupuesto hasta la fecha, incluyendo explicaciones de cualesquiera variaciones relevantes, tal y como se estipula en el Plan fiscal certificado. La Junta de Supervisión podrá determinar proporcionar a la AEEPR una plantilla para la preparación de tales informes,

en cuyo caso todos los informes de ejecución del presupuesto hasta la fecha elaborados por la AEEPR se presentarán de conformidad con la citada plantilla.

**Sección 8.-** La Junta de Supervisión se reserva el derecho —a su absoluta discreción y de conformidad con la Sección 202(a) de la Ley PROMESA— de cursar un aviso al Gobernado para establecer un calendario de revisión del presupuesto de la AEEPR.

**Sección 9.-** El presupuesto de la AEEPR correspondiente al ejercicio fiscal 2023 entrará en vigor el 1 de julio de 2022.

# **ANEXO G**

RESUMEN DE LA REFORMA DE PENSIONES

**TÉRMINOS DE MODIFICACIÓN DE LAS OBLIGACIONES DEL SRE DE LA AEEPR**

A efectos de crear futuras responsabilidades en materia de pensiones y de estabilizar el sistema para los futuros retirados y contribuyentes, el devengo de prestaciones del plan del SRE de la AEEPR se congelará en la Fecha de entrada en vigor del Plan de ajuste (la "Fecha de entrada en vigor del PdA").

A continuación presentamos un resumen de las condiciones tentativas para el congelamiento de ulteriores beneficios definidos del SRE de la AEEPR.

Las modificaciones aquí enumeradas modifican las obligaciones de la AEEPR y de cualquier otro empleador gubernamental cuyos empleados continúen participando en el plan de beneficios definidos del SRE de la AEEPR para financiar los beneficios proporcionados por el SRE de la AEEPR, tal como se estableció en la normativa de la Junta de Gobierno de la Autoridad de Energía Eléctrica de Puerto Rico el 1 de julio de 1945 y en sucesivas enmiendas, hasta la Fecha de entrada en vigor del PdA, y que habrán de regir para la administración de los beneficios del SRE de la AEEPR por parte del SRE.  Los procedimientos administrativos no abordados a continuación (como los de redondeo para determinar las edades y aportaciones de los participantes) serán congruentes en prácticas pasadas.

Los empleados de la AEEPR participan de conformidad con una fórmula de BD que es complementaria de, o está coordinada con, la Seguridad Social. Esto es de aplicación a todos los participantes activos del SRE de la AEEPR ("Miembro" o "Miembros"), independientemente de su cargo, clasificación laboral o empleador.  Los Miembros mantendrán los beneficios adquiridos hasta la Fecha de entrada en vigor del PdA, aunque en el bien entendido de que, de conformidad con el PdA se eliminarán los futuros ajustes del costo de la vida, ya que el derecho a los futuros ajustes no es un beneficio adquirido y no lo será a partir de la Fecha de entrada en vigor del PdA.  Los beneficios adquiridos a partir de la Fecha de entrada en vigor del PdA estarán basados en las aportaciones e ingresos en las nuevas cuentas de retiro de DC segregadas, financiadas por las aportaciones de los empleados.  En consecuencia, los empleados tendrán la certidumbre de que sus aportaciones e inversiones estarán protegidas de cara al futuro, garantizando la seguridad de sus jubilaciones.

| Definiciones | |
|---|---|
| **Participantes cubiertos** | Los términos y condiciones de esta propuesta tienen por objeto congelar las acumulaciones de BD de todos los participantes activos del SRE de la AEEPR (incluyendo los Empleados movilizados, tal como se describe a continuación). |
| **Edad de elegibilidad para el retiro** | La Edad de elegibilidad para el retiro es aquella en la que un miembro puede comenzar a recibir una pensión mensual. |
| **Beneficio de retiro** | El Beneficio de retiro es la cuantía del beneficio pagadera a un miembro cada mes. |
| **Servicio acreditable** | Total de los servicios previos de un miembro que se acreditan para una pensión. |
| **Empleados movilizados** | Antiguos empleados de la AEEPR que fueron transferidos, o actuales empleados de la AEEPR que serán transferidos a instrumentalidades del Estado Libre Asociado en relación con una transacción con una Asociación público-privada ("P3").  Los Empleados movilizados recibirán Servicio acreditable solamente por los períodos de empleo en el Estado Libre Asociado, en la medida en que dichos servicios se presten de conformidad con la legislación vigente. |

| Compensación promedio | El promedio de los tres salarios básicos anuales más altos, limitado a $50,000 en el caso de los miembros contratados después del 1/1/1993. |
|---|---|

| **Plazo** | |
|---|---|
| Fecha de congelamiento | El congelamiento de la acumulación del beneficio de pensión del SRE de la AEEPR surtirá efecto en la Fecha de entrada en vigor del PdA |

| **Disposiciones de la propuesta** | |
|---|---|
| Tratamiento de las aportaciones acumuladas del empleado | Los participantes mantienen un derecho adquirido de recibir las aportaciones acumuladas del empleado de conformidad con el documento del plan del SRE de la AEEPR, en lugar de los beneficios de retiro, fallecimiento, discapacidad o cese, aplicables de conformidad con el SRE de la AEEPR. |
| Elegibilidad para el retiro antes de la Fecha de congelamiento | Antes de la Fecha de congelamiento, los participantes mantendrán las siguientes elegibilidades de retiro de conformidad con el SRE de la AEEPR:<br>• Participantes contratados antes del 1 de enero de 1993: 60 años de edad o 20 años de servicio<br>• Participantes contratados a partir del 1 de enero de 1993: 60 años de edad con 5 años de servicio; 65 años de edad con 20 años de servicio; o 50 años con 30 años de servicio |
| Elegibilidad para retiro después de la Fecha de congelamiento | A partir de la Fecha de congelamiento, los participantes serán elegibles para retiro, dentro del plan del SRE de la AEEPR, al alcanzar las siguientes combinaciones de edad/servicio:<br>• Participantes contratados antes del 1 de enero de 1993:<br> ○ Los participantes que hayan alcanzado los 60 años de edad o hayan prestado 20 años de servicios acreditados a la Fecha de congelamiento serán elegibles para retirarse en cualquier momento.<br> ○ Los participantes que no hayan alcanzado la edad de 60 años ni hayan cumplido 20 años de servicios acreditados a la Fecha de congelamiento serán elegibles para retirarse en función de la edad que tengan a la Fecha de congelamiento de conformidad con la siguiente tabla:<br><br>{{TABLE1}}<br><br>• Participantes contratados a partir del 1 de enero de 1993:<br> ○ Los participantes que hayan alcanzado los 60 años de edad con 5 años de servicios acreditables; los 65 años de edad o los 20 años de servicios acreditables a la Fecha de congelamiento serán elegibles para retirarse en cualquier momento<br> ○ Todos los demás participantes serán elegibles para retirarse una vez que a) hayan alcanzado los 65 años de edad; o bien b) en la fecha en que el participante hubiese alcanzado i) tanto los 5 años de servicio suponiendo que el congelamiento no se hubiese producido, y ii) la edad, en función de la siguiente tabla:<br><br>{{TABLE2}} |

TABLE1:

| Edad alcanzada a la Fecha de congelamiento | Edad de elegibilidad para retiro después de la Fecha de congelamiento |
|---|---|
| A partir de 57 | 61 |
| 56 | 62 |
| Menor de 55 años | 63 |

TABLE2:

| Edad alcanzada a la Fecha de congelamiento | Edad de elegibilidad para retiro después de la Fecha de congelamiento |
|---|---|
| A partir de 57 | 61 |
| 56 | 62 |
| Menor de 55 años | 63 |

| | |
|---|---|
| **Eliminación del beneficio mínimo** | El beneficio mínimo mensual de $180 será eliminado en el caso de los participantes que se retiren a partir de la Fecha de congelamiento. |
| **Eliminación del uso de licencias por enfermedad para adquirir acreditación para una pensión meritoria** | En el caso de las separaciones de servicio o retiros que se produzcan a partir de la Fecha de congelamiento, el Servicio acreditables se determinará a la Fecha de congelamiento y no se incrementará en el futuro. Antes de la Fecha de congelamiento, las licencias por enfermedad podían convertirse, al retirarse del servicio, en una anualidad meritoria calculada como 1 mes por cada 15 días acumulados de licencia por enfermedad. A partir de la Fecha de congelamiento, el tiempo acumulado por enfermedad no se acreditará para el beneficio de pensiones, ni será posible implementarlo para adquirir días de servicio. Se respetarán las solicitudes de retiro presentadas antes de la Fecha de confirmación del Plan solicitando la aplicación de los días de licencia por enfermedad para adquirir días de servicio. |
| **Pagos de bonificaciones** | Las bonificaciones de verano y de vacaciones serán eliminadas de los retiros después de la Fecha de congelamiento. Solamente se mantendrán las bonificaciones únicas por funeral.<br><br>Los pagos de las bonificaciones no se verán afectados en los retiros que se produzcan antes de la Fecha de congelamiento. |
| **Aportaciones de empleados** | Las aportaciones de los empleados al Plan del SRE de la AEEPR cesarán en la Fecha de congelamiento. |
| **Implementación de Cuentas de aportaciones definidas** | Los Empleados movilizados participarán en las cuentas de Aportaciones definidas (DC), de conformidad con la Ley 106-2017 (Ley 106). Para los actuales empleados de la AEEPR se establecerán nuevas cuentas de DC, encuadradas en el Plan de DC, con las mismas cláusulas estipuladas por la Ley 106. |
| **Eliminación de los ajustes por costo de la vida (COLA)** | Históricamente, los ajustes por costo de la vida (COLA, por sus siglas en inglés) que se otorgaban cada tres años no continuarán después de la Fecha de congelamiento. Quedarán eliminados los futuros COLA. Los COLA previamente otorgados serán respetados.<br><br>Los beneficios que previamente se incrementaban mediante los COLA históricos no se verán reducidos, y se respetarán los COLA anteriores a la Fecha de congelamiento. |
| **Beneficios por fallecimiento** | Los ceses como consecuencia de fallecimiento recibirán un reintegro de las aportaciones acumuladas del empleado. |
| **Beneficios por fallecimiento posteriores al retiro** | En concepto de los retiros que se produzcan a partir de la Fecha de congelamiento, el beneficio se pagará en forma de anualidad vitalicia. Si al retirarse el participante opta por recibir una anualidad con un beneficio de supervivencia del 30% a su fallecimiento, la cuantía pagada durante la vida del empleado será el equivalente actuarial de la anualidad vitalicia. La equivalencia actuarial del plan (es decir, tasa de mortalidad y tipo de interés) se determinará de conformidad con otras formas opcionales de pago en el marco del plan. |
| **Beneficios por discapacidad** | A partir de la Fecha de congelamiento, los participantes que queden discapacitados tendrán derecho a:<br>  a. Percibir un beneficio de retiro si se cumplen los demás criterios de elegibilidad para el retiro,<br>  b. Percibir una pensión diferida si se han acumulado más de 10 años de servicio (a pagar de igual modo que los beneficios a los que tenga derecho un participante cesado), o bien<br>  c. Recibir un reintegro de las aportaciones acumuladas por el empleado |

| | |
|---|---|
| **Implicaciones específicas del beneficio de retiro** | Los beneficios de retiro se mantendrán sin cambio con respecto a los actualmente prestados por el SRE de la AEEPR hasta la Fecha de congelamiento. Las disposiciones en el caso de los retiros que se produzcan después de la Fecha de congelamiento son las siguientes:<br><br>a. Los beneficios mínimos ya no serán de aplicación a futuros retirados<br><br>b. El congelamiento elimina la posibilidad de adquirir períodos de servicio adicionales aplicando los períodos de licencia por enfermedad o por vacaciones no aprovechados, o cualquier otro medio. Se respetarán las solicitudes de retiro presentadas antes de la Fecha de entrada en vigor del PdA solicitando la aplicación de los días de licencia por enfermedad o de vacaciones para adquirir días de servicio.<br><br>c. Los participantes contratados antes del 1 de enero de 1993 que hayan cumplido 25 años de Servicio acreditable a la Fecha de congelamiento percibirán una anualidad vitalicia equivalente al 2.5% de la Compensación promedio determinada a la Fecha de congelamiento, multiplicada por el número de años de servicio a la Fecha de congelamiento (hasta un máximo de 30 años). Si los beneficios se coordinan con la Seguridad Social, se ajustarán desde los 65 a los 80 años de edad, reduciéndose en $40 por cada año de Servicio acreditable a la Fecha de congelamiento (hasta un máximo de 30 años).<br><br>d. Los participantes contratados antes del 1 de enero de 1993 que no hayan alcanzado 25 años de Servicio acreditable a la Fecha de congelamiento percibirán un beneficio del 1.5% de la Compensación promedio determinada a la Fecha de congelamiento por año de Servicio acreditable hasta dicha fecha, más un 0.5% adicional de la Compensación promedio determinada a la Fecha de congelamiento por año de Servicio acreditable a la Fecha de congelamiento por encima de los 20 años. Si la fecha de comienzo del beneficio del participante se produce antes de los 60 años de edad, el beneficio será el equivalente actuarial del beneficio de los 60 años.<br><br>e. Los participantes contratados a partir del 1 de enero de 1993 que hayan alcanzado los 30 años de servicio a la Fecha de congelamiento percibirán un beneficio equivalente al 75% de la Compensación promedio determinada a dicha fecha. El factor del 75% se verá adicionalmente reducido en el caso de los retiros anteriores a los 55 años de edad tal y como detalla a continuación:<br><br>| Edad de retiro | Multiplicador del beneficio |<br>|---|---|<br>| 50 | 62.5% |<br>| 51 | 65.0% |<br>| 52 | 67.5% |<br>| 53 | 70.0% |<br>| 54 | 72.5% |<br><br>f. Los participantes contratados a partir del 1 de enero de 1993 que no hayan alcanzado 30 años de Servicio acreditable a la Fecha de congelamiento percibirán un beneficio del 1.5% de la Compensación promedio determinada a la Fecha de congelamiento por año de Servicio acreditable hasta dicha fecha, más un 0.5% adicional de la Compensación promedio determinada a la Fecha de congelamiento por año de Servicio acreditable a la Fecha de congelamiento por encima de los 20 años. Si la fecha de comienzo del beneficio del participante se produce antes de los 60 años de edad, el beneficio será el equivalente actuarial del beneficio de los 60 años. |

| Estructura de financiamiento | Las pensiones seguirán siendo pagadas con cargo al fideicomiso de pensión actual (es decir, SRE de la AEEPR). La estructura de financiamiento del SRE de la AEEPR pasará a ser un modelo financiado a un sistema de reparto (PayGo). El SRE de la AEEPR se le reembolsará en concepto de los pagos del sistema de reparto con los ingresos recaudados por un nuevo fideicomiso que se constituirá de conformidad con el Plan de ajuste de la AEEPR (el "Fideicomiso de PayGo de la AEEPR"), tal como se explica en el Apéndice I de la presente Ficha de condiciones. Los activos del Fideicomiso PayGo de la AEEPR serán mantenidos en custodia para el beneficio exclusivo de los actuales y futuros retirados del sistema del SRE de la AEEPR. |
|---|---|
| | El Plan de ajuste dispondrá la emisión al Fideicomiso PayGo de bonos garantizados por los ingresos, cuya estructura, volumen y precio —como el capital anual y el pago de los intereses— serán suficientes para reembolsar al SRE de la AEEPR las pensiones y los costos administrativos pagados durante el ejercicio fiscal precedente, fondos suficiente para cubrir los gastos operativos tanto del SRE de la AEEPR como del Fideicomiso PayGo de la AEEPR, más una cuantía anual adicional que se mantendrá como reserva y que se acumulará durante un período de al menos 2 años de pagos previstos. Estos bonos estarán subordinados a los bonos de ingresos de la deuda reestructurada, y tendrán convenido un tipo tanto de intereses como de pagos de capital. |
| | Los activos del Fideicomiso PayGo de la AEEPR, incluyendo la rentabilidad de las inversiones, se aplicarán al reembolsar al SRE de la AEEPR los pagos anuales de PayGo y los gastos administrativos pertinentes. Las retiradas de fondos del Fideicomiso PayGo de la AEEPR requerirán la aprobación de la Junta de Fideicomisarios del Fideicomiso PayGo de la AEEPR, y el SRE de la AEEPR solamente podrá aplicarlos a financiar el pago de los repartos, de conformidad con el Plan de DB modificado en virtud de esta Ficha de condiciones. |

## Beneficios negociados además de los beneficios del SRE de la AEEPR

| Descripción de los beneficios negociados | Los beneficios se pagarán a los participantes si su cese del servicio activo en la AEEPR es consecuencia de alguno de los siguientes motivos:<br>• Discapacidad física o mental<br>• Jubilación o cese cumpliendo los requisitos de edad o de servicio del SRE de la AEEPR<br>• Fallecimiento de un miembro activo<br><br>Los beneficios serán pagadero solamente en una única instancia, y un participante que vuelva al trabajo no tendrá derecho a percibir ningún beneficio adicional por los mismos supuestos |
|---|---|
| Importe de los beneficios negociados | • Retiro, discapacidad o fallecimiento ordinario: $7,000<br>• Fallecimiento vinculado con las obligaciones de su empleo: $20,000<br>• Fallecimiento vinculado con las obligaciones de empleo de un técnico de líneas eléctricas o en cargos identificados específicamente como elegibles para una compensación anual de riesgo especial: $50,000<br>• Discapacidad física resultante de obligaciones laborales: $8,000 |
| Repercusiones del congelamiento en los importes de los beneficios negociados | Los beneficios pagaderos en una sola vez descritos en esta fórmula no se verán afectados por el congelamiento de las pensiones |

## APÉNDICE I
### PROPUESTA DE TÉRMINOS DE CREACIÓN DEL FIDEICOMISO PAYGO DE LA AEEPR

Para crear un tope retroactivo de financiamiento de futuras obligaciones de pensiones durante períodos de demanda restringida, como más tardar en la Fecha de entrada en vigor del PdA se constituirá el Fideicomiso PayGo de la AEEPR.

A continuación presentamos un resumen de los términos y condiciones tentativos propuestos para la constitución y administración de un Fideicomiso PayGo de la AEEPR para el SRE de la AEEPR.

De conformidad con el PdA de la AEEPR, el financiamiento del pago de los beneficios del SRE de la AEEPR se convertirá en un sistema de reparto, lo cual incluirá la creación del nuevo Fideicomiso PayGo de la AEEPR para pagar los beneficios de las pensiones, ajustados como aquí se especifica. El Fideicomiso PayGo de la AEEPR será regido por una Junta de Fideicomisarios (la "Junta del Fideicomiso PayGo"). En consecuencia, los empleados tendrán la certidumbre de que sus aportaciones e inversiones estarán protegidas de cara al futuro, garantizando la seguridad de sus jubilaciones.

| Definiciones | |
|---|---|
| **Fideicomiso PayGo de la AEEPR** | El Fideicomiso PayGo de la AEEPR será un fideicomiso con sede en Puerto Rico, existente exclusivamente para el fin público de prestar beneficios a los pensionistas de la AEEPR, que no tributará en Puerto Rico. La JSAF hará todo lo posible para que el Fideicomiso PayGo de la AEEPR pueda acogerse a la exclusión tributaria de la Sección 115 del Código Tributario del IRS a efectos de inversiones. |
| **Escritura de fideicomiso del Fideicomiso PayGo de la AEEPR** | La Escritura de fideicomiso del Fideicomiso PayGo de la AEEPR ("Escritura de fideicomiso") constituirá al Fideicomiso PayGo de la AEEPR como entidad jurídica independiente e irrevocable, en el sentido del Capítulo III de la Ley de Fideicomisos (32 L.P.R.A §33534 y ss.). Incorporará las disposiciones expuestas en esta Ficha de términos y un Apéndice (pendiente de ultimar tras alcanzar un acuerdo), que por referencia queda aquí incorporado, y que definirá los mecanismos de gestión y operativos del Fideicomiso PayGo de la AEEPR. |
| **Junta de Fideicomisarios del Fideicomiso PayGo de la AEEPR** | La Junta del Fideicomiso PayGo de la AEEPR será creada mediante una Escritura de fideicomiso, en calidad de organismo rector del Fideicomiso. La composición y responsabilidades de la Junta del Fideicomiso PayGo serán congruentes con las disposiciones de la propuesta y definidas en el Apéndice. |
| **Periodo de transición** | El período entre la confirmación del PdA de la AEEPR y la fecha en que la Junta esté plenamente operativa se denominará Período de transición. Para que se la considere plenamente operativa, la Junta del Fideicomiso PayGo deberá tener designados a todos sus integrantes, habrá puesto en marcha sus funciones administrativas, tendrá nombrados sus responsables y conformados sus subcomités. Las funciones y responsabilidades de la AEEPR, del SRE de la AEEPR, del Estado Libre Asociado y de la JSAF en los aspectos operativos del Fideicomiso PayGo de la AEEPR durante el Período de transición se establecerán en la Escritura de fideicomiso. |

**ANEXO H**

RESUMEN DE LOS BONOS EN CIRCULACIÓN DE LA AEEPR

## RESUMEN DE LOS BONOS CIRCULANTES DE LA AEEPR[1]

| Serie | Fecha de emisión | Importe emitido | Rango de tipos de interés de los bonos circulantes | Fecha de vencimiento final | Capital reclamado a la fecha de la petición | Capital e intereses reclamados a la fecha de la petición |
|---|---|---|---|---|---|---|
| SERIE JJ | 1/3/02 | 720,370,000 | 5.375% - 5.375% | 7/1/18 | 42,315,000 | 43,452,216 |
| SERIE LL | 7/2/02 | 499,910,000 | 5.500% - 5.500% | 7/1/19 | 77,905,000 | 80,047,388 |
| SERIE MM | 10/3/02 | 105,055,000 | 5.000% - 5.000% | 7/1/23 | 56,200,000 | 57,605,000 |
| SERIE NN | 8/19/03 | 517,305,000 | 4.750% - 5.500% | 7/1/33 | 171,525,000 | 175,942,925 |
| SERIE PP | 8/26/04 | 224,700,000 | 3.750% - 5.000% | 7/1/25 | 84,765,000 | 86,875,446 |
| SERIE QQ | 4/4/05 | 224,700,000 | 5.500% - 5.500% | 7/1/18 | 35,340,000 | 36,311,850 |
| SERIE RR | 4/4/05 | 993,450,000 | 5.000% - 5.000% | 7/1/28 | 236,265,000 | 242,171,625 |
| SERIE SS | 4/4/05 | 993,450,000 | 3.875% - 5.000% | 7/1/30 | 332,205,000 | 340,436,128 |
| SERIE TT | 5/3/07 | 1,943,565,000 | 4.200% - 5.250% | 7/1/37 | 622,085,000 | 637,570,581 |
| SERIE UU | 5/3/07 | 1,943,565,000 | 1.189% - 5.000% | 7/1/31 | 777,280,000 | 789,310,979 |
| SERIE VV | 5/30/07 | 557,410,000 | 5.250% - 5.500% | 7/1/35 | 546,645,000 | 561,018,444 |
| SERIE WW | 6/26/08 | 697,345,000 | 5.000% - 5.500% | 7/1/38 | 610,140,000 | 626,460,619 |
| SERIE XX | 4/7/10 | 822,210,000 | 4.625% - 5.750% | 7/1/40 | 822,210,000 | 843,980,338 |
| SERIE YY | 4/29/10 | 320,175,000 | 6.125% - 6.125% | 7/1/40 | 320,175,000 | 325,077,680 |
| SERIE AAA | 5/5/10 | 363,075,000 | 5.250% - 5.250% | 7/1/31 | 363,075,000 | 372,605,719 |
| SERIE ZZ | 5/5/10 | 631,160,000 | 3.700% - 5.250% | 7/1/28 | 514,900,000 | 528,076,798 |
| SERIE BBB | 5/26/10 | 76,800,000 | 5.400% - 5.400% | 7/1/28 | 76,800,000 | 77,836,800 |
| SERIE CCC | 5/26/10 | 316,920,000 | 4.250% - 5.250% | 7/1/28 | 316,920,000 | 325,033,941 |
| SERIE DDD | 10/14/10 | 218,225,000 | 3.300% - 5.000% | 7/1/24 | 218,225,000 | 223,144,738 |
| SERIE EEE | 12/29/10 | 355,730,000 | 5.950% - 6.250% | 7/1/40 | 355,730,000 | 361,133,935 |
| SERIE 2012A | 5/1/12 | 650,000,000 | 4.800% - 5.050% | 7/1/42 | 630,110,000 | 645,848,240 |
| SERIE 2013A | 8/21/13 | 673,145,000 | 6.750% - 7.250% | 7/1/43 | 673,145,000 | 696,364,450 |
| SERIE 2016A | 5/19/16 | 55,639,539 | 10.000% - 10.000% | 7/1/19 | 55,639,539 | 58,421,516 |
| SERIE 2016B | 6/22/16 | 55,210,625 | 10.000% - 10.000% | 7/1/19 | 55,210,625 | 57,971,156 |
| SERIE 2016C | 6/30/16 | 104,600,000 | 5.400% - 5.400% | 7/1/20 | 104,600,000 | 110,264,090 |
| SERIE 2016D | 6/30/16 | 64,375,560 | 7.500% - 7.500% | 7/1/20 | 64,375,560 | 69,217,139 |
| SERIE 2016E | 6/30/16 | 94,828,424 | 10.000% - 10.000% | 7/1/22 | 94,828,424 | 104,337,608 |
| Total | | 14,222,919,148 | | | 8,258,614,148 | 8,476,517,345 |

---

[1]    La información incluida en este documento se presenta solamente a título de resumen.  En la medida en que existiesen
discrepancias entre este documento y las declaraciones oficinas de los respectivos bonos, la Reclamación principal de bonos
(Reclamación núm. [___]), la Declaración de divulgación o el Plan, se estará en todos los aspectos a lo incluido en dichos
documentos.

# ANEXO I

LISTA DE CUENTAS BANCARIAS, SALDOS Y CATEGORIZACIÓN DE RESTRICCIONES PRELIMINARES AL 30 DE SEPTIEMBRE DE 2022 Y AL 1 DE NOVIEMBRE DE 2022

**AEEPR:**

| Número de cuenta | Institución financiera | Saldo al 09/30/2022 ($) | Saldo al 11/01/2022 ($)[1] | Categorización |
|---|---|---|---|---|
| 132/BSA-45-4468 | First Bank | $217,984,445.66 | $200,786,595.80 | **Restringidas: Fondos federales** – fondos aportados por las agencias federales de EE.UU., incluyendo la FEMA y el Departamento de Vivienda y Desarrollo Urbano, para la reparación, sustitución, restauración, mejora, resiliencia, construcción o mitigación de riesgos del sistema de transmisión y distribución ("TyD") |
| 132/BSA-50-2350 | First Bank | $177,186,999.15 | $185,011,204.86 | **Restringidas: Contratos con terceros** – fondos apartados para gastos de TyD relacionados con costos y gastos incurridos para la prestación de servicios de operación mantenimiento, de conformidad con Contrato de operación y mantenimiento del Sistema de Transmisión y distribución de Puerto Rico, del 22 de junio de 2020, entre la AEEPR, la Autoridad de Alianzas Público-Privadas de Puerto Rico, Luma Energy, LLC, y Luma Energy Servco, LLC (el "Contrato de LUMA") |

[1] Los saldos actualizados al 1 de noviembre de 2022 fueron obtenidos de la AEEPR, aunque no han sido verificados de manera independiente con las instituciones financieras relevantes. También se identificaron cuatro cuentas bancarias, cada una con un saldo de $0, aunque no se incluyen en este documento por haber sido cerradas (como lo han confirmado las instituciones financieras relevantes).

| Número de cuenta | Institución financiera | Saldo al 09/30/2022 ($) | Saldo al 11/01/2022 ($)[1] | Categorización |
|---|---|---|---|---|
| 132/BCP-55-2348 | Banco Popular | $149,612,983.74 | $149,879,821.57 | **Restringidas: Fondos federales** – fondos aportados por la FEMA en concepto de adelantos de capital circulante |
| 132/BCP-56-1678 | Banco Popular | $112,527,994.33 | $184,340,588.50 | **Restringidas: Fondos federales** – fondos aportados por la FEMA para reembolsar los costos de las reparaciones de los daños de los huracanes y los terremotos |
| 132/OR1-03-2677 | Oriental Bank | $92,196,591.97 | $69,924,994.79 | Sin restricciones |
| 132/BCP-17-4253 | Banco Popular | $71,409,622.92 | $26,144,003.06 | Sin restricciones |
| 132/BSA-48-2383 | First Bank | $61,599,739.66 | $61,828,695.53 | **Restringidas: Contratos con terceros** – fondos apartados para gastos de generación de energía vinculados con costos y gastos incurridos para suministrar energía y electricidad de conformidad con el Contrato de LUMA |
| 132/BSA-46-2405 | First Bank | $48,907,285.15 | $52,193,282.79 | **Restringidas: Contratos con terceros** – fondos apartados para la reserva de contingencia según el Contrato de LUMA |
| 132/BSA-49-2361 | First Bank | $46,585,174.70 | $29,644,578.79 | **Restringidas: Contratos con terceros** – fondos apartados para las mejoras de capital según el Contrato de LUMA |
| 132/FIR-58-2515 | First Bank | $41,016,997.41 | $41,072,522.06 | **Restringidas: Contratos con terceros** – fondos apartados a costos y gastos incurridos para generar energía según el Contrato de LUMA |

| Número de cuenta | Institución financiera | Saldo al 09/30/2022 ($) | Saldo al 11/01/2022 ($)[1] | Categorización |
|---|---|---|---|---|
| 132/CIT-03-5287 | Citibank | $36,795,793.35 | $12,014,660.34 | **Restringidas: Orden judicial**– fondos de indemnizaciones de seguros apartados por orden judicial (Título III de la AEEPR, Doc. 514) para la reparación, sustitución o reconstrucción de bienes dañados o destruidos |
| 132/BSA-47-2394 | First Bank | $33,659,588.44 | $76,564,357.52 | **Restringidas: Contratos con terceros** – fondos apartados para costos y gastos incurridos para el suministro de combustible según el Contrato de LUMA |
| 132/BSA-51-2372 | First Bank | $30,031,610.07 | $30,072,963.19 | **Restringidas: Contratos con terceros** – fondos apartados para reserva en caso de apagones según el Contrato de LUMA |
| 132/BCP-47-2622 | Banco Popular | $22,780,656.14 | $22,780,656.14 | **Restringidas: Fondos federales** – fondos aportados por la FEMA para los gastos aprobados por el programa de subvenciones para mitigación de riesgos de la FEMA |
| 132/CIT-02-5015 | Citibank | $19,445,069.41 | $6,144,662.88 | Sin restricciones |
| 132/FIR-39-5280 | First Bank | $16,918,452.46 | $16,940,006.10 | **Propensas a restricciones: Contratos con terceros** – sujetas a los pleitos de bonistas de la AEEPR[2] |

[2] Esta cuenta está relacionada con fondos sujetos a un pleito sobre el alcance de la garantía prendaria del fideicomisario de bonos de la AEEPR (Proc. abr. núm. 19-00391-LTS).

| Número de cuenta | Institución financiera | Saldo al 09/30/2022 ($) | Saldo al 11/01/2022 ($)[1] | Categorización |
|---|---|---|---|---|
| 132/USB-01-8002 | US Bank | $16,878,288.09 | $16,878,429.13 | **Restringidas: Contratos con bonistas** – fondos mantenidos por el fideicomisario de bonos de la AEEPR de conformidad con el Contrato de Fideicomiso de 1974, con sus enmiendas, entre la AEEPR y el fideicomisario de bonos |
| 132/FIR-01-0527 | First Bank | $9,576,117.19 | $1,573,993.67 | Sin restricciones |
| 132/BCP-11-3540 | Banco Popular | $7,196,157.80 | $10,347,137.13 | **Restringidas: Fondos federales** – fondos aportados por la FEMA en concepto de costos relacionados con el huracán María |
| 132/BCP-19-5914 | Banco Popular | $3,826,644.93 | $6,702,886.81 | **Restringidas: Fondos federales** – fondos aportados por la FEMA en concepto de costos relacionados con los terremotos |
| 132/FIR-40-5281 | First Bank | $3,343,323.16 | $3,347,582.46 | Sin restricciones |
| 132/BCP-09-2689 | Banco Popular | $2,490,266.00 | $2,490,266.00 | Sin restricciones |
| 132/BCP-02-3165 | Banco Popular | $2,161,060.93 | $2,164,915.30 | Sin restricciones |
| x6855 | Banco Popular | $1,985,034.44 | $1,988,574.86 | No revisada[3] |
| x2592 | Banco Popular | $1,875,438.02 | $1,875,438.02 | No revisada |
| x4708 | Banco Popular | $1,578,886.00 | N/A[4] | No revisada |
| x5023 | Citibank | $1,548,651.02 | $1,551,558.13 | No revisada |

Página 5 de 7

---

[3] En general, las cuentas con un saldo inferior a los $2 millones no son sometidas a revisiones de evaluación de restricciones.  Al 30 de septiembre de 2022, las cuentas cuya situación de restricción fue revisada representaban aproximadamente $1,224 millones, de un total de $1,236 millones; es decir, el 99.1% de los fondos mantenidos en cuentas de la AEEPR.  Las cuentas que no han sido revisadas en función del umbral de sus cuantías se presentan en casillas grises.
[4] En el momento de preparar este documento no disponíamos de un saldo actualizado de esta cuenta al 1 de noviembre de 2022.

| Número de cuenta | Institución financiera | Saldo al 09/30/2022 ($) | Saldo al 11/01/2022 ($)[1] | Categorización |
|---|---|---|---|---|
| x5282 | First Bank | $1,162,635.32 | $1,164,116.49 | No revisada |
| x8000 | US Bank | $966,889.87 | $969,856.41 | No revisada |
| x5201 | Citibank | $835,476.44 | $546,850.94 | No revisada |
| x0158 | Banco Popular | $631,531.83 | $900,325.42 | No revisada |
| x9652 | Banco Popular | $257,566.50 | $257,883.84 | No revisada |
| x7862 | Banco Popular | $162,119.41 | $162,119.41 | No revisada |
| x9317 | Banco Popular | $143,417.73 | $110,968.95 | No revisada |
| x8020 | US Bank | $126,549.06 | $126,550.12 | No revisada |
| x9000 | US Bank | $65,706.64 | $65,707.19 | No revisada |
| x5357 | Banco Popular | $60,591.73 | $297,892.49 | No revisada |
| x8004 | US Bank | $59,817.06 | $59,817.56 | No revisada |
| x8016 | US Bank | $36,895.93 | $36,896.24 | No revisada |
| x2835 | Banco Popular | $34,000.00 | $34,000.00 | No revisada |
| x3524 | Banco Popular | $31,835.82 | $76,235.35 | No revisada |
| x5317 | Citibank | $25,978.73 | $25,978.73 | No revisada |
| x9007 | Banco Popular | $2,043.88 | $624.17 | No revisada |
| x9823 | Banco Popular | $1,420.76 | N/A | No revisada |
| x8013 | US Bank | $944.67 | $944.67 | No revisada |
| x8018 | US Bank | $250.39 | $250.39 | No revisada |
| x9001 | US Bank | $152.61 | $152.61 | No revisada |
| x8017 | US Bank | $46.06 | $46.06 | No revisada |
| x0001 | US Bank | $9.96 | $9.96 | No revisada |
| x1001 | US Bank | $9.32 | $9.32 | No revisada |
| x8015 | US Bank | $5.13 | $5.13 | No revisada |
| x8019 | US Bank | $5.03 | $5.03 | No revisada |
| x4048 | Banco Popular | $0.00 | $0.00 | No revisada |
| x5309 | Citibank | $0.00 | N/A | No revisada |
| x9000 | US Bank | $0.00 | N/A | No revisada |
| x8014 | US Bank | $0.00 | N/A | No revisada |

| Número de cuenta | Institución financiera | Saldo al 09/30/2022 ($) | Saldo al 11/01/2022 ($)[1] | Categorización |
|---|---|---|---|---|
| x2000 | US Bank | $0.00 | N/A | No revisada |
| x0000 | US Bank | $0.00 | N/A | No revisada |
| x5365 | Banco Popular | $0.00 | $0.00 | No revisada |
| x3933 | Banco Popular | $0.00 | $0.00 | No revisada |
| x3941 | Banco Popular | $0.00 | $0.00 | No revisada |
| x0458 | Banco Popular | $0.00 | $0.00 | No revisada |
| x7870 | Banco Popular | $0.00 | $0.00 | No revisada |
| x6062 | Banco Popular | $0.00 | $0.00 | No revisada |
| x5295 | Citibank | $0.00 | $0.00 | No revisada |
| x5104 | Citibank | $0.00 | N/A | No revisada |
| x5112 | Citibank | $0.00 | N/A | No revisada |
| x5074 | Citibank | $0.00 | N/A | No revisada |
| x5279 | Citibank | $0.00 | $0.00 | No revisada |
| x5058 | Citibank | $0.00 | $0.00 | No revisada |
| x5139 | Citibank | $0.00 | $0.00 | No revisada |
| x5147 | Citibank | $0.00 | $0.00 | No revisada |
| x5155 | Citibank | $0.00 | $0.00 | No revisada |
| x5244 | Citibank | $0.00 | N/A | No revisada |
| x1414 | Oriental Bank | $0.00 | $0.00 | No revisada |
| x3073 | Oriental Bank | $0.00 | $0.00 | No revisada |
| x8003 | US Bank | $0.00 | N/A | No revisada |
| x8021 | US Bank | $0.00 | N/A | No revisada |
| x4099 | US Bank | $0.00 | N/A | No revisada |
| x3001 | US Bank | $0.00 | N/A | No revisada |
| x4001 | US Bank | $0.00 | N/A | No revisada |
| x5000 | US Bank | $0.00 | N/A | No revisada |
| **TOTAL** | | **$1,235,724,772.02** | **$1,219,101,621.91** | |

# **ANEXO J**

ESTADOS FINANCIEROS AUDITADOS DE 2022 DE LA AEE



**GOBIERNO DE PUERTO RICO**

AUTORIDAD DE ASESORÍA FINANCIERA Y
AGENCIA FISCAL DE PUERTO RICO

# Portada de Información de Divulgación del Mercado Secundario Municipal Junta Reglamentadora de Bonos Municipales (MSRB)
## Sistema Electrónico de Acceso al Mercado Municipal (EMMA)

**ESTA DECLARACIÓN ESTÁ RELACIONADA CON UNA ÚNICA EMISIÓN DE BONOS:**

Nombre del bono emitido, exactamente como aparece en la portada de la Declaración oficial:

_____

_____

Números de CUSIP* de nueve dígitos, si los hubiere, con los cuales está vinculada la información.

_____

**ESTA DECLARACIÓN ESTÁ RELACIONADA CON TODOS LOS VALORES, O VARIOS DE ELLOS, EMITIDOS POR EL EMISOR, O A LA TOTALIDAD O A VARIOS DE LOS VALORES DE UN ACREEDOR ESPECÍFICO:**

Nombre del emisor: Autoridad de Energía Eléctrica de Puerto Rico ("AEEPR") _____

Nombre de otra(s) persona(s) obligada(s) (en su caso): _____

Número(s) de CUSIP* de seis dígitos:_____745268 y 74526Q _____

## TIPO DE INFORMACIÓN APORTADA:

A.     [ ] Información financiera anual y Datos operativos, de conformidad con la Regla 15c2-12

      Período fiscal cubierto: _____

B.     [X] Estados financieros auditados, o Informe Financiero Anual Integral (CAFR), de conformidad con la Regla 15c2-12

      Período fiscal cubierto: _____2019-20_____

C.     [ ] Notificación de omisión de presentación de la información financiera anual obligatoria:   _____

      _____

Manifiesto estar autorizado por el emisor, el deudor o su agente para difundir públicamente esta información.

*/s/ Julián M. Bayne Hernández* _____

Julián M. Bayne Hernández

Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico,

en calidad de Agente fiscal de la AEEPR

Fecha: 12 de octubre de 2022

Roberto Sánchez Villela (Minillas) Government Center, De Diego Ave. Stop 22, San Juan, PR 00907  |  PO Box 42001, San Juan, PR 00940-2001

 787.722.2525          contact@aafaf.pr.gov          aafaf.pr.gov

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Estados financieros básicos e información complementaria requerida

Para el año fiscal que termina el 30 de junio de 2020

(Con el informe de los auditores independientes)

Contenido

Informe de auditores independientes                                              1-3

Debate y análisis de la gerencia (no auditado)                                   4-22

Estados financieros básicos:

    Estado de resultados netos (déficit)                         23-24

    Estado de ingresos, gastos y cambios
     en los resultados netos (déficit)                        25

    Estado de flujos de efectivo                                 26-27

Notas a los estados financieros                                                  28-121

Información complementaria requerida (no auditada):

    Esquema de cambios en el pasivo neto por pensiones para de la Autoridad
     e índices relacionados                                     122

    Esquema de contribuciones de los empleados - plan de pensión  123

    Esquema de los cambios en el pasivo total de OPEB de la Autoridad
     e índices relacionados                                     124

    Notas de la información complementaria requerida              125-127



KPMG LLP
American International Plaza
Suite 1100
250 Munoz Rivera Avenue
San Juan, PR 00918-1819

### Informe de auditores independientes

A la Junta de Gobierno de la Autoridad de
Energía Eléctrica de Puerto Rico:

Hemos auditado los estados financieros adjuntos de la Autoridad de Energía Eléctrica de Puerto Rico (la Autoridad) al 30 de junio de 2020 y para el año terminado en esa fecha, y las notas relacionadas a los estados financieros, que en conjunto comprenden los estados financieros básicos de la Autoridad, según se indica en el Contenido.

## Responsabilidad de la gerencia sobre los estados financieros

La gerencia es responsable de la preparación y presentación justa de estos estados financieros de acuerdo con los principios contables generalmente aceptados de los Estados Unidos; esto incluye el diseño, la implementación y el mantenimiento del control interno relevante para la preparación y presentación justa de estados financieros libres de errores sustanciales, ya sea debido a fraude o error.

## Responsabilidades del auditor

Nuestra responsabilidad es expresar un dictamen sobre estos estados financieros con base en nuestra auditoría. No auditamos los estados financieros de PREPA Holdings, LLC, una unidad componente combinada de la Autoridad, que representan el 0.6% y el 0.3%, respectivamente, del total de activos e ingresos de la Autoridad. Dichos estados fueron auditados por otros auditores, cuyo informe nos ha sido facilitado, y nuestra opinión, en lo que se refiere a los importes incluidos para PREPA Holdings, LLC, se basa únicamente en el informe de otros auditores.

Hemos realizado nuestra auditoría de acuerdo con las normas de auditoría generalmente aceptadas en los Estados Unidos de América y con las normas aplicables a las auditorías financieras contenidas en las Normas de Auditoría Gubernamental, publicadas por el Contralor General de los Estados Unidos. Dichas normas exigen que planifiquemos y ejecutemos la auditoría con el fin de obtener una seguridad razonable sobre si los estados financieros están libres de desviaciones sustanciales. Los estados financieros de PREPA Holdings, LLC, no fueron auditados de acuerdo con las *Normas de Auditoría Gubernamental*.

Una auditoría implica ejecutar procedimientos para obtener evidencia de auditoría acerca de los montos y las revelaciones en los estados financieros. Los procedimientos seleccionados dependen de la sentencia de los auditores, lo que incluye la evaluación de los riesgos de declaraciones erróneas significativas en los estados financieros, ya sea debido a fraude o a error. Al efectuar esas evaluaciones de riesgos, el auditor considera el control interno existente en la entidad, en lo que sea relevante para la preparación y presentación razonable de los estados financieros, a fin de diseñar procedimientos de auditoría que sean apropiados en las circunstancias, pero no con el propósito de expresar un dictamen sobre la efectividad del control interno de la entidad. Por lo tanto, no expresamos tal opinión. Una auditoría también implica evaluar lo apropiado de las políticas contables utilizadas y la razonabilidad de los estimados contables significativos realizados por la gerencia, así como evaluar la presentación de los estados financieros tomados en su conjunto.

Creemos que las pruebas de auditoría que hemos obtenido son suficientes y apropiadas para fundamentar nuestro dictamen de la auditoría, tanto modificadas como sin modificar.

KPMG LLP, una sociedad de responsabilidad limitada de Delaware y una firma miembro de la organización mundial de KPMG de firmas miembro independientes afiliadas con KPMG International Limited, una compañía privada inglesa limitada por garantía.

**Base de dictámenes calificados**

El pasivo acumulado de la Autoridad para reclamaciones y sentencias al 30 de junio de 2020 incluye una estimación contable para ciertas reclamaciones relacionadas con el trabajo de aproximadamente $137.8 millones. No pudimos obtener suficientes pruebas de auditoría apropiadas en relación con la estimación de la gerencia porque algunos expedientes de empleados que eran necesarios para apoyar los supuestos de la gerencia en la estimación contable estaban incompletos o no estaban disponibles. Por consiguiente, no pudimos determinar si era necesario realizar algún ajuste de este monto.

**Dictámenes calificados**

En nuestro dictamen, basado en nuestra auditoría, y en el informe de otros auditores, excepto por los posibles efectos del asunto descrito en las *Bases para el dictamen calificado*, los estados financieros antes mencionados presentan razonablemente, en todos los aspectos materiales, la posición financiera de la Autoridad de Energía Eléctrica de Puerto Rico al 30 de junio de 2020, y los cambios en la posición financiera y sus flujos de efectivo para el año terminado en esa fecha de acuerdo con los principios de contabilidad generalmente aceptados en los Estados Unidos.

*Esencia del tema*

*Incertidumbre sobre la capacidad de continuar como empresa en funcionamiento*

Los estados financieros básicos adjuntos se han elaborado asumiendo que la Autoridad continuará como empresa en funcionamiento. Como se explica en la nota 3 de los estados financieros básicos, la Autoridad tiene un déficit acumulado de aproximadamente $8,000 millones, no dispone actualmente de fondos suficientes para reembolsar completamente sus diversas obligaciones a medida que van venciendo, y ha incumplido varias obligaciones de deuda. Además, el 2 de julio de 2017, la Junta de Supervisión y Administración Financiera, a petición del Gobernador, presentó una petición en nombre de la Autoridad para el alivio bajo el Título III de la Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico (PROMESA) en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico. La evaluación de los hechos y condiciones y los planes de la gerencia en relación con estos asuntos también se describen en la nota 3. Los estados financieros básicos no incluyen ningún ajuste que pueda resultar del resultado de esta incertidumbre. Nuestro dictamen sobre los estados financieros básicos no se modifica con respecto a este asunto.

*Adopción de nuevos pronunciamientos contables*

Como se indica en la nota 4 de los estados financieros básicos, la Autoridad adoptó las disposiciones de la Declaración núm. 83 de la Junta de Normas de Contabilidad Gubernamental, *Ciertas obligaciones de retiro de activos*. Nuestro dictamen no se modifica con respecto a este asunto.

*Otras cuestiones*

*Información adicional complementaria*

Los principios de contabilidad generalmente aceptados en los EE. UU. requieren que la discusión y el análisis de la gerencia en las páginas 4 a 22; el calendario de cambios en el pasivo neto de pensiones de la Autoridad y los ratios relacionados en la página 122; el esquema de contribuciones del empleador - plan de contribuciones en la página 123; y el esquema de cambios en el pasivo total de OPEB de la Autoridad y los índices relacionados en la página 124, se presenten para complementar los estados financieros básicos. Tal información, aunque no forma parte de los estados financieros básicos, es requerida por la Junta de Normas de Contabilidad Gubernamental, que considera que es una parte esencial de la información financiera para ubicar los estados financieros básicos en un contexto operativo, económico o histórico apropiado.

No pudimos aplicar determinados procedimientos limitados al debate y análisis de la gerencia, de conformidad con las normas de auditoría generalmente aceptadas en los Estados Unidos de América, debido a las cuestiones descritas en "Base de dictámenes calificados". No expresamos un dictamen ni ofrecemos ninguna garantía sobre la información.



Hemos aplicado ciertos procedimientos limitados al programa de cambios en el pasivo neto de pensiones de la Autoridad y a los ratios correspondientes; al programa de contribuciones del empleador - plan de pensiones; y al programa de cambios en el pasivo total de OPEB de la Autoridad y a los ratios correspondientes, de acuerdo con las normas de auditoría generalmente aceptadas en los Estados Unidos de América, que consistieron en preguntar a la gerencia sobre los métodos de preparación de la información y en comparar la información para comprobar su coherencia con las respuestas de la gerencia a nuestras preguntas, los estados financieros básicos y otros conocimientos que obtuvimos durante nuestra auditoría de los estados financieros básicos. No expresamos un dictamen ni ofrecemos ninguna garantía sobre la información porque los procedimientos limitados no nos proporcionan pruebas suficientes para expresar una opinión ni ofrecer ninguna garantía.

**Otros informes requeridos por las Normas de auditoría gubernamentales**

De acuerdo con las *Normas de auditoría gubernamentales*, también hemos emitido nuestro informe de fecha 30 de septiembre de 2022 sobre nuestra consideración del control interno de la Autoridad sobre los informes financieros y sobre nuestras pruebas de su cumplimiento con ciertas disposiciones de leyes, reglamentos, contratos y acuerdos de subvención y otros asuntos. El objetivo de dicho informe es únicamente describir el alcance de nuestras pruebas de control interno sobre la información financiera y el cumplimiento, así como los resultados de dichas pruebas, y no proporcionar un dictamen sobre la eficacia del control interno de la Autoridad sobre la información financiera o sobre el cumplimiento. Dicho informe es parte integrante de una auditoría realizada de acuerdo con las *Normas de Auditoría Gubernamentales* al considerar el control interno de la Autoridad sobre la información financiera y el cumplimiento.

*KPMG LLP*

San Juan, Puerto Rico 30 de septiembre de 2022

El sello N.º E481810 de la Sociedad de Contadores Públicos Certificados de Puerto Rico fue colocado en la copia de registro de este informe.

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Debate y análisis de la gerencia (no auditado)

30 de junio de 2020

<u>Introducción</u>

En esta sección del informe financiero se presenta el análisis del desempeño financiero de la Autoridad de Energía Eléctrica de Puerto Rico (la "Autoridad") para el año fiscal terminado el 30 de junio de 2020. Recomendamos a los lectores que consideren la información aquí presentada junto con los estados financieros y las notas a los estados financieros que siguen a esta sección.

<u>Estados financieros requeridos</u>

Los estados financieros básicos proporcionan una indicación de la salud financiera de la Autoridad. El estado de resultados netos (déficit) presenta todos los activos, las salidas de recursos diferidas, los pasivos, las entradas de recursos diferidas y los resultados netos (déficit) al final del año. El estado de ingresos, gastos y cambios en los resultados netos (déficit) presenta todos los ingresos y gastos del año e información sobre cómo cambió el resultado neto o déficit durante el año. El estado de flujos de efectivo muestra los cambios en el efectivo y los equivalentes de efectivo, resultantes del efectivo recibido y pagado por las actividades de explotación, las actividades de no financiamiento de capital, las actividades de financiamiento de capital y las actividades de inversión. Las notas a los estados financieros proporcionan la información requerida y necesaria para la comprensión de los estados financieros.

*Este espacio se ha dejado intencionadamente en blanco*

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Debate y análisis de la gerencia (no auditado) - (continuación)

30 de junio de 2020

Análisis financiero

Los estados condensados de los resultados netos (déficit) de la Autoridad al 30 de junio de 2020 y 2019 son los
siguientes (las cifras de 2019 no incluyen el efecto del replanteamiento revelado en la Nota 4) (en miles):

|  | 2020 | 2019 |
|---|---|---|
| Activos y salidas de recursos diferidas |  |  |
| Activos corrientes | $ 1,516,437 | $ 1,728,887 |
| Otros activos no corrientes | 184,614 | 101,986 |
| Activos de capital | 7,917,266 | 8,068,377 |
| Activos totales | 9,618,317 | 9,899,250 |
|  |  |  |
| Salidas de recursos diferidas | 753,070 | 731,508 |
|  |  |  |
| Total de activos y salidas de recursos diferidas | $10,371,387 | $10,630,758 |
|  |  |  |
| Pasivo, entradas de recursos diferidas y resultados netos (déficit) |  |  |
|  |  |  |
| Deuda a largo plazo | $14,638,034 | $14,296,349 |
| Otros pasivos | 3,682,004 | 2,891,909 |
|  |  |  |
| Total de pasivos | 18,320,038 | 17,188,258 |
| Entradas de recursos diferidas | 104,554 | 247,193 |
|  |  |  |
| Total de pasivos y entradas de recursos diferidas | 18,424,592 | 17,435,451 |
|  |  |  |
| Resultados netos (déficit) |  |  |
| Inversión neta en activos de capital | (500.522) | (268,167) |
| Restringido | 166,782 | 85,831 |
| Déficit | (7,719,465) | (6,622,357) |
|  |  |  |
| Total de resultados netos (déficit) | (8,053,205) | (6,804,693) |
| Total de pasivos, entradas de recursos diferidas y resultados netos (déficit) | $10,371,387 | $10,630,758 |

- 5 -

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Debate y análisis de la gerencia (no auditado) - (continuación)

30 de junio de 2020

Análisis financiero - (continuación)

## Activos y salidas de recursos diferidos



## Pasivos y entradas de recursos diferidos



Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Debate y análisis de la gerencia (no auditado) - (continuación)

30 de junio de 2020

<u>2020 en comparación con 2019</u>

Al 30 de junio de 2020 y 2019, los activos totales de la Autoridad y los flujos de salida de recursos diferidos ascendían a aproximadamente $10,400 millones y $10,600 millones, respectivamente, una disminución de aproximadamente $200 millones (2%). La disminución neta de los activos totales y las salidas de recursos diferidas se debe principalmente al efecto neto de lo siguiente

- Un aumento del efectivo y los equivalentes de efectivo de aproximadamente $118.4 millones, o el 37%. Durante el año fiscal 2020, el funcionamiento normal de la Autoridad se vio afectado por la pandemia mundial COVID-19. El aumento del efectivo y los equivalentes de efectivo está directamente relacionado con un aumento de aproximadamente $160.3 millones, o del 12%, en las cuentas por pagar en comparación con el año fiscal 2019. Este aumento en las cuentas por pagar fue causado principalmente por la declaración de emergencia y el bloqueo asociado ordenado por el Gobernador de Puerto Rico por orden ejecutiva en marzo de 2020 y el efecto que esto tuvo en la revisión de las facturas de los proveedores, su aprobación y, finalmente, la emisión de los pagos. Ver la Nota 17.

- Un aumento del efectivo y equivalentes de efectivo restringidos de aproximadamente $61.5 millones, o el 60%. Durante el año fiscal 2020, la Autoridad estableció un fondo de transición inicial para pagar los servicios de transición, según lo estipulado en el recién firmado Contrato de T&D (como se define en la Nota 18 de los Estados Financieros) con respecto a la transición de la operación del sistema de transmisión y distribución de la Autoridad a un proveedor de servicios de operación y mantenimiento.

- Una disminución neta de las cuentas por cobrar de aproximadamente $265.7 millones, o el 26%, debido principalmente a la corrección de aproximadamente $232.5 millones de las cuentas por cobrar del año anterior de las subvenciones del Gobierno Federal de Estados Unidos (ver la Nota 4). También hubo una disminución de las cuentas por cobrar a clientes generales y gubernamentales de aproximadamente $44.8 millones. La disminución de las cuentas por cobrar a clientes generales y gubernamentales se ve afectada por el aumento de la provisión para cuentas dudosas de aproximadamente $93.5 millones. La principal causa del aumento de la provisión fue la incertidumbre económica, ya que el efecto del cierre de la pandemia de la COVID-19 provocó un retraso en los pagos de sus clientes. El cambio en las cuentas por cobrar de la FEMA es el reconocimiento de ingresos de $40.9 millones, neto de la recepción de $29.2 millones en cobros.

- Una disminución del inventario de combustible de aproximadamente $53.6 millones, o el 34%. Esto se debió principalmente a la disminución del precio medio de compra de combustible, que pasó de $74.85 el barril en el año fiscal 2019 a $68.92 el barril en el año fiscal 2020. Asimismo, se produjo un aumento de aproximadamente el 5% en el consumo de combustible, pasando de $1,404 millones en el año fiscal 2019 (18.5 millones de barriles) a $1,468 millones en el año fiscal 2020 (20.5 millones de barriles).

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Debate y análisis de la gerencia (no auditado) - (continuación)

30 de junio de 2020

<u>2020 en comparación con 2019 - (continuación)</u>

- Una disminución neta de los activos de capital de aproximadamente $151.1 millones, o el 2%, impulsada principalmente por cargos de depreciación de $350.3 millones, netos de adiciones de activos de capital de $227.8 millones, entre otras fluctuaciones. Consultar las secciones *Activos de capital y Administración de la deuda* de este MD&A.

- Un aumento de las salidas de recursos diferidas de aproximadamente $21.6 millones, o el 3%. Esto se debió principalmente a la aplicación de la Declaración núm. 83 de la GASB, "Ciertas obligaciones de retiro de activos", que aumentó las salidas de recursos diferidas de la Autoridad en aproximadamente $66 millones, y disminuyó las salidas diferidas relacionadas con las pensiones en aproximadamente $54 millones. Asimismo, se produjo una disminución del valor razonable negativo combinado de los instrumentos derivados que posee la Autoridad, en aproximadamente $12 millones.

Al 30 de junio de 2020, el total de pasivos y entradas de recursos diferidas de la Autoridad ascendía a aproximadamente $18,400 millones, lo que supone un aumento de aproximadamente $1,000 millones (6%) con respecto al importe de $17,400 millones del 30 de junio de 2019. El aumento neto del pasivo total y de las entradas de recursos diferidas se debe principalmente al efecto neto de lo siguiente:

- Un aumento neto de aproximadamente $160.3 millones en cuentas por pagar y pasivos devengados, o el 12%. El aumento neto de las cuentas por pagar está directamente relacionado con los efectos de la pandemia de COVID-19. Este aumento en las cuentas por pagar fue causado principalmente por la declaración de emergencia y el bloqueo asociado ordenado por el Gobernador de Puerto Rico por orden ejecutiva en marzo de 2020 y el efecto que esto tuvo en la revisión de las facturas de los proveedores, su aprobación y, finalmente, la emisión de los pagos. Ver la Nota 17.

- Un aumento en los intereses devengados de aproximadamente $446.9 millones, o el 38%, principalmente relacionado con el aumento de $390.5 millones en los intereses de los bonos a pagar de aproximadamente $1,100 millones en el año fiscal 2019 a aproximadamente $1,500 millones de dólares en el año fiscal 2020; y el aumento de aproximadamente $56.1 millones de dólares en los intereses a pagar en las líneas de crédito de combustible de la Autoridad. Como se indica más adelante en la sección *Activos de capital y administración de la deuda* en este MD&A, conforme al Título III de la Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico ("PROMESA"), los pagos de intereses se suspenden en espera del resultado de la Petición del Título III (como se define más adelante) y están sujetos a los derechos de la Autoridad en el caso del Título III. Durante el año fiscal finalizado el 30 de junio de 2020, un total de aproximadamente $87.2 millones de pagos de intereses fueron pagados por las compañías de seguros monolínea sobre ciertos bonos de ingresos de energía de la Autoridad que aseguraron (ver la Nota 12); sin embargo, como las aseguradoras monolínea se subrogan y pueden, por lo tanto, ejercer los derechos y recursos de los tenedores de bonos y pueden tener derecho a la recuperación, los intereses pagados por las aseguradoras monolínea siguen presentándose como intereses debidos y pagaderos por la Autoridad, pero están sujetos a los derechos de la Autoridad en el caso del Título III.

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Debate y análisis de la gerencia (no auditado) - (continuación)

30 de junio de 2020

2020 en comparación con 2019 - (continuación)

- Un aumento del pasivo neto por pensiones de aproximadamente $314.9 millones, o el 7%, debido principalmente a cambios en los supuestos actuariales.

- Un aumento del pasivo no corriente debido a la aplicación de la Declaración Núm. 83 de GASB, "Ciertas obligaciones por retiro de activos" ("ARO" o "GASB 83"), que requirió el registro de obligaciones por retiro de activos de aproximadamente $148.6 millones.

- Una disminución de las entradas diferidas relacionadas con las prestaciones de pensiones de aproximadamente $142.6 millones, o el 58%, principalmente relacionada con los ajustes de pensiones de la Declaración GASB Núm. 68 de aproximadamente $130.8 millones.

- Un aumento de otros pasivos por pensiones posteriores al empleo de aproximadamente $20.2 millones, o 6%, debido principalmente a cambios en los supuestos actuariales.

La mayor parte de los resultados netos (déficit) de la Autoridad es el déficit de aproximadamente $7,700 millones en resultados netos no restringidos (déficit). Una parte adicional de los resultados netos (déficit) de la Autoridad consiste en $166.8 millones en activos y pasivos restringidos para proyectos de capital y otros. Se produce un déficit en los resultados netos restringidos cuando los pasivos relacionados con los activos restringidos superan a dichos activos. El déficit neto de la Autoridad al final del año fiscal 2020 aumentó en aproximadamente $1,200 millones, aproximadamente un 15%, en comparación con su déficit neto al final del año fiscal 2019. Esto se debió principalmente a la disminución de los ingresos de explotación y a la disminución de los fondos de la Agencia Federal de Gestión de Emergencias ("FEMA"), que se explican con más detalle a continuación.

La inversión neta en activos de capital consiste en activos de capital tales como terrenos, infraestructuras, edificios, equipos, entre otros, menos cualquier deuda pendiente relacionada utilizada para adquirir estos activos. A 30 de junio de 2020, la inversión neta en activos fijos era negativa en $500.5 millones. Este saldo negativo aumentó desde un saldo negativo de aproximadamente $268.2 millones al final del año fiscal 2019, principalmente como resultado de la disminución neta de los activos de capital durante el año fiscal 2020 de aproximadamente $151.1 millones y el registro de las obligaciones de retiro de activos requeridas por GASB 83.

*Este espacio se ha dejado intencionadamente en blanco*

- 9 -

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Debate y análisis de la gerencia (no auditado) - (continuación)

30 de junio de 2020

Los estados condensados de ingresos, gastos y cambios en los resultados netos (déficit) de la Autoridad para los ejercicios fiscales cerrados el 30 de junio de 2020 y 2019 fueron los siguientes (las cifras de 2019 no incluyen el efecto del replanteamiento revelado en la Nota 4) (en miles):

|  | 2020 | 2019 |
|---|---|---|
| Ingresos: |  |  |
| Ingresos operativos | $ 3,278,875 | $ 3,611,664 |
| Gastos operativos: |  |  |
| Combustible y poder de compra | 1,969,408 | 2,089,683 |
| Mantenimiento y otros gastos operativos | 1,156,169 | 1,222,198 |
| Reparaciones de emergencia tras los huracanes | 286,581 | 48,926 |
| Depreciación | 350,259 | 367,130 |
| Contribución en lugar de impuestos | 69,986 | 169,196 |
| Total de gastos operativos | 3,832,403 | 3,897,133 |
| Ingresos y (gastos) no operativos: |  |  |
| Ingresos no operativos | 54,217 | 749,156 |
| Intereses y otros gastos | (445,574) | (479,465) |
| Ingresos y (gastos) no operativos, netos | (391,357) | 269,691 |
| Pérdidas netas de las contribuciones de capital | (944,885) | (15,778) |
| Contribuciones de capital | 7,538 | 72,845 |
| Variación de los resultados netos (déficit) | (937,347) | 57,067 |
| Resultados netos (déficit) al principio del año | (6,804,693) | (6,936,014) |
| Aplicación de GASB y corrección de errores | (311,165) | 74,254 |
| Resultados netos (déficit) al principio del año, replanteado | (7,115,858) | (6,861,760) |
| Resultados netos (déficit) al final del año | $ (8,053,205) | $ (6,804,693) |

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Debate y análisis de la gerencia (no auditado) - (continuación)

30 de junio de

2020 en comparación con 2019 - (continuación)

## Ingresos



Ingresos no operativos 2%

Ingresos operativos 98%

## Gastos operativos



Reparaciones energéticas 8%

Depreciación 9%

Contribución en lugar de impuestos 2%

Mantenimiento y otros 30%

Combustible y energía comprada 51%

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Debate y análisis de la gerencia (no auditado) - (continuación)

30 de junio de 2020

2020 en comparación con 2019 - (continuación)

Para los ejercicios fiscales terminados el 30 de junio de 2020 y 2019, los ingresos operativos de la Autoridad ascendieron a aproximadamente $3,300 millones y $3,600 millones, respectivamente, una disminución de aproximadamente $332.8 millones (9%).

La disminución de los ingresos operativos se debe principalmente al efecto neto de lo siguiente:

- Una disminución de los ingresos de aproximadamente $59.2 millones resultante de la aprobación de la Oficina de Energía de Puerto Rico ("PREB") de una reducción de las tarifas de facturación de los servicios a los clientes durante el último trimestre del año fiscal 2020. Tras los terremotos de enero de 2020, dos unidades de la central eléctrica Costa Sur, en Guayanilla, sufrieron importantes daños y quedaron fuera de servicio. En consecuencia, la Autoridad cubrió el déficit de capacidad de generación utilizando unidades de generación de pico, lo que provocó un aumento del costo del combustible. La indisponibilidad de estas dos líneas de gas natural en Costa Sur repercutió en costo medio del combustible, ya que estas unidades producen una fuente de energía más rentable, y no estuvieron operativas durante el segundo semestre del año fiscal 2020. Los costos de combustible se facturan habitualmente a los clientes de la Autoridad, pero estos costos adicionales no se repercutieron a los clientes dado un pedido aprobado por la PREB durante el último trimestre del año fiscal 2020.

- Una disminución de aproximadamente $100.6 millones en ingresos debido a la eliminación el 1 de mayo de 2019 de la facturación de alumbrado público a los municipios por orden de la PREB bajo la Ley 4-2016- Ley de Revitalización de la Autoridad de Energía Eléctrica de Puerto Rico.

- Asimismo, el 1 de mayo de 2019, la Autoridad implementó varios ajustes de la cláusula adicional, relacionados con los cargos cobrados a sus clientes durante cada uno de los años terminados en junio de 2017, 2018 y 2019. Esta orden incluía, entre otros cargos de conciliación, el diferencial entre la Tarifa Provisional de $1.299 céntimos/kWh aprobada por la PREB el 24 de junio de 2016 y la Tarifa Permanente de $0.9948 céntimos/kWh que entró en vigor el 1 de mayo de 2019. Estos ajustes fueron recuperados/pagados por la Autoridad de/a sus clientes generales y gubernamentales durante el año fiscal 2020. El efecto neto de esta aplicación fue una reducción de los ingresos por ventas de aproximadamente $123 millones.

- Una disminución de los ingresos causada por un aumento de aproximadamente $90.8 millones en el gasto de deudas incobrables en comparación con 2019, directamente relacionado con el retraso en los cobros de los clientes debido a la pandemia de COVID-19.

La disminución de $694.9 millones en los ingresos netos no operativos es el efecto neto de lo siguiente:

- 12 -

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Debate y análisis de la gerencia (no auditado) - (continuación)

30 de junio de 2020

2020 en comparación con 2019 - (continuación)

- Durante el año fiscal 2020 y 2019, la Autoridad realizó transacciones voluntarias sin intercambio con y para la recepción de fondos de subvenciones federales de la FEMA tras el paso de los huracanes Irma y María (los "huracanes") en septiembre de 2017 (año fiscal 2018) y tras varios terremotos que afectaron a Puerto Rico durante enero de 2020. Los costos admisibles se facturaron para su reembolso en función de los requisitos de elegibilidad, y los ingresos se reconocieron una vez aprobados los costos. Los ingresos netos por subvenciones federales disminuyeron en aproximadamente $631.8 millones, o 94%, de aproximadamente $672.7 millones en el año fiscal 2019 a aproximadamente $40.9 millones en el año fiscal 2020.

- Una reducción de $59.9 millones en ganancias debido al reconocimiento durante el año fiscal 2019 de una ganancia no recurrente dada una transacción parcial con el Fideicomiso de Entidades Públicas. Esta ganancia se compone de la recuperación de aproximadamente $15.3 millones en efectivo de los depósitos mantenidos anteriormente en el Banco Gubernamental de Fomento para Puerto Rico ("BGF") y la cancelación de aproximadamente $35.8 millones y unos $6.7 millones de pagarés pendientes y los intereses devengados por ellos, respectivamente, adeudados al BGF.

Los gastos operativos de la Autoridad ascendieron a unos $3,832 millones y $3,897 millones para los ejercicios fiscales terminados el 30 de junio de 2020 y 2019, respectivamente, lo que representa una disminución de aproximadamente $64.7 millones o 2%. La disminución de los gastos operativos se debe principalmente al efecto neto de lo siguiente:

- Un aumento de $50.7 millones, o 7%, en la energía comprada por la Autoridad durante el año fiscal 2020. Durante el año fiscal finalizado el 30 de junio de 2020, la energía comprada por la Autoridad fue de 0.27 M kWh más, en comparación con el año fiscal finalizado el 30 de junio de 2019. El costo promedio para el ejercicio 2020 fue de $0.1031 por kWh, mientras que para el año fiscal 2019, el costo promedio fue de $0.1000. El aumento de los gastos de compra de energía está directamente relacionado con el incremento de los costos medios de compra.

- Una reducción de $99.2 millones en contribuciones en lugar de impuestos durante el año fiscal 2020, una disminución del 59% cuando se compara con el año fiscal 2019, resultó del hecho de que, a partir del 1 de mayo de 2019, la obligación de contribuciones en lugar de impuestos de la Autoridad ya no toma en cuenta los costos del alumbrado público.

*Este espacio se ha dejado intencionadamente en blanco*

- 13 -

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Debate y análisis de la gerencia (no auditado) - (continuación)

30 de junio de 2020

Activos de capital y administración de la deuda

*Activos de capital*

Los activos de capital al 30 de junio de 2020 y 2019 ascendían a aproximadamente $7,900 millones y $8,100 millones, respectivamente. El total de activos de capital de la Autoridad disminuyó en aproximadamente $151.1 millones, o 2%, principalmente por el efecto neto de las adiciones de activos de capital de $227.8 millones, reducidas por $350.3 millones en depreciación.

Los proyectos de bienes de capital principales emprendidos por la Autoridad durante el año fiscal finalizado el 30 de junio de 2020 fueron los siguientes:

- La Autoridad incurrió en actividades de restauración relacionadas con los terremotos de enero de 2020 y continuó con las reparaciones de los daños causados por los huracanes. La Autoridad incurrió en los costos relacionados con los daños a los activos de capital de aproximadamente $16.1 millones, de los cuales aproximadamente $14.6 millones fueron capitalizados como infraestructura de generación y $1.5 millones como transmisión y distribución. Ver la Nota 17.

- Las contribuciones de capital recibidas durante el año fiscal finalizado el 30 de junio de 2020 ascendieron a aproximadamente $7.5 millones, de los cuales aproximadamente $6.0 millones fueron recibidos del Cuerpo de Ingenieros del Ejército de los Estados Unidos ("USACE"). La Autoridad capitalizó $8 millones de las contribuciones del USACE, recibidas durante este año fiscal y los anteriores, en las áreas de transmisión y distribución, y $2 millones se utilizaron para gastos operativos.

- La Autoridad invirtió $15.9 millones en la rehabilitación de las unidades 5 y 6 de la Central Térmica de Ciclo Combinado de San Juan, que incluyó la sustitución de piezas críticas que aumentan su vida útil. Otros proyectos significativos de rehabilitación incluyen $21.3 millones para rehabilitar las turbinas de la Central Mayaguez, mejoras en las calderas de las unidades 1 y 2 de la Central Aguirre y mejoras en las unidades 2 y 3 de Cambalache.

- La Autoridad invirtió $21.5 millones en la rehabilitación y mejoras de la Central de Ciclo Combinado Aguirre y en la rehabilitación y otras mejoras de Costa Sur.

- La Autoridad invirtió $1.5 millones en la unidad 9 de la central de vapor de San Juan para realizar trabajos de sustitución de piezas de alta presión.

- La Autoridad también invirtió $12.9 millones en la adquisición e instalación de medidores inteligentes para clientes residenciales que captan información sobre el consumo de electricidad y la transmiten automáticamente a la Autoridad. Los medidores inteligentes pueden proporcionar mediciones precisas del uso de la electricidad al tiempo que eliminan la necesidad de leer los medidores físicos.

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Debate y análisis de la gerencia (no auditado) - (continuación)

30 de junio de 2020

Activos de capital y administración de la deuda - (continuación)

En la Nota 8 de los estados financieros se puede encontrar información adicional sobre los activos de capital de la Autoridad.

*Administración de la deuda*

Al 30 de junio de 2020 y 2019, la Autoridad tenía un total de pagarés y bonos por pagar de aproximadamente $9,054 millones y $9,061 millones, respectivamente. En la fecha de emisión de los estados financieros, los bonos no asegurados de la Autoridad fueron calificados como "NR" por Moody's Investors Service ("Moody's"), "NR" por Standard & Poor's ("S&P") y "D" por Fitch Ratings ("Fitch").

Durante el año fiscal 2020, la Autoridad tomó prestados $1.6 millones adicionales bajo una línea de crédito renovable de $27 millones para financiar las mejoras del Complejo de Abastecimiento de Agua de Aguirre y la Planta de Tratamiento de Aguas Residuales de San Juan, con una fecha de vencimiento de 20 años después de la fecha de finalización de la construcción y una tasa de interés efectiva del 2% anual. A la fecha de estos estados financieros, la fecha de finalización de la construcción de este proyecto se estima en marzo de 2024; por lo tanto, la fecha estimada de vencimiento de este empréstito bajo la línea será probablemente alrededor de marzo de 2044. El aumento del importe del préstamo se debe al reembolso de los gastos realizados por la Autoridad durante los ejercicios fiscales anteriores y el actual.

Al 30 de junio de 2019, la Autoridad no había pagado aproximadamente $955 millones de capital adeudado por sus bonos y pagarés al 1 de julio de 2019. Al 30 de junio de 2020, esa cantidad aumentó a $1,300 millones. Como se indica en las Notas 3, 11 y 12, los pagarés y los bonos por pagar, así como sus respectivos pagos de intereses, están sujetos a la reestructuración de la deuda de la Autoridad a tenor con el Título III de PROMESA; y, por lo tanto, estos pagos se paralizan y están sujetos a los derechos de la Autoridad en el caso del Título III.

Durante el año fiscal terminado el 30 de junio de 2020, las aseguradoras monolínea de ciertos bonos de ingresos de energía de la Autoridad pagaron un total de $139.2 millones de capital (ver Nota 12); sin embargo, debido a que las aseguradoras monolínea están subrogadas y, por lo tanto, adquirieron los derechos de los tenedores de bonos asegurados después de hacer dicho pago, están sujetas a los derechos de la Autoridad en el caso del Título III, y las cantidades pagadas por las aseguradoras monolínea continúan siendo presentadas como vencidas y pagaderas por la Autoridad.

*Este espacio se ha dejado intencionadamente en blanco*

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Debate y análisis de la gerencia (no auditado) - (continuación)

30 de junio de 2020

_Adopción inicial de la declaración de GASB núm. 83 y corrección de un error no sustancial_

Durante el año fiscal finalizado el 30 de junio de 2020, la Autoridad adoptó las disposiciones de la Declaración núm. 83 de GASB, "Ciertas obligaciones de retirada de activos". Esta declaración aborda la contabilidad y la información financiera de ciertas obligaciones de retiro de activos. En consecuencia, el déficit neto inicial se modificó para reflejar de manera retroactiva el pasivo inicial de ARO y las salidas de recursos diferidas relacionadas con las obligaciones de retiro de activos. (Ver la Nota 4).

La Autoridad también identificó un error relacionado con los estados financieros del año anterior, que dio lugar a la corrección del déficit neto inicial de la Autoridad debido al saldo de las cuentas por cobrar de las subvenciones del Gobierno Federal de Estados Unidos. El efecto acumulado de la corrección y la aplicación de la nueva norma GASB se refleja en los estados financieros adjuntos como un aumento del déficit neto de principios de año de aproximadamente $311.1 millones. (Ver la Nota 4).

Hechos o condiciones actualmente conocidas que pueden tener un efecto significativo en la condición financiera o los resultados de las operaciones de la Autoridad de Energía Eléctrica de Puerto Rico

_La Junta de Administración y la Gerencia de la Autoridad_

El 26 de junio de 2017, el Gobernador promulgó la Ley Núm. 37 de 2017 ("Ley 37 2017") que cambia la composición de la Junta de Administración de la Autoridad (la "Junta de Administración"). La Junta de Administración se compone ahora de siete miembros, seis de los cuales son designados por el Gobernador (tres de los cuales requieren la aprobación del Senado) y uno es un representante de los consumidores elegido.

_PROMESA_

El 30 de junio de 2016, el Presidente de los Estados Unidos firmó la ley PROMESA. En términos generales, PROMESA pretende dotar al ELA de una disciplina fiscal y económica a través de, entre otras cosas: (i) la creación de la Junta de Supervisión y Gestión Financiera (la "Junta de Supervisión"), cuyas responsabilidades incluyen, entre otras, la certificación de los planes fiscales y los presupuestos del ELA y sus unidades componentes; (ii) la paralización de todos los juicios de los acreedores; y (iii) dos métodos alternativos para ajustar la deuda insostenible: (a) un proceso de modificación voluntaria de la deuda bajo el Título VI de PROMESA, que establece un proceso de reestructuración de la deuda en gran medida extrajudicial a través del cual las modificaciones de la deuda financiera pueden ser aceptadas por una supermayoría de los acreedores afectados; y (b) un procedimiento de cuasi quiebra bajo el Título III de PROMESA, que establece un proceso de reestructuración de la deuda en los tribunales basado sustancialmente en las disposiciones incorporadas del Código de Quiebras de los Estados Unidos.

_Este espacio se ha dejado intencionadamente en blanco_

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Debate y análisis de la gerencia (no auditado) - (continuación)

30 de junio de 2020

<u>Hechos o condiciones actualmente conocidas que pueden tener un efecto significativo en la condición financiera o los resultados de las operaciones de la Autoridad de Energía Eléctrica de Puerto Rico - (continuación)</u>

*Legislación clave tras la promulgación de PROMESA*

*Ley 2 2017 - Ley de habilitación de la AAFAF*

La Ley Núm. 2 del 18 de enero de 2017, Ley de la Agencia Fiscal de Puerto Rico, y Autoridad de Asesoría Financiera (la "Ley Habilitante de la AAFAF" o "Ley 2 2017") fue promulgada para derogar y reemplazar las secciones bajo la Ley Núm. 21-2016 (la "Ley de Moratoria") que crearon la Agencia Fiscal y Autoridad de Asesoría Financiera ("AAFAF") y sus facultades y responsabilidades. La Ley 2 2017 amplió las facultades de la AAFAF para disponer que la AAFAF será la única entidad autorizada para celebrar un convenio de acreedores, y/o renegociar o reestructurar la deuda pública, total o parcialmente, o cualquier otra deuda emitida por cualquier organismo del Gobierno, incluidos, entre otros, agencias, juntas, comisiones, instrumentalidades, corporaciones públicas (incluida la Autoridad) o subdivisiones políticas aplicables. Además, la AAFAF es la entidad encargada de los esfuerzos de colaboración, comunicación y cooperación entre el ELA y sus instrumentalidades y la Junta de Supervisión bajo PROMESA.

*Ley 5 2017 - Ley de responsabilidad fiscal y emergencia financiera de Puerto Rico*

El 29 de enero de 2017, el Gobernador promulgó la Ley Núm. 5 de 2017, conocida como la Ley de Responsabilidad Fiscal y Emergencia Financiera de Puerto Rico ("Ley 5 2017"), que enmendó y derogó algunas otras disposiciones de la Ley de Moratoria y estableció un estado de emergencia en relación con las finanzas del Gobierno. La Ley 5 2017 mantuvo la moratoria del pago de la deuda existente en la Ley de Moratoria.

El período de emergencia en virtud de la Ley 5 2017 estaba programado para expirar el 1 de mayo de 2017 para coincidir con la expiración de la paralización en virtud de PROMESA (como se discutió anteriormente), a menos que se extendiera por tres meses adicionales por orden ejecutiva.

El 30 de abril de 2017, el Gobernador emitió la orden ejecutiva OE 2017 031, que extendió el período de emergencia de la Ley 5 2017 hasta el 1 de agosto de 2017. El 19 de julio de 2017, la Asamblea Legislativa promulgó la Ley Núm. 46 2017 ("Ley 46 2017"), que prorrogó nuevamente el período de emergencia de la Ley 5 2017 hasta el 31 de diciembre de 2017. La Ley 46 2017 permitió al Gobernador firmar órdenes ejecutivas para extender el período de emergencia por períodos sucesivos de seis meses mientras la Junta de Supervisión siga establecida para Puerto Rico bajo PROMESA. El actual período de emergencia expira el 31 de diciembre de 2022.

*Inicio del caso del Título III por parte de la Junta de Supervisión*

Como se indica en la Nota 3, el 2 de julio de 2017, la Junta de Supervisión presentó una petición de amparo en nombre de la Autoridad en virtud del Título III de PROMESA. Todos los casos del Título III de Puerto Rico se han consolidado solo para fines procesales y se están administrando conjuntamente en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Debate y análisis de la gerencia (no auditado) - (continuación)

30 de junio de 2020

<u>Hechos o condiciones actualmente conocidas que pueden tener un efecto significativo en la condición financiera o los
resultados de las operaciones de la Autoridad de Energía Eléctrica de Puerto Rico - (continuación)</u>

Rico. El Título III de PROMESA incorpora las disposiciones de paralización automática del Código de Quiebras de los
Estados Unidos, que se hacen aplicables a los casos del Título III conforme a la sección 301(a) de PROMESA.

*Ley 120 2018 Ley de transformación del sistema eléctrico de Puerto Rico*

El 20 de junio de 2018, el Gobernador firmó la Ley Núm. 120 de 2018, conocida como la Ley de Transformación del
Sistema Eléctrico de Puerto Rico ("Ley 120 2018"). La Ley 120-2018 autorizó el marco legal necesario para la
transformación de la Autoridad a través de una serie de alianzas público-privadas, que se harán de acuerdo con el
marco establecido en la Ley de Alianzas Público-Privadas de 2009 (la "Ley P3" o "Ley 29"). La Ley P3 permite la venta
de activos de la Autoridad relacionados con la generación y la transferencia o delegación de cualquiera de las
operaciones, funciones o servicios de la Autoridad. La Ley P3 modifica la estructura reguladora existente y crea un
grupo de trabajo para diseñar un nuevo marco regulador y una política pública energética para un sistema energético
basado en el sector privado. El 11 de abril de 2019, el Gobernador firmó la Ley 17-2019 para establecer, entre otras
cosas, el marco regulatorio del sector energético de Puerto Rico y la transformación de la Autoridad.

*Empresa en funcionamiento, situación financiera y riesgo de liquidez*

En la Nota 3 se analizan los hechos y condiciones relacionados con la liquidez de la Autoridad que tendrán un efecto
significativo sobre la situación financiera y las operaciones de la Autoridad.

La situación económica y financiera de la Autoridad se ve afectada por diversos factores jurídicos, financieros, sociales,
económicos, medioambientales, gubernamentales y políticos. Incluso después de solicitar la protección del Título III,
la condición operativa y financiera de la Autoridad se vio afectada negativamente por diversos retos empresariales
que se vieron exacerbados por la situación económica del ELA, la volatilidad de los precios del petróleo y el hecho de
que la Autoridad no aumentó las tarifas de sus clientes a niveles suficientes para compensar los efectos de los costos
crecientes hasta mayo de 2019. Sus principales retos, algunos de los cuales están interrelacionados, son: (i) hacer frente
a la disminución de la demanda de energía eléctrica; (ii) hacer frente a la volatilidad de los costos del petróleo; (iii)
hacer frente a las altas tarifas de energía eléctrica de los clientes; (iv) reducir las cuentas por cobrar del gobierno; (v)
mejorar su liquidez; (vi) hacer frente a la rebaja de la calificación de sus bonos; y (vii) hacer frente al impacto en la
economía de Puerto Rico y la infraestructura de la Autoridad tras el paso de los huracanes. Consultar la Nota 17.

*Este espacio se ha dejado intencionadamente en blanco*

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Debate y análisis de la gerencia (no auditado) - (continuación)

30 de junio de 2020

Hechos o condiciones actualmente conocidas que pueden tener un efecto significativo en la condición financiera o los resultados de las operaciones de la Autoridad de Energía Eléctrica de Puerto Rico - (continuación)

*Eventos posteriores*

Los hechos posteriores más significativos son los siguientes:

Mediación del plan de ajuste de la autoridad

Durante el último trimestre del año fiscal 2022, la Autoridad, la AAFAF y la Junta de Supervisión iniciaron una mediación con ciertas partes interesadas de la Autoridad en relación con las disputas relativas a las obligaciones financieras de la Autoridad, con la intención de desarrollar un plan de ajuste consensuado para la Autoridad. El Tribunal de Título III ha fijado como fecha límite el 15 de agosto de 2022 para que la Junta de Supervisión presente un escrito en el que identifique su propuesta de camino a seguir para concluir eficazmente el caso del Título III de la Autoridad (la fecha límite de terminación de la mediación). El plazo de finalización de la mediación estuvo sujeto a múltiples prórrogas, la última de ellas hasta el 16 de septiembre de 2022 con una prórroga automática hasta el 30 de septiembre de 2022. Sin embargo, el 19 de septiembre de 2022, el equipo de mediación presentó su notificación e informe indicando que la mediación había finalizado e informando que no se había alcanzado un consenso en la mediación entre las partes, pero que aún era posible lograr un acuerdo si se modificaban los términos y las condiciones de la mediación. Cabe destacar que el 19 de septiembre de 2022, los tenedores de bonos presentaron una moción para desestimar el caso del Título III de la Autoridad o para el alivio de la paralización automática.

El 20 de septiembre de 2022, la Junta de Supervisión, en nombre de la Autoridad, presentó una moción en la que solicitaba al tribunal de Título III que estableciera un calendario para continuar las negociaciones durante el litigio, abarcando únicamente las disputas fundamentales sobre las reclamaciones que el plan debe reestructurar. En esa misma fecha, el Tribunal de Título III ordenó al equipo de mediación que presentara una propuesta de orden de continuación de la mediación que identificara un período de tiempo adecuado para la siguiente fase de la mediación y las disposiciones adicionales necesarias para abordar los obstáculos que el equipo de mediación identificó en el informe de mediación. Por ello, el 22 de septiembre de 2022, el equipo de mediación propuso una orden modificada en la que se establecen los términos y las condiciones de la mediación y en la que se propone un calendario revisado para la Mediación que avanza en paralelo con el calendario del Tribunal para el examen de diversas cuestiones litigiosas que se habían paralizado a la espera de la realización anterior a la Mediación. El 22 de septiembre de 2022, el Tribunal de Título III ordenó a las partes que presentaran cualquier objeción o respuesta a las condiciones modificadas propuestas por el Equipo de Mediación. El 23 de septiembre de 2022, la Junta de Supervisión presentó una respuesta a la propuesta de modificación de la mediación en la que se mostraba parcialmente de acuerdo y proponía también algunos cambios. El 29 de septiembre de 2022, el Tribunal de Título III dictó una Orden por la que se modifican los términos y las condiciones de la mediación y se establece un nuevo plazo hasta el 31 de diciembre de 2022, para dar por finalizada la mediación, con una prórroga automática hasta el 31 de enero de 2023. En esa misma fecha, el Tribunal de Título III emitió una orden en la que se instruía a la Junta de Supervisión para que presentara una propuesta de plan de ajuste para la Autoridad antes del 1 de diciembre de 2022, que considere que podría ser confirmable, teniendo en cuenta el riesgo de litigio y las cuestiones económicas que están en disputa, también debe incluir una declaración de divulgación y una propuesta de calendario de confirmación que contemple una vista de confirmación en junio de 2023.

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Debate y análisis de la gerencia (no auditado) - (continuación)

30 de junio de 2020

**Hechos o condiciones actualmente conocidas que pueden tener un efecto significativo en la condición financiera o los resultados de las operaciones de la Autoridad de Energía Eléctrica de Puerto Rico - (continuación)**

*Eventos posteriores - (continuación)*

Transformación del Sistema de Transmisión y Distribución ("T&D") y de los Activos de Generación de la Autoridad - El proceso de contratación de la transformación de T&D fue llevado a cabo por la Autoridad para Alianzas Público-Privadas de Puerto Rico ("Autoridad P3") con el propósito de adjudicar un contrato de asociación a largo plazo a un proveedor calificado de servicios de operación y mantenimiento ("O&M") para el Sistema T&D.

El 11 de enero de 2020, el Comité de Asociación seleccionó un proponente preferido, LUMA, LLC ("LUMA"), para negociar los términos finales de un acuerdo de O&M.

El 17 de enero de 2020, el Comité de Asociación aprobó la propuesta final de acuerdo de O&M de LUMA, y el 16 de abril de 2020, el Consejo de Supervisión aprobó el acuerdo.

El 15 de mayo de 2020, el Comité de Alianzas (el "Comité de Alianzas") establecido por la Autoridad para las Alianzas Público-Privadas de Puerto Rico (la "Autoridad P3") conforme a la Ley 120-2018, y sus enmiendas, recomendó a la junta directiva de la Autoridad P3 que el contrato (el "Contrato T&D") para la gestión, operación, mantenimiento, reparación, restauración y reemplazo del Sistema T&D (el "Proyecto") fuera adjudicado a LUMA Energy, LLC ("LUMA").

El 22 de junio de 2020, la Junta de Gobierno y el Gobierno de Puerto Rico, conforme a los procedimientos establecidos en la Ley 29, aprobaron cada uno el acuerdo de O&M, y el acuerdo de O&M fue firmado por las partes.

El 1 de junio de 2021 se produjo la transición a LUMA de la responsabilidad de la gestión, operación, mantenimiento, reparaciones, restauración y sustitución del Sistema T&D.

Con respecto a las operaciones de generación de energía de la Autoridad, la Autoridad P3 está llevando a cabo un proceso competitivo para identificar, calificar y seleccionar uno o más operadores privados para gestionar los activos de generación heredados de la Autoridad.

En septiembre de 2020, la FEMA aprobó aproximadamente $9,600 millones en subvenciones federales por unos $10,500 millones en costos totales del proyecto para que la Autoridad pudiera reparar los daños causados por los huracanes en su red eléctrica. Los fondos federales están destinados a reparar y sustituir miles de kilómetros de líneas de transmisión y distribución, subestaciones eléctricas, sistemas de generación de energía y otras mejoras de la red. La financiación federal está sujeta a que la Autoridad contribuya con un 10% de los costos.

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Debate y análisis de la gerencia (no auditado) - (continuación)

30 de junio de 2020

Hechos o condiciones actualmente conocidas que pueden tener un efecto significativo en la condición financiera o los resultados de las operaciones de la Autoridad de Energía Eléctrica de Puerto Rico - (continuación)

• El 28 de diciembre de 2019, el primero de muchos terremotos golpeó la costa suroeste de Puerto Rico. Esta actividad sísmica causó importantes daños en la zona afectada, incluso en dos unidades de la central eléctrica Costa Sur en Guayanilla. Las unidades dañadas proporcionan aproximadamente el 25% de la capacidad de generación de carga base de la Autoridad. En agosto de 2020, la primera unidad dañada de Costa Sur volvió al servicio, y la segunda unidad entró en funcionamiento en enero de 2021. A la fecha de emisión de estos estados financieros, la Autoridad ha solicitado, pero aún no ha recibido, aproximadamente $238.8 millones de la FEMA y aproximadamente $70 millones de varias compañías de seguros en relación con los daños resultantes de los terremotos de enero de 2020.

• El 24 de agosto de 2020, la PREB aprobó el Plan de Recursos Integrados de la Autoridad ("IRP") que incluye una directiva para que la Autoridad desarrolle un proceso de licitación competitivo para la adquisición de 3,750MW de generación renovable y 1,500MW de recursos de almacenamiento de energía en apoyo de, entre otras cosas, el logro de los objetivos de la Ley 17-2019 para las instalaciones de energía renovable. La PREB estableció un calendario para la adquisición por parte de la Autoridad, mediante un proceso de solicitud de propuestas, de cantidades mínimas de energía renovable y recursos de almacenamiento de energía. El calendario se divide en seis (6) tramos. En el primer tramo, la Autoridad tenía que adquirir al menos 1,000 MW de generación solar fotovoltaica (u otra energía renovable equivalente) y al menos 500 MW (2,000 MWh o equivalente) de almacenamiento de energía en baterías. En consecuencia, el 22 de febrero de 2021, la Autoridad emitió la Solicitud de Propuesta 112648 para la Generación de Energía Renovable y Recursos de Almacenamiento de Energía Tramo 1 de 6 ("Tramo 1 RFP") solicitando propuestas para la generación de energía renovable, el almacenamiento de energía y los recursos de la planta de energía virtual. El 23 de diciembre de 2021, la Autoridad informó a la PREB que había hecho ofertas a las contrapartes para proyectos de energía solar fotovoltaica por una capacidad adicional de 112.1 MW. La Autoridad presentó a la PREB para su aprobación proyectos de acuerdos de compra de energía y de explotación por un total de 844 MW de energía solar fotovoltaica ("Bespoke PPOA") y 200 MW de recursos de almacenamiento de energía. El 2 de febrero de 2022, la PREB emitió una orden de aprobación de los PPOA de Bespoke, y fueron aprobados por la Junta de Supervisión el 25 de marzo de 2022. Los Bespoke PPOA están ahora sujetos al resultado de los estudios de integración que LUMA está realizando. La PREB no se ha pronunciado sobre la solicitud de la Autoridad de aprobar los 200 MW de recursos de almacenamiento de energía. Los contratos de almacenamiento también están sujetos a la aprobación de la Junta de Supervisión y al resultado de los estudios de integración que está realizando LUMA.

• El 30 de octubre de 2020, Whitefish Energy Holdings, LLC ("Whitefish") presentó una moción para la prioridad de los gastos administrativos de sus más de $150 millones de dólares en reclamaciones en los casos del Título III. La moción solicitaba el reconocimiento de una reclamación de gastos administrativos basada en los servicios prestados a la Autoridad consistentes en reparaciones tras los huracanes. El 1 de marzo de 2022, la Junta de Supervisión presentó una moción en nombre de la Autoridad para aprobar una transacción con Whitefish. El 21 de marzo de 2022, el Tribunal de Título III emitió una orden aprobando dicha transacción.

- 21 -

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Debate y análisis de la gerencia (no auditado) - (continuación)

30 de junio de 2020

<u>Hechos o condiciones actualmente conocidas que pueden tener un efecto significativo en la condición financiera o los
resultados de las operaciones de la Autoridad de Energía Eléctrica de Puerto Rico - (continuación)</u>

- El 18 de enero de 2022, el Tribunal de Título III dictó una orden aprobando el Plan de Ajuste ("POA") del ELA.
El POA reduce los bonos del ELA y otras deudas en un 80% y ahorra a Puerto Rico más de $50,000 millones
en pagos futuros del servicio de la deuda. El 27 de enero de 2022, la Junta de Supervisión certificó un nuevo
plan fiscal del ELA que refleja el POA, los recientes aumentos de la financiación federal y la recuperación
económica de Puerto Rico. La Junta de Supervisión también certificó el 22 de febrero de 2022 un presupuesto
revisado para el ELA que incluye los nuevos pagos de la deuda. El POA entró en vigor el 15 de marzo de
2022.

- El 18 de septiembre de 2022, el huracán Fiona tocó tierra en Puerto Rico por el municipio de Cabo Rojo. El
huracán Fiona llegó a Puerto Rico como huracán de categoría 1 con vientos de 85 mph y rachas de hasta
103 mph. A pesar de los fuertes vientos, la mayoría de los daños en toda la isla fueron causados por las fuertes
lluvias. El huracán Fiona provocó un apagón general en todo Puerto Rico como resultado de los daños
causados en el sistema eléctrico. A la fecha de los presentes estados financieros, la Autoridad y LUMA,
todavía están evaluando los daños.

Para un análisis más detallado de estos y otros acontecimientos posteriores que pueden tener un efecto significativo
sobre la situación financiera y las operaciones de la Autoridad, consultar la Nota 20 de los estados financieros.

<u>Solicitud de información</u>

Las preguntas relativas a la información proporcionada en este informe o las solicitudes de información financiera
adicional deben dirigirse al Director Financiero de la Autoridad. Las oficinas ejecutivas de la Autoridad están ubicadas
en la Avenida Ponce de León 1110, San Juan, Puerto Rico 00907. Se puede obtener otra información financiera en la
página web oficial de la Autoridad www.aeepr.com.

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Estado de resultados netos (déficit)
(En miles)
30 de junio de 2020

Activos y salidas de recursos diferidas

Activos corrientes:

| | | |
|---|---|---|
| Efectivo y equivalentes de efectivo | $ | 435,603 |
| Cuentas por cobrar, neto | | 634,613 |
| Cuentas por cobrar a compañías de seguros y la FEMA, netas | | 134,355 |
| Inventario de combustible | | 102,886 |
| Materiales e insumos | | 207,931 |
| Pagos anticipados y otros activos | | 1,049 |
| Total de activos corrientes | | 1,516,437 |

Activos no corrientes:

| | |
|---|---|
| Efectivo y equivalentes de efectivo restringidos | |
| Inversiones restringidas | 163,303 |
| Activos fijos amortizables, netos | 21,311 |
| Activos fijos no amortizables | 7,428,816 |
| | 488,450 |
| Total de activos no corrientes | 8,101,880 |
| Total de activos | 9,618,317 |

Salidas de recursos diferidas:

| | | |
|---|---|---|
| Relacionado con las pensiones | | |
| Relacionado con OPEB | | |
| Relacionado con la obligación de retiro de activos | | 588,385 |
| Relacionado con la devolución de la deuda | | 21,519 |
| Relacionados con los instrumentos derivados | | 66,023 |
| | | 23,241 |
| Total de entradas diferidas de recursos | | 53,902 |
| Total de activos y salidas de recursos diferidas | | 753,070 |
| | $ | 10,371,387 |

(continuación)

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Estado de resultados netos (déficit) - (continuación)
(En miles)
30 de junio de 2020

Pasivo, entradas de recursos diferidas y resultados netos (déficit)

Pasivos corrientes:

| | | |
|---|---|---:|
| Cuentas por pagar y pasivos devengados | $ | 1,522,225 |
| Parte corriente de los bonos a pagar | | 1,666,169 |
| Parte corriente de los efectos a pagar | | 696,652 |
| Interés devengado | | 1,634,466 |
| Depósitos de clientes | | 108,046 |
| Ausencias compensadas | | 19,030 |
| Ingresos no obtenidos | | 9,408 |
| Total de pasivos corrientes | | 5,655,996 |

Pasivos no corrientes:

| | |
|---|---:|
| Ausencias compensadas | 17,424 |
| Depósitos de clientes y otros | 212,266 |
| Ingresos no obtenidos | 1,035 |
| Documentos a pagar | 27,069 |
| Préstamo a pagar | 451 |
| Bonos a pagar | 6,664,562 |
| Otros pasivos de beneficios posteriores al empleo | 368,248 |
| Reclamaciones y sentencias | 288,231 |
| Obligación de retiro de activos | 148,593 |
| Valor de mercado de los instrumentos derivados | 53,902 |
| Pasivos netos por pensiones | 4,882,261 |
| Total de pasivos no corrientes | 12,664,042 |
| Total de pasivos | 18,320,038 |

Entradas de recursos diferidas:

| | |
|---|---:|
| Relacionado con las pensiones | 91,666 |
| Relacionado con OPEB | 12,888 |
| Total de entradas diferidas de recursos | 104,554 |

Resultados netos (déficit)

| | |
|---|---:|
| Inversión neta en activos de capital | (500.522) |
| Restringido | 166,782 |
| No restringido | (7,719,465) |
| Total de resultados netos (déficit) | (8,053,205) |
| Total de pasivos, entradas de recursos diferidas y resultados netos | $   10,371,387 |

Las notas adjuntas son parte integrante de estos estados financieros

- 24 -

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Estado de ingresos, gastos y cambios en los resultados netos (déficit)

(En miles)

Para el año fiscal que termina el 30 de junio de 2020

| | |
|---|---:|
| **Ingresos operativos** | |
| Servicios de electricidad | |
| Residencial y comercial | $ 2,930,540 |
| Gobierno | 529,463 |
| Otros | (60,330) |
| Gastos en deudas incobrables | (138,713) |
| Telecomunicaciones | 14,096 |
| Riego | 3,819 |
| Total de ingresos operativos | 3,278,875 |
| | |
| **Gastos operativos:** | |
| Combustible | |
| Energía comprada | 1,236,488 |
| Depreciación | 732,920 |
| Mantenimiento | 350,259 |
| Administrativos y generales | 268,110 |
| Transmisión y distribución | 297,978 |
| Contabilidad y cobro de clientes | 287,445 |
| Otra producción | 190,550 |
| Gasto de la obligación de retiro de activos | 108,164 |
| Reparaciones de emergencia después del huracán María | 3,922 |
| Contribución en lugar de impuestos | 286,581 |
| | 69,986 |
| | |
| Total de gastos operativos | 3,832,403 |
| | |
| Pérdida operativa | (553,528) |
| | |
| **Ingresos y (gastos) no operativos, netos:** | |
| Subvenciones del Gobierno Federal de los EE. UU., netas de provisión | 40,895 |
| Ingresos por intereses y otros | 13,322 |
| Gastos de intereses y otros | (445,574) |
| | |
| Total de ingresos y (gastos) no operativos, netos | (391,357) |
| | |
| Pérdidas netas de las contribuciones de capital | (944,885) |
| | |
| Contribuciones de capital | 7,538 |
| | |
| Variación de los resultados netos (déficit) | (937,347) |
| | |
| Resultados netos (déficit) al principio del año, replanteado (ver Nota 4) | (7,115,858) |
| | |
| Resultados netos (déficit) al final del año | $ (8,053,205) |

Las notas adjuntas son parte integrante de estos estados financieros

Autoridad de Energía Eléctrica de Puerto Rico

(Una unidad componente del ELA de Puerto Rico)

Estado de flujos de efectivo

(En miles)

Para el año fiscal que termina el 30 de junio de 2020

| | | |
|---|---:|---:|
| **Flujos de efectivo de actividades operativas:** | | |
| Efectivo recibido de los clientes | $ | 3,328,692 |
| Efectivo pagado a los proveedores | | (2,520,223) |
| Efectivo pagado a los empleados | | (435,644) |
| Efectivo pagado a los clientes | | (18,498) |
| Efectivo recibido de las compañías de seguros | | <u>74,375</u> |
| Flujos de efectivo netos procedentes de las actividades de operativas | | 428,702 |
| | | |
| **Flujos de efectivo de actividades de financiamiento no relacionadas con el capital:** | | |
| Ingresos recibidos del Gobierno Federal de los Estados Unidos | | 29,207 |
| Gastos pagados y reclamados a las compañías de seguros | | (93) |
| Producto de los documentos a pagar | | 1,611 |
| Capital principal pagado sobre los documentos a pagar | | (660) |
| Flujos de efectivo netos procedentes de actividades de financiamiento no relacionadas con el capital | | 30,065 |
| | | |
| **Flujos de efectivo de actividades de financiamiento relacionadas con el capital:** | | |
| Gastos de construcción | | (258,073) |
| Ingresos recibidos del capital contribuido | | 846 |
| Intereses percibidos del préstamo a pagar en el marco del programa de protección de la nómina | | 451 |
| Intereses pagados | | (758) |
| Bonos de ingresos de energía: | | - |
| Ingresos de las compañías de seguros para pagar los bonos de ingresos asegurados | | 139,165 |
| Capital principal pagado sobre los vencimientos de los bonos de ingresos asegurados | | (139,165) |
| Ingresos de las compañías de seguros para pagar los intereses de los bonos de ingresos asegurados | | 87,243 |
| Intereses pagados por los bonos de ingresos asegurados | | <u>(87,243)</u> |
| Flujos de efectivo netos utilizados para actividades de capital y financiamiento relacionadas | | (257,534) |
| <u>Flujo de efectivo de las actividades de inversión:</u> | | |
| Inversión en certificados de depósito | | (21,311) |
| Flujos de caja Flujos de efectivo netos utilizados en actividades de inversión | | (21,311) |
| | | |
| Disminución neta de efectivo y equivalentes de efectivo | | 179,922 |
| Efectivo y equivalentes de efectivo al principio del año | | <u>418,984</u> |
| | | |
| Efectivo y equivalentes de efectivo al final del año | $ | 598,906 |
| | | |
| **Efectivo y equivalentes de efectivo:** | | |
| No restringido | $ | 435,603 |
| Restringido | | 163,303 |
| | $ | <u>598,906</u> |

- 26 -

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Estado de flujos de efectivo - (continuación)
(En miles)
Para el año fiscal que termina el 30 de junio de 2020

Conciliación de la pérdida operativa con el efectivo neto
proporcionado por las actividades operativas:

| | | |
|---|---|---|
| Pérdida operativa | $ | (553,528) |
| Ajustes para conciliar las pérdidas operativas con el efectivo neto proporcionado por las actividades operativas: | | |
| Depreciación | | |
| Disposición para cuentas incobrables y otras | | 350,259 |
| Gasto por obligación de retiro de activos | | 138,713 |
| Otras misceláneas | | 3,921 |
| Cambios en activos y pasivos operativos | | 28,672 |
| Cuentas por cobrar | | - |
| Inventario de combustible | | (80,391) |
| Materiales e insumos | | 53,574 |
| Pagos anticipados y otros activos | | 1,711 |
| Salidas de recursos diferidas | | 7,777 |
| Cuentas por pagar y otros pasivos devengados | | 51,583 |
| Pasivos netos por pensiones | | 199,384 |
| Depósitos de clientes y otros | | 314,940 |
| Otros pasivos de beneficios posteriores al empleo | | 14,884 |
| Reclamaciones y sentencia | | 20,153 |
| Ausencias compensadas que se liquidarán al cabo de un año | | 11,564 |
| Entrada de recursos diferida | | (142,639) |
| Ingresos no obtenidos | | 1,937 |
| Total de ajustes | | 982,230 |
| Flujos de efectivo netos procedentes de las actividades operativas | $ | 428,702 |

Información complementaria sobre los flujos de caja:
Transacciones no monetarias:

| | | |
|---|---|---|
| Contribuciones de capital | $ | 6,692 |
| Contribuciones en lugar de impuestos, facturaciones y efecto de compensación | $ | (69,986) |
| Variación del valor razonable de los instrumentos derivados | $ | (12,562) |
| Cambios en la pérdida diferida resultante del reembolso de la deuda | $ | 5,440 |
| Gastos de construcción no pagados | $ | 348,850 |

Las notas adjuntas son parte integrante de estos estados financieros

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 1 - <u>Organización</u>

La Autoridad de Energía Eléctrica de Puerto Rico (la "Autoridad") es una corporación pública y unidad componente del ELA de Puerto Rico (el "ELA") creada el 2 de mayo de 1941, conforme a la Ley Núm. 83, y sus enmiendas (la "Ley"). La Autoridad produce, compra, transmite y distribuye, sustancialmente, toda la energía eléctrica que se consume en Puerto Rico. La Autoridad tiene amplias facultades que incluyen, entre otros, la emisión de bonos para cualquiera de sus propósitos corporativos, sujetos a las limitaciones establecidas en un Contrato de Fideicomiso, fechado el 1 de enero de 1974, y sus enmiendas (el "Contrato de 1974"). Como corporación pública e instrumentalidad del ELA, la Autoridad está exenta del pago de impuestos sobre la renta, la propiedad, municipales y federales.

El 27 de mayo de 2014, el ELA aprobó la Ley Núm. 57 ("Ley 57-2014"), que autoriza a la Oficina de Energía de Puerto Rico (la "PREB") (entonces conocido como la Comisión de Energía de Puerto Rico) a aprobar las tarifas eléctricas propuestas por la Autoridad, entre otros asuntos. El 16 de febrero de 2016, el ELA aprobó la Ley núm. 4, también conocida como Ley de Revitalización de la Autoridad de Energía Eléctrica de Puerto Rico ("Ley núm. 4"), que modifica el marco regulatorio para establecer las tarifas eléctricas y los asuntos del código de conducta y establece un marco legal y judicial para la reestructuración de la deuda de la Autoridad. La Ley núm. 4 también creó la Corporación de Revitalización de la Autoridad de Energía Eléctrica de Puerto Rico ("CRAEE"). La entidad de propósito especial recién creada está facultada para emitir bonos de titulización para reestructurar con descuento la deuda pendiente a largo plazo de la Autoridad. Entre otras actividades, tal y como se define en la Ley núm. 4, la CRAEE también está facultada para presentar ante la PREB una propuesta de resolución de reestructuración que cree una propiedad de reestructuración y prevea el cobro de cargos de transición para reembolsar los bonos y cubrir otros costos relacionados.

Como se discute en las Notas 3 y 19, el 2 de julio de 2017, la Junta de Supervisión y Administración Financiera (la "Junta de Supervisión") presentó una petición bajo el Título III de la Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico ("PROMESA") en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico (el "Tribunal de Título III"), iniciando un caso de Título III para la Autoridad (la "Petición de Título III") para reestructurar la deuda y otros pasivos de la Autoridad. El Tribunal está evaluando la petición de reparación del Título III. Los estados financieros básicos adjuntos no incluyen ningún ajuste que pueda resultar del resultado de la Petición del Título III.

*Este espacio se ha dejado intencionadamente en blanco*

- 28 -

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 2 - <u>Resumen de las principales políticas contables</u>

A continuación se resumen las políticas contables más significativas seguidas por la Autoridad en la elaboración de sus estados financieros:

<u>Base contable</u>

Los estados financieros se presentan como una entidad empresarial utilizando el enfoque de medición de los recursos económicos y la base contable de devengo, de acuerdo con los principios contables generalmente aceptados en los Estados Unidos de América ("GAAP") para los gobiernos, según lo prescrito por la Junta de Normas de Contabilidad Gubernamental ("GASB"). Por consiguiente, los ingresos se reconocen cuando se obtienen y los gastos cuando se producen, independientemente del momento en que se reciba o pague el dinero. La Autoridad lleva a cabo sus actividades de manera similar a las empresas privadas; la intención es que los costos de proporcionar bienes o servicios al público en general de manera continua sean financiados o recuperados principalmente a través de las tarifas de los usuarios.

<u>Entidad informante</u>

Los estados financieros de la Autoridad incluyen, como una unidad componente combinada, la posición financiera y las operaciones de PREPA Holdings, LLC ("PREPA Holdings"), una subsidiaria de propiedad absoluta, creada como una compañía tenedora para PREPA Networks, LLC (ahora HUB Advanced Networks, LLC) ("PREPA Net"), InterAmerican Energy Sources, LLC, Consolidated Telecom of Puerto Rico, LLC. e International Network Operations, LLC. Estas entidades se incluyen como parte de la entidad informante de PREPA Holdings. La base para la presentación combinada es que PREPA Holdings, creada por la Junta de Gobierno de la Autoridad conforme a la Resolución núm. 3661 adoptada el 16 de octubre de 2009, es una sociedad de responsabilidad limitada de un solo miembro, y la Autoridad es el único miembro con representantes de gestión compartida.

*Este espacio se ha dejado intencionadamente en blanco*

- 29 -

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 2 - <u>Resumen de las principales políticas contables - (continuación)</u>

    <u>Entidad informante - (continuación)</u>

    La información financiera condensada de PREPA Holdings para el año fiscal terminado el 30 de junio de 2020 es la siguiente (en miles):

| | | |
|---|---|---:|
| Estado de resultados netos: | | |
|   Total de activos: | | |
|     Activos corrientes | $ | 9,382 |
|     Activos no corrientes | | 979 |
|     Activos de capital, netos de depreciación | | <u>48,715</u> |
|       Total de activos | $ | <u>59,076</u> |
| Pasivos: | | |
|   Pasivos corrientes | $ | 4,225 |
|   Pasivos no corrientes | | <u>28,783</u> |
|     Total de pasivos | | <u>33,008</u> |
| | | |
| Resultados netos | | |
|   Inversión neta en activos de capital | | 34,733 |
|   No restringido (déficit) | | <u>(8,665)</u> |
| Resultados netos | $ | <u>26,068</u> |

*Este espacio se ha dejado intencionadamente en blanco*

- 30 -

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 2 - Resumen de las principales políticas contables - (continuación)

Entidad informante - (continuación)

Estado de ingresos, gastos y cambios en los resultados netos:

| | | |
|---|---:|---:|
| Ingresos operativos | $ | 14,095 |
| Gastos operativos | | (12,960) |
| Pérdida operativa | | 1,135 |
| Gastos no operativos | | (274) |
| Cambio en los resultados netos | | 861 |
| Resultados netos, saldo inicial | | 25,207 |
| Resultados netos, saldo final | $ | 26,068 |

Estado de flujos de efectivo:

| | | |
|---|---:|---:|
| Efectivo neto proporcionado por las actividades operativas | $ | 3,562 |
| Efectivo neto utilizado en actividades de capital y financiamiento relacionadas | | (2,788) |
| Efectivo neto procedente de actividades de inversión | | 1,331 |
| Aumento neto de la tesorería | | 2,105 |
| Efectivo, al principio del año | | 4,837 |
| Efectivo, al final del año | $ | 6,942 |

Los estados financieros completos, emitidos por separado, auditados de PREPA Holdings pueden obtenerse en: Condominio Aquablue en la Milla de Oro, Edificio Comercial Cuarto Piso, Avenida Muñoz Rivera 48, San Juan, Puerto Rico, 00918.

Estimados

La elaboración de los estados financieros básicos requiere que la gerencia realice estimaciones y supuestos que afectan a los importes presentados de los activos y pasivos y a la divulgación de los activos y pasivos contingentes en la fecha de los estados financieros básicos, así como a los importes presentados de los ingresos y gastos durante el período de referencia. Los resultados reales podrían diferir de esas estimaciones.

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 2 - Resumen de las principales políticas contables - (continuación)

### Efectivo y equivalentes de efectivo (incluidos restringidos)

El efectivo y los equivalentes de efectivo incluyen el efectivo en caja, los depósitos en las cuentas bancarias comerciales, las inversiones en el mercado monetario, los certificados de depósito y los instrumentos con vencimiento original de tres meses o menos.

El efectivo restringido y los equivalentes de efectivo son cantidades reservadas para la construcción, los pagos del servicio de la deuda u otros fines específicos que se limitan a los fines especificados en los acuerdos aplicables. (Ver la Nota 7).

### Inversiones restringidas

Las inversiones restringidas incluyen certificados de depósito con vencimiento original de seis meses, reservados para la construcción y otros fines específicos delimitados por los acuerdos aplicables. (Ver la Nota 7).

### Cuentas por cobrar

Las cuentas por cobrar consisten en la facturación mensual o bimensual por el servicio eléctrico prestado a los clientes en base a las lecturas de los contadores y la acumulación de ingresos por el servicio eléctrico prestado a los clientes no facturados a final de mes. La Autoridad acumula los ingresos no facturados basándose en una media del consumo no facturado por cliente.

Las cuentas por cobrar se presentan netas de las provisiones estimadas para importes incobrables, que se determinan tras considerar la probabilidad de cobros posteriores y las condiciones económicas actuales, entre otros factores. La Autoridad establece una asignación general o específica para cada grupo de clientes (es decir, residencial, comercial, industrial y gubernamental). Debido a las incertidumbres inherentes al proceso de estimación, la estimación de la gerencia de las pérdidas crediticias en las cuentas por cobrar existentes y la correspondiente provisión pueden cambiar en el futuro.

La Autoridad tiene importantes cuentas por cobrar al ELA, a sus unidades componentes y a los municipios. Existe incertidumbre en cuanto al cobro de estos créditos debido a los problemas financieros que afrontan estas entidades. La Autoridad lo ha tenido en cuenta en su estimación de la provisión gubernamental específica para cuentas incobrables.

### Inventario de combustible

El inventario de combustible representa el valor del combustible líquido de bajo contenido en azufre y de otro tipo que la Autoridad tenía a mano al final del año fiscal para satisfacer las necesidades de demanda de sus estaciones generadoras.

- 32 -

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)


Notas a los estados financieros


Para el año fiscal que termina el 30 de junio de 2020


Nota 2 - Resumen de las principales políticas contables - (continuación)

El inventario del combustible se valora según el método de los costos medios ponderados. En el momento del consumo, se registra un gasto al costo medio ponderado.

Inventario de materiales y suministros

El inventario de materiales y suministros apoya las operaciones y el mantenimiento de los activos de generación, transmisión y distribución. Las existencias se contabilizan con arreglo a los costos medios. A 30 de junio de 2020, una reserva de aproximadamente $48 millones para inventarios obsoletos se incluye como parte de los materiales y suministros en el estado de los resultados netos (déficit) adjunto.

Activos de capital

Los activos fijos se contabilizan a los costos, que incluyen la mano de obra, el material, los servicios y los gastos generales. Los gastos de capital de aproximadamente $1,200 o más y una vida útil superior a un año se capitalizan a los costos en la fecha de adquisición. El mantenimiento, las reparaciones y los costos de renovación de elementos menores de las unidades inmobiliarias se cargan a los gastos de funcionamiento. La depreciación compuesta supone que todos los activos se retiran al final de su vida útil, por lo que no se reconoce ninguna ganancia o pérdida al momento de la jubilación. Los costos de los activos retirados se eliminan tanto de la cuenta de activos de capital como de la cuenta de depreciación acumulada.

Las contribuciones de capital consisten principalmente en activos de infraestructura que son construidos por entidades privadas, para proyectos residenciales, comerciales o industriales, que son transferidos al finalizar los proyectos, para que la Autoridad conecte las instalaciones a la red eléctrica. Los activos de capital donados por partes relacionadas (es decir, el ELA u otras unidades componentes del ELA) se registran al valor contable existente en los registros del cedente. Para el año fiscal terminado el 30 de junio de 2020, la Autoridad recibió aproximadamente $7.5 millones en contribuciones de capital, de los cuales aproximadamente $6 millones fueron recibidos del Cuerpo de Ingenieros del Ejército de los Estados Unidos ("USACE"). Ver la Nota 17.

Deterioro de activos de capital

La Autoridad evalúa los acontecimientos o cambios significativos en las circunstancias que puedan afectar a sus activos de capital para determinar si se ha producido el deterioro de un activo de capital. Tales acontecimientos pueden incluir la evidencia de daños físicos, la promulgación o aprobación de leyes o reglamentos, los cambios en los factores ambientales, los cambios tecnológicos o la evidencia de obsolescencia, los cambios en la forma o la duración del uso de un activo de capital, y la paralización de la construcción, entre otros, que da lugar a la disminución significativa e inesperada de la utilidad o capacidad de servicio del activo. Los bienes de capital deteriorados que la Autoridad ya no utilizará se contabilizan al menor de los valores contables o al valor razonable, menos los costos de enajenación.

- 33 -

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Resumen de las principales políticas contables - (continuación)

Nota 2 -

Deterioro de activos de capital - (continuación)

La Autoridad sigue la Declaración núm. 42 de la GASB, *"Contabilidad e información financiera sobre el deterioro de los activos de capital y las recuperaciones de seguros"*. Esta declaración establece que la restauración o reposición de un activo de capital deteriorado se informa como una transacción separada de la pérdida por deterioro y la recuperación del seguro asociado. Las pérdidas por deterioro se contabilizan netas de la recuperación del seguro asociada cuando la recuperación y la pérdida se producen en el mismo año; las recuperaciones de los años siguientes se contabilizan como ingresos no operativos. Las recuperaciones de seguros se reconocen cuando se realizan o son realizables como una reducción de la pérdida correspondiente. Para el año fiscal finalizado el 30 de junio de 2020, la Autoridad no informó de pérdidas de valor en sus activos de capital.

Depreciación y amortización

La Autoridad utiliza el método de depreciación compuesta para todos los bienes de capital. Los gastos de depreciación de las instalaciones en servicio resultan de la aplicación de tasas determinadas por estudios de la vida útil de los activos en servicio. Las tasas se aplican a grupos de propiedades depreciables. A partir del 11 de noviembre de 2021, la Autoridad revisó sus tasas de depreciación para reflejar el valor neto contable ajustado y la vida útil de los activos de la planta, lo que resultó en una tasa de depreciación compuesta promedio de aproximadamente 2.90% para el 30 de junio de 2020.

Por separado, los activos de arrendamiento financiero y las mejoras de la propiedad arrendada se amortizan a lo largo de la vida de los activos o del plazo del arrendamiento, si es menor, utilizando el método lineal.

A continuación, se indican las vidas útiles estimadas por categoría según el estudio de amortización:

| Categoría | Vida útil (en años) |
|---|---|
| Producción | 20 a 80 |
| Distribución | 10 a 50 |
| Transmisión | 20 a 55 |
| General y administrativo | 10 a 40 |
| Red de fibra | 5 a 23 |
| Sistemas de riego | 14 a 100 |

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 2 - Resumen de las principales políticas contables - (continuación)

### Salidas/entradas flujos de recursos diferidas

Las salidas de recursos diferidas representan un consumo de la posición neta que se aplica a un período futuro, por lo que no se reconocerá como una salida de recursos (gasto) hasta entonces. La Autoridad tiene las siguientes salidas de recursos diferidas:

- La diferencia entre la experiencia esperada y la real, los cambios en los supuestos y la contribución de la Autoridad con posterioridad a la fecha de medición, tanto para el plan de pensiones como para otros beneficios posteriores al empleo ("OPEB").

- Pérdida diferida no amortizada por reembolso de deuda.

- Disminución acumulada del valor razonable de los instrumentos derivados de cobertura.

- En el caso de las obligaciones de retiro de activos, se miden por el importe del pasivo correspondiente.

Las entradas de recursos diferidas representan entradas de recursos durante un año fiscal relacionadas con períodos futuros. La Autoridad tiene las siguientes entradas de recursos diferidas:

- Diferencia entre la experiencia esperada y la real, y cambios en los supuestos tanto para el plan de pensiones como para OPEB.

- Diferencia neta entre las ganancias proyectadas y reales en las inversiones del plan de pensiones

### Primas y descuentos en la emisión de deuda

Los costos de emisión de la deuda se registran como gastos cuando se producen. Las primas y descuentos en la emisión de bonos se difieren y amortizan utilizando el método lineal, que se aproxima al método de los intereses, a lo largo del plazo de los bonos correspondientes. Los bonos por pagar se presentan netos de la prima o el descuento amortizado de los bonos.

### Depósitos de clientes y otros

La Autoridad requiere depósitos de sus clientes antes de que se active una conexión de servicio eléctrico. Los depósitos se registran como un pasivo en el estado de los resultados netos, hasta la terminación del servicio. En el momento de la terminación o cancelación del servicio eléctrico, el depósito correspondiente se aplica al saldo pendiente de la cuenta.

- 35 -

Autoridad de Energía Eléctrica de Puerto Rico

(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 2 - Resumen de las principales políticas contables - (continuación)

Depósitos de clientes y otros - (continuación)

Cualquier exceso entre el saldo pendiente y el depósito se devuelve al cliente. Además, los pagos en exceso de los clientes se registran como un pasivo en el estado de situación neta si los pagos en exceso no pueden compensarse con otros créditos de clientes. Al 30 de junio de 2020, los depósitos de los clientes y los pagos en exceso de los clientes, de aproximadamente $229 millones y $80.5 millones, se presentan como pasivos en el estado de resultados netos.

Ausencias compensadas

Los empleados ganan vacaciones a razón de 15 días por año hasta una acumulación máxima permitida de 60 días para los empleados sindicales y el personal directivo.

Los beneficios de vacaciones acumuladas a los empleados son acumuladas por la Autoridad como un pasivo y como un gasto. El importe de las vacaciones acumuladas que se espera pagar en los próximos doce meses se clasifica como corriente, mientras que los importes que se esperan pagar después de doce meses se clasifican como pasivo no corriente. Ver la Nota 10.

Los empleados acumulan la licencia por enfermedad a razón de 18 días por año hasta una acumulación máxima permitida de 90 días. La acumulación anual de bajas por enfermedad se limita a 12 días para las nuevas contrataciones posteriores al 3 de febrero de 2017, según la Ley 8-2017. Sin embargo, esta prestación no se acumula en el pasivo porque la ley no permite la liquidación de las bajas por enfermedad acumuladas en el momento de la separación del servicio.

Ingresos no obtenidos

Los ingresos no devengados representan un pasivo que se crea cuando se recibe dinero por servicios aún no prestados. Los ingresos se reconocerán, y el pasivo por ingresos no devengados se eliminará, cuando se presten los servicios. Las contribuciones en efectivo de los clientes para proyectos de construcción específicos y las cantidades recibidas por adelantado relacionadas con la red de comunicación de fibra óptica aún no amortizadas se incluyen como parte de los ingresos no devengados de la Autoridad.

Pensiones

La Autoridad contabiliza los costos de las pensiones de acuerdo con las disposiciones de la Declaración núm. 68 de la GASB, *"Contabilidad e información financiera sobre las pensiones"*, y la Declaración núm. 71 de la GASB, *"Transición de las pensiones para las contribuciones realizadas con posterioridad a la fecha de medición"*.

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 2 - Resumen de las principales políticas contables - (continuación)

Pensiones - (continuación)

La Autoridad reconoce un pasivo neto por pensiones, que representa el exceso del pasivo total por pensiones sobre los resultados netos fiduciarios del plan de pensiones, como se refleja en los estados financieros del plan de pensiones. El pasivo neto por pensiones se mide a partir del inicio del año fiscal de la Autoridad. Los cambios en el pasivo neto por pensiones se registran como gastos por pensiones o como entradas o salidas diferidas de recursos, dependiendo de la naturaleza del cambio. Consultar la Nota 13.

Otros beneficios posteriores al empleo (OPEB)

La Autoridad contabiliza otros beneficios posteriores al empleo, ("OPEB") de acuerdo con la Declaración núm. 75 de la GASB, "Contabilidad e información financiera sobre beneficios posteriores al empleo distintos de las pensiones". Los empleados jubilados de la Autoridad tienen derecho a participar en un plan de atención médica de beneficio definido para un solo empleador, denominado Plan de Atención Médica para Empleados Jubilados de la Autoridad (el Plan OPEB), en el que no se acumulan activos en un fideicomiso que cumpla los criterios del párrafo 4 de la Declaración núm. 75 de la GASB; por lo tanto, la financiación se realiza sobre la base de pagos. Consultar la Nota 13.

Reclamaciones y sentencias

El importe estimado del pasivo por reclamaciones y sentencias se basa en la evaluación de la Autoridad de la probabilidad de un resultado desfavorable en el litigio aplicable. La Autoridad consulta con un asesor jurídico para determinar si se espera un resultado desfavorable. Debido a las incertidumbres inherentes al proceso de estimación, la estimación de la gerencia del pasivo por reclamaciones y juicios puede cambiar en el futuro. Sin embargo, la mayoría de las reclamaciones legales están actualmente paralizadas debido a la presentación de la Petición del Título III.

Obligación de remediación de la contaminación

La Autoridad contabiliza las obligaciones de remediación de la contaminación ("PRO") de acuerdo con la norma núm. 49 de la GASB, *Contabilidad e información financiera sobre las obligaciones de remediación de la contaminación*, que exige que el pasivo se registre por el valor actual de los costos que la Autoridad espera incurrir para realizar el trabajo. Los costos estimados de saneamiento están sujetos a cambios en el tiempo y se revisan en función de la tecnología actualizada, los cambios en las partes potencialmente responsables, los resultados de los estudios medioambientales, los cambios en las leyes o reglamentos y otros factores.

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 2 - <u>Resumen de las principales políticas contables - (continuación)</u>

<u>Obligación de retiro de activos</u>

A partir del 1 de julio de 2019, la Autoridad acumula las obligaciones de retiro de activos ("ARO") de acuerdo con la norma núm. 83 de la GASB, *Contabilidad e información financiera para ciertas obligaciones de retiro de activos*, que requiere que un gobierno que tiene obligaciones legales para realizar actividades futuras de retiro de activos relacionadas con sus activos de capital tangibles reconozca un pasivo y una salida diferida de recursos para tales obligaciones. La valoración de dicho pasivo se basa en la mejor estimación del valor actual de los desembolsos en los que se espera incurrir al final del período de información actual.

<u>Mediciones del valor de mercado</u>

La declaración núm. 72 de la GASB, *Medición y aplicación del valor de mercado*, establece los principios generales para la medición del valor de mercado y las normas de contabilidad e información financiera para los activos y pasivos medidos a valor de mercado. El valor de mercado es el precio que se recibiría por la venta de un activo o se pagaría para transferir un pasivo en una transacción ordenada entre participantes del mercado en la fecha de medición. El valor de mercado es una medición basada en el mercado, no una medición específica de la entidad. Para algunos activos y pasivos, puede haber transacciones de mercado observables o información de mercado; para otros, puede no haberla.

La jerarquía del valor de mercado clasifica los datos de las técnicas de valoración utilizadas para medir el valor razonable en tres niveles que se describen a continuación:

Nivel 1: valoraciones que utilizan precios cotizados (no ajustados) para activos o pasivos idénticos en mercados activos a los que la Autoridad puede acceder en la fecha de valoración.

Nivel 2: mediciones (distintas de los precios de cotización incluidos en el Nivel 1) que son observables para un activo o un pasivo, ya sea directa o indirectamente.

Nivel 3: mediciones que utilizan datos no observables para un activo o un pasivo. En algunas valoraciones, los datos utilizados pueden corresponder a diferentes niveles de jerarquía. En estos casos, el nivel del instrumento financiero dentro de la jerarquía del valor razonable se basa en el nivel más bajo de información que sea significativo para la medición del valor razonable.

En la Nota 12 se explica con más detalle el valor razonable de los acuerdos de permuta de tasas de interés de la Autoridad. La Autoridad valora a su valor de mercado sus acuerdos de permuta de tasas de interés. Los bienes de capital donados se registran por su valor de adquisición en el momento de la donación.

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 2 - Resumen de las principales políticas contables - (continuación)

Resultados netos

La Autoridad clasifica sus resultados netos de la siguiente manera:

Inversión neta en activos de capital: este componente de los resultados netos consiste en los activos de capital netos de la depreciación acumulada, reducidos por los saldos pendientes de los bonos, pagarés u otros préstamos atribuibles a la adquisición, construcción o mejora de dichos activos, incluidos los correspondientes flujos de salida diferidos.

Resultados netos restringidos: consiste principalmente en efectivo restringido para fines de construcción, neto de su deuda o compromisos de pago relacionados.

Resultados netos no restringidos: consiste en el importe neto de los activos, las salidas de recursos diferidas, los pasivos y las entradas de recursos diferidas que no se incluyen en la determinación de la inversión neta en activos de capital o en el componente restringido de los resultados netos, como se ha definido anteriormente.

Cuando se dispone de recursos restringidos y no restringidos para un uso específico, la política de la Autoridad es utilizar primero los recursos restringidos y luego los no restringidos, según se necesiten. Sin embargo, después de que la Junta de Supervisión presentara la Petición del Título III el 2 de julio de 2017, la Autoridad dejó de retirar fondos de sus recursos restringidos.

Clasificación de los ingresos y gastos operativos y no operativos

Los ingresos operativos incluyen actividades que tienen las características de una transacción de intercambio, como los servicios eléctricos. Los gastos operativos también incluyen actividades que tienen las características de una transacción de intercambio, como los salarios de los empleados, los beneficios y los gastos relacionados, los servicios públicos, los suministros y otros servicios.

Otros ingresos incluyen cargos relacionados con multas o sanciones administrativas, irregularidades en el consumo de energía eléctrica y sanciones por retraso en el pago.

Los ingresos no operativos incluyen actividades que tienen las características de las transacciones sin intercambio, como las subvenciones federales. Para el año fiscal terminado el 30 de junio de 2020, la Autoridad recibió subvenciones federales de la Agencia Federal para el Manejo de Emergencias ("FEMA") en ayuda por los daños a los activos de la Autoridad causados por los huracanes Irma y María (los "huracanes"), y de un acuerdo con la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico para trabajos ambientales y de reparación relacionados. La Autoridad aplicó las disposiciones de la Declaración núm. 33 de la GASB, *"Contabilidad e información financiera sobre operaciones sin contraprestación"*, para contabilizar estas subvenciones. La Declaración núm. 33 de la GASB permite que los ingresos

- 39 -

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 2 - Resumen de las principales políticas contables - (continuación)

Clasificación de los ingresos y gastos operativos y no operativos - (continuación)

se reconozcan cuando se cumplan los requisitos de elegibilidad y se disponga de los recursos, lo que ocurra primero. Ver la Nota 14.

Los gastos no operativos incluyen los intereses de las obligaciones y otros gastos relacionados que se definen como gastos no operativos.

Ingresos por servicios eléctricos

Los ingresos por servicios eléctricos se registran en función de los servicios prestados durante cada período contable, incluida una estimación de los servicios no facturados, netos de descuentos y provisiones. Las tarifas de facturación de los servicios eléctricos incluyen un componente de recuperación de los costos de combustible y energía comprada, que está diseñado para permitir la recuperación total de los costos de combustible y energía comprada según lo dispuesto por la PREB. A partir del 1 de mayo de 2019, como resultado de la nueva estructura tarifaria aprobada bajo la Ley núm. 4, se implementaron tres nuevas cláusulas de recuperación de costos: contribución en lugar de impuestos ("CILT"), y dos cláusulas adicionales diseñadas para cubrir los costos asociados con los subsidios, el alumbrado público y otras iniciativas de la PREB, según lo establecido en el CEPR-AP_2015-001 de la PREB del 10 de enero de 2017.

Los costos del combustible y de la energía comprada se reflejan en los gastos de explotación a medida que se consumen. Los costos relacionados con los nuevos pilotos implantados se presentan como una reducción de los ingresos netos y como gastos operativos.

*Este espacio se ha dejado intencionadamente en blanco*

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 2 - Resumen de las principales políticas contables - (continuación)

### Contribuciones en lugar de impuestos

El CILT es una cantidad que representa el servicio de energía eléctrica prestado por la Autoridad a los municipios de Puerto Rico, a cambio de la exención total de impuestos municipales conforme a lo dispuesto en la sección 22 de la Ley.

### Gestión de Riesgos

La Autoridad está sujeta a ciertos riesgos empresariales comunes al sector de los servicios públicos. La mayoría de estos riesgos se mitigan con la cobertura de seguros externos obtenidos por la Autoridad. Sin embargo, para otros riesgos empresariales, la Autoridad ha optado por autoasegurarse. Ver la Nota 16.

### Acuerdos de permuta de tasas de interés

La Autoridad contabiliza sus acuerdos de permuta de tasas de interés de acuerdo con la Declaración núm. 53 de la GASB, *"Contabilidad e información financiera sobre instrumentos derivados"*. Las permutas de tasas de interés se utilizan para aprovechar las tasas de interés favorables del mercado y limitar el riesgo de tasas de interés asociado a la exposición de la deuda a tasa variable.

El importe neto recibido o pagado en virtud de los acuerdos de permuta financiera se registra como un ajuste de los gastos por intereses. Las permutas de tasas de interés se contabilizan por su valor razonable en el estado de los resultados netos (déficit). Los cambios en el valor de mercado de las coberturas efectivas se registran como entradas o salidas de recursos diferidas en el estado de los resultados netos. Los cambios en el valor de mercado de las coberturas inefectivas se contabilizan en los ingresos de las inversiones.

*Este espacio se ha dejado intencionadamente en blanco*

- 41 -

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 2 - Resumen de las principales políticas contables - (continuación)

Pronunciamientos contables emitidos pero aún no efectivos

Se han emitido los siguientes nuevos estándares contables, pero aún no son efectivos:

- Declaración núm. 84 de la GASB, *Actividades fiduciarias*. En esta declaración se establecen los criterios para identificar las actividades fiduciarias de los gobiernos estatales y locales. En general, los criterios se centran en (1) si un gobierno controla los activos de la actividad fiduciaria y (2) los beneficiarios con los que existe una relación fiduciaria. En esta declaración también se establece el reconocimiento de un pasivo para los beneficiarios en un fondo fiduciario cuando ha ocurrido un evento que obliga al gobierno a desembolsar recursos fiduciarios. Los requisitos de esta declaración entraron en vigor originalmente para los períodos de información que comienzan después del 15 de diciembre de 2018, aunque se pospusieron debido a la pandemia de COVID-19. Consultar la Declaración núm. 95 de la GASB más adelante.

- Declaración núm. 87 de la GASB, *Arrendamientos*. El objetivo de esta declaración es cumplir mejor las necesidades de información de los usuarios de los estados financieros mejorando la información contable y financiera para los arrendamientos de los gobiernos. Esta declaración exige el reconocimiento de determinados activos y pasivos por arrendamientos que anteriormente se clasificaban como arrendamientos operativos y se reconocían como entradas o salidas de recursos en función de las disposiciones de pago del contrato. Los requisitos de esta declaración entraron en vigor originalmente para los períodos de información que comienzan después del 15 de diciembre de 2019, aunque se pospusieron debido a la pandemia de COVID-19. Consultar la Declaración núm. 95 de la GASB más adelante.

- Declaración núm. 88 de la GASB, *Cierta información relacionada con la deuda, incluidos los empréstitos directos y las colocaciones directas*. El objetivo principal de esta declaración es mejorar la información que se divulga en las notas a los estados financieros del gobierno relacionados con la deuda, incluidos los empréstitos directos y las colocaciones directas. También aclara qué pasivos deberían incluir los gobiernos al divulgar información relacionada con la deuda. Los requisitos de esta declaración entraron en vigor originalmente para los períodos de información que comienzan después del 15 de junio de 2018, aunque se pospusieron debido a la pandemia de COVID-19. Consultar la Declaración núm. 95 de la GASB más adelante.

- Declaración núm. 90 de la GASB, *Participación mayoritaria en el capital*. Los objetivos principales de esta Declaración son mejorar la consistencia y la comparabilidad de informar la participación mayoritaria en el capital o parte de un gobierno en una organización legalmente separada y mejorar la relevancia de la información de los estados financieros para ciertas unidades de componentes. Los requisitos de esta declaración entraron en vigor originalmente para los períodos de información que comienzan después del 15 de diciembre de 2018, aunque se pospusieron debido a la pandemia de COVID-19. Consultar la Declaración núm. 95 de la GASB más adelante.

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 2 - <u>Resumen de las principales políticas contables - (continuación)</u>

<u>Pronunciamientos contables emitidos pero aún no efectivos - (continuación)</u>

- Declaración núm. 91 de la GASB, *Obligaciones de deuda conducida*. Esta Declaración exige a los emisores que divulguen información general sobre sus obligaciones de deuda conducida, organizada por tipo de compromiso, incluido el importe principal agregado pendiente de las obligaciones de deuda conducida de los emisores y una descripción de cada tipo de compromiso. Los requisitos de esta Declaración entraron en vigor originalmente para los períodos de información que comienzan después del 15 de diciembre de 2020, aunque se pospusieron debido a la pandemia de COVID-19. Consultar la Declaración núm. 95 de la GASB más adelante.

- Declaración núm. 92 de la GASB, *Omnibus 2020*. En esta Declaración se abordan una serie de temas y se incluyen disposiciones específicas sobre lo siguiente: La fecha de entrada en vigor de la Declaración núm. 87, Arrendamientos, y la Guía de Implementación núm. 2019 3, Arrendamientos, para los informes financieros intermedios; la presentación de informes sobre las transferencias de activos dentro de la entidad entre un empleador del gobierno primario y un plan de pensiones de beneficios definidos o un plan de OPEB de una unidad componente; la aplicabilidad de las Declaraciones núm. 73, Contabilización e información financiera sobre pensiones y activos relacionados que no están dentro del alcance de la Declaración núm. 68 de la GASB, y las modificaciones a ciertas disposiciones de las Declaraciones núm. 67 y 68 de la GASB, según su modificación, y núm. 74, *Información financiera sobre planes de beneficios posteriores al empleo distintos de los planes de pensiones*, según su modificación, para informar sobre los activos acumulados para beneficios posteriores al empleo; la aplicabilidad de ciertos requisitos de la Declaración núm. 84, *Actividades fiduciarias*, a los acuerdos sobre beneficios posteriores al empleo; la valoración de los pasivos (y los activos, en su caso) relacionados con ARO en una adquisición gubernamental; la información por parte de las agrupaciones de riesgo de las entidades públicas de los importes recuperables de los reaseguradores o aseguradores en exceso; la referencia a las valoraciones no recurrentes del valor razonable de los activos o pasivos en la literatura autorizada; y la terminología utilizada para referirse a los instrumentos derivados. La parte de esta Declaración que se refiere a la fecha de entrada en vigor de la Declaración 87 y su guía de aplicación asociada es efectiva a partir de su emisión. Las disposiciones relativas a las transferencias de activos dentro de la entidad y a la aplicabilidad de las declaraciones 73 y 74 son efectivas para los ejercicios fiscales que comienzan después del 15 de junio de 2020. Los requisitos restantes relacionados con las obligaciones de retiro de activos entraron en vigor para las adquisiciones de la Administración que se produjeran en los períodos de información posteriores al 15 de junio de 2020, aunque se pospusieron debido a la pandemia de COVID-19. Consultar la Declaración núm. 95 de la GASB más adelante. Se recomienda la aplicación anticipada y está permitida por tema.

- Declaración núm. 93 de la GASB, *Reemplazo de las tasas de oferta interbancaria*. El objetivo de esta Declaración es abordar esas y otras implicaciones contables y de información financiera que se derivan Reemplazo de las tasas de oferta interbancaria de Londres ("LIBOR"). El LIBOR dejó de existir en su forma actual a finales de 2021, lo que llevó a los gobiernos a modificar o reemplazar los instrumentos financieros con el fin de reemplazar el LIBOR por otros tipos de referencia, ya sea cambiando el tipo de referencia o añadiendo o modificando las disposiciones de reserva relacionadas con el tipo de referencia.

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 2 - Resumen de las principales políticas contables - (continuación)

Pronunciamientos contables emitidos pero aún no efectivos - (continuación)

La supresión del LIBOR como tasa de interés de referencia apropiado es efectiva para los períodos de información que finalizan después del 31 de diciembre de 2021, aunque se ha pospuesto debido a la pandemia de la COVID-19. Consultar la Declaración núm. 95 de la GASB más adelante. Todos los demás requisitos de esta Declaración entraron en vigor originalmente para los períodos de información que comienzan después del 15 de junio de 2020. Se alienta la aplicación anticipada.

• Declaración núm. 94 de la GASB, *Acuerdos de pago de disponibilidad y asociaciones público-privadas y público-públicas*. El objetivo principal de esta Declaración es mejorar la información financiera abordando cuestiones relacionadas con los acuerdos de colaboración público-privada y proporcionando orientaciones para la contabilidad y la información financiera de los acuerdos de pago por disponibilidad. Los requisitos de esta Declaración son efectivos para los ejercicios fiscales que comienzan después del 15 de junio de 2022 y todos los informes posteriores. Se alienta la aplicación anticipada.

• Declaración núm. 95 de la GASB, *Aplazamientos de fechas de entrada en vigencia de cierta orientación autorizada*. El objetivo principal de esta declaración es proporcionar un alivio temporal a los gobiernos y otras partes interesadas a la luz de la pandemia de COVID 19 mediante el aplazamiento de las fechas de entrada en vigor de determinadas disposiciones de las Declaraciones y Guías de aplicación que entraron en vigor por primera vez o son efectivas inmediatamente.

Las fechas de entrada en vigor de determinadas disposiciones contenidas en los siguientes pronunciamientos se posponen un año después de la fecha de aplicación original:

• Declaración núm. 84 de la GASB, *Actividades fiduciarias*.
• Declaración núm. 89 de la GASB, *Contabilidad de costos de intereses incurridos antes del fin de un período de construcción*
• Declaración núm. 90 de la GASB, *Interés mayoritario en el capital*
• Declaración núm. 91 de la GASB, *Obligaciones de deudas de conductos*
• Declaración núm. 92 de la GASB, *Omnibus 2020*
• Declaración núm. 93 de la GASB, *Reemplazo de las tasas de oferta interbancarias*.
• Guía de implementación de la GASB núm. 2017 3, *Informes contables y financieros para beneficios posteriores al empleo distintos de las pensiones (y ciertos problemas relacionados con los informes del plan OPEB)*
• Guía de implementación de la GASB núm. 2018 1, *Actualización de la guía de aplicación—2018*
• Guía de implementación de la GASB núm. 2019 1, *Actualización de la guía de aplicación—2019*
• Guía de Implementación de la GASB núm. 2019 2, *Actividades fiduciarias*.
• Guía de Implementación de la GASB núm. 2019 3, *Arrendamientos*.

- 44 -

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 2 - Resumen de las principales políticas contables - (continuación)

Pronunciamientos contables emitidos pero aún no efectivos - (continuación)

Las fechas de vigencia de los siguientes pronunciamientos se posponen 18 meses después de la fecha de implementación original:

- Declaración núm. 87 de la GASB, *Arrendamientos*.

Se fomenta la aplicación anticipada de las disposiciones tratadas en las Declaraciones anteriores y se permite en la medida en que se especifica en cada pronunciamiento tal y como se emitió originalmente.

- Declaración núm. 96 de la GASB, *Acuerdos de tecnología de la información basados en suscripción*. El objetivo principal de esta Declaración es brindar orientación sobre la información contable y financiera para acuerdos de tecnología de la información basados en suscripción ("SBITA") para usuarios finales gubernamentales (gobiernos). Esta declaración (1) define un SBITA; (2) establece que un SBITA da lugar a un derecho de uso de un activo de suscripción (un activo intangible) y a un pasivo de suscripción correspondiente; (3) proporciona los criterios de capitalización para los desembolsos distintos de los pagos de suscripción, incluidos los costos de implementación de un SBITA; y (4) exige la divulgación de notas relativas a un SBITA. En la medida en que sea relevante, los estándares para SBITA se basan en los estándares establecidos en la Declaración núm. 87, *Arrendamientos*, y sus enmiendas. Los requisitos de esta Declaración son efectivos para los ejercicios fiscales que comienzan después del 15 de junio de 2022 y todos los informes posteriores. Se alienta la aplicación anticipada.

- Declaración núm. 97 de la GASB, *Ciertos criterios de las unidades componentes e informes contables y financieros para el código de rentas internas sección 457 Planes de Compensación Diferida, enmienda de las Declaraciones núm. 14 y núm. 84 de la GASB y una sustitución de la Declaración núm. 32 de la GASB.* Los objetivos principales de esta Declaración son (1) aumentar la coherencia y la comparabilidad en relación con la información de las unidades componentes fiduciarias en circunstancias en las que una unidad componente potencial no tiene un consejo de administración y el gobierno primario desempeña las funciones que normalmente realizaría un consejo de administración; (2) mitigar los costos asociados a la presentación de información sobre determinados planes de pensiones de contribución definida, planes de OPEB de contribución definida y planes de prestaciones a los empleados distintos de los planes de pensiones o los planes de OPEB (otros planes de prestaciones a los empleados) como unidades componentes fiduciarias en los estados financieros de los fondos fiduciarios; y (3) mejorar la pertinencia, la coherencia y la comparabilidad de la información contable y financiera de los planes de compensación diferida de la Sección 457 del Código de Rentas Internas (planes de la Sección 457) que cumplen la definición de plan de pensiones y de las prestaciones proporcionadas a través de dichos planes.

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 2 - <u>Resumen de las principales políticas contables - (continuación)</u>

<u>Pronunciamientos contables emitidos pero aún no efectivos - (continuación)</u>

Los requisitos establecidos en (1) el párrafo 4 de esta Declaración, tal y como se aplican a los planes de pensiones de contribución definida, a los planes de OPEB de contribución definida y a otros planes de beneficios para empleados, y (2) el párrafo 5 de esta Declaración, entran en vigor inmediatamente. Los requisitos de los párrafos 6 a 9 de esta Declaración son efectivos para los ejercicios fiscales que comienzan después del 15 de junio de 2021. Todos los demás requisitos de esta declaración son efectivos para los períodos de informe que comienzan después del 15 de junio de 2021. La gerencia aún no ha determinado el impacto que estas declaraciones pueden tener en los estados financieros básicos de la Autoridad.

Nota 3 - <u>Incertidumbre de la empresa en funcionamiento</u>

<u>Consideraciones de la empresa en funcionamiento</u>

La gerencia cree que existen dudas sustanciales sobre la capacidad de la Autoridad para continuar como empresa en funcionamiento porque:

- Actualmente, la Autoridad no dispone de fondos suficientes para reembolsar íntegramente sus diversas obligaciones a medida que vayan venciendo. La Autoridad ha incumplido varias obligaciones de deuda.

- A 30 de junio de 2020, la Autoridad tiene un déficit acumulado de aproximadamente $8,000 millones.

- Como se señala en la Nota 1, el 2 de julio de 2017, la Junta de Supervisión presentó la Petición del Título III. El Título III de PROMESA establece un proceso judicial para la reestructuración de las deudas de Puerto Rico y otros territorios de Estados Unidos que sigue el modelo del proceso del Capítulo 9 del Código de Quiebras de los Estados Unidos. Entre otras cosas, el Título III de PROMESA incorpora las disposiciones de paralización automática del Código de Quiebras de los EE. UU., que son aplicables a los casos del Título III conforme a la sección 301(a) de PROMESA. El 20 de julio de 2021, Moody's Investors Service ("Moody's") retiró su calificación de los bonos de la Autoridad. El 9 de febrero de 2018, Standard & Poor's ("S&P") retiró su calificación para los bonos de la Autoridad y ahora los califica (NR). Fitch Ratings ("Fitch") mantiene actualmente su calificación "D" para los bonos no asegurados de la Autoridad.

- La situación operativa y fiscal de la Autoridad se ha visto aún más afectada por una serie de acontecimientos catastróficos. Los huracanes causaron daños sustanciales en toda la isla al Sistema de Transmisión y Distribución ("Sistema T&D") de la Autoridad y a otros activos. En enero de 2020, un terremoto de magnitud 6.4 localizado cerca de la costa suroeste de Puerto Rico causó importantes daños en dos unidades de la central eléctrica Costa Sur de la Autoridad y dejó a la mayor parte de Puerto Rico sin servicio eléctrico durante horas.

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 3 - Incertidumbre de la empresa en funcionamiento (continuación)

Consideraciones de la empresa en funcionamiento (continuación)

Los efectos del terremoto fueron seguidos rápidamente por la aparición de la pandemia de COVID-19, que ha tenido un efecto negativo en las recaudaciones e ingresos de la Autoridad, debilitando aún más su posición de liquidez. Y más recientemente, el 24 de febrero de 2022, la invasión de Ucrania por parte de Rusia volvió a poner de relieve la dependencia mundial de los combustibles fósiles, y la consiguiente interrupción del suministro afectó directamente a las operaciones de la Autoridad al aumentar considerablemente los costos de compra de combustible.

Plan de remediación

Plan operativo

El objetivo actual de la Autoridad, evaluado por su consejo de administración, es (1) apoyar los esfuerzos para maximizar las asignaciones de fondos federales con el fin de invertir en la reparación y el fortalecimiento de su Sistema T&D y otros activos energéticos; (2) implementar reformas operativas y de gestión a corto plazo que mejoren la calidad del servicio y la eficiencia operativa; (3) apoyar la transferencia de las responsabilidades de operación y mantenimiento del Sistema T&D y de generación a operadores profesionales y privados; y (4) apoyar los esfuerzos para reestructurar su deuda heredada y sus obligaciones de pensiones.

Plan fiscal de la Autoridad

El 13 de marzo de 2017, la Autoridad presentó su primer plan fiscal decenal a la Junta de Supervisión. La Autoridad se compromete a la responsabilidad fiscal y a la modernización de las infraestructuras, a las asociaciones público-privadas, a las reducciones de gastos/eficiencias específicas (operativas y de otro tipo) y a los aumentos de ingresos específicos.

La Junta de Supervisión ha certificado varios planes fiscales para la Autoridad y el más reciente el 28 de junio de 2022 (el "Plan Fiscal Certificado 2022"). El 27 de enero de 2022, la Junta de Supervisión también certificó el Plan Fiscal del ELA de 2022 (el "Plan Fiscal del ELA"). El Plan Fiscal Certificado 2022 de la Autoridad, el Plan Fiscal del ELA y la política pública energética y el marco legal establecido por el Gobierno de Puerto Rico establecen la hoja de ruta de la transformación de la Autoridad. Si se aplica con éxito, un sistema energético reformado dará lugar a un servicio energético modernizado y fiable en toda la isla.

Sin embargo, no hay certeza de que el Plan Fiscal Certificado 2022 o el Plan Fiscal del ELA vayan a aplicarse en su totalidad o, en caso de aplicarse, vayan a ofrecer finalmente los resultados previstos. Todos estos planes y medidas, así como la capacidad de la Autoridad para reducir su déficit operativo financiero, dependen de una serie de factores y riesgos, algunos de los cuales no están totalmente bajo el control de la Autoridad.

- 47 -

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 3 -   Incertidumbre de la empresa en funcionamiento (continuación)

Acuerdo de apoyo a la reestructuración y Plan de ajuste de deudas de la Autoridad

Tras la finalización del Acuerdo de Apoyo a la Reestructuración de 2019 el 8 de marzo de 2022 y a la fecha de estos estados financieros, la Junta de Supervisión no ha presentado un plan de ajuste para la Autoridad ante el Tribunal de Título III. Durante el último trimestre del año fiscal 2022, por orden del Tribunal del Título III, las Partes Gubernamentales y algunas partes interesadas de la Autoridad iniciaron una mediación sobre las disputas relacionadas con las obligaciones financieras de la Autoridad, con la intención de desarrollar un plan de ajuste para la Autoridad. El Tribunal de Título III fijó como fecha límite el 15 de agosto de 2022, que está sujeta a una prórroga automática hasta el 9 de septiembre de 2022, según sea necesario sobre la base de la discreción del equipo de mediación, para que la Junta de Supervisión presente los documentos pertinentes para su propuesta de camino a seguir para concluir eficientemente el Título III de la Autoridad (la fecha límite de terminación de la mediación). El plazo de finalización de la mediación estuvo sujeto a múltiples prórrogas, la última de ellas hasta el 16 de septiembre de 2022 con una extensión automática hasta el 30 de septiembre de 2022. A la fecha de estos estados financieros, el tribunal de Título III no ha dictado una orden que adjudique estas controversias o que determine el camino a seguir, y la Junta de Supervisión no ha presentado un plan de ajuste para la Autoridad. Antes de la culminación del período de extensión hasta el 30 de septiembre de 2022, se produjeron eventos adicionales, para más detalles consulte la Nota 20.

Nota 4 -   Corrección de un error irrelevante y adopción de una nueva norma contable

Durante el año fiscal finalizado el 30 de junio de 2020, la Autoridad identificó un error relacionado con los estados financieros del año anterior y adoptó las disposiciones de la norma núm. 83 de la GASB, *"Contabilidad e información financiera de ciertas obligaciones de retiro de activos"*. Estas acciones dieron lugar al replanteamiento de los resultados netos iniciales de los estados financieros de la Autoridad. El impacto de la corrección de errores no significativos y la adopción de nuevos pronunciamientos contables en los resultados netos (déficit) fue el siguiente (en miles):

|  | Resultados netos (déficit) |
|---|---|
| Como se informó anteriormente | $ (6,804,693) |
| Corrección de las cuentas por cobrar y provisión de las subvenciones del Gobierno Federal de los EE. UU. | $ (232,516) |
| Implementación de GASB 83 | (78,649) |
| Saldo inicial, según replanteamiento | $ (7,115,858) |

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 4 - Corrección de un error irrelevante y adopción de una nueva norma contable

    a)   Corrección de un error irrelevante

El saldo inicial de las cuentas por cobrar a las compañías de seguros y la FEMA, en neto, estaba sobreestimado. El efecto de esta corrección supuso un aumento del déficit neto de la Autoridad de aproximadamente $232.5 millones.

    b)   Adopción de nuevos pronunciamientos contables GASB núm. 83

Esta declaración requiere el registro de los pasivos por retiro de activos, así como las salidas de recursos diferidas, sobre las obligaciones legales de los gobiernos para realizar futuras actividades de retiro de activos relacionadas con sus activos de capital tangibles. La Autoridad modificó su posición neta inicial en aproximadamente $78.6 millones para reconocer el efecto de esta adopción.

Nota 5 - Depósitos

Al 30 de junio de 2020, el importe en libros y el saldo bancario de los depósitos de efectivo mantenidos por la Autoridad en bancos comerciales es el siguiente (en miles):

|  | Cuenta corriente | Saldo Bancario |
|---|---|---|
| Efectivo no restringido | $ 435,603 | $ 444,117 |
| Efectivo restringido y depósitos a plazo fijo | $ 163,303 | $ 163,303 |
| Inversiones restringidas | $ 21,311 | $ 21,311 |

Riesgo de crédito de custodia - Depósitos en bancos comerciales

El riesgo de crédito de custodia es el riesgo de que, en caso de quiebra de un banco, no se devuelvan los depósitos. El ELA exige que los fondos públicos depositados en los bancos comerciales de Puerto Rico estén totalmente garantizados. La política de la Autoridad es depositar los fondos en instituciones que ofrecen seguros o valores como garantía. Dicha garantía está en manos del Departamento del Tesoro del ELA.

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 6 - <u>Cuentas por cobrar de servicios y cuentas por cobrar de compañías de seguros y la FEMA</u>

Las cuentas por cobrar consisten en (en miles):

Corrientes:
  Servicios eléctricos y afines:

| | | | |
|---|---:|---:|---:|
| Agencias y unidades componentes del ELA | | $ | 181,889 |
| Residencial, industrial y comercial | | | 1,043,833 |
| Servicios no facturados | | | 187,963 |
| Municipalidades | | | |
|   Cuentas por cobrar | 180,647 | | |
|   Compensación de cuentas por pagar (ver la nota 9) | (176,881) | | 3,766 |
| Telecomunicaciones y otros | | | 23,436 |
| | | | 1,440,887 |
| Provisión para cuentas incobrables | | | (806,274) |
|     Total de cuentas por cobrar, neto | | $ | 634,613 |

| | | | |
|---|---:|---:|---:|
| Compañías de seguros | | | 3,415 |
| Subvenciones del Gobierno Federal de los EE. UU., netas | | | 130,940 |
|     Total de cuentas por cobrar a las compañías de seguros y la FEMA | | $ | 134,355 |

No corrientes:
  Servicios eléctricos y afines:

| | | | |
|---|---:|---:|---:|
| Agencias gubernamentales y municipios | $ | 127,427 | |
| Otros créditos relacionados con la Administración | | 95,104 | $ | 222,531 |
| Provisión para cuentas incobrables | | | (222,531) |
|     Total de cuentas por cobrar no corrientes, netas | | $ | - |

*Este espacio se ha dejado intencionadamente en blanco*

- 50 -

Autoridad de Energía Eléctrica de Puerto Rico

(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 6 - <u>Cuentas por cobrar de servicios y cuentas por cobrar de compañías de seguros y la FEMA - (continuación)</u>

Al 30 de junio de 2020, los créditos con los municipios ascendían a $180.6 millones, de los cuales la Autoridad tiene derecho a compensar con el CILT a pagar aproximadamente $176.9 millones. Ver la Nota 9.

La Autoridad registró subvenciones por cobrar del Gobierno de los EE. UU. por un valor aproximado de $157.6 millones, así como una provisión de $26.7 millones para ciertos fondos que permanecen bajo la revisión de la FEMA en el estado los resultados netos (déficit) adjunto.

La parte de las cuentas por cobrar y otras cuentas por cobrar gubernamentales que no se espera cobrar durante el próximo año fiscal se registra en otras cuentas por cobrar no corrientes. La Autoridad registró una provisión para cuentas incobrables de $222.3 millones para el año fiscal terminado el 30 de junio de 2020, de los cuales $127.4 millones son en consideración a las dificultades financieras del ELA, sus unidades componentes y municipios. Los restantes $95.1 millones representan la provisión por la reclamación pendiente que tenía la Autoridad por los depósitos que anteriormente tenía en el Banco Gubernamental de Fomento para Puerto Rico ("BGF"), que fue reestructurado y sustituido por una reclamación de la Autoridad en el Fideicomiso de Entidades Públicas que se estableció como parte del proceso de reestructuración del BGF bajo el Título VI de PROMESA. Ver la Nota 12.

*Este espacio se ha dejado intencionadamente en blanco*

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

## Nota 7 - Efectivo, equivalentes de efectivo e inversiones restringidas

Al 30 de junio de 2020, la Autoridad tenía el siguiente efectivo y equivalente de efectivo restringido en manos de la U.S National Bank Association, el fideicomisario bajo el Acuerdo de 1974 (el "Fideicomisario de 1974") y de otras instituciones financieras comerciales, que consisten principalmente en depósitos de bancos comerciales, mercados monetarios, depósitos a plazo y certificados de depósito (en miles):

| | Efectivo y equivalentes a efectivo restringidos | Inversiones Restringidas |
|---|---|---|
| Fondo de construcción | $    84,846 | $    1,157 |
| Fondo de transición inicial para la transferencia del sistema T&D | 59,379 | - |
| Fondo de mantenimiento de reserva | - | 16,829 |
| Cuenta de reserva en el fondo de amortización | 17,100 | - |
| Fondo de clientes de la AEE | - | 3,325 |
| Otros fondos restringidos | 1,978 | - |
| Total | $    163,303 | $    21,311 |

Todo el dinero depositado en el Fideicomisario de 1974 o en cualquier otro depositario, según se define en el Acuerdo de 1974, que supere la cantidad garantizada por la Corporación Federal de Seguros de Depósitos u otra agencia federal, está continuamente garantizado en un banco o compañía fiduciaria aprobada por la Autoridad y por el Fideicomisario de 1974, en calidad de custodio, o, si la ley lo permite en ese momento, apartando bajo control del departamento fiduciario del banco que mantiene dicho depósito, como garantía colateral, Obligaciones del Gobierno (según se define en el Acuerdo de 1974) u otros valores negociables elegibles.

Fondo de construcción - El producto de los Bonos de ingreso de energía emitidos o el producto del seguro recibido, según lo estipulado por el Acuerdo de 1974, con el fin de pagar los costos de adquisición o construcción de mejoras, junto con el dinero recibido de cualquier otra fuente para tal fin, excepto el producto que (i) se aplique al reembolso de anticipos, (ii) se depositen en la Cuenta de Reserva de 1974, (iii) se depositen en la Cuenta de Servicio de Bonos como intereses capitalizados o (iv) se utilicen para el pago de gastos de financiamiento, se depositarán en el Fondo de Construcción de 1974 y serán mantenidos por la Autoridad sujetos a un interés de garantía a favor del Fideicomisario de 1974 (definido en la Nota 7). Para el año fiscal finalizado el 30 de junio de 2020, el saldo mantenido en este fondo representa principalmente los ingresos del seguro restringidos para la inversión de activos de capital de acuerdo con una determinación del Tribunal de Título III que restringió el uso de esos fondos para reparar, reemplazar o reconstruir la propiedad dañada o destruida.

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 7 - Efectivo, equivalentes de efectivo e inversiones restringidas (continuación)

Fondo de transición inicial - Para pagar los servicios de transición estipulados en el nuevo contrato firmado para la transformación del Sistema T&D de la Autoridad, o el Contrato T&D (como se define en la Nota 18). Estos servicios de transición se pagarán a partir de la fecha de entrada en vigor del contrato definida, hasta la fecha de inicio del servicio, según lo estipulado en el Contrato T&D.

Fondo de mantenimiento de reserva - Para pagar los costos de mantenimiento o reparaciones inusuales o extraordinarias, no recurrentes, y renovaciones y reemplazos, incluidos artículos importantes de equipo.

Cuenta de reserva en el fondo de amortización - Importes del año en curso para el capital principal y los intereses de los bonos de ingresos de energía.

Fondo de clientes de la AEE - Fondos recibidos de PREPA Holdings para ayudar a estabilizar el precio de la energía eléctrica suministrada a los clientes de la Autoridad.

Otros fondos restringidos - Fondos depositados en el marco del Proyecto de Adquisición de Tierras, un decreto de consentimiento entre la Autoridad y el Departamento de Justicia de LOS EE. UU., fechado el 19 de marzo de 1999, en el que la Autoridad acordó depositar aproximadamente $3.4 millones en una cuenta de depósito en garantía que devenga intereses para ejecutar un proyecto de restauración y protección del medio ambiente. El objetivo principal del proyecto es la adquisición y preservación de terrenos en la marisma de Cucharillas o adyacentes a ella en Catano.

*Este espacio se ha dejado intencionadamente en blanco*

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 8 - Activos de capital

La Autoridad tuvo las siguientes actividades en activos de capital (en miles):

| | Saldo 30 de junio de | Agregados | Jubilaciones y cesiones | Transferencias y ajustes | Saldo 30 de junio de |
|---|---|---|---|---|---|
| **Activos fijos no amortizables:** | | | | | |
| Terreno y mejoras del terreno | $ 158,844 | $ - | $ - | $ 56 | $ 158,900 |
| Trabajos de construcción en curso | 186,384 | 151,422 | - | (8,256) | 329,550 |
| Total de bienes de capital no amortizables | 345,228 | 151,422 | - | (8,200) | 488,450 |
| **Activos fijos amortizables:** | | | | | |
| Producción | 4,928,469 | 65,407 | - | (8,769) | 4,985,107 |
| Distribución | 4,852,478 | 3,030 | (425) | 16,132 | 4,871,215 |
| Transmisión | 2,442,893 | 6,768 | (223) | (34,111) | 2,415,327 |
| General y administrativo | 1,595,633 | - | - | 7,032 | 1,602,665 |
| Red de fibra | 73,359 | 1,196 | (1,296) | - | 73,259 |
| Sistemas de riego | 35,505 | - | - | - | 35,505 |
| Total de activos fijos amortizables | 13,928,337 | 76,401 | (1,944) | (19,716) | 13,983,078 |
| **Depreciación acumulada** | | | | | |
| Producción | (2,588,072) | (99,300) | - | (3,749) | (2,691,121) |
| Distribución | (1,925,434) | (142,779) | 425 | 905 | (2,066,883) |
| Transmisión | (666,882) | (55,585) | 223 | 2,487 | (719,757) |
| General y administrativo | (972,095) | (49,090) | - | (244) | (1,021,429) |
| Sistemas de riego | (23,358) | (468) | - | - | (23,826) |
| Red de fibra | (29,347) | (3,037) | 1,398 | (260) | (31,246) |
| Total de la depreciación acumulada | (6,205,188) | (350,259) | 2,046 | (861) | (6,554,262) |
| Total de activos fijos amortizables, netos | 7,723,149 | (273,858) | 102 | (20,577) | 7,428,816 |
| Total de activos de capital | $ 8,068,377 | $ (122,436) | $ 102 | $ (28,777) | $ 7,917,266 |

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

**Nota 8 - Activos de capital - (continuación)**

Los trabajos de construcción en curso al 30 de junio de 2020 consisten principalmente en ampliaciones y mejoras de los sistemas de generación, transmisión y distribución de electricidad. Los gastos de depreciación y amortización durante el año fiscal 2020 fueron de aproximadamente $350.3 millones. Al 30 de junio de 2020, la Autoridad no había registrado pérdidas de valor en sus activos de capital.

**Nota 9 - Cuentas por pagar y pasivos devengados**

Las cuentas por pagar y los pasivos devengados al 30 de junio de 2020 eran los siguientes (en miles):

| | | |
|---|---:|---:|
| Cuentas por pagar, gastos devengados y retenciones | | $ 1,032,800 |
| Contribución en lugar de impuestos | | |
| Cuentas por pagar | 176,881 | |
| Compensación de cuentas por cobrar (Ver Nota 6) | (176,881) | - |
| Contribución acumulada al plan de pensiones y retención de los empleados | | 479,028 |
| Otras obligaciones por beneficios posteriores al empleo | | 7,937 |
| Compensación acumulada y otros | | 2,460 |
| Total | | $ 1,522,225 |

**Nota 10 - Otros pasivos a largo plazo**

La actividad de la deuda a largo plazo para el año fiscal cerrado el 30 de junio de 2020 fue la siguiente (en miles):

| | Saldo al 30 de junio de 2019 | Aumentos | Disminuciones | Saldo al 30 de junio de 2020 | Vencido en un año |
|---|---:|---:|---:|---:|---:|
| Bonos a pagar | $ 8,338,448 | $ 139,165 | $ (146,882) | $ 8,330,731 | $1,666,169 |
| Documentos a pagar | 722,770 | 1,611 | (660) | 723,721 | 696,652 |
| Préstamos a pagar | - | 451 | - | 451 | - |
| Ausencias compensadas | 30,266 | 19,814 | (13,626) | 36,454 | 19,030 |
| Reclamaciones y sentencias | 276,667 | 11,564 | - | 288,231 | - |
| Pasivos netos por | 4,567,321 | 594,280 | (279,340) | 4,882,261 | - |
| Pasivo OPEB | 360,877 | 27,878 | (12,570) | 376,185 | 7,937 |
| Total del pasivo a largo plazo | $ 14,296,349 | $ 794,763 | $ (453,078) | $ 14,638,034 | $2,389,788 |

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

## Nota 10 - Otros pasivos a largo plazo - (continuación)

A partir de la presentación de la Petición del Título III, la Autoridad no ha realizado ningún pago (ni de intereses ni del capital principal) de los bonos por pagar y de algunos documentos a pagar. Como tal, se espera que la parte corriente del pasivo a largo plazo aumente a medida que vaya venciendo, sujeto a los derechos de la Autoridad en el caso del Título III, hasta que se negocien nuevos términos para la deuda a largo plazo de la Autoridad en los casos del Título III.

## Nota 11 - Documentos y préstamos a pagar

### Documentos a pagar

A continuación, se presenta un resumen de los documentos a pagar al 30 de junio de 2020 (en miles):

| | Fecha de vencimiento | Tasa de Interés Efectiva | Partes corrientes | Deuda A largo plazo | Total |
|---|---|---|---|---|---|
| Documentos por pagar, no restringidos: | | | | | |
| Línea de crédito renovable de $250 millones para financiar el capital circulante | Enero de 2015 | 8.32% (V) | $ 146,042 | $ - | $ 146,042 |
| Línea de crédito renovable de $550 millones para financiar el capital circulante | Agosto de 2014 | 7.25% (V) | 549,950 | - | 549,950 |
| Línea de crédito renovable de $27 millones para financiar mejoras en Aguirre and San Juan | 20 años tras la finalización de la construcción 2.00% (V) | | - | 14,230 | 14,230 |
| Documento a pagar de $16 millones (PREPA Holdings) para financiar el capital de trabajo general y los gastos de capital | Febrero de 2023 | 5.00% (V) | 660 | 12,839 | 13,499 |
| Total de documentos a pagar | | | $ 696,652 | 27,069 | $ 723,721 |

*(V) - tasa de interés variable*

- 56 -

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 11 - <u>Documentos y préstamos a pagar (continuación)</u>

<u>Documentos a pagar - (continuación)</u>

El calendario de vencimientos de los documentos a pagar con los intereses correspondientes al 30 de junio de 2020 es el siguiente (en miles):

| Año fiscal que termina el 30 de junio, | Capital | Interés | Total |
|---|---|---|---|
| 2021 | $ 696,652 | $ 51,945 | $ 748,597 |
| 2022 | 660 | 907 | 1,567 |
| 2023 | 12,179 | 577 | 12,756 |
| 2024 | - | 271 | 271 |
| 2025 | - | 271 | 271 |
| 2026-2030 | - | 1,355 | 1,355 |
| 2031-2035 | - | 1,355 | 1,355 |
| 2036-2040 | 14,230 | 1,355 | 15,585 |
| Total de documentos a pagar | 723,721 | $ 58,036 | $ 781,757 |
| Menos la cantidad que vence dentro de un año | (696,652) | | |
| Documentos a pagar, menos el importe adeudado dentro de un año | $ 27,069 | | |

El cuadro anterior se ha presentado de acuerdo con los términos originales de los documentos a pagar y no refleja el efecto, si lo hay, que pueda resultar del caso del Título III de la Autoridad. Por consiguiente, los acontecimientos posteriores relacionados con el caso del Título III pueden afectar a los importes en libros, las tasas de interés y los términos de reintegro. Para obtener más información sobre el caso y el caso del Título III de la Autoridad, vea la Nota 3.

En julio de 2012, la Autoridad suscribió un acuerdo de línea de crédito renovable con Citibank que no superará los $250 millones aproximadamente con el fin de proporcionar a la Autoridad fondos para (a) comprar energía o gasóleo o (b) la construcción de una instalación de gas natural licuado ("GNL") en relación con las operaciones comerciales de la Autoridad, y para pagar los costos relacionados con el acuerdo. Al 30 de junio de 2020, esta línea de crédito está bajo la gerencia de Solus Alternative Asset Management; y su saldo pendiente es de aproximadamente $146.0 millones, sujeto a los derechos de la Autoridad en el caso del Título III.

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 11 - <u>Documentos y préstamos a pagar - (continuación)</u>

    <u>Documentos a pagar - (continuación)</u>

En abril de 2012, la Autoridad celebró un acuerdo de línea de crédito renovable con un grupo de bancos comerciales, bajo la gerencia de Scotiabank, por un importe de aproximadamente $500 millones. La finalidad de esta línea de crédito era cubrir los déficits operativos de la Autoridad para los ejercicios fiscales 2012 y 2013, mediante el pago de ciertas líneas de crédito existentes y para cumplir con los términos y condiciones de los contratos celebrados para la compra de gasoil. La fecha de vencimiento original de este acuerdo era el 3 de mayo de 2013, pero se amplió hasta el 15 de agosto de 2014; y su importe se incrementó en $50 millones adicionales. Al 30 de junio de 2020, esta línea de crédito está bajo la gerencia de Cortland Capital Market Services, LLC; y su saldo pendiente es de aproximadamente $550.0 millones, sujeto a los derechos de la Autoridad en el caso del Título III.

Durante el año fiscal 2020, la Autoridad tomó prestado de la Autoridad para el Financiamiento de la Infraestructura de PR $1.6 millones adicionales bajo una línea de crédito revolvente de aproximadamente $27 millones para financiar las mejoras al complejo de abastecimiento de agua de Aguirre y la planta de tratamiento de aguas residuales de San Juan, con una fecha de vencimiento de 20 años después de la fecha de finalización de la construcción, y un interés efectivo de 2%. A la fecha de estos estados financieros, la fecha de finalización de la construcción de los proyectos se estima en marzo de 2024; el saldo pendiente de la línea de crédito renovable al 30 de junio de 2020 es de aproximadamente $14.2 millones y su fecha de vencimiento estimada es marzo de 2044. El aumento del importe del préstamo se debe al reembolso de los gastos realizados por la Autoridad durante los ejercicios fiscales anteriores y el actual.

El 31 de diciembre de 2015, PREPA Net convirtió una antigua línea de crédito no renovable, garantizada de alto nivel, para la construcción, en un préstamo a plazo que devenga un interés del 5% anual o 350 puntos básicos sobre el LIBOR a 3 meses, el que sea mayor (5% al 30 de junio de 2020), y que es pagadero en ochenta y tres (83) pagos mensuales de capital principal más intereses, con un pago global final por la totalidad del capital pendiente más los intereses devengados en la fecha de vencimiento del 1 de febrero de 2023. Al 30 de junio de 2020, el importe de capital principal pendiente de pago es de aproximadamente $13.5 millones. Este documento a pagar está garantizado por una primera hipoteca sobre la propiedad inmobiliaria, y una cesión de todas las pólizas de seguro, una cesión de todos los contratos materiales tanto con las partes relacionadas como con terceros, y una prenda de todo el efectivo, el equipo, las cuentas por cobrar y la propiedad personal de PREPA Net.

<u>Préstamo a pagar en el marco del programa de protección de la nómina</u>

El 22 de abril de 2020, PREPA Net solicitó y se le aprobó un préstamo de $450,554 bajo el Programa de Protección de Cheques creado como parte de los esfuerzos de ayuda relacionados con la pandemia de COVID-19 y administrado por la Administración de Pequeños Negocios. El préstamo devenga un interés del 1% y será

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 11 - Documentos y préstamos a pagar - (continuación)

Préstamo a pagar en el marco del programa de protección de la nómina - (continuación)

pagadero en cada fecha de pago. El importe principal del préstamo de $25,031 será pagadero en dieciocho (18) cuotas mensuales consecutivas a partir del 1 de noviembre de 2020. PREPA Net tiene diez (10) meses después del último día del período cubierto por la condonación del préstamo para solicitarla y no se le exigirá ningún pago hasta que la cantidad de la condonación sea remitida al prestamista por la Administración de Pequeñas Empresas. PREPA Net es elegible para la condonación de hasta el 100% del préstamo, si cumple con ciertos requisitos. PREPA Net presentó la condonación del préstamo, pero aún está esperando la respuesta del prestamista. El préstamo no tiene garantía y está totalmente garantizado por el gobierno federal.

Nota 12 - Bonos a pagar

Bonos de ingresos de energía por pagar

La Autoridad ha emitido bonos de ingresos de energía para financiar los costos de las mejoras y ampliaciones de sus activos de capital. Los ingresos netos, únicamente en la medida en que se depositen en el "Fondo de Amortización" o en algunos otros fondos designados en virtud del Convenio de 1974, están sujetos a una garantía real, en su caso, a favor del Fideicomisario de 1974 para reembolsar el capital principal y los intereses de los bonos de renta eléctrica. El Acuerdo de 1974 establece ciertos pactos afirmativos y negativos, entre otros requisitos; sin embargo, al 30 de junio de 2020, la Autoridad no cumplía con algunos de estos pactos de deuda. El 2 de julio de 2017, la Junta de Supervisión presentó la Petición del Título III y la obligación de reembolso de la Autoridad relacionada con sus bonos de ingresos de energía se paralizaron como resultado, y están sujetos a los derechos de la Autoridad en el caso del Título III.

*Este espacio se ha dejado intencionadamente en blanco*

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 12 - <u>Bonos a pagar - (continuación)</u>

<u>Bonos de ingresos de energía por pagar - (continuación)</u>

Al 30 de junio de 2020, los bonos de ingresos de energía por pagar consistían en (en miles):

| Emisiones de bonos | Fecha de emisión | Interés efectivo Efectiva | | Año fiscal de Última fecha de vencimiento | Saldo pendiente |
|---|---|---|---|---|---|
| Emisión de 2002, serie JJ | 3 de enero de 2019 | 5.4% | (F) | 2018 | $      42,315 |
| Emisión de 2002, serie LL | 2 de julio de 2002 | 5.5% | (F) | 2019 | 77,905 |
| Emisión de 2002, serie MM | 3 de octubre de 2002 | 5.0% | (F) | 2023 | 56,200 |
| Emisión de 2003, serie NN | 19 de agosto de 2003 | 5.2% | (F) | 2033 | 171,525 |
| Emisión de 2004, serie PP | 26 de agosto de 2004 | 5.0% | (F) | 2025 | 84,765 |
| Emisión de 2005, series QQ, RR y SS | 4 de abril de 2005 | Del 5.0% al 5.5% | (F) | Desde 2018 a 2030 | 603,810 |
| Emisión de 2007, series TT, UU y VV | 3 de mayo de 2007 | Del 3.4% al 5.3% | (F)(V) | Desde 2031 a 2037 | 1,946,010 |
| Emisión de 2008, serie WW | 26 de junio de 2008 | 5.3% | (F) | 2038 | 610,140 |
| Emisión de 2010, serie XX | 7 de abril de 2010 | 5.3% | (F) | 2040 | 822,210 |
| Emisión de 2010, serie YY | 29 de abril de 2010 | 6.1% | (F) | 2040 | 320,175 |
| Emisión de 2010, series ZZ y AAA | 5 de mayo de 2010 | Del 5.1% al 5.3% | (F) | Desde 2028 a 2031 | 877,975 |
| Emisión de 2010, series BBB y CCC | 26 de mayo de 2010 | Del 5.1% al 5.4% | (F) | 2028 | 393,720 |
| Emisión de 2010, serie DDD | 14 de octubre de 2010 | 4.5% | (F) | 2024 | 218,225 |
| Emisión de 2010, serie EEE | 29 de diciembre de 2010 | 6.1% | (F) | 2040 | 355,730 |
| Emisión de 2012, serie A | 1 de mayo de 2012 | 5.0% | (F) | 2042 | 630,110 |
| Emisión de 2013, serie A | 21 de agosto de 2013 | 6.9% | (F) | 2043 | 673,145 |
| Emisión de 2016, serie A | 19 de mayo de 2016 | 10.0% | (F) | 2019 | 55,640 |
| Emisión de 2016, serie B | 22 de junio de 2016 | 10.0% | (F) | 2019 | 55,211 |
| Emisión de 2016, series C, D y E | 30 de junio de 2016 | Del 5.4% al 10.0% | (F) | Desde 2020 a 2022 | <u>263,803</u> |
| Valor nominal del capital principal total | | | | | 8,258,614 |
| Primas y descuentos no amortizados | | | | | <u>72,117</u> |
| Bonos de ingresos de energía, netos | | | | | 8,330,731 |
| Importe a pagar en el plazo de un año | | | | | (1,666,169) |
| Parte a largo plazo de los bonos a pagar | | | | | $   6,664,562 |

*(V) - tasa de interés variable*

*(F) - tasa de interés fija*

- 60 -

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 12 - Bonos a pagar - (continuación)

Bonos de ingresos de energía por pagar - (continuación)

El calendario de vencimientos de los bonos a pagar con los intereses correspondientes al 30 de junio de 2020 es el siguiente (en miles):

| Año fiscal que termina el 30 de junio, | Capital | Interés | Total |
|---|---|---|---|
| 2021 | $ 1,666,169 | $ 371,477 | $ 2,037,646 |
| 2022 | 322,937 | 351,095 | 674,032 |
| 2023 | 317,030 | 334,113 | 651,143 |
| 2024 | 332,580 | 318,557 | 651,137 |
| 2025 | 294,575 | 301,957 | 596,532 |
| 2026-2030 | 1,859,845 | 1,264,224 | 3,124,069 |
| 2031-2035 | 1,472,875 | 802,533 | 2,275,408 |
| 2036-2040 | 1,429,730 | 404,335 | 1,834,065 |
| 2041-2043 | 562,873 | 60,643 | 623,516 |
| Total | 8,258,614 | $ 4,208,934 | $12,467,548 |
| Más o menos: prima o descuento no amortizado | 72,117 | | |
| Interés | - | | |
| Total de bonos a pagar | 8,330,731 | | |
| Total de la parte corriente de los bonos a corrientes | (1,666,169) | | |
| | $ 6,664,562 | | |

El cuadro anterior se ha presentado de acuerdo con los términos originales de los bonos a pagar y no refleja el efecto, si lo hay, que pueda resultar del caso del Título III de la Autoridad. Por consiguiente, los efectos del caso del Título III de la Autoridad pueden afectar a los importes en libros, las tasas de interés y los plazos de reembolso. Para obtener más información sobre el caso y el caso del Título III de la Autoridad, vea la Nota 3.

Del total de aproximadamente $8,300 millones de bonos en circulación, aproximadamente $2,200 millones están asegurados por ciertas compañías de seguros monolínea. Durante el año fiscal 2020, estas compañías de seguros realizaron pagos de aproximadamente $139 millones en concepto del capital principal y aproximadamente $87 millones en concepto de intereses a medida que los importes adeudados iban venciendo. Una vez que las aseguradoras monolínea realizan los pagos asegurados, se subrogan en los derechos de los tenedores de bonos originales. En consecuencia, la Autoridad presenta los importes adeudados a las compañías de seguros como bonos a pagar e intereses devengados hasta que dichos derechos se resuelvan mediante el pago o por el caso del Título III de la Autoridad. Por lo tanto, los pagos de capital principal e intereses efectuados por las compañías de seguros monolínea no se registran ni se presentan como servicio de la deuda.

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 12 - Bonos a pagar - (continuación)

Investigación de la Comisión de valores y bolsa

La Comisión del mercado de valores de los Estados Unidos ("SEC") solicitó a la Autoridad información sobre las emisiones de bonos de las series 2012A, 2012B y 2013A en los ejercicios fiscales 2012 y 2013. La Autoridad ha cooperado en la investigación, incluso proporcionando a la SEC documentos e información. A la fecha de los estados financieros, no se puede predecir cuándo concluirá la investigación de la SEC ni cuál será el resultado final.

Exámenes del servicio de impuestos internos de los Estados Unidos

El Servicio de impuestos internos de los Estados Unidos (el "IRS") emitió a la Autoridad varias cartas de investigación desde el 7 de febrero de 2019 hasta el 6 de septiembre de 2019 relacionadas con (i) ciertos Formularios 8038CP de declaración de pagos de créditos a emisores de bonos calificados, según la definición del IRS, y las emisiones de bonos de la serie YY y EEE y (ii) el Formulario 8038B de declaración de información para bonos Build America y bonos de desarrollo económico de la zona de recuperación con respecto a la emisión de bonos de la serie EEE, en relación con su calificación como bonos Build America. Las investigaciones dieron lugar a contingencias por un valor aproximado de $16.9 millones que se acumulan en los estados financieros adjuntos. Al 30 de junio de 2020, los recursos ante el IRS siguen pendientes. Ver la Nota 20.

Acuerdos de permuta de tasas de interés

La Autoridad suscribió acuerdos de permuta de tasas de interés de pago fijo y recepción variable como cobertura de flujo de caja del riesgo de tipos de interés de algunos de los Bonos de la Serie UU. Al 30 de junio de 2020, la siguiente es la información sobre los instrumentos derivados en circulación (en miles):

| Artículo | Fecha de entrada en vigencia | Fecha de vencimiento | Plazo | Calificación crediticia de la contraparte | Importe nocional |
|---|---|---|---|---|---|
| A | 3 de mayo de 2007 | 1 de julio de 2029 | Pagar el 4.08%; recibir el 67%. 3M LIBOR + 0.52% | A2/A-/AA- | $  169,532 |
| B | 3 de mayo de 2007 | 1 de julio de 2029 | Pagar el 4.08%; recibir el 67%. 3M LIBOR + 0.52% | Aa2/A-/AA- | 83,343 |
| | | | | | $  252,875 |

*Este espacio se ha dejado intencionadamente en blanco*

Autoridad de Energía Eléctrica de Puerto Rico

(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 12 - <u>Bonos a pagar - (continuación)</u>

<u>Acuerdos de intercambio de tasas de interés - (continuación)</u>

Los instrumentos derivados A y B cubren las variaciones de los flujos de efectivo de los bonos flotantes subyacentes con cupones basados en el índice SIFMA a 5 años o en el 67% del índice LIBOR a 3 meses, y con vencimientos iguales a los de las correspondientes permutas. Por ello, los instrumentos A y B se consideran instrumentos derivados de cobertura. Al 30 de junio de 2020, el valor razonable negativo combinado de los instrumentos derivados era de $53.9 millones.

Las siguientes tablas incluyen información resumida de las coberturas efectivas de la Autoridad relacionadas con los acuerdos de intercambio de tasas de interés pendientes para el año fiscal finalizado el 30 de junio de 2020 (en miles):

| Bonos de ingreso de energía asociados | Variación del valor de mercado | | Valor de mercado | | |
|---|---|---|---|---|---|
| | Clasificación | Monto | Clasificación | Monto | Nocional |
| Bonos Libor, serie UU | Salidas diferidas de recursos | $   (8,421) | Valor de mercado de los instrumentos derivados | $(36,135) | $169,532 |
| Mini-BMS Bonos, serie UU | Salidas diferidas de recursos | (4,141) $ (12,562) | Valor de mercado de los instrumentos derivados | (17,767) $= (53,902) | 83,343 $ 252,875 |

Los importes nocionales de las permutas coinciden con los importes del capital principal de los bonos de la electricidad asociados.

La metodología de valoración utilizada para determinar el valor de mercado de los acuerdos de permutas de tasas de interés al 30 de junio de 2020, consiste en un valor presente equivalente utilizando una tasa de descuento ajustada al riesgo.

- Basó el tipo de descuento para cada importe de transacción en la curva de tipos al contado del LIBOR en la Fecha de Valoración, más un diferencial de crédito, aplicable cuando se encuentra en una posición de pasivo. El diferencial de crédito se añadió para reflejar el riesgo de crédito.

- Estima el diferencial de crédito utilizando las siguientes fuentes de información: (1) permutas de incumplimiento crediticio y (2) diferenciales del LIBOR para bonos comparables.

- Aplicó el diferencial de crédito estimado en la determinación de una tasa de descuento adecuado para el importe de la transacción.

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 12 - Bonos a pagar - (continuación)

Acuerdos de intercambio de tasas de interés - (continuación)

*Riesgo crediticio*

Al 30 de junio de 2020, las permutas tenían un valor razonable negativo. Sin embargo, si las tasas de interés cambian y el valor de mercado de las permutas se vuelve positivo, la Autoridad estaría expuesta al riesgo de crédito de contraparte por el importe del valor de mercado positivo de los derivados. En la fecha de emisión de los estados financieros, una de las contrapartes de las permutas estaba calificada como A2 por Moody's, A- por S&P, AA- por Fitch y AAL por DBRS Morningstar. La otra contraparte fue calificada A3u por Moody's, A- por S&P, A+ por Fitch y AH por DBRS Morningstar.

*Riesgo de rescisión*

Los acuerdos de permuta utilizan el Acuerdo Maestro de Permuta de la International Swaps and Derivatives Association, Inc., que incluye supuestos de rescisión estándar, como la falta de pago y la quiebra. La Autoridad o las contrapartes pueden rescindir las permutas si la otra parte no cumple los términos de los contratos. Además, la Autoridad puede rescindir las permutas si la calificación crediticia de las contrapartes cae por debajo de Baa1 según Moody's o BBB+ según S&P. Si en el momento de la rescisión, las permutas tienen un valor razonable negativo, la Autoridad sería responsable ante las contrapartes de un pago igual al valor de mercado total de las permutas.

La Autoridad utilizó datos de nivel 2 para determinar el valor de mercado de los instrumentos de permuta de tasas de interés.

*Riesgo de base*

Durante el año fiscal 2020, los pagos de intereses a tasa fija de la Autoridad habrían superado la cantidad recibida como intereses variables de las contrapartes de la permuta en aproximadamente $5.7 millones. Debido a la paralización impuesta por la Petición del Título III, este importe se ha devengado en los estados financieros adjuntos.

*Riesgo de renovación*

Utilizando las tasas al 30 de junio de 2020, los importes del servicio de la deuda a tasa variable y los pagos netos de las permutas, asumiendo que las tasas de interés actuales se mantienen durante su plazo, se establecen en la siguiente tabla (en miles). En la actualidad, las fechas de vencimiento de las permutas de tasas de interés y de la deuda asociada son coincidentes. Al variar las tasas, variarán los pagos de intereses de los bonos a tasa variable y los pagos netos de las permutas.

- 64 -

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 12 - Bonos a pagar - (continuación)

Acuerdos de intercambio de tasas de interés - (continuación)

*Riesgo de renovación (continuación)*

| Año fiscal terminado el 30 de junio, | Capital principal | Interés | Intercambio de tasas de interés, neta | Total |
|---|---|---|---|---|
| 2021 | $ - | $ 1,826 | $ 8,491 | $ 10,317 |
| 2022 | - | 1,826 | 8,491 | 10,317 |
| 2023 | - | 1,826 | 8,491 | 10,317 |
| 2024 | - | 1,826 | 8,491 | 10,317 |
| 2025 | - | 1,826 | 8,491 | 10,317 |
| 2026-2029 | 252,875 | 7,307 | 33,963 | 294,145 |
| Total | $ 252,875 | $ 16,437 | $ 76,418 | $ 345,730 |

Cancelación de la deuda

En años anteriores, la Autoridad ha reembolsado por adelantado ciertos Bonos de Ingresos de Energía y otras obligaciones colocando el producto de la nueva deuda en un fideicomiso irrevocable para proveer los futuros pagos del servicio de la deuda de dichos bonos hasta su vencimiento o fechas de redención anteriores. En consecuencia, las cuentas fiduciarias, los activos y los pasivos de los bonos cancelados no se incluyeron en los estados financieros de la Autoridad. Al 30 de junio de 2020, los registros del fideicomisario de la Autoridad indican que no hay bonos vencidos.

*Este espacio se ha dejado intencionadamente en blanco*

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 13 - Beneficios de jubilación de los empleados

Plan de pensiones

A. Información general sobre el plan de pensiones

*Descripción del plan*

Todos los empleados permanentes a tiempo completo de la Autoridad son actualmente elegibles para participar en el Plan de Pensiones de la Autoridad, un plan de pensiones de beneficio definido para un solo empleador (el "Plan de Pensiones") administrado por el Sistema de Retiro de Empleados de la Autoridad de Energía Eléctrica de Puerto Rico (el "SRE de la Autoridad"). El SRE de la Autoridad publica anualmente un informe financiero que incluye los estados financieros y la información complementaria requerida para el Plan de Pensiones.

Si un miembro deja de trabajar antes de tener derecho a los beneficios de este Plan de Pensiones, puede recibir el reembolso de su contribución más los intereses compuestos anualmente. El Plan de Pensiones no está sujeto a los requisitos de la Ley de Seguridad de Ingresos de Jubilación de los Empleados de 1974.

*Beneficios proporcionados*

Las disposiciones sobre los beneficios del Plan de Pensiones son establecidas y pueden ser modificadas por la Junta de Fideicomisarios del SRE de la Autoridad con la ratificación de la Junta Directiva de la Autoridad.

*Beneficios de jubilación*

Prestación de jubilación

Cualquier miembro tiene derecho a una pensión del 75 % de su salario medio final si se jubila con 30 años de servicio acreditable. Los miembros contratados antes del 1 de enero de 1993 tienen derecho a recibir beneficios de pensión del 62.5% al 72.5% de su salario medio final si se jubilan con 25 a 29 años de servicio acreditado. A partir del 1 de enero de 2015, los miembros activos que comenzaron a trabajar con la Autoridad el 1 de enero de 1993 o posteriormente, con una edad no inferior a 55 años y 30 años de servicio acreditable, tendrán derecho a recibir beneficios de pensión del 62.5% al 72.5% de su salario medio final si se jubilan entre los 50 y los 54 años.

- 66 -

Autoridad de Energía Eléctrica de Puerto Rico

(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 13 - Beneficios de jubilación de los empleados - (continuación)

### Plan de pensiones - (continuación)

#### Prestación de jubilación por invalidez

Todo miembro activo que tenga cinco años o más de servicio acreditado, o diez años o más, si comenzó a trabajar en la Autoridad a partir del 1 de enero de 1993, y su incapacidad no esté relacionada con un accidente de trabajo, según lo certifique la Corporación del Fondo del Seguro del Estado de Puerto Rico, podrá retirarse con una pensión por incapacidad solicitada por la Autoridad o por el miembro.

#### Ajustes del costo de vida

Se prevén aumentos del costo de vida en los beneficios de las pensiones para los jubilados a partir del 30 de junio de 1992, y futuros aumentos automáticos del costo de vida cada tres años para los jubilados actuales y futuros. Los aumentos efectivos a partir del 1 de julio de 1992 para todas las pensiones concedidas a partir del 30 de junio de 1990 son los siguientes

- 8%   de aumento  para la pensión mensual hasta $300.
- 4%   de aumento  para la pensión mensual entre $300 y $600.
- 2%   de aumento  para la pensión mensual que supera los $600.

El aumento mínimo mensual es de $25 y el máximo de $50.A las pensiones actuariales se les concede el incremento mínimo de $25 al mes si se concedieron el 30 de junio de 1990 o antes. Estos aumentos se conceden automáticamente cada tres años a partir del 1 de julio de 1992, o desde la fecha de jubilación para todos aquellos que se jubilaron después del 30 de junio de 1990.

#### Beneficio salarial anual (beneficio por jubilación o fallecimiento)

Se dispone de un pago a tanto alzado, equivalente al salario percibido durante el último año en el momento de la jubilación del servicio activo o del fallecimiento en servicio activo. El pago a tanto alzado puede reducirse en determinadas situaciones.

#### Beneficio de supervivencia

Los cónyuges supervivientes de los miembros jubilados que reciben un beneficio de pensión recibirán una renta vitalicia igual al 30% de la pensión anual pagadera a los miembros en el momento del fallecimiento sujeto a ciertas condiciones.

#### Bono navideño para jubilados

Todos los jubilados reciben un bono navideño anual de $400.

- 67 -

Autoridad de Energía Eléctrica de Puerto Rico

(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 13 - Beneficios de jubilación de los empleados - (continuación)

Plan de pensiones - (continuación)

Bono de verano para jubilados

Todos los jubilados actuales recibirán un bono de verano de $100.

Beneficio para el funeral

Hasta $1,000 de beneficio funerario.

Las disposiciones y los beneficios del Plan de Pensiones en vigor al 30 de junio de 2020 se resumen de la siguiente manera:

| Fecha de contratación | Antes del 1 de enero de 1993 | A partir del 1 de enero de 1993 |
|---|---|---|
| Fórmula de beneficios | 75% a los 30 años de servicio en el momento de la jubilación completa | El 75% está limitado a $50,000 a los 30 años de servicio en el momento de la jubilación completa |
| Calendario de adquisición de beneficios | 10 años de servicio | 10 años de servicio |
| Pagos de beneficios | Mensualidad de por vida | Mensualidad de por vida |
| Edad de jubilación | N/A | 55 |
| Beneficios mensuales, en % la compensación elegible | Varía según la edad y los años de servicio | Varía según la edad y los años de servicio |
| Tasas de contribución exigidas a los empleados | 9.06% | 11.00% |
| Tasas de contribución requeridas por la | 34.54% | 34.54% |

*Este espacio se ha dejado intencionadamente en blanco*

Autoridad de Energía Eléctrica de Puerto Rico

(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 13 - Beneficios de jubilación de los empleados - (continuación)

Plan de pensiones - (continuación)

*Empleados cubiertos*

A la fecha de valoración del 30 de junio de 2019, los siguientes miembros estaban cubiertos por las condiciones de los beneficios del Plan de Pensiones:

|  | Número |
|---|---|
| Participantes jubilados y beneficiarios que reciben actualmente beneficios | 12,568 |
| Afiliados y beneficiarios con derecho a recibir beneficios, pero que aún no los reciben | 124 |
| Participantes activos | 5,542 |
| Total | 18,234 |

*Contribuciones*

Las tasas de contribución de la Autoridad se determinan anualmente mediante la evaluación actuarial y entrarán en vigor el 1 de julio, tras la notificación de un cambio en la tasa. Las contribuciones a la financiación del Plan de Pensiones se determinan cada año sobre una base actuarial al 30 de junio, por el SRE de la Autoridad. La tasa determinada actuarialmente es la cantidad estimada necesaria para financiar los costos de los beneficios obtenidos por los empleados durante el año, con una cantidad adicional para financiar cualquier pasivo acumulado no financiado. La contribución de la Autoridad se calcula como la diferencia entre la tasa determinada actuarialmente y la tasa de contribución de los empleados. Para el año fiscal que finalizó el 30 de junio de 2020, la contribución anual de la Autoridad fue de $241.9 millones.

B. Pasivos netos por pensiones

El pasivo neto por pensiones al 30 de junio de 2020 se midió al 30 de junio de 2019 y la fecha de valoración actuarial fue el 30 de junio de 2019.

*Supuestos actuariales*

Los supuestos actuariales se basan en los supuestos recomendadas en el estudio de experiencia actuarial realizado para el período de cinco años finalizado el 30 de junio de 2016. A continuación, se presenta un resumen de los principales supuestos y métodos utilizados para determinar el pasivo neto por pensiones.

- 69 -

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 13 - Beneficios de jubilación de los empleados - (continuación)

Plan de pensiones - (continuación)

El pasivo total por pensiones se determinó utilizando los siguientes supuestos actuariales:

| | |
|---|---|
| Fecha de valoración | 30 de junio de 2019 |
| Fecha de medición | 30 de junio de 2019 |
| Fecha del informe | 30 de junio de 2020 |
| Tasa de interés única equivalente | |
| Tasa de rendimiento esperada a largo plazo | 5.75% |
| Índice de bonos municipales | 2.79% |
| Año fiscal en el que se prevé que los resultados | |
| netos fiduciarios del Plan de Pensiones | |
| se agoten con los futuros pagos de beneficios | |
| para los miembros actuales | 2023 |
| | |
| Supuestos actuariales: | |
| Tasa de descuento | 2.84% |
| Inflación | 2.25% |
| Crecimiento de las nóminas | 0.00% |
| Aumento de sueldo | Del 2.5% al 7.25%, incluida la inflación |
| Tasa de rendimiento de la | 5.75%, neto de gastos, incluida la |
| inversión | inflación |
| | 100% de los empleados, y se |
| | presume que las esposas son 4 años |
| Porcentaje casado | más jóvenes que sus maridos |

Las proyecciones de los beneficios a efectos de información financiera se basan en el plan sustantivo (el plan tal y como lo entienden la Autoridad y los miembros del plan) e incluyen los tipos de beneficios proporcionados en el momento de cada valoración y el patrón histórico de reparto de los costos de los beneficios entre la Autoridad y los miembros del plan hasta ese momento. Los métodos y supuestos utilizados incluyen técnicas destinadas a reducir los efectos de la volatilidad a corto plazo de los pasivos acumulados actuariales y del valor actuarial de los activos, en consonancia con la perspectiva a largo plazo de los cálculos. La proyección de los beneficios futuros de un plan en curso implica estimaciones del valor de los importes declarados y supuestos sobre la probabilidad de que se produzcan acontecimientos futuros a largo plazo.

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 13 - Beneficios de jubilación de los empleados - (continuación)

Plan de pensiones - (continuación)

*Supuestos de mortalidad*

Las tasas de mortalidad se basaron en la tabla de mortalidad media ponderada por recuentos de la PUB 2010, proyectada generacionalmente utilizando la escala MP-2019. Este supuesto mide las probabilidades de que cada pago de beneficios se realice después de la jubilación.

*Cambios en los términos de los beneficios*

El Plan de Pensiones no ha sufrido cambios en los términos de los beneficios desde la valoración anterior.

*Tasa de descuento*

La tasa de descuento utilizada para medir el pasivo total por pensiones fue del 2.84%. La proyección de los flujos de caja utilizada para determinar la tasa de descuento partió de la base de que los miembros contribuyen con la tasa de contribución obligatoria, y la Autoridad contribuirá con el 34.54% de la compensación del grupo cerrado. Sobre la base de estos supuestos, se proyectó que la posición neta fiduciaria del plan de pensiones estaría disponible para realizar todos los pagos de beneficios futuros proyectados de los miembros actuales del plan hasta el año del plan que termina el 30 de junio de 2023. Por lo tanto, la tasa de rendimiento esperada a largo plazo de las inversiones del plan de pensiones del 5.75% se aplicó a todos los períodos de pagos de beneficios proyectados hasta el 30 de junio de 2023, y la tasa de índice de bonos municipales aplicable del 2.79%, basada en el Índice de Tasa de Bonos Municipales a 20 años de alto grado a partir del 30 de junio de 2019, se aplicó a todos los períodos de pagos de beneficios proyectados después del 30 de junio de 2023. Para determinar el pasivo total por pensiones al 30 de junio de 2019 se utilizó la tasa de interés única equivalente ("SEIR") del 2.84% que descuenta todo el flujo de beneficios proyectados al mismo importe que la suma de los valores actuales de los dos flujos de pagos de beneficios separados.

La tasa de rendimiento esperada a largo plazo de las inversiones del SRE de la Autoridad se determinó utilizando un análisis de distribución logarítmica normal en el que se desarrollan rangos de estimación óptima de las tasas de rendimiento reales futuras esperadas (rendimientos esperados, netos de los gastos de inversión del SRE de la Autoridad y de la inflación) para cada clase principal de activos. Estos rangos se combinan para producir la tasa de rendimiento esperada a largo plazo ponderando las tasas de rendimiento reales futuras esperadas por el porcentaje de asignación de activos objetivo y añadiendo la inflación esperada.

Autoridad de Energía Eléctrica de Puerto Rico

(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 13 -   Beneficios de jubilación de los empleados - (continuación)

Plan de pensiones - (continuación)

La asignación de activos proyectada y las mejores estimaciones de las tasas reales aritméticas de rendimiento para cada clase de activos principales se resumen en la siguiente tabla:

| Clase de activos | Asignación proyectada | Tasa de rendimiento real esperada a largo plazo |
|---|---|---|
| Bonos básicos | 30.00% | 1.45% |
| Renta variable estadounidense de | 70.00% | 4.97% |
| alta capitalización total | 100.00% | |

C.   Cambios en el pasivo neto por pensiones

Los cambios en el pasivo neto por pensiones del Plan de Pensiones son los siguientes (en miles):

| | Aumento/(Disminución) | | |
|---|---|---|---|
| | Total del pasivo por pensiones | Posición neta fiduciaria del plan de pensiones | Pasivo neto por pensiones |
| Saldo al período de informe del 30 de junio de 2019 | $ 5,765,887 | $ 1,198,566 | 4,567,321 |
| Cambios para el año: | | | |
| Costo del servicio | 82,860 | - | 82,860 |
| Interés | 171,460 | - | 171,460 |
| Diferencias entre la experiencia prevista | | | - |
| y la real | (1,958) | - | (1,958) |
| Cambios en los supuestos | 339,551 | - | 339,551 |
| Contribuciones - empleador | - | 224,436 | (224,436) |
| Contribuciones - empleado | - | 18,203 | (18,203) |
| Ingresos netos de inversión | - | 34,440 | (34,440) |
| Pagos de beneficios, incluidos los reembolsos de | | | - |
| las contribuciones de los empleados | (288,482) | (288,482) | - |
| Gastos administrativos | - | (409) | 409 |
| Otros cambios | - | 303 | (303) |
| Cambios netos | 303,431 | 11,509 | 314,940 |
| Saldo al período de informe del 30 de junio de 2020 | $ 6,069,318 | $ 1,187,057 | $ 4,882,261 |

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 13 - Beneficios de jubilación de los empleados - (continuación)

Plan de pensiones - (continuación)

*Sensibilidad del pasivo neto por pensiones a las variaciones de la tasa de descuento*

A continuación, se presenta el pasivo neto por pensiones del SRE de la Autoridad, calculado utilizando la tasa de descuento del 2.84%, así como lo que sería el pasivo neto por pensiones del SRE de la Autoridad si se calcula utilizando una tasa de descuento de 1 punto porcentual menos (1.84%) o 1 punto porcentual más (3.84%) que la tasa actual (en miles):

|  | Disminución del 1% | Actual | Aumento del 1% |
|---|---|---|---|
| Tasa de descuento | 1.84% | 2.84% | 3.84% |
| Pasivo neto por pensiones | $ 5,814,624 | $ 4,882,261 | $ 4,133,299 |

Posición neta fiduciaria del plan de pensiones - La información detallada sobre la posición neta fiduciaria del plan de pensiones está disponible en el informe financiero emitido por separado del SRE de la Autoridad.

D.   Cambios en los supuestos

A continuación, se detallan los cambios en los supuestos para el período finalizado el 30 de junio de 2019 (la "Fecha de Medición"):

- La tasa de descuento utilizado para determinar el pasivo total por pensiones se redujo del 3.05% al 2.84%.
- La tasa de interés de los bonos municipales bajó del 2.98% al 2.79%.
- Los supuestos de las tasas de mortalidad se cambiaron de la Tabla de Mortalidad Ponderada por Cabezas de 2010proyectada generacionalmente usando la Escala MP-2019 a la Tabla de Mortalidad Ponderada por Cabezas de 2010 proyectada generacionalmente usando la Escala MP- 2019.

Para cualquier cambio en el pasivo total de pensiones debido a cambios en los supuestos actuariales, el reconocimiento del cambio se repartiría a lo largo de la vida restante de los miembros del SRE de la Autoridad.

*Este espacio se ha dejado intencionadamente en blanco*

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 13 - Beneficios de jubilación de los empleados - (continuación)

Plan de pensiones - (continuación)

E.  Gastos de pensiones, salidas de recursos diferidas y entradas de recursos diferidas relacionadas con las pensiones

Para el año fiscal finalizado el 30 de junio de 2020, la Autoridad reconoció un gasto en pensiones de aproximadamente $480.3 millones, sujeto a los derechos de la Autoridad en el caso del Título III. A 30 de junio de 2020, la Autoridad informó de salidas de recursos diferidas y entradas de recursos diferidas relacionadas con las pensiones de las siguientes fuentes (en miles):

| Salidas de recursos diferidas: | | |
|---|---|---|
| Diferencias entre la experiencia prevista y la real | $ | - |
| Contribuciones del empleador posteriores a la fecha de medición | | 241,829 |
| Cambios en los supuestos | | 346,556 |
| Total de salidas de recursos diferidas | $ | 588,385 |

| Entradas de recursos diferidas: | | |
|---|---|---|
| Cambios en los supuestos | $ | 58,020 |
| Diferencias entre la experiencia prevista y la real | | 27,023 |
| Diferencia neta entre los beneficios previstos y los reales | | |
| de las inversiones del plan de pensiones | | 6,623 |
| Total de entradas de recursos diferidas | $ | 91,666 |

Las contribuciones de aproximadamente $241.8 millones se registraron como salidas de recursos diferidas resultantes de las contribuciones realizadas con posterioridad a la Fecha de Medición. Estas contribuciones reducirán el pasivo neto por pensiones en el año fiscal 2021. Los importes informados como salidas de recursos diferidas (distintas de las contribuciones posteriores a la fecha de medición y anteriores al cierre del año fiscal) y las entradas de recursos diferidas relacionadas con las pensiones se reconocerán en el gasto por pensiones como sigue (en miles):

| Año que termina el 30 de junio: | Monto | |
|---|---|---|
| 2021 | $ | 94,398 |
| 2022 | | 115,690 |
| 2023 | | 38,171 |
| 2024 | | 6,631 |
| | $ | 254,890 |

- 74 -

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 13 - <u>Beneficios de jubilación de los empleados - (continuación)</u>

<u>Otros beneficios posteriores al empleo ("OPEB")</u>

A.  <u>Información general sobre el plan OPEB</u>

*Descripción del plan OPEB*

El Plan OPEB es un plan de atención médica de beneficio definido para un solo empleador, en el que no se acumulan activos en un fideicomiso, que cumple los criterios del párrafo 4 de la Declaración núm. 75 de la GASB, *"Contabilidad e información financiera sobre los beneficios posteriores al empleo distintos de las pensiones"*, y que es administrado por la Autoridad.

*Beneficios proporcionados*

Las disposiciones relativas a los beneficios del Plan OPEB son establecidas y pueden ser modificadas por la Junta Directiva de la Autoridad. El Plan OPEB para todos los jubilados tiene un tope de $300 por miembro al mes para los jubilados menores de 65 años y de $200 por miembro al mes para los jubilados mayores de 65 años. En caso de que el jubilado fallezca, el Plan OPEB volverá a contribuir con $300 al mes para los cónyuges supervivientes menores de 65 años y con $200 al mes para los cónyuges supervivientes mayores de 65 años. La contribución efectiva realizada para los cónyuges supervivientes menores y mayores de 65 años es efectivamente de $0, ya que el Plan OPEB recibe el reembolso de su contribución a la cobertura de los cónyuges con la pensión del jubilado.

*Membresía*

Los empleados que se jubilen a partir del 1 de septiembre de 2009 y que hayan acumulado al menos 30 años de servicio, así como todos los empleados jubilados antes del 1 de septiembre de 2009, independientemente de la duración del empleo, tienen derecho a participar en el plan OPEB. Para poder seguir participando, los participantes jubilados que reúnen los requisitos de Medicare y sus cónyuges deben inscribirse en la Parte B de Medicare a los 65 años, o siempre que reúnan los requisitos, corriendo con los gastos. Las disposiciones relativas a las prestaciones de los empleados jubilados se establecen y pueden ser modificadas por la Autoridad.

En la fecha de valoración, los siguientes miembros estaban cubiertos por el Plan OPEB:

|  | Número |
|---|---|
| Miembros inactivos o beneficiarios que reciben beneficios en la actualidad | 8,135 |
| Miembros inactivos con derecho a recibir beneficios, pero que aún no los reciben | - |
| Miembros activos | 5,739 |
| Total | 13,874 |

- 75 -

Autoridad de Energía Eléctrica de Puerto Rico

(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 13 - Beneficios de jubilación de los empleados - (continuación)

Otros beneficios posteriores al empleo ("OPEB") - (continuación)

*Política de financiación y costos anuales de OPEB*

El Plan OPEB se financia sobre la base de un sistema de reparto. Los requisitos de contribución de los miembros del Plan OPEB y de la Autoridad se establecen y pueden ser modificados por la Autoridad.

B.  Total del pasivo OPEB

El pasivo total de OPEB ("TOL") de la Autoridad al 30 de junio de 2020 se midió al 30 de junio de 2019 y se determinó mediante una valoración actuarial a esa fecha.

*Supuestos actuariales y otros datos*

| | |
|---|---|
| Fecha de valoración | 30 de junio de 2019 |
| Fecha de medición (MD) | 30 de junio de 2019 |
| Fecha del informe | 30 de junio de 2020 |
| Supuestos actuariales | |
| Inflación | 2.25% |
| Crecimiento de los salarios reales | 0.25% |
| Inflación salarial | 2.50% |
| Aumento de sueldo | Del 2.5% al 7.25%, incluida la inflación |
| Tasa de descuento: | |
| Tasa del índice de bonos municipales en MD | 2.79% |
| Porcentaje casado | 100% de los empleados, y se supone que las esposas son 4 años más jóvenes que sus maridos |
| Futuras elecciones de participación y cobertura | Se supone que todos los futuros jubilados participan en el plan OPEB |
| Cobertura del cónyuge de los futuros jubilados tras el fallecimiento | 75% |

*Este espacio se ha dejado intencionadamente en blanco*

- 76 -

Autoridad de Energía Eléctrica de Puerto Rico

(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 13 - Beneficios de jubilación de los empleados - (continuación)

Otros beneficios posteriores al empleo ("OPEB") - (continuación)

La tasa de descuento se basó en el Índice de Bonos Municipales a 20 años de alto grado al 30 de junio de 2019.

Las tasas de mortalidad se basaron en la tabla de mortalidad media ponderada por recuentos de la PUB 2010, proyectada generacionalmente utilizando la escala MP-2019.

El Plan OPEB de la Autoridad no tiene tendencias de la atención médica.

El resto de los supuestos actuariales utilizadas en la valoración para el período de información finalizado el 30 de junio de 2020 se basaron en los resultados de un estudio de experiencia actuarial realizado para el período de cinco años finalizado el 30 de junio de 2016.

El Plan OPEB no ha sufrido cambios en las condiciones de los beneficios desde la valoración anterior.

C.   Cambios en el pasivo total de OPEB

Los cambios en el TOL son los siguientes (en miles):

|  |  |  |
|---|---|---|
| Pasivo total de OPEB al período de informe del 30 de junio de 2019 | $ | 360,877 |
| Cambios para el año: | | |
| Costo de servicio | | 3,059 |
| Interés | | 10,567 |
| Diferencia entre la experiencia prevista y la real | | - |
| Cambios en los supuestos u otros datos | | 14,252 |
| Pagos de beneficios | | (12,570) |
| Cambios netos | | 15,308 |
| Pasivo total de OPEB al período de informe del 30 de junio de 2020 | $ | 376,185 |

Las modificaciones de los supuestos y otros datos reflejan un cambio en la tasa de descuento del 2.98% al 2.79%. Los supuestos de la tasa de mortalidad se cambiaron de la Tabla de Mortalidad Ponderada por Cabeza de 2010 proyectada generacionalmente utilizando la Escala MP-2019 a la Tabla de Mortalidad Ponderada por Cabeza de 2010 proyectada generacionalmente utilizando la Escala MP-2019.

*Este espacio se ha dejado intencionadamente en blanco*

Autoridad de Energía Eléctrica de Puerto Rico

(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 13 - <u>Beneficios de jubilación de los empleados - (continuación)</u>

Otros beneficios posteriores al empleo ("OPEB") - (continuación)

*<u>Sensibilidad del pasivo total de OPEB a los cambios en la tasa de descuento</u>*

A continuación, se presenta el TOL del Plan OPEB, calculado utilizando la tasa de descuento del 2.79%, así como cuál sería el TOL del Plan OPEB si se calculara utilizando una tasa de descuento un punto porcentual inferior (1.79%) o un punto porcentual superior (3.79%) a la tasa actual (en miles):

|  | Disminución del 1% | | Partes | | Aumento del 1% |
|---|---|---|---|---|---|
| Tasa de descuento | 1.79% | | 2.79% | | 3.79% |
| Total del pasivo de OPEB | $ 426,560 | $ | 376,185 | $ | 335,147 |

D. <u>Gastos de OPEB, salidas de recursos diferidas y entradas de recursos diferidas relacionadas con OPEB</u>

Para el año fiscal finalizado el 30 de junio de 2020, la Autoridad reconoció un gasto de OPEB de aproximadamente $8.5 millones. Al 30 de junio de 2020, la Autoridad informó de salidas de recursos diferidas y entradas de recursos diferidas relacionadas con OPEB de las siguientes fuentes (en miles):

Salidas de recursos diferidas:

| | | |
|---|---|---|
| Pagos de beneficios realizados con posterioridad a la fecha de medición | $ | 7,937 |
| Cambios en los supuestos | | 13,582 |
| Total de entradas diferidas de recursos | $ | 21,519 |

Entradas de recursos diferidas:

| | | |
|---|---|---|
| Diferencias entre la experiencia prevista y la real | $ | 9,018 |
| Cambios en los supuestos | | 3,870 |
| Total de entradas diferidas de recursos | $ | 12,888 |

*Este espacio se ha dejado intencionadamente en blanco*

- 78 -

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 13 - Beneficios de jubilación de los empleados - (continuación)

Otros beneficios posteriores al empleo ("OPEB") - (continuación)

Los pagos de beneficios de aproximadamente $7.9 millones se informaron como salidas de recursos diferidas resultantes de los pagos realizados después del 30 de junio de 2019, la Fecha de Medición. Estos pagos de beneficios reducirán el pasivo total de OPEB en el año fiscal 2021. Los importes consignados como salidas de recursos diferidas (distintas de los beneficios pagados después de la fecha de medición y antes del final del año) y las entradas de recursos diferidas relacionadas con OPEB se reconocerán en el gasto de la OPEB como sigue (en miles):

| Período de medición finalizado el 30 de junio, | Importe |
|---|---|
| 2020 | $ (3,678) |
| 2021 | 2,808 |
| 2022 | 1,564 |
| | $ 694 |

Nota 14 - Ingresos

Órdenes de la PREB

La Ley 57-2014 autoriza a la PREB a aprobar las tarifas eléctricas propuestas por la Autoridad, entre otros asuntos. La Autoridad tiene la obligación de mantener cuentas de compensación para registrar las diferencias entre determinados costos incurridos y los importes facturados a través de determinadas tarifas y cláusulas adicionales aprobadas para recuperar dichos costos. Estas cuentas de compensación se revisan posteriormente y son evaluadas por la PREB para ajustar las tarifas vigentes con ajustes de compensación que permitan a la Autoridad cobrar o reembolsar a los clientes por dichos excesos/descensos.

El 27 de junio de 2019, la PREB ordenó a la Autoridad implementar prospectivamente una reducción total de tarifas de aproximadamente $15.3 millones, netos de varios ajustes de cláusulas adicionales, relacionados con los cargos cobrados a sus clientes durante cada uno de los años terminados en junio de 2017, 2018 y 2019, para ser recuperados/pagados durante el año fiscal 2020. Esta orden incluía, entre otros cargos de conciliación, el diferencial entre la Tarifa Provisional de $1.299 céntimos/kWh aprobada el 24 de junio de 2016 y la Tarifa Permanente de $0.9948 céntimos/kWh implementada el 1 de mayo de 2019, como parte de la nueva estructura tarifaria. Además de la aplicación de la Tarifa Permanente, esta nueva estructura tarifaria incluye la aplicación de nuevas cláusulas adicionales para recuperar los costos de varias subvenciones y del CILT. Estos importes a cobrar/pagar se reconocen cuando se facturan.

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 14 - Ingresos - (continuación)

Principales clientes y partes relacionadas

Los ingresos operativos netos procedentes de los principales clientes y partes relacionadas durante el año fiscal cerrado el 30 de junio de 2020 son los siguientes (en miles):

| | |
|---|---|
| ELA de Puerto Rico y unidades componentes | $ 459,477 |
| Municipalidades | 69,986 |
| Total | $ 529,463 |

Acuerdo de asistencia financiera entre la Autoridad de Financiamiento de Infraestructuras de Puerto Rico y la Autoridad

El 29 de julio de 2018, la Autoridad y la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico, actuando en nombre del Gobierno, celebraron un Acuerdo de asistencia financiera en virtud del cual la Autoridad recibió una notificación de concesión de subvención de $20.8 millones para financiar los costos de ciertos proyectos especificados en el marco del Programa del Fondo Renovable para el Control de la Contaminación del Agua del Gobierno, establecido de conformidad con la Ley de Agua Limpia.

La Autoridad aplicará los ingresos de la subvención para reembolsarse a sí misma los costos admisibles de los proyectos aprobados. De acuerdo con la Declaración núm. 33 de la GASB, *"Contabilidad e información financiera de las operaciones sin contraprestación"*, la Autoridad reconoce los activos e ingresos cuando se incurre en los costos admisibles o se reciben los recursos, lo que ocurra primero. Al 30 de junio de 2020, la Autoridad aún no había recibido ningún fondo de subvención.

Nota 15 - Arrendamientos

Acuerdo de arrendamiento operativo

El 8 de abril de 2016, PREPA Net firmó un contrato de arrendamiento que cubre ciertos espacios en uno de sus edificios por un plazo de 20 años. El contrato de arrendamiento prevé que PREPA Net reciba pagos mensuales de alquiler de aproximadamente $27.9 mil. El acuerdo prevé un período libre de alquiler de 150 días, a partir de la fecha en que el inquilino acepte la posesión de las ubicaciones. La fecha de entrada en vigencia del arrendamiento operativo es el 4 de noviembre de 2016.

PREPA Net y la Autoridad tenían otros contratos de arrendamiento por períodos menores a un año. Los ingresos por arrendamiento para el año fiscal terminado el 30 de junio de 2020 ascienden a unos $636 mil.

Autoridad de Energía Eléctrica de Puerto Rico

(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 15 - <u>Arrendamientos - (continuación)</u>

<u>Acuerdo de arrendamiento operativo - (continuación)</u>

El calendario de los futuros ingresos mínimos anuales por arrendamiento al 30 de junio de 2020 es el siguiente (en miles):

| Año que termina el 30 de junio | Monto |
|---|---|
| 2021 | 335 |
| 2022 | 335 |
| 2023 | 335 |
| 2024 | 335 |
| 2025 | 335 |
| Después | 3,883 |
| Total | $ 5,558 |

<u>Compromisos de arrendamiento operativo</u>

La Autoridad contrajo compromisos de arrendamiento para el uso de edificios y terrenos locales. Estos acuerdos están programados para expirar entre 2021 y 2025. La Autoridad también tiene un acuerdo de servicio de terminal a largo plazo que incluye el alquiler de seis (6) tanques de búnker C. Los depósitos son para uso de la Autoridad y para uso de los proveedores de combustible de la Autoridad a través del inicio de los contratos de arrendamiento celebrados como subarrendamientos. La duración del contrato es de diecinueve meses, a partir del 10 de junio de 2020 y hasta diciembre de 2021. El contrato es un arrendamiento no cancelable con pagos mínimos futuros de arrendamiento. Todas las tasas se mantienen en vigor durante toda la vigencia del acuerdo. Para el año fiscal 2020, el pago mínimo del arrendamiento es de $22.7 millones y de $11.3 millones para 2021. Del total de seis (6) tanques de búnker C, tres están subarrendados bajo un contrato no cancelable de un año, con opción de renovación. No existen arrendamientos mínimos a percibir en el futuro en virtud de estos subarriendos, ya que sus contratos de arrendamiento son cancelables en el plazo de un año.

PREPA Net arrienda una estación de comunicaciones bajo un contrato de arrendamiento no cancelable pagadero por PREPA Net en cuotas mensuales de aproximadamente $36.5 mil. El 11 de septiembre de 2020, este contrato de arrendamiento fue modificado para aumentar los pagos de arrendamiento de PREPA Net en un 10% a partir del 1 de enero de 2022, y para ampliar el plazo de arrendamiento hasta el 31 de diciembre de 2022.

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 15 - Arrendamientos - (continuación)

Compromisos de arrendamiento operativo - (continuación)

En el año fiscal cerrado el 30 de junio de 2020, los gastos de alquiler consolidados ascendieron a aproximadamente $3.8 millones y se incluyen como gastos generales y administrativos en el estado de ingresos, gastos y cambios en los resultados netos (déficit) adjunto.

Los gastos mínimos anuales de alquiler para los cinco ejercicios fiscales posteriores al 30 de junio de 2020 son los siguientes (en miles):

| Año que termina el 30 de junio | Monto |
|---|---|
| 2021 | $  24,432 |
| 2022 | 12,601 |
| 2023 | 788 |
| 2024 | 544 |
| 2025 | 250 |
| Total | $  38,615 |

Nota 16 - Gestión de riesgos

General

La Autoridad adquiere seguros comerciales que cubren la propiedad a todo riesgo (incluidos los riesgos catastróficos), la interrupción de la actividad y los gastos extraordinarios (excluidas las líneas de transmisión y distribución), la caldera y la maquinaria, la responsabilidad general, la aviación y los programas de líneas financieras. No se dispone de un seguro comercial para el sistema de T&D de la Autoridad. La estructura y la cobertura del programa de seguros para el año fiscal 2020 siguen siendo similares a las de años anteriores para las principales categorías de riesgo. Durante el año fiscal 2021, la estructura de la póliza de propiedad de la Autoridad y la cobertura relacionada con el seguro de propiedad comercial de la Autoridad cambiaron. La cobertura consiste ahora en una indemnización del sesenta por ciento (basada en el importe [sujeto a franquicias y límites] para restablecer los bienes asegurados a su estado anterior a los daños) y un cuarenta por ciento paramétrico según el cual el importe fijo de la indemnización se determina por una medida del suceso (como, por ejemplo, un huracán de categoría 3 o superior que se produzca durante la vigencia de la póliza), en lugar del daño real sufrido por dicho suceso. La Autoridad también tendrá una mayor retención en los límites del nivel superior del programa de seguros de propiedad.

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 16 - Gestión de riesgos - (continuación)

Programa de autoseguro de salud

El programa de atención médica autofinanciada proporciona cobertura de beneficios a todos los empleados activos de la Autoridad en lo que respecta a las necesidades de atención dental, farmacéutica y física/mental. Los cambios en los saldos del programa de seguro de salud (riesgo de autoseguro) incurridos pero no registrados fueron los siguientes (en miles):

| Ejercicios fiscales finalizados el 30 de junio | Saldo inicial | Gasto | Pagos | Saldo final |
|---|---|---|---|---|
| 2019 | $  3,652 | $36,290 | $ (36,984) | $  2,958 |
| 2020 | $  2,958 | $27,153 | $ (27,881) | $  2,230 |

Este importe se incluye en las cuentas a pagar y pasivos devengados en el estado de los resultados netos (déficit).

Nota 17 - Catástrofes naturales y pandemia mundial

Septiembre 2017: impacto del huracán María en el sistema eléctrico

El 20 de septiembre de 2017, el huracán María tocó tierra en Puerto Rico, trayendo vientos sostenidos de 155 millas por hora y lluvias significativas durante un período de 30 horas. El huracán María cruzó Puerto Rico en diagonal, entrando por el sureste y saliendo por el noroeste. El huracán causó una destrucción catastrófica en Puerto Rico, incluidos graves daños en el sistema de energía eléctrica. Dos semanas antes, el huracán Irma pasó justo al norte de Puerto Rico, perjudicando sustancialmente partes de la ya débil infraestructura de la Autoridad.

Los terremotos de enero de 2020 afectan al sistema eléctrico y a la central de Costa Sur

El 28 de diciembre de 2019, el primero de muchos terremotos sacudió a Puerto Rico. El 8 de enero de 2020, el presidente Trump emitió una Declaración de Emergencia para Puerto Rico, en la que se concedió asistencia federal directa para ayudar a Puerto Rico en las evaluaciones preliminares de los daños, después de que Puerto Rico experimentara un terremoto de magnitud 5.8 el 6 de enero de 2020, y un terremoto de magnitud 6.4 al día siguiente.

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 17 - Catástrofes naturales y pandemia mundial - (continuación)

Esta actividad sísmica causó importantes daños en la región sur de la isla. Desde entonces, se han producido más de 500 terremotos de magnitud 2 o superior, principalmente en la misma región. El 16 de enero de 2020 se emitió una declaración de desastre para asistencia individual federal que cubre Guánica, Guayanilla, Peñuelas, Ponce, Utuado y una declaración de asistencia pública federal que cubre Guánica, Guayanilla, Peñuelas, Ponce, San Germán y Yauco. Desde entonces, se añadieron 9 municipios más al programa de asistencia individual y 8 municipios más al programa de asistencia pública.

Dos unidades de la central eléctrica Costa Sur, en Guayanilla, resultaron gravemente dañadas por los terremotos de principios de enero de 2020. Las unidades dañadas proporcionan aproximadamente el 25% de la capacidad de generación de carga base de la Autoridad. Actualmente se están preparando las reclamaciones por daños con el apoyo de la compañía de seguros.

Efectos de la COVID-19 en las operaciones de la Autoridad

El 11 de marzo de 2020, la Organización Mundial de la Salud declaró la COVID-19 como una pandemia mundial. El brote de COVID-19 comenzó a interrumpir las cadenas de suministro y a afectar a la producción y las ventas en toda una serie de industrias y negocios en Puerto Rico, y contribuyó a una importante inflación de los precios. Aunque se esperaba que la interrupción fuera temporal, existe una considerable incertidumbre en torno a la duración del impacto. Por lo tanto, el alcance del impacto de la COVID-19 en los resultados operativos y financieros de la Autoridad dependerá de ciertos acontecimientos, incluida la duración y la propagación del brote y la cadena de suministro, la inflación y otros impactos en los clientes, empleados y proveedores de la Autoridad, todos los cuales son inciertos y aún no se pueden predecir. Ver la Nota 20.

Impacto financiero de las catástrofes naturales y la pandemia mundial

Los huracanes de 2017 y los terremotos de enero de 2020 causaron importantes daños en las infraestructuras y pérdidas en la red eléctrica y otros activos de la Autoridad.

Durante el año fiscal finalizado el 30 de junio de 2020, la Autoridad reconoció ingresos de aproximadamente $40.9 millones, en concepto de subvenciones aprobadas por la FEMA, de acuerdo con las orientaciones establecidas por la Declaración núm. 33 de la GASB, *"Contabilidad e información financiera sobre transacciones sin contraprestación"*. Además, se ha cobrado de la FEMA un importe total de aproximadamente $29.2 millones procedentes de siniestros reconocidos en ejercicios fiscales anteriores. Unos $157.6 millones de cuentas por cobrar de

Autoridad de Energía Eléctrica de Puerto Rico

(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 17 - <u>Catástrofes naturales y pandemia mundial - (continuación)</u>

<u>Impacto financiero de las catástrofes naturales y la pandemia mundial</u>

la FEMA, así como una provisión reformulada de $26.7 millones se presentan en el estado de los resultados netos (déficit) adjunto. Además, la Autoridad capitalizó unos $16.1 millones en nuevas reparaciones de infraestructuras.

Se realizaron reparaciones de emergencia tras los huracanes y los terremotos de enero de 2020 por un valor aproximado de $286.6 millones, que se presentan netos de recuperaciones de seguros por valor de $74 millones en el estado de ingresos, gastos y cambios en los resultados netos (déficit) adjunto.

Además, durante el año fiscal terminado el 30 de junio de 2020, del total de contribuciones de capital de aproximadamente $7.5 millones presentado en el estado de ingresos, gastos y cambios en la posición neta (déficit) adjunto, aproximadamente $6 millones representaron donaciones recibidas del USACE relacionadas con los desastres naturales.

El 22 de mayo de 2020, la PREB aprobó el gasto de $25.2 millones de la Autoridad para reparar las unidades dañadas de Costa Sur. La PREB también permitió a la Autoridad comprometer $15 millones adicionales para las reparaciones. Ver la Nota 20.

Nota 18 - <u>Transformación del sistema de la Autoridad</u>

<u>Transformación del sistema de transmisión y distribución ("T&D") de la Autoridad</u>

El 15 de mayo de 2020, el Comité de Alianzas (el "Comité de Alianzas") establecido por la Autoridad para las Alianzas Público-Privadas de Puerto Rico (la "Autoridad P3") conforme a la Ley 120-2018, y sus enmiendas, recomendó a la junta directiva de la Autoridad P3 que el contrato (el "Contrato T&D") para la gestión, operación, mantenimiento, reparación, restauración y reemplazo del Sistema T&D (el "Proyecto") fuera adjudicado a LUMA Energy, LLC ("LUMA").

El 22 de junio de 2020, la Junta de Gobierno y el Gobierno de Puerto Rico aprobaron cada uno el Contrato de T&D, y el Contrato de T&D fue firmado por la Autoridad, la Autoridad P3 y LUMA. El 1 de junio de 2021, a tenor con el Contrato de T&D, LUMA se hizo cargo de la gestión y operación del Sistema de T&D. Consultar la Nota 20.

*Este espacio se ha dejado intencionadamente en blanco*

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 18 - <u>Transformación del sistema de la Autoridad - (continuación)</u>

<u>Transformación del sistema de generación de la Autoridad</u>

El 16 de abril de 2019, la Autoridad P3, en colaboración con la Autoridad, solicitó declaraciones de cualificación ("SOQ") a empresas y consorcios interesados en desarrollar, construir, gestionar y operar nuevas unidades de generación móviles o fijas, flexibles y distribuidas (o una combinación de las mismas) que se ubicarían en varios lugares de Puerto Rico (las "Unidades de Generación"), conforme a un acuerdo de compra y operación de energía de veinticinco años.

Además, el 12 de julio de 2019, la Autoridad P3, en colaboración con la Autoridad, solicitó SOQ de empresas y consorcios interesados en proporcionar capacidad de generación para reemplazar la generación existente a través de una nueva instalación en o adyacente a la planta de energía existente de Palo Seco, conforme a un contrato de asociación público-privada a largo plazo. El 10 de junio de 2020, la Autoridad P3 seleccionó a los preseleccionados cualificados para participar como proponentes en la solicitud de propuestas. Ver sección "Transformación de la generación de la Autoridad" en la Nota 20.

*Este espacio se ha dejado intencionadamente en blanco*

Autoridad de Energía Eléctrica de Puerto Rico

(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 19 - <u>Compromisos, contingencias y otras obligaciones</u>

<u>Compromisos</u>

<u>Acuerdos de compra de energía</u>

Los acuerdos de compra de energía al 30 de junio de 2020 eran los siguientes (en miles):

| | Acciones de autoridad | Tipo | Capacidad (MW) | Compromiso excepcional |
|---|---|---|---|---|
| AES Puerto Rico | 100% | Carbón | 454.3 | $ 2,165,885 |
| EcoElectrica | 100% | Gas | 507 | 383,518 |
| Humacao Solar Project, LLC | 100% | Renovable | 40 | 284,710 |
| Pattern Santa Isabel | 100% | Renovable | 95 | 356,286 |
| Oriana Energy, LLC (Yarotek) | 100% | Renovable | 45 | 341,425 |
| San Fermin Solar Farm, LLC | 100% | Renovable | 20 | 124,699 |
| AES Ilumina, LLC | 100% | Renovable | 20 | 111,211 |
| Punta Lima Wind Farm, LLC | 100% | Renovable | 26 | 101,394 |
| Horizon Energy, LLC | 100% | Renovable | 10 | 105,244 |
| Coto Laurel Solar Farm, Inc. | 100% | Renovable | 10 | 62,681 |
| Landfill Gas Technologies of Fajardo, LLC (Toa Baja) | 100% | Renovable | 2 | 13,501 |
| Windmar Renewable Energy, Inc. | 100% | Renovable | 2 | 12,413 |
| Landfill Gas Technologies of Fajardo, LLC (Fajardo) | 100% | Renovable | 2 | 7,338 |
| Total | | | | $ 4,070,305 |

La Autoridad no es propietaria de ningún activo relacionado con estos acuerdos. A medida que se incurre en los costos cada año, se registran como gasto de energía comprada. Durante el año fiscal cerrado el 30 de junio de 2020, la Autoridad registró como gasto $732.9 millones por sus compromisos de compra de energía. Los proyectos de energía renovable suelen incluir un componente de precio relacionado con la energía exportada a la red, y un componente de precio relacionado con los créditos de energía renovable ("REC") asociados a la energía exportada. Solo los dos proyectos de gas de vertedero incluyen la transferencia de REC sin un cargo adicional. Los acuerdos de compra de energía están programados para expirar entre 2022 y 2045. El compromiso pendiente en la tabla anterior es un costo proyectado basado en las diferentes variables incluidas en los términos acordados a lo largo de la duración restante de los acuerdos de compra de energía. De acuerdo con el actual Plan Fiscal de la Autoridad, ésta ha renegociado varios de los acuerdos operativos de compra de energía ("PPOA") para conseguir una reducción de sus precios actuales y asumir o rechazar los acuerdos en el caso del Título III de la Autoridad. Ver la Nota 20.

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 19 - Compromisos, contingencias y otras obligaciones - (continuación)

Compromisos (continuación)

Compromisos de construcción y otros

Al 30 de junio de 2020, la Autoridad tiene compromisos de aproximadamente $823 millones en contratos activos de construcción, mantenimiento y servicios de ingeniería.

Contingencias

Contingencias legales

*General*

La Autoridad es demandada o codemandada en numerosos procedimientos judiciales, entre los que se incluyen reclamaciones relacionadas con la mano de obra, reclamaciones por daños debidos a cables electrificados, fallos en el suministro de energía y fluctuaciones en el suministro eléctrico. En el estado de los resultados netos (déficit) adjunto se incluye un pasivo acumulado de aproximadamente $264 millones para cubrir dicha exposición.

Como se indica en la Nota 3, el 2 de julio de 2017, la Junta de Supervisión presentó la Petición del Título III. En consecuencia, las reclamaciones contra la Autoridad para el período anterior al 2 de julio de 2017 se paralizaron hasta que se levante la suspensión del Título III conforme a PROMESA. La mayoría de estas reclamaciones estarán sujetas a objeción en el caso del Título III y probablemente se considerarán como una reclamación no garantizada previa a la competencia sujeta a deterioro en el caso del Título III de la Autoridad.

Bajo ciertas circunstancias, según dispone la Ley núm. 104 de 29 de junio de 1955, según enmendada ("Ley núm. 104"), el ELA podrá proveer a sus funcionarios y empleados, incluidos los directores, directores ejecutivos y empleados de las corporaciones públicas y unidades componentes del gobierno y los alcaldes de los municipios del ELA, representación legal, así como asumir el pago de cualquier sentencia que se dicte en su contra. No hay limitación en el monto de la sentencia que puede ser pagada bajo las disposiciones de la Ley núm. 104 en casos ante el tribunal federal, pero en todos los demás casos el Secretario de Justicia del ELA puede determinar si, y en qué medida, el ELA asumirá el pago de dicha sentencia. Aunque los directores, el director ejecutivo y los empleados de la Autoridad están cubiertos por las disposiciones de la Ley núm. 104, el Artículo 19 de la Ley 104 requiere que la Autoridad cubra los costos asociados con sentencias, gastos y

*Este espacio se ha dejado intencionadamente en blanco*

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 19 - <u>Compromisos, contingencias y otras obligaciones - (continuación)</u>

<u>Contingencias - (continuación)</u>

<u>Contingencias legales - (continuación)</u>

honorarios de abogados incurridos por el ELA en la representación legal de los directores, el director ejecutivo y los empleados de la Autoridad. En la medida en que la Autoridad no pueda cubrir estos costos y gastos, la Autoridad estaría obligada a reembolsar al ELA con los ingresos futuros, según lo dispuesto por el Secretario del Tesoro del ELA en consulta con la junta directiva de la Autoridad.

*Reclamaciones relacionadas con el trabajo*

• Reclamación de licencia por exceso de vacaciones
En 1999, la Unión de Trabajadores de la Industria Eléctrica y Riego ("UTIER") presentó una reclamación contra la Autoridad ante el Negociado de Conciliación y Arbitraje del Departamento del Trabajo y Recursos Humanos de Puerto Rico ("PRDLegLHR") por los saldos de vacaciones acumuladas por encima de las 450 horas en base al período de diez años que comenzó el 24 de julio de 1989. El 26 de septiembre de 2012, un árbitro del PRDLegLHR resolvió que la reclamación era aplicable a todos los miembros de la UTIER y condenó a la Autoridad a pagar lo siguiente:

a)   Dos veces el salario correspondiente por los saldos de días de vacaciones en exceso de 60 días que tenían o tienen los empleados sindicalizados desde el 1 de agosto de 1995 hasta la fecha de la decisión apoyada en la Ley 84 de 1995 y la Ley 180 de 1998.

b)   La mitad de la citada cantidad en concepto de sanción, más los intereses legales desde el día de la resolución.

c)   El 10% del importe total en concepto de honorarios de abogados.

El 18 de mayo de 2015, la Autoridad presentó una demanda para dejar sin efecto el laudo arbitral de PRDLegLHR en el Tribunal de Primera Instancia de San Juan. El 18 de abril de 2016, el Tribunal falló en contra de la Autoridad y desestimó el caso de la Autoridad. El 20 de mayo de 2016, la Autoridad apeló la desestimación ante el Tribunal de Apelaciones de Puerto Rico. La apelación se paralizó automáticamente como consecuencia de la presentación de la Petición del Título III, y el 17 de noviembre de 2017, el Tribunal de Apelación dictó una sentencia confirmando la paralización del procedimiento. La estimación de la gerencia sobre la contingencia de pérdidas se contabiliza en los estados financieros adjuntos.

- 89 -

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 19 - <u>Compromisos, contingencias y otras obligaciones - (continuación)</u>

      <u>Contingencias - (continuación)</u>

      <u>Contingencias legales - (continuación)</u>

      <u>*Reclamaciones relacionadas con el trabajo - (continuación)*</u>

- Bono navideño

  El 17 de diciembre de 2014, la UTIER presentó una reclamación contra la Autoridad ante la Junta de Relaciones Laborales de Puerto Rico ("PRLRB") debido a la decisión de la Autoridad de reducir los aguinaldos de los empleados adeudados en diciembre de 2014 a aproximadamente $600, de acuerdo con el Artículo 11 de la Ley 66 del 14 de junio de 2014. La UTIER alegó que, al 30 de junio de 2014, el bono navideño de diciembre de 2014 ya estaba devengado. El 31 de mayo de 2017, el funcionario de vistas emitió una recomendación a la PRLRB para que se condenara a la Autoridad a pagar el importe en el que se redujo el bono navideño de Navidad en diciembre de 2014.

  El 31 de julio de 2017, la Autoridad informó a la PRLRB que la suspensión del Título III estaba en vigor debido a la presentación de la Petición del Título III. Posteriormente, el Tribunal Supremo de Puerto Rico ordenó a la PRLRB que evaluara, caso por caso, todas las reclamaciones monetarias en las que la Autoridad es la parte demandada, para determinar si los casos se paralizan o no bajo PROMESA. Tras el levantamiento de la paralización del Título III, en caso de que la Autoridad no tenga éxito en su defensa, la gerencia ha estimado una pérdida probable, incluidas las sanciones, que se registra como pasivo en el estado de resultados netos (déficit).

  En 2014, un grupo de empleados gerenciales de la Autoridad presentó ante la Comisión de Apelaciones del Servicio Público ("PSAC") una reclamación contra la Autoridad relacionada con el bono navideño de diciembre de 2014, que fue reducido a $600, de acuerdo con el artículo 11 de la Ley 66 del 14 de junio de 2014. La Comisión no ha emitido ninguna resolución al respecto.

  Algunos de estos casos fueron consolidados por la PSAC en función del año en que se reclama el bono. Se presentaron las respectivas mociones para asumir la representación legal de la Autoridad, pero la PSAC aún no se ha pronunciado sobre todas ellas. Se presentaron las respectivas mociones de paralización a causa de la Petición del Título III, pero la PSAC aún no se ha pronunciado sobre todas ellas.

*Este espacio se ha dejado intencionadamente en blanco*

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 19 - <u>Compromisos, contingencias y otras obligaciones - (continuación)</u>

      <u>Contingencias - (continuación)</u>

      <u>Contingencias legales - (continuación)</u>

      <u>*Reclamaciones relacionadas con el trabajo - (continuación)*</u>

- Asunto: Violaciones del acuerdo de negociación

En mayo de 2010, la UTIER presentó ante el PRDLHR un total de 171 reclamaciones contra la Autoridad, por violaciones del convenio de negociación colectivo. Por esas fechas, la Autoridad contrató a nuevos empleados, y los empleados de emergencia previamente desplazados no fueron tenidos en cuenta para estas funciones, conforme al convenio de negociación colectivo de la UTIER. La vista arbitral se celebró el 14 de mayo de 2010. El 18 de junio de 2013, el árbitro concluyó que la Autoridad violó el convenio de negociación colectivo, porque no dio prioridad a los empleados desplazados antes de contratar a nuevos empleados. Se ordenó a la Autoridad que pagara todos los salarios que habrían devengado los empleados anteriormente desplazados desde la fecha de contratación de los nuevos empleados. La estimación de la gerencia sobre la contingencia de pérdidas se contabiliza en los estados financieros adjuntos. El caso se paralizó debido a la petición del Título III.

- Reclamación de la sanción de la hora de comer

El 31 de diciembre de 1997, la Unión Insular de Trabajadores Industriales y Construcciones Eléctricas ("UITICE") y la Autoridad firmaron una estipulación de acuerdo con la Ley 41 de 1990. A través de esta estipulación, la Autoridad pagaría una sanción por el trabajo realizado durante un período de tiempo de comida acordado desde el momento en que la Ley 41 de 1990 entró en vigor hasta la fecha de la estipulación. Tras el acuerdo, el Tribunal Supremo de Puerto Rico resolvió otro caso en el que afirmaba que el derecho de los trabajadores a un período de comida existía desde 1974. A continuación, la UITICE solicitó a un árbitro con jurisdicción en el caso que le diera carácter retroactivo de acuerdo con la decisión del Tribunal Supremo.

El 7 de julio de 2000, el PRDLHR emitió una nueva decisión en la que determinó que la estipulación firmada el 31 de diciembre de 1997 no era definitiva, y determinó que el pago debía ser retroactivo, según la decisión del Tribunal Supremo. El 30 de junio de 2017, las partes firmaron una nueva estipulación para cumplir con la orden judicial. El caso fue paralizado como resultado de la presentación de la Petición del Título III. La estimación de la gerencia sobre la contingencia de pérdidas se contabiliza en los estados financieros adjuntos.

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 19 - Compromisos, contingencias y otras obligaciones - (continuación)

Contingencias - (continuación)

Contingencias legales - (continuación)

*Reclamaciones relacionadas con el trabajo - (continuación)*

- Otros casos relacionados con asuntos de convenios de negociación colectivos

En 2007, la UTIER presentó ante la PRLRB una reclamación contra la Autoridad debido a múltiples presuntas violaciones de las disposiciones del convenio colectivo por parte de la Autoridad desde el 11 de diciembre de 2006 hasta el 23 de agosto de 2008. Estas supuestas violaciones incluyen cuestiones relativas a los horarios de trabajo, el tiempo de relevo diario de los empleados de guardia y la publicación de los puestos de trabajo disponibles en la Autoridad.

El 23 de abril de 2014, la PRLRB resolvió que las disposiciones pertinentes del convenio colectivo en cuestión debían haberse aplicado durante el período en cuestión. El 16 de julio de 2014, la Autoridad recurrió esta decisión ante el Tribunal de Apelaciones de Puerto Rico. El proceso para determinar el importe de los pagos se paralizó como consecuencia de la presentación de la petición del Título III. La estimación de la gerencia sobre la contingencia de pérdidas se contabiliza en los estados financieros adjuntos.

*Litigios de CAPECO*

En 2009, un gran incendio en una instalación industrial de almacenamiento de combustible y productos diésel propiedad de CAPECO causó importantes daños en las zonas circundantes. La Autoridad almacenaba parte de su combustible en estas instalaciones. Después del incendio, se presentaron numerosas reclamaciones contra CAPECO. Algunos de los demandantes incluyeron a la Autoridad como demandada en estas demandas, alegando que la Autoridad no cumplió con su deber (como propietaria del combustible almacenado en el lugar) de supervisar adecuadamente las operaciones de CAPECO en la instalación de almacenamiento. El 12 de agosto de 2010, CAPECO se declaró en quiebra. Las reclamaciones contra la Autoridad se paralizaron debido a la Petición del Título III. Esta contingencia de pérdida no cumple los criterios de probabilidad, y no se ha registrado ningún pasivo en el estado los resultados netos (déficit) adjunto relacionado con esta contingencia.

*Este espacio se ha dejado intencionadamente en blanco*

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020


Nota 19 - <u>Compromisos, contingencias y otras obligaciones - (continuación)</u>

       <u>Contingencias - (continuación)</u>

       <u>Contingencias legales - (continuación)</u>

       *Litigio sobre la facturación de los consumidores*

- Ismael Marrero y otros. V. la Autoridad y otros.

       Se trata de una demanda colectiva contra la Autoridad, William A. Clark, Edwin Rodríguez y César Torres, así como contra varios laboratorios y empresas de suministro de petróleo. Los demandantes afirman que los demandados entraron en una conspiración RICO por la que la Autoridad pagó por el gasoil no conforme a los precios del gasoil ajustados, a cambio de sobornos a los demandados individuales. Los demandantes alegaron además que se les cobró de más en las facturas mensuales de electricidad como resultado de la supuesta conspiración RICO.

       El Tribunal de Distrito bifurcó el caso y, posteriormente, certificó el grupo. Los demandados apelaron la decisión. La certificación del grupo fue confirmada por el Tribunal de Apelación de los Estados Unidos para el Primer Circuito, pero la petición de apelación fue denegada. El caso está actualmente paralizado. El comité de reclamaciones especiales de la Junta de Supervisión ("SCC") y el comité de acreedores no garantizados ("UCC"), en calidad de fideicomisarios codemandantes en nombre de la Autoridad, presentaron una acción de anulación ante el Tribunal de Título III y se encuentran actualmente en la acción de anulación. La SCC, la UCC y los vendedores demandados estipularon el levantamiento de la paralización con el propósito limitado de informar y determinar las mociones de desestimación o de sentencia sobre los alegatos. Esas mociones están siendo informadas. El descubrimiento de la acción de paralizada sigue suspendido. El 8 de febrero de 2019, los demandantes presentaron una moción en el Tribunal de Distrito para levantar la paralización en cuanto a todos los demandados excepto la Autoridad. El 9 de mayo de 2019, la petición fue denegada.

       La Autoridad litigará enérgicamente, defendiendo la fase de fondo del caso y negando todas las acusaciones en su contra. Los demandantes no reclaman en este momento una cantidad específica de daños a la Autoridad. La estimación de la gerencia sobre la contingencia de pérdidas se contabiliza en los estados financieros adjuntos.


*Este espacio se ha dejado intencionadamente en blanco*

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 19 - <u>Compromisos, contingencias y otras obligaciones</u> - (continuación)

<u>Contingencias</u> - (continuación)

<u>Contingencias legales</u> - (continuación)

<u>*Litigio sobre la facturación de los consumidores*</u> - *(continuación)*

- Pedro Santiago V. AEE y otros.

  El caso de Pedro Santiago v. AEE, y otros, núm. civil KPE20160618, es una acción colectiva de consumidores contra la Autoridad bajo 32 L.P.R.A. § 3341. Un grupo de demandantes propuestos, todos ellos consumidores residenciales de energía, impugnan el cargo por ajuste de combustible y el cargo por compra de energía por varios motivos, incluidas reclamaciones por incumplimiento de contrato. Los demandantes también reclaman un enriquecimiento injusto, daños y perjuicios por valor de unos $600 millones, violaciones de la legislación antimonopolio y solicitan un interdicto permanente. El caso está paralizado como resultado de la presentación de la petición del Título III. Una vez que se levante la paralización, la Autoridad defenderá enérgicamente el caso y sostiene que no hay ninguna causa de acción contra la Autoridad. La estimación de la gerencia sobre la contingencia de pérdidas se contabiliza en los estados financieros adjuntos.

<u>AEE V. Vitol Inc.</u>

En 2009, la Autoridad presentó una demanda en el Tribunal de Primera Instancia de San Juan contra Vitol, Inc. y Vitol S.A. (colectivamente, "Vitol") solicitando una sentencia declaratoria en cuanto a la nulidad de dos acuerdos de suministro de combustible debido a que Vitol no reveló (a) ciertos cargos penales por corrupción a los que Vitol S.A. se declaró culpable y (b) varias otras investigaciones. Vitol presentó esta demanda ante el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico ("Tribunal de Distrito") y presentó una reconvención alegando que la Autoridad debía a Vitol, Inc. aproximadamente $45 millones, que consistían en aproximadamente $28 millones en combustible que fue entregado a, y utilizado y no pagado por, la Autoridad y aproximadamente $17 millones para el reembolso de los impuestos al consumo, más los intereses, costos y honorarios de abogados. La Autoridad solicitó la devolución del asunto al Tribunal de Primera Instancia.

El 28 de noviembre de 2012, la Autoridad presentó una segunda demanda contra Vitol ante el Tribunal de Primera Instancia en la que solicitaba esencialmente las mismas soluciones solicitadas en la primera acción, pero en relación con otros cuatro contratos, después de que el descubrimiento revelara la fecha en la que Vitol tuvo conocimiento de las investigaciones en los casos de corrupción. Vitol también presentó esta acción ante el Tribunal de Distrito. La Autoridad pidió que se reenvíe al Tribunal de Primera Instancia. El Tribunal de Distrito consolidó los dos casos. La Autoridad reclama aproximadamente $3,890 millones en total.

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 19 - Compromisos, contingencias y otras obligaciones - (continuación)

Contingencias - (continuación)

Contingencias legales - (continuación)

AEE V. Vitol Inc. - (continuación)

Vitol, Inc. ha resuelto una reclamación de la Autoridad por unos $17 millones en impuestos especiales y ha declarado que modificará su reconvención para desestimar dicha reclamación. El caso fue devuelto al Tribunal de Primera Instancia, y ese foro fijó el 15 de noviembre de 2019 como fecha para que la Autoridad y Vitol presentaran mociones simultáneas de sentencia sumaria. El 14 de noviembre de 2019, Vitol retiró el caso de nuevo al Tribunal de Distrito en el caso del Título III de la Autoridad, debido a que el SCC en los casos del Título III había presentado una demanda modificada en un procedimiento adverso alegando reclamaciones contra Vitol en virtud de los contratos en cuestión en el Tribunal de Primera Instancia. La Autoridad solicitó la devolución al Tribunal de Primera Instancia una vez más, pero el Tribunal de Distrito denegó la moción de la Autoridad el 13 de marzo de 2020. El caso se encuentra actualmente ante el Tribunal de Distrito como procedimiento contradictorio en el caso del Título III de la Autoridad. Después de escuchar las mociones cruzadas de sentencia sumarias de las partes, el 27 de septiembre de 2021, el Tribunal de Distrito concedió, en parte, y negó, en parte, cada moción cruzada. El tribunal falló en contra de la Autoridad en su reclamación de $3,890 millones y a favor de Vitol en su reconvención de $28.4 millones más intereses. El Tribunal de Distrito ordenó a las partes que identificaran las cuestiones que quedaban por resolver en el procedimiento contradictorio y que presentaran (i) una estipulación que resolviera dichas cuestiones, incluidas, pero sin limitarse a ellas, (a) el período y la tasa pertinentes para calcular cualquier interés previo al juicio, (b) el importe total de cualquier interés previo al juicio pagadero, (c) la reclamación de Vitol de los honorarios de los abogados, y (d) si la sentencia puede dictarse correctamente tras la resolución de las cuestiones pendientes, o (ii) un informe de situación que incluyera una propuesta de calendario de información para cualquier cuestión jurídica pendiente.

El 1 de noviembre de 2021, las partes presentaron un informe conjunto sobre el estado de las cuestiones legales restantes y acordaron que el Tribunal dictara una sentencia final en relación con una suma determinada de intereses previos a la sentencia, y la retirada de las reclamaciones de Vitol por los honorarios de los abogados y los intereses posteriores a la sentencia. El 2 de noviembre de 2021, el Tribunal emitió una sentencia final, que: (i) niega cualquier recuperación monetaria por parte de la Autoridad; (ii) ordena una sentencia final contra la Autoridad por un monto de $41.5 millones sobre la reconvención de Vitol Inc, cuyo monto incluye los intereses de prejuicio acumulados hasta el 2 de julio de 2017, la fecha de la Petición del Título III; (iii) grava todos los costos admisibles contra la Autoridad bajo Fed. R. Civ. P. 54(d)(1); y (iv) deniega toda la reparación no concedida en la sentencia. El 2 de diciembre de 2021, la Autoridad recurrió la sentencia finaldel Tribunal ante el Tribunal de Apelación de los Estados Unidos para el Primer Circuito, donde el asunto está actualmente pendiente. El 2 de mayo de 2022, la Autoridad presentó su escrito de apertura. CEl 20 de julio de 2022, las partes informaron al Primer Circuito que habían llegado a un acuerdo de principio para resolver su disputa.

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 19 - Compromisos, contingencias y otras obligaciones - (continuación)

Contingencias - (continuación)

Contingencias legales - (continuación)

AEE V. Vitol Inc. - (continuación)

En consecuencia, las partes solicitan conjuntamente que el Tribunal deje en suspenso el recurso y paralice todos los plazos para permitir a las partes finalizar su acuerdo de conciliación. Las partes informarán al Tribunal del estado de sus discusiones de conciliación el 18 de agosto de 2022 o antes. La estimación de la gerencia de la contingencia de pérdida se ha acumulado en los estados financieros adjuntos.

*Arbitraje de Tradewinds Energy Barceloneta LLC y Tradewinds Energy Vega Baja*

La Autoridad y Tradewinds Energy LLC celebraron dos acuerdos de compra y explotación de energía ("PPOA de Tradewinds") para desarrollar instalaciones de energía eólica, que fueron asignadas a Tradewinds Energy Barceloneta y Tradewinds Energy Vega Baja (colectivamente, "Tradewinds"). El 18 de enero de 2016, Tradewinds presentó una demanda de arbitraje en virtud de los dos PPOA de Tradewinds en la que reclamaba aproximadamente $30 millones en daños. Las partes han seleccionado al árbitro, pero todavía tienen que firmar el acuerdo de sumisión al arbitraje para que la Autoridad pueda proceder a responder a la demanda de arbitraje. La Autoridad negará toda responsabilidad a Tradewinds y niega haber incumplido cualquier obligación en virtud de los PPOA de Tradewinds. El caso fue paralizado como resultado de la presentación de la Petición del Título III. Dado que esta contingencia no cumple los criterios de probabilidad, no se ha registrado ningún pasivo en el estado de resultados netos (déficit) adjunto relacionado con esta contingencia.

*Litigios y arbitrajes de ReSun (Barceloneta) LLC*

ReSun (Barceloneta) LLC ("ReSun") y la Autoridad celebraron un Acuerdo de Compra de Energía y Operación ("PPOA de ReSun"). ReSun alega que la Autoridad incumplió sus obligaciones en virtud de PPOA de ReSun y exigió un arbitraje. La Autoridad afirmó que no tenía que someterse al arbitraje y, el 30 de diciembre de 2015, ReSun presentó una demanda ante el Tribunal de Primera Instancia de San Juan para obligar a la Autoridad a someterse al arbitraje.

Posteriormente, la Autoridad presentó una moción de sentencia sumaria y, el 20 de abril de 2016, el Tribunal concedió la moción de la Autoridad y desestimó la demanda para obligar al arbitraje. El 23 de junio de 2016, ReSun apeló la sentencia sumaria. El Tribunal de Apelación confirmó la sentencia sumaria. ReSun presentó una petición de certiorari ante el Tribunal Supremo de Puerto Rico, que fue paralizada como resultado de la presentación de la Petición del Título III.

Autoridad de Energía Eléctrica de Puerto Rico

(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 19 - <u>Compromisos, contingencias y otras obligaciones - (continuación)</u>

<u>Contingencias - (continuación)</u>

<u>Contingencias legales - (continuación)</u>

<u>*Litigio de PBJL Energy Corporation V. la Autoridad*</u>

El 20 de diciembre de 2011, la Autoridad y PBJL Energy Corporation ("PBJL") celebraron un Acuerdo Maestro de Compra de Energía Renovable y de Explotación ("PBJL MPPOA") conforme al cual PBJL, a su discreción, podía proponer a la Autoridad proyectos de energía solar fotovoltaica ("PV") en virtud de los cuales, si el sistema de la Autoridad podía interconectar los proyectos propuestos, y la Autoridad aceptaba un sitio y un punto de interconexión propuestos, la Autoridad y PBJL podían celebrar un Acuerdo de Compra de Energía y de Explotación ("PBJL PPOA"). El 5 de mayo de 2015, PBJL presentó una demanda contra la Autoridad y varios empleados a título oficial y personal, alegando que la Autoridad tenía la obligación de adjudicar los PPOA de PBJL a PBJL y que la Autoridad incumplió sus obligaciones en virtud del MPPOA de PBJL al negarse a adjudicar los PPOA de PBJL en virtud del MPPOA de PBJL.

PBJL reclama daños y perjuicios por valor de unos $210 millones. La Autoridad ha negado cualquier responsabilidad a PBJL y ha afirmado que la Autoridad no tenía ninguna obligación de adjudicar un PPOA a PBJL bajo el MPPOA de PBJL porque no es un contrato, y que, en la medida en que el MPPOA de PBJL sea un contrato, el mismo es nulo por falta de consideración y debido a que PBJL no proporcionó a la Autoridad la declaración jurada requerida por la Ley 458 de 2000, en su versión enmendada, entre otras defensas planteadas por la Autoridad en su respuesta a la demanda. El caso estaba en la etapa de descubrimiento cuando, el 30 de agosto de 2017, el Tribunal de Primera Instancia de Puerto Rico paralizó este caso debido a la presentación de la Petición de Título III. Dado que esta contingencia no cumple los criterios de probabilidad, no se ha registrado ningún pasivo en el estado de resultados netos (déficit) adjunto relacionado con esta contingencia.

*Este espacio se ha dejado intencionadamente en blanco*

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 19 - <u>Compromisos, contingencias y otras obligaciones - (continuación)</u>

    <u>Contingencias - (continuación)</u>

    <u>Contingencias legales - (continuación)</u>

    *Whitefish*

El 30 de octubre de 2020, Whitefish Energy Holdings, LLC ("Whitefish") presentó una moción de gastos administrativos contra la Autoridad en el caso del Título III, solicitando la concesión de una reclamación de gastos administrativos basada en los servicios prestados a la Autoridad que consisten en reparaciones tras los huracanes. Whitefish alegó un derecho a dicha reclamación administrativa basado en los importes facturados pendientes de pago y en los intereses que seguían devengándose al 1% mensual. El 1 de marzo de 2022, la Autoridad presentó una moción para aprobar un acuerdo (el "Acuerdo de Conciliación") con Whitefish. El 21 de marzo de 2022, el Tribunal de Título III emitió una Orden (la "Orden del 21 de Marzo") que aprobaba dicha transacción. El Acuerdo de Conciliación resuelve todos los asuntos en disputa que surgen o están relacionados de alguna manera con el contrato, las facturas y los gastos de financiación de Whitefish, incluidos los intereses y las penalizaciones que Whitefish hace valer como reclamación administrativa. Parte de los acuerdos aprobados por el Tribunal de Título III incluyen que no se devengarán más intereses a partir de la fecha de ejecución del Acuerdo de Conciliación siempre que todos los pagos de la Autoridad en virtud del Acuerdo de Conciliación se realicen a tiempo y en su totalidad. La estimación de la gerencia de la contingencia de pérdida se ha acumulado en los estados financieros adjuntos.

    *Cobra*

El 30 de septiembre de 2019, Cobra Acquisitions LLC ("Cobra") presentó una moción de gastos administrativos contra la Autoridad ante el Tribunal de Título III, solicitando la concesión de una reclamación de gastos administrativos, por los importes derivados de varios servicios prestados por Cobra a la Autoridad para ayudar en la reconstrucción de la red eléctrica de la Autoridad tras los huracanes. El caso está actualmente paralizado a la espera de la resolución de los cargos penales en curso contra el ex presidente de Cobra y dos funcionarios de la FEMA que han sido acusados penalmente y detenidos por fraude y conspiración para cometer sobornos en relación con el trabajo de Cobra en la red eléctrica de la Autoridad, en virtud de los contratos que Cobra pretende hacer cumplir. Ver U.S.A. v. Tribble, Caso núm. 19-CR-541-FAB, ECF núm. 3 (D.P.R. 3 de septiembre de 2019) (el "Caso Penal"). El 18 de mayo de 2022, los funcionarios se declararon culpables de cargos menores. La causa penal sigue pendiente, y no se ha dictado sentencia aceptando la declaración, la sentencia la vista está pendiente de orden judicial.

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 19 - <u>Compromisos, contingencias y otras obligaciones - (continuación)</u>

    <u>Contingencias - (continuación)</u>

    <u>Contingencias legales - (continuación)</u>

En cuanto al primer contrato de la Autoridad con Cobra, la FEMA había emitido una determinación formal que denegaba aproximadamente $46 millones por tres razones. La FEMA descubrió que el contrato no autorizaba unos $24 millones, porque Cobra tenía más del número máximo de trabajadores de línea permitidos en el trabajo sin autorización escrita de la Autoridad. Unos $22 millones fueron denegados como cargos no justificados por los términos del contrato. La Autoridad presentó un recurso administrativo de primer nivel contra la determinación de la FEMA, aportando pruebas de la autorización escrita con respecto a la denegación de $24 millones. El 31 de mayo de 2022, la FEMA emitió su primera decisión de apelación, concediendo el recurso en parte y denegándolo en parte. La FEMA aprobó $24 millones y modificará el PW 251 para reasignar esta financiación. La Autoridad había recibido previamente esta financiación de la FEMA (a través del COR3), por lo que la reobligación no supondrá un pago en efectivo, sino que la Autoridad no tendrá que devolver los fondos que le fueron desembolsados previamente. La FEMA denegó el resto de los importes apelados. La Autoridad puede presentar un Segundo Recurso ante la Sede de la FEMA (a través de la COR3) o una Solicitud de Arbitraje ante la Junta Civil de Apelación de Contratos de los Estados Unidos dentro de los 60 días siguientes a la decisión (30 de julio de 2022). La FEMA también está trabajando para determinar la elegibilidad para el reembolso bajo el programa de Asistencia Pública de la agencia de los honorarios cobrados por Cobra por su trabajo en la red eléctrica de la Autoridad bajo el segundo contrato de la Autoridad con Cobra.

El 19 de enero de 2022, las partes presentaron ante el Tribunal de Título III un informe sobre el estado de los procedimientos penales y la revisión de la elegibilidad por parte de la FEMA, en el que la Autoridad afirma que la paralización del litigio debe seguir en vigor y Cobra afirma que la suspensión debe ser levantada. El 26 de enero de 2022, el Tribunal de Título III emitió una orden con respecto al informe de estado del 19 de enero de 2022, dejando la paralización en su lugar y ordenando a las partes que presenten un nuevo informe de estado que aborde el estado de la revisión de la FEMA de los contratos de Cobra con la Autoridad, el estado de cualquier recurso administrativo en relación con las determinaciones de la FEMA con respecto a los contratos, y el estado del Caso Penal. El 7 de junio de 2022, Cobra presentó una moción para levantar la paralización del litigio en este asunto impugnado. El 14 de junio de 2022, la Junta de Supervisión y la AAFAF, en nombre de la Autoridad, presentaron una objeción a la moción de Cobra, a la que Cobra respondió el 21 de junio de 2022. Tras una vista sobre el asunto, el 29 de junio de 2022, el Tribunal dictó una orden denegando la moción de Cobra de levantar la paralización del litigio. El Tribunal ordenó además a las partes que presentaran un informe sobre el estado de la cuestión antes del 6 de enero de 2023. Si la revisión del contrato Cobra por parte de la FEMA finaliza antes del 6 de enero de 2023, las partes deberán presentar un informe de situación en los 30 días siguientes a la resolución de la FEMA. Debido a las circunstancias, este caso no cumplía los criterios de probabilidad.

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 19 - <u>Compromisos, contingencias y otras obligaciones - (continuación)</u>

      <u>Contingencias - (continuación)</u>

      <u>Contingencias legales - (continuación)</u>

      <u>Principales mociones y procedimientos adversos en los casos del Título III</u>

- Litigios por gastos corrientes

    a. Prestamistas de líneas de combustible

    El 9 de julio de 2019, el agente administrativo sucesor de los prestamistas de la Autoridad en virtud del Acuerdo de Crédito, de fecha 4 de mayo de 2012, y algunos prestamistas de la Autoridad en virtud de un Acuerdo de Financiación Comercial, de fecha 20 de julio de 2012 (colectivamente, los "Prestamistas de la Línea de Combustible"), presentaron una demanda contra la Autoridad y otras partes. Los Prestamistas de la Línea de Combustible solicitaron al Tribunal de Título III que dictara una sentencia en la que se declarara que todos los importes que supuestamente se les adeudan son gastos corrientes en virtud del Acuerdo de 1974 y afirmaran que deben pagarse antes de realizar cualquier otro pago al fideicomisario de 1974 o a los tenedores de bonos. La Autoridad, la Junta de Supervisión y la AAFAF presentaron conjuntamente mociones para desestimar la demanda enmendada el 11 de noviembre de 2019 y, el 5 de diciembre de 2019, los Prestamistas de Líneas de Combustible contestaron. Sin embargo, conforme a la orden del Tribunal de Título III, la vista sobre las mociones de desestimación pendientes se aplaza sin fecha.

    b. SRE de la AEE

    El 30 de octubre de 2019, el Sistema de Retiro de los Empleados de la Autoridad de Energía Eléctrica de Puerto Rico (el "SRE de la AEE") presentó una demanda enmendada contra la Autoridad y otras partes. El SRE de la AEE solicitó al Tribunal de Título III que determinara que todos los montos adeudados al SRE de la AEE son Gastos Corrientes según se definen en el Acuerdo de 1974 porque las contribuciones hechas a las pensiones y al sistema de retiro supuestamente califican como Gastos Corrientes bajo el Acuerdo de 1974. El SRE de la AEE afirma que estos "Gastos Corrientes" deben ser pagados antes de realizar cualquier otro pago al Fideicomisario de 1974 o a los tenedores de bonos de la Autoridad.

    La Autoridad, la Junta de Supervisión y la AAFAF presentaron conjuntamente una moción para desestimar la demanda enmendada, a la que se opuso el SRE de la AEE. Posteriormente, el Tribunal de Título III aplazó la vista sobre este asunto sin fecha.

Autoridad de Energía Eléctrica de Puerto Rico

(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 19 - <u>Compromisos, contingencias y otras obligaciones - (continuación)</u>

      <u>Contingencias - (continuación)</u>

      <u>Contingencias legales - (continuación)</u>

      <u>Principales mociones y procedimientos adversos en los casos del Título III - (continuación)</u>

• Impugnación del gravamen

El 1 de julio de 2019, la Autoridad, la Junta de Supervisión y la AAFAF presentaron una demanda contra el Fideicomisario de 1974 solicitando al Tribunal de Título III que (a)(i) declare que el interés de garantía del Fideicomisario de 1974 en la propiedad de la Autoridad se limita a los fondos depositados al crédito del "Fondo de Amortización" y algunos otros fondos bajo el Acuerdo de 1974; (ii) declarar que el Fideicomisario de 1974 no ha perfeccionado ningún interés de garantía en ninguno de los bienes de la Autoridad que no sea el efectivo depositado en el crédito del Fondo de Amortización; (iii) anular cualquier interés de garantía concedido al Fideicomisario de 1974 en cualquiera de los bienes de la Autoridad que no sea el efectivo depositado en el crédito del Fondo de Amortización, preservando todos los gravámenes anulados en beneficio de la Autoridad; (b)(i) declarar que los pactos y recursos contractuales establecidos en el Acuerdo de 1974 son obligaciones de la Autoridad, no propiedad de la Autoridad, y no constituyen ni pueden constituir una garantía en la que la Autoridad haya concedido un interés de seguridad para garantizar los bonos de la Autoridad; (ii) declarar que el Fideicomisario de 1974 no ha perfeccionado ningún interés de seguridad en ninguno de dichos convenios y remedios y que el interés de la Autoridad en los mismos tiene prioridad sobre cualquier interés del Fideicomisario de 1974 bajo la ley de Puerto Rico; (iii) anular cualquier interés de seguridad en dichos convenios y remedios, preservando todos los gravámenes anulados para el beneficio de la Autoridad; y (c) rechazar todas las reclamaciones que afirmen intereses de seguridad no otorgados bajo el Acuerdo de 1974 o que no estén perfeccionados.

El 16 de julio de 2019, el Tribunal de Título III emitió una orden que paraliza este procedimiento hasta lo que ocurra primero: (i) 60 días después de que el Tribunal deniegue la Moción 9019; (ii) la consumación de un plan de ajuste; (iii) 60 días después de que los demandantes presenten una notificación para reanudar el litigio; o (iv) una nueva orden del Tribunal.

*Este espacio se ha dejado intencionadamente en blanco*

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 19 -   Compromisos, contingencias y otras obligaciones - (continuación)

Contingencias - (continuación)

Contingencias legales - (continuación)

*Reclamaciones por lesiones corporales*

La Autoridad es parte demandada en varias acciones judiciales en las que se reclaman los daños corporales sufridos por personas que entran en contacto con cables y otros accidentes y sucesos similares. El total de las reclamaciones asciende a unos $203 millones.

La estimación de la gerencia de la contingencia de pérdida se ha acumulado en los estados financieros adjuntos como un pasivo contingente para resolver estas demandas legales, pero tiene la intención de seguir defendiendo los casos con vigor. Estas demandas se paralizaron como resultado de la presentación de la Petición de Título III.

Contingencias medioambientales

Las instalaciones y operaciones de la Autoridad están sujetas a las normas de la legislación medioambiental federal y del ELA, como la Ley de Aire Limpio, la Ley de Agua Limpia, la Ley de Contaminación por Petróleo, la Ley de Conservación y Recuperación de Recursos, la Ley de Agua Potable, la Ley de Planificación de Emergencias y Derecho a Saber de la Comunidad y la Ley de Respuesta Ambiental Integral, Compensación y Responsabilidad ("CERCLA"). La Autoridad supervisa su cumplimiento de las leyes y reglamentos y revisa sus obligaciones de corrección de forma continua.

Decreto de consentimiento de 1999

En 1993, los Estados Unidos de América ("Estados Unidos"), a través del Departamento de Justicia de los Estados Unidos ("DOJ") y la Agencia de Protección Ambiental de los Estados Unidos ("EPA"), presentaron una demanda contra la Autoridad en el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico (el "tribunal") (Acción Civil Núm. 93-2527 CCC). La demanda alegaba violaciones ambientales por parte de la Autoridad bajo múltiples estatutos ambientales federales, incluidos los relacionados con el aire, el agua y los residuos en las instalaciones de generación de Palo Seco, San Juan, Aguirre y Costa Sur, y el Centro de Transmisión de Monacillos. En 1999, el tribunal dictó un decreto de consentimiento en el caso ("Decreto de Consentimiento"). El Decreto de Consentimiento exige que la Autoridad mejore y aplique programas y operaciones para garantizar el cumplimiento de las leyes y reglamentos medioambientales.

En 2004, el tribunal aprobó una modificación del Decreto de Consentimiento ("Modificación de 2004"). La Modificación de 2004 requirió que la Autoridad redujera el contenido de azufre en el gasoil núm. 6 utilizado en ciertas

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 19 - Compromisos, contingencias y otras obligaciones - (continuación)

Contingencias - (continuación)

Decreto de consentimiento de 1999 - (continuación)

unidades generadoras en sus Centrales Eléctricas Costa Sur, Aguirre, Palo Seco y San Juan. Además, la modificación de 2004 obligaba a la Autoridad a aplicar un programa de reducción de las emisiones de óxido de nitrógeno en determinadas unidades y a modificar los rangos operativos óptimos de las unidades sujetas al Decreto de Consentimiento.

En 2014, representantes de la Autoridad y de los Estados Unidos se reunieron para discutir la terminación de ciertos programas/provisiones de cumplimiento bajo el Decreto de Consentimiento y la Modificación de 2004. En consecuencia, los Estados Unidos solicitaron que la Autoridad presentara información sobre el cumplimiento de los programas por parte de la Autoridad para su revisión y evaluación. En septiembre de 2014, la Autoridad presentó la información solicitada y una solicitud de rescisión parcial por escrito a los Estados Unidos que abarcaba esos programas/provisiones.

En la fecha de emisión de estos estados financieros, los Estados Unidos están revisando un proyecto de Decreto de Consentimiento modificado. Una vez concluidas las negociaciones, el Decreto de Consentimiento modificado deberá presentarse ante el tribunal y pasar por un proceso de notificación y comentarios públicos antes de su aprobación.

La Autoridad no ha sido informada de ningún costo relacionado que se considere acumulable como pasivo contingente, por lo que no hay ningún importe registrado en los estados financieros adjuntos.

*Cumplimiento de la calidad del aire y del agua*

La Autoridad está obligada a mantener el cumplimiento de los requisitos de calidad del aire (incluida la opacidad) y del agua. En virtud del Decreto de Consentimiento, la Autoridad está sujeta a sanciones estipuladas en caso de desviaciones. La Autoridad había pagado sanciones estipuladas de aproximadamente $37 mil en el año fiscal 2020.

*Este espacio se ha dejado intencionadamente en blanco*

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 19 - <u>Compromisos, contingencias y otras obligaciones - (continuación)</u>

    <u>Contingencias - (continuación)</u>

    <u>Programas de cumplimiento</u>

    La Autoridad sigue desarrollando y aplicando un programa integral para mejorar el cumplimiento de la normativa medioambiental. Este programa fue, y sigue siendo, actualizado para ajustarse a los nuevos requisitos reglamentarios.

    <u>*Normas sobre el mercurio y las sustancias tóxicas del aire*</u>

    La Norma de Mercurio y Tóxicos del Aire ("MATS") establece normas nacionales de emisión de contaminantes atmosféricos peligrosos, incluidos los límites de emisión y las normas de prácticas de trabajo, que se aplican a las unidades de generación de vapor de las empresas eléctricas de carbón y petróleo ("EGU") en zonas continentales y no continentales. La Autoridad posee y explota catorce (14) EGU de petróleo que se ven afectadas por el reglamento.

    Desde que el MATS entró en vigor el 16 de abril de 2015 (en el caso de Aguirre, el 16 de abril de 2016), las unidades de la Autoridad han experimentado varios períodos de incumplimiento de la norma.

    En caso de que la Autoridad llegue a un acuerdo con los Estados Unidos en relación con el incumplimiento de los MATS, el decreto de consentimiento resultante requerirá casi con toda seguridad que la Autoridad realice diversos gastos relacionados con el cumplimiento y puede exigir el pago de sanciones civiles.

    El 24 de agosto de 2020, la PREB emitió su orden final sobre el Plan de Recursos Integrados ("IRP") de la Autoridad, aprobando en parte lo propuesto por la Autoridad y realizando ciertas modificaciones. Se espera que el IRP aprobado sirva de base para un posible plan de cumplimiento de los MATS. También se espera que el plan estatal de aplicación del dióxido de azufre ($SO_2$) que está elaborando el Departamento de Recursos Naturales y Medioambientales ("DNER"), descrito a continuación, sirva de base para cualquier decreto de consentimiento.

    La Autoridad no ha identificado ninguna pérdida contingente que se considere de probable ocurrencia en relación con el incumplimiento de MATS y el IRP de la Autoridad; por lo tanto, no se ha registrado ningún importe en los estados financieros adjuntos.

*Este espacio se ha dejado intencionadamente en blanco*

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 19 - <u>Compromisos, contingencias y otras obligaciones - (continuación)</u>

<u>Contingencias - (continuación)</u>

<u>Programas de cumplimiento - (continuación)</u>

<u>*Cumplimiento de la norma nacional de calidad del aire ambiente sobre SO$_2$*</u>

El 9 de enero de 2018, la EPA publicó en el Registro Federal la tercera ronda de designaciones finales de áreas bajo las normas nacionales de calidad del aire ambiente ("NAAQS") sobre dióxido de azufre ("SO$_2$") de 2010. Las designaciones de no cumplimiento entraron en vigor el 9 de abril de 2018. La EPA identificó dos (2) áreas de no cumplimiento de SO$_2$ localizadas en Puerto Rico, el área de San Juan y el área de Guayama-Salinas. La Ley de Aire Limpio exige a las agencias del aire que tomen medidas para controlar la contaminación atmosférica en las zonas de SO$_2$ no alcanzadas. Estas medidas pueden incluir controles más estrictos de las instalaciones industriales. Los gobiernos estatales y locales detallan estos pasos en planes que demuestran cómo van a cumplir el estándar sobre SO$_2$. Esos planes se conocen como planes estatales de aplicación ("SIP"). Los Estados tienen 18 meses después de la fecha de entrada en vigor de las designaciones definitivas para desarrollar y presentar sus SIP a la EPA. El SIP de Puerto Rico debía llegar a la EPA antes del 9 de octubre de 2019. El SIP debe mostrar cómo las zonas afectadas cumplirán la norma tan pronto como sea posible, pero a más tardar el 9 de abril de 2023. Puerto Rico no cumplió el plazo del 9 de octubre de 2019 para presentar su SIP.

El DNER ha estado trabajando con la EPA en la presentación de un SIP calificado para mayo de 2022, con el fin de evitar sanciones, incluyendo la pérdida de ciertos fondos federales para Puerto Rico. El DNER emitió una propuesta de SIP para comentarios y vistas públicas el 11 de marzo de 2022, y celebró una audiencia pública sobre la propuesta de SIP el 11 de abril de 2022. Según el DNER y la EPA, las centrales eléctricas de la Autoridad son las principales emisoras de SO$_2$ en las zonas identificadas. Las instalaciones de la Autoridad afectadas en las zonas de no cumplimiento son las centrales eléctricas de San Juan, Palo Seco y Aguirre. Desde la designación de no cumplimiento, la Autoridad y el DNER han estado en comunicación para que el SIP aprobado considere el estado de la implementación del IRP y los proyectos de la Autoridad, aprobados por la PREB en agosto de 2020, así como las consideraciones de fiabilidad. El DNER no ha informado a la Autoridad sobre la presentación prevista a la EPA del SIP calificado del DNER.

La Autoridad no ha identificado ninguna pérdida contingente que se considere probable en relación con este asunto, por lo que no se ha registrado ningún importe en los estados financieros adjuntos.

*Este espacio se ha dejado intencionadamente en blanco*

- 105 -

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 19 - Compromisos, contingencias y otras obligaciones - (continuación)

### Obligación de remediación de la contaminación (PRO)

La Autoridad registra las obligaciones de descontaminación ("PRO") cuando se produce un acontecimiento que obliga a ello, tal y como se define en la Declaración núm. 49 de la GASB, *"Contabilidad e información financiera sobre las obligaciones de descontaminación"*, y si se puede realizar una estimación razonable de los costos de descontaminación. Tres lugares diferentes requieren el análisis de las obligaciones de remediación de la contaminación, incluidos los sitios del Superfondo de Protección Técnica Ecológica en Peñuelas (el "Sitio Proteco"), el Sitio del Superfondo de Eliminación de Residuos Sólidos de la Vega Baja (el "Sitio Vega Baja"), y el sitio de Palo Seco.

### El sitio de Proteco

El 28 de marzo de 2019, la EPA emitió una notificación de responsabilidad potencial y una solicitud de información a la Autoridad en virtud de la CERCLA en relación con el sitio de Proteco. La EPA alega que la Autoridad es una parte potencialmente responsable ("PRP") del sitio de Proteco como organizador y que, por medio de un contratista o un acuerdo, dispuso la eliminación o el tratamiento de sustancias peligrosas en el sitio de Proteco. El 28 de junio de 2019, la Autoridad recibió una carta de notificación especial de la EPA en la que se solicitaba que la Autoridad celebrara un acuerdo administrativo y una orden de consentimiento ("ASAOC") para llevar a cabo una investigación de remediación y un estudio de viabilidad ("RI/FS")[1] del sitio de Proteco (en adelante, la "Carta de notificación especial del 28 de junio de 2019"). La Autoridad cree que se envió una carta de notificación especial similar a otras PRP.

En septiembre de 2020, la Autoridad y otras PRP ("Grupo de PRP") celebraron un ASAOC (CERCLA- 02-2020-2010) con la EPA para llevar a cabo la RI/FS. El ASAOC exige el pago del Grupo de PRP a la EPA por un importe aproximado de $444,708 por los costos de respuesta pasados. El acuerdo también exige que el Grupo de PRP ofrezca una garantía financiera, inicialmente un importe de aproximadamente $5 millones (en función de los costos estimados de los trabajos), en beneficio de la EPA.

La parte de la Autoridad se aplicará a cualquier pago de los trabajos de la RI/FS que se lleven a cabo en el vertedero y se considerará parte de la responsabilidad, así como para pagar y absorber cualquier responsabilidad futura que pueda imponerse por el incumplimiento del ASAOC.

*Este espacio se ha dejado intencionadamente en blanco*

---

[1] Una RI/FS es el proceso exigido por la normativa para recopilar datos que permitan caracterizar las condiciones del emplazamiento, determinar la naturaleza de los residuos presentes en el mismo, evaluar el riesgo para la salud humana y el medio ambiente (si lo hay), e identificar y evaluar las posibles opciones de rehabilitación a partir de los datos recopilados. *Ver* Estudio de investigación/viabilidad del Superfondo (caracterización del sitio) | EPA EE. UU.

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 19 -   Compromisos, contingencias y otras obligaciones - (continuación)

Obligación de remediación de la contaminación - (continuación)

PROTECO - (continuación)

La RI/FS se encuentra en las primeras etapas.

A la fecha de emisión de estos estados financieros, el Junta de Administración de la Autoridad autorizó un gasto inicial de hasta aproximadamente $1.5 millones (incluido como parte de Demandas y Sentencias en los estados financieros adjuntos) para pagar la parte de la Autoridad de los costos totales de la RI/FS. Los $1.5 millones son los únicos costos estimables en este momento y, por lo tanto, esa es la cantidad devengada por la Autoridad.

El sitio de Vega Baja

En 2002, la Autoridad recibió una notificación especial relativa a la investigación de remediación/estudio de viabilidad del suelo en el sitio de Vega Baja. La EPA identificó a la Autoridad y a otras seis entidades como PRP.

El 25 de abril de 2013, la acción civil del Decreto de Consentimiento (núm. 12 1988 [ADC]) se presentó en el Tribunal de los Estados Unidos para el Distrito de Puerto Rico. El BGF, en calidad de agente de custodia, la Autoridad de Tierras de Puerto Rico ("PRLA"), el Departamento de Vivienda de Puerto Rico ("PRHD"), la Autoridad y los Estados Unidos de América celebraron un acuerdo de custodia ambiental ("EEA"). El EEA sirve de garantía financiera para el cumplimiento de la obligación en virtud del Decreto de Consentimiento. El 24 de junio de 2013, la Autoridad depositó unos $400 mil en una cuenta de depósito en garantía, según lo previsto en el Decreto de Consentimiento y en el EEA. Si el saldo de la cuenta de depósito en garantía se reduce por debajo de los $250 mil, la Autoridad, la PRLA y el PRHD deben establecer y mantener una garantía de cumplimiento en beneficio de la EPA igual a la diferencia entre el saldo de la cuenta de depósito en garantía y los $250 mil. Los organismos públicos pueden optar por satisfacer este requisito de garantía de cumplimiento aportando garantías de cumplimiento separadas que sumen la cantidad que se debe mantener según lo establecido anteriormente, ya sea individual o colectivamente. La principal acción correctiva de retirar el plomo de la zona residencial a un sitio no residencial se completó en 2015. Los costos que se producirán en el futuro se limitan a las evaluaciones anuales operativas, y si se considera necesaria alguna acción correctiva en las zonas no residenciales y residenciales, la Autoridad, la PRLA y el PRHD serán responsables. En el momento de la emisión de estos estados financieros, no se han identificado medidas correctoras.

*Este espacio se ha dejado intencionadamente en blanco*

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 19 -   Compromisos, contingencias y otras obligaciones - (continuación)

Obligación de remediación de la contaminación - (continuación)

El sitio de Vega Baja - (continuación)

La Autoridad, en nombre de la PRLA y el PRHD, solicitó que los desembolsos se carguen a la cuenta de depósito en garantía, y dichos pagos se tramitaron. Todos los pagos que deben cargarse a la cuenta de depósito en garantía son para cubrir los proyectos exigidos por el Decreto de Consentimiento. Si no se cumplen los pagos, los servicios pueden ser suspendidos por los contratistas, lo que da lugar a la aplicación de multas por incumplimiento según lo estipulado en el Decreto de Consentimiento.

Este Decreto de Consentimiento puede rescindirse mediante la moción de cualquiera de las partes, siempre que todos los demandados públicos hayan cumplido con sus obligaciones de pago de Costo de Respuesta y Sanciones Estipuladas. La terminación del Decreto de Consentimiento no afectará a ciertos "Convenios de No Demanda" incluidas todas las reservas relativas a dichos convenios y no afectará a ninguna obligación continua de la Autoridad, la PRLA y el PRDH (todos ellos referidos en el Decreto de Consentimiento como los Demandados que Aceptan el Acuerdo).

Actualmente está en curso el nombramiento de un contratista supervisor. Los trabajos de inspección e información exigidos en el Acuerdo de Depósito Ambiental están siendo realizados por un coordinador del proyecto designado por la Autoridad, en coordinación con los representantes designados por la PRLA y el PRDH. En septiembre de 2020, la EPA llevó a cabo una revisión a 5 años para comprobar si la acción correctora protege la salud humana y el medio ambiente. Como parte de esta revisión, el contratista de la EPA inspeccionó varias propiedades que no se remediaron porque la concentración de plomo que se detectó en el lugar era menor que 450 ppm. La información recopilada fue evaluada por la EPA y se determinó que la Autoridad, la PRLA y el PRHD no fallaron en la operación y el mantenimiento de la acción de remediación como se requería y no hay que emprender más acciones de respuesta para el Sitio por el momento. La Autoridad pagará a la EPA todos los costos futuros que no sean incompatibles con el plan de contingencia requerido para el Sitio de Vega Baja.

En el momento de la emisión de estos estados financieros, la Autoridad no ha identificado ningún PRO que se considere de probable ocurrencia, por lo que no se ha registrado ningún importe en los estados financieros adjuntos.

*Este espacio se ha dejado intencionadamente en blanco*

- 108 -

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 19 - <u>Compromisos, contingencias y otras obligaciones - (continuación)</u>

<u>Obligación de remediación de la contaminación - (continuación)</u>

*El sitio de Palo Seco*

El sitio de Palo Seco está situado en Toa Baja, Puerto Rico (cerca de San Juan), e incluye la central eléctrica de Palo Seco, una zona de depósito y el antiguo canal del río Bayamón.

En 1997, como resultado de una inspección de la EPA y la Junta de Calidad Ambiental de Puerto Rico (la "JCA") en la Central Eléctrica de Palo Seco de la Autoridad, la EPA emitió una Orden Administrativa (CERCLA- 97-0302) para la investigación y posible remediación de siete áreas de interés identificadas por la EPA en el Sitio de Palo Seco. La Orden Administrativa exigía a la Autoridad la realización de una RI/FS.

Tras la RI/FS, se tomaron medidas adicionales para tratar los hidrocarburos en fase separada en dos de las zonas de interés. El 6 de noviembre de 2008, la EPA y la Autoridad firmaron una Orden Administrativa de Consentimiento ("AOC") para tratar los hidrocarburos en fase separada (núm. CERCLA-02-2008-2022). Posteriormente, la Autoridad completó una acción de eliminación en una de las zonas de interés para eliminar los hidrocarburos en fase separada. En julio de 2012, la EPA publicó para comentario público su propuesta de plan para no tomar más medidas en el sitio. En septiembre de 2012, la EPA emitió su Registro de Decisión para el sitio, en el que se seleccionó el remedio de "no seguir actuando".

La AOC incluía varias condiciones para que la Autoridad reembolsara a la EPA los costos incurridos por ésta en relación con el sitio. El 4 de diciembre de 2015 y el 11 de mayo de 2016, la EPA envió a la Autoridad un paquete de costos de respuesta. El paquete de costos incluía dos componentes: (i) $62,077.31 que la EPA había incurrido en relación con la supervisión de la acción de remoción realizada bajo la AOC; y (ii) $1,473,061.62 en costos que no entraban en esa categoría (es decir, los que no estaban directamente relacionados con la AOC), incluidos los costos de investigación y otros costos de respuesta que, a partir del 31 de julio de 2015, habían sido pagados por la EPA conforme a la CERCLA con respecto al sitio.

Con respecto a la primera categoría de costos, el 7 de marzo de 2016, la EPA envió a la Autoridad un aviso de cobro de facturas por los $62,077.31 incurridos por la EPA en relación con la AOC. La Autoridad pagó este importe el 8 de marzo de 2016.

Con respecto a la segunda categoría de los costos, el 10 de julio de 2017 se firmó un acuerdo de conciliación (CERCLA-02- 2017-2014) que obliga a la Autoridad a pagar a la EPA la suma principal de $1 millón, más los intereses, en tres cuotas anuales. La primera cuota se pagó el 9 de agosto de 2017, por un importe de $333,333.33. La segunda cuota se pagó el 29 de mayo de 2018, por un importe de $337,838.01. La tercera y última cuota se pagó el 19 de julio de 2019, por un importe de $339,779.36. El tercer pago completó los compromisos financieros de la Autoridad en virtud del acuerdo de conciliación.

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 19 - <u>Compromisos, contingencias y otras obligaciones - (continuación)</u>

<u>Obligación de remediación de la contaminación - (continuación)</u>

<u>*El sitio de Palo Seco*</u> *- (continuación)*

En septiembre de 2020, la Autoridad preparó una solicitud de propuestas para la instalación de un sistema de recuperación de producto libre de los pozos de monitorización de aguas subterráneas construidos durante la RI/FS mencionada por $100,000.00. Los trabajos de instalación finalizaron en abril de 2021. Este proyecto se financió como Gasto de Mantenimiento Necesario.

<u>Obligación de retiro de activos</u>

Como se describe en la Nota 2, a partir del 1 de julio de 2019, la Autoridad adoptó la Declaración núm. 83 de la GASB, Ciertas obligaciones de retiro de activos. Esta norma requiere que la Autoridad registre un pasivo y salidas diferidas asociadas con el retiro de activos de capital tangibles que tiene una obligación legal ejecutable de retirar. La norma núm. 83 de la GASB exige a las entidades gubernamentales que registren un pasivo y el correspondiente flujo de salida diferido en el momento en que se produzca un hecho obligatorio externo, como una normativa federal o estatal, un contrato legalmente vinculante o una sentencia judicial, y cuando se produzca un hecho obligatorio interno que se produzca en el momento en que se adquiera un activo o se ponga en servicio su construcción. De acuerdo con la norma núm. 83 de la GASB, la Autoridad estimó y registró sus obligaciones de retiro de activos al valor actual de los desembolsos en los que se espera incurrir utilizando los estudios de costos específicos del sitio realizados por consultores de terceros o estudios de costos publicados de sitios similares. El valor actual es el importe que se pagaría si todo el equipo, las instalaciones y los servicios incluidos en la estimación se adquirieran al final del período actual del informe. Este enfoque incluye la ponderación de la probabilidad de los posibles resultados cuando esta información puede obtenerse a un costo razonable.

La Autoridad registró las obligaciones de retiro de activos tangibles aplicables, tales como sitios de generación térmica, instalaciones de energía hidroeléctrica, componentes selectos del sistema de transmisión y distribución (T&D), y otros activos, siguiendo los requisitos de la GASB núm. 83. La vida útil restante estimada de los activos fijos tangibles asociados es de hasta 49 años. Se revisaron las leyes y reglamentos federales sobre energía, las leyes y reglamentos federales sobre medio ambiente y las leyes y reglamentos sobre medio ambiente de Puerto Rico (ELA) emitidos por el Departamento de Recursos Ambientales Naturales de Puerto Rico (DNER) para determinar las obligaciones de retiro de activos. La metodología utilizada para elaborar las estimaciones de la ARO incluía una combinación de métodos estocásticos y deterministas. La Autoridad no tiene activos restringidos para el pago de estos pasivos.

- 110 -

Autoridad de Energía Eléctrica de Puerto Rico

(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 19 - <u>Compromisos, contingencias y otras obligaciones - (continuación)</u>

<u>Obligación de retiro de activos - (continuación)</u>

La Autoridad tenía las siguientes obligaciones de retiro de activos a 30 de junio de 2020 (en miles):

| Obligación de retiro de activos: | 2020 |
|---|---|
| Saldo al 1 de julio de 2019 | $143,130 |
| Adiciones | 5,463 |
| Pagos | |
| Saldo al 30 de junio de 2020 | <u>$148,593</u> |

La Autoridad amortiza sus salidas diferidas utilizando el método lineal a lo largo de la vida útil restante del activo o del plazo de arrendamiento, si se trata de un arrendamiento. El pasivo se reduce a medida que se pagan los costos reales de desmantelamiento. La amortización del flujo salidas diferidas se registra como gasto de funcionamiento y mantenimiento en los estados de ingresos, gastos y cambios en los resultados netos (déficit).

Los flujos de salidas diferidas relacionados con las obligaciones de retiro de activos de la Autoridad son los siguientes para el año fiscal finalizado el 30 de junio de 2020 (en miles):

| Salidas diferidas - ARO | 2020 |
|---|---|
| Saldo a 1 de julio de 2019 | $ 64,481 |
| Agregados | 5,464 |
| Amortizaciones | (3,922) |
| Saldo al 30 de junio de 2020 | $ 66,023 |

*Este espacio se ha dejado intencionadamente en blanco*

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 20 - <u>Eventos posteriores</u>

Se han evaluado los hechos posteriores hasta el 30 de septiembre de 2022 para determinar si deben reconocerse o revelarse en los estados financieros básicos de 2020.

<u>Plan fiscal de la Autoridad</u>

El 27 de mayo de 2021, la Junta de Supervisión aprobó el Plan Fiscal 2022 certificado para la Autoridad. El 27 de enero de 2022, la Junta de Supervisión certificó el Plan Fiscal del ELA. Aunque la Autoridad tiene su propio Plan Fiscal, el Plan Fiscal del ELA incluye un debate sobre la reforma energética y la transformación de la Autoridad. El Plan Fiscal del ELA establece que, en los próximos cinco años, el sector eléctrico de Puerto Rico debe continuar su transformación y modernización para apoyar el suministro de energía fiable, limpia y asequible. El ELA debe seguir aplicando una reforma integral del sector energético para permitir una transformación exitosa y desbloquear el crecimiento resultante de los proyectos del Plan Fiscal. Conforme al Plan Fiscal del ELA, el éxito de la transformación del sector eléctrico de Puerto Rico depende de: (1) la implementación de la reforma regulatoria apoyada por la PREB, (2) la transición de la operación de la red eléctrica y los activos de generación de la Autoridad a operadores privados a través de asociaciones público-privadas, mientras se mueve el sistema energético hacia el 100% de renovables, y (3) la reestructuración de las obligaciones de la deuda heredada de la Autoridad para poder acceder a los mercados de capital y apoyar la modernización de la red eléctrica.

<u>Principales mociones y procedimientos adversos en los casos del Título III</u>

- <u>El Plan de ajuste de mediación de la Autoridad</u>

El 3 de mayo de 2019, la Junta de Supervisión, la AAFAF y la Autoridad (las "Partes Gubernamentales"), celebraron el RSA 2019 con una parte sustancial de los tenedores de bonos de la Autoridad y Assured Guaranty Corp. y Assured Guaranty Municipal Corp (el "Grupo Ad Hoc"). El 10 de mayo de 2019, la Junta de Supervisión y la AAFAF presentaron una moción solicitando la aprobación de ciertos acuerdos plasmados en el RSA 2019 (la "Moción 9019"). Algunas partes presentaron objeciones a la Moción 9019 el 30 de octubre de 2019. Sin embargo, en respuesta a la pandemia de la COVID-19, el 27 de marzo de 2020, la Junta de Supervisión y la AAFAF solicitaron al Tribunal de Título III que se aplazaran todos los plazos de vista y de información en relación con la Moción 9019. El Tribunal concedió la moción, y la Moción 9019 fue paralizada. El 8 de marzo de 2022, la AAFAF ejerció su derecho a rescindir el RSA con el apoyo de la Junta de Supervisión. La terminación de la AAFAF hace que el RSA sea nulo y no tenga más fuerza o efecto para todas las partes. El 8 de marzo de 2022, el Tribunal de Título III emitió una Orden (la "Orden del 8 de marzo") en la que ordenaba a la Junta de Supervisión y a la AAFAF que presentaran un informe conjunto sobre el estado de sus esfuerzos para avanzar en las negociaciones o en la formulación de los parámetros de un plan de ajuste para la Autoridad antes del 18 de marzo de 2022. La Orden del 8 de marzo también ordenó a la Junta de Supervisión que informara al Tribunal antes del 2 de mayo de 2022 sobre su propuesta de camino a seguir para concluir el caso del Título III de la Autoridad. El 17 de mayo de 2022, las Partes Gubernamentales informaron al Tribunal de Título III que el siguiente paso óptimo es entrar en mediación con las partes interesadas de la Autoridad.

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 20 - Eventos posteriores - (continuación)

Principales mociones y procedimientos adversos en los casos del Título III - (continuación)

• Mediación del plan de ajuste de la autoridad - (continuación)

El 8 de abril de 2022, el Tribunal de Título III dictó una orden por la que se nombraba a tres jueces de quiebras en activo como mediadores para el Caso del Título III de la Autoridad y los procedimientos relacionados en los términos establecidos en una orden emitida simultáneamente que establecía los términos y condiciones de la mediación. Ninguna de las partes se opuso a la designación del equipo de mediación. El Tribunal también designó formalmente a las siguientes partes de la mediación: (a) la Junta de Supervisión, (b) AAFAF, (c) el Grupo Ad Hoc de Tenedores de Bonos de la Autoridad, (d) National Public Finance Guarantee Corporation, (e) Assured Guaranty Corp. y Assured Guaranty Municipal Corp., (f) Syncora Guarantee, Inc., (g) UTIER, (h) SRE de la AEE, (i) el Comité Oficial de Acreedores No Garantizados, y (j) los prestamistas de líneas de combustible de la Autoridad. El Tribunal de Título III había fijado como fecha límite el 15 de agosto de 2022 para que la Junta de Supervisión presentara un escrito en el que identificara su propuesta de camino a seguir para concluir eficientemente el caso del Título III de la Autoridad (la fecha límite de terminación de la mediación).

El plazo de finalización de la mediación estuvo sujeto a múltiples prórrogas, la última de ellas hasta el 16 de septiembre de 2022 con una prórroga automática hasta el 30 de septiembre de 2022. Sin embargo, el 19 de septiembre de 2022, el equipo de mediación presentó su notificación e informe indicando que la mediación había finalizado e informando de que no se había alcanzado un consenso en la mediación entre las partes, pero que aún era posible alcanzar un acuerdo si se revisaban los términos y condiciones de la mediación. Cabe destacar que el 19 de septiembre de 2022, los tenedores de bonos presentaron una moción para desestimar el caso del Título III de la Autoridad o para el alivio de la paralización automática. El 20 de septiembre de 2022, la Junta de Supervisión, en nombre de la Autoridad, presentó una moción en la que solicitaba al tribunal de Título III que estableciera un calendario para continuar las negociaciones durante el litigio, abarcando únicamente las disputas fundamentales sobre las reclamaciones que el plan debe reestructurar. En esa misma fecha, el Tribunal de Título III ordenó al equipo de mediación que presentara una propuesta de orden de continuación de la mediación que identificara un período de tiempo adecuado para la siguiente fase de la mediación y las disposiciones adicionales necesarias para abordar los obstáculos que el equipo de mediación identificó en el informe de mediación. Por ello, el 22 de septiembre de 2022, el equipo de mediación propuso una orden modificada en la que se establecen los términos y las condiciones de la mediación y en la que se propone un calendario revisado para la Mediación que avanza en paralelo con el calendario del Tribunal para el examen de diversas cuestiones litigiosas que se habían paralizado a la espera de la realización anterior a la Mediación. El 22 de septiembre de 2022, el Tribunal de Título III ordenó a las partes que presentaran cualquier objeción o respuesta a las condiciones modificadas propuestas por el Equipo de Mediación. El 23 de septiembre de 2022, la Junta de Supervisión presentó una respuesta a la propuesta de modificación de la mediación en la que se mostraba parcialmente de acuerdo y proponía también algunos cambios.

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

**Nota 20 - <u>Eventos posteriores - (continuación)</u>**

<u>Principales mociones y procedimientos adversos en los casos del Título III - (continuación)</u>

<u>Mediación del plan de ajuste de la autoridad - (continuación)</u>

El 29 de septiembre de 2022, el Tribunal de Título III dictó una Orden por la que se modifican los términos y las condiciones de la mediación y se establece un nuevo plazo hasta el 31 de diciembre de 2022, para dar por finalizada la mediación, con una prórroga automática hasta el 31 de enero de 2023. En esa misma fecha, el Tribunal de Título III emitió una orden en la que instruía a la Junta de Supervisión para que presentara una propuesta de plan de ajuste para la Autoridad antes del 1 de diciembre de 2022, que considere que podría ser confirmable, teniendo en cuenta el riesgo de litigio y las cuestiones económicas que están en disputa, también debe incluir una declaración de divulgación y una propuesta de calendario de confirmación que contemple una vista de confirmación en junio de 2023.

• <u>El desafío de la UTIER a las leyes fiscales locales</u>

El 7 de agosto de 2017, la UTIER presentó un procedimiento contencioso (contra la Autoridad, el ELA y ciertos demandantes individuales) ante el Tribunal de Título III impugnando varias leyes de Puerto Rico promulgadas para hacer frente a la crisis fiscal, y ciertos presupuestos y planes fiscales de la Autoridad y el ELA. El 26 de abril de 2021, la Autoridad solicitó la desestimación del asunto. Después de que el asunto fuera completamente informado, el 4 de febrero de 2022, el Tribunal de Título III emitió una orden que concedía la moción de la Autoridad para desestimar la demanda adversa de la UTIER por no exponer una reclamación sobre la que se pueda conceder una reparación. La desestimación es con perjuicio, y deja al ELA como único demandado. El 2 de marzo de 2022, la UTIER recurrió esta decisión ante el Tribunal de Apelación de los Estados Unidos para el Primer Circuito. Sin embargo, el 18 de marzo de 2022, a petición de la UTIER, el Primer Circuito desestimó voluntariamente el recurso.

<u>Transformación de la Autoridad</u>

• <u>Transformación del sistema de T&D de la Autoridad</u>

El 20 de abril de 2021, UTIER presentó un procedimiento contencioso contra la Autoridad, entre otros, ante el Título III impugnando la ejecución del Contrato T&D. En su demanda, UTIER afirma múltiples causas de acción con el objetivo final de impedir la transición de la Autoridad de las responsabilidades de gestión, operación, mantenimiento, reparaciones y restauración a LUMA y la sustitución de LUMA del sistema T&D. El 26 de abril de 2021, UTIER presentó una moción de interdicto preliminar para impedir que LUMA se hiciera cargo de las operaciones del sistema de T&D de la Autoridad. La Autoridad y otros demandados se opusieron a la moción de objeción preliminar de UTIER el 5 de mayo de 2021. Después de una vista sobre el asunto, el 21 de mayo de 2021, el Tribunal de Título III

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 20 - Eventos posteriores - (continuación)

Transformación de la Autoridad - (continuación)

• Transformación del sistema de T&D de la Autoridad - (continuación)

emitió una orden denegando la moción de la UTIER para el requerimiento preliminar. El 19 de julio de 2021, la Autoridad presentó una moción para desestimar la demanda de la UTIER. La UTIER presentó una respuesta a la moción de desestimación el 7 de septiembre de 2021, y la Autoridad presentó una respuesta en apoyo de su moción de desestimación el 4 de octubre de 2021. La moción de desestimación está completamente informada y pendiente de resolución.

El 6 de mayo de 2021, la SRE de la AEE presentó una demanda ante el Tribunal de Título III contra la Autoridad con causas de acción sustancialmente similares a las del procedimiento contencioso de la UTIER. El 19 de julio de 2021, la Autoridad presentó una moción para desestimar la demanda del SRE de la AEE, a la que ésta respondió el 7 de septiembre de 2021. El 4 de octubre de 2021, la Autoridad presentó una respuesta en apoyo de su moción de desestimación. La moción de desestimación está completamente informada y pendiente de resolución.

• Transformación de la generación de la Autoridad

El 10 de agosto de 2020, la Autoridad P3, en colaboración con la Autoridad, emitió una Solicitud de Cualificaciones para identificar, calificar y seleccionar uno o más operadores privados para gestionar, operar y mantener los activos de generación heredados de la Autoridad con el fin de lograr los siguientes objetivos: (i) introducir la experiencia operativa del sector privado; (ii) aumentar la seguridad, la fiabilidad, la resiliencia y la eficiencia de las operaciones de los activos de generación heredados; (iii) aumentar la eficiencia de los costos en coordinación con LUMA; y (iv) implementar las mejores prácticas de la industria y la excelencia operativa, incluido el cumplimiento de los requisitos ambientales. El 22 de octubre de 2020, la Autoridad P3 seleccionó a los preseleccionados calificados para participar como proponentes (los "Proponentes") en el proceso de solicitud de propuestas ("RFP"). Posteriormente, la Autoridad P3 emitió la RFP, y la misma fue distribuida a los Proponentes. Las propuestas se recibieron el 22 de diciembre de 2021. La Autoridad P3 está evaluando las propuestas, y a la fecha de estos estados financieros no se ha anunciado ninguna determinación.

Aprobación de $9,600 millones para reparar la red

En octubre de 2020, la FEMA aprobó aproximadamente $9,600 millones en subvenciones federales por aproximadamente $10,500 millones en costos totales del proyecto para que la Autoridad pueda reparar los daños a su red eléctrica causados por los huracanes. Los fondos federales están destinados a reparar y sustituir miles de kilómetros de líneas de transmisión y distribución, subestaciones eléctricas, sistemas de generación de energía y otras mejoras de la red. La financiación federal está sujeta a que la Autoridad contribuya con un 10% de los costos. La financiación de la FEMA ayudará a proteger el sistema eléctrico de futuras catástrofes.

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 20 - <u>Eventos posteriores - (continuación)</u>

<u>Suministro de gas natural y conversión de las unidades 5 y 6 de la central de ciclo combinado de San Juan</u>

El 5 de marzo de 2019, luego de un proceso de licitación competitivo, la Autoridad celebró un contrato con NFEnergia LLC ("NFEnergia"), la subsidiaria en Puerto Rico de New Fortress Energy LLC ("New Fortress"), para el suministro de gas natural y la conversión de las Unidades 5 y 6 de la Central Eléctrica de San Juan a capacidad de doble combustible (gas natural y diésel). La construcción de la instalación de recepción y vaporización de GNL frente a la central eléctrica de San Juan comenzó a principios del verano de 2019, y la conversión de las unidades 5 y 6 de San Juan a la capacidad de doble combustible comenzó durante el otoño de 2019. La construcción y el proyecto de conversión se completaron sustancialmente durante el primer trimestre de 2020, y las instalaciones de recepción y vaporización de GNL y las Unidades 5 y 6 de San Juan pasaron a ser capaces de soportar el funcionamiento sostenido a plena carga de las Unidades con gas natural en junio de 2020. Ya se ha recibido el GNL en las instalaciones de NFEnergia desde los buques que hacen escala en el puerto de San Juan, y se ha puesto a disposición el gas natural para la puesta en marcha de las Unidades 5 y 6 con gas natural. Desde entonces, las Unidades 5 y 6 de San Juan funcionan principalmente con gas natural.

El 18 de junio de 2020, la Comisión Federal Reguladora de la Energía de los Estados Unidos ("FERC") emitió una "Orden para mostrar la causa" en la que se ordenaba a New Fortress que demostrara por qué la instalación de manipulación de GNL de NFEnergia no está sujeta a la jurisdicción de la FERC en virtud de la sección 3 de la Ley de Gas Natural. La Autoridad celebró su acuerdo con NFEnergia partiendo de la base de que no sería necesaria la aprobación de la FERC para el emplazamiento y la construcción de la instalación de manipulación de GNL. Tras considerar los argumentos que New Fortress Energy LLC y la Autoridad presentaron sobre por qué la instalación de manipulación de GNL de NFEnergia no debía considerarse sujeta a la jurisdicción de la Comisión y subrayar los beneficios medioambientales y económicos asociados al uso de gas natural en lugar de gasóleo en las Unidades 5 y 6 de San Juan, la FERC concluyó en una orden emitida el 19 de marzo de 2021 que la instalación es una "terminal de GNL" sujeta a su jurisdicción en virtud de la Sección 3 la Ley de Gas Natural. La orden se mantuvo en apelación por el Tribunal Federal de Apelaciones del Circuito del Distrito de Columbia el 14 de junio de 2022. La FERC ordenó a NFEnergia que presentara una solicitud de autorización en virtud del artículo 3 de la Ley de Gas Natural para explotar su instalación receptora de GNL de San Juan Harbor, pero se negó a ordenar la suspensión de las operaciones de la instalación. NFEnergia presentó la solicitud requerida a la FERC el 15 de septiembre de 2021 en el expediente núm. CP21-496-000. La FERC emitió un aviso de que las mociones para intervenir en el procedimiento y los comentarios sobre la solicitud debían presentarse antes del 20 de octubre de 2021. Desde entonces, la FERC ha emitido varias solicitudes de datos a NFEEnergía, presentando las últimas respuestas complementarias en febrero de 2022. La solicitud que se encuentra actualmente ante la FERC está pendiente de consideración, y la Autoridad no puede predecir cuándo puede actuar la FERC al respecto. Mientras tanto, la instalación receptora de GNL de NFEnergia sigue funcionando y suministrando gas natural a las Unidades 5 y 6 de la Autoridad.

El 11 de noviembre de 2020, las organizaciones de defensa del medio ambiente Sierra Club y El Puente de Williamsburg Inc. (los "Grupos Ambientales") presentaron una demanda contra la Autoridad en el

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 20 - Eventos posteriores - (continuación)

Suministro de gas natural y conversión de las unidades 5 y 6 de la central de ciclo combinado de San Juan - (continuación)

Tribunal de Primera Instancia de San Juan solicitando interdictos preliminares y permanentes y una sentencia declaratoria que suspenda la operación de la instalación de manejo de GNL de NFEnergia. En su demanda, los grupos ecologistas afirman que la instalación de manipulación de GNL de NFEnergia se construyó de forma ilegal.

La Oficina de Permisos Generales de Puerto Rico presentó una respuesta a la queja el 25 de noviembre de 2020. NFEnergia presentó una moción para desestimar la demanda el 27 de noviembre de 2020 y presentó una oposición a las solicitudes de interdictos preliminares y permanentes el 1 de diciembre de 2020. El Tribunal de Primera Instancia celebró una vista preliminar el 1 de diciembre y tomó nota de los argumentos. El 2 de diciembre de 2020, el Tribunal de Primera Instancia desestimó el recurso por falta de legitimación.

El 16 de diciembre de 2020, los Grupos Medioambientales solicitaron la reconsideración de la sentencia que desestimaba el caso. El Tribunal denegó la moción el 12 de enero de 2021. El 1 de febrero de 2021, los Grupos Medioambientales apelaron la sentencia que desestimaba el caso ante el Tribunal de Apelaciones de Puerto Rico. El 20 de mayo de 2021, el Tribunal de Apelación confirmó la sentencia del Tribunal de Primera Instancia. No se presentó ninguna apelación ante el Tribunal Supremo de Puerto Rico.

Exámenes del servicio de impuestos internos de los Estados Unidos

El IRS notificó a la Autoridad en cartas fechadas entre el 7 de febrero de 2019 y el 6 de septiembre de 2019 que el IRS está llevando a cabo investigaciones relacionadas con (i) ciertas Declaraciones del Formulario 8038-CP para Pagos de Créditos a Emisores de Bonos Calificados, según la definición del IRS, y las emisiones de bonos de las series YY y EEE y (ii) la Declaración Informativa del Formulario 8038-B para Bonos Build America y Bonos de Desarrollo Económico de la Zona de Recuperación con respecto a la emisión de bonos de la Serie EEE, en relación con su calificación como Bonos Build America ("BAB"). El 11 de agosto de 2020, la Autoridad recibió una carta que cerraba el examen del formulario 8038-B y la calificación de los bonos Build America de la emisión de bonos de la serie EEE en (ii) de la oración anterior sin cambios.

Con respecto a la investigación en (i) del párrafo anterior, el 10 de julio de 2020, el IRS también emitió cartas de «30 días" a la Autoridad, solicitando la devolución de los Pagos de Subvención BAB recibidos para las fechas de pago de intereses del 1 de julio de 2017, 1 de octubre de 2017, 1 de enero de 2018, 1 de abril de 2018 y 1 de enero de 2020, por un monto total de \$18.9 millones, y denegando la solicitud de la Autoridad de los Pagos de Subvención BAB para el 1 de julio de 2018, el 1 de octubre de 2018, el 1 de enero de 2019, el 1 de abril de 2019, el 1 de julio de 2019, el 1 de octubre de 2019 y el 1 de abril de 2020 las fechas de pago de intereses, por un importe total de \$23.7 millones. Desde esa fecha y hasta julio de 2022, la Autoridad ha seguido presentando solicitudes de Pagos de Subvención BAB,

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 20 - Eventos posteriores - (continuación)

### Exámenes del servicio de impuestos internos de los Estados Unidos - (continuación)

y el IRS ha seguido denegando dichas solicitudes; el importe agregado de esas solicitudes adicionales de Pagos de Subvención BAB que han sido presentadas al IRS por la Autoridad es de $30.6 millones. La Autoridad ha apelado todas estas determinaciones del IRS; las apelaciones siguen pendientes.

### Catástrofes naturales y pandemia mundial

En agosto de 2020, la primera unidad de Costa Sur dañada en los terremotos de enero de 2020 volvió a entrar en servicio y la segunda unidad entró en funcionamiento en enero de 2021. A la fecha de emisión de estos estados financieros, la Autoridad había recibido un total de aproximadamente $1,900 millones de la FEMA y aproximadamente $198 millones de varias compañías de seguros en relación con los daños resultantes de los huracanes, los terremotos de enero de 2020 y la pandemia de COVID-19.

### Asignación de $76 millones para la mitigación de la pandemia

El 23 de octubre de 2021, el Gobernador anunció que había autorizado la asignación a la Autoridad de $76 millones de los fondos de la Ley del Plan de Rescate Americano para ayudar a mitigar los efectos de la pandemia. Los fondos se utilizarán para la compra de combustible y para cubrir una parte del mantenimiento de los activos de generación de la Autoridad.

### Renegociación de los Acuerdos de Operación de Compra de Energía "PPOA"

Para alinear mejor las finanzas de la Autoridad con los objetivos del Plan Fiscal Certificado 2022 de la Autoridad (y los planes fiscales certificados anteriores de la Autoridad) conforme al proceso del Título III, a partir de finales de 2019 la Autoridad negoció con nueve (9) contrapartes para enmendar los PPOA existentes relacionados con la operación de proyectos de energía renovable para proporcionar un ahorro objetivo del 10% durante el resto de los términos de los PPOA. La Autoridad llegó a un acuerdo con siete (7) de las nueve (9) contrapartes. La Junta de Supervisión aprobó los acuerdos el 30 de septiembre de 2020; (ii) la PREB los aprobó el 16 de octubre de 2020 y el 19 de octubre de 2020; y (iii) la Autoridad P3 los aprobó el 5 de noviembre de 2020. Los acuerdos modificados entraron en vigor durante enero y febrero de 2021. La Autoridad también negoció modificaciones de otros PPOA para conseguir una reducción de sus precios actuales. La Autoridad llegó a un acuerdo sobre las enmiendas con seis (6) de las once (11) contrapartes. La estimación revisada de los costos (incluidos los ahorros) de los contratos modificados en su conjunto es de $1,400 millones. Las fechas de entrada en vigor de los contratos modificados oscilan entre finales de enero de 2021 y finales de marzo de 2021. La mayoría de estas transacciones incluyen tanto modestas extensiones de plazo como posibles aumentos en la cantidad de capacidad de generación de energía renovable en las instalaciones cubiertas por los PPOA y, por lo tanto, se espera que apoyen aún más los esfuerzos de la Autoridad hacia el cumplimiento de los requisitos de la cartera de energía renovable que le impone la Ley 17-2019 y el actual IRP aprobado por la PREB de la Autoridad.

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 20 - <u>Eventos posteriores - (continuación)</u>

<u>Tramos para adquirir sistemas de energía renovable y de almacenamiento en baterías</u>

El IRP impone a la Autoridad importantes requisitos de producción de energía renovable, incluido el requisito de que, para 2025, la Autoridad obtenga al menos el 40% de la producción de energía conectada al sistema de T&D a partir de la generación de energía renovable. El IRP también incluye una directiva para que la Autoridad desarrolle un proceso de licitación competitivo para la adquisición de nuevos recursos de generación renovable y de almacenamiento de energía en apoyo de, entre otras cosas, el logro de los objetivos de la Ley 172019 para las instalaciones de energía renovable. La PREB estableció un calendario para la adquisición de cantidades mínimas de recursos renovables y recursos de almacenamiento de energía a través de un proceso de solicitud de propuestas.

De acuerdo con lo anterior, el 22 de febrero de 2021, la Autoridad emitió la RFP del Tramo 1 solicitando propuestas de recursos de energía renovable, almacenamiento de energía y centrales eléctricas virtuales.

El 16 de diciembre de 2021, la Autoridad anunció que había hecho ofertas a las contrapartes para proyectos de energía solar fotovoltaica con una capacidad de 732.72 MW y para hasta 220 MW de recursos de almacenamiento de energía. El 23 de diciembre de 2021, la Autoridad informó a la PREB que había hecho ofertas a las contrapartes para proyectos de energía solar fotovoltaica por una capacidad adicional de 112.1 MW. Los PPOA para la cantidad total de 844 MW de energía solar fotovoltaica y 200 MW de recursos de almacenamiento de energía se presentaron a la PREB para su aprobación. El 2 de febrero de 2022, la PREB emitió una orden por la que se aprobaban los PPOA por un importe total de 844 MW, y la Junta de Supervisión los aprobó el 25 de marzo de 2022. Los PPOA están sujetos al resultado de los estudios de integración que está realizando LUMA.

La PREB no se ha pronunciado sobre la solicitud de la Autoridad de aprobar los 200 MW de recursos de almacenamiento de energía. Los contratos de almacenamiento también están sujetos a la aprobación de la Junta de Supervisión y al resultado de los estudios de integración que está realizando LUMA.

Además, el 15 de octubre de 2021, la Autoridad presentó ante la PREB una Moción de Presentación de la Solicitud de Propuestas del Tramo 2 para Recursos de Generación de Energía Renovable y Almacenamiento de Energía (RFP) ("Moción de Presentación de la RFP del Tramo 2"). Como parte de la Moción de Presentación del Tramo 2 de la RFP, la Autoridad presentó un borrador de la Solicitud de Propuestas núm. 128568 Generación de Energía Renovable y Recursos de Almacenamiento de Energía Tramo 2 de 6 ("RFP del Tramo 2") para la revisión y posterior publicación de la PREB. El 29 de octubre de 2021, la PREB informó a la Autoridad de que había decidido nombrar a un coordinador independiente (el "Coordinador Independiente de la PREB") para el Tramo 2 de la RFP, pero que la Autoridad mantendría un papel importante en el proceso del Tramo 2 de la RFP. La PREB declaró además que establecería las facultades y los deberes detallados del Coordinador Independiente de la PREB, así como el papel de la Autoridad en el proceso de la RFP del Tramo 2 en una resolución separada.

- 119 -

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 20 - Eventos posteriores - (continuación)

Tramos para adquirir sistemas de energía renovable y de almacenamiento en baterías - (continuación)

El 27 de enero de 2022, la PREB nombró formalmente al Coordinador Independiente de la PREB del Tramo 2. Dicha orden no incluía las facultades y los deberes detallados de la Autoridad o de LUMA en el proceso del Tramo 2 de la RFP, pero preveía que la PREB adoptaría en breve una resolución separada en la que se establecerían las responsabilidades de LUMA y de la Autoridad. El 9 de junio de 2022, la PREB adoptó la resolución por la que se creaba un comité de selección de 6 miembros para la evaluación de las ofertas del Tramo 2 de la RFP y la selección de las propuestas, y se describían las responsabilidades y obligaciones de la Autoridad y de LUMA en el proceso del Tramo 2 de la RFP. El comité de selección estará compuesto por (i) el Director Ejecutivo de la Autoridad P3 o su delegado; (ii) un (1) funcionario de la Autoridad directamente relacionado con el proceso de RFP o su delegado; (iii) un (1) miembro de la Junta de Gobierno de la Autoridad, seleccionado entre los miembros designados por el Gobernador a su entera discreción; (iv) dos (2) funcionarios de otras entidades gubernamentales, elegidos por el PREB por sus conocimientos y/o experiencia en transacciones similares; y (v) un (1) representante de LUMA, elegido por LUMA por sus conocimientos y/o experiencia en transacciones similares.

Las responsabilidades y los deberes de la Autoridad incluyen proporcionar la información necesaria, la revisión de documentos y los comentarios, el asesoramiento jurídico y otras orientaciones relativas a las lecciones aprendidas como parte del proceso del Tramo 1 para colaborar con el Coordinador Independiente de la PREB como parte del proceso de la RFP del Tramo 2. Las responsabilidades y los deberes de LUMA incluyen el suministro de los datos necesarios, la orientación y la colaboración con el Coordinador Independiente de la PREB, incluidos los estudios necesarios para evaluar la interconexión de los proyectos del Tramo 2 de la RFP.

La PREB reiteró que tomará todas las decisiones finales requeridas durante el proceso del Tramo 2 de la RFP y que ni la Autoridad ni LUMA retrasarán dicho proceso y advirtió expresamente a la Autoridad y a LUMA que el incumplimiento de las órdenes de la PREB o de los requisitos legales aplicables puede conllevar la imposición de multas administrativas de hasta $25,000 por día, por violación y/u otras sanciones que la PREB considere apropiadas.

Aprobación del Plan de ajuste de la deuda del ELA

El 18 de enero de 2022, el Tribunal de Título III dictó una orden aprobando el Plan de Ajuste ("POA") del ELA. El POA reduce los bonos del ELA y otros tipos de deuda en un 80% y ahorra a Puerto Rico más de $50,000 millones en futuros pagos del servicio de la deuda. Además, el Tribunal de Título III presentó sus conclusiones de hecho y de derecho (las "Conclusiones de Hecho") en relación con el *Plan de Ajuste Conjunto Modificado del Título III del ELA de Puerto Rico, y otros* (el Plan de Ajuste del ELA), y el 15 de marzo de 2022, presentó una orden confirmando el Plan de Ajuste del ELA (la "Orden de Confirmación del ELA"). Entre el 28 de enero de 2022 y el 17 de febrero de 2022, se presentaron seis apelaciones a la Orden de Confirmación en el Primer

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a los estados financieros

Para el año fiscal que termina el 30 de junio de 2020

Nota 20 - <u>Eventos posteriores - (continuación)</u>

<u>Aprobación del Plan de ajuste de la deuda del ELA - (continuación)</u>

Circuito. Además, el 22 de febrero de 2022, la Junta de Supervisión certificó un presupuesto revisado para el gobierno de Puerto Rico que incluye los nuevos pagos de la deuda. El Primer Circuito denegó las mociones de todas las partes para paralizar el POA del ELA en espera de la apelación, lo que permitió que el POA del ELA entrara en vigor a pesar de las apelaciones. El 15 de marzo de 2022 (la "Fecha de Entrada en Vigor"), las condiciones precedentes a la Fecha de Entrada en Vigor del Plan de Ajuste del ELA fueron satisfechas o renunciadas por la Junta de Supervisión, y el POA entró en vigor. El 26 de abril de 2022 y el 18 de julio de 2022, el Primer Circuito emitió opiniones que confirmaban la orden del Tribunal de Título III que confirmaba el Plan de Ajuste.

<u>Guerra de Rusia contra Ucrania - Efectos de la cadena de suministro de combustible en las operaciones de la Autoridad</u>

El 24 de febrero de 2022, Rusia invadió Ucrania. La guerra puso de nuevo el acento en la dependencia mundial de los combustibles fósiles, y la consiguiente interrupción del suministro provocó un importante aumento de los precios de la energía para los consumidores. Puerto Rico no está exento de esta subida de precios. Puerto Rico también se enfrenta a una escasez de suministro de GNL. Los vendedores de GNL han advertido a la Autoridad que, en este momento, y en el futuro previsible, la entrega de GNL a Puerto Rico está seriamente comprometida y han animado a la Autoridad a ajustar sus planes en consecuencia. Garantizar que la Autoridad disponga de los suministros de GNL necesarios es fundamental para satisfacer la demanda de energía de sus clientes. Debido a la escasez de GNL, la Autoridad ha tenido que comprar diésel y búnker C en sustitución. Son combustibles menos eficientes, más contaminantes y caros, cuyos precios también han aumentado. Además, la compra de gasóleo y búnker C para sustituir la generación de gas conlleva gastos adicionales de compra de combustible, que en última instancia corren a cargo de los contribuyentes de la Autoridad. Como se trata de un problema continuo, es difícil determinar el alcance del impacto que la guerra seguirá teniendo en el suministro de combustible y su efecto en las operaciones de la Autoridad.

<u>Septiembre 2022: impacto del huracán Fiona en el sistema eléctrico</u>

El 18 de septiembre de 2022, el huracán Fiona tocó tierra en Puerto Rico por el municipio de Cabo Rojo. El huracán Fiona llegó a Puerto Rico como huracán de categoría 1 con vientos de 85 mph y rachas de hasta 103 mph. A pesar de los fuertes vientos, la mayoría de los daños en toda la isla fueron causados por las fuertes lluvias. La mayoría de estas lluvias se concentraron en la zona sur y sureste de Puerto Rico. El huracán Fiona provocó un apagón general en todo Puerto Rico como resultado de los daños causados en el sistema eléctrico. A la fecha de los presentes estados financieros, la Autoridad y LUMA, todavía están evaluando los daños.

Autoridad de Energía Eléctrica de Puerto Rico

(Una unidad componente del ELA de Puerto Rico)

Calendario de cambios en el pasivo neto por pensiones de la Autoridad

e índices relacionados (no auditados)

(En miles)

Para el año fiscal que termina el 30 de junio de 2020

| | Para el período de medición finalizado el 30 de junio: | | | | | |
|---|---|---|---|---|---|---|
| | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 |
| **Total del pasivo por pensiones** | | | | | | |
| Costo del servicio | $ 82,860 | $ 80,783 | $ 95,768 | $ 79,927 | $ 86,627 | $ 38,420 |
| Intereses sobre el total del pasivo por pensiones | 171,460 | 184,768 | 168,407 | 209,459 | 205,706 | 249,451 |
| Diferencias entre la experiencia prevista y real | (1,958) | (50,005) | (21,443) | (19,815) | 11,763 | 47,103 |
| Cambios en los supuestos | 339,551 | 253,387 | (284,071) | 947,510 | (60,243) | 1,796,904 |
| Pagos de beneficios | (288,482) | (274,818) | (268,469) | (254,624) | (279,479) | (216,811) |
| Reintegro de contribuciones | - | - | (709) | (1,200) | (1,126) | (795) |
| Cambio neto en el total de pasivos por pensiones | 303,431 | 194,115 | (310,517) | 961,257 | (36,752) | 1,914,272 |
| Total de pasivos por pensiones: al inicio | 5,765,887 | 5,571,772 | 5,882,289 | 4,921,032 | 4,957,784 | 3,043,512 |
| Total de pasivos por pensiones: al final (a) | $ 6,069,318 | $ 5,765,887 | $ 5,571,772 | $ 5,882,289 | $ 4,921,032 | $ 4,957,784 |
| **Resultados netos fiduciarios del plan** | | | | | | |
| Ajuste a los resultados netos iniciales plan | $ - | $ - | $ (58) | $ - | $ 1,672 | $ - |
| Contribuciones del empleador | 224,436 | 129,728 | 120,326 | 113,384 | 99,179 | 100,145 |
| Contribuciones de los miembros | 18,203 | 22,985 | 24,871 | 26,470 | 28,242 | 36,871 |
| Ingresos netos de inversión | 34,440 | 94,616 | 134,564 | 18,700 | 69,991 | 179,191 |
| Pagos de beneficios | (288,482) | (274,818) | (268,469) | (254,625) | (279,479) | (216,811) |
| Gastos administrativos y otros | (106) | (156) | (230) | (385) | (598) | (348) |
| Reintegro de las contribuciones de los empleados | - | - | (709) | (1,200) | (1,126) | (795) |
| Transferencias de otros sistemas | | | 162 | 309 | 437 | 1,275 |
| Pérdida por deterioro de los depósitos en el BGFBGF | - | - | - | (4,129) | - | - |
| Cambio neto en la posición neta fiduciaria del plan | (11,509) | (27,645) | 10,457 | (101,476) | (81,682) | 99,528 |
| Resultados netos fiduciarios del plan: al inicio | 1,198,566 | 1,226,211 | 1,215,754 | 1,317,230 | 1,398,912 | 1,299,384 |
| Resultados netos fiduciarios del plan: al final (b) | $ 1,187,057 | $ 1,198,566 | $ 1,226,211 | $ 1,215,754 | $ 1,317,230 | $ 1,398,912 |
| Pasivo neto por pensiones: al final (a)-(b) | $ 4,882,261 | $ 4,567,321 | $ 4,345,561 | $ 4,666,535 | $ 3,603,802 | $ 3,558,872 |
| Nómina de empleados cubiertos | $ 218,151 | $ 247,705 | $ 258,210 | $ 270,705 | $ 287,143 | $ 341,910 |
| Resultados netos fiduciarios del plan porcentaje del pasivo por pensiones | 19.56% | 20.79% | 22.01% | 20.67% | 26.77% | 28.22% |
| Pasivo neto por pensiones como de la nómina de los empleados cubiertos | 2,238% | 1,844% | 1,683% | 1,724% | 1,255% | 1,041% |

Consultar las notas de la información complementaria requerida y el informe de los auditores independientes.

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Esquema de contribuciones de los empleados - plan de pensión (no auditado)
(En miles)

Para el año fiscal que termina el 30 de junio de 2020

| Año fiscal finalizado el 30 de junio | Contribución del empleador determinada actuarialmente | Contribución real del empleador | Déficit/(Exceso) real del empleador | Nómina de empleados cubiertos | Contribuciones reales en porcentaje de la nómina del personal cubierto |
|---|---|---|---|---|---|
| 2020 | $ 241,856 | $ 241,829 | $ 27 | $ 213,353 | 34.54% |
| 2019 | 224,368 | 75,349 | 149,019 | 218,151 | 34.54% |
| 2018 | 124,634 | 82,232 | 42,402 | 247,705 | 33.20% |
| 2017 | 147,607 | 120,326 | 27,281 | 258,210 | 46.60% |
| 2016 | 113,384 | 113,384 | - | 270,705 | 41.88% |
| 2015 | 99,179 | 99,179 | - | 287,143 | 34.54% |
| 2014 | 100,145 | 100,145 | - | 341,910 | 29.29% |
| 2013 | 89,481 | 89,481 | - | 347,094 | 25.78% |
| 2012 | 85,361 | 85,361 | - | 357,758 | 23.86% |
| 2011 | 85,313 | 85,313 | - | 358,458 | 23.80% |
| 2010 | 69,926 | 69,926 | - | 354,955 | 19.70% |

Consultar las notas de la información complementaria requerida y el informe de los auditores independientes.

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Esquema de los cambios en el pasivo total de OPEB de la Autoridad
e índices relacionados (no auditados)
(En miles)
Para el año fiscal que termina el 30 de junio de 2020

| | Período de medición finalizado el 30 de junio de 2019 | | Período de medición finalizado el 30 de junio de 2018 | | Período de medición finalizado el 30 de junio de 2017 |
|---|---|---|---|---|---|
| Total del pasivo OPEB | | | | | |
| Costo del servicio | $ | 3,059 | $ 2,929 | $ | 3,235 |
| Interés | | 10,567 | 11,446 | | 10,674 |
| Diferencia entre la experiencia prevista y la real | | - | (18,671) | | (5,274) |
| Cambios en los supuestos u otros datos | | 14,252 | 8,368 | | (18,948) |
| Pagos de beneficios | | (12,570) | (17,785) | | (17,952) |
| Cambio neto en el pasivo total de OPEB | | 15,308 | (13,713) | | (28,265) |
| Total del pasivo de OPEB: al principio | | 360,877 | 374,590 | | 402,855 |
| Total del pasivo OPEB: al final (a) | $ | 376,185 | $ 360,877 | $ | 374,590 |
| Nómina de empleados cubiertos | $ | 218,151 | $ 247,705 | $ | 258,210 |
| Total del pasivo de OPEB como porcentaje de los empleados cubiertos | | 172.44% | 145.69% | | 145.07% |

Consultar las notas de la información complementaria requerida y el informe de los auditores independientes.

- 124 -

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a la información complementaria requerida (no auditado)

Para el año fiscal que termina el 30 de junio de 2020

## Nota 1 - Cambios en los beneficios

No ha habido cambios en el plan de pensiones ni en el de OPEB desde la fecha de medición anterior.

## Nota 2 - Cambios en los supuestos – Pensiones

A continuación, se detallan los cambios en los supuestos para el período de medición finalizado el 30 de junio de 2019:

- La tasa de descuento utilizado para determinar el pasivo total por pensiones se redujo del 3.05% al 2.84%.
- La tasa de interés de los bonos municipales bajó del 2.98% al 2.79%.
- Los supuestos de las tasas de mortalidad se cambiaron de la Tabla de Mortalidad Ponderada por la Cabeza 2010 proyectada generacionalmente usando la Escala MP-2019 a la Tabla de Mortalidad Ponderada por la Cabeza 2010 proyectada generacionalmente usando la Escala MP-2019.

A continuación, se detallan los cambios en los supuestos para el período de medición finalizado el 30 de junio de 2018:
- La tasa de descuento utilizado para determinar el pasivo total por pensiones se redujo del 3.40% al 3.05%.
- La tasa de interés de los bonos municipales bajó del 3.13% al 2.98%.
- Los supuestos de las tasas de mortalidad se cambiaron de la Tabla de Mortalidad de Empleados RP-2014 proyectada a 2018 utilizando la Escala BB a la Tabla de Mortalidad por Debajo de la Mediana PUB 2010 proyectada generacionalmente utilizando la Escala MP-2019.
- Los flujos de caja proyectados utilizados para determinar la tasa de descuento asumieron que la Autoridad contribuirá con el 34.54% de la compensación del grupo cerrado para 2018, mientras que para 2017 el supuesto fue que la Autoridad contribuirá con el 46.60% de la compensación del grupo cerrado.
- Para el 30 de junio de 2018, la base para la asignación de activos objetivo y las mejores estimaciones de las tasas de rendimiento reales aritméticas para cada clase de activos principal es la Encuesta de Supuestos del Mercado de Capital, Edición 2019, publicada por Horizon Actuarial Services, LLC. Para el 30 de junio de 2017, esta base fue proporcionada por los consultores de inversión del SRE de la Autoridad.

Durante el período de medición finalizado el 30 de junio de 2017, el único cambio en el supuesto fue sobre la tasa de descuento utilizada para determinar el pasivo total por pensiones, que se incrementó del 2.93% al 3.40% desde la fecha de medición anterior.

Durante el periodo de medición finalizado el 30 de junio de 2016, los cambios en los supuestos fueron los siguientes:

- La tasa de descuento utilizada para determinar el pasivo total por pensiones se redujo del 4.37% al 2.93% desde la fecha de medición anterior.
- Se ajustaron las tasas de jubilación supuestas para los miembros contratados antes del 1 de enero de 1993.

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a la información complementaria requerida (no auditado)

Para el año fiscal que termina el 30 de junio de 2020

Nota 2 - Cambios en los supuestos - Pensiones-(continuación)

- Se ajustaron las tasas supuestas de retiro por invalidez.
- Las tasas supuestas de mortalidad de los activos y de los jubilados sanos se han actualizado a la Tabla de Mortalidad RP-2014 proyectada hasta 2018 utilizando la Escala BB, retrasada un año para los hombres.
- Las tasas supuestas de mortalidad de los pensionistas discapacitados se actualizaron según la tabla de mortalidad de pensionistas discapacitados del RP-2014, proyectada hasta 2018 con la escala BB.
- Se ajustó el componente de mérito de la escala salarial.
- La tasa de inflación salarial supuesta se redujo del 3.50% al 2.50%.
- La tasa de inflación de los precios se redujo del 2.50% al 2.25%.
- La tasa de rendimiento asumida sobre los activos se redujo del 8.25% al 5.75%.
- El supuesto de crecimiento de la nómina para amortizar el pasivo actuarial no financiado como porcentaje nivelado de la nómina se redujo del 3.50% al 0.00%.

No hubo cambios en los supuestos durante los períodos de medición terminados el 30 de junio de 2015 y el 30 de junio de 2014. Los importes presentados como gastos representan la amortización de los cambios en los supuestos de años anteriores.

Nota 3 -    Contribuciones determinadas actuarialmente - Pensiones

Las tasas de contribución determinadas actuarialmente se calculan a partir del 30 de junio, un año antes del final del año fiscal en el que se reportan las contribuciones. A continuación, se presentan los métodos y los supuestos utilizados para determinar las tasas de contribución para el año fiscal cerrado el 30 de junio de 2020, así como la información relacionada con el Plan y los beneficios complementarios:

| | |
|---|---|
| Método de los costos actuariales | Edad de entrada |
| Método de amortización | Nivel del dólar, cerrado |
| Período de amortización restante | 23 años |
| Método de valoración de activos | Mercado suavizado a 5 años |
| Inflación | 2.25% |
| Aumentos salariales | 2.5% al 7.25%, incluida la inflación |
| Tasa de rendimiento de la | 5.75%, neto de los gastos de inversión del sistema, incluida la inflación |

Nota 4 -    Cambios en los supuestos - OPEB

A continuación, se detallan los cambios en los supuestos para el período de medición finalizado el 30 de junio de 2019:

- Desde la fecha de medición anterior, la tasa de descuento cambió del 2.98% al 2.79% debido a un cambio en la tasa de los bonos municipales.

- 126 -

Autoridad de Energía Eléctrica de Puerto Rico
(Una unidad componente del ELA de Puerto Rico)

Notas a la información complementaria requerida (no auditado)

Para el año fiscal que termina el 30 de junio de 2020

Nota 4 - Cambios en los supuestos - OPEB - (continuación)

- Los supuestos de las tasas de mortalidad se modificaron a partir de la tabla de mortalidad por debajo de la media ponderada por la cabeza de PUB 2010, proyectada generacionalmente utilizando la escala MP-2019. Tabla de mortalidad media ponderada de la PUB 2010 proyectada generacionalmente utilizando la escala MP-2019.

A continuación, se detallan los cambios en los supuestos para el período de medición finalizado el 30 de junio de 2018:

- Desde la fecha de medición anterior, la tasa de descuento cambió del 3.13% al 2.98% debido a un cambio en la tasa de los bonos municipales.
- Los supuestos de las tasas de mortalidad se cambiaron de la Tabla de Mortalidad de Empleados RP-2014 proyectada a 2018 utilizando la Escala BB a la Tabla de Mortalidad por Debajo de la Mediana PUB 2010 proyectada generacionalmente utilizando la Escala MP-2019.

A continuación, se detallan los cambios en los supuestos para el período de medición finalizado el 30 de junio de 2017:

- El tipo de descuento ha pasado del 2.71% al 3.13% debido a un cambio en el tipo de los bonos municipales.

Los calendarios pretenden mostrar información para 10 años. En el futuro se añadirán más años cuando estén disponibles.

## **ANEXO K**

INFORMES DE PRUEBAS DE MEJORES INTERESES

Anexo que se proporcionará en un momento posterior.

# **ANEXO L**

ACCIONES A TRANSFERIR AL FIDEICOMISO DE ACCIONES DE ANULACIÓN

**Acciones a transferir al Fideicomiso de Acciones de Anulación**[1]

| NOMBRE DEL PROVEEDOR | NÚM. DE PROCEDIMIENTO CONTENCIOSO |
|---|---|
| Core Laboratories N.V. d/b/a Saybolt | 19-381 |
| Puerto Nuevo Security Guards, Inc. | 19-384 |

---

[1] Las acciones a transferir al Fideicomiso de Acciones de Anulación, incluyen, entre otras, las enumeradas en este documento.

## ANEXO M

ACUERDO DE TRANSACCIÓN Y APOYO AL PLAN (PSA, por sus siglas en inglés)

DE PRESTAMISTAS DE LÍNEAS DE COMBUSTIBLE



GOBIERNO DE PUERTO RICO

AUTORIDAD DE ASESORIA FINANCIERA Y AGENCIA FISCAL DE
PUERTO RICO

## Portada de Información de Divulgación del Mercado Secundario Municipal
## Junta Municipal de Reglamentación de Valores (MSRB)
## Sistema Electrónico de Acceso al Mercado Municipal (EMMA)

### Divulgación Adicional/Voluntaria Basada en Eventos

ESTA RADICACIÓN SE RELACIONA CON TODOS O VARIOS VALORES EMITIDOS POR EL EMISOR, O
CON TODOS O VARIOS VALORES DE UN ACREEDOR ESPECÍFICO.

Nombre del emisor: **Autoridad de Energía Eléctrica de Puerto Rico**

Nombre de otra persona obligada (si corresponde): _____

Número(s) CUSIP* de nueve dígitos: **745268 y 74526Q**

**TIPO DE INFORMACIÓN PROPORCIONADA:**

A.  ☐  Enmienda a la Tarea de Divulgación Continua

B.  ☐  Cambio de Persona Obligada

C.  ☐  Aviso al Inversionista de Conformidad con los Documentos de Bonos

D.  ☐  Comunicado del Servicio de Impuestos Internos

E.  ☐  Oferta de Tasa de Subasta y Otros Valores

F.  ☐  Plan de Financiamiento de Capital u Otro Plan de Financiamiento

G.  ☐  Litigio/Acción Ejecutoria

H.  ☐  Cambio de Agente de Licitación, Agente de Recomercialización u Otra Parte Continua

I.  ☐  Transacción de Derivados u Otra Transacción Similar

J.  ☒  Otras Divulgaciones Basadas en Eventos: Acuerdo de Transacción y Apoyo al Plan de
Prestamistas de Líneas de Combustible.

Declaro que he sido autorizado por el emisor, el deudor o su agente para distribuir esta
información públicamente.

/f/ Nelson J. Pérez Méndez_____
Nelson J. Pérez Méndez
Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico
Como Agente Fiscal del Estado Libre Asociado y Sus Instrumentalidades

Fecha: 1 de diciembre de 2022

Roberto Sánchez Vilella (Minillas) Government Center, De Diego Ave. Stop 22, San Juan, PR 00907 | PO Box 42001, San Juan, PR 00940-2001

787.722.2525    contact@aafaf.pr.gov    aafaf.pr.gov

AUTORIDAD DE ENERGÍA ELÉCTRICA DE PUERTO RICO

AVISO DE RADICACIÓN VOLUNTARIA

ACUERDO DE TRANSACCIÓN Y APOYO AL PLAN DE PRESTAMISTAS DE LÍNEAS DE COMBUSTIBLE

De conformidad con las órdenes del Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico que preside el caso de reestructuración de la deuda de la Autoridad de Energía Eléctrica de Puerto Rico ("AEE") bajo el Título III de la Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico, la Junta de Supervisión y Administración Financiera para Puerto Rico (la "JSAF") y la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico ("AAFAF") iniciaron una mediación con respecto a un posible acuerdo de transacción de, entre otras cosas, la deuda de la AEE bajo ciertos acuerdos conforme a los cuales se le prestaron fondos a la AEE para comprar combustible (los "Préstamos de Líneas de Combustible") por parte de ciertas partes (colectivamente, los "Prestamistas de Líneas de Combustible").

El 1 de diciembre de 2022, la JSAF y los Prestamistas de Líneas de Combustible celebraron un Acuerdo de Transacción y Apoyo al Plan (el "FLL PSA", por sus siglas en inglés).

Se adjunta una copia del FLL PSA como Anexo A.

Fecha: 1 de diciembre de 2022.

**ESTE AVISO NO ES UNA OFERTA CON RESPECTO A NINGÚN TÍTULO VALOR NI UNA SOLICITUD DE ACEPTACIONES DE UN PLAN DE TÍTULO III EN EL SENTIDO DE LA SECCIÓN 1125 DEL CÓDIGO DE QUIEBRAS INCORPORADO EN LA SECCIÓN 301 DE PROMESA. CUALQUIER TAL OFERTA O SOLICITUD CUMPLIRÁ CON TODAS LAS LEYES DE VALORES Y DISPOSICIONES DE PROMESA APLICABLES.**

**ANEXO A**

**FLL PSA**

*VERSIÓN A FIRMAR*

**ESTE ACUERDO DE TRANSACCIÓN Y APOYO AL PLAN NO ES UNA OFERTA CON RESPECTO A NINGÚN TÍTULO VALOR NI UNA SOLICITUD DE ACEPTACIONES DE UN PLAN DE AJUSTES PARA FINES DE PROMESA, YA SEA BAJO LAS SECCIONES 1125 Y 1126 DEL CÓDIGO DE QUIEBRAS O DE OTRA FORMA. CUALQUIER TAL OFERTA O SOLICITUD CUMPLIRÁ CON TODAS LAS LEYES DE VALORES Y/O DISPOSICIONES APLICABLES DE PROMESA Y DEL CÓDIGO DE QUIEBRAS. NADA DE LO CONTENIDO EN ESTE ACUERDO SERÁ UNA ADMISIÓN DE HECHO O RESPONSABILIDAD NI SE CONSIDERARÁ VINCULANTE PARA CUALQUIERA DE LAS PARTES DEL PRESENTE HASTA LA FECHA DE VIGENCIA DEL ACUERDO EN LOS TÉRMINOS DESCRITOS EN EL PRESENTE.**

**ESTE ACUERDO DE TRANSACCIÓN Y APOYO AL PLAN NO PRETENDE RESUMIR TODOS LOS TÉRMINOS, CONDICIONES, DECLARACIONES, GARANTÍAS Y OTRAS DISPOSICIONES CON RESPECTO A LAS TRANSACCIONES DESCRITAS EN EL PRESENTE DOCUMENTO, LAS CUALES ESTARÁN SUJETAS A LA FORMALIZACIÓN DE LOS DOCUMENTOS DEFINITIVOS QUE INCORPORAN LOS TÉRMINOS ESTABLECIDOS EN EL PRESENTE DOCUMENTO Y EL CIERRE DE CUALQUIER TRANSACCIÓN ESTARÁ SUJETO A LOS TÉRMINOS Y CONDICIONES ESTABLECIDOS EN DICHOS DOCUMENTOS DEFINITIVOS Y A LOS DERECHOS DE APROBACIÓN DE LAS PARTES ESTABLECIDOS EN EL PRESENTE DOCUMENTO Y EN DICHOS DOCUMENTOS DEFINITIVOS.**

## ACUERDO DE TRANSACCIÓN Y APOYO AL PLAN

Se celebra este Acuerdo de Transacción y Apoyo al Plan (junto con los anexos adjuntos, incluyendo, entre otros, el Pliego de Términos (según se define en el presente) adjunto al presente como **Anexo A**, según cada uno pueda ser enmendado, actualizado, complementado o de otro modo modificado periódicamente de conformidad con los términos del presente, el "**Acuerdo**") de fecha 1 de diciembre de 2022, entre: (i) la Junta de Supervisión y Administración Financiera para Puerto Rico (la "**JSAF**"), como representante del Título III de la Autoridad de Energía Eléctrica de Puerto Rico ("**AEE**") y (ii) todos los tenedores de Préstamos de Líneas de Combustible (según se definen en el presente), identificados en el **Anexo A**, según dichos tenedores puedan cambiar periódicamente de conformidad con la Sección 5(e) (colectivamente, los "**Prestamistas de Líneas de Combustible**", y cada uno individualmente, un "**Prestamista de Líneas de Combustible**"). Este Acuerdo se refiere colectivamente a la JSAF y a los Prestamistas de Líneas de Combustible como las "**Partes**", y a la JSAF y a cada Prestamista de Líneas de Combustible individualmente como una "**Parte**".

## CONSIDERANDOS

**POR CUANTO**, la AEE es el prestatario de $700,877,093.58 (el "**Monto de Reclamación Previo a la Petición de los Prestamistas de Líneas de Combustible**") en monto de capital de préstamos y otras facilidades financieras (incluyendo intereses devengados hasta el 2 de julio de 2017) de conformidad con (i) el Contrato de Crédito de fecha 4 de mayo de 2012, por y entre la AEE, Scotiabank de Puerto Rico y ciertos prestamistas (según enmendada, enmendada y reformulada, complementada o de otro modo modificada periódicamente, la "**Línea Scotia**"), y (ii) el Acuerdo de Facilidad de Financiamiento Comercial, de fecha 20 de julio de 2012, por y entre la AEE y Citibank, N.A. (según enmendada, enmendada y reformulada, complementada o de otro modo modificada periódicamente, la "**Línea Citi**", y junto con la Línea Scotia, las "**Facilidades de Líneas de Combustible**", y los préstamos y anticipos emitidos bajo cada una de ellas, colectivamente, los "**Préstamos de Líneas de Combustible**").

**POR CUANTO**, a la fecha del presente, la suma total del capital pendiente de pago de los Préstamos de Líneas de Combustible que son de propiedad en usufructo de cada Prestamista de Líneas de Combustible se establece en sus respectivas páginas de firmas del presente.

**POR CUANTO**, el 30 de junio de 2016, el Presidente de los Estados Unidos promulgó la Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico (L.P. 114-187, "**PROMESA**").

**POR CUANTO**, PROMESA estableció la JSAF y le otorgó ciertos poderes sobre las finanzas y el proceso de reestructuración con respecto al Estado Libre Asociado de Puerto Rico y sus instrumentalidades según lo dispuesto en PROMESA, y la JSAF ha designado a la AEE como una Instrumentalidad Territorial Cubierta (según se define en PROMESA).

**POR CUANTO**, el 2 de julio de 2017, la JSAF radicó una petición de Título III en nombre de la AEE (el "**Caso de Título III**") ante el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico (el "**Tribunal de Título III**").

**POR CUANTO**, de conformidad con la sección 315(b) de PROMESA, la JSAF es el representante de Título III de la AEE en el Caso de Título III.

**POR CUANTO**, el 9 de julio de 2019, los Prestamistas de Líneas de Combustible presentaron una demanda y procedimiento contencioso [Pro. Cont. Núm. 19-00396] (el "**Litigio Prioritario**") contra la JSAF, la AEE, la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico ("**AAFAF**") y el U.S. Bank National Association, en su calidad de fideicomisario de ciertos bonos de ingresos de energía y bonos de refinanciamiento de ingresos de energía emitidos y en circulación de conformidad con el Contrato de Fideicomiso, con fecha del 1 de enero de 1974, según enmendado, enmendado y actualizado, complementado o de otro modo modificado periódicamente, entre la AEE y el U.S. Bank National Association (el "**Contrato de Fideicomiso**"), aseverando, entre otras cosas, que los Préstamos de Líneas de Combustible constituyen "Gastos Corrientes" bajo el Contrato de Fideicomiso y tienen prioridad sobre los tenedores de bonos de la AEE.

**POR CUANTO**, la JSAF, la AEE, la AAFAF, y otras demandadas en el Litigio Prioritario presentaron mociones para desestimar el Litigio Prioritario, las cuales fueron terminadas sin prejuicio el 29 de septiembre de 2022 [Caso Núm. 17-4780, ECF Núm. 3013].

**POR CUANTO**, el Litigio Prioritario ha estado paralizado desde el 2 de abril de 2020.

**POR CUANTO**, las Partes han entablado negociaciones de buena fe y en condiciones de igualdad con respecto a (i) la resolución consensuada del Litigio Prioritario y (ii) los términos económicos principales de una reestructuración propuesta de los Préstamos de Líneas de Combustible que se implementará de una manera acordada mutuamente como se establece en el Pliego de Términos y en este Acuerdo.

**POR CUANTO**, las Partes desean expresarse mutuamente su común apoyo y compromiso con respecto a un plan de ajuste para la AEE, incluyendo los asuntos discutidos en este Acuerdo.

**ENTONCES, POR LO TANTO**, en consideración de los convenios del presente, cada Parte, con la intención de quedar legalmente obligada por el presente, acuerda lo siguiente:

**Sección 1.**    *Fecha de Vigencia del Acuerdo*.  Este Acuerdo entrará en vigencia y será vinculante para cada Parte inmediatamente después de la firma y entrega de las contrapartes de este Acuerdo por cada uno: la JSAF y una mayoría en número de los Prestamistas de Líneas de Combustible, que posean en usufructo o controlen, en total, por lo menos dos tercios del Monto de Reclamación Previo a la Petición de los Prestamistas de Líneas de Combustible (la **"Fecha de Vigencia del Acuerdo"**).

**Sección 2.**    *Transacción*.  Para arribar a una transacción de conciliación de la prioridad, los derechos y las reclamaciones afirmados por los Prestamistas de Líneas de Combustible según se establece en los escritos presentados en el Litigio de Prioridad y las Evidencias de Reclamación de los Prestamistas de Líneas de Combustible,[1] las Partes acuerdan que el plan de ajuste del Título III de la AEE, (a) radicado inicialmente por la JSAF después de la fecha del presente, y cada enmienda, enmienda y actualización, actualización, complemento o modificación al mismo que sea presentado por la JSAF después de la fecha del presente, y (b) que entre en vigencia, deberá, en todo caso, incorporar los términos de la reestructuración de los Préstamos de Líneas de Combustible establecidos en el pliego de términos adjunto al presente como **Anexo A** (el "**Pliego de Términos**", y los términos en mayúscula utilizados pero no definidos de otro modo en el presente tendrán los significados que se les atribuyan en el Pliego de Términos) y de otro modo incluir términos y disposiciones (incluidas, entre otras, las condiciones de efectividad) razonablemente satisfactorios para los Prestamistas de Líneas de Combustible que posean en usufructo o controlen, en conjunto, por lo menos una mayoría del monto del capital de los Préstamos de Líneas de Combustible de propiedad en usufructo o controlados, en conjunto, por los Prestamistas de Líneas de Combustible en ese momento (los "**Prestamistas Requeridos**") como titulares de reclamaciones secundarios (colectivamente, el "**Plan**").

**Sección 3.**    *Anexos Dados por Reproducidos*.  Cada uno de los anexos y apéndices adjuntos al presente se tienen expresamente por reproducidos como si se insertasen a la letra y forman parte de este Acuerdo, y todas las referencias a este Acuerdo incluirán los anexos.

**Sección 4.**    *Convenios de las Partes*.

                (a)    Convenios de la JSAF.  La JSAF emprenderá sus mejores esfuerzos para hacer que la AEE tome todas las acciones necesarias para obtener, y no alentará a ninguna otra persona a tomar ninguna acción que pudiera impedir o imposibilitar, o razonablemente se esperaría que impidiera o imposibilitara la presentación del Plan y una declaración de divulgación relacionada (la "**Declaración de Divulgación**"), la aprobación de la Declaración de Divulgación y el dictado de una orden de confirmación con respecto al Plan (la "**Orden de Confirmación**") y la consumación, implementación y administración del Plan, incluyendo la ejecución y entrega de todos los documentos definitivos requeridos para implementar el Plan, incluyendo un contrato de emisión o contrato de fideicomiso que rija los Nuevos Bonos (los "**Documentos Definitivos**"), siempre que la Declaración de Divulgación, el Plan (y su consumación, implementación y administración) y los demás Documentos Definitivos sean consecuentes con los términos del presente. Tales acciones incluirán, entre otras: (i) presentar el Plan y la Declaración de Divulgación, en forma y sustancia consecuentes con este Acuerdo y razonablemente aceptables para la JSAN y los Prestamistas Requeridos, ante el Tribunal de Título III antes del 9 de diciembre de 2022, o en cualquier fecha posterior según lo ordene

---

[1] Las *Evidencias de Reclamación* son las evidencias de reclamación presentadas por los Prestamistas de Líneas de Combustible a cuenta de los Préstamos de Líneas de Combustible y presentadas como evidencias de reclamación Núm. 44342, 44358, 44378, 44388, 45816, 44378, 45816.

el Tribunal de Título III, sujeto a cualquier enmienda posterior que no sea incompatible con este Acuerdo y que sea razonablemente satisfactoria para los Prestamistas Requeridos; (ii) tramitar, de manera oportuna y adecuada la aprobación de la Declaración de Divulgación y el cronograma de confirmación propuesto que contempla una audiencia de confirmación para junio de 2023 y la confirmación del Plan; (iii) presentar una Orden de Confirmación razonablemente satisfactoria para los Prestamistas Requeridos; (iv) hacer que la fecha de vigencia del Plan (la "**Fecha de vigencia del Plan**") ocurra antes del 1 de diciembre de 2023; (v) hacer que los Bonos de la Serie A estén exentos de impuestos en la medida permitida por la ley (incluida la búsqueda de una determinación de no acción o autorización apropiada del Servicio de Impuestos Internos); y (vi) abstenerse de iniciar o apoyar directa o indirectamente (o de continuar procesando) cualquier acción o procedimiento (incluso en el Litigio Prioritario), o de afirmar cualquier reclamación u objeción, contra cualquiera de los Prestamistas de Líneas de Combustible que impugnen su prioridad, derechos y reclamaciones afirmados según se establecen en los escritos presentados en el Litigio Prioritario y las Evidencias de Reclamación de los Prestamistas de Líneas de Combustible.[2] La JSAF deberá responder a solicitudes razonables de los asesores de los Prestamistas de Líneas de Combustible en cuanto a (x) el estatus y avance del Caso de Título III, incluyendo, entre otros, el avance en relación con las negociaciones del Plan y los Documentos Definitivos y (y) el estatus de la obtención de las autorizaciones necesarias o deseables (incluyendo los consentimientos) con respecto al Plan y los Documentos Definitivos, de cualquier órgano judicial competente, autoridad gubernamental u organismo bancario, fiscal, supervisor o regulador. Como representante de la AEE en el Caso de Título III, la JSAF no aceptará que la AEE Reorganizada proporcione una recuperación a ningún acreedor bajo el Plan que impida la satisfacción del Pliego de Términos.

(b)    Convenios de los Prestamistas de Líneas de Combustible. A partir de la fecha del presente y en adelante, siempre que (i) este Acuerdo no haya sido rescindido y (ii) ni la Declaración de Divulgación, ni el Plan ni ninguno de los Documentos Definitivos hayan sido radicados, enmendados o modificados de manera adversa a los Prestamistas de Líneas de Combustible y en contradicción con las disposiciones del presente, cada uno de los Prestamistas de Líneas de

---

[2] Para no dejar lugar a dudas, nada en este Acuerdo impedirá que los Prestamistas de Líneas de Combustible hagan valer o defiendan sus derechos y reclamaciones —incluyendo su estatus prioritario de "Gastos Corrientes"— en relación con la confirmación del Plan o en cualquier procedimiento contencioso radicado por cualquiera de las partes (incluyendo Pro. Cont. Núm. 19-00391). Por lo tanto, los Prestamistas de Líneas de Combustible tendrán derecho a realizar radicaciones ante el Tribunal de Título III en apoyo de la confirmación del Plan y en relación con Pro. Cont. Núm. 19-00391, incluyendo presentaciones que respalden su posición de que los tenedores de bonos de la AEE tienen como máximo un gravamen y reclamación de ingresos "netos" y que los Prestamistas de Líneas de Combustible tienen derechos de prioridad exigibles frente a los tenedores de bonos de la AEE. No obstante lo anterior, mientras este Acuerdo permanezca vigente y antes de la Fecha de Terminación, los Prestamistas de Líneas de Combustible no apoyarán al Sistema de Retiro de los Empleados de la Autoridad de Energía Eléctrica ("**SREAEE**") o a ningún otro tercero en oponerse a la confirmación del Plan, o en busca de desagravio en Pro. Cont. Núm. 19-00405 o cualquier apelación del mismo (u otro procedimiento contencioso o apelación que aborde el estatus prioritario de "Gastos Corrientes" de las reclamaciones del SREAEE o de cualquier otro tercero), basándose en el estatus prioritario de "Gastos Corrientes" afirmado por el SREAEE en virtud del Acuerdo de Fideicomiso, siempre que: (1) la JSAF, como representante de la AEE en el Caso de Título III, renuncie a todos y cada uno de los argumentos de que cualquier reclamación, causa de acción o posición de los Prestamistas de Líneas de Combustible se ve afectada por cualquier decisión u orden dictada en litigio con el SREAEE o cualquier tercero respecto a la prioridad de "Gasto Corriente", con base en doctrinas de preclusión de emisión, preclusión de reclamo, ley de la causa o cualquier doctrina similar; y (2) de ocurrir la Fecha de Terminación, la JSAF, como representante de la AEE en el Caso de Título III, cooperará con los Prestamistas de Líneas de Combustible para establecer un cronograma de litigio acelerado para disputas relacionadas con el estatus prioritario de "Gastos Corrientes" de los Prestamistas de Líneas de Combustible para ser atendidas con respecto al fondo del asunto, y hacer los mejores esfuerzos razonables para garantizar que cualquier apelación relacionada con el "Gasto Corriente" o estatus prioritario de los Prestamistas de Líneas de Combustible sea atendida por o al mismo tiempo que las apelaciones relacionadas con el estatus prioritario de "Gasto Corriente" del SREAEE. Para no dejar lugar a dudas, los compromisos sobrevivirán a la terminación de este Acuerdo.

Combustible: (A) respaldará (I) la aprobación de la Declaración de Divulgación de conformidad con
la sección 1125 del Código de Quiebras, y (II) la confirmación del Plan de conformidad con la sección
1129 del Código de Quiebras; (B) sujeto a la recepción de la Declaración de Divulgación y otros
materiales de solicitud con respecto al Plan, según lo aprobado por el Tribunal de Título III, votará o
hará que se voten oportunamente, todas sus reclamaciones para aceptar el Plan, de conformidad con
las órdenes aplicables del Tribunal de Título III con respecto a la solicitud de votos sobre el Plan, y no
cambiará ni retirará (ni hará que se cambie o retire) dicho voto de aceptación; y (C) después de la Fecha
de Vigencia del Plan, solicitará la desestimación del Litigio Prioritario con perjuicio.

(c)     Convenios Mutuos. Cada una de las Partes, en forma individual y no
conjunta, conviene que:

(i)  Sujeta a los términos y condiciones del presente, dicha Parte apoyará
[sic], y de otro modo se abstendrá de alentar a ninguna otra persona a tomar
cualquier acción que infrinja o sea incompatible —o que razonablemente se
esperaría que infringiera o fuera incompatible— con los términos del presente, o
que impida o imposibilite la radicación del Plan, la administración del Caso de
Título III, la aprobación de la Declaración de Divulgación y el dictado de la Orden
de Confirmación y la consumación, implementación y administración del Plan,
incluyendo la firma y entrega de los Documentos Definitivos, siempre que dicha
Declaración de Divulgación, Orden de Confirmación y Plan (y su consumación,
implementación y administración) y los demás Documentos Definitivos sean
consecuentes con los términos del presente y el Plan.

(ii) Dicha Parte se esforzará por evitar litigios sobre la prioridad de los
Prestamistas de Líneas de Combustible antes de que el Tribunal de Título III
considere su transacción en el Plan.

(iii) Dicha Parte cooperará y negociará con la otra de buena fe y realizará
los mejores esfuerzos razonables con respecto a la búsqueda, aprobación,
negociación, firma, entrega e implementación de los Documentos Definitivos que
lleven a efecto los términos establecidos en el Pliego de Términos, en coherencia
con este Acuerdo en todos sus aspectos.

(iv) Sin perjuicio de cualquier otra disposición del presente, este Acuerdo
no es y no se considerará como una oferta con respecto a ningún valor o solicitud
de votos para la aceptación de un plan de ajuste para los propósitos de PROMESA,
ya sea bajo las secciones 1125 y 1126 del Código de Quiebras o de otro modo.

(v)  Cualquier tal oferta o solicitud se realizará únicamente de conformidad
con todas las leyes de valores aplicables y las disposiciones de PROMESA y el
Código de Quiebras, y no se solicitará hasta que el Tribunal de Título III haya
aprobado la Declaración de Divulgación y los materiales de solicitud relacionados,
y dicha Declaración de Divulgación y materiales de solicitud se hayan transmitido
a las partes con derecho a recibirlos.

**Sección 5.**    *Cesión de Reclamaciones e Intereses*.

(a)     Durante el período que comienza a partir de la Fecha de Vigencia del
Acuerdo hasta la rescisión del mismo con respecto a cualquier Prestamista de Líneas de Combustible
de conformidad con los términos del presente, dicho Prestamista de Líneas de Combustible se
abstendrá de vender, ceder, transferir o de otro modo dar en prenda o enajenar ("**Ceder**") cualquier
Préstamo de Líneas de Combustible de propiedad en usufructo de dicho Prestamista de Líneas de
Combustible, o cualquier derecho de participación, voto, consentimiento o dirección relacionado con
dichos Préstamos de Líneas de Combustible, o cualquier reemplazo de los mismos con certificados de

fideicomiso identificables por un número CUSIP único de acuerdo con la Sección 7, excepto que dicha Cesión podrá realizarse (i) si el cesionario es un Prestamista de Líneas de Combustible al momento de la Cesión o (ii) si el cesionario no es un Prestamista de Líneas de Combustible al momento de la Cesión, dicho cesionario (un cesionario de conformidad con esta cláusula (ii) o la cláusula (i) inmediatamente anterior, un "**Cesionario Calificado**") (x) celebra cartas de compromiso con los asesores de los Prestamistas de Líneas de Combustible sin desviarse de los términos del compromiso ya acordados con los Prestamistas de Líneas de Combustible existentes, si aún no es parte de la misma, y (y) entrega a los abogados de la JSAF y a los abogados de los Prestamistas de Líneas de Combustible, durante o antes de la consumación de la Cesión, la acumulación adjunta al presente como **Anexo B**, conforme a la cual dicho cesionario asumirá todos los derechos (incluyendo, entre otros, el derecho a los Costos de Consumación, pero no el derecho al Reembolso de Honorarios Profesionales) y obligaciones (incluyendo, entre otras, la obligación de pagar su parte proporcional de los honorarios y gastos adeudados en virtud de las Facilidades de Líneas de Combustible) de dicho Prestamista de Línea de Combustible cedente en virtud del presente (y dicho cesionario, si aún no es un Prestamista de Línea de Combustible, también pasará a ser un "Prestamista de Línea de Combustible" en virtud del presente). En la medida en que una Cesión infrinja las disposiciones de esta sección, la Cesión será nula *ab initio* y los Préstamos de Líneas de Combustible aplicables y el Prestamista de Líneas de Combustible que intente la Cesión de los Préstamos de Líneas de Combustible seguirán estando sujetos a los términos de este Acuerdo. De ninguna manera se interpretará este Acuerdo en el sentido de impedir que cualquiera de los Prestamistas de Líneas de Combustible adquiera Préstamos de Líneas de Combustible adicionales; *siempre que* dichos Préstamos de Líneas de Combustible adquiridos se consideren automática e inmediatamente sujetos a todos los términos de este Acuerdo tras su adquisición por parte de un Prestamista de Líneas de Combustible.

(b)     Sin perjuicio de cualquier disposición en contrario contenida en este Acuerdo, (i) un Prestamista de Líneas de Combustible puede Ceder cualquier derecho, título o interés en los Préstamos de Líneas de Combustible o cualquier certificado de fideicomiso identificable por un número CUSIP único por el cual los Préstamos de Líneas de Combustible se intercambian de conformidad con la Sección 7 a un Creador de Mercado Calificado (según se define a continuación), actuando en su calidad de Creador de Mercado Calificado, sin el requisito de que dicho Creador de Mercado Calificado sea o se convierta en un Prestamista de Líneas de Combustible; *siempre que* dicho Creador de Mercado Calificado Ceda posteriormente dicho derecho, título o interés en los Préstamos de Líneas de Combustible a un Prestamista de Línea de Combustible o un Cesionario Calificado dentro de la fecha que sea treinta (30) días después de la adquisición de dicho derecho, título o interés por parte de dicho Creador de Mercado Calificado; y (ii) en la medida en que un Prestamista de Líneas de Combustible actúe en su calidad de Creador de Mercado Calificado, podrá Ceder cualquier derecho, título o interés en los Préstamos de Líneas de Combustible que el Creador de Mercado Calificado adquiera de un tenedor de Préstamos de Líneas de Combustible que no sea un Prestamista de Líneas de Combustible sin el requisito de que el cesionario sea o se convierta en un Prestamista de Líneas de Combustible.

(c)     "**Creador de Mercado Calificado**" significa una entidad que (i) se presenta al mercado como lista en el curso ordinario de sus negocios para comprar de los clientes y vender a los clientes valores de deuda tales como los Préstamos de Líneas de Combustible o cualquier certificado de fideicomiso identificable por un número CUSIP único para el cual los Préstamos de Líneas de Combustible se intercambian de conformidad con la Sección 7 o entran con los clientes en posiciones largas y cortas en títulos de deuda tales como los Préstamos de Líneas de Combustible, en su calidad de agente o creador de mercado en dichos Préstamos de Líneas de Combustible; (ii) está de hecho regularmente en el negocio de crear un mercado de títulos de deuda; y (iii) si está tramitando una transacción con respecto a Préstamos de Líneas de Combustible o certificados de fideicomiso

identificables por un número CUSIP único por el cual se intercambian Préstamos de Líneas de Combustible de acuerdo con la Sección 7, ésta está registrada ante la Comisión de Bolsa y Valores y la Autoridad Reguladora de Instituciones Financieras.

(d)   Cualquier divulgación por parte de cualquier Prestamista de Líneas de Combustible a cualquier otra Parte de sus participaciones de Préstamos de Líneas de Combustible se tratará como información confidencial por dicha otra Parte a menos que dicha otra Parte reciba tal información a través de otros medios que no estén sujetos a un deber de confidencialidad. Lo anterior no impedirá que la JSAF divulgue el monto agregado del capital de los Préstamos de Líneas de Combustible en poder de los Prestamistas de Líneas de Combustible en forma colectiva.

(e)   Los Prestamistas de Líneas de Combustible a la fecha del presente se enumeran en el **Anexo A** del mismo, junto con sus participaciones actuales de Préstamos de Líneas de Combustible bajo cada una de las Facilidades de Líneas de Combustible. Se podrán agregar o eliminar Prestamistas de Líneas de Combustible de este Acuerdo periódicamente, conforme a los términos del mismo, tras la entrega de un aviso a la JSAF por un abogado de los Prestamistas de Líneas de Combustible con un **Anexo A** actualizado y, en el caso de la incorporación de una persona a los Prestamistas de Líneas de Combustible que no sea de otro modo parte de este Acuerdo, la firma por tal persona de un acuerdo de adhesión en forma del **Anexo B** del presente y la entrega de tal acuerdo de adhesión a los abogados de la JSAF y los abogados de los Prestamistas de Líneas de Combustible.

(f)   En cumplimiento de lo anterior, la JSAF tomará y hará sus mejores esfuerzos razonables para que la AEE tome todas las acciones necesarias para consentir a las cesiones de los Préstamos de Líneas de Combustible de acuerdo con las Facilidades de Líneas de Combustible y esta Sección 5, según corresponda.

**Sección 6.**   *Manifestaciones y Garantías*.

6.01.   Manifestaciones y Garantías Mutuas. Por el presente, cada Parte, por separado y no conjuntamente, manifiesta y garantiza a las otras Partes que las siguientes declaraciones son verdaderas y correctas a la fecha del presente (o en el caso de un Cesionario Calificado que no sea un Prestamista de Líneas de Combustible a la fecha del presente, la fecha en que dicho Cesionario Calificado se convierta en Prestamista de Líneas de Combustible):

(a)   que tal Parte tiene el poder, la autoridad y el derecho legal para celebrar este Acuerdo;

(b)   que tal Parte está debidamente organizada y válidamente existente y solvente bajo las leyes de la jurisdicción de su organización, con pleno poder y autoridad para celebrar y entregar, y para ejecutar y observar los términos y disposiciones de este Acuerdo; y

(c)   que la firma, entrega, ejecución y observancia de este Acuerdo por tal Parte (i) ha sido debidamente autorizada por todas las acciones necesarias por dicha Parte, que no tiene ni tendrá conflicto alguno con, ni resultará en una infracción de, cualquier ley que le sea aplicable, y que no requiere que obtenga ningún permiso, consentimiento, aprobación, orden o autorización de, ni que notifique o realice una radicación ante cualquier tribunal, agencia o autoridad gubernamental o reguladora, o cualquier otra persona o entidad que no haya sido obtenido, proporcionado o realizado, según corresponda, (ii) excepto en la medida en que PROMESA lo modifique, paralice o exima de otro modo, (A) con respecto a la JSAF, no contraviene ni constituye un incumplimiento de ninguna disposición de ley o regulación aplicable o de ningún acuerdo, sentencia, interdicto, orden, decreto u otro instrumento vinculante para la JSAF, según corresponda y (B) con respecto a cada Parte, no infringe, entra en conflicto o da lugar al incumplimiento de ninguna disposición de sus documentos organizacionales o de gobernanza y (iii) no da ni dará lugar a ninguna violación de, constituirá un incumplimiento (o un evento que con la notificación o el lapso de tiempo, o ambos, se convertiría en un incumplimiento) bajo, requerirá ningún consentimiento según, ni

7

otorgará a otros ningún derecho de rescisión, modificación, aceleración, paralización, revocación o cancelación de ningún pagaré, bono, hipoteca, contrato de emisión, contrato, acuerdo, arrendamiento, subarrendamiento, licencia, permiso, franquicia u otro instrumento o acuerdo del que sea parte, el cual afectaría material y adversamente su capacidad para llevar a cabo sus obligaciones en virtud de este Acuerdo y de otro modo observarlo o causar la ocurrencia de un Evento de Terminación.

6.02.   <u>Manifestaciones Adicionales de los Prestamistas de Líneas de Combustible</u>.  Cada Prestamista de Líneas de Combustible, por separado y no conjuntamente, manifiesta, garantiza y acuerda con cada una de las Partes que las siguientes declaraciones son verdaderas, correctas y completas a la fecha de este Acuerdo (o en el caso de un Cesionario Calificado que no sea un Prestamista de Líneas de Combustible a la fecha del presente, la fecha en que dicho Cesionario Calificado se convierta en Prestamista de Líneas de Combustible) (cada uno de los cuales es una manifestación, garantía y convenio continuo): que es el propietario en usufructo o es responsable de la gestión de inversiones de las cuentas que son propietarios en usufructo de los Préstamos de Líneas de Combustible en los montos de capital establecidos en su respectiva página de firma del presente o de un acuerdo de adhesión a este Acuerdo en la forma del **<u>Anexo B</u>** (según corresponda), bajo los cuales tendría derecho a voto en una solicitud de plan, que no ha vendido, cedido, transferido, participado o de otro modo pignorado dichos Préstamos de Líneas de Combustible, o cualquier derecho de voto, consentimiento o dirección relacionado con dichos Préstamos de Líneas de Combustible, a ninguna otra persona o entidad, que impediría o afectaría adversamente de alguna manera el cumplimiento de las obligaciones contenidas en este Acuerdo por parte de dicho Prestamista de Líneas de Combustible en el momento en que dichas obligaciones deban cumplirse, en cada caso, excepto según lo permitido por la Sección 5 de este Acuerdo.

**Sección 7.**   ***Conversión a Certificados de Fideicomiso***.  La JSAF se compromete a emplear sus mejores esfuerzos razonables para ocasionar el intercambio de los Préstamos de Líneas de Combustible de propiedad en usufructo de los Prestamistas de Líneas de Combustible por certificados de fideicomiso identificables mediante un número CUSIP único antes del 31 de enero de 2023. Todo tal certificado de fideicomiso de reemplazo seguirá siendo un Préstamo de Líneas de Combustible para todos los efectos de este Acuerdo y cualquier tenedor del mismo estará obligado por todas las disposiciones aplicables de este Acuerdo.

**Sección 8.**   ***Enmiendas y Renuncias***.  No podrán renunciarse, modificarse, enmendarse o complementarse los términos y condiciones de este Acuerdo, incluidos los anexos o apéndices del mismo, sin el consentimiento por escrito de (a) la JSAF y (b) los Prestamistas de Líneas de Combustible que posean en usufructo o controlen, en conjunto, al menos dos tercios del capital del monto total agregado de los Préstamos de Líneas de Combustible vigentes en virtud de las Facilidades de Líneas de Combustible en ese momento; en el entendido de que, (i) si cualquier disposición material del Pliego de Términos (o el Plan que incorpora el Pliego de Términos) o de las Secciones 5 o 9 de este Acuerdo es modificada, complementada o renunciada materialmente sin el consentimiento por escrito de un Prestamista de Líneas de Combustible de una manera que sea materialmente adversa para dicho Prestamista de Líneas de Combustible, entonces dicho Prestamista de Líneas de Combustible tendrá derecho a retirarse de este Acuerdo de conformidad con la Sección 9.02(d) del presente y (ii) cualquier renuncia, modificación, enmienda o suplemento a esta Sección 8 requerirá el consentimiento por escrito de la JSAF y de cada Prestamista de Líneas de Combustible.

**Sección 9.**   ***Rescisión***.

9.01.   <u>Por Consentimiento Mutuo</u>.  Este Acuerdo podrá ser rescindido por consentimiento mutuo de (a) la JSAF y (b) los Prestamistas Requeridos.

9.02.   <u>Eventos de Rescisión</u>.

(a)      Este Acuerdo podrá ser rescindido por (x) la JSAF o (y) los Prestamistas Requeridos, en cada caso mediante notificación por escrito con cinco (5) días hábiles de anticipación entregada a las demás Partes antes mencionadas después de que ocurra cualquiera de los siguientes eventos (cada uno, un "**Evento de Rescisión**"); en el entendido de que, sin embargo, este Acuerdo podrá ser rescindido únicamente por los Prestamistas Requeridos (y no por la JSAF) al ocurrir el Evento de Rescisión establecido en las cláusulas (ii), (iv), (v), (vii), (xi), (xii), (xiii) y (xiv) a continuación; únicamente por la JSAF (y no los Prestamistas de Líneas de Combustible) al ocurrir el Evento de Rescisión establecido en las cláusulas (vi) y (viii) a continuación, y únicamente por una Parte no infractora (y no las otras Partes) al ocurrir el Evento de Rescisión establecido en la cláusula (i) a continuación:

(i)      la ocurrencia –luego de la entrega de una notificación por escrito de la misma por una Parte no infractora– de un incumplimiento material por parte de cualquiera de las Partes de cualquiera de sus obligaciones, manifestaciones, garantías, convenios o compromisos establecidos en este Acuerdo que no se puede subsanar o que no es subsanada dentro de los cinco (5) días hábiles siguientes a la entrega de dicha notificación; en el entendido de que la JSAF no podrá rescindir este Acuerdo en virtud de esta Sección 9.02(a)(i) mientras los Prestamistas de Líneas de Combustible no infractores (A) sean más de la mitad en número de todos los Prestamistas de Líneas de Combustible, (B) sean propietarios en usufructo o controlen, en conjunto, al menos dos tercios del Monto de Reclamación Previo a la Petición de los Prestamistas de Líneas de Combustible, y (C) los Prestamistas de Líneas de Combustible infractores o sus sucesores no radiquen ni procesen una objeción de confirmación u otro litigio que pudiera hacer que el Plan sea inconfirmable;

(ii)      la JSAF repudia públicamente cualquiera de los términos establecidos en este Acuerdo (incluyendo en el Pliego de Términos) o celebra, o apoya públicamente, una transacción propuesta, declaración de divulgación, plan de ajuste, legislación, orden de confirmación o documentación definitiva en relación con el mismo (por enmienda o de otra manera) que sea materialmente inconsistente con dichos términos;

(iii)      la desestimación del Caso Título III;

(iv)      la determinación por parte de la JSAF de (A) no proceder con las transacciones materialmente consecuentes con aquellas contempladas por el Acuerdo o (B) proceder con una transacción que sería materialmente incompatible con los términos de, o las transacciones contempladas por, este Acuerdo;

(v)      la Fecha de Vigencia del Plan no ocurre el o antes del 1 de diciembre de 2023;

(vi)      los Prestamistas de Líneas de Combustible dejan de poseer en usufructo o controlar, en conjunto, al menos dos tercios del Monto de Reclamación Previo a la Petición de los Prestamistas de Líneas de Combustible;

(vii)      la JSAF inicia o apoya (o continúa procesando), directa o indirectamente, cualquier acción o procedimiento (incluso en el Litigio Prioritario), o afirma cualquier reclamación u objeción, contra cualquiera de los Prestamistas de Líneas de Combustible que impugna su prioridad, derechos y reclamaciones afirmados según se establecen en los escritos presentados en el Litigio Prioritario y las Evidencias de Reclamaciones de los Prestamistas de Líneas de Combustible; disponiéndose, para evitar dudas, que cualquier oposición de la JSAF a cualquier prioridad afirmada por la SREAEE o cualquier otra entidad no constituirá un Evento de Rescisión;

(viii)      cualquiera de los Prestamistas de Líneas de Combustible continúa o intenta continuar el Litigio Prioritario contra la JSAF o la AEE;

(ix)    el Tribunal de Título III emite una orden (A) que otorgue cualquier reparación que menoscabe la capacidad de las Partes para cumplir con sus respectivas obligaciones en virtud de este Acuerdo en cualquier aspecto material, incluido, entre otros, negar la confirmación del Plan o (B) que sea materialmente incompatible con el Pliego de Términos;

(x)    el Tribunal de Título III aprueba ya sea la *Moción del Grupo Ad Hoc de Tenedores de Bonos de la AEE, Assured Guaranty Corp., Assured Guaranty Municipal Corp., National Public Finance Guarantee Corporation y Syncora Guarantee, Inc., para Desestimar el Caso de Título III de la AEE, o para Exención de la Paralización Automática para Hacer Valer su Derecho a un Síndico (Asiento de Expediente Núm. 22291 en el Caso Núm. 17-3283 y Asiento de Expediente Núm. 2973 en el Caso Núm. 17-4780)* o la *Moción del Grupo Ad Hoc de Tenedores de Bonos de la AEE, Assured Guaranty Corp., Assured Guaranty Municipal Corp., National Public Finance Guarantee Corporation y Syncora Guarantee, Inc., para Autorización para Presentar una Moción Combinada para Desestimar el Caso de Título III de la AEE y Solicitud Alternativa para Exención de la Paralización Automática (Asiento de Expediente Núm. 2971 en el Caso Núm. 17-4780);*

(xi)    el Negociado de Energía de Puerto Rico ("**NEPR**") deniega el Cargo de Transición y el Tribunal de Título III no exige que el NEPR revoque su decisión con tiempo suficiente para permitir que la Fecha de Vigencia del Plan ocurra el o antes del 1 de diciembre de 2023;

(xii)    la Orden de Confirmación es revocada, desestimada o anulada sin el consentimiento previo por escrito de los Prestamistas Requeridos y el Tribunal de Título III no emite una orden enmendada dentro de los noventa (90) días que confirme que el Plan es razonablemente aceptable para la JSAF y los Prestamistas Requeridos;

(xiii)    la Declaración de Divulgación no ha sido aprobada el o antes del 30 de abril de 2023; o

(xiv)    la Orden de Confirmación no ha sido aprobada por el Tribunal de Título III el o antes del 31 de agosto de 2023.

(b)    Este Acuerdo quedará automáticamente rescindido en la Fecha de Vigencia del Plan.

(c)    La fecha en la que este Acuerdo es rescindido de conformidad con las disposiciones de la Sección 9.01, la Sección 9.02(a) o la Sección 9.02(b) se denominará "**Fecha de Rescisión**". En la Fecha de Rescisión, las disposiciones de este Acuerdo terminarán, excepto según se disponga lo contrario en este Acuerdo, a menos que la JSAF y los Prestamistas Requeridos renuncien por escrito a la ocurrencia del Evento de Rescisión que dé lugar a la ocurrencia de dicha Fecha de Rescisión. Sin perjuicio de (1) cualquier Cesión de Préstamos de Líneas de Combustible de conformidad con este Acuerdo o (2) la rescisión de este Acuerdo de conformidad con sus términos, los acuerdos y obligaciones de las partes en la Sección 10 (que no sea la Sección 10.03) y cualquier acuerdo de confidencialidad vigente antes de la fecha del presente entre la JSAF y cualquier Prestamista de Líneas de Combustible sobrevivirá a dicha Cesión y/o rescisión y continuará en pleno vigor y efecto para el beneficio de las Partes de acuerdo con los términos del presente y del mismo.

(d)    Si cualquier disposición material del Pliego de Términos (o el Plan que incorpora el Pliego de Términos) o de la Sección 5 o de esta Sección 9 es modificada, complementada o renunciada materialmente sin el consentimiento por escrito de un Prestamista de Líneas de Combustible de una manera materialmente adversa a tal Prestamista de Líneas de Combustible, dicho

Prestamista de Líneas de Combustible tendrá derecho a retirarse de este Acuerdo dentro de los cinco (5) días hábiles posteriores a la recepción de la notificación de dicha enmienda, modificación, complemento o renuncia mediante la entrega de una notificación de dicho retiro a los abogados de la JSAF y a los abogados de los Prestamistas de Líneas de Combustible. Dicho retiro entrará en vigencia dos (2) días hábiles después de la entrega de dicha notificación de retiro (en la medida en que dicha enmienda o retiro no sea rescindida), después de lo cual este Acuerdo quedará rescindido únicamente en lo que respecta a dicho Prestamista de Líneas de Combustible y dicho Prestamista de Líneas de Combustible no será ya parte del mismo.

(e)      Si en cualquier momento un Prestamista de Líneas de Combustible ya no es el propietario en usufructo de cualesquiera Préstamos de Líneas de Combustible como resultado de una Cesión que cumpla con la Sección 5 del presente, entonces este Acuerdo quedará rescindido únicamente con respecto a dicho Prestamista de Líneas de Combustible, y dicho Prestamista de Líneas de Combustible ya no será una Parte del presente a menos que y hasta tanto dicho Prestamista de Líneas de Combustible se convierta posteriormente en el propietario en usufructo de cualquier Préstamo de Líneas de Combustible, tras lo cual se considerará automáticamente como un Prestamista de Líneas de Combustible en virtud de este Acuerdo.

(f)      Ninguna Parte podrá rescindir este Acuerdo tras un Evento de Rescisión si el mismo es el resultado de un incumplimiento o inejecución injustificados por dicha Parte en cualquier aspecto material con los términos y condiciones de este Acuerdo, en el entendido de que, sin embargo, nada en esta Sección 9 eximirá a ninguna de las Partes de responsabilidad por cualquier incumplimiento o inejecución de este Acuerdo que ocurra antes de la Fecha de Rescisión.

## Sección 10.    *Disposiciones Varias*.

10.01.   Integridad del Acuerdo.  Este Acuerdo constituye el acuerdo completo entre las Partes con respecto a la transacción del Litigio Prioritario, el Plan y el proceso de reestructuración contemplado en el presente y reemplaza todos los acuerdos, declaraciones y actos previos orales o escritos entre las Partes con respecto al mismo. No obstante lo anterior, en la medida en que un Prestamista de Líneas de Combustible haya celebrado un acuerdo de confidencialidad con la JSAF antes de la fecha del presente, los términos de dicho acuerdo de confidencialidad seguirán aplicándose y permanecerán en pleno vigor y efecto de acuerdo con sus términos y este Acuerdo no reemplaza ningún derecho u obligación que de otro modo surja de dichos acuerdos de confidencialidad.

10.02.   Sólo Liberaciones Expresas.  Ninguna de las Partes renuncia o libera ningún derecho excepto lo dispuesto expresamente en el presente.

10.03.   Garantías Adicionales.  Sujeto a los otros términos de este Acuerdo, las Partes acuerdan ejecutar y entregar tales otros instrumentos y realizar tales actos, además de los asuntos especificados en este documento, a su cargo, según sea razonablemente apropiado o necesario, o según sea periódicamente requerido por orden del Tribunal de Título III, para hacer efectivos los términos de este Acuerdo.

10.04.   Encabezados.  Los encabezados de todas las secciones de este Acuerdo se insertan únicamente para la conveniencia de referencia y no son parte ni pretenden regir o limitar ningún término o disposición del mismo. Los encabezados pueden ayudar en la interpretación únicamente en la medida en que no sean incompatibles con las disposiciones expresas de este Acuerdo.

10.05.   DERECHO APLICABLE; SOMETIMIENTO A COMPETENCIA; SELECCIÓN DE

FUERO. ESTE ACUERDO SE REGIRÁ E INTERPRETARÁ DE ACUERDO CON LAS LEYES DEL ESTADO DE NUEVA YORK APLICABLES A LOS CONTRATOS HECHOS Y A SER REALIZADOS EN DICHO ESTADO, SIN DAR EFECTO A NINGÚN CONFLICTO DE PRINCIPIOS LEGALES QUE RESULTARÍAN EN LA APLICACIÓN DE LAS LEYES DE OTRA JURISDICCIÓN. Cada Parte iniciará cualquier acción o procedimiento con respecto a cualquier reclamación que surja de o se relacione con este Acuerdo ante el Tribunal de Título III (o tribunal de jurisdicción de apelación correspondiente) (el "**Tribunal Elegido**"), y únicamente en lo que respecta a las reclamaciones que surjan bajo este Acuerdo: (a) se somete irrevocablemente a la jurisdicción sobre la materia y sobre la persona del Tribunal Elegido; (b) renuncia a cualquier objeción a fijar jurisdicción para dicha acción o procedimiento en el Tribunal Elegido; y (c) renuncia a cualquier objeción de que el Tribunal Elegido es un foro inconveniente o no tiene jurisdicción sobre cualquiera de las Partes del presente. Si el Tribunal de Título III determina que carece de jurisdicción sobre la materia y la determinación se vuelve definitiva y ya no está sujeta a apelación, la acción se iniciará en el Tribunal de Distrito de los Estados Unidos para el Distrito Sur de Nueva York si tiene jurisdicción sobre la materia, y de lo contrario se iniciará en la Corte Suprema de Nueva York en Manhattan.

10.06.  Renuncia a Juicio por Jurado.   CADA PARTE DEL PRESENTE RENUNCIA IRREVOCABLEMENTE A CUALQUIER Y TODO DERECHO A UN JUICIO POR JURADO EN CUALQUIER PROCEDIMIENTO LEGAL QUE SURJA O SE RELACIONE CON ESTE ACUERDO O LAS TRANSACCIONES CONTEMPLADAS EN EL PRESENTE.

10.07.  Firma del Acuerdo.  Este Acuerdo puede ser firmado y entregado en cualquier número de contrapartes y por medio de firma y entrega electrónicas. Cada contraparte, una vez firmada y entregada, se considerará un original, y todas juntas constituirán el mismo acuerdo. Salvo que se disponga expresamente en este Acuerdo, cada individuo que firme este Acuerdo en nombre de una Parte ha sido debidamente autorizado y facultado para celebrar y entregar este Acuerdo en nombre de dicha Parte.

10.08.  Normas de Interpretación.   Cuando se haga una referencia en este Acuerdo a una sección o anexo, dicha referencia será a una sección o anexo, respectivamente, de o adjunto a este Acuerdo, a menos que se indique lo contrario. A menos que el contexto de este Acuerdo requiera lo contrario, (a) las palabras que usan el número singular o plural también incluyen el número plural o singular, respectivamente, (b) los términos "del presente", "aquí", "por el presente" y palabras derivadas o similares se refieren a la totalidad de este Acuerdo, (c) las palabras "incluyen", "incluye" e "incluyendo" cuando se usan en el presente se considerará que en cada caso van seguidas de las palabras "entre otros", y (d) la palabra "o " no será excluyente y se interpretará como "y/o". "Escritura", "escrito" y términos comparables se refieren a la impresión, mecanografiado y otros medios de reproducción de palabras (incluidos los medios electrónicos) en forma visible, y cualquier requisito de que cualquier notificación, consentimiento u otra información se proporcione "por escrito" incluirá el correo electrónico. Cualquier referencia a "día hábil" significa cualquier día, que no sea sábado, domingo o cualquier otro día en el que los bancos ubicados en Nueva York, estado de Nueva York estén cerrados al público como resultado de un feriado federal, estatal o local y cualquier otra referencia al día significa un día calendario.

10.09.  Interpretación; Representación por un Abogado. Este Acuerdo es el producto de negociaciones entre las Partes y en la aplicación o interpretación del mismo, debe interpretarse de manera neutral, y cualquier presunción con respecto a la interpretación a favor o en contra de cualquier Parte por razón de que esa Parte haya redactado o hecho que sea redactado este Acuerdo, o cualquier parte del mismo, no será efectiva con respecto a la interpretación del mismo. Cada una de las Partes

estuvo representada por un abogado durante las negociaciones y la redacción de este Acuerdo y continúan estando representadas por un abogado y, por lo tanto, renuncian a la aplicación de cualquier ley, reglamento, cláusula o norma de interpretación que disponga (a) que las ambigüedades en un acuerdo u otro documento se interpretarán en contra de la parte que redacta dicho acuerdo o documento o (b) cualquier Parte con una defensa contra la aplicación de los términos de este Acuerdo contra dicha Parte basándose en la falta de asesoría legal.

10.10.  Sucesores y Cesionarios; Sin Terceros Beneficiarios. Este Acuerdo tiene por objeto vincular y redundar en beneficio de las Partes y sus respectivos sucesores y cesionarios permitidos, según corresponda. No hay terceros beneficiarios en virtud de este Acuerdo, y los derechos u obligaciones de cualquier Parte en virtud de este Acuerdo no podrán ser cedidos, delegados o transferidos a ninguna otra persona o entidad, excepto según lo permitido en este documento.

10.11.  Notificaciones.   Todas las notificaciones en virtud del presente se considerarán entregadas si se dan por escrito y se envían por correo electrónico, servicio de mensajería o correo registrado o certificado (con acuse de recibo) (y si se hace por cualquier otro método que no sea el correo electrónico, luego con una copia por correo electrónico) a las siguientes direcciones (o en cualquier otra dirección que se especifique por medio de notificación similar):

(a)   Si va dirigida a la JSAF, enviarla a:

Proskauer Rose LLP
11 Times Square
New York, NY 10036
Atención: Martin Bienenstock, Paul V. Possinger, y Ehud Barak
Correo electrónico: mbienenstock@proskauer.com;
ppossinger@proskauer.com; ebarak@proskauer.com

(b)   Si va dirigida a los Prestamistas de Líneas de Combustible, enviarla a:

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York 10019
Atención: Richard Mason y Stephanie Marshak
Correo electrónico: rgmason@wlrk.com; samarshak@wlrk.com

o a cualquier otra dirección que haya sido proporcionada por una Parte a cada una de las otras Partes mediante notificación dada de conformidad con los requisitos establecidos anteriormente. Cualquier notificación dada por entrega, correo (electrónico o de otro tipo) o servicio de mensajería será efectivo al momento de su recepción.

10.12.  Análisis Independiente.  Cada Parte confirma que su decisión de celebrar este Acuerdo se ha basado en su evaluación independiente de los documentos y la información disponible para ella, según lo ha considerado apropiado.

10.13.  Renuncia.  Excepto según se indique expresamente en este documento, se considerará que ninguna Parte ha renunciado a ningún derecho como resultado de su celebración de este Acuerdo y, si este Acuerdo se rescinde por cualquier motivo, las Partes se reservan todos y cada uno de sus derechos.

10.14.  Relación Entre las Partes.  Sin perjuicio de cualquier disposición en contrario en el

presente, (a) los acuerdos, manifestaciones, garantías, responsabilidades, deberes y obligaciones de las Partes en virtud de este Acuerdo son, en todos los aspectos, individuales y no solidarios, (b) ninguna Parte tendrá ningún responsabilidad en virtud de este Acuerdo por ninguna negociación realizada por cualquier otra entidad; (c) ningún historial, patrón o práctica anterior de compartir confidencias entre las Partes afectará o negará de ninguna manera este Acuerdo; (d) las Partes por el presente reconocen que este Acuerdo no constituye un acuerdo, arreglo o entendimiento con respecto a actuar juntas con el propósito de adquirir, tener, votar o enajenar cualquier título valor de la AEE y las Partes no constituyen un "grupo" dentro del significado de la Regla 13d-5 de la Ley de Bolsa de Valores de 1934, según enmendada; (e) ninguna de las Partes tendrá ningún deber fiduciario, ningún deber de confianza de ninguna forma, u otros deberes o responsabilidades de cualquier tipo o forma entre sí; y (f) ninguna acción tomada por cualquiera de las Partes de conformidad con este Acuerdo se considerará que constituye o crea una presunción por parte de cualquiera de las Partes de que las Partes están actuando de alguna manera en concierto o como tal "grupo".

10.15.  Cumplimiento Específico. Cada una de las Partes reconoce que las indemnizaciones monetarias son un remedio insuficiente para cualquier incumplimiento de este Acuerdo por cualquiera de las Partes y cada Parte que no incumpla tendrá derecho a buscar el cumplimiento específico y medidas cautelares u otras medidas equitativas como remedio para dicho incumplimiento de este Acuerdo, incluyendo, entre otras, una orden del Tribunal de Título III o cualquier otro tribunal de jurisdicción competente exigiendo a cualquier Parte que cumpla con prontitud con cualquiera de sus obligaciones en virtud del presente. Sin perjuicio de cualquier disposición en contrario contenida en este Acuerdo, el cumplimiento específico y la medida cautelar u otra medida similar y el derecho a rescindir este Acuerdo de conformidad con los términos y disposiciones del presente serán los únicos y exclusivos recursos para cualquier incumplimiento de este Acuerdo por cualquiera de las Partes (o cualquier otra persona) y ninguna Parte (o ninguna otra persona) tendrá derecho a una indemnización monetaria por cualquier incumplimiento de cualquier disposición de este Acuerdo. Para no dejar lugar a dudas, cualquier derecho de consentimiento, derecho de rescisión o derecho de retiro otorgado a un Prestamista de Líneas de Combustible en virtud de este Acuerdo será acumulativo y no en lugar de cualquier otro derecho de consentimiento, derecho de rescisión o derecho de retiro otorgado a dicho Prestamista de Líneas de Combustible en virtud al presente. Las Partes reconocen y acuerdan que la notificación de rescisión por parte de cualquier Prestamista de Líneas de Combustible de conformidad con este Acuerdo no constituirá una violación de la paralización automática; siempre y cuando nada de lo aquí dispuesto perjudique ningún derecho a argumentar que la entrega de la notificación de rescisión no se realizó de acuerdo con los términos de este Acuerdo.

10.16.  Divisibilidad e Interpretación. Si un tribunal de jurisdicción competente considera que alguna disposición de este Acuerdo es ilegal, inválida o inaplicable, ya sea en todo o en parte, las Partes negociarán de buena fe para modificar este Acuerdo a fin de que se haga efectiva la intención original de las Partes en la forma más cercana posible de una manera razonablemente aceptable para que las transacciones contempladas en el presente se consuman como se contemplaron originalmente en la mayor medida posible si el nuevo acuerdo proporciona a cada Parte un resultado económico que no sea materialmente adverso a su resultado económico original. Si no se puede reconstruir el mismo resultado económico sin necesidad de hacer cambios materiales, este Acuerdo quedará rescindido y cada Parte recuperará los derechos que tenía al momento de celebrar este Acuerdo.

10.17.  Divulgación Pública. Cualquier presentación pública de este Acuerdo, ante el Tribunal de Título III o de otro modo, que incluya páginas de firma ejecutadas de este Acuerdo incluirá dichas páginas de firma solo en forma redactada con respecto a los Préstamos de Líneas de Combustible en poder de cada Prestamista de Líneas de Combustible. Para no dejar lugar a dudas, nada en este Acuerdo

absuelve a los Prestamistas de Líneas de Combustible de sus deberes de cumplir con la Regla de Quiebras 2019 y la Orden de Administración de Casos en el Caso de Título III.

10.18.  <u>Discusiones de Transacción</u>. Este Acuerdo es parte de una transacción de conciliación propuesta de asuntos que de otro modo podrían ser objeto de litigio entre las Partes. Este Acuerdo es producto de la mediación ordenada por el Tribunal de Título III el día 8 de abril de 2022, y todas las negociaciones relacionadas con el mismo están sujetas a la *Orden que Establece los Términos y Condiciones de la Mediación (Asiento de Expediente Núm. 2773 en el Caso Núm. 17-4780)*, según dicha orden pueda ser enmendada, reformulada, complementada o de otro modo modificada periódicamente. Además, de conformidad con la Regla 408 de las Reglas Federales de Evidencia, con cualquier regla de evidencia estatal aplicable y con cualquier otra ley aplicable, ya sea extranjera o nacional, ni este Acuerdo ni ninguna de las negociaciones relacionadas con el mismo serán admisibles como evidencia en ningún procedimiento que no sea un procedimiento para hacer cumplir sus términos.

[*El resto de la página se dejó en blanco intencionalmente.*]

**EN FE DE LO CUAL,** las Partes han firmado este Acuerdo en el día y año antes indicados.

Junta de Supervisión y Administración Financiera
para Puerto Rico

Por: _____

Nombre: Jaime A. El Koury
Título: Asesor Jurídico

[Página de Firmas del Acuerdo de Transacción y Apoyo al Plan]

**[LAS PÁGINAS DE FIRMAS DE LOS PRESTAMISTA DE LÍNEAS DE COMBUSTIBLE HAN SIDO CENSURADAS]**

[Página de Firmas del Acuerdo de Transacción y Apoyo al Plan]

## Anexo A

**Pliego de Términos**

PLIEGO DE TÉRMINOS DEL PLAN

*Este Pliego de Términos del Plan no aborda todos los términos materiales que se requerirían en los documentos definitivos y para consumar las transacciones establecidas en el Acuerdo de Transacción y Apoyo al Plan (el "**PSA**" o el "**Acuerdo**") al cual se encuentra anexo este Pliego de Términos del Plan, y en este Pliego de Términos del Plan, cuyos términos serán acordados mutuamente por las Partes. Nada en este Pliego de Términos del Plan constituirá un compromiso vinculante de ninguna de las Partes ni constituirá una admisión o representación de cualquier hecho o circunstancia o una admisión de cualquier responsabilidad o renuncia a cualquier derecho o reclamación. A menos que y hasta tanto se lleve a cabo la firma de la documentación definitiva, las Partes conservarán sus respectivos derechos. De firmarse, prevalecerán los términos de dicha documentación definitiva. Este Pliego de Términos del Plan no es (ni se interpretará que sea) una oferta con respecto a ningún título valor o solicitud de votos para la aceptación de un plan de ajuste para los fines de PROMESA, secciones 1125 y 1126 del Código de Quiebras o de otra manera.*

*Los términos en mayúscula que se usen pero que no se encuentren definidos en el presente, tendrán los significados que se les atribuyan a dichos términos en el PSA.*

| | |
|---|---|
| **PERMISIBILIDAD Y CLASIFICACIÓN DE RECLAMACIONES** | ▪ Las reclamaciones de los Prestamistas de Líneas de Combustible se considerarán permitidas (no sujetas a impugnación, objeción o revocación) en el Monto de Reclamación Previo a la Petición de los Prestamistas de Líneas de Combustible y se tratarán colectivamente como una clase de reclamaciones, distinta de todas las demás clases de reclamaciones, sin ninguna distinción en el trato entre las reclamaciones que surjan de la Línea Scotia y la Línea Citi. |
| **DEVENGO DE INTERESES** | ▪ Los Prestamistas de Líneas de Combustible tendrán derecho a intereses sobre los Bonos Serie A que se les emitirán bajo el Plan a la Razón de Cambio a continuación, cuya acumulación comenzará en la Fecha de Vigencia del Acuerdo y continuará hasta la Fecha de Vigencia del Plan, a una tasa del 6.0% anual; disponiéndose que la cantidad de interés acumulado antes de la Fecha de Vigencia del Plan no deberá exceder un (1) año de acumulación. Los intereses devengados en virtud del presente serán pagaderos a la Fecha de Vigencia del Plan en forma de Bonos Serie A adicionales o en efectivo, a criterio exclusivo de la JSAF. |
| **RAZÓN DE CAMBIO** | ▪ 84% del Monto de Reclamación Previo a la Petición de los Prestamistas de Líneas de Combustible, pagadero en forma de Bonos Serie A. |
| **NUEVOS BONOS** | ▪ Además de la contraprestación en efectivo pagada en la Fecha de Vigencia del Plan, la AEE reorganizada ("**AEE Reorganizada**") emitirá a los acreedores de la AEE en la Fecha de Vigencia del Plan, solamente Bonos Serie A, Bonos Serie B u otros bonos, siempre que tales otros bonos (a) estén subordinados en la prioridad de pago de capital a los Bonos Serie A, (b) no afecten de ninguna manera los términos de los Bonos Serie A establecidos en este Pliego de Términos, y (c) no estén garantizados por ninguna garantía que no se haya pignorado para los Bonos Serie A. |
| **CARGO DE** | ▪ Cargo de Transición significa un cargo híbrido de conexión y un cargo volumétrico que se agregará a las facturas de los clientes para el pago de |

| TRANSICIÓN | los Nuevos Bonos, en una estructura y montos que no cambien la fecha esperada de repago y la vida promedio ponderada esperada de los Bonos Serie A según se establece en el presente, y que sean por lo demás razonablemente aceptables para los Prestamistas Requeridos. |
|---|---|
| BONOS SERIE A | ▪ Los Bonos Serie A, a ser emitidos únicamente a favor de los Prestamistas de Líneas de Combustible, tendrán primera prioridad en la amortización del capital tras el pago de los intereses devengados de todos los Nuevos Bonos en circulación.<br><br>▪ En caso de no ser pagados al Vencimiento Final de los Bonos Serie A, los Bonos Serie A permanecerán en circulación hasta que sean pagados en su totalidad en efectivo, pero dejarán de devengar intereses a partir del Vencimiento Final de los Bonos Serie A. |
| BONOS SERIE B | ▪ Los Bonos Serie B se distribuirán a (a) los tenedores de Préstamos de Líneas de Combustible por un monto equivalente a las Reclamaciones Restantes de los Prestamistas de Líneas de Combustible y en el cumplimiento de las condiciones establecidas a continuación bajo las Protecciones de Tratamiento y (b) otros acreedores de la AEE.<br><br>▪ No se pagará capital de los Bonos Serie B hasta tanto los Bonos Serie A hayan sido pagados íntegramente en efectivo. A partir de entonces, los Bonos Serie B recibirán el 100% de los ingresos del Cargo de Transición, que se aplicarán en primer lugar a los intereses vencidos y pagaderos y en segundo lugar al capital.<br><br>▪ En caso de no ser pagados al Vencimiento Final de los Bonos Serie B, los Bonos Serie B permanecerán en circulación hasta que sean pagados en su totalidad en efectivo, pero dejarán de devengar intereses a partir del Vencimiento Final de los Bonos Serie B. |
| VENCIMIENTO FINAL | ▪ Bonos Serie A: Vencimiento final declarado de 15 años[1] (amortización esperada de 5 años; vida promedio ponderada esperada de 3 años).<br><br>▪ Bonos Serie B: Vencimiento final declarado de 50 años (amortización esperada de 35 años).<br><br>Los períodos de amortización esperados se basan en la demanda del Plan Fiscal, los datos de los clientes y las tarifas incluidas en la propuesta de la JSAF del 8 de noviembre de 2022 a los Prestamistas de Líneas de Combustible, sujeto a la Cascada de Pago. |
| CUPÓN | ▪ Bonos Serie A:  6.00% de interés en efectivo<br><br>▪ Bonos Serie B:  6.00% de interés en efectivo |
| TRATAMIENTO FISCAL | ▪ Bonos Serie A:  Exento de impuestos<br><br>▪ Bonos Serie B:  Exento de impuestos |

---

[1] Sujeto a modificación con base en convenios acordados y Cargo de Transición, a ser negociado entre las Partes.

| | |
|---|---|
| **PROTECCIÓN CONTRA DERECHO DE REDENCIÓN** | ▪ Bonos Serie A: Redimible después de 10 años a la par<br>▪ Bonos Serie B: Redimible después de 10 años a la par |
| **GARANTÍA** | ▪ Los Nuevos Bonos estarán garantizados y pagados únicamente con los ingresos netos de la AEE Reorganizada, y el derecho a recibir dichos ingresos netos, hasta el monto de los ingresos del Cargo de Transición, de acuerdo con la Cascada de Pago. Para no dejar lugar a dudas, los gravámenes y reclamaciones sobre los Nuevos Bonos no se limitan a los ingresos netos depositados en el Fondo de Amortización de la Deuda. |
| **CUENTAS Y CASCADA DE PAGO** | ▪ Todos los ingresos se depositarán en el fondo general de la AEE Reorganizada.<br>▪ El primer día hábil de cada mes, la AEE Reorganizada aplicará las cantidades en el siguiente orden de prioridad (la "**Cascada de Pago**"):<br>- *Primero*, al pago de los Gastos de Explotación;[2]<br>- *Segundo*, al pago de los honorarios y gastos del fideicomisario de Nuevos Bonos que no excedan $100,000 por año;<br>- *Tercero,* al Fondo de Amortización de la Deuda (según se define a continuación) hasta el monto de los ingresos del Cargo de Transición (que se distribuirá de acuerdo con las disposiciones del presente);<br>- *Cuarto*, al pago de gastos de capital;<br>- *Quinto*, al pago de la deuda subordinada (si la hubiere); y<br>- *Sexto*, para fines corporativos generales. |
| **FONDO DE AMORTIZACIÓN DE LA DEUDA** | ▪ A partir de y después de la Fecha de Vigencia del Plan, hasta que los Nuevos Bonos hayan sido pagados o satisfechos en su totalidad de acuerdo con sus términos, la AEE Reorganizada depositará, de acuerdo con la Cascada de Pago, dineros hasta el monto de los ingresos del Cargo de Transición al crédito del "Fondo de Amortización de la Deuda" que estará en poder del fideicomisario de Nuevos Bonos. Tales dineros depositados en el Fondo de Amortización de la Deuda serán aplicados, en la medida disponible, por el fideicomisario de Nuevos Bonos:<br>- *Primero*, al pago de los intereses declarados vencidos y pagaderos de los Nuevos Bonos;<br>- *Segundo*, al pago del capital de los Bonos Serie A hasta su amortización; y<br>- *Tercero*, al pago del capital de los Bonos Serie B. |

[2] "***Gastos de Explotación***" significará los gastos corrientes razonables y necesarios de la AEE Reorganizada para mantener, reparar y operar el sistema e incluirá, sin limitar la generalidad de lo anterior, todos los gastos administrativos, primas de seguros, gastos de estudios preliminares no imputables a gastos de capital, gastos de ingeniería relacionados con operación y mantenimiento, gastos legales, cualquier pago a fondos de pensión, fideicomiso de pensión o fondos de retiro, y todos los demás gastos que la AEE Reorganizada deba pagar conforme a las disposiciones de la documentación definitiva que rige los Nuevos Bonos o por ley, o permitidos por las prácticas estándar para sistemas de servicios públicos, más una reserva de hasta dos meses de gastos para lo anterior según lo estime razonablemente la AEE Reorganizada periódicamente.

| | |
|---|---|
| **CONVENIO DE TASA DE INTERÉS** | ▪ Hasta la amortización de los Bonos Serie A o el Vencimiento Final de los Bonos Serie A, lo que ocurra primero, si en un año determinado, los ingresos del Cargo de Transición depositados en el Fondo de Amortización de la Deuda son insuficientes para satisfacer los intereses vencidos y pagaderos sobre los Nuevos Bonos ese año fiscal, la AEE Reorganizada deberá (y en ausencia de la acción de la AEE Reorganizada, el fideicomisario de Nuevos Bonos o un síndico en nombre de los Nuevos Bonos deberá) (a) ejercer sus poderes en la máxima medida de la ley para implementar un aumento en el Cargo de Transición suficiente para reembolsar dichos intereses adeudados y pagaderos sobre los Nuevos Bonos en el año fiscal siguiente y/o (b) iniciar un caso de tasa ante el NEPR o cualquier otro procedimiento para obligar al NEPR a implementar un aumento en el Cargo de Transición suficiente para reembolsar dichos intereses adeudados y pagaderos sobre los Nuevos Bonos en el año fiscal subsiguiente (el "**Convenio de Tasa de Interés**"). |
| **INCUMPLIMIENTO DE PAGO** | ▪ No habrá ningún evento de incumplimiento de los Nuevos Bonos por falta de pago de la amortización de la deuda programado antes del Vencimiento Final, según corresponda, siempre que la AEE Reorganizada (a) cobre y emplee sus mejores esfuerzos razonables para recaudar los ingresos generados por el Cargo de Transición, y el monto total cobrado bajo el Cargo de Transición se deposite en el Fondo de Amortización de la Deuda de acuerdo con la Cascada de Pago y (b) cumpla con el Convenio de Tasa de Interés. |
| **RECURSOS** | ▪ Ante la ocurrencia de un evento de incumplimiento, los únicos recursos del fideicomisario de Nuevos Bonos serán: (a) procurar el cumplimiento de la obligación de la AEE Reorganizada de tomar medidas razonables para recaudar los ingresos generados por el Cargo de Transición y depositar dichos dineros recibidos en el Fondo de Amortización de la Deuda de conformidad con la Cascada de Pago, y/o (b) antes del Vencimiento Final, según corresponda, a solicitud del 25% o más de los Bonos Serie A, hacer cumplir el Convenio de Tasa de Interés. <br><br> ▪ El Plan y el Contrato de Emisión de Nuevos Bonos dispondrá que el "Derecho a la Sindicatura en Caso de Incumplimiento", codificado en 22 L.P.R.A. § 207, es precedida y renunciada. No existirá ningún derecho de aceleración en virtud de los Nuevos Bonos que no sea una aceleración en relación con un procedimiento de insolvencia (incluyendo el Título III de PROMESA). <br><br> ▪ La JSAF hará los mejores esfuerzos razonables para obtener la aprobación del NEPR y las protecciones ordenadas por el tribunal para el Convenio de Tasas de Interés y las obligaciones de la AEE Reorganizada de cobrar, recaudar y pagar los ingresos del Cargo de Transición según lo dispuesto en este documento. Para no dejar lugar a dudas, los mejores esfuerzos razonables con respecto a la oración anterior incluyen la incorporación de tales protecciones en el borrador de la Orden de Confirmación presentado ante el Tribunal de Título III. |

| PROTECCIONES DE TRATAMIENTO | ▪ Si la JSAF y la AEE prevalecen o acuerdan llegar a una transacción de conciliación sobre el litigio contra los tenedores de bonos de la AEE [Pro. Cont. Núm. 19-00391], y como resultado de ello existen Bonos Serie B a ser emitidos bajo el Plan disponibles para distribución en exceso de los Bonos Serie B asignados para el tratamiento inicial de reclamaciones, la Reclamación Restante[3] de los Prestamistas de Líneas de Combustible (que equivale a 16% del Monto de Reclamación Previo a la Petición de los Prestamistas de Líneas de Combustible) recibirá dicho exceso de Bonos Serie B a prorrata con las Reclamaciones Restantes de los acreedores quirografarios de la AEE (incluyendo las Reclamaciones Restantes de cualquier clase de tenedores de bonos en transacción de conciliación y reclamaciones de pensión); siempre y cuando los Prestamistas de Líneas de Combustible no reciban Nuevos Bonos que excedan el Monto de Reclamación Previo a la Petición de los Prestamistas de Líneas de Combustible, excepto según lo dispuesto a continuación para Costos de Consumación y Reembolso de Honorarios Profesionales, según corresponda. |
|---|---|
| DESASTRES DECLARADOS FEDERALMENTE | ▪ En caso de un desastre declarado por el gobierno federal como resultado de una tormenta u otro evento catastrófico que interrumpa las operaciones de la AEE Reorganizada de tal manera que la AEE Reorganizada no pueda recaudar los ingresos del Cargo de Transición necesarios para cubrir los Gastos de Explotación y la amortización de la deuda pagaderos sobre los Nuevos Bonos para un determinado año fiscal, la AEE Reorganizada podrá optar, a su entera discreción, por diferir la amortización de la deuda hasta en dos (2) pagos semestrales consecutivos de la amortización de la deuda.<br><br>▪ Para no dejar lugar dudas, si la AEE Reorganizada ejerce tal elección, los intereses sobre los Nuevos Bonos continuarán acumulándose hasta que se paguen. Todo el capital e intereses diferidos relacionados con dichos Bonos Serie A afectados por dicha elección se pagarán en o antes de lo que ocurra primero entre el Vencimiento Final de los Bonos Serie A o cinco (5) años después del final de dicho período de diferimiento de la amortización de la deuda. |
| DOCUMENTACIÓN DEFINITIVA | ▪ Los Nuevos Bonos se documentarán en virtud de un contrato de emisión o contrato de fideicomiso en los términos establecidos en el Acuerdo y este Pliego de Términos y, de lo contrario, en los términos habituales para transacciones de este tipo, según lo negociado entre los Prestamistas de Líneas de Combustible, la JSAF y otros posibles tenedores de Bonos Serie B conforme al Plan, según corresponda, cuyos términos serán razonablemente aceptables para la JSAF y los Prestamistas Requeridos. Sin perjuicio de lo anterior, los Nuevos Bonos, una vez emitidos, |

---

[3] "*Reclamación Restante*" significa, con respecto a cualquier reclamación permitida, el monto de dicha reclamación permitida que no haya sido pagado, después de restar del monto total de la reclamación permitida, el tratamiento, si lo hubiere, que dicho tenedor haya recibido a causa de dicha reclamación permitida al momento de calcular la Reclamación Restante.

| | |
|---|---|
| | quedarán sujetos a una "prueba de bonos adicionales" a ser acordada entre las Partes en los Documentos Definitivos. |
| **GASTOS DE CONSUMACIÓN Y REEMBOLSO DE HONORARIOS PROFESIONALES** | ▪ En contraprestación por la asistencia de los Prestamistas de Líneas de Combustible en la formulación del plan de ajuste y para compensar por los honorarios y gastos razonables incurridos en la negociación y celebración del Acuerdo, y la documentación definitiva de dicho Acuerdo, los Prestamistas de Líneas de Combustible recibirán (a) costos de consumación por $15 millones y (b) un reembolso de hasta $11 millones en honorarios profesionales documentados, pagaderos a la Fecha de Vigencia del Plan en forma de Bonos Serie A adicionales o en efectivo, a criterio exclusivo de la JSAF. Los Costos de Consumación se pagarán prorrateados a cada Prestamista de Líneas de Combustible, incluyendo los Cesionarios Calificados después de que se conviertan en Prestamistas de Líneas de Combustible de conformidad con la Sección 5 del Acuerdo. El Reembolso de Honorarios Profesionales se asignará de la siguiente manera: 10% al Prestamista de Líneas de Combustible registrado a la Fecha de Vigencia del Acuerdo (parte del PSA a la Fecha de Vigencia del Acuerdo) bajo la Línea Citi y 90% a los Prestamistas de Líneas de Combustible (parte del PSA a la Fecha de Vigencia del Acuerdo) bajo la Línea Scotia (y prorrateado entre dichos Prestamistas de Líneas de Combustible). Para no dejar lugar a dudas, el Reembolso de Honorarios Profesionales no será pagadero a los Cesionarios Calificados. |
| **RELEVO** | ▪ Las Partes se relevarán mutuamente en la medida máxima permitida por la ley. A solicitud de la JSAF, los Prestamistas de Líneas de Combustible relevarán a cualquier otra parte interesada que pudiera ser responsable por los Préstamos de Líneas de Combustible. |

**<u>Anexo B</u>**

**Formulario de Adhesión**

## FORMULARIO DE ACUERDO DE ADHESIÓN

Este Acuerdo de Adhesión (el "**Acuerdo de Adhesión**") al Acuerdo de Transacción y Apoyo al Plan (según periódicamente enmendado, complementado o de otro modo modificado, el "**Acuerdo**"), con fecha del 1 de diciembre de 2022, celebrado por y entre: (i) la Junta de Supervisión y Administración Financiera para Puerto Rico ("**JSAF**"), como representante de Título III de la Autoridad de Energía Eléctrica de Puerto Rico ("**AEE**"), y (ii) todos los tenedores de Préstamos de Líneas de Combustible, según identificados en el **Anexo A** del mismo y parte del mismo, según dichos tenedores puedan cambiar periódicamente de conformidad con la Sección 5(e) del mismo (colectivamente, los "**Prestamistas de Líneas de Combustible**"), es celebrado y entregado por [_____] (el "**Prestamista de Líneas de Combustible a Incorporarse**" ) a partir del _____ de 202_. Cada término en mayúscula utilizado pero no definido en el presente tendrá el significado establecido en el Acuerdo.

1.  <u>Acuerdo a Obligarse</u>. Por medio del presente, el Prestamista de Líneas de Combustible a Incorporarse acepta estar sujeto a todos los términos del Acuerdo, incluyendo que el Prestamista de Líneas de Combustible a Incorporarse asumirá todos los derechos (incluyendo, entre otros, el derecho a los Costos de Consumación, pero no el derecho al Reembolso de Honorarios Profesionales) y obligaciones (incluyendo, entre otras, la obligación de pagar su parte proporcional de los honorarios y gastos adeudados en virtud de las Facilidades de Líneas de Combustible) de un Prestamista de Líneas de Combustible en virtud del Acuerdo. En adelante, se considerará que el Prestamista de Líneas de Combustible a Incorporarse es un "Prestamista de Líneas de Combustible" y una Parte a todos los efectos del Acuerdo, incluyendo, para no dejar lugar a dudas, con respecto a cualquier Préstamo de Líneas de Combustible en poder del Prestamista de Líneas de Combustible a Incorporarse a la fecha de este Acuerdo de Adhesión.

2.  <u>Manifestaciones y Garantías</u>. Con respecto al monto de capital agregado de los Préstamos de Líneas de Combustible en poder del Prestamista de Líneas de Combustible a Incorporarse, incluso tras la consumación de la Cesión de Préstamos de Líneas de Combustible al Prestamista de Líneas de Combustible a Incorporarse, por medio del presente el Prestamista de Líneas de Combustible a Incorporarse hace, a partir de la fecha del presente, las manifestaciones y garantías de los Prestamistas de Líneas de Combustible establecidas en las Secciones 6.01 y 6.02 del Acuerdo a cada una de las otras Partes del Acuerdo.

3.  <u>Derecho Aplicable</u>. La Sección 10.05 del Acuerdo se tiene aquí por reproducida como si a la letra se insertase, excepto que cualquier referencia al "Acuerdo" se reemplazará con referencias al "Acuerdo de Adhesión".

\* \* \* \* \*

[EL RESTO DE ESTA PÁGINA SE HA DEJADO EN BLANCO INTENCIONALMENTE]

EN FE DE LO CUAL, el Prestamista de Líneas de Combustible a Incorporarse ha hecho que se firme este Acuerdo de Adhesión en la fecha establecida anteriormente.


**[NOMBRE DE LA INSTITUCIÓN]**


Por: _____

Nombre: _____

Cargo: _____

Dirección:

Atención:

Correo electrónico:


Monto del capital de los Préstamos de Líneas de Combustible de propiedad en usufructo del Prestamista de Líneas de Combustible a Incorporarse, o de propiedad en usufructo de cuentas por las cuales el Prestamista de Líneas de Combustible a Incorporarse tiene responsabilidad de gestión de inversiones, sobre las cuales tendría derecho a votar en una solicitud de plan: $_____ (total)


$_____ (Línea Citi)

$_____ (Línea Scotia)


[Página de Firmas del Acuerdo de Adhesión al RSA Preliminar]

## Apéndice A

**Relación de Prestamistas de Líneas de Combustible**

**[CENSURADO]**