# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

------------------------------------------------------------------------ x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

      as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al*.,

      Debtors.

PROMESA
Title III

Case No. 17-BK-3283 (LTS)

(Jointly Administered)

------------------------------------------------------------------------ x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

      as representative of

PUERTO RICO ELECTRIC POWER AUTHORITY, *et al*.,

      Debtors.

PROMESA
Title III

Case No. 17-BK-4780 (LTS)

------------------------------------------------------------------------ x

## OMNIBUS OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO (I) DISCLOSURE STATEMENT FOR TITLE III PLAN OF ADJUSTMENT OF <u>PUERTO RICO ELECTRIC POWER AUTHORITY AND (II) RELATED MOTIONS</u>

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................. 1

BACKGROUND .................................................................................... 6

I.      SUMMARY OF NEW BONDS WATERFALL UNDER PLAN.................... 7

OBJECTION........................................................................................ 13

I.      LEGAL STANDARD.................................................................... 13

II.    DISCLOSURE STATEMENT CANNOT BE APPROVED BECAUSE IT DOES
NOT PROVIDE ADEQUATE INFORMATION ........................................ 15

     A.    Disclosure Statement's Description of Plan is Too Complicated and
Contains Too Many Contingencies to Provide Adequate Information............... 15

     B.    Inadequate Disclosures Regarding Creditor Recoveries..................................... 18

          i.    *Failure to Provide Useful Estimate of Estimated Recoveries for
General Unsecured Claims (Class 5)* ...................................................... 19

               1.    Failure to Provide Basis for Estimate of Class Size ................... 20

               2.    Inadequate Disclosures Regarding Avoidance Action Trust....... 23

          ii.    *Disclosure Statement Does Not Answer Important Questions About
Preferential Treatment of Fuel Line Lenders* ......................................... 25

               1.    Disclosure Statement Does Not Disclose Fuel Line Lenders
Will Receive More than 84%....................................................... 26

               2.    Disclosure Statement Does Not Disclose Basis for
Preferred Treatment of Fuel Line Lenders as Compared to
General Unsecured Creditors in Class 5 ..................................... 28

          iii.   *Inadequate Disclosures Regarding Terms of Key Settlements* ............... 30

          iv.   *Inadequate Disclosures Regarding Feasibility, Legacy Charge,
and Possibility of Fully Secured Bondholders* ........................................ 32

          v.    *Other Inadequacies of Disclosure* .......................................................... 35

               1.    Inadequate Disclosures Regarding Value and Availability
of PREPA's Assets ...................................................................... 35

               2.    Inadequate Disclosures Regarding Pending Litigation................ 37

III.   DISCLOSURE STATEMENT CANNOT BE APPROVED BECAUSE PLAN IS
PATENTLY UNCONFIRMABLE .............................................................. 38

     A.    Plan Is Unfairly Discriminatory.......................................................... 39

IV.   SOLICITATION PROCEDURES OBJECTION ............................................ 42

V.    CONFIRMATION PROCEDURES MOTION OBJECTION ......................... 44

RESERVATION OF RIGHTS ................................................................... 46

**TABLE OF CONTENTS**
(continued)

**Page**

CONCLUSION.................................................................................................................... 46

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Acemla de P.R. Inc.*,
   No. 17-02021 ESL, 2019 WL 311008 (Bankr. D.P.R. Jan. 22, 2019) ...................................14

*In re Am. Capital Equip., LLC*,
   688 F.3d 145 (3d Cir. 2012) .................................................................................................38

*Am. United Mut. Life Ins. Co. v. City of Avon Park*,
   311 U.S. 138 (1940) .............................................................................................................26

*In re Armstrong World Indus., Inc.*,
   348 B.R. 111 (D. Del. 2006) ................................................................................................39

*In re Arnold*,
   471 B.R. 578 (Bankr. C.D. Cal. 2012) .................................................................................33

*In re City of Detroit*,
   524 B.R. 147 (Bankr. E.D. Mich. 2014) .........................................................................25, 26

*In re Cnty. of Orange*,
   219 B.R. 543 (Bankr. C.D. Cal. 1997) .............................................................................13, 36

*Cnty. of Orange v. Merrill Lynch & Co. (In re County of Orange)*,
   191 B.R. 1005 (Bankr. C.D. Cal. 1996) ...........................................................................25, 36

*In re Coalinga Reg'l Med. Ctr.*,
   608 B.R. 746 (Bankr. E.D. Cal. 2019) .................................................................................13

*In re Connector 2000 Ass'n*,
   447 B.R. 752 (Bankr. D.S.C. 2011) .................................................................................25, 36

*In re Copy Crafters Quickprint, Inc.*,
   92 B.R. 973 (Bankr. N.D.N.Y. 1988) ..................................................................................16

*In re DeLeo*,
   No. 21-20025, 2022 WL 1072857 (Bankr. D. Me. Apr. 8, 2022) ...........................................41

*In re Delphi Corp.*,
   No. 05-44481 (Bankr. S.D.N.Y. Jan. 12, 2007) [Docket No. 7118].......................................28

*In re El Comandante Mgmt. Co.*,
   359 B.R. 410 (Bankr. D.P.R. 2006) ......................................................................................38

Table of Authorities

(continued)

Page(s)

*In re Ferretti*,
128 B.R. 16 (Bankr. D.N.H. 1991) ...............................................................14, 15

*Fleet Cap. Corp. v. Yamaha Motor Corp., U.S.A.*,
No. 01 Civ. 1047 (AJP), 2002 WL 31174470 (S.D.N.Y. Sept. 26, 2002).............................41

*In re Forest Grove*,
448 B.R. 729 (Bankr. D.S.C. 2011) ...............................................................16

*In re Franklin Indus. Complex, Inc.*,
386 B.R. 5 (Bankr. N.D.N.Y. 2008) ...............................................................17

*In re Fullmer*,
No. 09-50086-RLJ-11, 2009 WL 2778303 (Bankr. N.D. Tex. Sept. 2, 2009) .......................30

*In re H & W Ents., Inc.*,
19 B.R. 582 (Bankr. N.D. Iowa 1982) ...............................................................17

*Harper v. Oversight Comm. (In re Conco, Inc.)*,
855 F.3d 703 (6th Cir. 2017) ...............................................................32

*Int'l Asset Recovery v. Thomson McKinnon Sec. Inc.*,
335 B.R. 520 (S.D.N.Y. 2005)...............................................................27

*In re Jeppson*,
66 B.R. 269 (Bankr. D. Utah 1986) ...............................................................14

*Kobak v. Nat'l City Bank (In re Kobak)*,
280 B.R. 164 (Bankr. N.D. Ohio 2002) ...............................................................42

*In re Lapworth*,
No. 97-34529DWS, 1998 WL 767456 (Bankr. E.D. Pa. Nov. 3, 1998)................................25

*In re Ligon*,
50 B.R. 127 (Bankr. M.D. Tenn. 1985) ...............................................................24, 35

*Lorber v. Vista Irr. Dist.*,
127 F.2d 628 (9th Cir. 1942) ...............................................................24, 36

*Mid-Continent Racing & Gaming Co. I v. Sunflower Racing, Inc. (In re Sunflower Racing Inc.)*,
218 B.R. 972 (D. Kan. 1998) ...............................................................17

*In re Monroe Well Serv., Inc.*,
80 B.R. 324 (Bankr. E.D. Pa. 1987) ...............................................................19

Table of Authorities

(continued)

Page(s)

*In re Moshe*,
567 B.R. 438 (Bankr. E.D.N.Y. 2017)........................................................................39

*Nelson v. Dalkon Shield Claimants Tr. (In re A.H. Robins Co.)*,
216 B.R. 175 (Bankr. E.D. Va. 1997)...................................................................14, 19

*In re New Power Co.*,
313 B.R. 496 (Bankr. N.D. Ga. 2004) ......................................................................27

*In re Nutritional Sourcing Corp.*,
398 B.R. 816 (Bankr. D. Del. 2008) .........................................................................31

*In re Quigley Co.*,
377 B.R. 110 (Bankr. S.D.N.Y. 2007).......................................................................38

*Resol. Tr. Corp. v. Best Prods. Co. (In re Best Prods. Co., Inc.)*,
177 B.R. 791 (S.D.N.Y.1995), *aff'd*, 68 F.3d 26 (2d Cir.1995) ..............................31

*In re Rodriguez Gas & Oil, Inc.*,
No. 08-50152, 2008 WL 4533687 ............................................................................16

*In re Smith*,
77 B.R. 624 (Bankr. N.D. Ohio 1987).......................................................................41

*SNTL Corp. v. Centre Ins. Co. (In re SNTL Corp.)*,
571 F.3d 826 (9th Cir. 2009) ....................................................................................27

*In re Sparta Surgical Corp.*,
No. 06-cv-02601-REB, 2008 WL 878948 (D. Colo. Mar. 28, 2008)......................25

*In re Trib. Co.*,
972 F.3d 228 (3d Cir. 2020)......................................................................................39

*In re Tribune*,
472 B.R. 223 (Bankr. D. Del. 2012) .........................................................................40

*In re Werth*,
29 B.R. 220 (Bankr. D. Colo. 1983) .........................................................................15

**Statutes**

11 U.S.C. § 1103(c)(3)..............................................................................................44

**Other Authorities**

Fed. R. Bankr. P. 3018(a)..........................................................................................43

v

Table of Authorities

(continued)

Page(s)

N.D. Ill. R. 3016-1(1)(a) (rev. Apr. 19, 2022) ............................................................................26

To the Honorable United States District Judge Laura Taylor Swain:

The Official Committee of Unsecured Creditors (the "Committee"),[1] respectfully files this omnibus objection (the "Objection") to (i) the *Disclosure Statement for Title III Plan of Adjustment of the Puerto Rico Electric Power Authority* [Docket No. 23097] (the "Disclosure Statement")[2] and the related motion seeking, among other things, approval of the Disclosure Statement and PREPA's proposed solicitation procedures [Docket No. 23099] (the "Disclosure Statement Motion") and (ii) the *Motion of Puerto Rico Electric Power Authority for Order Establishing, Among Other Things, Procedures and Deadlines Concerning Objections to Confirmation and Discovery in Connection Therewith* [Docket No. 23100] (the "Confirmation Procedures Motion").  In support of its Objection, the Committee respectfully states as follows:[3]

## PRELIMINARY STATEMENT

1.      The purpose of a disclosure statement is to disclose adequate information to creditors so they can determine whether to vote to accept or reject the plan proposed by a debtor. Foremost among these disclosures are two fundamental questions confronting any creditor: What is my recovery under the plan?  And is that recovery fair?

2.      To answer the first of these questions, a creditor needs various details concerning the nature, form, and value of its recovery.  For example, a creditor needs to understand with whom it is sharing its recovery, whether its recovery is in cash or other assets (and, if other assets, the value of such assets), when it will receive its recovery, whether the recovery is

---

[1]    The Committee is the official committee of unsecured creditors for all Title III Debtors, other than PBA and COFINA.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Disclosure Statement.

[3]    To be clear, the Committee has had discussions with the Oversight Board in an attempt to resolve the Committee's concerns with the Plan, and will continue to try to come to an amicable resolution of all of the Committee's concerns, both with the Plan and with the Disclosure Statement.

conditioned on anything or subject to any contingencies, and what, if anything, has to happen for the debtor to be able to make distributions under its proposed plan.  The creditor ultimately needs to understand both its best-case scenario and worst-case scenario, and the likelihood of each. Similarly, to evaluate the fairness of its recovery, a creditor needs to know, among other things, what other creditors are receiving under the plan, and, if they are receiving a greater recovery, the basis for that disparate result.  It should be obvious that the more complex the proposed plan and disclosure statement, the more questions creditors are likely to have, and the more difficult it will be for creditors to be able to answer these questions.  It is, after all, much more difficult to put together a thousand piece puzzle than one with only one hundred pieces.

