# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO *et al.*,<br><br>Debtors.[1] | PROMESA Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Debtor. | PROMESA Title III<br><br>No. 17 BK 4780-LTS<br><br>(Jointly Administered) |

## OBJECTIONS OF PREPA BOND TRUSTEE REGARDING MOTION FOR APPROVAL OF DISCLOSURE STATEMENT FOR TITLE III PLAN OF ADJUSTMENT OF THE PUERTO RICO ELECTRIC POWER AUTHORITY

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's Federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico ("**Commonwealth**") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("**COFINA**") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("**HTA**") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("**ERS**") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("**PREPA**") (Bankruptcy Case No. 17 BK 04780-LTS) (Last Four Digits of Federal Tax ID: 3747).

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ..................................................................................................... ii

I.    INTRODUCTION ....................................................................................................... 1

II.   OBJECTION TO SETTLEMENT CLASS 1 ............................................................ 2

III.  SPECIFIC OBJECTIONS REGARDING THE INADEQUACY OF INFORMATION IN THE DISCLOSURE STATEMENT ................................................ 8

    A.    The Disclosure Statement Provides Incomplete and Unclear Information About the Series B Bonds and CVI. ...................................................... 10

        1.    Inadequate Disclosures About the Relationship of Legacy Charges and the Net Revenues that Will Be Available to Fund the Series B Bonds and CVI. .................................................................... 10

        2.    Inadequate and Inconsistent Disclosures About the Duty of Reorganized PREPA to Earn Net Revenues to Fund the Series B Bonds and CVI. ............................................................................. 12

        3.    The Remedies Supporting the New Bonds and CVI Are Unclear. ........... 13

        4.    The Disclosure Statement Is Unclear about the Proposed Collateral for the New Bonds. ........................................................... 15

    B.    The New Master Trust Agreement Should Be Made Available Prior to the Hearing on the Disclosure Statement. ............................................... 15

    C.    The Disclosure Statement Fails to Disclose Adequate Information Regarding the Treatment of Insured Bonds and Monoline Policies. ................. 177

    D.    The Disclosure Statement Fails to Disclose that Certain Federal Subsidy Monies Held by the PREPA Bond Trustee May Be Subject to Unique Lien Rights of the Series EEE and YY Bonds. ............................................ 17

IV.   AGREEMENT WITH JOINT OBJECTION ................................................................. 18

V.    CONCLUSION ............................................................................................................. 18

i

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**                                                                                        **<u>Page(s)</u>**

*Beal Bank, S.S.B. v. Waters Edge Ltd. P'ship,*
    248 B.R. 668 (D. Mass. 2000) ........................................................................ 6

*First Am. Bank of N.Y. v. Century Glove, Inc.,*
    81 B.R. 274 (D. Del. 1988) ........................................................................... 9

*Granada Wines, Inc. v. New England Teamsters and Trucking Industry Pension Fund,*
    748 F.2d 42 (1st Cir.1984) ............................................................................ 5

*In re Am. Roads LLC,*
    496 B.R. 727 (Bankr. S.D.N.Y. 2013) ........................................................... 4

*In re Autterson,*
    547 B.R. 372 (Bankr. D. Colo. 2016) ............................................................ 6

*In re BSL Operating Corp.,*
    57 B.R. 945 (Bankr. S.D.N.Y. 1986) ............................................................. 9

*In re Charles St. Afr. Methodist Episcopal Church of Bos.,*
    499 B.R. 66 (Bankr. D. Mass. 2013) .............................................................. 5

*In re Chateaugay Corp.,*
    89 F.3d 942 (2d Cir. 1996) ............................................................................. 6

*In re City of Detroit,*
    524 B.R. 147 (Bankr. E.D. Mich. 2014) ......................................................... 7

*In re Crowthers McCall Pattern, Inc.,*
    120 B.R. 279 (Bankr. S.D.N.Y. 1990) ........................................................... 9

*In re Deming Hospitality, LLC,*
    No. 11–12–13377 TA, 2013 WL 1397458 (Bankr. D. N.M. 2013) ........................... 6

*In re Dow Corning Corp.,*
    280 F.3d 648 (6th Cir. 2002) ......................................................................... 7

*In re Enron Corp.,*
    302 B.R. 463 (Bankr. S.D.N.Y. 2003) ........................................................... 5

*In re Ferretti,*
    128 B.R.  (Bankr. D.N.H. 1991) ................................................................... 9

*In re Hanish, LLC,*
    570 B.R. 4 (Bankr. D.N.H. 2017) ............................................................... 5

*In re Innkeepers USA Trust,*
    448 B.R. 131 (Bankr. S.D.N.Y. 2011) ......................................................... 5

*In re Ion Media Networks, Inc.,*
    419 B.R. 585 (Bankr. S.D.N.Y. 2009) ...................................................... 5, 7

*In re Lightsquared Inc.,*
    513 B.R. 56 (Bankr. S.D.N.Y. 2014) ........................................................... 6

*In re Loop 76, LLC,*
    465 B.R. 525 (9th Cir. BAP 2012) ........................................................... 6, 7

*In re McLean Indus., Inc.,*
    87 B.R. 830 (Bankr. S.D.N.Y. 1987) ........................................................... 8

*In re Momentum Mfg. Corp.,*
    25 F.3d 1132 (2d Cir. 1994) ........................................................................ 8

*In re Save Our Springs (S.O.S.) All., Inc.,*
    388 B.R. 202 (Bankr. W.D. Tex. 2008) ....................................................... 6

