# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors.[1] | PROMESA Title III<br><br>No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Debtor. | PROMESA Title III<br><br>No. 17-BK-4780-LTS |

---

[1]   The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("**COFINA**") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("**HTA**") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("**ERS**") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("**PREPA**") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("**PBA**") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**ASSURED GUARANTY CORP. AND ASSURED GUARANTY MUNICIPAL CORP.'S (A) OBJECTION TO MOTION OF PUERTO RICO ELECTRIC POWER AUTHORITY FOR ORDER (I) APPROVING DISCLOSURE STATEMENT, (II) FIXING VOTING RECORD DATE, (III) APPROVING CONFIRMATION HEARING NOTICE AND CONFIRMATION SCHEDULE, (IV) APPROVING SOLICITATION PACKAGES AND DISTRIBUTION PROCEDURES, (V) APPROVING FORMS OF BALLOTS AND VOTING PROCEDURES, (VI) APPROVING NOTICE OF NON-VOTING STATUS, (VII) FIXING VOTING AND CONFIRMATION DEADLINES, AND (VIII) APPROVING VOTE TABULATION PROCEDURES, AND (B) JOINDER TO OMNIBUS OBJECTIONS OF THE AD HOC GROUP OF PREPA BONDHOLDERS TO THE DISCLOSURE STATEMENT FOR THE TITLE III PLAN OF ADJUSTMENT OF THE PUERTO RICO ELECTRIC POWER AUTHORITY [ECF NO. 3111], AND RELATED PROCEDURAL MOTIONS RELATED TO THE DISCLOSURE STATEMENT AND PLAN CONFIRMATION [ECF NOS. 3113, 3114]**

# <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

PRELIMINARY STATEMENT ...........................................................................1

BACKGROUND ...............................................................................................3

I.      PREPA's Interest Rate Swaps. ........................................................3

II.     The Amended Lien and Recourse Challenge.....................................6

III.    Disclosure Statement. .....................................................................8

OBJECTION ...................................................................................................10

I.      The Disclosure Statement Fails to Include Adequate Information Regarding the
        Swap Claims. ...............................................................................10

        A.      The Disclosure Statement Fails to Include a Description of the Swap
                Claims. ...........................................................................11

        B.      The Disclosure Statement Contains Inadequate Disclosures Concerning
                Litigation Claims That Impact Plan Distributions of Swap Claim Holders. .........13

        C.      The Disclosure Statement Contains Inadequate Information Regarding the
                Risks and Contingencies for Distributions to the Swap Claim Holders. ..............17

II.     Matured Bonds No Longer Held through DTC Should be Voted by Ballot Rather
        than Through ATOP. ....................................................................19

III.    Joinder to Ad Hoc Group Objection ...............................................20

RESERVATION OF RIGHTS ...........................................................................20

CONCLUSION................................................................................................21

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases:**

*BKB Properties LLC v. SunTrust Bank*,
   453 Fed. Appx. 582 (6th Cir. 2011) .................................................................4

*Enron Creditors Recovery Corp. v. Alfa, SAB de CV*,
   651 F.3d 329 (2d Cir. 2011) .........................................................................18

*In re Brundage-Bone Concrete Pumping, Inc.*,
   Case No. 10-10758-TBM, ECF No. 1421 (Bankr. D. Colo. Jan 18, 2011) ...........10

*In re Cardinal Congregate I*,
   121 B.R. 760 (Bankr. S.D. Ohio 1990) ..................................................11, 12, 17

*In re Energy Future Holdings Corp.*,
   Case No. 14-10979-CSS, ECF No. 1957 (Bankr. D. Del.  Sept. 3, 2014) .............10

*In re Feretti*,
   128 B.R. 16 (Bankr. D.N.H. 1991) ........................................................11, 12, 17

*In re Forester*,
   2021 WL 603378 (Bankr. C.D. Cal. Feb. 10, 2021) ...........................................7

*In re Forrest*,
   424 B.R. 831 (Bankr. N.D. Ill. 2009) ............................................................6

*In re Gatehouse Media, Inc.*,
   Case No. 13-12503-MFW, ECF No. 15 (Bankr. D. Del.  Sept. 27, 2013) .............10

*In re Metrocraft Publ'g Servs., Inc.*,
   39 B.R. 567 (Bankr. N.D. Ga. 1984) ..........................................................12, 13

*In re Mickey's Enters., Inc.*,
   165 B.R. 188 (Bankr. W.D. Tex. 1994) .........................................................13, 17

*In re Nat'l Gas Distribs., LLC*,
   556 F.3d 247 (4th Cir. 2009) .....................................................................18

*In re Robert's Plumbing and Heating LLC*,
   No. 10-23221, 2011 WL 2972092 (Bankr. D. Md. July 20, 2011) .......................12

*In re Scioto Valley Mortg. Co.*,
   88 B.R. 168 (Bankr. S.D. Ohio 1988) ............................................................11, 12

**TABLE OF AUTHORITIES, *cont'd***

**Page(s)**

*In re Tribune Co. Fraudulent Conveyance Litig.*,
    818 F.3d 98 (2d Cir. 2016) ..................................................................................18

*Thrifty Oil Co. v. Bank of Am. Nat'l Tr.*,
    322 F.3d 1039 (9th Cir. 2003) ........................................................................5, 10

*Westland Oil Dev. Corp. v. MCorp Mgmt. Solutions*,
    157 B.R. 100 (S.D. Tex. 1993) ......................................................................13, 17

*Whyte v. Barclays Bank PLC*,
    494 B.R. 196 (S.D.N.Y. 2013), *aff'd* 664 Fed. Appx. 60 (2d Cir. 2016) ................6

**Statutes:**

11 U.S.C. §

    362(b)(17) ........................................................................................................5, 9
    546(g) ............................................................................................................5, 18
    560 ......................................................................................................................5
    1125(a)(1) ..........................................................................................................11
    1125(b) ..............................................................................................................10

Fed. R. Bankr. P. 3007(b) ...................................................................................6

Fed. R. Bankr. P. 7001 .......................................................................................6

Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (together, "**Assured**") hereby submit this (A) objection to the *Motion of Puerto Rico Electric Power Authority for Order (I) Approving Disclosure Statement, (II) Fixing Voting Record Date, (III) Approving Confirmation Hearing Notice and Confirmation Schedule, (IV) Approving Solicitation Packages and Distribution Procedures, (V) Approving Forms of Ballots and Voting Procedures (VI) Approving Notice of Non-Voting Status, (VII) Fixing Voting and Confirmation Deadlines, and (VIII) Approving Vote Tabulation Procedures* (Case No. 17-3283-LTS, ECF No. 23099, the "**Motion**"),[2] and (B) partial joinder (such joinder and objection, together, the "**Objection**") to the *Omnibus Objections of the Ad Hoc Group of PREPA Bondholders to the Disclosure Statement for the Title III Plan of Adjustment of the Puerto Rico Electric Power Authority [ECF No. 3111], and Related Procedural Motions Related to the Disclosure Statement and Plan Confirmation* (the "**Ad Hoc Group Objection**"), and respectfully state as follows:

## PRELIMINARY STATEMENT

1.      At the November 2, 2022 omnibus hearing, this Court made clear that it expected the Financial Oversight and Management Board for Puerto Rico ("**FOMB**") to submit a "confirmable" plan, meaning a plan that "meaningfully and realistically contemplates scenarios in which each party fails to prevail on their claims in litigation to the extent that they expect to in order that, on resolution of issues in the litigation, no matter what the outcome is, we can move toward confirmation with alacrity." *See* Hr'g Tr. 16:10-16, Nov. 2, 2022, Case No. 17-3283, ECF No. 22795.  Despite the court's clear expectations, the plan and disclosure statement filed by the Board are patently unconfirmable and unapprovable.  FOMB filed the *Disclosure Statement for*

---

[2]    Capitalized terms used in this Objection but not defined herein shall have the meanings ascribed to them in the Motion and/or in the Title III Plan, as applicable.  Unless otherwise indicated, references to ECF numbers in this Objection are to the docket in case number 17-4780-LTS.

*Title III Plan of Adjustment of the Puerto Rico Electric Power Authority* (Case No. 17-3283, ECF No. 23097, the "**Disclosure Statement**") and a related Title III plan of adjustment for PREPA (the "**Title III Plan**").   While FOMB touted that it had the support of two creditor groups that collectively hold $800 million of claims, this represents less than ten percent of the indebtedness that FOMB claimed PREPA needed to restructure.[3]   In other words, the Title III Plan lacks the support of the vast majority of PREPA's creditors.

2.      Beyond lacking significant creditor support, the Disclosure Statement is clearly but a placeholder, because it is devoid of basic information that creditors need to properly assess the Title III Plan.   As this Court has recognized, a disclosure statement must provide "information sufficient to permit a hypothetical creditor or investor to make an informed judgment about the proposed Plan of Adjustment."[4]   The Disclosure Statement lacks such information.

3.      As one example, Assured is an insurer of swap claims, which are included within Class 7 of the Title III Plan.   The Disclosure Statement purports to describe the treatment of such claims, but actually fails to include any summary of the swap claims.   The Disclosure Statement also does not explain what claims Assured, in its capacity as the holder of the swap claims, would settle or why litigation concerning the PREPA bondholders' liens and recourse is relevant to the treatment of Class 7.   Nor does the Disclosure Statement describe a potential claim objection to the Swaps under section 502(b)(2) of the Bankruptcy Code—notwithstanding that FOMB has admitted it may bring such an objection.   That information is critical because, by FOMB's own admission, the recoveries under the Plan are driven by whether: (i) the swap holders settle litigation claims and (ii) FOMB prevails in its lien and recourse adversary proceeding against the

---

[3]   *See* ECF No. 2 ¶ 4 ("PREPA believes that, as of the Petition Date, it has over $10 billion in liabilities that it must restructure so that it can operate as a viable business entity.").

[4]   Hr'g Tr. 75:1-3, July 14, 2021, Case No. 17-3283, ECF No. 17379.

bondholders.  But that lien and recourse adversary complaint was not filed against the swap holders.  Any disclosure statement must clearly describe the treatment creditors will receive, when creditors will receive their distributions, and the risks in obtaining distributions.  The Disclosure Statement fails to provide Assured, in its capacity as the holder of the swap claims, with this basic information.

4.      In addition, the proposed voting procedures for which the Motion seeks approval are flawed, because those voting procedures generally require uninsured claims in the "Bond Classes" to vote through DTC's ATOP system, but fail to account for the fact that certain bonds in the "Bond Classes" were paid by Assured at maturity and therefore are no longer held through DTC.  PREPA's proposal that claimants in the "Bond Classes" vote through DTC therefore does not work for claimants holding these matured bonds, and such claimants should instead be permitted to vote by ballot.

5.      As explained in further detail below, the Disclosure Statement cannot be approved unless it is revised to include adequate information, and the proposed Disclosure Statement Order must be revised to provide appropriate voting procedures for holders of matured bonds.  In the absence of such necessary revisions (and proper notice to creditors), the Motion should be denied.

6.      In addition, the Title III Plan and Disclosure Statement are rife with numerous other infirmities, particularly relating to PREPA's Revenue Bonds.  To the extent provided below, Assured joins in the Ad Hoc Group Objection, which addresses these additional infirmities.

## **BACKGROUND**

### I.      **PREPA's Interest Rate Swaps.**

7.      On July 3, 2017 (the "**Petition Date**"), FOMB filed a Title III petition on behalf of PREPA.  On the Petition Date, FOMB filed the *Statement of Oversight Board Regarding PREPA's*

*Title III Case* (the "**First Day Declaration**").  ECF No. 2.[5]  In the First Day Declaration, the Board provided a high level summary of PREPA's capital structure, which consists of approximately $10 billion of financial indebtedness.  Most of that debt consists of PREPA's revenue bonds and unsecured lines of credit, but it also includes interest rate swaps (the "**Swaps**").  *Id*. ¶ 6.

8.      Prior to the Petition Date, PREPA entered into agreements with two third party dealers with respect to the Swaps:  JPMorgan Chase Bank N.A. and UBS AG (collectively, the "**Swap Counterparties**").  Assured has insured certain payments under the Swaps.  PREPA used the Swaps as a "cash flow hedge" on certain variable rate bonds to "take advantage of favorable market interest rates and to limit interest rate risk associated with variable rate debt exposure."[6]  In other words, the Swaps serve the purpose of "enabling [PREPA] to obtain the benefit of the equivalent of fixed-rate financing when it was unable to syndicate a sizable fixed-rate loan."[7] The Swaps are governed by Master ISDA Agreements and related confirmations and schedules (the "**Swap Agreements**"), which create obligations that are independent of PREPA's revenue bonds.

