**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>The Financial Oversight and Management Board for Puerto Rico,<br><br>     as representative of<br><br>The Commonwealth of Puerto Rico, *et al.*,<br><br>     Debtors.[1] | PROMESA<br>Title III<br><br>Case No. 17-3283-LTS<br><br>**Court Filing Relates Only to PREPA** |
| In re:<br><br>The Financial Oversight and Management Board for Puerto Rico,<br><br>     as representative of<br><br>The Puerto Rico Electric Power Authority,<br><br>     Debtor. | PROMESA<br>Title III<br><br>Case No. 17-4780-LTS<br><br>(Jointly Administered) |

**OBJECTION OF SYNCORA GUARANTEE, INC. TO THE MOTION OF PUERTO RICO ELECTRIC POWER AUTHORITY FOR AN ORDER (I) APPROVING DISCLOSURE STATEMENT, (II) FIXING VOTING RECORD DATE, (III) APPROVING CONFIRMATION HEARING NOTICE AND CONFIRMATION SCHEDULE, (IV) APPROVING SOLICITATION PACKAGES AND DISTRIBUTION PROCEDURES, (V) APPROVING FORMS OF BALLOTS AND VOTING PROCEDURES, (VI) APPROVING NOTICE OF NON-VOTING STATUS, (VII) FIXING VOTING AND CONFIRMATION DEADLINES, AND (VIII) APPROVING VOTE TABULATION PROCEDURES**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ..................................................................................1

RELEVANT FACTUAL BACKGROUND................................................................5

OBJECTION ...............................................................................................................9

I.      THE COURT SHOULD DENY APPROVAL OF THE DISCLOSURE STATEMENT BECAUSE
THE PLAN IS PATENTLY UNCONFIRMABLE AS A MATTER OF LAW ..................................9

      A.      The Plan Reflects A Mere Placeholder Plan In Violation Of This Court's
Directives ..........................................................**Error! Bookmark not defined.**1

      B.      The Plan Is Admittedly Not Based On What PREPA Can Afford To Pay,
And The Legal Foundation For The Plan Is Fatally Flawed. .....**Error! Bookmark
not defined.**2

      C.      The Plan Cannot Be Confirmed Under Section 1129(b) Of The
Bankruptcy Code Regardless Of The Amended Lien & Recourse
Challenge Outcome...............................................**Error! Bookmark not defined.**7

      D.      The Plan Cannot Satisfy PROMESA § 314(b)(6)'s "Best Interests Of
Creditors" Test ....................................................**Error! Bookmark not defined.**0

      E.      The Plan Was Not Proposed In Good Faith.........**Error! Bookmark not defined.**2

      F.      The Plan Impermissibly Gerrymanders Classes Of Claims In Violation Of
Section 1122(a) Of The Bankruptcy Code...........**Error! Bookmark not defined.**6

            1.      Separate classification of Settling and Non-Settling Bondholders. ... **Error!
Bookmark not defined.**7

            2.      Separate Classification of Vitol ...............**Error! Bookmark not defined.**8

            3.      Separate Classification of Fuel Line Lenders to Facilitate Impaired
Accepting Class ......................................**Error! Bookmark not defined.**8

      G.      The Plan Is Tainted By PREPA's Impermissible Solicitation Without An
Approved Disclosure Statement ...........................................................................30

II.     THE DISCLOSURE STATEMENT FAILS TO PROVIDE ADEQUATE INFORMATION AS
REQUIRED BY SECTION 1125(B) OF THE BANKRUPTCY CODE ...........................................35

RESERVATION OF RIGHTS ...................................................................................36

CONCLUSION............................................................................................................36

1

# **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*In re 18 RVC, LLC*,
485 B.R. 492, 495 (Bankr. E.D.N.Y. 2012)................................................. 29

*In re ACEMLA de P.R. Inc.*,
2019 WL 311008 (Bankr. D. P.R. 2019) ............................................... 35

*In re Affordable Auto Repair, Inc.*,
2020 WL 6991012 (Bankr. C.D. Cal. Sept. 2, 2020)......................... 27

*In re Am. Cap. Equip.*,
688 F.3d 145 (3d Cir. 2012)...................................................... 9

*In re Bos. Post Rd. Ltd. P'ship (Boston Post)*,
21 F.3d 477, 483-84 (2d Cir. 1994) ........................................... 26

*Century Glove, Inc. v. First Am. Bank of N. Y.*,
860 F.2d 94 (3d Cir. 1988)................................................ 32, 33

*In re City of Detroit*,
524 B.R. 147 (Bankr. E.D. Mich. 2014) ............................... *passim*

*In re Clamp-All Corp.*,
233 B.R. 198 (Bankr. D. Mass. 1999) .................................... 31

*In re Cnty. of Orange*,
219 B.R. 543 (Bankr. C.D. Cal. 1997)..................................... 35

*In re E. Me. Elec. Co-op., Inc.*,
125 B.R. 329 (Bankr. D. Me. 1991)..................................... 9, 10

*In re El Comandante Mgmt Co., LLC*,
2006 WL 3903592 (Bankr. D.P.R. Mar. 3, 2006) ............... 10, 19

*In re El Comandante Mgmt. Co.*,
359 B.R. 410 (Bankr. D.P.R. 2006) .......................................... 9

*Fano v. Newport Heights Irr. Dist.*,
1[1]4 F.2d 563 (9th Cir. 1940)........................................ 13, 14

*In re Ferretti*,
128 B.R. 16 (Bankr. D.N.H. 1991) ......................................... 31

1

*In re Filex, Inc.*,
116 B.R. 37 (Bankr. S.D.N.Y. 1990) ........................................................................ 9

*In re Fin. Oversight and Mgmt. Bd. for Puerto Rico*,
637 B.R. 223, 211 (D. P.R. 2022) ................................................................... *passim*

*In re FirstEnergy Sols. Corp.*,
606 B.R. 720 (Bankr. N.D. Ohio 2019) ................................................................... 9

*Granada Wines, Inc. v. New England Teamsters & Trucking Industry Pension Fund*,
748 F.2d 42 (1st Cir. 1984) ...................................................................................... 26

*In re Greystone III Joint Venture*,
995 F.2d 1274 (5th Cir. 1991) ................................................................................. 27

*In re GSC, Inc.*,
453 B.R. 132, 157, n.27 (Bankr. S.D.N.Y. 2011) .................................................... 9

*In re Hanish, LLC*,
570 B.R. 4 (Bankr. D.N.H. 2017) ........................................................................... 27

*Hardeman County Hospital District*,
540 B.R. 229 (Bankr. N.D. Tex. 2015) ............................................................ 14, 15

*In re Heritage Org., L.L.C.*,
376 B.R. 783 (Bankr. N.D. Tex. 2007) ................................................................... 32

*In re Hermanos Torres Perez Inc.*,
2011 WL 5854929 (Bankr. D.P.R. Nov. 21, 2011) ............................................... 18

*In re Indianapolis Downs, LLC.*,
486 B.R. 286 (Bankr. D. Del. 2013) ....................................................................... 33

*In re LightSquared Inc.*,
513 B.R. 56 (Bankr. S.D.N.Y. 2014) ...................................................................... 18

*Lorber v. Vista Irr. Dist.*,
127 F.2d 628 (9th Cir. 1942) ................................................................................... 14

*In re Monroe Well Serv., Inc.*,
80 B.R. 324 (Bankr. E.D. Pa. 1987) ....................................................................... 10

*In re Phoenix Petroleum Co.*,
278 B.R. 385 (Bankr. E.D. Pa. 2001) ..................................................................... 10

*In re Quigley Co.*,
377 B.R. 110 (Bankr. S.D.N.Y. 2007) ........................................................ 9, 25, 29

2

*In re Thornwood Assocs.*,
161 B.R. 367 (Bankr. M.D. Pa. 1993), *aff'd*, 162 B.R. 438 (M.D. Pa. 1993) ....................... 28

## **Statutory Authorities**

11 U.S.C. § 1123 ......................................................................................................... 20, 27

11 U.S.C. § 1125 ........................................................................................................... *passim*

11 U.S.C. § 1126 ......................................................................................................... 25, 29

11 U.S.C. § 1129 ........................................................................................................... *passim*

11 U.S.C. § 943 ........................................................................................................... 13, 14

22 L.P.R.A. § 207 .............................................................................................................. 21

22 L.P.R.A. § 208 .............................................................................................................. 21

Act 33-2019 § 24 ............................................................................................................... 21

PROMESA § 301 ............................................................................................................ *passim*

PROMESA § 314 ............................................................................................................ *passim*

## **Rules and Regulations**

Fed. R. Bankr. P. 3013 ...................................................................................................... 29

## **Legislative Materials**

H.R. Rep. No. 94-686 (1976), reprinted in 1976 U.S.C.C.A.N. 539, 1975 WL 12383 ............... 13

H.R. Rep. No. 95-595 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 1977 WL 9628 ............... 31

## **Additional Authorities**

*AAFAF Chief Marrero Signals PREPA RSA 'Most Likely' Will Need Renegotiation,
Given Lack of Legislative Support,* REORG (Feb. 7, 2022), https://app.reorg.com/v3 ............. 16

*Oversight Board Outlines Next Steps for Taking Commonwealth Plan Effective by
March 15 Deadline, Aims to Complete Restructuring of PREPA, HTA in 2022,* REORG
(Jan. 18, 2022), https://app.reorg.com/v3 ................................................................................. 6

Syncora Guarantee, Inc. ("Syncora") hereby respectfully submits this objection (the "Objection") to the *Motion of Puerto Rico Electric Power Authority for Order (I) Approving Disclosure Statement, (II) Fixing Voting Record Date, (III) Approving Confirmation Hearing Notice and Confirmation Schedule, (IV) Approving Solicitation Packages and Distribution Procedures, (V) Approving Forms of Ballots and Voting Procedures, (VI) Approving Notice of Non-Voting Status, (VII) Fixing Voting and Confirmation Deadlines, and (VIII) Approving Vote Tabulation Procedures* (ECF No. 3111) (the "Disclosure Statement Motion") and the related *Disclosure Statement for Title III Plan of Adjustment for Puerto Rico Electric Power Authority* (ECF No. 3113) (the "Disclosure Statement"), and respectfully states as follows:[2]

## PRELIMINARY STATEMENT

1.      This Court has confirmed five Title III plans of adjustment since the first Title III case was filed in May 2017. Each of the confirmed plans was largely uncontested with the Oversight Board working cooperatively with each debtor's largest creditor constituencies in order to develop consensus and facilitate an efficient and orderly confirmation hearing process. Puerto Rico now stands on the precipice of achieving finality and closure on its entire Title III process with only a single governmental entity—The Puerto Rico Electric Power Authority ("PREPA")—remaining in Title III and under the supervision of this Court. Unfortunately, rather than follow the path taken with the other Title III debtors, the Oversight Board has opted for brinkmanship and litigation by proposing a non-consensual Plan.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Disclosure Statement Motion and Disclosure Statement, as applicable. Reference to ECF numbers are to Case No. 17-4780-LTS unless otherwise noted. Syncora joins in Part III (relating to the litigation and discovery timeline) of the *Omnibus Objection of the Ad Hoc Group of PREPA Bondholders' to the Disclosure Statement for the Title III Plan of Adjustment for the Puerto Rico Electric Power Authority (ECF No. 3111) and Related Procedural Motions Related to the Disclosure Statement and Plan Confirmation (ECF Nos. 3113, 3114)*.

