### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors.[1] | PROMESA Title III<br><br>No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Debtor. | PROMESA Title III<br><br>No. 17-BK-4780-LTS |

**OMNIBUS OBJECTIONS OF THE AD HOC GROUP OF PREPA BONDHOLDERS TO THE DISCLOSURE STATEMENT FOR THE TITLE III PLAN OF ADJUSTMENT OF THE PUERTO RICO ELECTRIC POWER AUTHORITY [ECF NO. 3111], AND RELATED PROCEDURAL MOTIONS RELATED TO THE DISCLOSURE STATEMENT AND PLAN CONFIRMATION [ECF NOS. 3113, 3114]**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................1

BACKGROUND .............................................................................................................6

ARGUMENT ...............................................................................................................11

I.      The Plan Is Patently Unconfirmable .........................................................11

      A.     The Oversight Board Proposed The Plan In Bad Faith...........................12

            1.    The Oversight Board Rejected The 2019 RSA In Bad Faith...................13

            2.    The Board Abused The Mediation Process .................................14

            3.    The Board Defied The Court's Order To File A Plan Confirmable Regardless of The Outcome Of Litigation.................................17

      B.     The Plan Is Not In The Best Interests Of Creditors .................................19

      C.     The Plan Is Not Feasible .............................................................22

      D.     The Plan Will Lack Any Valid Impaired Accepting Class...................................23

      E.     The Plan Cannot Satisfy The Cramdown Requirements .......................................31

            1.    The Plan Is Not Fair And Equitable Because PREPA Can Pay More.................................................................................32

            2.    The Plan Is Not Fair And Equitable Because It Disregards Bondholders' Liens.................................................................34

            3.    The Plan Unfairly Discriminates Against Non-Settling Bondholders.....................................................................35

II.     The Disclosure Statement Is Inadequate .........................................................36

III.    Objections To The Plan Litigation Schedule ..................................................43

IV.   Objections To Solicitation And Plan Confirmation Procedures ........................47

RESERVATION OF RIGHTS ...........................................................................................50

CONCLUSION.............................................................................................................50

### TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*In re 499 W. Warren St. Assocs., Ltd. P'ship*,
   151 B.R. 307 (Bankr. N.D.N.Y. 1992) ...........................................................................23, 24

*In re Acemla De P.R. Inc.*,
   No. 17-02021 ESL, 2019 Bankr. LEXIS 182 (Bankr. D.P.R. Jan. 22, 2019)....................37, 40

*In re Am. Cap. Equip., LLC*,
   688 F.3d 145 (3d Cir. 2012)..........................................................................................11

*In re Arnold*,
   471 B.R. 578 (Bankr. C.D. Cal. 2012)...........................................................................11

*In re City of Detroit*,
   524 B.R. 147 (Bankr. E.D. Mich. 2014) .........................................................................12

*In re DVR, LLC*,
   582 B.R. 507 (Bankr. D. Colo. 2018) ............................................................................24

*In re Eastern Maine Elec. Co-op., Inc.*,
   125 B.R. 329 (Bankr. D. Maine 1991)........................................................................10, 11

*In re El Comandante Mgmt. Co.*,
   359 B.R. 410 (Bankr. D.P.R. 2006) ...........................................................................11, 26

*In re Ferretti*,
   128 B.R. 16 (Bankr. D.N.H. 1991) ............................................................................37, 43

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
   637 B.R. 223 (D.P.R. 2022)......................................................................................19, 29

*In re Genco Shipping & Trading Ltd.*,
   513 B.R. 233 (Bankr. S.D.N.Y. 2014)............................................................................12

*Granada Wines, Inc. v. New England Teamsters & Trucking Industry Pension
   Fund*, 748 F.2d 42 (1st Cir. 1984.) ................................................................................30

*In re Hardeman Cnty. Hosp. Dist.*,
   540 B.R. 229 (Bankr. N.D. Tex. 2015)...........................................................................32

*In re Heritage Org., L.L.C.*,
   376 B.R. 783 (Bankr. N.D. Tex. 2007)...........................................................................28

*In re Hermanos Torres Perez Inc.*,
   No. 09-cv-5585, 2011 WL 5854929 (Bankr. D.P.R. Nov. 21, 2011)......................................35

**TABLE OF AUTHORITIES—Continued**

*In re Iridium Operating, LLC*,
  478 F.3d 452 (2d Cir. 2007).........................................................................25

*Jacobson v. AEG Cap. Corp.*,
  50 F.3d 1493 (9th Cir. 1995) .......................................................................31

*Kane v. Johns-Manville Corp.*,
  843 F.2d 636 (2d Cir. 1988).........................................................................12

*Loc. No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*,
  478 U.S. 501 (1986).....................................................................................26

*In re Memorial Products Co., Inc.*,
  212 B.R. 178 (1st Cir. B.A.P. 1997) .......................................................27, 30

*In re RIM Dev., LLC*,
  448 B.R. 280 (Bankr. D. Kan. 2010) ...........................................................35

*In re Wabash Valley Power Ass'n*,
  No. 85-2238, 1991 WL 11004220 (Bankr. S.D. Ind. Aug. 7, 1991) .............22

*In re Walker*,
  165 B.R. 994 (E.D. Va. 1994).....................................................................16

**Constitutions, Statutes & Rules**

3 L.P.R.A. § 9142 .............................................................................................22

22 L.P.R.A. § 195 .............................................................................................22

22 L.P.R.A. § 196 .......................................................................................21, 22

22 L.P.R.A. § 207 .......................................................................................20, 22

22 L.P.R.A. § 215 ...............................................................................................4

11 U.S.C. § 1123 ..............................................................................................27

11 U.S.C. § 1125.........................................................................1, 29, 31, 36

11 U.S.C. § 1126 ..............................................................................................29

11 U.S.C. § 1129.......................................................................12, 23, 32, 35

Fed. R. Bankr. P. 3017 .......................................................................................1

Fed. R. Civ. P. 33..............................................................................................47

**TABLE OF AUTHORITIES—Continued**

PROMESA § 104 ................................................................................................7

PROMESA § 301 ...................................................................................... *passim*

PROMESA § 310 ................................................................................................1

PROMESA § 314 ...................................................................................... *passim*

PROMESA § 601 ................................................................................................7

**Other Authorities**

6 Collier on Bankruptcy § 943.03 ...................................................................32

Crude Oil Prices: West Texas Intermediate (WTI), St. Louis Federal Reserve,
    https://fred.stlouisfed.org/graph/?g=ZwTc ...............................................13

H.R. Rep. No. 94-686 (1976) ..........................................................................32

H.R. Rep. No. 114-602 (2016) .........................................................................19

PREPA FOMB Proposal to Bondholder Group (Nov. 8, 2022),
    https://emma.msrb.org/P11641653-P11264323-P11690562.pdf....................1, 9, 21

PREPA Proposal to Bondholders (Sept. 13, 2022),
    https://emma.msrb.org/P11622357-P11250316-P11674788.pdf...........................14

Pursuant to Section 1125 of the Bankruptcy Code and Rule 3017 of the Federal Rules of Bankruptcy Procedure, made applicable to this proceeding by Sections 301 and 310 of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), the Ad Hoc Group of PREPA Bondholders (the "Ad Hoc Group"), respectfully submits these objections to the Disclosure Statement for the Title III Plan of Adjustment of the Puerto Rico Electric Power Authority ("Disclosure Statement" or "DS"), ECF No. 3111; the motion seeking approval of the Disclosure Statement and addressing procedural matters related to the Disclosure Statement ("Approval Motion"), ECF No. 3113; and the motion seeking to establish a confirmation schedule and procedures ("Confirmation Scheduling Motion"), ECF No. 3114, submitted by the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board").

## PRELIMINARY STATEMENT

1.      The Oversight Board's proposed Title III Plan of Adjustment for PREPA (the "Plan") is patently unconfirmable and does not represent a serious attempt to legally restructure PREPA's obligations.[2]  It is a placeholder that the Oversight Board cannot plausibly expect to confirm or consummate as written.  The Plan would arbitrarily limit creditors' total recovery, on the nearly $15 billion that PREPA owes them, to around $5.4 billion (most of it payable over three to five decades).  The Oversight Board maintains that it would be unaffordable and unsustainable for PREPA to repay its creditors even a penny more than that sum.  But the same day the Oversight Board filed its Plan and Disclosure Statement, it publicly released its own recent proposal for PREPA to repay its creditors approximately $7.8 billion.[3]  And only a few months before that, the Oversight Board was still touting its Restructuring Support Agreement with bondholders (the

---

[2]     Unless otherwise defined, capitalized terms have the same meaning as in the Disclosure Statement.

[3]     *See* PREPA FOMB Proposal to Bondholder Group at 6-7 (Nov. 8, 2022), https://emma.msrb.org/P11641653-P11264323-P11690562.pdf.

"2019 RSA"), which was premised on PREPA's ability to pay just Bondholders alone more than $8 billion in recovery on their Bonds.  And as recently as February 28, 2022, the Oversight Board told the Court that it continued to stand by the 2019 RSA.

2.      The Oversight Board's Plan and Disclosure Statement do not try to explain how billions of dollars of concededly affordable and sustainable creditor recoveries could have simply vanished in just a few days and months.  Indeed, neither the Plan nor the Disclosure Statement provides *any information whatsoever* about how billions of dollars disappeared from its projected available cash flows for creditors virtually overnight, or how it arrived at its new cap on achievable creditor recoveries from PREPA.  Instead, the Oversight Board filed a highly misleading Plan and Disclosure Statement that are not crafted to provide creditors fair recoveries, but rather serve as a pressure tactic and attempt to induce less knowledgeable creditors to take a lowball settlement offer.[4]  Unless and until the Oversight Board offers creditors a realistic recovery on PREPA's debt, backed by actual and defensible data showing what PREPA can really afford to pay, the Plan is patently unconfirmable and no disclosure statement should be approved.

3.      At the same time that the Oversight Board has sought to arbitrarily reduce creditors' recoveries, Puerto Rico's economy has, by every objective measure, markedly improved.  Today, 're Puerto Rico has record low unemployment rates; growing income levels; strong manufacturing, retail, and tourism activity; and tax collections that significantly exceed forecasts.[5]  That success

---

[4] To make matters worse, the Series B Bonds that the Plan would provide to Bondholders contain such severely off-market terms—including a lack of any meaningful protection that Bondholder recoveries stretched over 35 years will not be erased by PREPA's operating expenses—that their actual value is likely to be materially less than the advertised $5.4 billion.  That is not just a disclosure issue.  It means that PREPA is offering even less value to creditors than the $5.4 billion it has admitted it can afford.

[5] Ex. 1 (Robert Slavin, *Puerto Rico's revenues come in strong*, The Bond Buyer (Jan. 3, 2023); Ex. 2 (Robert Slavin, *Puerto Rico's December revenues 28% ahead of projections*, The Bond Buyer (Jan. 31, 2023))

in rejuvenating Puerto Rico's economy is supplemented by over $84 billion in federal funds committed to Puerto Rico through 2035.[6]  Ignoring Puerto Rico's booming economy and strong financial position following the Commonwealth's exit from Title III, the Oversight Board posits throughout the Disclosure Statement that bondholders should be prepared to recover significantly *less* from PREPA than they were offered a year ago, and four years ago, and eight years ago—and even though the Commonwealth is in fact in much *better* economic and fiscal shape now than then.

4.      To add insult to injury, neither the Oversight Board nor the Commonwealth have taken even the most basic steps to maximize PREPA's value before seeking to substantially reduce creditor recoveries.  For example, the Oversight Board continues to permit PREPA to massively subsidize the Commonwealth government and its municipalities.  Indeed, about 5% of the rates that PREPA customers pay is siphoned off to subsidize the Commonwealth government and its municipalities through subsidies styled as a "contribution in lieu of taxes" (or "CILT"), on top of free highway lighting and other free or heavily subsidized electricity.[7]  DS 53.  PREPA also persistently fails to collect on hundreds of millions of dollars of past due receivables from governmental entities.  And Commonwealth policy requires PREPA to uneconomically subsidize electrical-grid access for customers with distributed generation resources (so-called "net metering" customers) like solar panels by requiring PREPA to charge these net metering customers far less than the value of the services they receive from PREPA, in violation of Bondholder rights and the Commonwealth's non-impairment covenant.  Simply removing expensive and unnecessary subsidies, collecting from governmental customers, and aligning net-metering incentives with

---

[6] Ex. 3 (2022 Commonwealth Fiscal Plan) at 36.

[7] Further discussion of the calculation and assessment of these expensive CILT subsidies—which are paid for by PREPA's ratepayers and should be subordinated to Bond payment—as well as discussion of other subsidy payments that the Commonwealth and its subdivisions extract from PREPA, will be further outlined in any objection to confirmation by the Ad Hoc Group and potential future litigation.

other jurisdictions would provide PREPA's customers significant rate relief while giving PREPA plenty of additional room to reach agreements with creditors and end this case.  Instead, the Oversight Board allows PREPA to keep subsidizing the Commonwealth, and now demands that Bondholders foot the bill.[8]

5.      It is thus abundantly clear that the vast majority of PREPA Bondholders (who make up the lion's share of PREPA's creditors) will reject out-of-hand the Oversight Board's cynical gambit to force upon them such a substantial (and inexplicable) reduction in what they are entitled to recover from PREPA. And without a consensual deal with PREPA's largest creditors, myriad issues about PREPA's operation, subsidies, and ability to pay will need to be litigated.  Facing that onslaught of creditor dissent to the Plan, the Oversight Board has tried to engineer accepting classes of impaired creditors through legally impermissible and unsupportable settlements.

