# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>     Debtors.[1] | PROMESA<br>Title III<br><br>No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>     Debtor. | PROMESA<br>Title III<br><br>No. 17-BK-4780-LTS<br><br>(Jointly Administered) |

## DISCLOSURE STATEMENT FOR FIRST AMENDED TITLE III PLAN OF ADJUSTMENT OF THE PUERTO RICO ELECTRIC POWER AUTHORITY

| | |
|---|---|
| **PROSKAUER ROSE LLP**<br>Eleven Times Square<br>New York, New York 10036 | **O'NEILL & BORGES LLC**<br>250 Muñoz Rivera Ave., Suite 800<br>San Juan, Puerto Rico 00918-181 |

*Attorneys for the Financial Oversight and Management Board as Representative for PREPA*

Dated: February 8, 2023

For inquiries regarding this Disclosure Statement, contact the Solicitation Agent, Kroll Restructuring Administration LLC ("Kroll"):
**Telephone** (available 10:00 a.m. to 7:00 p.m. AST):  (844) 822-9231 (toll free for U.S. and Puerto Rico)

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19- BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

| | |
|---|---|
| (646) 486-7944 (for international callers) **Email**: puertoricoballots@ra.kroll.com (reference "PREPA Plan of Adjustment" in the subject line) Please note that Kroll is not authorized to provide, and will not provide, legal advice. | |

**THIS IS NOT A SOLICITATION OF VOTES ON THE PLAN OF ADJUSTMENT. VOTES MAY NOT BE SOLICITED UNTIL THE TITLE III COURT HAS APPROVED A DISCLOSURE STATEMENT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, BUT HAS NOT YET BEEN APPROVED BY THE TITLE III COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

<u>**NO OTHER INFORMATION HAS BEEN JUDICIALLY APPROVED**</u>.

**THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO (THE "<u>OVERSIGHT BOARD</u>"), AS THE DEBTOR'S REPRESENTATIVE IN THIS TITLE III CASE PURSUANT TO SECTION 315(b) OF THE PUERTO RICO OVERSIGHT, MANAGEMENT, AND ECONOMIC STABILITY ACT ("<u>PROMESA</u>"), HAS NOT AUTHORIZED ANY PARTY TO GIVE ANY INFORMATION CONCERNING THE PLAN OR THE DEBTOR, OR THE VALUE OF THE DEBTOR'S PROPERTY, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT OR THE DISCLOSURE STATEMENT ORDER.[2] HOLDERS OF CLAIMS SHOULD UNDERSTAND THAT ANY INFORMATION, REPRESENTATIONS, WARRANTIES, OR INDUCEMENTS MADE TO OBTAIN ACCEPTANCE OR REJECTION OF, OR OBTAIN AN ELECTION TO SETTLE CERTAIN CLAIMS PURSUANT TO (IF APPLICABLE), THE PLAN HAVE NOT BEEN APPROVED BY THE TITLE III COURT. FURTHER, HOLDERS OF CLAIMS SHOULD NOT RELY ON ANY INFORMATION DISTRIBUTED VIA SOCIAL MEDIA, INCLUDING, BUT NOT LIMITED TO, FACEBOOK, TWITTER, AND INSTAGRAM.**

**THE OVERSIGHT BOARD AND ALL PARTIES TO A PLAN SUPPORT AGREEMENT (COLLECTIVELY, THE "<u>SUPPORTING PARTIES</u>") BELIEVE THE PLAN REPRESENTS A FAIR AND REASONABLE OUTCOME FOR ALL CREDITORS OF THE DEBTOR AND, THEREFORE, CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR AND ITS CREDITORS. THE OVERSIGHT BOARD AND THE SUPPORTING PARTIES RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

**FOR THE AVOIDANCE OF DOUBT, THIS DISCLOSURE STATEMENT WAS DRAFTED BY THE OVERSIGHT BOARD, AND SOME OF THE STATEMENTS**

---

[2] Capitalized terms used but not defined in this Disclosure Statement have the respective meanings given to them in the Plan (as defined below).

HEREIN MAY BE DISPUTED BY CERTAIN CREDITORS OR THE GOVERNMENT, INCLUDING, WITHOUT LIMITATION, STATEMENTS REGARDING THE INTERPRETATION OF PROMESA AND RIGHTS AND REMEDIES OF THE DEBTOR AND CREDITORS.  EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, THE VIEWS EXPRESSED IN THIS DISCLOSURE STATEMENT ARE THE VIEWS OF THE OVERSIGHT BOARD AND THE DEBTOR ONLY AND MAY NOT BE ATTRIBUTED TO ANY OF THE SUPPORTING PARTIES OR ANY OTHER PARTY.

## IMPORTANT INFORMATION

**OVERSIGHT BOARD AUTHORITY.  THE OVERSIGHT BOARD MAY TAKE ANY ACTION NECESSARY TO PROSECUTE A CASE UNDER TITLE III OF PROMESA OF A DEBTOR, INCLUDING FILING A TITLE III PETITION, FILING A PLAN OF ADJUSTMENT FOR A DEBTOR, AND OTHERWISE GENERALLY FILING PLEADINGS IN RELATION TO THE TITLE III CASE.  PROMESA ALSO PROVIDES THAT ONLY THE OVERSIGHT BOARD MAY FILE A PLAN OF ADJUSTMENT OF THE DEBTS OF A DEBTOR.  PROMESA REQUIRES THE PLAN OF ADJUSTMENT FOR A TITLE III DEBTOR BE FILED IN ITS TITLE III CASE TOGETHER WITH A DOCUMENT CALLED A DISCLOSURE STATEMENT.**

**PURPOSE OF DISCLOSURE STATEMENT.  THIS DOCUMENT IS THE DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") FOR THE FIRST AMENDED TITLE III PLAN OF ADJUSTMENT OF THE PUERTO RICO ELECTRIC POWER AUTHORITY ("PREPA" OR THE "DEBTOR"), DESCRIBED HEREIN (THE "PLAN").  THE FUNCTION OF A DISCLOSURE STATEMENT IS TO PROVIDE A HYPOTHETICAL INVESTOR TYPICAL OF THE CLAIMHOLDERS IN THE CASE INFORMATION REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF THE DEBTOR AND CONDITIONS OF ITS BOOKS AND RECORDS TO ENABLE THE HYPOTHETICAL INVESTOR TO MAKE AN INFORMED JUDGMENT TO ACCEPT OR TO REJECT THE PLAN.**

**SOURCE OF DATA.  THIS DISCLOSURE STATEMENT INCLUDES CERTAIN EXHIBITS, EACH OF WHICH ARE INCORPORATED INTO THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.   THIS DISCLOSURE STATEMENT HAS BEEN PREPARED AND FILED BY THE OVERSIGHT BOARD ON BEHALF OF THE DEBTOR.**

**THE UNITED STATES GOVERNMENT CREATED THE OVERSIGHT BOARD ON JUNE 30, 2016.  THE PRESIDENT OF THE UNITED STATES (THEN PRESIDENT BARACK OBAMA) APPOINTED THE OVERSIGHT BOARD'S SEVEN VOTING MEMBERS ON AUGUST 31, 2016.  AT ITS INCEPTION, THE OVERSIGHT BOARD HAD NO INFORMATION OR DATABASE OF ITS OWN, BUT HAD THE LEGAL RIGHT TO PROCURE INFORMATION AND DATA FROM THE COMMONWEALTH OF PUERTO RICO (THE "COMMONWEALTH").**

**ORIGIN OF FINANCIAL INFORMATION.  ALL FINANCIAL INFORMATION HEREIN IS BASED ON DATA THE OVERSIGHT BOARD HAS EITHER RECEIVED FROM THE COMMONWEALTH AND ITS INSTRUMENTALITIES (INCLUDING PREPA), LUMA ENERGY[3] OR THAT IS PUBLICLY AVAILABLE.  AS OF THE DATE OF THIS DISCLOSURE STATEMENT, THE COMMONWEALTH HAD NOT YET PUBLISHED AUDITED FINANCIAL STATEMENTS FOR ITS 2021 OR 2022 FISCAL YEARS. PREPA HAS NOT YET PUBLISHED AUDITED FINANCIAL STATEMENTS FOR ITS 2021 AND 2022 FISCAL YEARS. IN SOME CASES, SUCH AS FOR PENSION LIABILITIES AND DETERMINATIONS OF AVAILABLE CASH, THE OVERSIGHT BOARD RETAINED EXPERTS TO HELP VERIFY AND UNDERSTAND THE DATA. ACCORDINGLY, WHILE THE OVERSIGHT BOARD HAS USED ITS BEST EFFORTS TO PROCURE ACCURATE AND COMPLETE INFORMATION, IT IS LIMITED TO USING THE COMMONWEALTH AND PREPA'S SYSTEMS AND DATA AS ITS SOURCES AND CANNOT INDEPENDENTLY VOUCH FOR THE CORRECTNESS OF SUCH DATA.  THIS DISCLOSURE STATEMENT AND THE ECONOMIC AND FINANCIAL INFORMATION PROVIDED HEREIN HAVE NOT BEEN APPROVED BY THE COMMONWEALTH'S FISCAL AGENT, THE PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY ("AAFAF"), OR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS (THE "UCC").**

**COURT REVIEW.  THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO (THE "TITLE III COURT") HAS REVIEWED THIS DISCLOSURE STATEMENT AND HAS DETERMINED IT CONTAINS ADEQUATE INFORMATION PURSUANT TO BANKRUPTCY CODE SECTION 1125(b)[4] AND MAY BE SENT TO YOU TO SOLICIT YOUR VOTE ON, OR ELECTION TO SETTLE CERTAIN CLAIMS UNDER (IF APPLICABLE), THE PLAN.  THE TITLE III COURT HAS NOT, HOWEVER, DETERMINED THE CORRECTNESS OR COMPLETENESS OF ANY INFORMATION HEREIN.**

**VOTE AFTER CONSIDERING RISK FACTORS.  ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN, OR MAKE AN ELECTION THEREUNDER (IF APPLICABLE), ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS CITED HEREIN AND THE PLAN ATTACHED HERETO, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN OR MAKING AN ELECTION THEREUNDER. SEE SECTION VIII OF THIS DISCLOSURE STATEMENT, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED."**

**FORWARD LOOKING STATEMENTS.  THIS DISCLOSURE STATEMENT CONTAINS STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF CERTAIN FEDERAL SECURITIES LAWS.  ALL STATEMENTS CONTAINED HEREIN THAT ARE NOT CLEARLY HISTORICAL IN**

---

[3] "LUMA Energy" shall refer, collectively to LUMA Energy, LLC, a joint venture between Quanta Services and Canadian Utilities Limited, an ATCO Ltd. Company, or to LUMA Energy ServCo, LLC its subsidiary.

[4] All provisions of Title 11 of the United States Code (the "Bankruptcy Code") referenced herein are made applicable to these Title III cases by PROMESA section 301(a).

NATURE ARE FORWARD-LOOKING AND THE WORDS "ANTICIPATE," "BELIEVE," "COULD," "SHOULD," "EXPECT," "ESTIMATE," "FORECAST," "INTEND," "POTENTIAL," "PROJECT," "TARGET," AND SIMILAR EXPRESSIONS ARE GENERALLY INTENDED TO IDENTIFY FORWARD-LOOKING STATEMENTS. ALL STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, OTHER THAN STATEMENTS OF HISTORICAL FACT, INCLUDING STATEMENTS ABOUT THE PLAN, STRATEGIES, PROSPECTS, AND EXPECTATIONS REGARDING FUTURE EVENTS AND THE DEBTOR'S FINANCIAL PERFORMANCE, ARE FORWARD-LOOKING STATEMENTS THAT INVOLVE CERTAIN RISKS AND UNCERTAINTIES. WHILE THESE STATEMENTS REPRESENT THE OVERSIGHT BOARD'S OR DEBTOR'S CURRENT JUDGMENT ON WHAT THE FUTURE MAY HOLD, AND THE OVERSIGHT BOARD BELIEVES THESE JUDGMENTS ARE BASED UPON REASONABLE ASSUMPTIONS UNDER THE CIRCUMSTANCES, THESE STATEMENTS ARE NOT GUARANTEES OF ANY EVENTS OR FINANCIAL RESULTS, AND THE DEBTOR'S ACTUAL RESULTS MAY DIFFER MATERIALLY. THE INFORMATION INCLUDED IN THIS DISCLOSURE STATEMENT, INCLUDING THE FORWARD-LOOKING STATEMENTS AND PROJECTIONS OF CERTAIN FINANCIAL DATA FOLLOWING CONSUMMATION OF THE PLAN, ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, UNLESS OTHERWISE SPECIFIED. THE DEBTOR UNDERTAKES NO OBLIGATION TO UPDATE PUBLICLY THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING ANY FORWARD-LOOKING STATEMENTS, TO REFLECT NEW INFORMATION, FUTURE EVENTS OR OTHERWISE, EXCEPT AS REQUIRED BY LAW. ALL FORWARD-LOOKING STATEMENTS INVOLVE RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE DEBTOR'S CONTROL, WHICH MAY CAUSE ACTUAL RESULTS, PERFORMANCE, OR ACHIEVEMENTS TO DIFFER MATERIALLY FROM ANTICIPATED RESULTS, PERFORMANCE, OR ACHIEVEMENTS. THE DEBTOR CANNOT GUARANTEE THAT PROJECTED RESULTS OR EVENTS WILL BE ACHIEVED. FACTORS THAT COULD CAUSE THE DEBTOR'S ACTUAL RESULTS TO BE MATERIALLY DIFFERENT FROM THE OVERSIGHT BOARD'S OR THE DEBTOR'S EXPECTATIONS INCLUDE THOSE FACTORS DESCRIBED HEREIN UNDER SECTION VII. THE DEBTOR URGES HOLDERS OF CLAIMS TO CONSIDER THESE FACTORS CAREFULLY IN EVALUATING THE FORWARD-LOOKING STATEMENTS AND NOT TO PLACE UNDUE RELIANCE ON THESE FORWARD-LOOKING STATEMENTS.

FACTS CAN CHANGE. THE STATEMENTS AND OTHER INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT WERE MADE AS OF THE DATE SET FORTH ON THE COVER PAGE, UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT THE FACTS SET FORTH HEREIN ARE UNCHANGED SINCE THE DATE SET FORTH ON THE COVER PAGE HEREOF. EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON, OR MAKE AN ELECTION WITH RESPECT TO, THE PLAN MUST RELY ON ITS OWN EVALUATION OF THE DEBTOR AND ITS OWN ANALYSIS OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO ACCEPT OR REJECT, OR MAKE AN ELECTION PURSUANT TO, THE PLAN.

**PLAN SUPPLEMENT.** A PLAN SUPPLEMENT CONTAINING DRAFT OR FINAL VERSIONS OF PRIMARY DOCUMENTS REQUIRED TO CONSUMMATE THE TRANSACTIONS CONTEMPLATED BY THE PLAN WILL BE FILED WITH THE TITLE III COURT AS SOON AS PRACTICABLE (BUT IN NO EVENT LATER THAN SEVEN (7) DAYS) PRIOR TO THE VOTING DEADLINE,[5] OR ON SUCH OTHER DATE AS THE TITLE III COURT ESTABLISHES. THE PLAN SUPPLEMENT, WHICH MAY BE AMENDED, SHALL BE DEEMED INCORPORATED INTO AND PART OF THE PLAN AS IF SET FORTH THEREIN IN FULL.

**DISCLOSURE STATEMENT IS SOLELY FOR VOTING AND/OR ELECTIONS.** THE DEBTOR IS PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT SOLELY FOR PURPOSES OF SOLICITING HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT, OR ELECT TO SETTLE CERTAIN CLAIMS PURSUANT TO, THE PLAN (IF APPLICABLE). NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PERSON FOR ANY OTHER PURPOSE. THE CONTENTS OF THIS DISCLOSURE STATEMENT SHALL NOT BE DEEMED AS PROVIDING ANY LEGAL, FINANCIAL, SECURITIES, TAX, BUSINESS, OR OTHER ADVICE. THE DEBTOR URGES EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY SUCH LEGAL, FINANCIAL, SECURITIES, TAX, BUSINESS, OR OTHER ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT AND THE PLAN.

**JUDICIAL APPROVAL DOES NOT MEAN ALL FACTS ARE CORRECT.** THIS DISCLOSURE STATEMENT AND THE TITLE III COURT'S APPROVAL OF THE ADEQUACY OF THIS DISCLOSURE STATEMENT DO NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. FURTHER, THE TITLE III COURT'S APPROVAL OF THE ADEQUACY OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE TITLE III COURT'S DETERMINATION THAT THE INFORMATION HEREIN IS CORRECT OR COMPLETE AND DOES NOT MEAN THE TITLE III COURT WILL CONFIRM THE PLAN. THE TITLE III COURT HAS SCHEDULED A HEARING ON [___] TO CONSIDER CONFIRMATION OF THE PLAN UNDER PROMESA AND THOSE SPECIFIC BANKRUPTCY CODE PROVISIONS MADE APPLICABLE TO THE TITLE III CASES PURSUANT TO PROMESA SECTIONS 301 AND 314.

**NO GOVERNMENTAL APPROVAL.** NEITHER THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") NOR ANY FOREIGN OR STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THE SECURITIES DESCRIBED HEREIN OR THIS DISCLOSURE STATEMENT OR OPINED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY MAY BE A CRIMINAL OFFENSE.

**UNREGISTERED SECURITIES.** NONE OF THE SECURITIES TO BE ISSUED TO HOLDERS OF ALLOWED CLAIMS PURSUANT TO THE PLAN WILL HAVE

---

[5] The "Voting Deadline" is defined as 5:00 pm (Atlantic Standard Time) on [_____], 2023 unless such time is extended.

BEEN REGISTERED WITH THE SEC UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY STATE "BLUE SKY" LAWS, AND SUCH SECURITIES WILL BE ISSUED IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND EQUIVALENT STATE LAWS.

**CONSEQUENCES OF HOLDING SECURITIES ISSUED PURSUANT TO THE PLAN OF ADJUSTMENT**. THE DEBTOR RECOMMENDS POTENTIAL RECIPIENTS OF NEW BONDS OR CVI TO BE ISSUED PURSUANT TO THE PLAN CONSULT THEIR OWN ADVISORS CONCERNING ANY RESTRICTIONS ON HOLDING OR THE TRANSFERABILITY OF SUCH SECURITIES, OR ANY OTHER POTENTIAL CONSEQUENCE OF HOLDING SUCH SECURITIES.

**TAX CONSIDERATIONS**. THE TAX CONSEQUENCES OF THE PLAN TO HOLDERS OF CLAIMS ARE COMPLEX AND DEPEND, IN PART, ON BOTH THE TYPE OF CLAIM HELD AND THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM. THE DEBTOR RECOMMENDS THAT ALL HOLDERS OF CLAIMS CONSULT THEIR OWN RESPECTIVE TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, TERRITORIAL (INCLUDING PUERTO RICO), LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN IN THEIR RESPECTIVE INDIVIDUAL CIRCUMSTANCES.

**PLAN OF ADJUSTMENT CONTROLS OVER THIS DISCLOSURE STATEMENT**. THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, CERTAIN OTHER DOCUMENTS, AND CERTAIN FINANCIAL INFORMATION RELATING TO THE DEBTOR. THE DEBTOR BELIEVES THESE SUMMARIES ARE FAIR AND ACCURATE. NO OTHER PARTY, INCLUDING ANY PARTY TO A PLAN OR PLAN SUPPORT AGREEMENT MAKES ANY REPRESENTATION AS TO THE FAIRNESS OR ACCURACY OF THESE SUMMARIES OR THE DESCRIPTIONS OF PARTIES' LEGAL RIGHTS AND REMEDIES CONTAINED HEREIN. IF THERE IS ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OF THE OTHER DOCUMENTS OR FINANCIAL INFORMATION REFERENCED HEREIN, THE TERMS AND PROVISIONS OF THE PLAN, OR SUCH OTHER DOCUMENT OR FINANCIAL INFORMATION, AS APPLICABLE, SHALL GOVERN FOR ALL PURPOSES.

**PLAN OF ADJUSTMENT MAY BE AMENDED**. THE OVERSIGHT BOARD RESERVES THE RIGHT TO AMEND, MODIFY, OR WITHDRAW THE PLAN AND PLAN SUPPLEMENT AT ANY TIME, IN ACCORDANCE WITH THE TERMS OF THE PLAN SUPPORT AGREEMENTS, THE PLAN, AND PROMESA TITLE III.

# TABLE OF CONTENTS

**Page**

I. Preface ........................................................................................................................2

    A. Plan Recovery Overview ...............................................................................2

    B. Revenue Support for Plan and the Legacy Charge ..................................5

    C. Background and Overview ...........................................................................6

II. Introduction ...........................................................................................................24

    A. PROMESA Title III Plan of Adjustment: An Overview ........................26

    B. Summary of Key Components of the Plan of Adjustment ....................27

    C. Holders of Claims Entitled to Vote on the Plan of Adjustment..........53

    D. Solicitation and Voting Procedures .........................................................55

    E. Confirmation Hearing and Deadline for Objections to Confirmation ................55

III. Overview of the Debtor ........................................................................................56

    A. General Information.....................................................................................56

    B. Debtor's Financial Obligations as of the Petition Date ........................65

    C. PREPA's Cash Management System.........................................................85

    D. PREPA's Cash Accounts ............................................................................86

    E. PREPA's Liquidity and Working Capital Analysis.................................94

    F. PREPA's Resource Planning and Transformation .................................99

IV. Significant Events Leading to Commencement of PREPA's Title III Case..................125

    A. PREPA's Operational and Financial Decline ......................................125

    B. Pre-Title III Negotiations with Creditors.............................................127

    C. Legislation Enacted by the Commonwealth to Address the Fiscal and Debt Crisis ................129

    D. PROMESA.................................................................................................131

    E. Adoption of PREPA Fiscal Year Budgets and Fiscal Plans ...............152

V. Overview of PREPA's Title III Case ................................................................167

    A. Commencement of PREPA's Title III Case ..........................................167

    B. Natural Disasters and the Oversight Board's Response .....................168

    C. 2019 Restructuring Support Agreement ................................................174

    D. Claims Process and Bar Date..................................................................177

    E. Vitol Settlement Agreement ...................................................................185

F.    Rejection or Assumption of Unexpired Leases of Nonresidential Real Property ..................................................................................................188

G.    Significant Adversary Proceedings and Contested Matters ................................193

A.    Appointments Clause Litigation .........................................................................236

B.    Oversight Board's Investigation of Potential Causes of Action .........................240

VI.    The Title III Plan of Adjustment ..................................................................................253

A.    General ................................................................................................................253

B.    Overview of the Plan of Adjustment ..................................................................254

C.    Compromise and Settlement of Disputes / Restructuring of PREPA .................255

D.    Provisions for Payment of Administrative Expense Claims ...............................260

E.    Classification and Treatment of Claims ..............................................................264

F.    Provisions Regarding Issuance and Distribution of the New Bonds ..................273

G.    Provisions Regarding National Insured Bonds and Treatment of National Insured Bonds .....................................................................................................282

H.    Treatment of Executory Contracts and Unexpired Leases .................................285

I.    GUC Trust ...........................................................................................................289

J.    Avoidance Action Trust ......................................................................................294

K.    Provisions Governing Distributions ....................................................................301

L.    Procedures for Resolving Disputed Claims ........................................................309

M.    Governance and Provisions Regarding PREPA PayGo Trust and Pension System ...............................................................................................................312

N.    Effect of Confirmation of the Plan .....................................................................313

O.    Modification, Revocation, or Withdrawal of the Plan ........................................317

P.    Corporate Governance and Management of Reorganized Debtor .......................318

Q.    Identification of Claims Impaired By the Plan and Not Impaired By the Plan ....................................................................................................................319

R.    Conditions Precedent to Confirmation of the Plan .............................................319

S.    Conditions Precedent to the Effective Date ........................................................322

T.    Provisions Regarding Committee .......................................................................324

U.    Provisions Regarding Oversight Board and Compliance with PROMESA ........324

V.    Retention of Jurisdiction .....................................................................................325

W.    Miscellaneous Provisions ...................................................................................327

VII.    Confirmation of the Plan of Adjustment .......................................................................334

A.    Confirmation Hearing .........................................................................................334

|  | B. | Deadlines to Object to Confirmation | 334 |
|  | C. | Requirements for Confirmation of the Plan of Adjustment | 334 |
| VIII. |  | Certain Risk Factors to Be Considered | 340 |
|  | A. | Risks Related to the Title III Case | 340 |
|  | B. | Risks Related to PREPA | 344 |
|  | C. | Risks Related to Transformation | 346 |
|  | D. | Risks Related to Projections in Revenues and Expenses in the Certified Fiscal Plan | 348 |
|  | E. | Risks Related to the New Bonds | 353 |
|  | F. | Risks Related to the CVI | 359 |
|  | G. | Risks Related to the Election of National Commutation Treatment | 363 |
|  | H. | Risks Related to the National Non-Commutation Treatment | 363 |
|  | I. | Risks Related to Making or Declining to Make the National Commutation Election | 364 |
|  | J. | Risks Related to the National Certificates | 365 |
|  | K. | Risks Related to the National Escrow Account | 365 |
|  | L. | Risks Related to Payment of National Acceleration Price | 365 |
|  | M. | Risks Related to the Collection of Revenues Supporting the Payment of New Bonds and CVI | 365 |
|  | N. | Risk Factors Related to Future Judicial Actions | 367 |
|  | O. | Risk Factors Related to Legislation | 368 |
|  | P. | Risk Factors Related to Tax Treatment of New Bonds | 369 |
|  | Q. | Risk Factors Related to the Assured Insurance Interest Rate Swap Claims | 370 |
| IX. |  | Certain Material United States Federal Income Tax Considerations | 372 |
|  | A. | General | 372 |
|  | B. | U.S. Holders | 373 |
|  | C. | Puerto Rico Individuals and Puerto Rico Corporations | 382 |
|  | D. | Non-U.S. Holders | 384 |
| X. |  | Certain Material Puerto Rico Income Tax Considerations | 387 |
|  | A. | General | 387 |
|  | B. | P.R. Holders | 387 |
|  | C. | Non-P.R. Holders | 391 |
| XI. |  | Applicability of Certain Federal and State Securities Laws | 393 |

A.      New Bonds.......................................................................................................393

XII.    Financial Information and Projections...........................................................................395

A.      Historical Financial Reporting...........................................................................395

B.      PREPA Certified Fiscal Plan and Projections ....................................................395

XIII.   Additional Information ................................................................................................397

XIV.    Conclusion ..................................................................................................................398

## TABLE OF EXHIBITS

**Exhibit A** – First Amended Title III Plan of Adjustment of the Puerto Rico Electric Power Authority

**Exhibit B** – Settlement Agreement and Release, dated as of August 26, 2022, by and among (i) the Financial Oversight and Management Board for Puerto Rico, as representative of PREPA, and (ii) Vitol Inc. and Vitol S.A. (together, "Vitol")

**Exhibit C** – Release and Settlement Agreement, dated as of February 11, 2022, by and among (i) Whitefish Energy Holdings, LLC, (ii) PREPA, and (iii), the Financial Oversight and Management Board for Puerto Rico, as Title III representative of PREPA

**Exhibit D** – Load Forecast and Illustrative Cash Flow for New Bonds

**Exhibit E** – Certified PREPA Fiscal Plan

**Exhibit F** – Certified PREPA Budget

**Exhibit G** – Summary of Pension Reform

**Exhibit H** – Summary of Outstanding PREPA Bonds

**Exhibit I** – List of PREPA's Bank Accounts, Balances, and Preliminary Restriction Categorizations as of November 1, 2022

**Exhibit J** – Latest Audited Financial Statements for the Debtor

**Exhibit K** – Best Interests Test Report

**Exhibit L** – Actions to be Transferred to Avoidance Actions Trust

**Exhibit M** – Plan Support and Settlement Agreement, dated as of December 1, 2022, between the Oversight Board, as Title III representative of PREPA, and holders of Fuel Line Loans (the "Fuel Line Lender PSA")

**Exhibit N** – PREPA Plan Support and Settlement Agreement, dated as of January 31, 2023, between the Oversight Board, as Title III representative of PREPA, and National Public Finance Guarantee Corporation (the "National PSA")

**Exhibit O** – Estimation of General Unsecured Claims Pool

**Exhibit P** – Legacy Charge Derivation

**Exhibit Q** – Analysis of Savings of CBA Modifications

**THE FOLLOWING STATEMENTS IN THESE <u>SECTIONS I AND II</u> ARE QUALIFIED IN THEIR ENTIRETY BY THE MORE DETAILED INFORMATION CONTAINED ELSEWHERE IN THIS DISCLOSURE STATEMENT AND IN THE PLAN AND THE EXHIBITS TO EACH.**

## I.   Preface

As described further herein, Congress has empowered the Oversight Board to restructure the debt and operations of the Commonwealth of Puerto Rico and its instrumentalities, including PREPA, to carry out the Oversight Board's statutory mission to restore fiscal responsibility and market access.   The Oversight Board is striving to restructure PREPA's debt and operations to produce affordable clean power at a cost low enough to facilitate a growing economy, achieve fiscal responsibility, and access to the capital markets at reasonable rates, and filed PREPA's Title III case (this "Title III Case") to accomplish those goals.   Subject to attaining its statutory mandates, the Oversight Board's goal is to provide creditors with returns on their allowable claims, reflecting the legal merits of creditors' asserted secured status, priorities, and claim.   The Oversight Board believes the Plan achieves these goals.   It has the support of at least three major classes of PREPA's creditors, accounts for the potential outcomes of pending litigation, provides meaningful recoveries for creditors while maintaining affordable rates for PREPA's rate–payers, and sets PREPA on the path to emergence from Title III.

### A.   Plan Recovery Overview

The Oversight Board been provided the guidance and dedication of United States Bankruptcy Judge Brendan L. Shannon and former Bankruptcy Judges Shelley C. Chapman and Robert D. Drain (collectively, the "Mediation Team").[6]   The mediation process assisted the Oversight Board in reaching deals with two major creditor groups: (i) the Fuel Line Lenders,[7] holders of over $700 million in unsecured claims, and (ii) National Public Finance Guarantee Corporation ("National"), a monoline insurer of PREPA's Revenue Bonds ("Bonds") and holder of certain claims against PREPA, including claims for reimbursement, with interest, for payments of principal and interest on, or any other costs incurred with respect to, the Insured PREPA Revenue Bonds (as defined in the Plan) (an "Asserted Reimbursement Claim").

The Oversight Board's settlement with the Fuel Line Lenders is embodied in the Fuel Line Lender PSA.   In full satisfaction of the Fuel Line Lenders' claims, and in settlement of pending litigation regarding the priority of such claims among PREPA's creditors, all as described more fully herein, the Fuel Line Lenders will receive, among other consideration, Series A Bonds in an amount equal to eighty-four percent (84.00%) of their prepetition claim.   Additionally, like certain other classes of creditors, the Fuel Line Lenders have the potential to be paid in full on account of their prepetition claim if the Oversight Board prevails in the Amended Lien & Recourse Challenge against holders of Bonds (the "Bondholders") and the Bond trustee.   The eighty-four percent (84.00%) base return to the Fuel Line claims reflects several factors including a settlement of their asserted seniority over the Bond Claims on the ground the documents governing the Bond claims

---

[6] As of December 31, 2022, the Mediation Team consists solely of Judge Shelley C. Chapman (ret.) and Judge Brendan L. Shannon until, without limitation, notice of reappointment of Judge Drain to the Mediation Team in a private capacity.   *See* Notice and Order Regarding Mediation Team [ECF No. 3137].

[7] "Fuel Line Lenders" shall refer to all holders of claims arising under (i) the Credit Agreement dated May 4, 2012, by and among PREPA, Scotiabank de Puerto Rico, and certain lenders, and (ii) the Trade Finance Facility Agreement, dated July 20, 2012, by and between PREPA and Citibank, N.A., as memorialized in proofs of claim numbers 44342, 44358, 44378, 44388, 45816, 44378, 45816 filed against PREPA in this Title III Case.

provides for payment of current expenses such as fuel costs before any net revenues are transferred to pay debt service on the Bonds.

The Oversight Board's settlement with National is embodied in the National PSA. In full satisfaction of National's claims against PREPA arising from the ownership or insurance of Bonds, which shall be allowed in the amount of $836,145,928.13, and in settlement of their rights in connection therewith, National shall receive Series B Bonds in an amount equal to seventy one and sixty five hundredths percent (71.65%) of their allowed claim. This return reflects several factors, including a settlement of its asserted security interest in PREPA's revenues, and its asserted right to appoint a receiver for PREPA. In full satisfaction of its Asserted Reimbursement Claim, and in settlement of its rights in connection therewith, National shall receive Series B Bonds in an amount equal to twenty percent (20%) of the National Reimbursement Claim (as defined in the Plan).

The Plan is also supported by a settlement with a class comprised of Vitol Inc.'s claim, which agreed as a treatment of its approximately $41 million Allowed Claim to receive fifty percent (50.00%) of the treatment provided to certain other general unsecured claims (as further described below, the General Unsecured Claim Recovery). These settlements each provide an impaired accepting class, one requirement for confirmation of the Plan.

Aside from the National PSA, the Oversight Board has not been able to reach a settlement with other holders and monoline insurers of Bonds. Significantly, the mediation has included several Bondholders who represent they hold $3.9 billion (or over 47% of all uninsured bonds) and monoline insurers of insured Bonds (the "Monoline Insurers")[8], but has not included many other Bondholders. Therefore, the Oversight Board has formulated the Plan to try to foster settlement of Bond claims and to provide a settlement opportunity for all Bondholders, including those who have not participated in the mediation. There is pending litigation challenging two aspects of the Bond claims. Generally, the Bondholders claim the Bonds are secured by PREPA's future revenues, while the Oversight Board believes they are secured solely by approximately $16 million deposited in certain funds. Additionally, the Bondholders argue their claims arising from the Bonds are allowable claims against PREPA, while the Oversight Board and UCC believe the claims are only allowable against those certain funds. Whether the Bonds have an allowable claim of over $8.5 billion against all of PREPA or only against the funds holding approximately $16 million, will make a very material difference as to how much value is available to other creditors.

The Plan undertakes to encourage settlement of Bond claims by its inclusion of two separate classes for Bond claims—one for Bondholders and Monoline Insurers (other than National) desiring to settle on the terms explained below, and one for Bondholders desiring to vindicate their purported rights through litigation. Bondholders and Monoline Insurers (other than National) who choose to settle their claims will receive fixed and two types of outcome dependent (*i.e.* contingent) contingent payments. Their fixed payment will be Series B Bonds in the face amount of fifty percent (50.00%) of their allowable petition date claims. If the Oversight Board prevails on the lien and recourse counts in the Amended Lien & Recourse Challenge, the Non-Settling Bondholders will receive only their pro rata share of amounts deposited in the Sinking

---

[8] The Monoline Insurers include Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (together, "Assured"), National, and Syncora Guarantee, Inc. ("Syncora").

Fund.  Settling Bondholders, on the other hand, will receive additional Series B Bonds as the first type of contingent payment.  In this scenario, where the Oversight Board has prevailed on its claim that the bonds are recourse solely to monies in the Sinking Fund, Settling Bondholders may receive up to one hundred percent (100.00%) of their prepetition claim in Series B Bonds otherwise payable to the Non-Settling Bondholders.[9]  Conversely, the more Bondholders that do settle reduce the amount of Bonds not settled, and that, in turn, reduces the amount of Series B Bonds otherwise payable to the Non-Settling Bondholders.  Therefore, as more Bonds settle, the additional Series B Bonds available to the Settling Bondholders on a contingent basis diminishes down to zero. Settling Bondholders will also receive a second type of contingent payment, a CVI, for the remaining part of their claim after distributions of Series B Bonds.  If the Oversight Board loses its claim that the Bonds are recourse solely to monies that are in the Sinking Fund, but wins its argument that the Bonds are secured only by monies in the Sinking Fund, Settling Bondholders are likely to receive between approximately five (5) cents to twelve (12) cents more than what the Oversight Board has offered to pay Non-Settling Bondholders.  In these two scenarios where Bonds have unsecured claims for the full amount of their debt, Settling Holders may not be entitled to any additional recovery if Bondholders show that PREPA is required to pay more to unsecured creditors, but rather will be limited to the fifty (50) cent recovery that they agreed to accept under the Settlement Offer Memorandum.

Because many Bondholders did not participate in the mediation, and have not had the opportunity to settle, the Oversight Board sent a settlement offer with a restructuring support agreement containing such terms to all bondholders on January 27, 2023, with responses to the settlement offer due by February 24, 2023.  This will enable every Bondholder to choose whether to be part of the settling class or non-settling class.  [Note, this section will be updated prior to solicitation to reflect the number of Bondholders/Monolines that chose to be in Class 1.]

In respect of PREPA's retirees, Sistema de Retiro de los Empleados de la Autoridad de Energía Eléctrica (the "PREPA ERS" or its Spanish acronym, "SREAEE") will receive the same treatment provided to other pensioners throughout the Commonwealth's confirmed Title III plans of adjustment:  PREPA's defined benefit pension system will be frozen effective as of the Effective Date, and Cost of Living Adjustments (COLAs) will be eliminated.  PREPA will deposit monies derived from its electricity rates in a "PREPA PayGo Trust" in amounts sufficient to pay retirees all pension benefits they will have earned as of the Effective Date, on account of accrued pensions, in the ordinary course rather than funding a trust corpus for investment.  Moreover, if the Oversight Board prevails on the lien and recourse counts in the Amended Lien & Recourse Challenge, the PREPA PayGo Trust will receive twenty percent (20.00%) of the Series B Bonds that remain, if any, after accounting for initial distributions to the Settling Bondholders, Non-Settling Bondholders, and Holders of General Unsecured Claims.  If Series B Bonds remain after Settling Bondholders, Fuel Line Lenders, and general unsecured claimholders are paid in full, then such excess bonds will either be deemed as not issued by PREPA or will go to the PREPA PayGo Trust or PREPA, or cancelled, in the Oversight Board's discretion.

Finally, general unsecured claimholders will receive a share of the Series B Bonds that remain after accounting for distributions to the Settling Bondholders and Non-Settling

---

[9] Actual recoveries will vary on a number of factors, including, but not limited to, the proportion of bondholders that opt into the settlement and the size of the General Unsecured Claims.

Bondholders, providing them an opportunity to recover in full or substantially in full if the Oversight Board prevails on the lien scope and recourse counts of the Amended Lien & Recourse Challenge (depending on the size of the unsecured claim pool and the proportion of Settling Bondholders). In this scenario, based on the Oversight Board's estimate of the allowable aggregate amount of general unsecured claims, the Oversight Board believes those claims will be paid approximately 14.13% to 100% of their claims, depending on the proportion of Bondholders that choose to settle. If the Non-Settling Bondholders prevail on the lien challenge, however, holders of general unsecured claims will receive very small distributions because nearly all the available monies will have been determined to be encumbered by the Non-Settling Bondholders' security interest.

B.    **Revenue Support for Plan and the Legacy Charge**

To fund the New Bonds issued under the Plan, a temporary, hybrid transition charge (the "Legacy Charge") will be added to PREPA's rates. Because PREPA's current rates, despite being among the highest in North America, are insufficient to fund legacy debt service and PREPA's operating expenses, the Legacy Charge will be included in PREPA's rates to allow for sufficient Net Revenues to provide a source of repayment for the New Bonds issued by PREPA under the Plan.

The Legacy Charge, described in greater detail in Section II.B.3.iii, will involve both a volumetric component based on customer class and a customer's electricity use, and/or a flat monthly connection charge for being connected to PREPA's electricity grid, based on customer class. The flat fee component is designed to provide a relatively more consistent and predictable cash flow by charging customers for access to PREPA's electricity grid not based on usage in any given month. Revenues from the volumetric component are projected to decrease with time if, as projected, demand for electricity decreases on the island. The level of the Legacy Charge added to a given customer's bill was determined considering factors such as a customer's rate class. For example, the most vulnerable customers (*e.g.*, subsidized residential customers) are not intended to be assessed any connection charge and would only be assessed a volumetric charge if their consumption exceeds 500 kWh per month. Other customer classes (*e.g.*, general residential customers and commercial and industrial customers) would be subject to a connection charge, a volumetric charge for consumption up to approximately 500 kWh, and an equivalent or higher volumetric charge for consumption over approximately 500 kWh.

Based on electricity demand projections pursuant to PREPA's 2022 certified fiscal plan (the "Certified Fiscal Plan"), the Legacy Charge is expected to generate sufficient revenue over the next thirty-five years to fully repay the approximately $5.68 billion of New Bonds being issued under the Plan. However, because PREPA's continued operations are necessary to generate any revenue, the New Bonds are structured so that all revenues, including the Legacy Charge Revenues, are subject to the payment of PREPA's necessary and reasonable operating expenses. While there is currently no requirement under the New Bonds that rates other than the Legacy Charge generate sufficient revenues to pay operating expenses, a task that PREPA's regulator, the Puerto Rico Energy Bureau ("PREB"), is in charge of, PREB is required to exercise its power over rates to ensure PREPA recovers all reasonable operational and maintenance costs (Act 57-2014 § 6.25(b)) and meets its obligations to bondholders (Act 17-2019 § 6.3(p)). If PREB does not set rates sufficient to cover operating expenses, holders of New Bonds may seek enforcement of the

5

Interest Rate Covenant. The Legacy Charge is anticipated to be removed after thirty-five years, when the New Bonds have been paid in full and the CVI has matured or no longer remain outstanding. If electricity demand exceeds projections in the Certified Fiscal Plan and the New Bonds are repaid earlier than thirty-five years, the Legacy Charge will remain in place during that time and revenues attributable to the fixed fee component of the Legacy Charge in place as of the Effective Date will be used to fund CVI distributed to claimholders under the Plan. However, if actual demand is lower than the 2022 Certified Fiscal Plan projections, and the New Bonds are not repaid in thirty-five years, the Legacy Charge will remain in place until the full payment of the Series B Bonds (and there will be no payments to the CVI). If the Series B Bonds are not paid in full at the time of their stated maturity, then no further interest will accrue. For avoidance of doubt, interest accrued through the stated maturity date shall remain outstanding and due and payable until paid in full. Unpaid principal on the New Bond after the stated maturity would also continue to be paid.

The $5.68 billion that the Plan provides PREPA can generate under the Legacy Charge to pay creditors has been challenged by certain creditors as being insufficient under the terms of the Bankruptcy Code. These creditors have indicated their intent to challenge whether PREPA is required under PROMESA to pay to creditors more than $5.68 billion in revenue over 35 years in connection with confirmation of the Plan.

Additionally, certain creditors have asserted that the terms of the Series B Bonds are not market and therefore the Series B Bonds may trade below their par value. While the terms of the Series B Bonds have been revised since the time of these assertions, it is possible these creditors will continue to assert these terms are below market.

The Oversight Board believes the Plan is a confirmable plan of adjustment that best balances various creditors' interests, the economic future of PREPA and Puerto Rico at large, and most importantly, provides a path forward for the people of Puerto Rico to have a reliable electric system. The Oversight Board strongly urges creditors to vote in favor of the Plan and support PREPA's emergence from Title III.

C.     **Background and Overview**

***PREPA's Establishment.*** PREPA was created in 1941 as a public corporation and governmental instrumentality of Puerto Rico pursuant to Act No. 83 of the Legislative Assembly of Puerto Rico (the "Legislative Assembly"), approved May 2, 1941. PREPA generates, transmits, and distributes substantially all of the electric power used in Puerto Rico. PREPA, as an instrumentality of the Commonwealth, is charged with certain duties and responsibilities, including "[t]o provide and allow electric power to be provided in a reliable, clean, efficient, resilient, and affordable manner thus contributing to the general wellbeing and sustainable development of the people of Puerto Rico." Section 6(a) of Act 17-2019.

PREPA is one of the largest municipal utilities in the United States, ranking first in number of clients and revenues among public power utilities. From 1981 to 2021, PREPA was the sole

energy distribution service provider in Puerto Rico.  Up until June 1, 2021,[10] PREPA served
approximately 1.5 million customers (91% residential, 9% commercial, and <1% industrial).
PREPA served its clients through an extensive transmission and distribution system with
approximately 2,600 miles of transmission and sub-transmission lines (230 kV/115 kV/38 kV),
over 16,000 miles of primary and secondary voltage distribution lines (13 kV, 8 kV, 4 kV), and
roughly 340 utility-owned substations (the "T&D System").  Electricity is supplied by PREPA-
owned generation plants and also procured from independent power producers under power
purchase agreements (the "Generation System").

   *The Commonwealth's and PREPA's Decline.*  Over the last several decades, a multitude
of factors contributed to the steep economic downturn of the Commonwealth and, in turn, the
decline of PREPA, including a contracting economy, a growing government structure, population
decline, and changes in tax status and available credits under the U.S. tax code.  From the early
2000s through 2016, Puerto Rico's public debt rose rapidly, in part from borrowing to cover
deficits including to pay debt service, and the outlook for Puerto Rico's economy continued
declining.

   By 2016, Puerto Rico was "in the midst of a fiscal crisis."[11]  The Commonwealth was
"being crushed under the weight of a public debt that [was] larger" than its gross national product,
"it ha[d] started to default on its debt obligations," and it had lost access to external financing.[12]
The Commonwealth had over $120 billion in combined debt and unfunded pension liabilities.
Even worse, these calamitous financial circumstances threatened a humanitarian crisis for the over
3 million U.S. citizens living in Puerto Rico.  As the United States Secretary of the Treasury
observed, the Commonwealth's ability to provide "basic healthcare, legal, and education services"
was in serious doubt.[13]

   Over the same time period, PREPA faced a similarly steep decline in its financial and
operating conditions.  The 2008 global recession and the Commonwealth's economic decline
resulted in the degradation of PREPA's infrastructure (an issue that has only been further
exacerbated by the devastating impacts of hurricanes Irma, Maria, and Fiona, as discussed further
below, and numerous high-magnitude earthquakes in 2020).   In addition to inadequate
infrastructure, PREPA suffered from a significant drop in energy sales, legal requirements to
provide power to certain customers at subsidized rates, relatively high levels of theft and non-
technical losses, systematic collections failures and refusals by customers to pay outstanding
invoices, inadequate reinvestments leading to old, inefficient and unreliable transmission,
distribution, and generation facilities and outdated information and technology systems, a high
dependence on fuel oil and an inability to diversify its fuel mix, a lack of a strategic environmental

---

[10] As of that date, PREPA's transmission & distribution system is operated and maintained by LUMA Energy LLC.
As of that date, PREPA remains responsible for the operation and maintenance of its legacy generation fleet which
supplies electricity to the grid operated by LUMA Energy LLC.

[11] *Puerto Rico v. Franklin Cal. Tax–Free Tr.*, 579 U.S. 115, 118 (2016).

[12] *Wal-Mart P.R., Inc. v. Zaragoza-Gómez*, 174 F. Supp. 3d 585, 602 (D.P.R. 2016), *aff'd*, 834 F.3d 110 (1st Cir.
2016); H.R. Rep. No. 114- 602, at 40 (2016).

[13] Letter from Jacob L. Lew, Secretary of the Treasury, to Paul Ryan, Speaker, U.S. House of Representatives (Jan.
15, 2016), https://www.treasury.gov/connect/blog/Pages/Secretary-Lew-Sends-Letter-to-Congress-on-Puerto-
Rico.aspx.

compliance plan, a disorganized and ineffective customer service infrastructure, above-market collective bargaining agreements with evergreen provisions, underfunded pension obligations, material operating liabilities, and a significant debt burden of its own, cumulatively causing a debt crisis. PREPA's debt crisis has resulted, in large part, from PREPA financing its operating deficits from bond proceeds, leading to underfunded infrastructure and an unsustainable debt structure.

PREPA's fiscal crisis rendered PREPA unable to pay its debts as they came due. PREPA's largest debt consists of approximately $8.5 billion claims of holders of Bonds. It also owed approximately $700 million in loans it had obtained to finance the purchase of fuel. PREPA further has failed to meet its obligations to fund its pension obligations and has an unfunded actuarial liability of over $3 billion. Other PREPA creditors have asserted billions of dollars in claims against it.

***Enactment of PROMESA.*** On June 30, 2016, to address the financial and fiscal crisis of the Commonwealth and its instrumentalities, the President signed PROMESA into law, 48 U.S.C. § 2101 *et seq.*, to work toward a remedy to the ongoing fiscal and humanitarian crisis in Puerto Rico. The goal of PROMESA is to meet Puerto Rico's immediate need to provide its citizens effective services, to formulate a debt restructuring, and to implement fiscal reform leading to a sustainable economy, fiscal responsibility, and market access.

***Main Components of PROMESA.*** PROMESA establishes two primary mechanisms for restoring fiscal responsibility. First, Titles I, II, IV, and V of PROMESA create the Oversight Board and provide it powers and duties governing the review and certification of multi-year fiscal plans, annual budgets, infrastructure revitalization, and fast-tracking of key infrastructure projects. Second, Titles III and VI of PROMESA provide for debt restructurings, similar to bankruptcy cases and out-of-court restructurings, respectively, for Puerto Rico and its instrumentalities.[14] By incorporating many provisions of Title 11 of the Bankruptcy Code into Title III of PROMESA, which provides for restructurings similar to restructurings under chapters 9 and 11 of the Bankruptcy Code, the statute also protects the debtors from creditor debt-enforcement actions[15] that otherwise could extract billions of dollars from the Commonwealth and inflict irreparable damage on Puerto Rico's economy. The statute includes unique attributes, such as an automatic stay triggered once the bill was signed into law. PROMESA Title VI provides an alternate, out-of-court restructuring process conditioned on voting thresholds.

***Historic Problems Leading to Oversight Board.*** To overcome decades of severe economic decline, operating deficits, lack of financial transparency, management inefficiencies, and excessive borrowing,[16] PROMESA established an independent entity within Puerto Rico's government—the Oversight Board.[17] The Oversight Board is "an entity within the territorial government," rather than a "department, agency, establishment, or instrumentality of the Federal

---

[14] 48 U.S.C. § 2161.

[15] 11 U.S.C. § 362(a) (incorporated into the Title III case by 48 U.S.C. § 2161(a)).

[16] PROMESA § 405(m)(1).

[17] 48 U.S.C. § 2121(b)(1).

Government."[18]  The Oversight Board is statutorily charged with restoring to the Commonwealth fiscal responsibility and market access.[19]  To achieve success in carrying out its statutory mission, the Oversight Board is granted authority to oversee the restructuring of the Commonwealth's and its instrumentalities' debt and to require fiscal reforms.  Elements of this authority have been challenged,[20] but have been confirmed by the Title III Court and the United States Court of Appeals for the First Circuit (the "<u>First Circuit</u>").[21]

***Oversight Board's Initial Actions to Fulfill PROMESA's Mandate.***  On August 31, 2016, President Obama appointed the seven voting members of the Oversight Board, who under PROMESA serve with no compensation, but are entitled to reimbursement of reasonable and necessary expenses incurred by reason of their service.[22]  When appointed, the Oversight Board had no staff, no office, and no data.  It commenced assembling the facilities and expertise it needed to carry out its statutory functions.  At the time, the Commonwealth had approximately $74 billion

---

[18] *Id.* § 2121(c); *see also* 48 U.S.C. § 2194(i)(2) (defining the term "Government of Puerto Rico" to include the Oversight Board for purposes of that section); 48 U.S.C. § 2127(b) (providing that the Oversight Board is funded exclusively by the territorial government of Puerto Rico).

[19] PROMESA § 101(a).

[20] The summaries of court filings in this Disclosure Statement are fully qualified by the corresponding publicly filed documents.

[21] As further described in section IV.D.4, on July 5, 2018, then-Governor Ricardo Rosselló Nevares ("<u>Governor Rosselló</u>") sued the Oversight Board, contending, among other things, that "any matters that constitute recommendations (whether or not styled as recommendations) under the Fiscal Plan that the Government has rejected or may rejected [sic] in the future (whether set forth herein or otherwise) are non-binding on the Government and do not need to be implemented by the Government."  Governor's Complaint against Oversight Board, dated July 5, 2018, Adv. Proc. No. 18-00080, ECF. No. 1 in 17-bk-3283 (D.P.R.), at ¶ 83.  By opinion and order dated August 7, 2018, the Title III Court ruled against the then-Governor on that issue, explaining:  "The power bestowed on the Oversight Board by Section 205(b)(1)(K) of PROMESA allows the Oversight Board to make binding policy choices for the Commonwealth, notwithstanding the Governor's rejection of Section 205 recommendations . . . ." *Rosselló Nevares v. Fin. Oversight & Mgmt. Bd. for P.R.*  [Adv. Proc. No. 18-00080, ECF No. 33], at 25.  On appeal brought by then-Governor Rosselló, the First Circuit affirmed the District Court decision, confirming there is nothing in PROMESA section 205 "suggesting that, by first seeking the Governor's agreement on a matter, the Board somehow loses whatever ability it otherwise had to act unilaterally on the matter," and the Oversight Board has the power to adopt "a rejected recommendation if it otherwise has the power to adopt the recommended action on its own." *Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 945 F.3d 3, 6-7 (1st Cir. 2019), *cert. denied*, 141 S. Ct. 241 (2020).  The Legislative Assembly also contested the Oversight Board's budget power.  It claimed "the Board's decision to certify its Budget over the Legislative Assembly's was an 'unlawful[] encroach[ment] upon the Legislative Assembly's exclusive legislative power under the Puerto Rico Constitution.'" *Méndez-Núñez v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 916 F.3d 98, 116 (1st Cir. 2019) (alterations in original).  The Title III Court ruled against the Legislative Assembly and the First Circuit affirmed, ruling:  "Under PROMESA's preemption provision, the grants of authority to the Board at §§ 201 and 202 to approve Fiscal Plans and Budgets 'prevail over any general or specific provisions of territory law,' including provisions of Puerto Rico's Constitution that are 'inconsistent with [PROMESA].'" *Id.* (citation omitted).  Most recently, the Title III Court confirmed the Oversight Board's authority to get court approval to nullify and render unenforceable Puerto Rico legislation that is inconsistent with the applicable certified fiscal plan.  *See Fin. Oversight & Mgmt. Bd. for P.R. v. Pierluisi Urrutia et al. (In re Fin. Oversight & Mgmt. Bd. for P.R.)* [Adv. Proc. No. 21-00072, ECF No. 78] in 17-bk-3283 (D.P.R.), at 5 (granting the Oversight Board's motion for summary judgment and authorizing the "override [of] Commonwealth executive and legislative actions that are inconsistent with certified fiscal plans and budgets . . . ." (quoting *Fin. Oversight & Mgmt. Bd. for P.R. v. Vázquez-Garced (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 403 F. Supp. 3d 1, 5 (D.P.R. 2019))).

[22] PROMESA § 101(g).

9

of funded debt, estimated pension liabilities of approximately $51.5 billion, and insufficient resources to meet those obligations. Likewise, PREPA had a then-estimated $11.4 billion in liabilities, including over $9 billion in funded debt. On September 30, 2016, the Oversight Board (i) announced a process for the development, submission, approval, and certification of fiscal plans for the Commonwealth and for covered territorial instrumentalities, (ii) designated an initial group of sixty-three (63) entities as covered entities under PROMESA,[23] including PREPA, (iii) requested a significant amount of financial and budgetary information from the Governor as a first step to develop improvements to the fiscal governance of the government of the Commonwealth (the "Government"), accountability, internal controls and financial affairs, and (iv) began the critical projects process authorized under Title V of PROMESA by developing selection criteria and processes for expediting certain critical energy and infrastructure projects. Furthermore, the Oversight Board commenced meetings with representatives of multiple groups of creditors ranging from Bondholders and Monoline Insurers, to retirees, credit line lenders, fuel suppliers, labor unions, and many others.

**Commencement of Title III Cases.**   Prior to PROMESA's enactment, PREPA had negotiated an initial restructuring support agreement (the "Prepetition RSA") with certain of its creditors, which, although neither complete nor final nor legally enforceable, was intended to culminate in an agreed restructuring. As it turned out, the Prepetition RSA contained several requirements that could not be satisfied such as the requirement that the debt issued under the PREPA restructuring plan be investment grade, which would have lower interest rates than non-investment grade debt. When PROMESA was enacted, it imposed a temporary automatic stay protecting the Commonwealth and its instrumentalities from creditor actions to enforce debt against them until May 1, 2017.[24] PROMESA also provided that agreements like the Prepetition RSA, could form the basis of a qualifying modification under Title VI of PROMESA. Ultimately, however, the parties could not come to an agreement on numerous material issues, including, but not limited to, how monoline insurers would provide required principal deferrals and the establishment of a new electric rate structure. At the same time, PREPA had failed to secure hundreds of millions of dollars in short-term liquidity that would have been necessary for the implementation of the Prepetition RSA. On June 28, 2017, the Oversight Board denied certification of the Prepetition RSA and did not grant authority to PREPA to invoke Title VI of PROMESA. On July 3, 2017, at the requests of the Governor, the Oversight Board issued a restructuring certification pursuant to PROMESA Sections 104(j) and 206 and filed a voluntary petition for relief for PREPA, pursuant to PROMESA Section 304(a), commencing this Title III Case. On October 6, 2017, the Title III Court entered an order granting the joint administration of the Title III Cases of the Commonwealth, HTA, ERS, and COFINA, and this Title III Case, for procedural purposes only [ECF No. 340].[25] The commencement of this Title III Case triggered the operation of the automatic stay in Bankruptcy Code section 362, thereby providing PREPA continued protection from enforcement actions.[26]

---

[23] On May 9, 2019, the Oversight Board also designated 78 municipalities as covered entities.

[24] PROMESA §§ 5(11), 405(b). The PROMESA stay was initially set to expire on February 15, 2017 but the Oversight Board extended the stay by 75 days as permitted under PROMESA section 405(d)(1)(B).

[25] Unless otherwise specified, references to the docket are to Case No. 17-BK-04780-LTS.

[26] PROMESA § 301(a).

*Related Restructurings*. Throughout the course of the Title III cases, the Oversight Board has led debt restructuring negotiations with the view that consensual negotiations are often better than contested resolutions. To that end, the Oversight Board and the Government negotiated with COFINA's stakeholders regarding a gating issue over whether certain sales and use taxes ("SUTs") were property of the Commonwealth or COFINA. These negotiations led to a consensual allocation of SUT revenues and ultimately the successful confirmation of a plan of adjustment for COFINA on February 5, 2019, reducing COFINA's debt from approximately $17 billion to $12 billion. With the SUT issue settled, the Commonwealth was one step closer to restructuring its debt in that it knew which SUT revenues it could use. This eliminated uncertainty over billions of dollars claimed by both the Commonwealth and COFINA.

Following resolution of this issue, the Oversight Board refocused its efforts on generating support for a framework for a plan of adjustment for the Commonwealth. In pursuit thereof, the Oversight Board engaged in mediation sessions and negotiations directed by and under the auspices of the Title III Court-appointed mediation team led by Chief Judge Barbara J. Houser of the United States Bankruptcy Court for the Northern District of Texas. These mediation sessions culminated in the execution of certain creditor plan support agreements that ultimately led to the Oversight Board filing the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [Case No. 17-bk-3283, ECF No. 19784] (the "Commonwealth Plan") and the related disclosure statement. The Commonwealth Plan was confirmed by the Title III Court on January 18, 2022 and became effective on March 15, 2022. Among other things, the Commonwealth Plan (i) resolves certain issues regarding taxes and fees collected by the Commonwealth and historically transferred to certain instrumentalities, and (ii) together with the restructuring of COFINA's debt, reduces the Commonwealth's debt by approximately sixty-two percent (62%) from $90.4 billion to $34.1 billion.

Most recently, having resolved the most significant outstanding issues among interested parties at HTA, the Oversight Board filed the *Modified Fifth Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* [Case No. 17-3567, ECF No. 1404] (the "HTA Plan") and related disclosure statement on a largely consensual basis. On October 12, 2022, the Title III Court confirmed the HTA Plan. The HTA Plan became effective on December 6, 2022.

Further, Oversight Board and Government have restructured a number of Commonwealth instrumentalities under PROMESA's Title VI. In November 2018, the Government and the Oversight Board completed a restructuring of the Government Development Bank of Puerto Rico ("GDB") pursuant to Title VI of PROMESA (the "GDB Qualifying Modification"). The GDB had more than $4 billion in legacy bond debt and approximately $8 billion in total liabilities. These claims were resolved with the issuance of $2.6 billion in new bonds under PROMESA's Title VI procedure. Those bonds are mainly secured by the cash flow from loans GDB previously made to Puerto Rico municipalities and other GDB assets. The policy goals of the Oversight Board and the Government in the GDB restructuring were to ensure that these new bonds are payable solely from legacy GDB assets, without recourse to any future general government appropriations from the Commonwealth, and to cushion the financial effect of the GDB restructuring on the many Puerto Rico municipalities who also were creditors of GDB.

11

In addition, the Oversight Board and Government have obtained court approval of two additional restructurings through qualifying modifications under Title VI of PROMESA upon agreements with the majority of bond debt creditors of (i) the Puerto Rico Infrastructure Financing Authority and (ii) the Convention Center District Authority, and are in the process of seeking approval of a Title VI restructuring for the Puerto Rico Public Finance Corporation.

*First PREPA Certified Fiscal Plan.*  Pursuant to Section 201 of PROMESA, PREPA submitted a fiscal plan to the Oversight Board on March 13, 2017, for its review and certification. The fiscal plan, among other requirements, demonstrated a method by which PREPA would achieve fiscal responsibility and access to the capital markets within the time period (not less than five years) set forth therein.  On April 28, 2017, the Oversight Board certified the first PREPA fiscal plan, subject to certain amendments proposed by the Oversight Board.[27]  The first PREPA fiscal plan required PREPA to commit to fiscal responsibility and implement urgently needed infrastructure modernization, including through public-private partnerships, as well as targeted expenditure reductions, operational and other efficiencies, and specific revenue enhancements, with the ultimate goal of returning PREPA to (i) fiscal stability, (ii) efficient and competitive energy prices through a formulaic rate structure (which structure was rejected by PREC), (iii) compliance with environmental and health standards, and (iv) being an agent of economic growth.

*The Creation of PREB and Act 17.*  On May 27, 2014, the Energy Transformation and Relief Act of Puerto Rico ("Act 57-2014") was signed into law by the Governor of Puerto Rico. Act 57-2014 aimed to make Puerto Rico's energy system more efficient and less dependent on fossil fuels by reforming PREPA's regulatory framework.  Act 57-2014 sought to accomplish this goal with the creation of the Commonwealth Energy Public Policy Office ("CEPPO"), the Puerto Rico Energy Commission ("PREC"), and the Independent Consumer Protection Office ("ICPO"). CEPPO, now the Energy Public Policy Program of the Department of Economic Development and Commerce, is tasked with developing public policy on energy, which involves identifying and evaluating alternative energy sources.  As further detailed below, PREC, now PREB, is an independent governing body responsible for regulating, supervising, and ensuring compliance with Puerto Rico's public policy on energy.  Under Act 57-2014, PREC's key role was to evaluate PREPA's Energy RELIEF Plan and Integrated Resource Plan ("IRP"), both of which are required to detail PREPA's strategies for complying with Act 57-2014.  Lastly, PREC was also responsible for reviewing and approving energy rates.  ICPO is a government agency whose primary purpose is to defend energy consumers before PREPA or PREC on matters such as, disputes related to electricity bills.

On April 11, 2019, in furtherance of the energy transformation and modernization goals established by Act 57-2014, the Puerto Rico Energy Public Policy Act ("Act 17-2019") was enacted.  In order to accomplish these goals, Act 17-2019 prohibits the continued vertically-integrated monopoly of Puerto Rico's electric system and requires the unbundling of the electric system through the transfer of operation and maintenance responsibilities of PREPA's T&D System and Generation System to private operators.

---

[27] A copy of the first PREPA fiscal plan is attached as Exhibit E to the *Statement of Oversight Board Regarding PREPA's Title III Case* [ECF No. 2].

Act 17-2019 also confirmed PREB's role as an independent, apolitical regulator and expanded its authority to (a) establish mechanisms for imposing incentives/penalties, (b) exercise a high degree of scrutiny over maintenance of the electric network, (c) require reports, and (d) use alternative mechanisms to regulate tariffs based on service costs. To ensure PREB's independence from the political influences that imperiled PREPA's operations, Act 17-2019 also delineated PREB's annual budget of $20 million and makes it clear that this budget is not subject to executive or legislative approval. In addition, PREB was mandated to transition to an employee structure with no less than seventy-five percent (75%) civil servant employees and no more than twenty-five percent (25%) trust employees.

Finally, Act 17-2019 promoted the transition of Puerto Rico's energy profile to renewable energy sources and distributed generation. It updates Puerto Rico's Renewable Portfolio Standard ("RPS"), requiring forty percent (40%) renewable energy generation by 2025, sixty percent (60%) by 2040, and one hundred percent (100%) by 2050, including by mandating the elimination of coal-fired generation by January 1, 2028. In furtherance of these goals, Act 17-2019 mandates PREPA prepare and submit to the PREB an IRP for a twenty (20)-year planning period, which shall be revised every three (3) years. Act 17-2019 defines the IRP as a resource plan that shall consider all reasonable resources, including both energy supply (*e.g.*, utility-scale generation) and energy demand (*e.g.*, energy efficiency, demand response, and distributed generation), to reliably satisfy the current and projected future needs of Puerto Rico's energy system and its customers at the lowest reasonable cost. Act 57-2014 also mandates that the IRP include evaluations of the T&D System (*e.g.*, capacity and reliability) and the environmental impact of the energy system. The current IRP was approved by PREB in August 2020 and remains active for three (3) years. The current IRP requires PREPA, LUMA Energy (defined below), and any PREPA generation successors to follow a Modified Action Plan (the "Modified Action Plan") and Modified Preferred Resource Plan (the "Modified Preferred Resource Plan") until an updated IRP is approved, with the following grid and generation modifications to form the three core elements of the approved IRP:

**Increasing share of renewable generation and storage** – including the additions of new renewable energy generation, energy storage, retiring or converting all existing coal and heavy fuel oil generation, and system modifications (*e.g.*, synchronous condensers) to enable integration of inverter-based generation;

**Enhancing grid resilience** – including capital investment in the T&D System to support greater resilience and reliability and further optimization proceedings to determine optimal T&D System investments to improve resiliency; and

**Enabling customer choice** – including changes to the system to support the incorporation of distributed generation ("DG," *e.g.*, rooftop solar photovoltaic) and recommended energy efficiency ("EE") and demand response ("DR") programs, allowing the customer to play a meaningful role in Puerto Rico's electricity grid.

***A New Landscape – Hurricanes Irma and Maria.*** In September 2017, the difficulty of improving the financial status worsened as Puerto Rico was devastated by Hurricanes Irma and Maria within a two-week span. Hurricane Maria was the strongest hurricane to hit Puerto Rico since 1932 and the fifth strongest ever to hit the United States. The hurricanes destroyed much of

Puerto Rico's infrastructure and upended the daily lives of all Puerto Ricans and the work of the Oversight Board.  In the aftermath of the hurricanes, approximately eighty percent (80%) of PREPA's energy transmission infrastructure was damaged.

Immediately after the hurricanes struck, the Oversight Board provided the Government with the flexibility to reapportion up to $1 billion in budgeted expenditures to cover disaster-related expenses.  Through several meetings, letters, Congressional testimony, and other interactions with the federal government and authorities in Puerto Rico, the Oversight Board actively advocated for the necessary resources to support Puerto Rico's recovery, critical rebuilding efforts, and necessary liquidity.

An estimated 1.5 million customers lost access to power and electricity as PREPA confronted the largest blackout in United States history.  PREPA immediately set out to restore power to Puerto Rico's residents in the face of significant obstacles including downed communication infrastructure that hampered efforts to distribute materials and coordinate repair efforts, mountainous and demolished terrains that prevented PREPA and their contractors from easily accessing damaged infrastructure, the vast scope of the work required to be done to repaid thousands of miles of transmission lines and utility poles, and more.  On August 14, 2018, after 11 months of non-stop labor to rebuild Puerto Rico's critical power generation and transmission infrastructure, PREPA announced that it had restored electricity and power access to one hundred percent (100%) of Puerto Rico's population.  While power restoration was a significant achievement, continuing to upgrade and modernize PREPA's electrical power grid remains a top priority.  As of December 6, 2021, the Federal Emergency Management Administration ("FEMA") and other federal government agencies and departments had collectively obligated almost $60 billion in recovery funds on account of the hurricanes, with approximately $18.5 billion disbursed to Puerto Rico as of the same date.  Of these amounts, approximately $12.7 billion had been obligated and approximately $1.5 billion disbursed to PREPA to help rebuild and harden Puerto Rico's electrical grid system as part of the recovery efforts from the hurricanes.

***New Fiscal Plans.***  Because the hurricanes created a new reality for Puerto Rico, the Oversight Board initiated a process for rewriting the fiscal plans for the Commonwealth and its covered instrumentalities, including PREPA.  During the nine months following Hurricanes Irma and Maria, the Oversight Board collaborated with the Government to develop new fiscal plans with the overarching goal of fulfilling PROMESA's mandates.  To do so, the fiscal plans would require a series of ambitious structural reforms and fiscal measures to restore growth and opportunity to the people and businesses of Puerto Rico.

***PREPA Postpetition Financing.***  In light of devastation wrought to the T&D System as a result of Hurricanes Irma and Maria, on January 27, 2018, the Oversight Board and AAFAF filed an urgent joint motion for PREPA to obtain postpetition financing of $1.3 billion secured by a first priming lien.  *See* ECF No. 549 ("PREPA Financing Motion").  On February 16, 2018, after the Court indicated it would reject the PREPA Financing Motion, if not modified, the Oversight Board and AAFAF filed an urgent joint application [ECF No. 722] seeking entry of a revised proposed order approving a $300 million credit facility and granting the lender a super-priority administrative expense claim.  On February 19, 2018, the Title III Court entered an order approving the revised PREPA Financing Motion [ECF No. 744] (the "PREPA Financing Order").  On March 8, 2019, PREPA repaid all of the outstanding amounts under the approved financing.

***Litigation Affecting PREPA's Debt Restructuring.***

The Receivership Motions

On July 18, 2017, certain Bondholders and Monoline Insurers filed a motion seeking to lift the automatic stay under PROMESA to pursue the appointment of a receiver in a non-Title III court [ECF No. 74] (the "Initial Receiver Motion"). On September 14, 2017, the Title III Court denied the Initial Receiver Motion because, among other things, the Title III Court considered movants' requested relief prohibited by PROMESA Section 305, which limits the jurisdiction and powers of the Title III Court over certain matters. *See* ECF No. 299 (the "District Court Receiver Opinion").

On August 8, 2018, the First Circuit reversed on one ground involving Section 305 and determined that because facts had changed due to the hurricanes, a new trial could be held on stay relief if the creditors desired it. *See Fin. Oversight & Mgmt. Bd. for P.R. v. Ad Hoc Grp. of PREPA Bondholders (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 899 F.3d 13 (1st Cir. 2018).

On October 3, 2018, certain Monoline Insurers filed a renewed motion to lift the stay to pursue the appointment of a receiver [ECF No. 975] (the "Renewed Receiver Motion"). Pursuant to several orders of the Title III Court, the briefing schedule for the Renewed Receiver Motion was extended by several months. *See* ECF Nos. 1176, 1183, and 1204.

Following the termination of the 2019 RSA and the expiration of mediation, on September 19, 2022, the Ad Hoc Group of PREPA Bondholders (the "Ad Hoc Group") and Monoline Insurers jointly filed a *Motion of the Ad Hoc Group of PREPA Bondholders, Assured Guaranty Corp., Assured Guaranty Municipal Corp., National Public Finance Guarantee Corporation, and Syncora Guarantee, Inc. to Dismiss PREPA's Title III Case, or for Relief From the Automatic Stay to Enforce Their Right to a Receiver* [ECF No. 2973] (the "Motion to Dismiss PREPA's Case"). The Motion to Dismiss PREPA's Case argues PREPA's failure to propose and confirm a plan of adjustment centered around either the Prepetition RSA or the 2019 RSA, or any other plan of adjustment, provides cause to dismiss PREPA's Title III Case or to lift the automatic stay to appoint a receiver to raise electricity rates further on Puerto Rico's residents and businesses. On September 29, 2022, the Title III Court entered the *Order (A) Granting in Part and Denying in Part Urgent Motion of Financial Oversight and Management Board for Order (I) Establishing Schedule to Continue Negotiations During Litigation of Gating Issues Pursuant to Litigation Schedule and (II) Granting Related Relief and (B) Staying Certain Motions Filed by PREPA Bondholders* [ECF No. 3013] (the "Litigation Schedule Order"). Pursuant to the Litigation Schedule Order, the Title III Court (i) ordered the Oversight Board to file a plan of adjustment for PREPA by December 1, 2022, and (ii) stayed the Motion to Dismiss PREPA's Case until the earlier of (a) the day after the deadline set by the Title III Court for filing a plan of adjustment, if such deadline is not met, and (b) the termination of the Plan confirmation process. On December 1, 2022, the Title III Court entered the *Order Concerning Mediation Team's Second Notice and Report* [ECF No. 3092], extending the Oversight Board's deadline to file a plan of adjustment for PREPA until December 8, 2022.

Fuel Line Lenders' Adversary Proceeding

On July 9, 2019, the Fuel Line Lenders filed a complaint and commenced an adversary proceeding against PREPA, the Oversight Board, AAFAF, and US Bank National Association (the "Bond Trustee"). *See* Adv. Pro. 19-00396. The complaint alleged that amounts owed to the Fuel Line Lenders pursuant to their credit agreements constituted "Current Expenses" under the Trust Agreement, dated as of January 1, 1974, by and between PREPA and First National City Bank as Bond Trustee (as the same has been amended and modified, the "Trust Agreement") governing PREPA's Bond issuances and, accordingly, was entitled to payment in full in advance of any recovery to PREPA's Bondholders. The Oversight Board is a defendant to certain, but not all, counts. The Oversight Board filed a motion to dismiss. This adversary proceeding and the grounds for the Oversight Board's motion to dismiss is discussed in more detail in section V.G.3 of this Disclosure Statement.

Pursuant to the Litigation Schedule Order, solely for statistical purposes, the Title III Court terminated (without prejudice fir statistical purposes) the motions to dismiss the complaint and continued the stay of litigation of the Fuel Line Lenders' Adversary Proceeding until "if necessary, after the security and recourse issues have been resolved or, if necessary, in connection with the plan confirmation process." Litigation Schedule Order, ¶ 3. As explained above, the Fuel Line Lenders and Oversight Board have agreed to settle the Fuel Line Lenders' claims on the terms set forth in the Plan.

***Changes in Government.*** On August 2, 2019, then-Governor Rosselló and several members of his cabinet resigned their positions on the heels of public outcry. Following his resignation and the resignation of Puerto Rico Secretary of State Luis G. Rivera Marin, then-Secretary of Justice of Puerto Rico, Wanda Vázquez Garced, would be sworn in as Governor. On November 3, 2020, alongside the rest of the country, the Commonwealth held territorial elections for Government, electing its Governor and all Senators and Representatives. The citizens of Puerto Rico elected Mr. Pedro Pierluisi of the New Progressive Party as Governor, while electing members of the Popular Democratic Party to a Senate majority and House plurality. The new Government was sworn into office effective as of January 2, 2021.

***COVID-19 Impact and Response.*** On March 11, 2020, the World Health Organization declared the Coronavirus Disease 2019 ("COVID-19") a global pandemic. As a result of the health threat and to contain the virus spread across Puerto Rico, then-Governor Vázquez-Garced issued an executive order on March 12, 2020, declaring a state of emergency in Puerto Rico, and measures to safeguard the health, well-being, and public safety of the citizens of Puerto Rico, including social and lock-down protections and curfews were put in place to contain the virus. PREPA's operations and financial performance drastically declined.

Federal and local government funds were provided to individuals, families, businesses, nonprofits, and other organizations across the United States, including Puerto Rico. As further discussed in Section V.B.4, the Government, Oversight Board, and federal government undertook a number of measures to contain and mitigate COVID-19.

As the COVID-19 pandemic evolves, ongoing evaluation will be critical to PREPA and LUMA Energy's management's ability to be prepared for unexpected changes in forecasts. An

16

assessment of PREPA's and LUMA Energy's response to the COVID-19 pandemic will inform PREPA's and LUMA Energy's emergency and contingency plans to respond to future unforeseen events better and more effectively.

*War in Ukraine and Rising Fuel Prices.*   On February 24, 2022, Russia invaded Ukraine, commencing a war that has since claimed tens of thousands of lives and continues to rage fiercely to this day.  In addition to the ongoing humanitarian crisis, the conflict has spurred an increase in energy prices and volatility that has impacted consumers worldwide.  Following Russia's invasion of Ukraine, the United States and other North American and Western European countries imposed financial sanctions to prevent Russian oil transactions from clearing through Western banks. Russian oil typically accounts for approximately ten percent (10%) of global oil supply, and its exclusion from the supply chain led to a significant decrease in supply for PREPA's primary source of fuel.  The cost of fuel used by PREPA and other generators increased by approximately thirty percent (30%) from the first to the second quarter of 2022 as a result.  On June 15, 2022, LUMA Energy filed its quarterly generation fuel cost adjustment calculations with PREB and requested a 4.1 c/kWh increase in the electricity rate for residential customers, bringing the residential electricity rate to 33.3 c/kWh, among the highest rates in the country and up from 21 c/kWh in 2019.

*Hurricane Fiona.*   On September 18, 2022, Hurricane Fiona made landfall on Puerto Rico's southwest coast, dropping upwards of thirty (30) inches of rain in some areas.  The hurricane caused catastrophic destruction in Puerto Rico, leaving it completely without power, flooding many streets and roads, and causing significant damage to PREPA's grid.[28]  PREPA, LUMA Energy, and FEMA immediately began assessing the damage caused by the hurricane, and began procedures to restart generation and restore power to PREPA's customers.

Hurricane Fiona inflicted damage to thirty percent (30%) of transmission lines, fifty percent (50%) of distribution feeders, submerged seven (7) substations and impacted generation facilities.[29]  Damage assessment remains ongoing, but LUMA Energy has estimated that the damage will exceed $1 billion. *Id.*

*Postpetition Restructuring Support Agreement.*   On July 30, 2018, the Oversight Board and AAFAF announced that they had entered into a preliminary Restructuring Support Agreement (the "Preliminary RSA") with members of the Ad Hoc Group.  The Preliminary RSA contemplated the inclusion of a variety of restructuring terms in an eventual plan of adjustment, and also contemplated the negotiation and execution of a definitive restructuring support agreement.

Following the Preliminary RSA, the Oversight Board and AAFAF continued negotiating with the Ad Hoc Group regarding the terms of a definitive Restructuring Support Agreement. Ultimately, Assured joined the negotiations.  On May 3, 2019, these efforts culminated in the

---

[28] Nicole Acevedo, Marlene Lenthang & Tim Stelloh, *Puerto Rico Reels From Fiona as Hurricane Plows Into Dominican Republic*, NBC News (Sept. 19, 2022), https://www.nbcnews.com/news/latino/puerto-rico-reels-fiona-13m-power-deluge-flash-floods-rcna48309.

[29] Nicole Acevedo, *Lawmakers Question LUMA Energy's Ability to Improve Puerto Rico's Fragile Power Grid*, NBC News (Oct. 5, 2022), https://www.nbcnews.com/news/latino/lawmakers-question-luma-energys-ability-improve-puerto-ricos-fragile-p-rcna50896.

execution of a definitive Restructuring Support Agreement ("2019 RSA"), which provided for the resolution of the claims and entitlements of the Ad Hoc Group, Assured, and other holders of uninsured PREPA bonds that join the 2019 RSA. Among other things, the 2019 RSA provided that the bondholders who are party to the 2019 RSA would support a plan of adjustment for PREPA, providing them with a certain level of economic recovery. On September 9, 2019, the parties to the RSA agreed to amend the 2019 RSA to provide for the joinder of Syncora and National.

The 2019 RSA would have provided parties to the 2019 RSA with Tranche A securitization bonds at an exchange ratio of 67.5% and contingent Tranche B securitization bonds at an exchange ratio of 10%. Parties settling their claims under the 2019 RSA would have also received certain waiver and support fees and would have accrued interest on the bonds to be issued under the 2019 RSA during the Title III case.

The 2019 RSA contemplated legislation to implement the restructuring transactions. The full benefits of the 2019 RSA required that the Legislative Assembly pass laws authorizing issuance of the bonds by the securitization vehicle contemplated by the 2019 RSA, levying a fixed transition charge to secure those bonds, and approving demand protections and other components of the securitization structure.

The 2019 RSA required the Oversight Board within ten (10) business days of execution to file a motion and proposed order for the Court to approve certain settlements embodied in the 2019 RSA. On May 10, 2019, the Oversight Board and AAFAF filed a motion under Bankruptcy Rule 9019 (the "9019 Motion") seeking approval of certain of the settlements and compromises embodied in the 2019 RSA. The 2019 RSA, Section 9(d)(iii), also provided the Oversight Board and Government termination rights in various circumstances, including if the order granting the 9019 Motion had not been entered by September 30, 2019. That deadline was not met, and the Oversight Board declined to waive the default.

Parties-in-interest in PREPA's Title III case engaged in significant discovery and litigation for several months over approval of the 9019 Motion. The Oversight Board and AAFAF Parties began the necessary legislative process for approval of the transactions contemplated under the RSA; however, in December 2019, the Government Parties sought to adjourn the 9019 Motion's hearing and related deadlines to provide "sufficient time to conclude the legislative process necessary to obtain approval of certain aspects of the [PREPA] RSA." [ECF No. 1844]. No parties objected to this extension.

After subsequent extensions for other reasons, including a series of earthquakes that affected PREPA's operations, and the onset of the COVID-19 pandemic, in April 2020, the Court stayed the deadlines applicable to the 9019 Motion and ordered the Government Parties to submit a subsequent status report. Order, ECF No. 1954. The 9019 Motion was further adjourned from time to time.

Since the decision to enter into the 2019 RSA, significant changes in the political, legal, and economic landscape rendered the 2019 RSA too costly for PREPA and its customers and too difficult or impossible to implement. First, the Oversight Board's support of the 2019 RSA was largely predicated on key structural benefits to be effectuated through legislation. These unique

and unprecedented benefits included, among other things, (i) a non-default securitization structure that reduced the risk of PREPA reentering Title III, (ii) the establishment of a fixed, predictable, long-term transition charge to fund the debt contemplated by the RSA that would not be subject to regulatory approval or modification, and (iii) "demand protections" that would slow the loss of PREPA's revenue (and its economic survival) due to residents transitioning to solar energy. Shifting control and party dynamics in the Legislative Assembly, however, made it all but certain the needed legislation would not be obtained, thus compromising the ability to achieve structural benefits that made the 2019 RSA attractive. Meanwhile, PREB prevented PREPA from passing the full amount of its fuel costs on to ratepayers, causing PREPA to operate at a substantial deficit.

The global COVID-19 pandemic, rising fuel prices, the rapid penetration and availability of solar energy, and rising inflation have left Puerto Rico and PREPA with a different economic reality than existed in 2019. PREPA is highly dependent on fossil fuels for its electricity generation, and the recent rapid rise in oil prices raised the average residential electricity price in Puerto Rico from ~21c/kwh in 2019 to ~33 c/kwh in 2022.[30]

On March 8, 2022, because of concerns regarding lack of implementing legislation and a comprehensive settlement of PREPA's legacy obligations, along with concerns regarding the affordability of the cost of electricity and the sustainability of the electric system as a result of rising inflation and significant surges in the price of crude oil to $119.65 per barrel, AAFAF exercised its unilateral right to terminate the 2019 RSA. [ECF No. 2747]. Pursuant to 2019 RSA Section 9(d)(vii), AAFAF's termination constitutes a Stipulated Treatment Termination (as defined in the 2019 RSA), rendering the 2019 RSA void and of no further force or effect as to all parties, except for those provisions that expressly survived termination.

Over a period of years, the UCC requested permission from the Title III Court to object to the Bond claims on the ground they are non-recourse claims and are only allowable against certain funds holding approximately $16 million. Ultimately, the Oversight Board amended its complaint challenging the Bondholders assertion of a security interest in all PREPA's future revenues to include an objection to the allowance of the Bondholders' recourse claim. That complaint is pending and the parties have filed dueling summary judgment motions to resolve it.

***Mediation and Path Forward Motion***. In February 2022, frustrated by the delayed implementation of the 2019 RSA, the Ad Hoc Group and certain monoline insurers filed a motion seeking the appointment of a mediator to negotiate an alternative structure that can be implemented without legislative support. [ECF No. 2718].

On April 8, 2022, the Title III Court entered an order [ECF No. 2772] (the "Appointment Order") appointing the Mediation Team. The Appointment Order designated the Oversight Board, AAFAF, the Ad Hoc Group, the Monoline Insurers, Unión de Trabajadores de la Industria Eléctrica y Riego, Inc. ("UTIER"), PREPA ERS, the UCC, and Fuel Line Lenders as mediation

---

[30] Certain creditors assert that Puerto Rico is actually better off today. They contend that Puerto Rico has "record low unemployment rates; strong manufacturing, retail, and tourism activity; tax collections significantly exceeding forecasts; more than $84 billion in emergency relief and redevelopment funds committed to Puerto Rico through 2035; and LUMA Energy assuming control of the T&D System.

parties (collectively, the "Mediation Parties"). Concurrently with the Appointment Order, the Title III Court entered an order establishing certain terms and conditions to govern mediation, including an initial mediation termination date of June 1, 2022. [ECF No. 2773] (the "Terms and Conditions Order"). Mediation continued until September 15, 2022 when the Mediation Team declined to further extend the mediation period. On September 29, 2022, the Title III Court entered an order calling for PREPA and the relevant parties to continue mediation while litigation of the Amended Lien & Recourse Challenge went forward, and the mediation has been extended by the Title III Court until April 28, 2023.

***Transformation of PREPA's Transmission and Distribution System.***

The Government of Puerto Rico and the Oversight Board have long been aligned in their determination that a complete transformation of PREPA—including the dealignment of the assets associated with the generation of electricity on Puerto Rico (the "Generation Assets") and the T&D System—by leveraging the expertise and cost efficiencies of the private sector, is required to bring safe, reliable, and modern T&D System services to PREPA's customers to move Puerto Rico's electric system and economy forward. On June 21, 2018, the Government enacted Act 120-2018 ("Act 120"), also known as the Puerto Rico Electric Power System Transformation Act ("Transformation Act"). Act 120 authorizes the legal framework required for the sale, disposition, and/or transfer of the assets, operations, functions, and services of PREPA, including a transaction under which operations of the T&D System would be assumed by a private manager with ownership remaining at PREPA.

Act 120 designates the Puerto Rico Public-Private Partnerships Authority (the "P3 Authority") as the government entity responsible for the functions, services, or facilities for which public-private partnerships in the electric sector would be established. The P3 Authority established the Partnership Committee in accordance with Act 120 to evaluate and select qualified bidders and to negotiate the terms and conditions of any public-private partnerships in the electric sector.

On June 5, 2018, the P3 Authority launched a procurement process under applicable law to award a long-term contract to a qualified operation and maintenance service provider for the T&D System. Bidders performed due diligence and evaluated the opportunity to serve as Puerto Rico's T&D System operator. The Partnership Committee evaluated the bids received in accordance with the legal requirements, including the comprehensive energy policy enacted in Act 17-2019. On October 31, 2018, the P3 Authority issued a request for qualification ("RFQ") from interested entities, following which four experienced and reputable respondents were selected as qualified respondents to participate in the next stage of the process. Ultimately, on January 11, 2020—based on their experience and capacity to manage large federally-funded projects and the associated project management capacity needed to execute important reconstruction work on Puerto Rico's T&D System—the Partnership Committee selected LUMA as the preferred proponent to engage in exclusive discussions and negotiations with the P3 Authority pursuant to Act 120.

On June 22, 2020, the T&D Contract[31] was executed following requisite approvals.  Under the T&D Contract PREPA continues to own the assets of its T&D System, and LUMA Energy acts as PREPA's agent in operating and maintaining the T&D System in accordance with the T&D Contract and the Supplemental Agreement.  LUMA Energy does not manage PREPA's energy generation system, which is subject to its own separate transformation process.  The T&D Contract has a term of 15 years from Service Commencement, during which time LUMA Energy will continue to provide the O&M Services.

On June 1, 2021, LUMA Energy completed the Front-End Transition Period, Interim Service Commencement occurred, and LUMA Energy officially assumed control of the T&D System, pursuant to the terms of the Supplemental Agreement.  [ECF No. 2503].  Since then, LUMA Energy has been responsible for the management, operation, maintenance, repair, restoration, and replacement and other related services for the T&D System, including electric transmission, distribution and load serving, long-term planning, dispatch, asset management, community and media relations, public and employee safety, billing and collection, reporting and record keeping, finance and accounting, emergency response, and customer service (collectively, the "O&M Services").

In the first year since assuming management of the T&D System following the conclusion of the Front End Transition Period, LUMA Energy has accomplished significant gains in all aspects of management, including (a) Customer Service (LUMA Energy reopened all twenty-five (25) customer service centers and answered over 2.5 million calls from 2 million customers, with an average call wait time of less than one minute); (b) Safety and Training (85% reduction in the injury severity rate, and sixty-eight percent (68%) reduction in the Total Recordable Injury Rate, with no recorded serious injuries and over 100,000 hours of mentorship and safety training accomplished); (c) Federally Funded Projects (launched a $1 billion community streetlight initiative with FEMA approval, as well as FEMA funding approval for an additional ten (10) projects representing $94 million in federal funding, and commencing the modernization of three hundred (300) substations); (d) System Reliability and Resiliency (over 3,000 broken and failing transmission poles, and a thirty percent (30%) reduction in customer outages); (e) Sustainable Energy Transformation (connected over 25,000 customers to net metering and distributed generation systems); and (f) Emergency Preparedness (trained over 1,000 field workers in emergency response and maintained $130 million in on-hand inventory of transmission and distribution material).

Despite these successful steps towards a safe, reliable, and affordable energy service, there remains immense progress that is required before PREPA can be the utility the people of Puerto

---

[31] The T&D Contract shall refer to the *Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement*, *dated as of June 22, 2020, by and among the Puerto Rico Electric Power Authority, as Owner, the Puerto Rico Public-Private Partnerships Authority, as Administrator, LUMA, LCC as Management Co, and LUMA Servco, LLC as ServCo*, as supplemented and amended.  A copy of the T&D Contract can be found on PREPA's docket at ECF No. 2053-4.  As part of the approval of the T&D Contract, a Supplemental Agreement (the "Supplemental Agreement") was approved to provide for the commencement of the T&D Services if Service Commencement Date Conditions are satisfied or waived other than PREPA's exit from Title III and delivery of a certain tax opinion and reliance letter (the "Interim Service Commencement Date").  The Supplemental Agreement provided that it shall be a Service Commencement Date Condition that the Title III Exit shall have occurred and that the Title III Plan and order of the Title III Court confirming same shall be reasonably acceptable to Operator.  See Exhibit A to T&D Contract.

Rico deserve.  Among other things, the impact of Hurricane Fiona demonstrates the need for further hardening of the T&D System to ensure future storms do not leave Puerto Rico without power again.

On November 30, 2022, the P3 Authority voted to extend the Interim Period under the Supplemental Agreement, which extension was approved that same day by the Oversight Board and on November 30, 2022, by the PREPA governing board and the Commonwealth government, thus avoiding the potential termination of the T&D Contract on account of PREPA's failure to exit from Title III with a confirmed plan within eighteen (18) months of the conclusion of the Front End Transition Period.  LUMA Energy maintains the ability to terminate the T&D Contract should a receiver be appointed over PREPA's assets or should the Title III Case be dismissed.  The Puerto Rico Legislature, as well as the two public interest representatives within the P3 Authority board of directors (the "P3 Authority Board"), have expressed their intent to challenge the legality and effectiveness of the extension of the T&D Contract by the P3 Authority on various grounds, including, but not limited to, assertions that the extension violates applicable Commonwealth law because it (1) was not approved in legislation, and (2) failed to receive the necessary affirmative vote of each of the public interest representatives of the P3 Authority Board.  The Oversight Board disputes both assertions.

### *Transformation of PREPA's Generation System*

Just as with the T&D System, pursuant to Act 120, the P3 Authority is the government entity responsible for the functions, services, or facilities for which public-private partnerships in the electric sector would be established, including the transformation of PREPA's Generation Assets.  The P3 Authority established the Partnership Committee in accordance with Act 120 to evaluate and select qualified bidders and to negotiate the terms and conditions of any public-private partnerships in the electric sector.

On August 10, 2020, the P3 Authority issued a Request for Qualification for companies or consortia interested in managing, operating, maintaining, asset managing and decommissioning, as applicable, one or more of the Generation Assets.  The objectives of the transformation of the Generation Assets included (a) introducing private sector operation expertise, (b) increasing the safety, reliability, resiliency, power quality, and efficiency of the Generation Asset operations, (c) facilitating Puerto Rico's transition to PREPA's "Vision for the Future of Power in Puerto Rico," as described in the proposed 2019 IRP, (d) implementing operational excellence of electricity generation facilities consistent with prudent industry practices, including improved safety and compliance with environmental and other applicable regulatory requirements, and (e) increasing cost efficiency while achieving the aforementioned operational objective in coordination with the operator of the T&D System.

On November 10, 2020, the P3 Authority qualified eight proponents and issued Requests for Proposals from such qualified respondents.  On January 15, 2023, the board of directors of the P3 Authority unanimously approved an operations and maintenance agreement for the private administration of the Generation Assets. On January 19, 2023, the agreement was approved by PREPA's governing board in a 4 to 1 vote.  Following these approvals, the Oversight Board, and Governor of Puerto Rico also approved the Legacy Generation Asset O&M Agreement.  For more information regarding the Generation Transaction see section III.F.5 of this Disclosure Statement.

In addition to the transformation of the Generation Assets, there are four concurrent solicitations from P3 Authority for PREPA related to its hydroelectric power plants, flexible distribution generation peaking units, new generation capacity at PREPA's Palo Seco site, and energy storage systems.

## II.    Introduction

THE FOLLOWING SUMMARY HIGHLIGHTS CERTAIN OF THE SUBSTANTIVE PROVISIONS OF THE PLAN, AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OR A SUBSTITUTE FOR A FULL AND COMPLETE REVIEW OF THE PLAN.  THE SUMMARY BELOW IS QUALIFIED IN ITS ENTIRETY BY THE TERMS OF THE PLAN.

THE DEBTOR URGES ALL HOLDERS OF CLAIMS TO CAREFULLY READ AND STUDY THE PLAN IN CONSIDERING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS UNDERLINE EXHIBIT A.

*Commencement of Title III Case.*  On July 2, 2017 (the "Petition Date"), the Oversight Board issued a restructuring certification for PREPA pursuant to PROMESA Sections 104(j) and 206 and filed a voluntary petition for relief for PREPA pursuant to PROMESA Section 304(a) with the Title III Court, commencing a case under Title III of PROMESA (the "Title III Case"). Pursuant to PROMESA Section 315, the Oversight Board is the sole representative of the Debtor[32] in its Title III Case.

*Certification of Plan of Adjustment.*   On January 26, 2023, pursuant to PROMESA Section 104(j), the Oversight Board certified the submission of the first amended plan of adjustment for PREPA.  On February 8, 2023, PREPA filed (a) the *First Amended Title III Plan of Adjustment of the Puerto Rico Electric Power Authority* [ECF No.     ], and (b) the disclosure statement related thereto [ECF No.        ].

*Disclosure Statement Approval and Confirmation Date.*  On [_____], the Title III Court entered the Disclosure Statement Order approving the Disclosure Statement (the "Disclosure Statement Order").  **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE TITLE III COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.  THE TITLE III COURT WILL CONSIDER CONFIRMATION OF THE PLAN AT THE CONFIRMATION HEARING SCHEDULED FOR [_____, 2023]** (the "Confirmation Hearing").

The Confirmation Hearing may be adjourned or continued from time to time.  Therefore, parties in interest should check the online docket at https://cases.ra.kroll.com/puertorico to confirm the latest scheduled date and time of the Confirmation Hearing.

The Title III Court has set the following schedule in connection with the confirmation proceedings:

- **February 28, 2023:** Hearing to consider the adequacy of the information contained in the Disclosure Statement;
- **_____, 2023:** Commencement of confirmation discovery;
- **_____, 2023:** Deadline to mail approved solicitation package;

---

[32] The Oversight Board, in its capacity as representative of PREPA, is referred to as the "Debtor."

- **_____, 2023 through _____, 2023:** Deadline to file objections to confirmation of the plan and confirmation discovery;
- **_____, 2023:** Plan confirmation pretrial hearing;
- **_____, 2023:** Voting and election deadline; and
- **_____, 2023:** Confirmation hearing.

PREPA is furnishing this Disclosure Statement as the proponent of the Plan pursuant to Bankruptcy Code section 1125 and in connection with the solicitation of votes to accept or reject, and elections to settle certain claims pursuant to (if applicable), the Plan, as it may be amended or supplemented from time to time in accordance with PROMESA Title III and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), as made applicable to Title III pursuant to PROMESA Section 310.

This Disclosure Statement provides the information required by Bankruptcy Code section 1125 and summarizes the Plan, the Debtor's operations, its financial condition, including financial projections, as well as other related matters, including the treatment of holders of Claims against the Debtor.  This Disclosure Statement also describes certain potential federal and Puerto Rico income tax consequences to holders of Claims, voting and settlement election procedures, and the confirmation process.  To the extent any inconsistencies exist between this Disclosure Statement and the Plan, the terms and provisions of the Plan will govern.

*Ballot and Election Forms.*  A ballot for the acceptance or rejection of the Plan (a "Ballot") and/or a notice of election pursuant to the Plan (an "Election Notice"), if applicable, is enclosed with the copy of this Disclosure Statement distributed to the holders of Claims in the Classes entitled to vote to accept or reject the Plan, elect to settle certain claims pursuant to the Plan, and/or elect the form of distributions pursuant to the Plan.  The Ballot includes information regarding the voting deadlines and detailed instructions for voting to accept or reject the Plan.  The Election Notice, if any, includes information regarding the election deadline and detailed instructions for making an election to settle certain claims and/or to elect the form of distributions pursuant to the Plan.  Before voting and/or making the applicable election, each holder of a Claim entitled to vote and/or make an election should read this Disclosure Statement (including the exhibits and documents incorporated by reference herein) and the instructions accompanying the Ballot and Election Notice.  These documents contain, among other things, important information concerning the classification of Claims for voting and tabulation of votes.  No solicitation of votes on the Plan may be made except pursuant to this Disclosure Statement, as it may be amended, the Disclosure Statement Order, and Bankruptcy Code section 1125.

*Exhibits to Disclosure Statement.*  This Disclosure Statement includes the following exhibits and supplements:

- **Exhibit A** – Title III Plan of Adjustment of the Puerto Rico Electric Power Authority

- **Exhibit B** – Settlement Agreement and Release, dated as of August 26, 2022, by and among (i) the Financial Oversight and Management Board for Puerto Rico, as Title III representative of PREPA, and (ii) Vitol

- **Exhibit C** – Release and Settlement Agreement, dated as of February 11, 2022, by and among (i) Whitefish Energy Holdings, LLC, (ii) PREPA, and (iii), the Financial Oversight and Management Board for Puerto Rico, as Title III representative of PREPA

- **Exhibit D** – Load Forecast and Illustrative Cash Flow for New Bonds

- **Exhibit E** – Certified PREPA Fiscal Plan

- **Exhibit F** – Certified PREPA Budget

- **Exhibit G** – Summary of Pension Reform

- **Exhibit H** – Schedule of PREPA Bonds

- **Exhibit I** – List of PREPA's Bank Accounts, Balances, and Preliminary Restriction Categorizations as of November 1, 2022

- **Exhibit J** – Latest Audited Financial Statements for the Debtor

- **Exhibit K** – Best Interests Test Report

- **Exhibit L** – Actions to be Transferred to Avoidance Actions Trust

- **Exhibit M** – Fuel Line Lender PSA

- **Exhibit N** – National PSA

- **Exhibit O** – Estimation of General Unsecured Claims Pool

- **Exhibit P** – Legacy Charge Derivation

- **Exhibit Q** – Analysis of Savings of CBA Modifications

A.    **PROMESA Title III Plan of Adjustment: An Overview**

Confirmation of a Title III plan of adjustment by the Title III Court binds the debtor, any issuer of securities under the plan of adjustment, any person acquiring property under the plan of adjustment, and any creditor of the debtor.  Except as provided in PROMESA, the plan of adjustment or the confirmation order, confirmation of a plan of adjustment discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the applicable obligations specified in the confirmed plan of adjustment.

The Title III Court will confirm a plan of adjustment if it satisfies both PROMESA Section 314(b) and the incorporated subsections of Bankruptcy Code section 1129, which are further discussed in Section VII.C of this Disclosure Statement.  Among other things, PROMESA Section 314(b) requires that (i) the plan of adjustment comply with the provisions of PROMESA and the incorporated provisions of the Bankruptcy Code, (ii) all the non-preempted legislative, regulatory, or electoral approvals necessary to carry out any provision of the plan of adjustment shall have

been obtained, or such provision is conditioned upon such approval, (iii) the plan of adjustment is feasible and in the best interests of creditors, and (iv) the plan of adjustment is consistent with the applicable fiscal plan certified by the Oversight Board under PROMESA Title II.

While the Debtor believes all classes of Claims entitled to vote should vote to accept the Plan, the Plan may be confirmed without acceptance by all classes. Bankruptcy Code section 1129(b)(1) provides that, if all the applicable requirements of section 1129(a) (including the requirement that at least one impaired class accepts the plan of adjustment) other than acceptance by all classes (as provided in section 1129(a)(8)) are met with respect to a plan of adjustment, the Title III Court, on request of the proponents, shall confirm the plan of adjustment if it does not discriminate unfairly and is fair and equitable with respect to each class of claims that is impaired under and has not accepted the plan of adjustment.

B.     **Summary of Key Components of the Plan of Adjustment**

Except for Administrative Expense Claims and Professional Claims, which are not classified and do not vote on the Plan, all Claims are divided into classes under the Plan. Under the Bankruptcy Code, a plan may place a claim in a particular class only if such claim is substantially similar to the other claims of such class. Under Section 301(e) of PROMESA, in determining whether claims are "substantially similar" to one another, the Oversight Board shall consider whether such claims are secured and whether such claims have priority over other claims. The following table shows the classes of claims against the Debtor, the approximate estimated claim amount, and the approximate percentage return or range of percentage returns proposed to be paid to the holders of claims in each class.

The amount a creditor may actually recover and the form of consideration a creditor may receive are dependent upon, among other things, the percent of Bondholders and Monoline Insurers that elect to settle their Bond Claims and the outcome of the Amended Lien & Recourse Challenge, as described in Section I of this Disclosure Statement. The amount a creditor may actually recover could vary materially from the summary below.

| Claim | Class | Estimated Claim Amount | Approx. Recovery (%) | Form of Consideration |
|---|---|---|---|---|
| Settling Bondholder and Settling Monoline Claims | Class 1 | [Unknown][33] | 50.00–100.00% if Oversight Board wins recourse and lien counts<br>50.00% if Oversight Board loses lien counts but wins recourse counts, or loses both | Pro rata shares of: Cash deposited in Sinking Fund, Series B Bonds, CVI |

---

[33] The Allowed amount of Settling Bondholder and Settling Monoline Claims will be determined following the Settlement Offer Deadline.

| Claim | Class | Estimated Claim Amount | Approx. Recovery (%) | Form of Consideration |
|---|---|---|---|---|
| Non-Settling Bondholder and Non-Settling Monoline Claims | Class 2 | [Unknown][34] | 0.21-0.84% if Oversight Board wins lien and recourse counts 39.22-46.52% if Oversight Board wins lien counts but loses recourse counts 51.52-56.08% if Oversight Board loses both lien and recourse counts [35] | Pro rata shares of: (i) Cash deposited in Sinking Fund, (ii) Series B Bonds, (i) if there is a Deficiency Claim, General Unsecured Claim Recovery, and/or (ii) if Class 2 votes to accept the Plan and PREPA Revenue Bonds are recourse solely to the Sinking Fund, CVI |
| Pension Claim | Class 3 | [TBD] | [TBD]% | Cash, Series B Bonds |
| Fuel Line Loan Claims | Class 4 | $700,887,093.58 | 84.00–100.00% | Series A Bonds, additional Series A Bonds or Cash, Remaining New Bonds |
| National Insured Bond Claims | Class 5 | $836,145,928.13 | 71.65% | Series B Bonds |
| National Reimbursement Claim | Class 6 | [TBD] | 20.00% | Series B Bonds |
| General Unsecured Claims | Class 7 | $800,000,000 | 0.10–100.00% | General Unsecured Claim Recovery[36] |
| Vitol Claim | Class 8 | $41,457,382.88 | 0.05–50.00% | General Unsecured Claim Recovery |
| Assured Insured Interest Rate Swap Claims | Class 9 | [TBD] | **If Class 9 settles:** 50.00–100.00% | Treatment provided to Class 1 |
| | | | **If Class 9 does not settle:** 0.21–55.63% | Treatment provided to Class 2 |
| Ordinary Course Customer Claims | Class 10 | $235,309 | 100.00% | Cash |

[34] The Allowed amount of Non-Settling Bondholder and Non-Settling Monoline Claims will be determined following the Settlement Class Deadline and the Amended Lien & Recourse Challenge Final Resolution.

[35] Non-Settling Bondholder recoveries reach 100% if (i) the Non-Settling Bondholders win the Lien Counts and Recourse Counts of the Amended Lien & Recourse Challenge and (ii) the percentage of Settling Bondholders exceeds 97.19%. Certain bondholders have argued the Title III Court must consider whether PREPA can issue more than the $5.68 billion under the Plan. If these creditors prevail on their argument, recoveries for Non-Settling Bondholders could exceed those provided in the chart.

[36] The General Unsecured Claim Recovery is payable from the GUC Trust Assets, which are comprised of (a) the Avoidance Action Proceeds, (b) the GUC New Bonds, if any, and (c) the GUC CVI.

| Claim | Class | Estimated Claim Amount | Approx. Recovery (%) | Form of Consideration |
|---|---|---|---|---|
| Eminent Domain/Inverse Condemnation Claims | Class 11 | $2,437,556 | **If payment in full is required:** 100.00%[37] | Cash |
| | | | **If Claims are dischargeable:** 0.10–100.00% | General Unsecured Claim Recovery |
| Federal Claims | Class 12 | $16,859,577 | **If payment in full is required pursuant to PROMESA Section 304(h):** 100.00%[38] | Treatment required by PROMESA Section 304(h) |
| | | | **If payment in full is not required:** 0.10–100.00% | General Unsecured Claim Recovery |
| Convenience Claims | Class 13 | Unknown | 100.00%[39] | Cash |
| Section 510(b) Subordinated Claims | Class 14 | Unknown | 0.00% | N/A |

Below is a chart setting forth in detail the potential recoveries to Settling Bondholders and Settling Monolines, Non-Settling Bondholders and Non-Settling Monolines, Fuel Line Lenders, National, holders of General Unsecured Claims, and Vitol based on different outcomes with respect to the amount of Settling Bondholders and Settling Monolines, and the Amended Lien and Recourse Challenge. The chart also illustrates the number of excess New Bonds that may remain after all allowable claims have been paid in full. At Reorganized PREPA's discretion, such bonds either would be deemed to have not been issued by Reorganized PREPA, or would be issued and distributed to the PREPA or the PREPA PayGo Trust.

*[Chart Begins on Following Page]*

---

[37] If the Confirmation Order and the Commonwealth Confirmation Order provide that Allowed Eminent Domain/Inverse Condemnation Claims must be paid in full, holders of such Claims will receive a 100% recovery. If, however, there is a ruling in favor of the Oversight Board's appeal of the Commonwealth Confirmation Order relating to the non-dischargeability of Eminent Domain/Inverse Condemnation Claims against the Commonwealth, holders of such Claims will receive their Pro Rata Share of the General Unsecured Claim Recovery.

[38] If a Federal Claim is required to be paid in full pursuant to section 304(h) of PROMESA, the holder of such claim will receive a 100% recovery. Otherwise, the holder will receive its Pro Rata Share of the General Unsecured Claim Recovery.

[39] If Convenience Claims exceed the Convenience Cap of $1,000,000.00, holders of Allowed Convenience Claims shall receive their Pro Rata Share of the Convenience Cap.

## PREPA Plan of Adjustment Illustrative Recoveries[1]

| | FOMB wins on Lien Counts and Recourse Counts | | FOMB wins on Lien Counts and Loses on Recourse Counts | | FOMB loses on Lien Counts[2] and Recourse Counts | |
|---|---|---|---|---|---|---|
| **0% Bonds Settle** | Settling Bonds | N/A | Settling Bonds | N/A | Settling Bonds | N/A |
| | Non-Settling Bonds | 0.21% | Non-Settling Bonds | 46.52% | Non-Settling Bonds | 51.52% |
| | National[3] | 71.65% | National | 71.65% | National | 71.65% |
| | FLLs[3] | 100.00% | FLLs | 84.00% | FLLs | 84.00% |
| | GUCs | 100.00% | GUCs | 46.52% | GUCs* | 0.10%+ |
| | Vitol | 50.00% | Vitol | 23.26% | Vitol* | 0.05%+ |
| | PREPA ERS | $705m | PREPA ERS | $0 | PREPA ERS | $0 |
| | Excess New Bonds | $2.29b | Excess New Bonds | $0 | Excess New Bonds | $0 |
| **25% Bonds Settle** | Settling Bonds | 100% | Settling Bonds | 50.00% | Settling Bonds | 50.00% |
| | Non-Settling Bonds | 0.28% | Non-Settling Bonds | 45.51% | Non-Settling Bonds | 52.03% |
| | National | 71.65% | National | 71.65% | National | 71.65% |
| | FLLs | 100.00% | FLLs | 84.00% | FLLs | 84.00% |
| | GUCs | 100.00% | GUCs | 45.51% | GUCs* | 0.10%+ |
| | Vitol | 50.00% | Vitol | 22.75% | Vitol* | 0.05%+ |
| | PREPA ERS | $514m | PREPA ERS | $0 | PREPA ERS | $0 |
| | Excess New Bonds | $579.1m | Excess New Bonds | $0 | Excess New Bonds | $0 |
| **50% Bonds Settle** | Settling Bonds | 70.16% | Settling Bonds | 50.00% | Settling Bonds | 50.00% |
| | Non-Settling Bonds | 0.42% | Non-Settling Bonds | 43.66% | Non-Settling Bonds | 52.81% |
| | National | 71.65% | National | 71.65% | National | 71.65% |
| | FLLs | 100.00% | FLLs | 84.00% | FLLs | 84.00% |
| | GUCs | 100.00% | GUCs | 43.66% | GUCs* | 0.10% |
| | Vitol | 50.00% | Vitol | 21.83% | Vitol* | 0.05% |
| | PREPA ERS | $323m | PREPA ERS | $0 | PREPA ERS | $0 |
| | Excess New Bonds | $0 | Excess New Bonds | $0 | Excess New Bonds | $0 |
| **75% Bonds Settle** | Settling Bonds | 56.34% | Settling Bonds | 50.00% | Settling Bonds | 50.00% |
| | Non-Settling Bonds | 0.84% | Non-Settling Bonds | 39.22% | Non-Settling Bonds | 56.08% |
| | National | 71.65% | National | 71.65% | National | 71.65% |
| | FLLs | 89.07% | FLLs | 84.00% | FLLs | 84.00% |
| | GUCs | 65.84% | GUCs | 39.22% | GUCs | 0.10%+ |

| | | | FOMB wins on Lien Counts and Recourse Counts | | FOMB wins on Lien Counts and Loses on Recourse Counts | | FOMB loses on Lien Counts[2] and Recourse Counts | |
|---|---|---|---|---|---|---|---|---|
| | Vitol | | 32.92% | Vitol | | 19.61% | Vitol | | 0.05%+ |
| | PREPA ERS | | $132m | PREPA ERS | | $0 | PREPA ERS | | $0 |
| | Excess New Bonds | | $0 | Excess New Bonds | | $0 | Excess New Bonds | | $0 |
| **100% Bonds Settle** | Settling Bonds | | 50.00% | Settling Bonds | | N/A | Settling Bonds | | N/A |
| | Non-Settling Bonds | | N/A | Non-Settling Bonds | | N/A | Non-Settling Bonds | | N/A |
| | National | | 71.65% | | | | | | |
| | FLLs | | 84.00% | FLLs | | N/A | FLLs | | N/A |
| | GUCs | | 14.14% | GUCs | | N/A | GUCs | | N/A |
| | Vitol | | 7.07% | Vitol | | N/A | Vitol | | N/A |
| | PREPA ERS | | $0m | PREPA ERS | | N/A | PREPA ERS | | N/A |
| | Excess New Bonds | | $0 | Excess New Bonds | | N/A | Excess New Bonds | | N/A |

\* Non-zero recovery to recipients of GUC Trust proceeds to reflect recoveries on account of avoidance action proceeds.

1 The numbers in this exhibit are for illustrative purposes. Neither the Oversight Board, PREPA, nor their respective advisors make any representations regarding the accuracy of these figures, which are subject in all respects to the terms of the Plan. Claimholders should consult their own advisors regarding potential recoveries. The above numbers are based on cash flow projected on the New Bonds and other consideration under the plan and do not account for whether the instruments will trade at their par value. Since no cash flow is currently projected under the CVI, recoveries on account of CVI distributions is not included.

2 Certain bondholders have asserted that, if they prevail on the Lien Counts in the Amended Lien & Recourse Challenge, their collateral would be worth more than what is provided to them under the Plan. The Oversight Board disputes that contention. Accordingly, for purposes of this illustration only, it is assumed that Bondholders' collateral if they prevail on the Lien Counts would be valued to be the same as the remaining Series B Bonds available for distribution.

3 In all scenarios reflected in the chart, National will also receive $97,943,887.64 in consummation and structuring costs, as well as receiving additional recoveries on its reimbursement claim per the terms of the National PSA, while the Fuel Line Lenders will receive $61,324,709 in consummations costs, professional fees, and interest accrual per the terms of the Fuel Line Lender PSA. Since this consideration is not provided on account of their respective claims, but on account of other value provided, they are not incorporated into the above calculation of these creditors' respective recoveries on the par amount of their claims. Moreover, the Fuel Lien Lenders will; receive Series A Bonds which accrue up to 1 years' worth of interest from the date the Fuel Line Lender PSA is effective, payable in Series A Bonds or Cash. Since the amount of interest is currently unknown, such amounts are not reflected in the Fuel Line Lenders' illustrative recoveries above.

The Debtor believes the Plan's contemplated restructuring is feasible and in the best interests of the Debtor's creditors. If confirmation of the Plan were to be denied, the Debtor's options would be either (i) for the Oversight Board to propose an alternate Title III plan of adjustment or (ii) for the Title III Cases to be dismissed, in which event the automatic stay would be terminated and multi-party, multifaceted litigation would ensue (including litigation commenced by Bondholders and other parties against PREPA), as holders of claims compete for the limited resources available to pay those claims.

The following overview summarizes certain key components of the Plan.  The overview is qualified in its entirety by the full text of the Plan.

### 1.    Fuel Line Lender PSA

On December 1, 2022, the Oversight Board, as PREPA's Title III Representative, and the Fuel Line Lenders entered into the Fuel Line Lender PSA, which generally resolves the Fuel Line Lenders' claims and asserted priority treatment as "Current Expenses" under the Trust Agreement and provides for the Fuel Line Lenders to support the Plan.  Pursuant to the Fuel Line Lender PSA, the Fuel Line Lenders will be receiving Series A Bonds, which will be current interest bonds with a 6.0% coupon, at an exchange ratio of 84% of the Allowed Fuel Line Loan Claim (as defined in the Plan).

Series A Bonds shall have a final maturity of fifteen (15) years from the Effective Date, with an expected repayment of five (5) years from the Effective Date based on upon 2022 Fiscal Plan Projections.  The Series A Bonds shall be issued on the Effective Date but shall accrue interest from the deemed issuance date of December 1, 2022 for purposes of the calculation of interest accrued; provided, however, the accrual of interest prior to the Effective Date shall be capped at one (1) year.  Such interest shall be payable in either cash or in the form of additional Series A Bonds at the Oversight Board's discretion.

Additionally, the Fuel Line Lenders will be entitled to receive on account of their Remaining Claim[40] a Pro Rata Share of Net Remaining New Bonds, if any, available for distribution to the Remaining Series B Bond Claims Pool (each, as defined in the Plan).  Finally, Fuel Line Lenders shall also receive certain consummation fees and professional fee reimbursement fees, in the amounts of $15,000,000 and up to $11,000,000, respectively, each of which shall be payable in either cash or in the form of additional Series A Bonds at the Oversight Board's discretion.

In exchange for such consideration, the Fuel Line Lenders have agreed to support confirmation of the Plan and, following the Effective Date, move to dismiss Adv. Pro. 19-00396 with prejudice.

### 2.    National Settlement

On January 31, 2023, the Oversight Board, as PREPA's Title III Representative, and National entered into the National PSA, which sets out the terms of the settlement of all Claims, interests, and controversies among PREPA, the Oversight Board, and National (the "National Settlement").  As a result of the National Settlement, National supports the Plan.  The National Settlement's terms have been embodied in the Plan and the Debtor is seeking its approval pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code via entry of the Confirmation Order, which will include findings that, among other things, the National Settlement is in the best

---

[40]  "*Remaining Claim*," as it pertains to the Fuel Line Loan Claims, shall mean the Allowed Fuel Line Loan Claim minus the amount of Series A Bonds received on account of the Allowed Fuel Line Loan Claim (except for Series A Bonds received, if any, on account of payment of accrued interest prior to the Effective Date).

interests of PREPA, its creditors, and other parties in interest, is fair and equitable, and is well within the range of reasonableness.

i.       **Principal Terms of the National PSA**

The National PSA, among other things, generally resolves National's claims arising from Bonds it owns or insures, and its Asserted Reimbursement Claim, and provides for National to support the Plan.  Pursuant to the National PSA, National will be receiving Series B Bonds at an exchange ratio of 71.65% of the Allowed National Insured Bond Claim (as defined in the Plan). National will also be receiving Series B Bonds at an exchange ratio of 20.00% of the Allowed National Reimbursement Claim (as defined in the Plan).

Pursuant to the National PSA, the Oversight Board and PREPA shall use their reasonable best efforts to cause PREPA to file, or cause PREPA to request that LUMA Energy file, an application with PREB to obtain approval of the equivalent of a one cent ($0.01)/KWH volumetric charge from the effective date of the National PSA times the National Insured Bond Claims divided by the PREPA Revenue Bond Claims, which, subject to PREB approval, shall be implemented by PREPA and added to customers' bills during the period from approval thereof by PREB up to and including the Effective Date (the "Interim Charge").

Subject to necessary approvals from PREB, from the effective date of the National PSA to the Plan Effective Date, National shall receive its pro rata share of revenues generated the Interim Charge.  If, however, PREB approval is not obtained for the Interim Charge, PREPA shall not be obligated to make interim payments to National.  Cumulative revenues received by National on account of the Interim Charge shall not exceed National's existing coupon on Bonds it owns and/or insures.  If National receives revenues from the Interim Charge and the Plan is not confirmed nor consummated, the amounts received shall constitute a reduction of the distributions to be received by National under a future plan, settlement, litigated judgment, or other resolution of National's claims, without further order from the Court.

National shall also receive certain consummation fees and structuring fees, in the amounts of 3% and 2.86% of the Allowed National Insured Bond Claim payable in either cash or in the form of additional Series B Bonds at the Oversight Board's discretion.

If a CVI is offered to other holders of Bonds pursuant to the Amended Plan, National shall receive CVI on account of its Bond claim and payments there from equal to fifty percent (50%) of the recovery of such holders' pro rata share until such other holders recover seventy-one and eighty-six one hundredths percent (71.65%) of their Bond claims and thereafter shall share, on a pro rata basis, equally with such holders.

Unlike certain other non-litigating classes of creditors, National will not receive additional Series B Bonds if the Oversight Board prevails on the Lien Counts and/or Recourse Counts in the Amended Lien & Recourse Challenge.  In other words, National shall not share in Gross Remaining New Bonds, Net Remaining New Bonds, or Excess New Bonds, if any, distributed under the Plan.

In exchange for such consideration, National has agreed to support confirmation of the Plan.

33

Additionally, as further described below, pursuant to the National PSA, in connection with the Oversight Board's pursuit of confirmation of the Plan, the Oversight Board will seek approval of its proposed settlement with National of the National Reimbursement Claim.

### ii.   National Reimbursement Claim

In connection with the issuance of the Bonds, National issued certain municipal bond insurance policies, insuring the payment of principal and interest on the Bonds.  In connection with the issuance of the insurance policies, PREPA entered into certain Bond insurance agreements with National, pursuant to which National asserts that PREPA agreed, to the extent that National made payments of principal and interest on or incurs any other costs with respect to the Bonds insured by PREPA, to reimburse National, with interest, for any and all such payments, and costs (i.e., the Asserted Reimbursement Claim).

Pursuant the Oversight Board's proposed settlement of the National Reimbursement Claim, the Oversight Board proposes to allow the National Reimbursement Claim in the amount of $244,728,681.25 (assuming the Effective Date is July 1, 2023), and provide the holder of such claim with Series B Bonds in a face amount equal to 20.0% thereof.  The settlement of the National Reimbursement Claim avoids the risk that such claim could be allowed in full and secured by all net or gross revenues of PREPA, if the Oversight Board does not prevail in the Amended Lien & Recourse Challenge.

The Oversight Board will demonstrate at confirmation that the proposed settlement of the National Reimbursement Claim should be approved pursuant to Bankruptcy Code section 1123(b)(3)(A) and Bankruptcy Rule 9019.  If the Court finds that such settlement does not satisfy the standard for approval of settlements, or otherwise finds that the proposed settlement and treatment of National's claims under the Plan renders the Plan unconfirmable, such finding shall not give rise to an event of termination for National under the National PSA, and the settlement and the treatment of National's claims shall, without further action, convert to a settlement of National's claims, as the case may be, that eliminates the obligation to issue Series B Bonds on account of the National Reimbursement Claim and any payments for debt service and any legal, consummation, or other fees arising from, relating to, or on account of the National Reimbursement Claim The level of Flat Fee and Volumetric Charge that different customer classes will incur to support payment o; provided, that in such circumstance, National will have the option to forego all consideration under the National PSA, including the fees and expenses set forth in Article II.D.2, and, in exchange, receive the same treatment as another settling Class of Holders of PREPA Revenue Bonds Claims, so long as the settlement with such class whose recovery National would receive was reached prior to the earlier to occur of (i) any substantive ruling on the claims and counterclaims asserted in the Amended Lien & Recourse Challenge that Holders of PREPA Revenue Bonds are secured by Revenues outside of the Sinking Fund, and (ii) an indication or a determination, either oral or written, at a hearing or otherwise, by the Title III Court that the Holders of PREPA Revenue Bonds are secured by Revenues outside of the Sinking Fund.

### 3.   Forms of Consideration Under the Plan

The consideration to be distributed to creditors under the Plan consists of the following, each of which is described in detail below:

i.    monies deposited in the Sinking Fund;

ii.    Up to approximately $5.68 billion in New Bonds to be issued on the Effective Date;

iii.    the CVI, to be issued on the Effective Date in the notional amount of the sum of the GUC CVI, Settling CVI, and Non-Settling CVI;

iv.    The Avoidance Action Proceeds, consisting of the net cash consideration received by PREPA in connection with the Avoidance Actions; and

v.    cash flow as budgeted annually solely for payments to PREPA ERS on account of the Pension Claim.

### i.    Overview of New Bonds to be Issued on the Effective Date

On the Effective Date, Reorganized PREPA shall issue two series of New Bonds—Series A Bonds and Series B Bonds.

Series A Bonds shall have a final maturity of fifteen (15) years from the Effective Date, with an expected repayment of five (5) years from the Effective Date based on upon 2022 Fiscal Plan Projections. Series A Bonds shall bear interest at a rate of 6.00%, payable semi-annually in cash. The Series A Bonds shall be issued on the Effective Date but shall accrue interest from the deemed issuance date of December 1, 2022 for purposes of the calculation of interest accrued; *provided*, *however*, the accrual of interest prior to the Effective Date shall not exceed one (1) year and that the interest accrued prior to the Effective Date shall be payable upon the Effective Date in the form of Series A Bonds or cash, at the Oversight Board's sole discretion. The Series A Bonds will be issued in a principal amount sufficient to comply with the terms of the Fuel Line Lender PSA, which shall be approximately $650,000,000.

Series B Bonds shall have a final stated maturity of fifty (50) years from the Effective Date. The Series B Bonds shall be dated as of the Effective Date. Series B Bonds may be issued in the form of current interest bonds or convertible capital appreciation bonds and shall bear interest rates at a range of six percent (6.00%) to six and seventy-five hundredths percent (6.75%).

Series B Bonds shall be issued in two series: Series B-1 Bonds (Current Interest Bonds) and Series B-2 Bonds (Convertible Capital Appreciation Bonds). The Series B-1 Bonds will be current interest bonds and shall bear interest at a rate of six percent (6.00%) per annum payable semi-annually, with an expected repayment of no later than thirty-four (34) years from the Effective Date based on 2022 Fiscal Plan Projections, subject to change based on load projections in subsequent PREPA Fiscal Plans. The Series B-1 Bonds have priority in principal repayment over the Series B-2 Bonds. Series B-1 Bonds shall be issued in the principal amount of approximately $4.63 billion .

Series B-2 Bonds will be convertible capital appreciation bonds and shall bear interest at a rate of six and seventy-five one-hundredths percent (6.75%) per annum, accreting annually until July 1, 2028, at which point the Series B-2 Bonds shall convert to paying interest semi-annually, with an expected repayment of thirty-five (35) years from the Effective Date based upon 2022 Fiscal Plan Projections, subject to change based on load projections in subsequent PREPA Fiscal

Plans. The Series B-2 Bonds shall be issued in an amount equal to the Administrative Expense Bonds Amount, with a maturity value of approximately $557,000,000 (with an assumed Effective Date of July 1, 2023 and an original principal value of approximately $400,000,000).

Where Reorganized PREPA is obligated to distribute Series B Bonds pursuant to the Plan, other than the Administrative Expense Bonds, Reorganized PREPA shall distribute Series B-1 Bonds.

The New Bonds shall have an aggregate original principal amount of up to approximately $5.68 billion. Series A Bonds shall be issued in a principal amount sufficient to comply with the terms of the Fuel Line Lender PSA. The Series B Bonds shall be issued in a principal amount equal to the above referenced principal amounts.

The New Bonds shall be secured by Reorganized PREPA's Net Revenues and the right to receive Net Revenues. All Revenues shall be deposited in the "General Fund" held by Reorganized PREPA. On the first business day of each month, Reorganized PREPA shall apply amounts in the following order of priority (the "Payment Waterfall"):

-   *First*, to the payment of Operating Expenses;

-   *Second*, to New Master Trustee fees and expenses not to exceed $100,000 per year;

-   *Third*, to the "Debt Service Fund" held by the New Master Trustee up to the amount of the Legacy Charge Revenues, and from and after the Series B Bond Defeasance Date and until the CVI Maturity Date, up to the amount of the Remaining Legacy Charge Revenues[41]; and

-   *Fourth*, to Reorganized PREPA for use as set forth in the New Master Indenture.

There shall be no event of default on the New Bonds (prior to stated final maturity of the Series A Bonds, solely with respect to the Series A Bonds, and generally with respect to the Series B Bonds) for failure to pay scheduled debt service so long as Reorganized PREPA (a) takes reasonable actions to (i) charge and collect the Legacy Charge, (ii) collect the Revenues generated by the Legacy Charge, and (iii) deposit the full amount of Net Revenues up to the amount of the Legacy Charge Revenues into the Debt Service Fund after providing for distributions made in accordance with the Payment Waterfall, and (b) complies with the Interest Rate Covenant.

With respect to each series of New Bonds, all debt service that is not paid when due, whether at or prior to final scheduled maturity, shall remain due and outstanding until paid in full and shall be paid. Interest shall not accrue on outstanding obligations under the New Bonds at the regular coupon rate after its respective stated maturity; only unpaid interest accrued prior to stated maturity and principal will be payable following the stated maturity if any remains outstanding at that time.

---

[41] "Remaining Legacy Charge" means the fixed fee component of the Legacy Charge in place as of the Effective Date, from and after the Series B Bond Defeasance Date, through the CVI Maturity Date.

A detailed description of the New Bonds to be issued pursuant to the plan can be found in Section VI.F of this Disclosure Statement.

## ii.        Overview of CVI to be Issued on the Effective Date

On the Effective Date, Reorganized PREPA shall issue the CVI with a 0.00% coupon, a final maturity date of thirty-five (35) years after the Effective Date, which shall only be payable if the New Bonds and any Refunding Bonds are paid in full prior to their expected 35 year repayment. Payments shall be made on the CVI only after the occurrence of the Series B Bond Defeasance Date, so long as such date occurs prior to the CVI Maturity Date.  If the Series B Bond Defeasance Date occurs prior to the CVI Maturity Date, the CVI shall be payable from that portion of Net Revenues constituting the Remaining Legacy Charge Revenues deposited to the credit of the Debt Service Fund in accordance with the Payment Waterfall until the earlier of (a) the date on which the CVI Notional Amount has been paid in full and (b) the CVI Maturity Date.  There shall be no event of default on the CVI so long as Reorganized PREPA takes reasonable actions to collect Revenues generated by the Remaining Debt Service Charge and deposits the full amount of Net Revenues up to the amount of the Remaining Legacy Charge Revenues into the Debt Service Fund.

Because the New Bonds are only expected to be repaid in 35 years under the projections in the Certified Fiscal Plan, the CVI is "truly contingent" because it would only generate any payment if PREPA's realized load exceeds the Certified Fiscal Plan projections.

## iii.        Overview of Legacy Charge

**Legacy Charge**

PREPA's current rates are insufficient to provide for the repayment of legacy or restructured debts after payment of PREPA's operating expenses.  Accordingly, to provide sufficient Net Revenues to provide a source of repayment of the New Bonds to be issued by PREPA under the Plan, the Plan requires the Debtor to implement the Legacy Charge, which will be an additional charge to PREPA's current rates.

The Legacy Charge is comprised of two components, a fixed monthly flat fee (the "Flat Fee") and a volumetric fee ("Volumetric Charge"), set at levels for each customer class, to be included in customer rates pursuant to the Plan and Confirmation Order.  This hybrid structure accounts for important objectives, including providing proper recompense to PREPA's legacy creditors, while minimizing: (i) the strain of increased rates on low-income and vulnerable customers, (ii) revenue losses due to customers either reducing their electricity consumption or transitioning to alternative electricity supplies.  The Oversight Board reserves its rights and may amend the rates prior to the confirmation objection deadline, upon further discussion with PREB, LUMA Energy and AAFAF, in a manner that will provide similar recoveries to creditors to those provided for in the Plan.

The Legacy Charge will have different tiers that will be assessed for each of PREPA's existing customer classes based on various factors, such as a respective capacity to tolerate rate increases.  Solely for purposes of assessing the Legacy Charge, the Plan will also provide for the creation of one new exemption from the Flat Fee and a portion of the Volumetric Charge for other

low-income residential customers not already falling within an exempted customer class (see below).

The increase in Net Revenues generated from inclusion of the Legacy Charge will fund debt service on the New Bonds after payment of PREPA's Operating Expenses, as specified in the Plan. The Legacy Charge is calculated so that the increase in Net Revenues is projected to cover the debt issued under the Plan within 35 years. The Legacy Charge will remain in place for the later of (i) the maturity of the CVI[42] and (ii) payment in full of the Series B Bonds. Because the increase in Net Revenues to be generated from the Legacy Charge is required by the Plan to pay debt service, and otherwise necessary to support repayment of the New Bonds issued under the Plan, the Oversight Board asserts that PREB is required under Puerto Rico law to approve the Legacy Charge rate increase, provided, that PREPA with the approval of PREB will be able to amend the Legacy Charge in an economically neutral manner subject to the Amendment Test (as defined in the Plan). If repayment in full of the principal of the New Bonds occurs prior to the maturity of the CVI, revenues from the fixed fee component of the Legacy Charge in place as of the Effective Date thereafter will fund distributions to holders of CVI until the maturity of the CVI. Risks relating to the payment of New Bonds and CVI are discussed in Section VIII.

Application of the Legacy Charge: First, PREPA will charge the Flat Fee to all customers each month unless the customer qualifies for an exemption from the Flat Fee. The amount paid for the Flat Fee portion of the Legacy Charge is a connection charge assessed on each non-exempt customer connected to PREPA's electricity grid. Second, PREPA will charge a Volumetric Charge based on each customer's consumption of electricity supplied by PREPA. The Volumetric Charge will be assessed on a cents per-kilowatt hour basis, the amount of which will vary per customer class, for electricity consumed during each billing cycle. Mirroring PREPA's current rate structure, a different Volumetric Charge will be assessed for consumption at or below 500 kWh per month and for consumption above that level for all residential and certain commercial classes.[43] A detailed description of the derivation of the Legacy Charge structure is attached hereto as Exhibit P.

Customers eligible for an exemption from the Flat Fee will also be exempt from paying the Volumetric Charge up to 500 kWh of monthly metered consumption. If an exempt customer's utilization exceeds that threshold, that customer will be charged fifty percent of the Volumetric Charge applicable for such customer class for consumption above the threshold on a per-kilowatt hour basis.

The Debtor intends to provide a new exemption from the Flat Fee and the Volumetric Charge up to 500 kWh for certain customers. This exemption is intended to protect lower-income residential customers, which are the most vulnerable, from further burden. To ensure the most vulnerable customers are not overly strained by the Legacy Charge, PREPA will create a new exemption for qualifying low-income residential customers that are not enrolled in the Lifeline

---

[42] The Legacy Charge that would support the CVI is limited to revenues from the Fixed Fee component of the Legacy Chare in place as of the Effective Date.

[43] PREPA currently utilizes a 425kWh threshold.

Residential Rate (*Servicio Residencial Especial*) (the LRS rate)[44] or the existing public housing subsidy rate (the RH3 and RFR rates)—the three rate classes that are also exempt and already receive certain subsidies. Residential customers of PREPA will qualify for this new exemption if their Modified Adjusted Gross Income (MAGI) is below a certain threshold similar to the MAGI eligibility levels needed to qualify for Medicaid healthcare benefits in Puerto Rico. It is expected that the new exempt class will overlap with the three existing PREPA rate classes listed above that are exempt from the Legacy Charge, however, it will include additional customers that do not fall into existing exempt rate classes.

PREPA customers currently enrolled in one of PREPA's existing subsidy customer classes, such as those for the elderly, students, customers that depend on lifesaving medical equipment, customers with disabilities, and participants in the Puerto Rico Nutrition Assistance Program (Programa de Asistencia Nutricional), among others, will continue to receive their existing subsidies from PREPA without interruption and may or may not be exempt from the Legacy Charge depending on whether they fall within the exempted customer classes mentioned above.

The Legacy Charge will be collected as part of the PREPA bill by PREPA's operator and servicer in the same manner the bills are currently collected.

The level of Flat Fee and Volumetric Charge that different customer classes will incur to support payment of the New Bonds is set forth in the table below. Notably, however, PREPA, with the approval of PREB, subject to the Amendment Test, will have the ability to modify the Flat Fee and Volumetric Charge provided that it will be done in an economically neutral manner, in structure and amounts that do not delay or extend the respective expected repayment date and expected weighted average life of the Series A Bonds and the Series B Bonds, and otherwise that are reasonably acceptable to the Required Fuel Line Lenders, and which will not decrease the projected revenues attributable to the Legacy Charge as of the date of the amendment to the Legacy Charge.[45]

**Legacy Charge Allocation**

|  | Fixed Fee ($/month) | Volumetric Charge (</=500 kWH, c/kWH) | Volumetric Charge (>500 kWH, c/kWH) |
|---|---|---|---|
| **RESIDENTIAL** |  |  |  |
| RH3, LRS, RFR | $    - | - | 1.50 |
| GRS 111/112 (Subsidy-eligible) | $    - | - | 1.50 |
| GRS 111/112 (General) | $   13 | 0.75 | 3.00 |

---

[44] Customers who fulfill the criteria to enroll in the Nutritional Assistance Program are eligible to enroll in the LRS rate.

[45] The Legacy Charge will be assessed on all of PREPA's customers, except where the Plan specifically exempts some or all of the Flat Fee or Volumetric Charge. While all rate classes are subject to the Legacy Charge, some may currently be "empty" classes that do not have any customers. For the avoidance of doubt, any rate class not identified in the Plan or herein, any class that is subsequently created, or any existing but empty rate class that subsequently has customers, will be subject to the Legacy Charge and will be classified in a way that does not decrease the projected revenues attributable to the Legacy Charge, unless PREPA, with the approval of PREB, subject to the Amendment Test, will modify the Legacy Charge in an economically neutral manner, which shall not decrease the projected revenues attributable to the Legacy Charge.

| COMMERCIAL | | | |
|---|---|---|---|
| GSS 211 | $   16.25 | 1.50 | 3.00 |
| GSP 212 | $   800 | 1.45 | 1.45 |
| GST 213 862 | $   1,800 | 0.97 | 0.97 |
| GOVERNMENT | | | |
| GSS 211 | $   20 | 1.45 | 2.90 |
| GSP 212 | $   800 | 1.45 | 1.45 |
| GST 213 862 | $   1,800 | 0.97 | 0.97 |
| MUNICIPALITIES | | | |
| GSS 211 | $   - | - | - |
| GSP 212 | $   - | - | - |
| GST 213 862 | $   - | - | - |
| INDUSTRIAL | | | |
| GSS 311 | $   20 | 2.18 | 2.18 |
| GSP 312 | $   800 | 2.18 | 2.18 |
| GST 313 | $   1,800 | 1.45 | 1.45 |
| TOU-T 363 | $   1,800 | 1.45 | 1.45 |
| LIS 333 | $   1,800 | 1.45 | 1.45 |
| TOU-T 963 | $   1,800 | 1.45 | 1.45 |

## PREPA Customer Segmentation[46]

PREPA maintains a differentiated rate structure for its customers depending on their customer class. The descriptions below, in conjunction with any other categorization of customers currently utilized by PREPA, identify categories of PREPA's customer base that may be utilized in establishing how each PREPA customer is charged the Legacy Charge.

## Residential Classes

1. GENERAL RESIDENTIAL SERVICE (GRS) - This rate shall apply to residential customers for domestic uses for a residence or apartment unless they fit into one of the other classes below. This rate may also apply to houses, apartments, and other structures which are primarily intended for residential purposes, where no more than two rooms in which the total connected load does not exceed 500 watts are used by tenant for business or professional purposes.

2. LIFELINE RESIDENTIAL SERVICE (LRS) - This rate shall apply to residential customers, who fulfill the Nutritional Assistance Program criteria, for all domestic uses for a residence or apartment.

3. RESIDENTIAL SERVICE FOR PUBLIC HOUSING PROJECTS (RH3) - This rate shall apply to residential customers of Public Housing Projects supported or subsidized in whole

---

[46] PREPA rate book, as of May 2019. Accessible at: https://lumapr.com/wp-content/uploads/2021/07/Tariff-Book-Electric-Service-Rates-and-Riders-Revised-by-Order-05172019-Approved-by-Order-05282019.pdf.

or in part by loans, grants, contributions or appropriations of the federal, state, or municipal governments.

4. RESIDENTIAL FIXED RATE FOR PUBLIC HOUSING UNDER OWNERSHIP OF THE PUBLIC HOUSING ADMINISTRATION (RFR) - The RFR Rate is established by according to the dispositions of Act 22-2016 and is granted to customers residing in a housing unit physically located within a public housing project owned by the Public Housing Administration for all domestic uses.

## Commercial and Industrial Classes

1. GENERAL SERVICE AT SECONDARY DISTRIBUTION VOLTAGE (GSS) - This rate shall apply to any non-residential service with a load lower than 50 kVA.  Also, it shall apply to temporary electric power service for limited use in streets, carnivals and others.

2. GENERAL SERVICE AT PRIMARY DISTRIBUTION VOLTAGE (GSP) - This rate shall apply to industrial customers and commercial customers.  Service shall be rendered through a single point of connection and a single meter.

3. GENERAL SERVICE AT TRANSMISSION VOLTAGE (GST) - This rate shall apply to commercial and industrial customers, connected to the transmission system, that have a demand of 250 kVA or greater, for general uses including motive power, heating, refrigeration, and incidental lighting of industries, hotels, and any other establishment.

4. TIME OF USE AT PRIMARY DISTRIBUTION VOLTAGE (TOU-P) - This rate shall apply to commercial and industrial customers with a demand of 1,000 kVA or greater, that: 1. Transfer load from the on-peak period to the off-peak period 2. Add load during the off-peak period 3. Remove load from the on-peak period

5. TIME OF USE AT TRANSMISSION VOLTAGE (TOU-T) - This rate shall apply to commercial and industrial customers with a demand of 1,000 kVA or greater, that: 1. Transfer load from the on-peak period to the off-peak period 2. Add load during the off-peak period 3. Remove load from the on-peak period

6. LARGE INDUSTRIAL SERVICE -115 kV (LIS) - This rate is exclusively for industries with a demand equal to 12,000 kW or higher, with a load factor equal to 80% or higher, and a monthly average power factor equal to 95% or higher.

7. GENERAL AGRICULTURAL SERVICE AND AQUEDUCT PUMPS OPERATED BY RURAL COMMUNITIES (GAS) - This rate applies to farmers and customers dedicated to raising animals.  The service shall be provided for motive power, lighting, irrigation pumps, refrigeration and heating.  Also, this rate applies to customers that operate pumps to supply aqueduct service exclusively in rural communities; incidental lighting related to this operation is permitted.

8. <u>OUTDOOR SPORTS FIELD LIGHTING FOR PARKS WHERE ADMISSION RIGHTS ARE COLLECTED (LP-13)</u> - This rate shall apply to sports fields where admission rights are collected having a connected load for outdoor illumination of 500 kilowatts or greater

9. <u>CABLE TV POWER SUPPLIES (CATV)</u> - This rate applies to all cable TV power supplies.

10. <u>UNMETERED SERVICE FOR SMALL LOADS (USSL)</u> - This rate shall apply to the services of the electric equipment installed on PREPA's pole or structures that operate 24 hours a day, except for that equipment for which PREPA has another rate available (for example: Cable TV).

11. <u>POWER PRODUCERS CONNECTED AT PREPA BUS BAR</u> - This rate shall apply to large power producers connected to the 230 kV bus bar that require PREPA's electric power service during startup, programmed maintenance, and outages of its generating equipment.

12. <u>PUBLIC LIGHTING GENERAL (PLG)</u> - This rate shall apply to the lighting of streets, ball parks and other parks of free admission, plazas, telephone booths, bus shelters, and traffic and police strobe lights.

### iv.   **Overview of Avoidance Action Trust**

PREPA has identified certain Avoidance Actions, listed on <u>Exhibit L</u>, which will be transferred to the Avoidance Actions Trust on the Effective Date.[47]  On or before the Effective Date, PREPA will enter into the Avoidance Actions Trust Agreement and establish the Avoidance Actions Trust.  The Avoidance Actions Trust Assets will consist of the Avoidance Actions and Cash held by the Avoidance Actions Trustee.  The Avoidance Actions Trust will be governed by a three-member board appointed as of the Effective Date, selected by the Oversight Board. This board will appoint the Avoidance Actions Trustee on or prior to the Effective Date.

The Avoidance Actions Trustee will have the power to litigate or compromise and settle the Avoidance Actions.  On a monthly basis, the Avoidance Actions Trustee will distribute to the GUC Trust all excess cash on hand, which will be a part of the General Unsecured Claim Recovery.

---

[47] The Oversight Board will disclose in a plan supplement whether certain avoidance actions, including what the UCC refers to as the "Fuel Oil Litigation" (Adv. Proc. Nos. 19-00381, 19-00384), and other vendor actions, including Adv. Proc. No. 19-00384, and/or their proceeds will be added to the Avoidance Action Trust.  If the Oversight Board determines to transfer such actions or their proceeds to the Avoidance Actions Trust, it would only serve to enhance the GUC recoveries disclosed in the plan.  These avoidance actions are described in Part V on the Disclosure Statement.  While the Oversight Board will not undertake to value these actions (which would likely involve some estimation of the probability of success), the amount PREPA is seeking to avoid can be determined by reference to the complaint themselves.

4.    **Class Treatment and Potential Variation Based on Contingent Litigation**

PREPA is currently involved in various contested matters and adversary proceedings with parties such as the Bondholders and PREPA ERS.  Resolution of these proceedings, whether by decision or settlement, will have a material effect on certain creditors' recovery under the Plan.  The following section first summarizes these proceedings and their individual significance, then describes the effect the outcomes of these proceedings will have on creditors' recovery under the Plan.

i.    **Litigation Affecting Distributions Under the Plan**

*Amended Lien & Recourse Challenge*

The Oversight Board is currently litigating *The Financial Oversight and Management Board for Puerto Rico v. U.S. Bank Nat'l Ass'n*, Adv. Proc. No. 19-00391 (D.P.R. July 1, 2019) (the "Amended Lien & Recourse Challenge"), whereby the Oversight Board seeks to (i) disallow any secured claim held by the Bondholders beyond the funds actually deposited in the Sinking Fund (the "Lien Scope Counts"); and (ii) limit any potential recourse, secured or unsecured, to the monies deposited in the in the aforementioned funds (the "Recourse Counts").

If the Title III Court finds that the Bond Trustee's security interest and recourse is limited to the Sinking Fund, then PREPA may be able to satisfy the approximately $8.5 billion in asserted Bond claims by providing the monies currently in the Sinking Fund, thus greatly enhancing the recoveries of many of PREPA's other creditors.

If the Title III Court holds the security interest is limited in the manner described above, but that the Bond Trustee has an unsecured deficiency claim against PREPA for the amount not satisfied by the monies in the Sinking Fund, then such deficiency claim would share *pro rata* with PREPA's other General Unsecured Claims, significantly diluting such claimholders' recoveries.

Finally, if the Title III Court determines the Bond Trustee has a security interest in PREPA's present or future net or gross revenues, the Bondholders will receive Series B Bonds in a face amount equal to the value of their collateral, up to all Series B Bonds available for distribution under the Plan and subject to Series B Bonds provided to the Settling Bondholders. To the extent the Series B Bonds are insufficient to pay the Bond Trustee the value of its collateral, the Bond Trustee may argue at confirmation that PREPA is obligated to issue additional Series B Bonds or otherwise provide for additional payment to the Bond Trustee not currently contemplated by the Plan.  In such circumstance, the Plan may not be confirmable or feasible without material amendments.  Additionally, in this scenario, the Bond Trustee may also have an unsecured deficiency claim against PREPA, which claim, to the extent not satisfied by the issuance of Series B Bonds, would share *pro rata* with PREPA's other General Unsecured Claims.

*PREPA ERS Current Expense Litigation*

On October 30, 2019, PREPA ERS filed an amended complaint against PREPA and other parties seeking determinations that all amounts owed to it are "Current Expenses" under the Trust Agreement and must be paid before any further payments are made to the Bond Trustee or the

Bondholders.  PREPA ERS further argued it is a third party beneficiary of the Trust Agreement and the Trust Agreement constitutes a valid subordination agreement under the Bankruptcy Code.

PREPA ERS holds a significant claim against PREPA.  Should the Title III Court find PREPA ERS's claims are a "Current Expense" and entitle them to repayment in full before Bond claims receive any recovery, the distributions under the Plan may have to be amended, although the amount of overall consideration under the Plan could remain unchanged.

### *Fuel Line Lender Priority Action*

The Oversight Board, the Ad Hoc Group, the Monoline Insurers, the Bond Trustee, and the Fuel Line Lenders are currently litigating the Current Expense Adversary Proceeding, whereby the Fuel Line Lenders seek declarations that all amounts owed to them are "Current Expenses" under the Trust Agreement and subordination of the Bondholders' claims.  The Oversight Board proposes to settle the Current Expense Adversary Proceeding

The Oversight Board has entered in the Fuel Line Lender PSA that settles the Fuel Line Lenders' claims against PREPA and the counts against PREPA in the Current Expense Adversary Proceeding as part of this Plan by giving the Fuel Line Lenders bonds that are senior to the bonds that all other creditors, including the Bondholders, will receive.  Certain creditors have argued that this is an intercreditor dispute that the Oversight Board cannot settle.  They also take issue with the amount and terms of the consideration.  The Oversight Board believes that, because the claims are against PREPA, it can settle such claims against PREPA in the reasonable amount embodied in the Fuel Line Lender PSA.  The Oversight Board further believes that, under the Trust Agreement, PREPA has full discretion to determine which expenses constitute "Current Expenses" and can therefore be paid ahead of bondholders, who, in turn, assert that they are payable before other creditors.

### ii.     **Class Treatment Based on Litigation Outcomes**

### *Settling Bondholder and Settling Monoline Claims*

Regardless of the outcome of the above-described proceedings, Settling Bondholders and Settling Monolines will receive from PREPA a recovery of 50.00% on their respective Allowed claims in the form of their *pro rata* share of the Sinking Fund and a distribution of Series B Bonds. However, the quantity of recovery on the remaining portions of their Allowed claims depends on the result of the Amended Lien & Recourse Challenge.  If PREPA and the Oversight Board prevail on the Lien Scope Counts and Recourse Counts, then the Non-Settling Bondholders and Non-Settling Monolines' recovery may be limited to the Sinking Fund, and additional Series B Bonds may therefore be available for distribution to Settling Bondholders and Settling Monolines.  If, on the other hand, the Non-Settling Bondholders and Non-Settling Monolines prevail on some or all counts, then the Settling Bondholders and Settling Monolines will receive CVI in an amount equal to their remaining allowed claims.

### *Non-Settling Bondholder and Non-Settling Monoline Claims*

The Non-Settling Bondholders and Non-Settling Monolines' recovery is determined, in part, by the outcome of the Amended Lien & Recourse Challenge and whether they vote to accept

the Plan provided, however that regardless of the outcome, Non-Settling Bondholders and Non-Settling Monolines will receive their *pro rata* share of the Sinking Fund.

If Non-Settling Bondholders prevail on the Recourse Counts, then any allowed unsecured deficiency claim will share, *pro rata*, in the General Unsecured Claim Recovery with all other holders of Claims in the Unsecured Claims Pool.

If Non-Settling Bondholders and Non-Settling Monolines prevail on the Lien Scope Counts, they will receive Series B Bonds in the face amount equal to the value of their collateral beyond amounts in the Sinking Fund, up to the amount of Series B Bonds available for distribution after distributions to the Settling Bondholders.

If Non-Settling Bondholders and Non-Settling Monolines vote to accept the Plan and the Oversight Board prevails on the Recourse Counts, they will receive CVI in the notional amount of such holder's Remaining Disallowed Non-Settling Claim, defined as the principal and interest accrued and unpaid on their PREPA Revenue Bond claim through the Petition Date, <u>minus</u> the cash from the Sinking Fund distributed to such holder.

*Assured Insured Interest Rate Swap Claims*

The Assured Insured Interest Rate Swap Claims were to have received substantially the same treatment as settled bond claims under the 2019 RSA. The Assured Insured Interest Rate Swap Claims have the same priority, if any, as the PREPA Revenue Bond Claims, which the Oversight Board believes is the basis for the Plan's provisions affording the swap claims with the same treatment as the bond claims and for the related references in the Plan to the Amended Lien & Recourse Challenge. The outcome of the Amended Lien & Recourse Challenge, therefore, would impact their recoveries in the same manner it would impact holders of claims in Class 1 or Class 2.

*Fuel Line Loan Claims*

To settle their claims, including their assertion of priority over the Bond Claims and assertion of entitlement to postpetition interest, the Fuel Line Lenders will receive treatment of (i) Series A Bonds in the face amount equal to 84.00% of their prepetition claim, (ii) Series A Bonds or cash, in the Oversight Board's discretion, in the face amount of interest deemed to have accrued on account of each holder's *pro rata* share of Series A Bonds to be distributed during a period equal to the shorter of December 1, 2022 through the Effective Date or one (1) year, and (iii) for the remaining 16.00% of their claim, a *pro rata* share of the Series B Bonds that remain after distribution of such bonds to Settling Bondholders and Non-Settling Bondholders, and initial distribution to the GUC Trust for the benefit of holders of claims in the General Unsecured Claims Pool up to 50.00% of their Allowed Claims.

In exchange for their efforts in connection with consummation of their settlement and confirmation of a plan, and not on account of their claims, the Fuel Line Lenders shall receive the Fuel Line Lender PSA Creditors Fees, comprised of $15 million in consummation costs and up to $11 million in professional fee reimbursement.

*General Unsecured Claims*

Much like recovery for the Non-Settling Bondholders and Non-Settling Monolines, recovery for General Unsecured Claims will vary materially based on the Amended Lien & Recourse Challenge's outcome.

If the Non-Settling Bondholders and Non-Settling Monolines prevail on all counts, holders of General Unsecured Claims will receive their *pro rata* share of the Series B Bonds available for distribution, if any, after distribution of such Bonds to the Settling Bondholders and Non-Settling Bondholders (up to the amount of the value of their collateral). If the Non-Settling Bondholders' collateral is determined to be the same or greater than the Series B Bonds available for distribution, holders of General Unsecured Claims will receive no New Bonds under the Plan, but will share on a *pro rata* basis in the proceeds of the Avoidance Action Trust and CVI.

If the Non-Settling Bondholders and Non-Settling Monolines lose on the Lien Scope Counts, but prevail on the Recourse Counts, then their deficiency claims will receive the General Unsecured Claim Recovery. This result would substantially dilute the recovery of other holders of General Unsecured Claims.

If the Non-Settling Bondholders and Non-Settling Monolines lose on all counts in the Amended Lien & Recourse Challenge, then holders of General Unsecured Claims will receive their *pro rata* share of the Series B Bonds up to 50% of their claim, assuming an estimated $800,000,000 in General Unsecured Claims. If Series B Bonds remain available for distribution thereafter, 20% of such bonds will go to the PREPA ERS. The remaining 80% of Series B Bonds will be shared pro rata among (i) the Remaining Claims of the holders of General Unsecured Claims, (ii) 40.00% of Settling Bondholders and Settling Monolines Remaining Claims, and (iii) the Remaining Claims of the Fuel Line Lenders. If and only if both (a) GUC New Bonds equal 100% of the Remaining Claims of the Unsecured Claims Pool Estimate and (b) 100% of the Remaining Claims of the Fuel Line Lenders are paid in full, Settling Bondholders and Settling Monolines will receive up to an additional 60% of their pro rata share of Net Remaining New Bonds, if any.

In all events, holders of General Unsecured Claims will receive, payable from the GUC Trust, their *pro rata* share of the Avoidance Action Proceeds. They will also receive CVI in the notional amount of their remaining claim after distributions of Series B Bonds, if any.

5.   **Bondholder, Monoline, and Assured Insured Interest Rate Swap Exchange Offer**

PREPA is currently a party to two interest rate swaps, with JPMorgan Chase Bank N.A. and UBS AG as counterparties, with notional amounts of $169.53 million and $83.34 million respectively. Both swaps mature on July 1, 2029. Given that swap payments are calculated periodically, the estimated amount of such payments (including termination damages) is not presently ascertainable.

In order to allow holders of PREPA Revenue Bond Claims and Assured Insured Interest Rate Swap Claims to settle their Claims against PREPA, the Oversight Board will provide each such holder with the opportunity to sign a settlement agreement by the expiration of the Exchange

Offer Period (as defined below), pursuant to which such holder can agree to be treated as a Settling Bondholder or Settling Monoline, as appropriate, pursuant to the Plan. Any signing claimholder shall receive a contra-CUSIP in exchange for their current holdings. Any holder that does not sign and deliver the settlement agreement shall be treated as a Non-Settling Bondholder or Non-Settling Monoline, as appropriate, and will not be able to join the Settling Bondholder and Settling Monoline Class, unless the Oversight Board agrees to extend such deadline, but in no event will such deadline be extended after a ruling by the Title III Court on the Amended Lien & Recourse Challenge.

The Holder of Assured Insured Interest Rate Swaps Claims shall be entitled to settle claims, rights, and remedies against PREPA arising under the swap agreements and applicable law (including, without limitation, claims arising under the Bankruptcy Code safe harbor provisions).

The Oversight Board commenced the period within which the holders of uninsured PREPA Revenue Bond Claims can sign the settlement offer (the "Exchange Offer Period") on January 27, 2023, with the Exchange Offer Period concluding on February 24, 2023 at 5p.m. (ET). *See Notice of Distribution of Settlement Offer Notice to Uninsured Bondholders* [ECF No. 3171] ("Settlement Agreement Notice"). Each eligible holder received through The Depository Trust company ("DTC") a settlement offer notice, a settlement agreement, and settlement term sheet, pursuant to which such holder may become a Settling Bondholder under the Plan, and explaining, among other things, the proposed treatment of such holder's Claims if the holder signs the settlement agreement.[48] Any failure to deliver the signed agreement prior to the expiration of the Exchange Offer Period will prevent from such holder opting into the settlement class and will prevent from such holder receiving the treatment that such class will receive if the Disclosure Statement is approved and the Plan is confirmed.

6.    **Illustrative Distribution of New Bonds Under the Plan**

For illustrative purposes only, the following summarizes the distributions of New Bonds under the Plan:

1.  Approximately four-hundred million ($400,000,000), or such lower principal or original principal amount as determined by the Oversight Board at or prior to the Confirmation Hearing, in Series B Bonds will be sold to the Commonwealth at par for Cash to fund payments of Administrative Expense Claims.

2.  Holders of Fuel Line Loan Claims will receive Series A Bonds in the amount of 84.00% of their Allowed Claim. The Series A Bonds will accrue up to 1 years' worth of interest from the date the Fuel Line Lender PSA is effective, payable in Series A Bonds or Cash. They will also receive Cash or Series A Bonds for the Fuel Line Lender Creditors Consummation Fees and Fuel Line Lender PSA Creditors Professionals' Reimbursement Fees. They will also get distributions on their Remaining Claim (16.00%) depending on the outcome, or

---

[48] Copies of these documents are included as exhibits to the Settlement Agreement Notice.

favorable settlement, of the Amended Lien & Recourse Challenge (*see* #7 below).

3. National will receive 71.65% of the Allowed National Insured Bond Claim and 20.00% of the Allowed National Reimbursement Claim in Series B Bonds.

4. Settling Bondholders and Settling Monolines will receive between 50.00% of their Allowed Claim in Series B Bonds. They will also get distributions on their Remaining Claim depending on the outcome, or favorable settlement, of the Amended Lien & Recourse Challenge (*see* #7 below).

5. Non-Settling Bondholders and Non-Settling Monolines will receive Series B Bonds in accordance with their litigation recoveries. This could be nothing if they lose Lien Counts and Recourse Counts, or it could be up to all the Series B Bonds that remain available for distribution if they win the Lien Counts and the Court determines their collateral is worth as much as the Series B Bonds available for distribution after primary distributions to Settling Bondholders and Settling Monolines. If the Non-Settling Bondholders and Non-Settling Monolines lose the Lien Counts but win on Recourse Counts, they will have a deficiency claim that will be treated the same as General Unsecured Claims.[49]

6. General Unsecured Claims will receive, up to 50.00% of their claim, assuming an estimated $800,000,000 in General Unsecured Claims, the Series B Bonds that remain after distributions to the Settling Bondholders and Non-Settling Bondholders. They will also get distributions on their Remaining Claim (50.00%) depending on the outcome, or favorable settlement, of the Amended Lien & Recourse Challenge (*see* #7 below).

7. If there are Series B Bonds remaining after paying General Unsecured Claims and Deficiency Claims (if any) up to 50.00% of their claims, then the PREPA ERS will get 20.00% of the Gross Remaining New Bonds, which shall go to the PREPA PayGo Trust.

8. The other 80.00% of the Gross Remaining New Bonds will be shared ratably between the Remaining Claims of (i) General Unsecured Claims (50.00%), (ii) the Fuel Line Lenders (16.00%), and (iii) 40.00% of the Remaining Claims of the Settling Bondholders (*i.e.*, 20.00% (40.00% of 50.00%)).

9. If and only if both (a) GUC New Bonds equal 100% of the Remaining Claims of the Unsecured Claims Pool Estimate and (b) 100% of the Remaining Claims of the Fuel Line Lenders are paid in full, Settling Bondholders and Settling Monolines will receive up to an additional 60% of their pro rata share of Net Remaining New Bonds, if any.

---

[49] Holders of Assured Insured Interest Rate Swap Claims will receive the same treatment as Settling Bondholders and Settling Monolines if they timely submit an Election of Settlement Class Signature Page, or the same treatment as Non-Settling Bondholders and Non-Settling Monolines if no submission is made.

10. Excess New Bonds available after creditors recover fully on their Allowed Claims, shall either be deemed not to be issued by PREPA, or shall be issued and distributed to the PREPA PayGo Trust, at PREPA's discretion.



*This chart is for illustrative purposes only. To the extent of any discrepancy between the chart and the Plan, the Plan shall govern in all respects

i.    **Settlement of Outstanding Disputes with National**

Pursuant to the terms of the National PSA, and in exchange for the consideration to be provided in the Plan, National agrees to settle, waive, release, and discharge all claims against PREPA, including, but not limited to, the following disputes (such disputes are summarized in Section V of this Disclosure Statement):

- Amended Lien & Recourse Challenge:

    o All counterclaims and affirmative defenses related to *The Financial Oversight and Management Board for Puerto Rico v. U.S. Bank Nat'l Ass'n*, Adv. Proc. No. 19-00391 (D.P.R. July 1, 2019).

    o Any other claims, theories, rights, and defenses related to, among other things, their proofs of claims and/or the Master PREPA Bond Claim, including, but not limited to, the scope of the asserted security interest in PREPA's property, assets, or revenues, whether the claims have recourse beyond moneys deposited to the credit of the Sinking Fund, and other asserted rights related to certain contractual covenants or statutory rights, including to seek appointment of a

50

receiver, an increase in PREPA's electricity rates, or the enforcement of collection of customers' bills.

- Motion to Appoint Receiver and Dismiss Title III Case:

  o Motion to Dismiss PREPA's Title III Case.

  o Any other motions, objections or joinders to these or such other motions or objections that may be filed related to the requested relief, including, but not limited to, seeking to lift the automatic stay, the appointment of a receiver at PREPA, and the dismissal of PREPA's Title III Case.

Pursuant to the terms of the Settlement Offer Memorandum, Settling Bondholders and Settling Monolines will make various covenants, including a covenant not to take or encourage any other person to take any action which would reasonably be expected to impede the administration of the Title III Case or the confirmation or consummation of the Plan.

Settling Bondholders may only terminate the Settlement Agreement in limited circumstances.

### ii.   Settlement of Outstanding Disputes with Settling Bondholders and Settling Monolines

Pursuant to the terms of the Settlement Offer Memorandum, and in exchange for the consideration to be provided in the Plan, the Settling Bondholders and Settling Monolines agree to settle, waive, release, and discharge all claims against PREPA, including, but not limited to, the following disputes (such disputes are summarized in Section V of this Disclosure Statement):

- Amended Lien & Recourse Challenge:

  o All counterclaims and affirmative defenses related to *The Financial Oversight and Management Board for Puerto Rico v. U.S. Bank Nat'l Ass'n*, Adv. Proc. No. 19-00391 (D.P.R. July 1, 2019).

  o Any other claims, theories, rights, and defenses related to, among other things, their proofs of claims and/or the Master PREPA Bond Claim, including, but not limited to, the scope of the asserted security interest in PREPA's property, assets, or revenues, whether the claims have recourse beyond moneys deposited to the credit of the Sinking Fund, and other asserted rights related to certain contractual covenants or statutory rights, including to seek appointment of a receiver, an increase in PREPA's electricity rates, or the enforcement of collection of customers' bills.

- Motion to Appoint Receiver and Dismiss Title III Case:

  o Motion to Dismiss PREPA's Title III Case.

o Any other motions, objections or joinders to these or such other motions or objections that may be filed related to the requested relief, including, but not limited to, seeking to lift the automatic stay, the appointment of a receiver at PREPA, and the dismissal of PREPA's Title III Case.

### iii. Settlement of Outstanding Disputes with Fuel Line Lenders

Pursuant to the terms of the Fuel Line Lender PSA, and in exchange for the consideration to be provided in the Plan, if the Fuel Line Lenders vote to accept the Plan, they agree to settle, waive, release, and discharge all claims against PREPA and the Settling Bondholders, including the following disputes (such disputes are summarized in Section V.G.3 of this Disclosure Statement):

- *Cortland Capital Market Services LLC v. The Financial Oversight and Management Board for Puerto Rico*, Adv. Proc. No. 19-00396 (D.P.R. July 9, 2019).

- Any other claims or rights related to the Fuel Line Loans, including, but not limited to, the Fuel Line Lenders' asserted priority and seniority over the Bonds pursuant to any agreement.

### iv. Settlement of Outstanding Disputes with Vitol

Pursuant to the terms of the Vitol Settlement Agreement, and in exchange for the consideration to be provided in the Plan, the following disputes in connection with Vitol will be compromised and settled pursuant to the Plan (such disputes are summarized in Section V.G.20-21 of this Disclosure Statement):

- Vitol's Releases:

    o Upon the effective date of the Plan, Vitol has agreed to release PREPA and the Oversight Board from any and all claims and causes of action arising out of or relating in any manner whatsoever to *PREPA v. Vitol Inc. et al.*, Adv. Proc. No. 19-00453 (D.P.R. Nov. 14, 2019).

    o For the avoidance of doubt, the Vitol Settlement Agreement expressly preserves any and all of Vitol's claims, rights, and defenses related to the avoidance action styled *Special Claims Comm. v. Inspectorate America Corp.*, Adv. Proc. No. 19-00388 in Case No. 17-bk-3283-LTS, D.P.R.

- PREPA's Releases:

    o Upon the effective date of the Plan, PREPA has agreed to release Vitol from any and all claims and causes of action arising out of or relating in any manner whatsoever to *PREPA v. Vitol Inc. et al.*, Adv. Proc. No. 19-00453 (D.P.R. Nov. 14, 2019).

    o For the avoidance of doubt, the Vitol Settlement Agreement expressly preserves any and all of PREPA's claims, rights, and defenses related to the avoidance

action styled *Special Claims Comm. v. Inspectorate America Corp.*, Adv. Proc. No. 19-00388 in Case No. 17-bk-3283-LTS, D.P.R.

### C.   Holders of Claims Entitled to Vote on the Plan of Adjustment

Pursuant to PROMESA Title III and the Bankruptcy Code, only holders of Allowed Claims in classes of claims that are impaired and are not deemed to have automatically accepted or rejected a proposed Title III plan of adjustment are entitled to vote to accept or reject a proposed plan of adjustment. Classes of claims in which the holders of claims are unimpaired under the Plan are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan. Classes of claims in which the holders of claims will receive no recovery under the plan of adjustment are deemed to have rejected the Plan and are also not entitled to vote.

Below is a summary of Classes of Claims entitled to vote to accept or reject the Plan, and not entitled to vote to accept or reject the Plan:

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Settling Bondholder and Settling Monoline Claims | Impaired | Entitled to Vote |
| 2 | Non-Settling Bondholder and Non-Settling Monoline Claims | Impaired | Entitled to Vote |
| 3 | Pension Claim | Impaired | Entitled to Vote |
| 4 | Fuel Line Loan Claims | Impaired | Entitled to Vote |
| 5 | National Insured Bond Claims | Impaired | Entitled to Vote |
| 6 | National Reimbursement Claim | Impaired | Entitled to Vote |
| 7 | General Unsecured Claims | Impaired | Entitled to Vote |
| 8 | Vitol Claims | Impaired | Entitled to Vote |
| 9 | Assured Insured Interest Rate Swap Claims | Impaired | Entitled to Vote |
| 10 | Ordinary Course Customer Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 11 | Eminent Domain/Inverse Condemnation Claims | Impaired | Entitled to Vote |
| 12 | Federal Claims | Impaired | Entitled to Vote |

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 13 | Convenience Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 14 | Section 510(b) Subordinated Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

Holders of Allowed Claims in Class 14 will not receive a distribution pursuant to the Plan and shall be deemed to have rejected the Plan and are not entitled to vote.

Holders of Allowed Claims in Classes 10 and 13 are Unimpaired pursuant to the Plan and shall be deemed to accept the Plan and are not entitled to vote.

Bankruptcy Code section 1126 defines "acceptance" of a plan of adjustment by a class of claims as acceptance by creditors in that class holding at least two-thirds in dollar amount and more than one-half in number of the allowed claims of such class held by creditors that voted to accept or reject the Plan. Thus, acceptance of the Plan by Claims in each Class entitled to vote on the Plan will occur only if at least two-thirds in dollar amount and a majority in number of the holders of Allowed Claims in such Class that have actually voted their Ballots have voted in favor of the Plan. A vote may be disregarded if the Title III Court determines, after notice and a hearing, that the acceptance or rejection was not solicited or procured in good faith or in accordance with the applicable provisions of PROMESA or the Bankruptcy Code.

It is important that holders of Claims in the Classes in the chart above that are eligible to vote exercise their right to vote to accept or reject the Plan. **EVEN IF YOU DO NOT VOTE OR DO NOT HAVE THE RIGHT TO VOTE TO ACCEPT THE PLAN, YOU MAY BE BOUND BY THE PLAN IF IT IS CONFIRMED BY THE TITLE III COURT.** The amount and number of votes required for acceptance or rejection of the Plan by a Class are computed on the basis of Claims actually voting to accept or reject the Plan. There are no quorum requirements with respect to the number of Claims in a Class that actually vote.

If at least one Impaired class of claims accepts a Title III plan of adjustment (without counting the votes of insiders), Bankruptcy Code section 1129(b), made applicable to Title III of PROMESA pursuant to PROMESA Section 301(a), permits the confirmation of the plan of adjustment under certain conditions, notwithstanding the rejection of the plan of adjustment by one or more other impaired classes of claims. Under that section, a plan of adjustment may be confirmed by a court if the plan of adjustment does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class. *See* Section VII.C of this Disclosure Statement for more information.

The Debtor's determination as to whether to request confirmation of the Plan pursuant to Bankruptcy Code section 1129(b) will be announced prior to or at the Confirmation Hearing.

D.     **Solicitation and Voting Procedures**

On December 16, 2022, the Debtor filed the *Motion of the Puerto Rico Electric Power Authority for an Order (I) Approving Disclosure Statement, (II) Fixing Voting Record Date, (III) Approving Confirmation Hearing Notice and Confirmation Schedule, (IV) Approving Solicitation Packages and Distribution Procedures, (V) Approving Forms of Ballots and Voting Procedures, (VI) Approving Notice of Non-Voting Status, (VII) Fixing Voting and Confirmation Deadlines, and (VIII) Approving Vote Tabulation Procedures* (the "Disclosure Statement Approval Motion") [ECF No. 3113], seeking an order from the Title III Court (i) approving the adequacy of the information contained in the proposed Disclosure Statement, (ii) fixing a Voting Record Date (as defined therein) for voting on the Plan, (iii) approving the Confirmation Hearing Notice (as defined therein) and confirmation schedule, (iv) approving the proposed contents of the Solicitation Package (as defined therein) and procedures for distribution thereof, (v) approving the forms of Ballots, and establishing solicitation, voting, and balloting procedures, (vi) approving the form and manner of Notice of Non-Voting Status (as defined therein), (vii) fixing the Voting Deadline (as defined therein), and confirmation deadlines, and (viii) approving procedures for tabulating creditor votes.  On [_____, 2023], the Title III Court entered the Disclosure Statement Order.

For more information regarding the solicitation and voting procedures surrounding the Plan, *see* the Disclosure Statement Order.

E.     **Confirmation Hearing and Deadline for Objections to Confirmation**

Pursuant to Bankruptcy Code section 1128, the Title III Court has scheduled the Confirmation Hearing on whether the Debtor has satisfied the confirmation requirements of PROMESA Section 314 and the incorporated subsections of Bankruptcy Code section 1129 on [_____, 2023] (Atlantic Standard Time) before the Honorable Laura Taylor Swain, United States District Judge designated by Chief Justice John Roberts of the U.S. Supreme Court to preside over the Commonwealth's Title III Case, Clemente Ruiz Nazario U.S. Courthouse, 150 Carlos Chardón Avenue, San Juan, P.R. 00918 at a courtroom to be later determined.  The Confirmation Hearing may be adjourned from time to time without notice except as given at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

The Title III Court has (i) established a Voting Deadline and Election Deadline of no later than 5:00 p.m. (Atlantic Standard Time) on [_____, 2023], and (ii) ordered that objections, if any, to confirmation of the Plan be filed and served on or before [_____, 2023] (Atlantic Standard Time).

### III.    Overview of the Debtor

### A.    General Information

### 1.    Overview of PREPA

The Puerto Rico Water Resources Authority ("PRWRA"), whose name was officially changed to the Puerto Rico Electric Power Authority in 1979, was established on May 2, 1941. PREPA was formed with the primary goal of ensuring the total electrification of Puerto Rico.[50] This process was largely accomplished by 1981, forty years after PREPA's creation.[51] As the only retail electric service provider in Puerto Rico, PREPA has supplied substantially all of the electricity utilized in Puerto Rico since its creation. Today, PREPA operates an outdated electric system with generation equipment that has sustained substantial damage from natural disasters. As a result, PREPA's customers experience relatively frequent extended service outages, which has led to the demand for better electric services in Puerto Rico.

### i.    Key Legislation

The Legislative Assembly has enacted numerous pieces of legislation focused on PREPA's operations since PREPA's establishment. Below are summaries of key legislation that have impacted PREPA.

### a.    Enabling Act (Act 83-1941)

In Puerto Rico, prior to 1941, electricity was produced and distributed mainly by private companies. In 1927, the Legislative Assembly created the System of Utilization of the Water Resources, the predecessor of PRWRA and PREPA, "with the idea that, the widespread use of electric power generated at a low cost, supplied at a reasonable price and in sufficient amounts, would be critical for industrial development and for promoting a better quality of life in Puerto Rico".[52] Leading up to 1941, the demand for electricity increased. Due to this demand, the Legislative Assembly enacted Act 83-1941 (as amended, the "PREPA Enabling Act") and established a government instrumentality responsible for a unified electric system, PRWRA, now known as PREPA. As a result, Puerto Rico became the first "self-contained area in the United States to be served entirely by a publicly owned electric system."[53]

The Legislative Assembly sought to streamline the operation of Puerto Rico's electric system with PREPA. In sum, the PREPA Enabling Act empowered PREPA to further develop and implement Puerto Rico's electric services for the benefit of Puerto Rico's citizens. The PREPA Enabling Act created a governing board (the "PREPA Board") to oversee PREPA's operations and the Governor of Puerto Rico was designated as chairman of the PREPA Board, with other government officials serving as members. As a public corporation, PREPA was

---

[50] Act 57-2014, *Statement of Motives*.

[51] *Id.*

[52] Act 120-2018, *Statement of Motives.*

[53] *Annual Report of the Puerto Rico Water Resources Authority Fiscal Year 1941–42*, 3 (Dec. 7, 1942).

authorized to, among other things, produce and distribute water and electric energy, determine appropriate rates for its energy services, and issue bonds in connection with its corporate purposes.

PREPA, as an instrumentality of the Commonwealth, is charged with certain duties and responsibilities including, "[t]o provide and allow electric power to be provided in a reliable, clean, efficient, resilient, and affordable manner thus contributing to the general well-being and sustainable development of the people of Puerto Rico." Section 6(a) of Act 17-2019.

### b. Puerto Rico Energy Transformation and Relief Act (Act 57-2014)

On May 27, 2014, Act 57-2014 was signed into law by the Governor of Puerto Rico. Act 57-2014 aimed to make Puerto Rico's energy system more efficient and less dependent on fossil fuels by reforming PREPA's regulatory framework. Act 57-2014 sought to accomplish this goal with the creation of CEPPO, PREC and the ICPO. CEPPO, now the Energy Public Policy Program of the Department of Economic Development and Commerce, is tasked with developing public policy on energy, which involves identifying and evaluating alternative energy sources. As further detailed below, PREC was an independent governing body, which was responsible for regulating, supervising, and ensuring compliance with Puerto Rico's public policy on energy. Under Act 57-2014, PREC's key role was to evaluate PREPA's Energy RELIEF Plan and IRP, both of which are required to detail PREPA's strategies for complying with Act 57-2014. Lastly, PREC was also responsible for reviewing and approving energy rates. ICPO is a government agency whose primary purpose is to defend energy consumers before PREPA or PREC on matters such as disputes related to electricity bills.

### c. Puerto Rico Electric System Transformation Act (Act 120-2018)

Act 120, approved on June 21, 2018, represents another effort by the Legislative Assembly to further reform PREPA's operations and services. Act 120 seeks to facilitate the transformation of Puerto Rico's electric system through the use of public-private partnerships. As contemplated by Act 120, a public-private partnership consists of an agreement between a private entity and PREPA to provide services for a set period of time in Puerto Rico. These partnerships are viewed as "a project delivery method that is not privatization."[54] In order to enable and encourage these public-private partnerships, Act 120 establishes a legal framework that permits PREPA to delegate its operations and sell its assets. However, there are limitations contained in this framework. For example, if PREPA is selling an asset related to electric power generation, both the Governor and Legislative Assembly must ratify the agreement for it to be approved. With regards to other transactions, the affirmative vote of both representatives of the public interest, consisting of two of the five members of the P3 Authority's Board, is required. 22 P.R. Laws Ann. § 1120(b). Act 120 is intended to prioritize a more reliable and financially feasible electric services provider that focuses on the welfare of its consumers.

### d. Puerto Rico Energy Public Policy Act (Act 17-2019)

---

[54] See https://www.p3.pr.gov/faq/.

Act 17-2019, enacted on April 11, 2019, sets parameters to accomplish the transformation goals of earlier legislation.  Act 17-2019, like previous legislation, aims to reform PREPA and modernize Puerto Rico's electric system.  In order to accomplish these goals, Act 17-2019 prohibits certain monopolization of Puerto Rico's electric system and provides that no electric power service company may control more than fifty-percent (50%) of Puerto Rico's power generation asset capacity.  Act 17-2019 also prioritizes renewable energy through various mechanisms, such as a faster permit process for renewable residential projects and the obligation to eliminate electricity generation from coal by January 2028.  In order to enforce the mandates contained in Act 17-2019 and accomplish the statute's goals, and as further detailed below, Act 17-2019 expanded PREC, now PREB's authority to include, among other powers, the ability to establish performance based incentives and penalty mechanisms.

ii.     **PREPA's Energy Services**

Puerto Rico's electric power Generation System, as of April 11, 2019, consists of two thousand seven hundred and forty-eight (2,748) miles of transmission lines, thirty-one thousand four hundred and eighty-five (31,485) miles of distribution lines, and three hundred and thirty-four (334) substations.[55]  PREPA generates approximately two-thirds of Puerto Rico's power and purchases additional power to meet the electricity demand in Puerto Rico.[56]  As of June 2022, PREPA provided electric services to a total of approximately 1.5 million customers, consisting of ninety-one percent (91%) residential customers, eight percent (8%) commercial customers, and less than one percent (1%) industrial customers.[57]  Based on the number of electric customers served, PREPA is one of the largest public power utilities in the United States.[58]  PREPA's commercial customers account for almost half of the electricity demand in Puerto Rico, residential customers account for forty-two percent (42%), and industrial customers twelve percent (12%).[59]  While PREPA's industrial customers are spread across Puerto Rico, most of its residential and commercial customers are concentrated in the San Juan metropolitan area.[60]

Although PREPA is one of the largest public power utilities in the United States, PREPA's reliability metrics are substantially behind peer standards.[61]  For example, "[t]he average PREPA customer loses power at least once every 5 to 6 weeks, compared to 1 to 2 times per year for mainland customers."[62]  In 2020, "the average duration of power outages was also nearly 10 times longer for PREPA's customers than for mainland customers."[63]  These outages, which occur frequently and often for extended periods of time, have significantly impacted Puerto Rico's

---

[55] Act 17-2019, *Statement of Motives*.

[56] *Id.*

[57] *2022 Certified Fiscal Plan for the Puerto Rico Electric Power Authority*, 32 (June 28, 2022).

[58] *Id.* at 19.

[59] *Id.* at 32.

[60] *Id.*

[61] *Id.* at 20.

[62] *Id.*

[63] *Id.*

citizens and businesses.[64]  In a June 2020 survey of PREPA customers, a majority of respondents indicated that they were dissatisfied with the reliability of Puerto Rico's electricity services.[65]

The low reliability of Puerto Rico's electricity services can be attributed primarily to PREPA's outdated system and the damage that the power Generation System and the T&D System sustained from multiple natural disasters.  PREPA operates an electric power Generation System that is approximately "thirty years (30) older than the electric power industry average in the United States."[66]  Despite the legislative reform measures enacted in recent years, PREPA has largely failed to modernize its operating system.[67]  However, since LUMA Energy assumed control of the T&D System in June 2021, there have been steps taken towards addressing PREPA's outdated system.[68]  Further, while LUMA Energy has proposed numerous initiatives to improve the electricity grid's ability to withstand extreme weather events, they have not yet been implemented.[69]

Puerto Rico's electric power Generation System and T&D System have been severely damaged in recent years by multiple hurricanes and earthquakes.  Most recently, in September 2022, PREPA's power Generation System was damaged by Hurricane Fiona, a Category 1 storm. Hurricane Fiona caused an island-wide power outage and is estimated to have damaged approximately fifty-percent (50%) of Puerto Rico's electrical grid infrastructure.[70]  In January 2020, PREPA's electrical grid was damaged by magnitude 5.4 and 6.4 earthquakes, which occurred only one day apart.  Following the earthquakes, nearly two-thirds of Puerto Rico's population were left without electricity for several days.[71]  Further complicating the outdated electric power Generation System and the catastrophic impact of natural disasters on PREPA's electricity grid are PREPA's historic failure to perform routine maintenance and "vegetation management" practices.[72]  This failure makes PREPA's electrical gird susceptible not only to extreme weather events but also to more routine disturbances.  For example, in 2016 "35 to 45% of all service outages were caused by tree trimming conditions."[73]  In 2018, a tree fell on a main power line and resulted in an outage that left approximately 900,000 customers without power.[74] However, LUMA Energy has implemented a Vegetation Management Plan to mitigate the risks

---

[64] *2020 Fiscal Plan for the Puerto Rico Electric Power Authority*, 20 (June 29, 2020).

[65] *Id.* at 20–21.

[66] Act 17-2019, *Statement of Motives*.

[67] *2020 Fiscal Plan for the Puerto Rico Electric Power Authority*, 89 (June 29, 2020).

[68] *2022 Certified Fiscal Plan for the Puerto Rico Electric Power Authority*, 184 (June 28, 2022).

[69] *Id.* at 68.

[70] *See* https://lumapr.com/news/luma-actively-responding-and-restoring-power-following-island-wide-outage-caused-by-hurricane-fiona/?lang=en; https://lumapr.com/news/damage-3/?lang=en.

[71] *2020 Fiscal Plan for the Puerto Rico Electric Power Authority*, 59 (June 29, 2020).

[72] *2021 Fiscal Plan for the Puerto Rico Electric Power Authority*, 16 (May 27, 2021).

[73] *Id.*

[74] *2020 Fiscal Plan for the Puerto Rico Electric Power Authority*, 58 (June 29, 2020).

associated with vegetation and completed an initial vegetation clearing.[75]  PREPA's already slow progress in improving its energy services was further hindered by the COVID-19 pandemic.[76]

Section III.E.2 discusses the federal funding allocated to PREPA for use in fixing and modernizing its electric grid.

### iii.    PREPA's Revenue Sources and Rate Structure

PREPA's revenue sources consist of revenue from its energy sales, which have decreased over the past decade.  Although PREPA is one of the largest public power utilities in the United States, compared to other power public power utilities it has lower sales to customers.[77]  The COVID-19 pandemic further exacerbated PREPA's already low customer sales, as it led to a further decrease in sales.[78]  Additionally, the Oversight Board projects that PREPA's sales will to continue to decline in upcoming years because the Oversight Board projects that Puerto Rico's population will continue to shrink, which is expected to decrease overall energy consumption in Puerto Rico.[79]  PREPA's revenues are also likely to decrease as a result of the eventual implementation of energy efficiency measures mandated in recent legislation.

Since 2004, PREPA "has been operating under a structural financial deficit."[80]  The financial deficit is the result of, among other things, PREPA's failure to adjust the energy rate structure to rates that would cover PREPA's operating costs.[81]  Despite PREPA's failure to increase energy rates, a majority of respondents, in a June 2020 survey of PREPA's customers, indicated that they were dissatisfied with the cost of electricity.[82]  On average, PREPA's customers "pay more for electricity relative to their income than consumers in any U.S. state."[83]

Act 57-2014, as amended, requires that PREB review and approve PREPA's rates and charges for its electric services.  PREPA's current rate structure was approved by PREB in 2017.  However, the rate structure was not implemented until May 1, 2019 due to delays resulting from hurricanes.[84]  Under the requirements of the current rate structure, customer bills must include a detailed itemization of rate components.[85]  The base rate to cover fixed costs, fuel and purchase power charges, and subsidies for municipalities (*i.e.*, Contributions in Lieu of Taxes ("CILT")),

---

[75] *2022 Certified Fiscal Plan for the Puerto Rico Electric Power Authority*, 68 (June 28, 2022).

[76] *Id.* at 17.

[77] *Id.* at 19.

[78] *2021 Fiscal Plan for the Puerto Rico Electric Power Authority*, 39 (May 27, 2021).

[79] *See 2022 Certified Fiscal Plan for the Puerto Rico Electric Power Authority*, 29–30 (June 28, 2022).

[80] *Id.* at 33.

[81] *Id.* at 33–34.

[82] *2020 Fiscal Plan for the Puerto Rico Electric Power Authority*, 20 (June 29, 2020).

[83] *2022 Certified Fiscal Plan for the Puerto Rico Electric Power Authority*, 32 (June 28, 2022).

[84] *2020 Fiscal Plan for the Puerto Rico Electric Power Authority*, 39 (June 29, 2020).

[85] *Id.*

among other statutory categories, are displayed on customer bills.[86]  In Fiscal Year 2023, the rate components are projected to consist of "5% for CILT and other subsidies, 24% for base rate, including utility operating and maintenance costs, and 71% for power generation costs."[87]

### iv.   Regulatory Structure

#### a.   Establishment of PREC

PREC was created pursuant to Act 57-2014 as an independent entity responsible for regulating, supervising, and ensuring compliance with Puerto Rico's public policy on energy. Pursuant to Act 57-2014, PREC was to be composed of two associate commissioners and one chair commissioner, all appointed by the Governor of Puerto Rico with the advice and consent of the Senate of Puerto Rico.  Act 57-2014 requires that PREC's commissioners are professional engineers licensed in Puerto Rico, Puerto Rico licensed attorneys, or economy, planning, or finance professionals preferably with a masters or doctorate degree, and with at least five (5) years of experience in energy-related matters and ten (10) years of experience in their profession.

PREC was established to facilitate energy reform in Puerto Rico, with a focus on regulating, overseeing, and enforcing the public policy on energy and developing a reliable, affordable, efficient, and transparent energy service.  Act 57-2014 required PREC to prioritize the efficient generation of energy, in order to lower production costs and customer electricity bills. Accordingly, PREC was empowered to develop and implement strategies to reduce and stabilize energy costs.  PREC was also responsible for evaluating plans that PREPA was required to submit under Act 57-2014 regarding its obligation to improve energy efficiency, pursue renewable energy, and address various operational concerns.  As a mechanism to ensure lower electric costs, PREPA and other electric power companies operating in Puerto Rico are required under Act 57-2014 to submit changes to rates and charges for electric services to PREC for PREC's approval before any changes can take effect.

#### b.   PREB and Recent Revisions to Regulatory Authority

In 2018, under the Puerto Rico Public Service Regulatory Board's Reorganization Plan, the Puerto Rico Public Service Commission, the Telecommunications Regulatory Board and PREC were consolidated under the umbrella of the Public Services Regulatory Board and PREC's name was changed to the Puerto Rico Energy Bureau, or PREB.  The consolidation of the three entities did not impact PREC's, now PREB's, status as an independent regulatory body or its regulatory oversight powers.  As characterized by the then Governor of Puerto Rico, the consolidation was purely for administrative purposes.

PREB is the current independent regulatory body responsible for regulating, overseeing, and enforcing Puerto Rico's energy policies.  It maintains its supervisory role of Puerto Rico's energy services to the extent its powers are not preempted by the Oversight Board's supervisory powers under PROMESA.  PREB is currently composed of four associate commissioners and one chair commissioner.  PREB has the same overall mission as PREC.  Its responsibilities include,

---

[86] *Id.*

[87] *2022 Certified Fiscal Plan for the Puerto Rico Electric Power Authority*, 132 (June 28, 2022).

among others, establishing guidelines for purchasing power, setting standards for power purchase agreements, creating demand response programs, establishing performance based incentives and penalty mechanisms, and overseeing compliance with vegetation management practice programs.

2.    **Overview of PREPA Subsidiaries**

On August 18, 2003, the Legislative Assembly enacted Act 189-2003, which authorizes PREPA, among other things, to (i) establish, develop or acquire prompt and flexible administrative structures such as profit or non-profit subsidiary corporations, affiliated or associated in Puerto Rico or abroad, which prepare PREPA to compete in the industry, for purposes, among others, of developing, financing, building and operating industrial projects and other infrastructure directly related to the maximization of PREPA's electrical infrastructure, and (ii) acquiring, having and disposing of value and participation, contract, bonds or interests in other companies, entities or corporations.

PREPA has utilized this authority and created several subsidiaries under the following structure:



In accordance with applicable law, the Commonwealth's and PREPA's Certified Fiscal Plans, and the T&D Contract, PREPA began executing a reorganization plan that lays out the necessary steps and timeline to undertake PREPA's corporate and legal reorganization into various corporate entities to cleanly divide assets and functions. The creation of the corporate entities, illustrated further below, must be approved by the applicable governmental bodies.

62

In accordance with the PREPA Enabling Act, after PREPA finalizes all the documents necessary to create the subsidiaries, the documents will be submitted to PREPA's Board for approval.  Thereafter, PREPA must submit the documentation to PREB for approval.  These steps must be considered in any timeline that is developed to complete the PREPA reorganization.



A description of the various entities in the PREPA structure is as follows:

i.      **PREPA Holdings, LLC**

On October 26, 2009, PREPA formed PREPA Holdings, LLC ("<u>PREPA Holdings</u>") as a Delaware limited liability company.  PREPA Holdings is a wholly owned subsidiary of PREPA that was created to function as a holding company.[88]  PREPA Holdings is the parent company of HUB Advanced Networks LLC ("<u>HUB Advanced Networks</u>"), InterAmerican Energy Sources, LLC ("<u>InterAmerican Energy</u>"), Consolidated Telecom of Puerto Rico, LLC ("<u>Consolidated Telecom</u>"), and International Network Operations, LLC ("<u>International Network Operations</u>").

ii.     **HUB Advanced Networks LLC**

HUB Advanced Networks, originally formed under the name PREPA Networks, LLC ("<u>PREPA Networks</u>") was created on November 13, 2008 as a Delaware limited liability company.  At the time of its formation, HUB Advanced Networks was responsible for marketing the excess

---

[88] *Puerto Rico Electric Power Authority Independent Auditors' Report Audited Financial Statements, Required Supplementary Information and Supplemental Schedules for the Fiscal Year Ended June 30, 2020*, 29 (Sept. 30, 2022).

communication capacity available from PREPA's fiber optic cable system.[89]  Since its creation, PREPA Networks has sought to expand its mission and services.  In December 2020, PREPA Networks changed its name to HUB Advanced Networks to reflect its new focus on providing telecommunications infrastructure services and advanced technology services.[90]

### iii.   InterAmerican Energy Sources, LLC

InterAmerican Energy was organized on May 25, 2007 as a Delaware limited liability Company.   InterAmerican Energy was formed to further develop PREPA's electric infrastructure.[91]   As part of this, InterAmerican was responsible for "investing, developing, financing, constructing, and operating renewable energy projects."[92]   As of the date of this Disclosure Statement, InterAmerican Energy is not operating.

### iv.   Consolidated Telecom of Puerto Rico, LLC

On October 26, 2009, Consolidated Telecom was created as a Delaware limited liability company.   Consolidated Telecom was organized to form and operate a telecommunications business either within or outside Puerto Rico.[93]   On June 1, 2018, Consolidated Telecom's operations were transferred to PREPA Networks, now HUB Advanced Networks.[94]  As of the fiscal year ended June 30, 2021, Consolidated Telecom had limited operations with only one customer.

### v.   International Network Operations, LLC

International Network Operations was organized on June 15, 2017, as a Delaware limited liability company.   International Network Operations was formed to create a new fiber optic business and other telecommunications technologies, including services directly or indirectly relating to the infrastructure of PREPA.[95]   International Network Operations commenced operations during the fiscal year ended June 30, 2018.

### vi.   PREPA PropertyCo, LLC

The creation of PREPA PropertyCo, LLC ("PropertyCo") was approved by PREPA's Board on December 15, 2021.  PropertyCo is the legal entity that will own and operate the PREPA assets not related to the T&D System or the legacy generation and irrigation facilities.  PREPA is

---

[89] *Puerto Rico Electric Power Authority Independent Auditors' Report Audited Financial Statements, Required Supplementary Information and Supplemental Schedules for the Year Ended June 30, 2017*, 20 (June 28, 2019).

[90] *See* Caribbean Business, *PREPA Networks changes name to HUB Advanced Networks*, Dec. 2, 2020, https://caribbeanbusiness.com/prepa-networks-changes-name-to-hub-advanced-networks/?cn-reloaded=1.

[91] *Puerto Rico Electric Power Authority Independent Auditors' Report Audited Financial Statements, Required Supplementary Information and Supplemental Schedules for the Year Ended June 30, 2017*, 23 (June 28, 2019).

[92] *Id.* at 20.

[93] *Id.*

[94] *Id.*

[95] *Id*. at 21.

the sole member of PropertyCo.  PREPA will contribute certain assets to Property-Co, including assets not related to the T&D System, the legacy thermal generation assets, or the hydropower assets.

The property, business, and affairs of PropertyCo will be managed and conducted by its board of managers, consisting of the PREPA Board.  The chairman and vice-chairman of PropertyCo's board of managers will be the chairman and vice-chairman of the PREPA Board.

### vii.    PREPA GenCo, LLC

The creation of PREPA GenCo, LLC ("GenCo") was approved by PREPA's Board on December 15, 2021.  GenCo is the legal entity that will own and operate (or delegate the operation of) the PREPA's legacy thermal generation assets.  The sole member of GenCo is PREPA.  PREPA will contribute certain capital to GenCo, including, but not limited to, thermal generation assets, employees, vehicles, software, and contracts.

The property, business, and affairs of GenCo will be managed and conducted by its board of managers, consisting of the PREPA Board.  The chairman and vice-chairman of GenCo's board of managers will be the chairman and vice-chairman of the PREPA Board.

### viii.    PREPA HydroCo, LLC

The creation of PREPA HydroCo, LLC ("HydroCo") was approved by PREPA's Board on December 15, 2021.  HydroCo is the legal entity that will own and operate (or delegate the operation of) PREPA's legacy hydroelectric generation and irrigation assets.  The sole member of the HydroCo is PREPA.  PREPA will contribute certain capital to HydroCo, including, but not limited to, the hydropower assets.

The property, business, and affairs of HydroCo will be managed and conducted by its board of managers, consisting of the PREPA Board.  The chairman and vice-chairman of HydroCo's board of managers will be the chairman and vice-chairman of the PREPA Board.

### B.    Debtor's Financial Obligations as of the Petition Date

#### 1.    The Trust Agreement and Outstanding PREPA Revenue Bonds

22 L.P.R.A. § 196(o) authorizes PREPA "[t]o borrow money, make and issue bonds of the Authority for any of its corporate purposes, and to secure payment of its bonds and of any and all other obligations by pledging or placing a lien on all or any of its contracts, revenues, and income." 22 L.P.R.A. § 196(o).

Pursuant to that authorization in the PREPA Enabling Act, PREPA entered into the Trust Agreement.  Between the years 1974 and–2016, PREPA issued several series[96] of the Bonds

---

[96] According to the proof of claim filed by U.S. Bank National Association, solely in its capacity as Bond Trustee, against PREPA, logged by Prime Clerk LLC (now Kroll Restructuring Administration LLC) as Proof of Claim No. 18449, PREPA's outstanding PREPA Revenue Bonds consist of the following: Series JJ, Series LL, Series MM, Series NN, Series PP, Series QQ, Series RR, Series SS, Series TT, Series UU, Series VV, Series WW, Series XX, Series

pursuant to the Trust Agreement, bearing effective interest rates between 3.9% and 10% and maturing between 2018 and 2043.

The proof of claim filed by U.S. Bank National Association, solely in its capacity as trustee, against PREPA, logged by Prime Clerk LLC (now Kroll Restructuring Administration LLC) as Proof of Claim No. 18449 (the "Master Bond Debt Claim"), asserts that, as of the Petition Date, PREPA has outstanding $8,258,614,148 aggregate principal amount of the Bonds.  As of the Petition Date, approximately $843,430,000 of the Bonds were insured by Assured,[97] approximately $1,245,785,000 were insured by National,[98] and approximately $276,185,000 were insured by Syncora, though these amounts have changed as the Monoline Insurers made payments pursuant to their insurance policies during the Title III Case.[99]  A schedule of PREPA's outstanding Revenue Bonds is attached to the Master Bond Debt Claim.

According to the Oversight Board, the Trust Agreement provides for the grant of a security interest to the Bond Trustee, for the benefit of the Bondholders, in specified "Revenues" that are deposited into a series of deposit accounts designated as the "Sinking Fund," as well as a series of deposit accounts described herein as the "Subordinate Funds."  Trust Agreement, §§ 401, 701. The Trust Agreement further specifies that the Revenue Bonds are payable solely from the "Revenues" that are pledged to secure the Bonds (*i.e.*, the Revenues deposited to the credit of the Sinking Fund and Subordinate Funds).  22 L.P.R.A. § 207 provides the holders of Revenue Bonds with the right to seek appointment of a receiver to operate PREPA in the event that PREPA defaults on its obligations under the Trust Agreement.

As described in Section V.G.2 of this Disclosure Statement, the scope of the Bond Trustee's security interest and recourse are the subject of active litigation.

2.    **Fuel Line Loans**

On May 4, 2012, PREPA entered into a Credit Agreement (the "Scotiabank Credit Agreement") with Scotiabank de Puerto Rico ("Scotiabank") and other lenders, in which the lenders agreed to advance up to $500,000,000 to PREPA (the "Scotiabank Fuel Line Loan").  The amount of the available line was subsequently increased to $550,000,000, of which $549,950,000 was outstanding as of the Petition Date.  Effective May 17, 2019, Cortland Capital Market Services LLC ("Cortland") replaced Scotiabank as administrative agent for the lenders under the Scotiabank Credit Agreement.

On July 20, 2012, PREPA entered into a Trade Finance Facility Agreement (the "Citibank Credit Agreement"), under which Citibank, N.A. ("Citibank") agreed to advance up to $250,000,000 (the "Citibank Fuel Line Loan," and together with the Scotiabank Fuel Line Loan, the "Fuel Line Loans"), of which approximately $146,042,000 in principal was outstanding as of

---

YY, Series ZZ, Series AAA, Series BBB, Series CCC, Series DDD, Series EEE, Series 2012A, Series 2013A, Series 2016A, Series 2016B, Series 2016C, Series 2016D, Series 2016E.

[97] *See* Proof of Claim Nos. 29020 and 32829.

[98] *See* Proof of Claim Nos. 22078 and 23396.

[99] *See* Proof of Claim No. 49143.

the Petition Date.  Citibank was the original lender under the Citibank Credit Agreement, but it subsequently assigned its loans to SOLA LTD, Solus Opportunities Fund 5 LP, Ultra Master LTD, and Ultra NB LLC (collectively, "Solus"), which continue to hold the majority of such loans.

The Fuel Line Loans were entered into in order to finance the purchase of fuel.  The Fuel Line Loans are both unsecured.

The Scotiabank Credit Agreement required that any advances to PREPA be repaid in 180 days.  The Citibank Credit Agreement required that any advances to PREPA be repaid in 270 days.

### i.    The Forbearance Agreements

In 2014, when PREPA was faced with a liquidity crisis, PREPA entered into forbearance agreements (the "Forbearance Agreements") with the Fuel Line Lenders, the Ad Hoc Group, and certain monoline insurers (collectively, the "Forbearing Creditors").  Under the Forbearance Agreements, the Forbearing Creditors agreed to forbear from the exercise of certain rights and remedies under their applicable debt instruments.  The Forbearance Agreements were originally scheduled to terminate on March 31, 2015, but were extended by certain of the Forbearing Creditors on numerous occasions, most recently through November 5, 2015.  The Forbearance Agreements expired on November 5, 2015, but the agreement of the Forbearing Creditors to refrain from exercising of certain rights and remedies was extended under the Prepetition RSA.  Under the Forbearance Agreements with the forbearing Bondholders, PREPA's obligations to pay any and all principal and interest payments on the Bonds were required to continue; however, the forbearing bondholders agreed that PREPA was not required to make transfers to a "Revenue Fund" or the Sinking Fund pursuant to sections 506 and 507 of the Trust Agreement while that agreement remained in effect.

PREPA was permitted until November 5, 2015 to delay certain payments that became due to the Forbearing Creditors in July and August 2014.  Under the Prepetition RSA, PREPA was permitted to delay such payments further until June 30, 2016; however, PREPA continued to pay interest while those agreements remained in effect.  In connection with the Forbearance Agreements and in order to address PREPA's liquidity challenges, on August 27, 2014, the Trust Agreement was amended to permit PREPA to use approximately $280 million held in its construction fund for payment of current expenses in addition to capital improvements.  The amendment also provided for an increase in the thresholds required for the exercise of remedies under the Trust Agreement.  Those amendments expired on March 31, 2015.  In connection with an extension of the Forbearance Agreements executed on June 30, 2015 and PREPA's agreement to pay approximately $415.8 million of principal and interest due on July 1, 2015, on the PREPA Bonds, the Trust Agreement was again amended to increase the thresholds for the exercise of remedies under the Trust Agreement and to allow for the issuance of $130.7 million in Bonds to the monoline bond insurers (the "2015A Bonds") that matured on January 1, 2016.  Those amendments expired on September 1, 2015.  On December 15, 2015, PREPA defeased the outstanding principal and interest requirements on the 2015A Bonds, and the 2015A Bonds were paid in full on the first business day of January 2016 (January 4, 2016) in accordance with their terms.

3.      **Accounts Receivable**

PREPA's operating accounts receivable primarily consist of five subsets of customer classes: (i) residential, (ii) commercial, (iii) industrial, (iv) non-municipal government entities, and (v) municipalities.  These accounts receivable consist of monthly or bi-monthly billings for electric service rendered to customers based on meter reads and the accrual of revenues for electric service rendered to customers not billed at applicable month-end.  PREPA accrues unbilled revenues based on an average of unbilled consumption by customer.

PREPA's audited accounts receivable are stated net of estimated allowances for uncollectible amounts, which are determined after considering the likelihood of subsequent collections and current economic conditions, among other factors.  PREPA establishes a general or specific allowance for each group of customers (*i.e.*, residential, commercial, industrial, and governmental).  Because of uncertainties inherent in the estimation process, credit losses in the existing accounts receivable and related allowance may change in the future.  PREPA also has significant accounts receivable from the Commonwealth, its component units, and municipalities.  In evaluating the aging of PREPA's outstanding accounts receivable balance at any point in time, it is important to take into account that PREPA's accounts receivable aging schedules incorporate amounts due from Puerto Rico municipalities, which are usually offset against PREPA's obligation to pay CILT.  There is uncertainty regarding the collection of such receivables due to the financial challenges that these entities are facing.  PREPA has considered this in its estimate of the specific governmental allowance for uncollectible accounts.

As of December 31, 2022, PREPA has the following unaudited, gross accounts receivable outstanding for its major customer classes: (i) $838,774,145.56 from residential customers, (ii) $665,484,314.59 from commercial customers, (iii) $86,063,237.19 from industrial customers, and (iv) $2,444,543,503.84 related to governmental accounts, a significant portion of which relates to municipal CILT and public lighting.

4.      **Accounts Payable and Accrued Liabilities**

PREPA's accounts payable and accrued liabilities consist of: accrued pension plan contribution and withholding from employees, other-post employment benefit obligations, accrued compensation, fuel oil and cogeneration vendor obligations, non-fuel oil/non-cogeneration vendor obligations (*e.g.*, professional fees, rents, security, fleet and storage, and government-related expenses), and major construction vendor obligations.

PREPA's latest unaudited accounts payable and accrued liabilities total is as of November 30, 2022, and amounts to $1,596,527,000.

5.      **Obligations under PREPA's Collective Bargaining Agreements**

Prior to the transition of the operation and management of PREPA's transmission and distribution system to LUMA Energy, there were four active unions representing PREPA employees, Union Insular de Trabajadores Industriales y Construcciones Eléctricas, Inc. ("UITICE"), Union de Pilotos de la Autoridad de Energía Eléctrica ("UPAEE"), UTIER, and the Union de Empleados Profesionales Independiente de la AEE ("UEPI," and, together with UTIER, the "Unions").  Upon the transition of grid operations to LUMA Energy, all of the employees

represented by UITICE and UPAEE transferred either to other positions at the Commonwealth or LUMA Energy. As such, UITICE and UPAEE have no members, and UTIER and UEPI are the only remaining active labor unions representing PREPA employees. As of November 2022, these two Unions represent more than 807 current employees of PREPA ("Represented Employees"), UTIER represents approximately 749 current employees and UEPI represents approximately 58 current employees. The number of Represented Employees is likely to substantially decrease following the transition of the operation and management of PREPA's legacy generation assets to Genera PR LLC. For a discussion of this transition, see section III.F.5 of this Disclosure Statement.

The terms and conditions of employment between the Represented Employees and PREPA are governed by collective bargaining agreements, a collective bargaining agreement between PREPA and UTIER (the "UTIER CBA") and a collective bargaining agreement between PREPA and UEPI (the "UEPI CBA," and, together with the UTIER CBA, the "CBAs"). The CBAs impose obligations on PREPA, many of which the Oversight Board has determined are no longer sustainable and are inconsistent with the Certified Fiscal Plan.

Pursuant to the CBAs, PREPA provides various employment benefits to Represented Employees including, among other benefits, vacation and sick leave, paid holidays, bonuses, overtime pay, health insurance. All collective bargaining agreements with PREPA have expired but contain "evergreen" clauses and, therefore, remain in full force and effect, except as modified by law (such as Act 26-2017, enacted on April 29, 2017 ("Act 26-2017")). The Oversight Board is currently negotiating with UTIER to determine whether consensual modifications of their CBA can be reached. Specifically, the Oversight Board believes the CBAs should be modified to align with Act 26-2017, which temporarily standardizes benefits across the Commonwealth, its agencies and public corporations that are provided to employees in addition to their salaries. Act 26-2017, among other things, (i) reduces vacation and sick leave benefits; (ii) reduces the number of public holidays; (iii) reduces the Christmas bonus of employees of public corporations to $600, prohibits the payment of other economic bonuses, and requires that an employee complete at least six (6) months of service per year in order to receive the Christmas bonus; (iv) replaces overtime pay for public employees with compensatory time up to certain caps; (v) eliminates the cash-out payment for sick day accruals and caps the liquidation for vacation leave accruals to sixty (60) days; and (vi) nullifies any provision of a collective bargaining agreement that provides public employees fringe benefits in excess of those set forth in the Act 26-2017. For an estimate of savings resulting from these modifications to the CBAs, see Exhibit Q.[100]

The most significant obligation in the CBAs the Oversight Board seeks to modify is the requirement that PREPA maintain a fully funded pension system for Represented Employees and retired PREPA employees with ongoing retirement benefit accruals and periodic cost of living adjustments. The UTIER CBA originally provided for the formation of an employee retirement system for PREPA. Thereafter, the PREPA Board established SREAEE, the entity responsible for the administration and payment of PREPA's pension obligations, pursuant to Resolution No. 200, adopted on June 25, 1945. Article XXXVIII of the UTIER CBA and Article XLII of the UEPI

---

[100] Note that the savings estimated in this exhibit were calculated without the impact of the transition of the operation of generation assets to Genco. Were the Genco transition to occur, these savings would reduce to a minimal amount as PREPA would be left with very few Represented Employees.

CBA contain provisions concerning the operation of SREAEE.[101]  Article XXXVIII, § 1 of the UTIER CBA provides that SREAEE, which was created at the "request" of prior collective bargaining agreements, "must continue to operate subject to proposals for improvements that [PREPA or UTIER] may submit to the SREAEE Board of Trustees and that the SREAEE Board of Trustees accepts, or that the SREAEE Board of Trustees considers appropriate."[102]  Article XLII of the UEPI CBA contains a similar requirement that SREAEE continue to operate.[103]  Article XXXVIII, § 2 of the UTIER CBA and Article XLII, § 2 of the UEPI CBA provide that PREPA has to make certain contributions to SREAEE.[104]  Specifically, pursuant to § 2.A of the UTIER CBA, PREPA is required to contribute to a special fund in SREAEE "the necessary amount actuarially calculated to pay a benefit to regular workers, special regular workers, and regular workers with special appointments."[105]

Moreover, each of UTIER and UEPI has filed proofs of claim against PREPA asserting claims of grievances purportedly arising under their respective CBAs on behalf of their members.  Specifically, UTIER filed a proof of claim with respect to such alleged grievances in the amount of $1,124,524,226.  The Oversight Board is in the process of evaluating the validity of this claim.  However, PREPA does not have the ability to satisfy a claim of this magnitude in full, even if only allowed at a small fraction of the asserted amount.  Additionally, UEPI filed a proof of claim for alleged grievances under its CBA in the amount of $3,711,794.

In addition to the foregoing asserted union liabilities against PREPA, the Oversight Board is continuing to engage in negotiations regarding the unsustainable obligations described above.  If an agreement cannot be reached with respect to these obligations, PREPA may need to seek rejections of the CBAs.

The following are prepetition labor-related actions filed by the unions that were stayed by PREPA's Title III Case:

(1) On July 23, 1999, UTIER filed a claim against PREPA with the Mediation and Arbitration Bureau of the Puerto Rico Department of Labor and Human Resources ("PRDLHR") for accrued vacation leave over 450 hours based on the ten-year period beginning July 24, 1989.  On April 17, 2015, the PRDLHR arbitrator issued an award ordering PREPA to pay: (i) two times the corresponding salary for employees having unpaid excess vacation leave after August 1, 1995; (ii) payment of an equal amount as penalty, plus post award legal interest, since the day of the decision; and (iii) 10% of the total amount for attorneys' fees.  On May 18, 2015, PREPA filed a lawsuit to vacate PRDLHR's arbitration award in the San Juan Superior Court.  On April 18, 2016, the court ruled against PREPA and dismissed the case.  On May 20, 2016, PREPA appealed the dismissal to the Puerto Rico Court of Appeals.  The appeal was automatically stayed as a

---

[101] UTIER CBA, Article XXXVIII, 108–9; UEPI CBA, Article XLII, 60.

[102] UTIER CBA, Article XXXVIII, at 108.

[103] UEPI CBA, Article XLII, at 60.

[104] UTIER CBA, Article XXXVIII, at 108; UEPI CBA, Article XLII, at 61.

[105] UTIER CBA, Article XXXVIII, at 108.

result of the filing of the Title III Case, and on November 17, 2017, the Court of Appeals issued a ruling confirming the stay of the proceedings.

(2) On December 17, 2014, UTIER filed a claim against PREPA with the Puerto Rico Labor Relations Board ("PRLRB") due to PREPA's decision to reduce to $600 the Christmas bonuses due to the employees in December 2014, pursuant to the provisions of Article 11(c)(iii) of Act 66-2014.  UTIER claimed that, as of June 30, 2014, the December 2014 Christmas bonus was already earned.  On May 31, 2017, the hearing officer issued a recommendation to the PRLRB that PREPA should be ordered to pay the amount by which the Christmas bonus was reduced in December 2014.  On July 31, 2017, PREPA informed the PRLRB that the Title III stay was in effect due to the filing of the Title III Case.

(3) A group of PREPA's managerial employees also filed a claim against PREPA with the Public Service Appeals Commission relating to the reduction of the 2014 Christmas bonuses.  The matter was stayed as a result of the filing of PREPA's Title III Case.

(4) A group of PREPA's managerial employees also filed two cases in the San Juan Court of First Instance relating to the reduction of the 2014 Christmas bonuses: (i*) Marie Serrano Algarín, y otros v. AEE*, Case No. KPE 2014-3736, pertaining to retired managerial employees; and (ii) *Antonsanti Colón, Luz Jannette y otros v. AEE,* Case No. KPE-2014-3737, pertaining to active managerial employees.  Case No. KPE 2014-3736 was stayed as a result of the filing of PREPA's Title III Case.  On March 18, 2015, PREPA filed a motion to dismiss Case No. KPE-2014-3737 for lack of jurisdiction and/or judicial abstention pursuant to the doctrine of exhaustion of administrative remedies.  The San Juan Court of First Instance granted the motion and entered a judgment dismissing the complaint on August 10, 2015.  The Puerto Rico Court Of Appeals confirmed the judgment on January 29, 2016, and, on April 15, 2016, the Puerto Rico Supreme Court denied the managerial employees' petition for writ of certiorari.

(5) In May 2010, UTIER filed before the Mediation and Arbitration Bureau of the PRDLHR a total of 171 claims against PREPA, for alleged violations of the UTIER CBA.  Around this time, PREPA recruited new employees, and UTIER alleges that previously displaced emergency employees were not considered for these positions as required by the UTIER CBA.  The arbitration hearing was held on May 14, 2010.  On June 18, 2013, the arbitrator concluded that PREPA violated the UTIER CBA because it did not give priority to displaced employees before hiring new employees.  PREPA was ordered to pay all salaries that would have been earned by the previously displaced employees from the date the new employees were hired.  The case has been stayed due to the Title III Case.

(6) UITICE filed a claim against PREPA before the Mediation and Arbitration Bureau to the PRDLHR for PREPA's failure to pay meal penalties during an extended period of time.  On July 7, 2000, the PRDLHR issued an arbitration award in favor of UITICE.  PREPA appealed to the San Juan Superior Court, which issued a judgment confirming the arbitration award.  Thereafter, UITICE requested the court issue an order mandating PREPA to comply with the arbitration award.  The court appointed Jose Luis García, CPA as a special commissioner retained to prepare a report containing the amounts

71

owed to UITICE employees, as well as a payment plan to satisfy the amounts owed by PREPA pursuant to the arbitration award.

According to the report submitted by the special commissioner, the valuation of the claim is as follows:

| | Description | Economic Impact |
|---|---|---|
| a. | Failure to pay meal penalties for extraordinary time worked by claimants (including the penalties, impact of Christmas bonus, interest agreed at 5%, plus attorneys' fees (7.5%)). | $2,799,323.16 |
| b. | Additional penalty payable to UITICE, plus attorneys' fees (7.5%). | $3,299,175.00 |
| | Total | **$6,098,498.16** |

On June 30, 2017, the parties filed a stipulation regarding the payments owed to UITICE. The matter is presently stayed as a result of the filing of PREPA's Title III Case.

(7) In 2007, UTIER filed, with the PRLBR, a claim against PREPA alleging multiple PREPA violations to provisions of the UTIER CBA from December 11, 2006, through August 23, 2008. These alleged violations include issues regarding work schedules, daily relief time for on-duty employees, and publication of available job positions within PREPA. On April 23, 2014, PRLRB determined that the relevant UTIER CBA provisions should have been implemented during the period at issue and, accordingly, PREPA had violated the UTIER CBA. On July 16, 2014, PREPA appealed this decision to the Puerto Rico Court of Appeals. However, the matter was stayed as a result of the filing of PREPA's Title III Case.

### 6.     PREPA Pension Obligations

#### i.     Background and Funded Status

PREPA ERS asserts it is an independent, "de facto" trust that is nonetheless a public pension system, established to receive employer and employee contributions and invest those contributions to support PREPA's defined benefit pension payment obligations. PREPA ERS covers current employees of PREPA ("Active Participants") and retired former employees receiving monthly pension payments ("Retired Participants," and together with the Active Participants, "Participants"). PREPA ERS also asserts that former PREPA employees who transferred to the Commonwealth or other public employers upon the transition to LUMA Energy are entitled to continue to participate in the PREPA ERS while so employed, and AAFAF has agreed with that assertion. Former employees who moved to LUMA Energy, however, have been informed they are no longer eligible to participate in the PREPA ERS pension plan, effective as of the date they left employment with PREPA.

All of PREPA's permanent, full-time employees are currently eligible to participate in PREPA ERS's defined benefit pension plan. PREPA ERS generally issues annually a publicly

available financial report that includes financial statements and required supplementary information for PREPA ERS. If a member's employment is terminated before they become eligible for any benefits under PREPA ERS, they may receive a refund of their member contribution plus interest compounded annually. PREPA ERS is not subject to the requirements of the Employees Retirement Income Security Act of 1974.

PREPA ERS provides several types of retirement benefits, including merit annuities (which depend on age and years of services and are based on a percentage of a Participant's final average pay), actuarial pensions, and age-based pensions. Additional benefits provided by PREPA ERS generally include, among others:

A Service Retirement Allowance:

- The service retirement allowance is based on a Participant's final average pay. Final average pay is the average of the three highest annual base salaries. For Active Participants who began working with PREPA on or after January 1, 1993, annual base salary is limited to $50,000.

- Pension benefits are coordinated with Social Security on an optional basis for Participants hired before September 30, 1990.

A Cost-of-Living Adjustment:

- Cost of living increases in pension benefits were provided effective July 1, 1992, to all pensions granted on or before June 30, 1990, as follows:

    - Eight percent (8%) increase of the monthly pension up to $300
    - Four percent (4%) increase of the monthly pension between $300 and $600
    - Two percent (2%) increase of the monthly pension in excess of $600

- The minimum monthly increase is $25, and the maximum is $50. Actuarial pensions are granted the minimum increase of $25 per month if they were granted on or before June 30, 1990.

- Automatic future cost of living increases are granted under the same terms automatically every three years beginning July 1, 1992, or from the retirement date for all those who retired after June 30, 1990.

A Survivor Benefit:

- The surviving spouses of Retired Participants receiving a pension benefit will receive a pension benefit equal to thirty percent (30%) of the annual pension payable to the Retired Participants at the time of death subject to certain conditions.

A Disability Retirement Allowance:

- Subject to certain conditions, an Active Participant may retire with a disability pension requested by PREPA if that member has five (5) years or more of credited

73

service if hired before January 1, 1993, or ten (10) years or more of credited service if hired on or after January 1, 1993 provided their disability is not related to a labor accident as certified by the State Insurance Fund Corporation of Puerto Rico.

Bonuses and Other Benefits:

- A Christmas bonus of $400 is payable to retirees

- A Summer bonus of $100 is payable to retirees

- An up to $1,000 funeral benefit

As of April 2022, there were approximately 12,336 Retired Participants receiving an average monthly pension benefit of $1,815, and, as of May 2022, 3,592 Active Participants[106] participating in the pension system.[107]   These figures include former PREPA employees who transferred to the Commonwealth and other government entities upon the takeover of grid operations by LUMA Energy (the "Mobility Transferees"), but do not include former PREPA employees who now work for LUMA Energy.  Approximately 1,000 former PREPA employees now work for LUMA Energy and participate in a defined contribution plan sponsored by LUMA Energy.  Upon the commencement date of LUMA Energy's services, approximately 2,000 PREPA employees transferred to the Commonwealth and other government entities pursuant to the mobility requirements of Act 120-2018, as amended by Act 17-2019.  As of the date of this Disclosure Statement, the Mobility Transferees continue to have employee contributions to PREPA ERS deducted from their paychecks and contributed to PREPA ERS.  PREPA ERS has taken the position that Mobility Transferees are eligible to accrue additional years of service and are entitled to higher PREPA pension benefits under the PREPA ERS even if such employees have been transferred to other government entities.  PREPA ERS Participants' benefits are determined based on years of service and compensation levels prior to the date of retirement and provides eligible Participants with a percentage of their salary as a defined pension benefit for life.

Notwithstanding the CBAs' mandates relating to the funding of PREPA ERS, PREPA ERS is materially underfunded.  As of June 30, 2020, PREPA ERS had an asserted actuarial liability to Participants of approximately $4.3 billion, which amount was at that time supported by only $762 million in assets.[108]  This represents a funded ratio of 18 percent, which decreases to 12 percent when illiquid assets are excluded.[109]  This means that PREPA ERS's assets only covered 18 percent of PREPA ERS's actuarial accrued liability as of the end of Fiscal Year 2020.[110]  As of

---

[106] *2022 Fiscal Plan for the Puerto Rico Electric Power Authority*, 173 (June 28, 2022).  ("The 3,592 includes over 2,000 former PREPA employees that transferred to Commonwealth agencies at the time of the formation of LUMA. [PREPA ERS] and the Oversight Board are engaged in on-going conversations related to the continued accruals of additional pension benefits in [PREPA ERS] for these employees.")

[107] *Id.*

[108] *Id.* at 175.

[109] *Id.*

[110] *Id.* at 176.

June 2022, it was estimated that PREPA ERS's assets will be depleted by the beginning of Fiscal Year 2024, at which point PREPA ERS will not have funds from which to pay pension benefits.[111]

The significantly underfunded status of PREPA ERS raises concerns on the solvency of the trust and ability for PREPA ERS to continue to make payments to Retired Participants. To ensure Participants receive their accrued monthly benefits, the Plan provides for funding of retiree benefits under a pay-as-you-go ("PayGo") system, which will be paid as ordinary operating expenses from PREPA's revenues as described in the Certified Fiscal Plan. Subject to PREB approval, LUMA believes the legacy pension costs and the Legacy Charge should be separately and transparently itemized on all customer bills.

The Oversight Board has engaged in negotiations with PREPA ERS and UTIER regarding the requirement in the CBAs and the PREPA ERS Regulations that PREPA continue to maintain the PREPA ERS as a defined benefit plan. If an agreement cannot be reached with respect to this, PREPA may need to reject the CBAs, and will impose pension reform measures as set forth in the Plan. Specifically the Oversight Board believes the following steps are essential to provide adequate funding for future PREPA ERS pension obligations: (a) close the pension system to future participants; (b) freeze pension benefits as of the Effective Date for current Active Participants, including, for the avoidance of doubt, Mobility Transferees; (c) eliminate the cost of living adjustments from and after the Effective Date for Participants; (d) convert PREPA ERS from being funded based on actuarially determined contributions or other rate of annual payroll to a PayGo system to fund annual benefits; and (e) establish a PREPA PayGo Trust to support the payment of pensions. These measures, including additional details related to the freeze of pension benefits, are incorporated into the Summary of Pension Reform and PREPA PayGo Trust attached hereto as Exhibit G. These measures are consistent with pension reform measures imposed previously by the Commonwealth government with respect to its Employee Retirement System pursuant to Act 3-2013, and by the Oversight Board through the Commonwealth Plan with respect to the Teachers' Retirement System and the Judicial Retirement System.

ii.   **PREPA ERS Claims**

As of June 2019, PREPA ERS asserted a claim against PREPA for a total of $3.6 billion on account of (i) approximately $600 million of past due employer contributions and (ii) $3 billion for unfunded pension liability.[112] Unlike in the Commonwealth Title III Case, the pension obligations are owed to PREPA ERS, rather than the Participants themselves (who instead hold claims against PREPA ERS).

On August 6, 2019, PREPA ERS filed a complaint against PREPA and other parties [Adv. Pro. No. 19-405, ECF No. 1]. PREPA ERS requested the Title III Court determine that all amounts owed to PREPA ERS are "Current Expenses" under the Trust Agreement because contributions made to pensions and the retirement system allegedly qualify as "Current Expenses" under the Trust Agreement. PREPA ERS asserts these "Current Expenses" must be paid before any further payments are made to the Bond Trustee or PREPA's bondholders. For a summary of Adv. Pro. No. 19-405, see Section V.G.4 of this Disclosure Statement. Regardless of the outcome of this

---

[111] *See id.* at 176.

[112] The Oversight Board and its advisors have not independently performed a calculation of the amount of this claim.

litigation, the Plan's treatment of the PREPA ERS claim provides that payments by PREPA to fund pensions, as adjusted by the Plan, shall be treated as Operating Expenses.

The Oversight Board has determined that the present value of the actuarially determined contribution ("ADC") payments PREPA would need to make to PREPA ERS in accordance with the PREPA ERS Regulations (i.e., the cost of maintaining the PREPA ERS pension system as-is) is approximately $3.622 billion, assuming a discount rate of 3.58% consistent with Governmental Accounting Standards Board requirements.  This present value estimate of the ADC payments, however, assumes (a) the amount of unpaid ADC payments by PREPA to date, which could be as high as approximately $1.2 billion by Plan Effective Date, is amortized over the funding period as opposed to paid in a lump sum, (b) the assumed rate of investment return of 5.75% set forth in the PREPA ERS Regulations is achieved, and (c) the ADC funding period lasts approximately twenty years, after which PREPA ERS would be solvent.  If PREPA ERS failed to achieve this rate of investment return, or PREPA continues to underfund the ADC payments, the ADC payment obligation and duration would increase.

The Oversight Board has further determined the present value of the payments PREPA would need to make to fund pension benefits as adjusted by the Plan (at the same 3.58% discount rate) is approximately $3.412 billion.  Importantly, the difference in cost to the ratepayers is significant.  Because the ADC payment stream ends in twenty years, the cost in cents per kWh to fund it starts at 2.04 cents in calendar year 2024, increasing thereafter to 2.4 cents in calendar 2025 and as high as 3.07 cents in 2037 so that the plan is fully funded in 2042.  By contrast, the projected cost to ratepayers to fund the Plan's pension treatment starts at 2.4 cents in 2024, dropping to 1.8 cents in 2031 and gradually declining to below 1 cent by 2050.   Thus, the Plan's treatment of the PREPA ERS claim (and with it the portion of PREPA's obligations under the CBAs relating to pension benefits) will save PREPA over $200 million on a present value basis, and will yield significant savings to ratepayers during the funding period.  The Oversight Board believes this reduction is essential to the success of PREPA's restructuring.  Moreover, given the history of defined benefit plans in Puerto Rico, including those of the Employees Retirement System, the Teachers Retirement System, the Judicial Retirement System, and PREPA ERS itself, the Oversight Board believes there is a substantial risk PREPA ERS will not realize the funding levels that would be generated under the foregoing assumptions, and instead will remain materially underfunded indefinitely, requiring even higher rate increases or a bailout from another source to ensure payments to retirees.  Indeed, PREPA ERS is presently experiencing a critical liquidity shortfall that puts retirees at risk of nonpayment within the next three months.  PREPA's retirement plan must therefore be closed and frozen, and the benefit structure converted to defined contribution, to protect against perpetual distress pension plans have experienced in Puerto Rico."

A chart summarizing the proposed pension reform is attached as Exhibit G.

### 7.   Other Post-Employment Benefit Obligations

Other post-employment (non-pension) benefits ("OPEB") provided by PREPA to retired employees include medical benefits.[113]  The medical benefits are not paid from the PREPA ERS

---

[113] *Id.* at 173.

trust.[114]   Retired employees with thirty (30) years of service are eligible to receive the medical benefits.[115]   As of June 2022, approximately 8,200 retired employees receive the OPEB medical benefits.[116]   The OPEB medical benefits are completely unfunded.[117]   Currently, the OPEB medical benefits are included in PREPA's operating budget and cost approximately $12 million annually.[118]

### 8.     Fuel, Purchased Power, and Obligations under Renewable Energy Contracts

PREPA supplies electricity to customers using energy from PREPA-owned generation plants and energy procured from independent power producers ("IPPs") under power purchase and operating agreements ("PPOAs").   Electricity supply from IPPs for fiscal year 2022 consisted of 984 megawatts ("MW") of generating capacity from two conventional power plants and 254 MW of generating power from various renewable energy providers.   Prior to filing the Title III petition, PREPA was party to over sixty (60) PPOAs for renewable energy projects, under which PREPA agreed to purchase renewable power generated by the developer counterparties to such agreements. PREPA entered into the PPOAs after the Commonwealth enacted Renewable Energy Portfolio Standards.   By 2018, only eleven (11) of the original sixty (60) PPOAs had been successfully developed and were operational.   Given the need to expedite the development of low-cost renewable resources and lower energy rates, PREPA, in 2018, determined it was necessary to evaluate and renegotiate these existing PPOAs to achieve lower prices consistent with market trends.

In accordance with PREPA's Certified Fiscal Plan, PREPA has renegotiated several PPOAs to procure a reduction in their current prices.   Progress to date on PPOA's includes amendments to the (i) EcoEléctrica, L.P. ("ECO") PPOA, (ii) Naturgy Aprovisionamientos S.A. ("Naturgy") natural gas sale and purchase agreement ("GSPA"), (iii) CIRO PPOA, and (iv) Xzerta-Tec Solar I, LLC ("Xzerta") PPOA.   PREPA also negotiated with nine counterparties to amend existing operational PPOAs to provide a targeted 10% savings over the remainder of the PPOAs' terms.   PREPA reached agreement with seven of the nine counterparties.   The Oversight Board approved the amendments on September 30, 2020; PREB approved them on October 16, 2020, and October 19, 2020; and the P3 Authority approved them on November 5, 2020.   The amended agreements became effective during January and February 2021.

### i.     Amended EcoEléctrica and Naturgy Agreements

ECO and PREPA are parties to a power purchase operating agreement executed on March 10, 1995 (the "ECO PPOA").   Naturgy and PREPA are parties to a tolling service agreement and a GSPA dated October 31, 1997 and March 10, 2014 (the "Naturgy GSPA"), respectively.   The ECO PPOA and GSPA provided the contractual basis for a program (the "LNG-to-Power

---

[114] Id.

[115] Id.

[116] Id.

[117] Id.

[118] Id.

Program") under which (i) Naturgy imported liquefied natural gas ("LNG") into Puerto Rico at a LNG regasification terminal facility, owned by ECO and located in Peñuelas (the "ECO LNG Terminal"), converted the LNG to natural gas, and sold such natural gas to PREPA for supply to the Costa Sur generation facility under the terms of the Naturgy GSPA and (ii) ECO imported LNG into Puerto Rico, converted the LNG into natural gas at the ECO LNG Terminal for supply to the ECO generation facility, and sold the power generation capacity and energy of such facility to PREPA under the terms of the ECO PPOA. PREPA has historically sourced up to forty percent (40%) of the baseload power in Puerto Rico through the LNG-to-Power Program. The Naturgy GSPA was set to expire in December 2020, and the ECO PPOA had a March 2022 expiration date.

In late 2018, PREPA began the process of renegotiating the terms of the ECO PPOA and Naturgy GSPA to reduce costs in a manner consistent with PREPA's 2018 and 2019 certified fiscal plans. That negotiation process resulted in the execution of the Amended and Restated Power Purchase and Operating Agreement dated March 27, 2020 (the "Amended ECO PPOA") and the Amended and Restated Natural Gas Sale and Purchase Agreement dated March 23, 2020 (ECF Entry No. 12579-3, the "Amended Naturgy GSPA," and, together with the Amended ECO PPOA, the "Amended Contracts").

The Amended Contracts (i) extend the LNG-to-Power Program until September 30, 2032; (ii) restructure the fuel supply arrangements such that (a) Naturgy imports LNG, converts such LNG into natural gas through the ECO LNG Terminal and sells this natural gas to PREPA for delivery to each of the generation facilities, and (b) PREPA supplies (but does not sell) natural gas to the ECO generation facility; and (iii) restructure the ECO PPOA such that ECO makes available power generation capacity from the ECO generation facility for dispatch, utilizing the natural gas supplied by PREPA, in exchange for a monthly payment by PREPA (as further defined in the New ECO PPOA, the Capacity Payment). Performance by the parties of one contract depends on the performance by the parties of the other contract.

PREPA's ability to make available low-cost, United States Environmental Protection Agency ("EPA") emission-compliant electricity on a secure basis to ratepayers from the generation facilities depends on a long-term source of uninterrupted supply of natural gas. The Amended Contracts provide the only cost-effective option to dispatch natural gas generation sources in the southern part of Puerto Rico following the expiration of the ECO PPOA and Naturgy GSPA. Naturgy controls the entire existing capacity of ECO's import terminal to receive and vaporize LNG for the delivery of natural gas to the generation facilities. Third-party LNG suppliers have no access rights to this terminal. ECO's low cost and beneficial position in the Puerto Rico electricity sector and Naturgy's de facto monopoly over the supply of gas into the southern part of Puerto Rico limit PREPA's alternatives for a supplier of natural gas and power.

Renegotiating the Amended Contracts at the current market rates, which are significantly lower than the rates set forth in the original contracts, provides ratepayers with savings. PREPA has historically paid 12.4 cents/kWh for generation from the ECO generation facility (fixed plus variable costs), but will likely pay an average of 10.7 cents/kWh under the renegotiated contracts. PREPA has determined that such a reduction in generation costs will result in substantial savings to Puerto Rico's ratepayers. Further, the Amended Naturgy GSPA removed a mechanism that acted as a built-in pricing hedge to oil. PREPA projects that removing the hedge to oil and reducing the adder fee will result in average savings for PREPA of approximately $29.1 million

78

per year for the PREPA's 820 MW Costa Sur generating facility (the "Costa Sur Generation Facility"). These savings are based upon fuel commodity price forecasts, which predict that natural gas prices will remain much lower than oil prices over the next decade.

PREPA determined that the Amended Contracts provide PREPA with significant cost savings, which will be critical to its operations and ability to meet its debt service obligations while it proceeds through its Title III case, ensuring the utility a reliable and continuous source of power and natural gas on reasonable terms. On December 26, 2019, the Oversight Board approved both the Amended ECO PPOA and Amended Naturgy GSPA under the contract review policy ("Contract Review Policy") established pursuant to PROMESA Section 204(b)(2), confirming PREPA's compliance with the PREPA 2020 Fiscal Plan.

Further, PREB also approved the Amended Contracts through a process whereby it was confirmed that PREPA provided a robust analysis of the Amended Contracts and PREB agreed with PREPA that the terms of such contracts were favorable. However, UTIER and certain environmental organizations have filed requests for PREB to reconsider the decision. PREB has not yet issued a ruling. Also, on June 22, 2020, the Title III Court approved the assumption of the Amended Contracts. UTIER, several environmental organizations, and a counterparty to another PPOA appealed to the First Circuit. On August 12, 2021, the First Circuit affirmed the Title III Court's decision.

## ii. Renegotiation of Non-Operational PPOAs.

Of the sixty (60) PPOAs PREPA entered into for renewable energy, it made material progress with development with approximately nineteen (19) but did not reach operations. PREPA and counterparties to sixteen (16) of the nineteen (19) total non-operating PPOAs reached agreements during the 2019 and 2020 to reduce the previously agreed upon contract price. The renegotiated contracts comprised over 590 MW of renewable energy generation and were estimated to deliver over $1 billion of savings to PREPA over the contract term, assuming all proceed to commercial operation.

The Oversight Board limited its approval of related new solar power generation to 150 MW, determining that approving the nearly 600 MW of proposed new solar generation embodied in the 16 PPOAs would result in energy rates higher than projected in PREPA's fiscal plan. On September 2, 2020, PREPA notified the 16 PPOA counterparties that it would only move forward with contracts comprising up to 150 MW in renewable energy generation. After a further evaluation and renegotiation process to accommodate other Oversight Board requirements, and final approval from the Oversight Board and PREB, PREPA signed amended and restated PPOAs with Xzerta for a 60 MW photovoltaic solar project and CIRO One Salinas, LLC ("CIRO One") for a 90 MW photovoltaic solar project in June and July, respectively, of 2021.

On August 2, 2021, AAFAF, the Oversight Board, and PREPA filed a notice of assumption of power purchase operating agreement between PREPA and Xzerta,[119] and a notice of assumption of power purchase operating agreement between PREPA and CIRO One.[120] On August 10, 2021,

---

[119] *See* Case No. 17-bk-4780, ECF 2577.

[120] *See* Case No. 17-bk-4780, ECF 2578.

Windmar Renewable Energy, Inc. ("Windmar") filed an objection to the assumption of these PPOAs.[121]  The Title III Court overruled Windmar's objection for lack of standing and approved PREPA's assumption of the PPOAs.[122]  The Title III Court issued the assumption order for both the CIRO One and Xzerta PPOAs on December 8, 2021.[123]  CIRO One and Xzerta are currently working with LUMA Energy on interconnection studies and planning processes.

### iii.   Renegotiation of Operational PPOAs

PREPA and counterparties to six operating PPOAs that were executed in or around the years 2011 to 2013 reached agreements to have the price that PREPA pays per kW/h amended. These agreements comprise over 250 MW of renewable energy generation and deliver price reductions between 10–15%, which was estimated to produce approximately $200 million in savings (non-discounted) over the remaining life of the amended contracts, and provide for possible capacity increases of 5–10 MW and term extensions of 5–10 years. Most of these transactions included both modest term extensions and possible increases in the amount of renewable energy generating capacity at the plants covered by the PPOAs, and, therefore, are expected to further support PREPA's efforts toward meeting the renewable energy portfolio requirements placed on it by Act 17-2019 and the operative IRP.

PREPA submitted the amended PPOAs for PREB's and the Oversight Board's review and approval.  On September 30, 2020, the Oversight Board approved these amendments in a letter that identified savings in the range of $495–$525 million during Fiscal Years 2021–2049.  PREB approved the amended PPOAs between September and October 2020 and the Title III Court approved their assumption on December 2, 2020.[124]

### iv.   Rejection of PPOAs

PREPA filed numerous motions with the Title III Court seeking to reject 27 non-operating PPOAs, or near equivalent agreements which motions are described below in Section V.F.2 of this Disclosure Statement.

### 9.   Environmental Contingencies and Obligations

Environmental Contingencies

PREPA's facilities and operations are subject to regulations under federal and Commonwealth environmental laws, including the Clean Air Act, Clean Water Act, Oil Pollution Act, Resource Conservation and Recovery Act, Safe Drinking Water Act, Emergency Planning and Community Right-to-Know Act, and Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA").  PREPA monitors its compliance with laws and regulations and reviews its remediation obligations on an ongoing basis.

---

[121] *See* Case No. 17-bk-4780, ECF 2591.

[122] *See* Case No. 17-bk-4780, ECF 2629.

[123] *See* Case No. 17-bk-4780, ECF 2667.

[124] *See* Case No. 17-bk-4780, ECF 2317.

1999 Consent Decree

In 1993, the United States of America, through the United States Department of Justice (the "DOJ") and the EPA, filed a complaint against PREPA in the United States District Court for the District of Puerto Rico (Civil Action No. 93-2527 CCC).  The complaint alleged environmental violations by PREPA under multiple federal environmental statutes, including those relating to air, water, and waste at the Palo Seco, San Juan, Aguirre, and Costa Sur generation facilities, and the Monacillos Transmission Center.  In 1999, the court entered a consent decree in the case (the "Consent Decree").  The Consent Decree requires that PREPA improve and implement programs and operations to ensure compliance with environmental laws and regulations.

In 2004, the court entered a Consent Decree modification (the "2004 Modification").  The 2004 Modification required PREPA to reduce the sulfur content in the No. 6 fuel oil used in certain generating units at its Costa Sur, Aguirre, Palo Seco, and San Juan Power Plants.  Additionally, the 2004 Modification required PREPA to implement a nitrogen oxide emissions reduction program at certain units and to modify the optimal operating ranges for units subject to the Consent Decree.

As of the date of this Disclosure Statement, a draft modified Consent Decree is under review by the United States.  After such negotiations conclude, the modified Consent Decree would need to be lodged with the court and must go through a public notice and comment process prior to approval.  PREPA has not been informed about any related costs that would be considered accruable as a contingent liability.

Air and Water Quality Compliance

PREPA is required to maintain compliance with air quality (including opacity) and water quality requirements.  Under the Consent Decree, PREPA is subject to stipulated penalties for deviations.  PREPA had paid stipulated penalties of approximately $37,000 in fiscal year 2020.  PREPA continues to develop and implement a comprehensive program to improve environmental compliance.  This program has been, and continues to be, updated to conform to new regulatory requirements.

Mercury and Air Toxics Standard

The Mercury and Air Toxics Standard ("MATS") establishes national emission standards for hazardous air pollutants, including emission limits and work practice standards, that apply to coal and oil fired electric utility steam generating units ("EGUs") in continental and non-continental areas.  PREPA owns and operates fourteen (14) oil fired EGUs that are affected by the regulation.

Since MATS went into effect on April 16, 2015 (for Aguirre, April 16, 2016), PREPA's units have experienced various periods of noncompliance with the standard.  As a result, PREPA and the United States are in negotiations to address the pertinent events of noncompliance.  Should PREPA reach a settlement with the United States regarding MATS noncompliance, the resulting consent decree will almost certainly require PREPA to make various compliance related expenditures and may require the payment of civil penalties.

On August 24, 2020, PREB issued its final order on PREPA's IRP. The approved IRP is expected to inform the basis of a potential MATS compliance plan. The state implementation plan ("SIP") for sulfur dioxide being developed by the Department of Environmental and Natural Resources ("DENR"), described below, is also expected to inform any such consent decree. PREPA has not identified any contingent losses that would be considered probable of occurrence in relation to MATS noncompliance and the IRP.

SO2 National Ambient Air Quality Standard Compliance

On January 9, 2018, the EPA published in the Federal Register the third round of final area designations under the 2010 sulfur dioxide ("SO2") national ambient air quality standards ("NAAQS") that includes nonattainment designations, which took effect on April 9, 2018. EPA identified two (2) SO2 non-attainment areas located in Puerto Rico, the San Juan Area, and the Guayama-Salinas Area. The Clean Air Act requires air agencies to take steps to control air pollution in SO2 non-attainment areas. Those steps may include stricter controls on industrial facilities. State and local governments detail these steps in plans that demonstrate how they will meet the SO2 standard. Those are the state plans known as SIPs. States have eighteen (18) months after the effective date of final designations to develop and submit their SIPs to the EPA. Puerto Rico's SIP was due to the EPA by October 9, 2019. The SIP is required to show how affected areas would meet the standard as expeditiously as practicable but by no later than April 9, 2023. Puerto Rico did not meet the initial October 9, 2019, deadline for filing its SIP and filed its final SIP on November 22, 2022. The EPA deemed the submission complete on December 3, 2022. Puerto Rico now awaits EPA's determination on the November 22, 2022 SIP submittal.[125]

DENR had been working with the EPA on submitting a qualifying SIP in order to avoid sanctions (including the loss of certain federal funding for Puerto Rico). DENR issued a proposed SIP for public comment and hearing on March 11, 2022, and held a public hearing on the proposed SIP on April 11, 2022. According to DENR and the EPA, PREPA's power plants are principal emitters of SO2 in the identified areas. PREPA's affected facilities in the non-attainment areas are the San Juan, Palo Seco, and Aguirre power plants. Since the non-attainment designation, PREPA and DENR have been in communication so that the approved SIP considers the status of the implementation of PREPA's IRP and projects, approved by PREB in August 2020, as well as reliability considerations. DENR has not advised PREPA as to the expected submission to the EPA of DENR's qualifying SIP.

Pollution Remediation Obligations

Following actions initiated by the EPA, three of PREPA's locations require the analysis of pollution remediation obligations ("PROs") for PREPA: the Protección Técnica Ecológica Superfund site in Peñuelas (the "Proteco Site"), the Vega Baja Solid Waste Disposal Superfund Site (the "Vega Baja Site"), and the site located in Toa Baja that includes the Palo Seco Power Plant (the "Palo Seco Site").

The Proteco Site

---

[125] https://www.elnuevodia.com/english/news/story/poor-air-quality-no-new-sanctions-for-puerto-rico/

On March 28, 2019, the EPA issued a notice of potential liability and request for information to PREPA under CERCLA in relation to the Proteco Site.  The EPA alleges that PREPA is a potentially responsible party ("PRP") for the Proteco Site as an arranger, who by contractor or arrangement, arranged for the disposal or treatment of hazardous substances at the Proteco Site.  On June 28, 2019, PREPA received a special notice letter from the EPA requesting that PREPA enter into an administrative settlement agreement and order on consent ("ASAOC") to conduct a remedial investigation and feasibility study ("RI/FS")[126] of the Proteco Site.  PREPA believes that a similar special notice letter was sent to other PRPs.

In September 2020, PREPA and other PRPs (the "PRP Group") entered into an ASAOC (CERCLA- 02-2020-2010) with the EPA to conduct the RI/FS.  The ASAOC requires payment from the PRP Group to the EPA in the amount of approximately $444,708 for past response costs.  The agreement also requires that the PRP Group provide financial assurance, initially in the amount of approximately $5 million (based on the estimated cost of work), for the EPA's benefit.

PREPA's share will be applied to any payment of RI/FS work to be carried out at the landfill and considered part of the liability, as well as to pay and absorb any future liability that may be imposed for noncompliance with the ASAOC.  The RI/FS is in the earliest stages.  PREPA's Board authorized an initial expenditure of up to approximately $1.5 million to pay for PREPA's share of the RI/FS total costs.

The Vega Baja Site

In 2002, PREPA received a Special Notice Concerning Remedial Investigation/ Feasibility Study for Soil at the Vega Baja Site.  The EPA has identified PREPA and six other entities as PRPs.

On April 25, 2013, the Consent Decree civil action (No. 12 1988 (ADC)) was filed in the U.S. Court for the District of Puerto Rico.  An Environmental Escrow Agreement ("EEA") was entered into by and among GDB, as the escrow agent, the Puerto Rico Land Authority ("PRLA"), the Puerto Rico Housing Department ("PRHD"), PREPA, and the United States.  The EEA serves as financial assurance for the performance of the obligations under the Consent Decree.  On June 24, 2013, PREPA deposited approximately $400,000 into an escrow account as provided in the Consent Decree and the EEA.  If the escrow account balance is reduced below $250,000, PREPA, PRLA, and PRHD must establish and maintain a performance guarantee for the benefit of the EPA equal to the difference between the escrow account balance and $250,000.  Public agencies may elect to satisfy this performance guarantee requirement by providing separate performance guarantees which total the amount required to be maintained as set forth above, either individually or collectively.  The main corrective action of removing lead from the residential area to a nonresidential site was completed in 2015.  The costs that will be incurred in the future are restricted to operational annual assessments, and if any corrective action is deemed necessary in

---

[126] An RI/FS is the regulatory-mandated process for collecting data to characterize site conditions, determining the nature of wastes at the site, assessing risk to human health and the environment (if any), and identifying and evaluating potential remediation options based on the collected data.  *See* EPA, *Superfund Remedial Investigation/Feasibility Study (Site Characterization)*, https://www.epa.gov/superfund/superfund-remedial-investigationfeasibility-study-site-characterization (last visited Nov. 28, 2022).

nonresidential and residential areas, PREPA, PRLA, and PRHD will be responsible.  As of the date of this Disclosure Statement, no corrective actions have been identified.

PREPA, on behalf of PRLA and PRHD, has requested disbursements be charged against the escrow account, and such payments have been processed.  All payments required to be charged against the escrow account are to cover projects required by the Consent Decree.  If payments are not fulfilled, services can be suspended by the contractors resulting in the application of fines for noncompliance as stipulated in the Consent Decree.

The Consent Decree can be terminated upon motion by any party, provided that all public defendants have satisfied their obligations of payments of certain "Response Cost and Stipulated Penalties."  Termination of the Consent Decree shall not affect certain "Covenants Not to Sue" including all reservations pertaining to those covenants and shall not affect any continuing obligation of PREPA, PRLA, and the PRHD.

Currently, the appointment of a Supervisory Contractor is in progress.  The inspection and reporting work required in the EEA is being carried out by a project coordinator appointed by PREPA in coordination with the representatives appointed by the PRLA and the PRHD.  In September 2020, the EPA conducted a five-year review of whether the remedial action is protective of human health and the environment.  As part of this review, the EPA contractor inspected a number of properties that were not remedied because the lead concentration detected in the field was below 450 parts per million.  The information collected was evaluated by the EPA, and it determined that PREPA, PRLA, and the PRHD have not failed to operate and maintain the remedial action as required and no further response actions for the Vega Baja Site have to be undertaken at the moment.  PREPA shall pay to the EPA all future costs consistent with the required contingency plan for the Vega Baja Site.

As of the date of this Disclosure Statement, PREPA has not identified any PROs that would be considered probable of occurrence.

The Palo Seco Site

The Palo Seco Site is located in Toa Baja, Puerto Rico (near San Juan), and includes the Palo Seco Power Plant, a depot area, and the former Bayamón river channel.

In 1997, as a result of an inspection by the EPA and the Puerto Rico Environmental Quality Board (the "EQB") at PREPA's Palo Seco Power Plant, the EPA issued an Administrative Order (CERCLA- 97-0302) for the investigation and possible remediation of seven areas of interest identified by the EPA at the Palo Seco Site.  The Administrative Order required PREPA to carry out a RI/FS.

Following the RI/FS, additional action was taken to address separate phase hydrocarbons at two of the areas of interest.  On November 6, 2008, the EPA and PREPA entered into an Administrative Order on Consent ("AOC") to address the separate phase hydrocarbons (No. CERCLA-02-2008- 2022).  Subsequently, PREPA completed a removal action at one of the areas of interest to remove separate phase hydrocarbons.  In July 2012, the EPA issued for public comment its proposed plan for no further action at the site.  In September 2012, the EPA issued its Record of Decision for the site, which selected the "No Further Action" remedy.

84

The AOC included various conditions for PREPA to reimburse the EPA for costs incurred by the EPA in connection with the site.  On December 4, 2015 and on May 11, 2016, the EPA sent PREPA a cost package for response costs.  The cost package included two components: (i) $62,077.31 that the EPA incurred in connection with the oversight of the removal action performed under the AOC; and (ii) $1,473,061.62 in costs that did not fall in that category (*i.e.*, those not directly related to the AOC), including investigative and other response costs that, as of July 31, 2015, had been paid by the EPA pursuant to CERCLA with respect to the site.

With respect to the first category of costs, on March 7, 2016, the EPA sent PREPA a bill collection notice for the $62,077.31.  PREPA paid this amount on March 8, 2016.

With respect to the second category of costs, on July 10, 2017, a settlement agreement (CERCLA-02- 2017-2014) was signed requiring PREPA to pay the EPA the principal sum of $1 million, plus interest, in three annual installments.  The first installment was paid on August 9, 2017, in the amount of $333,333.33.  The second installment was paid on May 29, 2018, in the amount of $337,838.01.  The third and final installment was paid on July 19, 2019, in the amount of $339,779.36.  The third payment completed PREPA's financial commitments under the settlement agreement.

In September 2020, PREPA prepared a request for proposals for the installation of a system to recover free product from groundwater monitoring wells constructed during the aforementioned RI/FS for $100,000.  The installation work was completed in April 2021.

C.      **PREPA's Cash Management System**

1.      **Operating Revenues and Customer Inflows**[127]

Prior to LUMA Energy's interim service commencement, PREPA transmitted and distributed substantially all the electric power consumed in Puerto Rico.[128]  PREPA currently produces most of the electricity generated in Puerto Rico.  The primary sources of PREPA's operating revenues and related customer collections are derived from the sale of electric services to residential, commercial, industrial, and government clients; however, PREPA also generates operating revenues from telecommunications and irrigation operations.  Other revenues include charges related to administrative fines or penalties, irregularities in electric energy consumption, and late payment penalties.

The billing rates for electric services include a fuel and purchased power cost recovery component, which is designed to permit full recovery of the fuel and purchased power costs as ordered by PREB.  Beginning May 1, 2019, as a result of the new tariff structure approved pursuant to Act 4-2016, the following cost recovery riders were implemented: CILT, and two additional

---

[127] The numbers reflected in this section are based on interim unaudited financial reports published by PREPA.  For PREPA's latest audited financial statements, *see* Exhibit J.

[128] Since June 1, 2021, LUMA Energy has been responsible for the management, operation, maintenance, repair, restoration, and replacement and other related services for the T&D System, including electric transmission, distribution and load serving, long-term planning, dispatch, asset management, community and media relations, public and employee safety, billing and collection, reporting and record keeping, finance and accounting, emergency response, and customer service.

riders designed to cover costs associated with subsidies, public lighting, and other PREB initiatives, as established in PREB's order (CEPR-AP_2015-001) of January 10, 2017.[129]

PREPA's fiscal year 2022 unaudited total consolidated revenues totaled approximately $4.1 billion.[130]

### 2. Operating Expenses and Disbursements[131]

The major components of PREPA's operating expenses and related cash disbursements include fuel and purchased power expenses, and operations and management expenses. PREPA's fiscal year 2022 operating expenses totaled approximately $4.1 billion. These are based on interim unaudited financial reports published by PREPA.[132]

Fuel and Purchased Power

Fuel expenses primarily include fuel oil and diesel products, and liquefied natural gas. Purchased power expenses include costs associated with PPOAs and several renewable energy projects. Fuel and purchased power expense for fiscal year 2022 included fuel expenses of approximately $2.1 billion and purchased power expenses of $840 million.

Operations and Maintenance Expenses

The types of expenses reported under "operations and maintenance" include, but are not limited to, employee salaries and wages, overtime pay, materials and supplies, transportation, per diem and mileage, utilities and rents, professional and technical outsourced services, and the LUMA Energy service fee, among other expenses. PREPA's operations and maintenance expenses for fiscal year 2022 amounted to approximately $1.2 billion.

### D. PREPA's Cash Accounts

The list of the Debtor's bank accounts, balances as of September 30, 2022, and preliminary restriction categorizations is attached hereto as Exhibit I. The list is based on the most current information available to the Oversight Board's professionals and the Oversight Board's legal analysis and judgment regarding restriction categorizations are based on such information.

### 1. Independent Forensic Analysis Team's Report

On January 31, 2018, the Oversight Board, acting by and through its Special Investigation Committee,[133] tasked an Independent Forensic Analysis Team (the "IFAT"), through the retention

---

[129] https://energia.pr.gov/wp-content/uploads/sites/7/2017/01/Final-Resolution-and-Order.pdf.

[130] https://www.aafaf.pr.gov/wp-content/uploads/prepa-b2a-fy2022-q4-aug-15-2022.pdf.

[131] The numbers reflected in this section are based on interim unaudited financial reports published by PREPA. For PREPA's latest audited financial statements, see Exhibit J.

[132] https://www.aafaf.pr.gov/wp-content/uploads/prepa-b2a-fy2022-q4-aug-15-2022.pdf.

[133] The Special Investigation Committee of the Oversight Board was at the time comprised of Members Ana J. Matosantos, David A. Skeel, and Judge Arthur J. Gonzalez (Ret.), and was charged with pursuing investigations

of Duff & Phelps LLC ("Duff & Phelps"), to conduct an investigation into bank accounts of government entities, including the entities covered by the Commonwealth fiscal plan, UPR, HTA, ERS, and PREPA. The scope of the assignment included (i) an inventory of cash, cash equivalents, and investments of the Puerto Rico Government, (ii) analysis of the sources and intended uses of these funds, and (iii) any documented legal restrictions on these funds.

The principal goal of the IFAT was the publication of a report that described the processes employed, results obtained, and an opinion from the IFAT on whether procedures performed validate, among other things, the PREPA bank and investment accounts identified, and account balances disclosed. The investigation was dependent on the assumption that PREPA, among others, would voluntarily provide the Oversight Board with specific financial information. The design of the investigation was tailored to collect and develop information as to whether the bank accounts identified by PREPA, among others, contained restricted funds, the quantities, and the nature of restricted funds.

### i.     Investigation Procedures

For purposes of the report, the IFAT identified a measurement date of June 30, 2018 (the "June 2018 Measurement Date"). The investigation included three components: (i) an information gathering process; (ii) an inquiry and data collecting process; and (iii) an analytical and reporting process.

*Information Gathering.* Gathering information was a sequenced process. A master database was created of government entities, including PREPA, and their respective bank accounts as of the June 2018 Measurement Date. The information was primarily received from the Department of Treasury (the "Department of Treasury"), AAFAF, and publicly available government information.

*Inquiry and Data Collecting Process.* Once the master database was created, each government entity that was identified, including PREPA, was contacted using a standardized format. The government entities were contacted to obtain the relevant bank account information and authorization from the government entities to allow the financial institutions that maintained the government entities' bank accounts to provide information directly to the IFAT.

*Analytical and Reporting Process.* The final step was contacting the financial institutions identified to confirm and verify the self-reported information from the government entities, including PREPA.

### ii.     Additional Steps Suggested in the IFAT's Report

The IFAT issued its report on March 12, 2019. The IFAT report suggested additional tasks and activities to more fully develop information referred to in the report, which included updating the June 2018 Measurement Date to a more current measurement date, in consideration of the possibility that amounts may have materially changed between these dates. The changes to

---

pursuant to the authority granted to the Oversight Board by PROMESA Section 104(o) and such other authority vested in the Oversight Board under PROMESA.

balances as of the new Measurement Dates, as well as additional procedures to reconcile balances and categorize restrictions, are addressed below.

2.    **Ongoing Analysis of Bank Accounts**

Following the release of the IFAT report, the Oversight Board, with assistance from its advisors other than Duff & Phelps, continued to expand upon the IFAT investigation and perform analyses of the cash accounts of the Commonwealth and its instrumentalities, including PREPA, on a periodic basis, most recently as of September 30, 2022 (the "September 2022 Measurement Date").

As described below, the Oversight Board's ongoing analyses of PREPA accounts included the collection, processing, and review of documents provided by financial institutions, agencies, and other government entities.  Collection of documents included account statements (including bank statements, brokerage statements, certificates of deposit or balance confirmation letters, depending on type of account and availability of information), restriction information (including contracts, and federal and local legislation), and signatory information.  In addition, this information was obtained via email, phone, in-person meetings, and through accounting and legal review.

i.    **Summary of Procedures Performed**

The Oversight Board focused on, among other things, (i) confirming the population of bank accounts and establishing their balances and (ii) assessing, based on available information and legal analysis, the amount of any restricted funds within those accounts.

The Oversight Board leveraged and enhanced the procedures noted in the IFAT report to roll forward the balances, most recently to the September 2022 Measurement Date.  Specifically, in addition to obtaining balance information for a set population of accounts through requests to the governmental entities, the Oversight Board's procedures included obtaining credentials for access to online account platforms for each entity, including PREPA, for a majority of the bank account balances.  The online account access allows for the rolling forward of balances and identification of the population of accounts at each financial institution for each governmental entity, including PREPA.  Requests for financial information were also sent to governmental entities and financial institutions in cases where online access was not available.  Further procedures were performed to align financial institution data with information provided by governmental entities to reconcile differences.

Concurrently, the Oversight Board requested documentation regarding any governmental entity's self-reported restriction classification.  Further procedures were performed to continuously support the governmental entities in providing the documentation for legal due diligence review.  For PREPA, the vast majority (99.1%) of the value of the account balances was concentrated in 23 of the 82 accounts.  The Oversight Board's legal advisors performed legal due diligence on these 23 accounts, all of which had balances in excess of $2.0 million, to obtain over 95% coverage of the total cash held in PREPA accounts as of the September 2022 Measurement Date.  The remaining 59 accounts contained $11.6 million and equated to 0.9% of the total cash balance in PREPA accounts as of the September 2022 Measurement Date.

88

a.   ***Identifying the Population of Bank Accounts and Establishing
Their Balances***

The Oversight Board sent letters requesting account balances as of the September 2022
Measurement Date to financial institutions ("FIs") for PREPA's accounts.  The letters were sent
in conjunction with a list of known accounts held by PREPA at the respective FIs and requested
that the FIs submit the following to the Oversight Board:

- bank or brokerage statements for any cash and/or investment balances for accounts
  held by the FIs relating to PREPA, or online access for the Oversight Board to
  obtain the relevant data for each account;

- a list of signatories with authority over each account;

- information pertaining to any known liens, encumbrances, or third-party claims;
  and

- details for any additional accounts held by PREPA that were not included within
  the IFAT report.

Simultaneously, letters were sent to PREPA requesting the following information for a list
of identified accounts:

- bank or brokerage statements for any cash and/or investment balances for accounts
  held by PREPA, or a completed consent form granting online access to obtain the
  relevant data for each account from a FI;

- the status of each account, such as open, closed, suspended, etc.;

- a list of signatories with authority over each account;

- details for any other PREPA accounts (*i.e.*, any not identified on the list of accounts
  sent to PREPA); and

- whether the funds in each account should be categorized as restricted, unrestricted,
  or pooled.[134]

b.   ***Determining Whether Accounts and Balances Include Legally
Restricted Funds***

As noted, requests sent to governmental entities, including PREPA, included a request for
the entity to classify its accounts as restricted, unrestricted, or pooled.  To help guide them, the
entities were provided with descriptions of various restricted and unrestricted account
designations.  If an account was viewed as restricted by the governmental entity, the governmental
entity, including PREPA, was requested to select the applicable category of restriction and provide

---

[134] Pooled account refers to any account that contains both restricted and unrestricted funds.

to the Oversight Board supporting documentation for the claimed restriction, including information about the sources and uses of funds.  If an account was viewed as unrestricted by the governmental entity, the governmental entity, including PREPA, was requested to provide the sources and uses of funds for the accounts.

A thorough examination of the documents provided by the governmental entities, including PREPA, was performed by the Oversight Board's legal advisors to investigate and assess asserted legal restrictions, which included:

- reviewing documentation gathered as part of the IFAT report;

- reviewing documents obtained since the IFAT report regarding account classifications; and

- working with other parties, such as the Department of Treasury and AAFAF, to obtain and review additional documentation relevant to the legal restriction classifications of bank accounts.

The accounts were then classified in the following categories based on the above-described account information review and legal analyses (the preliminary designation for each account above the review threshold of $2.0 million as of the September 2022 Measurement Date is provided in Exhibit I):

- **Unreviewed Accounts**: Except as otherwise indicated, accounts with a balance below $2.0 million as of the September 2022 Measurement Date have been designated as "Unreviewed" in Exhibit I.

- **Restricted Federal Funds/Law**: Funds received from the federal government, and/or restricted by federal law or regulation, for specific uses (*e.g.*, grants or support funds from FEMA regarding hurricane and earthquake repair projects).  Such cash could be recouped by the federal government if not used as designated.

- **Restricted by Third Party Contract**: Funds held for transmission, distribution, operation, and maintenance costs and expenses pursuant to the T&D Contract.

- **Restricted by Court Order**: An account holding insurance proceeds which are to be used for repair, replacement, or reconstruction of damaged or destroyed property per court order (Case No. 17-bk-4780, ECF No. 514).

- **Restricted by Bondholder Contract**: Funds held by the Bond Trustee pursuant to the Trust Agreement.

- **Asserted to be Restricted**: An account holding funds that are subject to active litigation regarding the scope of the Bond Trustee's security interest.

- **Unrestricted Funds**: Funds that are not subject to legal restrictions.

## ii.     Summary of Preliminary Findings[135]

While the Oversight Board's analysis is ongoing, preliminary investigation shows PREPA maintains approximately $1.236 billion as of the September 2022 Measurement Date across 82 accounts held by PREPA at various FIs.  The list of such accounts is attached as Exhibit I, and a summary is set forth directly below:

| Agency | No. of Accts. | 9/30/2022 Balance | Unreviewed | Restricted | Unrestricted[136] |
|--------|---------------|-------------------|------------|------------|-------------------|
| PREPA | 82 | $ 1,023,508,811 | $ 11,593,909 | $ 1,006,590,359 | $ 200,622,052 |

Legal due diligence review for restriction classification was performed for $1.224 billion out of the $1.236 billion in balances for the September 2022 Measurement Date.  The remaining accounts totaling approximately $11.6 million were not reviewed for restriction designations due to the size of individual balances.  Each of the balances for those accounts were below $2.0 million as of the September 2022 Measurement Date and has been classified as unreviewed.  Legal due diligence is continuing; however, out of the $1.224 billion account balances analyzed, approximately $1.024 billion were classified as restricted (some of which may be restricted if certain parties are successful in litigation regarding their asserted security interests), and $200.6 million were classified as unrestricted.

Additionally, the Oversight Board has obtained updated information for account balances as of November 1, 2022,[137] as set forth below:

| Agency | No. of Accts. | 11/01//2022 Balance | Unreviewed | Restricted | Unrestricted[138] |
|--------|---------------|---------------------|------------|------------|-------------------|
| PREPA | 65 | $ 1,219,101,622 | $ 10,252,817 | $ 1,097,058,386 | $ 111,790,418 |

Legal due diligence review for restriction classification was performed for $1.209 billion out of the $1.219 billion in balances as of November 1, 2022.  The remaining accounts totaling approximately $10.3 million were not reviewed for restriction designations due to the size of individual balances.  Each of the balances for those accounts were below $2.0 million as of November 1, 2022 and has been classified as unreviewed.  Legal due diligence is continuing; however, out of the $1.209 billion account balances analyzed, approximately $1.097 billion were classified as restricted (some of which may be restricted if certain parties are successful in litigation regarding their asserted security interests), and $111.8 million were classified as unrestricted.  The account balances as of November 1, 2022, where available, are also included in Exhibit I.

---

[135] The information included herein is as of the date of this Disclosure Statement and should be considered preliminary and subject to material change.  Amounts included throughout this Disclosure Statement with respect to the Debtor's cash accounts are subject to modification based on the receipt of additional information and review by legal counsel.

[136] Of the $229.1 million in unrestricted or unreviewed balance, $1.3 million is held at US Bank, the Bond Trustee.

[137] Of the 82 bank accounts with balances as of September 30, 2022, PREPA provided updated balances as of November 1, 2022, for 65 accounts.  The preliminary legal restriction classification is not impacted by the updated balances as of November 1, 2022.  Of the remaining 17 accounts, 15 accounts each had a $0 balance, one account had $1.6 million, and one account had $1,421 as September 30, 2022.

[138] Of the $139.0 million in unrestricted or unreviewed balance, $1.3 million is held at the Bond Trustee.

iii.     **Updates to Information Referenced in the IFAT Report**

The following provides a summary highlighting the areas of progress made since the June 2018 Measurement Date:

- Since the June 2018 Measurement Date, twenty-nine (29) new PREPA accounts totaling approximately $972 million were identified and supported by financial documents.  These 29 accounts were identified based on information provided by governmental entities and FIs.

- Since the June 2018 Measurement Date, ten (10) PREPA accounts that were included within the IFAT report were identified as being closed accounts, duplicate accounts, or non-existent accounts and this was confirmed by the FIs or governmental entities.  The IFAT report included one (1) account with reported balance of $1.1 million that was deemed as duplicate and nine (9) accounts with reported balances of approximately $13.0 million that were closed subsequent to the June 2018 Measurement Date.

iv.     **Continuation of Tasks and Activities Referenced in the IFAT Report**

The IFAT report suggested nine (9) additional tasks and activities to more fully develop the relevant information.  The Oversight Board has adopted the suggestions and continued procedures to enhance the information subsequent to the release of the IFAT report.  Accordingly, the following provides an update, specific to PREPA, on the nine suggestions:

- The Oversight Board continued and updated its procedures to review and update account balances and legal restriction classifications, most recently as of the September 2022 Measurement Date.

- The Oversight Board updated its procedures to review accounts for legal restriction classifications across the population of accounts for PREPA that would result in a review of more than 95% of combined total account balances.

- The procedures to review and update account balances and legal restriction classifications included gathering additional documents, which were used to update and enhance financial and legal due diligence procedures.  Specifically, PREPA and the respective FIs were contacted regarding accounts and were asked to provide further information regarding closed or suspended accounts, as well as potential duplicate, non-existent, or new accounts.  Follow-up calls and meetings were scheduled to clarify and ask questions about the information provided.

- Additional analytical procedures were performed for the review of legal restriction classifications, including obtaining PREPA's descriptions of the various legal restriction categories asserted by PREPA and reviewing sources and uses of funds for accounts.

92

- Updated procedures were applied to obtain appropriate supporting documentation from PREPA to inform the legal team's assessment of account designations.

- Updated procedures were applied to identify federal funds within PREPA's accounts. The procedures included obtaining information from the Department of Treasury, AAFAF, and PREPA.

- Discrepancies noted between the IFAT report findings and information subsequently obtained from agencies, including PREPA and FIs, were reconciled through additional procedures, such as obtaining direct confirmation from FIs and clarifying the current status of a bank account. Similarly, discrepancies noted between the IFAT report findings and information obtained from AAFAF and from the Department of Treasury, were reconciled through additional procedures, such as identifying and reconciling the differences between the scope and time period covered by the IFAT report and those reported by the Puerto Rico Office of the Chief Financial Officer ("OCFO"). Currently, the unreconciled differences between the PREPA balances reported by OCFO and the PREPA balances reported by FIs are less than five percent (5%) of the total balance as of the September 2022 Measurement Date.

### v.    **Status of Review**

As of the September 2022 Measurement Date, PREPA holds 82 accounts across five FIs, for all of which the Oversight Board has received supporting documentation of balances. PREPA also provided online bank account access via the FIs for $293.3 million held in 68 out of 82 bank accounts (approximately 83% of accounts and 24% of balances in the total population). Bank account statements for the remaining $942.4 million held in 14 out of 82 bank accounts (approximately 17% of the total population) are obtained directly from the FIs and from PREPA due to limitations in online bank account access.

The balances reported above as of the September 2022 Measurement Date for PREPA have been substantively reconciled to the OCFO Bank Account Balances Report as of September 30, 2022 ("OCFO Report").[139]

The list of the Debtor's bank accounts, balances as of the September 2022 Measurement Date, and preliminary legal restriction categorizations is attached hereto as Exhibit I. The information presented therein includes accounts where balances have been confirmed with FI information as of the September 2022 Measurement Date. The Oversight Board and its advisors are continuing to analyze the legal restriction assessments for the accounts, and any determinations provided in Exhibit I are preliminary and, in all respects, subject to change based on new and additional information as it becomes available. The Oversight Board will update this Disclosure Statement to a new measurement date as warranted.

---

[139] *Summary of Bank Account Balances for the Government of Puerto Rico and its Instrumentalities, Information as of September 30, 2022*, published by OCFO on October 31, 2022.

E.    **PREPA's Liquidity and Working Capital Analysis**

<u>Liquidity Monitoring</u>

Historically PREPA has suffered severe cash shortfalls that have led to liquidity crises and ultimately led to PREPA filing for relief under Title III of PROMESA.  PREPA's operating cash flow fell from a deficit of $188 million in fiscal year 2000 to a deficit in excess of $800 million during fiscal year 2008—its worst point in history.  This led to PREPA relying on financing to make up for revenue shortfalls.  By fiscal year 2014, PREPA's financial condition had deteriorated to the point where it had to enter into forbearance agreements with creditors, it having become apparent that there were insufficient funds to pay debt service.  From fiscal year 2014 to fiscal year 2017, PREPA's annual operating results and one-time accounting adjustments depict an increasingly distressed financial situation.  Of particular note is that, between fiscal year 2014 and fiscal year 2015, PREPA's operating deficit increased from $58 million to $489 million, with the recognition of PREPA's substantial net pension liability.  As a result of changes in pension accounting assumptions and liability valuation, PREPA faced an additional $1.6 billion in unfunded pension liability in fiscal year 2015.  Although operating expenses steadily declined between fiscal years 2014 and 2017, revenues declined at a faster pace, resulting in a growing deficit.

Since the Petition Date, PREPA has improved its cash flow and liquidity monitoring, reporting, controls, and communications.  These improvements have been instrumental in preserving PREPA's financial stability through the significant disruptions caused by Hurricanes Irma, Maria, and Fiona, the earthquakes in January 2020, the COVID-19 pandemic, and the current geopolitical situation impacting fuel supply and prices.

While the measures implemented by PREPA have been effective in maintaining financial stability, there are several significant factors that will impact PREPA's future liquidity including among other things, continued funding requirements of the T&D Contract; funding for the transformation of PREPA's legacy generation assets; operational working capital; the restructuring of PREPA's legacy debt obligations; underfunded pension obligations; capital and maintenance requirements (including funding for permanent work projects);[140] resolution of federal funding, insurance proceeds, and remaining outstanding obligations associated with the 2017 hurricanes and the 2020 earthquake; federal funding, insurance proceeds, and obligations associated with Hurricane Fiona;[141] and the costs required to exit Title III.

---

[140] In October 2020, FEMA approved approximately $9.6 billion in federal grants for approximately $10.5 billion in total project costs to enable PREPA to repair damage to its electric grid caused by Hurricanes Irma and Maria.  The federal funding is targeted to repair and replace thousands of miles of transmission and distribution lines, electrical substations, power generation systems, and other grid improvements.  The federal funding is subject to PREPA contributing a 10% cost share.  The FEMA funding will help protect the electrical system from future catastrophic events.

[141] On September 18, 2022, Hurricane Fiona made landfall in Puerto Rico by the municipality of Cabo Rojo.  Hurricane Fiona reached Puerto Rico as a Category 1 hurricane with winds of 85 mph and gusts of up to 103 mph.  Despite the strong winds, most of the damage throughout Puerto Rico was caused by the heavy rains.  Most of these rains were concentrated in the southern and southeastern areas of Puerto Rico.  Hurricane Fiona caused a general blackout

As of November 1, 2022, PREPA has an unrestricted cash balance of approximately $112 million.  Hurricane Fiona and global fuel commodity prices have had a substantial and negative impact on PREPA's liquidity which may continue, or worsen, depending on several factors currently being assessed by PREPA and LUMA Energy.  As a result of the increasingly negative confluence of factors impacting liquidity, it is likely that PREPA's current cash position will not be enough to fund the expenses needed to exit Title III or the amounts that will likely be necessary to execute the transition of the operation and maintenance of PREPA's legacy generation assets and employees to a private operator (the "Generation Transaction") in the near future.

PREPA continues to monitor its cash position closely as it prepares for the aforementioned expenditures while maintaining a sufficient working capital reserve.

1.    **Liquidity Needs**

In addition to amounts necessary to fund administrative expenses and other costs of a Title III exit, PREPA's operations require that it maintain sufficient liquidity to (i) comply with its obligations under the T&D Contract to fully fund and replenish the T&D Service Accounts (defined below),[142] and (ii) maintain generation operations, including complying with the potential obligations under a final agreement associated with the Generation Transaction, and (iii) satisfy any other liquidity needs of the legacy PREPA organization, including any newly created subsidiaries.

The T&D Contract requires PREPA to maintain several restricted operational reserve accounts (the "T&D Service Accounts").  The funding deposited in these accounts is used exclusively by LUMA Energy for the maintenance and operation of the T&D System and the execution of capital improvement projects, including FEMA-funded projects, as such functions are described and contemplated in the T&D Contract.  Below are the T&D Service Accounts that have a replenishment requirement under the T&D Contract.  Subject to certain exceptions and cure periods, PREPA's failure to replenish these accounts constitutes a default under the T&D Contract.

| T&D Contract Description | Bank Account | Nov. 1, 2022 Balance | Replenishment Requirement |
|---|---|---|---|
| Operating Account | FirstBank -2350 | $185,011,204.86 | PREPA must maintain a funding level equal to the sum of anticipated T&D Pass-Through Expenditures for the subsequent four and a half (4.5) months, under the Operating Budget or the relevant Default Budget in effect and the anticipated Service Fee for the subsequent four and a half (4.5) months. |

---

throughout Puerto Rico, due to the damages caused to the electric power system.  PREPA and LUMA Energy are still assessing the damages, which LUMA Energy estimates will be in the vicinity of $4 billion.

[142] Capitalized terms used but not defined in this section shall have the meanings given to them in the T&D Contract.

| T&D Contract Description | Bank Account | Nov. 1, 2022 Balance | Replenishment Requirement |
|---|---|---|---|
| Capital Account – Non-Federally Funded | FirstBank -2361 | $29,644,578.79 | PREPA must maintain a funding level equal to the sum of anticipated Capital Costs – Non-Federally Funded for the subsequent four and a half (4.5) months under the Capital Budget – Non-Federally Funded or the relevant Default Budget then in effect. |
| Capital Account – Federally Funded | FirstBank -4468 | $200,786,595.80 | PREPA must maintain a funding level equal to, or ensure the availability of a credit facility in an amount equal to or greater than, the sum of anticipated Capital Costs – Federally Funded for Federally Funded Capital Improvements that have been obligated and scheduled as of such date in accordance with the Federal Funding Requirements for the subsequent four and a half (4.5) months under the Capital Budget – Federally Funded or the relevant Default Budget then in effect. |
| Outage Event Reserve Account | FirstBank -2372 | $30,072,963.19 | Following a withdrawal, PREPA must replenish so as to maintain an amount equal to $30,000,000. |
| Generational Expenditures – Purchased Power Account | FirstBank -2383 | $61,828,695.53 | PREPA must maintain a funding level equal to the sum of anticipated, applicable Generation Pass-Through Expenditures for the subsequent two (2) months under the Generation Budget or the relevant Default Budget then in effect. |
| Generation Expenditures – Fuel Account | FirstBank -2394 | $76,564,357.52 | PREPA must fund in accordance with the minimum working capital level set forth under the GridCo-GenCo PPOA and any fuel supply arrangement between GridCo and GenCo. |
| Contingency Reserve Account | FirstBank -2405 | $52,193,282.79 | PREPA must fund in an amount equal to 1/24 of the Contingency Reserve Amount, until such time as the Contingency Reserve Account is funded to the level of the Contingency Reserve Amount. |

In the event that PREPA is assigned an Investment Grade Rating by two or more credit rating agencies, the level of pre-funding for Operating Expenditures, operator service fees, Federally Funded Capital, Non-Federally Funded Capital, and other expenses will be reduced from 4.5 to 3 months' worth of expenses, and there will be no further obligation to deposit funds into the Contingency Reserve Account.

In addition to liquidity necessary to be in a position to replenish the T&D Service Accounts, PREPA must maintain sufficient liquidity to pay generation expenses. The T&D Contract permits PREPA to open Generation Expenditures accounts to pay for actual Generation Pass-Through Expenditures. PREPA opened a third Generation Expenditures account to reserve for GenCo's labor and non-labor operating expenditures. This account (*i.e.*, FirstBank -2515) is maintained at a funding level equal to the sum of anticipated labor and non-labor operating expenditures for the subsequent two (2) months under the Generation Budget. Based on the current fiscal year 2023 Generation Budget, PREPA maintains this account at an approximately $40 million funding level. Moreover, in the event that PREPA successfully closes a partnership agreement related to the Generation Transaction, it will have additional generation related funding obligations.

The T&D Service Accounts were initially funded on June 1, 2021, from the $750 million[143] funding from the Commonwealth and from $122.6 million of PREPA operating cash, totaling $872.6 million.[144] After the initial funding, the T&D Service Accounts are required to be replenished by PREPA no later than the 10th business day of each month. Based on the terms of the T&D Contract, and fiscal 2023 budget, as of the 10th business day of November 2022 the T&D Service Accounts required a combined balance to be fully-funded of approximately $727 million (excluding the Generation Expenditures – Fuel Account, but including FirstBank -2515). As of November 1, 2022, the balance in the T&D Service Accounts totaled approximately $601 million[145] (excluding the Generation Expenditures – Fuel Account, but including FirstBank -2515) resulting in a funding request of approximately $126 million.

PREPA must also reserve for a sufficient amount of funds necessary to maintain an additional, adequate operational reserve. This reserve is necessary to: (i) ensure PREPA maintains a prudent level of financial resources at all times to mitigate against current and future liquidity risks (*e.g.*, revenue shortfalls, natural disasters, and unanticipated expenditures); and (ii) prevent curtailing operations or forced shutdowns, which could be catastrophic to Puerto Rico's citizens and economy. While PREPA has been able to operate in recent months with approximately $100–$125 million of operating cash outside of the T&D Service Accounts, it will require additional liquidity to mitigate current and future liquidity risks and to pay Title III administrative expenses, exit fees, and fees associates with the Generation Transaction. Accordingly, in addition to amounts

---

[143] If the T&D Contract is terminated, PREPA must immediately return the $750 million contribution to the Commonwealth. PREPA may not use these funds other than for their intended purposes and does not have the authority to transfer the money to any other account, or use such funds without the Oversight Board's advanced written approval.

[144] The $872.6 million includes the Generation Expenditures – Fuel Account of approximately $128 million. Excluding the Generation Expenditures – Fuel Account the initial funding was approximately $745 million.

[145] As of November 1, 2022 the T&D Service Accounts including the Generation Expenditures – Fuel Account totaled approximately $677 million.

in the T&D Service Accounts, under the Plan PREPA will sell $400 million in Series B Bonds to the Commonwealth at par to make payments on its estimated administrative expense claims.

## 2.   Federal Funding for Natural Disasters

On September 20, 2017, Hurricane Maria made landfall in Puerto Rico, bringing sustained winds of 155 miles per hour and significant rainfall over a 30-hour period.  Hurricane Maria crossed Puerto Rico diagonally, entering through the Southeast and exiting through the Northwest. The hurricane caused catastrophic destruction in Puerto Rico, including severe damage to the electric power system.  Two weeks earlier, Hurricane Irma passed just north of Puerto Rico, substantially impairing portions of PREPA's already weak infrastructure.

On December 28, 2019, the first of many earthquakes shook Puerto Rico.  On January 8, 2020, the President of the United States issued an Emergency Declaration for Puerto Rico, wherein direct federal assistance was granted to aid Puerto Rico in preliminary damage assessments after Puerto Rico experienced a 5.8 magnitude earthquake on January 6, 2020, and a 6.4 magnitude earthquake on the following day.

On September 18, 2022, Hurricane Fiona made landfall in Puerto Rico as a category 1 hurricane. Hurricane Fiona brought winds reaching over 100 miles per hour and over 30 inches of rain that caused severe floods, mudslides, and washed-out roads and bridges across Puerto Rico.  According to LUMA Energy, Hurricane Fiona caused more than $4 billion in damage to the T&D System alone.[146]

Following all of these natural disasters, PREPA incurred significant costs and has received certain recoveries from federal funds and insurance proceeds.  The electric power system in Puerto Rico endured substantial infrastructure damage in recent years due to the above-mentioned natural disasters.  As a result of the severe damage, PREPA qualified for the following federal programs that fund eligible emergency work and permanent projects:

1. FEMA's Public Assistance ("PA") Program: This program provides funds for communities to recover from federally declared disasters or emergencies through Sections 428 and 406 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (the "Stafford Act").  Funding is provided for both emergency assistance and for permanently restoring infrastructure.  Under certain circumstances, funding can be extended beyond restoring infrastructure and cover future hazard mitigation.  For example, measures that directly reduce the potential of future, similar disaster damages can be funded.  PREPA must meet a 10–25% cost-share requirement (depending on the type of projects) for all funding under the PA program.

2. FEMA's Hazard Mitigation Grant Program ("FEMA 404 HMGP"): This program funds protection to undamaged parts of a facility or may be used to prevent or reduce damages caused by future disasters.  Under Section 404 of the Stafford Act, PREPA must meet a twenty-five percent (25%) cost-share requirement for this source of funding, which has to date been met by funding from the Community Development Block Grant ("CDBG"),

---

[146] https://lumapr.com/fiona/?lang=en.

however, there is no guarantee that future cost share funding will be financed by the CDBG monies.

3. Federal Housing and Urban Development ("HUD") CDBG – Disaster Recovery ("CDBG-DR") and Mitigation ("MIT") Programs: Funds from the CDBG programs must address a disaster-related impact in a Presidentially-declared disaster area and meet several additional criteria. PREPA intends to use the funds from this program to cover the cost-share requirements of the FEMA PA and FEMA 404 HMGP programs

As a part of these grants, a funding obligation of $10.7 billion—inclusive of insurance payouts and cost share—was earmarked for PREPA to repair or replace electrical systems including thousands of miles of transmission and distribution lines, electrical substations, power generation systems, office buildings, and make other grid improvements. Of this $10.7 billion, the federal share is $9.5 billion. PREPA intends to use CBDG-DR funds to cover, at least in part, the local cost-share requirement. The total $10.7 billion funding obligation earmarked for PREPA[147] is referred to as the "Global Settlement."

In addition, PREPA has received approximately $2.1 billion, as of November 18, 2022, in emergency funds related to Hurricanes Maria and Irma, the January 2020 earthquakes, and the COVID-19 pandemic from FEMA and other federal entities. PREPA has also received approximately $227 million, as of November 18, 2022, from several insurance companies in respect of damages resulting from Hurricane Maria and the January 2020 earthquakes.

PREPA released a report that details the projects that will be undertaken using the new FEMA funds.[148] PREPA's top priorities include protecting critical infrastructure loads, transmission and distribution lines, and large industrial loads that are essential to Puerto Rico's economy. To that end, five investment focus areas were designated to meet PREPA's top priorities: (i) reliability and system resiliency; (ii) renewable integration; (iii) codes, standards, and regulatory compliance; (iv) automation and modernization; and (v) hazard mitigation.

F.    **PREPA's Resource Planning and Transformation**

1.    **Integrated Resource Plan**

Prior to 2014 and the enactment of Act 57-2014, PREPA substantially operated as an unregulated electrical utility. With the enactment of Act 57-2014, PREB became responsible for instituting measures intended to completely transform Puerto Rico's electrical grid. Act 57-2014, as amended, known as the Puerto Rico Energy Transformation and RELIEF Act, permits PREPA to become the instrumentality of Puerto Rico responsible for supplying electric power to Puerto Rico at the lowest possible cost, while observing the highest environmental standards, with the

---

[147] LUMA Energy is responsible for the use of federal funds to reconstruct transmission and distribution related infrastructure. PREPA, in turn, is responsible for the use of federal funds assigned for reconstruction of generation related infrastructure.

[148] https://energia.pr.gov/wp-content/uploads/sites/7/2021/02/Response-to-Resolution-and-Order-Entered-on-Jan-25-2021-and-Request-for-Approval-of-Revised-10-Year-Infrastructure-Plan-NEPR-MI-2021-0002-1.pdf.

oversight of PREB.[149]  To do so, Act 57-2014 requires the Energy Bureau of the Public Service Regulatory Board to adopt necessary rules for the presentation, evaluation, and approval of PREPA's IRP.[150]   Generally, an IRP is a planning document, commonly used by utilities nationwide, which outlines how a utility will provide energy resources to a particular geographic region over a period ranging between five (5) to twenty (20) years.

Similar to other utilities, PREPA's generation resource planning is performed using an IRP. An IRP, which is also defined by Act 57-2014, is a resource plan that will consider all reasonable resources together, including both energy supply and energy demand, to fulfill the current and projected future needs of Puerto Rico's electrical system at the lowest possible price.[151]  Act 57-2014 mandates PREPA's IRP include the environmental impact of the energy system contemplated by the proposed action plan contained within the IRP.[152]  At least every three (3) years, PREPA is required to prepare and submit to PREB a revised IRP, covering a period of twenty (20) years, that is compliant with both Act 57-2014 and Regulation 9021.  Both Act 57-2014 and Regulation 9021 require PREPA to include, among other things, (i) an assessment of the planning environment; (ii) a detailed study of a range of future load forecasts, present generation resources, present demand resources, current investments in electricity conservation technologies, existing T&D[153] facilities; and (iii) the relevant forecast and scenario analyses in support of PREPA's selected resource plan.  The IRP must also contain a proposed action plan.  The action plan within the IRP contains the recommended actions that PREB should approve and PREPA should implement to restructure the PREPA electrical utility system during the years of the relevant proposed IRP (currently, 2019-2023).[154]

The most recent IRP was proposed on June 7, 2019.  LUMA Energy is required to submit the next proposed IRP by no later than March 1, 2024.  The objective of the most recent proposed IRP was to comply with the Government of Puerto Rico's energy public policy, generally, and specifically as it related to the transformation and development of Puerto Rico's electrical sector. Central to the development of the Government's vision was the focus on the transformation of Puerto Rico's electrical sector as indispensable to Puerto Rico's overall long term successful transformation.  After Hurricane María, the Government of Puerto Rico, in coordination with the Oversight Board, outlined a vision for the transformation of the energy sector, known as "The Vision of the Future of Power in Puerto Rico."  The Vision of the Future of Power in Puerto Rico emphasizes the need for a customer-centric, safe, reliable, resilient, sustainable, and cost-efficient

---

[149] Act 57-2014, Puerto Rico Energy Transformation and RELIEF Act, approved May 27, 2014.

[150] Act 57-2014, Puerto Rico Energy Transformation and RELIEF Act, approved May 27, 2014.

[151] Siemens Industry, Puerto Rico Integrated Resource Plan 2018-2019, RPT-015-19, rev. 2 (Schenectady, June 7, 2019), 7-3, PREPA Ex. 1.0 IRP 2019 PREPA IRP Report.pdf (aeepr.com).

[152] Act 57-2014, Puerto Rico Energy Transformation and RELIEF Act, approved May 27, 2014.

[153] Transmission is the movement of high voltage electricity between power plants, while the process of distribution refers to the movement of electricity to consumers.  Puerto Rico's transmission and distribution system is comprised of three major transmission loops that move electric generation from power plants along the southern coast to load centers concentrated in the northeast.

[154] Siemens Industry, Puerto Rico Integrated Resource Plan 2018-2019, RPT-015-19, rev. 2 (Schenectady, June 7, 2019), 7-3, PREPA Ex. 1.0 IRP 2019 PREPA IRP Report.pdf (aeepr.com).

electric power service that meets environmental, regulatory, and statutory requirements.[155]  During the development of PREPA's proposed IRP, one of the main objectives was to have the proposed IRP align with the following five (5) pillars:

1) Customer-Centric:  The proposed IRP allows for increased customer participation through the empowerment and encouragement of customers to participate and take ownership of their energy security and affordability.

2) Financial Viability:  The proposed IRP minimizes the cost of supply and substantially reduces the dependence on imported fossil fuels.  This results in affordable rates that promote financial viability for both PREPA and consumers.

3) Reliable and Resilient:  The proposed IRP is centered on the concept of implementing mini-grids, which are intended to increase the resiliency and reliability of Puerto Rico's electrical grid by providing a stronger electrical grid to withstand the force of any major natural disasters.  The mini-grids divide Puerto Rico's electrical grid into eight (8) different electrical grids, which can operate independently, during and after major weather events to continue to support and provide electricity to Puerto Rico with minimal disruption during and after the natural disaster.

4) Model of Sustainability:  The proposed IRP's implementation will transition the Puerto Rico electric system from one that has been previously centered on fossil fuels, to one in which renewable resources play a central and predominant role.  The proposed IRP's implementation will drastically reduce emissions, increase the implementation of renewable generation, achieve compliance with all current regulations, and position Puerto Rico for future regulations.

5) Economic Growth Engine:  The nature of the new generation resources that must be developed, the high levels of customer participation on the energy production, and the overall reduction in the system cost are expected to result in employment opportunities and substantial economic growth for Puerto Rico.  The proposed IRP will support a reliable economic system that will in turn attract economic development in Puerto Rico.

As a result of the numerous studies completed to develop the proposed IRP, the ultimate recommendations of the latest proposed IRP, filed on June 7, 2019, were aimed to align with the five (5) key pillars adopted by the PREPA Board in its Vision for the Future of Power in Puerto Rico.  The proposed, updated IRP seeks to serve as the foundational building block for the transformation of Puerto Rico's electrical system into a thriving operation.

---

[155] Press Release, Governor of Puerto Rico, PREPA's Board Adopts a New Vision for the Transformation Announced by the Governor of Puerto Rico, Puerto Rico Electric Power Authority (Feb. 1, 2018).

2.     **Overview of the Approved IRP**

PREPA's first ever IRP was filed in 2015, and subsequently approved by PREC, PREB's predecessor, in 2016.[156]  However, PREPA's first ever filed IRP soon proved to not be conducive to Puerto Rico's energy system due to destruction left by the natural disasters.  This forced PREPA to completely reevaluate its approach to energy supply and the structure of the electrical grid to ensure that the utility infrastructure was better prepared for similar future events.  These natural disasters focused PREPA on the need to (i) increase the resiliency and survivability of its systems; (ii) decrease its dependence on fuel oil; and (iii) increase its reliance on renewable energy resources.

After intensive study and re-evaluation was completed relating to what was best for the transformation of Puerto Rico's energy sector, on February 13, 2019, PREPA filed its initial proposed IRP for PREB's approval (the "Initial IRP").  After reviewing the Initial IRP, PREB found the Initial IRP "non-compliant," and requested PREPA refile it after addressing a series of items listed and detailed in a resolution issued by PREB on March 14, 2019.[157]  On June 7, 2019, PREPA refiled its proposed IRP after making a series of revisions that were delineated and required by PREB (the "Proposed IRP").[158]  PREB issued its Final Resolution and Order on PREPA's Proposed IRP on August 24, 2020 (the "Final Resolution and Order"), approving the Proposed IRP in part and rejecting it in part.[159]  As a result, PREB ultimately ordered the adoption and implementation of a Modified Action Plan and Modified Preferred Resource Plan in lieu of the proposed action plan (the "Action Plan") and preferred resource plan (the "Preferred Resource Plan") set forth within PREPA's Proposed IRP.[160]

The latest Proposed IRP developed by PREPA, which was partially approved on August 24, 2020,[161] was designed with the intent to:

a) Address the impacts of an unreliable, inflexible, and aging generation fleet that burns high cost fossil fuels and does not satisfy environmental regulations, by developing and incorporating renewable resources into Puerto Rico's electrical system;

---

[156] Final Resolution and Order, In Re: Integrated Resource Plan for the Puerto Rico Electric Power Authority, Case No. CEPR-AP-2015-0002, Sept. 23, 2016.

[157] Resolution and Order, In Re: Completeness of Puerto Rico Electric Power Authority Integrated Resource Plan Filing, Confidential Treatment of Portions of the Integrated Resource Plan and Requested Waivers, Case No. CEPR-AP-2018-0001, Mar. 14, 2019.

[158] Final Resolution and Order, In Re: Integrated Resource Plan for the Puerto Rico Electric Power Authority, Case No. CEPR-AP-2015-0002, Sept. 23, 2016.

[159] Final Resolution and Order, In Re: Review of the Puerto Rico Electric Power Authority Integrated Resource Plan, Case No. CEPR-AP-2018-0001, Aug.24, 2020.

[160] Final Resolution and Order, In Re: Review of the Puerto Rico Electric Power Authority Integrated Resource Plan, Case No. CEPR-AP-2018-0001, Aug. 24, 2020.

[161] Final Resolution and Order, In Re: Review of the Puerto Rico Electric Power Authority Integrated Resource Plan, Case No. CEPR-AP-2018-0001, Aug. 24, 2020.

b) Achieve a reduction in supply costs by incorporating renewable resources into Puerto Rico's electrical transformation, which will provide a permanent reduction in expensive and volatile fuel costs;

c) Achieve compliance with the mandates of Act 17-2019 (*i.e.*, to achieve 40% generation from renewable sources by 2025; 60% by 2040; 100% by 2050), and to achieve the possibility of going beyond the current mandates; and

d) Shift from centralized generation located in the south of Puerto Rico to more decentralized generation resources distributed across Puerto Rico.[162]

The final recommendations that were ultimately suggested to PREB, within the Action Plan of the Proposed IRP for PREPA, to implement between 2019 and 2023, included the following:

a) Supply Resources: integrating the maximum amount of renewable generation that is practical to interconnect, including new and existing generation, purchase power energy storage, and fuel infrastructure;

b) Transmission System and Distribution: adding distributed resources, and hardening the transmission and distribution grid so that it can be segregated into eight (8) largely self-sufficient electric islands; and

c) Energy Efficiency and Demand Response: increasing energy efficiency and demand response, and retiring obsolete oil fired units and modernizing the generation fleet with dual fuel gas turbines.[163]

3.     **Recommended Course of Action**

The Modified Action Plan is the plan that was ultimately approved by PREB after review of the Proposed IRP submitted by PREPA in 2019. LUMA Energy, PREPA and the future operator of PREPA's Generation Assets shall use and implement, the extent possible, the Modified Action Plan and Modified Preferred Resource Plan as a guide for repairs, upgrades, and replacements of existing generation resources as well as procurement and development of new generation resources. At a high level, the implementation of the Modified Action Plan to Puerto Rico's electrical grid will help (i) advance increased reliance on renewable sources of energy, principally, solar photovoltaic ("PV") energy; (ii) improve energy efficiency goals, battery storage, natural gas–fueled generation and supply infrastructure; and (iii) transition out existing coal and heavy fuel oil generation. The Modified Action Plan also supports the reduction and stabilization of current energy costs and the incorporation of renewable sources.

---

[162] Siemens Industry, Puerto Rico Integrated Resource Plan 2018-2019, RPT-015-19, rev. 2 (Schenectady, June 7, 2019), 7-3, PREPA Ex. 1.0 IRP 2019 PREPA IRP Report.pdf (aeepr.com).

[163] Siemens Industry, Puerto Rico Integrated Resource Plan 2018-2019, RPT-015-19, rev. 2 (Schenectady, June 7, 2019), 7-3, PREPA Ex. 1.0 IRP 2019 PREPA IRP Report.pdf (aeepr.com).

The following three (3) notable modifications to the grid were approved by PREB, which form the base framework of the Modified Action Plan and Modified Preferred Resource Plan for PREPA:

1. Increasing share of renewable generation and storage, while retiring or converting existing coal and heavy fuel oil generation and system modifications to enable integration of inverter-based generation;

2. Enabling customer choice through investment in distributed generation ("DG"), energy efficiency ("EE") and demand response ("DR") programs to allow for greater and more meaningful participation of the customer in Puerto Rico's electricity grid; and

3. Enhancing grid resilience through capital investment in the T&D System to support greater resilience and reliability and further optimization proceedings to determine optimal T&D System investments to improve resiliency.

PREPA has worked with the P3 Authority to implement a reorganization of PREPA's electrical grid that is consistent with these policies. The P3 Authority, in collaboration with PREPA and the Oversight Board, selected LUMA Energy to take responsibility to operate and maintain PREPA's T&D System. As of June 2021, LUMA Energy, as the selected private operator of the T&D System, has been responsible for implementing the Modified Action Plan. LUMA Energy also operates as PREPA's representative before PREB and any other local, state, or federal government agencies, and is responsible for preparing and proposing a new IRP for review and approval by PREB every three (3) years.

i.      **Increasing Share of Renewable Generation and Storage**

In the Final Resolution and Order entered on August 24, 2020, PREB ordered PREPA to develop a plan to procure 3,750 MW of renewable energy and 1,500 MW of battery storage by 2025.[164] In addition, PREB approved the installation of up to 81 MW of local peaking capacity procured through a technology-agnostic, competitive bid RFP process that is open to all single or aggregate sources of demand and supply-side options. PREB also approved the conversion of eight (8) retired steam plants to synchronous condensers to enable voltage stability following the installation of inverter-based renewable generation and battery storage. The Final Resolution and Order clarified that the conversion plan will be subject to additional studies and coordinated with retirement schedules.

PREB rejected the development and construction of most proposed new fossil fuel generation resources, including the retirement and wholesale replacement of all eighteen (18) existing gas turbine peaking units, any new LNG infrastructure, and large-scale development efforts on a new combined cycle gas turbine unit at Palo Seco.

a.      ***Replacement of Palo Seco Power Plant***

---

[164] Final Resolution and Order, In Re: Review of the Puerto Rico Electric Power Authority Integrated Resource Plan, Case No. CEPR-AP-2018-0001, Aug. 24, 2020.

In 2019, PREPA was inspecting various facilities in Puerto Rico to submit damage reports to FEMA to describe the full impact of the hurricanes on power plants across Puerto Rico. At the same time, PREPA was exploring opportunities to enhance the northern region of San Juan, which included the proposal of a power plant at Palo Seco, which was ultimately included in the Proposed IRP. In rejecting any large-scale development efforts on a new combined cycle gas turbine unit at Palo Seco, PREB found that PREPA did not support inclusion of a new power plant at Palo Seco by 2025 in a least cost plan, but only by 2028, at the earliest. In the Final Resolution and Order, dated August 24, 2020, PREB ordered PREPA to cease any spending on the development of the new plant at Palo Seco, except for limited preliminary purposes and engineering requirements.[165] Under the Final Resolution and Order, PREB authorized $5 million for a preliminary economic, siting, permitting, and feasibility analysis at the Palo Seco site for a new fossil fuel-powered unit and fuel infrastructure, so long as it did not interfere with or delay the procurement of renewable energy or battery storage.[166] PREB also ordered PREPA to start submitting quarterly reports on January 1, 2021, describing the work performed, the staffing or consultant resources used to complete the work, and the status of the overall preliminary efforts related to the authorized funding of the unit at Palo Seco. If PREPA determined the preliminary efforts required more than the $5 million allocated to them by PREB in the Final Resolution and Order, PREPA would have to file a request seeking more funding. Thus, PREB did not directly approve including a new power plant at Palo Seco, but still allowed for a feasibility study to be conducted in order to determine if the development was possible and feasible for Puerto Rico.

PREPA filed the feasibility study on July 15, 2022.[167] Under the feasibility study, Sargent & Lundy Puerto Rico, LLC, ("Sargent & Lundy"), found that a new power plant in San Juan would utilize proven technology to provide (i) a new level of resiliency to the electrical grid to manage any future natural disasters; (ii) flexibility to react to electrical grid demands; and (iii) reliability in line with North American standards. However, Sargent & Lundy ultimately found the Palo Seco site was not the best proposed or most suitable location for the new power plant. Sargent & Lundy ultimately recommended the following: (i) a new power plant facility in the northern grid adjacent to critical loads in San Juan operating to provide emergency generation services; (ii) generation equipment including black start capability for emergency use; (iii) repairs to storm harden existing fossil and power plants, allowing them to be fully functioning for seven (7) days without refueling; and (iv) full compliance with the EPA. This will provide PREPA with reliable generation equipment and support PREPA's needs to integrate renewable energy and storage projects. The proposed commercial operation date of the power plant would be in or before 2032, however the commercial operation date is dependent upon the following: (i) acquisition of property near the San Juan power plant for development of the new power plant; (ii) relocation of existing facilities; and (iii) application for permits and demolition work.

---

[165] Final Resolution and Order, In Re: Review of the Puerto Rico Electric Power Authority Integrated Resource Plan, Case No. CEPR-AP-2018-0001, Aug.24, 2020.

[166] Final Resolution and Order, In Re: Review of the Puerto Rico Electric Power Authority Integrated Resource Plan, Case No. CEPR-AP-2018-0001, Aug. 24, 2020.

[167] Motion to Submit Feasibility Study and July 2022 Status Report, In Re: Preliminary Studies for New Combined Cycle Power Plant in Palo Seco, Case No. NEPR-MI-2021-0003, July 15, 2022.

On August 3, 2022, PREB entered a resolution and order, determining that due to the lack of a site for the new proposed power plant based on the status reports and recommendations of the feasibility study, that "out of an abundance of caution, there is a need to determine the costs and timeframe of availability of a new combined cycle gas turbine, to gauge the current market trends for resource costs, and compare against the costs of ongoing PVs and battery energy resource deployment, however delayed, to attain the goals set in the Approved IRP to meet the energy public policy goals and serve electricity customers' best interests."[168] PREB reasoned there is nothing contained within the Approved IRP that limits the development of the power plant to a particular location and it is within PREB's authority to ascertain the costs and development of the plant at other locations in Puerto Rico to determine the best location for the plant. PREB therefore ordered PREPA to notify the P3 Authority within five (5) business days of the resolution and order that an RFP should be established for a new power plant, which should be duel burning for natural gas and hydrogen or be converted to burn hydrogen, at any location in Puerto Rico.[169] PREB also reaffirmed the order to PREPA to continue to file the monthly status reports on the status of the development of studies for the new power plant in the San Juan area and to include actions by PREPA to amend requests for federal funds to now be used towards the development of an energy storage project at Palo Seco, instead of a power plant.[170]

b. ***Development of New Flexible Distributed Generation Units***

Generation units in Puerto Rico are and have historically been powered primarily by fossil fuels. Almost 40% of Puerto Rico's electricity was generated by petroleum-fired power plants in fiscal year 2021, and more than 97% of total electricity was generated from non-renewable resources.[171] More recently, PREPA has progressed towards diversifying its fuel mix, including (i) completing the conversion of the San Juan power plant's dual fuel use to burn natural gas and diesel; (ii) selecting 150 MW of non-operational renewable energy power purchase agreements for development; and (iii) launching an RFP for up to 1000 MW of renewable generation and 500 MW of battery storage. The total planned addition of 3,750 MW of renewable generation capacity will significantly increase the existing renewable capacity in Puerto Rico, with current projections estimating renewable sources will generate over 45% of all electricity in Puerto Rico by fiscal year 2027.

On February 22, 2021, PREPA issued an RFP for 1,000 MWs of renewable power production and 500 MWs of battery storage, incorporating recommendations from both PREB and the Oversight Board to pursue implementation of the Modified Action Plan.[172] The RFP solicits proposals for the design, construction, installation, ownership, operation, and maintenance of renewable energy resources, energy storage resources, and virtual power plants for various sites to

---

[168] Final Resolution and Order, In Re: Preliminary Studies for New Combined Cycle Power Plant in Palo Seco, Case No. NEPR-MI-2021-0003, Aug. 3, 2022.

[169] *Id.*

[170] *Id.*

[171] 2022 Certified Fiscal Plan for Puerto Rico Electric Power Authority, Chapter 2, "Historical Context and Current Challenges."

[172] PREPA RFP No. 112648, Feb. 22, 2021.

be located across Puerto Rico.  The initial RFP is the first of six (6) RFP tranches to be released over the next three (3) years seeking 3,750 MWs of renewable energy resources and 1,500 MWs of energy storage resources.  On June 15, 2021, PREPA filed a *Motion to Submit Updated Procurement Plan Addressing Plans for The Second Renewable Generation and Energy Storage Resource Procurement Tranche,* submitting a proposed plan for the implementation of the second tranche and suggested revisions as a result of what has occurred during implementation of the first tranche.[173]  PREPA has continued to file motions submitting various updates relating to projects that PREPA wishes to include within each tranche, to be approved by PREB.

On December 16, 2021, PREPA filed the *Motion Submitting 733 MW of PV Energy Draft Power Purchase and Operating Agreements Offered in Tranche 1 of Evaluation and Approval.*[174] In this motion, PREPA mentioned fifteen (15) solar PV projects totaling 732.7 MW and submitted draft PPOA contracts for nine (9) of those projects for evaluation and approval by PREB.  In the submission, PREPA also identified three (3) energy storage resource projects totaling 220 MW, with the submission of energy storage services agreements and the remaining six (6) draft PV PPOAs forthcoming on or before December 23, 2021.

Subsequently, on December 23, 2021, PREPA filed the *Supplemental Motion Submitting PV Renewable Energy Draft Power Purchase and Operating Agreements (PPOAs) As Well As Generation and Energy Storage Resources RFP for Energy Bureau Evaluation and Approval.*  In this motion, PREPA submitted three (3) contracts totaling 220 MW and six (6) draft PV PPOAs, reflecting the projects submitted in the motion filed by PREPA on December 16, 2021.[175]  PREPA also included three (3) draft solar PV PPOAs totaling 112.1 MW.  On December 28, 2021, PREB, in response, issued a resolution and order requesting additional information.  PREPA requested multiple extensions to respond to questions from PREB in its December 28, 2021 resolution and order.  After the submission of information, PREB entered a resolution and order on February 2, 2022, approving both the eighteen solar PV projects, totaling 844.8 MW and taking notice of the request for approval of the three (3) battery energy storage projects due to the requirement of additional information, as a part of the tranche one procurement process for renewable energy and storage.

Due to delays associated with tranche one of the RFP process, going forward, PREB will determine the timeline for issuance of the five (5) remaining tranches and will be primarily responsible for the procurement process of the new renewable generation capacity.  PREPA submitted a complete set of tranche two RFP documents to PREB on October 29, 2021, per PREB's order.  PREB subsequently issued a resolution and order on January 27, 2022 establishing

---

[173] Motion to Submit Updated Procurement Plan Addressing Plans for the Second Renewable Generation and Energy Storage Resource Procurement Tranche, In re: The Implementation of the Puerto Rico Electric Power Authority Integrated Resource Plan and Modified Action Plan, Case No. NEPR MI-2020-0012, June 15, 2021.

[174] Motion Submitting 733 MW of PV Energy Draft Power Purchase and Operating Agreements Offered in Tranche 1 of Evaluation and Approval, In re: The Implementation of the Puerto Rico Electric Power Authority Integrated Resource Plan and Modified Action Plan, Case No. NEPR MI-2020-0012, Dec. 16, 2021.

[175] Supplemental Motion Submitting PV Renewable Energy Draft Power Purchase and Operating Agreements (PPOAs) As Well As Generation and Energy Storage Resources RFP for Energy Bureau Evaluation and Approval, In re: The Implementation of the Puerto Rico Electric Power Authority Integrated Resource Plan and Modified Action Plan, Case No. NEPR MI-2020-0012, Dec. 23, 2021.

an independent coordinator to manage all future renewable energy procurements and describing the coordinator's corresponding role and responsibilities. The procurement of renewable energy and battery storage as set forth in the Proposed IRP is intended to set Puerto Rico on a path to reach 100% renewable energy by 2050.

## ii.   **Enabling Customer Choice**

Customer engagement is crucial to the successful future operation and restructuring of Puerto Rico's electrical system. The Approved IRP's Modified Action Plan enables customer choice through various programs, including DG, EE, and DR programs. PREB ordered PREPA to enable DG by ensuring all distribution system planning and expenditures support DG. Regarding DR, the Modified Action Plan requires PREPA to develop internal systems and external programs and offerings available to all customer classes to engage aggregators of DR resources to offer, dispatch, and be compensated for cost-effective DR resources. For EE, PREB ordered PREPA to take all necessary steps to support the objective of 30% EE savings by 2040, as mandated in Act 17-2019, including providing support for program implementation, analysis, funding, and financing.

LUMA Energy is responsible for ensuring the grid is prepared for the integration and implementation of DG, which includes activation of net energy metering for customers that request it. A customer can apply for a net energy metering credit on their bill if they install behind the meter generation. Doing so, customers give electricity back to the grid in exchange for a credit on their electricity bill. Pursuant to Act 17-2019, the credit is equal to the full retail rate of electricity. There was originally a backlog of over 8,000 net energy metering applications, however since June 1, 2021, the date LUMA Energy took over the T&D System, LUMA Energy has activated net energy metering service for over 21,000 solar customers in Puerto Rico representing ~100 MW of renewable energy.

Furthermore, Act 57-2014 requires PREB to establish regulations governing EE and DR programs. PREB adopted a regulation for DR on December 10, 2020[176] and adopted a regulation for EE on January 21, 2022.[177] The adopted DR and EE regulations utilize similar program approaches for development, administration, implementation, and funding, that require PREPA to develop and implement DR and EE programs. Implementation of the programs is centered on three-year periods and three-year plans developed by LUMA Energy, on behalf of PREPA, that are ultimately approved by PREB. Each plan will identify the proposed DR or EE programs, budgets, and goals for the three-year period. LUMA Energy will be required to prepare and submit separate three-year plans for both DR and EE. After implementation of the first two (2) years of the programs, LUMA Energy will be required to submit an annual update to PREB for approval that describes in detail any proposed changes to the program offerings, performance metrics, targets, and/or budget.

---

[176] Adoption of Regulation for Demand Response, In Re: Regulation for Energy Efficiency and Demand Response, Case No. NEPR-MI-2019-0015, Dec. 10, 2020.

[177] Notice of Proposed Regulation and Request for Public Comments, In Re: Regulation for Energy Efficiency, Case No. NEP-MI-2021-0005, Apr. 21, 2021.

The approved program budgets permitted by the DR and EE programs will be recovered in customer rates.  The DR regulation also permits LUMA Energy to develop and implement time-varying rates and/or demand charges informed by the costs of distribution or transmission infrastructure and energy supply and capacity, so long as the rate structure does not discourage beneficial electrification, as approved by PREB.

On February 1, 2022, PREB entered a resolution and order that detailed the actions following the adoption of the EE regulation, which include: (1) establishing a schedule for the filing of the first three-year plan to coincide with the start of other energy efficiency programs; (2) inviting various stakeholders to a workshop on February 28, 2022 regarding the process for the development and implementation of the three-year plan; and (3) providing a template for the transition period plan under section 2.02(C)(4) of the EE regulation. According to the EE regulation, LUMA Energy can combine the planning processes and documents for EE and DR. PREB ordered LUMA Energy to submit a proposed transition period plan on or before June 6, 2022.  The deadline for the first three-year EE plan is March 1, 2024.

LUMA Energy has also supported PREB's new initiative on the launch of electric vehicles in Puerto Rico, which was originally launched in October 2021.  The launch and usage of electric vehicles in Puerto Rico has the potential to increase demand as a result of more customers connecting their electric vehicle to the grid, which could offset the load losses of other drivers. LUMA Energy has already made improvements to the energy grid to improve day-to-day reliability of the system and will, over the coming years, make additional upgrades to the grid that will further support cleaner energy and the adoption of electric vehicles.  As noted in the company's November 2021 report before PREB, LUMA Energy is continuing to work to:

- Increase connection of renewables and battery storage by streamlining the process for customers;

- Repair and modernize Puerto Rico's electrical grid to ensure reliable and sustainable power to support the transition of usage of electric vehicles in Puerto Rico; and

- Advance procurement of utility-scale renewable energy and storage to help ensure future electric vehicles are charged by cleaner energy.

### iii.   **Enhancing Grid Resilience**

The Final Resolution and Order found that the Proposed IRP adequately established the need for (1) T&D System upgrades; (2) expenditure of up to $2 billion for hardening and improvement of transmission and distribution ("T&D") infrastructure; and (3) the investment of $911 million in distribution system upgrades to enhance resiliency and support distributed generation.  One of the main goals of the Final Resolution and Order was to strengthen the resiliency and sustainability of Puerto Rico's electrical grid through the establishment of mini-grids and micro-grids, particularly after the occurrence of any natural disaster in Puerto Rico. However, PREB ordered PREPA to seek approval from it for specific T&D expenditures before any final planning or investments.  PREPA also announced the opening of an optimization proceeding that will determine the optimal transmission investments for ensuring a more resilient

electric power system, including assessing the ability for small-scale distributed resources—such as mini-grids—to contribute to resiliency.

LUMA Energy is responsible for planning and implementing grid resiliency measures as Puerto Rico's T&D operator.  As part of LUMA Energy's Front End Transition, LUMA Energy developed capital plans, to be funded with federal-and non-federal capital, to repair, reconstruct, and modernize the existing T&D System and improve resiliency against extreme events, such as natural disasters.  In LUMA Energy's proposed annual budget, filed on April 1, 2022, LUMA Energy budgeted approximately $2.6 billion from fiscal year 2023 through fiscal year 2025 for T&D infrastructure repair, modernization, and hardening projects.  In connection with this proposed budget, LUMA Energy is further required to submit monthly reports which provide an overview of the major investment projects PREPA is considering to enhance Puerto Rico's electrical grid.

4. **Development of Future Integrated Resource Plans in Puerto Rico Beginning in 2023**

PREB's Final Resolution and Order entered on August 24, 2020, included a section titled, "Preparation for the Next IRP Cycle."  PREB ordered PREPA to conduct a competitive bid process to select the next consultant to assist in the development of the next IRP.[178]  PREB explained the next proposed IRP's creation should take less time, ensure greater value, and allow PREB to approve the next IRP without as many modifications as were necessary with the current Approved IRP and Modified Action Plan.  In doing so, PREB listed specific action items that should be incorporated into PREPA's next proposed IRP.  The specific action items fall into eight (8) categories, which include the following:

1. Energy Efficiency and Demand Response: PREPA should ensure the energy efficiency programs contained within the current approved IRP are the most cost effective, and are the best-practice programs in comparison to other jurisdictions outside of just Puerto Rico.

2. Distributed Generation and Storage: PREPA should explore the current market and determine up to-date PV prices for Puerto Rico's development, as well as incorporate distributed storage resources to ensure better and enhanced grid services to Puerto Rico.

3. Load Forecasting: PREPA should consider the improvements made to the electrical loads and conduct studies to explore independent variables that could affect the cost and performance of the loads which include, but are not limited to wind, weather, and population.

4. Wind Resources: PREPA should conduct studies tailored to Puerto Rico's wind resources and electrical grid to evaluate cost generation profile utilizing the most current information available in Puerto Rico.

---

[178] Final Resolution and Order, In Re: Review of the Puerto Rico Electric Power Authority Integrated Resource Plan, Case No. CEPR-AP-2018-0001, Aug. 24, 2020.

5.  <u>Resource Need Assessment</u>: Within the body of the next proposed IRP, PREPA should include a load and capacity resource balance by year for all years that will be covered by the next proposed IRP, as well as a forecast of the "annual net position" of PREPA's electrical system for all the years that will be covered by the next proposed IRP.

6.  <u>Caveats and Limitations</u>: If PREPA chooses to utilize a scorecard, PREPA should include specific quantitative weightings for any attribute within the next proposed IRP, with accompanying explanation and rationale for any assigned weights.

7.  <u>Transmission and Distribution</u>: PREPA should examine how resource planning could affect requirements for spending on T&D, as well as how to optimize the development of a resource plan, while taking this spending into account.

8.  <u>Modified Action Plan:</u> As to the current Modified Action Plan, PREPA may consider as a possible alternative, the conversion of the AES Puerto Rico coal plant to natural gas fueled operation as part of the next IRP.

In addition to the eight (8) categories proposed by PREB to be incorporated into the development of the next IRP, PREB also ordered PREPA to improve its internal organization and processes to make Puerto Rico's electrical system operate more efficiently.  To do so, within the Final Resolution and Order, PREB ordered PREPA to submit a report, detailing how PREPA would improve its resource planning processes, not later than a year from the notification date of the August 24, 2020 Final Resolution and Order.  The IRP process review report was to include the following information: (i) the steps PREPA planned to take to address all the deficiencies in PREPA's latest proposed IRP and a corresponding schedule detailing those steps; (ii) the identities of who would be responsible for ensuring these steps are in fact taken; (iii) a description of the modeling framework to be used in the next proposed IRP; (iv) what internal groups would be involved in the development of the next proposed IRP; (v) the process and steps PREPA will take to ensure all personnel, who will be involved in developing the next proposed IRP, are sufficiently educated and experienced; and (vi) a description of how PREPA plans to improve its record keeping process.

On June 1, 2021, LUMA Energy began operating PREPA's T&D System.  As PREPA's representative, LUMA Energy is required to comply with the Final Resolution and Order as part of the process of preparing the next IRP.

On November 5, 2021, LUMA Energy filed an *Informative Motion on Status of Activities Related to Next IRP Cycle, Request for Extension to File Documents, and Request to Schedule Technical Conference.*[179]  In the motion, LUMA Energy acknowledged its role in connection with preparation of the next IRP.  Further, LUMA Energy requested additional time to submit the internal IRP process review report required by the August 24, 2020 Final Resolution and Order. Further, LUMA Energy requested PREB schedule a technical conference to discuss in detail the IRP preparation process.  LUMA Energy also provided PREB with updates on its current work relating to the development of the next IRP, which included: working on defining processes,

---

[179] Informative Motion on Status of Activities Related to Next IRP Cycle, Request for Extension to File Documents, and Request to Schedule Technical Conference, In Re: Implementation of the Puerto Rico Electric Power Authority Integrated Resource Plan and Modified Action Plan, Case No. NEPR-MI-2020-0012, Nov. 5, 2021.

staffing, and consulting needs and working with the United States Department of Energy ("DOE") to determine what is required of LUMA Energy for the next IRP, including the development of a study surrounding grid resilience and transitioning Puerto Rico to the usage of one-hundred percent (100%) renewable energy.

On November 30, 2021, LUMA Energy filed the *Informative Motion on Timeline to Submit the Report on Resource Planning for The Next IRP Cycle and The Draft RFQ and RFP for IRP Consultant and Request for Additional Time.*[180]  LUMA Energy informed PREB that a preliminary draft of the internal IRP process review report had been prepared, as well as a draft document to meet the RFQ and RFP requirements relating to conducting a competitive bid process to select the next consultant to assist in the development of the next IRP.  However, LUMA Energy advised PREB, these reports were not yet ready for PREB's review and approval.  As a result, LUMA Energy requested an extension granting LUMA Energy until December 17, 2021 to submit the internal IRP process review report and drafts of the RFQ and RFP.

On December 15, 2021, PREB granted LUMA Energy's November 5 and November 30 requests and ordered LUMA Energy to file the report on or before December 17, 2021.[181]  PREB further granted LUMA Energy's request for a technical conference to discuss the next proposed IRP, which was to be held on January 25, 2022.

On December 17, 2021, LUMA Energy filed the *Motion to Submit Report on Resource Planning Process for Next IRP Cycle and Draft RFQ/RFP for IRP Consultant and Request for Confidential Treatment.*[182]  Within the motion, LUMA Energy submitted the internal IRP process review report in compliance with PREB's resolution and order, dated December 15, 2021.  LUMA Energy also provided a streamlined overview of LUMA Energy's proposed process for selecting the next consultant for developing the next IRP, which is subject to PREB's approval.

LUMA Energy requested PREB not delay approving the process proposed by LUMA Energy in the motion to retain a consultant for the next IRP, pending the technical conference scheduled in January 2022.

The motion also provided the internal IRP process review report, as required by the August 24, 2020 Final Resolution and Order.  The internal IRP process review report provided for near and medium term IRP activities and the status of those activities.  On January 25, 2022, PREB held the technical conference where LUMA Energy gave a presentation regarding (i) the next proposed IRP development process and status and (ii) the development and proposal of an approval process of an RFQ and a contract for an IRP technical consultant.  During the technical conference,

---

[180] Informative Motion on Timeline to Submit The Report On Resource Planning for The Next IRP Cycle and The Draft RFQ and RFP for IRP Consultant and Request for Additional Time, In Re: Implementation of the Puerto Rico Electric Power Authority Integrated Resource Plan and Modified Action Plan, Case No. NEPR-MI-2020-0012, Nov. 30, 2021.

[181] Resolution and Order, In Re: Implementation of the Puerto Rico Electric Power Authority Integrated Resource Plan and Modified Action Plan, Case No. NEPR-MI-2020-0012, Dec. 15, 2021.

[182] Motion to Submit Report on Resource Planning Process for Next IRP Cycle and Draft RFQ/RFP For IRP Consultant and Request for Confidential Treatment, In Re: Implementation of the Puerto Rico Electric Power Authority Integrated Resource Plan and Modified Action Plan, Case No. NEPR-MI-2020-0012, Dec. 17, 2021.

the deadline to file a new proposed IRP was confirmed to be January 3, 2024. However, LUMA Energy filed an informative motion with PREB after the technical conference, noting that based on the current status of the process of the next IRP, the date of January 3, 2024 is very limiting. Subsequently PREB entered a resolution and order, requiring LUMA Energy submit an IRP by no later than March 1, 2024, and approving the plan and technical consultant proposed by LUMA Energy.

5. **PREPA'S Ten-Year Infrastructure Plan, IRP, and Modified Action Plan**

One of the main goals of the Approved IRP and Modified Action Plan is to strengthen the resiliency of Puerto Rico's electrical grid through the establishment of mini-grids and micro-grids. The process of strengthening the resiliency of the T&D System will be attained over the next decade through federal reconstruction grants from FEMA

Upon LUMA Energy beginning maintenance of Puerto Rico's T&D System, PREPA refocused its efforts on projects in the generation and dams and hydro asset categories, while projects in the T&D, substations, IT/telecom, buildings, and environmental asset categories were transitioned to, and now remain, LUMA Energy's responsibility.

PREB has identified the IRP as "the centerpiece for carrying out the legislative intent to modernize the electric system, so it is less reliant on fossil fuels, employs more utility scale and distributed renewable energy and promotes efficiency and conservation so as to improve the environment, comply with federal laws addressing clean air and manage the cost of electricity."[183] The IRP ultimately serves to develop the most-cost effective plan to meet the needs of Puerto Rico customers. .

i.  **LUMA Energy Contract**

On January 17, 2020, the Partnership Committee established by the P3 Authority approved the final proposal of LUMA Energy and the form of the T&D Contract. On March 3, 2020, the P3 Authority submitted that form of the T&D Contract to the FOMB for approval. Pursuant to the Contract Review Policy and in accordance with PREPA's 2020 Fiscal Plan, the FOMB reviewed the T&D Contract with the P3 Authority and suggested certain revisions, including a supplement to the T&D Contract that contemplates, to the extent necessary, LUMA Energy assuming operation and maintenance services for a limited duration prior to the effectiveness of a plan of adjustment. On April 14, 2020, the FOMB voted to approve the updated T&D Contract.

On May 18, 2020, the P3 Authority filed the final T&D Contract with PREB for the required regulatory approval. On June 17, 2020, PREB issued a resolution and order (the "PREB Resolution and Order") approving the T&D Contract. The PREB Resolution and Order determined "the Proposed Contract (as modified) complies with Puerto Rico Energy Public Policy and the regulatory framework."

---

[183] Resolution and Order, Determination on Alignment with the Approved Integrated Resources Plan and Modified Action Plan, In Re: Review of the Puerto Rico Electric Power Authority's 10-Year Infrastructure Plan – December 2020, Case No. NEPR-MI-2021-0002, Jan. 25, 2021.

On June 22, 2020, the PREPA Board and the Government of Puerto Rico, pursuant to the procedures set forth in Act 29-2009 (as amended), each approved the T&D Contract. Following these approvals, the T&D Contract was signed by the parties on June 22, 2020.

Pursuant to the T&D Contract, LUMA Energy assumes responsibility for the O&M Services. LUMA Energy is responsible for all electric transmission, distribution, load serving and related activities for the safe and reliable operation and maintenance of the T&D System, including: (i) expansions and replacements to meet the contract standards, including fleet, asset management, asset acquisition/procurement, IT infrastructure, as further provided in the T&D Contract, and preparation and implementation of required components of PREPA's IRP, while prioritizing expansion and replacement projects that improve the safe, reliable, and economic dispatch of the T&D System's connected generating units; (ii) management and performance of construction of improvements thereto, including compliance with approved FEMA scope of work for projects that are eligible for federal funding and required maintenance; (iii) delivery of electricity to customers; (iv) billing and collections implementation and optimization; (v) maintenance and improvement of public lighting system; (vi) maintenance of fiber optic cable structure infrastructure, as set forth in a lease agreement between PREPA and PREPA Networks; (vii) compliance with interconnection of renewables in accordance with applicable law; (viii) management of the system operation principles to meet safe and reliable system operations in accordance with prudent utility practices and the system operation principles; and (ix) recordkeeping and reporting in accordance with applicable law or prudent utility practices.

The T&D Contract will be in effect for fifteen (15) years from service commencement (the "Service Commencement Date"), unless extended or earlier terminated in accordance with the terms thereof.

Prior to assuming full operational control over PREPA and commencing the O&M Services, the T&D Contract contemplated a Front End Transition Period during which LUMA Energy provides "Front End Transition Services" as defined in the T&D Contract, to ensure an orderly transition of the responsibility for O&M Services. The T&D Contract provides for payment by PREPA of the "Front End Transition Service Fee" to LUMA Energy, consisting of: (i) a one-time fixed amount of $60 million (payable in twelve monthly installments of $5 million starting at the commencement of the Front End Transition Period); plus (ii) (a) the hourly rate for each category of employee of LUMA Energy providing Front End Transition Services, as listed in Annex V of the T&D Contract, multiplied by (b) the number of hours worked by each employee in providing Front End Transition Services; plus (iii) all other reasonable costs and expenses incurred by LUMA Energy that are necessary and reasonable in the course of providing the Front End Transition Services and satisfying certain conditions precedent to hand over the operation of the T&D System to LUMA Energy; and (iv) any accrued indemnification obligations and any other amounts[184] required to be paid by PREPA to LUMA Energy under the T&D Contract during the Front End Transition Period (collectively, the "Front End Transition Obligations").

---

[184]   Such other obligations primarily include any interest accrued on late payments owed to LUMA Energy (at a rate of Prime plus 2%) (T&D Contract § 20.7), and expenses relating to LUMA Energy's demobilization if it terminates the T&D Contract during the Front End Transition Period (T&D Contract § 4.8(b)(vi)(B)). These obligations, along

114

Commencement of full service under the T&D Contract requires that PREPA obtain necessary Title III Court approvals.  The Oversight Board believed that in light of the status of PREPA's Title III case, PREPA might not be able to confirm and consummate a Title III plan of adjustment prior to the Service Commencement Date.  Given the importance of the energy reforms contemplated by the T&D Contract, the Oversight Board wanted to avoid delaying the Service Commencement Date if confirmation of PREPA's Title III plan of adjustment had not occurred when all other conditions precedent to the Service Commencement Date were achieved.  Thus, the Oversight Board requested that amendments be made to the T&D Contract to address the anticipated timing.  These amendments culminated in the "Supplemental Agreement".

The Supplemental Agreement provides for the commencement of the O&M Services if conditions for full service commencement are satisfied or waived other than PREPA's exit from Title III and delivery of a certain tax opinion and reliance letter (the "Interim Service Commencement Date").[185]  The Interim Service Commencement Date occurred on June 1, 2021, and began a period (the "Interim Period") during which the Supplemental Agreement is in effect, and LUMA Energy assumed full control of the T&D System, until the earlier of the Service Commencement Date (which will occur when a PREPA plan of adjustment is confirmed) or the "Interim Period Termination Date," which was set to occur on December 1, 2022.[186]  On November 29, 2022, the Oversight Board and the P3 Authority approved an extension of the Supplemental Agreement.  On November 30, 2022, the PREPA Board and Government of Puerto Rico also approved the extension of the Supplemental Agreement.  Pursuant to the extension of the Supplemental Agreement, the Interim Period Termination Date has been extended until PREPA's exit from Title III.

The Puerto Rico House of Representatives and Senate have asserted the extension of the Supplemental Agreement is invalid because, among other things, there was no approval of the extension by either of the P3 Authority Board's public interest representatives (who are appointed by the legislature). The Oversight Board disagrees with the Puerto Rico House of Representatives and Senate's position.

The Supplemental Agreement provides as a condition to the Interim Service Commencement Date that the Title III Court has entered a final and non-appealable order[187] granting administrative expense treatment for the Interim Obligations (defined below).[188] Litigation surrounding entry of such order is discussed below in Section V.D.5 of this Disclosure Statement.

Under the Supplemental Agreement, the Interim Obligations primarily consist of: (i) compensation for the O&M Services during the Interim Period, in an annual fixed amount of $115

---

with PREPA's indemnification obligations, are contingent on PREPA to honoring all of its obligations under the T&D Contract on a timely basis.

[185] Supplemental Agreement §§ 2.2 & 2.3.

[186] Supplemental Agreement § 7.1.

[187]   The requirement that the order be non-appealable can be waived by LUMA Energy.  LUMA Energy waived the parallel condition in connection with the Front End Administrative Expense Order.

[188] Supplemental Agreement § 2.3(b).

million (payable in monthly installments);[189] (ii) indemnification of LUMA Energy and its affiliates primarily for any claims or damages against them arising from PREPA's operation of the utility, similar to the indemnification obligation during the Front End Transition Period;[190] and (iii) a $115 million termination fee, if applicable.[191]

The O&M Services benefit Puerto Rico and its residents, as well as PREPA and its commercial and industrial customers, by putting PREPA's power grid on a path to becoming a more modern, sustainable, reliable, efficient, cost-effective, and resilient T&D System. The transition of control over the T&D System to LUMA Energy is the crucial first step in the overall transformation of Puerto Rico's energy sector.

ii.     **Genera PR Contract**

*Background on Genera*

On August 25, 2022, after a robust and competitive procurement process that lasted more than 24 months, the P3 Authority Partnership Committee (the "Partnership Committee"), established pursuant to Section 5 of the Transformation Act, determined to recommend to the board of directors of the P3 Authority Board that the contract for the management, operation, maintenance, management of fuel supply, and decommissioning, where applicable, of certain base-load generation plants and gas turbine peaking units (the "LGA Project," and such plants the "Legacy Generation Assets") be awarded to Genera PR LLC ("Genera"), a Puerto Rico limited liability company and a wholly-owned subsidiary of New Fortress Energy Inc. ("NFE"). Genera is the surviving entity after its merger with Encanto Power LLC, the wholly-owned subsidiary of NFE that qualified to bid on the LGA Project.

NFE is a multi-billion dollar, publicly traded, critical energy infrastructure company with (i) over 3,000 MW of experience installing, maintaining, operating, optimizing, monitoring and decommissioning generation assets, (ii) nearly 1,000 MW of power generation capacity currently operational, under development, or for which it provides fuel management services, (iii) demonstrated experience in fuel procurement and management, including seven terminals and fuel handling facilities operational or in development, and (iv) experience coordinating the integration of renewable generation with dispatchable thermal power. NFE is also an affiliate of NFEnergía LLC, which has significant, direct experience with fuel management and power generation in Puerto Rico, including the Fuel Sale and Purchase Agreement between NFEnergía LLC and PREPA, dated March 5, 2019, pursuant to which NFEnergía LLC agreed to convert generation units 5 and 6 of the San Juan Combined Cycle Power Plant to be capable of operating on liquified natural gas and to supply such gas to those units. See Section III.F.5.iv) of this Disclosure Statement for additional information regarding the NFEnergía LLC contract,

Following the requisite approvals, including Oversight Board approval, on January 24, 2023, the Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement (the

---

[189] Supplemental Agreement § 3.3.

[190] T&D Contract at § 18.2.

[191] Supplemental Agreement § 7.2(c) ((a)–(c) collectively, the "Interim Obligations.")

"Legacy Generation Asset O&M Agreement") was signed by PREPA, the P3 Authority, and Genera. Genera is equipped to stabilize and optimize the operations of Puerto Rico's Legacy Generation Assets until replacement renewable and distributed energy generation is installed and the Legacy Generation Assets are decommissioned, ushering in both a clean and resilient energy future for the people of Puerto Rico.

### Overview of Legacy Generation Asset O&M Agreement

Pursuant to the Legacy Generation Asset O&M Agreement, immediately upon its execution, the process shifted to the "Mobilization Period" to begin transitioning the Generation System187 functions to Genera. The Mobilization Period is an approximately 22-week period during which Genera will implement plans and strategies to effect the efficient, safe, and cost-effective transition of operation and management services from PREPA to Genera (the "Mobilization Services"). Among the many complex transition items performed, Genera has and will:

- Engage in stakeholder outreach;

- Develop a "Handover Checklist" and provide periodic status updates regarding Handover Checklist action items;

- Recruit and hire personnel, including by conducting key employment evaluations of and making employment offers to PREPA generation employees;

- Identify and onboard subcontractors;

- Plan and implement IT systems and tools;

- Review applicable permits and compliance obligations;

- Evaluate and maintain inventory and coordinate with the T&D Operator;

- Develop plans and procedures for various aspects of operations, including, but not limited to, a Procurement Manual, Legacy Emergency Response Plan, O&M Procedures, and Operator Training Programs;

- Develop an approach with a Spanish-speaking workforce;

- Plan for key milestones; and

- Develop a fuel savings strategy related to Fuel Contracts, including management of Fuel Contract related decisions during the Mobilization Period.

Genera is in compliance with all of its obligations under the Legacy Generation Asset O&M Agreement during the Mobilization Period, and is on track to complete all Mobilization

117

Services and "Commencement Date Conditions" within the twenty-two (22) -week period contemplated by the Legacy Generation Asset O&M Agreement. The Mobilization Period will lead to an optimal transition of operation and management services from PREPA to Genera as quickly as practicable.

Upon the Mobilization Period's completion, Genera will assume responsibility for the management, operation, maintenance, repair, restoration, and replacement, and other related services for the Legacy Generation Assets, including fuel and efficiency optimization approved by PREB, asset management, community and media relations, finance and accounting, testing and reporting, emergency response, and public and employee health and safety (collectively, the "Generation O&M Services").

In addition to the day-to-day operations and maintenance functions, as part of the Generation O&M Services, Genera will play an integral role in executing PREPA's modernization goals, as well as actively participating and assisting in the deployment of federal funding for energy generation reconstruction. Genera's role is strategically important given its proven expertise in fuel management, operations, and maintenance of power plants in island environments, as well as its demonstrated strong understanding of PREPA exemplified by its tailored approached to the Generation O&M Services. Genera's role in this regard should assure federal agencies that there is an operator with proven and verifiable experience to deploy modernization plans effectively, efficiently, and in a compliant manner.  Delivering major generation modernization capital projects on time and on budget is important to protect Puerto Rico from future devastation from hurricanes and other natural disasters.

Lastly, pursuant to the Legacy Generation Asset O&M Agreement, PREPA will be responsible for certain fixed and variable fees, consisting primarily of (i) the Mobilization Service Fee (up to $15 million), (ii) the O&M Fixed Fee ($22.5 million a year - guaranteed for the first five (5) years and may be reduced following that period as the Legacy Generation Assets are retired), and (iii) the O&M Incentive Payment (up to $100 million a year of performance-based payments tied to Genera achieving certain savings, based on service categories linked to incentives and penalties, which may also be reduced as the Legacy Generation Assets are retired).

PREPA may may also be responsible for certain contingent fees if (i) Genera decommissions the Legacy Generation Assets, or (ii) upon the Legacy Generation Asset O&M Agreement's termination or expiration, Genera is forced to demobilize and handover its rights and responsibilities with respect the Legacy Generation Assets back to PREPA or to a successor operator. Moreover, if the Legacy Generation Asset O&M Agreement is terminated, PREPA will have to pay Genera a $45 million Termination Fee.

### *Benefits and Risks of Implementation*

The transition of control over PREPA's Legacy Generation Assets to Genera is a crucial step in the overall transformation of Puerto Rico's energy sector and will lead to a wholesale change of this sector by dismantling and reorganizing the current vertically integrated corporation—and the historic challenges that it has faced. The Generation O&M Services will also help improve every day efficiency, safety, and reliability, and benefit PREPA and its customers

118

by putting PREPA's Legacy Generation Assets on a path to becoming a more modern, sustainable, reliable, efficient, cost-effective, and resilient power generation system.

- Consistent with the foregoing, it is expected that the Legacy Generation Asset O&M Agreement will provide the following benefits:

  - Transform PREPA's Legacy Generation Assets into modern, sustainable, reliable, efficient, cost-effective, and resilient power generation facilities with technologically and operationally prudent practices in order to improve and increase power generation;

  - Deliver cost-effective power generation to the transmission and distribution system;

  - Increase Legacy Generation Asset resiliency, achieving performance in line with codes, specifications, and standards consistent with U.S. mainland power generation facilities;

  - Increase Legacy Generation Asset reliability; and

  - Implement industry best practices and operational excellence through managerial continuity and long-term planning.

- Moreover, the Generation O&M Services will also benefit PREPA's employees by preserving existing jobs. Genera has pledged to interview and provide offers of employment to full-time PREPA plant generation employees in good standing and to give preference to non-plant PREPA employees in new roles.

The Legacy Generation Asset O&M Agreement also facilitates compliance with specific PREPA Fiscal Plan objectives, such as: (i) improving Legacy Generation Asset operational performance through systematic improvements and introducing and leveraging experienced personnel; (ii) upgrading Legacy Generation Asset technology to increase reliability and improve system resilience and efficiency; (iii) improving Legacy Generation Asset related processes and procedures; (iv) creating an energy sector environment that allows for decisions to be made free of the kind of political interference; (v) implementing effective and efficient capital project delivery; and (vi) enabling renewable energy generation.

Genera estimates the Legacy Generation Asset O&M Agreement will result in (i) operation and management savings of $19 million per year and (ii) fuel savings of approximately $85 million per year. The Oversight Board has not independently verified these estimates.

PREPA is now primed to turn the page on its past operational problems with its Legacy Generation Assets and begin its generation transformation. But this is dependent on both the Mobilization Services and Generation O&M Services being implemented. Such implementation

119

will lead to a more efficient, reliable, and affordable power utility, which is not only critical for Puerto Rico's economy, but will also support PREPA's restructuring and exit from Title III.

iii.    **Supply of Natural Gas and Conversion of Units 5 and 6 of the San Juan Combined Cycle Power Plant and Proposal of Conversion of Units 7-10 of the San Juan Combined Cycle Power Plant**

Generation units in Puerto Rico are and have historically been powered primarily by fossil fuels. Almost 40% of Puerto Rico's electricity was generated by petroleum-fired power plants in fiscal year 2021, and more than 97% of total electricity was generated from non-renewable resources.[192]  One of the uses of PREPA's IRP is for generation resource planning (which is now performed by LUMA Energy as the operator of the T&D System). Accordingly, one of the major supply side projects included within the Proposed IRP was the conversion of the San Juan combined cycle power plant units 5 and 6's usage of diesel gas to effectively also burn natural gas. This initiative was also included as one of the major transformation initiatives, beginning with PREPA's August 2018 Fiscal Plan and continuing with PREPA's June 2019 Fiscal Plan (each as defined below), as one of the first steps to progress PREPA forward in becoming a customer-centric and financially sustainable utility that provides affordable, reliable, and resilient electrical services to customers in Puerto Rico, as outlined in the Government's Vision Statement and Proposed IRP. The goal in the conversion of San Juan units 5 and 6 was to modernize PREPA's generation fuel mix, reduce fuel cost and price volatility, and achieve operational efficiencies. The conversion of the San Juan fuel to natural gas was intended to generate significant cost savings for PREPA, as well as Puerto Rico customers. The work on conversion to natural gas of units 5 and 6 of the San Juan facility began in 2019 with the execution of a contract with New Fortress Energy, LLC ("New Fortress"), to work in conjunction with a management team at PREPA to replace the diesel fuel with natural gas at the San Juan facility units 5 and 6. In fiscal year 2020, the San Juan power plant facility completed conversion of units 5 and 6 to burn natural gas in addition to diesel as a dual fuel use plant, which was a significant step forward for PREPA in diversifying PREPA's generation fleet.

The reliability and availability of San Juan units 5 and 6 is crucial to PREPA maintaining a stable and efficient electrical grid, because San Juan units 5 and 6 are PREPA's most modern base load units due to their capacity to burn both diesel and natural gas after successful completion of the conversion project. San Juan units 5 and 6 supply approximately 35% of load for the north region of Puerto Rico and 15% for the rest of Puerto Rico with efficient, environmentally compliant, and reliable energy.[193]  The natural gas conversion of units 5 and 6 of the San Juan facility offers a reduction of 90% in $SO_2$ emissions rates compared with diesel fuel oil, as well as from other pollutants such as PM, PM10, PM2.5, $H_2SO_4$, NOx, and CO[194].  Using natural gas to run San Juan units 5 and 6 has allowed PREPA to reduce reliance on other generating units that

---

[192] 2022 PREPA Certified Fiscal Plan, Chapter 2, "Historical Context and Current Challenges."

[193] 2022 PREPA Certified Fiscal Plan, Chapter 9, "Operational Measures."

[194] 2022 PREPA Certified Fiscal Plan, Chapter 9, "Operational Measures."

consume heavy fuel oil, yielding additional emissions reductions.  The transformed units allow PREPA to achieve reductions in both air emissions and generation costs.

Now that the conversion of units 5 and 6 of San Juan is complete, PREPA is evaluating the potential to utilize federal funds to further expand particular units' capability to use natural gas. Accordingly, on February 11, 2022, PREPA filed the *Petition for Leave to Conduct Works in PREPA's Steam Units to Achieve Environmental Regulatory Compliance*,[195] seeking authority from PREB to pursue the conversion of San Juan units 7, 8, 9, and 10 to natural gas as a way achieve proper compliance with certain air quality and environmental standards in the San Juan air district to avoid costly sanctions for otherwise not doing so.  PREPA's plan is to convert San Juan units 7–10 to dual-fuel use in order to allow for the capacity to operate on alternative fuel in the event of an emergency.  On October 12, 2022, PREB entered a resolution and order informing PREPA it will not consider the request to amend the IRP to allow for work to begin on the conversion of San Juan units 7–10 on the grounds that the request is inconsistent with the provisions of the T&D Contract, which requires LUMA Energy to make any requests to amend the Approved IRP and carry out other tasks in connection thereto before PREB, and reminded PREPA it must comply with the provisions of the O&M Agreement to request amendments or waivers regarding the IRP.[196]

### iv.    NFEnergía LLC Contract

On March 5, 2019, after a competitive RFP bid process, PREPA entered into a contract with NFEnergía LLC ("NFEnergía"), the Puerto Rico subsidiary of New Fortress, for the supply of natural gas and conversion of units 5 and 6 of the San Juan Power Plant to dual fuel (natural gas and diesel) capacity.  The construction and conversion projects were substantially completed during the first quarter of 2020.  LNG receiving and vaporization facilities and San Juan units 5 and 6 became capable of supporting sustained full load operation of the units on natural gas in June 2020.  LNG has now been received into the NFEnergía facility from vessels calling upon San Juan Harbor and natural gas has been made available for commissioning both units 5 and 6 on natural gas.  San Juan units 5 and 6 have run primarily on natural gas since that time.

On June 18, 2020, the U.S. Federal Energy Regulatory Commission ("FERC") issued an "Order to Show Cause" directing New Fortress to show cause why the NFEnergía LNG handling facility is not subject to FERC's jurisdiction under section 3 of the Natural Gas Act ("Natural Gas Act").  PREPA entered into its agreement with NFEnergía on the assumption that FERC approval for the siting and construction of the LNG handling facility would not be required.  After considering arguments which New Fortress and PREPA presented as to why the NFEnergía LNG handling facility should not be deemed to be subject to FERC's jurisdiction and stressing the environmental and economic benefits associated with the use of natural gas in place of diesel fuel in San Juan units 5 and 6, FERC concluded in an order issued on March 19, 2021 that the facility is an "LNG terminal" subject to its jurisdiction under section 3 of the Natural Gas Act.  The order

---

[195] Petition for Leave to Conduct Works in PREPA's Steam Units to Achieve Environmental Regulatory Compliance, In Re: Review of the Puerto Rico Electric Power Authority's 10 Year Infrastructure Plan-December 2020, Case No. NEPR-MI-2021-0002, Feb. 11, 2022.

[196] Resolution and Order, In Re: Review of the Puerto Rico Electric Power Authority's 10 Year Infrastructure Plan-December 2020, Case No. NEPR-MI-2021-0002, Oct. 12, 2022.

was upheld on appeal by the Federal Court of Appeals for the District of Columbia Circuit on June 14, 2022. FERC directed NFEnergía to submit an application for authorization under section 3 of the Natural Gas Act to operate its San Juan Harbor LNG receiving facility but did not order the suspension of facility operations. NFEnergía submitted the required application to FERC on September 15, 2021, in ECF No. CP21-496-000. FERC issued a notice that motions to intervene in the proceeding and comments on the application were to be filed by October 20, 2021. Since then, FERC has issued several data requests to NFEnergía, filing the last supplemental responses in February 2022. The application currently before FERC is pending consideration. In the meantime, the NFEnergía LNG receiving facility continues to operate and to supply natural gas to the Authority's San Juan units 5 and 6.

On November 11, 2020, environmental advocacy organizations the Sierra Club and El Puente de Williamsburg Inc. (the "Environmental Groups") filed a complaint against PREPA in the Court of First Instance in San Juan seeking preliminary and permanent injunctions and a declaratory judgment suspending the operation of the NFEnergía LNG handling facility. In their complaint, the Environmental Groups assert that the NFEnergía LNG handling facility was constructed unlawfully.

On December 2, 2020, the Court of First Instance dismissed the action for lack of standing. On December 16, 2020, the Environmental Groups moved for reconsideration of the judgment dismissing the case. The Court denied the motion on January 12, 2021. On February 1, 2021, the Environmental Groups appealed the judgment dismissing the case to the Puerto Rico Court of Appeals. On May 20, 2021, the Court of Appeals affirmed the Court of First Instance's judgment. No appeal to the Supreme Court of Puerto Rico was taken.

## 6. Renewable Energy Certificates

PV Properties, Inc. ("PV Properties") has requested that PREPA add the following definitions and additional language to this Disclosure Statement. PREPA disputes the accuracy and completeness of each of PV Properties' proposed definitions.

"**Net Meter** – Means a tool used to measure and register the two-way flow of power (bidirectional), that is, supplied and received energy in kilowatt-hour by a customer who has a distributed generation system interconnected to the power grid of PREPA.

**Net Metering Contracts** – Any customer that, on the date in which the Bureau issues its final determination, has a net metering contract or has notified the Bureau about the certification of the distributed generator. In such cases, the Net Meter customer shall have the right to the rate or compensation mechanism in effect at the time for a term of not less than twenty (20) years as of the execution of the net metering contract.

**Grandfather Customers** – Means Prosumers with Net Metering Contracts in effect as of the date of approval of the Energy Public Policy Act. To whom – Pursuant to the Authority or transmission and distribution network Contractor shall honor Net Metering Contracts in effect as of the date of approval of this Act in accordance with the agreed-upon terms.

122

**Renewable Portfolio Standard**, "RPS" - Means the mandatory percentage of sustainable renewable energy or alternative renewable energy required from each retail electricity supplier as established.

**Renewable Energy Credits**, "REC" – Means a personal property that constitutes a tradeable and negotiable asset or commodity that may be purchased, sold, assigned, and transferred between persons for any lawful purpose which is integrally and inseparable equal to one (1) megawatt-hour (MWh) of electricity generated from a sustainable renewable energy source in Puerto Rico issued and registered pursuant to Act 82-2010 and, in turn, represents all environmental and social attributes, as defined in this Act.

**RECs Self-Consumed** – Means a REC that is generated from a renewable energy source and consumed behind the meter.

**RECs Exported to the Grid** – Means a REC that is generated from a renewable energy source and is exported to the grid under a Net Metering Contract.

**Renewable Energy Registry** – Means the North American Renewable Registry (NAR), which administers a Web-based platform to issue serialized Renewable Energy Certificates (RECs), for sustainable renewable energy and alternative renewable energy sources where registered may create and manage their individual accounts, and qualifying and transferring RECs, or any other registry established or authorized by the Commission for accounting and transferring RECs in Puerto Rico.

**Prosumer** – Means any users or customers of the Electrical System who have the capacity to generate electric power for self-consumption that, in turn, have the capacity to supply any energy surplus through the electric power grid.

PV Properties, Inc. asserts that:

- Act 17 of 2019 mandates that after 2014, the rate applicable to Net Meter customers, including the rate or mechanisms through which customers shall be compensated for the energy they supply to the electric power grid, shall be determined exclusively by PREB as part of the electric power service rate review process provided in Act No. 57-2014, or through a separate administrative process when deemed necessary or convenient.
- To attest compliance with Section 2.3(e) of Act 17-2019, the Puerto Rico Public Policy Act, the renewable energy generated by Prosumers shall be measured and access provided to public to the Registry of Renewable Energy Certificates.
- PREPA has to comply with the Renewable Portfolio Standard ("RPS") by filing with the PREB the RECs acquired thereby.
- The Renewable Energy Policy Act mandates, among other things, that retail electricity suppliers in Puerto Rico, like PREPA, comply with a RPS that requires that specified percentages of their energy production must come from renewable energy sources, escalating to twenty percent (20%) by 2022, subject to important qualifications. Act 82-2010, 22 L.P.R.A. § 8124.
- PREPA has not purchased RECs from any Distributed Generator.

123

- In October 2021, PREB issued a draft regulation for comments, which has not progressed since that time (NEPR-MI-2021-0011)."

PREPA does not agree with PV Properties' assertion of facts or interpretations of Puerto Rico law, and disputes that it has a statutory or contractual obligation to purchase RECs from PV Properties.  Further, PREPA notes that, as described in section V.G.12 above, on December 29, 2020, PV Properties filed an adversary proceeding seeking, inter alia, a declaratory judgment that PREPA is obligated to purchase PV Properties' RECs.  The Title III Court dismissed PV Properties' adversary proceeding because its complaint did not plead any facts demonstrating that PREPA was obligated to acquire RECs from PREPA; further, even if such an obligation existed, PV Properties had not pled any facts demonstrating that it had an available private right of action and private remedy under Puerto Rico law to enforce such an obligation for its own benefit.  [Adv. Proc. No. 20-000142, ECF No. 20 at 13-14].

[*Remainder of Page Intentionally Left Blank*]

IV.     **Significant Events Leading to Commencement of PREPA's Title III Case**

A.     **PREPA's Operational and Financial Decline**

Historically, PREPA's substandard operations, declining infrastructure, and failure to adjust rates to cover its costs led to the accumulation of unsustainable debt and pension obligations. PREPA has operated at a deficit since the early 2000s, and did not raise its base rate between 1989 and 2016. PREPA's rates have historically been insufficient to cover its operating costs, pension costs, and debt obligations. Instead of raising rates to cover costs, PREPA borrowed from GDB, relying on the proceeds of these financing sources to cover its budget deficits and pay debt service, rather than using these proceeds for infrastructure maintenance and improvements. PREPA has also systemically underfunded its pension system. As of the Petition Date, PREPA held approximately $8.5 billion in bond debt and other debt obligations and had approximately $3.6 billion in underfunded pension liabilities.

The significant factors that contributed to PREPA's financial and operational decline in the years preceding its Title III Case are described below.

***Challenges to PREPA's Infrastructure.*** PREPA is the only electric power utility in Puerto Rico. Operating a power system on an isolated, mountainous, tropical island creates challenges that require significant maintenance of remote T&D Systems. PREPA's limited liquidity has led to its infrastructure falling into disrepair and becoming obsolete due to underinvestment in maintenance, repairs, capital improvements, and modernization. Given PREPA's limited liquidity, it has been unable to adequately fund system maintenance and capital improvements necessary to improve the safety and reliability of its grid and to reduce costs in the future. Accordingly, PREPA has avoided investing in routine maintenance, and, in years immediately preceding the Title III petition, expenditures related to its T&D System were limited primarily to urgent projects, rather than improvements that would proactively improve and stabilize the system for the future.

As a result of PREPA's consistent underinvestment in its infrastructure, PREPA historically operated far below industry standards. PREPA was unable to upgrade and modernize its aging power generation facilities or shift to lower-cost renewable energy and natural gas, due to its limited liquidity and political influence over natural gas conversion projects. Leading up to its Title III filing, approximately 45% of PREPA's generation resources used oil, compared to the national average of 4%; renewable energy made up 4% of PREPA's generation resources, compared to the national average of 15%.[197] As a result, PREPA's power Generation System is older and more costly than the industry standard—PREPA's generation resources average approximately forty-four (44) years old, while the national industry average is only eighteen (18) years.[198] In addition, due to underinvestment, PREPA's system lacks basic safety measures—PREPA's safety incident rate is five times higher than the industry average, leading to unsustainable insurance, worker compensation, and wage costs. Even before hurricanes and earthquakes damaged PREPA's system in recent years, both the frequency and duration of PREPA's power outages, caused primarily by a lack of routine maintenance and outdated

---

[197] April 2018 Fiscal Plan at 19.

[198] April 2017 Fiscal Plan at 10.

equipment, significantly exceeded the industry average.  PREPA experienced outages at a rate more than 50% higher than national averages.[199]

*High Labor and Pension Costs.*  As of the Petition Date, approximately 70% of PREPA's 6,400 employees were unionized, and PREPA had collective bargaining agreements with four unions.[200]  Under the collective bargaining agreements, PREPA's annual payroll and benefits costs payable to active employees was approximately $530 million.[201]  PREPA self-funded all medical expenses, spending approximately $9,600 per employee per year, significantly higher than other governmental agencies.[202]  PREPA was also responsible for defined benefit pension obligations for its active and retired employees, and had approximately 10,000 retired employees in addition to its active employees.[203]  As of 2018, PREPA ERS was underfunded by approximately $3.6 billion.[204]

*Management Challenges.*  In addition, PREPA's management decisions have historically been subject to political influence, with hundreds of employees leaving PREPA with the election of each new governor, if not more often.  This key turnover led to a lack of institutional knowledge, a lack of skilled workers, and the inability to complete capital improvement projects, exacerbating PREPA's problems with declining infrastructure and inefficient operations.  In addition to a high turnover of key employees, there has also been an overall decline in PREPA's workforce—from 2012 to 2017, PREPA lost approximately 30% of its workforce.[205]

*Revenue Collection Challenges.*  PREPA has historically failed to collect a significant portion of its receivables from certain electricity customers.  Exacerbating PREPA's revenue collection challenges was the fact that the Commonwealth and its other instrumentalities are significant customers of PREPA.  Due to their own financial difficulties, these entities were often unable to pay PREPA in a timely matter, and would often finance their own budget deficits by delaying payments to PREPA.  PREPA had over $255 million in overdue balances from government entities as of the Petition Date.[206]  With respect to residential and commercial customers, PREPA often delayed suspensions of electricity service, and failed to collect on overdue accounts.[207]

PREPA also has high levels of energy theft as compared to the industry average, leading to reduced revenue collection.  Inefficient customer service, a low rate of online billing, and an unreliable IT system also contribute to PREPA's inability to collect revenues.

---

[199] *Statement of Oversight Board Regarding PREPA's Title III Case* [ECF No. 2] (the "Statement"), ¶ 9.

[200] *Id*. ¶ 3.

[201] *Id*. ¶ 7.

[202] April 2018 Fiscal Plan at 35.

[203] Statement ¶ 7.

[204] April 2018 Fiscal Plan at 28.

[205] *Id*. at 25.

[206] Statement ¶ 10.

[207] *Id*.

*Environmental Compliance Challenges.*  PREPA also faced challenges in complying with federal environmental regulations.  PREPA was subject to two consent decrees with the EPA, which required it to pay substantial penalties.[208]   In addition, ongoing compliance with environmental regulations requires expensive infrastructure improvements, and noncompliance would result in additional federal fines and penalties, as well as operational constraints and public health and environmental impacts.

*Macroeconomic Challenges.*   PREPA has also been impacted by macroeconomic challenges facing Puerto Rico, including an increasing population decline that reduced PREPA's customer base, thereby reducing demand for electricity and PREPA's revenue.  Demand has also been impacted by the broader economic crisis in Puerto Rico.  In the ten years leading up to the Petition Date, demand for electricity dropped by 18%.[209]

B.     **Pre-Title III Negotiations with Creditors**

1.     **The Prepetition RSA**

In 2014, with an increasingly unsustainable debt load, PREPA began to engage with its creditors, including Bondholders, bond insurers, and lenders under its revolving credit facilities, regarding the potential restructuring of its debt.

On August 14, 2014, PREPA entered into three forbearance agreements with (i) certain Monoline Insurers and Bondholders controlling more than 60% of its bonds; (ii) the Fuel Line Lenders; and (iii) GDB.  Among other things, the agreements required PREPA to take certain steps towards a restructuring, including appointing a Chief Restructuring Officer, hiring a financial advisor, and developing a business plan, each of which PREPA accomplished in the coming months.  The agreements also required PREPA to propose a restructuring plan by March 2, 2015.  The agreements were originally set to expire on March 31, 2015, but were extended numerous times as negotiations between PREPA and its stakeholders continued.  Certain of these extensions also contained economic terms providing PREPA with additional liquidity including, for example, the bond insurers' provision of bridge financing to enable PREPA to make an upcoming bond payment in July 2015.

On September 1, 2015, PREPA and the ad hoc group of bondholders (the "Prepetition Ad Hoc Group") holding approximately 40% of PREPA's outstanding bonds reached an agreement in principle on the terms of a restructuring support agreement, and agreed to extend the forbearance.  The majority of the Monoline Insurers, the Fuel Line Lenders, and GDB also agreed to extend their forbearance agreements, although they had not yet reached an agreement with PREPA.  Under the agreement, the Prepetition Ad Hoc Group would (i) exchange all outstanding bonds for 85% of their existing bond claims in new securitization bonds; and (ii) have the option to receive (a) securitization bonds that would pay cash interest only for the first five (5) years, or (b) convertible capital appreciation bonds that would accrue PIK interest for the first five (5) years and pay cash interest after five (5) years.  Interest rates would be dependent on the investment rating issued to the bonds.  In addition, all of PREPA's uninsured Bondholders would have an

---

[208] *Id.* ¶ 7.

[209] *See* April 2018 Fiscal Plan at 23.

opportunity to participate in this exchange.  PREPA's discussions with the Monoline Insurers and Fuel Line Lenders remained ongoing.

On September 22, 2015, PREPA announced an agreement in principle with the Fuel Line Lenders that would restructure approximately $700 million in debt.  Under the agreement, the Fuel Line Lenders would have the option to either (i) convert their existing revolving credit facilities into 6-year term loans with a fixed 5.75% interest rate, or (ii) exchange all or part of the principal due under their existing credit agreements for new securitization bonds on the same terms as the bonds to be issued under the agreement with the Prepetition Ad Hoc Group.  The Prepetition Ad Hoc Group and Fuel Line Lenders subsequently agreed to extend their forbearances several times as PREPA continued to engage in discussions with the Monoline Insurers.

On November 5, 2015, PREPA announced its entry into the Prepetition RSA with the Prepetition Ad Hoc Group and the Fuel Line Lenders.  The terms of the Prepetition RSA were substantially the same as the terms of the previously announced agreements with the Prepetition Ad Hoc Group and Fuel Line Lenders, with GDB also being treated in substantially the same way as the Fuel Line Lenders.  The agreement set forth in the Prepetition RSA was contingent on (i) PREPA also reaching a restructuring support agreement with the Monoline Insurers by November 12, 2015, and (ii) legislative approval by November 20, 2015, of the proposed PREPA Revitalization Act (the "PREPA Revitalization Act"), described further below, which would enable certain key aspects of the restructuring.  Both deadlines, as well as other milestones set forth in the Prepetition RSA, were extended multiple times as PREPA continued to negotiate with the Monoline Insurers and awaited legislative approval.

On December 23, 2015, PREPA entered into an amendment to the Prepetition RSA with the Monoline Insurers, the Prepetition Ad Hoc Group, the Fuel Line Lenders, and GDB.  The amended Prepetition RSA provided substantially the same terms for the Fuel Line Lenders and Prepetition Ad Hoc Group as the initial Prepetition RSA.  In addition, the amended Prepetition RSA now provided for the issuance of bonds to the Monoline Insurers, on the same economic terms as the existing insured bonds, with the debt service paid on such bonds to be used by the Monoline Insurers to fund debt service on PREPA's existing insured bonds, relieving the Monoline Insurers of payments under their insurance policies.  A key component of the Prepetition RSA was the designation of a portion of the electricity charges collected from customers as the "Proposed Transition Charge" and the transfer of the Proposed Transition Charge to a bankruptcy remote special purpose vehicle, or "SPV" that would issue the securitization bonds.  The SPV would apply the Proposed Transition Charge to the indebtedness under the securitization bonds.  The Monoline Insurers would also provide up to $462 million in surety bonds as further support for the securitization bonds.  The Prepetition RSA also outlined additional elements of PREPA's proposed restructuring, including a new governance structure and a capital improvement plan.

The Prepetition RSA required legislative approval of the proposed PREPA Revitalization Act in order to establish the SPV and enable the securitization bonds to be issued.  On January 23, 2016, after the January 22 deadline for legislative approval had passed and the Prepetition Ad Hoc Group did not agree to extend the milestone, the Prepetition RSA was terminated.  However, on January 27, 2016, PREPA and its stakeholders reinstated the Prepetition RSA on substantially the same terms, extending the deadline for legislative approval of the PREPA Revitalization Act to February 16.  The PREPA Revitalization Act was enacted on February 16, 2016, and the Puerto

Rico Electric Power Authority Revitalization Corporation ("PREPARC") was created and established as the SPV that would collect the Proposed Transition Charge and issue the securitization bonds.

The Prepetition RSA also required, pursuant to the PREPA Revitalization Act, (i) the filing of a petition seeking approval of a securitization charge and rate adjustment mechanism with PREC, and (ii) PREPA to initiate a rate approval process with PREC.

Following the enactment of the PREPA Revitalization Act, the Prepetition RSA was amended several times, primarily to extend milestones.

In December 2016, newly-elected Governor Roselló announced that his administration was undertaking a holistic review of the proposed PREPA restructuring with the goal of obtaining a better outcome for PREPA. In addition, changes to the Prepetition RSA were required in light of the enactment of PROMESA, and the Prepetition RSA could not become effective without a determination from the Oversight Board that it was in the best interests of creditors and feasible. Accordingly, extensive discussions among PREPA, its key stakeholders, and the Commonwealth government regarding potential amendments to the Prepetition RSA took place in late 2016 and early 2017.

On April 6, 2017, Governor Roselló announced an agreement in principle regarding amendments to the Prepetition RSA, which he stated would create an additional $1.5 billion in savings. On April 26, 2017, a supplement to the Prepetition RSA documenting the terms of this agreement was executed. As supplemented, the Prepetition RSA provided for a restructuring pursuant to Title VI of PROMESA, but preserved PREPA's ability to file a Title III case. The new agreement required approval from the Oversight Board, however the Oversight Board declined to act on the RSA until its requested changes to the April 2017 Fiscal Plan (defined below), described in detail in Section IV.E.1(i) below, had been made. A fiscal plan complying with the Oversight Board's requested changes ultimately could not be reached. On June 27, 2017, the Oversight Board voted not to approve the Prepetition RSA, and also stated that PREPA's restructuring would likely occur under Title III, rather than Title VI. Certain creditors refused to extend certain Prepetition RSA milestones, and on June 29, 2017, the Prepetition RSA was terminated. PREPA's Title III case was filed shortly thereafter.

C.     **Legislation Enacted by the Commonwealth to Address the Fiscal and Debt Crisis[210]**

The Commonwealth enacted legislation to address Puerto Rico's fiscal crisis, several of which are discussed below.

---

[210] Legislation enacted by the Commonwealth before and after the effectiveness of PROMESA on June 30, 2016 is preempted by section 4 of PROMESA to the extent it is inconsistent. Additionally, it violates PROMESA section 204 to the extent the procedures for vetting the legislation for consistency with the certified fiscal plan are not followed, it violates PROMESA section 207 to the extent it modifies debt without Oversight Board consent, and it violates PROMESA section 108(a)(2) to the extent it would impair or defeat the purposes of PROMESA as determined by the Oversight Board. By describing the legislation in this section of the Disclosure Statement, the Oversight Board is not waiving the application of PROMESA to any portion of it.

1.    **The Moratorium Act and Creation of AAFAF**[211]

On April 6, 2016, the Government enacted the Moratorium Act (the "Moratorium Act"), which granted the Governor the authority to, among other things, (i) implement a moratorium on debt service payments; (ii) redirect certain monies historically conditionally appropriated to public entities for the payment of their obligations to the payment of essential services; and (iii) temporarily stay related creditor remedies.  To implement the Moratorium Act, former Governor Alejandro Garcia Padilla issued a number of executive orders.

AAFAF was also created under the Moratorium Act as an independent public corporation and public instrumentality of the Commonwealth with a board appointed by the Governor. AAFAF was created for the purpose of acting as fiscal agent, financial advisor and reporting agent of the Commonwealth and its public corporations, instrumentalities, commissions, authorities, municipalities and political subdivisions and to assist such entities in confronting the grave fiscal and economic emergency.  AAFAF also oversees all matters related to the restructuring or adjustment of any covered obligation, or otherwise coordinate and implement liability management transactions for any covered obligation.

2.    **Act 2-2017**[212]

On January 18, 2017, the Commonwealth's Legislative Assembly approved the Puerto Rico Fiscal Agency and Financial Advisory Authority Act, Act 2-2017 ("Act 2"), which was signed into law by the Governor on the same day.  Act 2 expanded AAFAF's role, designating it as the only government entity authorized to restructure, and negotiate with holders of, debt issued by the government or its instrumentalities, and authorized it to compel any governmental entity to take action to comply with a fiscal plan certified by the Oversight Board.

3.    **Act 5-2017**[213]

On January 29, 2017, the Commonwealth enacted Act 5-2017 ("Act 5"), known as the Puerto Rico Financial Emergency and Fiscal Responsibility Act of 2017, to repeal parts of the Moratorium Act and declare a financial emergency.  Although certain provisions of the Moratorium Act were repealed, the debt moratorium orders issued under the Moratorium Act continue in effect pursuant to Act 5.  Act 5 also established an emergency period, during which the Governor may issue executive orders designating the priority for the use of available resources. The Governor was also granted broad receivership powers over government agencies in order to rectify the financial emergency.

Act 5 was amended by Act 46-2017 to authorize the Governor to continue extending the emergency period declaration by additional 6-month periods as long as the Oversight Board exists.

---

[211] https://sutra.oslpr.org/osl/sutra/anejos_conv/2013-2016/%7B1937f638-bcc9-4991-9dc3-2dd4995eeb04%7D.pdf.

[212] https://sutra.oslpr.org/osl/sutra/anejos/124364/a-002-2017.pdf.

[213] https://sutra.oslpr.org/osl/sutra/anejos/123147/ley%205-2017.pdf.

The emergency period is currently set to expire on December 31, 2022,[214] unless further extended by the Governor.

### 4.   Act 26-2017[215]

On April 29, 2017, the Commonwealth enacted Act 26-2017, known as the Fiscal Plan Compliance Act, to implement a broad array of fiscal measures to reduce costs across the Commonwealth and its public corporations and support the Commonwealth's compliance with the fiscal plan certified by the Oversight Board.  Some of the measures implemented by Act 26-2017 relate to the standardization of fringe benefits across the Commonwealth and public corporations. The measures adopted by Act 26-2017 among other things: (i) reduced vacation and sick leave benefits; (ii) reduced the number of public holidays; (iii) reduced the Christmas bonus of employees of public corporations to $600 and conditioned its eligibility to six (6) months of service per year or more; (iv) replaced overtime pay for public employees with compensatory time; (v) eliminated the cash-out payment for sick day accruals and capped the liquidation for vacation leave accruals to sixty (60) days; (vi) nullified any provision of a collective bargaining agreement that provided public employees fringe benefits in excess of those set forth in Act 26-2017; (vii) imposed a special dividend tax on the Joint Underwriting Association; (viii) ordered all public corporations and instrumentalities to transfer surplus revenues to the Treasury Department's General Fund; (ix) established a process for selling real properties of the government; (x) shortened the effectiveness of most multiyear appropriations; (xi) increased taxes on cigarettes and tobacco products; (xii) reduced funding for the Conservatory of Music and the School of Plastic Arts; and (xiii) reduced until Fiscal Year 2021 the annual funding set aside for the Commonwealth's emergency fund.

Act 26-2017 provides that when the fiscal situation has stabilized and the condition of the public fiscal situation so permits, the "Fiscal Plan Compliance Committee" established by the act may suspend its effectiveness.  The committee is composed of three members, with the Governor, the Speaker of the Puerto Rico House of Representatives, and the President of the Puerto Rico Senate each appointing one member.

### D.   PROMESA[216]

#### 1.   Enactment of PROMESA

On June 30, 2016, Congress enacted PROMESA, which provides a framework, among other things, for the Commonwealth and its covered instrumentalities to restructure their indebtedness.  The Oversight Board designated PREPA as a covered instrumentality on September 30, 2016.

---

[214] https://www.estado.pr.gov/en/executive-orders/.

[215] https://sutra.oslpr.org/osl/sutra/anejos/127857/a-026-2017.pdf.

[216] This section summarizes certain provisions of PROMESA.  Although the Debtor believes that this description covers the material provisions of PROMESA, this summary does not purport to be complete and is subject to, and is qualified in its entirety by reference to, PROMESA.

2.    **Creation of the Oversight Board**

PROMESA Section 101(a) established the Oversight Board for the purpose of providing "a method for a covered territory to achieve fiscal responsibility and access to the capital markets." The Oversight Board currently consists of seven voting members appointed by the President of the United States from a bipartisan list of nominees and a non-voting *ex officio* member appointed by the Governor.[217]   On August 31, 2016, President Obama appointed the Oversight Board's seven voting members: (1) José B. Carrión III, (2) Carlos M. García, (3) David A. Skeel, Jr., (4) Andrew G. Biggs, (5) Arthur J. González, (6) José R. González and (7) Ana J. Matosantos.

On August 31, 2020, the resignations of Carlos M. García and José R. González became effective, and on October 5, 2020, the resignation of José B. Carrión III, Chairman of the Oversight Board, became effective.   On October 6, 2020, David A. Skeel, Jr. was designated Chairman of the Oversight Board.   On October 7, 2020, President Trump appointed Justin Peterson to replace Arthur J. González as member of the Oversight Board.   In December 2020, President Trump reappointed Andrew G. Biggs and appointed Antonio L. Medina, John E. Nixon, and Betty E. Rosa as members of the Oversight Board.   In January 2021, President Trump reappointed David A. Skeel, Jr. and appointed Arthur J. González as members of the Oversight Board.   The current seven voting members of the Oversight Board are:  (1) David A. Skeel, Jr., (2) Andrew G. Biggs, (3) Arthur J. González, (4) Antonio L. Medina, (5) John E. Nixon, (6) Justin M. Peterson, and (7) Betty E. Rosa.   Governor Pedro Pierluisi Urrutia is currently the Commonwealth's non-voting *ex officio* member of the Oversight Board.

Each member of the Oversight Board serves a three-year term without any compensation and may be appointed to an unlimited number of consecutive terms.   When a term expires, Board members serve until replaced.   The President of the United States may remove any member for cause.

In addition to its seven voting members and non-voting *ex officio* member, the Oversight Board also has Jaime A. El Koury as its General Counsel.   Formerly, Natalie A. Jaresko served as the Oversight Board's Executive Director and Interim Revitalization Coordinator.   Ms. Jaresko resigned from the Oversight Board effective April 1, 2022.   On November 17, 2022, the Oversight Board announced the appointment of Robert F. Mujica Jr. as Executive Director, commencing January 1, 2023.   Pursuant to the Oversight Board's bylaws, the Executive Director acts as the chief executive officer of the Oversight Board with general supervision and direction of its business affairs (including the power to enter into contracts on behalf of the Oversight Board), subject to the supervision and control of the Oversight Board.   The General Counsel acts as the chief legal officer of the Oversight Board.   The Revitalization Coordinator is responsible for executing the duties prescribed under PROMESA Section 503 relating to the identification, prioritization, and implementation of critical infrastructure projects for the Commonwealth.

In accordance with PROMESA Section 108(a), the Oversight Board acts as an autonomous entity, such that neither the Governor nor the Legislative Assembly may exercise any control over the Oversight Board and its activities and cannot take any actions that would impair or defeat the

---

[217] For a discussion of litigation related to challenges under the Appointments Clause, *see* Section V.H of this Disclosure Statement.

purposes of PROMESA.  Although created by federal statute, the Oversight Board is not a
"department, agency, establishment, or instrumentality of the Federal Government."  Instead, as
set forth in PROMESA Section 101(c)(1), the Oversight Board is deemed "an entity within the
territorial government" of the Commonwealth.  The Oversight Board remains a small organization,
with a flat hierarchy, and operates from offices located in San Juan, Puerto Rico and New York,
New York.  One of its organizational goals during Fiscal Year 2019 was to take advantage of the
incredible talent in Puerto Rico to build organizational strength through local recruiting, thereby
reducing costs and the use of third-party consultants.  The overwhelming majority of the Oversight
Board's new hires are Puerto Ricans, several of whom have returned from the U.S. mainland to
help Puerto Rico recover.

In accordance with PROMESA Section 209, the Oversight Board will continue in existence
until the Oversight Board certifies that: (i) the Commonwealth has adequate access to the short-
term and long-term capital markets at reasonable interest rates to meet its borrowing needs and (ii)
for at least four consecutive fiscal years: (a) the Commonwealth has developed its budgets in
accordance with modified accrual accounting standards and (b) the expenditures made by the
Commonwealth during each such fiscal year did not exceed its revenues during that year, as
determined in accordance with modified accrual accounting standards.

### 3.    Oversight Board Powers and Responsibilities

*Certification of Fiscal Plans and Budgets*

One of the cornerstones of PROMESA is the development, certification, and enforcement
of fiscal plans and budgets for the Commonwealth and its covered instrumentalities.  Such fiscal
plans and budgets provide a framework for achieving fiscal responsibility and access to the capital
markets.  Fiscal plans are short-term and long-term planning tools, covering a period of at least
five fiscal years, while budgets cover at least one fiscal year.  Budgets must be consistent with the
fiscal plan then in effect.

PROMESA contemplates the Oversight Board and the elected government of the
Commonwealth will work together to adopt a fiscal plan, but grants the Oversight Board the power
to develop and certify its own fiscal plan if the government does not provide it with a proposed
fiscal plan it determines to certify.  The process begins with the Oversight Board providing the
Governor with a schedule for the development, submission, and certification of fiscal plans for the
Commonwealth and/or any covered instrumentality.  The Governor is required to submit the
proposed fiscal plan in accordance with such schedule.  Following submission, the Oversight
Board may certify the proposed fiscal plan if it determines that such fiscal plan meets 14 statutory
requirements set forth in PROMESA Section 201(b), which are designed to "provide a method to
achieve fiscal responsibility and access to the capital markets."  The fiscal plan must:

- provide for estimates of revenues and expenditures in conformance with agreed
  accounting standards and be based on (i) applicable laws or (ii) specific bills that
  require enactment in order to reasonably achieve the projections of the fiscal plan;

- ensure the funding of essential public services;

- provide adequate funding for public pension systems;

- provide for the elimination of structural deficits;

- for fiscal years covered by a fiscal plan in which a stay under Title III or Title IV of PROMESA is not effective, provide for a debt burden that is sustainable;

- improve fiscal governance, accountability, and internal controls;

- enable the achievement of fiscal targets;

- create independent forecasts of revenue for the period covered by the fiscal plan;

- include a debt sustainability analysis;

- provide for capital expenditures and investments necessary to promote economic growth;

- adopt appropriate recommendations submitted by the Oversight Board;

- include such additional information as the Oversight Board deems necessary;

- ensure that assets, funds, or resources of a territorial instrumentality are not loaned to, transferred to or otherwise used for the benefit of a covered territory or another covered territorial instrumentality of a covered territory, unless permitted by the constitution of the territory, an approved plan of adjustment under Title III or a Qualifying Modification approved under Title VI of PROMESA; and

- respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to the date of enactment of PROMESA.

Fiscal plans must ensure the funding of essential public services. The Oversight Board takes the view that "essential services" is a phrase used to refer, at a minimum, to services which, due to the police power, a court of competent jurisdiction can allow to be paid from revenues to which a creditor has a priority claim or a valid, unavoidable secured claim. This Disclosure Statement and the Plan do not define "essential services" or "essential expenses" for the following reasons among others.

*First*, Title II of PROMESA requires that a fiscal plan "ensure the funding of essential public services." This language sets a minimum floor on spending, meaning that the fiscal plan must fund essential services. At confirmation, the Title III Court considers the Plan. The fiscal plan's certification is outside the subject matter jurisdiction of the Title III Court pursuant to PROMESA Section 106(e). PROMESA Section 314(b)(7) requires that the Plan be consistent with the fiscal plan, but imposes no testing of the fiscal plan. Therefore, essential services are not in issue.

*Second*, the concept of "essential services" is not conducive to simple listings of which services or expenses are essential, and which are not, because essential services may vary greatly over time and depending on circumstances post-confirmation. PREPA's Certified Fiscal Plan covers periods of growth and decline. Accordingly, the best interest analysis for PREPA analyzes creditors' recovery outside Title III by assuming different percentages of the Certified Fiscal Plan and budget expenses are cut (on top of the cuts already in the fiscal plan) by various percentages, rather than engaging in a debate over each expense. Thus, a definition of essential services is neither required by nor relevant to the best interest analysis pursuant to PROMESA.

After certification of the fiscal plan, the Oversight Board will provide to the Governor and the Legislative Assembly a schedule for the development and certification of budgets for the Commonwealth and its covered instrumentalities. If the Oversight Board determines the proposed PREPA budget submitted by the Governor is compliant with the approved fiscal plan, the Oversight Board will certify it. If the Oversight Board determines the proposed budget is not compliant with the Certified Fiscal Plan, it will provide a notice of violation to the Governor regarding the budget that includes a description of the necessary corrective action and an opportunity to correct such violation by submitting a revised budget that complies with the Certified Fiscal Plan. The Governor may submit as many revised budgets as the schedule established by the Oversight Board permits. However, if the Governor fails to submit a budget that complies with the Certified Fiscal Plan within the time frame set by the Oversight Board, the Oversight Board must develop and submit to the Governor a budget that complies with the Certified Fiscal Plan. Such budget shall be deemed to be approved by the Governor and will be in effect on the first day of the fiscal year.

At the end of each fiscal quarter, the Governor must submit to the Oversight Board a financial report for PREPA describing its actual revenues, expenditures, and cash flows for such quarter. If the Oversight Board determines that actual revenues, expenditures, and cash flows are not consistent with the projected revenues, expenditures, or cash flows set forth in the certified budget for such quarter, the Oversight Board will establish a deadline by which the Government must provide an explanation for the inconsistency that the Oversight Board finds reasonable or the Government must implement corrective actions to address such inconsistency. If the Government fails to provide a reasonable explanation or to correct the inconsistency, the Oversight Board must certify to the President, the United States Congress, the Governor, and the Legislative Assembly that PREPA is inconsistent with the certified budget and describe the amount of the inconsistency. After providing such certification and determining that the Government has failed to correct the inconsistency, the Oversight Board can (i) make appropriate reductions in non-debt expenditures to ensure that revenues and expenses are in line with the certified budget; (ii) institute hiring freezes; and (iii) prohibit PREPA from contracting.

Since the enactment of PROMESA on June 30, 2016, the Oversight Board has certified budgets for PREPA for fiscal years 2018, 2019, 2020, 2021, 2022, and 2023.

In furtherance of the foregoing duties, the Oversight Board has the authority to enforce the certified fiscal plans and budgets by reviewing the activities of the government of the Commonwealth and its instrumentalities. Accordingly, the Commonwealth's proposed legislative acts must be submitted to the Oversight Board and must be accompanied by an estimate of the new law's impact on expenditures and revenues.

Since its creation, the Oversight Board and the Governor have disagreed on many occasions as to whether government reporting has complied with PROMESA and whether certain executive orders and newly enacted laws violated PROMESA and/or certified fiscal plans and budgets.

The Oversight Board also has the authority to review any of the contracts, rules, regulations, and orders of the Commonwealth and its covered instrumentalities for their economic impact on the certified fiscal plans and budgets. If the Oversight Board determines any of the foregoing activities are inconsistent with a certified fiscal plan or budget, the Oversight Board may take any actions necessary to ensure that the enactment of a new law or execution of a new contract will not adversely affect compliance with the certified fiscal plan or budget. In addition, the Oversight Board at any time may submit to the Governor or the Legislative Assembly recommendations for actions that would ensure compliance with the fiscal plans or otherwise promote financial stability and management responsibility in the Commonwealth's public corporations, including PREPA. The Commonwealth may adopt or reject such recommendations, subject to providing a report to the President of the United States and Congress on its justifications for rejecting any recommendations. The Oversight Board, however, can in its certified fiscal plan adopt and impose recommendations the Governor declines to adopt.[218]

PROMESA Section 207 also provides the Commonwealth and its covered instrumentalities may not issue any debt without the approval of the Oversight Board.

### *Responsibilities Under Title III of PROMESA*

If a consensual restructuring is not accomplished, Title III of PROMESA provides access to a federal bankruptcy process for the adjustment of the indebtedness of the Commonwealth and its covered instrumentalities. Eligibility for the Commonwealth or a Commonwealth instrumentality to be a debtor under Title III of PROMESA is conditioned on satisfaction of certain requirements, as set forth in PROMESA Section 302. Pursuant to PROMESA Section 304(b), the hearing to consider an objection to a Title III petition cannot commence until the 120th day after the petition is filed. At that hearing, the Title III Court will consider Section 302's requirements that: (i) the entity has been designated by the Oversight Board as a covered territorial instrumentality; and (ii) the Oversight Board has issued a restructuring certification determining that (a) prior good-faith efforts were made with creditors to restructure the debt, (b) the entity's audited financial statements are publicly available, (c) the entity previously adopted a fiscal plan, and (iii) the entity desires to effect a plan to adjust its debts. The Oversight Board has exclusive authority, under PROMESA Sections 304 and 312, to file a voluntary petition seeking protection under Title III and to file a plan of adjustment for the debtor and make modifications thereto. Furthermore, PROMESA Section 315 grants the Oversight Board the right to "take any action necessary on behalf of the debtor to prosecute the cases of the debtor," and the Oversight Board "is the representative of the debtor" in the Title III case.

---

[218] For a discussion of litigation related to the Oversight Board's powers, see Section IV.D.4 of this Disclosure Statement.

### Other Powers and Responsibilities

Pursuant to PROMESA Section 208, within thirty (30) days after the end of each Commonwealth fiscal year, the Oversight Board is required to submit an annual report to the President of the United States, Congress, the Governor, and the Legislative Assembly. The annual report must describe the Commonwealth's progress in achieving PROMESA's objectives and how the Oversight Board has assisted such progress. In addition, the Oversight Board must describe the precise manner in which it used its funds during the fiscal year. The annual report may also include the Oversight Board's recommendations for further federal action, including amending PROMESA or enacting other legislation, to support compliance with certified fiscal plans.

In addition to the foregoing core responsibilities, the Oversight Board has also been granted other significant powers to assist in achieving its objectives. These additional powers include, among other things:

- holding hearings and sessions;

- obtaining official data from the Commonwealth, the federal government and creditors;

- issuing and enforcing subpoenas;

- entering into contracts;

- certifying voluntary restructuring agreements and protecting certain qualifying pre-existing restructuring agreements between the Commonwealth and its creditors;

- certifying debt modifications under Title VI of PROMESA;

- initiating civil actions to enforce its authority under PROMESA;

- investigating the Commonwealth's disclosure and selling practices related to its bonds;

- ensuring the prompt payment and administration of Commonwealth taxes through the adoption of electronic reporting, payment and auditing technologies;

- analyzing any materially underfunded pensions in the Commonwealth's pension system; and

- intervening in any litigation filed against the Commonwealth or its covered instrumentalities.

### Implementation of Oversight Board Policies

The Oversight Board implemented various initiatives in its efforts to meet the objectives of PROMESA, including, among other things:

137

i.    **Improving    the    Government's    Fiscal    Governance,
Accountability, Internal Controls, and Financial Affairs**

One of the Oversight Board's core responsibilities is to improve the Government's fiscal governance, accountability, and internal controls.  Following the commencement of the Title III Cases, the Oversight Board continued to identify and implement structural and process improvements to fulfill its mandate pursuant to PROMESA.

The Oversight Board also created a budget-to-actuals ("B2A") reporting requirement for the Central Government and the top twenty component units, as well as public corporations such as PREPA and the Puerto Rico Aqueducts and Sewer Authority ("PRASA"), which has pushed the Government to add resources and capacity to its budgeting and accounting departments.  The B2A reporting requirement has enabled the Government to provide greater visibility to stakeholders into its actual spending patterns and an early warning mechanism to alert the Government and the Oversight Board if PREPA's actual spending deviates from budgeted amounts.  The B2A report is publicly reported by the Government on a monthly basis.

Other reporting requirements implemented by the Oversight Board include: (i) monthly public reporting of pension obligation balances for the Government and PREPA; (ii) monthly public reporting of public employee payroll, headcount, and attendance data; (iii) quarterly reporting of revenue forecasts; and (iv) posting the full text of all Government contracts to the Comptroller's website.

In addition, for fiscal year 2020, the Oversight Board eliminated PREPA's ability to use prior year appropriations in the next fiscal year, other than those budgeted for fuel and purchased power as necessary to maintain the electric system, to force PREPA to close out the prior fiscal year on a timely basis.

ii.    **Section 205 Recommendations**

Pursuant to PROMESA Section 205, the Oversight Board may, at any time, submit recommendations to the Governor or the Legislative Assembly on actions the Government may take to ensure compliance with the certified fiscal plan, or to otherwise promote the financial stability, economic growth, management responsibility, and service delivery efficiency of the Government.

On August 28, 2017, the Oversight Board sent a Section 205 Recommendation to the Government to recommend an independent board of directors for PREPA to strengthen governance, enhance credibility, and attract investment.

iii.    **Title V Critical Projects Process**

On April 20–21, 2017, the Oversight Board hosted a summit on P3 and Title V critical projects.  Throughout the 2017 Fiscal Year, the Oversight Board and interim Revitalization Coordinator developed the criteria and processes for selecting, implementing, and monitoring critical infrastructure projects, particular to the energy industry.  In the April 2017 Fiscal Plan, the Oversight Board found that PREPA's needed infrastructure upgrades and new capital projects generally qualified as "Critical Projects" under Title V, as projects related to addressing an

138

emergency, as they relate to a "grave problem of deterioration in the physical infrastructure for the rendering of essential services to the people . . . including problems in the physical infrastructure for energy."

Following the aftermath of Hurricanes Irma and Maria, the Revitalization Coordinator restarted the critical projects process, hiring the requisite personnel, retaining local firms for additional support, and overhauling the project submission website.

On July 31, 2018, the Oversight Board adopted a Title V policy that helped further specify procedural requirements the Revitalization Coordinator must follow when considering potential critical projects.  The policy clarifies requirements for projects that involve doing business with any government agency or public corporation, especially, energy related projects that require a PPOA.  All projects that require obtaining a contract or RFP award from any government agencies or public corporations must obtain such contract or RFP award prior to the project submission through Title V.  In the case of energy related projects, projects that require a PPOA must be validly assumed under Title III of PROMESA in order to satisfy the contract award requirement.

The Title V policy of July 31, 2018, allowed the Revitalization Coordinator to focus efforts on projects that had obtained valid contract awards or RFP awards, and other projects, such as private to private or with a municipal government.

By the beginning of fiscal year 2019, the Revitalization Coordinator evaluated 55 projects totaling an excess of approximately $9 billion dollars.  Upon adoption of the Title V policy as of July 31, 2019, active projects had to be withdrawn from participation or placed on hold (at project sponsor's discretion) since approximately 80% were energy related requiring a valid PPOA assumed under Title III and the remaining approximately 19% required a government RFP or similar.  The remaining 1% of the 55 evaluated projects constituted a qualifying project and a rejected project that did not meet initial requirements.  Nevertheless, many energy related project sponsors continued to negotiate their contracts with PREPA through the respective process and demonstrated interest in reactivating their project submission upon successfully complying with the Oversight Board's Title V policy.

### iv.  Review of Legislative Acts and Certain Rules, Regulations, Administrative, and Executive Orders

PROMESA Section 204(a) requires that the Government submit to the Oversight Board all new laws, no later than seven (7) business days after the law is duly enacted.  The Governor must also submit certain rules, regulations, and executive orders to the Oversight Board for review and approval pursuant to Sections 204(b)(2) and (b)(4) of PROMESA and policies established by the Oversight Board.  The singular objective is to assure that all enacted acts as well as any proposed rule, regulation, administrative order, and executive order will have no adverse impact on the certified fiscal plan or budget.  The Government has consistently failed to comply with its obligations under Section 204(a) to send acts no later than seven (7) business days after enactment. Over 100 signed acts and joint resolutions were not submitted to the Oversight Board as required by PROMESA.

On July 3, 2019, the Oversight Board commenced an action under PROMESA Sections 108(a)(2), 204(a)(5), 204(c), and 207 to prevent the implementation of Act 29-2019 and numerous joint resolutions, because such laws are significantly inconsistent with the applicable certified fiscal plan, reprogram funds without Oversight Board approval, modify debt without Oversight Board approval, and/or otherwise were not properly submitted to the Oversight Board pursuant to PROMESA Section 204(a). This was the first action filed under PROMESA Section 204. Following the commencement of such action, on October 25, 2019, Governor Vázquez signed Executive Order 2019-057, which creates a procedure for the express purpose of complying with PROMESA Section 204(a). The procedure requires, among other things, the OMB and the Department of Treasury to complete and submit to AAFAF within seven (7) business days of the Governor's signing new legislation a certified analysis of the financial and budgetary impact of that law.

On June 12, 2020, the Governor and AAFAF filed six adversary complaints seeking declaratory judgments that certain Acts and the related certifications satisfy PROMESA's requirements under Sections 204(a) and 108(a). The Title III Court generally ruled in the Oversight Board's favor, and the First Circuit affirmed. *See* Section IV.D.4(viii) of this Disclosure Statement for a summary of such action.

### v.   **Contract Review**

On November 6, 2017 (as modified on April 30, 2020), the Oversight Board established a Contract Review Policy, pursuant to PROMESA Section 204(b)(2), to require prior Oversight Board approval of contracts with an aggregate value of $10 million or more that would be entered into by the Commonwealth or any covered instrumentality. The Contract Review Policy's objectives are to promote market competition and ensure a government contract's consistency with the applicable certified fiscal plan and certified budget. Accordingly, the Oversight Board focuses its review on whether the contract is consistent with the fiscal plan and in the case of disaster aid spending, provide observations regarding the compliance with federal funding and/or reimbursement requirements.

In order to make the contracting policy more transparent, the Oversight Board publishes a status report of each contract under review, including the name of the contracting party, the date of submission, the date of any response from the Oversight Board or from the contracting party, and a copy of all the Oversight Board's formal responses. The Contract Review Policy requires that the government contracting entity submit to the Oversight Board a certification whereby its head or general counsel certifies that no person has unduly intervened, offered anything of value or wielded any influence in connection with the execution of the contract. The Contract Review Policy requires that contractors submit a similar certification to the Oversight Board and disclose any sharing of any portion of its compensation with any third party. Since the inception of the Contract Review Policy, the Oversight Board has reviewed 200 contracts that PREPA is party to, for a total aggregate value of over $41.7 billion.

Moreover, the Oversight Board included in the Commonwealth fiscal plan a requirement for the text of all government contracts to be made public on the Office of the Comptroller's website by September 30, 2018, and executed a memorandum of agreement with the Office of the Comptroller to promote transparency in government contracting.

vi.      **Debt Transaction Approvals**

In December 2017, the Oversight Board established a policy pursuant to PROMESA Section 207 to require prior Oversight Board approval of any debt transaction to be entered into by the Commonwealth or any covered instrumentality.  The objectives of this policy are to promote fiscal prudence and ensure that the debt transactions are consistent with the applicable certified fiscal plan.  During fiscal year 2018, the Oversight Board approved, among other transactions, a loan from the Commonwealth to PREPA.

4.      **Controversies Over Oversight Board's Powers**

i.      ***Rosselló Nevares v. The Financial Oversight and Management Board  for Puerto Rico***, Adv. Proc. No. 18-00080

On July 5, 2018, then-Governor Ricardo Rosselló and AAFAF filed a complaint [Adv. Proc. No. 18-00080, ECF No. 1] against the Oversight Board, each individual Oversight Board member, and the Oversight Board's executive director, seeking declarations that (i) the Oversight Board lacked the authority to impose policy initiatives on the Commonwealth Government through a fiscal plan and/or budget, including the June 2018 Commonwealth Fiscal Plan and the certified Commonwealth budget for FY2019; (ii) the substantive policy mandates contained in the June 2018 Commonwealth Fiscal Plan, that were rejected by the Governor pursuant to PROMESA Section 205, were null and void; and (iii) the substantive policy mandates contained in the Oversight Board's FY2019 budget exceeded the Oversight Board's powers and were null and void. Plaintiffs also sought an injunction prohibiting defendants from implementing and enforcing certain provisions included in the June 2018 Commonwealth Fiscal Plan that plaintiffs characterized as recommendations.

On July 12, 2018, the Oversight Board filed a motion to dismiss the complaint [Adv. Proc. No. 18-00080, ECF No. 17].  The Title III Court granted the motion to dismiss the plaintiff's claims regarding (i) agency consolidation and compensation reductions/hiring freezes because there was not a ripe case or controversy; and (ii) budgetary reprogramming because such reprogramming by plaintiffs would be inconsistent with PROMESA's declaration that the budget certified by the Oversight Board was in full force and effect, and therefore it was preempted by Section 4 of PROMESA.  The Title III Court did not dismiss claims regarding automatic budget reductions and corrective measures.  In so ruling, the Title III Court held that "[t]he power bestowed on the Oversight Board by Section 201(b)(1)(K) of PROMESA allows the Oversight Board to make binding policy choices for the Commonwealth, notwithstanding the Governor's rejection of Section 205 recommendations." *Nevares v. Fin. Oversight & Mgmt. Bd. for P.R.* (*In re Fin. Oversight & Mgmt. Bd. for P.R.*), 330 F. Supp. 3d 685, 700 (D.P.R. 2018), *aff'd and remanded*, 945 F.3d 3 (1st Cir. 2019), *cert denied,* 141 S. Ct. 241 (2020).  The Title III Court rejected plaintiffs' argument that unspent funds from prior-year budgets could be spent outside of the strictures of the current year's budget, despite Section 204(c)'s prohibition on unapproved reprogramming.  The Title III Court ruled: "It beggars reason, and would run contrary to the reliability and transparency mandates of PROMESA, to suppose that a budget for a fiscal year could be designed to do anything less than comprehend all projected revenues and financial resources, and all expenditures, for the fiscal year.  Since a certified budget is in full effect as of

the first day of the covered period, means and sources of government spending are necessarily rendered unavailable if they are not provided for within the budget." *Id.* at 704.

On September 10, 2018, plaintiffs filed an urgent motion requesting certification of the Title III Court's August 7, 2018, opinion and order for immediate appeal under PROMESA Sections 306(e)(3)-(4) [Adv. Proc. No. 18-00080, ECF No. 43]. On October 9, 2018, the Title III Court entered a memorandum order certifying certain aspects of the August 27, 2018 opinion and order for interlocutory appeal [Adv. Proc. No. 18-00080, ECF No. 54].

On December 18, 2019, the First Circuit affirmed the Title III Court decision, confirming there is nothing in PROMESA Section 205 "suggesting that, by first seeking the Governor's agreement on a matter, the Board somehow loses whatever ability it otherwise had to act unilaterally on the matter," and the Oversight Board had the power to adopt "a rejected recommendation if it otherwise has the power to adopt the recommended action on its own." *Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 945 F.3d 3, 6-7 (1st Cir. 2019), *cert. denied,* 141 S. Ct. (2020). The First Circuit further affirmed the Title III Court's ruling on reprogramming, noting "PROMESA prohibits the Governor from spending any funds that are not budgeted regardless of whether the recommendation had been adopted" and "regardless of what any territorial laws say." *Id.* at 8.

On October 5, 2020, the Supreme Court denied the Governor's petition for certiorari. On August 25, 2021, the parties filed a stipulation voluntarily dismissing the remaining claims in the adversary proceeding in light of the First Circuit's decision. [Adv. Proc. No. 18-00080, ECF No. 71].

ii.    ***Rivera-Schatz et al v. The Financial Oversight and Management Board for Puerto Rico et al.*, Adv. Proc. No. 18-00081**

On July 9, 2018, Hon. Thomas Rivera-Schatz, in his official capacity as President of the Senate of Puerto Rico and on behalf of the Senate of Puerto Rico, and Hon. Carlos J. Méndez-Núñez, in his official capacity as Speaker of the House of Representatives of Puerto Rico and on behalf of the House of Representatives collectively, filed a complaint seeking declaratory and injunctive relief against the Oversight Board, each of its members, and its executive director solely, in their official capacities, alleging the Oversight Board "overreached its powers" by "trying to force" the plaintiffs to pass a bill retroactively repealing Law 80 (Puerto Rico's wrongful dismissal act) as a condition for the Oversight Board's certification of the plaintiff's approved Commonwealth budget [Adv. Proc. No. 18-00081, ECF No. 1]. The complaint also sought an injunction prohibiting defendants from implementing the Oversight Board's FY2019 budget and directing the Oversight Board to certify the FY2019 budget approved by the plaintiff on June 30, 2018.

On July 17, 2018, defendants filed a motion to dismiss the complaint [Adv. Proc. No. 18-00081, ECF No. 27]. On August 7, 2018, the Title III Court dismissed the complaint in its entirety, holding that it lacked jurisdiction to review the Oversight Board's certification decisions, as such review is "directly precluded by Section 106(e)." *Rivera-Schatz v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 327 F. Supp. 3d 364, 371 (D.P.R. 2018),

142

*aff'd*, 916 F.3d 98 (1st Cir. 2019).  It also affirmed that the Oversight Board may use its "powers in a manner designed to incentivize assent to the policy goals supported by the Board." *Id.* at 373.

On February 22, 2019, the First Circuit affirmed the Title III Court's decision, ruling, among other things, that "[u]nder PROMESA's preemption provision, the grants of authority to the Board at Sections 201 and 202 to approve Fiscal Plans and Budgets 'prevail over any general or specific provisions of territory law,' including provisions of Puerto Rico's Constitution that are 'inconsistent with [PROMESA],'" and that "[w]hen the Board certified the 2019 Fiscal Plan and Budget … it [properly] exercised authority granted to it under PROMESA." *Méndez-Núñez v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 916 F.3d 98, 116 (1st Cir. 2019).

iii.     ***Autonomous Municipality of San Juan v. The Financial Oversight & Management Board for Puerto Rico, et al.*, Case No. 19-cv-1474**

On May 19, 2019, the Municipality of San Juan filed a complaint against the Oversight Board in the District Court for the District of Puerto Rico alleging that (i) the Oversight Board's designation of San Juan as a covered entity for purposes of oversight under PROMESA was without a rational basis; (ii) PROMESA was unconstitutional because it did not provide sufficient bounds to the Oversight Board's discretion and therefore violated the non-delegation doctrine; and (iii) the designation was invalid because the Oversight Board's members were appointed in violation of the Appointments Clause [Case No. 19-cv-1474, ECF No. 1].  On July 1, 2019, the Oversight Board filed a motion to transfer the case to the Title III Court [Case No. 19-cv-1474, ECF No. 36], which the District Court granted [Case No. 19-cv-1474, ECF No. 40].  On August 9, 2019, the Oversight Board filed a motion to dismiss [Case No. 19-cv-1474, ECF No. 46, 51, 52], which the Title III Court granted on December 5, 2019, with respect to counts I and II of the complaint.  Count III was stayed pending the Supreme Court's decision in the Appointments Clause litigation described in Section V.H of this Disclosure Statement [Case No. 19-cv-1474, ECF No. 61].

After the Appointments Clause litigation was concluded, on September 21, 2020, the Title III Court dismissed the remaining count with prejudice [Case No. 19-cv-1474, ECF No. 64].

On September 25, 2020, San Juan filed a notice of appeal of the Title III Court's order granting defendants' motion to dismiss [Case No. 19-cv-1474, ECF No. 65].  On April 27, 2021, San Juan filed a motion to voluntarily dismiss the appeal, which was granted on April 29, 2021.

iv.     ***The Financial Oversight & Management Board for Puerto Rico v. Hon. Vázquez Garced, et al.*, Adv. Proc. No. 19-00393**

On July 3, 2019, the Oversight Board filed a complaint against then-Governor Rosselló and AAFAF challenging Act 29-2019 ("Act 29"), which eliminates the obligation of municipalities to reimburse the Commonwealth for pension payments to municipality retirees and make payments to the Commonwealth's health plan, as well as 23 joint resolutions.  Specifically, the complaint alleged that (i) Act 29, including its enactment and enforcement, violated PROMESA Sections 204(a), 204(c), and 207; (ii) the Oversight Board was entitled to a permanent injunction prohibiting defendants from implementing Act 29; (iii) the Oversight Board was entitled to an injunction

143

compelling the Governor to submit PROMESA Section 204(a) certifications for Act 29, as well as the other newly enacted laws and joint resolutions that had not yet been so certified; (iv) Act 29 and the joint resolutions violated PROMESA Section 108(a) and were not enforceable and were of no effect because they impaired and/or defeated the purposes of PROMESA, as determined by the Oversight Board; and (v) the Governor's alleged policy of not providing certifications for newly passed legislation as required under PROMESA Section 204 violated PROMESA Section 108(a) because it impaired and/or defeated the purposes of PROMESA, as determined by the Oversight Board.

Defendants filed a motion to dismiss on July 15, 2019 [Adv. Proc. No. 19-00393, ECF No. 17]. On August 22, 2019, the Title III Court issued an order and opinion denying the Governor's motion to dismiss on all counts, holding that (i) the court had subject matter jurisdiction because the challenged measures had not been fully implemented, and therefore a live case or controversy existed; (ii) the Oversight Board could challenge the compliance of the Commonwealth's certifications under PROMESA Section 204(a); (iii) the Oversight Board had plausibly alleged that Act 29 was an unapproved modification of the Commonwealth's prior debt or guaranty obligation to pensioners under Act 106; (iv) the challenged measures reprogrammed funds without the Oversight Board's authorization; and (v) the Oversight Board had plausibly alleged that the challenged measures impaired the purposes of PROMESA [Adv. Proc. No. 19-00393, ECF No. 66]. Defendants answered the complaint on September 10, 2019 [Adv. Proc. No. 19-00393, ECF No. 73].

On December 13, 2019, the Oversight Board filed a motion for summary judgment [Adv. Proc. No. 19-00393, ECF No. 77]. On April 15, 2020, the Title III Court granted the Oversight Board's motion for summary judgment on five of the eight counts [Adv. Proc. No. 19-00393, ECF No. 107]. The Title III Court granted the Oversight Board's request for permanent injunctions on Act 29 and the joint resolutions under PROMESA Sections 204(c), 204(a), and 108(a)(2), holding that Act 29 and the joint resolutions effectuate reprogrammings outside of the fiscal plan and certified budget without Oversight Board approval, in violation of PROMESA Section 204(c), and were unenforceable and of no effect. The Title III Court also held defendants did not comply with the procedures required by PROMESA Section 204(a) with regard to new legislation and defendants' formal estimate, purporting to detail the cost of Act 29, was facially noncompliant. The Title III Court held Act 29 and the joint resolutions were also invalid pursuant to PROMESA Section 108(a)(2), finding that the Oversight Board's determination that the laws defeated and/or impaired the purposes of PROMESA is entitled to deference under an arbitrary and capricious standard of review. The Title III Court denied summary judgment on the Oversight Board's claim for a permanent injunction as to the other laws for which defendants had not submitted 204(a) certifications based on defendants' submission of facts showing certifications for the vast majority of these laws had, after the filing of the lawsuit, been submitted. The Title III Court also declined to grant summary judgment on the Oversight Board's claim that the Governor had a policy of noncompliance with PROMESA Section 204(a), in light of the disputed facts raised by defendants regarding the reasons for past non-compliance and then-Governor Vázquez Garced's efforts to improve compliance. Lastly, the Title III Court declined to address the Oversight Board's motion for summary judgment for its PROMESA Section 207 claim, finding count II to be moot because the relief requested in that claim was already granted in the Title III Court's other rulings.

On October 1, 2021, the parties filed a joint status report informing the Title III Court that the parties agreed the remaining claims in the adversary proceeding could be dismissed and judgment entered on the claims upon which summary judgment was granted [Adv. Proc. No. 19-00393, ECF No. 116]. On October 13, 2021, the Title III Court issued a judgment dismissing the adversary proceeding and closing the case [Adv. Proc. No. 19-00393, ECF No. 119].

v.   ***La Liga de Ciudades de Puerto Rico v. The Financial Oversight and Management Board for Puerto Rico, et al.***, **Adv. Proc. No. 21-00026**

On March 14, 2021, La Liga de Ciudades de Puerto Rico ("La Liga"), a non-profit corporation claiming to have as members mayors of Puerto Rico's municipalities, filed a complaint against the Oversight Board, AAFAF, Centro de Recaudacion de Ingresos Municipales ("CRIM"), Administración de Seguros de Salud ("ASES"), and Luis M. Collazo Rodríguez, in his capacity as administrator of ERS [Adv. Proc. No. 21-00026, ECF No. 1]. The complaint alleges that CRIM, ASES, and ERS are collecting and withholding money from Puerto Rico's municipalities based on an incorrect interpretation of an order entered by the Title III Court in earlier litigation regarding Act 29, Adv. Proc. No. 19-00393, ECF No. 1 (the "Act 29 Litigation"), described above in Section IV.D.4(iv).

After the Act 29 Litigation was decided, CRIM held back funds that otherwise would have been disbursed to the municipalities in order to pay ASES and ERS the health care and retirement contributions that, but for Act 29, would have been made. In the complaint, La Liga sought (i) a declaratory judgment "decreeing that the debts claimed by CRIM, ASES and [ERS] . . . are 'inexistent'" and that the withholdings made by CRIM to purportedly offset those inexistent debts are "illegal"; (ii) an injunction "prohibiting defendants from collecting from the [m]unicipalities any of the monies that Act 29 exempted them" from paying; (iii) an order requiring CRIM to immediately disburse any funds withheld to pay for the Act 29-related debts; and (iv) an order requiring ERS and ASES to return to CRIM "any and all monies" received to pay the purported debts.

On May 14, 2021, the defendants filed motions to dismiss [Adv. Proc. No. 21-00026, ECF Nos. 14, 15, 18], which were granted by the Title III Court [Adv. Proc. No. 21-00026, ECF No. 40]. The Title III Court held that La Liga lacked standing to assert claims against AAFAF, ASES, and the ERS Administrator under rule 12(b)(1) of the Federal Rules of Civil Procedure because La Liga could not plausibly allege that its injury was traceable to them or that any relief granted against them could redress La Liga's alleged injury. The Title III Court also granted the Oversight Board's and CRIM's motions to dismiss, holding that La Liga's allegations rested on a misreading of the order granting the Oversight Board summary judgment in the Act 29 Litigation "in a manner fatal to the Complaint" because the order nullified Act 29 *ab initio* and thus Act 29 "was never effective to excuse the municipalities' obligations to pay pension and benefit contributions."

On January 18, 2022, La Liga filed a notice of appeal [Adv. Proc. No. 21-00026, ECF No. 42]. Following briefing, oral argument is was heard on December 5, 2022.

145

vi.   ***Hernandez-Montanez v. Pierlusi***, **Adv. Proc. No. 21-00042**

On April 21, 2021, the Speaker of the Puerto Rico House of Representatives, acting on behalf of the Puerto Rico House of Representatives, filed a complaint against the Governor, AAFAF, the President of the Puerto Rico State Elections Commission, and the Secretary of the Department of Treasury, seeking declaratory and injunctive relief prohibiting defendants from distributing certain election-related funds [Adv. Proc. No. 21-00042, ECF No. 1].

This case arose out of a dispute regarding Act 167-2020, which called for a Special Election (the "Special Election") on May 16, 2021 to select a six-member delegation to be sent to Washington, D.C. in order to press for Puerto Rico's admission as a state. Because Puerto Rico's certified budget for the 2020-2021 fiscal year did not allocate funds for this Special Election, the Governor sought authorization from the Oversight Board to reprogram funds. The Oversight Board informed the Governor that, in the unique circumstances presented, the reprogramming request must be submitted to both the Oversight Board and the Legislative Assembly. Subsequently, the Governor requested a budget amendment to appropriate funds for the Special Election and submitted a proposed amended budget to the Oversight Board pursuant to PROMESA Section 202. The Oversight Board determined the Governor's proposed amended budget was compliant, as required by PROMESA Section 202(c)(1), and submitted it to the Legislative Assembly. Thereafter, the Legislative Assembly informed the Oversight Board that a bill identical to the Governor's proposed amended budget was defeated during a markup session vote and that it would not comply with the budget amendment process. As a result, the Oversight Board issued a resolution stating, among other things, that (i) the Governor and the Legislative Assembly were at an impasse concerning the appropriation of funds to cover the cost of the Special Election; (ii) PROMESA Section 402 constrained the Oversight Board from adopting an interpretation of PROMESA that might restrict Puerto Rico's determination of its political status; (iii) the Oversight Board desired to allow the Commonwealth government to adopt or not to adopt the proposed amended budget the same as would occur absent PROMESA; and (iv) therefore, the original Commonwealth budget would remain in effect without revision. Thereafter, AAFAF informed the Oversight Board that the Governor authorized the disbursement of funds to fund the Special Election.

Plaintiff sought orders declaring that PROMESA's budgetary provisions apply to all budgetary expenditures, including those relating to contested election-related funds, and that Section 402 did not exempt the proposed reallocation of funds from PROMESA's budgetary provisions. Plaintiff also sought an order enjoining the Governor and Secretary of the Treasury from allegedly misappropriating and distributing those funds.

On April 22, 2021, plaintiff filed a motion seeking a temporary restraining order or preliminary injunction prohibiting defendants from distributing the election-related funds pending resolution of the complaint [Adv. Proc. No. 21-00042, ECF No. 3].

On June 4, 2021, the defendants filed motions to dismiss plaintiff's complaint [Adv. Proc. No. 21-00042, ECF Nos. 47, 49]. After plaintiff requested several extensions of its deadline to oppose the motions to dismiss, plaintiff ultimately failed to respond to the motions to dismiss. Accordingly, on August 27, 2021, the Title III Court issued an order granting defendants' motions to dismiss, holding that any controversy over the validity of the actions of the defendants or the

146

Oversight Board's role in supporting or funding the Special Election was moot because the Special Election had been held and the designated funds spent [Adv. Proc. No. 21-00042, ECF No. 63].

vii. ***The Financial Oversight & Management Board for Puerto Rico v. Hon. Vázquez Garced, et al.*, Adv. Proc. No. 20-00078**

On June 8, 2020, the Oversight Board filed a complaint against the Governor and AAFAF seeking injunctive relief and a writ of mandamus in connection with the Governor and AAFAF's failure to produce to the Oversight Board certain documents and information regarding the Commonwealth Government's procurement and negotiation of contracts to purchase COVID-19 testing equipment and other medical supplies [Adv. Proc. No. 20-00078, ECF No. 1]. On June 23, 2020, the Governor and AAFAF filed a motion to dismiss, arguing the Title III Court lacked jurisdiction over the claim, the Oversight Board lacked standing, and the complaint failed to state a claim for mandamus relief [Adv. Proc. No. 20-00078, ECF No. 11].

On July 24, 2020, the Oversight Board filed a notice of voluntary dismissal of the action [Adv. Proc. No. 20-00078, ECF No. 18]. On August 3, 2020, the adversary proceeding was closed.

viii. ***Hon. Vázquez Garced, et al. v. The Financial Oversight & Management Board for Puerto Rico*, Adv. Proc. Nos. 20-00080, 20-00081, 20-00082, 20-00083, 20-00084, 20-00085; Case No. 21-1071 (1st Cir.)**

On June 12, 2020, the Governor and AAFAF filed six adversary complaints seeking declaratory judgments that Acts 47, 82, 90, 138, 176, and 181 and the related certifications pursuant to PROMESA Section 204(a) satisfy PROMESA's requirements. Act 47 expands the group of health professionals eligible for tax benefits under the Puerto Rico Incentives Code, reducing revenues without any offsetting cost savings. Act 82 establishes a new office within the Puerto Rico Department of Health to further regulate various entities that contract services from pharmacies in Puerto Rico. Act 82 also prevents Pharmacy Benefit Managers (as defined therein) from controlling the cost of prescription medications. Act 138 forces public health insurance companies such as managed care organization ("MCOs") to accept into their networks all medical providers regardless of price. Act 138 also bars health-insurance organizations, insurers, and other medical plans from including in any contract or stipulation with a healthcare provider a right to unilaterally terminate the contract. Act 176 increases the accrual rate for vacation days and sick days for public employees. Act 181 provides for a salary increase to firefighters amounting to almost $3 million per year.

On July 16, 2020, plaintiffs voluntarily dismissed the adversary complaint related to Act 90 [Adv. Proc. No. 20-00081, ECF No. 5]. On July 17, 2020, the Oversight Board filed answers and counterclaims in connection with the five remaining adversary complaints related to Acts 47, 82, 138, 176, 181 (the "Five Acts") [Adv. Proc. No. 20-00080, ECF No. 5; Adv. Proc. No. 20-00082, ECF No. 5; Adv. Proc. No. 20-00083, ECF No. 6; Adv. Proc. No. 20-00084, ECF No. 5; Adv. Proc. No. 20-00085, ECF No. 5]. The Oversight Board's counterclaims sought to nullify and enjoin the Five Acts pursuant to PROMESA Sections 204(a) and 108(a), and with respect to Act 82 and Act 181, pursuant to PROMESA Section 204(c) as well. Specifically, the Oversight Board challenged Act 47 on the grounds that the law is significantly inconsistent with the

147

Commonwealth's certified fiscal plan (as it is not revenue neutral) and the Governor's certification pursuant to PROMESA Section 204(a) lacked sufficient specificity needed for a formal estimate of Act 47's impact on expenditures and revenues, as PROMESA requires. The Oversight Board challenged Act 82 on the grounds that the law is significantly inconsistent with the Commonwealth certified fiscal plan and will reduce the competitive market for quality healthcare services in Puerto Rico. The Oversight Board challenged Act 138 on the grounds that the law is significantly inconsistent with the Commonwealth certified fiscal plan, will inhibit MCOs' ability to control healthcare costs, and deprives Puerto Rico of a competitive market for quality healthcare services and increases healthcare costs by eliminating incentives for doctors to compete on price and quality. The Oversight Board challenged Act 176 on the grounds that the law is significantly inconsistent with the Commonwealth certified fiscal plan, among other things, undermining right-sizing measures contemplated in the Commonwealth certified fiscal plan. The Oversight Board challenged Act 181 on the grounds that the law is significantly inconsistent with the Commonwealth certified fiscal plan and the Governor never demonstrated to the Oversight Board how the salary increase for firefighters would or could be funded through a new tax.

On July 30, 2020, the Oversight Board filed a motion to consolidate the five remaining adversary proceedings [Adv. Proc. No. 20-00080, ECF No. 8], and the Title III Court issued an order granting the motion [Adv. Proc. No. 20-00080, ECF No. 9]. The Government filed answers to the Oversight Board's counterclaims in connection with the Five Acts on August 3, 2020 [Adv. Proc. No. 20-00080, ECF No. 11; Adv. Proc. No. 20-00082, ECF No. 9; Adv. Proc. No. 20-00083, ECF No. 10; Adv. Proc. No. 20-00084, ECF No. 10; Adv. Proc. No. 20-00085, ECF No. 9].

On September 28, 2020, the Government filed motions for summary judgment in connection with Acts 138 and 176 [Adv. Proc. No. 20-00082, ECF No. 12; Adv. Proc. No. 20-00083, ECF No. 13]. On October 5, 2020, the Oversight Board filed motions for summary judgment in connection with Acts 47, 82, and 181 [Adv. Proc. No. 20-00080, ECF Nos. 14, 16; Adv. Proc. No. 20-00084, ECF Nos. 13, 15; Adv. Proc. No. 20-00085, ECF Nos. 12, 13].

On December 23, 2020, the Title III Court issued an order: (i) denying the Government's motion for summary judgment in connection with Acts 138 and 176 [Adv. Proc. No. 20-00082, ECF No. 52; Adv. Proc. 20-00083, ECF No. 53]; and (ii) partially granting both the Oversight Board's (a) motions for summary judgment in connection with Acts 47, 82, and 181, and (b) cross-motions for summary judgment in connection with all claims and counterclaims related to Acts 138 and 176 [Adv. Proc. No. 20-00080, ECF No. 72; Adv. Proc. No. 20-00084, ECF No. 61; Adv. Proc. No. 20-00085, ECF No. 60]. With respect to Act 47, the Title III Court dismissed count II of the Act 47 complaint, which sought declaratory relief concerning PROMESA Section 108(a)(2), and granted summary judgment on Act 47 counterclaim III, which sought injunctions barring implementation of the relevant laws under PROMESA Section 108(a)(2). The Title III Court concluded that the Oversight Board's determination that Act 47 violates PROMESA Section 108(a)(2) is supported by a rational basis and substantial evidence. With respect to Act 82, the Title III Court dismissed count I of the Act 82 complaint, which sought declaratory relief concerning PROMESA Section 204(a), and granted summary judgment on Act 82 counterclaim II, which sought injunctions under PROMESA Section 104(k). The Title III Court found the Oversight Board's conclusions that the implementation of Act 82 should be prevented as it would involve significant expenditures that are not clearly provided for in the fiscal plan are neither arbitrary nor capricious. With respect to Act 138, the Title III Court dismissed count I of the Act

138 complaint, which sought declaratory relief concerning PROMESA Section 204(a), and granted summary judgment on Act 138 counterclaim II, which sought injunctions under PROMESA Section 104(k).  The Title III Court reasoned that the Oversight Board's challenges to Act 138 were supported by rational concerns given the Government's failure to comply with the Oversight Board's directives under PROMESA Section 204(a)(4)(A) to correct deficiencies with the Act 138 certificate.  With respect to Act 176, the Title III Court dismissed count II of the Act 176 complaint, which sought declaratory relief concerning PROMESA Section 108(a)(2), and granted summary judgment on Act 176 counterclaim III, which sought injunctions barring implementation of the relevant laws under PROMESA Section 108(a)(2).  The Title III Court concluded that the Oversight Board's determination that Act 176 will impair or defeat PROMESA's purposes was rational and supported by substantial evidence on the record.  With respect to Act 181, the Title III Court granted summary judgment on Act 181 counterclaim IV, which sought an injunction under PROMESA Section 104(k) barring implementation of Act 181 under PROMESA Section 204(c).  The Title III Court ruled that Act 181 violates PROMESA Section 204(c) because it creates a revenue deficiency that the Government would likely need to remedy through reprogramming that has neither been requested nor authorized.

Also, on December 23, 2020, the Title III Court issued an order directing the parties to show cause why the Title III Court should not dismiss the remaining claims and counterclaims [Adv. Proc. No. 20-00080, ECF No. 73; Adv. Proc. No. 20-00082, ECF No. 53; Adv. Proc. No. 20-00083, ECF No. 54; Adv. Proc. No. 20-00084, ECF No. 62; Adv. Proc. No. 20-00085, ECF No. 61].  On January 4, 2021, the parties filed a joint stipulation dismissing the remaining claims without prejudice [Adv. Proc. No. 20-00080, ECF No. 74; Adv. Proc. No. 20-00082, ECF No. 54; Adv. Proc. No. 20-00083, ECF No. 55; Adv. Proc. No. 20-00084, ECF No. 63; Adv. Proc. No. 20-00085, ECF No. 62].

On February 4, 2021, the parties filed a joint motion for entry of an order approving a joint stipulation modifying the injunction regarding Act 181 [Adv. Proc. No. 20-00084, ECF No. 72].  The parties agreed, to the extent tax revenues from tax on insurance premiums and revenues from safety inspections on commercial properties covered the salary increase of $125 per month for the firefighters, the Oversight Board would have no further objection to the increase as provided by Act 181.  The parties informed the Title III Court that the pay increase would be put into effect.  On February 5, 2021, the Title III Court issued an order approving the stipulation [Adv. Proc. No. 20-00084, ECF No. 73].

On January 21, 2021, the Government filed a notice of appeal in connection with the Title III Court's December 23, 2020, orders on the summary judgment motions [Adv. Proc. No. 20-00080, ECF No. 78; Adv. Proc. No. 20-00082, ECF No. 58; Adv. Proc. No. 20-00083, ECF No. 60; Adv. Proc. No. 20-00084, ECF No. 67; Adv. Proc. No. 20-00085, ECF No. 66].

On June 22, 2022, the First Circuit affirmed the Title III Court's December 23, 2020, orders on the parties' summary judgment motions.  The court reasoned that whether it was appropriate for the Oversight Board to supplement its rationale for rejecting Commonwealth legislation during litigation should be judged on a case-by-case basis, found that it was appropriate here, and concluded that the Oversight Board did not act arbitrarily and capriciously in exercising its authority under PROMESA to nullify the challenged measures.  On July 14, 2022, the First Circuit issued its mandate.

ix.  ***The Financial Oversight and Management Board for Puerto Rico v. Hon. Pierluisi Urrutia, et al.*, Adv. Proc. No. 21-00072**

On July 2, 2021, the Oversight Board filed a lawsuit against Governor Pedro Pierluisi Urrutia in his official capacity; AAFAF; and the Honorable José Luis Dalmau, in his official capacity as Speaker of the Puerto Rico House of Representatives, in the Title III Court to enjoin the enforcement and to nullify Act 7-2021 [Adv. Proc. No. 21-00072, ECF No. 1].  As set forth in the complaint, Act 7-2021 sought to replace the Commonwealth's reformed pension systems with a new, defined-benefit pension system, mandated that the Government repudiate any plan of adjustment that required pension reductions, budget cuts, or further bond restructurings, and prohibited the use of any resources by the Government to achieve and enable the Oversight Board's then-proposed plan of adjustment.  The complaint alleged that (i) Act 7-2021 violated PROMESA Section 108(a) because it impaired and/or defeated the purposes of PROMESA, as determined by the Oversight Board; (ii) Act 7-2021 violated PROMESA Sections 204(a), 204(c), and 207; (iii) Act 7-2021 violated the Supremacy Clause of the U.S. Constitution and PROMESA Section 4; and (iv) the Oversight Board was entitled to an order enjoining and nullifying Act 7-2021 and any actions taken to implement Act 7-2021.  On July 23, 2021, the defendants filed answers to the complaint [Adv. Proc. No. 21-00072, ECF Nos. 13, 14, 15].

On August 15, 2021, the Oversight Board filed a motion for summary judgment [Adv. Proc. No. 21-00072, ECF No. 17].  On October 13, 2021, the Title III Court issued an order granting, in part, the Oversight Board's motion for summary judgment [Adv. Proc. No. 21-00072, ECF No. 78].  The Title III Court found that (i) the Oversight Board had authority to seek judicial relief under PROMESA Section 204(a) because Act 7-2021 was significantly inconsistent with the Commonwealth Certified Fiscal Plan and the Governor failed to comply with the Oversight Board's directions to correct the inconsistency; and (ii) Act 7-2021 violated PROMESA Section 108(a) by impairing or defeating the purposes of PROMESA, as determined by the Oversight Board.  As to Counts IV, V, and VI, the Title III Court denied summary judgment with respect to the claims on PROMESA Sections 204(c) and 207, and declined to reach a conclusion on the question of preemption under PROMESA Section 4 and the Supremacy Clause.  Based on these rulings, the Title III Court, pursuant to PROMESA Section 204(a)(5), nullified the entirety of Act 7-2021 and enjoined the defendants from implementing and enforcing Act 7-2021.  The Title III Court also, pursuant to PROMESA Section 108(a)(2), declared section 1.02, section 5.02, Chapter 2, Chapter 3, Chapter 4, and the last sentence of section 5.01 of Act 7-2021 to be nullified, unenforceable, and of no effect, and enjoined defendants from implementing or enforcing those provisions.

On December 9, 2021, the parties filed a stipulation of voluntary dismissal without prejudice as to the remaining counts in the case (counts IV, V, and VI).  [Adv. Proc. No. 21-00072, ECF No. 79].

x.  ***R&D Master Enterprises, Inc., et al. v. The Financial Management and Oversight Board for P.R.*, et al., Case No. 21-cv-1317**

On July 8, 2021, R&D Master Enterprises, Inc., Pro Pave Corp., Matrix Transport, Inc., José A. Rovira González, and Maria Magdalena Díaz Vila filed a complaint in the United States

District Court for the District of Puerto Rico against the Oversight Board and Natalie Jaresko, in her official capacity as Executive Director of the Oversight Board [Case No. 21-cv-1317, ECF No. 1]. In their complaint, plaintiffs seek an order requiring the Oversight Board to review the Economic Development Bank's contract selling a $384,269,047 loan portfolio to an investor, PR Recovery and Development JV, LLC, pursuant to its contracts review policy and PROMESA Section 204(b). Plaintiffs contend the Oversight Board's alleged failure to review the contract violates PROMESA, the U.S. Constitution's Due Process and Equal Protection Clauses, and the Oversight Board's own contracts review policy.

On July 27, 2021, defendants filed a motion to transfer the case to the Title III Court as a case related to the Commonwealth Title III Case [Case No. 21-cv-1317, ECF No. 8].

On September 3, 2021, defendants filed a motion to dismiss, arguing that (i) plaintiffs lack standing to bring the suit; (ii) their claims are time-barred; and (iii) the complaint fails to state a viable claim for relief [Case No. 21-cv-1317, ECF No. 19].

On October 25, 2021, Judge Arias-Marxuach issued an order denying the defendants' motion to transfer the case to the Title III Court [Case No. 21-cv-1317, ECF No. 25].

On April 12, 2022, Judge Arias-Marxuach entered an opinion and order granting the Oversight Board's motion to dismiss, holding that plaintiffs' claims were time-barred. [Case No. 21-cv-1317, ECF No. 33]. On April 25, 2022, plaintiffs filed a notice of appeal of the court's order dismissing the complaint [Case No. 21-cv-1317, ECF No. 35].

On May 24, 2022, the First Circuit docketed the appeal as Case No. 22-1342. On July 20, 2022, plaintiffs filed its opening brief. On August 19, 2022, the Oversight Board filed its answering brief. The parties are awaiting further order from the First Circuit regarding oral argument.

xi.   ***The Financial Oversight and Management Board for Puerto Rico v. Hon. Pierluisi Urrutia, et al.*, Adv. Proc. No. 21-00119**

On December 20, 2021, the Oversight Board filed a complaint against the Governor of Puerto Rico, AAFAF, the ERS Administrator, the Executive Director of the Government of Puerto Rico Retirement Board, and the OMB Director seeking to nullify and enjoin enforcement of Act 80-2020, Act 81-2021, Act 82-2020, and Joint Resolution 33 ("JR 33"), a measure requiring the Commonwealth to implement, at least partially, Act 80 [Adv. Proc. No. 21-00119, ECF No. 1]. The Acts proposed to modify certain government employees' pension benefits by permitting them to retire early and/or providing enhanced benefits. The Oversight Board alleged that the Acts and JR 33 imposed a specified treatment of certain prepetition pension claims in a manner inconsistent with the Plan of Adjustment, which violated PROMESA Sections 312 and 313, and increased the treatment of certain claimants to recover in excess of the full amount of their claims in violation of PROMESA Section 301(a) and Bankruptcy Code section 1129(b). In addition, the Oversight Board alleged that: (i) each Act and JR 33 violated PROMESA Section 207 by modifying debt without prior Oversight Board approval, and impaired and defeated the purposes of PROMESA, as determined by the Oversight Board, specifically its purpose of achieving fiscal responsibility, in violation of PROMESA Section 108(a); (ii) the Governor and AAFAF failed to comply with

PROMESA Section 204(a) with respect to each Act; and (iii) Act 80 and JR 33 reprogrammed funds without prior Oversight Board certification, in violation of PROMESA Section 204(c).

On December 27, 2021, the Oversight Board, the Governor of Puerto Rico, AAFAF and the OMB filed a stipulation and order reflecting their resolution of the Oversight Board's complaint [Adv. Proc. No. 21-00119, ECF No. 5]. The parties stipulated that (i) they would work towards an agreement to pursue several of the Acts' objectives, (ii) entry of an order approving the stipulation would invalidate the Acts and JR 33, and (iii) upon entry of an order approving the stipulation, the Oversight Board's complaint would be dismissed with prejudice [Adv. Proc. No. 21-00119, ECF No. 5]. On December 28, 2021, the Title III Court entered the stipulation and order [Adv. Proc. No. 21-00119, ECF No. 6]. By effect of the Title III Court's order, the Acts and JR 33 were invalidated and the Oversight Board's complaint was dismissed with prejudice [Adv. Proc. No. 21-00119, ECF No. 6].

On February 16, 2022, the Oversight Board, the Governor of Puerto Rico, and AAFAF filed a joint motion (i) to inform the Title III Court that the parties had reached agreements concerning Act 81 and Act 82, as contemplated in the stipulation and order resolving the Oversight Board's complaint; and (ii) to extend the deadline for the parties to satisfy their respective obligations under the Title III Court's order in connection with Act 80 [Adv. Proc. 21-00119, ECF No. 8]. After several extensions, on August 26, 2022, the Title III Court entered an order granting a motion for an extension of the deadline until September 22, 2022 [Adv. Proc. No. 21-00119, ECF No. 15].

### E.     Adoption of PREPA Fiscal Year Budgets and Fiscal Plans

#### 1.     Fiscal Plans

The Oversight Board is tasked with interacting with the Governor, for fiscal plans, and with the Governor and Legislative Assembly, for budgets, in the development, submission, approval, and certification of fiscal plans and budgets. The Oversight Board must determine in its sole discretion whether proposed fiscal plans comport with PROMESA Section 201(b). Among PROMESA's goals is that fiscal plans provide Puerto Rico and its instrumentalities with permanent, pro-growth fiscal reforms and a method to achieve fiscal responsibility and access to the capital markets.[219]

Through a collaborative process with the Commonwealth Government, the Oversight Board has certified fiscal plans for PREPA that strive to transform PREPA into a cost-efficient, safe, and reliable utility. For example the measures in the certified fiscal plans focus on capital improvements to PREPA's infrastructure, the pursuit of more cost-effective electricity generation methods, reductions in labor and pension costs, and the privatization of PREPA through proposed transactions with experienced utility providers.

A summary of the certified fiscal plans is set forth below.

---

[219] PROMESA § 701 ("It is the sense of the Congress that any durable solution for Puerto Rico's fiscal and economic crisis should include permanent, pro-growth fiscal reforms that feature, among other elements, a free flow of capital between possessions of the United States and the rest of the United States.").

i.    **The April 2017 Fiscal Plan Certification**

October 14, 2016, the Oversight Board designated PREPA as an entity that would be required to submit fiscal plans under PROMESA. Shortly thereafter, PREPA's executive director, Javier Quintana, announced that PREPA's first fiscal plan was in the process of being prepared. On February 21, 2017, PREPA submitted a fiscal plan to the Oversight Board. In the following weeks, the Oversight Board worked closely with the Government and PREPA to further develop the fiscal plan, and PREPA submitted a revised fiscal plan to the Oversight Board on April 21, 2016. The Oversight Board certified the April 2017 Fiscal Plan on April 28, 2017, with certain amendments described below (the "April 2017 Fiscal Plan").

The April 2017 Fiscal Plan was PREPA's first fiscal plan developed in accordance with PROMESA and marked a significant step in PREPA's commitment to fiscal responsibility and sustainability for PREPA and its stakeholders. The April 2017 Fiscal Plan projected budget surpluses through 2022 and contemplated PREPA returning to bond markets by the end of that year.

The April 2017 Fiscal Plan was premised on the terms of the Prepetition RSA, which is described in detail in Section IV.B.1 of this Disclosure Statement, and detailed reforms aimed at transforming PREPA into an efficient, safe, reliable, and cost-effective utility system. Among these reforms was a 10-year, $4.66 billion capital investment program aimed at modernizing PREPA's power grid. PREPA's long-term investment program contemplated (i) $2.5 billion in capital expenditures aimed at improving PREPA's T&D infrastructure; (ii) $1.68 billion invested in public-private partnerships that would shift PREPA's portfolio of electricity generation methods to increase the use of renewable energy and natural gas and bring power plants into compliance with environmental requirements; and (iii) approximately $400 million in external financing for an offshore gas port. In addition to infrastructure improvements, the April 2017 Fiscal Plan outlined various operational reforms that would increase efficiency and cost savings, including, among others, measures that would improve employee productivity, employee management practices, security, administration, and customer service.

In addition to outlining the restructuring contemplated by the Prepetition RSA and highlighting key infrastructure and operational reforms, the April 2017 Fiscal Plan contemplated (i) changes to the treatment of CILTs that would reduce the cost of the CILTs to PREPA to the greatest extent possible without legislation and (ii) changes to PREPA's corporate governance framework that would help drive its transformation.

The Oversight Board certified the April 2017 Fiscal Plan at a public meeting on April 28, 2017, with certain amendments that were required to be made. Specifically, the Oversight Board found that the April 2017 Fiscal Plan, as originally drafted, did not provide for sufficiently low-cost reliable power. The Oversight Board required that the April 2017 Fiscal Plan be amended to, among other things, provide for the delivery of power at a projected 21 cents per kilowatt hour by 2023 (the "Target Rate"). To enable PREPA to achieve the Target Rate, the Oversight Board required amendments to the April 2017 Fiscal Plan that would lower the cost of generating power and improve the power distribution grid. The Oversight Board also called for amendments that would ensure the composition of PREPA's board of directors included members with independence and industry expertise, and that would establish a mechanism for rate approval with

153

the PREC reflecting the rate structures necessary to meet the Target Rate. The Oversight Board required that a revised fiscal plan incorporating these amendments be submitted by May 13, 2017, with subsequent deadlines for PREPA's implementation of the policies reflected in such amendments.

The Oversight Board continued to work closely with PREPA and the Government to implement its requested amendments to the April 2017 Fiscal Plan. However, a fiscal plan achieving the Target Rate ultimately could not be reached which, in part, led to the termination of the Prepetition RSA and PREPA's Title III filing.

ii.     **The April 2018 Fiscal Plan Certification**

On October 31, 2017, in light of the devastation caused by Hurricane Maria, the Oversight Board established a timeline for the certification of a new fiscal plan for PREPA to reflect post-hurricane economic realities, requiring that PREPA's revised fiscal plan be submitted by December 22, 2017. This timeline was subsequently extended, and the Governor submitted a proposed fiscal plan on January 24, 2018.

After reviewing the Governor's proposed fiscal plan, on February 5, 2018, the Oversight Board issued a notice of violation pursuant to Section 201(c)(3)(B)(i) of PROMESA and informed the Governor that the proposed fiscal plan required certain revisions before it could be certified. Specifically, the Oversight Board requested, among other things, that the fiscal plan implement measures to (i) provide a five-year plan for financial sustainability; (ii) define realistic measures to reduce costs; (iii) provide requirements for potential bidders to meet in the bidding process in connection with the Governor's recently-announced plan to privatize PREPA; and (iv) address debt service.

The Governor submitted a revised fiscal plan on March 21, 2018. After reviewing the revised fiscal plan, the Oversight Board cancelled the public meeting it had scheduled for fiscal plan certification to continue to work with the Government to develop the fiscal plan. On March 28, 2018, the Oversight Board informed the Government of additional revisions to the fiscal plan that would be required for certification including, among other things, (i) rate projections falling below 20 cents per kilowatt hour by 2023; (ii) pension reform and related financial reporting; and (iii) additional information regarding the proposed privatization of PREPA. The Governor submitted a further revised fiscal plan on April 5, 2018.

Following extensive discussions among the Government and the Oversight Board and its experts and consultants, the Oversight Board developed its own revised fiscal plan for PREPA, which it published on April 18, 2018, and certified at a public meeting on April 19, 2018 (the "April 2018 Fiscal Plan").

The April 2018 Fiscal Plan was premised on a framework for the transformation of PREPA into an efficient, affordable, and reliable power system, through improvements to infrastructure and operations, reforms that would provide for rates below 20 cents per kilowatt hour, and the restructuring of certain liabilities. This framework included (i) a shift to lower-cost power generation sources and renewable energy; (ii) rebuilding and modernizing PREPA's grid after the hurricanes; (iii) operational improvements involving areas such as billing and collections, fuel

154

management, budgeting, and labor; (iv) approximately $12 billion in capital expenditures to improve infrastructure—including approximately $8 billion needed to rebuild and improve infrastructure damaged by the hurricanes; (v) pension reform that would result in $58 million in savings per year through switching to a defined contribution system and reducing benefits by approximately 10%; and (vi) the transformation of PREPA's structure and management through a transaction that would privatize PREPA over the course of approximately eighteen (18) months.

While the details of a privatization transaction had not been determined, the April 2018 Fiscal Plan laid out general milestones for the process: (i) preparation of diligence materials and qualification requirements; (ii) determination of parties qualified to participate in the process; (iii) a request for proposal process; and (iv) the eventual closing of a transaction. In addition, the April 2018 Fiscal Plan set forth principals for an improved rate structure and a regulatory process for future private energy participants, which would need to be developed in connection with the proposed transaction.

The April 2018 Fiscal Plan projected that rates below 20 cents per kilowatt hour could be achieved by fiscal year 2023 through implementing comprehensive reforms to the power system through a complete transformation of PREPA, down from a projected 30 cents if PREPA were to maintain the status quo, with this projected reduction in rates largely driven by a shift to lower-cost power generation sources and renewable energy. The PREPA privatization and transformation process is described in detail in Section III.F of this Disclosure Statement.

### iii.   The August 2018 Fiscal Plan Certification

On May 31, 2018, PREPA submitted a request to the Oversight Board to update certain projections in its fiscal plan and to extend the deadline to submit its proposed budget for fiscal year 2019. The Oversight Board granted this request on June 7, 2018, and established a June 13, 2018, deadline for the submission of a revised fiscal plan. Subsequently, the Oversight Board announced that the April 2018 Fiscal Plan must be revised to incorporate macroeconomic projections contained in the most recent Commonwealth fiscal plan, which was certified on June 29, 2018. The Oversight Board, working with PREPA and the Government, revised the April 2018 Fiscal Plan accordingly, and on August 1, 2018, the Oversight Board certified a revised fiscal plan (the "August 2018 Fiscal Plan"). The August 2018 Fiscal Plan superseded the April 2018 Fiscal Plan.

The substance of the August 2018 Fiscal Plan was largely the same as the April 2018 Fiscal Plan, in that it is premised on a transformation and privatization of PREPA, a target rate of 20 cents per kilowatt hour by 2023, and a capital expenditure program to improve and modernize PREPA's systems.

The key changes to the projections in the August 2018 Fiscal Plan, driven by the changes to the Commonwealth's fiscal plan, are as follows for the period from fiscal years 2017 through 2023: (i) an additional 1% population decline; (ii) a 3.1% economic decline, rather than 0%, driven by the hurricane impact; (iii) an additional 1% energy efficiency; (iv) a 56% increase in fuel price inflation, rather than only 10%; and (v); an additional 1% decline in sales and consumption. Changes to a Commonwealth policy would also reduce PREPA's employer healthcare contributions, resulting in savings of up to $44.3 million per year.

155

The August 2018 Fiscal Plan also addressed certain reforms not previously described in detail in the April 2018 Fiscal Plan including, among others, (i) reforms to reduce costs of fuel procurement and (ii) a labor capacity assessment that could be used to improve employee staffing and productivity. In addition, the August 2018 Fiscal Plan highlighted the importance of obtaining federal funding in order to achieve PREPA's goals of establishing a safe, reliable, and cost-effective system. Finally, the August 2018 Fiscal Plan included an estimate of the impact of the implementation of the measures proposed in the August 2018 Fiscal Plan, providing that over $1.5 billion in value was at stake in connection with the August 2018 Fiscal Plan measures.

#### iv.     The June 2019 Fiscal Plan Certification

Also on August 1, 2018, the Oversight Board announced that additional information would be incorporated into the Commonwealth's fiscal plan, including full fiscal year 2018 actuals and revised federal disaster spending estimates, which were anticipated to improve revenue projections in the fiscal plan. Accordingly, the Oversight Board requested that PREPA submit a further revised fiscal plan to the Oversight Board by October 12, 2018, to account for these changes. The Oversight Board subsequently extended this deadline in order to focus on the certification process for a revised Commonwealth fiscal plan and, after further extensions, PREPA submitted a fiscal plan on April 28, 2019.

After reviewing the proposed fiscal plan, on May 3, 2019, the Oversight Board issued a notice of violation pursuant to Section 201(c)(3)(B)(i) of PROMESA and informed the Governor that the proposed fiscal plan required certain revisions before it could be certified. On May 30, 2019, the Governor submitted a proposed revised fiscal plan and, after extensive discussions between the Oversight Board, Government, and PREPA, the Oversight Board developed a further revised fiscal plan for PREPA. The Oversight Board certified such fiscal plan on June 27, 2019 (the "June 2019 Fiscal Plan").

The June 2019 Fiscal Plan also detailed a framework for the privatization of PREPA, under which PREPA's generation and T&D services would be separated into two separate entities, to be operated by experienced utility providers. The June 2019 Fiscal Plan detailed the work towards privatization that had completed thus far and laid out the next steps that would be required.

In addition, the June 2019 Fiscal Plan was premised on the 2019 RSA, executed on May 3, 2019, the terms of which are described in detail in Section V.C.2 of this Disclosure Statement. The June 2019 Fiscal Plan indicated that the 2019 RSA would achieve an overall debt reduction of $3 billion, which would allow for a reduction of projected rates in fiscal year 2024 from 30 cents per kilowatt hour to 25 cents, without accounting for further reductions that would be attainable through the modernization and improved efficiency of PREPA.

Like prior fiscal plans, the June 2019 Fiscal Plan also emphasized the transformation of PREPA into a financially sustainable utility providing affordable, safe, and reliable electricity services through certain infrastructure and operational reforms. The June 2019 Fiscal Plan detailed reforms that had been accomplished to date, and described an IRP intended to establish strategies to meet electricity demands and improve PREPA's systems over the next twenty (20) years.

The June 2019 Fiscal Plan also detailed numerous initiatives planned for fiscal year 2020, which would improve the cost, safety, and reliability of PREPA's system. These initiatives included, among other things: (1) implementing pension reforms to reduce underfunding and improve long-term viability of the pension plan; (2) modernizing the grid through vegetation management, establishment of "MiniGrids" which could each operate independently in the event of a grid failure to prevent system-wide blackouts, and additional projects identified to strengthen the grid; (3) renegotiating purchased power agreements to achieve short- and long-term savings and enhanced reliability; (4) finalizing and developing additional generation projects aimed at shifting to natural gas and renewable energy; (5) implementing workforce reforms to optimize employee productivity and minimize cost; and (6) developing a fuel procurement strategy that would deliver further savings.

Finally, the June 2019 Fiscal Plan outlined the status of FEMA reimbursement for PREPA's emergency expenditures following the hurricanes. PREPA had requested approximately $2.5 billion, with $1.7 billion having been obligated to PREPA, and $1.3 billion disbursed. The June 2019 Fiscal Plan also projected that inadequate federal funding could result in rate increases up to 13 cents per kilowatt hour by 2029.

v.    <strong>The June 2020 Fiscal Plan Certification</strong>

In a January 23, 2020 letter, members of the United States Congress called on the Oversight Board to revise PREPA's fiscal plan in light of the impact of the earthquakes that struck Puerto Rico in early 2020, damaging PREPA's power systems. The Oversight Board extended the deadline for PREPA to submit an updated fiscal plan several times in response to the onset of the COVID-19 pandemic, and PREPA submitted a revised fiscal plan to the Oversight Board on May 22, 2020.

After a review of this fiscal plan, in a letter dated June 5, 2020, the Oversight Board noted the significant improvements PREPA had made in the past year, but highlighted the inefficiencies that continued to result in unreliable and costly service. Specifically, PREPA continued to underspend on critical maintenance and was not utilizing its allocated maintenance budgets in fiscal years 2019 and 2020. In addition, PREPA's fuel procurement process continued to impose high costs, PREPA continued to underperform with respect to safety, and delays in implementation of various initiatives across PREPA, including natural gas conversions, repairs, and contract renegotiations, among other issues, contributed to inefficiency and cost concerns.

To address these and other structural challenges, the Oversight Board requested that the fiscal plan provide for implementation of the following initiatives in fiscal year 2021: (i) enhanced vegetation management; (ii) development of a proactive maintenance program; (iii) expansion of online billing to at least 40% of customers; (iv) implementing a damaged meter replacement program, (v) managing overtime personnel costs; and (vi) improving employee and public safety. The Oversight Board also requested additional changes to the fiscal plan, including, among several others: (a) reconciling the financial projections in the fiscal plan to financial models reflecting a higher deficit for the same period; (b) addressing the costs of PREPA's pension system; (c) adding 30-year projections to ensure long-term sustainability; (d) incorporating macroeconomic projections included in the Commonwealth's May 2020 certified fiscal plan; (e) updating rate collection projections in light of the uncertainty and decrease in collections caused by the COVID-

157

19 pandemic; (f) detailing earthquake and COVID-19 recovery efforts; and (g) eliminating the terms of the 2019 RSA due to uncertainty.

The Oversight Board requested that a revised fiscal plan be submitted by June 15, 2020, and the Governor submitted a revised fiscal plan on that date. Following extensive discussions among the Government and the Oversight Board's experts and consultants, the Oversight Board developed a revised fiscal plan for PREPA. On June 29, 2020, the Oversight Board certified the revised fiscal plan that it had developed (the "June 2020 Fiscal Plan").

The June 2020 Fiscal Plan continued to focus on the transformation of PREPA into a safe, reliable, and affordable utility, noting the progress PREPA had made in fiscal year 2020 but highlighting initiatives that needed to be accomplished, including improvements to operations, modernization of the T&D System, safety improvements, restructuring of debt, and pension reform. Accordingly, the June 2020 Fiscal Plan detailed certain initiatives to be implemented in fiscal year 2021 including, among others, the renegotiation of certain PPOAs, repair of earthquake damage and additional maintenance, improvements to fuel supply costs, energy grid modernization, measures to reduce labor costs, pension reforms, and other measures to remedy operational inefficiencies.

The June 2020 Fiscal Plan also remained focused on ongoing efforts to privatize PREPA, and detailed the privatization efforts undertaken so far as well as next steps, including the anticipated management of PREPA's T&D grid by LUMA Energy, described in detail in Section III.F of this Disclosure Statement. LUMA Energy was anticipated to reduce costs by introducing experienced personnel, modernize the grid, improve operational inefficiencies, make decisions with limited political interference, and implement efficient capital projects. PREPA's generation services would be operated independently by PREPA until a private operator is identified. The June 2020 Fiscal Plan also detailed key legislative and regulatory issues that would need to be addressed in connection with the privatization of PREPA.

The reforms set forth in the June 2020 Fiscal Plan would reduce rates from 27–30 cents per kilowatt hour to 20–22 cents per kilowatt hour between 2021 and 2025.

Finally, the June 2020 Fiscal Plan outlined the status of PREPA's federal funding, noting that of a total of $20.2 billion in CDBG-DR and CDBG-MIT funding apportioned to Puerto Rico, approximately $1.9 billion was designated to energy projects. In addition, PREPA had received approximately $1.4 billion in FEMA funds. The June 2020 Fiscal Plan also noted that inadequate federal funding may result in rate increases necessary to fund repairs and capital improvements.

## vi.  The May 2021 Fiscal Plan Certification

On February 25, 2021, the Oversight Board established a timeline for the certification of a new fiscal plan for PREPA, requiring that PREPA's revised fiscal plan be submitted by April 12, 2021. The Oversight Board requested that such fiscal plan be consistent with the plans, objectives, and initiatives established by LUMA Energy pursuant to the Operation and Maintenance Agreement (the "O&M Agreement") between LUMA Energy, PREPA, and the P3 Authority. This deadline was subsequently extended to April 20, 2021, and the Governor submitted a proposed fiscal plan on that date.

After reviewing the proposed fiscal plan, on May 3, 2021, the Oversight Board issued a notice of violation pursuant to Section 201(c)(3)(B)(i) of PROMESA and informed the Governor that the proposed fiscal plan required certain revisions and additional supporting information before it could be certified.  The Oversight Board noted the progress made to date toward the transformation of Puerto Rico's energy system, including the selection of LUMA Energy and the identification of priority capital improvement projects, but highlighted significant challenges that remained before Puerto Rico's residents would be able to benefit from a reliable and affordable energy sector.  Specifically, PREPA continued to underperform in the areas of reliability and safety, compared to industry standards.  PREPA also relied on petroleum-fired power plants, which are expensive with high emissions, and had aging infrastructure, with an average age of forty-two (42) years compared to a national average of eighteen (18) years, requiring higher maintenance costs and greater risk of mechanical failures and inefficiencies.  In light of these challenges, the Oversight Board noted that PREPA must focus on continuing to support the transition of the T&D System and Generation Asses to private operators, the transition to renewable energy and compliance with regulatory requirements, the implementation of operational measures designed to improve efficiency and reliability, and achieving financial sustainability through the restructuring and reform of legacy debt and pension obligations.

To address these challenges and areas of focus, the Oversight Board requested that the fiscal plan include the following: (i) with respect to the transition to a private operator, discussions of the transition of employees and associated costs, transparency on working capital funding for PREPA's operational reserve accounts, and the steps and timeline to be taken to achieve PREPA's reorganization; (ii) detail on debt service and debt transition charges, and, separately, projected energy rates; (iii) a proposal for pension reform and funding; (iv) transparency on capital expenditure planning and funding, including the relationship between PREPA's infrastructure plan and LUMA Energy's T&D System remediation plan; (v) uses and sources of federal funding; (vi) detail on operational measures, including generation-related and other operational measures not transferred to LUMA Energy, and the associated savings; (vii) compliance with PREB's resource determinations and regulations; (viii) updated financial projections based on the Commonwealth's fiscal plan certified in April 2021; and (ix) additional discussion of risks to PREPA's system.

The Oversight Board requested that a revised fiscal plan be submitted by May 7, 2021, and the Governor submitted a revised fiscal plan on that date.  Following extensive discussions among the Government and the Oversight Board's experts and consultants regarding the Oversight Board's concerns about the proposed fiscal plan, the Oversight Board developed a revised fiscal plan for PREPA.  On May 27, 2021, the Oversight Board certified the revised fiscal plan that it had developed (the "May 2021 Fiscal Plan").

The May 2021 Fiscal Plan continued to focus on the transformation of PREPA into a safe, reliable, and affordable utility.  Accordingly, the May 2021 Fiscal Plan detailed certain reforms to be implemented to strengthen the regulatory framework for PREPA and promote greater transparency and accountability.  The May 2021 Fiscal Plan also remained focused on the privatization of PREPA and detailed the privatization efforts undertaken so far as well as next steps for LUMA Energy's services to commence, a private operator to be selected for the Generation Assets, and collaboration with the private operators to rebuild PREPA's system.  The May 2021 Fiscal Plan also prioritized maintenance and capital improvement programs, the procurement of renewable energy capacity, and the need for debt restructuring and pension reform.

159

Specifically, the May 2021 Fiscal Plan provided for LUMA Energy to rebuild the T&D System by implementing various improvement projects focused on system improvement, repair, and modernization, employee safety and training, and customer service, with a total cost of approximately $3.85 billion from fiscal years 2022 to 2024.  During fiscal year 2022, PREPA was to focus on the transition of the Generation Assets to a private operator, necessary maintenance and other operational improvements, improving fuel procurement and delivery terms, and restructuring legacy debt and pension obligations.

Further, the May 2021 Fiscal Plan projected stable rates and electricity bills, compared to potentially significant rate and bill increases if PREPA's debt restructuring and transformation were not pursued.

The May 2021 Fiscal Plan also highlighted the importance of optimizing federal funding to enable the improvement of PREPA's systems.  Approximately $14.4 billion was obligated to rebuild energy infrastructure over the next several years and, to date, PREPA had received approximately $1.6 billion in FEMA funds primarily related to hurricane damages.  PREPA, LUMA Energy, and P3 Authority were required to cooperate to ensure effective and efficient use of federal funding under the O&M Agreement.

vii.    <b>The June 2022 Fiscal Plan Certification</b>

On February 22, 2022, the Oversight Board established a timeline for the certification of a new fiscal plan for PREPA, requiring that PREPA's revised fiscal plan be submitted by March 25, 2022.  The Oversight Board requested that such fiscal plan be consistent with the plans, objectives, and initiatives established by LUMA Energy pursuant to the O&M Agreement between LUMA Energy, PREPA, and P3 Authority.  This deadline was subsequently extended to May 11, 2022, and the Governor submitted a proposed fiscal plan on that date.

After reviewing the proposed fiscal plan, on May 25, 2022, the Oversight Board issued a notice of violation pursuant to Section 201(c)(3)(B)(i) of PROMESA and informed the Governor that the proposed fiscal plan required certain revisions and additional supporting information before it could be certified.  The Oversight Board noted the progress made to date toward the transformation of Puerto Rico's energy system, including LUMA Energy's assumption of responsibility for the operation and maintenance of PREPA's T&D System, and requested that LUMA Energy and PREPA work collaboratively to ensure the timely delivery of a revised proposed fiscal plan.  The Oversight Board also highlighted significant challenges that remained before Puerto Rico's residents would be able to benefit from a reliable and affordable energy sector.  Specifically, PREPA relied on non-renewable resources, including coal and natural gas, which are expensive and subject to volatile fuel prices.  In addition, despite the selection of new renewable generation contracts, the modernization of generation resources remained behind schedule.  In light of these challenges, the Oversight Board noted that PREPA must focus on continuing to support the transition of generation operations to private operators, the transition to renewable energy and compliance with regulatory requirements, the implementation of operational measures designed to improve efficiency and reliability, achieving financial sustainability through the restructuring and reform of legacy debt and pension obligations, and cooperating with LUMA Energy on shared services.

160

To address these challenges and areas of focus, the Oversight Board requested that the fiscal plan include, among other things, the following: (i) the timeline for finalizing the Generation Transaction and employees to private operators, and details surrounding PREPA's proposed corporate reorganization including information regarding each of its subsidiaries and affiliates; (ii) detail on debt service assuming no debt restructuring, and the impact of unrestricted debt on an average residential customer's monthly bill; (iii) a proposal for pension reform and funding; (iv) transparency on capital expenditure planning and funding, including the relationship between PREPA's infrastructure plan and LUMA Energy's T&D System remediation plan; (v) sources and uses of federal funding; (vi) detail on operational measures and related costs and savings including fuel purchasing and delivery strategy, vegetation management, and necessary maintenance; (vii) compliance with PREB's resource determinations and regulations; and (viii) updated financial projections based on LUMA Energy's budget and budget allocation.

The Oversight Board requested that a revised fiscal plan be submitted by May 31, 2022, and the Governor submitted a revised fiscal plan on June 1, 2022.  On June 7, 2022, the Oversight Board issued a notice of violation pursuant to Section 201(c)(3)(B)(i) of PROMESA and informed the Governor that the proposed fiscal plan required certain revisions and additional supporting information before it could be certified.  Specifically, the Oversight Board requested that the fiscal plan be revised to reflect a balanced budget, as the fiscal plan included aggregate expenses in excess of revenues due to LUMA Energy's proposed revenue allocation.  The Oversight Board encouraged PREPA to work collaboratively with LUMA Energy to develop a revised fiscal plan and requested that PREPA submit a revised fiscal plan by June 17, 2022.

On June 16, 2022, PREPA requested an extension of time to submit the revised fiscal plan until June 22, 2022, which the Oversight Board granted on June 20.  PREPA submitted a revised fiscal plan on June 22 and submitted additional data on June 23.  Following extensive discussions among the Government and the Oversight Board's experts and consultants regarding the Oversight Board's concerns about the proposed fiscal plan, the Oversight Board developed a revised fiscal plan for PREPA.  On June 28, 2022, the Oversight Board certified the revised fiscal plan that it had developed (the "June 2022 Fiscal Plan").

The June 2022 Fiscal Plan continued to focus on the transformation of PREPA into a safe, reliable, and affordable utility.  Accordingly, the June 2022 Fiscal Plan detailed the steps necessary to complete the transfer of maintenance and operation of PREPA's Generation Assets to private operators, and to modernize power generation resources and increase renewable energy generation. The June 2022 Fiscal Plan provides for PREPA's support of PREB's efforts to transition energy generation to renewable systems, and also outlines nearly $11 billion in federal funding available to improve the electrical system.

The June 2022 Fiscal Plan projects that electricity consumption will continue to decline due to the lack of economic growth and population decline.  The June 2022 Fiscal Plan projections assume that PREPA will make considerable progress towards achieving energy efficiency and renewable energy targets.  However, for the first time, the June 2022 Fiscal Plan includes an alternative forecast that reflects projected electricity consumption based on market conditions, including delays in the adoption of more energy efficient measures, in order to reflect uncertainties in future energy demand.

In addition, the June 2022 Fiscal Plan provides that contributions to PREPA's pension plan are insufficient, that the pension plan's assets are rapidly declining, and that pension reform is needed to support continuing needs of pensioners, balanced with the impact of future reductions in electricity demand.

### 2. Budgets

PROMESA Section 202(c)(1) sets forth a process for the approval of annual budgets that must comply with the certified plan.  In the first instance, PROMESA Section 202(c)(1) provides the Governor with the initial opportunity to develop and submit to the Oversight Board a budget for the applicable fiscal year.  The Oversight Board then conducts a detailed review of the proposed budget to ensure that expenditures are consistent with the certified fiscal plan.  If the Oversight Board determines that a budget is not compliant with the fiscal plan, the Oversight Board notifies the Governor of the violation, and the Governor may correct any violation.  If the Governor fails to develop a compliant budget, the Oversight Board develops and submits a budget to the Governor.

Through a collaborative process with the Commonwealth Government, the Oversight Board has certified budgets for PREPA that support the goals of the fiscal plans described above to ensure PREPA is on a path to becoming an affordable, safe, and reliable utility.

### i. The Fiscal Year 2018 Budget Certification

On June 19, 2017, the Governor submitted to the Oversight Board a proposed budget for fiscal year 2018 in connection with the April 2017 Fiscal Plan.  Following extensive discussions among the Oversight Board, Governor, and PREPA, the Oversight Board found that the proposed budget complied with the April 2017 Fiscal Plan.  The Oversight Board certified the budget on June 30, 2017 (the "Fiscal Year 2018 Budget").

However, as is described above, the April 2017 Fiscal Plan remained subject to revision, and the Oversight Board requested that a revised fiscal plan and compliant budget be submitted within forty-five (45) days of certification of the Fiscal Year 2018 Budget.  However, when the Oversight Board's requested amendments to the April 2017 Fiscal Plan were unable to be achieved, the Fiscal Year 2018 Budget remained in place.  The Fiscal Year 2018 Budget provided for approximately $1.07 billion in expenditures, comprised of $471 million in labor costs, $265 million in non-labor operating expenses, and $332 million in maintenance expenses.

### ii. The Fiscal Year 2019 Budget Certification

On December 12, 2017, the Oversight Board sent a letter to the Governor that outlined six guiding principles and set a timeline by which the Governor would submit a proposed budget for fiscal year 2019.  The six guiding principles provided that: (i) all budgets were to be compliant with their applicable fiscal plan and developed in accordance with modified accrual accounting standards; (ii) revenue forecasts were to be provided by the Oversight Board to the Governor, Legislative Assembly, and Boards of Directors for use in developing relevant budgets; (iii) budgeted expenses were to be properly justified; (iv) reporting blueprint templates were to be agreed to by the Governor and the Oversight Board and the Government to report pursuant to these templates; (v) clear responsibility for enforcement of all elements of the budget and reporting was

162

critical; and (vi) all expenditures, including capital expenditures, of the Commonwealth and instrumentalities were to be made only pursuant to a budget certified by the Oversight Board.

The timeline for submission of a proposed budget was extended several times, ultimately through June 18, 2018.  The Governor submitted a proposed budget on June 13, 2018, in connection with the April 2018 Fiscal Plan.  On June 26, 2018, the Oversight Board notified the Governor that the proposed budget was not compliant with the April 2018 Fiscal Plan.

The Oversight Board developed a revised budget compliant with the April 2018 Fiscal Plan and certified such budget on June 30, 2018 (the "Original Fiscal Year 2019 Budget").  The Original Fiscal Year 2019 Budget provided for total revenue of approximately $2.9 billion and expenses totaling approximately $3.1 billion, with a budget deficit of approximately $164 million.  The Oversight Board also noted that, as the April 2018 Fiscal Plan would be revised in the future to align with the most recent Commonwealth fiscal plan, the Original Fiscal Year 2019 Budget would also need to be revised.

In an August 1, 2018 letter, the Oversight Board requested that the Original Fiscal Year 2019 Budget be adjusted as a result of the revisions made in the August 2018 Fiscal Plan, which resulted in an approximately $7 million decrease in PREPA's revenue.  The Oversight Board requested that a revised budget be submitted by August 6, 2018, and PREPA submitted a revised budget on that date.

On August 12, 2018, the Oversight Board issued a notice of violation pursuant to PROMESA Section 202(c)(1)(B) regarding the draft budget, finding that it did not comply with the August 2018 Fiscal Plan because (i) expenses were inconsistent with those outlined in the fiscal plan, (ii) it did not comply with certain of the Oversight Board's guidelines for proposed budgets, and (iii) it did not include a breakdown of labor and maintenance expenses.  The Oversight Board requested that a revised budget by August 15, 2018.

A compliant budget was not submitted, and accordingly the Oversight Board developed a revised budget compliant with the August 2018 Fiscal Plan and certified such budget on September 28, 2018 (the "Revised Fiscal Year 2019 Budget"), which was deemed to be in effect as of July 1, 2018.  The Revised Fiscal Year 2019 Budget provided for total revenue of approximately $3.01 billion and expenses totaling approximately $2.98 billion, with a budget surplus of approximately $17 million.

### iii.    **The Fiscal Year 2020 Budget Certification**

On March 12, 2019, the Oversight Board announced a timeline for the fiscal year 2020 budget, under which a proposed budget was to be submitted by May 22, 2019.  A proposed budget was submitted on May 24, 2019, in connection with the June 2019 Fiscal Plan (which had originally been submitted in May).  The Oversight Board certified the June 2019 Fiscal Plan on June 27, 2019, and the Oversight Board and Government engaged in extensive discussions regarding the proposed budget.  The Governor submitted a revised budget on June 29, 2019.

The Oversight Board determined that the revised budget did not comply with the June 2019 Fiscal Plan, and accordingly the Oversight Board developed a revised compliant budget and certified such budget on June 30, 2019 (the "Fiscal Year 2020 Budget").  The Fiscal Year 2020

Budget provided for total revenue of approximately $3.2 billion and expenses totaling approximately $3 billion, in addition to a $158 million RSA settlement charge, creating a budget surplus of approximately $3.6 million.

In addition, the Fiscal Year 2020 Budget restricted PREPA from reallocating any budgeted amounts contained in the budget during fiscal year 2020, other than those budgeted for fuel and purchased power, which expenses may fluctuate due to market factors or increase as necessary to maintain the electric system. The remaining expenditures contained in the Fiscal Year 2020 Budget, including any line item, could only be reallocated with prior approval of the Oversight Board. The Fiscal Year 2020 Budget also provided for quarterly reporting with an explanation of any variances. The Oversight Board reserved the right to establish a schedule for revising the Fiscal Year 2020 Budget in its sole discretion.

iv.     **The Fiscal Year 2021 Budget Certification**

On June 19, 2020, PREPA submitted a proposed budget for fiscal year 2021, in connection with the June 2020 Fiscal Plan. On June 29, 2020, after certifying the June 2020 Fiscal Plan that same day, the Oversight Board issued a notice of violation pursuant to Section 202(c)(1)(B) of PROMESA, finding that the proposed budget was not compliant with the June 2020 Fiscal Plan because PREPA did not provide sufficient supporting information for certain expenses. The Oversight Board requested a revised budget by June 30, 2020, and the Governor submitted a revised budget on that day.

The Oversight Board determined that the revised budget did not comply with the June 2020 Fiscal Plan, and accordingly the Oversight Board developed a revised compliant budget and certified such budget on June 30, 2020 (the "Original Fiscal Year 2021 Budget"). The Original Fiscal Year 2021 Budget provided for total revenue of approximately $2.7 billion and expenses totaling approximately $2.9 billion, with a budget deficit of approximately $126 million.

The Original Fiscal Year 2021 Budget also contained provisions terminating any expenditures authorized in a prior fiscal year, requiring PREPA to provide a certification indicating whether there were unused Fiscal Year 2020 amounts for certain line items, and requiring that no unused amounts from any prior fiscal year be used unless expressly authorized by the Oversight Board. In addition, the Original Fiscal Year 2021 Budget restricted PREPA from reallocating any budgeted amounts contained in the budget without prior approval from the Oversight Board. However, with respect to expenses budgeted for fuel and purchased power, Oversight Board approval could be obtained within five (5) days after the reallocation. The Original Fiscal Year 2021 Budget also provided for monthly reporting with an explanation of any variances. The Oversight Board reserved the right to establish a schedule for revising the Original Fiscal Year 2020 Budget in its sole discretion.

On April 27, 2021, the Oversight Board announced a timeline for a revised budget for fiscal year 2021, for purposes of funding a Voluntary Transition Program ("VTP") for PREPA employees, reflecting an equity contribution from the Commonwealth to PREPA, and funding operational reserve accounts to ensure necessary working capital under the agreement by which LUMA Energy was to assume the operation and management of PREPA's T&D System. The Oversight Board requested that a revised budget be proposed by April 29, 2021. In addition, the

Oversight Board estimated that the total funding required for the reserve accounts was approximately $1 billion, with $750 million to be contributed by the Commonwealth and $250 million to be funded from PREPA's cash on hand.  The Oversight Board also requested that PREPA identify funding for the VTP.

The Oversight Board and the Governor jointly developed a revised fiscal year 2021 budget, which the Oversight Board certified on May 11, 2021 (the "Revised Fiscal Year 2021 Budget"). The Revised Fiscal Year 2021 Budget provided for total revenue of approximately $2.7 billion and operating and maintenance expenses totaling approximately $2.9 billion, like the Original Fiscal Year 2021 Budget.  In addition, a $1 billion expense to fund the reserve account, an $85 million expense to fund the VTP, and a $750 million contribution from the Commonwealth were reflected in the Revised Fiscal Year 2021 Budget, leading to a budget deficit of approximately $461 million.

Further, the Revised Fiscal Year 2021 Budget provided for the amounts contributed by the Commonwealth to fund the reserve account to be held in trust by the Department of Treasury, and not to be transferred to PREPA until LUMA Energy's service begins.  Upon termination of the LUMA Energy agreement, PREPA is required to return the funds to the Commonwealth.

The Revised Fiscal Year 2021 Budget contained the same restrictions on the use of excess funds from prior fiscal years, the reallocation of budgeted expenditures, and monthly reporting. The Revised Fiscal Year 2021 Budget was deemed to take effect on July 1, 2020.

### v.      **The Fiscal Year 2022 Budget Certification**

On February 25, 2021, the Oversight Board announced a timeline for the fiscal year 2022 budget, under which a proposed budget was to be submitted by April 12, 2021, and subsequently extended this deadline to April 20, 2021.

On May 25, 2021, the Oversight Board issued a notice of violation pursuant to Section 202(c)(1)(B) of PROMESA, as a proposed budget had not been submitted.  The Oversight Board requested that a proposed budget be submitted by May 27, 2021, and provided guidance for the proposed budget.  Specifically, the Oversight Board requested that the proposed budget, among other things, reflect a proposal for pension reform and funding, provide sufficient supporting information for certain labor expense line items, and include expenses related to the transition to LUMA Energy.  The Governor submitted a proposed budget on May 27, 2021.

The Oversight Board determined that the proposed budget did not comply with the May 2021 Fiscal Plan, and accordingly the Oversight Board developed a revised compliant budget and certified such budget on May 31, 2021 (the "Original Fiscal Year 2022 Budget").  The Original Fiscal Year 2022 Budget provided for total revenue of approximately $3.1 billion and expenses totaling approximately $3.1 billion, with a budget surplus of approximately $6 million.

On June 17, 2021, after consulting with PREPA regarding certain technical adjustments to the Original Fiscal Year 2022 Budget, the Oversight Board requested that the Governor submit a revised budget by June 21, 2021.  The Governor submitted a revised budget on that date and, on June 24, 2021, the Oversight Board issued a notice of violation pursuant to PROMESA Section 202(c)(1)(B), requesting that the proposed budget be corrected to (i) reflect a reduction in labor expenses to account for employees to retire or otherwise resign from employment during Fiscal

Year 2022, (ii) not reflect payment of a Christmas Bonus, consistent with the May 2021 Fiscal Plan, (iii) update the shared services budget which was based on outdated information, and (iv) correct the shared services methodology, which differed from that used by LUMA Energy and PREB.  The Governor submitted a revised proposed budget on June 25, 2021.

The Oversight Board determined that the revised budget did not comply with the May 2021 Fiscal Plan, and accordingly the Oversight Board developed a revised compliant budget and certified such budget on June 30, 2021 (the "Revised Fiscal Year 2022 Budget").  The Revised Fiscal Year 2022 Budget provided for total revenue of approximately $3.1 billion and expenses totaling approximately $3.1 billion, with a budget surplus of approximately $6.5 million.

The Original Fiscal Year 2022 Budget and Revised Fiscal Year 2022 Budget contain the same restrictions on the use of excess funds from prior fiscal years and the reallocation of budgeted expenditures, but provide for quarterly rather than monthly reporting.  The Revised Fiscal Year 2022 Budget was deemed to take effect on July 1, 2021.

### vi.    The Fiscal Year 2023 Budget Certification

On February 22, 2022, the Oversight Board announced a timeline for the fiscal year 2023 budget, under which a proposed budget was to be submitted by June 1, 2022.  This deadline was subsequently extended to June 22, 2022, and the Governor submitted a proposed budget on that date.

On June 28, 2022, the Oversight Board issued a notice of violation pursuant to Section 202(c)(1)(B) of PROMESA, as a proposed budget had not been submitted.  The Oversight Board requested that a proposed budget be submitted by June 29, 2022, and provided guidance for the proposed budget.  Specifically, the Oversight Board requested that the proposed budget, among other things, eliminate operational deficits and prioritize necessary maintenance, reallocate certain expenses to other PREPA affiliates, decrease the allowance of revenues from electricity sales for unrecoverable "bad debt" expenses, and transparently allocate expenses rather than aggregating them together.

The Governor did not submit a proposed budget by the deadline, and accordingly the Oversight Board developed a revised budget and certified such budget on June 30, 2022 (the "Fiscal Year 2023 Budget").  The Fiscal Year 2023 Budget provided for total revenue of approximately $4.6 billion and expenses of $4.6 billion.

*[Remainder of Page Intentionally Left Blank]*

## V.    Overview of PREPA's Title III Case

A.    **Commencement of PREPA's Title III Case**

1.    **Filing of the PREPA Title III Petition**

Prior to PROMESA's enactment, PREPA had negotiated the Prepetition RSA with certain of its creditors, which, although not final or legally enforceable, was intended to culminate in an agreement that could form the basis of a qualifying modification under Title VI of PROMESA. Under the Prepetition RSA, Bondholders agreed to a 15% reduction in the principal amount of PREPA's outstanding bonds.  In exchange, Bondholders claims were to be converted to secured claims.  Additionally, the Prepetition RSA protected Bondholders by imposing rate securitization, whereby PREPA could implement automatic rate increases in response to decreased demand. After taking office in January 2017, Governor Rosselló oversaw renewed negotiations with Bondholders.  From the entry into the Prepetition RSA through the commencement of this Title III Case, PREPA and the Oversight Board continued to negotiate a comprehensive debt adjustment, and agreed to extend the term and amend the provisions of the Prepetition RSA on multiple occasions. Ultimately, however, the parties could not come to an agreement on numerous material issues, including, but not limited to, how Monoline Insurers would provide required principal deferrals and the establishment of a new electric rate structure.  At the same time, PREPA had failed to secure hundreds of millions of dollars in short-term liquidity that would have been necessary for the implementation of the Prepetition RSA.

On June 28, 2017, the Oversight Board denied certification of the Prepetition RSA and did not grant authority to PREPA to invoke Title VI of PROMESA.  Accordingly, on July 2, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA Sections 104(j) and 206 and filed a voluntary petition for relief for PREPA pursuant to PROMESA Section 304(a), commencing the PREPA Title III Case.  On October 6, 2017, the Title III Court entered an order granting the joint administration of the Title III Cases of the Commonwealth, HTA, ERS, and COFINA, and this Title III Case, for procedural purposes only [ECF No. 340].  The commencement of this Title III Case triggered the operation of the automatic stay in Bankruptcy Code section 362, thereby providing PREPA continued protection from enforcement actions for the duration of this Title III Case.[220]

2.    **Appointment of Statutory Committees**

On June 15, 2017, the UCC and the retiree committee (the "Retiree Committee") were appointed [Case No. 17-bk-3283, ECF Nos. 338, 340].  The current members of the UCC are (i) The American Federation of Teachers ("AFT"); (ii) Baxter Sales and Distribution Puerto Rico Corp.; (iii) Drivetrain, LLC, as the Creditors' Trustee for Doral Financial Corporation; (iv) Genesis Security Services, Inc.; (v) Service Employees International Union; (vi) Tradewinds Energy Barceloneta, LLC.; and (vii) The Unitech Engineering Group, S.E. [Case No. 17-bk-3283, ECF No. 20691].  The current members of the Retiree Committee are (i) Blanca Paniagua; (ii) Carmen

---

[220] PROMESA § 301(a).

Nunez; (iii) Jose Marin; (vi) Juan Ortiz; (v) Lydia Pellot; (vi) Marcos A. Lopez; (vii) Miguel Fabre; (viii) Milagros Acevedo; and (ix) Rosario Pacheco [Case No. 17-bk-3283, ECF No. 1062].

B.    **Natural Disasters and the Oversight Board's Response**

1.    **Hurricanes Irma and Maria**

Shortly following the commencement of PREPA's Title III Case, in September 2017, Hurricanes Irma and Maria struck Puerto Rico causing widespread damage throughout Puerto Rico and exacerbating the economic challenges described above.  Hurricane Maria made landfall in Puerto Rico on September 20, 2017, bringing sustained winds of 155 miles per hour and significant rainfall over a 30-hour period.  Hurricane Maria crossed Puerto Rico diagonally, entering through the southeast and exiting through the northwest region of Puerto Rico.  The hurricane caused catastrophic destruction in Puerto Rico, leaving it completely without power and flooding many streets and roads.  Only two weeks prior to Hurricane Maria, Hurricane Irma—one of the strongest hurricanes ever recorded in the Atlantic—passed by Puerto Rico's northern coast.

Hurricane Irma and Maria caused catastrophic damage to PREPA's T&D System, impacted Generation Assets, and took down critical communications and control infrastructure, resulting in the longest power outage in U.S. history.[221]  Over 2,700 transmission poles were damaged, and 92% of inspected substations were affected, with 41% of substations suffering major damage.[222]  PREPA estimated approximately $1.2 billion in total loss of revenue collected for the first six months after the hurricanes.[223]

As a result of the massive impact of the hurricanes, the Government and the Oversight Board undertook a series of actions to address the crisis.  The Oversight Board (through its members and executive staff) was active in Washington D.C. advocating for the necessary resources to support Puerto Rico's recovery, critical rebuilding efforts, and necessary liquidity to maintain services.  The Oversight Board joined the Governor in requesting cost-sharing waivers, lifting funding caps, increased financial assistance, and most importantly, expedited responses to the Governor's requests.[224]  Numerous Oversight Board officials appeared before several Congressional committees to testify.[225]  Additionally, the Oversight Board wrote to the President,

---

[221] *See* PREPA Financing Motion, at ¶ 17.

[222] *2022 Certified Fiscal Plan for the Puerto Rico Electric Power Authority*, 67 (June 28, 2022).

[223] *See* PREPA Financing Motion, ¶ 19.

[224] Press Release, Fin. Oversight & Mgmt. Bd. for P.R., Oversight Board Urges Maximum Support for Puerto Rico with Trump Administration Officials, Congress (Sept. 30, 2017), https://drive.google.com/file/d/1kD5kywyNexMkbEdtjQynZax5gcnYPhSV/view.

[225] *See* Written Testimony of Natalie Jaresko, Executive Director, Fin. Oversight Mgmt. Bd. for P.R. before the House Committee on Natural Resources, "Examining Challenges in Puerto Rico's Recovery and the Role of the Financial Oversight and Management Board" (Nov. 7, 2017), https://drive.google.com/file/d/1prDID1QmnX_nD2XwZmRl2AzAZzgIDsMA/view; Written Testimony of Noel Zamot, Executive Director , Fin. Oversight Mgmt. Bd. for P.R. before the House Committee on Natural Resources, "Examining Challenges in Puerto Rico's Recovery and the Role of the Financial Oversight and Management Board" (Nov. 7, 2017), https://drive.google.com/file/d/1p9zv_86gXQ7XeD1o9Gopw_xs5c-5KrGp/view.

the Secretary of the Treasury and the Congressional Leadership formally requesting support.[226] The Oversight Board met with federal and territorial authorities in Puerto Rico, from the aftermath of the hurricane until present day, including dozens of meetings with FEMA officials at the local headquarters, and dozens of meetings with territorial officials.

On September 21, 2017, the Oversight Board authorized the Government to "reallocate" up to $1 billion of its budget for emergency funding to recover from the hurricanes' effects and to ensure it had resources to begin immediate emergency response and recovery efforts in anticipation of federal funds.  This would enable the Government to act quickly to reapportion (reprogram) funds as needed, without seeking the Oversight Board's approval prior to movement of funds.

On October 4, 2017, taking into account the need to focus on the needs of residents to restore basic services and the nature of the destruction across Puerto Rico, the Oversight Board (a) withdrew the litigation it had initiated to enforce the Government's compliance with certain measures in the certified fiscal plan and (b) postponed the implementation of any furlough measures for at least a year.

Additionally, the Oversight Board certified the recovery plan (the "Recovery Plan") on August 28, 2018, as directed by Congress in the Bipartisan Budget Act, but provided two caveats to its certification.  First, the Oversight Board expressed concern that the Recovery Plan lacked sufficient detail of funding sources and estimated a much greater amount of federal funding than the certified fiscal plan for Puerto Rico projected.  Second, the Oversight Board indicated that the Recovery Plan did not address oversight of federal funds and the recovery process.  The Oversight Board did not receive the Recovery Plan for consideration until after the Government had provided it to Congress.

2.    **Hurricane Dorian**

On August 27, 2019, President Trump issued an emergency declaration to address Hurricane Dorian, which made landfall in Puerto Rico on August 26, 2019.  The declaration authorized FEMA to coordinate disaster relief efforts.  On August 28, 2019, the Oversight Board authorized the use of $260 million in aggregate emergency reserve funds from Fiscal Year 2019 and Fiscal Year 2020 to address Hurricane Dorian.

---

[226] *See* Letter from José B. Carrión, Fin. Oversight & Mgmt. Bd. for P.R. to United States Congressional Leaders, Oct. 3, 2017, https://drive.google.com/file/d/1XkrMHCDxl-eiDbAcnjt8RFHrri7jAoCj/view; Letter from José B. Carrión, Fin. Oversight & Mgmt. Bd. for P.R. to United States President Trump (Oct. 6, 2017), https://drive.google.com/file/d/1gkGAw4WcH9kIBNOsANsnTw7-yKoiCDkx/view; Letter from Jose B. Carrión, Fin. Oversight & Mgmt. Bd. for P.R. to Steven Mnuchin, Secretary of the United States Treasury (Oct. 10, 2017), https://drive.google.com/file/d/1dHC0i3yiggV_5aDXG-Lmy0lkLR1tCih6/view; Press Release, Fin. Oversight & Mgmt. Bd. for P.R., The Governor and the Financial Oversight and Management Board Each Ask the Trump Administration to Address Liquidity Issues Following Hurricane Maria (Oct. 10, 2017), https://drive.google.com/file/d/1gJmhmQMusQDTo2dh6Bdh-0jYJHrU5aQH/view.

169

### 3.      January 2020 Earthquakes

Beginning on December 28, 2019, a series of earthquakes and aftershocks struck Puerto Rico.  More than 2,000 earthquakes or tremors have struck Puerto Rico since then, the strongest of which took place on January 7, 2020, reaching a peak magnitude of 6.4.

After the January 7, 2020 earthquake, FEMA announced federal emergency aid had been made available to Puerto Rico to supplement local response efforts, following a request from Governor Vazquez.  The Oversight Board also approved the Commonwealth's request for access to emergency reserve funds from Fiscal Years 2019 and 2020 in the amount of approximately $260 million to manage near-term earthquake emergency-related expenses.  These emergency reserve funds were included and certified by the Oversight Board in the Fiscal Year 2019 and Fiscal Year 2020 budgets so that the Commonwealth would be prepared to fund emergency needs in the event of another natural disaster following Hurricane Maria.  On January 16, 2020, President Trump signed a major disaster declaration (the "Major Disaster Declaration") authorizing access to Category A and B relief from the federal government at a reimbursement rate of 75% federal and 25% local.  The Major Disaster Declaration supplements local recovery efforts in the aftermath of the continued earthquakes.  Currently, sixteen (16) municipalities are covered by the Major Disaster Declaration enabling a range of federal assistance, including certain provisions under the Stafford Act.  The municipalities under the current Major Disaster Declaration include: Adjuntas, Cabo Rojo, Corozal, Jayuya, Lajas, Lares, Maricao, San Germán, San Sebastián, Villalba, Guánica, Guayanilla, Peñuelas, Ponce, Utuado, and Yauco.

On January 16, 2020, the U.S. House Appropriations Committee also introduced a supplemental spending bill that would provide Puerto Rico with an additional $3.35 billion in disaster relief to assist with damage caused by the ongoing earthquakes and seismic activity.  The $3.35 billion package includes $100 million for education, $1.25 billion to rebuild roads, and $2 billion in additional CDBG-DR disaster relief.

### 4.      COVID-19 Impact and Response

As a result of the health threat and to contain the virus spread across Puerto Rico, then-Governor Vázquez-Garced issued an executive order on March 12, 2020, declaring a state of emergency in Puerto Rico to concentrate all efforts and implement necessary measures to safeguard the health, well-being, and public safety of the citizens of Puerto Rico.  As a result of social and lock-down protections, including curfews, put in place to contain the virus, PREPA's operations and financial performance drastically declined.  These measures required PREPA to halt all non-essential work, including vegetation management and maintenance projects, and led to a decline in generation levels and customer sales.  By late March 2020, average daily collections had dropped by 50%, forcing PREPA to implement strict financial controls to preserve liquidity.  By the end of June 2020, average daily collections had returned to normal levels relative to forecast and expected collections.

To help combat the economic effects of the COVID-19 lockdown procedures, the Governor's executive order authorized the Commonwealth's Secretary of the Treasury and the Director of the Office of Management and Budget of the Commonwealth ("OMB") to set up a special budget, from any available funds, including the Emergency Reserve, to cover all necessary

170

costs for the containment of COVID-19 throughout Puerto Rico and sharing information with municipalities.

Federal and local government funds were provided to individuals, families, businesses, nonprofits, and other organizations across the United States, including Puerto Rico. On March 3, 2020, the Oversight Board made an initial $5 million of Emergency Reserve Funds available to the Government to contain and mitigate COVID-19. On March 13, 2020, the Oversight Board made the remainder of the $260 million of Emergency Reserve Funds available to respond to the pandemic. On March 23, 2020, the Government and the Oversight Board agreed to provide $787 million in financial support (Emergency Measures Support Package) to those on the front line of the COVID-19 pandemic and those most affected by the emergency measures that have resulted.

On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act, Public Law No. 116-136 (the "CARES Act"), was signed into law by then-President Donald J. Trump. The CARES Act created the Coronavirus Relief Fund ("CRF"), which provided $150 billion in general assistance for domestic governments. Under the CRF, $2.2 billion of relief was directed to Puerto Rico. The deadline for spending CRF funds was initially December 30, 2020, but was extended through December 31, 2021, by the Consolidated Appropriations Act, 2021, Public Law No. 116-260, which was signed into law on December 27, 2020. In addition to the extension, the Act also combines $900 billion in stimulus relief for the COVID-19 pandemic in the United States with a $1.4 trillion omnibus spending bill for the 2021 Federal Fiscal Year. Of the approximately $900 billion of stimulus relief, Puerto Rico is estimated to receive $7 billion. On March 11, 2021, President Biden signed into law the American Rescue Plan Act of 2021 ("ARP"). The ARP provides $1.9 trillion nationally in funding, program changes and tax policies aimed at mitigating the continuing effects of the pandemic. The ARP provided a further $350 billion in aid to state and local governments, of which Puerto Rico (including its municipalities) is set to receive $4 billion.

### 5. Hurricane Fiona

On September 18, 2022, Hurricane Fiona made landfall in southwestern Puerto Rico as a Category 1 hurricane, dropping as much as thirty-two (32) inches of rain in some areas of Puerto Rico. As a result of Hurricane Fiona, Puerto Rico suffered massive floods, mudslides, and an island-wide power outage. Although damage assessments are ongoing, Hurricane Fiona is estimated to have resulted in over $1 billion in damage.[227]

### 6. Federal Disaster Assistance Funding

#### i. Extent of Damage

There are multiple views on how to measure the impact and extent of damage to PREPA's infrastructure caused by Hurricanes Irma and Maria and recent earthquakes. The following

---

[227] *See* National Oceanic and Atmospheric Administration, Billion-Dollar Weather and Climate Disasters, https://www.ncei.noaa.gov/access/billions/events/PR/2022?disasters[]=all-disasters.

sources provide various methods of measuring Hurricanes Irma's and Maria's impact and extent of damage:

- Puerto Rico's Build Back Better plan, published in November 2017 estimates rebuilding costs at $94.4 billion — $17.8 billion of which was requested for power grid repairs.[228]

- Puerto Rico's "Transformation and Innovation in the Wake of the Devastation," certified by the Oversight Board in August 2018, outlines the Government of Puerto Rico's perspective on the full set of capital investments needed for Puerto Rico to recover from Hurricanes Irma and Maria. Fully funding these roughly 270 actions would require approximately $139 billion over the years 2018–2028.[229]

- The National Oceanic and Atmospheric Administration estimate of damage in Puerto Rico and the U.S. Virgin Islands due to Maria is $90 billion, with a 90% confidence range of +/- $25.0 billion, or $65.0 to $115.0 billion.[230]

- In December 2018, the Puerto Rico Planning Board issued a report stating the storm's impact on the economy was $43.135 billion,[231] which included both physical damage and business interruption (*e.g.*, losses due to systems going down, etc.).

Additionally, the earthquakes caused both significant damage to homes and buildings on Puerto Rico's southern coast as well as significant damage to PREPA's Costa Sur power plant, an 820 MW natural gas-fired facility which typically generates as much as 25% of Puerto Rico's power.[232] Repairs to the Costa Sur plant cost an estimated $39 million.[233]

ii.    **Federal Aid Provided and To Be Provided**

The Certified Fiscal Plan projected that approximately $14 billion of disaster relief funding in total from federal and state sources have been obligated to rebuilding Puerto Rico's energy infrastructure.[234]

The major sources of disaster relief funding are detailed below:

---

[228]    Governor    of    Puerto    Rico,    *Build    Back    Better    Puerto    Rico*    (Nov.    2017), http://www.documentcloud.org/documents/4198852-Build-Back-Better-Puerto-Rico.html.

[229] Central Office for Recovery, Reconstruction and Resiliency, *Transformation and Innovation in the Wake of Devastation: An Economic and Disaster Recovery Plan for Puerto Rico* (Aug. 8, 2018), https://pr-transformation-innovation-plan.pdf (prsciencetrust.org).

[230] Richard J. Pasch, Andrew B. Penny, & Robbie Berg, *National Hurricane Center Tropical Cyclone Report: Hurricane    Maria*    (National    Hurricane    Center)    (Feb.    14,    2019), https://www.nhc.noaa.gov/data/tcr/AL152017_Maria.pdf.

[231] *See* Antonio R. Gómez, *Junta de Planificación revisa sus números y reporta un alza,* Negocios, Dec. 4, 2018.

[232] *2022 Certified Fiscal Plan for the Puerto Rico Electric Power Authority*, 41 (June 28, 2022).

[233] *Id.*

[234] *2022 Certified Fiscal Plan for the Puerto Rico Electric Power Authority*, 81 (June 28, 2022).

- **FEMA's 428 and 406 Public Assistance Programs:**  FEMA is authorized by sections 406 and 428 of the Stafford Act to provide assistance to local governments via its Public Assistance Program ("PA Program") to assist in recovery efforts from federally declared disasters or emergencies.  In September 2020, FEMA announced its plans to earmark approximately $9.5 billion for PREPA to repair and/or replace electrical systems including thousands of miles of T&D lines, electrical substations, power Generation Systems, and office buildings, and make other grid improvements under the PA Program.[235]  As of February 2022, PREPA has received approximately $1.8 billion in FEMA PA Program funds.[236]   The funds received relate to contractor expenses, mutual aid assistance, incremental costs incurred by PREPA related to increased peaking unit usage, and other eligible costs incurred by PREPA.  Additionally, PREPA qualified to receive additional funds related to Section 406 of the Stafford Act, which funds mitigation measures in conjunction with the repair of disaster-damage facilities.  As of February 2022, PREPA has received $1.6 billion in PA Program funds related to both Hurricanes Irma and Maria.[237]   PREPA has also received $238 million out of the total $317 million earmarked under the PA Program for damage caused by the thousands of earthquakes occurring from 2019 until now.[238]

- **FEMA's 404 Hazard Mitigation Grant Program:**  Under Section 404 of the Stafford Act, FEMA is authorized to provide assistance through the "FEMA 404 HMGP" for long-term hazard reduction after a major disaster.  "FEMA 404 HMGP" funds also support the reduction and removal of hazards during the immediate recovery from a disaster.  To date, PREPA has not received any funds under the "FEMA 404 HGMP".[239]

- **HUD Community Development Block Grant-Disaster Recovery (CDBG-DR):** Based on the action plan submitted by the Puerto Rico Department of Housing,[240] the federal HUD provides CDBG-DR funding that can be used for assistance to individuals (*e.g.*, housing repair) and public assistance (*e.g.*, infrastructure development), or by the Government for certain operational costs (*e.g.*, to cover their disaster relief cost match).  To date, PREPA has received $1.8 million in CDBG funds related to Hurricane Irma peaking units.[241]

---

[235] *Id.* at 90.

[236] *Id.* at 88, Exhibit 32.

[237] *Id.* at 87.

[238] *Id.*

[239] *Id.* at 88.

[240] The Governor of Puerto Rico appointed the Puerto Rico Department of Housing as the responsible agency to administer the CDBG-DR grant program in close collaboration with the COR3.  The HUD approved the Action Plan corresponding to the first allocation of $1.5 billion on July 29, 2018. On February 28, 2019, HUD approved Substantial Amendment 1 to the Action Plan.  Non-Substantial Amendment 2 was submitted to HUD in August 2019.  Action Plan and subsequent amendments, https://www.cdbg-dr.pr.gov/en/action-plan/.

[241] *2022 Certified Fiscal Plan for the Puerto Rico Electric Power Authority*, 89 (June 28, 2022).

C.  **2019 Restructuring Support Agreement**

1.  **The Preliminary RSA**

After months of negotiation, on July 30, 2018, the Oversight Board and AAFAF announced that they had entered into a preliminary restructuring support agreement with members of the Ad Hoc Group. The Preliminary RSA contemplated the inclusion of a variety of restructuring terms in an eventual plan of adjustment, and provided that the parties would cooperate to negotiate a definitive restructuring support agreement.

2.  **The 2019 RSA**

Following the Preliminary RSA, the Oversight Board and AAFAF continued negotiating with the Ad Hoc Group regarding the terms of a definitive restructuring support agreement. Ultimately, Assured joined the negotiations. On May 3, 2019, these efforts to reach a consensual resolution culminated in the execution of the 2019 RSA, which provided for the resolution of the claims and entitlements of the Ad Hoc Group, Assured, and other holders of uninsured PREPA bonds that joined the 2019 RSA. On September 9, 2019, the 2019 RSA was amended to permit the joinder of Syncora and National.

The 2019 RSA was a complicated settlement agreement that addressed the economic issues facing its parties. The 2019 RSA provided for the allowance of the Monoline Insurers and the Ad Hoc Group, (collectively, the "Supporting Holders") claims as secured claims in the reduced amounts described below. In turn, the 2019 RSA provided for the settlement of all litigation that the Supporting Holders could bring arising from their bond claims, including their right to a receiver under PREPA's Enabling Act.

To settle the Ad Hoc Group's asserted security interests in PREPA's revenues and other rights and claims, the 2019 RSA would have provided parties to the 2019 RSA with Tranche A securitization bonds at an exchange ratio of 67.5% and contingent Tranche B securitization bonds at an exchange ratio of 10%. The 2019 RSA also contained a securitization structure, whereby (i) the Tranche A and B bonds were to be issued by a separate, special purpose entity, rather than PREPA itself; and (ii) there would be no default on the Tranche A or Tranche B bonds if the transition charge did yield sufficient funds to pay debt service.

The 2019 RSA contemplated the enactment of legislation by the Legislative Assembly to implement the PREPA restructuring transaction. Specifically, the 2019 RSA contemplated legislation: (i) imposing a non-bypassable and unavoidable transition charge; (ii) granting a lien over specified "Restructuring Property" to the holders of new bonds; and (iii) providing for the enactment of certain demand protections intended to provide reasonable assurances that the transition charge would have been paid by customers that remained on the grid but installed solar equipment, and that future Government policies relating to renewable energy or solar would not have reduced transition charge revenues otherwise contemplated by the 2019 RSA parties. Certain bondholders assert that, in some circumstances, the 2019 RSA also provided for an agreed-upon secured claim for bondholders which would assure them substantially equivalent recovery even if the securitization contemplated by the 2019 RSA was not achievable due to failure to pass legislation. This summary is qualified in its entirety by reference to the 2019 RSA itself.

174

Although the Oversight Board made numerous attempts to obtain the required legislation, it was unable to do so. On March 8, 2022, AAFAF announced its decision to terminate the 2019 RSA, pursuant to its right to terminate the 2019 RSA under Sections 9(d)(iii) and 27 of the 2019 RSA. The Government concluded that implementation of the 2019 RSA was neither feasible nor in the best interest of Puerto Rico, as the circumstances prevailing when the 2019 RSA was originally negotiated in 2019 had significantly changed, including worldwide economic conditions, such as rising inflation and significant surges in the price of crude oil due to the war in Ukraine.

3.   **Litigation Relating to the RSA**

i.   **Rule 9019 Motion**

On May 10, 2019, the Oversight Board, AAFAF, and PREPA filed the 9019 Motion seeking approval of certain settlements embodied in the 2019 RSA. Thes 9019 Motion asked the Court to approve certain aspects of the settlements contained in the 2019 RSA, included, among other things, (i) allowing certain claims as secured claims in reduced amounts; (ii) providing parties supporting the 2019 RSA with consideration and distributions through administrative expense claims; (iii) approving the settlement terms requiring PREPA to file and confirm a plan of adjustment in line with the terms of the 2019 RSA; and (iv) approving the settlement terms requiring the supporting parties to vote in favor of such a plan of adjustment. Numerous parties, including the UCC, UTIER, SREAEE, and the Fuel Line Lenders, filed objections to the 9019 Motion on October 30, 2019, on the grounds, including others, that the settlement was unreasonable because PREPA Bonds are secured solely by, and have recourse solely to, amounts credited to certain deposit accounts. *See, e.g.*, [ECF Nos. 1697, 1700, 1701]. In March 2020, while the Oversight Board prepared to prosecute the 9019 Motion following several adjournments, the COVID-19 pandemic reached the shores of Puerto Rico and the U.S. mainland in full force. On March 27, 2020, in response to the emerging threat of COVID-19 and its potential long-term effects on the people and economy of Puerto Rico, the Oversight Board, PREPA, and AAFAF jointly filed an urgent motion seeking to indefinitely adjourn all deadlines relating to the 9019 Motion [ECF No. 1947] (the "Adjournment Motion"). On April 2, 2020, the Title III Court granted the Adjournment Motion. [ECF No. 1954]. Subject to a single exception, PREPA's bondholders and the Monoline Insurers either consented to or did not object to the Adjournment Motion or any of its extensions. Throughout this time 9019 Motion was not heard or otherwise resolved and remained pending.

On August 18, 2020, the UCC filed a motion requesting the Title III Court terminate the 9019 Motion [Case No. 17-bk-4780, ECF No. 2144] (the "Motion to Terminate"). The UCC argued the Title III Court did not have jurisdiction over the 9019 Motion since, they alleged, the 2019 RSA no longer constituted a functioning or viable agreement. The Oversight Board, AAFAF, and PREPA filed a joint objection to the UCC's motion on September 1, 2020. The objection noted that the 2019 RSA still remained in effect, the UCC provided no basis for allowing the Title III Court to exercise its discretion and terminate the 9019 Motion, and even if such basis existed, the UCC failed to explain why the Title III Court should exercise its discretion in such a manner. Upon considering additional briefing, on November 4, 2020, the Title III Court denied the Motion to Terminate without prejudice to renewal after April 21, 2021, because the 2019 RSA had not been terminated and the continued stay did not prejudice the UCC.

175

On December 4, 2020, the UCC appealed the Title III Court's order to the First Circuit. Thereafter, on February 2, 2021, the First Circuit entered an order directing the UCC to show cause why the appeal should not be dismissed for lack of jurisdiction. On May 21, 2021, the First Circuit dismissed the appeal for lack of jurisdiction and on June 11, 2021, the First Circuit issued its mandate.

After termination of the 2019 RSA on April 1, 2022, the Title III Court issued an order requiring certain parties to enter into mediation over PREPA's restructuring. Mediation continued until September 15, 2022, when the Mediation Team declined to further extend the mediation period. On September 29, 2022, the Title III Court entered an order calling for PREPA and relevant parties to continue mediating while litigation of the Amended Lien & Recourse Challenge went forward.

ii.     **"Current Expenses" Adversary Proceedings**

a.     **Fuel Line Lenders**

On July 9, 2019, the Fuel Line Lenders filed a complaint against the Debtor and other parties requesting the Title III Court enter judgment (i) declaring that all amounts allegedly owed to them are "Current Expenses" under the Trust Agreement; (ii) further declaring that the Bond Trustee holds no lien on PREPA's revenues beyond the monies deposited in the "Sinking Fund," and such lien is not enforceable until the Fuel Line Lenders' debts, as purported "Current Expenses" under the Trust Agreement, are paid in full; and (iii) disallowing the "Bond Trustee's claim" to the extent it seeks moneys outside the Sinking Fund and it seeks to recover before the Fuel Line Lenders.

The Oversight Board and AAFAF filed motions to dismiss the amended complaint on November 11, 2019. The Oversight Board argued dismissal was warranted since (i) the Fuel Line Lenders are parties to nor third-party beneficiaries of the Trust Agreement; (ii) the Trust Agreement is not an enforceable subordination agreement under section 510(a) of the Bankruptcy Code; (iii) the complaint constitutes a claim objection against the Bond Trustee, and the Fuel Line Lenders lack standing to bring such an objection; and (iv) the 2019 RSA did not harm the Fuel Line Lenders' rights. The Title III Court subsequently adjourned all deadlines and hearings in connection with the adjournment of the 9019 Motion.

Following the termination of the 2019 RSA, the Title III Court, in its September 29, 2022 order, terminated without prejudice (for statistical purposes) the various motions to dismiss. The order also stayed litigation of the "Current Expense" issues until either after resolution of the now pending Amended Lien & Recourse Challenge or during the plan confirmation process, if necessary.

On December 1, 2022, PREPA and the Fuel Line Lenders entered into the Fuel Line Lender PSA, under which the Fuel Line Lenders agreed to settle the Fuel Line Lender Priority Action in exchange for the treatment on Allowed Fuel Line Loan Claims described in this Disclosure Statement and the Plan. *See* Section VI.C below.

b.     **SREAEE**

176

On October 30, 2019, SREAEE filed an amended complaint against the Debtor and other parties. Similarly to the Fuel Line Lenders, SREAEE requested the Title III Court determine that all amounts owed to SREAEE are "Current Expenses" under the Trust Agreement. SREAEE argued these "Current Expenses" must be paid before any payments are made to the Bond Trustee or the Debtor's bondholders. SREAEE further argued it is a third party beneficiary of the Trust Agreement and that the Trust Agreement constitutes a valid subordination agreement under the Bankruptcy Code.

The Oversight Board, and AAFAF jointly filed a motion to dismiss the amended complaint (the "Joint Motion to Dismiss"). The Joint Motion to Dismiss describes SREAEE's complaint as a "collateral attack" on the 2019 RSA and related PREPA 9019 Motion. The Oversight Board relies on substantially the same arguments as in its motion to dismiss the Fuel Line Lenders' amended complaint, with the additional assertions that (i) SREAEE's outstanding debt does not constitute a "Current Expense" under the Trust Agreement and (ii) the Title III Court lacked subject matter jurisdiction to review PREPA's certified fiscal plan (which was implicated by SREAEE's complaint). The Title III Court adjourned all deadlines and hearings on this matter due to the COVID-19 pandemic. As part of its September 29, 2022 order, the Title III Court terminated without prejudice the Joint Motion to Dismiss. The order also stayed litigation of the "Current Expenses" issue until either after resolution of the now pending Amended Lien & Recourse Challenge or during the plan confirmation process, if necessary.

### D.    Claims Process and Bar Date

#### 1.    Section 924/925 Lists

Bankruptcy Code section 924 requires debtors to file a list of creditors ("List of Creditors"). Bankruptcy Code section 925 provides that "[a] proof of claim is deemed filed" for claims set forth on the List of Creditors required by Bankruptcy Code section 924 except as to claims that are "listed as disputed, contingent, or unliquidated." 11 U.S.C. § 925.[242]

#### 2.    Bar Date Orders (the Debtors, Other Than PBA)

Pursuant to the *Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claims and (B) Approving Form and Manner of Notice Thereof* [Case No. 17-bk-3283, ECF No. 2521] (the "Initial Bar Date Order") and the *Order (A) Extending Deadlines for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof* [Case No. 17-bk-3283, ECF No. 3160] (together with the Initial Bar Date Order, the "Bar Date Orders"), the Title III Court established the following bar dates for filing proofs of claim in the PREPA Title III Case:

- June 29, 2018, at 4:00 p.m., Atlantic Standard Time, as the general bar date for the filing of all proofs of claim (the "General Bar Date"), except for claims held by PREPA customers in connection with the disposition of their deposits or any individual billing or service disputes, or as otherwise noted below;

---

[242] *See Notice of Filing of Creditor List for the Puerto Rico Electric Power Authority* [Case No. 17-bk-4780, ECF No. 520] (the "List of Creditors").

- the later of (i) the General Bar Date or (ii) 4:00 p.m., Atlantic Standard Time, on the date that is the first business day that is thirty-five (35) days after the date of entry of the applicable order rejecting an executory contract or unexpired lease as the bar date for any claims arising from the rejection of such executory contract or unexpired lease; and

- the later of (i) the General Bar Date or (ii) 4:00 p.m., Atlantic Standard Time, on the date that is thirty-five (35) days after the date that a notice of an amendment to the List of Creditors is served on a claimant as the bar date for any Claims relating to such amendment to the List of Creditors.

The Bar Date Orders authorized the following parties to file master proofs of claim on behalf of the constituencies described below:

- The indenture trustees, fiscal agents, or any similar agent or nominee (each a "Bond Representative") for each respective series of bonds issued by a debtor or non-debtor (to the extent such Bond Representative exists) were permitted to file a master proof of claim against the applicable debtor on behalf of themselves and all holders of bond claims for the respective series of bonds for obligations arising under the respective trust agreements, resolutions, or similar bond documents;

- Each union was permitted to file a separate master proof of claim on behalf of its respective constituents against the applicable debtor on account of all obligations due under its respective CBAs or applicable statutes; and

- Each agent under any credit agreement was permitted to file a separate master proof of claim (each, a "Credit Agreement Master Proof of Claim") against the applicable debtor on behalf of itself and all lenders under such credit agreement.

### 3.   Alternative Dispute Resolution Procedures

On June 5, 2019, the Debtors filed the *Motion for Entry of an Order (A) Authorizing Alternative Dispute Resolution Procedures, (B) Approving Additional Forms of Notice, (C) Approving Proposed Mailing, and (D) Granting Related Relief* [Case No. 17-bk-3283, ECF No. 7224], seeking an order establishing an alternative dispute resolution procedure ("ADR Procedures") for resolving certain general unsecured claims, including unliquidated litigation claims, asserted against PREPA (as well as other Title III Debtors), and approving a proposed mailing to creditors whose claims did not provide sufficient information to enable the Debtors to reconcile their claims.

By order dated August 13, 2019, the Title III Court approved the proposed mailing, and adjourned consideration of the ADR Procedures and forms of notice pending the submission of revised proposed procedures and forms of notice consistent with the guidance provided by the Title III Court [ECF No. 8453].

On January 7, 2020, the Debtors filed their *Amended Motion for Entry of an Order (A) Authorizing Alternative Dispute Resolution Procedures, (B) Approving Additional Forms of*

178

*Notice, (C) Approving Proposed Mailing, and (D) Granting Related Relief* [Case No. 17-bk-3283, ECF No. 9718] (the "Amended ADR Motion").  On April 1, 2020, the Title III Court entered an order authorizing the amended ADR procedures (the "Amended ADR Procedures") and approving the additional forms of notice [Case No. 17-bk-3283, ECF No. 12576].  The Amended ADR Procedures establish a process for the Debtors and claimants to attempt to resolve the amount of asserted claims through an exchange of offers and counteroffers, and if no resolution is reached, a streamlined mediation procedure.  If the claim remains unresolved following these processes, the Amended ADR Procedures further provide for the claimant to elect whether to resolve their claim using one of three methods: (1) litigation before the Commonwealth's courts (subject to certain restrictions); (2) binding arbitration; or (3) litigation before the Title III Court.

On December 29, 2020, the Title III Court entered an order amending the ADR procedures [Case No. 17-bk-3283, ECF No. 15505].  To date, the Debtors have filed twenty-six notices of transfer, transferring over 1,000 claims into the ADR procedures.

### 4.    **Administrative Claims Reconciliation**

On October 8, 2019, the Debtors filed their *Motion for Entry of an Order (A) Authorizing Administrative Reconciliation of Certain Claims, (B) Approving Additional Forms of Notice, (C) Approving Proposed Mailing, and (D) Granting Related Relief* [Case No. 17-bk-3283, ECF No. 8827] (the "ACR Motion").  The ACR Motion seeks approval of ACR procedures (the "ACR Procedures") that would allow the Commonwealth, ERS, HTA, PREPA, and PBA, through the Oversight Board, and/or the Title III Court to determine which claims will be resolved through administrative claims reconciliations ("ACR").  The ACR Procedures establish a process for the Title III Court to permit certain types of claims which are administrative in nature—including tax refund claims, union grievance claims, public employee claims, and pension claims—to be resolved by the Commonwealth's existing administrative processes.

At the October 30, 2019 omnibus hearing, the Title III Court provisionally approved the ACR Motion, pending the submission of revised proposed ACR Procedures.  On March 12, 2020, the Title III Court issued an order approving the revised proposed order [Case No. 17-bk-3283, ECF No. 12274].  To date, the Commonwealth, ERS, and PBA have filed twenty-six notices of transfer, transferring 44,866 claims into the ACR procedures, of which over 27,000 have already been marked as resolved.  PREPA has not filed any notices transferring claims into the ACR Procedures.

As set forth in the ACR Order, all claims transferred into ACR will be designated as "Subject to Administrative Reconciliation" on the Title III claims registry.  Claims that are transferred into ACR will not be entitled to vote on the Plan, but will be paid in full in the ordinary course, pursuant to the terms of the ACR Order.

### 5.    **LUMA Energy Administrative Expense Motions**

As part of the T&D Contract, PREPA was required to obtain court approval establishing that any accrued and unpaid portion of the applicable Front End Transition Services (as defined in the T&D Contract), along with other amounts PREPA was required to pay under the contract during the period of time between its effective date and the service commencement date (the Front

End Transition Period), as well as associated fees (the "Front End Transition Fees"), would constitute administrative expense claims in PREPA's Title III case. To fulfill PREPA's obligation under the T&D Contract, on July 7, 2020, the Government Parties filed the *Motion for Entry of an Order Allowing Administrative Expense Claim for Compensation for Front End Transition Services Under Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement with LUMA Energy* [ECF No. 2053] (the "Front End Admin Motion").

On October 19, 2020, the Title III Court entered an opinion and order granting in part and denying in part the Front End Admin Motion. The Title III Court found that the Government Parties' proffers were sufficient to "support a determination" that the Front End Transition Fees, with the exception of certain late fees, were entitled to administrative expense priority. The Title III Court, however, denied without prejudice administrative expense priority for late fees, finding that the government parties had failed to establish on the record that such fees met the requirements for administrative expense status. *See* [ECF No. 2258].

On October 26, 2020, UTIER and SREAEE filed a notice of appeal as to Judge Swain's order and opinion partially granting the Front-End Administrative Expense Motion. [ECF No. 2269]. The appeal was docketed as Case No. 20-2041 in the United States Court of Appeals for the First Circuit on November 9, 2020.

In support of the appeal, appellants argued there is no "estate" under PROMESA and, as a result, there can be no "necessary costs and expenses of preserving the estate" within the meaning of section 503(b)(1)(A) of the Bankruptcy Code. Appellants relied on case law arising in the context of Chapter 9 holding that certain Bankruptcy Code provisions referring to a debtor's "estate" are inapplicable in Chapter 9 which, like PROMESA, does not incorporate the Bankruptcy Code provision, section 541, that defines "estate" and "property of the estate." In the alternative, appellants argued that the Government Parties failed to satisfy their burden that the fees at issue qualified for an administrative expense priority. In opposition, the Oversight Board contended the Title III Court correctly found "the text and structure of PROMESA compel the conclusion that operating expenses of PREPA are eligible for administrative expense priority under section 503(b)(1)(A) of the Bankruptcy Code." The Oversight Board also argued that, as the Title III Court found, Congress' decision to carve out specific subsections of certain incorporated Bankruptcy Code provisions, while incorporating section 503 in its entirety, provided a strong indication that Congress did not intend to preclude the applicability of section 503(b)(1)(A) in the Title III context. In further support of this conclusion, the Oversight Board observed that Section 301(c)(5) of PROMESA directs Bankruptcy Code references to "property of the estate" be read as references to property of the debtor. Finally, the Oversight Board argued that the Title III Court correctly held that the Government Parties met their burden of demonstrating that the fees qualified for administrative expense treatment.

By opinion dated August 12, 2021, the First Circuit affirmed the Title III Court's decision.

Concurrent with the appeal of the order approving the Front End Admin Motion, and as PREPA and LUMA Energy approached the turnover of O&M Services of the T&D System to LUMA Energy, the Government Parties filed the *Government Parties' Motion for Order Allowing Administrative Expense Claim for Amounts to be Paid to LUMA Energy by PREPA During Interim Period Under Supplemental Agreement and the T&D Contract* [ECF No. 2417] (the "Interim

180

Period Admin Motion," and together with the Front End Admin Motion, the "LUMA Energy Admin Motions"). For substantially the same reasons as the Front End Admin Motion, the Government Parties sought approval from the Title III Court for administrative expense priority for certain costs of operating the T&D System (the "Interim Period Services Fees"), including (i) compensation for providing the operation and management services under the T&D Contract, in an annual fixed amount of $115 million; (ii) indemnification of LUMA Energy and its affiliates for any claims or damages against them arising from PREPA's operation of the utility; and (iii) a $115 million inflation-adjusted termination fee, payable under certain circumstances. The Interim Period Admin Motion also received a number of objections and responses. *See* [ECF Nos. 2435, 2436, 2437, 2438, and 2439].

On May 3, 2021, the Title III Court entered an order granting the relief requested in the Interim Period Admin Motion on largely the same grounds as with respect to the order approving the Front End Admin Motion [ECF No. 2473]. Once again, UTIER and SREAEE sought to prevent entry and implementation of the order, each seeking injunctive relief to prevent the Service Commencement Date from occurring. *See* Adv. Proc. Nos. 21-00041 and 21-00049. Further details regarding the adversary proceedings for injunctive relief can be found in Section V.G.24 – 25 of this Disclosure Statement.

### 6. Cobra Acquisitions Administrative Expense Motion

On October 19, 2017, after Hurricanes Irma and Maria hit Puerto Rico, PREPA and Cobra Acquisitions LLC ("Cobra") entered into the *Emergency Master Service Agreement for PREPA's Electrical Grid Repairs – Hurricane Maria*, dated October 2017 (the "First Contract") for Cobra to perform emergency "storm restoration services" for $200 million. Through five subsequent amendments, the contract amount for the First Contract was increased to $945 million.

On May 26, 2018, PREPA and Cobra entered into the *Master Services Contract for PREPA's Electrical Grid Repairs - Hurricane Maria*, dated May 26, 2018 (the "Second Contract," and with the First Contract, the "Cobra Contracts"), for Cobra to perform restoration and reconstruction services in addition to its emergency storm repair services under the First Contract, in the amount of up to an additional $900 million.

On September 30, 2019, Cobra filed a motion seeking (i) allowance of an approximately $216 million postpetition administrative expense claim, arising from various services provided by Cobra in connection with the Cobra Contracts, with interest accruing, and (ii) immediate payment of that asserted administrative expense claim. [Case No. 17-bk-3283, ECF No. 8789] (the "Cobra Admin Motion"). As of June 21, 2022, Cobra alleges approximately $123 million of interest has accrued in connection with non-payment of amounts due pursuant to the Cobra Contracts. [Case No. 17-bk-3283, ECF No. 21286].

On October 10, 2019, the Government Parties filed an urgent motion seeking to stay all applicable deadlines relating to the Cobra Admin Motion until January 29, 2020 due to (i) an ongoing criminal investigation and pending trial relating to certain actions allegedly taken by Cobra's former president in connection with Cobra's work on PREPA's electricity grid, including alleged acts of bribery committed by Cobra's former president in order to obtain work on PREPA's

grid, and (ii) an investigation by FEMA into the reasonableness of the fees charged by Cobra for its work on PREPA's electricity grid.  [ECF No. 1653] (the "Urgent Cobra Stay Motion").

On October 17, 2019, the Title III Court entered an order granting the Urgent Cobra Stay Motion, staying briefing on the Cobra Admin Motion and setting a status conference on the motion.

On March 25, 2020, Cobra filed an urgent motion seeking to modify the stay imposed by the Title III Court and have the Title III Court allow certain purportedly "undisputed" tax claims arising from Cobra's work on PREPA's electricity grid.  [Case No. 17-bk-3283, ECF No. 12531] (the "Urgent Cobra Stay Modification Motion").  The Government Parties opposed the Urgent Cobra Stay Modification Motion.  [ECF No. 1959].  Following briefing, the Title III Court denied the Urgent Cobra Stay Modification Motion.  [ECF No. 2004].

On April 6, 2021, Cobra filed a motion to lift the stay.  [Case No. 17-bk-3283-LTS, ECF No. 16328] (the "April 2021 Cobra Lift Stay Motion").  On June 7, 2021, the Government Parties filed a status report advising the Title III Court that there were no material changes warranting modification of the stay.  [Case No. 17-bk-3283, ECF No. 16893].  By order dated June 4, 2021, the Title III Court (i) extended the stay; (ii) directed the parties to meet and confer and file a status report by July 20, 2021; and (iii) adjourned a hearing on the April 2021 Cobra Lift Stay Motion until the August 4, 2021, omnibus hearing.  [Case No. 17-bk-3283, ECF No. 16970].

On August 4, 2021, the Title III Court heard oral argument regarding the April 2021 Cobra Lift Stay Motion.  *See* [Case No. 17-bk-3283, ECF No. 17691].  The Title III Court denied the April 2021 Cobra Lift Stay Motion on the record because, among other things, FEMA's ongoing investigation would reduce the need for discovery to resolve disputed amounts sought by Cobra as administrative expenses, and directed the parties to file another joint status report by January 19, 2022.  Aug. 4, 2021 Hr'g Tr. at 68-71.

On June 7, 2022, Cobra filed another motion to lift the stay.  [ECF No. 2841] (the "June 2022 Cobra Lift Stay Motion").  The Government Parties filed an objection to the June 2022 Cobra Lift Stay Motion on June 14, 2022.  [ECF No. 2848].  That same day, the Court issued an order denying the June 2022 Cobra Lift Stay Motion.  *Id.*  In addition, pursuant to an oral ruling issued during the June 29, 2022 hearing, the Title III Court ordered the parties to file a further joint status report by January 6, 2023, or, if earlier, thirty (30) days following the issuance of a FEMA determination concerning the Second Contract.  June 29, 2022 Hr'g. Tr. at 41:15-19.  On January 7, 2023 the parties submitted a joint status report. [ECF No. 3146].  On January 18, 2023, the Court ordered that the stay on the administrative expense litigation would remain in place for "substantially the same reasons" stated by the court for the record in denying Cobra's previous lift stay motion during a June 2022 omnibus hearing, and directed the parties to file a further status report by July 31, 2023.  [ECF no. 3155].

With respect to the First Contract, FEMA has determined approximately $21.5 million of costs were not payable under the First Contract.  PREPA appealed this determination to the U.S. Civilian Board of Contract Appeals ("CBCA"), which did not overturn FEMA's determination.  The CBCA's decision is final.  Because this $21.5 million amount represents costs FEMA had already obligated and paid to the grant recipient, Central Office of Response, Recovery, and Resilience (COR3), which in turn disbursed the funding to PREPA, which in turn paid Cobra,

the result of the CBCA's decision is that FEMA will automatically claw back the funding from COR3's federal bank account and PREPA now owes this amount back to COR3, which COR3 will likely recoup through setoff against other Public Assistance obligations for PREPA.

With respect to the Second Contract, FEMA's review was bifurcated into two projects. With respect to the first project, FEMA determined that approximately $49.3 million is eligible for reimbursement under the Second Contract. PREPA has already paid Cobra more than the amount FEMA determined eligible under the first project. Thus, FEMA's decision will not result in additional funds to PREPA for Cobra-related costs.

With respect to the second project of the Second Contract, FEMA determined eligible approximately $233.7 million in costs. PREPA has already paid Cobra $150.0 million invoiced under this project, of which FEMA determined eligible $123.5 million. This project is reimbursable at a 90% cost share by FEMA. Accordingly, PREPA expects $111.1 million (90% of $123.5 million eligible) in reimbursement to be obligated by FEMA and available to PREPA as reimbursement for payments it already made to Cobra. With respect to the unpaid invoices, $99.2 million is associated with invoices determined eligible. PREPA asserts it may offset the amounts FEMA denied under the First Contract against valid amounts due to Cobra under the First or Second Contract. Accordingly, the remaining $99.2 million (less $21.5 million owed to COR3 on the First Contract as a result of the CBCA ruling) is expected to be available for reimbursement if PREPA pays the associated eligible invoices.

FEMA determined that approximately $5.6 million under the first project and $68.1 million under the second project are ineligible for reimbursement. These determinations are appealable. PREPA has filed a first-level administrative appeal of FEMA's decision on the first project.

### 7. Whitefish Energy Administrative Expense Motion and Settlement Agreement

In the aftermath of Hurricanes Irma and Maria, PREPA engaged various contractors to repair the electrical system on an emergency basis, including Whitefish Energy Holdings, LLC ("Whitefish" or "WEH"), who was the first transmission line contractor engaged by PREPA to assist in repairing Puerto Rico's island-wide blackout.

On September 26, 2017, PREPA entered into a contract with Whitefish (the "WEH Contract") for the repair of Puerto Rico's electrical system main structures (the back bone of the system) composed of approximately 200 miles of transmission lines and towers, many of which were located in the mountainous region of Puerto Rico's rugged interior, and therefore, were only accessible by using a helicopter. The work requested by PREPA and completed by Whitefish under the WEH Contract, included, among other projects: (1) clearing right-of-ways, access roads, and helicopter staging areas so repair equipment and manpower could be transported to repair sites and repair work could begin; (2) replacing over 50 electrical towers, dismantling a similar number of towers, and completing corrective actions on over 200 other transmission structures; and (3) restoring electricity to customers in major residential and industrial areas across Puerto Rico, including in San Juan, Calguas, Manati, and Juntos. On October 31, 2017, PREPA subsequently terminated the WEH Contract in accordance with its terms, after Whitefish completed all work

required by PREPA in connection with the island-wide blackout repair work, which termination became effective on November 30, 2017.

On October 30, 2020, Whitefish filed the *Motion of Whitefish Energy Holdings, LLC for Allowance of Administrative Expense Claim* [ECF No. 2281] (the "Whitefish Admin Motion"), seeking allowance of an administrative expense claim arising from various services provided to PREPA to respond to the devastation wrought by Hurricanes Irma and Maria to the electrical grid. [ECF No. 2281].  The parties subsequently engaged in discussions to seek a consensual resolution of the claims asserted in the motion.  To facilitate these continuing discussions, the briefing deadlines were consensually extended several times.  [ECF Nos. 2334, 2351, 2371, 2413, 2451, 2489, 2527, 2543, 2585, 2613, 2626, 2648, 2662, 2682, 2707, and 2749].

PREPA remains primarily liable for payment required by the WEH Contract, but the federal government authorized one-hundred percent (100%) federal-share emergency protective measures, including direct federal assistance, for 180 days, starting on September 17, 2017 for the WEH Contract, subject to FEMA review and approval.  This leaves PREPA liable solely for any remaining amounts not approved and paid by FEMA.  Whitefish completed all the work requested by PREPA within the federally designated 180-day period.  After the work was completed, Whitefish submitted invoices to PREPA, with the invoices totaling approximately $144,249,543.00.

Prior to entry into the Whitefish Settlement Agreement (as defined below), PREPA made payments on account of invoices in connection with the WEH Contract (the "WEH Invoices") in the amount of $37,056,105.00.  In addition, finance charges had accrued at a rate of 1% per month for all overdue WEH Invoices (the "WEH Finance Charges").  As of February 11, 2022, Whitefish asserted all WEH Finance Charges accrued through that date in the amount of $51,887,962.60.

On June 29, 2018, PREPA submitted documentation supporting its claim for reimbursement by FEMA (the "WEH FEMA Documentation") to the Governor's Authorized Representative (the "GAR") for review.  On or around August 24, 2018, the GAR submitted the WEH FEMA Documentation to FEMA, requesting reimbursement of approximately $144.3 million.  On August 19, 2021, FEMA issued Determination Memorandum Number FEMA-4339-DR-PR, in which FEMA determined, of the $144,249,543.53 submitted by PREPA for reimbursement for the WEH Invoices, $111,352,417.00 was eligible for reimbursement, but that PREPA had not sufficiently demonstrated that the remaining $32,897,126.53 was eligible for reimbursement ("FEMA Denied Amounts").  On October 18, 2021, PREPA filed a first appeal in which PREPA appealed FEMA's determination that the FEMA Denied Amounts were not eligible for reimbursement.  On December 17, 2021, Puerto Rico's Government Authorized Representative, the COR3, submitted the first appeal to FEMA.

On March 1, 2022, the Oversight Board, as representative of PREPA in their Title III Case, entered into a settlement agreement (attached hereto as Exhibit C) with Whitefish (the "Whitefish Settlement Agreement") and filed a motion for court approval of the Whitefish Settlement Agreement [ECF No. 2281].  The Whitefish Settlement Agreement provides for, among others things, the allowance of an initial administrative expense claim in the total amount of $133,369,078.00, of which $127,345,388.00 has been paid, with the remainder of payment to be comprised of the remaining administrative expense claim amount of $6,023,690.00, to be payable

on the effective date of the Plan, but in no event later than December 31, 2023. The Whitefish Settlement Agreement also (i) requires the Oversight Board, PREPA and Whitefish to collaboratively pursue the administrative appeal process for the reimbursement of FEMA Denied Amounts and (ii) reduces the overall accrued interest charges by $19,004,808.50, with no further interest accrual to occur as of the date of the execution of the Whitefish Settlement Agreement, provided all payments by PREPA under the Whitefish Settlement Agreement are timely and fully made. The remaining $33,884,282.57 of accrued interest charges is also allowed as an administrative expense claim. On March 21, 2022, the Title III Court entered the order approving the Whitefish Settlement Agreement in resolution of the Whitefish Admin Motion [ECF No. 2763].

### 8.    Claim Objections Filed to Date

As of the date of this Disclosure Statement, approximately 4,687 proofs of claim have been filed in the Title III Case against PREPA, totaling approximately $27.4 billion in asserted liabilities plus unliquidated amounts. In accordance with the terms of the Bar Date Orders, PREPA believes that many of these claims need not have been filed at all, or suffer from other flaws or infirmities, such as being subsequently amended or duplicative of other proofs of claim, including master proofs of claim filed against PREPA on behalf of certain bondholders.

Pursuant to the *Order (A) Approving Limited Omnibus Objection Procedures, (B) Waiving the Requirement of Bankruptcy Rule 3007(e)(6), and (c) Granting Related Relief* [Case No. 17-bk-3283, ECF Nos. 4230, 4230-1] (the "Initial Objection Procedures"), and the *Order (A) Approving Amended Omnibus Objection Procedures, (B) Waiving the Requirement of Bankruptcy Rule 3007(e)(6), (C), Approving Additional Forms of Notice, and (D) Granting Related Relief* [Case No. 17-bk-3283, ECF No. 7440], PREPA, through the Oversight Board, has filed 54 objections to claims. Those omnibus objections sought to disallow, in the aggregate, 2,552 claims on the bases that they lacked sufficient information to permit the Oversight Board to reconcile the claim, were asserted against the incorrect debtor, were subsequently amended, were duplicative of other proofs of claim, or, otherwise asserted amounts for which the asserted debtor entity is not liable. To date, 463 claims have been expunged, withdrawn, or resolved, or were docketed in error.

Significant claim objections were also filed to certain Bond Claims, and are described in Section V.G of this Disclosure Statement.

### E.    Vitol Settlement Agreement

***Background.*** PREPA entered into various fuel supply purchase contracts with Vitol prior to the commencement of PREPA's Title III case, whereby Vitol was to supply fuel oil to PREPA for various generating plants and stations, among PREPA's electrical grid, at various locations across Puerto Rico.

On November 4, 2009 and November 28, 2012, PREPA initiated two (2) litigations in the Commonwealth of Puerto Rico Court of First Instance (the "Commonwealth Court") against Vitol: (i) *Autoridad de Energía Eléctrica de Puerto Rico v. Vitol Inc., et al.*, Case No. K AC2009-1376 (901) and (ii) *Energía Eléctrica de Puerto Rico v. Vitol Inc., et al.*, Case No. 2012-1174 (905) (together, the "Commonwealth Court Actions"). In the Commonwealth Court Actions, PREPA

sought to nullify six (6) fuel oil contracts entered into between PREPA and Vitol between 2005 and 2008, worth approximately $3.89 billion, because, among other things, Vitol allegedly violated Law 458 ("Law 458"), one of Puerto Rico's anti-corruption statutes. PREPA's allegations against Vitol relating to Law 458 turned on Vitol S.A.'s guilty plea entered in connection with alleged overpayments made by Vitol S.A. to certain Iraqi officials during its participation in the United Nations' Oil-for-Food Programme. An investigation of the payments made by Vitol S.A. was conducted by the United Nations in 2004 and the District Attorney in the State of New York from 2005–2006. Vitol S.A. entered into a guilty plea regarding the allegations on November 20, 2007, in New York state court, and was convicted on December 10, 2007. PREPA asserted Vitol S.A.'s guilty plea and failure to disclose same to PREPA resulted in violations of Law 458 in connection with the six (6) fuel oil contracts, and PREPA sought the return of approximately $3.89 billion that PREPA paid to Vitol pursuant to those contracts. In response, Vitol asserted a counterclaim against PREPA for approximately $28.4 million for allegedly unpaid invoices related to fuel oil delivered to PREPA pursuant to the contracts with PREPA. Vitol also asserted that PREPA would be unjustly enriched if PREPA were to receive the entirety of the $3.89 billion, and that the disgorgement remedy PREPA sought violated the Excessive Fines Clause, the Due Process Clause, and the Takings Clause of the U.S. Constitution.

On May 23, 2018, Vitol filed a proof of claim in PREPA's Title III Case, logged by Kroll as Proof of Claim No. 14537, asserting a general, unsecured, prepetition claim against PREPA in the total amount of $41,472,771.43, for PREPA's alleged failure to pay for fuel oil sold and delivered by Vitol prior to the commencement of PREPA's Title III case pursuant to the supplier contracts executed between PREPA and Vitol plus interest.

On November 14, 2019, the Commonwealth Court Actions were removed to the Title III Court [Adv. Proc. No. 19-00453, ECF No. 1]. On December 13, 2019, PREPA filed a motion to remand the Commonwealth Court Actions [Adv. Proc. No. 19-00453, ECF No. 8], but on March 13, 2020, the Title III Court issued an order denying PREPA's motion to remand [Adv. Proc. No. 19-00453, ECF No. 27]. On July 31, 2020, Vitol filed a motion for summary judgment on the grounds that: (i) Law 458 does not apply to Vitol's contracts with PREPA, thus PREPA cannot prove any of its affirmative claims; (ii) PREPA is not entitled to the remedy sought; and (iii) the remedy is otherwise unconstitutional because it would violate the Excessive Fines Clause, the Takings Clause, and the Due Process Clause [Adv. Proc. No. 19-00453, ECF No. 37]. On November 9, 2020, PREPA filed an opposition and cross-motion for summary judgment in response, on the grounds that (i) the contracts were null as a result of Vitol's conviction, and were otherwise supported by illicit consideration; and (ii) PREPA was entitled to reimbursement of the approximately $3.89 billion PREPA paid to Vitol, as mentioned above. [Adv. Proc. No. 19-00453, ECF Nos. 48, 53].

On September 27, 2021, the Title III Court issued an opinion and order partially granting Vitol and PREPA's motions for summary judgment [Adv. Proc. No. 19-00453, ECF No. 77]. The Title III Court found that (i) PREPA's contracts with Vitol were not null pursuant to Law 458, nor were the contracts null as a result of illicit consideration and (ii) Vitol was entitled to the claim for $28,489,560.16 for the unpaid invoices for the fuel oil delivered to PREPA in connection with the contracts between PREPA and Vitol, but (iii) granted PREPA's motion for summary judgment with respect to certain affirmative defenses and counterclaims raised by Vitol.

On November 2, 2021, the Title III Court entered a judgment, closing the adversary proceeding, granting Vitol a judgment against PREPA in the amount of $41,457,382.88 (which included interest) on Vitol's counterclaim, and denying all other relief not granted in the judgment. [Adv. Proc. No. 19-00453, ECF No. 82]. On, December 2, 2021, the Oversight Board appealed the Title III Court's November 2, 2021 judgment to the First Circuit (the "Law 458 Appeal"). *See Fin. Oversight Mgmt. Bd. v. Vitol S.A., et al.*, No. 21-1987 (1st Cir. 2021), which has now been dismissed.

***The Settlement Agreement with Vitol.*** Since the Law 458 Appeal was filed, PREPA commenced settlement negotiations with Vitol. The negotiation efforts of these Parties resulted in the Vitol Settlement Agreement, which was executed on August 26, 2022 and is discussed in more detail below.

Pursuant to the Vitol Settlement Agreement, PREPA was required to withdraw the Law 458 Appeal with prejudice, by filing a stipulation of dismissal with the First Circuit. PREPA filed the stipulation of dismissal with prejudice on August 31, 2022, four (4) days after execution of the Vitol Settlement Agreement, and the Law 458 Appeal was subsequently dismissed on September 13, 2022. Relatedly, following entry of the stipulation of dismissal by the First Circuit in the Law 458 Appeal, PREPA was required within two (2) business days to direct Kroll to adjust Vitol's claim on the claims register to reflect the correct value of Vitol's claim in the total amount of $41,457,382.88.

The Vitol Settlement Agreement also sets forth the treatment of Vitol's claim pursuant to PREPA's proposed plan of adjustment. Under PREPA's proposed Plan, Vitol's claim will be deemed allowed in the aggregate total amount of $41,457,382.88 and be separately classified from other general unsecured claims asserted against PREPA. On the effective date of the Plan, Vitol's claim will be put in a class where Vitol is paid a distribution that equals one half of what the claims receive in the class of non-bond general unsecured claims not for money borrowed to be determined on a percentage basis. However, if PREPA's Plan contains more than one class of non-bond general unsecured claims not for money borrowed, Vitol will receive a distribution equal to one half of the average percentage distributions paid to claims in these classes, provided that, prepetition fuel lines of credit and pension-related obligations are not included in the calculation of the average percentage distribution. PREPA will also be included as an exculpated party under the proposed PREPA plan of adjustment, however the exculpation will not apply to any claims of Vitol relating to the action styled, *Special Claims Comm. v. Inspectorate America Corp.*, Adv. Proc. No. 19-00388 in Case No. 17-bk-3283, D.P.R. In exchange for the agreed upon treatment of Vitol's claim pursuant to the proposed PREPA plan of adjustment, Vitol will not oppose approval of this Disclosure Statement, nor oppose confirmation of the proposed Plan or otherwise interfere with the administration and confirmation of the Plan. Vitol will further timely submit a vote to accept the Plan upon being solicited.

On the Effective Date, PREPA and the Oversight Board will automatically be released from any and all causes of action, demands or claims, arising out of or in any way related to the Commonwealth Court Actions. In exchange, on the effective date of the Plan Vitol will also automatically be released from any and all causes of action, demands or claims, arising out of or in any way related to the Commonwealth Court Actions. However, PREPA's claims, rights, and defenses related to the avoidance action styled *Special Claims Comm. v. Inspectorate America*

187

*Corp.*, Adv. Proc. No. 19-00388 in Case No. 17-bk-3283, D.P.R., are otherwise expressly preserved.

      F.      **Rejection or Assumption of Unexpired Leases of Nonresidential Real Property**

      1.      **Unexpired Leases of Nonresidential Real Property**

PREPA is party to approximately fifty (50) nonresidential real estate leases (the "Real Estate Leases"). The decision to assume or reject the Real Property Leases ("Real Property Leases") involves the consideration of various factors, not all of which can be addressed expeditiously. Despite contacting each lessor, it was unlikely PREPA could receive affirmative consent from each lessor as a direct consequence of the widespread destruction and mass power outages in Puerto Rico following Hurricane Maria that made it extremely difficult for parties to communicate with each other for a significant period of time. In turn, the Debtor and their advisors had been unable to obtain written consent of all their landlords to grant the requested extension of time for the Debtor to assume or reject Real Property Leases. Accordingly, PREPA sought to extend the 365(d)(4) Deadline (the "365(d)(4) Deadline") for leases with other entities that either provided affirmative consent or did not expressly decline such consent. The rights of parties whose consent was "deemed" because consent was not expressly denied were preserved [ECF No. 546]. No party expressly denied consent.

On October 24, 2017, the Oversight Board filed a motion seeking approval of an extension of time to assume or reject any unexpired Real Estate Leases pursuant to Bankruptcy Code section 365(d)(4), made applicable to these cases by PROMESA Section 301(a) [Case No. 17-bk-3283, ECF No. 1518]. On January 26, 2018, the Title III Court entered a supplemental order extending the 365(d)(4) Deadline for PREPA until the earlier of (i) January 1, 2019; (ii) the date of expiration or termination of such leases pursuant to their own terms; or (iii) the date on which PREPA's plan of adjustment is confirmed [ECF No. 546].

The 365(d)(4) Deadline was further extended by the Title III Court on multiple occasions. *See* [Case No. 17-bk-3283, ECF Nos. 4977 and 9670]. The current 365(d)(4) Deadline is the earlier of (i) January 1, 2022; (ii) the date of expiration or termination of such leases pursuant to their own terms; or (iii) the date on which a plan of adjustment is confirmed for each Debtor [Case No. 17-bk-3283, ECF No. 15574].

      2.      **PREPA's Power Purchase and Operating Agreements**

      i.      **Title III Court's Assumption Procedures**

To streamline the process of evaluating and renegotiating the PPOAs, PREPA determined to set forth procedures for assuming beneficial PPOAs. On April 2, 2019, PREPA filed a motion seeking an order approving procedures to assume PPOAs designed to avoid the cost of a standalone motion to assume each PPOA individually while affording parties-in-interest their due process rights. [ECF No. 1162]. PREPA filed amended assumption procedures (the "Assumption Procedures") on April 16, 2019. [ECF No. 1194]. On April 22, 2019, the Title III Court entered an order approving the Assumption Procedures as amended authorizing, but not requiring, PREPA to assume PPOAs in accordance with the Assumption Procedures. [ECF No. 1199].

ii.     **EcoEléctrica and Naturgy Amended Power Purchase Operating Agreements**

PREPA has historically sourced up to 40% of the baseload power in Puerto Rico from LNG converted into electricity in an arrangement known as the "LNG-to-Power Program."[243]   Two energy companies historically played key roles in this program—ECO and Naturgy.   Both companies imported LNG and converted it to natural gas at a terminal owned by ECO and controlled, through a tolling services agreement, by Naturgy.

PREPA's relationship with these two companies is embodied in two contracts. The first contract—the PPOA between PREPA and ECO (the "Original PPOA")—was executed on March 10, 1995, and was due to expire in March 2022.  The second contract—the Amended and Restated Natural Gas Sale and Purchase Agreement between PREPA and Naturgy (the "Original GSPA," and together with the Original PPOA, the "Original Contracts")—was executed on March 28, 2012, and was due to expire in December 2020.

PREPA determined it was of critical importance to ensure the constant supply of natural gas to the Costa Sur Plant, as well as ensure the availability of ECO's capacity.  Accordingly, the Oversight Board certified fiscal plans in 2018 and 2019 that contemplated renegotiation of the Original Contracts.  PREPA entered into separate renegotiations of the contracts with Naturgy and ECO on a bilateral basis to extend their term and realize cost savings.  After lengthy negotiations, PREPA signed the Amended Contracts on March 23rd and March 27th of 2020, respectively. Further description of the Amended Contracts' terms can be found in Section III.B.8 of this Disclosure Statement.

The Amended Contracts were subject to a robust review process including the PREPA Board, the Oversight Board, PREB, and ultimately the Title III Court.  PREPA issued its final approval for the Amended Contracts on October 29, 2019.  On December 26, 2019, the Oversight Board approved both the Amended PPOA and the Amended GSPA under the contract-review policy established pursuant to PROMESA § 204(b)(2), 48 U.S.C. § 2144, confirming their consistency with PREPA's Fiscal Plan.  PREB approved the Amended Contracts on March 11, 2020.  *See* PREB Res. & Order, Case No. NEPR-AP-2019-0001, at 13 (Mar. 11, 2020).

On April 1, 2020, the Oversight Board, as representative of PREPA, filed a motion to assume the Amended Contracts.  [ECF No. 1951].  Further description of this motion and the related litigation can be found in Section V.G.10 of this Disclosure Statement.

iii.     **Freepoint Natural Gas Supply Contract**

In 2015, PREPA entered into a fuel oil purchase contract (the "Fuel Supply Contract") with Freepoint Commodities LLC ("Freepoint") for the supply of oil used in operation of PREPA's steam plants in Aguirre, Costa Sur, San Juan, and Palo Seco.  On April 10, 2017, PREPA and Freepoint entered into an amendment to the Fuel Supply Contract (the "2017 Amendment") that extended the term of the Fuel Supply Contract through and including October 31, 2018, with one automatic extension of one year unless either party indicated its intention not to carry out the

---

[243] Padilla Decl. ¶ 5 [Case No. 17-bk-4780, ECF No. 1952].

automatic extension. The 2017 Amendment further removed certain default provisions, provided an alternative form of certification that contemplated a potential Title III case, and required PREPA to request the assumption of the Fuel Supply Contract in the event of a Title III filing, as a first day filing, and obtain an order granting the assumption request within forty days of the Title III filing.

On July 2, 2017, concurrently with the filing of PREPA's Title III petition, the Oversight Board filed a motion seeking approval of the Fuel Supply Contract. [ECF No. 3]. On August 1, 2017, the Title III Court approved PREPA's assumption of the Fuel Supply Contract. [ECF No. 154]. The automatic one-year extension was implemented, and the Fuel Supply Contract was set to expire on October 21, 2019. PREPA and Freepoint negotiated additional amendments (the "2019 Amendment") to the Fuel Supply Contract including, (i) a two-year contract extension to October 31, 2021; (ii) price alterations to reflect costs imposed by the fuel supplier; (iii) a reduction in the line of credit; and (iv) a covenant that if PREPA were to sell any of its plants, any new owner, operator, manager, or party acting in a similar capacity agrees to be bound by the terms of the Fuel Supply Contract until its expiration. On August 20, 2019, the Oversight Board filed a motion seeking an order approving the 2019 Amendment to the Fuel Supply Contract. [ECF No. 1600]. The Title III Court approved the 2019 Amendment on September 4, 2019. [ECF No. 1624]. The Fuel Supply Contract expired on October 31, 2021 and was not renewed.

### iv.    Operational PPOAs

As discussed in Section III.B.8 above, eleven (11) of the renewable energy projects reached commercial operations and currently sell energy and Renewable Energy Certificates (the "RECs") to PREPA (the "Operational PPOAs").

To better align PREPA's finances with the objectives of PREPA's fiscal plan, PREPA's management determined in 2019 to pursue the renegotiation of nine (9) of the eleven (11) Operational PPOAs. PREPA initiated negotiations with the owners/sponsors of these operating projects in late 2019. PREPA chose not to renegotiate the PPOAs for two small waste-to-energy projects as pricing under those contracts already met targets for new renewable generation.

PREPA reached agreements in principle with the respective counterparties of six (6) Operational PPOAs on amendments to their agreements. The Oversight Board approved the PPOAs per the Oversight Board's contract review policy and, on November 17, 2020, filed a motion seeking an order approving PREPA's assumption of the six (6) amended Operational PPOAs (the "Assumed PPOAs"). [ECF No. 2299]. PREPA's motion was unopposed, and on December 2, 2020, the Title III Court entered an order approving PREPA's assumption of the Assumed PPOAs. [ECF No. 2317].

One of the Operational PPOAs subject to renegotiation relates to the Punta Lima wind-powered facility located in Naguabo which was significantly damaged in Hurricane María. PREPA reached an agreement in principle with the counterparties, and the Oversight Board approved a renegotiated PPOA and related asset purchases related to resumption of operations at the facility on May 27, 2021.

After extensive negotiations, PREPA was unable to negotiate acceptable amendments to the remaining two (2) Operational PPOAs (the "Windmar Operational PPOAs") with Windmar, Inc. and Windmar Renewable Energy, LLC (collectively, "Windmar"). On November 17, 2020, the Oversight Board filed a motion seeking approval of PREPA's rejection of certain PPOAs, including the Windmar Operational PPOAs. [ECF No. 2296] (the "Second Omnibus Rejection Motion"). Following the filing of that motion, however, PREPA and Windmar recommended negotiations related to amendments to the Windmar Operational PPOAs. At this time, the motion to reject those PPOAs is adjourned pending the outcome of renegotiation efforts. [ECF No. 2623].

<strong>v.    Renegotiated PPOAs</strong>

As discussed in Section III.B.8(ii) above, PREPA submitted sixteen renegotiated PPOAs to the Oversight Board, with 593 MW in capacity. PREPA selected these projects for renegotiation because they fulfilled some or all of the following criteria: (i) have been identified in the past by the Puerto Rico Planning Board, the Puerto Rico Management Permits Office, and/or PREPA staff as having nearly completed their development activities; (ii) have demonstrated a willingness to renegotiate pricing to reflect changes in the industry by agreeing to amend their agreements in or around 2013–2014, at which time they were vetted and approved by one or more prior PREPA Board(s) to proceed with amendments; and/or (iii) more recently confirmed their willingness and potential ability to commence construction in the relatively near term.

After reviewing the amended terms of PPOAs, the Oversight Board found that the amended terms were inconsistent with PREPA's fiscal plan since they resulted in electricity costs that far exceeded PREPA's own price projections. The PPOAs also failed to promote market competition because they were not procured through a competitive process. PREPA's responses reflected that the determining factor in the selection was the PPOA proponents' agreement to a PREPA-determined price, and not whether the proposed price represented the lowest possible price. Moreover, PREPA did not take into account whether the proponent possessed the necessary financial and technical capabilities before entering into the PPOAs. However, to promote the development of some additional renewable energy capacity without significantly impacting projected energy costs, the Oversight Board resolved to authorize PREPA to enter into a number of PPOAs for the development of up to 150MW of capacity, with the selection based on an assessment by PREPA of each proponent's technical and financial capabilities.

PREPA selected and proposed two (2) PPOAs to move forward on amended terms, and on February 26, 2021, the Oversight Board approved renegotiated PPOAs with CIRO One and Xzerta to develop 90 MW and 60 MW, respectively, of renewable capacity. On August 2, 2021, the Oversight Board filed notices of the assumption of the PPOAs with CIRO One and Xzerta under the Assumption Procedures. [ECF Nos. 2577, 2578]. Windmar was the sole objector to the PPOAs alleging the PPOAs do not comply with Puerto Rico law. [ECF No. 2591]. On December 8, 2021, the Title III Court entered an order overruling Windmar's objection and approving PREPA's assumption of the PPOAs with CIRO One and Xzerta. [ECF No. 2667].

<strong>vi.    Rejected PPOAs</strong>

On July 7, 2020, the Oversight Board filed an omnibus motion to reject twenty-seven (27) Rejected PPOAs that PREPA determined were not worthy of renegotiation. [ECF No. 2050, as

191

amended by ECF No. 2055] (the "First Omnibus Rejection Motion"). Many of the Rejected PPOAs had either failed to commence construction or, at best, were in the earliest stages. In addition, the contract rates for sales of energy under the Rejected PPOAs were well above the market rate, often by more than 30%, with uncapped escalation and additional charges for RECs. Tradewinds Energy, LLC, GS Fajardo Solar, and GG Alternative Energy Corp., counterparties to various Rejected PPOAs, filed objections to the First Omnibus Rejection Motion. [ECF Nos. 2067, 2100, 2117]. On September 16, 2020, the Title III Court heard oral arguments on the First Omnibus Rejection Motion, and on September 17, 2020, issued an order approving PREPA's rejection of the Rejected PPOAs. [ECF No. 2198].

PREPA also conducted extensive negotiations with the counterparties to the renegotiated PPOAs. PREPA was unable to successfully renegotiate acceptable terms with the counterparties to three (3) of the renegotiated PPOAs, those with Windmar, M Solar Generating, LLC ("M Solar"), and YFN Yabucoa Solar, LLC ("YFN"). Windmar encountered difficulties with its project that led to Windmar requesting a new location for the project and significant delays to its projected operation date. PREPA negotiated at length with YFN and M Solar, however, the counterparties were not able to agree the price reductions proposed by PREPA. PREPA determined that the three (3) PPOAs would not be ready to supply cost-effective energy in the near term, and sought approval of the rejection of these PPOAs in the Second Omnibus Rejection Motion ("Second Omnibus Rejection Motion").

YFN and M Solar objected to the rejection of their renegotiated PPOAs, arguing (i) a decision on the rejection of YFN and M Solar's PPOAs was unripe absent a PREB determination on PREPA's and the Oversight Board's authority to reject PPOAs; (ii) PREPA's motion to reject the PPOA's constituted an unlawful price fixing predetermination; (iii) PREPA's motion was contrary to public policy; (iv) PREPA proposed the incorrect standard of review for rejecting the PPOAs; (v) PREPA's motion lacks the necessary facts to review the rejection of the PPOAs; (vi) PREPA's decision to reject the PPOAs lacked the necessary public participation; and (vii) PREPA's motion was untimely. [ECF Nos. 2360, 2361]. The Title III Court entered an order approving PREPA's rejection of YFN and M Solar's PPOAs on September 16, 2021. [ECF No. 2622]. The Title III Court found (i) no statute requires PREPA to seek approval from PREB before rejecting PPOAs; (ii) PREPA satisfied the relevant standard applicable to rejecting the YFN and M Solar's PPOAs; and (iii) YFN and M Solar's arguments related to the environmental and energy public policies are not relevant in reviewing a motion to reject an executory contract. *Id.*

On November 17, 2020, the Oversight Board filed the Second Omnibus Rejection Motion, including four (4) non-operational PPOAs executed between PREPA and Windmar that were terminated by PREPA's Board on March 25, 2020. [ECF No. 2296]. No parties opposed the rejection of these PPOAs or Windmar's Shovel-Ready PPOA, and the Title III Court entered an order approving the rejection of those PPOAs on December 2, 2020. [ECF No. 2318]

On July 16, 2022, the Oversight Board filed a motion seeking approval of PREPA's further rejection of fifteen (15) PPOAs. [ECF No. 2893] (the "Third Omnibus Rejection Motion"). The PPOAs rejected in the Third Omnibus Rejection Motion included (i) thirteen (13) renegotiated PPOAs that the Oversight Board declined to approve; and (ii) certain non-operational PPOAs whose energy prices would have imposed significant financial burdens on PREPA and the

192

ratepayers of Puerto Rico.  The Title III Court entered an order approving the Third Omnibus Objection Motion on August 08, 2022.

G.    **Significant Adversary Proceedings and Contested Matters**

1.    **Motion of Ad Hoc Group of PREPA Bondholders, National Public Finance Guarantee Corporation, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and Syncora Guarantee Inc. For Relief from the Automatic Stay to Allow Movants to Enforce their Statutory Right to Have a Receiver Appointed, Case No. 17-bk-4780, ECF No. 74;** *Puerto Rico Electric Power Authority v. Ad Hoc Group of PREPA Bondholders,* **(1st Cir. 17-2079)**

On July 18, 2017, the Ad Hoc Group and Monoline Insurers filed the Initial Receiver Motion seeking relief from the automatic stay and the appointment of a receiver for PREPA. According to movants, their right to appoint a receiver was part of their purported "collateral package" and that the Court should lift the stay to permit them to seek appointment of a receiver that would then produce net revenues in amounts sufficient to timely pay debt service on the PREPA Bonds [Case No. 17-bk-4780, ECF No. 74].  Movants argued there was cause to lift the stay due to PREPA's failure to abide by the rate covenant, PREPA's ongoing mismanagement, and a decline in the value of their collateral while the stay is in effect.  Movants also argued the balance of harms favored bondholders because rate increases would allow PREPA to stop incurring debt to fund operations and reduce its debt burden.  On July 26, 2017, the Bond Trustee filed a joinder to the Initial Receiver Motion.

On July 31, 2017, the Fuel Line Lenders filed a response to the Initial Receiver Motion, requesting that the Title III Court direct parties to engage in mediation [Case No. 17-bk-4780, ECF No. 146].

On the same day, the Instituto de Competitividad y Sostenibilidad Económica de Puerto Rico ("ICSE") filed an objection to the Initial Receiver Motion, and the Oversight Board, joined by AAFAF, filed a separate objection to the Initial Receiver Motion [Case No. 17-bk-4780, ECF Nos. 147, 149, 150].  ICSE argued that it was too early to appoint a receiver, and pursuant to Section 362(b)(4), PREC can and presumably will continue to oversee PREPA under its regulatory authority [Case No. 17-bk-4780, ECF No. 147].  The Oversight Board argued the automatic stay is critical to a successful plan of adjustment and there is no "cause" on account of alleged mismanagement.  The Oversight Board, joined by AAFAF, also argued movants cannot lack adequate protection because their asserted security interests on PREPA's (negative) net revenues have no value [Case No. 17-bk-4780, ECF No. 149, 150].

On August 1, 2017, the UCC filed a limited joinder to the Fuel Line Lenders' response [Case No. 17-bk-4780, ECF No. 153].  The UCC joined the Fuel Line Lenders' response solely to the extent it sought to have PREPA-related issues made subject to the global mediation process and the motion be held in abeyance while that mediation proceeds.  On August 4, 2017, the Bond Trustee filed a limited response to the Oversight Board's objection [Case No. 17-bk-4780, ECF No. 175], arguing that the Oversight Board was wrong as the Bond Trustee's lien attaches only to the net revenues of PREPA's system but instead, according to the Bond Trustee, argued it attaches

193

to all PREPA's gross revenues.  On August 5, 2017, movants filed a reply in support of their motion [Case No. 17-bk-4780, ECF No. 177].

On August 15, 2017, the Title III Court issued an order requesting supplemental briefing to address Sections 305 and 306 of PROMESA [Case No. 17-bk-4780, ECF No. 232].  On August 22, 2017, movants filed a supplemental brief in support of their motion, arguing that the appointment of a receiver would not implicate either Section 305 or Section 306 of PROMESA, and neither section prevents the Title III Court from lifting the automatic stay [Case No. 17-bk-4780, ECF No. 249].  On August 29, 2017, AAFAF and the Oversight Board filed supplemental briefs in opposition to the Initial Receiver Motion, arguing that granting the relief sought would violate Sections 305 and 306 of PROMESA, which expressly limit the jurisdiction and powers of the district court over certain matters [Case No. 17-bk-4780, ECF Nos. 258, 260].

On September 14, 2017, the Title III Court issued an order denying the Initial Receiver Motion [Case No. 17-bk-4780, ECF No. 299].  The Title III Court held that movants' requested relief was in fact prohibited by PROMESA Section 305's "or otherwise" language.  That language, along with other Title III provisions limiting the power to formulate a debt adjustment plan to the governmental debtor, protects the authority of the elected officials to direct the restructuring effort.  The Title III Court also reasoned that Congress denied the Title III Court the power to displace PREPA's management, even for misconduct, by omitting section 1104 of the Bankruptcy Code from PROMESA's statutory scheme.

On September 28, 2017, movants filed a notice of appeal to the First Circuit, which was docketed as Case No. 17-2079 [Case No. 17-bk-4780, ECF No. 324].  By opinion dated August 8, 2018, the First Circuit reversed and remanded the Title III Court's denial of the Initial Receiver Motion, holding that PROMESA Section 305 does not prohibit the Title III Court from lifting the stay to allow PREPA bondholders to seek appointment of a receiver.  According to the First Circuit, the word "otherwise" in Section 305 broadly defines where the Title III Court may not interfere: "in the case or otherwise."  Moreover, Section 362(d)(1) of the Bankruptcy Code, which PROMESA incorporates, says the court "shall" provide relief from the automatic stay "for cause, including the lack of adequate protection of [a creditor's] interest in property."  It advised that, on a renewed receiver motion, the Title III Court must assess the prepetition value of the Bondholders' collateral (if any), whether the bondholders face a threat of uncompensated diminution in such value, whether the bondholders are seeking the protection of existing collateral or, instead, the creation of new collateral, and what, if any, adequate protection PREPA can offer short of a receiver being appointed to manage it if protection is warranted.  On August 30, 2018, the First Circuit issued its mandate.

2.   **The Financial Oversight and Management Board for Puerto Rico v. U.S. Bank National Association, Adv. Proc. No. 19-00391**

On July 1, 2019, PREPA, by and through the Oversight Board, and AAFAF, filed a complaint against the Bond Trustee regarding the existence and enforceability of certain alleged security interests in PREPA's revenues and alleged in the Master PREPA Bond Claim [Adv. Proc. No. 19-00391, ECF No. 1].  The complaint alleged that the Trust Agreement expressly limited the Bond Trustee's security interest in PREPA's revenues to funds deposited to the credit of the Sinking Fund and certain other Subordinate Funds and sought to disallow.  The Bond Trustee's

claim, in which the Bond Trustee had asserted that it held a valid security interest in all of PREPA's current and future revenues on behalf of holders of bonds issued by PREPA, the Bondholders, and that PREPA's covenants in the Trust Agreement constitute part of the collateral in which PREPA granted a security interest to secure PREPA's bond debt. Plaintiffs sought declaratory relief establishing the limited nature of the defendant's interest in PREPA revenues in accordance with the Trust Agreement; establishing there is no security interest in PREPA's covenants; and avoiding the Bond Trustee's unperfected security interests in any PREPA property beyond the revenues deposited to the credit of the Sinking Fund and preserving such unperfected security interests for the benefit of PREPA pursuant to Bankruptcy Code section 551, made applicable by PROMESA Section 301(a).

Also on July 1, 2019, plaintiffs filed a joint motion to stay the adversary proceeding [Adv. Proc. No. 19-00391, ECF No. 2]. Plaintiffs requested that all deadlines and further proceedings be stayed until the earlier of (i) 60 days after the Title III Court denies the pending motion seeking the Title III Court's approval of a restructuring support agreement with holders and insurers of PREPA's Bonds (the 9019 Motion, which is described further in Section V.C.3, above); (ii) consummation of a plan of adjustment for PREPA; (iii) 60 days after the filing by plaintiffs of a notice to resume litigation; or (iv) further order of the Title III Court. The Oversight Board and AAFAF contended that staying this adversary proceeding would spare all parties involved from engaging in costly and time-consuming litigation that might be resolved by the 9019 Motion.

On July 8, 2019, the Title III Court issued an order referring the matter to Magistrate Judge Dein [Adv. Proc. No. 19-00391, ECF No. 6]. The Title III Court granted the joint motion to stay on July 16, 2019 [Adv. Proc. No. 19-00391, ECF No. 10].

On September 17, 2022, the Oversight Board filed a motion for entry of an order establishing a litigation schedule for the continuation of certain unresolved adversary proceedings in connection with the plan of adjustment for PREPA [Adv. Proc. No. 19-00391, ECF No. 11]. The motion was fully briefed [Adv. Proc. No. 19-00391, ECF Nos. 14, 15, 19]. On September 29, 2022, the Title III Court issued an order granting in part and denying in part the Oversight Board's motion for entry of an order establishing a litigation schedule, and ordering the Oversight Board to file an amended complaint by September 30, 2022 [Adv. Proc. No. 19-00391, ECF No. 22].

On September 30, 2022, the Oversight Board filed an amended complaint (the "Amended Complaint") against the Bond Trustee, seeking a judgment disallowing the Master PREPA Bond Claim except as to a secured claim against the Sinking Fund and Self-Insurance Fund [Adv. Proc. No. 19-00391, ECF No. 24]. On October 3, 2022, the Oversight Board re-filed the Amended Complaint with an amended caption page [Adv. Proc. No. 19-00391, ECF No. 26].

On October 6, 2022, the Oversight Board filed a motion (i) requesting approval of joint stipulations allowing the Bondholders, the Fuel Line Lenders, UTIER and SREAEE to intervene in the adversary proceeding and (ii) stating the parties' intent to file joint stipulations allowing AAFAF and the UCC to intervene in the adversary proceeding [Adv. Proc. No. 19-00391, ECF No. 29]. On the same day, the UCC filed an informative motion and AAFAF filed a motion for leave to intervene in connection with the same [Adv. Proc. No. 19-00391, ECF Nos. 30, 31]. On October 7, 2022, UTIER and SREAEE filed reservations of rights in connection with the parties' joint stipulations allowing them to intervene [Adv. Proc. No. 19-00391, ECF Nos. 32, 33]. On the

195

same day, Judge Dein issued orders approving the parties' joint stipulations allowing SREAEE, UTIER and the Bondholders to intervene in the adversary proceeding [Adv. Proc. No. 19-00391, ECF Nos. 34, 35, 36]. Also on October 7, 2022, the Oversight Board filed a motion requesting approval of a joint stipulation allowing the Fuel Line Lenders to intervene in the adversary proceeding [Adv. Proc. No. 19-00391, ECF No. 37]. On October 10, 2022, the Oversight Board filed a motion requesting approval of a joint stipulation allowing the UCC to intervene in the adversary proceeding [Adv. Proc. No. 19-00391, ECF No. 38].

On October 11, 2022, Judge Dein issued an order approving the parties' joint stipulation allowing the Fuel Line Lenders to intervene in the adversary proceeding [Adv. Proc. No. 19-00391, ECF No. 39]. On October 12, 2022, Judge Dein issued an order approving the parties' joint stipulation allowing the UCC to intervene in the adversary proceeding [Adv. Proc. No. 19-00391, ECF No. 40]. On the same day, the parties filed a motion for entry of an order approving their stipulation, setting the deadline for the Bondholders and Bond Trustee to file their answer to the Amended Complaint [Adv. Proc. No. 19-00391, ECF No. 42]. On October 13, 2022, Judge Dein issued an order granting the motion [Adv. Proc. No. 19-00391, ECF No. 43]. On the same day, the Oversight Board filed a motion for entry of an order approving the parties' stipulation allowing AAFAF to intervene in the adversary proceeding [Adv. Proc. No. 19-00391, ECF No. 44].

On October 14, 2022, the Oversight Board filed a motion for entry of an order approving the parties' stipulation allowing AAFAF to intervene in the adversary proceeding [Adv. Proc. No. 19-00391, ECF No. 44]. On October 17, 2022, Judge Dein issued an order approving the stipulation [Adv. Proc. No. 19-00391, ECF No. 46].

On October 17, 2022, the Bondholders and U.S Bank filed their answer, affirmative defenses, and counterclaims [Adv. Proc. No. 19-00391, ECF No. 47]. In the counterclaims, the defendants seek declaratory judgments (i) that they have recourse to PREPA's current and future revenues (count I); (ii) that they have valid and perfected liens in PREPA's revenues and other revenues not subject to avoidance under section 544(a) of the Bankruptcy Code (count II); (iii) that PREPA has breached the Trust Agreement (count III); (iv) that PREPA has breached its obligations as trustee of funds held in trust for bondholders (count IV); (v) that they are entitled to relief on account of certain equitable arguments (count V); (vi) that if PREPA prevails on its claims, that the Bond Trustee should receive an allowed claim on behalf of all Bondholders for rescission (count VI); and (vii) that if PREPA prevails on its claims, it would give rise to a non-dischargeable claim for just compensation (count VII).

That same day, the defendants filed a motion requesting leave to move for summary judgment on counts I and II of the counterclaims at the same time they move for summary judgment on counts I–VII of the Amended Complaint, and a motion for expedited consideration [Adv. Proc. No. 19-00391, ECF Nos. 48, 49]. On October 18, 2022, Judge Dein issued an order allowing the motion and scheduling briefing on whether to grant the Bondholders and the Bond Trustee leave to move for summary judgment [Adv. Proc. No. 19-00391, ECF No. 50]. On October 20, 2022, the Title III Court issued an order granting the motion for leave and allowing the parties to move for summary judgments on the Amended Complaint and counts I and II of the counterclaims [Adv. Proc. No. 19-00391, ECF No. 59].

On October 24, 2022, the Oversight Board filed its motion for summary judgment of the Amended Complaint and counts I and II of the counterclaims.  In the motion, the Oversight Board argues that the Master PREPA Bond Claim should be disallowed because (i) it asserts a secured claim in revenues beyond those deposited to the Sinking Fund and Self-Insurance Fund despite the fact the Trust Agreement did not grant a security interest in anything other than the Sinking Fund and Subordinate Funds to the Trustee, and the Bond Trustee only perfected its interest in the Sinking Fund and Self-Insurance Fund; (ii) the Bond Trustee failed to perfect any security interests in PREPA revenues outside of the Sinking Fund and Self-Insurance Fund to the extent any such interests exist; (iii) under section 22 L.P.R.A. § 2267, any unperfected security interests should be subordinated to PREPA's interest in the property; (iv) PREPA could not have granted security interests in certain covenants and remedies in the Trust Agreement as they are not PREPA's property; (v) any such security interests in those covenants and remedies should be avoided and preserved for the benefit of PREPA because they were not perfected; (vi) any security interests over those covenants and remedies should be subordinated to PREPA's interest because they were not perfected; and (vii) the unambiguous terms of the PREPA Bonds and the Trust Agreement limit the Bondholders' right to payment to the Sinking Fund and the Self-Insurance Fund [Adv. Proc. No. 19-00391, ECF No. 63].  Additionally, the Oversight Board argued that it is entitled to summary judgment on counts I and II of the counterclaims for substantially the same.

On the same day, defendants filed their motion for summary judgment of the Amended Complaint and counts I and II of the counterclaims [Adv. Proc. No. 19-00391, ECF No. 67].  In the motion, defendants argue that they are entitled to summary judgment because (i) the Trust Agreement grants the Bond Trustee recourse to all revenues and other moneys whether or not credited to the sinking fund, and its recourse is not limited by Bankruptcy Code section 927; (ii) the Bond Trustee has a perfected lien on moneys credited to the sinking fund and on all future special revenues; and (iii) the Trust Agreement grants liens in all PREPA revenues, with covenants, rights and remedies guaranteeing their payment to bondholders, and those liens are not subject to avoidance, limitation, or subordination.  On October 31, 2022, SREAEE filed a memorandum in support of the Oversight Board's motion for summary judgment, arguing in addition that the Trust Agreement is a subordination agreement [Adv. Proc. No. 19-00391, ECF No. 74].

On November 18, 2022, the Oversight Board filed its response to the defendants' motion for summary judgment [Adv. Proc. No. 19-00391, ECF No. 89].  In the motion, the Oversight Board argues that the defendants' arguments that they have full recourse to all PREPA's current and future revenues contradict the Trust Agreement's provisions, and that defendants' sole right to payment is from the Sinking Fund and Self-Insurance Fund, and that the covenants and remedies contained in the Trust Agreement do not expand defendants' rights to payment.  Moreover, the Oversight Board argues that the Bond Trustee has a perfected security interest only in the revenues deposited to the credit of the Sinking Fund and Self-Insurance Fund.  The Oversight Board also argues the parties' claims are ripe and the court has subject matter jurisdiction because its action to disallow the Bond Trustee's claim may be heard at any time.

On the same day, defendants filed their response to the Oversight Board's motion for summary judgment [Adv. Proc. No. 19-00391, ECF No. 90].  In the response, the defendants argue that the Oversight Board's motion should be denied because (i) the Trust Agreement grants security interests in all PREPA revenues; (ii) the Bond Trustee's claim is not subject to

197

disallowance based on lien avoidance or subordination; and (iii) the Bond Trustee has an enforceable right to payment to all PREPA revenues.  Defendants also argue that the claims are unripe because any permanent alteration to the Bond Trustee's and Bondholders' rights and remedies can only happen in the context of a plan of adjustment.

On December 11, 2022, the PREPA bondholders filed a reply in support of their request to stay or deny the FOMB's motion for summary judgment pursuant to Rule 56(d). [Case No. 19-ap-391, ECF No. 101]. While the bondholders continued to assert that their positions are unambiguously supported by the Trust Agreement, they argued in the alternative that there are sufficient factual disputes such that the court should order discovery. They disputed FOMB's argument that cross-motions for summary judgment preclude Rule 56(d) discovery, and argued that their discovery requests were legally sound.

On December 14, 2022, the FOMB and PREPA bondholders filed replies in support of their motions for summary judgment [Case No. 19-ap-391, ECF Nos. 104, 105]. The FOMB argued that the Trustee's security interest is limited to the sinking fund and self-insurance fund; that the bondholders' perfection arguments are inconsistent with the terms of the trust agreement and Article 9 of the UCC; that the bondholders effectively concede judgement should be entered against them by failing to counter arguments regarding disallowance of the Master PREPA Bond Claim asserting a security interest in Covenants and Remedies; and that the bondholders have no recourse to any revenues beyond those deposited to the sinking fund and self-insurance fund. The FOMB also argued for the exclusion of the expert declaration of Robert E. Lamb, a subject covered in separate briefing [Case No. 19-ap-391, ECF Nos. 107, 114, 117]. The bondholders argued that the trustee's right to payment is not limited to the amount currently credited to the sinking fund; that the Trustee's and bondholders' enforceable liens cover all present and future revenues; and that the FOMB's complaint is unripe.

On December 20, 2022, AAFAF filed a joinder to the FOMB's reply in support of its motion for summary judgment.  [Case No. 19-ap-391, ECF No. 110]. On December 21, 2022, in PREPA v. U.S. Bank, the UCC filed a supplemental reply and joinder to the FOMB's reply in support of its motion for summary judgment.  [Case No. 19-ap-391, ECF No. 111]. In its supplemental reply, the Official Committee of Unsecured Creditors argued that the bondholders have no lien on future revenues, and that the bondholders agreed their recourse is limited to their collateral.

Briefing on the motions for summary judgment concluded on December 20, 2022.  On January 11, 2023, the parties filed a joint informative motion submitting a Conformed Trust Agreement.  [Case No. 19-ap-391, ECF No. 118].  Oral argument on the motions for summary judgment was held on February 1, 2023. [Adv. Proc. No. 19-00391, ECF No. 119].

### 3.   Cortland Capital Market Services LLC v. The Financial Oversight and Management Board for Puerto Rico, Adv. Proc. No. 19-00396

On July 9, 2019, the Fuel Line Lenders filed a complaint against the Oversight Board, PREPA, AAFAF, and the Bond Trustee [Adv. Proc. No. 19-00396, ECF No. 1].  As discussed in Section V.C.3(ii)(a) above, at its essence, the Fuel Line Lenders argue they have an enforceable priority right over PREPA's Bonds because their claims are "Current Expenses" under the Trust

Agreement, and that PREPA Bondholders' security interests and recourse are limited to specific deposit accounts of PREPA's into which PREPA's *net* revenues (revenues after the payment of Current Expenses) are meant to be deposited.  The Fuel Line Lenders thus sought an order disallowing the Bond Trustee's claim to the extent it seeks more than the amounts properly determined to be in the Sinking Fund unless and until PREPA has paid all Current Expenses, as well as an order subordinating the Bond Trustee's claim to the Fuel Line Lenders' claims.  On July 11, 2019, the Title III Court issued an order referring the matter to Magistrate Judge Dein [Adv. Proc. No. 19-00396, ECF No. 5].

On August 26, 2019, the Monoline Insurers and the Ad Hoc Group filed a motion for leave to intervene [Adv. Proc. No. 19-00396, ECF No. 10].  On August 29, 2019, the UCC also moved for limited intervention [Adv. Proc. No. 19-00396, ECF No. 19].

On September 9, 2019, the Oversight Board, PREPA, and AAFAF filed a motion to dismiss, arguing that: (i) plaintiffs fail to state a claim that they have seniority under the Trust Agreement as Current Expenses; (ii) plaintiffs lack standing to assert a claim for equitable subordination; and (iii) plaintiffs also lack standing to object to the secured claims of PREPA's bondholders, such that the complaint  should be dismissed, or alternatively, be stayed until at least 60 days after adjudication of the 9019 Motion discussed above in Section V.C.3 [Adv. Proc. No. 19-00396, ECF No. 24].

The Bond Trustee also filed a motion to dismiss on September 9, 2019, arguing that: (i) all counts are unripe and the Title III Court therefore lacks subject matter jurisdiction; (ii) the Title III Court should dismiss plaintiffs' request for a declaration they have priority over the PREPA Bondholders under the Trust Agreement for lack of standing and failure to state a claim; (iii) the Title III Court should dismiss plaintiffs' claim for equitable subordination for failure to state a claim, as the plaintiffs fail to allege the existence of any subordination agreement, a necessary prerequisite when seeking equitable subordination; and (iv) the Title III Court should either dismiss or stay the remaining counts in deference to the Amended Recourse & Lien Challenge and the 9019 Motion [Adv. Proc. No. 19-00396, ECF No. 25].

On September 12, 2019, plaintiffs responded, without objecting, to the UCC's motion for limited intervention and filed an opposition to the intervenors' motion for leave to intervene [Adv. Proc. No. 19-00396, ECF Nos. 32-33].  On September 16, 2019, the Title III Court granted the UCC's motion for limited intervention [Adv. Proc. No. 19-00396, ECF No. 34].  On September 18, 2019, the intervenors filed a reply in further support of their motion for leave to intervene [Adv. Proc. No. 19-00396, ECF No. 35].

The Fuel Line Lenders filed an amended complaint on September 30, 2019, adding the intervenors as defendants and seeking additional judgments imposing an equitable lien against the Bond Trustee's collateral; requiring defendants to specifically perform under certain prepetition forbearance agreements by withdrawing any argument that the amounts owed on the Fuel Line Loans are not Current Expenses on any basis; and declaring the 2019 RSA null and void to the extent its provisions were entered into with "illegal consideration" under Puerto Rico law [Adv. Proc. No. 19-00396, ECF No. 36].  On the same day, the Fuel Line Lenders filed an informative motion regarding the amended complaint, submitting that defendants' pending motions to dismiss the initial complaint are moot and that because the amended complaint adds the intervenors as

199

defendants, the intervenors' motion to intervene is also moot [Adv. Proc. No. 19-00396, ECF No. 37]. On October 4, 2019, the Title III Court issued an order denying the intervenors' motion to intervene as moot [Adv. Proc. No. 19-00396, ECF No. 38]. The Title III Court also issued an order rendering defendants' motions to dismiss moot on October 15, 2019 [Adv. Proc. No. 19-00396, ECF No. 43].

On November 11, 2019, the Oversight Board and PREPA filed a motion for leave to intervene in the Second, Third, and Fourth Claims for Relief of the amended complaint [Adv. Proc. No. 19-00396, ECF No. 49]. On the same day, the Oversight Board, PREPA, and AAFAF filed a motion to dismiss the amended complaint, arguing that: (i) counts I and IV fail to state a claim that plaintiffs have seniority over the bond claim; (ii) count IV fails to state a claim under Bankruptcy Code section 510; (iii) plaintiffs lack standing to bring counts II and III; (iv) count VI seeking specific performance for breach of contract cannot be granted because specific performance on the Fuel Line Lenders contracts' is not a viable remedy under the Bankruptcy Code, the rights of counterparties to prepetition, unassumed contracts are unenforceable and subject to the automatic stay, as well as treatment and discharge pursuant to a plan of adjustment, and specific performance against PREPA is barred pursuant to PROMESA Section 305; and (v) count VII fails to state a claim because plaintiffs' legal rights are not prejudiced by the 2019 RSA [Adv. Proc. No. 19-00396, ECF No. 50].

Also on November 11, 2019, the Bond Trustee and the intervenors filed a motion to dismiss the amended complaint, arguing that: (i) counts I, II, III, IV, V, and VII are unripe for adjudication; (ii) the plaintiffs lack standing and fail to state a claim for declaratory relief in count I; (iii) the Title III Court should dismiss count IV, as plaintiffs fail to allege the existence of any subordination agreement; (iv) plaintiffs fail to state a claim for unjust enrichment in count V; (v) the Title III Court should either dismiss or stay counts II and III in deference to the 9019 Motion; (vi) count VI's claim for specific performance should be dismissed because the intervenors have taken no action in violation of any forbearance agreement with plaintiffs; and (vii) count VII should be dismissed for failure to state a claim because the 2019 RSA is not a contract in violation of plaintiffs' rights [Adv. Proc. No. 19-00396, ECF No. 51].

The Fuel Line Lenders, on November 19, 2019, filed a response to the Oversight Board and PREPA's motion to intervene [Adv. Proc. No. 19-00396, ECF No. 58]. On November 26, 2019, the Title III Court issued an order granting in part and denying in part the Oversight Board and PREPA's motion to intervene [Adv. Proc. No. 19-00396, ECF No. 59].

On December 5, 2019, the Fuel Line Lenders filed an omnibus opposition to both motions to dismiss the amended complaint, arguing that (i) there is a justiciable and ripe controversy between the parties; (ii) the amended complaint states a claim for declaratory judgments that the Fuel Line Loans are current expenses; (iii) the Fuel Line Lenders have independent standing; (iv) the Fuel Line Lenders have valid subordination claims; (v) the amended complaint states a claim for unjust enrichment; and (vi) the amended complaint states a claim for breach of the forbearance agreements, precluding a dismissal of count VI [Adv. Proc. No. 19-00396, ECF No. 62]. The following day, the UCC filed a joinder to the Fuel Line Lenders' omnibus opposition [Adv. Proc. No. 19-00396, ECF No. 63].

On February 3, 2020, the Oversight Board, PREPA, AAFAF, the Bond Trustee, and the intervenors filed replies in support of their motions to dismiss, arguing that (i) the claims are not enforceable property rights; (ii) are not current expenses; (iii) do not state a claim for subordination, unjust enrichment, specific performance, or unfair prejudice; and (iv) that the plaintiffs lack standing [Adv. Proc. No. 19-00396, ECF Nos. 79, 80]. The following day, the UCC filed a limited joinder to the reply filed by the Oversight Board, PREPA, and AAFAF [Adv. Proc. No. 19-00396, ECF No. 81].

On February 11, 2020, the Fuel Line Lenders, UTIER, and SREAEE filed an urgent motion to adjourn the March 4, 2020, hearing on the motions to dismiss, arguing that the status of the 9019 Motion was uncertain and that, should it fail, various causes of action would be mooted [Adv. Proc. No. 19-00396, ECF No. 82]. On February 14, 2020, the UCC filed a joinder to the Fuel Line Lenders' motion [Adv. Proc. No. 19-00396, ECF No. 84]. Also on February 14, 2020, the Supporting Holders, the Oversight Board, and AAFAF filed responses to the Fuel Line Lenders' motion [Adv. Proc. No. 19-00396, ECF Nos. 85, 86, 87]. On February 19, 2020, the Title III Court granted the Fuel Line Lenders' motion and adjourned the hearing on the motions to dismiss until the June 3, 2020, omnibus hearing [Adv. Proc. No. 19-00396, ECF No. 89]. On April 2, 2020, in light of the COVID-19 pandemic, the Title III Court further adjourned the hearing on the motions to dismiss *sine die*.

This adversary proceeding is settled pursuant to the Fuel Line Lender PSA.

4.      **Sistema de Retiro de los Empleados de La Autoridad de Energia Electrica v. Financial Oversight and Management Board of Puerto Rico, Adv. Proc. No. 19-00405**

On August 6, 2019, SREAEE filed a complaint against the Oversight Board, PREPA, AAFAF, the Commonwealth of Puerto Rico, the Governor of Puerto Rico, the Executive Director of AAFAF, and Bond Trustee alleging that the 2019 RSA violates its alleged priority rights to payment over PREPA's bondholders [Adv. Proc. No. 19-00405, ECF No. 1]. SREAEE seeks a declaration that (i) the amounts owed to SREAEE are Current Expenses under the Trust Agreement; (ii) the Bondholders have no lien on revenues received by PREPA unless and until all Current Expenses are paid in full; and (iii) SREAEE should be paid in full all current and legacy liability before PREPA pays or agrees to pay any Bondholder. On August 26, 2019, the Title III Court issued an order referring the matter to Magistrate Judge Dein for general pre-trial management [Adv. Proc. No. 19-00405, ECF No. 8].

On September 17, 2019, the Monoline Insurers and the Ad Hoc Group filed a motion for leave to intervene, asserting that they should be permitted to intervene with full participation rights as defendants under Fed. R. Civ. P. 24(a–b). [Adv. Proc. No. 19-00405, ECF No. 12]. On October 7, 2019, plaintiff filed an opposition to the motion for leave to intervene [Adv. Proc. No. 19-00405, ECF No. 19]. On October 18, 2019, the Supporting Holders filed a reply in further support of their motion for leave to intervene [Adv. Proc. No. 19-00405, ECF No. 24]. On November 7, 2019, the Title III Court issued an order allowing the Supporting Holders' motion for leave to intervene and permitting the Supporting Holders to exercise full participation rights [Adv. Proc. No. 19-00405, ECF No. 30].

Plaintiff filed an amended complaint on October 30, 2019, naming Wanda Vázquez-Garced, the then-Governor of Puerto Rico, and Omar Marrero, the then-director of AAFAF, as defendants and adding additional claims for relief, including: (i) a request for an order disallowing the Bond Trustee's claim because the Trustee's alleged right to payment exceeds the amount in the Sinking Fund; (ii) a declaration that SREAEE is a third-party beneficiary entitled to enforce the Trust Agreement provisions that benefit it; (iii) a request for an order subordinating the Trustee's lien and claim to the SREAEE claims; and (iv) a request for an order declaring that the Bondholders' claims are not secured [Adv. Proc. No. 19-00405, ECF No. 25].

On November 13, 2019, the Oversight Board, PREPA, and the Commonwealth filed a motion for leave to intervene in the second claim for relief of the amended complaint [Adv. Proc. No. 19-00405, ECF No. 34]. On November 22, 2019, the Oversight Board, PREPA, and the Commonwealth filed a reply in further support of their motion for leave to intervene in the second claim for relief of the amended complaint [Adv. Proc. No. 19-00405, ECF No. 40]. On November 26, 2019, the Title III Court issued an order granting in part and denying in part the Oversight Board, PREPA, and the Commonwealth's motion to intervene [Adv. Proc. No. 19-00405, ECF No. 41].

On November 13, 2019, the Oversight Board, PREPA, AAFAF, the Commonwealth of Puerto Rico, and Wanda Vázquez-Garced filed a motion to dismiss the amended complaint, arguing that: (i) counts I, III, IV, and V fail to state a claim because SREAEE is neither a party to nor a third party beneficiary of the Trust Agreement, the Trust Agreement is not a subordination agreement, and amounts allegedly owed to SREAEE are not "Current Expenses" under the Trust Agreement; (ii) the Title III Court lacks subject matter jurisdiction over count III because PROMESA Section 106(e) divests the Title III Court of jurisdiction; (iii) plaintiff lacks standing to bring and fails to state a claim for counts II and VI; and (iv) PROMESA Section 105 bars all claims against the Oversight Board [Adv. Proc. No. 19-00405, ECF No. 35].

On the same day, the Supporting Holders and Bond Trustee also filed a motion to dismiss, arguing that: (i) all of the plaintiff's claims are unripe for adjudication; (ii) count IV fails to state a claim because plaintiff is neither a party to nor a third party beneficiary of the Trust Agreement; (iii) plaintiff lacks standing to bring and fails to state a claim for count I; (iv) plaintiff fails to state a claim for counts III and V because there is no enforceable subordination agreement; and (v) the Title III Court should either dismiss or stay counts II and VI in deference to the Amended Lien & Recourse Challenge and the 9019 Motion [Adv. Proc. No. 19-00405, ECF No. 36].

On December 4, 2019, plaintiff filed an omnibus opposition to both motions to dismiss the Amended Complaint [Adv. Proc. No. 19-00405, ECF No. 42]. On February 3, 2020, the Oversight Board, PREPA, AAFAF, the Commonwealth of Puerto Rico, Governor Wanda Vázquez-Garced, the Supporting Holders, and Bond Trustee filed replies in support of their motions to dismiss, largely reiterating their original arguments [Adv. Proc. No. 19-00405, ECF Nos. 53-54]. On February 11, 2020, the Fuel Line Lenders, UTIER, and SREAEE filed an urgent motion to adjourn the March 4, 2020, hearing on the motions to dismiss [Adv. Proc. No. 19-00396, ECF No. 82]. On February 14, 2020, the Oversight Board filed a response to the Fuel Line Lenders' motion [Adv. Proc. No. 19-0405, ECF No. 59]. On February 19, 2020, the Title III Court granted the Fuel Line Lenders' motion and adjourned the hearing on the motions to dismiss until the June 3, 2020, omnibus hearing. [Adv. Proc. No. 19-00405, ECF No. 60]. On April 2, 2020, in light of the

COVID-19 pandemic, the Title III Court further adjourned the hearing on the motions to dismiss *sine die*.

> **5.**      **Urgent Motion for Entry of Order Confirming Appointment and Authority of Chief Transformation Officer, Case No. 17-bk-4780, ECF No. 361**

On October 26, 2017, the Oversight Board filed a motion (the "CTO Motion") seeking entry of an order confirming the appointment of Noel Zamot as PREPA's Chief Transformation Officer (the "CTO"), with all of the powers of a chief executive officer reporting to the Oversight Board, pursuant to PROMESA Sections 305 and 306 [Case No. 17-bk-4780, ECF No. 361]. In light of the effects of Hurricanes Irma and Maria on Puerto Rico and PREPA's historical operational challenges, the Oversight Board appointed Mr. Zamot as CTO pursuant to PROMESA Section 315 to oversee PREPA's recovery efforts. According to the CTO Motion, the CTO's responsibilities would include developing a comprehensive and sequenced restoration plan, directing disaster recovery and rebuilding efforts in conjunction with federal government agencies, ensuring PREPA operates in a manner that is compatible with the overall recovery of Puerto Rico, and communicating with the Oversight Board and the Puerto Rico Government on behalf of PREPA's management.

On November 3, 2017, PREC filed a motion stating that it took no position on the selection of PREPA's leadership, but seeking (i) a declaration that the Title III Court's approval of the CTO Motion does not preempt PREC's authority, and (ii) an order directing counsel for the Oversight Board and PREC to develop a set of protocols ensuring that the actions of each entity are not in conflict and are coordinated and mutually supportive [Case No. 17-bk-4780, ECF No. 376]. The PREC argued that reducing PREC's authority would make it difficult for regulatory rigor to return once the Oversight Board departs. Also on November 3, 2017, the Ad Hoc Group, National, Scotiabank, and AAFAF filed oppositions to the CTO Motion [Case No. 17-bk-4780, ECF Nos. 377, 379, 380, 381].

The Ad Hoc Group argued PROMESA does not authorize the Oversight Board to appoint a CTO outside the color of Commonwealth law. It further argued the Oversight Board's powers under PROMESA do not include control over the day-to-day operations of PREPA. National asserted PROMESA did not give the Oversight Board such broad authority, but proposed authorizing Mr. Zamot to oversee the immediate power grid repairs on an interim basis for a period of 120 days, pursuant to section 105 of the Bankruptcy Code, incorporated by Section 301 of PROMESA. Scotiabank argued the appointment of a new chief executive exceeds the authority of the Oversight Board, but did not object to the Oversight Board's appointment of a CTO to help support repair efforts, within the Oversight Board's statutory role. AAFAF opposed the CTO Motion, arguing that PROMESA does not give the Oversight Board the right to assume day-to-day operational control of PREPA.

On the same day, November 3, 2017, the Bond Trustee filed a joinder to the Ad Hoc Group's opposition, ISCE filed a joinder to the CTO Motion, Assured filed a joinder to National's opposition, and the PREPA Board filed a joinder to AAFAF's opposition [Case No. 17-bk-4780, ECF Nos. 382, 383, 384, 390].

On November 8, 2017, the Oversight Board filed its omnibus reply and a revised proposed order incorporating comments it received from the U.S. Department of Justice [Case No. 17-bk-4780, ECF No. 414]. The Oversight Board argued that in exchange for the authority to seek bankruptcy protection, Congress made the Oversight Board the representative of the Debtor and gave it many of the powers of a bankruptcy trustee of the Debtor. Moreover, the Oversight Board argued PROMESA Section 305 allows the Oversight Board to request the Title III Court confirm the Oversight Board's power over the property and affairs of PREPA.

On November 11, 2017, AAFAF filed a sur-reply in further opposition to the CTO Motion, arguing that PROMESA did not grant the Oversight Board the power to appoint a CTO [Case No. 17-bk-4780, ECF No. 445].

A hearing on the CTO Motion was held on November 13, 2017, and on November 16, 2017, the Title III Court issued an opinion and order denying the CTO Motion [Case No. 17-bk-4780, ECF No. 471]. The Title III Court concluded that PROMESA does not allow the Oversight Board to unilaterally impose changes in a statutorily-created management structure by appointing a CTO, to direct the executive functions of a Title III debtor—*i.e.*, PREPA—or to delegate that authority to an agent of the Oversight Board. Instead, the structure established by Titles I and II of PROMESA, alongside the reservation of territorial power in Section 303, requires the Oversight Board and the Puerto Rico Government to work together to establish a fiscally responsible path forward that is acceptable to the Oversight Board.

### 6. Urgent Motion for Entry of Order Authorizing Postpetition Secured Financing, Case No. 17-bk-4780, ECF No. 549

On January 27, 2018, the Oversight Board and AAFAF filed the PREPA Financing Motion to obtain postpetition financing of $1.3 billion secured by a first priming lien [Case No. 17-bk-4780, ECF No. 549]. The Title III Court scheduled an omnibus hearing on the PREPA Financing Motion for February 7, 2018 [Case No. 17-bk-4780, ECF No. 548]. On January 31, 2018, the Oversight Board filed a motion seeking an order clarifying the scope of the hearing [Case No. 17-bk-4780, ECF No. 557], which the Ad Hoc Group opposed [Case No. 17-bk-4780, ECF No. 558], and National joined that opposition [Case No. 17-bk-4780, ECF No. 561]. On February 1, 2018, Assured, Bond Trustee, and Syncora also filed joinders to the Ad Hoc Group's opposition [Case No. 17-bk-4780, ECF Nos. 564, 578, 581], and National filed a supplement to its joinder [Case No. 17-bk-4780, ECF No. 582]. On February 2, 2018, the Title III Court issued an order denying the motion clarifying the scope of the hearing [Case No. 17-bk-4780, ECF No. 616].

On February 1, 2018, Arc American, the Ad Hoc Group of General Obligation Bondholders (the "GO Group"), the Bond Trustee, the Ad Hoc Group, Whitefish, Scotiabank, National, Ambac, Assured, and Syncora filed oppositions to the PREPA Financing Motion [Case No. 17-bk-4780, ECF Nos. 563, 566, 568, 570, 571, 572, 580, 583, 585]. In general, the oppositions supported PREPA seeking postpetition financing to address its liquidity needs, but they either challenged the terms on which the postpetition financing was offered (including the priming of asserted existing security interests) and the procedural process pursuant to which it was negotiated, or they sought to modify the terms of the financing to allow for the payment of certain administrative expense claims.

On February 1, 2018, Solus filed a statement in support of the PREPA Financing Motion [Case No. 17-bk-4780, ECF No. 576]. On February 2, 2018, the UCC also filed a statement in support of the PREPA Financing Motion [Case No. 17-bk-4780, ECF No. 597]. On February 3, 2018, the Oversight Board filed its reply in support of the PREPA Financing Motion [Case No. 17-bk-4780, ECF No. 617]. In its reply, the Oversight Board argued that (i) PREPA would be unable to obtain PRPA Financing on more favorable terms; (ii) the holders of certain PREPA bonds would be adequately protected (assuming they had valid security interests at all); (iii) that the DIP Financing was fair, in the best interest of PREPA and its creditors, and necessary to preserve PREPA's finances; and (iv) that its terms were fair and reasonable. On February 5, 2018, AAFAF filed a joinder to the Oversight Board's reply [Case No. 17-bk-4780, ECF No. 623].

On February 9, 2018, Whitefish, Bond Trustee, the Ad Hoc Group, Assured, National and Syncora supplemented their oppositions to the PREPA Financing Motion [Case No. 17-bk-4780, ECF Nos. 648, 649, 650, 652, 655, 656, 663]. Also on February 9, 2018, Knighthead Capital Management, LLC filed an opposition to the PREPA Financing Motion and also joined several of the creditors' oppositions to the PREPA Financing Motion [Case No. 17-bk-4780, ECF No. 653]. On February 12, 2018, Scotiabank, and Solus filed a reply in support of the PREPA Financing Motion [Case No. 17-bk-4780, ECF No. 687].

On February 14, 2018, the Ad Hoc Group and Syncora filed a joint proposal to offer non-priming postpetition financing to PREPA, and the Oversight Board and AAFAF filed an informative motion noting that the competing proposal was not a valid financing proposal nor a reason for the Title III Court to deny the PREPA Financing Motion [Case No. 17-bk-4780, ECF Nos. 707, 714]. On February 15, 2018, the Ad Hoc Group filed a response to the Oversight Board and AAFAF's informative motion [Case No. 17-bk-4780, ECF No. 715].

The hearing on the PREPA Financing Motion was held on February 15, 2018. Following argument by both sides, the Title III Court determined it would not approve the financing on the terms proposed in the PREPA Financing Motion, but would hold the motion in abeyance without prejudice to the parties filing an amended proposal with a smaller draw-down amount and administrative super-priority, under Bankruptcy Code section 364(c) (but no priming liens under section 364(d)) and without prejudice the possible future requests for additional funding and/or priming liens. Feb. 15, 2018 Hr'g Tr. at 232:10-14 [Case No. 17-bk-4780, ECF No. 754].

Accordingly, on February 16, 2018, the Oversight Board and AAFAF filed an urgent joint application [Case No. 17-4780, ECF No. 722], seeking entry of a revised proposed order approving a $300 million credit facility and granting the lender a superpriority administrative expense claim (the "Revised Financing"). The Oversight Board and AAFAF further revised the proposal on February 17, 2018 [Case No. 17-4780, ECF No. 729].

On February 19, 2018, the Title III Court entered the PREPA Financing Order, approving the Revised Financing, and determining that the proposed financing was necessary, essential, and appropriate for PREPA's continued operations, and that good cause had been shown for granting a superpriority administrative expense claim to the lender in exchange for the credit facility [Case No. 17-bk-4780, ECF No. 744]. On March 8, 2019, PREPA repaid all of the outstanding amounts under the Revised Financing.

      7.      **Renewed Motion of National Public Finance Guarantee Corporation, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and Syncora Guarantee Inc. for Relief from the Automatic Stay to Allow Movants to Enforce Their Statutory Right to Have a Receiver Appointed, Case No. 17-bk-4780, ECF No. 975**

On October 3, 2018, the Monoline Insurers filed the Renewed Receiver Motion to lift the stay in order to pursue the appointment of a receiver to PREPA [Case No. 17-bk-4780, ECF No. 975]. The Monoline Insurers argued that cause existed to lift the stay due to PREPA's alleged historical and continuing mismanagement of PREPA. They further argued that the Bonds are secured by PREPA's revenues and certain covenants contained in the Trust Agreement, and that such interest was not adequately protected because PREPA's mismanagement reduced PREPA's revenues.

On December 5, 2018, the Monoline Insurers, the Oversight Board, PREPA, AAFAF, and the UCC filed a stipulation requesting entry of an order providing for the UCC's participation in discovery and briefing in connection with the Renewed Receiver Motion [Case No. 17-bk-4780, ECF No. 1038]. On December 6, 2018, the Title III Court issued an order referring the Renewed Receiver Motion to Judge Dein for discovery related matters and the parties' stipulation was approved upon referral. [Case No. 17-bk-4780, ECF Nos. 1039, 1040]. On December 26, 2018, the parties stipulated to a protective order in connection with the Renewed Receiver Motion [Case No. 17-bk-4780, ECF No. 1051]. Accordingly, the Title III Court issued a protective order on December 27, 2018 [Case No. 17-bk-4780, ECF No. 1052].

On March 27, 2019, the UCC filed an opposition to the Renewed Receiver Motion [Case No. 17-bk-4780, ECF No. 1151]. Therein, the UCC argued that the Monoline Insurers' are not entitled to relief from the automatic stay because, under the terms of the Trust Agreement, they do not hold a security interest in any collateral that requires adequate protection. On March 29, 2019, UTIER also filed an opposition to the Renewed Receiver Motion [Case No. 17-bk-4780, ECF No. 1158]. On April 30, 2019, Scotiabank and Solus filed an opposition and reservation of rights in response to the Renewed Receiver Motion [Case No. 17-bk-4780, ECF No. 1207].

On May 7, 2019, the Government Parties filed a motion seeking an order staying the briefing on the Renewed Receiver Motion until after the Title III Court's ruling on both the 9019 Motion and a related motion to dismiss the Renewed Receiver Motion [Case No. 17-bk-4780, ECF Nos. 1214, 1233]. Assured also filed a joinder to the motion [Case No. 17-bk-4780, ECF No. 1219]. On May 8, 2019, National and Syncora filed oppositions to the motion [Case No. 17-bk-4780, ECF Nos. 1221, 1222]. On May 9, 2019, the Title III Court entered an order granting the Stay Motion and staying the briefing on the Renewed Receiver Motion until after the Title III Court's ruling on (i) the PREPA 9019 Motion and (ii) the motion to dismiss the Renewed Receiver Motion previously filed by the Oversight Board [Case No. 17-bk-4780, ECF No. 1230].

On May 10, 2019, the Government Parties filed a motion to dismiss the Renewed Receiver Motion [Case No. 17-bk-4780, ECF No. 1233]. The Government Parties argued, among other things, that because movants entered the 2019 RSA with Assured and the Ad Hoc Group, who collectively hold and/or insure approximately 48% of the outstanding principal amount of PREPA Bonds, if the 2019 RSA is approved, Assured would be contractually bound to withdraw from the

Renewed Receiver Motion.  Moreover, the Government Parties also contended that if the 2019 RSA were approved, the Renewed Receiver Motion would be settled and dismissed as to the Supporting Bondholders, including Assured, and the Supporting Bondholders would no longer have the ability to seek lift of the stay in order for a receiver to be appointed.  Likewise, the Government Parties argued that National and Syncora are barred from pursuing or maintaining an action supported by less than a fifth of outstanding bondholders.

After granting several deadline extensions, on September 13, 2019, the Title III Court issued an order staying the briefing on the motion to dismiss, pending resolution of the 9019 Motion [Case No. 17-bk-4780, ECF No. 1638].

On March 8, 2022, AAFAF terminated the 2019 RSA [Case No. 17-bk-4780, ECF No. 2747].  Upon termination, the Title III Court issued an order requiring the Oversight Board to mediate with all major stakeholders and interested parties in order to reach an appropriate plan of adjustment for PREPA [Case No. 17-bk-4780, ECF No. 2748].  During the mediation period, the Government Parties' motion to dismiss remained stayed.  On September 19, 2022, upon the expiration of the mediation time period, the Bondholders filed a motion to dismiss the PREPA Title III case or, in the alternative, relief from the automatic stay in order to appoint a receiver to PREPA [Case No. 17-bk-4780, ECF Nos. 2973, 2974].  On September 29, 2022, the Title III Court issued an order staying the Motion to Dismiss PREPA's Case, which subsumes the Renewed Receiver Motion [Case No. 17-bk-4780, ECF No. 3013].

8. **Joint Motion of PREPA and AAFAF Pursuant to Bankruptcy Rule 9019 for Order Approving Settlements Embodied in the RSA, Case No. 17-bk-4780, ECF No. 1235;** *Official Committee of Unsecured Creditors v. Financial Oversight and Management Board for Puerto Rico,* **(1st Cir. 20-2162)**

On May 10, 2019, the Oversight Board, AAFAF, and PREPA filed the 9019 Motion seeking approval of certain of the settlements and compromises embodied in the 2019 RSA [Case No. 17-bk-4780, ECF No. 1235].  In the 9019 Motion, movants argued that the proposed settlements represented a significant milestone in PREPA's Title III case because, *inter alia*, the 2019 RSA would allow for the settlement of the bondholders' claims in less than their full face amounts.  In addition, pursuant to the 2019 RSA, PREPA was required to propose a plan under which any persons who beneficially own or control uninsured bonds that are party to the RSA or execute a joinder to the 2019 RSA will exchange their bonds for securitization bonds that are secured by a fixed and predictable transition charge.  On May 22, 2019, the Title III Court issued an order referring the motion to Magistrate Judge Dein [Case No. 17-bk-4780, ECF No. 1252].

On June 7, 2019, the Oversight Board and AAFAF filed joint motions *in limine* to exclude testimony offered by UTIER, SREAEE, Windmar, and certain environmental parties [Case No. 17-bk-4780, ECF No. 1300].  Those parties filed a response to the motions *in limine* to exclude testimony on June 11, 2019, arguing that the environmental intervenors fulfilled the criteria for permissive intervention and had standing to appear [Case No. 17-bk-4780, ECF No. 1319].  On July 12, 2019, the Title III granted the motions *in limine* and excluded the proffered testimony. [Case No. 17-bk-4780, ECF No. 1457].

AAFAF filed a motion for entry of an order scheduling briefing on the joint motions *in limine* [Case No. 17-bk-4780, ECF No. 1302]. On June 18, 2019, movants and certain anticipated objectors filed a supplemental joint status report, along with an amended proposed order (the "Amended Proposed 9019 Order") limiting and clarifying the scope of the relief sought in the 9019 Motion [Case No. 17-bk-4780, ECF No. 1361]. On July 2, 2019, movants filed a supplemental memorandum of law and facts in support of the 9019 Motion [Case No. 17-bk-4780, ECF No. 1425]. In the supplemental memorandum, movants contended that the settlement achieved three key objectives: (i) it caps the amount electricity prices can be raised to pay debt; (ii) it transforms the existing debt into new debt having no receiver remedy, no rate covenant, and no payment default remedies for underpayment of required debt service as long as the revenues from the transition charges are paid to the Bondholders; and (iii) it discounts the original debt to save PREPA between $2 billion and $3 billion in cash flow. They further argued that the Title III Court had power to approve the 2019 RSA terms.

On July 11, 2019, a pretrial conference was held on the 9019 Motion. At the pretrial conference, the Title III Court reiterated the limited scope of the Amended Proposed 9019 Order, noting that the Government Parties now only seek approval of certain RSA provisions that would (i) allow the asserted secured claims of the Supporting Holders in discounted amounts; (ii) allow the accrual of certain administrative claims; (iii) allow certain settlement and adequate protection payments prior to plan confirmation; (iv) exculpate supporting bondholders and the Bond Trustee for acts and omissions in furtherance of the RSA; (v) require the supporting Bondholders to vote in favor of a plan consistent with the 2019 RSA; and (vi) dismiss the Renewed Receiver Motion as to the settling movants. With the more limited scope, the Title III Court noted it is no longer being asked to approve 2019 RSA provisions that would, for example, implement rate increases, impose the settlement charge or transition charge, or implement demand protections or securitization protections. Further, in the Amended Proposed 9019 Order, the Government Parties are no longer asking the Title III Court to determine whether the treatment of disputed secured claims proposed in the RSA would be confirmable or not confirmable in the context of PREPA's eventual plan of adjustment.

Pursuant to the Title III Court's directions at the July 11 conference, movants filed a second supplemental memorandum of law and facts on July 19, 2019 [Case No. 17-bk-4780, ECF No. 1486]. In the second supplemental memorandum, movants contended that the Title III Court can grant the requested relief without eliminating PREPA's ability to fully compensate Fuel Line Lenders' claims if they ultimately prevail on their contention that their claims are senior to the PREPA bondholders' claims. They further contended that the expense claimants had no enforceable property rights.

On September 20, 2019, Whitefish filed an objection to the 9019 Motion, arguing that the settlement would unduly harm smaller creditors [Case No. 17-bk-4780, ECF No. 1641]. On October 25, 2019, Cobra filed an objection to the 9019 Motion, arguing that the settlement should not be approved before it was paid for postpetition services Cobra had provided [Case No. 17-bk-4780, ECF No. 1682]. On October 30, 2019, UTIER, SREAEE, the Fuel Line Lenders, and the UCC filed objections to the 9019 Motion [Case No. 17-bk-4780, ECF Nos. 1697, 1698, 1700, 1701], arguing that the settlement would unfairly discriminate between creditors, subvert the rights of lenders, and unfairly affect other creditors' claims.

208

On March 27, 2020, in response to the emerging threat of COVID-19 and its effects on the people and economy of Puerto Rico, movants jointly filed the Adjournment Motion seeking to adjourn all deadlines relating to the 9019 Motion *sine die* [Case No. 17-bk-4780, ECF No. 1947]. On April 2, 2020, the Title III Court granted the Adjournment Motion [Case No. 17-bk-4780, ECF No. 1954]. Pursuant to the Title III Court's order, movants provided periodic status reports relating to PREPA's condition and the status of the 9019 Motion. *See, e.g.*, [Case No. 17-bk-4780, ECF Nos. 1992, 2111, 2220, 2330, 2394, 2404, 2476]. On May 18, 2020, the UCC filed a reply to a status report by movants wherein it requested the Title III Court terminate the 9019 Motion because, according to the UCC, the 2019 RSA no longer exists in its current form [Case No. 17-bk-4780, ECF No. 1996]. The Title III Court denied the UCC's request [Case No. 17-bk-4780, ECF No. 2006]. On August 18, 2020, the UCC filed a motion again requesting the Title III Court terminate the 9019 Motion on the same basis [Case No. 17-bk-4780, ECF No. 2144]. On November 4, 2020, the Title III Court denied the motion to terminate without prejudice to renewal after April 21, 2021 [Case No. 17-bk-4780, ECF No. 2287].

On December 4, 2020, the UCC appealed the Title III Court's denial of its motion to terminate [Case No. 17-bk-4780, ECF No. 2320]. On December 22, 2020, the appeal was docketed as Case No. 20-02162 in the First Circuit. On February 2, 2021, the First Circuit issued an order directing appellant to either move for voluntary dismissal of the appeal or show cause why the appeal should not be dismissed for lack of jurisdiction. On February 16, 2021, appellant filed a response to the First Circuit's order to show cause, arguing that the Title III Court's order was appealable and the First Circuit thus had jurisdiction. On February 25, 2021, with leave of court, the Oversight Board filed a response in which it argued that the Title III Court's order denying the UCC's motion was not final, and thus the First Circuit lacked jurisdiction. On May 21, 2021, the First Circuit issued a judgment dismissing the appeal for lack of jurisdiction. On June 11, 2021, the First Circuit issued its mandate.

Following the First Circuit's dismissal, all hearing and briefing on the 9019 Motion remained adjourned, and the Oversight Board thereafter provided the Title III Court periodic status updates. The 2019 RSA has since been terminated, however, rendering the 9019 Motion moot. [Case No. 17-bk-4780, ECF No. 2745].

9.   **Objection of Official Committee of Unsecured Creditors to Proof of Claim Number 18449, Case No. 17-bk-04780, ECF No. 1691;** *Official Committee of Unsecured Creditors v. Puerto Rico Electric Power Authority, et al.***, (1st Cir. 20-1122)**

On October 30, 2019, while the 9019 Motion remained pending, the UCC filed an objection (the "Claim Objection") to Proof of Claim Number 18449, the Master PREPA Bond Claim, which was filed by the Bond Trustee [Case No. 17-bk-4780, ECF No. 1691]. The UCC argued that the Bonds, which are governed by the Trust Agreement, are secured by and payable solely from amounts actually deposited in the deposit accounts comprising the Sinking Fund and certain other subordinate accounts. Accordingly, the Claim Objection argued the Bond Trustee and beneficial owners of the PREPA Bonds, the Bondholders, have no right to recovery against PREPA or its assets beyond their right to look to amounts on deposit in those accounts.

On November 13, 2019, the Title III Court issued an order directing the parties to file supplemental briefing regarding whether the UCC has standing to object to the Master PREPA Bond Claim without leave of Court and whether the Title III Court must hear and adjudicate the Claim Objection in light of the pending 9019 Motion [Case No. 17-bk-4780, ECF No. 1734]. *See* Section V.C.3. On November 21, 2019, the UCC and both the Oversight Board and AAFAF, the Government Parties filed their supplemental briefs [Case No. 17-bk-4780, ECF Nos. 1767, 1769]. The UCC argued that it had standing to bring its objection despite the pendency of the 9019 Motion, which sought to settle the challenges the UCC was raising. The Government Parties, in turn, argued that the UCC lacked standing to bring its objection and that the Title III Court was not required, and should not hear, the UCC's objection before it adjudicated the 9019 Motion. The Fuel Line Lenders, the Responding Bondholder Parties,[244] UTIER, and SREAEE also filed supplemental briefs on November 25, 2019 [Case No. 17-bk-4780, ECF Nos. 1782, 1783, 1784]. The Fuel Line Lenders, UTIER and SREAEE largely agreed with the UCC's objection, while the Responding Bondholders were supportive of the Government Parties' position.

On December 4, 2019, the UCC and the Government Parties filed supplemental reply briefs [Case No. 17-bk-4780, ECF Nos. 1800, 1801]. The Responding Bondholder Parties and the Fuel Line Lenders also filed supplemental reply briefs on December 6, 2019, largely reiterating their original arguments [Case No. 17-bk-4780, ECF Nos. 1811, 1812]. On January 3, 2020, the Title III Court issued an order terminating the Claim Objection without prejudice to renewal after resolution of the 9019 Motion, noting that requiring courts to resolve claim objections prior to approving a settlement would result in "bankruptcy cases routinely [being] . . . stalemated." [Case No. 17-bk-4780, ECF No. 1855, at 6].

On January 27, 2020, the UCC filed a notice of appeal of the Title III Court's order terminating the Claim Objection [Case No. 17-bk-4780, ECF No. 1878]. On February 22, 2020, the appeal was docketed as Case No. 20-1122 in the First Circuit. On March 3, 2020, the Government Parties filed a motion to dismiss the appeal for lack of appellate jurisdiction, arguing that the Title III Court's order is not a final order and is therefore not appealable. On March 23, 2020, the UCC filed a response to the Government Parties' motion to dismiss, arguing the order was final and appealable and thus the First Circuit had jurisdiction, and a conditional cross-motion to hold the appeal in abeyance pending resolution of the 9019 Motion. On April 8, 2020, the Government Parties filed a notice of non-opposition of the UCC's cross-motion to hold the appeal in abeyance. On June 2, 2020, the First Circuit issued an order granting the UCC's cross-motion, holding the appeal in abeyance pending resolution of the 9019 Motion. The UCC has filed periodic status reports and the appeal remains in abeyance.

The Title III Court has since ordered the Oversight Board to file an amended lien challenge, which the Oversight Board subsequently filed on October 3, 2022. [Adv. Proc. No. 19-00391, ECF No. 22, 26.] The UCC is an intervenor in that litigation. [Adv. Proc. No. 19-00391, ECF No. 40.] The Amended Lien & Recourse Challenge seeks substantially the same relief the UCC's Claim Objection.

10. **Motion for Entry of an Order Authorizing PREPA to Assume Certain PPOA Contracts, Case No. 17-bk-4780, ECF No. 1951;** ***Union de***

---

[244] The Responding Bondholder Parties refers to the Bond Trustee, the Ad Hoc Group, and the Monoline Insurers.

*Trabajadores de la Industria Electrica y Riego, Inc. (UTIER) v. Puerto
Rico Electric Power Authority, et al.***, (1st Cir. 20-1685, 20-1709, 20-1710)**

On April 1, 2020, the Oversight Board, as representative of PREPA, filed a motion for authorization to assume (i) the ECO PPOA between PREPA and ECO, which concerns the existing MW combined-cycle, cogeneration facility in Peñuelas; and (ii) the Amended Naturgy GSPA, which concerns the supply of natural gas to Units 5 and 6 of the Costa Sur Generation Facility [Case No. 17-bk-4780, ECF No. 1951]. The Oversight Board argued that PREPA's decision to assume the contracts pursuant to PROMESA Section 365 falls within the purview of the Oversight Board's Contract Review Policy and is a sound exercise of its judgment. According to PREPA, the contracts would reduce PREPA's purchase costs of power and fuel on a net basis by approximately $100 million annually through September 2032. These significant cost savings for PREPA would ultimately aid PREPA's ability to meet its debt service obligations during the Title III process, while ensuring a reliable and continuous source of power and natural gas. The assumption by PREPA of the contracts will afford economic benefits as compared to the prior terms and will benefit PREPA, given the lack of reasonably available alternatives for replacement of the power and fuel provided under the contracts.

On April 27, 2020, Windmar filed an opposition to the motion [Case No. 17-bk-4780, ECF No. 1973]. Also on April 27, 2020, UTIER and various environmental groups filed an opposition to the motion as creditors and purported parties in interest [Case No. 17-bk-4780, ECF No. 1974]. The opposing parties argued that the contracts were negotiated behind closed doors and without the benefit of public scrutiny or competitive bidding. They further argued that the contracts have not been supported with convincing data as being beneficial to PREPA's restructuring and operational expenses, that they fail to benefit ratepayers or Puerto Rico's economic stability and energy needs, and would be detrimental to the sustainable transformation of PREPA.

On May 18, 2020, the Oversight Board filed an omnibus reply in support of the motion, and on May 27, 2020, the opposing parties filed sur-replies to the Oversight Board's omnibus reply [Case No. 17-bk-4780, ECF Nos. 1997, 2010, 2012]. Also on May 27, 2020, UTIER filed a motion for leave to file a sur-reply [Case No. 17-bk-4780, ECF No. 2013]. On May 29, 2020, the Oversight Board filed a motion to strike Windmar's sur-reply and an opposition to UTIER's motion for leave to file a sur-reply [Case No. 17-bk-4780, ECF Nos. 2018, 2019]. Also on May 29, 2020, the Title III Court issued an order granting the Oversight Board's motion to strike and denying UTIER's motion for leave to file a sur-reply [Case No. 17-bk-4780, ECF No. 2020].

The Title III Court held oral argument on the motion on June 3, 2020. Following the hearing, the Title III Court issued an order and opinion authorizing PREPA to assume the Amended ECO PPOA and Amended Naturgy GSPA [Case No. 17-bk-4780, ECF Nos. 2038, 2039]. In its opinion, the Title III Court rejected the arguments advanced by the opposing parties that PREPA's postpetition execution of the contracts created new postpetition obligations, finding that the contracts merely amended the terms of preexisting prepetition agreements between the same parties. Accordingly, the Title III Court held that the contracts constitute prepetition executory contracts that can be assumed pursuant to section 365(a) of the Bankruptcy Code. The Title III Court also found that PREPA's assumption of the contracts were a sound exercise of PREPA's business judgment and not the product of bad faith, whim, or caprice. As such, the Title III Court

211

refused to "second-guess" the decisions made by PREPA in its negotiation and execution of the contracts.

On July 3, 2020, the opposing parties filed notices of appeal of the Title III Court's order [Case No. 17-bk-4780, ECF Nos. 2041, 2042, 2044]. The three appeals were docketed as Case Nos. 20-1685, 20-1709, and 20-1710 in the First Circuit, and were ultimately consolidated for briefing and oral argument on November 2, 2020. The appeals were fully briefed and the case was argued on May 4, 2021. On May 20, 2021, appellants filed a 28(j) letter clarifying an issue raised during oral argument. On May 22, 2021, appellee filed a letter in response to appellants' 28(j) letter. On August 12, 2021, the First Circuit issued its opinion and judgment affirming the Title III Court's order authorizing PREPA to assume the PPOA Contracts. The First Circuit held that the decision to assume contracts under the Bankruptcy Code is reviewed under the deferential business judgment standard and not the more onerous standard for rejection of collective bargaining agreements first espoused in *NLRB v. Bildisco & Bildisco,* 465 U.S. 513 (1984), and, separately, that the Title III Court did not err in concluding that the renegotiated agreements were an exercise of sound business judgment by PREPA. On September 3, 2021, the First Circuit issued its mandate.

11.     **Urgent Motion of the Ad Hoc Group of PREPA Bondholders Pursuant to Section 312 of PROMESA and Section 105 of the Bankruptcy Code to Compel Mediation and Impose Deadlines for a PREPA Plan of Adjustment, Case No. 17-bk-4780, ECF No. 2716**

On February 18, 2022, the Ad Hoc Group and certain Monoline Insurers filed a motion to compel mediation with the Oversight Board and impose deadlines for the Oversight Board to file and prosecute a plan of adjustment for PREPA [Case No. 17-bk-4780, ECF No. 2718]. Therein, the Ad Hoc Group urged the Title III Court to implement these requirements due to the delays in implementation of the terms of the 2019 RSA.

Also on February 28, 2022, the Oversight Board filed an objection to the Ad Hoc Group's motion [Case No. 17-bk-4780, ECF No. 2735]. Therein, the Oversight Board agreed that mediation could benefit the parties in developing a path towards a plan of adjustment for PREPA and an exit from Title III, and supported a global mediation with all parties under the guidance of a judicial mediation team. The Oversight Board, however, objected to the Ad Hoc Group's (i) proposed deadlines as inflexible and unrealistic and (ii) request to exclude other parties in interest from the mediation, rather than consider all PREPA stakeholders.

On March 8, 2022, the Title III Court issued the Path Forward Order denying the Ad Hoc Group's Motion and establishing the Path Forward Deadline by which the Oversight Board was required to take certain actions [Case No. 17-bk-4780, ECF No. 2748]. The Path Forward Order provided that by the Path Forward Deadline, initially established as May 2, 2022, the Oversight must file either: (i) a proposed plan of adjustment for PREPA; (ii) a term sheet for the plan of adjustment; (iii) a proposed schedule for litigation of significant disputed issues in the PREPA Title III Case; or (iv) a declaration and memorandum showing cause as to why the Title III Court should not consider dismissal of the PREPA Title III case for failure to take one of the actions outlined above. On April 8, 2022, the Title III Court entered (i) the Appointment Order, appointing Judges Chapman, Drain, and Shannon as the Mediation Team and (ii) the Terms and Conditions

Order, establishing the terms and conditions of the mediation, including an initial mediation termination date of June 1, 2022.

On April 25, 2022, the Oversight Board filed a motion to extend the Path Forward Deadline to be coterminous with the mediation termination date in order to enable the Oversight Board to continue progressing in mediation before prematurely filing a pleading in accordance with the requirements of the Path Forward Order [Case No. 17-bk-4780, ECF No. 2784].  On the same day, the Title III Court issued an order granting the motion, and extending the Path Forward deadline to June 1, 2022 [Case No. 17-bk-4780, ECF No. 2785].

On September 17, 2022, in accordance with the Path Forward Order and upon the termination date of mediation, the Oversight Board filed a litigation schedule seeking to litigate certain threshold issues relating to the bondholders' claims [Case No. 17-bk-4780, ECF No. 2956]. On September 19, 2022, the Mediation Team filed a report notifying the Title III Court that the Mediation Team had not exercised its discretion to extend the termination date but urging the Title III Court to issue an order revising the Terms and Conditions Order to extend mediation with the additional requirement of filing interim reports and increased transparency in the parties' negotiations [Case No. 17-bk-4780, ECF No. 2975].  On September 20, 2022, the Title III Court entered an order affirming that Judges Chapman, Drain, and Shannon remain the designated Mediation Team [Case No. 17-bk-4780, ECF No. 2987].

On September 29, 2022, the Title III Court entered an order restarting the mediation and setting a termination date of December 31, 2022, subject to extension until January 31, 2023 in the Mediation Team's sole discretion [Case No. 17-bk-4780, ECF No. 3011].  The order further authorized the Mediation Team to file interim reports, as well as reports at any time recommending whether any pending litigation should be paused to enable negotiations to proceed, and requiring the parties to produce certain data and non-privileged analyses underlying their respective positions.

On December 28, 2023, the Mediation Team exercised their discretion to extend mediation until January 31, 2023.  [Case No. 17-bk-4780, ECF No. 3135].  On January 23, 2023, the Mediation Team filed a report seeking to extend mediation by three months, to and include, April 28, 2023, and stating that it "expects that negotiations will resume in the coming weeks and may well continue for some time thereafter."  [Case No. 17-bk-4780, ECF No. 3159].  On January 26, 2023, the Title III Court entered an order extending mediation until April 28, 2023.  [Case No. 17-bk-4780, ECF No. 3167].

12.  ***PV Properties, Inc. v. Puerto Rico Electric Power Authority et al.*, Adv. Proc. No. 20-00142; PV Properties, Inc.'s Motion for Relief from the Automatic Stay, Case No. 17-bk-4780, ECF No. 2779**

On December 29, 2020, PV Properties filed a complaint against PREPA, the Oversight Board, and Natalie Jaresko, seeking a declaration that: (i) PREPA is obligated to acquire PV Properties' RECs; and (ii) PREPA is obligated to pay for RECs generated by PV Properties after the filing of the PREPA Title III petition as an administrative expense under section 507(a)(2) of the Bankruptcy Code [Adv. Proc. No. 20-00142, ECF No. 1].  On January 4, 2021, PV Properties

filed an amended complaint making minor corrections to the text [Adv. Proc. No. 20-00142, ECF No. 3].

On March 15, 2021, defendants moved to dismiss the amended complaint [Adv. Proc. No. 20-00142, ECF No. 12]. In the motion to dismiss, defendants argue that the entire action should be dismissed on the grounds PV Properties lacked Article III standing because it has not suffered any injury. Defendants also argue that the claims against the Oversight Board and Ms. Jaresko should be dismissed because PV Properties failed to allege actionable conduct by either the Oversight Board or Ms. Jaresko and because PROMESA Section 105 bars such claims against both defendants. Defendants further argue that (i) PV Properties has failed to allege a basis for a declaration that PREPA is obligated to purchase the RECs, and (ii) PV Properties has failed to allege the existence of any qualifying postpetition transaction with PREPA, as required for entitlement to an administrative expense claim.

On April 13, 2021, PV Properties filed an opposition to defendants' motion to dismiss arguing (i) PV Properties had standing because it had lost the right for PREPA to obtain the RECs; (ii) that the Oversight Board and Ms. Jaresko were proper defendants as representatives of the debtor; (iii) PROMESA § 105 is inapplicable because PV Properties did not bring a claim against the Oversight Board and Ms. Jaresko related to the carrying out of PROMESA; (iv) PV Properties had alleged sufficient facts to show it was entitled to relief; and (v) PV Properties' RECs fall within the scope of "actual, necessary" costs and expenses [Adv. Proc. No. 20-00142, ECF No. 17].

On September 27, 2021, the Title III Court issued an opinion and order granting defendants' motion to dismiss [Adv. Proc. No. 20-00142, ECF No. 20]. In its order, the Title III Court dismissed the claims against the Oversight Board and Ms. Jaresko because PV Properties failed to adequately allege constitutional standing with respect to those claims by failing to allege that either defendant have a duty, or even authority, to direct PREPA to purchase RECs from PV Properties. With respect to the claims against PREPA, the Title III Court concluded that PV Properties failed to plead sufficient facts to support its assertions that (i) purchasing RECs is the only method available to PREPA to comply with Act 82-2010, which requires that a certain percentage of the electricity distributed by PREPA be generated from renewable energy sources, and (ii) PREPA must acquire RECs from PV Properties to meet the standard. The Title III Court reasoned that even if PV Properties could allege sufficient facts, it still could not demonstrate that it has a private right of action to enforce PREPA's obligations. The adversary proceeding was subsequently closed.

On April 20, 2022, PV Properties then filed a motion for relief from the automatic stay [Case No. 17-bk-4780, ECF No. 2779] to proceed with claims against PREPA in the Commonwealth Court for purported inverse condemnation of PV Properties' RECs. On June 9, 2022, the Oversight Board filed an opposition to the motion, arguing that PV Properties does not have a Fifth Amendment Takings Clause claim and that it failed to show cause to lift the automatic stay [Case No. 17-bk-4780, ECF No. 2843].

On June 17, 2022, the Title III Court issued an order directing the parties to meet and confer and to file supplemental briefing in connection with PV Properties' motion for relief from the automatic stay, which the parties filed on June 26, 2022 [Case No. 17-bk-4780, ECF Nos. 2856, 2868]. The joint motion described various areas of laws and fact that the parties disagreed on. On

214

June 29, 2022, the Title III Court issued an order denying PV Properties' motion for relief from the automatic stay because PV Properties had not shown that pursuing its claim would result in a complete resolution of the issues and allowing it to pursue its claim would distract resources from PREPA's Title III case [Case No. 17-bk-4780, ECF No. 2876].

13. **Assured Guaranty Corporation et al., v. Puerto Rico Electric Power Authority, Adv. Proc. No. 17-00232**

On August 7, 2017, Assured, National, the Ad Hoc Group, and Syncora filed a complaint against PREPA, the Oversight Board, AAFAF, Nelson Morales Rivera, and José Roque Torres [Adv. Proc. No. 17-00232, ECF No. 1]. The complaint alleged that PREPA failed to comply with its affirmative obligations to turn over current and future revenues, receipts, and other income derived by PREPA, as "Revenues" to holders or insurers of revenue bonds pursuant to the Trust Agreement between PREPA and Bond Trustee.

Plaintiffs sought declarations that (i) the filing of PREPA's Title III Case does not stay the application of "Revenues" to the payment of debt service on the Bonds; (ii) the failure to remit "Revenues" securing the Bonds for application to debt service during PREPA's Title III case violates sections 922(d) and 928(a) of the Bankruptcy Code; (iii) capital improvements, capital expenditures, and all other non-current expenses that are not reasonable and necessary expenses are subordinate to payment of debt service on the Bonds; and (iv) defendants' withholding or use of "Revenues" for capital expenditures, future expenses, and all other non-current expenses that are not reasonable and necessary expenses violates plaintiffs' rights under the Takings Clause and Due Process Clause of the U.S. Constitution.

Plaintiffs further sought to enjoin defendants from taking any action that would, according to plaintiffs, further violate sections 922(d) and 928(a) of the Bankruptcy Code, and from using "Revenues" to fund capital expenses and all other expenses that are not reasonable and necessary expenses prior to complying with its alleged obligations under section 507 of the Trust Agreement. Finally, plaintiffs also sought orders requiring defendants to promptly and regularly remit "Revenues" securing the Bonds and to submit each month to plaintiffs and the Trustee reports itemizing current operating expenses that defendants seek to prioritize over the Bonds, as well as the balances of each account created under the Trust Agreement.

On August 18, 2017, the Title III Court issued an order referring the matter to Magistrate Judge Dein [Adv. Proc. No. 17-00232, ECF No. 16]. On September 1, 2017, the UCC filed a motion for leave to intervene [Adv. Proc. No. 17-00232, ECF No. 18]. On September 12, 2017, Scotiabank and Solus (collectively, the "Fuel Line Intervenors") also filed a motion for leave to intervene [Adv. Proc. No. 17-00232, ECF No. 24]. On September 19, 2017, the UCC filed a limited response to the Fuel Line Intervenors' motion for leave to intervene, and Assured, National, the Ad Hoc Group, and Syncora filed an opposition to the motion [Adv. Proc. No. 17-00232, ECF Nos. 33, 36]. On the same day, the Oversight Board and PREPA also filed a response to the UCC's motion for leave to intervene [Adv. Proc. No. 17-00232, ECF No. 37].

On October 2, 2017, the UCC filed a supplemental brief in support of its request for limited participation [Adv. Proc. No. 17-00232, ECF No. 43]. On October 9, 2017, the Oversight Board

215

and PREPA, as well as Assured and National, filed responses to the UCC's supplemental brief [Adv. Proc. No. 17-00232, ECF No. 46-7].

On October 13, 2017, the plaintiffs voluntarily dismissed the adversary proceeding without prejudice [Adv. Proc. No. 17-00232, ECF No. 49]. On October 17, 2017, the Title III Court issued an order dismissing the adversary proceeding and rendering the pending motions moot [Adv. Proc. No. 17-00232, ECF No. 50].

14. **Unión de Trabajadores de la Industria Eléctrica y Riego v. Puerto Rico Electric Power Authority, et al., Adv. Proc. No. 17-00229**

On August 7, 2017, UTIER filed a complaint against PREPA, the Commonwealth, the Oversight Board, Natalie A. Jaresko, and several individual defendants, including Hon. Ricardo Rosselló Nevares, Ricardo Ramos Rodríguez, Gerardo Portela Franco, Hon. Raúl Maldonado Gautier, and José Iván Marrero Rosado (the "Individual Defendants") [Adv. Proc. No. 17-00229, ECF No. 1]. The complaint alleged that the CBA between UTIER and PREPA was unconstitutionally impaired by the approval and adoption of Act No. 66-2014, Act No. 3-2017, Act No. 8-2017, and Act No. 26-2017 (the "Challenged Laws"). Specifically, UTIER contended passage of the Challenged Laws impaired its CBA in violation of the Contracts Clause and the Takings Clause of the United States Constitution. UTIER further contended that PREPA's fiscal plan was unconstitutional because it implemented both Act No. 66-2014 and Act No. 3-2017; the Commonwealth's fiscal plan was unconstitutional because it specifically adopted an employee mobilization policy, uniform fringe benefits, and the elimination of liquidation of vacation and sick days; and the Commonwealth's and PREPA's fiscal year 2017-2018 budgets and fiscal plans violated Sections 201(b)(1)(A), 201(b)(1)(B), 201(b)(1)(G), and 201(b)(1)(N) of PROMESA. Accordingly, UTIER sought declarations that PREPA is a "protected essential service"; the Challenged Laws violate the Contracts Clause and the Takings Clause; and the 2017-2018 Commonwealth budget and PREPA budget are both arbitrary, lacking a rational basis, and in violation of the Contracts Clause and the Takings Clause. UTIER also sought an injunction requiring the Oversight Board to "recast" the PREPA fiscal plan, the Commonwealth fiscal plan, and the 2017-2018 budgets in order to comply with Section 201(b) of PROMESA, and an injunction precluding defendants from presenting any plan of adjustment until the requested modifications were made. On September 6, 2017, the Title III Court issued an order referring the matter to Magistrate Judge Dein [Adv. Proc. No. 17-00229, ECF No. 17].

On October 31, 2017, the Oversight Board, on behalf of itself, Ms. Jaresko, PREPA, and the Commonwealth, filed a motion to dismiss, arguing that: (i) because no concrete injury resulted from the challenged conduct, UTIER lacked standing, and the Title III Court lacked subject-matter jurisdiction; (ii) the Title III Court also lacked subject-matter jurisdiction with respect to certain counts under PROMESA Section 106(e), which divests the Title III Court of jurisdiction to adjudicate UTIER's claims to the extent they challenge the Oversight Board's decisions to certify fiscal plans and budgets; (iii) PROMESA Section 305 precluded the injunctive relief UTIER sought; (iv) the relief sought would violate the Oversight Board's authority and mandate under PROMESA Sections 312 and 315; (v) UTIER failed to state a claim under the Contracts Clause and the Takings Clause; and (vi) PROMESA Section 105 barred all claims against the Oversight Board and Ms. Jaresko [Adv. Proc. No. 17-00229, ECF No. 31]. On October 31, 2017, the Individual Defendants also moved to dismiss, arguing that: (i) none of the named individuals was

a proper party to the case; (ii) UTIER's claims were not ripe for adjudication; (iii) UTIER failed to state a claim under the Contracts Clause; and (iv) UTIER failed to state a claim under the Takings Clause [Adv. Proc. No. 17-00229, ECF No. 34].

On December 12, 2017, UTIER filed an amended complaint further describing how the articles in the CBA allegedly were impaired and how the Individual Defendants implemented and enforced the fiscal plans and budgets [Adv. Proc. No. 17-00229, ECF No. 38]. As a result of the amendment, the Title III Court issued an order terminating the motions to dismiss the original complaint without prejudice as moot [Adv. Proc. No. 17-00229, ECF No. 39].

On January 12, 2018, PREPA, the Commonwealth, the Oversight Board, and Ms. Jaresko filed a motion to dismiss the amended complaint on largely the same grounds as their previous motion [Adv. Proc. No. 17-00229, ECF No. 44]. The remaining Individual Defendants also filed a motion to dismiss the amended complaint on January 12, 2018, again for largely the same reasons as before [Adv. Proc. No. 17-00229, ECF No. 46].

On September 26, 2018, the Title III Court entered an opinion and order granting in part and denying in part the motions to dismiss the amended complaint [Adv. Proc. No. 17-00229, ECF No. 62]. In dismissing a majority of UTIER's claims, the Title III Court held that: (i) counts I and X sought impermissible advisory opinions; (ii) the Title III Court lacks subject-matter jurisdiction over counts I, X, and XI because count I failed to frame a justiciable controversy, Section 106(e) of PROMESA precludes federal District Courts from reviewing challenges to the Oversight Board's certification determinations, and Section 305 precludes the injunctive relief that UTIER sought in count XI; (iii) counts III, V, VII, and IX were not ripe for adjudication; and (iv) count IV and the part of count VIII that was directed to the constitutionality of the Fiscal Plans consist of conclusory assertions such that no relief could be granted [Adv. Proc. No. 17-00229, ECF No. 62]. The Title III Court denied the motions to dismiss as to lack of standing and as to the Contracts Clause claims contained in counts II, VI, and VIII, but granted the motions insofar as counts II, VI, and VIII were asserted against the Oversight Board and Ms. Jaresko in light of Section 105 of PROMESA. As a result of that ruling, only the Contracts Clause claims remained against the defendants other than the Oversight Board and Ms. Jaresko.

On December 17, 2018, PREPA and the Commonwealth answered the remaining claims in the amended complaint [Adv. Proc. No. 17-00229, ECF No. 76]. Several Individual Defendants also filed answers to the amended complaint on the same day [Adv. Proc. No. 17-00229, ECF Nos. 72-75, 77]. On August 30, 2019, UTIER filed its second amended complaint, adding allegations regarding alternatives the Commonwealth and PREPA supposedly could have implemented instead of enacting the Challenged Laws, updating the named Individual Defendants to reflect changes in leadership, and demanding approximately $589 million in damages and attorneys' fees [Adv. Proc. No. 17-00229, ECF No. 89]. On October 15, 2019, PREPA and the Commonwealth, as well as several Individual Defendants, filed their answers to UTIER's second amended complaint [Adv. Proc. No. 17-00229, ECF Nos. 92-97].

On March 12, 2021, UTIER filed its third amended complaint, reducing its damages demand to approximately $276 million but otherwise requesting the same relief as in the second amended complaint [Adv. Proc. No. 17-00229, ECF No. 131]. On April 20, 2021, the parties filed a stipulation addressing defendants' repleading of certain previously dismissed claims and

clarifying that the only remaining claims in this adversary proceedings were Claims 2, 6, 8, and 12, which relate to alleged violations of the Contracts Clause and damages in connection therewith (but not to the extent they challenge the fiscal plans) [Adv. Proc. No. 17-00229, ECF No. 137]. The Title III Court approved the stipulation on April 21, 2021 [Adv. Proc. No. 17-00229, ECF No. 138].

On April 26, 2021, defendants answered the third amended complaint [Adv. Proc. No. 17-00229, ECF Nos. 140, 149-53]. Also on April 26, 2021, PREPA and the Individual Defendants moved to dismiss the remaining claims against them on the basis that they are not state legislatures, do not make laws, and therefore could not have violated the Contracts Clause in connection with the Challenged Laws or budgets. Additionally, they claimed that the Contracts Clause does not apply to individuals taking actions to carry out legislatively granted authority [Adv. Proc. No. 17-00229, ECF No. 144]. Also on April 26, 2021, UTIER filed motions to exclude the testimony of defendants' experts (Dr. Andrew Wolfe, Dr. Henry S. Farber, Dr. James R. Hines Jr., and Michael Nadol) [Adv. Proc. No. 17-00229, ECF Nos. 145, 146, 147, 148]. On June 10, 2021, UTIER filed an opposition to PREPA and the Individual Defendants' motion to dismiss, arguing that the movants were liable for the impairment of UTIER's CBA, in violation of the Contracts Clause, because they enforced the challenged legislation and had alternative means to address the fiscal crisis without impairing the CBA [Adv. Proc. No. 17-00229, ECF No. 175].

On July 19, 2021, the Oversight Board filed a reply in support of its motion to dismiss, reiterating that PREPA did not exercise legislative power, enforcement of laws does not implicate the Contracts Clause, and UTIER did not otherwise state a Contracts Clause claim against it [Adv. Proc. No. 17-00229, ECF No. 183]. On July 19, 2021, certain defendants filed a joinder to PREPA's reply in support of PREPA's motion to dismiss UTIER's third amended complaint. They argued that the Title III Court never decided whether the Individual Defendants were proper defendants, and that in any event, no Contracts Clause claim was stated against them [Adv. Proc. No. 17-00229, ECF No. 184].

On February 4, 2022, the Title III Court granted PREPA and the Individual Defendants' motion to dismiss UTIER's third amended complaint, holding that UTIER did not allege that the they were a legislature or individual legislators, or that they exercised any legislative power. Further, the Title III Court held that enforcement or implementation of legislation does not give rise to a Contracts Clause claim [Adv. Proc. No. 17-00229, ECF No. 218].

On March 2, 2022, UTIER appealed from the dismissal of the claims against PREPA and the Individual Defendants. The notice of appeal was docketed by the First Circuit on March 8, 2022 as Case No. 22-1164 [Adv. Proc. No. 17-00229, ECF Nos. 219, 222]. On March 16, 2022, appellant filed a motion for voluntary dismissal of the appeal because appellate jurisdiction did not yet exist in that a final judgment had not yet been entered issued under 28 U.S.C. § 1291. In the motion, appellant reserved its right to appeal the dismissal upon issuance of a final judgment in Adv. Proc. No. 17-00229. On March 18, 2022, the First Circuit issued a judgment and mandate granting the appellant's voluntary dismissal [Adv. Proc. No. 17-00229, ECF Nos. 223-24].

On June 1, 2021, the parties filed cross-motions for summary judgment. UTIER argued that (i) the Challenged Laws substantially impaired the CBA, and (ii) such impairment was not reasonable or necessary to serve an important government purpose due to the availability of policy

218

alternatives [Adv. Proc. No. 17-00229, ECF No. 170].  Defendants argued in their motion that (i) the Challenged Laws served important public purposes; (ii) each of the Challenged Laws was reasonable and necessary to accomplish its purposes; and (iii) UTIER's proposed policy alternatives were insufficient to create a genuine dispute of fact regarding the reasonableness and necessity of the Challenged Laws [Adv. Proc. No. 17-00229, ECF No. 163].  On July 2, 2021, UTIER filed an amended memorandum of law in support of its motion for summary judgment, with a reduced damages demand of approximately $102 million [Adv. Proc. No. 17-00229, ECF No. 180].

On September 20, 2022, the Title III Court denied UTIER's cross-motion for summary judgment and granted defendants' motion, fully resolving all remaining claims.  The Title III Court held that UTIER had failed to establish that the Commonwealth's enactment of the Challenged Laws, and their impact on UTIER's CBA with PREPA, was not reasonable or necessary to achieve an important public purpose; accordingly, UTIER's claims under the Contracts Clause failed [Adv. Proc. No. 17-00229, ECF No. 226].  Also on September 20, the Title III Court denied UTIER's motions to exclude the testimony of defendants' four experts [Adv. Proc. No. 17-00229, ECF No. 225].  On September 29, 2022, judgment was entered and the case was closed [Adv. Proc. No. 17-00229, ECF No. 227].  UTIER did not file a notice of appeal.

15.  **Puerto Rico Electric Power Authority, et al. v. P.R. Energy Commission, Adv. Proc. No. 17-00256**

On September 5, 2017, *Instituto de Conservación y Competitividad Económica de Puerto Rico v. Comisión de Energía de Puerto Rico & Autoridad de Energía Eléctrica de Puerto Rico*, No. KLRA201700444 (the "ICSE Civil Action") and *Autoridad de Energía de Puerto Rico & Instituto de Conservación y Competitividad Económica de Puerto Rico v. Comisión de Energía Eléctrica de Puerto Rico*, No. KLRA20170446 (the "PREPA Civil Action," together with the ICSE Civil Action, the "Civil Actions") were removed to the Title III Court [Adv. Proc. No. 17-00256, ECF No. 1].  The Civil Actions are actions to review a rate order (the "Rate Order") issued by the PREC.  In the Civil Actions, PREPA challenges the Rate Order on several grounds, including that it infringes upon the authority of the Oversight Board and the authority of PREPA's board and management to control PREPA's business and operations.  Specifically, PREPA alleges that the Rate Order exceeds PREC's regulatory authority by purporting to establish a process under which PREPA's budgets, investments, and spending are subject to an advance approval process for PREPA that is not tied to the approved Fiscal Plan in substance, and is procedurally inconsistent with the fiscal and budgetary process mandated by the Oversight Board pursuant to the powers granted to it by PROMESA.  On September 6, 2017, the Title III Court issued an order referring the matter to Magistrate Judge Dein [Adv. Proc. No. 17-00256, ECF No. 6].

On November 10, 2017, ICSE filed a motion to remand and to lift the automatic stay because PREC was more qualified to adjudicate the dispute, and was permitted to do so under PROMESA and Commonwealth law [Adv. Proc. No. 17-00256, ECF No. 16].  AAFAF filed an opposition to the motion to remand on November 24, 2017, arguing (i) that the Title III Court is best situated to decide issues relating to PROMESA, and (ii) that the dispute concerned the scope of PREC's authority, not the Rate Order itself [Adv. Proc. No. 17-00256, ECF No. 18].  ICSE filed a reply to AAFAF's opposition on December 1, 2017, claiming that they were seeking remand of the Rate Case (which AAFAF claimed it did not seek removal of), and that the issue at hand was

219

governed purely by local law.  Additionally, ICSE argued that there was no valid claim that PREC was encroaching on the Oversight Board's powers [Adv. Proc. No. 17-00256, ECF Nos. 21].

On December 6, 2017, the Title III Court denied, without prejudice, the portion of ICSE's motion relating to the automatic stay because such motion was improperly combined with the remand motion without court authorization.  Further, the automatic-stay request was premature, as the Title III Court first needed to determine whether remand was appropriate [Adv. Proc. No. 17-00256, ECF No. 25].  On the same day, the Title III Court issued an order requiring supplemental briefing regarding whether, and to what extent, "PROMESA issues" had been pleaded in the Civil Actions [Adv. Proc. No. 17-00256, ECF No. 26].

On December 19, 2017, PREC filed a response to AAFAF's assertions of preemption in support of the notice of removal, PREC argued that its budget review process is necessary to protect against imprudent PREPA costs, and that there was no conflict between the Oversight Board and PREC because PREPA could comply with both agencies' orders [Adv. Proc. No. 17-00256, ECF No. 29].  On January 19, 2018, AAFAF submitted its supplemental brief, claiming that the conflict regarding the Oversight Board and PREC's scope of authority necessitated the Title III Court's interpretation of PROMESA [Adv. Proc. No. 17-00256, ECF No. 36].  On January 26, 2018, ICSE submitted its reply to, arguing that AAFAF did not demonstrate that the removed actions implicated PROMESA issues on any non-theoretical basis and only sought an advisory opinion on the scope of PREC and the Oversight Board's powers [Adv. Proc. No. 17-00256, ECF No. 39].  On February 22, 2018, the Title III Court issued an order directing AAFAF to file a sur-reply, which AAFAF filed on February 28, 2018.  In their sur-reply, AAFAF clarified that (i) it had not removed an administrative or legislative rate-setting proceeding; (ii) the Title III court had jurisdiction to hear the Civil Actions under 48 U.S.C. § 2166(d); (iii) it was not seeking an advisory opinion; and (iv) that it sought removal of only the two specific Civil Actions [Adv. Proc. No. 17-00256, ECF Nos. 41-42].

On March 28, 2018, the Title III Court denied ICSE's motion to remand because (i) the Civil Actions were within the Title III Court's jurisdiction under PROMESA; (ii) there were no grounds supporting equitable remand of the Civil Actions; and (iii) there were no grounds for abstention, due to the limited scope of the Civil Actions within the underlying administrative rate proceedings (*i.e.*, review was limited to discrete legal issues under PROMESA) [Adv. Proc. No. 17-00256, ECF No. 46].

On October 22, 2018, the Title III Court entered an order directing the parties to file a joint status report relating to their respective positions on the management of the proceeding [Adv. Proc. No. 17-00256, ECF No. 51].  The parties have subsequently filed a series of status reports regarding their efforts to narrow the issues pertinent to the case [Adv. Proc. No. 17-00256, ECF No. 52, 55, 57, 59, 61, 63, 65, 67, 70, 72, 74, 76, 78, 80, 83, 86, 89, 92, 94, 98, 101, 104, 106, 109, 112, 115, 118, 120, 123, 126, 129].  Per the Title III Court's order on October 24, 2022, the next joint status report is due on or before December 12 [Adv. Proc. No. 17-00256, ECF No. 130].

16.     **Puerto Rico Energy Commission v. The Financial Oversight and Management Board for Puerto Rico, Adv. Proc. No. 18-00021**

On March 4, 2018, PREC filed a complaint against the Oversight Board and PREPA seeking (i) a declaration that the Oversight Board can neither mandate nor authorize PREPA to take "substantive electricity actions" that are subject to PREC's jurisdiction, but that PREC has not authorized and (ii) preliminary and permanent injunctions prohibiting the Oversight Board from mandating or authorizing PREPA to take "substantive electricity actions" that are subject to PREC's jurisdiction, but that PREC has not authorized, and prohibit PREPA from complying with any such mandates or authorizations.  The complaint asserts that, when the Oversight Board exercises its fiscal powers over PREPA, it must do so consistently with PREC actions, orders, and regulations on "substantive electricity matters."  Further, the complaint asserts that whenever a proposed PREPA fiscal plan would impact "substantive electric industry" matters, PREC's timely assessment and approval is a prerequisite for the Oversight Board's certification of such Fiscal Plan [Adv. Proc. No. 18-00021, ECF No. 1].  According to the complaint, "substantive electricity actions" include, but are not limited to, actions affecting resource mix; asset ownership; operations, maintenance and retirement; market structure; microgrids; integrated resource planning; and rates.

On March 12, 2018, the Title III Court issued an order referring the adversary proceeding to Magistrate Judge Dein [Adv. Proc. No. 18-00021, ECF No. 19].  On the same day, the Title III Court issued an order granting the UCC's motion for limited intervention [Adv. Proc. No. 18-00021, ECF No. 22].  On March 16, 2018, the Title III Court issued an order granting the Monoline Insurers and Bondholders limited intervention rights [Adv. Proc. No. 18-00021, ECF No. 36].

On March 16, 2018, the defendants filed an opposition to PREC's motion for preliminary injunction, and the UCC filed a joinder to the opposition [Adv. Proc. No. 18-00021, ECF Nos. 37, 39].  Defendants argued that PREC was unlikely to succeed on the merits because: (i) PREC cannot constrain the Oversight Board's decisions regarding fiscal plans; (ii) PREC was asking the Title III Court to issue an advisory opinion; (iii) PROMESA Section 305 barred PREC's requested relief; and (iv) the requested injunctive relief failed to satisfy Federal Rule of Civil Procedure 65(d).  Additionally, defendants argued that PREC would not suffer irreparable harm since fiscal plans are not self-effectuating, PREC does not have a substantive role in the fiscal plan process, and the Oversight Board's assertions regarding its role would not harm PREC.  Further, any urgency at issue was a result of PREC's delay.  Finally, defendants argued that an injunction would not serve the public interest as PREPA's economic recovery depends on the Oversight Board's ability to efficiently oversee its debt restructuring efforts.

On March 21, 2018, PREC filed a reply to the various oppositions to its motion for preliminary injunction.  PREC argued that defendants overstate their statutory scope under PROMESA and that the Oversight Board lacked authority to direct PREPA's operations or control Puerto Rico's electricity policies.

On March 28, 2018, the Title III Court denied PREC's motion for preliminary injunction [Adv. Proc. No. 18-00021, ECF No. 73].  The Title III Court held that PREC failed to identify a specific mandate or authorization from the Oversight Board that PREC believes invades PREC's alleged sphere of control over substantive energy policy.  Because PREC failed to identify a concrete dispute, and the Title III Court lacked jurisdiction to issue the advisory opinion PREC

desired, the request for a preliminary injunction was denied.  On April 10, 2018, PREC filed a motion to voluntarily dismiss without prejudice, [Adv. Proc. No. 18-00021, ECF No. 78], and the Title III Court issued an order dismissing the case accordingly [Adv. Proc. No. 18-00021, ECF No. 79].

17.   ***Rivera Rivera, et al. v. Puerto Rico Electric Power Authority, et al.***, Adv. Proc. No. 18-00047; Rivera Rivera, et al. v. Puerto Rico Electric Power Authority, et al., (1st Cir. 20-1797)

On April 27, 2018, *José Ramón Rivera Rivera, et al. v. Commonwealth of Puerto Rico, et al.*, Civil Case No. SJ2018cv01670, an action originally filed in the Commonwealth Court, was removed to the Title III Court [Adv. Proc. No. 18-00047, ECF No. 1].  Therein, plaintiffs José Ramón Rivera Rivera, Ralphie Dominicci Rivera, Ángel R. Figueroa Jaramillo and Erasto Zayas López, each of whom were members of the SREAEE Board of Trustees, sought a declaration that SREAEE is a trust separate and independent of PREPA and the Commonwealth, and is therefore not under the jurisdictional scope of the Executive Branch or the Governor.  The complaint also sought to enjoin Executive Order OE-2018-012 ("EO-2018-012").  EO-2018-012 appointed PREPA's Board as trustees of SREAEE to finalize and submit the required SREAEE financial information through fiscal year 2017 and deliver to AAFAF information about SREAEE "necessary or convenient" to prepare PREPA's 2019 fiscal plan and fiscal year 2019 budget.  EO-2018-012 provided that this limited appointment automatically expired when (i) SREAEE issued actuarial reports and audited financial statements for fiscal years 2015 through 2017; (ii) the Oversight Board approved PREPA's 2019 fiscal plan; and (iii) the Oversight Board certified a PREPA budget for fiscal year 2019.  On May 2, 2018, the Title III Court issued an order referring the matter to Magistrate Judge Dein [Adv. Proc. No. 18-00047, ECF No. 4].

On May 28, 2018, plaintiffs filed a motion to remand [Adv. Proc. No. 18-00047, ECF No. 12].  On June 22, 2018, the Oversight Board and PREPA filed an opposition to the motion to remand, and on July 2, 2018, plaintiffs filed a reply in further support of their motion to remand [Adv. Proc. No. 18-00047, ECF Nos. 18, 20].

On July 2, 2018, SREAEE filed a motion to intervene as a "party in interest" in the adversary proceeding given that it is the entity directly affected by EO-2018-012 [Adv. Proc. No. 18-00047, ECF No. 21].  On August 3, 2018, the Title III Court issued an order granting SREAEE's motion to intervene [Adv. Proc. No. 18-00047, ECF No. 31].  On October 12, 2018, the Title III Court issued an order denying plaintiffs' motion to remand [Adv. Proc. No. 18-00047, ECF No. 33].

On February 6, 2019, an amended complaint was filed, adding SREAEE, PREPA's Board of Trustees, Juan Carlos Adrover, Sammy Rodríquez, and Alvin Román as plaintiffs, and Elí Díaz Atienza, Ralph A. Kreil, Christian Sobrino Vega, David K. Owns, Charles Bayles, Robert Pou, María Palou Abasolo, and José Ortiz as defendants [Adv. Proc. No. 18-00047, ECF No. 38].  On April 25, 2019, the Oversight Board filed an answer to the amended complaint, and asserted a counterclaim seeking a declaration that SREAEE is an instrumentality of PREPA and within the Title III Court's subject matter jurisdiction [Adv. Proc. No. 18-00047, ECF No. 49-50].  Plaintiffs answered the counterclaim on May 16, 2019 [Adv. Proc. No. 18-00047, ECF No. 53].

222

On January 17, 2020, plaintiffs filed a second amended complaint, which indicated that the EO-2018-012 was withdrawn on November 24, 2019 [Adv. Proc. No. 18-00047, ECF No. 68]. In the second amended complaint, plaintiffs contend that, despite the withdrawal of the Executive Order, there is still an imminent risk that another similar order will issue, repeating the injury to plaintiffs; for that reason, plaintiffs argued the withdrawal of EO-2018-012 does not reduce the risk that the Governor will reissue a similar order that would also violate plaintiffs' rights.

On February 24, 2020, defendants filed a motion to dismiss the second amended complaint [Adv. Proc. No. 18-00047, ECF No. 74]. In the motion to dismiss, defendants contend that because the Governor rescinded EO-2018-012, which was the sole subject of plaintiffs' claims for relief, there is no case or controversy for the Title III Court to address. Defendants further argue that even if there was a real case or controversy, the second amended complaint should nevertheless be dismissed because, under the *de facto* officer doctrine, the PREPA Board's actions should be deemed valid because they were taken under color of official title.

On March 18, 2020, plaintiffs filed an opposition to the motion to dismiss, arguing that the second amended complaint is not moot and that the *de facto* officer doctrine is not applicable because plaintiffs are not questioning the appointment of PREPA's Board of Directors [Adv. Proc. No. 18-00047, ECF No. 76].

On July 30, 2020, the Title III Court granted defendants' motion to dismiss, holding that the second amended complaint is moot to the extent it seeks a declaration as to the legality of the now-withdrawn EO-2018-012, and constitutes a non-justiciable request for an advisory opinion to the extent it seeks a general declaration that all actions taken pursuant to the EO-2018-012 are null and void [Adv. Proc. No. 18-00047, ECF No. 80]. On August 11, 2020, plaintiffs appealed by the First Circuit as Case No. 20-01797 [Adv. Proc. No. 18-00047, ECF No. 82].

On October 27, 2021, the First Circuit issued an opinion and order affirming the Title III Court's dismissal of the case for lack of subject matter jurisdiction. On November 17, 2021, the First Circuit issued its mandate.

18. ***Unión de Trabajadores de la Industria Eléctrica y Riego v. Ortiz Vazquez et al.*, Adv. Proc. No. 19-00298; Unión de Trabajadores de la Industria Eléctrica y Riego v. Ortiz Vazquez et al., (1st Cir. 20-1332)**

On May 8, 2019, *Unión de Trabajadores de la Industria Eléctrica y Riego (UTIER) v. Ing. José F. Ortiz Vázquez y Autoridad de Energía Eléctrica*, No. SJ2019cv03986, an action originally filed in the Puerto Rico Court of First Instance, was removed to the Title III Court [Adv. Proc. No. 19-00298, ECF No. 1]. Therein, UTIER sought a writ of mandamus ordering PREPA and José F. Ortiz Vázquez, then-Executive Director of PREPA, to identify savings and additional resources sufficient to enable PREPA to avoid increasing employees' health-plan contributions and to maintain contributions to health insurance for employees' dependents who suffer from a pre-existing condition during the time the employee remains "linked to public service." According to defendants, granting the writ would require PREPA to increase its employee healthcare expenditures above the levels designated in the certified PREPA Fiscal Plan dated August 1, 2018, and the certified PREPA Budget for Fiscal Year 2019. On May 9, 2019, the Title III Court issued an order referring the matter to Magistrate Judge Dein [Adv. Proc. No. 19-00298, ECF No. 5].

On July 12, 2019, the Oversight Board, as the sole Title III representative of PREPA, filed a motion to dismiss UTIER's mandamus petition [Adv. Proc. No. 19-00298, ECF No. 13]. Therein, the Oversight Board argued that (i) the mandamus relief sought is unavailable because it does not involve purely ministerial duties and because relief is available through litigation in connection with a PREPA plan of adjustment; (ii) PROMESA Section 305 prohibits the Title III Court from issuing any stay, order, or decree that would interfere with PREPA's property or revenues or its political or governmental powers; (iii) PROMESA Section 106(e) prevents the Title III Court from exercising jurisdiction over challenges to the Oversight Board's certification determinations; and (iv) a law mandating budget expenditures usurps the control Congress granted the Oversight Board over budget expenditures and would be preempted under PROMESA Sections 4, 108, 202, and 207.

On January 23, 2020, the Title III Court issued an order granting the Oversight Board's motion to dismiss, finding that UTIER had not met its burden of showing there were no adequate alternative remedies to obtain the relief UTIER sought, which is a prerequisite for mandamus relief [Adv. Proc. No. 19-00298, ECF No. 19].  On February 18, 2020, UTIER appealed.

On January 15, 2021, the First Circuit issued an opinion and order affirming the Title III Court's dismissal of UTIER's mandamus petition for failure to state a claim.  On February 5, 2021, the First Circuit issued its mandate.

19. **Sciemus Limited v. Financial Oversight and Management Board for Puerto Rico, Adv. Proc. No. 19-00369**

On June 3, 2019, Sciemus Limited; Markel Europe; Lloyd's Syndicates MSP 318, WRB 1967, and AGM 2488; Lloyd's Syndicates MIT 3210, KLN 510, MMX 2010, CSL 1084, TMK 1880, AML 2001, and BRT 2987; Indian Harbor Insurance Company; and PartnerRe Ireland Insurance DAC (collectively, the "Insurers") filed a complaint against the Oversight Board and PREPA [Adv. Proc. No. 19-00369, ECF No. 1].  In the complaint, the Insurers alleged that they insured certain PREPA assets pursuant to certain insurance policies (the "Policies").  The Complaint requested that the Title III Court determine the rights, duties, and liabilities of the parties pursuant to the Policies for losses claimed by PREPA arising from the deflection and subsequent collapse of the roof of a reserve fuel oil storage tank at PREPA's Costa Sur facility. Specifically, the Insurers sought declaratory relief that: (i) the amount calculated by Insurers, $1,726,000, is the correct amount owed to PREPA; and (ii) the Title III Court approve payment of that amount and direct PREPA to execute a proof of loss.  The Title III Court issued an order referring the matter to Magistrate Judge Dein for general pre-trial management on June 4, 2019 [Adv. Proc. No. 19-00369, ECF No. 5].

The Insurers filed an amended complaint on June 11, 2019, adding Swiss National Insurance Co. Ltd. as a plaintiff and Insurer [Adv. Proc. No. 19-00369, ECF No. 9].  On November 19, 2019, the Oversight Board and PREPA sought entry of an order providing that: (i) PREPA may accept from Insurers an immediate payment of $1,726,000 (the "Undisputed Payment") as payment of insurance proceeds under the Policies; (ii) no liens, encumbrances, priorities, or other claims by pre-existing creditors of PREPA may be asserted against the Undisputed Payment; (iii) no third party shall be permitted to interfere with the transfer of the Undisputed Payment to PREPA or PREPA's use of the Undisputed Payment; (iv) the Insurers shall not be subject to claims from

224

PREPA's existing creditors or third parties with respect to the Undisputed Payment; (v) Insurers shall not seek a refund, reimbursement, or claw-back of the Undisputed Payment or any portion thereof; (vi) Insurers retain all rights, remedies, and defenses under the Policy and at law and maintain that no further payment is owed; and (vii) defendants retain all further rights, remedies, and defenses under the Policy, including without limitation the right to seek additional amounts under the Policy (the "Motion for Undisputed Payment") [Adv. Proc. No. 19-00369, ECF No. 24]. At the December 11, 2019 Omnibus Hearing, the Title III Court informed the parties that the proposed order would improperly bind potential existing creditors and third parties, which due process would not allow. The parties notified the Title III Court that they would be filing an amended motion.

The Oversight Board and PREPA renewed their Motion for Undisputed Payment on December 26, 2019 and filed a certificate of no objection in connection with the renewed motion on January 17, 2020 [Adv. Proc. No. 19-00369, ECF Nos. 32, 38].  On January 21, 2020, the Title III Court issued an order directing the Oversight Board and PREPA to either file a revised proposed order limiting the scope of the relief sought in the renewed motion or be prepared at the upcoming omnibus hearing to identify legal and factual bases that would allow the Title III Court to grant the full scope of relief sought [Adv. Proc. No. 19-00369, ECF No. 40].  On January 24, 2020, the Oversight Board and PREPA filed a revised proposed order via a notice of presentment, limiting the scope of the relief sought in the renewed motion [Adv. Proc. No. 19-00369, ECF No. 41].  On January 30, 2020, plaintiffs filed an objection to the notice of presentment [Adv. Proc. No. 19-00369, ECF No. 42].  On February 4, 2020, the Title III Court issued an order denying the renewed motion, reasoning that the renewed motion—which limited third parties' rights only if they had been served with notice of the motion—no longer reflected a consensual resolution with the Insurers [Adv. Proc. No. 19-00369, ECF No. 46].

On February 26, 2020, Insurers filed a motion for leave to file a second amended complaint [Adv. Proc. No. 19-00369, ECF No. 47].  On March 2, 2020, the Title III Court issued an order directing the parties to meet and confer with respect to the motion and to file a joint status report, which the parties filed on March 5, 2020 [Adv. Proc. No. 19-00369, ECF Nos. 48-49].  The following day, the Title III Court granted Insurers' motion for leave to file a second amended complaint [Adv. Proc. No. 19-00369, ECF No. 50].

On October 6, 2020, the Oversight Board filed a motion under Bankruptcy Rule 9019 seeking approval of settlements with the Insurers, wherein PREPA would receive a $3.5 million payment in satisfaction of the Insurers' obligations under the Policies and a release of all claims against the Insurers [Adv. Proc. No. 19-00369, ECF No. 92].  On October 23, 2020, the Title III Court issued an order granting the motion and approving the settlement [Adv. Proc. No. 19-00369, ECF No. 98].  On December 14, 2020, the parties filed a joint stipulation for dismissal with prejudice in light of the approved settlements [Adv. Proc. No. 19-00369, ECF No. 99].  The Title III Court dismissed the adversary proceeding with prejudice on the same day [Adv. Proc. No. 19-00369, ECF No. 100].

225

20.    **Special Claims Committee v. Inspectorate America Corporation, Adv. Proc. No. 19-00388**

On June 30, 2019, the Special Claims Committee ("SCC"), as representative of PREPA, and the UCC, filed a complaint against Trafigura Trading LLC, Trafigura Beheer B.V., Trafigura Limited, Trafigura Argentina S.A. (collectively, "Trafigura"), Vitol, and Carlos R. Méndez & Associates (together with Trafigura, the "Supplier Defendants") and Inspectorate America Corporation ("Inspectorate America"), Saybolt LP, Altol Chemical Environmental Laboratory Inc., and Altol Environmental Services, Inc. ("Alchem") (together with Inspectorate America, Saybolt LP, Altol Chemical Environmental Laboratory Inc., and Alchem, the "Laboratory Defendants") [Adv. Proc. No. 19-00388, ECF No. 1]. The complaint alleges that the Supplier Defendants sold lower-grade fuel oil to PREPA at the higher prices commanded by highly-refined, higher-grade fuel oil, and the Laboratory Defendants improperly certified the non-compliant fuel oil met all specifications. As a result of those violations, plaintiffs asserted breach of contract claims against the Supplier Defendants and the Laboratory Defendants, as well as claims for avoidance and recovery of transfers made to defendants pursuant to the Bankruptcy Code. On July 8, 2019, the Title III Court issued an order referring the matter to Magistrate Judge Dein for general pretrial management [Adv. Proc. No. 19-00388, ECF No. 2].

On September 17, 2019, the plaintiffs in a pending class action, *Marrero-Rolón, et al. v. Autoridad de Energía Eléctrica*, et al., Case No. 15-01167 (JAG) (D.P.R.) (the "*Marrero* Action") filed a motion to intervene [Adv. Proc. No. 19-00388, ECF No. 9]. The *Marrero* Action, which was filed on behalf of alleged PREPA customers on February 24, 2015, alleges that PREPA (i) conspired with certain fuel suppliers and laboratories for PREPA to acquire non-compliant fuel oil at the cost of more expensive compliant fuel oil and (ii) passed on the cost of the oil to PREPA's ratepayers through a surcharge on its electricity bills. A class action has been certified in the *Marrero* Action, which is currently stayed, and the class filed a proof of claim against PREPA in its Title III case. On October 25, 2019, the SCC, the UCC, Inspectorate America, Saybolt LP, and the Supplier Defendants filed objections to the *Marrero* plaintiffs' ("*Marrero* Plaintiffs") motion to intervene [Adv. Proc. No. 19-00388, ECF Nos. 29-31]. On November 1, 2019, plaintiffs filed an amended complaint [Adv. Proc. No. 19-00388, ECF No. 33]. On November 14, 2019, Vitol filed an answer and counterclaims [Adv. Proc. No. 19-00388, ECF No. 37].

On November 15, 2019, the SCC filed a motion to stay the adversary proceeding, so long as the *Marrero* Action remained stayed pursuant to the automatic bankruptcy stay [Adv. Proc. No. 19-00388, ECF No. 38]. On December 10, 2019, the Title III Court issued an order granting the SCC's motion to stay the adversary proceeding and setting a deadline for the parties to submit a joint status report regarding coordination between this action and the *Marrero* Action [Adv. Proc. No. 19-00388, ECF No. 61].

On August 17, 2020, the plaintiffs filed a joint status report, stating that parties could not come to an agreement regarding the potential limited intervention of the *Marrero* Plaintiffs, and therefore restating their opposition to the *Marrero* Plaintiffs' motion to intervene on behalf of defendants [Adv. Proc. No. 19-00388, ECF No. 69]. On December 14, 2020, the Title III Court issued an order granting in part and denying in part the *Marrero* Plaintiffs' motion to intervene [Adv. Proc. No. 19-00388, ECF No. 85].

226

On September 14, 2020, the UCC filed an informative motion advising the Title III Court that it had filed a two-count complaint against the *Marrero* Plaintiffs, Adv. Proc. No. 20-00114, seeking (i) a declaration that the claims the *Marrero* Plaintiffs sought to pursue belong to PREPA, not the *Marrero* Plaintiffs, and (ii) an injunction enjoining prosecution of the *Marrero* Action [Adv. Proc. No. 19-00388, ECF No. 79].  On September 21, 2020, the *Marrero* Plaintiffs filed their own informative motion advising the Title III Court that they had filed an additional adversary proceeding against PREPA, Adv. Proc. No. 20-00115, seeking a declaration that the claims asserted in the *Marrero* Action are not PREPA assets, as well as relief from the automatic stay to permit the *Marrero* Plaintiffs to pursue a direct claim against PREPA, the Supplier Defendants, and the Laboratory Defendants [Adv. Proc. No. 19-00388, ECF No. 84].  In light of the related adversary proceedings, the Title III Court also stayed this proceeding until certain issues related to ownership of the claims against the Supplier Defendants and the Laboratory Defendants are resolved in Adv. Proc. No. 20-00115.

On October 29, 2021, Vitol filed a motion for judgment on the pleadings, arguing (i) plaintiffs' claims are time-barred, and (ii) the complaint otherwise fails to state a claim [Adv. Proc. No. 19-00388, ECF No. 93].  Also on October 29, 2021, Carlos Méndez & Associates and Inspectorate America each filed motions to dismiss the amended complaint [Adv. Proc. No. 19-00388, ECF Nos. 94, 96].  Therein, Carlos Méndez & Associates primarily argued that it is not a properly named party because plaintiffs did not, and could not, allege that it is a supplier of fuel oil, nor an initial transferee of transfers made by PREPA [Adv. Proc. No. 19-00388, ECF No. 94].  Inspectorate America argued that dismissal was warranted due to defects in plaintiffs' pleadings regarding breach of contract claims [Adv. Proc. No. 19-00388, ECF No. 96].  Additionally, Trafigura, Inspectorate America, Saybolt LP, and Carlos Méndez & Associates filed an omnibus motion to dismiss the amended complaint [Adv. Proc. No. 19-00388, ECF No. 98].

On November 15, 2021, the parties filed a joint motion for limited relief from the stay as to Vitol's counterclaims in its answer to the UCC's amended complaint [Adv. Proc. No. 19-00388, ECF No. 107] which was granted on December 7, 2021.  On December 14, 2021, Vitol filed its answer and counterclaims against plaintiffs and PREPA, alleging breach of contract, seeking declaratory judgment and alleging certain constitutional claims [Adv. Proc. No. 19-00388, ECF No. 120].

On the same day, April 25, 2022, Alchem filed an answer to the SCC's second amended complaint [Adv. Proc. No. 19-00388, ECF No. 159].  Also on April 25, 2022, Laboratory Defendant Inspectorate America and Supplier Defendants Saybolt LP, Vitol and Trafigura filed an omnibus motion to dismiss the SCC's second amended complaint [Adv. Proc. No. 19-00388, ECF No. 162].  On the same day, Laboratory Defendants Alchem filed a joinder to the omnibus motion to dismiss [Adv. Proc. No. 19-00388, ECF No. 166].  Also on April 25, 2022, Inspectorate America and Vitol filed individual motions to dismiss [Adv. Proc. No. 19-00388, ECF Nos. 161, 165].  On April 26, 2022, Saybolt LP filed a motion to dismiss [Adv. Proc. No. 19-00388, ECF Nos. 172].

On May 6, 2022, the UCC and SCC filed a motion to strike Alchem's joinder to the omnibus motion to dismiss [Adv. Proc. No. 19-00388, ECF No. 175].  On June 16, 2022, the Title III Court issued an order denying (i) the UCC and SCC's motion to strike Alchem's joinder to the

omnibus motion and (ii) the SCC's motion to strike Alchem's affirmative defenses in its answer to the SCC's second amended complaint [Adv. Proc. No. 19-00388, ECF No. 188].

On June 24, 2022, the UCC and SCC filed oppositions to Saybolt LP, Inspectorate America and Vitol's motions to dismiss and the omnibus motion to dismiss [Adv. Proc. No. 19-00388, ECF Nos. 189, 190, 193, 192]. On July 1, 2022, Alchem filed a motion for entry of an order finding waiver of plaintiffs' objections to their joinder and granting dismissal of all claims against Alchem [Adv. Proc. No. 19-00388, ECF No. 198]. Therein, Alchem asserted that plaintiffs' response to the omnibus motion to dismiss did not qualify as an opposition to Alchem's motion to dismiss, and as a result argued that the Title III Court should find that plaintiffs' waived their objections to the motion. The UCC and SCC filed a motion to clarify their opposition to the omnibus motion to dismiss applies to Alchem's joinder [Adv. Proc. No. 19-00388, ECF No. 199]. On July 6, 2022, Magistrate Judge Dein issued an order (i) denying Alchem's motion for entry of an order finding waiver of plaintiffs' objections to their joinder; (ii) granting in part the UCC and SCC's motion to clarify their opposition to the omnibus motion; and (iii) directing the UCC and SCC to file an amended response [Adv. Proc. No. 19-00388, ECF No. 200]. On July 7, 2022, the UCC and SCC filed their amended opposition to the omnibus motion to dismiss [Adv. Proc. No. 19-0388, ECF No. 200].

On July 25, 2022, Vitol filed a reply in support of its motion to dismiss [Adv. Proc. No. 19-00388, ECF No. 211]. On July 25, 2022, Saybolt LP filed a reply in support of its motion to dismiss and a motion to seal certain documents with the same [Adv. Proc. No. 19-00388, ECF Nos. 212, 213]. On the same day, Inspectorate America filed a reply in support of its motion to dismiss [Adv. Proc. No. 19-00388, ECF No. 214]. Also on July 25, 2022, defendants Saybolt LP, Inspectorate America, Vitol and Trafigura filed (i) a reply in support of the omnibus motion to dismiss and (ii) a reply in support of the request for judicial notice in connection with the omnibus motion [Adv. Proc. No. 19-00388, ECF Nos. 215, 216]. On the same day, Alchem filed a reply in support of their joinder to the omnibus motion to dismiss and a joinder to defendants Saybolt LP, Inspectorate America, Vitol and Trafigura's reply in support of the omnibus motion to dismiss [Adv. Proc. No. 19-00388, ECF No. 217]. On July 28, 2022, Judge Dein issued an order granting Saybolt LP's motion to seal certain documents in connection with its reply in support of its motion to dismiss [Adv. Proc. No. 19-00388, ECF No. 218].

21.   **Puerto Rico Electric Power Authority v. Vitol Inc., et al., Adv. Proc. No. 19-00453**

On November 14, 2019, *Autoridad de Energía Eléctrica de Puerto Rico v. Vitol Inc., et al.*, No. K AC2009-1376 (901) and *Energía Eléctrica de Puerto Rico v. Vitol Inc., et al.*, No. 2012-1174 (905), two consolidated cases then-pending in the Commonwealth Court, were removed to the Title III Court [Adv. Proc. No. 19-00453, ECF No. 1]. PREPA asserts various claims against Vitol, on the basis that PREPA's fuel supply contracts with Vitol, Inc. are null, void, and without any legal effect under Puerto Rico law because Vitol S.A. was convicted of a crime in New York state court in November 2007. As a result of that conviction, PREPA contends all contracts between the parties at the time of conviction were automatically rescinded, and all contracts entered into by the parties after the date of conviction were null *ab initio*. Further, PREPA seeks the return of approximately $3.89 billion paid by PREPA pursuant to those contracts. Vitol S.A. and Vitol, Inc. assert a counterclaim against PREPA for approximately $28.4 million in allegedly

228

unpaid invoices.  On December 3, 2019, the Title III Court issued an order referring the matter to Magistrate Judge Dein for general pre-trial management [Adv. Proc. No. 19-00453, ECF No. 6].

On December 13, 2019, the Oversight Board filed a motion to remand on equitable grounds [Adv. Proc. No. 19-00453, ECF No. 8].  On January 14, 2020, defendants filed a response to the motion to remand [Adv. Proc. No. 19-00453, ECF No. 10].  On February 5, 2020, the Oversight Board filed a reply to the defendants' response to the motion to remand and on February 20, 2020, defendants filed a sur-reply to the reply [Adv. Proc. No. 19-00453, ECF Nos. 15, 18].  The motion to remand was argued on March 5, 2020 [Adv. Proc. No. 19-00453, ECF No. 21].  On March 13, 2020, the Title III Court issued an order denying PREPA's motion to remand, concluding (i) it has federal subject matter jurisdiction; (ii) PREPA waived any timeliness objection; (iii) PREPA waived the operative forum selection clause by filing a breach of contract claim against defendants in the *Marrero* Action; and (iv) the notice of removal did not violate the automatic stay [Adv. Proc. No. 19-00453, ECF No. 27].  On May 14, 2020, the parties filed a joint status report setting forth a schedule for briefing and argument of dispositive motions [Adv. Proc. No. 19-00453, ECF No. 33].

On July 31, 2020, defendants filed a motion for summary judgment, arguing that: (i) Law 458 does not apply to Vitol Inc.'s contracts with PREPA, and as a result, PREPA cannot prove any of its affirmative claims; (ii) PREPA is not entitled to the remedy it seeks; and (iii) the remedy PREPA seeks is unconstitutional because it would violate the Excessive Fines Clause, the Takings Clause, and the Due Process Clause [Adv. Proc. No. 19-00453, ECF No. 37].

On November 9, 2020, the Oversight Board filed an opposition and cross-motion for summary judgment, alleging that (i) PREPA's contracts with Vitol, Inc. were null pursuant to Law 458 as a result of Vitol S.A.'s conviction; (ii) PREPA's contracts with Vitol, Inc. were also null because they were supported by illicit consideration; and (iii) PREPA was entitled to reimbursement of the approximately $3.89 billion paid to Vitol, Inc. and Vitol S.A. over the life of the contracts, notwithstanding Vitol, Inc.'s and Vitol S.A.'s constitutional defenses [Adv. Proc. No. 19-00453, ECF Nos. 48, 53].

On February 8, 2021, defendants filed a consolidated reply to the Oversight Board's response to their motion for summary judgment and an opposition to the Oversight Board's cross-motion for summary judgment, alleging that (i) PREPA's liability claims fail as a matter of law; (ii) PREPA cannot obtain a forfeiture under Puerto Rico law; and (iii) PREPA's claimed forfeiture remedy is unconstitutional [Adv. Proc. No. 19-00453, ECF No. 54].

On March 12, 2021, the Oversight Board filed a reply in support of its cross-motion for summary judgment, alleging that (i) PREPA established a Law 458 violation; (ii) PREPA is entitled to disgorgement under Puerto Rico law; (iii) PREPA is entitled to the rescission remedy provided in Articles 1257 and 1258; and (iv) PREPA's disgorgement remedy is constitutional [Adv. Proc. No. 19-00453, ECF No. 61].  On April 28, 2021, the Title III Court heard oral argument on the parties' cross-motions for summary judgment, and on April 30, 2021, the Title III Court ordered defendants to submit additional evidence referenced by defendants at the hearing [Adv. Proc. No. 19-00453, ECF No. 67].  Also on April 30, 2021, defendants filed the additional evidence requested by the Title III Court [Adv. Proc. No. 19-00453, ECF No. 68].  On May 10, 2021, the Title III Court issued an order directing the parties to file a joint submission regarding each party's

229

position on the impact of defendants' supplemental documents [Adv. Proc. No. 19-00453, ECF No. 73].  On May 11, 2021, the parties filed the joint submission [Adv. Proc. No. 19-00453, ECF No. 74].

On September 27, 2021, the Title III Court issued an opinion and order partially granting the parties' motions for summary judgment [Adv. Proc. No. 19-00453, ECF No. 77].  The Title III Court held that PREPA's contracts with Vitol, Inc. were not null pursuant to Law 458 or as a result of illicit consideration and that defendants were entitled to summary judgment on their counterclaim.  The Title III Court also granted PREPA's motion for summary judgment with respect to certain affirmative defenses raised by defendants.  On November 1, 2021, the parties filed a joint status report regarding the remaining issues to be resolved in the adversary proceeding [Adv. Proc. No. 19-00453, ECF No. 81].  Also on November 2, 2021, the Title III Court entered a judgment against PREPA in the amount of $41,457,382.88 on Vitol's counterclaim, and denying all relief not granted in the judgment.  The adversary proceeding was closed [Adv. Proc. No. 19-00453, ECF No. 82].

On December 2, 2021, the Oversight Board filed a notice of appeal [Adv. Proc. No. 19-00453, ECF No. 83].  On December 7, 2021, the appeal was docketed as Case No. 21-1987 in the First Circuit.  On May 2, 2022, appellant filed its opening brief.  On July 20, 2022, the parties filed a joint motion to hold the appeal in abeyance and stay all briefing deadlines pending a settlement of the action. On July 25, 2022, the First Circuit issued an order (i) granting the parties' joint motion to hold the appeal in abeyance and stay all briefing deadlines pending a settlement of the action and (ii) directing the parties to file a joint status report.  On August 31, 2022, the parties filed a notice of voluntary dismissal with prejudice.  On September 13, 2022, the First Circuit issued its judgment and mandate dismissing the appeal.

22.   **Official Committee of Unsecured Creditors v. Catesby Jones, Adv. Proc. No. 20-00114**

On September 14, 2020, the UCC filed a complaint against Anne Catesby Jones and Jorge Valdes Llauger [Adv. Proc. No. 20-00114, ECF No. 1].  The UCC sought a declaration that PREPA has the sole right to pursue claims against certain fuel oil suppliers (the "Fuel Oil Suppliers") and fuel oil laboratories (the "Fuel Oil Laboratories"), which both the UCC and defendants allege participated in a scheme to sell low-grade fuel oil to PREPA at the higher prices commanded by high-grade fuel oil.  Defendants had brought a separate class action, No. 15-cv-02267, on behalf of PREPA's ratepayers against the Fuel Oil Suppliers, the Fuel Oil Laboratories, and PREPA, alleging that PREPA, the Fuel Oil Suppliers, and the Fuel Oil Laboratories participated in a scheme to supply PREPA with lower-grade fuel oil.  The UCC also sought an injunction prohibiting defendants from prosecuting those claims, contending that it would interfere with the Title III centralized claims resolution process, frustrate the confirmation of a viable plan of adjustment, and result in a material diminution of recoveries to similarly situated creditors.  Accordingly, the UCC filed a motion for entry of a preliminary injunction on September 14, 2020 [Adv. Proc. No. 20-00114, ECF No. 2].

On September 15, 2020, the Title III Court issued an order referring the matter to Magistrate Judge Dein [Adv. Proc. No. 20-00114, ECF No. 3].  On October 9, 2020, the UCC filed a notice of voluntary dismissal without prejudice [Adv. Proc. No. 20-00114, ECF No. 11].

23.     **Catesby Jones v. Special Claims Committee, Adv. Proc. No. 20-00115**

On September 17, 2020, Anne Catesby Jones and Jorge Valdes Llauger filed a complaint against PREPA, the SCC, and the UCC seeking: (i) declaratory relief that the claims asserted by the Oversight Board and the UCC in Adv. Proc. No. 19-00388 avoidance action are not assets of the estate; and (ii) relief from the automatic stay [Adv. Proc. No. 20-00115, ECF No. 1].   On October 16, 2020, the Title III Court issued an order referring the matter to Magistrate Judge Dein for general pre-trial management [Adv. Proc. No. 20-00115, ECF No. 11].   On October 26, 2020, plaintiffs filed an amended complaint, naming only PREPA as a defendant [Adv. Proc. No. 20-00115, ECF No. 14].   On November 12, 2020, the UCC filed an agreed motion to intervene [Adv. Proc. No. 20-00115, ECF No. 19].   On November 16, 2020, the Title III Court granted the UCC's motion to intervene on a limited basis [Adv. Proc. No. 20-00115, ECF No. 21].

On January 22, 2021, plaintiffs filed a motion for leave to file a second amended complaint, which the Title III Court granted on January 25, 2021 [Adv. Proc. No. 20-00115, ECF Nos. 33-34].   On February 2, 2021, plaintiffs filed their second amended complaint [Adv. Proc. No. 20-00115, ECF No. 36].   On March 30, 2021, the Oversight Board filed a motion to dismiss counts I and II of plaintiffs' second amended complaint on the basis that the claims and any recovery asserted in the avoidance action are property of PREPA, and the UCC filed a joinder to PREPA's motion [Adv. Proc. No. 20-00115, ECF Nos. 41, 43].   On April 27, 2021, plaintiffs filed their opposition to PREPA's motion to dismiss [Adv. Proc. No. 20-00115, ECF No. 44].

On May 25, 2021, the Oversight Board filed a reply in support of its motion to dismiss plaintiffs' second amended complaint, and the UCC filed a joinder to the Oversight Board's reply [Adv. Proc. No. 20-00115, ECF Nos. 48, 49].   On June 24, 2021, the Title III Court issued an order granting the Oversight Board's motion to dismiss, as plaintiffs failed to allege a justiciable case or controversy, plaintiffs lacked standing to obtain a declaration concerning whether PREPA is an appropriate plaintiff in the avoidance action, and the Title III Court did not have subject matter jurisdiction regarding certain claims [Adv. Proc. No. 20-00115, ECF No. 53].   On September 17, 2021, the Title III Court ordered the parties to meet and confer and file a joint status report informing the Title III Court of the status of the litigation and the parties' positions on management of the proceedings on or before October 1, 2021 [Adv. Proc. No. 20-00115, ECF No. 54].

On September 30, 2021, plaintiffs filed a notice of voluntary dismissal [Adv. Proc. No. 20-00115, ECF. No. 55].   On November 18, 2021, judgment was entered closing the adversary proceeding [Adv. Proc. No. 20-00115, ECF No. 56].

24.     **Unión de Trabajadores de la Industria Eléctrica y Riego, et al. v. Pierluisi, et al., Adv. Proc. No. 21-00041**

On April 20, 2021, UTIER, along with other current and former members, filed a complaint initiating the proceeding.  On April 26, 2021, plaintiffs filed (i) an amended complaint seeking a declaratory judgment nullifying PREPA's T&D Contract with LUMA Energy and related injunctive relief and (ii) a motion for a preliminary injunction to temporarily enjoin the enforcement of the T&D Contract [Adv. Proc. No. 21-00041, ECF Nos. 7, 8].   In the amended complaint, plaintiffs argued (i) the T&D Contract favors only LUMA Energy; (ii) the T&D Contract contains clauses that are contrary to law and public order; (iii) the T&D Contract is a

tortious transaction for prejudicing third parties; and (iv) the T&D Contract and Act 29-2009 are unconstitutional under both the U.S. and Puerto Rico Constitutions.

On May 5, 2021, defendants filed an opposition to plaintiffs' motion [Adv. Proc. No. 21-00041, ECF No. 19].  In the opposition, defendants argued that public interest requires denying the motion.  Defendants further argued that (i) plaintiffs lack standing to bring their claims; (ii) plaintiffs are unlikely to succeed on the merits of their claim under PROMESA Section 305; and (iii) plaintiffs failed to state valid claims that the T&D Contract violated Puerto Rico law.  On May 11, 2021, plaintiffs filed a reply in support of their motion [Adv. Proc. No. 21-00041, ECF No. 30].  The motion was heard on May 18, 2021.

On May 21, 2021, the Title III Court issued an order denying plaintiffs' motion, citing to (i) plaintiffs' lack of standing to pursue their claims that the T&D Contract is void or unenforceable; (ii) plaintiffs' failure to demonstrate the T&D Contract violates law and public order; (iii) plaintiffs' failure to assert that the T&D Contract constitutes a tortious transaction; and (iv) plaintiffs' failure to assert that the T&D Contract is unconstitutional under either the U.S. or Puerto Rico Constitutions [Adv. Proc. No. 21-00041, ECF No. 56].

On May 28, 2021, plaintiffs filed a motion for reconsideration of the Title III Court's order [Adv. Proc. No. 21-00041, ECF No. 57].  The Title III Court issued an order denying the motion on June 1, 2021, determining (i) the Title III Court correctly applied Act 120 without consideration of certain amendments effected thereto by Act No. 17-2019; (ii) the Title III Court's findings regarding plaintiffs' lack of standing to challenge the T&D Contract's validity on public policy were proper; and (iii) the Title III Court did not err in finding no likelihood of success on the merits of plaintiffs' tortious interference claims [Adv. Proc. No. 21-00041, ECF No. 61].

On June 4, 2021, plaintiffs filed their second amended complaint, seeking a declaratory judgment nullifying PREPA's T&D Contract with LUMA Energy and related injunctive relief [Adv. Proc. No. 21-00041, ECF No. 64].  On July 19, 2021, defendants filed a motion to dismiss plaintiffs' second amended complaint [Adv. Proc. No. 21-00041, ECF No. 71].  In the motion to dismiss, defendants argued that (i) plaintiffs lacked standing to assert their claims challenging the T&D Contract; (ii) plaintiffs failed to state valid claims challenging the T&D Contract's validity; (iii) plaintiffs failed to state valid claims under Puerto Rico law; (iv) plaintiffs failed to allege any federal violations of Employee Retirement Income Security Act ("ERISA"), PROMESA Section 201, or the U.S. Constitution's Contracts Clause; and (v) plaintiffs wrongly sued individual defendants in their "official capacities" without alleging any acts they took.  On September 1, 2021, plaintiffs filed an opposition to defendants' motion to dismiss [Adv. Proc. No. 21-00041, ECF No. 75].

On October 12, 2021, Cortland filed a protective motion to be heard as *amicus curiae* in connection with defendants' motion to dismiss the second amended complaint [Adv. Proc. No. 21-00041, ECF No. 85].  Cortland claimed that defendants' motion to dismiss implicates certain disputes related to third-party beneficiaries under the Trust Agreement.

On October 29, 2021, Assured, National, the Ad Hoc Group, and US Bank filed (i) a response to Cortland's protective motion to be heard as *amicus curiae* in connection with defendants' motion to dismiss the second amended complaint and (ii) a cross-protective motion to

232

be heard as *amicus curiae* in connection with defendants' motion to dismiss plaintiffs' second amended complaint [Adv. Proc. No. 21-00041, ECF No. 88].

Also on October 29, 2021, the Governor of Puerto Rico, the Commonwealth, the Oversight Board, PREPA, the President of the PREPA Board, the Executive Director of PREPA, the Puerto Rico Public-Private Partnership Authority, the Executive Director of the Puerto Rico Public-Private Partnership Authority, AAFAF, and the Executive Director of AAFAF filed a response to Cortland's protective motion to be heard as *amicus curiae* in connection with defendants' motion to dismiss the second amended complaint [Adv. Proc. No. 21-00041, ECF No. 89].

On December 30, 2021, the Title III Court issued an order denying (i) Cortland's protective motion to be heard as *amicus curiae* in connection with defendants' motion to dismiss plaintiffs' second amended complaint and (ii) Assured, National, the Ad Hoc Group and US Bank's cross-protective motion to be heard as *amicus curiae* in connection with the same (the "Amicus Denial Order") [Adv. Proc. No. 21-00041, ECF No. 96]. The Title III Court stated that it was not persuaded that the moving parties requesting to be heard as amicus curiae have demonstrated a special interest in the case that justifies being heard as *amicus curiae*.

On January 13, 2022, Cortland filed an objection to the Title III Court's Amicus Denial Order [Adv. Proc. No. 21-00041, ECF No. 98]. On January 28, 2022, the Puerto Rico Governor, the Commonwealth, the Oversight Board, PREPA, the President of the PREPA Board, the Executive Director of PREPA, the Puerto Rico Public-Private Partnership Authority, the Executive Director of the Puerto Rico Public-Private Partnership Authority, AAFAF, the Executive Director of AAFAF, Assured, National, the Ad Hoc Group, Syncora and US Bank filed responses to Cortland's objection to the Title III Court's Amicus Denial Order [Adv. Proc. No. 21-00041, ECF Nos. 99, 100]. On February 3, 2022, Cortland filed a reply in support of its objection [Adv. Proc. No. 21-00041, ECF No. 101]. Cortland's objection and the defendants' motions to dismiss remain pending.

25. **Sistema de Retiro de los Empleados de la Autoridad (SREAEE) v. Pierluisi, et al., Adv. Proc. No. 21-00049**

On May 6, 2021, SREAEE and certain members of SREAEE's Board of Trustees filed a complaint seeking a declaratory judgment nullifying PREPA's T&D Contract with LUMA Energy and related injunctive relief [Adv. Proc. No. 21-00049, ECF No. 1]. On June 4, 2021, plaintiffs filed an amended complaint [Adv. Proc. No. 21-00049, ECF No. 7]. The amended complaint alleged that (i) the T&D Contract favors only LUMA Energy; (ii) the T&D Contract contains clauses that are contrary to law and public order; (iii) the T&D Contract is a tortious transaction; (iv) the T&D Contract violates Section 201(b) of PROMESA; (v) the T&D Contract deprives plaintiffs of their vested rights under SREAEE's Regulations and the CBA; and (vi) Act 29-2009 is unconstitutional under both the U.S. and Puerto Rico Constitutions' Contracts Clause.

On July 19, 2021, defendants filed a motion to dismiss plaintiffs' amended complaint [Adv. Proc. No. 21-00049, ECF No. 13]. Defendants' motion asserted that plaintiffs lacked Article III standing to bring "broad legal and public policy" based challenges to the T&D Contract. Defendants further asserted that (i) plaintiffs failed to state valid claims challenging the T&D Contract's validity; (ii) plaintiffs failed to identify any vested or legally protected right that the

T&D Contract allegedly impairs under Puerto Rico law; (iii) plaintiffs failed to allege any violations of ERISA, PROMESA Section 201, or the United States Constitution's Contract Clause; and (iv) plaintiffs wrongly sued individual defendants in their "official capacit[ies]" without alleging any acts they took.

On September 7, 2021, plaintiffs filed an opposition to defendants' motion to dismiss their amended complaint, arguing that (i) plaintiffs had standing to challenge the T&D Contract; (ii) they had plausibly alleged the T&D Contract was unlawful; and (iii) they had plausibly alleged that the T&D Contract violated federal law and the U.S. and Puerto Rico Constitutions [Adv. Proc. No. 21-00049, ECF No. 19].

On October 4, 2021, defendants filed a reply in support of their motion to dismiss plaintiffs' amended complaint, reiterating their arguments that the plaintiffs lacked standing and had failed to plausibly allege under any Puerto Rico or federal law, or the Puerto Rico or U.S. Constitutions [Adv. Proc. No. 21-00049, ECF No. 23].  The matter remains pending before the Title III Court.

26.  **Senado de Puerto Rico v. Paredes-Maisonet et al., Adv. Proc. No. 21-00059**

On June 4, 2021, PREPA and AAFAF filed a notice of removal from the Commonwealth Court to the Title III Court for a civil action seeking injunctive relief to enjoin LUMA Energy's exercise of authority under the T&D Contract, and to reverse the steps taken to effectuate the T&D Contract with LUMA Energy [Adv. Proc. No. 21-00059, ECF No. 1].  On June 10, 2021, the Senate of Puerto Rico filed a motion to remand the case to the Commonwealth Court, arguing that the complaint's core issues do not raise a federal question independently from that which falls under PROMESA [Adv. Proc. No. 21-00059, ECF No. 9].  The motion to remand was fully briefed [Adv. Proc. No. 21-00059, ECF Nos. 15, 16, 18].

On June 24, 2021, the Oversight Board filed a motion for entry of an order directing the Senate of Puerto Rico to withdraw the complaint, arguing that the complaint violated the automatic stay [Case No. 17-bk-4780, ECF No. 2530] because it seeks to exercise control over PREPA's property, namely the T&D Contract with LUMA Energy by declaring it null and void and to interfere with PREPA's operations by reversing the handover of operations of PREPA's T&D. The motion was fully briefed [Case No. 17-bk-4780, ECF Nos. 2530, 2572].

On February 7, 2022, the Title III Court issued an order directing the Senate of Puerto Rico to withdraw the complaint, reasoning that the T&D Contract constituted property within the meaning of the automatic stay, and, thus, the relief sought of effectively nullifying the T&D Contract would have impacted PREPA's contractual rights and violated the automatic stay [Adv. Proc. No. 21-00059, ECF No. 20].  The Court Clerk issued a judgment closing the case and the adversary proceeding was closed [Adv. Proc. No. 21-00059, ECF No. 21].

27.  **Hon. Luis Raul Torres Cruz v. LUMA Energy, LLC & LUMA Energy Servco, LLC, Adv. Proc. No. 21-00067**

On June 25, 2021, LUMA Energy filed a notice of removal from the Commonwealth court to the Title III Court for a civil action seeking disclosure of financial and operational information related to PREPA's T&D Contract with LUMA Energy [Adv. Proc. No. 21-00067, ECF No. 1].

234

On June 26, 2021, plaintiff filed a motion to remand the case to the Commonwealth court on the basis that it is improper for an Article III court to become an arbiter of a dispute between a private citizen and a House Commission about legislative oversight [Adv. Proc. No. 21-00067, ECF No. 3]. On June 28, 2021, the Title III Court issued an order referring the case to Magistrate Judge Dein for general pre-trial management [Adv. Proc. No. 21-00067, ECF No. 6].

On June 30, 2021, defendants filed an opposition to plaintiff's motion to remand, arguing that the Title III Court had jurisdiction because the removed action was related to the PREPA Title III Case [Adv. Proc. No. 21-00067, ECF No. 9]. On July 1, 2021, plaintiff filed a reply in support of his motion, reiterating its arguments that the dispute centered on the appropriate exercise of legislative power and did not concern PREPA's property [Adv. Proc. No. 21-00067, ECF No. 15].

On July 7, 2021, the Title III Court issued an order granting plaintiff's motion to remand the case to the Commonwealth court, holding that LUMA Energy had failed to show that the removed action involved the property or revenues of PREPA and therefore the Title III Court lacked jurisdiction [Adv. Proc. No. 21-00067, ECF No. 16], and the adversary proceeding was closed.

### 28.    *Herrero Domenech v. LUMA Energy, LLC*, Adv. Proc. No. 22-00050

On July 29, 2022, LUMA Energy filed a notice of removal from the Commonwealth Court to the Title III Court for a class action regarding LUMA Energy's performance of O&M Services and operation of the T&D System [Adv. Proc. No. 22-00050, ECF No. 1]. The class action was removed in connection with PREPA's indemnification obligations to LUMA Energy pursuant to the T&D Contract. On August 2, 2022, the Title III Court issued an order referring the case to Magistrate Judge Dein for pre-trial management [Adv. Proc. No. 22-00050, ECF No. 5].

On August 29, 2022, the class action plaintiffs filed a motion to remand, arguing that the Title III Court should exercise its equitable discretion to abstain from hearing the case and remand the case because LUMA is not a party to PREPA's restructuring nor is it considered part of PREPA's property [Adv. Proc. No. 22-00050, ECF No. 12].

On September 13, 2022, LUMA Energy filed its opposition to the motion to remand, arguing that LUMA Energy had standing as a party to the class action and the Title III Court had subject matter jurisdiction because the dispute was related to the PREPA Title III Case [Adv. Proc. No. 22-00050, ECF No. 14]. On October 12, 2022, the Title III Court referred plaintiff's motion for remand to Magistrate Judge Dein for a report and recommendation [Adv. Proc. No. 22-00050, ECF No. 15].

On October 28, 2022, Magistrate Judge Dein recommended that the Title III Court decline to exercise its jurisdiction under PROMESA's abstention and equitable remand provisions because the claims in the class action were based wholly on Puerto Rico law, and did not implicate PREPA or any other Title III Debtor [Adv. Proc. No. 22-000050, ECF No. 16].

On November 14, 2022, Luma Energy filed its objection to Magistrate Judge Dein's report and recommendation, arguing that there was no basis to abstain under PROMESA and that the case would necessarily impact PREPA's Title III Case and so warranted being heard before the Title III Court [Adv. Proc. No. 22-00050, ECF No. 17]. On December 9, 2022, the class action

plaintiffs filed an opposition arguing that Magistrate Judge Dein's analysis of the equitable and abstention factors was correct and warranted remand back to the Commonwealth courts [Adv. Proc. No. 22-00050, ECF No. 25]. On December 16, 2022, Luma Energy filed its reply in support of its objection, reiterating its argument that the Title III Court should exercise jurisdiction over the case due to the impact that this case could have on the administration of PREPA's Title III case [Adv. Proc. No. 22-00050, ECF No. 26].

On January 18, 2023, the Title III Court entered the *Memorandum Order Overruling Objections and Adopting Report and Recommendation* [Adv. Proc. No. 22-00050, ECF No. 27]. The Title III Court adopted Magistrate Judge Dein's report and recommendation in its entirety and remanded the class action to the Commonwealth Court pursuant to section 306(d)(2) and section 309 of PROMESA.

### H.   Appointments Clause Litigation

#### 1.   Aurelius Investments, LLC, et al. v. Commonwealth of Puerto Rico, et al., Case Nos. 18-01671; 18-08014 (1st Cir.)

On August 7, 2017, Aurelius Investment, LLC, Aurelius Opportunities Fund, LLC, and Lex Claims, LLC (collectively, "Aurelius") moved to dismiss the Commonwealth's Title III petition [Case No. 17-bk-3283, ECF No. 913]. Aurelius alleged that the Oversight Board lacked authority to initiate the Title III case because its members were appointed in violation of the Appointments Clause of the United States Constitution, U.S. Const. art. II, § 2, and the principle of separation of powers. In response, the Oversight Board argued that its members were not "Officers of the United States" under the Appointments Clause, and that the Oversight Board's powers were purely local, not federal, and thus the Appointments Clause did not apply [Case No. 17-bk-3283, ECF No. 1622]. The Oversight Board also argued that even if its members were federal officers, the Appointments Clause was not violated because Board members exercised authority in Puerto Rico, where the Territories Clause endows Congress with plenary powers. In the alternative, the Oversight Board argued that the appointment of its members' did not require advice and consent of the Senate because they were "inferior officers."

On July 13, 2018, the Title III Court denied Aurelius' motion to dismiss the Commonwealth's Title III Case [Case No. 17-bk-3283, ECF No. 3503]. Aurelius appealed. On September 7, 2018, the First Circuit consolidated the Aurelius appeal with similar appeals involving Appointments Clause challenges to the Oversight Board (discussed below) brought by UTIER and Assured Guaranty Corp.

On February 15, 2019, the First Circuit ruled that the appointment of the Oversight Board's members was unconstitutional. However, the First Circuit affirmed the Title III Court's decision declining to dismiss the Title III Cases, holding that actions taken by the Oversight Board prior to the First Circuit's ruling were valid under the *de facto* officer doctrine. The First Circuit stayed its ruling for ninety (90) days to allow the President and the Senate to cure the defective appointments.

The Oversight Board filed a petition for a writ of certiorari on April 23, 2019, which was docketed as U.S. Supreme Court Case No. 18-1334. On April 24, 2019, the Oversight Board

moved with the First Circuit to stay the mandate pending the disposition of its petition for certiorari. On May 6, 2019, the First Circuit extended the stay of the mandate by sixty (60) days until July 15, 2019.

On May 24, 2019, Aurelius filed a petition for a writ of certiorari challenging the First Circuit's *de facto* officer ruling, which was docketed as U.S. Supreme Court Case No. 18-1475. The UCC, which appeared as an appellee in the appeal at the First Circuit, filed a petition for a writ of certiorari on May 28, 2019, which was docketed as U.S. Supreme Court Case No. 18-1496. The United States filed a petition for a writ of certiorari on May 28, 2019, which was docketed as U.S. Supreme Court Case No. 18-1514. UTIER filed a petition for a writ of certiorari on June 5, 2019, which was docketed as U.S. Supreme Court Case No. 18-1521.

On June 18, 2019, the Oversight Board moved the First Circuit to extend the stay of the mandate until resolution of the above cases by the Supreme Court. On June 19, 2019, the Supreme Court granted all of the petitions for certiorari and consolidated the cases. U.S. Supreme Court Case No. 18-1334 was designated as the lead case. On July 2, 2019, the First Circuit granted the Oversight Board's motion to stay the mandate pending a merits decision by the Supreme Court.

On July 25, 2019, the Oversight Board, AAFAF, the Retirees Committee, the United States, and the UCC filed briefs at the Supreme Court challenging the First Circuit's Appointments Clause ruling. On August 22, 2019, UTIER and Aurelius filed their consolidated opening briefs, supporting the First Circuit's ruling on the Appointments Clause and challenging its ruling on the *de facto* officer doctrine. On September 19, 2019, the Oversight Board, AAFAF, the Retirees Committee, the United States, and the UCC filed replies in support of their challenges to the First Circuit's Appointments Clause ruling and supporting the First Circuit's ruling on the *de facto* officer doctrine. The COFINA Senior Bondholders' Coalition filed a brief that was limited to supporting the First Circuit's ruling on the *de facto* officer doctrine. On October 4, 2019, and October 8, 2019, UTIER and Aurelius filed reply briefs. Oral argument was held on October 15, 2019.

On June 1, 2020, the United States Supreme Court reversed the First Circuit's February 15, 2019 decision. The Court held that the Appointments Clause does not apply to the appointment of the Oversight Board's members. Because the Oversight Board's statutory responsibilities consist of "primarily local duties"—namely, representing Puerto Rico "in bankruptcy proceedings and supervising aspects of Puerto Rico's fiscal and budgetary policies"—the Oversight Board's members are not "Officers of the United States" and thus not subject to the Appointments Clause. The Supreme Court declined to consider the application of the *de facto* officer doctrine since it held that the Oversight Board's members were validly appointed. Justices Sotomayor and Thomas issued opinions concurring in the judgment. Justice Sotomayor "reluctantly" concurred in the judgment but wrote to underscore the autonomy of Puerto Rico. Justice Thomas concurred that the appointment of the members of the Oversight Board did not violate the U.S. Constitution but took issue with the majority's "amorphous" test distinguishing between an officer's local and federal duties.

2.      **Assured Guaranty Corp., et al. v. Financial Oversight and Management Board for Puerto Rico, et al., Adv. Proc. No. 18-00087**

On July 23, 2018, plaintiffs Assured, like Aurelius, filed a complaint challenging the constitutionality of the appointment of the Oversight Board's members.  Assured sought declarations that the appointment of the Oversight Board's members violated the Appointments Clause and that the Oversight Board's actions were null and void.  Assured also sought to enjoin the Oversight Board and its voting members from taking any further action until its members were lawfully appointed.

On August 3, 2018, the Title III Court issued a stipulated judgment for the Oversight Board on the ground that the claims raised in Assured's complaint had already been found defective by the Title III Court in the Aurelius matter.  *In re Fin. Oversight & Mgmt. Bd. for P.R.,* 318 F. Supp. 3d 537 (D.P.R. 2018), *aff'd in part, rev'd in part,* 915 F.3d 838 (1st Cir. 2019), *rev'd and remanded,* 140 S. Ct. 1649 (2020).  Assured filed a notice of appeal to the First Circuit, which was docketed as Case No. 18-1746.  That appeal was consolidated with the Aurelius appeal (discussed above) and was resolved on the same grounds.

3.      **Unión de Trabajadores de la Industria Eléctrica y Riego v. Puerto Rico Electric Power Authority, et al., Adv. Proc. No. 17-00228 (D.P.R. Aug. 7, 2017) (1st Cir. 18-1787)**

On August 6, 2017, plaintiff UTIER brought a nearly identical Appointments Clause challenge to the appointment of the Board's members as Aurelius and Assured.  UTIER sought (i) declaratory judgments that PROMESA violated the Appointments Clause and all of the Oversight Board's acts to date were invalid, and (ii) an order enjoining the Oversight Board from exercising any authority granted to it by PROMESA.  On November 10, 2017, UTIER amended its complaint [Adv. Proc. No. 17-00228, ECF No. 75].

On November 20, 2017, the Oversight Board moved to dismiss the amended complaint [Adv. Proc. No. 17-00228, ECF No. 88].

On August 15, 2018, the Title III Court granted the Oversight Board's motion on the ground that there was no violation of the Appointments Clause.  *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 318 F. Supp. 3d 537, 557 (D.P.R. 2018).

On August 16, 2018, UTIER appealed to the First Circuit (docketed as Case No. 18-1787).  On September 7, 2018, the First Circuit consolidated the UTIER appeal with the appeals brought by Aurelius and Assured discussed above.  UTIER's appeal was resolved in the same manner as the Aurelius and Assured appeals.  *See* Section V.H.1–2.

4.      **Hernandez-Montañez, et al. v. Financial Oversight & Management Board for Puerto Rico, et al., Adv. Proc. No. 18-00090**

On July 25, 2018, certain members of the minority Popular Democratic Party serving in the Legislative Assembly filed a complaint seeking declaratory judgments that (i) the Oversight Board's members were appointed in a manner that violates the Appointments Clause of the U.S. Constitution; (ii) the delegation of executive and legislative authority to the Oversight Board is a

violation of the separation of powers doctrine; and (iii) the Oversight Board's use of its budgetary powers to allegedly encourage adoption of its preferred policies constitutes "impermissible interference" with the autonomy of the Legislative Assembly. Plaintiffs also sought orders enjoining the Oversight Board from exercising its authority under PROMESA and enjoining the Oversight Board from supposedly interfering with the legislative process.

On August 27, 2018, the parties filed a joint status report in which plaintiffs agreed (i) to stay their Appointments Clause claim while Aurelius's Appointments Clause appeal was pending and (ii) dismiss their legislative autonomy claim [Adv. Proc. No. 18-00090, ECF No. 18]. The parties disagreed as to whether plaintiffs' remaining claim that PROMESA violates the separation-of-powers doctrine should be stayed pending resolution of the Aurelius Appointments Clause appeal. On November 20, 2018, Magistrate Judge Dein entered an order [Adv. Proc. No. 18-00090, ECF No. 32] staying the case pending resolution of the consolidated appeals in *Aurelius Investments, LLC v. Commonwealth of Puerto Rico*, No. 18-1671, *Assured Guaranty Corp. v. Financial Oversight & Management Board for Puerto Rico,* No. 18-1746, and *UTIER v. Puerto Rico Electric Power Authority,* et al., No. 18-1787. For more information on those appeals, see Section V.H.1–3 above.

On August 19, 2020, after the Supreme Court's decision in *Aurelius*, plaintiffs moved to lift the stay [Adv. Proc. No. 18-00090, ECF No. 33]. On September 11, 2020, the United States and the Oversight Board filed notices of non-opposition to plaintiffs' motion [Adv. Proc. No. 18-00090, ECF Nos. 35, 36]. On September 14, 2020, the Title III Court lifted the stay [Adv. Proc. No. 18-00090, ECF No. 37].

On November 30, 2020, the Oversight Board moved to dismiss plaintiff's complaint, asserting that it fails to state a claim for relief [Adv. Proc. No. 18-00090, ECF No. 45]. Also, on November 30, 2020, the United States filed a brief in support of the constitutionality of PROMESA [Adv. Proc. No. 18-00090, ECF No. 47]. On February 26, 2021, plaintiffs filed an opposition to the Oversight Board's motion to dismiss [Adv. Proc. No. 18-00090, ECF No. 52]. On March 29, 2021, the Oversight Board filed its reply in support of its motion [Adv. Proc. No. 18-00090, ECF No. 53].

On May 7, 2021, the Title III Court issued an order granting the Oversight Board's motion to dismiss, as to count I of the complaint [Adv. Proc. No. 18-00090, ECF No. 54]. On May 14, 2021, the parties filed a joint stipulation of dismissal with prejudice as to count III of the complaint [Adv. Proc. No. 18-00090, ECF No. 55]. On July 7, 2021, plaintiffs filed a motion for entry of judgment [Adv. Proc. No. 18-00090, ECF No. 57]. On July 8, 2021, the Title III Court issued an order approving the parties' joint stipulation of dismissal [Adv. Proc. No. 18-00090, ECF No. 58]. On July 9, 2021, the Title III Court issued a judgment dismissing the case with prejudice, and the adversary proceeding was closed [Adv. Proc. No. 18-00090, ECF No. 59]. On July 25, 2021, plaintiffs filed a notice of appeal in connection with the Title III Court's judgment dismissing the case with prejudice [Adv. Proc. No. 18-00090, ECF No. 60].

On August 2, 2021, the First Circuit docketed the appeal as Case No. 21-1581. On October 11, 2021, all plaintiffs except for the House Speaker filed a notice of partial voluntary dismissal. On May 13, 2022, the First Circuit issued an order dismissing the appeal as to all plaintiffs except the House Speaker and Pedro Garcia-Figueroa. On May 24, 2022, Pedro Garcia-Figueroa filed a

notice of voluntary dismissal.  On May 27, 2022, the First Circuit issued an order dismissing the appeal as to Pedro Garcia-Figueroa.  On August 1, 2022, the House Speaker filed his opening brief. On September 30, 2022, the United States and the Oversight Board each filed their responsive briefs.  Oral argument was held on December 5, 2022.

## I.   Oversight Board's Investigation of Potential Causes of Action

The Oversight Board is vested with broad investigative powers.  Pursuant to PROMESA Section 104(o), which empowers the Oversight Board to investigate the disclosure and selling practices in connection with the purchase of bonds issued by the Debtor, and related sections, the Oversight Board, through its Special Investigation Committee, pursued an investigation into potential causes of actions related to Puerto Rico's fiscal crisis.

### 1.   Independent Investigator Report

#### i.   Process and Mandate

On September 1, 2017, the Oversight Board, acting by and through the Special Investigation Committee, retained Kobre & Kim LLP (the "Independent Investigator") to conduct an investigation into certain matters relating to Puerto Rico's fiscal crisis in furtherance of the Oversight Board's mandate pursuant to PROMESA.

Specifically, the Independent Investigator was asked to investigate: (i) the factors contributing to Puerto Rico's fiscal crisis, including changes in the economy, expansion of spending commitments and entitlement programs, changes in the federal funding it receives, and reliance on debt to finance a structural budget deficit; (ii) Puerto Rico's debt, the general use of proceeds, the relationship between the debt and Puerto Rico's structural budget deficit, the range of its debt instruments, as well as how Puerto Rico's debt practices compare to the debt practices of states and large municipal jurisdictions; and (iii) Puerto Rico's debt issuance, disclosure, and selling practices, including its interpretation of Puerto Rico's constitutional debt limit.  In consultation with the Special Investigation Committee and the Oversight Board's General Counsel, the Independent Investigator focused its inquiry on the following specific areas: GDB; Puerto Rico's Public Utilities[245]; COFINA; ERS; Puerto Rico's Budgeting, External Reporting, and Accounting Functions; calculation of the constitutional debt limit; the credit rating agencies; selling practices for Puerto Rico-related Bonds; Puerto Rico's government ethics framework; issuers' use of interest rate swaps; Puerto Rico's lack of a clear mechanism for validating Puerto Rico-related bonds before they issue; and the possession tax credit.

The Special Investigation Committee's principal goals for the investigation were: (i) to identify any policies (or lack of safeguards) that contributed to the Puerto Rico debt crisis, including factors that permitted Puerto Rico and certain of its instrumentalities to issue significant amounts of debt without adequate sources of repayment; and (ii) to identify potential value recovery from culpable parties and identify matters for regulatory attention, all to assist the Oversight Board in its mission to restore fiscal balance and economic opportunity and to promote Puerto Rico's access to the capital markets.  Specifically, with respect to the Public Utilities, the

---

[245] The "Public Utilities" were defined as both PREPA and PRASA.

Independent Investigator examined how the Public Utilities' governance structures, degree of dependence on and oversight by Puerto Rico, rate setting and collection of revenues, bond issuances, capital improvement projects, and general operations combined to impact their revenue streams and contribute to Puerto Rico's fiscal crisis.

## ii.    Investigation Procedures

In May 2017, the Oversight Board adopted the PROMESA Investigative Procedures ("PROMESA Investigative Procedures") to establish the procedural framework for the investigation.[246]  Those PROMESA Investigative Procedures authorize the Oversight Board to commence two investigations, one informal (the "Informal Investigation") and one formal (the "Formal Investigation") to probe activities or conduct for which the Oversight Board has authority to investigate under PROMESA.  The key procedural difference between the two types of investigations is that the Oversight Board is only authorized to issue process to compel testimony and production of investigative materials upon the commencement of a Formal Investigation.[247] The Independent Investigator used both formal and informal investigative techniques to achieve the mandate set out by the Special Investigation Committee.

On October 18, 2017, the Special Investigation Committee, acting on behalf of the Oversight Board, approved a Resolution Initiating Formal Investigation for Purpose of Issuing Investigative Subpoenas (the "Investigative Subpoenas Resolution").[248]  In general terms, under the Investigative Subpoenas Resolution, a Formal Investigation is deemed initiated for the purpose of authorizing the Independent Investigator to issue Investigative Subpoenas[249] in certain circumstances.[250]

Starting in September 2017, in furtherance of the Informal Investigation, the Independent Investigator delivered letters to more than 90 entities (collectively, the "Document Preservation and Request Letters").  The Document Preservation and Request Letters identified various categories of documents that the Independent Investigator deemed relevant to the Informal Investigation and requested that the recipients of the letters preserve and produce any responsive documents in their possession, custody, or control.  After the Document Preservation and Request Letters were sent, the Independent Investigator scheduled and conducted conferences with the

---

[246] The PROMESA Investigative Procedures are available at https://oversightboard.pr.gov/documents/.

[247] PROMESA Investigative Procedures, §§ 3.1(b), 3.2(b)(2).  Section 104 of PROMESA vests the Oversight Board with the power to issue subpoenas "requiring the attendance and testimony of witnesses and the production of books, records, correspondence, memoranda, papers, documents, electronic files, metadata, tapes, and materials of any nature relating to any matter under investigation by the Oversight Board." 48 U.S.C. § 2124(f)(1).

[248] The Investigative Subpoenas Resolution is available at https://oversightboard.pr.gov/documents/.

[249] An "Investigative Subpoena" is defined in section 1.3(a)(16) of the PROMESA Investigative Procedures to mean a subpoena issued by the Oversight Board or its authorized agent pursuant to PROMESA section 104(f)(i), substantially in the form of an exhibit attached to the Investigative Subpoenas Resolution.

[250] Those circumstances would occur where a witness has not voluntarily cooperated with the Independent Investigator's requests for documents or an interview, where the witness has communicated that it cannot voluntarily cooperate with the Independent Investigator's requests, or where the witness has provided an interview but the Independent Investigator, in consultation with the Oversight Board's General Counsel, determines that it would be appropriate to have the witness testify under oath.

recipients (most by phone, some in person) to reiterate the requests and discuss a process for identification and delivery of documents to the Independent Investigator.

Witnesses generally cooperated with the Independent Investigator, and the Independent Investigator used the tools available through the Informal Investigation.  That cooperation— facilitated by the Independent Investigator's use of its subpoena power only as needed—enabled the Independent Investigator to complete the investigation in an efficient and timely manner, consistent with the objectives of PROMESA and as requested by the Special Investigation Committee.  The Independent Investigator was especially mindful of avoiding the delay and cost of litigating subpoenas.

Over the course of the investigation, the Independent Investigator received a total of approximately 260,800 documents consisting of approximately 2,740,000 pages, from 32 parties. Those parties include, among others, a number of Puerto Rico entities, financial institutions, rating agencies, financial advisors, professionals, and regulators.

The Independent Investigator also secured direct, read-only access to the email custodial files of dozens of employees and former employees of GDB through its representative, AAFAF.[251] On behalf of GDB, AAFAF produced to the Independent Investigator approximately 36,000 documents from that database.

Pursuant to the Investigative Subpoenas Resolution, the Independent Investigator issued twelve (12) Investigative Subpoenas ("Investigative Subpoenas") (five of which were withdrawn after issuance based on the recipient's subsequent agreement to voluntarily cooperate with the Independent Investigator).[252]  Without exception, the recipients of the Investigative Subpoenas produced documents to the Independent Investigator in response to those subpoenas.

From December 2017 to August 2018, the Independent Investigator conducted a total of approximately 120 voluntary witness interviews, probing a wide range of topics relevant to the investigation.  The individuals interviewed included four former governors of Puerto Rico, former and current senior government officers, underwriters, credit rating agencies, auditors, outside professionals and advisors.

Throughout the investigation, the Independent Investigator engaged in robust cooperation and consultation with the UCC and Retiree Committee.  Beginning in November 2017, the Independent Investigator regularly engaged with both the UCC and Retiree Committee regarding the investigation.  Specifically, in addition to cooperation and communication by calls and e-mails when needed, the Independent Investigator participated in weekly telephone conferences with

---

[251] That access was obtained through PROMESA section 104(c)(2), which provides as follows: "Notwithstanding any other provision of law, the Oversight Board shall have the right to secure copies, whether written or electronic, of such records, documents, information, data, or metadata from the territorial government necessary to enable the Oversight Board to carry out its responsibilities under this Act.  At the request of the Oversight Board, the Oversight Board shall be granted direct access to such information systems, records, documents, information, or data as will enable the Oversight Board to carry out its responsibilities under this Act." 48 U.S.C. § 2124(c)(2).

[252] The recipients of Investigative Subpoenas (apart from those that were withdrawn) were Banco Popular de Puerto Rico, Mesirow Financial Inc., Popular Inc., Popular Securities LLC, Santander Asset Management LLC, Santander Bancorp, and Santander Securities LLC.

counsel for the UCC and Retiree Committee respectively. During those conferences, the Independent Investigator provided information regarding witnesses to be interviewed in the coming week, solicited input on questions to ask of witnesses, provided counsel to the UCC and Retiree Committee with its preliminary observations regarding the results of the investigation in areas in which the UCC and Retiree Committee had expressed interest, and also facilitated the UCC and Retiree Committee's access to materials that were provided to the Independent Investigator.

### iii. Major Findings from the Independent Investigation about PREPA

On August 20, 2018, the Independent Investigator published its Final Investigative Report ("Final Investigative Report"). This Disclosure Statement includes a summary of the Independent Investigator's primary findings relating only to PREPA. The summary included in this Disclosure Statement should not be construed as a substitute for the comprehensive reporting, recommendations, and claims analysis included in the Final Investigative Report.[253]

### a. PREPA and the Public Utilities

Part V of the Final Investigative Report presents the findings of the investigation into the Public Utilities, including PREPA.

The Independent Investigator found evidence that political influence directly impacted PREPA's rates in a way that simultaneously kept the rates high and, yet, insufficient to cover operational expenses and capital improvement projects. PREPA's base electricity rate had not increased from 1989 to 2016. To compensate for its insufficient base rate, PREPA became dependent on financing from GDB, as explained below. PREPA often resorted to bond proceeds intended for maintenance and capital improvements in order to pay debt service.

The Independent Investigator attributed these problems to: (i) a lack of political will to raise PREPA's base rate; (ii) political obstacles to reducing rates by converting to natural gas; and (iii) required payments to municipalities that reduced PREPA's collected revenues. Specifically, the Independent Investigator noted that PREPA had the authority to raise rates without governmental approval—previously through its board, and through PREC since 2014. However, in practice, PREPA would not change its rates without permission from the governor, and governors were historically opposed to raising rates. In addition, political disagreement regarding the shift from oil to lower cost natural gas contributed to PREPA's high debt burden and inability to complete capital projects, with multiple pipeline projects being approved by the government and subsequently cancelled. PREPA issued debt to fund construction of gas pipelines that were ultimately not completed after projects were cancelled, while also drawing lines of credit to continue to purchase oil. Government-mandated subsidies that PREPA must pay to municipalities, known as CILTs, also impacted PREPA's balance sheet. Because PREPA does not pay property taxes to municipalities, CILTs are intended to compensate the municipalities by reducing their electricity costs. However, rather than collecting power revenue from the municipalities and then

---

[253] A comprehensive overview of the entire Final Investigative Report is available in the Executive Summary, available at the Oversight Board's website at https://drive.google.com/open?id=19-lauVo3w9MPS03xYVe0SWhQin-Q6FEf.

paying back the CILTs, as required by law, PREPA instead offset the amount of the CILT against its outstanding receivables, and did not collect on its invoices.

In addition, PREPA's large number of Governor-appointed employees and high rates of turnover subjected PREPA to poor decision making and lack of institutional knowledge. The Independent Investigator found that, in recent years, six of the nine seats on PREPA's Board, which has exclusive authority to approve or reject all of PREPA's borrowing and rate setting, approve budgets, and to choose its Executive Director, changed hands every time a new governor was elected, if not more often. Government-appointed employees were present at all levels of PREPA, including both high-level positions and operational positions, and with each new governor hundreds of employees left PREPA. Over the course of twenty (20) years, the average length of time that an Executive Director of PREPA stayed in that position was approximately sixteen (16) months.

Also, PREPA systematically included uncollected revenues when it calculated and represented to the public its ability to pay its operating costs and debt service, and was therefore able to issue more debt despite not having the ability to cover debt service. With respect to PREPA's bond issuances, neither GDB nor the underwriters under the bonds monitored PREPA's actual use of bond proceeds or compared PREPA's actual use of proceeds to PREPA's represented use of those proceeds.

b.      **The Role of GDB**

As addressed in Part IV of the Final Investigative Report, GDB's dual roles as fiscal agent and lender for certain Commonwealth instrumentalities and public corporations, including PREPA were in tension, and that tension became untenable over time. The tension was compounded by structural deficiencies that allowed the policy considerations of various gubernatorial administrations to affect the decision-making of GDB in its capacities as both lender and fiscal agent.

One example of GDB's work as fiscal agent is a July 2011, request from PREPA to GDB's board to draw a $260 million line of credit from a private bank. PREPA emphasized that any delay in approval would put PREPA at risk of having its oil supply interrupted because PREPA already had an 86-day overdraft with one of its largest suppliers. Just one month earlier, however, PREPA had proposed that it obtain a different line of credit in the amount of $150 million, to be drawn from a different private bank. That earlier proposal did not mention any existing overdraft or potential need for a meaningful amount of additional liquidity in the foreseeable future. Certain GDB officials expressed surprise at the subsequent request for the $260 million credit line, but GDB nevertheless approved it. The Independent Investigator did not find any evidence to demonstrate that the discrepancy was explained, that GDB took steps to resolve it; or that GDB imposed any consequences on PREPA.

GDB was also a lender to PREPA and other public corporations and, as the Independent Investigator reported, often provided loans to cover operating deficits and provided loans when entities could not access the capital markets. PREPA did not raise its rates at all between 1989 and 2016. Instead, it borrowed from GDB to cover its operational costs. GDB funding eventually became a method for PREPA to balance its budgets—PREPA's annual budgets were set with the

assumption PREPA would receive funding from GDB.  After the budget was decided, PREPA would request the financing.

According to the Final Investigative Report, policy considerations often influenced GDB's decision-making.  Near the end of 2013, GDB and PREPA requested approval of a short-term one cent per kilowatt hour rate increase, which would allow PREPA to decrease costs over time by investing in improvements to its system.  The Governor rejected the request and instead directed PREPA to cut costs.

iv.   **Bond Proceeds Analysis**

From 1994 to 2013, PREPA issued nearly $13.5 billion in bonds.  Neither GDB, in its capacity as fiscal agent, nor the underwriters of the Public Utilities' bonds monitored the Public Utilities' actual use of proceeds in relation to the represented uses identified in relevant offering documents.  For this reason, the Independent Investigator worked with financial advisory firm Duff & Phelps to analyze PREPA's use of the proceeds of bonds issued between 2010 and 2013.  This analysis is attached to the Final Investigative Report as Appendix B.

PREPA raised debt through ten bond issuances during this time, in the total amount of approximately $4.43 billion which, combined with additional bond-related funding sources, resulted in available proceeds of approximately $4.72 billion.  As set forth in the offering documents, of that amount, approximately $1.31 billion was to be deposited in a "Construction Fund" intended for infrastructure improvements and capital projects, $1.24 billion for repayment of lines of credit, $1.33 billion for repayment of other debt, and $841 million for miscellaneous purposes.

The analysis found that the amount of bond proceeds designated for the Construction Fund exceeded the amount actually used for construction-related projects by approximately $430 million during the relevant timeframe.

v.   **Summary of Potential Causes of Action as Relevant to PREPA**

In its Final Investigative Report, the Independent Investigator evaluated whether its factual findings support the view that any of the parties involved in Puerto Rico's fiscal crisis committed conduct that is actionable under certain U.S. federal, state, and local laws.  The Independent Investigator discussed its consideration of certain, but not all, potential claims available to Title III Debtors (or their estates) and investors, among other stakeholders, under applicable U.S. federal law (including securities laws and the Bankruptcy Code, as made applicable by PROMESA), the law in Puerto Rico, and the law of other U.S. jurisdictions as indicated by choice of law analyses. This discussion was undertaken for the statutory purposes outlined in PROMESA and not for reliance by any specific litigant.  The Independent Investigator's overview of and application of the law is not legal advice and its factual findings do not constitute admissible evidence in any pending or future litigation.

The following is a summary of potential causes of action identified by the Independent Investigator in the Final Investigative Report in relation to PREPA.  The summary included in this

245

Disclosure Statement should not be construed as a substitute for the comprehensive reporting, recommendations, and claims analysis included in the Final Investigative Report.[254]

From 1994 to 2013, PREPA issued over $13.5 billion in bonds.  The PREPA Bonds are subject to the Trust Agreement, which imposes certain legal requirements on PREPA, its Executive Directors, and its consulting engineer related to the setting and collection of rates.  Under the PREPA Trust Agreement, in order to issue bonds and while any bonds remain outstanding, PREPA agreed to a "debt coverage requirement" by which it is obligated to "fix, charge, and collect reasonable rates and charges so that revenues [would] be sufficient to pay [then and future] current expenses and to provide an amount of at least 120% of the aggregate principal and interest requirements for the [then] next fiscal year."  PREPA's Executive Directors and consulting engineer are responsible for calculating whether PREPA's net revenues satisfied its debt coverage requirement and submitting a certificate along with an official statement attesting to the fact that PREPA is able to meet the debt service requirement.  Additionally, various of PREPA's Executive Directors signed off on the bonds and representations in the official statements, GDB supervised the bond issuances and approved them as fiscal agent, and the consulting engineer made various representations about the state of PREPA's infrastructure and finances.

Based on these facts, the Independent Investigator identified in the Final Investigative Report that PREPA's Executive Directors and consulting engineer, GDB, and the underwriters of the PREPA Bonds could be subject to potential liability for three categories of possible material misstatements or omissions in the official statements that may support actions under United States securities law.

The first category of possible misstatements concerned whether PREPA was satisfying its debt coverage requirement.  Despite not raising its base rate for nearly thirty (30) years, PREPA consistently represented to the public in official statements, signed by PREPA's Executive Directors, that PREPA's rates were sufficient to cover operating expenses.  Additionally, from at least 1994 to 2013, the official statements contained similar language by PREPA's consulting engineer.  By contrast, there is now a consensus among PREPA's outside professionals—and PREPA, itself—that PREPA's rates were insufficient to cover its operating expenses.  Notably, the Independent Investigator found it unlikely that any of these potential defendants could substantiate a defense that they did not know and should not have known at the time of the issuances that PREPA's rates were not, in fact, sufficient to cover operating expenses.

The second category of possible misstatements concerned the collectability of revenues PREPA represented that it would collect in its public filings.  The Independent Investigator found evidence that PREPA increased its revenue figures by including accounts receivable that it had reason to believe it would never collect in its revenues, and that both PREPA and GDB knew by 2012, at the very latest, that if PREPA had used a revenue figure that accurately reflected the amount of revenues it expected to, and did, collect, then PREPA would not be able to satisfy the debt coverage requirement needed to issue the Series 2013A Power Revenue Bonds.  There also is evidence that PREPA overestimated its revenues for a 2013 bond issuance by an additional $25

---

[254] The discussion of potential causes of action spans nearly 100 pages of the Final Investigative Report.  The summary herein is qualified in its entirety by the Final Investigative Report, which parties should reference in the event of any ambiguity or conflict.

million by being overly optimistic in the success of its electricity theft prevention programs. However, PREPA's Executive Directors and consulting engineer approved the debt coverage calculations with the inflated revenue figures and represented that the debt coverage met the requirements under the PREPA Trust Agreement.

The third category of possible misstatements concerned the use of PREPA bond proceeds. The Independent Investigator, working with a financial advisory firm, identified a difference of several hundred million dollars between proceeds from PREPA Bonds issued between 2010 and 2013 that were represented in PREPA's relevant offering documents as earmarked for PREPA's Construction Fund, on the one hand, and the reported uses of funds for construction-related projects, on the other hand. The Independent Investigator further found evidence reflecting that neither GDB, in its capacity as fiscal agent, nor the underwriters of PREPA's Bonds, monitored PREPA's actual use of proceeds.

### vi.   Summary of Recommendations Related to PREPA

The Final Investigative Report includes recommendations related to each of the topics investigated by the Independent Investigator. The following is a summary of the Independent Investigator's recommendations relating only to PREPA. The summary included in this Disclosure Statement should not be construed as a substitute for the comprehensive reporting, recommendations, and claims analysis included in the Final Investigative Report.

Based on the findings set forth in Parts IV and V of the Final Investigative Report, the Independent Investigator proposed the following recommendations for consideration by the political branches in Puerto Rico:

- Recomposing the boards of directors for the Public Utilities to include a mix of Governor-appointed and independent members, with longer and staggered terms across administrations;

- Establishing an audit committee comprised of a majority of independent members of the Public Utilities' boards of directors, to verify financials and compliance with rate covenants. The committee should be instructed to exclude uncollected revenues from rate covenant calculations, including CILTs;

- Adopting specific requirements for the Public Utilities to disclose their actual use of bond proceeds;

- Establishing independent rate boards for both of the Public Utilities, which will be tasked with setting and adhering to rate changes on a predictable, market-responsive schedule;

- Empowering an independent fiscal agent to implement the Public Utilities' respective fiscal oversight agreements, which give GDB access to financial information, in a way that requires compliance with rate covenants; and

- Eliminating CILTs.

The Independent Investigator also recommended that Puerto Rico's political branches evaluate measures to separate the fiscal agent and lending functions for GDB's successor, and consider reforms for each role including, among other things, (i) staggered terms or terms spanning gubernatorial administration changes for board members, (ii) improved oversight of instrumentalities and public corporations, and (iii) improved policies and risk assessment.

2.    **Appointment of Special Claims Committee and Retention of Counsel**

Within a few days of receiving the published Final Investigative Report, the Oversight Board executed a unanimous written consent appointing the independent SCC to pursue claims resulting from the findings of the Investigation.  The Oversight Board then issued an RFP for counsel to the newly formed committee.

On November 28, 2018, the Oversight Board, acting by and through its SCC, retained Brown Rudnick LLP as counsel to the SCC to assist the SCC in the investigation, initiation of negotiation, and/or prosecution of potential claims that might arise from conduct described in the Final Investigative Report ("Claims Counsel").  Additionally, in February 2019, the SCC retained a financial advisory services firm to assist Claims Counsel in its investigation of potential claims.

The Final Investigative Report did not address Avoidance Actions[255] and did not identify specific claims or causes of action the Commonwealth and its instrumentalities might hold against individuals and entities involved in their financial transactions.  Rather, the Final Investigative Report outlined the necessary informative and analytical background which would serve as a springboard for the SCC to identify actionable claims that the Debtors, including PREPA, may hold.

Thus, immediately after its retention, Claims Counsel began investigating and analyzing the conclusions in the Final Investigative Report to determine and recommend whether there were

---

[255] Causes of action arising under sections 544, 545, 547, and 548 of the Bankruptcy Code.  There are essentially two different legal theories for these avoidance actions: preference and fraudulent transfer.  A *preference* is a payment in the 90 days prior to the bankruptcy to a "preferred" creditor, *i.e.*, someone who got paid more than usual when others in similar situations were not being paid due to Puerto Rico's insolvency.  (For parties with family relationships to elected officials, and others with "insider" relationships to the government, the relevant period is one year, not 90 days.)  11 U.S.C. § 547.  A *fraudulent transfer* is, most importantly, a payment made for which Puerto Rico did not receive "reasonably equivalent value" in exchange.  If not, even if the transfer was not intentionally wrongful or fraudulent, Puerto Rico can recover the funds because the money rightfully should benefit all creditors and citizens.  11 U.S.C. §§ 544, 548.  Preferences and fraudulent transfers can be "avoided" and funds recovered by Puerto Rico from the transferees; likewise or in the alternative, the avoidance liability may cause the transferee's claims against Puerto Rico may be set off or disallowed.  *See* 11 U.S.C. §§ 502, 545, 550, 553.

Avoidance actions are very common in large bankruptcy proceedings, including those involving government entities.  They allow debtors to ensure that money transferred to third parties in the period before bankruptcy was appropriately and fairly spent, and if not, recover that money for the benefit of creditors and taxpayers.  Importantly, avoidance actions of this type do not intend to convey that a third party vendor committed any wrongdoing.  Rather, avoidance actions ensure no one creditor is favored by payments made prior to the bankruptcy filing and that a fair distribution of a debtor's assets is made in accordance with applicable law.  As with any other civil lawsuit, the plaintiff (*i.e.*, the Oversight Board, in some cases along with the UCC) has the burden to prove each element of the avoidance action by a preponderance of the evidence in order for the third party vendor to be found liable to and have to return the money to the estate.

viable causes of action that the Oversight Board could assert for the benefit of the Commonwealth's taxpayers and legitimate creditors.

### 3.      Counsel Investigation and Statute of Limitations Concerns

Claims Counsel examined the documents related to the Final Investigative Report to assist it in identifying meritorious causes of action.  Furthermore, and as described additionally below, the SCC made frequent and numerous inquiries to other professionals involved in the Title III Cases, as well as potential defendants and other parties in order to obtain reports, financial data, presentations, and other materials necessary for the Oversight Board to assert its causes of action. In sum, Claims Counsel reviewed, among other things:

- The 600-page Final Investigative Report;

- Approximately 100,000 documents provided to date that support the facts and legal analysis contained in the Final Investigative Report;

- Records of millions of transfers by the Title III Debtors to third parties during the four-year avoidance period prior to the Commonwealth's Petition Date; and

- Thousands of documents identifying recipients of purported principal and interest payments on allegedly invalid bonds, through records of tens of thousands of transactions.

The SCC and Oversight Board's investigative activity and commencement of litigation has been largely driven by applicable statutes of limitations.  Most notably, the statute of limitations for avoidance actions pursuant to Bankruptcy Code section 546(a)(1) expired on May 2, 2019, for actions brought on behalf of the Commonwealth, on May 20, 2019, for HTA and ERS, and July 1, 2019, for PREPA.  The expiration of the statute of limitations could, in many instances, preclude the Oversight Board's ability to prosecute many of the claims described herein.

The Oversight Board has taken a number of measures to protect its claims against statute of limitations defenses.  Foremost among these, the Oversight Board commenced hundreds of adversary proceedings prior to the expiration of the applicable statute of limitations.  In some cases the Oversight Board has commenced litigation with the explicit intention of preserving rights, notwithstanding that prosecution of its claims would not be an optimal resource allocation at the present time, and has accordingly requested that the litigation itself be stayed for the time being. Additional measures to preserve claims include efforts to toll the statute of limitations by consent through tolling agreements with parties potentially liable to the Debtors, described below.

### 4.      Fuel Oil Litigation

The Final Investigative Report identified certain litigation brought by PREPA ratepayers against certain parties to an alleged unlawful scheme to deliver fuel oil to PREPA at inflated prices and in violation of, among other requirements, contractual specifications regarding the presence of environmental contaminants.  The SCC identified certain claims arising from the alleged fuel oil scheme that belonged to PREPA in the Title III proceeding.  In collaboration with the UCC, the SCC thereafter filed Adversary Proceeding No. 19-388, alleging that certain fuel oil suppliers

and laboratories had, among other things, breached contracts with PREPA and overcharged PREPA for fuel oil and laboratory services. The SCC and UCC have sought approximately $4 billion in damages on behalf of PREPA in connection with the alleged scheme, and additionally have signed tolling agreements with four potential defendants regarding claims with another $2.88 billion in potential damages. This litigation is described in more detail at Section V.G.20-21 above.

## 5.  Avoidance Actions Against Vendors

The Final Investigative Report focused on large-scale debt financing transactions and largely did not concern potential avoidance actions relating to the billions of dollars in payments by the Title III Debtors to parties who purported to provide goods and services to Debtors pursuant to purported contracts (the "Vendor Payments" to "Vendors").[256] Accordingly, the SCC began investigating the Vendor Payments to ensure that such payments complied with applicable law.

Working with the UCC, the Oversight Board obtained from AAFAF records of all payments to vendors within the four years prior to commencement of the respective Title III cases. The Oversight Board, in collaboration with the UCC, reviewed records of millions of individual payments to hundreds of thousands of unique vendors, totaling over $12 billion. After reviewing the contracts on file and excluding government bodies and non-profit organizations, among others, the Oversight Board identified over $4 billion in payments to approximately 345 vendors as potentially recoverable under avoidance theories, including $3.01 billion in payments made by PREPA to 14 vendors. Of this amount, approximately $2.88 billion was received by four vendors who were likewise identified as defendants to fuel oil litigation claims as discussed above. Accordingly, any damages sought would be coextensive with damages sought in that litigation.

### i.  Tolling Agreements and Litigation

After concluding its review and identifying potentially liable parties, the Oversight Board provided the vendors an opportunity to toll the statute of limitations for filing the vendor avoidance actions, *i.e.*, extend by agreement the time provided for the Oversight Board to file an avoidance action. As such, in the weeks prior to the respective statute of limitations expirations, Claims Counsel sent to each vendor a cover letter and tolling agreement which the vendors could sign and return in order to avoid the filing of a complaint and preserving the Title III Debtors' rights with respect to its avoidance claims. This effort led to negotiation of approximately 85 tolling agreements with vendors who purportedly contracted with the Debtors, including six who purportedly contracted with PREPA.

After excluding the parties to the tolling agreements, the Oversight Board filed approximately 250 vendor avoidance actions seeking to recover approximately $3 billion in payments to vendors.[257] Eight of these avoidance actions seek to recover approximately $55 million in payments made by PREPA. The vast majority of the remaining avoidance actions relate to the Commonwealth. The Oversight Board announced its preference to settle these actions, and

---

[256] "Vendors" and "Vendor Payments" refer to contractors and payments made pursuant to contract, respectively, as opposed to transferees of payments made pursuant to legislative appropriation.

[257] The UCC joined in some, but not all of these avoidance actions.

the potential claims subject to tolling agreements, pursuant to a voluntary out-of-court dispute resolution procedure that is described more fully below.

## ii.    **Informal Resolution Procedures**

On June 7, 2019, the Oversight Board and the UCC filed an omnibus motion in the Title III cases of PREPA, the Commonwealth, HTA, and ERS, requesting approval of case management procedures in the avoidance proceedings brought against vendors.[258]   The Vendor Action Procedures Motion specifically requested approval of procedures governing (i) litigation procedures and deadlines; (ii) voluntary mediation; and (iii) settlement (the "Vendor Action Procedures").   On July 12, 2019, the Title III Court entered an order approving the Vendor Action Procedures, which were then served on all defendants to the vendor avoidance actions along with the summons and complaint.[259]

With respect to the litigation procedures and deadlines, the Vendor Action Procedures provide that court documents must be filed in accordance with the case management orders entered by the Title III Court in the Commonwealth Title III case.  *See Sixteenth Amended Notice, Case Management and Administrative Procedures* [Case No. 17-bk-3283, ECF No. 20190-1].   The procedures further require service of the procedures and order approving them upon any Defendants, and specify manners and addresses of service consistent with the applicable rules. Additionally, the Vendor Action Procedures provide for relaxation of deadlines for responsive and dispositive pleadings, discovery, and other filings, subject to alteration by request of any party. On May 24, 2021, the Title III Court entered an order applying substantially the same settlement procedures set forth in the Vendor Action Procedures to the vendors party to tolling agreements [ECF No. 16791].[260]

These deadlines provided in the Vendor Action Procedures generally continue all litigation deadlines.   During the continuance period, as extended by court orders, the Oversight Board and UCC have engaged in an informal resolution process described as the "Information Exchange," whereby the Oversight Board and vendors conduct additional diligence within specified parameters and thereafter commence settlement negotiations.

The Vendor Action Procedures outline a mediation process whereby the Oversight Board and any Defendant(s) may select mediators, schedule mediation, and advise the court of mediation progress.   The mediation process is by its own terms fully voluntary and non-binding and adjustable by agreement of the parties; the Vendor Action Procedures merely outline the mediation

---

[258] *See Omnibus Motion by the Financial Oversight and Management Board for Puerto Rico, Acting by and through the Members of the Special Claims Committee, and the Official Committee of Unsecured Creditors to (I) Establish Litigation Case Management Procedures and (II) Establish Procedures for the Approval of Settlements*, [Case No. 17-bk-3283, ECF No. 7325] (the "Vendor Action Procedures Motion").

[259] *See Order Granting Omnibus Motion by the Financial Oversight and Management Board for Puerto Rico, Acting by and through the Members of the Special Claims Committee, and the Official Committee of Unsecured Creditors to (I) Establish Litigation Case Management Procedures and (II) Establish Procedures for the Approval of Settlements*, [Case No. 17-bk-3283, ECF No. 7941] (order with attached, revised Vendor Action Procedures).

[260] *See Order Granting Motion by the Financial Oversight and Management Board for Puerto Rico, Acting By and Through the Members of the Special Claims Committee, and the Official Committee of Unsecured Creditors to Establish Procedures for the Approval of Settlements* [Case No. 17-bk-3283, ECF No. 16791].

process and would provide advance approval thereof, obviating the need for parties to seek court approval of a litigation stay during the pendency of the mediation.

As of this time, several dozen avoidance action defendants and tolled parties have been flagged for potential monetary settlement due to information exchanges suggesting avoidance liability. The SCC and the UCC concluded numerous settlement agreements prior to the Effective Date of the Commonwealth Plan of Adjustment, at which time settlement funds and related assets, along with outstanding claims against vendors in connection with the Commonwealth, PBA, and ERS were transferred to an avoidance actions trust ("Avoidance Actions Trust").

The SCC and the UCC have also sought entry of default judgments against ten vendors, one of which is related to PREPA. Default judgment has been granted and, as to the PREPA-related defendant, is held by the SCC and UCC as an asset of PREPA. Additional claims are stayed indefinitely due to the vendor having commenced bankruptcy proceedings and obtained the protection of the automatic stay, or due to similar litigation stays imposed by court order.

The SCC and the UCC have been working to resolve the tolling agreements and avoidance actions entered into with or filed against vendors. As of the Effective Date of the Commonwealth Plan of Adjustment on March 15, 2022, approximately 240 of the 350 claims initially raised by the SCC and UCC had been dismissed or, in the case of tolled claims, resulted in no further action. Of the remaining approximately 110 claims, the vast majority were transferred to an Avoidance Actions Trust by the terms of the Commonwealth, PBA, ERS, and HTA plans of adjustment. Six remain as property of PREPA, asserted by the SCC and UCC as of October 17, 2022. These include one claim in an adversary proceeding in which the plaintiffs have received a default judgment in the amount of $4.8 million, and four tolled claims and one adversary proceeding for which damages are coextensive with the above-referenced fuel oil litigation, which will be transferred to the Avoidance Actions Trust pursuant to the Plan.

[*Remainder of Page Intentionally Left Blank*]

## VI.     The Title III Plan of Adjustment

A.     **General**

1.     **Filing of a Plan of Adjustment**

A plan of adjustment provides for the treatment and discharge of the debts of the Title III Debtor.  Only the Oversight Board may file a plan of adjustment, which may be contemporaneous with the petition, at a later time in its sole discretion, or by the time set by the Title III Court, and it may only do so if it determines, in its sole discretion, that the Plan is consistent with the applicable certified fiscal plan.[261]  The Oversight Board may modify the Plan at any time before confirmation, provided that the modified plan meets the requirements of PROMESA Title III.[262]

2.     **Contents of a Plan of Adjustment**

Notwithstanding otherwise applicable nonbankruptcy law, among other things, a plan of adjustment (i) designates classes of claims (claims in a class must be "substantially similar"),[263] (ii) specifies any classes of claims that are not impaired under the plan of adjustment and specifies the treatment accorded to classes of claims or interests that are impaired, (iii) provides the same treatment for each claim of a particular class unless the holder of a particular claim agrees to less favorable treatment, and (iv) provides adequate means for the plan of adjustment's implementation through, for example the retention of property by the Title III Debtor, the transfer or sale of property to another entity, the satisfaction or modification of any lien or indenture, and the curing or waiving of any default.[264]

A class of claims is impaired under a plan of adjustment, unless the plan of adjustment either (i) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such a claim or interest; or (ii) notwithstanding applicable nonbankruptcy law that entitles the holder of the claim or interest to demand or receive accelerated payment after default the plan of adjustment cures the default, reinstates the maturity of the claim or interest, compensates the holder for damages incurred as a result of any reasonable reliance by such holder on such applicable nonbankruptcy law and (for failures to perform nonmonetary obligations) compensates the holder for any actual pecuniary loss incurred by such holder, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder.[265]

---

[261] PROMESA §§ 312(a)-(b), 104(j)(3).

[262] PROMESA § 313.

[263] In determining whether claims are "substantially similar," the Oversight Board is to consider whether such claims are secured and whether such claims have priority over other claims.  PROMESA § 301(e).

[264] 11 U.S.C. §§ 1123(a)(1)-(5), 1122(a).

[265] 11 U.S.C. § 1124.

3.        **Acceptance of a Plan of Adjustment**

The holder of an Allowed Claim may vote to accept or reject a plan of adjustment. PROMESA specifically excludes from the definition of "holder of a claim or interest" for such purpose any "Issuer" or "Authorized Instrumentality of the Territory Government Issuer" (as defined in PROMESA Title VI) or a corporation, trust or other legal entity that is controlled by the Issuer or an Authorized Territorial Instrumentality of the Territory Government Issuer, provided that the other beneficiaries of such claims are not excluded, and provided that with respect to insured bonds, such "holder of a claim or interest" will be the monoline insurer insuring such bonds to the extent such insurer is granted the right to vote insured bonds for purposes of directing remedies or consenting to proposed amendments or modifications as provided in the applicable documents.[266]

A class that is not impaired under the plan of adjustment is conclusively presumed to accept the plan, and a class that is not entitled under the plan of adjustment to receive or retain any property on account of the holders' claims is deemed not to have accepted the plan of adjustment.[267]   A class of claims accepts a plan of adjustment if it has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class (other than those designated as not in good faith under Bankruptcy Code section 1126(e)).[268]

4.        **Solicitation of Acceptances of Plan of Adjustment**

Prior to soliciting acceptances or rejections from the holders of claims, the Oversight Board is required to issue, and have the Title III Court approve, a disclosure statement providing adequate information to holders of claims and interests in order to solicit acceptances for the Plan.[269]   The type of adequate information provided should enable a hypothetical investor of the relevant class to make an informed judgment about the Plan.  The same disclosure statement must be transmitted to each holder of a claim of a particular class, but alternate disclosure statements differing in the amount or kind of information provided may be transmitted to different classes.[270]

B.        **Overview of the Plan of Adjustment**

THE FOLLOWING SUMMARY HIGHLIGHTS CERTAIN OF THE SUBSTANTIVE PROVISIONS OF THE PLAN, AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OR A SUBSTITUTE FOR A FULL AND COMPLETE REVIEW OF THE PLAN.  THE DEBTOR URGES ALL HOLDERS OF CLAIMS TO CAREFULLY READ AND STUDY THE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS <u>EXHIBIT A</u>.

---

[266] PROMESA § 301(c)(3).

[267] 11 U.S.C. §§ 1126(f)-(g).

[268] 11 U.S.C. § 1126(c).

[269] 11 U.S.C. §§ 1125, 1126(b).

[270] 11 U.S.C. § 1126(c).

Bankruptcy Code section 1123, made applicable to the Title III Case by PROMESA, provides that except for administrative claims, a plan of adjustment must categorize claims against a debtor into individual classes.  Although PROMESA and the Bankruptcy Code give the Debtor significant flexibility in classifying claims, Bankruptcy Code section 1122 dictates that a plan of adjustment may only place a claim into a class containing claims that are substantially similar.

The Plan identifies fourteen (14) Classes of Claims (certain of which encompass numerous individual series of the relevant debt, as set forth on the Exhibits to the Plan).  These Classes take into account the differing nature and priority of Claims against the Debtor.  Administrative Claims are not classified for purposes of voting or receiving distributions under the Plan (as is required by Bankruptcy Code section 1123(a)(1)) but are treated separately as unclassified Claims.

The Plan provides specific treatment for each Class of Claims.  Only certain holders of Claims that are impaired under the Plan are entitled to vote and receive Distributions under the Plan.  *See* the Disclosure Statement Order for a summary of the voting and election procedures in connection with the solicitation for the Plan.

For all purposes of the Plan, including, without limitation, for purposes of distributions pursuant to the terms and provisions of Article XXIV of the Plan, the Holder of a Claim shall mean any Entity who, directly or indirectly, has investment power with respect to any Claim, which includes the power to dispose or to direct the disposition of such Claim; *provided*, *however*, that, solely with respect to Insured PREPA Revenue Bonds and Bankruptcy Code section 1126, the Holder of any Insured PREPA Revenue Bond Claims shall be determined in accordance with PROMESA Section 301(c)(3) and any law or governing documents applicable to such Insured PREPA Revenue Bond Claims.

Unless otherwise provided in the Plan or the Confirmation Order, the treatment of any Claim under the Plan will be in full satisfaction, settlement, release and discharge of, and in exchange for, such Claim.  Upon Confirmation, the Plan will be binding on all holders of a Claim regardless of whether such holders voted on the Plan or voted to accept the Plan.

The following discussion sets forth the classification and treatment of all Claims against the Debtor.  It is qualified in its entirety by the terms of the Plan, which is attached hereto as Exhibit A, and which should be read carefully by you in considering whether to vote to accept or reject the Plan.

C.      **Compromise and Settlement of Disputes / Restructuring of PREPA**

1.      **Litigation Resolution**

The Plan sets forth the terms and conditions for the compromise and settlement of the following disputes with the following parties:

- All motions, objections, or joinders to motions or objections by holders of Revenue Bond Claims and Assured Insured Interest Rate Swap Claims that elect to settle their Claims against PREPA seeking to lift the automatic stay, appoint a receiver at PREPA,

and/or dismiss PREPA's Title III Case, including but not limited to all rights related to the Motion to Dismiss PREPA's Title III Case.[271]

- All counterclaims and affirmative defenses held by holders of Revenue Bond Claims and Assured Insured Interest Rate Swap Claims that elect to settle their Claims against PREPA related to the Amended Lien & Recourse Challenge.[272]

- All disputes related to and outlined in the National PSA, including but not limited to claims or other rights held by National against PREPA, related to (i) National's asserted priority rights as set forth in its proof of claims, (ii) the Asserted Reimbursement Claim, (iii) the claims underlying the Amended Lien & Recourse Challenge, (iv) the Fuel Line Lender Priority Action, (v) the PREPA ERS Priority Action, (vi) the objection docketed at [Case No. 17-bk-4780, ECF No. 1691], and (vii) the motions seeking to lift the automatic stay, appoint a receiver at PREPA, and/or dismiss PREPA's Title III Case, including but not limited to all rights related to the Motion to Dismiss PREPA's Title III Case.

- All disputes related to and outlined in the Fuel Line Lender PSA, including but not limited to claims or other rights held by the Fuel Line Lenders against PREPA, the Fuel Line Lenders' asserted priority and seniority over the Bonds pursuant to any agreement, and the claims underlying the Fuel Line Lender Priority Action.[273]

- All disputes relating to and outlined in the Vitol Settlement Agreement, including but not limited to the dispute captioned *PREPA v. Vitol Inc. et al.*, Adv. Proc. No. 19-00453 (D.P.R. Nov. 14, 2019). For the avoidance of doubt, the Vitol Settlement Agreement expressly preserves PREPA's, the Oversight Board's, and Vitol's claims, rights, and defenses related to the avoidance action captioned *Special Claims Comm. v. Inspectorate America Corp.*, Adv. Proc. No. 19-00388 in Case No. 17-bk-3283-LTS, D.P.R. (the "Vitol-SCC AP").

### 2.   Creditor Recovery Based on Litigation Resolution[274]

The Plan includes variations in recovery for the following creditors based on the outcome and/or resolution of certain ongoing disputes:

- ***Settling Bondholders and Settling Monolines***

---

[271] *See* Sections V.G.1 and V.G.7 of this Disclosure Statement for a summary of such dispute.

[272] *See* Section V.G.2 of this Disclosure Statement for a summary of such dispute.

[273] *See* Section V.E of this Disclosure Statement for a summary of such disputes.

[274] *See* Section II.B.3 of this Disclosure Statement for further information on the effect of ongoing disputes on creditor recovery.

o   Settling Bondholders and Settling Monolines will receive a minimum recovery 50% on their respective Allowed Claims, in the form of their *pro rata* share of the Sinking Fund and a distribution of Series B Bonds.

o   If PREPA and the Oversight Board prevail on the Lien Scope Counts and the Recourse Counts of the Amended Lien & Recourse Challenge, then the Remaining Claims of the Settling Bondholders and Settling Monolines will receive, after (i) initial distributions of Series B Bonds are made to Settling and Non-Settling Bondholders and Monolines, (ii) the GUC Trust receives the next distribution of Series B Bonds in a face amount sufficient to provide General Unsecured Claims 50% of the estimated value of their Claims, and the (iii) the PREPA PayGo Trust receives 20% of the Series B Bonds remaining after the distributions of Series B Bonds in (i) and (ii), (A) initially 40% of their *pro rata* share of remaining Series B Bonds available and then, (B) if and only if the GUC Trust and Fuel Line Lenders receive Series B Bonds in a face amount sufficient to pay them in full, up to the remaining 60% of their *pro rata share* of Series B Bonds.

o   The Settling Bondholders and Settling Monolines will receive CVI in an amount equal to their Remaining Claims, if any, after the above distributions.

- ***Non-Settling Bondholders and Non-Settling Monolines***

  o   If the Non-Settling Bondholders and Non-Settling Monolines lose on the Lien Scope Counts and the Recourse Counts in the Amended Lien & Recourse Challenge, then they receive only their *pro rata* share of monies deposited in the Sinking Fund and have no deficiency claim against the Debtor. If the Class of Non-Settling Bondholders and Non-Settling Monolines votes to accept the Plan, however, they will receive CVI equal to the difference between their principal and accrued interest on their PREPA Revenue Bonds and the distributions made to them from the Sinking Fund.

  o   If the Non-Settling Bondholders and Non-Settling Monolines lose on the Lien Scope Counts, but prevail on the Recourse Counts, then they will receive a *pro rata* share of monies deposited in the Sinking Fund, and any potential unsecured deficiency claim will share, *pro rata*, in the General Unsecured Claim Recovery with all other Allowed Claims in the Unsecured Claims Pool.

  o   If the Non-Settling Bondholders and Non-Settling Monolines prevail on the Lien Scope Counts, but lose the Recourse Counts, then their claims will receive a *pro rata* share of Series B Bonds in a face amount equal to the value of their Bond Collateral (minus the Sinking Fund), up to all Series B Bonds available for distribution under the Plan, after distributions of Series B Bonds provided to the Settling Bondholders, and they will have no unsecured deficiency claim against PREPA.

    o  If the Non-Settling Bondholders and Non-Settling Monolines prevail on the Lien Scope and Recourse Counts, then their Claim will receive a *pro rata* share of Series B Bonds in a face amount equal to the value of their Bond Collateral (minus the Sinking Fund), up to all Series B Bonds available for distribution under the Plan and subject to Series B Bonds provided to the Settling Bondholders, and their deficiency claim will share, *pro rata*, in the General Unsecured Claim Recovery with all other Claims in the Unsecured Claims Pool.

- *Fuel Line Lenders*

    o  Fuel Line Lenders will receive (i) Series A Bonds in the face amount equal to 84% of their Fuel Line Loan Claims, and (ii) for the remaining 16% of their Claims, a *pro rata* share of the Series B Bonds available after (a) initial distributions of such bonds are made to Settling and Non-Settling Bondholders and Monolines, (b) the GUC Trust receives the next distribution of Series B Bonds in a face amount sufficient to provide General Unsecured Claims 50% of the face value of their Claims, and the (c) the PREPA PayGo Trust receives 20% of the Series B Bonds remaining after the distributions of Series B Bonds in (a) and (b).

- *National*

    o  National will receive (i) Series B Bonds in the face amount equal to 71.65% of their National Insured Bond Claims, and (ii) either Series B Bonds or Cash, in the Oversight Board's sole discretion, in the aggregate face amount equal to the sum of (a) 3.0% of the Allowed National Insured Bond Claims to compensate for the reasonable fees and expenses incurred by National in connection with the Title III Case and negotiating and executing the National PSA and prosecution of approval of the Disclosure Statement and Plan, and (b) 2.86% of the Allowed National Insured Bond Claims in consideration for the structuring of payments to be made to holders of claims arising from or relating to National Insured Bonds in accordance with the National PSA.

    o  In addition, and subject to the approval of the settlement of the Asserted Reimbursement Claim, National will receive in full consideration, satisfaction, release, settlement, and exchange of the Allowed National Reimbursement Claim, unless National agrees to a less favorable treatment, Series B Bonds in the face amount equal to 20.0% of the amount of the National Reimbursement Claim. For the avoidance of doubt, if the National Reimbursement Claim is Allowed, it will not be subject to Article XXVII.G of the Plan. However, if the Title III Court does not approve the settlement, or determines the treatment of the Asserted Reimbursement Claim does not comply with PROMESA, or the Title III Court finds the treatment of the Asserted Reimbursement Claim constitutes unfair discrimination, the settlement and the treatment of National's Claims will, without further action, convert to a settlement of National's Claims that eliminates the obligation to issue Series B Bonds on account of the National Reimbursement Claim and any payments for debt service arising from, relating

to, or on account of the National Reimbursement Claim; *provided*, that in such circumstance, National will have the option to forego all consideration under the National PSA, including the fees and expenses set forth in Article II.D.2 of the Plan, and, in exchange, receive the same treatment as another settling Class of Holders of PREPA Revenue Bonds Claims, so long as the settlement with such class whose recovery National would receive was reached prior to the earlier to occur of (i) any substantive ruling on the claims and counterclaims asserted in the Amended Lien & Recourse Challenge that Holders of PREPA Revenue Bonds are secured by Revenues outside of the Sinking Fund, and (ii) an indication or a determination, either oral or written, at a hearing or otherwise, by the Title III Court that the Holders of PREPA Revenue Bonds are secured by Revenues outside of the Sinking Fund.

- *General Unsecured Claims*

  o If the Non-Settling Bondholders and Non-Settling Monolines prevail on the Lien Scope Counts and the Recourse Counts in the Amended Lien & Recourse Challenge, then holders of General Unsecured Claims will share, on a *pro rata* basis, in the proceeds of the Avoidance Action Trust and CVI.

  o If PREPA and the Oversight Board prevail on the Lien Scope Counts and the Recourse Counts in the Amended Lien & Recourse Challenge, then holders of General Unsecured Claims will receive their *pro rata* share with all other Claims in the Unsecured Claims Pool of Cash received by the GUC Trust on account of (i) initial Series B Bonds distributed to the GUC Trust, which are projected to provide General Unsecured Claims 50% of the face value of their Claims (based on an $800 million estimated claims pool), and a further *pro rata* share of any remaining Series B Bonds after the PREPA PayGo Trust receives 20% of the Series B Bonds remaining following the initial distributions of Series B Bonds to the GUC Trust, (ii) the Avoidance Action Proceeds, and (iii) CVI in the notional amount of their Remaining Claim, if any.

  o If the Non-Settling Bondholders and Non-Settling Monolines lose on the Lien Scope Counts, but prevail on the Recourse Counts, then their deficiency claims will also be entitled to their *pro rata* share of the General Unsecured Claim Recovery with all other Claims in the Unsecured Claims Pool.

    3.    **Allowance of Claims**

For purposes of confirmation and consummation of the Plan, and distributions to be made under the Plan, and in accordance with the Fuel Line Lender PSA, Settlement Offer Memorandum and PSA, and Vitol Settlement Agreement, on the Effective Date, the following Claims will be allowed in the following amounts:

- The Fuel Line Loan Claims shall be deemed Allowed in the aggregate amount of $700,887,093.58, and not subject to challenge, objection, or revocation.

259

- The Vitol Claims shall be deemed Allowed in the aggregate amount of $41,457,382.88.

- The National Insured Bond Claims shall be Allowed in the aggregate amount equal to $836,145,928.13.

- Subject to the approval of the settlement between the Oversight Board and National with respect to the Asserted Reimbursement Claim, the National Reimbursement Claim shall be Allowed in the aggregate amount equal to the payments made by National after the Petition Date and, as they may continue to be made up to, but not including, the Effective Date to holders of the National Insured Bonds on account of interest accrued on such bonds.

- Each PREPA Revenue Bond Claim held by a Settling Bondholder or a Settling Monoline will be deemed Allowed in the aggregate amount equal to the principal amount of the PREPA Revenue Bonds held by such Holder plus interest accrued and unpaid on such PREPA Revenue Bonds through the Petition Date.

- Each Assured Insured Interest Rate Swaps Claim shall be Allowed in an amount to be agreed upon between the Oversight Board and the Holder of such Claim; *provided* that, if no agreement can be reached on the amount of the Assured Insured Interest Rate Swaps Claim to be Allowed, the Oversight Board and Holder of the Claim shall submit such dispute to the Title III Court (or other Person or Entity upon mutual agreement of the Oversight Board and Holder) to determine the amount of such Claim to be Allowed, which amount shall be determined in accordance with applicable law.

4. **Releases, Injunctions, and Exculpation**

The releases, injunctions, and exculpation provided in Article XXVII of the Plan are integral to obtaining the value provided under the settlements in the Plan. The releases, injunctions, and exculpation under the Plan constitute an essential component of the compromises reached and are not severable from the other provisions of the Plan.

D. **Provisions for Payment of Administrative Expense Claims**

Administrative Expense Claims and Professional Claims are not classified and therefore are excluded from the classes outlined in Article II of the Plan.

1. **Administrative Expense Claims**

On the later to occur of (i) the Effective Date and (ii) the date on which an Administrative Expense Claim shall become an Allowed Claim, the Reorganized Debtor shall (a) pay to each holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Administrative Expense Claim or (b) satisfy and discharge such Allowed Administrative Expense Claim in accordance with such other terms no more favorable to the claimant than as may be agreed upon by and between the holder thereof and the Reorganized Debtor; *provided*, *however*, that Allowed Administrative Expense Claims representing indebtedness incurred in the ordinary course prior to the Effective Date by the Debtor shall be paid in full and performed by the

260

Reorganized Debtor in accordance with the terms and subject to the conditions of any agreement governing, investment evidencing, or other document relating to such transactions; and, *provided, further*, that, if any such ordinary course expense is not billed, or a written request for payment is not made, within one hundred twenty (120) days after the Effective Date, such ordinary course expense shall be barred and the Holder thereof shall not be entitled to, or receive, a distribution pursuant to the Plan.

### 2.  Administrative Expense Claims Bar Date

Except as provided by Article II.A of the Plan or otherwise ordered by the Title III Court, unless previously filed, requests for payment of Administrative Expense Claims must be filed and served on PREPA no later than ninety (90) days after the Effective Date.   Holders of Administrative Expense Claims that are required to file and serve a request for payment of such Administrative Expense Claims and that do not file and serve such a request by the applicable Bar Date will be forever barred from asserting such Administrative Expense Claims against PREPA or its property, and such Administrative Expense Claims will be deemed discharged as of the Effective Date.   Objections to such requests must be filed and served on PREPA and the requesting party by the later of (i) 180 days after the Effective Date, or (ii) such other period of limitation as may be specifically fixed by a Final Order for objection to such Administrative Expense Claims. The foregoing procedures shall be specified in the Confirmation Order and the notice of entry of the Confirmation Order and served on all parties in interest.

### 3.  Professional Compensation and Reimbursement Claims

All Entities awarded compensation, including, without limitation, to the fullest extent provided in respective letters of engagement or similar instruments or agreements, or reimbursement of expenses by the Title III Court shall be paid in full, in Cash, in the amounts allowed by the Title III Court (i) as soon as reasonably practicable following the later to occur of (a) the Effective Date and (b) the date upon which the Title III Court order allowing such Claims is deemed to be a Final Order or (ii) upon such other terms no more favorable to the claimant than as may be mutually agreed upon between such claimant and the Government Parties; *provided, however*, that, except as provided herein, each Professional must file its application for final allowance of compensation for professional services rendered and reimbursement of expenses on or prior to the date that is one hundred twenty (120) days following the Effective Date.   The Reorganized Debtor shall pay compensation for professional services extended and reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Title III Court approval.

From and after the Confirmation Date, any requirement that Professionals comply with PROMESA Sections 316 and 317 in seeking compensation for services rendered after such date shall terminate, and PREPA may employ and will pay any Professional without any further notice to or action, order, or approval of the Title III Court.

4. **Supporting Creditors' Fees**

i. **Fuel Line Lenders**

On the Effective Date, each Fuel Line Lender PSA Creditor shall receive, in the form of either additional Series A Bonds or Cash, in the Oversight Board's sole discretion, and not on account of their Allowed Claim, such Fuel Line Lenders PSA Creditors' (i) Pro Rata Share of the Fuel Line Lender PSA Creditors Consummation Fees in consideration for their assistance in formulating the Plan and (ii) Pro Rata Share of the Fuel Line Lender PSA Creditors Professionals' Reimbursement Fees to compensate for the reasonable fees and expenses incurred in connection with the Title III Case and negotiating and executing the Fuel Line Lender PSA; *provided*, that ten percent (10%) of the Fuel Line Lender PSA Creditors Professionals' Reimbursement Fees shall be allocated to the Fuel Line Lenders PSA Creditor of record as of the Agreement Effective Date (as defined in the Fuel Line Lender PSA) under the Fuel Line Citibank Facility and ninety percent (90%) of the Fuel Line Lender PSA Creditors Professionals' Reimbursement Fees shall be allocated to the Fuel Line Lender PSA Creditors (party to the Fuel Line Lender PSA as of the Agreement Effective Date) under the Fuel Line Scotia Facility (and pro rata among such Fuel Line Lender PSA Creditors). The Fuel Line Lender PSA Creditor Fees compensate the Fuel Line Lender PSA Creditors for value received and constitute an essential component of the compromises and settlements embodied herein and are not severable from the other terms and provisions set forth herein.

On the Effective Date, each Fuel Line Lender PSA Creditor shall also receive Series A Bonds or Cash, in the sole discretion of the Oversight Board, in the face amount of interest at a rate of six percent (6.0%) per annum deemed to have accrued on account of each Holder's Pro Rata Share of Series A Bonds to be distributed pursuant to the immediately preceding clause (i), during a period equal to the shorter of (a) December 1, 2022 to the Effective Date, and (b) one (1) year.

ii. **National**

On the Effective Date, National shall receive, in the form of an Allowed Administrative Expense Claim and not on account of its Allowed Claims, Series B Bonds or Cash, as elected in the Oversight Board's sole discretion (which election shall be deemed to be Series B Bonds, unless the Oversight Board elects otherwise at or prior to the commencement of the Confirmation Hearing), in the aggregate face amount equal to the sum of (i) three percent (3.0%) times the Allowed National Insured Bond Claims to compensate for the reasonable fees and expenses incurred by National in connection with the Title III Case and negotiating and executing the National PSA and prosecution of approval of the Disclosure Statement and Plan, and (ii) two and eighty-six one hundredths percent (2.86%) times the Allowed National Insured Bond Claims in consideration for the structuring of payments to be made to holders of claims arising from or relating to National Insured Bonds in accordance with the National PSA. The fees and costs in Article II.D.2 of the Plan compensate National for value received and constitute an essential component of the compromises and settlements embodied herein and are not severable from the other terms and provisions set forth in the Plan.

5.      **LUMA Administrative Expense Claim**

Pursuant to (i) the *Memorandum Order Granting in Part and Denying in Part PREPA's Motion for Entry of an Order Allowing Administrative Expense Claim for Compensation for Front End Transition Services Under the Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement with LUMA Energy* [ECF No. 2258], and (ii) the *Memorandum Order Granting Government Parties' Motion for Order Allowing Administrative Expense Claim for Amounts to be Paid to LUMA Energy by PREPA During Interim Period Under Supplemental Agreement and the T&D Contract* [ECF No. 2473] (together with [ECF No. 2258], the "LUMA Administrative Expense Orders"), and in accordance with the terms of the T&D Contract and supplements thereto, all undisputed amounts required to be paid under the T&D Contract and supplements thereto during the Interim Period (as defined in the LUMA Administrative Expense Orders), solely to the extent accrued and unpaid, shall be (a) paid in full in Cash on the later to occur of (1) the Effective Date, or (2) the date such amount becomes due and owing under the terms and conditions of the T&D Contract and supplements thereto, or (b) satisfied and discharged in accordance with such other terms no more favorable to LUMA Energy than as may be agreed upon by and between LUMA Energy and the Reorganized Debtor.

6.      **Whitefish Administrative Expense Claim**

Pursuant to the Whitefish Settlement Agreement, Whitefish shall have an allowed administrative expense claim in the total amount of $133,369,078.00, of which $127,345,388.00 has been paid, with the remainder of payment to be comprised of the remaining administrative expense claim amount of $6,023,690.00, to be payable on the Effective Date, but in no event later than December 31, 2023.  In addition, the remaining $33,884,282.57 of accrued interest charges shall also be allowed as an administrative expense claim.

7.      **Pending Administrative Claims**

On the Effective Date, in order to provide for the payment of the Allowed Administrative Expenses Claims, Reorganized PREPA will sell, assign, transfer, and convey to the Commonwealth an aggregate original principal amount of approximately $400,000,000 of Series B-2 Bonds, or such lower principal or original principal amount as determined by the Oversight Board at or prior to the Confirmation Hearing, in each case, which principal amount will be subject to the consultation rights of AAFAF (the "Administrative Expense Bonds"), in exchange for an amount equal to the Administrative Expense Bonds in Cash.

As explained in Section V.D.6 above, pending before the Title III Court is the Cobra Admin Motion.  In a recent pleading, Cobra estimated its Administrative Expense Claim at approximately $350 million.  June 2022 Cobra Lift Stay Motion at 1.  If the Title III Court allows COBRA an Administrative Expense Claim, PREPA will satisfy such Claim through the proceeds of the Administrative Expense Bonds, but only to the extent not satisfied by funds PREPA receives from FEMA.  PREPA believes that FEMA will reimburse PREPA for at least some the amounts owned under the Cobra agreements, as further described in Section V.D.6.  However, PREPA expressly reserves all rights related to the Cobra's asserted Claim, including but not limited to arguments over the liability, amount, and liability on interest owed on the Cobra's Allowed Claim (if any).

E.   **Classification and Treatment of Claims**

| **Class 1:** Settling Bondholder and Settling Monoline Claims | *Classification:* Class 1 consists of all claims against PREPA on account of PREPA Revenue Bond Claims held by Bondholders and Monoline Insurers that timely submitted to the Solicitation Agent by the Settlement Class Deadline an Election Form. |
|---|---|
| | *Treatment:* On the Effective Date, the PREPA Revenue Bond Claims of each Settling Bondholder or Settling Monoline will receive, on account of their Allowed Claim: [275] |
| | (i) such Holder's Pro Rata Share of the amounts deposited in the Sinking Fund, subject to the terms of the Trust Agreement; |
| | (ii) Series B Bonds in the face amount equal to fifty percent (50.00%) <u>times</u> the amount of such holder's Allowed PREPA Revenue Bond Claim <u>minus</u> the amount distributed to such holder pursuant to the immediately preceding clause (i); |
| | (iii) with respect to such Holder's Remaining Claim after the collective distributions are made pursuant to the immediately preceding clauses (i) and (ii): (A) forty percent (40.0%) of such Holder's Pro Rata Share of the Net Remaining New Bonds, if any, available for distribution, to the Remaining Series B Bond Claims Pool; and (B) up to an additional sixty percent (60.0%) of such Holder's Pro Rata Share of the Net Remaining New Bonds, if any, available for distribution, to the Remaining Series B Bond Claims Pool, if and only if both (I) the face amount of the GUC New Bonds equal one hundred percent (100.0%) of the Unsecured Claims Pool Estimate and (II) the Remaining Claims of the Fuel Line Lenders described in Article VII.A(ii) of the Plan receive Net Remaining New Bonds in the face amount equal to one hundred percent (100.0%) of such Remaining Claims; and |
| | (iv) with respect to such holder's Remaining Claim, if any, after accounting for the collective distributions made pursuant to the immediately preceding clauses (i), (ii), and (iii), a CVI in the notional amount of such holder's Remaining Claim. |
| | *Voting:* Class 1 is Impaired by the Plan. Class 1 and each Settling Bondholder or Settling Monoline is entitled to vote to accept or reject the Plan. |

---

[275] The beneficial holders of Class 1 Claims shall receive the distributions made pursuant to the Plan.

| | |
|---|---|
| | ***Allowed Amount of Claims:***  To be determined following the Settlement Class Deadline<br><br>***Projected Recovery from PREPA:***  50% – 100.00% |
| **Class 2:**<br>Non-Settling Bondholder and Non-Settling Monoline Claims | ***Classification:***  Class 2 consists of all claims against PREPA on account of PREPA Revenue Bond Claims held by Bondholders and Monoline Insurers that did not timely submit an Election Form to the Solicitation Agent by the Settlement Class Deadline.<br><br>***Treatment:***  On the Effective Date, each Non-Settling Bondholder or Non-Settling Monoline will receive, on account of their Allowed Claim: [276]<br><br>(i)  such Holder's Pro Rata Share of the funds deposited in the Sinking Fund, subject to the terms of the Trust Agreement;<br><br>(ii)  if the Court determines the Bond Trustee has an Allowed Secured Clam in connection with the Amended Lien & Recourse Challenge, the lesser of (a) such Holder's Pro Rata Share of Series B Bonds in the face amount equal to the value of the Bond Collateral (as determined in connection with the Confirmation Hearing or any other appropriate proceeding), if any, minus the amount distributed to such Holder pursuant to the immediately preceding clause (i), and (b) such Holder's Pro Rata Share of the Series B Bonds available after the distributions of Series B Bonds are made pursuant to Article IV.A(ii) of the Plan;<br><br>(iii)  with respect to such Holder's Deficiency Claim that is a Remaining Claim, if any, after the collective distributions are made pursuant to the immediately preceding clauses (i) and (ii), such Holder's Pro Rata Share of the General Unsecured Claim Recovery; and<br><br>(iv)  if Class 2 votes to accept the Plan and a Final Order is entered in the Amended Recourse & Lien Challenge determining that the PREPA Revenue Bonds are recourse solely to the Sinking Fund, with respect to the principal and interest accrued and unpaid on such PREPA Revenue Bonds through the Petition Date accrued interest held by such Holder minus the Cash distributions made to such Holder pursuant to the preceding clause (i) (the "<u>Remaining Disallowed Non-Settling Claim</u>"), of CVI in the notional amount of such Holder's Remaining Disallowed Non-Settling Claim. |

---

[276] The beneficial holders of Class 2 Claims shall receive the distributions made pursuant to the Plan.

| | |
|---|---|
| | ***Voting:*** Class 2 is Impaired by the Plan. Class 2 and each Non-Settling Bondholder or Non-Settling Monoline are entitled to vote to accept or reject the Plan. |
| | ***Allowed Amount of Claims:*** To be determined following the Settlement Class Deadline and the Amended Lien & Recourse Challenge Final Resolution |
| | ***Projected Recovery from PREPA:*** 0.21% – 56.08% |
| **Class 3:** <br><br> Pension Claim | ***Classification:*** Class 3 consists of the claim held by PREPA ERS on account of contributions owed (including amounts payable in the future) by PREPA to PREPA ERS to pay retiree benefits in accordance with the PREPA ERS Regulations, collective bargaining agreements, resolutions, and applicable law. |
| | ***Treatment:*** The PREPA PayGo Trust shall reimburse PREPA ERS for retirement benefits paid and reasonable administrative costs (as determined by PREB to be subject to payment as part of the rate to be charged by PREPA to its customers) incurred in the prior Fiscal Year ending June 30; provided that benefit payments for which PREPA ERS is entitled to reimbursement under the Plan will be limited to (i) benefits payable to any Participant who is a Retiree as of the Effective Date, without any further cost of living adjustments from and after the Effective Date, and (ii) benefits payable to Participants who are Active PREPA ERS Participants as of the Effective Date, (A) with benefit accruals frozen as of the Effective Date in the manner set forth in Schedule C of the Plan, and (B) not subject to any cost of living adjustments from and after the Effective Date. |
| | The PREPA PayGo Trust will be funded through a combination of Series B Bonds and through operating expenses of PREPA as detailed in Section VI.M below. |
| | ***Voting:*** Class 3 is Impaired by the Plan. Class 3 and the holder of the Pension Claim are entitled to vote to accept or reject the Plan. |
| | ***Allowed Amount of Claims:*** TBD |
| | ***Projected Recovery from PREPA:*** TBD |
| **Class 4:** <br><br> Fuel Line Loan Claims | ***Classification:*** Class 4 consists of all claims against PREPA on account of Fuel Line Loans or otherwise arising from or related to the Fuel Line Facilities. |
| | ***Treatment:*** On the Effective Date, each holder of an Allowed Fuel Line Loan Claim shall be entitled to receive: |

|  | (i) Series A Bonds in the face amount equal to eighty-four percent (84.0%) of the amount of such holder's Allowed Fuel Line Loan Claim; and |
|---|---|
|  | (ii) with respect to such holder's Remaining Claim after accounting for the distributions made pursuant to the immediately preceding clause (i), such Holder's Pro Rata Share of the Net Remaining New Bonds, if any, available for distribution, with the Remaining Series B Bond Claims Pool. |
|  | *Fuel Line Lenders Creditors Consummation Fees* |
|  | On the Effective Date, the Fuel Line Lender PSA Creditors will receive, in order to compensate certain parties for the cost of negotiation, confirmation and consummation of the Fuel Line Lender PSA and the Plan, a *pro rata* share of fifteen million dollars ($15,000,000.00), in the form of either additional Series A Bonds or Cash, at the Oversight Board's sole discretion. |
|  | *Voting:*  Class 4 is Impaired by the Plan.  Class 4 and each holder of a Fuel Line Loan Claim are entitled to vote to accept or reject the Plan. |
|  | *Allowed Amount of Claims:*  $700,887,093.58 |
|  | *Projected Recovery from PREPA on Allowed Claims:* 84.00%–100.00% |
| **Class 5:**<br><br>National Insured Bond Claims | *Classification:*  Class 5 consists of all PREPA Revenue Bonds that have been insured or are otherwise owned (by subrogation or otherwise) by National, including, without limitation, pursuant to a secondary market insurance policy. |
|  | *Treatment:*  On the Effective Date, and subject to the terms and provisions of Article XX of the Plan, National will receive, on account of the Allowed National Insured Bond Claims and unless National agrees to a less favorable treatment, Series B Bonds in the face amount equal to seventy-one and sixty-five one hundredths percent (71.65%) of the amount of the Allowed National Insured Bond Claims. |
|  | *Voting:*  Class 5 is Impaired by the Plan.  Class 5 and each holder of a General Unsecured Claim are entitled to vote to accept or reject the Plan. |
|  | *Estimated Allowed Amount of Claims:*  $836,145,928.13 |
|  | *Projected Recovery from PREPA:* 71.65% |
| **Class 6:** | *Classification:*  Class 6 consists of the Claim of National arising from the payments made by National after the Petition Date and through the |

| National Reimbursement Claim | Effective Date to holders of the National Insured Bonds on account of interest accrued on such bonds. |
|---|---|
| | **Treatment:** On the Effective Date, and subject to the approval of the settlement of the National Reimbursement Claim as set forth in Article XVIII.I of the Plan, National will receive, in full consideration, satisfaction, release, settlement, and exchange of the Allowed National Reimbursement Claim, unless National agrees to a less favorable treatment, Series B Bonds in the face amount equal to twenty percent (20.00%) of the amount of the National Reimbursement Claim.  For the avoidance of doubt, if the National Reimbursement Claim is Allowed, it shall not be subject to Article XXVII.G of the Plan. |
| | If the Title III Court does not approve the settlement or determines the treatment of the National Reimbursement Claim does not comply with PROMESA for reasons including, without limitation, the Allowability and/or treatment of the National Reimbursement Claim, or the Title III Court finds the treatment of the National Reimbursement Claim constitutes unfair discrimination, the settlement and the treatment of National's Claims will, without further action, convert to a settlement of National's Claims that eliminates the obligation to issue Series B Bonds on account of the National Reimbursement Claim and all payments for debt service arising from, relating to, or on account of the National Reimbursement Claim; *provided*, that in such circumstance, National shall have the option to forego all consideration under the National PSA, including the fees and expenses set forth in Article II.D.2 of the Plan, and, in exchange, receive the same treatment as another settling Class of Holders of PREPA Revenue Bonds Claims, so long as the settlement with such class whose recovery National would receive was reached prior to the earlier to occur of (i) any substantive ruling on the claims and counterclaims asserted in the Amended Lien & Recourse Challenge that Holders of PREPA Revenue Bonds are secured by Revenues outside of the Sinking Fund, and (ii) an indication or a determination, either oral or written, at a hearing or otherwise, by the Title III Court that the Holders of PREPA Revenue Bonds are secured by Revenues outside of the Sinking Fund. |
| | **Voting:** Class 6 is Impaired by the Plan.  Class 6 and each holder of a National Reimbursement Claim are entitled to vote to accept or reject the Plan. |
| | ***Estimated Allowed Amount of Claims:*** $[TBD] |
| | ***Projected Recovery from PREPA:*** 20.00% |
| **Class 7:** | ***Classification:*** Class 7 consists of all unsecured claims against PREPA other than an Administrative Expense Claim, a Federal Claim, a |

| General Unsecured Claims | Professional Claim, an Eminent Domain/Inverse Condemnation Claim, a Pension Claim, a Fuel Line Loan Claim, a PREPA Revenue Bond Claim (including a Deficiency Claim), a Vitol Claim, an Assured Insured Interest Rate Swaps Claim, a Secured Claim, an Ordinary Course Customer Claim, or a Section 510(b) Subordinated Claim.  For the avoidance of doubt, each CBA Rejection Damages Claim is a "General Unsecured Claim." |
|---|---|
| | *Treatment:*  On the Effective Date, each holder of an Allowed General Unsecured Claim will receive its Pro Rata Share of the General Unsecured Claim Recovery.  The General Unsecured Claim Recovery is the aggregate recovery by holders of Allowed Claims in the General Unsecured Claims Pool, payable from the GUC Trust Assets.  The GUC Trust Assets consist of (i) the Avoidance Action Proceeds, (ii) the GUC New Bonds, and (iii) the GUC CVI. |
| | *Voting:*  Class 7 is Impaired by the Plan.  Class 7 and each holder of a General Unsecured Claim are entitled to vote to accept or reject the Plan. |
| | *Estimated Allowed Amount of Claims:*  $800,000,000 |
| | *Projected Recovery from PREPA:* 0.10%–100.00% |
| **Class 8:** Vitol Claim | *Classification:*  Class 8 consists of the claim against PREPA held by Vitol on account of the Vitol Settlement Agreement. |
| | *Treatment:*  On the Effective Date, Vitol will receive fifty percent (50%) of its Pro Rata Share of the General Unsecured Claim Recovery. |
| | *Voting:*  Class 8 is Impaired by the Plan.  Class 8 and the holder of the Vitol Claim are entitled to vote to accept or reject the Plan. |
| | *Allowed Amount of Claim:* $41,457,382.88 |
| | *Projected Recovery from PREPA:* 0.05%–50.00% |
| **Class 9:** Assured    Insured Interest Rate Swap Claims | *Classification:*  Class 9 consists of all claims against PREPA on account of the Assured Insured Interest Rate Swap. |
| | *Treatment:*  On the Effective Date, each holder of an Allowed Assured Insured Interest Rate Swap Claim will receive its Pro Rata Share of the Assured Insured Interest Rate Swap Claim Recovery, consisting of (a) the Settling Bondholder Treatment, if the holder of the Assured Insured Interest Rate Swap Claim timely submitted to the Solicitation Agent by the Settlement Class Deadline an Election Form or (b) the Non-Settling Bondholder Treatment. |

| | |
|---|---|
| | ***Voting:*** Class 9 is Impaired by the Plan.  Class 9 and each holder of an Assured Insured Interest Rate Swap Claim are entitled to vote to accept or reject the Plan.<br><br>***Allowed Amount of Claims:*** TBD<br><br>***Projected Recovery from PREPA if Holder Settles:*** 0.19% – 100.00%<br><br>***Projected Recovery from PREPA if Holder Does Not Settle:*** 0.21% – 55.63% |
| **Class 10:**<br><br>Ordinary Course Customer Claims | ***Classification:***  Class 10 consists of all claims against PREPA held by a customer of PREPA on account of ordinary course customer matters, including overpayment of customer bills.<br><br>***Treatment:***  On the Effective Date, each holder of an Allowed Ordinary Course Customer Claim will receive satisfaction of such Holder's Claim in the ordinary course of business, including that PREPA and Reorganized PREPA, as applicable, may retain any customer deposits in the ordinary course of business.<br><br>***Voting:*** Class 10 is Unimpaired by the Plan.  Class 10 and each holder of an Ordinary Course Customer Claim are deemed to accept the Plan.<br><br>***Estimated Allowed Amount of Claims:*** $235,309<br><br>***Projected Recovery from PREPA:*** 100.00% |
| **Class 11:**<br><br>Eminent Domain/Inverse Condemnation Claims | ***Classification:*** Class 11 consists of all claims against PREPA arising from or related to a condemnation action or proceeding commenced prepetition by PREPA or an agency or entity thereof in the Court of First Instance in accordance with 32 L.P.R.A. § 2905 to obtain title to real property located in Puerto Rico, and a Final Order has been entered for an amount in excess of the amount deposited by the condemnor.<br><br>***Treatment:***  On the Effective Date,<br><br>   a)  to the extent not previously modified, the automatic stay pursuant to section 362 of the Bankruptcy Code and the discharge injunction pursuant to Article XXVII of the Plan will be deemed modified to permit the holder of an Eminent Domain/Inverse Condemnation Claim to (i) liquidate such Eminent Domain/Inverse Condemnation Claim, and (ii) cause the Clerk of the Court of First Instance to distribute to such holder the amount of monies on deposit with the Court of First Interest with respect to the condemned property; and |

270

|  | b) subject to the entry of the Confirmation Order and the Commonwealth Confirmation Order providing such claims must be paid in full to the extent they are Allowed Claims for just compensation, upon each such order becoming a Final Order, and upon the occurrence of another Final Order determining the validity and amount of just compensation attributable to an Eminent Domain/Inverse Condemnation Claim, the holder of an Allowed Eminent Domain/Inverse Condemnation Claim shall be entitled to receive 100% of such unpaid balance in cash.<br><br>If, however, the Oversight Board's appeal of the Commonwealth Confirmation Order and the Findings of Fact and Conclusions of Law entered with respect thereto relating to the non-dischargeability of Eminent Domain/Inverse Condemnation Claims against the Commonwealth is successful and such Commonwealth Confirmation Order is reversed to such extent, the holder of such unpaid balance will receive, in full consideration, satisfaction, release and exchange therefor, such holder's Pro Rata Share of the General Unsecured Claim Recovery.<br><br>***Voting:*** Class 11 is Impaired by the Plan. Class 11 and each holder of an Eminent Domain/Inverse Condemnation Claim are entitled to vote to accept or reject the Plan.<br><br>***Estimated Allowed Amount of Claims:*** $2,437,556<br><br>***Projected Recovery from PREPA:*** 100.00% if provided in a Final Order; otherwise, approximately 0.10%–100.00% of the outstanding balance of the Allowed Eminent Domain/Inverse Condemnation Claim after application of any deposit |
| **Class 12:**<br>Federal Claims | ***Classification:*** Class 12 consists of all claims against PREPA held by the United States of America, its agencies, departments or agents, including, without limitation, the HUD, the United States Department of Homeland Security, the EDPA, and the United States Department of Labor.<br><br>***Treatment:*** On the Effective Date, each holder of an Allowed Federal Claim will receive the greater of (i) its Pro Rata Share of the General Unsecured Claim Recovery, and (ii) the treatment of such Allowed Federal Claim as required by Section 304(h) of PROMESA.<br><br>***Voting:*** Class 12 is Impaired by the Plan. Class 12 and each holder of an Allowed Federal Claim are entitled to vote to accept or reject the Plan<br><br>***Estimated Allowed Amount of Claims:*** $16,859,577<br><br>***Projected Recovery from PREPA:*** 100.00% if required to be paid in full pursuant to Section 304(h) of PROMESA; otherwise, 0.10%–100.00%. |

| **Class 13:** Convenience Claims | ***Classification:*** Class 13 consists of (a) all Allowed General Unsecured Claims (a) that are equal to or less than ten thousand dollars ($10,000.00) or (b) claims held by holders of Allowed General Unsecured Claims, as applicable, that have elected to reduce the amount of such Allowed General Unsecured Claim to ten thousand dollars ($10,000.00).  In addition, Class 11 includes claims by holders of multiple General Unsecured Claims that are in the aggregate greater than twenty thousand dollars ($20,000.00) that have elected to reduce all such Claims to an aggregate amount of twenty thousand dollars ($20,000.00).  The aggregate amount of consideration to be made available to Convenience Claims is the convenience cap of one million dollars ($1,000,000.00) and, in the event that such Convenience Cap is exceeded, holders of Allowed Convenience Claims shall receive their Pro Rata Share of the Convenience Cap. <br><br> ***Treatment:***  On the later of the Effective Date and the date the Convenience Claim becomes an Allowed Claim, each holder of an Allowed Convenience Claim will receive the full amount of such Allowed Convenience Claim, in cash, from the GUC Trust. <br><br> ***Voting:*** Class 13 is Unimpaired by the Plan.  Class 13 and each holder of a Convenience Claim are deemed to accept the Plan. <br><br> ***Estimated Allowed Amount of Claims:*** Unknown <br><br> ***Projected Recovery from PREPA:*** 100.00%, provided that the Convenience Cap is not exceeded |
|---|---|
| **Class 14:** Section 510(b) Subordinated Claims | ***Classification:***  Class 14 consists of all claims, to the extent determined pursuant to a Final Order, against PREPA or its assets arising from or relating to (a) rescission of a purchase or sale of an existing security of the Debtor or an affiliate of the Debtor, (b) purchase, sale, or retention of such a security, or (c) reimbursement, indemnification, or contribution allowed under Bankruptcy Code section 502 on account of such claim. <br><br> ***Treatment:*** Allowed Section 510(b) Subordinated Claims will not receive a distribution pursuant to the Plan. <br><br> ***Voting:*** Class 14 is Impaired by the Plan.  Class 14 and each holder of a Section 510(b) Subordinated Claim are deemed to have rejected the Plan. <br><br> ***Estimated Allowed Amount of Claims:***  Unknown <br><br> ***Projected Recovery from PREPA:***  0.00% |

F.      **Provisions Regarding Issuance and Distribution of the New Bonds**

1.      **Issuance and Distribution**

i.      **New Bonds**

The New Bonds shall be issued pursuant to the terms and provisions of the New Master Indenture and shall be distributed as set forth in the Plan.  The definitive documentation governing the New Bonds generally shall provide for the terms set forth herein, subject to the results of any election permitted by the Plan and other adjustments permitted or required by the Plan.

ii.      **CVI**

The CVI will be issued pursuant to the terms and provisions of the New Master Indenture and shall be distributed as set forth in the Plan.  The definitive documentation governing the CVI generally shall provide for the terms set forth in the Plan.

2.      **General Terms**

i.      **New Bonds**

On the Effective Date, Reorganized PREPA shall issue two series of New Bonds:  Series A Bonds; and Series B Bonds, which Series B Bonds shall consist of two subseries.  The maturities, interest rates, and amortization schedules for the New Bonds, assuming the maximum original principal amount of New Bonds authorized to be issued pursuant to the Plan (approximately $5.68 billion) is issued, are attached to the Plan as **Schedule E**.

a.      Series A Bonds

Series A Bonds shall be issued in a principal amount sufficient to comply with the terms of the Fuel Line Lender PSA and Article VII of the Plan, which shall be approximately $650,000,000.  They shall have a final stated maturity of fifteen (15) years from the Effective Date, which final stated maturity date may be modified based on agreed upon covenants in the New Master Indenture and relating to the Legacy Charge, which final stated maturity date shall be acceptable to the Required Fuel Line Lenders, with an expected repayment of five (5) years from the Effective Date and an expected weighted average life of 2.89 years from the Effective Date, in each case based upon 2022 Fiscal Plan Projections.  The Series A Bonds shall be issued on the Effective Date but shall accrue interest from the deemed issuance date of December 1, 2022 for purposes of the calculation of accrued interest; provided, however, the period for accrual of interest prior to the Effective Date shall not exceed one (1) year and that the interest accrued prior to the Effective Date shall be payable upon the Effective Date in the form of Series A Bonds or Cash, at the Oversight Board's sole discretion.  From and after the stated maturity date, the Series A Bonds shall no longer accrue interest, although principal and accrued but unpaid interest outstanding shall continue to be paid.  Series A Bonds shall bear interest at a rate of six percent (6.00%) per annum payable semi-annually in Cash.

b.      Series B Bonds

The Series B Bonds shall be issued in a principal amount equal to the aggregate principal amount of New Bonds minus the aggregate principal amount of Series A Bonds. Series B Bonds shall have a final stated maturity of fifty (50) years from the Effective Date, with an expected repayment of thirty-five (35) years from the Effective Date based upon 2022 Fiscal Plan Projections, which is subject to change based on load projections in subsequent PREPA Fiscal Plans, as described further herein. The Series B Bonds shall be dated as of the Effective Date. The Series B Bonds shall bear interest at rates that range from six percent (6.00%) per annum to six and seventy-five one-hundredths percent (6.75%) per annum. From and after the stated maturity date, the Series B Bonds shall no longer accrue interest, although principal outstanding and accrued but unpaid interest outstanding shall continue to be paid.

Series B Bonds shall be issued in two subseries: Series B-1 Bonds; and Series B-2 Bonds. The Series B-1 Bonds will be current interest bonds and shall bear interest at a rate of six percent (6.00%) per annum payable semi-annually, with an expected repayment of thirty-four (34) years from the Effective Date and an expected weighted average life of 21.81 years from the Effective Date, in each case based upon 2022 Fiscal Plan Projections.

The Series B-1 Bonds have priority as to payments of principal over the Series B-2 Bonds. The Series B-1 Bonds shall be issued in the principal amount of approximately $4.63 billion.

The Series B-2 Bonds will be convertible capital appreciation bonds and shall bear interest at a rate of six and seventy-five one-hundredths percent (6.75%) per annum, accreting annually until July 1, 2028, at which point the Series B-2 Bonds shall convert to current interest bonds with interest payable semi-annually, with an expected repayment of thirty-five (35) years from the Effective Date, and expected weighted average life of 34.51 years from the Effective Date, in each case based upon 2022 Fiscal Plan Projections. The Series B-2 Bonds shall be issued in an amount equal to the Administrative Expense Bonds Amount with a maturity value of approximately $557,000,000 (with an assumed Effective Date of July 1, 2023 and an original principal value of approximately $400,000,000).

ii.   **CVI**

On the Effective Date, Reorganized PREPA shall issue the CVI in the amount of the CVI Notional Amount with a zero percent (0.00%) coupon and a final maturity date of the CVI Maturity Date. Payments shall be made on the CVI only after the Series B Bond Defeasance Date has occurred, so long as the Series B Bond Defeasance Date occurs prior to the CVI Maturity Date. If the Series B Bond Defeasance Date occurs prior to the CVI Maturity Date, the CVI shall be payable from that portion of Net Revenues constituting the Remaining Legacy Charge Revenues deposited to the credit of the Debt Service Fund in accordance with the Payment Waterfall until the earlier of (a) the date on which the CVI Notional Amount has been paid in full and (b) the CVI Maturity Date.

On the CVI Maturity Date, any amount of principal outstanding on account of the CVI shall no longer be due and payable.

The CVI shall not carry any default rate of interest. The CVI will be issued in denominations to be specified in the New Master Indenture.

3.      **Excess New Bonds**

On the Effective Date, Reorganized PREPA shall, in its sole discretion, issue some, all, or none of the Excess New Bonds to the PREPA PayGo Trust.  Any amount of Excess New Bonds that are available for distribution to the PREPA PayGo Trust, but that Reorganized PREPA determines to not issue to the PREPA PayGo Trust, shall be deemed to have not been issued, and the amount of New Bonds issued pursuant to the Plan shall be reduced on dollar-for-dollars basis by the aggregate principal amount of such unissued Excess New Bonds.

4.      **Payment Provisions**

Interest on the New Bonds shall be paid on the next January 1 or July 1 date following the Effective Date and each January 1 and July 1 thereafter until the earlier of the New Bonds (a) the respective stated maturity dates of the New Bonds or (b) their payment or satisfaction in full in accordance with their respective terms.

All unpaid principal on the New Bonds not paid when due, whether at or prior to final scheduled maturity date, shall remain outstanding and due and payable until paid in full.  Interest shall not accrue on any outstanding obligations under the New Bonds after the New Bonds' respective stated maturity dates; only unpaid principal and unpaid interest accrued through the stated maturity shall be payable following the respective final stated maturity dates.  Interest on the New Bonds will be computed on the basis of a 360-day year consisting of twelve 30-day months.  The New Bonds shall not carry any default rate of interest.

5.      **Security**

i.      **New Bonds**

The New Bonds shall be secured by Reorganized PREPA's Net Revenues up to an amount equal to the Legacy Charge Revenues and the right to receive such Net Revenues up to an amount equal to the Legacy Charge Revenues, as more particularly described in the New Master Indenture. For the avoidance of doubt, (i) the New Bonds shall not have a priority of payment senior to that of the Additional Bonds, provided, however, that the Revenues securing any Additional Bonds exclude during the applicable periods an amount up to the Legacy Charge Revenues and Remaining Legacy Charge Revenues, as applicable, and (ii) the Lien securing the New Bonds is not limited to the Net Revenues deposited in the Debt Service Fund.

ii.      **CVI**

The CVI shall be secured by Reorganized PREPA's Remaining Net Revenues up to an amount equal to the Remaining Legacy Charge Revenues and the right to receive such Remaining Net Revenues up to an amount equal to the Remaining Legacy Charge Revenues, as more particularly described in the New Master Indenture.

iii.      **Additional Bonds**

Reorganized PREPA may issue Additional Bonds payable from Revenues and the right to receive such Revenues.  For the avoidance of doubt, the New Bonds shall not have a priority of

payment senior to that of the Additional Bonds, provided, however, that the Revenues securing any Additional Bonds exclude during the applicable periods an amount up to the exclude during the applicable periods up to an amount Legacy Charge Revenues and Remaining Legacy Charge Revenues, as applicable.  The Additional Bonds shall be subject to an additional bonds test, which shall be reasonably acceptable to the Oversight Board and the Required Fuel Line Lenders, and documented in the New Master Indenture.

6.     **Call Provisions**

i.     **New Bonds**

The New Bonds are subject to redemption prior to maturity, at the election or direction of Reorganized PREPA, in whole or in part (and, if in part, in an authorized denomination provided for under the New Master Indenture), on any date that is on or after ten (10) years following the Effective Date, upon thirty (30) days' prior written notice, at a redemption price equal to the principal amount thereof, plus accrued interest to the redemption date.

If less than all the New Bonds of a particular series are called for redemption prior to maturity, Reorganized PREPA will select the maturity or maturities of such series of the New Bonds to be redeemed, and DTC, on behalf of the New Master Trustee, will select the New Bonds within the same maturity of such series to be redeemed by means of a random lottery.

ii.     **CVI**

The CVI is subject to redemption prior to maturity, at the election or direction of Reorganized PREPA, in whole or in part (and, if in part, in an authorized denomination provided for under the New Master Indenture), on any date that is on or after ten (10) years following the Effective Date, upon thirty (30) days' prior written notice.  The redemption price shall be equal to the CVI Redemption Price.

7.     **Accounts and Payment Waterfall**

All Revenues shall be deposited in the "<u>General Fund</u>" held by Reorganized PREPA.  On the first Business Day of each month, Reorganized PREPA shall apply or transfer, as applicable, Revenues in the amounts and in the order of priority set forth in the New Master Indenture (the "<u>Payment Waterfall</u>"); provided that the Payment Waterfall set forth in the New Master Indenture shall provide that Revenues will be (i) first, applied by Reorganized PREPA to the payment of Operating Expenses, (ii) second, transferred by Reorganized PREPA to the New Master Trustee for the payment of the New Master Trustee's fees and expenses not to exceed one hundred thousand dollars ($100,000) per year, and (iii) third, transferred to the New Master Trustee for deposit to the credit of the Debt Service Fund in an amount sufficient to pay debt service on all outstanding New Bonds, up to the amount of the Legacy Charge Revenues and, from and after the Series B Bond Defeasance Date and until the CVI Maturity Date, up to the amount of the Remaining Legacy Charge Revenues.  Any amounts remaining after such transfers and deposits will be used by Reorganized PREPA as set forth in the New Master Indenture.

For the avoidance of doubt, (i) the New Bonds shall not have a priority of payment senior to that of the Additional Bonds, provided, however, that the Revenues securing any Additional

Bonds exclude during the applicable periods an amount up to the Legacy Charge Revenues and Remaining Legacy Charge Revenues, as applicable, and (ii) the Payment Waterfall in the New Master Indenture will reflect the application and transfer of Revenues pledged to the payment of debt service on Additional Bonds.

8.      **Key Covenants for New Bonds**

The Definitive Documents, including the New Master Indenture and the Confirmation Order, shall contain customary terms, conditions, and covenants, including, without limitation, covenants by Reorganized PREPA that it shall, among other things:

a)      make reasonable best efforts to (a) continue to levy and collect rates, fees, and charges, including, but not limited to, the Legacy Charge and the Remaining Legacy Charge and (b) deposit Net Revenues collected from such rates, fees, and charges into the Debt Service Fund in accordance with the Payment Waterfall;

b)      take no action that would (a) limit or alter the rights vested in PREPA or Reorganized PREPA in accordance with the Plan and the Confirmation Order to fulfill the terms of any agreements with the holders of the New Bonds or the CVI or (b) limit or impair the rights and remedies of the holders of the New Bonds or the CVI;

c)      take all reasonable actions to cause the Series A Bonds and Series B Bonds to be tax-exempt to the extent permitted by law (including seeking any appropriate no-action, clearance determination, or favorable ruling from the IRS);

d)      do and perform all acts and things permitted by law and reasonably necessary or desirable to ensure that interest paid to holders of any federally tax-exempt New Bonds shall be and remain excludable from gross income for federal income tax purposes;

e)      not create any Lien, pledge, or charge on the Net Revenues up to the amount of the Legacy Charge Revenues, or right to receive the same, except in connection with issuance of Additional Bonds as permitted under the New Master Indenture; and

f)      not issue any Series A Bonds to any parties other than to be issued pursuant to the Plan and the Fuel Line Lender PSA.

9.      **Application of Moneys in Debt Service Fund**

From and after the Effective Date, until the New Bonds, Refunding Bonds, and/or CVI have been paid, satisfied in full in accordance with their terms or otherwise no longer deemed to be outstanding under the New Master Indenture, Reorganized PREPA shall deposit, in accordance with the Payment Waterfall, Net Revenues up to the amount of the Legacy Charge Revenues with

respect to the New Bonds and up to the amount of the Remaining Legacy Charge Revenues with respect to the CVI to the credit of the Debt Service Fund.

The monies deposited into the Debt Service Fund shall be applied, to the extent available, as follows:

### i.    New Bonds

- *First,* to the payment of stated interest due and payable on the New Bonds;

- *Second*, to the payment of principal on the Series A Bonds and any Refunding Bonds issued to refund the Series A Bonds until irrevocably paid in full in Cash or otherwise deemed not to be outstanding in accordance with the terms of the New Master Indenture; and

- *Third*, to the payment of principal on the Series B Bonds and any Refunding Bonds (other than the Refunding Bonds described in *Second* above) until irrevocably paid in full in Cash or otherwise deemed not to be outstanding in accordance with the terms of the New Master Indenture.

### ii.    CVI

- *Then*, to the payment of the CVI Notional Amount.

### 10.    Interest Rate Covenant

Until the earlier of repayment of the Series A Bonds and the Series B Bonds or the final maturity of the Series A Bonds and the Series B Bonds, if, in any given year, the Net Revenues up to the amount of the Legacy Charge Revenues deposited in the Debt Service Fund are insufficient to pay the interest due and owing on the New Bonds in that Fiscal Year, Reorganized PREPA shall (and absent Reorganized PREPA's action, the New Master Trustee shall) (a) exercise its powers to the fullest extent of the law to implement an increase in the Legacy Charge sufficient to repay such interest due and payable on the New Bonds in the succeeding Fiscal Year and/or (b) initiate a rate case before PREB or any other proceeding to compel PREB to implement an increase in the Legacy Charge sufficient to pay such interest due and payable on the New Bonds in the succeeding Fiscal Year (the "Interest Rate Covenant"). The New Master Trustee shall have the right to compel specific performance of the Interest Rate Covenant.

### 11.    No Rights of Acceleration

The New Bonds and the CVI shall not be subject to acceleration other than an acceleration of the New Bonds in connection with an insolvency proceeding (including under Title III of PROMESA).

12.   **Limited Default**

i.    **New Bonds**

There shall be no event of default on the New Bonds (prior to the stated final maturity date of the Series A Bonds, solely with respect to the Series A Bonds, and generally with respect to the Series B Bonds) for failure to pay scheduled debt service, so long as Reorganized PREPA (a) charges and employs its reasonable best efforts to (i) levy the Legacy Charge, (ii) collect the Revenues generated by the Legacy Charge, and (iii) deposit the full amount of Net Revenues up to the amount of the Legacy Charge Revenues into the Debt Service Fund after providing for distributions made in accordance with the Payment Waterfall, and (b) complies with the Interest Rate Covenant.

ii.   **CVI**

There shall be no event of default on the CVI so long as Reorganized PREPA takes reasonable actions to collect Revenues generated by the Remaining Legacy Charge and deposits the full amount of Net Revenues up to the amount of the Remaining Legacy Charge Revenues into the Debt Service Fund.

13.   **Limited Remedies**

Upon the occurrence of an event of default on the New Bonds or the CVI, the New Master Trustee's sole remedies shall be to: (a) seek enforcement of Reorganized PREPA's obligation to take reasonable measures to levy rates, fees, and charges, including, but not limited to, the Legacy Charge and the Remaining Legacy Charge and collect Revenues generated by the Legacy Charge and Remaining Legacy Charge and deposit Net Revenues up to the amount of the Legacy Charge Revenues with respect to the New Bonds and up to the amount of the Remaining Legacy Charge Revenues with respect to the CVI into the Debt Service Fund in accordance with the Payment Waterfall; and/or (b) prior to the Series A Bond Defeasance Date or the earlier of the Series B Bond Defeasance Date or Series B Bonds final maturity, as applicable, at the request of twenty-five percent (25.0%) or more of the Series A Bonds or Series B Bonds, as applicable, enforce the Interest Rate Covenant. All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies that provide the "Right to Receivership Upon Default," codified at 22 L.P.R.A. § 207, are preempted as inconsistent with PROMESA. For the avoidance of doubt, the Lien securing the New Bonds is not limited to the Net Revenues deposited in the Debt Service Fund.

14.   **Additional Bonds and Refunding Bonds**

Reorganized PREPA may issue Refunding Bonds to refund, refinance, or defease outstanding New Bonds authorized under the New Master Indenture. Such Refunding Bonds shall be secured by Net Revenues up to the amount of the Legacy Charge Revenues as more specifically set forth in the New Master Indenture.

Reorganized PREPA may issue Additional Bonds for any lawful purpose in accordance with the additional bonds test and the other terms of the New Master Indenture. Such Additional Bonds may be secured by Revenues as more specifically set forth in the New Master Indenture;

279

*provided* that the Revenues securing any such Additional Bonds exclude during the applicable periods an amount up to Legacy Charge Revenues and Remaining Legacy Charge Revenues, as applicable, while the New Bonds, any Refunding Bonds, or the CVI remain outstanding.  For the avoidance of doubt, the New Bonds shall not have a priority of payment senior to that of the Additional Bonds; *provided, however,* that the Revenues securing any Additional Bonds exclude during the applicable periods an amount up to the Legacy Charge Revenues and Remaining Legacy Charge Revenues, as applicable.

15. **Force Majeure**

i. **New Bonds**

In the event of a federally-declared disaster as a result of a storm or other catastrophic event that disrupts Reorganized PREPA's operations such that Reorganized PREPA cannot collect Revenues necessary to cover Operating Expenses and deposit Net Revenues up to the amount of the Legacy Charge Revenues with respect to the New Bonds in accordance with the Payment Waterfall for a given Fiscal Year, Reorganized PREPA may elect, in its sole discretion, to defer up to two (2) consecutive semi-annual debt service payments.

For the avoidance of doubt, if Reorganized PREPA exercises such election, interest on the New Bonds will continue to accrue until paid.  All deferred principal and interest on Series A Bonds impacted by such election shall be paid on or before the earlier of Series A Bonds final stated maturity date or the first scheduled payment date five (5) years after the end of the debt service deferral period.  All deferred principal and interest on Series B Bonds impacted by such election shall be paid on or before the first scheduled payment date five (5) years after the end of the debt service deferral period.  For the avoidance of doubt, the interest on the New Bonds that is deferred as a result of the force majeure election shall keep accruing even after the stated maturity of the Series B Bonds.

ii. **CVI**

In the event of a federally-declared disaster as a result of a storm or other catastrophic event that disrupts Reorganized PREPA's operations such that Reorganized PREPA cannot collect Revenues necessary to cover Operating Expenses and deposit Remaining Net Revenues up to the amount of the Remaining Legacy Charge Revenues with respect to the CVI into the Debt Service Fund in accordance with the Payment Waterfall for a given Fiscal Year, Reorganized PREPA shall be under no obligation to make CVI payments for any shortfalls in Remaining Legacy Charge Revenues.

16. **Direct Right of Action**

Pursuant to the New Master Indenture, and subject to such additional rights as provided therein, the New Master Trustee shall have a direct right of action to enforce the terms of the New Master Indenture, including, without limitation, with respect to funding deposits in the Debt Service Fund and seeking specific performance remedies for any breach of covenants in the New Master Indenture.

17.     **New Master Indenture**

Provisions requiring the Legacy Charge to be added to bills issued by Reorganized PREPA to its customers to pay principal and interest on the New Bonds, make payments on the CVI, and governing, among other things, amendments of or supplements to the New Bonds, the CVI, or the New Master Indenture, events of default, remedies, priority of payments after default under the New Master Indenture, and defeasance under the New Master Indenture will be set forth in the New Master Indenture.  The New Master Indenture will be executed and delivered on or prior to the Effective Date.

18.     **Governing Law**

The New Master Indenture, and the New Bonds and CVI issued thereunder, as applicable, will be governed by the laws of the State of New York and, for certain limited matters, the laws of the Commonwealth, without giving effect to principles of conflicts of law.

19.     **Tax Exemption of the New Bonds**

In the event that the Government Parties obtain a ruling from the IRS (the "Determination") that certain features of the New Bonds will not prevent the issuance of all of the New Bonds on the Effective Date as tax-exempt obligations, any Holders of Claims or Entities receiving New Bonds pursuant to the Plan shall receive the benefit of such Determination in the form of tax-exempt New Bonds issued pursuant to the Plan with coupons for all maturities equal to the coupons on the tax-exempt New Bonds as set forth herein; *provided*, *however*, that such New Bonds shall be accompanied by the favorable opinion of Section 103 Bond Counsel that the interest, other than pre-issuance accrued interest, on such New Bonds is, in such counsel's opinion, excluded from gross income for purposes of U.S. federal income tax, Commonwealth income tax, and U.S. state and local income tax; *provided*, *further*, *however*, that, in the event that the Determination is obtained subsequent to the Effective Date, then the holders of the taxable New Bonds affected by such Determination (the "Invited Bonds") shall be invited to exchange such bonds for converted bonds (the "Exchange Offer") and, subject to the application of all reasonable expenses incurred by the Government Parties in connection with such Exchange Offer, the interest rate on the converted bonds shall be the same as the interest on Invited Bonds of the same type, interest rate, series and maturity; and, *provided*, *further*, that, such converted bonds shall be accompanied by the favorable opinion of Section 103 Bond Counsel that the interest, other than pre-issuance accrued interest, on such converted bonds, and on the Invited Bonds exchanged for such converted bonds from the original date of delivery of such Invited Bonds so exchanged, is, in such counsel's opinion, excluded from gross income for purposes of U.S. federal income tax, Commonwealth income tax, and U.S. state and local income tax; and, *provided*, *further*, that, in the event that neither of the foregoing Determinations are obtained, the covenants to seek such Determinations shall terminate upon the earliest to occur of (1) within forty-five (45) days of the entry of the Confirmation Order, (2) notification by the IRS to the Commonwealth that IRS is unable to issue a favorable private letter ruling, closing agreement, or other type of IRS Determination with respect to the matters addressed by this subsection, and (3) the amendment of the New Master Indenture following receipt of a favorable Determination and consummation of an Exchange Offer.

20.  **CVIs Not Tax Exempt**

Any income received on account of the CVIs shall not be excluded from gross income for purposes of U.S. federal income tax, Commonwealth income tax, and U.S. state and local income tax.

G.  **Provisions Regarding National Insured Bonds and Treatment of National Insured Bonds**

In the event that Classes 5 and 6 vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, and all National Insurance Policies and related agreements related to National Insured Bonds are in full force and effect, or have otherwise been fully performed by National, with no outstanding payment defaults by National with respect to such National Insured Bonds up to and including the Effective Date, then, notwithstanding any other provision of the Plan, on the Effective Date, Holders of Allowed National Insured Bond Claims shall receive the following treatments, which treatments shall be selected by National, in its sole and absolute discretion, at or prior to the Plan Supplement Deadline and be set forth on the National Bondholder Election Form; *provided*, *however*, that, for the avoidance of doubt, National Insured Bonds owned or held by National (by subrogation or otherwise) shall not be subject to the treatment elections set forth in Article XX of the Plan and, subject to the rights of the Bond Trustee, National shall receive the National Plan Consideration on account of such bonds; and, *provided*, *further*, that, subject to providing Holders of Allowed National Insured Bond Claims with the treatment or elections set forth in Article XX of the Plan and satisfying all such treatment or elections, National shall have all right, title, and interest in the National Plan Consideration and shall manage the National Plan Consideration in its sole and absolute discretion subject to and in accordance with all applicable laws and regulations; and, *provided*, *further*, that any calculations and/or payments to be made to a Holder based on, or in relation to, such Holder's Allowed National Insured Bond Claim pursuant to the options set forth in Article XX of the Plan will take into account any payments of principal and/or accrued interest already made to such Holder by National pursuant to the terms of the relevant National Insurance Policies, and such Holder shall not be compensated for any amounts already paid to such Holder pursuant to the terms of the relevant National Insurance Policies.

1.  **National Commutation Treatment of National Insured Bond Claims**

Each Holder of an Allowed National Insured Bond Claim shall have the option to elect on the National Bondholder Election Form to receive, on the Effective Date, the National Commutation Consideration, distributable by or at the direction of National, and, if elected, (i) the Holder thereof shall have no other or further rights under or with respect to the applicable National Insurance Policy or any National Trust or National Escrow Account, (ii) the Holder thereof shall not receive any payments from National under the National Insurance Policies on account of accrued and unpaid interest on and after, or, in the case of any capital appreciation bonds, the accreted value on and after, the Effective Date, and to the extent any accrued or accreted interest is paid to such Holder by National after such date, such amount shall be credited against the consideration such Holder, their successors, transferees, or assigns are otherwise entitled to receive as National Commutation Consideration, and (iii) National shall receive the National Plan Consideration distributable on account of the applicable Allowed National Insured Bond Claim.

282

The National Insured Bonds of a Holder that timely and validly elects to receive the National Commutation Treatment or makes an improper election as described in Article XX.F of the Plan, shall be deemed cancelled on the Effective Date, and National's obligations under the applicable National Insurance Policies shall be fully and finally satisfied, released, and discharged.

2.   **National Non-Commutation Treatment of National Insured Bond Claims**

In the event that a Holder of an National Insured Bond Claim timely and validly elects on the National Bondholder Election Form to receive the National Non-Commutation Treatment in accordance with the provisions of Article XX.B and Article XX.F of the Plan, (i) National shall receive the National Plan Consideration distributable on account of the applicable Allowed National Insured Bond Claim, and (ii) such Holder shall receive one or more of the following treatments, at National's election, which election shall be exercised by National in its sole discretion at or prior to the Plan Supplement Deadline, and as detailed in the applicable National Bondholder Election Form:

i.   **Custodial Trusts**

Such Holder of an National Insured Bond Claim shall (A) deposit, or be deemed to have deposited, among other things, such Holder's Pro Rata Share of the National Trust Consideration, the National Insured Bonds allocable to such electing Holder, and the related National Insurance Policies into the applicable National Trust, (B) be deemed to have received its Pro Rata Share of the National Trust Consideration and National Certificates in consideration therefor, and (C) have no recourse to National or the National Insurance Policies other than as provided for under the terms of the National Trust.

ii.   **Escrow**

Such Holder of a National Insured Bond Claim shall deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the National Escrow Consideration in the National Escrow Account and such deposited National Escrow Consideration shall be held as security for National's obligations to the Holders of the National Insured Bonds whose National Escrow Consideration was deposited in the National Escrow Account under the National Insurance Policies.

iii.   **Payment of Accelerated Amounts**

National shall receive the National Plan Consideration that would be otherwise allocable to such Holder of an Allowed National Insured Bond Claim and National shall fully and completely discharge its obligation to such Holder of an Allowed National Insured Bond Claim by paying on the Effective Date, in Cash, the amount thereof at the National Acceleration Price as of the date of payment.

iv.   **Alternative Treatment**

The Oversight Board and National reserve the right to formulate an alternative election or implementation option with respect to the National Insured Bonds that is mutually acceptable to the Oversight Board and National, each in their respective sole discretion; *provided*, *however*, that

any such alternative election or implementation option must be proposed, in writing, prior to the commencement of the Disclosure Statement hearing.  Notwithstanding the foregoing, and for the avoidance of doubt, National may make different elections, with respect to different CUSIPs and different holders of National Insured Bonds.

### 3.    Acceleration of National Insured Bonds

Notwithstanding any other provision of the Plan, to the extent that there are no outstanding payment defaults by National with respect to National Insured Bonds up to and including the Effective Date, the payment of the principal of the National Insured Bonds shall be accelerated as of the Effective Date, and such National Insured Bonds shall be due and payable from and after the Effective Date at the National Acceleration Price of one hundred percent (100%) of the principal amount thereof plus interest accrued thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) to the date of payment.  National shall have the right to pay the National Acceleration Price with respect to the National Insured Bonds at any time, and the Holder of the National Insured Bonds and the trustee or fiscal agent (as applicable) shall be required to accept the same in satisfaction of National's obligations under the applicable National Insurance Policy with respect to such bonds, and, upon such payment, National's obligations under the applicable National Insurance Policy shall be fully satisfied and extinguished, notwithstanding any provision of the applicable National Insurance Policy or other documents related to the National Insured Bonds.  For the avoidance of doubt, notwithstanding such acceleration, there shall be no acceleration of any payment required to be made under any National Insurance Policy unless National elects, in its sole and absolute discretion, to make such payment(s) on an accelerated basis.

### 4.    Assignment of Redemption Rights

Notwithstanding any other provision of the Plan, to the extent permitted pursuant to applicable definitive documents and not inconsistent with the rights provided in accordance with the applicable National Insurance Policy, on the Effective Date, PREPA shall be deemed to have assigned to National any and all rights to redeem and call the National Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by National as if it were PREPA for such purpose.  Any amounts due in connection with any such redemption shall be equal to the lesser of the applicable redemption price and the National Acceleration Price.

### 5.    Entitlement to Vote

Subject to the terms and provisions of the Disclosure Statement Order, (a) the solicitation of acceptances and rejections to the Plan by Holders of National Insured Bond Claims shall be made by the Oversight Board to National in accordance with the provisions of Section 301(c)(3) of PROMESA, applicable law and governing documents, and (b) the election to choose between the National Commutation Treatment as set forth in Article XX.A of the Plan and the National Non-Commutation Treatment as set forth in Article XX.B of the Plan shall be made by the beneficial Holders of the applicable National Insured Bonds on the applicable National Bondholder Election Form; *provided*, *however*, that the form of the National Non-Commutation Treatment shall be selected by National in accordance with Article XX.B of the Plan.

6.      **Improper Election**

If a Holder of an Allowed National Insured Bond Claim (1) fails to timely and validly elect the National Non-Commutation Treatment pursuant to Article XX.B of the Plan, or (2) submits an election for less than all of its National Insured Bond Claims in a particular class (in which case, such election shall be void and of no force or effect), such Holder shall be deemed to have elected to receive the National Commutation Treatment set forth in Article XX.A of the Plan with respect to such National Insured Bond Claims, to commute the applicable National Insurance Policies, to release and discharge National's obligations under such National Insurance Policies, and to receive distributions in accordance with Article XX.A of the Plan.  In addition, the National Insured Bonds of a Holder of an Allowed National Insured Bond Claim that does not validly elect to receive the National Non-Commutation Treatment pursuant to clauses (1) or (2) above shall be deemed cancelled on the Effective Date, and National's obligations under the applicable National Insurance Policies shall be fully and finally satisfied, released, and discharged.

H.      **Treatment of Executory Contracts and Unexpired Leases**

1.      **Rejection or Assumption of Executory Contracts and Unexpired Leases**

Pursuant to Bankruptcy Code section 365(b)(2) and subject to the provisions of Article XXI.F and Article XXI.H of the Plan, all Executory Contracts and Unexpired Leases that exist between the Debtor and any Entity, and which have not expired by their own terms on or prior to the Confirmation Date, shall be deemed rejected by the Debtor as of the Effective Date, except for any Executory Contract or Unexpired Lease (a) that has been assumed, assumed and assigned, or rejected pursuant to an order of the Title III Court entered prior to the Effective Date, (b) that is specifically designated as a contract or lease to be assumed or assumed and assigned on the Schedule of Assumed Contracts and Leases to the Plan Supplement, (c) that has been registered with the Office of the Comptroller of Puerto Rico or has been approved by the Oversight Board or authorized by the Title III Court, (d) with the United States, or any of its agencies, departments, or agents pursuant to any federal program, (e) by or between any Commonwealth agencies, departments, municipalities, public corporations, or instrumentalities, unless specifically designated a contract to be rejected in the Plan Supplement, or (f) that contains any easement, license, or permit in favor of PREPA or Reorganized PREPA or necessary to PREPA's or Reorganized PREPA's operations or assets; *provided*, *however*, that the Debtor reserves the right, on or prior to the Effective Date, to amend such schedules to delete any Executory Contract and Unexpired Lease therefrom or add any Executory Contract and Unexpired Lease thereto, in which event such Executory Contract(s) and Unexpired Lease(s) shall be deemed to be, as the case may be, either rejected, assumed, or assumed and assigned as of the Effective Date.  The Debtor shall serve (y) notice of any Executory Contract and Unexpired Lease to be assumed or assumed and assigned through the operation of Article XXI.A of the Plan, by including a schedule of such contracts and leases in the Plan Supplement and (z) notice of any Executory Contract and Unexpired Lease to be rejected through the operation of Article XXI.A of the Plan, by serving a separate notice to the relevant counterparties to such agreements.  To the extent there are any amendments to such schedules, the Debtor shall provide notice of any such amendments to the parties to the Executory Contract and Unexpired Lease affected thereby.  The listing of a document on the schedules to the Plan Supplement or in any separate notice shall not constitute an admission

285

by the Debtor that such document is an Executory Contract and Unexpired Lease or that the Debtor has any liability thereunder.

Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by PREPA during the Title III Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by PREPA during the Title III Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

2.    **Approval of Rejection or Assumption of Executory Contracts and Unexpired Leases**

Entry of the Confirmation Order by the Title III Court shall constitute approval, pursuant to Bankruptcy Code sections 365(a) and 1123(b)(2), of the rejection, assumption, or assumption and assignment, as the case may be, of an Executory Contract and an Unexpired Lease pursuant to Article XXI.A of the Plan.

3.    **Inclusiveness**

Unless otherwise specified on the schedules to the Plan Supplement, each Executory Contract and Unexpired Lease listed or to be listed therein shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such Executory Contract and Unexpired Lease, without regard to whether such agreement, instrument, or other document is listed on such schedule.

4.    **Cure of Defaults and Objections to Cure and Assumption**

Except to the extent that different treatment has been agreed to by the non-Debtor party or parties to any Executory Contract and Unexpired Lease to be assumed or assumed and assigned pursuant to Article XXI.A of the Plan, the Debtor shall, pursuant to the provisions of Bankruptcy Code section 1123(a)(5)(G) and 1123(b)(2) and consistent with the requirements of Bankruptcy Code section 365, within at least twenty (20) days prior to the Confirmation Hearing, file with the Title III Court and serve by first class mail on each non-Debtor party to such Executory Contracts

and Unexpired Leases to be assumed pursuant to Article XXI.A of the Plan, a notice, which shall list the cure amount as to each Executory Contract or Unexpired Lease to be assumed or assumed and assigned.  The parties to such Executory Contracts and Unexpired Leases will have twenty (20) days from the date of service of such notice to file and serve any objection to the cure amounts listed by the Debtor.  If there are any objections filed, the Title III Court shall hold a hearing on a date to be set by the Title III Court.  **Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or assumption and assignment of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption or assumption and assignment.**  Notwithstanding the terms and provisions of Article XXI.A of the Plan, the Debtor shall retain its rights to reject any of its Executory Contracts and Unexpired Leases that are subject to a dispute concerning amounts necessary to cure any defaults through the Effective Date.

Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by PREPA of the Cure Claim; *provided*, *however*, that nothing herein shall prevent PREPA from paying any Cure Claim despite the failure of the relevant counterparty to file such request for payment of such Cure Claim.  PREPA also may settle any Cure Claim without any further notice to or action, order, or approval of the Title III Court.  If there is any dispute regarding any Cure Claim, the ability of PREPA or any assignee to provide "adequate assurance of future performance" within the meaning of Bankruptcy Code section 365, or any other matter pertaining to assumption, then payment of such Cure Claim shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by PREPA and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cure Claims, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim (but, for the avoidance of doubt, not including Cure Claims) based upon Executory Contracts or Unexpired Leases that have been assumed in the Title III Case, including pursuant to the Confirmation Order, shall be deemed Disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Title III Court.**

5.      **Contracts and Leases Entered Into After the Petition Date**

Contracts, leases, and other agreements entered into after the Petition Date by PREPA and any Executory Contracts and Unexpired Leases assumed by PREPA may be performed by PREPA in the ordinary course of its operations.

6.      **Insurance Policies**

Subject to the terms and provisions of Article XXI.H of the Plan, each of the Debtor's Insurance Policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan and shall be assumed as of the Effective Date; *provided*,

*however*, that such treatment shall not, and shall not be construed to, discharge, or relieve any Monoline Insurer with respect to its respective obligations to Holders of Claims under policies of insurance and applicable law and governing documents with respect thereto, as applicable, under the Plan.

### 7. Rejection Damage Claims

If the rejection of an Executory Contract and Unexpired Lease by the Debtor hereunder results in damages to the other party or parties to such contract or lease, any Claim for such damages, if not heretofore evidenced by a filed Proof of Claim, shall be forever barred and shall not be enforceable against the Debtor, or its properties or agents, successors, or assigns, including, without limitation, the Reorganized Debtor, unless a Proof of Claim is filed with the Title III Court and served upon attorneys for the Oversight Board and Reorganized Debtor, as the case may be, on or before thirty (30) days after the later to occur of (i) the Confirmation Date, and (ii) the date of entry of an order by the Title III Court authorizing rejection of a particular Executory Contract and Unexpired Lease.

### 8. Indemnification and Reimbursement Obligations

For purposes of the Plan, (i) to the extent executory in nature, the obligations of the Debtor, including, without limitation, directors and officers Insurance Policies, to indemnify and reimburse its directors or officers that were directors or officers, respectively, on or prior to the Petition Date, as the case may be, shall be deemed assumed as of the Effective Date, and (ii) indemnification obligations of the Debtor arising from conduct of officers and directors during the period from and after the Petition Date, as the case may be, shall be Administrative Expense Claims; *provided*, *however*, that, under no circumstances shall the Debtor or the Reorganized Debtor, as the case may be, be responsible for any indemnification obligation, cost, or expense associated with the gross negligence, intentional fraud, or willful misconduct of their respective officers or directors.

### 9. Nonoccurrence of Effective Date

If the Effective Date does not occur, the Title III Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Executory Contracts and Unexpired Leases pursuant to Bankruptcy Code section 365(d)(4), unless such deadline(s) have expired.

### 10. Reservation of Rights

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtor, Reorganized Debtor, or any other party that any such contract or lease is in fact an Executory Contract and Unexpired Lease or that the Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtor or Reorganized Debtor shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

I.  **GUC Trust**

1.  **Execution of GUC Trust Deed of Trust**

On or before the Effective Date, PREPA and the GUC Trustee shall execute the GUC Trust Deed of Trust, and shall take all other necessary steps to establish the GUC Trust and the GUC Trust Interests therein, which shall be for the benefit of the GUC Trust Beneficiaries, whether their Claims are Allowed before, on, or after the Effective Date.  The GUC Trust Deed of Trust may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities do not affect the status of the GUC Trust as a "liquidating trust" for United States federal income tax purposes.

2.  **Purpose of the GUC Trust**

The GUC Trust shall be established for the sole purpose of receiving and distributing the GUC Trust Assets in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the GUC Trust.

3.  **GUC Trust Assets**

The GUC Trust shall consist of the GUC Trust Assets.  On the Effective Date, PREPA shall transfer all the GUC Trust Assets to the GUC Trust.  The GUC Trust Assets may be transferred subject to certain liabilities, as provided in the Plan or the GUC Trust Deed of Trust. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar Tax, pursuant to section 1146(a) of the Bankruptcy Code.  Upon delivery of the GUC Trust Assets to the GUC Trust, PREPA and its predecessors, successors and assigns, and each other Entity released pursuant to Article XXVII of the Plan shall be discharged and released from all liability with respect to the delivery of such distributions.

4.  **Administration of the GUC Trust**

The GUC Trust shall be administered by the GUC Trustee according to the GUC Trust Deed of Trust and the Plan.  In the event of any inconsistency between the Plan and the GUC Trust Deed of Trust, the GUC Trust Deed of Trust shall govern.

5.  **The GUC Trustee**

If the GUC Trustee dies, becomes incapacitated, is terminated, or resigns for any reason, the GUC Trust Board shall designate a successor; *provided*, *however*, that under no circumstance shall the GUC Trustee be a director or officer with respect to any Affiliate of the GUC Trust.

6.  **Role of the GUC Trustee**

In furtherance of and consistent with the purpose of the GUC Trust and the Plan, and subject to the terms of the Confirmation Order, the Plan, and the GUC Trust Deed of Trust, and the oversight of the GUC Trust Board, the GUC Trustee shall, among other things, have the following rights, powers, and duties: (i) to hold the GUC Trust Assets for the benefit of the GUC

289

Trust Beneficiaries, whether their Claims are Allowed on or after the Effective Date; (ii) to prepare and file (or cause to be prepared and filed), from and after the Effective Date, all tax and regulatory forms, returns, reports, and other documents required, or that the GUC Trustee otherwise deems appropriate with respect to the GUC Trust; (iii) to hold, manage, and timely distribute Cash obtained through the exercise of its power and authority to the GUC Trust Beneficiaries; and (iv) to not unduly prolong the duration of the GUC Trust.  In all circumstances, the GUC Trustee shall act in the best interests of all GUC Trust Beneficiaries and in furtherance of the purpose of the GUC Trust.  The GUC Trustee shall be obligated to provide prompt written responses to the Oversight Board's questions, from time to time, about the GUC Trust's progress in administering its Assets and distributions and its finances.

### 7.    GUC Trustee's Tax Power for Reorganized PREPA

From and after the Effective Date, the GUC Trustee shall prepare and file (or cause to be prepared and filed), on behalf of Reorganized PREPA, all tax returns or other tax information statements required to be filed with respect to the GUC Trust or that the GUC Trustee otherwise deems appropriate.

### 8.    Transferability of GUC Trust Interests

The GUC Trust Interests shall not be transferable or assignable except by will, intestate succession, or operation of law.

### 9.    Cash

The GUC Trustee may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code; *provided*, *however*, that such investments are investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

### 10.    Distribution of GUC Trust Assets

The GUC Trustee shall make distributions to Holders of Claims in the Unsecured Claims Pool in accordance with Article XXIV of the Plan.

### 11.    Funding, Costs, and Expenses of the GUC Trust

On or prior to the Effective Date, PREPA shall fund the GUC Trust on a one-time basis in an amount of one million dollars ($1,000,000).  The reasonable costs and expenses of the GUC Trust, including the fees and expenses of the GUC Trust and its retained professionals, shall be paid out of the GUC Trust Assets, including the fifty percent (50.0%) of the Holder of the Allowed Vitol Claim's Pro Rata Share of the General Unsecured Claim Recovery not distributed to the Holder of the Allowed Vitol Claim pursuant to Article XI of the Plan, which shall be retained by the GUC Trust.  The GUC Trustee shall be authorized to use proceeds of GUC Trust Assets to fund the GUC Trust, if necessary.

12.    **Compensation of the GUC Trustee**

The individual(s) serving as or comprising the GUC Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar roles, the payment of which shall not be subject to the approval of the Title III Court.

13.    **Retention of Professionals/Employees by the GUC Trustee**

Subject to the approval and consent of the GUC Trust Board, the GUC Trust may retain and compensate attorneys, other professionals, and employees to assist the GUC Trust Board on such terms as the GUC Trustee deems appropriate without Title III Court approval.

14.    **Federal Income Tax Treatment of the GUC Trust**

i.    **GUC Trust Assets Treated as Owned by Creditors**.  For all United States federal income tax purposes, all parties (including, without limitation, the Debtor, the GUC Trustee, and the GUC Trust Beneficiaries) shall treat the transfer of the GUC Trust Assets to the GUC Trust as (1) a transfer of the GUC Trust Assets (subject to any obligations relating to those Assets) directly to the GUC Trust Beneficiaries, followed by (2) the transfer by such beneficiaries to the GUC Trust of the GUC Trust Assets in exchange for GUC Trust Interests.  Accordingly, the GUC Trust Beneficiaries shall be treated for United States federal income tax purposes as the deemed grantors and owners of their respective share of the GUC Trust Assets.  The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

ii.    **Tax Reporting.**

a.    **The GUC Trustee shall prepare and file (or cause to be prepared and filed) tax returns for the GUC Trust treating the GUC Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with Article XXII.N of the Plan.  The GUC Trustee also will annually send to each Holder of a GUC Trust Interest a separate statement regarding the receipts and expenditures of the GUC Trust as relevant for U.S. federal income tax purposes and will instruct all such Holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such Holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.  The GUC Trustee shall also file (or cause to be filed) any other statement, return, or disclosure relating**

291

to the GUC Trust that is required by any Governmental Unit.

b.    The GUC Trustee shall then in good faith value all other GUC Trust Assets, and shall make all such values available from time to time, to the extent relevant, and such values shall be used consistently by all parties to the GUC Trust (including, without limitation, the Debtor, the GUC Trustee, and GUC Trust Beneficiaries) for all United States federal income tax purposes.

c.    Allocations of GUC Trust taxable income among the GUC Trust Beneficiaries shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the GUC Trust had distributed all its assets to the holders of the GUC Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the GUC Trust. Similarly, taxable loss of the GUC Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining GUC Trust Assets. The tax book value of the GUC Trust Assets for purpose of this paragraph shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the IRC, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

d.    Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the GUC Trustee of a private letter ruling if the GUC Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the GUC Trustee), the GUC Trustee shall (A) timely elect to treat any reserve for the GUC Trust Assets as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including the GUC Trustee and the GUC Trust Beneficiaries) shall report for United States federal, state, and local income tax purposes consistently with the foregoing.

e.     **The GUC Trustee shall be responsible for payment, out of the GUC Trust Assets, of any taxes imposed on the trust or its Assets. In the event, and to the extent, any Cash retained on account of Disputed Claims insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such taxes may be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (ii) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts otherwise distributable by the GUC Trustee as a result of the resolution of such Disputed Claims.**

iii.     **Tax Withholdings by GUC Trustee.** The GUC Trustee may withhold and pay to the appropriate tax authority all amounts required to be withheld pursuant to the IRC or any provision of any foreign, state, or local tax law with respect to any payment or distribution to the holders of GUC Trust Interests. All such amounts withheld and paid to the appropriate tax authority (or placed in escrow pending resolution of the need to withhold) shall be treated as amounts distributed to such holders of GUC Trust Interests for all purposes of the GUC Trust Deed of Trust, and it being understood that any such amount withheld shall reduce the amount actually realized by the applicable holder upon distribution. The GUC Trustee shall be authorized to collect such tax information from the holders of GUC Trust Interests (including, without limitation, social security numbers or other tax identification numbers) as in its sole discretion the GUC Trustee deems necessary to effectuate the Plan, the Confirmation Order, and the GUC Trust Deed of Trust. In order to receive distributions under the Plan, all holders of GUC Trust Interests shall be required to identify themselves to the GUC Trustee and provide tax information and the specifics of their holdings, to the extent the GUC Trustee deems appropriate in the manner and in accordance with the procedures from time to time established by the GUC Trustee for these purposes. This identification requirement generally applies to all holders of GUC Trust Interests, including those who hold their securities in street name. The GUC Trustee may refuse to make a distribution to any holder of a GUC Trust Interest that fails to furnish such information in a timely fashion, and until such information is delivered, and may treat such holder's GUC Trust Interests as disputed; provided, however, that, if such information is not furnished to the GUC Trustee within six (6) months of the original request to furnish such information, no further distributions shall be made to the holder of such GUC Trust Interest; and, provided, further, that, upon the delivery of such information by a holder of a GUC Trust Interest, the GUC Trustee shall make such distribution to which the holder of the GUC Trust Interest is entitled, without additional interest occasioned by such

holder's delay in providing tax information; and, provided, further, that, if the GUC Trustee fails to withhold in respect of amounts received or distributable with respect to any such holder and the GUC Trustee is later held liable for the amount of such withholding, such holder shall reimburse the GUC Trustee for such liability (to the extent such amounts were actually distributed to such holder).

### 15. Dissolution of GUC Trust

The GUC Trustee and the GUC Trust shall be discharged or dissolved, as the case may be, upon the earlier to occur of (i) all of the GUC Trust Assets have been distributed pursuant to the Plan and the GUC Trust Deed of Trust, and (ii) all distributions required to be made by the GUC Trustee under the Plan and the GUC Trust Deed of Trust have been made.  Upon the dissolution of the GUC Trust, all remaining GUC Trust Assets, if any, shall revert to PREPA.

### 16. Indemnification of GUC Trustee and Members of GUC Trust Board

The GUC Trustee or the individual(s) comprising the GUC Trustee, as the case may be, the GUC Trust Board, the members of the GUC Trust Board and their respective employees, agents, and professionals, shall not be liable to the GUC Trust Beneficiaries for actions taken or omitted in their capacity as, or on behalf of, the GUC Trustee or the GUC Trust Board, as applicable, except those acts arising out of their own willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement by the GUC Trust for fees and expenses in defending any and all actions or inactions in their capacity as, or on behalf of, the GUC Trustee or the GUC Trust Board, as applicable, except for any actions or inactions involving willful misconduct or gross negligence.  Any indemnification claim of the GUC Trustee, the GUC Trust Board, the members of the GUC Trust Board, and the other parties entitled to indemnification under this subsection shall be satisfied solely from the GUC Trust Assets and shall be entitled to a priority distribution therefrom, ahead of the GUC Trust Interests and any other claim to or interest in such assets.  The GUC Trustee, the GUC Trust Board, and the members of the GUC Trust Board shall be entitled to rely, in good faith, on the advice of their retained professionals.

### J. Avoidance Action Trust

### 1. Execution of Avoidance Actions Trust Agreement

On or before the Effective Date, PREPA and the Avoidance Actions Trustee shall execute the Avoidance Actions Trust Agreement, and shall take all other necessary steps to establish the Avoidance Actions Trust and the Avoidance Actions Trust Interests therein, which shall be for the benefit of the Avoidance Actions Trust Beneficiaries, whether their Claims are Allowed before, on, or after the Effective Date.  The Avoidance Actions Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities do not affect the status of the Avoidance Actions Trust as a "liquidating trust" for United States federal income tax purposes.

294

2.      **Purpose of the Avoidance Actions Trust**

The Avoidance Actions Trust shall be established for the sole purpose of prosecuting the Avoidance Actions and distributing its assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Avoidance Actions Trust.

3.      **Avoidance Actions Trust Assets**

The Avoidance Actions Trust shall consist of the Avoidance Actions Trust Assets.  On the Effective Date, PREPA shall transfer all of the Avoidance Actions Trust Assets to the Avoidance Actions Trust.  The Avoidance Actions Trust Assets may be transferred subject to certain liabilities, as provided in the Plan or the Avoidance Actions Trust Agreement.  Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar Tax, pursuant to section 1146(a) of the Bankruptcy Code.  Upon delivery of the Avoidance Actions Trust Assets to the Avoidance Actions Trust, PREPA and its predecessors, successors and assigns, and each other Entity released pursuant to Article XXVII of the Plan shall be discharged and released from all liability with respect to the delivery of such distributions.

4.      **Administration of the Avoidance Actions Trust**

The Avoidance Actions Trust shall be administered by the Avoidance Actions Trustee according to the Avoidance Actions Trust Agreement and the Plan.  In the event of any inconsistency between the Plan and the Avoidance Actions Trust Agreement, the Avoidance Actions Trust Agreement shall govern.

5.      **The Avoidance Actions Trustee**

If the Avoidance Actions Trustee dies, becomes incapacitated, is terminated, or resigns for any reason, the Avoidance Actions Trust Board shall designate a successor; *provided*, *however*, that under no circumstance shall the Avoidance Actions Trustee be a director or officer with respect to any Affiliate of the Avoidance Actions Trust.

6.      **Role of the Avoidance Actions Trustee**

In furtherance of and consistent with the purpose of the Avoidance Actions Trust and the Plan, and subject to the terms of the Confirmation Order, the Plan and the Avoidance Actions Trust Agreement, and the oversight of the Avoidance Actions Trust Board, the Avoidance Actions Trustee shall, among other things, have the following rights, powers, and duties: (i) to hold, manage, convert to Cash, and timely distribute the Avoidance Actions Trust Assets to the GUC Trust, including prosecuting and resolving the Claims belonging to the Avoidance Actions Trust; (ii) to hold the Avoidance Actions Trust Assets for the benefit of the Avoidance Actions Trust Beneficiaries, whether their Claims are Allowed on or after the Effective Date; (iii) in the Avoidance Actions Trustee's reasonable business judgment, to investigate, prosecute, settle and/or abandon rights, Causes of Action, or litigation of the Avoidance Actions Trust; (iv) to prepare and file (or cause to be prepared and filed), from and after the Effective Date, all tax and regulatory forms, returns, reports, and other documents required, or that the Avoidance actions Trustee

295

otherwise deems appropriate with respect to the Avoidance Actions Trust; (v) in the Avoidance Actions Trustee's reasonable business judgment, to control, prosecute, and/or settle on behalf of the Avoidance Actions Trust, objections to Claims on account of which the Avoidance Actions Trustee will be responsible; (vi) to hold, manage, and timely distribute Cash or non-Cash Avoidance Actions Trust Assets obtained through the exercise of its power and authority to the GUC Trustee; and (vii) to not unduly prolong the duration of the Avoidance Actions Trust.  In all circumstances, the Avoidance Actions Trustee shall act in the best interests of all Avoidance Actions Trust Beneficiaries and in furtherance of the purpose of the Avoidance Actions Trust.  The Avoidance Action Trustee shall be obligated to provide prompt written responses to the Oversight Board's questions, from time to time, about the Avoidance Action Trust's progress in administering its assets and distributions and its finances.

### 7.        Avoidance Actions Trustee's Tax Power for Reorganized PREPA

From and after the Effective Date, the Avoidance Actions Trustee shall prepare and file (or cause to be prepared and filed), on behalf of Reorganized PREPA, all tax returns or other tax information statements required to be filed with respect to the Avoidance Actions Trust or that the Avoidance Actions Trustee otherwise deems appropriate.

### 8.        Transferability of Avoidance Actions Trust Interests

The Avoidance Actions Trust Interests shall not be transferable or assignable except by will, intestate succession, or operation of law

### 9.        Cash

The Avoidance Actions Trustee may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code; *provided*, *however*, that such investments are investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

### 10.        Distribution of Avoidance Actions Trust Assets

The Avoidance Actions Trustee shall distribute to the GUC Trust, on a monthly basis, all unrestricted Cash on hand (including any Cash received from PREPA on the Effective Date), except (i) Cash reserved pursuant to the Avoidance Actions Trust Agreement to fund the activities of the Avoidance Actions Trust, (ii) such amounts as are allocable to or retained to pay reasonable incurred or anticipated expenses (including, but not limited to, any taxes imposed on or payable by the Avoidance Actions Trust in respect of the Avoidance Actions Trust Assets); *provided*, *however*, that the Avoidance Actions Trustee shall not be required to make a distribution pursuant to Article XXIII.J of the Plan if the aggregate, net amount of unrestricted Cash available for distribution (taking into account the above listed exclusions) is such that it would make the distribution impracticable as reasonably determined by the Avoidance Actions Trustee, with the consent of the Avoidance Actions Trust Board, in accordance with applicable law, and so long as such aggregate amount is less than one million dollars ($1,000,000).

11.     **Funding, Costs, and Expenses of the Avoidance Actions Trust**

On the Effective Date, the Avoidance Actions Trust shall be funded on a one-time basis in an amount of one million dollars ($1,000,000). The reasonable costs and expenses of the Avoidance Actions Trust, including the fees and expenses of the Avoidance Actions Trustee and its retained professionals, shall be paid out of the Avoidance Actions Trust Assets. Fees and expenses incurred in connection with the prosecution and settlement of any Avoidance Actions shall be considered costs and expenses of the Avoidance Actions Trust. The Avoidance Action Trustee shall be authorized to use proceeds of trust assets to fund the Avoidance Action Trust, if necessary.

12.     **Compensation of the Avoidance Actions Trustee**

The individual(s) serving as or comprising the Avoidance Actions Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar roles, the payment of which shall not be subject to the approval of the Title III Court.

13.     **Retention of Professionals/Employees by the Avoidance Actions Trustee**

Subject to the approval and consent of the Avoidance Actions Trust Board, the Avoidance Actions Trust may retain and compensate attorneys, other professionals, and employees to assist the Avoidance Actions Trust Board on such terms as the Avoidance Actions Trustee deems appropriate without Title III Court approval.

14.     **Federal Income Tax Treatment of the Avoidance Actions Trust**

   i.     **Avoidance Actions Trust Assets Treated as Owned by Creditors.** For all United States federal income tax purposes, all parties (including, without limitation, the Debtor, the Avoidance Actions Trustee, and the Avoidance Actions Trust Beneficiaries) shall treat the transfer of the Avoidance Actions Trust Assets to the Avoidance Actions Trust as (1) a transfer of the Avoidance Actions Trust Assets (subject to any obligations relating to those Assets) directly to the Avoidance Actions Trust Beneficiaries, followed by (2) the transfer by such beneficiaries to the Avoidance Actions Trust of the Avoidance Actions Trust Assets in exchange for Avoidance Actions Trust Interests. Accordingly, the Avoidance Actions Trust Beneficiaries shall be treated for United States federal income tax purposes as the deemed grantors and owners of their respective share of the Avoidance Actions Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

   ii.     **Tax Reporting.**

      a.     **The Avoidance Actions Trustee shall prepare and file (or cause to be prepared and filed) tax returns for the**

297

**Avoidance Actions Trust treating the Avoidance Actions Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with Article XXIII.N of the Plan.  The Avoidance Actions Trustee also will annually send to each holder of an Avoidance Actions Trust Interest a separate statement regarding the receipts and expenditures of the Avoidance Actions Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such Holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.  The Avoidance Actions Trustee shall also file (or cause to be filed) any other statement, return, or disclosure relating to the Avoidance Actions Trust that is required by any Governmental Unit.**

b.  **The Avoidance Actions Trustee will then in good faith value all other Avoidance Actions Trust Assets, and shall make all such values available from time to time, to the extent relevant, and such values shall be used consistently by all parties to the Avoidance Actions Trust (including, without limitation, the Debtor, the Avoidance Actions Trustee, and Avoidance Actions Trust Beneficiaries) for all United States federal income tax purposes.**

c.  **Allocations of Avoidance Actions Trust taxable income among the Avoidance Actions Trust Beneficiaries shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Avoidance Actions Trust had distributed all its assets to the holders of the Avoidance Actions Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Avoidance Actions Trust.  Similarly, taxable loss of the Avoidance Actions Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Avoidance Actions Trust Assets.  The tax book value of the Avoidance Actions Trust Assets for purpose of this paragraph shall equal their fair market value on the Effective Date, adjusted in accordance with**

298

tax accounting principles prescribed by the IRC, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

d.       Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Avoidance Actions Trustee of a private letter ruling if the Avoidance Actions Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Avoidance Actions Trustee), the Avoidance Actions Trustee shall (A) timely elect to treat any reserve for the Avoidance Actions Trust Assets as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  All parties (including the Avoidance Actions Trustee and the Avoidance Actions Trust Beneficiaries) shall report for United States federal, state, and local income tax purposes consistently with the foregoing.

e.       The Avoidance Actions Trustee shall be responsible for payment, out of the Avoidance Actions Trust Assets, of any taxes imposed on the trust or its assets.  In the event, and to the extent, any Cash retained on account of Disputed Claims insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such taxes may be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (ii) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts otherwise distributable by the Avoidance Actions Trustee as a result of the resolution of such Disputed Claims.

iii.    **Tax Withholdings by Avoidance Actions Trustee.**    The Avoidance Actions Trustee may withhold and pay to the appropriate tax authority all amounts required to be withheld pursuant to the IRC or any provision of any foreign, state, or local tax law with respect to any payment or distribution to the holders of Avoidance Actions Trust Interests.    All such amounts withheld and paid to the appropriate tax authority (or placed in escrow pending resolution of the need to withhold) shall be treated as amounts distributed to such holders of Avoidance Actions Trust Interests for all purposes of the Avoidance Actions Trust Agreement, and it being understood that

299

any such amount withheld shall reduce the amount actually realized by the applicable holder upon distribution.  The Avoidance Actions Trustee shall be authorized to collect such tax information from the holders of Avoidance Actions Trust Interests (including, without limitation, social security numbers or other tax identification numbers) as in its sole discretion the Avoidance Actions Trustee deems necessary to effectuate the Plan, the Confirmation Order, and the Avoidance Actions Trust Agreement.  In order to receive distributions under the Plan, all holders of Avoidance Actions Trust Interests shall be required to identify themselves to the Avoidance Actions Trustee and provide tax information and the specifics of their holdings, to the extent the Avoidance Actions Trustee deems appropriate in the manner and in accordance with the procedures from time to time established by the Avoidance Actions Trustee for these purposes.  This identification requirement generally applies to all holders of Avoidance Actions Trust Interests, including those who hold their securities in street name.  The Avoidance Actions Trustee may refuse to make a distribution to any holder of a Avoidance Actions Trust Interest that fails to furnish such information in a timely fashion, and until such information is delivered, and may treat such holder's Avoidance Actions Trust Interests as disputed; provided, however, that, if such information is not furnished to the Avoidance Actions Trustee within six (6) months of the original request to furnish such information, no further distributions shall be made to the holder of such Avoidance Actions Trust Interest; and, provided, further, that, upon the delivery of such information by a holder of a Avoidance Actions Trust Interest, the Avoidance Actions Trustee shall make such distribution to which the holder of the Avoidance Actions Trust Interest is entitled, without additional interest occasioned by such holder's delay in providing tax information; and, provided, further, that, if the Avoidance Actions Trustee fails to withhold in respect of amounts received or distributable with respect to any such holder and the Avoidance Actions Trustee is later held liable for the amount of such withholding, such holder shall reimburse the Avoidance Actions Trustee for such liability (to the extent such amounts were actually distributed to such holder).

15. **Dissolution of Avoidance Action Trust**

The Avoidance Actions Trustee and the Avoidance Actions Trust shall be discharged or dissolved, as the case may be, upon the earlier to occur of (i) all of the Avoidance Actions Trust Assets have been distributed pursuant to the Plan and the Avoidance Actions Trust Agreement, (ii) the Avoidance Actions Trustee determines, with the consent of the Avoidance Actions Trust Board, that the administration of any remaining Avoidance Actions Trust Assets is not likely to yield sufficient additional Avoidance Actions Trust proceeds to justify further pursuit, including because the expense of administering the Avoidance Actions Trust so as to make a final

300

distribution to its beneficiaries is likely to exceed the value of the Assets remaining in the Avoidance Actions Trust, and (iii) all distributions required to be made by the Avoidance Actions Trustee under the Plan and the Avoidance Actions Trust Agreement have been made.  Upon the dissolution of the Avoidance Actions Trust, all remaining Avoidance Action Trust Assets, if any, shall be transferred to the GUC Trust.

16.  **Indemnification of Avoidance Actions Trustee and Members of Avoidance Actions Trust Bond**

The Avoidance Actions Trustee or the individual(s) comprising the Avoidance Actions Trustee, as the case may be, the Avoidance Actions Trust Board, the members of the Avoidance Actions Trust Board and their respective employees, agents, and professionals, shall not be liable to the Avoidance Actions Trust Beneficiaries for actions taken or omitted in their capacity as, or on behalf of, the Avoidance Actions Trustee or the Avoidance Actions Trust Board, as applicable, except those acts arising out of their own willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement by the Avoidance Actions Trust for fees and expenses in defending any and all actions or inactions in their capacity as, or on behalf of, the Avoidance Actions Trustee or the Avoidance Actions Trust Board, as applicable, except for any actions or inactions involving willful misconduct or gross negligence.  Any indemnification claim of the Avoidance Actions Trustee, the Avoidance Actions Trust Board, the members of the Avoidance Actions Trust Board, and the other parties entitled to indemnification under this subsection shall be satisfied solely from the Avoidance Actions Trust Assets and shall be entitled to a priority distribution therefrom, ahead of the Avoidance Actions Trust Interests and any other claim to or interest in such assets.  The Avoidance Actions Trustee, the Avoidance Actions Trust Board, and the members of the Avoidance Actions Trust Board shall be entitled to rely, in good faith, on the advice of their retained professionals.

K.  **Provisions Governing Distributions**

1.  **Appointment of Distribution Agent**

PREPA, Reorganized PREPA, the GUC Trustee, and/or the Solicitation Agent shall act as Distribution Agent or may employ or contract with other Entities, to act as the Distribution Agent or to assist in or make the distributions required by the Plan.  Any Distribution Agent appointed by PREPA or the GUC Trustee shall serve without bond.  Other than as specifically set forth in the Plan, the Distribution Agent shall make all distributions required to be made under the Plan.  Except as otherwise provided herein, all distributions under the Plan shall be made by the Distribution Agent.

2.  **Distributions on Account of Claims Allowed as of the Effective Date**

Except as otherwise provided herein, a Final Order, or as otherwise agreed to by PREPA and the Holder of the applicable Claim, on the first Distribution Date, the Distribution Agent shall make initial distributions under the Plan on account of Claims Allowed on the Effective Date or as soon as practicable thereafter, subject to PREPA's and Reorganized PREPA's right to object to Claims; *provided*, *however*, that Allowed Administrative Expense Claims with respect to liabilities incurred by PREPA in the ordinary course of its operations during the Title III Case or assumed

301

by PREPA prior to the Effective Date shall be paid or performed in the ordinary course of its operations in accordance with the terms and conditions of any controlling agreements, course of dealing, course of operations, or industry practice; *provided*, *further*, that the Distribution Agent may make distributions of Fuel Line Lender PSA Creditor Fees to a party entitled thereto in a manner mutually agreed upon between such party and the Distribution Agent and to the extent the Fuel Line Lender PSA Creditor Fees shall be payable in Cash, such Fuel Line Lender PSA Creditor Fees will be paid no later than ten (10) Business Days following the Effective Date; *provided*, further, that the Oversight Board will use reasonable efforts to distribute New Bonds through The Depository Trust Company.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date. Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim.

3. **Rights and Powers of Distribution Agent**

i. **Powers of the Distribution Agent**

Except as may be provided otherwise hereunder, the Distribution Agent shall be empowered to (a) take all steps and execute all instruments and documents necessary to effectuate the Plan, (b) make distributions contemplated by the Plan, (c) comply with the Plan and the obligations thereunder, and (d) exercise such other powers as may be vested in the Distribution Agent pursuant to order of the Title III Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions of the Plan.

ii. **Fees and Expenses Incurred On and After the Effective Date**

Except as otherwise ordered by the Title III Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on and after the Effective Date and any reasonable compensation and expense reimbursement claims, including, without limitation, reasonable fees and expenses of counsel, incurred by the Distribution Agent, shall be paid in Cash without further order of the Title III Court.

4. **Special Rules for Distributions to Holders of Disputed Claims**

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties: (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order or the Claims have been Allowed or expunged.  Any dividends or other distributions arising from property distributed to Holders of Allowed Claims in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims in such Class.

302

At such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, Reorganized Debtor shall distribute to the Holder thereof the distributions, if any, to which such Holder is then entitled under the Plan, together with any earnings that have accrued thereon (net of any expenses, including any taxes, relating thereto), but only to the extent that such earnings are attributable to the amount of the Allowed Claim. Such distribution, if any, shall be made as soon as practicable after the date that the order or judgement of the Title III Court allowing such Disputed Claim becomes a Final Order.

### 5. Delivery of Distributions

#### i. Timeliness of Distributions

Any distribution to be made pursuant to the Plan shall be deemed to be timely made if made within ten (10) Business Days after the date specified in the Plan. Whenever any distribution to be made under the Plan shall be due on a day other than a Business Day, such distribution shall instead be made, without interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due.

#### ii. Record Date for Distributions

Subject to the provisions of Bankruptcy Rule 9010, and except as provided in the Confirmation Order or herein, distributions and deliveries to Holders of Allowed Claims shall be made through DTC or at the address of each such Holder as set forth on the Schedules filed with the Court, unless superseded by the address set forth on Proofs of Claim filed by such Holders, or at the last known address of such Holder if no Proof of Claim is filed or if the Debtor has been notified in writing of a change of address; *provided*, *however*, that initial distributions by the Distribution Agent for the benefit of Holders of Allowed PREPA Revenue Bond Claims shall be made to the Bond Trustee, as applicable, for such obligation in accordance with the respective governing documents for such obligations. Neither PREPA nor any Distribution Agent, including the GUC Trustee, will have any obligation to recognize the transfer of, or the sale of any participation in, any Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those Holders of Allowed Claims (including Holders of Claims that become Allowed after the Distribution Record Date) that are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date; *provided*, *however*, that the New Bonds will be transferable and transfers will be recognized if made in accordance with the terms and conditions of the New Master Indenture. PREPA and any Distribution Agent shall instead be entitled to recognize and deal for all purposes under the Plan with only those record Holders stated on the official Claims Register as of the close of business on the Distribution Record Date.

#### iii. Distribution Process

The Distribution Agent shall make all distributions required under the Plan, except that distributions to Holders of Allowed Claims governed by a separate agreement and administered by a Servicer shall be deposited with the appropriate Servicer, at which time such distributions shall be deemed complete, and the Servicer shall deliver such distributions in accordance with the Plan and the terms of the governing agreement. Except as otherwise provided herein, and

notwithstanding any authority to the contrary, distributions to Holders of Allowed Claims, including Claims that become Allowed after the Effective Date, shall be made to Holders of record as of the Effective Date by the Distribution Agent or a Servicer, as appropriate: (1) to the address of such Holder as set forth in the books and records of the Debtor (or if the Debtor has been notified in writing, on or before the date that is ten (10) days before the Effective Date, of a change of address, to the changed address); (2) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, if no address exists in the Debtor's books and records, no Proof of Claim has been filed and the Distribution Agent has not received a written notice of a change of address on or before the date that is ten (10) days before the Effective Date; or (3) on any counsel that has appeared in the Title III Case on the Holder's behalf.  The Debtor and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan.

iv.   **Foreign Currency Exchange Rate**

Except as otherwise provided in a Final Order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

v.   **De Minimis, Fractional, Undeliverable, and Unclaimed Distributions**

a.   De Minimis and Fractional Distributions.  **No distribution of (i) New Bonds shall be made by the Distribution Agent on account of an Allowed Claim if the amount to be distributed to the specific Holder of an Allowed Claim on the applicable Distribution Date has an economic value of less than $1,000.00 and (ii) Cash shall be made by the Distribution Agent on account of an Allowed Claim if the amount to be distributed to the specific Holder of an Allowed Claim on the applicable Distribution Date has an economic value of less than $100.00.  No fractional New Bonds shall be distributed.  Where a fractional portion of a New Bond otherwise would be called for under the Plan, the actual issuance shall reflect a rounding down to the nearest whole New Bond.**

b.   Undeliverable Distributions.  **If any distribution to any Holder is returned to the Distribution Agent as undeliverable, no further distribution shall be made to such Holder unless and until the Distribution Agent is notified, in writing, of such Holder's then-current address.  Subject to the terms and provision of Article XXIV.E.5(c) of the Plan, undeliverable distributions shall remain in the possession of the Distribution Agent until such time as a distribution becomes deliverable.  All**

**Entities ultimately receiving previously undeliverable Cash shall not be entitled to any interest or other accruals thereon of any kind. Nothing contained in the Plan shall require the Distribution Agent to attempt to locate any Holder of an Allowed Claim.**

c.   Reversion of Unclaimed Distributions. **If (i) a check is sent, by the Distribution Agent to a Holder in respect of distributions and such check is not negotiated within one hundred twenty (120) days following the date on which such check was issued, or (ii) any other form of distribution to a Holder is otherwise undeliverable or that has become an Unclaimed Distribution, the Distribution Agent (or its duly authorized agent) shall, on or prior to the date that is one hundred eighty (180) days from (i) the Effective Date, with respect to all Allowed Claims as of the Effective Date, and (ii) the date that a distribution is made with respect to any Disputed Claim that becomes an Allowed Claim subsequent to the Effective Date, file a list with the Title III Court setting forth the names of those Entities for which distributions have been made hereunder that have not been negotiated or have been returned as undeliverable as of the date thereof. Any Holder of an Allowed Claim on such list that does not identify itself and assert its rights pursuant to the Plan to receive a distribution within six (6) months from the date so listed shall have its entitlement to such undeliverable distribution discharged and shall be forever barred from asserting any entitlement pursuant to the Plan, against the Reorganized Debtor or the GUC Trustee, or their respective professionals, agents, or property, and any (1) Cash in the possession of the Distribution Agent or the trustee with respect to existing securities, as the case may be, shall be released to the Reorganized Debtor for use to discharge operating expenses of the Reorganized Debtor and (2) the New Bonds in the possession of the Distribution Agent with respect to existing securities, shall be released to the Reorganized Debtor for cancellation or deposit into the treasury of the Reorganized Debtor, as determined by Reorganized Debtor in its sole and absolute discretion.**

vi.   **Surrender of Cancelled Instruments**

As a condition to participation under the Plan, the Holder of a note, debenture or other evidence of indebtedness of PREPA that desires to receive the property to be distributed on account of an Allowed Claim based on such note, debenture, or other evidence of indebtedness shall

305

surrender such note, debenture, or other evidence of indebtedness to PREPA or its designee (unless such Holder's Claim will not be Impaired by the Plan, in which case such surrender shall not be required), and shall execute and deliver such other documents as are necessary to effectuate the Plan; *provided*, *however*, that, if a claimant is a Holder of a note, debenture, or other evidence of indebtedness for which no physical certificate was issued to the Holder but which instead is held in book-entry form pursuant to a global security hold by DTC or other securities depository or custodian thereof, there shall be no requirement of surrender.  In PREPA's sole discretion, if no surrender of a note, debenture, or other evidence of indebtedness occurs and the Holder of a Claim does not provide an affidavit and indemnification agreement, in form and substance reasonably satisfactory to PREPA, that such note, debenture, or other evidence of indebtedness was lost, then no distribution may be made to such Holder in respect of the Claim based on such note, debenture, or other evidence of indebtedness.

> ### vii. Cancellation of Notes, Instruments, Certificates, and Other Documents

Except (a) as provided in any contract, instrument, or other agreement or document entered into or delivered in connection with the Plan, (b) for purposes of evidencing a right to distribution under the Plan, or (c) as specifically provided otherwise in the Plan (including any rejection of Executory Contracts or Unexpired Leases pursuant to Article XXI.A of the Plan), on the Effective Date, the PREPA Revenue Bonds and Fuel Line Facilities and all instruments and documents related thereto will be deemed automatically cancelled, terminated, and of no further force or effect against the Debtor without any further act or action under any applicable agreement, law, regulation, order or rule, with the Debtor and the applicable trustee, paying agent, or fiscal agent, as the case may be, having no continuing obligations or duties and responsibilities thereunder and the obligations of the parties to the Debtor, as applicable, under the PREPA Revenue Bonds and Fuel Line Facilities and all instruments and documents related thereto shall be discharged; *provided*, *however*, that, notwithstanding anything contained herein to the contrary, the PREPA Revenue Bonds and Fuel Line Facilities and such other instruments and documents shall continue in effect solely (i) to allow the Distribution Agent to make any distributions as set forth in the Plan and to perform such other necessary administrative or other functions with respect thereto, (ii) to allow Holders of Allowed PREPA Revenue Bond Claims, Allowed National Claims, and Allowed Fuel Line Loan Claims to receive distributions in accordance with the terms and provisions of the Plan, (iii) for any trustee, agent, contract administrator, or similar entity under all instruments and documents related thereto, to perform necessary functions, including making distributions, in accordance with the Plan and to have the benefit of all the rights and protections and other provisions of such instruments and documents, as applicable, and all other related agreements, (iv) to set forth the terms and conditions applicable to parties to such documents and instruments other than the Debtor, or (v) as may be necessary to preserve any claims under the respective Insurance Policies and related documents issued by a Monoline Insurer.  Notwithstanding the foregoing, and except as otherwise expressly provided in the Plan, such bonds or bond documents that remain outstanding shall not form the basis for the assertion of any Claim against the Debtor or Reorganized Debtor, as the case may be.

6. **Claims Paid or Payable by Third Parties**

i. **Claims Paid by Third Parties**

A Claim shall be reduced in full, and such Claim shall be Disallowed without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Title III Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not the Distribution Agent. To the extent a Holder of a Claim receives a distribution on account of such Claim and also receives payment from a party that is not the Distribution Agent on account of such Claim from the Distribution Agent, such Holder shall repay, return, or deliver any distribution held by or transferred to the Holder to the applicable Distribution Agent to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

ii. **Claims Payable by Insurance Carriers**

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of PREPA's Insurance Policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of PREPA's insurers agrees to satisfy in full a Claim, then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register by the Solicitation Agent without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Title III Court.

iii. **Applicability of Insurance Policies**

Except as otherwise provided herein, distributions to Holders of Allowed Claims shall be in accordance with the provisions of an applicable insurance policy. Except as otherwise expressly provided herein, nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that PREPA or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

7. **Withholding and Reporting Requirements**

Any party issuing any instrument or making any distribution under the Plan shall comply with all applicable withholding and reporting requirements imposed by any United States federal, state or local tax law or tax authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such Holder by any Governmental Unit, including income, withholding and other tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such Holder has made arrangements satisfactory to such issuing or distributing party for payment of any such withholding tax obligations and, if any party issuing any instrument or making any distribution under the Plan fails to withhold with respect to any such Holder's distribution, and is later held liable for the amount

of such withholding, the Holder shall reimburse such party. The Distribution Agent may require, as a condition to the receipt of a distribution, that the Holder complete the appropriate Form W-8 or Form W-9, as applicable to each Holder. If the Holder fails to comply with such a request within one year, such distribution shall be deemed an Unclaimed Distribution. PREPA reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

8.    **Time Bar to Cash Payments**

Checks issued by the Distribution Agent on account of Allowed Claims shall be null and void if not negotiated within one hundred twenty (120) days from and after the date of issuance thereof. Requests for reissuance of any check shall be made directly to the Distribution Agent by the holder of the Allowed Claim with respect to which such check originally was issued. Any claim in respect of such a voided check shall be made on or before the later of (i) the first (1st) anniversary of the Effective Date or (ii) ninety (90) days after the date of issuance of such check, if such check represents a final distribution hereunder on account of such Claim. After such date, all Claims in respect of voided checks shall be discharged and forever barred and the Distribution Agent shall retain all monies related thereto for the sole purpose of redistribution to Holders of Allowed Claims in accordance with the terms and provisions of the Plan.

9.    **Distributions After Effective Date**

Distributions made after the Effective Date to Holders of Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made in accordance with the terms and provisions of Article XXIVI.E of the Plan.

10.    **Setoffs**

Except as otherwise provided in the Plan or in the Confirmation Order, the Distribution Agent may, pursuant to applicable bankruptcy or non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account thereof (before any distribution is made on account of such Claim by the Distribution Agent), the claims, rights, and Causes of Action of any nature that the Debtor or Reorganized Debtor may hold against the Holder of such Allowed Claim; *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor or Reorganized Debtor of any such claims, rights, and Causes of Action that the Debtor or the Reorganized Debtor may possess against such Holder; and, *provided*, *further*, that nothing contained herein is intended to limit the ability of any Creditor to effectuate rights of setoff or recoupment preserved or permitted by the provisions of Bankruptcy Code sections 553, 555, 559, or 560 or pursuant to the common law right of recoupment; and, *provided*, *further*, that nothing in Article XXIV.J of the Plan shall affect the releases and injunctions provided in Article XXVI of the Plan.

11.    **Allocation Between Principal and Accrued Interest**

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated *first*, to interest accrued and unpaid as of the date immediately preceding the

308

Petition Date, *second*, to the principal amount of the Claim (as determined for federal income tax purposes) and *third*, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts; *provided*, *however*, that the Debtor's or Reorganized Debtor's treatment of any distributions for its tax purposes will not be binding on any Creditor as to the treatment of such distributions for any regulatory, tax, or other purposes.

### 12. Holder of Claim

For all purposes of the Plan, including, without limitation, for purposes of distributions pursuant to the terms and provisions of Article XXIV of the Plan, the Holder of a Claim shall mean any Entity who, directly or indirectly, has investment power with respect to any Claim, which includes the power to dispose or to direct the disposition of such Claim; *provided*, *however*, that, solely with respect to Insured PREPA Revenue Bonds and Bankruptcy Code section 1126, the Holder of any Insured PREPA Revenue Bond Claims shall be determined in accordance with PROMESA section 301(c)(3) and any law or governing documents applicable to such Insured PREPA Revenue Bond Claims.

### 13. Exculpation

From and after the Effective Date, the Distribution Agent shall be exculpated by all Entities, including, without limitation, Holders of Claims and other parties in interest, from any and all claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Distribution Agent by the Plan or any order of the Title III Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct of such Distribution Agent. No Holder of a Claim or other party in interest shall have or pursue any claim or cause of action against the Distribution Agent for making payments in accordance with the Plan or for implementing the provisions of the Plan.

### L. Procedures for Resolving Disputed Claims

### 1. Objections to Claims and Prosecution of Disputed Claims

Except with respect to Allowed Claims, and subject to the terms and conditions of the ADR Procedures and the ADR Order, the Reorganized Debtor, by and through the Oversight Board, shall object to, and shall assume any pending objection filed by the Debtor to, the allowance of Claims filed with the Title III Court with respect to which it disputes liability, priority or amount, including, without limitation, objections to Claims that have been assigned and the assertion of the doctrine of equitable subordination with respect thereto. All objections, affirmative defenses, and counterclaims shall be litigated to Final Order; *provided*, *however*, that the Reorganized Debtor, by and through the Oversight Board, shall have the authority to file, settle, compromise, or withdraw any objections to Claims, without approval of the Title III Court. Unless otherwise ordered by the Title III Court, to the extent not already objected to by the Debtor, the Reorganized Debtor shall file and serve all objections to Claims as soon as practicable, but, in each instance, not later than the Claims Objection Bar Date. Notwithstanding anything contained in the Plan to the contrary, on the Effective Date, any (i) PREPA Revenue Bond Claim or Fuel Line Loan Claim filed by any Entity for amounts due under existing securities and (ii) Proofs of Claim included on

a schedule to the Plan Supplement, if any, shall be deemed satisfied and expunged and the Oversight Board shall instruct the Solicitation Agent, its court-appointed representative, to remove such Claims from the Claims Register maintained for the benefit of the Title III Court.

Except as otherwise provided herein, no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or PROMESA, or the Title III Court has entered a Final Order allowing such Claim. For the avoidance of doubt, there is no requirement to file a Proof of Claim (or move the Title III Court for allowance) to be an Allowed Claim under the Plan. **Except as otherwise provided herein, all Proofs of Claim filed after the Effective Date shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against PREPA or Reorganized PREPA, without the need for any objection by PREPA or Reorganized PREPA or any further notice to or action, order, or approval of the Title III Court.**

2.      **Estimation of Claims**

Except with respect to Allowed Claims, on and after the Effective Date, and unless otherwise limited by an order of the Title III Court, including, without limitation, the ACR Order and the ADR Order, the Reorganized Debtor, by and through the Oversight Board, may at any time request the Title III Court to estimate for final distribution purposes any contingent, unliquidated or Disputed Claim pursuant to Bankruptcy Code section 502(c) regardless of whether the Debtor previously objected to or sought to estimate such Claim, and the Title III Court will retain jurisdiction to consider any request to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. Unless otherwise provided in an order of the Title III Court, in the event that the Title III Court estimates any contingent, unliquidated, or Disputed Claim, the estimated amount shall constitute either the allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Title III Court; *provided*, *however*, that, if the estimate constitutes the maximum limitation on such Claim, the Reorganized Debtor, by and through the Oversight Board, may elect to pursue supplemental proceedings to object to any ultimate allowance of such Claim; and, *provided*, *further*, that the foregoing is not intended to limit the rights granted by Bankruptcy Code section 502(j). All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and not necessarily exclusive of one another.

3.      **Claims Administration Responsibilities**

Except as otherwise specifically provided in the Plan, after the Effective Date, PREPA shall have the sole authority: (1) to file, withdraw, or litigate to judgment, objections to Claims; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Title III Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Title III Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, PREPA shall have and retain any and all rights and defenses PREPA had immediately prior to the Effective Date with respect to any Disputed Claim.

310

4.    **Adjustment to Claims Without Objection**

Any duplicate Claim or any Claim that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by PREPA without PREPA having to file an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim and without any further notice to or action, order, or approval of the Title III Court.

5.    **Extension of Claims Objection Bar Date**

Upon motion by Reorganized PREPA to the Title III Court, Reorganized PREPA may request, and the Title III Court may grant, an extension to the Claims Objection Bar Date generally or with respect to specific Claims.  Any extension granted by the Title III Court shall not be considered to be a modification of the Plan under PROMESA section 313.

6.    **Authority to Amend Creditor List**

PREPA will have the authority to amend the Creditor List with respect to any Claim and to make distributions based on such amended Creditor List without approval of the Title III Court. If any such amendment to the Creditor List reduces the amount of a Claim or changes the nature or priority of a Claim, PREPA will provide the Holder of such Claim with notice of such amendment and such Holder will have twenty (20) days to file an objection to such amendment with the Title III Court.  If no such objection is filed, the Distribution Agent may proceed with distributions based on such amended Creditor List without approval of the Title III Court.

7.    **No Interest**

Unless otherwise specifically provided for herein or by order of the Title III Court, postpetition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

8.    **Disallowance of Claims**

All Claims of any Entity from which property is sought by PREPA under Bankruptcy Code sections 550 or 553 or that PREPA alleges is a transferee of a transfer that is avoidable under Bankruptcy Code sections 544, 545, 547, 548, or 549 shall be Disallowed if:  (a) the Entity, on the one hand, and PREPA, on the other hand, agree or the Title III Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned Bankruptcy Code sections; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

M.     **Governance and Provisions Regarding PREPA PayGo Trust and Pension System**

1.     **Formation and Responsibilities of the PREPA PayGo Trust**

On or prior to the Effective Date, PREPA shall take all necessary steps to establish the PREPA PayGo Trust, including, without limitation, by execution and delivery of the PREPA PayGo Deed of Trust.

2.     **Funding of the PREPA PayGo Trust**

i.     **Initial Funding**

On the Effective Date, PREPA shall contribute, or cause to be contributed to the PREPA PayGo Trust, one million dollars ($1,000,000) to fund the initial administrative fees, costs, and expenses of the PREPA PayGo Trust.

ii.     **Ongoing Funding of the PREPA PayGo Trust**

Reorganized PREPA shall make debt service payments with respect to the PREPA PayGo New Bonds Distribution and Excess New Bonds, if any, held by the PREPA PayGo Trust in accordance with the New Master Indenture.  In addition, from and after the Fiscal Year in which the Effective Date occurs, Reorganized PREPA shall make, or cause to be made, annual (but in no event later than September 30th following the conclusion of each Fiscal Year) contributions to the PREPA PayGo Trust such that:

a.     **the combined payments on account of the PREPA PayGo New Bonds Distribution and Excess New Bonds and Cash payments under Article XXVI.B.2 of the Plan shall be sufficient for the PREPA PayGo Trust to reimburse PREPA ERS for retirement benefits paid and administrative expenses incurred in the prior Fiscal Year ending June 30 as set forth in Article VI.A.1, and**

b.     **the contribution in the immediately foregoing clause (a) shall be increased or limited such that, after such contribution, the PREPA PayGo Trust assets shall equal two (2) times the expected retirement benefits to be paid and administrative expenses to be incurred during the current Fiscal Year, with any resulting increase to the amount paid pursuant to the immediately foregoing clause (i) not to exceed fifty million dollars ($50,000,000) in a given Fiscal Year.**

312

3.      **Management of PREPA PayGo Trust**

The PREPA PayGo Trust will be managed by an independent entity whose members shall meet the independence, professionalism, experience, and qualification standards set forth in the PREPA PayGo Deed of Trust.

4.      **Non-Impairment Covenant**

PREPA covenants herein, and will covenant in the PREPA PayGo Deed of Trust, for the benefit of all Participants that, with respect to payments and other obligations owed to PREPA ERS pursuant to the Plan, all such obligations shall remain in place and not otherwise be altered, modified, or amended until all such obligations have been satisfied in full in accordance with the provisions of the Plan and the Definitive Documents, enforceable by any and each of the Oversight Board, the PREPA PayGo Trust, and PREPA ERS and, with respect to any such provision, the PREPA PayGo Deed of Trust shall not be amended or modified by Reorganized PREPA except (i) with the express prior written consent of the Oversight Board (if in existence), and PREPA ERS, or (ii) pursuant to a new or re-opened Title III case for Reorganized PREPA and a confirmed new or modified, and effective, plan of adjustment.

5.      **Maintenance of Pension**

Before the tenth (10th) anniversary of the Effective Date, both the Government of the Commonwealth of Puerto Rico and Reorganized PREPA, including, without limitation, by any Entity or Person acting for or on behalf thereof, shall not (a) implement existing legislation, enact new legislation, or enter into new collective bargaining agreements or other contracts to create or increase any defined benefit pension payment or obligation to current or future retirees from or related to any defined benefit plans over the benefits provided by the Plan, regardless of funding source, or (b) undo (in whole or part) the Plan's eliminations of defined benefit plan accruals and cost of living adjustments for PREPA ERS Participants.

N.      **Effect of Confirmation of the Plan**

1.      **Discharge and Release of Claims and Causes of Action**

i.      **Complete Satisfaction, Discharge, and Release**

Except as expressly provided in the Plan or the Confirmation Order, all distributions and rights afforded under the Plan shall be, and shall be deemed to be, in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims or Causes of Action against PREPA and Reorganized PREPA that arose, in whole or in part, prior to the Effective Date, relating to the Title III Case, the Debtor or Reorganized Debtor or any of their respective Assets, property, or interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Causes of Action. Upon the Effective Date, the Debtor and Reorganized Debtor shall be deemed discharged and released from any and all Claims, Causes of Action, and any other Debts that arose, in whole or in part, prior to the Effective Date (including prior to the Petition Date), and all Debts of the kind specified in Bankruptcy Code sections 502(g), 502(h), or 502(i), whether or not (a) a Proof of Claim based upon such Debt is

313

filed or deemed filed under Bankruptcy Code section 501, (b) a Claim based upon such Debt is allowed under Bankruptcy Code section 502 (or is otherwise resolved), or (c) the Holder of a Claim based upon such Debt voted to accept the Plan; *provided*, for the avoidance of doubt, Article XXVII.A.1 of the Plan does not extend to or include any claims, rights, or defenses (whether ordinary or affirmative) of the Vitol Parties related to the Vitol-SCC AP preserved pursuant to the Vitol Settlement Agreement, and the Vitol Parties are not releasing and instead is expressly preserving, all of its claims, rights, or defenses related to the Vitol-SCC AP as provided in the Vitol Settlement Agreement.

### ii.     Preclusion from Assertion of Claims Against the Debtor

All Entities shall be precluded from asserting any and all Claims or other obligations, suits, judgments, damages, Debts, rights, remedies, Causes of Action, or liabilities, of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtor and Reorganized Debtor and each of their respective Assets, property and rights, relating to the Title III Case, regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or other obligations, suits, judgments, damages, Debts, rights, remedies, Causes of Action, or liabilities.   In accordance with the foregoing, except as expressly provided in the Plan or the Confirmation Order, the Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge and release of all such Claims, Causes of Action, or Debt of or against the Debtor and the Reorganized Debtor pursuant to Bankruptcy Code sections 524 and 944, applicable to the Title III Case pursuant to PROMESA section 301, and such discharge shall void and extinguish any judgment obtained against the Debtor or Reorganized Debtor and their respective Assets, and property at any time, to the extent such judgment is related to a discharged Claim, Debt, or liability.  As of the Effective Date, and in consideration for the value provided under the Plan, each Holder of a Claim in any Class under the Plan shall be and hereby is deemed to release and forever waive and discharge as against the Debtor and Reorganized Debtor, and their respective Assets and property and all such Claims; *provided*, for the avoidance of doubt, Article XXVII.A.2 of the Plan does not extend to or include any claims, rights, or defenses (whether ordinary or affirmative) of the Vitol Parties related to the Vitol-SCC AP preserved pursuant to the Vitol Settlement Agreement, and the Vitol Parties are not releasing and instead is expressly preserving, all of its claims, rights, or defenses related to the Vitol-SCC AP as provided in the Vitol Settlement Agreement.

### iii.     Injunction Related to Discharge of Claims

Except as otherwise expressly provided in Article XXVII of the Plan, the Confirmation Order or such other Final Order of the Title III Court that may be applicable, all Entities who have held, hold, or may hold Claims or any other Debt or liability that is discharged or released pursuant to Article XXVII of the Plan or who have held, hold, or may hold Claims or any other Debt or liability that is discharged or released pursuant to Article XXVII of the Plan are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing, directly or indirectly, in any manner, any action or other proceeding (including, without limitation, any judicial, arbitral, administrative, or other proceeding) of any kind on any such Claim or other Debt or liability that is discharged or released pursuant to the Plan against any of the Released Parties or any of their respective Assets or property, (b) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against any of the

314

Released Parties or any of their respective assets or property on account of any Claim or other Debt or liability that is discharged or released pursuant to the Plan, (c) creating, perfecting, or enforcing any encumbrance of any kind against any of the Released Parties or any of their respective assets or property on account of any Claim or other Debt or liability that is discharged or released pursuant to the Plan, and (d) except to the extent provided, permitted, or preserved by Bankruptcy Code sections 553, 555, 556, 559, or 560 or pursuant to the common law right of recoupment, asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from any of the Released Parties or any of their respective assets or property, with respect to any such Claim or other Debt or liability that is discharged or released pursuant to the Plan.  Such injunction shall extend to all successors and assigns of the Released Parties and their respective assets and property.

2.      **Releases by the Debtor and Reorganized Debtor**

**Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, and for good and valuable consideration, each of the Debtor and Reorganized Debtor, the Distribution Agent and each of the Debtor's and Reorganized Debtor's Related Persons shall be deemed to have and hereby does irrevocably and unconditionally, fully, finally, and forever waive, release, acquit, and discharge the Released Parties from any and all Claims or Causes of Action that the Debtor, Reorganized Debtor, and the Distribution Agent, or any of them, or anyone claiming through them, on their behalf or for their benefit, have or may have or claim to have, now or in the future, against any Released Party that are Released Claims or otherwise are based upon, relate to, or arise out of or in connection with, in whole or in part, any act, omission, transaction, event, or other circumstance relating to the Title III Case, the Fuel Line Lender PSA, the National PSA, or the Debtor taking place or existing on or prior to the Effective Date, and/or any Claim, act, fact, transaction, occurrence, statement, or omission in connection with or alleged or that could have been alleged, including, without limitation, any such Claim, demand, right, liability, or cause of action for indemnification, contribution, or any other basis in law or equity for damages, costs, or fees.**

3.      **Releases by Holders of Claims**

**Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for good and valuable consideration, each Holder of a Claim is deemed to have released and discharged the Debtor and the Reorganized Debtor from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtor, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtor (including management, ownership, or operation thereof), the Debtor's in- or out-of-court restructuring efforts, intercompany transactions, the Title III Case, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Uninsured Bond Settlement Agreement, the Monoline Settlement Agreement, the Vitol Settlement Agreement, the Restructuring Transactions, the Fuel Line Lender PSA, the National PSA or any contract, instrument, release, or other Definitive Documents, agreement, or document created or entered into in connection with the Disclosure Statement, or the Plan, the filing of the Title III Case, the pursuit of Confirmation, the pursuit of**

315

consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, the Restructuring Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

4.     **Exculpation**

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Title III Case, the formulation, preparation, dissemination, negotiation, or filing of the Fuel Line Lender PSA, the National PSA, Disclosure Statement, the Plan, the Uninsured Bond Settlement Agreement, the Monoline Settlement Agreement, the Vitol Settlement Agreement, or any Restructuring Transaction, contract, instrument, release or other Definitive Document, agreement, or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Title III Case, the pursuit of Confirmation, the pursuit of consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

5.     **Injunction**

As of the Effective Date, all Entities that hold, have held, or may hold a Released Claim that is released pursuant to Article XXVII of the Plan, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred, and enjoined from taking any of the following actions, whether directly or indirectly, derivatively, or otherwise, on account of or based on the subject matter of such discharged Released Claims: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding (including, without limitation, any judicial, arbitral, administrative, or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting, or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly,

any amount against any liability or obligation owed to any Entity released under Article XXVII of the Plan; and (v) commencing or continuing in any manner, in any place of any judicial, arbitration, or administrative proceeding in any forum, that does not comply with or its inconsistent with the provisions of the Plan or the Confirmation Order.

6.   **Non-Severability of Releases, Injunctions, and Exculpations**

Notwithstanding anything else contained in the Plan, the releases, injunctions, and exculpation provided in Article XXVII of the Plan are integral to obtaining the value provided hereunder and constitute an essential component of the compromises reached and are not severable from the other provisions of the Plan.

7.   **Reimbursement or Contribution**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to Bankruptcy Code section 502(e)(1)(B), then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever Disallowed and expunged notwithstanding Bankruptcy Code section 502(j), unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

8.   **Release of Liens**

Except (a) with respect to the Liens securing the New Bonds and CVI, or (b) as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtor shall be fully released and discharged, and the Holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtor, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Debtor and its successors and assigns.

O.   **Modification, Revocation, or Withdrawal of the Plan**

1.   **Modification of Plan**

Subject to sections 104(j) and 313 of PROMESA and sections 942 and 1127(d) of the Bankruptcy Code, applicable to the Title III Cases pursuant to PROMESA section 301 of PROMESA, PREPA may alter, amend, or modify the Plan or the Exhibits at any time prior to or after the Confirmation Date but prior to the Effective Date; *provided*, that such alteration, amendment, or modification does not materially and adversely impact LUMA Energy, shall not be inconsistent with the Fuel Line Lender PSA or the National PSA, and shall be reasonably acceptable to the Required Fuel Line Lenders and National.  Subject to Article I.G of the Plan, a Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as altered, amended, or modified so long as the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

2.      **Revocation or Withdrawal**

The Plan may be revoked or withdrawn prior to the Confirmation Date by the Oversight Board.  If the Plan is revoked or withdrawn prior to the Confirmation Date, or if the Plan does not become effective for any reason whatsoever, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claim by the Debtor or any other Entity, or to prejudice in any manner the rights of the Debtor or any other Entity in any further proceeding involving the Debtor.

3.      **Amendment of Plan Documents**

From and after the Effective Date, the authority to amend, modify, or supplement the Plan Supplement, the exhibits and schedules to the Plan Supplement and the exhibits and schedules to the Plan, and any document attached to any of the foregoing, shall be as provided in such Plan Supplement, exhibits and schedules to the Plan Supplement, or exhibits and schedules to the Plan and their respective attachments, as the case may be.

4.      **No Admission of Liability**

The submission of the Plan is not intended to be, nor shall it be construed as, an admission or evidence in any pending or subsequent suit, action, proceeding, or dispute of any liability, wrongdoing, or obligation whatsoever (including as to the merits of any claim or defense) by any Entity with respect to any of the matters addressed in the Plan.

None of the Plan (including, without limitation, the exhibits and schedules hereto), or any settlement entered, act performed, or document executed in connection with the Plan: (i) is or may be deemed to be or may be used as an admission or evidence of the validity of any claim or of any wrongdoing or liability of any Entity; (ii) is or may be deemed to be or may be used as an admission or evidence of any liability, fault, or omission of any Entity in any civil, criminal, or administrative proceeding in any court, administrative agency, or other tribunal; (iii) is or may be deemed to be or used as an admission or evidence against Reorganized Debtor, the Debtor, or any other Entity with respect to the validity of any Claim.  None of the Plan or any settlement entered, act performed, or document executed in connection with the Plan shall be admissible in any proceeding for any purposes, except to carry out the terms of the Plan, and except that, once confirmed, any Entity may file the Plan in any action for any purpose, including, but not limited to, in order to support a defense or counterclaim based on the principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar, or reduction or any other theory of claim preclusion or issue preclusion or similar defense of counterclaim.

P.      **Corporate Governance and Management of Reorganized Debtor**

1.      **Corporate Action**

On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the directors of the Debtor or Reorganized Debtor, including, without limitation, to the extent applicable, the authorization to issue or cause to be issued the New Bonds, the authorization to enter into the Definitive Documents, the adoption of Reorganized Debtor By-Laws, and the election or appointment, as the case may be, of directors and officers of Reorganized

Debtor pursuant to the Plan, as applicable, shall be authorized and approved in all respects, in each case, in accordance with the New Master Indenture and the new corporate governance documents, as applicable, and without further action by any Entity under any other applicable law, regulation, order, or rule. Other matters provided under the Plan involving the corporate structure of the Reorganized Debtor, or corporate action by the Reorganized Debtor, shall be deemed to have occurred, be authorized, and shall be in effect in accordance with the New Master Indenture and the new corporate governance documents, as applicable, and without requiring further action by any Entity under any other applicable law, regulation, order, or rule. Without limiting the foregoing, from and after the Confirmation Date, the Debtor and Reorganized Debtor shall take any and all actions deemed appropriate in order to consummate the transactions contemplated herein in accordance with the New Master Indenture, and the new corporate governance documents, as applicable.

### 2. Reorganized Debtor's By-Laws

To the extent applicable, the by-laws of the Reorganized Debtor shall be amended as of the Effective Date to be consistent with the Plan, as applicable.

### 3. Officers of Reorganized Debtor

The Reorganized Debtor's officers and governing directors will remain the same as of the Effective Date, unless disclosed otherwise in the Plan Supplement.

### Q. Identification of Claims Impaired By the Plan and Not Impaired By the Plan

### 1. Impaired Classes

The Claims in Classes 1–9, and 11–12 are Impaired and receiving distributions pursuant to the Plan, and are therefore entitled to vote to accept or reject the Plan. The Claims in Class 14 are Impaired and not receiving a distribution pursuant to the Plan and, therefore, Class 14 is deemed to have rejected the Plan.

### 2. Unimpaired Classes

The Claims in Classes 10 and 13 are Unimpaired pursuant to the Plan, are deemed to have accepted the Plan, and are not entitled to vote to accept or reject the Plan.

### R. Conditions Precedent to Confirmation of the Plan

### 1. Conditions Precedent to Confirmation Date

It shall be a condition precedent to Confirmation of the Plan that the following conditions shall have been satisfied or waived pursuant to Article XXXI.B of the Plan:

    a.    **Fiscal Plan Certification:** The Oversight Board shall have certified a Fiscal Plan consistent with the Plan and shall have certified the submission of the Plan, and any modifications to the Plan through the Confirmation Date, in accordance with PROMESA sections 104(j) and 313.

b.   **Required Orders:**  The Title III Court shall have entered an order or orders (including, without limitation, the Disclosure Statement Order and, the Confirmation Order in accordance with PROMESA section 314 and Bankruptcy Code section 1129, made applicable to the Title III Cases pursuant to PROMESA section 301) providing for the following:

(i)   Approving the Disclosure Statement as containing "adequate information" pursuant to Bankruptcy Code section 1125;

(ii)   Authorizing the solicitation of votes and elections with respect to the Plan;

(iii)   Determining that all votes and elections or deemed elections are binding and have been properly tabulated;

(iv)   Confirming and giving effect to the terms and provisions of the Plan, including the releases set forth in Article XXVII of the Plan;

(v)   Subject to Article XVIII with respect to the settlement of the National Claims, determining that the compromises and settlements set forth in the Plan are appropriate, reasonable, and approved and authorizing the transactions contemplated therein;

(vi)   Determining that all applicable tests, standards, and burdens in connection with the Plan have been duly satisfied and met by the Oversight Board, the Debtor, and the Plan;

(vii)   Determining the validity, priority, extent, and enforceability of the Lien asserted by the Bond Trustee;

(viii)   Determining the amount, if any, of the Deficiency Claim;

(ix)   Determining that PREB is required to approve the Legacy Charge as a rate, fee, and/or charge necessary to guarantee that Reorganized PREPA meets its obligations to holders of New Bonds;

(x)   Approving the documents in the Plan Supplement, and determining that such documents are valid and binding on parties with respect thereto; and

(xi)   Authorizing the Reorganized Debtor to execute, enter into, and deliver the documents in the Plan Supplement, and to execute, implement, and take all actions otherwise necessary or appropriate to give effect to the transactions contemplated by the Plan, and the documents in the Plan Supplement;

(xii)   Authorizing the Debtor to take all actions necessary to enter into, implement, and consummate the contracts, instruments, securities,

320

releases, leases, indentures, and other agreements or documents created in connection with the Plan, including setting, implementing, and enforcing the Legacy Charge;

(xiii)   Decreeing that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

(xiv)   Authorizing the Debtor and Reorganized Debtor to: (1) make all distributions and issuances as required under the Plan; and (2) enter into any agreements and transaction as set forth in the Plan Supplement;

(xv)   Authorizing the implementation of the Plan in accordance with its terms;

(xvi)   Determining the New Bonds, and the covenants by Reorganized PREPA, for the benefit of the holders of the New Bonds, as provided in the New Master Indenture or the Confirmation Order, as applicable, constitute valid, binding, legal, and enforceable obligations of Reorganized PREPA, under Puerto Rico, New York, and federal law;

(xvii)   Determining the CVI, and the covenants by Reorganized PREPA, for the benefit of the holders of the CVI, as provided in the New Master Indenture or the Confirmation Order, as applicable, constitute valid, binding, legal, and enforceable obligations of Reorganized PREPA, under Puerto Rico and federal law;

(xviii)   Determining that the Lien on and security interest in the Net Revenues up to the amount of the Legacy Charge Revenues, and the right to receive Net Revenues up to the amount of the Legacy Charge Revenues, and all other provisions to pay the New Bonds, are valid, binding, legal, and enforceable;

(xix)   Determining that the Lien on and security interest in the Remaining Net Revenues up to the amount of the Remaining Legacy Charge Revenues, and the right to receive the Remaining Net Revenues up to the amount of the Legacy Charge Revenues, and all other provisions to pay the CVI, are valid, binding, legal, and enforceable;

(xx)   Determining that the Lien on and security interest in the Net Revenues up to the amount of the Legacy Charge Revenues shall be deemed automatically perfected on the Effective Date, subject only to Liens and security interests permitted under the New Master Indenture, and shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under PROMESA

321

or any applicable non-bankruptcy law, to the fullest extent permitted by law;

(xxi)   Providing that no party, Person, or Entity shall enact, adopt, or implement any law, rule, regulation, or policy that impedes, financially or otherwise, consummation and implementation of the transactions contemplated by the Plan; and

(xxii)   Determining the Plan is consistent with the Debtor's Fiscal Plan and satisfies PROMESA section 314(b)(7).

c.   **Form of Orders:**  The Confirmation Order and the Plan are each in form and substance acceptable to the Oversight Board and reasonably acceptable to the Required Fuel Line Lenders.

d.   **<u>PREB Approval</u>**:  PREB shall have provided any required approval of the rates, fees, and charges, including the Legacy Charge, necessary to guarantee that Reorganized PREPA meets its obligations to holders of New Bonds.

e.   **Confirmation Order:**  The Confirmation Order includes (i) determinations that all of the settlements and compromises contained in the Plan satisfy applicable standard Bankruptcy Code sections 365, 1123(b)(3), and 1129 and Bankruptcy Rule 9019, to the extent applicable, (ii) the releases, exculpations, and injunctions set forth in Article XXVII of the Plan, and (iii) the applicable provisions set forth in Article XXXI of the Plan; *provided*, that approval of the National Settlement with respect to the National Reimbursement Claim shall not be a condition to Confirmation of this Plan.

2.   **Waiver of Conditions Precedent to Confirmation**

To the extent practicable and legally permissible, each of the conditions precedent in Article XXXI.A of the Plan may be waived, in whole or in part, by the Oversight Board, with the consent of the Required Fuel Line Lenders with respect to conditions that directly impact their rights under the Plan or the Fuel Line Lender PSA (with such consent not to be unreasonably withheld).  Any such waiver of a condition precedent may be effected at any time by filing a notice thereof with the Title III Court executed by the Oversight Board.

S.   **Conditions Precedent to the Effective Date**

1.   **Conditions Precedent to the Effective Date**

It shall be a condition precedent to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article XXXII.B of the Plan:

a.   **Fiscal Plan Certification:**  The Oversight Board shall have determined that the Plan is consistent with the Debtor's Fiscal Plan and shall have certified

the submission of the Plan, and any modifications to the Plan through the Confirmation Date, in accordance with PROMESA sections 104(j) and 313. The Fiscal Plan certified as of the Effective Date shall provide for payment of principal and interest with respect to the New Bonds as set forth in the Plan.

b.     **Confirmation:**  All conditions precedent to Confirmation, including entry of the Confirmation Order, shall have been satisfied or waived pursuant to XXXI.B of the Plan.

c.     **Final Order; No Injunction:** The Confirmation Order shall be a Final Order, and shall not be stayed in any respect.

d.     **Authorizations:** All authorizations, consents, regulatory approvals, rulings, or documents, if any, that are necessary to implement and effectuate the Plan, including that PREB approves rates, fees, and charges necessary to guarantee that Reorganized PREPA meets its obligations to holders of New Bonds and the PREPA PayGo Trust, including the Legacy Charge, have been obtained or enacted or entered and not revoked or reversed.

e.     **Execution of Documents; Other Actions:** All actions and all contracts, instruments, settlements, releases and other agreements or documents, including Definitive Documents, necessary to implement the terms and provisions of the Plan, including the Definitive Documents, are effected or executed and delivered, as applicable, are in full force and effect, and are in form and substance satisfactory to the Oversight Board.

f.     **Plan Supplement:** The final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in a manner consistent in all material respects with the Plan, Fuel Line Lender PSA, and National PSA and shall be in form and substance acceptable to PREPA.

2.     **Waiver of Conditions Precedent**

The Oversight Board may waive any of the conditions to the Effective Date set forth in Article XXXII.A of the Plan at any time without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Title III Court, and without any formal action other than proceeding to confirm and consummate the Plan, with the consent of the Required Fuel Line Lenders with respect to conditions that directly impact their rights under the Plan or the Fuel Line Lender PSA (with such consent not to be unreasonably withheld); *provided*, that the Oversight Board must provide at least five (5) business days' notice to LUMA Energy prior to waiving any condition precedent to the Effective Date.

3.     **Effect of Non-Occurrence of Conditions to Effective Date**

If prior to the Effective Date, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Title III Court vacating the Confirmation Order, the

323

Plan will be null and void in all respects, and nothing contained in the Plan or Disclosure Statement shall: (a) constitute a waiver or release of any Claims or Causes of Action; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtor or any other Entity.

### T. Provisions Regarding Committee

#### 1. Dissolution of Committee

On the Effective Date, the Creditors' Committee shall be (a) dissolved and deemed to have satisfied all of its respective duties and obligations, and (b) released and discharged from any action or activity taken, or required to be taken, in connection with the Title III Case. To the extent that, as of the date immediately prior to the Effective Date, the Creditors' Committee was a party to a contested matter or adversary proceeding in connection with the Title III Case or any objection to claim, from and after the Effective Date and to the extent not already a party thereto, the Reorganized Debtor shall be deemed to have assumed such role and responsibility in connection with such contested matter or adversary proceeding and, upon such assumption, the Creditors' Committee shall be relieved of any role, responsibility, or obligation with respect thereto.

### U. Provisions Regarding Oversight Board and Compliance with PROMESA

#### 1. Effect of Confirmation

Nothing in the Plan or the Confirmation Order shall discharge, substitute, alter, or otherwise modify the powers and responsibilities of the Oversight Board pursuant to PROMESA or the obligations of the Reorganized Debtor under PROMESA. From and after the Effective Date, the Reorganized Debtor shall continue to have all of its obligations pursuant to PROMESA, including, without limitation, the terms and conditions of Titles I and II thereof.

#### 2. Ongoing Role of the Oversight Board

Nothing in the Plan or the Confirmation Order shall discharge any or all obligations of each Debtor under PROMESA and, from and after the Effective Date, the Oversight Board's powers and responsibilities under PROMESA shall continue, and the Debtor's duties and obligations shall continue and be unaffected by the Plan and the consummation thereof.

#### 3. Preemption of Laws

As of the Effective Date, and to the extent not previously preempted pursuant to an order of the Title III Court, provisions of Commonwealth laws, rules, or regulations that affect PREPA or Reorganized PREPA and are inconsistent with PROMESA shall be preempted for the reasons, and to the extent, set forth in Exhibit "A" to the Findings of Fact and Conclusions of Law, such preempted laws, rules, and regulations include, without limitation, (a) pursuant to Section 4 of PROMESA, all laws, rules, and regulations (or such portions thereof) of the Commonwealth of Puerto Rico to the extent they give rise to obligations of the Debtor discharged or altered by the Plan and the Confirmation Order pursuant to PROMESA, and such discharge shall prevail over any general or specific provisions of territory laws, rules, and regulations, are preempted to the extent inconsistent with the Plan's discharge of the Debtor's obligations and all such laws shall

not be enforceable to the extent they are inconsistent with the Plan's discharge of the Debtor's obligations or any of the transactions contemplated by the Plan.  Without in any way limiting the foregoing, (y) the Commonwealth laws preempted by PROMESA that affect the Debtor include, without limitation, those listed on **Schedule D** of the Plan for the reasons and to the extent set forth in Exhibit "A" to the Findings of Fact and Conclusions of Law, and (z) all litigation in which any Government Party is a defendant, over whether Commonwealth law listed on **Schedule D** of the Plan is preempted by PROMESA shall be dismissed, with prejudice, as of the Effective Date and the parties thereto shall provide the Oversight Board prompt notice of such dismissal.  For the avoidance of doubt, the non-inclusion of a payment obligation arising from a valid law in a certified Fiscal Plan or PREPA budget is not a basis for disallowance of such obligation to the extent the claim arising therefrom otherwise satisfies the requirements for allowance of a claim under the relevant provisions of the Bankruptcy Code.

### V.  Retention of Jurisdiction

The Title III Court shall retain all its exclusive and concurrent subject matter jurisdiction, as the case may be, over any matter arising under PROMESA, arising in or related to, the Title III Cases and the Plan, or that relates to the following:

1.  allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim not compromised or settled hereby, including the resolution of any request for payment of any Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims not compromised or settled hereby;

2.  resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which PREPA is party or with respect to which PREPA may be liable and to hear, determine, and, if necessary, liquidate, any Cure Claim, including pursuant to Bankruptcy Code section 365; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

3.  ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

4.  adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving PREPA or the Reorganized Debtor that may be pending on the Effective Date or brought thereafter;

5.  decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to PROMESA, the Plan, or orders entered by the Title III Court;

6.      enter and implement such orders as may be necessary or appropriate to execute, implement, consummate, or enforce the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Title III Case and (b) the Plan, the Confirmation Order, and any other contracts, instruments, securities, releases, indentures, and other agreements or documents created in connection with the Plan;

7.      adjudicate, decide, or resolve any cases, controversies, suits, disputes, or other challenges of any kind that may arise in connection with the consummation, interpretation, or enforcement of the Plan, the Confirmation Order, or any other contract, instrument, security, release, or other agreement or document that is entered into or delivered pursuant to the Plan or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents, including, for the avoidance of doubt, any issues relating to setting, implementing, and enforcing the Legacy Charge and rate covenant and any amendments to the Legacy Charge and rate covenant, as well as PREB's authorization over the Legacy Charge and any amendments to the Legacy Charge;

8.      approve any modification of the Plan or approve any modification of the Confirmation Order or any other contract, instrument, security, release, or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any order, the Plan, the Confirmation Order, or any other contract, instrument, security, release, or other agreement or document created in connection with the Plan or the Confirmation Order, or enter any order in aid of confirmation pursuant to Bankruptcy Code sections 945 and 1142(b), in such manner as may be necessary or appropriate to consummate the Plan;

9.      adjudicate, decide, or resolve any matters relating to PREPA's compliance with the Plan and the Confirmation Order consistent with Bankruptcy Code section 945;

10.     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any other contract, instrument, security, release, or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement, or the Confirmation Order, in each case, solely to the extent that any such document does not provide for another court or courts to have exclusive jurisdiction;

11.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to enforce or restrain interference by any Entity with consummation or enforcement of the Plan or the Confirmation Order;

12.     adjudicate any and all controversies, suits, or issues that may arise regarding the validity of any actions taken by any Entity pursuant to or in furtherance of the Plan or Confirmation Order, including, without limitation, issuance of the New Bonds, and enter any necessary or appropriate orders or relief in connection with such adjudication;

326

13.     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, the Definitive Documents, or any other contract, instrument, security, release, other agreement, or document created in connection with the Plan, in each case, solely to the extent that any such document does not provide for another court or courts to have exclusive jurisdiction;

14.     enforce the New Bonds and the New Master Indenture, including, without limitation, the Interest Rate Covenant, or, in the event that the Title III Court declines such retention of jurisdiction or the Title III Case has been closed in accordance with the terms and provisions of PROMESA, the United States District Court for the District of Puerto Rico is hereby designated to enforce the New Bonds and the New Master Indenture, including, without limitation, the Interest Rate Covenant;

15.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

16.     enter an order or final decree concluding or closing the Title III Case pursuant to Bankruptcy Code section 945(b);

17.     enforce and clarify any orders previously entered by the Title III Court in the Title III Case; and

18.     hear any other matter over which the Title III Court has jurisdiction under the provisions of PROMESA subject to any limits on the Title III Court's jurisdiction and powers under PROMESA sections 305 and 306.

### W.     Miscellaneous Provisions

#### 1.     Title to Assets

Except as otherwise provided in the Confirmation Order or the Plan, on the Effective Date, title to all Assets and properties of the Debtor encompassed by the Plan shall vest in the Reorganized Debtor, free and clear of all Liens (except the Liens granted pursuant to the Plan and Confirmation Order).

#### 2.     No Waiver

Notwithstanding anything to the contrary contained herein, the releases and injunctions set forth in the Plan shall not, and shall not be deemed to, limit, abridge or otherwise affect the rights of the Oversight Board, AAFAF, or the Reorganized Debtor, or the Fuel Line Lender PSA Creditors (consistent with the Fuel Line Lender PSA), or National (consistent with the National PSA) to enforce, sue on, settle or compromise the rights, claims, and other matters expressly retained by any of them.

3.    **Supplemental Injunction**

Notwithstanding anything contained herein to the contrary, except to the limited extent provided in the Plan, all Entities, including Entities acting on their behalf, who currently hold or assert, have held or asserted, or may hold or assert, any Released Claims against any of the Released Parties based upon, attributable to, arising out of or relating to the Title III Case or any Claim against the Debtor, whenever and wherever arising or asserted, whether in the U.S. or anywhere else in the world, whether sounding in tort, contract, warranty, statute, or any other theory of law, equity or otherwise, shall be, and shall be deemed to be, permanently stayed, restrained and enjoined from taking any action against any of the Released Parties for the purpose of directly or indirectly collecting, recovering or receiving any payment or recovery with respect to any Released Claims arising prior to the Effective Date (including prior to the Petition Date), including, but not limited to:

A.    Commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Released Claim against any of the Released Parties or the assets or property of any Released Party;

B.    Enforcing, attaching, collecting, or recovering, by any manner or means, any judgment, award, decree, or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

C.    Creating, perfecting, or enforcing any Lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

D.    Except as otherwise expressly provided in the Plan or the Confirmation Order, asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any such Released Claim; and

E.    Taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan or the Confirmation Order, provided, however, that the Debtor's compliance with the formal requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for any injunction against conduct not otherwise enjoined under the Bankruptcy Code.

4.    **Immediate Binding Effect**

Pursuant to Bankruptcy Code section 944(a), applicable to the Title III Cases pursuant to PROMESA section 301, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or any other provision, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding on any and all Holders of Claims and their respective successors and assigns, whether or not the Claim of any such Holder is Impaired under the Plan and whether or not such Holder has accepted the Plan.  The releases, exculpations, and settlements effected under the Plan shall be operative, and subject to enforcement by the Title III Court, from and after the Effective Date, including pursuant to the

328

injunctive provisions of the Plan. Once approved, the compromises and settlements embodied in the Plan, along with the treatment of any associated Allowed Claims, shall not be subject to collateral attack or other challenge by any Entity in any court or other forum. As such, any Entity that opposes the terms of any compromise and settlement set forth in the Plan must (a) challenge such compromise and settlement prior to confirmation of the Plan and (b) demonstrate appropriate standing to object and that the subject compromise and settlement does not meet the standards governing settlements under Bankruptcy Rule 9019 and other applicable law.

5. **Additional Documents**

On or before the Effective Date, the Oversight Board may file with Clerk of the Title III Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, the Fuel Line Lender PSA, and the National PSA. The Debtor and all Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest, from time to time, may prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

6. **Reservation of Rights**

Except as expressly set forth herein, the Plan shall have no force or effect unless the Title III Court shall enter the Confirmation Order. None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtor with respect to the Holders of Claims prior to the Effective Date. Except as expressly set forth herein, the rights, and powers of the government of the Commonwealth under the Puerto Rico Constitution and PROMESA, including, without limitation, under PROMESA sections 303 and 305, are expressly reserved (subject to any limitation thereon imposed by the Puerto Rico Constitution, the U.S. Constitution or PROMESA), and nothing herein shall be deemed a waiver of any such rights and powers.

7. **Successors and Assigns**

Except as expressly provided otherwise in the Plan, the rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

8. **Post-Effective Date Fees and Expenses**

From and after the Effective Date, the Reorganized Debtor shall, in the ordinary course of business and without the necessity for any approval by the Title III Court, retain professionals and pay the reasonable professional fees and expenses incurred by the Reorganized Debtor related to implementation and consummation of the Plan without further approval from the Title III Court. Without limiting the foregoing, from and after the Effective Date, the Reorganized Debtor shall, in the ordinary course of business and without the necessity for any approval by the Title III Court, but in no event later than forty-five (45) days following the submission of invoices or statements with respect to the incurrence of fees and expenses to the Reorganized Debtor, pay the reasonable

and documented fees and reimburse the expenses of the Oversight Board and its professionals related to the implementation and consummation of the Plan and in connection with its duties and responsibilities pursuant to PROMESA and the terms and provisions of the Plan.

9. **Securities Act Exemption**

Pursuant to Bankruptcy Code section 1145 and/or Securities Act section 3(a)(2), the offering, issuance, and distribution of the New Bonds and CVI pursuant to the terms of the Plan shall be exempt from registration under the Securities Act and any state or local law requiring registration for the offer, issuance or distribution of securities, including, but not limited to, the registration requirements of Securities Act section 5 and any other applicable state or federal law requiring registration and/or prospectus delivery or qualification prior to the offering, issuance, distribution, or sale of securities.

10. **Governing Law**

Except to the extent that other federal law is applicable, or to the extent that an exhibit hereto or any document to be entered into in connection herewith provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, PROMESA (including the provisions of the Bankruptcy Code made applicable under section 301 of PROMESA) and, to the extent not inconsistent therewith, the laws of the Commonwealth of Puerto Rico, giving effect to principles of conflicts of laws.

11. **Closing Case**

The Oversight Board shall, promptly upon the full administration of the Title III Cases, file with the Title III Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Title III Court.  Notwithstanding the closing of the Title III Cases, the Title III Court shall retain jurisdiction of all of the matters set forth in Article XXXV of the Plan.

12. **Section Headings**

The section headings contained in the Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan.

13. **Document Retention**

From and after the Effective Date, the Reorganized Debtor may maintain documents in accordance with its standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtor.

14. **Service of Documents**

All notices, requests to, demands, or other document(s) required by the Plan or the Confirmation Order to be served on or delivered to the Oversight Board, PREPA, or AAFAF to be effective shall be in writing including by facsimile transmission and unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in

the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| | |
|---|---|
| **PREPA or the Oversight Board** | Financial Oversight and Management<br>Board for Puerto Rico<br>268 Muñoz Rivera Ave, Suite 1107<br>San Juan, PR 00918-1813<br>Attn:  Executive Director<br><br>– with a copy to –<br><br>PROSKAUER ROSE LLP<br>Eleven Times Square<br>New York, NY 10036<br>Attn:  Martin J. Bienenstock, Esq.<br>      Paul V. Possinger, Esq.<br>      Ehud Barak, Esq.<br>      Daniel S. Desatnik, Esq.<br>Tel:  (212) 969-3000<br>Fax:  (212) 969-2900 |
| **AAFAF** | Fiscal Agency and Financial Advisory Authority<br>Roberto Sánchez Vilella (Minillas) Government Center<br>De Diego Ave. Stop 22<br>San Juan, Puerto Rico 00907<br><br>– with a copy to –<br><br>O'MELVENY & MYERS LLP<br>Seven Times Square<br>New York, NY 10036<br>Attn:  John Rapisardi, Esq.<br>      Peter Friedman, Esq.<br>      Maria J. DiConza, Esq.<br>Tel:  (212) 326-2000<br>Fax:  (212) 326-2061 |

### 15.   Term of Injunctions or Stays

**Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Title III Case (pursuant to Bankruptcy Code sections 105, 362, or 922 or any order of the Title III Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

331

16.     **Entire Agreement**

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.  Notwithstanding the foregoing, the Fuel Line Lender PSA (other than the Term Sheet defined under and attached to the Fuel Line Lender PSA) shall continue to apply and remain in full force and effect according to its terms until the Effective Date, and the Plan does not supersede any rights or obligations otherwise arising under the Fuel Line Lender PSA (other than the Term Sheet defined under and attached to the Fuel Line Lender PSA) until the Effective Date.  Notwithstanding the foregoing, the National PSA shall continue to apply and remain in full force and effect according to its terms until the Effective Date, and the Plan does not supersede any rights or obligations otherwise arising under the National PSA until the Effective Date.

17.     **Plan Supplement Exhibits**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  Upon the filing of the Plan Supplement with the Clerk of the Title III Court, copies of the documents contained therein shall be made available upon written request to the Oversight Board's counsel at the address above or by downloading such documents from https://dm.epiq11.com/case/prepa/info or the Title III Court's website, available via PACER.  After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to the Oversight Board's counsel at the address   above   or   by   downloading   such   exhibits   and   documents   from https://dm.epiq11.com/case/prepa/info or the Title III Court's website, available via PACER. Unless otherwise ordered by the Title III Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control; *provided*, *however*, that with respect to the matters governed by the New Master Indenture, to the extent that any provisions of the Plan are inconsistent with the New Master Indenture, the New Master Indenture shall control.

18.     **Non-Severability**

Except to the extent otherwise expressly specified in the Plan, if any term or provision of the Plan is held by the Title III Court to be invalid, void, or unenforceable, the Title III Court, in each case at the election of and with the consent of PREPA, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The provisions of the Plan, including its release, injunction, exculpation, and compromise provisions, are mutually dependent and non-severable.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan is:  (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the consent of PREPA; *provided*

that any such deletion or modification must be consistent with (i) the Fuel Line Lender PSA with respect to provisions that directly impact the rights of the Fuel Line Lenders under the Plan and the Fuel Line Lender PSA and (ii) the National PSA with respect to provisions that directly impact the rights of National under the Plan and the National PSA; and (c) non-severable and mutually dependent.

### 19.    **Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, PREPA will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to Bankruptcy Code section 1125(e), PREPA and its agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or PREPA will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the securities offered and sold under the Plan and any previous plan.

### 20.    **Waiver or Estoppel**

Each Holder of a Claim shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim should be Allowed in a certain amount, in a certain priority, secured, or not subordinated by virtue of an agreement made with PREPA or its counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers filed with the Title III Court prior to the Confirmation Date.

[*Remainder of Page Intentionally Left Blank*]

## VII.    Confirmation of the Plan of Adjustment

### A.    Confirmation Hearing

PROMESA and the Bankruptcy Code require the Title III Court, after notice, to conduct a Confirmation Hearing at which it will hear arguments in support of the Plan, any objections to the Plan, and consider evidence with respect to whether the Plan should be confirmed.  At the Confirmation Hearing, the Title III Court will confirm the Plan only if all of the requirements of PROMESA Section 314 described below are met.

On _____, the Title III Court entered the _____ [ECF No. ___] (the "Scheduling Order").    Among other things, the Scheduling Order provides that the Confirmation Hearing will begin on [_____] at [_____] (Atlantic Standard Time) before the Honorable Laura Taylor Swain, United States District Judge, at the Title III Court, Clemente Ruiz Nazario United States Courthouse, 150 Carlos Chardón Avenue, San Juan, P.R. 00918 at a courtroom to be later determined.  The Confirmation Hearing may be adjourned from time to time by the Title III Court or the Debtor without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

### B.    Deadlines to Object to Confirmation

The Disclosure Statement Order establishes the objection deadline to confirmation of the Plan as _____ at _____ (Atlantic Standard Time).  Objections to confirmation of the Plan must: (1) be in writing; (2) state the name and address of the objecting party and the nature of the Claim of such party; (3) state with particularity the basis and nature of any objection; and (4) be filed with the Title III Court, and served on the following parties so that they are received no later than the applicable deadline set forth above:

- the Office of the United States Trustee for the District of Puerto Rico, Edificio Ochoa, 500 Tanca Street, Suite 301, San Juan, P.R. 00901 (re: In re: Puerto Rico Electric Power Authority);

For purposes of filing objections in these cases, the address of the Title III Court is: United States District Court, Clerk's Office, 150 Ave. Carlos Chardon Ste. 150, San Juan, P.R. 00918-1767.

### C.    Requirements for Confirmation of the Plan of Adjustment

At the Confirmation Hearing, the Title III Court will determine whether the Plan satisfies the requirements of PROMESA Section 314.  The Debtor believes that the Plan will satisfy all of the applicable statutory requirements of PROMESA and the Bankruptcy Code.  Among the requirements for confirmation are that the Plan: (1) is accepted by the requisite Holders of impaired Classes of Claims or, if not so accepted, is "fair and equitable" and does not discriminate unfairly as to the non-accepting class; (2) is in the "best interests" of creditors; (3) is feasible; and (4) complies with the applicable provisions of PROMESA and the Bankruptcy Code.

1.  **Acceptance or Cramdown**

A plan is accepted by an impaired class of claims if holders of two-thirds in dollar amount and a majority in number of allowed claims of that class vote to accept the plan. Only those holders of claims who actually vote to accept or reject the plan count in the tabulation. The impaired classes must accept the plan in order for the plan to be confirmed without application of the "cramdown" test contained in sections 1129(b)(1), (b)(2)(A) and (b)(2)(B) of the Bankruptcy Code.

i.  **Cramdown**

PROMESA and the Bankruptcy Code provide that the Title III Court may confirm a plan of adjustment that is not accepted by all impaired classes if at least one impaired class of claims accepts the plan and the so-called "cramdown" provisions set forth in sections 1129(b)(l), (b)(2)(A) and (b)(2)(B) of the Bankruptcy Code are satisfied. The plan of adjustment may be confirmed under the cramdown provisions if, in addition to satisfying the other requirements of section 943(b) of the Bankruptcy Code, it (i) is "fair and equitable" and (ii) does not discriminate unfairly with respect to each class of claims that is impaired under and has not accepted the plan. The Debtor believes that the Plan and the treatment of all Classes of Claims under the Plan satisfy the following requirements for nonconsensual confirmation of the Plan.

ii.  **"Fair and Equitable"**

Uncertainty exists as to the contours of the "fair and equitable" requirement in Title III. Outside of the context of Title III, the "fair and equitable" requirement generally requires, among other things, that, unless a dissenting unsecured class of claims receives payment in full for its allowed claims, no holder of allowed claims in any class junior to that class may receive or retain any property on account of such claims. This is known as the "absolute priority rule." Few published opinions have addressed the meaning of the "fair and equitable" requirement in chapter 9 cases. Courts that have addressed this requirement in context of a chapter 9 case have indicated that, because there are no equity holders in chapter 9 cases (who, in theory, would be junior in priority to a debtor's general unsecured creditors), the absolute priority rule cannot be applied in chapter 9 cases and, thus, in such cases, the "fair and equitable" requirement should not be interpreted as synonymous with the absolute priority rule. Instead, courts have held that the requirement that the "fair and equitable" requirement in chapter 9 is understood as requiring that, where a debtor seeks nonconsensual confirmation of a plan of adjustment, the impaired creditors of such debtor, under the proposed plan, will receive all that they can reasonably expect under the circumstances.

The Debtor believes that the Plan is "fair and equitable" with respect to Holders of Claims against the Debtor because it provides such Holders of Claims with all they reasonably can expect under the circumstances of the Title III Case. The commencement of the Title III Case was precipitated by, among other things, the Debtor's untenable debt burden, a severe cash shortage, and the economic decline and outmigration eroding the Debtor's revenues. The Debtor believes that the Plan is "fair and equitable" because the creditor recoveries proposed therein have been calculated – and, in certain cases, negotiated – to reasonably compensate Holders of Claims while enabling the Debtor to, among other things, (A) avoid a recurrence of the financial difficulties that

led to the commencement of the Title III Case; (B) institute desperately-needed reinvestment initiatives to ensure the Debtor's continued operation; (C) maintain electricity rates that are within the range of affordability to PREPA's customers; (D) avoid driving customers from the grid; and (E) ensure the Debtor is able to provide effective services and is positioned to meet the energy mandates under Puerto Rico law.

### iii.    Unfair Discrimination

A plan of adjustment does not "discriminate unfairly" if a dissenting class is treated substantially equally with respect to other classes similarly situated, and no class receives more than it is legally entitled to receive for its claims.  The Debtor does not believe that the Plan discriminates unfairly against any impaired Class of Claims.

**IN THE EVENT OF REJECTION OF THE PLAN BY ONE OR MORE IMPAIRED CLASSES, THE OVERSIGHT BOARD RESERVES THE RIGHT TO REQUEST THE TITLE III COURT TO CONFIRM THE PLAN IN ACCORDANCE WITH PROMESA AND SECTIONS 1129(b)(1), (b)(2)(A), AND (b)(2)(B) OF THE BANKRUPTCY CODE. THE OVERSIGHT BOARD HAS RESERVED THE RIGHT TO MODIFY THE PLAN TO THE EXTENT, IF ANY, THAT CONFIRMATION OF THE PLAN UNDER SECTION 314 OF PROMESA AND SECTION 1129(b) OF THE BANKRUPTCY CODE REQUIRES MODIFICATION.**

### iv.    The "Best Interests of Creditors" Test

The Title III Court also must determine that the Plan satisfies the best interests of creditors test pursuant to PROMESA Section 314(b)(6).  The Title III Court has determined in another Title III case that the "best interests of creditors" test under PROMESA only requires the court "to *consider* whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by [the] plan." *Findings of Fact and Conclusions of Law in Connection with Confirmation of the Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority* [Case No. 17-bk-3283, ECF No. 19812, ¶ 211] (alteration in original) (emphasis in original).  Unlike the chapter 11 best interests test, the PROMESA best interests test (i) is not a liquidation test, because the Debtor cannot be liquidated, and (ii) is applied to creditors collectively, not individually.  *Id.* (observing "the chapter 9 [best interests] test is not a liquidation test (because municipalities cannot be liquidated) and is focused on the *collective* recovery of creditors in the aggregate.") (emphasis in original).[277]    Accordingly, the Title III Court has concluded, "the PROMESA best interests test *does not* impose a litmus test or establish a floor for creditor recoveries." *Id.* at 135.

---

[277] This Court's interpretation is consistent with the approach taken by courts in chapter 9 cases, where Bankruptcy Code section 943(b)(7) requires the plan to be "in the best interests of creditors," similarly using the plural "creditors." *See In re City of Detroit*, 524 B.R. 147, 217 (Bankr. E.D. Mich. 2014).  *See also In re City of Stockton,* 542 B.R. 261, 283 (B.A.P. 9th Cir. 2015) (by its terms, the "best interests" test in chapter 9 is collective rather than individualized).

The best interests test analysis (the "Best Interests Test Report") that the Title III Court considers is attached hereto as Exhibit K.[278]  The Best Interests Test Report analyzes the recoveries that the Oversight Board believes that the creditors of the Debtor could expect based on available remedies under the non-bankruptcy laws and the Commonwealth Constitution and the certified PREPA fiscal plan.

The Debtor believes that the Plan satisfies the best interests of creditors test set forth in PROMESA Section 314(b)(6) because, among other things, the failure of plan confirmation and dismissal of the Debtor's Title III case would result in a race to the courthouse that would leave many creditors with no recovery at all, would eliminate PREPA's ability to discharge debt necessary to regain market access, and could lead to unrestrained rate hikes that could threaten the reliable generation and delivery of power and drive customers from the grid.

v.   **Feasibility**

PROMESA Section 314(b)(6) requires that a plan of adjustment be in the best interests of creditors and feasible.  While the statute explains the best interests of creditors requirement means the Title III Court shall consider what creditors would recover pursuant to available remedies outside Title III, the statute does not provide guidance as to what is meant by "feasible," beyond the word itself.  Chapter 9 of the Bankruptcy Code is the chapter available to municipalities of the States.  It also imposes a feasibility requirement in its section 943(b)(7) without providing further guidance.  Courts have interpreted the feasibility requirement in chapter 9 to mean the municipality will be viable, and the plan offers a reasonable prospect of success and is workable.  The debtor must show it can satisfy the obligations in its plan.  Unlike chapter 9, Title III also contains a requirement that the Title III Plan of Adjustment be consistent with the certified fiscal plan.  Significantly, pursuant to PROMESA Section 201(b)(1)(I), the certified fiscal plan must contain a debt sustainability analysis.  Accordingly, the feasibility of the Title III Plan of Adjustment is at least partially determinable by whether the plan provides for an amount of ongoing debt within the range of the debt sustainability analysis in the certified fiscal plan.

Based on the projections in the Certified Fiscal Plan, Reorganized PREPA should be able to pay its debts under the Plan when they come due and it should be viable.  If needed, the Debtor will update the analysis if a new fiscal plan is certified, but expects that under a new fiscal plan, Reorganized PREPA will be able to pay its debts under the Plan when they come due.

Accordingly, the Debtor believes that the Plan meets the feasibility requirement of PROMESA Section 314(b)(6).

---

[278] The Best Interests Test Report will be filed at a later date.

vi.   **Compliance with Applicable Provisions of PROMESA and the Bankruptcy Code**

In addition to the foregoing, the Plan must comply with other applicable provisions of PROMESA and the Bankruptcy Code, as follows:

- The Plan must comply with the provisions of the Bankruptcy Code made applicable by PROMESA Section 301 (PROMESA § 314(b)(1));

- The Plan must comply with the provisions of PROMESA Title III (PROMESA § 314(b)(2));

- The Debtor must not be prohibited by law from taking any action necessary to carry out the Plan (PROMESA § 314(b)(3));

- Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan must provide that on the Effective Date each holder of a claim of a kind specified in 507(a)(2) of the Bankruptcy Code will receive on account of such claim cash equal to the allowed amount of such claim (PROMESA § 314(b)(4));

- Any legislative, regulatory, or electoral approval necessary under applicable law in order to carry out any provision of the Plan must be obtained, or such provision must be expressly conditioned on such approval (PROMESA § 314(b)(5));

- The Plan must be consistent with the Fiscal Plan certified by the Oversight Board under Title III (PROMESA § 314(b)(7));

- The Debtor, as the proponent of the Plan by and through the Oversight Board, must have complied with all provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(2); PROMESA § 301(a)); and

- The Plan must have been proposed in good faith and not by any means forbidden by law (11 U.S.C. § 1129(a)(3); PROMESA § 301(a)).

2.   **Alternatives to Confirmation and Consummation of the Plan**

The Debtor has evaluated numerous alternatives to the Plan, including alternative structures and terms of the Plan and delaying the adoption thereof. While the Debtor has concluded that the Plan is the best alternative and will maximize recoveries by holders of Allowed Claims against the Debtor, if the Plan is not confirmed, the Debtor could attempt to formulate and propose a different plan of adjustment. The Debtor (or another party in interest) may also move to dismiss the Title III Case pursuant to 11 U.S.C. § 930 (as incorporated by PROMESA § 301(a). In addition, the Court could take up the Ad Hoc Group and Monoline Insurers' Motion to Dismiss PREPA's Case [Case No. 17-bk-4780, ECF Nos. 2973, 2974], which has been stayed by the Court unless the plan confirmation process terminates [Case No. 17-bk-4780, ECF No. 3013].

338

The Plan was formulated after the Title III Court ordered the Oversight Board to file a Plan following the conclusion of months of difficult negotiations, including in connection with numerous mediation sessions ordered by the Title III Court, that did not materialize in a settlement with PREPA's major creditor constituencies.  Under the circumstances, the Oversight Board has formulated a Plan that offers certain creditor constituencies the opportunity for higher recoveries as a settlement of their disputed rights.  The Debtor believes that the Plan provides the greatest and earliest possible recoveries to Creditors and that acceptance and confirmation of the Plan are in the best interests of the Debtor and all Creditors.  The Debtor further believes that any alternative to the Plan, including dismissal of the Title III case or lifting of the automatic stay for appointment of a receiver, would result in unnecessary delay, uncertainty, prolonged litigation, and expense, the net effect of which would result in recoveries to Creditors less than the distributions to be made to Creditors under the Plan.  The Debtor, therefore, believes that confirmation and consummation of the Plan is preferable to potential alternatives.

[*Remainder of Page Intentionally Left Blank*]

VIII.   **Certain Risk Factors to Be Considered**

**AS WITH ANY INVESTMENT, RECOVERIES ON THE NEW BONDS AND CVI INVOLVE RISKS. YOU SHOULD CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW REGARDING THE PLAN, THE NEW BONDS, AND CVI, AS WELL AS ALL OTHER INFORMATION CONTAINED OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT. THE FOLLOWING RISK FACTORS ARE NOT THE ONLY RISKS THE DEBTOR FACES, ARE NOT MEANT TO BE A COMPLETE LIST OF RISKS ASSOCIATED WITH THE PLAN OR THE NEW BONDS, AND DO NOT NECESSARILY REFLECT THE RELATIVE IMPORTANCE OF VARIOUS RISKS. ADDITIONAL RISKS AND UNCERTAINTIES NOT CURRENTLY KNOWN TO THE DEBTOR OR THAT THE DEBTOR DOES NOT CURRENTLY CONSIDER TO BE MATERIAL, OR THAT ARE GENERALLY APPLICABLE TO ALL GOVERNMENTAL INSTRUMENTALITIES, ALSO MAY MATERIALLY AND ADVERSELY AFFECT THE DEBTOR AND THE DEBTOR'S ABILITY TO CONSUMMATE THE PLAN AND MAKE PAYMENTS ON THE NEW BONDS AND CVI. YOU ARE ADVISED TO CONSIDER THE FOLLOWING RISK FACTORS, AMONG OTHERS, AND TO REVIEW THE OTHER INFORMATION CONTAINED OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT BEFORE MAKING ANY DECISIONS WITH RESPECT TO THE PLAN. ANY ONE OR MORE OF THE FACTORS DISCUSSED HEREIN, AND OTHER FACTORS NOT DESCRIBED HEREIN, COULD AFFECT RECOVERIES UNDER THE PLAN OR LEAD TO A DECREASE IN THE MARKET VALUE AND THE LIQUIDITY OF THE NEW BONDS OR CVI. THERE CAN BE NO ASSURANCE THAT OTHER RISK FACTORS NOT DISCUSSED BELOW WILL NOT BECOME MATERIAL IN THE FUTURE.**

**NEITHER THE DEBTOR NOR ANY FEDERAL, STATE, OR COMMONWEALTH SECURITIES COMMISSION OR REGULATORY AUTHORITY HAS APPROVED OR DISAPPROVED THE NEW BONDS AND CVI OR OTHER SECURITIES TO BE ISSUED PURSUANT TO THE PLAN OR PASSED ON THE ADEQUACY OR ACCURACY OF THIS DISCLOSURE STATEMENT.**

A.   **Risks Related to the Title III Case**

***The Title III Court may not confirm the Plan.***

PROMESA Section 314(b) and Bankruptcy Code section 1129 (in its incorporated parts) set forth the requirements for confirmation of a Title III plan of adjustment, and require the Title III Court to make a series of specified, independent findings. For an overview of such requirements, see section VII.C of this Disclosure Statement. Interested parties who have standing will have an opportunity to object to confirmation of the Plan and the Title III Court may sustain any number of such objections. There can be no assurance that the Title III Court will find that the Plan meets all of these requirements and confirm the Plan. If the Plan is not confirmed, it is uncertain what recoveries, if any, holders would receive with respect to their Claims under an alternative plan of adjustment or under other applicable law if the Title III Court dismisses the Title III Cases.

340

***The Title III Court does not find the Plan is consistent with the applicable Certified Fiscal Plan.***

Pursuant to PROMESA Section 314(b)(7), the Plan must be consistent with the Certified Fiscal Plan, certified by the Oversight Board.  Although the Oversight Board has certified that the Plan is consistent with the Certified Fiscal Plan pursuant to PROMESA Section 104(j)(3), PROMESA Section 314(b) requires that the Title III Court make an independent determination as to whether the Plan is consistent with the Certified Fiscal Plan.  There can be no assurance that the Title III Court will find that the Plan is consistent with the Certified Fiscal Plan.  To be consistent with the applicable certified fiscal plan, the Plan cannot provide for more debt than the applicable certified fiscal plan's debt sustainability analysis determines should be sustained by Reorganized PREPA.

An overview of the Certified Fiscal Plan is provided in Section IV.E of this Disclosure Statement.

***If any claimant is successful in prosecuting and obtaining an allowed (i) administrative expense claim; (ii) priority claim; (iii) secured claim; or (iv) non-dischargeable claim, and any such claim is not contemplated to be paid pursuant to the Plan, the Plan may not be confirmable.***

Various parties have asserted claims against the Debtor that they assert may be administrative expense claims, priority claims, secured claims, or non-dischargeable and that are not contemplated to be paid pursuant to the Plan.  If such and other similar claims are ultimately allowed, the Plan may not be confirmable without amendments that may materially change its proposed distributions.

Certain litigation concerning the allowability of such claims is continuing. For a description of such litigation see sections V.D and V.G of this Disclosure Statement.  If this litigation is not resolved prior to the Confirmation Hearing, the Confirmation Hearing and Effective Date may be delayed to allow for resolution of these disputed claims.  Alternatively, the Oversight Board may be required to establish an appropriate reserve to ensure adequate recoveries on the claims sought to be disallowed if the Oversight Board is unsuccessful.  PREPA may be required to seek a loan, or an appropriation from the Commonwealth, to have sufficient cash to pay allowed administrative expense claims on the Effective Date.  If such and other similar claims are ultimately allowed, or if the Oversight Board is required to establish an appropriate reserve in respect of such disputed claims pending their resolution, the Plan may not be confirmable without amendments that may materially change its proposed distributions, and any material changes would be subject to new votes by the affected claimholders.

***The Title III Court may determine, in connection with the Amended Lien & Recourse Challenge that the Bond Trustee possesses valid and perfected security interests in PREPA's revenues or a portion thereof.***

The Bond Trustee asserts that it possesses valid, perfected, and priority security interests in all of PREPA's past, present, and future revenues, and that those security interests are not subject to avoidance or subordination.  For additional details regarding the Amended Lien & Recourse Challenge, see section V.G.2 of this Disclosure Statement.  If the Title III Court determines the Bond Trustee has a security interest in some or all of PREPA's revenues, such revenues may not

be available to distribution to PREPA's non-bondholder creditors. Under this scenario, Non-Settling Bondholders may be entitled to a greater recovery than that provided under the Plan, and the Plan may not be confirmable or feasible without material amendments. If the Title III Court determines that Non-Settling Bondholders are secured by all or substantially all of PREPA's future revenues, no restructuring of PREPA's legacy debts may be possible, and no Title III plan of adjustment may be feasible.

***The Title III Court may determine, in connection with the Amended Lien & Recourse Challenge that the Bond Trustee possesses a claim beyond the Sinking Fund and Subordinate Funds, and that such claim is non-dischargeable.***

The Amended Lien & Recourse Challenge seeks to disallow the Master Bond Debt Claim to the extent it asserts a right to payment beyond moneys in the Sinking Fund and Subordinate Funds. For additional details regarding the Amended Lien & Recourse Challenge, see section V.G.2 of this Disclosure Statement. Even if the Title III Court determines that the Trust Agreement limits the Bond Trustee's recourse to the Sinking Fund and Subordinate Funds, the Bond Trustee has asserted certain affirmative defenses that may (i) preclude PREPA from enforcing contractual provisions limiting their recourse, or (ii) provide them with recourse beyond those funds. Moreover, these parties have asserted a number of defenses, that even if PREPA obtains a judgment limiting their recourse to the Sinking Fund and Subordinate Funds, PREPA's breach of certain covenants gives rise to a Takings Claim under the Fifth Amendment of the U.S. Constitution, which, under the First Circuit's current precedent, may be non-dischargeable and required to be paid in full. Under such circumstances, the Plan may not be confirmable or feasible without material amendments.

***The Title III Court may determine that PREPA is unable to reject the CBAs.***

If the Oversight Board is unable to renegotiate the CBAs, PREPA may need to seek rejection of the CBAs. If the Title III Court determines that PREPA is unable to reject the CBAs, the Plan may not be confirmable or feasible without material amendments. For additional information regarding the CBAs, see sections III.B.5-6 of this Disclosure Statement.

***The Title III Court may not approve the settlements and compromises in the Plan.***

The Plan contains certain settlements and compromises, as well as proposed settlements and compromises, that the Debtor believes are fair, equitable, and reasonable. Such compromises and settlements are an integral part of the Plan, and the Oversight Board believes they provide value and certainty for the Debtor and all creditors by eliminating significant litigation risk and expenses, and providing a framework for the Debtor to emerge from Title III expeditiously.

An overview of the Fuel Line Lender PSA and National PSA is provided in Section II.B of this Disclosure Statement. An overview of the Vitol Settlement Agreement is provided in Section V.E of this Disclosure Statement.

The Plan may also be contingent on the approval of other settlements and compromises resolved pursuant to the Plan. If the settlements and compromises contained in the Plan require approval, but are not approved, the Debtor may not be able to confirm the Plan.

342

***The Effective Date may be significantly delayed or not occur.***

The Effective Date may be significantly delayed due to pending litigation, including, without limitation, the Amended Lien & Recourse Challenge. The Effective Date may not occur until the Amended Lien & Recourse Challenge is resolved, which could take years.

Article XXXII of the Plan provides for certain conditions that must be satisfied (or waived) prior to the occurrence of the Effective Date. Many of the conditions are outside of the control of the Debtor. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions to effectiveness of the Plan will be satisfied (or waived). Accordingly, even if the Plan is confirmed by the Title III Court, there can be no assurance that the Plan will be consummated and the adjustment of the Debtor's debts completed. *See* Section VI.R of this Disclosure Statement (description of the conditions to the effectiveness of the Plan). In addition, certain agreements contemplated in the Plan impose conditions that must be satisfied as of the Effective Date. There can be no assurance that such conditions will be timely satisfied or waived.

***If the National PSA, Fuel Line Lender PSA, Vitol Settlement Agreement, or agreements with Settling Bondholders or Settling Monolines are terminated, the ability of the Debtor to confirm the Plan may be materially and adversely affected.***

The National PSA, Fuel Line Lender PSA, Vitol Settlement Agreement, and agreements with Settling Bondholders and/or Settling these settling parties are obligated to vote to accept the Plan and not to oppose confirmation of the Plan. The breach of any of these covenants or the termination of these agreements may have a material adverse effect on the Debtor's ability to confirm the Plan.

An overview of the Fuel Line Lender PSA and National PSA is provided in section II.B of this Disclosure Statement. An overview of the Vitol Settlement Agreement is provided in section V.E of this Disclosure Statement.

***If the Debtor is unable to confirm the Plan, the Title III Court may dismiss the Title III Case or lift the automatic stay to enable the PREPA Bondholders to pursue appointment of a receiver.***

As discussed in Section I.C of this Disclosure Statement, following the expiration of mediation, certain Bondholders and Monoline Insurers moved to dismiss PREPA's Title III Case, or in the alternative, lift the automatic stay to pursue appointment of a receiver. The Title III Court stayed the motion until the earlier of (i) the day after the deadline set by the Title III Court for filing a proposed plan of adjustment and related materials, if such deadline is not met or (ii) termination of the plan confirmation process. Should PREPA be unable to confirm the Plan, the Title III Court may consider and grant the Motion to Dismiss PREPA's Case. If a receiver is appointed for PREPA, LUMA Energy would have the option to terminate the T&D Contract. Termination of the T&D Contract would leave PREPA without an operator for its electricity grid and significantly disrupt the ongoing efforts to transform PREPA's Generation Assets. A receiver may also seek to significantly increase PREPA's rates sufficient to cover the principal and interest obligations on the Bonds. The sharp and substantial increase in electricity rates may drive

343

customers from the grid, accelerate outmigration, reduce load, and otherwise negatively impact Puerto Rico's economy.

B.   **Risks Related to PREPA**

*The financial information contained herein is based upon the Debtor's books and records and publicly available information as of the date hereof or the date to which such information relates, as applicable; no audit or independent examination of such information was performed.*

Unless otherwise specified, the financial information contained herein has not been, and will not be, audited or reviewed by any independent accounting firm or third party and is limited in scope.  Although the Debtor believes that it has used its reasonable efforts to assure the accuracy of the financial information provided herein, there can be no assurance that the financial information contained herein is without material inaccuracies or inconsistencies.  Neither the Oversight Board nor the Government can vouch for the accuracy and completeness of such information.  As a result, you are cautioned not to place undue reliance on any of the financial information contained herein.

*PREPA has no duty to update the statements contained in this Disclosure Statement.*

The statements contained in this Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtor has no duty to update this Disclosure Statement unless otherwise ordered to do so by the Title III Court or as required under the Bankruptcy Code or Bankruptcy Rules.

*The Oversight Board may be dissolved before Plan obligations are fully satisfied.*

After certifying the government has met the requirements under Section 209 of PROMESA, including, among other things, the development of budgets in accordance with modified accrual accounting standards and certification that expenditures made by the territorial government during each fiscal year did not exceed the revenues, the Oversight Board and associated requirements for the publication of fiscal plans and other fiscal transparency measures will be terminated.  This may occur many years before the obligations under the Plan are fully satisfied.

For additional information regarding the dissolution of the Oversight Board, see section IV.D.2 of this Disclosure Statement.

*When the Oversight Board is dissolved, the Government may eliminate controls, protections, and transparency the Oversight Board has created.*

Subject to certain constitutional limitations, every legislature can change prior laws.  There is no assurance the Oversight Board's protections and systems will be continued by subsequent administrations, and the Government may object to measures the Oversight Board imposes and may continue to do so once the Oversight Board is no longer present to enforce the reforms it has imposed.

***When the Oversight Board is dissolved, PREPA and/or PREB may fail to take steps to ensure payment of the New Bonds or CVI.***

The New Bonds require the implementation of the Legacy Charge, and the New Bonds and CVI require the collection and application of revenue generated by the Legacy Charge for their payment. Once the Oversight Board terminates, there can be no guarantee that PREB will continue to assess the Legacy Charge, or that PREPA or its agent will continue to fully collect the Legacy Charge and apply it to payment of the New Bonds in accordance with the applicable payment waterfall.

For additional information regarding the New Bonds and CVI, see section VI.F of this Disclosure Statement.

***Financial reporting going forward may not be completed on a timely basis.***

The most recent basic audited financial statements prepared by PREPA are for Fiscal Year 2020. No guaranty can be made as to the availability of current audited financial statements or the Debtor's ability to provide financial reporting on a timely basis.

An overview of PREPA's financial statements is provided in section XII.A of this Disclosure Statement.

***Future events and actual results may differ materially from any estimates, projections, or statements contained herein.***

Any statements and assumptions contained herein, whether forward-looking or historical, are not guarantees of future performance and involve certain risks, uncertainties, estimates, and other assumptions made in this document. The economic and financial condition of PREPA is affected by various legal, financial, social, economic, environmental, governmental and political factors. These factors can be very complex, may vary from one fiscal year to the next, and are frequently the result of actions taken or not taken, not only by the Government, PREPA, and the Oversight Board, but also by other third party entities such as the government of the United States. Nothing in this document should be considered as an express or implied warranty of facts or future events.

***The Debtor may fail or be unable to successfully implement proposed reforms by the Oversight Board via Section 205(a) recommendations and the Certified Fiscal Plan.***

To achieve long-term sustainability, the Government, PREPA, and other agencies may need to implement additional reforms to address the numerous underlying challenges of the current system. The Oversight Board has proposed, among others, the following reform measures: (1) reducing PREPA's reliance on fossil fuels, diversifying PREPA's energy sources, and prioritizing clean renewable energy; (2) increasing service reliability; and (3) expanding and developing structurally hardened infrastructure to withstand extreme weather events. However, many of these reforms cannot be implemented without the support of Puerto Rico's elected Government. Failure of PREPA or the Government to implement these measures may materially impact PREPA's future revenues or operations.

C.     **Risks Related to Transformation**

***Termination of the T&D Contract could materially impact PREPA's operations.***

Pursuant to the T&D Contract, LUMA Energy may terminate the agreement upon certain events, including if PREPA has not emerged from Title III by December 1, 2022.  On November 29, 2022, the Oversight Board and P3 Authority voted to extend the Interim Period of the T&D Contract.  On November 30, the Government and PREPA Board approved the extension of the T&D Contract.  In connection with this extension, the two "public interest" members of the P3 Authority's board of directors have announced that they are considering litigating whether the extension was improperly approved.  The Puerto Rico House of Representatives and Senate have also indicated that they intend to challenge the extension of the T&D Contract in the Title III Court.  If the Interim Period extension is invalidated, the T&D Contract may be terminated.  If the T&D Contract is terminated, the Plan may not be feasible or confirmable, or may require material amendment.

Additionally, as a condition to the commencement of the 15-year term of the T&D Contract, numerous conditions precedent to service commencement must be satisfied, including but not limited to (i) PREPA's exit from Title III with a plan that is reasonably acceptable to LUMA Energy; (ii) approval and implementation of the PREPA reorganization; and (iii) approval by PREB of LUMA's Performance Metrics.  To the extent this Plan or the confirmation order entered by the Title III Court is not reasonably satisfactory to LUMA Energy, the T&D Contract may be terminated.  Moreover, the 15-year T&D Contract cannot enter service commencement until all conditions precedent to service commencement are satisfied or waived.  Finally, LUMA Energy may terminate the T&D Contract if a receiver, trustee, custodian, or similar official is put in place for PREPA or a substantial portion of its assets, a proceeding for which has already been commenced by the Ad Hoc Group and Monoline Insurers.  Termination of the T&D Contract would leave PREPA without an operator for the T&D System, and would result in PREPA incurring at least $115 million in termination fees allowable as an administrative expense claim, as well as additional costs related to transitioning operation of the T&D System back to PREPA or another operator.  The Oversight Board believes that termination would significantly disrupt the ongoing efforts to transform PREPA and the transmission and distribution system, and may materially impact PREPA's future revenues or operations.  PREPA's failure to achieve its transformation goals could have serious ramifications related to reliability of the grid.

An overview of the T&D Contract is provided in section III.F.5 of this Disclosure Statement.

***The Legislative Assembly may continue its attempts to interfere with the T&D Contract, PREPA's debt, and PREPA's Transformation.***

The Legislative Assembly has attempted to enact legislation that would materially impede, hinder, or interfere with or control PREPA's transformation, the restructuring of PREPA's debt, and the T&D Contract.  There is no certainty that the Legislative Assembly will not attempt to interfere with the Plan either prior to or after the Effective Date.  These actions could materially adversely affect PREPA's operations, revenues, Legacy Charge, or ability to comply with the Certified Fiscal Plan.

346

Moreover, the P3 Authority has regulatory authority over certain public-private transactions, including the T&D Contract and the Legacy Generation Asset O&M Agreement. The Legislative Assembly appoints two "public interest" representatives to the P3 Authority's board, each of whose affirmative approval of any PREPA Transaction, including PREPA's transformation, entry into and compliance with the T&D Contract, and entry into, consummation of, and compliance with the Legacy Generation Asset O&M Agreement. As such, the Legislative Assembly and its appointed representatives can materially impact the P3 Authority's approval processes, among other things, in connection with PREPA's transformation.

While the Oversight Board could seek to exercise its powers under PROMESA to enjoin such legislative actions it believes are inconsistent with the purposes of PROMESA, including under PROMESA § 108, there is no certainty the Title III Court will grant the foregoing judicial relief, or that it would be upheld on appeal.

***The Legacy Generation Asset O&M Agreement may not be consummated.***

The conditions precedent to the Legacy Generation Asset O&M Agreement are not within PREPA's control. PREPA cannot predict when or if these conditions will be satisfied. PREPA or the P3 Authority may choose not to take actions necessary for the transaction to go into effect. Failure to consummate the Legacy Generation Asset O&M Agreement may threaten PREPA's long term generation capacity, precipitate a liquidity crisis for PREPA, and otherwise render PREPA unable to comply with its Certified Fiscal Plan or obligations under applicable law. Moreover, the Generation Asset O&M Agreement still requires certain approvals from, for example, the Oversight Board and Governor, and there can be no guarantee that such approvals will be obtained.

An overview of the Generation Transaction and Legacy Generation Asset O&M Agreement is provided in section III.F.5 of this Disclosure Statement.

***PREPA and LUMA Energy may be unable to achieve full compliance with the IRP.***

PREPA and LUMA Energy may not achieve full implementation of the IRP. For example, PREPA and LUMA Energy may not be able to, among other things, (i) increase the share of renewable generation and storage, while retiring or converting existing coal and heavy fuel oil generation and system modifications to enable integration of inverter-based generation; (ii) enhance grid resilience through optimal capital investment in the T&D System to support greater reliability; or (iii) enable customer choice through investment in distributed generation, energy efficiency, and demand response programs, at the levels required by the IRP. Failure to achieve full compliance with the IRP could impact PREPA's revenues and rates going forward.

An overview of the IRP is provided in section III.F of this Disclosure Statement.

***The T&D Contract and Legacy Generation Asset O&M Agreement may fail to achieve their stated goals.***

PREPA's transformation has been comprehensively planned. It is a large scale, ambitious undertaking that is the product of countless hours of coordination between the Oversight Board and numerous parts of the Government. PREPA's transformation is expected to accomplish many

diverse goals and provide significant benefits to Puerto Rico and its residents. Among these goals, the T&D Contract was entered into with the objectives of delivering low-cost electricity, leveraging LUMA Energy's experience to optimize application for and deployment of federal funds, increasing the resiliency and reliability of the T&D System, deploying new technologies, and implementing industry best practices and operational excellence through managerial continuity and long-term planning. To that end, the T&D Contract requires LUMA Energy to build a roadmap to a safe and reliable T&D System by, among other things, developing a system remediation plan, emergency response plans, security plans, and vegetation management plans to rebuild and maintain the T&D System.

Moreover, the Legacy Generation Asset O&M Agreement was entered into to assist PREPA with complying with applicable energy efficiency and renewable energy targets set in Act 17-2019 and the IRP, including transitioning from PREPA's current fuel mix to renewable energy resources and Liquefied Natural Gas as the primary sources of generation. PREPA's transformation is expected to take decades to be fully realized, and there are countless variables, known and unknown, including factors outside of the Oversight Board's control, that could affect PREPA's ability to achieve its transformation goals, which could, in turn, affect PREPA's revenues and ability to repay debt pursuant to the Plan,

An overview of the T&D Contract is provided in section III.F.5 of this Disclosure Statement. An overview of the Generation Transaction and Legacy Generation Asset O&M Agreement is provided in section III.F.5 of this Disclosure Statement.

D.   **Risks Related to Projections in Revenues and Expenses in the Certified Fiscal Plan**

*Numerous external and internal risks could materially impact the expected outcomes in the Certified Fiscal Plan.*

Any statements and assumptions contained in this Disclosure Statement, whether forward-looking or historical, are not guarantees of future performance and involve certain risks, uncertainties, estimates and other assumptions.

The assumptions underlying the information are necessarily subjective. There can be no assurance that these assumptions are currently correct in this Disclosure Statement or that they will remain correct or accurate in the future. Accordingly, there can be no guaranty that this information fully or correctly demonstrates the relationships among the economic factors comprised by this information. There are no representations or warranties that the projections are without flaws in logic or mechanics, although best efforts to design and build the financial information to demonstrate forecasted financial operations and financial performance based on the stated assumptions were undertaken. The economic and financial condition of the Government and its instrumentalities embodied in the projections are affected by various legal, financial, social, public health, economic, environmental, governmental and political factors. These factors are very complex, may vary from one fiscal year to the next and are frequently the result of actions taken or not taken, not only by the Government, but also by the Oversight Board and other third party entities such as the government of the United States. Examples of these factors include, but are not limited to:

348

- The effect of COVID-19 on the health and well-being of the people of Puerto Rico;

- The short-term economic effects of COVID-19 on the global economy and the economies of the United States and Puerto Rico as they relate to Puerto Rico's tax revenue and budget;

- The longer-term economic ramifications of behavioral changes caused by COVID-19 (*i.e.*, reduced travel, increased work from home, reduced activity in large gathering places, etc.);

- The amount of federal government aid provided to U.S. states and territories (including Puerto Rico), as well as the efficacy and speed of disbursement of such aid;

- The need to shift resources to create a more resilient structure to prevent or mitigate future pandemics;

- Any future actions taken or not taken by the United States government related to Medicaid;

- The amount and timing of receipt of any distributions from FEMA, HUD's CDBG-DR Program and private insurance companies to repair damage caused by Hurricanes Irma, Maria, and Fiona and the thousands of earthquakes occurring from 2019 until now;

- The amount and timing of receipt of any additional amounts appropriated by the United States government to address the funding gap described herein;

- The timeline for completion of the work being done by PREPA to repair its electric system and infrastructure and the impact of any future developments or issues related to the (i) reconstruction and modernization of the T&D System and infrastructure by LUMA Energy and the (ii) decommission and modernization of PREPA's legacy generation assets by Genera;

- The impact of outmigration and declining population;

- The timing and impact of the resolution of PREPA and Puerto Rico's Title III Cases and related litigation;

- High electricity rates may lead residential and commercial customers to use less electricity or to be unable to pay all or part of their electricity bills;

- Reductions in load could result in lower revenues, which, in turn could challenge PREPA's ability to pay operating costs and deliver services; and

- Factors that could affect the demand for electricity across Puerto Rico, including, but not limited to, trends in energy efficiency (EE) and distributed generation (DG), the adoption of electric vehicles, fluctuations in the price of fossil fuels, and advancements to, or changes in the price of, solar technologies.

***The Certified Fiscal Plan model relies on historical data to project GNP and inflation and does not take into account potential future external shocks.***

349

The Certified Fiscal Plan model relies on historical data on a key set of economic variables (*e.g.*, oil prices, food prices, output gap, capital growth, net federal transfers) to project GNP and inflation—and layers on the effects of Hurricanes Maria and Irma, the thousands of earthquakes occurring from 2019 until now, the COVID-19 pandemic, as well as the resulting disaster relief funding projected to be received by Puerto Rico. It does not take into account the impact of Hurricane Fiona and potential future external shocks such as unforeseen economic crises, natural disasters, or other changes in global (or local) economic activity that are not currently projected. Because future projections take into account past performance, if economic growth (or inflation) for the United States or Puerto Rico is materially higher or lower than projected, that could significantly affect the accuracy of the subsequent GNP and inflation projections in the Certified Fiscal Plan and thus the accuracy of the revenue and expense projections. Additionally, delayed or ineffective implementation of structural reforms on labor, energy, ease of doing business and education could impact GNP growth and in consequence, overall revenue performance.

PREPA's baseline volume forecast is also based in part on the Commonwealth's GNP forecast. There is a significant risk in the future that actual GNP will differ from projected GNP, since the accuracy of the GNP projections is significantly affected by the underestimated or overestimated projection of economic growth. The inaccuracy of GNP projections reduce the reliability of the projections. Therefore, GNP growth and PREPA's overall revenue performance can be significantly impacted.

***The Certified Fiscal Plan model does not incorporate major demographic shifts not currently apparent.***

Population projections in the Certified Fiscal Plan model are driven by projected future economic growth, as well as several demographic factors—such as projected fertility and mortality rates and net outmigration—based on the most recent available data (as of the certification date) from the Centers for Disease Control and Prevention (CDC), Bureau of Transportation Statistics, and U.S. Census Bureau, among others. Major demographic shifts not currently apparent (*e.g.*, major changes in fertility rates, age-mix of the population, migration patterns) could significantly change the accuracy of population estimates underlying the fiscal plan model. Since population serves as an input for overall macroeconomic projections (*e.g.*, GNP in Puerto Rico), which in turn drive projections for revenue and expense items (*e.g.*, load, distributed generation, labor costs), changes in population projections would impact the accuracy of the projected surplus.

***The Certified Fiscal Plan uses current data and policies to project federal funds for disaster relief and other major federal programs.***

Historically, PREPA has suffered as a result of a lack of a clear process for delivering capital programs. The projections in the Certified Fiscal Plan rely on the efficient and timely implementation of receipt and disbursement of federal and private disaster relief funds. This assumes both federal and local government processes to apply for and disburse funds will continue on their current pace and that the latest federal projections are accurate. The projections are also built on current legislation and federal policies governing the use of these funds. If overall local or federal government efficiency levels or processes change, or there are changes to the appropriations or governing policies (*i.e.*, changes made by Congress, FEMA, HUD, USDA, or other federal agencies), there could be direct impacts on the accuracy of revenue and expenditure

projections given disaster relief funds impact GNP growth estimates (which then impact population projections) as well as estimates regarding local government cost share.

Projected funding levels for standard federal programs and transfers (*e.g.*, TANF, NAP, Title I Funding) are based on the latest federal legislation as well as funding formulas for each program. Similar to disaster relief funds and healthcare federal funds, if the federal formulas or funding levels for other major social programs change, the accuracy of projected revenues and expenditures could materially change.

There is also a risk to the level of federal funding that PREPA receives, which is based on its ability to comply with federal requirements and guidelines. For example, if PREPA fails to meet certain cost-share requirements there can be implications to the level and limitations of federal funding. The Certified Fiscal Plan assumes recent historical consistency of PREPA's compliance with these requirements.

Without the timely receipt and disbursement of funding, PREPA may not be able to repair and modernize the grid system. Therefore, changes in efficient and reliable funding will negatively impact successful implementation of the measures outlined in the Certified Fiscal Plan.

***The Certified Fiscal Plan assumes current Puerto Rico and U.S. tax law and effective revenue measure implementation.***

The Certified Fiscal Plan projections take into account current U.S. and Puerto Rico tax laws and assume timely and effective implementation of revenue measures, including establishment of new revenue streams from taxes and fees and increased tax compliance.

Changes in Puerto Rico and U.S. tax law could therefore impact revenues, as could decisions that large businesses (including multinationals) make regarding their scale of operations in Puerto Rico, and their global tax planning. Further, if revenue measures are not effectively implemented, or if they exceed expected revenue yield, revenues could differ materially from those in the Certified Fiscal Plan projections.

***The Certified Fiscal Plan assumes rates are adjusted to meet PREPA's operational and capital expenditure needs.***

The Certified Fiscal Plan projections account for the implementation of rate adjustments necessary to meet PREPA's operational and capital expenditure needs. For example, during the first 10 years, PREPA will need to provide an additional approximately $500 million (or 5% of the approximately $10 billion paid over 10 years) of cost share to access FEMA funding that was not included in the Certified Fiscal Plan. Moreover, benchmarking PREPA against comparable utilities suggests that it may need to spend an additional $93 million, increasing to $125 million on capital expenditures annually between Fiscal Years 2035 to 2051. The implementation of rate adjustments and increases needed to pay these amounts, however, may be determined by PREB, and therefore cannot be guaranteed by PREPA. Furthermore, because the rate adjustments contemplated by the Certified Fiscal Plan are linked to inflation, fluctuations in inflation will ultimately affect revenues.

351

Failure to implement rate adjustments in alignment with inflation and the Certified Fiscal Plan could therefore significantly impact projected revenues. If the rate adjustments are not properly and effectively implemented, PREPA's revenues could differ materially from those projected in the Certified Fiscal Plan.

***PREPA's collections may be worse than projected.***

Customer collections could be lower than currently forecasted in the Certified Fiscal Plan. If PREPA is unable to collect amounts due from customers at the rates projected in the fiscal plan, the reduction in revenues could affect its ability to pay expenses and deliver services.

***Potential underestimation of necessary capital expenditures and operating expenses could impact creditor recoveries.***

If necessary capital expenditures or operating expenses are incorrect, incomplete, or materially higher than currently projected, the increased costs to PREPA could impact creditor recoveries, and the increased costs to PREPA's ratepayers could impact the feasibility of the plan as well as PREPA's ability to complete its transformation efforts.

***The Certified Fiscal Plan assumes agency efficiency measures are implemented to achieve savings without adverse impact on economic conditions.***

Expense measures assume that savings will generally be achieved through reforms that improve government efficiency while maintaining a level of services commensurate with the needs of the population and facilitate economic growth. However, if such savings are captured via simple attrition or expensive buy-out programs, there would be increased risk that efficiencies are not achieved and that the lower level of expenditures compromise PREPA's delivery of services.

***The Certified Fiscal Plan assumes effective and timely implementation of revenue and expense measures.***

The Certified Fiscal Plan projections rely on the effective and timely implementation of various revenue and expense measures. This assumes that any subsequent policy changes or departures from the Certified Fiscal Plan targets and objectives will adhere to the revenue-neutrality and overall spending limits contemplated by the Certified Fiscal Plan and related certified budgets. In order to assure effective implementation and credibility to the Certified Fiscal Plan objectives and projections, the Oversight Board requires the Government to provide periodic reports on financial performance and implementation progress. The Oversight Board has also developed a monitoring mechanism on its website, which can provide further transparency and accountability to the public on the Government's efforts relating to the Certified Fiscal Plan milestones and achievements. Delays or departures from the revenue and expense measure targets, milestones, and reporting specified in the Certified Fiscal Plan could materially alter the Certified Fiscal Plan projections.

***The Certified Fiscal Plan model is based on historical data reported by the Commonwealth or PREPA, much of which has not been audited or independently reviewed.***

The Certified Fiscal Plan is based on the input of historical macroeconomic, revenue and expense data reported by the Commonwealth, PREPA and/or LUMA Energy. PREPA has faced challenges in the past in reporting complete and accurate data, and much of the financial information provided has not been audited or reviewed by any independent accounting firm or third party. Any material inaccuracies or inconsistencies in the data could impact the accuracy of projections based on that data.

***The Certified Fiscal Plan model is based on current data and information to project capital improvement program needs and impact.***

The Certified Fiscal Plan projections incorporate capital expenditure based on current and projected future assessment of capital improvement program needs. The capital expenditure plans may need to be revised periodically due to various factors including, but not limited to, changes in legislative policy, changes in public sector operations, need for acceleration or deferrals of planned improvements, interaction with other governmental agencies, instrumentalities, municipalities, and private investors and financing sources, and other macroeconomic factors. Needs for quantification or increase in structural reform relating to public infrastructure may also impact the capital expenditure projections in the Certified Fiscal Plan. Changes in these expenditure projections as well as any deviations from the projected impact of such capital improvements could also impact the timing and achievement of other financial projections that are inter-dependent on effective accomplishment and existence of underlying framework and infrastructure.

***The Certified Fiscal Plan does not assume major changes in the current political climate in Puerto Rico or the United States subsequent to its certification.***

The Fiscal Plan policies and financial projections are driven by the executive commitment and legislative policies in the United States and Puerto Rico political climate which existed at the time of the certification of the Certified Fiscal Plan. Much of the financial projections are closely tied to federal funding availability and local political commitment. The Certified Fiscal Plan does not take into account future changes in the political environment – such as those from the Puerto Rican administration, Puerto Rican legislative and regulatory direction, federal appropriations and funding policies, federal tax exemptions, or Puerto Rico's statehood or relationship with the federal government.

E.    **Risks Related to the New Bonds**

***The New Bonds are payable solely from the Net Revenues deposited to the credit of the Debt Service Fund.***

The New Bonds are payable solely from the Net Revenues deposited to the credit of the Debt Service Fund and the holders of the New Bonds will have no other security or recourse for payment other than from the Net Revenues.

The New Bonds are not general obligations of Reorganized PREPA and are limited to the net cash flow from Legacy Charge as detailed in this Disclosure Statement, the Plan, the New Master Indenture and also are not indebtedness or liabilities of the Commonwealth or any of the Commonwealth's other public instrumentalities or political subdivisions. The New Bonds are not backed by the good faith, credit and taxing power of the Commonwealth nor are they payable or

secured by any of the Commonwealth's other public instrumentalities or political subdivisions. The New Bonds will not be insured or guaranteed by the New Master Trustee, any other service provider engaged pursuant to the New Master Indenture or any of their respective affiliates, or any other person.  Reorganized PREPA does not have any taxing authority.

For additional information regarding the New Bonds, see section VI.F of this Disclosure Statement.

***The New Bonds may not trade at par and limited liquidity may make the New Bonds less attractive to investors.***

As a result of concerns with PREPA's current and future financial circumstances, holders of the New Bonds may encounter limited market acceptance upon any attempt to sell the New Bonds.  Sales of New Bonds at or near par may be difficult.  Holders of the New Bonds after the Effective Date may not be able to sell such instruments for any price for some time.  Alternatively, potential purchasers may demand discounts to the par amount of such instruments before a potential purchaser would be willing to purchase them.  There can be no assurance that a secondary market will exist for the New Bonds.  The absence of a secondary market for the New Bonds or a lack of liquidity in the secondary market could limit holders' ability to resell any New Bonds or adversely affect the market value of the New Bonds.

The New Bonds and transactions described herein will be made on the basis of exemptions from registration provided in the Securities Act of 1933, as amended.  The New Bonds have not been approved or disapproved by the SEC, any state or Commonwealth securities commission or any other regulatory authority, nor have any of the foregoing passed upon the accuracy or adequacy of this Disclosure Statement.  Any representation to the contrary is a criminal offense.  Therefore, the secondary market for the New Bonds may be limited, and holders may not be able to sell them when they want to do so or obtain the price that they wish to receive, and, as a result, could suffer significant losses.

Given the unique nature of the Plan, certain closing conditions and closing deliverables, including legal opinions, with respect to the Plan will differ in type and scope from those typically required in municipal debt offering transactions that occur outside of a court-supervised restructuring process.  In making their investment decision, investors should consider that certain actions, procedures or requirements of legal advisors and other third parties in connection with the Plan will differ materially from and be more limited than those typical requirements.

Major disruptions in the global financial markets in recent years have caused a significant reduction in liquidity in the secondary market for securities.  Periods of illiquidity have and could occur again and affect the secondary market, thereby materially adversely affecting the value of the New Bonds and limiting holders' ability to sell them.  Concerns with the Commonwealth's economic prospects may also adversely affect the market value and liquidity of the New Bonds.

In addition, certain creditors believe the Series B Bonds being offered to Bondholders are not market securities and could trade substantially under par.  Provisions of the Series B Bonds they believe are below market include: limited ability of Series B Bondholders to compel PREPA to raise rates; the New Revenues used to pay Series B Bonds are subject to PREPA's ability to

354

first pay its operating expenses; the risk that Series B Bonds may be subject to amendments that delay or extend their expected repayment date and expected weighted average life; waiver of interest post-maturity; and the Indenture Trustee's fees may be capped in the event of default, among others.

***The rights of the holders of the New Bonds are limited in nature and may be adversely affected by issues generally associated with the enforcement of liens on collateral.***

Upon any declaration of default under the New Master Indenture, the payment of the New Bonds cannot be accelerated. The New Bonds are not subject to redemption prior to maturity at the election of the holders thereof, and the holders will have no recourse against Reorganized PREPA upon an event of default and no right to a receiver. Further, New Bonds will not carry any default rate of interest or accretion yield, as applicable. The Series B Bonds have only an interest rate covenant and may be limited in their ability to require Reorganized PREPA to set rates at a level sufficient to produce any Legacy Charge Revenues other than for interest. PREB, however, does have the responsibility under Puerto Rico law to exercise its power over rates to ensure PREPA recovers all operational and maintenance costs (Act 57-2014 § 6.25(b)) and meets its obligations to bondholders(Act 17-2019 § 6.3(p)).

The security interests in the Net Revenues and the right to receive the same, will be subject to practical problems generally associated with the realization of security interests in collateral. For example, the enforcement of the security interest in the Net Revenues requires a favorable determination from the Title III Court. There is no assurance that the New Master Trustee will obtain such favorable judgment and, accordingly, the New Master Trustee may not have the ability to foreclose upon such Net Revenues. Further, the lien of Net Revenues or right to receive the same may be avoidable by the pledgor (as debtor in possession), by its trustee in bankruptcy, or potentially by other creditors in a future bankruptcy of Reorganized PREPA if certain events or circumstances exist or occur, including, among others, the fact that the pledge or perfection permits the holders of New Bonds to receive a greater recovery in a hypothetical future Title III (or Chapter 7 or equivalents) case than if such pledge or perfection had not been given. To the extent that the grant or perfection of such Net Revenues is avoided as a preference or otherwise, the holders of the New Bonds would lose the benefit of the security interest and could have to return payments to Reorganized PREPA.

For additional information regarding the New Bonds, see section VI.F of this Disclosure Statement.

***Limited Nature of Ratings; Reductions, Suspension, or Withdrawal of a Rating.***

To the extent the Government Parties, each acting in its sole and absolute discretion, determine to apply for ratings on the New Bonds, the Government Parties have agreed to use commercially reasonable best efforts to obtain ratings on the New Bonds as soon as reasonably practicable as determined solely by the Government Parties and to subsequently use their commercially reasonable best efforts to obtain the best possible ratings. The New Master Indenture will not include a covenant by the Government Parties to maintain a specific rating with respect to outstanding New Bonds.

Any future rating assigned to the New Bonds by a rating agency will reflect such rating agency's assessment of the likelihood of the payment of interest when due and principal of the New Bonds on their respective maturity dates.   Any rating of the New Bonds is not a recommendation to purchase, hold or sell such New Bonds and such rating will not address the marketability of such New Bonds, their market price, or suitability for a particular investor.   There is no assurance that any rating will remain for any given period of time or that any rating will not be lowered, suspended, or withdrawn entirely by a rating agency if, in such rating agency's judgment, circumstances so warrant based on factors prevailing at the time, including, but not limited to, the evaluation by such rating agency of the financial outlook for Reorganized PREPA or the Commonwealth's economy.   Any such reduction, suspension or withdrawal of a rating, if it were to occur, could adversely affect the availability of a market or the market prices for the New Bonds.

*An adverse rating of the New Bonds could adversely affect the market price of the New Bonds.*

Notwithstanding that the government parties may not initially solicit a rating, a rating agency may issue an unsolicited rating on the New Bonds, employing quantitative and qualitative factors, including Reorganized PREPA's actual or perceived financial strength, the prospects for payment of principal and interest on the New Bonds, the impact of the Commonwealth's recent fiscal crisis, and other macroeconomic conditions in the Commonwealth.   Ratings also reflect various methodologies and assumptions used by the rating agencies, which are subject to change without notice.   Actions taken by the rating agencies can include initiating, maintaining, upgrading, downgrading or withdrawing a current rating of Reorganized PREPA's indebtedness or placing Reorganized PREPA on negative outlook for possible future downgrading.   Such action may be taken at any time and is beyond Reorganized PREPA's control.   The downgrade or withdrawal of any credit rating of Reorganized PREPA's indebtedness, including the New Bonds, or placing Reorganized PREPA on negative outlook for possible future downgrading may have a negative effect on the value of the New Bonds.

*The New Bonds will not be subject to the Trust Indenture Act.*

The New Bonds will not be required to be and will not be issued under an indenture qualified under the Trust Indenture Act of 1939, as amended (the "TIA").   Accordingly, holders of the New Bonds will not have the benefit of the protections of the TIA with respect to their investment in the New Bonds.

*Early redemption of the New Bonds may materially adversely affect the return on the New Bonds.*

The New Bonds are redeemable in whole or in part, prior to maturity.   See Section VI.F.6 of this Disclosure Statement.   The redemption price to be paid to holders of New Bonds upon such an early redemption thereof will be equal to the principal amount thereof plus accrued interest thereon to the date fixed for redemption.   Reorganized PREPA may choose to redeem the New Bonds, at times when prevailing interest rates are lower than the Interest Rate paid on the New Bonds.   In this circumstance, holders of such New Bonds may not be able to reinvest the redemption proceeds in a comparable security at an effective interest rate as high as that of the New Bonds being redeemed.

***The New Bonds issuance and implementation of the Legacy Charge may be subject to approval by PREB.***

The Title III Court may determine that PREB must approve the issuance of the New Bonds. Act 57-2014, as amended, contains a provision that grants PREB approval powers with respect to PREPA's bond issuances. However, Act 57-2014, as amended, provides that this approval requirement does not apply to debt issued pursuant to Title III of PROMESA. Nonetheless, if the Title III Court determines that PREB's obligation to approve PREPA's debt issuances does apply to bonds issued pursuant to Title III of PROMESA, the issuance of the New Bonds may be subject to PREB's approval.

The Title III Court may also determine that PREB must approve the modifications and increase to PREPA's electricity rates required in order to generate sufficient Net Revenues for repayment of the New Bonds, including implementation of the Legacy Charge. Pursuant to Act 57-2014, as amended, changes to PREPA's electricity rates must be approved by PREB before the proposed rates can take effect.

Furthermore, under the PREPA Enabling Act, as amended, transfers of PREPA's property require PREB's approval. While the Oversight Board believes that PROMESA preempts PREB's authority as it relates to approval of such transfers, if a court of competent jurisdiction determines that PREB approval is required, the Plan may be conditioned upon PREB approval.

If the Title III Court determines that PREB must approve (i) the issuance of the New Bonds (ii) the Legacy Charge, and/or (iii) transfers of PREPA's property, and PREB's approval cannot be obtained, it may have a material adverse effect on the Debtor's ability to confirm the Plan and the Plan may not be confirmable without material amendments.

An overview of PREB and its authority is provided in Section III.1 of this Disclosure Statement.

***The New Bonds may be subject to restrictions imposed by AAFAF.***

Pursuant to the Puerto Rico Debt Responsibility Act ("Act 101-2020"), AAFAF may establish a Debt Management Policy (as defined in Act 101-2020) to govern the issuance of debt by the Government of Puerto Rico and its public corporations and instrumentalities. While the Oversight Board believes that PROMESA preempts AAFAF's authority as it relates to debt issuances under PROMESA, to the extent AAFAF has adopted a Debt Management Policy that encompasses new Debt issued by PREPA, the Title III Court may determine that the issuance of the New Bonds must comply with any relevant restrictions imposed by such Debt Management Policy. If the New Bonds do not comply with such restrictions, such noncompliance may have a material adverse effect on the Debtor's ability to confirm the Plan and the Plan may not be confirmable without material amendments.

***The Legacy Charge may not generate sufficient revenue to make all payments of interest and principal on the New Bonds.***

The New Bonds are payable solely from the Net Revenues of PREPA deposited to the credit of the Debt Service Fund. The future Net Revenues generated, in part, by the Legacy Charge

are highly dependent on electricity usage volumes, electronic fee collection, enforcement fines, and other income.  Further, such revenue will depend on the continued operation of the electric system.  There is no assurance Reorganized PREPA will continue to operate the system in accordance with current or industry standards, or that a significant increase in contributions to the general operation and maintenance of the system will not be required.  Moreover, the increase in rates due to the Legacy Charge may also reduce demand, which in turn will reduce Net Revenues and the ability to make payments on the New Bonds.  Net Revenues generated from inclusion of the Legacy Charge will fund debt service on the New Bonds after payment of PREPA's Operating Expenses. Accordingly, projections of debt repayment assume that PREPA's revenues from sources other than the Legacy Charge will be sufficient to cover Operating Expenses.  PREB is required under Puerto Rico law to exercise its powers, including those over rates, to guarantee that PREPA covers it operational and maintenance expenses and meets its obligations to bondholders, but there is no assurance it will do so.  Furthermore, to the extent the Legacy Charge incorporates forward-looking projections, actual results may differ from such projections and, inherent in using forward-looking projections, there can be no guarantee that these projections and related considerations used in developing the Legacy Charge will match the actual results and conditions in the future.

The system may also be vulnerable to a *force majeure* event (*e.g.*, hurricanes and other natural disasters, fires, pandemics, epidemics, heat stress, floods, man-made disasters, war, riots) and other unforeseen circumstances and incidents, and the damage caused by such an event may adversely affect the performance of such assets until such damage has been remedied.  In certain circumstances, compliance by Reorganized PREPA with certain terms of the New Master Indenture may be suspended upon the occurrence of a force majeure event.  PREPA has not completed plans to improve system resilience and strengthen the energy system against future extreme weather events, which may increase in frequency and magnitude.  Earthquakes can cause serious damage to PREPA's infrastructure, as well as damage to transmission lines.  The U.S. Geological Survey forecasts the yearly chance of a magnitude 5+ earthquake currently at over 99%, and will remain at above 50% for the next three to ten years in Puerto Rico.  PREPA has not conducted a comprehensive risk assessment of its infrastructure to target structural enhancements required to limit damage from future earthquakes.

**PREB may modify the terms of the Legacy Charge and such modification may reduce debt service on the New Bonds.**

The Title III Court may determine that PREB has discretion to determine how electricity rates may be modified to meet PREPA's obligations under the New Bonds and/or other obligations under the Plan. PREB, therefore, may not implement the Legacy Charge precisely as described in the Plan and Disclosure Statement.  The rate structure PREB implements may, in turn, affect PREPA's ability to generate sufficient Net Revenues for repayment of the New Bonds.

An overview of PREB and its authority is provided in Section III.1 of this Disclosure Statement. An overview of the Legacy Charge is provided in Section II.B.3 of this Disclosure Statement.

**If the implementation of the Legacy Charge is delayed, the New Bonds may not be repaid in thirty-five (35) years.**

The Plan requires the Debtor to implement the Legacy Charge, an additional charge to PREPA's current rates, to generate sufficient Net Revenues to provide a source of repayment for the New Bonds to be issued by PREPA pursuant to the Plan.  Based on electricity demand projections in the Certified Fiscal Plan, the Legacy Charge is expected to generate sufficient revenue over thirty-five (35) years to repay the New Bonds. However, the Certified Fiscal Plan projects that electricity demand will decrease over time.  If implementation of the Legacy Charge is delayed, the New Bonds would not be projected to be repaid, and may not be repaid, in thirty-five (35) years.

An overview of the Legacy Charge is provided in Section II.B.3 of this Disclosure Statement.

***The Series B Bonds may trade at a discount to the Series A Bonds.***

The Series B Bonds may trade at discount to the Series A Bonds.

While the Series B-1 Bonds carry an interest rate of six percent (6%), similar to the Series A Bonds, and Series B-2 Bonds carry an interest rate of six and seventy-five hundredths percent (6.75%), the Series A Bonds have priority in payment of principal and are expected to be repaid in five (5) years as opposed to thirty-five (35) years.

F.    **Risks Related to the CVI**

***The CVI are payable solely from the Remaining Net Revenues deposited to the credit of the CVI Debt Service Fund.***

The CVI are payable solely from the Remaining Net Revenues deposited to the credit of the CVI Debt Service Fund and the holders of the CVI will have no other security or recourse for payment other than from the Remaining Net Revenues.

The CVI are not general obligations of Reorganized PREPA and are limited to the net cash flow from Remaining Legacy Charge as detailed in this Disclosure Statement, the Plan, the New Master Indenture and also are not indebtedness or liabilities of the Commonwealth or any of the Commonwealth's other public instrumentalities or political subdivisions.  The CVI are not backed by the good faith, credit and taxing power of the Commonwealth nor are they payable or secured by any of the Commonwealth's other public instrumentalities or political subdivisions.  The CVI will not be insured or guaranteed by the New Master Trustee, any other service provider engaged pursuant to the New Master Indenture or any of their respective affiliates, or any other person.

For additional information regarding the CVI, see section VI.F of this Disclosure Statement.

***The CVI may not trade at par or their notional value and limited liquidity may make the CVI less attractive to investors.***

As a result of concerns with PREPA's current and future financial circumstances, holders of the CVI may encounter limited market acceptance upon any attempt to sell the CVI.  Sales of CVI at or near par or their notional value may be difficult.  Holders of the CVI after the Effective

Date may not be able to sell such instruments for any price for some time. Alternatively, potential purchasers may demand discounts to the par or notional amount of such instruments before a potential purchaser would be willing to purchase them. There can be no assurance that a secondary market will exist for the CVI. The absence of a secondary market for the CVI or a lack of liquidity in the secondary market could limit holders' ability to resell any CVI or adversely affect the market value of the CVI.

The CVI and transactions described herein will be made on the basis of exemptions from registration provided in the Securities Act of 1933, as amended. The CVI have not been approved or disapproved by the SEC, any state or Commonwealth securities commission or any other regulatory authority, nor have any of the forgoing passed upon the accuracy or adequacy of this Disclosure Statement. Any representation to the contrary is a criminal offense. Therefore, the secondary market for the CVI may be limited, and holders may not be able to sell them when they want to do so or obtain the price that they wish to receive, and, as a result, could suffer significant losses.

Given the unique nature of the Plan, certain closing conditions and closing deliverables, including legal opinions, with respect to the Plan will differ in type and scope from those typically required in municipal debt offering transactions that occur outside of a court-supervised restructuring process. In making their investment decision, investors should consider that certain actions, procedures or requirements of legal advisors and other third parties in connection with the Plan will differ materially from and be more limited than those typical requirements.

Major disruptions in the global financial markets in recent years have caused a significant reduction in liquidity in the secondary market for securities. Periods of illiquidity have and could occur again and affect the secondary market, thereby materially adversely affecting the value of the CVI and limiting holders' ability to sell them. Concerns with the Commonwealth's economic prospects may also adversely affect the market value and liquidity of the CVI.

***The rights of the holders of the CVI are limited in nature and may be adversely affected by issues generally associated with the enforcement of liens on collateral.***

Upon any declaration of default under the New Master Indenture, the payment of the CVI cannot be accelerated. The CVI are not subject to redemption prior to maturity at the election of the holders thereof, and the holders shall have no recourse against Reorganized PREPA upon an event of default and no right to a receiver. Further, the CVI shall not carry any default rate of interest or accretion yield, as applicable. As currently configured, the CVI has no rate covenant and is subject to the operating expenses Reorganized PREPA may have.

The security interests in the Remaining Net Revenues and the right to receive the same, will be subject to practical problems generally associated with the realization of security interests in collateral. For example, the enforcement of the security interest in the Remaining Net Revenues requires a favorable determination from the Title III Court. There is no assurance that the New Master Trustee will obtain such favorable judgment and, accordingly, the New Master Trustee may not have the ability to foreclose upon such Remaining Net Revenues. Further, the lien of Remaining Net Revenues or right to receive the same may be avoidable by the pledgor (as debtor in possession), by its trustee in bankruptcy, or potentially by other creditors in a future bankruptcy

of Reorganized PREPA if certain events or circumstances exist or occur, including, among others the pledge or perfection permits the holders of CVI to receive a greater recovery in a hypothetical future Title III (or Chapter 7 or equivalents) case than if such pledge or perfection had not been given.  To the extent that the grant or perfection of such Remaining Net Revenues is avoided as a preference or otherwise, the holders of the CVI would lose the benefit of the security interest and could have to return payments to Reorganized PREPA.

For additional information regarding the New Bonds, see section VI.F of this Disclosure Statement.

***The CVI will not be subject to the Trust Indenture Act.***

The CVI will not be required to be and will not be issued under an indenture qualified under the Trust Indenture Act of 1939, as amended (the "TIA").  Accordingly, holders of the CVI will not have the benefit of the protections of the TIA with respect to their investment in the CVI.

***Early redemption of the CVI may materially adversely affect the return on the CVI.***

The CVI are redeemable in whole or in part, prior to maturity.  *See* Section VI.F of this Disclosure Statement.  Reorganized PREPA may choose to redeem the CVI.  In this circumstance, holders of such CVI may not be able to reinvest the redemption proceeds in a comparable security.

***The CVI Issuance and Implementation of the Remaining Legacy Charge may be subject to approval by PREB.***

The Title III Court may determine that PREB must approve the issuance of the CVI.  Act 57-2014, as amended, contains a provision that grants PREB approval powers with respect to PREPA's debt issuances.  However, Act 57-2014, as amended, provides that this approval requirement does not apply to debt issued pursuant to Title III of PROMESA.  Nonetheless, if the Title III Court determines that PREB's obligation to approve PREPA's debt issuances does apply to CVI issued pursuant to Title III of PROMESA, the issuance of the CVI may be subject to PREB's approval.

The Title III Court may also determine that PREB must approve the increase to PREPA's electricity rates required by the CVI, including implementation of the Remaining Legacy Charge.  Pursuant to Act 57-2014, as amended, changes to PREPA's electricity rates must be approved by PREB before the proposed rates can take effect.

If the Title III Court determines that PREB must approve (i) the issuance of the CVI and (ii) the Remaining Legacy Charge, and PREB's approval cannot be obtained, it may have a material adverse effect on the Debtor's ability to confirm the Plan and the Plan may not be confirmable without material amendments.

An overview of PREB and its authority is provided in Section III.1 of this Disclosure Statement.

***The CVI may be subject to restrictions imposed by AAFAF.***

361

Pursuant to the Puerto Rico Debt Responsibility Act ("Act 101-2020"), AAFAF may establish a Debt Management Policy (as defined in Act 101-2020) to govern the issuance of debt by the Government of Puerto Rico and its public corporations and instrumentalities. While the Oversight Board believes that PROMESA preempts AAFAF's authority as it relates to debt issuances under PROMESA, to the extent AAFAF has adopted a Debt Management Policy that encompasses new Debt issued by PREPA, the Title III Court may determine that the issuance of the CVI must comply with any relevant restrictions imposed by such Debt Management Policy. If the CVI does not comply with such restrictions, it may have a material adverse effect on the Debtor's ability to confirm the Plan and the Plan may not be confirmable without material amendments.

***Holders of CVI may not receive any payments on the CVI.***

The CVI are payable solely from the Remaining Net Revenues of PREPA deposited to the credit of the CVI Debt Service Fund. The future Remaining Net Revenues generated, in part, by the Remaining Legacy Charge are highly dependent on all factors affecting the Legacy Charge and repayment of New Bonds, including, but not limited to, electricity usage volumes, electronic fee collection, enforcement fines and other income, and for the reasons set forth in Section VIII.D of this Disclosure Statement. Further, such revenue will depend on the continued operation of the electric system. There is no assurance Reorganized PREPA will continue to operate the system in accordance with current or industry standards, or that a significant increase in contributions to the general operation and maintenance of the system will not be required. Moreover, the increase in rates due to the Remaining Legacy Charge may also reduce demand, which in turn will reduce Remaining Net Revenues and the ability to make payments on the CVI. Remaining Net Revenues generated from inclusion of the Remaining Legacy Charge will fund CVI payments after payment of Operating Expenses. Accordingly, any amounts owed on account of CVI at a given time assumes that PREPA's revenues from sources other than the Remaining Legacy Charge will be sufficient to cover Operating Expenses at that time. PREB is required under Puerto Rico law to exercise its powers, including those over rates, to guarantee that PREPA covers its operational and maintenance expenses and meets its obligations to bondholders, but there is no assurance it will do so. Furthermore, to the extent the Legacy Charge incorporates forward-looking projections, actual results may differ from such projections and, inherent in using forward-looking projections, there can be no guarantee that these projections and related considerations used in developing the Legacy Charge will match the actual results and conditions in the future.

The system may also be vulnerable to a force majeure event (*e.g.*, hurricanes and other natural disasters, fires, pandemics, epidemics, heat stress, floods, man-made disasters, war, riots) and other unforeseen circumstances and incidents, and the damage caused by such an event may adversely affect the performance of such assets until such damage has been remedied. In certain circumstances, compliance by Reorganized PREPA with certain terms of the New Master Indenture may be suspended upon the occurrence of a force majeure event. If such a suspension occurs, there will not be an accompanying extension of the maturity of the CVI. Accordingly, any such suspension will be a permanent reduction in potential value to the CVI. PREPA has not completed plans to improve system resilience and strengthen the energy system against future extreme weather events, which may increase in frequency and magnitude. Earthquakes can cause serious damage to PREPA's infrastructure, as well as damage to transmission lines. The U.S. Geological Survey forecasts the yearly chance of a magnitude 5+ earthquake currently at over

99%, and will remain at above 50% for the next three to ten years in Puerto Rico.  PREPA has not conducted a comprehensive risk assessment of its infrastructure to target structural enhancements required to limit damage from future earthquakes.

For additional information regarding the New Bonds, see section VI.F of this Disclosure Statement.

G.    **Risks Related to the Election of National Commutation Treatment**

Each Holder of an Allowed National Insured Bond Claim shall have the option to elect on the National Bondholder Election Form to receive, on the Effective Date, the National Commutation Consideration, distributable by or at the direction of National, and, if elected, (i) the Holder thereof shall have no other or further rights under or with respect to the applicable National Insurance Policy or any National Trust or National Escrow Account, (ii) the Holder thereof shall not receive any payments from National under the National Insurance Policies on account of accrued and unpaid interest on and after, or, in the case of any capital appreciation bonds, the accreted value on and after, the Effective Date, and to the extent any accrued or accreted interest is paid to such Holder by National after such date, such amount shall be credited against the consideration such Holder, their successors, transferees, or assigns are otherwise entitled to receive as National Commutation Consideration, and (iii) National shall receive the National Plan Consideration distributable on account of the applicable Allowed National Insured Bond Claim. National retains the sole discretion to select the form of National Commutation Consideration to be distributed under the National Commutation Treatment.  Holders will know how their claims will be treated by the Plan Supplement Deadline, seven (7) days in advance of the election deadline.

H.    **Risks Related to the National Non-Commutation Treatment**

Each holder of an Allowed National Insured Bond Claim may elect not to receive the National Commutation Treatment.  Holders will know how their claims will be treated by the Plan Supplement Deadline, seven (7) days in advance of the election deadline.

National is entitled to elect from the treatments described in Section 20.B of the Plan, which include custodial trusts, escrow accounts, or cash payments of accelerated amounts.  In the event that a Holder of an National Insured Bond Claim timely and validly elects on the National Bondholder Election Form to receive the National Non-Commutation Treatment, (i) National shall receive the National Plan Consideration distributable on account of the applicable Allowed National Insured Bond Claim, and (ii) such Holder shall receive one or more of the following treatments, at National's election, which election shall be exercised by National in its sole discretion at or prior to the Plan Supplement Deadline, and as detailed in the applicable National Bondholder Election Form.

To the extent that National elects a custodial trust (each such trust, as applicable, a "National Trust") on terms substantially similar those reflected in (i) the relevant form "Standard Terms to Trust Agreement" included as an exhibit in the Plan Supplement if elected by National as the form of National Non-Commutation Treatment, and (ii) the relevant form "Trust Agreement" included as an exhibit in the Plan Supplement if elected by National as the form of National Non-Commutation Treatment (together, and as they may be modified prior to

363

implementation, the "National Trust Agreement"), holders receiving such treatment will (i) deposit, or be deemed to have deposited, among other things, such Holder's Pro Rata Share of the National Trust Consideration, the National Insured Bonds allocable to such electing Holder, and the related National Insurance Policies into the applicable National Trust, (ii) be deemed to have received its Pro Rata Share of the National Trust Consideration and National Certificates in consideration therefor, and (iii) have no recourse to National or the National Insurance Policies other than as provided for under the terms of the National Trust.

To the extent that National elects an escrow account, holders receiving such treatment will deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the National Escrow Consideration in the National Escrow Account and such deposited National Escrow Consideration will be held as security for National's obligations to the holders of the National Insured Bonds whose National Escrow Consideration was deposited in the National Escrow Account under the National Insurance Policies.

To the extent that National elects cash payments, National will fully and completely discharge its obligation to such holder of an Allowed National Insured Bond Claim by paying on the Effective Date, in Cash, the amount thereof at the National Acceleration Price as of the date of payment.

In addition, National and the Oversight Board may formulate an alternative election or implementation option not identified in the Plan with respect to the National Insured Bonds prior to commencement of the Disclosure Statement Hearing.

Any holder of an Allowed National Insured Bond Claim that does not timely and validly elect to receive the National Non-Commutation Treatment, or submits an election for less than all of its National Insured Bond Claims, will be deemed to have elected to receive the National Commutation Treatment.

I.      **Risks Related to Making or Declining to Make the National Commutation Election**

The Plan provides holders of Allowed National Insured Bond Claim with an option to choose the National Commutation Treatment or National Non-Commutation Treatment. The National Insured Bonds of a holder of an Allowed National Insured Bond Claim that does not validly elect to receive the National Non-Commutation Treatment will be deemed cancelled on the Effective Date, and National's obligations under the applicable National Insurance Policies will be fully and finally satisfied, released, and discharged.

The ability of a non-commuting holder of Claims in Class 5 to recover on account of its Allowed National Insured Bond Claims is subject to the collection risk associated with National. The holders of Claims in Class 5 should investigate the financial condition of National prior to determining whether to elect to receive the National Commutation Treatment under the Plan. Future events could occur that could give rise to payment or other counterparty risks with respect to National. Such risks would attach to the National Certificates and the Debtor can make no guarantee that any holder would be able to realize any particular level of recovery from National.

J.      **Risks Related to the National Certificates**

A holder of an Allowed National Insured Bond Claim that elects not to receive the National Commutation Treatment may, at National's election, be deemed to have received its Pro Rata Share of the National Trust Consideration and National Certificates in consideration for the deposit of such holder's Pro Rata Share of the National Trust Consideration, the National Insured Bonds allocable to such holder, and the related National Insurance Policies into the applicable National Trust and will have no recourse to National or the National Insurance Policies other than as provided for under the terms of the National Trust.

K.      **Risks Related to the National Escrow Account**

A holder of an Allowed National Insured Bond Claim that elects not to receive the National Commutation Treatment may, at National's election, be required to deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the National Escrow Consideration in the National Escrow Account and such deposited National Escrow Consideration will be held as security for National's obligations to the holders of the National Insured Bonds whose National Escrow Consideration was deposited in the National Escrow Account under the National Insurance Policies.

L.      **Risks Related to Payment of National Acceleration Price**

A holder of an Allowed National Insured Bond Claim that elects not to receive the National Commutation Treatment may, at National's election, receive the National Acceleration Price, which is an amount equal to the outstanding principal plus accrued and unpaid interest (or, in the case of any capital appreciation bonds, the compounded amount thereof) as of the date of payment. Such payment will satisfy and discharge in full National's obligations under the National Insurance Policies with respect to such National Insured Bonds.

Holders of the National Insured Bonds that are paid the National Acceleration Price may be dependent on National to have sufficient cash to satisfy its payment obligations. There is no certainty that National will have sufficient funds to pay the National Acceleration Price. Moreover, holders of the National Insured Bonds that are paid the National Acceleration Price will not be entitled to any further interest payments on the National Insured Bonds, and will have no further rights to or interest in the National Insurance Policies or the National Plan Consideration.

M.      **Risks Related to the Collection of Revenues Supporting the Payment of New Bonds and CVI**

The Puerto Rico power grid and its operators may be subject to additional future economic shocks and recessions that may be triggered by causes other than a global pandemic, such as banking crises, trade and fuel disruptions, and political crises, among others. To mitigate future disruptions under curfew or adverse economic conditions on the utility sector, operational measures to increase remote control of the grid (*e.g.*, distribution automation technologies, smart meter installation) must be considered in addition to pursuing measures to enhance system

365

reliability and resilience. During an economic shock, declining collections would lead to a lower cash balance, elevating the need for effective liquidity management in the short term.

***The Legacy Charge and legacy pension costs will increase PREPA's rates to cover PREPA's legacy debt obligations.***

The Legacy Charge and legacy pension costs will increase PREPA's rates to cover PREPA's legacy debt obligations, including the principal and interest obligations on the New Bonds. This increase in PREPA's rates may drive customers from the grid, accelerate outmigration, reduce load, and have other negative ramifications.

An overview of the Legacy Charge is provided in Section II.B.3 of this Disclosure Statement.

***Natural disasters may impact the ability of the PREPA and LUMA Energy to collect revenue.***

Natural disasters may disrupt PREPA and LUMA Energy's ability to collect revenues as forecast and could lead to additional outmigration and damage to the electric system that could also potentially reduce revenues.

***Outbreak of Disease; COVID-19.***

The impact that the COVID-19 pandemic is having and will have on commerce, financial markets and Puerto Rico, and the nature of the impact, is likely to evolve over the next several years. The Government has experienced reductions in its revenue sources. The information contained in this Disclosure Statement describes current impacts that the COVID-19 pandemic and related orders have had on Puerto Rico's finances and operations, and describe some of the actions that Puerto Rico is taking in response. Neither the duration nor extent of the COVID-19 public health emergency, nor the magnitude of the impact on Puerto Rico, on regional economy or on collection of tax receipts can be predicted.

The COVID-19 outbreak is ongoing, and its dynamic nature leads to uncertainties, including: (i) the geographic spread of the virus; (ii) the severity of the disease; (iii) the duration of the outbreak; (iv) actions that governmental authorities may take to contain or mitigate the outbreak; (v) the development and distribution of medical therapeutics and vaccinations; (vi) additional or changed travel restrictions; (vii) the impact of the outbreak on the local or global economy, or on the aviation sector generally; (viii) whether and to what extent the Puerto Rico may order additional public health measures; and (ix) the impact of the outbreak and actions taken in response to the outbreak to the collection of tax receipts, expenses and financial condition. It should be assumed that the restrictions and limitations instituted related to COVID-19 may continue, that the current upheaval to the national and global economies and financial markets may continue and/or be exacerbated, at least over the near term, and that the recovery may be prolonged. Additional local epidemics or pandemics may occur and may occur with greater frequency given trends in globalization.

*Reduction in PREPA residential customers and households due to population decline.*

The Certified Fiscal Plan forecasts a population reduction of approximately eleven percent (11%) from Fiscal Years 2024 to 2038 and the corresponding gross load decline.  However, the IRP does not project a decrease in the number of residential customers.  It is likely that population decline will cause a decline in the number of residential and household customers of PREPA.  This decline in customers would further increase customers' overall cost due to higher relative fixed costs passed on to the declining customer base.

N.    **Risk Factors Related to Future Judicial Actions**

*The New Bonds and CVI are being issued in connection with the Plan that is subject to confirmation pursuant to PROMESA Title III, which has only been utilized for financial restructuring in three other instances.*

The Plan is effected pursuant to PROMESA Title III.  PROMESA is a new federal statute signed into law in 2016, and a plan of adjustment pursuant to Title III has only been confirmed by a court in three instances—with respect to HTA (confirmed on October 12, 2022), Commonwealth (confirmed on January 18, 2022), and COFINA (confirmed on February 4, 2019).  As a result, there are uncertainties relating to the successful confirmation and consummation of a plan of adjustment pursuant to PROMESA Title III.  For example, it is uncertain to what extent an order of the Title III Court confirming the Plan can be appealed or its effectiveness delayed.  While courts likely will borrow from existing precedents from chapters 9 and 11 of the Bankruptcy Code, there can be no assurances that courts would do so or consider other factors when interpreting the provisions of PROMESA.  Such uncertainties may affect, among other things, market perception and, therefore, the trading value of the New Bonds.

In addition, there is uncertainty associated with the consummation of a plan of adjustment pursuant to PROMESA Title III because there is limited judicial experience interpreting the provisions of a plan of adjustment confirmed pursuant to PROMESA Title III.  Judicial interpretations of a plan of adjustment confirmed pursuant to PROMESA Title III, including those related to the successful consummation of a plan of adjustment, could affect the value of the New Bonds issued under the Plan.

*PROMESA is subject to challenges regarding its constitutionality.*

Certain parties have challenged the constitutionality of PROMESA on the grounds that it violates the requirement under the Bankruptcy Clause of the United States Constitution that bankruptcy laws are uniform.  *See Ambac Assurance Corporation v. The Financial Oversight and Management Board for Puerto Rico, et al.*, Adv. Proc. No. 20-00068.  That challenge was subsequently withdrawn pursuant to a settlement, but other parties not bound by the settlement may raise similar challenges to PROMESA's constitutionality.

*PREPA may be subject to future claims and legal actions.*

PREPA may be subject to various claims and legal actions arising in the ordinary course of its activities that arise after the Effective Date.  The Debtor is not able to predict the nature and extent of any such claims and actions and cannot guarantee that the ultimate resolution of such

claims and actions will not have a material adverse effect on the Debtor after its emergence from Title III.

***The enforcement of rights under the New Bonds and CVI and the New Master Indenture may be limited to the extent Reorganized PREPA is subject to a subsequent case under Title III of PROMESA.***

The holders of New Bonds and CVI may be unable to enforce rights under the New Bonds or CVI, as applicable, and New Master Indenture to the extent Reorganized PREPA is subject to a subsequent case under Title III of PROMESA as a result of the application of the automatic stay on enforcement of remedies that would become effective upon the filing of the Title III petition.

***Certain closing conditions and closing deliverables with respect to the Plan may differ in type and scope from those described herein.***

Certain closing conditions and closing deliverables with respect to the Plan may differ in type and scope from those described herein if the Title III Court enters a Confirmation Order that is different than expected.

O.     **Risk Factors Related to Legislation**

***The Legislative Assembly may pass legislation that interferes with, hinders, impedes, or attempts to control, PREPA's ability to restructure and the terms of any bond issuance or achieve PREPA's transformation goals.***

The Plan contemplates relying on existing Puerto Rico statutes to authorize the transactions contemplated in the Plan, including the issuance of the New Bonds and CVI.  The Legislative Assembly has historically attempted to pass legislation that may interfere with, hinder, impede, or attempt to control, PREPA's ability to restructure and the terms of any bond issuance or achieve PREPA's transformation goals.  There is no certainty that the Legislative Assembly will not attempt to interfere with the Plan either prior to the Effective Date or following PREPA's exit from Title III.  These actions could materially adversely affect the value of the New Bonds and CVI and the recoveries on such instruments.

While the Oversight Board would seek to exercise its powers under PROMESA to enjoin such legislative actions, including under PROMESA § 108, there is no certainty the Title III Court will grant the foregoing judicial relief, or that it would be upheld on appeal.

Future action by the Legislative Assembly could change the legislation authorizing the transactions contemplated by the Plan in ways that affect the New Bonds and CVI.  Any action of the Government to amend the legislation, as well as the litigation that likely would ensue, might adversely affect the value of the New Bonds or CVI, and the recoveries on the same.

***Certain provisions in the Plan may require AAFAF's approval.***

Pursuant to the Act 101-2020, AAFAF may establish a Debt Management Policy (as defined in Act 101-2020).  As explained in Act 101-2020, the Debt Management Policy governs

368

the issuance of "Debt"[279] by the Government of Puerto Rico and its public corporations and instrumentalities.  Pursuant to Act 101-2020, AAFAF may have the power to include any Debt of any instrumentality or public corporation within its Debt Management Policy, which may include new Debt of PREPA issued after the effective date of the Commonwealth Plan.  While the Oversight Board believes that PROMESA preempts AAFAF's authority as it relates to debt issuances under PROMESA, to the extent that AAFAF has adopted a Debt Management Policy that encompasses new Debt issued by PREPA, there is a risk that a court of competent jurisdiction may determine the Plan is subject to obtaining such approvals.

P.    **Risk Factors Related to Tax Treatment of New Bonds**

*The proportion of New Bonds that will be tax-exempt for U.S. federal income tax purposes is uncertain.*

The New Bonds are expected to be issued as Tax-Exempt New Bonds as defined in Section IX of this Disclosure Statement.  However, if the New Bonds, or a portion thereof, are determined not to be tax-exempt, they will be treated as Taxable New Bonds as defined in Section IX of this Disclosure Statement.  Reorganized PREPA covenants under the Plan that, until all obligations with respect thereto have been paid or satisfied in full in accordance with their terms, it will do and perform all acts and things permitted by law and reasonably necessary to assure that interest paid to the holders of any Tax-Exempt New Bonds shall be and remain excludable from gross income for federal income tax purposes.  The tax status of the New Bonds has not been determined as of the date of this Disclosure Statement, including (i) whether a portion of the interest on the New Bonds will be eligible to be excluded from gross income for U.S. federal income tax purposes or (ii) if such interest, or a portion thereof, is determined to not eligible to be excluded, the ratio of the aggregate amount of all Taxable New Bonds to be issued on the Effective Date to the total aggregate amount of all New Bonds.  *See* Section IX.B.2 of this Disclosure Statement.

*The manner in which interest accruals should be calculated with respect to the New Bonds for U.S. federal income tax purposes is uncertain.*

The Debtor does not intend to treat the New Bonds as "contingent payment debt instruments" under the applicable Treasury Regulations as defined in Section IX of this Disclosure Statement.  However, there is limited authority as to the treatment of the New Bonds, and there can be no assurances that the IRS will respect such treatment.  U.S. Holders are urged to consult their own tax advisors regarding the treatment of New Bonds as contingent payment debt instruments, including any limitation under those rules on the amount of tax-exempt interest on the Tax-Exempt New Bonds that may be excluded from gross income for U.S. federal income tax purposes.  *See* Section IX.B.2 of this Disclosure Statement.

---

[279] Act 101-2020 defines Debt broadly to include "bonds, notes, loans and other evidences of indebtedness for borrowed money."

***U.S. Holders may be required to report income in certain years in excess of the amount of cash received by such holders in those years, resulting in "phantom income" for U.S. federal income tax purposes.***

If, for U.S. federal income tax purposes, the Taxable New Bonds (as defined in Section IX of this Disclosure Statement) are issued with more than a *de minimis* amount of original issue discount, generally, 0.25% of the stated redemption price at maturity multiplied by the number of complete years to maturity, then a U.S. Holder of such bonds must include original issue discount in income as it accrues (regardless of the holder's regular method of tax accounting) using a constant yield method under the accrual rules for original issue discount.  If interest accruals exceed the cash payments on the Taxable New Bonds in any year, a U.S. Holder will have "phantom income" in that year, *i.e.*, taxable income in excess of the cash received, which may be substantial.

In the event of a sale or other taxable disposition of a New Bonds with accrued market discount, a U.S. Holder must recognize ordinary income (in lieu of capital gain) to the extent of accrued market discount, unless the U.S. Holder previously elected to include the market discount in income as it accrued.   See "*Certain Material United States Federal Income Tax Considerations—U.S. Holders—Tax Treatment of Allowed Claims.*"

ALL HOLDERS SUBJECT TO UNITED STATES TAXATION SHOULD READ THE DISCUSSION OF THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PURCHASE, OWNERSHIP AND DISPOSITION OF THE NEW BONDS THAT IS CONTAINED IN THIS DISCLOSURE STATEMENT UNDER THE HEADING "CERTAIN MATERIAL UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS."=

Q.      **Risk Factors Related to the Assured Insurance Interest Rate Swap Claims**

Payments to the Holder of the Assured Insured Interest Rate Swap Claims are subject to entry of a final order determining the amount, if any, of the allowed claim.  The timing of a settlement or final order on the amount of the claim is uncertain, and may occur after the Effective Date, which would delay distributions to the holder thereof.   To the extent the amount of the Assured Insured Interest Rate Swap Claim is unliquidated as of the Effective Date, the Oversight Board will demonstrate at confirmation it has the ability to make payments on such claim if and when such claim is allowed after the Effective Date.  Each Assured Insured Interest Rate Swaps Claim shall be Allowed in an amount to be agreed upon between the Oversight Board and the Holder of such Claim; provided that, if no agreement can be reached on the amount of the Assured Insured Interest Rate Swaps Claim to be Allowed, the Oversight Board and Holder of the Claim shall submit such dispute to the Title III Court (or other Person or Entity upon mutual agreement of the Oversight Board and Holder) to determine the amount of such Claim to be Allowed, which amount shall be determined in accordance with applicable law.

*[Remainder of Page Intentionally Left Blank]*

## IX.    Certain Material United States Federal Income Tax Considerations

### A.    General

A general description of certain material U.S. federal income tax consequences of the Plan to holders of certain Claims is provided below.  This description is based on the U.S. Internal Revenue Code of 1986, as amended (the "IRC"), regulations (including temporary and proposed regulations) promulgated under the IRC (the "Treasury Regulations"), judicial decisions and administrative determinations, all as in effect on filing the date of this Disclosure Statement and all of which are subject to change, possibly with retroactive effect.  Changes in any of these authorities or in their interpretation could cause some, or all, of the U.S. federal income tax consequences of the Plan to differ materially from the consequences described below.

The U.S. federal income tax consequences of the Plan are complex, and may vary based on the Class of Claims held by a holder.  As of the date of this Disclosure Statement, no ruling has been requested from the IRS as to any aspect of the Plan; no opinion has been requested from the Debtor's counsel concerning any tax consequence of the Plan except as specifically set forth therein; and no tax opinion is given by this Disclosure Statement.

The description that follows does not cover all aspects of U.S. federal income taxation that may be relevant to holders of Claims.  For example, the description does not address issues of special concern to certain types of taxpayers (*e.g.*, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold their Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency for tax purposes is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax, individuals receiving Social Security or Railroad Retirement benefits, and persons whose claims are part of a straddle, hedging, constructive sale, or conversion transaction).  In addition, the description does not address U.S. federal taxes other than income taxes, nor does it apply to any person that acquires New Bonds in the secondary market.  Furthermore, the description does not discuss state, territorial (including Puerto Rico), local or non-U.S. income or other tax consequences (including estate or gift tax consequences).  Finally, this discussion does not address the U.S. federal income tax consequences to holders of Claims who are deemed to have rejected the Plan.

For these reasons, the description that follows is not a substitute for careful tax planning and professional tax advice based upon the individual circumstances of each holder of a Claim.  Holders of Claims are urged to consult with their own tax advisors regarding the U.S. federal, state, territorial (including Puerto Rico), local and non-U.S. tax consequences of the Plan.

**The Puerto Rico tax consequences of the Plan to holders that are bona fide residents of the Commonwealth, and others who may be subject to tax on a gross or net basis by the Commonwealth are not discussed in this section. Such holders should review Section X below.**

372

B.     **U.S. Holders**

1.     **Definition of U.S. Holder**

Unless otherwise noted, the discussion below applies only to U.S. Holders.  As used herein, the term "U.S. Holder" means a beneficial owner of PREPA Revenue Bonds (the "Existing Securities") on the Effective Date of the Plan that is, for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable U.S. Treasury regulations to be treated as a U.S. person.

If a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes holds Existing Securities, the U.S. federal income tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership.  Partners in such a partnership holding Existing Securities are urged to consult their tax advisors.

The term "U.S. Holder" does not include a Puerto Rico Individual or a Puerto Rico Corporation, each as defined in Section IX.C below.  Puerto Rico Individuals and Puerto Rico Corporations should review the certain U.S. federal income tax consequences of the Plan discussed in Section IX.C below.

A U.S. Holder who holds Allowed Claims of more than one Class may have different U.S. federal income tax consequences for each Class of Allowed Claims.  U.S. Holders should carefully review the sections of this discussion applicable to each Class of Allowed Claims such U.S. Holder holds, and U.S. Holders of more than one Class of Allowed Claims should consult their own tax advisors as to the potential interaction of the U.S. federal income tax consequences of each Class of Allowed Claims such U.S. Holder holds.

Certain U.S. Holders that use the accrual method of accounting for U.S. federal income tax purposes generally will be required to include certain amounts in income with respect to the Allowed Claims no later than the time that such amounts are reflected on certain financial statements of such U.S. Holders.  Such U.S. Holders should consult their own tax advisors regarding the U.S. federal income tax consequences of the Plan in their individual circumstances.

2.      **Tax Treatment of Allowed Claims**

i.      **Settling Bondholder and Settling Monoline Claims (Class 1), Non-Settling Bondholder and Non-Settling Monoline Claims (Class 2) (if applicable), Fuel Line Loan Claims (Class 4), National Insured Bond Claims (Class 5), National Reimbursement Claim (Class 6), General Unsecured Claims (Class 7) (if applicable), Vitol Claim (Class 8), Assured Insured Interest Rate Swaps Claims (Class 9) (if applicable), Eminent Domain/Inverse Condemnation Claims (Class 11), Federal Claims (Class 12)**

The Debtor expects that, pursuant to the Plan, each U.S. Holder of any of the following: (i) Settling Bondholder and Settling Monoline Claims (Class 1); (ii) Non-Settling Bondholder and Non-Settling Monoline Claims (Class 2); (iii) Fuel Line Loan Claims (Class 4), (iv) National Insured Bond Claims (Class 5); (v) National Reimbursement Claim (Class 6); (vi) General Unsecured Claims (Class 7) (if applicable), (vii) Vitol Claim (Class 8), (viii) Assured Insured Interest Rate Swaps Claims (Class 9) (if applicable), (ix) Eminent Domain/Inverse Condemnation Claims (Class 11), and (x) Federal Claims (Class 12) will be treated, or in the case of Classes 2, 7, 8, 9, 11, and 12, may be treated, as exchanging such U.S. Holder's PREPA Revenue Bonds that are the subject of these Classes of Allowed Claims for New Bonds, CVI, and Cash for U.S. federal income tax purposes.  The Debtor intends to report these transactions consistently with this treatment to the IRS, and the remainder of this discussion assumes the expected treatment will be followed by each U.S. Holder.

a.      **Tax Treatment of Exchange**

The tender of the PREPA Revenue Bonds for the New Bonds, CVI, and Cash, as applicable, pursuant to the Plan will be considered an exchange under Section 1001 of the IRC.  A U.S. Holder will recognize gain or loss in an amount equal the difference between (i) the sum of any Cash received (other than Cash received attributable to accrued but unpaid interest on the PREPA Revenue Bonds) plus the "issue price" for U.S. federal income tax purposes (determined in the manner described in Section IX.B.2(i)(d)(A) below) for any New Bonds and CVI received and (ii) the U.S. Holder's adjusted tax basis in the PREPA Revenue Bonds that were tendered therefore (such adjusted tax basis calculated as described below).  Subject to the discussion in Section IX.B.2(i)(c) any gain or loss that a U.S. Holder recognizes upon the exchange of the PREPA Revenue Bonds for the New Bonds, CVI, and Cash, as applicable, pursuant to the exchange will generally be capital gain or loss and, if the U.S. Holder's holding period of the PREPA Revenue Bonds surrendered is more than one year, long-term capital gain or loss.  Long-term capital gain is generally taxable at preferential rates to non-corporate U.S. Holders.  The deductibility of capital losses is subject to limitations.

A U.S. Holder's holding period for any New Bonds and CVI received will begin the day after the exchange.  A U.S. Holder's tax basis in the New Bonds and CVI received in the exchange will generally be equal to the issue price of the New Bonds and CVI (determined in the manner described in Section IX.B.2(i)(d)(A) below).

374

b.      **Tax Treatment of Receipt of Cash**

A.      **Cash**

Cash is expected to be treated as a payment on the PREPA Revenue Bonds for U.S. federal income tax purposes, other than Cash received that is attributable to accrued but unpaid interest. The Plan provides that, to the extent applicable, distributions to a holder of a Claim will be allocated first to any applicable accrued but unpaid interest as of the date immediately preceding the Petition Date, as applicable, second, to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts (such as any accrued but unpaid interest other than described in the preceding clauses).  Legislative history of the Bankruptcy Tax Act of 1980 indicates that Congress intended for an allocation of consideration between principal and interest provided in certain reorganizations under the United States Bankruptcy Code to be binding for U.S. federal income tax purposes.  Consistent with such allocation under the Plan, the Treasury Regulations generally treat payments on indebtedness as allocated first to accrued but unpaid interest.  While the Debtor intends to report distributions to a U.S. Holder in accordance with the Plan, and the Debtor believes that such reporting is consistent with applicable law and congressional intent, there can be no assurance that the IRS will respect those allocations with respect to payment on the PREPA Revenue Bonds.  U.S. Holders should consult their tax advisors to determine the appropriate characterization of payments received.

Subject to the discussion in the previous paragraph, if any of the Cash received is attributable to accrued but unpaid interest on the PREPA Revenue Bonds, the treatment of such Cash paid to a U.S. Holder will depend on whether the accrued but unpaid interest on such U.S. Holder's Claim is, or is not, tax-exempt for U.S. federal income tax purposes.  In general, a U.S. Holder that was not previously required to include in taxable income any accrued but unpaid interest on a Claim that is not tax-exempt may be required to include such amount of Cash received as interest income for U.S. federal income tax purposes upon receipt of a distribution with respect to such interest.  A U.S. Holder that was previously required to include in taxable income any accrued but unpaid interest on a Claim that is not tax-exempt may be entitled to recognize a deductible loss, to the extent that such interest is not satisfied under the Plan.  However, a U.S. Holder of a tax-exempt Claim will not be entitled to recognize a deductible loss with respect to any unpaid interest if such U.S. Holder never included such unpaid interest in U.S. gross income. Additionally, a U.S. Holder that receives a distribution of accrued but unpaid interest on a Claim that is tax-exempt will not be required to include such amount as interest income for U.S. federal income tax purposes upon receipt of a distribution with respect to such interest.  Although U.S. Holders generally will not be required to include the foregoing amounts in computing U.S. taxable income, U.S. Holders will likely have to report such amounts to the IRS.

For tax-exempt PREPA Revenue Bonds that are capital appreciation bonds, if any, where the accrual of the original issue discount is treated as tax exempt interest, the amount of such accrual would have increased the tax basis of a bondholder, thereby increasing a bondholder's investment in such capital appreciation bond.  Such increase in tax basis is generally considered an increase in the principal amount of the capital appreciation bond.  U.S. Holders of Claims on which such interest has accrued are urged to consult their own tax advisors regarding the tax

375

treatment of distributions under the Plan and the deductibility of any accrued but unpaid interest for U.S. federal income tax purposes.

### B.   Consummation Costs

The U.S. federal income tax treatment of the Fuel Line Lender PSA Creditors Consummation Fees and Fuel Line Lender PSA Creditors Professionals' Reimbursement Fees under the Fuel Line Lender PSA is unclear.  The Debtor intends to treat the receipt of such fees in the same manner as discussed in Section IX.B.2(i)(b)(A) above.  It is possible, however, that the consummation costs and the professional fees could instead be treated as a separate fee that would be reported as ordinary income, rather than an amount paid under the New Bonds and such ordinary income generally would not be tax-exempt regardless of whether the underlying New Bonds were tax-exempt for U.S. federal income tax purposes.  These fees may also be treated as additional consideration paid to holders that would be taken into account in calculating a holder's gain or loss.  U.S. Holders should consult their own tax advisors regarding the U.S. federal income tax treatment of these fees.

### c.   Market Discount

If a U.S. Holder acquired the PREPA Revenue Bonds for less than the "adjusted issue price" of the PREPA Revenue Bonds and the difference between the U.S. Holder's cost and the "adjusted issue price" exceeded a *de minimis* threshold (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining complete years to maturity), such difference will generally be treated as "market discount."

Any gain recognized on the exchange will generally be treated as ordinary income to the extent of any accrued market discount not previously included in ordinary income with respect to the PREPA Revenue Bonds.  To the extent gain is recognized pursuant to the exchange of PREPA Revenue Bonds for New Bonds and CVI, a U.S. Holder must include as ordinary income any gain that would have otherwise been treated as capital gain to the extent of the accrued market discount on the PREPA Revenue Bonds, unless the U.S. Holder previously elected to include the market discount in income as it accrued.  See Section IX.B.2(i)(d)(E) below for a further discussion regarding the election to include market discount in income as it accrues.  U.S. Holders should consult their own tax advisors regarding the tax treatment of market discount pursuant to the exchange, including the interaction of the market discount, original issue discount ("OID") and acquisition premium rules.

### d.   Taxation of New Bonds

The New Bonds will be issued either as bonds the interest on which is excluded from gross income for U.S. federal income tax purposes (the "Tax-Exempt New Bonds"); or, bonds the interest on which is not excluded from gross income for U.S. federal income tax purposes (the "Taxable New Bonds").  The tax status of the New Bonds has not been determined as of the filing date of this Disclosure Statement, including (i) whether a portion of the New Bonds will be eligible to be excluded from gross income for U.S. federal income tax purposes or (ii) the ratio of the aggregate amount of all Taxable New Bonds and the CVI to be issued on the Effective Date to the

total aggregate amount of all New Bonds and CVI.  The CVI are not expected to be financial instruments the income from which is excluded from gross income for U.S. federal income tax purposes or otherwise exempt from U.S. federal income tax.

### A.    Issue Price

The Debtor expects that the issue price of the New Bonds should equal the fair market value of the New Bonds on the date of the exchange.  This determination is based on the Debtor's conclusion that the PREPA Revenue Bonds as well as the New Bonds should be treated as "publicly traded" within the meaning of applicable Treasury Regulations.  The fair market value of the New Bonds will be determined by the "trading price" of such Bonds on or about the date of the exchange.  There is no specific guidance on how to determine the trading price as of a specific time; however, related Treasury Regulations suggest that a taxpayer may use any consistently applied, reasonable method to determine fair market value when there is more than one sales price or quoted price.  The Debtor's determination that the PREPA Revenue Bonds and the New Bonds are "publicly traded" will be binding on all holders, unless a holder discloses its contrary position in the manner required by applicable Treasury Regulations.  The rules regarding the determination of issue price are complex, and U.S. Holders should consult their own tax advisors regarding the determination of the issue price of the New Bonds for federal income tax purposes.

### B.    Interest Including OID

The U.S. federal income tax rules used to determine what amounts are treated as interest are complex. U.S. Holders are urged to consult their own tax advisors regarding what amounts will be treated as interest for U.S. federal income tax purposes in their individual circumstances.

#### 1.    Tax-Exempt New Bonds

The IRC imposes certain requirements that must be met subsequent to the issuance and delivery of the Tax-Exempt New Bonds for interest thereon to be and remain excluded from gross income for U.S. federal income tax purposes pursuant to Section 103 of the IRC.  Noncompliance with such requirements could cause the interest on the Tax-Exempt New Bonds to be included in gross income for U.S. federal income tax purposes retroactive to the date of issue of the Tax-Exempt New Bonds.  When the Tax-Exempt New Bonds are issued on the Effective Date, Reorganized PREPA will, pursuant to the Definitive Documents, covenant to do and perform all acts and things permitted by law and reasonably necessary or desirable to assure that interest paid to the holders of any Tax-Exempt New Bonds shall be and remain excludable from gross income for U.S. federal income tax purposes pursuant to Section 103 of the IRC.  However, as noted above, the tax status of the New Bonds has not been determined as of the date of this Disclosure Statement.

Amounts allocable to pre-issuance accrued interest on the Tax-Exempt New Bonds will not be treated as tax-exempt interest under Section 103 of the IRC.

#### 2.    Taxable New Bonds and CVI

If interest on the New Bonds or payments in respect of CVI (or a portion of them) is not treated as exempt from gross income for U.S. federal income tax purposes, then payments or accruals of "qualified stated interest" (as defined below) on the New Bonds or CVI (or the relevant

portion of them) will be taxable to such U.S. Holder as ordinary interest income at the time received or accrued, in accordance with such U.S. Holder's regular method of accounting for U.S. federal income tax purposes.  The term "qualified stated interest" generally means stated interest that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually during the entire term of the debt instrument at a single fixed rate of interest, or, subject to certain conditions, based on one or more interest indices.  Stated interest payments on the New Bonds generally are expected to be qualified stated interest for this purpose.

### 3.   OID

The amount of OID on the New Bonds, if any, will be equal to the excess of the sum of all principal and stated interest payments (if any, other than qualified stated interest) provided by such New Bonds (initially taking into account the payment schedule as described below) over the issue price (determined in the manner described in Section IX.B.2(i)(d)(A) above) of such New Bonds. Furthermore, the Taxable New Bonds would bear OID only if the issue price of the New Bonds, as applicable, is less than its principal amount by more than a *de minimis* amount. OID will be considered *de minimis* if it is less than 0.25% of the stated redemption price at maturity multiplied by the number of remaining complete years to maturity of such New Bonds.  U.S. Holders, whether on the cash or accrual method of accounting for U.S. federal income tax purposes, must include the OID on Taxable New Bonds in gross income as ordinary income as it accrues on a constant yield to maturity basis, regardless of whether cash attributable to such OID is received at such time.  However, the New Bonds may be subject to the acquisition premium rules (described in Section IX.B.2(i)(d)(C) below), which could reduce the amount of OID includible in gross income.

For Taxable New Bonds, the amount of OID includible in gross income by a U.S. Holder in any taxable year generally is the sum of the daily portions of OID with respect to a Taxable New Bond, as applicable, for each day during such taxable year or portion of such taxable year on which the U.S. Holder holds the Taxable New Bond.  The daily portion is determined by allocating to each day in any accrual period a *pro rata* portion of the OID allocable to that accrual period.  The accrual period for a Taxable New Bond may be of any length and may vary in length over the term of the Taxable New Bond, as applicable, provided that each accrual period is no longer than one year and each scheduled payment of principal or interest occurs on either the first day or the final day of an accrual period.  The amount of OID allocable to any accrual period, subject to the possible adjustments described below, will be an amount equal to the product of the Taxable New Bond's adjusted issue price at the beginning of the accrual period and its yield to maturity (less payments of qualified stated interest allocable to that period).  The yield to maturity of the Taxable New Bonds is the discount rate that, when used in computing the present value (as of the issue date) of all principal and interest payments to be made on the Taxable New Bonds, as applicable, produces an amount equal to the issue price of such Taxable New Bonds.  The amount of OID allocable to the final accrual period is the difference between the amount payable at maturity (other than a payment of qualified stated interest) and the adjusted issue price at the beginning of the final accrual period.  The adjusted issue price of a Taxable New Bond at the beginning of any accrual period is equal to its issue price, increased by the accrued OID for each prior accrual period and reduced by any payments made on the Taxable New Bond during the prior accrual periods (other than payments of qualified stated interest).

378

For Tax-Exempt New Bonds, the amount of OID is excluded from gross income for U.S. federal income tax purposes to the same extent as interest on the Tax-Exempt New Bonds, as applicable, is so expected to be excluded. The OID accruals are computed in the same manner as described above for Taxable New Bonds, but such accruals will be added to the holder's tax basis for the Tax-Exempt New Bonds, as applicable. The accrual of OID may be taken into account as an increase in the amount of tax-exempt income for purposes of determining various other tax consequences of owning the Tax-Exempt New Bonds, as applicable, even though there will not be a corresponding cash payment. Owners of the Tax-Exempt New Bonds with OID are urged to consult with their own advisors with respect to the tax consequences of owning such Tax-Exempt New Bonds.

The rules regarding OID are complex and the rules described above may not apply in all cases. If other rules apply instead, U.S. Holders receiving the New Bonds could be treated differently than described above. U.S. Holders receiving the New Bonds should consult their own tax advisors regarding the potential application of the OID and related U.S. federal income tax rules to the New Bonds and CVI.

This Disclosure Statement assumes that the New Bonds will not be considered contingent payment debt instruments within the meaning of the applicable Treasury Regulations. However, there is limited authority as to the treatment of the New Bonds, and there can be no assurances that the IRS will respect such treatment. U.S. Holders are urged to consult their own tax advisors regarding the treatment of New Bonds as contingent payment debt instruments, including any limitation under those rules on the amount of tax-exempt interest on the Tax-Exempt New Bonds that may be excluded from gross income for U.S. federal income tax purposes.

## C.   **Acquisition Premium**

A New Bond would be treated as acquired with acquisition premium if the U.S. Holder's initial basis in the New Bond is (a) less than or equal to the sum of all amounts payable on the New Bond (other than payments of qualified stated interest) and (b) greater than such bond's adjusted issue price for U.S. federal income tax purposes. If a Taxable New Bond was acquired with acquisition premium, a U.S. Holder generally would reduce the amount of OID that otherwise would be included in income for each accrual period by an amount equal to (i) the amount of OID otherwise includible in income multiplied by (ii) a fraction, the numerator of which is the excess of the adjusted tax basis of the Taxable New Bond, as applicable, immediately after its acquisition by the U.S. Holder over the adjusted issue price of the Taxable New Bond, as applicable, and the denominator of which is the excess of the sum of all amounts payable on the Taxable New Bond, as applicable, after the purchase date, other than payments of qualified stated interest, over the Taxable New Bond's, as applicable, adjusted issue price. If a Tax-Exempt New Bond was acquired with acquisition premium, a U.S. Holder will reduce the Tax-Exempt New Bond's, as applicable, tax basis during each accrual period using the same method described above for a Taxable New Bond.

As an alternative to reducing the amount of OID that otherwise would be included in income during an accrual period or reducing the tax basis of the Tax-Exempt New Bond, the U.S. Holder may elect to compute OID accruals by applying the constant yield method described above; provided, however, that if a U.S. Holder chooses to make such election, the election shall also

apply with respect to all other bonds held by such U.S. Holder at the beginning of the taxable year to which the election applies and to any bonds thereafter acquired, and such election generally may not be revoked.  U.S. Holders who acquire New Bonds with acquisition premium should consult their own tax advisors as to the consequences of such an election in their individual circumstances.

### D.    Taxation of payments on CVI

The treatment of a financial instrument with the terms of the CVI is uncertain under current U.S. federal income tax laws, and no opinion of counsel or ruling from the U.S. tax authorities as to such treatment will be received by the Issuer.  A U.S. Holder who holds CVI should consult with their own advisers about the U.S. federal income tax treatment of receiving payments in respect of CVI.

### E.    Sale, Retirement or Other Disposition of New Bonds and CVI

A U.S. Holder will generally recognize taxable gain or loss on the sale, exchange, retirement (including redemption) or other taxable disposition of a New Bond or CVI equal to the difference, if any, between (i) the amount realized upon such disposition (other than cash received attributable to accrued but unpaid interest) and (ii) the adjusted tax basis of such New Bond or CVI.  A U.S. Holder's adjusted tax basis in a New Bond or CVI will generally equal such U.S. Holder's tax basis on such New Bond or CVI on the date the U.S. Holder acquired such New Bond or CVI, increased by any OID previously accrued by the U.S. Holder, and decreased by the amount of any Cash payments (other than payments of qualified stated interest) previously received on such New Bond or CVI by the U.S. Holder.  U.S. Holders should consult with their own tax advisors as to the tax basis of their New Bonds and CVI on the date of acquisition, and as to the specific tax consequences of a sale, exchange or retirement (including redemption) of a CVI.

Subject to the discussion of market discount below, any gain or loss that a U.S. Holder recognizes upon the sale or other taxable disposition of a New Bond should generally constitute capital gain or loss, and will be long-term capital gain or loss if such holder's holding period in the New Bond is greater than one year.  A U.S. Holder's holding period in New Bonds received pursuant to the exchange will begin the day after the exchange. Long-term capital gain is generally taxable at preferential rates to non-corporate U.S. Holders.  The deductibility of capital losses is subject to limitations.  Upon a taxable disposition of the New Bonds, a U.S. Holder must recognize ordinary income (in lieu of capital gain) to the extent of accrued market discount, unless the U.S. Holder previously elected to include the market discount in income as it accrued.  A U.S. Holder can elect to include market discount in income as it accrues, in which case such income would be treated as ordinary interest income at the time it is recognized, and the U.S. Holder would increase its basis in the New Bonds, as applicable, by the amount of the market discount recognized.  Such election is made by including market discount in income on a timely filed U.S. federal income tax return and attaching a statement to the return providing that such election has been made.

If such election is made, the election applies to all market discount bonds acquired by the U.S. Holder during the year for which the election is made and all subsequent years.

ii.      **Holder of Pension Claim (Class 3)**

In general, this discussion does not apply to the Pension Claim (Class 3).  The holder of such Claim that files a U.S. federal income tax return should consult its tax advisor regarding the U.S. federal income tax consequences of holding such Claim.

3.      **Medicare Tax**

A U.S. Holder of Taxable New Bonds that is an individual, estate or trust that does not fall into a special class of trusts that is exempt from such tax, is subject to a 3.8% Medicare surtax on the lesser of (1) the U.S. Holder's "net investment income" (or "undistributed net investment income" in the case of an estate or trust) for the relevant taxable year, which includes, among other items, interest (including original issue discount) on debt and capital gains from the sale or other taxable disposition of debt, and (2) the excess of the U.S. Holder's modified adjusted gross income (or adjusted gross income in the case of an estate or trust) for the taxable year over a certain threshold (which in the case of individuals is between $125,000 and $250,000, depending on the individual's circumstances).  A U.S. Holder that is an individual, estate or trust should consult its own tax advisors regarding the applicability of the Medicare surtax to its income and gains in respect of its exchanges and their ownership of the Taxable New Bonds, as well as to the applicability of the Medicare surtax to the CVI generally.

4.      **Bad Debt and/or Worthless Securities Deduction**

A U.S. Holder who, under the Plan, receives in respect of an Allowed Claim an amount less than the U.S. Holder's tax basis in the Allowed Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction or a worthless securities deduction.  The rules governing the character, timing and amount of bad debt or worthless securities deductions place considerable emphasis on the facts and circumstances of the U.S. Holder, the obligor and the instrument with respect to which a deduction is claimed.  U.S. Holders of Allowed Claims should consult their tax advisors with respect to their ability to take such a deduction and as to what taxable year.

5.      **Information Reporting and Backup Withholding**

Information reporting will generally apply to (i) payments in respect of the exchange; (ii) payments of principal and interest and OID, if any, on the New Bonds and CVI; and (iii) payments of proceeds of the sale or other disposition of the New Bonds and CVI.

Additionally, backup withholding may apply to any payments if such U.S. Holder (a) fails to provide an accurate taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) is notified by the IRS that it has failed to report all interest and dividends required to be shown on its U.S. federal income tax returns, or (d) fails to certify under penalties of perjury that the U.S. Holder has furnished a correct taxpayer identification number and that the IRS has not notified the U.S. Holder that the U.S. Holder is subject to backup withholding.  The application for exemption is available by providing a properly completed IRS Form W-9 (or suitable substitute).

381

Backup withholding is not an additional tax.  A U.S. Holder generally may obtain a refund of any amounts withheld under the backup withholding rules that exceed its U.S. federal income tax liability by timely filing a refund claim with the IRS.

Certain U.S. Holders are not subject to information reporting and backup withholding in some cases, provided they properly identify themselves as exempt.  U.S. Holders should consult their own tax advisors regarding their qualification for an exemption from backup withholding and the procedures for obtaining such an exemption.

C.    **Puerto Rico Individuals and Puerto Rico Corporations**

1.    **Definition of Puerto Rico Individuals and Puerto Rico Corporations**

As used herein, the term "Puerto Rico Individual" means a beneficial owner of a Bond Claim, a New Bond or CVI that is an individual and a bona fide resident of the Commonwealth within the meaning of Section 937 of the IRC and the Treasury Regulations for the entire taxable year that includes the Effective Date.  As used herein, the term "Puerto Rico Corporation" means a beneficial owner of a Bond Claim, a New Bond or CVI that is a business entity or corporation organized under the laws of the Commonwealth.

The following discussion includes only certain U.S. federal income tax consequences of the Plan to Puerto Rico Individuals and Puerto Rico Corporations. The discussion does not include any non-U.S. (including Puerto Rico) tax considerations.  A Puerto Rico Individual or a Puerto Rico Corporation should review the Section X below for the Puerto Rico tax consequences of the Plan.

The rules governing the U.S. federal income tax consequences to Puerto Rico Individuals and Puerto Rico Corporations are complex.  Puerto Rico Individuals and Puerto Rico Corporations should consult their own tax advisors regarding the U.S. federal, state and local, and the foreign tax consequences of the consummation of the Plan in their own circumstances.

2.    **Tax Treatment of Exchange**

A Puerto Rico Individual generally will not be subject to U.S. federal income tax with respect to any gain realized on the exchange of an Allowed Claim pursuant to the Plan.  A Puerto Rico Corporation generally would not be subject to U.S. federal income tax with respect to any gain realized on the exchange of an Allowed Claim pursuant to the Plan, unless such gain is effectively connected with such Puerto Rico Corporation's conduct of a trade or business in the United States, in which case the gain will be subject to tax in  the same manner as effectively connected income as described in Section IX.C.3(ii) below.

3.    **Taxation of New Bonds**

i.    **Treatment of Interest**

Payments of interest on a New Bonds, including OID, to a Puerto Rico Individual or a Puerto Rico Corporation, generally, would not be subject to U.S. federal income tax unless, in the case of a Puerto Rico Corporation, the Puerto Rico Corporation is deemed to be engaged in a trade

or business in the United States and such income is effectively connected with the conduct of a trade or business within the United States.

If a Puerto Rico Corporation is treated as engaged in a trade or business in the United States and interest (including OID) on the Taxable New Bonds is "effectively connected" with the conduct of that trade or business, then the Puerto Rico Corporation would be subject to U.S. federal income tax on that interest (including OID) on a net income basis generally in the same manner as if it were a U.S. Holder. In addition, a Puerto Rico Corporation may be subject to a branch profits tax with respect to such effectively connected income.

ii.    **Sale, Retirement or Other Disposition of New Bonds and CVI**

Gain realized upon a sale, retirement or other disposition of a New Bond or CVI by a Puerto Rico Individual or a Puerto Rico Corporation generally would not be subject to U.S. federal income tax unless, in the case of a Puerto Rico Corporation, the Puerto Rico Corporation is deemed to be engaged in a trade or business in the United States and such income is effectively connected with the conduct of a trade or business within the United States.

If a Puerto Rico Corporation is treated as engaged in a trade or business in the United States and gain realized upon a sale, retirement or other disposition of a New Bond or CVI by the Puerto Rico Corporation is "effectively connected" with the conduct of that trade or business, then the Puerto Rico Corporation would be subject to U.S. federal income tax on that gain on a net income basis generally in the same manner as if it were a U.S. Holder. In addition, a Puerto Rico Corporation may be subject to a branch profits tax with respect to such effectively connected income.

**Certain tax consequences of the Plan to Puerto Rico Individuals and Puerto Rico Corporations are uncertain. Puerto Rico Individuals and Puerto Rico Corporations should consult their tax advisors regarding the particular tax consequences to them of the transactions contemplated by the Plan.**

4.    **Information Reporting and Backup Withholding**

Information reporting will generally apply to (i) payments in respect of the exchange, (ii) payments of principal and interest and OID, if any, on the New Bonds and CVI, and (iii) payments of proceeds of the sale or other disposition of the New Bonds and CVI.

In general, a Puerto Rico Individual will not be subject to backup withholding with respect to any payments on the New Bonds and CVI if it provides a validly completed IRS Form W-9 (or suitable substitute) unless such Puerto Rico Individual (a) fails to provide an accurate taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) is notified by the IRS that it has failed to report all interest and dividends required to be shown on its U.S. federal income tax returns, or (d) fails to certify under penalties of perjury that the U.S. Holder has furnished a correct taxpayer identification number and the IRS has not notified the U.S. Holder that the U.S. Holder is subject to backup withholding.

A Puerto Rico Corporation, generally, will not be subject to backup withholding with respect to payments in respect of the exchange or payments of principal and interest and OID, if

383

any, on the New Bonds and CVI, provided that the Puerto Rico Corporation has provided a validly completed IRS Form W-8BEN-E (or other applicable form) establishing that it is not a U.S. person as defined in the IRC (or it satisfies certain documentary evidence requirements for establishing that it is not a U.S. person).  Information reporting and, depending on the circumstances, backup withholding will apply to payments of proceeds of the sale or other disposition of the New Bonds and CVI made within the United States or conducted through certain United States-related financial intermediaries, unless the Puerto Rico Corporation certifies to the payor under penalties of perjury that it is not a U.S. person (and the payor does not have actual knowledge or reason to know that such Puerto Rico Corporation is a U.S. person), or otherwise establishes an exemption.

Backup withholding is not an additional tax.  A Puerto Rico Individual or Puerto Rico Corporation, as applicable, generally may obtain a refund of any amounts withheld under the backup withholding rules that exceed its U.S. federal income tax liability by timely filing a refund claim with the IRS.

Certain Puerto Rico Individuals and Puerto Rico Corporations are not subject to information reporting and backup withholding in specific circumstances, provided they properly identify themselves as exempt.  Puerto Rico Individuals and Puerto Rico Corporations should consult their own tax advisors regarding their qualification for an exemption from backup withholding and the procedures for obtaining such an exemption.

### D.    Non-U.S. Holders

#### 1.    Definition of Non-U.S. Holder

Unless otherwise noted, the discussion below applies only to Non-U.S. Holders.  As used herein, the term "Non-U.S. Holder" means a beneficial owner of Existing Securities that is not (i) a U.S. Holder, (ii) a partnership or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes or (iii) a Puerto Rico Individual or a Puerto Rico Corporation.

The following discussion includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders.  The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Non-U.S. Holders should consult their own tax advisors regarding the U.S. federal, state and local, and the foreign tax consequences of the Plan in their individual circumstances.

#### 2.    Treatment of Exchange

A Non-U.S. Holder generally would not be subject to U.S. federal income tax with respect to any gain realized on the exchange of an Allowed Claim pursuant to the Plan, unless (i) such gain is effectively connected with such Non-U.S. Holder's conduct of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment or fixed base maintained by such Non-U.S. Holder in the United States), in which case the gain will be subject to tax in the same manner as effectively connected income as described in Section IX.C.3(ii) above, or (ii) such Non-U.S. Holder is a nonresident alien individual who holds the New Bonds and CVI as a capital asset and is present in the United States for 183 days or more in the taxable year of the exchange and such gain is derived from sources within the United States.

384

3.      **Taxation of New Bonds**

i.      **Treatment of Interest**

Payments of interest on a New Bond, including OID, to a Non-U.S. Holder, which will be foreign source income for U.S. federal income tax purposes, generally would not be subject to U.S. federal income tax so long as the Non-U.S. Holder is not deemed to be engaged in a trade or business in the United States and such income is not effectively connected with the conduct of a trade or business within the United States.

If a Non-U.S. Holder is treated as engaged in a trade or business in the United States and interest (including OID) on the Taxable New Bonds and Taxable CVI is "effectively connected" with the conduct of that trade or business, then the Non-U.S. Holder will be subject to U.S. federal income tax on that interest (including OID) on a net income basis generally in the same manner as if it were a U.S. Holder unless an applicable income tax treaty provides otherwise.  In addition, if the Non-U.S. Holder is a corporation, it may be subject to a branch profits tax with respect to such effectively connected income unless an applicable income tax treaty applies to reduce such rate.

ii.      **Sale, Retirement or Other Disposition of New Bonds and CVI**

Gain realized upon a sale, retirement or other disposition of a New Bond or CVI by a Non-U.S. Holder generally would not be subject to U.S. federal income tax so long as the Non-U.S. Holder is not deemed to be engaged in a trade or business in the United States, and such gain is not effectively connected with the conduct of a trade or business within the United States.

If a Non-U.S. Holder is treated as engaged in a trade or business in the United States and gain realized upon a sale, retirement or other disposition of a New Bond or CVI by the Non-U.S. Holder is "effectively connected" with the conduct of that trade or business, then the Non-U.S. Holder will be subject to U.S. federal income tax on that gain on a net income basis generally in the same manner as if it were a U.S. Holder unless an applicable income tax treaty provides otherwise.  In addition, if the Non-U.S. Holder is a corporation, it may be subject to a branch profits tax with respect to such effectively connected income unless an applicable income tax treaty applies to reduce such rate.

The tax consequences of the Plan to the Non-U.S. Holders are uncertain.  Non-U.S. Holders should consult their tax advisors regarding the particular tax consequences to them of the transactions contemplated by the Plan.

4.      **FATCA Compliance**

Pursuant to FATCA, foreign financial institutions (which term includes most foreign hedge funds, private equity funds, mutual funds, securitization vehicles and other investment vehicles) and certain other foreign entities generally must comply with certain new information reporting rules with respect to their U.S. account holders and investors, or confront a new withholding tax on U.S.-source payments made to them (whether received as a beneficial owner or as an intermediary for another party).  A foreign financial institution or such other foreign entity that does not comply with the FATCA reporting requirements generally would be subject to withholding tax with respect to any "withholdable payments."  For this purpose, "withholdable

payments" are any U.S.-source payments of fixed or determinable, annual or periodic, profits and income and certain "foreign passthru payments."  Withholding under FATCA generally should not apply to payments of interest (including OID) under a New Bond and CVI because such payment generally should be foreign source income.  Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules.  Holders should consult with their tax advisors as to the application of FATCA in their individual circumstances.

*[Remainder of Page Intentionally Left Blank]*

## X.    Certain Material Puerto Rico Income Tax Considerations

### A.    General

A general description of certain material Puerto Rico income tax consequences of the Plan to holders of certain Claims is provided below. This description is based on the Puerto Rico Internal Revenue Code of 2011, as amended (the "P.R. Code"), regulations promulgated under the P.R. Code, administrative pronouncements and judicial decisions, all as in effect on the date of this Disclosure Statement and all of which are subject to change, possibly with retroactive effect (collectively, "Applicable P.R. Tax Law").  Changes in Applicable P.R. Tax Law or in their interpretation could cause some or all of the Puerto Rico income tax consequences of the Plan to differ materially from the consequences described below.

The Puerto Rico income tax consequences of the Plan are complex.  As of the date of this Disclosure Statement, no ruling has been formally requested from the Department of Treasury no opinion has been requested from the Debtor's counsel concerning any tax consequence of the Plan except as specifically set forth therein; and no tax opinion is given by this Disclosure Statement.

The description that follows does not cover all aspects of Puerto Rico income taxation that may be relevant to Holders of Claims.  For example, the description does not address issues of special concern to certain types of taxpayers (*e.g.*, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold their Claims through, corporations of individuals, partnerships or other pass-through entities for Puerto Rico income tax purposes, and persons whose Claims are part of a straddle, hedging, constructive sale, or conversion transaction).  In addition, the description assumes that a Holder holds Existing Securities, New Bonds and CVI only as a "capital asset" within the meaning of Section 1034.01(a)(1) of the P.R. Code.  This description does not address Puerto Rico taxes other than Commonwealth income taxes, nor does it apply to any person that acquires New Bonds or CVI in the secondary market.  Finally, this discussion does not address the Puerto Rico income tax consequences to Holders of Claims who are deemed to have rejected the Plan.

For these reasons, the description that follows is not a substitute for careful tax planning and professional tax advice based upon the individual circumstances of each Holder of a Claim. Holders of Claims are urged to consult with their own tax advisors regarding the Puerto Rico tax consequences of the Plan.

### B.    P.R. Holders

#### 1.    Definition of P.R. Holder

Unless otherwise noted, the discussion below applies only to P.R. Holders.  As used herein, the term "P.R. Holder" means a beneficial owner of Existing Securities on the Effective Date of the Plan that is, for Puerto Rico income tax purposes:

- An individual who for the entire taxable year is a bona fide resident of Puerto Rico for purposes of Section 933 of the U.S. Internal Revenue Code of 1986, as amended (as

determined under Section 937(a) of such Code) and a resident of Puerto Rico for purposes of the P.R. Code;

- a corporation or other entity organized under the laws of Puerto Rico that is treated as a corporation for Puerto Rico income tax purposes, excluding a corporation or any other type of entity subject to pass through tax treatment or any other special tax regime under the P.R. Code;

- an estate, the income of which is subject to Puerto Rico income taxation regardless of its source; or

- a trust (other than a business trust), all of the beneficiaries of which are individual residents of Puerto Rico, as described above.

If a partnership or other entity or arrangement taxable as a partnership for Puerto Rico income tax purposes holds Existing Securities, the Puerto Rico income tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership. Partners in such a partnership holding Existing Securities are urged to consult their tax advisors.

A P.R. Holder who holds Allowed Claims of more than one Class may have different Puerto Rico income tax consequences for each Class of Allowed Claims. P.R. Holders should carefully review the sections of this discussion applicable to each Class of Allowed Claims such P.R. Holder holds, and P.R. Holders of more than one Class of Allowed Claims should consult their own tax advisors as to the potential interaction of the Puerto Rico income tax consequences of each Class of Allowed Claims such P.R. Holder holds.

2.    **Tax Treatment of Allowed Claims**

i.    **Holders of Settling Bondholder and Settling Monoline Claims (Class 1), Non-Settling Bondholder and Non-Settling Monoline Claims (Class 2) (if applicable); National Insured Bond Claims (Class 5); National Reimbursement Claim (Class 6), and Assured Insured Interest Rate Swaps Claims (Class 9) (if applicable)**

The Debtor expects that, pursuant to the Plan, each P.R. Holder of any of the following: (i) Settling Bondholder and Settling Monoline Claims (Class 1); (ii) Non-Settling Bondholder and Non-Settling Monoline Claims (Class 2) (if applicable); (iii) National Insured Bond Claims (Class 5); (iv) National Reimbursement Claim (Class 6); (v) Assured Insured Interest Rate Swaps Claims (Class 9) (if applicable), will be treated, or in the case of Classes 2 and 9, may be treated, as exchanging such P.R. Holder's PREPA Revenue Bonds that are the subject of these Classes of Allowed Claims for New Bonds, CVI, and Cash (as applicable).

a.    **Tax Treatment of Exchange**

The Debtor expects that, and intends to take the position that, the exchange of a portion of the PREPA Revenue Bonds for the New Bonds, Cash and CVI will be considered a taxable

exchange under the P.R. Code.  Therefore, a P.R. Holder will recognize gain or loss equal to the difference between the amount realized on the exchange and the P.R. Holder's adjusted tax basis in the PREPA Revenue Bonds on the date of the exchange.  The amount realized on the exchange of PREPA Revenue Bonds will equal the fair market value of each New Bond, CVI and any Cash received (except for any portion attributable to accrued and unpaid interest).

Gain or loss on the exchange of PREPA Revenue Bonds for New Bonds, CVI and Cash will be a capital gain or loss and may be a long-term capital gain or loss if the P.R. Holder's holding period for the PREPA Revenue Bonds is longer than one year.  Long-term capital gains recognized by P.R. Holders that are individuals, estate and trusts may be subject to a maximum Puerto Rico income tax rate of 15% (or a maximum of 24% if the alternate basic tax is applicable).  The long-term capital gains of P.R. Holders that are taxable as corporations may be subject to a maximum Puerto Rico income tax rate of 20%.

P.R. Holders may deduct capital losses realized in the exchange of the PREPA Revenue Bonds for New Bonds against capital gains realized during the taxable year, and non-corporate P.R. Holders may deduct any excess net capital losses of up to $1,000 against ordinary income. Excess net capital losses may be carried forward as short-term capital losses for seven taxable years and may be used to offset up to 90% of the capital gains realized during any such taxable years.

To the extent that any consideration (*i.e.* New Bonds, CVI or portion thereof, plus any Cash payment) received by a P.R. Holder in exchange for PREPA Revenue Bonds is attributable to accrued and unpaid interest on the PREPA Revenue Bonds, that amount of consideration will be considered exempt interest income for Puerto Rico income tax purposes.  In that event, the portion allocated to accrued and unpaid interest will reduce the amount realized by the P.R. Holder to compute gain or loss on the exchange.

The Plan provides that, to the extent applicable, distributions to a holder of a Claim will be allocated first to any applicable accrued but unpaid interest as of the date immediately preceding the Petition Date, second, to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts (such as any accrued but unpaid interest other than described in the preceding clauses).  Legislative history of the Bankruptcy Tax Act of 1980 indicates that Congress intended for an allocation of consideration between principal and interest provided in certain reorganizations under the United States Bankruptcy Code to be binding for U.S. federal income tax purposes.  Consistent with such allocation under the Plan, the Treasury Regulations generally treat payments on indebtedness as allocated first to accrued but unpaid interest.  There is no specific Applicable P.R. Tax Law that considers how payments must be applied in our situation. While the Debtor intends to report distributions to a P.R. Holder in accordance with the Plan, and the Debtor believes that such reporting is consistent with applicable law and congressional intent, there can be no assurance that the Department of Treasury will respect those allocations with respect to payment on the PREPA Revenue Bonds.

P.R. Holders should consult their own tax advisors regarding the tax treatment of distributions received under the Plan.

b.     **Taxation of New Bonds and CVI**

*Interest on the New Bonds*.  Interest paid or accrued to P.R. Holders on the New Bonds will not be subject to Puerto Rico income tax, including the alternate basic tax.  The excess of the principal amount of the New Bonds due at maturity over its initial issue price, if any, will not be subject to Puerto Rico income tax, including the alternate basic tax.

Ownership of the New Bonds may result in a portion of the interest paid or accrued by a P.R. Holder and other expenses incurred by the P.R. Holder attributable to interest on the New Bonds being disallowed as deductions for Puerto Rico income tax purposes.

*Sale, Exchange or Retirement of the New Bonds*.  Gain or loss on the sale or exchange of New Bonds will be a capital gain or loss and may be a long-term capital gain or loss if the P.R. Holder's holding period for the New Bonds is longer than one year.  Long-term capital gains recognized by P.R. Holders that are individuals, estate and trusts may be subject to a maximum Puerto Rico income tax rate of 15% (or a maximum of 24% if the alternate basic tax is applicable).  The long-term capital gains of P.R. Holders that are taxable as corporations may be subject to a maximum Puerto Rico income tax rate of 20%.

P.R. Holders may deduct capital losses realized in the sale or exchange of the New Bonds against capital gains realized during the taxable year, and non-corporate P.R. Holders may deduct any excess net capital losses of up to $1,000 against ordinary income.  Excess net capital losses may be carried forward as short-term capital losses for seven taxable years and may be used to offset up to 90% of the capital gains realized during any such taxable years.

*Payments from CVI*.  Treatment of CVI is uncertain under Applicable P.R. Tax Law, and no opinion of counsel or ruling from Department of Treasury as to such treatment will be received by the Issuer.  P.R. Holders who hold CVI should consult with their own advisers about the Puerto Rico income tax treatment of receiving payments in respect of CVI.

*Sale, Exchange, or Retirement of CVI*.  A P.R. Holder will generally recognize taxable gain or loss on the sale, exchange, retirement (including redemption) or other taxable disposition of a CVI equal to the difference between the amount realized on the exchange and the P.R. Holder's adjusted tax basis in the CVI on the date of the exchange.  P.R. Holders should consult with their own tax advisors as to the tax basis of their CVI on the date of acquisition and as to the specific tax consequences of a sale, exchange or retirement (including redemption) of a CVI.

ii.     **Holder of Pension Claim (Class 3)**

In general, this discussion does not apply to the holder of the Pension Claim (Class 3).  The holder of such Claim should consult its tax advisor regarding the Puerto Rico income tax consequences of holding such Claim.

iii.     **Holders of Non-Settling Bondholder and Non-Settling Monoline Claims (Class 2) (if applicable); Fuel Line Loan Claims (Class 4); Holders of General Unsecured Claims (Class 7); Vitol Claim (Class 8); Assured Insured Interest Rate Swap Claims (Class 9) (if applicable); Ordinary Course Customer Claims (Class 10);**

390

**Eminent Domain/Inverse Condemnation Claims (Class 11);
Federal Claims (Class 12); and Convenience Claims (Class 13)**

The Debtor expects that pursuant to the Plan, each P.R. Holder of any of the following: (i) Fuel Line Loan Claims (Class 4); (ii) Non-Settling Bondholder and Non-Settling Monoline Claims (Class 2) (if applicable); (iii) General Unsecured Claims (Class 7), (iv) Vitol Claim (Class 8); (v) Assured Insured Interest Rate Swaps Claims (Class 9) (if applicable); (vi) Ordinary Course Customer Claims (Class 10); (vii) Eminent Domain/Inverse Condemnation Claims (Class 11); (viii) Federal Claims (Class 112); and (ix) Convenience Claims (Class 13) will be treated, or in the case of Classes 2 and 9, may be treated, as receiving a distribution in full consideration, satisfaction, release, and exchange of such holder's Claims that are the subject of these Classes of Allowed Claims.  The consequences of the receipt of such distribution will vary depending on the P.R. Holder's individual circumstances and the nature of the Claims and assets being distributed. P.R. Holders are urged to consult their tax advisors regarding the tax consequences of the receipt of such distribution based on their individual circumstances.

C.     **Non-P.R. Holders**

1.     **Definition of Non-P.R. Holders**

Unless otherwise noted, the discussion below applies only to Non-P.R. Holders.  As used herein, the term "Non-P.R. Holder" means a beneficial owner of Existing Securities, New Bonds or CVI that is not (i) a P.R. Holder or (ii) a partnership or other entity treated as a partnership or other pass-through entity for Puerto Rico income tax purposes.

If a partnership or other entity or arrangement taxable as a partnership for Puerto Rico income tax purposes holds Existing Securities, New Bonds or CVI, the Puerto Rico income tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership.  Partners in such a partnership are urged to consult their tax advisors.

The following discussion includes only certain Puerto Rico income tax consequences of the Plan to Non-P.R. Holders.  This discussion does not include any non-Puerto Rico tax considerations.  Non-P.R. Holders should consult their own tax advisors regarding the Puerto Rico and foreign tax consequences of the Plan under their individual circumstances.

2.     **Tax Treatment of Exchange**

A Non-P.R. Holder that is not engaged in trade or business in Puerto Rico would not be subject to Puerto Rico income tax with respect to any gain realized on the exchange of an Allowed Claim pursuant to the Plan, including any amount allocated to accrued and unpaid interest.  On the other hand, Non-P.R. Holders that are corporations (or treated as corporations under the P.R. Code) and nonresident aliens that are engaged in trade or business in Puerto Rico for income tax purposes will be subject to Puerto Rico income tax as a P.R. Holder on any such gain if it is effectively connected with their Puerto Rico trade or business.

391

3.      **Taxation of New Bonds and CVI**

i.      **Tax Treatment of Interest on New Bonds**

Interest paid or accrued on a New Bond to a Non-P.R. Holder will not be subject to Puerto Rico income tax, including the alternate basic tax.  The excess of the principal amount of the New Bond due at maturity over its initial issue price, if any, will not be subject to Puerto Rico income tax, including the alternate basic tax.

The deductions for Puerto Rico income tax purposes of a Non-P.R. Holder engaged in a trade or business in Puerto Rico that are related to interest paid or accrued and other expenses incurred that are attributable to interest on the New Bonds may be disallowed.

ii.     **Treatment of Payments from CVI**

Treatment of CVI is uncertain under Applicable P.R. Tax Law, and no opinion of counsel or ruling from Department of Treasury as to such treatment will be received by the Issuer.  Non-P.R. Holders who hold CVI should consult their own tax advisors regarding the Puerto Rico income tax consequences upon the receipt of any payment from CVI.

iii.    **Sale, Retirement or Other Disposition of New Bonds and CVI**

Gain realized on the sale, retirement or other disposition of a New Bond or a CVI by a Non-P.R. Holder that is not engaged in a trade or business in Puerto Rico would not be subject to Puerto Rico income tax, by way of withholding or otherwise.  On the other hand, Non-P.R. Holders that are corporations (or treated as corporations under the P.R. Code) and nonresident aliens that are engaged in trade or business in Puerto Rico for Puerto Rico income tax purposes will be subject to Puerto Rico income tax on any such gain if it is effectively connected with their Puerto Rico trade or business in the same manner as a P.R. Holder.  In addition, a corporation may be subject to a branch profits tax with respect to such effectively connected income.

*[Remainder of Page Intentionally Left Blank]*

392

XI.    **Applicability of Certain Federal and State Securities Laws**

A.    **New Bonds**

1.    **Registration of Securities**

In general, securities issued by Reorganized PREPA such as the New Bonds and the CVI are exempt from the registration requirements of the Securities Act under section 3(a)(2) of the Securities Act.

In addition to exemptions provided to governmental entities such as Reorganized PREPA and government agencies and instrumentalities thereof under the Securities Act, Bankruptcy Code section 1145(a)(1), made applicable to the Title III Cases pursuant to PROMESA Section 301, provides an exemption from the registration requirements of the Securities Act and from any requirements arising under state securities laws for the offer or sale under a plan of adjustment of securities of the debtor, an affiliate of the debtor participating in a joint plan of adjustment with the debtor, or a successor of the debtor.  The Bankruptcy Code provides that certain creditors, which are deemed "underwriters" within the meaning of the Bankruptcy Code, may not resell such securities without registration under the Securities Act or pursuant to an exemption therefrom.  Since obligations of PREPA are exempt from registration under generally applicable securities law, this exception is not relevant to securities of Reorganized PREPA although the provisions of Bankruptcy Code section 1145 which suspend the operation of securities laws may not be available to "underwriters" within the meaning of the Bankruptcy Code.  Creditors of the Debtor who believe they meet the definition of "underwriter" within the meaning of the Bankruptcy Code should consult qualified counsel with respect to their obligations under relevant U.S. federal and state securities laws.

Like the exemption from registration provided to Reorganized PREPA under section 3(a)(2) of the Securities Act, generally applicable securities laws provide an exemption from qualification for certain trust indentures entered into by governmental entities.  Therefore, each trust indenture, ordinance, resolution and other written actions of PREPA or Reorganized PREPA relating to the New Bonds will be exempt from qualification under section 304(a)(4) of the TIA.

State securities laws generally provide registration exemptions for subsequent transfers by a bona fide owner for the owner's own account and subsequent transfers to institutional or accredited investors.  Such exemptions generally are expected to be available for subsequent transfers of the New Bonds and the CVI.

2.    **Market Disclosure**

i.    **Initial Offer and Sale**

Although exempt from registration, securities issued by Reorganized PREPA are subject to the anti-fraud provisions of federal securities laws.  Sections 10(b) and 17(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated by the SEC under section 10(b) of the Exchange Act generally prohibit fraud in connection with the purchase and sale of securities.  Therefore, each publicly offered sale of a public entity's obligations typically is accompanied by an offering document that is referred to as an "Official Statement" and contains

393

disclosure of material information regarding the issuer and the securities being sold so that investors may make an informed investment decision as to whether to purchase the securities being offered. Bankruptcy Code section 1125(d), which has been adopted by PROMESA, provides that the adequacy of any disclosure to creditors and hypothetical investors typical of holders of Claims in this case is not subject to principles of any otherwise applicable non-bankruptcy law, rule or regulation, which includes federal securities laws. Instead, Bankruptcy Code section 1125(b), which has been adopted by PROMESA, provides disclosure regulation by requiring that adequate information be provided to the various classes of creditors of the Debtor and to hypothetical investors in obligations of the Debtor through a disclosure statement such as this Disclosure Statement.

ii.      **Continuing Disclosure**

Publicly offered securities of Reorganized PREPA generally are subject to the requirements of Rule 15c2-12 under the Exchange Act (for purposes of this Section XI.A.2(ii), the "Rule"), unless such securities meet certain exemptions provided for in the Rule. Among other requirements, the Rule requires underwriters participating in an offering to obtain an agreement imposing ongoing market disclosure requirements upon an issuer of municipal securities, such as Reorganized PREPA.

The delivery of the securities pursuant to the Plan is not covered by the Rule because the securities are proposed to be issued in exchange for a claimholder's Claim without the involvement of an underwriter as defined in the Rule.

[*Remainder of Page Intentionally Left Blank*]

## XII.   Financial Information and Projections

### A.   Historical Financial Reporting

#### 1.   PREPA Financial Statements

PREPA periodically issues financial information and operating data for the prior fiscal years, including: (1) audited financial statements and (2) an Annual Financial Information and Operating Data Report (the "Annual Report"), which has provided financial information and operating data on revenues, expenditures, financial operations, and indebtedness of the type generally found in the PREPA's official statements prepared in connection with its bond issuances.

The most recent basic audited financial statements prepared by PREPA are for Fiscal Year ending June 30, 2020. These financial statements were filed by PREPA with the Municipal Securities Rulemaking Board (the "MSRB") through its Electronic Municipal Markets Access System ("EMMA") on October 12, 2022. The most recent Annual Report is dated January 23, 2020, and sets forth unaudited financial information as of June 30, 2015.

The financial statements for Fiscal Year ending 2020 were audited by KPMG LLP ("KPMG"), which reports and expresses qualified, modified and unmodified opinions[280] and include emphasis of matter paragraphs regarding going concern considerations relating to PREPA. KPMG did not audit the financial statements of PREPA Holdings, a blended component unit of PREPA, which represents 0.6 percent and 0.3 percent, respectively, of the total assets and total revenues of PREPA. Those statements were audited by other auditors, whose report has been furnished to KPMG, and in whose opinion, insofar as it relates to the amounts included for PREPA Holdings is based solely on the report of other auditors. Audited financial statements for Fiscal Year 2021 are in progress.

Since the Petition Date, PREPA has also filed audited financial statements of PREPA for Fiscal Years ending 2015, 2016, 2017, 2018, and 2019. The audited financial statements for Fiscal Year 2015 were audited by Ernst & Young LLP, for Fiscal Years 2016 and 2017, by BDO Puerto Rico, P.S.C., and for Fiscal Years 2018 and 2019, by KPMG. The audited financial statements for Fiscal Year 2017 were withdrawn and restated in a consolidated financial statement for Fiscal Year 2018.

### B.   PREPA Certified Fiscal Plan and Projections

Attached to this Disclosure Statement as Exhibit E is a copy of the 2022 PREPA Certified Fiscal Plan, certified by the Oversight Board on June 28, 2022. The Certified Fiscal Plan provides details regarding the PREPA's projected operations under the Plan, subject to the assumptions and qualifications set forth in the Certified Fiscal Plan.[281]

---

[280] A qualified opinion is a statement issued after an audit is completed suggesting that the information being provided is limited in scope; an unmodified opinion is the opinion where auditor expresses an opinion that financial statements are presented, in all material respects, in accordance with applicable financial reporting framework.

[281] The Debt Sustainability Analysis ("DSA") in the Certified Fiscal Plan provides a framework for assessing PREPA's long-term capacity to pay debt service. The DSA notes PREPA's debt levels need to align with the objective of

It is important to note the projections described in the Certified Fiscal Plan may differ from actual performance and are highly dependent on significant assumptions concerning the future economic and financial condition of the Commonwealth and its instrumentalities, including PREPA, which are affected by various legal, financial, social, economic, environmental, governmental and political factors.  These factors can be very complex, may vary from one fiscal year to the next and are frequently the result of actions taken or not taken, not only by the government of the Commonwealth of Puerto Rico, the Oversight Board, and other third party entities such as the government of the United States.

The financial projections included in the Certified Fiscal Plan should be reviewed in conjunction with the assumptions, notes, and qualifications included in the Certified Fiscal Plan and the assumptions, qualifications, and explanations set forth in this Disclosure Statement, including in Sections III, VI, VIII, IX, X, and XI.

The Certified Fiscal Plan does not constitute an audit conducted in accordance with generally accepted auditing standards, an examination of internal controls or other attestation or review services in accordance with standards established by the American Institute of Certified Public Accountants or any other organization.  Accordingly, the Oversight Board cannot express an opinion or any other form of assurance on the financial statements or any financial or other information or the internal controls of the government of the Commonwealth of Puerto Rico or PREPA and the information contained herein.

In deciding whether to vote to accept or reject the Plan, holders of Claims must make their own determinations as to the reasonableness of the assumptions and the reliability of the financial projections and should consult with their own advisors.

*[Remainder of Page Intentionally Left Blank]*

---

recovering capital market access to fund ongoing and future infrastructure capital investment and/or refunding savings, and ensuring affordable energy prices for the Commonwealth and its residents.  The DSA illustrates PREPA's implied debt capacity at varying coupon levels and hypothetical levels of net revenue.

XIII.   **Additional Information**

Any statements in this Disclosure Statement concerning the provisions of any document are not necessarily complete, and in each instance reference is made to such document for the full text thereof.  Certain documents described or referred to in this Disclosure Statement have not been attached as exhibits because of the impracticability of furnishing copies of these documents to all recipients of this Disclosure Statement.  All exhibits to the Plan will be filed with the Title III Court and available for review, free of charge, on the document website at https://cases.ra.kroll.com/puertorico prior to the Voting Deadline.  Copies of all exhibits to the Plan also may be obtained, free of charge, by contacting the solicitation agent, Kroll Restructuring Administration LLC, by telephone at (844) 822-9231 (toll free for U.S. and Puerto Rico) or (646) 486-7944 (for international callers), available 10:00 a.m. to 7:00 p.m. (Atlantic Standard Time) (Spanish available), or by email at puertoricoinfo@ra.kroll.com and reference "PREPA Plan of Adjustment Exhibits" in the subject line.  Please note that Kroll Restructuring Administration LLC is not authorized to provide, and will not provide, legal advice.

[*Remainder of Page Intentionally Left Blank*]

XIV.   **Conclusion**

The Oversight Board and the Debtor believe that the Plan is in the best interests of all creditors and urge the Holders of Impaired Claims entitled to vote on the Plan to vote to accept the Plan and to evidence the acceptance by timely returning their Ballots marked to accept the Plan by the Voting Deadline.

[*Remainder of Page Intentionally Left Blank*]