## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>                    Debtors.[1] | PROMESA<br>Title III<br><br>No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>                    Debtor. | PROMESA<br>Title III<br><br>No. 17-BK-4780-LTS<br><br>(Jointly Administered) |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Movant, |  |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19- BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

v.

AD HOC GROUP OF PREPA BONDHOLDERS; HON.
RAFAEL HERNÁNDEZ-MONTAÑEZ, in his capacity as
Speaker of the Puerto Rico House of Representatives;
HON. JOSÉ L. DALMAU-SANTIAGO, in his capacity as
President of the Puerto Rico Senate; PV PROPERTIES,
INC.; SISTEMA DE RETIRO DE LOS EMPLEADOS DE
LA AUTORIDAD DE ENERGÍA ELÉCTRICA; UNIÓN
DE TRABAJADORES DE LA INDUSTRIA ELÉCTRICA
Y RIEGO, INC.; MANUEL GONZALEZ JOY;
WHITEFISH ENERGY HOLDINGS, LLC; OFFICIAL
COMMITTEE OF UNSECURED CREDITORS; U.S.
BANK NATIONAL ASSOCIATION, in its capacity as
bond trustee; SYNCORA GUARANTEE INC.; ASSURED
GUARANTY CORP.; ASSURED GUARANTY
MUNICIPAL CORP.

Respondents.

**OMNIBUS REPLY OF THE PUERTO RICO
ELECTRIC POWER AUTHORITY TO OBJECTIONS
TO THE (I) ADEQUACY OF THE DISCLOSURE STATEMENT, (II) RELIEF
REQUESTED IN THE DISCLOSURE STATEMENT MOTION, AND (III) RELIEF
REQUESTED IN THE CONFIRMATION DISCOVERY PROCEDURES MOTION**

ii

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................ 2

BACKGROUND ........................................................................................................... 8

OMNIBUS REPLY ..................................................................................................... 11

    A.    The Plan's Classification Structure Does Not Render the Plan Patently
Unconfirmable ...................................................................................... 15

    B.    The Plan Is Not Patently Unconfirmable as a Result of Unfair
Discrimination...................................................................................... 20

        1..........The Amended Plan Does Not Unfairly Discriminate Against the General
Unsecured Claimholders ....................................................... 20

        2........The Bondholders Are Not Unfairly Discriminated Against in Favor of the
Fuel Line Lenders ................................................................. 23

    C.    Affordability Contentions Do Not Render the Plan Patently
Unconfirmable ...................................................................................... 24

    D.    The Bondholders' Bad Faith Allegations are Inappropriate and Incorrect........... 33

    E.    The Ad Hoc Group's Feasibility Argument Fails................................................ 45

    F.    The Uninsured Bond Settlement Agreement Is Not an Improper
Solicitation in Violation of Bankruptcy Code § 1125(b) and Does Not
Constitute Unlawful Gerrymandering................................................... 46

II.    THE DISCLOSURE STATEMENT PROVIDES ADEQUATE INFORMATION ........ 51

    A.    The Disclosure Statement Adequately Apprises Creditors of their
Recoveries in Various Scenarios. ......................................................... 51

    B.    The Disclosure Statement Adequately Apprises Creditors of the Risks of
an Adverse Judgment in the Amended Lien & Recourse Challenge,
Including that the Plan May Not Be Feasible in Certain Circumstances............. 55

    C.    The Disclosure Statement Adequately Describes the Unsecured Claim
Pool and the Range of Creditor Claims and Recoveries....................... 56

RESERVATION OF RIGHTS ...................................................................................... 61

CONCLUSION ............................................................................................................ 62

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*ACQIS, LLC v. EMC Corp.*,
    No. 14-cv-13560, 2017 WL 2818984 (D. Mass. June 29, 2017)............................................36

*AMC Demolition Specialists, Inc. v. Bechtel Jacobs Co.*,
    2007 U.S. Dist. LEXIS 7463 (E.D. Tenn. Feb. 1, 2007) ........................................................39

*Andalusian Glob. Designated Activity Co. v. Fin. Oversight & Mgmt. Bd. for P.R.*
    *(In re Fin. Oversight & Mgmt. Bd. for P.R.)*,
    954 F.3d 1 (1st Cir. 2020)......................................................................................................27

*Brooks v. Lincoln Nat'l Life Ins. Co.*,
    No. 8:05-cv-118, 2006 WL 2487937 (D. Neb. Aug. 25, 2006)..............................................39

*Dawson v. United States*,
    68 F.3d 886 (5th Cir. 1995) ...................................................................................................39

*Duff v. United States Tr.* (*In re Cal. Fidelity, Inc.*),
    198 B.R. 567 (9th Cir. B.A.P. 1996).......................................................................................47

*Fano v. Newport Heights Irrigation Dist.*,
    114, F.2d 563 (9th Cir. 1940) .................................................................................................30

*Fisher v. SmithKline Beecham Corp.*,
    No. 07-cv-0347A(F), 2008 WL 4501860 (W.D.N.Y. Sept. 29, 2008) ....................................40

*Hunter v. Prisbe*,
    No. 12-cv-2013, 2013 WL 1246797 (M.D. Pa. 2013)............................................................40

*In re A.T. Reynolds & Sons, Inc.*,
    452 B.R. 374 (S.D.N.Y. 2011)..........................................................................34, 37, 39, 40

*In re Am. Cap. Equip., LLC*,
    688 F.3d 145 (3d Cir. 2012)..............................................................................................12, 13

*In re Comandante Mgmt. Co.*,
    359 B.R. 410 (Bankr. D.P.R. 2006) ................................................................................12, 14, 16

*In re Copy Crafters Quickprint, Inc.*,
    92 B.R. 973 (Bankr. N.D.N.Y. 1988) .....................................................................................54

*In re Corcoran Hosp. Dist.*,
    233 B.R. 449 (Bankr. E.D. Cal. 1999)................................................................18, 20, 29, 30

*In re Dow Corning Corp.*,
227 B.R. 111 (Bankr. E.D. Mich. 1999) ...................................................................47

*In re Dow Corning Corp.*,
244 B.R. 634 (Bankr. E.D. Mich. 1999) ............................................................18, 19

*In re DVR, LLC*,
582 B.R. 507 (Bankr. D. Colo. 2018), *aff'd*, 606 B.R. 80 (D. Colo. 2019) ...........................23

*In re E. Me. Elec. Coop., Inc.*,
125 B.R. 329 (Bankr. D. Me. 1991) ........................................................................14

*In re Ellipso, Inc.*,
No. 09-00148, 2012 WL 368281 (Bankr. D.D.C. Feb. 3, 2012) .......................................13, 16

*In re Ferretti*,
128 B.R. 16 (Bankr. D.N.H. 1991) ......................................................................53, 54

*In re Filex, Inc.*,
116 B.R. 37 (Bankr. S.D.N.Y. 1990) ........................................................................14

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
432 F. Supp. 3d 25 (D.P.R. 2020), *aff'd*, 954 F.3d 1 (1st Cir. 2020) ..................................27

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
478 F. Supp. 3d 190 (D.P.R. 2020) ..........................................................................27

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
621 B.R. 289 (D.P.R. 2020), *aff'd*, 7 F.4th 31 (1st Cir. 2021) ......................................27

*In re FirstEnergy Sols. Corp.*,
606 B.R. 720 (Bankr. N.D. Ohio 2019) ................................................................12, 14

*In re Forest Grove, LLC*,
448 B.R. 729 (Bankr. D.S.C. 2011) ..........................................................................54

*In re Genco Shipping & Trading Ltd.*,
513 B.R. 233, 261 (Bankr. S.D.N.Y. 2014) ...................................................................6

*In re Gilbert*,
104 B.R. 206 (Bankr. W.D. Mo. 1989) ......................................................................47

*In re Hardeman Cnty. Hosp. Dist.*,
540 B.R. 229 (N.D. Tex. 2015) ...............................................................................31

*In re Heritage Org., LLC*,
376 B.R. 783 (Bankr. N.D. Tex. 2007) ......................................................................48

*In re Indianapolis Downs, LLC*,
    486 B.R. 286 (Bankr. D. Del. 2013) ...............................................................47, 48

*In re Kellogg Square Partnership*,
    160 B.R. 336 (Bankr. D. Minn. 1993) .....................................................................47

*In re Pecht*,
    57 B.R. 137 (Bankr. E.D. Va. 1986) ........................................................................13

*In re Perry*,
    425 B.R. 323 (Bankr. S.D. Tex. 2010) .....................................................................57

*In re Phoenix Petroleum Co.*,
    278 B.R. 385 (Bankr. E.D. Pa. 2001) ......................................................................14

*In re Pleasant Hill Partners, L.P.*,
    163 B.R. 388 (Bankr. N.D. Ga. 1994) ......................................................................47

*In re Quigley Co.*,
    377 B.R. 110 (Bankr. S.D.N.Y. 2007) ......................................................................18

*In re Quigley Co., Inc.*,
    437 B.R. 102 (Bankr. S.D.N.Y. 2010) ...............................................................44, 45

*In re Rodriguez Gas & Oil Servs., Inc.*,
    No. 08-50152, 2008 WL 4533687 (Bankr. S.D. Tex. Oct. 2, 2008).........................54

*In re Rook Broad. of Idaho, Inc.*,
    154 B.R. 970 (Bankr. D. Idaho 1993) ......................................................................47

*In re Sunshine Precious Metals, Inc.*,
    142 B.R. 918 (Bankr. D. Idaho 1992) ..........................................................13, 16, 46

*In re Thornwood Assocs.*,
    161 B.R. 367 (Bankr. M.D. Pa. 1993) *aff'd*, 162 B.R. 438 (M.D. Pa. 1993) ..........19

*In re Trib. Co.*,
    972 F. 3d 228 (3d Cir. 2020)....................................................................................21

*In re U.S. Brass Corp.*,
    194 B.R. 420 (Bankr. E.D. Tex. 1996) .....................................................................13

*In re Wash. Mut., Inc.*,
    442 B.R. 314 (Bankr. D. Del. 2011) .........................................................................19

*In re Worth*,
    29 B.R. 220 (Bankr. D. Colo. 1983) ........................................................................54

*Kothe v. Smith*,
    771 F.2d 667 (2d Cir. 1985) ............................................................................39

*Lorber v. Vista Irr. Dist.*,
    127 F.2d 628 (9th Cir. 1942) ..........................................................................29

*Procaps S.A. v. Patheon Inc.*,
    No. 12-24356-CIV, 2015 WL 3539737 (S.D. Fla. Jun. 4, 2015) ..............34, 37, 39

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
    579 U.S. 115 (2016) ........................................................................................30

*Quint v. A.E. Staley Mfg. Co.*,
    172 F.3d 1 (1st Cir. 1999) ...............................................................................38

*U.S. Bank N.A. v. Vill. at Lakeridge, LLC*,
    138 S.Ct. 960 (2018) .......................................................................................17

*W. Real Estate Equities, L.L.C. v. Vill. at Camp Bowie I, L.P. (In re Vill. at Camp
    Bowie I, L.P.)*,
    710 F.3d 239 (5th Cir. 2013) ..........................................................................17

**STATUTES & RULES**

11 U.S.C. § 928(b) ......................................................................................................43

11 U.S.C. § 1122 .................................................................................................17, 18

11 U.S.C. § 1122(a) ....................................................................................................18

11 U.S.C. § 1125 .......................................................................................................6, 8

11 U.S.C. § 1125(a) ....................................................................................................54

11 U.S.C. § 1125(a)(1) ................................................................................................54

11 U.S.C. § 1125(b) .........................................................................................46, 47, 48

11 U.S.C. § 1129 ..........................................................................................................5

11 U.S.C. § 1129(a)(3) ...............................................................................................5, 6

11 U.S.C. § 1129(a)(10) ..............................................................................................17

11 U.S.C. § 1129(b) ...................................................................................11, 21, 25, 55

11 U.S.C. § 1325(b) ....................................................................................................28

48 U.S.C. §§ 2101–2241 ...............................................................................................1

48 U.S.C. § 2174(b)(6) ................................................................................................28

PROMESA § 106(e) ...................................................................................................25

PROMESA § 201 ........................................................................................................25

PROMESA § 201(b)(1)(B) .........................................................................................30

PROMESA § 201(b)(1)(I) ..........................................................................................27

PROMESA § 301 ..................................................................................................8, 47

PROMESA § 301(a) ...................................................................................................18

PROMESA § 301(e) ...................................................................................................18

PROMESA § 314(b)(6) .............................................................................5, 11, 26, 28

PROMESA § 314(b)(7) ..............................................................................................27

PROMESA § 405(m)(2) .............................................................................................30

Fed. R. Evid. 408 ................................................................................................. passim

**OTHER AUTHORITIES**

*Custodial Receipts: A Useful Tool for Restructuring Insured Municipal Bonds*,
     Apr. 30, 2018, https://www.kramerlevin.com/en/perspectives-
     search/custodial-receipts-a-useful-tool-for-restructuring-insured-municipal-
     bonds.html (last accessed Feb. 10, 2023) ...............................................................19

*Governor of Puerto Rico announces termination of Electric Power Authority's
     Restructuring Support Agreement*, Thursday, March 10, 2022,
     https://www.bnamericas.com/en/news/governor-of-puerto-rico-announces-
     termination-of-electric-power-authoritys-restructuring-support-agreement...........................42

To the Honorable United States District Court Judge Laura Taylor Swain:

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as Title III representative of the Puerto Rico Electric Power Authority (the "PREPA" or the "Debtor"), pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA")[2] respectfully submits this omnibus reply (the "Omnibus Reply") in support of (i) approval of the *Disclosure Statement for the Title III Plan of Adjustment of the Puerto Rico Electric Power Authority* [ECF No. 3111],[3] as amended in the *Disclosure Statement for the First Amended Title III Plan of Adjustment of the Puerto Rico Electric Power Authority* [ECF No. 3201] (as the same may be further amended, modified, or supplemented from time to time before the close of the disclosure statement hearing, the "Disclosure Statement"), (ii) the *Motion of Puerto Rico Electric Power Authority for Order (I) Approving Disclosure Statement, (II) Fixing Voting Record Date, (III) Approving Confirmation Hearing Notice and Confirmation Schedule, (IV) Approving Solicitation Packages and Distribution Procedures, (V) Approving Forms of Ballots and Voting Procedures, (VI) Approving Notice of Non-Voting Status, (VII) Fixing Voting and Confirmation Deadlines, and (VIII) Approving Vote Tabulation Procedures* [ECF No. 3113] (the "Disclosure Statement Motion"), and (iii) the *Motion of Puerto Rico Electric Power Authority for Order Establishing, Among Other Things, Procedures and Deadlines Concerning Objections to Confirmation and Discovery in Connection Therewith* [ECF No. 3114] (the "Confirmation Discovery Procedures Motion"), and in response to the objections and responses filed in connection with the same.  In support of this Omnibus Reply, the Debtor respectfully states as follows:

---

[2]   PROMESA is codified at 48 U.S.C. §§ 2101–2241.

[3]   Unless otherwise stated, all ECF Nos. shall refer to the docket in Case No. 17-bk-4780-LTS.

## Preliminary Statement[4]

1.      From the Objections of many of the bondholders one would think that the confirmation hearing has already commenced.  While the filing of PREPA's proposed Title III plan of adjustment [ECF No. 3110] (the "Plan") and the Disclosure Statement were critical first steps towards a comprehensive adjustment of PREPA's debts and the transformation of PREPA into a reliable and affordable electric system for Puerto Rico, we are still at the beginning of the process, and the only issue before the Court at this time is the adequacy of information in the Disclosure Statement.  Ironically, each objector to the Disclosure Statement allowed to vote seems to have already determined how it will vote.  On February 9, 2023, the Oversight Board filed amended versions of the Plan [ECF No. 3200] (the "Amended Plan") and Disclosure Statement reflecting, among other things, the inclusion of a settlement reached between the Oversight Board and National, as well as certain alterations to the Disclosure Statement to reflect that settlement, other changes to the Plan, and many changes to accommodate the Objections to the Disclosure Statement and Disclosure Statement Motion.  The Oversight Board respectfully submits the Disclosure Statement provides adequate information for a hypothetical investor to make an informed decision on the Amended Plan, and it should be approved.  The Oversight Board also respectfully submits the Disclosure Statement Motion seeks approval of procedures and deadlines consistent with (i) this Court's prior guidance and (ii) fundamental due process and fairness, and should therefore be approved.

2.      Instead of focusing on the issue before the Court—whether the Disclosure Statement contains adequate information—many groups, including Syncora and the Ad Hoc

---

[4]   Capitalized terms used in this preliminary statement shall have the meaning ascribed to such terms in the following sections of the Omnibus Reply.  Capitalized terms used in the Omnibus Reply but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan or the Disclosure Statement, as applicable.

