## Exhibit A

**Omnibus Reply Chart**

## I.     OBJECTIONS TO DISCLOSURE STATEMENT

| Objection | Argument | Response |
|---|---|---|
| | **Hernández-Montañez Objection** | |
| Adequate Information | • The Disclosure Statement should be corrected to reflect the lack of a valid contract between PREPA and LUMA. <u>Hernández-Montañez Obj.</u> p. 3.<br><br>• The Disclosure Statement should cite statutory authority that outlines legislature's authority to regulate public private partnerships. <u>Hernández-Montañez Obj.</u> p. 5. | The Oversight Board disagrees with the assertion that the extension of the Supplemental Agreement is invalid. In addition, the Disclosure Statement is not the place to litigate this issue and the Oversight Board reserves all rights to address the issues if and when they come up. Nonetheless, the Debtor has added the following language at Section III.F.5 of the Disclosure Statement:<br><br>"The Puerto Rico House of Representatives and Senate have asserted the extension of the Supplemental Agreement is invalid because, among other things, there was no approval of the extension by either of the public interest representative' board members of the PPP Board (proposed by the legislative leadership or legislation). The Oversight Board disagrees with the Puerto Rico House of Representatives' and Senate's position."<br><br>The Disclosure Statement already stated that Act 120 provides that any PREPA transactions involving the sale of assets will require approval by both legislative chambers. *See* Disclosure Statement, Section III.A.1.  Although the Oversight Board does not believe it is required as "adequate information", it nevertheless has added language regarding the requirement under Act 120 that the affirmative vote of both representatives of the public interest on the P3 Authority board is needed in the event that a PREPA transaction does not involve the sale of PREPA assets. *Id.* ("With regards to other transactions, the affirmative vote of both representatives of the public interest, consisting of two of the five members of the P3 Authority's Board, is required."). |

| Objection | Argument | Response |
|---|---|---|
| | | The Debtor has also added the following language in Section VIII.C of the Disclosure Statement:<br><br>"The Puerto Rico House of Representatives and Senate have also indicated that they intend to challenge the extension of the T&D Contract in the Title III Court.  If the Interim Period extension is invalidated, the T&D Contract may be terminated.  If the T&D Contract is terminated, the Plan may not be feasible or confirmable, or may require material amendment." |
| | • The extension of the Supplemental Agreement ("Extension") is null and void because it required the enactment of legislation; Any extension of a partnership contract requires a mandatory assessment of efficiency and effectiveness, something that Puerto Rico's Public-Private Partnership Authority ("P3A") did not do; Once the term of a partnership expires, any renewal requires legislation. Hernández-Montañez Obj. p. 6 and p. 9. | The Oversight Board disagrees with this legal position, and it is not relevant to whether the Disclosure Statement contains adequate information.  Amendments to Public Private Partnership ("PPP") agreements are regulated by Sections 10(a)(x) and 10(b)(ix) of Act 29, providing that PPP Agreements must include provisions regarding the amendment and extension of such contracts, respectively. Accordingly, amendments or extensions of PPP Agreements are subject to the amendment and extension provisions set forth in such contracts, and not to any special statutory requirements. The general norm is that extensions of PPP Agreements do not require legislation. Legislation is required only in the event the extension will lead to a PPP Agreement that exceeds a 50-year term. *See*, Article 10(e) of Act 29, providing, in relevant:<br><br>*Term of Partnership Contract.* — The term of a Partnership Contract executed under this Act shall be that which the Authority deems shall serve the best interests of the People of Puerto Rico, but in no case shall such term exceed fifty (50) years; however, upon evaluation of its merits and efficiency and effectiveness results, such Partnership Contracts may be extended for successive terms which collectively do not exceed twenty-five (25) additional years, as the Authority, the Partnering Government Entity, and the Governor or the |

| Objection | Argument | Response |
|---|---|---|
| | | executive official on whom he/she delegates, may determine. Said extension must be approved by legislation. |
| | • Act 120 provides that PREPA Transactions involving the sale of assets will require approval by both legislative chambers. Hernández-Montañez Obj. pp. 7-8. | A PREPA Transaction is a defined term under Section 2 of Act 120. It means "a transaction whereby the P3A establishes one or more partnerships or executes a sales contract for PREPA Generation assets". The Extension here is neither because (a) it did not create a new public-private partnership and (ii) it did not involve the sale of a PREPA generation asset. Language in Section 10(b) of Act 120 (22 LPRA 1120(b) is inapplicable as it pertains to the approval process for PREPA Transactions. |
| | **PV Properties Objection** | |
| Adequate Information | • The Disclosure Statement does not properly address Puerto Rico's public policy regarding energy and environmental attributes associated with the generation of electricity utilizing renewable energy as established by various pieces of legislation. PV Properties Obj. ¶ 3. <br><br> • PV Properties provides sample language to be added to the Disclosure Statement. PV Properties Obj. ¶ 7-10. | While the Oversight Board disagrees that creditors' interpretations of Puerto Rico statutes need to be included in the Disclosure Statement to constitute "adequate information", to resolve this objection it has nevertheless added to the Disclosure Statement the proposed language in paragraphs 7 and 8 of the PV Properties Objection. *See* Disclosure Statement, Section III.F.6.  Accordingly, the PV Properties Objection is resolved. |
| | **SREAEE Objection** | |

A-3

| Objection | Argument | Response |
|---|---|---|
| Adequate Information | • Disclosure Statement does not include sufficient information as to how it is going to fund the PREPA PayGo Trust, including how it is going to fund its initial 1-million-dollar deposit, or the adequacy of the deposit amount. <u>SREAEE Obj</u>. ¶ 7. | The Plan has been clarified to indicate that PREPA will fund the initial deposit to the PREPA PayGo Trust.  *See* Disclosure Statement, Section VI.M.  The Plan provides that Reorganized PREPA shall pay to the PREPA PayGo Trust the amounts required to reimburse PREPA ERS for retirement benefits paid and reasonable administrative costs incurred by PREPA ERS.  Plan Article VI.  These payments are to be made to the PREPA PayGo Trust as an Operating Expense.  Plan Article XIX.G (explaining Operating Expenses are paid before debt service); Article I.166 (explaining "Operating Expenses" include payments to the PREPA PayGo Trust).  The Oversight Board will demonstrate at confirmation that the Plan is feasible, and that Reorganized PREPA will be able to make the payments necessary to satisfy its Plan obligations to the PREPA PayGo Trust. |
|  | • There is no analysis concerning the decision to subordinate Trust payments to Series B Bonds, and general unsecured creditors <u>SREAEE Obj</u>. ¶ 8. | The PREPA PayGo Trust is not subordinate to the Series B Bonds.  As explained above, the Plan provides that payments to the PREPA PayGo Trust are paid out of Operating Expenses, which are paid before Net Revenues are applied to payment of New Bonds.  The PREPA PayGo Trust may also receive additional Series B Bonds; if so, payments on such bonds would decrease amounts necessary for Reorganized PREPA to pay to the PREPA PayGo Trust from Operating Expenses. |
|  | • There is no financial analysis in the Disclosure Statement proving what will be accomplished as a result of pension freeze or the CBA savings. <u>SREAEE Obj</u>. ¶ 9. | The Debtor has added (i) a description to the Disclosure Statement summarizing the relative costs to PREPA with and without the Plan's pension reform measures and (ii) Exhibit Q to the Disclosure Statement, which provides an estimate of savings that would result from proposed modifications to the CBAs (in the absence of the transition to Genco). |

| Objection | Argument | Response |
|---|---|---|
| | **UTIER Objection** | |
| Adequate Information | • The Disclosure Statement does not provide information regarding the effects of a rejected CBA. <u>UTIER Obj</u>. ¶ 9. | Exhibit Q to the Disclosure Statement provides an estimate of savings that would result from proposed modifications to the CBAs. The Disclosure Statement also describes savings to be achieved from the freeze of the pension system and the magnitude of CBA grievance claims asserted by UTIER that would need to be paid in full were the CBA to be assumed.<br><br>The Debtor has also added the following language in Section III.B.5 of the Disclosure Statement:<br><br>    • "The number of Represented Employees is likely to substantially decrease following the transition of the operation and management of PREPA's legacy generation assets to Genera PR."<br><br>Because PREPA will have very few, if any, remaining union employees following the transition of operation of its Generations Assets to Genera PR, the non-pension and non-grievance savings from modifications to CBAs will be minimal. |
| | • The Disclosure Statement provides no information regarding the agreements with Genera PR LLC or Luma Energy LLC. <u>UTIER Obj</u>. ¶ 10-11. | The Genera PR agreement was not in effect at the time the Disclosure Statement was filed. The Debtor has since added a summary of the operation and maintenance agreement for the private operation of PREPA's legacy generation assets by Genera PR to Section III.F.5.ii of the Disclosure Statement. The Disclosure Statement already included a comprehensive description of the T&D Contract with LUMA, including at Sections I.C. and III.F.5.i. |
| Feasibility | • The Disclosure Statement does not adequately explain how PR will generate sufficient demand to support electric system operations. Specifically, the "Debt Sustainability Analysis" does not show that ongoing debt | The projected revenues under the Plan are based on the 2022 Certified Fiscal Plan and are projected to cover operating expenses. PROMESA provides the Oversight Board with ultimate authority regarding the contents of the Fiscal Plan, and with certain powers to ensure PREPA's compliance with the Certified Fiscal Plan. *See*, *e.g.*, |

