UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>The Financial Oversight and Management Board for Puerto Rico,<br><br>  as representative of<br><br>The Commonwealth of Puerto Rico, *et al.*,<br><br>    Debtors.[1] | PROMESA<br>Title III<br><br>Case No. 17-3283-LTS<br><br>**Court Filing Relates Only to PREPA** |
| In re:<br><br>The Financial Oversight and Management Board for Puerto Rico,<br><br>  as representative of<br><br>The Puerto Rico Electric Power Authority,<br><br>    Debtor. | PROMESA<br>Title III<br><br>Case No. 17-4780-LTS<br><br>(Jointly Administered) |

**SUPPLEMENTAL OBJECTION OF SYNCORA GUARANTEE, INC. TO THE MOTION OF PUERTO RICO ELECTRIC POWER AUTHORITY FOR AN ORDER (I) APPROVING DISCLOSURE STATEMENT, (II) FIXING VOTING RECORD DATE, (III) APPROVING CONFIRMATION HEARING NOTICE AND CONFIRMATION SCHEDULE, (IV) APPROVING SOLICITATION PACKAGES AND DISTRIBUTION PROCEDURES, (V) APPROVING FORMS OF BALLOTS AND VOTING PROCEDURES, (VI) APPROVING NOTICE OF NON-VOTING STATUS, (VII) FIXING VOTING AND CONFIRMATION DEADLINES, AND (VIII) APPROVING VOTE TABULATION PROCEDURES**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

Pursuant to the Court's February 13, 2023 order (ECF No. 3210 in Case No. 17-4780-LTS) (the "February 13 Order"), Syncora Guarantee, Inc. ("Syncora") hereby respectfully submits this supplemental objection to the Disclosure Statement for First Amended Title III Plan of Adjustment of the Puerto Rico Electric Power Authority (ECF No. 3201) (the "Disclosure Statement"), and respectfully states as follows:[2]

## SUMMARY OF SUPPLEMENTAL OBJECTION[3]

1. ***The Sequel Is Even Worse.*** On February 9, 2023, the Oversight Board filed the Amended Plan and accompanying Disclosure Statement. The most significant change in the Amended Plan and Disclosure Statement from the initial versions is the disclosure of the terms of the Oversight Board's long-awaited settlement with National Public Finance Guarantee Corporation ("National"). National, like Syncora, is one of the monolines that insured the bonds issued by PREPA (the "National Settlement").[4] Although the Oversight Board touts the National Settlement as progress, the patent defects in the Amended Plan are even more glaring than in the original.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Disclosure Statement and the First Amended Title III Plan of Adjustment of the Puerto Rico Electric Power Authority (ECF No. 3200) (the "Amended Plan"), as applicable. Reference to ECF numbers are to Case No. 17-4780-LTS unless otherwise noted.

[3] On February 3, 2023, Syncora filed its objection to the Disclosure Statement Approval Motion and the initial Disclosure Statement (ECF No. 3190) (the "Initial Syncora Objection"). Syncora is filing this Supplemental Objection solely to address new information that has come to light since that filing.

[4] Syncora insured approximately $100 million of PREPA bonds that have been fully repaid by Syncora, as well as an additional approximate $77 million of PREPA bonds that continue to accrue interest and be paid by Syncora.

2

2. ***National Deal Reeks Of Unfair Discrimination.*** In order to orchestrate the National Settlement, the Amended Plan proposes the creation of two (2) new classes of claims for PREPA Revenues Bonds: Class 5—The National Insured Bond Claims and Class 6—The National Reimbursement Claim (collectively, the "National Claims"). *See* Am. Plan. at § III.A. The Amended Plan then deems the National Claims to be Allowed[5] in their full amount under the Plan and would receive the following treatment: (i) Series B Bonds (just like other holders of PREPA Revenue Bond Claims) issued in the face amount equal to **71.65%** (*unlike* other holders of PREPA Revenue Bonds Claims) of the Allowed National Insured Bond Claims, **plus** (ii) Series B Bonds in the aggregate amount of **5.86%** (*unlike* other holders of PREPA Revenue Bond Claims) of the Allowed National Insured Bond Claims, for a **total of 77.51%** of the Allowed National Insured Bond Claims,[6] **plus** (iii) Series B Bonds in the face amount equal to twenty

