**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO *et al.*,<br><br>Debtors.[1] | PROMESA Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Debtor. | PROMESA Title III<br><br>No. 17 BK 4780-LTS<br><br>(Jointly Administered) |

**SUPPLEMENTAL OBJECTION AND RESERVATION OF
RIGHTS OF PREPA BOND TRUSTEE REGARDING MOTION
FOR APPROVAL OF DISCLOSURE STATEMENT FOR FIRST
AMENDED TITLE III PLAN OF ADJUSTMENT OF THE
<u>PUERTO RICO ELECTRIC POWER AUTHORITY</u>**

**<u>[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]</u>**

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's Federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 04780-LTS) (Last Four Digits of Federal Tax ID: 3747).

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. THE PREPA BONDHOLDER CLASSIFICATION SHOULD SIMPLY ALIGN WITH THE TRUST AGREEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III. THE AMENDED DISCLOSURE STATEMENT FAILS TO PROVIDE ADEQUATE INFORMATION TO HOLDERS OF INSURED NATIONAL BONDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

IV. THE AMENDED DISCLOSURE STATEMENT AMENDMENTS REGARDING THE SERIES B BONDS AND THE CVI DO NOT REMEDY THE INADEQUATE INFORMATION PROBLEM . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## TABLE OF AUTHORITIES

**Cases**                                                                                                                    **Page(s)**

*Fin. Oversight & Mgmt. Bd. for Puerto Rico v. U.S. Bank National Association as Trustee*, Adversary Proceeding No. 19-00391-LTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

*In re Chateaugay Corp.*, 89 F.3d 942 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*In re Corcoran Hosp. Dist.*, 233 B.R. 449 (Bankr. E.D. Cal. 1999) . . . . . . . . . . . . . . . . . . . 3

*In re Dow Corning Corp.*, 244 B.R. 634 (Bankr. E.D. Mich. 1999) . . . . . . . . . . . . . . . . . . . 3

*In re Wash. Mut., Inc.*, 442 B. R. 314 (Bankr. D. Del. 2011) . . . . . . . . . . . . . . . . . . . . . . . 3

U.S. Bank National Association, in its capacity as trustee (the "**PREPA Bond Trustee**") under the terms of that certain Trust Agreement dated as of January 1, 1974 (as amended and supplemented, the "**Trust Agreement**"),[2] respectfully submits this Supplemental Objection and Reservation of Rights to the *Motion for an Order (I) Approving Disclosure Statement, (II) Fixing Voting Record Date, (III) Approving Confirmation Hearing Notice and Confirmation Schedule, (IV) Approving Solicitation Packages and Distribution Procedures, (V) Approving Forms of Ballots and Voting Procedures, (VI) Approving Notice of Non-Voting Status, (VII) Fixing Voting and Confirmation Deadlines, and (VIII) Approving Vote Tabulation Procedures* [ECF No. 3113] filed by the Financial Oversight and Management Board for Puerto Rico (the "**Oversight Board**") as it relates to the Disclosure Statement for First Amended Title III Plan of Adjustment of the Puerto Rico Electric Power Authority (the "**Amended Disclosure Statement**") [ECF No. 3201] and proposed First Amended Title III Plan of Adjustment of Puerto Rico Electric Power Authority (the "**Amended Plan**") [ECF No. 3200].

I. INTRODUCTION

The Amended Plan and Amended Disclosure Statement do little, if anything, to address the prior objections of the PREPA Bond Trustee.[3] [ECF No. 3187]. The Amended Plan continues to divide PREPA Bondholders into subclasses, attempting to break up the claims and lien rights held in trust by the PREPA Bond Trustee without regard to the governance, intercreditor, and distribution provisions of the Trust Agreement. And it now includes another dramatically

---

[2] References herein to the Trust Agreement are to the conformed version filed in *Fin. Oversight & Mgmt. Bd. for Puerto Rico v. U.S. Bank National Association as Trustee*, Adversary Proceeding No. 19-00391-LTS ("**Adversary 391**") [Joint Informative Mot., Ex. A, ECF No. 118]. Capitalized terms not otherwise defined herein have the meaning ascribed to them in the Amended Plan or Amended Disclosure Statement.

