UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

```
------------------------------------------------------------------------ x
                                                             :
In re:                                                       :
                                                             :
THE FINANCIAL OVERSIGHT AND                                  :   PROMESA
MANAGEMENT BOARD FOR PUERTO RICO,                            :   Title III
                                                             :
         as representative of                                :   Case No. 17-BK-3283 (LTS)
                                                             :
THE COMMONWEALTH OF PUERTO RICO, et al.,                     :   (Jointly Administered)
                                                             :
         Debtors.                                            :
------------------------------------------------------------------------ x
                                                             :
In re:                                                       :
                                                             :
THE FINANCIAL OVERSIGHT AND                                  :   PROMESA
MANAGEMENT BOARD FOR PUERTO RICO,                            :   Title III
                                                             :
         as representative of                                :   Case No. 17-BK-4780 (LTS)
                                                             :
PUERTO RICO ELECTRIC POWER AUTHORITY, et al.,                :
                                                             :
         Debtors.                                            :
------------------------------------------------------------------------ x
```

**SUPPLEMENTAL OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN RESPONSE TO DISCLOSURE STATEMENT FOR FIRST AMENDED TITLE III PLAN OF ADJUSTMENT OF THE PUERTO RICO <u>ELECTRIC POWER AUTHORITY</u>**

## TABLE OF CONTENTS

                                                **Page**

PRELIMINARY STATEMENT ............................................................................................... 1

SUPPLEMENTAL BACKGROUND ...................................................................................... 3

SUPPLEMENTAL OBJECTION............................................................................................. 5

I.     AMENDED DISCLOSURE STATEMENT DOES NOT PROVIDE
      ADEQUATE INFORMATION ABOUT NATIONAL SETTLEMENT.......................... 5

      A.     Amended Disclosure Statement Understates National's Recovery ....................... 5

      B.     Amended Disclosure Statement Fails to Disclose Terms of, and Basis for,
            National Settlement.................................................................................................. 6

      C.     National Settlement Adds Additional Contingencies to First Amended
            Plan, Thereby Making Amended Disclosure Statement *More* Complicated,
            Not Less ................................................................................................................... 7

II.    OTHER MODIFICATIONS AND ADDITIONS TO AMENDED DISCLOSURE
      STATEMENT ARE INADEQUATE............................................................................... 9

      A.     Amended Disclosure Statement Does Not Explain Basis for Estimate of
            General Unsecured Claims ..................................................................................... 9

      B.     Amended Disclosure Statement Does Not Explain PREPA's Supposed
            "Full Discretion" Over Current Expenses............................................................. 10

      C.     Disclosures Regarding Legacy Charge Remain Inadequate ................................ 10

To the Honorable United States District Judge Laura Taylor Swain:

The Official Committee of Unsecured Creditors (the "Committee") respectfully files this supplemental objection (the "Supplemental Objection") to the *Disclosure Statement for First Amended Title III Plan of Adjustment of the Puerto Rico Electric Power Authority* [Docket No. 23507] (the "Amended Disclosure Statement").[1] In support of this Supplemental Objection,[2] the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1. The Amended Disclosure Statement introduces a new and critical settlement, *i.e.*, the Oversight Board's settlement with National. However, instead of reducing or resolving contingencies, this settlement only adds **more** contingencies to the First Amended Plan, while simultaneously raising important, and unanswered, questions about the terms of, as well as legal and factual basis for, the settlement itself. Indeed, it is bizarre—to put it mildly—for the Oversight Board to offer National an aggregate recovery in excess of **83%** (regardless of the outcome of the Amended Lien & Recourse Challenge), while taking the position in the Amended Lien & Recourse Challenge (which position the Committee supports) that National has no claims at all, other than a claim secured by the very limited funds in the Sinking Fund. The National settlement thus causes the Committee to begin to question whether the First Amended Plan is even proposed in good faith. In light of the foregoing, the Committee respectfully submits that

---

[1] Concurrently with the Amended Disclosure Statement, the Oversight Board filed the *First Amended Title III Joint Plan of Adjustment of the Puerto Rico Electric Power Authority* [Docket No. 23506] (the "First Amended Plan"). Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the First Amended Plan, the Amended Disclosure Statement, or the *Omnibus Objection of Official Committee of Unsecured Creditors to (I) Disclosure Statement for Title III Plan of Adjustment of Puerto Rico Electric Power Authority and (II) Related Motions* [Docket No. 23477] (the "Preliminary Objection"), as applicable.

