**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors.[1] | PROMESA Title III<br><br>No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Debtor. | PROMESA Title III<br><br>No. 17-BK-4780-LTS |

**SUPPLEMENTAL OBJECTIONS OF THE AD HOC GROUP OF
PREPA BONDHOLDERS TO THE DISCLOSURE STATEMENT FOR
THE FIRST AMENDED TITLE III PLAN OF ADJUSTMENT OF THE
<u>PUERTO RICO ELECTRIC POWER AUTHORITY [ECF NO. 3201]</u>**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................................1

I. The First Amended Plan Is Patently Unconfirmable For The Additional Reason That It Unfairly Discriminates Between National And Other PREPA Bondholders ..........3

    A. The Different Base Settlement Treatment Between National And Both Settling and Non-Settling Bondholders Is Unjustifiable .........................................3

    B. The Settlement Of National's Postpetition Interest Claims Discriminates Against All Other Bondholders, Who Would Get Zero Postpetition Recovery ...................................................................................................................5

    C. The National Fees Are Additional Compensation With No Economic Basis ..................................................................................................................................6

II. The Oversight Board's Increase In Total Creditor Recoveries, To Facilitate Its National Deal, Confirms That PREPA *Can* Afford To Pay Creditors More Than Asserted By Its Artificial Affordability Cap........................................................................7

III. The First Amended Disclosure Statement Remains Inadequate..........................................9

CONCLUSION.............................................................................................................................10

# TABLE OF AUTHORITIES

**Page(s)**


**Cases**

*In re Acemla De P.R. Inc.*,
  No. 17-02021 ESL, 2019 WL 311008 (Bankr. D.P.R. Jan. 22, 2019) ...................................10

*In re Barney & Carey Co.*,
  170 B.R. 17 (Bankr. D. Mass. 1994) ..................................................................................3

*In re Hermanos Torres Perez Inc.*,
  No. 09-05585-EAG, 2011 WL 5854929 (Bankr. D.P.R. Nov. 21, 2011) ................................3

*Ins. Co. of N. Am. v. Puerto Rico Marine Mgmt., Inc.*,
  768 F.2d 470 (1st Cir. 1985) ...............................................................................................4

*In re LTC Holdings, Inc.*,
  No. 14-11111, 2020 WL 5576850 (D. Del. Sept. 17, 2020) ..................................................4

*New York Bd. of Fire Underwriters v. Trans Urb. Constr. Co.*,
  91 A.D.2d 115 (N.Y. App. Div. 1983) ................................................................................4

*Small v. Yonkers Contracting Inc.*,
  242 A.D.2d 378 (N.Y. App. Div. 1997) ..............................................................................4

**Statutes**

PROMESA § 312(a) ..................................................................................................................9

**Other Authorities**

PREPA Bondholder Mediation Presentation, available at
  https://emma.msrb.org/P11641653-P11264323-P11690562.pdf............................................8

PREPA FOMB Proposal to Bondholder Group (Nov. 8, 2022) ....................................................8

Pursuant to Section 1125 of the Bankruptcy Code and Rule 3017 of the Federal Rules of Bankruptcy Procedure, made applicable to this proceeding by Sections 301 and 310 of the Puerto Rico Oversight, Management, and Economic Stability Act, and as authorized by the Court, ECF No. 3210, the Ad Hoc Group of PREPA Bondholders respectfully submits these supplemental objections to the Disclosure Statement for the First Amended Title III Plan of Adjustment of the Puerto Rico Electric Power Authority ("Feb. 9 DS"), ECF No. 3201, submitted by the Financial Oversight and Management Board for Puerto Rico.[2]

## INTRODUCTION

1. PREPA's Plan and Disclosure Statement have gone from bad to worse. The First Amended Plan doesn't correct the fundamental flaws that made its original version patently unconfirmable. Rather, the Oversight Board added to the Plan the terms of a National Settlement that could hardly be more brazen in its unfair discrimination against other Bondholders. The resulting First Amended Plan proposes to "settle" National's bond claim for *83 cents* on the dollar, but offers to pay the virtually identical claims of Settling Bondholders and Monolines only *50 cents*, and to pay even *victorious* Non-Settling Bondholders and Monolines only *56 cents*.

