# EXHIBIT B

## Ad Hoc Group Letter to PREPA Bondholders

The Ad Hoc Group of PREPA Bondholders (the "Ad Hoc Group") are institutional investors that hold approximately 47% of all uninsured PREPA bonds. Members of the Ad Hoc Group have been involved in restructuring negotiations and discussions with PREPA and the Oversight Board for more than seven years. All of the members of the Ad Hoc Group were engaged in intensive mediation and plan discussions with the Oversight Board and PREPA from April 8, 2022 through December 16, 2022, and all intend to object to and vote "no" on this Plan. We want to explain why, as you make your decision.

***Bondholders should understand that the information contained herein may be disputed by the Oversight Board and other parties. Statements expressed herein are the views of the Ad Hoc Group, and may not be attributed to any other party. This letter does not provide legal advice or investment advice. You should review the Plan and Disclosure Statement in full and with your own professionals before making a final determination on your vote to accept or reject the Plan.***

If you hold PREPA bonds, then your claim will fall into one of two classes under PREPA's Plan: Class 1 or Class 2. Class 1 comprises Bondholders that wish to settle with the Oversight Board for a purported recovery of 50% of the outstanding bond principal. Class 2 comprises Bondholders that do not wish to settle their claims in advance, and depending on the result of the Amended Lien & Recourse Challenge, may recover up to approximately 55% of the outstanding bond principal. Meanwhile, the Oversight Board proposes to pay just one insurer that has insured PREPA bonds more than 83% of its outstanding bond principal.

First, the Plan arbitrarily caps recoveries for Bondholders and provides Bondholders with low levels of recovery that are arbitrary and are far from substantiated. The Oversight Board does not attempt to justify the Plan's original $5.4 billion cap on total distributable value or its new $5.68 billion cap or explain why it cannot at least pay the amount in its final offer just one month before the termination of mediation, which contemplated approximately $7.8 billion of total value.

The Ad Hoc Group believes PREPA can afford to pay its creditors significantly more than the Plan provides, and the Oversight Board has admitted as much. To understand the Oversight Board's prior offers to Bondholders and what the Ad Hoc Group believes that PREPA can afford to pay Bondholders, Bondholders should review the 2019 RSA (available at https://emma.msrb.org/ES1303869-ES1019724-ES1421269.pdf) and the proposals the Oversight Board made in September and November of 2022 (attached to the Disclosure Statement as Exhibits [ ] and [ ], respectively), as well as the additional disclosure materials the Ad Hoc Group published in December 2022 (attached to the Disclosure Statement as Exhibit [ ]) before voting on the Plan.

The new settlement the Oversight Board has entered into with an insurer – National – would give National:

- A guaranteed recovery of 71.65% (while offering other Bondholders only 50%, with a risky option to receive more);

- Additional New Bonds for 20% of its post-petition interest (while offering other Bondholders nothing on post-petition interest);

- Additional fees of up to 5.86% of its claim; and

- Additional cash payments, if PREPA's regulator approves a new "Interim Charge."

Altogether, these amounts mean National will receive a guaranteed recovery of 83% of its claim, while other Bondholders will receive a guaranteed recovery of only 50%.  The Ad Hoc Group believes that this preferential treatment is unjustified and violates the Bankruptcy Code.

Second, the Ad Hoc Group believes that the new bonds being offered to bondholders (Series B Bonds) are not market securities – and, in fact, could be worth a fraction of the nominal amount that the Oversight Board purports to offer to Bondholders.  Unlike the traditional revenue bonds that you own today, these bonds contain no covenant that requires PREPA to raise rates (without taking into account the new debt charge) in an amount sufficient to pay any principal amount of the bonds, much less operating expenses, and the revenue stream to pay the bonds is wholly subordinate and subject to whatever operating expenses may arise in PREPA's future, with no adjustment for inflation over the thirty-five (35) year life of the bonds.  The Ad Hoc Group will not accept these securities as currently structured because they are not even worth their face amount; it will vote against any plan that contains these terms; and it does not think that any market participant would want to buy bonds on these terms, making them illiquid.

Other examples of the Series B Bonds' non-market terms include:

- The Series B-1 Bonds' interest rate of six (6) percent is not a market rate of interest; their subordination to the Series A Bonds and longer duration warrant a higher coupon than the six (6) percent being provided to the Series A Bonds;

- Interest accrual on Series B Bonds will cease after the final maturity of 50 years;

- PREPA has no obligation to set rates at a level sufficient to pay interest on the Series B Bonds that accrues pre-maturity, but is not paid pre-maturity;

- The Indenture Trustee's fees may be capped in the event of default;

- The Indenture Trustee's ability to enforce bondholder rights is severely limited, including no ability to move for a rate increase (other than a limited interest rate covenant that does not protect the New Bonds from having their charge invaded to pay operating expenses) or appoint a receiver to manage the system;

- The issuance of Additional Bonds with a payment priority ahead of the Series B Bonds may be permitted; and

- There is no assurance that the Series B Bonds will have adequate protections against the issuance of Refunding Bonds that could impair the Series B Bonds.

Third, it could take at least a year and possibly longer to distribute the Series B Bonds to creditors under the Plan, and there is no accrual of interest that compensates bondholders for this delay.

Fourth, the settlement offer you may have received was highly misleading, and fails to offer any meaningful settlement to Bondholders for the billions of dollars that will have accrued by the Plan's Effective Date on the PREPA Bonds over the almost six years since the Petition Date.  If you settle, you are estimated to receive no more than 50 cents on the dollar despite misleading suggestions that a 100-cent recovery is possible.  Any recovery beyond 50% requires bondholders to lose on the non-recourse issue in the Amended Lien & Recourse Challenge.  The Ad Hoc Group believes that this would be an improbable result and that the Title III Court is unlikely to rule in the Oversight Board's favor on this issue.  Thus, any recovery for Settling Bondholders is unlikely to be higher than 50% of their claim.

Moreover, there is also the risk that, if the Oversight Board wins the Amended Lien & Recourse Challenge, it will retract the Plan and instead offer even harsher treatment to PREPA creditors, as it has done before in its prior settlement agreements with bondholders.

Even if you accepted the settlement offer that was sent to you, potentially because you were not provided with a full list of disclosures and risk factors, you can still vote against the Plan.  The Ad Hoc Group believes that the recoveries offered to Bondholders under the Plan are substantially less than what PREPA can and should pay to Bondholders.  If you do not accept the settlement offer, you preserve your ability to argue at confirmation that PREPA can afford to pay its creditors more than what the Plan is offering and that Bondholders are entitled to receive bonds that contain market terms and are actually worth the amount contemplated.

For these reasons, the members of the Ad Hoc Group intend to vote no on the plan.