# **Exhibit K**

BEST INTEREST ANALYSIS

***Analysis of creditor recoveries should the Title III case be dismissed for the Puerto Rico Electric Power Authority ("PREPA")***

This analysis assesses the recoveries available to creditors of PREPA based on available remedies under non-bankruptcy laws, including the Constitution of the Commonwealth of Puerto Rico. Pursuant to section 314(b)(6) of PROMESA, a proposed Plan of Adjustment should be "feasible and in the best interest of creditors, which requires the court to consider whether available remedies under non-bankruptcy law and the constitution of the territory would result in greater recoveries for the creditors than provided by the plan." This analysis provides an estimated range of recoveries available to creditors if the stay of debt enforcement is terminated, no Plan of Adjustment for PREPA is confirmed, and the Title III case for PREPA is dismissed.

This document consists of two sections. The first section provides an overview of the methodology followed in developing this analysis. The methodology outlines the approach to estimating resources available for debt service, a summary of outstanding creditor obligations, the priority in which funds are disbursed, and the order in which creditor claims are assumed to be paid. The second section presents the estimated likely range of recoveries available to creditors of PREPA based on the resources available.

This analysis was prepared by McKinsey & Company Puerto Rico Consulting, Inc. ("McKinsey & Company"). Proskauer Rose LLP and O'Neill & Borges LLC,[1] legal advisors to the Financial Oversight and Management Board for Puerto Rico ("FOMB"), provided McKinsey & Company with a set of legal assumptions used in the preparation of this analysis. The legal assumptions are included in Appendix 2 of this document. Certain financial advisors to the FOMB provided McKinsey & Company with financial information used in the preparation of this analysis. Such financial information included schedules detailing estimates of outstanding bond debt and other financial data. McKinsey & Company also relied on data published by or directly provided by the Government of Puerto Rico, PREPA, LUMA, and their respective advisors.

McKinsey & Company has accepted as true, accurate, and appropriate all the legal and financial information and assumptions provided by Proskauer Rose LLP, O'Neill & Borges LLC, other FOMB advisors, and the Government of Puerto Rico, PREPA, LUMA, and their respective advisors. McKinsey & Company has not independently verified any of the information or assumptions received from Proskauer Rose LLP, O'Neill & Borges LLC, other FOMB advisors, the Government of Puerto Rico, PREPA, LUMA, and their respective advisors, nor does it take any independent position with respect to this information and these assumptions.

The assumptions, projections, and estimates used in this analysis are inherently subject to business, economic, and political uncertainties and, therefore, are subject to change. McKinsey & Company makes no representation or warranty that the actual recoveries available to, or potentially realized by, creditors on the basis of available remedies under any laws, including the Puerto Rico Constitution, would or would not approximate the estimates and assumptions represented in this analysis, and actual results may vary materially from those estimated herein. McKinsey &

---

[1] Proskauer Rose LLP and O'Neill & Borges LLC are collectively referred to as "the FOMB's legal advisors" in this analysis.

Company does, however, represent that the recovery range identified herein is its best estimate of such recoveries based on the information provided to it.

## I.   *Methodology*

Based on guidance provided by the FOMB's legal advisors, this analysis assumes the PROMESA Title III case for PREPA is dismissed and PROMESA Titles I and II continue to apply. Therefore, this analysis assumes the automatic stay of debt enforcement terminates, and the FOMB remains in place and continues to certify and, as necessary or appropriate, enforce PREPA Fiscal Plans and budgets, subject to any debt enforcement in excess of the budget the Puerto Rico courts would lawfully order.

This analysis is based on the revenue and expense projections as contained in the June 2022 PREPA Certified Fiscal Plan ("Fiscal Plan 2022"). Based on guidance provided by the FOMB's legal advisors, and as described in Appendix 2, adjustments to certain Fiscal Plan 2022 projections have been made to reflect the impact of the dismissal of the Title III case and the assumption that no Plan of Adjustment is confirmed and consummated. Those adjustments are the following:

- This analysis assumes that the creditors will successfully petition the courts for the appointment of a receiver.[2] In the absence of Title III protections, the stay of debt enforcement would be terminated. At that point, it is assumed that creditors would seek to exercise their right to have a receiver appointed as provided for in the Puerto Rico Electric Power Authority Act (the "PREPA Enabling Act") and/or the Trust Agreement by and between PREPA and First National City Bank as Bond Trustee (the "Trust Agreement"). This analysis considers a range of outcomes dependent on a receiver's operation of PREPA, subject to the Fiscal Plan 2022, as outlined later in this document.
- This analysis assumes that PREPA will continue to be regulated by the Puerto Rico Energy Bureau ("PREB"). It is assumed the PREB will continue to regulate according to current legislation and approve rates under the same procedures and rules.
- This analysis assumes that LUMA will have terminated its agreement with PREPA as of the Effective Date (defined below), as no Plan of Adjustment will be implemented and that LUMA will exercise its termination right resulting from appointment of a receiver.
- This analysis assumes that PREPA, in the absence of Title III protections and a Plan of Adjustment, will not be able to attract a private operator to replace (i) LUMA and assume operations and maintenance ("O&M") responsibility for PREPA's transmission & distribution ("T&D") system or (ii) to assume O&M responsibility for PREPA's generation assets, either in general or on reasonable terms acceptable to the Government and/or the FOMB. PREPA is assumed to continue performing generation O&M responsibilities itself and take over operation of the T&D system as well.
- This analysis assumes that the FOMB will continue to exist throughout the period covered herein because the requirements for dissolution of the FOMB as defined by PROMESA would most likely not be met during this period if the Title III case is dismissed.

