## **Exhibit N**

NATIONAL PSA

EXECUTION COPY

## PREPA PLAN SUPPORT AGREEMENT

PREPA PLAN SUPPORT AGREEMENT, dated as of January 31, 2023, by and among (a) Financial Oversight and Management Board for Puerto Rico (the "**Oversight Board**"), on behalf of itself and as the sole Title III representative of the Puerto Rico Electric Power Authority ("**PREPA**"), and (b) National Public Finance Guarantee Corporation, solely in its capacity as insurer and asserted holder, deemed holder, or subrogee with respect to PREPA Revenue Bonds ("**National**", and also a "**PSA Creditor**" ). The signatories hereto are referred to hereafter collectively as the "**Parties**" or individually as a "**Party**".  Capitalized terms used but not otherwise defined herein shall have the meanings set forth below or in the Amended Plan (as defined below), as applicable.

## RECITALS

A.      Pursuant to the authority granted pursuant to Act No. 83-1941, as amended, PREPA was established on May 2, 1941, a government instrumentality responsible for a unified electric system with the primary purpose of, among other things, ensuring the total electrification of Puerto Rico.

B.      In accordance with provisions of 22 L.P.R.A. § 196(o) and that certain Trust Agreement, dated as of January 1, 1974, as has and may be amended, restated, supplemented or otherwise modified from time to time (the "**Bond Trust Agreement**"), between PREPA and U.S. Bank National Association, as successor trustee (the "**Trustee**"), PREPA issued series of power revenue bonds and power revenue refunding bonds (collectively, the "**PREPA Revenue Bonds**"),

C.      As of July 2, 2017 (the "**PREPA Petition Date**"), and as set forth on Exhibit "A" hereto, the outstanding principal amount of the PREPA Revenue Bonds is asserted to be Eight Billion Two Hundred Fifty-Eight Million Six Hundred Fourteen Thousand One Hundred Forty-Eight Dollars ($8,258,614,148.00).

D.      In connection with the issuance of certain of the PREPA Revenue Bonds, National issued certain municipal bond insurance policies (the "**Insurance Policies**"), insuring the scheduled payment of principal of and interest accrued, One Billion Two Hundred Forty-Five Million Seven Hundred Eighty-Five Thousand Dollars ($1,245,785,000.00), in original principal amount of the PREPA Revenue Bonds.

E.      In connection with the issuance of the Insurance Policies, PREPA entered into certain Agreements Regarding Bond Insurance (collectively, the "**Insurance Agreements**"), pursuant to which National asserts that PREPA agreed to, among other things, and to the extent that National made payments of principal and interest on or incurs any other costs with respect to, the Insured PREPA Revenue Bonds, PREPA would reimburse National, with interest, as the case may be, for any and all such payments, and costs (an "**Asserted Reimbursement Claim**")[1].

---

[1] For the avoidance of doubt, neither the Asserted Reimbursement Claims nor the Settled Reimbursement Claim, each as defined below, include any Transferred Claims.

EXECUTION COPY

F.      On June 30, 2016, the Puerto Rico Oversight, Management, and Economic Stability Act was signed into law by the President of the United States (P.L. 114-187) ("**PROMESA**").

G.      PROMESA created the Oversight Board and provided the Oversight Board with certain powers over the finances and restructuring process with respect to, among others, the Commonwealth of Puerto Rico (the "**Commonwealth**") and its instrumentalities, including, without limitation, PREPA, all as provided for in PROMESA.

H.      Pursuant to Act 2-2017, the Puerto Rico Fiscal Agency and Financial Advisory Authority ("**AAFAF**") was appointed as the agent of, and advisor to, the Government of the Commonwealth of Puerto Rico (the "**Government**"), and granted authority with respect to the restructuring of any indebtedness issued by the Commonwealth and any governmental entity of the Commonwealth, including, without limitation, PREPA.

I.      On the PREPA Petition Date, the Oversight Board filed a Title III petition on behalf of PREPA (the "**PREPA PROMESA Case**") in the United States District Court for the District of Puerto Rico (the "**Title III Court**").

J.      The Oversight Board is the sole Title III representative of PREPA in the PREPA PROMESA Case pursuant to Section 315(b) of PROMESA.

K.      On July 1, 2019, the Oversight Board commenced an adversary proceeding against the Trustee, as amended (the "**Adversary**"), by filing a complaint, styled The Financial Oversight and Management Board for Puerto Rico v. U.S. Bank National Association, Adv. Proc. No. 19-00391-LTS, currently pending in the Title III Court, in which the Oversight Board asserts, among other claims and causes of action, that the Trustee's lien and security interest is limited to funds in certain deposit accounts held by the Trustee and that the Trustee's claims with respect to the PREPA Revenue Bonds are non-recourse to PREPA.

L.      On December 16, 2022, PREPA filed that certain Title III Plan of Adjustment of Puerto Rico Electric Power Authority, (the "**Initial Plan**") [Dkt. No. 3110], in the Title III Court, and a corresponding disclosure statement (the "**Initial Disclosure Statement**") [Dkt. No. 3111].

M.      National represents that, from and after the PREPA Petition Date and as of January 1, 2023, National has made payments of Two Hundred Twenty Six Million Four Hundred Sixty-Five Thousand Eight Hundred Fifty-Six Dollars and Twenty-Five Cents ($226,465,856.25) to holders of Insured PREPA Revenue Bonds, on account of interest payments due and payable with respect thereto, as they may continue to accrue up to, but not including, the PREPA Effective Date, as defined below (the "**Settled Reimbursement Claim**").

N.      The Parties, through mediation and direct interaction, have engaged in good faith, arm's-length negotiations, including, without limitation, regarding the terms of a proposed restructuring of the PREPA Revenue Bonds and other claims held by National, including, without limitation, the Asserted Reimbursement Claims, to be implemented in a manner as set forth herein, including, without limitation, in accordance with the Settlement Summary annexed hereto as Exhibit "B".

**EXECUTION COPY**

O.     The Oversight Board consents to the execution and delivery of this Agreement by PREPA and to PREPA's performance and exercise of its respective rights under this Agreement, including, without limitation, the right to terminate this Agreement and right to consent to any waiver or amendment, in each case, in accordance with the terms and conditions set forth herein.

NOW, THEREFORE, the Parties, in consideration of the promises and covenants herein described, acknowledged by each of them to be satisfactory and adequate, and intending to be legally bound, do hereby mutually agree as follows:

ARTICLE I

DEFINITIONS

Section 1.1     Recitals.  The recitals set forth above are incorporated by reference and are explicitly made a part of this Agreement.

Section 1.2     Definitions.  The following definitions shall apply to and constitute part of this Agreement and all schedules, exhibits and annexes hereto:

*"Agreement"* shall mean this PREPA Plan Support Agreement, and each exhibit annexed hereto or thereto, including, without limitation, upon filing, the Settlement Summary annexed hereto as Exhibit "B", as may be amended, supplemented, or otherwise modified in accordance with the terms hereof or thereof.

*"Amended Plan"* shall mean the Amended Title III Plan of Adjustment of the Puerto Rico Electric Power Authority, other than the First Amended Plan, to be filed by the Oversight Board with respect to PREPA after the date hereof in accordance with this Agreement, as it may be amended, modified, or supplemented, incorporating the terms and provisions of this Agreement, including, without limitation, the Settlement Summary.

*"Bankruptcy Code"* shall mean Title 11 of the United States Code, as amended, §§101, et seq.

*"Bankruptcy Rules"* shall mean the Federal Rules of Bankruptcy Procedure.

*"Business Day"* shall mean a day other than a Saturday, a Sunday, or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

*"Commonwealth PROMESA Case"* shall mean the case commenced under Title III of PROMESA in the Title III Court, Case No. 17-BK-3283-LTS.

*"CUSIP"* shall mean the Committee on Uniform Securities Identification Procedures nine-digit numeric or nine-digit character alphanumeric code which, for purposes of this Agreement, identifies the series of PREPA Revenue Bonds for the purposes of facilitating clearing and settlement of trades.

3

EXECUTION COPY

***"Custodial Trust Documents"*** shall mean, collectively, the trust agreements and other documents and instruments attendant to the custodial trusts to be created as of the PREPA Effective Date and relating to the National Insured Bonds and the distributions to be made in accordance with the Amended Plan.

***"CVI"*** shall mean a contingent value instrument which may be included in distributions to PREPA's creditors in accordance with the terms and provisions of the Amended Plan.

***"Face Amount"*** shall mean, solely for purposes of Article II hereof and the signature pages affixed hereto, (a) with respect to current interest PREPA Revenue Bonds, insured or uninsured, the outstanding principal amount of such PREPA Revenue Bonds as of the date of this Agreement, and (b) with respect to capital appreciation PREPA Revenue Bonds, insured and uninsured, the accreted value of such PREPA Revenue Bonds during the period up to, but not including, the PREPA Petition Date.

***"Final Order"*** shall mean an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, remand proceeding, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial reargument, or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed or reversed in part or in full, with no further proceedings on remand, by the highest court to which such order was appealed, certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and (ii) the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; <u>provided, however,</u> that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order, except as provided in the Federal Rules of Appellate Procedure, the Bankruptcy Rules, or the applicable local Bankruptcy Rules.

***"First Amended Plan"*** shall mean the First Amended Title III Plan of Adjustment of the Puerto Rico Electric Power Authority to be filed by the Oversight Board with respect to PREPA.

***"Fiscal Plan"*** shall mean a "Fiscal Plan" as defined by Section 5(10) of PROMESA.

***"Fiscal Year"*** shall mean a fiscal year of PREPA commencing on July 1st and concluding on June 30th of the following calendar year.

***"Fuel Line Adversary"*** shall mean that certain litigation, styled <u>Cortland Capital Market Services LLC v. The Financial Oversight and Management Board for Puerto Rico</u>, Adv. Proc. No. 19-00396-LTS, currently pending in the Title III Court.

***"Fuel Line Lender PSA"*** shall mean that certain Plan Support and Settlement Agreement, dated as of December 1, 2022, by and among the Oversight Board and the Fuel Line Lender PSA Creditors, as it may be amended, modified, or supplemented in accordance with the terms thereof.

4

EXECUTION COPY

*"Fuel Line Lender PSA Creditors"* shall mean, collectively, the parties to the Fuel Line Lender PSA, other than the Oversight Board, as they may change from time to time in accordance with the terms and conditions of the Fuel Line Lender PSA.

*"Government Parties"* shall mean, collectively, the Oversight Board and PREPA.

*"Government Released Claims"* shall mean, collectively, any and all claims, demands, rights, liabilities, or causes of action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, whether asserted or unasserted, which any Party, or anyone claiming through them, on their behalf or for their benefit have or may have or claim to have, now or in the future, against any Government Releasee arising from, related to, or in connection with PREPA, the PREPA Revenue Bonds, the PREPA Revenue Bond Claims, and arising prior to the PREPA Effective Date (including for the avoidance of doubt claims against the Commonwealth related to the PREPA Revenue Bonds); provided, however, that "Government Released Claims" shall not include any and all rights, privileges, claims, demands, liabilities, or causes of action of any and every kind, character or nature whatsoever (a) against (i) PREPA arising from or relating to the Amended Plan, the securities to be issued pursuant to the Amended Plan, or (ii) a Government Party unrelated to the PREPA Revenue Bonds, or the PREPA Revenue Bond Claims, or (b) arising from or related to any act or omission that constitutes intentional fraud or willful misconduct.

*"Government Releasees"* shall mean the Government Parties, together with their respective current or former board members, directors, principals, special committees, agents, officers, employees, advisors and professionals, in each case, in their capacities as such, including, without limitation, any and all advisors and professionals retained by the Government Parties in connection with the PROMESA Cases, in their respective capacities as such.

*"Insured Bond Claims"* shall mean, collectively, the claims of National arising from or related to the Insured PREPA Revenue Bonds; provided, however, that, for the avoidance of doubt, "Insured Bond Claims" do not include Asserted Reimbursement Claims or Settled Reimbursement Claims.

*"Insured PREPA Revenue Bonds"* shall mean the National Insured Bonds.

*"Interim Charge"* shall mean the equivalent of a one cent ($0.01)/KWH volumetric charge from the effectiveness of this Agreement, if approved by PREB, times the Insured Bond Claims divided by the PREPA Revenue Bond Claims, which shall be implemented by PREPA and added to customers' bills during the period from approval thereof by PREB up to and including the PREPA Effective Date, at which time the Interim Charge shall be terminated.

*"Interim Payment"* shall mean, collectively, the payments to be made solely from the cash flow generated and collected from the Interim Charge, subject to PREB approval, to National in accordance with the terms and provisions of Section 6.2 hereof and the Settlement Summary.

