# THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| *In re:* <br><br> THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, <br><br> as representative of <br><br> THE COMMONWEALTH OF PUERTO RICO, *et al.*, <br><br> Debtors.[1] | PROMESA Title III <br><br> Case No. 17-03283 (LTS) <br><br> (Jointly Administered) |
| *In re:* <br><br> THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, <br><br> as representative of <br><br> PUERTO RICO ELECTRIC POWER AUTHORITY, <br><br> Debtor. | PROMESA Title III <br><br> Case No. 17-4780-LTS |

**REPLY AND STATEMENT OF NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION IN SUPPORT OF THE PREPA DISCLOSURE STATEMENT**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ................................................................................................... 1

ARGUMENT .................................................................................................................................. 3

    I.    Objectors' Arguments against the National PSA Are Premature at the Disclosure Statement Stage ........................................................................................................................................ 3

    II.   Arguments against the National PSA and Its Embodiment in the First Amended Plan Will Prove Unmeritorious at Confirmation ........................................................................................ 5

    III.  The National Reimbursement Claim Is Adequately Disclosed and Permissible under PROMESA ................................................................................ 9

RESERVATION OF RIGHTS ..................................................................................................... 11

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Allied Owners' Corp*,
   74 F.2d 201 (2d Cir. 1934) .................................................................................................. 8

*In re Cent. Valley Processing, Inc.*,
   2007 WL 840500 (Bankr. E.D. Cal. Mar. 16, 2007) ............................................................ 9

*In re Comandante Mgmt. Co.*,
   359 B.R. 410 (Bankr. D.P.R. 2006) ..................................................................................... 4

*In re Corcoran Hosp. Dist.*,
   233 B.R. 449 (Bankr. E.D. Cal. 1999) ................................................................................. 5

*Durrett v. Housing Auth. of City of Providence*,
   896 F.2d 600 (1st Cir. 1990) ................................................................................................ 9

*In re Fin. Oversight and Mgmt. Bd. for Puerto Rico*,
   637 B.R. 223 (D.P.R. 2022) ................................................................................................. 4

*In re Hibbard Brown & Co.*,
   217 B.R. 41 (Bankr. S.D.N.Y. 1998) ................................................................................... 9

*In re Jefferson*,
   144 B.R. 620 (Bankr. D.R.I. 1992) ...................................................................................... 9

*Lex Claims, LLC v. Garcia-Padilla*,
   236 F. Supp. 3d 504 (D.P.R. 2017) ...................................................................................... 8

**Statutes**

11 U.S.C. § 509(c) ................................................................................................................ 10, 11

11 U.S.C. § 1122(a) ...................................................................................................................... 5

PROMESA § 301(a) ..................................................................................................................... 5

PROMESA § 301(c)(3) ................................................................................................................. 8

**Other Authorities**

Fed. R. Bankr. P. 3003(c)(5) ......................................................................................................... 7

Fed. R. Bankr. P. 3007, 1983 ........................................................................................................ 7

Fed. R. Bankr. P. 9014, 1983 ........................................................................................................ 7

National Public Finance Guarantee Corporation ("National") hereby submits this reply and statement in support of (i) the *Disclosure Statement for First Amended Title III Plan of Adjustment of the Puerto Rico Electric Power Authority* (ECF No. 3201) (as may be further amended, the "Disclosure Statement");[2] (ii) the *Urgent Motion of Puerto Rico Electric Power Authority for Order (I) Scheduling a Hearing to Consider the Adequacy of Information Contained in the Disclosure Statement, (II) Establishing the Deadline for Filing Objections to the Disclosure Statement and Replies Thereto, (III) Approving Form of Notice Thereof, (IV) Establishing Document Depository Procedures in Connection Therewith, and (V) Granting Related Relief* (ECF No. 3112) (as may be further amended, the "Disclosure Statement Motion"); (iii) the *Motion of Puerto Rico Electric Power Authority for Order Establishing, Among Other Things, Procedures and Deadlines Concerning Objections to Confirmation and Discovery in Connection Therewith* (ECF No. 3114) (the "Procedures Motion"); and (iv) all related documents, and respectfully states as follows:

## PRELIMINARY STATEMENT

1. On December 16, 2022, the Oversight Board announced that it had reached an agreement in principle with National. ECF No. 3115. That settlement was documented in a PREPA Plan Support Agreement, executed on February 2, 2023 (the "National PSA"). On February 9, 2023, the Oversight Board filed the Disclosure Statement for the *First Amended Title III Plan of Adjustment of the Puerto Rico Electric Power Authority*, ECF No. 3200 (the "First Amended Plan"), which reflects terms of the National PSA. The First Amended Plan places the National Insured Bond Claims in Class 5 and the National Reimbursement Claim in Class 6.

