# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>                 Debtors.[1] | PROMESA<br>Title III<br><br>No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>                 Debtor. | PROMESA<br>Title III<br><br>No. 17-BK-4780-LTS<br><br>(Jointly Administered) |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Movant, | |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19- BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

v.

AD HOC GROUP OF PREPA BONDHOLDERS; HON.
RAFAEL HERNÁNDEZ-MONTAÑEZ, in his capacity as
Speaker of the Puerto Rico House of Representatives;
HON. JOSÉ L. DALMAU-SANTIAGO, in his capacity as
President of the Puerto Rico Senate; PV PROPERTIES,
INC.; SISTEMA DE RETIRO DE LOS EMPLEADOS DE
LA AUTORIDAD DE ENERGÍA ELÉCTRICA; UNIÓN
DE TRABAJADORES DE LA INDUSTRIA ELÉCTRICA
Y RIEGO, INC.; MANUEL GONZALEZ JOY;
WHITEFISH ENERGY HOLDINGS, LLC; OFFICIAL
COMMITTEE OF UNSECURED CREDITORS; U.S.
BANK NATIONAL ASSOCIATION, in its capacity as
bond trustee; SYNCORA GUARANTEE INC.; ASSURED
GUARANTY CORP.; ASSURED GUARANTY
MUNICIPAL CORP.; AHIMSA FOUNDATION; AD
HOC COMMITTEE OF NATIONAL ASSIGNED
CLAIMS

Respondents.

**SUPPLEMENTAL OMNIBUS REPLY OF THE PUERTO
RICO ELECTRIC POWER AUTHORITY TO OBJECTIONS
TO THE (I) ADEQUACY OF THE DISCLOSURE STATEMENT, (II) RELIEF
REQUESTED IN THE DISCLOSURE STATEMENT MOTION, AND (III) RELIEF
REQUESTED IN THE CONFIRMATION DISCOVERY PROCEDURES MOTION**

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ..................................................................................................................... 5

OMNIBUS REPLY .................................................................................................................. 7

I.    THE NATIONAL DEAL DOES NOT RENDER THE AMENDED PLAN
PATENTLY UNCONFIRMABLE ........................................................................... 7

    A.    The Amended Plan Is Not Patently Unconfirmable as a Result of
Unfair Discrimination ................................................................................ 7

    B.    The Separate Classification of National Does Not Prohibit Approval of
the Disclosure Statement nor Render the Amended Plan Patently
Unconfirmable ......................................................................................... 10

    C.    The Trust Agreement Does Not Require All Bond Claims to be in the
Same Class or Prohibit the Oversight Board from Separately
Classifying Bond Claims ......................................................................... 14

    D.    The Treatment of National's Reimbursement Claim and National's
Receipt of Certain Consideration in the Form of Fees Do Not Render
the Amended Plan Patently Unconfirmable ............................................ 16

II.    THE DISCLOSURE STATEMENT CONTAINS ADEQUATE
INFORMATION REGARDING BASIS FOR NATIONAL SETTLEMENT .......... 18

III.    THE DISCLOSURE STATEMENT CONTAINS ADEQUATE
INFORMATION REGARDING THE LEGACY CHARGE.................................... 21

IV.    THE DISCLOSURE STATEMENT CONTAINS ADEQUATE
INFORMATION REGARDING THE NEW BONDS AND CVI ............................ 23

V.    UTIER'S SUPPLEMENTAL OBJECTION RAISES ISSUES NOT
RELEVANT TO THIS PROCEEDING................................................................... 23

    A.    UTIER Prematurely and Improperly Argues the Merits of CBA
Rejection .................................................................................................. 23

    B.    SREAEE Continues to Misconstrue the Proposed Treatment of
Pension Claims......................................................................................... 24

CONCLUSION...................................................................................................................... 28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Granada Wines, Inc. v. New England Teamsters & Trucking Indus. Pension Fund*,
748 F.2d 42 (1st Cir. 1984) ...................................................................................11

*In re Barney & Carey Co.*,
170 B.R. 17 (Bankr. D. Mass. 1994) ........................................................................8

*In re City of Colo. Springs Spring Creek Gen. Improvement Dist.*,
187 B.R. 683 (Bankr. D. Colo. 1995) ................................................................11, 14

*In re Corcoran Hosp. Dist.*,
233 B.R. 449 (Bankr. E.D. Cal. 1999) ....................................................................11

*In re Destileria Nacional, Inc.*,
No. 20-01247, 2021 WL 820178 (Bankr. D.P.R. Mar. 3, 2021) ..............................13

*In re Dow Corning Corp.*,
244 B.R. 634 (Bankr. E.D. Mich. 1999) ..................................................................11

*In re Hanish, LLC*,
570 B.R. 4 (Bankr. D.N.H. 2017) ...........................................................................12

*In re Hermanos Torres Perez Inc.*,
No. 09-05595 EAG, 2011 WL 5854929 (Bankr. D.P.R. Nov. 21, 2011)..............8, 11

*In re Red Mountain Mach. Co.*,
448 B.R. 1 (Bankr. D. Ariz. 2011)......................................................................12, 14

*In re Rosewood at Providence, LLC*,
470 B.R. 619 (Bankr. M.D. Ga. 2011) .....................................................................12

*In re Sacred Heart Hosp.*,
182 B.R. 413 (Bankr. E.D. Pa. 1995) ......................................................................11

*In re Save Our Springs (S.O.S.) Alliance, Inc.*,
388 B.R. 202 (Bankr. W.D. Tex. 2008) ...................................................................11

*In re SPM Mfg. Corp.*,
984 F.2d 1305 (1st Cir. 1993) .................................................................................13

*In re Tribune Co.*,
972 F.3d 228 (3rd Cir. 2020) ...............................................................................7, 8

*U.S. Bank N.A. v. Vill. at Lakeridge, LLC (In re Vill. at Lakeridge, LLC)*,
    814 F.3d 993 (9th Cir. 2016) ........................................................................................13

*Victory Park Credit Opportunities, LP v. VPR Liquidation Tr.*,
    539 B.R. 305 (W.D. Tex. 2015)....................................................................................8, 9

**STATUTES**

11 U.S.C. § 509(c) ...........................................................................................................15, 16

11 U.S.C. § 1122(a) ...............................................................................................................11

11 U.S.C. § 1125(a)(1)......................................................................................................22, 24

PROMESA § 301(a) ..............................................................................................................22

PROMESA § 305 ..................................................................................................................20

Puerto Rico Energy Public Policy Act, Act 17-2019, § 6(a) .........................................................4

To the Honorable United States District Court Judge Laura Taylor Swain:

The Oversight Board,[2] as Title III representative of PREPA, respectfully submits this supplemental omnibus reply (the "Supplemental Omnibus Reply") in support of approval of the Disclosure Statement, and in response to the supplemental objections filed in connection with the same.  In support of this Supplemental Omnibus Reply, the Debtor respectfully states as follows:

### **Preliminary Statement**

1.     The Oversight Board has always sought, and continues to seek, to build as much consensus as possible for Title III plans of adjustment, including PREPA's.  The Oversight Board is pleased it was able to reach a settlement with National Public Finance Guarantee Corporation ("National"), embodied in the National PSA, of its approximately $836 million in claims arising from its ownership or insurance of bonds (the "National Insured Bond Claim") and an estimated $244.7 million in claims for reimbursement on account of payments and costs incurred with respect to bonds it insures ("National Reimbursement Claim").  In satisfaction of these claims, which National asserted were fully secured and owed par plus accrued interest, National will receive Series B Bonds in the amount of 71.65% of the National Insured Bond Claim and 20% of the National Reimbursement Claim.  The Amended Plan enjoys the support of three major classes of creditors—representing over $1.8 billion in claims—and furthers PREPA's path towards confirmation of the Amended Plan and emergence from Title III.

