## Exhibit A

**Supplemental Omnibus Reply Chart**

**PREPA DS Supplemental Reply Chart**

| Argument | Objection | Response |
|---|---|---|
| | **AHC of National Claim Assignees Objection** | |
| Classification | If the Court determines it will permit the Oversight Board to solicit votes on the Plan, the AHC requests the Court order the Oversight Board to include the language attached in "Exhibit A." <u>AHC Obj</u>. p. 7. | The Oversight Board will incorporate the AHC's proposed insert into the Disclosure Statement, with additions in underline and deletions struck. *See* Section VIII.A of the Disclosure Statement.<br><br><u>***The Title III Court may determine the Assigned National Claims must be classified in Class 5 and 6 of the Plan.***</u><br><br>    National assigned a portion of its claims (the "<u>Assigned National Claims</u>") to certain third parties (the "<u>National Assignees</u>") on December 24, 2021, which assignments were filed on the Docket of <u>PREPA's Title III</u> case on January 12, 2022 <u>ECF</u> Nos 2685 & 2686). A group of National Assignees have asserted that the Assigned National Claims must be treated the same as the claims of National as provided in the National Settlement. The Oversight Board proposes to treat the Assigned <u>National</u> Claims as Class 2 bond claims in the Plan. <u>While the Oversight Board believes the Assigned National Claims have different legal rights than National's claims because they hold uninsured bonds and did not enter into the National Settlement</u>, among other reasons, if the National Assignees or others object to the confirmation of the Plan on this basis and prevail, it could have an adverse impact on voting and the confirmability of the Plan. |
| | The Oversight Board's voting scheme is discriminatory. While the Plan recognizes the Assigned National Claims as actual claims of National, it nevertheless classifies the Assigned National Claims as "Insured Bond Claims," unable to vote or opt into Class 1 and relegated to Class 2. <u>AHC Obj</u>. p. 11. | The Amended Plan expressly carves out from the definition of National Insured Bonds the bonds that make up the Assigned National Claims.  *See* Amended Plan Art. I.A.148 (excluding from the definition of "National Insured Bonds" the "PREPA Revenue Bonds that National (a) satisfied all amounts due and owing thereunder and (b) sold, assigned, and transferred its interests and rights into certain third-party buyers."). Accordingly, the AHC holds Uninsured PREPA Revenue Bonds and will be entitled to vote on the Amended Plan along with all other holders of Uninsured PREPA Revenue Bonds.<br><br>The AHC contends the CUSIPs identified on Exhibit E are Uninsured PREPA Revenue Bonds and thus should have been eligible to sign the |

| Argument | Objection | Response |
|---|---|---|
| | | Uninsured Bond Settlement Agreement.  While the AHC has not indicated any of its members actually desire to agree to the Uninsured Bond Settlement Agreement, the Oversight Board will extend the offer to sign the Uninsured Bond Settlement Agreement to the members of the AHC with respect to the CUSIPs identified on Exhibit E to their objection until February 27, 2023, at 5:00 p.m. Eastern Standard Time. |
| Adequate Information | The complete lack of disclosure regarding even the existence of the Assigned National Claim, let alone any rationale supporting the separate classification and disparate treatment of the Assigned National Claims, and the claims retained by National, means the Disclosure Statement does not meet the threshold for providing adequate information. AHC Obj. p. 13. | There is no requirement that a plan proponent include in the disclosure statement its rationale for its classification or other plan provisions. The Oversight Board has added a slightly modified version of the AHC's proposed insert with respect to their claims to the Disclosure Statement, as described above. *See* Section VIII.A of the Disclosure Statement.  The Oversight Board's justification for classifying the Assigned National Claims—which are at bottom Claims with respect to Uninsured PREPA Revenue Bonds—differently than National Insured Claims—is a matter to be determined at confirmation.  Likewise, whether or not the treatment of the Assigned National Claims and the Class(es) in which they are placed is permissible is a matter to be determined at confirmation. |
| **Trustee Supplemental Objection** | | |
| Classification | The Oversight Board cites no cases where bondholders under a single claim indenture are split into plan subclasses based on settlement status. All of the cases the Oversight Board cites involve creditors that already had the right to settle their claims under non-bankruptcy law. Trustee Supp. Obj. p. 3. | The Trustee ignores the plethora of case law the Oversight Board cited to in the Omnibus Reply that shows that settlement of a claim changes the treatment of the settled claim and requires separate classification of those claims.  Omnibus Reply ¶ 31 (citing *In re Corcoran Hosp. Dist.*, 233 B.R. 449 (Bankr. E.D. Cal. 1999) (existence of settlement with creditor justified separate classification); *In re Dow Corning Corp.*, 244 B.R. 634 (Bankr. E.D. Mich. 1999) (same).  Indeed, separate classification of different types of general unsecured claims, which otherwise have the same legal rights, are routinely done where a settlement exists with a sub-division of general unsecured claimholders.  *See In re PG & E Corp.*, 617 B.R. 671, 685 (Bankr. N.D. Cal. 2020) (finding separate classification of claims all stemming from fires warranted in part because "each class receives distributions through different procedures tailored to that class, and the classes have accepted different treatment pursuant to executed settlement agreements"). The Trustee provides no reason why the Trust Agreement bars the same analysis here. The Trustee also fails to justify its attempt to deprive its beneficial holders of the right to settle their claims. |