3.      In PREPA's case, the Disclosure Statement describes a jigsaw puzzle of epic proportions.  Indeed, the plan proposed by the Oversight Board is so complex, and subject to so many uncertainties and contingencies, that it is nearly impossible to provide general unsecured creditors with adequate information to understand and evaluate the answer to the most important question of "what is my recovery."  The Disclosure Statement ultimately falls far short of meeting this standard and, therefore, should not be approved.

4.      As an initial matter, the Disclosure Statement does not adequately convey to general unsecured creditors the value of their recoveries under the Plan because those recoveries are entirely dependent on a series of interrelated contingencies, including (i) the extent to which PREPA's Bondholders elect to become Settling Bondholders or, instead, choose to pursue the Amended Lien & Recourse Challenge and (ii) the resolution of the Amended Lien & Recourse Challenge, which can be resolved in at least three different ways.  Depending on the resolution of these contingencies, holders of General Unsecured Claims in Class 5 may receive a recovery of 0.1% or 100%, or pretty much anything in between.

5.      The Disclosure Statement also omits information that general unsecured creditors need in order to decide if the promised payments will actually be made (*i.e.*, information about the Plan's feasibility) and to evaluate the value of their non-cash recovery.  The Disclosure Statement further fails to explain to general unsecured creditors the basis for capping their recoveries based on an estimate of $800 million in General Unsecured Claims.

6.      In other words, not only does the Plan have thousands of pieces, but, according to the Disclosure Statement, many of the most important pieces have been left out of the box entirely, thus making it impossible to assemble the puzzle.  The Disclosure Statement goes to great lengths to attempt to describe these voids in the Plan, but, ironically, these efforts serve only to reinforce the point: even with hundreds of pages and numerous tables, charts, and illustrative recoveries, the Disclosure Statement cannot give general unsecured creditors a much more precise answer than that their recovery will range somewhere from 0.1% to 100%.

7.      As this Court is well aware, the Committee has been diligent (perhaps more so than any other stakeholder) in attempting to move PREPA's Title III case forward, especially as it relates to the threshold legal issues that will be resolved in the Amended Lien & Recourse Challenge (*i.e.*, the scope of the Bondholders' security interest and the non-recourse nature of their bond claims).  Unfortunately, progress has been slow to nonexistent in light of, among other things, the aborted 9019 Motion and nearly a year of unsuccessful mediation.  The Committee wholeheartedly supports a path to the successful restructuring of PREPA that will permit it to exit these Tile III cases after five and a half years.  Nonetheless, that end is not a basis to move forward with voting on a plan that fails to include basic pieces of information that will be critical for any unsecured creditor to meaningfully consider the plan.

8.      The Committee acknowledges the substantial work and effort that went into crafting the Plan now before the Court.  However, the Plan's complexity—and, particularly, the extent to which its recovery scenarios are determined by information not yet available—makes it impossible for the Disclosure Statement to provide information that would allow general unsecured creditors to adequately understand and evaluate their recoveries.  And because the relevant information is not yet available *to anyone*, these deficiencies cannot (at this time) be cured by more disclosure or through a "Committee letter," as is sometimes the case in complex bankruptcies.  For that reason, approval of the Disclosure Statement must be denied.

9.      In addition, the Court should also deny approval of the Disclosure Statement because, under the Plan, the recoveries to general unsecured creditors (to the extent they can be ascertained) are fundamentally unfair.  This unfairness (*i.e.*, unfair discrimination) is grounded in the far superior treatment of the Fuel Line Loan Claims in Class 4 as compared to the treatment of General Unsecured Claims in Class 5.  Both classes of claims are unsecured and neither has a right to PREPA's assets that is greater or prior to the other.  In fact, the Fuel Line Lenders have not even asserted that they have any priority *vis-à-vis* other general unsecured creditors.  Yet, according to the Disclosure Statement, the Fuel Line Lenders are receiving a ***guaranteed*** recovery of 84% on their claims (and the Disclosure Statement actually understates that guaranteed recovery, which is really as high as 92.7%).  In contrast, holders of General Unsecured Claims in Class 5 are only ***guaranteed*** a recovery of 0.1%.

10.     The Fuel Line Lenders' recovery is also qualitatively better.  Their recovery is not dependent on the outcome of any contingencies (such as the resolution of the Amended Lien & Recourse Challenge or the amount of PREPA Revenue Bond Claims that opt into the plan settlement).  Moreover, the New Bonds to be distributed to holders of Fuel Line Loan Claims,

*i.e.*, the Series A Bonds, are of significantly higher quality than the Series B Bonds to be distributed to other creditors, including as it relates to maturity (15 years vs. 50 years), expected repayment date (5 years vs. 35 years), and payment priority (requiring payment in full of principal on the Series A Bonds before any payment of principal on the Series B Bonds).  And, by giving the Fuel Line Lenders near-full recovery under the Plan, regardless of the outcome of the Amended Lien & Recourse Challenge, the Plan reflects the basic assumption—without any explanation in the Disclosure Statement—that the Fuel Line Lenders will not be affected even if the Oversight Board loses the Amended Lien & Recourse Challenge (and the Bondholders would be entitled to much greater recovery).

11.     While the Fuel Line Lenders have asserted that their claims against PREPA are entitled to payment priority over the claims of the Bondholders because the Fuel Line Lenders' claims qualify as "Current Expenses" under the Trust Agreement,[4] the Oversight Board and the Bondholders dispute this characterization, and the Plan assumes that the Fuel Line Lenders have a near certain chance of prevailing on that issue.  In any event, any such Current Expense Priority applies only *as against the Bondholders* and, thus, any incremental recovery offered to the Fuel Line Lenders has to come out of the Bondholders' distribution.  The Plan, however, ignores this principle by providing the Fuel Line Lenders with Series A Bonds, which are of an entirely different type than the Series B Bonds offered to the Bondholders, demonstrating that, under the proposed Plan, the Bondholders are *not* turning over a portion of their recovery to the Fuel Line Lenders, which is how subordination is supposed to work.

---

[4]     This Objection will refer to the asserted payment priority as the "Current Expense Priority," and creditors who assert the Current Expense Priority as "Current Expense Creditors."

12.     Finally, if the Fuel Line Lenders are Current Expense Creditors, then so are many of the holders of General Unsecured Claims in Class 5.  In fact, the Best Interest Test recently filed by the Oversight Board ***concedes that many, if not all, of the estimated $800 million of General Unsecured Claims in Class 5—a figure that materially understates the likely allowed amount of claims in that class—<u>are, in fact, Current Expense claims</u>***.  Any holders of such claims may receive no worse treatment under the Plan than the Fuel Line Lenders, and the Plan is unconfirmable to the extent it provides otherwise.

13.     In sum, the Disclosure Statement should not be approved because, among other things, (a) it is impossible for general unsecured creditors to answer the most basic questions they are entitled to know when voting on a proposed plan, such as what is my recovery, and (b) the vastly superior treatment offered to Fuel Line Lenders under the Plan unfairly discriminates against General Unsecured Creditors, thus rendering the Plan patently unconfirmable.[5]

## **BACKGROUND**

14.     On December 16, 2022, the Oversight Board filed the Disclosure Statement and the related *Title III Joint Plan of Adjustment of the Puerto Rico Electric Power Authority* [Docket No. 3110] (the "<u>Plan</u>").  The Disclosure Statement Motion and the Confirmation Procedures Motion were filed the same day.

---

[5]   For the avoidance of doubt, the Committee reserves all its rights to raise this and other confirmation issues in connection with confirmation of the Plan (assuming the Court were to approve the Disclosure Statement).  For example, the Committee believes that the Plan also unfairly discriminates as between General Unsecured Claims and the PREPA Revenue Bond Claims by providing Settling Bondholders with a materially better treatment than general unsecured creditors.  For one, even if the Bondholders prevailed in the Amended Lien & Recourse Challenge as to the issue of whether they have an unsecured deficiency claim, that would, at most, entitle the Bondholders to be treated the same as general unsecured creditors.  And while the Bondholders have asserted that they are also secured by all of PREPA's revenues (in addition to the funds in certain specified accounts), the Committee believes that there is no legal basis whatsoever for any such secured claim, and, certainly, no basis to offer Settling Bondholders a materially higher recovery than general unsecured creditors.

## I.   Summary of New Bonds Waterfall Under Plan

15.     The distributions to holders of allowed General Unsecured Claims (Class 5) under the Plan (and, indeed, many other creditors as well) are determined by a complex waterfall (the "New Bonds Waterfall") pursuant to which a fixed aggregate amount of **$5.4 billion** of New Bonds (in the form of Series A Bonds and Series B Bonds) would be issued by Reorganized PREPA and allocated to creditors depending on the outcome of a series of contingencies, including, most notably, (a) the Amended Lien & Recourse Challenge, (b) the amount of Bonds that opt into the plan settlement, and (c) the ultimate allowed amount of unsecured claims.[6] Importantly, because holders of allowed General Unsecured Claims participate at two different levels of the New Bonds Waterfall, a full understanding of this waterfall (and the numerous contingencies that drive the allocation of New Bonds at the various levels) is necessary to understand the wide-ranging and uncertain potential recoveries for general unsecured creditors.[7]

### A.   Waterfall Level 1: Distributions of Series A Bonds to Holders of Fuel Line Loan Claims (Class 4)

16.     At the top of the New Bonds Waterfall are the holders of Fuel Line Loan Claims (Class 4), who stand to receive:

a.     Series A Bonds in the face amount equal to 84% of their allowed Fuel Line Loan Claims (or approximately $588.7 million in Series A Bonds); and

b.     Additional Series A Bonds or cash, in the sole discretion of the Oversight Board, equal to postpetition interest at a rate of 6% for up to one year (or approximately $35.3 million); and

---

[6]   The Committee recognizes that, in addition to Series B Bonds, holders of allowed General Unsecured Claims are also entitled to other consideration under the Plan, namely the Avoidance Actions Proceeds and the GUC CVI.  However, as the Disclosure Statement makes clear, the value attributable to such assets is *de minimis*.  In fact, in the absence of any distribution of Series B Bonds, the estimated recovery percentage for holders of General Unsecured Claims is 0.1%.  Discl. Stmt. at 28.

[7]   The following summary is, by necessity, a simplified version of the actual allocation of New Bonds under the Plan.

      c.     Additional Series B Bonds under certain circumstances (as further described below).[8]

17.     In addition, the Fuel Line Lender PSA Creditors would receive additional Series A Bonds or cash (as determined by the Oversight Board in its sole discretion) to (a) reimburse them for their professional fees, *i.e.*, the Fuel Line Lender PSA Creditors Professionals' Reimbursement Fees, in the amount of up to $11 million and (b) pay a consent fee, *i.e.*, the Fuel Line Lender PSA Creditors Consummation Fees, in the amount of $15 million.[9]

18.     Taken together, holders of Fuel Line Loan Claims stand to receive up to $650.1 million, or a recovery percentage of **92.7%**, in the form of Series A Bonds (assuming that the Oversight Board elects to pay postpetition interest, the professional fee reimbursement, and the consent fees in the form of New Series A Bonds, and not cash).[10]  This recovery is not dependent on the outcome of any contingencies (such as the Amended Lien & Recourse Challenge or the amount of PREPA Revenue Bond Claims that opt into the plan settlement).  Moreover, the Series A Bonds are of significantly higher quality than the Series B Bonds to be distributed to other creditors, including as it relates to maturity (15 years vs. 50 years),[11] expected repayment date (5 years vs. 35 years),[12] and payment priority (requiring payment of principal on the Series A Bonds before payment of principal on the Series B Bonds).[13]  The Fuel Line Lenders are also the **<u>only</u>** creditors entitled to receive Series A Bonds under the Plan.