*In re U.S. Truck Co.,*
    800 F.2d 581 (6th Cir.1986) ........................................................................ 7

*Oneida Motor Freight, Inc. v. United Jersey Bank,*
    848 F.2d 414 (3d Cir. 1988) ........................................................................ 9

**<u>Statutes</u>**

11 U.S.C. § 510(a) ....................................................................................... 5, 7

11 U.S.C. § 1109 ............................................................................................. 4

11 U.S.C. § 1122 ....................................................................................... 5, 6, 7

11 U.S.C. § 1123(a)(4) ................................................................................... 8

11 U.S.C. § 1125 ..................................................................................... 2, 8, 9

22 L.P.R.A. § 207 ........................................................................................ 14

U.S. Bank National Association, in its capacity as trustee (the "**PREPA Bond Trustee**") under the terms of that certain Trust Agreement dated as of January 1, 1974 (as amended and supplemented from time to time, the "**Trust Agreement**"),[2] by and between PREPA and the Trustee, relating to the Puerto Rico Power Authority Power Revenue Bonds and the Puerto Rico Electric Power Authority Power Revenue Refunding Bonds (together, the "**Bonds**"),[3] by its undersigned attorneys respectfully submits this Objection (the "**Objection**") to the *Motion for Order (I) Approving Disclosure Statement (II) Fixing Voting Record Date, (III) Approving Confirmation Hearing Notice and Confirmation Schedule (IV) Approving Solicitation Packages and Distribution Procedures, (V) Approving Forms of Ballots and Voting Procedures, (VI) Approving Notice of Non-Voting Status, (VII) Approving Forms of Ballots and Voting Procedures, and (VIII) Approving Vote Tabulation Procedures* (the "**Disclosure Statement Approval Motion**") [ECF No. 3113] filed by the Financial Oversight and Management Board of Puerto Rico (the "**Oversight Board**") in conjunction with the disclosure statement (the "**Disclosure Statement**") [ECF No. 3111] and the proposed Title III Plan of Adjustment of Puerto Rico Power Electric Authority (the "**Plan**") [ECF No. 3110].

## I.  INTRODUCTION

The PREPA Bond Trustee objects to the Disclosure Statement because the Plan includes an impermissible effort to allocate the PREPA Bond Trustee's claim to individual bondholders in violation of the Trust Agreement.[4] Simply put, individual uninsured Bondholders have no ability

---

[2] References herein to the Trust Agreement are to the conformed version filed in the adversary proceeding styled *Fin. Oversight & Mgmt. Bd. for Puerto Rico v. U.S. Bank National Association as Trustee*, Adversary Proceeding No. 19-00391-LTS ("**Adversary 391**") [Joint Informative Mot., Ex. A, ECF No. 118]. Capitalized terms not otherwise defined herein have the meaning ascribed to them in the Plan or Disclosure Statement.

[3] Holders of the Bonds shall be referred to herein as "**Bondholders**".

[4] The PREPA Bond Trustee is not a party to the Settlement Offer and has not been consulted about its terms or contents.

1

to settle any part of the PREPA Bond Trustee's claim and lien rights, which the PREPA Bond Trustee is litigating on behalf of all Bondholders, consistent with the Trust Agreement's governance and collective action provisions. The Oversight Board's recently launched Settlement Offer Memorandum and RSA ("**Settlement Offer**") to beneficial holders of uninsured Bonds seeks unauthorized partial settlements of the Trustee's claims and to use those agreements to misclassify those who agree as a separate Class in the Plan. More generally, the Oversight Board's Disclosure Statement provides neither individual Bondholders nor the PREPA Bond Trustee with adequate information as required by Section 1125 of the Bankruptcy Code with respect to the New Bonds and CVI.

## II.   OBJECTION TO SETTLEMENT CLASS 1

The Oversight Board incorrectly assumes in its Plan that it has the right to settle Adversary 391 litigation disputes on a *pro rata* basis with any number of individual uninsured Bondholders[5] without regard to the governance provisions of the Trust Agreement. The Plan's proposed Bondholder Class 1 depends entirely on this assumption that the Oversight Board can do that which the Trust Agreement does not permit. Under the Trust Agreement individual Bondholders do not have the right to settle any portion of the PREPA Bond Trustee's claims unilaterally or to divert common consideration to themselves rather than to the Trust for distribution under Section 805 of the Trust Agreement.

The Trust Agreement is more than just a series of promises by PREPA to Bondholders and the PREPA Bond Trustee. It is also a comprehensive set of intercreditor promises among Bondholders and the PREPA Bond Trustee about how their claims against PREPA will be held

---

[5] Nothing in this Objection is intended to address separate Plan classification issues that may arise with respect to insured Bondholder claims, as to which all rights are reserved.

in trust and enforced collectively, as well as how any proceeds will be shared among Bondholders. No part of the Trust Agreement authorizes an individual Bondholder to settle any claim related to individual Bonds and to thereby obtain an individualized recovery.[6] Claims are to be asserted, whether by the Trustee or in some instances by Bondholders if they have sufficient holdings, on behalf of the Trust as a whole.

The Oversight Board's allegations in the Amended Complaint in Adversary 391 are based upon the correct premise that the entire Bond claim and lien rights (whatever the scope) are legally held by the PREPA Bond Trustee under the terms of the Trust Agreement for all Bondholders. [Adversary 391, Am. Compl. ¶ 11, ECF No. 26 (PREPA Bond Trustee "serves as the legal representative of all PREPA Bondholders with respect to the subject matter of this proceeding")].