9.      Like any other swap agreement, the Swap Agreements require PREPA and the Swap Counterparties to exchange payments based upon a fixed benchmark.  In standard swap documentation, that benchmark is known as the "notional amount," which is a hypothetical loan that is never exchanged between the parties.[8]  One party agrees to make payments in an amount "equal to the interest which would accrue on an agreed hypothetical principal amount . . . at a fixed

---

[5]   The accompanying notice for the First Day Declaration (which is also filed in ECF No. 2) does not list the First Day Declaration as an exhibit.  For the avoidance of doubt, all references to paragraphs within the First Day Declaration shall only refer to the *Statement of the Oversight Board Regarding PREPA's Title III Case*, not to the accompanying notice.

[6]   *See* 2020 Audited Financial Statements at 41, 62, available at https://emma.msrb.org/P21672654.pdf.

[7]   *BKB Properties LLC v. SunTrust Bank*, 453 Fed. Appx. 582, 587 n.2 (6th Cir. 2011).

[8]   *See id.* at 583-84  ("Although this notional amount is used to calculate the payments owed, it is not directly exchanged.").

interest rate," while the other party agrees to make the same payments but measured by a "floating interest rate."[9]  If one party's interest rate exceeds the other party's rate, then the first party is considered to be "out of the money" and has to make net payments to the other party.  There is thus the prospect that the debtor may receive net periodic payments under a swap agreement if it is "in the money."

10.    In addition, interest rate swaps—including the Swaps at issue here—permit the swap counterparty to terminate the swap prior to its scheduled termination date under certain circumstances.  Such early termination may occur due to a debtor's bankruptcy filing.  When the swap is terminated, the swap counterparty obtains "market quotations for the cost of replacing the swap at the time of termination."[10]  Those market quotations, in turn, form the basis for calculating the "termination damages" for the swap.[11]  Swap agreements may also provide that a defaulting party may not collect termination damages.[12]  These provisions, among others, are specifically protected by the safe harbor provisions of the Bankruptcy Code and thus no provision of the Bankruptcy Code (nor any court order) may interfere with a swap counterparty's rights under the swap agreements.[13]  Those safe harbor provisions have been interpreted broadly by courts.  As one court observed, "the facial breadth and the corresponding legislative history make plain that

---

[9]    *Thrifty Oil Co. v. Bank of Am. Nat'l Tr.*, 322 F.3d 1039, 1042 (9th Cir. 2003).

[10]    *Id.* at 1043.

[11]    *See id.*

[12]    *See id.*

[13]    *See, e.g.*, 11 U.S.C §§ 362(b)(17) (removing application of stay from swaps), 546(g) (exempting swaps from avoidance claims), 560 (broadly protecting the rights to terminate, liquidate, or accelerate a swap, as well as providing that the ability to net out termination values or payments "shall not be stayed, avoided, or otherwise limited by operation *of any provision of this title or by order of a court or administrative agency in any proceeding* under this title").

Congress intended to place swap transactions *totally beyond* the inherently destabilizing effects of bankruptcy and its attendant litigation."[14]

11.    The Swaps have been included in virtually every restructuring support agreement entered into by PREPA, including the 2019 restructuring support agreement that FOMB negotiated (the "**RSA**").  For example, in the RSA, the Swaps were to receive the same treatment as PREPA's revenue bonds and would be exchanged for securitization bonds at the same exchange ratio as PREPA's revenue bonds.  *See* ECF No. 1235-1, Ex. C (RSA Recovery Plan Term Sheet) at n.3 (providing that the exchange ratio for swap payments—including termination damages—would be the same as the bonds).  Further, the parties would agree to the amount of the termination damages.  *See id.*[15]

## II.    The Amended Lien and Recourse Challenge.

12.    On July 1, 2019, FOMB filed an adversary complaint against PREPA's bond trustee seeking to determine the extent of and to avoid the bond trustee's security interests, which is relief that must be sought in an adversary complaint (the "**Lien and Recourse Challenge**").  Adv. Proc. No. 19-391, ECF No. 1.[16]  The Swaps were not included in that complaint.  *See* Adv. Proc. No.

---

[14]    *Whyte v. Barclays Bank PLC*, 494 B.R. 196, 200 (S.D.N.Y. 2013) (emphasis added), *aff'd* 664 Fed. Appx. 60 (2d Cir. 2016).

[15]    The treatment of the Swaps was included as part of the "Assured Treatment," which, in turn, was included within the "Stipulated Treatment."  *See, e.g.*, RSA §§ 2(c) (defining Stipulated Treatment to include Assured Treatment and providing for deemed allowed secured claim as part of Stipulated Treatment equal to the anticipated exchange ratio), 1(a) (defining "Assured Treatment" to include treatment set forth in the Recovery Plan Term Sheet regarding "Assured Insured Interest Rate Swaps"); *id.* Ex. C. (Recovery Plan Term Sheet), n.3 (stating that the "Exchange Ratio" for the applicable bond claims would also apply to the Assured Insured Interest Rate Swaps, including, without limitation, the termination damages for those Swaps).  FOMB agreed not to take any action that would interfere with its ability to provide that Stipulated Treatment, and, in exchange, Assured (as a "Supporting Holder") agreed to refrain from exercising any remedies against the Government Parties.  *See id.* §§ 2, 3, 6, 7, 10(b).  The RSA remained in effect through at least early 2022.

[16]    *See* Fed. R. Bankr. P. 3007(b), 7001; *see also In re Forrest*, 424 B.R. 831, 833 (Bankr. N.D. Ill. 2009) ("[W]hen the existence of the lien is itself at issue, then the 'validity' and 'extent' of the lien are certainly

19-391, ECF No. 1.  Thereafter, FOMB moved to stay the Lien and Recourse Challenge, as required under the RSA.  *See* Adv. Proc. No. 19-391, ECF No. 2.  Following a three year stay of the Lien and Recourse Challenge, FOMB moved to establish a litigation schedule for the Lien and Recourse Challenge, citing the need to address what it called "gating issues."  Adv. Proc. No. 19-391 ECF No. 11 ¶¶ 6-7.  These gating issues were limited exclusively to PREPA's bonds.  *See id.* ¶¶ 6-7, 34-41.  This Court established a briefing schedule for the Lien and Recourse Challenge, which permitted FOMB to file an amended complaint.