2.      The Oversight Board has no such free option, and was required to file a realistic plan in good faith.  In direct violation of this Court's directive, the Oversight Board filed a place-holder Plan that suffers from facial (and fatal) defects.  As such, it would be incompatible with this Court's Order (and the Bankruptcy Code) to authorize dissemination of the Disclosure Statement for this Plan.

3.      Late in the fifth year of this Title III case, the Governor of Puerto Rico with the support of the Oversight Board announced he was terminating PREPA's post-petition restructuring support agreement (the "2019 RSA").  In order to facilitate a new agreement, the Court appointed a mediation team consisting of three experienced bankruptcy judges (the "Mediation Team") to work with the parties to achieve a consensual restructuring.  Regrettably, the Oversight Board declined to engage in good-faith negotiations with creditors whose class represents more than 80% of PREPA's total indebtedness—an opportunity the Oversight Board took for granted.  Instead, it made its latest low-ball offer based on outdated and erroneous data and assumptions, while hitching its wagon to an amended complaint against the Bondholders' trustee.  The Oversight Board's unilateral approach to mediation doomed it to failure.[3]

4.      Even though the Court set a deadline for the Oversight Board to file a confirmable plan for PREPA, the Oversight Board abandoned the pretense of negotiating with Bondholders and instead entered into a sweetheart and impermissible deal with the Fuel Line Lenders, creditors holding less than 10% of PREPA's indebtedness.  In an attempt to justify the favorable treatment provided to procure an impaired accepting class, the settlement purports to treat the Fuel Line

---

[3] *See Statement of Justin Peterson*, dated Dec. 16, 2022 (the "Peterson Statement") ("The Oversight Board's unilateral approach to mediation was disappointing.  It prevented a global deal with all bondholders that was within reach."), https://drive.google.com/file/d/1_dGcLf64DJ7gwiA7_GFjPMdT9wwa7KIQ/view.

2

Lenders' (pre-petition) claims as "current expenses," an absurd position that the Oversight Board had repeatedly and vigorously opposed at every opportunity. Irrespective of the Oversight Board's inexplicable about-face regarding the merits of the Fuel Line Lenders' entitlement to priority, the Oversight Board's attempt to "settle" a purely inter-creditor issue (in which the Debtor has no stake) is entirely inappropriate, especially when its sole purpose is to buy off (using Bondholder collateral) an impaired accepting class.

5. As the Court itself remarked, the Oversight Board has also taken a 180-degree turn in its legal position vis-à-vis the Bondholders.[4] Instead of formulating a plan that would balance the legitimate interests of Bondholders and ratepayers reasonably and fairly, the Oversight Board wants to forge ahead with its non-consensual Plan while it hides as much information as possible from creditors and the Court. While this Plan clearly fails to meet the confirmation requirements of PROMESA, the Oversight Board appears to believe that it can take as many shots at confirmation as it pleases. In essence, the Oversight Board has treated this plan filing as a free option without regard for the consequences of spending the next six months pursuing wasteful litigation only to discover what is already obvious—this Plan stands no chance of being confirmed. The consequences of the Oversight Board's cavalier behavior is far from free for PREPA's many stakeholders, including the residents of the island who deserve a functioning electric utility that can access the capital markets.

---

[4] *See Transcript of Hearing Held November 2, 2022* ("Nov. 2, 2022 Tr."), at 12:11-18 ("It continues to puzzle me why the Oversight Board now is focusing so much time and effort on promoting a position in motion practice that's directly contrary to the risk analysis that must have under[laid] the Board's prior advocacy for the RSA and the prior proposals that offered significant recovery to the bondholders. Can you give me any insight into why there is such a dramatic flip of the switch?").

6.     By asking the Court to approve a disclosure statement for a patently unconfirmable plan, which flouts the Court's prior Order,[5] the Oversight Board is either asking the Court to reconsider its prior directive or to turn a blind eye to the Plan's numerous fatal and patent deficiencies.  Foremost among the Plan's defects is the Oversight Board's reliance on an incorrect legal standard under which the Oversight Board believes it need not make any showing regarding affordability or even provide candid disclosure of PREPA's financial capacity.

7.     Among other deficiencies, the Plan: (a) fails to comply with this Court's Order that the Oversight Board file something more than a "placeholder"; (b) was not proposed in good faith, as demonstrated by, *inter alia*, blatant vote buying; (c) hides the most relevant financial information needed to evaluate the reasonableness of proposed impairments; (d) by employing a novel legal construct, does not even attempt to meet PROMESA § 314(b)(6)'s "best interests of creditors" test as it must; (e) unfairly discriminates and is not fair and equitable to the class of Non-Settling Bondholders; (f) is tainted by unlawful premature solicitations that never received any approval of the Court; and (g) is plagued by a gerrymandered classification.

8.     Syncora respectfully submits that Court should decline to approve the Disclosure Statement for a Plan that should never have been filed and is dead on arrival.

---

[5] *See Order (A) Granting in Part and Denying in Part Urgent Motion of Financial Oversight and Management Board for Order (I) Establishing Schedule to Continue Negotiations During Litigation of Gating Issues Pursuant to litigation Schedule and (II) Granting Related Relief and (B) Staying Certain Motions Filed by PREPA Bondholders*, Sept. 29, 2022 (ECF No. 3013) ("September Scheduling Order") (requiring the Oversight Board to file a plan that "it believes could be confirmable, taking into account the litigation risk and economic issues that are in dispute.").  The Court clarified at the November 2, 2022 hearing that "what I mean by a confirmable plan is one that meaningfully and realistically contemplates scenarios in which each party fails to prevail on their claims in litigation to the extent that they expect to in order that, on resolution of the issues in the litigation, no matter what the outcome is, we can move forward toward confirmation with alacrity."  Nov. 2, 2022 Tr. at 16:10-16.

4

## RELEVANT FACTUAL BACKGROUND

9.      In June 2016, then-President Obama signed into law the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA").  The financial crisis then enveloping the Commonwealth of Puerto Rico (the "Commonwealth") and its instrumentalities precipitated the need for such legislation.  Among other things, PROMESA provided for the appointment of the Oversight Board and provided it with the tools necessary to adjust the debts of the Commonwealth and its instrumentalities.  The tools included the ability to file a bankruptcy-type proceeding under Title III of PROMESA or through a primarily out-of-court qualifying modification process under Title VI.

10.      At the time PROMESA was enacted, PREPA had already entered into the Prepetition RSA with its largest creditors, the Bondholders and Fuel Line Lenders, which provided for a significant adjustment of PREPA's indebtedness.[6]  Given this pre-existing agreement, PROMESA included specific provisions that were designed to facilitate implementation of the Prepetition RSA's transactions with alacrity.[7]  Despite this path to an expeditious and economical restructuring envisioned by Congress, on July 2, 2017, the Oversight Board filed a full-blown Title III case for PREPA.

11.      Following the natural disasters that befell the Commonwealth after the Title III filing, including the devastation to the Island and its electric grid caused by Hurricane Maria, the

---

[6] *See Disclosure Statement For Title III Plan of Adjustment of PREPA*, Dec. 16, 2022 (ECF No. 3111) (the "Disclosure Statement"), at 122.

[7] *See* PROMESA § 104(i)(3) (providing that a "voluntary agreement" reached prior to May 18, 2016 is deemed to satisfy the certification requirements under PROMESA); PROMESA § 601(g)(2) (providing a special process for Oversight Board authorization to implement voluntary agreements with creditors under Title VI).

Oversight Board and its creditors entered into the 2019 RSA with additional creditors that had not been parties to the Prepetition RSA, including Syncora.[8]

12.     On May 10, 2019, the Oversight Board moved for this Court's approval of the 2019 RSA.[9]   The Oversight Board explained that the terms of the 2019 RSA were "eminently reasonable," set "fair and reasonable" terms, and would be "the foundation for a plan of adjustment for PREPA."[10]   The 9019 Motion remained pending, with the Oversight Board's and Government Parties' continuing support as recently as February 2022,[11] the Oversight Board reiterated its determination to "move forward with the settlement set forth in the . . . [2019] RSA."[12]

13.     Despite its many benefits, Governor Pedro Pierluisi terminated the 2019 RSA in March 2022.[13]   After years of supporting the 2019 RSA, the Oversight Board abruptly changed its mind and backed the Governor's termination of the RSA.[14]

14.     Following the termination of the 2019 RSA, the Court ordered the parties to mediation to facilitate confidential negotiations regarding the formulation of a plan of adjustment

---

[8] *See* Disclosure Statement at 171.

[9] *See Joint Motion of Puerto Rico Electric Power Authority and AAFAF Pursuant to Bankruptcy Code Sections 362, 502, 922, and 928, and Bankruptcy Rules 3012(A)(1) and 9019 for Order Approving Settlements Embodied in the Restructuring Support Agreement and Tolling Certain Limitations Period*, May 10, 2019 (ECF No. 1235) (the "9019 Motion").