6.      In the Board's first such attempt, the Oversight Board proposes to settle a single unsecured claim by fuel supplier Vitol by allowing that claim in full, classifying it separately, and then paying a recovery on that claim equal to half that of other unsecured creditors.  To state the obvious, that "settlement" is the economic equivalent of allowing only half the claim and then providing that half-allowed claim the same treatment as other unsecured creditors.  The Oversight Board's approach is thus a clear attempt to manufacture an impaired accepting class of one.

7.      Recognizing the weakness in the Vitol "class," the Oversight Board proposes to "settle" the Fuel Line Lenders' subordination claims *against Bondholders* in the Current Expense Litigation—even though those claims aren't PREPA's to settle, and despite years of *opposing* the

---

[8] These net metering rules—in which net metering customers pay artificially low rates because they generate their own power—are the result of a public policy decision by the Commonwealth to support solar that causes grid defection.  The cost of the public policy decision should be borne by the customer and not by Bondholders.  Many of these subsidies, including the treatment of net metering, violate Bondholders' rights and the Commonwealth's non-impairment covenant in 22 L.P.R.A. § 215.  If these issues are not addressed, the Ad Hoc Group expects to contest these subsidies at a later date.

Fuel Line Lenders' baseless arguments that their claims are senior to Bondholders' claims. The Oversight Board filed dozens of pages of briefs supporting Bondholders and rejecting what it then called a "manifestly" erroneous theory squarely foreclosed by Puerto Rico law. As recently as this past September, the Oversight Board renewed its request that the Court dismiss the Fuel Line Lenders' case. *See* ECF No. 2956 ¶¶ 6-7, 42; *see also* Adv. Proc. No. 19-396, ECF Nos. 54, 79. But on the eve of a plan-filing deadline, and needing to conjure up a more facially plausible impaired accepting class than the Vitol "class," the Oversight Board largely adopted the Fuel Line Lenders' litigation position, and now proposes to use Bondholders' collateral to pay for the Fuel Line Lenders' "yes" vote. There is no legal or good-faith basis for the Oversight Board to "settle" an intercreditor dispute over relative priorities, let alone to do so merely to generate an impaired accepting class. The Fuel Line Lenders' vote in favor of the Plan thus cannot serve that intended purpose. Instead, the Current Expense Litigation between the Fuel Line Lenders and Bondholders—which this Court temporarily stayed, but in which these subordination and priorities issues have been fully briefed—should be taken up in short order to determine these creditors' relative priority and whether the Oversight Board has any basis for classifying the Fuel Line Lenders separately from other unsecured creditors.[9]

8.    What we are left with—coming up on six years into this Title III proceeding—is a proposed Plan with virtually no chance of being confirmed. The people of Puerto Rico, along with PREPA's creditors, have waited too long for real progress and an exit from Title III to put them

---

[9] The Oversight Board's other, still-emerging attempts to engineer Plan support appear also have fallen short. *First*, the Oversight Board stated its intent to seek settlements with individual bondholders in exchange for a guaranteed recovery. Approval Motion 4 n.6. These offers to settle were supposed to be sent to Bondholders on or around December 28, 2022. DS 2. In fact, they went out a month later than scheduled, on January 27, in violation of the prohibition on soliciting support of the Plan prior to the approval of the Disclosure Statement. *Second*, the Oversight Board announced a settlement with monoline insurer National the same night that it filed the Plan. As of this filing, weeks later, the Oversight Board still has not disclosed the terms of any such settlement.

through the charade of disclosing, voting on, and proceeding with a Plan that cannot be confirmed. This Court demanded months ago that the Oversight Board bring forward a real, achievable, and realistically confirmable plan.  The Oversight Board has utterly failed to do so, and now feigns compliance with the Court's requirements to further forestall making the political choices necessary to craft a confirmable plan—inviting years of further delay and attendant costs.

9.      If any case required a serious effort with a real and confirmable plan this is it. PREPA's Title III case has lasted six years and consumed hundreds of millions of dollars in fees, even though all parties agree that PREPA must exit Title III soon.[10]  The Court should deny approval of the Disclosure Statement, and task the Oversight Board to propose a realistic plan that stands a reasonable chance at obtaining confirmation and consummation.  Allowing solicitation of this fatally flawed Plan to move forward will merely waste more months or years, substantially postpone PREPA's restructuring, and continue to hinder PREPA's progress.

10.      In the event that the Court determines that it will approve the Disclosure Statement and allow solicitation to move ahead on the existing Plan, the Ad Hoc Group has laid out a number of important disclosure issues that should first be remedied to ensure that the Disclosure Statement provides adequate information and is not misleading.  The Ad Hoc Group also raises specific concerns about the proposed confirmation schedule, and in particular the discovery and briefing schedule, as well as other procedural concerns that should be addressed now.

## **BACKGROUND**

11.      The record in this case reflects a chronic pattern of delay and false starts. Restructuring discussions about PREPA's debt began almost nine years ago, when PREPA faced

---

[10] Ex. 4 (Danica Coto, *Efforts to restructure Puerto Rico power company debt wobble*, AP (Dec. 16, 2022)) (noting over $200 million in legal fees for PREPA).

a liquidity crunch in the summer of 2014. DS 59-60. Those initial discussions culminated, in 2015,

in a deal between PREPA and its Bondholders and the Fuel Line Lenders. DS 122. In June 2016,

Congress enacted PROMESA, with specific provisions intended to allow PREPA to restructure

quickly under that 2015 deal. DS 6, 9.[11] Instead, six months after its appointment, the Oversight

Board refused to approve the Prepetition RSA, resulting in its termination, and filed a Title III

petition on behalf of PREPA on July 3, 2017. DS 8-9.

     12.     In July 2018, several months after Hurricanes Irma and Maria struck Puerto Rico

in the fall of 2017, the Oversight Board, the Ad Hoc Group, and Assured formalized their

agreement in the execution of the 2019 RSA, which later added other Bondholders, National, and

Syncora. DS 16, 171.

     13.     On May 10, 2019, the Oversight Board moved for approval of the 2019 RSA under

Rule 9019. ECF No. 1235. The Oversight Board explained that the RSA's terms were "eminently

reasonable," set "fair and reasonable" terms, and would be "the foundation for a plan of adjustment

for PREPA." *Id.* ¶¶ 1, 9, 50-51. The 9019 Motion remained pending, with the Oversight Board's

and Government Parties' continuing support, through confirmation of the Commonwealth Title III

plan, until March 2022.[12] As recently as February 28, 2022, the Oversight Board reiterated its

---

[11] The Bondholders dispute the Disclosure Statement's characterization of PROMESA (DS 8) as
allowing—rather than requiring—pre-enactment deals with creditors to form the basis of a qualifying
modification. *See* PROMESA § 104(i)(3) (providing that a "voluntary agreement" reached prior May18,
2016 is deemed in conformance with certain requirements under PROMESA); PROMESA § 601(g)(2)
(providing special process for Oversight Board authorization to implement voluntary agreements with
creditors under Title VI). It also disputes its characterization of the status of the Prepetition RSA in the
spring of 2017.

[12] Ex. 5 (*Oversight Board Reaches Agreement with Bond Insurers over PREPA Restructuring*, Reorg (Sept.
9, 2019)); Ex. 6 (*Jaresko, Key Lawmakers Discuss With Reorg Prospects for Passage of PREPA RSA
Legislation, Acknowledge Real Risk of Creditor-Focused Receivership*, Reorg (March 3, 2020)); Ex. 7
(*Board Member Peterson Suggests Reconfiguring PREPA RSA to Quicken Bondholder Recovery*, Reorg
(Dec. 20, 2021)); Ex. 8 (*Oversight Board Outlines Next Steps for Taking Commonwealth Plan Effective by
March 15 Deadline, Aims to Complete Restructuring of PREPA, HTA in 2022*, Reorg (Jan. 18, 2022)); ECF

determination to "move forward with the settlement set forth in the . . . [2019] RSA." ECF No. 2735 ¶ 20 (internal quotation marks omitted).

14.     But then, just days later, Governor Pedro Pierluisi purported to terminate the 2019 RSA. Case No. 17-3283, ECF No. 20277-2 at 1-2. The Governor argued that this step was compelled by rising fuel costs in the immediate aftermath of Russia's invasion of Ukraine—a political calculation likely intended counterbalance the unpopularity of rate increases to cover the short-term boost in fuel costs. *Id.* The Oversight Board, after years of support for the RSA, and very recent promises that it was on the cusp of filing a PREPA plan based on the RSA, abruptly reversed course and backed the Governor's termination announcement. The Court found the 2019 RSA's termination "disturbing," and emphasized that the "RSA termination announcement presents the risk of a major setback." ECF No. 2748 at 10.

15.     This Court thus ordered the parties into mediation to "facilitate confidential negotiations regarding the formulation of a plan of adjustment for PREPA." ECF No. 2767 at 3. That mediation initially terminated in September 2022, after it became apparent that the Oversight Board could not reach a mediated solution with Bondholders. The Court ordered the parties back into mediation, but at the same time ordered the Oversight Board, by December 1, to file a plan "that it believes could be confirmable, taking into account the litigation risk and economic issues that are in dispute." ECF No. 3013 at 4. The Court counseled the Oversight Board to include in that plan "alternative provisions addressing proposed resolutions contingent on different outcomes of the disputed issues." *Id.* "[W]hat I mean by a confirmable plan," the Court emphasized, is one "that meaningfully and realistically contemplates scenarios in which each party fails to prevail on their claims in litigation to the extent that they expect to in order that, on resolution of issues in the

---

No. 2691 ¶ 7-8; ECF No. 2697 ¶ 3; ECF No. 2697 ¶ 2; ECF No. 2735 ¶ 4; Case No. 17-3283, ECF No. 19514 ¶ 9; ECF No. 2733 ¶ 2.

litigation, no matter what the outcome is, we can move forward toward confirmation with alacrity."
11/2/2022 Tr. 16.  "I don't expect to see a place holder filed on December 1.  I want to see
something that the Oversight Board believes in good faith should move toward approval of a
disclosure statement."  *Id.* at 18.

16.     The Oversight Board has failed to meet the Court's requirements.  For starters, the
Oversight Board admits that its Plan is not confirmable if the Court holds that Bondholders have
a security interest in PREPA's revenues that is worth more than what the Board proposes to pay
Bondholders.  DS 337-38.  Further, the Plan structure depends on the Oversight Board's baseless
attempt to "settle" Fuel Line Lenders' subordination claims *against the Bond Trustee and
Bondholders* by granting Fuel Line Lenders most of the priority treatment *over Bondholders* that
they seek—even though PREPA has no economic stake in that intercreditor dispute, and despite
the Oversight Board's prior position that the Fuel Line Lenders' subordination claims "clearly,"
"certainly," and "manifestly" fail "as a matter of law and fact."  FOMB Mot. to Dismiss, Adv.
Proc. No. 19-396, ECF No. 54 at 7, 15, 18, 26; *see also id.* at 21-22 (Fuel Line Lenders' claims
are "without basis as a matter of law" and precluded by precedent that "is on all fours").

17.     Even more generally, the Plan is premised on the Oversight Board's new and
unsupported assertion that PREPA cannot afford to pay its creditors any more than around $5.4
billion, spread out over the next 35 years.  DS 4.  That asserted ceiling on the resources available
for creditor recoveries limits what each class of creditors stands to receive under the Plan.  Yet the
Disclosure Statement never explains how the Oversight Board came up with that cap on total
recoveries or 35-year cut-off, or why it is billions of dollars lower than what the Oversight Board

had agreed that PREPA could affordably pay its creditors under the 2019 RSA and even under a

proposal made (and disclosed to all PREPA creditors) as recently as November 2022.[13]

18.    The Oversight Board contends that this deeply flawed, highly contentious Plan

nevertheless will be confirmable because it recently has reached plan support agreements with the

Fuel Line Lenders and two individual creditors.    But none of those agreements withstand

scrutiny—including the solicitation of individual bondholder settlements outside the plan process,

absent the protections or Title III, and based on demonstrably misleading disclosures.

19.    After more than five and a half years in Title III, the filing of a PREPA plan should

have been a momentous occasion.    Instead, after years of broken agreements with creditors and

broken commitments to this Court, the Oversight Board has failed to do what the Court asked of

it: file a realistic and confirmable plan actually designed to bring about PREPA's near-term exit

from Title III.    The Plan is little more than a lowball placeholder, unsupported by facts or law, that

does not plausibly meet the confirmation requirements.    And even if—counterfactually—the Plan

could be confirmed, it cannot become effective for years more until final resolution of litigation

including (but not limited to) the Bondholders' right to payment and liens.[14]    The Oversight Board

is thus no nearer to achieving plan confirmation today than it was when this case started in 2017.