Group—dedicate the vast majority of their Objections to opposing confirmation. As the jurisprudence makes clear, confirmation objections are premature at the disclosure statement hearing except for objections showing a plan provision renders the plan patently unconfirmable under any set of facts. As shown below, there are no such provisions here. The Objections include inappropriate and baseless accusations against the Oversight Board, including relating to the Oversight Board's alleged conduct in confidential and privileged mediation sessions. They characterize negotiated settlements as "vote-buying," and assert the Oversight Board has attempted to engage in a "jedi mind trick" to obtain support for the Amended Plan. Syncora Obj. ¶ 65. At bottom, these parties assert no plan is confirmable unless it has their consent. But the Bondholders' scattershot approach, attempting to assert all manner of confirmation objections to derail the confirmation process before it begins, are premature, depend on facts not yet in existence, and, at least in part, depend on the outcome of voting. The Objectors fail to show any flaw rendering the Amended Plan patently unconfirmable. They all should therefore be overruled.

3.      More specifically, the Ad Hoc Group and Syncora complain the Plan is a "placeholder" plan because the Oversight Board included as a risk factor that the Plan may not be confirmable in the scenario where bondholders (i) win the Amended Lien & Recourse Challenge and (ii) show at confirmation they are secured by all future revenues that could ever be created by PREPA, and thus the value of their collateral exceeds the value of the New Bonds to be issued under the Amended Plan. This argument, however, does not show the Amended Plan is patently unconfirmable because it assumes the outcome of the objection to their disputed claim (that the scope of their security interests is as broad as they erroneously claim) and another highly disputed factual matter (that the value of any security interests ultimately allowed is worth more than all bonds issued under the Amended Plan). But the Court did not direct the Oversight Board to file a

plan that could be confirmed under every hypothetical scenario, but rather one that is confirmable in a range of "realistic[]" litigation outcomes.  Nov. 2, 2023 Tr. 16:4–16.  Notably, the bondholders do not dispute the Plan would be confirmable if the Oversight Board were to prevail on the Amended Lien & Recourse Challenge, and even in various other circumstances where the Oversight Board's position is not wholly vindicated.  For instance, while the Oversight Board believes the bondholders do not have an allowable recourse claim for defaults under the Trust Agreement because there could never be nonrecourse debt if its default would create a recourse claim and the permissible remedy under the governing agreement is ignored, even if the Oversight Board is wrong and the bondholders do have an allowable unsecured recourse claim, the Plan is confirmable as long as the bondholders' allowed secured claim does not include future, unearned revenues.

4.      The Amended Plan is not patently unconfirmable as a result of purported illegitimate classification, unfair discrimination, supposed "affordability" considerations, bad faith, or under the best interests test, contrary to the Ad Hoc Group's, the Committee's, and Syncora's contentions.  Each and every one of these objections address confirmation issues dependent on evidence at the confirmation hearing.  The Oversight Board will present the evidence necessary at the confirmation hearing to demonstrate the confirmability of the Amended Plan.  None of the confirmation objections raised by these Objectors raise a "pure question of law" apparent "from the face of the plan" and thus none can be considered in evaluating the adequacy of the Disclosure Statement.

5.      In any event, no Objector raises any meritorious objection to confirmation.  The Amended Plan's classification scheme is fair and appropriate.  First and foremost, because there are already three classes of impaired accepting claims, there can be no gerrymandering concern.

We understand the objectors are unhappy the Fuel Line Lenders agreed to a discount, but there can be no dispute their claims were for expenses to be paid before bonds under the Trust Agreement. Similarly, Vitol has an undisputed claim and agreed to half the return other general unsecured claims receive. National settled its secured and unsecured claims. Second, the Plan classifies different claims based on differences in the rights they assert and the treatment of them that makes sense. The Amended Plan provides recoveries that the Court's consideration of the best interests test in PROMESA § 314(b)(6), should not disturb, as will be demonstrated at the confirmation hearing. This test does not contain the bright-line "affordability" test advocated by Syncora and the Ad Hoc Group, but rather requires the Court to "consider" what aggregate creditor recoveries would be outside Title III based on a host of complex factors, as well as the overall purpose of PROMESA Title III, which is not to maximize creditor recoveries, but rather to pay creditors fairly, subject to the provision of effective and affordable power critical to the Commonwealth.

6.      Allegations of bad faith against the Oversight Board similarly fail. The attempts of the Ad Hoc Group and Syncora to turn disputed allegations regarding confidential mediation into patent bad faith within the meaning of § 1129(a)(3) of title 11 of the United States Code (the "Bankruptcy Code") is a nonstarter. Their allegations not only depend on disputed facts; they depend on confidential mediation facts. Offers and conduct in mediation are not admissible in evidence under Rule 408 of the Federal Rules of Evidence, even if an offer is made public. Moreover, these allegations are entirely irrelevant to confirmation of the Amended Plan. Regardless, the Oversight Board has conducted itself consistent with its statutory mission and, by any measure, in good faith throughout these Title III cases, including in PREPA's mediation. The Oversight Board will demonstrate at confirmation that the Plan meets the good faith requirement of Bankruptcy Code § 1129. While not an issue appropriately raised at this stage, whether the Plan

is proposed in good faith pursuant to Bankruptcy Code § 1129(a)(3) turns on whether the Plan carries out PROMESA's requirements.  It is not a measure of the Oversight Board or the Objectors' subjective assessment of the Oversight Board or the Government.

7.      The dissemination of the Uninsured Bondholders Settlement Offer does not constitute impermissible solicitation under Bankruptcy Code § 1125.  The settlement offer does not initiate any plan voting process, or even bind the parties to it to vote in favor of the Amended Plan and offer when voting begins.  Rather, it permits creditors to elect to have their bond claims classified in the Settling Bondholder Class (Class 1), or remain classified in the Non-Settling Bondholder Class (Class 2).  This is not an improper plan solicitation or a sale of securities, but an opportunity for bondholders, including those not present in mediation, to have their bond claims avoid the risk of an adverse judgment in the Amended Lien & Recourse Challenge.

8.      No remaining objection to the Disclosure Statement shows how any additional information is necessary to enable a hypothetical investor to make an informed decision to accept or reject the Amended Plan.  Some wish the Amended Plan had different treatment—but these Objections ignore the fact the Disclosure Statement adequately discloses the treatment the Amended Plan puts forward.

9.      Others, such as the Committee, contend the contingencies and complexities of the Amended Plan are too complicated for general unsecured claimholders to understand.  The complexity, however, is simply the variety of claim treatments presented depending on different litigation outcomes.  It is an inevitable consequence of proposing a plan before the Amended Lien & Recourse Challenge is decided, before the amount of general unsecured claims is determined, and while the offer to Settling Bondholders is pending.  The Disclosure Statement nonetheless provides detailed explanations of the treatment contained in the Amended Plan and the

contingencies affecting recovery. The Disclosure Statement contains more than sufficient information of what the Amended Plan provides, including, among other things, (i) illustrative charts and graphs, and plain language explanations of recoveries and distributions in all relevant outcomes, (ii) the underlying fiscal plans and budgets showing revenue and expenses, (iii) the Debtor's cash analyses, (iv) the Debtor's best interest analyses, (v) PREPA's debt history, (vi) the causes of distress, (vii) summaries of all litigation, and (viii) descriptions of the Plan's treatment of each type of claim. The Oversight Board respectfully submits this constitutes adequate information to inform claimholders' votes on the Plan.

10.     The Oversight Board has worked with numerous Objectors and adopted, in some form, the majority of their requested inclusions into the amended Disclosure Statement. This includes dozens of edits from the Ad Hoc Group's redline of the original Disclosure Statement. A redline of the amended Disclosure Statement to the December 16, 2022 Disclosure Statement is included as **Exhibit D**. The Oversight Board, however, declines to include the Ad Hoc Group's "statement" as part of the Disclosure Statement. The Ad Hoc Group is not a statutory committee, the trustee of the bonds, nor a representative or fiduciary of all bondholders. Its opinions on the Plan, Disclosure Statement, and the merits of the Amended Lien & Recourse Challenge are exactly that—its opinions. Its statement, moreover, contains unfounded accusations and attacks on the Oversight Board and the Plan. If the Ad Hoc Group wishes to make its opinions known to all bondholders, it is free to circulate its statement itself—but there is no requirement to include it in the Disclosure Statement, and the Oversight Board has no duty to help it advocate against the Amended Plan.

11.     As to the remaining Objections or comments to the solicitation process proposed in the Disclosure Statement Motion and addressing the adequacy of the information contained in the

Disclosure Statement, the Objections and comments have been either addressed by revisions to the Disclosure Statement and the proposed order in the form attached to the Disclosure Statement Motion as Exhibit A (the "Disclosure Statement Order") or should be overruled for the reasons set forth in the chart attached hereto as **Exhibit A** (the "Omnibus Reply Chart").

12.    In light of the foregoing and below, PREPA submits the Disclosure Statement satisfies the requirements of Bankruptcy Code § 1125, made applicable pursuant to PROMESA § 301. Accordingly, and for all reasons in the Disclosure Statement Motion and this Omnibus Reply, the Disclosure Statement Motion and the Confirmation Discovery Procedures Motion should be granted and the Debtor should be authorized to solicit votes on the Plan.

## Background

13.    On December 16, 2022, the Oversight Board filed with this Court, among other things: (i) the Plan; (ii) the Disclosure Statement; (iii) the Disclosure Statement Motion; and (iv) the Confirmation Discovery Procedures Motion.

14.    On February 9, 2023, PREPA filed (i) the Amended Plan and (ii) the amended Disclosure Statement. The Amended Plan and Disclosure Statement reflect, among other things, the Plan Support and Settlement Agreement, dated as of January 31, 2023, by and among, the Oversight Board and National (the "National PSA").

15.    Pursuant to the *Order (I) Scheduling a Hearing to Consider the Adequacy of Information Contained in the Disclosure Statement, (II) Establishing the Deadline for Filing Objections to the Disclosure Statement and Replies Thereto, (III) Approving Form and Manner of Notice Thereof, (iv) Establishing Document Depository Procedures in Connection Therewith, and (v) Granting Related Relief* [ECF No. 3132], the Court established February 3, 2023, at 5:00 p.m. (AST), as the deadline to file objections to the adequacy of the information contained in the Disclosure Statement and the relief requested in the Disclosure Statement Motion (the "Objection

Deadline"). The following objections (collectively, the "Objections") were submitted by the listed

objecting parties (collectively, the "Objectors"):

| ECF No. | Date Filed | Objection | Party |
|---|---|---|---|
| Case No. 17-bk-3283-LTS, ECF No. 23311 | 01/24/23 | *Objection to the Adequacy of the Disclosure Statement* ("Hernández-Montañez, Objection") | Hon. Rafael Hernández-Montañez, in his official capacity as Speaker of the PR House of Reps and the Hon. José L. Dalmau-Santiago, in his official capacity as President of the PR Senate |
| Case No. 17-bk-3283-LTS, ECF No. 23311 | 01/26/23 | *PV Properties, Inc.'s Objection to Disclosure Statement to the Honorable Court* ("PV Properties Objection") | PV Properties, Inc. |
| 3179 | 02/02/23 | *SREAEE'S Disclosure Statement Objection and Reservation of Rights* ("SREAEE Objection") | Sistema de Retiro de los Empleados de la Autoridad de Energía Eléctrica ("SREAEE") |
| 3178 | 02/02/23 | *UTIER'S Disclosure Statement Objection and Reservation of Rights* ("UTIER Objection") | Unión de Trabajadores de la Industria Eléctrica y Riego, Inc. ("UTIER") |
| 3181 | 02/02/23 | *Objection to Disclosure Statement* ("Joy Objection") | Manuel Gonzalez Joy |
| 3195 | 02/03/23 | *Limited Objection and Reservation of Rights of Whitefish Energy Holdings, LLC to the Disclosure Statement for Title III Plan of Adjustment of the Puerto Rico Electric Power Authority* ("Whitefish Objection") | Whitefish Energy Holdings, LLC |
| 3186 | 02/03/22 | *Omnibus Objection of Official Committee of Unsecured Creditors to (1) Disclose Statement for Title III Plan of Adjustment of Puerto Rico Electric Power Authority and (II) Related Motions* ("UCC Objection") | The Official Committee of Unsecured Creditors (the "Committee") |
| 3189 | 02/03/22 | *Omnibus Objections of the Ad Hoc Group of PREPA Bondholders to the Disclosure Statement for the Title III Plan of Adjustment of Puerto Rico Electric Power Authority [ECF No. 3111], and Related Procedural Motions Related to the Disclosure Statement and Plan Confirmation [ECF Nos. 3113, 3114]* ("AHG Objection") | Ad Hoc Group of PREPA Bondholders (the "Ad Hoc Group") |
| 3187 | 02/03/22 | *Objections of PREPA Bond Trustee Regarding Motion for Approval of Disclosure Statement for Title III Plan of Adjustment of* | PREPA Bond Trustee |

| ECF No. | Date Filed | Objection | Party |
|---------|-----------|-----------|-------|
| | | *the Puerto Rico Electric Power Authority* ("Bond Trustee Objection") | |
| 3190 | 02/03/22 | *Objection of Syncora Guarantee, Inc. to the Motion of Puerto Rico Electric Power Authority for an Order (I) Approving Disclosure Statement, (II) Fixing Voting Record Date, (III) Approving Confirmation Hearing Notice and Confirmation Schedule, (IV) Approving Solicitation Packages and Distribution Procedures, (V) Approving Forms of Ballots and Voting Procedures, (VI) Approving Notice of Non-Voting Status, (VII) Fixing Voting and Confirmation Deadlines, and (VIII) Approving Vote Tabulation Procedures* ("Syncora Objection") | Syncora Guarantee, Inc. ("Syncora") |
| 3188 | 02/03/22 | *Assured Guaranty Corp. and Assured Guaranty Municipal Corp.'s (A) Objection to Motion of Puerto Rico Electric Power Authority For Order: (I) Approving Disclosure Statement, (II) Fixing Voting Record Date, (III) Approving Confirmation Hearing Notice and Confirmation Schedule, (IV) Approving Solicitation Packages and Distribution Procedures, (V) Approving Forms of Ballots and Voting Procedures, (VI) Approving Notice of Non-Voting Status, (VII) Fixing Voting and Confirmation Deadlines, and (VIII) Approving Vote Tabulation Procedures, and (B) Joinder to Omnibus Objections of the Ad Hoc Group of PREPA Bondholders to the Disclosure Statement For the Title III Plan of Adjustment of the Puerto Rico Electric Power Authority [ECF No. 3111], and Related Procedural Motions Related to the Disclosure Statement and Plan Confirmation [ECF Nos. 3113, 3114]* ("Assured Objection") | Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (collectively, "Assured") |

16.     Additionally, to address various concerns raised by non-objecting parties in interest, and in light of the revised Plan and Disclosure Statement, the Debtors have attached a revised Disclosure Statement Order hereto as **Exhibit B** (the "Revised Disclosure Statement Order").  For convenience, a redline comparing the Revised Disclosure Statement Order against the Disclosure Statement Order is attached hereto as **Exhibit C**.

## OMNIBUS REPLY

17.     For the reasons set forth herein and in the Omnibus Reply Chart, the Objections should be overruled in their entirety.[5]

## I.     THE PLAN IS NOT PATENTLY UNCONFIRMABLE

18.     Certain objectors argue the Plan is patently unconfirmable (and therefore the Disclosure Statement should not be approved) because: (i) the Amended Plan's classification scheme is impermissible and there are no valid impaired accepting classes (AHG Obj. ¶¶ 46–60, Syncora Obj. ¶¶ 53–60); (ii) the Amended Plan unfairly discriminates against certain classes and/or is not "fair and equitable" within the meaning of Bankruptcy Code § 1129(b) (AHG Obj. ¶¶ 65–75; Syncora Obj. ¶¶ 32–38); (iii) the Plan does not pay creditors enough, either to meet an "affordability test" invented by Bondholders or to meet the "best interests" test contained in PROMESA § 314(b)(6) (AHG Obj. ¶¶ 37–43; Syncora Obj. ¶¶ 24–31, 39–44); (iv) the Amended Plan was proposed in bad faith (AHG Obj. ¶¶ 23–32; Syncora Obj. ¶¶ 45–52); (v) the Amended Plan is a mere "placeholder" that violates this Court's orders because the Amended Plan fails to accommodate a scenario where the Bondholders prove the value of their collateral exceeds the value of the New Bonds to be distributed to Non-Settling Bondhoders (Syncora Obj. ¶¶ 22–23; AHG Obj. ¶¶ 33–36); (vi) the Amended Plan is not feasible (AHG Obj. ¶¶ 44–45); and (vii) the Amended Plan is "tainted" by PREPA's impermissible solicitation to Settling Bondholders (Syncora Obj. ¶¶ 61–68).  These objections all raise confirmation issues that should not be heard

---

[5]   Failure of the Debtor to address other arguments made in the Objections does not constitute a waiver of the Debtor's rights to object to such arguments at the hearing(s) to consider approval of the Disclosure Statement or confirmation of the Plan.  The Debtor denies many of the factual and legal assertions and characterizations contained in the Objections and, for the avoidance of doubt, affirms that the Disclosure Statement, Disclosure Statement Motion, and Confirmation Procedures Discovery Motion all can be approved or granted over each and every objection.  Similarly, the Amended Plan is confirmable and the Oversight Board will demonstrate it satisfies all applicable confirmation standards at the confirmation hearing.

at this stage, but in any case, they have no merit and do not warrant disapproval of the Disclosure Statement.