| Objection | Argument | Response |
|---|---|---|
| | service would be feasible. <u>UTIER Obj</u>. ¶ 12-13. | PROMESA §§ 201, 204.  The feasibility of the Plan, including the sustainability of the debt and the Legacy Charge, will be demonstrated at confirmation.  Notably, bondholders have argued the demand projections in the Certified Fiscal Plan are *too* low and *too* conservative.  This stands in contrast to UTIER, who calls into doubt the feasibility of the Plan based on asserted "onerous Legacy Charges." |
| | • The Disclosure Statement does not address the issues described in the Kobre & Kim Report (mismanagement, political opportunism, improper oversight, ect.) Obj. ¶ 17 | The Disclosure Statement includes an extensive summary of Kobre & Kim LLP's investigation and eventual report, as well as the positive steps taken by the Oversight Board in response to the report.  Disclosure Statement, Section V.I.1. |
| **Joy Objection** | | |
| Adequate Information | • The Disclosure Statement does not provide information regarding if Class 9 (Eminent Domain) Claims will be allowed to vote, or their expected recovery amount. <u>Joy Obj</u>. ¶ 2. | The Disclosure Statement has been updated to reflect an estimated $2.4 million in eminent domain claims.  *See* Disclosure Statement Section VI.E.  Holders of Clams in Class 11 shall be entitled to vote on the Plan.  Their recovery will be equal to the recovery for General Unsecured Claims if the Oversight Board prevails in its appeal that takings claims can be discharged in a title III plan of adjustment.  If the Oversight Board does not prevail, Eminent Domain/Inverse Condemnation claims will receive a 100% cash recovery. |
| **Whitefish Objection** | | |
| Adequate Information | • The Disclosure Statement should include the "Finance Charge Administrative Claim" (the Objector's claim) in its discussions of administrative claims. <u>Whitefish Obj</u>. ¶ 4. | The Oversight Board has included language in the Disclosure Statement clarifying Whitefish's administrative expense claim, and therefore satisfying its objection to the Disclosure Statement.  *See* Disclosure Statement, Section V.D.6. |
| **UCC Objection** | | |
| Adequate Information | • The Disclosure Statement is too complicated and contains too many contingencies. <u>UCC Obj</u>. ¶ 38. | As explained in Section II.A of the Reply, the Plan, despite providing for various litigation outcomes, is not prohibitively complex, and the Disclosure Statement adequately and in several different ways |

| Objection | Argument | Response |
|---|---|---|
| | | explains how different litigation outcomes affect different creditor recoveries.  The Disclosure Statement includes numerous plain language explanations of creditors' treatment under the Plan and the distribution waterfall.  *See* Disclosure Statement, Section I.A, II.B, II.B.(iv)(4)-(6).  It also includes illustrative recovery tables, and an illustrative chart was added to further graphically demonstrate the distribution waterfall.  *See* Disclosure Statement, Section II.B(iv)(6). The UCC itself provided a succinct and plain language summary of the Plan's distributions in its own Objection (UCC Obj. ¶ 38), demonstrating the Plan is intelligible. |
| | • The Disclosure Statement does not adequately describe creditor recoveries for general unsecured creditors. UCC Obj. ¶ 46. | As explained above and in Section II.A of the Reply, the Disclosure Statement adequately describes general unsecured creditor recoveries in plain language and graphically, and how the various litigation outcomes impact creditor recoveries. *See* Disclosure Statement, Section II.B, VI.C.2. |
| | • The Disclosure Statement fails to adequately explain the basis for its estimate of the size of the total claims in Class 5. UCC Obj. ¶¶ 50-54. | The Disclosure Statement has been updated to explain the Oversight Board's estimation of the General Unsecured Claims Pool. *See* Disclosure Statement, Ex. O. |
| | • The Plan excludes eminent domain/inverse condemnation claims from the Unsecured Claims Pool Estimate.  UCC Obj. ¶ 50 n.32. | The Oversight Board has amended the plan to provide that, unless, by the Effective Date of the Plan, the Oversight Board has lost its appeal that takings claims can be discharged in a Title III plan of adjustment, the amount of such claims will be added to the Unsecured Claims Pool Estimate.  *See* Disclosure Statement, Section VI.C. |
| | • The Disclosure Statement lacks adequate information regarding which PREPA claims will be transferred to ACR.  UCC Obj. ¶ 55. | While the ACR procedures apply to PREPA, the Oversight Board has no intention of transferring any claims to ACR at this time.  However, the Oversight Board expressly reserves the right to move claims to ACR should the Oversight Board deem it appropriate in the future. |
| | • The Disclosure Statement does not provide adequate disclosure with respect to the Avoidance Action Trust. UCC Obj. ¶ 57. | The Oversight Board will disclose in a plan supplement whether certain avoidance actions, including what the UCC refers to as the "Fuel Oil Litigation", and/or their proceeds will be added to the |

| Objection | Argument | Response |
|---|---|---|
| | | Avoidance Action Trust.  If the Oversight Board determines to transfer such actions or their proceeds to the Avoidance Actions Trust, it would only serve to enhance GUC recoveries.  These avoidance actions are described in Part V on the Disclosure Statement.  While the Oversight Board will not undertake to value these actions (which would likely involve some estimation of the probability of success), the amount PREPA is seeking to avoid can be determined by reference to the complaint themselves. |
| | • The Disclosure Statement does not describe the full treatment afforded to the Fuel Line Lenders. UCC Obj. ¶ ¶ 61-67. | The Disclosure Statement describes the full treatment of Fuel Line Lenders' claims in numerous places.  *See, e.g.* Disclosure Statement, Sections II.B(1), (4) and (6).  The Disclosure Statement also discusses that the Fuel Line Lenders will receive certain professional reimbursement fees and consummation costs, which sums are not on account of their claims.  *Id*.  It further makes clear that the calculation of the recovery on their claims does not include these sums.  *Id*.  The UCC's objection is that these fees are not calculated as a recovery on account of the Fuel Line Lenders' claims, and not that these amounts were not disclosed (which they repeatedly are). As in both the Commonwealth and HTA disclosure statements, [ECF No. 17628 in Case No. 17-3283]; [ECF No. 21269 in Case No. 17-3283], professional fees and consummation costs are not accounted for in the calculation of a claimholder's recovery on their Allowed Claim, and are instead listed separately.  *See* Disclosure Statement, Section II.B.4 and VI.E, Ex. M.  The UCC provides no reason to divert from this Court-approved practice here. |
| | • The Disclosure Statement does not adequately describe PREPA ERS's "Current Expense" claim and the potential affect the outcome of the underlying litigation will have on PREPA's restructuring.  UCC Obj. ¶¶ 70-71. | The Disclosure Statement identifies both the asserted size of PREPA ERS's claim, and the alleged sources of such liabilities.  Disclosure Statement, Section III.B.6(ii).  In addition, the Disclosure Statement clearly explains "[r]egardless of the outcome of [the Current Expense] litigation, the Plan's treatment of the PREPA ERS claim provides that payments by PREPA to fund pensions, as adjusted by the Plan, shall be treated as Operating Expenses."  *Id.*  Finally, and as cited by the Committee, the Disclosure Statement recognizes a potential need to amend the Plan should PREPA ERS prevail in its |

| Objection | Argument | Response |
|---|---|---|
| | | "Current Expenses" claim. *Id.* Section II.B.4(i).  There is no basis for the Oversight Board to speculate the likelihood of how the Court might rule on PREPA ERS's claim for priority. |
| | • The Disclosure Statement does not provide adequate information regarding the terms of key settlements. <u>UCC Obj</u>. ¶ 74. | The Disclosure Statement thoroughly discloses the issues in the Current Expense Adversary Proceedings with the Fuel Line Lenders and the terms of the Fuel Line Lender PSA settling the claims of the Fuel Line Lenders against PREPA. *See, e.g.,* Disclosure Statement, Sections I.A, I.C, II.B.1, III.B.2, and V.C.3.  Now that the National PSA has been executed, the Plan has been amended and the Disclosure Statement thoroughly discloses the terms of the settlement with National and explains why such terms are reasonable. *See, e.g.,* Disclosure Statement, Sections I.A, II.B(2), II.B(7), VI.C(1)-(2), and VI.D(4). The reasonableness of the settlements and their consistency with confirmation requirements will be demonstrated at the confirmation hearing. |
| | • The Disclosure Statement does not provide adequate disclosure regarding feasibility, the Legacy Charge and possibility of fully secured bondholders <u>UCC Obj</u>. ¶¶ 80-85. | As explained above, the projected revenues under the Plan are based on the 2022 Certified Fiscal Plan.  PROMESA provides the Oversight Board with ultimate authority over the contents of the fiscal plan and with certain powers to ensure PREPA's compliance with the Certified Fiscal Plan.  The feasibility of the Plan, including the Legacy Charge, will be demonstrated at confirmation.  The 2022 Certified Fiscal Plan provides for a rate sufficient to pay operating expenses of PREPA, and the Legacy Charge provides sufficient revenue to pay the debt issued under the Amended Plan. The Disclosure Statement also explains as risk factor that if the Non-Settling Bondholders prevail on the Lien and Recourse Counts and are determined to be fully secured by all of PREPA's future revenues, then no restructuring of PREPA may be possible. *See* Part VIII.A. |
| | • The Disclosure Statement does not provide adequate disclosure regarding the value and availability of PREPA's assets. <u>UCC Obj</u>. ¶¶ 87-90. | The Committee's argument is based on the incorrect contention that government assets must be identified for liquidation to "maximize creditor recoveries." This theory is thoroughly rebutted in the Reply Section I.C.  PREPA requires its physical assets to operate and provide an essential service and they are not available for distribution |