---

[5] The National Insured Bond Claims are Allowed in the aggregate amount equal to $836,145,928.13, and the National Reimbursement Claim is Allowed in the aggregate amount equal to the payments made by National after the Petition Date and, as they may continue to be made up to, but not including, the Effective Date to holders of the National Insured Bonds on account of interest accrued on such bonds. ***In other words, the National Reimbursement Claim is for payment of post-petition interest on National Insured Bonds.***

[6] The Oversight Board can also elect to pay this incremental 5.86% of the Allowed National Insured Bond Claims in cash. This 'gift with purchase' is purportedly to compensate National for the reasonable fees and expenses incurred by it during the Title III Case and for the structuring of payments to be made to holders of claims arising from or relating to National Insured Bonds. That's an almost ***$50 million payment*** going to a ***single creditor*** who at all times negotiated exclusively ***for its own recovery***, that provided zero benefit to anyone else, let alone an entire class of creditors. To be clear, **Syncora has no objection to a holder of Bond Claims receiving a 77.51% recovery as a good-faith settlement with PREPA**. It does object, however, to absurd postulates purporting to justify obvious discriminatory treatment that is unfair to all similarly situated creditors. Why doesn't the Oversight Board just admit it is paying **77.51%** to National on account of its National Insured Bond Claims plus an additional amount of post-petition interest on such claims?

3

percent (20.0%) of the amount of the National Reimbursement Claim (*unlike* other monoline insurers of PREPA Revenue Bond Claims).[7]  *See* Plan at §§ VIII.A., II.D.2., and IX.A., respectively.  The Oversight Board proffers no rationale for the disparate treatment of National Claims from other PREPA Revenue Bond Claims.  Syncora submits that, while there could be legitimate reasons to classify a monoline insurer's PREPA Revenue Bond Claims separately so as to facilitate commutation elections for its wrapped bondholders, there is no rationale for PREPA's discriminatory ***treatment*** of otherwise identical PREPA Revenue Bond Claims.

3. ***Omitted Litigation Scenario Was Intentional.***  The Initial Syncora Objection asserted that the original Plan did not comply with the Court's instruction for the Oversight Board to file a plan that would be confirmable whatever the outcome of the Amended Lien & Recourse Challenge.  *See* Initial Syncora Objection at ¶ 22 (pointing out that if the Trustee has a lien on PREPA's future revenues and the arbitrary 56% recovery cap is insufficient to pay the PREPA Bondholders' entitlement, then the Initial Plan "may not be confirmable or feasible without material amendments") (quoting initial Disclosure Statement at 37-38).  Rather than cure this important deficiency, in a recent filing, the Oversight Board explained that it ***intentionally omitted*** the scenario where PREPA Bondholders have a lien on future revenues because it did not deem that scenario "plausible."  *See Omnibus Reply of the Puerto Rico Electric Power Authority to the (I) Adequacy of the Disclosure Statement, (II) Relief Requested in the Disclosure Statement Motion, and (III) Relief Requested in the Confirmation Discovery Procedures Motion* (ECF No.

---

[7] The Oversight Board estimates that 20% payment on the National Reimbursement Claim equals another approximate $50 million on top of the approximate $50 million in fees.

3206), at ¶ 73. The Oversight Board cannot self-select litigation scenarios (under the guise of plan exclusivity) based on its view of creditors' rights; indeed, that is presumably the reason the Court gave its instruction to file a confirmable plan which contemplates all litigation scenarios. What the Oversight Board keeps missing is that it is not writing on a clean slate in this Title III case, with an exclusive right to take a few 'free shots on goal.' The Court imposed a deadline on the Oversight Board because PREPA is approaching its sixth year in bankruptcy with no viable path for emergence thanks to the Oversight Board's flip-flops in legal positions. Yet, the Oversight Board has again admitted it did exactly what the Court asked it not to do: File a placeholder plan that will have to be scrapped entirely if the Court disagrees with the Oversight Board's litigation position.

4. Rather than enhancing the Plan to make it more confirmable (or at least, less 'dead on arrival'), the Oversight Board has actually *exacerbated* and *highlighted* the reasons why it is patently unconfirmable as a matter of law and under this Court's prior instruction.