[3] A narrow exception concerns the distribution of Federal Subsidy Amounts held by the PREPA Bond Trustee in the Sinking Fund. The Amended Plan addresses the PREPA Bond Trustee's prior objection by clarifying that the distribution of these amounts will be made in accordance with the Trust Agreement (rather than pro rata).

1

different interim offer to the new Class 5 National Bond Claims with the possibility of yet further PREPA Bondholder settlement subclasses in the future. At the same time, the Amended Disclosure Statement remains vague and ambiguous on key issues relating to the Series B Bonds and CVI in ways that clearly do not satisfy the disclosure requirements of Section 1125 and are no substitute for disclosure of the full New Master Trust Indenture at this time.

In addition to compounding the existing classification problems, the Oversight Board's settlement with National Public Finance Corporation ("**National PSA**" and "**National**" respectively) adds to the disclosure shortcomings. The Oversight Board should be required to disclose the basis in National's underlying policies or related agreements for the rights conferred by the Amended Plan (i) to accelerate the indebtedness evidenced by the PREPA Bonds insured by National ("**Insured National Bonds**" and their holders "**Insured National Bondholders**"),[4] (ii) to require a commutation settlement response from Insured National Bondholders in order to avoid compulsory settlement of policy rights, and (iii) for National to receive directly and to retain "some or all" of the Class 5 Plan consideration for the National Insured Bond Claims.[5] Separately, the PREPA Bond Trustee continues to join in the positions asserted by the Ad Hoc Group of PREPA Bondholders that the Amended Plan is patently unconfirmable on the legal grounds set forth in its original and supplemental objections.

---

[4] The underlying monoline policies were issued by MBIA Insurance Corporation or Financial Insurance Guaranty Corporation and have been assumed by National or National has otherwise succeeded as the monoline insurer. A list of the CUSIPs for Insured National Bonds is attached as a schedule to the National PSA that is Exhibit N to the Amended Disclosure Statement.

[5] The PREPA Bond Trustee does not dispute that National is entitled to vote the claim evidenced by the Insured National Bonds by reason of PROMESA § 301(c)(3) in a properly classified plan.

2

### II. THE PREPA BONDHOLDER CLASSIFICATION SHOULD SIMPLY ALIGN WITH THE TRUST AGREEMENT.

In its Omnibus Reply ("**Reply**"), the Oversight Board argues that it has unfettered discretion to split up the PREPA Bond lien and claim rights of the PREPA Bond Trustee being litigated in Adversary 391 into any number of classes because Section 1122(a) does not expressly prohibit it. [ECF No. 3206]. This overstates the law. Putting aside whether the strict classification rule under *Granada Wines* applies here, the Court clearly has discretion at the disclosure statement stage to require that the classification of PREPA Bond claims be made on a legitimate basis consistent with applicable law and the purposes of Title III. *In re Chateaugay Corp.*, 89 F.3d 942, 949 (2d Cir. 1996) ("to warrant having separate classification of similar claims, the debtor must advance a legitimate reason supported by credible proof"). Here, the Oversight Board's classification and disparate treatment of Class 1, Class 2 and Class 5 fail that test.

With respect to Class 1, the classification is not legitimate or reasonable because the individual PREPA Bondholders solicited by the Oversight Board do not have the right to split off and settle "their portion" of the PREPA Bond Trustee's rights.[6] The Oversight Board cites no case in which pari passu bondholder claims under a single indenture are split into plan subclasses based upon a purported settlement of claims done in violation of the applicable indenture. The cases cited by the Oversight Board that used settlement as a basis for classification involved creditors who had the right to settle their individual claims under applicable nonbankruptcy law. [Reply at 19 (citing *In re Dow Corning Corp.*, 244 B.R. 634 (Bankr. E.D. Mich. 1999); *In re Wash. Mut., Inc.*, 442 B. R. 314 (Bankr. D. Del. 2011); *In re Corcoran Hosp. Dist.*, 233 B.R. 449 (Bankr. E.D. Cal. 1999))]. Similarly, the Oversight Board cites no case in which a court has

---

[6] The Class 1 Settlement Agreement with Class 1 expressly purports to settle the respective rights and claims as set forth in the Amended Lien and Recourse Challenge, i.e., Adversary 391, which individual Bondholders do not have the right to do under the governing Trust Agreement.