[2] This Supplemental Objection addresses only those issues and inadequacies that are new to, and arise from, the modifications to the Amended Disclosure Statement and the First Amended Plan. This Supplemental Objection is not intended to advance additional arguments in further support of the arguments raised in the Committee's Preliminary Objection, or to respond to the arguments made in the Oversight Board's reply [Docket No. 23517] (the "Reply"). The Committee reserves all rights with respect thereto.

1

the Amended Lien & Recourse Challenge needs to be resolved ***before*** a plan goes out for a vote—otherwise, the Oversight Board can simply continue to put forward one-off settlements with creditors that have no basis in law or fact, for the sole purpose of pressing forward with what can only be described as a "Frankenstein" plan.

2. In addition, the Amended Disclosure Statement introduces new confusion by stating that PREPA has "full discretion" to determine which expenses are entitled to Current Expense Priority. This statement raises a number of questions about the fundamental architecture of the First Amended Plan, including the allocation of the New Bonds, which is based, in no small part, on that priority and/or the settlement of that priority.

3. Further, the Amended Disclosure Statement adds a one-page "Estimation of General Unsecured Claims Pool" that provides no insight into the Oversight Board's $800 million estimate of General Unsecured Claims but instead only estimates that allowed claims may range from $245 million and $4.9 billion. Worse, imposing a cap based on an unsupported claims estimate is highly prejudicial to holders of General Unsecured Claims and completely unnecessary at this late stage in the case—and any perceived exigency is largely due to the Oversight Board's own failure to make any material progress over the last five-and-a-half years in resolving claims against PREPA.

4. In short, the most important modifications and additions to the Amended Disclosure Statement suffer from the same flaws and inadequacies as the Initial Disclosure Statement.³ Accordingly, for the reasons set forth in this Supplemental Objection, as well as the Preliminary Objection, the Amended Disclosure Statement should not be approved.

---

³ The "Initial Disclosure Statement" is the *Disclosure Statement for Title III Plan of Adjustment of Puerto Rico Electric Power Authority* [Docket No. 23097].

## SUPPLEMENTAL BACKGROUND

5. The First Amended Plan introduces several important modifications, most notably the incorporation of the settlement between the Oversight Board and National. Pursuant to that settlement, National stands to receive the following distributions under the First Amended Plan:

   a. Series B Bonds equal to 71.65% of the National Insured Bond Claims, which claim would be allowed, under the First Amended Plan, in the amount of approximately $836.1 million;[4]

   b. Series B Bonds equal to 20% of the National Reimbursement Claim,[5] estimated at approximately $244.7 million (assuming the effective date of the First Amended Plan occurs on July 1, 2023);[6]

   c. Additional Series B Bonds or cash, in the discretion of the Oversight Board, equal to (i) 3% of the National Insured Bond Claim (or approximately $25.1 million), as a reimbursement of National's fees and expenses and (ii) 2.86% of the National Insured Bond Claim (or approximately $23.9 million), as a so-called "structuring" fee.[7]

6. Thus, under the First Amended Plan, National would receive aggregate distributions in excess of $697.0 million, which represents more than **83%** of the National Insured Bond Claims. To fund the distributions of additional Series B Bonds, the First Amended Plan increases the total amount of New Bonds to be issued by Reorganized PREPA from $5.4 billion to $5.68 billion, an increase of $280 million.[8]

7. In addition, under the National PSA, the Oversight Board agreed to use its reasonable best efforts to cause PREPA to impose an "Interim Charge" to fund interim payments

---

[4] *See* First Am. Plan art. VIII.A; XVIII.A.
[5] The "National Reimbursement Claim" is defined in the First Amended Plan as "the Claim of National arising from the payments made by National after the Petition Date, as they may continue to be made up to, but not including, the Effective Date to holders of the National Insured Bonds on account of interest accrued on such bonds." First Am. Plan art. I.A.153.
[6] First Am. Plan art. IX.A; Am. Discl. Stat. at 34.
[7] First Am. Plan at. II.D.2.
[8] First Am. Plan art. I.A.159. The $280 million of additional Series B Bonds represents the increase in National's distribution from 50% (which it would have received has it opted to become a Settling Monoline), *i.e.*, approximately $418.1 million, to the aggregate distribution it now stands to receive under the First Amended Plan, *i.e.*, approximately $697.0 million.

3

to National for the period from the effective date of the National PSA (*i.e.*, January 31, 2023) through the Effective Date of the First Amended Plan.[9] The "Interim Charge" (which is subject to PREB approval) would be imposed on PREPA ratepayers.[10]  ***While the Committee is unable to quantify the size of these interim payments at this time, it is obvious that they will further increase National's aggregate recovery above 83%***.