2. The Disclosure Statement provides no basis for these wide disparities in recoveries among holders of the same bonds, other than National's agreement to vote for the Plan in exchange for wildly preferential treatment. To fund National's "yes" vote, moreover, the Oversight Board simply adds more than $250 million to the total amount of creditor recoveries—thereby confirming that the Oversight Board's asserted affordability cap is a made-up figure that it moves up or down at its whim. The Court should deny approval of the Disclosure Statement in support of this patently

---

[2] Unless otherwise noted, capitalized terms have the same meaning as in the Ad Hoc Group's Disclosure Statement Objection, ECF No. 3189, and in the First Amended Disclosure Statement.

1

unconfirmable Plan—which is built atop one-off preferential deals that do not pass legal muster, an improper and misleading pre-Disclosure Statement solicitation of plan treatment to bondholders, and arbitrary and unsupportable allegations about what can be paid to creditors.

## THE NATIONAL SETTLEMENT

3. Under the First Amended Plan, National would receive more than ***83 cents*** on every dollar of principal and prepetition interest on PREPA Bonds that National insures or owns. *First*, it would receive a 71.65 cent recovery on the bond claim itself. Feb. 9 DS at 258. *Second*, National would get another 5.86 cents in fees—3 cents for its efforts during this case, plus 2.86 cents for structuring payments to its own insureds. *Id.* *Third*, it would get 5.85 more cents in a 20% recovery on National's post-petition payouts to its insured Bondholders. *See id.*[3] The differences between National's proposed settlements and Bondholders' recoveries are illustrated here:

| **National's Recovery vs. Other Bondholders' Recovery** *(assuming Bondholders have a right to payment—secured or unsecured[4])* | | | | |
|---|---|---|---|---|
|  | Base | Fee & Expense | Reimbursement | TOTAL |
| National | 71.65% | 5.86% | 5.85% | **83.36%** |
| Settling Bondholders | 50.00% | 0 | 0 | **50.00%** |
| Non-Settling Bondholders* | 56.08% | 0 | 0 | **56.08%** |

4. National's 83% recovery under the First Amended Plan would provide it a substantial—and indefensible—premium over what both Settling and Non-Settling Bondholders

---

[3] The deal also provides that National can receive a contingent value instrument (a "CVI") that could pay additional sums if a new CVI is offered to holders of other Bonds. Amounts are calculated as of July 2023.

[4] Settling Bondholders can receive more than 50 cents only in certain remote scenarios in which (1) this Court holds that PREPA's bondholders have no right to payment or security beyond the $16 million Sinking Fund, and (2) particular proportions of Settling versus Non-Settling Bondholders are achieved. Moreover, this chart and brief presents recoveries in terms of Series B Bond face value, which will not match their far-lower actual value—further depressing all bondholder recoveries. *See* AHG Obj. ¶ 68.

2

would recover. Even assuming that Non-Settling Bondholders *win on every issue* in the Amended Lien and Recourse Litigation, they would *still* recover no more than 56%. Settling Bondholders—who, like National, would also agree to resolve the Amended Lien and Recourse Litigation—are being offered a recovery capped at 50% in almost every plan scenario for settling the same claims. *See* Feb. 9 DS at 39. Accordingly, National's 83% recovery is one and a half times greater than other Bondholders' 50-56% recovery, even in the *least* discriminatory realistic scenario.

## SUPPLEMENTAL OBJECTIONS

**I.      The First Amended Plan Is Patently Unconfirmable For The Additional Reason That It Unfairly Discriminates Between National And Other PREPA Bondholders**

5.      The Oversight Board has no justification for its unequal treatment of PREPA Bonds insured by National versus those *not* insured by National, and so the Plan unfairly discriminates against other Bondholders. A plan unfairly discriminates against a class of creditors when "creditors and equity interest holders with similar legal rights . . . receiv[e] materially different treatment under a proposed plan without compelling justifications for doing so." *In re Hermanos Torres Perez Inc.*, No. 09-05585-EAG, 2011 WL 5854929, at *9 (Bankr. D.P.R. Nov. 21, 2011). "[D]ifferentiated treatment of similar classes intended merely to induce acceptance by one class fails." *In re Barney & Carey Co.*, 170 B.R. 17, 25 (Bankr. D. Mass. 1994). "The burden is on the Debtor to show that unequal treatment between classes having the same priority does not constitute unfair discrimination." *Id.* The Oversight Board cannot possibly meet that burden here.