---

[2] This and other capitalized terms are defined in the First Amended Disclosure Statement for Title III Plan of Adjustment of the Puerto Rico Electric Power Authority, dated January 27, 2023 (the "Disclosure Statement", to which this document is attached as Exhibit K).

- This analysis adjusts legal and non-legal Title III professional fees to reflect anticipated need for prolonged and heightened litigation and dismissal of the Title III case.

This analysis relies on the following three components to calculate the potential recoveries available to creditors:

i. **Resource Envelope:** The money available to satisfy PREPA creditor obligations, including cash on hand available for debt service
ii. **Outstanding Obligations:** The principal, interest, and maturity schedule of each group of creditor obligations
iii. **Priorities for Distribution of Funds:** The allocation of resources for debt payment consistent with the priorities of use of funds and of payments according to Puerto Rico law and the terms of the applicable contracts.

The "Effective Date" of this analysis is June 30, 2023. The percentage recovery is calculated as the present value as of the Effective Date of the total amount expected to be paid to creditors over the entire period of this analysis (i.e., FY2024 to FY2050) as a proportion of the total outstanding principal and unpaid interest as of the PREPA Title III petition date of July 2, 2017 (the "Petition Date"). Based on guidance provided by the FOMB's financial advisors, this analysis assumes an annual discount rate of 6% as reasonable for the calculation of the present value of future principal and interest payments.

### *i. Resource Envelope*

The total amount of resources available to pay PREPA obligations in each year (the "Resource Envelope") is the sum of (1) starting cash available for debt service as of the Effective Date and (2) surplus generated by PREPA over the course of the year in question.

**(1) Starting cash available for debt service ("starting cash"):** Based on guidance provided by the FOMB's legal and financial advisors, and as described in Appendix 2, the starting cash available for debt service as of the Effective Date considers the following:

- **Sinking fund cash balance:** As described in Appendix 2, PREPA bondholders have a perfected security interest in any moneys in the sinking fund as of the Effective Date. Based on guidance provided by FOMB's legal advisors, this analysis assumes that there will be $16 million available in the sinking fund as of the Effective Date.
- **Unrestricted cash:** Refers to PREPA funds that do not have legal limitations on their use. The unrestricted cash excludes funds that must be used for specific ongoing operating expenses due to Federal or Puerto Rico laws and regulations. Unrestricted cash also excludes funds that have any legal restriction because they are part of custodial or trust accounts, and funds whose use is restricted by a security interest or court orders. Based on guidance provided by the FOMB's legal advisors and as outlined in section "PREPA's cash accounts" of the Disclosure Statement, unrestricted cash is assumed to be available for debt service and is expected to be $112 million as of the Effective Date.
- **Minimum cash balance:** This analysis assumes that PREPA will maintain a minimum cash balance to avoid liquidity constraints that could put its operations at risk. Based on guidance provided by the FOMB's financial advisors, per Section 506 of the Trust Agreement,

3

PREPA is allowed to hold an amount equal to 1/6 its annual operating budget (i.e., two months). To assess starting cash available for debt service, this analysis considers the FY2023 ongoing operating expenses based on Fiscal Plan 2022 as the annual operating budget resulting in a minimum cash balance estimate of $762 million as of the Effective Date.

The total starting cash available for debt service for all the creditors is comprised of unrestricted cash, less PREPA's allowed minimum cash balance. The required minimum cash balance exceeds the estimated unrestricted cash available as of the Effective Date. Therefore, starting cash available for debt service for all creditors is assumed to be $0. Additionally, the bondholders have access to $16 million in the sinking fund as of the Effective Date.

**(2) Surplus generated by PREPA over the course of each year**: The Trust Agreement provides for the existence of a sinking fund for the payment of bond obligations owed by PREPA. The same document stipulates that all net revenues should flow into the sinking fund each year. Any such funds that flow into the sinking fund each year are available for the payment of interest and principal owed by PREPA to the bondholders to the extent that such interest and principal remains unpaid.

The total revenues received by PREPA, minus its total ongoing operating and capital expenses and any amount required to meet PREPA's minimum cash balance requirements, constitute the annual PREPA surplus in any given year. The Fiscal Plan 2022 outlines the following PREPA revenue categories:

- **Sale of electricity:** Revenue earned from sale of electricity to residential, commercial, and industrial customers
- **Other operating income:** Revenues from sources other than sale of electricity (e.g., lease of non-utility property, interest income)

The Fiscal Plan 2022 outlines the following PREPA expense categories:

- **Transmission and distribution operating and capital costs:** Expenses for labor, non-labor and other operating costs, necessary maintenance expenses, and capital costs including system rebuild
- **Labor operating costs**: Expenses for labor associated with operating generation assets and the transmission and distribution system
- **Non-labor and other operating costs**: Expenses other than labor (e.g., supplies, rent, transportation, bad debt expense) associated with operating, maintaining, and administering generation assets and the transmission and distribution system
- **Necessary maintenance expenses**: Expenses for maintaining generation assets and the transmission and distribution system (e.g., repairs, materials)
- **Fuel and power purchase agreements:** Cost of fuel (e.g., coal, diesel, fuel oil) and expenses for power purchased from 3rd party providers
- **CILT and subsidies:** Expenses for contributions in lieu of taxes ("CILT") and other subsidies that benefit rate payers (e.g., for low-income rate payers)

- **PREPA Employees Retirement System pension charge (the "pension obligations")**: Expenses to fund pension benefits and other post-employee benefits for retirees. Pension obligations are treated as ongoing operating expenses in the analysis.