*"LUMA"* shall mean LUMA Energy, LLC or LUMA Energy ServCo, LLC, as applicable.

5

*"Motion to Dismiss"* shall mean that certain Motion of the Ad Hoc Group of PREPA Bondholders, Assured Guaranty Corp., Assured Guaranty Municipal Corp., National Public Guarantee Corporation, and Syncora Guarantee, Inc. to Dismiss PREPA's Title III Case, or for Relief from the Automatic Stay to Enforce Their Right to a Receiver, Case No. 17-bk-4780-LTS, ECF No. 2973.

*"National Insured Bonds"* shall mean, collectively, the PREPA Revenue Bonds that are insured by National or any of its affiliates and listed on Exhibit "C" annexed hereto; provided, however, that, for the avoidance of doubt, "National Insured Bonds" shall not include the Transferred Bonds.

*"New Bonds"* shall mean, collectively, the Series A Bonds and the Series B Bonds, as more fully described in the Settlement Summary annexed hereto as Exhibit "B", to be issued on the PREPA Effective Date by PREPA in accordance with the terms and conditions of the Amended Plan, the PREPA Confirmation Order, and the New Master Indenture, including, without limitation, any refunding bonds which may be issued in accordance with the New Master Indenture.

*"New Master Indenture"* shall mean the master trust indenture or resolution to be executed and delivered as of the PREPA Effective Date pursuant to which PREPA, as reorganized, shall issue the New Bonds, and including all of the terms and provisions in connection therewith, as it may be amended, supplemented or modified from time to time, in accordance with its terms and conditions, the form of which will be included in the Plan Supplement.

*"New Master Trustee"* shall mean the trustee or replacement trustee, as the case may be, appointed in accordance with the terms and conditions of the New Master Indenture.

*"Operation and Maintenance Agreement"* shall mean that certain Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement, dated as of June 22, 2020, by and among PREPA, the Puerto Rico Public-Private Partnership Authority and LUMA.

*"Plan Supplement"* shall mean, collectively, the compilation of some or all of the PREPA Definitive Documents filed by PREPA with the Title III Court.

*"PREB"* shall mean the Puerto Rico Energy Bureau, together with its successors and assigns.

*"PREPA Revenue Bond Claims"* shall mean, collectively, the claims against PREPA arising from or relating to the PREPA Revenue Bonds, which shall be calculated, for the purposes of the Amended Plan, as the outstanding principal amount of the PREPA Revenue Bonds plus accrued, but unpaid, interest up to, but not including, the PREPA Petition Date.

*"PREPA Confirmation Order"* shall mean the order of the Title III Court confirming the Amended Plan in accordance with Section 314 of PROMESA and section 1129 of the Bankruptcy Code made applicable in the PROMESA Cases in accordance with Section 301 of

PROMESA, which shall have been proposed to the Title III Court in a form reasonably satisfactory to the Oversight Board and National.

*"PREPA Definitive Documents"* shall mean, collectively, the documents, including, without limitation, any related agreements (including the New PREPA Bonds Indenture), instruments, schedules or exhibits, that are necessary or desirable to implement, or otherwise relate to, the terms and provisions set forth herein, in the Settlement Summary, the Amended Plan (including any amendments, modifications and supplements thereto), the PREPA Disclosure Statement, the PREPA Disclosure Statement Order, the PREPA Confirmation Order, and bond resolutions, as amended or as repealed and replaced, each having terms and conditions consistent with this Agreement, the Settlement Summary, and PROMESA, in all respects and otherwise be in form and substance reasonably satisfactory to the Oversight Board and National. For the avoidance of doubt, the PREPA Definitive Documents include documents as proposed or subsequently revised and proposed.

*"PREPA Disclosure Statement"* shall mean the disclosure statement to be filed with respect to the Amended Plan with the Title III Court by the Oversight Board in the PREPA PROMESA Case in accordance with section 1125 of the Bankruptcy Code made applicable in the PROMESA Cases in accordance with Section 301 of PROMESA, which disclosure statement shall be in form and substance reasonably acceptable to the Oversight Board and National.

*"PREPA Disclosure Statement Order"* shall mean the order of the Title III Court (a) approving the form of PREPA Disclosure Statement and the adequacy of the information contained therein in accordance with section 1125 of the Bankruptcy Code, made applicable in the PREPA PROMESA Case in accordance with Section 301 of PROMESA, and (b) authorizing, among other things, the form and manner of solicitation of (i) acceptance and rejections to the Amended Plan, and (ii) elections, if applicable, of distributions thereunder, which order shall be in form and substance reasonably satisfactory to the Oversight Board and National, and in each case solely as to itself.

*"PREPA Effective Date"* shall mean, the date on which the transactions contemplated by the Amended Plan and authorized by the Title III Court pursuant to the PREPA Confirmation Order have been substantially consummated, but under all circumstances, shall be the date no later than the tenth (10th) calendar day following the date on which all conditions to the effectiveness of the Amended Plan have been satisfied or waived in accordance with its terms.

*"PROMESA Cases"* shall mean, collectively, the Commonwealth PROMESA Case and the PREPA PROMESA Case.

*"Proofs of Claims"* shall mean, collectively, the proofs of claims filed by National, Claim Nos. 22078 and 23396.

*"Qualified Marketmaker"* shall mean an entity that (x) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers debt securities such as the PREPA Revenue Bonds or enter with customers into long and short positions in debt securities such as the PREPA Revenue Bonds, in its capacity as a dealer or market marker in such PREPA Revenue Bonds; (y) is in fact regularly in the business

of making a market in debt securities; and (z) if transacting with respect to PREPA Revenue Bonds, is registered with Securities and Exchange Commission and financial institutions regulatory authority.

*"Renewed Receiver Motion"* shall mean that certain Renewed Motion of National Public Finance Guarantee Corporation, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and Syncora Guarantee Inc. for Relief from the Automatic Stay to Allow Movants to Enforce Their Statutory Right to Have a Receiver Appointed, Case No. 17-BK-4780-LTS, Dkt. No. 975.

*"Series A Bonds"* shall mean, collectively, the series of New Bonds to be issued on the PREPA Effective Date and to be distributed to the Fuel Line Lender PSA Creditors in accordance with the terms and conditions of the Amended Plan, the PREPA Confirmation Order, the Fuel Line Lender PSA and the New Master Indenture.

*"Series B Bonds"* shall mean, collectively, the series of New Bonds to be issued on the PREPA Effective Date and to be distributed to holders and insurers of PREPA Revenue Bonds in consideration of the release and exchange of all claims arising from, or related to, among other claims, the PREPA Revenue Bonds and pursuant to the Amended Plan, the PREPA Confirmation Order and the New Master Indenture.

*"Settlement Summary"* shall mean the summary of the key economic terms to be included in the Amended Plan as set forth in Exhibit "C" annexed hereto.

*"Sinking Fund"* shall have the meaning ascribed to such term in the Adversary.

*"Sistema Adversary"* shall mean that certain litigation, styled Sistema de Retiro de los Empleados de la Autoridad de Energia Electrica v. Financial Oversight and Management Board for Puerto Rico, Adv. Proc. No. 19-0045-LTS, currently pending in the Title III Court.

*"Transferred Bonds"* shall mean, collectively, the PREPA Revenue Bonds that National (a) satisfied all amounts due and owing thereunder and (b) sold, assigned, and transferred its interests and rights into certain third-party buyers.

*"Transferred Claims"* shall mean, collectively, claims arising under or relating to the Transferred Bonds.

*"UCC Objection"* shall mean that certain Objections of the Official Committee of Unsecured Creditors to Proof of Claim Number 18449, Case No. 17-bk-4780-LTS, Dkt. No. 1691.

Section 1.3   Other Terms.   Other terms may be defined elsewhere in this Agreement and, unless otherwise indicated, shall have such meaning throughout this Agreement.  As used in this Agreement, any reference to any federal, state, local, or foreign law, including any applicable law, will be deemed also to refer to such law as amended and all rules and regulations promulgated thereunder, unless the context requires otherwise. The words "include", "includes", and "including" will be deemed to be followed by "without limitation." Pronouns in masculine, feminine or neutral genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise

8

requires. The words "this Agreement", "herein", "hereof", "hereby", "hereunder", and words of similar impact refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited,

Section 1.4    Interpretations.  The Parties have participated jointly in the negotiation and drafting of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties hereto and no presumption or burden of proof will arise favoring or disfavoring any party hereto because of the authorship of any provision of this Agreement.

Section 1.5    Exhibits.  Each of the exhibits, annexes, signature pages and schedules annexed hereto are expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes and schedules.

ARTICLE II

GENERAL PROVISIONS

Section 2.1    Financial Information.  The Oversight Board represents and covenants that (a) the financial information set forth on signature pages affixed to this Agreement and the CUSIP numbers for the PREPA Revenue Bonds, provided by the Parties pursuant to Section 2.2 hereof are proprietary, privileged, and confidential, and (b) unless otherwise ordered by the Title III Court, shall not disclose to any third party and shall otherwise use its reasonable best efforts to protect the confidential nature of such financial information and CUSIP numbers, including, without limitation, in filings to be made in the Title III Court or any other public release.

Section 2.2    CUSIP Information.  Unless the then-current information has previously been provided to the Oversight Board, within two (2) Business Days after the date hereof, National shall provide the Oversight Board, in writing, the Face Amount and CUSIP numbers for each of the PREPA Revenue Bonds, if any, such Party owns, insures or has due investment management responsibility and authority for funds or accounts which own such PREPA Revenue Bonds.  In addition, within five (5) Business Days of each calendar month or upon the request of the Oversight Board, which request shall be made no more frequently than monthly from and after the date hereof, National shall provide the Oversight Board, in writing, the Face Amount and CUSIP numbers for each of the PREPA Revenue Bonds, if any, such Party then owns, insures or has due investment management responsibility and authority for funds or accounts which own such PREPA Revenue Bonds.

Section 2.3    Settlement.  The Agreement sets forth the Parties' understanding regarding the compromise and settlement of asserted claims, causes of action, and asserted priority, rights and claims as set forth in the Proofs of Claims, the National Insured Bonds, the Insurance Agreements, the Adversary, the Motion to Dismiss, the Fuel Line Adversary, the Renewed Receiver Motion, the Sistema Adversary and the UCC Objection, including, without limitation, the terms and conditions set forth in the Settlement Summary, and such understanding, terms and conditions shall be included in the Amended Plan.  In the event of any inconsistencies between the terms of this Agreement and the Settlement Summary, the terms of the Settlement Summary shall control.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

Section 3.1    Representations and Warranties of the Oversight Board.  The Oversight Board hereby represents and warrants that: (a) it is duly created in accordance with the terms and provisions of PROMESA with all requisite consent, approval, power and authority to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite, consent, approval, power and authority to execute and deliver and to perform its obligations under this Agreement and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any material agreements specifically applicable to it or any law, rules or regulations applicable to it; and (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder other than other creditors' assertions that they may object to confirmation of a plan of adjustment, request stay relief, and/or move to dismiss the PREPA PROMESA Case.

Section 3.2    Representations and Warranties of PREPA.  PREPA, through its Title III representative, the Oversight Board, hereby represents and warrants that, subject to entry of an order of the Title III Court: (a) it is duly organized and validly existing under the laws of the jurisdiction of its organization with all requisite, consent, approval, power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any material agreements specifically applicable to it, or any law, rules or regulations applicable to it; and (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which PREPA believes would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder.

Section 3.3    Representations and Warranties of National.  National hereby represents and warrants that, as of the date hereof: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite, consent, approval, power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any agreements specifically applicable to it, or any law rule or regulations applicable to it; (c)

10

it owns or has investment management responsibility for accounts that own PREPA Revenue Bonds or claims with respect to the Insured Bonds Claims in the amounts set forth on Exhibit "C" hereto, which it would be entitled to vote in a plan solicitation, including, without limitation, in accordance with the provisions of Section 301(c)(3) of PROMESA; (d) it has the authority pursuant to applicable insurance agreements and insurance policies to settle the claims of National Insured Bonds, including, without limitation, in accordance with the provisions of Section 301(c)(3) of PROMESA; (e) except with respect to Transferred Bonds and Transferred Claims, it has not sold, assigned, transferred, participated, or otherwise pledged such claims or assigned such insurance agreements, or any voting, consent or direction rights related to such claims or insurance agreements, to any other person or entity, that would prevent or adversely affect in any way its obligations pursuant to this Agreement at the time such obligations are required to be performed; and (f) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder.