2. Certain parties, including the PREPA Bond Trustee (ECF No. 3224) (the

---

[2] Unless otherwise indicated, ECF numbers referenced in this statement refer to the docket in Case Number 17-04780-LTS.

1

"Trustee Obj."), the Ad Hoc Group of PREPA Bondholders (ECF No. 3225) (the "AHG Obj."), the Official Committee of Unsecured Creditors (ECF No. 3226) (the "UCC Obj."), Syncora Guarantee, Inc. (ECF No. 3223) (the "Syncora Obj."), the Ad Hoc Committee of National Claim Assignees (ECF No. 3222) (the "Assignee Obj."), and AHIMSA (ECF No. 3228) (the "AHIMSA Obj."), have filed supplemental objections to the Disclosure Statement, some of which include arguments against implementation of the settlement embodied in the National PSA. The objecting parties that address the National PSA contend that the First Amended Plan unfairly discriminates between National and other PREPA Bondholders (*see, e.g.*, AHG Obj. ¶¶ 5-12), and improperly classifies National's claims separately in Classes 5 and 6 from other PREPA Bond claims in Classes 1 and 2 (*see, e.g.*, Trustee Obj. at pp. 3-6, Assignee Obj. at pp. 11-12). The PREPA Bond Trustee further claims that "the individual PREPA Bondholders solicited by the Oversight Board do not have the right to split off and settle 'their portion' of the PREPA Bond Trustee's rights." Trustee Obj. at p. 3.

3. National disagrees with the objecting parties' contentions and will address them at the appropriate time, but such arguments are premature and irrelevant to the issue presently before the Court: Whether the Disclosure Statement contains adequate information and should be approved. This Court should therefore reserve consideration of these arguments for the confirmation stage.

4. In any event, the arguments against the National PSA and its embodiment within the First Amended Plan are substantively unfounded. To start, National's separate classification under the First Amended Plan appropriately reflects National's status as a settling party and allows it to implement settlement provisions for insured bondholders and recognizes National's separate contractual reimbursement claims. The separate classification of settling monoline insurers has already been approved by this Court in three other Title III cases. And National's treatment is justified. National not only agreed to support the First Amended Plan before the

Court issued rulings in connection with the competing summary judgment motions filed in the lien and recourse litigation—National also reached a settlement in principle with the Oversight Board before, and voluntarily did not participate in, oral argument on the summary judgment motions. Indeed, National was the first bondholder to agree to compromise its bond claims, settle numerous active disputes with PREPA, and support the First Amended Plan. Further, nothing in the Trust Agreement impairs the right of a bondholder to settle its individual bankruptcy claims. While the no-action clause prohibits individual bondholders from instituting actions or proceedings asserting remedies under the Trust Agreement, it does not prevent a bondholder from filing a proof of claim in bankruptcy or from settling its claim pursuant to a plan support agreement. It is therefore no impediment to a consensual resolution of bondholder claims in bankruptcy.

5. National reached an agreement in principle with the Oversight Board in the midst of hotly contested litigation because a consensual resolution is far better for bondholders, PREPA, and its ratepayers. In doing so, National cleared a path for others to follow suit such that a largely consensual plan is achievable today, and in the coming weeks. The Disclosure Statement Motion should be granted.