2.     The Oversight Board filed the Amended Plan and an amended Disclosure Statement on February 9, 2023, to reflect the terms of the National PSA, enhance the terms of the Series B Bonds offered to settle with other bondholders, and supplement disclosures to address issues raised

---

[2]  Capitalized terms used in this Supplemental Omnibus Reply but not defined herein shall have the meaning ascribed to such terms in the *Omnibus Reply of the Puerto Rico Electric Power Authority to Objections to the (I) Adequacy of the Disclosure Statement, (II) Relief Requested in the Disclosure Statement Motion, and (III) Relief Requested in the Confirmation Discovery Procedures Motion* [ECF No. 3206] (the "Omnibus Reply").

by various parties-in-interest in the initial Disclosure Statement objections.  Various parties have filed supplemental objections to address these new features of the Amended Plan and Disclosure Statement which are addressed below.  Other objections serve as impermissible sur-replies, or object to pre-existing features of the Amended Plan and Disclosure Statement, which should be rejected as outside the scope of the Court's order allowing supplemental objections.  In any event, all supplemental objections should be overruled, and the confirmation process should be permitted to proceed.

3.      The Ad Hoc Group, Syncora, and Assured, who, unlike National, chose not to settle with the Oversight Board and instead litigate their claims to seek payment in full plus interest, assail National's decision to accept a significant haircut on its bond claims as somehow "unfair" and "discriminatory."  On one hand, they argue National is actually receiving an 83% recovery in Series B Bonds, while on the other they argue the Disclosure Statement recoveries are misleadingly high because the Series B Bonds will trade significantly under par.  Their criticism of the National settlement further ignores that Settling Bondholders could receive 100% recoveries on their claims based on the outcome of the Amended Lien & Recourse Challenge and will also receive CVI, while National's recovery on the National Insured Bond Claim is capped at 71.65% and National will not receive any CVIs in the Amended Plan.  Regardless, these issues are not related to the adequacy of disclosure of the National settlement.  As these parties recently admitted, issues such as unfair discrimination and the basis for settlement require development of the factual record,[3] and thus the National settlement cannot render the Amended Plan patently unconfirmable on its face.

---

[3] *See Informative Motion of the Ad Hoc Group of PREPA Bondholders, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and Syncora Guarantee, Inc. Concerning the Government Parties' Refusal to Commence Plan Discovery* [ECF No. 3219] (the "Informative Motion") ¶ 4 ("The reasoning behind those settlements [with National and the Fuel Line Lenders] will need to be explored through discovery").

4.      Other objections argue the separate classification of National's claim renders the Amended Plan patently unconfirmable.  But this Court has previously held that classification is a confirmation issue which involves factual inquiry into the business or governmental justification of separate classification.  *See*, *e.g.*, Case No. 17-bk-3283-LTS, ECF No. 19812 ¶ 64.  Here, National's rights differ from other bond claims as they have settled their claims to collateral security and negotiated for a custodial trust structure which necessitates separate classification.  *See* Omnibus Reply at 19 n.8.

5.      Certain objectors also take issue with the terms of the settlement as it relates to the National Reimbursement Claim.  They argue that National is receiving postpetition interest while other bondholders are not, or that its reimbursement claim is not allowable.   National's reimbursement claim arises from PREPA's prepetition contractual obligation to reimburse National for payments National made under its insurance policies to provide bondholders the interest PREPA did not pay.  The reasonableness of PREPA's settlement, providing it a 20% distribution, should be determined in connection with confirmation.  If National's reimbursement claim is allowable and not settled, it will cost PREPA far more than the 20% settlement.  In any event, the treatment of the National Reimbursement Claim could never render the Amended Plan unconfirmable because the Amended Plan provides that if the settlement of that claim is not approved or the reimbursement claim is not allowed, National will not receive any recovery on account of the National Reimbursement Claim, but National would still be required to support the Amended Plan as long as it receives the settlement amounts unrelated to its reimbursement claim.  *See* National PSA § 6.1(c).

6.      As to the remaining Supplemental Objections addressing the adequacy of the information contained in the Disclosure Statement, the Supplemental Objections and comments

have either been addressed by revisions to the Disclosure Statement or should be overruled for the reasons set forth below and in the chart attached hereto as **Exhibit A** (the "Supplemental Omnibus Reply Chart").   The Oversight Board has incorporated certain of the additional requested inclusions in a modified Disclosure Statement filed contemporaneously herewith.  A redline of the modified Disclosure Statement to the February 9, 2023, Disclosure Statement is attached hereto as **Exhibit B**.

7.     The Amended Plan incorporates settlements of over $1.8 billion of claims and provides alternate treatments to creditors consistent with their legal rights in different litigation outcomes, while also ensuring PREPA can complete its transformation and achieve its mandate to provide electric power to the people of Puerto Rico in a reliable, clean, resilient, and affordable manner.  *See* Act 17-2019 § 6(a).  The contention of certain creditors that PREPA is taking "an unlimited number of 'free shots'" at proposing plans (Syncora Supp. Obj. ¶ 12), is particularly unmeritorious.  First, PROMESA Title III only allows PREPA to propose plans of adjustment.  Second, it was bondholders who requested the Court to set a deadline for the Oversight Board to submit a "toggle" plan before the Amended Lien & Recourse Challenge was resolved.  The Court imposed a deadline for PREPA to either propose a plan (which could be a toggle plan), a detailed plan term sheet, a litigation path, or to show cause why the case should not be dismissed.  PREPA proposed a toggle plan and a litigation path.  Having procured the order imposing the deadline, these creditors now seek to derail confirmation before the confirmation hearing even begins and before the litigation is resolved.  The Oversight Board respectfully submits their objections to Disclosure Statement approval based on patent unconfirmability should be overruled because they are wrong, and the Disclosure Statement should be approved.

## BACKGROUND

8.     On December 16, 2022, the Oversight Board filed with this Court, among other things: (i) the Plan; (ii) the Disclosure Statement; (iii) the Disclosure Statement Motion; and (iv) the Confirmation Discovery Procedures Motion.

9.     The Court established February 3, 2023, at 5:00 p.m. (AST), as the deadline to file objections to (i) the adequacy of the information contained in the Disclosure Statement, (ii) the relief requested in the Disclosure Statement Motion, and (iii) the relief requested in the Confirmation Discovery Procedures Motion (the "Objection Deadline"). *See* ECF No. 3132.

10.     On or before the Objection Deadline, the Oversight Board received eleven (11) objections to (i) the Disclosure Statement, (ii) the relief requested in the Disclosure Statement Motion, and/or (iii) the relief requested in the Confirmation Discovery Procedures Motion.[4]

11.     On February 9, 2023, the Oversight Board filed the Amended Plan [ECF No. 3200] and Disclosure Statement [ECF No. 3201] reflecting, among other things, the inclusion of a settlement reached between the Oversight Board and National, revisions to the Disclosure Statement to reflect that settlement and other changes contained in the Amended Plan, and numerous changes to accommodate the Objections to the Disclosure Statement and Disclosure Statement Motion.