2

| Argument | Objection | Response |
|---|---|---|
| | By subdividing PREPA bondholders into subclasses based on settlement offers, the Oversight Board fails to secure an accepting vote by a single class of bondholders. This one-off settlement approach ensures a cramdown fight as well as other intercreditor disputes. <u>Trustee Supp. Obj.</u> p. 5. | The Trustee's observations are not legal bars to enabling some bondholders to settle while others do not settle. |
| Adequate Information | The Disclosure Statement should include information regarding the general release, and discharge exculpation and injunction provisions of the Amended Plan to indicate that such provisions do not limit rights under the National Insurance Policies. <u>Trustee Supp. Obj.</u> p.7. | The Amended Plan does not impact the payment obligations of National under the National Insurance Policies.  To ensure there is no ambiguity, the Oversight Board will add the following provision to the exculpation section of the Amended Plan (Article XXVII.D) and corresponding section of the Disclosure Statement, Section VI.N.4: |
| | The Disclosure Statement should include information regarding the HTA Plan limitation in the general release, and discharge exculpation and injunction provisions of the Amended Plan to preserve monoline insurance. <u>Trustee Supp. Obj</u>. pp. 6-7. | "For the avoidance of doubt, notwithstanding anything contained herein to the contrary, the terms and provisions of the Plan shall not, and shall not be construed to, release or exculpate, any payment obligation under the applicable National Insurance Policy, to any beneficial holder of National Insured Bonds, in accordance with its terms solely to the extent of any failure of such holder to receive the treatment provided to Holders of Claims in Class 5 (or any claims that National may have against a beneficial holder of National Insured Bonds with respect to National's applicable obligations under the National Insurance Policies)." |
| | The Series B Bonds value depends on specific terms set forth in the New Master Trust Agreement; therefore, the Oversight Board should be required to file the New Master Trust Agreement before the Disclosure Statement is approved. <u>Trustee Supp. Obj.</u> p. 8. | The Disclosure Statement includes ample information regarding the terms of the Series B Bonds,[1] which were further negotiated by National and detailed in the National PSA, which is attached to the Disclosure Statement.  It also includes various risk factors that the Series B Bonds might not receive cash flow payments if PREPA cannot afford to pay its operating expenses, and that the Series B Bonds may trade under par.  *See* Section VIII.E. of the Disclosure Statement.  The disclosed terms were sufficient for parties like National and the Fuel Line Lenders to agree to accept Series B Bonds.  The New Master Indenture will reflect these material terms.  Further, the New Master Indenture is required to be |

---

[1]  The definitions in the Amended Plan regarding the structure of the New Bonds and CVI are explained in Section VI.F.1 of the Disclosure Statement, and information regarding the Legacy Charge and Net Revenues are explained in Section II.B.3 of the Disclosure Statement. The Amended Plan sets forth, in Article XIX, provisions regarding the New Bonds and material terms with respect thereto to be contained in the New Master Indenture.