---

[8]    Plan art. VII.A.

[9]    Plan art. VII.B.

[10]   This recovery does not take into account the additional Series B Bonds that holders of Fuel Line Loan Claims would be entitled to receive under certain circumstances.

[11]   Plan art. XVII.B.1.

[12]   Plan art. XVII.B.1.

[13]   Plan art. XVII.I.1.

19.     After making the foregoing distributions of Series A Bonds, approximately $4.75 billion in capacity would remain available (out of the $5.4 billion in total New Bonds) to issue and distribute Series B Bonds to other creditors under the Plan.

B.     Waterfall Level 2: Distribution of Series B Bonds to Bondholders and Sale of Administrative Expense Bonds to Commonwealth

20.     At the next level of the New Bonds Waterfall, the Plan provides for certain other "mandatory" distributions to other parties, namely (a) the distribution of Series B Bonds to the Settling Bondholders and Settling Monolines (Class 1), (b) depending on the outcome of the Amended Lien & Recourse Challenge, the distribution of Series B Bonds to Non-Settling Bondholders and Non-Settling Monolines (Class 2), and (c) the issuance and sale of a $400 million Series B Bond to the Commonwealth.  These distributions, together with the distribution of the Series A Bonds to holders of Fuel Line Loan Claims, are referred to in the Plan as the "Mandatory New Bonds Distribution."

21.     For their part of the Mandatory New Bonds Distribution, the Settling Bondholders and Settling Monolines would be entitled to receive Series B Bonds in the face amount equal to **50%** of their PREPA Revenue Bond Claims (minus the distribution they receive from the Sinking Fund).[14]  The aggregate amount of Series B Bonds to be so distributed is ***unknown*** at this time because it depends on the amount of PREPA Revenue Bond Claims that opt into to the plan settlement on or before the Settlement Offer Deadline (*i.e.*, February 24, 2023).[15]  However,

---

[14]     *See* Plan art. IV.A(ii), V.A(ii).  In addition, holders of Assured Insured Interest Rate Swap Claims, to the extent they opt into the plan settlement, would also be entitled to receive Series B Bonds equal to 50% of their claims. *See* Plan art. X.A.

[15]     While the Plan set the Settlement Offer Deadline for February 15, 2023, the Oversight Board's *Notice of Distribution of Settlement Offer Notice to Uninsured Bondholders* indicated a Settlement Offer Deadline of February 24, 2023.  *See* Docket No. 23434.

to be clear, all Settling Bondholders and Settling Monolines would receive a guaranteed recovery of 50%, with no contingencies.

22.     The Non-Settling Bondholders and Non-Settling Monolines would also receive Series B Bonds at this level of the New Bonds Waterfall to the extent that their claims are determined to be secured (beyond the amounts in the Sinking Funds), but subject to certain limitations.[16]  The aggregate amount of Series B Bonds to be so distributed is also **_unknown_** at this time because it depends on the outcome of the Amended Lien & Recourse Challenge.

23.     Finally, to fund the payment of administrative expense claims under the Plan, Reorganized PREPA would issue a $400 million Series B Bond (*i.e.*, the Administrative Expense Bond) to the Commonwealth in exchange for $400 million in cash.

24.     In sum, other than the Administrative Expense Bond, it is impossible to determine at this time how many Series B Bonds would be distributed as part of Level 2 of the New Bonds Waterfall, and accordingly, it is also impossible to determine how many Series B Bonds remain available for other creditors (such as the Committee's constituents) that are situated lower in the waterfall.  Indeed, depending on the resolution of the aforementioned contingencies (including the outcome of the Amended Lien & Recourse Challenge) it is possible that **_no_** Series B Bonds remain available beyond this point.

C.     Waterfall Level 3: Distribution of Series B Bonds to GUC Trust

25.     The Plan proposes to distribute any Series B Bonds that remain available after the foregoing distributions (*i.e.*, the GUC Remaining New Bonds) to the GUC Trust for the benefit

---

[16]     *See* Plan art. V.A(ii).  Such distributions to the Non-Settling Bondholders and Non-Settling Monolines would be limited to the Series B Bonds available after the mandatory distributions of Series B Bonds to Settling Bondholders and Settling Monolines pursuant to Article IV.A(ii) of the Plan (*i.e.*, under Level 2 of the New Bonds Waterfall).

of holders of claims in the Unsecured Claims Pool (subject to a 50% recovery cap).[17]  This

distribution is referred to in the Plan as the "GUC New Bonds Initial Distribution."

26.     Importantly, the Unsecured Claims Pool is **not** limited to General Unsecured

Claims, but includes other unsecured claims as well, most notably any unsecured PREPA

Revenue Bond Claims held by Non-Settling Bondholders and Non-Settling Monolines, as

determined in the Amended Lien & Recourse Challenge (*i.e.*, the Deficiency Claims, if any).[18]

The amount of any such Deficiency Claims is **unknown** at this time, and, of course, depends on

the resolution of the Amended Lien & Recourse Challenge.  Because holders of allowed General

Unsecured Claims must share any Series B Bonds with other unsecured creditors, their recovery

***is also contingent on the allowed amount of such other claims, which is unknown at this time***.

27.     Further, as noted, the recoveries of unsecured creditors at Level 3 of the waterfall

are subject to a 50% recovery cap.  This cap is not based on the amount at which such claims are

ultimately allowed, but rather on the Oversight Board's **estimate** of all claims in the Unsecured

Claims Pool, which, according to the Plan, is the sum of (i) $800 million (*i.e.*, the Oversight

Board's estimate of General Unsecured Claims), (ii) the Vitol Claim (i.e., approximately $41.5

million), and (iii) the Deficiency Claims (if any).[19]  How and when the Oversight Board intends

to estimate the Deficiency Claims is not explained.

D.     Waterfall Level 4: Distribution of Series B Bonds to PREPA PayGO Trust

28.     Next, 20% of the Series B Bonds remaining after all of the foregoing distributions

(*i.e.*, the Gross Remaining New Bonds) would be distributed to the PREPA PayGo Trust for the

---

[17]   Plan art. I.A.102, 108, 109, and 111; art. VIII.A.

[18]   Plan art. I.A.215.

[19]   Plan art. I.A.109 and 216.

benefit of PREPA ERS.[20]  The Series B Bonds, if any, that remain available after distribution to

the PREPA PayGo Trust are referred to in the Plan as the "Net Remaining New Bonds."

     E.     Waterfall Level 5: Distribution of Net Remaining New Bonds

     29.     At Level 5 of the New Bonds Waterfall (and assuming any Series B Bonds remain

available at this point), any Net Remaining New Bonds would be distributed, on a *pro rata* basis,

to supplement the recoveries of various creditor groups, as follows:

> a.     With respect to the remaining Fuel Line Loan Claims (*i.e.*, the amount of Fuel Line Loan Claims remaining after the distribution of Series A Bonds or cash at Level 1 of the New Bonds Waterfall), such holders' *pro rata* share of the Net Remaining New Bonds;[21]

> b.     With respect to the remaining PREPA Revenue Bond Claims of Settling Bondholders and Settling Monolines (*i.e.*, the amount of PREPA Revenue Bond Claims remaining after the distributions from the Sinking Fund and the distribution at Level 2 of the New Bonds Waterfall), 40% of such holders' *pro rata* share of the Net Remaining New Bonds;[22] and

> c.     With respect to the remaining claims in the Unsecured Claims Pool (*i.e.*, the difference between the Unsecured Claims Pool Estimate and the distributions at Level 3 of the New Bonds Waterfall), such holders' *pro rata* share of the Net Remaining Bonds, subject to a 100% cap of the Unsecured Claims Pool Estimate.[23]  This distribution is referred to in the Plan as the "GUC New Bonds Secondary Distribution."

     30.     After the foregoing distributions, to the extent the Fuel Line Loan Claims and the

claims in the Unsecured Claims Pool (based on the Unsecured Claims Pool Estimate) are paid in

full, the Settling Bondholders and the Settling Monolines would receive any remaining Net

Remaining Bonds for up to 60% of their remaining PREPA Revenue Bond Claims.[24]

---

[20]    Plan art. I.A. 161.

[21]    Plan art. VII.A(iii).

[22]    Plan art. IV.A(iii).

[23]    Plan art. I.A.110.

[24]    Plan art. IV.A(iii).

F.    <u>Waterfall Level 6: Distribution of Net Remaining New Bonds</u>

31.    Any Net Remaining New Bonds that remain available after the making all of the foregoing distributions (*i.e.*, the Excess New Bonds) may be issued by Reorganized PREPA, in its sole discretion, to the PREPA PayGo Trust.[25]

* * *

32.    The foregoing is not a complete summary of the Plan and its proposed treatment of creditors thereunder; it serves, however, to illustrate certain inherent complexities with the plan structure and the significant uncertainties these complications create for general unsecured creditors.  This uncertainty is perhaps best encapsulated by the Oversight Board's estimated recovery percentage for general unsecured creditors: 0.1% to 100%.[26]

**OBJECTION**[27]

**I.    <u>Legal Standard</u>**

33.    Section 1125(b) of the Bankruptcy Code, which is incorporated into PROMESA, "requires that the disclosure statement contain 'adequate information'" to enable a "hypothetical reasonable investor to make an informed judgment about the plan."  *In re Cnty. of Orange*, 219 B.R. 543, 560 (Bankr. C.D. Cal. 1997) (as modified, internal references omitted) (citing section 901 of the Bankruptcy Code in support of application of section 1125 in chapter 9); *see also In re Coalinga Reg'l Med. Ctr.*, 608 B.R. 746, 756 (Bankr. E.D. Cal. 2019) (noting that section 1125 "is incorporated fully in chapter 9").

---

[25]   Plan art. I.A.82 and XVII.C.

[26]   Discl. Stmt. at 26.

[27]   Although there are numerous deficiencies in the Disclosure Statement, this Objection addresses only those issues and deficiencies the Committee believes to be most important.  Accordingly, this Objection is not meant to be exhaustive—nor could it be.  The Committee anticipates that the Oversight Board will make changes to the Disclosure Statement and/or add new documents to the Disclosure Statement Depository, and the Committee reserves its rights to supplement its objections accordingly.

34.    A clear, accessible, and comprehensive disclosure statement is therefore critical to ensuring a fair and effective plan confirmation process. *See In re Acemla de P.R. Inc.*, No. 17-02021 ESL, 2019 WL 311008, at *14 (Bankr. D.P.R. Jan. 22, 2019) ("[T]he importance of full and honest disclosure is critical and cannot be overstated") (internal citations and quotations omitted). "In short, a proper disclosure statement must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

35.    "Creditors rely on the disclosure statement to determine what distribution or other assets they will receive and also what risks they will face." *In re Acemla de P.R. Inc*., 2019 WL 311008, at *14 (internal citations and quotations omitted). "Creditors form their ideas about what they will receive out of the debtor's estate from that disclosure statement." *Nelson v. Dalkon Shield Claimants Tr. (In re A.H. Robins Co.)*, 216 B.R. 175, 180 (Bankr. E.D. Va. 1997). Accordingly, the disclosure statement "plays a pivotal role in the give and take among creditors and between creditors and the debtor that leads to a confirmed negotiated plan of reorganization by requiring adequate disclosure to the parties so they can make their own decisions on the plan's acceptability." *Id.*

36.    Creditors that do not support a plan or are subject to cramdown are entitled to the same level of disclosure and all the protections of section 1125 of the Bankruptcy Code. *See In re Jeppson*, 66 B.R. 269, 297 (Bankr. D. Utah 1986) (creditor that sought to cram down its plan on all other parties still needed to comply with disclosure statement requirements, as the "opportunity for parties in interest to appear and effectively express a dissenting voice would be drastically diminished if these minimal creditor protections were ignored").