In 2018, the Court upheld objections by both the PREPA Bond Trustee [ECF No. 991] and PREPA [ECF No. 993] to a lift stay motion brought by a PREPA Bondholder, Pan American Grain Co., Inc., who sought to exercise an alleged right of setoff of its Bond debt against a prepetition unsecured obligation that it owed to PREPA [ECF No. 974]. PREPA argued that there was no mutuality of debt as between Bondholder Pan American and PREPA because its Bond claims were held by the PREPA Bond Trustee. Specifically, PREPA forcefully observed:

> [U]nder Section 805 of the Trust Agreement, PREPA pays principal and interest due on the bonds to the Trustee, which then distributes the funds on a *pro rata* basis to bondholders.
>
> The rights of the bondholders under the Trust Agreement, therefore, are to be exercised for the benefit of **all** bondholders and not for the benefit of any single bondholder. An individual bondholder does not have the right to force payment of bond principal and interest solely for its own benefit. By attempting to implement a setoff, Pan American seeks to enforce the rights specific to its claim—a 100% recovery on its bonds through a dollar-for-dollar reduction in the amount it owes PREPA—for the sole benefit of itself. The plain language of the Trust Agreement,

---

[6] The Oversight Board cannot modify this basic tenet of the Trust Agreement by making the unauthorized offer to all Bondholders at once. Section 1102 of the Trust Agreement sets forth the method for amending its terms and nothing in the Settlement Offer seeks to follow that procedure.

however, prohibits Movant from enforcing any rights it may have as a bondholder
for its own benefit and not for the benefit of all bondholders.

In addition, contrary to the terms of Sections 805 and 808, Movant's setoff would
prejudice other bondholders. If Movant were allowed to set off its bond claim
against its debt to PREPA for electric power services, Movant effectively would
reduce the revenues securing the bonds while Movant would receive full payment
of the principal and interest on its bonds ahead of all other bondholders, leaving no
benefit to be distributed on a pro rata basis among other bondholders. The Trust
Agreement precludes Movant's assertion of any individual action to enforce any
rights in connection with its bonds for its own benefit. Accordingly, Movant's
separate debt to PREPA cannot be offset by any portion of PREPA's joint debt to
all bondholders.

[PREPA Obj. at 4–5, ECF No. 993].

The Court appropriately denied the motion, agreeing with the PREPA Bond Trustee (and

PREPA) that Pan American Grain was bound by limitations imposed by the Trust Agreement on

its rights to collect its Bond indebtedness separately:

> Due to the collective structure of bondholder rights and remedies under the
> Operative Trust Agreement, and specifically because of the no-action clause of
> that agreement, … movant does not have standing to unilaterally bring
> proceedings to enforce collection upon its PREPA bonds. …
>
> Moreover, the no-action clause of the Trust Agreement requires that all
> proceedings in law or equity brought by individual PREPA bondholders be
> maintained for the benefit of all PREPA bondholders. Nothing in the trust
> instrument or in bankruptcy law changes the powers of an individual bondholder
> under the Trust Agreement upon the issuer's entry into a bankruptcy proceeding.
>
> . . . .
>
> In effect, movant is asking this Court to create an additional noncontractual right
> to direct payment for certain PREPA bondholders. There is no legal basis for such
> a revision of a complex contractual arrangement to benefit a single bondholder
> that has no right to individual relief as against the issuer under the governing
> documents.

[Case No. 17-03283-LTS, Hearing Tr. at 48:8–50:9, ECF 4198]. The Court's ruling was in accord

with other courts that have considered the enforceability of "no action" provisions in bankruptcy.

*In re Am. Roads LLC*, 496 B.R. 727, 729–31 (Bankr. S.D.N.Y. 2013) ("[N]otwithstanding the

broad standing provisions of Bankruptcy Code section 1109, bankruptcy courts have routinely held that a party lacks standing to take an enforcement action in bankruptcy unilaterally in violation of a 'no action' clause."); *see also In re Innkeepers USA Trust*, 448 B.R. 131, 144 (Bankr. S.D.N.Y. 2011); *In re Ion Media Networks, Inc.*, 419 B.R. 585, 597 (Bankr. S.D.N.Y. 2009); *In re Enron Corp.*, 302 B.R. 463, 477 (Bankr. S.D.N.Y. 2003).

This is not an issue about the discretion of plan proponents under Section 1122(a) of the Bankruptcy Code to place substantially similar claims into separate classes, or whether *Granada Wines* applies to limit that discretion.[7] The point here is that neither PREPA nor individual prospective bondholders in Class 1 have any right under the Trust Agreement to unilaterally settle "any separate portion" of the claims and lien rights held collectively in trust by the PREPA Bond Trustee, which it has asserted on their behalf. Nor do they have any right to have any portion of the settlement value of the PREPA Bond Trustee's claim diverted to their own benefit. The right to vote in bankruptcy for plan approval does not mean that beneficial debtholders also have the right during the Title III process to violate the intercreditor limitations in their agreement with other debtholders. *See* 11 U.S.C. § 510(a). The Settlement Offer by the Oversight Board itself acknowledges that it might violate the classification provisions of the Bankruptcy Code and