13.     Pursuant to this Court's order, FOMB filed an amended complaint in the Lien and Recourse Challenge in September 2022.  *See* Adv. Proc. No. 19-391, ECF No. 26.  The amended complaint included new causes of action that sought to limit the allowed amount of the bondholders' claims to monies credited on the petition date to a trustee held special fund known as the "Sinking Fund."  *See id.*  As in the original complaint, FOMB did <u>not</u> include any allegations about the Swaps, did <u>not</u> seek any relief with respect to the Swaps, and did <u>not</u> name the Swap Counterparties or Assured in its capacity as an insurer of the Swaps as defendants.  *See generally id.*  Competing summary judgment motions were filed by the parties in the Lien and Recourse Challenge, and briefing on various pleadings concluded in January 2023.  A hearing on those motions was held on February 1, 2023.

14.     As FOMB has repeatedly acknowledged, the statute of limitations for any additional avoidance claims expired on July 1, 2019—nearly four years ago.  *See* Disclosure Statement at p. 251 (acknowledging that actions brought pursuant to section 546(a)—which includes actions under section 544—needed to be filed by July 1, 2019); *see also Joint Motion of Oversight Board and AAFAF to Stay Adversary Proceeding*, Adv. Proc. No. 19-391, ECF No 2

---

at issue, so an adversary proceeding is necessary."); *In re Forester*, 2021 WL 603378, at **1-2 (Bankr. C.D. Cal. Feb. 10, 2021) (collecting cases standing for similar proposition).

¶ 3 ("Pursuant to Bankruptcy Code section 546(a), the two-year statute of limitations for the
Debtor to bring avoidance actions under Bankruptcy Code section 544 (among others) is set to
expire on July 1, 2019.").  More importantly, the Board has never contended that any claims arising
under the Swaps (whether unsecured or otherwise) should generally be disallowed under section
502(b) of the Bankruptcy Code.

### III.   Disclosure Statement.

15.     On December 16, 2022, FOMB filed the Disclosure Statement.  As is customary,
the Disclosure Statement summarizes the treatment provided to PREPA's creditors under the Title
III Plan.  With respect to the Swaps, the Disclosure Statement indicates that Assured, in its capacity
as the holder of the Class 7 Assured Insured Interest Rate Swaps Claims, shall receive the same
treatment as settling or non-settling bondholders, as applicable.  *See* Disclosure Statement at 28,
42 n.43.  That treatment is generally consistent with the prior RSAs, which treated the Swaps
equally with the Bonds.  *See supra* ¶ 11.

16.     The Swap claims are included in Class 7 under the Title III Plan, with such claims
being labeled under the Title III Plan as the "Assured Insured Interest Rate Swaps Claims."
Despite acknowledging the treatment of the Swaps and providing a separate class for such claims,
the Disclosure Statement does not contain any description or summary of the Swap claims.  *See*
Disclosure Statement at pp. 58-77 (not including any description or summary of Swap claims in
summary of capital structure).

17.     And while the Title III Plan provides the Swaps with equal treatment with the
Bonds (which is consistent with all other RSAs), the Disclosure Statement notes that recoveries of
the Swaps and bond claims are driven entirely by litigation outcomes in the Lien and Recourse
Challenge.  *See id.* at pp. 258-59; *see also id.* at 38 (noting that the "quantity of recovery on the
remaining portions of [the Settling Monolines'] Allowed Claims depends on the result of the

8

Amended Lien & Recourse Challenge"). But the Disclosure Statement does not explain why the litigation outcomes in the Lien and Recourse Challenge are relevant to the Swap claims and how specifically such litigation outcomes would impact the Swap claims.

18.     The Disclosure Statement also states that the holders of "Assured Insured Interest Rate Swaps Claims" shall be entitled to elect "to settle their claims against PREPA related to the Amended Lien & Recourse Challenge." *Id.* at p. 258.[17]   However, the Lien and Recourse Challenge does not address the Swaps. *See generally* Adv. Proc. No. 19-391, ECF No. 26. The Disclosure Statement also notes that holders of Swap claims would settle their pending lift stay motions. Disclosure Statement at p. 258. But Assured, in its capacity as the holder of the Swap claims, did not file any lift stay motions, and neither Assured nor the Swap Counterparties would need to file any such motions because remedial actions by swap and other financial participants are not subject to the automatic stay. *See* 11 U.S.C. § 362(b)(17). Thus, the Disclosure Statement provides insufficient and inaccurate information related to what specific claims will be settled by Assured in its capacity as the holder of the "Assured Insured Interest Rate Swaps Claims."

19.     Finally, the Disclosure Statement provides that the allowed amount of the Swap claims will be subject to agreement between FOMB and the Settling Monoline. *See* Disclosure Statement at p. 261. In the absence of an agreement between the parties as to the allowed amount of such claim, then the Disclosure Statement provides that the parties may submit such dispute to the Court *or*, to a "Person" or "Entity" (as such terms are defined in the Bankruptcy Code). *Id.* This type of mutual agreement language typically refers to an agreement between the parties as to

---

[17]   The Disclosure Statement refers the reader to "Sections V.I(1) and (7) . . . for a summary of" the disputes referenced on page 258 of the Disclosure Statement. *Id.* That cross-reference appears to be a scrivener's error because neither of the cross-referenced sections contains a relevant summary of such disputes. *See generally* Disclosure Statement, Section V.I (discussing FOMB's investigation of "potential causes of action").

the termination damages for an interest rate swap, which typically is not liquidated prior to the bankruptcy.[18]  Indeed, that is precisely what FOMB and Assured previously agreed to under the RSA.  *See* RSA Recovery Plan Term Sheet n.3 (ECF No. 1235-1) ("Such Swap MTM Amounts will be mutually agreed to between the Government Parties and Assured. . . .").  The Disclosure Statement does not explain whether FOMB will object to the general allowance of the Swap claims.[19]  More importantly, the Disclosure Statement provides no information regarding the estimated timeframe for adjudication of any such claim objection (including appeals) and whether such adjudication will occur prior to receipt of distributions under the plan of adjustment.