[10] *Id.* ¶¶ 1, 9, 50-51

[11] *See Objection of Financial Oversight and Management Board for Puerto Rico to Urgent Motion of the Ad Hoc Group of PREPA Bondholders to Compel Mediation and Impose Deadlines for a PREPA Plan of Adjustment* (ECF No. 2735) (the "FOMB Mediation Objection") at ¶ 20; *Oversight Board Outlines Next Steps for Taking Commonwealth Plan Effective by March 15 Deadline, Aims to Complete Restructuring of PREPA, HTA in 2022*, REORG (Jan. 18, 2022), https://app.reorg.com/v3#/items/intel/1869?item_id=166198.

[12]  FOMB Mediation Objection at ¶ 20.

[13] *See AAFAF's Informative Motion Regarding Termination of PREPA RSA* (Case No. 17-3283-LTS, ECF No. 20277-2 at 2).

[14]     *See FOMB Statement*, (March 8, 2022), https://drive.google.com/file/d/1TQqI5kZTVeHX0BEmRLa6GSFShVSnEgG9/view.

6

for PREPA, and appointed the Mediation Team to assist the parties in reaching a new agreement.[15] After the parties failed to reach a mediated settlement during the initial phase of mediation, the Court ordered the parties back to mediation, and ordered the Oversight Board to file a plan "that it believes could be confirmable, taking into account the litigation risk and economic issues that are in dispute," adding that the plan should include "alternative provisions addressing proposed resolutions contingent on different outcomes of the disputed issues."[16]

15.     At the November 2, 2022 omnibus hearing, the Court explained what it expected to see from the Oversight Board: "What I mean by a confirmable plan," is one "that meaningfully and realistically contemplates scenarios in which each party fails to prevail on their claims in litigation to the extent that they expect to in order that, on resolution of issues in the litigation, no matter what the outcome, we can move forward toward confirmation with alacrity."[17]  The Court made clear:  "I don't expect to see a place holder filed on December 1.  I want to see something that the Oversight Board believes in good faith should move toward approval of a disclosure statement."[18]

16.     Without going into any confidential material, it is a matter of public record that the Oversight Board made one proposal to the Bondholders in mediation.[19]   Thereafter, the Bondholders asked for information regarding the assumptions and data underlying the proposal.

---

[15] *See* Order and Notice of Preliminary Designation of Mediation Team and Setting Deadlines for Objections to Membership (ECF No. 2767) (the "Mediation Order") at 3.

[16] *See Order (A) Granting in Part and Denying in Part Urgent Motion of Financial Oversight and Management Board for Order (I) Establishing Schedule to Continue Negotiations During Litigation of Gating Issues Pursuant to Litigation Schedule and (II) Granting Related Relief and (B) Staying Certain Motions filed by PREPA Bondholders*, Sept. 29, 2022  (ECF No. 3013).

[17] Nov. 2, 2022 Tr. at 16.

[18] *Id.* at 18.

[19]   *See* PREPA FOMB Proposal to Bondholder Group at 6-7, (Nov. 8, 2022), https://emma.msrb.org/P11641653-P11264323-P11690562.pdf.

Upon pointing out the errors in such assumptions and data, the Bondholders made a good-faith counterproposal. This record is all posted publicly on EMMA.[20] Despite being provided numerous opportunities to make a good-faith counter to the Bondholders' proposal, the Oversight Board simply declined to do so.[21] As the Mediation Team leader had reported to the Court, the mediators did not "feel much coming back from the Board," and "[t]he creditors have been kept waiting . . . and it's just gone on too long."[22]

17.     As is now clear, the Oversight Board's tactics were all part of its overall litigation strategy, and it never intended to move from its first offer. On December 16, 2022, the Oversight Board filed a non-consensual Plan and related Disclosure Statement. The Oversight Board flouted this Court's directions and filed a Plan that can only be described as a placeholder plan. The Plan is not even premised on the confirmation requirements of PROMESA and the Bankruptcy Code, but rather the opposite. In the words of one Oversight Board member, "it was predicated on financial analysis produced to solve for a desired outcome—to pay *as little as possible*."[23] Thus, instead of complying with the Court's mandate to file a confirmable plan no matter the outcome of litigation, the Oversight Board has pinned all hope on the Court ruling in its favor on every contested issue—from the Amended Lien & Recourse Challenge to the Oversight Board's newly invented standard for confirmation.

---

[20] *Id.*

[21] *See Order Granting Second Urgent Motion of the Financial Oversight and Management Board for Puerto Rico Requesting Extension of Filing Deadline to December 16, 2022 Automatically Extendable through December 21, 2022 for Submission of PREPA Plan of Adjustment, Disclosure Statement, & Related Motions*, Dec. 34, 2022 (ECF No. 3109).

[22] Nov. 2, 2022 Tr. at 26:21-27:3.

[23] *See Peterson Statement* (emphasis added).

## OBJECTION

## I.    THE COURT SHOULD DENY APPROVAL OF THE DISCLOSURE STATEMENT BECAUSE THE PLAN IS PATENTLY UNCONFIRMABLE AS A MATTER OF LAW

18.    A court cannot approve a disclosure statement describing a plan that is patently unconfirmable.  *See, e.g., In re Am. Cap. Equip.*, 688 F.3d 145, 154 (3d Cir. 2012) (a court should "not proceed with the time-consuming and expensive proposition of hearings on a disclosure statement and plan when the plan may not be confirmable because it does not comply with [confirmation requirements]"); *In re El Comandante Mgmt. Co.*, 359 B.R. 410, 415 (Bankr. D.P.R. 2006) ("At the hearing on the approval of a disclosure statement, the court may consider issues pertaining to the plan, and may rule upon such issues, when the plan defects will make it unconfirmable[.]").[24]  Thus, "if it appears there is a defect that makes a plan inherently or patently unconfirmable, the Court may consider and resolve that issue at the disclosure stage[.]"  *In re FirstEnergy Sols. Corp.*, 606 B.R. 720, 731–32 (Bankr. N.D. Ohio 2019).  Simply put, "court approval of a disclosure statement for a plan which will not, nor can not, be confirmed by the Bankruptcy Court is a misleading and artificial charade which should not bear the imprimatur of the court."  *In re Filex, Inc.*, 116 B.R. 37, 41 (Bankr. S.D.N.Y. 1990).[25]

19.    While it is a high bar for a court to deny approval of the disclosure statement based on plan futility, that bar is easily surpassed here.  *See Am. Cap. Equip.*, 688 F.3d at 155 ) (citing

---

[24]  *See also In re GSC, Inc.*, 453 B.R. 132, 157, n.27 (Bankr. S.D.N.Y. 2011) ("An unconfirmable plan is grounds for rejection of the disclosure statement; a disclosure statement that describes a plan patently unconfirmable on its face should not be approved."); *In re Quigley Co.*, 377 B.R. 110, 115-16 (Bankr. S.D.N.Y. 2007) ("If the plan is patently unconfirmable on its face, the application to approve the disclosure itself must be denied as solicitation of the vote would be futile."); *In re E. Me. Elec. Co-op., Inc.*, 125 B.R. 329, 333 (Bankr. D. Me. 1991) ("Where the plan's inadequacies are patent, they may, and should be addressed at the disclosure statement stage.").

[25]  The Court has previously recognized that these principles apply to the Title III cases.  In overruling confirmation-related objections made to approval of the disclosure statement in the Commonwealth of Puerto Rico's Title III case, the Court noted that none of the objections pose "a pure question of law that would render confirmation futile or unfeasible at this stage," *see Transcript of July 14,*

*In re Monroe Well Serv., Inc.*, 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987)) (noting that a plan is patently unconfirmable where (i) it contains confirmation defects that cannot be overcome by creditor voting results; and (ii) those defects concern matters upon which all material facts are not in dispute).  As a result of these patent flaws, solicitation of the Plan would constitute a tremendous waste of time and resources and, ultimately, would be futile.  *See In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) ("If the disclosure statement describes a plan that is so fatally flawed that confirmation is impossible, the court should exercise its discretion to refuse to consider the adequacy of disclosures. Such an exercise of discretion is appropriate because undertaking the burden and expense of plan distribution and vote solicitation is unwise and inappropriate if the proposed plan could never legally be confirmed.").

20.     Plan-related issues relevant at the disclosure statement approval stage include whether the plan unfairly discriminates against a class of claims, artificial classification of claims, improper solicitation procedure, *In re El Comandante Mgmt Co., LLC*, 2006 WL 3903592, at *5 (Bankr. D.P.R. Mar. 3, 2006),  inability to comply with the fair and equitable requirement with respect to class that is sure to reject the plan, and "the stark absence of good faith."  *E. Me. Elec.*, 125 B.R. at 333.

21.     For multiple and independent reasons addressed below, the Plan proposed by the Oversight Board is patently unconfirmable.  Consequently, the Court should decline to approve the Disclosure Statement and related relief sought by the Disclosure Statement Motion.

---

*2021 Further Disclosure Statement Hearing* (Case No. 17-3283 ECF 17379) (the  "July 14, 2021 Tr.") at 81:21-23 or "demonstrated that the proposed plan is patently unconfirmable."  *Id.* at 84:7-8.

**A.**     **The Plan Reflects A Mere Placeholder Plan In Violation Of This Court's Directives**

22.     As an initial matter, the Oversight Board admits that the Plan is not confirmable based on at least one very obvious scenario.  The Disclosure Statement includes a section on litigation affecting distributions under the Plan.  There, after discussing various potential outcomes, the Oversight Board admits that if the Court finds that (i) the Trustee has a lien[26] on PREPA's present and future revenues and (ii) the arbitrary cap on recoveries imposed by the Plan are insufficient to pay the Bondholders' entitlement, then the Plan "may not be confirmable or feasible without material amendments."[27]  This outcome, which is squarely in the range of possible (if not probable) litigation scenarios, demonstrates that the Oversight Board has failed to comply with the Court's directive that it file a plan that can be confirmed whatever the litigation's outcome. Indeed, the Oversight Board admits that if it loses on the value of the Trustee's liens, it will have to embark on a do-over of the whole solicitation and confirmation process because the amendments will be "material."  This Court specifically charged the Oversight Board—after six years in bankruptcy, a terminated RSA, overall lack of progress, and inexplicable flip-flops in legal and factual positions—not to treat this plan deadline as just another free option.  Yet, that's exactly what the Oversight Board has done.