---

[13] PREPA FOMB Proposal to Bondholder Group at 6-7 (Nov. 8, 2022), https://emma.msrb.org/P11641653-P11264323-P11690562.pdf.

[14] The Plan does not address how distributions will be made to creditors in the likely event that litigation necessary to determine distributions remains unresolved for years, including until a Final Order on the Amended Lien & Recourse Litigation.    There are other factors, too, that could hold up distributions, including the potential need for PREB to approve any proposed Legacy Charge.

## ARGUMENT

### I.     The Plan Is Patently Unconfirmable

20.     "[U]ndertaking the burden and expense of plan distribution and vote solicitation is
unwise and inappropriate if the proposed plan could never legally be confirmed."  *In re Eastern
Maine Elec. Co-op., Inc.*, 125 B.R. 329, 333 (Bankr. D. Maine 1991).   "Where the plan's
inadequacies are patent"—that is, the plan suffers from "fatal facial deficiencies or the stark
absence of good faith" that "cannot be cured by balloting"—the confirmability of the plan "should
be addressed at the disclosure statement stage."  *Id.* at 333-34; *see also In re El Comandante Mgmt.
Co.*, 359 B.R. 410, 415 (Bankr. D.P.R. 2006) ("At the hearing on the approval of a disclosure
statement, the court may consider issues pertaining to the plan, and may rule upon such issues,
when the plan defects will make it unconfirmable, that is, when the plan is so fatally, and obviously
flawed that confirmation is impossible" (internal quotation marks and citations omitted).).

21.     Plans are patently unconfirmable where, for example, there are deficiencies in the
"classification of claims, [such as] an artificial classification of a claim," where "the plan unfairly
discriminates against a class of claims," and where there are problems in "the solicitation
procedure."  *El Comandante Mgmt.*, 359 B.R. at 415.  Plans have also been held to be patently
unconfirmable in cases of bad faith or where other cramdown requirements cannot be satisfied.
*See In re Am. Cap. Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012) (plan not feasible or filed in
good faith patently unconfirmable); *In re Arnold*, 471 B.R. 578, 586, 614 (Bankr. C.D. Cal. 2012)
(plan violating absolute priority rule patently unconfirmable).

22.     The Plan proposed here is so facially and incurably flawed that it should never be
put to a vote.  *First*, it has not been proposed in good faith in the context of this long-running case
and the prior negotiations between the parties.  *Second*, the Plan proposes to pay Bondholders
billions less than the Oversight Board has publicly disclosed that PREPA is able to affordably and

sustainably pay creditors, and thus cannot plausibly satisfy the confirmation requirement that any

plan must be in creditors' best interests. *Third*, the Plan depends on settlements with small classes

of unsecured junior creditors that discriminate against Non-Settling Bondholders and violates the

priority rules. *Finally*, the Plan patently fails to meet other confirmation safeguards that protect

dissenting, Non-Settling Bondholders from a Plan that runs roughshod over their rights.

## A.  The Oversight Board Proposed The Plan In Bad Faith

23.     The Oversight Board's Plan can be confirmed only if it was "proposed in good

faith."  11 U.S.C. 1129(a)(3) (incorporated by PROMESA §§ 301(a), 314(b)(1)).  That is, the

Oversight Board must have proposed its Plan "with honesty and good intentions and with a basis

for expecting that a reorganization can be effected." *Kane v. Johns-Manville Corp.*, 843 F.2d 636,

649 (2d Cir. 1988) (internal quotation marks omitted).  To that end, the Oversight Board must have

"deal[t] with [PREPA's] creditors in a manner that is fundamentally fair." *In re City of Detroit*,

524 B.R. 147, 248 (Bankr. E.D. Mich. 2014).  The good faith requirement thus "speaks more to

the process of plan development than the content of the plan," such that unfairness and dishonesty

by the Oversight Board during that process is at least as important as the Plan's substantive

deficiencies. *In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 261 (Bankr. S.D.N.Y. 2014)

(internal quotation marks omitted).

24.     The process by which the Oversight Board arrived at the current Plan is the result

of a year (at least) of bad faith dealings with Bondholders and other creditors.  This Plan arises out

of the Oversight Board's unjustifiable decision to withdraw its support for the 2019 RSA, and its

subsequent abuse of the mediation process to further stall creditor recoveries (and to buy time to

negotiate sweetheart deals with isolated creditors to construct a façade of Plan support).  And the

Plan does not provide a path to confirmation if the Oversight Board loses the Amended Lien and

Recourse Litigation, or the Fuel Line Lenders lose the Current Expense Litigation, and provides

no path to plan consummation pending any appeal of decisions on these and other issues.  This is not a Plan proposed in good faith or with an eye towards effective reorganization.

### 1.     The Oversight Board Rejected The 2019 RSA In Bad Faith

25.     The Oversight Board demonstrated bad faith in its support of the Government Parties' abrupt and unilateral abandonment of the 2019 RSA.  The Oversight Board has had five years to achieve a consensual resolution of this Title III proceeding with PREPA's largest creditors.  It largely succeeded with the 2019 RSA, in which it agreed that PREPA would pay Bondholders and Monolines 77.5% of their claims, plus the continued accrual of postpetition interest and fees[15]—presumably after concluding that PREPA could afford to pay that amount *plus* additional sums to other creditors.  The Oversight Board then sang the 2019 RSA's praises for more than two years, explaining that the terms of the RSA were "eminently reasonable," set "fair and reasonable" terms, and would be "the foundation for a plan of adjustment for PREPA."  ECF No. 1235 ¶¶ 1, 9, 50-51.  The Oversight Board reiterated its determination to "move forward with the settlement set forth in the . . . RSA" as recently as February 28, 2022, when it evidently *still* believed that consummating that deal would be affordable to PREPA.  ECF No. 2735 ¶ 20.

26.     But then, just days later, in March 2022, the Government Parties, with the Oversight Board's support, purported to unilaterally terminate the 2019 RSA.  The Oversight Board and the government made this decision based on the flimsiest of pretenses—citing short-term fluctuations in the price of oil resulting from Russia's invasion of Ukraine.  Case No. 17-3283, ECF No. 20277-2 at 1-2.  While that war was unexpected, oil-price fluctuations over a fifty-year deal were not—

---

[15] The UCC and the Fuel Line Lenders both argued that Bondholders would receive approximately $7.3 billion under the 2019 RSA, assuming an effective date of June 30, 2020.  ECF No. 1701 ¶ 1; ECF No. 1700 ¶ 54.  Bondholders calculate that, as of February 28, 2022—the last date on which the Oversight Board supported the 2019 RSA—Bondholders would receive more than $8 billion.

and, indeed, oil prices have since reverted to pre-war levels.[16]  The RSA termination was a calculated political decision made to further delay debt repayment by throwing this case back into the abyss, and was not fundamentally fair to PREPA's creditors or part of any good faith effort to restructure PREPA and end the Title III process.

27.     Indeed, even while scuttling the 2019 RSA over an uptick in oil prices, government officials touted Puerto Rico's strong and improving economic prospects.  *Id.*  By any objective measure, Puerto Rico's economy and fiscal health has emerged from hurricanes and the pandemic on substantially surer footing.  The Oversight Board has acknowledged Puerto Rico's "growing economy."  ECF No. 2956 ¶ 1.  Other officials have also proclaimed the Commonwealth's "strong recovery"—pointing to substantial gains in labor participation, historically low unemployment, significant boosts to income and consumption, and record tourism.[17]

## 2.    The Board Abused The Mediation Process

28.     The Board's bad faith continued in mediation, both in substance and process.  The Court gave the Oversight Board another chance to strike a consensual deal in seven more months of mediation.  But again, the Oversight Board failed to reach a deal with the Ad Hoc Group and the Monolines, PREPA's largest creditors.  Instead, the Oversight Board abused the mediation process to the detriment of Bondholders.  In September 2022, the Oversight Board offered

---

[16] The price for crude oil on March 8, 2022 (the day the Governor terminated the 2019 RSA) was $119.65 per barrel.  The price for crude oil as of February 2, 2023 was $75.88 per barrel.  Oil prices are almost back to the levels they were in 2018 when the Preliminary RSA was signed ($70.13 as of July 30, 2018) and when the 2019 RSA was finalized ($62.90 as of April 28, 2019).  Crude Oil Prices: West Texas Intermediate (WTI), Trading Economics, https://tradingeconomics.com/commodity/crude-oil.

[17] Ex. 9 (AAFAF, PRNOW Summit Presentation, *Welcome to the Puerto Rico of Now* (June 6-7, 2022)); *see also* Ex. 10 (AAFAF, Investor Presentation, *Closing A Chapter Beginning A New Era* (Feb. 28, 2022)); Ex. 11 (Jim Wyss and Michelle Kaske, *Puerto Rico Sees Lowest Unemployment Rate Since 1947,* Bloomberg (June 6, 2022)) ("Puerto Rico's unemployment rate hit 6.4% in April, its lowest level since 1947, as the US territory is seeing a historic influx of federal reconstruction funds").

Bondholders 71.65% of their prepetition claim—$6.073 billion,[18] or about two billion dollars less

than what the Oversight Board had agreed that PREPA could affordably pay Bondholders under

the 2019 RSA (and yet roughly $2 billion *more* than Bondholders would recover under the Plan).[19]

29.     The Board's bad faith was reflected not only in that offer, but also in its conduct in

mediation, which was not aimed at actually achieving a deal with Bondholders that would permit

PREPA to reorganize.  As the mediators informed the Court, the Oversight Board refused to

meaningfully engage or produce relevant support for its position until forced to do so.  When

mediation discussions ended in September 2022, the Mediation Team suggested that changes to

the mediation were needed, including the appointment of a single voice to speak for the Oversight

Board.  *See* ECF No. 3011 at 6 ("The Oversight Board shall promptly designate a lead negotiator

to facilitate the Mediation Team's and other Mediation Parties' interaction with the Oversight

Board").  After mediation restarted, the Mediation Team informed the Court, at the November 2,

2022 omnibus hearing, that for most of the six weeks since the Court restarted mediation there

were "virtually no substantive communications" from the Oversight Board, which had resisted

even *scheduling* mediation sessions.  11/2/2022 Tr. 24.

30.     The stonewalling in mediation continued after the November 2022 omnibus

hearing.  As the mediators later told the Court, the Oversight Board refused to provide basic

information to the Ad Hoc Group voluntarily.  ECF No. 3091 ("Despite reasonable requests by the

Ad Hoc Group and the Monolines, the Oversight Board is still in the process of providing basic

data and analyses.").  For instance, the mediators explained that the Oversight Board produced

previously withheld data the night before a mediation meeting, well past the deadline imposed by

---

[18] PREPA Proposal to Bondholders at 2 (Sept. 13, 2022), https://emma.msrb.org/P11622357-P11250316-P11674788.pdf.

[19] *See infra* p.32.

the mediators.  12/14/2022 Tr. 14-16; *see also* Case No. 17-3283, ECF No. 23445 at 8 (Oversight

Board acknowledging that such information had been "requested earlier" than it was belatedly

produced).  The lead mediator further informed the Court that the mediators believed the Oversight

Board "need[s] to be held to account," and that the Oversight Board had been lacking "an overall

atmosphere of candor and cooperation" in the mediation.  12/14/2022 Tr. 16.

31.     The Oversight Board's gaming of mediation continued through to the end of the

process.  The Oversight Board requested additional deadline extensions under the pretense of

permitting additional mediation with bondholders and to consider information that the Oversight

Board had in its possession but had not produced or, allegedly, considered.  ECF No. 3108.  The

Court granted the Oversight Board's final extension request.  The Oversight Board evidently

disregarded the newly disclosed data that its own advisors had agreed was important for it to

review, 12/14/2022 Tr. 21, and opted not to make any new settlement offer to Bondholders.

Instead, the Oversight Board filed the Plan and Disclosure Statement on December 16, 2022.  A

few hours later, the Oversight Board announced a settlement in principle with National, ECF No.

3115, on terms that it still has not disclosed to the parties or to the Court a month and a half after

announcing the deal.

32.     The Oversight Board's conduct before, during, and after mediation was not honest

with the Ad Hoc Group, the mediators, or the Court; the Oversight Board did not demonstrate good

intentions.  The Oversight Board's conduct was anything but fundamentally fair.  And what did

the Oversight Board accomplish with these sharp practices?  A mostly non-consensual plan backed

only by small pockets of creditors holding a small fraction of PREPA's debts and that depends on

settlements that do not withstand scrutiny because they unfairly discriminate against certain

Bondholders in order to gerrymander and purchase an impaired accepting class.  *See infra* pp. 23-

31.  And a Plan that pays creditors billions less than the Oversight Board has publicly disclosed that it believes PREPA can afford.  *See infra* pp.19-22, 32-34.  This "failure of [PREPA] to use the full reach of its disposable resources to repay creditors is evidence that [the] [P]lan is not proposed in good faith because such conduct frustrates" the objective of repaying creditors.  *In re Walker*, 165 B.R. 994, 1001 (E.D. Va. 1994).