19.    A plan will only be considered patently unconfirmable when it "is so fatally, and obviously flawed that confirmation is impossible"; in that case, and that case only, the court may then "consider issues pertaining to the plan, and may rule upon such issues." *In re Comandante Mgmt. Co.*, 359 B.R. 410, 415 (Bankr. D.P.R. 2006) (citing *In re Mahoney Hawkes, LLP*, 289 B.R. 285, 294 (Bankr. D. Mass. 2002)).  In these extreme circumstances, the scope of the court's inquiry is limited to legal issues, not facts.  *See In re FirstEnergy Sols. Corp.*, 606 B.R. 720, 732 (Bankr. N.D. Ohio 2019) ("Patent unconfirmability is treated as a matter of law.") (citation omitted).  As the Third Circuit notes, "[a] plan is patently unconfirmable where (1) confirmation 'defects [cannot] be overcome by creditor voting results' and (2) those defects 'concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing.'" *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 154–55 (3d Cir. 2012) (quoting *In re Monroe Well Serv., Inc.*, 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987)).

20.    The Objectors cite a ragtag collection of authorities to attempt to support their arguments, but ignore the fact this Court has previously stated that there is a "high threshold" to demonstrate a plan is patently unconfirmable.  July 14, 2021 Hr'g Tr. 84:18–85:1.  As this Court has ruled, the defect rendering the plan unconfirmable must appear "on its face," June 17, 2022 Hr'g Tr. 26:22–27:4, and it must render the plan such that it "could *never be legal*." Apr. 28, 2021 Hr'g Tr. 145:13–22 (emphasis added).  Thus, to render a plan patently unconfirmable, an objection must "pose[] a pure question of law that would render a confirmation futile or unfeasible," July 14, 2021 Hr'g Tr. 81:20–23, and that does not "require further factual development."  *Id.* 84:1–2.

21.     This Court's ruling is in line with other courts' jurisprudence, which warns that courts should be "careful[l] so as not to convert the disclosure statement hearing into a confirmation hearing, and [ensure] that due process concerns are protected." *In re U.S. Brass Corp.*, 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996); *see also In re Am. Cap. Equip., LLC*, 688 F.3d at 154 n.6 (cautioning that bankruptcy court should "tak[e] care to not prematurely convert a disclosure statement hearing into a confirmation hearing.") (citation omitted).  Whether a plan is patently unconfirmable must be determined "on the face of the plan," without any further evidentiary development.  *In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986) ("If, on the face of the plan, the plan could not be confirmed, then the Court will not subject the estate to the expense of soliciting votes and seeking confirmation.").

22.     And, indeed, for precisely these reasons, courts routinely refuse to consider, at the disclosure statement hearing, the same kind of objections relating to a plan's proposed classification or treatment of claims, whether a plan is fair and equitable, and other issues bearing on whether the plan should be confirmed or not raised by Objectors here.  *See, e.g.*, *In re Sunshine Precious Metals, Inc.*, 142 B.R. 918, 920 (Bankr. D. Idaho 1992) (refusing to adjudicate objections to the plan's classification of claims and feasibility at disclosure statement hearing, holding that "these are [] confirmation issues"); *In re Ellipso, Inc.*, No. 09-00148, 2012 WL 368281, at *2 (Bankr. D.D.C. Feb. 3, 2012) (declining to consider objections related to the feasibility of the proposed plan, the classification of claims, and whether the plan was proposed in good faith at disclosure statement hearing); *see also In re Comandante Mgmt. Co.*, 359 B.R. at 420 (court refused to consider objections relating to unfair discrimination, improper classification, and plan feasibility at disclosure statement hearing).

23.     The cases cited by the Objectors—including *In re Comandante Mgmt. Co., LLC*, 359 B.R. at 420 (AHG Obj. ¶ 20) (refusing to consider classification and other confirmation issues at disclosure statement stage) and *In re E. Me. Elec. Coop., Inc.*, 125 B.R. 329, 335 (Bankr. D. Me. 1991) (refusing to consider good faith issues at disclosure statement stage)—rejected the very kind of arguments raised by the Objectors here, and held that confirmation issues should be resolved at confirmation, not before.  And those cases the Objectors cited that did deny approval of the disclosure statement did so for reasons not applicable here.  *See, e.g.*, *In re FirstEnergy Sols. Corp.*, 606 B.R. at 741 (inclusion of unsupportable, nonconsensual third-party release in plan rendered it patently unconfirmable); *In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) (court permitted consideration of gating issue as to one of debtor's major creditor's set off rights to be considered at disclosure statement stage where "all parties . . . urged" the Court "to consider this issue at the disclosure statement stage"); *In re E. Me. Elec. Coop., Inc.*, 125 B.R. at 335 (disapproving disclosure statement because plan proposed impaired accepting class by classifying various parties that clearly did not even possess claims against debtor); *In re Filex, Inc.*, 116 B.R. 37, 40 (Bankr. S.D.N.Y. 1990) (parties did not intend to seek confirmation of plan discussed in disclosure statement).

24.     Significantly, with respect to the Objections related to: (i) classification (AHG Obj. ¶¶ 46–60, Syncora Obj. ¶¶ 53–60); (ii) the best interests test and PREPA's ability to pay (AHG Obj. ¶¶ 37–43; Syncora Obj. ¶¶ 24–31, 39–44); and (iii) feasibility (AHG Obj. ¶¶ 44–45), this Court has previously ruled that these are confirmation issues, not appropriate objections to the disclosure statement. *See* November 20, 2018 Hr'g Tr. 52:5–16 (COFINA disclosure statement hearing) ("The Court will consider the economics and structure of the proposed Plan of Adjustment as well as the legality of the elements of the plan in connection with the [confirmation hearing]");

*see also* July 14, 2021 Hr'g Tr. 74:11–75:11 (CW disclosure statement hearing) ("Many of the
objections that I have considered are to specific substantive and economic features or alleged
consequences of the Plan of Adjustment, including, among others, the discharge of certain claims,
the propriety of the proposed classification, and treatment of claims held by certain creditors, and
the economic feasibility of satisfying the Commonwealth's liabilities in the manner contemplated
by the Plan of Adjustment.  These are serious issues, and they reflect important aspects of the
proposed Plan of Adjustment that could affect large numbers of people.  The adequacy and legality
of the proposed Plan of Adjustment, however, are issues that principally will be addressed in
connection with the Oversight Board's request for confirmation of the Plan of Adjustment.").

25.     As set forth below, because none of the Objections establishes that the Plan cannot
be confirmed as a matter of law regardless of the evidence, they should be overruled.

### A. The Plan's Classification Structure Does Not Render the Plan Patently Unconfirmable

26.     The Ad Hoc Group (¶¶ 46–61) and Syncora (¶¶ 53–60) both contend the Disclosure
Statement cannot be approved because no less than four different classes of claims in the Amended
Plan—the class containing the Vitol claim, the class of Fuel Line Lenders' claims, the National
class (in the Amended Plan), and the class of Settling Bondholders—are *all* invalid and all
allegedly constitute gerrymandering.  The objectors therefore contend "[t]here is [] no prospect
that the Plan will have the support of at least one impaired class," rendering it patently
unconfirmable.  AHG Obj. ¶ 46.

27.     As a preliminary matter, the argument is facially premature as it is impossible for
the Court to determine whether the Plan has an impaired accepting class—including, for example,
general unsecured creditors—prior to votes being tabulated.  This Court and others—including in
cases cited by Objectors—have thus refused to consider classification challenges at the disclosure

15

statement stage, because they raise confirmation issues—not issues about whether the disclosure statement contains adequate information.  *See, e.g.*, *In re Sunshine Precious Metals, Inc.*, 142 B.R. at 920 (refusing to adjudicate objections to the plan's classification of claims, holding they "are [] confirmation issues"); *In re Ellipso, Inc.*, 2012 WL 368281, at *2 (declining to consider objections related to the classification of claims at disclosure statement hearing); *see also In re Comandante Mgmt. Co.*, 359 B.R. at 421 (court refused to consider objections relating to improper classification at disclosure statement hearing, because "[t]he classification may be permissible upon the particular circumstances of this case").  That makes good sense, because whether classification is permissible rests on whether there is a valid "governmental purpose" for the separate classification, based on evidence and considerations that will be presented at the confirmation hearing.  *See, e.g.*, Case No. 17-bk-3283-LTS, ECF No. 19812 ¶ 64 (Commonwealth plan findings of fact and conclusions of law) ("Separate classification of these Claims is reasonable, justified, and supported by a governmental purpose."); *cf. In re Comandante Mgmt. Co.*, 359 B.R. at 420 (classification issues not to be heard at disclosure statement stage as "[t]he classification may be permissible upon the particular circumstances of this case").  Objectors' attempt to derail the confirmation process before it begins based on speculative arguments as to improper classification should be rejected.

28.     Indeed, the sheer ambition of Objectors' arguments demonstrate their flaw.  The Ad Hoc Group and Syncora contend no impaired accepting class will exist because not a *single* one of the four challenged classes is permissible.  *See, e.g.*, AHG Obj. ¶ 46.  Implicit in that contention is the admission that if the separate classification of a *single* one of those classes is upheld, then the plan has an impaired accepting class and therefore is confirmable under Bankruptcy Code § 1129(a)(10).  A plan cannot possibly be "patently unconfirmable" if it puts forward four plausible impaired accepting classes, any one of which could satisfy § 1129(a)(10).

16

And, indeed, it is impossible at this time to determine whether other impaired accepting classes whose classification is not even challenged—for example, the general unsecured claimholders—will vote in favor of the Amended Plan.  Given the sheer number of possible avenues to the plan obtaining an impaired accepting class, it is simply impossible for the Court to hold at this time that the plan is "patently unconfirmable" for lack of an impaired accepting class or due to gerrymandering.

29.    Similarly, the repeated refrain from Objectors that a "relatively small creditor group" should not be used as an impaired accepting class in a plan, Syncora Obj. ¶ 59, rings hollow. There is no test in Bankruptcy Code §§ 1122 or 1129(a)(10) as to the size of any impaired accepting creditor class for a plan to be confirmed.  Nor do the settling creditors represent a small group. The Amended Plan features settlements with very significant PREPA creditor groups who have been very active, and at times very adverse, participants in this case, including the Fuel Line Lenders (holding claims in face value more than $700 million), National (holding and/or insuring approximately $836 million PREPA Bonds), Vitol (holding an allowed claim of approximately $41.5 million), and a currently unknown number of Settling Bondholders.

30.    Tellingly, the Objectors fail to cite instances where classes of small claims satisfied the requirement to have at least one impaired accepting class.  *See, e.g.*, *U.S. Bank N.A. v. Vill. at Lakeridge, LLC*, 138 S.Ct. 960 (2018) (out of money $2.6 million claim purchased for $5,000 served as impaired, accepting class in case involving over $12 million); *Western Real Estate Equities, L.L.C.  v. Vill. at Camp Bowie I, L.P. (In re Vill. at Camp Bowie I, L.P.)*, 710 F.3d 239, 242 (5th Cir. 2013) (impaired accepting class held under $60,000 of claims in case involving over $32 million).

31.    In any event, the Oversight Board will demonstrate at confirmation that the
classification scheme proposed by the Amended Plan is permissible under PROMESA Title III
and this Court's precedents.  Significantly, Bankruptcy Code § 1122(a), made applicable by
PROMESA § 301(a), provides similar claims may be classified together, not that they must be
classified together:

- Fuel Line Loan Claims (Class 4):  First, unlike the bond claims, the Fuel Line Loan Claims
  are not subject to objections they have no recourse.  Second, PROMESA § 301(e) provides
  that the Oversight Board must consider for purposes of classifying claims under
  Bankruptcy Code § 1122 "whether such claims have priority over other claims."  Here, the
  Fuel Line Loan Claims had the benefit of the Trust Agreement providing an argument they
  were senior, because it provided they be paid before bond debt service.  Separate
  classification of these claims is justified based on their asserted priority and the settlement
  thereof.  PROMESA § 301(e); *see also In re Corcoran Hosp. Dist.*, 233 B.R. 449 (Bankr.
  E.D. Cal. 1999) (existence of settlement with creditor justified separate classification); *In
  re Dow Corning Corp.*, 244 B.R. 634 (Bankr. E.D. Mich. 1999) (same).  Neither the Ad
  Hoc Group nor Syncora challenge any of this, instead arguing the Fuel Line Lenders cannot
  be an impaired accepting class because the Ad Hoc Group and Syncora do not like the
  settlement terms between the Oversight Board and the Fuel Line Lenders.  AHG Obj. ¶¶
  47–53; Syncora Obj. ¶¶ 58–60.  That, of course, is not the test.  Neither raise any real
  argument suggesting the Fuel Line Loans cannot be separately classified or serve as an
  impaired accepting class.[6]

- National Claims (Classes 5 and 6):  The Amended Plan separately classifies National's
  Insured Bond Claims from the other bonds (Class 5), and also separately classifies
  National's asserted claim for reimbursement based upon its insurance policies (Class 6).
  The Ad Hoc Group preemptively challenged this classification of National's claims, stating
  "National cannot form an impaired accepting class because it has no distinguishing legal
  features, and there is no business justification for treating it differently than other
  Monolines."  AHG Obj. ¶ 57.  The Ad Hoc Group is wrong.  National settled its secured
  claims in exchange for, among other things, a special custodial trust structure.  The other
  monolines have not settled their secured claims.  Every single plan confirmed in these Title
  III cases has separately classified monoline insurers that—like National here—have settled

---

[6]  Syncora argues, without citation, that if the Fuel Line Loan Claims were "Current Expenses" then they should have
been paid in the ordinary course, and, if they had been, they now could not serve as an impaired accepting class.
Syncora Obj. ¶ 59.  Syncora's simple *ipse dixit* ignores the substantial litigation that has already occurred as to the
Fuel Line Loan Claims' status as Current Expenses, which is an unresolved question, and also that, regardless of
imaginary counterfactuals, the Fuel Line Loan Claims are currently outstanding as prepetition claims.  *In re Quigley
Co.*, 377 B.R. 110, 126–29 (Bankr. S.D.N.Y. 2007), cited by Syncora (¶¶ 51, 59), is not on point.  There, the debtor's
parent engaged in a long running campaign to buy votes by promising claimants on certain product liability litigations
a recovery from the parent, but, instead of obtaining a general release of the corporate family, intentionally left those
claimants with claims against the debtor and required them to vote in favor of the plan.  *Id.*  There is no similar vote-
buying scheme here.  Here, the Oversight Board simply settled claims against PREPA.

and required a custodial trust structure as part of the treatment of their claims.[7]  *See*
National PSA § 5.3.  The use of the custodial trust structure in restructuring insured
municipal bonds is itself a valid justification for separate classification.[8]

- Vitol Class (Class 8):  Vitol's classification is based on a settlement entered into between
  Vitol and the Oversight Board resolving an appeal.  The Court had already granted Vitol
  an allowed damage claim.  In exchange for the Oversight Board withdrawing its appeal,
  Vitol agreed to accept half the return going to other general unsecured claims and to release
  PREPA.  Without more, that justifies separate classification.  The Ad Hoc Group's
  speculation that the settlement could have been structured differently (¶¶ 54–55) does not
  account for Vitol's release, nor does it alter the fact the settlement that was actually reached
  between the parties requires separate classification.  Syncora complains that Vitol's claim
  is small compared to the Bondholders.  Syncora Obj. ¶ 57.  The size of Vitol's claim does
  not change the permissibility of separate classification due to Vitol's different legal rights,
  the release of Vitol, and the existence of a settlement between the Oversight Board and
  Vitol.[9]

- Settling Bondholder Claims (Class 1):  The Amended Plan permits all Bondholders to elect
  to either join the Settling Bondholder and Settling Monoline Claim Class (Class 1) and
  thereby settle their bond claims in exchange for a set recovery of 50% (which may increase
  in certain scenarios) *or* they can elect to remain in the Non-Settling Bondholder and Non-
  Settling Monoline Claims Class (Class 2) and receive a recovery dependent on the extent
  to which they succeed in the lien and recourse litigation.  Every bondholder has the right
  to choose the class in which they are to be treated.  Plans containing materially
  indistinguishable structures are routinely approved by the courts.  *See, e.g.*, *In re Dow
  Corning Corp.*, 244 B.R. at 669 (confirming plan permitting certain claimants to either
  settle and receive set recovery or continue litigation against debtor and receive whatever
  litigation eventually yields); *In re Wash. Mut., Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011)
  (same).  And, as discussed above, separate classification is permitted when creditors settle.
  *See, e.g.*, *Corcoran*, 233 B.R. at 449.  The Ad Hoc Group and Syncora's (¶ 56) arguments
  simply ignore this basis for separate classification and treatment.