| Objection | Argument | Response |
|---|---|---|
| | | to creditors. Unlike a chapter 11 bankruptcy, a municipality's physical assets are not valued or used for distributions to creditors, as they are necessary for the entity to keep operating.  The Supreme Court in *Faitoute Iron & Steel Co. v. City of Asbury Park*, 316 U.S. 502, 509–10 (1942) foreclosed this argument when it ruled that creditors were not entitled to the value of assets owned by municipal debtors.  *Id.* at 509 ("An unsecured municipal security is therefore merely a draft on the good faith of a municipality in exercising its taxing power. The notion that a city has unlimited taxing power is, of course, an illusion. A city cannot be taken over and operated for the benefit of its creditors, nor can its creditors take over the taxing power."). |
| | • The Disclosure Statement fails to adequately address the potential outcome of the Cobra Admin Motion and does not include any substantive discussion of the Cobra Admin Motion. UCC Obj. ¶ 91.<br>• Neither the Disclosure Statement nor Plan define the term "Claim Reserve Fund" and, in fact, that term appears nowhere else in either document. *Id.*<br>• Plan contemplates that PREPA will generate only $400 million through the sale of the Administrative Expense Bonds. This calls into question PREPA's ability to pay its administrative expenses (and, therefore, to confirm any plan) if Cobra prevails on the Cobra Admin Motion. *Id.* | Detailed discussion of the Cobra Admin Motion is contained in Section VI.D.7 of the Disclosure Statement.   In particular, Section VI.D.7 has been amended to reflect updates regarding the amounts expected to be obtained from FEMA.  The Disclosure Statement has been revised to remove the concept of the "Claim Reserve Fund".<br><br>Whether sufficient funds are available to satisfy administrative expenses is a factual issue regarding feasibility—an issue to be determined at confirmation. The Legacy Charge takes into account the need to fund the Series B-2 bonds that will be issued to finance the Admin Expense Claim. |
| Patently Unconfirmable | • The Disclosure Statement cannot be confirmed because the Plan is patently unconfirmable and unfairly discriminatory. UCC Obj. ¶¶ 94-103. | This argument is addressed in detail in the Reply.  *See* Reply Sections I.A and B.1.<br><br>As a preliminary matter, however, this is yet another confirmation issue that the UCC is attempting to raise as an objection to the Disclosure Statement. Even the authority the UCC cites when |

| Objection | Argument | Response |
|---|---|---|
| | | describing the legal standard for what constitutes unfair discrimination is taken from a Third Circuit opinion discussing a senior noteholder's appeal to a *plan confirmation* rather than a disclosure statement objection. *See In re Trib. Co.* 972 F.3d 228, 236-37 (3d. Cir. 2020).<br><br>The same is true with the authority the UCC relies on when arguing the risk associated with the Oversight Board's claim classification is unfair discrimination. *See In re DeLeo*, 2022 WL 1072857, at *1 (Bankr. D. Me. Apr. 8, 2022) ("Following approval of a related disclosure statement, the debtor solicited votes on the Plan.") |
| | • The UCC asserts the Oversight Board concedes in the Best Interest Test report that many general unsecured claims are current expense claims and thus must receive priority commensurate with the Fuel Line Lenders or else constitute unfair discrimination. <u>UCC Obj</u>. ¶ 97. | The referenced header in the Best Interest Test report was for descriptive purposes only and is not a concession that any prepetition expenses were current expenses. For the avoidance of doubt, any amended report will update such header to clarify the claims it covers are simply prepetition unsecured claims.<br><br>PREPA does not believe any general unsecured creditors can assert Current Expense priority. The claims are not like the Fuel Line Lenders, whose agreements with PREPA provided they would be treated as Current Expenses under the Trust Agreement and whose claims are expressly referred to in the Trust Agreement. The Trust Agreement provides that there are no third-party beneficiaries, and the Puerto Rico Court of First Instance has already determined that the purported priority waterfall cannot be enforced by third parties. *UTIER, et al. v. Autoridad de Energia Electrica de Puerto Rico, et al.*, Case No. K-AC2016-0291 at 72-73 (Dec. 19, 2016). Moreover, PREPA has discretion to determine which expenses constitute Current Expenses, and only those expenses that PREPA budgeted as Current Expenses in the appropriate fiscal year could assert such a claim. *See* Trust Agreement section 505 (making clear PREPA is only authorized to "first pay" Current Expenses that "*will not exceed the amount provided therefor in the Annual Budget for* |

| Objection | Argument | Response |
|---|---|---|
| | | *such fiscal year . . . .*"). Unbudgeted expenses, even if they meet the definition of "Current Expenses," are not subject to section 505.<br><br>In any case, the Oversight Board will demonstrate at confirmation that there is no unfair discrimination with respect to the treatment of the Fuel Line Lenders and the General Unsecured Claims. |
| Voting Procedures | • Any creditor that has or will receive a request for estimation should be entitled to vote on the Plan and receive a Solicitation Package to the extent that such claim is not contingent or unliquidated. Reference of "a request for estimation" is "an impossibly vague statement." <u>UCC Obj</u>. ¶ 105. | Section 502(c) of the Bankruptcy Code clearly provides for the estimation of claims. Allowing claimants subject to a request for estimation to vote on the Plan at the full amount of their asserted claim would prejudice other creditors if the claim is ultimately estimated at a lower amount. Claimants subject to a request for estimation are not without recourse, however. The proposed procedures provide a process for such holders to seek allowance of their claim for voting purposes pursuant to Bankruptcy Rule 3018(a).<br><br>Furthermore, the proposed voting procedures are consistent with the voting procedures the Court approved in connection with the solicitation of the plans of adjustment for COFINA, the Commonwealth, and HTA. *See Order (I) Approving Disclosure Statement, (II) Fixing Voting Record Date, (III) Approving Confirmation Hearing Notice and Confirmation Schedule, (IV) Approving Solicitation Packages and Distribution Procedures, (V) Approving Forms of Ballots, and Voting and Election Procedures, (VI) Approving Notice of Non-Voting Status, (VII) Fixing Voting, Election, and Confirmation Deadlines, and (VIII) Approving Vote Tabulation Procedures* [Case No. 17-3284, ECF No. 375] ("<u>COFINA DS Order</u>") ¶ 26(h); *Order (I) Approving Disclosure Statement, (II) Fixing Voting Record Date, (III) Approving Confirmation Hearing Notice and Confirmation Schedule, (IV) Approving Solicitation Packages and Distribution Procedures, (V) Approving Forms of Ballots, and Voting and Election Procedures, (VI) Approving Notice of Non-voting Status, (VII) Fixing Voting, Election, and Confirmation Deadlines, and (VIII) Approving Vote Tabulation Procedures* [Case No. 17-3283, ECF No. 17639] ("<u>Commonwealth DS Order</u>") ¶ 26(i); |