## ARGUMENT

5. In the Syncora Objection, Syncora noted that the Oversight Board's settlement with the Fuel Line Lenders constituted unfair discrimination among similarly-situated creditors embedded in the initial version of the Plan. The Amended Plan conspicuously doubles down on such unfair discrimination by providing National, as the holder/insurer of PREPA revenue bond claims, a 77.51% recovery on its claims (and by the Oversight Board's own estimate more than 83% recovery if the post-petition interest payment is approved), while it offers a 50% recovery to other similarly situated Bondholders (including monoline insurers) who agree to settle their claims. To add insult to injury, the Oversight Board arbitrarily sets 56% as the recovery cap for Non-

5

Settling Bondholders who litigate and *win* on both the recourse and lien issues. That's right: The Amended Plan proposes to pay National *more* in a "good-faith settlement" than Non-Settling Bondholders can receive if they win.[8]

6.  Notably, the *Settlement Offer Notice to Uninsured Bondholders* distributed on January 27, 2023 (ECF No. 3171) made no mention of the National Settlement or the terms thereof. And even the Oversight Board's solicitation to Syncora,[9] which does reference the National Settlement, only did so for purposes of ensuring Syncora would receive "customary monoline accommodation provisions," while continuing to offer a 50% settlement. Without realizing it, the Oversight Board has admitted through the Syncora solicitation that the materially higher ***treatment*** for National (77.51% vs 50.0%) has nothing to do with National's status as a monoline insurer.

7.  The unfair discrimination standard prevents creditors "with similar legal rights from receiving materially different treatment under a proposed plan without compelling justifications for doing so." *In re Hermanos Torres Perez Inc.*, 2011 WL 5854929, at *9 (Bankr. D.P.R. Nov. 21, 2011); *see also In re LightSquared Inc.*, 513 B.R. 56, 99 (Bankr. S.D.N.Y. 2014) ("The purpose of the requirement is to ensure that a dissenting class will receive relative value

---

[8] The Oversight Board has had ample time to formulate a purported rationale since it announced the National Settlement months ago, yet the Court will not find one in the Disclosure Statement.

[9] A copy of the February 14, 2023 solicitation to Syncora (via counsel) is attached hereto as Exhibit A. Syncora wishes to make clear that despite the "Privileged and Confidential" stamp on the solicitation, this was not an offer made in mediation, no communications were made with Syncora about the offer other than this email, and the Mediation Team was not even copied on the solicitation. Syncora submits nothing in the solicitation is confidential as the communication is what the Oversight Board advertised it would be sending in the Disclosure Statement (as cross-referenced in the communication) and on the first page of the public *Notice to Uninsured Bondholders* referenced above.

equal to the value given to all other similarly situated classes."). The Court would be hard-pressed to find a more blatant form of unfair discrimination among holders of the *same instrument with the same legal rights* than the Oversight Board proposes to provide in the Plan. Syncora challenges the Oversight Board to name a single precedent to defend this unfair discrimination gambit in its final reply in support of the Disclosure Statement.

8. Critically, unlike the Commonwealth Title III case and plan of adjustment, this is not a situation where holders of PREPA bonds have different risk profiles based upon the unique challenges to the bonds they held. The Oversight Board offers no justification (let alone a convincing one) for the disparate treatment among holders of PREPA revenue bond claims based upon any unique legal risks or rights. The Oversight Board does not have a magic wand to remove critical statutory protections from creditors, and it cannot make the "unfair discrimination" standard disappear from the Bankruptcy Code.

9. Syncora, a monoline insurer of PREPA bonds like National, is not aware of any legal grounds that would justify the disparate treatment between a creditor who holds an uninsured bond and the monoline that insures the bonds. Certainly, none of the plans of adjustment in which Syncora participated in these jointly-administered cases contained disparate *treatment* of a bond claim *by the debtor* based upon whether or not the bond claim was insured. Any differences in bondholder outcomes in those other plans was a result of how the *monoline* proposed to treat holders of *its* insured bonds—the monolines' contract counterparties—to resolve their relationships with third parties (*e.g.,* commutation, acceleration, creation of trusts, etc.).[10] The

---

[10] Most financial guaranty policies provide that a bond issuer's default, including non-payment or an issuer's bankruptcy filing, does not accelerate the payment of the insured bond by

debtor was (and should be) agnostic as to whether a particular bond claim was insured or uninsured because the rights vis-à-vis the debtor are identical as between uninsured and insured bondholders.