3

approved a classification of subclasses of pari passu bonds issued under a single indenture where one subclass receives additional compensation if pending litigation brought on behalf of all bondholders is unsuccessful or based upon how many bondholders elect into the class. What the Oversight Board has proposed with Class 1 appears to be an unprecedented extension of Section 1122(a).

The Oversight Board defends the Class 1 bifurcation partially on the grounds that the Settlement Offer has been extended to all uninsured PREPA Bondholders. But that is not how the governance provisions of the Trust Agreement work and, in any event, the Oversight Board has now offered a different, less risky treatment to National, rendering its "equal opportunity" argument a nullity, not to mention creating an unfair discrimination problem in the process. The Oversight Board also inappropriately invokes the 2019 RSA as justifying Class 1 here, but that agreement was backed by a 94% Bondholder direction to (and exculpation of) the PREPA Bond Trustee and provided a comprehensive settlement of all Bondholder claims. Finally, the Oversight Board equates an individual Bondholder's rights to vote in bankruptcy and to sell their bond positions with a right to settle claims held by the PREPA Bond Trustee for the benefit of all Bondholders.[7] However, the PREPA Bonds of the settling bondholders are not being purchased, so any argument based on such a hypothetical is unavailing. Instead, the Class 1 Bonds remain outstanding, and the PREPA Bond Trustee continues to have duties to all Bondholders with some having completely adverse interests.

The Class 1/Class 2 bifurcation cuts against the grain of the Trust Agreement and makes no practical sense. The paramount goal of claim classification should be to promote a potential consensual plan through a relevant and controlling affirmative plan vote. Like most indentures,

---

[7] The PREPA Bond Trustee acknowledged in its initial Objection that it does not have the right to vote the PREPA Bond Claims in Title III.

4

the Trust Agreement includes provisions that virtually preclude consensual restructuring outside of Title III or Title VI—such as the requirement of 100% Bondholder consent to change interest rate and principal payment terms, let alone to accept replacement Series B Bonds and CVI. [Trust Agreement § 1102]. By continually subdividing PREPA Bondholders into subclasses based upon their acceptance of variable interim settlement offers, the Oversight Board fails to seek what is needed: an accepting vote by a single class of Bondholders.

The Oversight Board's one-off settlement approach not only assures a cramdown fight, but also sets the stage for other unproductive disputes about how the Trust Agreement's governance, intercreditor, and distribution provisions are affected. Areas of concern include whether Settling Class 1 PREPA Bondholders are still included in the Trust Agreement's governance-by-consent provisions and have input in how the PREPA Bond Trustee conducts Adversary 391 or whether it should object to confirmation of the Amended Plan. The prospect for such disputes is obviously problematic because the Oversight Board has fitted Class 1 with a directly conflicting right to benefit from the PREPA Bond Trustee's loss in Adversary 391. Other areas of concern include whether the PREPA Bond Trustee, who receives Series B Notes for both Class 1 and Class 2 under Article XXIV.E of the Amended Plan, will be required by the confirmation order to violate the pro rata distribution provisions of Section 805 of the Trust Agreement, and, if so, whether the PREPA Bond Trustee will be exculpated for doing so (which is currently not provided). There also may be disputes about the scope or enforceability of subclass settlements. These are problems apart from the obvious unfair discrimination objections that result from the Oversight Board offering different deals to holders of the same PREPA Bonds. If the goal is to reach a consensual Title III plan supported by an affirmative vote of PREPA Bondholders, the Court should require the Oversight Board to classify PREPA Bondholders together and to limit the separate classification of National's Class 5 claims to solving the

5

custodial trust issues associated with combining plan and insurance policy distributions for insured PREPA Bondholders. The Court also should not allow the Oversight Board to use Class 5 as a basis for providing materially different or better terms for identical PREPA Bond claims or for precluding the holders of Insured National Bonds from asserting their rights to the extent they have been retained.