8. The distribution of Series B Bonds to National under the Plan would ***not*** depend on any contingencies (such as the outcome of the Amended Lien & Recourse Challenge), with one exception discussed below.  In fact, the distribution of Series B Bonds to National is now also included in the revised definition of "Mandatory New Bond Distributions" under the First Amended Plan, such that National stands at the top of the New Bonds Waterfall.[11]

9. The First Amended Plan also provides that if the Court denies approval of the National settlement as it relates to the National Reimbursement Claim (including because it gives rise to unfair discrimination),[12] National would not be entitled to receive any distribution on account of the National Reimbursement Claim.  However, in that event, National would have the option to forego all consideration under its settlement and instead elect the treatment as may be provided in the future to other settling bondholders.[13]

---

[9] *See* National PSA § 6.2.

[10] *See* Am. Discl. Stat. at 33.  The Interim Charge, which is subject to PREB approval, will be approximately 10% of 1 cent/KWH, as the National Insured Bond Claim (approximately $836.1 million) is approximately 10% of the PREPA Revenue Bond Claims (approximately $8.5 billion).

[11] As detailed in the Preliminary Objection, the New Bonds Waterfall is a complex, multi-level, waterfall that determines how the New Bonds are allocated to various creditor groups.  At Level 1 of the waterfall, the Fuel Line Lenders receive their distribution of Series A Bonds, while, at Level 2 of the waterfall, the Settling Bondholders and Settling Monolines (as well as Non-Settling Bondholders and Non-Settling Monolines, to the extent secured beyond the Sinking Fund), and now National as well, receive their distribution of Series B Bonds.  General Unsecured Claims will only receive a distribution of Series B Bonds to the extent any Series B Bonds remain available after the distributions made at Level 1 and Level 2 of the New Bonds Waterfall.

[12] For the avoidance of doubt, the Committee reserves all its rights to argue that the National settlement should not be approved, including because it gives rise to unfair discrimination.

[13] First Am. Plan art. IX.B.  The exercise of this "most-favored-nation" clause is subject to the proviso that such other settlement is reached before the Court makes a substantive ruling, or gives an indication or determination, that the PREPA Revenue Bond Claims are secured by revenues outside the Sinking Fund

4

10. What the Amended Disclosure Statement fails to mention is that this "most-favored-nation" option is *always* open to National, regardless of whether the Court denies the proposed plan treatment of the National Reimbursement Claim.[14]

**SUPPLEMENTAL OBJECTION**

I. **Amended Disclosure Statement Does Not Provide Adequate Information About National Settlement**

   A. Amended Disclosure Statement Understates National's Recovery

11. The Amended Disclosure Statement represents, repeatedly, that National will receive 71.65% recovery on its bond claims. This is substantially misleading. As shown above, the aggregate recovery offered to National is actually **83%—*without* even including the *"Interim Charge" National would receive *during the case***. The Amended Disclosure Statement seeks to justify this misleading statement by asserting, in a footnote, that while "National will also receive $97,943,887.64 in consummation and structuring costs, as well as receiving additional recoveries on its reimbursement claim . . . this consideration is not provided on account of their respective claims, but on account of other value provided," therefore these amounts "are not incorporated into" National's recovery percentage.[15]

12. This statement is both wrong and insufficient. It is wrong because adequate information requires disclosure of the total value of recovery offered to any given class of creditors.[16] It is insufficient because it fails to actually *explain* anything. National stands to receive almost $100 million in additional recoveries, and the Amended Disclosure Statement says only—in a footnote—that these recoveries are for "other value [National has] provided."[17]

---

[14] National PSA § 8.2. The exercise of this "most-favored-nation" clause is also subject to the same proviso as above.
[15] Am. Discl. Stat. at 31 n.3.
[16] *See also* Prelim. Obj. ¶ 64 n. 41.
[17] Am. Discl. Stat. at 31 n. 3.

5

The need for a satisfactory explanation is highlighted by the fact that, as discussed in the Preliminary Objection, the Bankruptcy Code does not permit creditors like National—unsecured or undersecured creditors that are already heavily involved in the case—to receive professional fees, consent fees, or payments during the case.[18] Moreover, the "other value" is not identified, nor is there any explanation of how this unidentified "other value" justifies almost $100 million in additional distributions.

        B.      <u>Amended Disclosure Statement Fails to Disclose Terms of, and Basis for, National Settlement</u>

13. A significant aspect of National's plan treatment is the proposed 20% recovery for the National Reimbursement Claim, which could represent $48.9 million (or more) in additional Series B Bonds. While the Amended Disclosure Statement notes that National takes the position that this claim is separate from National's underlying bond claims and, therefore, is not part of National's recovery on account of its bond claims, this statement and other aspects of the National Reimbursement Claim raise important, and unanswered, questions.