**A.      The Different Base Settlement Treatment Between National And Both Settling And Non-Settling Bondholders Is Unjustifiable**

6.      The Oversight Board cannot explain why National should receive 72 cents on the base settlement of its bond claims, while all other Settling Bondholders receive 50 cents for settling exactly the same claims. The National-insured PREPA Bonds were issued under the same Trust Agreement as uninsured PREPA Bonds. And the National-insured bonds were issued in the same

3

manner, for the same purpose, and largely at the same times as PREPA bonds insured by other monolines. National is simply asserting subrogation claims for the principal and interest that National had to pay insured Bondholders, under non-Debtor agreements, after PREPA defaulted on its obligation to make those payments. And those agreements make clear that, once National makes such payments, it steps into the insured Bondholders' claims with no greater rights than the insured holders had. In other words, PREPA does not owe a penny more on a National-insured bond than it does on an uninsured bond.[5]

7. Neither the Oversight Board nor National has ever argued, nor does the Disclosure Statement even try to suggest, that National's claims are in any way legally distinct from other PREPA bond claims. To the contrary, the Disclosure Statement is clear that the claims the Oversight Board is settling with National are *the exact same claims that other Bondholders also have against PREPA*. *See* Feb. 9 DS at 50-52 (listing exactly the same claims under "Settlement of Outstanding Disputes" for National and Settling Bondholders).

8. There couldn't be a clearer case of unfair discrimination. National would plainly receive a vastly better deal for identical claims. Nor can the Oversight Board justify such discrimination simply by contending that Settling Bondholders (if any) are *agreeing* to accept inferior terms in response to the Oversight Board's unapproved solicitation made *after* the National settlement had been reached in principle, but without disclosing that settlement's much more favorable terms. This adds to the myriad reasons, set forth in the Ad Hoc Group's initial

---

[5] It is well-settled that a subrogation claim has no more rights than those possessed by the underlying claim. *See Ins. Co. of N. Am. v. Puerto Rico Marine Mgmt., Inc.*, 768 F.2d 470, 473 (1st Cir. 1985) (holding, that "plaintiff, an insurer, has no greater or lesser rights than those of its insured"); *see also Small v. Yonkers Contracting Inc.*, 242 A.D.2d 378, 379 (N.Y. App. Div. 1997); *New York Bd. of Fire Underwriters v. Trans Urb. Constr. Co.*, 91 A.D.2d 115, 119 (N.Y. App. Div. 1983); *In re LTC Holdings, Inc.*, No. 14-11111, 2020 WL 5576850, at *6 (D. Del. Sept. 17, 2020) (several federal jurisdictions hold "a surety cannot, by way of subrogation, assert any greater rights than the creditor in whose shoes it is substituted").

4

Objections (at ¶¶ 58-63), that the settlement solicitation is improper, misleading, and independently warrants denying approval of the Disclosure Statement.

9. The unfairness of the First Amended Plan's discrimination against Non-Settling Bondholders is similarly apparent. For instance, the most that Non-Settling Bondholders and Monolines can recover under the Plan is 56 cents on the dollar, even if they *win on every issue* in the Amended Lien and Recourse Litigation. *See* Feb. 9 DS at 28. And yet National would get 72 cents on the dollar for *settling* the same claims (plus 12 cents in other payments). What kind of litigation "settlement" pays out substantially *more* than non-settling parties could achieve on the same claims by winning the case outright? This preferential treatment of identical claims can be understood only as an attempt to manufacture the illusion of meaningful creditor support for the plan by creating yet another questionable one-creditor accepting class.