For all revenue and expense items above, this analysis uses projections from the Fiscal Plan 2022, although certain projections are modified to reflect the dismissal of PREPA's Title III case and the lack of a Plan of Adjustment. The modifications take into consideration a number of risks resulting from financial instability and political uncertainty that may impact implementation of fiscal measures in the Fiscal Plan 2022, if a Plan of Adjustment is not confirmed.

The list of modifications to the Fiscal Plan 2022 is described below.

- **Rates:** As described in Appendix 2, this analysis assumes that a receiver will attempt to increase rates above Fiscal Plan 2022 levels to maximize creditor recoveries throughout the period of this analysis. The ability of a receiver to increase rates is uncertain but would impact overall surplus.
- **Load defection:** As a consequence of rate increases, this analysis assumes potential for load defection beyond the Fiscal Plan 2022 projections (i.e., Base Case[3] and Alternative Forecast[4]). As a receiver acts to raise rates, this analysis assumes incremental load defection from three different sources: (1) reduction of gross load consumption stemming from changes in customer behavior (e.g., lower usage of residential appliances), (2) accelerated adoption of distributed generation (e.g., solar panels, small-scale diesel generators), and (3) accelerated adoption of energy efficiency solutions (e.g., LED lighting).
- **Generation management transition:** As described in Appendix 2, this analysis assumes that PREPA, following the termination of LUMA's contract and in the absence of Title III protections and a Plan of Adjustment, will not be able to attract a private operator to replace LUMA and assume O&M responsibility for PREPA's T&D system or PREPA's generation assets, either in general or on reasonable terms acceptable to the FOMB and/or Government. PREPA is assumed to continue performing generation O&M responsibilities itself. This analysis assumes future efficiencies on ongoing operating expenses under the Fiscal Plan 2022 to be delayed, resulting in lower overall surplus.
- **Bad debt expense:** Bad debt expense is estimated as a proportion of revenues. The Fiscal Plan 2022 assumes a gradual improvement in collections which is not expected to fully materialize in an environment where the PREPA Title III case is dismissed and rates are increased by a receiver, resulting in lower overall surplus.

---

[3] As defined in the Fiscal Plan 2022: "The Certified Fiscal Plan Base Case (the "Base Case") developed by PREPA and LUMA includes a load scenario that is based on assumptions for key gross load drivers (GNP and population projections consistent with Commonwealth Certified Fiscal Plan) and for key net load drivers related to energy efficiency (EE), distributed generation (DG) adoption and electric vehicle (EV) uptake."

[4] As defined in the Fiscal Plan 2022: "An alternative forecast based on a bottom-up approach, that uses the current situation in Puerto Rico as the starting point, that is not constrained by Puerto Rico Energy Public Policy Act ("Act 17-2019"), that incorporates the latest data available on current and future costs, and that is supported by driver specific models provides a perspective on a potentially different load forecast (the "Alternative Forecast".)"

- **Additional engineering and O&M expenses:** This analysis also assumes that a new private operator will be required to provide additional services to ensure grid reliability, further increasing engineering and O&M expenses beyond the Fiscal Plan 2022 level.

Once ongoing PREPA operating expenses and prepetition claims that constitute current expenses under the Trust Agreement are paid with the revenues received by PREPA, any remaining revenues received by PREPA flow into the sinking fund. Moneys deposited into the sinking fund are part of the Resource Envelope and therefore available for debt payment.

## ii.    *Outstanding Obligations*

This analysis assumes and considers the following classes of claims and associated balances based on information provided by the FOMB's legal and financial advisors:

- **Bonds and swaps:** As of the Effective Date, the total amount of principal is projected to be $8,266 million and interest is expected to be $2,959 million. This comprises of:
  - **PREPA bonds** totaling $8,259 million in principal and $2,959 million in interest as of the Effective Date.
  - **Swap agreements** totaling $7 million as of the Effective Date arising from interest rate swaps entered into by (i) PREPA and J.P. Morgan (JPM) and (ii) PREPA and Union de Banques Suisse (UBS), each of which is insured by Assured Guaranty. Based on guidance provided by the FOMB's legal advisors, the swap agreements have the same priority as the bond claims.
- **General Unsecured Claims ("GUCs"):** Based on guidance provided by the FOMB's legal and financial advisors and as highlighted in Appendix 2, the total amount of General Unsecured Claims is projected to be of $3,453 million as of the Effective Date, comprised of:
  - **Fuel Line Lenders claims:** Total claims estimated to be $1,143 million, including accrued interest
  - **Commonwealth repayment (per resolution of LUMA contract):** Total claims estimated to be $750 million
  - **Cobra claim:** Total claims estimated to be $393 million, including accrued interest
  - **LUMA termination fee:** Total claims estimated to be $137 million, comprehensive of inflation adjustments accruals
  - **LUMA backend transition and demobilization:** Total claims estimated to be $90 million
  - **PUMA Energy claim:** Total claims estimated to be $45 million
  - **Whitefish Energy claim:** Total claims estimated to be $34 million
  - **Federal claims:** Total claims estimated to be $17 million
  - **Vitol claim:** Total claims estimated to be $41 million
  - **Takings claims:** Total claims estimated to be $2 million
  - **Other claims:** Total claims estimated to be $800 million