Section 3.4    Representations of the Parties to this Agreement.  Each Party, severally and not jointly, represents and acknowledges that: (a) in executing this Agreement, it does not rely, and has not relied, upon any representation or statement made by any other Party or any of such Party's representatives, agents or attorneys, with regard to the subject matter, basis or effect of this Agreement or otherwise, other than as stated in this Agreement; (b) in executing this Agreement, it has relied entirely upon its own judgment, beliefs and interest and the advice of its counsel and that it has had a reasonable period of time to consider the terms of this Agreement before entering into it; and (c) it has reviewed this Agreement and that it fully understands and voluntarily accepts all of the provisions contained herein.  Nothing contained herein shall limit or otherwise modify any commutation or other separate agreement or instrument entered into by one or more holders of PREPA Revenue Bonds, on the one hand, and National, on the other hand, or prevent any such parties from voluntarily entering into any commutation or similar separate agreement or instrument from and after the date hereof.

ARTICLE IV

COVENANTS

Section 4.1    Covenants of the Oversight Board.  The Oversight Board shall take, and cause PREPA to take, all actions necessary to obtain, and shall not, nor encourage or support any other person to, take any action which would, or would reasonably be expected to, impede or preclude the performance and implementation of this Agreement, including, the filing of the Amended Plan, the PREPA Disclosure Statement and, the approval of the PREPA Disclosure Statement and the entry of the PREPA Confirmation Order and the consummation, implementation and administration of the Amended Plan including the execution and delivery of the PREPA Definitive Documents, provided that the PREPA Disclosure Statement, and the Amended Plan (and their consummation, implementation and administration) and the other PREPA Definitive Documents are consistent with the terms herein and in the Amended Plan, including, without limitation, that the Parties have acted in good faith in connection with mediation and the negotiation of the terms hereof and thereof.  Such actions shall include, but not be limited to, (a) filing the Amended Plan and PREPA Disclosure Statement, in form and

11

substance consistent with this Agreement and reasonably acceptable to the Parties as it relates to implementation of this Agreement, including their treatment recovery, or releases pursuant to the Amended Plan, with the Title III Court, by February 10, 2023, or such later date as agreed to by the Parties or ordered by the Title III Court, (b) prosecuting and otherwise defending, in a timely and appropriate manner, the approval of the PREPA Disclosure Statement and proposed confirmation schedule contemplating a July 2023 confirmation hearing with respect to the Amended Plan, including, without limitation, approval of the compromise and settlement set forth herein and in the Settlement Summary, (c) filing a proposed PREPA Confirmation Order as contemplated herein, (d) not issuing Series A Bonds other than those to be issued pursuant to the Initial Plan and the Fuel Line Lender PSA, (e) refraining from directly or indirectly commencing, supporting or continuing to prosecute, directly or indirectly, any action or proceeding or asserting any claim or objection against National (or its trustees, fiscal agents, or paying agents) relating to the PREPA Revenue Bonds and taking all reasonable efforts to prevent any other person or entity (private or governmental) from directly or indirectly commencing, supporting or continuing to prosecute any such action or proceeding or asserting any such claim or objection; provided, however, that the Oversight Board shall be entitled to prosecute the Adversary against any party other than National, including, without limitation, the Trustee, any successor trustee for the PREPA Revenue Bonds, and other monoline insurers of the PREPA Revenue Bonds; and, provided, further, that any judgment against any such party shall not affect the Parties' rights and obligations pursuant to this Agreement if the settlement set forth herein and in the Amended Plan is approved; and, provided, further, that, for the avoidance of doubt, the Oversight Board is permitted to continue to prosecute and/or settle the Adversary without any limitation as long as the result will not affect the Parties' rights and obligations herein, (f) except as set forth in the preceding subsection (e), refraining from directly or indirectly commencing (or continuing to prosecute) or taking any legal position in any action or proceeding, including, without limitation, asserting any claim or objection, that is inconsistent with the compromises and settlements described herein or set forth in the Amended Plan, (g) at least five (5) days prior to such filing, delivering to counsel for National copies of the PREPA Disclosure Statement, the Amended Plan, the PREPA Plan Supplement, the PREPA Confirmation Order, the other PREPA Definitive Documents, and all other documents related to any of the foregoing, (h) if a party (i) files a notice of appeal from the entry of the PREPA Confirmation Order and (ii) seeks a stay pending appeal in connection therewith, using reasonable best efforts to oppose such stay request, including, without limitation, seeking the posting by the appealing of a supersedeas bond in an amount commensurate with potential losses resulting from any delay caused by any appeals or petitions for review of the PREPA Confirmation Order, (i) using its reasonable best efforts to provide, and cause PREPA to provide, to National (and its advisors) information reasonably requested to facilitate, implement, consummate or otherwise give effect to the Amended Plan and the restructuring of PREPA, (j) using its reasonable best efforts and negotiating in good faith with National the terms and provisions of the Amended Plan, the proposed PREPA Confirmation Order, the New PREPA Bonds Indenture, and the Custodial Trust Documents, in an effort to conclude the documentation thereof prior to the PREPA Effective Date; provided, however, that, if the Title III Court will not confirm the Amended Plan because, among other reasons, it will not approve the settlement set forth herein or because of an unfair discrimination objection involving the treatment of the claims of National, nothing herein bars the Oversight Board, PREPA's Title III representative, from amending such plan of adjustment to provide the class of Insured Bond Claims and Asserted Reimbursement Claims the same treatment as other bondholders and

EXECUTION COPY

prosecuting its confirmation so long as the Oversight Board first undertakes to consult in good faith with National on a consensual resolution the Oversight Board reasonably believes would facilitate the Amended Plan being confirmable, (k) requesting that PREPA file, or cause PREPA to request that LUMA file, an application with PREB seeking approval of the Interim Charge, and take such other action to prosecute such application, and (l) not entering into any agreement with any other party that does not accept and/or support the First Amended Plan, the Amended Plan and the Settlement.

      Section 4.2   Covenants of PREPA.  PREPA shall take all actions reasonably necessary to obtain, and shall not, nor encourage or support any other person, entity or party in interest, to, take any action which would, or would reasonably be expected to, impede or preclude the performance and implementation of this Agreement, including, the filing of the Amended Plan, the PREPA Disclosure Statement, the approval of the PREPA Disclosure Statement, the entry of the PREPA Confirmation Order, and the consummation, implementation and administration of the Amended Plan, including the execution and delivery of the PREPA Definitive Documents provided that the PREPA Disclosure Statement, the Amended Plan (and their consummation, implementation and administration) and the other PREPA Definitive Documents are consistent with the terms herein and in the Amended Plan, including, without limitation, that the Parties have acted in good faith in connection with the mediation and the negotiation of the terms hereof and thereof.  Such actions shall include, but not be limited to, (a) filing the Amended Plan and the PREPA Disclosure Statement in form and substance consistent with the Agreement and reasonably acceptable to the Parties as it relates to implementation of this Agreement, including their treatment recovery or releases pursuant to the Amended Plan, with the Title III Court by February 10, 2023, or such later date as agreed to by the Parties or ordered by the Title III Court, (b) prosecuting and otherwise defending, in a timely and appropriate manner, the approval of the PREPA Disclosure Statement and proposed confirmation schedule contemplating a July 2023 confirmation hearing with respect to the Amended Plan, including, without limitation, approval of the compromise and settlement set forth herein and in the Settlement Summary, (c) providing the Oversight Board with such financial information as shall be reasonably requested to be necessary to prosecute the PREPA PROMESA Case, (d) filing a proposed PREPA Confirmation Order as contemplated herein, (e) not issuing Series A Bonds other than those to be issued pursuant to the Initial Plan and the Fuel Line Lender PSA, (f) refraining from directly or indirectly commencing, supporting or continuing to prosecute any action or proceeding or asserting any claim or objection against National, relating to the PREPA Revenue Bonds (or their respective trustees, fiscal agents or paying agents), as the case may be, and taking all reasonable efforts to prevent any other person or entity (private or governmental) from directly or indirectly commencing, supporting or continuing to prosecute, directly or indirectly, any such action or proceeding or asserting any such claim or objection provided, however, that the Oversight Board, as representative of PREPA in the PREPA PROMESA Case, shall be entitled to prosecute the Adversary in accordance with the terms and provisions of Section 4.1(e) hereof, (g) subject to the right and ability of the Oversight Board and PREPA to prosecute the Adversary set forth in the preceding subsection (f), refraining from directly or indirectly commencing (or continuing to prosecute) or taking any legal position in any action or proceeding, including, without limitation, asserting any claim or objection, that is inconsistent with the compromises and settlements described herein or set forth in the Amended Plan, (h) within thirty (30) days of the date hereof, file, or request that LUMA file, an application with PREB seeking approval of the Interim Charge, (i) using its reasonable best efforts to provide to National (and its advisors)

13

information reasonably requested to facilitate, implement, consummate or otherwise give effect to the Amended Plan and the restructuring of PREPA, (j) if a party (i) files a notice of appeal from the entry of the PREPA Confirmation Order and (ii) seeks a stay pending appeal in connection therewith, using reasonable best efforts to oppose such stay request, including seeking the posting by the appealing party of a supersedeas bond in an amount commensurate with potential losses resulting from any delay caused by any appeals or petitions for review of the PREPA Confirmation Order, and (k) using its reasonable best efforts to provide information as shall be reasonably requested by the Oversight Board, and National (and its advisors) to facilitate, implement, consummate or otherwise give effect to the Amended Plan and the restructuring of PREPA, including, without limitation, the ongoing prosecution of the PREPA PROMESA Case.

Section 4.3    Covenants of National.  National hereby covenants as follows:

(a)    National shall not, except as expressly provided herein, (i) file any additional claims or proofs of claim, whatsoever, with the Title III Court against the Commonwealth, or PREPA (including secured, unsecured, administrative or substantial contribution claims) on account of any National Insured Bonds, the Asserted Reimbursement Claims, or any PREPA Revenue Bond Claims provided that the failure to file any additional proofs of claim as a result of its obligations under this clause (i) shall not prejudice, nor shall it be deemed to be a limitation of, National's aggregate holdings of PREPA Revenue Bond Claims, (ii) file any additional claims, commence or prosecute any pending or additional litigation (including the Adversary), proceeding, action or matter on account of any National Insured Bonds, the Asserted Reimbursement Claim, or any of its PREPA Revenue Bond Claims in the PREPA PROMESA Case (and National agrees to stay all such pending litigations, proceedings, actions or matters) or seek to recover damages or to seek any other type of relief against any of the Government Releases based upon, arising from or relating to the Government Released Claims or any of the claims or causes of action asserted or which could have been asserted in the Adversary or the Renewed Receiver Motion, or (iii) directly or indirectly aid any person in taking any action with respect to the Government Released Claims that is prohibited by this Section 4.3(a).  Without limiting the foregoing, within four (4) Business Days from the date hereof,  (A) National and the Oversight Board shall file joint urgent motions, in form reasonably acceptable to National and the Oversight Board, to stay, to the extent necessary, the Adversary, the Motion to Dismiss, the Fuel Line Adversary, the Renewed Receiver Motion, the Sistema Adversary, and the UCC Objection, each as to National, and (B) National shall take, or cause to be taken, any and all actions necessary, including, without limitation, serving notice thereof upon all affected parties, to cause the stay of discovery propounded solely by National in connection with the Adversary, the Motion to Dismiss, the Fuel Line Adversary, the Renewed Receiver Motion, the Sistema Adversary, and the UCC Objection, including, without limitation, the withdrawal of all subpoena, deposition notices, requests for production of documents, and any joinders by National in such proceedings and to requests for discovery filed in accordance with Bankruptcy Rule 2004.

(b)    National shall (i) support, and otherwise not encourage or support any other person to, take any action that would, or would reasonably be expected to, breach or be inconsistent with the terms herein, or impede or preclude the performance and implementation of this Agreement, including the filing of the Amended Plan the administration of the PROMESA

14

Cases, the approval of the PREPA Disclosure Statement the entry of the PREPA Confirmation Order and the consummation, implementation and administration of the Amended Plan including the execution and delivery of the PREPA Definitive Documents provided that the PREPA Disclosure Statement, the PREPA Confirmation Order, the Amended Plan (and its consummation, implementation and administration) and the PREPA Definitive Documents are consistent with the terms herein, (ii) in accordance with the provisions of Section 5.1 hereof, (A) not consent to or vote for any modification of the Amended Plan unless such modification is proposed or supported by the Oversight Board, and otherwise consistent with the terms herein and (B) not vote for or support any plan of adjustment not proposed or supported by the Oversight Board, so long as none of the Government Parties is in material breach of their obligations set forth in this Agreement; provided, however, that National acknowledges that each Insured Bond Claim shall be voted in accordance with Section 301(c)(3) of PROMESA and such other applicable law and governing documents, so long as this Agreement remains in effect, (iii) in the event a party (A) files a notice of appeal from the entry of the PREPA Confirmation Order and (B) seeks a stay pending appeal in connection therewith, use reasonable best efforts to oppose such stay request, including, without limitation, seeking the posting by the appealing party of a supersedeas bond in an amount commensurate with potential losses resulting from any delay caused by any appeals or petitions for review of the PREPA Confirmation Order and (iv) use its reasonable best efforts and negotiate in good faith with the Oversight Board on the terms and conditions of the Amended Plan, the proposed PREPA Confirmation Order, the New Master Indenture, and the Custodial Trust Documents, in an effort to conclude the documentation thereof prior to the PREPA Effective Date.