## ARGUMENT

### I. Objectors' Arguments against the National PSA Are Premature at the Disclosure Statement Stage

6. At this stage, the issue before the Court is whether the Disclosure Statement contains adequate information. This Court has repeatedly recognized that objections concerning classification or plan treatment must be reserved for plan confirmation. *See* July 14, 2021 Hr'g Tr. at 80-81, Case No. 17-3283, ECF No. 17379 (approving disclosure statement and reserving for confirmation issues concerning classification and treatment of claims that did not "pose[] a pure question of law that would render a confirmation futile or unfeasible at this stage"); June 17, 2022 Hr'g Tr. at 27, Case No. 17-3283, ECF. No. 21274 (overruling disclosure statement

3

objection and explaining that objector "may litigate in connection with confirmation, if necessary, whether the proposed classification and treatment of the claims may differ from those of other general unsecured claims"). This Court has also held that unfair discrimination objections should not be heard at the disclosure statement stage because they "require factual development" as to the reason for the discrimination. July 14, 2021, Hr'g Tr. at 84:13-17, Case No. 17-3283, ECF No. 17379 (overruling unfair discrimination objection because "[s]uch arguments are properly raised in connection with plan confirmation").

7. Only if a plan is patently unconfirmable may the court "consider issues pertaining to the plan" and "rule upon such issues." *In re Comandante Mgmt. Co.*, 359 B.R. 410, 415 (Bankr. D.P.R. 2006) (citing *In re Mahoney Hawkes, LLP*, 289 B.R. 285, 294 (Bankr. D. Mass. 2002)). The "patently unconfirmable" standard, however, is an exceedingly high bar to clear: The objecting party must show that the plan is "so fatally, and obviously flawed that confirmation is impossible." *Id.* As this Court has explained, the alleged defect rendering a plan unconfirmable must appear on the face of the plan and in a manner by which the plan "could *never* be legal." June 17, 2022 Hr'g Tr. at 26:22-27:4; Apr. 28, 2021 Hr'g Tr. at 145:13-22, Case No. 17-3283, ECF No. 16662 (emphasis added).

8. The objecting parties do not and cannot meet this heavy burden. The First Amended Plan proposes four impaired accepting classes, and it therefore has four avenues through which PREPA may obtain an impaired accepting class required for confirmation. Although the Ad Hoc Group of PREPA Bondholders asserts that the First Amended Plan is patently unconfirmable because it unfairly discriminates between National and other PREPA Bondholders, the Ad Hoc Group fails to acknowledge that PROMESA permits disparate treatment between National and other PREPA Bondholders if the difference in treatment is justified. *See, e.g.*, *In re Fin. Oversight and Mgmt. Bd. for Puerto Rico*, 637 B.R. 223, 283 (D.P.R. 2022). The Ad Hoc Group's assertion that National's treatment "can be understood only

4

as an attempt to manufacture the illusion of meaningful creditor support for the plan," AHG Obj. at ¶ 9, is at best conclusory. Of course, a justification for National's different treatment could (and does) exist. The Court should accordingly reserve for confirmation consideration of such arguments.

### II. Arguments against the National PSA and Its Embodiment in the First Amended Plan Will Prove Unmeritorious at Confirmation

9. Moreover, at plan confirmation these objections will prove to be unfounded. A creditor's settlement of its claims, for example, is ample justification for the separate classification of those claims. *See In re Corcoran Hosp. Dist.*, 233 B.R. 449, 455 (Bankr. E.D. Cal. 1999) (holding that settlement provided business and economic justification for separately classifying claims). Consistent with this principle, the plans of adjustment that this Court has confirmed in the COFINA, Commonwealth, and HTA Title III cases have all separately classified the claims of monoline insurers that settled their claims. *See* Case No. 17-3284, ECF No. 436 (COFINA); Case No. 17-3283, ECF No. 19813 (Commonwealth); Case No. 17-3567, ECF No. 1415 (HTA). Indeed, the PREPA Bond Trustee also acknowledges that National's separate classification is justified based on National's status as a bond insurer: separate classification is needed to "solve[] custodial trust issues associated with combining plan and insurance policy distributions for insured PREPA Bondholders." Bond Trustee Obj. at pp. 5-6.

10. The Ad Hoc Committee of National Claim Assignees also mistakenly argues that the Assigned National Claims are entitled to be classified with National. Assignee Obj. at pp. 9-12. As an initial matter, creditors have no right to be included in a particular class; PROMESA incorporates section 1122 of the Bankruptcy Code, which permits, but does not *require*, similar creditors to be placed in the same class. *See* PROMESA § 301(a); 11 U.S.C. § 1122(a) ("[A] plan *may* place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.") (emphasis added). Further,

5

the First Amended Plan appropriately does not include the Assigned National Claims in Classes 5 and 6 because the claims are not similar. National is a settling monoline insurer with remaining obligations to insured bondholders, whereas the holders of Assigned National Claims are non-settling bondholders who purchased certain claims from National after National had already paid the insured bondholders in full. The National Claim Assignees are therefore on fundamentally different footing because they are not settling bondholders, they have never paid any claims to insured bondholders that may be reimbursed, and they do not have ongoing insured obligations to insured bondholders. These differences justify separate classification of National's claims from the Assigned National Claims.