12.     On February 10, 2023, the Oversight Board filed the Omnibus Reply.

13.     That same day, the Ad Hoc Group filed an *Urgent Motion to File Supplemental Objection to Disclosure Statement for First Amended Title III Plan of Adjustment of the Puerto*

---

[4]   Objections were received from: (1) Hon. Rafael Hernández-Montañez [Case No. 17-bk-3283-LTS, ECF No. 23311]; (2) PV Properties, Inc. [Case No. 17-bk-3283-LTS, ECF No. 23567]; (3) UTIER [ECF No. 3178]; (4) the SREAEE [ECF No. 3179]; (5) Manuel Gonzalez Joy [ECF No. 3181]; (6) the Committee [ECF No. 3186]; (7) the PREPA Bond Trustee [ECF No. 3187]; (8) Assured [ECF No. 3188]; (9) the Ad Hoc Group [ECF No. 3189]; (10) Syncora [ECF No. 3190]; and (11) Whitefish Energy Holdings, LLC [ECF No. 3185].

*Rico Electric Power Authority* [ECF No. 3204], requesting permission for the Ad Hoc Group and other parties in interest to file supplemental objections to the amended Disclosure Statement.

14.     On February 13, 2023, the Court entered the *Order Granting Urgent Motion to File Supplemental Objection to Disclosure Statement for First Amended Title III Plan of Adjustment of the Puerto Rico Electric Power Authority* [ECF No. 3210], granting the Ad Hoc Group, and any other parties in interest, permission to file supplemental objections to the amended Disclosure Statement on or before 3:00 p.m. (AST) on February 17, 2023, with replies due on or before 3:00 p.m. (AST) on February 21, 2023.

15.     On February 17, 2023, the Oversight Board received supplemental objections and joinders to supplemental objections from the Ad Hoc Group [ECF No. 3225] (the "AHG Supp. Obj."), the Committee [ECF No. 3226] (the "UCC Supp. Obj."), UTIER [ECF No. 3221] (the "UTIER Supp. Obj."), the SREAEE [ECF No. 3220] (the "SREAEE Supp. Obj."), PV Properties [ECF No. 3230] (the "PV Properties Supp. Obj."), the Trustee [ECF No. 3224] (the "Trustee Supp. Obj."), Syncora [ECF No. 3223] (the "Syncora Supp. Obj."), the National Assignees (as defined below) [ECF No. 3222] (the "AHC Obj."), AHIMSA [ECF No. 3228] (the "AHIMSA Obj."), and Assured [ECF No. 3229] (collectively, the "Supplemental Objections").

16.     Contemporaneously herewith, the Oversight Board filed the *Modified Disclosure Statement for the First Amended Title III Plan of Adjustment of the Puerto Rico Electric Power Authority* incorporating, among other things, changes to accommodate the Supplemental Objections to the Disclosure Statement.

## OMNIBUS REPLY

17.    For the reasons set forth herein, the Supplemental Objections should be overruled in their entirety.[5]

## I.    THE NATIONAL DEAL DOES NOT RENDER THE AMENDED PLAN PATENTLY UNCONFIRMABLE

18.    The primary change in the Amended Plan is its incorporation of the terms of settlement with National.  National is a major monoline insurer, holding or insuring over $800 million in PREPA bonds.  Various Supplemental Objectors complain about the settlement embodied in the National PSA, and the different treatment National will receive pursuant to the Amended Plan.  Further, the Committee contends the National PSA renders the Disclosure Statement unintelligibly complex.  These objections will be addressed in turn.

### A.    The Amended Plan Is Not Patently Unconfirmable as a Result of Unfair Discrimination

19.    The Ad Hoc Group, Syncora, and the National Assignees argue the Amended Plan's treatment of National unfairly discriminates against the other bondholder classes.  AHC Obj. at 7; Syncora Supp. Obj. ¶¶ 5–11; AHG Supp. Obj. ¶¶ 5–16.  Unfair discrimination, however, is a confirmation objection, and, indeed, is only a valid objection if the class that contains the objecting parties ultimately rejects the Amended Plan.  If, for example, the Settling Bondholders Class (Class 1) votes to accept the Amended Plan, then no unfair discrimination challenge can be raised with regard to that Class at confirmation.  *In re Tribune Co.*, 972 F.3d 228, 242 (3rd Cir.

---

[5]    Failure of the Debtor to address other arguments made in the Supplemental Objections does not constitute a waiver of the Debtor's rights to object to such arguments at the hearing(s) to consider approval of the Disclosure Statement or confirmation of the Amended Plan.  The Debtor denies many of the factual and legal assertions and characterizations contained in the Supplemental Objections and, for the avoidance of doubt, affirms that the Disclosure Statement, Disclosure Statement Motion, and Confirmation Procedures Discovery Motion all can be approved or granted over each and every objection.  Similarly, the Amended Plan is confirmable, and the Oversight Board will demonstrate it satisfies all applicable confirmation standards at the confirmation hearing.

2020).  None of the Supplemental Objectors address the considerable authority, including from this Court, refusing to consider unfair discrimination at the disclosure statement stage.  *See* Omnibus Reply ¶¶ 22, 33.

20.      The Ad Hoc Group, Syncora, and Assured, moreover, have essentially conceded the Amended Plan cannot be patently unconfirmable on the ground of unfair discrimination, as only a few days ago they filed an "informative motion" demanding extensive discovery into, among other things, the *factual* issues underpinning the settlements making up the Amended Plan and the different treatment being received by National and the other bondholders.  *See* Informative Motion ¶ 4.  By seeking discovery on the basis that unfair discrimination is an intensely factual issue, these parties can no longer maintain that unfair discrimination is apparent from the face of the Amended Plan.  June 17, 2022 Hr'g Tr. 26:22–27:4.

21.      In any event, these unfair discrimination objections are without merit.  As the cases cited by the Supplemental Objectors demonstrate, the difference in treatment between National and the other bondholder classes is permissible if it is supported by a "legitimate basis" or, in this case, a governmental purpose.  *In re Barney & Carey Co.*, 170 B.R. 17, 25 (Bankr. D. Mass. 1994) (cited by AHG Supp. Obj. ¶ 5); *see also In re Hermanos Torres Perez Inc.*, No. 09-05595 EAG, 2011 WL 5854929, at *9 (Bankr. D.P.R. Nov. 21, 2011) (cited by Syncora Supp. Obj. ¶ 7; AHG Supp. Obj. ¶ 5) (permitting materially different treatment based on "compelling justifications").  And, among other things, courts have held different treatment is justifiable on the basis of settlement, *Victory Park Credit Opportunities, LP v. VPR Liquidation Trust*, 539 B.R. 305, 315 (W.D. Tex. 2015) (quoting *In re Mortgage Inv. Co. of El Paso, Tex.*, 111 B.R. 604 (Bankr. W.D. Tex. 1990)), and contribution to the reorganization by the creditor.  *In re Tribune Co.*, 972 F.3d at 244.

22.     Here, National is receiving different treatment than the other bondholders because, among other things, it settled its asserted entitlement to collateral security and other issues when other bondholders would not.  Under the National PSA, the Oversight Board obtained a variety of benefits, including certainty with respect to National's treatment (and any concomitant cost to PREPA ratepayers) and the pre-pledged support of a large creditor for the Amended Plan.  National's treatment compensates National for these benefits, by giving National certainty as to its treatment (71.65% on account of its bond claim) in exchange for the greater certainty given to PREPA and the Oversight Board.[6]  This settlement and the contribution it makes to PREPA's reorganization justify the disparate treatment.  *Victory Park Credit Opportunities, LP*, 539 B.R. at 315.