| Argument | Objection | Response |
|---|---|---|
| | | reasonably acceptable to the Fuel Line Lenders and National and may add additional protections for Bondholders<br><br>The Oversight Board will file the New Master Trust Indenture as part of the Plan Supplement seven days before the Voting Deadline. This timing is identical to the schedules utilized in the Commonwealth and HTA Title III Cases.  *See* Case No. 17-bk-3283-LTS, ECF Nos. 18470, 18258. This is customary in chapter 11 bankruptcy cases as well. The Bond Trustee provides no compelling reason as to why the Oversight Board must deviate from this practice here for claimholders to cast an informed vote on the Amended Plan. It is not reasonably practicable for the New Master Indenture to be completed by the current deadline for the Disclosure Statement hearing. |
| | **Committee Supplemental Objection** | |
| Adequate Information | The National Settlement adds more contingencies to the First Amended Plan, making the Disclosure Statement more complicated. The settlement introduces another "toggle" depending on whether the settlement (as it relates to the National Reimbursement Claim) passes muster. The "most-favored-nation" option available to National introduces further uncertainty. UCC Supp. Obj. ¶¶ 18-19. | As explained in the Omnibus Reply, the contingent nature of creditor recovery does not constitute grounds for withholding approval of a disclosure statement.  *See* Omnibus Reply ¶¶ 89-93.  The Disclosure Statement explains the contingencies relevant here, including those stemming from the National PSA. *See* Parts II.B and VI.C of the Disclosure Statement.  As a policy, Bankruptcy favors settlements. To enter to the National PSA, National required that it would not be left behind if there is more favorable settlement in the future. The "most favored nation" provides for that contingency. Should the Oversight Board reach an agreement triggering the "most favored nation" clause in the National PSA, National's recovery and the subsequent effect on creditor recovery overall will be easily quantifiable, as National will receive the exact same treatment as the hypothetical settling party receiving more favorable treatment.  Thus, the impact would not be "unknown," as the UCC suggests.  Any such impact is unknowable at this time, as it is purely hypothetical. |
| | In addition to delaying Plan voting until after the Amended Lien & Recourse Challenge has been resolved, the Committee should also be permitted to conduct in-person sessions with GUCs to explain the New Bonds Waterfall and the Committee's opposition to the Amended Plan. UCC Supp. Obj. ¶ 20. | The proposed order does not prohibit the Committee from conducting in-person sessions with its constituents.<br><br>Provisions granting the Committee's permission to conduct in-person meetings in the (i) *Order (I) Approving Disclosure Statement, (II) Fixing Voting Record Date, (III) Approving Confirmation Hearing Notice and* |