## II. Disclosure Statement Cannot Be Approved Because It Does Not Provide Adequate Information

37.     The Disclosure Statement does not provide adequate information because it fails to adequately advise creditors of their likely recoveries under the Plan.  The Disclosure Statement also fails to include adequate, and accurate, information regarding numerous other critical issues, including: (i) the basis for estimating General Unsecured Claims at $800 million, an amount billions of dollars less than the face value of proofs of claim filed by general unsecured creditors; (ii) questions about the treatment of alleged Current Expense Creditors; (iii) the details of, and rationale for, key settlements embedded in the Plan; and (iv) important information about the feasibility of the Plan, including information about the Legacy Charge which is the source of payment for the $5.4 billion of New Bonds to be issued under the Plan.

### A. Disclosure Statement's Description of Plan is Too Complicated and Contains Too Many Contingencies to Provide Adequate Information

38.     Information in a disclosure statement "must be clear and comprehensible" and "should not contain overly technical language that the average creditor cannot readily understand." *In re Ferretti*, 128 B.R. at 19.  Nor should creditors be faced with "the burden of deciphering the meaning of the treatment of a claim." *Id.*  In short, "a proper disclosure statement must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *Id.*; *see also In re Werth*, 29 B.R. 220, 223 (Bankr. D. Colo. 1983) (noting that "information which might be helpful and comprehensible to lawyers" does not necessarily enable 'typical investor' to make an informed decision").

39.     The Plan and the accompanying Disclosure Statement here are so complicated and convoluted that they are virtually "incomprehensible to lay people." *Werth,* 29 B.R. at 223.

For starters, both documents are premised on a veritable maze of defined terms, the understanding of which is frequently dictated by still other defined terms.  Asking the average creditor to sift through and understand these defined terms and their impact on key components of the Plan is a nearly impossible task.  *See generally In re Forest Grove*, 448 B.R. 729, 737-38 (Bankr. D.S.C. 2011) ("creditors should not be required to go on a treasure hunt throughout multiple filings in order to ascertain [their treatment under the plan]"); *In re Rodriguez Gas & Oil, Inc.*, No. 08-50152, 2008 WL 4533687, at *1 (disclosure statement was inadequate where "it is so tedious and so packed with unnecessary information that the Court was unable to dig out relevant, useful data without extraordinary effort").

40.     But perhaps more importantly, the entire structure of the Plan is that creditor recoveries ***cannot*** be known now at this time and, instead, are premised on the outcome of multiple, inter-related contingencies that will determine creditor recoveries.  Even the most sophisticated general unsecured creditors are likely to find it extremely difficult to unpack the various defined terms, follow the complicated waterfall of plan currency under the various contingencies, and understand the numerous contingencies themselves and their impact on creditor recoveries.  Furthermore, even if an average creditor could understand ***how*** the contingencies will impact its recoveries, the creditor would still need to undertake an educated analysis of the likelihood of the many different possible outcomes for each contingency.  In short, the Plan and the Disclosure Statement are so complex that average creditors are unlikely to be able to determine what they will receive and how the various contingencies affect their recovery under the Plan.  *See In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988) ("burden of deciphering the meaning of the treatment of a claim should not be placed upon a creditor inexperienced with the technicalities of bankruptcy law").

41.     Because many of these contingencies are so fundamental to the Plan—particularly the resolution of the Amended Lien & Recourse Challenge and the extent to which bondholders elect to become Settling Bondholders—the Committee submits that it makes sense to hold off considering approval of the Disclosure Statement until these contingencies are resolved.[28]  This is especially so because these contingencies will likely be resolved in the near future, considering that the Court recently heard oral argument on the Amended Lien & Recourse Challenge and the Settlement Offer Deadline is scheduled for February 24, 2023, *i.e.*, three weeks from the date hereof.  *See In re Franklin Indus. Complex, Inc.*, 386 B.R. 5, 10 (Bankr. N.D.N.Y. 2008) ("[T]he Court concludes that under the current circumstances as discussed above, the best course to follow is to postpone the hearing on the disclosure statement until some, if not all, the issues have been resolved . . .:); *Mid-Continent Racing & Gaming Co. I v. Sunflower Racing, Inc. (In re Sunflower Racing Inc.)*, 218 B.R. 972, 977 (D. Kan. 1998) ("Several courts have held that a bankruptcy court has authority pursuant to section 105 to defer hearings on creditor's disclosure statement or on other important matters.").

42.     At the very least, the Oversight Board should be required to provide additional disclosures to creditors as this information becomes available.  *See In re H & W Ents., Inc.*, 19 B.R. 582, 588 (Bankr. N.D. Iowa 1982) ("Debtor will also be directed to amend its Amended Disclosure Statement to accurately reflect any changes in its financial condition, or in the information contained in its Amended Disclosure Statement, that have occurred since that Amended Statement was filed.").  For example, the Oversight Board should be required to

---

[28]   The Oversight Board has conceded the centrality of this issue, as it recently explained, in oral arguments on the Amended Lien & Recourse Challenge, that "we're dealing here with an $8 billion claim," which "is not something we can confirm a plan now and see what the claim is, secured, unsecured, recourse, nonrecourse later."  Hr'g Tr. 105:20-24 (Feb. 1, 2023).

supplement the Disclosure Statement as soon as it has processed the results of the Settlement

Offer Deadline, and it should update the Illustrative Recovery chart based on that information.

43.     To the extent the Oversight Board provides such additional disclosures, creditors

should be given sufficient time to consider this new information and raise any objections to its

adequacy.  Indeed, at the February 1, 2023 omnibus hearing, counsel to the Oversight Board

signaled that the Oversight Board contemplates adding one or more settlements to the Plan and

Disclosure Statement, and would consent to providing additional time for the filing of

supplemental objections to such amendments.

B.     Inadequate Disclosures Regarding Creditor Recoveries

44.     Creditors cannot make informed voting decisions on a plan if the disclosure

statement does not contain adequate, and accurate, information regarding estimated creditor

recoveries and the treatment of their claims.  Creditors are entitled to full and accurate

disclosures regarding not only their own recoveries but also the recoveries and treatment of other

classes of creditors, especially where the plan proponent alleges that recoveries are a "zero sum

game" (*i.e.*, an increase in recoveries for one group of creditors can only come at the expense of

the recoveries of another group of creditors).

45.     The Disclosure Statement is deficient in meeting these requirements, both because

it omits critical information regarding creditor recoveries and because it fails to provide

explanations or rationales for the estimated claim amounts and estimated recovery percentages

that it ***does*** disclose and, in some instances, provides misleading information about those

recoveries.

> i.  *Failure to Provide Useful Estimate of Estimated Recoveries for General Unsecured Claims (Class 5)*

46.     It is axiomatic that creditors view the amount of their proposed recovery as among the most important information required for understanding whether to accept or reject the plan.  *See also Nelson v. Dalkon Shield Claimants Tr. (In re A.H. Robins Co.)*, 216 B.R. 175, 180 (Bankr. E.D. Va. 1997) ("Creditors form their ideas about what they will receive out of the debtor's estate from that disclosure statement."); *In re Monroe Well Serv., Inc.*, 80 B.R. 324, 331 (Bankr. E.D. Pa. 1987) ("[T]he crucial matters [for unsecured creditors] concern . . . what the plan proposes to pay creditors.").  Here, however, the Disclosure Statement does not provide the required level of disclosure because it does not (i) set forth a useful estimate of the expected recovery for general unsecured creditors in Class 5 or (ii) explain the basis for the estimated amount of General Unsecured Claims in Class 5.

47.     The Disclosure Statement "estimates" that holders of allowed General Unsecured Claims in Class 5 will receive a recovery between 0.1% and 100% on their claims.  And this is not a binary outcome: creditors could receive ***literally any possible percentage recovery in that range***.  In other words, the Disclosure Statement essentially tells creditors in Class 5 that they might get nothing (or next to nothing), they might get paid in full, or they might get something somewhere in between.  This description of virtually unlimited potential outcomes is entirely inadequate to allow creditors to cast informed votes on the Plan.

48.     The Disclosure Statement includes a table of "Illustrative Recoveries" that purports to provide estimated recoveries for the Plan's various classes depending on how many bondholders settle (the "Y axis") and how the Amended Lien & Recourse Challenge is resolved

(the "X axis").[29]  This table indicates that, depending on the outcome of certain contingencies, general unsecured creditors may receive 0.1%, 13.09%, 39.7%, 44.01%, 45.78%, 46.74%, 66.87%, or 100%.  Providing this range of recoveries—literally as broad a range as is mathematically possible—does not solve the Disclosure Statement's disclosure problem; it only highlights the issues by driving home the magnitude of the Plan's uncertainties.

49.     In addition, the Disclosure Statement fails to adequately explain (i) the basis for its estimate of the size of the total claims in Class 5, which directly impacts the recoveries of the holders of General Unsecured Claims who will share *pro rata* in the General Unsecured Claim Recovery with all other members of the Unsecured Claims Pool, and (ii) the potential value of the Avoidance Action Proceeds, which form part of the GUC Trust Assets that will be used to fund the General Unsecured Claim Recovery.[30]

1.  Failure to Provide Basis for Estimate of Class Size

50.     For any creditor, it is just as important to know **what** it is receiving under a plan as it is to know **with whom** that recovery is shared.  Here, the Disclosure Statement estimates that the allowed amount of General Unsecured Claims in Class 5 is $800 million.[31]  Absent from the Disclosure Statement, however, is any explanation of how the Oversight Board arrived at this estimate.  The basis for this estimate is critical because, if it proves wrong, and the allowed claims in Class 5 total more than $800 million (as the Committee believes will be the case), that will reduce the recovery to general unsecured creditors.  In fact, the $800 million claims estimate takes on particular significance under the Plan because it forms part of the Unsecured Claims

---

[29]   Discl. Stmt. at 28.

[30]   Discl. Stmt. at 268.

[31]   Discl. Stmt. at 268.

Pool Estimate, which, in turn, determines the recovery cap of the GUC New Bonds Initial

Distribution (*i.e.*, Level 3 of the New Bonds Waterfall) as well as the recovery cap of the GUC

New Bonds Secondary Distribution (*i.e.*, Level 5 of the New Bonds Waterfall).[32]  No legal basis

is offered in the Disclosure Statement for capping recoveries to general unsecured creditors on

the basis of an unsupported claims ***estimate***, as opposed to the actual allowed amount of such

claims, *i.e.*, a creditor's actual legal entitlements.[33]

51.     The Committee's concerns regarding the genesis of the claims estimate are well

founded considering that the current face amount of proofs of claim filed by general unsecured

creditors totals more than $6 billion.  The Disclosure Statement does not explain (i) why the

Oversight Board's claims estimate is so much lower than the asserted amount of claims or (ii) the

impact on the recovery of general unsecured creditors if that estimate proves to be wrong.

52.     Since PREPA filed its Title III case on July 2, 2017 very little progress has been

made in terms of reconciling, objecting to, and/or allowing general unsecured claims (other than

run-of-the-mill procedural objections).[34]  The Oversight Board would have general unsecured

creditors bear the risk if its unsupported $800 million estimate proves to be wrong—all without

explaining any of this in the Disclosure Statement.

53.     Nor does the Oversight Board's *Notice of Filing of Load Forecast and Best

Interest Test Report for PREPA* [Docket No. 23412], including the *Best Interest Test* attached

---

[32]    In this regard, the Committee also notes that, oddly, the definition of Unsecured Claims Pool Estimate does **not** even include an estimate for certain types of claims that may, under certain circumstances, be included in the Unsecured Claims Pool, such as, for example, Eminent Domain/Inverse Condemnation Claims, in the event of a Takings Clause SCOTUS Victory.  *Compare* Plan art. I.A.215 *with* Plan art. I.A.216.  No explanation is offered for that discrepancy.