---

[7] In 1984, the First Circuit stated that "[t]he general rule regarding classification is that all creditors of equal rank with claims against the same property should be placed in the same class," and that "[s]eparate classifications for unsecured creditors are only justified where the legal character of their claims is such as to accord them a status different from the other unsecured creditors." *Granada Wines, Inc. v. New England Teamsters and Trucking Industry Pension Fund*, 748 F.2d 42, 46 (1st Cir.1984) (internal quotations omitted); *In re Hanish, LLC*, 570 B.R. 4, 15 (Bankr. D.N.H. 2017) (gathering cases and stating that "[t]he First Circuit follows what is known as the 'strict approach' to classification"). However, the Court in this Title III case has previously ruled that *Granada Wines*' holding "is not an interpretation of section 1122 in Chapter 11 cases," that the classification rule was not "imported into PROMESA," and that section 1122 "does not require substantially similar claims to be joined together in the same class." [Case No. 17-03283-LTS, Hearing Tr. at 77:12–78:12, ECF No. 17379] (quoting *In re Charles St. Afr. Methodist Episcopal Church of Bos.*, 499 B.R. 66, 95 (Bankr. D. Mass. 2013)).

permits the Oversight Board unilaterally to terminate its obligations on that basis. [Notice of Distribution of Settlement Offer, Ex. B., § 10.02(vii), ECF No. 3171].

Even if Section 1122(a) applies here, it requires that the separate classification of substantially similar claims (let alone the division of a unified claim) have an appropriate business or economic justification, and there can be none where the prospective class is based entirely on settlement rights that do not exist. *See Beal Bank, S.S.B. v. Waters Edge Ltd. P'ship,* 248 B.R. 668, 691 (D. Mass. 2000); *see also In re Lightsquared Inc.*, 513 B.R. 56, 82–83 (Bankr. S.D.N.Y. 2014) (requiring a "reasonable (or rational) justification for separate classification" that does not "offend one's sensibility of due process and fair play" (internal quotation marks omitted)); *In re Loop 76, LLC*, 465 B.R. 525, 536 (9th Cir. BAP 2012), *aff'd,* 578 F. App'x 644 (9th Cir. 2014) (requiring a "business or economic justification"). After a creditor objects to a separate classification of substantially similar claims, the bankruptcy court will look to the debtor for a reasonable justification. *In re Chateaugay Corp.*, 89 F.3d 942, 949 (2d Cir. 1996) ("[T]o warrant having separate classification of similar claims, the debtor must advance a legitimate reason supported by credible proof."); *In re Autterson*, 547 B.R. 372, 398 (Bankr. D. Colo. 2016) ("[T]he Court will place the burden on the plan proponent to justify any separate classification of substantially similar claims, if a party in interest objects on gerrymandering grounds.") (quoting *In re Deming Hospitality, LLC,* No. 11–12–13377 TA, 2013 WL 1397458 (Bankr. D. N.M. 2013)) (internal quotation marks omitted). Failure to meet that burden results in improper classification. *E.g., In re Save Our Springs*

*(S.O.S.) All., Inc.,* 388 B.R. 202, 234 (Bankr. W.D. Tex. 2008) (finding that "the Debtor has failed to show any basis, in law or fact" for the separate classification of similar claims and, rather, "its purpose in doing so was to improperly gerrymander the vote"), *aff'd sub nom. In re*

*Save Our Springs All., Inc.*, No. A-08-CA-727 LY, 2009 WL 8637183 (W.D. Tex. Sept. 29, 2009),

*aff'd sub nom. In re Save Our Springs (S.O.S.) All., Inc.*, 632 F.3d 168 (5th Cir. 2011).

The propriety of classification is a matter over which the Court has significant discretion, and it should use that discretion at the disclosure statement phase to prohibit the bifurcated structure. *In re Dow Corning Corp.*, 280 F.3d 648, 661 (6th Cir. 2002) ("We have observed that 'Congress incorporated into section 1122 . . . broad discretion to determine proper classification according to the factual circumstances of each individual case.'") (quoting *In re U.S. Truck Co.*, 800 F.2d 581, 585 (6th Cir.1986)); *see also In re Loop*, 465 B.R. at 536; *In re City of Detroit*, 524 B.R. 147, 245 (Bankr. E.D. Mich. 2014) (applying *Dow Corning*'s quote to Chapter 9 cases).

Here the proposed classification would be especially harmful to the PREPA Bond Trustee's administration of Trust Agreement rights because it sets up conflicts and potential disputes between subsets of uninsured Bondholders. The proposed Class 1 Bondholders would be given a Plan treatment that would result in their obtaining a greater recovery if the Court rules against the PREPA Bond Trustee in Adversary 391, in which case the non-settling Bondholders would get nothing. The proposed Class 1 Bondholders would also do worse if the PREPA Bond Trustee prevails in Adversary 391. The PREPA Bond Trustee could hardly take actions that would serve their common interests as it confronts the issues in Adversary 391 or in connection with disputes concerning the Plan. PREPA should not be permitted in violation of the Trust Agreement to create inconsistent uninsured Bondholder classes who have diametrically opposed incentives with respect to the enforceability and value of the rights that the PREPA Bond Trustee is holding and is currently litigating for the benefit of all Bondholders. The proposed classification of claims is inappropriate and runs contrary to the principle that intercreditor agreements are enforceable in bankruptcy. *See* 11 U.S.C. § 510(a); *see also Ion Media Networks*, 419 B.R. at 595. If the

Oversight Board chooses, it can give individual Bondholders the option for less favorable treatment after a disclosure statement is approved under 11 U.S.C. § 1123(a)(4), but it cannot do so as it has proposed.