## OBJECTION

**I.    The Disclosure Statement Fails to Include Adequate Information Regarding the Swap Claims.**

20.    Section 1125 of the Bankruptcy Code provides that solicitation of votes on a plan may not occur unless and until a court determines that a disclosure statement contains "adequate information."  11 U.S.C. § 1125(b).  As defined in the Bankruptcy Code, "adequate information" is information that "would enable . . . a hypothetical investor of the relevant class to make an

---

[18]    *See, e.g.*, *In re Energy Future Holdings Corp.*, Case No. 14-10979-CSS, ECF No. 1957 (Bankr. D. Del. Sept. 3, 2014) (providing for mutually agreeable liquidation procedures for calculating settlement payments for swaps during bankruptcy and negotiation of amount of termination damages); *In re Gatehouse Media, Inc.*, Case No. 13-12503-MFW, ECF No. 15 at pp. 24-25 (Bankr. D. Del.  Sept. 27, 2013) (noting that swap claims were not yet liquidated, and that the debtors reserved their rights with respect to determination of such amount); *In re Brundage-Bone Concrete Pumping, Inc.*, Case No. 10-10758-TBM, ECF No. 1421 at 14, 47 (Bankr. D. Colo. Jan. 18, 2011) (noting that swap termination fees may include amounts stipulated between the parties or "such other amounts as may be Allowed by the Bankruptcy Court").

[19]    Just recently, FOMB indicated to Assured that it may seek to object to the Swap claims on the grounds that payments on such Swaps are payments on post-petition interest.  To Assured's knowledge, FOMB has not notified the Swap Counterparties of this potential claim objection.  Any such claim objection would be without merit, as precedent is clear that swap payments and swap termination damages are *not* the economic equivalent of interest (unmatured or otherwise) and thus not subject to disallowance under section 502(b)(2).  *See, e.g.*, *Thrifty Oil Co. v. Bank of America Nat. Trust*, 322 F.3d 1039 (9th Cir. 2003).  FOMB has not disclosed whether it will actually waste PREPA's resources to pursue that claim objection, and if so, when it will do so.  That disclosure is critical to Assured and other holders of Swap claims, as well as to PREPA's other creditors.

informed judgment about the plan. . . ." *Id*. § 1125(a)(1).   In assessing whether a disclosure statement provides adequate information, the court may consider "the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information." *Id.*

21.     Courts have found that disclosure statements should include information regarding, *inter alia*, "the circumstances that gave rise to the filing of the bankruptcy petition," the "claims against the estate, including those allowed, disputed, and estimated," the treatment that creditors will receive under the plan, and "risks being taken by the creditors and interest holders." *In re Feretti*, 128 B.R. 16, 18-19 (Bankr. D.N.H. 1991).   Moreover, a case may "arise in which disclosure of all the foregoing type of information is still not sufficient to provide adequate information upon which holders of claims or interests may evaluate a plan." *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 171 (Bankr. S.D. Ohio 1988).   At a minimum, a disclosure statement "must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *In re Feretti*, 128 B.R. at 19; *see also In re Cardinal Congregate I*, 121 B.R. 760, 765 (Bankr. S.D. Ohio 1990) ("A disclosure statement should contain all material information relating to the risks posed to creditors and equity interest holders under the proposed plan of reorganization.").

22.     For the reasons discussed below, the Disclosure Statement fails to provide adequate information with respect to the Swap claims.   The Disclosure Statement must therefore be revised to provide such information, and creditors must receive adequate notice of such revisions.   In the absence of such necessary revisions, the Motion should be denied.

A.     **The Disclosure Statement Fails to Include a Description of the Swap Claims.**

23.     One of the basic pieces of information required in a disclosure statement is a description of the "claims against the estate, including those allowed, disputed, and estimated." *In*

*re Feretti*, 128 B.R. at 18.  When a disclosure statement fails to include a complete description of

those claims, courts have denied approval of the disclosure statement.  *See*, *e.g.*, *In re Scioto Valley*

*Mortg. Co.*, 88 B.R. at 171 (denying approval of disclosure statement and ordering debtor to

include disclosure of "Agreement and Note" entered into between debtor and a creditor); *In re*

*Cardinal Congregate I*, 121 B.R. 760 at 767 (disclosure statement failed to adequately describe

certain loan claims); *In re Metrocraft Publ'g Servs., Inc.*, 39 B.R. 567, 569-70 (Bankr. N.D. Ga.

1984) (denying approval of disclosure statement that contained inadequate disclosure of scheduled

claims); *In re Robert's Plumbing and Heating LLC*, No. 10-23221, 2011 WL 2972092 at **7-8

(Bankr. D. Md. July 20, 2011) (denying disclosure statement and ordering debtor to include a

description of the nature of its prepetition claims in a future disclosure statement).  This makes

inherent sense, as creditors reviewing a plan need to understand what claims are included in each

class, as well as the nature and magnitude of such claims in order to make an informed judgment

about a plan.

24.     The Disclosure Statement fails to include any description of the Swap claims.

PREPA's creditors need such a description in order to properly assess what claims are receiving

distributions, as well as the nature and size of the claims in a particular class.  Including a brief

description of the Swap claims is hardly cumbersome or costly here.  FOMB included that

summary in COFINA's disclosure statement.[20]  Moreover, the First Day Declaration prepared by

FOMB summarized the Swap claims and thus FOMB can easily import that description into the

Disclosure Statement.  FOMB cannot, however, expect PREPA's creditors to scour through the

docket to obtain such information.  That basic information must be included in the Disclosure

Statement itself so that the Disclosure Statement can serve its intended purpose – permitting all

---

[20]     *See* Case No. 17-03283-LTS, ECF No. 4364 at 38.

creditors to make an informed judgment about and assess the Title III Plan. To help the Disclosure

Statement carry out that goal, Assured has included proposed language summarizing the Swaps in

Exhibit A. [21]

**B.     The Disclosure Statement Contains Inadequate Disclosures Concerning Litigation Claims That Impact Plan Distributions of Swap Claim Holders.**

25.     A "disclosure statement, to be adequate, should disclose all litigation likely to arise

in a non-bankruptcy context," and "[b]ankruptcy related litigation which is likely to arise should

also be specifically disclosed." *In re Mickey's Enters., Inc.*, 165 B.R. 188, 194 (Bankr. W.D. Tex.