23.     Moreover, the Oversight Board's single admission is hardly the only litigation scenario in which the proposed Plan would not be confirmable.  As explained further below, the Plan fails the "fair and equitable" and "unfair discrimination" tests with respect to the inevitable rejecting class

---

[26] "Lien" under section 101(37) of the Bankruptcy Code  means "charge against or interest in property to secure payment of a debt or performance of an obligation."  11 U.S.C. § 101(37).  Under section 928(a) of the Bankruptcy Code, as a result of the covenants and pledges of revenues contained in the Trust Agreement, the Bondholders have a lien on all current and future special revenues generated by PREPA's electric power system.

[27] *See* Disclosure Statement at 37-38.

11

of Non-Settling Bondholders and Monolines based upon its treatment of the Oversight Board's
new creditor-of-the-month,[28] the Fuel Line Lenders.   In every potential litigation scenario—
irrespective of whether the Bondholders' claims are secured or unsecured, and even if the *seven-
year old* claims of the Fuel Line Lenders are treated as "*current* expenses" (which they are not),
the Plan will not comply with section 1129(b)(2).

> **B.    The Plan Is Admittedly Not Based On What PREPA Can Afford To Pay, And
> The Legal Foundation For The Plan Is Fatally Flawed.**

24.    The Oversight Board does not mince its words; it plainly declared with regard to
the Plan that "PROMESA Does Not Include an 'Affordability' Test."[29] Just weeks before it filed
the Plan, the Oversight Board proposed a distribution of $7.8 billion[30] (which is public
information) to its creditors (resulting in an approximately 71% recovery for Bondholders).   And
this proposal already reflected a reduction relative to the recoveries proposed under the 2019 RSA,
which the Oversight Board supported as recently as last year.   Yet, by any metric, the Puerto Rican

---

[28] When pressed by the Court on how the Oversight Board could conceivably move forward on
a plan with just one tiny consenting creditor in Vitol, counsel for the Fuel Line Lenders agreed with that
dubious proposition. *See* Nov. 2, 2022 Tr. at 29:4-9 ("Mr. Mason: Mr. Bienenstock referred to Vitol, which
I think is a small creditor in the scheme of things, as potentially being an impaired accepting class. I think
we would meet that with some pretty severe skepticism, but, obviously, if that's the road he is going to go
down, we'll address it at the time.").   This proposition has become even more dubious because the Fuel
Line Lenders' rights to payment are subordinate to the Bondholders.

[29] *See Omnibus Reply of the Oversight Board in Support of the Urgent Motion of Puerto Rico
Electric Power Authority for Order (I) Scheduling a Hearing to Consider Adequacy of Information
Contained in Disclosure Statement, (II) Establishing Deadline for Filing Objections to the Disclosure
Statement and Replies Thereto, (III) Approving Form and Manner of Notice Thereof, (IV) Establishing
Document Depository Procedures in Connection Therewith, and (V) Granting Related Relief*, Dec. 22,
2022 (ECF No. 2990) at ¶ 8 (stating that PROMESA does not include a requirement that PREPA pay the
maximum it can pay creditors; rather, the "Oversight Board considers affordability along with multiple
factors impacting PREPA and Puerto Rico").   Previously, counsel for the Oversight Board said the
Oversight Board was looking for PREPA to pay what it could afford to creditors. *See* Nov. 2, 2022 Tr. at
22:9-11 ("[The Board's] not trying to save money.  It's not trying to pay less than it can pay to creditors
who are absorbing some amount of losses. That's never been the Board's objective.").

[30] *See* PREPA FOMB Proposal to Bondholder Group at 6-7 (Nov. 8, 2022),
https://emma.msrb.org/P11641653-P11264323-P11690562.pdf.

economy has actually strengthened since March 2022.  Moreover, inexplicably, the Plan even

proposes to distribute $2.4 billion less to its creditors that the Board proposed to creditors just *a

few weeks* before (slashing Bondholder recoveries to, at most, 55%).  Despite the obvious

confusion this causes in the public markets, the Disclosure Statement makes no effort even to

bridge the difference and explain the reasonableness and necessity of the drastically slashed

proposed distributions.  Finally, the Disclosure Statement includes virtually no information or data

from which a creditor could assess what it in fact PREPA *can* afford.[31]

25.    Section 314(b) of PROMESA is modeled on Section 943(b) of the Bankruptcy

Code, which prescribes the confirmation requirements for a municipality's plan of adjustment.

Prior to 1976, Chapter IX of the Bankruptcy Act included, as conditions for confirmation, that the

plan be fair and equitable, not discriminatory, and in the best interests of creditors.  Congress

described the "fair and equitable" test as the following:

> Fair and equitable has additional consent in Chapter IX. ***The petitioner must
> exercise its taxing power to the fullest extent possible for the benefit of its
> creditors***. *Fano v. Newport Heights Irr. Dist.*, 1[1]4 F.2d 563 (9th Cir. 1940). The
> court must find that the amount proposed to be paid under the plan was all that the
> creditors could reasonably expect under the circumstances . . . .

H.R. REP. NO. 94-686, at 33 (1976), *reprinted in* 1976 U.S.C.C.A.N. 539, 571, 1975 WL 12383

(emphasis added).  In the cited *Fano* case, the Ninth Circuit upheld the reversal of confirmation of

a plan, finding that the plan was not fair and equitable because there was an insufficient showing

that taxes could not be raised to pay creditors.  *Fano*, 114 F.2d at 565-66 ("[W]e are unable to find

any reason why the tax rate should not have been increased sufficiently to meet the District's

---

[31] Without this information, it would be impossible for Bondholders to make an "informed
judgment" about the Plan.  *See* 11 U.S.C. § 1125(a) (describing what constitutes "adequate information").
The Disclosure Statement should not be approved on the separate, independent, basis that it does not contain
"adequate information" as required under section 1125(b) of the Bankruptcy Code, made applicable to this
case by section 301 of PROMESA.

13

obligations or why it can be said that the plan is 'equitable' and 'fair' and for the 'best interest of the creditors' with no sufficient showing that the taxing power was inadequate to raise the taxes to pay them.").[32]

26.     Today, under the Bankruptcy Code, the "fair and equitable" standard in the Chapter 9 context remains as described in its legislative history and *Fano*—the debtor must pay all that it is reasonably able to pay to creditors in an impaired dissenting class.  Of course, a Title III plan (like a Chapter 9 plan) must in all circumstances be "feasible."  PROMESA § 314(b)(6); 11 U.S.C. § 943(b)(7); *see also In re City of Detroit*, 524 B.R. 147, 219 (Bankr. E.D. Mich. 2014) (noting that the "feasibility" requirement establishes a ceiling which prevents the debtor from promising more than it can deliver, and therefore "may obtain confirmation of a plan over objection, which does not utilize *all* of the assets of the estate to retire its obligation . . . . There is no more money available for creditors in the City's already tight budget projections.  Every dollar is accounted for in providing necessary services, implementing the necessary [reinvestment and restructuring initiatives], and in meeting plan obligations." (emphasis added)).

27.     A good example of how the balancing of fairness and equity, on one hand, and feasibility on the other, must be undertaken is the Chapter 9 case of *Hardeman County Hospital District*, 540 B.R. 229 (Bankr. N.D. Tex. 2015).  In confirming a plan over the dissent of general unsecured creditors, the court found that the plan was fair and equitable because it "reasonably compensates and provides the best recovery for Creditors in the circumstances and the ***maximum*** that the Debtor is able to pay while maintaining its mission of continuing to provide health care

---

[32] *See also Lorber v. Vista Irr. Dist.*, 127 F.2d 628, 639 (9th Cir. 1942) (applying fair and equitable test by considering "whether or not the amount to be received by the bondholders is all that they can reasonably expect in the circumstances," which required the trial court to make findings to support a conclusion that "the payments provided for in the plan of composition are *all that the District is reasonably able to pay in the circumstances*" (internal quotation marks omitted and emphasis added)).

services to Hardeman County and its needy inhabitants." *Id.* at 239 (emphasis added).  Ultimately,
"[n]o viable alternative to the Plan exist[ed] that would resolve the debtor's insolvency and provide
a greater recovery to the objecting and the rejecting Creditors in Class 5."  *Id.* at 240; *see also id.*
at 242 ("[T]he credible evidence at the Confirmation Hearing is that the Debtor is not in a position
to raise taxes because of property values and economic conditions; and the taxpayers of the county
are already paying the maximum the taxpayers will permit.").

28.     Even if the Oversight Board had not readily admitted it, there is no doubt that the
Plan proposes to pay less than what PREPA can reasonably afford to pay under the circumstances.
It cannot be lost on the Court or voting creditors, that the Plan proposes *billions of dollars less*
than every previous RSA to which the Oversight Board was a party.  For example, under the 2019
RSA negotiated in the wake of Hurricanes Irma and Maria, each dollar of Bondholder claims was
to be exchanged for 67.5 cents in tax-exempt "A" bonds and 10 cents in "B" bonds.  Total
distributions to Bondholders would have exceeded $8.0 billion had the plan reflected in the 2019
RSA (for which the Oversight Board reiterated its support in early 2022) been consummated at the
end of last year.  In contrast, proposed distributions to bondholders under the Plan are $4.0 billion.

29.     The Government Parties have long been on record stating that the debt reduction
and transition charge they agreed to in the 2019 RSA were reasonable, affordable, and beneficial
to PREPA and its customers.  As late as February 2022, in the midst of the Commonwealth's
emergence from bankruptcy, the Government Parties publicly pronounced on the Court's docket
that the 2019 RSA "provides PREPA and all present and future ratepayers with gargantuan
benefits."[33]  That same month, AAFAF's Executive Director proudly noted that "it is not typical

---

[33] *See* FOMB Mediation Objection ¶ 4.

to achieve such a substantial reduction."[34]  The Disclosure Statement makes no effort to explain why those statements are no longer true.  Instead, the Oversight Board adopts a novel, discretionary, and untestable proposition:  PREPA need only pay what the Oversight Board deems appropriate.