### 3. The Board Defied The Court's Order To File A Plan Confirmable Regardless of The Outcome Of Litigation

33.  The Oversight Board's bad faith is further evident in the Oversight Board's disregard for the Court's order that it file a "confirmable plan . . . that meaningfully and realistically contemplates scenarios in which each party fails to prevail on their claims in litigation to the extent that they expect to in order that, on resolution of issues in the litigation, no matter what the outcome, we can move forward toward confirmation with alacrity."  11/2/22 Tr. 16.  The Oversight Board defied that order by submitting a plan that it *concedes* "may not be confirmable or feasible" if Bondholders prevail in the Amended Lien and Recourse Litigation. DS 337-38.[20]

34.  The Oversight Board also fails to provide for the exceedingly likely scenario in which the Ad Hoc Group prevails against Fuel Line Lenders' subordination claims in the Current Expenses Litigation.  The Plan provides the Fuel Line Lenders the only first priority bonds secured by PREPA's revenue, along with accelerated payment, and a far greater recovery percentage than Bondholders—all based on the Oversight Board's purported "settlement" with the Fuel Line Lenders of the intercreditor dispute at issue in the Current Expense Litigation.  DS 25-26.[21]  But

---

[20] The Ad Hoc Group reserves the right to file a Rule 3012 motion asking the Court to determine the value of their secured claim before or at confirmation, as it bears directly on the confirmability of the Plan, as the Board acknowledges.

[21] In July 2019, the Fuel Line Lenders brought Adversary Proceeding No. 19-396, in which they contend that their claims constitute Current Expenses, under the Trust Agreement, and so must be paid in full from

17

PREPA has no meaningful stake in the underlying dispute over subordination and priority.  In fact,

the Trustee and Ad Hoc Group are the principal defendants in the Current Expense Litigation—

and they are the *only* defendants on the key subordination claims that the Oversight Board purports

to settle out from under them.  The Trustee and Ad Hoc Group have every right to litigate these

issues for themselves.  And the Oversight Board's prior motion to dismiss the Fuel Line Lenders'

claims has already explained why Bondholders have by far the better of the argument based on the

relevant facts and governing law.  Adv. Proc. No. 19-396, ECF Nos. 54, 79.  If the Trustee and Ad

Hoc Group prevail in this litigation (as the Oversight Board has predicted it will), then that would

invalidate the Plan's approach of giving the Fuel Line Lenders preferential treatment, and, because

the Plan does not account for this possibility, it would render the Plan unconfirmable.[22]

35.    Further, even if the Oversight Board were to prevail in this Court on each of these

litigated issues, and the Plan were to be confirmed on that basis, the Plan cannot be consummated

during the inevitable appeals of these issues by the losing parties, especially since there is not even

a Plan provision or disclosure for any reserve or contingency that would allow the Oversight Board

to consummate the Plan while appeals are pending.  *See, e.g.*, DS 337.  For this reason, also, the

Plan was filed in bad faith, and is therefore patently unconfirmable.[23]

---

PREPA's revenues before any payments are made on the Bonds (the "Current Expense Litigation").  As
discussed below, the Oversight Board originally hotly contested this contention in a motion to dismiss the
complaint but now has made an about-face and proposes premium treatment to the Fuel Lien Lenders.  *See,
e.g.*, Adv. Proc. No. 19-396, ECF No. 54 at 3.  The Oversight Board's dismissal motion (along with a
dismissal motion from the Trustee, Ad Hoc Group, and Monolines (Adv. Proc. No. 19-396, ECF No. 55))
remained pending until September 2022, when they were administratively terminated without prejudice.
*See* ECF No. 3013.  The adversary proceeding remains pending.

[22] This restriction on Bondholder recoveries is in direct contrast to the 2019 RSA, which—as the Oversight
Board itself said—did "not affect any third party rights, including any rights of the Fuel Line Lenders.  In
short, if the Fuel Line Lenders are entitled to payment in full, the approval of the RSA will not prevent such
payment."  Adv. Proc. No. 19-396, ECF No. 54 at 14 (internal citations omitted).

[23] The Court cautioned the Board that if it failed to propose a confirmable plan, "every possible way of
reacting to that will be on the table."  11/2/2022 Tr. 18.  The Oversight Board ignored that warning.

\*       \*       \*

36.     In sum, the Oversight Board dealt with Bondholders in bad faith by supporting the termination of the 2019 RSA.  It manipulated the mediation process to gain time to settle with creditors other than the Bondholders.  And then it filed a Plan that is concededly unconfirmable in several possible litigation scenarios, contrary to the Court's direction.  The Oversight Board has submitted this Plan in bad faith, and therefore the Plan is patently unconfirmable.

**B.      The Plan Is Not In The Best Interests Of Creditors**

37.     To be confirmed, the Oversight Board's plan must be "in the best interests of creditors, which shall require the court to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan."  PROMESA § 314(b)(6).  The Title III Court has held that this means creditors must fare better in the aggregate than they would by exercising their rights and remedies outside of Title III.  *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico* ("*Commonwealth Confirmation*"), 637 B.R. 223, 311-12 (D.P.R. 2022).[24]

38.     Bondholders are by far the largest group of PREPA creditors, as demonstrated by the Oversight Board's own filings and summarized in the table below.  Therefore, if Bondholders

---

Accordingly, it is appropriate for the Court to considers options such as lifting the automatic stay or dismissing the case to facilitate the appointment of a receiver.

[24] The Board also notes this Court's holding, in the *Commonwealth Confirmation* decision, that the "best interests test does not impose a litmus test or establish a floor for creditor recoveries," based on creditors' non-bankruptcy available remedies, because PROMESA instructs the Court only "to consider" what creditors could achieve outside Title III.  DS 332-33 (quoting 637 B.R. at 311).  The Ad Hoc Group respectfully disagrees that PROMESA cabins the best interests test to a mere consideration undertaken only in the aggregate.  In PROMESA, Congress codified the best interest test that courts have developed in Chapter 9 cases, and directed that the "[t]he court shall confirm the plan *if* . . . the plan . . . [is] in the best interests of creditors," a prerequisite that "shall require the court to consider" creditors' available recovery outside of Title III.  The Court thus lacks discretion to confirm a plan that does *not* satisfy this test.  *See* H.R. Rep. No. 114-602, pt. 1, at 116 (2016) ("[T]he federal judge *must* determine, among other things, that the plan (1) is feasible and in the best interests of creditors" (emphasis added)).

would fare better outside of the Title III proceeding than under the Plan, then creditors in the aggregate would do so as well and the Plan fails the best interest test.

| Claim | Amount | Percentage of Total Claims |
|---|---|---|
| Bondholders[25] | $11.225 billion | 76.48% |
| So-Called "Post-Petition Current Expenses," plus Fuel Line Lenders[26] | $2.592 billion | 17.66% |
| So-Called "Pre-Petition Current Expenses"[27] | $861 million | 5.86% |
| **Total** | $14.678 billion | 100% |

39.    The best interest test thus poses an insurmountable hurdle to plan confirmation because of how robust and comprehensive the Trustee's and Bondholders' rights and remedies are outside of this proceeding.  If this Title III case were dismissed, then the Trustee and Bondholders would seek the appointment of a receiver for PREPA.  That receiver would be statutorily obligated, authorized, and empowered to collect revenues sufficient to maintain PREPA's operations and repay Bondholders and other creditors in full over as much time as it takes (with, in the Bondholders' case, contract interest accruing in the meantime).  22 L.P.R.A. § 207 (Act 19-1942 §§ 17-18); Ex. 12 (Trust Agreement) §§ 502, 804.[28]  Moreover, the Trustee and Bondholders would also enforce their contractual and statutory rights to PREPA's specific performance of its

---

[25] *See* ECF No. 3169, Ex. B at 21 (hereinafter, "PREPA Best Interests Test") (sum of PREPA bond principal, interest, and swap claims).

[26] *See id.* (sum of Fuel Line Lenders claims, Commonwealth repayment, Cobra claim, LUMA termination fee, LUMA backend transition and demobilization, PUMA Energy claim, and Whitefish Energy claim).  If LUMA does not terminate its arrangement with PREPA, these claims would be significantly lower.

[27] *See id.* (sum of Other General Unsecured claims, Vitol claim, Takings claims, and Federal claims).

[28] The Plan proposes to provide Bondholders and other creditors a CVI, which would provide them with a recovery if PREPA performs better than the Oversight Board anticipates, and thus repays the New Bonds earlier than the expected 35 years.  The Oversight Board never explains why holders of the New Bonds could not continue to benefit from the CVI past the 35 years until they are fully paid on their claims—the cut-off is entirely arbitrary.  The receiver would not be constrained to attempt to achieve all recoveries in the 35-year timeline contemplated in the Plan, and thus could continue to collect revenues to repay creditors past that cut-off.  For this reason, too, creditors are facially better off under a receiver.

binding obligations to charge rates, bill customers, and collect revenues sufficient to pay all of the System's expenses and debts, and PREB's binding obligation to set rates at a level sufficient to meet obligations to Bondholders.  22 L.P.R.A. §§ 196a(c), 208; Ex. 12 (Trust Agreement) § 804; *see also* Act 17-2019 § 6.3(p).

40.     The Disclosure Statement resorts to baseless fear-mongering that appointing a PREPA receiver would "lead to unrestrained rate hikes that could threaten the reliable generation and delivery of power and drive customers from the grid."  DS 333.  But the receiver's statutory and contractual task is not to raise rates indiscriminately, and thereby threaten the continuing operation of the system on which Bondholders rely for repayment.  Rather, a receiver's mandate would be to ensure PREPA's success and longevity by setting rates at sustainable levels that allow for PREPA to generate and deliver power to customers for decades to come.

41.     Undisputed facts make clear that the Plan offers PREPA's creditors—starting with its largest creditor group, the Bondholders—far less than would be available to them by obtaining a receiver and enforcing their other non-bankruptcy remedies.  In the 2019 RSA, the Oversight Board agreed that PREPA could afford to pay Bondholders and Monolines *alone* more than $8 billion—77.55% of their claim—on top of paying additional recoveries to Fuel Line Lenders and other creditors.  *See infra* p.32.  And just one month before proposing the Plan, the Oversight Board had proposed to pay Bondholders approximately $6 billion (plus a contingent value instrument (or "CVI")).[29]  It stands to reason that PREPA's creditors will be able to demonstrate to this Court what the Oversight Board has evidently already concluded itself: that PREPA *can*

---

[29] PREPA FOMB Proposal to Bondholder Group at 6-7 (Nov. 8, 2022), https://emma.msrb.org/P11641653-P11264323-P11690562.pdf

afford to pay Bondholders much more than the $4 billion that Oversight Board now proposes to pay them under the Plan, and thus *would* be compelled to pay creditors more outside of Title III.

42.     The Oversight Board also asserts, without evidence or authority, that dismissal of the Title III case would "result in a race to the courthouse that would leave many creditors with no recovery at all." DS 333. Not so. The only creditors authorized to obtain a receiver at PREPA are the Trustee and Bondholders. PREPA's other creditors could pursue contract and other claims against PREPA, but cannot enforce any judgment against PREPA's assets or revenues and are able to collect on their claims only through the budgeting process. *See* Act 17-2019, 22 L.P.R.A. § 195a-1 (previous 22 L.P.R.A. § 196(o)); 3 L.P.R.A. § 9142; Ex. 12 (Trust Agreement) § 601.

43.     Notwithstanding their more limited remedies, PREPA's other creditors would benefit from a receiver's determination that repaying PREPA's other debts is necessary to PREPA's operations and other obligations. *See* 22 L.P.R.A. § 207(b). Nor would a receiver preclude PREPA's ability "to regain market access." DS 333. To the contrary, a receiver would ensure that Bondholders are repaid, and thus reassure bond-market participants that they can rely on their contractual rights for protection when lending to Puerto Rico instrumentalities.[30]

## C.     The Plan Is Not Feasible

44.     A plan can be confirmed only if it is "feasible." PROMESA § 314(b)(6). A plan is not feasible where, among other things, there is reason to expect that it will not result in the debtor collecting sufficient revenues to comply with the plans requirements to pay creditors. *Cf.*

---

[30] One week ago, the Oversight Board filed the PREPA Best Interest Test comparing creditor recoveries under Title III to a scenario where the case is dismissed. ECF No. 3169-2. The result of that Best Interest Test is preordained by the unsupported assumptions on which it relies (*see id.* at 2-3 & App'x 2), and does not address the fact that, mere weeks before filing the Plan, the Oversight Board *admitted* that PREPA can afford to pay creditors *substantially more* than they would recover under the Plan. The Court thus has no reason to credit the Best Interest Test, which is yet another reason that the Plan is patently unconfirmable.

*In re Wabash Valley Power Ass'n*, No. 85-2238, 1991 WL 11004220, at *76 (Bankr. S.D. Ind. Aug. 7, 1991) (plan infeasible where projected revenues less than planned payments).

45.     Here, the Plan offers most creditors Series B Bonds that are effectively unenforceable.  Those Bonds would provide payment of their principal and interest only if PREPA in fact sets total rates (including the so-called Legacy Charge for debt service) high enough to generate revenues sufficient to pay *both* operating expenses *and* debt service.  But the Plan offers no assurance that Series B bondholders can enforce payment of their bonds if PREB fails to approve total rates sufficient to pay all operating expenses and debt service, and this Court does not enter an order requiring such total rates.  In that case, the Legacy Charge will give way to any rising operational costs, and end up as nothing more than a piggy bank to be raided to pay future expenses while Series B bondholders go unpaid and unable to enforce their Bonds. Without any binding obligation on PREPA actually to pay Series B Bonds, the Plan is not remotely feasible.