---

[7]  *See Modified Fifth Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority*
[ECF No. 1415 in Case No. 17-bk-3567-LTS]; *Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax
Financing Corporation* [ECF No. 436 in Case No. 17-bk-3284-LTS]; *Modified Eighth Amended Title III Joint Plan
of Adjustment of the Commonwealth of Puerto Rico et al.* [ECF No. 19813 in Case No. 17-bk-3283-LTS].

[8]  Custodial receipt structures are recognized as useful tools for restructuring insured municipal bonds.  *See, e.g.*,
*Custodial Receipts: A Useful Tool for Restructuring Insured Municipal Bonds*, Apr. 30, 2018,
https://www.kramerlevin.com/en/perspectives-search/custodial-receipts-a-useful-tool-for-restructuring-insured-
municipal-bonds.html (last accessed Feb. 10, 2023).  The inclusion of a custodial trust structure necessitates separate
classification.

[9]  *In re Thornwood Assocs.*, 161 B.R. 367, 374 (Bankr. M.D. Pa. 1993) *aff'd*, 162 B.R. 438 (M.D. Pa. 1993) (cited in
Syncora Obj. ¶ 57), is not to the contrary.  Here, separate classification is not based upon different treatment, as in *In
re Thornwood Assocs.*  Rather, separate classification is required due to a pre-plan settlement that happens to also
require different treatment, as well as the release for Vitol.

### B.     <u>The Plan Is Not Patently Unconfirmable as a Result of Unfair Discrimination</u>

32.     The Committee, the Ad Hoc Group, and Syncora all attack the Amended Plan as unconfirmable on the basis that it purportedly unfairly discriminates in favor of the Fuel Line Loan Claims and against their classes. Specifically, Objectors assert the Court cannot approve the Disclosure Statement as a result of the Fuel Line Lender PSA which settles the Fuel Line Lenders' claims against PREPA and the Fuel Line Lender Priority Action, filed against the Oversight Board and PREPA, among others, seeking to ensure that the Fuel Line Lenders are paid in full before Bondholders are paid anything. Unlike the bonds claims, the Fuel Line Loan Claims are undisputed. Unlike the Committee's constituency, the Fuel Line Loan Claims assert seniority rights against the bond claims arising from contracts particular to the Fuel Line Loan Claims.

33.     This Court has already held that unfair discrimination objections should not be heard at the disclosure statement stage because they "require factual development" as to the reason for the discrimination. July 14, 2021, Hr'g Tr. 84:13–17 ("Parties' objections concerning whether the plan unfairly discriminates against certain classes or claims are also overruled. Such arguments are properly raised in connection with plan confirmation as they concern issues that require factual development."). That is true here. The different treatment of different classes is supported by a variety of governmental, economic, historical, and other considerations that will be explored in detail at the confirmation hearing. There is simply no basis to state that the different treatment of different creditor classes "could *never be legal*." Apr. 28, 2021 Hr'g Tr. 145:13–22 (emphasis added).

#### 1.     The Amended Plan Does Not Unfairly Discriminate Against the General Unsecured Claimholders

34.     The Committee argues the Amended Plan provides unfair treatment by providing the Fuel Line Lenders with a different series of bonds and a greater recovery than general

unsecured creditors.  UCC Obj. ¶¶ 96–104.[10]  As a preliminary matter, this issue cannot be decided

now.  Unfair discrimination is only relevant if the objecting class rejects the Amended Plan.  *See*

11 U.S.C. § 1129(b); *In re Trib. Co.*, 972 F. 3d 228, 242 (3d Cir. 2020) ("unfair discrimination

applies only to classes of creditors (not the individual creditors that comprise them), and then only

to classes that dissent.").  It is impossible to determine, at this time, whether the general unsecured

claimholders will or will note vote in favor of the Amended Plan.  If they vote in favor of the

Amended Plan, then no unfair discrimination argument can be raised with respect to them.  As

such, there is no basis for this Court to adjudicate this issue now.

35.    In any event, the treatment proposed for the Fuel Line Lenders is the result of a

reasonable settlement of significant litigation risk between the parties, embodied in the Fuel Line

Lender PSA.  The Fuel Line Lenders have a colorable assertion of priority which they have

asserted in their proof of claims against PREPA and vigorously litigated in the Fuel Line Lender

Priority Action.  The Fuel Line Lenders have argued this priority entitles their claims to payment

in full plus postpetition interest accrued over the past 5-plus years before payments to bondholders

can be made.  The Fuel Line Lenders' claims to priority are based on Trust Agreement provisions

requiring Current Expenses to be paid before bond debt service, including as a result of the Fuel

Line Lenders being expressly named in the Trust Agreement and having contracts with PREPA

promising they would be treated as a Current Expense.  The Committee's constituency of general

---

[10] In addition, the Committee argues the Disclosure Statement fails to adequately explain the basis for the Fuel Line Lenders' preferred treatment over general unsecured creditors.  UCC Obj. ¶¶ 68–73.  The Committee is wrong.  The Committee ignores the multiple instances where the Disclosure Statement describes both the basis for and benefits incurred through the Fuel Line Lender PSA.  *See* Disclosure Statement Parts II.B.1, II.B.7(iii), and VI.C.  To the extent the Committee seeks additional information, the Committee's argument is a thinly veiled attempt to compel the Oversight Board to preview its confirmation arguments by placing them in the Disclosure Statement.  At confirmation, to the extent necessary, the Oversight Board will demonstrate that the Plan, including the treatment of the Fuel Line Lenders, satisfies all relevant confirmation requirements.

unsecured claims have no such arguments or rights.  The proposed treatment of Fuel Line Lenders'

claims, therefore does not, and cannot, make the Amended Plan patently unconfirmable.

36.     The Committee further asserts the Plan is patently unconfirmable because "even to

the extent the Fuel Line Lenders have a Current Expense Priority that other general unsecured

creditors do not have, that priority can be asserted only against the Bondholders, and it cannot be

used to justify a lower recovery for other general unsecured creditors."  UCC Obj. ¶ 101.  The

Committee is simply wrong.  The Fuel Line Lenders Claims can receive more than bond claims

based on their seniority arguments, and although that would cause the bond claims to be paid less

than the Committee's constituency of unsecured claims, the bond claims can receive in settlement

more than the other general unsecured claims because the bond claims settlement also entails

settling their claim to a security interest in all future, unearned revenues.  While the Oversight

Board believes the bond claims to such collateral security are completely wrong, the consequences

of the Oversight Board being wrong are onerous enough to justify providing the bond claims more

in settlement.

37.     The Oversight Board has settled these priority assertions, and the Amended Plan

treats them accordingly.  That is not unfair discrimination; it is distinct treatment based upon the

settlement of different asserted rights.[11]

---

[11] The Committee contends the discrimination is unfair because, according to the Committee, some or all of the general
unsecured claimholders are also "Current Expenses."  UCC Obj. ¶ 100.  That is incorrect.  The Fuel Line Lenders'
claims to priority are different than all other creditors, as they are based on prepetition agreements from PREPA
specifically agreeing to pay the Fuel Line Lenders as Current Expenses before Bonds, specifically agreeing not to
challenge the Fuel Line Loan Claims' status as Current Expenses, and adding the Fuel Line Lenders as named parties
to the Trust Agreement.  Those facts set them apart from other claimholders that may assert to be Current Expenses
and justify different treatment.

### 2. The Bondholders Are Not Unfairly Discriminated Against in Favor of the Fuel Line Lenders

38.     The Ad Hoc Group and Syncora, meanwhile, argue the Oversight Board does not have authority to enter into the Fuel Line Lenders PSA, rendering the Plan patently unconfirmable, because it is an intercreditor dispute in which PREPA has no stake.[12]  AHG Obj. ¶¶ 7, 16, 34; Syncora Obj. ¶ 51.  These Objectors are also wrong.  The Oversight Board can settle Fuel Line Lenders' claims against PREPA, especially when the settlement nowhere deprives the bond claims of any rights and pays the Fuel Line Lenders' prepetition claims less than in full.  The Fuel Line Lenders have filed claims against PREPA as well as a lawsuit against PREPA seeking to block it from consummating restructuring transactions that violate their purported priority rights.  And the Fuel Line Lenders' rights arise from contracts *with PREPA*, including the credit agreements, the Trust Agreement, and specific forbearance agreements.  Their claims are against PREPA, and the Oversight Board has discretion to settle them, as the Oversight Board has extensively argued before.  *See, e.g.*, Case No. 17-bk-3283-LTS, ECF No. 9291 ¶¶ 9–15.[13]  "To hold otherwise,"— i.e., to hold that litigation pertaining to claims against the estate cannot be settled by the trustee alone—"would permit a creditor to hold the estate hostage to protracted litigation."  *In re DVR, LLC*, 582 B.R. 507, 522 (Bankr. D. Colo. 2018), *aff'd*, 606 B.R. 80 (D. Colo. 2019).  Simply put, the Objectors' contention the Fuel Line Lender PSA and the treatment of Fuel Line Lenders' claims under the Plan is funded with Bondholder money (of which there is no such thing unless

---

[12] In a similar vein, the Ad Hoc Group argues the Plan is patently unconfirmable since it does not account for the possibility of the Ad Hoc Group prevailing over the Fuel Line Lenders in the Fuel Line Lender Priority Action.  AHG Obj. ¶ 34.  The Oversight Board's ability to settle such disputes, as described herein, renders such arguments moot.

[13] The Ad Hoc Group and Syncora both cite the Fuel Line Lenders' briefs arguing that they held particularized claims that cannot be settled by the Oversight Board.  Syncora Obj. ¶ 51; AHG Obj. ¶ 49.  But they ignore the Oversight Board's briefs, refuting those very arguments and demonstrating that the Oversight Board had the power to settle the priority issues relating to the Bondholders and Fuel Line Lenders.  *See, e.g.*, Adv. Proc. No. 19-396-LTS, ECF No. 79 ¶¶ 50–54.

they are secured by nonexistent, unearned future revenues) is incorrect—the Bondholders have conceded they are subordinate to Current Expenses,[14] and PREPA has the right under the Trust Agreement to determine what constitutes Current Expenses and to pay them.  Moreover, the Debtor has full authority to settle claims against it.  Furthermore, no intercreditor claims are adjusted by the Amended Plan and the Amended Plan contains no third party releases.

39.     The Bondholders' protestations on this point ring particularly hollow given their affirmative representations at the most recent hearing on February 1, 2023, that if the Fuel Line Loan claims are "Current Expenses" "[they] will be paid out ahead of us [*i.e.*, ahead of bondholders]." Feb. 1, 2023 Hr'g Tr. 137:9–12. And, notably, the Fuel Line Lenders have asserted claims that PREPA is either estopped or contractually barred from challenging the Fuel Line Lenders' status as a "Current Expense" under the Trust Agreement. *See* Fuel Line Lender Priority Action, ECF No. 62 at 32–33, 59–71. Moreover, under the Trust Agreement PREPA has discretion to determine which expenses qualify as current expenses and are paid first at any time. Trust Agreement at 1 (PREPA has "complete control and supervision of any undertaking . . . including the power to determine the character of and necessity for all its expenditures and the manner in which they shall be incurred, allowed and paid . . . and such determination shall be final and conclusive . . . ."). PREPA thus has authority under the Trust Agreement to determine what claims are Current Expenses and pay them before Bonds. Accordingly, Bondholders, who depend totally on the Trust Agreement, cannot complain as to the treatment of the Fuel Line Lenders.

C.     **Affordability Contentions Do Not Render the Plan Patently Unconfirmable**

40.     The Ad Hoc Group and Syncora assert the Court should not approve the Disclosure Statement because the Amended Plan does not provide creditors the maximum PREPA can afford

---

[14] Hr'g Tr. 137:9–12 (Feb. 1, 2023).

to pay while maintaining public services.  *See* AHG Obj. ¶¶ 37–43, 66–70; Syncora Obj. ¶¶ 24–31, 39–44.  Their argument can be distilled as follows: (1) the "fair and equitable" and "best interests of creditors" tests require that PREPA pay creditors what it can afford to pay under the Plan; (2) the Plan does not pay all PREPA can afford; so, therefore, (3) the Plan is patently unconfirmable.  *Id.*  Those arguments fail at every stage.

41.      These "affordability" objections are premature on the Objectors' own terms and do not render the Amended Plan patently unconfirmable.  Initially, the objectors' legal contentions are simply wrong and, tellingly, omit any mention that PROMESA § 201 grants the Oversight Board exclusive discretion to determine PREPA's debt sustainability limits while providing in § 106(e) that no district court has subject matter jurisdiction to challenge the Oversight Board's certification of PREPA's fiscal plan containing the mandatory debt sustainability analysis.  The fair and equitable test under Bankruptcy Code § 1129(b), which only applies to rejecting classes, imposes the absolute priority rule on classes subordinate to the rejecting classes.  It does not remotely provide the debtor must pay creditors the maximum it can afford.  The best interest test in Title III requires the Court to consider what creditors would be paid outside Title III.[15]  That test says nothing about requiring the debtor to pay the maximum it can afford.  That would be contrary to the requirement in PROMESA § 314(b)(7) that the Plan be consistent with the fiscal plan.

---

[15] Contrary to Syncora's assertion otherwise (Syncora Obj. ¶ 31), the Oversight Board recognizes that the Plan must satisfy the best interests test and fair and equitable standard; it just disagrees with the Ad Hoc Group of PREPA Bondholders and Syncora's contention that to satisfy those requirements PREPA must pay its creditors all it can afford.  The Oversight Board believes the Plan satisfies these confirmation requirements and will submit its evidence establishing such satisfaction at the appropriate time in connection with the hearing to consider confirmation of the Plan.  The Ad Hoc Group of PREPA Bondholders and Syncora will have the opportunity to assert that the proposed Plan fails to meet the best interests test and/or is not fair and equitable at the confirmation hearing.

42.     Even assuming PROMESA did include an affordability test (which it does not),
determining PREPA's ability to afford debt would be a fact intensive inquiry that can only be
resolved at confirmation.  The Ad Hoc Group and Syncora essentially concede affordability is a
fact issue by citing to macroeconomic data and other materials outside the four corners of the
Amended Plan.  AHG Obj. ¶¶ 3, 27, 69; Syncora Obj. ¶ 24.  Absent an evidentiary record, the
Court could not possibly determine what PREPA could afford (if there were any reason to do so
in the first place, which there is not).  Indeed, at the same time the Ad Hoc Group and Syncora
argue PREPA must pay more, other parties in interest, such as UTIER, have asserted the Amended
Plan pays **too much** and that the Legacy Charge is already too "onerous" and may render the Plan
infeasible as drafted.  *See* UTIER Obj. ¶ 14.  The Oversight Board will show, at confirmation, that
the Amended Plan satisfies all relevant confirmation requirements.  What is clear at this time is
that this issue simply cannot render the Amended Plan unconfirmable on its face.[16]  For this reason,
this Court has previously rejected attempts to litigate similar issues at the disclosure statement
stage.[17]  It should do so again here.

43.     The purpose of PROMESA is to ensure the provision of effective public services,
not maximize creditors' recoveries without regard to PREPA's statutory mission and PROMESA's

---

[16]  Indeed, it would make no sense to even try to determine the amount that PREPA can afford *today*.  PROMESA §
314(b)(6) and the fair and equitable test (which are different than the affordability test applied by Objectors) must be
satisfied at the time of confirmation.  As we have seen just in this Title III case, through the devastating hurricanes
Irma and Maria in 2017, which destroyed significant amounts of PREPA's infrastructure, to the invasion of Ukraine
by Russia in 2022, which sent fuel prices skyrocketing, PREPA's financial situation can change materially in a short
space of time.