A-12

| Objection | Argument | Response |
|---|---|---|
| | | *Order (I) Approving Disclosure Statement, (II) Fixing Voting Record Date, (III) Approving Confirmation Hearing Notice and Confirmation Schedule, (IV) Approving Solicitation Packages and Distribution Procedures, (V) Approving Forms of Ballots, and Voting and Election Procedures, (VI) Approving Notice of Non-voting Status, (VII) Fixing Voting, Election, and Confirmation Deadlines, and (VIII) Approving Vote Tabulation Procedures* [Case No. 17-3567, ECF No. 1248] ("HTA DS Order") ¶ 37(h). |
| Service | • The Debtor should serve on the parties entitled to receive the Solicitation Package a paper summary of the Plan (in English and in Spanish), including a hard copy of the UCC's recommendation letter and instructions for how and where creditors can obtain and review hard copies of all the Disclosure Statement and Plan.  UCC Obj. at ¶¶ 106–107.<br>• The Debtors should establish certain "centers" where such hard copies will be available. UCC Obj. at ¶ 107.<br>• The Solicitation Package should include a letter from the UCC setting forth the UCC's recommendation to holders of General Unsecured Claims in Class 5 with respect to whether to vote to accept or reject the Plan. UCC Obj. at ¶¶ 108–109. | The UCC fails to explain what the paper summary of the Plan should include, or provide a form of proposed paper summary.  Nonetheless, the Oversight Board proposes to include in the Solicitation Package to holders of claims in Class 7 (General Unsecured Claims) a paper copy of Section II.B of the Disclosure Statement (*Summary of Key Components of the Plan of Adjustment*); provided, however, that such paper copy shall be deemed to be subject to all disclaimers and provisions of the Disclosure Statement.   The UCC's failure to specify the contents, or provide a proposed form, of such paper summary should not allow it to delay the approval of the proposed solicitation procedures and commencement of solicitation to finalize the contents of the paper summary.<br><br>The proposed procedures already provide that copies of the Disclosure Statement and Plan will be available at the various on-island ballot collection sites.  *Order (I) Approving Disclosure Statement, (II) Fixing Voting Record Date, (III) Approving Confirmation Hearing Notice and Confirmation Schedule, (IV) Approving Solicitation Packages and Distribution Procedures, (V) Approving Forms of Ballots and Voting and Election Procedures, (VI) Approving Notice of Non-voting Status, (VII) Fixing Voting, Election, and Confirmation Deadlines, and (VIII) Approving Vote Tabulation Procedures* (the "Proposed PREPA DS Order") ¶ 35.<br><br>The Oversight Board does not object in principle to inclusion of a letter from the UCC in the Solicitation Package but reserves the right |

| Objection | Argument | Response |
|---|---|---|
| | | to object to the content of such letter.  The UCC should provide a proposed form of UCC letter well in advance of the Disclosure Statement Hearing to allow the Oversight Board to review such letter. Subject to any objection to the proposed letter, the UCC should be required to provide the Oversight Board with a finalized English and Spanish version of the letter no later than two (2) business days after entry of the Proposed PREPA DS Order. The Oversight Board reserves the right not to include materials with its solicitation package that advocate against the Amended Plan. |
| Depository | • The Debtor should be required to prepare a privilege log in connection with the Depository. UCC Obj. at ¶ 111.<br>• The UCC objects to the Objection/Discovery Procedures proposed by the Oversight Board. UCC Obj. ¶ 110. | The proposed Depository procedures are consistent with those approved in connection with the plans of adjustment for the Commonwealth and HTA.  *See Order Establishing Procedures and Deadlines Concerning Objections to Confirmation and Discovery in Connection Therewith* [Case No. 17-3283, ECF No. 17640] (the "Commonwealth Conf. Proc. Order"); *Order Establishing, Among Other Things, Procedures and Deadlines Concerning Objections to Confirmation and Discovery in Connection Therewith* [Case No. 17-3567, ECF No. 1249] (the "HTA Conf. Proc. Order").<br><br>As in the Commonwealth and HTA's confirmation proceedings, a privilege log is unnecessary and unworkable. The purpose of the Depository is to make available the "Debtor's relevant *non-privileged* documents relied upon by the Debtor in analyzing its assets and the various claims asserted against it," and "Debtor's relevant *non-privileged* documents concerning the Best Interests Test Report set forth in the Disclosure Statement." *Motion of Puerto Rico Electric Power Authority for Order Establishing, Among Other Things, Procedures and Deadlines Concerning Objections to Confirmation and Discovery in Connection Therewith* [Case No. 17-4780, ECF No. 3114] (the "Conf. Proc. Mot.") ¶ 36 (emphasis added).  Given the scope of the Debtor's review of documents in connection with populating the Depository, a privilege log is unnecessary. |

| Objection | Argument | Response |
|---|---|---|
| | | Notwithstanding the above, the Debtor is willing to revisit whether the creation of a privilege log is appropriate in light of any forthcoming production requests. |
| Discovery Notice | • Parties in interest who wish to participate in discovery should not be required to file a Discovery Notice.  UCC Obj. at ¶¶ 112–113.<br>• The deadlines for filing a Discovery Notice will prevent parties in interest from participating in discovery because parties in interest won't have sufficient time to (i) review the Disclosure Statement, (ii) determine whether to file a Discovery Notice, and (iii) prepare and file a Discovery Notice. UCC Obj. at ¶ 113. | The proposed Discovery Notice is consistent with the notice approved in connection with the plans of adjustment for the Commonwealth. *See* Commonwealth Conf. Proc. Order ¶ 3.  Importantly, the Discovery Notice gives the Oversight Board fair notice of the parties seeking to take discovery, which will allow it to include them in relevant communications, if necessary, to minimize duplicative efforts.<br><br>Notice of the deadline to file the proposed Discovery Notice is included in the Confirmation Hearing Notice, which will be mailed on or before five (5) business days after entry of the Proposed PREPA DS Order, or as soon as reasonably practicable thereafter—well before the initial March 29, 2023 deadline to submit such notice for purposes of participating in discovery. Proposed PREPA DS Order, Schedule 2 ¶¶ 8–10.<br><br>Parties in interest do not need to review the Disclosure Statement before filing a Discovery Notice.  Parties in interest may file a Discovery Notice to reserve their rights to participate in discovery, but they are not obligated to participate in discovery if, after reviewing the Disclosure Statement, they determine discovery is not necessary.<br><br>Filing a Discovery Notice is a low burden for parties in interest.  A form of a Discovery Notice will be available at https://cases.ra.kroll.com/puertorico/ and it will only require minimal biographical information, including the party's name, address, nature of their Claim, and Claim number.  Indeed, as the Court is well aware, hundreds of creditors had no difficulty preparing and filing Discovery Notices in connection with the Commonwealth's confirmation proceedings. |

| Objection | Argument | Response |
|---|---|---|
| | | |
| | **Ad Hoc Group Objection** | |
| Patently Unconfirmable | • The Plan is patently unconfirmable and proposed in bad faith. <u>AHG Obj</u>. ¶ 20-24. | This is addressed in detail in the Reply. *See* Reply Section I.D. |
| | • The Oversight Board has abused the mediation process. <u>AHG Obj</u>. ¶ 28. | This is addressed in detail in the Reply. *See* Reply Section I.D.ii. |
| | • The Oversight Board defied the Court's order to file a Plan confirmable regardless of the outcome of litigation. <u>AHG Obj</u>. ¶ 33. | This is addressed in detail in the Reply. *See* Reply Section II.A. |
| | • The Plan does not satisfy the best interest of the creditors. <u>AHG Obj</u>. ¶ 37. | This is addressed in detail in the Reply. *See* Reply Section I.C. |
| | • The Plan is infeasible because the Series B Bonds may not be paid. <u>AHG Obj</u>. ¶¶ 44–45. | If the Plan is not feasible, it will not be confirmed. This is addressed in detail in the Reply. *See* Reply Section I.E. PREPA's regulator (PREB) is required to exercise its power over rates to ensure PREPA recovers all operational and maintenance costs (Act 57-2014 § 6.25(b)) and meets its obligations to bondholders (Act 17-2019 § 6.3(p)). Nevertheless, the Plan has been amended to provide an interest rate covenant for the benefit of the Series B Bonds. Moreover, the New Bonds do not default if they are not fully defeased by their maturity date, so failure to pay them in full by their expected repayment date does not render the plan infeasible. The Legacy Charge will continue to generate revenues until the Series B Bonds are paid in full (including interest that accrued prior to the final maturity date). |
| | • The Plan will lack any valid impaired accepting class. <u>AHG Obj</u>. ¶ 46. | This is addressed in detail in the Reply. *See* Reply Section I.A. The Oversight Board believes the Plan is supported by numerous impaired accepting classes. Nevertheless, until voting has been completed, we cannot ascertain which classes will accept and whether, in the Ad Hoc Group's estimation, they constitute a valid impaired accepting class. Therefore this issue cannot render the plan patently unconfirmable because the record requires further development. |

| Objection | Argument | Response |
|---|---|---|
| | • The settlement offer to uninsured bondholders exposes post-reorganization PREPA to liability under the securities laws.  <u>AHG Obj</u>. ¶¶ 62 – 63. | The Ad Hoc Group's hypothetical contention is irrelevant to the issue before the Court, which is whether the Disclosure Statement contains adequate information. The settlement offer, which is not an offer for a sale of securities, but provides bondholders the opportunity to choose which class to vote in on a plan *after* and after a disclosure statement has been approved, does not violate any securities laws.  Nor does it require them to vote affirmatively on such a plan.  As such, PREPA will not face any liability as a result of such settlement offer.<br><br>In any event, even if any liability were to arise, such liability would not burden any reorganized PREPA for at least two reasons: (1) the Amended Plan, Article XXVII.D contains the customary express exculpation of PREPA from liability for actions taken in connection with its restructuring, including with respect to the bondholder settlement offers, and (2) any liability would arise pre-confirmation and thus would be discharged by the Plan, under Bankruptcy Code § 944(b), and all parties would be precluded from bringing actions against PREPA with respect to the settlement offer and all other claims arising against PREPA prior to the Effective Date.  *See* Plan Article XXVII.A.  The Ad Hoc Group's citation to *Jacobson v. AEG Cap. Corp.*, 50 F.3d 1493, 1496 (9th Cir. 1995) is inapposite.  In that case, shareholders of a bankrupt company that had emerged from bankruptcy filed a complaint in federal court alleging that *other shareholders*—not the bankrupt company—had committed securities law fraud.  *Id.* at 1495.  Therefore, *Jacobsen* does not support the Ad Hoc Group's contention that a securities law violation could saddle a *debtor* with post-effective date liability.<br><br>Furthermore, Bankruptcy Code section 944(b) incorporated into PREPA's Title III case by PROMESA section 301 provides that the debtor is discharged from all debt as of confirmation. Subsection (c) lists only two kinds of debt not discharged by a confirmation order: (i) those debts "excepted from discharge by the plan or order confirming the plan"; and (ii) those debts "owed to an entity that, |