10. By contrast, the Amended Plan here provides extreme differences in the treatment of claims based not only on whether the bond is insured, but whether it was insured by a particular monoline. Moreover, the Amended Plan goes so far as to propose different treatment to bonds that were insured by National depending on whether or not National has sold, assigned, and transferred its interests and rights to third-party buyers. *See* Amended Plan at §I.A.148 (definition of National Insured Bonds). In other words, the treatment provided to a holder of a National insured bond claim will change depending on the owner of the claim. There is a simple reason why the Oversight Board offers no justification for the unfair and discriminatory treatment between holders

---

the monoline insurer. Rather, following such a default and an acceleration of the issuer's payment obligations under the operative bond documents, the monoline is generally required to make only regularly scheduled payments of principal and interest as and when such payments would otherwise be due in the absence of an acceleration. As a result of this tripartite relationship among the issuer, the monoline insurer and the holder of insured bonds, a bankruptcy plan involving financial guaranty insurers often provides the monoline with the plan consideration distributed on account of its insured bond claim from the debtor with monoline remaining liable to its insureds for the duration and under the terms of the original governing bond documents. Consequently, the monoline will often offer its insured an option to receive an accelerated distribution of the plan consideration plus some form of commutation consideration in lieu of the insurer's ongoing payment obligations and an insured may be incentivized to prefer to settle its outstanding claims with its insurer rather than take the long-term credit risk of the insurer. *See Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*, dated December 20, 2021 (ECF No. 19568 in Case No. 17-3283), at Art. LXXV (Provisions Regarding Assured Insured Bonds, National Insured Bonds, Syncora Insured Bonds, Ambac Insured Bonds and FGIC Insured Bonds).

of Class 1 claims (Settling Bondholder and Settling Monoline Claims) and Class 5 claims (National Insured Bond Claims); namely, there is none.[11]

11. In what can only be described as a weak attempt to distract viewers from the brazen unfair discrimination in Class 5, the Oversight Board purports to take a higher road when creating Class 6.[12] Class 6 on its face (without even needing to compare it to another class) recognizes a novel category of claim (called the National Reimbursement Claim), in order to attempt a distribution that is incompatible with the Bankruptcy Code and PROMESA. First, the allowance and treatment of the National Reimbursement Claim constitutes payment of post-petition interest to National that is not provided to any other bondholder or monoline. Second, the allowance of the National Reimbursement Claim violates section 509(c) of the Bankruptcy Code by providing payment of the National Reimbursement Claims before holders of the underlying National Insured Bonds are paid in full. *See* 11 U.S.C. § 509(c) ("The court shall subordinate to the claim of a creditor and for the benefit of such creditor an allowed claim, by way of subrogation under this section, or for reimbursement or contribution, of an entity that is liable with the debtor on, or that has secured, such creditor's claim, until such creditor's claim is paid in full, either through payments under this title or otherwise.").

---

[11] *See* Amended Plan at § 1.A.227 (defining Settling Monoline to mean "a Monoline Insurer (*other than National*) that, by the Settlement Offer Deadline, became party to a Monoline Settlement Agreement.") (emphasis added).

[12] The Oversight Board recognizes the inherent unfairness in the allowance and treatment it proposes to provide only to the National Reimbursement Claim, and voluntary offers to excise it. *See* Amended Plan §§ IX.B. and XVIII.I. (providing for the proposed treatment of the National Reimbursement Claim to be eliminated if the Court does not approve its allowability and treatment). The Oversight Board's inclusion of Class 6 alone mimics life in the bazaar: "***You make a good point about Class 6, so just let me have Class 5 and we'll call it a deal.***"

9

12. As acknowledged in the Initial Syncora Objection, finding that a plan is unconfirmable as a matter of law at the disclosure statement stage is generally a very high bar to meet. The Amended Plan, however, easily breaks the boundaries of what any plan proponent could propose in good faith. Moreover, while the Oversight Board appears to believe that it has an unlimited number of "free shots" in this case, this behavior is unfair to creditors who are being kept at bay by the automatic stay. The cost of pursuing a patently unconfirmable plan only to learn in July that the plan must fail is simply too high for all stakeholders. Accordingly, the Court should decline to approve the Disclosure Statement and, if it deems appropriate, the Court should provide the Oversight Board with one final opportunity to propose a confirmable plan. And since the Oversight Board did not hear it the first time, the Court should make clear that failing to do so will result in real consequences, such as dismissal of this Title III case or lifting the stay to facilitate the appointment of a receiver. Absent real consequences, the Oversight Board will continue to view the Title III process as a perpetual free option to attempt to evade legal requirements.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## **CONCLUSION**

WHEREFORE, Syncora respectfully requests that the Court deny the Disclosure Statement Approval Motion, and provide Syncora such other and further relief as the Court deems appropriate.