### III. THE AMENDED DISCLOSURE STATEMENT FAILS TO PROVIDE ADEQUATE INFORMATION TO HOLDERS OF INSURED NATIONAL BONDS.

National is the insurer under a number of monoline payment insurance policies (the "**Policies**") for PREPA Bonds with a combined face value of $815,250,000 issued and outstanding under the Trust Agreement at this time. U.S. Bank in connection with its role as the PREPA Bond Trustee is a party to separate agreements with PREPA and serves as paying agent or fiscal agent regarding the Policies.[8]

The Amended Plan classifies the National Insured Bond Claim in Class 5 as being an allowed claim of $836,145,928.13 and provides for National to receive 71.65% of that amount in the form of Series B Bonds.[9] Under the terms of the National PSA, National is also to receive an additional 3% of the National Insured Bond Claim ($25,084,377.84) for "Consummation Costs" and an additional 2.86% of the National Insured Bond Claim ($23,913,773.54) as a "Structuring Fee," both in the form of Series B Bonds or cash.

Article XX of the Amended Plan provides that all Class 5 distributions go directly to National and authorizes National to use PREPA's Title III plan to "treat" its Policy obligations to Insured National Bondholders in various ways:

---

[8] The PREPA Bond Trustee has only the duties set forth in the Trust Agreement or other related agreement to which it is party and expressly disclaims any additional duties to any person or entity that are not expressly set forth therein with respect to Insured National Bonds or the Policies or otherwise.

[9] This Objection does not address the treatment of the Class 6 National Reimbursement Claim.

6

1) National is granted the right to pay the accelerated obligations evidenced by the Insured National Bonds as opposed to the regularly scheduled PREPA Bond payments (which have not yet been otherwise accelerated).

2) Insured National Bondholders are subject to a commutation offer through an ATOP election at DTC to "commute" or settle their Policy rights for a discounted amount that National will disclose 7 days before the Plan voting and objection deadline. Errors and nonresponses are deemed acceptances.

3) For Insured National Bondholders who affirmatively elect non-commutation treatment, the Amended Plan provides National with an option to create either (i) a "custodial trust" or (ii) an "escrow" for their benefit. National is designated as the initial recipient of consideration for the Insured National Bonds under Class 5 and is required to deposit the National Trust Consideration or the National Escrow Consideration (as the case may be) into a custodial trust or an escrow, but neither definition is clear about what consideration National may retain for its own account (whether Series B Bonds, CVI, the Consummation Costs, or the Structuring Fee).

4) National is designated as a Released Party without a provision making clear that any general release, discharge, exculpation or injunction does not limit rights under the Policies, such as is provided in Section 41(c) of the HTA Plan.

In addition to including the HTA Plan limitation in the general release, discharge, exculpation and injunction provisions of the Amended Plan to preserve monoline insurance, the Amended Disclosure Statement should include disclosures about the basis, if any, in the relevant underlying National Policies or other agreements or applicable law that supports granting the above rights to National and should also require National to clarify specifically how the National Consideration will be used in an escrow or custodial trust to protect the interests of Insured

7

National Bondholders. Such disclosures are appropriate to allow Insured National Bondholders to protect their interests, if any, in the Title III confirmation process.

### IV. THE AMENDED DISCLOSURE STATEMENT AMENDMENTS REGARDING THE SERIES B BONDS AND THE CVI DO NOT REMEDY THE INADEQUATE INFORMATION PROBLEM.

The Series B Bonds' value depends upon the specific terms and remedies to be set forth in the New Master Trust Indenture when it is drafted. Because creditors need to determine whether the New Bonds are good faith debt instruments and their value, the Oversight Board should be required to file the New Master Trust Indenture before the Amended Disclosure Statement is approved. This is not routine plan documentation to be produced in the ordinary course. It is instead an attempt to address a legacy cost that has already been the subject of several failed settlement efforts. Greater transparency regarding the New Master Trust Indenture's terms is therefore necessary.