14. As explained in the Preliminary Objection, a disclosure statement must describe how a proposed settlement satisfies Bankruptcy Rule 9019.[19] The Amended Disclosure Statement, however, offers practically no explanation of the underlying issues being settled. While the First Amended Plan recognizes the possibility that the Court will reject this 20% recovery under Bankruptcy Rule 9019 or otherwise, the Amended Disclosure Statement does not explain what, precisely, is being settled. For example, is this "reimbursement" claim based on the same bonds that are part of National's bond claims? If so, how is this claim not duplicative of such bond claims? And what are the legal and factual bases for allowing such a "reimbursement" claim, especially since it is based on National's payment of postpetition

---

[18] *See also* Prelim. Obj. ¶¶ 66-67 n. 42.
[19] *See* Prelim. Obj. ¶ 75.

6

interest to bondholders (*i.e.*, payments which PREPA itself does not owe because the bondholders are undersecured)? The absence of this information is particularly striking in light of the fact that the Initial Disclosure Statement did not even mention the National Reimbursement Claim.

15. Further, the very existence of the National settlement raises a host of other important questions not answered by the Amended Disclosure Statement. The initial proposed Plan would have treated Settling Bondholders and Settling Monolines, on the one hand, differently from Non-Settling Bondholders and Non-Settling Monolines, on the other hand. What, then, is the rationale for a significantly more expensive one-off settlement with a single bond/monoline claimant such as National? Is this settlement designed to create an impaired accepting class of a single bond/monoline claimant?

16. Finally, the recovery table on page 28 of the Amended Disclosure Statement notes that the estimated claim amount for the National Reimbursement Claim is "TBD," even though it later notes that "the Oversight Board proposes to allow the National Reimbursement Claim in the amount of $244,728,681.25 (assuming the Effective Date is July 1, 2023)."[20] It is unclear why that estimate is not included in the recovery table.

C. National Settlement Adds Additional Contingencies to First Amended Plan, Thereby Making Amended Disclosure Statement *More* Complicated, Not Less

17. In its Preliminary Objection, the Committee explained that the Initial Disclosure Statement described a plan that was premised on so many complicated and inter-related contingencies that it was ***impossible*** for average unsecured creditors to determine their recoveries without knowing the resolution of those contingencies. Paradoxically, instead of reducing these contingencies, the National settlement adds ***more*** contingencies for all creditors whose recovery

---

[20] Am. Discl. Stat. at 34.

depends on the amount of New Bonds available after distributions to creditors at Level 1 and Level 2 of the New Bonds Waterfall (including the Fuel Line Lenders, the Settling Bondholders, the Settlement Monolines, and, now also, National).

18. In fact, the National settlement introduces another "toggle" depending on whether the settlement (as it relates to the National Reimbursement Claim) passes muster. If the Court denies approval of that part of the settlement, National could choose to continue with its current settlement (but without the recovery for the National Reimbursement Claim) or opt into a different settlement that the Oversight Board may enter into with other bondholders on terms that are unknowable at this time. Moreover, this "most-favored-nation" option is available to National regardless of whether the Court denies approval of the settlement with respect to the National Reimbursement Claim. If National exercises this option, it could have a substantial and unknown impact on the Series B Bonds that remain available for creditors at Level 3 of the New Bonds Waterfall or below, including holders of allowed General Unsecured Claims.

19. Unfortunately, as with many other contingencies in the First Amended Plan, these new contingencies are based on information that is not yet available to ***anyone***, and, thus, these deficiencies cannot (at this time) be cured by more disclosure or through a Committee letter.[21] Instead, as noted, the Committee submits that the Amended Lien & Recourse Challenge should be decided before any plan is put to a vote.

20. Further, because a letter alone will not be sufficient to explain all the contingencies and complexities in the First Amended Plan, the Committee should also be permitted to conduct in-person sessions with general unsecured creditors to explain, among other things, the New Bonds Waterfall and the Committee's opposition to the First Amended Plan.

---

[21] As noted in the Preliminary Objection, the Committee intends to file its proposed recommendation letter in advance of the hearing on the approval of the Amended Disclosure Statement.

8

The Committee previously received permission to communicate with its constituents in connection with the solicitation of the Commonwealth plan [Docket No. 17639] and the HTA plan [Docket No. 21293], and it should be permitted to do so here as well.