**B.    The Settlement Of National's Postpetition Interest Claims Discriminates Against All Other Bondholders, Who Would Get Zero Postpetition Recovery**

10. Next, the National Settlement gives National roughly another 6 cents (calculated through July 2023) to settle its postpetition interest claims against PREPA, but offers Settling Bondholders and Non-Settling Bondholders *nothing* on these claims.

11. The Ad Hoc Group agrees that all Bondholders are entitled to receive postpetition interest. As recently as early 2022, the Oversight Board appeared to see this the same way, when it reaffirmed a 2019 RSA under which PREPA would have paid Bondholders roughly 67 percent on postpetition interest claims that accrued during the case. There was never any suggestion then, or now, that National is somehow entitled to a better claim for postpetition interest than other PREPA Bondholders. To the contrary, National's insurance contracts with PREPA provide only

5

that it steps into the shoes of Bondholders after PREPA fails to pay, and do not give National any greater claim to repayment of principal and interest from PREPA than the Bondholders possess.[6]

12. Even the Oversight Board appears to understand that this discrimination is illegal: It expressly acknowledges that its treatment of National's so-called "reimbursement claim" for postpetition payments to its insureds might unfairly discriminate against other Bondholders and Monolines, which are being offered *zero* post-petition recovery. Feb. 9 DS at 33-34, 258-59.[7]

**C. The National Fees Are Additional Compensation With No Economic Basis**

13. Finally, the "fees" the Oversight Board proposes to pay National—amounting to more than 5% of National's prepetition claim (and nearly $50 million)—cannot be justified as reasonable compensation, and merely provide National a backdoor recovery on its claim.

14. With respect to the "structuring fee," as further set forth in the Trustee's supplemental objection, National is receiving a 2.86% fee to pay its insured holders for structuring commutation elections that may very well be beneficial to National and detrimental to its insured holders. Whether or not National is using this bankruptcy process to benefit itself at the expense of its claimholders, one thing is clear—structuring the resolution of National's insurance contracts is an issue between National and its policyholders, not one that should cause PREPA to pay National additional compensation at other creditors' expense.[8]

---

[6] Certain National agreements (which can be provided to the Court on request) require PREPA to reimburse National for fees and expenses, but only those incurred to pursue remedies under the Trust Agreement and not for payments made under its policies. Payments made under the polices are covered in a separate section stating that National will be subrogated to underlying holders' rights to payment from PREPA.

[7] As further outlined in the supplemental objection by the Ad Hoc Committee of National Claim Assignees, which the Ad Hoc Group joins, the unfair discrimination is heightened by providing this settlement treatment to National alone, and not also to holders who purchased, *from National*, the same subrogation claims on certain National-wrapped bonds. *See* Feb. 9 Plan, art. I.A.148, I.A.153.

[8] *See* FOMB "Reply Chart," ECF No. 3206-1, at A-28 to A-29 ("[T]he relative rights of an insured bondholder and its monoline insurer should otherwise be resolved between the parties in accordance with

6

15. National's 3% RSA fee for its efforts in this case is likewise just a back-door way to increase National's total recovery on its claim. The RSA fees approved in other Title III cases were intended to reimburse holders whose expenditure of significant time and resources, during years-long negotiations with Title III debtors, had resulted in settlements in which other, less-active holders were able to participate. Here, by contrast, National has merely settled its own claims, bestowing no benefit on other creditors.

16. In summary, the stark difference in recovery being offered to National (83 cents) versus other identically situated Bondholders (50-56 cents) is unheard of in Title III proceedings. The Oversight Board has *never* asked the Court to accept such substantially divergent plan treatment of insured and uninsured bond claims, nor such a dramatic difference between monoline insurers of the same bonds. This disparate treatment is patently unconfirmable. Rather than narrowing the many confirmation issues, the First Amended Plan presents yet another misguided attempt to manufacture an artificial impaired accepting class—creating only more issues to litigate at a protracted confirmation hearing.