### iii.   Priorities for Distribution of Funds

As described in Appendix 2, the available funds will be first distributed to pay the ongoing operating expenses in "an amount which is reasonable and necessary for maintaining, repairing and operating the System in an efficient and economical manner." Pension obligations in Fiscal Plan 2022 are treated as ongoing operating expenses. This analysis assumes that after paying the ongoing operating expenses, PREPA will pay the current expenses under the Trust agreement and other critical unsecured claims, listed below:

- Fuel Line Lenders claims
- Commonwealth repayment (per resolution of LUMA contract)
- Cobra claim
- LUMA termination fee
- LUMA backend transition and demobilization
- PUMA Energy claim
- Whitefish Energy claim

PREPA bonds and swap agreements will be paid next, using moneys available in the Resource Envelope. Subsequently, if there are any resources remaining after paying PREPA bonds and swap agreements, they will be used to pay the remaining General Unsecured Claims.

Exhibit 1 summarizes the order in which funds are disbursed and claims are paid, based on guidance provided by the FOMB's legal advisors and outlined in Appendix 2. For the claims considered in this analysis, debt with the same priority receives the same percentage recovery of debt owed in a given year.  The distribution of resources available to pay creditor obligations follows a distribution waterfall (described below) and leads to a range of recoveries, as described below.

*Exhibit 1: Distribution waterfall*

**Priority of distribution of funds considered in analysis[1]**



1 See Appendix 2 for more details
2 Includes Fuel Line Lenders claims, Commonwealth repayment (per resolution of LUMA contract), Cobra claim, LUMA termination fee, LUMA backend transition and demobilization, PUMA Energy claim, and Whitefish Energy claim, including accrued interest where applicable

Based on guidance provided by the FOMB's legal advisors, funds available at each stage are first assumed to be credited against cumulative interest owed, and then to the debt principal maturing in that year or previously, if any amount remained unpaid. Unpaid principal is assumed to accrue interest according to the original rates stipulated in each of the relevant contracts and is then added to the following year's debt. It is assumed that no interest accrues on interest balances. Based on the same guidance provided by the FOMB's legal advisors, stating that the trustee has the right to accelerate the PREPA bonds and swap agreements, including past due principal and interest, and current debt service going forward, this analysis assumes that payment of all PREPA bonds and swap agreements is to be accelerated, that is, owed to claimholders on the Effective Date.

## II.   *Estimated likely range of recoveries available to creditors*

The estimated likely range of recoveries available to PREPA creditors is dependent on the realization of (i) two possible scenarios ("Scenario 1" where the Government of Puerto Rico does not permit a receiver to increase rates above a certain cap and "Scenario 2" where the Government of Puerto Rico and the FOMB do not interfere with such receiver's actions) and (ii) business assumptions impacting the lower and higher ends of the recovery range (see details below). The combination of various scenarios and business assumptions results in four possible outcomes as described in this analysis.

Based on guidance provided by the FOMB's legal advisors, both Scenario 1 and Scenario 2 assume that PREPA's Title III case will be formally dismissed, a receiver will be appointed in a timely fashion (i.e., within two months of the Effective Date), and that such receiver will choose to increase rates to the extent possible with the sole goal of maximizing the funds available in the Resource Envelope for creditor recovery.

As outlined in Appendix 2, there are many situations in which the Commonwealth may be empowered to set electricity rates. The Commonwealth may be permitted to exercise legislative and/or police power to establish a cap on electricity rates, even if this restriction conflicts with the desired rates of PREPA or any receiver, or even if the rate covenants of bond or fuel line lender documents are found to be enforceable and/or PREB approves of or orders higher rates. Puerto Rico law also allows the government to limit rate increases in certain circumstances. Therefore, Scenario 1 assumes that the Government of Puerto Rico does not permit a receiver to increase rates above a certain cap (i.e., the cap based on the Fiscal Plan 2022).

Alternatively, in the absence of the Commonwealth's exercise of legislative and/or police powers, or if a court finds that such powers do not override the Trust Agreement and other creditor agreements, a receiver will be assumed to operate without restrictions and enforce rate increases to maximize creditor recoveries. Therefore, Scenario 2 assumes that the Government of Puerto Rico and the FOMB do not interfere with such receiver's actions.

In addition, the following business assumptions impact the higher and lower ends of the recovery range:

- **Load defection:** The lower and upper ends of the range are impacted by (1) different assumptions on incremental adoption of distributed generation solutions driven by rate increases and (2) varying baseline projections of energy efficiency solutions adoption.
  (1) The upper end of the range assumes lower adoption of distributed generation solutions driven by rate increases (i.e., lower elasticity parameter). The lower end of the range assumes higher adoption of distributed generation driven by rate increases (i.e., higher elasticity parameter).
  (2) The upper end of the range assumes lower energy efficiency adoption resulting in lower load defection (i.e., Alternative Forecast, as specified in the Fiscal Plan 2022). The lower end of the range assumes higher energy efficiency adoption resulting in higher load defection (i.e., Base Case, as specified in the Fiscal Plan 2022).
- **Generation management transition:** This analysis assumes future efficiencies on ongoing operating expenses under the Fiscal Plan 2022 will be delayed, driven by challenges associated with LUMA contract termination. The reduction in ongoing operating expenses associated with future efficiencies that were budgeted into the Fiscal Plan 2022 starting in FY2024 will not be achieved within the originally projected timeline. Therefore, this analysis assumes a delay in achieving these efficiencies. The upper end of the range assumes a delay of 3 years. The lower end of the range assumes a delay of 4 years.