(c) Subject to the terms set forth herein, including, without limitation, the stay of litigation as required in accordance with Section 4.3(a) hereof, National shall not be limited or prohibited from (i) taking such action that National shall deem necessary or appropriate to preserve, protect or defend any of its rights under this Agreement, the Amended Plan, the other PREPA Definitive Documents, (ii) asserting any claims or causes of action against any Party that breaches this Agreement, or (iii) participating, in support of PREPA or LUMA's application for the Interim Charge, in any proceeding before PREB adjudicating approval of that charge or in any other proceeding relating to the Interim Charge; provided, however, that, in accordance with the provisions of Section 4.3(a) hereof, National shall take no action in connection with the Adversary other than the filing of the requisite notices and withdrawals required therein.

(d) National shall not sell, transfer, pledge, hypothecate or assign (except as may be required in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law with respect to a National Insured Bond) (a "**Transfer**") any National Insured Bonds, or any voting, consent, or direction rights or participations or other interests therein (collectively, the "**PREPA Interests**") during the period from the date hereof up to and including the earlier to occur of (i) the PREPA Effective Date and (ii) the termination of this Agreement in accordance with the provisions of Section 7.2 hereof; provided, however, that, notwithstanding the foregoing, National may transfer any PREPA Interests to an entity that executes and delivers, within five (5) calendar days after execution thereof, to counsel for the Oversight Board and AAFAF, the Joinder Agreement attached hereto as Exhibit "D" (a "**Qualified Transferee**"), pursuant to which (y) such Qualified Transferee shall (i) assume all the rights and obligations of the transferor in accordance with the terms and conditions of this Agreement, and (ii) such Qualified Transferee shall then be deemed a PSA Creditor for all

15

purposes herein, including, without limitation, with respect to any additional PREPA Revenue Bonds held by such Qualified Transferee at the time it joins this Agreement, and shall assume all of the rights and obligations hereunder (other than the right to receive the Consummation Costs) and (z) on or after the effective date of the Transfer, such transferor shall be deemed to have relinquished its rights (other than the right to receive the Consummation Costs), and be released from its obligations (other than as set forth in Section 4.3(c) hereof) on or after the effective date of the Transfer under this Agreement solely to the extent of such transferred rights; and, provided, further, that, to the extent that a Transfer violates the provisions of this Section 4.3(d), it shall be void *ab initio* and the applicable PREPA Revenue Bond Claims and the entity attempting such Transfer shall continue to remain subject to the terms of this Agreement; and, provided, further, that nothing contained herein is intended, nor shall it be construed, to preclude any entity from acquiring additional PREPA Revenue Bond Claims; provided, however, that any such PREPA Revenue Bond Claims acquired from and after the date hereof shall automatically and immediately upon acquisition by an entity be deemed subject to all of the terms and provisions of this Agreement.

Section 4.4    Covenants of the Parties.  Subject to the terms and conditions hereof, each of the Parties, severally and not jointly, hereby covenants as follows:

(a)    Coordination.  The Parties shall coordinate and use their reasonable best efforts to obtain the consent and joinder of AAFAF prior to consummation of the transactions contemplated herein.  Any representations, warranties, covenants, or other obligations of AAFAF contemplated herein shall not be effective until an authorized signature for such entity has been affixed hereto.

(b)    Good Faith Negotiations.  The Parties shall cooperate and negotiate in good faith and exercise reasonable best efforts with respect to the prosecution, approval, negotiation, execution, delivery and implementation of the PREPA Definitive Documents.

(c)    Legal and Other Protections.  The Amended Plan, the proposed PREPA Confirmation Order, the New Master Indenture and the PREPA Definitive Documents, to the extent applicable, in a manner to be agreed to by the Oversight Board and National, shall, to the extent allowed by law, include the following legal protections:

(i)    The PREPA Fiscal Plan in effect on the PREPA Effective Date, and any post-PREPA Effective Date PREPA Fiscal Plan will include provisions for the payment in each Fiscal Year of principal and interest of New Bonds, including, without limitation, sinking fund payments due in such Fiscal Year;

(ii)    The Amended Plan, the proposed PREPA Confirmation Order and the New Master Indenture shall provide for a covenant setting forth an additional bonds test, if any, to be agreed upon by the parties to the PREPA Definitive Documents;

(iii)    PREPA Fiscal Plans certified on or after the PREPA Effective Date, the Amended Plan and the proposed PREPA Confirmation Order shall provide for the measures necessary to service the obligations contemplated pursuant to this Agreement, the Amended Plan, the New Bonds and the New Master Indenture;

EXECUTION COPY

(iv)     The proposed PREPA Confirmation Order shall provide for (A) the retention of jurisdiction by the Title III Court, or, in the event the Title III Court declines such retention of jurisdiction or the PREPA PROMESA Case has been closed in accordance with the terms and provisions of PROMESA, and (B) the United States District Court for the District of Puerto Rico, to rule on enforcement of the certified Fiscal Plans and the obligations contemplated pursuant to this Agreement, the New Bonds and the New Master Indenture;

(v)     The New Bonds, including, without limitation, any New Bonds issued in accordance with the terms and provisions of Section 4.4(c) hereof, and, to the extent feasible, shall bear a stamp or similar legend stating that the United States District Court for the District of Puerto Rico has determined that such bonds and securities are valid, legally binding and enforceable pursuant to the PREPA Confirmation Order;

(vi)     The New Master Indenture and the New Bonds, shall be governed by New York law; and

(vii)     The PREPA Confirmation Order shall be full, final, complete, conclusive and binding upon and shall not be subject to collateral attack or other challenge in any court or other forum by (1) PREPA, (2) each person or entity asserting claims or other rights against PREPA, or any of their respective instrumentalities or agencies, including a beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer or otherwise) in respect of bonds by the Commonwealth, or any of its or their instrumentalities or with respect to any trustee, collateral agent, indenture trustee, fiscal agent, and any bank that receives or holds funds related to such bonds, whether or not such claim or other rights of such person or entity are impaired pursuant to the Amended Plan and, if impaired, whether or not such person or entity accepted the Amended Plan, (3) any other person, and (4) each of the foregoing's respective heirs, successors, assigns, trusted, executors, officers, directors, agents, representatives, attorneys, beneficiaries or guardians; provided, however, that, notwithstanding the foregoing, the Amended Plan and PREPA Confirmation Order shall not include any third-party releases.

(c)     Tax-Exempt Treatment of the Series B Bonds.  The Oversight Board and PREPA shall use their reasonable best efforts to cause the payment of principal and interest with respect to the Series B Bonds to be treated as triple tax-exempt.

Section 4.5     Right to Vote.  Each Party acknowledges that, for purposes of this Agreement, and any Amended Plan solicited in accordance with the provisions of this Agreement, and so long as this Agreement remains in effect and is not otherwise terminated by National as to itself, (a) National shall have the right to vote to accept or reject the Amended Plan to the extent provided by the terms and provisions of Section 301(c)(3) of PROMESA and such other applicable law and governing documents on account of the National Insured Bonds, and (b) it shall not object to National's right to vote to accept or reject the Amended Plan in accordance with subsection (a) above.  For the avoidance of doubt, if this Agreement is no longer in effect, all Parties hereto reserve their respective rights to seek a determination by the Title III Court with respect to National's and its insured bondholders' rights to vote to accept or reject any Amended Plan.

Section 4.6    Qualified Marketmaker.  Notwithstanding anything contained in this Agreement to the contrary, including, without limitation, the terms and provisions of Section 4.3(d) hereof, National may transfer any rights, title or interests in the National Insured Bonds, or any municipal CUSIP bonds for which the PREPA Revenue Bonds are exchanged in accordance with the provisions of the Settlement Summary to a Qualified Marketmaker, acting in its capacity as a Qualified Marketmaker, without the requirement that such Qualified Marketmaker become a party to this Agreement, provided that such Qualified Marketmaker subsequently transfers all such rights, title or interests to a Qualified Transferee within the date that is ninety (90) days after such Qualified Marketmaker's acquisition of such rights, title or interests.

ARTICLE V

PLAN AND PLAN SUPPORT

Section 5.1    Amended Plan Support Commitment.  From and after the date hereof, provided that (a) this Agreement has not been terminated and (b) none of the PREPA Disclosure Statement, the Amended Plan or any of the proposed PREPA Definitive Documents have been filed, amended or modified in a manner inconsistent with the provisions of this Agreement, each of the PSA Creditors (to the extent remaining a Party), shall (i) support (A) approval of the PREPA Disclosure Statement in accordance with section 1125 of the Bankruptcy Code, (B) confirmation of the Amended Plan in accordance with Section 314 of PROMESA and section 1129 of the Bankruptcy Code, and (C) take no further action in connection with the Adversary, the Motion to Dismiss, the Fuel Line Adversary, the Renewed Receiver Motion, the Sistema Adversary, and the UCC Objection, through a date no earlier than the PREPA Effective Date, other than as provided in Section 4.3 hereof, as applicable; provided, however, that nothing herein shall limit or prohibit a PSA Creditor from taking any action, or asserting any claims or causes of action, in connection with any matter relating solely to National or prohibit National from taking any action, or asserting any claims or causes of action, in connection with any matter relating solely to the holders of Insured Bond Claims that are insured by National (including, without limitation, voting of claims, subrogation, acceleration, commutation, or any act necessary to maintain the benefits of, and rights under, the applicable monoline insurance policy), and (D) a stay of any joinders by National to requests for discovery served pursuant to Bankruptcy Rule 2004, (ii) subject to receipt of the PREPA Disclosure Statement and/or other solicitation materials in respect of the Amended Plan, to the fullest extent permitted by law, timely vote, or cause to be voted, to accept the Amended Plan in its capacity as a PREPA Holder, or insurer of Insured Bond Claims with rights of acceptance in accordance with the PREPA Disclosure Statement Order, each as the case may be; provided, however, that National shall only be required to vote, or cause to be voted, to accept the Amended Plan with respect to those PREPA Revenue Bond Claims and Settled Reimbursement Claims that National owns or beneficially holds or insures and is entitled to vote in accordance with the terms of Section 301(C)(3) of PROMESA and such other applicable law and governing documents, (iii) not change or withdraw (or cause to be changed or withdrawn) any such vote, (iv) not consent to or vote for any modification of the Amended Plan unless such modification is (Y) not adverse to National, and (Z) not inconsistent with the terms provided herein and the Amended Plan, and (v) not vote for or support any PREPA plan of adjustment not proposed to or supported by the Government Parties, so long as none of the Government Parties is in material breach of this Agreement; provided, however, that each of the Parties acknowledges that each Insured Bond

18

Claim shall be voted in accordance with the terms of Section 301(c)(3) of PROMESA and such other applicable law and governing documents, so long as this Agreement remains in effect as to such Party.

Section 5.2     Solicitation Required in Connection with Plans.  Notwithstanding anything contained in this Article V or elsewhere in this Agreement to the contrary, this Agreement is not, and shall not be deemed to be, an offer with respect to any securities or a solicitation of acceptances of the Amended Plan for purposes of PROMESA, sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will comply with all applicable securities laws and/or provisions of PROMESA and the Bankruptcy Code.  Each of the Parties, severally and not jointly, acknowledges that (a) the votes on the Amended Plan will not be solicited until the Title III Court has approved the disclosure statement and related solicitation materials, and such disclosure statement and solicitation materials have been transmitted to parties entitled to receive same and (b) this Agreement does not constitute an offer to issue or sell securities to any person or entity, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful.  NOTWITHSTANDING THE FOREGOING, NOTHING CONTAINED HEREIN SHALL REQUIRE ANY PARTY TO TAKE ANY ACTION PROHIBITED BY PROMESA, THE SECURITIES ACT OF 1933, AS AMENDED, THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED, ANY RULE OR REGULATIONS PROMULGATED THEREUNDER, OR BY ANY OTHER APPLICABLE LAW OR REGULATION OR BY ANY ORDER OR DIRECTION OF ANY COURT OR ANY STATE OR FEDERAL GOVERNMENTAL AUTHORITY.