11. The difference in treatment between National Insured Bond Claims and the claims of other PREPA Bondholders in the proposed Amended Plan is also justified. National has worked tirelessly with the Oversight Board over an extended period of time to reach a consensual resolution of its claims. It reached an agreement in principle in the midst of hotly contested litigation over the bondholders' claims, and before the Court heard oral argument on the Oversight Board's and bondholders' motions for summary judgment in the lien and recourse litigation. And National executed its settlement well before any informal or formal rulings issued in the adversary proceeding to determine the scope of liens and recourse rights under the Trust Agreement. For decades, National has supported PREPA, and it will continue to do so consistent with the National PSA. For these and other reasons, no unfair discrimination will be found to exist at confirmation.

12. In addition, the PREPA Bond Trustee incorrectly suggests that National cannot independently settle its bankruptcy claims and rights under the National PSA. In its initial objection, the PREPA Bond Trustee conflates a proof of claim and settlement thereof with an action or proceeding to enforce the Trust Agreement and mistakenly relies on this Court's decision denying Pan American Grain Co.'s motion for relief from the automatic stay to set off

6

its bond claim against its prepetition obligation to PREPA. Trustee's Initial Disclosure Statement Objection at 3-4, ECF No. 3187. Pan American held PREPA bonds but also owed PREPA a prepetition debt of over $2 million for electrical services, and it sought to set off its liability by the amount of the outstanding principal and interest PREPA owed it. The Court concluded that the Trust Agreement's no-action clause precluded this individual creditor from pursuing a setoff action seeking "individual relief as against the issuer." *See id.* at 4 (quoting Nov. 7, 2018 Hr'g Tr. at 48:8-50:9, Case No. 17-3283, ECF No. 4198). The no-action clause provides that bondholders shall have no "right to institute any suit, action or proceeding in equity or at law on any bond … or for any other remedy hereunder [*i.e.*, the Trust Agreement]" unless the requisite percentage of bondholders consent. Trust Agreement § 808. And Pan American unquestionably instituted an action where, via setoff, it effectively sought to recover outstanding principal and interest on its bonds, *i.e.*, an action to recover under the Trust Agreement. Pan American could not and did not contend that the no-action clause was inapplicable, but rather argued that the Court should "use its equitable powers and just eliminate Pan American from that no-action clause." Nov. 7, 2018 Hr'g Tr. at 36:24-37:1. The Court declined to do so.

13. Here, instead, the no-action clause does not apply. In the first instance, no provision in the Trust Agreement states that the Trustee may file a proof of claim, or that bondholders may not do so. Bankruptcy Rule 3003(c)(5)—not any express provision of the Trust Agreement—permitted, but did not require, the Bond Trustee to file the Master Proof of Claim. Indeed, the no-action clause only prohibits bondholders from instituting a "suit, action or proceeding" to pursue remedies under the Trust Agreement. Filing a proof of claim does not institute a suit, action or proceeding. *See* Fed. R. Bankr. P. 3007, 1983 Advisory Comm. Note ("The *contested matter initiated by an objection* to a claim is governed by rule 9014.") (emphasis added); Fed. R. Bankr. P. 9014, 1983 Advisory Comm. Note ("[T]he filing of an *objection* to a proof of claim … *creates a dispute* which is a contested matter.") (emphasis added). The same

7

also is true when a bondholder settles its bankruptcy claim. Moreover, the National PSA does not seek or obtain a remedy under the Trust Agreement within the meaning of the no-action clause. To the contrary, National has agreed to *refrain* from pursuing any action to exercise its rights and remedies under the Trust Agreement. And, if the First Amended Plan is confirmed, no PREPA bond interest or principal will be paid to National, no receiver will be appointed, and no rate covenant will be enforced. Instead, National will receive new bonds issued under a new indenture, and other consideration outside the terms and contemplation of the Trust Agreement. *See, e.g.*, *Lex Claims, LLC v. Garcia-Padilla*, 236 F. Supp. 3d 504, 522 (D.P.R. 2017) (bond resolution no-action clause did not bar monoline insurer's motion to intervene because motion was "unrelated to the Resolution").