23.     Moreover, National's treatment will not necessarily pay it more than the treatment other bondholders will receive.  National's recovery is fixed at 71.65% with no CVI, unlike Settling Bondholders, who, in the Amended Plan, could receive 100% recoveries from the New Bonds and CVIs they receive, depending on the outcome of the Amended Lien & Recourse Challenge and distributions made on account of the CVI.  It is thus incorrect to contend National is getting "a vastly better deal for identical claims" than the Settling Bondholders.  AHG Supp. Obj. ¶ 8; *see also* Syncora Supp. Obj. ¶¶ 2, 7–8.  National is getting different, more stable treatment, but is not receiving the upside other creditors may potentially receive.[7]

---

[6]  Various creditors attempt to increase the amount that they argue National is receiving by including in the amount that National is receiving on account of its reimbursement claim and/or certain amounts it will receive on accounts of its fees and/or expenses.  These other recoveries are discussed *infra* in Section I.D.  They are not, however, payments made on account of National's bond claims, and thus should not be considered in the unfair discrimination calculus.  Uninsured bondholders have no rights to reimbursement, which arise from postpetition payments made by National on account of its insurance policies.  Nor do they have an entitlement to be paid fees and expenses.

[7]  National's treatment is not based on the insured nature of the National bonds, *cf.* Syncora Supp. Obj. ¶ 9, nor on "whether [the bond] was insured by a particular monoline."  *Id.* ¶ 10.  The considerations discussed in the main text, and which justify different treatment, only apply to claims held by National, because National entered into the National PSA.

24.     Nor is it true that National is receiving "*more* in a 'good-faith settlement' than Non-Settling Bondholders can receive if they win."  Syncora Supp. Obj. ¶ 5 (emphasis in original).  While the Amended Plan does not contemplate providing Non-Settling Bondholders with greater recovery than approximately 56% in the event they prevail in the Amended Lien & Recourse Challenge, the Oversight Board has expressly noted that if the Non-Settling Bondholders win in both the Lien Counts and Recourse Counts and demonstrate that the value of their collateral exceeds the value of the Bonds available for distribution to them, then the Amended Plan might not be confirmable.[8]  In the event they obtained such litigation victories, Bondholders may be entitled to receive more than National.

25.     At bottom, instead of continuing to litigate, National has settled its asserted claim to liens on all of PREPA's future revenues, which, if they prevailed on, could jeopardize PREPA's ability to restructure.  In return for that settlement, and pledging to support the Amended Plan, National is receiving an agreed-upon recovery.  The Non-Settling Bondholders must be paid the value of their share of the collateral if they prevail in the Amended Lien & Recourse Challenge.  The Amended Plan cannot otherwise be confirmed.  If the Non-Settling Bondholders prevail on the Recourse Count, but not the Lien Count, they can be paid less than National because National is receiving consideration for settling the lien challenge.

**B.      <u>The Separate Classification of National Does Not Prohibit Approval of the Disclosure Statement nor Render the Amended Plan Patently Unconfirmable</u>**

26.     In their Supplemental Objections, neither Syncora nor the Ad Hoc Group challenge the separate classification of National.   Indeed, on the contrary, Syncora recognizes that

---

[8]   Notably, it is unlikely any of the objecting parties will elect to join the Settling Bondholder class and thus they will not even be part of the class against which the Amended Plan allegedly discriminates.  The bondholders and monolines who elect to join this class will be known by the February 28 hearing on the adequacy of the Disclosure Statement, as acceptances are due February 24.

"legitimate reasons" to separately classify National exist if National negotiated for a custodial trust structure and commutations (Syncora Supp. Obj. ¶ 2)—which it did.  A new set of parties, however, calling themselves the "Ad Hoc Committee of National Claim Assignees" (the "National Assignees")[9] filed a supplemental objection challenging their classification as uninsured bondholders in Class 2 and not in National's class (Class 5).  AHC Obj. at 6–7.  The National Assignees claim they own bonds previously owned by National and, as a result, their claims are "identical" to National's and cannot be separately classified.  *id.* at 9, 11–12.  The National Assignees are wrong.  As a preliminary matter, classification is a matter for confirmation, not the disclosure statement hearing.  Omnibus Reply ¶¶ 27–28.  As such, National Assignees' arguments are premature and should not be considered at this time.

27.     In any event, the National Assignees' claims should be classified separately from National's claims.  Bankruptcy Code § 1122(a) only provides that similar claims *may* be classified together, it does not require that all similar claims be classified in one class.[10]  National's separate classification is justified (indeed, required) because National settled its claims, including all asserted lien and recourse claims and reimbursement claims, in exchange for, among other things, an obligation to vote for the Amended Plan and a special custodial trust structure applicable to the bonds it continues to insure.  Omnibus Reply ¶ 31; *see also In re Corcoran Hosp. Dist.*, 233 B.R. 449 (Bankr. E.D. Cal. 1999) (existence of settlement with creditor justified separate classification); *In re Dow Corning Corp.*, 244 B.R. 634 (Bankr. E.D. Mich. 1999) (same).  This settlement changes

---

[9]   The National Assignees have not yet filed their required Rule 2019 disclosure and so the Oversight Board— ironically—does not have adequate information regarding their claims and the composition of their so-called Ad Hoc Committee.

[10]   *See, e.g., In re City of Colo. Springs Spring Creek Gen. Improvement Dist.*, 187 B.R. 683, 690 (Bankr. D. Colo. 1995) ("In summary, there is no requirement in § 1122 that similar claims be classified together.  Therefore, it does not matter whether the Bond Claims of Class III are similar to Bond Claims in other classes.").  The Title III Court has previously determined that *Granada Wines, Inc. v. New England Teamsters & Trucking Indus. Pension Fund*, 748 F.2d 42, 43 (1st Cir. 1984), is not applicable in these PROMESA Title III cases.  July 14, 2022, Hr'g Tr. 80:13–25.

the legal character of the claims and differentiates it from the non-settling bond claims of the National assignees.  *Id*.; *In re Save Our Springs (S.O.S.) Alliance, Inc*., 388 B.R. 202, 236 (Bankr. W.D. Tex. 2008) (permitting separate classification of settled claims because settlement rendered the claims "uniquely situated"); *In re Sacred Heart Hosp.*, 182 B.R. 413 (Bankr. E.D. Pa. 1995) (holding that classification of settling bond claims into one class was appropriate because "[b]ondholders effectively gave up both their secured and unsecured claims in return for a certain specific treatment under the settlement agreement . . . .").  Moreover, the custodial trust structure alone justifies separate classification, as it cannot be applied to uninsured bonds, such as those held by the National Assignees.  Omnibus Reply ¶ 39.  The National Assignees ignore this argument and these cases, which are fatal for their argument, despite the fact they were in the Omnibus Reply.  The National Assignees are not subject to the same settlement, have not agreed to settle their lien and recourse assertions in exchange for a stated recovery, and have not agreed to support the Amended Plan.