| Argument | Objection | Response |
|---|---|---|
| | | *Confirmation Schedule, (IV) Approving Solicitation Packages and Distribution Procedures, (V) Approving Forms of Ballots, and Voting and Election Procedures, (VI) Approving Notice of Non-voting Status, (VII) Fixing Voting, Election, and Confirmation Deadlines, and (VIII) Approving Vote Tabulation Procedures* ¶ 56 [Case No. 17-bk-3283-LTS, ECF No. 17639] and (ii) *Order (I) Approving Disclosure Statement, (II) Fixing Voting Record Date, (III) Approving Confirmation Hearing Notice and Confirmation Schedule, (IV) Approving Solicitation Packages and Distribution Procedures, (V) Approving Forms of Ballots, and Voting and Election Procedures, (VI) Approving Notice of Non-voting Status, (VII) Fixing Voting, Election, and Confirmation Deadlines, and (VIII) Approving Vote Tabulation Procedures* ¶ 50 [Case No. 17-bk-3567-LTS, ECF No. 1248] were only incorporated following settlements with the Creditors' Committee.  These provisions were added pursuant to Bankruptcy Code § 1125(e) because the Committee was a supporter of the plans of adjustment for the Commonwealth of Puerto Rico and the Puerto Rico Highways and Transportation Authority, and was therefore communicating its support for the plans of adjustment with its constituents. To the extent such communications would have been considered solicitation of the plans of adjustment under Bankruptcy Code § 1125, these provisions provided that such communications were authorized communications.  There is no basis to provide similar provisions here when the Committee has not signed any similar settlement.  The Oversight Board will not, however, oppose the Committee communicating with its constituents as appropriate and consistent with relevant law. |
| | The Disclosure Statement does not explain the basis for estimating GUCs. Exhibit O is insufficient to explain the rationale behind the $800 million estimate. UCC Supp. Obj. ¶¶ 21-22. | The Oversight Board has added a comprehensive discussion of its estimate of the GUC Pool in Section II.B.8 of the Disclosure Statement.   It has also filed an updated Exhibit O regarding the same. |
| | The Disclosure Statement does not explain PREPA's supposed "full discretion" over current expenses. If this is true, it could give the Oversight Board unfettered discretion to allocate New Bonds between creditor groups according to who it deems to be a current expense. UCC Supp. Obj. ¶ 23. | This argument misconstrues the Oversight Board's statement.  As explained in the Omnibus Reply [ECF No. 3206-1 at A-11] "PREPA does not believe any general unsecured creditors can assert Current Expense priority." The Oversight Board, however, holds the right to satisfy and settle PREPA's outstanding debts in a Title III case.  PROMESA §§ 305, 315.  Moreover, PREPA may settle claims arising from the Trust Agreement.  *See* Trust Agreement at 1 (explaining that PREPA is granted the right to "determine the character of and necessity for all its |

| Argument | Objection | Response |
|---|---|---|
| | | expenditures and the manner in which they shall be incurred, allowed and paid"). The amended Disclosure Statement provides a detailed summary of the terms of and justification for the Fuel Line Lender PSA. *See* Parts II.B.1, II.B.4, II.B.6, II.B.7, VI.C.1, VI.C.2, VI.C.3, and VI.D.4 of the Disclosure Statement. While the Oversight Board is not required to explain the entirety of its reasoning in the amended Disclosure Statement, one of the reasons the Oversight Board determined to settle the Fuel Line Lenders' claims to Current Expense status is, unlike other creditors, PREPA and Bondholders expressly agreed to treat them as Current Expenses and had referenced its agreements with Fuel Line Lenders in the Trust Agreement. |
| **AHIMSA Objection** | | |
| Adequate Information | The Disclosure Statement fails to adequately detail or explain key material aspects of the settlement, and the legal and financial characteristics of the Series B-1 Bonds and CVI that are to be distributed to the settling and non-settling bondholders under the plan. AHIMSA Obj. ¶¶ 2; 4-5. | AHIMSA is a non-profit that asserts it is the beneficial owner of approximately $12 million of Uninsured PREPA Revenue Bonds. AHIMSA did not file an original objection to the Disclosure Statement. The arguments it raised in its "supplemental" objection could have been and should have been raised at the original objection deadline, and supplemental objection it did file was filed after the 3:00 p.m. AST deadline for supplemental objections.  Nonetheless, even if considered, AHIMSA's objections to the adequacy of the Disclosure Statement are without merit.

The key details of the Uninsured Bond Settlement Agreement are both described generally in the Disclosure Statement. (*see* Parts II.B.5 and II.B.7) and in the Amended Plan.  Furthermore, the Oversight Board will attach, as an exhibit to the Disclosure Statement, the Uninsured Bond Settlement Agreement that was distributed to holders of Uninsured PREPA Revenue Bonds, just as the Oversight Board has done for the plan support agreements with the Fuel Line Lenders and National.  *See* Exhibit R to the Disclosure Statement.