[33]    To be clear, capping creditor recoveries based on a claims estimate (as opposed to the claimant's actual legal entitlements) also raises serious confirmation issues.  The Committee reserves all its rights in that regard.

[34]    The Oversight Board's most recent status report [Docket No. 23445] provides no details on the status of the PREPA claims reconciliation process.

thereto as Exhibit B (the "Best Interest Test"), shed any light on these issues.[35]  The Best Interest Test report omits any explanation of how the Oversight Board arrived at the $800 million estimate for General Unsecured Claims in Class 5.

54.        For all these reasons, the Committee submits that the Disclosure Statement should be revised to include a comprehensive summary that breaks down the 4,687 proofs of claim filed against PREPA, by claim status (expunged, claims to be expunged by pending objections, active, etc.) and by claim class, including subcategories for General Unsecured Claims (for example, accounts payable, litigation claims, PPOA claims, union claims, etc.), and in each case showing the filed claim details by claim count and dollar amount, as well as the Oversight Board's estimates for each such claim class and subcategory.  This would enable creditors to assess whether the Oversight Board's $800 million estimate is even close to reasonable.

55.        Separately, but relatedly, the Disclosure Statement does not provide any explanation for why certain types of claims are included in the class of General Unsecured Claims, while others are excluded.  For example, the definition of General Unsecured Claim includes types of claims that were excluded from the corresponding definition in the Commonwealth and HTA plans, such as claims by governmental units, employee benefit claims, and union claims.  Moreover, unlike in the Commonwealth and HTA cases, it appears that the Oversight Board is not utilizing the ACR Procedures to resolve claims against PREPA (even though the Disclosure Statement recognizes that the ACR Procedures apply in the PREPA case).[36]  Under the Commonwealth and HTA plans, claims submitted to the ACR Procedures

---

[35]    Exhibit A is the *Load Forecast and Illustrative Cash Flow for New Bonds* (the "New Bond Cash Flow").

[36]    Discl. Stmt. at 177.

were also excluded from the respective definitions of general unsecured claims.  The Disclosure Statement offers no explanation for these differences in approach, or its impact on recoveries.

56.     Similarly, the definition of General Unsecured Claim specifically includes damages claim arising from the rejection of collective bargaining agreements.  However, the Disclosure Statement does not indicate whether these damages claims are included in the estimated $800 million in General Unsecured Claims.  This is significant, as these claims have the potential to materially dilute the recovery to general unsecured creditors.  More than five years into PREPA's Title III case, the Oversight Board surely knows (or should know) which collective bargaining agreements it expects to reject, and the likely size of the any resulting rejection damages claims.[37]  Yet, this information is also absent from the Disclosure Statement.

2.   Inadequate Disclosures Regarding Avoidance Action Trust

57.     The Disclosure Statement provides that general unsecured creditors will receive Avoidance Actions Proceeds, defined in the Plan as the net cash consideration received by PREPA in connection with Avoidance Actions.  But the Disclosure Statement sheds virtually no light on these Avoidance Actions or their potential value.  It explains only that "PREPA has identified certain Avoidance Actions, listed on Exhibit L, which will be transferred to the Avoidance Actions Trust on the Effective Date."[38]  But Exhibit L lists only two specific avoidance actions and includes a footnote that other litigations may also be transferred to the Avoidance Actions Trust.  The details regarding such other litigation is important information, and creditors have a right, and need, to know what actions will be transferred.

---

[37]   The Disclosure Statement says only that the "Plan contemplates the rejection of the collective bargaining agreements that require PREPA to maintain PREPA ERS as a defined benefit plan."  Discl. Stmt. at 338.  This one sentence does not indicate which collective bargaining agreements are affected by the Plan, or the likely amount of the resulting rejection damages claims.

[38]   Discl. Stmt. at 36-37.

58.     For example, the Disclosure Statement does not discuss whether the Fuel Oil

Litigation and potential claims relating to vendor payments will be transferred to the trust.  These

claims are significant.  The Committee, together with the Special Claims Committee, has brought

litigation against certain of PREPA's fuel oil suppliers and laboratories alleging that they had,

among other things, breached contracts with PREPA and overcharged PREPA for fuel oil and

laboratory services.[39]  In addition, the Oversight Board has identified numerous Vendor

Payments that are potentially recoverable under various avoidance theories.[40]  Even a partial

recovery on these claims could significantly increase creditor recoveries if transferred to the

Avoidance Action Trust (as the Committee believes they should be).

59.     On the other hand, if these actions, and other potentially valuable avoidance

actions, are ***not*** transferred to the Avoidance Actions Trust (which they should be), the

Disclosure Statement must explain why not and, more importantly, how PREPA will use the

value derived from these assets.  Debtors, including municipal debtors, have an obligation to

demonstrate that they have made reasonable efforts to repay their creditors, and are using, and

allocating, their assets accordingly.  *See In re Ligon,* 50 B.R. 127, 130 (Bankr. M.D. Tenn. 1985)

("A description of available assets and their value is a vital element of necessary disclosure.");

*see also Lorber v. Vista Irr. Dist.*, 127 F.2d 628, 639 (9th Cir. 1942) (rejecting plan where court

could not conclude "that the payments provided for in the plan of composition are all that the

[D]istrict is reasonably able to pay in the circumstances") (quoting *Consol. Rock Co. v. Du Bois*,

312 U.S. 510 (1941)).  Conversely, courts have confirmed chapter 9 plans only where the debtor

has demonstrated that it has divvied up its assets in a way that does the best the debtor could do

---

[39]   Discl. Stmt. at 251.

[40]   Discl. Stmt. at 251-52.

for creditors.  *See, e.g.*, *In re Connector 2000 Ass'n*, 447 B.R. 752, 766 (Bankr. D.S.C. 2011)

(noting that evidence established that "the Plan affords all creditors the potential for the greatest

economic return from Debtor's assets"); *In re City of Detroit*, 524 B.R. 147, 219 (Bankr. E.D.

Mich. 2014) (noting "there is no more money available for creditors in the City's already tight

budget projections" as "[e]very dollar is accounted for").

60.     PREPA, therefore, must explain what it plans to do with any avoidance actions

***not*** transferred to the Avoidance Actions Trust, and let creditors (and, ultimately, the Court)

determine if those plans represent "a reasonable effort by the municipal debtor" (*i.e.*, PREPA) to

repay its creditors.  *Cnty. of Orange v. Merrill Lynch & Co. (In re County of Orange)*, 191 B.R.

1005, 1020 (Bankr. C.D. Cal. 1996) (as modified).

> ii.  *Disclosure Statement Does Not Answer Important Questions About Preferential Treatment of Fuel Line Lenders*

61.     In addition to being entitled to know what recovery they are receiving, and with

whom they are sharing it, creditors are also entitled to know what a debtor proposes to pay to

other creditors—especially similarly situated creditors.  *See, e.g.*, *In re Sparta Surgical Corp.*,

No. 06-cv-02601-REB, 2008 WL 878948, at *2 (D. Colo. Mar. 28, 2008) (affirming denial of

disclosure statement by bankruptcy court where disclosure statement "fail[ed] to disclose the

discriminatory treatment that resulted from the settlement with the IRS regarding the company's

tax liabilities, such that its unsecured claim will be treated differently from other unsecured

claims"); *In re Lapworth,* No. 97-34529DWS, 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 3,

1998) (denying confirmation where disclosure statement did not disclose that one similarly

classified creditor received improved treatment because "the other unsecured creditor . . . could

not make an informed decision on whether to support the Plan").

62.     Under the plan, the Fuel Line Loan Claims in Class 4 stand to receive a vastly better recovery than holders of General Unsecured Claims in Class 5, both qualitatively and quantitatively.

63.     The treatment of Fuel Line Loan Claims, therefore, raises important questions, including what is the basis for their preferential treatment as compared to other General Unsecured Claims, and what is the basis for offering such preferential treatment only to the Fuel Line Lenders and not to other potential Current Expense Creditors.  Because the Disclosure Statement does not answer these questions, its disclosures are inadequate.

1.   Disclosure Statement Does Not Disclose Fuel Line Lenders Will Receive More than 84%

64.     Adequate information requires disclosure of the **total** value of recovery offered to any given class of creditors.  *See, e.g.*, *Am. United Mut. Life Ins. Co. v. City of Avon Park,* 311 U.S. 138, 144 (1940) (requisite finding that "compensation to be received by the fiscal agent was reasonable" could not be made "without passing on the worth of the aggregate of all the emoluments accruing to [the City's fiscal agent] as a result of consummation of the plan").[41]

65.     Here, Disclosure Statement states that the Fuel Line Lenders will receive a guaranteed recovery of Series A Bonds valued at 84% of their claims.  However, the Fuel Line Lenders will also be entitled to postpetition interest accruing on the Series A Bonds from the date the Fuel Line PSA was signed (*i.e.*, December 1, 2022) to the effective date of the Plan (subject

---

[41]   More recent authority also supports this proposition.  Indeed, at least one court has expressly adopted this requirement, providing in its local rules that a disclosure statement must include "exact proposed treatment of each [C]lass showing total dollar amounts and timing of payments to be made under the plan, and all sources and amounts of funding thereof."  Bankr. N.D. Ill. R. 3016-1(1)(a) (rev. Apr. 19, 2022).  And in the *Detroit* bankruptcy, the court explained that, under the particular facts presented to it, it believed that even third party contributions "should be included in the recovery calculations"—and that "*City of Avon Park* seems to require that result."  *In re City of Detroit*, 524 B.R. 147, 255 n.24 (Bankr. E.D. Mich. 2014).  If *Avon Park* requires inclusion that a recovery percentage include payments from third parties, it certainly requires inclusion of additional payments from the debtor itself.

26

to a one-year cap), reflecting up to $35.3 million, payable in cash or additional Series A Bonds.

This equates to an additional 5% recovery, bringing the Fuel Line Lenders' recovery to 89%.

The Plan will further pay the Fuel Line Lender PSA Creditors up to $26 million, or 3.7% of their

claims, in consent fee and professional fee reimbursements, *bringing their recovery to 92.7%*.

66.     The Disclosure Statement explains none of this and, instead, misleadingly claims

that the Fuel Line Lenders baseline recovery is 84%.  PREPA's other creditors, however, have a

right to understand the Fuel Line Lenders' true recovery, including all sources of value.  This

information is especially important because the sources of the Fuel Line Lenders' incremental

recoveries—postpetition interest, consent fees, and professional fees—are not permissible under

the Bankruptcy Code.  *See Int'l Asset Recovery v. Thomson McKinnon Sec. Inc.*, 335 B.R. 520,

527 (S.D.N.Y. 2005) ("The general rule regarding post-petition interest is clear: unsecured or

under-secured creditors are not entitled to post-petition interest on a pre-petition claim."); *SNTL*

*Corp. v. Centre Ins. Co. (In re SNTL Corp.)*, 571 F.3d 826, 841 n.16 (9th Cir. 2009) ("In the

majority line of cases, courts have held that unsecured creditors are not entitled to claim

[attorneys' fees incurred postpetition]"); *In re New Power Co.*, 313 B.R. 496, 506 (Bankr. N.D.

Ga. 2004) ("A majority of courts have held that, unlike a secured creditor, *an unsecured creditor*

*is not entitled to collect post-petition attorneys' fees or collection costs*, notwithstanding the

existence of a contractual or statutory right to do so.") (emphasis added).