## III.   SPECIFIC OBJECTIONS REGARDING THE INADEQUACY OF INFORMATION IN THE DISCLOSURE STATEMENT

Apart from the problems with Class 1 described above, the Disclosure Statement fails to disclose sufficient detail regarding important aspects of the proposed Plan treatment of Bondholders, especially with respect to the New Bonds and CVI. Pursuant to section 1125(a) of the Bankruptcy Code, the proponent of a proposed plan must provide "adequate information" regarding that plan to holders of impaired claims and interests entitled to vote on the plan. 11 U.S.C. § 1125. Specifically, section 1125(a)(1) states, in relevant part, as follows:

> "[A]dequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan.

*Id.* § 1125(a)(1). A disclosure statement must, as a whole, provide information that is "reasonably practicable" to permit an "informed judgment" by creditors and interest holders, if applicable, to vote on a plan. *See In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994). The information provided to creditors must apprise them of both the risks and financial consequences of the proposed plan. *See In re McLean Indus., Inc.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987) ("substantial financial information with respect to the ramifications of any proposed plan will have to be provided to, and digested by, the creditors and other parties in interest in order to arrive at an informed decision concerning the acceptance or rejection of a proposed plan").

Congress intended "adequate information" to be a flexible standard that courts would apply on a case-by-case basis. *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("From the legislative history of § 1125 we discern that adequate information will be determined by the facts and circumstances of each case."). Despite the flexible standard, the bankruptcy code skews in favor of more disclosure. *In re Crowthers McCall Pattern, Inc*., 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990). The need for disclosure increases the more sophisticated the debtor is. *See First Am. Bank of N.Y. v. Century Glove, Inc.*, 81 B.R. 274, 279 (D. Del. 1988) (noting that adequacy of disclosure for a particular debtor will be determined based on how much information is available from outside source). Additionally, courts consider many factors, such as the complexity and size of the bankruptcy case and the nature of the proposed plan, in determining the burden that the debtor must meet in adequately disclosing information. *In re Ferretti*, 128 B.R. 18, 18–19 (Bankr. D.N.H. 1991). The Oversight Board has consistently apprised the Court of the complexity of these Title III cases and has described the wealth of resources it has at its disposal to address issues raised in these Title III cases. Therefore, it is appropriate for the Court to hold PREPA to a high standard and to require that PREPA provide enough information such that a reasonable and typical creditor may make an informed judgment regarding the toggle plan that PREPA has proposed. *In re BSL Operating Corp*., 57 B.R. 945, 950 (Bankr. S.D.N.Y. 1986).

In the Disclosure Statement Approval Motion, the Oversight Board correctly acknowledged that it is bound to make full and honest disclosures, stating that "[g]iven the important role a disclosure statement plays in the bankruptcy process, courts place great emphasis on the debtor's obligation to make a "'full and honest disclosure.'" [Disclosure Statement Approval Mot., ¶ 43, ECF 3113].

The Disclosure Statement spends hundreds of pages covering general topics about Puerto Rico and PREPA, which is of marginal importance to a hypothetical Bondholder trying to discern the value of the proposed Plan consideration relative to its existing rights and remedies. Moreover, the limited information that is presented with respect to the value being offered to Bondholders is incomplete and obscures the uncertain nature of the New Bonds and the CVI as enforceable debt instruments.

### A.    The Disclosure Statement Provides Incomplete and Unclear Information About the Series B Bonds and CVI.

Under the Plan, Bondholders, however classified, are eligible to receive new Series B Bonds and CVI as the principal form of Plan consideration. The Disclosure Statement is incomplete and unclear about the rights being offered to Bondholders and the rights and powers being retained by Reorganized PREPA that go to the heart of the Plan value proposition.[8]

### 1.    Inadequate Disclosures About the Relationship of Legacy Charges and the Net Revenues that Will Be Available to Fund the Series B Bonds and CVI.

The concept of "Net Revenues" is crucial to understanding the value of the Series B Bonds and CVI as it is their only source of payment or value. Yet its meaning is not well defined or complete.[9] The Disclosure Statement suggests that Bondholders have direct rights in future Legacy Charges to back repayment of the New Bonds, but other provisions inconsistently indicate that the

---

[8] The PREPA Bond Trustee notes that the Settlement Offer appears to contain corresponding information deficiencies. The PREPA Bond Trustee had no role in drafting the Settlement Offer and expressly disclaims any responsibility for its compliance or lack of compliance with applicable laws. The PREPA Bond Trustee's duties are limited by the Trust Agreement.

[9] Statements herein about the apparent terms or legal effect of the New Bonds as disclosed in the Disclosure Statement are not intended in any way as statements about the terms or legal effect of the Bonds or the rights of Bondholders or the PREPA Bond Trustee under the Trust Agreement, and nothing herein is intended as a waiver or admission of any kind with respect thereto. Rather, as stated above, they are intended to point out possible defects, some of which may exist only if the Oversight Board's erroneous arguments in Adversary 391 were to be accepted.

Legacy Charges function only as additional Revenues and as a cap on the amount of Net Revenues that PREPA is required to deposit to the Debt Service Fund.

Net Revenues are defined in the Plan as "Revenues" less "Operating Expenses" [Plan at 14]. Revenues, in turn, are defined in the Plan as:

> all moneys received by Reorganized PREPA, including the income derived by Reorganized PREPA from the sale of electricity generated or distributed, any proceeds of use and occupancy insurance or any part thereof, and income from investments made by Reorganized PREPA.