1994). Moreover, "any bankruptcy litigation that the plan proponent is planning on bringing

against a known creditor with known claims . . . *should be fully disclosed*." *Id.* (emphasis added);

*see also Westland Oil Dev. Corp. v. MCorp Mgmt. Solutions*, 157 B.R. 100, 103-04 (S.D. Tex.

1993) (holding that a debtor "must disclose those claims that are likely"). Thus, a disclosure

statement does not contain adequate information when it fails to disclose litigation that the debtor

knows it may bring. *See*, *e.g.*, *Mickey's Enters. Inc.*, 165 B.R. at 194 (where debtor failed to

disclose potential preference claims, disclosure statement provided inadequate information for

purposes of Bankruptcy Code section 1125); *In re Metrocraft Publ'g Servs. Inc.*, 39 B.R. 567, 570-

71 (Bankr. N.D. Ga. 1984) (disclosure statement denied where debtor failed to "shed light" on its

---

[21]     The language in Exhibit A generally incorporates the language from paragraph 6 of the First Day Declaration, which summarized the Swap claims. In the First Day Declaration, the Board estimated that PREPA was approximately $52.2 million "out of the money" as of June 30, 2015. ECF No. 2 ¶ 6. However, in its recently filed best interest analysis, the Board estimated that PREPA is approximately $7 million "out of the money" on the Swaps. *See* Case No. 17-3283-LTS, ECF No. 23412-2 at p. 6. It is not clear whether that figure includes the net payments made prior to any early termination of the Swaps. Those payments would clearly be a part of the Swap holders' claims. Given that the "out-of-the-money" figures fluctuate and remain subject to change, Assured proposes to omit that figure in the Disclosure Statement. As noted above, termination damages are calculated under the Swap Agreements by obtaining quotes from market participants. Thus, to provide a more accurate disclosure to parties in interest in this case, Assured proposes that the Disclosure Statement should provide that the size of the swap payments is not presently ascertainable.

preferential transfer claims that debtor knew existed, as well as certain other litigation with an affiliate).

26.    FOMB admits that litigation recoveries in the Lien and Recourse Challenge will drive the recoveries of the holders of Assured Insured Interest Rate Swaps Claims, and indeed, a higher recovery is provided to such holders where they agree to settle certain claims.  *See* Disclosure Statement at pp. 258-59 (stating that the plan would settle the lift stay motion seeking to appoint a receiver, and claims "related to the Amended Lien & Recourse Challenge"); *see also id.* at 38 (noting that the "quantity of recovery on the remaining portions of [the Settling Monolines'] Allowed Claims depends on the result of the Amended Lien & Recourse Challenge"); *id.* at 28 (showing various recoveries for Settling and Non-Settling Bondholders).[22]  The Lien and Recourse Challenge thus serves as the guidepost for creditors' recoveries, including those of Assured in its capacity as the holder of the Assured Insured Interest Rate Swaps Claims.

27.    But the Disclosure Statement does not explain why the Lien and Recourse Challenge is relevant to the Swap recoveries.[23]  The Lien and Recourse Challenge does not concern or otherwise address the Swaps, only PREPA's revenue bonds.  *See supra* ¶¶ 12-14; *see also* Adv. Proc. No. 19-391, ECF No. 26 ¶¶ 74-114 (seeking declarations only with respect to the "Master PREPA Bond Claim" and against "the Trustee").  The Lien and Recourse Challenge complaint does not contain a single factual allegation concerning the Swaps, and does not name the Swap

---

[22]    As defined in the Plan, the term "Settling Monoline" is applicable to both PREPA bond claims and the "Assured Insured Interest Rate Swaps Claims."  Title III Plan at p. 21 (definition of "Settling Monoline").

[23]    Although confirmation of the Title III Plan is not presently before the Court, the Title III Plan contains similar infirmities.  For example, the Plan states that any "Deficiency Claim" for the Swap claims shall be "determined by the Amended Lien & Recourse Challenge Final Resolution."  Title III Plan at p. 8 (definition of "Deficiency Claim").  The "Amended Lien & Recourse Challenge" is Adv. Proc. No. 19-391. *Id.* at 3 (definition of "Amended Lien & Recourse Challenge").  The Swaps and Swap Counterparties are not addressed in the Lien and Recourse Challenge complaint, and thus it is not clear why the "Amended Lien & Recourse Challenge Final Resolution" is relevant to the Swap claims.

Counterparties or Assured in its capacity as an insurer of the Swaps as defendants.[24]   The

Disclosure Statement needs to provide more information that would explain why the Lien and

Recourse Challenge drives the Swap claim holders' recoveries, including if such creditors do not

settle their claims.[25]   FOMB disclosed in its best interest analysis that the "swap agreements have

the same priority as the bond claims." *See* Case No. 17-3283-LTS, ECF No. 23412-2 at 6.   If that

is the asserted basis for equal application of the Lien and Recourse Challenge to the Swaps, then

the Disclosure Statement should include that disclosure.

28.     Nor does the Disclosure Statement properly disclose which claims the Swap holders

would settle, including specifically what claims FOMB believes the Swap holders would have the

authority to settle. Instead, the Disclosure Statement provides that a Settling Monoline (which

includes Assured on account of its Swap claims) would release any claims related to the lift stay

motion and the Lien and Recourse Challenge.   *See* Disclosure Statement at pp. 42-43.   As

previously discussed, however, the Swap claims are not subject to the Lien and Recourse

Challenge, and Assured, in its capacity as the holder of Swap claims, cannot settle the claims

asserted therein.   The Swap claims were likewise not subject to any of the lift stay motions that

were filed.   Only the bondholders filed such motions.   *See*, *e.g.*, ECF No. 975 at 1 (insurers filing

lift stay motion in capacity as bondholders); ECF No. 2973 at 1 (movants filed motion to dismiss

---

[24]   Moreover, the deadline to file any avoidance action was on July 1, 2019, which was nearly four years
ago.  *See* Disclosure Statement at p. 251 (acknowledging that actions brought pursuant to Bankruptcy Code
section 546(a)—which includes actions under Bankruptcy Code section 544—needed to be filed by July 1,
2019); *see also Joint Motion of Oversight Board and AAFAF to Stay Adversary Proceeding*, Adv. Proc.
No. 19-391, ECF No 2 ¶ 3 ("Pursuant to Bankruptcy Code section 546(a), the two-year statute of limitations
for the Debtor to bring avoidance actions under Bankruptcy Code section 544 (among others) is set to expire
on July 1, 2019.").  The Swap Counterparties—as the direct parties to the Swap Agreements—would be
necessary parties to any lien challenge.