30.     Indeed, rather than requiring PREPA to pay as much as it can afford, the Oversight Board has deputized PREPA to be *the Commonwealth's engine of growth*—a shiny new role for PREPA that is incompatible with PREPA's obligation to act fairly and equitably towards its own dissenting class of creditors.  *See* 11 U.S.C. § 1129(b).  As explained above, that standard requires the Court to find that PREPA has paid all that it could reasonably pay.  And this standard is not only embedded in the history of the term "fair and equitable," it makes sense because, outside of bankruptcy, the municipality's policy decisions would be constrained by the Contracts Clause.  *Cf.* U.S. CONST. Art. I, sect. 10; *United Steel Paper & Forestry Rubber Mfg. Allied Indus. & Serv. Workers Int'l Union AFL-CIO-CLC v. Gov't of Virgin Islands*, 842 F.3d 201, 210 (3d Cir. 2016) (explaining that when impairing private obligations, the state must act in a "reasonable and necessary" way).

31.     While the affordability analysis is a fact-specific one, it is fundamental to this Court's role in considering a contested plan of adjustment to have those facts in front of it.  Here, the Oversight Board has clearly conceded in both words (*see* ECF No. 3131) and substance (*see* 2019 RSA and its latest proposal on EMMA)) that it is *not even trying* to satisfy this requirement

---

[34] *See AAFAF Chief Marrero Signals PREPA RSA 'Most Likely' Will Need Renegotiation, Given Lack of Legislative Support*, REORG (Feb. 7, 2022), https://app.reorg.com/v3#/items/intel/1869?item_id=168129, (attached as Exhibit 5 to *Motion of the Ad Hoc Group of PREPA Bondholders, Assured Guaranty Corp., Assured Guaranty Municipal Corp., National Public Finance Guarantee Corporation, and Syncora Guarantee, Inc. to Dismiss PREPA's Title III Case, or for Relief From the Automatic Stay to Enforce Their Right to a Receiver*, Sept. 19, 2022 (ECF No. 2973) (the "Bondholder Motion to Dismiss/Stay Relief Motion")).

because the Plan is based on a different standard entirely. Indeed, at the most recent hearing in the

Title III Cases, counsel for the Oversight Board doubled down on the position that PREPA does

not need to demonstrate how much it can afford to pay creditors at the confirmation hearing,

effectively excising the "best interests" and "fair and equitable" tests from PROMESA's Section

314 confirmation requirements.[35] Accordingly, the Court can and should at this stage determine

that the Plan is premised on a flawed subjective (and novel) standard that writes "fair and

equitable" out of the Bankruptcy Code. Rather than waste everyone's time with a half-baked Plan

that is based on an incorrect legal standard, this case is a paradigm for when the Disclosure

Statement should not be approved.

### C.   The Plan Cannot Be Confirmed Under Section 1129(b) Of The Bankruptcy Code Regardless Of The Amended Lien & Recourse Challenge Outcome

32.   A debtor can confirm a plan on a non-consensual basis (*i.e.*, over the objection of a

dissenting impaired class of creditors), if the plan otherwise satisfies the requirements of section

1129(a) (other than section 1129(a)(8)) and meets the additional "cramdown" requirements of

section 1129(b). Section 1129(b) authorizes confirmation of a plan over the dissenting vote of an

impaired class so long as the plan does not "discriminate unfairly" and is "fair and equitable." 11

U.S.C. § 1129(b)(2). The appropriate fair and equitable test for cramdown is based upon whether

the dissenting impaired class of creditors is secured or unsecured.

33.   To satisfy the "fair and equitable" requirement of section 1129(b)(2)(A) with

respect to an impaired secured class of creditors, a plan must provide for the secured creditors to

either (i) retain the liens securing their claims and receive deferred cash payments totaling the

allowed amount of their secured claims, or (ii) receive the "indubitable equivalent" of their

---

[35]   *See Transcript of February 1, 2023 hearing* at 111:21-24 (Mr. Bienenstock: "There's no
separate . . . affordability test. They can argue that. That's not the way we read PROMESA.").

claims.[36]  For an impaired non-consenting class of unsecured claims, a plan is considered fair and equitable if "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property." 11 U.S.C. § 1129(b)(2)(B)(ii).  As set forth below, the Plan fails to meet the "cramdown requirements" of 1129(b) with respect to the Non-Settling Bondholder Class, irrespective of whether the Bondholders' claims are found to be secured or unsecured

34.     First, if the Court determines that the Bonds are secured by PREPA's revenues, then the Plan necessarily will violate section 1129(b)(2)(A) with respect to the Non-Settling Bondholder Class.  Under the Plan, the Bondholders would be capped at approximately 55% recovery even if Bondholders prevail on the lien and recourse issues.  There is no assertion in the Disclosure Statement that this arbitrary cap is based on the value of PREPA's revenues or, therefore, the full value of the Bondholders' secured claim.

35.     Moreover, even if the Court determines that the Bondholders' collateral is limited to the $8 million of cash in the Sinking Fund as of the petition date, and therefore the Bondholders' claims are effectively unsecured, the Plan unfairly discriminates between Bondholders and Fuel Line Lenders, because they would all be similarly situated unsecured creditors.  The unfair discrimination standard prevents creditors "with similar legal rights from receiving materially different treatment under a proposed plan without compelling justifications for doing so."  *In re Hermanos Torres Perez Inc.*, 2011 WL 5854929, at *9 (Bankr. D.P.R. Nov. 21, 2011); *see also In re LightSquared Inc.*, 513 B.R. 56, 99 (Bankr. S.D.N.Y. 2014) ("The purpose of the requirement is to ensure that a dissenting class will receive relative value equal to the value given to all other

---

[36] Section 1129(b)(2)(A) also provides an additional basis to cramdown a non-consenting secured class in the context of an asset sale. *See id.* § 1129(b)(2)(A)(ii).  However, this provision is not applicable because the Plan does not contemplate a sale of property.

similarly situated classes.").  It is clear that the treatment of the Fuel Line Lenders is materially different from the proposed treatment of Bondholders where Fuel Line Lenders are receiving a 60% greater recovery than even the best-case scenario for Bondholders.  *See El Comandante*, 2006 WL 3903592, at \*5 (Under the unfair discrimination test, the "differentiated treatment of similar classes intended merely to induce acceptance by one class fails").

36.     The Oversight Board seeks to justify the discrimination between the Bondholders and the Fuel Line Lenders by asserting that the Fuel Line Lenders' claims are "Current Expenses" or "Necessary Operating Expenses."[37]  As an initial matter, the Oversight Board's newfound discovery of the nature of the Fuel Line Lenders' claims is born out of expediency, not any legitimate legal analysis or purported good-faith settlement.  In any event, the argument that the Fuel Line Lenders' claims are current expenses is not credible.

37.     The Fuel Line Lenders provided unsecured loans, and their claims represent debts incurred entirely prior to the Title III filing.  Therefore, in the more than six years since its establishment, the Oversight Board never certified a budget for PREPA that authorized PREPA to make payments to the Fuel Lien Lenders.  That is because the claims of the Fuel Line Lenders have never been expenses necessary for PREPA to continue operating all these years.  In the Oversight Board's own words: "***Payment of debt service on prepetition unsecured debt cannot possibly play any role in keeping PREPA operational in this or any future fiscal year***."[38]

---

[37] The Trust Agreement defines Current Expenses as PREPA's "reasonable and necessary current expenses of maintaining, repairing and operating the System" and includes a long list of *direct* expenses to fund PREPA's operations.  *See* Trust Agreement at 20-22.

[38] *See Memorandum of Law of PREPA, AAFAF, and the Oversight Board in Support of Motion, Pursuant to Fed. R. Civ. P. 12(b)(6) to Dismiss Counts I, II, III, IV, VI, and VII of Plaintiffs' Amended Complaint with Prejudice* (Adv. Proc. No. 19-396-LTS, ECF No. 54), at 33 (emphasis added).

19

38.     Even assuming, *arguendo,* that the claims of the Fuel Line Lenders could be considered "current expenses" (even though they are not), then PREPA should have been paying them in the ordinary course in order to maintain its operations, as it has been doing with all legitimate "current expenses," as permitted by the Trust Agreement.   In this respect, current expenses are akin to administrative expenses under the Bankruptcy Code, which are not subject to classification at all.  *See* 11 U.S.C. § 1123(a).  Since administrative claims are not classified, they cannot qualify as a sole impaired consenting class for the purposes of section 1129(a)(10).  Accordingly, the Oversight Board's attempt to invent an accepting impaired class of claims thorough bogus classification of the allegedly "current expenses" of the Fuel Line Lenders fails.

### D.     The Plan Cannot Satisfy PROMESA § 314(b)(6)'s "Best Interests Of Creditors" Test

39.     The Plan does not provide PREPA's creditors—the overwhelming majority of whom are Bondholders—with a better alternative than dismissal of the Title III case, and therefore cannot satisfy the requirement that it is in the "best interests of creditors,"  PROMESA § 314(b)(6), providing yet another basis for denying approval of the Disclosure Statement.

40.     Section 314(b)(6) requires that the Plan be in the "best interests of creditors," which "requires the court to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided in such plan."  PROMESA § 314(b)(6).  The test requires the court to consider "whether creditors ***in the aggregate*** receive an equal or greater recovery on their Claims pursuant to the Plan than they would outside of Title III if the Debtor's Title III case were dismissed and creditors exercised their remedies."  *In re Fin. Oversight and Mgmt. Bd. for P.R.*, 637 B.R. 223, 211 (D. P.R. 2022) (emphasis in original).

Case:17-03283-LTS   Doc#:23480   Filed:02/03/23   Entered:02/03/23 16:57:53   Desc: Main
Document    Page 26 of 43

41.     Here, more than 80% of PREPA's prepetition debt is held by Bondholders who, as the Oversight Board acknowledges, "[o]utside bankruptcy" have specific performance remedies by which they could cause PREPA to "add more money to the Sinking Fund"[39] by raising rates and making revenues available for credit to that fund, as well as a contractual right to seek the appointment of a receiver to enforce the Trust Agreement.  *See* Trust Agreement §§ 502, 804, 808. The Oversight Board also acknowledges that, outside of Title III, "a court is likely to find the Bondholders have a right to receiver appointed under 22 L.P.R.A. § 207."[40]

42.     Moreover, Puerto Rico law independently requires PREPA to meet its obligations to Bondholders.  PREPA's Authority Act, as amended, requires PREPA to collect revenues "that are sufficient . . . for the payment of the principal of and interest on its bonds, and for fulfilling the terms and provisions of the agreements entered into with or for the benefit of purchasers or holders of any bonds of [PREPA] and other creditors." Act 33-2019 § 24 (amending Section 5 of the Authority Act).  The Authority Act also gives Bondholders the right to enforce PREPA's statutory and contractual obligations "by mandamus or other suit, action, or proceeding at law or in equity." 22 L.P.R.A. § 208.