## D.     The Plan Will Lack Any Valid Impaired Accepting Class

46.     A plan cannot be confirmed without the support of at least one impaired class.  11 U.S.C. § 1129(a)(10) (incorporated by PROMESA §§ 301(a), 314(b)(1)).  Each settlement through which the Oversight Board intends to construct an impaired accepting class—with the Fuel Line Lenders, Vitol, National, and any Settling Bondholders—are fatally flawed and cannot be lawfully approved.  And no other impaired classes can reasonably be expected to vote to accept the Plan given the demonstrable lack of any meaningful incentives for them to do so.  There is thus no prospect that the Plan will have the support of at least one impaired class, and thus it is patently not confirmable.  *Cf. In re 499 W. Warren St. Assocs., Ltd. P'ship*, 151 B.R. 307, 313 (Bankr. N.D.N.Y. 1992) (finding plan patently unconfirmable and dismissing case where there was no reasonable prospect of plan obtaining votes of impaired accepting class).

23

47.     **Fuel Line Lenders.**   The Fuel Line Lender settlement purports to resolve the Current Expense Litigation by granting Fuel Line Lenders first priority bonds and an 84% recovery on their claim over just five years.  DS 29-30.  That settlement cannot be approved—and certainly cannot provide the basis of an impaired accepting class—for at least three independent reasons.

48.     *First*, the Fuel Line Lenders assert that Bondholders' claims are subordinated to the Fuel Line Lenders' claims, which is an intercreditor dispute over payment priority that is not the Oversight Board's dispute to settle.   The Fuel Line Lenders argue, in the Current Expense Litigation, that their loans for fuel purchases are Current Expenses under the Bondholders' Trust Agreement with PREPA, and therefore that loan repayments to the Fuel Line Lenders have priority over bond repayments to the Bondholders.  The only defendants on those subordination claims are the Trustee, Bondholders, and Monolines—*not* PREPA or the Oversight Board.[31]  After all, the Fuel Line Lenders' subordination claims are about where each creditor group stands in line for payment, not how much PREPA must pay those creditors in total.

49.     The Oversight Board nevertheless purports to "settle" this dispute between the Bondholders and Fuel Line Lenders—and by giving the Fuel Line Lenders most of what they want from Bondholders.  That is plainly improper.  Indeed, the Fuel Line Lenders objected to the 2019 RSA by arguing that "[t]he Oversight Board should not be permitted to compromise or release the particularized objections and claims of the Fuel Line Lenders."  ECF No. 1700 at 67-68.  Just as the Fuel Line Lenders used to see it, "when creditors have 'individual claims' against other creditors based on theories not shared by the general creditor base, 'neither the trustee, the DIP,

---

[31] The Oversight Board was allowed to intervene for the purpose of addressing this count only.  Adv. Proc. No. 19-00396, ECF No. 59.

nor the bankruptcy court has the authority to settle the objection, regardless of the powers conferred by Rule 9019.'" *Id.* (quoting *In re DVR, LLC*, 582 B.R. 507, 522 (Bankr. D. Colo. 2018)).

50.     The improper "settlement" advocated by the Plan and Disclosure Statement is also surprising, given that the Oversight Board has already explained to this Court that the Fuel Line Lenders' arguments are baseless "sleight of hand" and fail to state a claim against Bondholders. When the Oversight Board intervened and moved to dismiss those claims, it argued that the Fuel Line Lenders are manufacturing non-existent subordination rights by "mushing together fragments" from different contracts and documents.  Adv. Proc. No. 19-396, ECF No. 54, at 2-4, 6.  The Oversight Board correctly observed then that "the Trust Agreement grants no rights to the Fuel Line Lenders and . . . the Fuel Line Lenders are not parties to the Trust Agreement which expressly provides it confers no rights . . . on non-parties."  *Id.*  Yet now, in hopes of conjuring up support for its contested Plan, the Oversight Board proposes to provide 84% recovery and priority treatment to the Fuel Line Lenders' claims—out of Bondholders' collateral and recovery—instead of the recovery (between 0.1% and 47%) that it is offering to other unsecured creditors.

51.     *Second*, the settlement and Plan purport to provide the Fuel Line Lenders senior claims to PREPA's revenues over all unsecured creditors.  Unless the litigation stay on the Current Expense Litigation is lifted and the Fuel Line Lenders prevail, that seniority is not the Oversight Board's to give pursuant to the settlement or to the Plan.  Instead, the senior liens remain those granted to the Trustee and Bondholders by the Trust Agreement, and any settlement that purports to transfer collateral subject to those senior liens is per se invalid.  Again, the Fuel Line Lenders made this precise point in the Current Expense litigation, when they explained that "whether a particular settlement's distribution scheme complies with the Code's priority scheme must be the most important factor for the bankruptcy court to consider when determining whether a settlement

25

is 'fair and equitable' under Rule 9019 and will often be the dispositive factor."  ECF No. 1700, at 25-28 (quoting *In re Iridium Operating, LLC*, 478 F.3d 452, 464 (2d Cir. 2007)).

52.     *Third*, the settlement and Plan promise the Fuel Line Lenders a greater percentage recovery than Bondholders, in effect paying the Fuel Line Lenders using money that Bondholders either have a senior lien on, or at minimum, have at least an equal claim to.  But the Oversight Board does not have the authority to settle claims with Bondholders' money.  "[P]arties who choose to resolve litigation through settlement may not dispose of the claims of a third party, and a fortiori may not impose duties or obligations on a third party, without that party's agreement." *Loc. No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 529 (1986).  Further, doing so here would be unfairly discriminatory, thus rendering the settlement and related Plan provisions invalid.  *El Comandante*, 2006 WL 3903592, at *5 ("[D]ifferentiated treatment of similar classes intended merely to induce acceptance by one class fails.").

53.     For each of these reasons, the settlement with the Fuel Line Lenders and related Plan provisions cannot be approved.  And without their approval, the Fuel Line Lenders have no reason to support the Plan, and thus cannot serve as an impaired accepting class for the Plan.

54.     **Vitol.**  The Vitol settlement was the earliest of the Oversight Board's efforts to gerrymander an impaired accepting class.  *See* 11/2/2022 Tr. 19.  And the structure of the Vitol settlement confirms that its sole purpose was to generate an impaired accepting class when the Oversight Board had none.  The settlement provides for Vitol to be placed in a separate class without any explanation for why Vitol is different than other unsecured creditors or should receive different treatment.  Further, the agreement simply allows Vitol's claim in full and then entitles Vitol to receive only 50% of what other unsecured creditors will receive on their allowed claims. DS 1-2.  The Oversight Board easily could have reached the same economic result, without

26

separate classification, just by agreeing to allow only 50% of Vitol's claim and then giving that allowed claim the same treatment as other unsecured creditors.[32]

55.     The only reason for the Oversight Board to have structured the Vitol settlement the way that it did is to tinker with this one unsecured creditor's claim in order to gerrymander an impaired accepting class. *In re Memorial Products Co., Inc.*, 212 B.R. 178, 183 n.5 (1st Cir. B.A.P. 1997) ("a claim is not impaired if the alteration of rights in question arises solely from the debtor's exercise of discretion").  Vitol's claim instead should be allowed at 50% of the agreed-upon amount and should be placed in the same class as other unsecured creditors. With this adjustment, Vitol will no longer serve as an impaired accepting class.

56.     **National.**  The Oversight Board has not yet disclosed the terms of its settlement with National.  Presumably, the settlement will provide National with preferential treatment compared to what the Plan proposes to provide to other Monolines and to the Bondholders (and perhaps even to the Settling Bondholders).  On the basis of that preferred treatment, the Board is likely to amend the Plan to separately classify National as another impaired accepting class.

57.     But National cannot form an impaired accepting class because it has no distinguishing legal features, and there is no business justification for treating it differently than other Monolines.  In addition, National cannot be paid more than other Bondholders and Monolines because doing so would unfairly discriminate against them, as National is not in a materially different position than other Bondholders and Monolines and is not offering PREPA

---

[32] Similarly, the Oversight Board could have just placed the full amount of Vitol's claim in the same class as other general unsecured claims, but provided for a less favorable treatment of Vitol's claim, because Section 1123(a)(4) of the Bankruptcy Code requires a plan to "provide the same treatment for each claim . . . of a particular class, *unless the holder of a particular claim . . . agrees to a less favorable treatment of such particular claim . . . .*"  11 U.S.C. § 1123(a)(4) (emphasis added).  Given that Vitol has agreed to a less favorable treatment, less favorable treatment of Vitol's claim would therefore be permissible even if Vitol's claim were classified alongside other general unsecured claims.

27

any value to justify providing it preferential treatment.  Once National's artificially inflated treatment is rejected by the Court, its status as an impaired accepting class will also fall away.[33]

58.     **Settling Bondholders.**  The Disclosure Statement originally indicated that a settlement offer to all Bondholders would be sent out on or around December 28, 2022, and require a response by February 15, 2023.  On January 27, a month late and shortly before the summary-judgment hearing on the Amended Lien and Recourse Litigation, the Oversight Board finally distributed the settlement offer to uninsured Bondholders, with responses due no later than February 24.  Doing so provided Bondholders less than a month to decide whether to accept the offer.  That cut short by weeks the already-limited time the Oversight Board had allotted for Bondholders to make a decision on the settlement offer, and was simply too late for the Oversight Board to begin this process.[34]

59.     Further, what the Oversight Board proposes is an improper solicitation of votes prior to the disclosure statement hearing to a population of Bondholders that includes not only large holders (like members of the Ad Hoc Group), but also individual and other much smaller holders that have not participated in this case and may lack the resources or sophistication to evaluate—in mere weeks, no less—the Oversight Board's proposed settlement.  This premature solicitation violates Section 1125(e)'s prohibition on soliciting votes prior to the approval of the Disclosure Statement, which was designed to "discourage the undesirable practice of soliciting acceptance or rejection at a time when creditors and stockholders were too ill-informed to act

---

[33] After any settlement between the Oversight Board and National is filed, the Ad Hoc Group intends to supplement its objection to the Disclosure Statement.

[34] The Ad Hoc Group only received notice of the settlement offer at the end of the day on January 30, just days before these Objections were due, ECF No. 3171, and reserves the right to supplement these objections once it has had the opportunity to fully review the documents filed by the Oversight Board.

capably in their own interests." *In re Heritage Org., L.L.C.*, 376 B.R. 783, 794 (Bankr. N.D. Tex. 2007) (quoting *In re Clamp–All Corp.*, 233 B.R. 198, 208 (Bankr. D. Mass. 1999)).  That justifies excluding all votes of any Settling Bondholders and Settling Monolines pursuant to Section 1126(e) because they were "not solicited or procured . . . in accordance with . . . this title."[35]

60.     The Oversight Board argues that the settlement offer is not a solicitation of votes governed by Section 1125 because it does not require the settling bondholders to vote one way or the other.  But even in the Disclosure Statement, the Oversight Board can't get its story straight—writing that "Settling Bondholders will have agreed to support the proposed Plan pursuant to the plan support agreement."  Approval Mot. at 4 n.6.  This same double-talk appears in the proposed settlement agreement itself, which binds Settling Bondholders to "support, and not otherwise object to" the Plan, but purports to allow them to vote against it.  ECF No. 3171, Ex. B at 4.  As a practical matter, the settlement and Plan all but formally lock up Settling Bondholders' votes by giving them no meaningful rights if they were to vote "no."  If they vote "no," Settling Bondholders are not permitted even to inform the Court of their concerns with the Plan.  Thus, the Oversight Board's attempt to skirt prohibitions on binding creditors to support plan approval falls short, and the proposed settlement agreement is an improper lockup agreement that invalidates any Settling Bondholders' and Settling Monolines' votes.[36]

61.     In addition to violating § 1125, the proposal to separately classify Settling Bondholders is patently improper because it serves no purpose other than to gerrymander an

---

[35] The Ad Hoc Group reserves the right to move for the designation of the class of Settling Bondholders and Settling Monolines as excluded from the plan confirmation vote tally pursuant to Section 1126(e).