[17]  This Court overruled a similar objection in connection with the hearing to consider whether the Commonwealth
disclosure statement contained adequate information. *See Omnibus Objection of Official Committee of Unsecured
Creditors to (I) Disclosure Statement for Third Amended Title III Joint Plan of Adjustment of Commonwealth of Puerto
Rico et al. and (II) Related Motions* [ECF No. 17017 in Case No. 17-bk-3283-LTS] at 39–40 (asserting the
Commonwealth disclosure statement failed to include information about the value, availability, and allocation of the
Commonwealth's assets, making it impossible for creditors to determine if they believed the proposed plan represented
"a reasonable effort by the [Commonwealth]" to repay its creditors, and that the proposed plan "affords all creditors
the potential for the greatest economic return from [the Commonwealth's] assets."); *see generally* July 14, 2021 Hr'g
Tr. 88:18–23.

purposes. *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 432 F. Supp. 3d 25, 30 (D.P.R. 2020), *aff'd*, 954 F.3d 1 (1st Cir. 2020) ("The goal of these PROMESA cases … is ***not merely to maximize creditors' recoveries***. Rather, these restructuring cases require a more holistic approach that focuses on the continuation and future of a government and its instrumentalities and their ability to meet the needs of the Commonwealth's residents as well ***as provide proper recompense of creditors***.") (emphasis added); *see also Andalusian Glob. Designated Activity Co. v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 954 F.3d 1, 7 (1st Cir. 2020) (same); *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 478 F. Supp. 3d 190, 196 (D.P.R. 2020) (same); *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 621 B.R. 289, 303 (D.P.R. 2020), *aff'd*, 7 F.4th 31 (1st Cir. 2021) ("[T]he purposes of the Title III proceeding are not narrowly focused on operation of the debtors for the benefit of the creditors or any particular stakeholder constituency") (quoting Ord. on Discovery at 6, Aug. 13, 2020, ECF No. 2140). As this Court has previously held, "unlike the commercial focus of bankruptcy cases of private entities, the 'primary purpose' of governmental insolvency proceedings 'is not future profit, but rather continued provision of public services.'" *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 478 F. Supp. 3d at 196 (quoting *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 432 F. Supp.3d at 30). In line with this, the Oversight Board is tasked with developing a "holistic approach" that "balanc[es] and prioritiz[es] the relevant issues and concerns in developing fiscal arrangements and plans of adjustment." *Id*. This Court has recognized that the Oversight Board is afforded substantial deference in developing this approach. *Id*. No provision of PROMESA creates an "affordability" test posited by the Objectors. On the contrary, the Oversight Board has exclusive discretion to determine PREPA's debt sustainability in certified fiscal plans for PREPA, with which the Amended Plan must be consistent. PROMESA §§ 201(b)(1)(I), 314(b)(7).

44.    Congress knew how to include provisions requiring that a debtor use all its available

funds to pay creditors.  Congress did exactly that in chapter 13, where it included § 1325(b) as a

confirmation requirement in a contested confirmation hearing, which requires the plan proposed

by the debtor "provide[] that all of the debtor's projected disposable income" be "applied to make

payments to unsecured creditors . . . ."  11 U.S.C. § 1325(b).  Yet Congress incorporated no

provision with any similarity to 11 U.S.C. § 1325(b) in PROMESA Title III.

45.    Notably, the PROMESA best interests test[18] neither requires PREPA to pay its

creditors the maximum it can afford nor establishes a minimum that PREPA must pay its creditors.

*Findings of Fact and Conclusions of Law in Connection with Confirmation of the Modified Eighth*

*Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees*

*Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico*

*Public Buildings Authority*, January 18, 2022, ECF No. 19812 in Case No. 17-bk-03283 (the "CW

FFCL") at 135 ("[T]he PROMESA best interests test *does not* impose a litmus test or establish a

floor for creditor recoveries.") (emphasis added); *Findings of Fact and Conclusions of Law in*

*Connection with Confirmation of the Modified Fifth Amended Title III Plan of Adjustment of the*

*Puerto Rico Highways and Transportation Authority*, October 12, 2022, [ECF No. 1416 in Case

No. 17-3567] (the "HTA FFCL") (same). As articulated by this Court, "PROMESA's best interests

test requires the Court only to *consider* whether creditors of the Debtor *in the aggregate* receive

an equal or greater recovery on their Claims pursuant to the [plan of adjustment] than they would

---

[18] PROMESA § 314(b)(6) provides:

The court shall confirm the plan if—the plan is feasible and in the best interests of creditors, *which
shall require the court to consider whether available remedies under the non-bankruptcy laws and
constitution of the territory would result in a greater recovery for the creditors than is provided by
such plan*.

48 U.S.C. § 2174(b)(6) (emphasis added).

outside of the Title III if the [Title III case] were dismissed and creditors exercised their remedies." CW FFCL at 135; HTA FFCL at 62–63 (emphasis original).[19]  While the Ad Hoc Group and Syncora raise a number of arguments to assert that creditors would receive a better recovery outside of PREPA's Title III case, *see* AHG Obj. ¶¶ 38–43; Syncora Obj. ¶¶ 39–44, these assertions are fact intensive and, even if they had merit, would not be dispositive of whether the best interests test is satisfied.

46.     Chapter 9 and its jurisprudence support the foregoing conclusions.  In chapter 9 cases, chief factors in determining whether creditors receive all they can reasonably expect are whether the debtor (i) will retain sufficient funds necessary to operate, (ii) make necessary improvements, and (iii) maintain its facilities or services.  Critically, <u>it is not necessary that all taxes collected be used to pay creditors, or that taxes be increased</u>.  *See Lorber v. Vista Irr. Dist.*, 127 F.2d 628, 639 (9th Cir. 1942); *see also Corcoran*, 233 B.R. at 459.

47.     Syncora relies on the 1940 Ninth Circuit decision of *Fano v. Newport Heights Irrigation District* (Syncora Obj. ¶ 25) to assert PREPA's rates must be raised to pay creditors. 114 F.2d 563 (9th Cir. 1940).  In *Fano*, an irrigation district upgraded its irrigation system in lieu of making bond payments.  These renovations ultimately reduced available cash flow and the district filed for bankruptcy.  The Ninth Circuit considered the following question: "[a]t the time of the filing of the petition was the District insolvent or unable to pay its debts as they fall due, and if so, is the proposed plan fair?"  *Id.* at 564.  After reviewing the facts, the Ninth Circuit found the irrigation district was "far from insolvent in the bankruptcy sense," and, in light of that, the court

---

[19]  The Ad Hoc Group is wrong that bondholders are the only creditor group relevant to the best interests test (¶ 38).  This self-serving assertion is clearly incorrect and has no support.  While the bondholders are a substantial creditor group, there is no basis to say that how other creditors would fare outside of Title III is not relevant to the best interests test. And it is clear they would likely do worse, as the bondholder groups have made no secret of their intent to immediately seek appointment of a receiver that would run PREPA for the bondholders' sole benefit, and resist paying other creditors.  AHG Obj. ¶¶ 39–43.

stated it was "unable to find any reason why the tax rate should not have been increased sufficiently to meet the [irrigation district's] obligations or why it can be said that the plan is 'equitable' and 'fair' and for the 'best interest of the creditors' with no sufficient showing that the taxing power was inadequate to raise the taxes to pay them." *Id.* at 565–66.

48.     *Fano*'s facts are opposite to the facts here. Congress enacted PROMESA because essential services were not being provided to the residents of Puerto Rico by its government. *See* PROMESA § 405(m)(2); *see also Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 118 (2016) ("Puerto Rico and its instrumentalities are in the midst of a fiscal crisis."). Congress gave the Oversight Board the duty to ensure such essential services were provided. *See* PROMESA § 201(b)(1)(B). Furthermore, *Fano*—a case from 1940—is today more often distinguished than applied. For example, in *Corcoran*, the committee of unsecured claimholders cited *Fano* to argue the plan was not fair and equitable because "the [debtor, a hospital district,] should be obligated to raise taxes or at least attempt to raise taxes to pay the unsecured creditors in full." *Corcoran*, 233 B.R. at 459. The court overruled that argument because the circumstances of the *Corcoran* case were different from *Fano*. *Id.* at 459–61 (explaining that in *Fano* the debtor's assets "exceeded its indebtedness by a large margin" whereas in the present case the "the liabilities of the debtor far exceed the value of its assets."). The facts of *Corcoran* are more similar to PREPA's situation. PREPA operates an antiquated electric system with generation equipment that has sustained substantial damage from natural disasters, yet already charges among the highest rates in the U.S. PREPA will need to make substantial investments in its infrastructure during the lifetime of the Legacy Charge just to provide basic services. Just as the Court concluded the debtor in *Corcoran* was unable to raise taxes to pay more to unsecured creditors, PREPA cannot endure unconstrained rate increases.

49.     Syncora also identifies *In re Hardeman County Hospital District*, 540 B.R. 229 (N.D. Tex. 2015), as a case they think balances fairness, equity, and feasibility.  There, however, the Court recognized "creditors cannot expect that, in making payments to Creditors under a plan, the Debtor's cash at any point in the future will go toward the additional payment of Claims because . . . the Debtor must be allowed to retain sufficient funds with which to operate, make necessary improvements, and maintain its facilities."  *Id.* at 239 (citation omitted).  Importantly, the Court noted it "will not second-guess the political discretion and governmental decision-making of the Debtor's governing board" in balancing creditors' recoveries and amounts needed for operation.  *Id.* at 240.  Similarly, here, the Oversight Board developed the Amended Plan, which it believes appropriately balances creditors' recoveries with PREPA's operational needs and satisfies the confirmation requirements under PROMESA.  The Oversight Board considered multiple factors in sizing the Legacy Charge, including future needs of PREPA and risks.

50.     Moreover, even if any of these tests could be considered at this stage (it cannot, as discussed above), neither the Ad Hoc Group nor Syncora put forward any compelling evidence PREPA can afford more than what the Amended Plan provides.  The Ad Hoc Group's and Syncora's citation to economic data and other materials outside the Amended Plan also do not help them, even if they could be considered now.  While they cite Commonwealth economic data as if it were somehow dispositive of PREPA's situation, AHG Obj. ¶¶ 3, 27, 69; Syncora Obj. ¶ 24, they completely ignore the antiquated state of PREPA's infrastructure, the poor service and frequent outages that customers face, the fact that PREPA's utilities use an expensive fuel mix, the fact PREPA's entire system is in dire need of capital expenditure, the fact defection from the grid is accelerating due to PREPA's condition and rates as well as the increasing affordability of alternatives, and the fact PREPA has one of the poorest customer bases in the country.  PREPA's

current rates, while among the highest in North America, do not produce excess revenue for debt service after payment of PREPA's operating expenses.  The average Puerto Rican household (whose median income is approximately $21,058)[20] pays more for electricity relative to their income than consumers in any U.S. state, while experiencing a lower quality of electric service with frequent outages.  None of the Commonwealth data the Ad Hoc Group and Syncora cites recognize these facts about PREPA, which seriously limit the scope of any rate increases PREPA could impose.[21]

51.     The Ad Hoc Group and Syncora also may not rely on the Oversight Board's proposal to bondholders in mediation (AHG Obj. ¶¶ 67–68; Syncora Obj. ¶ 24) to support their arguments regarding affordability.  Moreover, it is misleading to refer to the bonds' potential treatment without considering what that meant for other constituencies.  The Official Committee might contend we offered the bonds too much at its constituencies' expense.  The Oversight Board has since endeavored to correct the imbalance.  In any event, the parties cannot negotiate or mediate if proposals become evidence, as the objectors well know because those settlement offers were made in settlement negotiations, and cannot be used against the Oversight Board in litigation to establish recovery thresholds.  *See* Fed. R. Evid. 408 (prohibiting reliance on settlement or conducts or statements made in negotiations as evidence against party).

52.     Likewise, bondholder recoveries under the 2019 RSA do not support the Ad Hoc Group and Syncora's assertions regarding affordability.  Indeed, it contained termination rights for the Government and Oversight Board, and depended on legislation the Legislature declined to

---

[20] U.S. Census Bureau quickfacts: Puerto Rico, https://www.census.gov/quickfacts/fact/table/PR/PST045221 (last visited January 9, 2023).

[21] Even financial support from FEMA, which could facilitate needed capital improvements, comes with a matching funding obligation that would place enormous financial pressure on PREPA—unless it were waived.

enact.  Whatever these recoveries amounted to in 2019, they have manifestly no bearing on what

PREPA is able pay creditors today.[22]  Moreover, at that time and not until recently did the

Oversight Board have the benefit of information from LUMA and various advisors of the extent

of capital expenses required.  In fact, as explained in the Disclosure Statement, AAFAF exercised

its unilateral right to terminate the 2019 RSA because of concerns regarding, among other things,

the affordability of the cost of electricity contemplated thereunder.  It would make no sense for the

2019 RSA to be terminated due to concerns about affordability, only to then offer the bondholders

the same or more recovery in negotiations shortly thereafter.

### D.    The Bondholders' Bad Faith Allegations are Inappropriate and Incorrect

53.    Syncora and the Ad Hoc Group argue the Plan was not proposed in good faith.

Specifically, Objectors allege: (a) in connection with mediation, the Oversight Board abused the

mediation process by delaying proposing a lead negotiator, communicating with bondholders, and

exchanging proposals and information, Syncora Obj. ¶ 48; AHG Obj. ¶¶ 29–32; (b) the Oversight

Board's proposal was less than the 2019 RSA but more than the Plan, AHG Obj. ¶ 28; (c) the

Oversight Board failed to further engage with bondholders or modify its November 8, 2022

proposal in light of bondholders' feedback concerning data and assumptions, Syncora Obj. ¶¶ 49,

50; (d) the Oversight Board improperly withdrew support for the 2019 RSA, Syncora Obj. ¶ 46;

AHG Obj. ¶¶ 25–27; (e) the Plan does not account for all potential contingencies pursuant to the

Court's directive, AHG Obj. ¶¶ 33–35; and (f) the Oversight Board's settlement with the Fuel Line

Lenders was an attempt at impermissible settlement of intercreditor claims and "vote buying."

Syncora Obj. ¶ 51.   These assertions do not state a valid disclosure statement objection or

---

[22] Bondholders mislead the Court by stating "PREPA [agreed it] would pay Bondholders and Monolines 77.5% of their claims" under the 2019 RSA.  AHG Obj. ¶ 25. Under the 2019 RSA, PREPA agreed to pay RSA parties 67.5% in Tranche A Bonds and 10% in contingent Tranche B Bonds.

confirmation objection, and are contrary to fact. They fail on their face. If there was delay in naming a lead negotiator, what harm did it cause? All the parties knew Citibank was leading negotiations, and the Oversight Board's members and their legal and other advisors did not change and were available at all times. What is the consequence of the failure to assign a title earlier? There was none and the Objectors fail to identify any problem. The allegations about the Oversight Board not recreating the 2019 RSA and agreeing with the objectors' analyses is just sour grapes that the Oversight Board determined PREPA should not pay more. The 2019 RSA provided the Oversight Board and Government termination rights. That is undisputed. As explained above, the settlement with the Fuel Line Lenders resolves their claims against PREPA and does not take anything from bondholders' rights. In short, the Objectors' have alleged nothing having any significance for the Disclosure Statement or confirmation hearings.

54.    Whether a plan is proposed in good faith is determined by the plan proposal, not the history of negotiations.[23] Moreover, the Ad Hoc Group (¶¶ 25–32) and Syncora (¶¶ 46–51) mischaracterize the facts. [24]

---

[23] The Ad Hoc Group cites *In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 261 (Bankr. S.D.N.Y. 2014), to argue that "the good faith requirement thus 'speaks more to the process of plan development than the content of the plan," AHG Obj. ¶ 23, but the court made clear that this requirement looked to all circumstances from before the bankruptcy was filed, including the debtor's need for a restructuring of its debt, as well as the issue of whether the plan was "meant to achieve a result consistent with Chapter 11, that is, to preserve the business and avoid liquidation." *In re Genco Shipping & Trading Ltd.*, 513 B.R. at 262–63. Here, as the Oversight Board will show at confirmation, the good faith requirement is satisfied, including because PREPA's debt clearly needs restructuring and the Amended Plan achieves a result consistent with PROMESA Title III.

[24] Courts should exercise caution when inquiring into accusations of bad faith in mediation. Inquiries into a party's level of participation (*i.e.*, the extent to which a party discusses issues, listens to opposing viewpoints and analyzes its liability) can imperil the confidentiality of mediation. *In re A.T. Reynolds & Sons, Inc.*, 452 B.R. 374, 384 (S.D.N.Y. 2011). Moreover, inquiring into a party's mediation conduct, backed by a sanctions threat, may exact a coercive influence on the parties to settle. *Procaps S.A. v. Patheon Inc.*, No. 12-24356-CIV, 2015 WL 3539737, at *8–9 (S.D. Fla. Jun. 4, 2015).

### i.     The Plan Is Proposed in Good Faith

55.     As explained in the Disclosure Statement, the Oversight Board formulated the Amended Plan to ensure sufficient electricity prices to maintain PREPA's sustainability as a provider of reliable electric services at what it believes is an affordable rate to Puerto Ricans, that leaves adequate room for capital expenses, does not incentivize conversion to solar power so that fewer PREPA customers must absorb the total fixed costs, and does not render Puerto Rico uncompetitive with other venues for consumers and businesses who would otherwise reside in Puerto Rico.  Although the Oversight Board could have determined all extra revenues are required for capital expenditures, it allocated substantial funds for debt service.

56.     The Oversight Board has made deals in and outside mediation with a variety of creditor groups on behalf of five debtors under PROMESA Title III and various other public entities culminating in qualifying modifications under PROMESA Title VI—totaling tens of billions of dollars of debt.  In PREPA's Title III Case, the Oversight Board has already made deals with the Fuel Line Lenders, National, and Vitol, with the first two being aided by the mediation process.  It has also negotiated with many other parties, some of which may still result in consensual arrangements.