| Objection | Argument | Response |
|---|---|---|
| | | before confirmation of the plan, had neither notice nor actual knowledge of the case." Any securities law liability would fit neither of these narrow exceptions to discharge. |
| | • The Plan cannot satisfy the cramdown requirements. <u>AHG Obj</u>. ¶ 65. | The cramdown requirement is an issue for confirmation that requires factual development. As addressed in detail in the Reply, this issue cannot render the Plan patently unconfirmable. *See* Reply Section I.C. |
| Adequate Information | • The Disclosure Statement does not provide adequate information about the Oversight Board's analysis to support its assertion that PREPA can affordably and sustainably pay Bondholders only around $4 billion, why it cannot afford to pay CVI holders for longer than 35 years, or why it has changed positions on affordability. <u>AHG Obj</u>. ¶ 79-80. | Bankruptcy Code section 1125 provides a disclosure statement need not describe alternate plans. For the reasons stated in Section II.C of the Reply, there is no affordability test under PROMESA, and it is not part of the requirements for confirmation. That said, circumstances have changed over the years since PREPA has been in Title III as well as changes to apparent risks. The Oversight Board has determined not to incur obligations greater than 35 years to the extent avoidable because, among other things, PREPA will have to engage in significant capital improvements and replacements just to keep functioning. The vast majority of municipal revenue bonds have maturities of 35 years or less, and such maturity is appropriate in this case. Moreover, PREPA's revenue bonds contained a 30 year maturity themselves.<br><br>The additional revenues available for the payment of debt has been the basis for the $5.68 billion of New Bonds, as described in Part II.B.3.iii of the Disclosure Statement. Furthermore, a derivation of the how the Oversight Board determined the amount of the Legacy Charge is set forth in Exhibit P to the Disclosure Statement. |
| | • The Disclosure Statement does not adequately explain the nature and structure of the Legacy Charge that will fund the debt service payment. <u>AHG Obj</u>. ¶ 81-82. | A derivation of the Legacy Charge that the Oversight Board has determined is affordable and sustainable is set forth in Exhibit P to the Disclosure Statement.<br><br>A description of the rates applicable to the various customer classes and exemptions is provided in Section II.B.3.iii of the Disclosure Statement and schedule B of the Plan. |

A-18

| Objection | Argument | Response |
|---|---|---|
| | • The Disclosure Statement must disclose the specifics of the Series B Bonds' off-market terms and must clarify the lien granted for the benefit of Series B Bonds. <u>AHG Obj</u>. ¶¶ 83–87. | The Plan has been amended to provide an interest rate covenant for the benefit of the Series B Bonds, and other improved terms for Series B Bonds resulting from the Oversight Board's settlement with National. The Oversight Board has also adopted some of the Ad Hoc Group's proposed language regarding their contention on market terms. *See, e.g.,* Disclosure Statement Sections I.B., VIII.E, VIII.F. |
| | • The Disclosure Statement does not adequately disclose risks related to the Amended Lien & Recourse Litigation and the Fuel Line Lender Priority Action. <u>AHG Obj</u>. ¶¶ 89-90. | Contrary to the Ad Hoc Group's assertions otherwise, the Disclosure Statement describes the risks and potential variations in creditor recovery based on the outcome of both the Amended Lien & Recourse Challenge and the Fuel Line Lender Priority Action multiple times throughout the document. *See* Disclosure Statement, Sections I.A, II.B, II.B.4, VI.C.2. |
| | • The Disclosure Statement does not adequately disclose the possibility that bondholders will be restricted from trading their bonds until the Effective Date. <u>AHG Obj</u>. ¶ 91. | The Debtor has revised the Proposed PREPA DS Order to remove the provision that the Debtor, in coordination with DTC, may determine that the bonds tendered through ATOP must be restricted from transferring or trading until the Effective Date. Accordingly, such risk factor is no longer necessary. However, holders of PREPA Revenue Bonds insured by National who make a distribution election will be restricted from trading until the Effective Date. Proposed PREPA DS Order ¶ 37. |
| | • Fifth part of the Disclosure Statement is inadequate; effect of delays on distributions <u>AHG Obj</u>. ¶ 91. | The Debtor has added the following language in Section VIII.A of the Disclosure Statement:<br><br>• "The Effective Date may be significantly delayed or not occur.<br><br>• The Effective Date may be significantly delayed due to pending litigation, including, without limitation, the Amended Lien & Recourse Challenge. The Effective Date may not occur until the Amended Lien & Recourse Challenge is resolved, which could take years." |

| Objection | Argument | Response |
|---|---|---|
| Current Expense Litigation | • The Current Expense Litigation "must be resolved," and the Ad Hoc Group "intends to move to lift the stay on this litigation and seek judgment on an expedited basis that the Fuel Line Lenders' subordination and priority claims against Bondholders are meritless." AHG Obj. at ¶ 94. | The Court has already declined to consider the Current Expense Litigation because, in its current posture, the parties' arguments are premised upon the Government Parties' motion to approve the now-terminated 2019 RSA.  The Ad Hoc Group offers no basis to reconsider this determination.<br><br>In any event, the Ad Hoc Group's request to litigate the Fuel Line Lenders' priority is a naked attempt to continue litigating an issue that the Fuel Line Lenders and the Oversight Board seek to settle through the Plan.  *See* Reply Section I.B.2. The PSA with the Fuel Line Lenders settles the priority claim against PREPA, and once the Plan is confirmed the litigation will become moot. However, Bondholders can object to the treatment of the Fuel line Lenders under the Plan at Confirmation. |
| Depository | • The Oversight Board "should be required to immediately load into the data depository all data, models, and supporting materials related to the determination that PREPA can afford to pay all creditors only $5.4 billion dollars, and comparisons with any affordability analysis underlying its earlier (and much higher) offers." AHG Obj. at ¶¶ 95–96. | As explained in section I.C of the Reply, there is no affordability test in PROMESA Title III.  The Depository has been operational for more than four (4) weeks and the Debtor will continue to make available documents relevant to confirmation of the Plan.  Conf. Proc. Mot. ¶ 36.   Specifically, and as the Oversight Board explained in the Confirmation Procedures Motion, the Oversight Board will populate the Plan Depository with relevant, non-privileged documents (1) "relied upon by the Debtor in analyzing its assets and the various claims asserted" and (2) concerning the Best Interests Test Report. *Id.*  Documents regarding affordability analyses do not fall within either category and accordingly may not be included in the Oversight Board's initial upload of documents to the Plan Depository.  The Oversight Board will of course continue to upload to the Plan Depository any relevant, non-privileged documents it produces in response to discovery requests served in accordance with an approved confirmation procedures order.<br><br>Further, the Oversight Board notes that it received discovery requests from the Ad Hoc Group on January 23, 2023.  As the Oversight Board informed the Ad Hoc Group in its letter response, those |

A-20

| Objection | Argument | Response |
|---|---|---|
| | | requests were premature because they were served before the Court entered its confirmation discovery procedures order.  Given the size and complexity of these proceedings, it is critical that discovery be conducted in the coordinated, efficient manner contemplated by the proposed confirmation discovery procedures in order to conserve PREPA's and the Court's resources and ensure an efficient and expeditious process.  Accordingly, PREPA will only respond to discovery requests served in compliance with a court-approved discovery procedures order. |
| Third Party Discovery | • AAFAF and LUMA Energy should be subject to and required to comply with the deadlines in the proposed *Order Establishing, Among Other Things, Procedures and Deadlines Concerning Objections to Confirmation and Discovery in Connection Therewith*, Conf. Proc. Mot. Exhibit A (the "Proposed PREPA Conf. Proc. Order").  AHG Obj. at ¶ 97. | Pursuant to Luma's agreements with PREPA, Luma is an independent contractor and is not a trustee or representative of PREPA pursuant to PROMESA, the Bankruptcy Code, or any other similar law.  However, the Proposed PREPA Confirmation Procedures Order does not place an affirmative prohibition on third party discovery. |
| Confirmation Deadlines | • Proposes changes to certain deadlines.  AHG Obj. at ¶ 98. | The Oversight Board's proposed schedule is designed to provide reasonable deadlines that allow the hearing to consider confirmation of the Plan to take place in July 2023.  Whether this proposed schedule is acceptable to the Title III Court is wholly within the Court's discretion.  In the Oversight Board's view, the proposed schedule maximizes efficiency, streamlines the proceeding, and manages the timetable to prepare for a confirmation hearing, all in support of the fair and efficient disposition of the Debtor's Title III case. Accordingly, the modifications proposed by the Ad Hoc Group are unnecessary and unfairly prejudice PREPA.