DATED: February 17, 2023

Respectfully submitted,

| | |
|---|---|
| REICHARD & ESCALERA | QUINN EMANUEL URQUHART & SULLIVAN, LLP |
| By : */s/ Rafael Escalera*<br>**Rafael Escalera**<br>USDC No. 122609<br>escalera@reichardescalera.com | **Susheel Kirpalani** (*pro hac vice*)<br>susheelkirpalani@quinnemanuel.com |
| **Sylvia M. Arizmendi**<br>USDC-PR 210714<br>arizmendis@reichardescalera.com | **Daniel Salinas**<br>USDC-PR 224006<br>danielsalinas@quinnemanuel.com |
| **Carlos R. Rivera-Ortiz**<br>USDC-PR 303409<br>riverac@reichardescalera.com | **Eric Kay** (*pro hac vice*)<br>erickay@quinnemanuel.com |
| | **Kate Scherling** (*pro hac vice)*<br>katescherling@quinnemanuel.com |
| 255 Ponce de León Avenue<br>MCS Plaza, 10th Floor<br>San Juan, Puerto Rico 00917-1913 | 51 Madison Avenue, 22nd Floor<br>New York, New York 10010-1603 |

*Co-Counsel for Syncora Guarantee, Inc.*

**CERTIFICATE OF SERVICE**

   I hereby certify that on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel for the parties of record.

*/s/Carlos R. Rivera-Ortiz*
USDC-PR 303409

**EXHIBIT A**

| | |
|---|---|
| **From:** | Esses, Joshua <JEsses@proskauer.com> |
| **Sent:** | Tuesday, February 14, 2023 8:07 PM |
| **To:** | Susheel Kirpalani |
| **Cc:** | Barak, Ehud; Possinger, Paul V.; Desatnik, Daniel |
| **Subject:** | Oversight Board Settlement Offer to Syncora |

**[EXTERNAL EMAIL from jesses@proskauer.com]**

Privileged & Confidential, subject to FRE 408

Susheel,

As you know, on February 9, 2023, the Oversight Board filed the *First Amended Title III Plan of Adjustment of the Puerto Rico Electric Power Authority* [Case No. 17-bk-4780, ECF No. 3200] (the "Plan") and a corresponding disclosure statement.

Article IV of the Plan sets forth the treatment to be provided to Settling Bondholders and Settling Monolines who accept the Oversight Board's settlement offer by the Settlement Offer Deadline of February 24, 2023 at 4:00 p.m. (ET). As explained in further detail in the Plan and the disclosure statement, Settling Bondholders and Settling Monolines are to receive cash and Series B Bonds in the nominal amount of 50% of the value of their claim. Settling Bondholders will also receive upside in the form of (i) additional Series B Bonds if the Oversight Board is successful in its prosecution of the Amended Lien & Recourse Challenge and (ii) CVI.

As explained in the Disclosure Statement, the Oversight Board hereby offers to settle Syncora's PREPA Revenue Bond Claims for the recoveries set forth in Article IV of the Plan and as detailed in the foregoing paragraph. Please let us know by no later than February 21, 2023, if you would like to settle your claims and become a "Settling Monoline" under the Plan, and we will provide a draft settlement agreement for your review. The settlement agreement will be similar in all respects (including the same recovery) to the settlement agreement provided to all uninsured bondholders but would also include the customary monoline accommodation provisions, consistent with the Title III plans for the Commonwealth and HTA, and with the Plan's current accommodations with respect to National.

Best,
Josh

**Joshua A. Esses**
Associate - Business Solutions, Governance, Restructuring & Bankruptcy Group

Proskauer
Eleven Times Square
New York, NY 10036-8299
d 212.969.3667
c 203.912.2064
jesses@proskauer.com

****************************************************************************************
****************************************************
This message and its attachments are sent from a law firm and may contain information that is confidential and

1

protected by privilege from disclosure.
If you are not the intended recipient, you are prohibited from printing, copying, forwarding or saving them.
Please delete the message and attachments without printing, copying, forwarding or saving them, and notify the sender immediately.
*********************************************************************************
*************************************************