Moreover, the Amended Disclosure Statement has now confirmed that the Reorganized PREPA has no obligation to seek rate increases or control Operating Expenses so as to generate sufficient Net Revenues to pay the Series B Bonds. Instead, the Oversight Board references only Puerto Rico Energy Bureau's duty under Section 6.3(p) of Act 57-2014, as amended by Act 17-2019, to set rates in a manner that complies with the Reorganized PREPA's "obligations to its bondholders." The Oversight Board relies on a statutory obligation that will need to be modified in light of the Amended Plan (to, for example, allow for Legacy Charges), but beyond that, the Amended Disclosure Statement fails to adequately explain what obligations (if any) the Reorganized PREPA has to holders of the New Bonds to set non-Legacy Charge rates at a level sufficient to pay Operating Expenses.

There are other ways in which the Amended Disclosure Statement makes less clear what value the Series B Bonds and CVI may have. On page 286 of the redlined Amended Disclosure

8

Statement, for example, the Oversight Board has added language to the description of the Payment Waterfall indicating that payments to the New Master Trustee for deposit to the Debt Service Fund will be limited to the amount sufficient to pay debt service on all outstanding New Bonds. This new language raises questions about whether the New Bonds will be paid down to the full extent possible from Net Revenues up to the amount of Legacy Charges without being limited by any amortization limitations the New Bonds may contain. The absence of such a limitation is the only way that the CVI would ever have any value.

The Amended Disclosure Statement also fails to clarify the Oversight Board's understanding of how Operating Expenses of the Reorganized PREPA will be determined, especially in light of the anticipated transformation process and the Oversight Board's new position that under the existing Trust Agreement PREPA has sole discretion to classify any expense as a Current Expense. Bondholders should not have to guess at what the Oversight Board intends: the Oversight Board should clearly disclose what categories of expenses are and are not permitted to be paid ahead of the Series B Bonds. The Oversight Board has added open-ended terms to the definition of Operating Expenses in the Amended Plan that appear to permit capital expenses and other amounts to be paid ahead of the Series B Bonds, even though capital expenses are behind the Series B Bond payments in the Payment Waterfall. Moreover, the revised Interest Rate Covenant described on page 289 of the redlined Amended Disclosure Statement affords no protection for the payment of principal on the Series B Bonds, and the existing limitations on remedies remain. Nevertheless, the Amended Disclosure Statement continues to imply that the Series B Bonds represent a full percentage recovery in whatever face amount they are distributed, notwithstanding the many missing or incomplete terms. Any consensual plan will undoubtedly require the Oversight Board to address the weaknesses and gaps in the Series B Bonds and CVI,

9

and for that reason it makes sense for the full New Master Trust Indenture to be disclosed sooner rather than later.

The PREPA Bond Trustee expressly reserves all rights with respect to confirmation objections, and nothing herein is intended as a waiver of any position taken in the initial Objection or in Adversary 391.

We hereby certify that, on this same date, we electronically filed the foregoing with the clerk of the Court using the CM/ECF system, which will notify the attorneys of record.

**RESPECTFULLY SUBMITTED,**

In San Juan, Puerto Rico, today February 17, 2023.

| **RIVERA, TULLA AND FERRER, LLC** | **MASLON LLP** |
|---|---|
| By: /s Eric A. Tulla<br>Eric A. Tulla, USDC-DPR No. 118313<br>Rivera Tulla & Ferrer Building<br>50 Quisqueya Street<br>San Juan, PR 00917-1212<br>Tel: (787)753-0438<br>Fax: (787)767-5784<br>Email: etulla@riveratulla.com | By: /s Clark T. Whitmore<br>Clark T. Whitmore (admitted *pro hac vice*)<br>Michael C. McCarthy (admitted *pro hac vice*)<br>John T. Duffey (admitted *pro hac vice*)<br>Jason M. Reed (admitted *pro hac vice*)<br>90 South Seventh Street, Suite 3300<br>Minneapolis, MN 55402<br>Telephone: 612-672-8200<br>Facsimile: 612-642-4800<br>Email:  clark.whitmore@maslon.com<br>          mike.mccarthy@maslon.com<br>          john.duffey@maslon.com<br>          jason.reed@maslon.com<br><br>**ATTORNEYS FOR U.S. BANK NATIONAL ASSOCIATION, IN ITS CAPACITY AS TRUSTEE** |