II. **Other Modifications and Additions to Amended Disclosure Statement Are Inadequate**

    A. Amended Disclosure Statement Does Not Explain Basis for Estimate of General Unsecured Claims

21. The Amended Disclosure Statement now includes a new Exhibit O, styled as the "Estimation of General Unsecured Claims Pool." Presumably, this is meant to provide some basis for the $800 million estimate that caps recoveries to general unsecured creditors. Yet, the one-page exhibit does no such thing. Instead, it (i) notes that the aggregate face value of the asserted claims is approximately $5.96 billion and (ii) estimates that the low and high values are, respectively, $245 million and $4.9 billion. This does nothing to provide any insight into the basis for the $800 million cap. Nor is there any explanation as to what work the Oversight Board has done to arrive at that $800 million estimate.[22]

22. As noted in the Preliminary Objection, the $800 million claims estimate takes on particular significance under the First Amended Plan because it forms part of the Unsecured Claims Pool Estimate, which, in turn, determines the recovery cap for distributions to general unsecured creditors. For example, if General Unsecured Claims were ultimately allowed in an aggregate amount of, for example, $1.6 billion, the recovery on account of such claims will be determined as if they were allowed at only $800 million.[23]

---

[22] The Committee recognizes that the Reply includes further discussion of the Oversight Board's views on the claims estimate. However, that discussion is not part of the Amended Disclosure Statement and, thus, could not be considered by creditors when deciding how to cast their vote on the First Amended Plan.

[23] As noted in the Preliminary Objection, capping creditor recoveries based on a claims estimate (as opposed to actual legal entitlements) also raises serious confirmation issues. The Committee reserves all its rights.

9

B. **Amended Disclosure Statement Does Not Explain PREPA's Supposed "Full Discretion" Over Current Expenses**

23. The Amended Disclosure Statement now also states that the Oversight Board "believes that, under the Trust Agreement, PREPA has full discretion to determine which expenses constitute 'Current Expenses' and can therefore be paid ahead of bondholders []."[24] This statement is remarkable and potentially sweeping. If true, it could give the Oversight Board virtually unfettered discretion to allocate New Bonds between creditor groups according to its views as to who is and who is not entitled to Current Expense Priority. Indeed, the New Bonds Waterfall is predicated, in large part, on which unsecured claims may qualify as Current Expenses and which do not. For example, while the Fuel Line Lender Claims would be paid at Level 1 of the New Bonds Waterfall (presumably because the Oversight Board now believes—despite years of taking the contrary position—such claims are entitled to Current Expense Priority), General Unsecured Claims are paid much lower in the waterfall (presumably because the Oversight Board believes that they are not entitled to Current Expense Priority).[25] If the Oversight Board takes the position that the Current Expense Priority is determined in its full discretion, this would raise serious questions about the entire architecture of the First Amended Plan.

C. **Disclosures Regarding Legacy Charge Remain Inadequate**

24. Finally, while the First Amended Plan now includes Annex 1 to Schedule B, the Amended Disclosure Statement still lacks the underlying customer information necessary to calculate the projected annual revenues to support the illustrative cash flow for New Bonds. The Amended Disclosure Statement should include the annual projected customer counts by customer class as well as the projected annual average electricity consumption by customer class.

---

[24] Am. Discl. Stat. at 44.
[25] As noted in the Preliminary Objection, the New Bonds Waterfall is difficult to reconcile with the Oversight Board's acknowledgment that many, if not all, of the estimated $800 million of General Unsecured Claims are Current Expense claims. *See* Prelim. Obj. ¶ 97.

10

WHEREFORE, the Committee respectfully requests that the Court deny the Disclosure Statement Motion and the Confirmation Procedures Motion and grant such other relief as is just and proper.

Dated: February 17, 2023  By: /s/ Luc A. Despins

PAUL HASTINGS LLP
Luc A. Despins, Esq. *(Pro Hac Vice)*
G. Alexander Bongartz, Esq. *(Pro Hac Vice)*
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
lucdespins@paulhastings.com
alexbongartz@paulhastings.com

*Counsel to the Official Committee of Unsecured Creditors*

By: /s/ Juan J. Casillas Santiago

CASILLAS, SANTIAGO & TORRES LLC
Juan J. Casillas Ayala, Esq. (USDC - PR 218312)
Israel Fernández Rodríguez, Esq. (USDC - PR 225004)
Juan C. Nieves González, Esq. (USDC - PR 231707)
Cristina B. Fernández Niggemann, Esq. (USDC - PR 306008)
PO Box 195075
San Juan, Puerto Rico 00919-5075
Telephone: (787) 523-3434 Fax: (787) 523-3433
jcasillas@cstlawpr.com
ifernandez@cstlawpr.com
jnieves@cstlawpr.com
crernandez@cstlawpr.com

*Local Counsel to the Official Committee of Unsecured Creditors*