II. **The Oversight Board's Increase In Total Creditor Recoveries, To Facilitate Its National Deal, Confirms That PREPA *Can* Afford To Pay Creditors More Than Asserted By Its Artificial Affordability Cap**

17. The Oversight Board's cap on total recoveries to creditors continues to move up or down depending on its negotiating positions at any given moment, and with no grounding in fact. Here is an updated chart of the Oversight Board's varying positions on affordability (*see* AHG Obj. ¶ 67):

---

their relevant insurance policies."). While insurers received a "structuring fee" in PRIFA's Title VI, that was a consensual restructuring with widespread creditor support, and no parties objected to those fees.

7

| Proposal | Amount |
|---|---|
| 2019 RSA (2018-2019) | Over $8 billion for Bondholders |
| FOMB Mediation Offer (Nov. 2022) | $6.073 billion for bondholders; $7.8 billion for all creditors[9] |
| Proposed Plan (Dec. 2022) | No more than $4.411 billion for Bondholders; $5.4 billion for all creditors |
| **First Amended Plan (Feb. 2022)** | **$5.68 billion for all creditors ($280 million increase for National)** |

18. The Oversight Board does not say where PREPA "found" the new $280 million over the past several weeks, because of course that sum (and more) has been available to fund creditor recoveries all along. The new $5.68 billion affordability cap is every bit as fictional as the $5.4 billion cap that came before it. After all, less than a month before the Oversight Board filed the Plan, it proposed $7.8 billion in total creditor recovery, and only twelve months ago it was still advocating for Bondholders *alone* to receive more than $8 billion.

19. In its reply, the Oversight Board did not even try to explain the disappearance of billions of dollars of potential creditor payments. It merely suggests that its earlier affordability concessions (first over $8 billion for Bondholders, then $6.073 billion for Bondholders) will be inadmissible to show what PREPA can pay creditors now. The Oversight Board maintains that the only relevant number is what it now asserts to be the most PREPA can possibly pay (which itself changed from $5.4 billion to $5.68 billion over just a few weeks). But as set forth below, that figure continues to be an arbitrary, unsupportable, and utterly conclusory affordability cap—and the lack of a discernible basis for that cap may explain why the Oversight Board fails to disclose enough information to allow even sophisticated creditors to understand it. The cap is also

---

[9] This number can be derived from the publicly available information available here: PREPA FOMB Proposal to Bondholder Group at 6-7 (Nov. 8, 2022); PREPA Bondholder Mediation Presentation at 12, both available at https://emma.msrb.org/P11641653-P11264323-P11690562.pdf.

8

a moving target—shifting to facilitate the Oversight Board's preferred deals only—which shows that, contrary to this Court's admonitions, the Oversight Board has filed a "place holder" plan that it never "believe[d] in good faith should move toward approval." 11/2/2022 Tr. 18. The Oversight Board is not dealing fairly with creditors or honestly with creditors, and its abuse of the confirmation process to pressure Bondholders into accepting lowball settlement offers—after almost six years in Title III—should not be tolerated by this Court.

20. The Oversight Board and its new allies would have this Court address all of these issues only at a confirmation hearing, months from now. But waiting months to address a patently unconfirmable Plan would merely postpone the tough political decisions that PREPA will need to make to reach fair agreements with the vast majority of its creditors—and creates an overwhelming likelihood that PREPA will come out of a July confirmation hearing even further away from exiting Title III.

21. Title III cases are not like ordinary restructuring cases. Creditors cannot propose alternative plans to combat a debtor's unconfirmable plan. *See* PROMESA § 312(a). Facing no risk of ever losing its exclusive right to propose plans, the Oversight Board evidently believes that it can take as many bites at the apple as it needs and for as long as it takes. The Court should not allow the Oversight Board to operate under this premise, and it should instead take this opportunity to again require the Oversight Board to put forward a confirmable plan.