Based on the scenarios and business assumptions described above, aggregate recoveries (i.e., the present value of total recoveries for all creditors assuming PREPA's Title III case is dismissed, and all claims are enforced under non-bankruptcy law) are estimated to be $16 million to $7,556

million. This would represent an implied aggregate recovery rate of ~0% to 65%. Recoveries would differ between different debt classes, as shown in Exhibit 2. Exhibit 3 (included in Appendix 1) provides additional detail on the estimated likely range of recoveries available to creditors for Scenario 1 and Scenario 2.

*Exhibit 2: Estimated likely range of recoveries available to creditors by debt class*

**Estimated likely range of recoveries available to creditors by debt class**
PV of total payment in USD million, % recovery

|  | Lower end of range[1] | Higher end of range[1] |
|---|---|---|
| **Current expenses under the Trust Agreement and other critical unsecured claims[2]** | $0 *0%* | $2,550 *100%* |
| **Bonds and swaps** | $16 *0%* | $5,006 *59%* |
| **Other GUCs** | $0 *0%* | $0 *0%* |
| **Total** | **$16** ***0%*** | **$7,556** ***66%*** |

1 Lower and higher ends of range described in section "II. Estimated likely range of recoveries available to creditors"
2 Includes Fuel Line Lenders claims, Commonwealth repayment (per resolution of LUMA contract), Cobra claim, LUMA termination fee, LUMA backend transition and demobilization, PUMA Energy claim, and Whitefish Energy claim, including accrued interest where applicable

*APPENDIX 1*

The following exhibit provides additional detail on the estimated likely range of recoveries available to creditors.

*Exhibit 3: Estimated likely range of recoveries available to creditors by debt class and scenario*

**Estimated likely range of recoveries available to creditors by debt class and scenario**
PV of total payment in USD million, % recovery

| | Scenario 1: Rate caps introduced by the Government | | Scenario 2: The Government does not interfere with the receiver | |
| --- | --- | --- | --- | --- |
| | Lower end of range[1] | Higher end of range[1] | Lower end of range[1] | Higher end of range[1] |
| **Current expenses under the Trust Agreement and other critical unsecured claims[2]** | $0 *0%* | $0 *0%* | $2,550 *100%* | $2,550 *100%* |
| **Bonds and swaps** | $16 *0%* | $16 *0%* | $3,581 *42%* | $5,006 *59%* |
| **Other GUCs** | $0 *0%* | $0 *0%* | $0 *0%* | $0 *0%* |
| **Total** | **$16** *0%* | **$16** *0%* | **$6,131** *54%* | **$7,556** *66%* |

1 Lower and higher ends of range described in section "II. Estimated likely range of recoveries available to creditors"
2 Includes Fuel Line Lenders claims, Commonwealth repayment (per resolution of LUMA contract), Cobra claim, LUMA termination fee, LUMA backend transition and demobilization, PUMA Energy claim, and Whitefish Energy claim, including accrued interest where applicable

11

*APPENDIX 2*

# PREPA Title III Plan

## Best Interests Test Analysis – Assumptions

| | Question | Assumption |
|---|---|---|
| 1. | Will a receiver be appointed, and if so, when? | **ASSUMPTION:** Yes.  A receiver will be appointed two months after the Title III case is dismissed.<br><br>**BASIS:** Outside of Title III, a court is likely to find the Bondholders have a right to have a receiver appointed under 22 L.P.R.A. § 207.  It is assumed that the Bondholders will renew their previous request to seek such relief in the Commonwealth courts, and relief will be granted in accordance with the Trust Agreement and the PREPA Enabling Act. |
| 2. | What electricity rates will be in effect for PREPA? When will those rates be set? | **ASSUMPTION 1 [MAIN ASSUMPTION]:**  Starting on the effective date of this analysis (June 30, 2023), rates will be limited to the lesser of (a) the rate determined by the Commonwealth, PREB, the legislature, and/or the FOMB that would minimize risk to the Commonwealth's economic recovery and/or harm PREPA through erosion of PREPA's customer base; and (b) the rate which allows PREPA's revenues to cover Current Expenses (defined below) (including funding the pension system back to solvency), annual revenue bond debt service (excluding swap agreements), and all overdue payments for all PREPA bonds.<br><br>Revenues include income derived from the sale of electricity generated or distributed by the System; proceeds of use and occupancy insurance on the System or any part thereof; income from the investment of moneys under the Trust Agreement, except income from the investment of moneys in the Construction Fund, the Reserve Maintenance Fund, the Capital Improvement Fund, the Subordinate Obligations Fund; and disaster relief funds from the federal government, including FEMA and HUD.<br><br>**BASIS:**  There are many situations in which the Commonwealth will be empowered to set electricity rates. The Commonwealth may be permitted to exercise legislative and/or police power to establish a cap on electricity rates, even if this restriction conflicts with the desired rates of PREPA or any receiver, or even if the rate covenants of bond or fuel line documents are found to be enforceable and/or PREB approves of or orders higher rates.  Puerto Rico law also allows the government to create a committee that could limit increases on the island.<br><br>**ASSUMPTION 2 [ALTERNATIVE ASSUMPTION]:**  The Bondholders and/or Fuel Line Lenders will be permitted to invoke and enforce the rate covenant to compel rates required pursuant to the Trust Agreement and Fuel Line Lender credit documents.  Additionally the pension system will be able to enforce collection of unpaid employer contributions from the last decade.  This invocation will apply independent of whether or |