Section 5.3     Custodial Trusts/Acceleration/Commutation of Insurance.  Subject to (a) the provisions set forth in Article VII hereof, including, without limitation, the termination of this Agreement by National, and (b) all insurance policies and related agreements relating to National Insured Bonds being in full force and effect, with no outstanding payment defaults by National with respect to such National Insured Bonds, respectively, up to and including the PREPA Effective Date, (i) the Amended Plan shall contain a provision providing that (A) the payment of the principal of the PREPA Revenue Bonds insured by National is accelerated as of the PREPA Effective Date, and (B) the PREPA Revenue Bonds insured by National are payable from and after the PREPA Effective Date at an "acceleration price" of one hundred percent (100%) of the principal amount thereof plus interest accrued thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) to the date of payment, (ii) the Amended Plan shall include provisions relating to, as applicable (A) the implementation of custodial trusts in connection with distributions to be made to the holders of National Insured Bonds, and (B) a proposal to the applicable holders of National Insured Bonds regarding the resolution of such holders' claims in respect of applicable policies of insurance, which provisions shall be in the form and substance satisfactory to the Oversight Board and, to the extent applicable, National.  Such proposals may take the form of one or more commutation transactions; provided, however, that no holder of National Insured Bonds shall be required to accept any such proposal to commute the respective policies of issuance.

**EXECUTION COPY**

ARTICLE VI

CONSUMMATION COSTS, STRUCTURING FEES, REIMBURSEMENT
CLAIMS AND INTERIM PAYMENTS

Section 6.1     Consummation Costs, Structuring Fees, and Reimbursement Claims.
Subject to the conditions set forth herein and in the Amended Plan, Consummation Costs,
Structuring Fees, and Settled Reimbursement Claims, each of which shall be fully earned as of
the date hereof, shall be paid on the PREPA Effective Date in accordance with the conditions set
forth in the Amended Plan and the PREPA Confirmation Order.

(a)     Consummation Costs.  In consideration for the fees and expenses incurred by
National in connection with Insured Bond Claims, the negotiation and execution of this
Agreement and the prosecution of approval of the Amended Disclosure Statement and
confirmation of the Amended Plan, National shall be entitled to receive on the PREPA Effective
Date, in the form of an allowed administrative expense claim, based upon the positions it holds
or has insured, as set forth on Exhibit "C" hereto, Cash or Series B Bonds, as elected by the
Oversight Board in its sole and absolute discretion, which election shall be made at or prior to
the commencement of the PREPA Confirmation Hearing, in an amount equal to three percent
(3.0%) times the National Bond Claim Amount; provided, however, that, in the event this
Agreement is terminated by National, National shall not be entitled to the payment of
Consummation Costs.

(b)     Structuring Fees.  In consideration for the structuring of payments to be made to
holders of claims arising from or relating to National Insured Bonds in accordance with the
Settlement Summary, on the PREPA Effective Date, PREPA shall make payments to National in
the amounts of 2.86% times the National Bond Claim Amount, in Cash or Series B Bonds,
elected in the sole discretion of the Oversight Board, which election shall be made at or prior to
the commencement of the PREPA Confirmation Hearing.

(c)     Reimbursement Claims.  In exchange for executing this Agreement and other
good and valuable consideration provided by the Parties pursuant hereto and in connection with
the compromise and settlement contemplated herein, subject to the entry of the PREPA
Confirmation Order, on the PREPA Effective Date, (i) the Settled Reimbursement Claims of
National will be allowed and (ii) National shall be entitled to receive, and PREPA shall issue
Series B Bonds in the original principal amount equal to twenty percent (20%) of National's
Settled Reimbursement Claim; provided, however, that, in the event that (a) one or more parties
in interest in the PREPA PROMESA Case objects to confirmation of the Amended Plan or the
settlement of National's claims embodied in the Amended Plan for reasons, including, without
limitation, its treatment or allowability of such Settled Reimbursement Claims, or (b) the Title III
Court considers either issue sua sponte or pursuant to an objection, and, in either case, the Title
III Court does not approve the settlement or finds unfair discrimination for reasons, including,
without limitation, the allowability and/or treatment of the Settled Reimbursement Claims, the
settlement and the treatment of National's claims shall, without further action, convert to a
settlement of National's claims that eliminates the obligation to issue Series B Bonds on account
of the Settled Reimbursement Claims and any payments for debt service and any legal,
consummation, or other fees arising from, relating to, or on account of the Settled

20

Reimbursement Claims; provided, further, that, in such circumstance, National shall have the option to forego all consideration which may be provided pursuant to the Amended Plan, the PREPA Confirmation Order, and this Agreement, including the Consummation Costs and Structuring Fees, and, in exchange therefor, receive the same treatment as another settling class of holders of PREPA Revenue Bond claims, so long as the settlement with such class whose recovery National would receive was reached prior to the earlier to occur of (y) any substantive ruling on the claims and counterclaims asserted in the Adversary that holders of PREPA Revenue Bonds are secured by revenues outside of the Sinking Fund, and (z) an indication or a determination, either oral or written, at a hearing or otherwise, by the Title III Court that the Holders of PREPA Revenue Bonds are secured by revenues outside of the Sinking Fund.

Section 6.2    Interim Payment. In exchange for executing this Agreement and other good and valuable consideration provided by the Parties pursuant hereto and in connection with the compromise and settlement contemplated herein, (a) in accordance with the terms and provisions of Section 4.1 and 4.2 hereof, the Oversight Board and PREPA shall use their reasonable best efforts to cause PREPA to file, or cause PREPA to request that LUMA file, an application with PREB to obtain approval of the Interim Charge, (b) in accordance with the terms and provisions of Section 4.2 hereof, PREPA shall use its reasonable best efforts to file, or cause LUMA to file, an application with PREB seeking approval of the Interim Charge and diligently prosecute, and to cause LUMA to prosecute, such application, and (c) subject to approval of such volumetric charge by PREB, from and after the effectiveness of the Agreement up to, but not including, the PREPA Effective Date, National shall receive payments of Cash collected, in an amount up to its pro rata share of revenues generated by from the Interim Charge, on account of its existing PREPA Revenue Bond Claims; provided, however, that, if PREB approval is not obtained, (i) PREPA shall not be obligated to make any such payments to National and (ii) National shall not be relieved of its obligation to support confirmation of the Amended Plan in accordance with the provisions of Article V hereof; and, provided, further, that cumulative revenues received by National pursuant to the provisions of this Section 6.2 and the Settlement Summary shall not exceed (i) National's existing coupon during the period from the Agreement effective date up to, but not including, the PREPA Effective Date and (ii) National's pro rata share of the revenues collected by PREPA on account of the Interim Charge; and, provided, further, amounts accrued on the Interim Charge, but not collected by the PREPA Effective Date, shall not be owed by PREPA and PREPA will not have to pay any such amounts; and, provided, further, that, if the Amended Plan is neither confirmed nor consummated, any amounts received by National with respect to the Interim Payment shall be, and shall be deemed to constitute, a reduction of the distributions to be recovered by National pursuant to (i) any future plan of adjustment for PREPA or (ii) settlement, litigation, or other resolution of National's claims on account of the principal amount of the National Insured Bonds without further order of the Title III Court.

## ARTICLE VII

## EFFECTIVENESS AND TERMINATION

Section 7.1    Effectiveness of Agreement. This Agreement shall become effective upon the date on which (a) execution and delivery of the applicable counterpart signature pages by the

Oversight Board, on behalf of itself and on behalf of PREPA, (b) with respect to National, the execution and delivery of the applicable signature page by National, and (c) in the sole and absolute discretion of the Oversight Board, with respect to any joining monoline, the execution and delivery of the applicable signature page by such monoline. In the event that National does not execute and deliver such signature page by January 31, 2023, it shall be deemed to have declined to be a party hereto and for all purposes shall not be a party and shall have no benefits, rights or obligations hereunder. Subject to the foregoing, the terms of this Agreement shall be effective as to National and, in the sole and absolute discretion of the Oversight Board, any joining monoline, in each case solely as to itself, including with respect to termination rights.

Section 7.2    <u>Termination of Agreement.</u>

(a)    This Agreement may be terminated by National, at its sole option and discretion and upon written notice to the other Parties, if (i) the Oversight Board fails to comply with any of its respective covenants in Article IV hereof or any of its undertakings in this Agreement, if such failure to comply has or would have a materially adverse impact on National, including a materially adverse impact in the treatment afforded to National pursuant to the Amended Plan (including any applicable settlement under the Amended Plan or changes to the legal protections set forth in Section 4.4(c) hereof), or to the definition or calculation of Consummation Costs that would have a materially adverse impact on National, (ii) the Oversight Board files or supports, directly or indirectly, any motion or pleading with the Title III Court, in each case, that is inconsistent with this Agreement, including the Amended Plan in a materially adverse respect (including treatment under the Amended Plan or any applicable settlement under the Amended Plan, or to the definition or calculation of Consummation Costs) before the earlier to occur of (y) five (5) Business Days after the Oversight Board receives written notice from another Party (in accordance with the notice provisions set forth in Section 8.11 hereof) that such motion or pleading is inconsistent with this Agreement in such materially adverse respect and (z) entry of an order of the Title III Court granting such motion or pleading, (iii) the entry of a Final Order in the PREPA PROMESA Proceeding has a material adverse effect on the confirmability of the Amended Plan; <u>provided</u>, <u>however</u>, that, under no circumstances may this Agreement be terminated by National if either (y) (a) one or more parties in interest in the PREPA PROMESA Case objects to confirmation of the Amended Plan or the settlement of National's claims embodied in the Amended Plan for reasons including, without limitation, its treatment or allowability of such Settled Reimbursement Claims or (b) the Title III Court considers either issue sua sponte or pursuant to an objection, and, in either case, the Title III Court does not approve the settlement or finds unfair discrimination for reasons, including, without limitation, the allowability and/or treatment of the Settled Reimbursement Claims, and the Oversight Board eliminates any payments for debt service and any legal, consummation or other fees arising from, relating to, or on account of, the Settled Reimbursement Claim, or (z) PREB declines to grant the request for the Interim Charge, (iv) the Title III Court dismisses the PREPA PROMESA Case, (v) the PREPA Confirmation Order is reversed, dismissed, or vacated without the consent of the PSA Creditors and the Title III Court does not enter a revised order confirming the Amended Plan that is acceptable to the Oversight Board and National within ninety (90) days after such reversal, dismissal, or vacatur, (vi) the PREPA Disclosure Statement has not been approved by the Title III Court on or prior to April 30, 2023, (vii) the PREPA Confirmation Order has not been entered by the Title III Court on or prior to August 31, 2023, (viii) the PREPA Effective Date does not occur by December 1, 2023 or such later date and on such terms as agreed to by

22

the Fuel Line Lender PSA Creditors pursuant to the Fuel Line Lender PSA, but in no event later than June 30, 2024, (ix) PREB does not approve the Legacy Charge, or (x) the Oversight Board publicly disavows any of the terms set forth in this Agreement, including the Settlement Summary, or enters into or publicly supports a proposed transaction materially inconsistent with such terms; provided, however, that, notwithstanding anything contained herein to the contrary, this Agreement may not be terminated by National solely for the reason that the Title III Court disallows the Settled Reimbursement Claims or does not approve the settlement of the Settled Reimbursement Claims on the terms set forth herein or that PREB declines to approve the Interim Charge.