14. For precisely this reason, when PREPA Bondholders, including National, independently filed their own proofs of claim in the billions of dollars, the Bond Trustee correctly did not object. See Claim Nos. 22078, 23396 (National); No. 31087 (Assured); No. 49143 (Syncora); No. 22078 (Ad Hoc Group Members); *see also* Claim No. 18449 (Master Proof of Claim) (acknowledging that certain monoline insurers "intend to file their own proofs of claim against the Authority with respect to their rights under applicable policies of insurance and/or insurance agreements"). When PREPA Bondholders entered into the 2019 PSA, the Bond Trustee correctly did not take action against them. It also correctly did not object to the Oversight Board's motion to approve the 2019 PSA pursuant to Rule 9019. *See* ECF No. 1253; *Preliminary Statement and Reservation of Rights of U.S. Bank National Association as PREPA Bond Trustee with Respect to 9019 Motion of Government Parties Relating to PREPA Restructuring Support Agreement*, ECF No. 1696. Just as uninsured bondholders may file proofs of claim, they also may vote their claims. *See e.g., In re Allied Owners' Corp.*, 74 F.2d 201, 203-04 (2d Cir. 1934). National, as a monoline insurer, has the right (expressly recognized under PROMESA § 301(c)(3)) to vote its insured claims—a right the Trustee does not dispute. *See*

8

Trustee Obj. at 2 n.5. For all of these reasons, the no-action clause is not applicable to, much less a prohibition on, settlements of bankruptcy claims by monolines or bondholders.

15. Public policy favoring settlements in restructuring proceedings also weighs strongly against the Bond Trustee's implausible reading of the Trust Agreement. *See Durrett v. Housing Auth. of City of Providence*, 896 F.2d 600, 604 (1st Cir. 1990); *In re Hibbard Brown & Co.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998) (noting the "general public policy favoring settlements"); *In re Cent. Valley Processing, Inc.*, 2007 WL 840500, at *3 (Bankr. E.D. Cal. Mar. 16, 2007) ("The policy favouring settlement is particularly acute in the context of bankruptcy."); *In re Jefferson*, 144 B.R. 620, 623 (Bankr. D.R.I. 1992) (rejecting interpretation of statute that would have discouraged settlement, and noting that a "deeply rooted principle of American jurisprudence is to favor settlement" (citation omitted)). If the Oversight Board must obtain "an accepting vote by a single class of Bondholders," as the Bond Trustee contends (Trustee Obj. at p. 5), this "all-or-nothing" standard would pose a significant impediment to settling bondholder claims. By precluding individual PREPA Bondholders or bondholder groups from entering separate settlement agreements, it would prevent bondholders from engaging in negotiations that account for the unique needs and interests of the individual bondholders and reaching agreements that accommodate their unique positions. The Court should reject the Bond Trustee's unsupported reading of the Trust Agreement's no-action clause.

### III. The National Reimbursement Claim Is Adequately Disclosed and Permissible under PROMESA

16. The Unsecured Creditors Committee separately objects to the Disclosure Statement for purportedly not explaining the basis for the National Reimbursement Claim. UCC Obj. at ¶¶ 13-14. The UCC's objection is unfounded. The Disclosure Statement makes clear that the National Reimbursement Claim is based on an insurance agreement National entered

9

directly with PREPA—separate from and in addition to its insurance agreement with the Bond Trustee and insured bondholders—which obligates PREPA to reimburse National for any payments of principal and interest it makes to insured bondholders. As the Disclosure Statement explains: "In connection with the issuance of the insurance policies, PREPA entered into certain Bond insurance agreements with National, pursuant to which National asserts that PREPA agreed, to the extent that National made payments of principal and interest on or incurs any other costs with respect to the Bonds insured by PREPA, to reimburse National, with interest, for any and all such payments, and costs (i.e., the Asserted Reimbursement Claim)." Disclosure Statement at 34. The Disclosure Statement further explains that the settlement of National's Reimbursement claim for a 20% recovery "avoids the risk that such claim could be allowed in full and secured by all net or gross revenues of PREPA, if the Oversight Board does not prevail in the Amended Lien & Recourse Challenge." *Id.* To answer the UCC's question, the Disclosure Statement plainly shows that the National Reimbursement Claim is not "based on the same bonds that are part of National's bond claims." UCC Obj. at ¶ 14.