28.     The National Assignees' gerrymandering assertions (AHC Obj. at 12) are further without basis.  There are at least three other (and maybe more) potential impaired accepting classes, even setting aside National's separate classification.  *In re Hanish, LLC*, 570 B.R. 4, 13 n.26 (Bankr. D.N.H. 2017) (classification objection "moot" where there are several impaired accepting classes); *In re Rosewood at Providence, LLC*, 470 B.R. 619, 629 (Bankr. M.D. Ga. 2011) (classification scheme of plan not problematic "there is no suggestion of gerrymandering to create an accepting impaired class, because multiple impaired voting classes have accepted the plan"); *In re Red Mountain Mach. Co.*, 448 B.R. 1, 7–8 (Bankr. D. Ariz. 2011) (where multiple impaired accepting classes exist, no classification violation in plan's classification scheme).[11]  And, even if

---

[11] The National Assignees complain that the basis for National's separate classification is not contained in the Amended Plan or Disclosure Statement.  AHC Obj. at 12.  That is not correct—the Disclosure Statement explains the settlement

the National Assignees were included with National in Class 5, the class may still vote to accept the Amended Plan.

29.     For similar reasons, the National Assignees are incorrect that they must be classified with National because "a valid assignment of a claim . . . does not divest the claim of its priority in bankruptcy or alter the debtor's obligation to pay the debt."  AHC Obj. at 10 (citing *In re SPM Mfg. Corp.*, 984 F.2d 1305, 1318 (1st Cir. 1993)).[12]  Nothing in the Amended Plan divests the claims of the National Assignees of the priority of their claims.  Rather, they are not classified in the same class as National because their claims have not been settled (and were divested by National before it entered into any settlement) nor could the custodial trust structure contemplated for the National bonds be implemented with respect to their uninsured bonds.  Nothing prohibits that result.[13]

---

and includes all the relevant background regarding the various items of litigation being settled.  *See* Disclosure Statement Section II.B.2.ii, V.G.1–2, V.G.7, VI.C.1.  Regardless, there is no obligation for the Oversight Board to put forward its legal arguments in support of confirmation of the Amended Plan in either document.  Rather, the Oversight Board will demonstrate separate classification satisfies the relevant standard at confirmation.

[12] The National Assignees appear to assert that they possess reimbursement claims that should be classified in Class 6. AHC Obj. at 12.  They offer no support for this proposition but, even if correct, for the same reasons explained in the main text those reimbursement claims should not be classified with National's claims, because they are not subject to the same settlement.

[13] *In re SPM Mfg. Corp.*, 984 F.2d at 1318, does not support the National Assignees.  The National Assignees simply cite certain statements from the First Circuit's decision rejecting an argument that certain claimants' rights to certain moneys were subordinated to others due to the original holder divesting itself of its lien.  *Id.*  No such situation exists here.  Similarly, the court in *In re Destileria Nacional, Inc.*, No. 20-01247, 2021 WL 820178, at *2 (Bankr. D.P.R. Mar. 3, 2021), made a general statement that an assignee of a claim steps into the original claimant's "shoes."  Nothing is said about separate classification of other claims based on the original claimant entering into a settlement. Moreover, the National Assignees ignore case law that recognizes that the assignment of a claim can alter the claim's character.  *See, e.g.*, *U.S. Bank N.A. v. Vill. at Lakeridge, LLC (In re Vill. at Lakeridge, LLC)*, 814 F.3d 993, 1000 (9th Cir. 2016) (insider claim does not retain insider status if sold to non-insider).

C.     **The Trust Agreement Does Not Require All Bond Claims to be in the Same
Class or Prohibit the Oversight Board from Separately Classifying Bond
Claims**

30.     The Trustee's Supplemental Objection repeats its argument[14] that the Amended

Plan is patently unconfirmable because it separately classifies Settling Bondholders and National

from Non-Settling Bondholders.  Trustee Supp. Obj. at 3–6.  Under the Trustee's theory, the Trust

Agreement virtually mandates that all bond claims be placed in the same class.  The Trustee,

however, acknowledges that separate classification is permissible where there is "a legitimate

reason supported by credible proof."  *Id.* at 3 (citing *In re Chateaugay Corp.*, 89 F.3d 942, 949 (2d

Cir. 1996)).  As discussed above, *supra* Section I.A, and in the Omnibus Reply, Omnibus Reply ¶

27 (collecting cases), because this standard requires development of the factual record and inquiry

into the circumstances of the case, this Court and others have refused to consider classification

challenges at the disclosure statement stage.  Moreover, as explained above, the settlement with

National requires different treatment of its claims, and separate classification of National is

required due to its custodial trust treatment.  *See supra* Section I.B.  And, while the Trustee

complains "[t]he Oversight Board cites no case in which pari passu bondholder claims under a

single indenture are split into plan subclasses" in a manner that violates the relevant indenture,

Trustee Supp. Obj. at 3, the Trustee overlooks *In re City of Colo. Springs Spring Creek Gen.*

*Improvement Dist.*, 187 B.R. at 686–92, which permitted a plan that (1) separately classified

---

[14]  The Trustee's Supplemental Objection does not raise any issues specific to the Amended Plan and amended Disclosure
Statement.  Instead, it is an impermissible sur-reply almost entirely dedicated to rehashing arguments the Trustee's
original objection already raised and already refuted by the Omnibus Reply—namely, that the Trust Agreement
purportedly precludes separate settlements and classifications of bond claims.  *See* Trustee Supp. Obj. at 1 ("The
Amended Plan and Amended Disclosure Statement do little, if anything, to address the prior objections of the PREPA
Bond Trustee."); *id.* at 3 (citing to and responding to the Oversight Board's omnibus reply).  It should be disregarded
for that reason, and because it raises premature confirmation objections that are irrelevant to the adequacy of the
Disclosure Statement.

bondholders holding bonds issued under the same trust indenture and (2) gave different classes of bondholders different treatment in violation of the applicable indenture.

31.     The Trustee next argues that individual PREPA bondholders do not have the right to split off or settle "their portion" of the Trustee's rights, such that the Settlement Offer is impermissible.   Trustee Supp. Obj. at 3.   The Settlement Offer, however, does not settle the Trustee's rights, but enables a bondholder to choose which class they want to be in for purposes of settling the bondholder's rights.   The Trustee does not cite to any provision of the Trust Agreement that would bar a bondholder from settling its own rights, and none exists.   The Trust Agreement's no-action clause (Trust Agreement § 808) only limits an individual bondholder from pursuing remedies under the Trust Agreement that would affect all bondholders; it does not bar any bondholder from settling its claim in a manner that does not impact the rights of other, non-settling bondholders (in the same way it could not bar an individual holder from selling their claim).   Nor has the Trustee articulated how the settlement of these claims impacts Non-Settling Bondholders' rights and remedies under the Trust Agreement when those rights are preserved and actively being litigated in the context of the Amended Lien & Recourse Challenge.[15]

32.     In any event, the Trust Agreement is a prepetition contract not being assumed.   It is just a claim.   It is not specifically enforceable against PREPA and it cannot dictate classification under a federal plan of adjustment.   PROMESA would preempt any contractual restriction on plan classification under the Trust Agreement (if one existed), in the same way that the Trustee admits individual bondholders have the right to vote their claims and bind a class to a certain treatment notwithstanding provisions in the Trust Agreement that require 100% consent to change interest

---

[15] Indeed, if the Trustee were correct about the scope of its asserted security interest, the fact that National and other bondholders settled their claims at reduced amounts would actually enhance Non-Settling Bondholders interests in the collateral, not impair their rights.

and principal payment terms.  *See* Trustee Supp. Obj. at 4.  For the same reasons bondholders can

vote, they can also elect to be included in the Settling Bondholder Class, and the Trustee points to

nothing in PROMESA that prohibits such an outcome.