The terms of the Series B-1 Bonds and CVI are described in detail in the Amended Plan and Disclosure Statement.  *See generally* Amended Plan Art. XIX and Disclosure Statement at Section VI.F. |
| | The Settlement Agreement Notice requires claimholders to elect their treatment 4 days prior to the DS hearing, forcing holders to | Determined to prove the adage that "no good deed goes unpunished," AHIMSA criticizes the Oversight Board for offering the Uninsured Bond |

| Argument | Objection | Response |
|---|---|---|
| | make a hasty decision without complete information. <u>AHIMSA Obj</u>. ¶6.<br><br>The Settlement Agreement Notice offers inadequate and materially misleading information (in particular, on account of National's alleged preferable treatment). <u>AHIMSA Obj</u>. ¶¶ 8–9. | Settlement Agreement to holders of Uninsured PREPA Revenue Bonds. The Oversight Board has proposed such an offer to allow bondholders that may not have been part of the mediation an opportunity to settle their claims without taking the large risks other bondholders have chosen to take by pursuing their claims in the Amended Lien & Recourse Challenge. This offer is simply a choice the Oversight Board has made available, despite being under no obligation to do so.  Bondholders are no worse off for having this option.  If AHIMSA is unhappy about the terms of the settlement offer, it need not accept it.<br><br>AHIMSA's criticism relating to the disclosure of, and information contained in, the Uninsured Bond Settlement Agreement, are all inapposite, as the settlement offer is not a disclosure statement, and the adequate information standard under Bankruptcy Code § 1125 is not applicable to settlement offers. Moreover, the settlement offer was not an offer of securities and did not violate any applicable fraud regulations. *See* Omnibus Reply Chart [ECF No. 3201 at A-17].<br><br>Nonetheless, each criticism misses the mark.  AHIMSA accuses the Oversight Board of providing insufficient time for holders of Uninsured PREPA Revenue Bonds to determine whether or not to sign the Uninsured Bond Settlement Agreement.  The Oversight Board provided over twenty (20) days for holders of Uninsured PREPA Revenue Bonds.  The Securities and Exchange Commission requires tender offers to be held open for a minimum of twenty (20) days.  *See* Rule 14e-1.  While the Uninsured Bond Settlement Agreement is not an offer with respect to securities, the Oversight Board found the twenty (20) day tender offer period to be instructive in determining how long to allow holders of Uninsured PREPA Revenue Bonds to consider whether or not to sign the Uninsured Bond Settlement Agreement.<br><br>There are two reasons why the time within which holders of Uninsured PREPA Revenue Bonds have to sign the Uninsured Bond Settlement Agreement must be limited.  First, it permits the Oversight Board to include the number of Settling Bondholders and Settling Monolines in the Disclosure Statement to be approved by the Court and distributed to Holders of Claims, as the Settlement Offer Deadline is prior to the Disclosure Statement Hearing.  Second, any bondholder settlement should |

| Argument | Objection | Response |
|---|---|---|
| | | come before the Title III Court resolves the Amended Lien & Recourse Challenge.  It would make no sense to permit bondholders to elect the settlement treatment even if they lose the Amended Lien & Recourse Challenge.<br><br>AHIMSA also criticizes the Oversight Board for indicating that monoline insurers will be offered a similar proposal.  The Oversight Board did offer similar proposals to Syncora and Assured.  While the National PSA differs from these offers, it was already known that the Oversight Board has reached an agreement in principle with National prior to the distribution of the settlement offer.  As explained in the Supplemental Reply, the National PSA provides benefits to PREPA simply unavailable pursuant to the settlement offers to other holders of PREPA Revenue Bonds.<br><br>No matter the substance of that settlement or any other settlement proposals, however, it does not change the terms of the settlement made available via the Uninsured Bond Settlement Agreement, and in any event is not relevant to whether the Disclosure Statement contains adequate information.<br><br>AHIMSA's argument that PREPA cannot settle in a higher amount to what they have provided the Settling Bondholders is without merits. The Oversight Board can always settle, and the standard is whether the settlement is reasonable.  The Settling Bondholders can decide not to take the settlement offered, or vote against the Amended Plan, but they cannot foreclose the Oversight Board from settling.  In any event, as explained in the Supplemental Reply, the National settlement is not inherently better to the offer to Settling Bondholders because National's recovery is fixed at 71.65% and no CVI whereas Settling Bondholders could receive as high as 100% and will also receive a CVI. |
| Solicitation and Adequate Information | The Settlement Agreement Notice constitutes improper solicitation. <u>AHIMSA. Obj</u>. ¶ 7. | AHIMSA alleges that the Uninsured Bond Settlement Agreement is an improper solicitation because it locks the Settling Bondholders into the settlement regardless of how they vote.  However, this does not bear on whether their votes were improperly solicited. This Court, in line with other applicable jurisprudence, has found the concept of "solicitation" is narrowly defined to only occur when there is an official vote for or against a plan. *See* Omnibus Reply ¶¶ 79–85.  No such vote has occurred and, |