67.     Accordingly, the Disclosure Statement should not be approved unless it is revised

to both disclose the true recovery being offered to Fuel Line Lenders under the Plan and explain

the basis for providing them recoveries not permitted by the Bankruptcy Code.[42]

---

[42]  The payments in question cannot be justified as "support fees," "break-up fees," or the like.  As has been
explained, "alternative transaction fees and the like" are not appropriate where the recipient is "so imbedded in
the capital structure already that they did not need further incentive to make their proposal."  *See* Hr'g Tr.
118:10-18, *In re Delphi Corp.*, No. 05-44481 (Bankr. S.D.N.Y. Jan. 12, 2007) [Docket No. 7118].  Here, the

2. Disclosure Statement Does Not Disclose Basis for Preferred
Treatment of Fuel Line Lenders as Compared to General
Unsecured Creditors in Class 5

68.    The Disclosure Statement explains that the Fuel Line PSA "resolves the Fuel Line

Lenders' claims and asserted priority treatment as 'Current Expenses' under the Trust

Agreement,"[43] in which litigation the Fuel Line Lenders asserted they were "entitled to payment

in full in advance of any recovery to PREPA's Bondholders."[44]  Absent from the Disclosure

Statement, however, is any explanation of why this asserted priority over Bondholders provides a

basis for granting the Fuel Line Lenders a recovery that is vastly better—quantitatively and

qualitatively—than the recovery offered to holders of General Unsecured Claims in Class 5,

creditors that are not subordinated to the Fuel Line Lenders.[45]

69.    Moreover, the Fuel Line Lenders are not the only creditors that may qualify as

Current Expense Creditors.  The Disclosure Statement acknowledges some of these creditors,

while ignoring others, but fails to include adequate information about any of them.

70.    For example, the Disclosure Statement notes that PRERA ERS has asserted "that

all amounts owed to it are 'Current Expenses' under the Trust Agreement and must be paid

before any further payments are made to the Bond Trustee or Bondholders."[46]  Because this is a

"significant claim," in the event PREPA ERS prevails in its pending litigation "the distributions

---

Fuel Line Lenders are not strangers to the case, nor are they contributing new money to support PREPA's
reorganization that would help fund recoveries to other stakeholders, or taking any other risk.  Instead, they
have simply agreed to a settlement of their prepetition claims at a minimal discount and to support a plan
consistent with that settlement, while enjoying a variety of other forms of consideration to "sweeten the pot."
Those forms of consideration, however, are not permissible under the Bankruptcy Code.

[43]    Discl. Stmt. at 29.

[44]    Discl. Stmt. at 14.

[45]    As discussed below, the Disclosure Statement should not be approved for the additional reason that there is no
such justification and the Plan, therefore, is patently unconfirmable because it unfairly discriminates in favor of
the Fuel Line Lenders and against holders of other General Unsecured Claims in Class 5.

[46]    Discl. Stmt. at 38.

under the Plan *may* have to be amended, although the amount of overall consideration under the

Plan *could* remain unchanged." [47]

71.     These "disclosures" raise more questions than they answer.  The Disclosure

Statement recognizes that the PREPA ERS claim is "significant"—yet provides no estimate of

that claim.  The Disclosure Statement then advises creditors that, because of the significance of

this (unspecified) claim, its resolution "may" require amending the Plan, but even then those

changes may or may not reduce the "overall consideration" under the Plan.  None of this is

helpful to creditors.  Creditors need to know (i) what is the Oversight Board's estimate of the

size of the PREPA ERS claim, (ii) what is the likelihood that PREPA ERS will prevail on its

"significant claim," (iii) what specific changes could be required to distributions under the Plan,

and (iv) even if not in their value, how would the "overall consideration" be changed?  The

Disclosure Statement answers none of these questions.

72.     The Disclosure Statement also fails to identify and address important questions

about other potential Current Expense claimants.  Any priority right the Fuel Line Lenders, or

PREPA ERS, may have is derived from the definition of "Current Expense" in the Trust

Agreement.  There is nothing in that definition, however, that applies uniquely to the Fuel Line

Lenders or to PREPA ERS.  To the contrary, the definition covers the "reasonable and necessary

current expenses of maintaining, repairing and operating [PREPA's] System," and specifically

refers to expenses whose payment is the "standard practice" of other utilities.[48]  It is, therefore,

---

[47]   Discl. Stmt. at 38 (emphasis added).

[48]   A copy of the Trust Agreement was filed as docket number 118 in the Amended Lien & Recourse Challenge.
*See* Docket No. 118-1, Adv. Proc. No. 19-00391-LTS.

possible, if not probable, that this definition encompasses many other claims against PREPA—

including claims that the Plan classifies as General Unsecured Claims in Class 5.[49]

73.     Yet, the Disclosure Statement offers no basis for the Plan's preferred treatment of

the Fuel Line Lenders as compared to other Current Expense Creditors.  The Disclosure

Statement also does not address the impact on the Plan if the Court finds that these other claims

are also entitled to the Current Expense Priority.  Nor does the Disclosure Statement explain

whether the plan would be still confirmable if the Court were to find that general unsecured

creditors are entitled to be paid in full as Current Expense Creditors.  These are important issues

that must be clarified before general unsecured creditors can be asked to vote on the Plan.

### iii.   Inadequate Disclosures Regarding Terms of Key Settlements

74.     Creditors—especially creditors not involved in settlement negotiations—are,

entitled to understand the terms of, and rationale for, a settlement embedded in a proposed plan,

including the parties' respective positions and any alternatives to the settlement.  *See In re*

*Fullmer*, No. 09-50086-RLJ-11, 2009 WL 2778303, at *2 (Bankr. N.D. Tex. Sept. 2, 2009)

(disclosure statement could not be approved where it contained insufficient description of

proposed settlement, as creditors that were not party to the settlement, "particularly unsecured

creditors, would be better informed if they are aware of [settling party's] articulated reasoning

regarding the comprehensive settlement").

75.     The disclosure statement must further describe how the proposed settlement

satisfies Bankruptcy Rule 9019 because, otherwise, creditors are left in the dark regarding how

the debtor believes it will be able to confirm its proposed plan.  *See, e.g.*, *Resol. Tr. Corp. v. Best*

---

[49]   Indeed, as discussed below, in the Best Interest Test the Oversight Board has **conceded** that other, non-Fuel
Line Lender, General Unsecured Claims qualify as Current Expenses.

*Prods. Co. (In re Best Prods. Co., Inc*.), 177 B.R. 791, 794 n. 4 (S.D.N.Y.1995) ("Irrespective of
whether a claim is settled as part of a plan . . . or pursuant to separate motion under Bankruptcy
Rule 9019, the standards applied by the Bankruptcy Court for approval are the same."), *aff'd*, 68
F.3d 26 (2d Cir.1995); *In re Nutritional Sourcing Corp*., 398 B.R. 816, 832 (Bankr. D. Del.
2008) ("When evaluating a settlement provided for under a plan of reorganization, the
Bankruptcy Court must determine that a proposed compromise forming part of a reorganization
plan is fair and equitable.") (as modified) (internal references omitted).

76.      Here, there are at least two significant settlements embedded in the Plan (in
addition to the opt-in settlement offered to Bondholders).  One is the settlement with the Fuel
Line Lenders, which, as discussed above, raises serious concerns.  Remarkably, the Disclosure
Statement presents no analysis of that settlement through the lens of Bankruptcy Rule 9019, or
the alternatives to that settlement.  Stated simply, creditors are unable to ascertain whether that
settlement is reasonable.

77.      The second settlement is the one reached between the Oversight Board and
monoline insurer National Public Finance Guarantee Corp. ("National").  Although the
Oversight Board announced this settlement on December 16, 2022,[50] it has yet to disclose the
settlement's terms and, therefore, creditors do not know how much National will be receiving
under the Plan.  Moreover, the very existence of the settlement with National raises a host of
other questions.  Given that the proposed Plan treats Settling Bondholders differently from Non-
Settling Bondholders, creditors need to know the rationale for a one-off settlement with a single
bond claimant and what impact the agreement has on other creditors' recoveries.

---

[50]    Media Release, *Oversight Bd. Files Plan of Adjustment to Significantly Reduce PREPA's Debt*, Fin. Oversight
& Mgmt. Bd. for P.R. (Dec. 16, 2022),
https://drive.google.com/file/d/15svM10SPfz4ngqdkrE23VLku79W7x2fn/view.

78.     In this regard, it is noteworthy that a discrepancy exists between the New Bond

Cash Flow and the Disclosure Statement concerning the value of the New Bonds to be issued

under the Plan.  Specifically, page 4 of the New Bond Cash Flow provides that the Beginning

Initial Value for the New Bonds (Series A and Series B) is $5,683,367,030—or approximately

***$283 million more than disclosed in the Disclosure Statement***.  This raises a number of

questions, including: (i) whether this $283 million is the cost of the settlement with National; (ii)

if so, how would creditor recoveries be affected if there was no such settlement; and (iii) whether

this $283 million represents additional debt capacity that PREPA did not disclose in the

Disclosure Statement and, if so whether there is additional undisclosed debt capacity?

79.     Without answers to these questions, creditors will not be able to assess the

settlement with the Fuel Line Lenders, the settlement with National, or any other settlement the

Oversight Board may announce.[51]  The Disclosure Statement either must be revised to include

this information, or it cannot be approved.

     *iv.   Inadequate Disclosures Regarding Feasibility, Legacy Charge, and
         Possibility of Fully Secured Bondholders*

80.     A disclosure statement must explain to creditors why the plan satisfies applicable

confirmation standards.  This includes providing creditors "with 'adequate information' prior to

the acceptance or rejection of a reorganization plan, in order for them to be able to make an

informed judgment as to the feasibility of the plan."  *Harper v. Oversight Comm. (In re Conco,

Inc.)*, 855 F.3d 703, 714 (6th Cir. 2017) (internal references omitted); *see also In re Arnold*, 471

B.R. 578, 586 (Bankr. C.D. Cal. 2012) ("There is no information in the Plan or Amended

Disclosure Statement to support the possibility of a New Value Contribution and the feasibility

---

[51]   Indeed, at the February 1, 2023 omnibus hearing, counsel to the Oversight Board indicated that the Oversight
Board is in ongoing discussions with various parties to reach additional settlements.

of the Plan, and therefore, the Amended Disclosure Statement does not contain adequate information for creditors to make an informed judgment about the plan under § 1125(a).").

81.     The Disclosure Statement, therefore, must allow creditors to determine whether the Plan is feasible (which is a confirmation requirement under section 314(b)(6) of PROMESA). The Disclosure Statement does not include adequate information in this regard, and instead provides only a brief statement that the Oversight Board believes, "[b]ased on the projections in the Certified Fiscal Plan, Reorganized PREPA should be able to pay its debts under the Plan when they come due and it should be viable."[52]  The Disclosure Statement does not describe the basis for this belief or provide creditors any information to reach an informed judgment as to its accuracy or completeness.  To the contrary, the Disclosure Statement only notes that the Plan is feasible because it is consistent with the Certified Fiscal Plan—and even this tepid statement is followed by the immediate qualification that, the Oversight Board will update this analysis "if needed" when the next fiscal plan is certified.  Creditors are entitled to actual information and supporting data concerning feasibility, not conclusory (and unconvincing) statements.

82.     This point is especially important here because the Plan is premised entirely on the imposition of the new Legacy Charge that will "fund the New Bonds issued under the Plan."[53]  If the Legacy Charge does not do what the Plan says it will do—*i.e.*, if the Legacy Charge does not generate the promised revenues over the promised time—the entire Plan will not work, and creditors will not see their promised recoveries.  This is particularly important to those creditors other than the Fuel Line Lenders (including general unsecured creditors) who stand to receive Series B Bonds with a lengthy 50 year maturity.

---

[52]   Discl. Stmt. at 333.

[53]   Discl. Stmt. at 3.

83.     The Disclosure Statement, however, is surprisingly opaque on the Legacy Charge. While the Oversight Board has recently filed the New Bond Cash Flow, the Plan continues to include a placeholder Annex 1 for information about the Legacy Charge.  Until this information is provided, it is impossible to know what the Oversight Board is using as the Flat Fee or the Volumetric Charge for each PREPA customer class.  Furthermore, the Oversight Board does not provide its estimated customer counts by customer class, nor does it provide the forecasted electricity consumption by customer class, by year.  Absent this information, creditors are unable to evaluate the Oversight Board's assumptions and, therefore, the feasibility of the Plan.