[Plan at 20]. Operating Expenses are defined as:

> Reorganized PREPA's reasonable and necessary current expenses of maintaining, repairing and operating the system and shall include, without limiting the generality of the foregoing, all administrative expenses, insurance premiums, expenses of preliminary surveys not chargeable to capital expenditures, engineering expenses relating to operation and maintenance, legal expenses, any payment to pension, pension trust, or retirement funds, and all other expenses required to be paid by Reorganized PREPA under the provisions of the definitive documentation governing the New Bonds, under its contractual obligations (including under any contracts relating to a "PREPA Transaction" as defined in Act 120-2018), or by law, or permitted by standard practices for public utility systems, plus a reserve of up to two (2) months of expenditures for the foregoing as reasonably estimated by Reorganized PREPA from time to time.

[Plan at 15].

Lurking within the above definitions are myriad questions, including whether Revenues are intended to include only income of, and moneys received by, Reorganized PREPA; whether Revenues include payments received by LUMA or by subsidiaries and affiliates of Reorganized PREPA; and who will decide whether an expenditure is a reasonable and necessary Operating Expense and on what basis.[10]

---

[10] The planned transformation of PREPA and its possible effect on repayment of the New Bonds is also not addressed. The Disclosure Statement fails to explain how the calculation of Net Revenues will be accounted for and affected by the transformation process before or during the life of the New Bonds and what protections if any exist with respect to the calculation of Net Revenues for purposes of the payments on the New Bonds. Are PREPA's capital expenses today to maintain a generation asset it owns going to become tomorrow's Operating Expenses in form of purchased electricity from a third party?

Moreover, the Disclosure Statement does not include any meaningful projections of Reorganized PREPA's future Net Revenues as defined in the Plan or what commitment Reorganized PREPA would undertake to produce Net Revenues. Because some or all of the Legacy Charges Revenues may simply be soaked up by higher discretionary Operating Expenses, adequate information would require the Oversight Board to provide more specific projections of Reorganized PREPA's Net Revenues taking into account: (i) the definitions it is using in the Plan for Reorganized PREPA, (ii) any new entities that will own system assets or have rights to collect or hold Revenues, and (iii) transfers of system assets and other relevant changes in its transformation process and protections, if any, afforded to the holders of New Bonds and CVI. The 2022 Fiscal Plan attached to the Disclosure Statement indicates that, according to its unaudited records, PREPA is currently operating at an operating deficit, but it is not clear how this information relates to the projected amount of Reorganized PREPA's Net Revenues. [Disclosure Statement, Ex. E at 40].

### 2. Inadequate and Inconsistent Disclosures About the Duty of Reorganized PREPA to Earn Net Revenues to Fund the Series B Bonds and CVI.

The Disclosure Statement is unclear and inconsistent about the duty that Reorganized PREPA will have to try to produce Net Revenues equal to or in excess of the Legacy Charges during the term of the Series B Bonds and the CVI. The only standards of duty for Reorganized PREPA referenced in the Disclosure Statement with respect to the Series B Bonds and CVI are described in one place as a duty "to take reasonable measures," in another as "reasonable best efforts," and in another as "reasonable efforts" [Disclosure Statement at 276, 278, 339, 351]. Importantly, these duties do not explicitly create any duty to maintain minimum Net Revenues. For example, the Disclosure Statement includes a "Key Covenant" by Reorganized PREPA to:

> Make reasonable efforts to (a) continue to levy and collect rates, fees, and charges,
> including, but not limited to, the Legacy Charge and the Remaining Legacy Charge
> and (b) deposit Net Revenues collected from such rates, fees, and charges into the
> Debt Service Fund in accordance with the Payment Waterfall.

[Disclosure Statement at 276]. Notably missing from this "key covenant" is any promise by

Reorganized PREPA to make reasonable efforts (or any efforts) to levy and collect enough

Revenues and control Operating Expenses to result in Net Revenues equal at least to the

amount of the Legacy Charges so that there will be deposits to the Debt Service Fund

corresponding in amount to the Legacy Charges.

Similarly, with respect to events of default on the Series B Bonds, the Disclosure Statement

provides:

> There shall be no event of default on the New Bonds (prior to stated final maturity
> of the Series A Bonds, solely with respect to the Series A Bonds, and generally with
> respect to the Series B Bonds) for failure to pay scheduled debt service, so long as
> Reorganized PREPA (a) charges and employs its reasonable best efforts to (i) levy
> the Legacy Charge, (ii) collect the Revenues generated by the Legacy Charge, and
> (iii) deposit the full amount of Net Revenues up to the amount of the Legacy Charge
> Revenues into the Debt Service Fund after providing for distributions made in
> accordance with the Payment Waterfall, and (b) complies with the Interest Rate
> Covenant.

[Disclosure Statement at 278]. At first blush this looks like a reasonable best-efforts commitment

to levy, collect and use the Legacy Charges to pay the New Bonds, but upon closer examination it

is not. The "reasonable best efforts" obligation of Reorganized PREPA does not extend to actually

generating Net Revenues at all.