[25]   This Court has previously recognized in the context of Rule 2019 disclosures that when a plan is driven
by claim objection litigation, enhanced disclosures are necessary.  *See* Case No. 17-3283-LTS, ECF No.
13217 at 12.

and lift stay motion in capacity as bondholders).  The Disclosure Statement should clarify what claims, if any, the holders of Swap claims would be settling.  If those claims are in addition to the pending lift stay motions and Lien and Recourse Challenge concerning the bondholders, then the Disclosure Statement should be amended to provide that clarification.  Assured has included in Exhibit A proposed language regarding the claims that Assured, in its capacity as the holder of the Assured Insured Interest Rate Swaps Claims, would have authority to settle.

29.     While the Disclosure Statement vaguely references a potential dispute as to the allowed amount of the Swap claims, this language appears to reflect customary language regarding the size and calculation of any termination damages, and does not appear to relate to the general allowance of the claim itself.  *See supra* ¶ 19.  This is confirmed by language in the Disclosure Statement that discloses that such dispute can either be submitted to the Court *or*, upon mutual agreement between FOMB and Assured, to a "person" or "entity" as such terms are defined in the Bankruptcy Code.  *See* Disclosure Statement at 261.  Debtors frequently attempt to preserve the flexibility to adjust the allowed amount of the termination damages claim arising from a swap agreement based upon a mutual agreement between the parties as to the size of that claim and the calculation of such damages, particularly given the potential for fluctuation in the market.[26]

30.     To the extent that FOMB is not merely referencing a dispute concerning the calculation of the Swaps' termination damages and is instead referencing an objection to the general allowance of the Swap claims in their entirety, then the Disclosure Statement should so clarify.  If FOMB intends to object to Swap claims under section 502(b)(2) of the Bankruptcy Code, then that should be disclosed within the Disclosure Statement.  As previously noted, FOMB has already informed Assured of the possibility of raising such an objection.  Regardless, "any

---

[26]   *See generally supra* note 18.

bankruptcy litigation that the plan proponent is planning on bringing against a known creditor with known claims . . . *should be fully disclosed*."   *In re Mickey's Enters., Inc.*, 165 B.R. 188, 194 (Bankr. W.D. Tex. 1994); *Westland Oil Dev. Corp.*, 157 B.R. at 103-04  (holding that a debtor "must disclose those claims that are likely").  Any potential litigation should therefore be disclosed in the Disclosure Statement.[27]

### C.   The Disclosure Statement Contains Inadequate Information Regarding the Risks and Contingencies for Distributions to the Swap Claim Holders.

31.   A disclosure statement must provide a creditor with information concerning "what contingencies there are to getting its distribution."   *In re Feretti*, 128 B.R. at 19; *see also In re Cardinal Congregate I*, 121 B.R. at 765.  In that regard, a disclosure statement must "inform the reader what the undisputed claims are, what the disputed claims are, what effect, if any, there will be on the distribution if disputed claims are or are not allowed, *and when will distribution be made*." *In re Ferretti*, 128 B.R. at 19  (emphasis added).

32.   Courts have recognized that litigation can pose a risk to the timing and receipt of distributions.  For example, in *In re Cardinal Congregate I*, creditors argued that the debtor's disclosure statement failed to "clearly advise creditors and interest holders of the risks and consequences associated with a possible delay in the 'Effective Date' of the [plan] because of an appeal or some other circumstance." 121 B.R. at 766.  The Court agreed and held that the debtor must "address the potential for postponement of the payment schedule proposed in the [plan] which might be occasioned if an order of confirmation is appealed." *Id.*

33.   As discussed above, litigation outcomes are plainly germane to the size of distributions under the Title III Plan.  *See In re Ferretti*, 128 B.R. at 19 (stating that disclosure

---

[27] To the extent that the claim amount is not presently ascertainable because FOMB may bring a claim objection under section 502(b), then page 26 of the Disclosure Statement should warn the Swap holders of such risk.

statement must inform the reader of "what effect, if any, there will be on the distribution if disputed claims are or are not allowed"). They are also clearly relevant to *when* Swap claim holders will receive the distributions. FOMB has indicated that it may pursue a claim objection to the general allowance of the Swap claims under section 502(b)(2). Does FOMB plan to do so prior to plan confirmation? And, if it does, how could it reasonably expect to adjudicate that dispute and any appeals before plan confirmation? Any such claim objection against the Swaps will present issues that are novel to these Title III cases, including specifically issues related to the Bankruptcy Code's safe harbor provisions. Those safe harbors are of critical importance to the financial markets, and thus such issues will likely draw the interest of key swap market participants, who may wish to be heard in such disputes.[28] Clearly, if that claim objection could not be litigated before plan confirmation (and there is substantial reason to doubt that it can be), then that could impact the Swap holders' ability to receive distributions. If FOMB does intend to bring such actions, it needs to disclose (i) the nature of such action, (ii) when it will bring that action, (iii) whether that action will impact the size of distributions to classes under the Title III Plan, and (iv) whether the dispute (including all appeals) will be resolved prior to receipt of distributions on the effective date.

34.    If there is a risk that any such objection cannot be resolved—including appeals—prior to the effective date, then the Disclosure Statement needs to disclose that risk. To the extent that PREPA believes that such dispute should not delay the effective date (and thus distributions under the Title III Plan), then the Disclosure Statement must disclose that as well, including when

---

[28]    Given the importance of swaps, securities contracts, and commodities in the market, key trade groups (such as the ISDA, which authors master swap agreements that are used by swap participants, including PREPA) and the Securities and Exchange Commission have filed amicus briefs in a number of disputes concerning the safe harbor provisions. *See, e.g., In re Nat'l Gas Distribs., LLC*, 556 F.3d 247 (4th Cir. 2009) (in dispute concerning section 546(g) safe harbor for swap, amicus brief was filed by the International Swaps and Derivatives Association, Inc.); *Enron Creditors Recovery Corp. v. Alfa, SAB de CV*, 651 F.3d 329, 335 (2d Cir. 2011) (amicus briefs filed by SEC and trade groups); *In re Tribune Co. Fraudulent Conveyance Litig.*, 818 F.3d 98, 119 (2d Cir. 2016) (amicus brief filed by SEC).