43.     Because Bondholders undoubtedly would do better upon dismissal of this Title III case, they have moved to dismiss the case, or lift the automatic stay, to permit them to pursue their rights under the Trust Agreement and Puerto Rican law.[41]  Indeed, in recognition of the powerful

---

[39] *Financial Oversight and Management Board of Puerto Rico's Motion for Summary Judgment* (Adv. Proc. 19-391-LTS, ECF No. 63) ¶ 2 n.6; *see also id.* ¶ 41 n.17 ("Outside of bankruptcy, those covenants provide the [b]ondholders with contractual rights to enforce payment on the Bonds." (emphasis added)); *id.* ¶ 83 n.22 (Bondholders could, "outside of Title III, enforce the Covenants and Remedies ***to expand their collateral***" (emphasis added)).

[40] *See Best Interest Test Report for PREPA*, Appendix 1, Assumptions, filed by the Oversight Board on Jan. 27, 2023 (ECF No. 3169-2).

[41] *See* Bondholder Motion to Dismiss/Stay Relief Motion.

rights of the Bondholders and their Trustee under Puerto Rican law, the Oversight Board asks that

the creditor protections embedded in the Authority Act (*e.g.,* rate covenant, right to a receiver,

specific performance, etc.) be preempted upon confirmation of the Plan.[42]

44.     Meanwhile, the proposed Plan does not provide (and the Disclosure Statement does

not describe) any significant benefits to PREPA's creditors (other than, perhaps, the Fuel Line

Lenders who were bought off with the Bondholders' collateral) that would be lost in the event of

dismissal.  In this way, the Plan is entirely distinguishable from the plan of adjustment confirmed

by the court in the city of Detroit's chapter 9 case.  There, the court cited the lost benefits to

creditors, whose recoveries would be "substantially impaired" if the case were dismissed, as well

as the city's loss of significant settlement contributions and potential enhanced credit ratings, in

holding that the plan was in the best interests of creditors.  *See Detroit*, 524 B.R. at 217-18.

PREPA's proposed Plan does not provide such benefits.  Unlike the State of Michigan, the

Commonwealth of Puerto Rico is not making *any* contribution to PREPA that would be

jeopardized upon dismissal, and it is difficult to see how PREPA's credit ratings would benefit

from the arbitrary slashing of Bondholder recoveries based not on PREPA's true financial

condition, but on its (or the Oversight Board's) unwillingness to generate revenues to the actual

amount PREPA could afford to pay.  Here, it is the Plan—not dismissal of the Title III—that would

"substantially impair" the recoveries for lion's share of PREPA's creditors.

### E.     The Plan Was Not Proposed In Good Faith

45.     The Oversight Board has not proposed the Plan in good faith, which "generally

requires that the plan be proposed with honesty and good intentions . . . and that the plan proponent

---

[42] *See Fuel Line Lender Plan Term Sheet*, Dec. 16, 2022 (ECF No. 3111-13), attached as Ex. X to
the Disclosure Statement.

deal with its creditors in a manner that is fundamentally fair." *Detroit*, 524 B.R. at 248 (internal quotation marks omitted).

46.    PREPA, through the Oversight Board, has over the years reneged on every agreement negotiated with Bondholders—most recently, the 2019 RSA.  For over three years, Bondholders complied with their obligations under the 2019 RSA, including by refraining from seeking to lift the stay and objecting to various issues in PREPA's and the Commonwealth's Title III cases.  During that time, inducing the Bondholders' continued reliance, the Government Parties repeatedly reiterated their support for the RSA.  *See, supra*, ¶ 12.  Then, without any economic justification, on March 8, 2022, the Governor, with the support of the Oversight Board, abruptly terminated the 2019 RSA.

47.    Following termination, on April 1, 2022, the Court ordered the Ad Hoc Group of Bondholders and other key constituencies to mediation (the "Mediation Parties").[43]  After four extensions of the mediation termination deadline, on September 29, 2022, the Court entered the Amended Mediation Order, which, among other things, directed representatives of the Mediation Parties to attend and participate in more mediation sessions "without undue delay," and further directed the Oversight Board to "promptly" designate a lead negotiator to facilitate the Mediation Team's and the other Mediation Parties' interaction with the Oversight Board.[44]

48.    The Oversight Board dragged its feet for *two weeks* even to pick its lead negotiator, who ended up being the party "whom the mediators felt was the obvious party to act as the lead negotiator."   Nov. 2, 2022 Tr. at 23:22-24.   Meanwhile, the Oversight Board had *no communications whatsoever* with the Mediation Team.  *See id.*  "Two weeks *became six weeks*,"

---

[43] *See* Mediation Order.

[44] *See Amendments to Order Establishing the Terms and Conditions of Mediation*, Sept. 29, 2022 (ECF No. 3011).

during which there were "virtually **no substantive communications**." *Id.* at 24:1-7.  As explained

on the record of these proceedings, the Meditation Team did not "feel much coming back from the

Board," and "[t]he creditors have been kept waiting . . . and it's just gone on too long."  *Id.* at

26:21-27:3.

49.     At that important November 2, 2022 hearing, the Court emphasized the importance

of the December 1, 2022 deadline by which the Oversight Board was required to propose a

confirmable plan of adjustment that "meaningfully and realistically contemplates scenarios in

which each party fails to prevail on their claims in litigation."  *See id.* at 16:4-16.  Thereafter, the

Bondholders and the Oversight Board exchanged proposals.  As discussed, *supra* ¶ 24 the

Oversight Board's latest proposal on or around November 8, 2022, would have made $7.8 billion

available for distribution to PREPA's creditors.  Bondholders explained that the Oversight Board

was actually using incorrect assumptions and data, and that simply correcting the Oversight

Board's assumptions would show PREPA could afford to pay creditors enough to bridge the gap

while still maintaining reasonable rates for the ratepayers.[45]  In response, the Oversight Board

never engaged again and filed the Plan.

50.     Indeed, despite all that time afforded by the Court ahead of its deadline, that was

the end of the exchange of proposals.  Rather than work with the largest bloc of creditors, and

presumably knowing it had to find an impaired consenting class, following the Fuel Line Lenders'

---

[45] *See Ad Hoc Group of PREPA Bondholders Discloses Additional Materials Produced in Recently
Terminated Mediation with FOMB,* with hyperlink to *Analysis Group Presentation on the Share of Wallet
Analysis* (Dec. 19, 2022), https://www.businesswire.com/news/home/20221218005080/en/Ad-Hoc-
Group-of-PREPA-Bondholders-Discloses-Additional-Materials-Produced-in-Recently-
Terminated-Mediation-with-FOMB.

filing of a Rule 2004 motions regarding the use of Vitol as an impaired accepting class, the Oversight Board quickly made a sweetheart deal with the Fuel Lien Lenders.[46]

51.     By entering into the settlement with the Fuel Line Lenders, and proposing they be classified in their own separate class, it is clear the Oversight Board is attempting to buy the votes of a small unsecured creditor class with the apparent goal of cramming down their largest creditor constituency.  Vote-buying has significant consequences, resulting either in designation of the creditor's vote, *see* 11 U.S.C. § 1126(e) ("the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title"), or preventing confirmation: Where a plan is not proposed in good faith—including because of bad faith in the solicitation process, like vote-buying—the plan violates section 1129(a)(3) and cannot be confirmed.  *See, e.g., In re Quigley Co.*, 437 B.R. at 129 (denying confirmation because the plan "was proposed in bad faith since it was designed to achieve acceptance through a tainted vote").  Moreover, the Oversight Board's settlement with the Fuel Line Lenders is improper as it seeks to settle an intercreditor dispute between the Fuel Line Lenders and the Bondholders as to priority of claims vis-à-vis one another. The Fuel Line Lenders themselves recognized this point when they objected to the 2019 RSA, arguing that "[t]he Oversight Board should not be permitted to compromise or release the particularized objections and claims of the Fuel Line Lenders."[47]

52.     Therefore, ***even if*** the Plan could satisfy the requirements under section 1129(b) for confirmation over the dissent of an impaired class—which for the reasons discussed above, it

---

[46] *See Urgent Motion of Fuel Line Lenders for Examination of Oversight Board Under Federal Rule of Bankruptcy Procedure 2004 Concerning Vitol Settlement*, Nov. 4, 2022  (ECF No. 3066).

[47]     *See Objection of Cortland Capital Markets Services LLC, as Administrative Agent, and Solus to PREPA Bondholder Settlement*, Oct. 30, 2019 (ECF No. 1700), at 67-68.

cannot—the Oversight Board did not negotiate fairly or in good faith, and it did not propose the Plan in good faith.  Approval of the Disclosure Statement should accordingly be denied.

> **F.     The Plan Impermissibly Gerrymanders Classes Of Claims In Violation Of Section 1122(a) Of The Bankruptcy Code.**

53.     Section 1122(a) of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.  PROMESA § 301 incorporates section 1122 into Title III cases and adds the additional gloss that in determining "whether claims are 'substantially similar' for the purpose of section 1122 . . . , the Oversight Board shall consider whether such claims are secured and whether such claims have priority over other claims."  PROMESA § 301(e).  In *In Granada Wines, Inc. v. New England Teamsters & Trucking Industry Pension Fund*, 748 F.2d 42 (1st Cir. 1984), the First Circuit took a strict approach to classification determinations under section 1122, holding that "all creditors of equal rank with claims against the same property should be placed in the same class."  *Granada Wines*, 748 F.2d at 46 (stating that "[s]eparate classifications for unsecured creditors are only justified where the legal character of their claims is such as to accord them a status different from the other unsecured creditors[.]").