[36] In the *Commonwealth Confirmation* decision, this Court found that the settlements solicited prior to the approval of the Disclosure Statement were not impermissible solicitations of votes.  637 B.R. at 284.  Unlike in the Commonwealth case, the settlement and Plan here are not the result of "extensive negotiations with numerous claimholder constituencies," *id.*, and specifically target smaller, less sophisticated creditors who Section 1125(e) was designed to protect.

impaired accepting class.  Just as there is no economic or legal difference between Vitol and other unsecured creditors, there is likewise no legal or economic difference between Settling and Non-Settling Bondholders that justifies the Board's decision to treat them differently.  *Memorial Products*, 212 B.R. at 183 n.5.  Nor are there any of the "government or business justifications" for the separate classification of otherwise identical Bondholders that the Oversight Board asserted in the Commonwealth's case.  *See* Case No. 17-3283, ECF No. 17379, at 25-26, 75-76.  Further, the settlements do not avoid the need to complete the costly Amended Lien and Recourse Litigation and Current Expense Litigation, as Non-Settling Bondholders necessarily will continue to press those cases.  The only explanation for the Oversight Board's approach, then, is to improperly gerrymander a class that exists only for that purpose, meaning that the Settling Bondholders cannot be a valid impaired accepting class to support the Plan.[37]

62.    Finally, by soliciting Exchange Offer consents outside the Disclosure Statement process, the Oversight Board exposes post-reorganization PREPA to liability under the securities laws, in particular Section 10b-5.  Based on the information available to it, the Ad Hoc Group has already identified materially misleading statements and omissions in the solicitation materials.  For instance, the Exchange Offer does not disclose that the Series B Bonds would likely trade at a significant discount from par; it fails to state that Non-Settling Bondholders may recover more than projected if the Court holds that Bondholders have a right to payment on the full amount of their bonds; it does not explain what it means to say that the Series B-1 Bonds would be "senior" to the Series B-2 bonds, or which creditors would receive which bonds; and it does not explain

_____

[37] The proposal to classify Settling Bondholders separately from Non-Settling Bondholders also violates the strict classification rule applied by the First Circuit in *Granada Wines, Inc. v. New England Teamsters & Trucking Industry Pension Fund*, 748 F.2d 42 (1st Cir. 1984.).  This Court held that *Granada Wines* does not apply under PROMESA.  Case No. 17-3283, ECF No. 17379, at 75-81.  The Ad Hoc Group respectfully disagrees with this Court's interpretation of PROMESA as allowing it to disregard First Circuit precedent, and is prepared to present additional briefing on this issue upon the Court's request.

Settling Bondholders' limited rights to terminate their settlement . And that's not to mention the incomplete disclosures regarding the Series B Bonds' structural deficiencies—such as their lack of a rate covenant or other assurances that PREPA would actually pay the Series B Bonds all— and failure to disclose other information and risk factors that the Ad Hoc Group asks to be included in the proposed Disclosure Statement.

63.     If Series B Bonds trade at materially below their face amount—as would seem to be all-but-certain—they will provide Settling Bondholders and Settling Monolines with less than the proffered 50-cent recovery on their bonds, and ensuing lawsuits will not be barred by Section 1125(e)'s safe harbor. *See Jacobson v. AEG Cap. Corp.*, 50 F.3d 1493, 1496 (9th Cir. 1995) ("[I]f the securities fraud alleged came from some other source or procedure than disclosure and solicitation, then section 1125(e) would not provide immunity."). Those lawsuits will jeopardize the post-reorganization stability of PREPA, giving every creditor, not just those that accept the settlement, an interest in the prosecution of the exchange offer through the Disclosure Statement.

64.     **Other Classes.** The Oversight Board cannot plausibly expect any non-settlement (non-gerrymandered) impaired classes to vote for its Plan. Non-Settling Bondholders who intended to accept the Plan would have settled. The only advantage to voting "yes" is to receive a CVI that, in the Oversight Board's view, is worthless. DS 32. Nor does the plan offer any incentive for the Committee to accept the plan, as there is only upside if they prevail in establishing that PREPA can afford to pay creditors, including the Committee's constituents, more than the Plan assumes. The same is true of PREPA's pension claims. This Plan simply has no class that reasonably can be expected to accept it, and thus it is patently unconfirmable.

**E.     The Plan Cannot Satisfy The Cramdown Requirements**

65.     The class of Non-Settling Bondholders and Monolines (Class 2) is by design a dissenting impaired class of creditors with no incentive to vote to approve the Plan. Because Non-

31

Settling Bondholders and Monolines are a dissenting impaired class, the Plan can be confirmed only if it satisfies the heightened "cramdown" requirements in Section 1129(b) (incorporated by PROMESA §§ 301, 314(b)), which require that the plan "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." The Oversight Board's Plan cannot satisfy those requirements.

### 1.   The Plan Is Not Fair And Equitable Because PREPA Can Pay More

66.     In municipal bankruptcies, a cramdown plan is not fair and equitable if a municipal debtor proposes to pay less than it can actually afford to pay while still maintaining public services. "[T]he fair and equitable rule fixes the minimum amount that is required." 6 Collier on Bankruptcy § 943.03. And a Court, to find a plan is fair and equitable, must conclude that it "reasonably compensates and provides the best recovery for Creditors in the circumstances and the maximum that the Debtor is able to pay while maintaining its mission of continuing to provide [for] . . . its needy inhabitants." *In re Hardeman Cnty. Hosp. Dist.*, 540 B.R. 229, 239 (Bankr. N.D. Tex. 2015). That includes finding that the municipality has fully exercised its power to collect revenues. H.R. Rep. No. 94-686, at 32-33 (1976) ("The petitioner must exercise its taxing power to the fullest extent possible for the benefit of its creditors.").

67.     The Oversight Board and PREPA have publicly and repeatedly agreed or offered to pay creditors, and Bondholders in particular, billions more than the $5.4 billion in the Plan.

| Proposal | Exchange Ratio | Amount |
|---|---|---|
| 2019 RSA (2018-2019) | 77.5% of accrued claim through May 1, 2019, plus accruals thereafter and fees | Over $8 billion for Bondholders |
| FOMB Mediation Offer (Nov. 2022) | 71.65% | $6.073 billion for Bondholders; $7.8 billion for all creditors |
| Proposed Plan (Dec. 2022) | 0-55% | No more than $4.411 billion for Bondholders; $5.4 billion for all creditors |

68.     The Oversight Board cannot fairly or equitably cap (simply by *ipse dixit*) creditors' recoveries to the much lower amount stated in the Plan.  Instead, this Court, not the Oversight Board, must determine what PREPA can, in fact, afford to pay.  And the Oversight Board's publicly disclosed offers before and during mediation put it beyond reasonable dispute that PREPA can pay substantially more than what is proposed in the Plan.  Moreover, PREPA is not even offering creditors consideration that is *actually worth* what is advertised by the Plan and Disclosure Statement:  Rather, Bondholders would be paid through Series B Bonds with a high likelihood of non-payment and significantly off-market terms (including the absence of any protection from operating expenses consuming their recovery).  That would likely depress their market value and render them essentially glorified CVIs, lowering actual creditor recoveries even further.  That is enough to declare the Plan based on this number patently unconfirmable.

69.     The absurdity of the Oversight Board's evolving affordability position is clear when compared to Puerto Rico's economic improvement during this same period.  The Puerto Rico Economic Development Bank has observed that economic activity already exceeds levels before the hurricanes and pandemic.[38]  Tax receipts surged, with the most recent reports showing that the Commonwealth's General Fund revenues for the first six months of fiscal year 2023 exceeded expectations by $668 million, with cash balances more than $1 billion above recent projections.[39]  Meanwhile, an unprecedented sum of federal money is available to aid Puerto Rico's redevelopment, including more than $12 billion to PREPA alone.[40]  Puerto Rico is in a far healthier

---

[38] Ex. 13 (*Index Exceeds Pre-Hurricane Levels*, NimB (July 8, 2022)).

[39] Ex. 14 (*General Fund Revenue Totals $5.42B in First 6 Months of FY'23, Beats Projections by $668.2M*, Reorg (Jan. 27, 2023)); Ex. 15 (*Puerto Rico TSA Report Discloses $7.096B Cash Balance*, Reorg (Feb. 1, 2023)).

[40] *See, e.g.*, Ex. 16 (PREPA obtains approval of $454.4m in FEMA allocations for grid modernization, Debtwire (Apr. 18, 2022)); Ex. 17 (LUMA Quarterly Funding Report (Sept. 7, 2022)), at 6-7.

position than it was when the Prepetition RSA and the 2019 RSA were signed; there can be no
economic justification to conclude that PREPA can afford to pay less than it could in 2017 or 2019.

70.     The only conceivable reason for arguing that rates must be lower than what PREPA
customers can afford is that PREPA believes itself to be responsible for stewarding "the economic
future of PREPA and the Island at large."  Approval Mot. 2.  The Oversight Board has contended
that PREPA should be "supporting long-term economic growth of the island activity," and even
that it must be an "agent of economic growth" and "facilitate economic growth."[41]  Presumably to
that end, the Oversight Board has not suggested any reforms to the expensive Commonwealth-
mandated subsidies, including CILT and other subsidies that make up over 5% of PREPA's base
rate, and uneconomic net metering rules.[42]  If these indefensible intergovernmental subsidies were
unwound or repaid, then rate would be lower and recoveries under this Plan could be substantially
higher.  If the Oversight Board believed that the Commonwealth and its instrumentalities needed
to be subsidized by PREPA to succeed economically, then it never should have moved forward
with confirmation of the Commonwealth plan.  A desire to subsidize other governmental interests
is not, and has never been, part of the standard for approving a Title III plan.

## 2.     The Plan Is Not Fair And Equitable Because It Disregards Bondholders' Liens

71.     A cramdown plan like this one is also fair and equitable only if it provides that
secured creditors either retain their liens and receive deferred cash payments equal to at least the

---

[41] Ex. 18 (2022 PREPA Fiscal Plan) at 15; Ex. 19 (2017 PREPA Fiscal Plan) at 5.

[42] Notably, Puerto Rico law used to provide that CILT was subordinate to debt service, although PREPA
did not enforce those requirements.  The much-abused CILT structure was reformed in 2016 in a way that
eliminated bondholders' seniority to payments from municipalities and shifted costs onto the rest of
PREPA's customer base.  DS 133-34; *see also* Act 4-2016 § 15.

value of their secured claims, or receive the indubitable equivalent of such claims, or other options

not applicable here.  11 U.S.C. § 1129(b)(2)(A) (incorporated by PROMESA § 301, 314(b)).

72.     If the Court holds that the Trust Agreement grants a lien on PREPA's current and

future revenues, then the Plan does not satisfy this test because it deprives Bondholders of their

liens and payment priority by subordinating their claims to those of the Fuel Line Lenders.  And it

does not give Bondholders the indubitable equivalent of their liens.  By providing Bondholders

with no more than about 55% of their claim in the form of lower priority Series B bonds with no

rate covenant, the Plan deprives them of revenues that it misdirects to the Fuel Line Lenders, who

receive first priority bonds on PREPA's revenues.  By providing the Fuel Line Lenders a lien

senior to Bondholders' current lien on PREPA's revenues, the Plan is patently unconfirmable.  *See,*

*e.g.*, *In re RIM Dev., LLC*, 448 B.R. 280, 291 (Bankr. D. Kan. 2010) ("where the debtor's plan

openly rearranges the lien priorities of the respective secured creditors" the plan is "patently

unconfirmable").

### 3.     The Plan Unfairly Discriminates Against Non-Settling Bondholders

73.     A plan unfairly discriminates against a class of creditors when "creditors and equity

interest holders with similar legal rights . . . receiv[e] materially different treatment under a

proposed plan without compelling justifications for doing so."  *In re Hermanos Torres Perez Inc.*,

No. 09-cv-5585, 2011 WL 5854929, at *9 (Bankr. D.P.R. Nov. 21, 2011) (internal quotation marks

omitted).  Bondholders have a priority security interest in PREPA's revenues under the Trust

Agreement that justifies providing them more, not less, than other creditors.  And even if they lack

a security interest, they have a right of recourse to PREPA's revenues that require treating their

claim at least *pari passu* with the claims of other unsecured creditors, including the Fuel Line

Lenders.  Despite this, the Plan proposes to pay the Fuel Line Lenders a premium recovery

35

compared to other creditors of 84% of their claim in the form of Series A bonds with senior liens on PREPA's revenues, discriminating against Bondholders who receive at most 55%.

74.     The Disclosure Statement states that the Oversight Board is providing the Fuel Line Lenders premium bonds and premium treatment on account of their alleged priority over Bondholders' claims, priority which the Board aggressively challenged in the Current Expense Litigation.  DS 1.  Indeed, the Plan pays all allowed unsecured claims, which are all *pari passu* with the Fuel Line Lenders claims, only a fraction of the Fuel Line Lenders' 84% recovery.  The Plan caps even fully allowed Non-Settling Bondholder claims far lower than that 84% recovery.  And to state the obvious, the Oversight Board's desire to make the Fuel Lien Lenders into an impaired accepting class is not a good and sufficient reason for the Plan to discriminate so unfairly (and aggressively) against Non-Settling Bondholders.

75.     And, to be clear, the discrimination against Bondholders is even worse than the Oversight Board admits.  There is no assurance the Series B Bonds will be paid *anything*, much less that they will be paid in full.  They lack any rate covenant guaranteeing PREPA's actual collection of revenues sufficient first to pay operating expenses, then pay Series A bonds, and only then to pay Series B bonds.  And whereas the Series A bonds provide for expected repayment in just five years, the Series B bonds' expected repayment spans 35 years (and that is if PREPA elects to comply with its unenforceable rate and collection obligations).  Thus, either the Series A Bonds are worth substantially more than par, or the Series B Bonds are worth substantially less than par— either of which magnifies the discrimination against Non-Settling Bondholders' claims.