57.     The Objectors mistakenly conflate the Oversight Board's actions and positions in furtherance of its statutory mandates, and its unwillingness to settle at levels the Oversight Board believes are beyond PREPA's sustainable debt capacity, with an unwillingness to negotiate.[25]  The Oversight Board's positions are the product of extensive deliberation, informed by advisors' analyses into, among other things, PREPA's financial and operational circumstances, the burden

---

[25] The Ad Hoc Group insinuates the Oversight Board "resisted [] scheduling mediation sessions" (AHG Obj. at 29). That is false.  The Oversight Board may have not agreed to move from its numbers, but it has **never** refused to attend a mediation session or evaluate, in good faith, a counterproposal.

PREPA's consumer and business ratepayers can tolerate, the state of the system, elasticity of demand, defection from the grid, and other considerations.

### ii. Syncora and the Ad Hoc Group Target the Oversight Board, When the Plan Is at Issue, Not the Oversight Board

58.     Syncora and the Ad Hoc Group trample on the mediation privilege and Rule 408 of the Federal Rules of Evidence in arguing the Oversight Board proposed the Plan in bad faith—a false allegation in any event.  Largely on the basis of oral argument at recent omnibus hearings, they contend the Oversight Board "abused the mediation process to the detriment of Bondholders," and as a result, the Plan was proposed in bad faith.  AHG Obj. ¶¶ 23, 28–32; *see also* Syncora Obj. ¶¶ 47–50.  The argument is defective on numerous levels and as stated above, wrongly focuses on the Oversight Board rather than the Plan.  Above, we explained why all the Objectors' allegations do not amount to any valid defense to approval of the Disclosure Statement or to Plan confirmation. In short, the objectors' allegations fail to show any harm from the Objectors' alleged actions of the Oversight Board other than their displeasure and anger that the Oversight Board did not continue to increase its offers.

59.     *First*, the allegations of Syncora and the Ad Hoc Group plainly violate the mediation privilege, Rule 408, the *Order Establishing the Terms and Conditions of Mediation* (the "Terms and Conditions Order") [ECF No. 2773], and this Court's constant emphasis on maintaining the confidentiality of mediation.   The Terms and Conditions Order specifically prohibits parties from disclosing "confidential Mediation exchanges, data or discussions regarding Settlement Proposals or responses thereto."  Terms and Conditions Order at 6.  Separately, as noted above, Rule 408 prohibits the admissibility of offers to compromise, and conduct or statements made during compromise negotiations.  The publication of such offers, conduct, or statements does not alter their inadmissibility under Rule 408.  Similarly, the mediation privilege protects from

36

disclosure a broad swath of mediation-related communications.  *See ACQIS, LLC v. EMC Corp.*,
No. 14-cv-13560, 2017 WL 2818984, at *2 (D. Mass. June 29, 2017).

60.      Consistent with the foregoing, this Court has repeatedly cautioned parties to "be
careful not to breach mediation confidentiality."  Dec. 14, 2022 Hr'g Tr. 10:14–16.  In fact, in
response to the improper divulgence of confidential mediation information in the earlier mediation
process, the Court entered a standing order prohibiting mediation parties from publicly disclosing
any "information regarding events or actions in the mediation process . . . and positions taken by
any participant in that confidential process."  Case No. 17-bk-3283, ECF No. 1841.  The mediation
privilege, Rule 408, and this Court's orders each ensure that mediation confidentiality remains
sacrosanct.

61.      The Ad Hoc Group's and Syncora's extensive effort to characterize the Oversight
Board's "conduct" and repeated reliance on privileged, Rule 408-protected mediation
communications to claim the Oversight Board mediated in bad faith (and that this somehow infects
the Plan) openly violates the Terms and Conditions Order, Rule 408, the mediation privilege, and
this Court's orders and admonitions and should be rejected.  *See also In re A.T. Reynolds & Sons,
Inc.*, 452 B.R. at 383–84 ("[C]onfidentiality considerations preclude a court from inquiring into
the level of a party's participation in mandatory court-ordered mediation, i.e., the extent to which
a party discusses the issues, listens to opposing viewpoints and analyzes its liability.").  Indeed,
Syncora's and the Ad Hoc Group's briefs illustrate precisely why strict separation between
mediation and litigation is necessary.  Specifically, both parties know their allegations hew too
close to the line of the mediation privilege to allow for a complete response, and the Oversight
Board is therefore unable to fully defend itself from their unfounded assertions without violating

the mediation privilege, Rule 408, and this Court's orders.  Most regrettably, Syncora and the Ad
Hoc Group's allegations and protests can only chill further mediation.

62.    *Second*, Syncora and the Ad Hoc Group's argument is logically flawed.  They
contend the Oversight Board supposedly behaved in bad faith in mediation and, on that basis,
contend the *Plan* was proposed in bad faith.  But there is no logical connection between the two.
*Procaps*, 2015 WL 3539737 at *7 (whether a party mediated in good faith is "typically
interpret[ed] narrowly").  There is no connection between good faith in mediation and the good
faith of a proposed Plan, and therefore no basis to contend that a finding of bad faith in mediation
(not justified here in any event) should lead to a finding the Plan was proposed in bad faith.

63.    *Third*, the Ad Hoc Group's and Syncora's arguments are based almost entirely on
citations to a colloquy at recent omnibus hearings.  AHG Obj. at ¶ 29–31, Syncora Obj. ¶¶ 48–49.
However, statements and arguments by attorneys are not facts, nor do they constitute competent
evidence.  *Quint v. A.E. Staley Mfg. Co.*, 172 F.3d 1 (1st Cir. 1999) ("[S]tatements by counsel are
not competent evidence.").  Suffice it to say, however, that the parties engaged in more than a
dozen mediation sessions, including meetings the Oversight Board held separately with the
Mediation Team to discuss its proposals or the Ad Hoc Group's proposals, and over a million
pages of documents were uploaded to the mediation data room used to share documents and
information with creditors.  In addition, the parties' respective advisors held numerous additional
meetings and exchanged analyses to further their understanding of the proposals.

64.    Simply put, the Oversight Board dedicated its time and energy for more than seven
months to seek common ground.  The fact that the Ad Hoc Group and Syncora ultimately declined
the Oversight Board's last offer and countered with a proposal the Oversight Board rejected does
not mean the Oversight Board's conduct was an "abuse" of the mediation process.  Indeed, it

protected Puerto Rico.  Regardless, under any analysis, the content and conduct of the mediation should have no bearing on whether the contents of the Disclosure Statement under consideration— or the various procedures motions before the Court—should be approved.

### iii. Accusations of Bad Faith for Failing to Increase Offers Has Nothing to Do With Disclosure Statements and Confirmation

65.     Syncora and the Ad Hoc Group fail to show how their anger that the Oversight Board did not offer them more in mediation translates into a valid disclosure statement of confirmation objection.  Moreover, even in mediation, "courts typically interpret good faith requirements narrowly, and limit them to compliance with orders to attend mediation, to provide pre-mediation memoranda and produce representatives with sufficient settlement authority." *Procaps*, 2015 WL 3539737 at *7.[26]  Parties are given enormously wide latitude in mediation.  For example, a negotiating party may enter mediation with the position that it would not make a settlement offer, as well as a pre-determined position about liability.  *In re A.T. Reynolds & Sons, Inc.*, 452 B.R. at 382.  A party is within its rights to adopt a "no-pay" position or may determine that it is not liable and adhere to that position at mediation.  *Procaps*, 2015 WL 3539737, at *8–9.  A court cannot use "pressure tactics" designed to coerce a settlement.  *Kothe v. Smith*, 771 F.2d 667, 669 (2d Cir. 1985).  Parties cannot be forced to settle or even to make settlement offers at mediation.  *Id.*; *AMC Demolition Specialists, Inc. v. Bechtel Jacobs Co.*, 2007 U.S. Dist. LEXIS 7463, at *5 (E.D. Tenn. Feb. 1, 2007) (finding party did not fail to mediate in good faith where party did not make any settlement offer at mediation); *see also Dawson v. United States*, 68 F.3d 886, 897 (5th Cir. 1995) (stating "there is no meaningful difference between coercion of an offer

---

[26] All of these requirements have been met.  The Oversight Board supplied a mediation statement and had principals and persons with decision-making authority attend all virtual and in-person mediation sessions.

and coercion of a settlement: if a party is forced to make a settlement offer because of the threat of sanctions, and the offer is accepted, a settlement has been achieved through coercion.").

66.     Syncora and the Ad Hoc Group assert the Oversight Board's alleged changes in the terms of its proposals and determinations to not further engage with bondholders or modify its proposals in light of bondholders' feedback concerning data and assumptions amount to bad faith negotiations.  Syncora Obj. ¶¶ 48–51; AHG Obj. ¶¶ 28–32.  Their assertions, however, which the Oversight Board rejects as false, are a far cry from conduct courts have determined to be bad faith in the context of mediation.  Bad faith conduct is typically only found in extraordinary circumstances where the negotiating party's conduct is tantamount to total disengagement.[27]

67.     That the Oversight Board would not settle at levels higher than it believed was consistent with its responsibilities under PROMESA, reflective of PREPA's condition, or appropriate for PREPA or its ratepayers (and at a level completely untethered from significant legal challenges to the bondholders' rights) is not bad faith.  Indeed, courts have declined to find bad faith in scenarios *far* more extreme than those alleged by Objectors.  *See In re A.T. Reynolds & Sons, Inc.*, 452 B.R. at 382 ("[the creditor] was within its rights to enter the mediation with the position that it would not make a settlement offer.  It was also within its rights to 'predetermine[] that it was not liable and to 'insist[] on being dissuaded of the supremacy of its legal position.'"); *Hunter v. Prisbe*, No. 12-cv-2013, 2013 WL 1246797 at *2 (M.D. Pa. 2013) ("[W]here a party's conduct consists of simply adopting a fixed, inflexible position in an initial mediation session, and

---

[27] *See e.g.*, *Brooks v. Lincoln Nat'l Life Ins. Co.*, No. 8:05-cv-118, 2006 WL 2487937, at *4 (D. Neb. Aug. 25, 2006) (finding lack of good faith where counsel did not respond to the defendants' initial offer, told the mediator the defendants had five minutes to put a serious settlement offer on the table or they were leaving, found the defendants' offer "unacceptable and unworthy of response," and refused to allow the mediator to explain the defendants' offers, or to engage in dialogue with counsel for the defendants to correct the problems); *Fisher v. SmithKline Beecham Corp.*, No. 07-cv-0347A(F), 2008 WL 4501860 (W.D.N.Y. Sept. 29, 2008) (finding lack of good faith where, on the eve of the mediation, while the plaintiffs and counsel were traveling to the mediation site, defendant filed a motion for summary judgment and then limited its mediation presentation to providing counsel with a copy of the memorandum of law supporting the summary judgment motion).

that fixed position is timely communicated to others, sanctions often are not appropriate since sanctions cannot be used as a vehicle for pressing parties to surrender honestly held convictions on the merits of litigation.").

68.     The Oversight Board remained and remains willing to negotiate with all parties that have not yet settled inside or outside of mediation.  Objectors' incorrect accusations only serve to threaten the confidentiality of mediation, which in turn, may impair the level of parties' participation.

### iv.     Termination of the 2019 RSA Does Not Indicate Bad Faith

69.     With respect to the termination of the 2019 RSA, objectors impute bad faith to the Oversight Board but concede the Governor, not the Oversight Board, terminated the RSA. *See* Syncora Obj. ¶ 13; AHG Obj. ¶ 14.  The Government was within its contractual rights to execute the termination provision.  Under the terms of the 2019 RSA, each party had rights to terminate the 2019 RSA.  *See* 2019 RSA § 9 (identifying termination rights).  The Oversight Board had an absolute right to terminate the 2019 RSA because an order approving certain of its settlements was not entered by an agreed date.  Notwithstanding the bondholders' requests, the Oversight Board never waived that right.  It is thus stunning that objectors' raise termination as an issue when it was part of the deal and well recognized.

70.     It is unsurprising that Bondholders consider the 2019 RSA the model for success relative to the Plan since it provided a higher recovery to them at the expense of other stakeholders. AHG Obj. ¶ 25 ("[The Oversight Board] largely succeeded with the 2019 RSA, in which it agreed that PREPA would pay Bondholders and Monolines 77.5% of their claims, plus the continued accrual of postpetition interest and fees . . . .").  But over time the Government and the Oversight Board learned the Legislature would not enact the legislation the 2019 RSA required, and determined that deal was not affordable, with the bondholder parties accruing substantial interest

($2 billion), at the same time macroeconomic events, including a significant spike in fuel prices as well as the COVID-19 pandemic, reduced PREPA's room to afford even larger price spikes. Absent legislation, PREPA would be deprived of some of the benefits of the 2019 RSA, such as the securitization structure and demand protections (that help PREPA slow down the defection of customers to solar). The Governor terminated the 2019 RSA shortly thereafter "because its implementation is neither feasible nor in the best interests of Puerto Rico."[28] The Government determined the 2019 RSA would overly burden the people of Puerto Rico as ratepayers and could not be achieved without the protections only available in legislation that the Government determined could not be obtained. The Oversight Board's support for the Governor's decision to terminate the 2019 RSA was logical.

> **v.   The Oversight Board Did Not Violate the Court's Directive to File a Confirmable Plan**

71.    When bondholders moved to compel the Oversight Board to file a toggle plan, the Court did not ask for a plan considering every possible outcome in litigation, but rather a plan that accounts for losses in litigation that are "realistic[]"   Nov. 2, 2022 Tr. 16:8–16 ("[W]hat I mean by a confirmable plan [is one] that meaningfully and *realistically* contemplates scenarios in which each party fails to prevail on their claims in litigation *to the extent that they expect to* in order that, on resolution of issues in the litigation, no matter what the outcome is, we can move forward toward confirmation with alacrity.") (emphasis added). The Amended Plan does precisely that.

72.    The Amended Plan allocates $5.68 billion of New Bonds to creditors and is confirmable in most potential outcomes in the Amended Lien & Recourse Challenge through the Amended Plan's built-in mechanisms to reallocate the New Bonds based on different litigation

---

28 *Governor of Puerto Rico announces termination of Electric Power Authority's Restructuring Support Agreement*, Thursday, March 10, 2022, https://www.bnamericas.com/en/news/governor-of-puerto-rico-announces-termination-of-electric-power-authoritys-restructuring-support-agreement.

outcomes. Yet the Oversight Board included a risk factor that if the Court were to (i) decide against the Oversight Board with respect to the Lien Scope Counts and Recourse Counts *and* (ii) then decide that the bondholders' security interest is worth more than the value of the New Bonds, then the Amended Plan might not be confirmable without material amendment. Because of this risk factor, the Ad Hoc Group and Syncora assert the Amended Plan does not comply with the Court's directive to propose a confirmable plan that takes into account plausible litigation possibilities. But that argument is wrong.[29]

73. The Amended Plan contains numerous contingencies for various different results in litigation, and does so within the confines of the Oversight Board's determinations with regard to PREPA's debt sustainability. The Amended Plan is confirmable if the Oversight Board wins on both the Lien Scope Counts and Recourse Counts (in which event excess value is shared among creditors), wins on the Lien Scope Counts but loses on the Recourse Counts (in which event the Bondholders share in recovery with general unsecured claimholders), and even if the Oversight Board loses on both the Lien Scope Counts and Recourse Counts but Bondholders' collateral is not held to exceed the value of the consideration allocated in the Amended Plan (in which case the Bondholders will receive most of the consideration under the Amended Plan). The Oversight Board believes the only scenario in which the Court can plausibly determine the Bondholders' collateral is worth more than $5.68 billion is if the Court determines the Bondholders currently have a valid security interest in all future, unearned revenues, which the Oversight Board believes is not plausible. Given that the bondholders are now on record agreeing that any lien they do have is subordinate to Current Expenses either due to the Trust Agreement and/or Bankruptcy Code §

---

[29] The argument also is tautological. The Ad Hoc Group and Syncora effectively argue the Plan is unconfirmable now because they will prove the Plan to be unconfirmable later. Under their theory, a plan is only confirmable if it somehow accounts for all situations where it is unconfirmable.

928(b), Feb. 1, 2023 Hr'g Tr. 135:20–23, 136:18–137:8, and PREPA has barely been able to pay

Current Expenses on time, let alone generate surplus to pay bondholders over the last decade, the

Oversight Board anticipates it is highly unlikely that Bondholders' collateral could possibly be

held to extend to such property and be valued at such an amount as to derail the Amended Plan.

The Amended Plan thus contemplates the realistic litigation outcomes and accounts for them.  No

plan could account for every possible ruling that could theoretically be issued—any plan is subject

to the risk the relevant court rules against it in some unexpected way.

74.     This objection of the Ad Hoc Group and Syncora essentially amounts to a valuation

fight with respect to their purported collateral.  It is often the case that secured parties oppose the

valuation and treatment of their secured claims in bankruptcy plans.  Here, the Objectors are one

step removed from that dispute, as they have not even established they have secured claims

(beyond certain deposit accounts held with the Trustee).  Regardless, the possibility of a valuation

fight at confirmation does not render the Disclosure Statement patently unconfirmable.