In particular, the request to push the Oversight Board's deadline to file its memorandum of law and proposed findings of fact and conclusions of law from June 21 to June 14 is unworkable.  Such documents are tied to the finalization of the Oversight Board's witness declarations, vote tabulation, and omnibus reply to objections to the Plan.  Thus, the Ad Hoc Group's proposed June 14 deadline |

| Objection | Argument | Response |
|-----------|----------|----------|
| | | would, in effect, provide the Oversight Board only seven (7) days to respond to numerous substantive confirmation objections.  The Oversight Board should be provided its initially proposed two-week period to respond to multiple objections and finalize related filings due on the same date, which will provide the Court a more complete and consistent set of documents and pleadings responsive to issues that may be raised. |
| | | Indeed, the sole reason for the Ad Hoc Group's request is to provide it with fourteen (14) days to object to the *proposed findings of fact and conclusions of law* (consistent with the procedures approved in connection with confirmation of the plans for the Commonwealth and HTA, there is no deadline to object to the Debtor's memorandum of law in support of confirmation).  Given the limited document at issue, and that all other briefing will be completed at the time the proposed findings of fact and conclusions of law is filed, seven (7) days is sufficient time for the Ad Hoc Group to review and prepare its objection. |
| Interrogatories | • Parties in interest should not be limited to fifteen (15) interrogatories. Instead, each party in interest should be permitted to serve twenty-five (25) interrogatories pursuant to Rule 33 of the Federal Rules of Civil Procedure. <u>AHG Obj.</u> at ¶ 98(d). | Limiting each party in interest to fifteen (15) interrogatories is consistent with the number of interrogatories permitted in connection with the plans of adjustment for the Commonwealth and HTA.  *See* Commonwealth Conf. Proc. Order ¶ 3; *Order Establishing, Among Other Things, Procedures and Deadlines Concerning Objections to Confirmation and Discovery in Connection Therewith* [Case No. 17-3567, ECF No. 1249] (the "<u>HTA Conf. Proc. Order</u>") ¶ 13.<br><br>Confirmation discovery protocols often do not include interrogatories when other, more efficient and useful discovery mechanisms are available. *See, e.g., In re Energy Future Holdings Corp. et al.*, No. 14-cv-10979 (CSS), *Order (A) Scheduling Certain Hearing Dates and Deadlines, (B) Establishing Certain Protocols in Connection with the Confirmation of Debtors' Plan of Reorganization, and (C) Revising Certain Dates in the Disclosure Statement Scheduling Order* [ECF No. 4916] (Bankr. D. Del. July 2, 2015) ¶ 15 (limiting interrogatories to identification of witnesses).  As recognized by several courts, interrogatories and requests for admission are |

| Objection | Argument | Response |
|---|---|---|
| | | inefficient discovery mechanisms when document requests and depositions are available. *See, e.g.*, S.D.N.Y. L.R. 33.3(b) ("During discovery, interrogatories other than those seeking information [regarding identity of witnesses, locations of documents, or computation of damages] may only be served (1) if they are a more practical method of obtaining the information sought than a request for production or a deposition, or (2) if ordered by the Court"); *see also New England Terminal Co. v. Graver Tank & Mfg. Corp.*, 1 F.R.D. 411, 413-14 (D.R.I. 1940) ("In actual effectiveness interrogatories are far inferior to the oral examination. Their defects are quite obvious . . . ") (citation omitted); *Espinal v. Coughlin*, No. 98-2579, 1999 WL 1063186, at *2 n.2 (S.D.N.Y. Nov. 23, 1999) (observing that "the use of interrogatories is limited" and should only "be permitted if they are a more practical method of discovery than a deposition").<br><br>Here, given the size and complexity of the Plan and PREPA's Title III case, document requests and depositions are more efficient means of providing information to parties in interest regarding the Plan than interrogatories.  Nonetheless, consistent with the number of interrogatories permitted in connection with the plans of adjustment for the Commonwealth and HTA, the Proposed PREPA Confirmation Procedures Order provides that parties in interest may serve up to fifteen (15) interrogatories.<br><br>Given the Debtor's (and many other parties') interest in exiting Title III as efficiently and expeditiously as possible, responding to additional formal interrogatories would be impractical and would waste the Debtor's limited resources when other, more effective means of discovery are available. |
| Tabulation Procedures | • The Balloting Agent should be required to file a notice with the Title III Court before it makes changes to vote proportions. Thereafter, impacted votes should be provided | Votes submitted through ATOP for Classes 1 and 2 will reflected in the principal amount only due to ATOP's system capabilities.  The proposed procedures provide that the Balloting Agent may thereafter adjust the voted amounts to reflect accrued but unpaid prepetition |

| Objection | Argument | Response |
|---|---|---|
| | an opportunity to be heard regarding any changes.  <u>AHG Obj.</u> at ¶¶ 101–102. | interest or accreted principal, as applicable, to reflect a holder's corresponding claim amount for voting purposes.  The Balloting Agent will also have to adjust the vote tabulation to account for numerosity (*e.g.*, a single claimant may hold multiple CUSIPs of PREPA Revenue Bonds and submit more than one vote through separate nominees, which will need to be adjusted to reflect a single vote for numerosity purposes).<br><br>The Debtor does not anticipate any other adjustments will be made.  Nonetheless, the vote tabulation certificate to be filed by the Oversight Board on behalf of Kroll in connection with the hearing to consider confirmation of the Plan will contain an explanation regarding any changes to vote proportions. The Debtor has updated the Proposed PREPA DS Order to provide (i) parties in interest may object to the vote tabulation certification by 5:00 p.m. (Atlantic Standard Time) on June 28, 2023 and (ii) the Debtor and other parties in interest may file a reply to any such objections by 5:00 p.m. (Atlantic Standard Time) on July 5, 2023.  Proposed PREPA DS Order ¶¶ 15-16.  Parties in interest will also have an opportunity to cross examine Kroll regarding the vote tabulation at the hearing to consider confirmation of the Plan. |
| Voting Procedures | • The Proposed PREPA DS Order should reflect (i) the PREPA Revenue Bond Claims will be allowed for voting purposes at $8.259 billion plus pre-petition interest and (ii) the Rule 3018(a) procedures are not necessary for Claims in Classes 1 and 2.  <u>AHG Obj.</u> at ¶¶ 103–105. | The Oversight Board has revised the Proposed PREPA DS Order to reflect the amounts PREPA Revenue Bond Claims will be allowed at for voting purposes.  Proposed PREPA DS Order ¶ 39.  The allowance of PREPA Revenue Bond Claims in Classes 1 and 2 solely for purposes of voting to accept or reject the Plan pursuant to decretal paragraph 39 of the Proposed PREPA DS Order shall not prejudice any parties in connection with the Amended Lien & Recourse Challenge.<br><br>The Oversight Board has revised the Proposed PREPA DS Order to make clear notwithstanding the Amended Lien & Recourse Challenge holders of Claims in Classes 1 and 2 are entitled to vote.  *Id.* |

| Objection | Argument | Response |
|---|---|---|
| Trading Restrictions | • Holders of PREPA Revenue Bonds who tender their bonds through ATOP should not be restricted from transferring their bonds. <u>AHG Obj.</u> at ¶¶ 106–107. | The Debtor has revised the Proposed PREPA DS Order to remove the provision that the Debtor, in coordination with DTC, may determine that the bonds tendered through ATOP must be restricted from transferring or trading until the Effective Date.  The Debtor will not restrict transfers to the Effective Date (except with respect to holders of PREPA Revenue Bonds insured by National who make a distribution election). However, holders of PREPA Revenue Bonds who tender their bonds through ATOP to vote will be restricted from transferring their bonds until immediately after the voting tabulation has been filed (anticipated to be on or before June 21, 2023). Proposed PREPA DS Order ¶ 36. |
| **Bond Trustee Objection** | | |
| Settlement | • The Oversight Board cannot offer to settle bondholder claims on a *pro rata* basis as the individual bondholders do not have the right under the Trust Agreement to settle claims unilaterally. <u>Trustee Obj</u>. pp. 2 – 8. | The Oversight Board has the discretion to classify classes of claims pursuant to section 1122 of the Bankruptcy Code, and the holder of a claim has the right to vote the claim pursuant to section 1126 of the Bankruptcy Code, notwithstanding any provisions of the Trust Agreement to the contrary, including any provisions which may grant the Trustee control over litigation and enforcement related to the bonds and the Trust Agreement.  *See In re Young Men's Christian Ass'n of Topeka, Kansas*, 2020 WL 7483739, at *3 (Bankr. D. Kan. Dec. 14, 2020) (the bondholders, not the trustee, constituted "holders of a claim or interest" and therefore allowed to vote per 11 U.S.C. § 1126, despite the fact that the trustee filed a proof of claim on behalf of the bondholders). Nothing in the Trust Agreement gives the Trustee the right to control claims in a bankruptcy proceeding even if that was legally permissible.  The Oversight Board, as the only party that has the right to propose a Title III plan of adjustment for PREPA, PROMESA § 312(a), has created two classes of claims into which Holders of PREPA Revenue Bonds Claims have been placed, and, pursuant to the settlement offer, is offering such Holders the opportunity choose one or the other class. The election does not alter the Trust Agreement in any manner. |