**III. The First Amended Disclosure Statement Remains Inadequate**

22. The February 9 Disclosure Statement contains new material, such as the Legacy Charge Derivation (Ex. P), supposedly offered to explain the Oversight Board's affordability conclusion. But this material is woefully insufficient to allow creditors to understand that conclusion. For instance, the Derivation references at least $2.245 billion in "necessary costs," including "capital expenditures"—*additional* to the billions in federal dollars earmarked for

9

PREPA's system—that are entirely new add-ons to the costs and expenses reflected in PREPA's Fiscal Plan certified by the Oversight Board on June 30, 2022. And yet the Plan and Disclosure Statement utter nary a word to explain these brand-new costs and expenditures, or why they have suddenly arisen after years of fiscal plans failing to include them.[10]

23. It is not sufficient disclosure for the Oversight Board to merely present its newly revised affordability cap on total creditor recovery, and to vaguely assert that it considered many different factors to arrive at it. The Oversight Board must produce actual data underlying these decisions so that creditors can assess their merit (or lack thereof). *In re Acemla De P.R. Inc.*, No. 17-02021 ESL, 2019 WL 311008, at *14 (Bankr. D.P.R. Jan. 22, 2019) ("Creditors rely on the disclosure statement to determine what distribution or other assets they will receive and also what risks they will face." (internal quotation marks omitted)).

24. The February 9 Disclosure Statement continues to omit adequate information about the Oversight Board's and Ad Hoc Group's affordability analyses (AHG Obj. ¶¶ 79-80); the nature and structure of and the process for establishing the Legacy Charge (*id.* ¶¶ 81-82); and details about the New Bonds including the indenture agreement (*id.* ¶¶ 83-88). The Oversight Board should be required to supplement its disclosure with this information.[11]

## CONCLUSION

The First Amended Plan remains patently unconfirmable, and the First Amended Disclosure Statement is inadequate. The Oversight Board's motion to approve should be denied.

---

[10] The Ad Hoc Group believes, based on the limited information already available in the Legacy Charge Derivation, that calculations and adjustments referenced in the Legacy Charge Derivation contain numerous errors, and reserves all rights regarding the Oversight Board's analysis therein.

[11] The Ad Hoc Group has prepared a new markup reflecting the proposed Disclosure Statement edits that the Oversight Board *did not* accept, as well as a supplemental markup to amended portions of the February 9 Disclosure Statement. This markup is contained in Exhibit A, and a revised Ad Hoc Group statement reflecting the National settlement and revisions to the terms of the Series B Bonds is attached as Exhibit B.

We hereby certify that, on this same date, we electronically filed the foregoing with the clerk of the Court using the CM/ECF system, which will notify the attorneys of record.

Dated: San Juan, Puerto Rico
February 17, 2023

| **TORO COLÓN MULLET P.S.C.** | **KRAMER LEVIN NAFTALIS & FRANKEL LLP** |
|---|---|
| */s/ Manuel Fernández-Bared* <br> Manuel Fernández-Bared <br> USDC-PR No. 204,204 <br> P.O. Box 195383 <br> San Juan, PR 00919-5383 <br> Tel.: (787) 751-8999 <br> Fax: (787) 763-7760 <br> E-mail: mfb@tcm.law <br><br> */s/ Linette Figueroa-Torres* <br> Linette Figueroa-Torres <br> USDC-PR No. 227,104 <br> E-mail: lft@tcm.law <br><br> */s/ Nayda Perez-Roman* <br> Nayda Perez-Roman <br> USDC–PR No. 300,208 <br> E-mail: nperez@tcm.law <br><br> *Counsel for the Ad Hoc Group of PREPA Bondholders* | */s/ Amy Caton* <br> Amy Caton* <br> Thomas Moers Mayer* <br> Alice J. Byowitz* <br> 1177 Avenue of the Americas <br> New York, New York 10036 <br> Tel.: (212) 715-9100 <br> Fax: (212) 715-8000 <br> Email: acaton@kramerlevin.com <br> tmayer@kramerlevin.com <br> abyowitz@kramerlevin.com <br><br> Gary A. Orseck* <br> Matthew M. Madden* <br> 2000 K Street NW, 4th Floor <br> Washington DC 20007 <br> Tel: (202) 775-4500 <br> Fax: (202) 775-4510 <br> Email: gorseck@kramerlevin.com <br> mmadden@kramerlevin.com <br><br> *Admitted Pro Hac Vice <br><br> *Counsel for the Ad Hoc Group of PREPA Bondholders* |

11