| | Question | Assumption |
|---|---|---|
| | | not a receiver has been appointed.  As of the date the order enforcing a rate increase goes into effect (described below), rates will be set each year to cover (a) in years where PREPA has defaulted on its debt obligations, all debt service (including all overdue payments) and (b) in years where PREPA is not in default on its debt obligations, 120% of annual debt service, after paying expenses (including maintenance expenses and future fuel line lender expenses), and reserving for two months of liquidity.  PREPA maintains the current rate structure until 60 days following PREB's entry of an order enforcing a requested rate increase, which order is assumed to occur six months after dismissal of the Title III case.<br><br>**BASIS**:  In the absence of the Commonwealth's exercise of legislative and/or police powers, or if a Court finds such powers do not override the Trust Agreement, Fuel Line Lender documents, or rights of the SREAEE, the rate covenant in the Trust Agreement and other such obligations of PREPA might be enforceable.  Further, once PREB enters an order approving a rate increase, Sec. 6.25(f) of Act 57-2014, as amended, provides that a "newly approved rate shall take effect sixty (60) days after the effective date of the Bureau's order." |
| **3.** | Should debt (principal + interest, plus pension arrearage, judgments, etc.) that remained unpaid during the stay accrue additional interest? | **ASSUMPTION:**  Assume contract or statutory interest that would have accrued during the Title III case is owed on a non-compounding basis.  Assume that in years where full payment of matured debt is not made, subsequent payments are first credited against interest, and then against principal.<br><br>i.   **Interest on all PREPA debt during stay**: Pursuant to PROMESA § 303, interest continues to accrue at the contract rate during any moratorium, unless the underlying contract provides for default interest, in which case the latter should be used.  There is no statutory provision for interest on interest.<br>    a.   **Interest on unsecured claims during stay**: Assume that under PR law, interest accrues on unpaid unsecured obligations after default at the agreed upon rate, or at the legal rate in the absence of agreement, unless the agreement provides that no such interest shall accrue, subject to certain conditions.  Further assume no interest accrues on debt having no interest rate.<br>    b.   **Interest on judgment claims**:  Commonwealth law also provides for interest on unpaid judgments at the legal rate, unless otherwise agreed.  The legal rate on government obligations was fixed by law at 6% until July of 2016, and is currently set by the Office of the Commissioner of Financial Institutions ("OCIF"). Pursuant to regulation adopted by OCIF's predecessor, the rate is equal to the 6-month Treasury bill rate, rounded to the nearest |

| | Question | Assumption |
|---|---|---|
| | | ½ of 1%. It was (i) 0.50% from July 2016 through 6/30/17; (ii) 1.00% from 7/1/17 through 12/31/17; (iii) 1.50% from 1/1/18 through 6/30/18; (iv) 2.00% from 7/1/18 through 12/31/18; (v) 2.50% from 1/1/2019 through 12/31/2019; (vi) 1.50% from 1/1/2020 through 6/30/2020; (vii) 0.50% from 7/1/2020 through 6/30/2022; and (viii) after 7/1/2022. <br><br> c.  **Interest on federal claims during stay**: Assume interest accrued during the stay.  The federal government can ultimately collect its debt and interest through setoffs against future aid.  The documents underlying each federal claim may set the interest rates.  The current federal judgment rate is 4.65% per year. <br><br> d.  **Interest on unpaid bond debt**: Assume any unpaid debt accrues interest according to the weighted average coupon rate as of 2023 provided by Citi. <br><br> e.  **Interest on interest should not accrue**: Puerto Rico law permits the payment of interest on overdue interest under certain circumstances, such as if it was expressly agreed by the parties.  However, the PREPA bonds, Fuel Line Lender claims, and SREAEE claims do not provide for interest on overdue interest. |
| 4. | What, if any, cash at PREPA is restricted or otherwise unavailable for distributions? | **ASSUMPTION:**  PREPA will be permitted to maintain a minimum cash balance equal to, and not more than, an amount equal to one-sixth of its Annual Operating Budget (i.e., two months) in the General Fund, which amount will be recalculated annually.  These amounts should be assumed not available for distribution to creditors as they are essential to maintain operations. <br><br> Additionally, any amounts that PREPA may have in investment accounts for the benefit of its pensioners are not available for distribution to creditors. <br><br> Federal and insurance funds allocated to payment of recovery expenses remain restricted, although funds reimbursed to PREPA for recovery costs already paid are unrestricted.  Because the LUMA O&M agreement is assumed to terminate, the LUMA reserve funds must be returned to the Commonwealth under the terms of that appropriation. <br><br> **BASIS:**  Under Section 506 of the Trust Agreement, PREPA is entitled to hold an amount equal to one-sixth of its Annual Operating Budget (i.e., two months) in the General Fund.  Based on the Trust Agreement, that |