(b)    This Agreement may be terminated at any time prior to the PREPA Effective Date (y) as to all Parties, upon written notice to the other Parties by the Oversight Board, or (z) solely as to itself, upon written notice to the Oversight Board by National in the event that (i) any other Party has failed to comply with any of its respective covenants set forth in Article IV hereof or any of its other undertakings in this Agreement, and such non-compliance has a material adverse effect on confirmability of the Amended Plan, (ii) a court order shall be entered, and such order shall not be reversed or otherwise consensually resolved in a manner satisfactory to the Government Parties, and such order in the light of the totality of circumstances, has a material adverse effect on the confirmability of the Amended Plan or renders consummation of the Amended Plan impracticable; provided, however, that, in the event that the treatment to be provided with respect to the Settled Reimbursement Claims or the receipt of any CVI in accordance with the terms hereof, renders the Amended Plan unconfirmable, the Oversight Board may delete such treatment from the Amended Plan, and such action shall not give rise to a right of termination of this Agreement as to any Party, so long as the Oversight Board and National have agreed upon an alternative methodology sufficient to render the Amended Plan confirmable while providing National equal economic treatment contemplated to this Agreement and the Settlement Summary (as pertains to any CVI), (iii) the Title III Court or such other court of competent jurisdiction enters a Final Order (A) denying confirmation of the Amended Plan, or (B) in order to confirm the Amended Plan, requiring the Oversight Board to further amend the Amended Plan with respect to any provision set forth in the Settlement Summary, and the Oversight Board determines, in its sole and absolute discretion, to terminate this Agreement, (iv) the economic situation of either the Commonwealth or PREPA suffers a material adverse change which, in light of the totality of the circumstances, renders the confirmation of the Amended Plan not feasible or consummation of the Amended Plan impracticable, or (v) a court of competent jurisdiction issues a ruling, judgment, or order making illegal or otherwise preventing or prohibiting the consummation of the Amended Plan, which ruling, judgment, or order has not been reversed or vacated within sixty (60) calendar days after such issuance and is not subject to a stay; and, provided, further, that, under no circumstances may this Agreement be terminated by National in the event that either (y) (a) one or more parties in interest in the PREPA PROMESA Case objects to confirmation of the Amended Plan or the settlement of National's claims embodied in the Amended Plan for reasons, including, without limitation, its treatment or allowability of such Settled Reimbursement Claims, or (b) the Title III Court considers either issue sua sponte or pursuant to an objection, and, in either case, the Title III Court does not approve the settlement or finds unfair discrimination for reasons, including, without limitation, the allowability and/or treatment of the Settled Reimbursement Claims, and the Oversight Board eliminates any payments for debt service and any legal, consummation or other fees arising from, relating to, or on account of, the Settled Reimbursement Claim, or (z) PREB declines to grant the

request for the Interim Charge; provided, however, that, notwithstanding anything contained herein to the contrary, this Agreement may not be terminated by National solely for the reason that the Title III Court disallows the Settled Reimbursement Claims or does not approve the settlement of the Settled Reimbursement Claims on the terms set forth herein or that PREB declines to approve the Interim Charge.

(c)     Without limiting the rights of National under any other provision in this Agreement, National may, in its sole discretion, terminate this Agreement if (i) the Oversight Board (A) modifies any of the provisions in the Amended Plan and any such modification materially adversely impacts the treatment afforded National in the Amended Plan or (B) files the Amended Plan and such plan of adjustment and the securities design features of the New PREPA Bonds are inconsistent with the treatment set forth in this Agreement), in each case, without the consent of National; provided, however, that, under no circumstances may this Agreement be terminated by National in the event that either (y) (a) one or more parties in interest in the PREPA PROMESA Case objects to confirmation of the Amended Plan or the settlement of National's claims embodied in the Amended Plan for reasons, including, without limitation, its treatment or allowability of such Settled Reimbursement Claims, or (b) the Title III Court considers either issue sua sponte or pursuant to an objection, and, in either case, the Title III Court does not approve the settlement or finds unfair discrimination for reasons, including, without limitation, the allowability and/or treatment of the Settled Reimbursement Claims and the Oversight Board eliminates any payments for debt service and any legal, consummation or other fees arising from, relating to, or on account of, the Settled Reimbursement Claim, or (z) PREB declines to grant the request for the Interim Charge.

(d)     The automatic stay under sections 362 and 922 of the Bankruptcy Code, made applicable to the PREPA PROMESA Case pursuant to Section 301 of PROMESA, shall not prohibit a Party from taking any action necessary to effectuate the termination of this Agreement pursuant to and in accordance with the terms hereof.

(e)     This Agreement shall automatically terminate as to all Parties upon the occurrence of the PREPA Effective Date except with respect to any actions of the Parties that are expressly set forth herein to occur after the PREPA Effective Date; provided, however, that, for all purposes of this Section 7.2, the treatment to be afforded to all classes of claims other than those described in Exhibit "B" hereto shall not constitute a materially adverse impact on any PSA Creditor; and, provided, further, that, in the event that National terminates this Agreement solely as to itself, National may not object to confirmation of the Amended Plan or otherwise oppose any motion or application on the basis of the payment of Consummation Costs to a non-terminating PSA Creditor, as applicable, provided by Article VI hereof and the Amended Plan.

Section 7.3     Effect of Termination.  Except as otherwise provided herein, in the event of the termination of this Agreement as to any Party, (a) this Agreement shall become null and void and be deemed of no force and effect, with no liability on the part of such Party or any of its affiliates (or of any of their respective directors, officers, employees, consultants, contractors, advisory clients, agents, legal and financial advisors or other representatives of such Party or its affiliates), (b) such Party shall not have any obligations to any other Party arising out of, and shall have no further rights, benefits or privileges under, this Agreement (including, without limitation, any rights to Consummation Costs except as provided in accordance with the

provisions of the Amended Plan), except for the obligations and/or provisions set forth in Sections 2.1, 7.2, 7.3, 8.3, 8.4, 8.8, 8.13 and 8.15 hereof and this clause (b) of Section 7.3, which provisions are intended to survive the expiration or termination of this Agreement and shall continue in full force and effect in accordance with the terms hereof; provided, however, that any liability of a Party for failure to comply with the terms of this Agreement prior to the date of such expiration or termination shall survive such expiration or termination, and (c) such Party shall have all the rights and remedies that it would have had, and be entitled to take all actions that it would have been entitled to take, had it not entered into this Agreement and no such rights shall be deemed waived pursuant to a claim of laches or estoppel, and the Parties agree to waive, and not raise as a defense, the applicable statute of limitations for any claim, litigation, proceeding, action or matter against another Party barred by this Agreement as though such statute of limitations had been tolled during such time that this Agreement was binding on the Party then asserting such claim, litigation, proceeding, action, or matter; provided, however, that in no event shall any such termination relieve such Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such expiration or termination; and, provided, further, that, unless otherwise ordered by the Title III Court, upon notice to such terminating Party, any and all consents, ballots and votes tendered by such Party prior to such expiration or termination shall be deemed to be, for all purposes, automatically null and void *ab initio,* and shall not be considered or otherwise used in any manner by the Parties in connection with the Amended Plan, this Agreement or otherwise; and, provided, further, that, termination of this Agreement shall have no effect on any rights provided pursuant to the with the Amended Plan.  Except in connection with a dispute concerning a breach of this Agreement or the interpretation of the terms hereof upon termination, (y) neither this Agreement nor any terms or provisions set forth herein shall be admissible in any dispute, litigation, proceeding or controversy among the Parties and nothing contained herein shall constitute or be deemed to be an admission by any Party as to any matter, it being understood that the statements and resolutions reached herein were the result of negotiations and compromises of the respective positions of the Parties and (z) no Party shall seek to take discovery concerning this Agreement or admit this Agreement or any part of it into evidence against any other Party hereto.

Section 7.4    Post-Effective Date Obligations.  In addition to the surviving obligations and provisions listed in Section 7.3(b) hereof, the obligations and/or provisions set forth in Sections 4.1(h), 4.1(i), 4.2(j), and 4.2(k) shall survive the automatic termination of this Agreement pursuant to Section 7.2(d) hereof.

## ARTICLE VIII

## MISCELLANEOUS

Section 8.1    Amendments.  This Agreement, may not be modified, amended, or supplemented except by a written agreement executed by the Government Parties that are Parties hereto, on the one hand, and National on the other hand; provided, however, that National may agree, in its sole and absolute discretion, to any modification, amendment or supplement that impacts National only.

Section 8.2    Most Favored Nations.  Notwithstanding anything contained herein to the contrary, in the event that, prior to the earlier of any substantive ruling on the claims and

counterclaims asserted in the Adversary that holders of PREPA Revenue Bonds are secured by revenues outside of the Sinking Fund and an indication or a determination, either oral or written, at a hearing or otherwise, by the Title III Court that the holders of PREPA Revenue Bonds are secured by revenues outside of the Sinking Fund, the Oversight Board reaches and enters into any agreements with any holder or insurer of PREPA Revenue Bonds (other than National) which provide (or the Amended Plan provides) for the settlement or Amended Plan treatment that, in the sole discretion of National, is more economically favorable to any PREPA Revenue Bond Claim than the treatment set forth in the Settlement Summary, then (a) National shall have the right to elect to receive such treatment pursuant to the Amended Plan in lieu of the terms set forth herein and in the Settlement Summary, (b) unless the Oversight Board determines, in its sole and absolute discretion, any such election shall not require or result in a change in the classification provided in any plan of adjustment, and (c) such election shall apply to all claims in the class including, without limitation, any claims not held by National; provided, however, that treatment of customary "Convenience Claims", as defined in the Amended Plan, shall be exempt from this provision; and, provided, further, the payment of any premium paid to National in connection with providing insurance with respect to the refunding of any New PREPA Bonds shall be exempt from this provision; and, provided, further, that, National shall at all times not be entitled to share in excess funds, if any, as set forth in the Amended Plan for all settling bondholders.

Section 8.3     No Admission of Liability.

(a)     The execution of this Agreement is not intended to be, nor shall it be construed as, an admission or evidence in any pending or subsequent suit, action, proceeding or dispute of any liability, wrongdoing, or obligation whatsoever (including as to the merits of any claim or defense) by any Party to any other Party or any other person with respect to any of the matters addressed in this Agreement.

(b)     None of this Agreement (including, without limitation, the Recitals and Exhibits hereto), the settlement or any act performed or document executed pursuant to or in furtherance of this Agreement or the settlement: (i) is or may be deemed to be or may be used as an admission or evidence of the validity of any claim, or any allegation made in the Adversary, the Fuel Line Adversary, the Renewed Receiver Motion, the Sistema Adversary, the UCC Objection, or of any wrongdoing or liability of any Party; (ii) is or may be deemed to be or may be used as an admission or evidence of any liability, fault or omission of any Party in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal; or (iii) is or may be deemed to be or used as an admission or evidence against the Commonwealth or PREPA with respect to the validity of any of the PREPA Revenue Bonds. None of this Agreement, the settlement, or any act performed or document executed pursuant to or in furtherance of this Agreement or the settlement herein shall be admissible in any proceeding for any purposes, except to enforce the terms of the Agreement.

Section 8.4     Good Faith Negotiations.  The Parties recognize and acknowledge that each of the Parties hereto is represented by counsel, and such Party received independent legal advice with respect to the advisability of entering into this Agreement; the negotiations related to this Agreement were conducted regularly and at arm's length; this Agreement is made and executed by and of each Party's own free will; and each Party knows all of the relevant facts and

his, her or its rights in connection therewith, and that he, she or it has not been improperly influenced or induced to make this settlement as a result of any act or action on the part of any party or employee, agent, attorney or representative of any party to this Agreement. The Parties further acknowledge that they entered into this Agreement because of their desire to avoid the further expense and inconvenience of litigation and other disputes, and to compromise permanently and settle the claims between the Parties settled by the execution of this Agreement. The Parties further acknowledge and agree that, in connection with the PROMESA Cases and the negotiation and consummation of this Agreement, including, without limitation, the Amended Plan, each of the Parties and their respective advisors, at all times, acted (a) in good faith and (b) solely for themselves and not on behalf of or in representation of any other creditors, bondholders or other parties in interest.

Section 8.5    Third Party Beneficiary.  Nothing in this Agreement, express or implied, is intended or shall be construed to confer upon, or to give to, any person other than the Parties hereto, and their respective successors and assigns, any right, remedy or claim under or by reason of this Agreement or any covenant, condition or stipulation thereof; and the covenants, stipulations and agreements contained in this Agreement are and shall be for the sole and exclusive benefit of the Parties hereto and their respective successors and assigns.

Section 8.6    Governing Law; Retention of Jurisdiction; Service of Process.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York and applicable federal law, without giving effect to the principles of conflicts of laws that would require the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each of the Parties hereby irrevocably and unconditionally covenants for itself that any legal action, suit or proceeding between any or all of the foregoing with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought in the Title III Court for that purpose only, and, by execution and delivery of this Agreement, each hereby irrevocably accepts and submits itself to the jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding, subject to a Party's rights pursuant to applicable law. If any such action, suit or proceeding is commenced, each of the Parties hereby (a) covenants and consents that service of process may be made, and personal jurisdiction over any Party hereto in any such action, suit or proceeding may be obtained, by service of a copy of the summons, complaint and other pleadings required to commence such action, suit or proceeding upon the Party at the address of such Party set forth in Section 8.11 hereof, unless another address has been designated by such Party in a notice given to the other Parties in accordance with Section 8.11 hereof and (b) waives to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising from or relating to this Agreement and the representations, covenants and other obligations set forth herein.

Section 8.7    Headings.  The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and are not part of this Agreement and do not in any way modify the terms or provisions of this Agreement and shall not affect the interpretation hereof.