17. Syncora also objects to the National Reimbursement Claim based on its assertion that the claim provides National with post-petition interest that other creditors do not receive and violates Section 509(c) by providing National a reimbursement before other creditors' allowed claims are paid in full. Syncora Obj. at ¶ 11. But again, as the Disclosure Statement makes clear, the National Reimbursement Claim is based on the unique contractual rights National has against PREPA based on its direct insurance agreement with PREPA. The National Reimbursement Claim is based on a contractual right separate from National's Bond Claims and the rights of insured bondholders, and therefore it does not constitute post-petition interest. For the same reason, Syncora is wrong that Section 509(c) could bar National's recovery. Section 509(c) provides that, where an entity is *co-liable* with the debtor for a creditor's claim, and the entity obtains a right to reimbursement from the debtor based on its

10

payment to the creditor on account of the liability, the entity is subordinated to the creditor until it is paid in full. *See* 11 U.S.C. § 509(c); 4 Collier on Bankruptcy ¶¶ 509.01-509.04 (16th 2022).[3] But National is not receiving reimbursement from PREPA as a co-obligor under its bonds within the meaning of Section 509(c); it is receiving reimbursement payments based on its independent, direct contractual rights against PREPA.

## RESERVATION OF RIGHTS

18. National hereby reserves all rights with respect to the Disclosure Statement, Disclosure Statement Motion, Procedures Motion, and all related documents, including National's right to address any of the foregoing at any hearing or in any supplemental briefing related to the Disclosure Statement.

**RESPECTFULLY SUBMITTED**, this 21st day of February 2023.

**WE HEREBY CERTIFY** that on this same date a true and exact copy of this motion was filed with the Clerk of Court using the CM/ECF system, which will notify a copy to counsel of record. Also, a copy of this document will be notified via electronic mail to all case participants.

[*Remainder of this page intentionally left blank*]

---

[3] Section 509(c) reads in full: "The court shall subordinate to the claim of a creditor and for the benefit of such creditor an allowed claim, by way of subrogation under this section, or for reimbursement or contribution, of an *entity that is liable with the debtor on*, or that has secured, *such creditor's claim*, until such creditor's claim is paid in full, either through payments under this title or otherwise." 11 U.S.C. § 509(c) (emphasis added).

11

| | |
|---|---|
| **ADSUAR MUÑIZ GOYCO SEDA & PÉREZ-OCHOA, P.S.C.** | **WEIL, GOTSHAL & MANGES LLP** |
| By: /s/ Eric Pérez-Ochoa<br>Eric Pérez-Ochoa<br>(USDC-PR No. 206314)<br>Luis Oliver-Fraticelli<br>(USDC-PR No. 209204)<br>Alexandra Casellas-Cabrera<br>(USDC-PR No. 301010)<br>PO BOX 70294<br>San Juan, PR 00936<br>Telephone: 787.756.9000<br>Facsimile: 787.756.9010<br>Email: epo@amgprlaw.com<br>  loliver@amgprlaw.com<br>    acasellas@amgprlaw.com<br><br>*Attorneys for National Public Finance Guarantee Corporation* | By: /s/ Robert Berezin<br>Matthew S. Barr*<br>Jonathan Polkes*<br>Robert Berezin*<br>767 Fifth Avenue<br>New York, New York 10153<br>Telephone: (212) 310-8000<br>Facsimile: (212) 310-8007<br>Email: matt.barr@weil.com<br>    jonathan.polkes@weil.com<br>    robert.berezin@weil.com<br><br>Gabriel A. Morgan*<br>700 Louisiana Street, Suite 1700<br>Houston, TX 77002<br>Telephone: (713) 546-5000<br>Facsimile: (713) 224-9511<br>Email: gabriel.morgan@weil.com<br><br>*\*Admitted pro hac vice*<br><br>*Attorneys for National Public Finance Guarantee Corporation* |