### D.   The Treatment of National's Reimbursement Claim and National's Receipt of Certain Consideration in the Form of Fees Do Not Render the Amended Plan Patently Unconfirmable

33.     Syncora argues the Amended Plan is patently unconfirmable due to its treatment of

the National Reimbursement Claim because (1) it constitutes payment of postpetition interest not

provided to other bondholders and (2) it violates Bankruptcy Code § 509(c).  Syncora Supp. Obj.

¶ 11.  The Ad Hoc Group similarly argues that the National Reimbursement Claim is not allowable

because it is allegedly a claim for postpetition interest.  AHG Supp. Obj. ¶¶ 10–12.  Both of these

arguments are incorrect because the treatment of National's claim settles the allowability of the

claims.  It settles all issues including the contentions the objectors make.  National has asserted the

Reimbursement Claim is not on account of postpetition interest but, instead, arises from PREPA's

covenant under prepetition reimbursement agreements that require PREPA to reimburse National

for payments it makes on account of bonds.  *See* Disclosure Statement Section II.B.2.ii.  If National

is correct, its reimbursement claim would not be on account of postpetition interest and thus

allowable.  Moreover, National has asserted Bankruptcy Code § 509(c) is not applicable because

the reimbursement claim is not on account of a bond claim but, instead, a separate contractual

obligation to reimburse National.  In light of the potential infirmities in the claim, the Oversight

Board has determined to settle National's reimbursement claim in an allowed amount of 20% of

the asserted claim, far below the settlement of its bond claim.  The reasonableness of that

settlement is a confirmation issue.  Regardless, the Amended Plan's treatment of the National

Reimbursement Claim cannot render the Amended Plan patently unconfirmable because the

settlement provides for that contingency.  If the Court denies approval of the National settlement as it relates to the National Reimbursement Claim for any reason, National would not be entitled to receive any distribution on account of the National Reimbursement Claim, but the balance of the settlement would survive.  *See* National PSA § 6.1(c).

34.     The Ad Hoc Group and Syncora also argue the fees and expenses National would receive under the Amended Plan are "a backdoor recovery on [National's] claim."  AHG Supp. Obj. ¶ 13; *see also* Syncora Supp. Obj. ¶ 2 n.6 (referring to fees as a "gift with purchase"). Syncora and certain members of the Ad Hoc Group, of course, did not complain when they received a similar fee pursuant to the PSA signed in connection with the Commonwealth restructuring, Case No. 17-bk-3283-LTS, ECF No. 19813 ("CW Plan") Art. III.3, and neither the Ad Hoc Group nor Syncora had qualms about receiving the "waiver and support fees" under the 2019 RSA.  *Definitive Restructuring Support Agreement*, available at https://drive.google.com/ open?id=1STXXAeklqmG_rJN5zqWCwJMoN8-1cOpO (last accessed Feb. 20, 2023), § 4.  Both the Ad Hoc Group and Syncora ignore or expressly elide the fact the fees and expenses of supporting creditors have been included in every Title III plan confirmed by this Court, and have been provided separately from treatment on the supporting creditors' claims.  CW Plan Art. III; Case No. 17-bk-3283-LTS, ECF No. 5048, Ex. A, Art. III; Case No. 17-bk-3283-LTS, ECF No. 22581, Ex. A, Art. III.

35.     The Ad Hoc Group, however, attempts to distinguish the RSA fees approved in other cases because those RSAs "resulted in settlements in which other, less-active holders were able to participate."  AHG Supp. Obj. ¶ 15.  The fees and expenses being paid to National are no different—they constitute consideration, separate from the treatment of National's prepetition claims, for National negotiating and structuring the terms of the Series B Bonds and the New

17

Master Indenture which will be distributed to almost all creditors under the Amended Plan.  For example, the Amended Plan now contains an interest rate covenant for Series B Bonds that was added as part of the negotiations with National.  *See* Amended Plan, Article XIX.J.  The Oversight Board will demonstrate that these fee and expense payments satisfy the confirmation standards at the confirmation hearing.  They do not render the Amended Plan patently unconfirmable.

## II.   THE DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION REGARDING BASIS FOR NATIONAL SETTLEMENT

36.    The Committee argues the Disclosure Statement "offers practically no explanation of the underlying issues being settled" under the National PSA to satisfy Bankruptcy Rule 9019. UCC Supp. Obj. ¶ 14.  To the contrary, the Disclosure Statement provides ample information on the issues being settled under the National PSA and the rationale for the settlement.  Section I.A of the Disclosure Statement describes the National Bond Claim and National Reimbursement Claim and explain the National PSA is based on "several factors, including a settlement of its asserted security interest in PREPA's future revenues, and its asserted right to appoint a receiver for PREPA."  The issues surrounding National's security interest and assertion of entitlement to par plus interest are comprehensively discussed in numerous places describing the Amended Lien & Recourse Challenge (*see*, *e.g.*, Disclosure Statement Sections II.B.24, II.B.4, V.G.2, VI.C), while National's asserted receiver right, among others, is comprehensively discussed in descriptions of various receiver motions (*see*, *e.g.*, Disclosure Statement Sections V.G.2, V.G.7). The risks associated with the Oversight Board losing on those issues are similarly described in numerous places.  *See*, *e.g.*, Disclosure Statement Section VIII.A.  Section II.B.7 of the Disclosure Statement provide a list of the rights and active litigations National is settling, while Section II.B.2 describes National's obligations to support the Amended Plan and take other steps that inure to the

benefit of PREPA's reorganization, such as its obligation to negotiate and approve the New Master Indenture. The National PSA is also attached as Exhibit N to the Disclosure Statement.

37.     The Committee next argues the Disclosure Statement lacks "the legal and factual bases for allowing [the National Reimbursement Claim]." UCC Supp. Obj. ¶ 14. Again, this is incorrect. The National Reimbursement Claim is comprehensively described in Section II.B.2(i) of the Disclosure Statement. That section explains that the claim arises from certain Bond insurance agreements PREPA entered into with National to which National asserts that PREPA agreed, to the extent that National made payments of principal and interest on or incurs any other costs with respect to the Bonds insured by PREPA, that PREPA would reimburse National with interest for any and all such payments and costs. *Id.* That section further explains that National asserts such claims are secured and that the settlement of the claim "avoids the risk that such claim could be allowed in full and secured by all future net or gross revenues of PREPA, if the Oversight Board does not prevail in the Amended Lien & Recourse Challenge." *Id.* Whether settlement of the claim in the amount of 20% is reasonable is a question for confirmation.