| Argument | Objection | Response |
|---|---|---|
| | | indeed, settling bondholders are not even required to vote for the Amended Plan.  As no votes have been solicited on the Amended Plan, no improper solicitation has taken place. |
| | Even if there is no improper solicitation, the issue of whether the Disclosure Statement satisfies 1125(b) should be evaluated in conjunction with the Settlement Agreement Notice to claimholders. AHIMSA. Obj. ¶ 8. | The Settlement Agreement Notice is not a disclosure statement and does not need to meet the standards for approval of the disclosure statement.<br><br>With respect to the Disclosure Statement, the Oversight Board will attach the Uninsured Bond Settlement Agreement as an Exhibit to the Disclosure Statement (*see* Exhibit R to the Disclosure Statement), in addition to the ample descriptions of the settlement that have already been provided. *See* Parts II.B.5 and II.B.7 of the Disclosure Statement. |
| | The Disclosure Statement also doesn't provide information regarding: (1) when Series B-1 Bonds and CVI will be issued; (2) what their fair-market value is; and (3) whether that market value equates to the 50% recovery represented in the Plan and the Uninsured Bond Settlement Agreement. AHIMSA Obj. ¶ 10. | The Series B Bonds and CVI will be issued on the Effective Date, and the Disclosure Statement makes clear that such date is subject to uncertainty and may never occur.  *See* Disclosure Statement Section VIII.A. The Disclosure Statement further makes clear that, like all securities, the Oversight Board cannot represent what the fair market value of the Series B-1 Bonds and CVI will be, and that such securities may trade at, above, or below their face amount.  *See* Parts VIII.E and VIII.F of the Disclosure Statement |
| | The Term Sheet attached to the Settlement Agreement Notice suggests settling bondholders are required to provide third-party releases but the scope and rationale is not addressed. AHIMSA Obj. ¶ 11. | The consensual releases contained in the Term Sheet attached to the Settlement Agreement Notice are separate from the Amended Plan and the Disclosure Statement and have no bearing on the propriety of the releases contained in the Amended Plan, which is a confirmation issue.  The limited consensual release consensual release in the Settlement Agreement will not be part of the confirmation order. They merely provide that a party that is settling their bond claim is releasing anyone that may be liable on that bond claim. Any Holder of an Uninsured PREPA Revenue Bond that does not wish to provide the release set forth in the Uninsured Bond Settlement Offer is not obligated to become a party thereto.<br><br>Further, the release provision of the Uninsured Bond Settlement Agreement is consistent with what the Oversight Board negotiated with the Fuel Line Lenders.  That release provision provides:  "The Parties shall release each other to the maximum extent permitted by law.  At the request of the FOMB, the Fuel Line Lenders shall release any other party in interest that may be liable on account of the Fuel Line Loans." |