84.     Similarly, the Oversight Board, on behalf of PREPA, has entered into an agreement with Genera PR to provide operation and maintenance services for PREPA's legacy thermal generation assets (the so-called "O&M Agreement").  This agreement, however, is not described in the Disclosure Statement.  The Disclosure Statement must describe this agreement, and how this agreement (and any other agreements into which PREPA has, or may, enter that impact the long-term performance and operation of PREPA's system) might impact PREPA's ability to perform in the future, both generally and with regards to its ability to make the make the long-term payments promised under the Plan.

85.     The Disclosure Statement also fails to provide adequate information regarding another critical issue and its impact on feasibility.  Under the Plan, the Amended Lien & Recourse Challenge will proceed to judgment with respect to any Non-Settling Bondholders. The Plan contemplates the possibility that those Non-Settling Bondholders will prevail in the litigation and receive secured claims in the full face value amount of their Bond Claims. However, neither the Plan nor the Disclosure Statement explains the impact of this outcome on

feasibility, leaving creditors to guess at the answers to critical questions.[54]  For example: would the Oversight Board be able to confirm this Plan if the Bondholders hold over $8 billion in fully secured debt?  Is that question dependent on how many bondholders elect to become Settling Bondholders, and, if so, is there a threshold below which the Plan would fail?  Do PREPA and the Oversight Board have a "backup plan" in the event resolution of the Amended Lien & Recourse Challenge makes the current Plan not feasible?  If that "backup plan" includes issuing more New Bonds, why has that additional debt capacity not already been allocated to other stakeholders?  The Disclosure Statement answers none of these questions.

*v.*        *Other Inadequacies of Disclosure*

86.        The Disclosure Statement also fails to provide critical information regarding (i) the value and availability of PREPA's assets and (ii) the treatment, and potential impact on the plan, of certain pending litigation.

1.    <u>Inadequate Disclosures Regarding Value and Availability of PREPA's Assets</u>

87.        As noted above in connection with the uncertain disposition of PREPA's avoidance actions, a debtor is required to include, in a disclosure statement, a description of its assets and their value.  *See In re Ligon,* 50 B.R. 127, 130 (Bankr. M.D. Tenn. 1985) ("A description of available assets and their value is a vital element of necessary disclosure").  And, as further noted above, this is of particular importance in a municipal bankruptcy, as creditors are entitled to know whether a municipal debtor is allocating its assets in a way that allows creditors (and the Court) to conclude "that the payments provided for in the plan of composition are all

---

[54]    To be clear, the Committee is confident in its litigation position and that the PREPA bondholders will not prevail on either of the two main prongs of the Amended Lien & Recourse Challenge (*i.e.*, the extent of the bondholders' security interest and whether they have recourse, even on an unsecured basis, to PREPA's assets beyond the limited amount of collateral held in certain specified accounts).

35

that the [Debtor] is reasonably able to pay in the circumstances." *Lorber v. Vista Irr. Dist.*, 127

F.2d 628, 639 (9th Cir. 1942) (rejecting plan and quoting *Consolidated Rock Company v. Du*

*Bois*, 312 U.S. 510 (1941)).

88.     Accordingly, creditors are entitled to full and accurate disclosure of what assets

may be available to maximize creditor recoveries.  However, the Disclosure Statement fails to

include information about the value, availability, and allocation of PREPA's assets, making it

impossible for creditors to assess whether the Plan represents "a reasonable effort by [PREPA]"

to repay its creditors, *In Cnty. of Orange*, 191 B.R. 1005, 1020 (Bankr. C.D. Cal. 1996), and that

the proposed Plan "affords all creditors the potential for the greatest economic return from

Debtor's assets."  *In re Connector 2000 Ass'n, Inc.*, 447 B.R. 752, 766 (Bankr. D.S.C. 2011).

89.     The Committee believes that there is likely to be significant value in certain

PREPA assets that could be used to increase the recovery offered to holders of General

Unsecured Claims in Class 5.  For example:[55]

- The Disclosure Statement advises creditors that HUB Advanced Networks LLC, a fiber optic telecom company with a cable system throughout Puerto Rico, is a wholly-owned subsidiary of PREPA.  The Disclosure Statement, however, discloses no information about the value, or potential monetization of, this business.

- PREPA has billions of dollars of past-due accounts receivable,[56] which could potentially be a source of value and could even be sold on the secondary market.

- The Oversight Board should disclose whether PREPA has any unused buildings or other property.  Indeed, the Disclosure Statement discloses the existence of

---

[55]   The specific questions presented in this section of the Committee's Objection are just examples of potentially available assets.  The Committee has not issued any discovery requests in connection with this Objection, and the Committee reserves all rights including, without limitation, the right to further investigate the existence of such assets through discovery.

[56]   *See* Discl. Stmt. at 61 ("As of September 30, 2022, PREPA has the following unaudited, gross accounts receivable outstanding for its major customer classes: (i) $829,447,560.15 from residential customers, (ii) $655,286,793 from commercial customers, (iii) $83,365,358.38 from industrial customers, and (iv) $2,418,794,329.13 from governmental customers, a portion of which may be subject to offset by the municipalities against PREPA's CILT payable.").

PREPA PropertyCo, LLC, but offers no details on the extent, value, use, and PREPA's need for the assets held by PREPA PropertyCo, LLC.[57]

90.     The Disclosure Statement should be revised to explain the value and availability of PREPA's assets, including, without limitation, to address the specific questions posed herein.

### 2.  Inadequate Disclosures Regarding Pending Litigation

91.     As noted above, the Disclosure Statement fails to address the potential impact on the Plan of an adverse outcome in the Amended Lien & Recourse Challenge or the PREPA ERS litigation over "Current Expenses."  In addition to these litigations, the Disclosure Statement also fails to adequately address the potential outcome of the Cobra Admin Motion.  In fact, the Disclosure Statement does not include any substantive discussion of the Cobra Admin Motion, and merely informs creditors that, as of June 2022, Cobra has estimated its Administrative Expense Claim at $350 million.[58]  The Disclosure Statement also notes that if this claim is allowed, "PREPA will satisfy such Claim through the Claim Reserve Fund."[59]  However, neither the Disclosure Statement nor Plan define the term "Claim Reserve Fund" and, in fact, that term appears nowhere else in either document.

92.     Moreover, the Plan contemplates that PREPA will generate only $400 million through the sale of the Administrative Expense Bonds.  This calls into question PREPA's ability to pay its administrative expenses (and, therefore, to confirm any plan) if Cobra prevails on the Cobra Admin Motion.

93.     For all these reasons, the Disclosure Statement does not contain adequate information and, accordingly, the Disclosure Statement should not be approved.

---

[57]   Discl. Stmt at 57-58.

[58]   Discl. Stmt at 264.

[59]   Discl. Stmt at 264.

### III.   <u>Disclosure Statement Cannot Be Approved Because Plan Is Patently Unconfirmable</u>

94.     In addition to the requirement that a disclosure statement contain "adequate information" about the plan it describes, the plan it describes must be confirmable.  "If the plan is patently unconfirmable on its face, the application to approve the disclosure statement must be denied, as solicitation of the vote would be futile."  *In re Quigley Co.*, 377 B.R. 110, 115– 16 (Bankr. S.D.N.Y. 2007) (collecting cases); *In re Am. Capital Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012) (a court should "not proceed with the time-consuming and expensive proposition of hearings on a disclosure statement and plan when the plan may not be confirmable because it does not comply with [confirmation requirements]") (citation omitted); *In re El Comandante Mgmt. Co.*, 359 B.R. 410, 415 (Bankr. D.P.R. 2006) ("At the hearing on the approval of a disclosure statement, the court may consider issues pertaining to the plan, and may rule upon such issues, when the plan defects will make it unconfirmable . . . .").

95.     A plan is patently unconfirmable where (i) it contains confirmation defects that cannot be overcome by creditor voting results; and (ii) those defects concern matters upon which all material facts are not in dispute.  *In re Am. Capital Equip., LLC*, 688 F.3d at 155, quoting *In re Monroe Well Serv., Inc.*, 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987).  In other words, a plan is patently unconfirmable where it does not comply with section 1129 and other applicable provisions of the Bankruptcy Code.  *See In re Moshe*, 567 B.R. 438, 444 (Bankr. E.D.N.Y. 2017) (courts will not subject the estate to the expense of the confirmation process of a plan that does not comply with section 1129).

A.    Plan Is Unfairly Discriminatory[60]

96.    While the Bankruptcy Code does not define unfair discrimination, it is widely recognized that this requirement "ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes." *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 121 (D. Del. 2006) (citation omitted).  Under the widely recognized test for unfair discrimination test, as formulated by former Bankruptcy Judge Bruce A. Markell, unfair discrimination is presumed where "there is (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution." *In re Trib. Co.*, 972 F.3d 228, 241 (3d Cir. 2020) (internal references omitted).

97.    The Plan's preferential treatment of the Fuel Line Lenders as compared to holders of other General Unsecured Claims in Class 5 is unfairly discriminatory.  First, the Fuel Line Lenders and holders of other General Unsecured Claims are of the same priority *vis-à-vis* each other.  The Fuel Line Lenders are not secured, nor do they even allegedly enjoy any priority of payment over General Unsecured Claims in Class 5. *See In re Trib. Co.*, 972 F.3d at 242 ("unfair discrimination is determined from the perspective of the dissenting class").  Moreover, in the Oversight Board's analysis of PREPA's "Debt Stack" (in the Best Interest Test report), the estimated $800 million of "Other General Unsecured Claims" is listed last in line.  However, that

---

[60]    The Committee's discussion of the defects rendering the proposed Plan patently unconfirmable is not intended to be exhaustive but is, instead, only a high-level discussion of the unfairly discriminatory nature of the Plan's treatment of the Fuel Line Lenders as compared to other General Unsecured Claims in Class 5.  If the Disclosure Statement is approved and the proposed Plan proceeds to a confirmation trial, the Committee reserves all rights to supplement these arguments and raise additional arguments, including, without limitation, with respect to other instances of unfair discrimination in the Plan.

category is specifically labeled as "***Pre-Petition Current Expenses***."  ***In other words, the Oversight Board concedes that many, if not all, of the estimated $800 million in claims in Class 5 <u>are, in fact, Current Expense claims</u>***.  In light of this concession, there can be no basis to discriminate in favor of the Fuel Line Loan Claims and against General Unsecured Claims in Class 5.[61]

98.     <u>Second</u>, this difference in plan treatment results in a materially lower percentage recovery for one class (General Unsecured Claims in Class 5) as compared to the favored class (Fuel Line Loan Claims in Class 4).  Under the Plan, Fuel Line Lenders would receive a guaranteed recovery of 84%—and, as noted above, their baseline recovery is actually 92.7%. The guaranteed recovery offered to General Unsecured Claims, on the other hand, is 0.1%.  This is, under any standard, grossly discriminatory.  *See In re Tribune*, 472 B.R. 223, 243 (Bankr. D. Del. 2012) ("Courts considering the issue of unfair discrimination have roundly rejected plans proposing grossly disparate treatment (50% or more) to similarly situated creditors.").