### 3.     The Remedies Supporting the New Bonds and CVI Are Unclear.

In addition to the limitations on events of default discussed above, if an event of default

occurs, the available remedies are severely restricted:

> Upon the occurrence of an event of default on the New Bonds or the CVI, the New
> Master Trustee's *sole remedies* shall be to: (a) seek enforcement of Reorganized
> PREPA's obligation to take reasonable measures to levy rates, fees, and charges,
> including, but not limited to, the Legacy Charge and the Remaining Legacy Charge

and collect Revenues generated by the Legacy Charge and Remaining Legacy Charge and deposit Net Revenues up to the amount of the Legacy Charge Revenues with respect to the New Bonds and up to the amount of the Remaining Legacy Charge Revenues with respect to the CVI into the Debt Service Fund in accordance with the Payment Waterfall; and/or (b) prior to the Series A Bond Defeasance Date, as applicable, at the request of twenty-five percent (25.0%) or more of the Series A Bonds, enforce the Interest Rate Covenant. All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies that provide the "Right to Receivership Upon Default," codified at 22 L.P.R.A. § 207, are preempted as inconsistent with PROMESA.

[Disclosure Statement at 278 (emphasis added)].

Once again, there is no express requirement that Reorganized PREPA levy rates or otherwise seek to produce sufficient Net Revenues so that the Legacy Charges will be transformed into payments to holders of the Series B Bonds. The remedy available to the New Master Trustee is to seek specific performance of Reorganized PREPA's duty to use "reasonable measures" to take various actions, none of which would necessarily be sufficient to cause there to be Net Revenues or payments.

Similarly, the Interest Rate Covenant referenced above superficially appears to suggest protection for Series B Bonds, but closer examination discloses otherwise. It states:

Until the earlier of repayment of the Series A Bonds or the final maturity of the Series A Bonds, if, in any given year, the Net Revenues up to the amount of the Legacy Charge Revenues deposited in the Debt Service Fund are insufficient to satisfy the interest due and owing on the New Bonds that Fiscal Year, Reorganized PREPA shall (and absent Reorganized PREPA's action, the New Master Trustee shall) (a) exercise its powers to the fullest extent of the law to implement an increase in the Legacy Charge sufficient to repay such interest due and payable on the New Bonds in the succeeding fiscal year and/or (b) initiate a rate case before PREB or any other proceeding to compel PREB to implement an increase in the Legacy Charge sufficient to repay such interest due and payable on the New Bonds in the succeeding fiscal year (the "Interest Rate Covenant"). The New Master Trustee shall have the right to compel specific performance of the Interest Rate Covenant.

[Disclosure Statement at 277].

14

First, the Interest Rate Covenant only lasts until the Series A Notes are paid, which is estimated to take three years, and apparently only the Series A Bondholders have the right to invoke the Interest Rate Covenant. Second, the only thing protected by the Interest Rate Covenant is the payment of interest on the New Bonds. Does this imply that no amortization of principal is required or expected?

### 4.    The Disclosure Statement Is Unclear about the Proposed Collateral for the New Bonds.

The Disclosure Statement claims that the New Bonds are secured, but the language is again unclear about what liens, if any, secure them. The Disclosure Statement provides:

> The New Bonds shall be secured by Reorganized PREPA's Net Revenues up to an amount equal to the Legacy Charge Revenues *and the right to receive such Net Revenues up to an amount equal to the Legacy Charge Revenues*, as more particularly described in the New Master Indenture. For the avoidance of doubt, the Lien securing the New Bonds is not limited to the Net Revenues deposited in the Debt Service Fund.

[Disclosure Statement at 275 (emphasis added)]. The intended scope of this lien suffers from all the uncertainties discussed above based upon unclear definitions of "Revenues" and "Operating Expenses" and how they are to be determined. *See supra* Section III.A.1. This lack of clarity about the intended lien is further confused by stand-alone statements in the Disclosure Statement that the New Bonds are "payable solely from the Net Revenues deposited to the credit of the Debt Service Fund." [Disclosure Statement at 349].

### B.    The New Master Trust Agreement Should Be Made Available Prior to the Hearing on the Disclosure Statement.

The Oversight Board indicates that it will file the New Master Trust Indenture as a Plan Supplement seven days before the voting and Plan confirmation objection deadline. Bondholders, however, should be permitted to review the complete New Master Trust Indenture before the Disclosure Statement is approved.

15

A complete New Master Trust Indenture could, for example, clarify for Bondholders whether the New Master Trustee will be independent of PREPA and to what extent the $100,000 cap on its fees and expenses will apply to limit enforcement remedies if Reorganized PREPA breaches its obligations. Additionally, the New Master Trust Indenture should indicate the applicable interest rate for Series B Bonds within the prescribed range of 5.625% and 6.50% or at least provide a method for its determination.[11] It should also explain the differences in subseries of Series B Bonds that may be issued and the rights, if any, of Bondholders to pick which subseries they will get. The complete New Master Trust Indenture would also let Bondholders know which covenants will be included and to see the actual wording for the "key covenants" described in the Disclosure Statement. Important covenants could include (i) the duty of Reorganized PREPA to seek rate approvals or control Operating Expenses at sufficient levels to generate New Revenues at least equal to or in excess of the Legacy Charges, (ii) financial reporting, (iii) limitations on the incurrence of liens, indebtedness, and transfer of "system" assets by PREPA. This level of disclosure, which is not extraordinary, but is rather adequate, would help Bondholders determine the value, if any, of the New Bonds and CVI.

Having the full New Master Trust Indenture might also provide more clarity about the relative rights of the Series A and Series B holders of New Bonds and the extent of subordination.[12]

---

[11] Recent disclosures by the Oversight Board provide some additional detail beyond what was included in the December 16, 2022, filings, but do not provide concrete detail regarding which Series B Bonds will be provided to settling Bondholders, appearing to leave the Oversight Board with unfettered discretion.