18

and how distributions will be made to Swap claim holders during the pendency of FOMB's section 502(b)(2) claim objection. Will those distributions be held in escrow or otherwise withheld, or will they be distributed to Swap claim holders with the requirement for an undertaking? The Disclosure Statement must answer those questions to allow the Swap claim holders to properly assess and make an informed decision about the Title III Plan.

## II. Matured Bonds No Longer Held through DTC Should be Voted by Ballot Rather than Through ATOP.

35. The proposed Disclosure Statement Order proposes that, in the case of uninsured bonds, the "Beneficial Owners" will vote such bonds by tendering them using the Automated Tender Offer Program ("**ATOP**"), a service available to users of DTC. *See*, *e.g.*, Proposed Disclosure Statement Order ¶¶ 32 & 36. As a practical matter, this proposal will not work in the case of bonds formerly insured by Assured in the primary market that have matured during the pendency of PREPA's Title III case. In the case of such matured bonds, Assured paid the principal amount to the former beneficial owners at maturity, thereby satisfying and discharging Assured's obligations under the applicable insurance policies and rendering the bonds uninsured. Because Assured paid the principal amount at maturity, DTC no longer recognizes the bonds as outstanding, and it is no longer possible to take any actions with respect to such bonds by way of DTC, including ATOP. However, the applicable insurance agreements provide that (i) as a legal matter, the bonds remain outstanding as against PREPA, regardless of whether they appear on DTC, and (ii) Assured became the holder of the bonds through subrogation upon paying the principal amount at maturity.

36. After becoming subrogated to the rights of the former beneficial holders upon paying the relevant bonds at maturity, Assured subsequently sold the claims arising from certain of these matured bonds to other holders. *See* ECF Nos. 2711, 2713, 2713, and 2714 in Case Number 17-4780-LTS and ECF Nos. 20141, 20142, 20143, and 20144 in Case Number 17-3283-

LTS.  Assured has not transferred all of the claims arising from such matured bonds, however, and Assured remains the holder of certain of the relevant claims.

37.     Regardless of whether such claims arising from matured bonds are held by Assured or by a transferee of Assured, it is no longer possible for such claims to be voted through ATOP, as the corresponding bonds no longer appear in DTC.  Therefore, the holders of such claims should be permitted to vote them by ballot rather than through ATOP.  Assured has proposed revisions to paragraphs 32 and 36 of the Disclosure Statement Order to permit such claims arising from matured bonds to be voted by ballot rather than through ATOP, as reflected in the revised proposed order attached as Exhibit B hereto.  Absent such revisions, the Motion should be denied for the additional reason that it fails to provide appropriate voting procedures for all claimants.

## III.     Joinder to Ad Hoc Group Objection

38.     In addition to the issues raised in this Objection, the relief sought in the Motion should be denied for additional reasons set forth in the Ad Hoc Group Objection, including among other things, because (i) the Title III Plan is patently unconfirmable, (ii) the Disclosure Statement fails to provide "adequate information" as required by Bankruptcy Code Section 1125 with respect to the treatment of PREPA's revenue bonds, and (iii) the Motion's proposed solicitation and Title III Plan confirmation procedures are prejudicial to Assured and other creditors.  Assured hereby joins in and incorporates by reference the substance of the arguments set forth in the Ad Hoc Group Objection, other than any portions addressing a settlement or potential settlement with National Public Finance Guarantee.

## <u>RESERVATION OF RIGHTS</u>

39.     Assured reserves the right to (i) amend or supplement this Objection in the event FOMB files a further amended plan, disclosure statement, or proposed Disclosure Statement

Order, (ii) join in any objection to the Disclosure Statement or related motions filed by any other party in interest, (iii) raise additional objections, arguments, or authorities not incorporated herein, and (iv) raise the objections, arguments, and authorities contained herein in connection with confirmation of the proposed Title III Plan or any other plan proposed in these proceedings, as well as any additional arguments relevant to confirmation.

## **CONCLUSION**

40.     FOMB must revise the Disclosure Statement to provide the information described in this Objection, and must revise the proposed Disclosure Statement Order to provide appropriate voting rights to holders of claims arising from matured bonds.  In the absence of such necessary revisions, Assured respectfully submits that this Court should deny approval of the Disclosure Statement.

Dated:     New York, New York
          February 3, 2023

**CASELLAS ALCOVER & BURGOS P.S.C.**

By: */s/ Heriberto Burgos Perez*
    Heriberto Burgos Pérez
    USDC-PR No. 204,809
    Ricardo F. Casellas-Sánchez
    USDC-PR No. 203,114
    Diana Pérez-Seda
    USDC–PR No. 232,014
    P.O. Box 364924
    San Juan, PR 00936-4924
    Tel.: (787) 756-1400
    Fax: (787) 756-1401
    E-mail:  hburgos@cabprlaw.com
           rcasellas@cabprlaw.com
           dperez@cabprlaw.com

*Counsel for Assured Guaranty Corp. and
Assured Guaranty Municipal Corp.*

**CADWALADER, WICKERSHAM & TAFT LLP**

By: */s/ Howard R. Hawkins, Jr.*
    Howard R. Hawkins, Jr.*
    Mark C. Ellenberg*
    Casey J. Servais*
    William J. Natbony*
    Thomas J. Curtin*
    200 Liberty Street
    New York, New York 10281
    Tel.: (212) 504-6000
    Fax: (212) 406-6666
    Email:  howard.hawkins@cwt.com
           mark.ellenberg@cwt.com
           casey.servais@cwt.com
           bill.natbony@cwt.com
           thomas.curtin@cwt.com

*Admitted Pro Hac Vice

*Counsel for Assured Guaranty Corp. and
Assured Guaranty Municipal Corp.*

**CERTIFICATE OF SERVICE**

I hereby certify that I filed this document electronically with the Clerk of the Court for the

United States District Court for the District of Puerto Rico by using the CM/ECF system, which

will send notification of such filing to all parties of record in the captioned case.

At New York, New York, the 3rd day of February, 2023.


By: */s/ Howard R. Hawkins, Jr.*
     Howard R. Hawkins, Jr.*
     * admitted pro hac vice