54.     In the Commonwealth Title III case, the Court stated its view that PROMESA provided the Oversight Board with flexibility when classifying claims.[48]  Notwithstanding this flexibility, the main commandment of section 1122, "thou shall not gerrymander" classes for purposes of creating an impaired accepting class, undoubtedly applies to Title III cases.  *See, e.g., In re Bos. Post Rd. Ltd. P'ship (Boston Post)*, 21 F.3d 477, 483-84 (2d Cir. 1994) (holding that "approving a plan that aims to disenfranchise the overwhelmingly largest creditor through artificial

---

[48] *See* July 14, 2021 Tr. at 80:23-25 ("[T]he Court finds no basis to import the *Granada Wines* strict classification principle into PROMESA.").

classification is simply inconsistent with the principles underlying the Bankruptcy Code"); *In re Hanish, LLC*, 570 B.R. 4, 16 (Bankr. D.N.H. 2017) (citing *In re Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991) (surveying the split in circuits on the interpretation of section 1122, and holding there "is one clear rule to which all courts adhere—*thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan*" (emphasis in original and internal quotes omitted)).

55.     In this case, unlike the Commonwealth Title III plan, the proposed classification reeks of gerrymandering in a transparent attempt to artificially create an impaired accepting class. The Plan purports to contain three separate classes of impaired creditors but each such class breaks the cardinal rule against gerrymandering as a matter of law.

### 1.     Separate classification of Settling and Non-Settling Bondholders.

56.     The Plan seeks to create two separate classes of Bondholders.  The ***only*** basis for the separate classification is the Bondholders' election whether to support the Plan.  Up until the moment the Bondholder votes, there are no distinguishing characteristics between and among the Bondholders as their legal entitlements are exactly the same.  If classification rises and falls with whether or not a creditor supports a plan, then a debtor would always be able to buy off a settling creditor for purposes of artificially creating an impaired accepting class.  This blatant form of gerrymandering disenfranchises Bondholders who seek to protect their legal rights rather than accede to the Oversight Board's coercive demands.[49]

---

[49] To the extent the Oversight Board would rely on cases that approve "death-traps" in plans, those cases are inapposite to what the Oversight Board proposes here.  While Courts have approved death-trap type plans, the approved death traps are based on how the class votes as a whole (*i.e.*, treatment of entire class is the same irrespective of whether or not the class, as a whole, accepts or rejects the plan). Here, there is not a class-wide death-trap but individual death-traps that punish creditors who vote no and reward creditors who vote yes on the Plan.  *See In re Affordable Auto Repair, Inc.*, 2020 WL 6991012, at *2 (Bankr. C.D. Cal. Sept. 2, 2020) (noting that while courts have approved class-wide death traps, an individual death trap may violate § 1123(a)(4)).

### 2.      Separate Classification of Vitol

57.      In its first attempt to artificially create an accepting impaired class, the Oversight Board's counsel informed the Court at the November 2, 2022 hearing that it had reached a settlement with Vitol, Inc., a single unsecured creditor holding a claim of approximately $41.5 million and that the Plan would classify Vitol separately from all other unsecured creditors based upon the allegedly lesser treatment that Vitol agreed to under the settlement.[50]   As counsel for the Fuel Line Lenders stated at the November 2 hearing, separate classification of Vitol's settled approximately $41.5 million disputed claim should be looked at with some pretty severe skepticism.[51]   Seeking to confirm a cramdown plan for a debtor with creditors holding more than $8 billion in Bondholder claims based upon a settlement with a single unsecured creditor is indeed dubious.  Simply put, there is no legal justification to cherry pick and separately classify Vitol's claim from the hundreds, if not thousands, of claims of other unsecured creditors, other than for gerrymandering purposes.[52]

### 3.      Separate Classification of Fuel Line Lenders to Facilitate Impaired Accepting Class

58.      At the 11th hour, the Oversight Board decided to settle with the Fuel Line Lenders upon terms extremely favorable to them, including *elevating* their claims above the claims of the Bondholders and general unsecured creditors.  The settlement is not currently before the Court and

---

[50]   Nov. 2, 2022 Tr. at 19:8-15.

[51]   *Id.* at 29:4-9.

[52]   *See In re Thornwood Assocs.*, 161 B.R. 367, 374 (Bankr. M.D. Pa. 1993) *aff'd*, 162 B.R. 438 (M.D. Pa. 1993) (classification based on *treatment* was improper because such a "difference is in a debtor's proposed treatment of a claim rather than in the nature of the claim as it relates to the assets of the estate. The latter constitutes the proper test for differential classification").

any objections to the settlement will wait for another day but the proposed use of that settlement should be heard now.

59.     One of the effects of the settlement and purported justification for the favorable treatment to be afforded the claims of the Fuel Line Lenders is that the Oversight Board now argues that, in fact, the claims are really "current expenses" that would be paid prior to the Bondholders. If the claims of the Fuel Line Lenders are deemed to be "current expenses," then such claims should have been paid in the ordinary course.  As a result, the Fuel Lenders Claims should not be classified and cannot be used as an accepting impaired class.  In any event, as counsel for the Fuel Line Lenders previously acknowledged in this case (before the Fuel Line Lenders' settlement), using a relatively small creditor group in the scheme of things, as potentially being an impaired accepting class is inherently suspect.  *See supra,* ¶¶ 23 n.28, 57.  Moreover, the settlement also represents impermissible vote-buying that should be addressed at the disclosure statement stage. *See, e.g.*, *Quigley,* 437 B.R. at 126-29.  Syncora reserves all rights with respect to the treatment afforded the claims of the Fuel Line Lenders, including the right to seek to designate the votes of the Fuel Line Lenders under section 1126(e) of the Bankruptcy Code.

60.     While true that classification objections are usually issues for confirmation, it is proper and timely for the Court to rule on the appropriateness of the classification scheme at the disclosure statement stage. *See* Fed. R. Bankr. P. 3013*; In re 18 RVC, LLC*, 485 B.R. 492, 495 (Bankr. E.D.N.Y. 2012) (declining to approve a disclosure statement which described a classification scheme that constituted improper gerrymandering).  Where a disclosure statement describes a plan that is patently unconfirmable, it should not be approved.  *See Quigley*, 377 B.R. at 115 (finding that an unconfirmable plan is grounds for rejection of the disclosure statement). Further, improper classification of claims is a valid basis for declining to approve a disclosure

statement.  *See id.*  Accordingly, the Court should decline to approve the Disclosure Statement and
not permit the Oversight Board to engage in a futile solicitation process.

**G.      The Plan Is Tainted By PREPA's Impermissible Solicitation Without An
Approved Disclosure Statement**

61.      The Oversight Board unabashedly seeks to drum up support for its patently
unconfirmable Plan through an impermissible solicitation, made with whatever information the
Oversight Board itself deems adequate.  Through a so-called settlement offer, which the Oversight
Board began disseminating to Bondholders on January 27, 2023, the Oversight Board seeks to
have Bondholders elect their treatment under the Plan by February 24—*i.e.*, four days **before** the
Disclosure Statement hearing.[53]  Both PROMESA and the Bankruptcy Code prohibit the Oversight
Board's premature attempt to entice Bondholders to accept treatment under a Plan without the
benefit of a disclosure statement approved by the Court as containing "adequate information."

62.      Before the Oversight Board may solicit acceptance of the Plan, PROMESA
expressly requires that the Oversight Board obtain court approval of a disclosure statement that
complies with the requirements of 11 U.S.C. § 1125.  PROMESA §§ 301(a), 314(b)(2); 11 U.S.C.
§ 1125(a), (b).  Section 1125(b) prohibits debtors from soliciting "acceptance or rejection of a
plan . . . after the commencement of a case . . . unless, at the time of or before such solicitation,
there is transmitted to such holder . . . a written disclosure statement *approved, after notice and a
hearing, by a the court as containing adequate information*."  11 U.S.C. § 1125(b) (emphasis
added).  This is no mere technicality; section 1125(b)'s pre-approval requirement ensures "that all
claim holders are provided with adequate information" that enables them "to make an informed
judgment regarding whether to vote for or against a reorganization plan."  *Id.* at 204 (citing *In re*

---

[53]    *See Notice of Distribution of Settlement Offer Notice to Uninsured Bondholders*, Jan. 30, 2023
(ECF No. 3171) ("Notice of Distribution of Settlement Offer").

*Ferretti,* 128 B.R. 16, 18 (Bankr. D.N.H. 1991)).  The Oversight Board's unprecedented
dissemination of such a solicitation is an "end-run around the disclosure requirements" imposed
by section 1125.  *In re Clamp-All Corp.*, 233 B.R. 198, 208 (Bankr. D. Mass. 1999) (quoting H.R.
REP. NO. 95-595, at 227 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 1977 WL 9628)).  The
Oversight Board's Plan is thus tainted and unconfirmable.  *See* 11  U.S.C. § 1129(a)(2).

63.  A "key feature" of the Oversight Board's proposed Plan is the "inclusion of two
separate classes for Bond claims"—a class of Settling Bondholders and a class of Non-Settling
Bondholders.[54]  Under the Plan, Settling Bondholders stand to receive a floor recovery of 50% of
their allowed claims.  Non-Settling Bondholders, on the other hand, will be paid according to
litigation outcomes; if the Oversight Board prevails on both the lien scope and recourse issues,
Non-Settling Bondholders will receive less than a penny (a *0.21%* recovery), while if the Non-
Settling Bondholders prevail on both the lien scope and recourse issues, *their maximum recovery
is 52.81%*.[55]

64.  To effectuate this divergent treatment, the Oversight Board sent Settlement Offers
to Uninsured Bondholders on January 27, 2023, with responses due February 24, four days before
this Court is scheduled to consider what information would be adequate for solicitations.[56]
Through this "offer" process, the Oversight Board purportedly "enable[s] every bondholder to
choose whether it wants to be part of the settling class or non-settling class" under the proposed
Plan.[57]  Uninformed, unrepresented Bondholders must therefore determine, without the benefit of

---

[54]  Disclosure Statement Motion ¶5.

[55]  *See Settlement Offer Notice*, Jan. 30, 2023 (ECF No. 3171-1), attached as Schedule 1 to Notice
of Distribution of Settlement Offer, at 6.

[56]  *See* Notice of Distribution of Settlement Offer, Jan. 30, 2023 (ECF No. 3171-1).

[57]  Disclosure Statement Motion ¶ 5.

an approved disclosure statement, whether the Settlement Offer represents a fair valuation of the

Bondholders' claims against PREPA, in light of their likelihood of success in the Amended Lien

& Recourse Challenge as well as whether the proposed Plan provides fair treatment.