## II.     The Disclosure Statement Is Inadequate

76.     Even if the Court declines to find the Plan is patently unconfirmable, the Disclosure Statement cannot be approved as proposed.  Section 1125 requires that a Disclosure Statement contain "adequate information," which means sufficient information to "enable . . . a hypothetical

investor of the relevant class to make an informed judgment about the plan."   "[A] proper
disclosure statement must clearly and succinctly inform the average unsecured creditor what it is
going to get, when it is going to get it, and what contingencies there are to getting its distribution."
*In re Ferretti,* 128 B.R. 16, 19 (Bankr. D.N.H. 1991); *see also In re Acemla De P.R. Inc.*, No. 17-
02021 ESL, 2019 Bankr. LEXIS 182, at *47 (Bankr. D.P.R. Jan. 22, 2019) ("Creditors rely on the
disclosure statement to determine what distribution or other assets they will receive and also *what
risks they will face*." (emphasis added and internal quotations marks omitted)).

77.     The Disclosure Statement falls short of this standard.  To remedy some of these
failures, the Ad Hoc Group has prepared a statement for bondholders, attached hereto as Exhibit
A (the "Ad Hoc Group Statement"), explaining the Ad Hoc Group's view of the Plan and many of
the Plan's shortcomings and explaining why the Ad Hoc Group will vote against the Plan.  It asks
the Court to order the Oversight Board to include the Ad Hoc Group Statement in the Disclosure
Statement materials following the conclusion of Section I.B (in which the Oversight Board urges
creditors to vote for the Plan).

78.     Even after including the Ad Hoc Group Statement, however, the Disclosure
Statement still fails in a number of material respects.  Below is a summary of the categories of
disclosure items that must be included in the Disclosure Statement.  The Ad Hoc Group also has
attached marked pages of the Disclosure Statement as Exhibit B to this Objection.

79.     *First*, the Disclosure Statement does not provide *any* information about the
Oversight Board's analysis to support its assertion that PREPA can affordably and sustainably pay
Bondholders only around $4 billion, or why it cannot afford to pay CVI holders for longer than 35
years.  Nor does the Disclosure Statement explain the stark contrasts between what the Oversight
Board asserts is affordable now and what PREPA and the Oversight Board asserted was affordable

under the Original RSA, the 2017 RSA, the 2019 RSA and the Oversight Board's final (and publicly disclosed) mediation proposal. *See supra* pp.32. For creditors to make an informed decision about what PREPA can actually afford to pay them, and thus whether to accept the Oversight Board's latest and most pessimistic view on that question, they would need to receive, in the Disclosure Statement and supporting materials, a detailed explanation of the Oversight Board's affordability assertions and access to the supporting data and analysis. This information presumably already exists, it is obviously critical to the voting decision, and there is no reason for creditors to have to seek and wait for discovery to receive this information. At the very least, the Ad Hoc Group's own view—that PREPA can afford to pay substantially more to creditors and that it is ready to show that at confirmation—should be included in the Disclosure Statement.

80.      At the very least, the mediation materials that were publicly disclosed—which include the November 8 proposal that would have paid $6 billion just to Bondholders alone, and the Oversight Board advisors' analysis of various proposals' affordability—should be included in their entirety in the Disclosure Statement. Not all Bondholders are sophisticated parties represented by counsel that have the time and ability to comb through all available public records related to the bonds. These parties instead must rely on the information contained in the Disclosure Statement when determining their vote, and a Disclosure Statement that lacks these materials lacks adequate information. Bondholders should be provided with their own copies so that they can make up their own minds about whether the treatment afforded them under the plan is fair. The Ad Hoc Group therefore asks that mediation materials attached as Exhibits C and D of this Objection be added to the Disclosure Statement as new exhibits to the Plan.

81.      *Second*, the Disclosure Statement does not adequately explain the nature and structure of the Legacy Charge that will fund the debt service payment; how the different parts of

the Legacy Charge will be allocated among classes of ratepayers, including individual customer class charges and aggregate charges; the contours of the new rate exemption proposed in the Plan, including the basis for the exemption, how eligibility will be determined, how the exemption will be granted, and how its application will be monitored; or what work, if any, the Oversight Board has done to confer with PREB and obtain its approval for this charge.  Without this information, creditors lack sufficient information to assess the likelihood that this Plan is confirmable, that the Legacy Charge will succeed in collecting sufficient revenues to repay the Bonds, that the Legacy Charge will remain in place after the Oversight Board ends, and (if this Court determines that PREB approval is necessary) that PREB and other regulators will approve of the rate structure proposed in the Plan.  It is not sufficient to say that rate information "will be subsequently determined."  DS 34.  This information bears directly on the Board's affordability analysis, the feasibility of the Plan, and the market value of the newly issued bonds.

82.     Any Disclosure Statement that does not contain a schedule of the rates it plans to charge and how those rates will be collected from customers does not allow any party whose recovery includes New Bonds—that is, almost all of the Plan's classes—to assess the value of what they are being offered.  The question of collections of the Legacy Charge, and indeed of all charges, is particularly acute given PREPA's historical failure to effectively collect revenues, in particular from government instrumentalities.[43]  Because the Legacy Charge is the sole source of recovery for the New Bonds, creditors must know what is being offered to make a determination

_____

[43] Ex. 20 (*Government Agencies Owe Millions to LUMA Energy*, TELEMUNDO PR (June 22, 2022)) (governmental entities owe $210 million to PREPA).  Relatedly, there is also insufficient disclosure regarding the P3 agreements with private entities that are intended to improve PREPA's performance.  The Oversight Board's forecast regarding whether those P3 agreements will successfully reduce operating expenses in an amount sufficient to offset the cost of the agreements bears directly on whether holders of the Series B Bonds can expect PREPA to collect sufficient revenues to pay debt service.

on how to vote.  The Oversight Board should be required to include this information in the Disclosure Statement.

83.     *Third*, the Disclosure Statement does not disclose sufficient information about the Series B Bonds and the risks that those bonds will trade at substantially less than their face value, making the Disclosure Statement's recovery levels materially misleading.[44]  A complete and accurate assessment of risks is a critical component of a disclosure statement.  *See In re Acemla De P.R. Inc.*, 2019 Bankr. LEXIS 182, at *47.

84.     The Disclosure Statement must disclose the specifics of the Series B Bonds' significant off-market terms, which taken together render them more akin to CVIs than traditional municipal bonds:  They have no rate-covenant of their own (even for interest alone), no true-up for missed payments, no ability to force higher rates or call an event of default, no structural protections from a future PREPA Title III proceeding, and no protection against declines in demand.  The Oversight Board's own financial advisor has already explained that "the omission of a security structure that ensures timely repayment (either with a coverage requirement and/or a true up mechanism)" alone "in municipal debt instruments is, to my knowledge, unprecedented." Brownstein Decl., ECF No. 1426 ¶ 47.  If demand is worse than anticipated and the Series B Bonds are not paid off before their final maturity, interest will stop accruing at that point, and any interest that has already accrued is waived.  Plan § XVII.D.

85.     What rights holders of Series B Bonds may have are anemic and, in many cases, are for the benefit of the Series A Bonds alone and sunset before the Series B Bonds mature.  There

---

[44] The Disclosure Statement does disclose the risk that the "New Bonds may not trade at par," and it explains that "certain closing conditions and closing deliverables, including legal opinions," may be "differ[ent] in type and scope from those typically required in municipal debt offering transactions."  DS 350.  This risk factor fails to mention that the *terms of the New Bonds themselves* are off-market.

is no indication that the Series B Bonds will have any way to ensure that PREPA sets rates at sufficient levels to cover operating expenses and repay the new bonds. The Series B Bonds will be paid only after payment of operating expenses. *See, e.g.*, Plan Sched. B ("The increase in Net Revenues generated from inclusion of the Legacy Charge will, until full payment of the principal of the New Bonds, fund debt service on the New Bonds *after payment of PREPA's Operating Expenses*, as specified in the Plan." (emphasis added)). The Interest Rate Covenant is enforceable only until the earlier of the repayment of the Series A Bonds or the final maturity of the Series A Bonds. Plan § XVII.J. There is no covenant to ensure that Net Revenues available for debt service will be equal to the amount of Legacy Charge Revenues, and no requirement that PREPA charge (or PREB or this Court approve) rates sufficient to cover even operating expenses. In light of the recent history of PREB refusing to approve rate increases for expenses LUMA believes are necessary, this is a serious concern.[45]

86.    These extra rights for Series A Bonds alone mean that the Series B Bonds are likely to trade at a substantial discount to the Series A Bonds. This risk is also never disclosed.[46]

87.    Just as important, there is no clarity about how the Oversight Board understands the nature of the security interest and recourse for holders of Series B Bonds, which refer to a lien on "Net Revenues up to an amount equal to the Legacy Charge Revenues and the right to receive such Net Revenues." Plan § XVII.E.1.

---

[45] DS 352-53; *see also* Ex. 21 (Maricarmen Rivera Sánchez, *Puerto Rico Energy Bureau Rejects Rate Hike*, THE WEEKLY JOURNAL (Sept. 8 2021)).

[46] The Ad Hoc Group has prepared disclosures on the points on which it has information, but it cannot answer many of the other questions that remain outstanding, such as whether liens on revenues beyond the Legacy Charge will be permitted (*see, e.g.*, Plan § XVII.H.5) and whether additional bonds can be paid from the Debt Service Fund (*compare* Plan §§ XVII.G *with* XVII.I.3). The Oversight Board should be required to disclose the proposed bond indentures to answer the numerous outstanding questions on the New Bonds.

88.     None of this information is disclosed in the Disclosure Statement, let alone the risks that each of these uncertainties poses to marketability of Series B bonds.  The Ad Hoc Group has prepared disclosures on the points on which it has information, included above and in the Ad Hoc Group Statement, but it cannot answer questions about the unknowns in the Plan and Disclosure Statement.  The Oversight Board should also be required to disclose the proposed bond indentures and make additional disclosures regarding each of these topics.

89.     *Fourth*, the Disclosure Statement does not adequately disclose risks related to the Lien and Recourse Litigation and Current Expense Litigation.  The Oversight Board concedes and discloses that the Plan will be unconfirmable if Non-Settling Bondholders vindicate their lien on PREPA's present and future revenues, and establish that the allowed amount of their secured claim is greater than the value offered to them in the Plan.  DS 37-38.  But the Disclosure Statement is materially misleading in that it represents the value offered to victorious Non-Settling Bondholders' claim as 55 cents in Series B Bonds, without disclosing the risk that the Court will determine the value of the Series B Bonds is substantially less.  In other words, the Disclosure Statement implies that the Plan is confirmable so long as Non-Settling Bondholders' secured claims are allowed at 55% of their asserted amount, which implication is materially misleading without disclosure of the risk that Series B Bonds have a value of substantially less than 55 cents. *See* Ex. B.

90.     The Disclosure Statement is also materially misleading because it does not disclose what happens if Non-Settling Bondholders' claims are allowed either senior to, or *pari passu* with, the Fuel Line Lenders' claims.  The Disclosure Statement never acknowledges those possibilities, which completely undermine the Plan's approach of compensating Fuel Line Lenders with Series A bonds and could render the Plan unconfirmable, as discussed above.  *See* Ex. B.

42

91.     *Fifth*, and relatedly, the Disclosure Statement also does not disclose the long delays that could be caused by ongoing litigation in the case and the impact those delays would have on Bondholders distributions under the Plan.  The rights of Bondholders to secured or full recourse unsecured claims will be determined only after the exhaustion of appeals.  The Disclosure Statement does not disclose the very real risk that distributions of Class B bonds to various classes will be held up for years while the Amended Lien & Recourse Challenge is fully litigated to a Final Order.  *See supra* p.18.  Or that distributions of Series B Bonds to all Classes—including the Fuel Line Lenders—will have to be escrowed until appeals of the dispute between the Fuel Line Lenders and bondholders are resolved.  *See In re Ferretti*, 128 B.R. at 19 (proper disclosure statement must inform creditor "when it is going to get [its recovery under the plan]").  Nor does the Disclosure Statement explain the very real risk that Bondholders may find themselves unable to trade their bonds for months or years, all the way through the Effective Date.  Form of Notice of Voting Instructions, at 3-4.  As discussed below, the Bondholders object to this provision of the Plan, but in the event that it is not changed, additional disclosure is necessary.

92.     In addition to the above objections, the Ad Hoc Group has inserted language in several places to ensure the factual record contained therein is accurate and to correct certain assertions made by the Oversight Board that are either misleading or incorrect.  Exhibit E hereto includes the disclosures that the Ad Hoc Group believes must be included in the Disclosure Statement.

III.    **Objections To The Plan Litigation Schedule**

93.     The Ad Hoc Group fully supports getting this case to plan confirmation this summer, as the Oversight Board proposes in the Approval Motion and Confirmation Scheduling Motion.  However, the Oversight Board's schedule is incomplete and does not provide for resolution of a number of gating issues that must be decided for this case to reach confirmation.

43

94.     As an initial matter, the Current Expense Litigation must be resolved.   The Oversight Board has put the Fuel Line Lenders' claim of seniority at the center of the Plan, a position the Ad Hoc Group has a right to litigate.   The Current Expenses Litigation is currently stayed, and the prior motions to dismiss have been administratively terminated.   The Ad Hoc Group intends to move to lift the stay on this litigation and to seek judgment on an expedited basis that the Fuel Line Lenders' subordination and priority claims against Bondholders are meritless.