### vi.     The Fuel Line Lender Settlement Procures Accepting Votes Like Every Other Settlement

75.     The assertions that the Oversight Board's settlement with the Fuel Line Lenders

was improper are without merit.  Renaming a settlement as "vote buying" does not create a

meritorious confirmation objection.  Sections I.A and I.B above refute various arguments that the

Fuel Line Lender PSA is an impermissible or unreasonable settlement of intercreditor claims.  Yet

Syncora throws another accusation at the Oversight Board in support of its bad faith argument—

that the Fuel Line Lender PSA amounts to "vote-buying."  Syncora Obj. ¶ 59.  Virtually every

confirmable reorganization plan contains settlements the plan proponent negotiated to procure

votes and consensus.  The single case Syncora cites in support of its "vote-buying" theory—*In re

Quigley Co., Inc.*, 437 B.R. 102 (Bankr. S.D.N.Y. 2010) assigned the "vote buying" moniker to a

scheme in which an interested third party paid some of a debtor's creditors to accept the debtor's plan. There, the debtor's parent (Pfizer) entered into prepetition settlements with tort claimants of the debtor (Quigley). Pfizer "simply paid cash to the Settling Claimants, a subclass, outside of a Quigley plan, and promised a second payment if any Quigley plan was confirmed. The payments came from Pfizer, not Quigley, and were not 'gifts' of its collateral to a class of creditors." *Id.* at 131. Thus the "global strategy was designed to free Pfizer from derivative liability through a Quigley plan" by literally paying creditors to vote in favor of the plan. *Id.* No such allegations have been or could be made here. Here, the Oversight Board simply settled a disputed claim as between the Debtor and its creditors in a reduced amount. If that is vote buying, no plan containing a settlement could be confirmed (including any plan that would have been based on the 2019 RSA), or the settlements that were embedded in the plan of the other five Title III cases the Court has confirmed (with substantial similar creditors). In substance, Objectors are not complaining about vote buying. They are complaining their votes were not bought!

### E.    The Ad Hoc Group's Feasibility Argument Fails

76.    The Ad Hoc Group argues the Amended Plan is not feasible because "there is reason to expect that it will not result in the debtor collecting sufficient revenues to comply with the plans [*sic*] requirements to pay creditors." AHG Obj. ¶ 44. The Ad Hoc Group contends this is the case because "the Plan offers no assurance that Series B bondholders can enforce payment of their bonds if PREB fails to approve total rates sufficient to pay all operating expenses and debt service." *Id.* ¶ 45.

77.    As a preliminary matter, the Amended Plan includes additional protections for Series B Bondholders as negotiated by National. These include the ability to invoke the Interest Rate Covenant if Net Revenues are insufficient to pay interest on the New Bonds prior to the final maturity date. Amended Plan, Art. XIX.J, XIX.M. The terms of the New Bonds have also been

45

amended to provide that accrued and unpaid interest will still be paid following final maturity.
The Oversight Board submits these additions moot this issue. The Plan already included covenants
that protect bondholders, including a covenant to "levy and collect rates, fees, and charges,
including, but not limited to, the Legacy Charge and the Remaining Legacy Charge and (b) deposit
Net Revenues collected from such rates, fees, and charges into the Debt Service Fund in
accordance with the Payment Waterfall." Amended Plan, Art. XIX.H. In addition, Puerto Rico
law provides that rates need to be set sufficiently to pay Bond issues under a Title III Plan. *See*
Act-17 §§ 6.3(q) and (p). PREB is also required by Puerto Rico law to implement PREPA rates
sufficient to pay PREPA's operating costs and debt. Act 57-2014, § 6.25(b). The Ad Hoc Group
gives no reason for the Court to believe PREB will for some reason abandon its statutory mandate.
In addition, when the New Master Indenture is drafted it will include additional covenants. Finally,
the Oversight Board intends to include some these protections in the proposed Confirmation Order.
The Oversight Board submits these additions moot this issue.

78.     In any event, the Ad Hoc Group's plan objection fails. Issues of feasibility are
highly-fact specific and cannot possibly be considered at the disclosure statement stage. *See, e.g.*,
*In re Sunshine Precious Metals, Inc.*, 142 B.R. at 920 (refusing to adjudicate objections to
feasibility at disclosure statement hearing, holding it is a "confirmation issue[].").

### F.     The Uninsured Bond Settlement Agreement Is Not an Improper Solicitation in Violation of Bankruptcy Code § 1125(b) and Does Not Constitute Unlawful Gerrymandering

79.     The Ad Hoc Group and Syncora argue the Uninsured Bond Settlement Agreement,
which allows holders of Uninsured PREPA Revenue Bond Claims to select whether the claims are
classified in a settlement class (Class 1) or litigation class (Class 2), renders the Amended Plan
patently unconfirmable because, they argue, it violates Bankruptcy Code § 1125(b) of the
Bankruptcy Code as improper solicitation and is unduly coercive. *See* AHG Obj. ¶¶ 58–61;

Syncora Obj. ¶¶ 61–68.  These objections fail for the simple reason that the claimholders' decisions to have their claims classified in a particular class do not bind them to vote the claims to accept or reject.  There can be no improper solicitation of a vote to accept or reject if the selection of classification does not include a commitment to vote.

80.     The Oversight Board's post-petition, pre-solicitation agreement is consistent with this Court's ruling on the Commonwealth's previous disclosure statement and plan of adjustment. CW FFCL ¶¶ 141, 143.  Importantly, uninsured bondholders who accept the settlement retain the right to vote to accept *or reject* the Amended Plan.

81.     Bankruptcy Code § 1125(b), incorporated into this Title III case through PROMESA § 301, provides acceptance or rejection of a plan of adjustment from holders of claims or interests may not be solicited unless a disclosure statement approved by the court is transmitted to such holder.  11 U.S.C. § 1125(b).  Although the word "solicitation" is not defined in the Code, a majority of courts, including this Court, have held "solicitation" should be defined narrowly, holding that solicitation only occurs when there is an official vote for or against a plan.[30]  Post-petition agreements to support the terms of a claimholder's treatment under a plan are commonplace, and do not run afoul of the requirements of Bankruptcy Code § 1125(b).  Congress intended debtors and creditors be afforded flexibility to resolve disputes, and where possible, reach

---

[30] *See Duff v. United States Tr.* (*In re Cal. Fidelity, Inc.*), 198 B.R. 567, 571–72 (9th Cir. B.A.P. 1996) (recognizing that solicitation has been interpreted as a "specific request for an official vote" and that "most courts have reasoned that a broader construction of the term would curtail free and honest negotiations among creditors and, therefore, inhibit creditor participation in the debtor's reorganization.") (citations omitted); *In re Dow Corning Corp.*, 227 B.R. 111, 118 (Bankr. E.D. Mich. 1999) ("Solicitation, then, is the process of seeking votes for or against a plan."); *In re Pleasant Hill Partners, L.P.*, 163 B.R. 388, 391 (Bankr. N.D. Ga. 1994) (holding that "[s]ection 1125 'solicitation' is usually construed very narrowly"); *In re Kellogg Square Partnership*, 160 B.R. 336, 340 (Bankr. D. Minn. 1993) ("There is no . . . reason not to apply *Century Glove*'s rationale to the debtor in reorganization, so as to [describe] the concept of 'solicitation' as [equivalent to] the formal polling process."); *In re Gilbert*, 104 B.R. 206, 214 (Bankr. W.D. Mo. 1989) (agrees with Third Circuit that a broad definition of solicitation would tend to chill creditor negotiations); *In re Rook Broad. of Idaho, Inc.*, 154 B.R. 970, 975 (Bankr. D. Idaho 1993) ("[S]ection 1125(b) . . . should be interpreted narrowly, to mean only a 'specific request for an official vote.") (citation omitted).

a consensual resolution of issues in contemplation of the development of a plan of adjustment. *See In re Indianapolis Downs, LLC*, 486 B.R. 286, 295 (Bankr. D. Del. 2013) ("[A] narrow construction of 'solicitation' affords [] parties the opportunity to memorialize their agreements in a way that allows a . . . case to move forward.").

82.     In the Commonwealth Title III case, prior to approval of the disclosure statement, the Commonwealth proposed an exchange offer to all holders of uninsured bonds.  The exchange offer proposed that in exchange for resolving outstanding disputes regarding the validity, priority, and asserted secured status of their bond claims, consenting bondholders would be deemed a party to the GO/PBA Plan Support Agreement (as defined in the CW FFCL), entitling them to a restriction fee, and allowing them to receive new general obligation bonds. *See* CW FFCL ¶ 142. The exchange offer was open to all holders of uninsured bonds, including retail bondholders. *Id.* For those that did not tender, they nonetheless remained eligible for a portion of the settlement distribution if their class voted to accept the Commonwealth plan of adjustment. *Id.* ¶ 143.

83.     Overruling objections that the commencement of the exchange offer prior to approval of the disclosure statement violated § 1125(b), the Title III Court found the commencement of the exchange offer was not a solicitation of votes to accept or reject the Commonwealth plan of adjustment because ballots were not distributed by the Solicitation Agent until after approval of the disclosure statement. *Id.*  In so holding, the Title III Court relied on *In re Heritage Organization*, *LLC*, 376 B.R. 783, 793 (Bankr. N.D. Tex. 2007), where the court held an "agreement to accept the Debtor's plan, made post-petition but before approval of the disclosure statement, remained executory until [the creditor] actually filed its accepting ballot . . . Neither the recitation in the disclosure statement, nor the parties' execution of the written memorandum, constituted an acceptance of the plan as such."

84.     As in *Heritage*, the Title III Court reasoned that the exchange offer was not a solicitation of votes in violation of § 1125(b), as ballots were not distributed until after disclosure statement approval, and "[t]he process of negotiation and solicitation of assent to the plan support agreements prior to the approval and distribution of the disclosure statement did not constitute improper solicitation of votes with respect to the Plan."  CW FFCL ¶ 141.

85.     The Title III Court's analysis is in accordance with the majority of courts that have construed the term "solicitation" to relate solely to the formal process of voting—*i.e.*, where the ballot and disclosure statements are presented to the creditors in relation to a specific plan.[31]  The Ad Hoc Group and Syncora claim the Title III Court's holding in connection with the Commonwealth plan of adjustment is inapplicable here because the GO/PBA Plan Support Agreement, unlike the Uninsured Bond Settlement Agreement, was the product of extensive negotiations by similarly situated bondholders.  AHG Obj. ¶ 60 n.36; Syncora Obj. ¶¶ 67–68.  But that is beside the point under the case law.  Under the case law, including from this Court, the question is whether a formal vote is processed, not how "negotiated" the document distributed to creditors is or is not.  This must be the case, because the bar is on "solicitation" and a solicitation either occurs or it does not—the extent of the negotiation that preceded the preparation of the materials sent to creditors cannot change whether a solicitation happens or not.  Here, as no formal vote was processed, no solicitation occurred.  Additionally, one of the main benefits of the Uninsured Bond Settlement Agreement is to provide entities who were not in the mediation the opportunity to settle.  Thus, their lack of prior negotiations is precisely the condition being alleviated.

---

[31] *See supra* n.29.

86.     Syncora further asserts the Oversight Board justified the exchange offer in the
Commonwealth's Title III case as a procedural mechanism by which uninsured bondholders could
tender and exchange their bonds, and that here, no such procedural mechanism exists.  Syncora
Obj. ¶ 68.   In the Commonwealth's Title III case, the Oversight Board explained that retail
bondholders needed to tender their bonds in connection with the exchange offer as a procedural
mechanism to track retail bondholders' entitlement to certain fees; the exchange offer itself was
not the procedural mechanism.  *See* July 29, 2021 Hr'g Tr. 48:24–50:6. Here, the exchange offer
is necessary to separate bondholders who have entered into the Uninsured Bond Settlement
Agreement from those who have not by providing such settling bondholders a separate CUSIP.
Doing so will allow the Debtor to track which bonds are subject to the Uninsured Bond Settlement
Agreement, which would not be possible to do within the same CUSIP without restricting such
holders from trading until the Effective Date.  The exchange offer does not change the fact that no
formal vote has taken place.

87.     Moreover, the Uninsured Bond Settlement Agreement explicitly preserves
signatories' ability to accept or reject the Plan, while also retaining their rights under the
settlement.   Uninsured Bond Settlement Agreement at 4.   The Uninsured Bond Settlement
Agreement simply gives uninsured bondholders the opportunity to choose which class their claims
should join, and provides a mechanism to differentiate between settling and non-settling
bondholders for distribution purposes by issuing a separate CUSIP.   Pursuant to the proposed
solicitation and tabulation procedures, any vote on the Plan cannot be made and recorded until
after the Debtor has distributed the Court-approved disclosure statement.  Objectors contend the
requirement in the Uninsured Bond Settlement Offer's provision requiring Settling Bondholders
to "support, and not otherwise object to . . . confirmation of the Plan," § 5.02, amounts to a "feebly

attempted jedi mind trick" that requires bondholders to vote in favor of the Amended Plan. Syncora Obj. ¶ 65.  That is simply false.  Nothing requires the claimholder to vote to accept. Nothing!  The settlement provision barring the claimholder from objecting to the Plan is a standard provision in virtually any settlement in a Plan because the settlement cannot be implemented if the Plan is not confirmed.  The settlement terms are not improper solicitations.  As noted, the Uninsured Bond Settlement Offer expressly preserves the Settling Bondholders' right to vote against the Amended Plan, Uninsured Bond Settlement Agreement at 4, and no formal vote has been processed.  The Settling Bondholders' agreement not to object to the Plan is no more an improper solicitation than any plan support agreement is, all of which (including, for example, the 2019 RSA) contain terms requiring that the parties support a plan containing certain terms.

## II.    THE DISCLOSURE STATEMENT PROVIDES ADEQUATE INFORMATION

88.    Certain Objectors, including the Ad Hoc Group, the Committee, Syncora, Assured, and the Bond Trustee contend the Disclosure Statement cannot be approved because it fails to incorporate adequate information for a variety of reasons.  Most of these Objections have been addressed either by the amended Disclosure Statement's inclusion of additional or amended language or are addressed in the attached Omnibus Reply Chart.  Certain others are discussed substantively below.  None support disapproval of the Disclosure Statement.  As noted above, none of the objections asserting the need for more information are lodged by Objectors allowed to vote who do not already know exactly how they will vote.

### A.    The Disclosure Statement Adequately Apprises Creditors of their Recoveries in Various Scenarios.

89.    The Committee objects that the Disclosure Statement is too complicated and contains too many contingencies to provide adequate information.  UCC Obj. ¶¶ 38–43.  In particular, the Committee believes (1) the document is too "complicated and convoluted" and

therefore incomprehensible to the average creditor, *id.* ¶ 39, and (2) the underlying recoveries are "premised on the outcome of multiple, inter-related contingencies that will determine creditor recoveries." *Id.* ¶ 40. These objections are misplaced.

90. First, precisely because the new bonds are allocated based on different litigation outcomes, the Disclosure Statement includes a simple chart explaining the creditor's return for each different outcome. *See* "Class Treatment Based on Litigation Outcomes" (at 38–41) and "Creditor Recovery Based on Litigation Resolution" (at 258–61). Second, because plans treat allowed claims and the $8 billion of bond claims are disputed and not allowed, there is no way to draft a plan without providing different plan treatments for different litigation outcomes for the disputed claims. That is likely why the Court required the Oversight Board to file a plan of adjustment "taking into account the litigation risk and economic issues that are in dispute" and permitting such a plan to "include alternative provisions addressing proposed resolutions contingent on different outcomes of the disputed issues." ECF No. 3013 (the "<u>Scheduling Order</u>") ¶ 4. The Oversight Board has done just that, filing a plan providing different treatment to creditors dependent on, among other things, whether the Oversight Board prevails on (i) the Lien Scope Counts and (ii) the Recourse Counts. As these critical items of litigation are not resolved yet, these contingencies are simply unavoidable. And the Disclosure Statement explains, in plain language in two sections entitled "Class Treatment Based on Litigation Outcomes" (at 38–41) and "Creditor Recovery Based on Litigation Resolution" (at 258–61), how the outcomes of the Amended Lien & Recourse Challenge affect creditor recoveries.[32] These explanations are contained in a variety of forms—both in the text in the aforementioned Disclosure Statement sections, and in flow charts

---

[32] The UCC requests the court delay confirmation of the Plan to allow for resolution of the Amended Lien & Recourse Challenge. UCC Obj. ¶ 41. The Court has already rejected this approach by requiring the Oversight Board to pursue confirmation and prosecution of the Amended Lien & Recourse Challenge simultaneously, Scheduling Order ¶ 4, and it should decline to adopt it here.

and tables attached to the Disclosure Statement, illustrating the potential recovery for creditors based on key variables, such as the final number of Settling Bondholders and the result of the Amended Lien & Recourse Challenge.  Disclosure Statement at 28.  Such descriptions are more than adequate to satisfy the requirement, as articulated by the Committee itself, that the Disclosure Statement "clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and ***what contingencies there are to getting its distribution***."  *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991) (emphasis added); UCC Obj. ¶ 38.