| Objection | Argument | Response |
|---|---|---|
| | | There is no dispute that the Trustee is the holder of any security interest for the benefit of bondholders (Obj. p.3) and, indeed, it is refreshing to see the Trustee agree with the Oversight Board's position in the Lien Challenge—that the Trustee is the only holder of the lien granted by the Trust Agreement.  Nonetheless, issues pertaining to which party is the lienholder, and the collective action provisions in the Trust Agreement more generally, are not relevant for purposes of classifying a claim in accordance with the results of the settlement offer, or plan voting under the Bankruptcy Code.  *See In re Allied Owners' Corp.*, 74 F.2d 201, 203 (2d Cir. 1934), corporate trustees, while permitted to file proofs of claim, are not entitled to vote on the plan or reorganization unless the trust indenture specifically authorizes them so to do. (quoting *In re Prudence Co.*, 22 F. Supp. 264, 266 (E.D.N.Y. 1937)).  The issue of who holds the lien is only relevant for purposes of adequate protection, and that issue is not implicated by individual bondholders' selecting which class to be in for voting purposes.  Further, PROMESA section 301(c)(3) provides an exception that monoline insurers, in certain circumstances, can vote the insured holders' claim—that exception would have been meaningless if the trustee would have been the one that can vote the claim.<br><br>The Trustee's argument that individual bondholders have neither the ability to settle "any separate portion" of the claims held by the Trustee, nor the right to have any portion of the settlement value of the Trustee's claim diverted to their own benefit (at p.5), ignores both the Bankruptcy Code's granting of the power to vote claims to the bondholders and the ubiquitous practice of debtors entering into restructuring support or plan agreements with some, but not all, holders of bonds issued by a debtor, as was done in the 2019 RSA and, most recently, with National, and has been the cornerstone of other Title III plans of adjustment.  It also ignores that individual claimholders are not seeking a remedy on behalf of all bondholders, but classification of solely their individual claim. No one would dispute that individual bondholders can sell their individual bond at |

| Objection | Argument | Response |
|---|---|---|
| | | any price they would accept.  So too can individual bondholders can choose to settle their claim directly with the debtor. |
| Adequate Information | • The Disclosure Statement provides incomplete and unclear information about Series B Bonds and CVI, including inadequate information regarding the relationship between the Legacy Charge and Net Revenues. <u>Trustee Obj</u>. pp. 10 – 12. | The definitions in the Plan regarding the structure of the New Bonds and CVI are explained in Section VI.F.1 of the Disclosure Statement, and information regarding the Legacy Charge and Net Revenues are explained in Section II.B.3 of the Disclosure Statement. Specifically, Section VI.F.5(ii) of the Disclosure Statement provides that:<br><br>The CVI shall be secured by Reorganized PREPA's Remaining Net Revenues up to an amount equal to the Remaining Legacy Charge Revenues and the right to receive such Remaining Net Revenues up to an amount equal to the Remaining Legacy Charge Revenues, as more particularly described in the New Master Indenture.<br><br>Additionally, in light of the Trustee's objection, the Oversight Board has updated the definition of Revenues to include monies collected by LUMA for the benefit of Reorganized PREPA.<br><br>The Trustee's objection that the Oversight Board must specifically project Net Revenues (Obj. p.12) is also misplaced. Exhibit D of the Disclosure Statement provides the load forecast and illustrative cash flow to the New Bonds based on Net Revenues following implementation of the Legacy Charge.   The Net Revenues are based on the 2022 Certified PREPA Fiscal Plan. In any case, PREB is required under Puerto Rico law to "[e]nsure that the powers and authorities exercised by PREB over the Authority….including those related to rate review or approval, guarantee that the Authority meets its obligations to bondholders." Act 17-2019 § 6.3(p).  If PREB does not set rates sufficient to cover operating expenses, holders of New Bonds may seek enforcement of the Interest Rate Covenant. |

| Objection | Argument | Response |
|---|---|---|
| | • The Disclosure Statement provides incomplete information regarding the duty of Reorganized PREPA to Earn Net Revenues to fund the Series B Bonds and CVI. Trustee Obj. pp. 12 – 13. | The Disclosure Statement provides a detailed description concerning the New Bonds and CVI in Section VI.F.1-20.<br><br>The Oversight Board has updated the Plan to provide certain benefits to the Series B Bonds, including the interest rate covenant, which was previously only for the benefit of the Series A Bonds. |
| | • The remedies supporting the New Bonds and CVI are unclear. Trustee Obj. pp. 13 – 14. | The Limited Remedies relating to the issuance of the New Bonds and CVI are explained in Section VI.F.13 of the Disclosure Statement and will be set forth further in the New Master Indenture. |
| | • The Disclosure Statement is unclear about the proposed collateral for the New Bonds. Trustee Obj p. 15. | Section VI.F.5 of the Disclosure Statement explains that the New Bonds will be secured by Reorganized PREPA's Net Revenues up to an amount equal to the Legacy Charge Revenues and the right to receive such Net Revenues up to an amount equal to the Legacy Charge Revenues. Further details will be set forth in the New Master Indenture. |
| | • The New Master Trust Agreement should be made available prior to the hearing on the Disclosure Statement. Trustee Obj. p. 15-16. | The Plan sets forth, in Article XIX, provisions regarding the New Bonds and material terms with respect thereto to be contained in the New Master Indenture. The Oversight Board will file the New Master Trust Indenture as part of the Plan Supplement seven days before the Voting Deadline. This timing is identical to the schedules utilized in the Commonwealth and HTA Title III Cases. See [ECF Nos. 18470, 18258 in Case No. Case No. 17-3283]; [ECF Nos. 18470, 18258 in Case No. 17-3283]. This is customary in chapter 11 bankruptcy cases as well. The Bond Trustee provides no compelling reason as to why the Oversight Board must deviate from this practice here for claimholders to cast an informed vote on the Plan. |
| | • The Disclosure Statement fails to disclose adequate information regarding the treatment of insured bonds and monoline policies. Trustee Obj. p. 17. | The Trustee's objection relates to the substance of the Plan, rather than adequate disclosure.  Accordingly, it should be considered in connection with confirmation, rather than the disclosure statement stage.  Nonetheless, the holder of insured bond claims will receive the consideration provided pursuant to the Plan. The mechanisms in the Commonwealth's Title III plan of adjustment were incorporated as a result of plan support agreements with the Monolines. Accordingly, the Plan incorporates these mechanisms for National. If a settlement |

| Objection | Argument | Response |
|---|---|---|
| | | is reached with any additional Monolines, the Oversight Board will incorporate relevant mechanisms, if requested. Absent such settlement(s), the Oversight Board will not incorporate these mechanisms in the Plan, as the relative rights of an insured bondholder and its monoline insurer should otherwise be resolved between the parties in accordance with their relevant insurance policies. |
| | • The Disclosure Statement fails to disclose that certain federal subsidy monies held by the PREPA Bond Trustee may be subject to unique lien rights of the Series EEE and YY Bonds. <u>Trustee Obj</u>. p. 17. | The Plan has been clarified to indicate that Sinking Fund distributions shall be made subject to the terms of the Trust Agreement.  Plan Article IV.A(i) & Article V.A(i). |
| | **Syncora Objection** | |
| Patently Unconfirmable | • The Plan reflects a mere "placeholder" in violation of Court directives. <u>Syncora Obj</u>. ¶ 22. | This is addressed in detail in the Reply.  *See* Reply Section II.B. |
| | • The Plan is not based on what PREPA can pay and the legal foundation for the Plan is fatally flawed. <u>Syncora Obj</u>. ¶ 24. | This is addressed in detail in the Reply.  *See* Reply Section I.C. |
| | • The Plan cannot be confirmed regardless of the outcome of the Amended Lien & Recourse Challenge.  <u>Syncora Obj</u>. ¶¶ 32-35. | This is addressed in detail in the Reply.  *See* Reply Section II.B. In addition, the Oversight Board has proposed a Plan that is confirmable under every outcome of the Amended Plan & Recourse litigation the Oversight Board deems to be realistic. *See* Section II.B at page 30 of the Disclosure Statement for a chart outlining the potential recoveries for bondholders depending on the outcome of the litigation.  Syncora's argument assumes the bond parties will prevail on the Lien and Recourse counts *and* they prevail at confirmation that bondholders' liens are worth more than the consideration provided under the plan. But that is an issue that requires factual development. There are numerous scenarios, even by bondholders' own admission, |