|   | Question | Assumption |
|---|----------|------------|
|   |          | amount is required to be retained by PREPA and is not available for payment to the Bondholders.  It is available to pay Current Expenses (defined below). |
| 5. | Should we assume that the ongoing Transmission & Distribution O&M transaction and the proposed Generation O&M transaction do not occur? | **ASSUMPTION:** Neither the Transmission and Distribution O&M transaction, nor the proposed Generation O&M transaction, occur in the absence of a Title III plan.  The contract with LUMA will terminate on the effective date of this analysis.  PREPA will be required to pay LUMA a $115 million termination fee in 2020 dollars, adjusted for inflation, in accordance with the contract (including the Supplemental Terms Agreement, as extended on or around November 30, 2022), plus fees for LUMA's back-end transition and demobilization, contemporaneous with the effective date, which are estimated to be $90 million.  Furthermore, PREPA will be obligated to repay the Commonwealth $750 million that was approved in the Oversight Board's May 2020 Resolution approving the LUMA contract.<br><br>**BASIS:**  No private operator would risk the time and investment with an insolvent entity that is run by a court-appointed receiver, the potential enforcement of the rate covenant, and litigation with the Fuel Line Lenders, Bondholders, pension system, and others.  The current O&M process assumes a fully restructured PREPA with no legacy issues.<br><br>The LUMA contract, by its terms, allows LUMA to terminate its agreement with PREPA if no plan of adjustment is confirmed for PREPA by December 1, 2022 (the extension of this date is currently under discussion among the parties); dismissal of the Title III case will be an anticipatory breach of the LUMA contract.<br><br>The FOMB agreed to have the Commonwealth provide PREPA $750 million to be used in connection with the contract with LUMA.  However, the resolution pursuant to which such monies were allocated provides that if the contract with LUMA is terminated, PREPA is obligated to return such funds to the Commonwealth. |
| 6. | Energy Efficiency: Based on Act 17-2019, PREB/PREPA is required to achieve a 30% load reduction through energy | **ASSUMPTION 1 (MAIN ASSUMPTION):**  Although this is aspirational and not within PREPA's control, the base case in the PREPA Fiscal Plan assumes efficiency targets are met.<br><br>**BASIS:**  The PREPA Fiscal Plan is consistent with Act 17-2019.  Accordingly, PREB/PREPA, and any receiver taking over PREPA's operations, are lawfully required comply with Act 17-2019. |

| | Question | Assumption |
|---|---|---|
| | efficiency by 2040 (i.e., more efficient appliance, building construction materials, etc.). Does this requirement remain in effect? | **ASSUMPTION 2 (ALTERNATIVE ASSUMPTION):** The PREPA Fiscal Plan's alternative scenario for slower adoption of energy efficiency is realized.<br><br>**BASIS:** The PREPA Fiscal Plan contemplated an alternative scenario to present a potentially more realistic timeline for energy efficiency targets. |
| 7. | To which Revenues are the Bondholders entitled pursuant to the Trust Agreement? | **ASSUMPTION:** The Bondholders are entitled under the Trust Agreement to have PREPA deposit in the Sinking Fund all Net Revenues (as defined in the Trust Agreement). The Net Revenues consist of all gross revenues of PREPA, including customer collections, insurance proceeds, and income from investments, minus "reasonable and necessary current expenses of maintaining, repairing and operating [PREPA]" (as defined in the Trust Agreement) (the "Current Expenses"), which includes engineering expenses related to operations and maintenance and "any payment to pension or retirement funds," and may include payments to the Fuel Line Lenders, discussed in the Assumption immediately below. PREPA is also entitled to retain an amount equal to 1/6 of its Annual Operating Budget in the General Fund.<br><br>**BASIS:** Independent of whether or not the Bondholders have a perfected security interest in Gross Revenues, PREPA has a contractual right to have Revenues flow through the General Fund, be used to pay Current Expenses, and then sent to the Sinking Fund, in which Bondholders have a perfected security interest through possession and control. The Trustee has control over the deposit accounts comprising the Sinking Fund, and Bondholders will be paid ratably from the monies in the Sinking Fund. If PREPA were to breach the Trust Agreement, the Bondholders could obtain a remedy of specific performance from the Commonwealth courts in addition to the appointment of a receiver to compel PREPA to raise rates to a sufficient level to pay current expenses and the amounts owed to the Bondholders. To the extent these contractual rights are *pari passu* with the contractual rights of other unsecured claimholders, the receiver will have the ability, and is likely, to provide for the flow of Revenues as described herein, such that Bondholders are paid from Net Revenues prior to other unsecured claimholders being paid from Net Revenues. The amount of Net Revenues that end up in the Sinking Fund depend on the rate assumptions described above. |
| 8. | Are retirement systems and Fuel Line Lenders | **ASSUMPTION:** Payments to fund the retirement system are determined to be Current Expenses with priority over bond debt. Similarly, Fuel Line Lender claims are determined to be Current Expenses with priority over bond debt. |