Section 8.8    Binding Agreement; Successors and Assigns.  This Agreement is intended to, and shall be effective and binding only upon the execution and delivery of this Agreement by the Parties listed on the signature pages hereto. This Agreement is intended to, and shall be deemed to, bind and inure to the benefit of the Parties and their respective successors, assigns, administrators, constituents and representatives. The agreements, representations, covenants and obligations of the Parties under this Agreement are several only and not joint in any respect and none shall be responsible for the performance or breach of this Agreement by another. If any provision of this Agreement, or the application of any such provision to any person or entity or circumstance, shall be held invalid or unenforceable, in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic and legal substance of the transactions contemplated herein or in the Amended Plan are not affected in any manner materially adverse to any Party. Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner so that the transactions contemplated herein are consummated as originally contemplated to the greatest extent possible.  Notwithstanding the foregoing, (a) unless otherwise agreed to by the Parties, provisions herein providing payment of the Consummation Costs are integral parts of this Agreement and cannot be severed and (b) nothing contained herein is intended to bind, and shall not be deemed to bind, any buyers or assignees of the Transferred Bonds and/or the Transferred Claims.

Section 8.9    Entire Agreement.  This Agreement, including, without limitation, the Amended Plan, constitutes the full and entire agreement among the Parties with regard to the subject hereof and the Amended Plan, and supersedes all prior negotiations, representations, promises or warranties (oral or otherwise) made by any Party with respect to the subject matter hereof.  No Party has entered into this Agreement in reliance on any other Party's prior representation, promise or warranty (oral or otherwise) except for those that may be expressly set forth in this Agreement.

Section 8.10    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original copy of this Agreement and all of which, when taken together, shall constitute one and the same Agreement. Copies of executed counterparts transmitted by telecopy or other electronic transmission service shall be considered original executed counterparts, provided receipt of copies of such counterparts is confirmed.

Section 8.11    Notices.  All demands, notices, requests, consents, and other communications hereunder shall be in writing and shall be deemed to have been duly given (i) when personally delivered by courier service or messenger, (ii) upon actual receipt (as established by confirmation of receipt or otherwise) during normal business hours, otherwise on the first business day thereafter if transmitted electronically (by e-mail transmission), by facsimile or telecopier, with confirmation of receipt, or (iii) three (3) Business Days after being duly deposited in the mail, by certified or registered mail, postage prepaid- return receipt requested, to the following addresses, or such other addresses as may be furnished hereafter by notice in writing, to the following Parties:

28

(a)    If to the Oversight Board, the Commonwealth or PREPA, to:

PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Attn: Martin J. Bienenstock, Esq.
Email: mbienenstock@proskauer.com
Brian S. Rosen, Esq.
Email: brosen@proskauer.com
Ehud Barak, Esq.
Email: ebarak@proskauer.com
Paul Possinger, Esq,
Email: ppossinger@proskauer.com
Facsimile: 212-969-2900

(b)    If to AAFAF, to:

O'MELVENY & MEYERS LLP
Seven Times Square
New York, NY 10036
Attn: John Rapisardi, Esq.
Email: jrapisardi@omm.com
Maria J. DiConza, Esq.
Email: mdiconza@omm.com
Facsimile: 212-326-2061

(c)    If to National, to:

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Attn: Matthew S. Barr, Esq.
Attn: Gabriel Morgan, Esq.
Email: matt.barr@weil.com
Email: Gabriel.morgan@weil.com

Section 8.12   Non-Waiver of Remedies.  Except as expressly provided in this Agreement, nothing contained herein is intended, nor shall it be construed in any manner, to waive, limit, impair or restrict any right or ability of the Parties to protect and preserve each of their rights, remedies and interests, contractual or otherwise, under the Bond Resolutions, Title III or any other provision of PROMESA or any other law or regulation.

Section 8.13   <u>Several, Not, Joint Obligations.</u>  The agreements, representations, covenants and other obligations of the Parties set forth in this Agreement are, in all respects, several and not joint.

Section 8.14   <u>Remedies Cumulative.</u>  All rights, powers and remedies provided in accordance with the terms and provisions of this Agreement or otherwise available in respect hereof of law or in equity shall be cumulative and not alternative, and the exercise of any right, power or remedy thereof by any Party shall not preclude the contemporaneous or later exercise of any other such right, power or remedy by any such Party.

Section 8.15   <u>Specific Performance.</u>  Each of the Parties covenants and understands that money damages are an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach of this Agreement, including, without limitation, an order of the Title III Court or such other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder. Notwithstanding anything contained in this Agreement to the contrary, specific performance and injunctive or other similar relief and the right to terminate this Agreement in accordance with the terms and provisions hereof shall be the sole and exclusive remedies for any breach of this Agreement by any Party (or any other person) and no Party (or any other person) shall be entitled to monetary damages for any breach of any provision of this Agreement; <u>provided</u>, <u>however</u>, that, in the event the Agreement is terminated in accordance with the terms and provisions of Section 7.2 hereof, the sole remedy (other than to enforce provisions of this Agreement that survive termination hereof) shall be the payment of the fees set forth in Section 6.1(b) hereof, as applicable.

Section 8.16   <u>Further Assurances.</u>  Each of the Parties hereto covenants to execute and deliver, or to cause to be executed and delivered, such instruments, and to take such action as the other Parties may reasonably request in order to effectuate the intent and purposes of, and to carry out the terms of, this Agreement.

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed as of the date set forth above.

**FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO**

By: _____

Name: Robert F. Mujica Jr.

Title: Executive Director

**THE PUERTO RICO ELECTRIC POWER AUTHORITY**

By: Financial Oversight and Management Board for Puerto Rico, as representative of the Puerto Rico Electric Power Authority

By: _____

Name: Robert F. Mujica Jr.

Title: Executive Director

31

135074950v6

**NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION**

By: _____
Name: __Patricia Ferrari_____
Title: __Managing Director_____

*[Signature Page to PREPA Plan Support Agreement]*

# **EXHIBIT A**

Schedule of PREPA Revenue Bonds

# SUMMARY OF OUTSTANDING PREPA BONDS[1]

| Series | Issue Date | Amount Issued | Range of Interest Rates for Outstanding Bonds | Final Maturity Date | Asserted Principal as of Petition Date | Asserted Principal & Interest as of Petition Date |
|---|---|---|---|---|---|---|
| SERIES JJ | 1/3/02 | 720,370,000 | 5.375% - 5.375% | 7/1/18 | 42,315,000 | 43,452,216 |
| SERIES LL | 7/2/02 | 499,910,000 | 5.500% - 5.500% | 7/1/19 | 77,905,000 | 80,047,388 |
| SERIES MM | 10/3/02 | 105,055,000 | 5.000% - 5.000% | 7/1/23 | 56,200,000 | 57,605,000 |
| SERIES NN | 8/19/03 | 517,305,000 | 4.750% - 5.500% | 7/1/33 | 171,525,000 | 175,942,925 |
| SERIES PP | 8/26/04 | 224,700,000 | 3.750% - 5.000% | 7/1/25 | 84,765,000 | 86,875,446 |
| SERIES QQ | 4/4/05 | 224,700,000 | 5.500% - 5.500% | 7/1/18 | 35,340,000 | 36,311,850 |
| SERIES RR | 4/4/05 | 993,450,000 | 5.000% - 5.000% | 7/1/28 | 236,265,000 | 242,171,625 |
| SERIES SS | 4/4/05 | 993,450,000 | 3.875% - 5.000% | 7/1/30 | 332,205,000 | 340,436,128 |
| SERIES TT | 5/3/07 | 1,943,565,000 | 4.200% - 5.250% | 7/1/37 | 622,085,000 | 637,570,581 |
| SERIES UU | 5/3/07 | 1,943,565,000 | 1.189% - 5.000% | 7/1/31 | 777,280,000 | 789,310,979 |
| SERIES VV | 5/30/07 | 557,410,000 | 5.250% - 5.500% | 7/1/35 | 546,645,000 | 561,018,444 |
| SERIES WW | 6/26/08 | 697,345,000 | 5.000% - 5.500% | 7/1/38 | 610,140,000 | 626,460,619 |
| SERIES XX | 4/7/10 | 822,210,000 | 4.625% - 5.750% | 7/1/40 | 822,210,000 | 843,980,338 |
| SERIES YY | 4/29/10 | 320,175,000 | 6.125% - 6.125% | 7/1/40 | 320,175,000 | 325,077,680 |
| SERIES AAA | 5/5/10 | 363,075,000 | 5.250% - 5.250% | 7/1/31 | 363,075,000 | 372,605,719 |
| SERIES ZZ | 5/5/10 | 631,160,000 | 3.700% - 5.250% | 7/1/28 | 514,900,000 | 528,076,798 |
| SERIES BBB | 5/26/10 | 76,800,000 | 5.400% - 5.400% | 7/1/28 | 76,800,000 | 77,836,800 |
| SERIES CCC | 5/26/10 | 316,920,000 | 4.250% - 5.250% | 7/1/28 | 316,920,000 | 325,033,941 |
| SERIES DDD | 10/14/10 | 218,225,000 | 3.300% - 5.000% | 7/1/24 | 218,225,000 | 223,144,738 |
| SERIES EEE | 12/29/10 | 355,730,000 | 5.950% - 6.250% | 7/1/40 | 355,730,000 | 361,133,935 |
| SERIES 2012A | 5/1/12 | 650,000,000 | 4.800% - 5.050% | 7/1/42 | 630,110,000 | 645,848,240 |
| SERIES 2013A | 8/21/13 | 673,145,000 | 6.750% - 7.250% | 7/1/43 | 673,145,000 | 696,364,450 |
| Series 2016A | 5/19/16 | 55,639,539 | 10.000% - 10.000% | 7/1/19 | 55,639,539 | 58,421,516 |
| Series 2016B | 6/22/16 | 55,210,625 | 10.000% - 10.000% | 7/1/19 | 55,210,625 | 57,971,156 |
| Series 2016C | 6/30/16 | 104,600,000 | 5.400% - 5.400% | 7/1/20 | 104,600,000 | 110,264,090 |
| Series 2016D | 6/30/16 | 64,375,560 | 7.500% - 7.500% | 7/1/20 | 64,375,560 | 69,217,139 |
| Series 2016E | 6/30/16 | 94,828,424 | 10.000% - 10.000% | 7/1/22 | 94,828,424 | 104,337,608 |
| Total | | 14,222,919,148 | | | 8,258,614,148 | 8,476,517,345 |

## **EXHIBIT B**

Settlement Summary

SETTLEMENT SUMMARY

| CLAIM ALLOWANCE | ▪ On the PREPA Effective Date, National's claims, other than its Settled Reimbursement Claim, will be deemed allowed in the amount of $836,145,928.13 (the "**National Bond Claim Amount**" or the "**Bond Claim Amount**"). |
|---|---|
| EXCHANGE RATIO | ▪ 71.65% of the Bond Claim Amount, to be paid in Series B Bonds. |
| REIMBURSEMENT CLAIM | ▪ 20.0% of the Settled Reimbursement Claim Amount, to be paid in Series B Bonds, as defined in the Amended Plan; provided, however, that, (a) if one or more parties in interest in the PREPA PROMESA Case objects to confirmation of the Amended Plan or the settlement of National's claims embodied in the Amended Plan for reasons, including, without limitation, its treatment or allowability of the Settled Reimbursement Claim, or (b) if the Title III Court considers either issue sua sponte or pursuant to an objection, and, in either case, the Title III Court does not approve the settlement or finds unfair discrimination for reasons including, without limitation, the allowability and/or treatment of the Settled Reimbursement Claims, the settlement and the treatment of National's claims shall, without further action, convert to a settlement of National's claims that eliminates the obligation to issue Series B Bonds on account of the Settled Reimbursement Claims and any payments for debt service and any legal, consummation, or other fees arising from, relating to, or on account of the Settled Reimbursement Claims; and, provided, further, that in such circumstance, National shall have the option to forego all consideration under this Agreement, including the Consummation Costs and Structuring Fees, and, in exchange, receive the same treatment as another settling class of holders of PREPA Revenue Bond claims, so long as the settlement with such class whose recovery National would receive was reached prior to the earlier to occur of (y) any substantive ruling on the claims and counterclaims asserted in the Adversary that holders of PREPA Revenue Bonds are secured by Revenues outside of the Sinking Fund, and (z) an indication or a determination, either oral or written, at a hearing or otherwise, by the Title III Court that the Holders of PREPA Revenue Bonds are secured by Revenues outside of the Sinking Fund. |
| CONSUMMATION COSTS | ▪ On the PREPA Effective Date, PREPA, as reorganized ("Reorganized PREPA"), shall pay to National, as the case may be, an amount equal three percent (3%) times the National Bond Claim Amount, in Cash or Series B Bonds, elected in the sole discretion of the Oversight Board, which election shall be made at or prior to the commencement of the PREPA Confirmation Hearing. |