38.     The Committee next argues the Disclosure Statement understates National's recovery at 71.65% when its purported recovery is actually 83% before including the Interim Charge that National would receive during the case. This argument misses the mark. Both the Committee (¶¶ 5–6) and Ad Hoc Group (¶ 2) arrive at 83% by incorrectly attributing to the recovery on the National Insured Bond Claim: (i) 3.0% for compensation of National's reasonable fees and expenses in negotiating the National PSA; (ii) 2.86% in consideration for structuring of payments to holders of claims of the National Insured Bonds; and (iii) the 20% recovery on the National Reimbursement Claim. The fees and expenses National would receive, however, are not on account of its claims, a fact the Disclosure Statement repeatedly discloses. *See* Disclosure

Statement Sections II.B.2, VI.C.2, and VI.D.4(ii). As in both the Commonwealth and HTA disclosure statements, Case No. 17-bk-3283-LTS, ECF No. 17628; Case No. 17-bk-3283-LTS, ECF No. 21269, professional fees and consummation costs are not accounted for in the calculation of a claimholder's recovery on their Allowed Claim and are instead listed separately. Moreover, the 20% recovery on the National Reimbursement Claim is on account of a separately classified claim, arising from separate agreements with PREPA, and therefore is correctly separately accounted for in disclosing recoveries on respective claims. *See* Claim No. 23396 ¶ 12 (separately asserting a secured claim for "any amounts paid and the amount of any and all costs, expenses, and fees incurred by National in connection with" the underlying bonds to the extent allowed under separate agreements with PREPA); Claim No. 22078 ¶ 26 (same). There is also nothing misleading or inadequate, because, however creditors choose to conceptualize National's recovery, its treatment was clearly disclosed and could be added up using simple arithmetic.

39. Finally, the Committee may take issue with National receiving monies generated by an Interim Charge (UCC Supp. Obj. ¶ 7), but it does not contest that the charge itself is adequately described in the Disclosure Statement (including through the attached National PSA). Rather, it argues the cash flow National would receive under the charge should be added to its disclosed recovery. The Interim Charge, however, is not a component of the Amended Plan, and therefore is not plan treatment on account of National's claim. If approved by PREB, it would provide certain cash flow to National until the Effective Date, but if the Amended Plan is not confirmed, any interim payment received would reduce distributions to National under a future plan of adjustment. National PSA § 6.2. The Court has recognized that it cannot interfere with how a Title III debtor uses its property during a case pursuant to PROMESA § 305. Here, PREPA has determined, subject to PREB approval, to provide modest cash flow to National as part of a

20

settlement prior to the Amended Plan's effective date, and not as treatment under a plan. That component of the settlement is adequately described, and since it is not part of the Amended Plan or National's treatment under the Amended Plan, it does not need to be added to the description of National's recovery under the Amended Plan. In a similar manner, monies totaling millions of dollars that were paid to the Ad Hoc Group, Syncora and Assured under the 2019 RSA are also not detailed in the Amended Plan. They were not distributed on account of the creditor's prepetition claim—the same is true here with respect to National.

III.   **THE DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION REGARDING THE LEGACY CHARGE**

40.   The Committee and Ad Hoc Group argue the Disclosure Statement lacks adequate information regarding the Legacy Charge. *See* UCC Supp. Obj. ¶ 24; AHG Supp. Obj. ¶ 22–24. Specifically, the Committee argues adequate information requires "the underlying customer information necessary to calculate the projected annual revenues to support the illustrative cash flow for New Bonds." UCC Supp. Obj. ¶ 24. The Committee cites no case or authority for the proposition that adequate information requires disclosure of the underlying data of projections so that hypothetical investors can recreate the projections. Here, the Disclosure Statement provides detailed information regarding the total projected net revenues available for payment of bonds, Disclosure Statement Section I.B; *id.* Ex. P at 6,[16] the projected costs not accounted for in the Fiscal Plan that must be taken from total revenues, *id.* Ex. P at 5–6, the intended rate structure by class, *id.* Section II.B.3, and detailed risks associated with design and implementation of the Legacy Charge. *See, e.g.*, *id.* Sections VIII.B, VIII.E–F, VIII.M. The Oversight Board submits this information is adequate for creditors to know the treatment of their claims, the charges that

---

[16] The projected cash flows supporting debt service on the New Bonds are also attached as Exhibit D to the Disclosure Statement.

will support that treatment, and the projected cash flow to be generated from the charge.  The
Oversight Board will, at confirmation, demonstrate the facts relevant to satisfying each
confirmation requirement (*e.g.*, feasibility, best interest of creditors, etc.).  Through the depository
and plan discovery procedures, interested parties will be provided the opportunity to review and
contest the Oversight Board's confirmation evidence.  Exhibit P to the Disclosure Statement
already explains the various considerations and methodology that went into calculating the Legacy
Charge.

41.     The Ad Hoc Group and AHIMSA argue the Disclosure Statement is deficient
because it does not explain why the principal amount of New Bonds increased from $5.4 billion
to $5.68 billion from the last iteration of the Plan and thus *increases* the value available for
creditors (including bondholders).  AHG Supp. Obj. ¶¶ 17–19; AHIMSA Obj. ¶ 13.  These
objections cite no authority for the proposition that the adequate information standard requires the
Disclosure Statement to explain why plan amendments were made (particularly where, as here, the
change is only 5%).  That is likely because Bankruptcy Code § 1125(a)(1), made applicable by
PROMESA § 301(a), expressly defines "adequate information" to exclude information "about any
other possible or proposed plan."  There is no confirmation requirement regarding that, either.  The
Oversight Board filed Exhibit P to the Disclosure Statement detailing its methodology in deriving
the Legacy Charge that will generate the revenue that will be used to pay the New Bonds.
Supporting information and data will be added to the document discovery repository.  At
confirmation, the Oversight Board will demonstrate the facts necessary to satisfy the requirements
of confirmation.  The Oversight Board has always maintained that it changes its debt sustainability
and other determinations based on new facts or if it finds it made a mistake.

## IV.   THE DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION REGARDING THE NEW BONDS AND CVI

42.   The Oversight Board incorporated requested language and made substantial enhancements to the terms of the Series B Bonds in the Amended Plan and Disclosure Statement. Various parties, nevertheless, continue to argue the Disclosure Statement does not contain adequate information regarding the Series B Bonds and CVI.  They raise these arguments despite the fact that the terms of the Series B Bonds have since been negotiated by National, the New Master Indenture is subject to the reasonable approval rights of the Fuel Line Lenders and National, and certain parties such as the Ad Hoc Group believed the Disclosure Statement contained enough information on the Series B Bonds for them to circulate a letter to all bondholders concluding the Series B Bonds would trade under par.  ECF No. 3189, Ex. A.  To dispel arguments regarding purported inadequate disclosure, attached as **Exhibit C** is a chart that provides a citation to where supposedly lacking information regarding the Series A & B Bonds and CVI can, in fact, be located in the Disclosure Statement.

## V.   UTIER'S SUPPLEMENTAL OBJECTION RAISES ISSUES NOT RELEVANT TO THIS PROCEEDING

### A.   UTIER Prematurely and Improperly Argues the Merits of CBA Rejection

43.   UTIER once again argues the Disclosure Statement fails to contain adequate information regarding the potential rejection of the UTIER CBA.  UTIER Supp. Obj. ¶ 7.  As UTIER acknowledges, however, the Oversight Board disclosed that it "is continuing to engage in negotiations regarding the unsustainable obligations described above.  If an agreement cannot be reached with respect to these obligations, PREPA may need to seek rejections of the CBAs." Disclosure Statement Section III.B.5.  As has been made clear through both the quoted language as well as the Oversight Board's reply to UTIER's initial objection [ECF No. 3178], the Oversight

Board remains hopeful of reaching a consensual resolution with respect to amended CBAs.  Should

such agreements prove unattainable, PREPA may be left with no option aside from seeking the

rejection of the UTIER CBA.  But that rejection would not be implemented through the Amended

Plan; it would proceed pursuant to a separate rejection motion subject to meeting the applicable

evidentiary burden within such distinct proceeding.  As a practical matter, the pension fund is

underfunded by approximately $3.5 billion.  Without more, the CBA's must be rejected absent a

consensual resolution because there is simply insufficient money to satisfy the existing CBAs by

any yardstick.