| Argument | Objection | Response |
|---|---|---|
| | | The purpose of the release is that Settling Bondholders would know that they will only get the recovery that their class will get under the Amended Plan and no other recovery on their bond claim is available for them. The Oversight Board may need to have the ability to enforce such limited release if it strikes additional settlements. |
| | The Disclosure Statement does not advise that the Uninsured Bond Settlement Agreement is essentially an option contract for the benefit of the Oversight Board, which it may unilaterally terminate. <u>AHIMSA Obj</u>. ¶ 12. | The Oversight Board will include the Uninsured Bond Settlement Agreement as an attachment to the Disclosure Statement, allowing any party to interest to review for itself the termination events.  That satisfies the adequate information standard under Bankruptcy Code § 1125.<br><br>In any event, the termination events do not render the Uninsured Bond Settlement Agreement illusory.  The Oversight Board is bound by the settlement except in the limited circumstances set forth in the Uninsured Bond Settlement Agreement.  *See* Uninsured Bond Settlement Agreement § 10.02(a)(ii)–(xi).  Notably, none of the termination events are related to a favorable outcome for the Oversight Board in the Amended Lien & Recourse Challenge.  In other words, the Oversight Board remains bound to provide Settling Bondholders fifty (50) cents on their claim in the form of cash and Series B Bonds, even if the Oversight Board obtains an order disallowing substantially all claims of the Bond Trustee and Non-Settling Bondholders. |
| | **PV Properties Supplemental Objection** | |
| Adequate Information | PV Properties asserts the Disclosure Statement attempts to by-pass PREB's authority, as established by Act 57-2014 and Act 17-2019, to set PREPA's rates. <u>PV Properties Supp. Obj</u>. ¶¶ 9–10, 14–17, 19–21. | PV Properties' objection relates to the substance of the Amended Plan, rather than adequate disclosure.  Accordingly, it should be considered in connection with confirmation rather than the disclosure statement stage.<br><br>Moreover, PV Properties is not PREB and has no regulatory authority.  PV Properties has no standing to complain of supposed violations of PREB's authority.<br><br>Nonetheless, pursuant to § 6.3(p) of Act 57-2014, as amended, PREB is required to "[e]nsure that the powers and authorities exercised by PREB over [PREPA] . . . including those related to rate review or approval, guarantee that [PREPA] meet its obligations to bondholders."  Act 57, § 6.3(p).  As such, Act 57-2014, as amended, requires PREB set a rate at a |

| Argument | Objection | Response |
|---|---|---|
| | | level sufficient to fund PREPA's payment to bondholders. PREB will therefore need to approve a rate and other obligations that provides the payments to bondholders contemplated by the Amended Plan.  PREB is, therefore, subject to the governing authorities, and must set a rate sufficient to pay PREPA's debt as restructured in the Amended Plan.<br><br>Moreover, under § 6.3(q), PREB's approval rights with respect to PREPA's debt issuances do not apply to bond issuances under Title III or Title VI of PROMESA. |
| | PV Properties requests additions and modifications relating to the Legacy Charge. <u>PV Properties Supp. Obj</u>. ¶¶ 24-25. | PV Properties' proposed revisions inappropriately seek to modify the terms of the Amended Plan, they do not provide additional information or clarify information already included in the Disclosure Statement. As such, the Debtor will not incorporate them. PV Properties can raise these revisions in connection with confirmation if it so chooses. |
| **SREAEE Supplemental Objection** | | |
| Adequate Information: PayGo Trust | The Disclosure Statement fails to specify the source of funds regarding the initial million-dollar deposit of the PREPA PayGo Trust. Additionally, this million-dollar figure was arbitrarily selected. <u>SREAEE Supp. Obj.</u> ¶¶ 8-9; 13. | The Amended Plan provides administrative expenses of the PREPA PayGo Trust will be funded on the Effective Date in the amount of $1 million out of PREPA's current assets.  This is a relatively small sum that PREPA can easily fund from its cash on hand on the Effective Date. |
| Adequate Information: Savings Analysis | The Disclosure Statement should discuss why the Oversight Board is anticipating poor performance on behalf of PREPA to meet its obligations. <u>SREAEE Supp. Obj</u> ¶ 19. | The SREAEE misunderstands the Oversight Board's position. The Oversight Board is opposed to defined benefit pension plans because of their poor performance historically. Rather than "projecting poor performance" for PREPA, the Oversight Board observes that PREPA has never met its previous obligations and likely cannot afford to do so moving forward. |
| Adequate Information: The Legacy Generation | The discussion of the Genera PR contract does not include any information regarding the effect of the transaction and the inevitable mobilization of most of PREPA's remaining workforce on the projected savings of the proposed pension reform. <u>SREAEE Supp. Obj.</u> ¶ 20. | Adequate information only requires information that is "reasonably practicable" under the circumstances.  11 U.S.C. § 1125(a)(1).  The Legacy Generation Asset O&M Agreement was only recently announced and approved. At this time, it is unclear how the agreement will impact the number of ongoing participants in the pension plan.  While there will likely be very few Represented Employees following the transition, it is unknown how many PREPA employees will stay at PREPA, move to Genera or choose to transfer to the Commonwealth or other public |