99.     <u>Third</u>, regardless of the difference in percentage recoveries, the proposed distribution to holders of General Unsecured Claims in Class 5 forces holders of such claims to accept materially greater risk in connection with their (already limited) recovery as compared to the risk accepted by the Fuel Line Lenders.  This is because, as noted above, the Series A Bonds are qualitatively better than the Series B Bonds, as they mature in 15 years, with an expected repayment of only five years.  In contrast, the Series B Bonds offered to other general unsecured creditors will mature in 50 years, with a hoped-for 35-year repayment term.  Adding to the risk,

---

[61]   The Committee also notes that at the February 1, 2023 hearing, counsel for the ad hoc group of PREPA bondholders acknowledged that Current Expense claims should be paid ahead of the claims of the Bondholders. Hr'g Tr. 137:9-12 (Feb. 1, 2023) ("No remedy that we are seeking will foreclose his ability to prove that he is a current expense, in which case if we have a gross revenue pledge, he will be paid out ahead of us.").

the Plan provides that Series B Bonds do not receive any principal payments on their Series B

Bonds until the Series A Bonds have been paid in full, principal and interest.  *See In re DeLeo*,

No. 21-20025, 2022 WL 1072857, at *6 (Bankr. D. Me. Apr. 8, 2022) ("But this inquiry into

equality is not, as the debtor seems to believe, strictly limited to the amount to be distributed to

each creditor. . . A distribution on the first day following confirmation is different from a

distribution seven years later . . . The point here is that risk matters when thinking about fairness

and the balancing of debtor and creditor interests that must occur in any chapter 11 case.").

100.    The Committee expects that the Oversight Board will point to the alleged Current

Expense Priority as the justification for the Fuel Line Lenders' preferential treatment.  This

argument, however, suffers from multiple flaws.  For one, as noted above, multiple other

creditors are equally entitled to assert a Current Expense Priority, and the Oversight Board has

already conceded that General Unsecured Claims qualify as Current Expenses.

101.    Moreover, even to the extent the Fuel Line Lenders have a Current Expense

Priority that other general unsecured creditors do not have, that priority can be asserted only

against the Bondholders, and it cannot be used to justify a lower recovery for other general

unsecured creditors.  *See, e.g.*, *Fleet Cap. Corp. v. Yamaha Motor Corp., U.S.A.*, No. 01 Civ.

1047 (AJP), 2002 WL 31174470, at *32 (S.D.N.Y. Sept. 26, 2002) ("It is well-settled that a

subordination agreement between two parties to a transaction cannot adversely affect a third

party without his or her consent.") (internal quotation marks and citations omitted); *In re Smith*,

77 B.R. 624, 627 (Bankr. N.D. Ohio 1987) ("[U]nder § 510(a) the subordination of a secured

claim may not impair the rights of the other creditors.").

102.    Therefore, any priority the Fuel Line Lenders have cannot harm General

Unsecured Creditors in Class 5.  Stated simply, the extra dollars given to the Fuel Line Lenders

must come out of the Bondholders' recovery, not at the expense of the recovery for General

Unsecured Claims.  *See, e.g.*, *Kobak v. Nat'l City Bank (In re Kobak)*, 280 B.R. 164, 169 (Bankr.

N.D. Ohio 2002) (modeling distributions to three creditors in which two are party to a

subordination agreement, and explaining that non-party must be "in the exact same position,"

and "receive what it had expect to receive," as if there was no subordination agreement).

103.    Neither the Plan nor the Disclosure Statement make any effort to demonstrate that

the Fuel Line Lenders' additional recovery is, in fact, coming out of the Bondholders' pockets,

and is not harming other general unsecured creditors.  To the contrary, the Plan indicates the

opposite.  As discussed, the Fuel Line Lenders are receiving Series A Bonds that are not being

offered to any other creditor.  The Fuel Line Lenders, therefore, are ***not*** taking their extra

recovery from the Bondholders, as is required under these circumstances.

104.    For all these reasons, approval of the Disclosure Statement should be denied.

## IV.    Solicitation Procedures Objection

105.    The proposed Solicitation Procedures should be modified in the following ways.

First, the Solicitation Procedures prevent not only a creditor whose claim is subject to an

objection from voting, but also a creditor that received "a request for estimation."[62]  Not only is

this an impossibly vague statement, it is unsupported by the Bankruptcy Code and Bankruptcy

Rules.  Bankruptcy Rule 3018(a) states that "[n]otwithstanding objection to a claim or interest,

the court after notice and hearing may temporarily allow the claim or interest in an amount which

the court deems proper for the purpose of accepting or rejecting a plan."  Noticeably absent from

that provision is a "request for estimation."  Any creditor that has or will receive a request for

---

[62]    Discl. Stmt., Ex. A, Proposed Discl. Stmt. Order ¶ 35(h).  The Confirmation Hearing Notice should also be
modified to reflect this change.

estimation should be entitled to vote on the Plan and receive a Solicitation Package to the extent that such claim is not contingent or unliquidated.[63]

106.    <u>Second</u>, the Court should require the Oversight Board to serve on the parties entitled to receive the Solicitation Package a paper summary of the Plan (in English and in Spanish).  As acknowledged by the Oversight Board in connection with certain subsets of voting creditors, serving the Disclosure Statement and Plan on a flash drive may not be "the most effective method of serving such a population of prospective voters."[64]  This fact is true for many populations of creditors, many of whom may not have easy access to a computer.  For this reason, a paper summary is likely to be more useful to most creditors than a flash drive alone would be, or even a paper copy of the voluminous Disclosure Statement and Plan.

107.    Included in this summary should be a hard copy of the Committee's recommendation letter (discussed below), as well as instructions for how and where creditors can obtain and review hard copies of all the Disclosure Statement and Plan (with all exhibits).  To that end, the Oversight Board and/or PREPA should establish certain "centers" where such hard copies will be available.

108.    <u>Finally</u>, in the event that this Court approves the Disclosure Statement, the Committee requests that the Solicitation Package include a letter from the Committee setting forth the Committee's recommendation to holders of General Unsecured Claims in Class 5 with respect to whether to vote to accept or reject the Plan, in accordance with the Committee's fiduciary obligation to "advise those represented by [the Committee] of such committee's determinations as to any plan formulated."  11 U.S.C. § 1103(c)(3).

---

[63]    The proposed Disclosure Statement Order does not require the Oversight Board send a Solicitation Package to a creditor that receive a request for estimation.  Proposed Discl. Stmt. Order ¶ 28.

[64]    Proposed Discl. Stmt. Order ¶ 21 n.9.

109.    Such a committee recommendation letter is common practice in large, complex

bankruptcies, and is particularly appropriate in these cases given the length and complexity of

the Disclosure Statement and the Plan, and the amount of creditors, many of whom are owed

relatively small amounts and lack the resources to retain counsel or other bankruptcy

professionals (such as financial advisors) to help them review and analyze the voluminous

materials.  Combining the Committee's recommendation letter with the other solicitation

materials is the logical, and most efficient and cost-effective way, to provide this information to

general unsecured creditors.  The absence of such a letter in the proposed Disclosure Statement

Order is particularly surprising given this Court previously approved the inclusion of such a

Committee letter in connection the disclosure statement order in the Commonwealth's Title III

case.[65]  For all the same reasons, a Committee recommendation letter should be included in the

Disclosure Statement Order in this case as well.[66]

## V.      Confirmation Procedures Motion Objection

110.    The Oversight Board's proposed confirmation objection and discovery procedures

(the "Objection/Discovery Procedures")[67] should not be approved in their current form, as

certain aspects of the Objection/Discovery Procedures impose unduly burdensome hurdles to the

participation of general unsecured creditors in the confirmation process, including as it relates to

seeking discovery in connection with plan confirmation.

111.    First, the Oversight Board and PREPA should be required to prepare a privilege

log, which should be populated into the Depository by a date certain.

---

[65]   See CW Discl. Stmt. Order ¶ 13, Sched. 7 [Docket No. 17639].

[66]   The Committee intends to file its proposed recommendation letter in advance of the hearing on the approval of
the Disclosure Statement.

[67]   The proposed Objection/Discovery Procedures are set forth in the proposed order annexed as Exhibit A to the
Confirmation Procedures Motion.

44

112.     <u>Second</u>, the Disclosure Statement Order should ***not*** require (as it does now) that

any party wishing to participate in discovery (as opposed to reviewing and observing the results

of those taking discovery) must file a notice of its intention to participate in discovery (a

"<u>Discovery Notice</u>") by March 29, 2023 in order to serve discovery requests, or by April 24,

2023 in order to gain access to the Plan Depository.[68]

113.     There are numerous problems with the Discovery Notice requirement.  For one,

parties should not be required to file a Discovery Notice at all in order to participate in discovery,

because such a requirement will only make it more burdensome for creditors to participate and

will not streamline the discovery process.  In addition, the Oversight Board's proposed deadlines

for filing a Discovery Notice—March 29, 2023 to serve discovery requests, and April 24, 2023

in order to gain access to the Plan Depository—will, as a practical matter, likely prevent

creditors from participating in the discovery process because those deadlines may well be before

the Solicitation Mailing Deadline, which is not until 28 days after entry of the order approving

the Disclosure Statement (the hearing on which is currently set to be heard on February 28,

2023).  Based on that timeline, the Solicitation Packages might not even be mailed until after the

March 29, 2023 deadline in connection with the Discovery Notices.  Such a timeline does not

give unsecured creditors sufficient time to: (a) obtain, read, and digest the Disclosure Statement,

totaling over 800 pages (with exhibits), (b) determine whether to file a Discovery Notice, and

(c) prepare and file a Discovery Notice.  That would be a herculean task, particularly for a small

law firm or a creditor acting *pro se*.

114.     Accordingly, the Court should not require creditors to incur the cost and expense

of preparing a Discovery Notice in order to participate in the discovery process, and the

---

[68]     Proposed Discl. Stmt. Order, Sched. 2 ¶ 8.

Committee and interested creditors should be permitted to take discovery of all matters pertinent to confirmation of the Plan.

## **RESERVATION OF RIGHTS**

115.    The Committee reserves the right to, among other things, (i) amend or supplement this Objection in the event the Oversight Board files an amended disclosure statement or plan, (ii) join in any objection to the Disclosure Statement filed by any other party in interest, (iii) raise additional objections not incorporated herein, and (iv) raise the arguments made herein, and additional arguments, in connection with confirmation, and any objection thereto, of the Plan (or any other plan of adjustment filed in this Title III case).

## **CONCLUSION**

116.    The Disclosure Statement simply does not provide creditors the information to which they are entitled and which they require to make an informed decision about whether to vote to accept or reject the Plan.  Moreover, the Plan, in its current form, is patently unconfirmable.  Accordingly, the Committee respectfully submits that the Court should not approve the Disclosure Statement or the related Disclosure Statement Motion and Confirmation Procedures Motion.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Committee respectfully requests that the Court deny the Disclosure Statement Motion and the Confirmation Procedures Motion and grant such other relief as is just and proper.

Dated: February 3, 2023          By:  _/s/ Luc A. Despins_____

PAUL HASTINGS LLP
Luc A. Despins, Esq. *(Pro Hac Vice)*
G. Alexander Bongartz, Esq. *(Pro Hac Vice)*
200 Park Avenue
New York, New York 10166
Telephone:  (212) 318-6000
lucdespins@paulhastings.com
alexbongartz@paulhastings.com

*Counsel to the Official Committee of Unsecured Creditors*

By:  _/s/ Juan J. Casillas Ayala_____

CASILLAS, SANTIAGO & TORRES LLC
Juan J. Casillas Ayala, Esq. (USDC - PR 218312)
Israel Fernández Rodríguez, Esq. (USDC - PR 225004)
Juan C. Nieves González, Esq. (USDC - PR 231707)
Cristina B. Fernández Niggemann, Esq. (USDC - PR 306008)
PO Box 195075
San Juan, Puerto Rico 00919-5075
Telephone: (787) 523-3434 Fax: (787) 523-3433
jcasillas@cstlawpr.com
ifernandez@cstlawpr.com
jnieves@cstlawpr.com
crernandez@cstlawpr.com

*Local Counsel to the Official Committee of Unsecured Creditors*