[12] The PREPA Bond Trustee does not agree that the Fuel Line Lenders are entitled to priority under the Plan.

**C.  The Disclosure Statement Fails to Disclose Adequate Information Regarding the Treatment of Insured Bonds and Monoline Policies.**

The Plan classifies Monolines[13] and Bondholders together without distinction. In the Disclosure Statement Approval Motion, the Oversight Board seeks authority to solicit votes on the Plan solely from the Monolines with respect to those Bonds for which the Trustee has made claims to the Monolines (the "**Insured Bonds**"). The Disclosure Statement does not indicate whether the holders of Insured Bonds or the Monolines will receive Plan consideration and fails to include mechanisms like those used in the Commonwealth's Title III plan to manage the respective rights of the Monolines and Bondholders with respect to Plan payments during the remaining life of the existing policies. While the Plan provides that the rights to receive insurance claim payments on the Insured Bonds are not cancelled, the Plan does not define or address the status of the insurance agreements that currently cover the process of making Monoline insurance claims. All of these issues should be addressed clearly so that both the holders of Insured Bonds and the PREPA Bond Trustee can determine the legal effect of the Plan on their respective rights and obligations over the remaining life of the Monoline insurance policies and related agreements.

**D.  The Disclosure Statement Fails to Disclose that Certain Federal Subsidy Monies Held by the PREPA Bond Trustee May Be Subject to Unique Lien Rights of the Series EEE and YY Bonds.**

The PREPA Bond Trustee is currently holding approximately $16.8 million in the Sinking Fund, which includes Federal Subsidy Payments (as defined in the Trust Agreement) received directly by the PREPA Bond Trustee. The Federal Subsidy Payments were pledged to secure only the Federally Subsidized Bonds (Series EEE and YY) by the relevant authorizing PREPA Board

---

[13] The "**Monolines**" include National Public Finance Guarantee Corporation ("**National**"), Assured Guaranty Corp. and Assured Guaranty Municipal Corp., and Syncora Guarantee Inc. The Oversight Board has disclosed that it has a settlement in principle with National, but it has as yet provided no detail, nor has it amended the Disclosure Statement. The PREPA Bond Trustee reserves all rights in that regard.

resolutions as permitted by Section 209 of the Trust Agreement. In addition, the rights of the Series EEE and YY Bondholders are subject to the prior rights of the PREPA Bond Trustee. [Trust Agreement at 905]. The Disclosure Statement inaccurately fails to disclose that a portion of the funds currently held by the PREPA Bond may be subject to the prior claims of Series EEE and YY Bondholders and to that extent would not be available for pro rata distribution to all Bondholders.

## IV.    AGREEMENT WITH JOINT OBJECTION

The PREPA Bond Trustee agrees with and joins in the objections to the Disclosure Statement included in the Objection filed by the Ad Hoc Group of Bondholders, including that (1) the Plan is unconfirmable and does not comply with the Court's request to the Oversight Board that it submit a confirmable plan, (2) the Plan is not in the best interest of creditors or feasible, (3) the Plan cannot satisfy the cramdown requirements, (4) the disclosures in the Disclosure Statement are inaccurate and incomplete, and (5) the proposed confirmation litigation schedule should be modified. In the event that the Court permits the Oversight Board to proceed with the Disclosure Statement, the Trustee joins in the arguments made by the Ad Hoc Group of Bondholders that the Disclosure Statement must include significant additional information, including many of the additions they propose.[14]

## V.    CONCLUSION

For the reasons set forth herein, including the arguments referenced herein that are included in the Joint Objection, the Trustee objects to the Disclosure Statement and asks that the Court reject

---

[14] To the extent that the Objection by the Ad Hoc Group of Bondholders includes statements regarding future actions that the Ad Hoc Group of Bondholders may take, the Trustee will decide in the future whether it will join in such actions on a case-by-case basis.

it as proposed. The PREPA Bond Trustee reserves the right to file supplemental objections if the

Oversight Board amends the Disclosure Statement.

We hereby certify that, on this same date, we electronically filed the foregoing with the clerk of the Court using the CM/ECF system, which will notify the attorneys of record.

Respectfully submitted,

In San Juan, Puerto Rico, today February 3, 2023.

**RIVERA, TULLA AND FERRER, LLC**

By: */s Eric A. Tulla*
Eric A. Tulla, USDC-DPR No. 118313
Rivera Tulla & Ferrer Building
50 Quisqueya Street
San Juan, PR 00917-1212
Tel: (787)753-0438
Fax: (787)767-5784
Email: etulla@riveratulla.com

-And-

**MASLON LLP**

By: */s Clark T. Whitmore*
Clark T. Whitmore (admitted *pro hac vice*)
Michael C. McCarthy (admitted *pro hac vice*)
John T. Duffey (admitted *pro hac vice*)
Jason M. Reed (admitted *pro hac vice*)
90 South Seventh Street, Suite 3300
Minneapolis, MN 55402
Telephone: 612-672-8200
Facsimile: 612-642-4800
Email:    clark.whitmore@maslon.com
            mike.mccarthy@maslon.com
            john.duffey@maslon.com
            jason.reed@maslon.com

**ATTORNEYS FOR U.S. BANK
NATIONAL ASSOCIATION, IN ITS
CAPACITY AS TRUSTEE**