65.     The Oversight Board's contention that the Settlement Offers do not constitute

"solicitation" is nothing but a feebly attempted jedi mind trick.  The Settlement Agreement requires

Settling Bondholders to "***support***, and not otherwise object to . . . confirmation of the Plan."[58]

Still, the Oversight Board dissonantly claims Settling Bondholders are free to "accept *or reject* the

Plan."  Despite this window dressing, the solicitation requires Bondholders to "support" the Plan

and agree to a particular treatment under the Plan.   Accordingly, the Settlement Offer is an

"untimely solicitation of an acceptance or rejection."  *Century Glove, Inc. v. First Am. Bank of N.

Y.*, 860 F.2d 94, 102 (3d Cir. 1988).[59]

66.     As crazy as it sounds, the Notice of Settlement Offer includes ***no information*** (let

alone "adequate information") regarding, among other things, (1) background about the Amended

Lien & Recourse Challenge, including the legal issues in dispute, (2) the strengths and weaknesses

of the Bondholders' position in the Amended Lien & Recourse Challenge, (3) the previous—

significantly higher—offers made to Bondholders, and why those higher offers are no longer being

---

[58] Settlement Agreement, attached as Exhibit B to the Settlement Offer Notice § 5.02 (Covenants of the Settling Bondholder) (emphasis added).

[59] In the decision confirming the Commonwealth, Employee Retirement System and Public Buildings Authority Plan, this Court noted that creditors' pre-disclosure-statement agreements to support a plan "remain[] executory until the creditor file[s] its accepting ballot."  *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 637 B.R. 223, 284-85 (D.P.R. 2022) (the "*CWPR/ERS/PBA*") (quoting *In re Heritage Org., L.L.C.*, 376 B.R. 783, 793 (Bankr. N.D. Tex. 2007)).  The Oversight Board offers nothing to suggest that the purported plan support agreement will impose an executory obligation on Bondholders or how the plan support agreement will be enforced.  If the Oversight Board can enforce the Settling Bondholders' obligation to "support the proposed Plan" through specific performance, the Settlement Offer is not executory and constitutes an improper solicitation under 11 U.S.C. § 1125(b).  *See id.* at 793-94 (citing *Century Glove*, 860 F.2d at 102) (explaining that "locking-up" a creditor's vote pre-disclosure strips the creditor of its right to court-approved disclosure under the Code).

offered, or (4) PREPA's ability to pay Bondholders, or why that is simply irrelevant under the Oversight Board's novel legal framework. This information cannot adequately enable a Bondholder to make an *informed* decision regarding the Plan such that he or she can agree not to object to, and support, confirmation of the Plan. While section 1125(b) accommodates some pre-disclosure communications aimed at facilitating honest *negotiations* between the debtor and its creditors, *Century Glove*, 860 F.2d at 101, there is nothing to suggest the Oversight Board is engaging in sincere negotiations with numerous strangers (particularly when it did no such thing with the other Mediation Parties). Indeed, the Settlement Offer the Oversight Board describes is not even an invitation to the negotiating table—it is just a confusing mass mailer that intimidates uninformed, unrepresented Bondholders with a take-it-or-leave-it ultimatum.

67.     The Oversight Board cites this Court's findings in *CWPR/ERS/PBA* to support its argument that the Settlement Offer is not a pre-disclosure "solicitation."[60] There, this Court explained that the pre-disclosure execution *of plan support agreements* did not constitute improper solicitations because such agreements were the product of "extensive negotiations" and lengthy mediations. *CWPR/ERS/PBA*, 637 B.R. at 250-51, 284 (citing *In re Indianapolis Downs, LLC.*, 486 B.R. 286, 295 (Bankr. D. Del. 2013)). Indeed, the Oversight Board engaged with various creditor constituencies to reach mutually agreeable plan support agreements that resulted in the confirmed, largely consensual, plan in *CWPR/ERS/PBA*. *Id.* at 250-52. The plan support agreements at issue in *CWPR/ERS/PBA* were the culmination of bilateral bargaining processes, where the key constituencies were given a seat at the negotiating table. *Id.* Here, quite to the contrary, the Oversight Board seeks to impose a unilaterally-conceived, "take-it-or-leave-it" offer on Bondholders: agree to support the Plan you have not seen and you get to retain some of your

---

[60] *See* Disclosure Statement Motion ¶ 5 n.6 (citing *CWPR/ERS/PBA*, 637 B.R. at 284-85).

33

rights; dissent and you may get nothing.  This is not the type of honest negotiation section 1125(b)

accommodates or that this Court approved in other Title III cases.

68.     The Oversight Board also relies on this Court's finding in *CWPR/ERS/PBA* that the

"Exchange Offer" made to bondholders was not an improper solicitation.[61]  The "Exchange Offer"

afforded bondholders not yet party to the plan support agreement, which had been extensively

negotiated by other similarly situated bondholders, an opportunity to join the plan support

agreement and share in its benefits.[62]  Moreover, the Oversight Board there justified the Exchange

Offer as "a procedural mechanism for all uninsured bondholders to deal with the tender and

exchange of bonds."[63]  Here, no such benefits or procedural mechanism appear to exist (or at least

they certainly have not been adequately articulated).  And the Exchange Offer there afforded

creditors more than two weeks to consider the offer, and if the creditors declined the offer, they

still stood to benefit to the same extent as accepting bondholders under the plan.[64]  Critically,

through the Exchange Offer, the debtors invited bondholders to join a plan support agreement that

was negotiated and agreed to by similarly situated bondholders holding a majority of the

bondholder claims.[65]  The PREPA Settlement Offer bears little resemblance to the Exchange Offer.

---

[61] *See* Disclosure Statement Motion ¶ 5 n.6 (citing *ERS/PBS*, 637 B.R. at 284-85).

[62] *Id.* at 284-85.

[63]  *Id.* at 285 (internal quotation marks omitted).

[64]   *See id.* ("[T]he Exchange Offer did not require retail bondholders to take immediate action
before the Participation Deadline to become entitled to a support fee. . . . The Exchange Offer also disclosed
that . . . retail bondholders who did not tender their bonds by the Participation Deadline remain entitled to
a [support fee under the plan] (in the same amount as the [support fee provided for in the plan support
agreement]), so long as their Class of retail bondholders approves the Plan and the retail bondholder certifies
their retail investor status.").

[65]   *Id.* at 252, 268-69 ("As a product of the negotiations culminating in the [Exchange Offer] PSA,
a similar Retail Support Fee (i.e., a form of "restriction fee") will be available to Retail Investors who did
not tender and exchange their bonds to join the [Exchange Offer] PSA.").

## II.   THE DISCLOSURE STATEMENT FAILS TO PROVIDE ADEQUATE INFORMATION AS REQUIRED BY SECTION 1125(B) OF THE BANKRUPTCY CODE

69.   Aside from the numerous fatal defects in the Plan, the Disclosure Statement cannot be approved because it does not contain "adequate information" as required under section 1125(b) of the Bankruptcy Code.  11 U.S.C. § 1125(b).

70.   Section 1125(b) of the Bankruptcy Code, which is incorporated into PROMESA by section 301, "requires that the disclosure statement contain 'adequate information'" that enables a "hypothetical reasonable investor to make an informed judgment about the plan."  *In re Cnty. of Orange*, 219 B.R. 543, 560 (Bankr. C.D. Cal. 1997); *see also* 11 USC. § 1125(b); *In re ACEMLA de P.R. Inc.*, 2019 WL 311008, at *14 (Bankr. D. P.R. 2019) ("A disclosure statement should provide the creditors with an accurate basis for determining their position and their ability to make an informed decision with regard to the acceptance or rejection of the plan.").  The Disclosure Statement does not come close to including adequate information that would enable PREPA's creditors, let alone Bondholders, to make an informed decision regarding the Plan.

71.   Unlike other disclosure statements, this Disclosure Statement cannot be remedied by suggested additions or revisions; it needs to be re-drafted.  Among its countless deficiencies, both large and small, is the Disclosure Statement's lack of ***any*** information that could assist a creditor (particularly, a Bondholder) in determining whether a Plan is "fair and equitable" or in the "best interests" of creditors.  More specifically, it does not provide a bridge to the analysis of how the Oversight Board believed payments were affordable in February 2022, as well as its mediation offers as late as November 2022, to the materially worse treatment of Bondholders proposed under the Plan.  It also does not contain any analysis on how much PREPA could afford to pay creditors or how proposed electricity rates relate to affordability.  Consequently, the Disclosure Statement does not contain the adequate information that section 1125 demands.

35

## RESERVATION OF RIGHTS

72.     Syncora continues to review the Disclosure Statement and Plan, and reserves all rights in connection with any amended Disclosure Statement or Plan.  Syncora reserves the right to supplement or amend this Objection in advance of, or in connection with, the hearing to approve the Disclosure Statement.  Nothing herein shall be or is intended to be a waiver by Syncora of any right, objection, argument, claim or defense in connection with any matter, including matters involving the Disclosure Statement and the Plan, all of which are expressly reserved.

## CONCLUSION

WHEREFORE, Syncora respectfully requests that the Court deny the Disclosure Statement Motion, and provide Syncora such other and further relief as the Court deems appropriate.

DATED:  February 3, 2023

Respectfully submitted,

REICHARD & ESCALERA                    QUINN   EMANUEL   URQUHART   &
                                       SULLIVAN, LLP

**By :**   */s/ Rafael Escalera*
           **Rafael Escalera**              **Susheel Kirpalani** (*pro hac vice*)
           USDC No. 122609                  susheelkirpalani@quinnemanuel.com
           escalera@reichardescalera.com

           **Sylvia M. Arizmendi**          **Daniel Salinas**
           USDC-PR 210714                   USDC-PR 224006
           arizmendis@reichardescalera.com  danielsalinas@quinnemanuel.com

           **Carlos R. Rivera-Ortiz**       **Eric Kay** (*pro hac vice*)
           USDC-PR 303409                   erickay@quinnemanuel.com
           riverac@reichardescalera.com
                                            **Kate Scherling** (*pro hac vice*)
                                            katescherling@quinnemanuel.com
           255 Ponce de León Avenue
           MCS Plaza, 10th Floor            51 Madison Avenue, 22nd Floor
           San Juan, Puerto Rico 00917-1913 New York, New York 10010-1603


                        *Co-Counsel for Syncora Guarantee, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel for the parties of record.

*<u>/s/ Carlos R. Rivera-Ortiz</u>*
USDC-PR 303409