95.     More generally, the Ad Hoc Group is concerned about the practicality of the Oversight Board's proposed confirmation litigation schedule.   The Oversight Board has proposed an extremely short time frame in which to conduct substantial confirmation discovery, beginning with its production of only limited materials to a data depository, other than certain documents relating to PREPA's assets and claims and its Best Interests Test.   This initial category of documents is too narrow.   Most importantly, the Oversight Board should be required to immediately load into the data depository all data, models, and supporting materials related to the determination that PREPA can afford to pay all creditors only $5.4 billion dollars, and comparisons with any affordability analysis underlying its earlier (and much higher) offers.

96.     Further, in order to provide any chance for the proposed discovery schedule to be met, the Ad Hoc Group, joined by the Trustee, Assured, and Syncora, served document requests on the Oversight Board and AAFAF on January 23, 2023, and asked them to begin scheduling an initial set of key depositions of Board members and key government decision-makers.   As of filing, the Oversight Board has not responded.   Its silence on necessary discovery does not bode well for the Oversight Board's willingness to move discovery forward with alacrity and to make its proposed confirmation schedule workable.   If the Oversight Board does not promptly and meaningfully engage in discovery; begin producing documents and substantially complete such

production by mid-February; and schedule depositions for March, then its proposed confirmation schedule is unrealistic. In particular, it will not be plausible to conduct all fact discovery and expert discovery simultaneously in the month of April, as the Oversight Board proposes (at Confirmation Sched. Mot. 15-16), especially given that the experts need information from fact discovery to prepare their analyses.

97.    The Oversight Board's proposed discovery plan and schedule is also ambiguous about which parties are governed by its provisions. In particular, it is not clear if the Oversight Board intends that other government entities, including AAFAF, LUMA, Genera PR, and other parties or non-parties are to be obligated to respond to document requests on the schedule proposed by the Oversight Board. The Ad Hoc Group maintains that, at minimum, AAFAF and LUMA should be required to comply with the expedited schedule to produce documents, and that, like PREPA itself, they should be required to immediately begin producing documents and begin producing witnesses for deposition upon request of the parties.[47]

98.    Assuming the Oversight Board promptly begins discovery, starting with document production by mid-February and proceeding with depositions in March, and consents to supplemental discovery and briefing regarding any amended plan, the Ad Hoc Group's objections would be narrowed to certain specific aspects of the discovery and briefing schedule and plan:

a.    The expert discovery schedule in the Oversight Board's Confirmation Scheduling Motion (at 15-16) is too compressed for the affordability and other analyses necessary in this case. The Motion proposes Opening Expert Reports due April 14,

---

[47] Given the many contingencies left unaddressed by the Plan—including the still-undisclosed National settlement, the Oversight Board's delayed settlement-solicitation process, and the pending dispositive motions in the Amended Lien and Recourse Litigation, significant amendments to the Plan are inevitable, as the Oversight Board acknowledged in part at the most recent omnibus hearing. The Ad Hoc Group objects to any aspect of the proposed confirmation litigation schedule that would prevent relevant discovery concerning any such forthcoming amendments after they are filed.

Rebuttal Expert Disclosures due April 17, Rebuttal Expert Reports due April 24,

expert depositions completed by April 28, and *Daubert* motions and motions *in*

*limine* also due April 28 (with responses on May 5 and replies on May 12).  The

Ad Hoc Group proposes that Opening Expert Reports be due April 21, that Rebuttal

Expert Disclosures be due April 28, that Rebuttal Expert Reports be due May 12,

that depositions be completed May 19, and *Daubert* motions and motions *in limine*

be due May 26 (with oppositions on June 2 and replies June 9).[48]

b.      The Oversight Board proposes that the proposed confirmation order be filed on

May 31, with objections due only 7 days later on June 7.  Given the complexity of

this Plan and likelihood of significant amendments, and the breadth of the expected

creditor objections to this largely non-consensual Plan, the Ad Hoc Group proposes

to move the Oversight Board's deadline to May 24 in order to provide 7 additional

days to prepare objections.

c.      The Oversight Board proposes that the memorandum of law and proposed findings

of fact in support of confirmation be filed on June 21, 2023, with objections due on

June 28.  The Ad Hoc Group proposes to move the Oversight Board's deadline to

June 14, again to provide creditors an additional 7 days to prepare their objections.

d.      The Oversight Board proposes to limit the number of interrogatories to 15 per party.

The Ad Hoc Group objects to this unexplained deviation from the 25 interrogatories

provided for under Rule 33 of the Federal Rules of Civil Procedure.

---

[48] ;tThe Oversight Board proposes that final witness lists, exhibits lists, and deposition designations be filed
on May 12, objections and counter-designations on May 17, and objections to counter-designations on May
24.  To accommodate the extended expert discovery schedule proposed by the Ad Hoc Group, the Ad Hoc
Group proposes that final witness lists, exhibits lists, and deposition designations be due May 26, that
objections and counter-designations be June 9, and that objections to counter-designations be due June 16.

99.     None of these scheduling modifications will delay the proposed date of the confirmation hearing.  The Ad Hoc Group will continue to confer with the Oversight Board regarding these issues in an effort to reach an agreement.  If the parties resolve these scheduling issues, or narrow their scheduling disagreements, they will promptly notify the Court.

## IV.     Objections To Solicitation And Plan Confirmation Procedures

100.    Certain parts of the solicitation and plan confirmation procedures are potentially prejudicial to Bondholders and should be revised.

101.    **Tabulation Procedures.**   Under the proposed tabulation procedures, each Beneficial Owner in the Bond Classes will vote their bonds based on the principal amount held, as processed through ATOP or a returned Form of Ballot.  The Balloting Agent will then possess the ability to adjust vote proportions to account for the total securities actually voted, including to reflect any accrued but unpaid prepetition interest, without oversight or court approval.  ECF No. 3113, Ex. A (the "Proposed Disclosure Statement Order") ¶ 36.  Bondholders' votes could be changed without notice and without any ability to check the Balloting Agent's proposed changes.

102.    Rather than provide the Balloting Agent with a blanket license to adjust vote proportions, the Ad Hoc Group submits that before changes to voting proportions occur, Beneficial Owners should be informed of and have the chance to review any proposed changes and the underlying calculations.  The Balloting Agent should be required to file notice with the Title III Court that it intends to make changes and how it plans to do so.  There should then be a mechanism for Beneficial Holders to be heard regarding any potential defects.

103.    **Challenges to Bondholder Class.**  Bondholders—who are classified in Classes 1 and 2 separately from all other types of claims—are subject to a distinct voting procedure that differs from any other Class's procedures.  Bondholders vote their claim through ATOP (or in the case of the Monolines, via a submitted Form of Ballot).  Proposed Disclosure Statement Order

47

¶ 36.  Their total vote will be based on principal amount held.  Beyond the adjustment for accrued interest (discussed above), there are no changes that should be made to bondholder votes—even if, for example, the Oversight Board wins in the Amended Lien & Recourse Challenge.

104.    The Proposed Disclosure Statement Order provides that the Oversight Board may disallow a claim for voting purposes if it has served an objection, request for estimation, or ACR transfer notice on the claim, and it empowers the Oversight Board to object to the amount of a claim and only allow it in the amount sought in the objection for voting purposes.   Proposed Disclosure Statement Order ¶ 35.  It also provides that the Oversight Board may notify different classes of the allowance or disallowance of a claim and allows members of all Classes to bring a 3018(a) Motion challenging the allowance or disallowance of a claim.  *Id.* ¶¶ 35, 37.

105.    The purpose behind Rule 3018—to help process the removal of illegitimate or overstated claims from the voting pool—and the rest of these provisions is inapplicable to the Bond Classes.  The Bond Claims are classified separately from all other Claims, and the Oversight Board knows the exact amount of principal and accrued but unpaid interest outstanding.  There is nothing to be gained by disallowing Bondholder claims other than improper attempts to disenfranchise Bondholders.  For example, even if this Court finds that Bondholders' claims are limited to amounts currently in the Sinking Fund, Bondholders will still have a claim for billions of dollars; it will simply be limited in source of payment, not in number.  The Proposed Disclosure Statement Order should be clear that PREPA Revenue Bond Claims will be allowed for voting purposes at their $8.259 billion face value plus pre-petition interest, that (for voting purposes only) the Oversight Board will not seek to allow the PREPA Revenue Bond Claims at a separate amount, and that the Rule 3018(a) procedures are therefore not necessary for claims in Classes 1 and 2— all without prejudice to the results of the Amended Lien & Recourse Challenge.

106.     **Trading Restriction.**  As part of the vote tabulation process, the Oversight Board

proposes that Beneficial Holders tender their PREPA Revenue Bonds through ATOP in order to

vote on the Plan.  The requirement that Bondholders vote by tendering through ATOP (with an

accompanying lockup in excess of three weeks) is not customary and has not been adequately

explained.  The Oversight Board claims in general terms that it is necessary to conduct this

solicitation of votes through ATOP "due to the magnitude and complexity of effectuating

*distributions* among holders of Claims in the Bond Classes."  *See* Approval Mot. ¶ 48 (emphasis

added). There is no explanation given as to why the complexity of *distributions* should affect how

Bonds *vote*.[49] Nothing in the Plan provides for different recoveries to different Bonds based on

how Bonds vote. The Settlement Notice that went out already contemplates a mechanism where

the Settling Bonds (prior to voting on the Plan) will be separately tagged with alternative

identifying CUSIPs.  The Oversight Board has not given any coherent explanation for why Non-

Settling Bondholders, who are already properly identified because they will not have an alternative

CUSIP, should be subject to these cumbersome restrictions, and, accordingly, this voting

mechanism should be denied.  Alternatively, the Debtors should be directed to provide an

explanation and Bondholders should be given an opportunity respond before the Court rules on

the appropriateness of this requirement.

107.     Requiring a tender through ATOP carries serious consequences.  As disclosed in

Schedule 3(a) to the Proposed Disclosure Statement Order (the "Form of Notice of Voting

Instructions"), once the PREPA Revenue Bonds are tendered, they are subject to indefinite

restriction from transfer, at the discretion of the Debtor and DTC, up and until the Effective Date.

---

[49] Nor is there any explanation for why requiring voting through ATOP will solve whatever issues are raised
by that complexity given that there is no guarantee that all Bonds will vote

Form of Notice of Voting Instructions, at 3-4.  Beneficial Holders that wish to vote to reject the Plan cannot avoid this restriction by simply not voting, as a non-voting Class will be deemed to accept the Plan.  A vote on the Plan should not come with the consequence of locking up a Beneficial Holder's PREPA Revenue Bonds indefinitely.  The Effective Date could be years away. Instead, if the Court allows this voting mechanism and it becomes necessary to restrict the transfer of tendered PREPA Revenue Bonds beyond June 21, 2023, then the justification for such restriction should be made public, and the Oversight Board should seek further court approval.

## RESERVATION OF RIGHTS

108.    The Ad Hoc Group reserves the right to  (i) amend or supplement this Objection in the event the Debtors file a further amended disclosure statement, (ii) join in any objection to the Disclosure Statement filed by any other party in interest, (iii) raise additional objections not incorporated herein, and (iv) raise the arguments made herein, and additional arguments, in connection with confirmation, and any objection thereto, of the proposed Plan.

## CONCLUSION

109.    The Board's proposed Plan is patently unconfirmable, and thus the Approval Motion should be denied.  In the alternative, at a minimum, the Disclosure Statement is inadequate and misleading as explained above, and should be supplemented with the Ad Hoc Group's statement on the Plan and additional proposed disclosures.  In addition, the proposed confirmation schedule and voting procedures should be amended as provided above.

We hereby certify that, on this same date, we electronically filed the foregoing with the clerk of the Court using the CM/ECF system, which will notify the attorneys of record.

Dated:  San Juan, Puerto Rico
          February 3, 2023

**TORO COLÓN MULLET P.S.C.**

*/s/ Manuel Fernández-Bared*
Manuel Fernández-Bared
USDC-PR No. 204,204
P.O. Box 195383
San Juan, PR 00919-5383
Tel.: (787) 751-8999
Fax: (787) 763-7760
E-mail: mfb@tcm.law

*/s/ Linette Figueroa-Torres*
Linette Figueroa-Torres
USDC-PR No. 227,104
E-mail: lft@tcm.law

*/s/ Nayda Perez-Roman*
Nayda Perez-Roman
USDC–PR No. 300,208
E-mail: nperez@tcm.law

*Counsel for the Ad Hoc Group of PREPA Bondholders*

**KRAMER LEVIN**
**NAFTALIS & FRANKEL LLP**

*/s/ Amy Caton*
Amy Caton*
Thomas Moers Mayer*
Alice J. Byowitz*
1177 Avenue of the Americas
New York, New York 10036
Tel.: (212) 715 9100
Fax: (212) 715-8000
Email:  acaton@kramerlevin.com
            tmayer@kramerlevin.com
            abyowitz@kramerlevin.com

Gary A. Orseck*
Matthew M. Madden*
2000 K Street NW, 4th Floor
Washington, DC 20006
Tel: (202) 775-4500
Fax: (202) 775-4510
Email:  gorseck@kramerlevin.com
            mmadden@kramerlevin.com

*\*Admitted Pro Hac Vice*

*Counsel for the Ad Hoc Group of PREPA Bondholders*