91.     The Committee argues "[e]ven the most sophisticated general unsecured creditors are likely to find it extremely difficult to unpack the various defined terms, follow the complicated waterfall of plan currency under the various contingencies, and understand the numerous contingencies themselves and their impact on creditor recoveries."  UCC Obj. ¶ 40.  Yet the Committee accomplishes this "extremely difficult" feat mere pages earlier, as the Committee Objection provides a succinct explanation of the Plan's "New Bonds Waterfall."  *Id.* ¶¶ 15–31. The variety of ways the Disclosure Statement explains the Amended Plan's treatment give plenty of opportunity for unsecured claimholders to understand the contingencies that will affect their treatment and thus be able to make an informed decision of whether to vote in favor of the Amended Plan.  PROMESA and the Bankruptcy Code require no more.

92.     The Committee further objects that creditor recoveries cannot be known at this time.  *Id.* ¶ 40.  Given the potential all or nothing nature of the Amended Lien & Recourse Challenge, it is certainly true that recoveries for creditors—unsecured claimholders in particular—can vary widely.  But such contingencies are known and disclosed to creditors, and estimated

creditor recoveries are set forth succinctly on the chart of recoveries on page 28 of the Disclosure
Statement.[33]

93.      The contingent nature of creditor recovery or the complex terms of the underlying
Plan do not constitute reasons to withhold approval of the Disclosure Statement.  The Committee
does not, and cannot, point to any authority supporting such an assertion.[34]   Indeed, one of the
authorities cited by the Committee notes that the Disclosure Statement *must* identify "what
contingencies there are to getting [a creditor's] distribution."  *In re Ferretti*, 128 B.R. at 19.  The
Bankruptcy Code itself contemplates the potential necessity for complex plans of adjustment and
reorganization, as 11 U.S.C. § 1125(a)(1) requires a court to consider "the complexity of the case"
in determining whether a disclosure statement includes "adequate information."   11 U.S.C. §
1125(a)(1).  The Title III Court, the Committee, and all parties in interest are well aware of the
complexity of PREPA's Title III Case, a case spanning years of contentious litigation, in which

---

[33]  The UCC observes that the results of the Settlement Offer Deadline shall be known by the Disclosure Statement
hearing, and that the Oversight Board should update the illustrative recovery chart subsequent to such deadline.  UCC
Obj. ¶ 41.  If indeed final results will be known prior to the Disclosure Statement hearing, the Oversight Board has no
objection to providing such update, and will include an updated chart in the Court-approved version of the Disclosure
Statement that will be distributed to creditors.

[34]  Beyond the boilerplate language quoted in the Committee Objection, the majority of the cases cited by them identify
infirmities specific to the disclosure statements before the respective courts but not present here.  *See In re Ferretti*,
128 B.R. at 19–21 (listing 13 specific issues with the disclosure statement before the Court.); *In re Worth*, 29 B.R.
220, 223–24 (Bankr. D. Colo. 1983) (identifying the additional information necessary for the debtor to satisfy the
adequate information requirement under 11 U.S.C. § 1125(a) for that specific debtor); *In re Forest Grove, LLC*, 448
B.R. 729, 734–38 (Bankr. D.S.C. 2011) (reviewing the adequacy of a debtor's disclosures related to, among other
things, (i) "Administrative Costs," (ii) the "Debtor's Future Income and Expenses," and (iii) "appraisal values").  None
of these cases take issue with contingent recoveries or complex plan structures.  The remaining cases refused to
approve disclosure statements that the relevant court found to be unclear, confusing, and unnecessarily complex.  *See
In re Rodriguez Gas & Oil Servs., Inc.*, No. 08-50152, 2008 WL 4533687, at *1 (Bankr. S.D. Tex. Oct. 2, 2008) ("[The
disclosure statement] is so tedious and so packed with unnecessary information that the Court was unable to dig out
relevant, useful data without extraordinary effort."); *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr.
N.D.N.Y. 1988) ("The Court finds that the First Amended Disclosure Statement does not contain the kind of clarity
nor realism required by the adequate information standard of [Bankruptcy] Code § 1125 with regard to this impaired
class of unsecured creditors. Rather, it paints a positive and misleading picture unsupported by the Debtor's financial
condition, the record or the Code.").  However, and as explained above, the Oversight Board went out of its way to
include visual aids and plain language summaries of the potential recoveries contemplated in the Plan, as well as the
Plan's other key terms.  *See* Disclosure Statement at 28, 37–42, 258–61.

time PREPA and the island of Puerto Rico suffered from (i) a global pandemic, (ii) two hurricanes, and (iii) many earthquakes, and in which important litigation remains unresolved. And any complexity left in the descriptions contained in the Disclosure Statement is not unnecessary, but rather an inevitable result of filing a plan before allowed claims are known.

### B.   The Disclosure Statement Adequately Apprises Creditors of the Risks of an Adverse Judgment in the Amended Lien & Recourse Challenge, Including that the Plan May Not Be Feasible in Certain Circumstances.

94.     Multiple creditors, including the Committee (¶ 85), the Ad Hoc Group (¶¶ 33–36), and Syncora (¶¶ 22–23, 32–34) argue the Plan is an impermissible placeholder Plan that cannot be confirmed in every litigation scenario. Specifically, bondholders argue that if the Oversight Board loses on the Lien Scope Counts, the Plan does not provide enough consideration to bondholders to satisfy the fair and equitable requirement of Bankruptcy Code § 1129(b) with respect to cramming down dissenting secured claims and is infeasible, *see, e.g.*, Syncora Obj. ¶ 35, and that that the Oversight Board did not adequately disclose the risk that the Plan may not be feasible in such a circumstance. *See, e.g.*, UCC Obj. ¶ 85. The short answer is, if the Plan is not feasible or otherwise confirmable, it will not be confirmed and creditors will not be affected by it. As discussed above, *supra* Section I, these contentions do not come close to rendering the Amended Plan patently unconfirmable. They also fail to demonstrate flaws in the Disclosure Statement itself. The Disclosure Statement discloses—conspicuously—the risk the Plan might not be confirmable without material amendments if the Oversight Board loses the Amended Lien & Recourse Challenge in respect of future, unearned revenues. *See, e.g.*, Disclosure Statement at 337–38 (section explaining the risks given that "the Title III Court may determine, in connection with the Amended Lien & Recourse Challenge that the Bond Trustee possesses valid and perfected security interests in PREPA's revenues or a portion thereof" such that confirmation of the Amended Plan may not be possible). The Objectors fail to recognize the lack of confirmation is not an issue for

voting.  For voting, creditors need to know the risks if the Plan is confirmed, not if the Plan is not confirmed.

        **C.**    **The Disclosure Statement Adequately Describes the Unsecured Claim Pool and the Range of Creditor Claims and Recoveries**

95.    The Committee asserts the Disclosure Statement cannot be approved because it does not provide sufficient information in support of the Oversight Board's projection of $800 million for the aggregate total of General Unsecured Claims.  UCC Obj. ¶¶ 46–56.  While the Oversight Board disagrees that the Disclosure Statement contains insufficient information on this issue, the Oversight Board has supplemented the Disclosure Statement to provide additional details in response to the Committee's questions.  Specifically, attached as Exhibit O to the Disclosure Statement is a table demonstrating the number of filed claims, their asserted amount, and the Oversight Board's current low and high estimates for various categories of General Unsecured Claims, including trade claims, litigation claims, lease claims, PPOA claims, and more.  The Oversight Board's high and low estimates are based upon its ongoing review of the underlying factual and legal assertions made by each claimant.  The Oversight Board believes its projected claim amount for General Unsecured Claims is well supported under the law and the facts presented in this Title III Case and is adequately explained in the Disclosure Statement.

96.    As an initial matter, the Debtor is not seeking Court approval to estimate claims for allowance, distribution, or voting purposes and is not seeking to impair the rights of any creditor.  Rather, the Debtor is disclosing its reasonably best projection as to a mid-point regarding the ultimate potential quantum of allowed General Unsecured Claims for purposes of providing information to general unsecured claimholders regarding their potential recoveries under the Plan.  Of course, as the Committee points out, the recovery for General Unsecured Creditors might be higher or lower depending on the ultimate amount of allowed unsecured claims.  The uncertainty

is, again, unavoidable as the claim process is ongoing.  This situation is not unusual in bankruptcy cases.

97.     For purposes of the Disclosure Statement, the Oversight Board, in conjunction with its professional advisors, undertook an analysis and determination of claims within the class of General Unsecured Claims and, as a court would be required to do in any estimation proceeding, "evaluate[d] claims pursuant to the legal rules which may govern the ultimate value of the claim." *In re Perry*, 425 B.R. 323, 342 (Bankr. S.D. Tex. 2010) (citing *In re Brints Cotton Mktg., Inc*., 737 F.2d 1338, 1340–41 (5th Cir. 1984)).  As demonstrated on Exhibit O to the Disclosure Statement, the Oversight Board estimates the amount of General Unsecured Claims to be approximately $800 million, with a low estimated value of approximately $245 million and a high estimated value of approximately $4.86 billion.  The large variance between the high and low estimates for the General Unsecured Claims values can generally be derived from three categories of General Unsecured Claims: (i) PPOA Claims, (ii) UTIER Employee Grievance Claims, and (iii) UITICE Litigation Claims.

98.     PPOA Claims:  Almost $3 billion of the General Unsecured Claims pool has been asserted by 14 counterparties to terminated power purchase and operating agreements ("PPOAs"), each of whom alleges millions of dollars in damages relating to lost profits that such claimants believe they would have been entitled to pursuant to their underlying PPOAs.  On the high end, the Oversight Board estimates that such claimants would hold General Unsecured Claims totaling approximately $2.78 billion.  On the low end, based upon its analysis of the factual and legal bases for the claims, and in particular, the claimant's entitlement to the damages asserted therein, the Oversight Board estimates the PPOA Claims to be valued at no more than $35 million.  The Oversight Board expects to begin objecting to the PPOA Claims in the upcoming weeks.  In the

meantime, however, the Oversight Board contends the holders of PPOA Claims are not entitled to claims asserted on account of lost profits because (i) each of the PPOAs was terminated in accordance with its terms and subject to provisions contained therein that prohibit the claimant from seeking additional damages upon termination, and (ii) under applicable law, lost profits claims are not compensable against governmental entities.  Due to the infirmities with the PPOA Claims, which will be subject to further claims reconciliation in the ordinary course, the Oversight Board believes that these claims should be valued for purposes of the Disclosure Statement at no more than $35 million, rather than the asserted $2.78 billion.

99.    <u>UTIER Grievances</u>:  The UTIER Grievances Claim, which is asserted in Proof of Claim No. 52867, asserts approximately $1.1 billion in damages relating to the "impairment to the rights and benefits negotiated under the CBA" to UTIER's employee base.  Following the filing of the proof of claim, the Debtor requested additional information and supporting documentation from UTIER to support the asserted claim amount, and received approximately 50,000 physical documents relating to thousands of allegedly pending grievances, none of which included any valuation information or other supporting data.  The Debtor's professionals have been diligently reviewing the claims asserted in the documentation provided, with the assistance of Debtor employees with significant experience handling such claims.  That review has identified approximately 26,000 individual claims, many of which may be duplicative of claims asserted in other contexts.  On the basis of the historical claim valuation data for claims similar to the approximately 26,000 individual claims, the Debtor's professionals estimate the UTIER Grievances may be allowed in an aggregate amount substantially lower than the asserted $1.1 billion—indeed, likely a small fraction of this amount.[35]

---

[35] UTIER also filed a separate proof of claim in the amount of approximately $1.2 billion asserting damages it allegedly incurred as a result of the enactment of certain prepetition legislation by the Commonwealth, including Act 26-2017.

100.   <u>UITICE Litigation</u>:   The UITICE Litigation claim arises from proof of claim number 80187 filed against the Debtor by the Unión Insular de Trabajadores Industriales y de Construcción ("<u>UITICE</u>"), one of the Debtor's previous employee unions.   PREPA and UITICE were parties to a collective bargaining agreement that, among other things, provided that retired UITICE employees and their spouses "will receive the Comprehensive Health Program known as the AR Plan" and that the "rules and conditions" of the Health Benefits Program to be provided pursuant to the CBA "shall not be inferior to those currently in effect . . . or to the terms, conditions, and benefits negotiated in this agreement.   The provider network will be materially similar to the current network in case of any change." Collective Bargaining Agreement by and between PREPA and UITICE, Art. XXV, § 4.   PREPA later altered the health insurance provider to provide similar coverage at a lower cost.   UITICE challenged PREPA's action, and PREPA was later ordered to compensate retired members of UITICE for any loss of benefits they suffered.   Despite many requests, UITICE has failed to provide any documentation to support its asserted claim amount. PREPA intends to object to this claim and believes it should be reduced to $0 absent further documentary support for the alleged damages.

101.   Finally, the Committee asserts the Disclosure Statement fails to provide sufficient information to creditors because it does not explicitly delineate the size of rejection damages claims related to the potential rejection of certain collective bargaining agreements ("<u>CBAs</u>").   As an initial matter, the Plan does not effectuate a rejection of any of its unions' CBAs.   The Oversight Board has not yet determined whether any such rejection will be necessary, and remains hopeful that a negotiated resolution on amended CBAs with each respective counterparty union may be

---

This claim was effectively denied by this Court in its ruling in Adv. Pro. 17-ap-229, ECF No. 226.  As any claim of UTIER based on legislation passed by the Commonwealth (and not PREPA), the Oversight Board has assigned a value of zero to this claim.

reached through the ongoing mediation process.   Moreover, as described in the Disclosure Statement, on January 24, 2022, the Oversight Board approved the Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement, signed by PREPA, the P3 Authority, and Genera PR LLC (the "Legacy Generation Asset O&M Agreement").   The Legacy Generation Asset O&M Agreement provides for Genera PR LLC to assume responsibilities for the management, operation, maintenance, management of fuel supply, and decommissioning, where applicable, of certain base-load generation plants and gas turbine peaking plants for PREPA. Among the significant benefits of the Legacy Generation Asset O&M Agreement is its benefits to PREPA's employees by preserving existing jobs, as Genera PR LLC has pledged to interview and provide offers of employment to full-time PREPA plant generation employees in good standing and to give preference to non-plant PREPA employees in new roles.   Accordingly, following implementation of the Legacy Generation Asset O&M Agreement, it is anticipated that PREPA would be left with very few union-represented employees, reducing the potential rejection damages to a *de minimis* amount.   The most significant obligation under the CBAs is the requirement for PREPA to maintain a fully funded pension system for represented employees. This obligation is duplicative of the claim asserted by SREAEE and treated under the Plan in Class 3.   For these reasons, it is both premature to estimate any rejection damages claim, and the Oversight Board asserts that any such claim will likely be in a *de minimis* amount.

102.   Adjusting the claims estimate table accordingly, PREPA reasonably estimates a low General Unsecured Claim value of approximately $245 million and a high General Unsecured Claim Value of approximately $916 million.   Accordingly, PREPA asserts the projected allowed General Unsecured Claims estimate of approximately $800 million is a more than reasonable estimate within the low and high ranges of the spectrum.

## **RESERVATION OF RIGHTS**

103.    The Oversight Board consented in advance to parties supplementing their objections to the Disclosure Statement following the filing of the First Amended Plan and First Amended Disclosure Statement.  Accordingly, the Oversight Board reserves the right to amend or supplement this Reply based on supplemented objections filed to this Reply and the First Amended Plan and First Amended Disclosure Statement.

[*Remainder of page intentionally left blank.*]

## CONCLUSION

WHEREFORE the Debtor respectfully requests entry of an order, substantially in the form of the Revised Disclosure Statement Order attached hereto as **Exhibit B**, (i) overruling the Objections, (ii) granting the Disclosure Statement Motion and approving the adequacy of the information contained in the Disclosure Statement, and (iii) granting the Debtor such other and further relief as is just.

Dated: February 10, 2023
      San Juan, Puerto Rico

Respectfully submitted,

*/s/ Luis F. del Valle-Emmanuelli*
Luis F. del Valle-Emmanuelli
USDC-PR No. 209514
P.O. Box 79897
Carolina, Puerto Rico 00984-9897
Tel. 787.647.3503
Fax. N/A
dvelawoffices@gmail.com

Of Counsel for A&S Legal Studio, PSC
434 Avenida Hostos
San Juan, PR 00918
Tel (787) 751-6764/763-0565
Fax (787) 763-8260

*Co-Attorney for the Financial Oversight and Management Board as Representative for PREPA*

*/s/ Martin J. Bienenstock*
Martin J. Bienenstock
Paul V. Possinger
Ehud Barak
Margaret A. Dale
Michael T. Mervis
Daniel S. Desatnik
Elliot R. Stevens
(Admitted *Pro Hac Vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900
Email: mbienenstock@proskauer.com
ppossinger@proskauer.com
ebarak@proskauer.com
mdale@proskauer.com
mmervis@proskauer.com
ddesatnik@proskauer.com
estevens@proskauer.com

*Attorneys for the Financial Oversight and Management Board as representative for PREPA*