| Objection | Argument | Response |
|---|---|---|
| | | where the plan is confirmable, and therefore the Plan is not patently unconfirmable nor a placeholder plan.<br><br>There is no unfair discrimination between bondholders and Fuel Line Lenders because the Fuel Line Lenders assert priority over the bondholders.  Under PROMESA section 301(e) the Oversight Board must consider "whether such claims have priority over other claims" in determining classification under Bankruptcy Code section 1122. The Oversight Board proposes to pay bondholders, including National and Settling Bondholders, under the Plan.  If the Fuel Line Lenders prevailed in their priority assertion, the Oversight Board would have to pay them in full.  Instead, the Oversight Board has determined to settle those claims in a materially reduced amount, thus avoiding the risk involved in the Current Expense Litigation. |
| | • The Plan does not satisfy the best interest of the creditors test. Syncora Obj. ¶ 39. | The best interests test is an issue for confirmation that requires factual development. As addressed in detail in the Reply, this issue cannot render the Plan patently unconfirmable.  *See* Reply Section I.C. |
| Good Faith | • The Plan was not proposed in good faith Syncora Obj. ¶ 45. | The Oversight Board filed a toggle plan as directed by the Court, and as requested by Syncora and other bondholders.  As addressed in detail in the Reply, the Plan is proposed in good faith because it satisfies Title III's requirements.  *See* Reply Section I.D. Nevertheless, this is an issue that would require factual development and therefore is inappropriately raised by bondholders at this juncture.  The Oversight Board will demonstrate at confirmation that the proposal of the Plan meets the good faith standard. |
| Gerrymandering | • The Plan impermissibly gerrymanders Syncora Obj. ¶ 53. | This is addressed in detail in the Reply.  *See* Reply Section I.A. |
| Solicitation | • The settlement offer to bondholders is an improper solicitation in violation of section 1125(e).  Syncora Obj. ¶¶ 61–68. | This is addressed in detail in the Reply.  *See* Reply Section I.F.<br><br>Bondholders agreeing to the settlement offer may still vote to accept or reject the Plan.  Accordingly, there can be no improper solicitation of votes, as no votes were solicited in connection with the settlement offer.  Further, the settlement offer does not allow the Oversight |

| Objection | Argument | Response |
|---|---|---|
| | | Board to seek specific performance to compel votes in favor of or in opposition to the Plan.<br><br>The authority Syncora cites in favor of its position that the Settlement Offer is an "untimely solicitation" concludes in favor of the Oversight Board. The full quote cited by Syncora (Obj. ¶ 65) in *Century Glove* reads:<br><br>We recognize that § 1125(b) bars the untimely solicitation of an "acceptance or rejection," indicating that the same definition applies to both. *A narrow definition might allow a debtor to send materials seeking to prepare support for the plan, "for the consideration of the creditors," without adequate information approved by the court*. Though *such preparatory materials may undermine the purpose of adequate disclosure, the potential harm is limited in several ways*. First, *a creditor still must receive adequate information before casting a final vote*, giving the creditor a chance to reconsider its preliminary decision. The *harm is further limited by free and open negotiations between creditors*. Last, *because they are not "solicitations," pre-disclosure communications may still be subject to the stricter limitations of the securities laws*. 11 U.S.C. § 1125(e). Where, as here, *the creditors are counselled and already have received disclosure about the debtor's business,* there seems little need for additional procedural formalities. *See e.g., In re Northwest Recreational Activities, Inc.*, 4 B.R. 43 (Bankr. N.D.Ga. 1980) (negotiations between debtor and creditor precede § 1125(b) approvals).<br><br>*Century Glove, Inc. v. First American Bank*, 860 F.2d 94, 102 (3d Cir. 1988). The *Century Glove* court's conclusion that solicitation is only a "specific request for an official vote" is consistent with the |

A-31

| Objection | Argument | Response |
|---|---|---|
|  |  | Oversight Board's solicitation process and further explained in Section I.F of this Reply. |
| Adequate Information | • The Disclosure Statement does not contain any analysis on how much PREPA could afford to pay creditors or how proposed electricity rates relate to affordability. Syncora Obj. ¶ 71. | Bankruptcy Code section 1125 expressly negates any requirement to describe alternate plans.  Schedule B of the Amended Plan provides for the Legacy Charge rates. Exhibit P of the Disclosure Statement provides the explanation of the Oversight Board methodology and determination of the Legacy Charge based upon many consideration including affordability and sustainability.

A description of the rates applicable to the various customer classes and exemptions is provided in Part II.B.3.iii of the Disclosure Statement. The Oversight Board maintains, however, that the maximum "affordability" of debt for PREPA is not a relevant inquiry at confirmation. |
|  | • The Disclosure Statement lacks any information that could assist a bondholder in determining whether a Plan is "fair and equitable," or in the "best interests" of creditors. Syncora Obj. ¶ 71. | Syncora does not identify any specific, let alone legitimate, inadequacy of the Disclosure Statement.  The Oversight Board's best interest analysis has been filed as directed by the Court on January 27, 2023.  Whether the Plan is "fair and equitable" is a confirmation issue that requires factual development, and therefore Syncora inappropriately raises it in its objection to the Disclosure Statement. Finally, whether potential distributions through a plan of adjustment are the maximum PREPA can afford to pay are not an element to either disclosure statement approval or plan confirmation.  As a result, the Oversight Board holds no obligation to divulge such information. |
| **Assured Objection** |||
| Adequate Information | • The Disclosure Statement fails to include a description of the swap claims. Assured Obj. ¶¶ 23 – 24. | The Oversight Board has met and conferred with Assured and agreed to add the language in the Disclosure Statement requested by Assured.

1. Summary of Swap Claims: PREPA is currently a party to two interest rate swaps, with JPMorgan Chase Bank N.A. and UBS AG as counterparties, with notional amounts of $169.53 million and $83.34 |

| Objection | Argument | Response |
|---|---|---|
| | | million respectively. Both swaps mature on July 1, 2029. Given that swap payments are calculated periodically, the estimated amount of such payments (including termination damages) is not presently ascertainable.<br><br>2. Language Concerning Potential Settlement of Swap Claims (Disclosure Statement p. 258): The Holder of Assured Insured Interest Rate Swaps Claims shall be entitled to settle claims, rights, and remedies against PREPA arising under the swap agreements and applicable law (including, without limitation, claims arising under the Bankruptcy Code safe harbor provisions). |
| | • The Disclosure Statement does not explain why the Amended Lien & Recourse Challenge is relevant to the Swap recoveries. <u>Assured Obj</u>. ¶¶ 25 – 30. | The Oversight Board has met and conferred with Assured and agreed to add language to the Disclosure Statement as follows:<br><br>The Assured Insured Interest Rate Swap Claims were to have received substantially the same treatment as settled bond claims under the 2019 RSA.  The Assured Insured Interest Rate Swap Claims have the same priority, if any, as the PREPA Revenue Bond Claims, which the Oversight Board believes is the basis for the Plan's provisions affording the swap claims with the same treatment as the bond claims and for the related references in the Plan to the Amended Lien & Recourse Challenge.  The outcome of the Amended Lien & Recourse Challenge, therefore, would impact their recoveries in the same manner it would impact holders of claims in Class 1 or Class 2. |
| | • The Disclosure Statement contains inadequate information regarding the risks and contingencies for distributions to the swap claim holders. <u>Assured Obj</u>. ¶¶ 31 – 34. | The Oversight Board will add a risk factor related to treatment of the of the Assured Insured Interest Rate Swap Claims as follows:<br><br>Payments to the Holder of the Assured Insured Interest Rate Swap Claims are subject to entry of a final order determining the amount, if any, of the allowed claim.  The timing of a settlement or final order on the amount of the claim is uncertain, and may occur after the Effective Date, which would delay distributions to the holder thereof.  To the extent the amount of the Assured Insured Interest |

| Objection | Argument | Response |
|---|---|---|
| | | Rate Swap Claim is unliquidated as of the Effective Date, the Oversight Board will demonstrate at confirmation it has the ability to make payments on such claim if and when such claim is allowed after the Effective Date.  Each Assured Insured Interest Rate Swaps Claim shall be Allowed in an amount to be agreed upon between the Oversight Board and the Holder of such Claim; *provided* that, if no agreement can be reached on the amount of the Assured Insured Interest Rate Swaps Claim to be Allowed, the Oversight Board and Holder of the Claim shall submit such dispute to the Title III Court (or other Person or Entity upon mutual agreement of the Oversight Board and Holder) to determine the amount of such Claim to be Allowed, which amount shall be determined in accordance with applicable law. |
| Voting Procedure | • Holders of matured bonds no longer held through DTC should vote by Ballot rather than through ATOP.  Assured Obj. at ¶¶ 35–37. | The Oversight Board has revised the Proposed PREPA DS Order to permit holders of matured bonds no longer held at DTC to vote by Ballot instead of through ATOP. Proposed PREPA DS Order ¶ 7, FN 7; ¶ 33; ¶ 41; Schedule 3(e). |