| | Question | Assumption |
|---|---|---|
| | entitled to be paid prior to, or after debt service? | **BASIS:** Retirement system expenses qualify as Current Expenses pursuant to the Trust Agreement and enforce a priority over the Bondholders, or alternatively, PREPA may decide to make these payments in its discretion to the retirement system. Similarly, Fuel Line Lender claims are Current Expenses pursuant to the Trust Agreement and that such a status entitles them to a priority of payment over the Bondholders. |
| 9. | Are the bondholder claims recourse or non-recourse? | **ASSUMPTION:** The Bondholder claims are nonrecourse against PREPA. They can recover only from the Sinking Fund and certain subordinate funds (which hold certain Net Revenues—i.e., Revenues minus Current Expenses) as described in the Trust Agreement, in which there is currently approximately $16 million. The Bondholders will not be able to enforce any deficiency claim against PREPA, including gross revenues.<br><br>**BASIS:** The language of the Trust Agreement provides that the bonds are nonrecourse. |
| 10. | What, if any, claims are accelerated? | **ASSUMPTION:** The Fuel Line Lenders will obtain a judgment with respect to their claim. The entire amount outstanding is due and payable immediately upon the effective date of this analysis (including accrued interest). The SREAEE employer contribution arrearage will also be due and payable.<br><br>The Trustee has the right to accelerate the PREPA bonds, which will include past due principal and interest, and current debt service going forward. The Trustee will make the decision regarding acceleration in the manner most economically favorable to the Bondholders.<br><br>**BASIS:** Pursuant to the underlying documents, as of the effective date of this analysis, the Fuel Line Lenders' claims and pension system arrears are already due, and the Bondholders have the right to accelerate their claims. |
| 11. | How should PREPA's swaps be treated? | **ASSUMPTION:** Swap obligations are treated the same as the Bondholders, and swap counterparties, like the Bondholders, are secured by the Sinking Fund and subordinate funds.<br><br>**BASIS:** Swap claims are secured claims under the Trust Agreement. PREPA's underlying exposure on swaps is insured by Assured, and claimants are allowed to assert their full claim against Assured. Assured will then have the equivalent of a bond claim under the Trust Agreement for any amounts paid by it. |

6

| | Question | Assumption |
|---|---|---|
| **12.** | What is the order in which PREPA will pay its various obligations? | **ASSUMPTION:** The claims will be paid in the following order, from both PREPA's starting available resources and revenues, subject to the litigation risks discussed herein:<br><br>1. Current Expenses (including maintenance to preserve generation capabilities and the grid's operational capacity in the long term, as well as any necessary catch-up payments on deferred maintenance (but not any payments to improve or modernize generation or the grid)), the two month reserve, payments for pension benefits, and payments to Fuel Line Lenders (if the Fuel Line Lenders are found to be a Current Expense).<br>2. One-sixth of the annual Operating Budget held in Reserve Account (Trust Agreement § 506).<br>3. Bondholders (entitled to all Net Revenues deposited into the Sinking Fund) (Trust Agreement § 507).<br>4. Unsecured claims (including legacy GUCs, the pension claim, and Fuel Line Lenders' claim, if not found to be a Current Expense).<br>5. Capital expenditures, including essential system improvements, other than improvements to be made from federal funds.<br><br>**BASIS:**  The Trust Agreement provides that PREPA "covenants that moneys in the General Fund will be used first for the payment of the Current Expenses of the System, that such expenses will not exceed an amount which is reasonable and necessary for maintaining, repairing and operating the System in an efficient and economical manner, and that the total amount of Current Expenses in any fiscal year will not exceed the amount provided therefor in the Annual Budget for such fiscal year or any amendment thereof or supplement…"  Trust Agreement § 505.<br><br>Pursuant to the Trust Agreement, PREPA first pays Current Expenses, then it retains in the General Fund a "reserve for Current Expenses as the Treasurer may determine, but not more than one-sixth (1/6) of the amount shown by the Annual Budget to be necessary for Current Expenses."  Trust Agreement § 506.  The budgets certified by the Oversight Board are used in lieu of any Annual Budget as defined in the Trust Agreement. Finally, any revenues still left are transferred to the Sinking Fund.  Trust Agreement §§ 506, 507.<br><br>Because capital improvements will be last, and other than improvements to be made with federal funding, the system will continue to degrade. |

## DEBT STACK[1]

1. **Adjustments from Fiscal Plan**
    a. In the case of PREPA professional advisor fees:
        i. Legal services fees will recur through FY2027 assuming extensive litigation need without Title III protections or a Plan of Adjustment, equaling the FY2022 run rate of legal fees plus an additional 20% through FY2027
        ii. Non-legal services fees would equal one-half of the FY2022 run rate through FY2027
    b. All professional fees for the creditors committee are assumed to be zero after the effective date of this analysis (June 30, 2023).
2. **PREPA Debt as of the Effective Date of the PREPA BIT Analysis**
    a. PREPA bonds: $8,259 million in principal and $2,959 million in interest
    b. Fuel Line Lenders claims: $1,143 million, including accrued interest
    c. Swap agreements: $7 million in principal and $0 in interest
3. **Post-Petition Current Expenses (as of the Effective Date of the PREPA BIT Analysis)**
    a. Commonwealth repayment (per resolution of LUMA contract): $750 million
    b. Cobra claim: $393 million including accrued interest
    c. LUMA termination fee: $137 million, comprehensive of inflation adjustments accruals
    d. LUMA backend transition and demobilization: $90 million
    e. PUMA Energy claim: $45 million
    f. Whitefish Energy claim: $34 million (assuming PREPA prevails in a pending appeal with the Federal Emergency Management Agency; could increase to $40 million).
4. **Pre-Petition Claims (as of the Petition Date)**
    a. General Unsecured Claims:  $800 million
    b. Vitol claim:  $41,457,382.88
    c. Takings claims:  $2,437,556
    d. Federal claims:  $16,859,577

---

[1] The financial information contained herein relies on information available in most recent publicly available financial statements and, in certain cases, information received from the Oversight Board's advisors and the Commonwealth advisors.  The legal advisors take no position as to the accuracy of the financial information provided herein or the validity or allowability of any of the claims enumerated herein, and the Oversight Board's right to challenge any such claims is expressly reserved.

LUMA was not involved in the preparation of the best interests test analysis. LUMA takes no position on the accuracy or completeness of the information contained therein and the conclusions derived therefrom.