| | |
|---|---|
| **STRUCTURING FEES** | ▪ On the PREPA Effective Date, Reorganized PREPA shall pay to National 2.86% <u>times</u> the National Bond Claim Amount, in Cash or Series B Bonds, elected in the sole discretion of the Oversight Board, which election shall be made at or prior to the commencement of the PREPA Confirmation Hearing. |
| **INTERIM CHARGE** | ▪ Subject to necessary approvals from PREB, as applicable, from and after the effectiveness of the Agreement and the collection of the charge up to, but not including, the PREPA Effective Date, National shall receive the equivalent amount of the interest on its existing PREPA Revenue Bond Claims payable from, and not to exceed, its pro rata share of the revenues generated from the equivalent of a one cent ($0.01)/KWH volumetric charge from the effective date of this Agreement times the Insured Bond Claims divided by the PREPA Revenue Bond Claims, which shall imposed by PREPA; <u>provided, however</u>, that, in the event that PREB approval is not obtained, PREPA shall not be obligated to make an Interim Payment; and, <u>provided, further</u>, that cumulative revenues received by National shall not exceed National's existing coupon during the period from the Agreement effective date up to, but not including, the PREPA Effective Date; and, <u>provided, further</u>, that, in the event that National receives amounts associated with the Interim Charge and the Amended Plan is neither confirmed nor consummated, any amounts received by National with respect to the Interim Charge shall be, and shall be deemed to constitute, a reduction of the distributions to be received by National pursuant to (i) any future plan of adjustment for PREPA or (ii) settlement, litigation, or other resolution of National's claims on account of the principal amount of the National Insured Bonds without further order of the Title III Court. |
| **NEW BONDS** | ▪ On the PREPA Effective Date, Reorganized PREPA shall issue to PREPA's creditors only Series A Bonds and Series B Bonds (together with Series A Bonds, as defined in the Amended Plan, the "**<u>New Bonds</u>**") as set forth on Schedule 1 hereto or other bonds as long as such other bonds (a) are consistent with the additional bonds test set forth in the New Master Indenture, (b) are not secured by the Legacy Charge or Remaining Legacy Charge during the applicable periods, and (c) do not in any way affect the terms of the Series B Bonds as set forth in this Settlement Summary. |
| | ▪ Reorganized PREPA shall not issue any Series A Bonds to any parties other than those to be issued pursuant to the Initial Plan and the Fuel Line Lender PSA. |
| **LEGACY CHARGE** | ▪ Legacy Charge shall have the meaning and terms in the Initial Plan, as amended consistent with the provisions of this Agreement, and shall |

| | |
|---|---|
| | refer to the hybrid connection charge and volumetric charge to be added to customers' bills to pay the New Bonds. |
| **SECURITY** | ▪ The New Bonds shall be secured by, and paid solely from, Reorganized PREPA's Net Revenues, as defined in the Initial Plan, and the right to receive such net revenues, up to the amount of the Legacy Charge revenues, in accordance with the Payment Waterfall, as defined in the Initial Plan.  For the avoidance of doubt, the New Bonds' liens are not limited to the net revenues deposited into the Debt Service Fund, as defined in the Initial Plan. |
| **PAYMENT DEFAULT** | ▪ There shall be no event of default on the New Bonds for failure to pay scheduled debt service prior to the final maturity thereof, as applicable, so long as Reorganized PREPA (a) charges and employs its reasonable best efforts to collect revenues generated by the Legacy Charge, and the full amount collected under the Legacy Charge is deposited into the Debt Service Fund in accordance with the Payment Waterfall and (b) complies with the Interest Rate Covenant, each as defined in the New Master Indenture. |
| **REMEDIES** | ▪ Upon the occurrence of an event of default, the New Master Trustee's sole remedies shall be to: (a) seek enforcement of Reorganized PREPA's obligation to take reasonable measures to collect Revenues generated by the Legacy Charge and deposit such monies received into the Debt Service Fund in accordance with the Payment Waterfall, and/or (b) prior to the final maturity thereof, as applicable, at the request of holders of twenty-five percent (25%) or more of the Series A Bonds or the Series B Bonds, enforce the Interest Rate Covenant.

▪ The Amended Plan and the New Master Indenture shall provide the "Right to Receivership Upon Default," codified at 22 L.P.R.A. § 207, is preempted and waived.  There shall be no right of acceleration under the New Bonds other than an acceleration in connection with an insolvency proceeding (including under Title III of PROMESA).

▪ The Oversight Board shall use reasonable best efforts to obtain PREB approval and Title III Court ordered protections for the Interest Rate Covenant and Reorganized PREPA's obligations to charge, collect, and pay Legacy Charge revenues as provided herein; <u>provided, however</u>, that, for the avoidance of doubt, reasonable best efforts with respect to the foregoing sentence shall include incorporating such protections in the draft PREPA Confirmation Order filed with the Title III Court. |
| **FEDERALLY-DECLARED DISASTERS** | ▪ In the event of a Federally-declared disaster as a result of a storm or other catastrophic event that disrupts Reorganized PREPA's operations such that Reorganized PREPA cannot collect Legacy Charge revenue necessary to cover Operating Expenses and the debt service payable on the New Bonds for a given Fiscal Year, Reorganized PREPA may elect, in its sole and absolute discretion, to defer debt service for up to |

| | two (2) consecutive semi-annual debt service payments per Federally-declared disaster; provided, however, that in the event that Reorganized PREPA exercises such election, interest on the New Bonds will continue to accrete until paid. |
|---|---|
| **PREPA DEFINITIVE DOCUMENTATION** | ▪ The New Bonds shall be documented under an indenture or trust agreement on the terms customary for transactions of this type, as reasonably acceptable to (a) the Fuel Line Lender PSA Creditors and (b) National.  Without limiting the foregoing, the New Bonds, when issued, may be subject to an "additional bonds test" to be reasonably acceptable to (a) the Fuel Line Lender PSA Creditors and (b) National. |
| **INSURER PROVISIONS** | ▪ The Amended Plan and related documents shall include provisions pertaining to the treatment of monoline insurers and monoline insurers' claims consistent with such provisions as set forth in the Title III plans of adjustment for the Commonwealth of Puerto Rico, the Puerto Rico Sales Tax Financing Corporation, and the Puerto Rico Highways and Transportation Authority. |
| **CONTINGENT VALUE INSTRUMENT (CVI)** | ▪ If a CVI different from the CVI in the First Amended Plan is offered to other holders of PREPA Revenue Bonds, upon the PREPA Effective Date, National shall be entitled to receive a CVI on account of the Insured Bond Claims and a payment therefrom equal to fifty percent (50%) of the recovery of such holders' *pro rata* share until such other holders recover seventy-one and sixty-five one hundredths percent (71.65%) of their PREPA Revenue Bond Claims and, thereafter, shall share, on a *pro rata* basis, equally with such holders. For the avoidance of doubt, any Series B Bonds received by other holders of PREPA Revenue Bonds from the Gross Remaining New Bonds, Net Remaining New Bonds, or Excess New Bonds, as such terms are defined in the Initial Plan, shall be counted towards the 71.65% threshold in the preceding sentence. |
| **RELEASE** | ▪ The Parties shall release each other to the maximum extent permitted by law (including for the avoidance of doubt claims against the Commonwealth related to the PREPA Revenue Bonds).  At the request of the Oversight Board and in exchange for reciprocal release, National shall release any other party in interest in the PREPA PROMESA Case that may be liable on account of National's claims. |
| **EXCESS FUNDS** | ▪ National shall not share in excess funds, if any, including, for the avoidance of doubt, the Gross Remaining New Bonds, Net Remaining New Bonds, or Excess New Bonds, as provided under the Amended Plan. |

**EXHIBIT C**

Schedule of National Insured Bonds

## SCHEDULE OF NATIONAL INSURED BONDS

| CUSIP | Issue Date | Maturity | Coupon | Face Amount | National Bond Claim Amount as of Petition Date |
|---|---|---|---|---|---|
| 7452688F2 | 10/3/2002 | 7/1/2022 | 5.000% | $1,535,000.00 | $1,573,375.00 |
| 7452688G0 | 10/3/2002 | 7/1/2023 | 5.000% | 1,615,000.00 | 1,655,375.00 |
| 74526QDB5 | 4/4/2005 | 7/1/2022 | 5.000% | 23,560,000.00 | 24,149,000.00 |
| 74526QEP3 | 4/4/2005 | 7/1/2022 | 5.000% | 22,945,000.00 | 23,518,625.00 |
| 74526QEQ1 | 4/4/2005 | 7/1/2022 | 4.125% | 985,000.00 | 1,005,315.63 |
| 74526QDC3 | 4/4/2005 | 7/1/2023 | 5.000% | 24,765,000.00 | 25,384,125.00 |
| 74526QER9 | 4/4/2005 | 7/1/2023 | 5.000% | 25,120,000.00 | 25,748,000.00 |
| 74526QDD1 | 4/4/2005 | 7/1/2024 | 5.000% | 26,035,000.00 | 26,685,875.00 |
| 74526QES7 | 4/4/2005 | 7/1/2024 | 5.000% | 25,310,000.00 | 25,942,750.00 |
| 74526QET5 | 4/4/2005 | 7/1/2024 | 4.250% | 1,085,000.00 | 1,108,056.25 |
| 74526QEU2 | 4/4/2005 | 7/1/2025 | 5.000% | 26,180,000.00 | 26,834,500.00 |
| 74526QEV0 | 4/4/2005 | 7/1/2025 | 4.300% | 1,525,000.00 | 1,557,787.50 |
| 74526QKM3 | 5/3/2007 | 7/1/2019 | 4.200% | 5,000,000.00 | 5,105,000.00 |
| 74526QKN1 | 5/3/2007 | 7/1/2020 | 5.000% | 1,000,000.00 | 1,025,000.00 |
| 74526QKP6 | 5/3/2007 | 7/1/2021 | 5.000% | 525,000.00 | 538,125.00 |
| 74526QKQ4 | 5/3/2007 | 7/1/2022 | 5.000% | 3,705,000.00 | 3,797,625.00 |
| 74526QKR2 | 5/3/2007 | 7/1/2023 | 5.000% | 1,000,000.00 | 1,025,000.00 |
| 74526QKS0 | 5/3/2007 | 7/1/2024 | 5.000% | 5,000,000.00 | 5,125,000.00 |
| 74526QKU5 | 5/3/2007 | 7/1/2026 | 5.000% | 5,000,000.00 | 5,125,000.00 |
| 74526QPH9 | 5/30/2007 | 7/1/2024 | 5.250% | 27,265,000.00 | 27,980,706.25 |
| 74526QPJ5 | 5/30/2007 | 7/1/2025 | 5.250% | 28,695,000.00 | 29,448,243.75 |
| 74526QPK2 | 5/30/2007 | 7/1/2026 | 5.250% | 30,200,000.00 | 30,992,750.00 |
| 74526QPM8 | 5/30/2007 | 7/1/2029 | 5.250% | 68,715,000.00 | 70,518,768.75 |
| 74526QPN6 | 5/30/2007 | 7/1/2030 | 5.250% | 72,365,000.00 | 74,264,581.25 |
| 74526QPQ9 | 5/30/2007 | 7/1/2032 | 5.250% | 80,255,000.00 | 82,361,693.75 |
| 74526QPR7 | 5/30/2007 | 7/1/2033 | 5.250% | 38,780,000.00 | 39,797,975.00 |
| 74526QPS5 | 5/30/2007 | 7/1/2034 | 5.250% | 40,870,000.00 | 41,942,837.50 |
| 74526QPT3 | 5/30/2007 | 7/1/2035 | 5.250% | 43,065,000.00 | 44,195,456.25 |
| 74526QAL6 | 8/19/2003 | 7/1/2022 | 5.250% | 26,430,000.00 | 27,123,787.50 |
| 74526QAM4 | 8/19/2003 | 7/1/2023 | 5.250% | 27,820,000.00 | 28,550,275.00 |
| 74526QAR3 | 8/19/2003 | 7/1/2033 | 4.750% | 45,745,000.00 | 46,831,443.75 |
| 74526QCK6 | 8/26/2004 | 7/1/2022 | 5.000% | 19,290,000.00 | 19,772,250.00 |
| 74526QCL4 | 8/26/2004 | 7/1/2023 | 5.000% | 20,260,000.00 | 20,766,500.00 |
| 74526QCM2 | 8/26/2004 | 7/1/2024 | 5.000% | 21,270,000.00 | 21,801,750.00 |
| 74526QCN0 | 8/26/2004 | 7/1/2025 | 5.000% | 22,335,000.00 | 22,893,375.00 |
| **Total** | | | | **$815,250,000.00** | **$836,145,928.13** |

## **Exhibit D**

Qualified Transferee Joinder