44.     UTIER seeks to prematurely litigate the merits of a hypothetical future rejection

motion, arguing the Disclosure Statement lacks adequate information regarding such hypothetical

litigation.  The Bankruptcy Code defines "adequate information" as "information of a kind, and in

sufficient detail, as far as is reasonably practicable in light of the nature and history of the

debtor . . . ."  11 U.S.C. § 1125(a)(1).  Simply put, it is not reasonably practicable to provide

additional information regarding the basis for rejecting the UTIER CBA when the pension

underfunding is by itself sufficient cause, and such rejection has not and may not occur.  It is

certainly not necessary to do so in the Disclosure Statement

**B.      SREAEE Continues to Misconstrue the Proposed Treatment of Pension
          Claims**

45.     SREAEE asserts the Disclosure Statement fails to contain adequate information

regarding the source of payments supporting accrued but unpaid benefits to retirees and other

future pensioners.  SREAEE Supp. Obj. ¶¶ 6–13.  Its confusion, however, arises from its strained

readings of the Disclosure Statement and misunderstandings regarding its terms.  SREAEE first

argues the Disclosure Statement implies the PREPA PayGo Trust will be paid out of a separate

charge rather than as ordinary operating expenses.  Not so.  As has always been the case, the

Disclosure Statement clearly states that "[t]o ensure Participants receive their accrued monthly benefits, the Amended Plan provides for funding of retiree benefits under a pay-as-you-go ('PayGo') system, which will be paid as ordinary operating expenses from PREPA's revenues as described in the Certified Fiscal Plan."  Disclosure Statement Section III.B.6.

46.     SREAEE points to a statement describing LUMA's position that PayGo expenses should be reflected separately on customer bills to allege confusion regarding whether the PayGo Trust will be funded from a separate source.  SREAEE Supp. Obj. ¶¶ 6–7.  But whether the rate increase for pensions is obtained through a rider process rather than a base rate case, or how pension costs are ultimately reflected on the face of customers' bills, the source of such funds (here, PREPA's revenues available for operating expenses) is not affected.  Moreover, the itemization on a customer's bill also may not be in the Oversight Board's control and may require PREB's approval.  While LUMA believes that transparency under Puerto Rico law requires that such amounts be separately itemized from the base rate on the bill, no determination has been made on the issue.  In any event, the obligations to fund the PREPA PayGo Trust under the Amended Plan will be paid as operating expenses and there is no adverse economic impact associated with either position.  *See* Amended Plan Art. I.A.167.

47.     SREAEE next asserts that being paid as ordinary expenses is somehow "discriminatory" to pensioners.  SREAEE Supp. Obj. ¶ 9.  To the extent SREAEE wishes to assert there is any unfair discrimination among the classes, such argument is a factual inquiry inappropriate for consideration at the Disclosure Statement stage.  Regardless, any such discrimination rings hollow, as the operating expenses (including PREPA's future PayGo obligations) are required to be paid in advance of any payments on account of the New Bonds.  If anything, the pension payments are treated more favorably than other claimholders.  Indeed, it is

for this reason the Ad Hoc Group has argued the New Bonds will trade below par because the supporting charge is subordinate to PREPA's operating expenses.  ECF No. 3189 ¶¶ 83–86.  The Disclosure Statement, therefore, adequately discloses the source of SREAEE's recoveries, and the SREAEE Objection should be overruled on these grounds.

48.      SREAEE further argues modification of the pension system from a funded plan to the PayGo plan should not be permitted because the "savings achieved by the pension reform are projected at around $200 million," which SREAEE unilaterally determines without evidence to be "insignificant."  SREAEE Supp. Obj. ¶ 15.  SREAEE misses the point.  The conversion to PayGo shows the pension fund runs out of money.  Paying PayGo costs a fortune.  SREAEE takes it for granted.  It is not required.  It increases PREPA's expenses and creates a need to raise electric rates to pay the expenses.  PREPA does not want its retirees to be worse off than the Commonwealth's retirees, but its desire to protect PREPA's retirees does not create a defense to rejection of the CBAs.  That $200 million more would fund additional benefits is beside the point.  SREAEE has no entitlement to PayGo in the first place.  SREAEE can reiterate its position at confirmation, but it is not relevant at this time, nor is it a determination for SREAEE to make.  SREAEE's argument also fails to acknowledge that the savings are represented on a "present value basis" over a period of twenty years, and the dollar value of such savings (and the corresponding savings to ratepayers) are materially higher throughout such period.  Disclosure Statement Section III.B.6.

49.      Finally, SREAEE dismisses summarily the Oversight Board's true concern regarding funded plans, namely the rates that would be required to be charged to customers to support funded pension obligations.  SREAEE Supp. Obj. ¶¶ 16–17.  Absent pension reform, the rates charged to consumers would be exponentially higher, as described in Section III.B.6 of the Disclosure Statement.  If SREAEE believes the treatment under the Amended Plan does not

comply with PROMESA—despite substantially identical treatment having been confirmed (and upheld on appeal) for three other pension systems in the Commonwealth's Title III Case—it can assert such position in connection with the confirmation hearing.

[*Remainder of page intentionally left blank.*]

## **CONCLUSION**

WHEREFORE the Debtor respectfully requests entry of an order, substantially in the form of the Revised Disclosure Statement Order attached to the Omnibus Reply as **Exhibit B**, (i) overruling the Objections and Supplemental Objections, (ii) granting the Disclosure Statement Motion and approving the adequacy of the information contained in the Disclosure Statement, and (iii) granting the Debtor such other and further relief as is just.

Dated: February 21, 2023                                    Respectfully submitted,
     San Juan, Puerto Rico

*/s/ Luis F. del Valle-Emmanuelli*                          */s/ Martin J. Bienenstock*
Luis F. del Valle-Emmanuelli                               Martin J. Bienenstock
USDC-PR No. 209514                                         Paul V. Possinger
P.O. Box 79897                                             Ehud Barak
Carolina, Puerto Rico 00984-9897                           Margaret A. Dale
Tel. 787.647.3503                                          Michael T. Mervis
Fax. N/A                                                   Daniel S. Desatnik
dvelawoffices@gmail.com                                    Elliot R. Stevens
                                                           (Admitted *Pro Hac Vice*)
Of Counsel for A&S Legal Studio, PSC                       **PROSKAUER ROSE LLP**
434 Avenida Hostos                                         Eleven Times Square
San Juan, PR 00918                                         New York, NY 10036
Tel (787) 751-6764/763-0565                                Tel: (212) 969-3000
Fax (787) 763-8260                                         Fax: (212) 969-2900
                                                           Email: mbienenstock@proskauer.com
*Co-Attorney for the Financial Oversight and*              ppossinger@proskauer.com
*Management Board as Representative for PREPA*             ebarak@proskauer.com
                                                           mdale@proskauer.com
                                                           mmervis@proskauer.com
                                                           ddesatnik@proskauer.com
                                                           estevens@proskauer.com

                                                           *Attorneys for the Financial*
                                                           *Oversight and Management Board*
                                                           *as representative for PREPA*