| Argument | Objection | Response |
|---|---|---|
| Asset O&M Agreement[2] | | employers.  As with the former PREPA employees who transferred to the Commonwealth or other public employers following the transition to LUMA Energy, SREAEE may argue that PREPA employees who transfer to the Commonwealth or other public employers following the transition to Genera are entitled to continue to participate in PREPA ERS, while those who move to Genera are not.<br><br>The Debtor has added information pertaining to this issue to Section III.B.6 of the Disclosure Statement.<br><br>Additionally, SREAEE makes much of the fact that the Disclosure Statement filed on December 16, 2022, did not include any information regarding the Legacy Generation Asset O&M Agreement.  SREAEE omits at the time of filing the initial Disclosure Statement, the Legacy Generation Asset O&M Agreement was not finalized or approved.  The Legacy Generation Asset O&M Agreement was not entered into until January 24, 2023.  The Disclosure Statement has since been updated to include a summary of the Legacy Generation Asset O&M Agreement.  See Section III.F.5.ii of the Disclosure Statement. |
| | **UTIER Supplemental Objection** | |
| Adequate Information: The Legacy Generation Asset O&M Agreement | The Disclosure Statement does not include any information regarding the effect of the Genera PR transaction and the inevitable mobilization of most of PREPA's remaining workforce on the projected savings for the rejection of the CBA. UTIER Supp. Obj. ¶ 8. | UTIER's contention that the Disclosure Statement does not include information about the effect of the agreement on PREPA's remaining workforce is incorrect.  The Disclosure Statement, as amended, indicates that the projected savings, following the transition, would "reduce to a minimal amount as PREPA would be left with very few Represented Employees."  See Section III.B.5 of the Disclosure Statement. |
| | The Oversight Board should provide its own analysis of estimated savings expected from the implementation of the Legacy Generation Asset O&M Agreement. UTIER Supp. Obj. ¶ 11. | As UTIER acknowledges, the Disclosure Statement provides Genera's estimate of savings expected from the implementation of the Legacy Generation Asset O&M Agreement.  See Section III.F.5.ii of the Disclosure Statement. Nonetheless, UTIER argues the Oversight Board should provide its own analysis of such savings. UTIER identifies no |

---

[2]  SREAEE and UTIER make much of the fact that the Disclosure Statement filed on December 16, 2022, did not include any information regarding the Legacy Generation Asset O&M Agreement.  SREAEE omits at the time of filing the initial Disclosure Statement, the Legacy Generation Asset O&M Agreement had not come into existence (it was entered into on January 24, 2023).  The Disclosure Statement has since been updated to include a summary of the Legacy Generation Asset O&M Agreement.  See Section III.F.5.ii of the Disclosure Statement.

| Argument | Objection | Response |
|---|---|---|
| | | reason why Genera's estimate is inadequate, and, at this time, it is not reasonably practicable for the Oversight Board to provide its own analysis given the Legacy Generation Asset O&M Agreement was just executed on January 24, 2023. |
| | It is "unclear from the Amended Disclosure Statement whether the O&Ms are a burden or a relief," which it asserts is an essential characterization for the Disclosure Statement to contain adequate information. <u>UTIER Supp. Obj.</u> ¶ 11. | The Debtor has described the benefits of the agreements with LUMA Energy and Genera throughout the Disclosure Statement. *See* Parts I.C. and III.F.5 of the Disclosure Statement. While both agreements impose obligations on PREPA, these agreements serve as crucial pieces to the necessary overall transformation of Puerto Rico's energy sector, as required by PREPA's certified fiscal plans for the last several years. |