# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors. [1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 4780-LTS<br><br>**This Motion relates to PREPA and shall be filed in Lead Case No. 17 BK 3283-LTS and Case No. 17 BK 4780-LTS.** |

## DECLARATION OF OMAR J. MARRERO IN SUPPORT OF PREPA'S MOTION FOR ENTRY OF ORDER ALLOWING ADMINISTRATIVE EXPENSE CLAIM FOR COMPENSATION FOR SERVICES UNDER PUERTO RICO THERMAL GENERATION FACILITIES OPERATION AND MANAGEMENT AGREEMENT

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico ("Commonwealth") (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

Pursuant to 28 U.S.C. § 1746, I, Omar J. Marrero, hereby declare as follows under penalty of perjury under the laws of the United States of America:

1.       I submit this declaration in support of *PREPA's Motion for Entry of an Order Allowing Administrative Expense Claim for Compensation for Mobilization Services Under the Puerto Rico Thermal Generation Facilities Operation and Management Agreement* (the "Motion"). I am over 18 years of age and am authorized to make this declaration on behalf of the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"). I have personal knowledge of the matters set forth herein, and if called upon and sworn as a witness, I could and would testify competently thereto.

2.       I am AAFAF's Executive Director. AAFAF is the "fiscal agent, financial advisor, and reporting agent of all entities of the Government of Puerto Rico" and the "government entity responsible for the collaboration, communication, and cooperation" between the Puerto Rico Government and the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board").[2]

3.       I am also a member of the Board of Directors of the Puerto Rico Public-Private Partnership Authority (the "P3 Authority") and a member of the Partnership Committee established by the P3 Authority pursuant to Section 5 of the Puerto Rico Electric System Transformation Act, Act No. 120-2018, as amended (the "Partnership Committee"). The P3 Authority promotes ongoing collaboration between Puerto Rico government entities and the private sector and is the entity entrusted with overseeing the negotiation of private sector partnership contracts.

---

[2] *See* AAFAF Enabling Act, Act No. 2-2017.

4.     In my current role as a member of the Partnership Committee, I have worked closely with the Puerto Rico Electric Power Authority ("PREPA") in connection with (i) the selection of Genera PR LLC ("Genera") as the winning bidder of the opportunity to serve as Puerto Rico's legacy generation assets ("Legacy Generation Assets") operator—which selection process is more fully described in the "Partnership Committee Report" attached as **Exhibit A** hereto; and (ii) the negotiation and execution of the Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement ("Generation Contract"), dated January 24, 2023, entered into by and among PREPA, the P3 Authority, and Genera, as approved by the Oversight Board, Puerto Rico Energy Bureau ("PREB")—PREPA's independent regulator—and the Government of Puerto Rico pursuant to the procedures set forth in the Puerto Rico Private Public Partnerships Act, Act No. 29-2009, a copy of which is attached as **Exhibit B** hereto.

## I.     Background and Procurement Process

5.     As the result of decades of operational, strategic, and financial challenges, which were exacerbated by natural disasters, Puerto Rico's energy systems are in need of critical recovery.[3] The cumulative effects of these challenges have resulted in an inefficient, costly, and unreliable system with electric power service that is prone to frequent blackouts, negatively impacting customers, the environment, and the Puerto Rico economy.

6.     Recognizing these issues, the Government of Puerto Rico determined that a complete transformation of the Legacy Generation Assets would be required to bring safe, reliable, efficient and modern power generation to PREPA's customers to move Puerto Rico's electric

---

[3] *See Transformation and Innovation in the Wake of Devastation an Economic and Disaster Recovery Plan for Puerto Rico*, Central Office for Recovery, Reconstruction and Recovery, https://prsciencetrust.org/wp-content/uploads/2019/01/pr-transformation-innovation-plan.pdf (last visited Feb. 6, 2023); *Puerto Rico One Year after Hurricanes Irma and María*, Federal Emergency Management Agency (Sept. 6, 2018), https://www.fema.gov/press-release/20210318/puerto-rico-one-year-after-hurricanes-irma-and-maria.

system and broader economy forward. Specifically, the primary objectives of the Legacy Generation Asset transformation include:

- delivering low-cost electricity to customers while increasing energy resiliency and deploying new technologies;

- introducing private sector operational expertise;

- facilitating managerial continuity of long-term planning;

- improving certainty and self-development for employees;

- implementing improvements in the safety, reliability, power quality and efficiency of Puerto Rico's generation facilities;

- facilitating Puerto Rico's transition to PREPA's "Vision for the Future of Power in Puerto Rico," as described in PREPA's integrated resource plan;

- implementing operational excellence of electricity generation facilities consistent with prudent industry practices, including improved safety and compliance with environmental and other applicable regulatory requirements; and

- increasing cost efficiency while achieving the operational objectives in coordination with the transmission and distribution operator.

7.      In August 2020, the Government launched a procurement process for awarding a long-term contract to a qualified operation and maintenance ("O&M") service provider for the Legacy Generation Assets. At the conclusion of this robust procurement process, the Partnership Committee selected Genera as the preferred provider to engage in exclusive discussions and negotiations with the P3 Authority. It is my understanding that Genera is a wholly-owned subsidiary of New Fortress Energy, which has developed, constructed, and commissioned numerous energy infrastructure assets on islands in the U.S. and the Caribbean and has particular expertise in fuel management and operating and maintaining power plants in island environments. I believe that Genera's experience make it a preferred enterprise to operate the Legacy Generation Assets.

8.       Through its services, Genera estimates that it will bring financial and economic benefits for Puerto Rico's electric customers. Genera estimates that it will generate annual fuel savings, which it plans to do by optimizing existing fuel contracts, achieving better risk and credit terms on existing oil contracts, and making operational changes to increase fuel efficiency. Genera believes additional potential fuel savings may also be achievable by converting dual fuel capable, and other conversion-capable, generation units to gas fuel generation units.

9.       Genera has a tailored approach to the O&M Services[4] for PREPA's Legacy Generation Assets and provided comprehensive plans, including an extensive Mobilization Plan (discussed herein). These approaches and plans are consistent and accounted for in the PREPA Fiscal Plan, will benefit the people of Puerto Rico by maximizing Legacy Generation Asset cost-efficiency, availability, health and safety compliance, and environmental compliance. Genera's services are already in motion and Puerto Rico's energy generation system will benefit from these services.

10.      Genera has also demonstrated a unique commitment to Puerto Rican workers by agreeing to interview and provide offers of employment to all suitable full-time PREPA generation plant employees in good standing, and by giving preference to non-plan PREPA employees for new roles with Genera. Accordingly, Genera's services will carve a path forward to achieving the Government's objective of transforming PREPA's aged, inefficient, and fossil fuel-reliant Legacy Generation Assets into safer, more reliable, and more efficient generation facilities and provides the best option for the people of Puerto Rico.

---

[4] Capitalized terms not otherwise defined herein shall have the meanings given to them in the Generation Contract or the Partnership Committee Report.

## II.  The Mobilization Period Under the Generation Contract

11.    Following the requisite approvals, the Generation Contract was signed by the parties on January 24, 2023, and the process immediately shifted to the approximately 22-week period (the "Mobilization Period") during which Genera will implement plans and strategies to effect the efficient, safe, and cost-effective transition of operation and management services from PREPA to Genera (the "Mobilization Services").

12.    I understand that Genera has been performing the Mobilization Plan to ensure an optimal transition of operation and management services from PREPA to Genera as quickly as practicable. Among the many complex transition items performed, Genera has and will:

- engage in stakeholder outreach;
- develop a Handover Checklist and provide periodic status updates regarding Handover Checklist action items;
- recruit and hire personnel, including by conducting key employment evaluations of and making employment offers to PREPA generation employees;
- identify and onboard subcontractors;
- plan and implement IT systems and tools;
- review applicable permits and compliance obligations;
- evaluate and maintain inventory and coordinate with the T&D Operator;
- develop plans and procedures for various aspects of operations, including, but not limited to, a Procurement Manual, Legacy Emergency Response Plan, O&M Procedures, and Operator Training Programs;
- develop an approach with a Spanish-speaking workforce;
- plan for key milestones; and
- develop a fuel savings strategy related to Fuel Contracts, including management of Fuel Contract related decisions during the Mobilization Period.

These services are necessary to allow for the orderly, timely, and efficient commencement of the subsequent operation and maintenance services ("O&M Services") provided for in the Generation Contract.

13.     In connection with Generation Contract, and as consideration for the Mobilization Services, I understand that PREPA will be responsible for certain fixed and variable fees, including the Mobilization Service Fee, which consists of (i) the hourly fully allocated cost rate for each category of employee providing Mobilization Services, multiplied by the number of hours worked by each employee in such category providing Mobilization Services, plus (ii) all other reasonably necessary and documented costs and expenses incurred by Genera in the course of providing the Mobilization Services and satisfying the "Service Commencement Date Conditions" under the Generation Contract, including the cost of any subcontractors or consultants providing Mobilization Services (the "Mobilization Obligations"). Additionally, under the Generation Contract, PREPA will be responsible for certain accrued and unpaid fixed and variable fees for the O&M Services, which will be paid in the ordinary course and are not the subject of the Motion.

14.     Accordingly, it is my understanding that, the Government Parties (as defined in the Motion) seek an order granting to Genera an allowed administrative expense claim for accrued, unpaid Mobilization Obligations required to be paid by PREPA to Genera pursuant to the Generation Contract. It is also my understanding that section 4.1(c)(i) of the Generation Contract requires PREPA to seek an administrative expense claim for the Mobilization Obligations within ten (10) business days after the contract's Effective Date, but Genera agreed to extend this deadline to February 21, 2023.

## III.   Administrative Expense Status for Mobilization Obligations Under the Generation Contract

15.     I believe affording administrative expense status for the Mobilization Obligations is appropriate. Such obligations benefit PREPA in that they further Puerto Rico's energy sector transformation process by permitting the Mobilization Period to lead the way to the commencement of the O&M Services and the subsequent execution of the O&M Services. Such

services aid in delivering this major power generation modernization capital project on time and on budget which is essential to protect Puerto Rico from future energy challenges.

16.     The unhindered progress of the Mobilization Services is vital to ensuring Genera's assumption of full control of PREPA's Legacy Generation Assets and realization of the full benefits of this transaction. The transition processes performed during the Mobilization Period will develop an important foundation for the O&M Services to build upon and integrate seamlessly with the T&D System currently in transformation.

17.     Additionally, through the O&M Services, Genera can realize significant cost savings and fuel savings without plant conversions or equipment replacement. To do so, as part of the Mobilization Services, Genera has plans to optimize existing fuel contracts, negotiate better risk and credit terms on existing oil contracts, and make operational changes at the Legacy Generation Assets, such as fixing broken equipment. The Mobilization Services will help guarantee the customer-centric, financially sustainable, affordable, reliable, and resilient utility the residents of Puerto Rico deserve. The Mobilization Obligations will properly compensate Genera for its essential services and allow this important work to proceed through completion.

18.     This Motion represents the culmination of almost three years of collective efforts by the P3 Authority, PREPA, AAFAF, and the Oversight Board. A more efficient, reliable, and cost-efficient power utility is not only critical for Puerto Rico's economy, but will also support PREPA's restructuring and exit from Title III. For these reasons, I believe that allowing an administrative expense claim in favor of Genera for the Mobilization Obligations is in the best interests of PREPA and the people of Puerto Rico.

I declare under penalty of perjury under 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 21st day of February, 2023 at San Juan, Puerto Rico.

_____

Omar J. Marrero

**<u>Exhibit A</u>**



PUERTO RICO
**PUBLIC-PRIVATE
PARTNERSHIPS**
AUTHORITY

**Partnership Committee Report**

# Puerto Rico Public-Private Partnership for the Puerto Rico Electric Power Thermal Generation Facilities

October 17, 2022
Amended January 18, 2023



This page has been intentionally left blank.

# Table of Contents

**1. Executive Summary** — 1

**2. Introduction** — 9

**3. Project Background and Objectives** — 13

   3.1  Project Background — 15

       3.1.1  PREPA and the Legacy Generation Assets — 15

       3.1.2  Recent Challenges — 16

       3.1.3  Government Response — 20

       3.1.4  Towards a Sustainable Transformation — 23

       3.1.5  Addressing Fiscal Challenges — 27

   3.2  Project Objectives — 29

**4. Procurement Process** — 31

   4.1  Partnership Committee — 33

   4.2  Market Sounding — 35

   4.3  Qualification Process — 36

   4.4  Request for Proposals — 41

       4.4.1  RFP and RFP Addenda — 41

       4.4.2  Due Diligence — 42

       4.4.3  Transaction Structure — 46

       4.4.4  Incentives and Penalties Structure — 48

       4.4.5  O&M Agreement Discussions — 48

       4.4.6  Submission of Binding Proposals — 50

       4.4.7  Meetings of the Partnership Committee — 52

       4.4.8  Key Milestones in RFP Process — 54

**5. Recommended Award** — 55

   5.1  Process for Recommended Award — 57

       5.1.1  Evaluation Criteria — 57

       5.1.2  Determination of Preferred Proponent — 59

       5.1.3  Recommendation to Award the O&M Agreement — 60

       5.1.4  Key Milestones in Evaluation Process — 62

   5.2  Key Considerations for Recommended Award — 63

       5.2.1  Operational Considerations — 63

       5.2.2  Financial Considerations — 67

       5.2.3  Legal and Contractual Considerations — 69

   5.3  PREB Comments to the Genera O&M Agreement — 73

**6. Conclusion**                                                                                          **75**

**Exhibit A:**
**Defined Terms**                                                                                        **81**

**Exhibit B:**
**Benefits of a Third-Party Generation Operator of the**
**Puerto Rico Legacy Generation Assets**                                                 **85**

**Exhibit C:**
**Request for Qualifications**                                                                    **109**

**Exhibit D:**
**Qualification Analysis and**
**Shortlist Report**                                                                                    **157**

**Exhibit E:**
**PREPA Management Presentation**                                                        **179**

**Exhibit F:**
**Summary of O&M Agreement**                                                              **275**



# 1. Executive Summary

This page has been intentionally left blank.

On August 25, 2022, after a robust and competitive procurement process that lasted more than 24 months, the Partnership Committee (the "**Partnership Committee**") established by the Puerto Rico Public-Private Partnerships Authority (the "**P3 Authority**") pursuant to Section 5 of the Puerto Rico Electric System Transformation Act, Act No. 120-2018, as amended (the "**Transformation Act**"), determined to recommend to the board of directors of the P3 Authority (the "**P3 Authority Board**") that the contract for the management, operation, maintenance, management of fuel supply, and decommissioning, where applicable, of certain base-load generation plants and gas turbine peaking plants (the "LGA Project," and such plants the "**Legacy Generation Assets**") be awarded to Genera PR LLC ("**Genera**"), a Puerto Rico limited liability company and a wholly-owned subsidiary of New Fortress Energy Inc. (NASDAQ: NFE) ("**NFE**"). Genera is the surviving entity after its merger with Encanto Power LLC ("**Encanto Power**"), the wholly-owned subsidiary of NFE that qualified to bid on the LGA Project.

NFE is a multi-billion dollar, publicly traded, critical energy infrastructure company with (i) over 3,000 MW of experience installing, maintaining, operating, optimizing, monitoring and decommissioning generation assets, (ii) nearly 1,000 MW of power generation capacity currently operational, under development, or for which it provides fuel management services, (iii) demonstrated experience in fuel procurement and management, including seven terminals and fuel handling facilities operational or in development, and (iv) experience coordinating the integration of renewable generation with dispatchable thermal power. NFE is also an affiliate of NFEnergía LLC, which has significant, direct experience with fuel management and power generation in Puerto Rico, including the Fuel Sale and Purchase Agreement between NFEnergía LLC and the Puerto Rico Electric Power Authority ("**PREPA**" or the "**Owner**"), dated March 5, 2019 (the "**NFE FSPA**"), pursuant to which NFEnergía LLC agreed to convert generation units 5 and 6 of the San Juan Combined Cycle Power Plant to be capable of operating on liquified natural gas and to supply such gas to those units.

Genera is equipped to stabilize and optimize the operations of Puerto Rico's Legacy Generation Assets until replacement renewable and distributed energy generation is installed and the Legacy Generation Assets are decommissioned, ushering in both a clean and resilient energy future for the people of Puerto Rico.

As required by the Certified Fiscal Plans for PREPA and the Commonwealth of Puerto Rico, the Partnership Committee's decision marks another important milestone in the implementation of the Government of Puerto Rico's (the "**Government's**") objective of providing modern, carbon-free, affordable, resilient, and reliable power, which will serve as a driver of economic growth in Puerto Rico following the destruction wrought by hurricane Irma ("**Irma**") and hurricane Maria ("**Maria**") in September 2017, the earthquakes of December 2019, January 2020 and May 2020[1], and hurricane Fiona ("**Fiona**") in September 2022. In particular, the PREPA Fiscal Plan, as certified on June 28, 2022 by the FOMB (the "**Certified PREPA Fiscal Plan**") highlights the LGA Project as a major transformation initiative needed to boost generation production and efficiency, increase environmental compliance, and improve reliability of services.

Prior to the impact of Irma and Maria, Puerto Rico already suffered from inherently disadvantaged energy infrastructure. In particular, the planning, design, and operation of an isolated (not interconnected) island based electricity system necessarily imposes on PREPA, and Puerto Rico as a whole, significant challenges with respect

---

[1]   Between December 28, 2019, and mid-April, 2020, more than 2,000 earthquakes hit the island of Puerto Rico, of which 30 were of a magnitude above 4.5 and five of a magnitude above 5.5.

to power system stability[2] and reliability. In addition, the Legacy Generation Assets have been vulnerable to turbine failures, generator failures, boiler failures and electrical system issues, among other challenges. As a result, the Legacy Generation Assets experience above industry average equivalent forced outage rates, primarily as a result of poor equipment conditions due to the age of the units and poor operational practices. Certain black start combustion turbines serve as peaking units, but are not currently operable and are scheduled for replacement. Because certain of the Legacy Generation Assets are indefinitely out of service or in need of significant repair, the Legacy Generation Assets in the aggregate have a dependable capacity of approximately 3,600 MW despite having a total installed capacity of 4,785 MW.

Further, the Legacy Generation Assets are dependent mostly on diesel (number 2 fuel oil) and number 6 fuel oil, with some units also dependent on natural gas. Particularly in the case of diesel and number 6 fuel oil, the Legacy Generation Assets produce higher air emissions, operate less efficiently and with less flexibility, and at high cost. As a result, regulatory agencies have found the Legacy Generation Assets to be noncompliant with certain environmental laws and regulations, and imposed limitations on their operation. Significant capital expenditures that could ameliorate these concerns are not contemplated by the currently effective integrated resource plan (the "**IRP**"), under which the Legacy Generation Assets will be retired in the near future in furtherance of Puerto Rico's commitment to renewable energy.

Moreover, Puerto Rico and PREPA were burdened with significant debt obligations, which further limited PREPA's ability to invest in Puerto Rico's energy infrastructure since 2014. On May 3, 2017 and July 3, 2017, the Financial Oversight and

Management Board for Puerto Rico (the "**FOMB**") filed petitions for relief under Title III ("**Title III**") of the Puerto Rico Oversight, Management, and Economic Stability Act ("**PROMESA**") for the Government and PREPA, respectively. PROMESA offers mechanisms to achieve fiscal and budgetary balance, thereby restoring access to the capital markets, which facilitates necessary investment in the energy infrastructure. On March 15, 2022, upon the effectiveness of the plan of adjustment for the Government (the "**Commonwealth Plan of Adjustment**"), Puerto Rico's central government emerged from its Title III proceedings. The Commonwealth Plan of Adjustment reduced Puerto Rico's total funded debt obligations by 78% and discharged legacy Puerto Rico general obligation bonds, ERS bonds, and PBA bonds, as well as all of the related Puerto Rico, ERS, and PBA obligations and guarantees. However, PREPA continues to engage in the in-court debt restructuring process under PROMESA, which began before Irma and Maria struck Puerto Rico.

The damage caused by Irma and Maria exacerbated PREPA's challenges and created new ones. Additionally, the damage to PREPA's power station in Costa Sur (the "**Costa Sur Power Plant**") as a result of the earthquakes in December 2019 and January 2020 significantly worsened the situation.

In the face of these unprecedented challenges, the Government sought not only to rebuild after Irma and Maria and restructure PREPA's legacy debt obligations, but also to use the recovery process to both jumpstart a long-term revitalization of the Puerto Rican economy and upgrade Puerto Rico's electric system to be more resilient against future natural disasters and to transition to renewable energy. In the months following Irma and Maria, the Government spent substantial time and resources to bolster the legal framework for public-private partnerships ("**PPPs**") in the

---

[2]  Power system stability refers to the ability of (i) the power generation plants and the electrical transmission and distribution system load to remain in balance during normal conditions and (ii) the power system to respond quickly to, and return to its normal state after, a power system disturbance. The power system design for island utilities must account for the lack of interconnection to other utilities. Otherwise, the power system will not be inherently stable and will suffer from load sheds and outages.

electric sector in order to attract and harness private sector creativity and resources, with a view towards fully delivering on the economic, infrastructure, and societal goals identified by the Government. As a result, the Transformation Act was enacted in June 2018, with the stated motive of transforming Puerto Rico's energy system into a modern, sustainable, reliable, efficient, cost effective, and resilient one through PPPs or sale agreements with respect to the functions, services or facilities of PREPA. The Transformation Act and the accompanying Regulation provided guidelines and procedures for identifying the PREPA assets, functions, services or facilities for which PPPs would be established and conducting the related procurement processes. Additionally, pursuant to the Transformation Act, a new energy public policy was developed that requires 100% of PREPA's energy to come from renewable sources by 2050.

The first energy project pursued by the Government under the new legal framework was the private operation and management of Puerto Rico's electric power transmission and distribution system (the "**T&D System**") pursuant to a long-term contract (the "**T&D Project**"). The P3 Authority issued the RFP for the T&D Project on February 1, 2019, and the RFP process culminated in PREPA entering into a 15-year operation and maintenance agreement (the "**T&D O&M Agreement**") on June 20, 2020, with LUMA Energy, LLC and LUMA Energy Servco, LLC (together, the "**T&D Operator**"). LUMA Energy, LLC is a Puerto Rico company formed by Canadian Utilities Limited, an ATCO Ltd. energy and utilities company, and Quanta Services, Inc.

In August 2020, the P3 Authority launched the procurement process for the LGA Project as the next phase of the Government's mission to transform Puerto Rico's electric system into a modern, renewable, sustainable, reliable, efficient, cost-effective, and resilient system. On August 10, 2020, the P3 Authority issued the Request for Qualifications (the "**RFQ**") for the LGA Project. On or before September 15, 2020, 15 private

sector parties (including Encanto Power, the NFE subsidiary that participated in the RFQ, which later merged with and into Genera, with Genera continuing as the surviving entity) interested in the LGA Project (each, a "**Respondent**") submitted Statements of Qualifications ("**SOQs**") in response to the RFQ.

On October 22, 2020, the Partnership Committee selected eight experienced and reputable Respondents in the qualification process conducted pursuant to the RFQ (the "**RFQ Process**") to participate in the next phase of the process: (i) EcoEléctrica, L.P. ("**EcoEléctrica**"); (ii) Empresa Generadora de Electricidad Haina, S.A. ("**EGE Haina**"); (iii) EthosEnergy Group Limited ("**EthosEnergy**"); (iv) Genera; (v) ProEnergy Services LLC ("**ProEnergy**"); (vi) NAES Corporation ("**NAES**"); (vii) NRG Energy Services Group LLC ("**NRG Energy Services**"); and (viii) Siemens Energy, Inc. ("**Siemens**"). On November 10, 2020, the P3 Authority issued the Request for Proposals (the "**RFP**") for the LGA Project. On December 22, 2021, two participants (each, a "**Proponent**") in the procurement process conducted pursuant to the RFP (the "**RFP Process**"), Genera and NAES (or the "**Other Proponent**"), submitted proposals in response to the RFP, which were subsequently modified and supplemented from January to May 2022 (each such proposal as supplemented and modified in writing, a "**Binding Proposal**").

The RFP required that each Proponent submit a Binding Proposal including the following three key elements:

• a proposal (the "**Operational Proposal**") reflecting (i) each Proponent's proposed plan (the "**Mobilization Plan**") to transition the Legacy Generation Assets from PREPA to the winning Proponent (the "**Operator**") consistent with the terms of the long-term operation and maintenance agreement with PREPA for the LGA Project (the "**O&M Agreement**"), (ii) each Proponent's approach to performing the operation and maintenance services (the "**O&M Services**") under the O&M Agreement,

(iii) each Proponent's approach to performing the decommissioning of the Legacy Generation Assets (the "**Decommissioning Services**") under the O&M Agreement, (iv) each Proponent's approach to the transition and handover of services and other rights and responsibilities at the conclusion of the term of the O&M Agreement (the "**Demobilization Plan**"), and (v) each Proponent's proposed plan for staffing and training employees and subcontracting certain services (the "**Operator Recruitment and Staffing Plan**");

- a proposal (the "**Financial Proposal**") reflecting certain financial terms and conditions proposed by each Proponent to be included in the O&M Agreement, including (i) the annual fixed fee payable by the Owner to the Operator for providing the O&M Services (the "**O&M Fixed Fee**"), (ii) incentive payments payable by the Owner to the Operator (an "**O&M Incentive**"), and penalties payable by the Operator to the Owner (an "**O&M Penalty**"), based on the Operator's performance of the O&M Services, (iii) beginning on the sixth Contract Year, the fixed fee payable by the Owner to the Operator for providing Decommissioning Services with respect to any Legacy Generation Assets (the "**Decommissioning Fixed Fee**"), (iv) incentive payments payable by the Owner to the Operator (a "**Decommissioning Incentive**"), and penalties payable by the Operator to the Owner (a "**Decommissioning Penalty**" and, together with the O&M Incentive, the O&M Penalty and the Decommissioning Incentive, the "**Incentives and Penalties**"), based on the Operator's performance of the Decommissioning Services, (v) the cost for the Operator to provide the services to transition the Legacy Generation Assets from PREPA to the Operator (the "**Mobilization Service Fee**") during the period between execution of the O&M Agreement and the Operator's assumption of operational control of the Legacy Generation Assets (the "**Mobilization Period**"), (vi) a profit percentage for the Operator to provide the services to transition any remaining Legacy

Generation Assets from the Operator to Owner or the Government (the "**Demobilization Service Fee**") upon the expiration or early termination of the term of the O&M Agreement (the "**Contract Term**"), (vii) liquidated damages for delays in satisfying the Service Commencement Date Conditions and commencing the O&M Services, (viii) fees payable to the Owner or the Operator, as applicable, in the event the O&M Agreement is terminated prior to the end of the term (the "**Termination Fee**"), and (ix) the dollar value of certain caps on liability; and

- a legal proposal (the "**Legal Proposal**") consisting of a mark-up of the proposed form of O&M Agreement for the LGA Project.

The Partnership Committee recommended to the P3 Authority Board that Genera be awarded the LGA Project because, of the two Binding Proposals submitted in response to the RFP, Genera's contained terms that were overall more favorable to the Government and the people of Puerto Rico.

Genera's Operational Proposal presented a tailored approach to the O&M Services for the Legacy Generation Assets, which demonstrated a strong understanding of PREPA and the context in which it operates. Among other things, Genera provided a comprehensive Mobilization Plan and Operator Recruitment and Staffing Plan. In addition, Genera essentially accepted the Government's approach to the Incentives and Penalties included in the RFP and proposed an additional O&M Incentive for fuel savings, which were designed to incentivize the Operator to perform the O&M Services in respect of the Legacy Generation Assets in a manner that maximizes cost-efficiency, availability, health and safety compliance and environmental compliance, for the benefit of the people of Puerto Rico. Finally, Genera demonstrated a unique commitment to transitioning PREPA generation employees ("**PREPA Employees**"), and further training and development of the generation workforce, as evidenced by its agreement to interview and provide offers of

employment to all full-time plant employees in good standing, and to give preference to other non-plant PREPA employees for the new roles as well. In addition, PIC Group, Inc. ("**PIC Group**"), a major and well-qualified subcontractor of Genera, will provide O&M Services, for much of the employee screening, assessment, hiring, training and qualifying of people for the new organization. This approach will include training employees for multi-skilled roles. PIC Group will also assist with the performance of certain O&M Services.

Genera's Financial Proposal included an O&M Fixed Fee (which included the value of a Decommissioning Fixed Fee, as Genera's Financial Proposal removed the concept of the Decommissioning Fixed Fee) with a net present value over the Contract Term close to $65 million lower than that of the Other Proponent. In addition, Genera's Financial Proposal included higher delayed liquidated damage payments than the Other Proponent in the event the Target Service Commencement Date is delayed.

Finally, from a legal and contractual perspective, Genera agreed to a form of the O&M Agreement that was closer to the one prepared by the P3 Authority and included in the RFP. In effect, Genera accepted, without significant change, the key elements of the O&M Agreement and required fewer material changes to the document, thus resulting in less risk and cost transfer from the Operator to the Government.

In view of all of the above, the Partnership Committee believes that the Binding Proposal submitted by Genera (i) meets the qualifications for the operational components of the RFP, (ii) reflects the more favorable approach to the financial components of the RFP, (iii) more closely aligns with the legal components contained in the draft of the O&M Agreement distributed with the RFP, (iv) presents a path forward to achieving the Government's objective of transforming PREPA's aged, inefficient and fossil fuel reliant generation system into one that is safer, more reliable, and more efficient, and (v) is the better option for the people of Puerto Rico.



This page has been intentionally left blank.



# 2. Introduction

This page has been intentionally left blank.

As required by law, this Partnership Committee Report (the "**Report**") has been prepared pursuant to:

- Section 8(b)(vii) and Section 9(g)(i) of the Public Private Partnership Authority Act, Act No. 29-2009, as amended ("**Act 29**");

- Section 5 and Section 10 of the Transformation Act; and

- Section 8.1 of the Regulation for the Procurement, Evaluation, Selection, Negotiation and Award of Partnership Contracts and Sale Contracts for the Transformation of the Electric System under Act No. 120-2018, as amended (the "**Regulation**").

Except as provided in Exhibit A hereto (*Defined Terms*), capitalized terms used but not otherwise defined in this Report have the meaning ascribed to them in, as applicable, Act 29, the Transformation Act, the Regulation or the RFP issued by the P3 Authority on November 10, 2020.

Pursuant to Section 5 of the Transformation Act and Resolution No. 2020-36 of the P3 Authority Board, as amended, on October 13, 2021 by Resolution No. 2021-63, the P3 Authority established the Partnership Committee responsible for the procurement of a PPP with PREPA for the management, operation, maintenance, management of fuel supply, and decommissioning, where applicable, of the Legacy Generation Assets.

This Report has been prepared in accordance with the Partnership Committee's recommendation to the P3 Authority Board that the LGA Project be awarded to Genera, a subsidiary of NFE, a global energy infrastructure company with nearly 1,000 MW of power generation capacity currently operational or under construction or for which it provides fuel management services. NFE is also an affiliate of NFEnergía LLC, which has significant, direct experience with fuel management and power generation in Puerto Rico.

On August 25, 2022, following a process of more than 24 months, the Partnership Committee voted unanimously to recommend to the P3 Authority Board that Genera be selected to execute the O&M Agreement for the LGA Project. Additionally, on November 9, 2022, the Partnership Committee voted unanimously to approve a revised draft of the O&M Agreement, which revisions were made in response to comments received from PREB, as further described in Section 5.3 hereof (*PREB Comments to the Genera O&M Agreement*). As required by Section 9(g) of Act 29, the Partnership Committee has prepared this Report to describe the procedures followed in the procurement process for the award of the O&M Agreement and the reasons for its decision. In particular, this Report describes, pursuant to Section 9(g) of Act 29, the following considerations:

- the public policy, environmental compliance, social welfare, and economic development objectives the P3 Authority seeks to address through the implementation of the LGA Project;

- the process leading to the recommended award of the O&M Agreement, including the RFQ Process, the RFP Process, and the evaluation of Binding Proposals;

- the Partnership Committee's selection of Genera as the Preferred Proponent to engage in exclusive discussions and negotiations with the P3 Authority in connection with the LGA Project (the "**Preferred Proponent**");

- the determination that Genera's Binding Proposal is the most advantageous to the Government and the people of Puerto Rico following such exclusive negotiations;

- the Partnership Committee's rationale for recommending to the P3 Authority Board that the O&M Agreement be awarded to the Genera (the "**Recommended Award**"); and

- the core elements and key provisions of the O&M Agreement.

Act 29 provides the Partnership Committee with the authority to negotiate the terms of the O&M Agreement and PREPA with the authority to execute the O&M Agreement negotiated by the Partnership Committee with the Preferred Proponent, subject to (i) the approval of the Puerto Rico Energy Bureau ("**PREB**") created by Act 57-2014, as amended, to regulate, monitor, and enforce the energy public policy of the Government, (ii) the approval of the P3 Authority Board and the board of directors of PREPA, and (iii) the approval of the Governor of Puerto Rico or a delegate, in each case pursuant to the Regulation (the approvals described in clauses (i) through (iii) together, the "**Required Approvals**").

In addition, PREPA's authority to execute the O&M Agreement negotiated by the Partnership Committee with the Preferred Proponent is subject to the consent of the FOMB ("**FOMB Consent**") pursuant to the FOMB's contract review policy established pursuant to Section 204(b)(2) of PROMESA, which requires FOMB approval of all local Puerto Rico contracts with an expected value of $10 million or more in the aggregate.



Accordingly, the O&M Agreement was submitted to the relevant entities for the Required Approvals and to the FOMB for the FOMB Consent. Upon receipt of the Required Approvals and the FOMB Consent, as well as the execution of the O&M Agreement, this Report will be (i) filed with the Office of the Clerk of the House of Representatives and of the Senate of the Legislative Assembly of the Commonwealth of Puerto Rico (the "**Legislature**") and (ii) published on the P3 Authority's website at: www.p3.pr.gov.

Throughout the procurement process for the LGA Project, the P3 Authority and the Partnership Committee have received advice from various consultants to the P3 Authority, the Puerto Rico Fiscal Agency and Financial Advisory Authority (known by its Spanish acronym "**AAFAF**"), PREPA, and the FOMB (the "**Consultants**").[3] In addition, the FOMB has been actively involved in each stage of the procurement process through the participation of its Director of Infrastructure and/or its financial Consultants (together, the "**FOMB Representatives**"), and in all meetings and other interactions with Proponents.

This Report has been prepared by the Partnership Committee and is divided into five main sections:

- this introduction;
- a summary of the LGA Project background and objectives;
- a summary of the procurement process;
- a summary of the selection process and key considerations relevant to the Recommended Award; and
- a conclusion.

---

[3]  Cleary, Gottlieb, Steen & Hamilton LLP ("**Cleary**"), FTI Consulting, Inc. ("**FTI**"), Pietrantoni Mendez & Alvarez LLC ("**PMA**," and together with Cleary and FTI, the "**P3 Consultants**"), CPM P.R. LLC ("**CPM**"), Baker, Donelson, Bearman, Caldwell & Berkowitz, PC ("**Baker Donelson**")were Consultants to the P3 Authority. Cleary and PMA provided legal advice. FTI provided technical and certain financial advice. CPM provided advice in the procurement process. Baker Donelson provided advice on matters related to federal funding. OMM provided advise on matters related to the Title III process. Citigroup Global Markets Inc. ("**Citigroup**"), Nixon Peabody LLP ("**Nixon**"), and Proskauer Rose LLP ("**Proskauer**") were Consultants to the FOMB and participated in the LGA Project on behalf of the FOMB. Citigroup provided financial advice. Nixon provided advice on tax-related matters, including with respect to ensuring that the O&M Agreement is a qualified management agreement. Proskauer provided advise related to labor matters. Ankura Consulting Group, LLC was a Consultant to PREPA and AAFAF, and provided certain technical and financial advice related to the Legacy Generation Assets and compliance with the fiscal plan. Hogan Lovells US LLP provided advice on environmental law. Finally, certain other Consultants provided advice from time to time on various specific elements of the LGA Project.



# 3. Project Background and Objectives

This page has been intentionally left blank.



## 3.1 Project Background

### 3.1.1 PREPA and the Legacy Generation Assets

PREPA is a public corporation and instrumentality of the Government, created pursuant to the PREPA Enabling Act, Act No. 83-1941, as amended. Its purpose is to provide electric power in a reliable manner, contribute to the general welfare and the sustainable development of Puerto Rico, and maximize the benefits while minimizing the social, environmental, and economic impacts of electric energy generation and distribution. As the sole electric utility in Puerto Rico, PREPA (currently through the T&D Operator) provides electricity to approximately 1.5 million customers, making it one of the largest U.S. public utilities by customers served.

PREPA's Legacy Generation Assets consist of base-load generation plants, peaking and emergency generation plants. In addition, at the large generation complexes, there are also black start combustion turbines that also serve as peaking plants on occasion. Some of these black start units are currently not operable and are scheduled for replacement under the mitigation program of the Federal Emergency Management Agency ("**FEMA**") in the near term. The Legacy Generation Assets are dependent mostly on, diesel (number 2 fuel oil) and number 6 fuel oil, with some units also dependent on natural gas. Although these plants have a total installed capacity of approximately 4,785 MW, their dependable capacity is approximately 3,600 MW as a result of certain units being indefinitely out of service or in need of significant repair for various reasons.

NFEnergía LLC completed the conversion at the San Juan base-load generation plant of combustion turbine units 5 & 6 ("**San Juan Unit 5**" and "**San Juan Unit 6**") from oil to dual fuel capability. As a result, both units are now capable and commissioned to burn natural gas or diesel (number 2 fuel oil). This conversion was

implemented in conjunction with the adjacent development of an NFEnergía LLC-owned and operated liquified natural gas import facility and other gas infrastructure that supply San Juan Unit 5 and San Juan Unit 6.

Because of (i) the age and the inefficient heat rates of the Legacy Generation Assets, (ii) the Environmental Protection Agency's ("**EPA**") Mercury and Air Toxics Standards ("**MATS**") requirements, and (iii) the requirements of Puerto Rico's energy public policy and the IRP, PREPA intends to retire and decommission most of the Legacy Generation Assets. Certain of the Legacy Generation Assets may be needed for interim operating periods, as determined by the needs of the T&D System and the timing of new, modern and renewable replacement generation sources, which will be developed through PPPs and in accordance with the parameters set forth in the IRP. Further, in accordance with the IRP, no capital expenditures by PREPA or a private partner that would extend the useful life of a Legacy Generation Asset are anticipated.

PREPA's current priorities are focused on improving safe and reliable electric service, reducing energy costs, and protecting the environment. Strategies to achieve these objectives include:

- reducing operating expenses;
- increasing efficiency;
- optimizing the availability of the baseload Legacy Generation Assets;
- diversifying energy sources and reducing reliance on fossil fuels
- increasing environmental compliance; and
- maximizing the use of advanced and renewable technologies.



### 3.1.2 Recent Challenges

PREPA has faced a number of significant challenges in recent years, including:

- a lack of managerial continuity and long-term planning, notably six people filling the role of executive director in three years;

- a bankruptcy-like process (*i.e.*, the Title III process) due to unmanageable balance sheet liabilities, including bond debt and pension obligations, which has led, among other things, to an inability to access credit markets for long term capital investment;

- a dated electrical generation and T&D System that is in a challenged condition due, in part, to the impact of major weather events including hurricanes and earthquakes, substandard practices, and chronic infrastructure under investment (due in large part to budget constraints imposed by the aforementioned liabilities);

- the geographic mismatch between supply and demand — much of the generation is located on the south side of the island while a majority of the demand has increasingly developed on the north side of the island, exacerbating the fragility and instability of the whole system;

- an aged and aging generation fleet that is expensive, inefficient, inflexible, and heavily reliant on historically costly fossil fuels; and

- a lack of credibility among major stakeholders.

Puerto Rico's dated and fragile electric system, which has received limited investment and corrective maintenance as a result of budget constraints, has faced significant operational and reliability challenges and has struggled to provide residents with reliable and affordable power, as evidenced by safety and reliability metrics below U.S. mainland and other island utility industry standards. PREPA's historical record of performance with respect to such metrics is described in more detail below.

*Safety* – Public and employee safety is a critical component to successful electric power plant operation. Eliminating hazards requires proper training and strict adherence to the rules and regulations set forth by the Occupational Safety and Health Administration ("**OSHA**"). OSHA requires the reporting of several metrics to evaluate and track the safety of an organization, including Incident Rate, which measures the number of safety-related incidents that are reported to OSHA scaled to workforce size, and number of fatalities, which measures job-related fatalities reported to OSHA.

Since 2003, PREPA's safety performance has been more than five times worse than the industry average. Incident Rates for T&D and generation on an annual basis have ranged from 11.0 to 19.0 and averaged approximately 15.0; this compares to a U.S. average for public power of approximately 4.92.[4]

---

[4] *American Public Power Association*, "Evaluation of Data Submitted to the American Public Power Association's 2020 Safety Awards of Excellence," 2020.



Figure 1 below shows PREPA's 2022 average year-to-date OSHA performance, indicating a Recordable Rate[5] of 4.6, compared to the industry average of 1.5[6], a Severity Rate of 17.7[7] and DART Rate[8] of 3.4, which are higher than the PREB benchmarks shown of a Recordable Rate of 1.8 and DART Rate of 0.9.

**FIGURE 1: PREPA GENERATION OSHA METRICS FOR 2022[9]**

| OSHA Metric | Sub-Group | FY 2022 Average | PREB Benchmark |
|---|---|---|---|
| **OSHA Recordable Rate** | Generation | 4.6 | 1.8 |
| **OSHA Fatality Rate** | Generation | 0 | 0 |
| **OSHA Severity Rate** | Generation | 17.7 | To be determined |
| **PSJA DART Rate** | Generation | 3.4 | .09 |

Thus, in 2022 PREPA's rate of recordable injury or illnesses has been over two and half times greater, and the rate of recordable injury or illnesses that resulted in days away from work, restricted work activity and/or job transfer has been **over three and a half times greater**, than the benchmarks established by PREB.

*Reliability* – The North American Electric Reliability Corporation ("**NERC**") initiated the Generation Availability Data System ("**GADS**") in 1982 to expand data collection activities that it began in 1963. Today, NERC's GADS maintains operating histories on more than 5,000 generating units in North America.

GADS is recognized as a valuable source of reliability information for total unit and major equipment groups and is widely used by industry analysts in a variety of applications. Through GADS, NERC collects information about and provides the FERC with an annual assessment of the performance of electric generating equipment. GADS also supports equipment reliability and availability analyses and other decision-making processes to the industry including informing O&M investment in order to improve plant performance.

GADS is a mandatory industry program for conventional generating units that are 20 MW and larger within NERC jurisdiction. PREPA's generating plants, although not under NERC jurisdiction,[10] have participated on a voluntary basis in GADS for many years. However, PREPA has not consistently followed the GADS data collection process in a rigorous way. Even so, recent analysis shows that the PREPA plants operate with Forced Outage **Rates up to five times worse** than the industry average.

---

[5] The "**Recordable Rate**" is a mathematical calculation that describes the number of employees per 100 full-time employees that have been involved in an OSHA-recordable injury or illness.

[6] *US Bureau of Labor Statistics, Incidence rates of nonfatal occupational injuries and illnesses by industry, fossil fuel electric power generation utilities,* NAICS code 221112, available at: https://www.bls.gov/home.htm.

[7] The "**Severity Rate**" is a mathematical calculation that describes the number of lost workdays experienced per 100 full-time employees as compared to the number of incidents experienced.

[8] The "**DART Rate**" (Days Away/Restricted or Transfer Rates) is a mathematical calculation that describes the number of recordable injuries and illnesses per 100 full-time employees that resulted in days away from work, restricted work activity and/or job transfer that a company has experienced in any given time frame.

[9] *PREB Benchmark per Resolution and Order, June 2021 - May 2022, 12-Month Metrics Summary,* August 18, 2022, available at: https://energia. pr.gov/wp-content/uploads/sites/7/2022/08/20220818-MI20190007-Resolution-and-Order.pdf.

[10] NERC is a not-for-profit international regulatory authority whose mission is to assure the effective and efficient reduction of risks to the reliability and security of the grid. NERC develops and enforces Reliability Standards; annually assesses seasonal and long-term reliability; monitors the bulk power system through system awareness; and educates, trains, and certifies industry personnel. NERC's area of responsibility spans the continental United States, Canada, and the northern portion of Baja California, Mexico. NERC is the Electric Reliability Organization (ERO) for North America, subject to oversight by the Federal Energy Regulatory Commission (FERC) and governmental authorities in Canada. NERC's jurisdiction includes users, owners, and operators of the bulk power system, which serves nearly 400 million people.



PREPA's generation plant performance from June 2019 to May 2022 is shown in Figure 2 below, highlighting underperformance in plant availability factor (at approximately 50% on average throughout the period) and plant Forced Outage Rates (approximately 25% on average versus the NERC North America average of approximately seven percent).

FIGURE 2: **PREPA GENERATION PLANT PERFORMANCE 2019 THROUGH 2022**[11]



With the PREPA generation plants performing at low Equivalent Availability Factors, and with Forced Outage Rates **over three and a half times greater** than the NERC North America average, the likelihood of forced outages leading to an interruption of the delivery of electricity to customers is heightened. **Indeed, some of these forced outages resulted in inadequate generation supply and significant loss of adequate power supply to meet customer demand**.

Increased and improved focus on the reliability of the Legacy Generation Assets is critical to reducing planned, forced and unplanned power outages. When there is insufficient power supply to meet demand, a large number of generation outages could result in load shed events, during which the operator of the T&D System must interrupt delivery of electricity to customers in order to prevent grid failures and more extended outages. It is believed that a third-party generation operator will be able to stabilize and reduce generation outages, allowing for higher power supply reliability.

*Generation Resource Adequacy* – Further, on August 30, 2022, the T&D Operator filed with PREB the results of a generation resource adequacy analysis it had performed, which concluded that:[12]

- Puerto Rico has inadequate supply resources to deliver reasonable system reliability to meet expected demand, thereby raising the risk of load shedding outages beyond industry standards.

- The loss of load expectation for Puerto Rico for 2023 was calculated to be 8.81 days per year, which is 88 times higher than the utility industry benchmark of 1 day in 10 years or 0.10 days per year. This means that on average it is expected that there will be 8.81 days per year when demand will not be met by generation supply in 2023.

---

[11] *See Request for Modification of Schedule for Filing System Data and Submission of Performance Metrics Report for June 2022 Subject: 22.07.29 Resumen Métricas*, available at: https://energia.pr.gov/en/dockets/?docket=nepr-mi-2019-0007.

[12] *Filing of Resource Adequacy Study prepared by LUMA*, available at: https://energia.pr.gov/wp-content/uploads/sites/7/2022/09/Motion-to-Submit-Lumas-Resource-Adequacy-Study-NEPR-MI-2022-0002.pdf.



- The risk of load shedding outages is partially the result of inadequate reliable generation power supply due to PREPA's unreliable, old and improperly maintained generation plants which account for 77% of Puerto Rico's thermal generation.

- In order to minimize the risk of generation outages, the following needs to be achieved: (i) attainment of 65% generation plant availability (as of today, PREPA's generation plant availability is 52%) and (ii) reduction of generation planned outage durations through significantly improved outage planning and execution (as of today, the duration of PREPA's generation planned outages are on average 20% longer than the original planned duration (compared to an industry average of less than 5%)).

*Environmental Compliance* – Additionally, PREPA has identified improving air quality by reducing harmful emissions as one of the most important challenges it faces with regard to the Legacy Generation Assets. Although the Legacy Generation Assets suffered comparatively minor damage from Irma and Maria, the Costa Sur base-load generation plant and two of the four Mayaguez peaking units sustained significant damage as a result of the January 7, 2020 earthquake, further demonstrating the vulnerability of the generation plants. Indeed, while Costa Sur Unit 5 returned to service in August 2020 and Costa Sur Unit 6 returned in December 2020, Costa Sur Unit 6 experienced a mechanical failure in August 2021 and remained out of service until December 2021. Combined with reduced generation from other natural gas power plants, the loss of Costa Sur Unit 5 and Costa Sur Unit 6 shifted Puerto Rico's power supply

for the first three months of 2020 to petroleum, which accounted for 60% of generation compared with 38% in 2019.[13]

Further, as discussed above, due to poor equipment conditions and the age of the units,[14] the Legacy Generation Assets have suffered above industry average equivalent forced outage rates. Reduced availability at base-load generation plants has led to an overreliance on peaking units, intended for operation only at times of peak demand, as effective base-load generation plants, resulting in increased usage of diesel fuel and higher costs. Limitations imposed for compliance with MATS, the United States Department of Justice ("**DOJ**") 1999 Consent Decree (the "**Consent Decree**"), which includes clean air and water compliance programs, and anticipated compliance with the National Ambient Air Quality Standards for sulfur dioxide further restrict the operation and efficient power generation of certain Legacy Generation Assets.

Finally, on September 18, 2022, Fiona struck Puerto Rico, a Category 1 storm that caused one of the largest rainfalls ever recorded during a hurricane from 12 to 30 inches. Almost five years after Irma and Maria and over two years after the earthquakes, which significantly impacted the Costa Sur Power Plant, the T&D Operator has assumed operation and management of the T&D System. However, the Legacy Generation Assets continue to operate at significantly lower capacity than their nameplate capacity and suffer from long-standing operational deficiencies and disrepair, resulting in load shed events and, in the aftermath of Fiona, delays in returning generation plants to service.

---

[13] U.S. Energy Information Administration, *Puerto Rico's electricity generation mix changed following early 2020 earthquakes* (June 24, 2020) https://www.eia.gov/todayinenergy/detail.php?id=44216.

[14] In particular, the units at Aguirre were initially operated in 1971 (Aguirre Unit 1) and 1972 (Aguirre Unit 2 and Aguirre gas turbine peaking units); at Costa Sur in 1962 (Costa Sur Unit 1, Costa Sur Unit 2, Costa Sur Unit 3 and Costa Sur Unit 4) and 1972 (Costa Sur Unit 5, Costa Sur Unit 6 and Costa Sur gas turbine peaking units); at Palo Seco in 1959 (Palo Seco Unit 1 and Palo Seco Unit 2), 1967 (Palo Seco Unit 3 and Palo Seco Unit 4) and 1972 (Palo Seco gas turbine peaking units); at San Juan in 1964 (San Juan Steam Unit 1, San Juan Steam Unit 2, and San Juan Steam Unit 3); at Daguao in 1972 (Daguao gas turbine peaking units); at Yabucoa in 1971 (Yabucoa gas turbine peaking units); at Jobos in 1971 (Jobos gas turbine peaking units); and at Vega Baja in 1971 (Vega Baja gas turbine peaking units).



### 3.1.3 Government Response



Against the backdrop of two devastating back-to-back hurricanes that intensified an economic and fiscal crisis, the Government sought to move forward in its economic and disaster recovery by investing in infrastructure, people, and the environment. In particular, Irma and Maria forced the Government to rethink how PREPA's power supply and delivery infrastructure should be managed and upgraded to ensure that it is better prepared for inevitable future weather events. A critical component of the transformation of the energy sector is the ability to bring to bear U.S. mainland and other international best industry practices to PREPA, as well as the expertise, experience, and know-how to design and execute on a transformation through managerial continuity and long-term planning.

Over the past decade, the Government has had success in bringing to bear such best industry practices, expertise, experience, and know-how to its infrastructure projects by entering into PPPs with private sector participants in other sectors pursuant to the framework set forth in Act 29. These include the long-term concession of toll roads PR-22 and PR-5 that was awarded in 2011 (the "**Toll Roads Project**"), the long term lease agreement for the Luis Muñoz Marin International Airport that was awarded in 2013 (the "**LMM Airport Project**"), the T&D O&M Project, and the Operation and Maintenance Agreement between the Puerto Rico Maritime Transport Authority (the "**MTA**"), HMS Ferries – Puerto Rico, LLC and HMS Ferries, Inc. to operate and maintain the MTA's ferry system, including the operation and maintenance of vessels and related facilities for the municipal ferry service provided in the key routes of Cataño-San Juan and Ceiba-Vieques-Culebra that was awarded in 2020 (the "**Ferries Project**"). In each of these cases, the Government sought to strike a balance between government and private sector participation through a mutually beneficial

contractual relationship that results in the efficient, effective, and affordable delivery of public goods and services to all people of Puerto Rico.

#### *Puerto Rico's Existing PPP Program*

For several years, Puerto Rico has been one of the few U.S. jurisdictions with an organized PPP program. Even before the enactment of the Transformation Act and the Regulation, the Government enacted Act 29 and promulgated the Regulation for the Procurement, Evaluation, Selection, Negotiation and Award of Participatory Public Private Partnerships Contracts under Act No. 29-2009, as amended (the "**Act 29 Regulation**"), in order to finance infrastructure projects and provide multiple public services.

By providing clarity, uniformity, and certainty with respect to PPP selection and contracting, Act 29 and the Act 29 Regulation comprise one of the most robust legal frameworks for PPPs in the Americas. In particular, Puerto Rico's PPP program is guided by the following five key components of a successful PPP program identified by the World Bank Group: clear public policy, strong legal framework, clear processes and *institutional responsibility*, responsible financial management, and good governance arrangements, each of which is described in more detail below.[15]

---

[15] World Bank Group; Private Infrastructure Advisory Facility; Asian Development Bank; Inter-American Development Bank; Multilateral Investment Fund. Public-Private Partnerships Reference Guide, version 3, 2017.

Project Project Background and Objectives



**Clear Public Policy** – Puerto Rico's PPP program clearly articulates (i) the Government's intent to use PPPs to deliver public services and (ii) the objectives, scope, and implementing principles of the PPP program.

**Strong Legal Framework** – Puerto Rico's PPP program is grounded in a strong legal framework that sets the rules and boundaries for how PPPs are implemented.

**Clear Processes and Institutional Responsibility** – Puerto Rico's PPP program provides a detailed, clear, and consistent process by which PPP projects are identified, developed, appraised, implemented, and managed, and sets forth the roles of different entities involved in that process.

**Responsible Financial Management** – Puerto Rico's PPP program requires responsible public financial management that ensures PPPs provide value without placing undue burden on future generations.

**Good Governance Arrangements** – Puerto Rico's PPP program provides for governance arrangements that allow other entities, such as auditing entities, the Legislature, and the public, to participate in PPP projects.

Act 29 provides that the public policy with respect to PPPs must be to maintain such controls as are necessary to protect the public interest, yet balance this need for controls with the profit-making purpose of any private operation. As described in Section 3.1.1 hereof (*PREPA and the Legacy Generation Assets*), the P3 Authority is a public corporation of the Government affiliated with AAFAF as part of the fiscal and economic component of the government of Puerto Rico. The P3 Authority is designated as the sole government entity authorized and responsible for implementing the Government's public policy on PPPs and for determining the functions, services, and facilities for which PPPs are to be established.[16]

Act 29 recognizes the need for PPPs to allow for the development of infrastructure and other projects by delegating the risks inherent to such development or service to the party that is best capable of assessing and managing such risks, improving services, creating new jobs, and developing Puerto Rico's economy and competitiveness. Likewise, these partnerships enable the Government to make infrastructure projects feasible when the funds needed to complete a project are not available in the public treasury.

The robustness of the Act 29 framework is evidenced by the success of the Toll Roads Project and the LMM Airport Project, T&D O&M Project and the Ferries Project. In fact, the P3 Authority was presented with the *Organization of the Year* – Public Sector award at the **P3 Awards 2021** international awards ceremony. *The Organization of the Year – Public Sector* award was presented to the P3 Authority for its ability to solidly lead and execute large-scale transformation projects, even in the face of unprecedented challenges such as the impact of hurricanes Irma and Maria, the earthquakes

---

[16] In addition, Act 29 expressly states that it is the public policy of the Government to favor and promote the establishment of PPPs and further authorizes all departments, agencies, public corporations, and instrumentalities, as well as municipalities and the legislative and judicial branches of the Government, to use the establishment of PPPs in accordance with the process specified therein. Act 29 also prohibits the Government from legislating to limit the powers or rights granted to the P3 Authority and partnering government entities, like PREPA, under Act 29 until the obligations under an executed PPP contract are satisfied.



of 2019 and 2020, a deteriorated fiscal situation, and the restrictions stemming from the pandemic, among others.

### The Toll Roads Project

The Toll Roads Project was initially structured as a 40-year concession agreement (the "**Toll Roads Agreement**") between Autopistas Metropolitanas de Puerto Rico LLC ("**Metropistas**"), a consortium composed by Goldman Sachs Infrastructure Partners and Abertis Infrastructures, and the Puerto Rico Highway and Transportation Authority ("**PRHTA**") for the maintenance and operation of two highways, PR-22 and PR-5. Pursuant to the Toll Roads Agreement, Metropistas made an up-front payment to PRHTA in the amount of $1.08 billion and committed to make certain investments to upgrade toll roads PR-22 and PR-5 and bring them to world-class standards. The Toll Roads Agreement provides that revenues generated by the toll roads belong to Metropistas. The Toll Roads Project was the first concession of its type successfully achieved in Puerto Rico and was internationally recognized as a successful PPP project, winning both Project Finance International's deal of the year in the Americas award and the American Road and Transportation Builders Association's project of the year award in 2011.

### The LMM Airport Project

The LMM Airport Project was structured as a 40-year lease agreement (the "**LMM Airport Agreement**") between the Puerto Rico Ports Authority ("**PRPA**") and Aerostar Airport Holdings LLC ("**Aerostar**"), a partnership between Grupo Aeropuertuario de Sureste S.A.B. de C.V. and Highstar Capital IV, L.P., to operate the Luis Muñoz Marin International Airport, the busiest airport in the Caribbean with the largest air cargo operation in Puerto Rico. Pursuant to the LMM Airport Agreement, Aerostar made an up-front payment to PRPA in the amount of $615 million, agreed to annual payments equal to a percentage of airport revenues, and committed to make certain investments to upgrade the airport facilities. Like in

the Toll Roads Project, the LMM Airport Agreement provides that revenues belong to Aerostar. The LMM Airport Project was the first PPP completed for an international airport under the Federal Aviation Administration Pilot Program and was also internationally recognized as a successful PPP project, winning Project Finance International's deal of the year award in 2013.

### The Ferries Project

The MTA Project was structured as a 23-year operation and maintenance agreement between MTA, HMS Ferries – Puerto Rico, LLC and HMS Ferries, Inc. to operate and maintain the MTA's ferry system, including the operation and maintenance of vessels and related facilities for the municipal ferry service provided in the key routes of Cataño-San Juan and Ceiba-Vieques-Culebra. The MTA Project was meant to ensure operational safety and quality of service provided to customers, modernize public services and build a stronger and more resilient infrastructure, introduce operational efficiencies, increase resources available for vessel maintenance and service improvement, and reduce in the public sector subsidy of the MTA's operations. The MTA Project O&M Agreement was signed on October 27, 2020. The MTA Project was also nominated for the *Project of the Year – Transportation*.

### Path Forward for the Electric System

In light of this successful track-record and the existing legal framework for PPPs in Puerto Rico, the Government decided to undertake a more radical transformation of Puerto Rico's electric system involving private sector participation. In doing so, the Government has sought solutions for the electric system that:

- are cost-effective and forward-looking;

- are resilient and built in accordance with codes, specifications, and standards consistent with mainland U.S. electric utilities;





### 3.1.4 Towards a Sustainable Transformation

From the outset, there were a number of factors that challenged the viability of both the T&D Project and the LGA Project, and the ability to attract private sector participation, including, among others:

- poor state of PREPA's energy infrastructure as a result of underinvestment;

- lack of access to capital markets due to complex financial restructuring process that PREPA is undertaking as a debtor under Title III; and

- corporate reorganization that PREPA needs to undergo in order to separate responsibility for the generation and T&D assets with a view towards creating a more efficient electric system for Puerto Rico.

Given this unique set of challenges facing PREPA and the general economic and fiscal difficulties that Puerto Rico is experiencing, procuring private sector expertise to transform the electric system could not occur in a vacuum. Instead, the Government pursued a multi-pronged strategy – involving a new legal framework, plans to modernize the energy sector, federal disaster assistance funding, and relief for PREPA's financial challenges – in order to create the right environment for positive and long-lasting change of the energy sector.

***Bolstering the Legal Framework***

The first element of a more thorough energy transformation was the adoption of legislation that would provide, among other things, for private sector participation in the transformation of the energy sector. The Government enacted the Transformation Act in June 2018 with the stated goal of transforming Puerto Rico's energy system into a modern, sustainable, reliable, efficient, cost effective, and resilient one pursuant to PPP or sale agreements with respect to the functions, services

- harness innovative thinking and best practices from around the world; and

- contribute to the greater economic development, revitalization, and growth of Puerto Rico (in alignment with broader Government efforts to achieve fiscal and economic stability).

PREPA's transformation process began with the approval of the Transformation Act and the P3 Authority's issuance of a Request for Qualifications for the T&D Project on October 31, 2018. The P3 Authority undertook a robust, competitive and transparent RFP Process to select a proponent, finalize a PPP contract and obtain all of the required regulatory approvals for the T&D Project. On June 22, 2020, the P3 Authority announced that PREPA had entered into the T&D O&M Agreement with the T&D Operator. Under the T&D O&M Agreement, the T&D Operator is responsible for operating, maintaining, and modernizing the T&D system.

The LGA Project that is the subject of this Report represents the next critical phase in PREPA's transformation process.



or facilities of PREPA (each such transaction, a "**PREPA Transaction**"). This new law, which provided the framework for the transformation of the energy sector, and the Regulation adopted thereunder, provide guidelines and procedures for, among other things:

- identifying the PREPA functions, services, or facilities for which PPPs will be established;

- identifying which PREPA assets related to energy generation will be sold or transferred through sale contracts or delegated to private operators through long-term operation and maintenance agreements;

- soliciting, obtaining, and evaluating proposals for PREPA Transactions;

- selecting the entities or individuals that will enter into transformation contracts with PREPA; and

- negotiating and awarding PPP contracts for PREPA Transactions.

The Transformation Act also set in motion the development of a new regulatory framework for the electric sector. A working group was created under the Transformation Act to develop a new energy public policy and regulatory framework, in consultation with the Southern States Energy Board and the U.S. Department of Energy, among others. Legislation to establish this new framework for Puerto Rico's energy sector, the Puerto Rico Energy Policy Act, Act No. 17-2019 (the "**Energy Policy Act**"), was signed into law on April 11, 2019. The Energy Policy Act formulates Puerto Rico's energy policy through 2050 and aims to set the parameters for a resilient, reliable, and robust energy system. In particular, the Energy Policy Act requires planning for greater resilience through the establishment of micro-grids, distributed and renewable generation, and underground distribution lines.

In addition, as part of the Government's public policy to achieve diversification of electricity

sources and energy technology infrastructure by reducing the dependence on fossil fuel-based energy sources, the Energy Policy Act (i) requires that at least 20% of PREPA's energy come from renewable sources by 2022, increasing to 40% by 2025 and 60% by 2040, and reaching 100% by 2050, and (ii) prohibits the production of energy through the combustion of coal and its derivatives as a source of generation beginning in 2028. The Energy Policy Act also confirms the role of PREB as the independent entity in charge of (A) regulating Puerto Rico's energy system with powers and duties to ensure fair, affordable, and reasonable costs through oversight and review of rates, and (B) supervising and enforcing Puerto Rico's energy policy.

Finally, the modernization of the regulatory framework has also taken a long-term view of the energy future of Puerto Rico. Pursuant to Act 57 requirements, PREPA prepared an integrated resource plan (the "**2019 IRP**") reflecting a detailed planning process considering all reasonable resources to satisfy the demand for electrical services over a 20-year planning horizon. PREPA's 2019 IRP, initially submitted on February 12, 2019, was developed by PREPA, with support from Siemens Power Technology, Inc., using a rigorous analytical process. It provided analysis and recommendations for PREPA's energy supply resources for the 20-year period from 2019 to 2038. The analyses set out in the 2019 IRP considered a large number of scenarios and incorporated input from PREPA and relevant stakeholders. Following a determination by PREB that the original submission was not fully in compliance with certain PREB regulations and prior orders, PREPA submitted a revised IRP on June 7, 2019.

On August 24, 2020, after a lengthy and thorough review process, PREB issued a Final Resolution and Order (the "**IRP Final Resolution and Order**") approving in part and rejecting in part the revised 2019 IRP. In the IRP Final Resolution and Order, PREB ordered the adoption and implementation of a modified action plan (the "**MAP**"), providing

a roadmap to realize PREPA's modernization goals. The MAP is based on the IRP Scenario 3, Case 2, rejecting the IRP's preferred resource plan (the Energy System Modernization Scenario or "ESM" scenario) following a determination that it did not demonstrate economic benefit relative to competing plans. Notwithstanding this, PREB found that the following five core elements of the Energy System Modernization Scenario should be retained as part of the MAP:

- timely retirement or conversion of older steam plant infrastructure into synchronous condensers;

- energy efficiency deployment to the maximum amount obtainable;

- maximum procurement of solar PV;

- procurement of battery energy storage to meet integration requirements for renewable energy generation; and

- hardening of the T&D system.

The MAP also depends on a combination of T&D system hardening and distributed resource deployment to ensure a resilient power system.

### Modernizing the Energy Sector

Given Puerto Rico's geographic location and susceptibility to extreme weather events, there has been a progressive focus on transitioning Puerto Rico's electric system towards cleaner renewable energy sources that by their nature support resiliency and guard against the devastating effects of another hurricane. Consistent with the Energy Policy Act and other applicable law, the IRP and the Electric Grid Modernization Plan for Puerto Rico (the "**GMP**") contemplate transforming the energy system through the incorporation of more renewables, micro-grids, and distributed energy resources, which will ultimately drive economic opportunities and customer well being.



The GMP was developed by the Central Office for Recovery and Reconstruction ("**COR3**") and the P3 Authority, in conjunction with PREPA, to provide a roadmap for the implementation of projects to transform the energy system through a detailed action plan tailored to Puerto Rico. The GMP adds granularity to the Government's vision to transform the electric system and sets the foundation for turning this vision into action with a view towards achieving a modernized, standardized, resilient, and distributed electric system in Puerto Rico, in accordance with the public policy set forth by the Transformation Act and the Energy Policy Act.

The programs and initiatives set forth in the GMP are guided by the following five core pillars for permanent reconstruction set forth in the Transformation Act and the Energy Policy Act: *customer-centricity, resiliency, reliability, affordability, and sustainability,* each of which is described in more detail below.



**Resiliency** – The GMP is centered on the concept of achieving an electric system that is able to adequately withstand future extreme weather and man-made events. As stated in the GMP, this requires continuous improvement of PREPA's emergency preparedness capabilities, including measures to support effective preparation for, management of, and timely recovery from major weather events.

**Reliability** – The GMP seeks to transform the electric system such that it provides best-in-class and reliable electric service, which is essential for all residents' well-being and economic development. Best-in-class power service requires meeting the growing demands of electricity users. The GMP contemplates increasing the reliability of the generation assets by engaging a third-party operator to take responsibility for operating and maintaining the existing units until they are retired.

**Affordability** – The GMP seeks to (i) transform the electric system to provide electric service at a cost that is reasonable to all residents and businesses by maximizing operational efficiency and financial stability in running the utility and (ii) minimize the cost of supply, and reduce the dependence on imported fuels (and the associated volatility), in order to support affordable rates while remaining in line with the core pillars of resiliency and reliability.

**Sustainability** – The GMP is centered on the concept of achieving a safe electric system that is a leader in environmental stewardship. This requires not only a trained and engaged workforce, but also a transition from an electric system centered on fossil fuels to one in which renewable resources play a central role.

### Securing Federal Funding

Another key component of the energy transformation involves the Government's efforts to secure federal disaster assistance funding to help rebuild Puerto Rico in the aftermath of Irma and Maria. These efforts have been essential not only to the recovery of Puerto Rico, but also to the ability to attract private sector investment. Market participants interested in contributing to PREPA's transformation have consistently stressed the importance of securing the federal government's support for the transformation efforts, particularly federal recovery funding.

In order to effectively procure and deploy Puerto Rico's federal funding needs, the Government has established a robust, centralized organizational framework that promotes transparency, governance, and accountability. The COR3 serves as the nerve center of this effort. COR3 is based on similar agencies that have been successfully deployed in post-disaster situations by other U.S. jurisdictions, including New York, New Jersey, and Louisiana. COR3 has been responsible for, among other things, (i) overseeing public and private sector efforts related to financial management of recovery funds, (ii) sub recipient monitoring, (iii) providing training and technical assistance, (iv) performing internal





auditing, and (v) conducting the reimbursement review process. Through these efforts, the Government was able to secure emergency supplemental appropriations of over $36 billion for the recovery and reconstruction of Puerto Rico. Of this amount, it is estimated that a large portion will be appropriated for the energy system, based on eligible work, though a relatively small portion will be appropriated for generation projects.

In February 2020, FEMA published the Public Assistance Alternative Procedures (Section 428) Guide for Permanent Work (FEMA-4339-DR-PR) (February 2020) (the "**428 Guide**"). The 428 Guide is applicable to large permanent work projects in Puerto Rico for critical service facilities and provides that cost estimates for funding eligible projects will be developed by FEMA. Certain cost estimates may be subject to validation by a third-party independent expert panel (the "**Expert Panel**"). The United States Army Corps of Engineers (USACE) Cost Engineering Center of Expertise acts as the Expert Panel under the 428

Guide. Expert Panel review is available under certain circumstances, including, among others, at an applicant's request for projects with a cost estimate greater than $5 million. Allowable costs for estimates include architectural, engineering, environmental review and design fees, construction, other restoration and reconstruction costs, hazard mitigation, and direct administrative costs.

To support its work, COR3 hired various third-party experts with extensive global experience in disaster recovery and reconstruction efforts, including experts with experience in (i) project formulation and grant management, (ii) technology solutions, software development, and report and data management, (iii) strategy, compliance, and financial management, and (iv) energy-related matters.

### 3.1.5  Addressing Fiscal Challenges[17]

The final critical component of the energy transformation involves the Government's strategy for tackling the fiscal crisis that Puerto

---

[17]  **NTD**: Subject to update by consultant.



Rico and its public corporations have been facing. Although PREPA has been struggling since 2014, recognizing the delicate and declining fiscal condition of Puerto Rico, the U.S. Congress enacted PROMESA in 2016. PROMESA provides a series of mechanisms to achieve fiscal and budgetary balance and restore access to the capital markets to spur the revitalization of infrastructure in Puerto Rico. PROMESA also established the FOMB, which is tasked with working with the Government and the people of Puerto Rico to create the necessary foundation for economic growth.

On May 3, 2017, the FOMB filed a petition for relief under Title III of PROMESA for the Commonwealth of Puerto Rico in the United States District Court for the District of Puerto Rico (the "**Title III Court**"). On January 18, 2022, the Title III Court entered orders confirming the Commonwealth Plan of Adjustment. On March 15, 2022, the conditions precedent to effectiveness of the Commonwealth Plan of Adjustment were satisfied. Accordingly, the Commonwealth Plan of Adjustment has been confirmed and is currently effective as of today. The Commonwealth Plan of Adjustment reduced Puerto Rico's total funded debt obligations from approximately $34.3 billion of prepetition debt to approximately $7.4 billion, representing a total debt reduction of 78%. All of the legacy Puerto Rico general obligation bonds, ERS bonds, and PBA bonds were discharged, and all of the related Puerto Rico, ERS, and PBA obligations and guarantees were discharged. In addition, all Puerto Rico laws that required the transfer of funds from the Commonwealth to other entities have been deemed preempted, and Puerto Rico has no obligation to transfer additional amounts pursuant to those laws. Importantly, effectuating the Commonwealth Plan of Adjustment provides a path for Puerto Rico to access the credit markets and develop balanced annual budgets.

In July 2017, the FOMB further filed a petition for relief under Title III on behalf of PREPA in order to begin the process of addressing PREPA's significant debt obligations and operational challenges. The filing resulted in an automatic stay of collection efforts against PREPA for prepetition debts. Restructuring PREPA's legacy obligations is a key component of Puerto Rico's energy transformation and its successful conclusion will pave the way for a resilient, reliable, and affordable energy system. The Title III process has also allowed the Government, including the P3 Authority, to work closely with the FOMB and its Consultants on transformation efforts. The process to restructure PREPA's debts is still ongoing. The Title III Court has recently issued orders staying a motion of PREPA's bondholders to dismiss PREPA's Title III Case or to lift the automatic stay to appoint a receiver. Instead, the Court set a schedule for litigation over whether PREPA's bondholders' claims are secured by PREPA's revenues or secured solely by amounts in PREPA bond trustee-held accounts. Moreover, the Title III Court has ordered the FOMB to file by December 16, 2022: (i) a proposed plan of adjustment for PREPA and accompanying disclosure statement and (ii) a proposed confirmation schedule contemplating a July 2023 confirmation hearing. This deadline shall be automatically extended through December 21, 2022 if the FOMB advises the mediators and the bondholders by December 16, 2022 that it would make a material change in position. In addition, the Court has ordered PREPA and its creditors to continue mediation in parallel with the litigation and plan schedule with the goal of achieving a global, consensual resolution to PREPA's Title III case.



## 3.2  Project Objectives

The Government's overarching mission is to transform Puerto Rico's energy system into a modern, sustainable, reliable, efficient, cost effective, and resilient one. Consistent with the foregoing, the LGA Project is intended to achieve the following objectives for the Legacy Generation Assets:

- introduce private sector operational expertise;

- facilitate managerial continuity of long-term planning;

- improve certainty and self-development for employees;

- implement improvements in the safety, reliability, power quality and efficiency of the Legacy Generation Asset operations;

- facilitate Puerto Rico's transition to PREPA's Vision for the Future of Power in Puerto Rico described in the IRP;

- implement operational excellence of electricity generation facilities consistent with prudent industry practices, including improved safety and compliance with environmental and other applicable regulatory requirements; and

- increase cost efficiency while achieving the operational objectives noted above in coordination with the T&D Operator.

The Government determined that these objectives would be best achieved through a PPP with a world class private operator that would be able to bring to bear its experience and expertise and best practices from the U.S. mainland and other jurisdictions. The private operator would need to have the appropriate experience managing power generation operations, as well the technical, operational, and financial wherewithal to successfully

operate the Legacy Generation Assets. More specifically, potential private partners would have to demonstrate: (i) capability and experience operating, maintaining, managing and undertaking selected maintenance capital projects as needed for thermal generation facilities with capacity in excess of 100 MW, which operate on natural gas and/or fuel oil; (ii) financial stability and resources; (iii) strong technical expertise, with a track record of high-quality safe and reliable operations; and (iv) experience and demonstrated ability to manage a largely Spanish-speaking workforce.

Consistent with the principles set forth in Section 204(b)(2) of PROMESA, the LGA Project is intended to "promote market competition" by harnessing private sector creativity and resources to help fully deliver on the economic, infrastructure, and societal goals identified by the Government. Furthermore, the LGA Project is consistent and compliant with the Certified PREPA Fiscal Plan. The Certified PREPA Fiscal Plan describes the LGA Project as one of the major transformation initiatives to be implemented in order to boost generation efficiency and productivity, as well as environmental compliance, resulting in increased affordability of electricity and improved reliability of services, and ensuring adherence to environmental and sustainability standards. **As stated in the Certified PREPA Fiscal Plan, Puerto Rico's economic recovery "depends on a comprehensive and overdue transformation of its energy sector" and the Certified PREPA Fiscal Plan "provide[s] the roadmap to complete the island's energy system transformation."**

As further described in this Report, the procurement process was undertaken with various goals in mind. First, the Government was keenly focused on implementing a robust, competitive, and transparent procurement process to identify the private partner best positioned to accomplish the LGA Project's

Project Project Background and Objectives



objectives. Second, from its inception, the procurement process was carried out in coordination with the FOMB and its advisors, given the importance of aligning the process with the efforts to address PREPA's financial challenges and aligning the LGA Project with the Certified Fiscal Plans of both PREPA and the Government. Both fiscal plans require the transformation of Puerto Rico's energy sector and acknowledge the importance of promoting reliable, affordable, and cost efficient energy service. The energy transformation is also expected to spur economic growth and help sustain an adequate tax base. Third, throughout the procurement process, the P3 Authority was in communication with PREB to keep it abreast of developments and facilitate its review of the O&M Agreement to determine its compliance with the energy public policy and the regulatory framework. Fourth, given the importance of compliance with environmental law in the operation of the Legacy Generation Assets, the procurement process involved frequent discussions regarding environmental matters, including the Consent Decree, and relevant applicable laws, with the Proponents, as well as communications with the EPA and the DOJ.





# 4. Procurement Process

This page has been intentionally left blank.

Procurement Process

# 4.1  Partnership Committee

Act 29 and the Regulation require that the P3 Authority establish a Partnership Committee for each PPP project. Accordingly, the P3 Authority established the Partnership Committee for the LGA Project on July 13, 2020. Pursuant to Section 5(c) of the Transformation Act, the P3 Authority must designate a Partnership Committee (as required by Act 29) to evaluate and select qualified Proponents and to establish and negotiate the terms of the O&M Agreement. Section 3.2 of the Regulation requires that the Partnership Committee be composed of:

- the executive director of the AAFAF or his/her delegate;

- a PREPA officer directly involved with the LGA Project or his/her delegate;

- one member of the board of directors of PREPA, his/her delegate, or an official thereof selected by the P3 Authority Board based on him/her having specialized knowledge pertinent to the project under consideration by the relevant partnership committee; and

- two officials from any government entity chosen by the P3 Authority Board for their knowledge and experience in the type of project under consideration by the relevant partnership committee.

As of the date of the Recommended Award, and pursuant to the requirements summarized in the paragraph above, the Partnership Committee was comprised of the following individuals:

- **Omar Marrero, Esq., Executive Director & Chairman of AAFAF; Secretary of State of the Government of Puerto Rico;**

- **Josué A. Colón Ortiz, PE, Executive Director of PREPA;**

- **Fernando Gil-Enseñat, Chairman of Governing Board of PREPA;**

- **Edison Avilés Deliz, PE, Esq., Chairman of the PREB; and**

- **Gerardo Lorán-Butrón, Esq., Special Advisor & Chief Officer for Public Corporations of AAFAF and member of the Governing Board of PREPA.**

Omar Marrero, Edison Avilés Deliz, and Gerardo Lorán-Butrón have been members of the Partnership Committee since it was first established by the P3 Authority.

As a result of his appointment as Chairman of the Governing Board of PREPA, Fernando Gil-Enseñat became a member of the Partnership Committee on September 29, 2021, replacing Ralph Kreil Rivera, who resigned from the Governing Board of PREPA.

As a result of his election as PREPA's executive director on October 13, 2021, Josué Colón became a member of the Partnership Committee, replacing Efrán Paredes Maisonet who previously served as the Executive Director of PREPA.

David K. Owens, a member of the Governing Board of PREPA, attended and participated in meetings of the Partnership Committee given his experience and knowledge in electric generation, including serving previously as the Vice President of the Edison Electric Institute, but did not vote on any resolutions.

Pursuant to Section 8 of Act 29, the Partnership Committee is responsible for the overall management of the process for the award of the LGA Project and determining the Recommended Award, including:



- engaging, or requesting that AAFAF engage, advisors, experts, or consultants on behalf of PREPA;

- approving documents prepared and distributed in connection with the RFQ Process and the RFP Process;

- evaluating and qualifying the SOQs submitted in response to the RFQ by the 15 Respondents that participated in the RFQ Process;

- inviting the qualified Respondents to participate in the RFP Process;

- engaging in, or supervising, the negotiation of the terms and conditions of the O&M Agreement with the Proponents;

- evaluating the Binding Proposals submitted by the two Proponents and selecting the one that meets the requirements of the RFP and better serves the goals of the LGA Project;

- preparing this Report and submitting the O&M Agreement for the Required Approvals; and

- overseeing proper compliance with the procedures established for the negotiation of the O&M Agreement, the determination of the Recommended Award, and the execution of the final O&M Agreement, including those requirements set forth in Act 29, the Transformation Act, and the Regulation.



## 4.2  Market Sounding

In December 2019, as the P3A Authority was evaluating the proposals submitted in response to the T&D RFP, the Government continued its effort to transform and revitalize Puerto Rico's energy system by conducting a market sounding process for the transformation of PREPA-owned generation assets. Advisors to the Government, including the P3 Authority, AAFAF and PREPA, together with the FOMB, issued a letter soliciting private sector feedback on participation in potential generation-focused transactions, with the stated objectives of delivering low-cost electricity to ratepayers of Puerto Rico, increasing energy resiliency and reliability, deploying new technologies, investment and financial strength, and exercising industry best-practices and operational excellence. The market sounding also requested feedback on potential transaction structures for the participation of the private sector in the Legacy Generation Assets. The potential transaction structures included acquisition of all or a portion of PREPA's generation fleet, the provision of O&M services to all or a portion of PREPA's generation fleet, and investing in new generation facilities and/or other capital investments in PREPA's generation fleet.

The market sounding indicated initial substantial interest in the LGA Project, and the Government received 14 responses. Respondents included (i) third party providers of O&M services for power plants, (ii) energy companies with experience in power-related infrastructure, and (iii) non-conforming responses that expressed interest only in developing new energy and/or infrastructure projects. Respondents provided generally consistent feedback on a number of key items. Most of the respondents:

• supported a single operator rather than multiple operator model for the operation of the generation assets, due to the efficiencies and synergies of leveraging resources across the fleet;

• did not opine on a preferred structure, but some suggested sale of the generation assets with

private generation owners would be the best approach;

• for those respondents interested in private ownership of the generation assets, most conditioned that interest in the ability to have development rights and deploy capital to upgrade or replace all or a subset of the acquired generation assets;

• stressed the importance of sufficient time for diligence (at least six months) and the urgency of engaging a private partner as soon as possible to prevent further degradation of the generation assets; and

• those respondents interested in private ownership and development also expressed concern regarding the creditworthiness of the Government counterparty, indicating the need for either a strong repayment guarantee or a payment structure where payments to the private partner would be senior to debt payments.

In addition, the respondents proposed various structures for fuel delivery and expressed varying willingness to assume environmental liabilities, in each case dependent on whether the transaction structure was the provision of O&M services or the acquisition of the generation assets.



## 4.3  Qualification Process

On August 10, 2020, the P3 Authority issued the RFQ pursuant to Section 5 of the Transformation Act and Section 3 of Act 29. Pursuant to Section 1.4 of the RFQ, the objective of the RFQ was to enable the Partnership Committee to identify the Respondents qualified to participate in the RFP Process based on their SOQs, which were due on September 15, 2020 (the "**SOQ Submission Deadline**").

Section 3 of the RFQ provided that the RFQ Process sought SOQs from companies or consortia that demonstrated, among other things:

- concurrent operation and maintenance of either (i) two or more oil and/or gas-fired generating facilities larger than 100 MW, or (ii) a fleet of at least 1,000 MW combined of oil and/or gas-fired generating facilities;

- repair and/or replacement of oil and/or gas-fired generating equipment;

- experience with execution or oversight of plant decommissioning, including the procurement of qualified subcontractors to decommission power generation facilities;

- demonstrated ability to safely operate similar technology generation facilities and managing outages and maintenance programs in order to achieve the operating objectives of the T&D Operator;

- management of fuel supply for similar or similarly situated generating facilities, including delivery and storage and fuel quality testing;

- locations where the Respondent or subcontractors have performed similar work as described above;

- certification of no significant or sustained environmental regulation violations or OSHA fines/violations; and

- demonstrable history of compliance with energy related policies, practices, and regulations from a state, commission, or other regulatory body.

As set forth in Section 2.3 of the RFQ, the RFQ contemplated PREPA entering into one or more long-term public-private partnership contracts with one or more private partners, the precise structure of which was still to be determined but pursuant to which (i) PREPA would (x) retain ownership of and title to all assets of the Legacy Generation Assets and (y) delegate oversight rights and responsibilities to the P3 Authority in its capacity as the Administrator of such contract (the "**Administrator**"), and (ii) the applicable private partner would assume all rights and responsibilities related to the operation, maintenance, and management of some or all of the Legacy Generation Assets, including:

- day-to-day operation services, including start-up, load variations, active follow-up of operating parameters and alarms, shutdown of the plants or units thereof;

- identifying, justifying and managing any required maintenance capital expenditures;

- hiring, training, and supervising personnel;

- providing routine inspections and operating tests of the Legacy Generation Assets;

- provisioning, storing and maintaining the inventory of any necessary spare and consumable parts for the Legacy Generation Assets;

- establishing and maintaining a computerized maintenance management system for the Legacy Generation Assets;



- performing scheduled and emergency maintenance, repair and replacement of equipment, including any balance of plant equipment;

- managing outages and restoring power;

- coordinating emergency planning and storm restoration and recovery;

- procuring and managing water or power supply, if applicable;

- procuring, as well as managing, the delivery and quality testing of fuel, including natural gas, diesel (number 2 fuel oil) and number 6 fuel oil (including logistics, fuel testing and storage tank management), if applicable, as an agent for PREPA;

- liaising with PREPA, the T&D Operator or any of their assignees or successors regarding dispatch and related T&D System matters and providing required information;

- interfacing with regulators including PREB and environmental compliance agencies as required;

- obtaining and maintaining licenses, permits and consents, as necessary;

- preparing for and assisting in, or subcontracting for and overseeing, the decommissioning of the relevant plants as outlined in the IRP and in coordination with PREPA, the T&D Operator and PREB;

- participating in emergency planning and drills led by the T&D Operator, as needed; and

- assisting with the transition of the plants to third parties to the extent certain of the plants are removed from the PPP contract.

In addition to performing the services typically performed by an operator of multiple generation assets, the RFQ contemplated that the applicable private partner would perform the decommissioning and retirement of the Legacy Generation Assets in accordance with the IRP. Certain of the Legacy Generation Assets may be needed for interim operating periods, as determined by the needs of the T&D System and the timing of new, modern and renewable replacement generation sources, which will be developed through PPPs and in accordance with the parameters set forth in the IRP. However, the LGA Project did not provide for new generation sources to be developed, owned, operated or maintained by the Operator. Further, in accordance with the IRP, no capital expenditures by PREPA or a private partner that would extend the useful life of a Legacy Generation Asset was anticipated. The rights and responsibilities for any Legacy Generation Assets that have not been decommissioned and retired by the expiration or early termination of the Contract Term would be transferred back to PREPA or to a successor operator. The RFQ provided that the compensation structure under the PPP contract(s) would be described in the RFP.[18]

Pursuant to Section 1.9 of the RFQ, Respondents were able to submit any requests for clarifications ("**RFCs**") they had with respect to the contents of the RFQ (each such RFC, an "**RFQ-RFC**") to the P3 Authority prior to August 31, 2020. On September 8, 2020, the P3 Authority issued responses to the RFQ-RFCs submitted by Respondents pursuant to the process established in Section 5.4 of the Regulation. The RFQ and the P3 Authority's responses to such RFQ-RFCs are available on the P3 Authority's website (www.p3.pr.gov).

On or before the SOQ Submission Deadline, the P3 Authority received 15 SOQs from the following Respondents:

- Abengoa-NTPC Consortium;
- Beowulf Energy LLC;
- Consolidated Asset Management Services, LLC;

---

[18] For more information on the RFQ Process please see the RFQ attached as Exhibit C hereto (*Request for Qualifications*).



- EcoEléctrica;
- EGE Haina;
- Enatura (SPEV Consortium);
- EthosEnergy;
- Excel Contractors, Inc.;
- Genera, the surviving entity after its merger with Encanto Power[19];
- Mitsubishi Power Americas, Inc.;
- NAES;
- NRG Energy Services;
- ProEnergy;
- PW Power Systems LLC; and
- Siemens.

Pursuant to Section 8(b) of Act 29 and Section 3.4 of the Regulation, the Partnership Committee evaluated each SOQ based on the requirements set forth in the RFQ. Specifically, the Partnership Committee considered the extent to which Respondents satisfied the evaluation criteria established in Section 3 of the RFQ based on scorecards established by the Consultants.

On October 13, 2020, the Partnership Committee met to analyze the information contained in the SOQs and score the SOQs. On October 22, 2020, based on the information included in the SOQs, the following entities were selected to participate in the RFP Process:[20][21]

**EcoEléctrica** is a Bermuda limited partnership formed on August 10, 1994 and is duly organized to do business in Puerto Rico to develop, design, finance, construct, own and operate a combined cycle natural gas-fired cogeneration facility, a liquified natural gas import terminal and storage facility, a desalination plant and other auxiliary assets. EcoEléctrica operates a 548 MW combined cycle and liquified natural gas terminal facility in Puerto Rico. Global Power Generation, S.A. of Grupo Naturgy and Engie Invest International S.A., the subsidiaries of EcoEléctrica's owners, Naturgy Energy Group S.A. and Engie S.A. were Team Members in the SOQ. Naturgy Energy Group S.A. is a multinational energy group that holds a large position in the gas sector and also has a presence in the electricity industry, being the largest integrated gas and electricity company in Spain. Global Power Generation, S.A., a subsidiary of Naturgy Energy Group S.A., was incorporated in 2014 to channel international generation activity, encompassing over 4 GW in operation with various technologies in seven different countries. Engie S.A. is a global energy player with operations in close to 70 countries on five continents. Engie S.A. is a corporation incorporated in the Duchy of Luxembourg. Engie S.A. has 115.3 GW of installed generating capacity. Engie S.A. has experience in managing and handling fuel supply of various types including natural gas, coal and diesel.

---

[19] On December 21, 2021 Encanto Power LLC merged with and into Genera PR LLC, with Genera PR LLC continuing as the surviving limited liability company. The merger became effective on November 22, 2022, the date on which the sole member of Encanto Power LLC ratified the merger. Encanto Power LLC submitted the SOQ, while Genera PR LLC submitted the Binding Proposal.

[20] For more information on the Respondents and the RFQ Process please see the report titled "Qualifications Analysis and Shortlist Report" attached as Exhibit D hereto (*Qualification Analysis and Shortlist Report*).

[21] The following description of the qualified Respondents was derived from their respective SOQs. Experience data and statistics are accurate as of the SOQ Submission Deadline.

Procurement Process



**EGE Haina** was founded under the Public Enterprise Reform Law on October 28th, 1999 in the Dominican Republic. It is a Public-Private Partnership between the Dominican Government and the private sector, 50% owned by the Haina Investment Company, the controlling partner, 49.99% owned by the Dominican government and 0.01% owned by private individuals. EGE Haina is the largest electricity generator in the Dominican Republic with operations of over 1,000 MW. The mix of fuels for the plants it operates consists of coal, gas and some liquid fuels. Besides its own generation, EGE Haina has experience performing O&M services on third-party power plants totaling

**EthosEnergy** is a private limited company organized in Scotland and a joint venture between two leading energy service companies, Siemens AG and Wood PLC (formerly Wood Group). EthosEnergy's capitalization is a combination of shareholder equity and debt, with Wood as 51% shareholder and Siemens AG as 49% shareholder. EthosEnergy is an independent service provider of rotating equipment services and solutions to the power, oil and gas, and industrial markets in over 100 countries. EthosEnergy has experience operating over 90 facilities totaling over 38 GW of power generation capacity. EthosEnergy has OEM-equivalent capabilities to support gas and steam turbines, compressors, and generators within power and cogeneration facilities, and is a manufacturer of transformers.

**Genera** – Each of Encanto Power and Genera is a Puerto Rico limited liability company and a wholly-owned subsidiary of NFE (NASDAQ: NFE). During the RFP Process, Encanto Power merged with and into Genera, with Genera continuing as the surviving entity. PIC Group was included as a Team Member in the SOQ. NFE is a global energy infrastructure company with nearly 1,000 MW of power generation capacity currently operational, under construction or for which it provides fuel management services. NFE is also an affiliate of NFEnergía LLC, which has significant, direct experience with fuel management and power generation in Puerto Rico, including the NFE FSPA with PREPA. NFE has developed, constructed, and commissioned numerous energy infrastructure assets on islands in the US and the Caribbean, and is developing energy infrastructure assets that it will own and operate in stranded locations in Mexico and Nicaragua. NFE has particular expertise in fuel management, operating and maintaining power plants in island environments.  PIC Group, a corporation organized in Georgia, is a service provider for the global power generation industry and a wholly owned subsidiary of Marubeni Group (OTCMKTS: MARUY). PIC Group has 20 years of O&M experience across various global power facilities for approximately 15 GW of total capacity across 68 plant sites across multiple technologies including over 90 combustion turbine generators, 102 reciprocating engines, 46 steam turbine-generators and nine hydroelectric units.

Procurement Process

**PUBLIC-PRIVATE PARTNERSHIPS**

**NAES** was established in 1980 by four Pacific Northwest utilities (Pacific Power & Light Company, Portland General Electric Company, Puget Sound Power & Light, and The Washington Water Power Company). NAES is owned by ITOCHU International Inc. (III) and I-Power Investment Inc., subsidiaries of ITOCHU Corporation ("**ITOCHU**") (OTCMKTS: ITOCY), an international trading conglomerate and Fortune Global 250 company with worldwide sales of $100 billion in 2020. NAES has significant global experience providing O&M services to 380 plants, totaling over 97 GW of power generation capacity, in 13 different countries including: Argentina, Belgium, Brazil, Canada, Colombia, Guatemala, Honduras, Jamaica, Mexico, Panama, Singapore, United Kingdom, and the U.S.A. NAES has a broad range of experience operating large complex facilities on an island and in remote locations, including the procurement, delivery, and unloading of the fuels (via tanker trucks) for the 60 MW Hamakua Energy Partners facility located on the island of Hawaii in Honokaa.

**NRG Energy Services** was established in 2011 and is a wholly-owned subsidiary of NRG Energy, Inc. (NYSE: NRG), which owns and operates power generation facilities. NRG Energy, Inc. and NRG Energy Services together have experience operating and maintaining a diverse set of plants totaling approximately 60 GW of power generation capacity, of which 35 GW encompasses various configurations of oil and gas-fired capacity. NRG Energy Services operates 8 GW of power plant generating capacity of which 4.5 GW is gas and oil-fired. NRG Energy Services also provides technical services from a large pool of engineers and technical specialists. NRG Energy Services also has a large machine shop located in Houston, Texas and provides inspection, machining, repair and fabrication services on major equipment like CT rotors, steam turbines and major pumps for the power and other industries.

**ProEnergy** is a privately held third-party solutions provider for the power generation and oil and gas industries. ProEnergy has experience with the construction, management, operations, maintenance and repair services for energy generation facilities and equipment around the world. ProEnergy's experience spans 6.5 GW of installed power generation capacity through engineering, procurement and construction contracts, with more than 50 facilities serviced through commissioning and startup, and through providing O&M services to more than 65 facilities. ProEnergy's experience includes several facilities in South America, Asia and Africa and covers several different fuel types such as natural gas and diesel.

**Siemens** is a corporation organized under the laws of Delaware, and is one of the largest integrated power plant O&M providers worldwide. Siemens provides O&M services to 55 sites, and has O&M contracts covering over 38 GW of power generation capacity, with more than 30 years of experience as an O&M provider in more than 90 counties. Siemens has a global network of factories, repair centers and regional offices. Siemens currently has 36 power stations under O&M contracts in 17 countries. Their experience includes modifications, upgrades and decommissioning and spans multiple fuel types including natural gas and oil.

## 4.4  Request for Proposals

### 4.4.1 RFP and RFP Addenda

On November 10, 2020, the P3 Authority issued the RFP to Proponents pursuant to Section 5 of the Transformation Act and Section 3 of Act 29. The RFP Process sought Binding Proposals from entities that had been pre-qualified in the RFQ Process. The objective of the RFP Process was to enable the Partnership Committee to determine the Proponent best qualified to enter into the O&M Agreement, based on the Binding Proposals.

The P3 Authority issued four addenda to the RFP to (i) update the timeline of the RFP Process and other terms set forth in the RFP, (ii) update the processes and procedures to be used to implement the RFP Process, including the evaluation criteria and weighting to be applied to the Binding Proposals and the Binding Proposal submission instructions, (iii) replace the original RFP, as amended and supplemented, with and Amended and Restated RFP, and (iv) distribute certain transaction documents provided to the Proponents prior to December 22, 2021, the date on which Binding Proposals were ultimately due (the "**Proposal Submission Deadline**"), including various drafts of the O&M Agreement.

The addenda were issued on March 9, July 24, November 4 and November 23, 2021.

As indicated below, certain transaction documents were distributed by addenda to the RFP, and the P3 Authority also distributed documents to the Proponents using the Messaging Tab in PowerAdvocate©[22] (each such communication, a "**PowerAdvocate© Message**").

During the period from March 2021 through November 2021, the Proponents received the following three drafts of the O&M Agreement:

- an initial draft of the O&M Agreement (the "**First Draft O&M Agreement**"), distributed on March 9, 2021, as part the first addendum to the RFP;

- a second draft of the O&M Agreement (the "**Second Draft O&M Agreement**"), distributed on July 24, 2021, as part of the second addendum to the RFP; and

- a final revised draft of the O&M Agreement (the "**Final Form of O&M Agreement**"), distributed on November 24, 2021, as part of the final addendum to the RFP.



---

[22] PowerAdvocate© is a digital platform specifically designed for the energy industry to make competitive procurement easy and efficient. With standardized data collection and reporting, go-to-market templates, customizable datasheets and access to a database of suppliers, PowerAdvocate© enabled the P3 Authority to (i) accelerate strategic sourcing activity through reduced cycle time, (ii) unearth hidden margin and gain negotiation leverage through granular bid data analysis, (iii) easily collaborate with business stakeholders across engineering, finance, operations, leadership, and procurement, and (iv) centrally track, measure, and report on savings over time.

Pursuant to the process set forth in the RFP, certain of the Proponents (i) provided written comments to and mark-ups of the first and third drafts of the O&M Agreement, and (ii) met with the P3 Authority, the P3 Consultants, and the FOMB Representatives via teleconference in advance of providing written comments on the First Draft O&M Agreement, and on April 27, 2021, April 28, 2021 and May 7, 2021 to discuss their comments to the First Draft O&M Agreement.

ProEnergy, EthosEnergy, Siemens, EcoEléctrica and NRG Energy Services elected not to proceed in the RFP Process in April 2021, October 2021, October 2021, November 2021, and November 2021, respectively.[23]  EGE Haina did not formally withdraw from the RFP Process, but did not submit a Binding Proposal.[24]  NAES withdrew from the RFP Process in April 2021, and rejoined the RFP process in November 2021.[25]

### 4.4.2 Due Diligence

Throughout the RFP Process, the Proponents were provided the opportunity to conduct extensive due diligence on the Legacy Generation Assets.

### Data Room

Subject to having signed confidentiality agreements, in November 2020, the Proponents were given access to a digital data room with information and key documents related to the LGA Project (the "**Data Room**"). Specifically, 6,574

documents related to PREPA totaling more than 117 gigabytes of data were uploaded to the Data Room, including the following, among others:

- real property documents, including documents related to PREPA's commercial, plants, hydro, irrigation, substation, and supply real estate (359 documents totaling 6,805 megabytes ("**MBs**") of data);

- environmental permits, approvals, and statements, including PREPA's emissions data and fuel quality and recycling reports (357 documents totaling 2,162 MBs of data);

- environmental reports and regulatory matters, including the Phase I Environmental Site Assessments (4835 documents totaling 81,616 MBs of data);

- commercial contracts and other agreements, including PREPA's general third-party, maintenance, fuel, and logos and trademarks agreements (96 documents totaling 216 MBs of data);

- human resources documents and records, including documents with PREPA's staffing, benefits, worker health and safety, and employee training information (60 documents totaling 401 MBs of data);

- facility data and operations records, including descriptions of PREPA's assets, fuel consumption

---

[23] Of the transaction documents distributed to Proponents, ProEnergy only received the First Draft O&M Agreement issued as part of the first addendum to the RFP. EthosEnergy, Siemens, EcoEléctrica and NRG Energy Services received the First Draft O&M Agreement issued as part of the first addendum to the RFP and the Second Draft O&M Agreement issued as part of the second addendum to the RFP. Neither ProEnergy nor EthosEnergy provided comments to any of the transaction documents or participated in any meetings to discuss the transaction documents. Siemens provided only high-level comments on the First Draft O&M Agreement and participated in an April 27, 2021 meeting to discuss those comments. EcoEléctrica and NRG Energy Services provided comments on the First Draft O&M Agreement, participated in separate April 28, 2021 meetings to discuss those comments, and attended separate in-person meetings in Puerto Rico on October 19, 2021 and October 20, 2021, respectively.

[24] Of the transaction documents distributed to Proponents, EGE Haina received the First Draft O&M Agreement issued as part of the first addendum to the RFP and the Second Draft O&M Agreement issued as part of the second addendum to the RFP. EGE Haina did not provide comments to either draft of the O&M Agreement, instead electing to send a letter to the P3 Authority expressing interest in proposing a strategy for the renewal of specific Legacy Generation Assets. EGE Haina did not participate in any meetings to discuss the transaction documents.

[25] Of the transaction documents distributed to Proponents, NAES received the First Draft O&M Agreement issued as part of the first addendum to the RFP and the Final Draft O&M Agreement issued as part of the fourth addendum to the RFP. NAES elected not to proceed in the RFP Process after submitting comments on the First Draft O&M Agreement. Accordingly, NAES did not participate in meetings to discuss the transaction documents until it rejoined the RFP Process.

and inventory data, and inspection and safety records (319 documents totaling 1,338 MBs of data);

- independent engineer and technical reports, including PREPA's historical IRPs and demarcation studies (301 documents totaling 5,364 MBs of data);

- finance and accounting records, including PREPA's audited financial statements, depreciation studies, fiscal plans and budget forecasts (14 documents totaling 46 MBs of data);

- transaction process materials (213 documents totaling 16,610 MBs of data);

- insurance and tax documents and records (17 documents totaling 174 MBs of data);

- information technology documents and records (two documents totaling 41 KBs of data); and

- litigation summary (one document totaling 687 KBs of data).

In addition, certain memoranda prepared by the Consultants summarizing key elements of the LGA Project were uploaded to the Data Room, including:

- a confidential information memorandum;

- a financial model for the LGA Project;

- a white paper on the electric sector regulatory framework;

- a white paper on environmental considerations;

- a white paper on labor considerations; and

- a white paper on the Title III process.

### Management Presentations and Site Visits

In order to provide Proponents with the opportunity to diligence the Legacy Generation Assets while restrictions imposed in response to the novel coronavirus ("**COVID-19**") were effective, narrated videos providing a site visit at each Legacy Generation Asset were prepared and uploaded to the Data Room in February 2021 in lieu of physical site visits. Similarly, in lieu of in-person presentations, key officers, directors, and managers of PREPA, together with certain of their advisors and representatives of the P3 Authority, and AAFAF, recorded virtual presentations regarding the LGA Project (the "**Management Presentation**") that were uploaded to the Data Room in April 2021.

Once the COVID-19 restrictions were eased, physical site visits to the PREPA facilities were scheduled with the Proponents in Puerto Rico on the following dates:

- NRG Energy Services – September 11–13, 2021;

- Genera – September 18–20, 2021;

- EGE Haina – September 25, 2021; and

- NAES – November 19–21, 2021.

Table 1 includes the agenda for each of the Management Presentations, including the topics covered and the key officers, directors, and managers of PREPA, the P3 Authority and AAFAF who presented.[26]

### TABLE 1: AGENDA FOR MANAGEMENT PRESENTATIONS

| Topic | Presenters |
| --- | --- |
| Opening Remarks | Fermín Fontanés<br>*Executive Director of the P3 Authority* |
| Opportunity Overview and Title III Update | Fermín Fontanés<br>*Executive Director of the P3 Authority*<br><br>Omar Marrero<br>*Executive Director and Chairman of the AAFAF* |
| PREPA Overview and Energy Sector Transformation | Efrán Paredes, PE<br>*Executive Director, PREPA* |
| Integrated Resource Plan | Alfonso Baretty<br>*Director of Planning and Environmental Protection, PREPA* |
| Legacy Assets Overview – Baseload Facilities | Fernando Padilla<br>*Deputy Executive Director of Operations, PREPA*<br><br>William Rios Mera<br>*Director of Generation Directorate (acting), PREPA* |
| Legacy Assets Overview – Peaking Units | William Rios Mera<br>*Director of Generation Directorate (acting), PREPA* |
| Fuel Management | Delis Zambrana;<br>*Senior Program Manager, PREPA*<br><br>Edwin Barbosa<br>*Fuel Office Administrator, PREPA*<br><br>Dennis Zabala<br>*Principal Advisor, Sargent & Lundy* |
| Financial Projections | Fernando Padilla<br>*Deputy Executive Director of Operations, PREPA* |
| Environmental Considerations | Luisette Rios<br>*Head of Environmental Protection and Quality Assurance, PREPA*<br><br>Alfonso Baretty<br>*Director of Planning and Environmental Protection, PREPA* |
| Safety | Shehaly Rosado<br>*Head of Occupational Safety, PREPA* |
| Human Resources | Nydza Irizarry Algarin<br>*Director of Human Resources and Labor Affairs, PREPA* |

---

[26] For more information on the Management Presentations please see PREPA's Management Presentation attached as Exhibit E hereto (PREPA Management Presentation).

Virtual tours of the following PREPA facilities were uploaded to the Data Room:

- Cambalache
- San Juan
- Costa Sur
- Vega Baja
- Daguao
- Yabucoa
- Jobos
- Palo Seco
- Mayagüez
- Aguirre

The Proponents were later given the opportunity to visit the same PREPA facilities in-person.

### RFP Requests for Clarification

Proponents were able to submit any RFCs they had with respect to the contents of the RFP, the information available in the Data Room, the Legacy Generation Assets, and other matters related to the LGA Project (each such RFC, an "**RFP-RFC**") to the P3 Authority prior to the Proposal Submission Deadline. The RFP required that all RFP-RFCs be submitted in writing through a PowerAdvocate© Message. Verbal RFP-RFCs were not accepted.

The P3 Authority generally answered RFP-RFCs in writing through a PowerAdvocate© Message. RFP-RFCs were made available to all Proponents together with the answers thereto, unless the Proponent requested that an RFP-RFC be given confidential treatment and the P3 Authority agreed that such confidential treatment was appropriate.

### Various Conferences with Proponents

Each of Genera and NAES participated in various conferences with the P3 Authority, the P3 Consultants, and the FOMB Representatives between March 2021 and April 2022.

Genera participated in various conferences regarding the following topics on the following dates:

- conference regarding the procurement process and the First Draft O&M Agreement on April 5, 2021;

- conference discussing comments on the First Draft O&M Agreement on May 7, 2021;

- in-person meeting in Puerto Rico to discuss the Second Draft O&M Agreement on October 20, 2021;

- conference regarding the financial model on November 1, 2021;

- conference discussing the Second Draft O&M Agreement on November 17, 2021;

- conference regarding clarification of Genera's Binding Proposal on January 10, 2022;

- conference regarding the procurement process on February 2, 2022;

- conference regarding clarification of Genera's Binding Proposal on February 15, 2022; and

- in-person meeting in Puerto Rico to discuss Genera's Binding Proposal and comments on the Final Form of O&M Agreement on April 19, 2022.

NAES participated in various conferences regarding the following topics on the following dates:

- conference regarding the procurement process and draft O&M Agreement on March 26, 2021;

- conference discussing First Draft O&M Agreement on April 8, 2021;



- conference regarding the procurement process and then-current draft O&M Agreement on November 5, 2021;

- conference discussing the Second Draft O&M Agreement on November 16, 2021;

- conference regarding environmental compliance related matters, including the Consent Decree, on December 3, 2021;

- conference regarding capital expenditures and federal funding on December 12, 2021;

- conference regarding clarification of NAES' Binding Proposal on January 10, 2022;

- conference discussing status of the PREPA-Genco-Hydroco Operating Agreement[27] and the demarcation of PREPA's assets, on January 31, 2022;

- conference regarding clarification of NAES' Binding Proposal, particularly regarding the financial proposal, on February 15, 2022; and

- in-person meeting in Puerto Rico to discuss NAES' Binding Proposal and comments on the Final Form of O&M Agreement on April 19, 2022.

### 4.4.3 Transaction Structure

In furtherance of its responsibilities under Act 29 and the Transformation Act and, in particular, the requirements of the Energy Policy Act, the Partnership Committee evaluated potential transaction structures for the LGA Project and considered whether the Legacy Generation Assets should be operated by one operator or multiple operators.

*Determination of One vs. Multiple Operators*

In the December 2019 market sounding, respondents generally favored a single-operator model and noted operational efficiencies of scale and synergies available by leveraging resources across the Legacy Generation Assets. However, certain respondents only expressed interest in operating select groups of assets. Respondents to the RFQ were similarly divided: of the qualified Respondents who progressed to the RFP stage, five expressed interest in operating all Legacy Generation Assets, while three were only interested in certain select assets.

The Partnership Committee believed that engaging one operator for all of the Legacy Generation Assets was preferable for a number of reasons. First, requiring proponents to bid on operating all of the Legacy Generation Assets as opposed to allowing them to elect to operate only certain assets was less likely to result in stranded assets. Given the poor condition of the plants, asking Proponents to bid on separate bundles of the Legacy Generation Assets created the risk that less attractive bundles would not receive bids. Any Legacy Generation Assets that did not receive bids would have remained under PREPA's continued operation and maintenance in contravention of the Transformation Act and the Energy Policy Act.

Second, multiple operators would exacerbate challenges with environmental compliance. Any operator of the Legacy Generation Assets is required to maintain compliance with federal and local environmental law and regulations, including the Consent Decree. If multiple operators assumed operation of different Legacy Generation Assets subject to the Consent Decree, then an amendment to the Consent Decree would have needed to be negotiated with the DOJ to identify the specific obligations attached to each asset.

---

[27] The **"PREPA-Genco-Hydroco Operating Agreement"** is the operating agreement that provides for certain rights and responsibilities, including fuel and non-fuel budgeting and account funding, the demarcation of the Legacy Generation Assets, dispatch and shut down procedures and protocols, planned maintenance communications, switching and clearance procedures, access to plant substations and other related equipment, and agreed upon requirements and procedures related to annual performance tests.





Finally, pursuant to the O&M Agreement, under a multiple-operator model the Administrator and PREB would have been required to oversee, and T&D Operator to coordinate with, multiple entities with respect to generation availability, performance, management of fuel supply contracts and delivery, communications, emergency responses, and other generation matters. This would have not only complicated the interactions between the T&D operator and the generation operators, but also reduced any synergies that currently exist under PREPA. Further, having multiple operators would likely result in additional costs, not only due to additional fees, but because of the lack of economies of scale.

### Dividing the Legacy Generation Assets into Bundles for Bidding

Despite the arguments in favor of a single-operator model, the Partnership Committee resolved to confirm whether a single-operator or multiple-operator model would provide the most cost effective and favorable arrangement for the people of Puerto Rico by asking the Proponents to provide Binding Proposals for different bundles of Legacy Generation Assets.

Before beginning its review of potential bundle options, on August 27, 2021, the P3 Authority filed a consultation at PREB asking for confirmation of the P3 Authority's interpretation that the operation and maintenance of the Legacy Generation Assets may be transferred to a single operator upon completion of the RFP Process and awarding the LGA Project. PREB informed the P3 Authority that such analysis would be conducted while performing its responsibility under the Transformation Act to determine compliance with the energy public policy and whether moving forward with the procurement process was the correct course of action.

The Partnership Committee then considered various options for such bundles, including: (i) a three-package approach, under which the Legacy Generation Assets would be grouped by Proponent preferences and geographically, (ii) a two-package approach, dividing the Legacy Generation Assets into either those located in the

north and south, or the east and west, of Puerto Rico, and (iii) a one-package approach containing all of the Legacy Generation Assets.

The bundles were created following certain guiding principles, including one operator per site (*e.g.*, one operator managing all units at the San Juan generation plant rather than one operator serving San Juan Unit 5 and a second operator serving San Juan Unit 6), which would maximize safety, environmental compliance and operational efficiency, equitable bundle sizes, installed capacity, geographic synergies and Proponent preferences. For example, to ensure equitable bundle sizes meant ensuring that each bundle was attractive enough to garner sufficient interest in operating such bundle of assets on a standalone basis, should a Proponent only be awarded one bundle. Additionally, because the term, fixed fee and decommissioning schedule for the O&M Agreement would be determined in part by the remaining useful life and installed capacity of the applicable assets, equitable bundle sizes would help to provide for comparable agreements for multiple operators.

Following discussion as to benefits and disadvantages of each of the proposed bundles, the Partnership Committee concluded that a three-bundle approach with three operators would be too complicated and costly, and instructed that the RFP be amended to include the request that the Proponents submit proposals for two bundles of assets in addition to a Binding Proposal for all assets.

The third addendum to the RFP encouraged Proponents to submit proposals covering bundles for (i) all of the Legacy Generation Assets, (ii) those on the western half of Puerto Rico (Mayaguez, Costa Sur and Cambalache) and (iii) those on the eastern half of Puerto Rico (Palo Seco, San Juan, Aguirre, Vega Baja, Daguao, Yabucoa and Jobos). Genera submitted a Binding Proposal that covered only the bundle consisting of all of the Legacy Generation Assets, while the Other Proponent's Binding Proposal covered each of the requested bundles.

## 4.4.4 Incentives and Penalties Structure

As discussed in Section 3.1.2 hereof (*Recent Challenges*), much of the Legacy Generation Assets' reliability and availability issues can be attributed to the budgetary constraints that have prevented sufficient investment and corrective maintenance. Additionally, the Legacy Generation Assets have underperformed with regard to safety and environmental compliance. In consideration of these challenges, the Partnership Committee crafted compensation mechanisms aimed to incentivize the Operator to operate and maintain the Legacy Generation Assets at an optimal level (taking into account limited resources and the remaining useful lives of the assets) and to generate cost efficiencies. Thus, the service fee was constructed to consist of (i) a fixed fee component and (ii) an incentive/penalty component that will vary depending on the Operator's performance across a number of standards (the "**Service Fee**"). Section 5.2.3 (*Legal and Contractual Considerations*) and the summary of the O&M Agreement attached as Exhibit F hereto (*Summary of O&M Agreement*) describe the Incentives and Penalties.

## 4.4.5 O&M Agreement Discussions

The RFP contemplated that multiple drafts of the O&M Agreement would be distributed to the Proponents, with each new draft reflecting the comments from the Proponents that the Partnership Committee had accepted. Specifically, the process set forth in the RFP required that each Proponent (i) provide written comments to and mark-ups of the First Draft of the O&M Agreement and (ii) meet with the P3 Authority, the P3 Consultants, and the FOMB Representatives via videoconference to walk through and discuss the Proponent's comments to such draft of the O&M Agreement. Proponents were asked to submit their mark-ups together with a separate document summarizing their principal comments in order of priority to allow for an efficient review process.

On March 9, 2021, the First Draft O&M Agreement was distributed to the Proponents. The First Draft O&M Agreement was modeled closely on its counterpart for the T&D System, the T&D O&M Agreement, which reflected the input and approval of multiple stakeholders, both market and governmental. In addition to implementing necessary changes to reflect the nature of the subject assets and goals of the respective Projects, namely, reliable operation until decommissioning of the Legacy Generation Assets as opposed to restoring and improving the T&D System, the First Draft O&M Agreement was prepared taking into account the engagement with the T&D Operator to that point. On March 19, 2021, a memorandum was distributed to Proponents summarizing the key terms in the First Draft O&M Agreement and, where relevant, the P3 Authority's rationale for certain provisions, particularly any significant differences between the First Draft O&M Agreement and the T&D O&M Agreement.

Proponents submitted comments to the First Draft O&M Agreement on April 14, 2021. Siemens provided high level comments and met with the P3 Authority, the P3 Consultants, and the FOMB Representatives on April 27, 2021 via videoconference to discuss those comments. EcoEléctrica and NRG Energy Services each provided mark-ups and separate summaries of their comments on the First Draft O&M Agreement and met separately via videoconference with the P3 Authority, the P3 Consultants, and the FOMB Representatives on April 28, 2021 to discuss those comments. Genera also submitted a mark-up and separate summary of its comments on the First Draft O&M Agreement, and met with the P3 Authority, the P3 Consultants, and the FOMB Representatives via videoconference on May 7, 2021 to discuss those comments. Though NAES submitted comments to the First Draft O&M Agreement, it withdrew from the RFP Process before its scheduled videoconference meeting on May 7, 2021.

On July 24, 2021, the Second Draft O&M Agreement was distributed to the Proponents.



This revised draft reflected the comments from Proponents that the Partnership Committee accepted as well as comments from the Partnership Committee and PREB. The P3 Authority did not solicit written comments on the Second Draft O&M Agreement from Proponents. On October 19 and October 20, 2021, the P3 Authority, the P3 Consultants, and the FOMB Representatives met with EcoEléctrica, NRG Energy Services, and Genera, respectively, in Puerto Rico to discuss the Second Draft O&M Agreement.

On November 1, 2021, NAES requested permission to rejoin the RFP process, explaining that following a change in leadership, NAES management had aligned on the desirability of the LGA Project. After NAES rejoined the RFP process, the P3 Authority, the P3 Consultants, and the FOMB Representatives met with NAES via videoconference on November 16, 2021 to discuss the Second Draft O&M Agreement.

On November 24, 2021, the Final Form of O&M Agreement was distributed to the Proponents. The Final Form of O&M Agreement reflected updates regarding the then-current status of the negotiation of the PREPA-Genco-Hydroco Operating Agreement, and further comments from the Proponents and the Consultants.

On December 22, 2021, Genera and NAES submitted their Binding Proposals, which included mark-ups of the Final Form of O&M Agreement.



PREPA Transactions and establishes the terms pursuant to which the P3 Authority and AAFAF may share with PREB certain information related to the PREPA Transactions, the P3 Authority provided PREB the opportunity to review and comment on drafts of the O&M Agreement.

Specifically, PREB provided feedback on an earlier draft of the First Draft O&M Agreement on February 18, 2021, and the Second Draft O&M Agreement on October 12, 2021. Accordingly, the Final Form of O&M Agreement reflected various comments received from PREB.[29]

### 4.4.6 Submission of Binding Proposals

The Proponents were required to submit their Binding Proposals by 11:59 PM AST on December 22, 2021. Both Genera and NAES submitted their respective Binding Proposals in accordance with the RFP by the Proposal Submission Deadline. Both Binding Proposals were substantially complete and consistent with the evaluation criteria included in the RFP. Both Proponents submitted their Binding Proposals subject to certain changes to the Final Form of O&M Agreement. On January 5, 2022, the P3 Authority circulated a list of clarification questions and comments to each of the Proponents regarding their respective Binding Proposals. On January 10, each of the Proponents participated in videoconferences to discuss their responses to those clarification questions. On January 11, the P3 Authority circulated follow-up legal and technical questions to each of the Proponents. Genera submitted responses to the legal questions on January 18, the financial questions on January 19 and the technical questions on January 24. NAES submitted responses to the legal questions on January 18, and to the technical questions on January 19.

The FOMB Representatives received all drafts of the O&M Agreement and participated in meetings with the Proponents. The Final Form of O&M Agreement reflected certain comments received from the FOMB's legal advisors with respect to certain employee provisions on July 7, 2021 and July 12, 2021.[28]

In addition, (i) consistent with Section 8(c) of the Transformation Act, which requires PREB to provide the technical, expert, financial, and human resources assistance requested by the P3 Authority to ensure that each PREPA Transaction succeeds and (ii) pursuant to a memorandum of understanding signed on November 15, 2018 by the P3 Authority, AAFAF, and PREB, which acknowledges the shared interest of the P3 Authority, AAFAF, and PREB in consummating the

---

[28] In addition, on October 23, 2022, the FOMB requested from the P3 Authority documentation and information regarding the O&M Agreement and the RFP Process to facilitate its review of the O&M Agreement. On November 17, 2022, the P3 Authority filed the O&M Agreement and the requested documentation and information with the FOMB.

[29] As described in Section 5.3 hereof (PREB Comments to the Genera O&M Agreement), PREB also provided feedback on the draft of the O&M Agreement with Genera approved by the Partnership Committee on August 25, 2022.

On January 27, 2022, the P3 Authority, the P3 Consultants, and the FOMB Representatives met with the Partnership Committee to present and discuss the Binding Proposals submitted by the Proponents. On January 27 and January 28, NAES and Genera, respectively, had the opportunity to present its Binding Proposal directly to the Partnership Committee in Puerto Rico, with AAFAF and the P3 Authority, representatives from PREPA, certain Consultants, and FOMB Representatives. The chief executive officer of NFE and the President of NAES attended the presentations, as well as teams from each of the Proponents. The teams included (i) in the case of Genera,17 individuals, including two individuals from PIC Group that would play a pivotal role in the Mobilization Period and in the performance of the O&M Services, and (ii) in the case of NAES, 24 individuals, including four individuals from Javelin Commodities, NAES' anticipated fuel subcontractor. During the presentations, each of which took place over the course of approximately four hours, the Proponents responded to detailed questions and comments raised by the Partnership Committee regarding specific elements of their Binding Proposals.

Separately, on January 16, 2022, the P3 Authority requested questions regarding the Consent Decree from Proponents to be discussed by the EPA and the P3 Authority during its meeting on January 21. The Proponents submitted questions on January 19, with NAES expressing concern regarding the requirement that the Operator become signatory to the Consent Decree. In addition, on February 1, the P3 Authority requested that the Proponents review and submit initial comments on the draft PREPA-Genco-Hydroco Operating Agreement, which comments were submitted by NAES on February 8 and Genera on February 9.

On February 3, 2022, each Proponent was asked to submit by February 8 responses to follow-up questions sent to the Proponent after their January 27 and 28 meetings with the Partnership Committee, which deadline was extended to February 11. The P3 Authority scheduled a conference with each Proponent to discuss their

responses on February 15. On February 11, NAES submitted its responses to the follow-up questions that were discussed during the February 15 conference, but Genera submitted an unsolicited updated proposal. Pursuant to Section 4.9 of the Regulation, modifications to a previously submitted proposal will only be accepted by the Partnership Committee if the modification is received before the due date specified in the RFP. Because it was received after December 22, 2021, the Proposal Submission Deadline, the Partnership Committee determined it would not accept or review the unsolicited proposal. On February 25, the P3 Authority informed Genera that the Partnership Committee had rejected its unsolicited proposal without review, and informed NAES that it had received and rejected an updated proposal from another Proponent.

On March 7, 2022, the P3 Authority, the P3 Consultants, and the FOMB Representatives met with the Partnership Committee to present and discuss the Binding Proposals as supplemented by the Proponents' responses to the clarification and follow-up questions. The Partnership Committee agreed to request from both Proponents updated proposals, which the P3 Authority requested on March 9 for submission by March 21. On March 21, both Proponents submitted updated proposals.

On April 1, 2022, the P3 Authority, the P3 Consultants, and the FOMB Representatives presented to the Partnership Committee the Proponents' Binding Proposals as further supplemented by their updated proposals. On April 19, the P3 Authority, the P3 Consultants, and the FOMB Representatives met with each Proponent in Puerto Rico to discuss their updated proposals and comments on the Final Form of O&M Agreement. On April 20, the P3 Authority requested additional clarification from the Proponents as well as marked versions (with specific language reflected as in-line edits) of the Final Form of O&M Agreement in the form that it would be prepared to execute if it were awarded the O&M Agreement. Each Proponent timely submitted these responses and documents



on April 22. The documents submitted by each Proponent on April 22 not only provided responses to additional questions and clarifications sent by the P3 Authority, but also modified certain elements of the Proponent's Binding Proposal in response to concerns raised by the P3 Authority.

On May 4, 2022, the P3 Authority, the P3 Consultants, and the FOMB Representatives met with the Partnership Committee to present and discuss their evaluations and scoring of each of the financial and operational elements of the Binding Proposals as modified. The P3 Authority, the P3 Consultants, and the FOMB Representatives also presented their assessments of the revised

mark-ups of the Final Form of O&M Agreement, which assessments focused on comments that would shift risk to the Owner and the Administrator. In the interest of agreeing upon the Final Form of O&M Agreement as soon as possible, the P3 Authority requested that each Proponent submit proposed final mark-ups of the O&M Agreement, specifically providing contract language for each comment raised. Genera and NAES submitted updated comments on May 20 and May 24, respectively.

Following receipt of the revised drafts of the O&M Agreement, on May 24, 2022, the Partnership Committee began its deliberative process.

## 4.4.7 Meetings of the Partnership Committee

In accordance with the requirements of Act 29, the Transformation Act, and the Regulation, the Partnership Committee met on numerous occasions over the course of more than 24 months in connection with the LGA Project, in most cases with the participation of the P3 Authority, the P3 Consultants, and the FOMB Representatives.



Continues on next page

**Procurement Process**



**2022**

**January 27, 2022** the Partnership Committee met to discuss the Binding Proposals submitted by the Proponents.

**January 27 and 28, 2022** the Partnership Committee met with each of the Proponents (with the P3 Authority, certain Consultants, and the FOMB Representatives present) in order for each Proponent to present its Binding Proposal and for the Partnership Committee to clarify elements of the Binding Proposals and ask questions. Immediately following the meetings with the Proponents, the Partnership Committee met to discuss and evaluate the quality and substance of the presentations.

**March 7, 2022** the Partnership Committee met to discuss (i) Binding Proposals, as modified by responses to follow-up questions, and (ii) next steps.

**April 1, 2022** the Partnership Committee met to further discuss (i) the updated Binding Proposals received on March 23, 2022, and (ii) next steps.

**May 4, 2022** the Partnership Committee met to further discuss (i) the Binding Proposals, as further modified by updated mark-ups of the O&M Agreement, and (ii) next steps.

**May 24, 2022** the Partnership Committee met to (i) discuss the Binding Proposals, (ii) determine next steps, and (iii) discuss selecting Genera as the Preferred Proponent.

**June 24, 2022** the Partnership Committee met to (i) review the most recent form of O&M Agreement submitted by Genera, in its capacity as the Preferred Proponent (the "**Genera O&M Agreement**")[30] and (ii) discuss comments by the Partnership Committee to the Genera O&M Agreement.

**August 15, 2022** the Partnership Committee held an informative meeting to discuss the status of the negotiations of the O&M Agreement with the Preferred Proponent.

**August 25, 2022** the Partnership Committee voted unanimously to approve the Genera O&M Agreement, and recommend to the P3 Authority Board that Genera be selected to execute the O&M Agreement for the LGA Project.

**September 30, 2022** the Partnership Committee held an informative meeting to discuss this Report and minutes of the Partnership Committee Meeting.

**October 4, 2022** the Partnership Committee met to discuss this Report and the minutes of the Partnership Committee Meeting.

**October 17, 2022** the Partnership Committee met to discuss and approve this Report and the minutes of the Partnership Committee Meeting.

**November 9, 2022** the Partnership Committee met to (i) discuss the comments to the O&M Agreement made by PREB and (ii) approve the most recent form of O&M Agreement.

Additionally, certain decisions were taken by unanimous written referendum, and Partnership Committee members met from time to time with the P3 Authority for periodic briefings as to the status of the process.

---

[30] On June 9, 2022, the Partnership Committee voted by referendum to select Genera as a Preferred Proponent.



### 4.4.8 Key Milestones in RFP Process

Table 2 summarizes the key milestones of the RFP Process.

**TABLE 2: RFP PROCESS KEY MILESTONES**

| Milestones | Date |
| --- | --- |
| RFP issued and Data Room access granted | November 10, 2020 |
| Period for due diligence and Q&A process | November 2020 – December 2021 |
| In-Person Site Visits | September and November 2021 |
| Addendum to RFP issued, including First Draft O&M Agreement | March 9, 2021 |
| Receipt of comments from Proponents to First Draft O&M Agreement | April 14, 2021 |
| O&M Agreement discussions with Proponents | April 27-28, and May 7, 2021 |
| Addendum to RFP issued, including Second Draft O&M Agreement | July 24, 2021 |
| O&M Agreement discussions with Proponents | October 19-20, 2021 |
| Addendum to RFP issued, including the Legacy Generation Assets bundles, definitive submission instructions for the Binding Proposals and information regarding the Bid Security | November 4, 2021 |
| Addendum to RFP issued, including Final Form of O&M Agreement | November 24, 2021 |
| Proposal Submission Deadline | December 22, 2021 |
| Conferences with Proponents to address questions/clarifications to Binding Proposals | January 11, 2022 |
| Proponent presentation of Binding Proposals to Partnership Committee | January 27-28, 2022 |
| Genera submitted unsolicited updated proposal | February 11, 2022 |
| Notification that Genera's unsolicited proposal had been rejected without review | February 15, 2022 |
| Conferences with Proponents to address questions/clarifications to Binding Proposals | February 15, 2022 |
| Proponents submitted updated Binding Proposals | March 21, 2022 |
| Meetings with Proponents to address questions/clarifications to Binding Proposals | April 19, 2022 |
| Receipt of updated mark-ups of O&M Agreement and further written modifications and/or clarifications to Binding Proposals | April 22, 2022 |
| Receipt of further updated mark-ups of O&M Agreement | May 20 and 24, 2022 |
| Notification of selection of Preferred Proponent | June 10, 2022 |



# 5. Recommended Award

This page has been intentionally left blank.



## 5.1   Process for Recommended Award

### 5.1.1   Evaluation Criteria

Act 29 and the Transformation Act require that the Partnership Committee take into account certain specific factors in evaluating responses to the RFP. The Partnership Committee reviewed and evaluated the Binding Proposals based on the evaluation criteria set forth below, which was developed by the P3 Authority and the Partnership Committee (with the input of the P3 Consultants and the FOMB Representatives) to meet the objectives of the LGA Project, including those objectives set forth in the Transformation Act and Act 29.

Table 3 sets forth the evaluation criteria applied to the Binding Proposals.

<div align="center">

TABLE 3: **EVALUATION CRITERIA FOR PROJECT**

</div>

| # | Component | Score/Weighing |
|---|-----------|----------------|
| **A.** | **QUALIFICATIONS/COMPLIANCE COMPONENTS** | |
| 1. | *Transmittal Letter* | **Not scored** |
| 2. | *Executive Summary and Table of Contents* | **Not scored** |
| 3. | *Confirmation of Acceptance of O&M Agreement* | **Pass/Fail** |
| 4. | *Bid Security; Other Required Forms and Certifications* | **Pass/Fail** |
| **B.** | **TECHNICAL COMPONENTS** | **50% Total** |
| 5. | *Approach to Mobilization* <br> The score for this component was based on the thoroughness and viability of the Proponent's approach to the Mobilization Services required by the LGA Project, and the experience and credentials of its proposed management team with respect to such services. | **10%** |
| 6. | *Approach to O&M Services* <br> The score for this component was based on the thoroughness and viability of the Proponent's proposed approach to providing the O&M Services, and the experience and credentials of its proposed management with respect to such services. | **15%** |
| 7. | *Approach to Decommissioning* <br> The score for this component was based on the thoroughness and viability of the Proponent's proposed approach to providing the demobilization services required by the LGA Project at the conclusion of the term of the O&M Agreement, and the experience and credentials of its proposed management team with respect to such work. | **5%** |
| 8. | *Approach to Demobilization* <br> The score for this component was based on the thoroughness and viability of the Proponent's proposed approach to providing the demobilization services required by the LGA Project at the conclusion of the term of the O&M Agreement, and the experience and credentials of its proposed management team with respect to such work. | **5%** |
| 9. | *Operator Recruitment and Staffing Plan* <br> The score for this component was based on the training to be provided to employees, optimization of workforce management, and consistency with the objectives of the LGA Project and the policy underlying the Transformation Act, among other things. | **10%** |



| # | Component | Score/Weighing |
|---|-----------|----------------|
| 10. | ***Presentation of Binding Proposals to the Partnership Committee***<br>The score for this component was based on the oral presentation of the Proponent's Binding Proposal to the Partnership Committee. The presentation allowed Proponents to support the contents of their Binding Proposal, explaining and/or clarifying any particular or significant elements related thereto. | 5% |
| **C.** | **FINANCIAL COMPONENTS** | **50% Total** |
| 11. | ***Financial Proposal***<br>The score for this component was based on (i) the net present value of the financial elements of the financial proposals, including, among others, the proposed O&M Fixed Fee and, from the sixth Contract Year on (where "**Contract Year**" means period from July 1 through June 30 for each year commencing on the date on which the Operator assumes operational control of the Legacy Generation Assets, and such date of assuming operational control, the "**Service Commencement Date**"), the Decommissioning Fixed Fee, for each year of the O&M Agreement and the proposed maximum Incentives and Penalties for each year of the O&M Agreement, (ii) the indicated amounts of the relevant operational proposals, including, among others, the proposed weekly amount of certain liquidated damages, (iii) the Proponent's proposed caps on liability (*i.e.*, higher points awarded for higher Operator liability caps and lower Owner liability caps), (iv) the Operator Guarantee and (v) the proposed Target Service Commencement Date. | 50% |

The Operational Proposals comprised 50% of the Proponents' total score. For the Operational Proposals, the RFP required each Proponent to provide detailed plans and proposals with respect to:

• performing the O&M Services;

• transitioning and handing over services and other rights and responsibilities with respect to the Legacy Generation Assets during the period between execution of the O&M Agreement and the Service Commencement Date, consistent with any requirements for the Mobilization Period under the Final Form of O&M Agreement (*i.e.*, the Mobilization Plan);

• performing the Decommissioning Services;

• transitioning and handing over to PREPA or a successor operator services and other rights and responsibilities with respect to any remaining Legacy Generation Assets at the conclusion of the term of the O&M Agreement (the period before the last day of the Contract Term during which such transition occurs, the

"**Demobilization Period**"), consistent with any requirements for the Demobilization Period under the Final Form of O&M Agreement (*i.e.*, the Demobilization Plan); and

• staffing and training of employees and subcontracting of services, among other things (*i.e.*, the Operator Recruitment and Staffing Plan).

The Financial Proposals comprised 50% of the Proponents' total score. For the Financial Proposals, the RFP required each Proponent to propose certain financial terms and conditions to be included in the O&M Agreement, including:

• the net present value of the O&M Fixed Fee and the Decommissioning Fixed Fee over the term of the O&M Agreement;

• the proposed amounts of certain operational elements, including the estimated Mobilization Service Fee, the O&M Incentive and O&M Incentive Penalty, the Decommissioning Incentive and Decommissioning Penalty, and the estimated Demobilization Service Fee;

- the dollar value of certain caps on liability included in the O&M Agreement, including the cap on the Operator's liability to the Owner, the cap on the guarantee to be provided by the parent company of the Operator (the "**Parent Guarantee**") and the cap on the liquidated damages payable by the Operator to the Owner in the event that (i) the Service Commencement Date is delayed 90 days beyond the targeted Service Commencement Date proposed by the Proponent as a result of failure of Operator to meet certain conditions precedent and (ii) such failure is not caused by any force majeure event or the Owner's fault;

- the Termination Fees payable to the Owner or the Operator, as applicable; and

- the targeted Service Commencement Date.

The Legal Proposal was graded on a pass/fail basis and required Proponents to submit a letter confirming their acceptance of the Final Form of O&M Agreement, save for the terms and conditions contemplated by the Financial Proposal to be filled into the agreement, immaterial amendments to incorporate party names, details, and execution mechanics, and subject to further discussion on a limited number of material comments.

The presentation component was scored based on each Proponent's presentation of its Binding Proposal to the Partnership Committee on January 27 and 28, 2022, for NAES and Genera, respectively, including the Proponent's responses to specific questions and comments raised by the Partnership Committee during the presentations.

The RFP indicated that the Partnership Committee would make a determination as to the most favorable Binding Proposal for the LGA Project based on pricing considerations as well as other non-price factors, including the Proponent's responsiveness to PREPA's long-term goals for the Legacy Generation Assets, as evidenced in its Operational Proposal and Legal Proposal.

## 5.1.2 Determination of Preferred Proponent

On May 4, 2022, the Partnership Committee met with the P3 Authority, the P3 Consultants and the FOMB Representatives to review and discuss the P3 Consultants' and FOMB Representatives' assessment of the Proponents' updated Binding Proposals, including revised mark-ups of the O&M Agreement. Genera and NAES submitted further updated mark-ups of the O&M Agreement on May 20 and 24, 2022, respectively. On May 24, 2022, the P3 Authority and P3 Consultants presented to the Partnership Committee, their assessment of the Proponents' revised comments to the O&M Agreement.

On June 9, 2022, the Partnership Committee voted by referendum, pursuant to Act 29, the Transformation Act, and the Regulation (including Section 5.1 thereof), to designate Genera as a Preferred Proponent to engage in exclusive discussions and negotiations with the P3 Authority in connection with the LGA Project pursuant to Section 5.1 of the Regulation. Each Partnership Committee member submitted their score of the Binding Proposals, and such scores were averaged to determine a final score for each Binding Proposal. The Partnership Committee granted Genera's Binding Proposal a higher average score. On June 10, 2022, Genera was notified in writing of its selection, and NAES was notified that another Proponent had been selected, as the Preferred Proponent.

Recommended Award



Table 4 below breaks down the final aggregate score assigned to each Proponent for each criterion.

**TABLE 4: BREAK DOWN OF PROPONENT SCORES**

| # | Component | GENERA | NAES |
|---|-----------|--------|------|
| **A.** | **QUALIFICATIONS/COMPLIANCE COMPONENTS** | | |
| 1. | Transmittal Letter and Executive Summary and Table of Contents | Submitted as required. | Submitted as required. |
| 2. | Confirmation of Acceptance of O&M Agreement, Bid Security, and Other Required Forms and Certifications | Proponent submitted comments to the Final Form of O&M Agreement. | Proponent submitted comments to the Final Form of O&M Agreement. |
| **B.** | OPERATIONAL COMPONENTS | | |
| 3. | Approach to Mobilization Plan, O&M Services, Decommissioning Services, Demobilization Plan, and the Operator Recruitment and Staffing Plan | 33.7 / 45 | 37.6 / 45 |
| 4. | Presentation of Binding Proposals to the Partnership Committee | 3.3 / 5 | 4.2 / 5 |
| **C.** | TECHNICAL AND FINANCIAL COMPONENTS | | |
| 5. | Financial Proposal | 43.1 / 50 | 35.7 / 50 |
| | **Total Score** | **80.1 / 100** | **77.5 / 100** |

With respect to the presentation component, both Proponents provided an overview of and support for the contents of their Binding Proposal and responded to questions and comments raised by the Partnership Committee with respect to particular elements of their Binding Proposal. Both Proponents provided a clear picture of their respective visions for the LGA Project:

• Genera described its affiliate success in Puerto Rico and enthusiasm for continuing to invest in Puerto Rico. In addition, Genera's presentation included significant savings, particularly with regard to fuel costs, and highlighted the importance of energy reliability. Genera noted the importance of retaining plant employees, who possess specific plant experience and knowledge vital to the operation of the Legacy Generation Assets;

• The Other Proponent described its extensive experience across 13 countries, with 179 best practices recognized by industry journals. The Other Proponent's presentation emphasized

the critical importance of the transition from PREPA to Operator during the Mobilization Period, particularly to engagement with and retention of plant employees, and included a dedicated department to mobilization services. In addition, the Other Proponent also indicated that significant savings could be accomplished with regard to both fuel costs and the performance of the O&M Services.

### 5.1.3 Recommendation to Award the O&M Agreement

As detailed in Section 5.1.2 hereof (*Determination of Preferred Proponent*), although Genera scored higher on the financial components and the Other Proponent scored higher on the operational components, the Partnership Committee granted Genera's Binding Proposal a higher average score overall taking all components into account. Despite receiving a slightly lower score, Genera's Operational Proposal demonstrated competence in and a commitment to (i) fuel management

and delivery, (ii) hiring all current power plant employees in good standing, and (iii) subcontracting for certain corrective maintenance, decommissioning, and certain Mobilization Services and O&M Services. Genera's core strength is in fuel management services, but Genera explained it intended to enter into a subcontract with PIC Group for a significant amount of its provision of the Mobilization Services and O&M Services. PIC Group is highly experienced in power plant O&M and technical services overall and has been in business since 1992, with early experience including serving as the exclusive start up and commissioning partner for GE Power Systems. PIC Group subsequently became a partner of Pratt & Whitney for installation, start up and commissioning of the FT8 product line. This skill set evolved into full power plant O&M services. PIC Group has worked closely with Genera on several other recent and on-going projects. Accordingly, the Partnership Committee sought to receive confirmation from Genera, as the Preferred Proponent, that it would be capable of continuing to provide uninterrupted services for the people of Puerto Rico in the event that its subcontract with PIC Group were to be terminated. Genera provided responses to questions regarding its performance of the Mobilization Services and O&M Services on February 18, 2022 and March 21, 2022, including with respect to PIC Group's role in such performance.

On July 12 and 13, 2022, the P3 Authority, the P3 Consultants, and the FOMB Representatives met with Genera to discuss outstanding concerns and seek to finalize a form of O&M Agreement. To address the Partnership Committee's strong interest in protecting Owner Employees, Genera agreed to offer employment to all Owner Employees employed and in good standing as of June 30, 2022.

Additionally, with regard to PIC Group, Genera explained the key terms of the contract.[31] Genera also provided a list of alternate providers of O&M Services with whom it could readily contract should its contract with PIC Group be terminated. Under the O&M Agreement, the Administrator would have the right to approve any Material Subcontractor,[32] thus would have approval rights over any alternate provider of O&M Services. Operator must use commercially reasonable efforts to select Material Subcontractors that are companies either established in Puerto Rico or with a significant presence in Puerto Rico. In the event of the early termination of the O&M Agreement, the subcontract would be assignable to the Administrator. Furthermore, Operator would agree to (i) provide any information the Administrator reasonably requested regarding any subcontractor, including PIC Group or any successor, and (ii) ensure that costs incurred will be reasonable, consistent with market terms, and consistent with the applicable budget.

During the discussions, the Genera O&M Agreement (*i.e.*, a form of O&M Agreement acceptable to the Partnership Committee, P3 Authority, and Genera) was further clarified and negotiated. The P3 Authority and Genera exchanged drafts of the Genera O&M Agreement between July 15 and August 12, 2022 and agreed on a revised form on August 12, 2022.

On August 25, 2022, the Partnership Committee met to approve the Genera O&M Agreement. After approving the Genera O&M Agreement, the Partnership Committee recommended that the P3 Authority proceed to obtain the Required Approvals.

---

[31] On September 1, 2022, Genera entered into the contract with PIC Group, a copy of which was provided to the P3 Authority. The executed agreement with PIC Group provided for a three-year term and, in the event Genera elects to voluntarily terminate, a requirement to give notice and satisfy certain termination payment obligations.

[32] A **"Material Subcontractor"** under the O&M Agreement is a subcontractor whose cost is expected to exceed $5.0 million per year or $15.0 in the aggregate.



### 5.1.4  Key Milestones in Evaluation Process

Table 5 summarizes the key milestones of the evaluation process.

TABLE 5: **EVALUATION PROCESS KEY MILESTONES**

| Milestones | Date |
| --- | --- |
| Partnership Committee voted to designate a Preferred Proponent | June 9, 2022 |
| Genera notified of selection as the Preferred Proponent | June 10, 2022 |
| Meetings with Genera to negotiate O&M Agreement | July 12 and 13, 2022 |
| Partnership Committee approval of Genera O&M Agreement | August 25, 2022 |



## 5.2  Key Considerations for Recommended Award

As detailed in Section 5.1.1 hereof (*Evaluation Criteria*), the Binding Proposals were evaluated on the basis of three elements:

- the Operational Proposal;
- the Financial Proposal; and
- the Legal Proposal.

The three elements were designed to enable the Partnership Committee to select the Proponent best suited to fulfill the LGA Project objectives. Based on its evaluation of the Binding Proposals pursuant to the evaluation criteria established in the RFP, the Partnership Committee determined that Genera clearly demonstrated its ability and commitment to stabilize and maximize output of the Legacy Generation Assets until they are decommissioned, facilitating the transformation of Puerto Rico's generation system into a modern, sustainable, reliable, efficient, cost-effective, and resilient system for the people of Puerto Rico. Sections 5.2.1 (*Operational Considerations*), 5.2.2 (*Financial Considerations*), and 5.2.3 (*Legal and Contractual Considerations*) hereof describe the key technical, operational and financial, and legal considerations, respectively, for the Recommended Award and provide the rationale for the Partnership Committee's determination that the LGA Project be awarded to Genera.

### 5.2.1 Operational Considerations

The Operational Proposals, reflecting 50% of the overall weighted scores, were evaluated on the basis of six main components: (i) proposal for the Mobilization Plan, (ii) approach to performing the O&M Services, (iii) approach to performing the Decommissioning Services, (iv) proposal for the Demobilization Plan, (v) proposal for the Operator Recruitment and Staffing Plan, and (vi) the presentation of the Binding Proposal to the Partnership Committee described in Section 5.1.2 (*Determination of Preferred Proponent*). Genera's Operational Proposal presented a tailored

approach to the Legacy Generation Assets that demonstrated a clear understanding of the challenges and opportunities of the LGA Project.

Below is a brief description of the Operational Proposals submitted by each Proponent:

- From a technical perspective, both Proponents are qualified to operate the Legacy Generation Assets. However, the Proponents took different approaches in their Operational Proposals. Genera showcased an understanding of the current situation and issues faced by PREPA and Puerto Rico and provided an approach tailored to addressing the issues, while the Other Proponent emphasized its in-house expertise.

- In addition to providing an overview of anticipated organizational charts for the Mobilization Period team and a subcontractor matrix listing over 30 subcontractors, Genera also identified special teams with responsibilities in key topic areas, including employee transition and the provision of services during the transition of the Legacy Generation Assets from the Operator back to the Government upon the expiration or early termination of the Contract Term.

- Both Proponents have adequately qualified staff (including Spanish speakers), sound approaches to recruiting, and plans to integrate the PREPA workforce into all levels of the organization.

- The Other Proponent provided its complete management team and details regarding the identity and use of subcontractors. Genera outlined its overall organization structure, but deferred naming its management team and the development of other human resource policies until the Mobilization Period.

- Both Proponents generally accepted the Incentives and Penalties set out in the RFP with

Recommended Award

minor exceptions. Both Proponents proposed additional fuel savings, with the Other Proponent utilizing a fuel consultant and Genera utilizing the extensive experience of NFE and its Affiliates, including on-island.

Overall, Genera's Operational Proposal clearly demonstrated the extensive due diligence that it performed on the electric system and the deep knowledge that it obtained as a result. Because the Other Proponent suspended its participation in the procurement process for approximately six months, it performed its due diligence over a shorter period.

### Approach to O&M Services

The RFP required Proponents to include in the Binding Proposal a detailed plan describing their approach to performing the O&M Services in a manner that results in the LGA Project objectives and the performance requirements set forth in the RFP and the O&M Agreement being met or exceeded. With regard to performance of the O&M Services, Genera's Binding Proposal reflected a tailored approach to the PREPA context.

Highlighting the vast scope of work involved with operating and maintaining the PREPA Legacy Generation Assets, Genera described its intention to work with several subcontractors, many of them based in Puerto Rico, to efficiently provide all the services needed to improve and maintain the reliability and efficiency of the Legacy Generation Assets.

In particular, Genera intends to subcontract PIC Group on a long-term basis to execute a significant portion of the technical and field service scope of the O&M Agreement. PIC Group is a service provider for the global power generation industry and a wholly-owned subsidiary of Marubeni Group. As previously described, PIC Group has significant experience in operating, managing and maintaining power generation facilities, including similar projects on-island and around the globe. In performing

these services, PIC Group has developed specialized equipment, tools, systems, processes and personnel to lead these critical activities. PIC Group's services include operations and maintenance, expert staffing services, commissioning and decommissioning services, and documentation and training services. PIC Group's expertise in these combined skill sets and their access to required resources provide "total project solutions" for the various power plant services on which their customers rely. PIC Group has a proven track record of consistently implementing high quality O&M programs and best practices at all of the plants it manages, focusing on the fundamentals of safety, reliability, compliance and cost.

PIC Group's 25 years of O&M experience includes 15 GW total capacity and covers 65 plant sites, 89 combustion turbine-generators, 102 reciprocating engines, 46 steam turbine-generators and nine hydroelectric units. This, combined with Genera's deep expertise in fuels and plant management, makes this partnership a preferred approach to operating the LGA power plants.

### Mobilization Plan

The RFP required Proponents to include in the Binding Proposals a detailed plan describing their approach to the transition and handover of services prior to the assumption of operational control of the Legacy Generation Assets. Genera's Mobilization Plan was complete and detailed. It (i) contained all the key components, (ii) incorporated detail around the plans, timeline, total hours per task and per person, and resources required to achieve key milestones, and (iii) included initial implementation plans with specific budgets. Genera also provided an outline of its intended leadership structure including some resumes of anticipated individuals for key roles, however, it deferred to specifically name its management team until the Mobilization Period. Genera included a subcontractor matrix listing over 30 potential subcontractors by functional group.

Recommended Award

Genera emphasized its goal to complete the Mobilization Services in a timely manner and as soon as practical. To achieve an efficient and orderly mobilization of Genera's capabilities and allow the commencement of the O&M Services, Genera identified the following critical actions as part of its Mobilization Plan:

- engage in stakeholder outreach;

- recruit and hire personnel;

- identify and onboard subcontractors;

- plan and implement information technology systems and tools;

- review applicable permits and compliance obligations;

- evaluate and maintain inventory;

- coordinate with T&D Operator;

- develop plans/procedures for various aspects of operation (including a Procurement Manual, Legacy Generation Emergency Response Plan, O&M Procedures, and Operator Training Programs, among others);

- develop an approach with a Spanish-speaking workforce;

- identify and complete items listed on the Handover Checklist;

- plan for and achieve key milestones; and

- develop a Communication Plan that works to create a well-orchestrated and consistent message to Operator's employees regarding expectations.

Upon commencement of the Mobilization Period, Genera's transition teams will begin working towards the goal of completing the critical activities identified in the Mobilization Plan. Team

leaders will be drawn from the Operator's pool of experienced managers. A number of these professionals will also be designated to serve as senior leadership for the Operator after the Service Commencement Date and will relocate to Puerto Rico on a permanent basis, to the extent that they are not already residents. The overall Mobilization Plan has been divided into four primary workstreams, as follows: (i) General Mobilization Management, (ii) Operational Takeover, (iii) Functional Takeover, and (iv) Staffing Approach.

Genera included in its Mobilization Plan a Handover Checklist to be completed by each transition team. Genera plans to manage the transition and completion of the Handover Checklist by continually maintaining a checklist based on a structured format, which will be revised as applicable for the unique characteristics of each Legacy Generation Asset. Genera's updates will include reporting checklist items that have been completed, as well as identifying any checklist items that might have emergent issues or problems that need to be escalated for resolution. In addition, any emergent items identified will be proposed as additions to the Handover Checklist to be reviewed with the Administrator.







***Operator Recruitment, Staffing Plan and Priority Hiring of PREPA Employees***

The RFP asked Proponents to provide a detailed description of their approach to staffing and training employees and subcontracting services. Genera provided a staffing plan that included (i) appropriate use and identification of subcontractors, (ii) a focus on offering roles to all current PREPA Employees employed at a generation plant, and (iii) giving preference to other PREPA generation employees.

As described in Section 5.2.3 hereof (*Legal and Contractual Considerations*), Genera agreed to offer employment to all such fulltime plant PREPA employees in good standing. PREPA Employees who are not employed at a generation plant will be given priority in hiring over other equally qualified applicants who are not PREPA Employees for the same job category.

In addition, certain elements of Genera's organizational structure demonstrated Genera's commitment to delivering on the detailed action plans described in its approach to performing the O&M Services, setting it apart from the Other Proponent. For example, Genera's recruitment and staffing schedule highlighted the use of job fairs to provide an opportunity to all current PREPA employees to participate in and take advantage of easy access to job openings. Interview tools, job descriptions, and assessments would be developed by Genera to support a fair and

organized process. The interview team will be integrated by bilingual human resources members and functional technical experts with power plant experience. Genera provided its initial plan for a weekly schedule for hiring and onboarding. In addition, upon PREPA or the Administrator's reasonable request, Genera will provide to PREPA and the Administrator information regarding the total employment offers made and accepted, including the breakdown between hired former PREPA Employees and other employees.

Finally, Genera will leverage its subcontractors, BMA Group Global and PIC Group, for additional support and coverage.

***Approach to Operational Standards of Performance and Incentives and Penalties***

The RFP asked Proponents to provide a detailed description of their approach to the development of safety, technical and operational, and financial performance metrics. The RFP stated that in order to incentivize Operator to meet certain targets in performing the O&M Services, Operator's performance would be evaluated in five (5) categories: (i) Operation Cost Efficiency, (ii) Equivalent Availability Factor (EAF), (iii) Safety Compliance, (iv) Environmental Compliance, and (v) Reporting Obligations.

Genera further explained its approach and understanding that measuring, reporting and analyzing performance metrics is a critical

Recommended Award

piece to achieving sound operational discipline and excellence. In addition to availability and reliability metrics for the baseload plants, Genera planned to calculate and track peaking starting reliability percentages and equivalent forced outage rates for all units. Genera described monthly reporting processes, with formal review meetings established with each plant so that any issues can be quickly identified and action plans for improvement can be created. A corrective action tracking tool will be utilized to assist with the disciplined activities that are required to capture the improvements needed.

In addition to operational savings achieved through improving and standardizing performance, Genera provided estimates of savings on fuel for all plants and outlined gas infrastructure that could be provided by as part of long-term agreements, which could also generate savings. Specifically, Genera identified the following methods of achieving fuel savings:

- optimizing existing fuel contracts;

- pursuing better financing terms and reducing fuel premiums. Fuel contracts will be renegotiated and extended, or replaced as per government guidelines;

- conducting required maintenance on the Legacy Generation Assets (e.g., San Juan Units 5 and 6, Palo Seco Units 3 and 4, and Costa Sur Units 5 and 6); and

- reducing maintenance intensive liquid fuel storage assets to reduce capital expenditures needed to rebuild storage tanks and decrease fugitive emissions.

## 5.2.2 Financial Considerations

The RFP required each Proponent to provide certain operational and financial terms and conditions to be included in the O&M Agreement as part of their Financial Proposals, as follows:

- Target Service Commencement Date;

- cost of the Mobilization Service Fee;

- proposed O&M Fixed Fee for each year of the O&M Agreement and the proposed maximum O&M Incentive and O&M Penalty for each year of the O&M Agreement;

- proposed Decommissioning Fixed Fee for each year of the O&M Agreement and the proposed maximum Decommissioning Incentive and Decommissioning Penalty for each year of the O&M Agreement

- cost of the Demobilization Service Fee;

- Termination Fees payable to the Owner or the Operator, as applicable; and

- certain Operator liability caps.

The Financial Proposals comprised 50% of the overall weighted scores.

The Partnership Committee determined that Genera's Binding Proposal (reflecting the Service Fee as adjusted) provided the better Financial Proposal, given that the figures proposed by Genera were in the aggregate significantly more favorable to the Government in certain categories.

Recommended Award

Table 6 illustrates the values for the Proponents' Financial Proposals. Figures highlighted in green are the ones that are more advantageous to the Government.

### TABLE 6: FINANCIAL PROPOSALS

| # | Component | Concept | GENERA | NAES |
|---|-----------|---------|--------|------|
| 1. | Mobilization Service Fee* | Operator's estimate of cost for providing services during the Mobilization Period. | $15.0 million | $14.0 million |
| 2. | Net Present Value Service Fee | The net present value of the O&M Fixed Fee and Decommissioning Fixed Fee (which, in Genera's Financial and Technical Proposal, was incorporated into the O&M Fixed Fee) over the 10-year term of the O&M Agreement. | $119.9 million | $185.1 million |
| | NPV of Maximum Incentives and Penalties** | The net present value of the maximum Incentives and Penalties over the 10-year term of the O&M Agreement | $34.1 million | $9.7 million |
| 3. | Operator Termination Fee*** | Fee payable to the Operator in the event the O&M Agreement is terminated prior to the end of the term of the agreement in the event of certain limited circumstances not due to Operator's fault. | $37.0 million | 18.1 million |
| 4. | Owner Termination Fee*** | Fee payable to the Owner in the event the O&M Agreement is terminated prior to the end of the term of the agreement in the event of certain limited defaults by Operator. | $37.0 million | $3.0 million |
| 5. | Operator Liability to Owner | The maximum liability of the Operator to PREPA under the O&M Agreement. | $20.0 million | $48.0 million |
| 6. | Parent Guarantee | The amount of the guarantee to be provided by the parent company of the Operator. | $45.0 million | $48.0 million |
| 7. | Delay Liquidated Damages Cap | The maximum penalty amount payable to PREPA for failure to handover Legacy Generation Assets by the Target Service Commencement Date due to the Operator's fault. | $15.0 million | $0.5 million |
| 8. | Gross Negligence Cap | The maximum amount of Operator's liability to PREPA for losses due to Operator's gross negligence. | $20.0 million | $48.0 million |
| 9. | Maximum Reporting Obligation Charge | The maximum Reporting Obligation Charge over the 10-year term of the O&M Agreement. | $1.0 million | $50,000 |
| 10. | Demobilization Service Fee* | Operator's estimate of cost for providing services during the Demobilization Period. | 10% | 20% |

* The proposed Mobilization Service Fee is a hard cap of the costs of the Mobilization Services, including the hourly fully allocated cost rate for each category of Operator employee or Affiliate personnel, the percentage of the product of hourly rates and hours worked during the Mobilization Period, subcontractor categories and expected costs, and the amount of reserve in the Mobilization Service Fee. The evaluated component of the Demobilization Service Fee was a percentage of the product of the hourly fully allocated cost rate for each category of Operator employee or Affiliate personnel and the hours worked during the Demobilization Period and represented the Operator's profit margin.

** The evaluated Incentives and Penalties did not include any Incentives or Penalties associated with operating cost efficiencies or fuel-related savings because they were equally shared between  the Operator and Owner (50%/50%).

*** The Operator Termination Fee and the Owner Termination Fee were averaged over the 10-year term of the O&M Agreement.



### 5.2.3 Legal and Contractual Considerations

The RFP required Proponents to accept the Final Form of O&M Agreement, save for the terms and conditions to be proposed by each Proponent in the Financial Proposal component of its Binding Proposal, immaterial amendments to incorporate party names and the like, and subject to further discussion on a limited number of material comments. In light of the extensive review and comment process with respect to the O&M Agreement, as described in Section 4.4.4 hereof (O&M Agreement Discussions), the expectation was that Proponents would have very limited and specific comments to the Final Form of O&M Agreement, if any. In light of this, the Legal Proposal was not scored.

Nonetheless, as part of their Binding Proposals, each of the Proponents provided comments to the O&M Agreement in the form of mark-ups with specific language, with Genera also providing a memorandum highlighting more critical concerns. Although neither Proponent accepted the Final Form of O&M Agreement as drafted, Genera initially had greater comments to the contract. After further negotiations and discussions, the Proponents submitted updated mark-ups of the O&M Agreement on April 22, 2022. In its updated mark-up, Genera accepted more of the Final Form of O&M Agreement's language, reflecting greater movement than the Other Proponent. Genera and the Other Proponent submitted revised mark-ups on May 20 and May 24, 2022, respectively. In this round, Genera's mark-up contained significantly fewer comments than the Other Proponent's mark-up. Genera generally accepted the O&M Agreement as drafted with a more limited number of changes. The Other Proponent's contract mark-up retained a number of items that shifted risk to the Government, including (i) delaying the applicability of the Operator Event of Default for Failure to Meet the Minimum Performance Threshold until two years after the Service Commencement Date, (ii) an approach to interviewing and making offers to Owner

Employees less favorable to Owner Employees, (iii) asserting that it was not legally required to become a signatory to the Consent Decree, and (iv) an expanded Owner Event of Default for failure to fund accounts.

The O&M Agreement contained certain core elements:

> minimum performance thresholds for the Operator's performance of the O&M Services;

> Mobilization Period activities aimed at a smooth transition of operations;

> signing onto the Consent Decree and agreeing to comply with environmental law applicable to the Legacy Generation Assets; and

> events of default, additional termination rights and payment of fees.

Set forth below is a summary description of the provisions of each of these elements of the O&M Agreement as well as the main comments of each of Genera and the Other Proponent to such provisions. The summary description does not reflect revisions made to the O&M Agreement in response to feedback provided by PREB on the draft of the Genera O&M Agreement approved by the Partnership Committee on August 25, 2022. Section 5.3 (*PREB Comments to the Genera O&M Agreement*) summarizes those revisions.

### Minimum Performance Threshold

As discussed under Section 4.4.4 (*Incentives for Optimal Performance with Limited Resources*), the O&M Agreement requires the Operator to perform the O&M Services in such a manner as to meet minimum standards of performance across certain Incentives and Penalties categories

PUBLIC-PRIVATE
PARTNERSHIPS

(each, a "**Minimum Performance Threshold**"). Incentives and Penalties would be added to or deducted from the Service Fee based on Operator's performance across a range of categories, including operation cost-efficiency (ability to meet budget), equivalent availability factor (reliable availability of power), health and safety compliance, environmental compliance, reporting obligations (only as a Penalty), fuel savings and decommissioning. After the Service Commencement Date, Operator's failure to meet the minimum performance threshold for any of the categories of equivalent availability factor, health and safety compliance, environmental compliance, and decommissioning, for two consecutive Contract Years would trigger an Event of Default for Failure to Meet the Minimum Performance Threshold.

In their Binding Proposals, each Proponent proposed a ramping-up period before the Operator would be subject to the Event of Default for Failure to Meet the Minimum Performance Threshold. Following multiple discussions with the Proponents as to their comments to the O&M Agreement, Genera agreed to adhere to the Final Form of O&M Agreement's original approach, removing any ramp up period to the Operator's obligations. The Other Proponent, however, continued to push to make the Event of Default for Failure to Meet the Minimum Performance Threshold applicable only after two years following the Service Commencement Date, reflecting less willingness to be responsible for performance of the O&M Services from day one. Given the 10-year duration of the O&M Agreement and the Government's intention that the Legacy Generation Assets be decommissioned over that term, exempting the Operator from the requirement to meet the Minimum Performance Thresholds for two years would significantly limit the Operator's liability to the Owner over the Contract Term and shift to the Owner the operational and financial risk of continued poor performance during the Operator's management of the Legacy Generation Assets.

## The Mobilization Period – Interviewing and Hiring Employees

The O&M Agreement specifies certain conditions precedent to Service Commencement Date, including the interview by Operator of all regular generation employees of Owner and its Affiliates who were, as of 30 Business Days following the effective date of the O&M Agreement, employed and that remained then currently employed by Owner and its Affiliates ("**Owner Employees**"), and the giving of offers to qualified Owner Employees in highly-skilled plant positions critical to the reliable operation and maintenance of the respective Legacy Generation Asset. In addition, the Legacy Generation Emergency Response Plan must be submitted to PREB, and the Procurement Manual to COR3, for its respective approval prior to the Service Commencement Date.

In their Binding Proposals, each Proponent generally accepted that the Operator would be responsible for the preparation of certain items prior to the Service Commencement Date and emphasized their commitment to hiring Owner Employees. The Other Proponent, however, did not agree to certain key concepts in those provisions, including by (i) clarifying that Operator is not required to hire all or substantially all of the Owner Employees and that Owner Employees must apply to job categories that Operator wished to fill, (ii) removing the deadline for Operator to interview Owner Employees, and (iii) reducing the period of time to keep offers to employees open. Following a series of meetings with and requests for clarification from the P3 Authority, the P3 Consultants, and the FOMB Representatives, though the Other Proponent agreed to withdraw certain comments, it did not accept as much of the Final Form of O&M Agreement's original approach as Genera had accepted. Specifically, Genera overall accepted Operator's interviewing and offering obligations, including to interview all currently employed, regular Owner Employees. **Additionally, during the negotiations that followed Genera's selection as the Preferred Proponent, Genera**

Recommended Award



**also agreed to offer employment to all full-time plant Owner Employees who were employed and in good standing as of June 30, 2022.** Operator will (i) provide a minimum two (2) year job guarantee to the Hired Former Employees of Owner and (ii) only separate the Hired Former Employees of Owner from such position during these two years if he or she engages in behavior that warrants dismissal or constitutes just cause.

Although the Other Proponent appeared willing to negotiate with respect to these items following discussion and multiple drafts of the O&M Agreement, the Other Proponent's request for Operator discretion in the interviewing process was concerning to the Partnership Committee, which emphasized throughout the RFP Process the importance of every Owner Employee of being interviewed by Operator, without being compelled to formally apply. By agreeing to interview all regular Owner Employees who were employed as June 30, 2022 and currently remain employed, and to offer employment to all full-time plant Owner Employees in good standing as of June 30, 2022, Genera went further in its

commitment to the people employed at PREPA's Legacy Generation Assets.

### *Events of Default, Additional Termination Rights and Funding of Accounts*

The O&M Agreement provides that certain breaches by the parties of their obligations under the O&M Agreement constitute events of default that result in a right to terminate the O&M Agreement. In addition, the O&M Agreement includes additional termination events arising under certain limited circumstances, such as an extended force majeure event that materially interferes with or increases the cost of the O&M Services. With a view towards reducing the risk of (i) early termination following the extensive RFP Process or (ii) renegotiation of the O&M Agreement while the Operator is performing the O&M Services (in which renegotiation the Operator would have significant leverage), the Government sought to ensure that the O&M Agreement did not include extensive termination rights.



Genera generally accepted all of the events of default and additional termination rights proposed by the Government, as well as the approach to payment of the Operator's fees and expenditures. The Other Proponent sought to expand the Operator's termination rights and other remedies. Whereas the O&M Agreement provides for default by Owner if an account falls below 50% of the requisite funding after the expiration of a cure period, the Other Proponent sought a termination right if an account falls below 100% of the requisite funding for more than two consecutive months or three months in a rolling 12-month period. Similarly, Genera accepted the Final Form of O&M Agreement's funding requirements for the Reserve Account, whereby if in the month following a withdrawal Owner is unable to fully replenish the Reserve Account to the requisite funding level, such failure to fund will not constitute an event of default if the Reserve Account is fully replenished as soon as Owner has sufficient funds. The Other Proponent maintained throughout negotiations that, if the Reserve Account is not fully replenished within 15 days of notification by Operator, such failure to fund must constitute an event of default, thus giving Operator an additional termination right. These significantly increased the risk of termination under circumstances where the Operator was still being paid and there was very limited risk of not continuing to be paid.

### Authorization to Execute the O&M Agreement

From a contractual perspective, there were other material differences between the Binding Proposals as relates to the terms, conditions, and legal and contractual risk that each Proponent was willing to bear. Although communications with the Other Proponent throughout April and May 2022 indicated that the Other Proponent would be willing to drop certain points that had the effect of allocating greater legal and contractual risk to the Government, as of the May 24, 2022 Partnership Committee meeting, the Other Proponent had been unable to secure shareholder approval to execute the O&M Agreement.

Overall, as of the May 24, 2022 evaluation, the Other Proponent's Legal Proposal, as compared to Genera's Legal Proposal, included a few more material changes and issues that could not quickly be resolved that had the cumulative effect of shifting additional risk and cost to the Government. In light of this, the Partnership Committee determined that accepting the Other Proponent's Legal Proposal would result in a less favorable and less certain arrangement for Puerto Rico.

In light of the above, Genera's higher financial scores and the fact that Genera had effectively accepted the Final Form of O&M Agreement proposed by the Government except for the limited number of changes, the Partnership Committee decided to produce a final form of O&M Agreement for Genera and to engage in exclusive negotiations with Genera as the Preferred Proponent.

Following the Partnership Committee's selection of Genera as the Preferred Proponent pursuant to Section 5.1 of the Regulation, the P3 Authority, the P3 Consultants, and the FOMB Representatives met with the Preferred Proponent to discuss the Preferred Proponent's final comments to the O&M Agreement, which were limited and primarily in the nature of clean up and clarification changes, all of which were acceptable. On August 25, 2022, the Partnership Committee voted unanimously to approve the Genera O&M Agreement, and recommend to the P3 Authority Board that Genera be selected to execute the O&M Agreement for the LGA Project.

Recommended Award



## 5.3   PREB Comments to the Genera O&M Agreement

Following the Partnership Committee's approval and recommendation, on August 25, 2022 the P3 Authority submitted the Genera O&M Agreement and a draft of this Report to PREB on October 21, 2022. After PREB provided feedback on the Genera O&M Agreement, on November 2, Genera, the P3 Authority, the P3 Consultants and the FOMB Representatives met with PREB to discuss its comments. Following that discussion, the P3 Authority and Genera negotiated a revised draft of the Genera O&M Agreement (the "**Revised Genera O&M Agreement**").

The key concerns raised by PREB and addressed in the Revised Genera O&M Agreement included (i) treatment of Penalties throughout the O&M Agreement, (ii) conflicts of interest and the Procurement Manual, (iii) liability standards applicable to Owner and Operator, (iv) alignment of capital improvements with the IRP, (v) Force Majeure Events pertaining to hazardous materials and waste disposal, (vi) Decommissioning Plan and completion of the Decommissioning Services, and (vii) PREB's oversight of the O&M Agreement.

On November 9, the Partnership Committee approved the Revised Genera O&M Agreement, subject to the resolution of a few remaining items under negotiation. Genera and the P3 Authority resolved those items on November 16, and the P3 Authority filed the Revised Genera O&M Agreement with PREB on November 17. Exhibit F (*Summary of O&M Agreement*) summarizes the terms of the Revised Genera O&M Agreement.



This page has been intentionally left blank.



# 6. Conclusion

This page has been intentionally left blank.

Due to PREPA's struggle to provide affordable and reliable electric service coupled with the fiscal mismanagement that caused an unprecedented restructuring, all of which was exacerbated by natural disasters (e.g., Irma and Maria and the earthquakes), the Government developed and began implementing a comprehensive and visionary plan intended to transform Puerto Rico's energy sector and PREPA, the sole electric utility for the island of Puerto Rico. PREPA serves approximately 1.5 million customers (currently through the T&D Operator) and employs in its generation directorate approximately 1,000 people in Puerto Rico. PREPA's purpose is to provide the people of Puerto Rico with reliable electric power, assist the sustainable development of Puerto Rico, and contribute to the general welfare as a service provider and employer on the island. In the years leading up to Irma and Maria, PREPA had become increasingly vulnerable to natural disasters for several reasons, including, among others, (i) political interference, (ii) lack of managerial continuity and long-term planning, (iii) poor and deferred maintenance of the Legacy Generation Assets, in part due to (iv) a fiscal and economic crisis that led to unmanageable debt obligations and inadequate levels of infrastructure investment. With regard to the generation system, the Legacy Generation Assets have historically experienced above industry average equivalent forced outage rates, primarily as a result of poor equipment conditions and operational practices.

In order to effect the transformation of PREPA and based on the demonstrated credibility of the model, the Government elected to initiate a PPP process. The objective of this PPP process carried out by the P3 Authority, PREPA, and the Partnership Committee was to realize the Government's long-term goals of (i) upgrading Puerto Rico's electric system to be more resilient against future natural disasters and (ii) revitalizing Puerto Rico's economy, in each case for the benefit of the people of Puerto Rico.

To achieve these goals, the Government had to first seek to (i) modernize the legislative framework for Puerto Rico's electric sector, (ii) secure federal disaster assistance funding to help rebuild Puerto Rico in the aftermath of Irma and Maria without resorting to the capital markets, (iii) address PREPA's unprecedented fiscal and economic crisis through the Title III process of PROMESA, and (iv) engage a private operator of the T&D System. It then had to design and implement an iterative, transparent, and competitive process to identify and select a private partner to operate and decommission PREPA's Legacy Generation Assets and obtain buy-in from multiple stakeholders.

Through the enactment of the Transformation Act in June 2018, the Government laid down the legal framework for its stated goal of transforming Puerto Rico's energy system into a modern, sustainable, reliable, efficient, cost effective, and resilient one. The very same month, the Government launched the T&D Project with a market sounding that indicated substantial interest in the LGA Project. On October 31, 2018, the P3 Authority commenced the process to identify a private partner for the T&D Project. On June 22, 2020, after a robust, competitive and transparent RFP Process, the P3 Authority announced that PREPA had entered into the 15-year T&D O&M Agreement with LUMA Energy, LLC and LUMA Energy Servco, LLC, as the T&D Operator.

One and a half months later, on August 10, 2020, the P3 Authority commenced the qualification process to identify a private partner for the operation, maintenance, and eventual decommissioning of the Legacy Generation Assets. Fourteen months later, on December 22, 2021, the Partnership Committee received two Binding Proposals from two Proponents qualified to operate the Legacy Generation Assets. Pursuant to RFP, the Binding Proposals received were comprised of three main components:





- an Operational Proposal highlighting the Proponent's plans with respect to certain technical and operational elements of the O&M Services;

- a Financial Proposal presenting the Proponent's proposed terms and conditions for certain financial provisions of the O&M Agreement; and

- a Legal Proposal confirming acceptance of the form of O&M Agreement.

On January 27 and 28, 2022, each Proponent presented its Binding Proposal to the Partnership Committee, the P3 Authority, the P3 Consultants, and the FOMB Representatives. On June 9, 2022, after nearly six months of review and evaluation of the Binding Proposals based on the evaluation criteria designed to meet the Government's objectives with respect to the transformation of the Legacy Generation Assets, the Partnership Committee voted to designate Genera as the Preferred Proponent.

Genera's Binding Proposal not only complied with the requirements of Act 29, the Transformation Act, the Regulation, and the RFP, but also was awarded the higher average score in its Financial Proposal based on the evaluation criteria developed to meet the objectives of the LGA Project and its Legal Proposal was determined to be the more favorable arrangement for Puerto Rico due to it aligning more closely to the Final Form of O&M Agreement.

- Genera's Operational Proposal presented a tailored approach to the O&M Services that indicated a strong understanding of the PREPA context. In particular, Genera (i)

included a fully developed Mobilization Plan with a proposed timeline and an Operator Recruitment and Staffing Plan; (ii) generally accepted the Government's approach to the Incentives and Penalties and indicated a willingness to work collaboratively with PREB; and (iii) demonstrated a uniquely strong commitment to transitioning PREPA employees, and further training and development of the generation workforce, as evidenced by its agreement to interview and provide offers of employment to all fulltime plant employees.

- Following discussions with Genera resulting in a significant reduction in the net present value of Genera's Service Fee over the Contract Term, Genera's Financial Proposal represented the lower net present calculation of the Service Fee over the Contract Term.

- Genera agreed to a form of the O&M Agreement that was the closest to the Final Form of O&M Agreement included in the RFP, which (i) resulted in less risk and cost transfer from the Operator to the Government and (ii) preserved the rights of the Government vis-à-vis the Operator included in the Final Form of O&M Agreement.

Following an extensive review of the Binding Proposals, the Partnership Committee determined that Genera's Binding Proposal was superior in respect of each of its financial and legal components (and received assurance from Genera as to the operational expertise of its team), and represents the better alternative to achieve the Government's stated goal of transforming the generation system for the benefit of the people of Puerto Rico. In particular, based on Genera's Binding Proposal, the Partnership Committee determined that Genera was well-suited to bring to fruition the Government's goal of transforming the generation system into one that is customer-centric, resilient, reliable, affordable, and sustainable by operating the Legacy Generation Assets efficiency, reliably,

and safely until decommissioning such assets, paving the path for the integration of renewable generation sources.

In conclusion, the PPP process for the LGA Project was carried out over the course of more than 24 months and involved (i) robust participation by a number of highly qualified private sector participants, (ii) extensive due diligence of the Legacy Generation Assets, (iii) multiple opportunities for comment on and discussion of the proposed transaction structure and the O&M Agreement, both with private sector participants and with various government entities and other stakeholders, including the FOMB and PREB, (iv) an extensive and in-depth assessment and analysis of the Binding Proposals by the Consultants, (v) the opportunity for Proponents to present and discuss their Proposals in person to the Partnership Committee, the P3 Authority, various Consultants, and the FOMB Representatives, (vi) thorough review of the Binding Proposals and the Consultant's assessment thereof by the P3 Authority, the Partnership Committee, and the FOMB, (vii) the scoring of the Binding Proposals by the Partnership Committee based on clearly-articulated evaluation criteria to achieve the Government's objectives for the LGA Project, and (viii) in-depth discussions with PREB to address PREB's comments on the Genera O&M Agreement. As such, the Partnership Committee unanimously recommends to the P3 Authority Board that Genera be awarded the O&M Agreement.

**Approved and received by the Partnership Committee Members:**

**Omar Marrero**
*Executive Director and Chairman*
Financial Advisory Authority and Fiscal Agency of Puerto Rico

**Josué A. Colón Ortiz**
*Executive Director*
Puerto Rico Electric Power Authority

**Fernando Gil-Enseñat**
*Chairman of Governing Board*
Puerto Rico Electric Power Authority

**Edison Avilés Deliz**
*Chairman*
Puerto Rico Energy Bureau

*Government officer chosen by the Board of the Directors of the P3 Authority for their knowledge and experience*

**Gerardo Lorán-Butrón**
*Executive Director Special Advisor & Chief Officer*
Financial Advisory Authority and Fiscal Agency of Puerto Rico

*Government officer chosen by the Board of the Directors of the P3 Authority for their knowledge and experience*

# Exhibit A: Defined Terms

This page has been intentionally left blank.



# DEFINED TERMS

For purposes of this Report, the following defined terms will have the meanings used in the sections indicated below.

| Term | Section | Term | Section |
|------|---------|------|---------|
| 2019 IRP | 3.1.4 | NERC | 3.1.2 |
| 428 Guide | 3.1.4 | NFE | 1 |
| AAFAF | 2 | NFE FSPA | 1 |
| Act 29 | 2 | Nixon | 2 |
| Act 29 Regulation | 3.1.3 | NRG Energy Services | 1 |
| Administrator | 4.3 | O&M Agreement | 1 |
| Aerostar | 3.1.3 | O&M Fixed Fee | 1 |
| Baker Donelson | 2 | O&M Incentive | 1 |
| Binding Proposal | 1 | O&M Penalty | 1 |
| Certified PREPA Fiscal Plan | 1 | O&M Services | 1 |
| Citigroup | 2 | Operational Proposal | 1 |
| Cleary | 2 | Operator | 1 |
| Commonwealth Plan of Adjustment | 1 | Operator Recruitment and Staffing Plan | 1 |
| Consent Decree | 3.1.2 | OSHA | 3.1.2 |
| Consultants | 2 | Other Proponent | 1 |
| Contract Term | 1 | Owner | 1 |
| Contract Year | 5.1.1 | Owner Employee | 5.2.3 |
| COR3 | 3.1.4 | P3 Authority | 1 |
| Costa Sur Power Plant | 1 | P3 Authority Board | 1 |
| COVID-19 | 4.4.2 | P3 Consultants | 2 |
| CPM | 2 | Parent Guarantee | 5.1.1 |
| DART Rate | 3.1.2 | Partnership Committee | 1 |
| Data Room | 4.4.2 | PIC Group | 1 |
| Decommissioning Fixed Fee | 1 | PMA | 2 |
| Decommissioning Incentive | 1 | PowerAdvocate© Message | 4.4.1 |
| Decommissioning Penalty | 1 | PPP | 1 |
| Decommissioning Services | 1 | PREB | 2 |
| Demobilization Period | 5.1.1 | Preferred Proponent | 2 |
| Demobilization Plan | 1 | PREPA | 1 |
| Demobilization Service Fee | 1 | PREPA Employees | 1 |
| DOJ | 3.1.2 | PREPA-Genco-Hydroco Operating Agreement | 4.4.2 |
| EcoEléctrica | 1 | PREPA Transaction | 3.1.4 |
| EGE Haina | 1 | PRHTA | 3.1.3 |
| Encanto Power | 1 | NFE FSPA | 1 |
| Energy Policy Act | 3.1.4 | ProEnergy | 1 |
| EPA | 3.1.1 | PROMESA | 1 |
| Expert Panel | 3.1.4 | Proponent | 1 |
| FEMA | 3.1.1 | PRPA | 3.1.3 |
| Ferries Project | 3.1.3 | Proposal Submission Deadline | 4.4.1 |



| Term | Section |
|------|---------|
| Fiona | 1 |
| Final Form of O&M Agreement | 4.4.1 |
| First Draft O&M Agreement | 4.4.1 |
| FOMB | 1 |
| FOMB Consent | 2 |
| FOMB Representatives | 2 |
| FTI | 2 |
| GADS | 3.1.2 |
| Genera | 1 |
| Genera O&M Agreement | 4.4.7 |
| GMP | 3.1.4 |
| Government | 1 |
| Incentives and Penalties | 1 |
| Irma | 1 |
| IRP | 1 |
| IRP Final Resolution and Order | 3.1.4 |
| Legacy Generation Assets | 1 |
| Legal Proposal | 1 |
| Legislature | 2 |
| LGA Project | 1 |
| LMM Airport Project | 3.1.3 |
| LMM Airport Agreement | 3.1.3 |
| Management Presentation | 4.4.2 |
| Maria | 1 |
| MAP | 3.1.4 |
| Material Subcontractor | 5.1.3 |
| MATS | 3.1.1 |
| MBs | 4.4.2 |
| Metropistas | 3.1.3 |
| Minimum Performance Threshold | 5.2.3 |
| Mobilization Period | 1 |
| Mobilization Plan | 1 |
| Mobilization Service Fee | 1 |
| MTA | 3.1.3 |
| NAES | 1 |

| Term | Section |
|------|---------|
| Proskauer | 2 |
| Recommended Award | 2 |
| Recordable Rate | 3.1.2 |
| Regulation | 2 |
| Report | 2 |
| Required Approvals | 2 |
| Respondent | 1 |
| RFC | 4.3 |
| RFP | 1 |
| RFP Process | 1 |
| RFP-RFC | 4.4.2 |
| RFQ | 1 |
| RFQ Process | 1 |
| RFQ-RFC | 4.3 |
| San Juan Unit 5 | 3.1.1 |
| San Juan Unit 6 | 3.1.1 |
| Second Draft O&M Agreement | 4.4.1 |
| Service Commencement Date | 5.1.1 |
| Service Fee | 4.4.4 |
| Severity Rate | 3.1.2 |
| Siemens | 1 |
| SOQ | 1 |
| SOQ Submission Deadline | 4.3 |
| T&D O&M Agreement | 1 |
| T&D Operator | 1 |
| T&D Project | 1 |
| T&D System | 1 |
| Financial Proposal | 1 |
| Termination Fee | 1 |
| Title III | 1 |
| Title III Approvals | 5.2.3 |
| Title III Court | 3.1.5 |
| Toll Roads Agreement | 3.1.3 |
| Toll Roads Project | 3.1.3 |
| Transformation Act | 1 |

# Exhibit B:
# Benefits of a Third-Party Generation Operator of the Puerto Rico Legacy Generation Assets

This page has been intentionally left blank.






**SEPTEMBER 22, 2022**

# BENEFITS OF A THIRD-PARTY GENERATION OPERATOR OF THE PUERTO RICO LEGACY GENERATION ASSETS

EXPERTS WITH **IMPACT**™



Benefits of a Third-Party Operator of the Puerto Rico Legacy Generation Assets



## Table of Contents

**I.   Executive Summary** ................................................................................ 2

**II.  Current Situation** ................................................................................. 6

   a.  Generation Plant Performance ........................................................ 6

   b.  Safety ....................................................................................... 7

   c.  Environmental ............................................................................ 9

   d.  Reliability .................................................................................. 9

**III. Reasons for Hiring a Third-Party O&M Provider** ..................................... 11

   a.  Benefits of Hiring a Third-Party ..................................................... 13

**IV.  Generation Operator Solicitation Process** ............................................. 13

   a.  The Process ............................................................................... 13

   b.  Justification .............................................................................. 13

   c.  RFP Process ............................................................................... 15

**V.   Financial and Economic Benefits of the Genera Contract** ........................ 16

   a.  Summary of Genera LGA OMA Financial Contract Provisions .................. 16

   b.  Economics of the Genera LGA OMA .................................................. 18

**Appendix A: List of Acronyms** ............................................................... 20

**Appendix B: Materials Referenced** ........................................................ 21



Benefits of a Third-Party Operator of the Puerto Rico Legacy Generation Assets



## I.   Executive Summary

The purpose of this document is to provide an overview of the benefits of selecting a Third-Party Generation Operator for the Puerto Rico Legacy Generation Assets ("LGA" or "Generation") through a competitive solicitation process. Given the myriad of issues facing the electric system in Puerto Rico, a qualified Third-Party generation operator will ensure operation of the LGA to better enable the transition from large fossil-fired generating plants to an increasingly renewable, distributed and resilient set of resources connected to a modern and reliable electric grid.

Over the past decades, Puerto Rico Electric Power Authority ("PREPA") LGA have faced a number of safety, reliability, operational, environmental compliance and financial challenges. A dependence on very expensive, inefficient, and aged oil-fired generation and significant damage created by earthquakes and other events has exacerbated PREPA's LGA poor performance. PREPA has also been criticized for ineffective management and underinvestment in critical generation assets. It has become clear that a complete transformation of the Puerto Rico electric system, along with a shift from the existing PREPA management organization, is essential to enable safe and reliable operation of the LGA for the benefit of Puerto Rico.

In order to drive this transformation, the Government of Puerto Rico enacted The Transformation Act, Act 120-2018 ("Act 120") to establish the legal framework for the transformation of the Puerto Rico electric system including incentivizing private participation through the formation of public-private partnerships ("PPPs") to be implemented by the Puerto Rico Public-Private Partnership Authority (the "Authority"). Act 120 stipulates that PREPA can sell or transfer its generation assets or transfer/delegate any of its operations, functions or services through a PPP (a "PREPA Transaction"). In conjunction, Act 120 empowers the Authority to (i) implement and execute PREPA Transactions, (ii) determine which PREPA functions, services and/or facilities would be best suited for PPPs and (iii) determine which specific PREPA generation assets to sell or transfer in separating the generation business from the T&D System business, detailed below.[1]

One of the first initiatives the Authority undertook after Act 120 was enacted, was the operational separation of the T&D System from the existing Legacy Generation Assets and to begin the search

---

[1] See Section 1.1 to 1.4 of Regulation for the Procurement, Evaluation, Selection, Negotiation and Award of Partnership Contracts and Sale Contracts for the Transformation of the Electric System Under Act No. 120-2018, as Amended. (March 8, 2019).

2



Benefits of a Third-Party Operator of the Puerto Rico Legacy Generation Assets        

for a qualified Third-Party operator for the T&D System.[2] The goal of separating the T&D System operations from the Generation operations is to (i) ensure the most qualified operator for both the T&D System and the Generation, and (ii) create a competitive dynamic within each function to attract qualified, industry-leading respondents.

The T&D Operator selection was completed in 2020, resulting in LUMA Energy, LLC ("LUMA") being selected as the T&D System Operator and, after an approximate one year transition, operations were formally handed over from PREPA on June 1, 2021. Since that time, LUMA has been implementing a well-defined, multi-year System Remediation Plan ("SRP") to address the decades of poor operation and maintenance practices, which is being funded by COR3/FEMA as part of a larger 10-year rebuild program.

The process for the selection of the LGA Operator has been executed in a similar rigorous manner to the T&D process. The selected Proponent will operate and maintain the LGA in accordance with the agreed to Operations and Maintenance Agreement ("OMA" or "LGA OMA"). During the LGA Request for Proposals ("RFP") and evaluation process, the Authority prequalified eight Respondents at the Request for Qualifications ("RFQ") stage to determine which Proponent would be the most qualified and best suited. The comprehensive process conducted involved the same stakeholders as the T&D process and resulted in Genera PR LLC ("Genera"), a New Fortress Energy ("NFE")-owned company, being selected as the preferred Proponent.

The Authority-led competitive solicitation process to select the LGA Operator has made progress toward accomplishing the objectives of Act 120-2018 by selecting qualified bidders with the operational and financial capability to enable the LGA to operate for the next 5-10 years in a safe and reliable manner while taking into consideration their planned retirement and demolition in future years per the Integrated Resource Plan ("IRP") as more renewable energy resources are built. As this document details, in addition to the operational benefits there are substantial financial and economic benefits that will flow directly to the electric ratepayers of Puerto Rico through operational and fuel savings as well as incentives for the Generation Operator to drive enhanced performance in LGA availability, safety and environmental compliance. Although the operator of the LGA doesn't interface directly with customers, their operational reliability cannot

---

[2] Due to the tax-exempt status of PREPA's debt, it was determined that PREPA must hold title to the T&D System assets to benefit from access to lower financing costs.

3



Benefits of a Third-Party Operator of the Puerto Rico Legacy Generation Assets



be understated in terms of ensuring that LUMA has enough power resources to provide customers with reliable power as demonstrated by numerous high profile events over the past several years where insufficient generation led to outages.

There are significant operational and financial benefits associated with the introduction of a Third-Party Operator of the Puerto Rico Legacy Generation Assets. These benefits will be explained in further detail in this report, but in summary these include programs and approaches that will address existing issues and challenges with the LGA:

- The LGA have been exposed to decades of under-investment and poor operational performance, which, to this day, has resulted in a lack of adequate power generation resources.

- The existing aged fleet of base, peak and emergency fossil-fueled power plants must be operational and reliable for approximately 10 more years while Puerto Rico transitions its future power generation resources to renewables per the approved IRP, after which the decommissioning and demobilizing period of the LGA will commence.

- As all fuel is imported and most plants operate on oil, operating the LGA more efficiently and buying fuel more effectively presents a less costly and more environmentally friendly operating mode for the LGA.

Across North America there are well established and highly capable Third-Party operators of power plants who provide the necessary operations and maintenance ("O&M") functions.

Due to PREPA's poor performance operating the LGA, and implementing the public policy mandated by Act 120, the P3 Authority decided that conducting a rigorous process to hire a highly qualified Third-Party operator of the power plants was the best path forward in order to ensure a seamless transition from the fossil-based plant operations to the future renewable power generation plants for Puerto Rico.

As a result of the above process, on May 14, 2022, the P3A Partnership Committee selected Genera as the Preferred Proponent.

4



Benefits of a Third-Party Operator of the Puerto Rico Legacy Generation Assets



The remainder of this document is structured as follows, outlining:

- In **Section II**, the current situation, including, generation plant performance, safety, environmental and reliability considerations;

- In **Section III**, the rationale for hiring a Third-Party Operator, as well as the associated benefits;

- In **Section IV**, the details of the competitive solicitation process to select a Third-Party Generation Operator; and

- In **Section V**, the financial and economic benefits of the Genera Generation OMA.

5

Benefits of a Third-Party Operator of the Puerto Rico Legacy Generation Assets



## II.   Current Situation

### a.   Generation Plant Performance

For decades, Puerto Rico has suffered the burden of unreliable and costly electric power, a result of an aging infrastructure with insufficient investment, poor operating performance, high and volatile fuel prices and devastating weather events. PREPA's largest expense is fuel. Puerto Rico imports all of its fuel, and most of the power pl  ants were designed to operate on liquid fuels, including distillate, diesel and heavy fuel oils which are more costly than natural gas. PREPA generation has underperformed relative to industry standards in several relevant categories including plant availability and plant forced outage rates (Figure 1, below) and safety. Some of these forced outages resulted in inadequate generation supply and significant loss of adequate power supply to meet electric customer demand.

**Figure 1. PREPA Generation Plant Performance 2019 through 2022[3]**



Situated in a coastal environment, the LGA equipment faces exposure to sea salt which causes problems of corrosion and erosion to the power plant equipment. In addition, the LGA have suffered significant damage due to earthquakes including several in 2020. Beyond the impact of the earthquakes, electric ratepayers have dealt with suboptimal power supply characterized by unacceptably long forced outages at the power plants thus making the delivery of power to LUMA's

---

[3] Source for PREPA operating data: LUMA draft report, "Resource Adequacy Analysis," July 1, 2022. Average North America data from NERC, General Availability Review (Weighted EFOR) Dashboard, https://www.nerc.com/pa/RAPA/Pages/GeneralAvailabilityReview.aspx.

6




Benefits of a Third-Party Operator of the Puerto Rico Legacy Generation Assets

customers extremely difficult. Further, the PREPA LGA was viewed as suffering from poor management and insufficient capital investment.

The Generation Operator Solicitation Process (described in Section IV) has incorporated a number of incentive mechanisms that tracks various performance metrics and awards financial compensation based on predefined target metrics based on industry practice.

### b. Safety

Public and employee safety is a critical component to a successful electric utility operation. Eliminating hazards requires proper training and strict adherence to the rules and regulations set forth by the Occupational Safety and Health Administration ("OSHA"). OSHA requires the reporting of several metrics to evaluate and track the safety of an organization, including, Incident Rate[4] which measures the number of safety-related incidents that are reported to OSHA scaled to workforce size and Number of Fatalities measures job-related fatalities reported to the OSHA.

Since 2003, PREPA's safety performance was more than five times worse than industry average. Incident rates for T&D and Generation on an annual basis ranged from 11.0 to 19.0 and averaged approximately 15.0; this compares to a U.S. average for public power of approximately 2.22.[5]

Figure 2, below, shows that PREPA has had a high number of fatalities historically with 17 occurring since 2003. While it has shown improvement with no fatalities occurring in the recent years, the industry standard is zero-tolerance with respect to fatalities. Figure 3 shows PREPA's 2022 average year-to-date OSHA performance indicating a recordable rate of 4.6, compared to the industry average of 1.5,[6] and a severity rate of 17.7 and DART rate of 3.4 which are also high; the PREB benchmarks are also shown.

---

[4] Measured as (# of OSHA Recordable Cases / # of Employee Labor Hours Worked) * 200,000.
[5] American Public Power Association, "Evaluation of Data Submitted to the American Public Power Association's 2020 Safety Awards of Excellence," 2020.
[6] US Bureau of Labor Statistics, Incidence rates of nonfatal occupational injuries and illnesses by industry, fossil fuel electric power generation utilities, NAICS code 221112, https://www.bls.gov/home.htm.

7



Benefits of a Third-Party Operator of the Puerto Rico Legacy Generation Assets



### Figure 2. PREPA T&D and Generation – Fatalities since 2003[7]



### Figure 3. PREPA Generation OSHA Metrics for 2022[8]

| OSHA Metric | Sub-Group | FY 2022 Average | PREB Benchmark |
|---|---|---|---|
| OSHA Recordable Rate | Generation | 4.6 | 1.8 |
| OSHA Fatality Rate | Generation | 0 | 0 |
| OSHA Severity Rate | Generation | 17.7 | To be determined |
| OSHA DART Rate | Generation | 3.4 | 0.9 |

Fostering an unsafe work environment has significant reputational and financial impacts. It creates a culture in which current employees may feel uneasy and apprehensive about performing their responsibilities and it hinders the ability to attract new hires who have safer occupational alternatives. Negative financial impacts also result in ongoing litigation relating to wrongful injury or death. Note that the OSHA metrics have only been partially reported for T&D separately from Generation since the LUMA Service Commencement Date.

---

[7] In 2014, two deaths occurred at SJ5 due to the explosion.
[8] PREB Benchmark per Resolution and Order, June 2021 - May 2022, 12-Month Metrics Summary, August 18, 2022.

8



Benefits of a Third-Party Operator of the Puerto Rico Legacy Generation Assets



### c.  Environmental

PREPA's aging infrastructure has many challenges, one of the most important of which is achieving environmental compliance in order to attain its goal to improve the air quality for the residents of Puerto Rico by reducing harmful emissions. Failure to comply with environmental regulations will inevitably result in fines which could force unit shutdowns and resultant generation shortfalls and may also present the risk of potential forfeiture of federal funds.

Also, when the available operational generation capacity is lower than the minimum required for reliable operation, the power system is at high risk of losing stability. This risk is even greater in an isolated system such as Puerto Rico's, where an instability event can evolve into a total system-wide outage or blackout. Keeping the generating units and their auxiliary equipment operational, in the best possible condition, and in compliance with environmental regulations, is critical.

PREPA's Legacy Generation fleet is subject to the applicable permit limits under the federal mercury and air toxic standards ("MATS") and the 1997 US EPA Consent Decree, as updated from time to time. Currently, Aguirre, Palo Seco and San Juan sites have compliance issues with MATS. For Aguirre, particulate matter ("PM") performance tests show emissions for Unit 2 slightly above the MATS limit. Palo Seco and San Juan have PM emissions above the MATS limit, and "limited-use" units have exceeded heat-input thresholds. The locations of the Aguirre, Palo Seco and San Juan power stations have also been named $SO_2$ nonattainment areas as they are not meeting the required sulfur dioxide air quality standards. In addition to the Consent Decree compliance requirement, PREPA has committed to implement $SO_2$ emissions reduction measures in the nonattainment areas as part of Puerto Rico's $SO_2$ State Implementation Plan ("SIP").

### d.  Reliability

Providing reliable, consistent, resilient power is critical to the safe operations of an electric utility. There are several metrics that utilities use to gauge reliability. PREPA has historically exceeded planned outage schedule durations by approximately 20%. If one were to include three outages that had recent delays of 6-9 months, it would have resulted in an average schedule variance of 66% longer than scheduled for the entire generation fleet.

The FOR is another important indicator of plant performance and reliability. Table 1, below, shows both the annual and overall average forced outage rate by unit from 2013 to 2022 YTD. As Table 1 shows, most the units have double-digit average annual forced outage rates, and three units have greater than 50% (San Juan 10, Palo Seco 2, Palo Seco 4). Again, these results are between 2x and

9

Benefits of a Third-Party Operator of the Puerto Rico Legacy Generation Assets



5x industry average based on data from the North American Electric Reliability Corporation ("NERC").[9] Meanwhile, the two AES-PR coal-fueled units, which hare not run by PREPA, have a forced outage rate of just 3%, one of the lowest on the island.[10]

**Table 1 - Annual Forced Outage Rate, 2013 – 2022 YTD**

| Unit | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Tot Avg | | Units | 2022 YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| San Juan CT 5 | 15 | 2 | 2 | 16 | 98 | 7 | 10 | 4 | 7 | 17.9% | | San Juan Steam | 43% |
| San Juan STG 5 | 13 | 2 | 3 | 6 | 8 | 8 | 44 | 8 | 4 | 10.7% | | | |
| San Juan CT 6 | 1 | 51 | 30 | 5 | 5 | 2 | 7 | 6 | 2 | 12.1% | | | |
| San Juan STG 6 | 5 | 17 | 28 | 7 | 6 | 3 | 8 | 60 | 21 | 17.2% | | | |
| San Juan 7 | 7 | 7 | 5 | 11 | 7 | 12 | 49 | 52 | 45 | 21.7% | | | |
| San Juan 8 | 3 | 5 | 3 | 13 | 12 | 28 | 0 | 73 | 100 | 26.3% | | | |
| San Juan 9 | 3 | 6 | 2 | 9 | 19 | 48 | 8 | 9 | 7 | 12.3% | | | |
| San Juan 10 | 8 | 49 | 97 | 100 | 100 | 100 | 100 | 100 | 100 | 83.8% | | | |
| Palo Seco 1 | 8 | 15 | 7 | 3 | 4 | 14 | 18 | 47 | 100 | 24.0% | | Palo Seco Steam | 3% |
| Palo Seco 2 | 2 | 1 | 6 | 13 | 100 | 100 | 100 | 100 | 100 | 58.0% | | | |
| Palo Seco 3 | 15 | 0 | 6 | 10 | 61 | 15 | 10 | 6 | 28 | 16.8% | | Palo Seco Gas | 67% |
| Palo Seco 4 | 3 | 2 | 93 | 100 | 100 | 100 | 68 | 9 | 7 | 53.6% | | | |
| Costa Sur 5 | 0 | 2 | 1 | 0 | 0 | 5 | 10 | 59 | 11 | 9.8% | | Costa Sur Steam | 9% |
| Costa Sur 6 | 4 | 0 | 2 | 12 | 12 | 1 | 2 | 98 | 47 | 19.8% | | | |
| Aguirre 1 | 2 | 6 | 27 | 7 | 7 | 6.46 | 1.21 | 5.39 | 7.22 | 7.7% | | Aguirre Steam | 9% |
| Aguirre 2 | 3 | 2 | 11 | 100 | 15 | 3.25 | 77.11 | 27.1 | 8.7 | 27.5% | | | |
| Aguirre CC 1 | 20 | 9 | 6 | 14 | 47 | 53.84 | 16.93 | 34.96 | 44.92 | 27.4% | | Aguirre CC | 28% |
| Aguirre CC 2 | 3 | 10 | 37 | 63 | 39 | 50.48 | 5.49 | 2.6 | 59.61 | 30.0% | | | |

*Notes:*
1. *CT – Combustion Turbine, STG – Steam Turbine Generator, CC – Combined Cycle*
2. *The two AES-PR coal-fueled units have a forced outage rate of just 3%, one of the lowest on the island.*
3. *Data for 2022 YTD was provided by steam, gas, CC units in aggregate, by site, and not on a unit basis.*

In addition, based on the Generation Resource Adequacy Analysis conducted by LUMA, and filed with the PREB on August 30, 2022, the following were LUMA's key findings:

- Puerto Rico has inadequate supply resources to deliver reasonable system reliability to meet expected demand, thereby raising the risk of load shedding outages beyond industry standards.

- The loss of load expectation ("LOLE") for Puerto Rico for 2023 was calculated to be 8.81 days per year, which is 88 times higher than the utility industry benchmark of 1 day in 10

---

[9] NERC GADS Dashboard, https://www.nerc.com/pa/RAPA/gads/Pages/GADS-Generation-Resource-Mix-Dashboard.aspx.
[10] Comments of AES Puerto Rico submitted to the House Natural Resources Committee, June 30, 2021.

10



Benefits of a Third-Party Operator of the Puerto Rico Legacy Generation Assets



years or 0.10 days per year. This means that on average it is expected that there will be 8.81 days per year when demand will not be met by generation supply in 2023.

- The risk of load shedding outages is partially the result of inadequate reliable generation capacity due to PREPA's unreliable, old and improperly maintained generation plants which account for 77% of Puerto Rico's thermal generation.

In order to minimize the risk of generation outages, the following needs to be achieved:

- Attainment of 65% generation plant availability.  Today PREPA generation plant availability is 52%.

- Today, PREPA's generation planned outage durations almost always are on average 20% longer than the original planned duration (compared to an industry average of less than 5%). This can be improved by significantly better outage planning and execution.

- LUMA is proposing rolling out demand response, energy efficiency and voluntary conservation programs.

- Promotion of distributed energy resources for additional system resources.


## III.   Reasons for Hiring a Third-Party O&M Provider

A Third-Party O&M provider can provide the necessary services and expertise to run the LGA plants and subsequently be responsible for decommissioning and demolition as appropriate. Third-Party power generation plant operators have been utilized in industry since the late 1980s. Third-Party power plant services companies can manage operations and maintenance to reduce plant down time and optimize generating efficiency as a result of bringing lessons learned from across several portfolios that they are operating.

O&M providers offer comprehensive project operations and maintenance services, flexible contract options, and industry experience covering virtually all technologies, types, and sizes of power plants to guarantee the highest reliability and availability, increased production and efficiency and lower operating costs. The LGA O&M services will include safety programs, compliance programs, maintenance programs, operation programs, plant management, operations technical support, training, procedure writing, operations readiness and asset performance improvements.

11



Benefits of a Third-Party Operator of the Puerto Rico Legacy Generation Assets



O&M providers offer services and approaches that align with customer objectives, including:

- Maintain Plant Performance - output, efficiency, availability and reliability

- Minimize Forced Outages *and* manage planned/unplanned outages

- Focused on preventive and predictive maintenance to ensure issues are prevented and costs are minimized

- Maintain compliance with all regulations, contract requirements and legal obligations

- Operate with good commercial management in operating all facilities in compliance with agreed budgets and operational metrics (KPIs)

- Interface effectively with the System Operator and other stakeholders.

There are numerous Third-Party O&M service providers currently managing power plants with proven technical, operational and commercial experience worldwide. Leading Third-Party O&M providers partner with facility owners to improve plant performance, reduce overall operating costs, and simplify management by delivering the right combination of trained and capable plant staff.

Genera intends to subcontract the PIC Group, Inc. ("PIC") on a long-term basis, to execute a majority of the technical and field service scope of the LGA OMA. PIC is a service provider for the global power generation industry and a wholly owned subsidiary of Marubeni Group and has significant experience in operating, managing and maintaining power generation facilities, including similar projects on-island and around the globe and has developed specialized equipment, tools, systems, processes and personnel to lead these critical activities. PIC's services include operations and maintenance, expert staffing services, commissioning, decommissioning services, and documentation and training services. PIC's expertise in these combined skill sets and their access to required resources provide "total project solutions" for the various power plant services that their customers rely on. PIC has a proven track record of consistently implementing high quality O&M programs and best practices at all of the plants it manages, focusing on the fundamentals of safety, reliability, compliance and cost.

PIC's 25 years of O&M experience includes 15,000 MW total capacity and covers 65 plant sites, 89 combustion turbine-generators, 102 reciprocating engines, 46 steam turbine-generators and 9 hydroelectric units. This, combined with Genera's deep expertise in fuels and plant management, makes this partnership a preferred combination to operate the LGA power plants.

12




Benefits of a Third-Party Operator of the Puerto Rico Legacy Generation Assets

### a.  Benefits of Hiring a Third-Party

Hiring a Third-Party Generation operator creates significant benefits, allowing for operational and fuel savings, more consistent and reliable operations (a reduction in forced and unplanned power plant outages) and increased safety and environmental compliance.

As discussed above, the LGA includes an aging set of power generation plants that has long suffered from underinvestment and poor operational, safety and environmental performance. Operating the LGA with good industry practice will require operators with expertise in operating similarly situated Generation Assets.

## IV.  Generation Operator Solicitation Process

### a.  The Process

On August 10, 2020, the Authority issued the LGA RFQ in accordance with the Act 120 mandate, seeking respondents with demonstrated experience in operating and maintaining a large electric utility, financial strength and access to capital, strong technical expertise and a track record of high-quality and safe power plant operations.

Following the issuance of the RFQ, the Authority issued an RFP on November 10, 2020 inviting bidders to submit proposals for the operation and management of the LGA, including the administration of federal disaster recovery funding. Specifically, the RFP sought a qualified private partner to manage, operate, maintain, rehabilitate, repair, refurbish, replace, improve, expand and finance the LGA pursuant to the contemplated OMA contract. The transaction and compensation structure is similar to a traditional operator-manager arrangement, with a compensation structure including fixed and incentive components comparable to similar management contracts in the U.S. mainland. As PREPA remains the Owner of the LGA, this structure supports the desire to maintain the tax-exempt status of PREPA's debt as a source of funding.

### b.  Justification

The RFQ process was a broad solicitation extending to many qualified operators in a competitive process that served to ensure an adequate number of qualified respondents. The process culminated in the selection of a qualified capable operator with the requisite experience to maintain and improve the generation to a level of operations consistent with good industry standards. The contractual structure in place has been designed to ensure the Operator:

13



Benefits of a Third-Party Operator of the Puerto Rico Legacy Generation Assets



- Manages the LGA consistent with prudent utility standards;

- Achieves benchmark performance based on an appropriate set of operational, financial, budgetary controls, and safety metrics more in line with industry standards;

- Receives an appropriate level of oversight from the Administrator and the PREB; and,

- Is compensated based on achievement of incentives in operation and fuel savings, LGA availability, and good safety and environmental performance.

14



Benefits of a Third-Party Operator of the Puerto Rico Legacy Generation Assets          

### c.  RFP Process

Milestones, key steps and a timeline of the RFP Process, and events leading to the process, include:

| Topic | Date | Details |
|---|---|---|
| Project Background | January 22, 2018 | The former Governor announced his intent to transform and modernize the electric system through private ownership or operation of PREPA's assets. |
| Market Sounding | December 2, 2019 | The Government and Public-Private Partnerships Authority ("P3A") issued a letter soliciting private sector feedback on the transformation of PREPA's electric generation operations, including the provision of O&M services to all or a portion of PREPA's generation fleet. |
| RFQ Issued | August 10, 2020 | P3A issued the Request for Qualifications pursuant to Section 5 of Act 120 and Section 3 of Act 29. |
| | September 15, 2020 | P3A received 15 responses to the RFQ (the Statement of Qualifications, ("SOQs"). |
| Qualification of Proponents | October 19, 2020 | Eight (8) experienced and reputable private sector respondents were selected to participate in the Request for Proposals process. |
| RFP Issued | November 10, 2020 | P3A issued the Request for Proposals |
| Proposal Submittals | December 22, 2021 | Two Proponents, Genera PR LLC and NAES Corporation, submitted Binding Proposals. |
| Video Discussions | January 11, 2022 | P3A and its advisors conducted video conferences with representatives of Proponents to discuss their proposals. |
| Initial Evaluation of Proposals | January, 2022 | P3A's advisors evaluated the Binding Proposals according to the rubric established in the RFP, identifying critical issues and costs in the financial and technical proposals, operational proposals, and legal proposals. |
| Presentations in Puerto Rico | January 27, 2022 | P3A and its advisors presented the initial evaluations of the Proponents' Binding Proposals to the Partnership Committee meeting. |
| | January 27-28, 2022 | Proponents presented their Binding Proposals with the PC in Puerto Rico. |
| Follow-Up Questions | February 3, 2022 | P3A and P3A's advisors distributed follow-up questions regarding the technical, financial and operational aspects of the Binding Proposals. |
| | February 15, 2022 | P3A and the Advisory Team held calls with representatives of Proponents to discuss their responses to the follow-up questions and further clarify elements of their bids. |
| Initial Scoring of Proposals | March 7, 2022 | P3A and its advisors presented to the Partnership Committee further evaluations and comments to the technical and financial, and operational, components of the Binding Proposals. |
| | | The Partnership Committee agreed to request updated proposals from Proponents. |
| Updated Proposals | March 9, 2022 | P3A invited both Proponents to submit updated proposals. |
| | March 21, 2022 | Both Proponents submitted their updated proposals; NAES made few changes to its proposal, Genera proposed a heavily revised financial proposal. |
| Scoring of Updated Proposals | April 1, 2022 | P3A and its advisors presented to the Partnership Committee revised evaluations and comments to the updated proposals. |
| Discussions in Puerto Rico | April 19, 2022 | P3A and its advisors held meetings with the Proponents in Puerto Rico to discuss the updated proposals. |
| | April 20, 2022 | P3A requested additional information from Proponents. |
| Further Updated Proposals and O&M Agreements | April 22, 2022 | Bidders submitted revised mark-ups of the O&M Agreement and additional information, addressing certain items and proposed compromises from prior discussions. |

15



Benefits of a Third-Party Operator of the Puerto Rico Legacy Generation Assets



| Topic | Date | Details |
|---|---|---|
| Further Comments to Updated Proposals | May 4, 2022 | P3A's advisors presented to the Partnership Committee further comments to updated proposals. |
| O&M Agreements | May 14, 2022 | P3A distributed separate revised drafts of the O&M Agreement to Genera and NAES. |
| | May 20, 2022 | Genera submitted updated comments on the O&M Agreement. |
| | May 24, 2022 | NAES submitted updated comments on the O&M Agreement. |
| Selection of Preferred Proponent | May 24, 2022 | At the Partnership Committee meeting, P3A's advisors presented the revised comments of each Proponent to the O&M Agreement, with Genera's legal proposal demonstrating significant improvement and a superior contractual arrangement for Puerto Rico. |
| | May 2022 | The Partnership Committee reviewed and scored the updated proposals, awarding a final score of Genera 80.1/100 and NAES a final score of 77.5/100, and agreed to select Genera as the Preferred Proponent. |
| | June 10, 2022 | Notices were distributed specifying the selection of the preferred proponent. |

## V.   Financial and Economic Benefits of the Genera Contract

The Genera Generation OMA provides substantial financial and economic benefits for the electric ratepayers of Puerto Rico. These benefits are in addition to the technical, operational, safety and reliability benefits mentioned in the prior sections of this report. The Genera OMA is structured with both fixed and incentive compensation, which will be described in the next sections. As further described below, the cost of the fixed and incentive compensation is expected to be offset by operation and maintenance and fuel savings that Genera expects to achieve during the life of the contract. These projected savings were provided by Genera in their presentations to the Partnership Committee as well as in responses to follow-up questions from the Committee, P3A and their advisors. The incentive compensation mechanisms for the O&M budget, fuel and decommissioning savings are structured as 50%/50% sharing formulas between Genera and the electric ratepayers of Puerto Rico. In addition, the Genera OMA caps the maximum amount of incentive compensation achievable by Genera in a contract year with the excess above the cap accruing 100% to the benefit of Puerto Rico electric ratepayers.

### a.   Summary of Genera LGA OMA Financial Contract Provisions

Under the Genera LGA OMA an annual fixed fee of $22.5 million plus inflation is payable each contract year. The inflation rate is capped under the contract at 3%. After contract year five the

16



Benefits of a Third-Party Operator of the Puerto Rico Legacy Generation Assets



fixed fee is reduced to reflect any plants that are in their post operational decommissioning phase as determined by the PREB. The minimum fixed fee post year five until the contract ends is $5 million. There is no specific fixed fee paid for a plant once it enters its decommissioning phase. Therefore, as Legacy Generation Assets are retired and decommissioned per the IRP and PREB directives, the fixed fee will decline over the ten-year contract life.

The annual incentive compensation under the Genera LGA OMA is based on six categories, along with a seventh category which is penalty-based only. These categories include:

- O&M budget savings
- Fuel savings
- Decommissioning budget savings
- Availability performance of plants
- Safety performance
- Environmental performance.

The seventh category is penalty-based only and is paid if Genera exceeds its contractual time periods for reporting obligations. The O&M budget, fuel and decommissioning budget savings include a 50%/50% sharing formula between Genera and Puerto Rico electric ratepayers. Genera is obligated to achieve the annual O&M budget approved by PREB, but to the extent that they do not there is no reimbursement.

The power plant availability performance incentive ranges from $5 to $15 million for the combined baseload units and also for the combined peaking units and depends on performance above pre-determined targets. The penalties are $5 million each for baseload and peaking for below-target performance. The safety and environmental incentives and penalties are structured as very heavily penalty oriented. The maximum incentives for safety are $30,000 versus potential penalties of $3 million and $100,000 of incentives versus $1 million of potential penalties for environmental. The reporting obligation maximum penalty is $1 million.

For decommissioning incentives/penalties, if Genera completes the decommissioning of a plant on time and under budget pursuant to the PREB approved plan, then they can earn an incentive equal to 50% of the savings relative to the PREB determined target budget cost. To the extent Genera completes decommissioning after the target date they pay $1 million per week of delay subject to a combined maximum of $15 million for all plants.

17




Benefits of a Third-Party Operator of the Puerto Rico Legacy Generation Assets

Under the Genera OMA, the maximum annual incentive compensation (incentives minus penalties) that can be earned in a contract year is $100 million. The incentive compensation, similar to the fixed fee, will decline as plants are decommissioned.

**b. Economics of the Genera LGA OMA**

**i. Projected Savings:**

In its presentations and responses to the Partnership Committee, P3A and their advisors, Genera has estimated significant O&M and fuel savings. Genera estimates achievable O&M savings of $19 million per year. These savings come mainly from labor and maintenance. Genera will utilize state of the art industry staffing and operational practices that will generate ongoing savings compared to historical norms. The key components of these practices include training and developing operations and maintenance employees to be proficient at multiple skills. This allows for maintenance work to be completed more efficiently.

On the fuel side, Genera has estimated fuel savings, without plant conversions or equipment replacement, of approximately $85 million per year which would come from optimizing the existing fuel contracts ($56 million), achieving better risk and credit terms on the existing oil contracts ($20 million) and making operational changes at the Legacy Generation Assets to increase fuel efficiency ($9 million). These operational changes encompass fixing broken equipment and addressing other operational issues that will result in increased MWhs generated at improved efficiencies.

In addition, if Genera proposes and the IRP allows, and PREB approves, it believes there are additional fuel savings achievable through fuel conversions of units. The projected annual savings net of conversion costs could be greater than $100 million. These conversions would involve commissioning of gas fuel operation for units that are dual fuel capable or conversions of units that are able to be converted.

Section II of this report highlights areas where PREPA's operation of the power plants has fallen far short of industry standards. In terms of forced and planned outages PREPA's forced outage rate over the 2019-2012 period has been well above the weighted average North American forced outage rate of 7% (Figure 1). Table 1 in that same Section shows double digit forced outage rates for the LGA and for several plants over 50%. These are 2x-5x industry average. In addition, PREPA has historically exceeded its planned outage durations by 20% and including several recent lengthy outages would increase this to 66%. The average industry rate is less than 5%.

18



Benefits of a Third-Party Operator of the Puerto Rico Legacy Generation Assets 

An experienced third-party operator such as Genera will better operate and maintain the LGA given their vast experience and their substantial financial incentives to do so. The effects of this improved operation and maintenance performance will translate into less forced outages and shorter planned outages for the LGA. This improved performance of the LGA will translate into additional operations and maintenance savings besides those stated by Genera and discussed in the prior paragraphs.

Safety is another area where PREPA has far exceeded industry benchmarks as shown in Section II. Improving safety performance and creating a positive safety culture allows current employees to perform their responsibilities better given the reduced uneasiness and apprehension. In addition, there will be reductions in injuries of skilled LGA employees and the risk and associated costs of potential litigation which negatively impact plant operations. Genera's proven safety programs will improve performance and workforce culture and result in better operation of the LGA, which means less employee and plant downtime resulting in further operation savings.

**ii.   Economics:**

The combined estimated savings from O&M and fuel range from $100 million to $200 million annually (including conversion savings if approved by PREB). Under the contractual terms described above, these savings would be shared 50%/50% between Genera and the electric ratepayers of Puerto Rico. That would result in $50 million to $100 million per year to Puerto Rico electric system customers. Puerto Rico is guaranteed a benefit and Genera's incentive compensation pays for itself. Given the low fixed fee, high incentive fee component and the 50%/50% sharing of the Genera LGA OMA, Genera is more than motivated to perform and operate the plants well and as fuel-efficiently as possible. Through these improvements, Genera can achieve higher annual compensation, which is paid for out of their share of the savings while the other 50% savings share goes directly to Puerto Rico, which will more than offset the Genera fixed fee of $22.5 million.

19




Benefits of a Third-Party Operator of the Puerto Rico Legacy Generation Assets

**FTI** CONSULTING

## Appendix A: List of Acronyms

| | |
|---|---|
| Authority | The Puerto Rico Public Private Partnership Authority |
| BLS | Bureau of Labor Statistics |
| Btu | British thermal unit |
| CCGT | Combined Cycle Gas Turbine |
| DART | Days Away from Work, Restricted or Transferred |
| EAF | Equivalent Availability Factor |
| GenCo | Successor to PREPA that acquires or obtains ownership of the Legacy Generation Assets |
| Generation Operator | GenCo Third-Party Operator |
| GridCo | Successor to PREPA that acquires or obtains ownership of the T&D System |
| GT | Gas Turbine |
| IPP | Independent Power Producer |
| IRP | Puerto Rico Integrated Resource Plan 2018-2019 |
| kWh | Kilowatt hour |
| Legacy Generation | Existing PREPA generating assets |
| MW | Megawatt |
| NG | Natural Gas |
| O&M | Operations and Maintenance |
| PPP | Public-Private Partnership |
| PPOA | Power Purchase and Operating Agreements |
| PREB | Puerto Rico Energy Bureau |
| PREPA | Puerto Rico Electric Power Authority |
| P3A | The Puerto Rico Public Private Partnership Authority |
| RFI | Request for Information |
| RFP | Request for Proposal |
| RFQ | Request for Qualifications |
| T&D Operator | Third-Party Operator of the T&D System |
| T&D System | Transmission and Distribution System |

20



Benefits of a Third-Party Operator of the Puerto Rico Legacy Generation Assets



## Appendix B: Materials Referenced

1. Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement, Draft format.

2. LUMA draft report, "Resource Adequacy Analysis," July 1, 2022.

3. PREB, Resolution and Order, Case No.: NEPR-MI-2019-0007, Subject: June 2021 - May 2022, 12-Month Metrics Summary, August 18, 2022.

4. LUMA, Quarterly Performance Metrics Report, FY22 Q3 Report Submission to P3A, May 16, 2022.

5. American Public Power Association, "Evaluation of Data Submitted to the American Public Power Association's 2020 Safety Awards of Excellence," 2020.

6. Genera Bid Proposal, December 22, 2021.

7. PREB, Petition, Case No.: NEPR-MI-2021-0002, "Petition for Leave to Conduct Works on PREPA's Steam Units to Achieve Environmental Regulatory Compliance", dated Feb 11, 2022.

8. US Bureau of Labor Statistics, Incidence rates of nonfatal occupational injuries and illnesses by industry, https://www.bls.gov/home.htm.

9. NERC GADS Dashboard, https://www.nerc.com/pa/RAPA/gads/Pages/GADS-Generation-Resource-Mix-Dashboard.aspx.

21

# Exhibit C:
# Request for Qualifications

This page has been intentionally left blank.





# REQUEST FOR QUALIFICATIONS

## Puerto Rico Electric Power Authority

## Thermal Generation Facilities

### RFQ 2020-1

Issued by the Puerto Rico Public-Private Partnerships Authority

**Date Issued: August 10, 2020**

**Responses Due Date: September 15, 2020 at 5:00 PM AST**





This page has been intentionally left blank.








# Contents

1.  Overview of RFQ and PPP Process ........................................................ 1
    1.1   Introduction .................................................................................... 1
    1.2   Background of Puerto Rico's PPP Program ................................... 2
    1.3   Background on Transformation of the Electric System .................. 3
    1.4   Function of this RFQ ...................................................................... 4
    1.5   Definitions ...................................................................................... 6
    1.6   Process and Schedule ................................................................... 6
    1.7   Consortia and Team Members ....................................................... 8
    1.8   Restricted Parties .......................................................................... 9
    1.9   Clarifications and Communications Protocol ............................... 10
    1.10  No Collusion or Lobbying ............................................................ 11
2.  Project Description ......................................................................... 13
    2.1   Puerto Rico ................................................................................. 13
        2.1.1   Overview ........................................................................ 13
        2.1.2   Financial Condition and Title III Process .......................... 13
        2.1.3   Hurricanes, Earthquakes and Recovery Efforts ............... 14
    2.2   Electric Power System ................................................................ 15
        2.2.1   PREPA Overview ............................................................. 15
        2.2.2   Current Status of the Legacy Generation Assets ............. 16
        2.2.3   Transformation of the Generation System ....................... 19
        2.2.4   The Integrated Resource Plan ........................................ 20
    2.3   Project Structure ......................................................................... 20
3.  Respondent Qualification Requirements and Evaluation Criteria ........... 22
4.  SOQ Requirements & Procedure ........................................................ 28
    4.1   SOQ Requirements ..................................................................... 28
    4.2   Required Information for SOQ ...................................................... 29
    4.3   Reporting of Material Adverse Change ........................................ 30
    4.4   SOQ Submission Instructions ...................................................... 30
    4.5   Confidentiality of SOQ ................................................................ 31
    4.6   Use of Confidential Information ................................................... 32
    4.7   Conflicts of Interest and Ineligible Persons ................................. 32
    4.8   RFQ Miscellaneous Instructions ................................................. 33
    4.9   The Authority's Requests for Clarification After SOQ Submissions ........... 34
    4.10  Disclaimer ................................................................................... 34
    4.11  Reservation of Rights .................................................................. 34
    4.12  Limitation of Damages ................................................................ 36
    4.13  Judicial Review ........................................................................... 36
    Appendix A: Form of Respondent and Team Members Certification .......... 37
    Appendix B: Form of Document Acknowledgement & Contact Information ... 40
    Appendix C: Additional Technical Information on Legacy Generation Assets ... 41



 

*This RFQ (as defined herein) is prepared for informational purposes only and does not purport to be all-inclusive or to contain all the information that a Respondent (as defined herein) may desire in investigating the potential transaction. No express or implied warranty is given by the Puerto Rico Public-Private Partnerships Authority or any other agency or instrumentality of the Government of Puerto Rico as to the accuracy or completeness of the information contained herein or otherwise made available in connection with the Project (as defined herein).*








GOVERNMENT OF PUERTO RICO
Puerto Rico Public-Private Partnerships Authority

# 1. Overview of RFQ and PPP Process

## 1.1 Introduction

The Puerto Rico Public-Private Partnerships Authority (the "**Authority**"), in collaboration with the Puerto Rico Electric Power Authority ("**PREPA**"), hereby issues this Request for Qualifications ("**RFQ**") to request Statements of Qualifications ("**SOQs**") from companies and consortia interested in managing, operating, maintaining, asset managing and decommissioning, as applicable, one (1) or more of the base-load generation plants and gas turbine peaking plants located throughout the island of Puerto Rico (the "**Legacy Generation Assets**"). The Legacy Generation Assets have a total system-wide PREPA-owned dependable generation capacity of approximately 3,600 MW. A full listing of the Legacy Generation Assets included in this solicitation is provided in Figure 1 of Section 2.2.2. Additional technical information on the Legacy Generation Assets can be found in Appendix C. The aforementioned services would be provided pursuant to one (1) or more public-private partnership ("**PPP**") contracts, in the form of one or more operation and maintenance agreements, relating to the Legacy Generation Assets and with terms tied to the remaining useful lives of the applicable Legacy Generation Assets (the "**Project**"). The Project will not involve the sale of any of the Legacy Generation Assets.

The Authority and PREPA wish to enter into a PPP with one (1) or more Person(s) (as defined in the Act 120 Regulation (as defined herein)), including but not limited to private sector companies or consortia, electric cooperatives or energy cooperatives (each, a "**Private Partner**") for the management, operation, maintenance and decommissioning, as applicable, of some or all of the Legacy Generation Assets in order to achieve the following objectives:

- introduce private sector operational expertise;

- increase the safety, reliability, resiliency, power quality and efficiency of Puerto Rico's Legacy Generation Asset operations;

- facilitate Puerto Rico's transition to PREPA's Vision for the Future of Power in Puerto Rico described in the 2019 IRP (as defined herein);

- implement operational excellence of electricity generation facilities consistent with prudent industry practices, including improved safety and compliance with environmental and other applicable regulatory requirements; and

- increase cost efficiency while achieving the aforementioned operational objectives in coordination with the T&D Operator (as defined herein).

Any natural or legal person, joint venture, partnership or other entity, or consortium thereof, that submits an SOQ in response to this RFQ (each, a "**Respondent**") is encouraged to review the following documents, which are available for download on the Authority's website at http://www.p3.pr.gov, for further background on the Project and the legal framework within which it will be executed:

- PREPA Organic Act, Act No. 83 of May 2, 1941, as amended;

- Public-Private Partnership Authority Act, Act No. 29-2009, as amended (the "**PPP Act**");

- Puerto Rico Energy Transformation and RELIEF Act, Act No. 57-2014, as amended ("**Act 57**"), including integration of the Integrated Resource Plan, docket number CEPR-AP-2018-0001 (the "**2019 IRP**");

- PREPA Revitalization Act, Act No. 4-2016, as amended;

Page 1





- Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. 114-187, as amended ("**PROMESA**");

- Puerto Rico Electric System Transformation Act, Act No. 120-2018, as amended ("**Act 120**");

- Regulation for the Procurement, Evaluation, Selection, Negotiation and Award of Partnership Contracts and Sale Contracts for the Transformation of the Electric System under Act No. 120-2018, as amended (the "**Act 120 Regulation**"); and

- Puerto Rico Energy Public Policy Act, Act No. 17-2019, as amended ("**Energy Public Policy Act**").

In addition, the PREPA Fiscal Plan, certified on June 29, 2020 by the Financial Oversight and Management Board for Puerto Rico ("**FOMB**") and the 2020 Fiscal Plan for Puerto Rico, certified by the FOMB on May 27, 2020 (the "**Government Fiscal Plan**") are available at https://oversightboard.pr.gov/fiscal-plans-2/.[1]

## 1.2    Background of Puerto Rico's PPP Program

The PPP Act provides that the public policy of the Government of Puerto Rico (the "**Government**") is to favor and promote the establishment of PPPs for the development of certain Priority Projects (as defined in the PPP Act) to, among other things:

- further the development and maintenance of infrastructure facilities;

- share with the private sector the risks involved in the development, operation and/or maintenance of such projects;

- improve the services rendered by and the functions of the Government; and

- encourage job creation and promote Puerto Rico's socioeconomic development and competitiveness.

The PPP Act provides that the public policy with respect to PPPs is to maintain such controls as are necessary to protect the public interest yet balance this need for controls with the profit-making purpose of any private operation. The contractual relationship must thus be mutually beneficial, while ensuring the efficient, effective and affordable provision of public goods and services to all citizens.

The Authority was created pursuant to the PPP Act as a public corporation of the Government affiliated with the Puerto Rico Fiscal Agency and Financial Advisory Authority (known by its Spanish acronym "**AAFAF**"). The Authority is designated as the sole government entity authorized and responsible for implementing the Government's public policy on PPPs and for determining the functions, services or facilities for which PPPs are to be established.

For each proposed PPP project, the Authority must establish a committee (the "**Partnership Committee**"), as provided in the PPP Act, responsible for, among other things: (i) qualifying, evaluating and selecting the proposed PPP; (ii) establishing the terms and conditions of the agreement(s) to be (A) awarded to each Private Partner as a result of the process described in this RFQ (the "**RFQ Process**") and the competitive procurement process that follows the RFQ Process (the "**RFP Process**") and (B) executed by each Private Partner and PREPA to establish a PPP (the "**PPP Contract**"); and (iii) reporting on the procedures followed and the reasons for selecting a particular proposal (the "**Partnership Committee Report**").

**Respondents should note that the Partnership Committee has been vested with the authority to negotiate the terms of each PPP Contract for the proposed PPP project. PREPA has been vested with the authority to execute each PPP Contract negotiated by the Partnership Committee with each Private**

---

[1] Please note that the Government Fiscal Plan does not reflect the impact of COVID-19. A revised fiscal plan will be made available once certified by the FOMB.

**Partner, subject to the approvals of (i) the Puerto Rico Energy Bureau (created by Act 57 to regulate, monitor, and enforce the energy public policy of the Government) ("PREB"), (ii) the board of directors of each of the Authority and PREPA, (iii) the FOMB and (iv) the Governor or her delegate, each such approval as described in more detail below.**

**Approval by PREB**

To obtain PREB's approval, PREB must find that the relevant PPP Contract complies with the energy public policy, the regulatory framework and applicable law, and issue a certificate certifying such compliance (the "**Energy Compliance Certificate**"). If PREB does not either issue the Energy Compliance Certificate or a negative decision with respect thereto within thirty (30) days, it will be deemed to have approved the PPP Contract. Once the Energy Compliance Certificate has been issued or deemed issued, any amendment to the PPP Contract will require the issuance of a new Energy Compliance Certificate.

**Approval by Board of Directors of the Authority and Board of Directors of PREPA**

After both the completion of the negotiation of the PPP Contract and the issuance of the Energy Compliance Certificate, the Board of Directors of the Authority and the Board of Directors of PREPA will approve or reject the Partnership Committee Report and the PPP Contract by means of a resolution.

**Approval by FOMB**

Once the PPP Contract has been approved by PREB, the Board of Directors of the Authority and the Board of Directors of PREPA, the Partnership Committee Report and the PPP Contract will be submitted to the FOMB. The PPP Contract will require the consent of the FOMB pursuant to the FOMB's contract review policy established under Section 204(b)(2) of PROMESA, which requires FOMB approval of all local Puerto Rico contracts entered into by the Government or any covered instrumentality with an expected value of $10 million or more in the aggregate.

**Approval by Governor**

Following the FOMB's consent, the Partnership Committee Report and the PPP Contract must be delivered to and approved by the Governor or her delegate. The Governor or her delegate must approve or deny the PPP Contract in writing within thirty (30) days of receiving the Partnership Committee Report and the PPP Contract. If the Governor or her delegate does not approve the PPP Contract within thirty (30) days, the PPP Contract will be treated as if it had been denied by the Governor.

The mere fact that a required approval is obtained does not confer the right by any Respondent to claim indemnity, refund or any payment whatsoever on account of expectations arisen in any stage of the process, or for expenses incurred during the RFQ Process or the RFP Process.

## 1.3 Background on Transformation of the Electric System

On January 22, 2018, the Government announced its intent to transform and modernize the electric system through private ownership, management or operation of PREPA's assets. PREPA had suffered years of underinvestment and substandard management, resulting in significant operational and financial challenges that were exacerbated by Hurricane Irma and Hurricane Maria in September 2017 and by the earthquakes in December 2019, January 2020 and May 2020.

On June 20, 2018, Act 120 was signed into law, with the stated goal of transforming Puerto Rico's energy system into a modern, sustainable, reliable, efficient, cost-effective and resilient system. Act 120 provides the legal framework through which the Authority will determine the PREPA services and facilities that will be subject to PPPs and the PREPA generation assets that may be sold, transferred, or be made subject to a PPP as "PREPA Transactions" (as defined in Act 120).

Exhibit C: Request for Qualifications



This RFQ is a part of the Government's mission to transform Puerto Rico's electric system pursuant to Act 120. PREPA's transformation process began with the Authority's issuance of a Request for Qualifications for the management and operation of Puerto Rico's electric power transmission and distribution ("**T&D**") system pursuant to a long-term contract (the "**T&D Transformation**"). The Authority undertook a robust, competitive and transparent RFP Process to select a proponent, finalize a PPP Contract and obtain all of the required regulatory approvals for the T&D Transformation. On June 22, 2020, the Authority announced that PREPA had entered into a 15-year PPP Contract with LUMA Energy, LLC (the "**T&D Operator**"), a Puerto Rico company formed by Canadian Utilities Limited, ATCO Ltd.'s energy company, and Quanta Services, Inc. Under such PPP Contract, the T&D Operator will operate, maintain, and modernize the T&D system. Additional information on the T&D Transformation, including relevant documentation and the Partnership Committee Report summarizing the T&D RFP Process can be found on the Authority's website: http://www.p3.pr.gov/prepa-transformation.html.

Following the successful completion of the T&D RFP Process, the next phase of PREPA's transformation process contemplates tapping private operational expertise for the operation, maintenance and eventual decommissioning, of PREPA's Legacy Generation Assets. In addition to this process to solicit one (1) or more operator(s) for the Legacy Generation Assets, three (3) concurrent PPP solicitations are also currently underway: (i) Hydroelectric Power Plants Revitalization (RFQ 2019-2),[2] (ii) Flexible Distributed Generation Units (RFQ 2019-3)[3] and (iii) Generation Capacity in Palo Seco (RFQ 2019-4).[4]  The Flexible Distributed Generation Units are intended to replace the existing peaking units. While the existing peaking units are part of this RFQ process, they may be removed from the PPP Contract for this Project and transitioned operationally to RFQ 2019-3. Such removal and transfer, if any, will be determined upon completion of the 2019 IRP proceedings and will be further addressed in the RFP. Further, when the new 300MW Palo Seco base-load generation plant (RFQ 2019-4) comes on-line, it will replace the existing steam turbine units located at the Palo Seco site. The recently installed peaking units at the Palo Seco complex (as described in Section 2.2.2 below) are also included in this RFQ and may transition operationally to RFQ 2019-4 at a later time.

## 1.4    Function of this RFQ

The Authority is issuing this RFQ pursuant to Section 5 of Act 120 and Section 4 of the PPP Act. This RFQ may be amended at any time through the publication of addenda that will be posted on the Authority's website: http://www.p3/pr.gov. Interested parties will be responsible for periodically checking the Authority's website for announcements and publication of relevant information concerning this process, including any addenda.

Prospective Respondents should carefully review Act 120, the PPP Act and the Act 120 Regulation (each of which is available for download on the Authority's website: http://www.p3.pr.gov) and should ensure that, in addition to the terms and conditions of this RFQ, they comply with all applicable provisions set forth therein.

The intent of this RFQ is to provide each interested prospective Respondent with sufficient information to enable it to prepare and submit an SOQ for consideration and evaluation by the Authority and its advisors. This RFQ contains instructions to Respondents, a Form of Respondent Certification and a Form of Document Acknowledgment & Contact Information, which forms must be completed in their entirety and submitted to the Authority for the Respondent to be considered for qualification. The completed Form of Respondent Certification and Form of Document Acknowledgment & Contact Information, together with all required attachments, will constitute the Respondent's SOQ. The Form of Respondent Certification is attached in **Appendix A**. The Form of Document Acknowledgment & Contact Information is attached in **Appendix B**.

This RFQ is being issued to identify those Respondents that meet the minimum requirements necessary to carry out the Project in compliance with Act 120 and the PPP Act, in particular those Respondents that demonstrate:

---

[2] http://www.p3.pr.gov/assets/rfq-2019-2-p3a-generation-hydro.pdf.
[3] http://www.p3.pr.gov/assets/rfq-2019-3-p3a-flexible-distributed-generation-units.pdf.
[4] http://www.p3.pr.gov/assets/rfq-2019-4.pdf.





- capability and experience operating, maintaining, managing and undertaking selected maintenance capital projects as needed for thermal generation facilities with capacity in excess of 100 MW, which operate on natural gas and/or fuel oil;

- financial stability and resources;

- asset management expertise primarily related to fuel procurement and management;

- strong technical expertise, with a track record of high-quality safe and reliable operations;

- experience and demonstrated ability to manage a largely Spanish-speaking workforce;

- experience operating within, and complying with, local community standards and expectations as a "good neighbor";

- experience complying with regulatory and permitting approvals; and

- experience with decommissioning, or subcontracting and overseeing the decommissioning of, thermal generation plants.

The objective of this RFQ is to enable the Partnership Committee to identify Respondents that, based on their SOQ submitted pursuant to this RFQ, are deemed qualified by the Partnership Committee to participate in the RFP Process ("**Qualified Respondents**").

In evaluating Respondents, the Partnership Committee may disqualify a Respondent for any of the reasons stated in Sections 7.1 (Disqualifying Events) and 7.2 (Other Grounds for Disqualification) of the Act 120 Regulation, or if the Respondent:

- is ineligible to submit a proposal on one (1) or more grounds specified in Act 120, the PPP Act or the Act 120 Regulation;

- fails to satisfy the standards established by the Partnership Committee with respect to the Respondent's required financial condition, or technical or professional ability and experience (as set forth in Section 4 of this RFQ); or

- fails to comply with the requirements of Sections 9(a) (Applicable Requirements and Conditions for those who wish to be considered as Proponents) and/or 9(d) (Consortia) of the PPP Act, as applicable.

**Pursuant to Section 4.3 (Qualification of Proponents (RFQ)) of the Act 120 Regulation, the Partnership Committee reserves the right in its absolute discretion to limit the number of Respondents it considers to be qualified in order to arrive at a shortlist of Qualified Respondents that allows for an orderly procurement.**

**The Authority reserves the right to terminate the procurement process in whole or in part at any time, for any reason or for no reason, prior to the execution by PREPA of a PPP Contract, without incurring any cost, obligations or liabilities whatsoever. Respondents will not be entitled to an indemnity (including but not limited to reimbursement for costs and expenses) from the Authority or PREPA if the Authority decides, in its sole and absolute discretion, to terminate the procurement process related to the Project.**





GOVERNMENT OF PUERTO RICO
Puerto Rico Public-Private Partnerships Authority

## 1.5    Definitions

For the purposes of this RFQ, the following defined terms will have the meanings used in the sections indicated below.

| Term | Section | Term | Section |
|------|---------|------|---------|
| 2019 IRP | 1.1 | PREB | 1.2 |
| AAFAF | 1.2 | PREPA | 1.1 |
| Act 57 | 1.1 | President | 2.1.3 |
| Act 120 | 1.1 | Private Partner | 1.1 |
| Act 120 Regulation | 1.1 | Project | 1.1 |
| Authority | 1.1 | PROMESA | 1.1 |
| Claim | 4.12 | Qualified Respondents | 1.4 |
| Conflict of Interest | 4.7 | Related | 1.7 |
| Control | 1.7 | Respondent | 1.1 |
| Covered Party | 3.1.2 | Respondent Representative | 4.2 |
| Energy Compliance Certificate | 1.2 | Restricted Parties | 1.8 |
| Energy Public Policy Act | 1.1 | RFCs | 1.6 |
| Ethics Guidelines | 1.8 | RFC Deadline | 1.9 |
| Evaluation Criteria | 3 | RFP | 1.6 |
| FEMA | 2.1.3 | RFP Process | 1.2 |
| FOMB | 1.1 | RFQ | 1.1 |
| Government | 1.2 | RFQ Process | 1.2 |
| Government Fiscal Plan | 1.1 | San Juan Unit 5, San Juan Unit 6 | 2.2.2 |
| Key Individuals | 3.2.1 | SOQs | 1.1 |
| Legacy Generation Assets | 1.1 | Submission Deadline | 1.6 |
| MATS | 2.2.2 | T&D | 1.3 |
| Partnership Committee Report | 1.2 | T&D Operator | 1.3 |
| Partnership Committee | 1.2 | T&D Transformation | 1.3 |
| PPP | 1.1 | Title III Court | 2.1.2 |
| PPP Act | 1.1 | Team Member | 1.7 |
| PPP Contract | 1.2 | | |

## 1.6    Process and Schedule

***Persons receiving this RFQ that intend to submit an SOQ should so indicate by providing their contact information to the Authority via e-mail at P3GenProject@p3.pr.gov.***

The procurement process for the Project is expected to take place in the following stages:

**Stage 1 —— RFQ Process (Qualification Stage)**

The RFQ Process is intended to identify the Qualified Respondents that are eligible to participate in the process and receive the Request for Proposals ("**RFP**") issued by the Authority to obtain proposals for the Project.

During this stage Respondents submit their SOQ pursuant to this RFQ.

The RFQ Process is standalone and independent and will be completed once the Qualified Respondents are identified by the Authority and all Respondents have received final notification from the





Authority as to the results of the RFQ Process. The Authority may choose to make the list of Qualified Respondents public.

## Stage 2 — RFP Process (Binding Bid Stage)

The RFP Process is the competitive procurement process that follows the RFQ Process. The RFP Process is intended for Qualified Respondents only and is expected to result in the selection of one (1) or more Private Partner(s).

Qualified Respondents that elect to participate in the RFP Process and sign a confidentiality and process agreement (a form of which will be provided to each Qualified Respondent) will have the opportunity to conduct a thorough due diligence of the Legacy Generation Assets, including:

- receipt of the RFP;

- access to an electronic data room;

- receipt of the Confidential Information Memorandum and financial model;

- site visits, management presentations and meetings with PREPA subject matter experts;

- diligence Q&A process with PREPA subject matter experts; and

- receipt of a draft of the PPP Contract.

A more detailed description of the RFP Process, together with a more detailed timetable, will be provided in the RFP.

## Stage 3 — Implementation of the PPP Contract

Once the Private Partner(s) and PREPA have executed the PPP Contract(s), the Project will proceed in accordance with the terms and conditions of the PPP Contract(s).

Below is a summary schedule of the major activities associated with the RFQ Process. The dates and activities are subject to change and may be revised through the issuance of subsequent addenda to this RFQ.

| | | |
|---|---|---|
| **August 10, 2020** | - | Date of issuance and first publication of public notice of RFQ by the Authority. |
| **August 31, 2020** | - | Deadline for submission of Requests for Clarification ("**RFCs**") with respect to this RFQ by prospective Respondents. |
| **September 8, 2020** | - | Deadline for the Authority to release responses to RFCs. |
| **September 15, 2020** | - | Deadline for submission of SOQs (no later than 5:00 pm AST). |
| **September 22, 2020** | - | Deadline for the Authority to issue RFCs, if any, to Respondents regarding the submitted SOQs. |
| **September 29, 2020** | - | Deadline for Respondents to respond to the RFCs issued by the Authority. |
| **October 14, 2020** | - | Estimated date for notification of Qualified Respondents. |

***All SOQs must be submitted by no later than September 15, 2020 at 5:00 pm AST (the "Submission Deadline") in the manner set forth in Section 4 of this RFQ.***

Page 7



The determination of whether an SOQ is submitted before the Submission Deadline will be based on the date and time stamp that each Respondent must ensure it receives from the Authority. It is the sole responsibility of each Respondent to ensure that both electronic and physical copies of its SOQ are submitted no later than the Submission Deadline.

***By submitting an SOQ, the Respondent specifically authorizes the Authority, PREPA, the Partnership Committee and their respective officers, employees, advisors, counsel, accountants and other consultants and representatives to make any inquiry or investigation to verify the statements, documents and information submitted in connection with such SOQ, and to seek clarification from the Respondent's directors, officers, employees, advisors, counsel, accountants and other consultants and representatives related thereto.***

## 1.7   Consortia and Team Members

To the extent that any Respondent has formed or proposes to form a consortium to participate in the RFP for this Project, such Respondent must include in its SOQ the identity, role, capabilities and proposed percentage ownership of each Team Member in the consortium. "**Team Member**" shall include, without limitation, each of the following with respect to a Respondent:

- consortium member, whether or not that member has an ownership interest; and

- individual person, partnership, company or legal entity that is formally or informally reviewing the Project, as well as any such entity expected to execute, or provide a performance guarantee in respect of, the PPP Contract. This will include, without limitation, the ultimate owner(s) (the natural person(s), if any, who, directly or indirectly owns 25 percent (25%) or more of the equity interests of the Respondent, and if no natural person fits that description, the legal entity who directly or indirectly owns 25 percent (25%) or more of the equity interests of the Respondent) or holding company of any such investor or, in the case of a managed fund or pension plan, the manager of the fund or pension plan.

The Respondent should indicate whether it intends to form a special purpose vehicle or other legal entity for the Project. Each Team Member and its role must be identified in a Respondent's SOQ and cannot be changed without the prior written consent of the Partnership Committee.

Except as specifically provided to the contrary in this RFQ, no Team Member may join or participate, directly or indirectly, as a Team Member with more than one (1) Respondent for this Project. Each person or legal entity that participates as a Team Member is responsible for ensuring that no other person or legal entity that is Related (as defined herein) to it joins or participates, directly or indirectly, as a Team Member in any other Respondent. Unless otherwise provided herein, any violation of this provision by a Respondent will disqualify such Respondent and each of its Team Members.

A person or company is "**Related**" to another person or legal entity if:

- one may exercise Control (as defined herein) over the other; or

- each is under the direct or indirect Control of the same ultimate person or legal entity.

For purposes of this RFQ, a person or legal entity exercises "**Control**" of another if (i) it is the owner of any legal, beneficial or equitable interest in 25% or more of the voting securities in a corporation, partnership, joint venture, other person or entity or (ii) if it has the capacity to (A) control the composition of the majority of the board of directors of any such person or entity, (B) control the decisions made by or on behalf of any such person or entity or (C) otherwise direct or cause the direction of the management, actions or policies of any such person or entity (whether formally or informally); the terms "**Controlling**" and "**Controlled**" have corresponding meanings.

Each of the Team Members will individually ensure compliance with all licensing and other requirements under applicable laws with respect to the services to be provided by such Team Member.

Page 8





Subject to the requirements and entitlements of the Authority set forth below, submission of an SOQ will not limit a Respondent's ability to add, substitute or remove Team Members during the procurement process.

The Authority intends to issue the RFP only to Qualified Respondents. If for any reason, after the Submission Deadline and prior to the issuance of the RFP, a Respondent wishes or is required to: (i) change any Team Members listed in the Respondent's SOQ (either by adding new members, removing listed members or substituting new members for listed members), (ii) materially change the ownership or Control of a Respondent or a Team Member or (iii) change the legal relationship between the Respondent and/or its Team Members, such as the creation of a new joint venture, partnership or legal entity that will take the place of the Respondent, then, in each case, the Respondent must submit a written application to the Partnership Committee seeking its consent to the proposed change, which consent may be withheld, delayed or conditioned in the sole and absolute discretion of the Partnership Committee. The Partnership Committee may request and require additional information from the Respondent to facilitate its decision of whether to consent to the proposed change.

Without limiting the foregoing, the Partnership Committee may refuse to consent to a change to a Respondent or its Team Members and/or may disqualify the Respondent from further participation in the procurement process if, in the Partnership Committee's sole and absolute discretion, (i) the change would result in (A) a less desirable Respondent or less desirable Team Members than that originally proposed in the Respondent's SOQ or (B) the Respondent or its Team Members being materially different from the Respondent that submitted the SOQ, (ii) evaluating the application for a change would delay the qualification process or (iii) the Partnership Committee deems the change detrimental to the process, the Project, PREPA or the Authority.

## 1.8    Restricted Parties

The following entities will be deemed "**Restricted Parties**" and neither they nor their respective directors, officers, partners, employees and persons or legal entities Related to them are eligible to participate as Team Members or to otherwise assist any Respondent or Team Member, directly or indirectly, or participate in any way as a director, officer, employee, advisor, counsel, accountant or other consultant or otherwise in connection with any Respondent. Each Respondent will ensure that each Team Member does not use, consult, include or seek advice from any Restricted Party. The following Restricted Parties have been identified:

- Ankura Consulting Group, LLC
- ATCO Ltd.
- Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
- Citigroup Global Markets Inc.
- Cleary Gottlieb Steen & Hamilton LLP
- CPM P.R. LLC
- Díaz & Vázquez PSC
- Ernst & Young LLP
- Filsinger Energy Partners
- FTI Consulting, Inc.
- Greenberg Traurig LLP
- Hogan Lovells US LLP

Page 9

Partnership Committee Report — Puerto Rico Public-Private Partnership for the Puerto Rico Electric Power Thermal Generation Facilities    123



- ICF International, Inc.

- Innovative Emergency Management, Inc.

- King & Spalding LLP

- LUMA Energy, LLC

- McKinsey & Company, Inc.

- Navigant Consulting, Inc.

- Nixon Peabody LLP

- O'Melveny & Myers LLP

- O'Neill & Borges LLC

- Pietrantoni Mendez & Alvarez LLC

- Proskauer Rose LLP

- Quanta Services, Inc.

- Sargent & Lundy

At all times during the procurement process, Respondents must comply, and must ensure that all persons engaged to provide any type of assistance in connection with the Project are in compliance, with the Authority's Guidelines for the Evaluation of Conflicts of Interest and Unfair Advantages in the Procurement of Public-Private Partnership Contracts (the "**Ethics Guidelines**"), which are available for download on the Authority's website: http://www.p3.pr.gov.

**Respondents should be aware that the list of Restricted Parties is not exhaustive and that a person that is not included as a Restricted Party may still be prohibited from participating in the Project pursuant to the provisions of the Ethics Guidelines.**

**Finally, except as to any Restricted Party, the fact that a person provides or has provided services to the Authority, PREPA or AAFAF in matters not related to the Project may not automatically prohibit such person from participating in the Project. To the extent any question exists as to whether such a person is a Restricted Party, the Respondent should consult with the Authority.**

## 1.9   Clarifications and Communications Protocol

If a Respondent has any questions or wishes to clarify the contents of this RFQ, they may submit an RFC to the Authority for explanation or interpretation of any matter *no later than 5:00 p.m. AST on August 31, 2020 (the "RFC Deadline")*. If the Authority provides any clarification as a result of an RFC, it will provide such clarification by means of a written explanation published on the Authority's website *no later than September 8, 2020*.

Respondents should note the following regarding any RFC:

- any questions, communications, or RFCs from a Respondent must be made in writing to the email address of the Authority no later than the RFC Deadline;

- the Authority will not respond to Respondents' questions or RFCs that are not submitted in accordance with this Section 1.9; verbal questions will not be accepted; and

- the Authority does not guarantee that all questions received will be answered; and

 

**GOVERNMENT OF PUERTO RICO**
Puerto Rico Public-Private Partnerships Authority

- any Respondent that has questions as to the meaning of any part of this RFQ or the Project, or who believes that the RFQ contains any error, inconsistency or omission, must submit its concern, in writing, to the Authority in accordance with this Section 1.9.

The Authority's procurement representatives designated as points of contacts for this RFQ may be reached at the following email address: **P3GenProject@p3.pr.gov**.

Respondents will be responsible for monitoring the Authority's website for additional information, updates, amendments and addenda concerning the RFQ that may be uploaded on an ongoing basis, without notice to the Respondents.

The Authority may, in its sole and absolute discretion, publish all submitted questions or RFCs, along with the Authority's answers thereto, without expressly identifying the originator. Questions should NOT contain proprietary information, as they may be made publicly available together with the answers to such questions. Any response provided by the Authority other than by way of an addendum issued in accordance with this RFQ will not be binding on the Authority or PREPA, nor will it change, modify, amend or waive the requirements of this RFQ in any way. Respondents may not rely on any response or information provided otherwise.

Respondents may also make inquiries regarding matters they consider to be commercially sensitive or confidential. Respondents must designate such inquiries as "commercially confidential". If the Authority determines, in its sole and absolute discretion, that an inquiry designated as commercially confidential is of general application or would provide a significant clarification to this RFQ or any process or other matter outlined hereunder, the Authority may issue a clarification to all Respondents via addenda posted to the Authority's website to address such matter. If the Authority agrees with the Respondent's designation of an inquiry as commercially confidential, the Authority will provide a response only to the Respondent that submitted the commercially confidential inquiry.

Additional information regarding RFCs and other communications is set forth in Section 4 of this RFQ.

## 1.10   No Collusion or Lobbying

The Authority and PREPA are committed to a fair, open and transparent selection process.

**No Collusion**

Respondents and Team Members will not discuss or communicate, directly or indirectly, with any other Respondent(s) or any director, officer, employee, consultant, advisor, counsel, accountant, other consultant or representative or Team Member of any other Respondent regarding the preparation, content or representation of their SOQs. SOQs will be submitted without any connection (*i.e.*, arising through an equity interest (other than an equity interest that does not represent a Controlling interest in an entity, as determined by the Authority from time to time) in or of a Respondent or Team Member), knowledge, comparison of information or arrangement, with any other prospective Respondent or any director, officer, employee, advisor, counsel, accountant or other consultant or representative or Team Member of any other prospective Respondent.

By submitting an SOQ, a Respondent, on its own behalf and as authorized agent of each firm, corporation or individual Team Member of the Respondent, represents and confirms to the Authority, with the knowledge and intention that the Authority may rely on such representation and confirmation, that its SOQ has been prepared without collusion with other Respondents, fraud or unfair advantages. The Authority reserves the right to disqualify any Respondent that does not comply with this provision.

**No Lobbying**

Respondents, their Team Members and their respective directors, officers, employees, advisors, counsel, accountants and other consultants and representatives will not, except as expressly contemplated by this RFQ or as expressly directed or permitted by the Authority, attempt to communicate directly or indirectly with any





representative of the Authority, PREPA, the Partnership Committee, AAFAF, PREB, the Government, the FOMB or the federal government (other than via an RFC or other official communication following the communications protocol indicated in Section 1 of this RFQ) in relation to the Project or the RFQ Process, at any stage of this RFQ Process, including during the evaluation process. Respondents are advised that indirect communication may include communication with news media. Respondents are further advised that prohibited communications includes (without limitation) commenting on or criticizing aspects of the RFQ, the RFP, the competitive selection process or the Project, whether or not in a manner which may give the Respondent or its Team Members a competitive or other advantage over other Respondents and their Team Members. **The Authority reserves the right to automatically disqualify a Respondent that does not comply with this provision.**

Respondents, their Team Members and their respective directors, officers, employees, advisors, counsel, accountants and other consultants and representatives must certify that they have complied with the requirements of Section 4.13 of the Act 120 Regulation by completing the Form of Respondent Certification included as Appendix A to this RFQ.



Page 12

 

**GOVERNMENT OF PUERTO RICO**
Puerto Rico Public-Private Partnerships Authority

# 2.   Project Description

## 2.1   Puerto Rico

### 2.1.1   Overview

Puerto Rico is a self-governing territory of the United States and is located approximately 1,030 miles southeast of Miami, Florida, in the Caribbean. Puerto Rico has an area of approximately 3,500 square miles and a population estimated at 3.19 million by the United States Census Bureau as of July 1, 2019.

Historically, Puerto Rico has had one of the largest and most dynamic economies in the Caribbean region. As a territory of the U.S. since 1898, Puerto Rico offers a stable legal and regulatory framework where major U.S. and foreign multi-national corporations have operated. Puerto Rico has a well-educated and bilingual workforce, and has been a global center for manufacturing, including in the pharmaceutical, biotechnology, medical devices, agriculture, aerospace and electronics industries, which was complemented by strong consumer, retail and service sectors.

Generally, U.S. federal laws apply in Puerto Rico, and Puerto Rico is subject to the jurisdiction of the U.S. regulatory authorities, including the U.S. Environmental Protection Agency (EPA) Region 2. Because it is a U.S. territory, the U.S. Federal Deposit Insurance Corporation (FDIC) insures banks operating in Puerto Rico, which are subject to the same federal controls applied to banks operating in the U.S. mainland. The U.S. Securities and Exchange Commission (SEC) regulates all publicly traded securities and commodities.

| Key Puerto Rico Facts | |
|---|---|
| Population | 3.19 million (July 1, 2019 est.) |
| Land Area | 8,959 sq. km (approx. 3,500 sq. mi) |
| Currency | U.S. Dollar |
| Languages | English, Spanish |
| GDP Per Capita | $31,022 (2018) |

* Data according to U.S. Census 2019 and the Economic Development Bank for Puerto Rico.

### 2.1.2   Financial Condition and Title III Process

The Government and most of its public corporations are in the midst of a profound fiscal crisis.

The Government's balance sheet deterioration, coupled with continued structural budget imbalances between revenues and expenditures, and a lack of continuity and execution capacity in fiscal and economic plans led to the loss of capital markets access in 2015. This limited the Government's ability to make necessary infrastructure investments and to meet scheduled debt service payments.

Recognizing the delicate fiscal condition of Puerto Rico, the U.S. Congress enacted PROMESA, which was signed into law on June 30, 2016. PROMESA provides a series of mechanisms to achieve fiscal and budgetary balance and restore access to the capital markets to spur revitalization of infrastructure in Puerto Rico. PROMESA also established the FOMB, which is tasked with working with the people of Puerto Rico and the Government to create the necessary foundation for economic growth. The Government Fiscal Plan estimates the Government's consolidated outstanding debt and pension liabilities to be over $120 billion, with more than $70 billion in financial debt and more than $50 billion in pension liabilities.

In July 2017, a voluntary petition for bankruptcy relief was filed on behalf of PREPA, commencing a case under Title III of PROMESA in the U.S. District Court for the District of Puerto Rico (the "**Title III Court**"). Upon the



commencement of PREPA's Title III case, an automatic stay on litigation related to the financial indebtedness and other obligations of PREPA immediately went into effect.

The PPP Contract(s) will need to comply with certain federal and local requirements and regulations, including PROMESA, which will be set forth in more detail in the RFP. The PPP Contract(s) will also require the consent of the FOMB pursuant to the FOMB's Contract Review Policy effective as of November 6, 2017 (as modified July 3, 2018), as well as the approval of others as described in Section 1.2 of this RFQ. The FOMB and its advisors are working closely with the Authority and PREPA throughout this process and are expected to be active participants in the process at all stages.

Similar to Chapter 9 of the U.S. Bankruptcy Code, PROMESA does not include an express provision requiring post-petition contracts to be approved by the Title III Court. However, confirmation of a plan of adjustment in PREPA's Title III case may be required to release liens against PREPA's assets and help ensure that the Project is free and clear of all legacy liabilities.

### 2.1.3   Hurricanes, Earthquakes and Recovery Efforts

In September 2017, Hurricanes Irma and Maria delivered devastating blows to Puerto Rico, resulting in the largest and most complex disaster response and recovery effort in recent U.S. history. Irma skirted the northern coast of Puerto Rico on September 6 and 7, 2017, as a Category 5 storm, causing significant flooding, regional power and water outages and other damage to Puerto Rico's infrastructure. On September 20, 2017, less than two (2) weeks after Irma and before Irma's response operations had concluded, Maria made a direct strike over Puerto Rico as a Category 4 storm, causing widespread and unprecedented devastation and destruction. Maria resulted in loss of life and massive infrastructure and property damage, and severely affected Puerto Rico's population, economy, critical infrastructure, social service network, healthcare system and the Government.

On September 5 and 17, 2017, the Government requested separate federal declarations of emergency and disaster for Puerto Rico in light of the effects of Hurricanes Irma and Maria. These requests were subsequently approved by the President of the United States (the "**President**"), paving the way for federal disaster assistance funding. On October 26, 2017, the President signed the Additional Supplemental Appropriations for Disaster Relief Requirements Act 2017, which provides $36.5 billion in fiscal year 2018 emergency supplemental appropriations to the Federal Emergency Management Agency ("**FEMA**"), the Department of Agriculture and the Department of the Interior, a portion of which has been appropriated for Puerto Rico's energy system in connection with Irma and Maria disaster recovery efforts.

Since December 28, 2019, a number of earthquakes of varying magnitudes have struck Puerto Rico, including a magnitude 6.4 earthquake on January 7, 2020, and most recently, a magnitude 5.4 earthquake on May 2, 2020. The earthquakes have led to the loss of human life and injuries and have caused substantial damage to private property and Puerto Rico's infrastructure. In particular, the January 7, 2020 earthquakes resulted in significant damage to the Costa Sur power plant, which was located close to the epicenter of those earthquakes and is an instrumental part of the electric power generation infrastructure in Puerto Rico.  Since January 2020, the Costa Sur power plant has been temporarily out of service and undergoing repairs that are expected to be completed for both units before the end of 2020 (Unit 5 is expected to be back online in August 2020, and Unit 6 is expected in October 2020).

As Puerto Rico looks to the future, it sees the recovery effort as an opportunity not just to rebuild what was damaged, but also to transform Puerto Rico's energy system by implementing solutions that:

- are cost-effective and forward-looking;

- are resilient;

- harness innovative thinking and best practices from around the world; and

- contribute to greater economic development, revitalization and growth of Puerto Rico (in alignment with broader Government efforts to achieve fiscal and economic stability).




GOVERNMENT OF PUERTO RICO
Puerto Rico Public-Private Partnerships Authority



Puerto Rico will move forward in its economic and disaster recovery by investing in infrastructure, people and the environment. Federal funds from FEMA and other government entities will help in achieving this vision. In order to fully deliver on all of the economic, infrastructure and societal goals identified by the Government, private sector creativity and resources will need to be harnessed.

## 2.2    Electric Power System

### 2.2.1    PREPA Overview

PREPA is a public corporation and instrumentality of the Government, created pursuant to Act No. 83 of May 2, 1941, as amended. Its purpose is to provide electric power in a reliable manner, contribute to the general welfare and the sustainable development of Puerto Rico and maximize the benefits while minimizing the social, environmental and economic impacts of electric energy generation and distribution. PREPA's current objectives include reducing energy costs, promoting smart and renewable energy consumption and protecting the environment.

Strategies to achieve these objectives include:

- reducing operating expenses;
- increasing efficiency;
- improving power quality;
- diversifying energy sources;
- establishing smart grid technologies for energy control and consumption monitoring; and
- maximizing the use of advanced technology.

PREPA has faced significant challenges in recent years including:

- a lack of managerial continuity, notably six (6) people filling the role of executive director in three (3) years;
- significant balance sheet liabilities, including bond debt and pension obligations, which has led, among other things, to an inability to access credit markets for long term capital investment;
- a dated electrical generation and T&D system that is in a challenged condition due, in part, to substandard practices and chronic infrastructure underinvestment;
- the geographic mismatch between supply and demand — much of the generation is located on the south side of the island while a majority of the demand is on the north side of the island, exacerbating the fragility and instability of the whole system; and
- an aging generation fleet that is expensive, inefficient, inflexible, and heavily reliant on historically costly fossil fuels.





### 2.2.2   Current Status of the Legacy Generation Assets

PREPA's Legacy Generation Assets consist of base-load generation plants and peaking plants.  In addition, at the large generation complexes there are black start combustion turbines that also serve as peaking plants on occasion. The Legacy Generation Assets are dependent on natural gas, diesel (number 2 fuel oil) and number 6 fuel oil. Although these plants have a total installed capacity of approximately 4,785 MW, the dependable capacity is approximately 3,600 MW as a result of certain units being indefinitely out of service or in need of significant repair for various reasons. Because of (i) the age and the inefficient heat rates of the Legacy Generation Assets and (ii) Environmental Protection Agency Mercury and Air Toxics Standards ("**MATS**") requirements, and in accordance with the 2019 IRP, PREPA intends to retire and decommission most of the legacy units. Some of the Legacy Generation Assets may be needed for interim operating periods, as determined by the needs of the electric grid and the timing of the new, modern replacement generation resources, which are expected to be privately owned and which will be clarified upon completion of the 2019 IRP proceedings and further addressed in the RFP.

While the Legacy Generation Assets suffered only minimal damage from Hurricanes Irma and Maria, the Costa Sur base-load generation plant and two (2) of the four (4) Mayaguez peaking units sustained significant damage as a result of the January 7, 2020 earthquake. Costa Sur Unit 5 is expected to be online in August 2020 and Unit The San Juan base-load generation plant has recently completed a conversion of combustion turbine units 5 & 6 (Mitsubishi Heavy Industry) ("**San Juan Unit 5**" and "**San Juan Unit 6**") from oil to dual fuel capability. As a result, both units are now capable and commissioned to burn natural gas or diesel (number 2 fuel oil).  This conversion was implemented in conjunction with the New Fortress LNG import facility and gas infrastructure to San Juan Unit 5 and San Juan Unit 6.

At the Palo Seco complex, three (3) new Pratt & Whitney FT8 MOBILPAC units were installed and commissioned in 2019 although operations are still limited due to the need to install water injection systems for NOX control.  The units are intended for peaking use and may be relocated in the future. For the purposes of this RFQ, these units will be operated by the successful proponent.

The remaining Legacy Generation Assets have historically been vulnerable to transformer failures, voltage and frequency fluctuations and transmission line outages. They thus experience above industry average equivalent forced outage rates, primarily as a result of poor equipment conditions due to the age of the units.  Historically, PREPA has operated the system with a spinning reserve equal to at least 450 MW, the capacity of the largest operational generation unit, regardless of contemporaneous output due to the high forced outage rates as well as the island nature of the system.  The T&D Operator, as system operator, will be responsible for scheduling and economic dispatch of all generating units in order to provide safe and reliable power to PREPA's customers.

The table below presents technical information on the Legacy Generation Assets as of July 2020. Additional technical information on the Legacy Generation Assets can be found in Appendix C.



**Figure 1. Legacy Generation Assets Summary**

| Site | Plant | Units | Nameplate Capacity (MW) | Dependable Capacity (MW) | Duty | Current Status | Operational Notes |
|------|-------|-------|--------------------------|---------------------------|------|----------------|-------------------|
| **Aguirre Steam Unit 1** | Steam Turbine | 1 | 450 | 450 | Base-load | In service | |
| **Aguirre Steam Unit 2** | Steam Turbine | 1 | 450 | 450 | Base-load | In service | |
| **Aguirre GT Units** | Gas Turbines* | 2 | 42 | 21 | Peaker | Limited service | Unit 2 fully operational. Unit 1 out of service since Q1 2019. |
| **Aguirre Combined Cycle Unit 1** | Steam Turbine | 1 | 96 | 96 | Base-load | In service | |
| | Gas Turbines | 4 | 200 | 200 | Base-load | In service | |
| **Aguirre Combined Cycle Unit 2** | Steam turbine | 1 | 96 | 0 | Base-load | Out of service | Out of service since Q2 2017, undergoing maintenance. |
| | Gas Turbines | 4 | 200 | 200 | Peaker | In service | |
| **Cambalache** | Units 1-3 | 3 | 249 | 166 | Peaker | Limited service | Units 2 and 3 fully operational. Unit 1 out of service since Q3 2011. |
| **Costa Sur** | Units 3-4 | 2 | 170 | 0 | Base-load | Out of service | Unit 3 and 4 out of service since Q3 2016, decommissioning pending. |
| | Units 5-6 | 2 | 820 | 410 | Base-load | Unit 6 out of service | Unit 6 expected operational October 2020. |
| | Gas Turbines* | 2 | 42 | 0 | Peaker | Out of service | Unit 1 out of service since Q3 2017, currently undergoing repairs. Unit 2 maintenance outage since Q4 2015. |
| **Mayaguez** | Units 1-4 | 4 | 216 | 216 | Peaker | In service | 2020 earthquake repairs on units 2 and 4 complete. |
| **Palo Seco** | Units 1-2 | 4 | 170 | 85 | Base-load | Limited service | Unit 2 out of service since 2016 due to water pump failure. |






GOVERNMENT OF PUERTO RICO
Puerto Rico Public-Private Partnerships Authority

| Site | Plant | Units | Nameplate Capacity (MW) | Dependable Capacity (MW) | Duty | Current Status | Operational Notes |
|---|---|---|---|---|---|---|---|
| | Units 3-4 | 4 | 432 | 432 | Base-load | In service | |
| | Gas Turbines | 3 | 63 | 42 | Peaker | Limited service | Units 1 and 3 fully operational. Unit 2 currently out of service, expected to return to service Q2 2020. |
| | MobilePac Units | 3 | 81 | 66 | Peaker | In service | Units limited due to a lack of water injection. |
| San Juan Combined Cycle 5&6 | Gas Turbine Units 5-6 | 2 | 320 | 320 | Base-load | In service | Units fully operational. Dual fuel commissioning complete. |
| | Steam Turbines 5-6 | 2 | 120 | 120 | Base-load | In service | Units fully operational. Dual fuel commissioning complete. |
| San Juan Steam | Steam Units 7-10 | 4 | 400 | 200 | Peaker | Limited service | Unit 8 out of service due to boiler rupture repair with an expected return in August 2020; Unit 10 long term out of service since 2016. |
| Daguao | Gas Turbines | 2 | 42 | 42 | Peaker | In service | Both units operational. |
| Yabucoa | Gas Turbines | 2 | 42 | 21 | Peaker | Limited service | Unit 1 operational. Unit 2 out of service since 2016. |
| Jobos | Gas Turbines | 2 | 42 | 42 | Peaker | In service | Both units operational. |
| Vega Baja | Gas Turbines | 2 | 42 | 21 | Peaker | Limited service | Unit 2 operational. Unit 1 out of service since Q3 2019. |

*Source: PREPA       *Indicates gas turbines with black start capabilities.*

Page 18



**Figure 2. Map of Legacy Generation Assets**



*Source: PREPA*

Note: Does not show hydro facilities, peakers, or third party-owned assets (EcoElectrica, AES, and renewables).
1.  Combustion turbine ("CT").
2.  Steam turbine ("ST").

### 2.2.3   Transformation of the Generation System

Puerto Rico needs an upgraded electric system to increase reliability and resiliency, reduce costs, facilitate distributed generation and allow for economic recovery of the island. Pursuant to Act 120, PREPA is authorized to carry out PPP transactions with respect to any function, service or facility of PREPA, including the Legacy Generation Assets. In turn, Act 120 designates the Authority as the only government entity authorized to determine and to be responsible for the functions, services or facilities for which PPPs will be established, subject to the priorities, objectives and principles established in the energy public policy and regulatory framework developed by the Government pursuant to Act 120.

Act 120 set in motion the development of a new regulatory framework for the electric sector. A working group was created under Act 120 to develop a new energy public policy and regulatory framework, in consultation with the Southern States Energy Board and the U.S. Department of Energy, among others. The Puerto Rico Energy Public Policy Act, Act No. 17-2019, legislation to establish this new framework for Puerto Rico's energy sector, was signed into law on April 11, 2019. The requirements of Section 1.7 of Act 17-2019 sets forth the following:

> *Electrical System planning, regulation, and operation as well as electric power generation, transmission, and distribution are the strategic functions in which the State has a legitimate interest. Therefore, the*



*Government of Puerto Rico, by itself or through the Authority or another public corporation affiliated to the Authority, shall maintain ownership of the transmission and distribution assets and may maintain ownership of the legacy power generation assets. The Authority shall delegate or transfer the operating, administrative, and/or maintenance functions for the electric power generation, transmission and distribution, commercialization, and operation of the Electrical System through contracts awarded and executed pursuant to the provisions of this Act, Act No. 120-2018, and Act No. 29-2009. The Electrical System planning and regulatory function shall be entrusted to the Government of Puerto Rico by means of the Energy Bureau and the Energy Public Policy Program, within the scope of their jurisdictions, and consistent with the Integrated Resource Plan.*

Prior to the impact of Hurricanes Irma and Maria and of the 2019-2020 earthquakes, Puerto Rico already had an inherently deficient energy infrastructure. The planning, design, and operation of an isolated island-based electric system imposes significant challenges with respect to system stability and reliability. In particular, while some of PREPA's Legacy Generation Assets have been upgraded to burn natural gas, much of the aging fleet relies on diesel (number 2 fuel oil) and number 6 fuel oil, which are expensive and inefficient, and the related fuel costs are the primary reason for Puerto Rico's high electricity rates. PREPA and the Authority are putting in place various initiatives to address the issues of Puerto Rico's electric system.  These modernization efforts will focus on near- and long-term solutions to, among other objectives, reduce Puerto Rico's reliance on fuel oil, increase availability of renewable energy and natural gas, increase system resilience and efficiency, invest in facility repairs, improve dispatch through implementation of modern technology, and retire, replace or repair and upgrade inefficient generation assets.

### 2.2.4   The Integrated Resource Plan

Under Act 57, PREPA is required to prepare an integrated resource plan that consists of a detailed planning process considering all reasonable resources to satisfy the demand for electrical services over a 20-year planning horizon. PREPA's 2019 IRP provides a roadmap to realize PREPA's modernization goals. In addition, the 2019 IRP considers the resiliency, reliability, and stability of the power system, and must be fully compliant with current and future environmental regulations.

The 2019 IRP, initially submitted on February 12, 2019, was developed by PREPA, with support from Siemens Power Technology, Inc., using a rigorous analytical process. It provides analysis and recommendations for PREPA's energy supply resources for the twenty (20)-year period from 2019 to 2038. The analyses set out in the 2019 IRP considered a large number of scenarios and incorporated input from PREPA and relevant stakeholders.

On March 14, 2019, PREB found that the 2019 IRP was not fully in compliance with Regulation 9021, Regulation on Integrated Resource Plan for the Puerto Rico Electric Power Authority, or prior PREB orders and ordered PREPA to re-file a revised 2019 IRP. The revised 2019 IRP was submitted on June 7, 2019 and is currently undergoing the review process required by Regulation 9021, with Phase 2 commenced by PREB on July 3, 2019. The Replies to Final Briefs were submitted by PREPA and other relevant parties on April 20, 2020. A final resolution and order from PREB is anticipated in the coming months. Updates are posted on the PREPA website at: https://aeepr.com/es-pr/QuienesSomos/Paginas/ley57/Plan-Integrado-de-Recursos.aspx. The 2019 IRP docket may be followed on PREB's website at: https://energia.pr.gov/en/dockets/?docket=CEPR-ap-2018-0001.

## 2.3   Project Structure

The Project contemplates PREPA entering into one (1) or more PPP Contracts in the form of operation and maintenance agreements with one (1) or more Private Partner(s), covering some or all of the Legacy Generation Assets, with terms tied to the remaining useful lives of the Legacy Generation Assets. Under one (1) or more PPP Contract(s) between PREPA and the Private Partner(s), PREPA will retain ownership of, and title to, the respective Legacy Generation Assets and the applicable Private Partner will manage, operate and eventually decommission, as applicable, those Legacy Generation Assets. The compensation structure under the PPP Contract(s) will be described in the RFP.



 

As currently envisioned, one (1) or more Private Partner(s) will assume all rights and responsibilities related to the management, operation, maintenance and decommissioning, as applicable, of the Legacy Generation Assets. These rights and responsibilities are expected to include, among other things:

- day-to-day operation services, including start-up, load variations, active follow-up of operating parameters and alarms, shut-down of the plants or units thereof;

- identifying, justifying and managing any required maintenance capital expenditures;

- hiring, training, and supervising personnel;

- providing routine inspections and operating tests of the Legacy Generation Assets;

- provisioning, storing and maintaining the inventory of any necessary spare and consumable parts for the Legacy Generation Assets;

- establishing and maintaining a computerized maintenance management system for the Legacy Generation Assets;

- performing scheduled and emergency maintenance, repair and replacement of equipment, including any balance of plant equipment;

- managing outages and restoring power;

- coordinating emergency planning and storm restoration and recovery;

- procuring and managing water or power supply, if applicable;

- procuring, managing the delivery and quality testing of fuel, including natural gas, diesel (number 2 fuel oil) and number 6 fuel oil (including logistics, fuel testing and storage tank management), if applicable, as an agent for PREPA;

- liaising with PREPA, the T&D Operator or any of their assignees or successors regarding dispatch and related T&D system matters and providing required information;

- interfacing with regulators including PREB and with environmental compliance agencies such as EPA, OSHA and NERC CIP compliance, as may be required;

- obtaining and maintaining licenses, permits and consents, as necessary;

- preparing for and assisting in, or subcontracting for and overseeing, the decommissioning of the relevant plants as outlined in the 2019 IRP and in coordination with PREPA/the T&D Operator and PREB;

- participating in emergency planning and drills led by the T&D Operator, as needed; and

- assisting with the transition of the plants to third parties to the extent certain of the plants are removed from the PPP Contract.

.





# 3.   Respondent Qualification Requirements and Evaluation Criteria

In order to provide an objective and transparent evaluation method, the Partnership Committee will evaluate SOQs by applying the criteria outlined in the table below ("**Evaluation Criteria**"). Application of the Evaluation Criteria will assist the Partnership Committee in identifying the Qualified Respondents.

| | Evaluation Criteria |
|---|---|
| **Part 1** | **Compliance with Requirements of the PPP Act and Act 120 (*Pass/Fail*)** |
| | *Each SOQ submitted pursuant to this RFQ will be reviewed to determine whether it satisfies the requirements under the PPP Act, the Act 120 Regulation and Act 120 in the following areas:* |
| 1.1 | Respondents that are corporations, partnerships or any other legal entity, whether based in the U.S., including Puerto Rico, or elsewhere in the world, must be properly registered, or capable of being properly registered, to do business in Puerto Rico at the time of the execution of the PPP Contract, and shall comply with all applicable Puerto Rico and U.S. laws and/or requirements. |
| 1.2 | Each Respondent and each Team Member must certify that: |

(a) neither it nor any of its directors, officers, controlling shareholders or subsidiaries, nor its parent company, nor in the case of a partnership, any of its partners, nor any person or entity that may be considered an alter ego or the passive economic agent of the Respondent or Team Member, as applicable, (each, a "**Covered Party**"), has been convicted, entered a guilty plea, been indicted or had probable cause found for their arrest in any criminal proceeding in Puerto Rico, the rest of the U.S. or any foreign jurisdiction for:

   (i) any of the crimes referenced in Articles 4.2, 4.3 or 5.7 of Act No. 1-2012, as amended, known as the Organic Act of the Office of Government Ethics of Puerto Rico;

   (ii) any of the crimes typified in Articles 250 through 266 of Act No. 146-2012, as amended, known as the Puerto Rico Penal Code; or

   (iii) any of the crimes listed in Act No. 2-2018, as amended, known as the Anti-Corruption Code for a New Puerto Rico or any other felony that involves misuse of public funds or property, including but not limited to the crimes mentioned in Article 6.8 of Act No. 8-2017, as amended, known as the Act for the Administration and Transformation of Human Resources in the Government, or under the U.S. Foreign Corrupt Practices Act; nor is any Covered Party under investigation in any legislative, judicial or administrative proceedings, in Puerto Rico, the rest of the U.S. or any other jurisdiction;

(b) it is in compliance and shall continue to comply at all times with all federal, state, local and foreign laws applicable to the Respondent or Team Member(s) that prohibit corruption or regulate crimes against public functions or public funds, including the U.S. Foreign Corrupt Practices Act;



 

| | Evaluation Criteria |
|---|---|
| 1.2 (cont'd) | (c) it completed the SOQ without prior understanding, agreement, connection, discussion or collusion in relation to this RFQ with any other person, firm or corporation submitting or participating in the submission of a separate SOQ or any officer, employee or agent of the Authority, PREPA, the Partnership Committee, AAFAF, PREB, the Government, the FOMB or any public agency of Puerto Rico; and |

(d) except as provided in Section 1.9 of this RFQ, as required by Section 4.13 (No Lobbying; No Collusion; No Prohibited Acts) of the Act 120 Regulation, it shall not attempt to communicate in relation to this RFQ, directly or indirectly, with any representative of the Authority, PREPA, the Partnership Committee, AAFAF, PREB, the Government, the FOMB or any public agency of Puerto Rico, including any Restricted Parties or any director, officer, employee, agent, advisor, staff member, counsel, consultant or representative of any of the foregoing, as applicable, for any purpose whatsoever, including for purposes of:

(i) commenting on or attempting to influence views on the merits of the Respondent's and Team Members' SOQ, or in relation to their SOQ;

(ii) influencing, or attempting to influence, the outcome of the RFQ Process or of the competitive selection process, including the review and evaluation of SOQs or the selection of the Qualified Respondents;

(iii) promoting the Respondent and Team Members or their interests in the Project, including in preference to that of other Respondents or Team Members;

(iv) commenting on or criticizing aspects of this RFQ, the competitive selection process or the Project, including in a manner which may give the Respondent or its Team Members a competitive or other advantage over other Respondents or their respective Team Members; or

(v) criticizing the SOQs of other Respondents.

***Requirements 1.1 and 1.2 shall be satisfied by completing the Form of Respondent Certification included as Appendix A to this RFQ.***

| 1.3 | Each Respondent and each Team Member must: |
|---|---|

(a) acknowledge that the Respondent and Team Members were able to access the Authority's website and download documents pertaining to this RFQ and the Project;

(b) provide the contact information for the Respondent and each Team Member;

(c) acknowledge and accept responsibility for periodically checking the Authority's website for any and all official communications regarding the Project; and

(d) accept the transmission of additional notifications via electronic communications.

***Requirement 1.3 shall be satisfied by completing the Form of Document Acknowledgement & Contact Information included as Appendix B to this RFQ.***



GOVERNMENT OF PUERTO RICO
Puerto Rico Public-Private Partnerships Authority

| Evaluation Criteria | |
| --- | --- |
| **Part 2** | **Background & Team Information (15 pages maximum) (25%)** |

*Respondent and Team Member(s) are encouraged to provide enough supporting information and details to enable the evaluators to perform a thorough evaluation of their strengths, roles and responsibilities.*

| | |
| --- | --- |
| 2.1 | A description of the Respondent and all Team Members that identifies: |

- anticipated roles, functions and overview of business operations;
- jurisdiction, form of entity organization, ownership structure and capitalization;
- anticipated legal relationships (*e.g.*, joint ventures, partnerships) and percentage ownership interest;
- up to five (5) individuals who will play an important role in the Project on behalf of Respondent and Team Member(s) (the "**Key Individuals**"), and their roles and previous experience (experience of the individuals should include experience in all phases of power plant project development including operating, maintaining, repairing, managing capital expenditures and decommissioning combined cycle, gas turbines and steam turbine generation plants);
- instances of working with Spanish-speaking workforces;
- instances, if relevant, in which Respondent and Team Member(s) have previously worked together; and
- evidence and tenor of operations and management experience in electric power generation (including experience with operating agreements).

Anticipated roles and legal relationships should include, among other relevant descriptions, whether the Respondent is the entity expected to submit the response to the RFP and execute the PPP Contract as the Private Partner. The description should include the entity expected to guarantee the Private Partner's performance under the PPP Contract in the case where Respondent is not the Private Partner.

| | |
| --- | --- |
| 2.2 | A list of technical, financial, legal, accounting or other advisors that Respondent or any Team Member has engaged or intends to engage in connection with the Project. |

| | |
| --- | --- |
| 2.3 | Resumes (indicating overall experience and any specific experience relevant to the nature and scope of the Project) for the Key Individuals, including Spanish-speaking skills. It is expected that the anticipated management team will be comprised of individuals with at least ten (10) years of relevant electric generation managerial experience for all executive-level positions. |
| | *(One page per resume maximum and resumes will not count towards the overall page count for Part 2)* |






GOVERNMENT OF PUERTO RICO
Puerto Rico Public-Private Partnerships Authority

| | Evaluation Criteria |
|---|---|
| **Part 3** | **Financial Capabilities (10 pages maximum) (*10%*)** |

*The evaluation of financial capabilities will examine each SOQ in accordance with the criteria set out below:*

3.1 **Financial Capacity of Team:** Respondent must demonstrate adequate financial wherewithal to fulfill the terms of the PPP Contract. Each Respondent or at least one (1) Team Member must provide:

- evidence of the financial capability to obtain operational security in the form of an unconditional and irrevocable direct pay letter(s) of credit;

- evidence of creditworthiness, such as credit ratings, if any, for each Team Member, or historical metrics supporting credit quality comparable to those used by credit analysts; and

- copies of financial statements (audited preferred), Form 10-Ks, 20-Fs or similar types of annual reports for the past two (2) years, together with any other relevant financial information.

*(Financials & supporting information not included in page count)*



Page 25



GOVERNMENT OF PUERTO RICO
Puerto Rico Public-Private Partnerships Authority

| | Evaluation Criteria |
|---|---|
| Part 4 | Technical & Operational Capabilities (50 pages maximum) (*50%*) |

*The evaluation of technical capabilities will examine each SOQ in accordance with the criteria set out below:*

4.1     Respondent must demonstrate its technical and operational capabilities to fulfill the terms of the PPP Contract. Respondent and Team Members will be expected to have current or past power generation operations, management and maintenance experience in the O&M context. As such, Respondent or at least one (1) Team Member must demonstrate with detailed evidence that its current or previous power generation experience fulfills the following criteria on a sustained basis:

- concurrently operating and maintaining either (i) two (2) or more oil and/or gas-fired generating facilities larger than 100 MW, or (ii) a fleet of at least 1,000 MW combined of oil and/or gas-fired generating facilities;

- repairing and/or replacing oil and/or gas-fired generating facilities;

- experience with execution or oversight of plant decommissioning, including the procurement of qualified subcontractors to decommission power generation facilities;

- demonstrated ability to safely operate similar technology generation facilities and managing outages and maintenance programs in order to achieve the operating objectives of the T&D Operator;

- managing fuel supply for similar or similarly situated generating facilities, including delivery and storage and fuel quality testing;

- names of the locations where the Respondent or subcontractors have performed similar work as described above;

- certification of no significant or sustained environmental regulation violations or OSHA fines/violations; and

- a demonstrable history of compliance with energy related policies, practices, and regulations from a state, commission, or other regulatory body.

In addition, preference will be given to Respondents with demonstrated experience operating and maintaining oil and/or gas-fired generating facilities on an island or other stranded location and under challenging natural circumstances, including management and scheduling of delivery of fuel to such locations. Respondent and Team Member(s) should aim to provide sufficient evidence to demonstrate an intimate understanding of the power and electric generation industry especially as it applies to operating and dispatching generation plants. Operations, maintenance, safety and environmental responsibility should each be a key focus.






| | Evaluation Criteria |
|---|---|
| **Part 5** | **Safety Performance (no page limit) (15%)** |
| 5.1 | Respondent and Team Member(s) must demonstrate (a) their ability to address and resolve safety issues and (b) their knowledge of safety strategies and methodologies. Respondent and Team Member(s) must submit copies of the Occupational Safety and Health Administration (OSHA) 300 forms for the past three (3) years, only as related to electric generation operations. If not applicable, Respondent and Team Member(s) must present a document explaining the reasons for not submitting the form.<br><br>*These may be included in an appendix.* |



Page 27





# 4.   SOQ Requirements & Procedure

## 4.1   SOQ Requirements

**Overview of Requirements**

*Both an electronic copy and a physical copy of the original SOQ must be delivered no later than the Submission Deadline. Prospective Respondents that anticipate responding to this RFQ should so indicate as soon as possible by sending to the e-mail address listed below the necessary contact information. The SOQ must comply with the outline provided under "Required Information for SOQ" below and all other conditions identified in this RFQ. Additional information not specifically related to the Project or this RFQ should not be included in the SOQ. All questions or requests for information regarding this RFQ should be directed to the Partnership Committee via e-mail, as provided in Section 1.9 of this RFQ.*

*Please do not contact, directly or indirectly, any officials or related parties of the Authority, PREPA, the Partnership Committee, AAFAF, PREB, the Government or the FOMB. Such contact may serve as grounds for disqualification.*

Address intent to respond to this RFQ to:

Puerto Rico Electric Power Authority Thermal Generation Facilities Partnership Committee

Request for Qualifications

Puerto Rico Electric Power Authority Thermal Generation Facilities Project

E-mail: P3GenProject@p3.pr.gov

**No Liability for Costs**

The Authority, PREPA, other agencies and instrumentalities of the Government and their respective advisors are not responsible for costs or damages incurred by Respondents, Team Members, subcontractors or other interested parties in connection with the solicitation or procurement process, including but not limited to costs associated with preparing responses, qualifications and proposals, and of participating in any conferences, oral presentations or negotiations, whether in connection with this RFQ Process, the RFP Process or otherwise. A Qualified Respondent will not be entitled to indemnity (including, but not limited to, reimbursement for costs and expenses) from the Authority, PREPA or any other agency or instrumentality of the Government if the Authority or PREPA decide, in their discretion, to terminate the procurement process for this Project.

**Modification and Termination Rights**

The Authority and PREPA reserve the right to modify or terminate the RFQ Process and the RFP Process for this Project at any stage if the Authority or PREPA determines such action to be in the public interest. The receipt of responses or proposals or other documents at any stage of either this RFQ or the RFP Process will in no way obligate the Authority or PREPA to enter into any contract of any kind with any party.



 

## 4.2    Required Information for SOQ

**Compliance with this RFQ**

The SOQ must be prepared in English and follow the format outlined below. Respondents may opt to submit responses in Word, PDF or PowerPoint templates. The Partnership Committee will review all SOQs and score them based on the evaluation criteria set forth below. Responses must comply with the following format:

- Cover Page (to include identification of all Team Members)
- Cover Letter (two (2) pages maximum)
- Table of Contents
- Executive Summary (two (2) pages maximum)
- The specific requirements as set out in Section 3 of this RFQ:
    - Part 1: Compliance with the Requirements of the PPP Act and Act 120 (No page limit) *(Pass/Fail)*
        - An executed Respondent Certification from the Respondent **and each Team Member**. This Certification must strictly follow the form attached to this RFQ as Appendix A.
        - An executed Document Acknowledgement and Contact Information letter from the Respondent (executed by the contact person ("**Respondent Representative**") for all future communication between the Authority and the Respondent). This letter must strictly follow the form attached to this RFQ as Appendix B.

        Proposals that do not meet the first two (2) "pass/fail" criteria will not be further evaluated.

    - **Part 2: Background & Team Information (15 pages maximum)** *(25%)*

        Respondents should address all areas referred to in the Evaluation Criteria set out in Section 3 of this RFQ, under the heading "Background & Team Information".

    - **Part 3: Financial Capabilities (10 pages maximum)** *(10%)*

        Respondents should address all areas referred to in the Evaluation Criteria set out in Section 3 of this RFQ, under the heading "Financial Capabilities".

    - **Part 4: Technical & Operational Capabilities (50 pages maximum)** *(50%)*

        Respondents should address all areas referred to in the Evaluation Criteria set out in Section 3 of this RFQ, with respect to "Technical Capabilities".

    - **Part 5: Safety Performance (No page limit)** *(15%)*

        Respondents should submit copies of the documents required by Section 3 of this RFQ with respect to safety performance. If not applicable, a Respondent should present a document explaining the reasons for not submitting such documents. Respondents must demonstrate (a) their ability to address and resolve safety issues, and (b) their knowledge of safety strategies and methodologies.



**GOVERNMENT OF PUERTO RICO**
Puerto Rico Public-Private Partnerships Authority

**Requests for Clarification or Additional Information**

As further described in Section 4.9 of this RFQ, after performing initial evaluations, the Authority may request additional information or clarification of the content of the submitted SOQs, including, but not limited to requests for references (name, telephone number, email address) familiar with the works performed by the Respondent detail in Part 4 of the SOQ. Responses to these Authority-issued RFCs will supplement the submitted SOQs. **Respondents should be aware that failure to submit a response to an Authority-issued RFC may negatively impact evaluation of the respective SOQ.**

## 4.3    Reporting of Material Adverse Change

Prior to the issuance of the RFP documents, the Authority and PREPA may, in their discretion, request that a Respondent confirm that there have been no material changes to the information submitted with respect to the Respondent and/or any Team Member in the relevant SOQ. If there have been any material changes to the submitted information, the Respondent must provide details of such changes in accordance with any requirements the Authority or PREPA may impose at that time. The Partnership Committee will evaluate the information submitted by the Respondent in accordance with the evaluation criteria set out in Section 3 of this RFQ, and may revise the results of the Respondent's evaluation.

## 4.4    SOQ Submission Instructions

The Respondent must submit one (1) originally executed SOQ, with signatures in blue ink and marked as "Original", and four (4) copies along with one (1) copy in portable document format (PDF) on a CD or USB flash drive. The one (1) electronic copy in PDF format must also be sent to the Authority by e-mail to P3GenProject@p3.pr.gov. **Both an electronic copy and a physical copy of the original SOQ must be delivered no later than the Submission Deadline.** Respondents should not submit promotional materials as part of their SOQs and are strongly encouraged not to submit information that is not required by this RFQ. Respondents are strongly encouraged to be succinct in their SOQs. Respondents must limit their SOQs, or each component of their SOQs, to the maximum number of pages indicated in Section 4.2 of this RFQ. **The Partnership Committee will not review pages submitted in excess of the maximum number of pages indicated for such item. Respondents should be aware that failure to follow these Submission Instructions may negatively impact evaluation of the respective SOQ**

**The SOQ must be labeled as follows:**

Puerto Rico Public-Private Partnerships Authority

Puerto Rico Electric Power Generation Authority Thermal Generation Facilities PPP SOQ Submitted by (*Respondent's name and Address*)

**The SOQ must be addressed to:**

Puerto Rico Electric Power Authority Thermal Generation Facilities PPP

Puerto Rico Public-Private Partnerships Authority

Attn: Fermin Fontanés, Esq. — Executive Director

Puerto Rico Fiscal Agency and Financial Advisory Authority Building

(former GDB Building), 3rd Floor Roberto Sánchez Vilella Government Center, De Diego Avenue

San Juan, PR 00940-2001

 

GOVERNMENT OF PUERTO RICO
Puerto Rico Public-Private Partnerships Authority

## 4.5   Confidentiality of SOQ

All SOQs will become the property of the Authority and may become public in accordance with applicable law, except for documents or information submitted by Respondents that are trade secrets, proprietary information or privileged or confidential information of the Respondents. Respondents are advised to review the confidentiality provisions contained in Sections 9(i) and 9(j) of the PPP Act and Section 11.2 of the Act 120 Regulation. In order to ensure that documents identified by Respondents as "confidential" or "proprietary" will not be subject to disclosure under the PPP Act, Respondents must label such documents as "confidential" or "proprietary," provide a written explanation of why such labeled documents are "confidential" or "proprietary," including why the disclosure of the information would be commercially harmful, specifically refer to any legal protection currently enjoyed by such information and why the disclosure of such information would not be necessary for the protection of the public interest, and request that the documents so labeled be treated as confidential by the Partnership Committee according to the process described in the following paragraph.

Notwithstanding the foregoing, all Respondents should submit a redacted copy of their SOQ that excludes all confidential or proprietary information not to be public as outlined in this section. In addition, un-redacted copies of the SOQ should identify such information. Any information not identified as confidential or proprietary information in the un-redacted SOQ will not be deemed confidential. If a Respondent neither submits a redacted copy nor labels the information as confidential or proprietary, the Authority will assume that the original copy of the SOQ can be made public.

If a Respondent has special concerns about confidential or proprietary information that it desires to make available to the Partnership Committee prior to submission of its SOQ, such Respondent may wish to:

- make a written request to the Partnership Committee for a meeting to specify and justify proposed confidential or proprietary documents;

- make an oral presentation to the Partnership Committee staff and legal counsel; and

- receive written notification from the Partnership Committee accepting or rejecting confidentiality requests.

Failure to take such precautions prior to submitting an SOQ may subject confidential or proprietary information to disclosure under Sections 9(i) and 9(j) of the PPP Act and/or Section 11.2 of the Act 120 Regulation.

The Partnership Committee will evaluate all confidentiality requests according to the criteria indicated in the PPP Act and the Act 120 Regulation. The Partnership Committee will determine whether or not the requested materials are exempt from disclosure. Upon such determination, the Authority will endeavor to maintain the confidentiality of any information that a Respondent indicates to be proprietary or a trade secret, or that must otherwise be protected from publication according to law, except as required by law or by a court order. In the event that the Partnership Committee elects to disclose the requested materials, it will provide the Respondent notice of its intent to disclose, in which case the Respondent may request the immediate return of such materials prior to disclosure by the Partnership Committee and they will thereafter form no part of the Respondent's submission. In no event will the Government, the Authority, the Partnership Committee or PREPA be liable to a Respondent for the disclosure required by law or a court order of all or a portion of an SOQ filed with the Authority.

Upon execution of a PPP Contract, the Partnership Committee is required to make public its report regarding the procurement process. This report will contain information related to the qualification, procurement, selection and negotiation process, and the information contained in the SOQ, except information that qualifies as trade secrets, confidential, proprietary or privileged information of the Respondent or its Team Members clearly identified as such by the Respondent, or information that must otherwise be protected from publication according to law, as may have been determined by the Partnership Committee, unless otherwise required by law or by a court order. **Pursuant to Section 5.1 (Evaluation Process) of the Act 120 Regulation, Respondents should**





GOVERNMENT OF PUERTO RICO
Puerto Rico Public-Private Partnerships Authority

be aware that before execution of the respective PPP Contract, all evaluations, discussions, negotiations, SOQs and Proposals must and shall be kept confidential.

## 4.6    Use of Confidential Information

Each Respondent must declare, and agree to be under an obligation to declare, that it does not have knowledge of or the ability to avail itself of confidential information of the Government, PREPA or the Authority relevant to the Project, except to the extent it has been expressly authorized by the Government, PREPA or the Authority. ***This requirement shall be satisfied by completing the Form of Respondent Certification included as Appendix A to this RFQ.***

Any such confidential information:

- will remain the sole property of the Government, the Authority or PREPA, as applicable, and the Respondent and its Team Members will treat it as confidential;

- may not be used by the Respondent or its Team Members for any other purpose other than preparation of its SOQ, RFP submission or the performance of any subsequent agreement relating to the Project with the Government, the Authority or PREPA, as applicable;

- may not be disclosed by the Respondent or any Team Member to any person who is not involved in the Respondent's preparation of its SOQ, RFP submission or the performance of any subsequent agreement relating to the Project with the Government, the Authority or PREPA, as applicable, without prior written authorization from the party in respect of whom the confidential information relates;

- if requested by the Government, the Authority or PREPA, will be returned or destroyed, as appropriate, no later than ten (10) calendar days after such request; and

- may not be used in any way that is detrimental to the Government, the Authority or PREPA.

Each Respondent and its Team Members will be responsible for any breach of the provisions of this Section 4.6 by any person to whom any of them discloses the confidential information. Each Respondent and its Team Members acknowledge and agree that a breach of the provisions of this Section 4.6 would cause the Authority, PREPA, the Government and/or their related entities to suffer loss which could not be adequately compensated by damages, and that the Authority, PREPA, the Government and/or any related entity may, in addition to any other remedy or relief, enforce any of the provisions of this Section 4.6 upon submission of the Respondent's SOQ to a court of competent jurisdiction for injunctive relief without proof of actual damage to the Authority, PREPA, the Government or any related entity.

The provisions in this Section 4.6 will survive any cancellation of this RFQ or the RFP and the conclusion of the RFQ Process and the RFP Process.

## 4.7    Conflicts of Interest and Ineligible Persons

Each Respondent Representative submitting an SOQ on behalf of such Respondent and the Team Members of such Respondent must declare and continue to be under an obligation to declare all Conflicts of Interest or any situation that may be reasonably perceived as a Conflict of Interest that exists now or may exist in the future. A "**Conflict of Interest**" includes any situation or circumstance where in relation to the Project, the Respondent submitting an SOQ or any Team Member of such Respondent has other commitments, relationships or financial interests that:

   (a) could or could be seen to exercise an improper influence over the objective, unbiased and impartial exercise of the Authority's or PREPA's independent judgment; or

Page 32





(b) could or could be seen to compromise, impair or be incompatible with the effective performance of its obligations under the PPP Contract.

In connection with its SOQ, each Respondent and each Team Member will:

(a) avoid any Conflict of Interest in relation to the Project;

(b) disclose to the Authority and to PREPA without delay any actual or potential Conflict of Interest that arises during the RFQ Process or at any point in the procurement process; and

(c) comply with any requirements prescribed by the Authority and PREPA to resolve any Conflict of Interest.

**Each Respondent is responsible for ensuring that all persons engaged to provide any type of assistance in connection with the Project are in compliance with the provisions of the Ethics Guidelines and, to the extent any question exists as to compliance with the Ethics Guidelines, the Respondent should consult with the Authority.**

In addition to all contractual or other rights or rights available at law or in equity or legislation, the Authority and PREPA may immediately exclude a Respondent or any of its Team Members from further consideration or remove the Respondent or any Team Member from the RFQ Process if:

(a) the Respondent knew, or reasonably should have known, and fails to disclose an actual or potential Conflict of Interest;

(b) the Respondent submitting an SOQ or a Team Member of such Respondent fails to comply with any requirements prescribed by the Authority or PREPA to resolve a Conflict of Interest; or

(c) the Respondent's Conflict of Interest issue cannot be resolved.

Pursuant to Section 7.1 of the Act 120 Regulation, any person, by virtue of its participation in this RFQ Process, authorizes the Authority to apply to the relevant competent governmental authority to obtain further information regarding a prospective Respondent and in particular, details of convictions of the offenses listed in Section 9(c)(ii) of the PPP Act if the Partnership Committee considers it necessary for its selection or evaluation process.

## 4.8    RFQ Miscellaneous Instructions

**Addenda to RFQ**

The Authority reserves the right to amend this RFQ at any time. All amendments to this RFQ will be described in written addenda. Copies of each addendum will be available at the Authority's website. Respondents are encouraged to review the Authority's website regularly. All addenda will become part of this RFQ. In the event of any conflict in the wording or any issue of interpretation, addenda, when issued, will take priority over the original wording in this RFQ and any wording in prior addenda. **Each Respondent will, in its SOQ, acknowledge receipt of each addendum.** Each Respondent is solely responsible to ensure that it and its Team Members have received all communications issued by the Authority and PREPA. A failure to obtain any such communication is at the sole and absolute risk of the Respondent and its Team Members, and the Authority and PREPA accept no responsibility for the failure of any Respondent or Team Member to receive or obtain all RFQ information (including addenda). Each response to this RFQ is deemed to be made on the basis of the complete RFQ, as amended by any addenda, issued prior to the Submission Deadline.

**Withdrawal of SOQs**

A Respondent may withdraw an SOQ by delivering to the Authority a written request for withdrawal prior to the Submission Deadline at the address for delivery of SOQs set forth in Section 4.4 of this RFQ. Any such



withdrawal does not prejudice the right of a Respondent to submit another SOQ prior to the Submission Deadline.

## 4.9    The Authority's Requests for Clarification After SOQ Submissions

As noted in Sections 4.11(k) and 4.11(p) of this RFQ, the Authority reserves the right to require direct confirmation of information furnished by a Respondent, additional information from a Respondent concerning its response or additional evidence of qualifications to perform the work described in this RFQ. After completing initial evaluations of the submitted SOQs, the Authority may issue RFCs to the Respondents that request such confirmation, additional information or evidence.

Should the Authority issue RFCs in response to the submitted SOQs, RFCs will be issued to each Respondent. Responses to these Authority-issued RFCs will supplement the submitted SOQs. **Respondents should be aware that failure to submit a response to an Authority-issued RFC may negatively impact evaluation of the respective SOQ and may be perceived as evidence of noncompliance with the requirements of this RFQ.**

## 4.10    Disclaimer

The information provided in this RFQ, or any other written or oral information provided by the Authority, PREPA, the Partnership Committee, the Government or their respective officers, employees, advisors, counsel or consultants in connection with the Project or the selection process is provided for the convenience of the Respondents only. Respondents and their Team Members will make their own conclusions as to such information. Oral explanations or instructions from officials, employees, advisors, counsel or consultants of the Authority, PREPA, the Partnership Committee or any Puerto Rico public agency will not be considered binding on the Authority, PREPA, the Partnership Committee or the Government. The Authority, PREPA, the Partnership Committee, the Government and their respective officers, employees, advisors, counsel and consultants make no representation or warranty as to any information provided in connection with this RFQ Process or the RFP Process. The accuracy and completeness of such information is not warranted by any of them and none of them will have any liability in connection with such information or the selection process, all of which liability is expressly waived by each Respondent and each Team Member of such Respondent. This RFQ is not an offer to enter into any contract of any kind whatsoever.

## 4.11    Reservation of Rights

In furtherance of the Authority's mission, the Partnership Committee reserves the right to reject any and all SOQs, to waive technical defects, irregularities or any informality in SOQs, and to accept or reject any SOQs in its sole and absolute discretion. The Partnership Committee also reserves the right to postpone the date on which SOQs are required to be submitted, or to take any other action it may deem in the best interests of the Authority and PREPA.

In addition, the Authority and PREPA reserve all rights (which rights will be exercisable by the Authority and PREPA in their sole and absolute discretion) available to them under applicable laws and regulations, including, without limitation, with or without cause and with or without notice, the right to:

(a) modify the procurement process to address applicable law and/or the best interests of the Authority, PREPA and the Government;

(b) develop the Project in any manner that they deem necessary and change the limits, scope and details of the Project;

(c) if the Authority and PREPA are unable to negotiate a PPP Contract to their satisfaction with a Private Partner, terminate the process or pursue other alternatives relating to the Project, or exercise such other rights as they deem appropriate;



GOVERNMENT OF PUERTO RICO
Puerto Rico Public-Private Partnerships Authority

(d) cancel the procurement process, as applicable, in whole or in part, at any time prior to the execution by PREPA of the PPP Contract, without incurring any cost, obligation or liability whatsoever;

(e) issue a new request for qualification after withdrawal of this RFQ;

(f) reject or disqualify any and all SOQs and responses received at any time for any reason without any obligation, compensation or reimbursement to any existing or prospective Respondent or Team Member;

(g) modify all dates, deadlines, process, schedule and other requirements set out, described or projected in this RFQ;

(h) terminate evaluations of responses received at any time;

(i) exclude any Respondent from submitting any response, or exclude from evaluation such Respondent's response, to this RFQ based on the failure to comply with any requirements;

(j) issue addenda, supplements and modifications to this RFQ;

(k) require direct confirmation of information furnished by a Respondent, additional information from a Respondent concerning its response or additional evidence of qualifications to perform the work described in this RFQ;

(l) consider, in the evaluation of any SOQ, any prior experience or performance by a Respondent, Team Member or Key Individual with related scope generation projects, whether included in the SOQ or otherwise known to the Authority or PREPA;

(m) seek or obtain data from any source that has the potential to improve the understanding and evaluation of the responses to this RFQ;

(n) add or delete Respondent responsibilities from the information contained in this RFQ or any subsequent process instruments;

(o) negotiate with any party without being bound by any provision in its response;

(p) waive any deficiency, defect, irregularity, non-conformity or non-compliance in any response to this RFQ or permit clarifications or supplements to any response to this RFQ, and accept such response even if such deficiency, defect, irregularity, non-conformity or non-compliance would otherwise render the response null and void or inadmissible;

(q) add or eliminate facility expansion to or from the Project;

(r) incorporate this RFQ or any Respondent's response to this RFQ or portion thereof as part of the RFP Process or any formal agreement with a Private Partner; and

(s) exercise any other right reserved or afforded to the Authority and PREPA under the PPP Act, the Act 120 Regulation, this RFQ or applicable law.

This RFQ does not commit either the Authority or PREPA to enter into a contract or proceed with the Project as described herein. The Authority, PREPA and the Government assume no obligations, responsibilities or liabilities, fiscal or otherwise, to reimburse all or part of the costs incurred or alleged to have been incurred by parties considering a response to and/or responding to this RFQ, or in considering or making any submission. All of such costs will be borne solely by each Respondent.



## 4.12   Limitation of Damages

Each Respondent, by submitting an SOQ, agrees that in no event will the Authority, PREPA, the Partnership Committee, the Government or any of their respective directors, officers, employees, advisors, counsel or representatives be liable, under any circumstances, for any claim, demand, liability, damage, loss, suit, action or cause of action, whether arising in contract, tort or otherwise, and all costs and expenses relating thereto (each, a "**Claim**"), or to reimburse or compensate the Respondent, any Team Member or their respective directors, officers, employees, advisors, counsel, accountants and other consultants and representatives, in any manner whatsoever, including, without limitation, any costs of preparation of the SOQ or the response to the RFP, loss of anticipated profits, loss of opportunity or for any other matter. Without in any way limiting the above, each Respondent and Team Member of such Respondent specifically agrees that it will have absolutely no Claim against the Authority, PREPA, the Partnership Committee or the Government or any of their respective directors, officers, employees, advisors, counsel or representatives if any such party for any reason whatsoever:

- does not select a list of Qualified Respondents;

- suspends, cancels or in any way modifies the Project or the solicitation process (including modification of the scope of the Project or modification of this RFQ or both);

- accepts any compliant or non-compliant response or selects a list of one (1) or more Qualified Respondent(s);

- under the terms of this RFQ permits or does not permit a Restricted Party to advise, assist or participate as part of a Respondent or its Team Members; or,

- breaches or fundamentally breaches a contract or legal duty of the Authority, PREPA, the Partnership Committee or the Government, whether express or implied, and each Respondent and each Team Member waives any and all Claims whatsoever, including Claims for loss of profits or loss of opportunity, if the Respondent is not selected as a Qualified Respondent for any other reason whatsoever.

## 4.13   Judicial Review

Judicial review of the selection and award process for qualifications must be pursued in accordance with Section 20 (Judicial Review Procedures) of the PPP Act. Only those Respondents who comply with the applicable requirements set forth in Section 20 of the PPP Act may request judicial review of a final determination that a Respondent is not qualified. Mechanisms for requesting reconsideration before the Authority or PREPA will not be available.

Section 20 establishes the period within which to seek judicial review, for the Puerto Rico Court of Appeals to address the writ of review, and to seek a writ of certiorari before the Puerto Rico Supreme Court. Section 20 also prescribes the notification requirements and the consequences of seeking such judicial remedies, including that if either the Puerto Rico Court of Appeals or the Puerto Rico Supreme Court grants a writ of review or writ of certiorari, as applicable, the procedures for the qualification of Respondents, or for the evaluation or selection of proposals or negotiation of the PPP Contract by the Partnership Committee will not be stayed.

The qualification determinations of the Partnership Committee and the approval of a PPP Contract by the Governor or the official onto whom she delegates, as provided under Section 9(g)(ii)-(v) of the PPP Act will only be overturned upon a finding of manifest error, fraud or arbitrariness. The non-prevailing party will defray the expenses incurred by the other parties involved in judicial review proceedings under Section 20 of the PPP Act. The Respondent that seeks judicial review may not, under any circumstance, as part of its remedies, claim the right to be redressed for indirect, special or foreseeable damages, including lost profits.

The above is only a succinct summary of Section 20 of the PPP Act and Respondents should review and understand such judicial review provisions.





# APPENDIX A: FORM OF RESPONDENT AND TEAM MEMBERS CERTIFICATION

*[Letterhead of each Respondent or Team Member, as applicable]*

Mr. Fermin Fontanés, Esq. — Executive Director
Puerto Rico Public-Private Partnerships Authority
Roberto Sánchez Vilella Government Center
De Diego Avenue, Parada 22
San Juan, PR 00940-2001 USA

**Re: Puerto Rico Electric Power Authority Thermal Generation Facilities PPP - Request for Qualifications**

Ladies and Gentlemen:

We have carefully reviewed the Request for Qualifications dated August 10, 2020 ("**RFQ**") issued by the Puerto Rico Public-Private Partnerships Authority and all other documents accompanying or made a part of the RFQ. Capitalized terms used in this certificate have the meanings given to them in the RFQ.

We acknowledge and agree to comply with all terms and conditions of the RFQ, the attached Statement of Qualifications ("**SOQ**") and all enclosures thereto. Without limitation, we specifically acknowledge the disclaimer contained in Section 4.10 of the RFQ and the limitation of damages contained in Section 4.12 of the RFQ.

We certify that the information contained in the attached SOQ is true and correct. We further certify that the individual who has signed and delivered this certification is duly authorized to submit the attached SOQ on behalf of the Respondent or Team Member, as applicable, as its acts and deed and that the Respondent or Team Member, as applicable, is ready, willing and able to participate in the RFP Process and perform if awarded the PPP Contract.

We further certify that we are *[describe the type of entity or entities (corporation, partnership, LLC, etc.)]* organized in *[indicate the jurisdiction of organization]* and the entity contemplated by Respondent and Team Members to be the one that shall execute the PPP Contract shall have no impediment to doing, and shall be authorized to do, business in Puerto Rico and to enter into a contractual relationship with government entities in Puerto Rico, as well as to comply with any other applicable Puerto Rico or U.S. laws and/or requirements.

We further certify that our directors, officers, controlling shareholders or subsidiaries, parent company and, in the case of a partnership, our partners, and any person or entity that may be considered an alter ego or the passive economic agent of the Respondent or Team Member, as applicable (each, a "**Covered Party**"), have not been convicted, have not entered a guilty plea and have not been indicted, and probable cause has not been found for their arrest, in any criminal proceeding in Puerto Rico, the rest of the U.S. or any foreign jurisdiction, for (i) any of the crimes referenced in Articles 4.2, 4.3 or 5.7 of Act No. 1-2012, as amended, known as the Organic Act of the Office of Government Ethics of Puerto Rico, (ii) any of the crimes typified in Articles 250 through 266 of Act No. 146-2012, as amended, known as the Puerto Rico Penal Code or (iii) any of the crimes listed in Act No. 2-2018, as amended, known as the Anti-Corruption Code for a New Puerto Rico or any other felony that involves misuse of public funds or property, including but not limited to the crimes mentioned in Article 6.8 of Act No. 8-2017, as amended, known as the Act for the Administration and Transformation of Human Resources in the Government, or under the U.S. Foreign Corrupt Practices Act; no Covered Party is under investigation in any legislative, judicial or administrative proceedings, in Puerto Rico, the rest of the U.S. or any other jurisdiction. The Respondent and Team Members are in compliance with all federal, state, local and foreign laws applicable to the Respondent or Team Member(s) that prohibit corruption or regulate crimes against public functions or public funds, including the U.S. Foreign Corrupt Practices Act.

Page 37



GOVERNMENT OF PUERTO RICO
Puerto Rico Public-Private Partnerships Authority

We further certify that we shall continue to comply at all times with laws which prohibit corruption or regulate crimes against public functions or funds, as may apply to the Respondent or any Team Member, as applicable, whether federal, state or Government statutes, including the Foreign Corrupt Practices Act.

We further certify that no officer or employee of the Authority, PREPA, the Partnership Committee, AAFAF, PREB, the Government, the FOMB or any public agency of Puerto Rico who participates in the selection process described in, or negotiations in connection with, the RFQ (nor any member of their families) has an economic interest in or is connected with the *[Respondent or Team Member, as applicable]*, and no officer or employees of the Authority, PREPA, the Partnership Committee, AAFAF, PREB, the Government, the FOMB or any public agency of Puerto Rico (nor any member of their families) has directly or indirectly participated with the *[Respondent or Team Member, as applicable]* in the preparation of its SOQ.

We further certify that we are in compliance with the provisions of Act No. 2 of 2018, also known as the Anti-Corruption Act 2018.

We further certify that we have reviewed the provisions of the Authority's Guidelines for the Evaluation of Conflicts of Interest and Unfair Advantages in the Procurement of Public-Private Partnership Contracts, available on the Authority's website: http://www.p3.pr.gov, and that we are in compliance therewith.

We further certify that this SOQ is made without prior understanding, agreement, connection, discussion or collusion with any other person, firm or corporation submitting or participating in the submission of a separate SOQ or any officer, employee or agent of the Authority, PREPA, the Partnership Committee, AAFAF, PREB, the Government, the FOMB or any public agency of Puerto Rico; and that the undersigned executed this Respondent and Team Members Certificate with full knowledge and understanding of the matters herein contained and was duly authorized to do so.

We further certify and declare, and agree to be under an obligation to declare, that we do not have knowledge of or the ability to avail ourselves of confidential information of the Government, PREPA or the Authority relevant to the Project, except to the extent we have been expressly authorized by the Government, PREPA, or the Authority.

We further certify that Respondent and Team Members shall not, other than as permitted in the RFQ, attempt to communicate in relation to the RFQ, directly or indirectly, with any representative of the Authority, PREPA, the Partnership Committee, AAFAF, PREB, the Government, the FOMB or any public agency of Puerto Rico, including any Restricted Parties, or any director, officer, employee, agent, advisor, staff member, counsel, consultant or representative of any of the foregoing, as applicable, for any purpose whatsoever, including for purposes of: (a) commenting on or attempting to influence views on the merits of the Respondent's and Team Members' SOQ, or in relation to their SOQ; (b) influencing, or attempting to influence, the outcome of the RFQ process, or of the competitive selection process, including the review and evaluation of SOQs or the selection of the Qualified Respondents; (c) promoting the Respondent and Team Members or their interests in the Project, including in preference to that of other Respondents or Team Members; (d) commenting on or criticizing aspects of the RFQ, the competitive selection process, or the Project including in a manner which may give the Respondent or its Team Members a competitive or other advantage over other Respondents or their respective Team Members; and (e) criticizing the SOQs of other Respondents.

To the extent the Authority and PREPA determine to submit any of the costs incurred under the PPP Contract for federal reimbursement, the Respondent shall be required to comply with all applicable federal certification and requirements.

Federal regulations restrict PREPA from contracting with parties that are debarred, suspended or otherwise excluded from participation in federal assistance programs and activities, where the contract is funded in whole or in part with federal funds. The Respondent certifies that:

1. Neither it nor any of its principals (defined at 2 C.F.R. § 180.995), or its affiliates (defined at 2 C.F.R. § 180.905), are excluded (defined at 2 C.F.R. § 180.940) or disqualified (defined at 2 C.F.R. § 180.935) from participation in this transaction by any federal department or agency. SAM Exclusions is the list



 

maintained by the General Services Administration that contains the name of parties excluded or disqualified, as well as parties declared ineligible under certain statutory or regulatory authority. The Respondent may verify its status and the status of its principals, affiliates and any actual or anticipated Team Members at www.SAM.gov.

2. The Respondent agrees to comply with the requirements of 2 C.F.R. pt. 180, subpart C and 2 C.F.R. pt. 3000, subpart C while this proposal is valid and throughout the period of any contract that may arise from this proposal. The Respondent further agrees to include a provision requiring such compliance in its lower tier covered transactions.

3. This certification is a material representation of fact relied upon by the Authority and PREPA. If it is later determined that the Respondent did not comply with 2 C.F.R. pt. 180, subpart C and 2 C.F.R. pt. 3000, subpart C, in addition to remedies available to the Authority and PREPA, the federal government may pursue available remedies, including but not limited to suspension and/or debarment.

The Respondent further certifies, to the best of its knowledge and belief, that:

1. No federal appropriated funds have been paid or will be paid, by or on behalf of the Respondent or any Team Member, to any person for influencing or attempting to influence an officer or employee of an agency, a member of the United State Congress, an officer or employee of the United States Congress or an employee of a member of the United States Congress in connection with the awarding of any federal contract, the making of any federal grant, the making of any federal loan, the entering into of any cooperative agreement and the extension, continuation, renewal, amendment or modification of any federal contract, grant, loan or cooperative agreement.

2. If any funds other than federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a member of the United States Congress, an officer or employee of the United States Congress or an employee of a member of the United States Congress in connection with this federal contract, grant, loan or cooperative agreement, the undersigned shall complete and submit Standard Form- LLL, "Disclosure Form to Report Lobbying," in accordance with its instructions.

3. The undersigned shall require that the language of this certification be included in the award documents for all sub-awards at all tiers (including subcontracts, sub-grants and contracts under grants, loans and cooperative agreements) and that all sub-recipients shall certify and disclose accordingly.

4. This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by 31, U.S.C. § 1352 (as amended by the Lobbying Disclosure Act of 1995). Any person who fails to file the required certification shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.

The undersigned Respondent and Team Members acknowledge that any violation or misrepresentation with respect to the above will prohibit their participation in any procurement process under the PPP Act and other applicable laws of Puerto Rico and, therefore, will be disqualified from participating hereunder.

The attached SOQ shall be governed by and construed in all respects according to the laws of Puerto Rico and the terms of the RFQ.

Our business address is:

[Insert business address]

Yours faithfully,

[Insert appropriate signature block for signature by a person duly authorized to bind the Respondent or Team Member]

Page 39

Exhibit C: Request for Qualifications





# APPENDIX B: FORM OF DOCUMENT ACKNOWLEDGEMENT & CONTACT INFORMATION

*[Letterhead of the Respondent]*

Mr. Fermin Fontanés, Esq. — Executive Director
Puerto Rico Public-Private Partnerships Authority
Puerto Rico Fiscal Agency and Financial Advisory Authority Building, 3rd Floor
Roberto Sánchez Vilella Government Center
De Diego Avenue, Parada 22
San Juan, PR 00940-2001 USA

Ladies and Gentlemen:

I, *[Name of Respondent Representative]* in my capacity as *[Title]* of *[Name of the Respondent],* acknowledge on behalf of the Respondent and each Team Member that the Respondent (for itself and each anticipated Team Member) was able to access the Puerto Rico Public-Private Partnerships Authority (the "Authority") web site and downloaded the following documents regarding the Request for Qualifications ("RFQ") for the Puerto Rico Electric Power Authority Thermal Generation Facilities PPP (the "Project"), issued by the Authority on August 10, 2020. Our contact information for further notifications is included below. We accept the transmission of such additional notifications via electronic communications, but acknowledge and accept that we shall have the responsibility of periodically checking in the Authority's website for any and all official communications regarding the RFQ and other stages of the procurement process for the Project.

Document/File Title                                          Date Received/Downloaded

Respondent Representative Signature

Date

Contact Information: *[Respondent Representative name, title, company, address, electronic mail, telephone number]*



 

## APPENDIX C: ADDITIONAL TECHNICAL INFORMATION ON LEGACY GENERATION ASSETS

| Site | COD | Fuel Type | Heat Rate | Turbine-Generator | Boiler |
|------|-----|-----------|-----------|-------------------|--------|
| Aguirre Steam Unit 1&2 | 1971 | Fuel Oil | 10,600 | ABB (now GE) | Combustion Engineering (now GE) |
| Aguirre Combined Cycle Unit 1&2 | 1975-76 | Diesel | 9,300 combined cycle  13,000 simple cycle | GE Frame EA CTs and STs | GE Heat recovery steam generator (HRSG) |
| Aguirre GT Units 21-22 | 1972 | Diesel | 16,800 | John Brown/GE Frame 5 | N/A |
| Cambalache Units 1-3 | 1997-98 | Diesel | 12,700 | ABB-GT11N1 | N/A |
| Costa Sur Units 3-4 | 1960-62 | Fuel Oil | 13,500 | N/A | N/A |
| Costa Sur Units 5-6 | 1969-71 | Fuel Oil / Gas | 11,000 | John Brown/GE | Combustion Engineering (now GE) |
| Costa Sur GT Units 1.1-1.2 | 1972 | Diesel | 14,500 | GE Frame 5 | N/A |
| Mayaguez Units 1-4 | 2009 | Diesel | 10,300 | Pratt & Whitney FT8 Twin Pack | N/A |
| Palo Seco Units 1-2 | 1959 | Fuel Oil | 11,200 | N/A | N/A |
| Palo Seco Units 3-4 | 1967-68 | Fuel Oil | 10,600 | N/A | N/A |
| Palo Seco GT Units | 1972-73 | Diesel | 13,700 | GE Frame 5 | N/A |

Page 41





**GOVERNMENT OF PUERTO RICO**
Puerto Rico Public-Private Partnerships Authority

| Site | COD | Fuel Type | Heat Rate | Turbine-Generator | Boiler |
|---|---|---|---|---|---|
| **San Juan Units 5-6** | 2008 | Diesel / Gas | 8,300 Diesel / Gas expected to be lower | ST – Ansaldo, CT – Westinghouse/ Mitsubishi 501F | HRSG |
| **San Juan Units 7-10** | 1964-65 | Fuel Oil | 12,000 | GE | B&W (Unit 7-8) Combustion Engineering (Unit 9-10) |
| **Daguao** | 1972 | Diesel | 16,800 | GE Frame 5 | N/A |
| **Yabucoa** | 1971 | Diesel | 16,300 | GE Frame 5 | N/A |
| **Jobos** | 1971 | Diesel | 14,600 | GE Frame 5 | N/A |
| **Vega Baja** | 1971 | Diesel | 14,200 | GE Frame 5 | N/A |

# Exhibit D:
# Qualification Analysis and Shortlist Report

This page has been intentionally left blank.





GOVERNMENT OF PUERTO RICO
PUERTO RICO PUBLIC-PRIVATE PARTNERSHIPS AUTHORITY

# QUALIFICATION ANALYSIS AND SHORTLIST REPORT

## Puerto Rico Public-Private Partnership for the Electric Power Authority Thermal Generation Facilities

October 17, 2022

Amended December **8**, 2022

## Confidential





Qualification Analysis and Shortlist Report

*Puerto Rico Electric Power Thermal Generation Facilities*

October 17, 2022, amended December 8, 2022
San Juan, Puerto Rico

**TO:**        Members of the Partnership Committee

**FROM:**    Puerto Rico Public-Private Partnerships Authority

**RE:**        Puerto Rico Electric Power Thermal Generation Facilities Project

On August 10, 2020, the Puerto Rico Public-Private Partnership Authority (the "**Authority**"), acting in collaboration with the Puerto Rico Electric Power Authority ("**PREPA**"), issued a Request for Qualifications (the "**RFQ**") from companies and consortia interested in managing and operating one or more of Puerto Rico's base-load generation plants and gas turbine peaking plants ("**Legacy Generation Assets**") (the "**Project**") through a public-private partnership ("**PPP**").

In response to the RFQ, the Authority received statements of qualifications (the "**SOQs**") from fifteen (15) prospective proponents ("**Respondents**"). This Qualification Process Report (the "**Report**") describes the process followed to evaluate the SOQs and determine if the Respondents are qualified to participate as proponents in the next stage of the Project, which is the Request for Proposal ("**RFP**") stage. Moreover, this Report sets forth the official list of the qualified Respondents selected by the partnership committee appointed to oversee the Project to proceed to the RFP stage.

This Report consist of six (6) sections: (I) Background of the Project; (II) Background of the Qualification Process; (III) Description of the Evaluation Criteria; (IV) Description of each Respondent; (V) Outcome of SOQ Evaluations; and (VI) Conclusion.



PO Box 42001 • San Juan, PR 00940-2001 • Teléfono (787) 722-2525 •  www.p3.pr.gov

Partnership Committee Report — Puerto Rico Public-Private Partnership for the Puerto Rico Electric Power Thermal Generation Facilities        160





Capitalized terms used but not otherwise defined in this Report have the meaning ascribed to them in, as applicable, the Public-Private Partnership Authority Act, Act No. 29-2009, as amended ("**Act 29**"), the Puerto Rico Electric System Transformation Act, Act No. 120-2018, as amended ("**Act 120**"), the Regulation for the Procurement, Evaluation, Selection, Negotiation and Award of Participatory Public-Private Partnership Contracts under Act No. 29-2009, as amended (the "**Act 29 Regulation**"), and the Regulation for the Procurement, Evaluation, Selection, Negotiation and Award of Partnerships Contracts and Sales Contracts for the Transformation of the Electric System under Act No. 120-2018, as amended (the "**Act 120 Regulation**"), and the RFQ.



PO Box 42001 • San Juan, PR 00940-2001 • Teléfono (787) 722-2525 • www.p3.pr.gov





## I.   Background on the Project

The Authority, in collaboration with PREPA, is interested in procuring a long-term public-private partnership contract ("**PPP Contract**") to manage, operate, maintain, rehabilitate, repair and decommission, as needed, Puerto Rico's Legacy Generation Assets. This is a project by which the Government of Puerto Rico (the "**Government**") seeks to transform the electric power system of Puerto Rico into one that is modern, sustainable, reliable, cost-effective and resilient to the ravages of nature. The Project is a key economic development initiative for Puerto Rico.

PREPA is a public corporation and instrumentality of the Government, created pursuant to Act No. 83-1941 of May 2, 1941, as amended. Its purpose is to provide electric power in a reliable manner, contribute to the general welfare and the sustainable development of Puerto Rico and maximize the benefits while minimizing the social, environmental and economic impacts of electric energy generation and distribution. PREPA's current objectives include reducing energy costs, promoting smart energy consumption and protecting the environment.

PREPA's Legacy Generation Assets consist of base-load generation plants and peaking plants. In addition, at the large generation complexes there are black start combustion turbines that also serve as peaking plants on occasion. Although the Legacy Generation Assets have a total installed capacity of approximately 4,785 MW, the dependable capacity is approximately 3,600 MW as a result of certain units being indefinitely out of service or in need of significant repair for various reasons. The Legacy Generation Assets have historically been vulnerable to transformer failures, voltage and frequency fluctuations and transmission line outages. They thus experience above industry average equivalent forced outage rates, primarily as a result of poor equipment conditions due to the age of the units. Further, the Legacy Generation Assets are dependent on natural gas, diesel (number 2 fuel oil) and number 6 fuel oil.

Roberto Sánchez Vilella (Minillas) Government Center, De Diego Ave. Stop 22, San Juan, PR 00907  I  PO Box 42001, San Juan, PR 00940-2001

787.722.2525          info@p3.pr.gov          p3.pr.gov





rights and responsibilities related to the operation, maintenance, management and decommissioning, as applicable, of the Legacy Generation Assets. These rights and responsibilities are expected to include, among others, the following:

- day-to-day operation services, including start-up, load variations, active follow-up of operating parameters and alarms, shut-down of the plants or units thereof;
- identifying, justifying and managing any required maintenance capital expenditures;
- hiring, training, and supervising personnel;
- providing routine inspections and operating tests of the Legacy Generation Assets;
- provisioning, storing and maintaining the inventory of any necessary spare and consumable parts for the Legacy Generation Assets;
- establishing and maintaining a computerized maintenance management system for the Legacy Generation Assets;
- performing scheduled and emergency maintenance, repair and replacement of equipment, including any balance of plant equipment;
- managing outages and restoring power;
- coordinating emergency planning and storm restoration and recovery;
- procuring and managing water or power supply, if applicable;
- procuring, managing the delivery and quality testing of fuel, including natural gas, diesel (number 2 fuel oil) and number 6 fuel oil (including logistics, fuel testing and storage tank management), if applicable, as an agent for PREPA;
- liaising with PREPA, the T&D Operator or any of their assignees or successors regarding dispatch and related T&D system matters and providing required information;
- interfacing with regulators including PREB and with environmental compliance agencies as may be required;
- obtaining and maintaining licenses, permits and consents, as necessary;

Roberto Sánchez Vilella (Minillas) Government Center, De Diego Ave. Stop 22, San Juan, PR 00907 | PO Box 42001, San Juan, PR 00940-2001

787.722.2525        info@p3.pr.gov        p3.pr.gov





rights and responsibilities related to the operation, maintenance, management and decommissioning, as applicable, of the Legacy Generation Assets. These rights and responsibilities are expected to include, among others, the following:

- day-to-day operation services, including start-up, load variations, active follow-up of operating parameters and alarms, shut-down of the plants or units thereof;
- identifying, justifying and managing any required maintenance capital expenditures;
- hiring, training, and supervising personnel;
- providing routine inspections and operating tests of the Legacy Generation Assets;
- provisioning, storing and maintaining the inventory of any necessary spare and consumable parts for the Legacy Generation Assets;
- establishing and maintaining a computerized maintenance management system for the Legacy Generation Assets;
- performing scheduled and emergency maintenance, repair and replacement of equipment, including any balance of plant equipment;
- managing outages and restoring power;
- coordinating emergency planning and storm restoration and recovery;
- procuring and managing water or power supply, if applicable;
- procuring, managing the delivery and quality testing of fuel, including natural gas, diesel (number 2 fuel oil) and number 6 fuel oil (including logistics, fuel testing and storage tank management), if applicable, as an agent for PREPA;
- liaising with PREPA, the T&D Operator or any of their assignees or successors regarding dispatch and related T&D system matters and providing required information;
- interfacing with regulators including PREB and with environmental compliance agencies as may be required;
- obtaining and maintaining licenses, permits and consents, as necessary;

Roberto Sánchez Vilella (Minillas) Government Center, De Diego Ave. Stop 22, San Juan, PR 00907  |  PO Box 42001, San Juan, PR 00940-2001

787.722.2525      info@p3.pr.gov      p3.pr.gov





**GOVERNMENT OF PUERTO RICO**
PUERTO RICO PUBLIC-PRIVATE PARTNERSHIPS AUTHORITY

- preparing for and assisting in, or subcontracting for and overseeing, the decommissioning of the relevant plants as outlined in the IRP and in coordination with PREPA/the T&D Operator and PREB;
- participating in emergency planning and drills led by the T&D Operator, as needed; and
- assisting with the transition of the plants to third parties to the extent certain of the plants are removed from the PPP Contract.

Under the structure currently contemplated for the Project, the Private Partner's compensation will consist of a regulated base management fee, which will be supplemented by performance-based compensation payments linked to established performance standards.[1] The Authority is seeking a Private Partner capable of meeting or exceeding established operational and performance standards while complying with applicable rate and performance regulations.

## II.   Background on Qualification Process

Pursuant to Act 29 and the Act 120 Regulation, the board of directors of the Authority established a partnership committee for the Project on July 13, 2020[2] (the "**Partnership Committee**") through Resolution 2020-36. The Partnership Committee has the duty and responsibility to evaluate and prequalify those Respondents most suitable to participate in the RFP process as proponents for the Project.

Section 3.2 of the Act 120 Regulation grants the Partnership Committee ample discretion to support its functions by way of contracting advisors for such purposes. Section 3.2 of the Act 120 Regulation provides that the Partnership Committee may "contract, on behalf of the Authority, advisors, experts or consultants with the knowledge necessary to assist

---

[1] Subject to outcome of the contract review and comment process and subsequent negotiations with the relevant participants in the RFP process.
[2] As further amended on October 13, 2021, by Resolution 2021-63.

Roberto Sánchez Vilella (Minillas) Government Center, De Diego Ave. Stop 22, San Juan, PR 00907  I  PO Box 42001, San Juan, PR 00940-2001

 787.722.2525      info@p3.pr.gov     p3.pr.gov





the Partnership Committee and the Authority in the adequate discharge of its functions."

Likewise, Section 3.6 of the Act 120 Regulation authorizes the Authority to "contract with consultants, advisors or agents to (a) assist the Authority and a Partnership Committee in the review of the Proposals, the selection of a winning Proponent, and negotiation of terms and conditions of a Transformation Contract for a PREPA Transaction, and (b) provide any other assistance that is deemed necessary or appropriate in connection with an Award of a Transformation Contract."

Accordingly, the advisors engaged to assist the Authority and the Partnership Committee throughout the Project's development and the issuance of the RFQ include the following, among others:[3]

- Cleary Gottlieb Steen & Hamilton LLP;

- CPM P.R. LLC

- FTI Consulting; and

- Pietrantoni Méndez & Alvarez, LLC.

The Act 29 Regulation and Act 120 Regulation authorize the Partnership Committee to qualify a limited number of Respondents in order to arrive at a shortlist for the Project. In Section 1.4 of the RFQ, the Partnership Committee (i) established that the aim of the RFQ is to enable the Partnership Committee to identify Respondents that, based on their SOQ, are deemed qualified by the Partnership Committee to participate in the RFP process ("**Qualified Respondents**") and (ii) notified prospective respondents of the Authority's right to limit in its absolute discretion the number of Respondents it considers to be qualified in order to arrive at a shortlist of Qualified Respondents that allows for an orderly procurement. Furthermore, the RFQ established specifically that the



[3] The Authority is also working with Citigroup Global Markets Inc., an advisor to the Financial Oversight and Management Board for Puerto Rico (the "**FOMB**"), and Ankura Consulting Group, LLC, an advisor to PREPA.

Roberto Sánchez Vilella (Minillas) Government Center, De Diego Ave. Stop 22, San Juan, PR 00907 | PO Box 42001, San Juan, PR 00940-2001

787.722.2525   info@p3.pr.gov   p3.pr.gov





Partnership Committee reserves the right to disqualify a Respondent for any of the reasons stated in Sections 7.1 and 7.2 of the Act 120 Regulation, or if the Respondent:

- is ineligible to submit a proposal on one or more grounds specified in Act 120, Act 29 or the Act 120 Regulation;

- fails to satisfy the standards established by the Partnership Committee with respect to the Respondent's required financial condition, or technical or professional ability and experience (as set forth in Section 4 of the RFQ); or

- fails to comply with the requirements of Sections 9(a) and/or 9(d) of Act 29, as applicable.

Pursuant to Section 8(b) of Act 29 and Section 3.2 of the Act 120 Regulation, the Partnership Committee evaluated the SOQs and selected those Respondents best qualified to undertake the Project to proceed as Qualified Respondents. Specifically, the Partnership Committee evaluated each SOQ by considering the extent to which Respondents satisfied the evaluation criteria established in Section 3 of the RFQ, as described below (the "**Evaluation Criteria**"):

- compliance with requirements of Act 120 and Act 29;

- required technical or professional ability or experience; and

- required financial condition.

The Partnership Committee reviewed each of the fifteen (15) SOQs and scored each Respondent according to the strength to which its SOQ satisfied the Evaluation Criteria. Each Respondent was scored five times—once by each member of the Partnership Committee—resulting in fifteen (15) sets of five (5) scores. The five sets of scores in Parts 2 through 5 were averaged for each Respondent to come up with an overall score for each Part. The average overall scores for each Part were then multiplied by the overall weights for that Part, then added together into a single weighted score for each Respondent (the "**Weighted**

Roberto Sánchez Vilella (Minillas) Government Center, De Diego Ave. Stop 22, San Juan, PR 00907  |  PO Box 42001, San Juan, PR 00940-2001

 787.722.2525           info@p3.pr.gov          p3.pr.gov





**Aggregate Score**"). The review and evaluation process was conducted by the Partnership Committee during a meeting held to assess and discuss the SOQs received in connection with the RFQ. On October 22, 2020, the Partnership Committee voted by referendum to select eight qualified Respondents to proceed to the RFP stage.

### III.   Description of the Evaluation Criteria

In order to provide an objective and transparent evaluation method, Respondents were evaluated pursuant to Section 8(b) of Act 29 and Section 3.2 of the Act 120 Regulation, and by considering the extent to which Respondents satisfied the evaluation criteria and requirements and procedures established in Sections 3 and 4 of the RFQ (the "**Evaluation Criteria**"). Specifically, Respondents were evaluated by reference to the following Evaluation Criteria:

*Part 1 -  Compliance with Requirements of Act 29 and Act 120 (Pass/Fail)*

Each SOQ submitted pursuant to the RFQ was reviewed to determine whether it satisfied the requirements under Act 29, Act 120 and the Act 120 Regulation in the following areas:

1.1     Respondents that are corporations, partnerships or any other legal entity, whether based in the U.S., including Puerto Rico, or elsewhere in the world, were required to be properly registered, or demonstrate that they were capable of being properly registered, to do business in Puerto Rico at the time of the execution of the PPP Contract, and comply with all applicable Puerto Rico and U.S. laws and/or requirements.

1.2     Each Respondent and each Team Member was required to certify that:

(a)     neither it nor any of its directors, officers, controlling shareholders or subsidiaries, nor its parent company, nor in the case of a partnership, any of its partners, nor

Roberto Sánchez Vilella (Minillas) Government Center, De Diego Ave. Stop 22, San Juan, PR 00907  I  PO Box 42001, San Juan, PR 00940-2001

 787.722.2525         info@p3.pr.gov        p3.pr.gov





any person or entity that may be considered an alter ego or the passive economic agent of the Respondent or Team Member, as applicable, (each, a "**Covered Party**"), has been convicted, entered a guilty plea, been indicted or had probable cause found for their arrest in any criminal proceeding in Puerto Rico, the rest of the U.S. or any foreign jurisdiction for:

i.      any of the crimes referenced in Sections 4.2, 4.3 or 5.7 of Act No. 1-2012, as amended, known as the Organic Act of the Office of Government Ethics of Puerto Rico;

ii.     any of the crimes typified in Sections 250 through 266 of Act No. 146-2012, as amended, known as the Puerto Rico Penal Code; or

iii.    any of the crimes listed in Act No. 2-2018, as amended, known as the Anti-Corruption Code for a New Puerto Rico or any other felony that involves misuse of public funds or property, including but not limited to the crimes mentioned in Section 6.8 of Act No. 8-2017, as amended, known as the Act for the Administration and Transformation of Human Resources in the Government, or under the U.S. Foreign Corrupt Practices Act; nor is any Covered Party under investigation in any legislative, judicial or administrative proceedings, in Puerto Rico, the rest of the U.S. or any other jurisdiction;

(b)     it is in compliance and shall continue to comply at all times with all federal, state, local and foreign laws applicable to the Respondent or Team Member(s) that prohibit corruption or regulate crimes against

Roberto Sánchez Vilella (Minillas) Government Center, De Diego Ave. Stop 22, San Juan, PR 00907 I PO Box 42001, San Juan, PR 00940-2001

787.722.2525          info@p3.pr.gov          p3.pr.gov





public functions or public funds, including the U.S. Foreign Corrupt Practices Act;

(c)   it completed the SOQ without prior understanding, agreement, connection, discussion or collusion in relation to the RFQ with any other person, firm or corporation submitting or participating in the submission of a separate SOQ or any officer, employee or agent of the Authority, PREPA, the Partnership Committee, the Puerto Rico Fiscal Agency and Financial Advisory Authority (known by its Spanish acronym "**AAFAF**"), PREB created by Act 57-2014, as amended, to regulate, monitor and enforce the energy public policy of the Government, the Government, the FOMB or any public agency of Puerto Rico; and

(d)   except as provided in Section 1.9 of the RFQ, as required by Section 4.13 of the Act 120 Regulation, it shall not attempt to communicate in relation to the RFQ, directly or indirectly, with any representative of the Authority, PREPA, the Partnership Committee, AAFAF, PREB, the Government, the FOMB or any public agency of Puerto Rico, including any Restricted Parties or any director, officer, employee, agent, advisor, staff member, counsel, consultant or representative of any of the foregoing, as applicable, for any purpose whatsoever, including for purposes of:

i.    commenting on or attempting to influence views on the merits of the Respondent's and Team Members' SOQ, or in relation to their SOQ;

ii.   influencing, or attempting to influence, the outcome of the RFQ process or of the competitive selection process, including the

Roberto Sánchez Vilella (Minillas) Government Center, De Diego Ave. Stop 22, San Juan, PR 00907 I PO Box 42001, San Juan, PR 00940-2001

787.722.2525      info@p3.pr.gov      p3.pr.gov

Partnership Committee Report — Puerto Rico Public-Private Partnership for the Puerto Rico Electric Power Thermal Generation Facilities      170





review and evaluation of SOQs or the selection of the Qualified Respondents;

iii.    promoting the Respondent and Team Members or their interests in the Project, including in preference to that of other Respondents or Team Members;

iv.    commenting on or criticizing aspects of the RFQ, the competitive selection process or the Project, including in a manner which may have given the Respondent or its Team Members a competitive or other advantage over other Respondents or their respective Team Members; or

v.    criticizing the SOQs of other Respondents.

1.3    Each Respondent and each Team Member was required to:

(a)    acknowledge that the Respondent and each Team Member were able to access the Authority's website and download documents pertaining to the RFQ and the Project;

(b)    provide the contact information for the Respondent and each Team Member;

(c)    acknowledge and accept responsibility for periodically checking the Authority's website for any and all official communications regarding the Project; and

(d)    accept the transmission of additional notifications via electronic communications.

Respondents could satisfy requirements 1.1 and 1.2 by completing the Form of Respondent Certification included as Appendix A to the RFQ.

Roberto Sánchez Vilella (Minillas) Government Center, De Diego Ave. Stop 22, San Juan, PR 00907 | PO Box 42001, San Juan, PR 00940-2001

 787.722.2525      info@p3.pr.gov     p3.pr.gov





### GOVERNMENT OF PUERTO RICO
PUERTO RICO PUBLIC-PRIVATE PARTNERSHIPS AUTHORITY

Respondents could satisfy requirement 1.3 by completing the Form of Respondent Certification included as Appendix B to the RFQ.

*Part 2 - Background and Team Information (25% Weighting)*

Respondent and Team Member(s) were encouraged to provide enough supporting information and details to enable the evaluators to perform a thorough evaluation of their strengths, roles and responsibilities. This included the following:

2.1  Respondents were required to provide a description of the Respondent and all Team Members that identified:

(a)  anticipated roles, functions and overview of business operations;

(b)  jurisdiction, form of entity organization, ownership structure and capitalization;

(c)  anticipated legal relationships (e.g., joint ventures, partnerships) and percentage ownership interest;

(d)  up to five (5) individuals who are expected to play an important role in the Project on behalf of Respondent and Team Member(s) (the "**Key Individuals**") and their roles and previous experience (experience of the individuals was to include experience in all phases of power plant project development including operating, maintaining, repairing, managing capital expenditures and decommissioning combined cycle, gas turbines and steam turbine generation plants);

(e)  instances of working with Spanish-speaking workforces;

(f)  instances, if relevant, in which Respondent and Team Member(s) had previously worked together; and

Roberto Sánchez Vilella (Minillas) Government Center, De Diego Ave. Stop 22, San Juan, PR 00907  I  PO Box 42001, San Juan, PR 00940-2001

787.722.2525     info@p3.pr.gov     p3.pr.gov





GOVERNMENT OF PUERTO RICO
PUERTO RICO PUBLIC-PRIVATE PARTNERSHIPS AUTHORITY

(g)   evidence and tenor of operations and management experience in electric power generation (including experience with operating agreements).

Anticipated roles and legal relationships were to include, among other relevant descriptions, whether the Respondent was the entity expected to submit the response to the RFP and execute the PPP Contract as the Private Partner. Such descriptions also were to include the entity expected to guarantee the Private Partner's performance under the PPP Contract in the case where Respondent was not the Private Partner.

2.2   A list of technical, financial, legal, accounting or other advisors that the Respondents or any Team Member(s) had engaged or intended to engage in connection with the Project.

2.3   Respondents were required to provide resumes (indicating overall experience and any specific experience relevant to the nature and scope of the Project) for the Key Individuals, including Spanish-speaking skills. Respondents were expected to identify an anticipated management team comprised of individuals with at least ten (10) years of relevant electric generation managerial experience for all executive-level positions.

### *Part 3 - Financial Capabilities (10% Weighting)*

The evaluation of the financial capabilities of each SOQ was examined in accordance with the criteria set out below:

3.1   Financial **Capacity of Team:** Respondents were required to demonstrate adequate financial wherewithal to fulfill the terms of the PPP Contract. Each Respondent or at least one (1) Team Member, was to provide:

Roberto Sánchez Vilella (Minillas) Government Center, De Diego Ave. Stop 22, San Juan, PR 00907  I  PO Box 42001, San Juan, PR 00940-2001

787.722.2525          info@p3.pr.gov          p3.pr.gov

Partnership Committee Report — Puerto Rico Public-Private Partnership for the Puerto Rico Electric Power Thermal Generation Facilities          173





**GOVERNMENT OF PUERTO RICO**
PUERTO RICO PUBLIC-PRIVATE PARTNERSHIPS AUTHORITY

(a)     evidence of the financial capability to obtain operational security in the form of an unconditional and irrevocable direct pay letter(s) of credit;

(b)     evidence of creditworthiness, such as credit ratings, if any, for each Team Member, or historical metrics supporting credit quality comparable to those used by credit analysts; and

(c)     copies of financial statements (audited preferred), Form 10-Ks, 20-Fs or similar types of annual reports for the past two (2) years, together with any other relevant financial information.

### *Part 4 - Technical & Operational Capabilities (50% Weighting)*

The evaluation of the technical and operational capabilities of each SOQ was examined in accordance with the criterion set out below:

Respondents were required to demonstrate their technical and operational capabilities to fulfill the terms of the PPP Contract. Respondents and Team Members were expected to have current or past power generation operations, management and maintenance experience in the O&M context. As such, Respondent or at least one (1) Team Member were required to demonstrate with detailed evidence that its current or previous power generation experience fulfilled the following criteria on a sustained basis:

- concurrently operating and maintaining either (i) two (2) or more oil and/or gas-fired generating facilities larger than 100 MW, or (ii) a fleet of at least 1,000 MW combined of oil and/or gas-fired generating facilities;
- repairing and/or replacing oil and/or gas-fired generating facilities;
- experience with execution or oversight of plant decommissioning, including the procurement of qualified subcontractors to decommission power generation facilities;

Roberto Sánchez Vilella (Minillas) Government Center, De Diego Ave. Stop 22, San Juan, PR 00907  I  PO Box 42001, San Juan, PR 00940-2001

 787.722.2525           info@p3.pr.gov          p3.pr.gov





GOVERNMENT OF PUERTO RICO
PUERTO RICO PUBLIC-PRIVATE PARTNERSHIPS AUTHORITY

- demonstrated ability to safely operate similar technology generation facilities and managing outages and maintenance programs in order to achieve the operating objectives of the T&D Operator;
- managing fuel supply for similar or similarly situated generating facilities, including delivery and storage and fuel quality testing;
- names of the locations where the Respondent or subcontractors have performed similar work as described above;
- certification of no significant or sustained environmental regulation violations or OSHA fines/violations; and
- a demonstrable history of compliance with energy related policies, practices, and regulations from a state, commission, or other regulatory body.

In addition, preference was given to Respondents with demonstrated experience in operating and maintaining oil and/or gas-fired generating facilities on an island or other stranded location and under challenging natural circumstances, including the management and scheduling of delivery of fuel to such locations. Respondents and Team Member(s) were asked to aim to provide sufficient evidence to demonstrate an intimate understanding of the power and electric generation industry, especially as it applies to operating and dispatching generation plants. The RFQ indicated that operations, maintenance, safety and environmental responsibility were a key focus.

### Part 5 - Safety Performance (15% Weighting)

The evaluation of the safety performance capabilities of each SOQ was examined in accordance with the criterion set out below:

5.1   Respondents and Team Member(s) were required to demonstrate (a) their ability to address and resolve safety issues and (b) their knowledge of safety strategies and methodologies. Respondents and Team Member(s) were required to submit copies of the Occupational Safety and Health Administration (OSHA) 300 forms for the past three (3) years, only as related to electric generation operations. If

Roberto Sánchez Vilella (Minillas) Government Center, De Diego Ave. Stop 22, San Juan, PR 00907 I PO Box 42001, San Juan, PR 00940-2001

787.722.2525          info@p3.pr.gov          p3.pr.gov





not applicable, Respondents and Team Member(s) were required to present a document explaining the reasons for not submitting the form.

*Part 6 - Compliance with SOQ Requirements and Procedures (Pass/Fail)*

Each SOQ submitted pursuant to the RFQ was reviewed to determine whether it satisfied the following Requirements and Procedures set forth in the RFQ:

6.1   Respondents were required to prepare their SOQs in English, comply with the specifications set forth in the RFQ and include the following components and sections in their SOQs:

(a)   cover page (including identification of all Team Members);

(b)   cover letter (two (2) pages maximum);

(c)   table of contents;

(d)   executive summary (two (2) pages maximum); and

(e)   the specific requirements set forth in Section 3 of the RFQ (as outlined above):

   i.   Part 1: Compliance with the Requirements of Act 29 and Act 120 (no page limit);

   ii.   Part 2: Background & Team Information (fifteen (15) pages maximum);

   iii.   Part 3: Financial Capabilities (ten (10) pages maximum) ;

   iv.   Part 4: Technical & Operational Capabilities (fifty (50) pages maximum); and

Roberto Sánchez Vilella (Minillas) Government Center, De Diego Ave. Stop 22, San Juan, PR 00907  I  PO Box 42001, San Juan, PR 00940-2001

 787.722.2525           info@p3.pr.gov          p3.pr.gov

Exhibit D: Qualification Analysis and Shortlist Report





v.       Part 5: Safety Performance (no page limit).

6.2    Respondents were required to:

(a)    Deliver both an electronic copy and four (4) physical copies of its original, completed SOQ to the Authority by 5:00 pm AST on the Submission Deadline; and

(b)    submit one (1) originally executed SOQ, with signatures in blue ink and marked as "Original", and four copies along with one copy in portable document format (PDF) on a CD or USB flash drive.

Respondents were given the option to submit responses in Word or PowerPoint templates.

6.3    Each Respondent was required to declare, and agree to be under an obligation to declare, that it does not have knowledge of or the ability to avail itself of confidential information of the Government, PREPA or the Authority relevant to the Project, except to the extent it has been expressly authorized by the Government, PREPA or the Authority.

## IV.    Description of each Respondent

The Authority received fifteen (15) responses to the RFQ from the following Respondents:

- Abengoa-NTPC Consortium ("**Abengoa-NTPC**")

- Beowulf Energy LLC ("**Beowulf**")

- Consolidated Asset Management Services, LLC ("**CAMS**")

- EcoEléctrica, L.P. ("**EcoEléctrica**");

Roberto Sánchez Vilella (Minillas) Government Center, De Diego Ave. Stop 22, San Juan, PR 00907  |  PO Box 42001, San Juan, PR 00940-2001

787.722.2525          info@p3.pr.gov          p3.pr.gov

Partnership Committee Report — Puerto Rico Public-Private Partnership for the Puerto Rico Electric Power Thermal Generation Facilities          177

This page has been intentionally left blank.

# Exhibit E:
# PREPA Management Presentation

This page has been intentionally left blank.






Puerto Rico Electric Power Authority

Management Presentation

April 2021

Exhibit E: PREPA Management Presentation

Exhibit E: PREPA Management Presentation




# Disclaimer

This Confidential Memorandum has been prepared at the direction of, and from materials and information supplied by, the Puerto Rico Electric Power Authority ("PREPA" or the "Company") in conjunction with the Puerto Rico Public-Private Partnerships Authority ("P3A" or the "Authority") and the Government of Puerto Rico (the "Government") in connection with a potential negotiated public-private partnership transaction (the "Transaction") related to the transformation of Puerto Rico's electric system. The Confidential Memorandum (references to which shall be deemed to include any information which has been or may be supplied in writing or orally in connection herewith or in connection with any further inquiries) is being delivered pursuant to a separate confidentiality agreement (the "Confidentiality Agreement") between the Authority and the recipient, a shortlisted proponent identified by the Public-Private Partnership Committee (the "PPP Committee") established pursuant to the Public-Private Partnership Act, Act No. 29-2009, as amended. The Confidential Memorandum is for the exclusive use of the persons to whom it is addressed and their advisers.

By its acceptance hereof, each recipient agrees (in addition to any obligations it may have under the Confidentiality Agreement) (i) that neither it nor its agents, representatives, directors, officers, employees advisors, counsel and consultants will copy, reproduce or distribute to others this Confidential Memorandum, in whole or in part, at any time without the prior written consent of the Authority, (ii) that it will keep confidential this Confidential Memorandum and all information contained herein in accordance with the provisions of the Confidentiality Agreement and (iii) that it will use this Confidential Memorandum for the sole purpose of evaluating the Transaction.

No representation or warranty, express or implied, is or will be given by the Company, the Authority, the PPP Committee, the Government, the Oversight Board or their respective agents, representatives, directors, officers, employees, advisers, counsel and consultants or any other person as to the accuracy, completeness or fairness of this Confidential Memorandum and no responsibility or liability whatsoever is accepted for the accuracy or sufficiency thereof or for any errors, omissions or misstatements, negligent or otherwise, relating thereto. Only those particular representations and warranties made by the Company in a definitive public-private partnership agreement, when and if one is executed and subject to such limitations and restrictions as may be specified in such agreement, shall have any legal effect.

This Confidential Memorandum includes certain statements, estimates, targets and projections provided by the Company with respect to the past, present and anticipated future performance of the Company. Such statements, estimates, targets and projections reflect significant assumptions and subjective judgments by the Company's management concerning past, present and anticipated results. These assumptions and judgments may or may not prove to be correct and there can be no assurance that any estimates, targets or projections are attainable or will be realized. None of the Company, the Authority, the PPP Committee, the Government, the Oversight Board or any of their respective directors, officers, partners, employees, advisers, counsel or consultants, or any other person, assumes responsibility for verifying any such statements, estimates, targets and projections. None of the Company, the Authority, the PPP Committee, the Government, the Oversight Board or any of their respective directors, officers, partners, employees, advisers, counsel or consultants, or any other person, shall be liable for any direct, indirect or consequential loss or damages suffered by any person as a result of relying on any statement in or omission from this Confidential Memorandum and any such liability is expressly disclaimed. In all cases, interested parties should conduct their own investigation and analysis of the Company, the Transaction and the information contained in this Confidential Memorandum.

Except where otherwise indicated, this Confidential Memorandum speaks as of the date hereof. Neither the delivery of this Confidential Memorandum nor the consummation of the Transaction shall, under any circumstances, create any implication that there has been no change in the affairs of the Company since the date hereof. In furnishing this Confidential Memorandum, none of the Company, the Authority, the PPP Committee, the Government, the Oversight Board or their advisors undertakes any obligation to update any of the information contained herein or to correct any inaccuracies which may become apparent.

This Confidential Memorandum shall remain the property of the Company and the Authority. The Authority reserves the right to require the return of this Confidential Memorandum (together with any copies or extracts thereof) at any time.

This Confidential Memorandum does not constitute an offer or invitation for the sale or purchase of the securities, assets or business described herein or any form of commitment or recommendation on the part of the Company, the Authority, the PPP Committee, the Government, the Oversight Board or their advisors.



# Management Presentation Agenda (new)

| Topic | Presenter(s) |
|---|---|
| 0. Opening Remarks | *Fermín Fontanés* <br> Executive Director of Puerto Rico Public-Private Partnerships Authority ("P3A") |
| 1. Opportunity Overview and Title III Update | *Fermín Fontanés; Omar Marrero* <br> Executive Director of P3A; Executive Director of the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") |
| 2. PREPA Overview and Energy Sector Transformation | *Efran Paredes* <br> Executive Director, PREPA |
| 3. Integrated Resource Plan | *Alfonso Baretty* <br> Director of Planning and Environmental Protection, PREPA |
| 4. Legacy Assets Overview – Baseload Facilities | *Fernando Padilla; William Ríos Mera* <br> Deputy Executive Director of Operations, PREPA; Director of Generation Directorate (acting), PREPA |
| 4. Legacy Assets Overview – Peaking Units | *William Ríos Mera* <br> Director of Generation Directorate (acting), PREPA |
| 5. Fuel Management | *Delis Zambrana; Edwin Barbosa; Dennis Zabala* <br> Senior Program Manager, PREPA; Fuel Office Administrator, PREPA; Principal Advisor, Sargent & Lundy |
| 6. Financial Projections | *Fernando Padilla* <br> Deputy Executive Director of Operations, PREPA |
| 7. Environmental Considerations | *Luisette Ríos; Alfonso Baretty* <br> Head of Environmental Protection and Quality Assurance, PREPA; Director of Planning and Environmental Protection, PREPA |
| 8. Safety | *Shehaly Rosado* <br> Head of Occupational Safety, PREPA |
| 9. Human Resources | *Nydza Irizarry Algarín* <br> Director of Human Resources and Labor Affairs, PREPA |

3

Partnership Committee Report – Puerto Rico Public-Private Partnership for the Puerto Rico Electric Power Thermal Generation Facilities



# 1. Opportunity Overview and Title III Update

*Fermín Fontanés – Executive Director of P3A*
*Omar Marrero – Executive Director of AAFAF*

Exhibit E: PREPA Management Presentation

Partnership Committee Report – Puerto Rico Public-Private Partnership for the Puerto Rico Electric Power Thermal Generation Facilities

4

Exhibit E: PREPA Management Presentation

# Opportunity to Operate & Maintain Legacy Generation

Seeking a private party to manage, operate, maintain and decommission the base-load generation plants and gas turbine peaking plants through a public-private partnership (a "PPP").

## Overview of the O&M Agreement ("OMA")

**Assets**
- PREPA's Legacy Generation Assets have a total nameplate capacity of 3,739 MW[1]; some of these units are currently undergoing repairs. An additional 1,984 MW are considered Out-of-Service Units (per the OMA) and are being primed for decommissioning.

**Structure**
- Under the OMA, PREPA will retain ownership of and title to the Assets and the Private Partner will manage, operate, maintain and eventually decommission the Legacy Generation Assets.

**Counterparty**
- PREPA, as owner, and the P3A will be signatories to the OMA. The T&D operator, LUMA Energy, will be responsible for collecting PREPA's retail revenues and paying the Operator's costs to operate and maintain, including the cost of fuel, on a monthly basis, and to eventually decommission the Legacy Generation Assets.

**Term**
- The initial contract term will be 10 years, subject to renewal. The total term will be tied to the remaining useful lives of the applicable Legacy Generation Assets as defined in the IRP or to a determination that the assets are no longer needed to meet PREPA's required load.

**Contract Structure**
- The OMA provides for recovery of non-fuel O&M costs or decommissioning costs, subject to a monthly budget cap, and for recovery of actual fuel costs on a monthly basis.
- Compensation will also include (i) a fixed management fee and (ii) performance incentives/penalties, each of which will vary depending on whether plants are operational.

**Fuel/Non-Fuel Costs**
- A fuel account will be prefunded on day 1 of service commencement with two months of projected fuel expenses and on the 1st of each month thereafter. In addition, a non-fuel O&M account will be prefunded on the same day with two months of budgeted non-fuel O&M costs and then replenished each month thereafter.

5   1. As of April 14, 2021.

Exhibit E: PREPA Management Presentation



# Legacy Generation Request for Proposals Process Outline

## RFP Process Overview

- Parties that have been advanced to the RFP stage of the procurement process ("Qualified Respondents") are invited to submit proposals to manage, operate, maintain, asset manage and decommission the Legacy Generation Assets

- At the conclusion of the RFP process, the Authority and PREPA expect to enter into the O&M Agreement with the selected Proponent (as defined below)

- The RFP process allows Qualified Respondents who intend to submit RFP proposals (the "Proponents") the opportunity to thoroughly diligence PREPA's Legacy Generation Assets through the following:

## Key RFP Process Milestones

*Note: Timeline and key RFP milestones are for illustrative purposes only and are subject to modification*



6

Partnership Committee Report – Puerto Rico Public-Private Partnership for the Puerto Rico Electric Power Thermal Generation Facilities

Exhibit E: PREPA Management Presentation




**PUBLIC-PRIVATE PARTNERSHIPS**

# Key Legislation and Policy Basis for the Transformation Process

Federal and local stakeholders have passed key legislation that forms the basis for the transformation process.

| Stakeholders | Key Legislation | Overview |
|---|---|---|
| **Enacted by the Government of Puerto Rico**  | **Public-Private Partnership Act** *(Act No. 29-2009)* | • The Public-Private Partnership Act of 2009 (as amended, "Act 29"), established the Puerto Rico Public-Private Partnerships Authority to promote collaboration between the public and private sector on capital projects that are critical to the people of Puerto Rico<br>• Act 29 established a clear legal framework for the process of creating a public-private partnership and the ultimate selection of a private partner |
| | **Puerto Rico Electric System Transformation Act** *(Act No. 120-2018)* | • Act No. 120-2018 (as amended, "Act 120") authorized the required legal framework for the transformation of PREPA via a series of Public-Private Partnerships<br>  – Public-Private Partnerships are to be made in accordance with the framework set forth in the Public-Private Partnership Act of 2009<br>• Act 120 allows for the sale of assets related to generation and the transfer or delegation of any of PREPA's operations, functions or services |
| | **Energy Public Policy Act** *(Act No. 17-2019)* | • Act No. 17-2019 ("Act 17") established a new energy public policy and a regulatory framework for Puerto Rico's energy sector<br>• Act 17 requires planning for greater resilience through the establishment of micro-grids, distributed and renewable generation and underground distribution lines |
| **Enacted by the U.S. Congress**  | **PROMESA (Including Title III)** | • Recognizing the delicate fiscal condition of Puerto Rico, the U.S. Congress enacted the Puerto Rico Oversight, Management and Economic Stability Act ("PROMESA") on June 30, 2016<br>• PROMESA provides a series of mechanisms to achieve fiscal and budgetary balance and restore access to the capital markets<br>• PROMESA established the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), which is tasked with working with the Government to create the necessary foundation for economic growth |

Source: Puerto Rico Oversight, Management and Economic Stability Act (Public Law 114-187); Puerto Rico Act No. 29-2009, as amended; Puerto Rico Act No. 120-2018, as amended; Puerto Rico Act No. 17-2009, as amended.

7

187



# Generation Transaction Structure

The organizational structures depicted below reflect the intended outcome of a reorganization of PREPA's operations as currently envisioned.

Note: GridCo would prefund and provide funds on an ongoing basis to pay GenCo's fuel and non-fuel expenses, including the costs of the Legacy Generation Assets' Operator.
1.  GridCo refers to PREPA, in its capacity as owner of the T&D assets.
2.  GenCo refers to the wholly-owned subsidiary of PREPA, who would obtain ownership of the Legacy Generation Assets after a potential reorganization of PREPA.

Exhibit E: PREPA Management Presentation

Exhibit E: PREPA Management Presentation




# Title III Process Overview

The Title III Process enabled by PROMESA provides PREPA a framework to restructure its debt.

## Title III Process Overview

- **PROMESA** provides a method for the **restructuring of debt issued** by Puerto Rico and its instrumentalities: a court-supervised process under Title III is akin to proceedings under Chapter 9 of the Bankruptcy Code
- Commencement of a Title III case requires the **Oversight Board to certify that the entity has satisfied certain criteria**, including that the entity made a good faith effort to reach a consensual restructuring prior to seeking relief under Title III
- Title III also **places the entity's restructuring efforts under the supervision of a federal court** (the "Title III Court")
- The restructuring of obligations is accomplished through a **"Plan of Adjustment"** or other applicable settlement vehicles
- A plan must satisfy a number of criteria for the Title III Court to "confirm" the plan
- Title III allows for **impairment of non-accepting creditors or classes of creditors** either through "cram down" of rejecting classes or imposing treatment on non-accepting members of accepting classes pursuant to requirements that are largely the same as the Bankruptcy Code

### Steps Required in a Title III Process

1. The Oversight Board Certifies Restructuring of Territory or Instrumentality Compliant With PROMESA Sections 302 and 206

2. Oversight Board Files Title III Petition in Title III Court; Filing Imposes Automatic Stay of Actions Against Instrumentality

3. Oversight Board to Formulate and Propose Plan of Adjustment

4. Title III Court Approves of Disclosure Statement; Creditor Solicitation and Vote on Plan

5. Title III Court Confirms Plan of Adjustment; Effective Date, Discharge and Injunction

### Characteristics of Title III Process

- Under PROMESA, the Oversight Board is the representative of the debtor in the Title III case
- Title III provides a forum which may implement consensual treatment or impose non-consensual treatment over creditor dissent through voting on cram-down
- Title III does not limit or impair the power of a covered territory to control, by legislation or otherwise, the territory or any territorial instrumentality thereof in the exercise of the political or governmental powers of the territory or territorial instrumentality, subject to the Oversight Board's powers under Titles I and II of PROMESA
- Provides for assumption or rejection of contracts and leases
- Restructuring and discharge will affect all impaired obligations as opposed to just financial obligations

### The Plan of Adjustment

- The restructuring of obligations under Title III is accomplished through a "Plan of Adjustment"
- Only the Oversight Board, as Title III representative of the debtor, can file the Plan of Adjustment for PREPA
- The Title III Court can confirm the Plan of Adjustment if it satisfies key requirements including, but not limited to:
  - **Feasibility:** if the plan is approved, another near-term restructuring is unlikely
  - **Fiscal Plan:** plan is consistent with the certified Fiscal Plan
  - **Creditor Support:** the plan has the requisite creditor support or satisfies "cram down" requirements
- Confirmation of a Plan of Adjustment can discharge legacy obligations and provide for the transfer of assets free and clear of liens and claims







9





# 2. PREPA Overview and Energy Sector Transformation

*Efran Paredes - Interim Executive Director, PREPA*

10

Exhibit E: PREPA Management Presentation



PUBLIC-PRIVATE PARTNERSHIPS

# Overview of PREPA Service Territory

**The majority of Puerto Rico's generation capacity is located in the southern region of the main island, with 230 kV and 115 kV transmission lines connecting the facilities to major load pockets in the northern region of the main island. The capacities below represent current installed capacities for units that are either currently in-service or will be returned to service.[1]**

| | |
|---|---|
| **Facility** | Mayaguez |
| **Capacity** | 220 MW |
| **Fuel** | Diesel[2] |
| **Tech.** | CT[3] |

| | |
|---|---|
| **Facility** | Cambalache |
| **Capacity** | 154 MW |
| **Fuel** | Diesel |
| **Tech.** | CT |

| | |
|---|---|
| **Facility** | Palo Seco |
| **Capacity** | 522 MW |
| **Fuel** | Diesel / Fuel Oil[4] |
| **Tech.** | ST[5] / GT[6] |

| | |
|---|---|
| **Facility** | San Juan |
| **Capacity** | 580 MW |
| **Fuel** | Diesel / Fuel Oil / Gas |
| **Tech.** | CCGT[7] / ST |

| | |
|---|---|
| **Facility** | Costa Sur |
| **Capacity** | 841 MW |
| **Fuel** | Diesel / Fuel Oil / Gas |
| **Tech.** | ST / GT |

| | |
|---|---|
| **Facility** | Aguirre |
| **Capacity** | 1,313 MW |
| **Fuel** | Diesel / Fuel Oil |
| **Tech.** | CCGT / ST / GT |

| | |
|---|---|
| **Facility** | Standalone Peakers |
| **Capacity** | 97 MW |
| **Fuel** | Diesel |
| **Tech.** | GT |

Note: Generation facilities listed do not include hydro facilities or third-party owned assets (i.e., EcoElectrica, AES and renewables); Two small emergency units also exist on Vieques and Culebra islands; capacity represented is nameplate rating for in-service units.

1. Based on data from April 14, 2021.
2. Diesel is also referred to as light distillate No. 2 fuel oil throughout.
3. Combustion Turbine ("CT").
4. Fuel oil is referred to as residual No. 6 fuel oil or bunker fuel throughout.
5. Steam Turbine ("ST").
6. Gas Turbine ("GT").
7. Combined Cycle Gas Turbine ("CCGT").





Exhibit E: PREPA Management Presentation

# Legacy Generation Continues to be PR's Main Power Source

Legacy Generation Assets continue to be an integral and important part of Puerto Rico's power supply. Maintaining generation and reliability will support Puerto Rico as the Island transitions power supply to meet its stated objectives.



**Composition of Generation Today[1]**
*(MW)*

6,746 MW
81% Legacy Generation
19% Other Generation

- Legacy Generation
- Other Generation

Other Generation
Legacy Generation

PREPA Hydro
IPP
Renewables
Conventional
Legacy Gen: Out-of-Service
Legacy Gen: In-Service

**Puerto Rico's Generation Composition**
*(GWh)*

21,000 / 18,000 / 15,000 / 12,000 / 9,000 / 6,000 / 3,000 / 0

FY2021 FY2022 FY2023 FY2024 FY2025 FY2026 FY2027 FY2028 FY2029 FY2030

*Legacy Generation Assets will continue to be a meaningful portion of Puerto Rico's power supply*

**Puerto Rico's Future**

**Historical Net Generation**
*(GWh)*

| | FY2016 | FY2017 | FY2018 | FY2019 | FY2020 |
|---|---|---|---|---|---|
| | 6,822 | 7,255 | 4,304 | 6,875 | 7,176 |
| | 13,291 | 12,194 | 9,735 | 10,878 | 10,998 |

Source: 2021 Fiscal Plan for the Puerto Rico Electric Power Authority, June 29, 2020.
1.   Other Generation installed capacity includes renewables and IPP-owned facilities. Legacy Generation Assets installed capacity include both In-Service Units and Out-of-Service Units, which are being primed for decommissioning, as defined in the O&M Agreement.

12

Partnership Committee Report — Puerto Rico Public-Private Partnership for the Puerto Rico Electric Power Thermal Generation Facilities

192



Exhibit E: PREPA Management Presentation

# Legacy Generation Decommissioning Schedule and Scope

Decommissioning will be an important activity and responsibility of the Operator. The eventual decommissioning schedule will be developed in coordination with PREB, the Administrator and PREPA (below illustrative advisors' view).

## Illustrative Decommissioning Schedule

| Plant | Installed Capacity | Status | Retirement Schedule (Advisors' View)[1] |
|---|---|---|---|
| Cambalache Unit 1 | 82.5 | Out-of-Service | TBD / Soon |
| San Juan Steam 10 | 100 | Out-of-Service | TBD / Soon |
| Palo Seco Unit 1 | 85 | Out-of-Service | TBD / Soon |
| Palo Seco Unit 2 | 85 | Out-of-Service | TBD / Soon |
| Costa Sur Units 1-2 | 170 | Out-of-Service | TBD / Soon |
| Costa Sur Units 3-4 | 170 | Out-of-Service | TBD / Soon |
| San Juan Steam 1-4 | 400 | Out-of-Service | TBD / Soon |
| San Juan Steam 9 | 100 | In-Service | TBD |
| Aguirre Steam Unit 1 | 450 | In-Service | 2021 |
| Costa Sur Units 6 | 410 | In-Service | 2021 |
| Aguirre CC1 | 296 | In-Service | 2022 |
| Aguirre CC2 | 296 | Out-of-Service[2] | 2022 |
| San Juan Steam 8 | 100 | In-Service | 2022 |
| Costa Sur Units 5 | 410 | In-Service | 2023 |
| Palo Seco Unit 3 | 216 | In-Service | 2023 |
| Aguirre Steam Unit 2 | 450 | In-Service | 2024 |
| Palo Seco Unit 4 | 216 | In-Service | 2024 |
| San Juan Steam 7 | 100 | In-Service | 2024 |
| GT Peakers | 390 | Various | 2025 |
| San Juan CC 5-6 | 440 | In-Service | 2028 |
| Cambalache Unit 2 | 82.5 | In-Service | Post-2028 |
| Cambalache Unit 3 | 82.5 | In-Service | Post-2028 |
| Mayaguez Units 1-4 | 220 | In-Service | Post-2028 |
| Palo Seco Mobile/Pecs | 81 | In-Service | Post-2028 |

Out-of-Service units are those that are not expected to return to service and are to be decommissioned.

Source: SS02 Base w/ PPOA from PREPA response to Energy Bureau-PREPA ROI 10-5, "Retirements All Scenarios" January 22, 2020. Adjusted for non-decommissions as of March 31 2020.
1. Final retirement / decommissioning schedule must build in time and restrictions associated with permitting new or modified units under the New Source Review permitting program
2. Aguirre CC2 Steam Unit is considered Out-of-Service but the gas turbines associated with CC2 are still able to operate in simple cycle mode.

## Process for Decommission Implementation

- Any decision to retire and decommission the generation plants will be subject to the direction and approval of PREB

- Upon a determination that a Legacy Generation Asset should be decommissioned, the Operator will create a Decommissioning Plan that will include a Decommissioning Budget and a decommissioning timeline

  – **Decommissioning Plan** will be based on decommissioning standards set by PREB, and will be subject to the approval of PREB and the Administrator (in consultation with the Operator)

  – **Decommissioning Budget** will consist of the Decommissioning Service Fee (fixed fee and maximum possible incentive payment) and the estimated Pass-Through Expenditures related to decommissioning

  – The O&M Budget will be adjusted down to reflect that the Legacy Generation Asset will no longer be in operation

## Decommissioning Objectives

✓ Safe, Efficient & Expedient Decommissioning
✓ Conducted in close coordination with PREB, the Administrator and PREPA
✓ Minimized Environmental Impacts

13



Exhibit E: PREPA Management Presentation



# Energy Sector Transformation – Current and Future State

## Current state

**PREB**

**Energy Sector**

**Private Generation**
- AES
- EcoElectrica
- Renewables

**PREPA**

**Vertically-Integrated Public Utility**

## Future state

**PREB**

**Energy Sector**

**Private Generation**
- AES
- EcoElectrica
- Renewables
- New Generation

**Legacy Generation: GenCo Operated by Private Party**

**GridCo Operated by LUMA Energy**

## Roles

**Puerto Rico Energy Bureau ("PREB" or "Energy Bureau")**
- Approve rates, IRP and capital planning
- Power purchase agreement review and oversight of companies in the energy sector
- Energy policy implementation

**The Authority**
- Oversee the development, evaluation, negotiation, selection and future monitoring of private operator contracts

**GenCo[1]**
- Manage, operate, maintain, repair and decommission the Legacy Generation Assets
- Fuel management, procurement and logistics
- Identify required maintenance expenditures
- Prepare annual O&M Budgets and manage payment of expenditures
- Provide routine inspections and annual testing
- Manage scheduled and unscheduled outages
- Recipient of shared services under the Shared Services Agreement ("SSA")
- Interface and provide reports to regulators

**GridCo[2]**
- Manage, operate, maintain and repair the T&D assets and system
- Control center operations, generation scheduling and economic system dispatch
- Power procurement, integration of renewable generation and distributed energy resources
- Prepare annual O&M Budgets and manage payment of expenditures
- End-customer metering, billing, collections service, support and new service interconnection
- Outage management, restoration, coordination of emergency planning and storm recovery
- Delivery of grid capital expenditures and deployment of federal funding across system
- Provision of shared services under the SSA
- Collection of the revenues to pay GenCo O&M operator for costs to run Legacy Generation Assets, including fuel

1. GenCo refers to the wholly-owned subsidiary of PREPA who would obtain ownership of the Legacy Generation Assets after a potential reorganization of PREPA.
2. GridCo refers to PREPA, in its capacity as owner of the T&D assets.

14

Exhibit E: PREPA Management Presentation



# GridCo Operator – LUMA Energy



**Decades of operational excellence managing several world-class utilities that deliver safe and reliable energy to millions of customers**

- Diversified global holding corporation with approximately 6,000 employees
- Customer service excellence and innovative business solutions across several platforms, including electricity, natural gas, energy storage, industrial water, modular structures, site support services, transportation (ports and logistics) and commercial real estate
- Provision of products and services in more than 100 countries around the globe for more than 70 years
- Impeccable customer service rating



**Industry leading technical experience in building sustainable infrastructure and best-in-class craft skilled workforce training**

- Leading infrastructure solutions provider for the electric power, pipeline, industrial and communications sectors in North America
- More than 40,000 employees
- Fourth largest private fleet of equipment in North America, behind leading companies such as Walmart and PepsiCo
- Leader in the areas of safety and training for its craft-skilled workforce – self performing more than 85% of its work to collaborate with customers to provide cost certainty and safe execution
- Extensive experience responding to natural disasters across North America





**Expert and transparent management of federal funds**

- Subcontracted by LUMA to administer federal funding
- More than 35 years of experience helping the public and private sectors enhance preparedness, mitigate risks and effectively respond to and recover from disasters
- Excels in the effective management of recovery program funds, which will enable LUMA to act efficiently and effectively in rebuilding and modernizing Puerto Rico's grid
- Ability to position LUMA to provide critical emergency management and crisis response support, should a future disaster occur

15

Source: Partnership Committee Report – Puerto Rico Public-Private Partnership for the Electric Power Transmission and Distribution System – May 15, 2020.



Exhibit E: PREPA Management Presentation



# 3. Integrated Resource Plan
*Alfonso Baretty - Director of Planning and Environmental Protection, PREPA*

16

Partnership Committee Report — Puerto Rico Public-Private Partnership for the Puerto Rico Electric Power Thermal Generation Facilities



Exhibit E: PREPA Management Presentation



## IRP Process: Update

- On August 24, 2020, the PREB issued a Final Resolution and Order (the "Final Order") on the IRP process, concluding a multi-year planning process
- The IRP, developed by PREPA, focuses on the development of the electric power system in Puerto Rico over the next 20 years, with improvements in reliability, efficiency, transparency and carbon emissions
- The IRP involves a detailed assessment of many possible scenarios, which consider the most current information on the electric power system, such as generation and demand resources, current investments in electric technology and existing T&D facilities

**March 15, 2018:**
PREB initiated a proceeding for the filing of an updated IRP

**February 13, 2019:**
PREPA filed its initial 2018 – 2019 IRP

**March 14, 2019:**
PREB issued a resolution and order on the completeness of PREPA's IRP filing and determined that PREPA's proposed IRP was not in compliance with Regulation 9021 and prior PREB orders

**June 7, 2019:**
PREPA filed its updated IRP

**June 14 – July 3, 2019:**
PREPA made filings to comply with PREB's order

**July 3, 2019:**
PREB determined that the Proposed IRP Filing complied with the requirements of Regulation 9021 and determined that it was necessary to move to Phase 2 of the IRP approval process; discovery process started

**August – September 2019:**
PREB held technical hearings

**February 2020:**
PREB held an Evidentiary Hearing and also held five public hearings

**March 6, 2020:**
Legal briefs submitted

**April 20, 2020:**
Reply briefs filed

**August 24, 2020:**
PREB issued Final Resolution and Order

17

Source: Case No.: CEPR-AP-2018-0001 - Final Resolution and Order on the Puerto Rico Electric Power Authority's Integrated Resource Plan.

Exhibit E: PREPA Management Presentation



# IRP Compliance Work Streams

The following IRP compliance work streams will be completed in the upcoming months and may impact the IRP retirement and capacity additions schedule

**Renewable Energy RFP (up to 3,500 MW of solar / 1,500MW Battery Energy Storage System ("BESS"))**
- Currently 1st tranche - 1,000 MW solar / 500 MW BESS

**Hydro study – due June 30th, 2021**
- Feasibility study of refurbishing each facility, including expected cost and likely change in electricity production

**Retirement of Thermal Resources – due May 16th, 2021**
- File status report (every six-months) that provide near-term forecast (two years forward of reporting date) of PREPA's expected capacity resource balance and its ability to meet peak demand and operating reserve requirements

**Optimization Procedure (T&D investments)**
- PREB will consider T&D needs associated with an optimized MiniGrid concept

18

Exhibit E: PREPA Management Presentation



# Potential Generation Transition Road Map

The Final Order established some rules around retirements and additions of assets. Ultimately, the retirement schedule will be dependent on achieving specific reliability milestones such as new peaking capacity, demand response ("DR") resources and peak load reduction through energy efficiency ("EE"). An estimated retirement schedule, based off the S3S2B IRP scenario, is presented below.



**Capacity Additions**

| 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 |

Solar PV / BESS additions[1]

BESS (500 MW)
Solar PV (1,000 MW)

BESS (500 MW)
Solar PV (1,000 MW)

BESS (375 MW)
Solar PV (1,000 MW)

BESS (125 MW)
Solar PV (500 MW)

San Juan CC (300-400 MW)[3]
Peakers[2] (TBD)

Peakers[2] (TBD)

San Juan 5 Conversion (220 MW)
San Juan 6 Conversion (220 MW)
Conversion to Natural Gas

Aguirre Steam 1 (450 MW)
Costa Sur 6 (410 MW)

Aguirre CC 1 (296 MW)
Aguirre CC 2 (296 MW)
San Juan 8 (100 MW)

Costa Sur 5 (410 MW)
Palo Seco 3 (216 MW)

Aguirre Steam 2 (450 MW)
Palo Seco 4 (216 MW)
San Juan 7 (100 MW)

Cambalache 2&3 (166 MW)
Mayaguez 1-4 (216 MW)
Palo Seco MobilePacs (81 MW)
Legacy Gen. Assets remaining online post-2028

**Capacity Retirements**

San Juan 5 Conversion (220 MW)
San Juan 6 Conversion (220 MW)

Per the Final Order, majority of old steam plants should be retired in the next five years[4]

AES 1 (227 MW)
AES 2 (227 MW)
3rd party retirements

San Juan 5 Conversion (220 MW)
San Juan 6 Conversion (220 MW)

Source: Case No.: CEPR-AP-2018-0001 - Final Resolution and Order on the Puerto Rico Electric Power Authority's Integrated Resource Plan.
1. Based on RFP target release date.
2. PREPA is to establish a retirement schedule for the worst-performing of the 18 peaker units and file this as part of the bi-annual status reports for retirement of oil-fired steam and CC units.
3. A new dual-fuel CC plant at San Juan is currently undergoing preliminary economic, siting, permitting, and planning analysis as per the Final Order. IRP retirement will also take into consideration environmental compliance, including restrictions required for sulfur dioxide implementation plan, as well as permitting considerations

19



# 4. Legacy Generation Assets Overview

*Fernando Padilla - Deputy Executive Director of Operations, PREPA*
*William Rios Mera - Director of Generation Directorate (acting), PREPA*

Exhibit E: PREPA Management Presentation

Partnership Committee Report — Puerto Rico Public-Private Partnership for the Puerto Rico Electric Power Thermal Generation Facilities

Exhibit E: PREPA Management Presentation

# Legacy Generation Assets Overview

## The Legacy Generation Assets comprise base-load generation plants and peaking plants.

- The Legacy Generation Assets, which are located on 10 separate sites across the island (plus two emergency island units), have a total nameplate capacity rating of approximately **3,739 MW**.[1] Additional Out-of-Service Units[2] comprise a total of **1,694 MW** which will not be returned to service and are primed for decommissioning. Among the **3,739 MW** of installed capacity, several units are undergoing short and long-term repairs, but are expected to return to service in the future.

- At large generation complexes there are some black start combustion turbines that also serve as peaking units

- The Legacy Generation Assets are dependent on natural gas, diesel and number 6 fuel oil

- The Legacy Generation Assets have historically been vulnerable to transformer failures, voltage and frequency fluctuations and transmission line outages, experiencing above industry average equivalent forced outage rates, primarily as a result of poor equipment conditions due to the age of the units



**FY 2020 Legacy Asset Net Generation Mix**
*(TWh)*

11.0
82%
18%

■ Natural Gas   ■ Oil & Diesel

**Legacy Asset Net Generation[3]**
*(TWh)*

| FY2015 | FY2016 | FY2017 | FY2018 | FY2019 | FY2020 |
|--------|--------|--------|--------|--------|--------|
| 12.8 | 13.3 | 12.2 | 9.7 | 10.9 | 11.0 |

Note: Reflects fiscal years.
1.  As of April 14, 2021.
2.  See OMA contract for more information on the services required for each of the in-service and out-of-service units.
3.  FY 2020 reflects the period from July 2019 through June 2020 and equivalent for previous years.

21

Partnership Committee Report — Puerto Rico Public-Private Partnership for the Puerto Rico Electric Power Thermal Generation Facilities

201





203

Exhibit E: PREPA Management Presentation

# Organization of the Generation Directorate Structure



23

1. Irrigation, Dams and Reservoirs Division will not be managed by the Private Party.
2. Hydro plants will not be managed by the Private Party.

Partnership Committee Report — Puerto Rico Public-Private Partnership for the Puerto Rico Electric Power Thermal Generation Facilities





Exhibit E: PREPA Management Presentation

# Legacy Generation Asset Operational Status

| Plant | Installed Capacity (MW) | Short Term Outage + Available Capacity | Out-of-Service Units | Fuel | Initial Operation | FY 2020 Capacity Factor | Operational Classification | Additional Notes on Plant Condition |
|---|---|---|---|---|---|---|---|---|
| Aguirre Steam Unit 1 | 450 | 450 | | Heavy Fuel Oil (No. 6) | 1971 | 57% | Base-load | This unit is temporarily operating at 300MW from low condenser vacuum due to Sargasso but will be available for full load in Q2 2021. Unit subject to Mercury and Air Toxics Standards ("MATS"). |
| Aguirre Steam Unit 2 | 450 | 450 | | Heavy Fuel Oil (No. 6) | 1972 | 8% | Base-load | Unit is temporarily operating at 300MW. The limitation is due to boiler air in leakage and feedwater heater 7 out of service. Unit subject to MATS. |
| Aguirre GT Units | 42 | 21 | GT Unit 1 | Diesel (No. 2) | 1972 | 3% | Peaker | Unit 2 short-term outage, expected to be online Q2 2021. Unit 1 out of service since Q1 2019, will not return to service. |
| Aguirre CC 1 – Steam | 96 | | | Diesel (No. 2) | 1977 | 28% | Base-load | Unit on outage due to condenser tube leaks, return to service TBD. |
| Aguirre CC 1 – Gas | 200 | 192 | | Diesel (No. 2) | 1977 | 36% | Base-load | All units fully operational. |
| Aguirre CC 2 – Steam | 96 | | Steam Unit | Diesel (No. 2) | 1977 | 0% | Base-load | Out of service since Q2 2017. Likely will not return to service. |
| Aguirre CC 2 – Gas | 200 | 200 | | Diesel (No. 2) | 1977 | 18% | Base-load | GT 2-1(50 MW) and GT 2-2 (50 MW) are undergoing scheduled maintenance, expected to return to service. |
| Cambalache Units 1-3 | 247.5 | 154 | Unit 1 | Diesel (No. 2) | 1997 | 13% | Peaker | Units 2 and 3 are operational. Unit 1 out of service since Q3 2011 and is not expected to return to service. |
| Costa Sur Units 1-2 | 170 | 170 | | Heavy Fuel Oil (No. 6) | 1962 | 0% | Base-load | Unit 1 and 2 are long term out of service. |
| Costa Sur Units 3-4 | 170 | 170 | | Heavy Fuel Oil (No. 6) | 1962 | 0% | Base-load | Unit 3 and 4 out of service since Q3 2016, decommissioning pending. Both units are limited due to MATS |
| Costa Sur Units 5 | 410 | 410 | | LNG / Heavy Fuel Oil | 1972 | 29% | Base-load | Unit 5 derated due to hydrogen cooler issue, expected repair by Q2 2021. Unit subject to MATS. |
| Costa Sur Units 6 | 410 | 410 | | Diesel (No. 2) | 1972 | 0% | Base-load | Returned to service on February 12, 2021; fully operational. Unit subject to MATS. |
| Costa Sur GT Units | 42 | 21 | Unit 2 | Diesel (No. 2) | 1972 | 11% | Peaker | Unit 1 out of service since Q3 2017, currently undergoing repairs, expected to return to service Q2 2021. Unit 2 long term outage since Q4 2015. |
| Mayaguez Units 1-4 | 220 | 220 | | Diesel (No. 2) | 2009 | 11% | Peaker | Unit 2 - 4 fully operational with 9 MW total degradation due to normal operations. Unit 1 return to service is TBD. |
| Palo Seco Units 1-2 | 170 | | All | Heavy Fuel Oil (No. 6) | 1959 | 18% | Base-load | Both units are reported to be on long term outage. Units are also limited due to MATS. |

Note: (1) Plant available capacity and status information are as of April 14, 2021. Additional details on return to service dates and operational status to be provided during diligence Q&A period. (2) Status of units may change due to restrictions or retirements that may be required due to ongoing sulfur dioxide attainment planning process and development of the state implementation plan. Palo Seco, San Juan, and Aguirre are all in non-attainment areas, and these units are all potentially subject to restrictions or retirement as a part of the state implementation plan. These units may also be required to switch to lower sulfur fuels (both boilers and combustion turbines). (3) A unit that has been out of service for a significant period of time should be evaluated to determine if regulatory or permitting restrictions apply if intended to return to service.

24



Exhibit E: PREPA Management Presentation

205

# Legacy Generation Asset Operational Status

| Plant | Installed Capacity (MW) | Short Term Outage + Available Capacity | Out-of-Service Units | Fuel | Initial Operation | FY 2020 Capacity Factor | Operational Classification | Additional Notes on Plant Condition |
|---|---|---|---|---|---|---|---|---|
| Palo Seco Units 3-4 | 432 | 381 | | Heavy Fuel Oil (No. 6) | 1967 | 45% | Base-load | Unit 3 undergoing environmental & condenser maintenance, expected to return to service Q2, 2021. Limitations are due to boiler air in leakages that can be corrected during the major outages. Units subject to MATS. |
| Palo Seco CT Units | 126 | 60 | Units 2-2, 3-1 and 3-2 | Diesel (No. 2) | 1972 | 23% | Peaker | Units 1-2 and 2-1 fully operational. Unit 1-1 expected to return to service Q2, 2021. Units 2-2, 3-1 and 3-2 will not be returned to service, to be replaced by MobilePacs. |
| Palo Seco MobilePacs | 81 | 81 | | LNG / Diesel | 2019 | 33% | Peaker | NOx injection controls must be operational, and permit must be obtained before these units can be operated. Operation of these units is subject to retirement of Palo Seco CT units. |
| San Juan Steam 1-4 | 400 | | All | n/a | n/a | n/a | Base-load | |
| San Juan CC Gas 5-6 | 320 | 280 | | LNG / Diesel | 2008 | 55% | Base-load | Unit 6 derated to 150 MW. Unit 5 derated to 130 MW and on outage, expected return to service Q2, 2021. |
| San Juan CC Steam 5-6 | 120 | 90 | | LNG / Diesel | 2008 | 41% | Base-load | Units 6 derated to 50 MW. Unit 5 derated to 40 MW and on outage, expected return to service Q2, 2021. |
| San Juan Steam 7-10 | 400 | 210 | Unit 10 | Heavy Fuel Oil (No. 6) | 1964 | 22% | Base-load | All units out of service or derated. Unit 7 expected to return to 70 MW Q2, 2021. Unit 9 expected to return to 40 MW Q2, 2021. Unit 8 return to 100 MW Q2 2021. Unit 10 long term outage; will not return. Units all subject to MATS, and 7&8 are limited use. |
| Daguao GTs 1-2 | 42 | 34 | | Diesel (No. 2) | 1972 | 11% | Peaker | Both units operational and derated, 1-1 at 18MW and 1-2 at 16MW. |
| Yabucoa GTs 1-2 | 42 | | | Diesel (No. 2) | 1971 | 7% | Peaker | Both units are out of service with return dates as TBD. |
| Jobos GTs 1-2 | 42 | 42 | | Diesel (No. 2) | 1971 | 9% | Peaker | |
| Vega Baja GTs 1-2 | 42 | 21 | | Diesel (No. 2) | 1971 | 4% | Peaker | Unit 1-1 operational. Unit 1-2 on outage with return to service date TBD. |
| Culebra 1-3 | 6 | 6 | | Diesel (No. 2) | 2019 | n/a | Emergency | |
| Vieques 1-2 | 6 | 6 | | Diesel (No. 2) | 2019 | n/a | Emergency | |
| Total | 5,433 | 3,739 | | | | | | |

Note: (1) Plant available capacity and status information are as of April 14, 2021. Additional details on return to service dates and operational status to be provided during diligence Q&A period. (2) Status of units may change due to restrictions or retirements that may be required due to ongoing sulfur dioxide attainment planning process and development of the state implementation plan. Palo Seco, San Juan, and Aguirre are all in non-attainment areas, and these units are all potentially subject to restrictions or retirement as a part of the state implementation plan. These units may also be required to switch to lower sulfur fuels (both boilers and combustion turbines). (3) A unit that has been out of service for a significant period of time should be evaluated to determine if regulatory or permitting restrictions apply if intended to return to service.

25



# Asset Descriptions
## Baseload Facilities

Exhibit E: PREPA Management Presentation

Partnership Committee Report – Puerto Rico Public-Private Partnership for the Puerto Rico Electric Power Thermal Generation Facilities

26



# 4a. Aguirre

Exhibit E: PREPA Management Presentation

Partnership Committee Report – Puerto Rico Public-Private Partnership for the Puerto Rico Electric Power Thermal Generation Facilities

27

Exhibit E: PREPA Management Presentation

## Aguirre Aerial Site View

The CC units each have four vertical single-pressure HRSGs, one per GT. The steam turbine Units 1 & 2 are located outdoors on a common turbine deck with weather shelters for each turbine and generator. Two black start No. 2 fuel oil gas turbines, #21 and #22, are located near the thermal units. The capacity of the GT Peaker Units is lower than the required output to black-start a thermal unit — due to this limitation, one of the GTs black-starts a 50-MW CC GT, which, in turn, black-starts a thermal unit.



GT Peakers Units #21 and #22

Steam Units 1 & 2

Combined Cycle Units 1 & 2

28



Exhibit E: PREPA Management Presentation

# Aguirre Steam Electric Station

## Facility Overview



**Facility Photo**



### Facility Overview

| | |
|---|---|
| **Location** | Salinas, Ponce Region |
| **Water Source** | Jobos Bay and five local wells |
| **Interconnection** | Connected through a dedicated transformer to the 230-kV switchyard |
| **Plant Capacity** | Nameplate: 450 MW (Unit 1) / 450 MW (Unit 2) Available + short-term outage: 450 MW (Unit 1) / 450 MW (Unit 2) |
| **COD** | 1971 |
| **Technology** | Oil-fired Steam Turbine |
| **Fuel/ Fuel Supplier** | No. 6 Fuel Oil / Freepoint Commodities (delivered to port via tankers and forwarded via pipeline) |
| **Control System** | ABB S90 Turbotrol (Unit 1) / Alstom BlueLine (Unit 2) Separate control room from Aguirre CC |
| **Availability**[1] | 71% (Unit 1) / 51% (Unit 2) |
| **Capacity Factor**[1] | 40% (Unit 1) / 24% (Unit 2) |
| **Minimum Load** | 200 MW (Unit 1) / 200 MW (Unit 2) |
| **Heat Rate**[2] | Full Load: 9,600 Btu/kWh / 9,700 Btu/kWh Min Load: 9,940 Btu/kWh / 10,158 Btu/kWh |
| **Ramp Rates** | 5 MW per minute up / 5 MW per minute down |
| **Start-Up Times** | Hot: 4 hours; Warm: 8 hours; Cold: 16 hours |
| **Steam Turbine** | ABB |
| **Boiler** | Combustion Engineering |

Row group labels (vertical): Facility Overview / Operational Metrics / Major Equipment

### Facility Highlights

- Facility is comprised of Aguirre Steam Units 1 and 2, each of which are rated at 450 MW; is anticipated to remain operational in the near term for system reliability / standby purposes

- Facility was not in the direct path of recent hurricanes but did incur some damage; high priority repairs have been completed and lower priority repairs are ongoing; Unit 2-1 to be completed Q2 2021 and Unit 2-2 to be completed by 2021 hurricane season

- Units are subject to Particulate Matter emissions limits and HCl/HF acid gas emissions limits under the MATS, as well as work-practice standards for tune-ups and startup/shutdown

- Units must be taken out of service for environmental outage at least every 18 months due to 1999 Consent Decree with EPA/DOJ

- Units are located in a nonattainment area for the sulfur dioxide National Ambient Air Quality Standard ("NAAQS") and may be subject to restrictions, retirement or reductions in sulfur content, depending on results of sulfur dioxide state implementation pla...

Source: Independent Engineering Report, Aguirre Power Plant Complex, May 2019.
1. Reflects average value by unit for 2017 – 2019.
2. Heat rates reflect assumption based on historic operating experience.

29

Partnership Committee Report — Puerto Rico Public-Private Partnership for the Puerto Rico Electric Power Thermal Generation Facilities

209

Exhibit E: PREPA Management Presentation



# Aguirre Steam: Major Maintenance and Future Plans

| | | |
|---|---|---|
| **Recent and Ongoing Projects** | **New Water Source** | PREPA is midway through a project to bring water from the PREPA-owned Patillas Lake to the Aguirre site. This alternate source is expected to reduce water treatment costs and provide a more stable supply compared to the wells currently utilized. |
| | **Upgrading Pump Capacity** | PREPA is in the process of upgrading the pump capacity and motor size to 2,200 hp to increase water flow and subsequently improve condenser vacuum. |
| | **Turbine Control Upgrades** | ABB's S90 Turbotrol turbine controls were installed in 2014 for the Unit 1 ST generator and in 2015 on the Unit 2 ST generator. The Unit 2 ST generator controls were upgraded in 2017 to the Alstom BlueLine version. |
| **Future Projects** | **No Projects Planned** | Unit 2 Generator rewind in May 2021. Unit 1 major inspection in December 2021 as recommended by the manufacturer. |

Source: Independent Engineering Report, Aguirre Power Plant Complex, May 2019.

30



PUBLIC-PRIVATE PARTNERSHIPS

# Aguirre Steam: Historical Operating Summary

**The Aguirre Steam plant is used for spinning reserve and other ancillary services such as frequency and voltage regulation.**

## Net Generation
*(GWh)*

## Capacity Factor
*(%)*

## Equivalent Availability Factor
*(%)*

## Equivalent Forced Outage Rate
*(%)*

Note: Reflects calendar years. Consolidated averages are weighted by capacity. 2017 includes the impact of Hurricanes Irma and Maria.
Source: PREPA monthly operating reports.





Exhibit E: PREPA Management Presentation

# Aguirre Combined Cycle

## Facility Overview

| | | |
|---|---|---|
| **Facility Overview** | Location | Salinas, Ponce Region |
| | Water Source | Jobos Bay and five local wells |
| | Interconnection | The combined-cycle main power transformers step up the generator voltage to 230-kV |
| | Plant Capacity | Nameplate: 296 MW (Unit 1) / 296 MW (Unit 2) Available + short-term outage: 192MW (Unit 1) / 200 MW (Unit 2) |
| | COD | 1975-76 (Unit 1) / 1975-76 (Unit 2) |
| | Technology | CCGT |
| | Fuel/Fuel Supplier | Low-sulfur Fuel Oil No. 2/ Puma Energy (delivered to port via tankers and forwarded via pipeline) |
| | Control System | GE Mark VI-E; Separate control room from Aguirre Steam |
| **Operational Metrics** | Availability[1] | 72% (Unit 1) / 37% (Unit 2) |
| | Capacity Factor[1] | 11% (Unit 1) / 6% (Unit 2) |
| | Minimum Load | 5 MW (Unit 1) / 5 MW (Unit 2) (gas turbines) |
| | Heat Rate[2] | Full Load: 11,140 Btu/kWh Min Load: 11,442 Btu/kWh |
| | Ramp Rates | 5 MW per minute up / 5 MW per minute down |
| | Start-Up Times | 15 minutes for each gas turbine |
| **Major Equipment** | Combustion Turbine | Original: General Electric 7B Current: General Electric 7EA (partial upgrade) |
| | Steam Turbine | General Electric |
| | HRSG | Originally General Electric, modified by Senior Engineering (1994 and 1995) |

Source: Independent Engineering Report, Aguirre Power Plant Complex, May 2019.

## Facility Photo





### Facility Highlights

- Facility is comprised of Aguirre Units 1 and 2, which each operate in a 4x1 (GT x ST) Steam and Gas ("STAG") combined configuration
  - The steam turbine of Unit 2 has been out of service since Q2 2017
  - The gas turbines associated with Unit 2 are still able to operate in simple cycle mode
- Facility utilizes obsolete technology and is only used for grid support / standby generation capacity
- Units are located in a nonattainment area for the sulfur dioxide NAAQS and may be subject to restrictions or retirement or reductions in fuel sulfur content depending on results of sulfur dioxide state implementation plan

1.   Reflects average value by unit for 2017 – 2019.
2.   Heat rates reflect assumption based on historic operating experience.

32





# Aguirre CC: Major Maintenance and Future Plans

| | | |
|---|---|---|
| **Recent and Ongoing Projects** | **Fuel conversion** | Beginning in 2007, modifications to the CCs began, which would have allowed the GTs to burn either natural gas or No. 2 fuel oil. These modifications were approximately 80% complete when the work was halted and so the GTs remain configured to operate solely on No. 2 fuel oil. Modifications were designed in 2011 for the thermal units to be converted to natural gas. The gas fuel components and boiler conversion parts were delivered but not installed. The project was put on hold, and the parts are in outdoor storage at the Plant. The boilers continue to operate on HFO. Natural gas is not available at the site. |
| | **New Water Source** | PREPA is midway through a project to bring water from the PREPA-owned Patillas Lake to the Aguirre site. This alternate source is expected to reduce water treatment costs and provide a more stable supply compared to the existing wells. |
| | **Upgrades to water pump capacity** | Seawater from the Jobos Bay is pumped by four 1,000 horsepower vertical circulating water pumps for Units 1 and 2 and a single installed spare for the two units for use in cooling once-through condensers at the thermal plant. Each of the CC blocks has its own seawater cooling tower and two 2,000-hp circulating water pumps for condenser cooling. They are in the process of upgrading the pump capacity and motor size to 2,200 hp to increase water flow and subsequently improve condenser vacuum. |
| **Future Projects** | **STAG STG control upgrades** | The HRSG controls are being upgraded by Foxboro. The STAG 1 STG controls recently underwent the upgrade to Mark VI-E along with an exciter upgrade to model EX-2100. However, STAG 2's STG controls and exciter have not yet been upgraded. |
| | **Update GTs to Mark VI-E** | CC1 4 GTs and ST 1 were upgraded to Mark VI-E. The remaining CC2 4 GTs and ST will be finished by Q2 2021. By end of Q2 2021, all operational units in the Aguirre CC will have Mark VI-E control system. |

Source: Independent Engineering Report, Aguirre Power Plant Complex, May 2019.

33

213



Exhibit E: PREPA Management Presentation



# Aguirre Combined Cycle: Historical Operating Summary

Aguirre Combined Cycle is base-load with two STAG units and is often used in a spinning reserve operating mode.

## Net Generation
*(GWh)*

**Total Generation**

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|
| | 238 | 613 | 615 | 622 | 393 | 222 | 742 |

Unit 1: 184, 209, 360, 491, 236, 156, 486
Unit 2: 54, 404, 255, 131, 157

■ Unit 1  ■ Unit 2

## Equivalent Availability Factor ("EAF")
*(%)*

Consolidated EAF

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|
| | 83% | 80% | 57% | 66% | 51% | 65% | 48% |

Unit 1: 69%, 65%, 62%, 52%, 44%, 51%, 16%
Unit 2: 97%, 94%, 52%, 80%, 58%, 79%, 80%

Consolidated EAF

■ Unit 1  ■ Unit 2

## Capacity Factor
*(%)*

Consolidated Capacity Factor

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|
| | 5% | 12% | 12% | 12% | 9% | 4% | 14% |

Unit 1: 2%, 8%, 14%, 5%, 6%, 6%, 10%
Unit 2: 7%, 16%, 10%, 19%, 6%, 3%, 19%

■ Unit 1  ■ Unit 2  ─○─ Consolidated Capacity Factor

## Equivalent Forced Outage Rate ("EFOR")
*(%)*

Consolidated EFOR

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|
| | 10% | 8% | 20% | 24% | 18% | 16% | 24% |

Unit 1: 10%, 10%, 4%, 17%, 17%, 14%, 6%
Unit 2: 10%, 6%, 35%, 31%, 19%, 19%, 42%

■ Unit 1  ■ Unit 2  ─○─ Consolidated EFOR

Note: Reflects calendar years. Consolidated averages are weighted by capacity. 2017 includes the impact of Hurricanes Irma and Maria.
Source: PREPA monthly operating reports.

34



Exhibit E: PREPA Management Presentation



# Aguirre GT Black Start Peakers

## Facility Overview

| Location | Salinas, Ponce Region |
|---|---|
| Water Source | Jobos Bay and five local wells |
| Interconnection | Connected to the 115-kV switchyard |
| Plant Capacity | Nameplate: 21 MW (Unit #21) / 21 MW (Unit #22)<br>Available + short-term outage: 0 MW (Unit #21) / 21 MW (Unit #22) |
| COD | 1972 |
| Technology | Frame 5 (GE design) manufactured by John Brown |
| Fuel/ Fuel Supplier | No. 2 Fuel Oil from Puma Energy (delivered to port via tankers and forwarded via pipeline) |
| Control System | Mark II |

### Major Maintenance and Future Plans

- **New Water Source:** PREPA is midway through a project to bring water from the PREPA-owned Patillas Lake to the Aguirre site. This alternate source is expected to reduce water treatment costs and be a more stable supply than the wells
- **Replacement of Units:** FEMA has approved a project to replace the two black start units at the Aguirre power plant with new rapid start aeroderivative gas turbines that can provide reliable black start capabilities to the plant and inject power into the grid for voltage stability
- **Unit 2 Starting Motor:** Expected to be available Q2 2021

Source: Independent Engineering Report, Aguirre Power Plant Complex, May 2019.

35

## Facility Photo



### Facility Highlights

- Unit #22 is currently experiencing a short-term outage due to a starting motor issue; it is normally available for emergency use, such as for a black start; it has been limited to four hours of operation before it trips on high oil temperature in the lubricating oil tank

- Unit #21 has been out of service since Q1 2019

- GTs have black-start capability

- In general, these gas turbines have degraded over time due to age and disuse in a marine environment; there are some areas that should be inspected/repaired to ensure reliability

- Units are located in a nonattainment area for the sulfur dioxide NAAQS and may be subject to restrictions or retirement or reductions in fuel sulfur content depending on results of sulfur dioxide state implementation plan

Facility Overview

Partnership Committee Report — Puerto Rico Public-Private Partnership for the Puerto Rico Electric Power Thermal Generation Facilities

215



Exhibit E: PREPA Management Presentation



# 4b. Cambalache

36



Exhibit E: PREPA Management Presentation

# Cambalache Aerial Site View

The Cambalache Power Plant consists of three simple-cycle GTs and generators, each with a main power transformer. Gas Turbines 2 and 3 have been in operational condition while Gas Turbine 1 is not operational and is deemed irreparable.



Partnership Committee Report — Puerto Rico Public-Private Partnership for the Puerto Rico Electric Power Thermal Generation Facilities

37

217



Exhibit E: PREPA Management Presentation

# Cambalache

## Facility Overview

### Facility Overview

| | |
|---|---|
| **Location** | Arecibo, Arecibo Region |
| **Water Source** | Four adjacent wells pump into the raw water tank; Puerto Rico Aqueduct and Sewer Authority ("PRASA")(local municipal supply) provides potable water |
| **Interconnection** | Connected through a dedicated transformer to the 230-kV switchyard |
| **Plant Capacity** | Nameplate: 82.5 MW (Unit 1) / 82.5 MW (Unit 2) / 82.5 MW (Unit 3)<br>Available + short-term outage: 0 MW (Unit 1) / 77 MW (Unit 2) / 77 MW (Unit 3) |
| **COD** | 1997 (Units 1 & 2) / 1998 (Unit 3) |

### Operational Metrics

| | |
|---|---|
| **Technology** | ABB GT11 N1 simple cycle |
| **Fuel / Fuel Supplier** | Low-sulfur Fuel Oil No. 2 / Puma Energy |
| **Control System** | Alstom BlueLine |
| **Availability[1]** | 0% (Unit 1) / 79% (Unit 2) / 88% (Unit 3) |
| **Capacity Factor[1]** | 0% (Unit 1) / 9% (Unit 2) / 10% (Unit 3) |
| **Minimum Load** | 50 MW (Unit 1); 50 MW (Unit 2); 50 MW (Unit 3) (60% of rated load) |
| **Heat Rate[2]** | Full Load: 11,549 Btu/kWh<br>Min Load: 11,550 Btu/kWh |
| **Ramp Rates** | 3 MW per minute up / 3 MW per minute down |
| **Start-Up Times** | 17 minutes (hot, warm and cold) |

### Major Equipment

| | |
|---|---|
| **Combustion Turbine** | ABB-GT11N1 |
| **HRSG** | Innovalties Technology |

1. Reflects average value by unit for 2017-2019.
2. Reflects heat rates for Units 2 & 3. Heat rates reflect assumption based on historic operating experience.

38

## Facility Photo



## Facility Highlights

- Facility is comprised of three simple-cycle ABB GTs and generators, each of which is rated at 82.5 MW

  – Unit 1 has been out of service since Q3 2011 and there is currently no plan to return it to service; it is expected to be retired or mothballed in the near-term

  – Units 2 & 3 are anticipated to remain operational for grid support Units are generally limited in operation for peaking service due to high operational costs

  – Units have inspections planned for June 2021 after which more information on major maintenance and future plans will be available

218



Case:17-03283-LTS Doc#:23602 Filed:02/21/23 Entered:02/21/23 23:01:20 Desc: Main Document Page 233 of 627

PUBLIC-PRIVATE PARTNERSHIPS

# Cambalache: Historical Operating Summary

**Cambalache is a peaking facility, with only units 2 and 3 currently operational.**

## Net Generation
*(GWh)*

## Capacity Factor
*(%)*

## Equivalent Availability Factor
*(%)*

## Equivalent Forced Outage Rate
*(%)*

**Note: Reflects calendar years. Consolidated averages are weighted by capacity. 2017 includes the impact of Hurricanes Irma and Maria.**
**Source: PREPA monthly operating reports.**

39



# 4c. Costa Sur

Exhibit E: PREPA Management Presentation

Partnership Committee Report — Puerto Rico Public-Private Partnership for the Puerto Rico Electric Power Thermal Generation Facilities



Exhibit E: PREPA Management Presentation

# Costa Sur Aerial Site View

The Costa Sur Power Plant consists of six steam power generation units with only two operational units (Unit 5 and Unit 6). Two GTs have been used for peaking and black start capability but are currently not in operating condition. Currently, the plant must rely on external power for startup, though FEMA has approved funding to develop new black start units. Gas supply is via a pipeline from the EcoElectrica LNG facility.



41




Exhibit E: PREPA Management Presentation

# Costa Sur Steam Electric Station – Units 5 & 6

## Facility Overview



| Facility Overview | | |
|---|---|---|
| | Location | Guayanilla, Ponce Region |
| | Water Source | Guayanilla Bay and PREPA deep well numbers 8, 9, 10 and 13 |
| | Interconnection | Power sent to 3 interconnected switchyards with operating voltages of 38 kV, 115 kV, and 230 kV |
| | Plant Capacity | Nameplate: 410 MW (Unit 5) / 410 MW (Unit 6) Available • short-term outage: 410 MW (Unit 5) / 410 MW (Unit 6) |
| | COD | 1969 (Unit 5) / 1971 (Unit 6) |
| | Technology | Gas –fired Steam |
| | Fuel / Fuel Supplier | Natural Gas & No. 6 Fuel Oil (standby/limited hours) / Gas Natural Aprovisionamientos (EcoEléctrica) via pipeline |
| | Control System | GE Mark VI |
| Operational Metrics | Availability[1] | 71% (Unit 5) / 76% (Unit 6) |
| | Capacity Factor[1] | 41% (Unit 5) / 44% (Unit 6) |
| | Minimum Load | 225 MW (Unit 5) / 225 MW (Unit 6) |
| | Heat Rate[2] | Full Load: 9,747 Btu/kWh / 9,747 Btu/kWh Min Load: 9,935 Btu/kWh / 10,069 Btu/kWh |
| | Ramp Rates | 5 MW per minute up / 5 MW per minute down |
| | Start-Up Times | Hot: 4 hours; Warm: 8 hours; Cold: 12 hours |
| Major Equipment | Steam Turbine | General Electric 170X446 |
| | Boiler | Combustion Engineering |
| | Environmental | Boiler converted to operate on natural gas |

Source: Independent Engineering Report, Costa Sur Steam Plant, May 2019.
1.  Reflects average value by unit for 2017 – 2020.
2.  Heat rates reflect assumption based on historic operating experience.

## Facility Photo



### Facility Highlights

- Costa Sur Units 5 and 6 are the larger, natural gas-fired generating units located at the Costa Sur Steam Electric Station
  - With the recent expansion of regasification facilities at EcoEléctrica (near Costa Sur), both units can now be fired simultaneously with lower-cost natural gas

- Unit 6 has recently returned to service, after damage incurred during the January 7, 2020 earthquake

- Unit 5 had been operating below capacity due to a hydrogen cooler issue; the coolers are being cleaned and Unit 5 is expected to be back in service by Q2 2021

- Units are subject to Particulate Matter emission limits and HCl/HF acid gas emission limits under the MATS, as well as work-practice standards for tune-ups and startup/shutdown

- Units must be taken out of service for environmental outage at least every 18 months due to 1999 Consent Decree with EPA/DOJ

222

223

Exhibit E: PREPA Management Presentation



# Costa Sur 5 & 6: Major Maintenance and Future Plans

## Recent and Ongoing Projects

**Retrofitting Boilers to Burn NG**
Boilers are tangentially fired Combustion Engineering (now GE Power), that were retrofitted in 2011 to burn natural gas but also still have the flexibility to burn a combination of natural gas and oil or oil-only as originally designed

**Control System Upgrades**
In 2010, Foxboro completed a control system upgrade on Units 5 and 6; additionally, GE completed an upgrade on the steam turbine controls to a Mark VI system.

**New Demineralizer Installed**
In 2015, PREPA designed and installed a new mixed bed demineralizer with three 400 gallons per minute trains. Units 5 and 6 have a combined daily average requirement of 300 gpm. The original 600 gpm mixed bed demineralized water treatment plant is still functional and used as a backup.

## Future Projects

**Demineralized Water to Unit 5**
PREPA is currently constructing a line to bring demineralized water from Unit 3 to Unit 5.

**Decommissioning of Units 1 & 2**
Units 1 and 2 steam power generation units are retired and were last operated in 2003. These units are considered irreparable.

**Decommissioning of Units 3 & 4**
Units 3 and 4 steam power generation units are no longer operated because they are considered unsafe for normal service. The boilers would require substantial investment to return pressure-containing parts to a condition for safe service.

Source: Independent Engineering Report, Costa Sur Steam Plant, May 2019.

43

PUBLIC-PRIVATE PARTNERSHIPS

# Costa Sur Units 5 & 6: Historical Operating Summary

Costa Sur 5 & 6 have operated on natural gas for many years. These are key baseload units in PREPA's dispatch stack. Units 5 & 6 were damaged during the 2020 earthquakes.

## Net Generation
*(GWh)*

## Capacity Factor
*(%)*

## Equivalent Availability Factor
*(%)*

## Equivalent Forced Outage Rate
*(%)*

**Note: Reflects calendar years. Consolidated averages are weighted by capacity. 2017 includes the impact of Hurricanes Irma and Maria.**
**Source: PREPA monthly operating reports.**

Exhibit E: PREPA Management Presentation

PUBLIC-PRIVATE
PARTNERSHIPS

# Costa Sur GT Black Start Peakers

## Facility Overview

### Facility Overview

| | |
|---|---|
| **Location** | Guayanilla, Ponce Region |
| **Water Source** | Guayanilla Bay and PREPA deep well numbers 8, 9, 10 and 13 |
| **Interconnection** | Connected to the 115-kV switchyard through the emergency service station transformer of Units 5 and 6 |
| **Plant Capacity** | Nameplate: 21 MW (Unit 1) / 21 MW (Unit 2) Available + short-term outage: 21 MW (Unit 1) / 0 MW (Unit 2) |
| **COD** | 1972 |
| **Technology** | Frame 5 (GE design) manufactured by John Brown |
| **Fuel/ Fuel Supplier** | No. 2 fuel oil delivered to site through lines from the Commonwealth Oil Refining Company, Inc. Refinery; No. 2 fuel oil can also be delivered by truck. |
| **Control System** | GE Mark I |

## Major Maintenance and Future Plans

- **Decommissioning:** The IE Report classified these units as irreparable, though decommissioning has not started
- **Replacement of Units:** FEMA has approved a project to replace the two black start units at the Costa Sur plant with new rapid start aeroderivative gas turbines that can provide reliable black start capabilities to the plant and inject power into the grid for voltage stability

## Facility Photo



## Facility Highlights

- The GTs had been used for peaking demand and as black start units but are currently not in operating condition
- Unit 1 was damaged by Hurricane Maria in 2017; undergoing repairs and expected to return to service by Q2 2021
- Unit 2's turbine rotor and compressor section were removed in 2015 and have remained in the San Juan maintenance shop for repairs; likely will not return to service
- Both GTs are considered likely to have start-up issues due to improper lay-up and lack of maintenance while idle





Exhibit E: PREPA Management Presentation



# 4d. Mayaguez

46

Partnership Committee Report – Puerto Rico Public-Private Partnership for the Puerto Rico Electric Power Thermal Generation Facilities

Exhibit E: PREPA Management Presentation



## Mayaguez Aerial Site View

The Mayaguez plant was designed to be a fast-response power generating plant available as needed to provide peak power assistance to the grid. After the hurricanes, the Mayaguez facility was utilized as the black start system for the south coast power plants and continued to generate power through the island's restoration efforts. The site equipment has faced some damage/corrosion due to its location in the aggressive, salt-laden marine environment and due to exposure to coastal winds.



Units 1 & 2

Units 3 & 4

47



Exhibit E: PREPA Management Presentation

# Mayaguez

## Facility Overview

<table>
<tr><td rowspan="8">Facility Overview</td><td>Location</td><td>Mayaguez, Mayaguez Region</td></tr>
<tr><td>Water Source</td><td>PRASA (local municipal supply)</td></tr>
<tr><td>Interconnection</td><td>Unit 1 and 2 share a step-up transformer connected to the 115-kV switchyard; Unit 3 is connected through a dedicated transformer to the 115-kV switchyard; Unit 4 is connected through a dedicated transformer to the 38-kV switchyard</td></tr>
<tr><td>Plant Capacity</td><td>Nameplate: 55 MW (Unit 1) / 55 MW (Unit 2) / 55 MW (Unit 3) / 28 MW (Unit 4a) / 27 MW (Unit4b)<br>Available + short-term outage: 55 MW (Unit 1) / 55 MW (Unit 2) / 55 MW (Unit 3) / 28 MW (Unit 4a) / 27 MW (Unit4b)</td></tr>
<tr><td>COD</td><td>2009</td></tr>
<tr><td>Technology</td><td>4 x Pratt & Whitney FT8 aeroderivative twin packs</td></tr>
<tr><td>Fuel</td><td>Low-sulfur Fuel Oil No. 2 / Puma Energy</td></tr>
<tr><td>Control System</td><td>Allen-Bradley</td></tr>
<tr><td rowspan="5">Operational Metrics</td><td>Availability[1]</td><td>65% (Unit 1) / 25% (Unit 2) / 52% (Unit 3) / 87% (Unit 4)</td></tr>
<tr><td>Capacity Factor[1]</td><td>7% (Unit 1) / 2% (Unit 2) / 5% (Unit 3) / 6% (Unit 4)</td></tr>
<tr><td>Minimum Load</td><td>0.5 MW (Unit 1) / 0.5 MW (Unit 2) / 0.5 MW (Unit 3) / 0.5 MW (Unit 4)</td></tr>
<tr><td>Heat Rate[2]</td><td>Full Load: 9,320 Btu/kWh<br>Min Load: 11,204 Btu/kWh</td></tr>
<tr><td>Ramp Rates</td><td>6 MW per minute up / 6 MW per minute down</td></tr>
<tr><td></td><td>Start-Up Times</td><td>10 minutes (hot, warm and cold)</td></tr>
<tr><td>Major Equipment</td><td>Combustion Turbine</td><td>Pratt & Whitney FT8 Twin packs</td></tr>
</table>

Source: Independent Engineering Report, Central Hidro Gas Mayaguez Plant, May 2019.
1. Reflects average value by unit for 2017 – 2020.
2. Heat rates reflect assumption based on historic operating experience.

48



## Facility Photo



## Facility Highlights

- Facility is comprised of four twin-pack units (eight gas turbines total)
- Units are dispatched for peaking services
  - Units have fast start capability (on-line in 10 minutes) based on aero-derivative combustion turbine technology and have built-in synchronous condensing capability; units may be useful for future grid support
- All units are anticipated to remain viable mid to long-term, notably if they are converted to run on natural gas
- Facility equipment did not sustain damage during the 2017 hurricanes; the available units were up and running quickly, able to respond to the emergency dispatch
- Units 2 and 4 were damaged in the 2020 earthquakes, but both have been repaired and returned to service
- Currently, there is no natural gas supply for the facility; however, each gas turbine has been provided with an OEM-designed fuel gas regulator valve skid and the units could be modified in the future if a gas source becomes available



Exhibit E: PREPA Management Presentation

# Mayaguez: Major Maintenance and Future Plans



| | | |
|---|---|---|
| **Recent and Ongoing Projects** | **Replacement of Air Compressor Systems** | Recent replacement of all combustion turbine unit air compressor systems, which originally had no enclosures and were not suitably configured for the operating conditions. |
| | **Air Intake Systems** | Many of the gas turbine air intake systems have permitted the ingress of salt fines through the air filters and into the cold side blades of the gas turbine. |
| | **Combustion Turbine Corrosion and Repair** | On the hot side of the turbines, some thermal barrier coating losses have been noted at the first stage high-pressure turbine blades across multiple units. Of the eight turbine units, four turbine units became non-operational. Several units have undergone repair, but two turbine units remain non-operational. Until the blade issues are resolved with the original equipment manufacturer, the units have been recommended to not be operated. A repair plan and commercial discussions are already in place to address the issues. |
| **Future Projects** | **Potential NG Conversion** | Currently, there is no natural gas supply for the facility, and the turbines are solely fired on No. 2 fuel oil. However, each gas turbine is provided with an OEM-designed fuel gas regulator valve skid. The external gas supply and regulation skids are currently blanked off at their supply point to the turbine; however, the equipment could deliver natural gas to the turbines if gas fuel was made available at the site. Gas manifolds and other gas control equipment inside the turbine enclosure would still need to be installed, along with necessary control system changes. Gas piping to the plant and distribution piping inside the plant are currently not in place would need to be procured and installed. |

Source: Independent Engineering Report, Central Hidro Gas Mayaguez Plant, May 2019.

49



Case:17-03283-LTS Doc#:23602 Filed:02/21/23 Entered:02/21/23 23:01:20 Desc: Main Document Page 244 of 627

PUBLIC-PRIVATE PARTNERSHIPS

# Mayaguez: Historical Operating Summary

## Mayaguez is primarily used for peaking capacity and transmission support due to its fast-start capability.

### Net Generation
*(GWh)*

### Capacity Factor
*(%)*

### Equivalent Availability Factor
*(%)*

### Equivalent Forced Outage Rate
*(%)*

**Note: Reflects calendar years. Consolidated averages are weighted by capacity. 2017 includes the impact of Hurricanes Irma and Maria.**
**Source: PREPA monthly operating reports.**

50





# 4e. Palo Seco

Exhibit E: PREPA Management Presentation

Partnership Committee Report — Puerto Rico Public-Private Partnership for the Puerto Rico Electric Power Thermal Generation Facilities

51



PUBLIC-PRIVATE PARTNERSHIPS

**Exhibit E: PREPA Management Presentation**

# Palo Seco Aerial Site View

Some of the major equipment at Palo Seco is not operable, and in many cases maintenance and repair would not be cost-effective for continued service largely due to the extended shutdowns and non-use, harsh coastal corrosion impact across the plant and equipment, and safety concerns associated with the end-of-life operation. The gas turbines are used as peaker units and for emergency dispatch and are nearing 50 years old. The units are adjacent to the ocean, and exposure to the marine elements has caused significant exterior corrosion. The units can be used for black start of the plant. These units are also considered to be near the end of their useful life.



Units 1-4

Six GT Peaker Units

**Three MobilePac Units**, installed in 2019, are nominally rated at 30MW each, but currently are limited due to lack of water for NOx reduction. These units are not able to be legally operated at this time and are pending a notice of violation. Permitting with PRDNER[1] is in progress, and PREPA is involved in discussions with both PRDNER and U.S. EPA to discuss the site permitting.

1. PRDNER refers to the Puerto Rico Department of Natural and Environmental Resources.

52

Exhibit E: PREPA Management Presentation



# Palo Seco Steam Electric Station – Units 1 & 2

## Facility Overview

### Facility Overview

| | |
|---|---|
| **Location** | Cataño, Bayamon Region |
| **Water** | San Juan Bay and Puerto Rico Aqueduct and Sewer Authority (local municipal supply) |
| **Interconnection** | Interconnected to the 115-kV gas insulated switchyard that was newly installed in 2012 |
| **Plant Capacity** | Nameplate: 85 MW (Unit 1) / 85 MW (Unit 2)<br>Available + short-term outage: 0 MW (Unit 1) / 0 MW (Unit 2) |
| **COD** | 1959 |
| **Technology** | ST |
| **Fuel/ Supplier** | No. 6 Fuel Oil/ Freepoint Commodities |
| **Control System** | N/A |

### Operational Metrics

| | |
|---|---|
| **Availability**[1] | 47% (Unit 1) / 0% (Unit 2) |
| **Capacity Factor**[1] | 16% (Unit 1) / 0% (Unit 2) |
| **Minimum Load** | 40 MW (Unit 1) / 40 MW (Unit 2) |
| **Heat Rate**[2] | 10,200 Btu/kWh |
| **Ramp Rates** | Not applicable |
| **Start-Up Times** | Hot: 3 hours; Warm: 6 hours; Cold: 8 hours |

### Major Equipment

| | |
|---|---|
| **Steam Turbine** | General Electric |
| **Boiler** | Combustion Engineering |

Source: Independent Engineering Report, Palo Seco Steam Plant, May 2019.
1.   Reflects average value by unit for 2017 – 2019.
2.   Reflects original design full load heat rate, not current capability of units.

53

## Facility Photo



## Facility Highlights

- Palo Seco Units 1 and 2 are the oldest at this complex; both are expected to be retired in the near term
  - Unit 1 has an outage due to exciter and ground fault issues
  - Unit 2 is out of service indefinitely due to a water pump failure and is not expected to return to operation
- Facility was idled in August 2017 due to age and infrastructure concerns but was used to help with generation after the 2017 hurricanes while transmission issues in the south were addressed
- Palo Seco Units 1-2 are limited-use units under MATS, subject to an 8% heat input limit
- Units must be taken out of service for environmental outage at least every 18 months due to 1999 Consent Decree with EPA/DOJ
- Units are located in nonattainment area for the sulfur dioxide NAAQS and may be subject to restrictions or retirement or reductions in fuel sulfur content depending on results of sulfur dioxide state implementation plan

Exhibit E: PREPA Management Presentation



# Palo Seco Units 1 & 2: Major Maintenance and Future Plans

| | | |
|---|---|---|
| **Recent and Ongoing Projects** | **Historic use** | • In August 2017, due to age and infrastructure concerns, the plant was idled; however, after the 2017 hurricanes, the facility was used to help with electrical generation while the transmission issues with the south side of the island were addressed<br>• The site was used by FEMA for additional temporary generation; two FEMA-provided mobile gas turbine packages were connected through the Palo Seco Unit 2 electrical connection and removed in early 2019; the temporary gas turbines were 2 x 35.9-MW General Electric TM2500 units |
| | **Various Unit 1 Repairs** | • Some Unit 1 components have been replaced with components from Unit 2.<br>• Unit 1 had output issues due to excessive air infiltration in the ductwork, and a plan has been developed to help resolve these issues<br>• Severe corrosion is present on the northeast structural platforms and around the deaerator tank. The plant replaced many of these major structural sections and platforms<br>• Encapsulation and restoration were also used to improve the columnar steel interfaces with major foundations<br>• Palo Seco has been updated with newer controls and electrical switchyard infrastructure in recent years<br>• The generator for Unit 1 was rewound in 2008 after it was damaged in a fire |
| **Future Projects** | **Unit 1 Circulating Water System** | Currently, pump motor 1-1 is out of service, the entire assembly is removed for repair, and the piping is blanked off. One of the traveling screens was also removed for service. |
| | **Unit 2 Decommissioning** | Unit 2 is in extended layup and has been inoperable since 2016 due to a steam turbine and generator issue and is not expected to return to service. |

Source: Independent Engineering Report, Palo Seco Steam Plant, May 2019.

54



# Palo Seco Units 1 & 2: Historical Operating Summary

**Palo Seco Units 1 and 2 have had minimal operation and Unit 2 is out of service permanently.**

## Net Generation
*(GWh)*

## Capacity Factor
*(%)*

## Equivalent Availability Factor
*(%)*

## Equivalent Forced Outage Rate
*(%)*

**Note: Reflects calendar years. Consolidated averages are weighted by capacity. 2017 includes the impact of Hurricanes Irma and Maria.**
**Source: PREPA monthly operating reports.**






Exhibit E: PREPA Management Presentation

# Palo Seco Steam Electric Station – Units 3 & 4



## Facility Overview

| | | |
|---|---|---|
| **Facility Overview** | Location | Cataño, Bayamón Region |
| | Water Source | San Juan Bay and Puerto Rico Aqueduct and Sewer Authority (local municipal supply) |
| | Interconnection | Oil fuel, both heavy and diesel oil, from two separate pipelines. Municipal water and sewer are provided. Seawater is used as circulating water. |
| | Plant Capacity | Nameplate: 216 MW (Unit 3) / 216 MW (Unit 4) Available + short-term outage: 216 MW (Unit 3) / 165 MW (Unit 4) |
| | COD | 1967 (Unit 3) / 1968 (Unit 4) |
| | Technology | ST |
| **Operational Metrics** | Fuel / Fuel Supplier | No. 6 Fuel Oil / Freepoint Commodities |
| | Control System | N/A |
| | Availability[1] | 44% (Unit 3) / 5% (Unit 4) |
| | Capacity Factor[1] | 39% (Unit 3) / 4% (Unit 4) |
| | Minimum Load | 80 MW (Unit 3) / 80 MW (Unit 4) |
| | Heat Rate[2] | Full Load: 9,725 Btu/kWh Min Load: 10,347 Btu/kWh |
| | Ramp Rates | 3 MW per minute up / 3 MW per minute down |
| | Start-Up Times | Hot: 3 hours; Warm: 6 hours; Cold: 8 hours |
| **Major Equipment** | Steam Turbine | Westinghouse |
| | Boiler | Combustion Engineering |

## Facility Photo



### Facility Highlights

- Palo Seco Units 3 and 4 are the larger, bunker fuel-fired generating units located at the Palo Seco Steam Electric Station; both units are required for short-term standby services due to their location

  - Unit 3 is undergoing environmental and condenser maintenance

  - Unit 4 is limited to 165 MW due to boiler feed pump

- Units are subject to Particulate Matter emission limits and HCl/HF acid gas emission limits under MATS, as well as work-practice standards for tune-ups and startup/shutdown

- Units must be taken out of service for environmental outage at least every 18 months due to 1999 Consent Decree with EPA/DOJ

- Units are located in a nonattainment area for the sulfur dioxide NAAQS and may be subject to restrictions or retirement or reductions in fuel sulfur content depending on the results of the sulfur dioxide state implementation plan

Source: Independent Engineering Report, Palo Seco Steam Plant, May 2009.
1. Reflects average value by unit for 2077 – 2019.
2. Heat rates reflect assumption based on historic operating experience.

56



Exhibit E: PREPA Management Presentation

# Palo Seco Units 3 & 4: Major Maintenance and Future Plans



| Recent and Ongoing Projects | | |
|---|---|---|
| **Various Unit 3 Repairs** | • The generator for Unit 3 underwent a complete overhaul in 2008<br>• Unit 3 has a significant boiler derate due to having only one boiler feedwater pump in service and excessive ductwork air infiltration which is currently derating the unit by approximately 65 MW<br>• Boiler feedwater pump 3-2 is currently damaged and requires a new water seal<br>• Portions of the furnace wall and economizer are near their end of life<br>• Corrosion is present throughout the facility and is currently being maintained or repaired based on input from GE Power | |
| **Various Unit 4 Repairs** | • Unit 4 recently underwent a major steam turbine repair on the HP section, generator cooling fan, and rotor<br>• The turbine was removed for repairs, including restoration of corrosion damage present on the critical areas of the rotor shaft, bearing and sealing surfaces, and the machine casings<br>• Unit 4 batteries were recently replaced | |

Independent Engineering Report, Palo Seco Steam Plant, May 2019.

57



Exhibit E: PREPA Management Presentation



# Palo Seco Units 3 & 4: Historical Operating Summary

Palo Seco Units 3 & 4 are in the middle of the dispatch queue; however, they have various service challenges limiting their use.

Note: Reflects calendar years. Consolidated averages are weighted by capacity. 2017 includes the impact of Hurricanes Irma and Maria.
Source: PREPA monthly operating reports.

Partnership Committee Report – Puerto Rico Public-Private Partnership for the Puerto Rico Electric Power Thermal Generation Facilities

58

Exhibit E: PREPA Management Presentation



PUBLIC-PRIVATE
PARTNERSHIPS

# Palo Seco CT Peakers

## Facility Overview

| | |
|---|---|
| **Location** | Cataño, Bayamon Region |
| **Water Source** | San Juan Bay and Puerto Rico Aqueduct and Sewer Authority (local municipal supply) |
| **Interconnection** | Connected to 115-kV switchyard |
| **Plant Capacity** | Nameplate: 126 MW (21 MW for each of: Unit 1-1, 1-2, 2-1, 2-2, 3-1, 3-2) Available + short-term outage: 60 MW (~20 MW for each of: 1-1, 1-2, 2-1, 0 MW for 2-2, 3-1, 3-2) |
| **COD** | 1972-73 |
| **Technology** | Three blocks of diesel-fueled combustion turbine generators; each block is composed of two 21 MW (nominal) Hitachi-GE Frame 5 gas turbines with a single step-up transformer |
| **Fuel/Fuel Supplier** | No. 2 / Puma Energy Caribe, LLC |
| **Control System** | GE Mark II |

Source: Independent Engineering Report, Palo Seco Steam Plant, May 2019.

## Major Maintenance and Future Plans

- For Palo Seco, the IE Report indicates that the major equipment at site, while still mostly operable, is at the end of its design life

- In general, anticipated infrastructure maintenance and repair would not be cost effective for continued service largely due to the current extended non-use of much of the thermal equipment, extensive coastal corrosion impact across the plant and equipment, as well as safety concerns

- The plant has seen much lower operation since the September 2017 hurricanes

## Facility Photo



## Facility Highlights

- There are three blocks of diesel-fueled gas turbine generators; Each block is composed of two 21 MW (nominal) Hitachi-GE (PB5341) combustion turbine generators. In total, the three blocks, with six gas turbines, have a nameplate capacity of 126 MW (3 blocks x 42 MW)

- The units operate on No. 2 fuel oil, with no provision for natural gas supply on site

- Units 2-2, 3-1, and 3-2 cannot be operated and cannot be returned to service; PREPA applied for a construction permit for the Palo Seco Mobile Pac units subject to the retirement of these units

- PREPA has represented to PRDNER and EPA that these units are out of service and will be retired

- Units are located in a nonattainment area for the sulfur dioxide NAAQS and may be subject to restrictions or retirement or reductions in fuel sulfur content depending on results of sulfur dioxide state implementation plan.

Facility Overview

59




PUBLIC-PRIVATE
PARTNERSHIPS

Exhibit E: PREPA Management Presentation

# Palo Seco MobilePac Peakers

## Facility Overview

| | |
|---|---|
| **Location** | Cataño, Bayamon Region |
| **Water Source** | San Juan Bay and Puerto Rico Aqueduct and Sewer Authority (local municipal supply) |
| **Interconnection** | Tied into existing site interconnection feeds |
| **Plant Capacity** | 81MW (3 x FT8 design MobilePac units) |
| **COD** | 2019 |
| **Technology** | MHI/PWPS Aero-derivative combustion turbines |
| **Fuel/ Fuel Supplier** | Diesel (and NG capable) |
| **Control System** | MHI/PWPS control systems |

## Major Maintenance and Future Plans

- Units are the newest in the PREPA fleet

- Aside from standard maintenance practices, there are no major maintenance or specific projects identified

## Facility Photo




## Facility Highlights

- Three units were installed in 2019

- MobilePac units are considered quick start, high reliability, simply-packaged and designed to be mobile and capable for relocation

- Units are located in a nonattainment area for the sulfur dioxide NAAQS and may be subject to restrictions or retirement or reductions in fuel sulfur content depending on the results of the sulfur dioxide state implementation plan.

- These units may not legally be operated at this time and are the subject of a pending notice of violation; Permitting with PRDNER is in progress, and PREPA is involved in discussions with PRDNER and U.S. EPA to discuss permitting

- NOx injection controls must be operational, and permit must be obtained before these units can be operated.

Source: Independent Engineering Report, Palo Seco Steam Plant, May 2019.

60



Exhibit E: PREPA Management Presentation



# 4f. San Juan

Partnership Committee Report – Puerto Rico Public-Private Partnership for the Puerto Rico Electric Power Thermal Generation Facilities

61



Exhibit E: PREPA Management Presentation

# San Juan Aerial Site View

San Juan is comprised of two combined-cycle units (Units 5 and 6) in a 1x1configuration, including Westinghouse/Siemens W501FC GTs in a multiple-shaft configuration of one GT, one heat recovery steam generator (HRSG), one ST and two generators. The units are now dual fuel and can operate on either No. 2 fuel oil or natural gas, with steam injection for NOx control. The four conventional steam plants are heavy fuel oil-fired units and consist of a Combustion Engineering (now GE Power) fired natural circulation boiler, a GE condensing ST generator, and associated auxiliary equipment. Each ST unit is rated at 100 MW.





Partnership Committee Report – Puerto Rico Public-Private Partnership for the Puerto Rico Electric Power Thermal Generation Facilities

242

62



Exhibit E: PREPA Management Presentation

# San Juan Combined Cycle – Units 5 & 6

## Facility Overview

### Facility Overview

| | |
|---|---|
| **Location** | San Juan, San Juan Region |
| **Water** | San Juan Bay and Puerto Rico Aqueduct and Sewer Authority (local municipal supply) |
| **Interconnection** | Each unit-block has a dedicated MPT which is connected to the 115-kV switchyard. Unit 5 - underground cable; Unit 6 - overhead conductor. |
| **Plant Capacity** | Nameplate: 220 MW (Unit 5) / 220 MW (Unit 6) Available + short-term outage: 170 MW (Unit 5) / 200 MW (Unit 6) |
| **COD** | 2008 |
| **Technology** | Dual Fuel CCGT |
| **Fuel / Fuel Supplier** | Natural Gas & Low-sulfur Fuel Oil No. 2 / NFE and Puma Energy |
| **Control System** | Emerson Ovation |

### Operational Metrics

| | |
|---|---|
| **Availability[1]** | 75% (Unit 5) / 87% (Unit 6) |
| **Capacity Factor[1]** | 51% (Unit 5) / 63% (Unit 6) |
| **Minimum Load** | 120 MW (Unit 5) / 120 MW (Unit 6) |
| **Heat Rate[2]** | Full Load: 7,625 Btu/kWh / 7,853 Btu/kWh Min Load: 8,461 Btu/kWh / 8,856 Btu/kWh |
| **Ramp Rates** | 15 MW per minute up / 15 MW per minute down |
| **Start-Up Times** | 30 minutes for the gas turbines (hot, warm and cold) |

### Major Equipment

| | |
|---|---|
| **Combustion Turbine** | Westinghouse/Siemens 501FC |
| **Steam Turbine** | Ansaldo Energia |
| **HRSG** | Ansaldo Energia |
| **Environmental** | Steam injection; Unit 5 has Selective Catalytic Reduction and Oxidation Catalyst ("SCR/OxCat") system with aqueous ammonia |

## Facility Photo





### Facility Highlights

- The San Juan Combined-Cycle Power Plant began commercial operation in October 2008
- The facility is comprised of San Juan Units 5 and 6, which each operate in a 1x1 (CT x ST) configuration; each unit includes a gas turbine, a gas turbine generator, a heat recovery steam generator, a steam turbine and a steam turbine generator
- Facility is anticipated to remain a core asset in the generation fleet post-transformation
- New Fortress Energy provides offshore liquified natural gas storage and land-based regasification facilities
- Units are located in a nonattainment area for the sulfur dioxide NAAQS and may be subject to restrictions or retirement or reductions in fuel sulfur content depending on the results of the sulfur dioxide state implementation plan

Source: Independent Engineering Report, San Juan Power Plant, May 2009.
1.  Reflects average value by unit for 2017 – 2019.
2.  Heat rates reflect assumption based on historic operating experience.

Partnership Committee Report – Puerto Rico Public-Private Partnership for the Puerto Rico Electric Power Thermal Generation Facilities

243

Exhibit E: PREPA Management Presentation




# San Juan CC 5 & 6: Major Maintenance and Future Plans

| Recent and Ongoing Projects | | |
|---|---|---|
| **Natural Gas Fuel Conversion** | | GTs in Units 5 and 6 were converted to add natural gas fuel capability. The units are dual fuel capable now and can burn either natural gas or liquid fuel (#2 diesel). There is a New Fortress Energy contract to supply re-gasified liquefied natural gas to the San Juan site. All modifications to the combined-cycle units for firing natural gas was completed under this contract. |
| **Units 5 & 6 Derate** | | Units 5 & 6 are not able to run at full capacity: bypass valves are leaking, and a significant amount of steam is being dumped directly to the cold reheat and condenser. The steam turbines cannot operate at the full load output of 65 MW and both have been limited to approximately 50 MW each. |
| **Unit 5 Generator Rotor Repair** | | In 2012, the Unit 5 ST was opened due to poor alignment. Additionally, the Unit 5 generator rotor required repair, so the Unit 6 generator rotor was switched into Unit 5. Unit 6 currently has the Unit 5 generator rotor. Unit 5 subsequently received a major overhaul in 2014. |

Source: Independent Engineering Report, San Juan Power Plant, May 2019.

64





# San Juan Combined Cycle: Historical Operating Summary

**San Juan 5 & 6 are among the least expensive PREPA-owned units and are located close to the largest load center, Greater San Juan. These units are a key provider of base-load services.**

**Note: Reflects calendar years. Consolidated averages are weighted by capacity. 2017 includes the impact of Hurricanes Irma and Maria.**
**Source: PREPA monthly operating reports.**

65

Exhibit E: PREPA Management Presentation




# San Juan Steam Electric Station – Units 7-10

## Facility Overview



| | | |
|---|---|---|
| **Facility Overview** | **Location** | San Juan, San Juan Region |
| | **Water** | San Juan Bay and Puerto Rico Aqueduct and Sewer Authority (local municipal supply) |
| | **Interconnection** | Four MPTS associated with the steam plant are connected to the 115-kV switchyard through underground cable |
| | **Plant Capacity** | Nameplate: 100 MW (Unit 7) / 100 MW (Unit 8) / 100 MW (Unit 9) / 100 MW (Unit 10) Available + short-term outage: 70 MW (Unit 7) / 100 MW (Unit 8) / 40 MW (Unit 9) / 0 MW (Unit 10) |
| | **COD** | 1964 (Units 7 & 8) / 1965 (Unit 9) / 1965 (Unit 10) |
| | **Technology** | ST |
| | **Fuel / Fuel Supplier** | No. 6 Fuel Oil / Freepoint Commodities (delivered via transfer lines from Port of San Juan) |
| **Operational Metrics** | **Control System** | Emerson Ovation |
| | **Availability¹** | 33% (Unit 7) / 48% (Unit 8) / 34% (Unit 9) / 3% (Unit 10) |
| | **Capacity Factor¹** | 19% (Unit 7) / 10% (Unit 8) / 27% (Unit 9) / 0% (Unit 10) |
| | **Minimum Load** | 50 MW (Unit 7) / 50 MW (Unit 8) / 50 MW (Unit 9) / 50 MW (Unit 10) |
| | **Heat Rate²** | Full Load: 10,497 Btu/kWh / 10,445 Btu/kWh Min Load: 10,498 Btu/kWh / 10,498 Btu/kWh |
| | **Ramp Rates** | 3 MW per minute up / 3 MW per minute down |
| | **Start-Up Times** | Hot: 3 hours; Warm: 6 hours; Cold: 8 hours |
| **Major Equipment** | **Steam Turbine** | General Electric |
| | **Boiler** | B&W (Units 7 & 8) / Combustion Engineering (Units 9 & 10) |

Source: Independent Engineering Report, San Juan Power Plant, May 2019.
1. Reflects average value by unit for 2017 – 2019.
2. Reflects heat rates for Units 7 & 8, respectively. Heat rates also reflect assumption based on historic operating experience.

## Facility Photo

## Facility Highlights

- The facility is comprised of four units, each of which are 100 MW; All units, 7-10, are at the end of their design life
  - Units 7 is anticipated to remain operational for standby services while new generation is brought online
  - Unit 8's main power transformer is undergoing maintenance but is anticipated to return to service
  - Unit 10 is out of service indefinitely and is not expected to return to operations
- Units 9 and 10 have hydrochloric acid and hydrogen fluoride MATS limits; compliance is demonstrated by fuel moisture content <1%
- The open plant design exposes much of the equipment to coastal conditions, and the plant's poor condition is primarily the result of this design and location. The facility is a 1960s era oil-fired design and does not have the benefit of modern emissions controls or newer equipment
- Units 1-6 have been retired; but kept mostly in place

66

246



Exhibit E: PREPA Management Presentation

247

# San Juan Units 7-10: Major Maintenance and Future Plans

**Facility Highlights (continued)**

- Units 9-10 are subject to Particulate Matter emission limits and HCl/HF acid gas emission limits under MATS, as well as work-practice standards for tune-ups and startup/shutdown
- Units 7-8 are limited-use units under MATS; subject to 8% heat input limit
- Units must be taken out of service for environmental outage at least every 18 months due to 1999 Consent Decree with EPA/DOJ
- Units are located in a nonattainment area for the sulfur dioxide NAAQS and may be subject to restrictions or retirement or reductions in fuel sulfur content depending on the results of the sulfur dioxide state implementation plan

| Future Projects | | |
|---|---|---|
| **Decommissioning of Units 1-6** | The original plants (Units 1 through 6) were constructed using a ST building along the Port Authority on San Juan Harbor. These thermal units were installed in the 1950s and were rated at nominally 22 MW each. |
| **Decommissioning of Units 7-10** | As per IRP schedule. |

Source: Independent Engineering Report, San Juan Power Plant, May 2019.

67



# San Juan Units 7-10: Historical Operating Summary

**San Juan units 7 – 9 are primarily used to provide peaking services (unit 10 does not operate). Despite operational challenges, the units may be dispatched due to their proximity to San Juan where power supply is needed.**

## Net Generation
*(GWh)*

## Capacity Factor
*(%)*

## Equivalent Availability Factor
*(%)*

## Equivalent Forced Outage Rate
*(%)*

Note: Reflects calendar years. Consolidated averages are weighted by capacity. 2017 includes the impact of Hurricanes Irma and Maria.
Source: PREPA monthly operating reports.





# 4g. Standalone Peaking Sites

Exhibit E: PREPA Management Presentation

Partnership Committee Report – Puerto Rico Public-Private Partnership for the Puerto Rico Electric Power Thermal Generation Facilities

69



Exhibit E: PREPA Management Presentation

# Standalone Peaking Sites

## Peaking Gas Turbine Footprint

2 x Frame 5 GTs at each site

Vega Baja ●

Daguao ●

Yabucoa ●

● Jobos

## Peaking Gas Turbine Capacity and Status

| | Number of Units | Nameplate Capacity | Available + Short-term Outage Capacity | Primary Use |
|---|---|---|---|---|
| **Daguao** | 2 | 42 MW | 34 MW | Peaking Capacity |
| **Jobos** | 2 | 42 MW | 42 MW | Peaking Capacity |
| **Vega Baja** | 2 | 42 MW | 21 MW | System Reliability |
| **Yabucoa** | 2 | 42 MW | 0 MW | System Reliability |

70   Note: Information as of October 31, 2020.

## Peaking Gas Turbine Commentary

- In addition to the gas turbine peaking units installed at some of the larger generating sites, there are four standalone peaking sites

- These GT units are distillate-fired GE design Frame 5 machines with nameplate capacity of 21 MW each

- The peaking sites are generally small and self-contained, with one common MPT feeding the switchyard.

- Puma Energy-supplied diesel fuel is delivered by tanker truck (differing from the Palo Seco, Aguirre and Costa Sur peaking GTs, which are connected by pipeline)

- Currently, 97 MW are classified as either available or undergoing a short-term outage. Most sites are exhibiting their age, and these units have the fleet's lowest efficiencies; as many are nearing end of life.

  – Vega Baja Unit 2 has a combustion & stage failure

  – Yabucoa Unit 1 and 2 are on outage due to high temperature trips

| | Commentary |
|---|---|
| | Both units operational and derated, 1-1 at 18MW and 1-2 at 16MW. |
| | Both units operational. |
| | Unit 1-1 operational. Unit 1-2 on outage with return to service date TBD. |
| | Unit 1 and 2 on short term outage due to high temperatures; return to service is TBD. |



Exhibit E: PREPA Management Presentation

Partnership Committee Report — Puerto Rico Public-Private Partnership for the Puerto Rico Electric Power Thermal Generation Facilities

# Standalone Peaking Sites

**Jobos**



**Yabucoa**



**Daguao**



**Vega Baja**



71



# 5. Fuel Management

*Delis Zambrana - Senior Program Manager, PREPA*
*Edwin Barbosa - Fuel Office Administrator, PREPA*
*Dennis Zabala - Principal Advisor, Sargent & Lundy*

Exhibit E: PREPA Management Presentation

Partnership Committee Report – Puerto Rico Public-Private Partnership for the Puerto Rico Electric Power Thermal Generation Facilities

72

Exhibit E: PREPA Management Presentation



# Fuel Procurement Overview

**The entire legacy generation fleet is fossil fuel powered, requiring significant fuel resources to be imported to the island. Fuel is the largest cost component in PREPA's current electric rate.**

## Overview

- Fuel contracts are awarded through competitive RFP processes
  - Fuel oil and diesel contracts are typically 1-2 years in length; the FOMB usually requires a new RFP when the original contract expires
  - Natural gas contracts are typically longer; the NFE contract is 5 years and the Naturgy contract is 12 years
  - Fuel pricing is tied to market indices with a fixed adder for shipping and other supply charges
- In addition to the commodity cost, PREPA incurs additional costs related to logistical / transportation challenges and environmental compliance
- No. 6 fuel oil is delivered to the island at the CORCO pier in the south, then transported by barge to Aguirre, San Juan and Palo Seco
  - Pipelines transport No. 6 fuel oil from CORCO to Costa Sur (south) and from Palo Seco to San Juan
  - No. 2 fuel oil is delivered at San Juan by pipeline from Puma Energy's Caribe facility; it is also transported via barge to Cambalache, Mayaguez and Aguirre
  - No. 2 fuel oil is delivered to other, smaller combustion turbine peaker sites and Costa Sur (if necessary) via tank truck
- At Aguirre, Palo Seco, and San Juan, the sulfur dioxide state implementation plan may potentially require reductions in fuel sulfur content in the near future

### Key Fossil Fuel Suppliers

| Natural Gas | • Naturgy<br>• New Fortress Energy |
|---|---|
| Fuel Oil and Diesel | • Puma Energy Caribe<br>• Freepoint Commodities |
| Propane and Automotive Fuel | • Liquilux Gas Corp.<br>• Total Petroleum Puerto Rico by joint GSA contract |

## Historical Realized Fuel Prices

*($ / MMBtu)*



## Fossil Fuel Import Stations



Note: Pipelines (not shown) connect CORCO to Costa Sur, EcoElectrica to Costa Sur and Palo Seco to San Juan.



Exhibit E: PREPA Management Presentation

# Site Specific Fuel Information

| | Aguirre | Cambalache | Costa Sur | Mayaguez | Palo Seco | San Juan | Standalone Peakers |
|---|---|---|---|---|---|---|---|
| **Natural Gas Supply** | • N/A | • N/A | • Supplied via pipeline from EcoEléctrica • LNG stored in a 42m gallon insulated tank | • No NG supply for site • Each GT is configured to be capable of NG conversion if gas fuel becomes available | • No provision for natural gas supply on site but San Juan Harbor could supply natural gas to site | • Regasified LNG to the San Juan site is complete | • N/A |
| **Heavy Fuel Oil Supply (#6)** | • Delivered to port by barge; pipelines to multiple onsite storage tanks | • N/A | • Delivered to port by barge or vessel; pipelines to multiple onsite storage tanks | • N/A | • Delivered via transfer lines from docking station at Port of San Juan | • Delivered via transfer lines from docking station at Port of San Juan | • N/A |
| **Diesel Supply (#2)** | • Delivered to port by barge; pipelines to multiple onsite storage tanks | • Delivered by barge at port, then by pipeline up to on site storage tanks; tank truck deliveries also possible | • Delivered to port by tank truck or piping transfer from CORCO; pipelines to multiple onsite storage tanks | • Delivered by barge to Mayaguez port transfer station and then via pipeline to on site storage tanks | • Delivered via pipeline from Puma Energy to on site storage tanks | • Delivered via pipeline from Puma Energy to on site storage tanks | • Delivered by tank trucks to onsite storage tanks |
| **Propane Supply** | • Delivered by truck to tanks on site • Propane is used to ignite the burners on the boilers | • N/A | • Delivered by truck to fuel tanks on site • Propane is used to ignite the burners when natural gas is not available | • N/A | • Delivered by truck to tanks on site • Propane is used to ignite the burners on the boilers | • Delivered by truck to tanks on site • Propane is used to ignite the burners on the boilers | • N/A |

74

255



# Summary of Key Fuel Procurement Contracts

| Contract Counterparty: | Fuel Oil and Diesel | | Automotive Fuel | Other Fuel-Related | LNG | |
|---|---|---|---|---|---|---|
| | Puma Energy Caribe, LLC | Freepoint Commodities LLC | Total Petroleum Puerto Rico Corp. | Commonwealth Oil Refining Company, Inc. | Naturgy | NFEnergía LLC |
| **Fuel Type/Services** | Light distillate No. 2 fuel oil | Residual No. 6 fuel oil | Gasoline and ultra low sulfur diesel ("ULSD") | Terminalling services in Peñuelas | LNG | LNG |
| **Volume (Min/Max)** | • Min. volume is 75% of the plant requirements | • Max. volume of 1,650,000 barrels per month | None | • Maximum available capacity for PREPA is 1.454 MM barrels (6 tanks) | • Min. annual volume: 55 Tbtu • Max. annual volume: 106 Tbtu | • Max. annual volume 25 Tbtu |
| **Credit Allowance** | • $45M • 60 days to pay invoice | • $200M • 70 days to pay invoice | • 45 days to pay invoice | • Various; 5 – 30 days to pay | • 30 days to pay invoice | • 30 days to pay invoice |
| **Contract Start** | November 21, 2019 | August 1, 2019 | August 1, 2015 | June 10, 2020 | April 2, 2020 | March 5, 2019 |
| **Expiration** | November 20, 2021 | October 30, 2021 | November 1, 2022 | December 31, 2021 | September 30, 2032 | March 4, 2024 |
| **Price Structure** | Unit price ($ / bbl) using a fixed price differential plus an escalator factor, taking as reference the delivery date | For initial term: Unit price ($ / bbl) using an escalator plus a price differential, with 70-day credit term | Unit price ($ / gallon) using a fixed price differential plus an escalator factor and applicable taxes (ASG gas/diesel contract) | Various unit prices depending on function | • Contract start until 2021: 115% x Henry Hub + $5.80 • 2021: 115% x Henry Hub + $5.70 • 2022: 115% x Henry Hub + $5.60 • 1/2023–9/2032: 115% x Henry Hub + $5.50 | • Transition Period and months 1–12: $6.50 + 115% x Henry Hub + Natural Gas Manufacturing Surcharge • Months 13–24: $7.50 + 115% x Henry Hub + NGMS • Months 25 to end of Contract Term: $6.50 + 115% x Henry Hub + NGMS |
| **Fixed Price Differential** | • Up to 12M bbls: $30.00/bbl • 12M bbls to 3.6M bbls: $9.50/bbl • Greater than 3.6M bbls: $9.00/bbl | • Payment in "Early Payment Discount Period" (62nd day): San Juan and Palo Seco plants: $4.28; Aguirre and Costa Sur plants: $6.28 • Payment in "Full Payment Period" (72nd day): San Juan and Palo Seco plants: $7.71; Aguirre and Costa Sur plants: $9.78 | $0.2102/gallon (both gasoline and ULSD); $0.379/gallon (both gasoline and diesel) | Fee Schedules: • Storage: $130 per shell bbl/month • Loading: $0.144787 per shell bbl/month • Unloading: $0.144787/bbl • Blending: $0.005810/shell bbl per hour • Direct unloading: $0.21620 /bbl • Tank transfer: $0.06684-2 /bbl • Truck loading rack: $1.2790032 /bbl • Wharfage / dock maintenance: $0.05697 /bbl • Dockage: $0.25792 /ton /day | Not Applicable | Not Applicable |
| **Price Escalator** | Formulaic escalation | Formulaic escalation | Formulaic escalation | — | — | — |
| **Delivery of Fuel** | Seagoing vessel, barge, tank to tank transfer or tank truck | Barge or other type vessel | Via tank trucks to Technical Services Offices and Workshops; TOTAL fuel stations | Not Applicable | Pipeline interconnection between Costa Sur and EcoEléctrica generation facilities | Pipeline interconnection from NFE facilities in Port of San Juan |

Note: All contracts are available in Data Room.



# 6. Financial Projections
*Fernando Padilla – Deputy Executive Director of Operations, PREPA*

256

76

Exhibit E: PREPA Management Presentation

Partnership Committee Report — Puerto Rico Public-Private Partnership for the Puerto Rico Electric Power Thermal Generation Facilities

Exhibit E: PREPA Management Presentation



# Legacy Generation Financial Budget

**According to the 2021 Fiscal Plan, operating the Legacy Generation Assets is expected to cost $978M in FY21, including $725M in non-controllable expenses (fuel, variable O&M, etc.) and $253M in controllable costs.**

- The operating budget for the Legacy Generation Assets consists of "non-controllable" costs; costs for which the magnitude is out of the control of the operator and "controllable" costs which the operator has some ability to control through its management of the plant operations

- Costs are expected to decline through 2025 for several reasons, including:

  - Many legacy generation units are expected to retire in the coming years leading to a decrease in variable costs and major maintenance

    - The retirement schedule implicit in the 2021 Fiscal Plan differs from the IRP retirement schedule due to timing differences in publication dates – as a result, these financial budgets will change once the IRP compliance plan is filed by PREPA and approved by PREB; Appendix D provides the retirement schedule assumed in the Fiscal Plan

  - New generation coming online is expected to displace legacy generation leading to lower production over the forecast period



Source: 2021 Fiscal Plan for the Puerto Rico Electric Power Authority, June 29, 2020.
Note: "Non-controllable" expenses defined as fuel and variable O&M costs, "Controllable" defined as all other operating costs.
1. Implicit in the budget forecast is the Fiscal Plan's assumptions on asset retirements; this retirement schedule will change once PREPA files its IRP compliance plan.



Exhibit E: PREPA Management Presentation

# Legacy Generation Operating Budget

The Fiscal Plan's detailed operating budget for the Legacy Generation Assets is presented below, including:

- Average total operating expenses of $706M from FY22 to FY25;
- Average non-controllable expenses of $556M from FY22 to FY25;
- Average controllable expenses of $150M from FY22 to FY25; and,
- Average major maintenance of $49M from FY22 to FY25.

| $ in thousands | Actual | | | | PREPA | | 2020 Fiscal Plan | | | | | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FY 17 | FY 18 | FY 19 | FY 20 | FY 21 | FY 21 | FY 21 | FY 22 | FY 23 | FY 24 | FY 25 | |
| **Non-Controllable Operating Expenses** | | | | | | | | | | | | |
| Fuel Expenses | $1,187,353 | $799,343 | $1,378,913 | $1,329,340 | $813,967 | $684,782 | $621,072 | $588,832 | $491,841 | $432,743 | | [1] |
| Variable Operating Expenses | 56,425 | 38,330 | 54,875 | 53,513 | 53,513 | 40,003 | 29,589 | 23,450 | 18,994 | 16,656 | | |
| **Total Non-Controllable Expenses** | $1,243,778 | $837,673 | $1,433,788 | $1,382,854 | $867,480 | $724,785 | $650,661 | $612,282 | $510,836 | $449,399 | | |
| **Controllable Operating Expenses** | | | | | | | | | | | | |
| **Labor Operating Expenses** | | | | | | | | | | | | |
| Salaries & Wages | $43,330 | $31,293 | $35,140 | $36,408 | $37,765 | $37,910 | $38,889 | $39,395 | $38,316 | $37,272 | | |
| Pension & Benefits | 26,103 | 18,736 | 20,565 | 20,203 | 22,725 | 22,813 | 10,911 | 11,053 | 10,750 | 10,457 | | |
| Overtime Pay | 11,937 | 11,586 | 10,703 | 12,785 | 6,524 | 12,897 | 9,811 | 7,458 | 7,543 | 7,634 | | |
| Overtime Benefits | 1,341 | 996 | 1,089 | 1,625 | 783 | 1,568 | 1,177 | 895 | 905 | 916 | | |
| **Total Labor Operating Expenses** | $82,710 | $62,611 | $67,497 | $71,020 | $67,797 | $75,187 | $60,787 | $58,801 | $57,514 | $56,279 | | |
| **Non-Labor / Other Operating Expenses** | | | | | | | | | | | | |
| Materials & Supplies | $16,701 | $16,455 | $16,794 | $18,241 | $15,402 | $16,946 | $17,128 | $17,303 | $17,499 | $17,710 | | |
| Transportation | 3,293 | 2,003 | 2,221 | 2,296 | 2,779 | 2,755 | 2,784 | 2,813 | 2,844 | 2,879 | | |
| Property & Casualty Insurance | 16,871 | 16,907 | 33,774 | 33,720 | 35,510 | 35,510 | 35,896 | 36,258 | 36,669 | 37,112 | | [2] |
| Security | 7,732 | 8,107 | 8,873 | 8,353 | 9,277 | 9,277 | 9,377 | 9,473 | 9,580 | 9,696 | | [2] |
| IT Service Agreements | 2,625 | 1,569 | 4,696 | 3,332 | 6,475 | 6,475 | 6,545 | 6,612 | 6,687 | 6,767 | | [2] |
| Utilities & Rents | 1,610 | 1,537 | 1,537 | 1,940 | 6,534 | 1,434 | 1,449 | 1,464 | 1,481 | 1,499 | | |
| Outsourced Services | 283 | 130 | 375 | 1,027 | 4,978 | 6,072 | 6,137 | 6,200 | 6,270 | 6,346 | | |
| Other Miscellaneous Expenses | 5,346 | 4,705 | 4,351 | 7,613 | 8,048 | 10,677 | 10,792 | 10,902 | 11,026 | 11,159 | | |
| **Total Non-Labor / Other Operating Expenses** | $54,460 | $51,413 | $72,621 | $76,522 | $89,003 | $89,147 | $90,101 | $91,024 | $92,055 | $93,167 | | |
| **Total Controllable Operating Expenses** | $137,171 | $114,023 | $140,118 | $147,542 | $156,800 | $164,334 | $150,887 | $149,825 | $149,568 | $149,447 | | |
| **Total Operating Expenses** | $1,380,949 | $951,696 | $1,573,906 | $1,530,396 | $1,024,280 | $889,118 | $801,549 | $762,607 | $660,404 | $598,846 | | |
| **Major Maintenance** | $78,159 | $17,363 | $95,615 | $85,999 | $88,553 | $88,553 | $82,405 | $58,235 | $34,941 | $20,965 | | [3] |
| Operating Capacity (MW) | 2,827 | 2,827 | 2,827 | 2,827 | 2,827 | 2,827 | 2,770 | 2,665 | 2,356 | 1,998 | | |
| Operating headcount by year | 1,078 | 1,078 | 1,078 | 1,078 | 1,078 | 1,078 | 1,094 | 1,097 | 1,055 | 1,014 | | |

**Notes:**

[1] The variable costs for FY17-FY20 have been derived from the historical and forecast period by using asset production (either actual or projected) and variable O&M rates per the Siemens PROMOD runs that underpin the fiscal plan that were prepared in June 2020.

[2] Historical costs in FY17-FY19 derived from total PREPA costs based on the implied GenCo allocation from the fiscal plan budget. FY20 costs sourced from fiscal plan.

[3] Maintenance capital in FY21 excludes $9.9 million associated with the hydro generating units. No adjustments have been made for FY22-FY25.

[4] The 2020 PREPA Fiscal Plan can be found in the data room in folder 2.1.2.1.

[5] FY17-FY20 and the PREPA FY21 forecast have been prepared using the PREPA general ledger data.

Source: 2021 Fiscal Plan for the Puerto Rico Electric Power Authority, June 29, 2020; PREPA data.

78

Partnership Committee Report — Puerto Rico Public-Private Partnership for the Puerto Rico Electric Power Thermal Generation Facilities

Exhibit E: PREPA Management Presentation



# Asset-Level Budget Detail

**Below is a summary of historical site-level operating costs from FY14 – FY20. In addition to the site data there are two overhead cost categories including general and administrative and general repair parts and expenses.**

| $in thousands | FY 14 | FY 15 | FY 16 | Actual FY 17 | FY 18 | FY 19 | FY 20 |
|---|---|---|---|---|---|---|---|
| **Non-Controllable Operating Expenses** | | | | | | | |
| Aguirre | $762,693 | $657,956 | $380,138 | $371,079 | $341,406 | $515,339 | $537,651 |
| Cambalache and Mayaguez | 19,068 | 26,448 | 29,872 | 15,810 | 42,214 | 16,633 | 51,310 |
| San Juan | 536,531 | 416,890 | 293,804 | 368,643 | 116,649 | 316,331 | 340,000 |
| Palo Seco | 276,880 | 155,656 | 102,901 | 125,239 | 61,612 | 154,181 | 234,291 |
| Costa Sur | 758,389 | 645,510 | 417,936 | 363,007 | 275,792 | 431,303 | 219,602 |
| **Total Non-Controllable Expenses** | $2,353,560 | $1,902,459 | $1,224,651 | $1,243,778 | $837,673 | $1,433,788 | $1,382,854 |
| **Labor Operating Expenses** | | | | | | | |
| Aguirre | $29,086 | $25,238 | $23,761 | $21,947 | $15,592 | $17,886 | $17,501 |
| Cambalache and Mayaguez | 13,841 | 11,570 | 11,167 | 9,989 | 7,985 | 8,635 | 11,043 |
| San Juan | 21,795 | 18,096 | 17,135 | 16,309 | 13,323 | 12,150 | 13,698 |
| Palo Seco | 18,945 | 14,479 | 13,704 | 13,618 | 9,481 | 13,167 | 12,650 |
| Costa Sur | 20,929 | 19,021 | 18,243 | 17,216 | 13,924 | 12,668 | 12,972 |
| General | 2,515 | 2,016 | 2,008 | 2,291 | 884 | 1,519 | 1,590 |
| Engineering & Technical | 1,591 | 1,114 | 1,185 | 1,340 | 1,420 | 1,472 | 1,566 |
| **Total Labor Operating Expenses** | $108,701 | $91,533 | $87,204 | $82,710 | $62,611 | $67,497 | $71,020 |
| **Non-Labor / Other Operating Expenses** | | | | | | | |
| Aguirre | $6,740 | $6,085 | $6,411 | $7,997 | $5,557 | $6,306 | $6,496 |
| Cambalache and Mayaguez | 3,303 | 2,958 | 2,980 | 3,210 | 3,966 | 2,722 | 4,901 |
| San Juan | 8,617 | 7,284 | 8,671 | 6,566 | 6,345 | 6,097 | 8,562 |
| Palo Seco | 4,075 | 2,817 | 4,644 | 3,103 | 3,907 | 4,208 | 4,543 |
| Costa Sur | 5,681 | 4,484 | 4,979 | 5,708 | 4,805 | 5,392 | 4,101 |
| General | 286 | 305 | 229 | 27,573 | 26,660 | 47,662 | 47,622 |
| Engineering & Technical | 345 | 287 | 305 | 304 | 172 | 235 | 298 |
| **Total Non-Labor / Other Operating Expenses** | $29,047 | $24,222 | $28,220 | $54,460 | $51,413 | $72,621 | $76,522 |
| **Total Operating Expenses** | $2,491,307 | $2,018,214 | $1,340,074 | $1,380,949 | $951,696 | $1,573,906 | $1,530,396 |

Source: PREPA data.

79



# Major Maintenance Budget in FY21

PREPA projects to spend $88.6M in major maintenance in FY21, including a $10M surcharge associated with LNG supply delivered by New Fortress Energy at San Juan and improvements to the turbine generator at Costa Sur Unit 6.



$ in thousands

| Description | Amount |
| --- | --- |
| **Aguirre CC** | |
| Scheduled Maintenance Stag I Combined Cycle | $2,500 |
| Other | 1,000 |
| **Total** | **$3,500** |
| **Aguirre Steam** | |
| Generator Rehabilitation - Unit 2 | $4,200 |
| Mark Vie Controls Upgrade | 3,500 |
| Other | 6,713 |
| **Total** | **$14,413** |
| **Cambalache** | |
| Major Inspection "C" Unit 1-3 | $4,000 |
| Cambalache GT Unit Repairs | 300 |
| **Total** | **$4,300** |
| **Costa Sur** | |
| Turbine Generator Improvement Unit 6 | $5,000 |
| Boiler Feed Pump Barrel Assembly Units 5 and 6 | 1,500 |
| Other | 950 |
| **Total** | **$7,450** |
| **Mayaguez** | |
| Aerodervative Improvement | $2,000 |
| Mayaguez Station Control System Upgrade (HMI) | 200 |
| **Total** | **$2,200** |
| **Palo Seco GT** | |
| Portable Generators (20-30 kW) | $600 |
| Battery Bank Replacements | 600 |
| Breaker | 100 |
| **Total** | **$1,300** |

| Description | Amount |
| --- | --- |
| **Palo Seco Steam** | |
| Turbine Generator Improvement | $2,500 |
| Boiler Improvement Unit 4 | 2,500 |
| Boiler Improvement Unit 3 | 2,000 |
| Upgrade Foxboro 1,3 and 4 (Cyber Security) | 2,000 |
| Water Boxes Improvement (Condenser) - Unit 3 and 4 | 1,200 |
| Forced and Induced Fan Wing Control System - Unit 3 and 4 | 1,000 |
| Other | 990 |
| **Total** | **$12,190** |
| **San Juan Steam** | |
| Natural Gas Manufacturing Surcharge (LNG Supply) | $10,050 |
| Combined Cycle Improvement Unit 5 | 7,000 |
| Combined Cycle Improvement Unit 6 | 7,000 |
| Scheduled Maintenance HRSG - Unit 5 | 5,000 |
| Spare Bundle for Feeding Pumps - Unit 5 and 6 | 1,900 |
| DCS Foxboro Upgrade Unit 7, 8, 9 and 10 (Cyber Security) | 1,800 |
| Other | 2,050 |
| **Total** | **$34,800** |
| **General** | |
| Fuel Storage Tanks Improvement | $3,000 |
| Equipment for Production Division | 1,100 |
| Transformer for Generation Plant | 1,000 |
| Other | 3,300 |
| **Total** | **$8,400** |

Source: 2021 Fiscal Plan for the Puerto Rico Electric Power Authority, June 29, 2020.

80

Exhibit E: PREPA Management Presentation



# 7. Environmental Considerations

*Luisette Rios - Head of Environmental Protection and Quality Assurance, PREPA*

*Alfonso Baretty - Director of Planning and Environmental Protection, PREPA*

81



Exhibit E: PREPA Management Presentation



# Environmental Overview

## 1999 Consent Decree Covering PREPA's Baseload Generation Resources

- An Air Compliance Program (including O&M and monitoring) for PREPA baseload units to meet opacity limits and performance measures
- A Clean Water Act compliance program to meet wastewater discharge limitations
- The payment of stipulated penalties for Consent Decree violations
- Mandatory environmental outages at least every 18 months for baseload units, during which boilers and key components are cleaned and recalibrated to meet the opacity standards of the Consent Decree
- PREPA is in the process of negotiating a modification to the Consent Decree that would significantly streamline its obligations
- PREPA has not been able to complete the required annual NOx testing at the Aguirre, Palo Seco, and Costa Sur Power Plants

## MATS

- Applies to PREPA oil-fired baseload generating units, including San Juan Units 7-10, Aguirre Units 1-2, Palo Seco Units 1-4, Costa Sur Units 3-6
  - San Juan Units 7-8, Palo Seco Units 1-2 and Costa Sur Units 3-4 designated as limited-use units subject to 8% heat input limit
  - Remaining units must comply with emissions limits for Particulate Matter and acid gases and work practice standard requirements
- PREPA power plants have operated in noncompliance and/or have not timely conducted required testing/audits, which is anticipated to be resolved through a consent decree with the EPA in 2021

## EPA granted No-Action Assurances Following Hurricanes Irma and Maria in 2017 and Jan. 2020 Earthquakes

- No Action Assurances ("NAA") have been granted to PREPA for certain Clean Air Act requirements in the wake of natural disasters
  - Hurricanes: NAA issued on October 6, 2017, extended through July 31, 2018 for various requirements, including certain MATS requirements
  - 2020 Earthquakes: 3 NAAs issued for:
    - MATS Compliance: Issued on February 13, 2020 and extended until August 14, 2020, for certain requirements
    - Fuel Consumption and Analysis: Issued on January 31, 2020 and extended until August 14, 2020, for certain requirements
    - Internal Combustion Engines: Issued on January 31, 2020; expired on April 30, 2020

82

Exhibit E: PREPA Management Presentation



# Environmental Overview

## Nonattainment with the 1-hr Sulfur Dioxide National Ambient Air Quality Standard ("NAAQS")

- In Jan. 2018, San Juan and Guayama-Salinas areas were designated as nonattainment areas
- Nonattainment status means that new or modified generation units in these areas will be subject to nonattainment New Source Review ("NNSR") permitting requirements
- San Juan, Palo Seco and Aguirre will be subject to the state implementation plan ("SIP") that is currently under development by the Puerto Rico Department of Natural and Environmental Resources ("PRDNER")
- PRDNER did not submit the SIP to the United States Environmental Protection Agency ("EPA") by the October 2019 deadline
- In November 2020, EPA issued a Finding of Failure to Submit ("FFS") the SIP, with an effective date of December 3, 2020
  - FFS triggers an EPA obligation to promulgate a federal implementation plan within two years if EPA has not approved a SIP
  - The FFS triggers deadlines for EPA to impose sanctions if Puerto Rico has not made a complete SIP submittal, including:
    - 2-to-1 emission offsets if EPA has not determined PRDNER made a complete SIP submitted by June 3, 2022
    - Federal highway funding sanctions if EPA has not determined PRDNER made a complete SIP submittal by 6 months after the offset sanctions
  - SIP may require PREPA to restrict operations at generation units, retire generation units, or switch to fuel with reduced sulfur content, among other things
  - PREPA is working with EPA and PRDNER on attainment modeling to develop the SIP

## Preconstruction Permitting Requirements for New or Modified Facilities

- Construction of new, or modification of existing, facilities are potentially subject to the New Source Review permitting program
- Projects also require a permit to construct from PRDNER
- On January 22, 2021, EPA issued a Notice of Violation and Opportunity to Confer regarding the Palo Seco MobilePac Units.
  - EPA alleges that PREPA violated: 1) PSD requirements by failing to apply for and obtain a PSD construction permit, 2) NNSR permitting requirements because the units are located in a non-attainment area for SO2, and 3) New Source Performance Standards and National Emission Standards for Hazardous Air Pollutants
    - PREPA is conferring with EPA regarding the NOV







Exhibit E: PREPA Management Presentation

# Summary of Key Environmental Regulations Applicable to PREPA

| Law / Regulation | Summary |
|---|---|
| **MATS** | • Finalized in February 2012 and effective April 2015 for San Juan, Palo Seco and Costa Sur and April 2016 for Aguirre<br>• Imposes emission limits, monitoring and reporting obligations for mercury, acid gases and particulate matter<br>• Requires compliance with work practice standards for startups / shutdowns and tune-ups |
| **National Ambient Air Quality Standards** | • Clean Air Act sets NAAQS for criteria pollutants: ozone, particulate matter, CO, NOx, SO$_2$ and lead<br>• Standards look at emissions contributions from all sources (e.g., stationary and mobile facilities)<br>• In January 2018, the U.S. EPA finalized its determination that the San Juan and Guayama-Salinas airsheds are in nonattainment for the 1-hour SO$_2$ NAAQS due to the San Juan, Palo Seco, and Aguirre power stations<br>   – Puerto Rico must develop a SIP requiring that PREPA take measures to return Puerto Rico's nonattainment areas to attainment (to be achieved by 2023)<br>   – SIP may require PREPA to restrict operations at or retire generation units, or switch to fuel with reduced sulfur content, among other things |
| **New Source Review ("NSR") Permitting Program** | • New major sources and major modifications to existing sources that increase emissions by certain threshold amounts must obtain a permit:<br>   – Prevention of Significant Deterioration ("PSD") permit for sources in attainment areas<br>   – NNSR permit for sources in nonattainment areas<br>• If subject to NSR, sources in attainment areas must install Best Available Control Technology ("BACT"), while sources in nonattainment areas must install equipment to achieve the Lowest Achievable Emissions Rate ("LAER") and offset emissions, among other things |
| **Title V Permitting** | • PREPA's power plants are required to have a Title V Air Operating Permit under the Clean Air Act |
| **NSPS and NESHAP** | • Depending on the type of unit, PREPA generating units are subject to New Source Performance Standards ("NSPS") under Section 111 of the Clean Air Act and 40 C.F.R. Part 60, including the NSPS for stationary combustion turbines (Subpart KKKK), electric generating units (subpart TTTT), and stationary compression ignition internal combustion engines (Subpart IIII)<br>• Depending on the type of unit, PREPA generating units are subject to National Emission Standards for Hazardous Air Pollutants ("NESHAP") under Section 112 of the Clean Air Act and 40 C.F.R. Part 63, including MATS (Subpart UUUUU), as well as the NESHAP for stationary combustion turbines (Subpart YYYY) and reciprocal internal combustion engines (Subpart ZZZZ) |
| **Greenhouse Gas Emission Standards** | • NSPS for Electric Utility Generating Units was finalized in 2015 under Clean Air Act Section 111(b)<br>   – If new power plants are built, or existing plants are reconstructed or modified, the NSPS may apply<br>• Puerto Rico is not subject to the Affordable Clean Energy Rule, i.e., Emissions Guidelines for Existing Electric Generating Units under Clean Air Act Section 111(d)<br>• D.C. Circuit Court of Appeals vacated the Affordable Clean Energy rule<br>• The new Administration is expected to propose a new regulation under Section 111(d) |

84



# Summary of Key Environmental Regulations

| Law / Regulation | Summary |
|---|---|
| **Clean Water Act / Puerto Rico Water Quality Standards** | • PREPA's four major baseload power plants are each required to have a National Pollutant Discharge Elimination System ("NPDES") permit; renewals must be applied for every five years<br>• Pursuant to Clean Water Act Section 316(b), the EPA promulgated final regulatory standards for cooling water intake structures, requiring covered facilities to reduce the impingement and entrainment of marine life by water intake structures [Placeholder for Section 316(b) language from Luisette]<br>• Under the Clean Water Act, Puerto Rico publishes and maintains water quality standards and regulations to protect, preserve, maintain and enhance the quality of water in Puerto Rico compatible with the social and economic needs of the people of Puerto Rico |
| **Spill Prevention, Control, and Countermeasure ("SPCC") Program** | • Section 311 of the Clean Water Act imposes requirements for prevention, preparedness, and response to oil discharges<br>• PREPA is required to prepare and update SPCC Plans for its generation facilities<br>  ◦ PREPA is behind schedule for on updating some of its plans, which must be updated every 5 years<br>• Requires integrity testing for oil storage tanks at PREPA's generation facilities<br>  ◦ PREPA is behind schedule on integrity testing for some of its oil storage tanks |
| **Underground Injection Control ("UIC") Regulation** | • PREPA has UIC facilities for the disposal of sanitary waste at most of its generation facilities that are regulated under PRDNER's Underground Injection Control regulations<br>• Generally, must either obtain a permit to operate the UIC or implement an alternate compliance plan to close the UIC<br>• PRDNER has approved alternate compliance plans for the septic systems at the San Juan, Aguirre, and Palo Seco power plants, but monitoring and closure activities are still in progress<br>• An alternate compliance plan for Costa Sur was submitted to PRDNER, but remains under consideration<br>• The UIC facilities have been closed at Mayaguez and Culebra<br>• PREPA needs to develop and submit alternative compliance plans for Jobos, Yabucoa, and Daguao |
| **Safe Drinking Water Act ("SDWA")** | • PREPA's Aguirre and Costa Sur power plants have public water systems that must comply with SDWA requirements<br>• Under the SDWA, PREPA's public water systems are subject to sampling and reporting requirements and maximum contaminant levels |
| **Palo Seco Superfund Site** | • The Site includes the Palo Seco Power Plant, a depot area, and the former Bayamon river channel.<br>• The site was not placed on the Superfund National Priorities List and was addressed via other Superfund authorities.<br>• PREPA entered into administrative order on consent with EPA to conduct a remedial investigation/feasibility study<br>• In the Record of Decision for the Site, EPA concluded that the "no additional action decision under CERCLA for the PREPA Palo Seco Site is believed to be protective of human health and the environment."<br>• PREPA maintains monitoring wells onsite and offsite, some of which contain free product/diesel, with small amounts of PCBs.<br>• PREPA plans to install free product recovery equipment. |

85



Exhibit E: PREPA Management Presentation

# Summary of Key Environmental Regulations

| Law / Regulation | Summary |
|---|---|
| **Resource Conservation and Recovery Act ("RCRA"):**<br><br>**Hazardous Waste Management** | • Various PREPA generation facilities are regulated as RCRA generators of hazardous waste and have obtained a RCRA ID Number from EPA<br>• Many generation facilities are currently either Very Small Quantity Generators or Small Quantity Generators<br>• PREPA generation facilities also are small quantity handlers of universal wastes (e.g., lamps, batteries) |
| **Toxic Substances Control Act ("TSCA"):**<br><br>**Polychlorinated Biphenyl ("PCB") Program** | • PREPA transformers and electrical equipment are regulated under TSCA if they contain oil with more than 49 ppm PCBs<br>• Requirements govern storage, disposal, spills, marking, and recordkeeping<br>• There are a handful of transformers at each generation facility<br>• There are generally one to two step-up/step-down transformers at the switchyards of the generation facilities.<br>• There are also transformers associated with each generation unit: (i) one to two main power transformers that provide power to the switchyard/grid, and (ii) normal service station transformers, which provide power to auxiliary equipment<br>• Because of the age of many of the generation facilities, transformers and other electrical equipment in the switchyards may contain PCBs<br>• EPA regulations establish assumptions to be applied in instances where the PCB concentration of a transformer or other electrical equipment has not been established |
| **Emergency Planning and Community Right-to-Know Act** | • PREPA generation facilities must file Toxic Release Inventory Form R reports and/or Tier II reports under EPCRA |

86

Partnership Committee Report -- Puerto Rico Public-Private Partnership for the Puerto Rico Electric Power Thermal Generation Facilities

Exhibit E: PREPA Management Presentation



# Environmental Compliance and Recent Upgrades

## Environmental Compliance Strategy

### MATS

- MATS compliance strategy will reflect PREPA's Integrated Resource Plan and will rely on retirement / reduced output at existing plants

  – Retire noncompliant generation as new capacity comes online

  – Limit output of oil-fired steam units to qualify as limited-use liquid oil-fired units (must operate below threshold of 8% heat input capacity factor averaged over a 24-month block period)

- On August 24, 2020, PREB issued its final order on the IRP, approving in part and disapproving in part PREPA's proposed IRP

- Negotiations with the EPA regarding the Consent Decree for MATS Compliance are expected to commence in 2021

### Clean Water Act Section 316(b)

- In order to comply, PREPA will replace the cooling water intake screens at all applicable facilities with improved traveling screens

  – These screens loop in an elliptical, allowing trapped marine to escape through an outflow channel, limiting marine life loss

  – Engineering study to select alternative for impingement and entrainment compliance requirements; preferred alternative: dual flow travelling screens and integrated vessel into dedicated fish return system through new outfall separate from existing debris trough system

  – Design work is complete for Costa Sur and Aguirre

  – Design work for Palo Seco and San Juan is in progress

87

## Recent Environmental Upgrades

- **FY 2006:** completed fuel upgrades at Palo Seco, San Juan, Aguirre and Costa Sur so fuel sulfur content does not exceed 0.5% by weight

- **FY 2007:** completed projects to reduce NOx emissions at Palo Seco, San Juan, Aguirre and Costa Sur

- **FY 2011 – 2012:** Costa Sur Units 5 and 6 converted to dual fuel (natural gas and residual oil), with modifications to support continued full load operation with all-gas firing

- **FY 2011:** completed installation of signage and spill response material at substations

- **FY 2013 – 2015:** completed construction of compliance containment at substations that needed to be upgraded

- **FY 2013:** performed remediation at major generating stations

- **FY 2014:** funded section 316(a) and (b) Clean Water Act projects at Costa Sur related to mitigation of the cooling water intake and discharge systems

  – Completed rehabilitation of Costa Sur's outflow channel walls in FY 2012

  – Total upgrade projects are expected to be completed in FY 2021

- **FY 2018:** replaced the water treatment system at San Juan

- **FY 2020:** converted San Juan Units 5–6 to dual-fired with natural gas; SCR/OxCat is being installed on Unit 5; performance testing required



267



# 8. Safety

*Shehaly Rosado – Head of Occupational Safety, PREPA*

Exhibit E: PREPA Management Presentation



# PREPA Safety Actions and Initiatives

PREPA began to implement DuPont's recommendations and Industry Safety Standards; however, progress slowed due to emergency hurricane recovery efforts. Work to improve safety standards continues.

## Ongoing Safety Programs

- Following the release of a third-party safety study, the 2014 DuPont report,[1] PREPA identified certain key recommendations to begin implementing into their system:
  - Safe Operational Leadership
    - Review safety vision, principles and standards
    - Review / define roles and responsibilities for all levels within the organization
    - Continued safety leadership training and development for line management
  - Management System
    - Develop, train and support a safety observation process
    - Improve the incident investigation process
    - Continued incident investigation training and support
    - Develop and improve a Contractor Safety Program
  - Worker Engagement
    - Build effective 2-way communication process to engage workers
    - Deploy motivational systems, including rewards and recognition programs
- There are additional safety considerations for natural gas use in San Juan, Costa Sur, and potentially LNG storage at Palo Seco

## PREPA Safety Actions

**Emergency Action Plan ("EAP")**
- Evacuation Plan
  - Verification route
  - Drills and exercises
- Revised and updated all Corporate Emergency Action Plans
  - Natural disasters
  - Active Shooting

**Safety Workshops for:**
- Municipality workers
- General communities

**Internal Safety Distributions and Alerts**
- Asegurate / Alertas
- Special Flash News

**Contractor Safety Briefings**

**Protective Equipment Suppliers**
- Extended contract times
- Develop new contract for uniform suppliers

**Dielectric Test**
- Develop a services contract

**Industrial Hygiene**
- Develop a professional services contract for 3 new Hygienists

**Safety Training and Re-Training**
- Supervisor and managers
- General workers
- Develop new corporate training
- Re-training operational workers, linemen, crane operators, heavy equipment operators, etc.

**Safety and Health Month Celebration**

## PREPA Safety Committees[2]



**UTIER**
- Address work health/safety issues impacting employees
- Implement investigation procedures
- safetyutier@prepa.com

**UEPI**
- OSHA and safety training
- safetyuep@prepa.com

**UITICE**
- Participate in Safety and Health corporate activities
- safetyuitice@prepa.com

1.  In 2014, DuPont Sustainable Solutions conducted a Workplace Safety Assessment Report for PREPA which revealed poor safety conditions and culture within PREPA.
2.  In addition to PREPA Safety Committees, all emails will also be sent to PREPA Occupational Safety Division at safety@prepa.com.

89

Exhibit E: PREPA Management Presentation



# Health & Safety Overview

**PREPA's historical OSHA safety statistics have trended downwards (improved) in recent years; however, they are still significantly above the average for U.S. utilities.**



**Historical Recordable Incident Rate ("IR")**
*(per 200,000 hours)*

■ PREPA   — U.S. Power Generation Utilities Avg. (2019)

| 2017 | 2018 | 2019 | 2020 |
|------|------|------|------|
| 10.2 | 9.0  | 7.9  | 1.8  |

1.1

**Lost Time Case Rate ("LTC")[1,2]**
*(per 200,000 hours)*

■ PREPA

| 2017 | 2018 | 2019 | 2020 |
|------|------|------|------|
| 3.7  | 3.9  | 3.5  | 1.5  |

**Historical Days Away, Restricted, or Transferred ("DART")[1,2]**

■ PREPA   — U.S. Power Generation Utilities Avg. (2019)

| 2017 | 2018 | 2019 | 2020 |
|------|------|------|------|
| 3.7  | 3.9  | 3.5  | 1.5  |

0.6

**Severity Rate[1]**

■ PREPA

| 2017 | 2018 | 2019 | 2020 |
|------|------|------|------|
| 38.5 | 32.8 | 20.1 | 20.8 |

Source: PREPA historical data, OSHA data.
Note: Data is in calendar years; 2019 is latest available U.S. Utilities OSHA data. All metrics represent the simple facility average across the legacy generation fleet.
1.  U.S. utilities average is not available for LTC and Severity Rate.
2.  LTC and DART metrics are the same because Restricted Work hours in the DART calculation are equal to zero.

90



# 9. Human Resources

*Nydza Irizarry Algarín – Director of Human Resources and Labor Affairs, PREPA*

Exhibit E: PREPA Management Presentation

Partnership Committee Report – Puerto Rico Public-Private Partnership for the Puerto Rico Electric Power Thermal Generation Facilities

91

Exhibit E: PREPA Management Presentation

# Generation Workforce Overview

**PREPA's Generation Directorate employs a large workforce of key personnel with valuable experience that can be leveraged by a potential private party.**

## Workforce Overview

- The Generation Directorate employs a total of 1,011 employees across two different unions

- PREPA workforce is ~74% unionized, with the majority (559) of unionized employees being members of the Union de Trabajadores de la Industria Electrica y Riego de Puerto Rico ("UTIER")

  – The collective bargaining agreements ("CBAs") with each of the unions remain in effect under an evergreen clause

  – The CBAs tends to restrict the manner PREPA can efficiently manage and deploy its human resources

- In addition to the labor unions, Generation has 10 trust positions, 249 management positions and 193 temporary workers

  – These are positions directly appointed and approved by PREPA's CEO and the Board of Directors

  – In general, all directorships, high-level management, are trust positions

  – Historically, a political shift in the local government results in a change of the CEO and the majority of the trust employees. Most trust employees revert to former career staff positions

  – The change of trust employees creates inefficiencies and continuity challenges

  – The use of trust positions is part of the organizational structure of the government it is not unique to PREPA

  – Act 4-2016 prohibits executive-level employees from participating in political activities

| Division | Average Annual Salary¹ ($ in thousands) | Total Annual Labor Costs ($ in millions)² |
|---|---|---|
| Generation Engineering, Technical Service & Administration | 34.5 | 8.9 |
| Distributed Peaker Sites | 35.7 | 9.0 |
| Aguirre | 40.7 | 13.5 |
| San Juan | 40.2 | 9.4 |
| Costa Sur | 39.5 | 11.1 |
| Palo Seco | 41.2 | 8.8 |
| **Total** | **38.6** | **60.6** |

1. Current applicable compensation for active employees is as of September 9, 2020 and includes regular compensation and pension, medical and other benefits. Does not including overtime and overtime benefits.
2. Reflects staffing levels as of September 9, 2020, summed to the relevant group and annualized assuming no new hires or retirements.



Exhibit E: PREPA Management Presentation

# PREPA Union Labor Overview (Generation Directorate)

## Labor Contract Overview

### Generation Union Workforce Breakdown



Employees By Union: 721 employees — UTIER 95%, UEPI 5%

Compensation By Union: $41M Total — UTIER 94%, UEPI 6%

|  | UTIER | UEPI |
|---|---|---|
| **Union Name** | UTIER | UEPI |
| **Union Description** | • Employees related to the O&M of PREPA's electrical and irrigation systems • Engineering division employees, including all office workers and draftsmen • Any other officer in the construction of substations, electrical aerial and underground T&D lines | • All professional employees, excluding executives, supervisors, confidential employees, employees closely allied to management and any employee with power to employ, dismiss, promote, discipline or otherwise vary the status of employees |
| **Effective Date** | August 24, 2008 | September 15, 2014 |
| **Contract Length** | 4 years (Evergreen Provision in Place) Act 3, 2017 until June 2021 | 4 years (Evergreen Provision in Place) Act 3, 2017 until June 2021 |
| **Employees Covered** | 685 | 36 |
| **Average Salary** | $35,045 | $45,458 |
| **Total Compensation of Covered Employees** | $38.2M | $2.6M |

*Contract Summary*
*Employee Demographics*

Note: Statistics reflect staffing levels and current compensation levels (excluding overtime and overtime benefits) as of September 9, 2020.

93

This page has been intentionally left blank.

# Exhibit F:
# Summary of O&M Agreement

This page has been intentionally left blank.



# SUMMARY OF OPERATION AND MAINTENANCE AGREEMENT FOR THE PUERTO RICO THERMAL GENERATION FACILITIES

*This summary of the principal terms and conditions of the operation and maintenance agreement for the Puerto Rico thermal generation facilities (the "**O&M Agreement**") is provided for convenience and should not be relied upon in lieu of the O&M Agreement. In the event of any conflict between this summary and the O&M Agreement, the O&M Agreement controls. Capitalized terms used in this summary and not otherwise defined herein have the meaning set forth in the O&M Agreement.*

| Term | Summary |
|------|---------|
| **Parties** | [The Puerto Rico Electric Power Authority][PREPA Genco, LLC] (["**PREPA**" or][1] "**Owner**"); The Puerto Rico Public-Private Partnerships Authority (the "**Administrator**"); and Genera PR, LLC ("**Operator**"), a limited liability company organized under the laws of Puerto Rico. Genera Management LLC, in its sole capacity as Management Co and for purpose of the references to Management Co, signs an acknowledgement to the O&M Agreement. |
| **Purpose** | The O&M Agreement awards the right to provide (i) the services provided in order to manage, operate, maintain, repair, restore, replace and other related services for the base-load generation plans and combustion turbine peaking units listed on Annex I (*Legacy Generation Assets*) (the "**Legacy Generation Assets**"), as well as optimize (including fuel and efficiency) if approved by PREB, commencing on the Service Commencement Date (all such services, the "**O&M Services**"), (ii) the services provided prior to the Service Commencement Date in order to complete the mobilization and handover to Operator of the operation, management and other rights and responsibilities with respect to the Legacy Generation Assets pursuant to the O&M Agreement, including the services contemplated by the Mobilization Plan (all such services, the "**Mobilization Services**"), (iii) the services provided in order to complete the dismantlement and removal of the structures comprising the Legacy Generation Assets, and all other activities indispensable for the retirement, dismantlement, Decontamination or storage of the Legacy Generation Assets, including the services contemplated by the Decommissioning Plan, in each case in compliance with Applicable Law and in accordance with the Integrated Resource Plan (all such services, the "**Decommissioning Services**"), and (iv) the services provided in order to complete the demobilization and handover of the rights and responsibilities, if any, with respect to the Legacy Generation Assets, back to Owner or to a successor operator upon the early termination or expiration of the Term, including the services contemplated by Demobilization Plan (all such services, the "**Demobilization Service**s"), in each case, subject to the terms and conditions of the O&M Agreement. (§1.1 and §5.1) |

---

[1]  If the reorganization of PREPA occurs after the execution of the O&M Agreement, then PREPA will be the signatory and assign the agreement to PREPA Genco, LLC, upon completion of the reorganization.



| Term | Summary |
|------|---------|
| **Effective Date** | The O&M Agreement becomes effective on the date it is executed by the Parties (the "Effective Date"), and includes the following conditions precedent to the Effective Date: (i) receipt by Parties of the approvals required under Act 120, in form and substance reasonably acceptable to Administrator and Operator; (ii) receipt by Owner of the Guarantee; (iii) receipt by Owner of a copy of a certificate as to certain matters of Commonwealth law duly executed by Operator; (iv) receipt by Owner of a Tax Opinion and receipt by Operator of a Reliance Letter; (v) receipt by Owner of a Sworn Statement executed by Operator; (vi) receipt by Operator of, and written agreement to be subject to, the obligations under the Consent Decree and the jurisdiction of the United States District Court for the District of Puerto Rico in connection with the Consent Decree; (vii) receipt by Administrator of a communications plan in a form reasonably satisfactory to Administrator; (viii) receipt by Administrator of an organizational conflict of interest policy in the final form agreed to by Administrator and Operator; (ix) a final plan for the reorganization of PREPA having been filed with the applicable Government Bodies; and (x) execution of a protocol agreement among Operator, Administrator, Owner, and the FOMB, which shall (A) include provisions governing the FOMB's interaction with the Parties with respect to the respective duties of the FOMB and Owner under PROMESA, which shall apply only during the period the FOMB is in existence and Owner is a covered territorial instrumentality pursuant to PROMESA and (B) have a set of rules for the period during Title III and a separate set of rules triggered by the Title III Exit. (§2.2) |
| **Mobilization Period and Service Commencement Date** | 1. Prior to the Service Commencement Date, Operator shall provide the Mobilization Services. (§4.1)<br><br>2. As compensation for the Mobilization Services, Owner or Administrator shall pay Operator an aggregate amount equal to (i) the hourly fully allocated cost rate for each category of Operator employee or Affiliate personnel providing Mobilization Services, as set out in Annex XI (*Mobilization Hourly Fully Allocated Rates*); *multiplied by* (ii) the number of hours worked by each Operator employee or Affiliate personnel in such category providing Mobilization Services; *plus* (iii) all other reasonably necessary and documented costs and expenses incurred by Operator (without markup for Operator profit) in the course of providing the Mobilization Services. The aggregate Mobilization Service Fee shall not exceed US$15,000,000 (the "**Mobilization Service Fee Cap**"). If the aggregate Mobilization Service Fee paid to Operator reaches 70% of the Mobilization Service Fee Cap, Operator shall provide notice to and meet with Administrator to discuss and review the pending Mobilization Services necessary to complete the Mobilization Plan and the cost thereof. (§4.6)<br><br>3. The "**Service Commencement Date**" is the date on which a handover to Operator of the O&M Services occurs, which shall be the first Business Day of a calendar month that is at least three Business Days following the date on which Administrator confirms that all Service Commencement Date Conditions have been satisfied or waived. (§4.7(b)) |

| Term | Summary |
|------|---------|
| **Service Commencement Date Conditions** | The "**Service Commencement Date Conditions**" include: (i) fulfillment by Operator of its obligations with respect to the Mobilization Period under the O&M Agreement (including (A) completion of the Mobilization Plan and Handover Checklist, (B) confirmation of the Guarantee and the Required Insurance, (C) interview and evaluation of candidates for employment at Operator, (D) offers of employment to all fulltime plant Owner Employees employed and in good standing as of June 30, 2022 and (E) execution of the joinder agreement to the PREPA-Genco-Hydroco Operating Agreement;[2] (ii) fulfillment by Owner and Administrator of their respective obligations with respect to the Mobilization Period under the O&M Agreement (including (A) completion of the Mobilization Plan, (B) pre-funding of the Service Accounts and (C) procurement and delivery of Fuel to each Legacy Generation Asset); (iii) issuance of all Commencement Date Governmental Approvals; (iv) acceptability and effectiveness of documents and instruments identified in Article 4 (*Mobilization Period*); (v) no Governmental Body having enacted or enforced any Applicable Law, and no injunction being in effect, that would make it illegal for, or prohibit or enjoin, any Party's performance of its obligations under the O&M Agreement; (vi) update by a qualified environmental consultant of the Baseline Environmental Study; (vii) finalization of the Initial Budgets (including any amendment thereto) and issuance by PREB of a Rate Order sufficient to fund the Initial Budgets and (viii) receipt by Operator of the Tax Decree. (§4.5) |

---

[2] The "**PREPA-Genco-Hydroco Operating Agreement**" is the operating agreement that provides for certain rights and responsibilities, including fuel and non-fuel budgeting and account funding, the demarcation of the Legacy Generation Assets, dispatch and shut down procedures and protocols, planned maintenance communications, switching and clearance procedures, access to plant substations and other related equipment, and agreed upon requirements and procedures related to annual performance tests.

| Term | Summary |
|------|---------|
| **Failure of Service Commencement Date Conditions** | 1. If (i) the Service Commencement Date does not occur by the date that is 90 days following the Target Service Commencement Date or such other later date as Administrator and Operator may agree and (ii) the failure to of the Service Commencement Date to occur is not caused by any Force Majeure Event or Owner Fault, Operator shall pay to Owner Delay Liquidated Damages in the amount of US$1,000,000 per week for each week the Target Service Commencement Date is delayed beyond such period, up to a maximum of US$15,000,000. Operator shall not be required to pay Delay Liquidated Damages after the earlier of (A) the date on which the Operator Service Commencement Date Conditions are satisfied by Operator or waived by Administrator or (B) the date of termination of the O&M Agreement for failure of the Service Commencement Date to occur. (§4.8(a)) |
| | 2. Administrator shall have the right, subject to approval by PREB, to terminate the O&M Agreement if (i) all of the Owner Service Commencement Date Conditions are satisfied but any of the Operator Service Commencement Date Conditions are not satisfied by Operator or waived by Administrator by a date that is six months following the Target Service Commencement Date or (ii) any of the Service Commencement Date Conditions are not satisfied or waived by each of Administrator and Operator by the date that is nine months following the Target Service Commencement Date. (§4.8(b)(i) and §4.8(b)(iii)) |
| | 3. Operator shall have the right to terminate the O&M Agreement if (i) all of the Operator Service Commencement Date Conditions are satisfied but any of the Owner Service Commencement Date Conditions are not satisfied by Owner or waived by Operator (unless such failure to satisfy the Owner Service Commencement Date Conditions is the result of the acts, omissions or breach of Operator) by the date that is six months following the Target Service Commencement Date or (ii) any of the Service Commencement Date Conditions are not satisfied or waived by each of Administrator and Operator by the date that is nine months following the Target Service Commencement Date. (§4.8(b)(ii) and §4.8(b)(iii)) |
| | 4. In the event of the termination of the O&M Agreement for failure of the Service Commencement Date to occur, Operator shall (i) retain any Mobilization Service Fee earned as of the effective date of such termination, and shall within five Business Days of the effective date of such termination, return to Administrator any amounts held in the Mobilization Account in excess of any earned Mobilization Service Fee and (ii) pay any accrued and unpaid Delay Liquidated Damages as of the effective date of such termination. (§4.8(b)(v)) |
| | 5. In addition to and notwithstanding anything to the contrary in Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*) of the O&M Agreement, in the event the O&M Agreement is terminated prior to the Service Commencement Date other than as a result of the acts, omissions or breach of Operator, Operator shall be reimbursed for any reasonable and documented costs and expenses incurred by Operator (without markup for Operator profit) that are necessary and reasonable in the course of terminating the activities undertaken in connection with the Mobilization Services, including reasonable and documented breakage fees for any Subcontractors providing Mobilization Services. (§4.8(b)(vi)) |



| Term | Summary |
|------|---------|
| **Term** | 10³ years from the Service Commencement Date (the "**Initial Term**") with option to extend, for some or all of the Legacy Generation Assets, for an additional period mutually agreed by Operator and Administrator (acting on Owner's behalf) (the "**Extension Term**"), subject to (i) the maximum term permitted under Act 29 at the time of such extension, (ii) receipt of a Tax Opinion and a Reliance Letter in connection with such Extension Term, (iii) to the extent required by Applicable Law, the conditions precedent to the Effective Date shall have been satisfied prior to the first date of the Extension Term, (iv) approval from PREB, to the extent required by Applicable Law, and (v) Administrator's approval shall be provided only following a decision of the Administrator's Board of Directors in accordance with Act 29 and Act 120. In the event that the Initial Term is extended solely for the purpose of Operator completing Decommissioning Services and any remaining Demobilization Services, none of the requirements of (ii) and (iii) shall be applicable. (§2.3) |
| **Reduction of Term and/ or Services** | Upon written notice to Operator, Administrator (acting on behalf of Owner) shall have the right to reduce the scope of the O&M Services, the Decommissioning Services and/ or the Term, if and to the extent necessary, (i) to prevent any adverse effect to the exclusion from gross income of interest on obligations of Owner, its Affiliates or another Governmental Body for federal income tax purposes under the Internal Revenue Code or (ii) to comply with the Fiscal Plan or any other Applicable Law or contractual requirement, including the Integrated Resource Plan. Notwithstanding any reduction in the scope of O&M Services, the fixed fee component of the service fee payable to Operator (the "**Fixed Fee**") shall not be reduced other than pursuant to an O&M Fixed Fee Adjustment. If any such reduction affects Operator's ability to achieve Actual Fuel Savings outlined in a PREB-approved Fuel Optimization Plan, then Operator and Administrator shall negotiate proportional adjustments to the Fuel Optimization Plan and Fuel Optimization Payment, to reasonably assure that Operator has a reasonable opportunity to earn the Fuel Optimization Payment, which adjustments shall be submitted to PREB for review and approval. (§2.3(c)) |
| **Ownership of the Legacy Generation Assets** | The Legacy Generation Assets is and remains owned by PREPA throughout Term. Operator shall perform the O&M Services as independent contractor with no ownership or other interest in Legacy Generation Assets. (§3.1 and §3.2) |
| **Qualified Management Contract** | The Parties intend for the O&M Agreement to constitute a "qualified management contract" under Revenue Procedure 2017-13, such that the provision of O&M Services by Operator under the O&M Agreement does not adversely affect the exclusion from gross income for federal income tax purposes under the Internal Revenue Code of the interest on such obligations. If the O&M Agreement is determined to fail the requirements to comply with the requirements of Revenue Procedure 2017-13 and Section 141 of the Internal Revenue Code for tax exempt status, the Parties agree to use reasonable efforts to amend the O&M Agreement to comply with such requirements to prevent any adverse effect to the exclusion from gross income of the interest obligations of Owner, its Affiliate or another Governmental Body for federal income tax purposes under the Internal Revenue Code. (§3.9) |
| **Administrative Expense Treatment** | 1. No later than ten Business Days after the Effective Date, Owner shall file a motion with the Title III Court seeking administrative expense treatment for any accrued and unpaid amounts required to be paid by Owner under the O&M Agreement during the Mobilization Period, including the Mobilization Service Fee. (§4.1(c)(i))<br><br>2. Operator shall have the right to terminate the O&M Agreement (i) if such motion is denied by the Title III Court, (ii) if such motion has not been approved by the Title III Court on or before the date that is 90 days following the date on which such motion is filed, which 90 day period may be extended for an additional 45 days by Administrator at its sole discretion, or such later date as Administrator and Operator may agree or (iii) if the Title III Court approval has been ultimately reversed on appeal. (§4.1(c)(ii)) |

---

³ Subject to confirmation based on final determination as to the remaining useful life of the Legacy Generation Assets.

| Term | Summary |
|------|---------|
| **Scope of O&M Services** | The O&M Agreement provides a list of operational and legal services to be performed by Operator, including: (i) administering Facility Contracts, including Fuel Contracts; (ii) recommending and, if approved by Administrator and PREB, procuring Consumables, Spare Parts and Capital Spare Parts, as well as recommending Capital Improvements that take into account the Integrated Resource Plan (which such Capital Improvements would be subject to PREB's approval, regardless of ownership and the source of funding); (iii) representing Owner before PREB and preparing related filings and submissions; (iv) sourcing, procuring, and managing the transportation, delivery, supply, quality-testing, storage and handling of Fuel; (v) providing Operator Benefit Plans; (vi) requesting and expending federal funds for the applicable Legacy Generation Assets; (vii) performing other accounting, financial, and IT services; (viii) complying with the PREPA-Genco-Hydroco Operating Agreement and coordinating with T&D Operator[4]  and (ix) assisting Owner in fulfilling any obligations under Applicable Law, including obligations (A) with respect to PREB, (B) with respect to the FOMB under PROMESA, (C) with respect to Environmental Law, including the Consent Decree and State Implementation Plan and (D) agreements that Owner or its Affiliates are a party to. (Article 5 and Annex IX) |
| **Contract Standards** | Operator is required to perform O&M Services and other obligations under the O&M Agreement in compliance with terms, conditions, methods, techniques, practices and standards imposed or required by: (i) Applicable Law, (ii) the practices, methods, and acts that are generally recognized and utilized by companies operating gas and/ or oil-fired, electric power generation plants in the US ("**Prudent Industry Practice**"), (iii) applicable equipment manufacturer's specifications and reasonable recommendations in the Facility Contracts, (iv) applicable insurance requirements, (v) the Procurement Manual and (vi) any other standard, term or condition specifically contracted in the O&M Agreement to be observed by Operator (the "**Contract Standards**"). (§1.1, §5.1 and Section I.L of Annex IX) |

---

[4]  The "**T&D Operator**" refers to LUMA Energy, LLC together with LUMA Energy ServCo, LLC.

| Term | Summary |
|---|---|
| **Pre-Existing Environmental Conditions** | 1. Operator shall perform environmental, health and safety activities related to the generation of Power and Electricity, including (i) managing an environmental, health and safety program for each of the applicable Legacy Generation Assets; (ii) coordinating, overseeing and maintaining compliance of the Legacy Generation Assets with applicable Environmental Law (including providing environmental permitting services); and (iii) monitoring and analyzing emerging Environmental Law to manage future and ongoing compliance and operational efficiencies; provided that Operator shall be responsible for any such activities with respect to any Pre-Existing Contamination only to the extent that: (x) Operator materially exacerbates Pre-Existing Contamination, and such exacerbation is attributable to Operator's gross negligence or willful misconduct and in such event, only to the extent of such exacerbation; (y) Owner and Operator agree in writing that Operator shall assume responsibility for any of the foregoing; and (z) such Pre-Existing Contamination would reasonably be expected to result in an imminent threat to human health or the environment, Operator shall undertake, at Owner's expense, all required Remedial Actions with respect to Pre-Existing Contamination  (§5.9) |
| | 2. Except with respect to Pre-Existing Contamination, which Operator is required to address under clause (x) above, if Operator at any time identifies a Pre-Existing Environmental Condition that (i) requires Remedial Action under Applicable Law, (ii) materially interferes with the performance of the O&M Services, (iii) materially increases the cost of performing the O&M Services or (iv) constitutes Environmental Noncompliance, or, alternatively, receives written notice from any Governmental Body or third party asserting or claiming any such Pre-Existing Environmental Condition requires Remedial Action or constitutes Environmental Noncompliance, Operator shall notify Administrator and Owner of this finding by written notice and Owner shall then, as soon as reasonably practicable given the condition in question, commence and diligently prosecute such Remedial Actions as are required by Applicable Law or to prevent future material interference with the performance of the O&M Services or material increases in costs of performing the O&M Services. Operator and Owner may agree that Operator shall assume responsibility for developing and implementing any required Remedial Actions, subject to reimbursement from Owner. (§5.9(a)(ii)) |
| | 3. Operator shall be responsible for any Losses resulting from or related to any Pre-Existing Contamination, including the failure to pursue those O&M Services impeded by the existence of Pre-Existing Contamination, only to the extent such Losses (i) are caused in whole or in part by Operator's material exacerbation of Pre-Existing Contamination that is attributable to Operator's gross negligence or willful misconduct and, in that event, only to the extent of such exacerbation (the "**Pre-Existing Contamination Liability Standard**") or (ii) result from Operator's negligent failure to take Remedial Action necessary to address an imminent threat to human health or the environment. Operator shall not be responsible for any Losses resulting from or related to any Pre-Existing Environmental Noncompliance, except to the extent such Losses are caused by Operator's negligence or willful misconduct ("**Pre-Existing Noncompliance Liability Standard**"). (§5.9(a)(iv)) |
| | 4. Any Losses related to any Environmental Noncompliance, including Pre-Existing Environmental Noncompliance, that are incurred or sustained within the first full fiscal year after the Service Commencement Date, and that arise out of the condition of or defects in the equipment and systems at any Legacy Generation Asset with respect to such equipment or systems that were in place on or prior to the Service Commencement Date, shall not be the responsibility of Operator, except where Operator failed to repair, maintain, or replace such equipment or systems in accordance with an approved O&M Budget. Any Losses related to any Environmental Noncompliance, including Pre-Existing Environmental Noncompliance, that arise out of or relate to the storage tanks or the associated piping at any Legacy Generation Asset shall not be the responsibility of Operator until the earlier of (x) the first full fiscal year after the Service Commencement Date or (y) such time as Operator has completed an inspection pursuant to American Petroleum Institute (API) Standard 653 (or a comparable standard addressing out-of-service tank inspection) and has implemented any remedial or repair measures as may be required to restore such tank to compliance with Environmental Laws. (§5.9(a)(ii)) |



| Term | Summary |
|------|---------|
| **Consent Decree** | 1. The O&M Agreement is conditioned on Operator's agreement to be subject to the obligations under, and becoming a signatory to, the Consent Decree and the jurisdiction of the United States District Court for the District of Puerto Rico in connection with the Consent Decree. To the extent required to effectuate Section 5.9(c) (*Environmental, Health and Safety Matters – Consent Decree*), Operator shall assist Owner in taking all necessary steps to make Operator a signatory to the Consent Decree or to obtain any needed U.S. District Court approval. (§5.9(c)(i)) <br><br> 2. During the term of the O&M Agreement, neither Owner nor Administrator may enter into a consent decree or other form of settlement in resolution of any Legal Proceeding that may be brought or asserted under any Environmental Law by a Governmental Body or third party that imposes, or has the potential to impose, any injunctive relief or other prospective restrictions on operations at any Legacy Generation Asset without notifying Operator. (§5.9(c)(i)) |
| **Decommissioning the Legacy Generation Assets** | 1. After the Service Commencement Date (i) Administrator (acting on behalf of Owner and taking into account the Integrated Resource Plan, and in consultation with PREB and T&D Operator) may deliver to Operator a decommissioning notice to commence Decommissioning Services for one or more of the Legacy Generation Assets (including any applicable Out-of-Service Units) or (ii) in the event that Operator determines in accordance with Prudent Industry Practice and taking into account the Integrated Resource Plan, and in consultation with PREB and T&D Operator that, due to an Emergency Event, Extended Event or other critical developments at the applicable Legacy Generation Asset, all or a portion of the Legacy Generation Asset cannot continue to be safely operated and maintained, Operator may deliver to Administrator and PREB (with copy to Owner and T&D Operator) a request to commence Decommissioning Services for the applicable Legacy Generation Asset, which request Administrator and PREB shall approve or deny within 30 days of receipt. Operator shall not commence any Decommissioning Services under clause (ii) above until it has provided T&D Operator at least two years advance written notice of the commencement of such Decommissioning Services, unless mandated by PREB to commence such Decommissioning Services on a specific earlier date. (§16.1(a)) <br><br> 2. The Decommissioning Plan shall provide for (i) the permitting, demolition, Decontamination, waste disposal and dismantling/or preparation for conversion to such other future use as Administrator and PREB may designate, as applicable, of the Legacy Generation Asset, and waste disposal, for achievement of end-state conditions within a prescribed time (provided that Operator does not have an obligation to perform Decommissioning Services after the expiration of the Term unless the O&M Agreement is extended by Owner and Administrator to allow Operator to complete such services), (ii) the development of the Decommissioning Budget (proposing the basis and methodology of determining cost savings, including the Incentive and Penalty for Decommissioning Costs Efficiency), (iii) reasonably acceptable arrangements to facilitate the transition of Operator Employees into new jobs or industries, including a training and/or severance plan (to be funded by Owner) for any Operator Employees, which arrangements Operator, Owner and Administrator shall cooperate as needed to implement and (iv) a timeline setting forth when Decommissioning Services shall be provided, including the date on which the Decommissioning Services shall commence (the "**Decommissioning Commencement Date**") and the date on which the Decommissioning Services for such Legacy Generation Asset shall be completed (the "**Decommissioning Completion Date**"). (§16.1(b)) <br><br> 3. Owner or Administrator shall pay Operator all Pass-Through Expenditures required to perform the Decommissioning Services and shall continue to pay the O&M Fixed Fee in full (subject to any applicable O&M Fixed Fee Adjustment) for the duration of the Term, notwithstanding the commencement of Decommissioning Services with respect to any Legacy Generation Assets prior to the end of the Term. Operator shall be entitled to earn an Incentive Payment or shall incur a Penalty based on Operator's performance of the Decommissioning Services in accordance with the Incentives and Penalties, as set forth in Section 7.1(c) (*Service Fee – Incentive and Penalties*). (§16.2(d)) |

| Term | Summary |
|------|---------|
| **Rights and Responsibilities of Owner** | From and after the Service Commencement Date, Owner shall (among other things): (i) grant Operator access to the Legacy Generation Assets; (ii) pay the applicable Service Fee and any other amounts due to Operator and fund the Service Accounts; (iii) ensure that, to the extent PROMESA requires Owner to submit any Budget to the FOMB for approval, such Budget provides that Owner is authorized to pay amounts due to Operator under the O&M Agreement and fund the Service Accounts; (iv) cooperate with Operator such that the Budgets and funds in support of O&M Services are sufficient in amount to enable Operator to meet the Contracts Standards and provide a reasonable opportunity for Operator to achieve the Incentive Payment; (v) respond promptly to requests for approval, review or consent of Owner or for information of Owner; (vi) except in certain circumstances, manage Owner's legal matters; (vii) cooperate with Operator and Administrator in obtaining and maintaining all Governmental Approvals and (viii) coordinate any Audits that Owner is entitled to perform under the O&M Agreement with any Audits being undertaken by Administrator and any other Governmental Body that has the right under Applicable law to perform an Audit. (§6.1) |
| **Rights and Responsibilities of Administrator** | Administrator shall be responsible for overseeing, in the manner provided for and subject to the terms and conditions of the O&M Agreement, Operator's compliance with its obligations under the O&M Agreement. In particular, from and after the Service Commencement Date, Administrator shall: (i) have the right to review and approve O&M Budgets for a given Contract Year, including modifications thereto, to ensure compliance with the then applicable Rate Order; (ii) have the right to review and approve the Incentive Payment payable to Operator for a given Contract Year, including based on Administrator's evaluation of Operator's performance with respect to the Incentives and Penalties; (iii) cooperate with Operator such that the Budgets and funds in support of O&M Services are sufficient in amount to enable Operator to meet the Contracts Standards and provide a reasonable opportunity for Operator to achieve the Incentive Payment; (iv) have the right to exercise Oversight in relation to Operator's compliance with O&M Budgets, including Pass-Through Expenditures, in accordance with the procedures set forth in the O&M Agreement (provided that Administrator shall (A) reasonably coordinate with Owner to avoid duplicative Oversight and (B) except to the extent provided under the O&M Agreement, avoid exercising Oversight with respect to items that fall within the scope of PREB's statutory oversight); (v) have the right to exercise Oversight in relation to Operator's compliance with its obligations under the O&M Agreement, including performance of the O&M Services; (vi) have the right to exercise Oversight, as agent of Owner, in relation to Operator's compliance with federal funding requirements; (vii) be responsible for responding promptly (and in any event within thirty (30) days or shorter period required by the O&M Agreement) to all requests of Operator with respect to matters requiring the approval, review or consent of Administrator (and in each such case, unless otherwise specifically stated in the O&M Agreement, Administrator shall not unreasonably withhold, delay or condition any such approval, review or consent) and as to such other matters relating to the obligations of Operator in respect of which Operator shall reasonably request the response of Administrator in accordance with the provisions of the O&M Agreement; (viii) be responsible for (A) cooperating with Operator by providing Operator such information, data and assistance as may be reasonably necessary for Operator to perform its obligations and (B) from time to time, as and when requested by Owner, executing and delivering, or causing to be executed and delivered, all such documents and instruments and take, or cause to be taken, all such reasonable actions, as necessary for Operator to perform its obligations under the O&M Agreement; (ix) have the right to declare an Event of Default and exercise remedies under the O&M Agreement, including termination of the O&M Agreement upon the occurrence of an Operator Event of Default; and (x) be responsible for coordinating any Audits that Administrator is entitled to perform under the O&M Agreement with any Audits being undertaken by Owner and any other Governmental Body that has the right under Applicable Law to perform an Audit. The Parties acknowledge that (x) Owner delegates unto Administrator all rights, responsibilities and obligations pertaining to the Oversight of Operator's compliance with its obligations under the O&M Agreement and (y) PREB is the entity responsible for overseeing all technical and operational aspects of Operator's performance under the O&M Agreement. (§6.2) |

PUBLIC-PRIVATE
PARTNERSHIPS

| Term | Summary |
|------|---------|
| **Staffing Levels** | From and after the Service Commencement Date and at all times during the Term, Owner and Administrator shall maintain staffing in connection with the O&M Services only at those levels strictly necessary for Owner and Administrator to timely and efficiently perform their obligations under the O&M Agreement. At all times prior to the Service Commencement Date, Owner shall maintain staffing necessary to continue to perform its obligations at the same or higher level than it performed such obligations as of the Proposal Submission Date. (§6.4) |
| **Operator Compensation** | 1. Owner shall pay Operator a service fee consisting of (i) the Fixed Fee plus (ii) any O&M Incentive Payment *plus* any Decommissioning Incentive Payment minus any O&M Penalty *minus* any Decommissioning Penalty, based on Operator's performance of the O&M Services and the Decommissioning Services, as applicable (collectively, the "**O&M Service Fee**," and together with the Mobilization Service Fee and the Demobilization Service Fee, the "**Service Fee**"). (§7.1)<br><br>2. The applicable Service Fee shall constitute payment for any amount incurred by Genera Management LLC, including for the on-island executive management team and their associated corporate overhead ("**Operator Overhead**"), none of which shall be subject to reimbursement as a Pass-Through Expenditure.  (§7.1) |
| **Incentives and Penalties** | 1. Based on Operator's performance with respect to the Incentives and Penalties, Operator shall be eligible to receive Incentive Payments or be subject to Penalties as a deduction from the O&M Service Fee in any given Contract Year, except during the Mobilization Period and the Demobilization Period. An amount equal to the maximum amount of the Incentive Payments in any given Contract Year shall be included in the Operating Budget or the Decommissioning Budget, as applicable. (§7.1)<br><br>2. As described in detail in Section III of Annex II (*Compensation – Incentives and Penalties*), in performing the O&M Services, Operator shall be evaluated in six categories: Operation Cost Efficiency, Equivalent Availability Factor (EAF), Safety Compliance, Environmental Compliance, Fuel Optimization, and Reporting Obligations. In performing the Decommissioning Services, Operator shall be evaluated in the category of Decommissioning Costs Efficiency. The annual cap on the aggregate sum of the amounts payable under each category shall be US$100,000,000 (the "**Annual Incentive Cap**"); provided, however, that any excess amounts shall be carried over into subsequent Contract Years. (§7.1(c) and Section III of Annex II)<br><br>3. For each of the Operation Cost Efficiency, Fuel Optimization, and Decommissioning Costs Efficiency categories, Operator and Owner shall each receive 50% of any savings achieved during the relevant Contract Year. (Section III of Annex II) |

| Term | Summary |
|------|---------|
| **Pass-Through Expenditures** | 1. Operator shall be reimbursed for the reasonable and documented costs and expenses (without markup for Operator profit) incurred by Operator in connection with the performance of its obligations (including the O&M Services and the Decommissioning Services) (the "**Pass-Through Expenditures**"), excluding Disallowed Costs and Operator Overhead.[5] (§7.2) |
| | 2. Operator shall provide promptly such additional supporting documentation evidencing the provision of the O&M Services and Decommissioning Services, if any, including evidence of the payment of any Subcontractor whose fees or allocated expenditures (in the case of Subcontractors that are Affiliates of Operator, charging any amounts to Operator on an allocation basis) are included in the applicable Pass-Through Expenditures, and the calculation of the Pass-Through Expenditures related thereto, as Administrator may request and as may be required by Applicable Law. To the extent necessary for Administrator to complete its review of the applicable invoice, upon Administrator's reasonable request, such additional supporting documentation shall include any relevant Confidential Information. Owner's sole responsibility with respect to all invoices shall be payment of undisputed amounts and shall not include review of any invoice. (§7.2) |
| | 3. A "Disallowed Cost" shall be (i) any and all Pass-Through Expenditures incurred as a result of Operator's gross negligence or willful misconduct, except as otherwise provided Section 5.9(a)(iv) (*Environmental, Health and Safety Matters – Pre-Existing Environmental Conditions*) where the applicable standard shall be either the Pre-Existing Contamination Liability Standard or the Pre-Existing Noncompliance Liability Standard, or are otherwise subject to an indemnity from Owner to Operator under the O&M Agreement (ii) any and all fines, penalties or other similar payments or charges imposed by PREB, the Puerto Rico Department of Natural and Environmental Resources, the EPA, the United States Department of Justice, OSHA, or any other Governmental Body on Operator, except to the extent that such fines, penalties or other similar payments or charges arise out of violations or circumstances that arose prior to the Effective Date, or are otherwise subject to an indemnity from Owner to Operator under the O&M Agreement, and (iii) any and all expenditures in excess of the then-currently approved Operating Budget or the relevant Default Budget, or the then-currently approved Decommissioning Budget(s) that are incurred by Operator other than as a result of Owner Fault, Operator's compliance with the Consent Decree or other Applicable Law, or a Force Majeure Event. (§7.6) |

---

[5]  Pass-Through Expenditures shall also include, without limitation, the items listed in Annex XII (*Pass-Through Expenditures*) to the O&M Agreement.

| Term | Summary |
|------|---------|
| **Budgets** | 1. For any Contract Year in which there is a single base rate covering each of PREPA's transmission and distribution system (the "**T&D System**") and related assets, Owner's Hydropower Assets, and the Legacy Generation Assets (other than the initial Contract Year, for which the procedures for the Initial O&M Budget shall apply, or a year in which a rate adjustment approved by PREB enters into effect, in which case the O&M Budget used in connection with obtaining such rate adjustment shall be used), in accordance with the PREPA-Genco-Hydroco Operating Agreement, Operator shall meet with T&D Operator, Administrator, and other relevant parties to determine the allocation of such base rate and the resulting revenues among the non-generation budgets T&D Operator must prepare, the Hydroco Budgets, the budgets for PREPA and its subsidiaries other than Genco and Hydroco, and the generation budgets Operator must prepare, which allocation shall be proportional to, and consistent with, the cost allocation among such budgets in the then applicable Rate Order (the "**Budget Allocation Meeting**"). (§7.3(a)) |
| | 2. Subject to the requirements determined in the Budget Allocation Meeting, Operator shall prepare the proposed O&M Budgets for such Contract Year, consolidate such budgets with the proposed Hydroco Budget (which Hydroco shall submit to Operator) and submit to T&D Operator the proposed O&M Budgets for the relevant Contract Year. (§7.3(b)) |
| | 3. Once Administrator has received the proposed O&M Budgets submitted by T&D Operator in accordance with the PREPA Genco Hydroco Operating Agreement, Administrator shall review the O&M Budgets to ensure compliance with the then applicable Rate Order and shall notify Operator whether the proposed budgets are compliant or request any changes or modifications to the proposed Budgets to conform the proposed O&M Budgets with the applicable Rate Order. (§7.3(c)) |
| **Quarterly Adjustments to Fuel Budget** | No later than 14 days prior to the end of a quarter, Operator shall prepare and submit to PREB for approval (with copy to Administrator and T&D Operator), as necessary, (i) a record of actual Fuel Costs spent in the current quarter, with all applicable invoices and necessary supporting information for auditing purposes and (ii) revised quarterly budgets describing the estimated variable Fuel Costs for the following quarter for the purpose of resetting the Fuel Costs to be recovered for that quarter. In the event PREB does not timely approve a proposed revised quarterly Fuel Budget prior to the start of the applicable quarter, the proposed quarterly Fuel Budget shall be adjusted to reflect the maximum amount of Fuel Costs to be recovered through the rates set forth in the applicable Fuel Adjustment Clause then in effect. (§7.3(f)) |



| Term | Summary |
|------|---------|
| **Amendments to Budgets** | 1. Operator may, from time to time, propose to Administrator to amend the approved Operating Budget for a given Contract Year; provided that any such amendment shall be compliant with the applicable Rate Order. (§7.3(e)(i)) |
| | 2. If, during a Contract Year, Operator becomes aware that the Pass-Through Expenditures for such Contract Year are expected to exceed the relevant Budget for such Contract Year (taking into account the allowances for Excess Expenditures), then (i) Operator shall promptly notify Administrator and T&D Operator of the expected shortfall, (ii) T&D Operator shall notify PREB of the expected shortfall and, (iii) as promptly as practical, Operator shall prepare and submit to PREB proposed amendments to the relevant Budget for such Contract Year, which amendments must be consistent with the then applicable Rate Order and shall require and be subject to approval by PREB. (§7.3(e)(i)) |
| | 3. Notwithstanding anything to the contrary contained in the foregoing, in the event that PREB takes any action or issues any order that could result in a change in the portion of rates that relate to the Legacy Generation Assets, then Operator shall, as promptly as practicable, prepare and submit to PREB, with copy to T&D Operator, Administrator and Hydroco, the proposed amendments to the Operating Budget, which amendments must be consistent with the then applicable Rate Order and shall require and be subject to approval by PREB. (§7.3(e)(ii)) |
| | 4. In the event Decommissioning Services for one or more of the Legacy Generation Assets occur during any given Contract Year and the applicable Decommissioning Budgets for such Legacy Generation Assets has been approved, as of the month such Decommissioning Services commence, the approved Operating Budget for such Contract Year shall be amended to reflect the transition of all costs related to such Legacy Generation Assets, including the O&M Fixed Fee Adjustment as set forth in Section I of Annex II (*Compensation – O&M Fixed Fee*), from the relevant operation line items to separate line items for the decommissioning of such Legacy Generation Asset. (§7.3(e)(iii)) |
| **Budget Policy** | The O&M Budgets and the related Operator staffing levels for each Contract Year shall be designed to be adequate in both scope and amounts to reasonably assure that Operator is able to carry out the related O&M Services in accordance with the Contract Standards and to reasonably assure that Operator has a reasonable opportunity to earn the Incentive Payment. The O&M Budgets for each Contract Year shall comply with (i) the then applicable Rate Order, (ii) any PREB-approved directive or requirement applicable to Hydroco, Owner or PREPA, (iii) Applicable Law, and (iv) amounts allocated to the generation budget as agreed in the Budget Allocation Meeting for such Contract Year and any follow up to such meeting. The Parties further acknowledge and agree that, from time to time, it may be necessary or appropriate to amend or otherwise adjust the relevant categories of Incentives and Penalties or the O&M Budgets as a result of (A) Force Majeure Events, (B) Owner Fault, (C) Forced Outages or (D) additional requirements imposed by Owner, Administrator, PREB, or any other Governmental Body after approval of the O&M Budgets, in the case of each of clauses (A) to (D), which (x) have resulted (or are reasonably likely to result) in schedule delays or increased work scope or costs and (y) are not attributable to Operator's gross negligence or willful misconduct. Operator shall provide notice to Administrator promptly following the occurrence of an event contemplated above and the Parties shall, in good faith and acting reasonably, consider necessary adjustments to the Incentives and Penalties or the O&M Budgets that are based on rates that are reasonable and necessary and shall submit such to PREB for approval. (§7.4) |

| Term | Summary |
|------|---------|
| **Service Accounts – Operating, Fuel and Decommissioning Accounts** | 1. Owner shall establish one or more operating accounts from which Operator shall draw funds from time to time to pay for Pass Through Expenditures actually incurred by Operator in performing the O&M Services and from which Owner shall pay the O&M Service Fee (collectively, the "**Operating Account**"). Prior to the Service Commencement Date, the Operating Account shall be funded with an amount equal to the sum of (i) anticipated Pass-Through Expenditures for the following two months plus (ii) the anticipated O&M Service Fee for the following two months, in each case based on the then-currently approved Operating Budget or the relevant Default Budget then in effect. Thereafter, the Operating Account shall be replenished to maintain a minimum balance of the amount that is equal to the corresponding funding level. Except under circumstances specified in the O&M Agreement, Operator shall not withdraw funds from the Operating Account for Pass Through Expenditures that are not included in the then-currently approved Operating Budget or the relevant Default Budget then in effect without Administrator approval. (§7.5(a)) |
| | 2. Owner shall have established one or more fuel accounts from which Owner shall draw funds from time to time to pay for costs and expenses related to the purchase, transportation, testing, delivery and storage (including tank maintenance) of fuel for the Legacy Generation Assets actually incurred by Operator (the "**Fuel Costs**") in performing the O&M Services (collectively, the "**Fuel Account**"). Prior to the Service Commencement Date, the Fuel Account shall be funded with an amount equal to at least an average of two months of Fuel Costs, based on the average monthly Fuel Costs set forth in the then currently approved Fuel Budget for the current quarter. Thereafter, the Fuel Account shall be replenished monthly. The required funding may be increased in accordance with any special stipulations in the approved and in-force fuel supply contracts for the Legacy Generation Assets. Operator shall not withdraw funds from the Fuel Account for any non-fuel costs or Fuel Costs that are not incurred pursuant to approved and executed fuel supply agreements for the Legacy Generation Assets without Administrator approval. (§7.5(b)) |
| | 3. Owner shall establish one or more operating accounts from which Operator shall draw funds from time to time to pay for Pass-Through Expenditures actually incurred by Operator in performing the Decommissioning Services (collectively, the "**Decommissioning Account**"). Prior to the Decommissioning Commencement Date for the applicable Legacy Generation Asset, the Decommissioning Account shall be funded with a amount equal to the sum of all anticipated Pass-Through Expenditures for the following one month, based on the then-currently approved Decommissioning Budget. Thereafter, the Decommissioning Account shall be replenished monthly in accordance with procedures set forth in the PREPA-Genco-Hydroco Operating Agreement until all payments for the Decommissioning Services contemplated by the O&M Agreement have been made. Except under circumstances specified in the O&M Agreement, Operator shall not withdraw funds from the Decommissioning Account for Pass-Through Expenditures that are not included in the then-currently approved Decommissioning Budget. (§7.5(c)) |



| Term | Summary |
|------|---------|
| **Service Accounts – Reserve Account** | 1. Owner shall establish one or more reserve accounts (each, a "**Reserve Account**") from which Operator (i) shall draw funds from time to time to pay for costs in connection with Forced Outages, Force Majeure Events or Owner Fault, and costs in connection with the procurement and installation of any Capital Spare Parts approved by Administrator and PREB and (ii) may draw funds from time to time to pay for any shortfalls in the required funding of any other Service Account. (§7.5(d)(i))

2. In the event there are no funds on deposit in the Reserve Account, Operator shall provide written notice to Administrator of such shortfall. Until the Reserve Account is replenished, to the extent costs are incurred under clause(i) of the foregoing, Operator may withdraw the necessary funds from any Service Account (other than the Fuel Account) provided that, prior to any withdrawal, Operator shall provide written notice of the intended withdrawal to Administrator for its review and approval. Operator may withdraw such funds only upon either (x) receipt of Administrator's written approval or (y) Administrator's failure to provide a response within a reasonable period. (§7.5(d)(i))

3. No later than ten Business Days prior to the Service Commencement Date, the Reserve Account shall be funded with an amount equal to US$30,000,000. Thereafter, in the event that Operator withdraws funds from the account, the Reserve Account shall be replenished the following month with an amount equal to the aggregate amount withdrawn from the Reserve Account during the previous month; provided that if in any given month, Owner does not have sufficient funds to fund the Reserve Account in the required amount, the failure to so fund shall not constitute a default under the O&M Agreement so long as the Reserve Account is funded to the corresponding fund level as soon as Owner has sufficient funds to do so. (§7.5(d)(ii)) |
| **Unfunded Amounts** | Operator shall have no obligation or responsibility to incur or pay any costs or make expenditures in providing the O&M Services (other than Disallowed Costs) to the extent any of the Service Accounts do not contain sufficient funds to pay such costs and expenditures. To the extent sufficient funds for the performance of all of Operator's obligations under the O&M Agreement are not available for withdrawal by Operator from the Service Accounts, the Mobilization Account or the Demobilization Account, as applicable, (i) Operator shall take reasonable measures (to the extent practicable using only the funds available in the Service Accounts) to maintain the continuity of the O&M Services in accordance with the Contract Standards to the extent possible in the absence of its receipt of such sufficient funding, (ii) Owner shall protect, defend, indemnify and hold harmless Operator and its Affiliates from and against any and all Losses arising in connection with the discontinuation of any Services that occurs notwithstanding Operator's efforts, and (iii) Operator shall not be liable for, and Owner hereby waives and releases Operator from any claims for, Penalties (other than the Safety Compliance and the Environmental Compliance Penalties), and Operator shall not be liable for any failure to perform its obligations in accordance with the terms of the O&M Agreement, until sufficient funds are made available. (§7.8) |
| **Administrator Costs** | Owner shall be solely responsible for all costs and expenses of Administrator in connection with the performance of Administrator's obligations under the O&M Agreement, and shall pay or reimburse Administrator promptly for any out-of-pocket or third-party costs and expenses. (§7.9) |
| **Payment Disputes** | Except as otherwise provided in Section 7.1(c) (*Service Fee – Incentives and Penalties*), if Owner or Administrator disagrees in good faith with any invoice submitted under the O&M Agreement, then such Person shall promptly notify Operator of such dispute (and in any event no later than the due date for the applicable invoice) and the reasons for the disagreement. Any amounts set forth in an invoice that are not paid as of the due date for such invoice shall be deemed disputed by the owing Person. (§7.10) |
| **Credit Support** | Operator shall cause the Guarantee to be provided on or prior to the Effective Date and maintained thereafter throughout the Term. (§8.1) The Guarantor's liability is capped at US$45,000,000 (§3.10 of the form of Guarantee Agreement). |



| Term | Summary |
|------|---------|
| **Compliance with Applicable Law** | Operator shall perform, and cause all Subcontractors to perform, the Services in accordance with the Contract Standards, including the Consent Decree and the payment of the PREB Regulatory Charge. Operator shall provide written notice to Administrator if Operator violates, or becomes subject to any government or regulatory investigation in connection with the Anti-Corruption Laws or Sanctions. (§9.1 and §9.2) |
| **Insurance** | 1. Operator shall maintain in effect, and cause any Subcontractor performing any of the O&M Services or the Decommissioning Services to maintain in effect, for the benefit of Owner and Operator, as applicable, the insurance policies and limits of coverage specified in the O&M Agreement and such insurance policies (i) as may be required by Applicable Law and (ii) as may be required by Prudent Industry Practice (the "**Required Insurance**"). All Required Insurance shall be in a form reasonably acceptable to Administrator and shall only be issued by generally recognized financially responsible insurers that (A) are authorized to do business in the Commonwealth or are otherwise authorized or permitted by the Office of the Commissioner of Insurance of Puerto Rico and (B) at a minimum have a rating of A-(VIII) or better by A.M. Best Company or an equivalent rating by another similarly recognized insurance rating agency (unless Administrator consents to waive this requirement). (§10.1) |
| | 2. If the event of a Loss relating to the O&M Services, the Legacy Generation Assets or any Generation Site, Owner shall open an account in which to deposit any proceeds of insurance for such Losses (the "**Insurance Proceeds Account**"). If Operator receives any proceeds of insurance for any Losses relating to the O&M Services, the Legacy Generation Assets or any Generation Site, Operator shall deposit such amounts into the Insurance Proceeds Account. If Owner receives any proceeds of insurance for any Losses relating to the O&M Services, the Legacy Generation Assets or any Generation Site, Owner shall hold such amounts in trust, for the benefit of Operator, and Owner shall deposit such amounts in the Insurance Proceeds Account following the request of Operator. In consultation with and subject to the reasonable approval of Administrator (not to be unreasonably withheld, conditioned or delayed, with notice to PREB), Operator shall determine whether to use funds in the Insurance Proceeds Account either to remediate or decommission the Legacy Generation Assets in a manner consistent with Prudent Industry Practice, taking into account the Integrated Resource Plan and the other generation resources available to the T&D System, each to the extent applicable. (§10.3) |
| **Subcontractors** | 1. Operator may engage Subcontractors to perform Operator's obligations under the O&M Agreement, including the Mobilization Services, the O&M Services, the Decommissioning Services, or the Demobilization Services. Operator's payment obligations under any Subcontract shall be a Pass-Through Expenditure, subject to certain exceptions. (§11.1(a)) |
| | 2. Operator shall provide to each person, firm, corporation, contractor, or subcontractor hired to perform any requirement of the Consent Decree (including its attachments or appendices) a copy of all sections of the Consent Decree (including its attachments and appendices) relevant to the employment of the person, firm, corporation, contractor, or subcontractor, and shall condition all contracts or subcontracts entered into upon performance of the requirement(s) in conformity with the terms of the Consent Decree (including its attachments and appendices). Operator shall further require that each such person, firm, corporation, contractor, or subcontractor provide written notice of the Consent Decree to all subcontractors hired to perform any portion of any requirement of the Consent Decree. (§11.2(b)) |
| | 3. In the event that any Affiliate of Operator proposes to participate in any procurement relating to subcontracting of services to be provided under the O&M Agreement, Operator shall provide Administrator with information regarding the identity of the Affiliate, the services to be provided and any other reasonable information as Administrator may reasonably request prior to such Affiliate participating in any such procurement process or receiving any information in connection therewith. (§11.4) |

| Term | Summary |
|---|---|
| **Taxation** | 1. Owner shall be entitled to (i) deduct and withhold from any consideration payable to Operator under the O&M Agreement such amounts as required under applicable Tax law and (ii) request any necessary Tax information from Operator. The Parties agree to cooperate in good faith to reduce or eliminate the amount of any applicable withholding Taxes. In the event any withholding Taxes are paid by Owner in respect of amounts payable to Operator, Owner shall use commercially reasonable efforts to provide Operator (A) receipts or other evidence of payment of such withholding taxes and (B) all informative statements required by Applicable Law. (§12.1)<br><br>2. Operator and each of its subsidiaries shall (i) prepare and timely file Tax Returns required under Applicable Law and (ii) pay Taxes required under Applicable Law. (§12.2) |
| **Intellectual Property** | 1. Operator shall grant to Owner, and shall cause its Affiliates and Subcontractors to grant to Owner, a perpetual, non exclusive, fully paid up, royalty free, worldwide license and sublicense, under all of such party's rights in, to and under the Operator Intellectual Property and Subcontractor Intellectual Property, solely in connection with the Legacy Generation Assets and related facilities of Owner and their related operations (including the O&M Services or the Decommissioning Services) by or on behalf of Owner or any successors or operators thereto to (i) make, have made, use, sell, offer for sale, export or import any product, service or apparatus and practice any method and (ii) use, reproduce, distribute, perform, display, execute and create derivative works in connection with any of the foregoing. (§13.1)<br><br>2. Any and all written, recorded or oral Facility Information furnished or made available in connection with the O&M Agreement, or that constitutes Work Product, shall be deemed "**Owner Confidential Information**" with respect to which Operator shall be deemed to be the receiving Party and Owner shall be deemed to be the disclosing Party. "**Operator Confidential Information**" includes Confidential Information pertaining to Operator Intellectual Property or Subcontractor Intellectual Property, or to Operator's policies and strategies. (§13.2(a)(i))<br><br>3. Operator shall comply with, and shall use commercially reasonable efforts to ensure that all Operator Related Parties and all Subcontractors comply with all Contract Standards and all requirements of Applicable Law regarding data security, cyber security and information security in respect of the Facility Information and related Information Systems. (§13.3) |

| Term | Summary |
|---|---|
| **Termination for Events of Default by Operator** | 1. Administrator, subject to specified cure periods, may terminate the O&M Agreement for certain events of default by Operator (each, an "**Operator Event of Default**"), including: (i) bankruptcy; (ii) failure to provide or maintain the Guarantee; (iii) failure to perform a material obligation, covenant, term or condition under the O&M Agreement; (iv) failure to pay any undisputed amount required to be paid by Operator under the O&M Agreement or by Guarantor under the Guarantee (other than a Penalty); (v) any representation or warranty of Operator under the O&M Agreement shall have been proven to be false or inaccurate in any material respect when made and thereby materially and adversely affects the legality of the O&M Agreement or the ability of Operator to carry out its obligations thereunder; (vi) failure to obtain or maintain the Required Insurance; (vii) a Change of Control of Operator that is not permitted by the O&M Agreement; (viii) transfer of any portion of Operator's rights or obligations under the O&M Agreement other than as permitted under the O&M Agreement; (ix) (A) a violation of any of the provisions of Article 3.2 of Act 2 or (B) entry of a plea of *nolo contendere* with a court of competent jurisdiction, in each case, resulting in a final, non-appealable judgment with respect to any Applicable Law or Anti-Corruption Laws; (x) failure to pay any one or more undisputed Penalties in the aggregate excess of US$100,000 that are required to be paid by Operator under the O&M Agreement or by Guarantor under the Guarantee, which failure is not cured within 30 days following notice thereof by Administrator and (xi) failure to meet the Minimum Performance Threshold for any two consecutive Contract Years with respect to any of the following Incentives and Penalties standards: (A) availability and reliability, (B) safety compliance, (C) environmental compliance and (D) decommissioning, and no such failure shall have been excused by a Force Majeure Event, a Forced Outage or Owner Fault (a "**Minimum Performance Threshold Default**"). (§14.1)<br><br>2. Upon the occurrence of an Operator Event of Default relating to (i) bankruptcy, (ii) a violation of Article 3.2 of Act 2 or (iii) entry of a plea of nolo contendere with a court of competent jurisdiction with respect to any Applicable Law or Anti Corruption Laws, the O&M Agreement shall terminate immediately without further action by Administrator. (§14.2(a))<br><br>3. Upon the occurrence of any other Operator Event of Default (and for so long as the same is continuing), Administrator may terminate the O&M Agreement upon not less than 120 days prior written notice to Operator, subject, to the extent required by Applicable Law, to the prior approval of PREB or the FOMB (if then in existence), without need for a court decision or arbitral award confirming Administrator's right to terminate, subject to certain additional conditions with respect to an Operator Event of Default relating to a Change of Control of Operator. (§14.2(b)) |

| Term | Summary |
|------|---------|
| **Termination for Events of Default by Owner** | 1. Operator, subject to specified cure periods, may terminate the O&M Agreement for certain events of default by Owner (each, an "**Owner Event of Default**"), including: (i) bankruptcy (provided that the pursuit by creditors of Owner of relief from the automatic stay extant pursuant to section 362(a) of the Bankruptcy Code in the current Title III Case for the purpose of seeking appointment of a receiver under applicable law shall not constitute an Owner Event of Default unless and until any such receiver is duly appointed); (ii) failure to perform a material obligation, covenant, term or condition under the O&M Agreement; (iii) failure to pay any undisputed Service Fee or other undisputed amount required to be paid by Owner to Operator under the O&M Agreement; (iv) failure (A) to fund any Service Account in an amount equal to the requisite funding for such Service Account, (B) to replenish any Service Account (other than the Reserve Account which is addressed in clause(C) below) in an amount equal to at least one half of the requisite funding for such Service Account or (C) to replenish the Reserve Account in accordance with Section 7.6(d)(ii) (*Service Accounts – Reserve Account*); and (v) any representation or warranty of Owner under the O&M Agreement shall have proven to be false or inaccurate in any material respect when made and thereby materially and adversely affects the legality of the O&M Agreement or the ability of Operator to carry out its obligations thereunder. (§14.3)

2. Upon the occurrence of an Owner Event of Default, Operator may terminate the O&M Agreement upon not less than 120 days prior written notice to Administrator, subject to certain additional conditions with respect to an Owner Event of Default relating to failure to fund a Service Account. Owner agrees the automatic stay extant in the Title III Case pursuant to section 362(a) of the Bankruptcy Code shall not apply to the exercise by Operator of its termination rights or other remedies under Section 14.4 (*Termination for Owner Event of Default*), Section 14.5 (*Additional Termination Rights*) or Section 14.6 (*Remedies Upon Early Termination*). (§14.4) |
| **Additional Termination Rights** | The O&M Agreement provides additional termination rights, subject to not less than 120 days' (and, in the case of (iii) below, 270 days') prior written notice to the other Party, including: (i) termination by Administrator or Operator in the event that a Force Majeure Event continues for a period in excess of 18 consecutive months and materially interferes with, delays or increases the cost of the Mobilization Services, the O&M Services, the Decommissioning Services or the Demobilization Services; (ii) termination by Operator in the event of a Change in Regulatory Law and (iii) termination by Operator in the event that the Procurement Manual is revoked and not replaced within such period by a procurement manual that is mutually agreed by the Parties. In addition, the O&M Agreement provides for termination by each of Administrator and Operator for failure to satisfy the Service Commencement Date Conditions. (§4.8(b) and §14.5) |



| Term | Summary |
|---|---|
| **Remedies Upon Early Termination** | 1. Upon the early termination of the O&M Agreement, (i) Owner shall pay Operator any accrued and unpaid amounts required to be paid by Owner under the O&M Agreement, (ii) Owner shall pay or reimburse Operator all Pass-Through Expenditures accruing after the date of such early termination that cannot reasonably be avoided by Operator and (iii) Operator shall pay Owner (A) any accrued and unpaid Penalties and (B) any penalties, fines or moneys incurred by Operator and owed to Governmental Bodies for violations of Applicable Law, including Environmental Law. Notwithstanding the termination of the O&M Agreement for all other purposes, Operator shall complete the Demobilization Services for each Legacy Generation Asst promptly following such termination, and Owner shall pay Operator all amounts required to be made under the O&M Agreement with respect to such Demobilization Services. (§14.6(a) and §14.6(b)) |
| | 2. In the event the O&M Agreement is (i) terminated, revoked, nullified, cancelled or otherwise rendered invalid by any duly enacted law of the Commonwealth, as determined by a final non-appealable judgment by a court of competent jurisdiction (a "**Contract Nullification or Cancellation**") or (ii) terminated by Operator as a result of a Change in Regulatory Law that has certain consequences specified in the O&M Agreement, Owner shall pay Operator the Operator Termination Fee. The "Operator Termination Fee" is an amount equal US$45,000,000. (§14.6(c)(i)) |
| | 3. In the event the O&M Agreement is terminated by Administrator due to either a Failure to Pay Penalties or a Minimum Performance Threshold Default, Operator shall pay Owner the Owner Termination Fee. "**Owner Termination Fee**" is an amount equal to US$45,000,000. (§14.6(c)(ii)) |
| **Dispute Resolution** | 1. Operator acknowledges and agrees that Administrator (or any Designated Person appointed by Administrator) shall be authorized to participate in or act for and on behalf of Owner in any Dispute Resolution Procedure. The Dispute Resolution Procedures set forth in the O&M Agreement do not apply to any dispute between a Party and PREB, which disputes shall be subject to resolution in accordance with Applicable Law. In the event that Operator disagrees with a decision of PREB, nothing shall prejudice, limit or otherwise impair Operator's right to exercise its rights pursuant to Act No. 38 of June 30, 2017 and Section 6.5(c) of Act 57. (§15.1) |
| | 2. The Parties agree to attempt to resolve any Dispute through good faith negotiations. If the Dispute remains unsolved with thirty (30) days after receipt of notice of such Dispute (the "**Negotiation Period**"), (i) Technical Disputes shall be referred to arbitration by an Independent Expert for a final and binding determination and (ii) any other Dispute shall proceed to mediation and, if necessary, litigation in the Commonwealth Court of First Instance, San Juan Part for a final and binding determination. If the Dispute is an O&M Budget Dispute or Decommissioning Budget Dispute, then during the Negotiation Period, the Designated Persons may agree to refer such Dispute to an Independent Expert appointed in accordance with the procedures set forth in Section 15.4(b)(i) (*Expert Technical Determination Procedure for Technical Disputes – Procedures*) for a non-final, non-binding determination. (§7.3(h) and §15.3) |
| | 3. Any Technical Dispute with a disputed value equal to or in excess of US$10 million may be referred to litigation pursuant to Section 15.6 (*Litigation as a Final Resort*) at the election of either Party at the time the Technical Dispute is initiated. (§15.4) |



| Term | Summary |
|------|---------|
| **Demobilization Period** | 1. Commencing on the Demobilization Commencement Date, in addition to providing any remaining O&M Services and/or Decommissioning Services, Operator shall (i) perform the Demobilization Services specified in the Demobilization Plan, (ii) reasonably cooperate with Administrator during any procurement process to identify a successor operator and (iii) commence preparations for an orderly surrender of the Generation Sites and any remaining Legacy Generation Assets to Owner or Administrator (or their designee). (§17.1(a))<br><br>2. Owner or Administrator shall pay Operator the Demobilization Service Fee as compensation for the Demobilization Services provided by Operator. (§17.3)<br><br>3. Operator shall have no obligation to continue performing any Demobilization Services as of the earlier of (i) the date which is 12 months following the expiration or early termination of the Term and (ii) the date on which there are no funds available in the Demobilization Account, without need for a court decision or arbitral award confirming Operator's right to terminate. (§17.1(d)) |
| **Termination Prior to Completion of Decommissioning** | In the event of the early termination of the O&M Agreement that occurs prior to the decommissioning of each and every Legacy Generation Asset, the Parties shall implement any arrangements contemplated by the Demobilization Plan, including arrangements relating to (i) the completion of any remaining Decommissioning Services currently being performed for a Legacy Generation Asset and that will not be completed by Operator, (ii) possible hiring of Operator Employees by a successor operator and (iii) a training and/or severance plan (to be funded by Owner) for any Operator Employees not hired into a successor job or industry, which arrangements Operator, Owner and Administrator shall cooperate as needed to implement. (§17.2) |
| **Force Majeure Events** | 1. A "**Force Majeure Event**" shall be any act, event, circumstance or condition (other than lack of finances) whether affecting the Legacy Generation Assets, Owner, Operator or any of Owner's contractors or Operator's Subcontractors that (i) is beyond the reasonable control of and unforeseeable by, or which, if foreseeable, could not be avoided in whole or in part by the exercise of due diligence by, the Party relying on such act, event or condition as justification for not performing an obligation or complying with any condition required of such Party under the O&M Agreement and (ii) materially interferes with or materially increases the cost of performing such Party's obligations under the O&M Agreement, to the extent that such act, event, circumstance or condition is not the result of the willful or negligent act, error or omission or breach of the O&M Agreement by such Party. The O&M Agreement provides (x) a list of acts, events or conditions that, subject to the requirements specified above, by way of example and without limitation, may constitute a Force Majeure Event and (y) a list of acts, events or conditions that shall not constitute a Force Majeure Event. (§1.1)<br><br>2. If a Force Majeure Event interferes with, delays or increases the cost of a Party's performance of its obligations under the O&M Agreement and such Party has given timely notice and description as required by the O&M Agreement, such Party shall be excused from performance and any associated Events of Default, except to the extent a Force Majeure Event continues for a period in excess of 120 days and Administrator and Operator negotiate in good faith to determine modifications to the Incentive Payment or other provisions of the O&M Agreement. In the event Operator is the party claiming the Force Majeure Event, Operator shall be entitled to request appropriate adjustments to the O&M Budgets or the Incentives and Penalties in accordance with the terms of the O&M Agreement. (§18.2(c) and §18.2(a))<br><br>3. In addition to all other relief pursuant to the O&M Agreement, the occurrence of a Force Majeure Event shall not excuse or delay the performance of (i) a Party's obligation to pay amounts previously accrued and owing under the O&M Agreement, including any earned and unpaid Service Fees, (ii) Owner's obligation to continue to pay all Owner Payments and to deposit and make funds available for Operator's use in the Service Accounts and the Insurance Proceeds Accounts in accordance with the O&M Agreement and (iii) any obligation under the O&M Agreement not affected by the occurrence of the Force Majeure Event. (§18.2(b)) |

| Term | Summary |
|------|---------|
| **Indemnification** | 1. Operator shall indemnify, defend and hold harmless Owner, Administrator and their respective Affiliates and Representatives against any and all Losses arising or resulting from: (i) a breach by Operator of any representation or warranty of Operator in the O&M Agreement that has a material adverse effect on (x) Operator's ability to perform its obligations under the O&M Agreement in respect of the Legacy Generation Assets or (y) the performance or the cost of performance by any Party of its obligations thereunder or (ii) the gross negligence or willful misconduct of Operator Indemnitees in connection with the O&M Agreement (except, in each case of the foregoing, as otherwise provided in Section 5.9(a)(iv) (*Environmental, Health and Safety Matters – Pre-Existing Environmental Conditions*), where the applicable standard shall be either the Pre-Existing Contamination Liability Standard or the Pre-Existing Noncompliance Liability Standard), in each case as determined by a final and non-appealable judgment by a court of competent jurisdiction. In the event that any Losses are incurred by an Owner Indemnitee in connection with Section 5.9(a)(iv) (*Environmental, Health and Safety Matters – Pre Existing Environmental Conditions*), then Operator's liability for Losses shall be reduced by the amount of the Penalty paid or owed, if any, with respect to the environmental compliance category in Section III of Annex II (*Compensation – Incentives and Penalties*), if such Penalties arose as a result of the same conduct that led to such Losses. (§19.1) <br><br> 2. Owner shall indemnify, defend and hold harmless Operator and the Equity Participants and its and their Affiliates and Representatives against any and all Losses arising or resulting from: (i) any breach by Owner or Administrator of any of its respective representations or warranties in the O&M Agreement that has a material adverse effect on the Legacy Generation Assets or on the performance or the cost of performance by any Party of its respective obligations under the O&M Agreement; (ii) any failure by Owner or Administrator to perform its obligations under the O&M Agreement or resulting from any Owner Fault; (iii) claims of any nature relating to the Legacy Generation Assets, Owner's operation thereof or any matter in the nature of the services to be provided by, or any other obligations imposed on, Operator under the O&M Agreement, in each case based on events or circumstances to the extent arising prior to the Service Commencement Date; (iv) the gross negligence or willful misconduct of Owner Indemnitees in connection with the O&M Agreement; (v) other than as expressly set forth in Section 5.5 (*Labor and Employment; Employee Benefits*), claims brought by Owner's or its Affiliates' former, current or future employees with respect to the non-payment or underfunding of benefits under Owner's pension plans, the PREPA Retirement System or any other employee benefit plans; (vi) claims brought against Operator by a Person not party to the O&M Agreement in connection with the Legacy Generation Assets or Operator's performance of the O&M Services, including (A) for loss of profits or revenues or special, exemplary, punitive, indirect or consequential damages (except to the extent arising out of fraud or intentional misrepresentation of any Operator Indemnitee) or (B) to the extent such claims are for Losses that would cause Operator's total liability to all Persons (including Owner Indemnitees) under or in connection with the O&M Agreement in aggregate to exceed the amount of any applicable limitation of liability set forth in Section 19.3 (*Indemnification – Limitation on Liability*); (vii) claims brought against Operator in connection with the T&D System or the performance by T&D Operator of its obligations under the T&D O&M Agreement;[6] (viii) Pre-Existing Environmental Conditions, except to the extent of an exacerbation of such Pre-Existing Environmental Conditions to the extent caused by the gross negligence or willful misconduct of any Operator Indemnitee; or (ix) all claims brought against Operator after the Effective Date by any creditor or other Person in connection with or related to the Title III Case. (§19.2) |

---

[6] The "T&D O&M Agreement" means the operation and maintenance agreement for the T&D System, entered into on June 22, 2020, by and among PREPA, Administrator, LUMA Energy, LLC and LUMA Energy ServCo, LLC, pursuant to which T&D Operator shall operate, maintain and modernize the T&D System.



| Term | Summary |
|------|---------|
| **Limitations on Liability** | 1. Administrator shall not be liable to Operator Indemnitees under the O&M Agreement. (§19.3(c)) |
| | 2. Except as set forth in Section 19.3(b) (*Limitation on Liability – Gross Negligence; Willful Misconduct*), Operator's liability to Owner Indemnitees or any other Person under or in connection with the O&M Agreement, including under Section 19.1 (*Indemnification by Operator*) and including for Disallowed Costs, shall be limited to US$5,000,000 in the aggregate for Losses occurring in any Contract Year and US$20,000,000 in the aggregate for all Losses during the Term. (§19.3(a)(i)). The limitations on liability in Section 19.3(a) will not apply to Operator's obligation to pay Delay Liquidated Damages (if any). |
| | 3. Operator's liability to Owner Indemnitees or any other Person for any Losses attributable to any Operator Indemnitee's gross negligence or willful misconduct as set forth in the O&M Agreement, including under Section 19.1 (*Indemnification by Operator*) or with respect to any Disallowed Costs attributable to Operator Indemnitees' gross negligence or willful misconduct, shall be limited to: (i) US$15,000,000 for all Losses occurring in each Contract Year for each of the first five Contract Years; (ii) US$20,000,000 for all Losses occurring in each Contract Year for each subsequent Contract Year and (iii) a total maximum of US$20,000,000 in the aggregate for all Losses during the Term. (§19.3(b)). The limitations on liability in Section 19.3(b) will not apply to Operator's obligation to pay Delay Liquidated Damages (if any). |
| | 4. Operator's liability to Owner Indemnitees or any other Person under or in connection with the O&M Agreement shall be subject to the limitation on liability set forth in Section 19.3(a) (*Limitations on Liability – Operator General Limitations*) and limited as follows: (i) from the Effective Date until the end of the second Contract Year, Operator shall not be liable for any Loss for which an Owner Indemnitee is entitled to be indemnified, unless and until the aggregate amount of such Losses in such Contract Year exceeds US$1,000,000, in which event Operator shall then be liable for all Losses in excess of US$1,000,000 and (ii) from the beginning of the third Contract Year until the end of the Term, Operator shall not be liable for any Loss for which an Owner Indemnitee is entitled to be indemnified, unless and until the aggregate amount of such Losses in such Contract Year exceeds US$500,000, in which event Operator shall then be liable for all Losses in excess of US$500,000. (§19.3) |
| **Amendments** | Neither the O&M Agreement nor any provision thereof may be changed, modified, amended or waived, except by written agreement duly executed by the Parties. Any such amendment shall not be effective until (i) to the extent required by Applicable Law, approved by PREB and the FOMB (if then in existence) and (ii) Administrator has obtained a Tax Opinion and a Reliance Letter, at the cost of Owner or Administrator, with respect to any such amendment. (§21.3) |
| **Governing Law** | The O&M Agreement shall be interpreted, construed and governed by and in accordance with, and enforced pursuant to, the laws of the Commonwealth of Puerto Rico. (§21.15) |

| Term | Summary |
|------|---------|
| **Commonwealth Support Provisions** | 1. Ratepayer Savings: No later than 90 days after the end of each Contract Year, Operator shall provide a summary (derived from reports otherwise provided to Administrator) to T&D Operator of Operator's calculation of the fuel and operational savings created by Operator's activities in the prior year. This summary shall provide T&D Operator with the information necessary to take such savings into account when proposing applicable electricity rates for PREB approval. Operator shall assist T&D Operator in developing strategies to use such savings to lower the applicable electricity rates. (§21.19(a)) |
| | 2. Employee Benefits and Protections: Operator shall provide Hired Former Employees of Owner with the following protections: (i) his or her job will be guaranteed for a minimum period of two (2) years and (ii) Hired Former Employees of Owner may only be separated them from the position during such period if he or she engages in behavior that warrants dismissal or constitutes just cause under Act 80 of May 30, 1970, as amended. (§21.19(b)) |
| | 3. Limits on Subcontracts: Operator shall disclose to Administrator information related to any Affiliate of Operator that proposes to participate relating to subcontracting of services under the O&M Agreement. Operator shall make commercially reasonable efforts to ensure that companies established in the Commonwealth or with a significant presence in the Commonwealth are included in the procurement process for materials and services under the O&M Agreement. (§21.19(c)) |
| | 4. Local Workforce Prioritization: Operator shall use commercially reasonable efforts to select companies established in the Commonwealth or with a significant presence in the Commonwealth as its Material Subcontractors. (§21.19(d)) |
| | 5. Enhance Transparency: No later than ninety (90) days following each Contract Year, Operator will provide an annual report for the Administrator to make available to the Legislative Assembly that includes a summary of the prior Contract Year's operational performance and expectations for the upcoming Contract Year. Administrator may reasonably request information on behalf of the Legislative Assembly or another Governmental Body. (§21.19(e)) |
| | 6. Agreement: Parties may extend the O&M Agreement only in conformity with the terms of the O&M Agreement; Administrator's approval of such extension shall be provided only following a decision of the Administrator's Board of Directors in accordance with Act 29 and Act 120. The O&M Agreement is deemed a PREPA Transaction subject to the requirements of Act 120. (§21.19(c)) |

This page has been intentionally left blank.



Roberto Sánchez Vilella (Minillas)
Government Center de Diego Ave. Stop 22 San Juan, PR 00907

www.p3.pr.gov

**<u>Exhibit B</u>**

*Execution Version*

**PRIVILEGED AND CONFIDENTIAL**

---

**PUERTO RICO THERMAL GENERATION FACILITIES**

**OPERATION AND MAINTENANCE AGREEMENT**

**dated as of**

**January 24, 2023**

**by and among**

**THE PUERTO RICO ELECTRIC POWER AUTHORITY**
as Owner,

**THE PUERTO RICO PUBLIC-PRIVATE PARTNERSHIPS AUTHORITY**
as Administrator,

and

**GENERA PR LLC**
as Operator

---

CONFIDENTIAL

## TABLE OF CONTENTS

**Page**

Article 1 Definitions; Interpretation...................................................................2
**Section 1.1**   Definitions.............................................................................2
**Section 1.2**   Interpretation; Construction..................................................35

Article 2 Purpose; Effective Date; Term..........................................................37
**Section 2.1**   Purpose.................................................................................37
**Section 2.2**   Effective Date......................................................................37
**Section 2.3**   Term.....................................................................................39

Article 3 Ownership of the Legacy Generation Assets.....................................40
**Section 3.1**   Ownership.............................................................................40
**Section 3.2**   Engagement of Operator.......................................................40
**Section 3.3**   Use of Legacy Generation Assets.........................................40
**Section 3.4**   Liens.....................................................................................40
**Section 3.5**   Right of Access....................................................................40
**Section 3.6**   Exclusivity...........................................................................41
**Section 3.7**   Essential Public Service.......................................................41
**Section 3.8**   Reporting Obligations..........................................................41
**Section 3.9**   Qualified Management Contract............................................41

Article 4 Mobilization Period..........................................................................42
**Section 4.1**   Mobilization Period Generally.............................................42
**Section 4.2**   Operator Responsibilities.....................................................44
**Section 4.3**   Owner and Administrator Responsibilities............................53
**Section 4.4**   Governmental Approvals and Tax Matters............................55
**Section 4.5**   Conditions Precedent to Service Commencement Date .......56
**Section 4.6**   Mobilization Period Compensation.......................................57
**Section 4.7**   Closing the Mobilization Period............................................59
**Section 4.8**   Failure of Service Commencement Date Conditions.............60

Article 5 O&M Services...................................................................................62
**Section 5.1**   Services Generally................................................................62
**Section 5.2**   Facility Contracts.................................................................63
**Section 5.3**   Facility Regulatory Matters..................................................64
**Section 5.4**   Safety and Security...............................................................66
**Section 5.5**   Labor and Employment; Employee Benefits.........................67
**Section 5.6**   Capital Spare Parts and Capital Improvements ...................68
**Section 5.7**   Management of Fuel and Fuel Contracts...............................70
**Section 5.8**   Federal Funding...................................................................70
**Section 5.9**   Environmental, Health and Safety Matters...........................71
**Section 5.10**  Accounting and Financial Services.......................................74
**Section 5.11**  Legal Matters.......................................................................74
**Section 5.12**  Coordination with T&D Operator.........................................75

CONFIDENTIAL

# TABLE OF CONTENTS
(continued)

Page

**Section 5.13**    Notification of Incidents and Emergencies.................................................76
**Section 5.14**    Information .....................................................................................................76
**Section 5.15**    Bill Payments ................................................................................................78
**Section 5.16**    Compliance with Obligations ........................................................................78
**Section 5.17**    Energy Policy.................................................................................................78
**Section 5.18**    Enforcement of Easements ............................................................................78
**Section 5.19**    Out-of-Service Units .....................................................................................78
**Section 5.20**    Communications Plan ....................................................................................79
**Section 5.21**    Other Services ...............................................................................................79
**Section 5.22**    Annual Performance Test ..............................................................................79

Article 6 Rights and Responsibilities of Owner and Administrator ................................79
**Section 6.1**    Rights and Responsibilities of Owner............................................................79
**Section 6.2**    Rights and Responsibilities of Administrator ...............................................81
**Section 6.3**    Reporting; Audits..........................................................................................82
**Section 6.4**    Staffing Levels ..............................................................................................83

Article 7 Compensation; O&M Budgets...........................................................................83
**Section 7.1**    Service Fee ....................................................................................................83
**Section 7.2**    Pass-Through Expenditures ..........................................................................86
**Section 7.3**    O&M Budgets ................................................................................................87
**Section 7.4**    O&M Budget Policy ......................................................................................89
**Section 7.5**    PREB Rate Proceedings.................................................................................90
**Section 7.6**    Service Accounts ..........................................................................................90
**Section 7.7**    Disallowed Costs. ..........................................................................................95
**Section 7.8**    Unfunded Amounts .......................................................................................95
**Section 7.9**    Owner Payment of Administrator Costs .......................................................96
**Section 7.10**    Payment Disputes.........................................................................................96

Article 8 Credit Support ...................................................................................................96
**Section 8.1**    Guarantee ......................................................................................................96
**Section 8.2**    Guarantor Reports .........................................................................................96

Article 9 Compliance with Applicable Law .......................................................................97
**Section 9.1**    Compliance Obligations.................................................................................97
**Section 9.2**    Anti-Corruption and Sanctions Laws............................................................97
**Section 9.3**    Commonwealth Requirements .......................................................................98
**Section 9.4**    Non-Discrimination Laws..............................................................................98
**Section 9.5**    Non-Collusion and Acceptance .....................................................................98
**Section 9.6**    Commonwealth Tax Liabilities......................................................................99
**Section 9.7**    Certifications Required by Commonwealth Contractor Requirements .................99
**Section 9.8**    Duty to Inform of Criminal Investigations ..................................................99

CONFIDENTIAL

## TABLE OF CONTENTS
(continued)

Page

**Section 9.9**   Act 120 ..........................................................................................99

Article 10 Insurance ...................................................................................99
**Section 10.1**   Insurance Generally ...........................................................................99
**Section 10.2**   Commercial Availability ....................................................................99
**Section 10.3**   Additional Named Insureds ..............................................................100
**Section 10.4**   Warranties .........................................................................................101
**Section 10.5**   Certificates of Insurance, Policies and Notice .................................101

Article 11 Subcontractors ..........................................................................101
**Section 11.1**   Ability to Subcontract .......................................................................101
**Section 11.2**   Subcontract Terms. ...........................................................................102
**Section 11.3**   Indemnity for Subcontractor Claims .................................................102
**Section 11.4**   Disclosure Related to Operator Affiliates .........................................103

Article 12 Taxation ....................................................................................103
**Section 12.1**   Withholding Tax ................................................................................103
**Section 12.2**   Tax Obligations .................................................................................103

Article 13 Intellectual Property; Proprietary Information ...........................104
**Section 13.1**   Intellectual Property ..........................................................................104
**Section 13.2**   Proprietary Information. .....................................................................106
**Section 13.3**   Data Security......................................................................................108

Article 14 Events of Default; Remedies .....................................................109
**Section 14.1**   Events of Default by Operator ...........................................................109
**Section 14.2**   Termination for Operator Event of Default .......................................111
**Section 14.3**   Events of Default By Owner...............................................................112
**Section 14.4**   Termination for Owner Event of Default............................................113
**Section 14.5**   Additional Termination Rights ..........................................................114
**Section 14.6**   Remedies Upon Early Termination ...................................................114

Article 15 Dispute Resolution ....................................................................116
**Section 15.1**   Scope .................................................................................................116
**Section 15.2**   Commencement of the Dispute Resolution Procedure .....................117
**Section 15.3**   Negotiation ........................................................................................117
**Section 15.4**   Expert Technical Determination Procedure for Technical Disputes ...118
**Section 15.5**   Mediation ...........................................................................................119
**Section 15.6**   Litigation as a Final Resort ................................................................121
**Section 15.7**   Waiver of Jury Trial ...........................................................................121
**Section 15.8**   Provisional Relief...............................................................................121
**Section 15.9**   Continuing Obligations ......................................................................121

CONFIDENTIAL

## TABLE OF CONTENTS
(continued)

Page

Article 16 Decommissioning .................................................................122
Section 16.1 Notice and Approval for Retirement of Legacy Generation Assets and Commencement of Decommissioning Services. .................................................122
Section 16.2 Decommissioning Compensation. ....................................................123

Article 17 Demobilization.....................................................................124
Section 17.1 Demobilization Services. ............................................................124
Section 17.2 Termination Prior to Completion of Decommissioning ....................................125
Section 17.3 Demobilization Period Compensation ................................................126

Article 18 Force Majeure Events ..............................................................128
Section 18.1 Notice; Mitigation .................................................................128
Section 18.2 Relief...............................................................................128

Article 19 Indemnification ...................................................................129
Section 19.1 Indemnification by Operator.........................................................129
Section 19.2 Indemnification by Owner ..........................................................130
Section 19.3 Limitation on Liability ..............................................................132
Section 19.4 Insurance and Other Recovery........................................................133
Section 19.5 Liability Limitation for Certain Damages.............................................134
Section 19.6 Additional Liability Limitation for Certain Damages ...................................134

Article 20 Representations and Warranties.......................................................135
Section 20.1 Representations and Warranties of Owner .............................................135
Section 20.2 Representations and Warranties of Operator ..........................................136

Article 21 Miscellaneous .....................................................................140
Section 21.1 Fees and Expenses .................................................................140
Section 21.2 Notices ............................................................................140
Section 21.3 Amendments ......................................................................141
Section 21.4 Entire Agreement ..................................................................142
Section 21.5 Relationship of the Parties .........................................................142
Section 21.6 Assignment and Transfer ...........................................................142
Section 21.7 Interest on Overdue Obligations .....................................................143
Section 21.8 Waivers ...........................................................................143
Section 21.9 Severability ........................................................................144
Section 21.10 Survival ...........................................................................144
Section 21.11 No Third-Party Beneficiaries .......................................................144
Section 21.12 Remedies..........................................................................144
Section 21.13 Counterparts.......................................................................145
Section 21.14 Office of the Comptroller...........................................................145
Section 21.15 Governing Law ....................................................................145

CONFIDENTIAL

# TABLE OF CONTENTS
(continued)

**Page**

**Section 21.16** Commonwealth Obligations ....................................................145
**Section 21.17** PREB Authority ...................................................................145
**Section 21.18** Non-Recourse .....................................................................146
**Section 21.19** Commonwealth Support Provisions .......................................146

ANNEXES

Annex I Legacy Generation Assets.................................................................I-1
Annex II Compensation .............................................................................. II-1
Annex III Baseline Environmental Study .....................................................III-1
Annex IV [Reserved] ...................................................................................IV-1
Annex V Communications Plan..................................................................... V-1
Annex VI Organizational Conflict of Interest Policy ......................................VI-1
Annex VII Mobilization Plan..................................................................... VII-1
Annex VIII PREPA-Genco-Hydroco Operating Agreement............................ VIII-1
Annex IX Scope of Services .........................................................................IX-1
Annex X Operator Employment Requirements ............................................... X-1
Annex XI Mobilization Hourly Fully Allocated Rates.....................................XI-1
Annex XII Pass-Through Expenditures ........................................................ XII-1
Annex XIII Insurance Specifications ........................................................... XIII-1
Annex XIV Termination Fees.......................................................................XIV-1
Annex XV Decommissioning Plan................................................................ XV-1
Annex XVI Demobilization Plan..................................................................XVI-1
Annex XVII Fuel Contracts .........................................................................XVII-1

EXHIBITS

Exhibit A Form of Guarantee Agreement........................................................ A-1
Exhibit B Form of Reliance Letter................................................................. B-1
Exhibit C Form of Sworn Statement.............................................................. C-1
Exhibit D Form of Tax Opinion – Effective Date ........................................... D-1
Exhibit E Form of Commonwealth Certifications.............................................E-1
Exhibit F Form of Anti-Corruption Certifications............................................F-1
Exhibit G Form of Acknowledgement of Consent Decree................................. G-1
Exhibit H Form of Consent to Federal Funding .............................................H-1

CONFIDENTIAL

## PUERTO RICO THERMAL GENERATION FACILITIES
## OPERATION AND MAINTENANCE AGREEMENT

This PUERTO RICO THERMAL GENERATION FACILITIES OPERATION AND MAINTENANCE AGREEMENT (this "Agreement") is made and entered into as of this 24th day of January, 2023 by and among: (i) the Puerto Rico Electric Power Authority ("PREPA" or "Owner"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, created by Act No. 83 of the Legislative Assembly of Puerto Rico, enacted on May 2, 1941; (ii) the Puerto Rico Public-Private Partnerships Authority ("Administrator"), a public corporation of the Commonwealth of Puerto Rico, created by Act No. 29 of the Legislative Assembly of Puerto Rico, enacted on June 8, 2009; and (iii) Genera PR LLC ("Operator" and, together with Owner and Administrator, the "Parties" and each a "Party"), a limited liability company organized under the laws of Puerto Rico. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in Article 1 (*Definitions; Interpretation*).

## RECITALS

**WHEREAS**, Owner owns and operates the base-load generation plants and combustion turbine peaking units listed on Annex I (*Legacy Generation Assets*) in which Owner has an ownership interest (the "Legacy Generation Assets");

**WHEREAS**, in accordance with Act No. 120 of the Legislative Assembly of Puerto Rico, enacted on June 21, 2018 ("Act 120"), known as the "Puerto Rico Electric System Transformation Act," the Legislative Assembly established a path for a more reliable, efficient and low-cost electric system with the intent of economic development;

**WHEREAS**, pursuant to Act 120, Owner desires to engage Operator to provide the O&M Services for the Legacy Generation Assets in accordance with the terms of this Agreement and has designated Administrator as a Representative of Owner for purposes of this Agreement;

**WHEREAS**, pursuant to, and under the terms and conditions contained in, Act No. 29 of the Legislative Assembly of Puerto Rico, enacted on June 8, 2009 ("Act 29"), known as the "Public-Private Partnership Authority Act," and Act 120, Owner is authorized to execute and deliver this Agreement, perform its obligations hereunder and enter into the transactions contemplated hereby;

**WHEREAS**, the Government of Puerto Rico is a vital and active participant in the energy transformation and public policy process, and Operator recognizes the responsibility that the Governmental Bodies have in representing the Puerto Rican people and ensuring their continued prosperity and bright future;

**WHEREAS**, in light of the foregoing, Operator seeks to have a positive and constructive relationship with the Legislative Assembly, including transparent communications as a fundamental pillar of the public-private partnership, as it executes the Agreement and works to provide a more reliable, efficient and low-cost generation system for the people of the Commonwealth of Puerto Rico and its businesses; and

CONFIDENTIAL

**WHEREAS**, Operator desires to provide the O&M Services for the Legacy Generation Assets in accordance with the terms of this Agreement.

**NOW THEREFORE**, in consideration of the mutual covenants, representations, warranties and agreements contained herein and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties covenant and agree as follows:

**Article 1
DEFINITIONS; INTERPRETATION**

**Section 1.1**   Definitions. As used in this Agreement, the following capitalized terms have the respective meanings set forth below.

"AAFAF" means the Puerto Rico Fiscal Agency and Financial Advisory Authority.

"Act 2" means Act No. 2 of the Legislative Assembly of Puerto Rico, enacted on January 4, 2018 (known as the "Anticorruption Code for the New Puerto Rico").

"Act 3" means Act No. 3 of the Legislative Assembly of Puerto Rico, enacted on January 23, 2017 (known as the "Puerto Rico Financial Emergency and Fiscal Responsibilities Act").

"Act 17" means Act No. 17 of the Legislative Assembly of Puerto Rico, enacted on April 11, 2019 (known as the "Puerto Rico Energy Public Policy Act").

"Act 26" means Act No. 26 of the Legislative Assembly of Puerto Rico, enacted on January 27, 2017 (known as the "Fiscal Plan Compliance Act").

"Act 29" has the meaning set forth in the Recitals.

"Act 38" means Act No. 38 of the Legislative Assembly of Puerto Rico, enacted on June 30, 2017 (known as the "Government of Puerto Rico Uniform Administrative Procedure Act").

"Act 57" means Act No. 57 of the Legislative Assembly of Puerto Rico, enacted on May 17, 2014 (known as the "Puerto Rico Energy Transformation and RELIEF Act").

"Act 66" means Act No. 66 of the Legislative Assembly of Puerto Rico, enacted on June 17, 2014 (known as the "Special Law for the Fiscal and Operational Sustainability of the Government of the Commonwealth of Puerto Rico").

"Act 120" has the meaning set forth in the Recitals.

"Act 173" has the meaning set forth in Section 9.3(b) (*Commonwealth Requirements – Practice of Engineering, Architecture and Other Professions in the Commonwealth*).

CONFIDENTIAL

"Act 237" means Act No. 237 of the Legislative Assembly of Puerto Rico, enacted on August 31, 2004, which establishes parameters and procedures for contracting professional or consulting services for government agencies and entities in the Commonwealth of Puerto Rico.

"Actual Fuel Savings" has the meaning set forth in Annex II, Section III.B.6 (*Compensation – O&M Services Categories – Fuel Optimization*).

"Adjusted O&M Fixed Fee" has the meaning set forth in Section I.B of Annex II (*Compensation – O&M Fixed Fee – Adjustments to O&M Fixed Fee upon Decommissioning or Removal from Scope of Services*).

"Adjustment Date" has the meaning set forth in Section I.B of Annex II (*Compensation – O&M Fixed Fee – Adjustments to O&M Fixed Fee upon Decommissioning or Removal from Scope of Services*).

"Administrator" has the meaning set forth in the introductory paragraph.

"Administrator Dispute" has the meaning set forth in Section 6.2(b) (*Rights and Responsibilities of Administrator – Disputes*).

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly, including through one or more intermediaries, Controls, is Controlled by or is under common Control with such Person; provided, that each Equity Participant and its Affiliates shall be deemed "Affiliates" of Operator.

"Agreed Operating Procedures" means the written operating procedures developed in accordance with the PREPA-Genco-Hydroco Operating Agreement, which shall include: (i) a method of day-to-day and real-time communications; (ii) clearances and switching practices; (iii) outage scheduling; (iv) daily available energy reports; (v) economic dispatch of dependable capacity, spinning reserve capacity and excess capacity; (vi) reactive power support; (vii) voltage scheduling; (viii) emergency procedures; and (ix) other necessary reporting procedures.

"Agreement" has the meaning set forth in the introductory paragraph.

"Annual Performance Test" means the performance tests to be conducted each Contract Year to determine the Tested Capacity and Heat Rate for each Legacy Generation Asset in accordance with the requirements and procedures to be agreed upon with T&D Operator in accordance with the PREPA-Genco-Hydroco Operating Agreement.

"Anti-Corruption Laws" has the meaning set forth in Section 9.2(a) (*Anti-Corruption and Sanctions Laws – Anti-Corruption*).

"Applicable Law" means any foreign, national, federal, state, Commonwealth, municipal or local law, constitution, treaty, convention, statute, ordinance, code, rule, regulation, common law, case law or other similar requirement enacted, adopted, promulgated or applied by any Governmental Body, including any Environmental Law, or PROMESA, and any order issued by the Title III Court, in each case applicable to the Parties.

CONFIDENTIAL

"Audit" means a review with respect to any matter relating to the Legacy Generation Assets, the O&M Services or this Agreement, including compliance with the terms of this Agreement, conducted in accordance with applicable United States audit practices customarily accepted in the electric sector and the terms of this Agreement or as required by Applicable Law.

"Authorized Inspector" has the meaning set forth in Section 6.3(a) (*Reporting; Audits – Generally*).

"Bankruptcy Code" means the United States Bankruptcy Code, 11 U.S.C. 101 et seq. "Bankruptcy Code" shall also include (i) Title III of PROMESA, (ii) Title VI of PROMESA, (iii) any similar state or Commonwealth law relating to bankruptcy, insolvency, the rights and remedies of creditors, the appointment of receivers or the liquidation of companies and estates that are unable to pay their debts when due and (iv) any similar insolvency or bankruptcy code applicable under the laws of any other jurisdiction.

"Baseline Environmental Study" means the environmental study identifying Pre-Existing Environmental Conditions attached hereto as Annex III (*Baseline Environmental Study*) and to be updated during the Mobilization Period.

"Baseload Unit" means each Legacy Generation Asset designated as a Baseload Unit in Annex I (*Legacy Generation Assets*).

"Bid Security" means a letter of credit or other form of acceptable security to backstop Operator's commitment to execute this Agreement, the requirements of which are described in the RFP.

"Budgets" means the O&M Budget, the Operating Budget, the Decommissioning Budget, a Default Budget or the Fuel Budget, and "Budget" means any one of the foregoing.

"Budget Allocation Meeting" has the meaning set forth in Section 7.3(a) (*O&M Budgets – Budget Allocation Meeting*).

"Business Day" means any day that is not a Saturday, a Sunday or a day observed as a holiday by either the Commonwealth or the United States federal government.

"Capital Spare Part" means any major, new or refurbished, equipment item the cost of which is equal to or in excess of US$1,000,000 that is required to ensure the reliability of the Legacy Generation Asset.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601 et seq.

"Change in Law" means any of the following events or conditions occurring on or after the Proposal Submission Date that has had, or is reasonably expected to have, a material adverse effect on the performance or the cost of performance by the Parties of their respective obligations under this Agreement (other than payment obligations), or on the operation or maintenance of the Legacy Generation Assets:

CONFIDENTIAL

(i)      the adoption, promulgation or issuance of a modification or written change in the Applicable Law or the administrative or judicial interpretation thereof, unless such modification or written change was duly adopted, promulgated or issued in final form prior to the Proposal Submission Date and becomes effective without any further action by any Governmental Body or governmental official having jurisdiction;

(ii)     any order or judgment of any Governmental Body to the extent such order or judgment is not the result of willful misconduct or negligent action or omission or lack of reasonable diligence of the Party claiming the occurrence of a Change in Law; provided, however, that the contesting in good faith or the failure in good faith to contest any such order or judgment shall not constitute or be construed as such a willful misconduct or negligent action or omission of, or lack of reasonable diligence by, the Party;

(iii)    the denial of an application for, the delay in the review, issuance or renewal of, or the suspension, termination, interruption, imposition of a new condition in connection with the issuance, renewal or the failure of issuance or renewal of any Governmental Approval to the extent that such denial, delay, suspension, termination, interruption, imposition of a new condition or failure (A) interferes with the performance of this Agreement and (B) is not the result of willful misconduct or negligent action or omission or a lack of reasonable diligence of the Party claiming the occurrence of a Change in Law; provided, however, that the contesting in good faith or the failure in good faith to contest any such denial, delay, suspension, termination, interruption, imposition of a new condition or failure shall not be construed as such a willful misconduct or negligent action or omission of, or lack of reasonable diligence by, the Party; or

(iv)     the commencement by or joinder of Operator in any action or contested matter in the Title III Case in order to protect its rights under this Agreement,

provided that "Change in Law" shall not include (x) the imposition of a Tax, or an increase in Taxes, unless (A) the Tax Decree is revoked (unless if due to Operator's noncompliance with the terms thereof) or amended without Operator's consent in a manner materially detrimental to Operator or any of its Affiliates or (B) the imposition or increase has a materially disproportionate impact on any of Operator, the Legacy Generation Assets or private operators of generation facilities in the Commonwealth or Contractors (as defined in Act 29) compared to any other entities that operate in the Power and Electricity sector in the Commonwealth; or (y) the delay or denial of any request to approve an O&M Budget or performance relief, except where arising out of the Title III Case.

"Change in Regulatory Law" means any change, amendment or modification to any Commonwealth Applicable Law (and not, for the avoidance of doubt, the Applicable Law of any other jurisdiction) or any adoption of, or change to, any administrative or judicial interpretation (having the force of law) of any Commonwealth Applicable Law or any regulation or regulatory action under any Commonwealth Applicable Law, including the entry of any consent decree to resolve any Legal Proceeding arising under any Environmental Law or any Environmental Approval, in each case occurring on or after the Proposal Submission Date, that:

CONFIDENTIAL

(i)     alters the scope of PREB's statutory oversight over Operator or Owner in a manner that materially and adversely affects Operator's ability to perform its obligations under this Agreement;

(ii)     renders unenforceable or invalid, in whole or in part, any right or privilege granted to Operator under this Agreement, including by invalidating Operator's selection under the RFP; or

(iii)     subjects Operator (or any of its Affiliates or Subcontractors that provides O&M Services hereunder) to other substantive regulation by PREB in a manner that materially and adversely affects Operator's ability to perform its obligations under this Agreement to the extent not otherwise mitigated by the terms of this Agreement, or that constitutes a default by the FOMB under the terms of the FOMB Protocol Agreement, <u>provided</u>, that written notice of such default has been given to FOMB by Operator and such default continues unremedied for a period of thirty (30) days following such written notice, <u>provided</u>, <u>further</u>, that any such default by the FOMB shall constitute a Change in Regulatory Law regardless of whether the conditions in the introductory paragraph of this definition are satisfied.

"<u>Change of Control</u>" means, with respect to Operator, whether accomplished through a single transaction or a series of related transactions and whether accomplished directly or indirectly, (i) a change in ownership resulting in more than 50% of the direct or indirect voting or economic interests in Operator being transferred to another Person or group of Persons acting in concert that did not have such direct or indirect voting or economic interests immediately prior to such transaction or transactions, (ii) the power directly or indirectly to direct or cause the direction of management and policy of Operator, whether through ownership of voting securities, by contract, management agreement or common directors, officers or trustees or otherwise, being transferred to another Person or group of Persons acting in concert that did not have such power immediately prior to such transaction or transactions or (iii) the merger, consolidation, amalgamation, business combination involving Operator or sale of substantially all of the assets of Operator for the purpose of or with the effect contemplated in clauses (i) or (ii) above; <u>provided</u>, <u>however</u>, that, notwithstanding anything to the contrary set forth in this definition, so long as either (x) the Guarantee continues to be provided or (y) Operator is a Controlled direct or indirect subsidiary of Parent Company upon completion of the relevant transaction(s), none of the following shall constitute a "Change of Control" for the purposes of this Agreement:

(A)     transfers of direct or indirect ownership, voting or economic interests in Operator between or among Persons that are Affiliates of each other or Persons who are under common Control;

(B)     transfers or sales of shares of Operator or the direct or indirect shareholders of Operator pursuant to bona fide open market transactions (including block trades) on the New York Stock Exchange, NASDAQ, London Stock Exchange or comparable United States or foreign securities exchange, including any such transactions involving an initial or "follow on" public offering;

(C)     transfers of direct or indirect ownership interests in Operator by any Equity Participant(s) or its/their beneficial owner(s) to any Person(s) so long as the Equity Participants or

CONFIDENTIAL

their respective beneficial owner(s) having ownership interests in Operator (as of the later of (1) the Effective Date or (2) the date on which Administrator most recently approved a Change of Control pursuant to Section 21.6 (*Assignment and Transfer*) or waived a Change of Control pursuant to Section 14.2(b) (*Termination for Operator Event of Default – Termination for Other Operator Event of Default*)) together retain, in the aggregate, 50% or more of the direct or indirect voting or economic interests in Operator or the power directly or indirectly to direct or cause the direction of management and policy of Operator, through ownership of voting securities or common directors, officers or trustees; or

(D)   a transfer of the direct or indirect ownership interest in Operator, including any events contemplated in (i), (ii) and (iii) of this definition above, or in any Affiliates of Operator.

"Claiming Party" has the meaning set forth in Section 18.1(a) (*Notice; Mitigation – Notice*).

"Clean Air Act" means the means the Clean Air Act of 1970, 42 U.S.C. §§ 7401 et seq, and regulations promulgated thereunder.

"Commencement Date Governmental Approvals" has the meaning set forth in Section 4.4 (*Governmental Approvals and Tax Matters*).

"Commonwealth" means the Commonwealth of Puerto Rico.

"Commonwealth Court" means the Commonwealth Court of First Instance, San Juan Part.

"Communications Plan" has the meaning set forth in Section 2.2(b)(xi) (*Effective Date – Conditions to Execution*).

"Confidential Information" means data or information in any form disclosed by one Party to the other Party by any means, if and for so long as the data and information are protectable as trade secrets by the disclosing Party or are otherwise confidential. As a non-exhaustive list of examples, "Confidential Information" includes non-public information regarding a Party's Intellectual Property, financial condition and financial projections, business and marketing plans, product plans, product and device prototypes, the results of product testing, research data, market intelligence, technical designs and specifications, secret methods, manufacturing processes, source code of proprietary software, the content of unpublished patent applications, customer lists, vendor lists, internal cost data, the terms of contracts with employees and third parties, and information tending to embarrass the disclosing Party or tending to tarnish its reputation or brand. For the avoidance of doubt, information in this list of examples is only considered "Confidential Information" for so long as it has not been made known to the general public by the disclosing Party or through the rightful actions of a third party.

"Consent Decree" means the Consent Decree between PREPA and the United States of America (through the United States Department of Justice and the EPA), as entered by the United States District Court for the District of Puerto Rico on March 19, 1999 in Civil Action No. 93-2527(CCC), as modified on September 9, 2004, and as may be further modified in the future, including any successor consent decree thereto.

CONFIDENTIAL

"Consumables" means consumables of all kinds that are necessary for the operation and maintenance of the Legacy Generation Assets, or any part thereof, including gaskets, parts that are not repairable, oils, grease, chemicals, lubricants, filters, resins and specialty gases but excluding fuel, electricity and water.

"Contract Nullification or Cancellation" has the meaning set forth in Section 14.6(c)(i) (*Remedies Upon Early Termination – Termination Fee*).

"Contract Standards" means the terms, conditions, methods, techniques, practices and standards imposed or required by: (i) Applicable Law; (ii) Prudent Industry Practice; (iii) applicable equipment manufacturer's specifications and reasonable recommendations set forth in the Facility Contracts; (iv) applicable insurance requirements under any insurance procured pursuant to this Agreement; (v) the Procurement Manual; and (vi) any other standard, term, condition or requirement specifically contracted in this Agreement to be observed by Operator.

"Contract Year" means the period from July 1 through June 30 of the following year during that portion of the Term commencing on the Service Commencement Date; provided, however, that (i) the initial Contract Year shall commence on the Service Commencement Date and end on June 30th of the following calendar year and (ii) the final Contract Year shall end on June 30th of the calendar year after the calendar year in which the tenth (10th) anniversary of the Service Commencement Date occurs. Any computation made on the basis of a Contract Year shall be adjusted on a Pro Rata basis to take into account any Contract Year of more or less than 365 days.

"Control", "Controlled by" and similar expressions mean the power, directly or indirectly, to direct or cause the direction of the management and policies of an entity, whether through the ownership of outstanding share capital (or equivalent interest), by contract or otherwise. Without limiting the foregoing, a Person shall be deemed to control another Person (i) if such Person has directly or indirectly designated a majority of the board of directors (or equivalent governing body) of such other Person or (ii) if such Person has the direct or indirect power whether through ownership of outstanding share capital (or equivalent interest), by contract or otherwise to designate a majority of the board of directors (or equivalent governing body) of such other Person.

"Copyright" means the exclusive legal rights held by the owner of a copyright including the rights to copy, publicly perform, publicly display, distribute, adapt, translate, modify and create derivative works of copyrighted subject matter, including the rights to any registrations and applications therefor, together with all renewals, extensions, translations, adaptations, derivations and combinations therefor, works of authorship, publications, documentation, website content, rights in fonts and typefaces and database rights.

"COR3" means the Central Office of Recovery, Reconstruction and Resiliency.

"Covered Contract" means any contract (i) for management, service, or incentive payment arrangements between Owner, Administrator, or Operator and another Person under which such Person provides services involving all, a portion of, or any function of, the Legacy

CONFIDENTIAL

Generation Assets; (ii) for the sale, lease, or use of Legacy Generation Assets and (iii) to sell Power and Electricity or electric capacity if (x) the term of such contract is in excess of three (3) years or (y) any fees under such contract were not based on a negotiated, arm's length agreement that provides for compensation at fair market value or generally applicable and uniformly applied rates; provided that "Covered Contract" shall not include any (A) Subcontract in which the compensation to the Subcontractor is paid by Operator solely out of the applicable Service Fee, (B) contract for services that are solely incidental to the primary governmental function or functions of the Legacy Generation Assets (such as contracts for janitorial, equipment repair, bookkeeping, physical security, or similar services), (C) contract for services performed exclusively during the Mobilization Period, pursuant to Article 16 (*Decommissioning*) or Article 17 (*Demobilization*) or in accordance with the Shared Services Agreement, (D) contract to design, build, rehabilitate or purchase property, assets, equipment or supplies, (E) contract to procure natural gas, coal or fuel oil, (F) contract for management, service or incentive payment arrangement or for consulting services under which the compensation consists entirely of a fixed fee and/or fees at hourly rates, (G) a negotiated, arm's length contract with a term of less than fifty (50) days, and (H) sales of assets (other than real property) in the ordinary course of business at the end of their expected useful lives.

"CPI Factor" means, with respect to any Contract Year, the amount equal to (i) CPI Value for the twelve month period immediately prior to the relevant Contract Year *divided by* (ii) the CPI Value for the twelve month period from and including December 2020 to and including November 2021 (subject only to a re-basing of the value for such period during the Term, if applicable), rounded to the fifth decimal place; provided, however, that in no case shall be the CPI Factor for any adjustment period be less than 1.000 or greater than 3.000.

"CPI Value" for any year means the "Annual Value" of such year obtained from "Consumer Price Index—All Urban Consumers—U.S. All Items Less Food and Energy (CUUR0000SA0L1E)" published by the Bureau of Labor Statistics of the United States Department of Labor, which is the calendar year 12-month average rounded to three decimal places; provided, however, that: (i) if such index is changed so that the base year thereof changes, such index shall be converted in accordance with the conversion factor published by the Bureau of Labor Statistics of the United States Department of Labor; (ii) if such index is discontinued or revised during the Term, such other index or computation with which it is replaced shall be used in order to obtain substantially the same result as would be obtained if such index had not been discontinued or revised; and (iii) any such revision shall not result in the retroactive adjustment of any amounts paid or payable pursuant to this Agreement prior to such revision. For illustrative purposes only, the CPI Value for the calendar year 2020 is 267.693, which can be obtained directly as an annual value or computed using monthly values with data from the official website of the Bureau of Labor Statistics of the United States Department of Labor.

"Critical Employee Positions" has the meaning set forth in Section 4.2(h) (*Operator Responsibilities – Owner Employees in Critical Positions*).

"Cybersecurity Breach" means any successful act to gain unauthorized access to, disrupt or misuse an Information System or information stored on such Information System.

CONFIDENTIAL

"Data Room" means the virtual data room containing written documents and information relating to the Owner and the Legacy Generation Assets made available on the Intralinks online datasite under the name "P3 Power System Projects" and to which Operator and its Representatives has had access on and prior to the date of this Agreement.

"Declared Emergency or Major Disaster" means an event declared as an emergency or major disaster in accordance with the provisions of the Stafford Act.

"Decommissioning Account" has the meaning set forth in Section 7.6(c)(i) (*Service Accounts – Decommissioning Account*).

"Decommissioning Budget" has the meaning set forth in Section 16.2(a) (*Decommissioning Compensation – Decommissioning Budget*).

"Decommissioning Budget Dispute" has the meaning set forth in Section 16.2(c) (*Decommissioning Compensation – Decommissioning Budget Disputes*).

"Decommissioning Commencement Date" has the meaning set forth in Section 16.1(b) (*Notice and Approval for Retirement of Legacy Generation Assets and Commencement of Decommissioning Services – Decommissioning Plan*).

"Decommissioning Completion Date" has the meaning set forth in Section 16.1(b) (*Notice and Approval for Retirement of Legacy Generation Assets and Commencement of Decommissioning Services – Decommissioning Plan*).

"Decommissioning Incentive Payment" means one or more incentive payments based on Operator's performance of the Decommissioning Services, as calculated pursuant to Section III.C.1 of Annex II (*Compensation – Incentives and Penalties – Decommissioning Services Categories – Decommissioning Costs Efficiency*).

"Decommissioning Notification Date" has the meaning set forth in Section 16.1(a) (*Notice and Approval for Retirement of Legacy Generation Assets and Commencement of Decommissioning Services – Generally*).

"Decommissioning Penalty" means one or more liquidated damages penalties based on Operator's performance of the Decommissioning Services.

"Decommissioning Plan" has the meaning set forth in Section 16.1(b) (*Notice and Approval for Retirement of Legacy Generation Assets and Commencement of Decommissioning Services – Decommissioning Plan*).

"Decommissioning Services" means services provided under this Agreement in order to complete the dismantlement and removal of the structures comprising the Legacy Generation Assets, and all other activities indispensable for the retirement, dismantlement, Decontamination or storage of the Legacy Generation Assets, including the services contemplated by the Decommissioning Plan, in each case in compliance with Applicable Law and in accordance with the Integrated Resource Plan; provided that the Decommissioning Services shall not include O&M Services or Demobilization Services.

CONFIDENTIAL

"Decontamination" means the removal of Hazardous Materials from a specified area in accordance with Prudent Industry Practice and Applicable Law.

"Default Budget" has the meaning set forth in Section 7.3(g) (*O&M Budgets – Default Budget*).

"Delay Liquidated Damages" has the meaning set forth in Section 4.8(a) (*Failure of Service Commencement Date Conditions – Remedy for Delay of Service Commencement Date Conditions*).

"Delay Period Date" has the meaning set forth in Section 4.8(a) (*Failure of Service Commencement Date Conditions – Remedy for Delay of Service Commencement Date Conditions*).

"Demobilization Account" has the meaning set forth in Section 17.3(c)(i) (*Demobilization Period Compensation – Funding*).

"Demobilization Commencement Date" has the meaning set forth in Section 17.1(a) (*Demobilization Services – Generally*).

"Demobilization Period" means the period of time from and including the Demobilization Commencement Date through the last day of the Term.

"Demobilization Plan" has the meaning set forth in Section 17.1(b) (*Demobilization Services – Demobilization Plan*).

"Demobilization Service Fee" has the meaning set forth in Section 17.3(b) (*Demobilization Period Compensation – Demobilization Service Fee*).

"Demobilization Service Fee Dispute" has the meaning set forth in Section 17.3(d)(ii) (*Demobilization Period Compensation – Invoices*).

"Demobilization Service Fee Estimate Dispute" has the meaning set forth in Section 17.3(c)(iii) (*Demobilization Period Compensation – Funding*).

"Demobilization Services" means services provided under this Agreement in order to complete the demobilization and handover of the rights and responsibilities, if any, with respect to the remaining Legacy Generation Assets, back to Owner or to a successor operator upon the early termination or expiration of the Term, including the services contemplated by the Demobilization Plan; provided that the Demobilization Services shall not be O&M Services or Decommissioning Services.

"Designated Person" means each Representative of Operator or Administrator who is designated as such for the purposes of Article 15 (*Dispute Resolution*).

"DHS" means U.S. Department of Homeland Security.

11

CONFIDENTIAL

"Disallowed Costs" has the meaning set forth in Section 7.7(a) (*Disallowed Costs – Generally*).

"Disallowed Costs Dispute" has the meaning set forth in Section 7.7(b) (*Disallowed Costs – Disallowed Costs Disputes*).

"Dispute" has the meaning set forth in Section 15.1 (*Scope*).

"Dispute Resolution Procedure" has the meaning set forth in Section 15.1 (*Scope*).

"Easement" means those certain real property rights vested or to be vested in Owner, whether or not recorded in the Registry of the Property of Puerto Rico, that: (i) encumber land portions or estates for the benefit of the Legacy Generation Assets to permit the ingress to and egress from each Generation Site to the public road; (ii) grant air rights; (iii) constitute restrictive use and construction covenants (*servidumbres en equidad*) for the operation of the Legacy Generation Assets; and (iv) allow for the construction and installation of above- or below-ground improvements and equipment and for the addition to, or maintenance, repair, restoration, replacement or alteration of, the Legacy Generation Assets or any other service for the Legacy Generation Assets.

"Effective Date" has the meaning set forth in Section 2.2(a) (*Effective Date – Execution of the Agreement*).

"Emergency" or "Emergency Event" means (i) any Declared Emergency or Major Disaster and (ii) any other circumstance defined as an Emergency in the Legacy Generation Emergency Response Plan to be prepared pursuant to Section 4.2(e) (*Operator Responsibilities – Legacy Generation Emergency Response Plan*).

"Emergency Unit" means each Legacy Generation Asset designated as an Emergency Unit in Annex I (*Legacy Generation Assets*).

"Energy Compliance Certificate" means the certificate issued by the PREB certifying that this Agreement complies with Act 120 and the regulatory framework, including Act 17.

"Environmental Approval" means any Governmental Approval issued under any Environmental Law.

"Environmental Claim and Cleanup Liability" means: (i) any liabilities, costs or expenses arising from or relating to any claim by a Governmental Body or other third party pursuant to any Environmental Law for personal injury, property damage or damage to natural resources or the environment (whether based on negligent or grossly negligent acts or omissions, statutory liability or strict liability without fault or otherwise) in connection with the Legacy Generation Assets, the O&M Services, the Decommissioning Services, the Mobilization Services or the Demobilization Services; (ii) any liabilities, costs or expenses arising from or relating to any investigation, study, response, remediation or abatement of any Release or threatened Release of Hazardous Materials, to the extent required by any Environmental Law or to meet the published cleanup standards of any Governmental Body with jurisdiction over such Release, and in

12

CONFIDENTIAL

accordance with the Safety and Hazardous Materials Procedures Manual, in connection with the Legacy Generation Assets, the O&M Services or the Decommissioning Services; (iii) any fines or penalties assessed for Environmental Noncompliance in connection with the Legacy Generation Assets, the O&M Services or the Decommissioning Services; or (iv) any liabilities, costs or expenses necessary to restore, achieve or maintain compliance with any Environmental Law.

"Environmental Law" means (i) any law, statute, ordinance, code, rule, regulation, order, writ, injunction, decree, ruling, determination, award, standard, permit or variance of any Governmental Body, or any binding agreement with any Governmental Body or the Consent Decree, and (ii) any other consent order or decree, settlement agreement or other similar agreement between Owner and the Puerto Rico Department of Natural and Environmental Resources, EPA, the United States Department of Justice, or other relevant Governmental Body, in each case having the force of law and applicable from time to time, relating to (A) the conservation, protection, pollution, contamination or remediation of the environment or natural resources, (B) any Hazardous Material, including investigation, study, remediation or abatement of such Hazardous Material, (C) the storage, treatment, disposal, recycling or transportation of any Hazardous Material or (D) human health or safety. For avoidance of doubt, Environmental Law includes the Consent Decree and the State Implementation Plan.

"Environmental Noncompliance" means the ownership or operation of the Legacy Generation Assets or Generation Sites in violation of Environmental Laws or the terms of any Environmental Approval.

"EPA" means the United States Environmental Protection Agency.

"Equity Participant" means any Person who holds any shares of capital stock or securities of, or units, partnership interests, membership interests or other equity interests in, Operator.

"Event of Default" means an Operator Event of Default or an Owner Event of Default, as the case may be.

"Existing Litigation" means any legal claims involving or affecting the Legacy Generation Assets and/or the Generations Sites, or the Owner as they relate to the Legacy Generation Assets and/or the Generation Sites, in each case which are pending or threatened in writing as of the Service Commencement Date.

"Expert Technical Determination" has the meaning set forth in Section 15.4(a) (*Expert Technical Determination Procedure for Technical Disputes – Generally*).

"Extended Event" has the meaning set forth in Section 18.2(c) (*Relief – Extended Event*).

"Extension Term" has the meaning set forth in Section 2.3(b)Section 2.3(b) (*Term – Extension*).

"Facility Contracts" means (i) the contracts, leases, licenses, permits and other similar arrangements of all types related to the Legacy Generation Assets that have been entered

13

CONFIDENTIAL

into by Owner (or pursuant to which Owner otherwise has rights), remain in effect as of the Service Commencement Date and (ii) any other contracts, leases, licenses, permits and similar arrangements of all types entered into after the Effective Date by Owner, or by Operator on behalf and as agent of Owner related to the Legacy Generation Assets, O&M Services, Decommissioning Services or the Demobilization Services pursuant to Section 4.3(d) (*Owner and Administrator Responsibilities – Additional Facility Contracts Between Effective Date and Service Commencement Date*) and/or Section 5.2(d) (*Facility Contracts – Additional Facility Contracts or Expired Facility Contracts After Service Commencement Date*), including contracts related to:

(A)    the ownership and operation and maintenance of the Legacy Generation Assets (including long-term service agreements with original equipment manufacturers and other related agreements);

(B)    the procurement, delivery, quality-testing and storage of fuel, and the maintenance of fuel tanks and pipelines (i.e., Fuel Contracts);

(C)    all information technology hardware and software used to operate or administrate the Legacy Generation Assets; or

(D)    Legacy Generation Assets operation, decommissioning, or ancillary services.

For the avoidance of doubt, Facility Contracts shall not include the PREPA-Genco-Hydroco Operating Agreement, the Shared Services Agreement, collective bargaining agreements with union labor or, with regard to clause (C) above, any agreement related exclusively to information technology, hardware and software utilized by Operator before the Effective Date and extended thereafter to operate or administer the Legacy Generation Assets.

"Facility Information" means any and all information relating to the Legacy Generation Assets, including: (i) actual and budgeted operating expenses (including actual and budgeted expenses related to maintenance and repair and actual and budgeted fuel-related expenses); (ii) daily operations log for the Legacy Generation Assets, which shall include information known to it customary and appropriate for the operation and maintenance of thermal generation facilities and any significant events related to the operation of the Legacy Generation Assets; (iii) all certificates, correspondence, data (including test data), documents, facts, files, information, investigations, materials, notices, plans, projections, records, reports, requests, samples, schedules, statements, studies, surveys, tests and test results analyzed, categorized, characterized, created, collected, generated, maintained, processed, produced, prepared, provided, recorded, stored or used by Operator or any of its Representatives in connection with the Legacy Generation Assets, the O&M Services or the Decommissioning Services; and (iv) books, records, accounts and documents relating to the O&M Services or the Decommissioning Services, including any information that is stored electronically or on computer-related media but not including (A) Operator's Confidential Information or other information that Operator reasonably believes is subject to attorney-client or other legal privilege, confidentiality restrictions or trade secret protections, (B) personally identifiable information protected by Applicable Law, other than Owner Personal Information, (C) correspondence between employees or other Representatives of Operator, (D) information and records pertaining to the applicable Service Fee or (E) information

CONFIDENTIAL

or records pertaining to any dispute with Owner or Administrator or their respective Representatives.

"Failure to Pay Penalties" has the meaning set forth in Section 14.1(k) (*Events of Default by Operator – Failure to Pay Penalties*).

"Federally Funded Generation Project Plan" has the meaning set forth in Section 4.2(u) (*Operator Responsibilities – Federally Funded Generation Project Plan*).

"Fees-and-Costs" means reasonable and documented fees and expenses of attorneys, expert witnesses, engineers and consultants with respect to any Legal Proceeding.

"Fiscal Plan" means each of the PREPA Fiscal Plan, certified on June 28, 2022 by the FOMB, and the 2021 Fiscal Plan for Puerto Rico, certified by the FOMB on January 27, 2022, in each case as supplemented and amended from time to time, and any successors thereto.

"FOMB" means the Financial Oversight and Management Board for Puerto Rico.

"FOMB Protocol Agreement" means a protocol agreement among Operator, Administrator, Owner, and the FOMB, which shall include provisions governing the FOMB's interaction with the Parties with respect to the respective duties of the FOMB and Owner under PROMESA, which shall apply only during the period the FOMB is in existence and Owner is a covered territorial instrumentality pursuant to PROMESA.

"Forced Outage" means, as defined by IEEE 762-2006, an unplanned disconnection or stoppage of a Legacy Generation Asset due to failure or defect of the unit or its equipment, or another such event, including due to the operational or unplanned malfunctioning of equipment on the transmission grid or human error that impacts the operation of the Legacy Generation Asset.

"Force Majeure Event" means any act, event, circumstance or condition (other than lack of finances) whether affecting the Legacy Generation Assets, Owner, Operator or any of Owner's contractors or Operator's Subcontractors that (i) is beyond the reasonable control of and unforeseeable by, or which, if foreseeable, could not be avoided in whole or in part by the exercise of due diligence by, the Party relying on such act, event or condition as justification for not performing an obligation or complying with any condition required of such Party under this Agreement, and (ii) materially interferes with or materially increases the cost of performing, such Party's obligations hereunder, to the extent that such act, event, circumstance or condition is not the result of the willful or negligent act, error or omission or breach of this Agreement by such Party; provided, however, that the contesting in good faith or the failure in good faith to contest such action or inaction shall not be construed as a willful or negligent act, error or omission or breach of this Agreement by such Party.

Subject to the requirements specified in the foregoing paragraph, Force Majeure Event shall include, by way of example, the following acts, events or conditions:

(A)  act of God, lightning, landslide, earthquake, fire, explosion, flood or similar occurrence;

CONFIDENTIAL

(B)     war, armed conflict, invasion, acts of terror, acts of civil or military authority, sabotage or similar occurrence, computer sabotage or virus, acts of a public enemy, acts of a foreign enemy, extortion, blockade, embargo, revolution, interference by military authorities, quarantine, epidemic, pandemic (including COVID-19), insurrection, riot or civil commotion or disturbance or civil disobedience; breakdown or unavailability of port facilities or port services (including the channel, tugs or pilots) or any similar occurrence;

(C)     to the extent not covered by (A) or (B) above, any event that causes any federal or Commonwealth Governmental Body to declare the municipality in which the applicable Legacy Generation Asset is located part of a "disaster zone," "disaster area," "state of emergency" or any similar pronouncement (for the avoidance of doubt, a "state of emergency" in the context of this provision is not limited to events defined herein as an Emergency Event);

(D)     a Change in Law;

(E)     refusal or failure to issue, delay in issuing, or amendment, revocation or suspension of, any Governmental Approvals if such refusal or failure, delay, amendment, revocation or suspension results in a delay or curtailment of the performance of any of the O&M Services, the Mobilization Services, the Decommissioning Services or the Demobilization Services;

(F)     the failure of any appropriate Governmental Body or private utility having operational jurisdiction in the area in which the respective Legacy Generation Asset is located (including Genco and the T&D Operator) to provide and maintain services to any facility comprising part of the Legacy Generation Assets, which services are required for the performance of this Agreement, if such failure results in a delay or curtailment of the performance of any of the O&M Services, the Mobilization Services, the Decommissioning Services or the Demobilization Services;

(G)     any failure of title to any portion of the Generation Sites, any revocation or termination or invalidity or material impairment of any Easement or other access right, or any other failure or restriction of access to or use of the Generation Sites;

(H)     any enforcement of any Lien on the Generation Sites or on any improvements thereon not consented to in writing by, or arising out of any action or agreement entered into by, the Party adversely affected thereby;

(I)     the preemption of materials or services by a Governmental Body in connection with a public emergency or any condemnation or other taking by eminent domain of any portion of the Legacy Generation Assets;

(J)     the presence of archeological finds, endangered species or Hazardous Materials at the Generation Sites, except to the extent Operator's negligence directly caused such presence, or the Release of any reportable quantity, as defined under applicable Environmental Law, of Hazardous Material or of any other Release that could reasonably be expected to result in material Losses to Owner;

CONFIDENTIAL

(K)     strikes, boycotts, work stoppages, lockouts or other labor or employment disputes or disturbances with respect to the employees of Operator, but only if occurring in the twelve (12) months immediately following the Service Commencement Date;

(L)     any significant failure in the transmission grid;

(M)     denial of access to the transmission grid or malfunctioning or unavailability of the transmission grid; and

(N)     the unavailability in Puerto Rico of a disposal facility for waste produced in connection with Operator's performance of Decommissioning Services if such unavailability is due to a change in Applicable Law or environmental policy during the time the Decommissioning Services are being performed.

It is specifically understood that none of the following acts, events or conditions shall constitute a Force Majeure Event:

(1)     to the extent that Operator deviates from Prudent Industry Practice or fails to adequately prepare for and/or mitigate the effects of an act of God, lightning, landslide, earthquake, fire, explosion, flood or similar occurrence on Operator's ability to provide Services hereunder;

(2)     general economic conditions, interest or inflation rates, increases in wage rates of Operator's employees and Subcontractors, insurance costs, commodity prices or currency fluctuations, or exchange rates;

(3)     the financial condition of Owner, Operator, any of their Affiliates (including Guarantor) or any Subcontractors;

(4)     any increase for any reason in premiums charged by Operator's insurers or the insurance markets generally for the required insurance that are compensated as Pass-Through Expenditures;

(5)     the failure of Operator to secure Patents or intellectual property licenses in connection with the technology necessary to perform its obligations under this Agreement, if available on commercially reasonable terms;

(6)     equipment malfunction or failure due to Operator's failure to provide the Services in accordance with Prudent Industry Practices (unless caused by an event that would otherwise constitute a Force Majeure Event);

(7)     interruption in the delivery of fuel or gas to the applicable Legacy Generation Asset or Legacy Generation Assets (unless caused by an event that would otherwise constitute a Force Majeure Event);

(8)     union or labor work rules, requirements or demands relating to Operator's employees which have the effect of increasing the number of employees employed at the Legacy

17

CONFIDENTIAL

Generation Assets, reducing the operating flexibility of Operator or otherwise increasing the cost to Operator of performing the O&M Services or the Decommissioning Services;

(9)     any impact of prevailing wage laws on Operator's operation and maintenance costs with respect to wages and benefits;

(10)    the failure of any Subcontractor or supplier to furnish labor, materials, services or equipment for any reason (unless caused by an event or circumstance that constitutes a Force Majeure Event); and

(11)    strikes, boycotts, work stoppages, lockouts or other labor or employment disputes or disturbances with respect to the employees of Operator, but only if occurring from and after the date that is twelve (12) months immediately following the Service Commencement Date.

"Force Majeure Event Dispute" has the meaning set forth in Section 18.1(c) (*Notice; Mitigation – Burden of Proof*).

"Fuel" means natural gas, propane, gasoline (vehicles), light distillate no. 2 fuel oil (diesel), residual no. 6 fuel oil bunker fuel, or hydrogen, as applicable.

"Fuel Account" has the meaning set forth in Section 7.6(b)(i) (*Service Accounts – Fuel Account*).

"Fuel Adjustment Clause" means the applicable cost recovery rate provision, as approved by PREB from time to time pursuant to Applicable Law, which is made up of the estimated charges related to the purchase, transportation, testing and delivery of fuel for the Legacy Generation Assets for the next quarterly period, along with any prior period cost reconciliations.

"Fuel Budget" means, for any given Contract Year, the budget of the Fuel Costs for such Contract Year, together with the projected budget of the Fuel Costs for the following two (2) Contract Years, and including monthly forecasts and quarterly budgets of estimated variable Fuel Costs expected to be incurred pursuant to the terms and conditions of any fuel supply agreement for the applicable Legacy Generation Assets, as such budget may be amended or adjusted from time to time in accordance with the terms and conditions of this Agreement and, with respect to the quarterly budgets described above, as adjusted pursuant to Section 7.3(f) (*O&M Budgets – Quarterly Adjustments to Fuel Budget*) in connection with the Fuel Adjustment Clause, the applicable fuel-supply agreements, and the PREPA-Genco-Hydroco Operating Agreement.

"Fuel Contracts" means any contracts, leases, licenses, permits and similar arrangements of all types entered into by Owner, or by Operator on behalf and as agent of Owner, related to the procurement, delivery, quality-testing and storage of fuel, and the maintenance of fuel tanks and pipelines.

"Fuel Cost Savings Initiatives" means any initiatives undertaken by Operator, its Affiliates or Subcontractors in connection with this Agreement, that reduce Fuel Costs, including by (i) improving the fuel efficiency of any Legacy Generation Assets, (ii) converting any Legacy Generation Assets to be able to operate on any new alternative fuel(s) (including natural gas and hydrogen), (iii) supplementing Legacy Generation Assets with power generation equipment at or

CONFIDENTIAL

in the vicinity of the relevant Generation Site that is more fuel efficient and/or operates on any new alternative fuel(s) (including natural gas and hydrogen), (iv) reducing transportation, testing, delivery or storage (including tank maintenance) costs or (v) pursuing savings opportunities related to credit and portfolio optimization, in each case whether such initiatives are implemented as Pass-Through Expenditures, at Operator's cost as Operator's own capital improvements pursuant to Section 5.6(b) (*Capital Spare Parts and Capital Improvements – Capital Improvements*), by replacement or renegotiation of Fuel Contracts or Facility Contracts, or otherwise.

"Fuel Costs" has the meaning set forth in Section 7.6(b)(i) (*Service Accounts – Fuel Account*).

"Fuel Optimization Payment" has the meaning set forth in Annex II, Section III.B.6(a) (*Compensation – Incentives and Penalties – O&M Services Categories – Fuel Optimization – Operator shall receive…*).

"Fuel Optimization Plan" has the meaning set forth in Section 4.2(t) (*Operator Responsibilities – Fuel Optimization Plan*).

"Fuel Optimization Report" has the meaning set forth in Annex II, Section III.B.6(b) (*Compensation – Incentives and Penalties – O&M Services Categories – Fuel Optimization – Operator shall prepare…*).

"Generation Sites" means the real property and interests therein (in each case, up to the corresponding Interconnection Point) upon which the components of the Legacy Generation Assets are and shall be located, including any land subject to Easements.

"Governmental Approvals" means all orders of approval, permits, licenses, authorizations, consents, certifications, exemptions, registrations, rulings and entitlements issued by a Governmental Body of whatever kind and however described that are required under Applicable Law to be obtained or maintained by any Person with respect to the performance of the O&M Services, including Environmental Approvals.

"Governmental Body" means any U.S. federal, state, Commonwealth, municipal or local, including but not limited to, legislative, executive, judicial or other governmental board, agency, authority, commission, bureau, administration, court, instrumentality or other duly authorized body, including PREB and the FOMB (if then in existence), other than Owner and, in its capacity as such under this Agreement, Administrator, or any official thereof having jurisdiction with respect to any subject of this Agreement.

"Grant Manager" means the relevant Governmental Body and any third-parties, in either case, authorized by Owner, and reasonably acceptable to Operator, to act as grant manager to administer federal funding.

"Grant Management Services" means recordkeeping and financial management of awards of federal funds, including project monitoring, quarterly reporting, submitting reimbursement requests, delivery of technical assistance, audit and appeal support, submitting responses to requests for information, and supporting timely closeout. For the avoidance of doubt, Grant Management Services do not include the submission of application materials to federal

19

CONFIDENTIAL

agencies, determining the scope of work of projects to be funded by federal grants, or procuring goods and services to complete the scope of work using such grants.

"Guarantee" means the guarantee agreement, dated as of the date hereof, by and between Guarantor and Owner in the form of Exhibit A (*Form of Guarantee Agreement*).

"Guarantor" means Parent Company and, as determined pursuant to the terms and conditions of the Guarantee, its permitted successors and assigns.

"Handover Checklist" means the handover checklist set forth in Annex VII (*Mobilization Plan*), which shall include individual checklists for each Legacy Generation Asset and details all of the requirements for Operator to complete the Mobilization Services by the Target Service Commencement Date.

"Handover Checklist Dispute" has the meaning set forth in Section 4.7(a) (*Closing the Mobilization Period – Notice of Service Commencement Date*).

"Hazardous Material" means: (a) any waste, substance, object or material deemed hazardous under Environmental Law, including "hazardous substances" as defined in CERCLA and "hazardous waste" as defined in RCRA and any local counterpart law; (b) any oil or petroleum product, lead-based paint, per- or poly-fluoroalkyl substances, polychlorinated biphenyl, or asbestos or asbestos-containing materials; and (c) any other pollutant, contaminant, material, substance or waste that has deleterious or hazardous properties and that is listed, defined or is subject to regulation or as to which liability may attach under any Environmental Law.

"Heat Rate" means the thermal efficiency (heat rate) of a respective Legacy Generation Asset's ability to convert Fuel into Power and Electricity, determined for each Contract Year pursuant to Section 5.22 (*O&M Services – Annual Performance Test*) and Section IV.A of Annex IX (*Scope of Services – Testing, Reports and Records – Annual Performance Test*).

"Hired Former Employees of Owner" has the meaning set forth in Section 4.2(g) (*Operator Responsibilities – Employment Offers*).

"Hydroco" means PREPA Hydroco LLC or its successor.

"Hydropower Assets" means all of PREPA's hydroelectric generating units and the public irrigation facilities.

"Hydroco Budget" has the meaning set forth in the PREPA-Genco-Hydroco Operating Agreement.

"ICC" has the meaning set forth in Section 15.4(b)(i) (*Expert Technical Determination Procedure for Technical Disputes – Procedures*).

"IEEE 762-2006" means the IEEE Standard Definitions for Use in Reporting Electric Generating Unit Reliability, Availability, and Productivity.

CONFIDENTIAL

"Incentive Payment" means each of the O&M Incentive Payment and Decommissioning Incentive Payment, as described in Section III of Annex II (*Compensation – Incentives and Penalties*).

"Incentives and Penalties" means the incentives and penalties set forth in Section III of Annex II (*Compensation – Incentives and Penalties*).

"Incentives and Penalties Report" has the meaning set forth in Section 7.1(c)(ii) (*Service Fee – Incentives and Penalties*).

"Indemnifying Party" means (i) in the case of a claim for indemnification by Operator Indemnitee, Owner and (ii) in the case of a claim for indemnification by an Owner Indemnitee, Operator.

"Independent Expert" has the meaning set forth in Section 15.4(a) (*Expert Technical Determination Procedure for Technical Disputes – Generally*).

"Information System" means a discrete set of electronic information resources organized for the collection, processing, maintenance, use, sharing, dissemination or disposition of electronic information, including, such resources organized as any specialized system such as industrial/process controls systems, telephone switching and private branch exchange systems, and environmental control systems, and "Information Systems" means more than one Information System.

"Initial O&M Budgets" means, collectively, the Operating Budget and the Fuel Budget, in each case, for the initial Contract Year, and the projected budget for the following two (2) Contract Years.

"Initial Term" has the meaning set forth in Section 2.3(a) (*Term – Initial Term*).

"Insurance Proceeds Account" has the meaning set forth in Section 10.3 (*Additional Named Insureds*).

"Integrated Resource Plan" means the latest integrated resource plan contemplated under Act 57, as (i) set forth in the Final Resolution and Order issued by PREB on August 24, 2020, as supplemented and amended from time to time, and (ii) subsequently approved by PREB in accordance with Applicable Law.

"Intellectual Property" means all (i) Patents, (ii) Trademarks, (iii) domain names, URLs and any other addresses for use on the Internet or any other computer network or communication system, (iv) Copyrights, (v) rights of publicity, rights of privacy and moral rights, (vi) Know-How, (vii) other intellectual property or similar corresponding or equivalent right to any of the foregoing or other proprietary or contract right relating to any of the foregoing (including remedies against infringements thereof and rights of protection of interest therein under the laws of all jurisdictions) and (viii) copies and tangible embodiments thereof (including Software), in each case whether or not the same are in existence as of the date of this Agreement or developed after such date and in any jurisdiction throughout the world.

**CONFIDENTIAL**

"Interconnection Point" means the physical demarcation point(s) where the output of the respective Legacy Generation Asset is delivered to the T&D System, as set forth in the PREPA-Genco-Hydroco Operating Agreement.

"Internal Revenue Code" means the United States Internal Revenue Code of 1986.

"Know-How" means proprietary rights in all, trade secrets, confidential or proprietary information, including confidential or proprietary concepts, ideas, knowledge, rights in research and development, financial, marketing and business data, pricing and cost information, plans (including business and marketing plans), algorithms, formulae, inventions, processes, techniques, technical data, designs, drawings (including engineering and AutoCAD drawings), specifications, databases, blueprints and customer and supplier lists and information, in each case whether patentable or not and whether or not reduced to practice.

"Legacy Generation Assets" has the meaning set forth in the Recitals; provided that the Legacy Generation Assets shall include Out-of-Service Units solely for the purposes of the Decommissioning Services and the O&M Services described in Section 5.19 (*Out-of-Service Units*).

"Legacy Generation Emergency Response Plan" has the meaning set forth in Section 4.2(e) (*Operator Responsibilities – Legacy Generation Emergency Response Plan*).

"Legal Proceeding" means any claim, litigation, action, suit (whether civil, criminal, administrative, judicial or investigative), audit, hearing, investigation, binding arbitration or mediation or proceeding, in each case commenced, brought, conducted, heard before or otherwise involving any Governmental Body, arbitrator or mediator.

"Lien" means any and every lien, pledge, security interest, claim, mortgage, deed of trust, lease, charge, option, right of first refusal, easement or other real estate declaration, covenant, condition, restriction or servitude, transfer restriction under any encumbrance or any other restriction or limitation whatsoever, including mechanics', materialmen's, laborers' and lenders' liens.

"Losses" means any and all actual out of pocket (i) losses, damages, costs, expenses, liabilities, interest, deficiencies, awards, judgments, fines, assessments, penalties (including Penalties, whether paid or incurred by Operator or set-off or otherwise deducted from any Service Fee or otherwise), forfeitures, obligations, deposits, Taxes, costs, offsets, expenses or other charges of any kind, including Fees-and-Costs, Environmental Claim and Cleanup Liability and costs of enforcing any right to indemnification hereunder or pursuing any insurance providers and (ii) settlements in connection with Section 19.1 (*Indemnification by Operator*) and Section 19.2 (*Indemnification by Owner*), the amount of which either has been agreed by Operator and Administrator or is below a specified amount to be agreed by Operator and Administrator from time to time.

"Management Co" means Genera Management LLC.

CONFIDENTIAL

"Material Facility Contract" has the meaning set forth in Section 5.2(d) (*Facility Contracts – Additional Facility Contracts or Expired Facility Contracts After Service Commencement Date*).

"Material Subcontractor" has the meaning set forth in Section 11.1 (*Ability to Subcontract*).

"Mediation Rules" has the meaning set forth in Section 15.5(b) (*Mediation – Procedures*).

"Minimum Performance Threshold" has the meaning set forth in Section III.A of Annex II (*Compensation – Incentives and Penalties*).

"Minimum Performance Threshold Default" has the meaning set forth in Section 14.1(l) (*Events of Default by Operator – Failure to Meet Minimum Performance Threshold*).

"Mobilization Account" has the meaning set forth in Section 4.6(c)(i) (*Mobilization Period Compensation – Funding*).

"Mobilization Period" means the period of time from and including the Effective Date to and excluding the Service Commencement Date.

"Mobilization Plan" has the meaning set forth in Section 4.1(a) (*Mobilization Period Generally – Role of Operator*).

"Mobilization Service Fee" has the meaning set forth in Section 4.6(b) (*Mobilization Period Compensation – Mobilization Service Fee*).

"Mobilization Service Fee Cap" has the meaning set forth in Section 4.6(b) (*Mobilization Period Compensation – Mobilization Service Fee*).

"Mobilization Service Fee Dispute" has the meaning set forth in Section 4.6(d)(ii) (*Mobilization Period Compensation – Invoices*).

"Mobilization Service Fee Estimate Dispute" has the meaning set forth in Section 4.6(c)(ii) (*Mobilization Period Compensation – Funding*).

"Mobilization Services" means services provided by Operator under this Agreement prior to the Service Commencement Date in order to complete the mobilization and handover to Operator of the operation, management and other rights and responsibilities with respect to the Legacy Generation Assets pursuant to this Agreement, including the services contemplated by the Mobilization Plan; provided that the Mobilization Services shall not be O&M Services.

"National Ambient Air Quality Standard" means an ambient air quality standard set by the EPA at 40 C.F.R. Part 50 that includes standards for carbon monoxide, particulate matter, ozone, sulfur dioxide, lead, and nitrogen dioxide.

CONFIDENTIAL

"Negotiation Period" has the meaning set forth in Section 15.3(b)(i) (*Negotiation – Negotiation Period*).

"Notice of Dispute" has the meaning set forth in Section 15.2(a) (*Commencement of the Dispute Resolution Procedure – Notice*).

"Notice of Mediation" has the meaning set forth in Section 15.5(a) (*Mediation – Generally*).

"Notice of Violation" means any written directive, notice of violation or infraction, or notice relating to actual or alleged Environmental Noncompliance.

"O&M Budget" means each of the Operating Budget and the Fuel Budget, and "O&M Budgets" means, collectively, both of them.

"O&M Budget Dispute" has the meaning set forth in Section 7.3(h) (*O&M Budgets – O&M Budget Disputes*).

"O&M Fixed Fee" means, for a given Contract Year, the fee specified in Section I.A of Annex II (*Compensation – O&M Fixed Fee – O&M Fixed Fee Amounts*).

"O&M Fixed Fee Adjustment" means a proportional adjustment of the O&M Fixed Fee, in any of Contract Year 6 through Contract Year 10, in the event that (i) Operator has begun or begins to perform Decommissioning Services with respect to a Legacy Generation Asset; or (ii) one or more Legacy Generation Assets has been or is removed from the scope of O&M Services, in each case, in accordance with this Agreement, in each case, calculated in accordance with Annex II, Section I (*Compensation – O&M Fixed Fee*).

"O&M Incentive Payment" means one or more incentive payments based on Operator's performance of the O&M Services, as determined pursuant to Annex II (*Compensation*).

"O&M Penalty" means one or more liquidated damages penalties based on Operator's performance of the O&M Services.

"O&M Service Fee" means the O&M Fixed Fee *plus* any O&M Incentive Payment *plus* any Decommissioning Incentive Payment *minus* any O&M Penalty *minus* any Decommissioning Penalty.

"O&M Services" has the meaning set forth in Section 5.1 (*Services Generally*).

"OSHA" means the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 et seq.

"Operating Account" has the meaning set forth in Section 7.6(a)(i) (*Service Accounts – Operating Account*).

CONFIDENTIAL

"Operating Budget", for any given Contract Year, (i) means the budget of the Pass-Through Expenditures required to perform the O&M Services (including the reasonably foreseeable costs of Planned Outages, Unplanned Outages and Forced Outages) for such Contract Year, together with the projected budget for the following two (2) Contract Years, in each case including monthly budgets of such expenditures and cash flows, as such budget may be amended or adjusted from time to time in accordance with the terms and conditions of this Agreement and the PREPA-Genco-Hydroco Operating Agreement; and (ii) includes amounts equal to the maximum amounts of the O&M Fixed Fee and the O&M Incentive Payment available in such Contract Year.

"Operations and Maintenance Procedures" has the meaning set forth in Section 4.2(m) (*Operator Responsibilities – Operations and Maintenance Procedures*).

"Operator" has the meaning set forth in the introductory paragraph.

"Operator Benefit Plans" has the meaning set forth in Section 5.5(a) (*Labor and Employment; Employee Benefits – Employee Plans*).

"Operator Employees" has the meaning set forth in Section 4.2(g) (*Operator Responsibilities – Employment Offers*).

"Operator Event of Default" has the meaning set forth in Section 14.1 (*Events of Default By Operator*).

"Operator Indemnitee" has the meaning specified in Section 19.2(a) (*Indemnification by Owner – Generally*).

"Operator Intellectual Property" means any Intellectual Property owned by or licensed to Operator or its Affiliates that is (i) used in the performance of the O&M Services or in connection with the Legacy Generation Assets and (ii) is embedded in or otherwise necessary for the use of the Work Product (as defined herein) or for the operation of the Legacy Generation Assets, but which does not constitute Work Product.

"Operator Overhead" means any amount incurred by Management Co, including for the on-island executive management team and their associated corporate overhead.

"Operator Related Parties" means Operator, Parent Company, Guarantor, their Affiliates and any of their respective employees, directors and officers.

"Operator Service Commencement Date Conditions" has the meaning set forth in Section 4.2 (*Operator Responsibilities*).

"Operator Termination Fee" has the meaning set forth in Section 14.6(c) (*Remedies Upon Early Termination – Termination Fee*).

"Operator Training Program" has the meaning set forth in Section 4.2(o) (*Operator Responsibilities – Operator Training Program*).

CONFIDENTIAL

"Organizational Conflict of Interest Policy" has the meaning set forth in Section 2.2(b)(xii) (*Conditions to Execution*).

"Other Employees" has the meaning set forth in Section 4.2(g) (*Operator Responsibilities – Employment Offers*).

"Out-of-Service Unit" means the Legacy Generation Assets identified on Annex I (*Legacy Generation Assets*) that, as of the Service Commencement Date, are out of service and not being repaired, or are decommissioned, and not scheduled to return to service in the future.

"Outside Date" has the meaning set forth in Section 2.2(c) (*Effective Date – Outside Date*).

"Overdue Rate" means the lower of (i) the Prime Rate *plus* two percent (2%) and (ii) the highest rate permitted by Applicable Law.

"Oversight" means, with respect to any matter relating to the Legacy Generation Assets, the O&M Services or this Agreement, the performance of such reviews, investigations, inspections, or examinations relating to such matters as are reasonably necessary in the circumstances, conducted, in each case, in accordance with generally accepted contract administration practices used in the electric utility industry.

"Owner" has the meaning set forth in the introductory paragraph.

"Owner Employees" has the meaning set forth in Section 4.2(f) (*Operator Responsibilities – Employment Evaluations*).

"Owner Event of Default" has the meaning set forth in Section 14.3 (*Events of Default By Owner*).

"Owner Fault" means (i) any breach (including any breach of any representation or warranty set forth in any Transaction Document), (ii) any failure of compliance or nonperformance by Owner or Administrator with its respective obligations under any Transaction Document, (iii) any negligence, tort, willful misconduct or non-compliance by Owner or Administrator with respect to performance of its respective obligations under any Transaction Document (whether or not attributable to any officer, trustee, member, agent, employee, representative, contractor, subcontractor of any tier or independent contractor of Owner or Administrator other than Operator and its Subcontractors), or (iv) any settlement, judgment or other circumstance arising in connection with Existing Litigation, in each case which has had, or is reasonably expected to have, a material adverse effect on Operator's performance or cost of performance or on Operator's rights or obligations under this Agreement or on the operation or maintenance of the Legacy Generation Assets.

"Owner Indemnitee" has the meaning specified in Section 19.1 (*Indemnification by Operator*).

"Owner Intellectual Property" means any Work Product and other Intellectual Property owned by Owner or its Affiliates.

CONFIDENTIAL

"<u>Owner Licensed Intellectual Property</u>" means any Intellectual Property licensed by Owner from a third-party not a party to this Agreement.

"<u>Owner Payments</u>" means Pass-Through Expenditures, the O&M Service Fee, the Mobilization Service Fee, the Demobilization Service Fee, indemnity obligations under Section 19.2 (*Indemnification by Owner*) or interest payable on any of the foregoing amounts pursuant to this Agreement.

"<u>Owner Personal Information</u>" means any and all personally identifiable information, in any form, collected by or provided to Operator, Operator Related Parties or Subcontractors in connection with the provision of O&M Services or services under this Agreement and that, alone or in combination with other information, uniquely identifies a current, former or prospective director, trustee, officer, employee, elected official, supplier, retiree of Owner, an Owner Related Party or a customer of any Owner Related Party (e.g., names, addresses, telephone numbers, or any other personally identifiable information as otherwise defined under Applicable Law) including (i) copies of such information or materials to the extent containing such information or (ii) such information Owner notifies Operator in advance in writing is subject to a duty of confidentiality that Owner owes to Owner's customers or pursuant to contracts of Owner or Owner Related Parties.

"<u>Owner Related Parties</u>" means Owner, its Affiliates and any of their respective employees, directors, trustees, elected officials and officers.

"<u>Owner Service Commencement Date Conditions</u>" has the meaning set forth in Section 4.5(b) (*Conditions Precedent to Service Commencement Date – Owner and Administrator Responsibilities*).

"<u>Owner Termination Fee</u>" has the meaning set forth in Section 14.6(c)(ii) (*Remedies Upon Early Termination – Termination Fee*).

"<u>Parent Company</u>" means New Fortress Energy Inc. and its successors and assigns.

"<u>Party</u>" has the meaning set forth in the introductory paragraph.

"<u>Pass-Through Expenditures</u>" has the meaning set forth in Section 7.2 (*Pass-Through Expenditures*).

"<u>Patents</u>" means the exclusive legal rights held by the owner of a patent (including utility and design patents) to exclude others from using, making, having made, selling, offering to sell, and importing patented subject matter and to practice patented methods. Patents include all legal rights in any patent applications, PCT filings, patent disclosures, issued patents and all related extensions, continuations, continuations-in-part, divisions, reissues and reexaminations, utility models, certificates of invention and design patents, and all extensions thereto.

"<u>Peaking Unit</u>" means each Legacy Generation Asset designated as a Peaking Unit in Annex I (*Legacy Generation Assets*).

"<u>Penalty</u>" means each of the O&M Penalty and the Decommissioning Penalty.

CONFIDENTIAL

"Permitted Liens" means (i) Liens arising by operation of law that are either contested in good faith and for which Operator or any Subcontractor has established adequate reserves or that are discharged promptly, (ii) Liens existing as of the Effective Date, if any, (iii) Liens that result from any act or omission by any Owner Related Party, Administrator or any other Governmental Body and (iv) purchase money Liens or similar Liens securing rental payments under capital lease arrangements.

"Person" means any individual (including the heirs, beneficiaries, executors, legal representatives or administrators thereof), firm, corporation, company, association, partnership, limited partnership, limited liability company, joint stock company, joint venture, trust, business trust, unincorporated organization or other entity or a Governmental Body.

"Planned Outage" means, as defined by IEEE 762-2006, a planned partial or complete disconnection or stoppage of the generating capability of the applicable Legacy Generation Asset that is for the purpose of inspection, testing, major overhauls, preventive maintenance, corrective maintenance or improvement of such Legacy Generation Asset and for which notice has been previously given to the T&D Operator.

"Power and Electricity" means the electrical energy, capacity and ancillary services available from the Legacy Generation Assets.

"PREB" means the Puerto Rico Energy Bureau, also known as the *Negociado de Energia de Puerto Rico*, an independent body created by Act 57.

"PREB Actions" has the meaning set forth in Section 3.9(c) (*Qualified Management Contract – PREB Actions*).

"PREB Regulatory Charge" means the fee required by Section 4.03 of Regulation 8701 and established annually by PREB; provided that the methods of determining such fee may be subject to change if an amendment to Regulation 8701 or resolution by PREB so provides.

"PREB Successor" has the meaning set forth in Section 3.9(c) (*Qualified Management Contract – PREB Actions*).

"PREPA" means the Puerto Rico Electric Power Authority, a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, created by Act No. 83 of the Legislative Assembly of Puerto Rico, enacted on May 2, 1941.

"PREPA-Genco-Hydroco Operating Agreement" means the operating agreement by and among PREPA, Owner, Hydroco, T&D Operator, Administrator and Operator, substantially consistent with the provisions set forth in Annex VIII (*PREPA-Genco-Hydroco Operating Agreement*), and any ancillary documents to the extent attached thereto or expressly incorporated therein by reference, including the respective interconnection agreements and the System Operation Principles and Agreed Operating Procedures, providing for certain rights and responsibilities, including fuel and non-fuel budgeting and account funding, the demarcation of the Legacy Generation Assets, dispatch and shut down procedures and protocols, planned maintenance communications, switching and clearance procedures, access to plant substations and

CONFIDENTIAL

other related equipment, and agreed upon requirements and procedures related to Annual Performance Tests.

"PREPA Retirement System" has the meaning set forth in Section 5.5(a) (*Labor and Employment; Employee Benefits*).

"Pre-Existing Contamination" means the presence or Release of Hazardous Materials in environmental media anywhere in, at, from, on or under the Legacy Generation Assets or the Generation Sites, on or before the Service Commencement Date that continues after the Service Commencement Date.

"Pre-Existing Contamination Liability Standard" has the meaning set forth in Section 5.9(a)(iv) (*Environmental, Health and Safety Matters — Pre-Existing Environmental Conditions*).

"Pre-Existing Environmental Condition" means any Pre-Existing Contamination and/or any Pre-Existing Environmental Noncompliance.

"Pre-Existing Environmental Noncompliance" means the ownership or operation of the Legacy Generation Assets or Generation Sites in violation of Environmental Laws or the terms of any Environmental Approval on or before the Service Commencement Date that continues after the Service Commencement Date.

"Pre-Existing Noncompliance Liability Standard" has the meaning set forth in Section 5.9(a)(iv) (*Environmental, Health and Safety Matters – Pre-Existing Environmental Conditions*).

"Prime Rate" means a variable per annum rate equal, as of any date of determination, to the rate as of such date published in the "Money Rates" section of The Wall Street Journal as being the "Prime Rate" (or, if more than one rate is published as the "Prime Rate," then the highest of such rates), or a mutually agreeable alternative source of the prime rate if it is no longer published in the "Money Rates" section of The Wall Street Journal or the method of computation thereof is substantially modified.

"Prior Obligations" has the meaning set forth in Section 5.5(a) (*Labor and Employment; Employee Benefits – Employee Plans*).

"PRIRC" means the Internal Revenue Code for a New Puerto Rico of 2011.

"Procurement Manual" has the meaning set forth in Section 4.2(p) (*Operator Responsibilities – Procurement Manual*).

"Pro Rata" and similar expressions mean a decrease or increase (as applicable) to a cost, payment, target or other amount applicable to a specific period of time to account for the increase or decrease of the relevant period of time (e.g. a Contract Year that is greater than or less than three hundred and sixty five (365) calendar days).

CONFIDENTIAL

"PROMESA" means the Puerto Rico Oversight, Management and Economic Stability Act enacted on June 30, 2016 (P.L. 114-187).

"Proposal" means the proposal submitted by Operator in response to the RFP.

"Proposal Submission Date" means December 22, 2021.

"Prudent Industry Practice" means, at any particular time, the practices, methods, techniques, conduct and acts that, at the time they are employed, are generally recognized and utilized by companies operating gas and/or oil-fired, electric power generation plants in the United States, as such practices (including timely reporting), methods, techniques, conduct and acts relate to the operation, maintenance, repair and replacement of assets, facilities and properties of the type covered by this Agreement. The interpretation of acts (including the practices, methods, techniques, conduct, and acts engaged in or adopted by a significant portion of the electrical generation industry prior thereto) shall consider the facts and the characteristics of the Legacy Generation Assets known at the time the decision was made. Prudent Industry Practice is not intended to be limited to the optimum or minimum practice, method, technique, conduct or act, to the exclusion of all others, but rather to be a spectrum of possible practices, methods, techniques, conduct or acts that a prudent operator would take to accomplish the intended objectives at reasonable cost consistent with Applicable Law, public and employee safety, reliability, and environmental compliance.

"Public Information Disclosure Requirements" means any Applicable Law requiring the disclosure of public documents or information.

"Public-Private Partnerships Authority's Ethical Guidelines" means the "Public-Private Partnerships Authority's Guidelines for the Evaluation of Conflicts of Interest and Unfair Advantages in the Procurement of Public-Private Partnership Contracts," promulgated by the Public-Private Partnerships Authority and dated as of December 19, 2009.

"Rate Order" means any rate order reflecting determinations and directives of, and requirements established by, PREB through its review of an application by T&D Operator requesting a change in customer rates or charges and the subsequent rate review proceeding.

"Rate Order Modification Request" shall have the meaning set forth in Section 7.5 (*PREB Rate Proceedings*).

"RCRA" means the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq.

"Release" means any emission, spill, seepage, leak, escape, leaching, discharge, injection, pumping, pouring, emptying, dumping, disposal, migration or release of Hazardous Materials from any source into or upon the environment.

"Reliance Letter" means a letter from tax counsel, substantially in the form set forth in Exhibit B (*Form of Reliance Letter*) that shall accompany a Tax Opinion and shall permit Operator to rely on such Tax Opinion.

CONFIDENTIAL

"Remedial Action" means (A) any investigation, clean-up, removal action, remedial action, restoration, repair, abatement, response action, corrective action, monitoring, sampling and analysis, installation, reclamation, closure or post-closure in connection with the suspected, threatened or actual Release of Hazardous Materials, or (B) any changes in operating procedures, actions or equipment including emissions control devices that are, individually or collectively, necessary to install, operate or utilize in order for the operations at one or more Legacy Generation Assets to comply with Environmental Laws or the terms of an Environmental Approval.

"Reporting Obligation Charge" has the meaning set forth in Section III.B.5 of Annex II (*Compensation – Incentives and Penalties – O&M Services Categories – Reporting Obligations*).

"Representative" means, with respect to any Person, any director, officer, employee, official, lender (or any agent or trustee acting on its behalf), partner, member, owner, agent, lawyer, accountant, auditor, professional advisor, consultant, engineer, contractor, Subcontractor, other Person for whom such Person is responsible at law or other representative of such Person and any professional advisor, consultant or engineer designated by such Person as its "Representative."

"Required Insurance" has the meaning set forth in Section 10.1 (*Insurance Generally*).

"Reserve Account" has the meaning set forth in Section 7.6(d)(i) (*Service Accounts – Reserve Account*).

"Revenue Procedure 2017-13" means the revenue procedure issued by the United States Internal Revenue Service that provides safe harbor conditions under which a management contract does not result in private business use under § 141(b) of the Internal Revenue Code or subsequent guidance from the United States Internal Revenue Service.

"RFP" means the Puerto Rico Electric Power Thermal Generation Facilities Request for Proposals 2020-1 issued by the Puerto Rico Public-Private Partnerships Authority.

"Safety and Hazardous Materials Procedures Manual" has the meaning set forth in Section 4.2(n) (*Operator Responsibilities – Safety and Hazardous Materials Procedures Manual*).

"Sanctioned Country" has the meaning set forth in Section 20.2(g)(iv) (*Representations and Warranties of Operator – Applicable Law Compliance*).

"Sanctioned Person" has the meaning set forth in Section 20.2(g)(iv) (*Representations and Warranties of Operator – Applicable Law Compliance*).

"Sanctions" has the meaning set forth in Section 20.2(g)(iv) (*Representations and Warranties of Operator – Applicable Law Compliance*).

CONFIDENTIAL

"Service Accounts" means the Mobilization Account, the Operating Account, the Fuel Account, the Decommissioning Account, the Demobilization Account and the Reserve Account, each of which is a "Service Account."

"Service Account Dispute" has the meaning set forth in Section 7.6(e) (*Service Accounts – Service Account Disputes*).

"Service Co" means Genera Services LLC.

"Service Commencement Date" has the meaning set forth in Section 4.7(b) (*Closing the Mobilization Period – Establishment of Service Commencement Date*).

"Service Commencement Date Conditions" has the meaning set forth in Section 4.5 (*Conditions Precedent to Service Commencement Date*).

"Service Fee" means each of the Mobilization Service Fee, the O&M Service Fee and the Demobilization Service Fee.

"Service Fee Dispute" has the meaning set forth in Section 7.1(e) (*Service Fee – Service Fee Disputes*).

"Services" means Mobilization Services, O&M Services, Demobilization Services, Decommissioning Services and Grant Management Services.

"Services Documentation" means, collectively, the Operations and Maintenance Procedures, the Legacy Generation Emergency Response Plan, the Safety and Hazardous Materials Procedures Manual and the Operator Training Program.

"Shared Services Agreement" means the shared services agreement, or similar contractual arrangement, by and among the T&D Operator, PREPA, Owner and the other parties thereto, pursuant to the T&D O&M Agreement, providing the terms and conditions pursuant to which T&D Operator shall provide certain shared services to Owner or its designee or agent.

"Software" means computer programs, proprietary software, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, operating systems, design documents, website code and specifications, flow-charts, user manuals and training materials relating thereto and any translations thereof.

"Spare Parts" means any new or refurbished replacement parts and tools, equipment and components or combination thereof such maintained or to be maintained by Operator in accordance with this Agreement in connection with the operation, maintenance, repair of the Legacy Generation Assets, excluding any Capital Spare Parts.

"Stafford Act" means the Robert T. Stafford Disaster Relief and Recovery Act, enacted on November 23, 1988.

"State Implementation Plan" means the plan required under the Clean Air Act, and developed by the Puerto Rico Department of Natural and Environmental Resources in

32

CONFIDENTIAL

collaboration with PREPA, to achieve National Ambient Air Quality Standards by reducing sulfur dioxide emissions and any other air pollutants, and as such plan may be modified in the future.

"Subcontract" means an agreement or purchase order by Operator to a Subcontractor or a Subcontractor to Operator, as applicable.

"Subcontractor" means every Person (other than employees of Operator) employed or engaged by Operator or any Person directly or indirectly at any subcontracting tier engaged for the performance of any Operator obligations hereunder (other than Operator Overhead activities), including any portion of the Mobilization Services, the O&M Services, the Decommissioning Services or the Demobilization Services, whether for the furnishing of labor, materials, equipment, supplies, services or otherwise. For the avoidance of doubt: (i) Subcontractors includes any Affiliates of Operator and personnel from any Affiliates of Operator assigned to perform the Mobilization Services, the O&M Services, the Decommissioning Services or the Demobilization Services under this Agreement, (ii) Subcontractors does not include third parties merely providing commercially available "off-the-shelf" Software or Information Systems to Operator (directly or as a service) and (iii) Subcontractors does not include counterparties to any Facility Contract (it being agreed that Operator shall enter into such agreements merely as agent for Owner).

"Subcontractor Intellectual Property" means any Intellectual Property owned by or licensed to a Subcontractor that is (i) used in the performance of the O&M Services or in connection with the Legacy Generation Assets and (ii) is embedded in or otherwise necessary for the use of the Work Product (as defined herein) or for the operation of the Legacy Generation Assets, but which does not constitute Work Product.

"Sworn Statement" means a sworn statement in the form set forth as Exhibit C (*Form of Sworn Statement*).

"System Operation Principles" means the operation principles and procedures conditionally approved by PREB on June 1, 2021, as may be amended from time-to-time in accordance with Section 4.1(h) or Section 5.13(c) of the T&D O&M Agreement.

"T&D O&M Agreement" means the operation and maintenance agreement for the T&D System, entered into on June 22, 2020, by and among PREPA, Administrator, LUMA Energy, LLC and LUMA Energy ServCo, LLC, pursuant to which T&D Operator shall operate, maintain and modernize the T&D System.

"T&D Operator" means LUMA Energy, LLC together with LUMA Energy ServCo, LLC.

"T&D System" means PREPA's transmission and distribution system and related facilities, equipment and other assets related to the transmission and distribution system in which PREPA has an ownership or leasehold interest.

"Target Service Commencement Date" means the date that is one hundred (100) days following the Effective Date, as such date may be extended pursuant to Section 4.8(c) (*Failure of Service Commencement Date Conditions – Effect of Force Majeure Events or Owner Fault*).

CONFIDENTIAL

"Tax" means all U.S. federal, state, Commonwealth, municipal, local and non-U.S. taxes and similar governmental charges, imposts, levies, fees and assessments, however denominated (including income taxes, business asset taxes, franchise taxes, net worth taxes, capital taxes, estimated taxes, withholding taxes, use taxes, value added tax, gross or net receipt taxes, sales taxes, transfer taxes or fees, excise taxes, real and personal property taxes, ad valorem taxes, payroll related taxes, employment taxes, unemployment insurance, social security taxes, minimum taxes and import duties and other obligations of the same or a similar nature), together with any related liabilities, penalties, fines, additions to tax or interest imposed by a Governmental Body.

"Tax Decree" has the meaning set forth in Section 4.2(s) (*Operator Responsibilities – Tax Decree*).

"Tax Opinion" means an opinion of Nixon Peabody LLP as counsel to the FOMB or other tax counsel reasonably acceptable to Administrator, rendered in connection with this Agreement and providing that neither this Agreement nor any provision hereof, nor the performance by each Party of its obligations hereunder (including Operator's administration of the Facility Contracts), adversely affects the exclusion from gross income of interest on obligations of Owner, its Affiliates or another Governmental Body for federal income tax purposes under the Internal Revenue Code and which, in the case of the opinion delivered on the Effective Date, shall be substantially in the form set forth in Exhibit D (*Form of Tax Opinion – Effective Date*).

"Tax Return" means any report, return, information return, form, declaration, statement or other information (including any amendments thereto and including any schedule or statement thereto) required to be filed or maintained by Applicable Law in connection with the determination, assessment or collection of any Tax.

"Technical Dispute" has the meaning set forth in Section 15.3(b)(i) (*Negotiation – Negotiation Period*)

"Term" means the Initial Term together with the Extension Term, if any.

"Tested Capacity" means, with respect to each Legacy Generation Asset, the capacity of such asset, determined for each Contract Year pursuant to Section 5.22 (*O&M Services – Annual Performance Test*) and Section IV.A of Annex IX (*Scope of Services – Testing, Reports and Records – Annual Performance Test*).

"Third-Party Intellectual Property" means Intellectual Property that is licensed to Operator by a third-party that is not an Affiliate of Operator and is used in the performance of this Agreement.

"Third-Party Payments" has the meaning set forth in Section 19.4(a) (*Insurance and Other Recovery – Generally*).

"Title III Case" means Owner's case under Title III of PROMESA in the U.S. District Court.

"Title III Court" means the U.S. District Court presiding over the Title III Case.

"Trademarks" means the exclusive legal rights to use and display any marks, names or symbols in association with businesses, products or services as an indication of ownership, origin, affiliation, or sponsorship, including trademarks, service marks, trade dress, brand names, certification marks, logos, slogans, rights in designs, industrial designs, corporate names, trade names, business names, geographic indications and other designations of source, origin, sponsorship, endorsement or certification, together with the goodwill associated with any of the foregoing, in each case whether registered or unregistered, and all applications and registrations therefor.

"Transaction Documents" means this Agreement, the Guarantee, the FOMB Protocol Agreement and any other agreement entered into by Operator with Owner, Administrator and/or any other ancillary Person from time to time in connection with the transactions contemplated hereby and expressly designated as a "Transaction Document" by the parties thereto (other than Facility Contracts, Fuel Contracts and Subcontracts).

"U.S. District Court" means the United States District Court for the District of Puerto Rico.

"United States" or "U.S." means the United States of America.

"Unplanned Outage" means, as defined by IEEE 762-2006, a partial or complete disconnection or stoppage of the generating capability of the applicable Legacy Generation Asset that is not a Planned Outage or a Forced Outage.

"Work Product" has the meaning set forth in Section 13.1(c) (*Intellectual Property – Work Product*).

**Section 1.2**    Interpretation; Construction.

(a)    Headings. The table of contents, articles, titles and headings to sections herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement. Except as otherwise indicated, all references in this Agreement to "Articles", "Sections", "Annexes" and "Exhibits" are intended to refer to Articles and Sections of this Agreement and Annexes and Exhibits to this Agreement.

(b)    Annexes and Exhibits. The Annexes and Exhibits referred to herein shall be construed with and as an integral part of this Agreement to the same extent as if they were set forth verbatim herein. In the event of an irreconcilable conflict, discrepancy, error or omission, the following descending order of precedence shall govern: (i) this Agreement, (ii) the Annexes and (iii) the Exhibits.

(c)    Construction. For purposes of this Agreement: (i) "include", "includes" or "including" shall be deemed to be followed by "without limitation"; (ii) "hereof", "herein", "hereby", "hereto" and "hereunder" shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (iii) "extent" in the phrase "to the extent" shall mean the degree to which a subject or other item extends and shall not simply mean "if"; (iv) in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the

CONFIDENTIAL

word "through" means "to and including"; (v) "dollars" and "US$" shall mean United States Dollars; (vi) the singular includes the plural and vice versa; (vii) reference to a gender includes the other gender; (viii) "any" shall mean "any and all"; (ix) "or" is used in the inclusive sense of "and/or"; (x) reference to any agreement, document or instrument means such agreement, document or instrument as amended, supplemented and modified in effect from time to time in accordance with its terms; provided, however, that amendments, supplements and modifications to any of the following agreements, documents or instruments shall not be binding on Operator or in any way applicable to this Agreement unless Operator confirms in writing, by reference to this Section 1.2(c)(x), that it accepts the terms of such amendment, supplement or modification: the Shared Services Agreement, the Agreed Operating Procedures, any Facility Contract, any Fuel Contract, the PREPA-Genco-Hydroco Operating Agreement or the FOMB Protocol Agreement; (xi) reference to any Applicable Law means such Applicable Law as amended from time to time and includes any successor legislation thereto and any rules and regulations promulgated thereunder; (xii) whenever this Agreement requires the Administrator's consent or approval of any matter, unless expressly otherwise provided, such consent or approval shall not be unreasonably withheld, conditioned or delayed and (xiii) reference to any Person at any time refers to such Person's permitted successors and assigns.

(d)    Days and Time. All references to days herein are references to calendar days, unless specified as Business Days, and, unless specified otherwise, all statements of or references to a specific time in this Agreement are to Atlantic Standard Time.

(e)    Accounting Principles. All accounting and financial terms used herein, unless specifically provided to the contrary, shall be interpreted and applied in accordance with then generally accepted accounting principles in the United States, consistently applied.

(f)    Negotiated Agreement. The Parties have participated jointly in the negotiation and drafting of this Agreement with the benefit of competent legal representation, and the language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent. In the event that an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provisions hereof.

(g)    References to Generation of Power. The phrases "generate", "generated", "generating" and "generation" and any similar phrases herein, when used with respect to Power and Electricity, shall mean and refer to the operation of the Legacy Generation Assets in accordance with this Agreement and the generation of Power and Electricity in accordance with this Agreement and the PREPA-Genco-Hydroco Operating Agreement.

(h)    Actions Taken Pursuant to Agreement. The Parties acknowledge that this Agreement sets forth procedures and intended results with respect to various circumstances that may arise during the Term. Such circumstances include the "generation" of Power and Electricity; Changes in Law and Force Majeure Events; the preparation, revision and updating of the O&M Budgets, the Procurement Manual and any other plan, manual, program, schedule or similar document to be prepared or amended under Article 4 (*Mobilization Period*); the provision of the Mobilization Services and the Demobilization Services; the provision of the O&M Services and

additional services; the provision of the Decommissioning Services; and the assignment and transfer of this Agreement. Unless otherwise agreed to by the Parties, any correspondence, report, submittal, revision update, consent or other document or communication given pursuant to this Agreement on account of such a circumstance shall be considered as among the Parties to be an action taken pursuant to this Agreement and not an amendment hereto.

(i)     Unspecified Time Periods; Equitable Adjustment of Timetables. Whenever this Agreement provides that the approval of certain matters shall not be unreasonably withheld, conditioned or delayed, or language to similar effect, and no specific time period is provided for such approval, Owner or Administrator, as the case may be, shall respond no later than ten (10) Business Days after Operator notifies Owner or Administrator, as applicable, in writing of Operator's request for approval. To the extent that a response is not received within ten (10) Business Days, Operator shall have the right to a day-for-day extension of the time for completion or occurrence of any obligation under this Agreement that requires such approval.

**Article 2**
**PURPOSE; EFFECTIVE DATE; TERM**

**Section 2.1**    Purpose. Owner hereby contracts with Operator for the provision of (i) O&M Services commencing on the Service Commencement Date, (ii) the Mobilization Services, (iii) the Decommissioning Services and (iv) the Demobilization Services, in each case, subject to the terms and conditions of this Agreement. The Parties acknowledge and agree that (x) this Agreement is a "Partnership Contract" as defined in Act 29, (y) Operator is a "Contractor" as defined in Act 29, entitled to all of the benefits, rights and protections granted to a "Contractor" thereunder and (z) Operator is not a "Contractor" as that term is defined in Title 2, Part 200 of the Code of Federal Regulations, Section 200.23.

**Section 2.2**    Effective Date.

(a)     Execution of the Agreement. This Agreement shall become effective on the date that it is executed by the Parties, by which execution the Parties acknowledge and agree that the conditions in Section 2.2(b) (*Effective Date – Conditions to Execution*) have been satisfied (the "Effective Date").

(b)     Conditions to Execution. The following conditions shall have been satisfied prior to the Effective Date:

(i)     receipt by the Parties of an Energy Compliance Certificate issued by PREB;

(ii)     receipt by the Parties of a resolution adopted by the board of directors of Administrator, in form and substance reasonably acceptable to Administrator and Operator, authorizing the execution, delivery and performance of this Agreement and the transactions contemplated hereby;

(iii)     receipt by the Parties of a resolution adopted by the board of directors of Owner, in form and substance reasonably acceptable to Administrator and Operator,

CONFIDENTIAL

authorizing the execution, delivery and performance of this Agreement and the transactions contemplated hereby;

(iv)     receipt by the Parties of authorization from the FOMB, in form and substance reasonably acceptable to Administrator and Operator, of the execution, delivery and performance of this Agreement and the transactions contemplated hereby;

(v)     receipt by the Parties of approval from the Governor of the Commonwealth or his/her delegate, in form and substance reasonably acceptable to Administrator and Operator, for the execution, delivery and performance of this Agreement and the transactions contemplated hereby;

(vi)     receipt by Owner of the Guarantee;

(vii)     receipt by Owner of a copy of a certificate as to certain matters of Commonwealth law in the form set forth as Exhibit E (*Form of Commonwealth Certifications*), duly executed by Operator;

(viii)     receipt by Owner of a Tax Opinion in the form set forth as Exhibit D (*Form of Tax Opinion – Effective Date*) and receipt by Operator of a Reliance Letter;

(ix)     receipt by Owner of a Sworn Statement executed by Operator;

(x)     Operator's receipt of, and written agreement to be subject to, the obligations under the Consent Decree and the jurisdiction of the United States District Court for the District of Puerto Rico in connection with the Consent Decree. Such written agreement shall contain the acknowledgement required by Section 20.2(i) (*Representations and Warranties of Operator – Ability to Perform Obligations*) and shall be substantially in the form of Exhibit G (*Form of Acknowledgment of Consent Decree*). To the extent required to effectuate this Section 2.2(b)(x) (*Effective Date – Conditions to Execution*), Operator shall assist Owner in taking all necessary steps to make Operator a signatory to the Consent Decree or to obtain any needed U.S. District Court approval;

(xi)     receipt by Administrator of a communications plan in a form satisfactory to Administrator in its reasonable discretion, which plan is attached hereto as Annex V (*Communications Plan*), (the "Communications Plan");

(xii)     Administrator's receipt of an organizational conflict of interest policy in the final form agreed to by Administrator and Operator, which is attached hereto as Annex VI (*Organizational Conflict of Interest Policy*) (the "Organizational Conflict of Interest Policy");

(xiii)     a final plan for the reorganization of PREPA shall have been filed with the applicable Governmental Bodies; and

(xiv)     Operator, Administrator, Owner and the FOMB shall have reached agreement on and formally executed the FOMB Protocol Agreement.

CONFIDENTIAL

(c)     Outside Date. If the Effective Date has not occurred by the latest of (i) the Business Day not later than one hundred twenty (120) days after the partnership committee accepts the Proposal and notifies Operator of its decision, (ii) such later date as the Parties may mutually agree in writing or (iii) upon request of Administrator, subject to an extension for an additional period, not to exceed one hundred twenty (120) days, if the satisfaction of any of the conditions to execution set forth in Section 2.2(b) (*Effective Date – Conditions to Execution*) is delayed by any action or omission of Administrator or any Governmental Body of the Commonwealth occurring prior to the date that is the later of clauses (i) and (ii) (the latest of (i), (ii) and (iii), the "Outside Date"), the Bid Security shall be held, drawn or returned as provided in the RFP.

**Section 2.3**     Term.

(a)     Initial Term. This Agreement shall be in full effect from the Effective Date through June 30 of the calendar year after the calendar year in which the tenth (10th) anniversary of the Service Commencement Date occurs (such period of time, the "Initial Term"), unless extended or earlier terminated, in whole or in part, in accordance with the terms hereof.

(b)     Extension. Operator and Administrator (acting on Owner's behalf) may mutually agree to extend, for all or some of the Legacy Generation Assets, the Initial Term for an additional period to be determined at the time and on terms and conditions to be agreed in good faith (the "Extension Term"); provided that (i) the Extension Term shall not exceed the maximum term permitted under Act 29 at the time of such extension, (ii) a Tax Opinion shall have been delivered to Owner and a Reliance Letter shall have been received by Operator in connection with such Extension Term, (iii) to the extent required by Applicable Law, the conditions precedent to the Effective Date set forth in Section 2.2(b) (*Conditions to Execution*) shall have been satisfied prior to the first date of the Extension Term (iv) to the extent required by Applicable Law, the Extension Term shall not be effective until approved by the PREB, and (v) Administrator's approval shall be provided only following a decision of the Administrator's Board of Directors in accordance with Act 29 and Act 120. This Agreement shall be deemed a PREPA Transaction subject to the requirements of Act 120. Notwithstanding the foregoing, in the event that the Initial Term is extended solely for the purpose of Operator completing Decommissioning Services pursuant to Section 17.2 (*Termination Prior to Completion of Decommissioning*) and any remaining Demobilization Services, none of the requirements of clauses (ii) and (iii) of the proviso to the prior sentence shall be applicable.

(c)     Reduction. Upon written notice to Operator, Administrator (acting on behalf of Owner) shall have the right to reduce the scope of the O&M Services, the Decommissioning Services and/or the Term, if and to the extent necessary, (1) in accordance with Section 3.9 (*Qualified Management Contract*), to prevent any adverse effect to the exclusion from gross income of interest on obligations of Owner, its Affiliates or another Governmental Body for federal income tax purposes under the Internal Revenue Code or (2) to comply with the Fiscal Plan or any other Applicable Law or contractual requirement, including in connection with the development of new generation capacity as mandated by the Integrated Resource Plan. Notwithstanding any reduction in the scope of the O&M Services, the O&M Fixed Fee shall not be reduced other than pursuant to an O&M Fixed Fee Adjustment in accordance with Annex II (*Compensation*). If (i) Administrator (acting on Owner's behalf) exercises its rights under this Section 2.3(c) (*Term – Reduction*) and (ii) any such reduction affects Operator's ability to achieve

CONFIDENTIAL

Actual Fuel Savings outlined in a Fuel Optimization Plan approved by PREB, then Operator and Administrator shall negotiate proportional adjustments to the Fuel Optimization Plan and Fuel Optimization Payment, to reasonably assure that Operator has a reasonable opportunity to earn the Fuel Optimization Payment, which adjustments shall be submitted to PREB for its review and approval.

### Article 3
### OWNERSHIP OF THE LEGACY GENERATION ASSETS

**Section 3.1**    Ownership. The Legacy Generation Assets are and shall be owned by Owner throughout the Term, and Operator shall have no ownership interest in the Legacy Generation Assets.

**Section 3.2**    Engagement of Operator. Operator shall perform the O&M Services as an independent contractor and shall not have any legal, equitable, tax, beneficial or other ownership or leasehold interest in the Legacy Generation Assets. Without limiting Operator's right to be reimbursed for all Pass-Through Expenditures, the only compensation payable by Owner to Operator for providing the O&M Services and the Decommissioning Services for the Legacy Generation Assets shall be the O&M Service Fee. The Service Accounts shall be funded in the manner contemplated hereunder for Operator's payment of Pass-Through Expenditures (without limiting Owner's indemnity or other obligations hereunder).

**Section 3.3**    Use of Legacy Generation Assets. From the Service Commencement Date and for the remainder of the Term thereafter, Operator and Subcontractors shall have the exclusive right (except as set forth in this Agreement), subject to Section 3.5 (*Right of Access*), to enter upon, occupy and use the Legacy Generation Assets and the Generation Sites for the sole purpose of performing the O&M Services, Mobilization Services, Decommissioning Services, and Demobilization Services, as applicable, in accordance with the terms hereof. Owner shall ensure that Operator and its Subcontractors are provided with all necessary access to exercise such right.

**Section 3.4**    Liens. From the Service Commencement Date and for the remainder of the Term thereafter, Operator shall keep the Legacy Generation Assets free and clear of any and all Liens (other than Permitted Liens) arising out of or in connection with any acts, omissions or debts of Operator, Guarantor or their Affiliates. Nothing in this Agreement shall be deemed to create any Lien in favor of Operator on any asset of Owner, including the Legacy Generation Assets, as security for the obligations of Owner hereunder.

**Section 3.5**    Right of Access. Upon reasonable notice to Operator, at reasonable times during normal business hours and at their own respective cost and risk, each of Owner, Administrator, PREB and their respective Representatives shall have the right to access the Legacy Generation Assets, Generation Sites and all Facility Information for Oversight of Operator's performance of the O&M Services and to otherwise carry out their obligations under Applicable Law; provided that such access shall not interfere with Operator's performance of the O&M Services and may be provided by read-only access where available, or a reasonably equivalent form of access to such information. Owner, Administrator, PREB and their respective Representatives shall comply with all of Operator's access, security (including cybersecurity) and safety procedures when exercising such right of access. Owner shall be responsible for the security

CONFIDENTIAL

of all access credentials provided to, and each access made and use and disclosure of Facility Information by, Owner, Administrator, PREB and their respective Representatives hereunder. At Administrator's request and sole cost and expense, Operator shall provide Administrator with dedicated on-site office space and access to and use of office facilities and equipment located at Operator's facilities in the Commonwealth or another suitable site mutually agreed upon; provided that such space is reasonable and adequate to enable Administrator to exercise its Oversight rights and responsibilities under this Agreement.

Section 3.6    Exclusivity. The Parties covenant and agree that Operator, acting directly or through Subcontractors, together with their respective Representatives, shall be the sole and exclusive providers of O&M Services with respect to the Legacy Generation Assets and that Operator shall not (i) generate Power and Electricity using the Legacy Generation Assets other than on behalf of Owner, or with the approval of PREB (or Administrator, if applicable), pursuant to the terms and conditions of this Agreement and in accordance with Applicable Law or (ii) use the Legacy Generation Assets (A) for any purpose other than the purposes contemplated hereby or (B) to serve or benefit any person other than Owner.

Section 3.7    Essential Public Service. The Parties acknowledge that Owner's provision of the Power and Electricity requirements of the Commonwealth constitutes an essential public service; it being understood that such acknowledgement shall not impose any obligation on the Parties other than those set forth in this Agreement. Owner acknowledges that Operator shall rely on (i) the certifications, resolutions, authorizations and approvals referred to in Section 2.2 (*Effective Date*) and (ii) the funding of the Service Accounts caused by Owner in the manner contemplated hereunder, in each case in order for Operator to (A) perform the O&M Services and Decommissioning Services under this Agreement and (B) have the opportunity to earn the applicable Service Fee in full.

Section 3.8    Reporting Obligations. In accordance with Sections IV and V of Annex IX (*Scope of Services – Testing, Reports and Records; Finance and Accounting Services*) Operator shall provide (i) Facility Information (both financial and operational), as reasonably available (and in any event on a monthly basis), to support Owner's financing activities, including Owner's administration of debt service and Owner's required disclosure and tax requirements, (ii) upon the request of Owner and/or Administrator, assistance to Owner and Administrator in connection with Owner's preparation of reports and other documents to satisfy Owner's reporting requirements and (iii) upon the request of Administrator, any Facility Information, information regarding the Hired Former Employees of Owner, or other information that it reasonably requires to comply with its obligations under this Agreement, including as described in Section 6.2 (*Rights and Responsibilities of Administrator*).

Section 3.9    Qualified Management Contract.

(a)    Generally. The Legacy Generation Assets have been financed with obligations the interest on which is excluded from gross income for federal income tax purposes under Section 103 of the Internal Revenue Code. The Parties intend for this Agreement to constitute a "qualified management contract" under Revenue Procedure 2017-13, such that the provision of O&M Services by Operator under this Agreement does not adversely affect the exclusion from gross income for federal income tax purposes under the Internal Revenue Code of

41

CONFIDENTIAL

the interest on such obligations. The Tax Opinion and the Reliance Letter delivered as of the Effective Date or thereafter have been and will be delivered on such basis.

(b)   Covenants.

(i)   Operator covenants and agrees that: (A) neither it nor any direct or indirect owner of an equity interest in it is entitled to any U.S. federal income tax benefits relating to the Legacy Generation Assets that are available to an owner or lessor of the Legacy Generation Assets covered by this Agreement; (B) it shall not take any tax position inconsistent with it being a service provider with respect to such Legacy Generation Assets; and (C) it shall not, and shall not permit or enable any direct or indirect owner of any equity interest in it to, claim any depreciation or amortization deduction, investment tax credit or deduction for any payment as rent, with respect to the Legacy Generation Assets.

(ii)   Owner, Administrator and Operator each covenant and agree that the terms of this Agreement shall be construed so as to comply with the requirements of Revenue Procedure 2017-13. To the extent that this Agreement is determined to fail to comply with Revenue Procedure 2017-13 for any reason or otherwise is determined to result in private business use of the Legacy Generation Assets within the meaning of Section 141 of the Internal Revenue Code, the Parties agree that they shall use reasonable efforts to amend the terms of this Agreement in order to comply with Revenue Procedure 2017-13 and Section 141 of the Internal Revenue Code to prevent any adverse effect to the exclusion from gross income of the interest on obligations of Owner, its Affiliate or another Governmental Body for federal income tax purposes under the Internal Revenue Code.

(c)   PREB Actions. The Parties hereby acknowledge and agree that to the extent PREB (i) is not permitted under Applicable Law to carry out its rights, duties and obligations under this Agreement ("PREB Actions"), all of which PREB is deemed to have acknowledged by delivery of the Energy Compliance Certificate, or (ii) ceases to be an entity of the government of the Commonwealth, the related PREB Actions shall automatically become the rights, duties and obligations of the Governmental Body of the Commonwealth designated under Applicable Law to assume and succeed to the interest of PREB hereunder or, absent such designation, Administrator (the "PREB Successor"). In the event that such PREB Actions become the rights, duties and obligations of the PREB Successor, it shall exercise such rights, duties and obligations (x) taking into account the standards, processes and procedures previously used by PREB with respect to the PREB Actions, (y) in a manner that does not adversely affect the exclusion from gross income of interest on obligations of Owner, its Affiliates or another Governmental Body for federal income tax purposes under the Internal Revenue Code and (z) taking into account any obligations under Section 10.1 of Act 120, to the extent applicable.

## Article 4
## MOBILIZATION PERIOD

**Section 4.1**   Mobilization Period Generally.

(a)   Role of Operator. Throughout the Mobilization Period, Operator shall not provide the O&M Services or otherwise be responsible for the Legacy Generation Assets, but shall,

CONFIDENTIAL

subject to and conditioned upon Owner providing funding pursuant to Section 4.6(b) (*Mobilization Period Compensation – Mobilization Service Fee*), solely provide the Mobilization Services as described in the Mobilization Plan set forth in Annex VII (*Mobilization Plan*) (the "Mobilization Plan"). The Mobilization Services are intended to ensure an orderly transfer of the care, custody and control of the Legacy Generation Assets to Operator by the Target Service Commencement Date without disruption of business continuity, in a manner consistent with the Mobilization Plan and Applicable Law.

(b)     Owner and Administrator Cooperation. Each of Owner and Administrator shall take all such actions as may be reasonably necessary to enable or assist Operator in providing the Mobilization Services, including (i) providing Operator's Representatives with a designated space and facilities at Owner's principal offices and each of the Generation Sites for their use throughout the Mobilization Period, (ii) allowing access, during normal business or operational hours (as may be applicable and relevant) and at such other times as are required, to Owner's premises for the purpose of providing the Mobilization Services, (iii) cooperating with and assisting, and causing its Representatives to cooperate with and assist, Operator in its performance of the Mobilization Services and its efforts to timely satisfy the Operator Service Commencement Date Conditions, and (iv) encouraging and facilitating a positive and cooperative working relationship with respect to the implementation and completion of the Mobilization Plan and the performance of the Mobilization Services.

(c)     Administrative Expense Treatment.

(i)     No later than ten (10) Business Days after the Effective Date, Owner shall file a motion with the Title III Court seeking administrative expense treatment for any accrued and unpaid amounts required to be paid by Owner under this Agreement during the Mobilization Period, including the Mobilization Service Fee.

(ii)     Operator shall have the right to terminate this Agreement upon not less than thirty (30) days' prior written notice to Administrator (with a copy to PREB) (A) if such motion is denied by the Title III Court, or (B) if such motion has not been approved by the Title III Court on or before the date that is ninety (90) days following the date on which such motion is filed, which ninety (90) day period may be extended for an additional forty-five (45) days by Administrator at its sole discretion, or such later date as Administrator and Operator may agree or (C) if the Title III Court approval is ultimately reversed on appeal.

(iii)     In the event of the termination of this Agreement pursuant to this Section 4.1(c) (*Mobilization Period Generally – Administrative Expense Treatment*), Operator shall retain any Mobilization Service Fee earned as of the effective date of such termination, and, within five (5) Business Days of the effective date of such termination, shall return to Administrator any amounts held in the Mobilization Account in excess of any earned Mobilization Service Fee. This Agreement (other than with respect to the aforementioned payment obligations and any limitations on liability set out elsewhere in this Agreement, each of which shall continue in effect) shall thereafter become void and have no effect, without any liability on the part of any Party or its Affiliates or Representatives in respect thereof, except that nothing herein shall relieve any party from liability that cannot be waived as a matter of Applicable Law, claims of fraud or intentional breach or misrepresentation; provided that, in any such event, the limitations of liability

43

specified in this Agreement (including Section 14.6(d) (*Remedies Upon Early Termination – Additional Remedies*) and Section 19.3 (*Limitation on Liability*)) shall, notwithstanding the foregoing, continue to apply. Furthermore, the remedies provided in this Section 4.1(c) (*Mobilization Period Generally – Administrative Expense Treatment*) shall be the sole and exclusive remedies of the Parties for any termination of this Agreement pursuant to this Section 4.1(c) (*Mobilization Period Generally – Administrative Expense Treatment*).

**Section 4.2**    Operator Responsibilities. As soon as practicable after the Effective Date, but in any event prior to the Target Service Commencement Date (subject to Owner and Administrator complying with their obligations set forth in Section 4.3 (*Owner and Administrator Responsibilities*) and elsewhere in the Agreement to the extent relevant), Operator shall be required to satisfy the following conditions precedent to (i) Owner's obligations to handover to Operator the O&M Services and other rights and responsibilities with respect to the Legacy Generation Assets pursuant to Section 4.7(b) (*Closing the Mobilization Period – Establishment of Service Commencement Date*) and (ii) the occurrence of the Service Commencement Date (collectively, the "Operator Service Commencement Date Conditions"):

(a)    Mobilization Plan. Operator shall carry out and complete the Mobilization Plan, and shall provide for management, technical, administrative, engineering, labor relations and other personnel necessary in connection therewith.

(b)    Handover Checklist. On or prior to the tenth (10th) day and the twenty-fifth day (25th) of each month during the Mobilization Period, Operator shall provide Administrator written monthly reports with respect to Operator's performance of the Mobilization Services for each Legacy Generation Asset, including a copy of the Handover Checklist updated to reflect (i) the progress of each item, (ii) the percentage completion for each item, (iii) the dollars expended for each item, and (iv) the identification of any risks to the completion of the Handover Checklist tasks, listed therein. From time to time during the Mobilization Period, in light of experience developed up to such point in the Mobilization Period, the Handover Checklist shall be adjusted, updated or otherwise modified by Operator and Administrator, each acting reasonably, as necessary to reflect such experience.

(c)    Confirmation of Guarantee. Operator shall execute and deliver a confirmation to Administrator that the Guarantee remains in full force and effect.

(d)    Required Insurance. Subject to Article 10 (*Insurance*), Operator shall submit to Administrator certificates of insurance for all Required Insurance to be effective as of the Service Commencement Date.

(e)    Legacy Generation Emergency Response Plan. As soon as reasonably practicable, but not less than ninety (90) days, following the Effective Date, Operator shall develop in consultation with T&D Operator and submit to Administrator and PREB, for their information and approval, a plan of action that takes effect from the Service Commencement Date and outlines the procedures and actions necessary for responding to any Emergency affecting or reasonably likely emergency that could affect the Legacy Generation Assets after the Service Commencement Date (the "Legacy Generation Emergency Response Plan"), including fire, weather, environmental, health, safety and other potential emergency conditions, which Legacy Generation

Emergency Response Plan shall become effective on the Service Commencement Date. The Legacy Generation Emergency Response Plan shall (i) provide for appropriate notice of any such emergency to T&D Operator, Administrator, PREB and all other Governmental Bodies that Operator is notified in writing have jurisdiction over the Legacy Generation Assets, (ii) establish measures that facilitate coordinated emergency response actions by all appropriate Governmental Bodies, (iii) specifically include outage minimization and response measures and (iv) include measures designed to assure the timely availability of all personnel required to respond to any emergency in accordance with the Contract Standards. In the event of a Declared Emergency or Major Disaster, such Legacy Generation Emergency Response Plan shall be updated by Operator as necessary or appropriate.

(f)     Employment Evaluations. As soon as reasonably practicable, but not less than thirty (30) Business Days, following the Effective Date, Operator shall, in accordance with the Owner Employee Interview Plan set forth in Schedule 1 to Annex X (*Operator Employment Requirements – Owner Employee Interview Plan*), interview and evaluate as candidates for employment at Operator, effective as of the Service Commencement Date, the regular employees of Owner and its Affiliates (other than Owner's transmission and distribution employees who have been hired by T&D Operator) who were, as of June 30, 2022, and currently remain employed by Owner and its Affiliates or are hired by Owner or its Affiliates on or after the Effective Date in the ordinary course of business consistent with the past practices of Owner and its Affiliates to replace any existing employee of Owner (collectively, the "Owner Employees"). For the avoidance of doubt, Operator shall not be liable for severance or other pay or benefits for Owner Employees who are not hired by Operator, including those to whom an offer of employment is made but who do not accept such offer. Owner and its Affiliates shall waive any non-competition, confidentiality or other obligation arising under any employment contract between Owner or Affiliate and any Owner Employee that may otherwise restrict any of Owner Employee's rights to be employed by Operator or an Affiliate. Owner shall provide Operator with the following information regarding Owner Employees promptly on request and to the extent permitted by Applicable Law: (v) job description for current and any prior positions occupied by such Owner Employee, (w) date of employment, (x) current salary and/or regular hourly wage, (y) any appraisals and accolades, as well as any reprimands or disciplinary actions, contained in the potential employees' personnel files, and (z) any other such information regarding Owner Employees that may be reasonably requested.

(g)     Employment Offers. Operator, the Authority and Owner acknowledge that Applicable Law establishes that no Owner Employee shall be left unemployed nor lose benefits as a result of the transactions contemplated hereby. Operator shall offer employment to fulltime plant Owner Employees who were employed and in good standing as of June 30, 2022; provided that such employees complete and satisfy customary background checks. Operator shall give priority in hiring to any other Owner Employee who meets Operator's stated requirements for employment as set forth in Annex X (*Operator Employment Requirements*) over other equally qualified applicants for the same job category that are not Owner Employees, it being understood that the determination of which Owner Employees, who are not plant Owner Employees, to hire shall be made by Operator in Operator's sole discretion, acting in good faith. Each Owner Employee who accepts an offer of employment with Operator pursuant to this Section 4.2(g) (*Operator Responsibilities – Employment Offers*) and commences such employment with Operator shall be referred to as a "Hired Former Employees of Owner." On the Service Commencement Date and

during the Term, Operator shall employ such other employees, including any employees of Operator or any of its Affiliates as of the Effective Date hired for the operation of the Legacy Generation Assets ("Other Employees" and, together with the Hired Former Employees of Owner, the "Operator Employees"), as are necessary to provide the O&M Services. Upon Administrator's or Owner's reasonable request, Operator shall provide to Owner and Administrator information regarding the total employment offers made and accepted, including a breakdown between Hired Former Employees of Owner and Other Employees. The following initial terms and conditions of employment shall apply to the Hired Former Employees of Owner, but not to any Other Employees:

   (i) Offers of employment shall remain open for a period of thirty (30) Business Days. Any such offer that is accepted within such thirty (30) Business Day period shall thereafter be irrevocable until the Service Commencement Date.

   (ii) Offers of employment shall provide for employment with Operator on terms and conditions that are set at Operator's sole discretion, but shall in all cases provide for (A) a base salary or regular hourly wage rate at least equal to the base salary or wage rate provided by Owner or its Affiliates (as applicable) to the Owner Employee immediately prior to the Service Commencement Date, (B) the employee fringe benefits established in Act 26 and (C) any other benefits required to be offered to Owner Employees pursuant to Act 120, as any such benefits may have been restricted, conditioned, modified or annulled by Act 3, Act 26 and Act 66.

   (iii) Pursuant to Section 21.19(b), Operator agrees that any Hired Former Employees of Owner that receive and accept offers of employment from Operator shall enjoy the following additional protections: (A) his or her job will be guaranteed for a minimum period of two (2) years, and (B) Hired Former Employees of Owner may only be separated from the position during such period of two (2) years if he or she engages in behavior that warrants dismissal or constitutes just cause under Act 80 of May 30, 1970, as amended.

   (h) <u>Owner Employees in Critical Employee Positions</u>. Notwithstanding the foregoing, Operator shall prioritize filling positions that are critical to the reliable operation and maintenance of the respective Legacy Generation Assets and are filled by highly skilled employees, as agreed by Administrator (in consultation with Owner) and Operator and listed in Annex X (*Operator Employment Requirements*) ("Critical Employee Positions"). For such purpose, as soon as reasonably practicable, but not less than ten (10) Business Days following the Effective Date, Operator shall interview each of the Owner Employees employed at such time in a Critical Employee Position. If Operator deems such employee qualified to fill such position, Operator shall offer such employee employment. If such employee rejects the offer of employment, or Operator deems that an Owner Employee occupying a Critical Employee Position is not qualified to do so, Operator shall use its commercially reasonable efforts to hire as promptly as possible a replacement for such employee, with a view towards ensuring that such replacement is trained in the relevant Critical Employee Position by the date that is thirty (30) days prior to the Target Service Commencement Date. Offers of employment to Owner Employees in Critical Employee Positions shall remain open for a period of thirty (30) Business Days, and such employees may accept Operator's offer of employment on the terms and conditions set forth therein. Any such offer that is accepted within such thirty (30) Business Day period shall thereafter be irrevocable.

**CONFIDENTIAL**

      (i)      <u>Periodic Reports</u>.

      (i)      Operator shall provide Administrator with detailed reports every two weeks and as Administrator may reasonably request from time to time with respect to Operator's performance of the Mobilization Services, including the progress against the Handover Checklist and any other completion schedules and milestones included in the Mobilization Plan, and including total actual dollar expenditures and any request for information submitted by Operator to Owner. In addition, Administrator may request any other periodic reports from time to time. In connection therewith, Operator shall provide Administrator (with copy to PREB) with any other information that (A) Administrator may reasonably request, including performance reports related to any of the Mobilization Services, and (B) may be reasonably produced from records maintained by Operator in the normal course of business consistent with the provisions of this Agreement relating to document retention.

      (ii)      Operator shall promptly advise Administrator of any actual or potential failure or inability to achieve milestones by the dates set forth in the Mobilization Plan, and shall promptly report to Administrator any problems encountered in performing the Mobilization Services that Operator has been unable to promptly and adequately resolve.

      (j)      <u>Consumables, Spare Parts and Capital Spare Parts</u>. Promptly (and in any event within sixty (60) days) following the Effective Date, and in accordance with the Mobilization Plan, Operator shall review the inventory of Consumables, Spare Parts and Capital Spare Parts for each Legacy Generation Asset and submit to Administrator and PREB (with copy to Owner), for their review and approval, a recommendation in consultation with the original equipment manufacturers of any additional Consumables, Spare Parts and Capital Spare Parts necessary to provide Operator with a supply of such Consumables, Spare Parts and Capital Spare Parts to allow Operator to comply with its obligations under this Agreement for twelve (12) months following the Service Commencement Date (with any modifications deemed to be appropriate by Administrator). During the twelve (12) months following the Service Commencement Date, in the event that, following review of the inventory of Consumables, Spare Parts and Capital Spare Parts for a Legacy Generation Asset, Operator determines that additional Consumables, Spare Parts and Capital Spare Parts are necessary to allow Operator to comply with its obligations under this Agreement for the remainder of such twelve (12) month period, Operator may submit to Administrator and PREB (with copy to Owner), for their review and approval, a revision to the initial approved recommendation. After such twelve (12) month period, it shall be Operator's responsibility to procure any additional, necessary Consumables and Spare Parts, and any additional, necessary Capital Spare Parts in accordance with Section 5.6 (*Capital Spare Parts and Capital Improvements*), in each case in accordance with the then-approved Operating Budget.

      (k)      <u>Representations</u>. The representations of Operator set forth in Section 20.2 (*Representations and Warranties of Operator*) and Guarantor set forth in its Guarantee shall be true and correct in all material respects as of the Service Commencement Date (other than any representations that are expressly made as of an earlier date), as if made on and as of the Service Commencement Date, and both Operator and Guarantor shall deliver to Administrator a certificate of an authorized officer of such entity to that effect.

CONFIDENTIAL

        (l)    <u>Notice of Default</u>. Operator shall provide to Administrator, promptly following the receipt thereof, copies of any notice of default, breach or noncompliance received under or in connection with any Governmental Approvals, if any, or Subcontract pertaining to the Mobilization Period.

        (m)    <u>Operations and Maintenance Procedures</u>. As soon as practicable (and in any event within ninety (90) days) after the Effective Date and at such time and in such manner as to permit Operator to perform its obligations under Section 4.2 (*Operator Responsibilities*), Operator shall prepare and submit to Administrator (with copy to Owner) procedures related to the operation and maintenance and fuel supply of each Legacy Generation Asset (such procedures, the "<u>Operations and Maintenance Procedures</u>"), which procedures shall be developed in accordance with Prudent Industry Practice and Applicable Law. Within thirty (30) days following its receipt of such proposed Operations and Maintenance Procedures, Administrator shall provide Operator comments on the appropriateness of the proposed Operations and Maintenance Procedures and recommend any changes or modifications it believes are necessary or appropriate. Within thirty (30) days following receipt of Administrator's comments, if any, or the end of forty-five (45) days following Administrator's receipt of the proposed Operations and Maintenance Procedures, if Administrator has no comments, Operator shall submit to Administrator for its review and approval the revised Operations and Maintenance Procedures incorporating or rejecting any of the modifications or changes suggested by Administrator, together with an explanation of any of Administrator's comments, as Operator shall reasonably deem appropriate in its sole discretion. Such Operations and Maintenance Procedures shall be updated by Operator, subject to review by Administrator, on an annual basis as necessary or appropriate. Until the Operations and Maintenance Procedures have been approved pursuant to this Section 4.2(m) (*Operator Responsibilities – Operations and Maintenance Procedures*), Operator shall perform the Services in accordance with the Consent Decree and corresponding PREPA operations and maintenance procedures.

        (n)    <u>Safety and Hazardous Materials Procedures Manual</u>. Promptly (and in any event within ninety (90) days) following the Effective Date, Operator shall prepare and submit to Administrator (with copy to Owner), for its information and approval, a manual, for each applicable Legacy Generation Asset and consistent with the Safety and Hazardous Materials Procedures Manual outline set forth in Schedule 1 to Annex IX (*Scope of Services – Safety and Hazardous Materials Procedures Manual Outline*), that sets forth an illness and injury prevention program, a description of Operator's participation in workplace safety and health management programs and a risk management plan that meets the latest requirements of Applicable Law (the "<u>Safety and Hazardous Materials Procedures Manual</u>"). Within thirty (30) days following its receipt of such proposed Safety and Hazardous Materials Procedures Manual, Administrator, acting reasonably, shall provide Operator comments on the appropriateness of the proposed Safety and Hazardous Materials Procedures Manual and recommend any changes or modifications it believes are necessary or appropriate. Within thirty (30) days following receipt of Administrator's comments, if any, or the end of forty-five (45) days following Administrator's receipt of the proposed Safety and Hazardous Materials Procedures Manual if Administrator has no comments, Operator shall submit to Administrator for its review and approval the revised Safety and Hazardous Materials Procedures Manual incorporating or rejecting any of the modifications or changes suggested by Administrator, together with an explanation of any of Administrator's comments, as Operator shall reasonably deem appropriate in its sole discretion. Such Safety and

CONFIDENTIAL

Hazardous Materials Procedures Manual shall be updated by Operator, subject to review by Administrator, on an annual basis as necessary or appropriate.

(o)     *Operator Training Program*. Promptly (and in any event within one hundred twenty (120) days) following the Effective Date, Operator shall prepare and submit to Administrator (with copy to Owner), for its information and approval, a written program, for each applicable Legacy Generation Asset, that ensures all personnel involved in providing the O&M Services have the required knowledge, training and experience for their respective assigned duties, including special training required for meeting all requirements under the Consent Decree and for the handling Hazardous Materials (the "Operator Training Program"). Within thirty (30) days following its receipt of such proposed Operator Training Program, Administrator, acting reasonably and in consultation with Owner, shall provide Operator comments, on the appropriateness of the proposed Operator Training Program and recommend any changes or modifications it believes are necessary or appropriate. Within thirty (30) days following receipt of Administrator's comments, if any, or the end of forty-five (45) days following Administrator's receipt of the proposed Operator Training Program, if Administrator has no comments, Operator shall submit to Administrator for its review and approval the revised Operator Training Program incorporating or rejecting any of the modifications or changes suggested by Administrator, together with an explanation of any of Administrator's comments, as Operator shall reasonably deem appropriate in its sole discretion. Such Operator Training Program shall be updated by Operator, subject to review by Administrator, on an annual basis as necessary or appropriate.

(p)     *Procurement Manual*.

(i)     Promptly (and in any event within ninety (90) days) following the Effective Date, Operator shall prepare and submit to Administrator and COR3 for review and approval (with copy to the Federal Emergency Management Agency, the Department of Homeland Security Office of the Inspector General and PREB) a manual that (A) includes the agreed Organizational Conflict of Interest Policy, which shall require the use of a third-party procurement office to be retained by the Administrator through an independent procurement process, whom shall be tasked with conducting all procurement processes where there is a possible organizational conflict of interest and of administering any and all contracts where there is an organizational conflict of interest (for the avoidance of doubt, Operator shall not participate in the procurement of the third-party procurement office) and (B) describes (i) the procurement guidelines to be applied to the procurement of any new or replacement, or modifications, amendments, renewals and extensions of any Subcontract or Facility Contract (including Capital Spare Parts and Spare Parts, but excluding Operator-funded capital improvements that do not involve the installation of equipment that becomes a part of the system at a Legacy Generation Asset), which guidelines shall aim to ensure that such procurement processes remain competitive, fair and transparent, (ii) the contractual provisions to be included in any new or replacement Facility Contract, including any contract relating to Owner-funded capital improvements (whether federally or non-federally funded), or any other Facility Contract involving federal funding and (iii) procedures for contract administration and oversight, including standards and methods for (1) avoiding acquisition of unnecessary or duplicative items, (2) granting awards to responsible contractors, (3) maintaining records of procurement history, (4) managing time-and-materials contracts, (5) resolving disputes, (6) selecting transactions for procurement, (7) conducting technical evaluations, (8) providing for oversight by Owner and Administrator and (9) Operator's reporting requirements thereunder (such

CONFIDENTIAL

manual, the "Procurement Manual"). Except as otherwise provided herein, the Procurement Manual shall comply with Prudent Industry Practice and Applicable Law in all respects, including, to the extent applicable, federal regulations and any applicable procurement rules set forth in 2 C.F.R. Part 200. For the avoidance of doubt procurement requirements that would otherwise apply to Owner under Act No. 83 of May 2, 1941 (including any rules or regulations issued thereunder) or Act 38 (including those relating to approval process and judicial review) shall not be applicable.

(ii)     Upon receipt of the Procurement Manual prepared in accordance with clause (i), Administrator, acting reasonably and in consultation with COR3 and PREB (each of which shall provide comments no later than thirty (30) days following receipt of a copy of the Procurement Manual), shall provide Operator comments on the proposed Procurement Manual including any changes or modifications it believes are necessary or appropriate.

(iii)     Within thirty (30) days following receipt of Administrator's consolidated comments, if any, Operator shall submit to Administrator and COR3 (with copy to PREB) the revised Procurement Manual, incorporating the feedback from Administrator, COR3 and PREB. If Operator disagrees with any comment from either Administrator, COR3 or PREB, Operator will deliver with the revised Procurement Manual a written statement describing such disagreement, and the parties will meet within five (5) Business Days to seek to resolve any such disagreement and obtain Administrator and COR3's approval of a Procurement Manual that is acceptable to Operator; provided that Operator must accept any comments from Administrator or COR3 that require measures to comply with applicable federal grant regulations.

(iv)     Operator shall not procure, amend and/or enter into any new Facility Contract until (A) Administrator and COR3 approve the Procurement Manual and (B) the Service Commencement Date has occurred.

(v)     Operator shall update the Procurement Manual (A) on an annual basis, (B) as necessary to reflect any changes in Applicable Law that affect any procurement and (C) upon any reasonable request from Administrator; provided that if such request may prohibit the avoidance, mitigation, or resolution of any conflict of interest identified in the Procurement Manual through the processes and procedures set forth in the Organizational Conflict of Interest Policy, then Operator shall promptly deliver to Administrator a written statement describing the possible impact on such processes and procedures, and Administrator and Operator shall meet within five (5) Business Days to discuss and agree upon a mutually acceptable update to the Procurement Manual. Such updates and other substantial changes to the Procurement Manual must be submitted to Administrator in writing no later than forty-five (45) days prior to the expected date of implementation of the revised Procurement Manual or thirty (30) days from the date of Administrator's request (or thirty (30) days from the date of any meeting between Administrator and Operator under clause (C) above), whichever occurs first.

(q)     Communications Plan. No later than thirty (30) days after the Effective Date, Operator shall prepare and submit to Administrator an updated Communications Plan, such plan in a form satisfactory to Administrator in its reasonable discretion, that (i) demonstrates a thorough understanding of the Commonwealth's communications landscape, (ii) describes systems to ensure that communication to Governmental Bodies, public officials, regulators, local municipalities and counties, employees, the media, the general public, and other such Persons as

CONFIDENTIAL

appropriate, is timely, effective, efficient and consistent, (iii) has been developed and will be implemented by the services of a communications team, which services may be contracted from a communications firm or consultant with expertise and experience in the areas of communications strategies, media relations, crisis management, relations with different public entities and stakeholders, public affairs and government relations, advertising, digital platforms, and community relation, and (iv) identifies the key personnel that will oversee and implement such plan, provided that such personnel must include spokesperson(s) fluent in Spanish to manage the Operator's communications. Operator shall coordinate with Administrator on all such communications and shall update the Communications Plan (x) on an annual basis and (y) upon reasonable request from Administrator. Such updates and other substantial changes to the Communications Plan must be submitted to Administrator in writing no later than forty-five (45) days prior to the expected date of implementation of the revised Communications Plan. The Parties agree that the Communications Plan will include a requirement that Owner's and Administrator's senior representatives attend, and Administrator shall request that senior representatives of the FOMB, the PREB and the T&D Operator attend, an in-person bimonthly (*i.e.*, every other month) meeting, it being the intent of the Parties to communicate and coordinate effectively on a regular basis with a view towards optimizing performance, operation and maintenance of the Legacy Generation Assets.

(r)     Invoice Review and Approval Procedures Manual. As soon as reasonably practicable, but no less than thirty (30) days following the Effective Date, Operator and Administrator shall coordinate and develop together in good faith a manual that sets forth procedures related to the review and approval of all invoices under this Agreement.

(s)     Tax Decree. Either (i) Operator shall have received a decree under Act 60, Section 2071.01, 13 L.P.R.A., Section 45651, with respect to all payments for services received pursuant to this Agreement on terms reasonably acceptable to Operator (the "Tax Decree"), to the extent that Operator and its Affiliates, as applicable, meet the requirements and are eligible for the matters requested in the Tax Decree or (ii) the Parties have amended this Agreement to provide that, on an after-tax basis, the amounts Operator will receive for services performed pursuant to this Agreement are at least equal to the amounts Operator would have been entitled to receive on an after-tax basis for services performed pursuant to this Agreement had the Tax Decree been granted.

(t)     Fuel Optimization Plan. As soon as reasonably practicable, but not less than ninety (90) days following the Effective Date, Operator shall develop and submit to Administrator a plan intended to take effect from the Service Commencement Date and describing the Fuel Cost Savings Initiatives and outlining the expected methods and estimated fuel savings to be achieved during the Term of the Agreement (the "Fuel Optimization Plan"). Administrator, acting reasonably, shall provide Operator comments on the appropriateness of the proposed Fuel Optimization Plan and recommend any changes or modifications it believes are necessary or appropriate. Within thirty (30) days following receipt of Administrator's comments, if any, or the end of forty-five (45) days following Administrator's receipt of the proposed Fuel Optimization Plan, if Administrator has no comments, Operator shall submit to PREB for its review and approval the revised Fuel Optimization Plan, incorporating the feedback from Administrator. If Operator disagrees with any comment from Administrator, Operator will deliver with the revised Fuel Optimization Plan a written statement describing such disagreement, and the parties will meet

within five (5) Business Days to seek to resolve any such disagreement and obtain Administrator's approval of a Fuel Optimization Plan that is acceptable to Operator. Operator shall update the Fuel Optimization Plan (A) on an annual basis, (B) as necessary pursuant to Section 2.3(c) (*Term – Reduction*) and (C) upon any order from PREB or reasonable request from Administrator. Notwithstanding anything to the contrary herein, Operator's submission of the Fuel Optimization Plan to the Administrator shall be sufficient to satisfy this Operator Service Commencement Date Condition; <u>provided</u> that, for the avoidance of doubt, the Fuel Optimization Plan shall not be effective until approved by Administrator and PREB pursuant to this Section 4.2(t) (*Operator Responsibilities – Fuel Optimization Plan*).

(u)     <u>Federally Funded Generation Project Plan</u>. As soon as reasonably practicable, but not less than ninety (90) days following the Effective Date, Operator shall develop and submit to Administrator and COR3 a plan of action intended to take effect from the Service Commencement Date and, taking into account the Integrated Resource Plan, listing and describing those projects proposed by Operator for priority in the receipt of any funding for the Legacy Generation Assets received or to be received by or for the benefit of Owner from any U.S. federal agency (the "<u>Federally Funded Generation Project Plan</u>"). Within thirty (30) days following its receipt of such proposed Federally Funded Generation Project Plan, Administrator, acting reasonably and in consultation with COR3 (which shall provide comments no later than thirty (30) days following its receipt of such proposed Federally Funded Generation Project Plan), shall provide Operator comments on the appropriateness of the proposed Federally Funded Generation Project Plan including any changes or modifications it believes are necessary or appropriate. Within thirty (30) days following receipt of Administrator's comments, if any, or the end of forty-five (45) days following Administrator's receipt of the proposed Federally Funded Generation Project Plan, if Administrator has no comments, Operator shall submit to PREB and COR3 (with copy to the Federal Emergency Management Agency and the Department of Homeland Security Office of the Inspector General) the revised Federally Funded Generation Project Plan, incorporating the feedback from Administrator and COR3. If Operator disagrees with any comment from either Administrator or COR3, Operator will deliver with the revised Federally Funded Generation Project Plan a written statement describing such disagreement, and the parties will meet within five (5) Business Days to seek to resolve any such disagreement and obtain Administrator and COR3's approval of a Federally Funded Generation Project Plan that is acceptable to Operator. Such Federally Funded Generation Project Plan shall be updated by Operator, subject to review by Administrator and COR3, on an annual basis as necessary or appropriate. Notwithstanding anything to the contrary herein, Operator's submission of the Federally Funded Generation Project Plan to the Administrator shall be sufficient to satisfy this Operator Service Commencement Date Condition; <u>provided</u> that, for the avoidance of doubt, the Federally Funded Generation Project Plan shall not be effective until approved by Administrator and COR3 pursuant to this Section 4.2(u) (*Operator Responsibilities – Federally Funded Generation Project Plan*).

(v)     <u>Annual Performance Test</u>.  No later than sixty (60) days prior to the Target Service Commencement Date, and in accordance with the Gridco-Genco-Hydroco Operating Agreement, Operator shall coordinate with T&D Operator to submit to PREB, for its review and approval, the procedures for the Annual Performance Test developed pursuant to the PREPA-Genco-Hydroco Operating Agreement. Within thirty (30) days following its receipt of such procedures, PREB, acting reasonably, shall provide Operator and T&D Operator comments on the

CONFIDENTIAL

appropriateness of the proposed procedures and recommend any changes or modifications it believes are necessary or appropriate. If PREB does not deliver such comments during such thirty (30) day period, it shall be deemed to have agreed with the procedures for the Annual Performance Test.

**Section 4.3**    Owner and Administrator Responsibilities. As soon as practicable after the Effective Date but in any event prior to the Target Service Commencement Date and at such time and in such manner as to permit Operator to perform its obligations under Section 4.2 (*Operator Responsibilities*), Owner and Administrator shall, at Owner's sole cost, satisfy the following conditions precedent (i) to Operator's obligations to take over the O&M Services and other rights and responsibilities with respect to the Legacy Generation Assets pursuant to Section 4.7(b) (*Closing the Mobilization Period – Establishment of Service Commencement Date*) and (ii) to the occurrence of the Service Commencement Date:

(a)    Representations. The representations of Owner set forth in Section 20.1 (*Representations and Warranties of Owner*) shall be true and correct in all material respects as of the Service Commencement Date as if made on and as of the Service Commencement Date (other than any representations that are expressly made as of an earlier date), and Owner shall deliver to Operator a certificate of an authorized officer to that effect.

(b)    Access. Owner shall provide Operator, its Subcontractors, if any, and their Representatives with access to the Legacy Generation Assets and the Generation Sites for the sole purpose of performing the Mobilization Services in accordance with the terms hereof.

(c)    Initial O&M Budget. Administrator shall provide Operator with the Initial O&M Budgets as soon as practicable following the Effective Date, which Initial O&M Budgets shall have been prepared in accordance with the PREPA-Genco-Hydroco Operating Agreement, approved by PREB and shall reflect the then applicable Rate Order, in the case of the Operating Budget, and the then-current Fuel Adjustment Clause, in the case of the Fuel Budget.

(d)    Additional Facility Contracts Between Effective Date and Service Commencement Date. During the Mobilization Period, the Parties agree that it is the intent that Owner and Administrator shall not amend or enter into any new Facility Contracts; provided, however, that:

(i)    if Owner and Administrator identify a need to do so, then Administrator shall notify Operator of such need and coordinate with Operator to implement any such amendment or new Facility Contract; provided that as part of such consultation process the Parties shall review the impact of any such amendment or new Facility Contract on the Initial O&M Budgets; and

(ii)    following such consultation process, Administrator shall ultimately determine if such amendment or new Facility Contract is required; provided that such amendment or new Facility Contract shall not be entered into if it causes Operator to exceed the Initial O&M Budgets.

(e)    Notices with respect to Facility Contracts. Owner shall (i) notify each counterparty to a Facility Contract in writing of Owner's delegation of authority to Operator with

CONFIDENTIAL

respect to such Facility Contract in the manner contemplated by Section 5.2(a) (*Facility Contracts – Generally*) and (ii) have obtained all required consents from such counterparties as may be required thereby in connection with such delegation of authority and (iii) take all such other actions as may be necessary for Operator to be able to comply with its obligations under Section 5.2(a) (*Facility Contracts – Generally*).

(f)     Mobilization Plan. Owner and Administrator shall perform all obligations of Owner and Administrator agreed in the Mobilization Plan.

(g)     Labor.

(i)     Owner and Administrator shall use commercially reasonable efforts to provide Operator the opportunity to hire Owner Employees in a manner consistent with the Proposal submitted by Operator or its Affiliate.

(ii)     Owner shall make good faith efforts to make Owner Employees available to support the Mobilization Plan upon Operator's reasonable request, including for training and consultation in connection with the Operations and Maintenance Procedures and the Safety and Hazardous Materials Procedures Manual.

(h)     Service Accounts. Owner shall provide evidence satisfactory to Operator that it has opened the Service Accounts and that each Service Account shall have been funded by such date and in an amount not less than the amount required to be funded in accordance with Section 7.6 (*Service Accounts*).

(i)     Consumables, Spare Parts and Capital Spare Parts.

(i)     Subject to Administrator's and PREB's approval of the initial recommendation and any revised recommendation provided by Operator pursuant to Section 4.2(j) (*Operator Responsibilities – Consumables, Spare Parts and Capital Spare Parts*), Owner shall procure and deliver to the applicable Generation Site the additional Consumables, Spare Parts and Capital Spare Parts, if any, in accordance with such recommendation, to allow Operator to comply with its obligations under this Agreement for twelve (12) months following the Service Commencement Date. After such twelve (12) month period, it shall be Operator's responsibility to procure any additional, necessary Consumables and Spare Parts, and any additional, necessary Capital Spare Parts in accordance with Section 5.6 (*Capital Spare Parts and Capital Improvements*), in each case in accordance with the then-approved Operating Budget.

(ii)     For the avoidance of doubt, title to the Consumables, Spare Parts and Capital Spare Parts shall remain vested in, or be vested in, Owner at all times.

(j)     Delivery of Fuel.

(i)     Subject to Operator recommending quantities in accordance with the Operations and Maintenance Procedures, which shall specifically detail the manner in which necessary quantities of Fuel shall be determined and delivered, Owner shall procure and supply the initial delivery of Fuel to each Legacy Generation Asset sufficient to allow Operator to comply

with its obligations under this Agreement for two (2) months after the Service Commencement Date.

(ii)    For the avoidance of doubt, title to Fuel shall remain vested in, or be vested in, Owner at all times.

(k)    [Reserved].

(l)    Procurement Manual. No later than thirty (30) days following Administrator's and COR3's approval of the Procurement Manual prepared by Operator in accordance with Section 4.2(p) (*Operator Responsibilities – Procurement Manual*), Owner shall acknowledge in writing that, after the Service Commencement Date, such approved and agreed Procurement Manual shall govern any procurement of any new or replacement, or modifications, amendments, renewals and extensions of any, Facility Contract (including contracts for Capital Spare Parts, Spare Parts, certain specified Subcontractor services, and any contract relating to Owner-funded capital improvements (whether federally or non-federally funded)), or any other Facility Contract involving federal funding.

(m)    Identification of Facility Contracts. From and after the Effective Date, but in any event by the date that is one hundred twenty (120) days following the Effective Date, Operator, Administrator and Owner shall together identify all material existing Facility Contracts and provide Operator and Administrator with copies thereof.

(n)    Approval of Fuel Contracts. During the Mobilization Period, each (i) procurement process related to the renewal of existing, or entry into new Fuel Contracts, (ii) nominations or similar actions under existing Fuel Contracts, (iii) decisions or actions to terminate, issue penalties, amend or otherwise modify or extend the term related to existing Fuel Contracts shall require the prior written consent of the Operator, not to be unreasonably withheld, conditioned, or delayed, in a manner consistent with the Mobilization Plan; provided that, in each of clauses (i), (ii) and (iii), Operator shall only have such consent right over a Fuel Contract that (x) has a term of twelve (12) months or longer and (y) the termination of which would result in a material termination payment by Owner or result in a material loss of volume in Owner's fuel supply.

**Section 4.4**    Governmental Approvals and Tax Matters. Except as otherwise provided herein, the Parties intend that all Governmental Approvals shall continue to name Owner as the permittee or applicant and that Operator shall only be a permittee, applicant, co-permittee or co-applicant if and to the extent required by Applicable Law or the terms of such Governmental Approval. Promptly following the Effective Date, Administrator and Owner shall coordinate to identify the Governmental Approvals required for the commencement on the Service Commencement Date of the O&M Services (the "Commencement Date Governmental Approvals"). Once the Parties have identified the Commencement Date Governmental Approvals: (i) (A) Operator shall coordinate with Owner and Administrator to prepare for and support Owner's efforts related to the transfer or assignment, to the extent required by Applicable Law, or the reissuance or assistance with the issuance of the Commencement Date Governmental Approvals, (B) Owner, with Operator's assistance, shall submit complete applications and take all other steps necessary under Applicable Law to obtain and maintain all required Commencement

CONFIDENTIAL

Date Governmental Approvals and (C) Owner shall provide Operator and Administrator with copies of any such Commencement Date Governmental Approvals; and (ii) Operator and Administrator shall cooperate with Owner in good faith in identifying, preparing, applying for, obtaining and maintaining the Commencement Date Governmental Approvals.

**Section 4.5**     Conditions Precedent to Service Commencement Date. The Service Commencement Date shall not occur, and the obligations of the Parties to proceed with their respective obligations hereunder on, and after, the Service Commencement Date shall not commence, until all of the following conditions precedent (the "Service Commencement Date Conditions") are, unless otherwise mutually agreed between the Parties in writing, either satisfied as determined, or waived in writing, by (i) Administrator, in the case of Section 4.5(a) (*Conditions Precedent to Service Commencement Date – Operator Responsibilities*), except for Section 4.2(s) (*Operator Responsibilities – Tax Decree*), (ii) Operator, in the case of (x) Section 4.2(s) (*Operator Responsibilities – Tax Decree*) and (y) Section 4.5(b) (*Conditions Precedent to Service Commencement Date – Owner and Administrator Responsibilities*) or (iii) both Administrator and Operator, in the case of Section 4.5(c) (*Conditions Precedent to Service Commencement Date – Governmental Approvals*), Section 4.5(d) (*Conditions Precedent to Service Commencement Date – Acceptability and Effectiveness of Documents*), Section 4.5(e) (*Conditions Precedent to Service Commencement Date – No Governmental Prohibitions or Injunctions*), Section 4.5(f) (*Conditions Precedent to Service Commencement Date – Initial O&M Budgets*), and Section 4.5(g) (*Conditions Precedent to Service Commencement Date – Delivery of Fuel*).

(a)     Operator Responsibilities.

(i)     Operator shall have fulfilled the Operator Service Commencement Date Conditions with respect to the Mobilization Period;

(ii)     Operator shall have executed the joinder agreement to the PREPA-Genco-Hydroco Operating Agreement, and executed or agreed to, as applicable, the System Operation Principles and the Agreed Operating Procedures attached thereto; and

(iii)     As of the date of satisfaction of all Service Commencement Date Conditions, the Critical Employee Positions have been filled in a manner consistent with the Mobilization Plan.

(b)     Owner and Administrator Responsibilities.

(i)     Owner and Administrator shall have fulfilled all of their respective obligations with respect to the Mobilization Period under this Agreement, including Section 4.3 (*Owner and Administrator Responsibilities*) (the "Owner Service Commencement Date Conditions").

(ii)     Administrator and COR3 shall have approved a Procurement Manual acceptable to Operator in accordance with Section 4.2(p) (*Operator Responsibilities – Procurement Manual*) and Owner has submitted to Operator a written acknowledgement that such Procurement Manual shall apply as contemplated by Section 4.3(l) (*Owner and Administrator Responsibilities – Procurement Manual*).

CONFIDENTIAL

(iii)     Administrator and any other applicable Governmental Bodies shall have approved the Operations and Maintenance Procedures developed by Operator pursuant to Section 4.2(m) (*Operator Responsibilities – Operations and Maintenance Procedures*).

(iv)     Evidence reasonably satisfactory to Operator that an amount equal to at least the applicable amount set forth in Section 7.6 (*Service Accounts*) has been deposited by Owner in each Service Account has been provided.

(v)     An update of the Baseline Environmental Study, reasonably identifying Pre-Existing Environmental Conditions that present a risk of material liability as of the date set forth in such updated study, shall have been completed and provided to Operator in final form.

(c)     Governmental Approvals.  All Commencement Date Governmental Approvals shall have been issued or obtained by the Parties and shall be in full force and effect.

(d)     Acceptability and Effectiveness of Documents. All of the documents and instruments identified in this Article 4 (*Mobilization Period*) shall be in form and substance reasonably satisfactory to Administrator and Operator and shall be valid, in full force and effect and enforceable against each party thereto on the Service Commencement Date. No such document, instrument or agreement shall be subject to the satisfaction of any outstanding condition precedent except those expressly waived in writing or to be satisfied after the Service Commencement Date. No party to any such document, instrument or agreement shall have repudiated or be in default thereunder, and each Party shall have received such certificates or other evidence reasonably satisfactory to it of such facts as such Party shall have reasonably requested.

(e)     No Governmental Prohibitions or Injunctions. No Governmental Body shall have enacted, issued, promulgated or enforced any Applicable Law that shall be in effect, and no injunction shall be in effect, which, in each case, would make it illegal for, or otherwise prohibit or enjoin, any Party's performance of its obligations hereunder in accordance with the terms of this Agreement from and after the Service Commencement Date.

(f)     Initial O&M Budgets. The Initial O&M Budgets (including any amendment thereto pursuant to Section 4.3(d) (*Owner and Administrator Responsibilities – Additional Facility Contracts Between Effective Date and Service Commencement Date*)) shall have been finalized for purposes of this Agreement in accordance with Section 4.3(c) (*Owner and Administrator Responsibilities – Initial O&M Budget*).

(g)     Delivery of Fuel. Owner shall have procured and delivered the Fuel in accordance with Section 4.3(j) (*Owner Responsibilities – Delivery of Fuel*).

**Section 4.6**     Mobilization Period Compensation.

(a)     Generally. As compensation for the Mobilization Services provided by Operator, Owner shall pay Operator the Mobilization Service Fee. The Mobilization Service Fee shall not be subject to any abatement, deduction, counterclaim or set-off of any kind or nature.

CONFIDENTIAL

(b) <u>Mobilization Service Fee</u>. The "<u>Mobilization Service Fee</u>" shall be an aggregate amount equal to: (i) (A) the hourly fully allocated cost rate for each category of Operator employee, Affiliate personnel providing Mobilization Services, as set out in Annex XI (*Mobilization Hourly Fully Allocated Rates*); *multiplied by* (B) the number of hours worked by each Operator employee or Affiliate personnel in such category providing Mobilization Services; *plus* (ii) all other reasonably necessary and documented costs and expenses incurred by Operator (without markup for Operator profit) in the course of providing the Mobilization Services and satisfying the Service Commencement Date Conditions, including the cost of any Subcontractors and/or consultants providing Mobilization Services; <u>provided</u>, <u>however</u>, that the aggregate Mobilization Service Fee shall not exceed $15 million (the "<u>Mobilization Service Fee Cap</u>"). If the aggregate Mobilization Service Fee paid to Operator reaches 70% of the Mobilization Service Fee Cap, Operator shall provide notice to Administrator, and within five (5) Business Days of such notice, Operator shall meet with Administrator to discuss and review the pending Mobilization Services required to complete the Mobilization Plan and the cost thereof.

(c) <u>Funding</u>.

(i) Owner shall establish one or more dedicated accounts from which Owner shall draw funds from time to time to pay Operator the Mobilization Service Fee (collectively, the "<u>Mobilization Account</u>"). Promptly after the Effective Date (and in any event within five (5) Business Days), Operator shall deliver to Administrator, for its review and approval, an estimate of the anticipated Mobilization Service Fee for the lesser of (A) the following four and a half (4.5) months of the Mobilization Period and (B) the entirety of the Mobilization Period (such fee, the "<u>Mobilization Period Deposit</u>"). Within ten (10) days of delivery of such estimate, and prior to and as a condition to the commencement of any Mobilization Services, Administrator shall provide Operator evidence reasonably satisfactory to Operator that an amount equal to the Mobilization Period Deposit has been funded in the Mobilization Account by Owner. Prior to the end of each month during the Mobilization Period, Operator shall deliver to Administrator an estimate of the anticipated Mobilization Period Deposit for the applicable duration of such period. Such estimate shall include any updates to the estimated aggregate Mobilization Service Fee for the entirety of the Mobilization Period. No later than the eleventh (11th) Business Day of the following month during the Mobilization Period, the Mobilization Account shall be replenished so as to maintain a balance in the Mobilization Account at the end of each calendar month equal to such anticipated Mobilization Period Deposit (excluding from the Mobilization Period Deposit any disputed amounts with respect to the Mobilization Service Fee that remain in the Mobilization Account), and so on subsequently until the Mobilization Services conclude.

(ii) In the event a Dispute arises between Operator and Administrator in connection with Operator's estimate of the anticipated Mobilization Service Fee, the matter shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, a "<u>Mobilization Service Fee Estimate Dispute</u>").

(d) <u>Invoices</u>.

(i) On or prior to the tenth (10th) day of each month from the Effective Date until completion of the Mobilization Services, Operator shall submit to Administrator for its review and approval a monthly invoice describing in reasonable detail the prior calendar month's

CONFIDENTIAL

Mobilization Services and the corresponding Mobilization Service Fee for such prior calendar month. All invoices shall comply with the requirements set forth in Section 9.2(c) (*Anti-Corruption and Sanctions Laws – Policies and Procedures*) and shall include evidence of the certifications required by Commonwealth contractor requirements, among others.

(ii)     Operator shall provide promptly to Administrator such additional supporting documentation evidencing the provision of the Mobilization Services, if any, including evidence of the payment of any Subcontractor whose fees are included in the Mobilization Service Fee, and the calculation of the Mobilization Service Fee related thereto, and a copy of the agreements with any Subcontractor, as Administrator may reasonably request and as may be required by Applicable Law. To the extent reasonably necessary for Administrator to complete its review of the applicable invoice, upon Administrator's request such additional supporting documentation shall include any relevant Confidential Information. Administrator shall promptly, but under no circumstance in excess of twenty (20) days after receipt of the invoice, advise Operator of any disputed invoice amounts, and all such disputes which Operator and Administrator are unable to resolve shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, a "Mobilization Service Fee Dispute").

(iii)     Payments of undisputed amounts under any invoice for Mobilization Service Fees shall be due within thirty (30) days of Administrator's receipt of such invoice. Owner's sole responsibility with respect to all invoices shall be payment of undisputed amounts and shall not include review of any invoice.

(iv)     All invoices and supporting documentation shall be provided by electronic transmission upon Administrator's request.

(e)     Audits. At any time and from time to time during and until the expiration of six (6) years following the end of the Mobilization Period, Administrator may, upon reasonable prior notice, Audit (or cause to be Audited) the books and records of Operator or any Subcontractor in connection with any requests for payment of the Mobilization Service Fee, together with the supporting vouchers and statements, and the calculation of the Mobilization Service Fee. Subject to the dispute resolution provisions in Article 15 (*Dispute Resolution*), each payment made by Owner hereunder shall be subject to subsequent adjustment. Following the determination that any such payment adjustment is required, the Party required to make payment shall do so within thirty (30) days of the date of such determination.

Section 4.7     Closing the Mobilization Period.

(a)     Notice of Service Commencement Date. Operator shall provide Administrator with prompt written notice (with a copy to PREB), including a completed Handover Checklist, at such time as Operator determines it has satisfactorily completed all items on the Handover Checklist and is therefore ready to perform all O&M Services under this Agreement. Such notice shall include the total number of Operator Employees, together with a breakdown between Hired Former Employees of Owner and Other Employees. Administrator shall respond within ten (10) Business Days whether Administrator confirms or disputes the completion of any item on the Handover Checklist, together with a written statement providing reasonable detail and supporting evidence for the basis of any dispute. In the event Administrator disputes completion

59

CONFIDENTIAL

of any item(s) on the Handover Checklist, Operator may advise Owner of its disagreement with Administrator's decision. The Parties shall attempt to resolve in good faith any disputed item(s) and, in the event the Parties are unable to resolve such disputed item(s) within thirty (30) days, such disputed item(s) only shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, a "<u>Handover Checklist Dispute</u>").

(b)    <u>Establishment of Service Commencement Date</u>. The "<u>Service Commencement Date</u>" shall be the date on which a handover to Operator of the O&M Services occurs, which shall be (i) the first (1st) Business Day of a calendar month that is at least three (3) Business Days following the date on which Administrator delivers a certificate to Operator confirming that all Service Commencement Date Conditions have been met or (ii) such other date as the Parties may agree. The satisfaction or waiver by Owner, Operator, or Administrator of all the Service Commencement Date Conditions applicable to each of them is required for the achievement of the Service Commencement Date.

**Section 4.8**    Failure of Service Commencement Date Conditions.

(a)    <u>Remedy for Delay of Service Commencement Date Conditions</u>. If any of the Operator Service Commencement Date Conditions are not satisfied or waived by Administrator on or before the date that is ninety (90) days following the Target Service Commencement Date or such other later date as Administrator and Operator may agree (such date, the "<u>Delay Period Date</u>"), and the failure to satisfy any outstanding Operator Service Commencement Date Condition(s) is not caused by any Force Majeure Event or Owner Fault, and the other Service Commencement Date Conditions have been or are immediately capable of being satisfied or waived by the Delay Period Date, Operator shall pay to Owner, as Owner's sole and exclusive remedy for all monetary damages, costs, Losses and expenses of whatever type or nature arising from or related to such failure of Operator Service Commencement Date Conditions to occur by the Delay Period Date, liquidated damages (the "<u>Delay Liquidated Damages</u>"), calculated from the first Business Day immediately following the Delay Period Date, in the amount of US$1 million per week for each week (or for any portion of a week on a Pro Rata basis) the Target Service Commencement Date is delayed beyond the Delay Period Date, up to a maximum of US$15 million. Operator shall not be required to pay Delay Liquidated Damages after the earlier of (i) the date on which the Operator Service Commencement Date Conditions are satisfied by Operator or waived by Administrator or (ii) the date of termination of this Agreement pursuant to Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*); <u>provided</u> that Operator shall pay any accrued and unpaid Delay Liquidated Damages as of such earlier date. It is understood and agreed by the Parties that if any of the Operator Service Commencement Date Conditions are not satisfied or waived by the Delay Period Date, Owner's damages would be difficult or impossible to quantify with reasonable certainty, and accordingly, the payment provided for in this Section 4.8(a) (*Failure of Service Commencement Date Conditions – Remedy for Delay of Service Commencement Date Conditions*) is a payment of liquidated damages (and not penalties), which is based on the Parties' estimate of damages Owner would suffer or incur. Operator hereby irrevocably waives any right it may have to raise as a defense that the Delay Liquidated Damages are excessive or punitive.

CONFIDENTIAL

(b)    Termination for Failure of Service Commencement Date Conditions.

(i)    Administrator shall have the right, subject to approval by PREB, to terminate this Agreement upon not less than thirty (30) days' prior written notice to Operator if all of the Owner Service Commencement Date Conditions are satisfied but any of the Operator Service Commencement Date Conditions are not satisfied by Operator or waived by Administrator (unless such failure to satisfy the Operator Service Commencement Date Conditions is the result of the acts, omissions or breach of Owner) by the date that is six (6) months following the Target Service Commencement Date or such later date as Administrator and Operator may agree.

(ii)    Operator shall have the right to terminate this Agreement upon not less than thirty (30) days' prior written notice to Administrator (with copy to PREB) if all of the Operator Service Commencement Date Conditions are satisfied but any of the Owner Service Commencement Date Conditions are not satisfied by Owner or waived by Operator (unless such failure to satisfy the Owner Service Commencement Date Conditions is the result of the acts, omissions or breach of Operator) by the date that is six (6) months following the Target Service Commencement Date or such later date as Administrator and Operator may agree.

(iii)    Each of Administrator and Operator shall have the right to terminate this Agreement upon not less than thirty (30) days' prior written notice to Operator or Administrator (with copy to PREB), respectively, if any of the Service Commencement Date Conditions (other than those referred to in Section 4.8(b)(i) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*) and Section 4.8(b)(ii) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*)) are not satisfied or waived by each of Administrator and Operator by the date that is nine (9) months following the Target Service Commencement Date or such later date as Administrator and Operator may agree.

(iv)    Notwithstanding anything to the contrary in this Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*), if the Service Commencement Date Conditions are satisfied or waived prior to any such termination right being exercised, then neither Administrator nor Operator shall have the right to terminate this Agreement pursuant to this Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*).

(v)    In the event of the termination of this Agreement pursuant to this Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*), (A) Operator shall retain any Mobilization Service Fee earned as of the effective date of such termination, and shall within five (5) Business Days of the effective date of such termination, return to Administrator any amounts held in the Mobilization Account in excess of any earned Mobilization Service Fee and (B) Operator shall pay any accrued and unpaid Delay Liquidated Damages as of the effective date of such termination. This Agreement (other than with respect to the aforementioned payment obligations and any limitations on liability set out elsewhere in this Agreement, each of which shall continue in effect) shall thereafter become void and have no effect, without any liability on the part of any Party or its Affiliates or Representatives in respect thereof, except that nothing herein shall relieve any party

from liability that cannot be waived as a matter of Applicable Law, claims of fraud or intentional breach or misrepresentation; provided that, in any such event, the limitations of liability specified in this Agreement (including Section 14.6(d) (*Remedies Upon Early Termination – Additional Remedies*) and Section 19.3 (*Limitation on Liability*)), Article 15 (*Dispute Resolution*), and Article 21 (*Miscellaneous*) shall, notwithstanding the foregoing, continue to apply. Furthermore, the remedies provided in this Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*) shall be the sole and exclusive remedies of the Parties for any termination of this Agreement pursuant to Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*).

(vi)     In addition to and notwithstanding anything to the contrary in this Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*), in the event this Agreement is terminated prior to the Service Commencement Date other than as a result of the acts, omissions or breach of Operator, Operator shall be reimbursed for any reasonable and documented costs and expenses incurred by Operator (without markup for Operator profit) that are necessary and reasonable in the course of terminating the activities undertaken in connection with the Mobilization Services, including reasonable and documented breakage fees for any Subcontractors providing Mobilization Services.

(c)     Effect of Force Majeure Events or Owner Fault. The dates in Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*) shall each be extended on a day-for-day basis for the period of any Force Majeure Event or any Owner Fault (except in the case of clauses (ii) and (iii) of Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*), in which case Owner shall not receive any such extension where the delay is caused by any Owner Fault).

**Article 5**
**O&M SERVICES**

**Section 5.1**     Services Generally. Commencing on the Service Commencement Date, and in exchange for Owner's payment to Operator of all amounts owing to Operator under this Agreement, Operator shall (i) provide management, operation, maintenance, repair, restoration, replacement and other related services for the Legacy Generation Assets, as well as any optimization (including fuel and efficiency) approved by PREB, in each case that are customary and appropriate, or as required by Applicable Law, including the services set forth in this Article 5 (*O&M Services*) and Annex IX (*Scope of Services*), and (ii) establish policies, programs and procedures with respect thereto, to the extent not already established in the Services Documentation (all such services, the "O&M Services"), in each case, in accordance with the Contract Standards and Applicable Law. It is the Parties' intent that except for the rights and responsibilities reserved to Owner and Administrator as set forth in Article 6 (*Rights and Responsibilities of Owner and Administrator*) or as may otherwise be expressly provided in this Agreement, Operator shall (A) be entitled to exercise all of the rights and perform the responsibilities of Owner in providing the O&M Services, and (B) have the autonomy and responsibility to operate and maintain the Legacy Generation Assets and establish the related

CONFIDENTIAL

plans, policies, procedures and programs with respect thereto as provided in this Agreement. In providing such O&M Services, Operator must comply with all requirements of Applicable Law, including the requirements of the Consent Decree.

**Section 5.2**    Facility Contracts.

(a)    <u>Generally</u>. Operator, as agent for and on behalf of Owner, shall administer and perform Facility Contracts, if any, and Owner's payment obligations thereunder, which shall be an expense that is paid by Operator as a Pass-Through Expenditure in accordance with Section 7.6(g) (*Service Accounts – Use of Funds by Operator*). Notwithstanding the foregoing but subject to the Contract Standards, (i) Operator shall administer and perform Owner's rights and obligations under such Facility Contracts in such a manner so as not to expand or increase the liabilities assumed by Owner thereunder, other than with respect to an amendment, renewal or expansion of existing Facility Contracts as required to provide the O&M Services or Decommissioning Services hereunder and (ii) Owner shall administer and perform any rights and obligations under such Facility Contracts to the extent that Applicable Law requires Owner's performance of such functions or Applicable Law or such Facility Contract prohibits Owner from delegating such functions. Owner hereby authorizes Operator to enforce Owner's rights under any such Facility Contracts. In the event that the cost of administering and performing Owner's rights and obligations, including enforcement, for any Facility Contract exceeds $1,000,000, then such costs shall be subject to approval by Administrator, such approval not to be unreasonably withheld, delayed or conditioned.

(b)    <u>Agent Designation</u>. Owner hereby designates and appoints Operator as its agent, and Operator hereby accepts such designation and appointment, for the purpose of entering into Facility Contracts on behalf of and for the account of Owner, as may be necessary or appropriate to operate, maintain and/or decommission the Legacy Generation Assets and to make such additions and extensions thereto in accordance with the terms of this Agreement.

(c)    <u>Powers</u>. In such capacity as Owner's designated agent pursuant to Section 5.2(b) (*Facility Contracts – Agent Designation*), Operator shall have full power and authority to act on Owner's behalf and to legally bind Owner, subject, in each case, to (i) Operator's action in such regard being consistent with Prudent Industry Practice and (ii) Owner's rights and responsibilities provided in Section 6.1 (*Rights and Responsibilities of Owner*) and the other terms of this Agreement. Operator and Owner shall promptly implement such policies and procedures as may be necessary or appropriate to effect the activities contemplated by this Section 5.2 (*Facility Contracts*) and to separately identify and segregate the equipment, material, supplies and services that Operator is purchasing as agent of Owner from those Operator (or its Affiliates) may be purchasing for its own or another Person's account. Where necessary or required by a Governmental Body or other Person, Operator and Owner shall execute and deliver such instruments, agreements, certificates or other evidence confirming Operator's designation, appointment and authority to act as Owner's agent as provided in this Section 5.2 (*Facility Contracts*) and confirming that the Facility Contracts are entered into on Owner's account.

(d)    <u>Additional Facility Contracts or Expired Facility Contracts After Service Commencement Date</u>. After the Service Commencement Date, if any Facility Contracts are required: (i) for the operation, maintenance and/or decommissioning of the Legacy Generation

CONFIDENTIAL

Assets or to comply with the provisions of this Agreement or Contract Standards or (ii) to replace any existing Facility Contract that has expired or has been terminated, then, in each case, Operator shall be responsible for obtaining such Facility Contract in Owner's name, on Owner's behalf and for Owner's account; provided that (x) any new or replacement Facility Contract shall be procured in accordance with the Procurement Manual, (y) any new or replacement Facility Contract that provides for payments in excess of US$1,000,000 in any Contract Year or US$3,000,000 in the aggregate (each a "Material Facility Contract") shall be subject to approval by Administrator, such approval not to be unreasonably withheld, delayed or conditioned, following which such proposed Facility Contract shall be executed by Owner and (z) a Tax Opinion and a Reliance Letter shall have been obtained, at the expense of Owner, with respect to any new, extended, amended or replacement Facility Contract that is a Covered Contract. For the avoidance of doubt, Operator, as agent for Owner, may procure new or replacement Facility Contracts in a manner consistent with the Procurement Manual, provided that procurement requirements that would otherwise apply to Owner under Act No. 83 of May 2, 1941 (including any rules or regulations issued thereunder) or Act 38 (including those relating to approval process and judicial review) shall not be applicable. Administrator shall not withhold approval of any Material Facility Contract based on a conflict of interest that Operator has mitigated, avoided or otherwise resolved in accordance with the Procurement Manual.

(e)     Reporting Obligations. Operator shall on or about the tenth (10th) Business Day of each Contract Year provide to Administrator a report documenting each Material Facility Contract and Material Subcontractor, which report shall include the name of the third party, the term, if applicable, of the Facility Contract or Subcontract, a description of the services or goods to be procured and the estimated amount payable thereunder.

(f)     Conditions on Term. Any Facility Contract entered into by Operator on behalf of Owner in connection with the O&M Services and/or the Decommissioning Services, and contracts with Subcontractors, shall, unless otherwise approved in writing by Administrator, such approval not to be unreasonably withheld, delayed or conditioned, either (i) be for a term that is no longer than the Term or (ii) provide that such contract is terminable at will (subject to any notice requirements) from and after the end of the Term, without cost or penalty. As permitted by Section 6(d)(ii) of Act 120, Facility Contracts for the provision of professional or consulting services (as defined in Act 237) entered into by Operator on behalf of Owner shall not be subject to the limitations on term established in Article 3(F.) of Act 237.

Section 5.3     Facility Regulatory Matters.

(a)     Generally. From the Service Commencement Date and during the duration of the Term thereafter, solely with respect to the Legacy Generation Assets, Operator shall function as agent of Owner, and Owner may request Operator to (i) represent Owner before PREB with respect to any matter related to the performance of any of the O&M Services provided by Operator under this Agreement, (ii) prepare all related filings and other submissions before PREB and (iii) represent Owner before any Governmental Body and any other similar industry or regulatory institutions or organizations having regulatory jurisdiction, in each case in consultation with T&D Operator, if deemed necessary by Operator. For the avoidance of doubt, Operator's responsibilities under this Section 5.3 (*Facility Regulatory Matters*) shall not include any matters related to PREPA's debt obligations, including any obligations pursuant to federal tax or securities laws.

CONFIDENTIAL

(b)    <u>Applications and Submittals</u>. Operator, as agent of Owner, shall cooperate with T&D Operator, as necessary, to make all filings and applications and submit all reports necessary to (i) comply with Applicable Law and Governmental Approvals, and (ii) obtain and maintain all Governmental Approvals in the name of Owner or, if required by Applicable Law, Operator. Owner and Administrator shall cooperate with Operator and, as necessary, T&D Operator, in fulfilling all such obligations under this Agreement including in this Section 5.3 (*Facility Regulatory Matters)*, including by promptly (and in any event within fifteen (15) Business Days or such shorter time as may be required by Applicable Law, a Governmental Approval or a Governmental Body) providing any necessary information to Operator, executing, signing or endorsing such applications, reports, submissions, or other related documents as Operator may reasonably request, and making all such filings and applications and submitting such reports requested by Operator in cases where Applicable Law does not permit Operator to do so. With respect to Governmental Approvals that are obtained or maintained in the name of Owner, Operator shall: (i) prepare the application and develop and furnish all necessary supporting material, data and information that may be required; (ii) familiarize itself with the terms and conditions of such Governmental Approvals; (iii) attend all meetings and hearings required to obtain such approvals; and (iv) take all other action necessary or otherwise reasonably requested by Administrator in order to assist and support Owner in obtaining, maintaining, renewing, extending and complying, as may be relevant, with the terms of such Governmental Approvals. Operator shall agree to be named as a co-permittee on any Governmental Approval if so required by the issuing Governmental Body.

(c)    <u>Data and Information</u>. All data and information required to be supplied and actions required to be taken in connection with the Governmental Approvals required for the O&M Services shall be supplied and taken by Operator on a timely basis considering the requirements of Applicable Law and the responsibilities of Owner as the legal and beneficial owner of the Legacy Generation Assets. The data and information supplied by Operator (as agent for Owner) to Owner, T&D Operator, Administrator and all regulatory agencies in connection therewith shall be correct and complete in all material respects; <u>provided</u>, <u>however</u>, that Operator shall be entitled to rely upon, and shall not be liable for, any such data and information derived from or comprising data and information supplied by or on behalf of Owner, T&D Operator or Administrator.

(d)    <u>Non-Compliance and Enforcement</u>. Operator shall report to Administrator and PREB, in writing, as soon as possible upon obtaining knowledge thereof (but in no event more than forty-eight (48) hours (or such shorter period within which notice is required to be given to a Governmental Body under Applicable Law) after obtaining such knowledge), all violations of the terms and conditions of any Governmental Approval.

(e)    <u>Reports to Governmental Bodies</u>. Operator, as agent for Owner, shall prepare all periodic and annual reports, make all information submittals and provide, on a timely basis, all notices to all Governmental Bodies required by all Governmental Approvals and under Applicable Law with respect to the Legacy Generation Assets; <u>provided</u>, <u>however</u>, that Operator shall be entitled to rely upon, and shall not be liable for, any such data and information derived from or comprising data and information supplied by or on behalf of Owner, T&D Operator or Administrator or from errors or omissions in such information. Such reports shall contain all information required by the Governmental Body and under Applicable Law and may be

substantially similar or identical to comparable reports previously prepared for Administrator if such are acceptable to the Governmental Body.

(f)     Opportunity for Comment. In connection with applications, reports, or submissions made to a Governmental Body under this Section 5.3 (*Facility Regulatory Matters*), Operator shall: (i) provide Administrator with a reasonable opportunity (and in any event within thirty (30) days) to comment in advance upon material written communications, filings, reports, or other writings given to any Governmental Body and consider accurate and timely provided comments in good faith, and (ii) to the extent practical, provide Administrator with a reasonable opportunity to participate in any meetings with any Governmental Body.

**Section 5.4**     Safety and Security.

(a)     Safety. Consistent with the Contract Standards, Operator shall: (i) take all reasonable precautions and actions for the health and safety of, and provide all reasonable protection to prevent physical damage, bodily injury or loss as a result of the operation of the Legacy Generation Assets to, (A) all members of the public, including Persons involved in providing the O&M Services, (B) all materials and equipment used in the provision of the O&M Services and under the care, custody or control of Operator and (C) other property constituting part of the Legacy Generation Assets and under the care, custody or control of Operator; (ii) establish and enforce all reasonable applicable safeguards for health and safety and protection, including posting danger signs and other warnings against hazards and promulgating health and safety regulations; (iii) provide all notices and comply with all Applicable Law relating to the health and safety of Persons or property or their protection from physical damage, bodily injury or loss; (iv) designate qualified and responsible employees, in such numbers as Operator shall determine at its sole discretion in accordance with Prudent Industry Practice, whose duty shall be the supervision of health and safety at the Legacy Generation Assets; (v) operate all equipment in a manner consistent with the manufacturer's safety recommendations; (vi) provide for safe and orderly equipment and vehicular movement; and (vii) develop and carry out a site-specific health and safety program, including OSHA required and other employee training and periodic inspections, designed to implement the requirements of this Section 5.4(a) (*Safety and Security – Safety*). Administrator agrees that Operator may withdraw funds necessary for taking such reasonable precautions and actions in the first instance out of the Reserve Account. In the event that there are no funds on deposit in the Reserve Account, Operator shall provide written notice to Administrator of such shortfall. Until the Reserve Account is replenished, to the extent that Operator determines reasonable precautions and actions are necessary to comply with its obligations under this Section 5.4(a) (*Safety and Security – Safety*), Operator may withdraw the necessary funds from any Service Account (other than the Fuel Account); provided that, prior to any withdrawal, Operator shall provide written notice of the intended withdrawal to Administrator for its review and approval. Operator may withdraw such funds only upon either (x) receipt of Administrator's written approval or (y) Administrator's failure to provide a response within ten (10) Business Days. Such withdrawal notice shall include the amount of the withdrawal and describe the precautions and actions to be funded by such withdrawal.

(b)     Security. From and after the Service Commencement Date Operator shall guard against and be responsible for as agent of Owner all physical damage to the Legacy Generation Assets in accordance with the Contract Standards, and DHS to the extent DHS has

CONFIDENTIAL

jurisdiction, caused by trespass, theft, negligence, vandalism, malicious mischief or cyber-attacks of third parties. Operator shall guard against, and be responsible for as agent of Owner, in each case to the extent of Operator's negligence or willful misconduct, all physical damage to the Legacy Generation Assets caused by trespass, theft, vandalism or malicious mischief of third parties. Any reasonable and documented costs and expenses arising therefrom shall be treated as Pass-Through Expenditures hereunder, except to the extent such costs are Disallowed Costs.

**Section 5.5**     Labor and Employment; Employee Benefits.

(a)     <u>Employee Plans</u>. Operator shall provide employee benefits to Operator Employees pursuant to the plans created by Operator to provide benefits to Operator Employees (collectively, the "<u>Operator Benefit Plans</u>"). Operator shall not assume nor shall it be responsible at any time during the term of the Agreement as provided for in Section 2.3 (*Term*) or after its termination for any obligations or debts to employees or independent contractors for any Legacy Generation Assets or Generation Sites (including of Owner under Owner's retirement plans or any benefit accruals under Owner's retirement plans) accrued or accruing with respect to any time prior to the term of the Agreement (collectively referred to as "<u>Prior Obligations</u>") and Owner shall protect, defend, indemnify and hold harmless Operator and its Affiliates from and against any and all Losses arising in connection with such Prior Obligations. These Prior Obligations include, but are not limited to, any amount owed or to be owed to cover benefits, accruals, and/or expenses of the Electric Power Authority Employees Retirement System approved by the Board of Directors of the Puerto Rico Electric Power Authority through the approval of Resolution 200 of June 25, 1945 in effect as of the Effective Date or any other system that replaces it in any way or form (the "<u>PREPA Retirement System</u>") related to all past, current and future participants, beneficiaries, employees, contractors or any other persons that are or could be entitled to the receipt or allocation of funds by any reason since the inception of the PREPA Retirement System until its termination and the extinction of all its obligations. Operator shall, pursuant to Act 29, make any employer contributions (other than Prior Obligations) required under Applicable Law to the PREPA Retirement System with respect to any Hired Former Employee of Owner who has ten (10) years or more of service accumulated prior to the Hired Former Employee's hiring date by Operator and who elects to continue participating in and making his/her individual contributions to the PREPA Retirement System. To the extent permitted by the PREPA Retirement System, any such Hired Former Employee of Owner may continue to make his/her individual contributions to the PREPA Retirement System. The payment of these employer contributions, which are considered Pass-Through Expenditures as described in Annex XII (*Pass-Through Expenditures*), shall be the only ongoing obligation of Operator as it relates to the PREPA Retirement System. This obligation shall be limited only to current amounts allocable to any Hired Former Employee of Owner participating in and contributing to such system corresponding only to their period of participation while employed by Operator during the term of the Agreement as provided for in Section 2.3 (*Term*).

(i)     Hired Former Employees of Owner shall not receive credit for their service prior to the Service Commencement Date for purposes of benefit accrual except as otherwise required by Act 120.

(ii)    Operator shall exercise commercially reasonable efforts to cause the Operator Benefit Plans to waive all limitations as to pre-existing conditions, actively-at-work exclusions and waiting periods for transitioned employees (and their eligible dependents).

(b)    Exclusivity. Operator shall not, without the prior written approval of Administrator (such approval not to be unreasonably withheld, delayed or conditioned), utilize Operator or its employees for any purpose other than providing the O&M Services or Decommissioning Services under this Agreement. In addition, Operator shall not hire, for any other business of Operator or an Affiliate, any existing Operator Employees without Owner's prior written consent (such consent not to be unreasonably withheld, delayed or conditioned). Owner acknowledges and agrees that this Section 5.5(b) (*Labor and Employment; Employee Benefits – Exclusivity*) applies solely to Genera PR LLC and not to any other Person (including any Affiliates or Subcontractors of Operator).

(c)    Other. Other than what it is expressly provided for in Section 5.5(a) (*Labor and Employment; Employee Benefits – Employee Plans*) above (or what is necessary to effectuate what is expressly provided in Section 5.5(a) (*Labor and Employment; Employee Benefits – Employee Plans*)), nothing in this Agreement is intended to amend any employee benefit plan or affect the applicable plan sponsor's right to amend or terminate any employee benefit plan pursuant to the terms of such plan.

**Section 5.6**    Capital Spare Parts and Capital Improvements.

(a)    Capital Spare Parts. From the Service Commencement Date and for the remainder of the Term thereafter, Operator shall procure, store, maintain and administer the Consumables, Spare Parts and any Capital Spare Parts, in accordance with the applicable O&M Budget then in effect; provided that during the twelve (12) months following the Service Commencement Date, Owner shall be responsible for the procurement of any additional Consumables, Spare Parts and Capital Spare Parts approved in accordance with Section 4.2(j) (*Operator Responsibilities – Consumables, Spare Parts and Capital Spare Parts*). In connection with such maintenance and administration, Operator shall conduct a physical inventory and review of all Capital Spare Parts in accordance with the Contract Standards on an annual basis. Operator shall promptly provide the results of such review to Administrator and PREB (with copy to Owner) following the completion of such review. If, pursuant to such review, Operator determines that the procurement and future installation of any replacement Capital Spare Parts (a) is necessary to allow Operator to continue to operate the respective Legacy Generation Asset to comply with its obligations under this Agreement, in accordance with the Integrated Resource Plan and the anticipated duration of the O&M Services for such Legacy Generation Asset, or (b) would improve unit availability and/or reduce fuel costs, which improvement and/or reduction would be realized within the anticipated duration of the O&M Services for such Legacy Generation Asset, then Operator shall submit a detailed recommendation of such procurement (including anticipated costs (taking into account the then-applicable Operating Budget), schedules and risk assessments in connection therewith) to Administrator and PREB (with copy to Owner) for their review and approval. Within thirty (30) days following its receipt of such recommendation, Administrator and PREB shall each provide Operator with its written approval or rejection of the recommendation. To the extent such approval is granted, Operator shall be entitled to withdraw funds from the Reserve Account to fund payment for costs in connection with such procurement and installation

CONFIDENTIAL

in accordance with Section 7.6(d) (*Service Accounts – Reserve Account*) and the approved recommendation. Any such procurement and installation shall be performed in accordance with Applicable Law and in a manner consistent with the Procurement Manual, underlined provided that procurement requirements that would otherwise apply to Owner under Act No. 83 of May 2, 1941 (including any rules or regulations issued thereunder) or Act 38 (including those relating to approval process and judicial review) shall not be applicable.

      (b)    Capital Improvements.

      (i)    Operator may from time to time during the Term propose to PREB certain capital improvements, taking into account the Integrated Resource Plan and the Federally Funded Generation Project Plan, that would be (x) federally funded and owned by Owner, (y) made, owned and funded by Owner or (z) made, owned and funded by Operator or its designated Affiliate; provided, however, that no such capital improvements shall be made that would in any manner jeopardize the exclusion from gross income of interest on Owner's or its Affiliates' obligations under the Internal Revenue Code. Operator shall provide PREB, with copy to Administrator and Owner, with a description of the capital improvement in sufficient detail to enable PREB to make a fully informed assessment and analysis thereof; provided that any such proposal pertaining to Operator-owned capital improvements shall contemplate Operator having the opportunity to earn a reasonable rate of return thereon consistent with the returns permitted to be earned by companies operating in the United States generation business on similar investments. Any such proposed federally funded or Owner-owned capital improvement shall be subject to review, and approval or rejection, by PREB in accordance with Applicable Law and shall be accompanied by an opinion of tax counsel to Administrator providing that such capital improvement shall not adversely affect the exclusion from gross income of interest on obligations of Owner, its Affiliates or another Governmental Body for federal income tax purposes under the Internal Revenue Code. In reviewing any such proposed capital improvement, PREB may request additional information or reports from Operator, and may require that any such proposed capital improvement be presented as part of a rate review proceeding.

      (ii)    Owner shall notify Operator in writing of any Capital Improvements that may be eligible for federal funding. In such case, Owner and Operator shall cooperate with each other to address and comply with federal agency requirements, so as not to jeopardize the relevant Legacy Generation Asset's eligibility to receive federal funding. Such cooperation shall include Owner (i) providing Operator with such documents and information it requests with respect to all applicable federal funding requirements, (ii) sharing with Operator any specific requirements imposed by the relevant funding agency to maintain eligibility to receive federal funding and (iii) making requests to such federal agencies to review Owner and Operator's systems and plans to comply with federal funding requirements.

      (iii)    The inclusion of the provisions of this Section 5.6(b) (*Capital Spare Parts – Capital Improvements*) shall in no way constitute an obligation by any of PREB, Owner or Administrator to agree to or pursue any Operator-owned capital improvement or require Owner or Administrator to pay for or reimburse the cost or expenses of pursuing any proposed Operator-owned capital improvement or an obligation of Operator to propose or pursue any Operator-owned capital improvement.

CONFIDENTIAL

**Section 5.7**     Management of Fuel and Fuel Contracts. From the Service Commencement Date and for the remainder of the Term thereafter, Operator shall source, procure and manage the nomination, transportation, delivery, supply, quality-testing, storage and handling of Fuel, manage and maintain fuel tanks, perform any required environmental reporting, and maintain and administer the Fuel Contracts, in accordance with the Contract Standards and the applicable Fuel Budget then in effect. Any renewal of an existing Fuel Contract and any procurement of a new Fuel Contract shall be subject to approval by Administrator and performed in accordance with Applicable Law and in a manner consistent with the Procurement Manual, <u>provided</u> that procurement requirements that would otherwise apply to Owner under Act No. 83 of May 2, 1941 (including any rules or regulations issued thereunder) or Act 38 (including those relating to approval process and judicial review) shall not be applicable. Administrator shall not withhold approval of any Fuel Contract based on a conflict of interest that Operator has mitigated, avoided or otherwise resolved in accordance with the Procurement Manual.

**Section 5.8**     Federal Funding.

(a)     Generally. As among the Parties, Owner shall retain the exclusive right to any federal funds received or to be received by or for the benefit of Owner, for the repair, improvement, resiliency, construction or hazard mitigation of the applicable Legacy Generation Assets, from any U.S. federal agency, including the U.S. Federal Emergency Management Agency and the U.S. Department of Housing and Urban Development. Owner shall also own any equipment and improvements purchased using federal funds, including any funds collected from the disposition thereof.

(b)     Cooperation and Participation. Owner shall cooperate, participate in and complete any and all necessary actions, and execute any and all necessary documents, to maximize the receipt of federal funds for which the Legacy Generation Assets are eligible. The Parties shall cooperate and participate with any relevant Governmental Body and any third parties, including those authorized to act as Grant Manager, to maximize, maintain, and appropriately use federal funds. The Parties shall cooperate and participate in any audits or investigations performed by Commonwealth or federal authorities in connection with federal funding.

(c)     Agent Designation. Owner hereby designates and appoints Operator as Owner's agent for the purpose of requesting and expending federal funds for the repair, improvement, resiliency, construction or hazard mitigation of the applicable Legacy Generation Assets, thereby delegating Owner's rights and responsibilities with respect to communicating with agencies awarding federal funds as necessary to obtain and maintain grants of federal funds, submitting application materials to federal agencies, determining the scope of work of projects to be funded by grants of federal funds, and procuring goods and services to complete the scope of work using such grants, all in compliance with all Applicable Law and the terms of any applicable grant agreements, and subject to the oversight provisions throughout this Agreement. Operator hereby accepts such designation, appointment and delegation. Owner and Administrator shall inform applicable U.S. federal agencies of such designation, appointment and delegation, by means of a written letter substantially in the form set forth in Exhibit H (*Form of Consent to Federal Funding*). For the avoidance of doubt, Owner's designation, appointment and delegation of Operator, and Operator's entry into this Agreement, shall not be construed as authorization for Operator or any of its Subcontractors or Affiliates to act as Grant Manager. Under no

CONFIDENTIAL

circumstances shall Operator or any of its Subcontractors or Affiliates act as Grant Manager, except as the result of a separate and express procurement process for such services by Owner or Administrator. The Parties hereby acknowledge that the procurement process leading to the execution of this Agreement was not intended to engage a Grant Manager, and that Grant Management Services are outside of the scope of the O&M Services covered hereunder.

**Section 5.9**   Environmental, Health and Safety Matters.

Generally. Operator shall perform the following environmental, health and safety activities related to the generation of Power and Electricity: (i) managing an environmental, health and safety program for each of the applicable Legacy Generation Assets in accordance with the Safety and Hazardous Materials Procedures Manual, Environmental Law, and the Prudent Industry Practices; (ii) coordinate, oversee and maintain compliance of the Legacy Generation Assets with applicable Environmental Law, the requirements of Environmental Approvals issued and the Consent Decree, including documentation thereof; (iii) monitor emerging federal, state, Commonwealth, municipal and local Environmental Law to manage future and ongoing compliance and operational efficiencies; (iv) perform analyses of proposed Environmental Law to prepare for future compliance thereunder; and (v) provide environmental permitting services to support operations. Notwithstanding the foregoing, Operator shall not be responsible for any of the foregoing activities with respect to any Pre-Existing Contamination, all of which shall be the sole obligation of Owner, except (x) Operator shall be responsible for the foregoing activities to the extent that Operator materially exacerbates Pre-Existing Contamination, and such exacerbation is attributable to Operator's gross negligence or willful misconduct and in that event, only to the extent of such exacerbation; (y) to the extent Owner and Operator agree in writing that Operator shall assume responsibility for any of the foregoing and (z) Operator shall undertake, at Owner's expense, all required Remedial Actions with respect to Pre-Existing Contamination to the extent such Pre-Existing Contamination would reasonably be expected to result in an imminent threat to human health or the environment.

(a)   Pre-Existing Environmental Conditions.

(i)   Operator shall perform the O&M Services so as not to exacerbate any Pre-Existing Environmental Condition that is either disclosed with reasonable specificity by Owner in the Data Room, including in the Baseline Environmental Study, or is encountered or discovered by Operator after the Effective Date. Discovery of a Pre-Existing Environmental Condition not reflected in the Baseline Environmental Study, and, as may be required, its reporting to the appropriate Governmental Body by Operator shall not be deemed an exacerbation of such condition or noncompliance.

(ii)   Except with respect to Pre-Existing Contamination, which Operator is required to address under the first paragraph of this Section 5.9 (*Environmental, Health and Safety Matters – Generally*), if Operator at any time identifies a Pre-Existing Environmental Condition that (A) requires Remedial Action under Applicable Law, (B) materially interferes with the performance of the O&M Services, (C) materially increases the cost of performing the O&M Services, or (D) constitutes Environmental Noncompliance, or, alternatively, receives written notice from any Governmental Body or third party asserting or claiming any such Pre-Existing Environmental Condition requires Remedial Action or constitutes Environmental Noncompliance,

71

CONFIDENTIAL

Operator shall notify Administrator and Owner of this finding by written notice and Owner shall then, as soon as reasonably practicable given the condition in question, commence and diligently prosecute such Remedial Actions as are required by Applicable Law or to prevent future material interference with the performance of the O&M Services or material increases in costs of performing the O&M Services. Operator and Owner may agree that Operator shall assume responsibility for developing and implementing any required Remedial Actions, subject to reimbursement from Owner.

(iii)    Administrator shall have the right to contest any claim of a Pre-Existing Environmental Condition and shall not be required to take any action under this Section 5.9 (*Environmental, Health and Safety Matters*) so long as (A) it is contesting any determination of a Pre-Existing Environmental Condition in good faith by appropriate proceedings conducted with due diligence and (B) Applicable Law permits continued operation of the area in question for the applicable Legacy Generation Asset(s) pending resolution of the contest. In any contest regarding whether the Release of Hazardous Materials on, under, at or from the Legacy Generation Assets or Generation Sites that is discovered on or after the Effective Date is a Pre-Existing Environmental Condition, where Operator submits a sworn certification that, after due inquiry (which inquiry shall not require any further environmental studies), and to the best of its knowledge, the alleged Pre-Existing Environmental Condition did not arise from facts, circumstances, conditions, actions or omissions first occurring after the Service Commencement Date, then Owner shall bear the burden of proof by a preponderance of the evidence that the Release of such Hazardous Material is not a Pre-Existing Environmental Condition.

(iv)    Operator shall not be responsible for any Losses resulting from or related to any Pre-Existing Contamination, including the failure to pursue those O&M Services impeded by the existence of Pre-Existing Contamination, except to the extent such Losses (A) are caused in whole or in part by Operator's material exacerbation of Pre-Existing Contamination that is attributable to Operator's gross negligence or willful misconduct and, in that event, only to the extent of such exacerbation (the "Pre-Existing Contamination Liability Standard"), or (B) result from Operator's negligent failure to take Remedial Action necessary to address an imminent threat to human health or the environment. Operator shall not be responsible for any Losses resulting from or related to any Pre-Existing Environmental Noncompliance, except to the extent such Losses are caused by Operator's negligence or willful misconduct ("Pre-Existing Noncompliance Liability Standard"); provided, however, that any Losses related to any Environmental Noncompliance, including Pre-Existing Environmental Noncompliance, that are incurred or sustained within the first (1st) full fiscal year after the Service Commencement Date and that arise out of the condition of or defects in the equipment and systems at any Legacy Generation Asset with respect to such equipment or systems that were in place on or prior to the Service Commencement Date shall not be the responsibility of Operator, except where the Operator failed to repair, maintain, or replace such equipment or systems in conformance with an approved O&M Budget; provided, further, however, that any Losses related to any Environmental Noncompliance, including Pre-Existing Environmental Noncompliance, that arise out of or relate to the storage tanks or the associated piping at any Legacy Generation Asset shall not be the responsibility of the Operator until the earlier of (x) the first (1st) full fiscal year after the Service Commencement Date or (y) such time as Operator has completed an inspection pursuant to American Petroleum Institute (API) Standard 653 (or a comparable standard addressing out-of-service tank inspection) and has implemented any remedial or repair measures as may be required to restore such tank to

CONFIDENTIAL

compliance with Environmental Laws or any Governmental Approval issued pursuant to any Environmental Law.

(v)     Operator shall not be required to conduct O&M Services to the extent they are impeded by Owner's implementation of Remedial Actions to address the Pre-Existing Environmental Condition pursuant to Section 5.9(a)(ii) (*Environmental, Health and Safety Matters—Pre-Existing Environmental Conditions*) above. Owner shall coordinate with Operator to prevent any such implementation of Remedial Actions that could impede or prevent Operator's performance of the O&M Services and any of its obligations under this Agreement.

(b)     Notice and Remedial Action Requirements.

(i)     Operator shall, promptly upon obtaining knowledge thereof, and in accordance with the Safety and Hazardous Materials Procedures Manual, report to Administrator and Owner, on a per occurrence basis, the Release of any reportable quantity, as defined under applicable Environmental Law, of Hazardous Material or of any other Release that could reasonably be expected to result in material Losses to Owner or Operator. Such report shall include details regarding the location at which the Release has occurred, the time, the agencies involved, the damage that has occurred and the Remedial Action alternatives to be considered for decision-making by Owner. Notice of any such Release, if initially delivered orally, shall be delivered to Administrator in writing promptly following Operator's knowledge of such Release. This reporting obligation shall be in addition to any other reporting obligation under Environmental Laws.

(ii)     Following delivery of the notification described in Section 5.9(b)(i) (*Environmental, Health and Safety Matters – Notice and Remedial Action Requirements*), Operator shall promptly propose to Administrator and Owner the Remedial Action to be taken to address the Release, which Remedial Action shall (A) comply with Environmental Law and (B) not unreasonably interfere with Operator's performance of its obligations under this Agreement. Operator, Owner and Administrator shall work in good faith to reach a prompt, written agreement for the pursuit of the Remedial Action, including terms assuring the pre-funding of Operator's reasonable and documented costs and expenses in effectuating the Remedial Action as a Pass-Through Expenditure, except to the extent such costs are Disallowed Costs. If such an agreement cannot be reached within ten (10) Business Days, or such other time as Administrator, Owner and Operator may agree, Owner may proceed with the Remedial Action at its cost, including at such times and in a manner so as to not materially interfere with the performance of the O&M Services. In the event of a Pre-Existing Environmental Condition, Owner and Operator may also reach an agreement whereby Operator is prepaid for effectuating the Remedial Action proposed by Owner after the presentation of Remedial Action alternatives by Operator for such condition. Operator shall cause such Hazardous Material to be handled, transported, manifested, and disposed of in Owner's name and in accordance with Environmental Law and the Safety and Hazardous Materials Procedures Manual. Administrator and Owner agree to promptly execute all such applications, submissions and related documents as required in connection with any such Remedial Action.

(iii)     With respect to any Release caused by the gross negligence or willful misconduct of Operator or Operator's employees, contractors, guests or invitees in

CONFIDENTIAL

connection with the O&M Services or the Decommissioning Services, Operator shall promptly obtain the necessary Environmental Approvals for, and then commence and diligently pursue to completion all Remedial Action necessary to comply with Environmental Law to address such Release. Operator shall keep Administrator and Owner reasonably informed of the progress of such Remedial Action and the schedule for completing it. In addition, in connection with such Remedial Action, Operator shall: (A) provide Administrator and Owner with a reasonable opportunity to comment in advance upon any material written communications, filings, reports, correspondence or other writings given to any Governmental Body and consider accurate and timely provided comments in good faith; (B) to the extent practical, provide Administrator and Owner with a reasonable opportunity to participate in any meetings with any Governmental Body regarding the Remedial Action; (C) comply with Applicable Law; and (D) within five (5) Business Days of sending or receipt, use commercially reasonable efforts to provide to Administrator and Owner copies of all non-privileged material written communications, filings, reports, correspondence or other writings, photographs or materials sent by Operator to or received by Operator from any Person (including any Governmental Body) in connection with any such Remedial Action. Operator shall be deemed the owner of Hazardous Materials subject to Remedial Actions under this Section 5.9(b)(iii) (*Environmental, Health, and Safety Matters – Notice and Remedial Action Requirements*) and identified as the "generator" on any manifest or bill of lading.

(iv)    Operator shall promptly notify Administrator and Owner, and any other Governmental Body as may be required by Environmental Law, in writing of its intention to handle, transport or dispose of Hazardous Material as part of a Remedial Action under this Section. Operator shall cause such Hazardous Material to be handled, transported, manifested, and disposed of in accordance with Environmental Law and the Safety and Hazardous Materials Procedures Manual.

(c)    Consent Decree.

(i)    This Agreement is conditioned on Operator's agreement to be subject to the obligations under the Consent Decree and the jurisdiction of the United States District Court for the District of Puerto Rico in connection with the Consent Decree. To the extent required to effectuate this Section 5.9(c) (*Environmental, Health and Safety Matters – Consent Decree*), Operator shall assist Owner in taking all necessary steps to make Operator a signatory to the Consent Decree or to obtain any needed U.S. District Court approval.

(ii)    During the term of this Agreement, neither Owner nor Administrator may enter into a consent decree or other form of settlement in resolution of any Legal Proceeding that may be brought or asserted under any Environmental Law by a Governmental Body or third party that imposes, or has the potential to impose, any injunctive relief or other prospective restrictions on operations at any Legacy Generation Asset without notifying Operator.

**Section 5.10**    Accounting and Financial Services. Operator shall provide accounting and financial services in respect of the Legacy Generation Assets, including those services listed in Annex IX (*Scope of Services*).

**Section 5.11**    Legal Matters. Operator shall manage Owner's legal matters in respect of the O&M Services including in consultation with Administrator and Owner, the selection of

CONFIDENTIAL

outside counsel, other than with respect to any dispute with, or other legal matters involving, Operator and Owner pursuant to this Agreement (including for those services listed in Annex IX (*Scope of Services*)), and Owner's related reporting obligations. In performing this Agreement, nothing shall require, or shall be construed as requiring, Operator to act as legal counsel to, or to provide legal advice or representation to, Owner.

**Section 5.12**   Coordination with T&D Operator.

(a)   PREPA-Genco-Hydroco Operating Agreement. Commencing on the Service Commencement Date, Operator, as agent for Owner, shall perform its obligations, covenants and undertakings under the PREPA-Genco-Hydroco Operating Agreement and shall coordinate with T&D Operator, as agent for PREPA, as required thereunder.

(b)   System Operation Principles and Agreed Operating Procedures. Operator, as agent for Owner and in accordance with the PREPA-Genco-Hydroco Operating Agreement, the Agreed Operating Procedures developed thereunder and the System Operation Principles, shall: (i) coordinate the dispatch of Power and Electricity from available Legacy Generation Assets to the respective Interconnection Point and provide related services; (ii) coordinate the scheduling of load requirements with T&D Operator; (iii) develop inputs to T&D Operator with respect to scheduling requirements and capacity requirements taking into consideration unit outages, including, but not limited to, maintenance of program outages, and other operational constraints; (iv) provide information with respect to operational constraints, including air permit constraints; and (v) provide any other related ancillary services.

(c)   Generation Information. At the request of T&D Operator, Operator shall grant reasonable access to information consistent with Prudent Industry Practice required to perform the dispatch and scheduling of Power and Electricity, inclusive of Heat Rate, fuel inventory, unit availability, unit marginal cost, unit outage schedules and any other information reasonably requested by T&D Operator consistent with Prudent Industry Practice required to perform the dispatch, scheduling and coordination of Power and Electricity and any related ancillary services.

(d)   PREB Submittals. At the reasonable request of T&D Operator, Operator shall coordinate with T&D Operator and grant reasonable access to information and documents consistent with Prudent Industry Practice required to prepare all filings and other submissions before PREB with respect to any matter related to the performance of any of the O&M Services provided by Operator under this Agreement, including in connection with the Fuel Adjustment Clause. Operator shall further cooperate in good faith with T&D Operator in anticipation of and throughout the course of any Rate Order modification proceedings before PREB, pursuant to Section 7.5 (*PREB Rate Proceedings*). With respect to PREB rate filing requirements, Operator shall provide such documents and information to T&D Operator at such times as such parties may mutually agree, but no later than seven (7) Business Days prior to the time T&D Operator is required to file such documents or information with PREB.

CONFIDENTIAL

**Section 5.13**   Notification of Incidents and Emergencies.

(a)   Incidents. Operator shall promptly notify Administrator and any other required authority, pursuant to Applicable Law, including OSHA and PREB, in writing of any material accident or incident involving injuries to person or property related to the Legacy Generation Assets within twenty-four (24) hours of receiving knowledge of the occurrence thereof, promptly notify Administrator in writing of all material claims made by or against Operator of which Operator has knowledge, and provide any information reasonably requested by Administrator to identify and assess potential material claims that may reasonably be expected to arise as a result of or in connection with such accident or incident.

(b)   Emergencies. Operator shall promptly notify Administrator, PREB and any other person listed under the Legacy Generation Emergency Response Plan in writing of all Emergencies related to the Legacy Generation Assets upon receiving knowledge thereof. To the extent that any such Emergency materially precludes or impairs, in whole or in part, the dispatch of Power and Electricity, Operator shall also notify T&D Operator and any other person listed under the Legacy Generation Emergency Response Plan of such Emergency within twenty-four (24) hours. Notwithstanding anything to the contrary in this Agreement, if at any time Operator determines in good faith that an Emergency Event exists with respect to the Legacy Generation Assets such that immediate action must be taken to (i) protect the safety of the public, Owner's employees and Operator's employees, (ii) protect the safety or integrity of the Legacy Generation Assets or prevent or limit environmental harm or (iii) mitigate the immediate consequences of such Emergency Event, Operator shall take all such action that it deems in good faith to be reasonable and appropriate under the circumstances in accordance with the Legacy Generation Emergency Response Plan. As promptly thereafter as is reasonable, Operator shall notify Administrator, PREB and any other person listed under the Legacy Generation Emergency Response Plan in writing of Operator's response to such Emergency Event. For so long as the Emergency Event continues, Operator shall provide a weekly written update to Administrator, PREB and any other person listed under the Legacy Generation Emergency Response Plan (provided that PREB may otherwise request more frequent updates in accordance with Applicable Law) specifying the nature of the Emergency Event, the remediation measures being taken by Operator, the expected duration of the Emergency Event and an estimate of any increases in costs resulting therefrom. Operator shall notify Administrator, PREB and any other person listed under the Legacy Generation Emergency Response Plan in writing as soon as the Emergency Event has ended. All necessary and documented costs related to the remediation of the Emergency Event shall be Pass-Through Expenditures and Operator shall be entitled to draw upon any Service Account to pay for such costs. As soon as practicable following the end of such Emergency Event, all such costs incurred shall be reflected in a proposed amendment to the approved Operating Budget, subject to the provisions of Section 7.3(e) (*O&M Budgets – Amendments to the Operating Budget*).

**Section 5.14**   Information.

(a)   Facility Information and Computer Databases. Operator shall, subject to the applicable Services Documentation, administer and maintain an Information System to record, and to the extent practicable, provide retrieval for Administrator's review and copying of Facility Information.

CONFIDENTIAL

(b) <u>Ownership of Owner Personal Information</u>. Any Owner Personal Information in existence as of the Service Commencement Date of this Agreement shall be considered Confidential Information of Owner and, as among the Parties, shall at all times remain the Intellectual Property of Owner.

(c) <u>Information Access</u>.

(i) Operator shall provide Owner with timely read-only access where available, or a reasonably equivalent form of access, to all information necessary to (A) maintain, protect and preserve the Legacy Generation Assets or (B) carry out any of Owner's responsibilities related to the Legacy Generation Assets under Applicable Law. For the avoidance of doubt, the access to information provided under this Section 5.14(c)(i) (*Information – Information Access*) shall be on the same basis as set out in Section 5.14(c)(ii) (*Information – Information Access*).

(ii) To the extent necessary for Owner and Administrator, as applicable, to carry out its responsibilities under this Agreement, Operator shall provide Administrator and its Representatives with (A) unrestricted read-only access where available, or a reasonably equivalent form of access to such information, to all Facility Information, all Owner Personal Information, and all information regarding Hired Former Employees of Owner, in each case contained in any database or system created or managed by Operator hereunder, and (B) to the extent that Operator has developed, compiled, collected, prepared or archived such information in the conduct of its services under this Agreement, full and complete access to such information, subject to confidentiality obligations applicable to Operator's Confidential Information and provided that Administrator and its Representatives shall comply with all of Operator's access, security (including cybersecurity) and safety procedures when exercising such right of access. Administrator shall be responsible for the security of all access credentials provided to and each access made and use and disclosure of Facility Information by Administrator or its Representatives hereunder.

(iii) Pursuant to Section 21.19(e), at the reasonable request of Administrator, by electronic transmission, Operator shall timely provide to Administrator all information related to this Agreement or the Legacy Generation Assets as may be specified in such request and as shall be in the possession or control of Operator or its Representatives. In the event that Operator fails to timely provide such information, Operator shall be subject to the Reporting Obligation Charge described in Section III of Annex II (*Compensation – Incentives and Penalties*). Operator acknowledges that (i) it is the public policy of the Commonwealth to promote transparency and citizen participation in every process related to the electric power service in the Commonwealth and (ii) in furtherance of this, the Administrator shall request information under this Section 5.14 (c)(iii) for other Governmental Bodies.

(d) <u>Restrictions</u>. Operator may not share or use any Facility Information or Owner Personal Information for any purpose unrelated to the O&M Services without the prior written consent of Administrator, such approval not to be unreasonably withheld, delayed or conditioned; <u>provided</u> that Operator may share or use such information with employees of Operator and Subcontractors. To the extent such consent is granted, Operator shall comply with all Applicable Law, and otherwise obtain any necessary consents, prior to any such permitted use.

CONFIDENTIAL

**Section 5.15**   Bill Payments. Subject to Section 7.6 (*Service Accounts*) and Section 7.8 (*Unfunded Amounts*) and to the extent not prevented from doing so by Owner Fault, Operator shall (i) timely pay all Subcontractor bills and other Pass-Through Expenditures related to the Legacy Generation Assets, that are proper, appropriate and not otherwise disputed, and (ii) assure that, to the extent within Operator's control and not otherwise caused by Owner Fault (including non-payment or insufficiency of funding), no mechanics' or similar Liens (other than those arising automatically by operation of law) are filed by Subcontractors against any component of the Legacy Generation Assets. In the event that Operator fails to timely pay any such bill with funds that are available in the relevant Service Account, Administrator shall have the right to instruct Owner to pay such bill and deduct an administrative fee in an amount of US$500 from the Incentive Payment otherwise due to Operator.

**Section 5.16**   Compliance with Obligations. Each Party shall use reasonable efforts to provide all representations, certifications, records and other documents necessary or appropriate for it and other Parties to comply with any obligations under Applicable Law (including obligations (i) with respect to PREB, (ii) with respect to the FOMB under PROMESA, (iii) related to the federal securities laws and (iv) related to maintaining the exclusion from gross income of interest on Owner's or its Affiliates' obligations for federal income tax purposes) or any of the agreements that Owner or its Affiliates may be party to from time to time that relate to the O&M Services.

**Section 5.17**   Energy Policy. As further detailed in Annex IX (*Scope of Services*), in accordance with the O&M Budget then in effect, Operator shall coordinate and assist with the services and operations required under Act 17 and any other Applicable Law, including Environmental Law, including services and operations related to the purchase and storage of fuel for Power and Electricity generation, the provision and maintenance of information regarding the Legacy Generation Assets, and decommissioning the Legacy Generation Assets in accordance with (a) the Integrated Resource Plan and (b) any order by PREB consistent with the intent of Act 17, and any other Applicable Law, including Environmental Law and the Integrated Resource Plan.

**Section 5.18**   Enforcement of Easements. Owner hereby authorizes Operator to enforce Owner's rights under the Easements. Operator, to the extent permitted by Applicable Law, may remove any obstruction of any kind or form hindering the area encumbered by an Easement.

**Section 5.19**   Out-of-Service Units. Operator shall provide O&M Services for the Out-of-Service Units, consisting of management, maintenance, and other related services, in each case that are customary and appropriate, or as required by Applicable Law, to maintain the Out-of-Service Units for the period of time from and including the Service Commencement Date to and excluding the Decommissioning Commencement Date for the applicable Out-of-Service Unit. In the event Applicable Law requires that any of the Out-of-Service Units become operational, Operator shall provide the O&M Services as provided in this Agreement. Operator shall take all necessary measures to ensure the safety of authorized personnel and visitors that may access the surroundings or interior of the Out-of-Service Units.

CONFIDENTIAL

**Section 5.20**   Communications Plan. Operator shall make all communications on all matters related to the Legacy Generation Assets and this Agreement in accordance with the Communications Plan set forth in Annex V (*Communications Plan*).

**Section 5.21**   Other Services.

(a)   Implied Services. If any services, functions or responsibilities not specifically described in this Agreement are reasonably required for the proper performance and provision of the O&M Services in accordance with Contract Standards, as mutually determined and agreed by Administrator and Operator, they shall be deemed to be implied by and included within the O&M Services, except to the extent they are obligations, rights or responsibilities reserved to Owner or Administrator as set forth in Article 6 (*Rights and Responsibilities of Owner and Administrator*) or as otherwise expressly provided in this Agreement.

(b)   Additional Services. If requested by Administrator, Operator may perform such additional services reasonably related to the Legacy Generation Assets not included within O&M Services, based upon terms and conditions, including price and additional reasonable and documented fees payable to Operator, as agreed to by Operator and Administrator.

(c)   Exclusivity. Without the prior approval of Administrator, Operator may not engage in any other business or activity other than to employ Operator employees and Subcontractors and to provide the Mobilization Services, the O&M Services, the Decommissioning Services and the Demobilization Services, and otherwise perform its obligations, pursuant to this Agreement. Owner acknowledges and agrees that this Section 5.21(c) (*Other Services – Exclusivity*) applies solely to Genera PR LLC and not to any other Person (including any Affiliates or Subcontractors of Operator).

**Section 5.22**   Annual Performance Test. No later than ninety (90) days following the Service Commencement Date, Operator shall conduct the first Annual Performance Test for each Legacy Generation Asset with reasonable assistance from Administrator, (as requested by Operator) and PREB's right to observe (upon PREB's election to observe), and in a manner consistent with the PREPA-Genco-Hydroco Operating Agreement and procedures developed pursuant to the PREPA-Genco-Hydroco Operating Agreement and reviewed by PREB in accordance with Section 4.2(u) (*Annual Performance Test*). Operator shall promptly submit the results of such test, the proposed Equivalent Availability Factor targets and Minimum Performance Thresholds, and all supporting calculations and documentation, to PREB for its review.

**Article 6**
**RIGHTS AND RESPONSIBILITIES OF OWNER AND ADMINISTRATOR**

**Section 6.1**   Rights and Responsibilities of Owner.

(a)   Generally. From and after the Service Commencement Date, Owner shall have the following rights and responsibilities with respect to the operation, management and maintenance of the Legacy Generation Assets:

CONFIDENTIAL

(i)       grant and assure Operator unrestricted access to and use of the Legacy Generation Assets and the Generation Sites for the performance of Operator's obligations hereunder;

(ii)      pay the applicable Service Fee and any other amounts due Operator, and fund the Service Accounts, all in accordance with the terms and conditions of this Agreement;

(iii)     ensure that, to the extent PROMESA requires Owner to submit any Budget to the FOMB for approval, such Budget provides that Owner is authorized to pay amounts due to Operator under this Agreement and fund the Service Accounts in accordance with Section 7.6 (*Service Accounts*);

(iv)     cooperate with Operator such that the Budgets and funds in support of O&M Services are sufficient in amount to enable Operator to meet the Contract Standards and provide a reasonable opportunity for Operator to achieve the Incentive Payment;

(v)      (A) respond promptly (and in any event within thirty (30) days or shorter period required by this Agreement) to all requests of Operator confirming its position or decision (as applicable) with respect to all matters requiring the approval, review or consent of Owner (and in each such case, unless otherwise specifically stated in this Agreement, Owner shall not unreasonably withhold, delay or condition any such approval, review or consent) and as to such other matters relating to the obligations of Operator hereunder in respect of which Operator shall reasonably request the response of Owner in accordance with the provisions of this Agreement, (B) provide Operator with such information, data and assistance as may be reasonably necessary or appropriate for Operator to perform its obligations (including with respect to any PREB rate or other proceeding or requirement) hereunder, and (C) from time to time, as and when requested by Operator, execute and deliver, or cause to be executed and delivered, all such documents and instruments and take, or cause to be taken, all such reasonable actions, as may be reasonably necessary for Operator to perform its obligations under this Agreement;

(vi)     except as otherwise contemplated by Section 5.11 (*Legal Matters*), manage Owner's legal matters, including Owner's reporting and related legal compliance;

(vii)    cooperate with Operator and Administrator in obtaining and maintaining all Governmental Approvals;

(viii)   take all other actions, and cause its employees and other Representatives to take all other actions, reasonably required or reasonably requested by Operator to permit Operator to perform the O&M Services in compliance with the Contract Standards and this Agreement, including the enforcement of existing Easements and, to the extent necessary, the constitution of new Easements;

(ix)     exercise its statutory powers pertaining to any and all rights and remedies granted to it under Applicable Law, including doing so promptly when requested by Operator;

(x)      comply with all Applicable Law; and

CONFIDENTIAL

(xi)    coordinate any Audits that Owner is entitled to perform hereunder with any Audits being undertaken by Administrator and any other Governmental Body that has the right under Applicable Law to perform an Audit.

(b)    _Authorization of Administrator_. On behalf of the Government of Puerto Rico, Owner hereby assigns and delegates to Administrator the rights and responsibilities under this Agreement necessary for Administrator to administer this Agreement and act as Owner's liaison with Operator in connection with the O&M Services; _provided_ that such assignment and delegation shall not release Owner from any of its obligations set forth herein; and _provided_, _further_, that Owner, on behalf of the Government of Puerto Rico, shall be responsible for all acts and omissions of Administrator in connection with this Agreement and the other Transaction Documents, and the transactions contemplated hereby and thereby, in the same manner as if such acts and omissions were those of Owner. For the avoidance of doubt, Owner's delegation of rights and responsibilities under this Agreement includes Owner's submission to applicable oversight by, and obligations to, PREB.

**Section 6.2**    Rights and Responsibilities of Administrator.

(a)    _Generally_. Operator shall be entitled to rely on the written directions of Administrator. Administrator shall be responsible for overseeing, in the manner provided for and subject to the terms and conditions of this Agreement, Operator's compliance with its obligations under this Agreement. Without limiting the generality of the foregoing, from and after the Service Commencement Date, Administrator shall have the following rights and responsibilities with respect to the operation, management and maintenance of the Legacy Generation Assets:

(i)    as set forth in Section 7.3 (_O&M Budgets_), review and approve O&M Budgets, including modifications thereto, to ensure compliance with the then applicable Rate Order;

(ii)    review and approve the Incentive Payment payable to Operator for a given Contract Year, including based on Administrator's evaluation of Operator's performance with respect to the Incentives and Penalties;

(iii)    cooperate with Operator such that the Budgets and funds in support of O&M Services are sufficient in amount to enable Operator to meet the Contract Standards and provide a reasonable opportunity for Operator to achieve the Incentive Payment;

(iv)    exercise Oversight in relation to Operator's compliance with O&M Budgets, including Pass-Through Expenditures, in accordance with the procedures set forth in this Agreement; _provided_ that, Administrator shall (i) reasonably coordinate with Owner to avoid duplicative Oversight and (ii) except to the extent provided under this Agreement, avoid exercising Oversight with respect to items that fall within the scope of PREB's statutory oversight;

(v)    exercise Oversight in relation to Operator's compliance with its obligations hereunder;

(vi)    respond promptly (and in any event within thirty (30) days or shorter period required by this Agreement) to all requests of Operator with respect to matters requiring

CONFIDENTIAL

the approval, review or consent of Administrator (and in each such case, unless otherwise specifically stated in this Agreement, Administrator shall not unreasonably withhold, delay or condition any such approval, review or consent) and as to such other matters relating to the obligations of Operator hereunder in respect of which Operator shall reasonably request the response of Administrator in accordance with the provisions of this Agreement;

(vii)    (A) cooperate with Operator by providing Operator such information, data and assistance as may be reasonably necessary for Operator to perform its obligations hereunder and (B) from time to time, as and when requested by Owner, execute and deliver, or cause to be executed and delivered, all such documents and instruments and take, or cause to be taken, all such reasonable actions, as necessary for Operator to perform its obligations under this Agreement;

(viii)    declare an Event of Default and exercise remedies under this Agreement, including termination of this Agreement upon the occurrence of an Operator Event of Default in accordance with Section 14.1 (*Events of Default By Operator*);

(ix)    exercise Oversight, as agent of Owner, in relation to Operator's compliance with federal funding requirements; and

(x)    coordinate any Audits that Administrator is entitled to perform hereunder with any Audits being undertaken by Owner and any other Governmental Body that has the right under Applicable Law to perform an Audit.

For the avoidance of doubt, the Parties acknowledge that Owner delegates unto Administrator all rights, responsibilities and obligations pertaining to the Oversight of Operator's compliance with its obligations under this Agreement. The Parties acknowledge that PREB is the entity responsible for overseeing all technical and operational aspects of Operator's performance under this Agreement.

(b)    Disputes. In the event of a Dispute among the Parties with respect to clauses (ii) through (x) of Section 6.2(a) (*Rights and Responsibilities of Administrator – Generally*), such Dispute shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, an "Administrator Dispute").

(c)    Approvals and Consents. When any approval or consent by Owner to an Operator submission, request or report is required pursuant to the terms of this Agreement, the approval or consent shall be given by Administrator in writing, and such writing shall be conclusive evidence of such approval or consent and shall be binding on Owner.

Section 6.3    Reporting; Audits.

(a)    Generally. At the reasonable request of Administrator or its relevant consultant (each, an "Authorized Inspector"), at Administrator's sole cost and expense, at reasonable times during normal business hours, Operator shall: (i) make available or cause to be made available to such Authorized Inspector all information related to this Agreement or the Legacy Generation Assets as may be specified in such request and as shall be in the possession or control of Operator or its Representatives; (ii) permit such Authorized Inspector, upon ten

CONFIDENTIAL

(10) Business Days' prior notice to Operator, which notice shall identify the persons such Authorized Inspector requests to be present for an interview and describe with reasonable specificity the subject matter to be raised in the interview, to discuss the obligations of Operator under this Agreement with any of the directors, chief executive officer and chief financial officer of Operator and its Representatives, for the purpose of enabling such Authorized Inspector to determine whether Operator is in compliance with this Agreement; and (iii) otherwise provide such cooperation as may reasonably be required by such Authorized Inspector in connection with any such Audit of the information required to be maintained or delivered by Operator under this Agreement or required by Applicable Law. Such Authorized Inspector shall be entitled to make copies of the information related to the conduct of such Audit and to take extracts therefrom at such Authorized Inspector's sole cost and expense. Absent good cause or as may be required by Applicable Law, audits shall occur no more than once every Contract Year. In the course of performing its Audits hereunder, each Authorized Inspector and its Representatives shall avoid any disruption to Operator's performance of the O&M Services or Operator's rights or responsibilities under this Agreement, having regard to the nature of the Audits being performed, and when accessing the Legacy Generation Assets, each Authorized Inspector and its Representatives shall do so at its own risk and shall comply with all of Operator's safety procedures.

(b)   <u>No Other Audit Rights</u>. This Agreement does not provide any Governmental Body any rights to undertake any Audit other than those stated herein, and, without restricting the foregoing, this Agreement does not provide any regional, municipal or local body with any rights to perform any Audit in addition to those permitted by Applicable Law. For the avoidance of doubt, nothing in this Section 6.3 (*Reporting; Audits*) shall be construed as a limitation on the right of PREB to conduct audits as needed in the performance of its statutory duties.

**Section 6.4**   Staffing Levels. From and after the Service Commencement Date and at all times during the Term, Owner and Administrator, including any of their subcontractors, shall maintain staffing in connection with the O&M Services only at those levels strictly necessary for Owner and Administrator to timely and efficiently perform their obligations under this Agreement. At all times before the Service Commencement Date, Owner shall maintain staffing necessary to continue to perform its obligations at the same or higher level than it performed such obligations as of the Proposal Submission Date.

### Article 7
### COMPENSATION; O&M BUDGETS

**Section 7.1**   Service Fee.

(a)   <u>Generally</u>.

(i)   In addition to Owner's funding or payment of Pass-Through Expenditures, in accordance with the then-currently approved Operating Budget, and any other amounts that become due and owing to Operator hereunder, from and after the Service Commencement Date, Owner shall pay Operator, in accordance with this Agreement, the O&M Fixed Fee.

CONFIDENTIAL

(ii)     In addition to the fees described in the foregoing paragraph, with respect to each Contract Year from and after the Service Commencement Date and as described in Section III of Annex II (*Compensation – Incentives and Penalties*) of this Agreement, Operator may (A) be eligible to receive an O&M Incentive Payment and a Decommissioning Incentive Payment, and (B) be subject to an O&M Penalty or a Decommissioning Penalty.

(iii)     For the avoidance of doubt, the applicable Service Fee shall constitute payment for Operator Overhead, none of which shall be subject to reimbursement as a Pass-Through Expenditure. Except as otherwise expressly provided for in this Agreement, the applicable Service Fee shall not be subject to any abatement, deduction, counterclaim or set-off of any kind or nature.

(b)     O&M Fixed Fee.

(i)     The O&M Fixed Fee payable to Operator for each Contract Year as compensation for the performance of the O&M Services shall be as set forth in Section I of Annex II (*Compensation – O&M Fixed Fee*). Owner and Administrator agree that an amount equal to the maximum amount of the O&M Fixed Fee available in any given Contract Year shall be included in the Operating Budget for such Contract Year.

(ii)     Owner shall pay the O&M Fixed Fee in monthly installments equal to (i) one-twelfth (1/12) of the O&M Fixed Fee for a Contract Year of twelve (12) months or (ii) in the case of any Contract Year that includes more or less than twelve (12) months, an amount equal to one (1) divided by the number of months in such Contract Year. In the event of a partial month, the monthly installment shall be adjusted on a Pro Rata basis.

(iii)     On or prior to the tenth (10th) Business Day of each month of any Contract Year, Operator shall submit to Administrator for its review and approval an invoice for the O&M Fixed Fee payable in respect of the prior month. The invoice shall specify the monthly portion of the O&M Fixed Fee for the relevant month, together with (A) the aggregate portion of the annual O&M Fixed Fee paid through such month and (B) the accumulated payments to the date of such invoice. Owner shall pay the invoice by the last Business Day of the month on which the invoice was submitted. Owner's sole responsibility with respect to all invoices shall be payment of such invoices and shall not include review of any invoice. All invoices shall comply with the requirements set forth in Section 9.2(c) (*Anti-Corruption and Sanctions Laws – Policies and Procedures*) hereto.

(iv)     The O&M Fixed Fee shall not be subject to the O&M Fixed Fee Adjustment during the first five (5) Contract Years. Beginning on the sixth (6th) Contract Year and for any Contract Year thereafter, the O&M Fixed Fee shall be subject to the O&M Fixed Fee Adjustment at any time and from time to time upon (i) the commencement of Decommissioning Services with respect to a Legacy Generation Asset or (ii) the removal, permanently or indefinitely, of a Legacy Generation Asset from the scope of the O&M Services by Administrator pursuant to Section 2.3(c) (*Term – Reduction*), as set forth in Section I of Annex II (*Compensation – O&M Fixed Fee*).

**CONFIDENTIAL**

    (c)    <u>Incentives and Penalties</u>.

    (i)    Based on Operator's performance with respect to the Incentives and Penalties described in Section III of Annex II (*Compensation – Incentives and Penalties*), Operator shall be eligible to receive Incentive Payments or be subject to Penalties as a deduction from the applicable Service Fee in any given Contract Year. For the avoidance of doubt, no Incentive Payments or Penalties shall be earned or incurred during the Mobilization Period or the Demobilization Period. The Incentive Payments or Penalties to be earned or incurred on any given Contract Year shall be calculated as set forth in Section III of Annex II (*Compensation – Incentives and Penalties*), as adjusted on a Pro Rata basis for a Contract Year that is more or less than three hundred and sixty-five (365) days. Owner and Administrator agree that an amount equal to the maximum amount of the Incentive Payments available in any given Contract Year shall be included in the Operating Budget or the Decommissioning Budgets, as applicable, for such Contract Year.

    (ii)    No later than thirty (30) days following the end of a Contract Year or the date of termination of this Agreement, Operator shall submit a report in a form substantially consistent with the form attached to the Mobilization Plan (the "<u>Incentives and Penalties Report</u>"), which report shall include the separate Fuel Optimization Report, to Administrator and PREB with (A) supporting performance data, information and reports evidencing its performance with respect to one or more of the categories of Incentives and Penalties and (B) based thereon, its good faith calculation of the proposed Incentive Payment and/or Penalties, in each case for the relevant Contract Year(s). The Incentives and Penalties Report shall comply with the requirements set forth in Section 9.2(c) (*Anti-Corruption and Sanctions Laws – Policies and Procedures*).

    (iii)    Administrator shall have a period of one hundred twenty (120) days after receipt of the Incentives and Penalties Report to review such report and during such period, Administrator and Operator shall meet weekly to discuss the Incentives and Penalties Report until an agreement is reached. During this period, Operator shall grant to Administrator reasonable access during normal business hours to all relevant personnel, Representatives of Operator, books and records of Operator and other items reasonably requested by Administrator in connection with the review of the Incentives and Penalties Report.

    (iv)    If Administrator delivers to Operator a written statement describing any disagreements with the Incentives and Penalties Report during such one hundred twenty (120) day review period, then Operator and Administrator shall attempt to resolve in good faith any such disagreements; <u>provided</u> that any unresolved disagreements shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*). If (A) Administrator does not deliver such statement during such one hundred twenty (120) day review period (in which case it shall be deemed to have agreed with the Incentives and Penalties Report), (B) Operator and Administrator reach a resolution with respect to such matters or (C) Administrator has no disagreements with the Incentives and Penalties Report, then Owner shall pay the Incentive Payment in accordance with Section 7.1(c)(v) (*Service Fee – Incentives and Penalties*) based on Operator's Incentives and Penalties Report or in the case of sub-clause (B) the terms of the relevant resolution.

CONFIDENTIAL

(v)      Owner shall pay the undisputed portion of the Incentive Payment for a given Contract Year within one hundred twenty (120) days of the date of receipt of the Incentives and Penalties Report. If any Penalties are determined to be due in accordance with Section 7.1(c)(iv) (*Service Fee – Incentives and Penalties*), Owner shall deduct the Penalty, or any portion thereof that is not subject to a Dispute, from the next payment of the applicable Service Fee due to Operator following such determination (or in the event the Penalty is higher than such payment, from the next series of payments). In the event that due to an early termination of this Agreement or the end of the Term, the Service Fee payments due to Operator after such determination are not sufficient to deduct the full amount of the Penalty, Operator shall pay to Owner the amount of the Penalty that has not been deducted from the Service Fee within six (6) months following the date of such termination or end of the Term.

(vi)      If any Force Majeure Event (other than a Force Majeure Event that is a Forced Outage) occurs, Operator and Administrator shall negotiate proportional adjustments to the relevant categories of Incentives and Penalties, as applicable, which shall apply during the duration of the Force Majeure Event to reasonably assure that Operator has a reasonable opportunity to earn the Incentive Payment.

(vii)      Each Penalty shall be Owner's sole and exclusive remedy and Operator's sole and exclusive liability with respect to the circumstances to which the relevant Penalty applies and any breach or other act or omission attributable Operator that directly or indirectly caused or contributed to such circumstances, except to the extent that such circumstances resulted from a violation of Applicable Law; provided that if such violation of Applicable Law results in the imposition of a fine or other penalty for which Operator is liable or otherwise responsible under this Agreement, then such fine or other penalty shall be in lieu of (and not in addition to) the Penalty under this Agreement.

(viii)      If there is any material error or inaccuracy in any information provided by Owner or any of its Affiliates to Operator or any of its Affiliates in connection with the Legacy Generation Assets or the Generation Sites, Operator and Administrator shall negotiate proportional adjustments to the relevant categories of Incentives and Penalties, to reasonably assure that Operator has a reasonable opportunity to earn the Incentive Payment.

(d)      Reporting Obligation Charge. Any Reporting Obligation Charge incurred by Operator as a result of its failure to provide required reporting under this Agreement, as provided in Section III of Annex II (*Compensation – Incentives and Penalties*), may be automatically deducted from the Service Fee payable to Operator.

(e)      Service Fee Disputes. The Parties hereby agree that, in the event that a Dispute arises between Operator and Administrator in connection with the applicable Service Fee (including any Incentives, Penalties or other adjustments thereto as permitted by this Agreement), the matter shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, a "Service Fee Dispute").

**Section 7.2**     Pass-Through Expenditures. For purposes of this Agreement, "Pass-Through Expenditures" shall be any reasonable and documented costs and expenses incurred by Operator in connection with the performance of its obligations (including O&M

Services and the Decommissioning Services) pursuant to this Agreement (without markup for Operator profit), including as set forth in Annex XII (*Pass-Through Expenditures*); <u>provided</u> that Pass-Through Expenditures shall not include any (i) Disallowed Costs or (ii) Operator Overhead which is included in the applicable Service Fee; <u>provided</u>, further that such costs and expenses subject to reimbursement shall comply with Applicable Law, including the applicable federal guidelines. Operator shall pay Pass-Through Expenditures in accordance with Section 7.6 (*Service Accounts*). Operator shall provide promptly such additional supporting documentation evidencing the provision of the O&M Services and Decommissioning Services, if any, including evidence of the payment of any Subcontractor whose fees or allocated expenditures (in the case of Subcontractors that are Affiliates of Operator, charging any amounts to Operator on an allocation basis) are included in the applicable Pass-Through Expenditures, and the calculation of the Pass-Through Expenditures related thereto, as Administrator may request and as may be required by Applicable Law. To the extent necessary for Administrator to complete its review of the applicable invoice, upon Administrator's reasonable request such additional supporting documentation shall include any relevant Confidential Information. Owner's sole responsibility with respect to all invoices shall be payment of undisputed amounts and shall not include review of any invoice.

**Section 7.3**   O&M Budgets.

(a)   <u>Budget Allocation Meeting</u>. For any Contract Year in which there is a single base rate covering each of the T&D System and related assets, Owner's Hydropower Assets, and the Legacy Generation Assets (other than the initial Contract Year, for which the procedures for the Initial O&M Budget set forth in Section 4.3(c) (*Owner and Administrator Responsibilities – Initial O&M Budget*) shall apply, or a year in which a rate adjustment approved by PREB enters into effect, in which case the O&M Budget used in connection with obtaining such rate adjustment shall be used), in accordance with the PREPA-Genco-Hydroco Operating Agreement, Operator shall, no later than one hundred twenty-five (125) days prior to the commencement of such Contract Year, meet with T&D Operator, Administrator and other relevant parties to determine the allocation of such base rate and the resulting revenues among the non-generation budgets T&D Operator must prepare, the Hydroco Budget, the budgets for PREPA and its subsidiaries other than Genco and Hydroco, and the generation budgets Operator must prepare, which allocation shall be proportionate to, and consistent with, the cost allocation among such budgets in the then applicable Rate Order (the "<u>Budget Allocation Meeting</u>"); <u>provided</u> that if, (i) during the Budget Allocation Meeting for a Contract Year, T&D Operator, Operator, Hydroco and PREPA are unable to reach agreement on the allocation of the base rate among such budgets for such Contract Year and/or (ii) after the Budget Allocation Meeting is held for a Contract Year but before the start of such Contract Year, the load forecast, on which the allocation of the base rate was based, changes, then, in each case, the final allocation shall be determined in accordance with the applicable procedures set forth in the PREPA-Genco-Hydroco Operating Agreement.

(b)   <u>O&M Budget Preparation</u>. Subject to the requirements of Section 7.3(a) (*O&M Budgets – Budget Allocation Meeting*), Operator shall prepare the proposed O&M Budgets for such Contract Year, consolidate such budgets with the proposed Hydroco Budget (which Hydroco shall submit to Operator no later than one hundred fifteen (115) days prior to the commencement of the relevant Contract Year), and, no later than one hundred five (105) days prior to the commencement of the relevant Contract Year, submit to T&D Operator the proposed O&M Budgets for such Contract Year. In the event that Operator receives a Genco Budget Notice or a

CONFIDENTIAL

Hydroco Budget Notice (as such terms are defined in the PREPA-Genco-Hydroco Operating Agreement), Operator shall follow the resolution procedures set forth in the PREPA-Genco-Hydroco Operating Agreement.

(c)     <u>Administrator Review of O&M Budgets</u>. Once Administrator has received the proposed O&M Budgets submitted by T&D Operator in accordance with the PREPA-Genco-Hydroco Operating Agreement, Administrator shall review the O&M Budgets to ensure compliance with the then applicable Rate Order and Section 7.4 of the T&D O&M Agreement. Within forty-five (45) days following its receipt of such budgets, Administrator shall notify T&D Operator, Operator and Hydroco whether the proposed budgets are compliant with the then applicable Rate Order and Section 7.4 of the T&D O&M Agreement, and shall request, acting reasonably, any changes or modifications to the proposed budgets to conform the proposed budgets with the then applicable Rate Order and Section 7.4 of the T&D O&M Agreement.

(d)     <u>Compliance with Existing Rate Order</u>. Without limiting Operator's rights under Section 7.6(d) (*Service Accounts – Reserve Account*), Section 7.8 (*Unfunded Amounts*) and Article 14 (*Events of Default; Remedies*), (i) Operator acknowledges that the Initial O&M Budget represents the maximum expenditure budget (excluding expenditures related to Fuel Costs, which shall be subject to rates determined pursuant to the Fuel Adjustment Clause as described in Section 7.3(f) (*O&M Budgets – Quarterly Adjustments to Fuel Budget*)) allocated to the Legacy Generation Assets under the then applicable Rate Order approved by PREB as of the Effective Date, (ii) in no event shall the Operating Budget for any subsequent Contract Year exceed the maximum expenditure budget allocated to the Legacy Generation Assets under the then applicable Rate Order and (iii) Owner and Administrator acknowledge that the O&M Budgets shall be compliant with the then-applicable Rate Order.

(e)     <u>Amendments to the Operating Budget</u>.

(i)     Operator may, from time to time, propose to Administrator to amend the approved Operating Budget for a given Contract Year; <u>provided</u> that any such amendment shall be compliant with the then applicable Rate Order and subject to approval by PREB. If, during a Contract Year, Operator becomes aware that the Pass-Through Expenditures for such Contract Year are expected to exceed the relevant Budget for such Contract Year, then (A) Operator shall promptly notify Administrator and T&D Operator of the expected shortfall, (B) T&D Operator shall notify PREB of the expected shortfall and, (C) as promptly as practicable, Operator shall prepare and submit to PREB proposed amendments to the relevant Budget for such Contract Year, which amendments must be consistent with the then applicable Rate Order and shall require and be subject to approval by PREB.

(ii)     Notwithstanding anything to the contrary contained in this Section 7.3(e) (*O&M Budgets – Amendments to the Operating Budget*), in the event that PREB takes any action or issues any order that could result in a change in the portion of rates that relate to the Legacy Generation Assets, then Operator shall, as promptly as practicable, prepare and submit to PREB, with copy to T&D Operator, Administrator and Hydroco, the proposed amendments to the Operating Budget, which amendments must be consistent with the then applicable Rate Order and shall require and be subject to approval by PREB.

CONFIDENTIAL

(iii)   In the event Decommissioning Services for one or more of the Legacy Generation Assets occur during any given Contract Year and the applicable Decommissioning Budgets for such Legacy Generation Assets has been approved pursuant to Section 16.2(a) (*Decommissioning Compensation – Decommissioning Budget*), as of the month such Decommissioning Services commence, the approved Operating Budget for such Contract Year shall be amended to reflect the transition of all costs related to such Legacy Generation Assets, including the O&M Fixed Fee Adjustment as set forth in Section I of Annex II (*Compensation – O&M Fixed Fee*), from the relevant operation line items to separate line items for the decommissioning of such Legacy Generation Asset.

(f)   Quarterly Adjustments to Fuel Budget. No later than fourteen (14) days prior to the end of a quarter, Operator shall prepare and submit to PREB for approval (with copy to Administrator and the T&D Operator), as necessary, (i) a record of actual Fuel Costs spent in the current quarter, with all applicable invoices and necessary supporting information for auditing purposes, and (ii) revised quarterly budgets describing the estimated variable Fuel Costs for the following quarter for the purpose of resetting the Fuel Costs to be recovered for that quarter. In the event PREB does not timely approve a proposed revised quarterly Fuel Budget prior to the start of the applicable quarter, the proposed quarterly Fuel Budget shall be adjusted to reflect the maximum amount of Fuel Costs to be recovered through the rates set forth in the applicable Fuel Adjustment Clause then in effect.

(g)   Default Budget. In the event any O&M Budget for a given Contract Year has not been finalized in accordance with Section 7.3(c) (O&M *Budgets – Administrator Review of O&M Budgets*) by July 1 of such Contract Year, the applicable approved O&M Budget for the immediately preceding Contract Year (as the same may have been amended) (such O&M Budget as it relates to the given Contract Year, a "Default Budget") shall remain in effect until such time as the applicable O&M Budget for such Contract Year is so finalized; provided that any such Default Budget shall be compliant with the then applicable Rate Order.

(h)   O&M Budget Disputes. The Parties hereby agree that, in the event that a dispute arises between Operator, Owner and Administrator in connection with an O&M Budget or the relevant Default Budget (including proposed amendments thereto or the need for amendments thereto), the matter shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, an "O&M Budget Dispute").

**Section 7.4**   O&M Budget Policy. The O&M Budgets and the related Operator staffing levels for each Contract Year shall be designed to be adequate in both scope and amounts to reasonably assure that Operator is able to carry out the related O&M Services in accordance with the Contract Standards to reasonably assure that Operator has a reasonable opportunity to earn the Incentive Payment. The O&M Budgets for each Contract Year shall comply with (a) the then applicable Rate Order, (b) any PREB-approved directive or requirement applicable to Hydroco, Owner or PREPA, (c) Applicable Law and (d) amounts allocated to the generation budget as agreed in the Budget Allocation Meeting for such Contract Year and any follow up to such meeting. The Parties further acknowledge and agree that, from time to time, it may be necessary or appropriate to amend or otherwise adjust the relevant categories of Incentives and Penalties or the O&M Budgets as a result of (i) Force Majeure Events, (ii) Owner Fault, (iii) Forced Outages or (iv) additional requirements imposed by Owner, Administrator, PREB or any other

CONFIDENTIAL

Governmental Body after approval of the O&M Budgets, in the case of each of clauses (i) to (iv), which (A) have resulted (or are reasonably likely to result) in schedule delays or increased work scope or costs and (B) are not be attributable to Operator's gross negligence or willful misconduct. Operator shall provide notice to Administrator promptly following the occurrence of an event contemplated above and the Parties shall, acting in good faith and acting reasonably, consider necessary adjustments to the Incentives and Penalties or the O&M Budgets that are based on rates that are reasonable and necessary and shall submit such to PREB for approval.

**Section 7.5**    PREB Rate Proceedings.

(a)    Operator acknowledges that from time to time, or as otherwise required by Applicable Law or ordered by PREB, T&D Operator may apply to PREB to request a change in the then applicable Rate Order (a "Rate Order Modification Request"). In accordance with the terms of the PREPA-Genco-Hydroco Operating Agreement, upon receipt of notice from T&D Operator that it plans to submit a Rate Order Modification Request which contemplates modifications to the O&M Budgets, Operator shall cooperate in good faith with T&D Operator and Administrator to prepare proposed O&M Budgets to be included in or otherwise form the basis of such Rate Order Modification Request. Operator shall provide reasonable further support to the T&D Operator through any applicable proceedings arising in connection with the Rate Order modification request to ensure that adequate amounts are available for inclusion in any O&M Budget. In the event that Operator wishes to propose capital improvements to the Legacy Generation Assets, or unforeseen circumstances require increases to the O&M Budgets, Operator shall discuss such proposal or requirements with Administrator and, with Administrator's approval, may coordinate with T&D Operator to prepare an application to PREB to request a change in the then applicable Rate Order. For the avoidance of doubt, nothing in this Agreement shall be construed to prohibit Operator from soliciting an audience with PREB at any applicable proceedings arising in connection with the Rate Order Modification Request or otherwise in order to advocate for any positions it may have with respect to the O&M Budgets. Operator, T&D Operator, Administrator and PREPA shall appear before PREB as may be requested by PREB in any proceedings arising in connection with a Rate Order Modification Request.

(b)    Operator, the Authority and Owner acknowledge that the Rate Order and the resulting customer rates may be subject to adjustment (including decreases) by PREB in accordance with the provisions set forth in Applicable Law, including the requirement that all rates be just and reasonable, and consistent with sound fiscal and operational practices that provide for a reliable and adequate service at the lowest reasonable cost including reflecting any saving incentives for Puerto Rico rate payers per Section 7.1.

**Section 7.6**    Service Accounts.

(a)    Operating Account.

(i)    No later than ten (10) Business Days prior to the Service Commencement Date, Owner shall establish one or more operating accounts from which Operator shall draw funds from time to time to pay for Pass-Through Expenditures actually incurred by Operator in performing the O&M Services and from which Owner shall pay the O&M Service Fee (collectively, the "Operating Account"). Owner shall pay Operator the O&M Service Fee in

CONFIDENTIAL

accordance with the terms of Section 7.1 (*Service Fee*) from funds available in the Operating Account.

(ii)    No later than ten (10) Business Days prior to the Service Commencement Date, the Operating Account shall be funded with an amount equal to the sum of (A) anticipated Pass-Through Expenditures for the following two (2) months *plus* (B) the anticipated O&M Service Fee for the following two (2) months, in each case based on the then-currently approved Operating Budget or the relevant Default Budget then in effect. Thereafter, beginning in the month in which the Service Commencement Date occurs, the Operating Account shall be replenished monthly in accordance with the procedures set forth in the PREPA-Genco-Hydroco Operating Agreement to maintain a minimum balance of the amount that is equal to the sum of (A) anticipated Pass-Through Expenditures for the following two (2) months *plus* (B) the anticipated O&M Service Fee for the following two (2) months.

(iii)    In each Contract Year, Operator shall be entitled to withdraw funds from the Operating Account for Pass-Through Expenditures actually incurred under the approved Operating Budget or the relevant Default Budget then in effect without Administrator approval. Operator shall not withdraw funds from the Operating Account for Pass-Through Expenditures that are not covered by the then-currently approved Operating Budget or the relevant Default Budget then in effect without prior Administrator approval; <u>provided</u> that no such approval shall be required in case of: (A) a Force Majeure Event, Owner Fault or Forced Outage; or (B) any circumstance, event or condition unforeseeable by Operator or which, if foreseeable, could not be avoided in whole or in part by the exercise of due diligence by Operator, requiring funding in excess of the amounts available for such matter in the then-currently approved Operating Budget or the relevant Default Budget then in effect and for which a prudent Person in the business of operating and managing the Legacy Generation Assets would expend funds prior to the time that the applicable O&M Budget could reasonably be expected to be amended; <u>provided</u> <u>further</u>, <u>however</u>, that Operator shall (x) notify Administrator in writing promptly upon Operator becoming aware of the occurrence of such circumstance, event or condition, (y) provide a description of the details of such circumstance, event or condition and the amount of any withdrawal related thereto that Operator intends to make from the Operating Account and (z) withdraw such amount from the Operating Account.

(iv)    Simultaneous with each withdrawal of funds from the Operating Account, Operator shall provide Administrator (with copy to T&D Operator) with written notice of such withdrawal, including a summary of Pass-Through Expenditures being paid. Not later than nine (9) Business Days following each month end, Operator shall provide Administrator, with a copy to T&D Operator, with (A) a full accounting setting forth in reasonable detail the Pass-Through Expenditures actually incurred and paid during the prior month and (B) a written certification that all such withdrawals are Pass-Through Expenditures.

(b)    <u>Fuel Account</u>.

(i)    No later than the Service Commencement Date, Owner shall have established one or more fuel accounts from which Operator shall draw funds from time to time to pay for costs and expenses related to the purchase, transportation, testing, delivery and storage

CONFIDENTIAL

(including tank maintenance) of fuel for the Legacy Generation Assets actually incurred by Operator (the "Fuel Costs") in performing the O&M Services (collectively, the "Fuel Account").

(ii)    No later than ten (10) Business Days prior to the Service Commencement Date, the Fuel Account shall be funded with an amount equal to at least an average of two (2) months of Fuel Costs, based on the average monthly Fuel Costs set forth in the then-currently approved Fuel Budget for the current quarter. Thereafter, beginning in the month in which the Service Commencement Date occurs, the Fuel Account shall be replenished monthly in accordance with the procedures set forth in the PREPA-Genco-Hydroco Operating Agreement. The required funding of the Fuel Account may be increased in accordance with any special stipulations in the approved and in-force fuel supply agreements for the applicable Legacy Generation Assets.

(iii)    In each Contract Year, Operator shall be entitled to withdraw funds from the Fuel Account for Fuel Costs actually incurred under the approved Fuel Budget without Administrator approval. Operator shall withdraw funds from the Fuel Account only for Fuel Costs that are incurred pursuant to approved and in-effect fuel supply agreements for the Legacy Generation Assets. Operator shall not withdraw funds from the Fuel Account for any non-fuel costs or Fuel Costs that are not incurred pursuant to approved and executed fuel supply agreements for the Legacy Generation Assets without Administrator approval.

(iv)    Simultaneous with each withdrawal of funds from the Fuel Account, Operator shall provide Administrator (with copy to T&D Operator) with written notice of such withdrawal, including a summary of Fuel Costs being paid. Not later than nine (9) Business Days following each month end, Operator shall provide Administrator, with a copy to T&D Operator, with (A) a full accounting setting forth in reasonable detail the Fuel Costs actually incurred and paid during the prior month and (B) a written certification that all such withdrawals are Pass-Through Expenditures.

(c)    Decommissioning Account.

(i)    No later than ten (10) Business Days prior to the Service Commencement Date, Owner shall establish one or more operating accounts from which Operator shall draw funds from time to time to pay for Pass-Through Expenditures actually incurred by Operator in performing the Decommissioning Services (collectively, the "Decommissioning Account").

(ii)    No later than ten (10) Business Days prior to the Decommissioning Commencement Date for the applicable Legacy Generation Asset, the Decommissioning Account shall be funded with an amount equal to the sum of all anticipated Pass-Through Expenditures for the following one (1) month, based on the then-currently approved Decommissioning Budget. Thereafter, beginning in the month in which the Decommissioning Commencement Date for the applicable Legacy Generation Asset occurs, the Decommissioning Account shall be replenished monthly in accordance with procedures set forth in the PREPA-Genco-Hydroco Operating Agreement until all payments for the Decommissioning Services contemplated by this Agreement have been made.

CONFIDENTIAL

(iii)    During the performance of the Decommissioning Services for the applicable Legacy Generation Asset, Operator shall be entitled to withdraw funds from the Decommissioning Account for Pass-Through Expenditures actually incurred under the approved Decommissioning Budget. Operator shall not withdraw funds from the Decommissioning Account for Pass-Through Expenditures that are not included in the then-currently approved Decommissioning Budget; provided that such approval shall not be required in case of: (A) a Force Majeure Event, Owner Fault or Forced Outage; and/or (B) any circumstance, event or condition unforeseeable by Operator or which, if foreseeable, could not be avoided in whole or in part by the exercise of due diligence by Operator, requiring funding in excess of the amounts available for such matter in the then-currently approved Decommissioning Budget and for which a prudent Person in the business of decommissioning the Legacy Generation Assets would expend funds prior to the time that such Decommissioning Budget could reasonably be expected to be amended. Operator shall (x) notify Administrator in writing promptly upon Operator becoming aware of the occurrence of such circumstance, event or condition and (y) provide the details of such circumstance, event or condition and the amount of any withdrawal related thereto that Operator intends to make from the Decommissioning Account.

(iv)    Simultaneous with each withdrawal of funds from the Decommissioning Account, Operator shall provide Administrator (with copy to T&D Operator) with written notice of such withdrawal, including a summary of Pass-Through Expenditures being paid. Not later than nine (9) Business Days following each month end, Operator shall furnish Administrator, with a copy to T&D Operator, with (A) a full accounting setting forth in reasonable detail the Pass-Through Expenditures actually incurred and paid during the prior month and (B) a written certification that all such withdrawals are Pass-Through Expenditures.

(d)    Reserve Account.

(i)    No later than ten (10) Business Days prior to the Service Commencement Date, Owner shall establish one or more reserve accounts (each, a "Reserve Account") from which Operator (A) shall draw funds from time to time to pay for costs in connection with Forced Outages, Force Majeure Events or Owner Fault, and costs in connection with the procurement and installation of any Capital Spare Parts approved by Administrator and PREB in accordance with Section 5.6 (*Capital Spare Parts and Capital Improvements*) and (B) may draw funds from time to time to pay for any shortfalls in the required funding of any other Service Account. In the event there are no funds on deposit in the Reserve Account, Operator shall provide written notice to Administrator of such shortfall. Until the Reserve Account is replenished, to the extent costs are incurred under clause (A) of this Section 7.6(d)(i) (*Service Accounts – Reserve Account*), Operator may withdraw the necessary funds from any Service Account (other than the Fuel Account) provided that, prior to any withdrawal, Operator shall provide written notice of the intended withdrawal to Administrator for its review and approval. Operator may withdraw such funds only upon either (x) receipt of Administrator's written approval or (y) Administrator's failure to provide a response within a reasonable period. Such withdrawal notice shall include the amount of the withdrawal and describe the Forced Outage, Force Majeure Event or Owner Fault, or procurement and installation of any Capital Spare Parts approved by Administrator and PREB pursuant to which such costs were incurred.

CONFIDENTIAL

(ii)     No later than ten (10) Business Days prior to the Service Commencement Date, the Reserve Account shall be funded with an amount equal to US$30 million. Following a withdrawal from the Reserve Account, the Reserve Account shall be replenished no later than the eleventh (11th) Business Day of the month immediately succeeding the month in which the withdrawal occurred, with an amount equal to the aggregate amount withdrawn from the Reserve Account during the previous month; provided that if in any given month, Owner does not have sufficient funds to fund the Reserve Account in the required amount, the failure to so fund shall not constitute a default hereunder so long as the Reserve Account is topped up to the level at which it should be in at any given point as soon as Owner has sufficient funds to do so.

(iii)     Subject to the terms of this Section 7.6(d) (*Service Accounts – Reserve Account*), Operator shall be entitled to withdraw funds from the Reserve Account from time to time only as necessary to pay for (A) costs in connection with Forced Outages, Force Majeure Events or Owner Fault, (B) any shortfalls in the required funding of any other Service Account or (C) costs in connection with the procurement and installation of any Capital Spare Parts approved by Administrator and PREB in accordance with Section 5.6 (*Capital Spare Parts and Capital Improvements*). Simultaneous with each such withdrawal, Operator shall provide Administrator with written notice of such withdrawal, including a summary of costs being paid. Not later than ten (10) Business Days following each month end during which funds were withdrawn from the Reserve Account, Operator shall furnish Administrator with a full accounting setting forth in reasonable detail the costs related to the applicable event or circumstance actually incurred and paid during the prior month, the transfer of funds to other Service Account(s) or the costs related to the approved procurement and installation of such Capital Spare Part.

(e)     Service Account Disputes. The Parties hereby agree that, in the event that a dispute arises in connection with a Service Account, the matter shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, a "Service Account Dispute").

(f)     Withdrawals by Owner. Owner shall not withdraw funds held in any Service Account (other than from (i) the Operating Account for payment of the O&M Service Fee due to Operator, (ii) the Mobilization Account for payment of the Mobilization Service Fee due to Operator and (iii) the Demobilization Account for payment of the Demobilization Service Fee due to Operator), without the prior written approval of each of Administrator and Operator.

(g)     Use of Funds by Operator. Notwithstanding any other provision of this Agreement (i) Operator shall under no circumstances be required to pay for or incur any Pass-Through Expenditure, liabilities under Facility Contracts, or Fuel Costs on its own account and (ii) Operator is hereby authorized by Owner to process direct payments from the Service Accounts to any Person to which payments are owed under any Facility Contract, Subcontract or under any other arrangement with respect to Pass-Through Expenditures, Facility Contracts, Fuel Costs, or employment, in each case in accordance with the applicable Budget(s).

CONFIDENTIAL

**Section 7.7**     Disallowed Costs.

(a)     Generally. Subject to the limitations on liability in Section 19.3 (*Limitation on Liability*), none of the following shall be treated as Pass-Through Expenditures for purposes of payment from Owner to Operator, and each shall be the sole responsibility of Operator (collectively, "Disallowed Costs"):

(i)     any and all Pass-Through Expenditures incurred as a result of Operator's gross negligence or willful misconduct, except as otherwise provided in Section 5.9(a)(iv) (*Environmental, Health and Safety Matters – Pre-Existing Environmental Conditions*) where the applicable standard shall be either the Pre-Existing Contamination Liability Standard or the Pre-Existing Noncompliance Liability Standard, or are otherwise subject to an indemnity from Owner to Operator under this Agreement;

(ii)     any and all fines, penalties or other similar payments or charges imposed by PREB, Puerto Rico Department of Natural and Environmental Resources, the EPA, the United States Department of Justice, OSHA or any other Governmental Body on Operator, except to the extent that such fines, penalties or other similar payments or charges arise out of violations or circumstances that arose prior to the Effective Date, or are otherwise subject to an indemnity from Owner to Operator under this Agreement; and

(iii)     any and all expenditures in excess of the then-currently approved Operating Budget or the relevant Default Budget, or the then-currently approved Decommissioning Budget(s) that are incurred by Operator other than as a result of Owner Fault, Operator's compliance with the Consent Decree or other Applicable Law, or a Force Majeure Event.

(b)     Disallowed Costs Disputes. The Parties hereby agree that, in the event that a dispute arises in connection with Disallowed Costs, the matter shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, a "Disallowed Costs Dispute"). In such event, Operator may continue to withdraw such Pass-Through Expenditures from the applicable Service Account; provided Owner shall be responsible to reimburse Owner promptly (and in any event within five (5) Business Days) any Pass-Through Expenditures that are determined to be Disallowed Costs pursuant to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*).

**Section 7.8**     Unfunded Amounts. Notwithstanding anything contained in this Agreement to the contrary, the Parties acknowledge and agree that Operator shall have no obligation or responsibility to incur or pay any costs or make expenditures in providing Services (other than Disallowed Costs) to the extent any of the Service Accounts do not contain sufficient funds to pay such costs and expenditures. Without limiting the foregoing or Operator's termination rights hereunder, and except to the extent Operator exercises its rights to cease providing the Services pursuant to Section 14.4 (*Termination for Owner Event of Default*), to the extent sufficient funds for the performance of all of Operator's obligations hereunder are not available for withdrawal by Operator from the Service Accounts, the Mobilization Account or the Demobilization Account, as applicable, (a) Operator shall take reasonable measures (to the extent practicable utilizing only the funding available in the Service Accounts) to maintain the continuity of the Services in accordance

CONFIDENTIAL

with the Contract Standards to the extent possible in the absence of its receipt of such sufficient funding (b) Owner shall protect, defend, indemnify and hold harmless Operator and its Affiliates from and against any and all Losses arising in connection with the discontinuation of any Services that occurs notwithstanding Operator's efforts pursuant to this Section 7.8(b) (*Unfunded Amounts*), and (c) Operator shall not be liable for, and Owner hereby waives and releases Operator from any claims for, Penalties (other than the Safety Compliance and the Environmental Compliance Penalties pursuant to Annex II, Section III.B (*Compensation – Incentives and Penalties – O&M Services Categories*)), and Operator shall not be liable for any failure to perform its obligations in accordance with the terms of this Agreement, until sufficient funds are made available.

**Section 7.9**    Owner Payment of Administrator Costs. Owner shall be solely responsible for all costs and expenses of Administrator in connection with the performance of Administrator's obligations under this Agreement, and shall pay or reimburse Administrator promptly for any out-of-pocket or third-party costs and expenses.

**Section 7.10**    Payment Disputes. Except as otherwise provided in Section 7.1(c) (*Service Fee – Incentives and Penalties*), if Owner or Administrator disagrees in good faith with any invoice submitted under this Agreement, then such Person shall promptly notify Operator of such dispute (and in any event no later than the due date for the applicable invoice) and the reasons for the disagreement. Any amounts set forth in an invoice that are not paid as of the due date for such invoice shall be deemed disputed by the owing Person.

**Article 8**
**CREDIT SUPPORT**

**Section 8.1**    Guarantee. Operator shall cause the Guarantee to be provided on or prior to the Effective Date and maintained thereafter throughout the Term.

**Section 8.2**    Guarantor Reports. While the Guarantee is outstanding, Operator shall deliver to Administrator (with copy to PREB): (i) within sixty (60) days after the end of the second quarter of Guarantor's fiscal year, a copy of the unaudited balance sheets of Guarantor at the end of each such period and the related unaudited statements of income, changes in equity and cash flows for each such period, in a manner and containing information consistent with Guarantor's current practices; and (ii) within one hundred twenty (120) days after the end of Guarantor's fiscal year, a copy of the audited balance sheets of Guarantor at the end of each such fiscal year, and the related audited statements of income, changes in equity and cash flows for such fiscal year, including, in each case, the notes thereto, in each case prepared in accordance with generally accepted accounting principles consistently applied in the United States (or the equivalent jurisdiction of Guarantor), together with a certificate from Guarantor's chief financial officer that such financial statements fairly present, in all material respects, the financial condition and the results of operations, changes in equity and cash flows of Guarantor as at the respective dates of and for the periods referred to in such financial statements, all in accordance with generally accepted accounting principles in the United States (or the equivalent jurisdiction of Guarantor) consistently applied. Such financial statements shall reflect the consistent application of such accounting principles throughout the periods involved, except as disclosed in the notes to such financial statements. In addition to the foregoing, Operator shall provide an opinion thereon of an independent public accountant of national stature in the United States (or the equivalent

CONFIDENTIAL

jurisdiction of Guarantor) engaged by Guarantor. Notwithstanding the foregoing, if the Guarantor is a publicly traded company in the United States, then the delivery by Operator of the quarterly and annual reports of Guarantor filed with the U.S. Securities and Exchange Commission shall be deemed to satisfy the financial information delivery requirements of Operator as otherwise described above.

## Article 9
## COMPLIANCE WITH APPLICABLE LAW

**Section 9.1** Compliance Obligations. Operator shall perform, and shall cause all Subcontractors to perform, the Services in accordance with Contract Standards, including the Consent Decree and the payment of the PREB Regulatory Charge.

**Section 9.2** Anti-Corruption and Sanctions Laws.

(a) Anti-Corruption. Neither Operator, its subsidiaries or Parent Company, nor, when acting on behalf of Operator or its subsidiaries, any director or officer or employee of Operator or its subsidiaries, nor, in connection with this Agreement or the O&M Services, any Affiliates of Operator shall violate, conspire to violate, aid and abet the violation of any anti-bribery, anti-corruption or anti-money laundering law or regulation, including Act 2 and any other laws or regulation related to political activity, conflicts of interest, embezzlement, the misuse of public funds, or property or bidding on or otherwise seeking government contracts (collectively, the "Anti-Corruption Laws"). No funds transferred by Owner to Operator shall be transferred by Operator, directly or indirectly, in violation of any Anti-Corruption Laws. Operator acknowledges and agrees that, it shall be subject to Title III of Act 2, known as the Code of Ethics for Subcontractors, Suppliers and Applicants for Economic Incentives of the Government of Puerto Rico.

(b) Sanctions. Neither Operator, its subsidiaries, Parent Company or Affiliates, nor any director or officer of Operator, its subsidiaries, Parent Company or Affiliates are Sanctioned Persons or are located, organized or resident in a Sanctioned Country. Neither Operator nor its subsidiaries, nor any director, or officer or employee of Operator, its subsidiaries (when acting on behalf of Operator or its subsidiaries), shall directly or, knowingly, indirectly, engage in any transactions or business activity of any kind with a Sanctioned Person or a Person located, organized or resident in a Sanctioned Country. No funds transferred by Owner to Operator or its subsidiaries shall be transferred by Operator or its subsidiaries, directly or indirectly, to a Sanctioned Person, a Person located, organized or resident in a Sanctioned Country, or in violation of Sanctions.

(c) Policies and Procedures. Operator and its subsidiaries, Parent Company and Affiliates shall maintain and implement policies, procedures and controls reasonably designed to ensure compliance by Operator and its subsidiaries with the Anti-Corruption Laws and Sanctions. Operator shall include in all invoices to Administrator a written certification substantially in the form of Exhibit F (*Form of Anti-Corruption Certification*), and Operator acknowledges that any invoice not including such certification shall not be accepted by Administrator. Operator shall require any Subcontractors engaged by Operator to execute at the commencement of the

CONFIDENTIAL

Subcontract (i) a Sworn Statement and (ii) a certification substantially in the form of Exhibit F (*Form of Anti-Corruption Certification*).

(d)   Notice. Operator shall within five (5) Business Days notify Administrator in writing in accordance with Section 21.2 (*Notices*) if, to Operator's knowledge, Operator, its subsidiaries, any director, officer or employee of Operator or its subsidiaries or Parent Company, or, in connection with this Agreement or the O&M Services, any Affiliates of Operator becomes subject to any investigation by law enforcement or regulatory authorities in connection with the Anti-Corruption Laws or Sanctions.

**Section 9.3**   Commonwealth Requirements.

(a)   Subcontractor and Supplier Contracts. To the extent permitted by Applicable Law, Operator shall include the provisions of this Article 9 (*Compliance with Applicable Law*) in every Subcontract and supply contract in order for such provisions to be binding on each Subcontractor or supplier. Operator shall require any Subcontractors engaged by Operator to execute at the commencement of such Subcontract a certification substantially in the form of Exhibit E (*Form of Commonwealth Certifications*). Operator shall use commercially reasonable efforts to select a company established under the Commonwealth of Puerto Rico or a company that has a significant presence in the Commonwealth of Puerto Rico as its Material Subcontractors.

(b)   Practice of Engineering, Architecture and Other Professions in the Commonwealth. To the extent that performance of the O&M Services involves performance of architectural, engineering, land surveying and landscape architecture services governed by Act No. 173 of the Legislative Assembly of Puerto Rico, enacted on August 12, 1988 ("Act 173"), known as the "Architects, Surveyor and Landscape Architects of Puerto Rico Act", then (i) Operator shall comply (and shall require Subcontractors or agents, if any, to comply) with Act 173 and (ii) Operator shall require that its Subcontractors and agents comply with Act 173.

(c)   Local Goods and Services. As required by Article 10 of Act No. 14 of the Legislative Assembly of Puerto Rico, enacted on January 8, 2004, Act No. 42 of January 21, 2018 of the Legislative Assembly, enacted on February 10, 2018, and any other Applicable Law, Operator shall not excuse by specification and shall use commercially reasonable efforts to use, goods and services extracted, produced, assembled, packaged, bottled, distributed, as applicable, in the Commonwealth by businesses, municipalities and consortiums operating in the Commonwealth or distributed by agents established in the Commonwealth.

**Section 9.4**   Non-Discrimination Laws. Operator shall comply with all Applicable Law regarding non-discrimination.

**Section 9.5**   Non-Collusion and Acceptance. Operator attests, subject to the penalties for perjury, that no Representative of Operator, directly or indirectly, to Operator's knowledge, entered into or offered to enter into any combination, conspiracy, collusion or agreement to receive or pay any sum of money or other consideration for the execution of this Agreement other than that which is expressly set forth in this Agreement.

CONFIDENTIAL

**Section 9.6**    Commonwealth Tax Liabilities. Operator shall inform Administrator if, at any time during the Term, there are any material tax disputes with any Governmental Body of the Commonwealth (other than Commonwealth Tax liabilities for which Operator is not responsible under this Agreement, if any).

**Section 9.7**    Certifications Required by Commonwealth Contractor Requirements. Operator has (i) certified that it has complied and is in compliance with the provisions of the Public-Private Partnerships Authority's Ethical Guidelines and (ii) delivered the Sworn Statement in accordance with Section 2.2(b)(ix) (*Effective Date – Conditions to Execution*).

**Section 9.8**    Duty to Inform of Criminal Investigations. Operator shall inform Administrator and PREB if, at any time during the Term, it becomes aware that it is subject to investigation in connection with criminal charges related to acts of corruption, the public treasury, the public trust, a public function or charges involving public funds or property.

**Section 9.9**    Act 120. Pursuant to Section 5(f) of Act 120 and subject to the provisions of this Agreement, Operator shall at all times comply with the public policy and regulatory framework applicable to the Legacy Generation Assets.

## Article 10
## INSURANCE

**Section 10.1**    Insurance Generally. From the Service Commencement Date and for the remainder of the Term thereafter, Operator shall maintain in effect, and cause any Subcontractor performing any of the O&M Services or the Decommissioning Services to maintain in effect, for the benefit of Owner and Operator, as applicable, the insurance policies and limits of coverage specified in Annex XIII (*Insurance Specifications*), and such additional coverage (i) as may be required by Applicable Law and (ii) as may be required by Prudent Industry Practice (the "Required Insurance"), and shall provide insurance management services, including placing insurance with carriers, and claims management and processing, as more fully described in Annex IX (*Scope of Services*). All Required Insurance shall be in a form reasonably acceptable to Administrator and shall only be issued by generally recognized financially responsible insurers that (x) are authorized to do business in the Commonwealth or are otherwise authorized or permitted by the Office of the Commissioner of Insurance of Puerto Rico and (y) at a minimum have a rating of A-(VIII) or better by A.M. Best Company or an equivalent rating by another similarly recognized insurance rating agency (unless Administrator consents to waive this requirement). All premiums, deductibles, and other reasonable fees, costs and expenses (including uninsured Losses that are not Disallowed Costs and losses in excess of insurance) shall be Pass-Through Expenditures.

**Section 10.2**    Commercial Availability. Notwithstanding anything to the contrary herein, if any Required Insurance policy shall not be available on commercially reasonable Terms, Operator shall promptly notify Administrator, in writing, but in no event less than sixty (60) days prior to the expiration of any Required Insurance. In the event that any Required Insurance policy is not available on commercially reasonable Terms, as reasonably determined by Operator, the requirement that Operator obtain and maintain such Required Insurance under this Article 10 (*Insurance*) shall be waived, provided that such waiver shall be effective only for so long as such

CONFIDENTIAL

insurance shall not be available on commercially reasonable Terms; provided, further, that during the period of such waiver, (i) Operator shall maintain the maximum amount of such insurance otherwise available on commercially reasonable Terms and (ii) Administrator shall have the right to seek alternative coverage acceptable to Administrator. During the period of any such waiver, any loss that would otherwise have been insured shall be treated as a Pass-Through Expenditure, and the Parties shall consider appropriate adjustments to the O&M Budgets in accordance with Section 7.4 (*O&M Budget Policy*). If Administrator elects to purchase alternative coverage for the period of such waiver (x) Operator shall use its commercially reasonable efforts to ensure that Administrator is able to timely obtain such coverage and (y) any reasonable excess cost of such alternative coverage shall be treated as a Pass-Through Expenditure. For the purposes of this Article 10 (*Insurance*), "Terms" shall include rates, conditions, self insured retentions such as deductibles or excesses and other terms of any of the Required Insurances.

**Section 10.3**   Additional Named Insureds. Operator, Operator Indemnitees and Owner shall be included as additional named insureds, where commercially applicable and pertinent to the coverage, including as provided in Annex XIII (*Insurance Specifications*), along with waivers of subrogation, breach of warranties or separation of insureds and contractual liability endorsements on any Required Insurance policies, as applicable, which policies shall require thirty (30) days prior written notice to Administrator by Operator prior to the effective date of any change in or non-renewal or cancellation of such policies. Insurance coverage required pursuant to this Section 10.3 (*Additional Named Insureds*) shall be maintained with generally recognized financially responsible insurers that (i) are authorized to do business in the Commonwealth or are otherwise authorized or permitted by the Office of the Commissioner of Insurance of Puerto Rico and (ii) at a minimum have a rating of A(VIII) or better by A.M. Best Company or an equivalent rating by another similarly recognized insurance rating agency (unless Administrator consents to waive this requirement). In addition, Operator shall be named as a "loss payee" for each of the policies of insurance contemplated herein and shall be entitled to receive all proceeds of the Required Insurance. In the event of a Loss relating to the O&M Services, the Legacy Generation Assets or any Generation Site, Owner shall open an account in which to deposit any proceeds of insurance for any such Losses (the "Insurance Proceeds Account"). If Operator receives any proceeds of insurance for any Losses relating to the O&M Services, the Legacy Generation Assets or any Generation Site, Operator shall deposit such amounts into the Insurance Proceeds Account within three (3) Business Days of receipt of such proceeds. If Owner receives any proceeds of insurance for any Losses relating to the O&M Services, the Legacy Generation Assets or any Generation Site, Owner shall hold such amounts in trust, for the benefit of Operator, and Owner shall deposit such amounts in the Insurance Proceeds Account within three (3) Business Days following the request of Operator. Funds in the Insurance Proceeds Account shall be used either to remediate or decommission the Legacy Generation Assets in a manner consistent with Prudent Industry Practice and reasonably approved by Administrator. In consultation with and subject to the approval of Administrator (not to be unreasonably withheld, conditioned or delayed, with notice to PREB), Operator shall determine whether to use such funds to remediate or decommission the Legacy Generation Assets, taking into account the Integrated Resource Plan and the other generation resources available to the T&D System (including load and energy forecasts and long and short range system plans prepared by T&D Operator), each to the extent applicable.

CONFIDENTIAL

**Section 10.4**  Warranties. Operator shall maintain and enforce any warranties or guarantees on any facilities, vehicles, equipment or other items owned or leased by Owner (to the extent made known to Operator), or purchased or leased on behalf of Owner and used by Operator in performing O&M Services under this Agreement. Operator shall not, by act or omission, negligently or knowingly invalidate in whole or part such warranties or guarantees without the prior approval of Administrator, such approval not to be unreasonably withheld, delayed or conditioned.

**Section 10.5**  Certificates of Insurance, Policies and Notice. Operator shall supply Administrator with copies of certificates of insurance promptly following issuance by the insurers. Not later than sixty (60) days prior to the beginning of each Contract Year following the Service Commencement Date, Operator shall furnish certificates of insurance to Administrator to confirm the continued effectiveness of the Required Insurance. Whenever a Subcontractor is utilized, Operator shall either obtain and maintain on behalf of the Subcontractor, or require the Subcontractor to obtain and maintain, insurance in accordance with the applicable requirements of Annex XIII (*Insurance Specifications*). Administrator's receipt of certificates that do not comply with the requirements stated herein, or Operator's failure to provide certificates, shall not limit or relieve Operator of the duties and responsibility of maintaining insurance in compliance with the requirements in this Article 10 (*Insurance*) and shall not constitute a waiver of any of the requirements in this Article 10 (*Insurance*).

## Article 11
## SUBCONTRACTORS

**Section 11.1**  Ability to Subcontract. Operator shall have the right, but not the obligation, to engage Subcontractors to perform Operator's obligations under this Agreement, including the Mobilization Services, the O&M Services, the Demobilization Services or the Decommissioning Services. Operator's payment obligations under any Subcontract shall be a Pass-Through Expenditure. Operator shall provide Administrator (with copy to PREB) with a list of any and all Subcontractors that Operator has engaged or intends to engage for the performance of any of the O&M Services or the Decommissioning Services. If the cost of any Subcontractor is expected to exceed US$5,000,000 per year or US$15,000,000 in the aggregate (each a "Material Subcontractor"), the list provided to Administrator and PREB shall include the expected costs for each Material Subcontractor. Administrator shall have the right to approve any Material Subcontractor engaged by Operator to perform any O&M Services or Decommissioning Services, which approval shall not be unreasonably withheld, delayed or conditioned. Operator shall be required to update such list on or about the fifth (5th) Business Day of each Contract Year. Operator shall ensure that: (i) any Subcontractor engaged by it exercises due diligence in the performance of the services subcontracted to such Subcontractor; (ii) any Subcontractor performing O&M Services shall be a licensed professional with experience in the performance of the work subcontracted to it; (iii) Administrator receives any information that it reasonably requests in respect of any Subcontractor; and (iv) the costs incurred with respect to any Subcontractor shall be consistent with the applicable O&M Budget or Decommissioning Budget and Operator shall use reasonable efforts to ensure such costs are reasonable and consistent with market terms, as applicable.

CONFIDENTIAL

**Section 11.2**   Subcontract Terms.

(a)   <u>Generally</u>. A Tax Opinion and a Reliance Letter shall be obtained, at the expense of Owner or Administrator, with respect to any Subcontract that is entered into, extended, replaced or amended and is a Covered Contract. Operator shall use commercially reasonable efforts to ensure that all agreements with third parties entered into after the Service Commencement Date in its own name or as agent for Owner that are material to Operator's performance of its obligations hereunder grant Owner or a Person designated by Administrator the right to own or license the goods and services to be provided thereunder. All contracts entered into with Subcontractors by Operator as agent for Owner, and all warranties and other rights related thereto, with respect to the Legacy Generation Assets (a) shall be assignable to Administrator or a Person designated by Administrator, solely at Administrator's election and without cost or penalty, upon early termination of this Agreement, and each Subcontractor shall acknowledge in writing the rights of Administrator to take such assignments and (b) shall terminate at the end of the Term. Operator shall be responsible for settling and resolving with all Subcontractors all claims arising out of delay, disruption, interference, hindrance or schedule extension caused by Operator or inflicted on Operator or a Subcontractor by the actions of another Subcontractor.

(b)   <u>Terms Related to Consent Decree</u>. Operator shall provide to each person, firm, corporation, contractor, or subcontractor hired to perform any requirement of the Consent Decree (including its attachments or appendices) a copy of all sections of the Consent Decree (including its attachments and appendices) relevant to the employment of the person, firm, corporation, contractor, or subcontractor, and shall condition all contracts or subcontracts entered into upon performance of the requirement(s) in conformity with the terms of the Consent Decree (including its attachments and appendices). Operator shall further require that each such person, firm, corporation, contractor, or subcontractor provide written notice of the Consent Decree to all subcontractors hired to perform any portion of any requirement of the Consent Decree.

**Section 11.3**   Indemnity for Subcontractor Claims. Operator shall retain full responsibility to Owner and Administrator under this Agreement for all matters related to the O&M Services and Decommissioning Services notwithstanding the execution or terms and conditions of any Subcontract. Subject to the limitations on liability set forth in Section 19.3 (*Limitation on Liability*), no failure of any Subcontractor used by Operator in connection with the provision of the O&M Services or Decommissioning Services shall relieve Operator from its respective obligations hereunder to perform the O&M Services and Decommissioning Services. Subject to Section 7.7 (*Disallowed Costs*) and Section 7.8 (*Unfunded Amounts)*, Operator shall pay when due all undisputed claims and demands of Subcontractors, mechanics, materialmen, laborers and others for any work performed on, or materials delivered for incorporation into any part of, the Legacy Generation Assets by or on behalf of Operator, and shall promptly discharge all mechanics', materialmen's and other construction Liens registered against the Legacy Generation Assets. All such reasonable and documented costs and expenses (other than Disallowed Costs) shall be treated as Pass-Through Expenditures. No Subcontractor shall have any right against Owner or Administrator for labor, services, materials or equipment furnished after the Service Commencement Date for the O&M Services or the Decommissioning Services. Operator acknowledges that its indemnity obligations under Section 19.1 (*Indemnification by Operator*) shall extend to all claims for payment or damages by any Subcontractor that furnishes or claims to

CONFIDENTIAL

have furnished any labor, services, materials or equipment in connection with the O&M Services after the Service Commencement Date or in connection with the Decommissioning Services.

**Section 11.4**   Disclosure Related to Operator Affiliates. In the event that any Affiliate of Operator proposes to participate in any procurement relating to subcontracting of services to be provided under this Agreement, Operator shall provide Administrator with information regarding the identity of the Affiliate, the services to be provided and any other reasonable information as Administrator may reasonably request prior to such Affiliate participating in any such procurement process or receiving any information in connection therewith.

<div align="center">

**Article 12**
**TAXATION**

</div>

**Section 12.1**   Withholding Tax. Owner shall be entitled to (i) deduct and withhold (or cause to be deducted or withheld) from any consideration payable or otherwise deliverable pursuant to this Agreement, such amounts as may be required to be deducted or withheld therefrom under any provision of the U.S. federal, state, Commonwealth, municipal, local or non-U.S. Tax law or under any applicable legal requirement and (ii) request any necessary Tax forms or information, from Operator or any other Person to whom a payment is required to be made pursuant to this Agreement. To the extent such amounts are so deducted or withheld and paid to the applicable taxing authority, such amounts shall be treated for all purposes under this Agreement as having been paid to the Person to whom such amounts would otherwise have been paid. The Parties agree to cooperate in good faith to reduce or eliminate the amount of any applicable withholding Taxes. In the event any withholding Taxes are paid by Owner in respect of amounts payable to Operator, Owner shall use commercially reasonable efforts to provide Operator (x) receipts or other evidence of payment of such withholding taxes and (y) all informative statements required by Applicable Law.

**Section 12.2**   Tax Obligations.

(a)   <u>Payment of Taxes</u>. Operator and each of its subsidiaries shall prepare and timely file, or cause to be prepared and filed at its cost, all Tax Returns required to be filed by it under any Applicable Law and shall pay any Taxes required to be paid by it under Applicable Law (whether or not shown as due on such Tax Returns). Such Tax Returns shall be true, correct and complete in all material respects.

(b)   <u>Exemption from Taxes</u>. During the Term, Operator shall not be responsible for, and Operator and the Legacy Generation Assets shall not be subject to, (i) any real property Tax imposed on or measured by the value of the Legacy Generation Assets (including any real property constituting part of the Legacy Generation Assets) that is imposed by any Governmental Body of the Commonwealth or that is imposed on the "owner" of the Legacy Generation Assets (including relating to future expenditures for real property) or (ii) any personal property tax that is imposed by any Governmental Body of the Commonwealth on property owned by Owner and used by Operator exclusively for the Legacy Generation Assets or for the services or functions subject to this Agreement, all of which shall be obligations of Owner, if and to the extent any such Taxes are payable.

<div align="center">

103

</div>

CONFIDENTIAL

      (c)   <u>Tax Deductions</u>. Operator and each of its subsidiaries shall comply with all applicable withholding, employment, social security and similar provisions of applicable U.S. federal, state, Commonwealth, municipal, local and foreign laws, and timely withhold and pay all Taxes that it is required to withhold and pay from any Person, including its employees and independent contractors. Owner shall not make any such withholdings or deductions on behalf of Operator.

## Article 13
## INTELLECTUAL PROPERTY; PROPRIETARY INFORMATION

**Section 13.1**   Intellectual Property.

      (a)   <u>Operator Intellectual Property and Subcontractor Intellectual Property</u>. Operator hereby grants to Owner, and shall cause its Affiliates and Subcontractors to grant to Owner, a perpetual, non-exclusive, fully paid-up, royalty-free license and sublicense, under all of such party's rights in, to and under the Operator Intellectual Property and Subcontractor Intellectual Property solely in connection with the Legacy Generation Assets and related facilities of Owner and their related operations (including the O&M Services or the Decommissioning Services) by or on behalf of Owner or any successors or operators thereto to (i) make, have made, use, sell, offer for sale, export or import any product, service or apparatus and practice any method, and (ii) use, reproduce, distribute, perform, display, execute and create derivative works in any medium or format, whether now known or later developed, in connection with any of the foregoing. Owner shall not and shall ensure that its Affiliates do not sublicense, rent, lease, distribute or otherwise authorize the use of Operator Intellectual Property or Subcontractor Intellectual Property to, by or on behalf of anyone other than Owner and its Affiliates, any successors or operators thereto or any other third-party with whom Owner, its Affiliates or any successors or operators thereto contract solely for purposes of operating the Legacy Generation Assets and related facilities. Operator Intellectual Property and Subcontractor Intellectual Property are Operator's Confidential Information to the extent disclosed to Owner and for so long as they are protectable as trade secrets or are otherwise confidential, and for the avoidance of doubt shall remain the Intellectual Property of the owner thereof.

      (b)   <u>Third-Party Intellectual Property</u>. Operator shall use commercially reasonable efforts to ensure that any Third-Party Intellectual Property is (i) licensed to Operator on the substantially same terms as are set forth in Section 13.1(a) (*Intellectual Property – Operator Intellectual Property and Subcontractor Intellectual Property*), subject to appropriate modifications relative to the scope of the particular third-party relationship and (ii) sublicensable to Owner under terms substantially similar to those obtained by Operator for the use thereof in connection with the Legacy Generation Assets and related facilities and their related operations. The use of Third-Party Intellectual Property shall be subject to the license terms governing the use of such Intellectual Property. To the extent Operator wishes to use any non-commercially available Intellectual Property of any third-party in the provision of the O&M Services or the Decommissioning Services, Operator shall identify to Administrator, in writing in advance of any use of any such Intellectual Property, whether or not Operator has a right to sublicense same to Owner under the same terms as those of the foregoing license requirements. If, despite using commercially reasonable efforts, Operator cannot secure such license or sublicense rights, then Operator shall (i) assist Owner in obtaining any necessary license directly from such third-party or

CONFIDENTIAL

(ii) pursue licensing of a non-infringing alternative capable of accomplishing the same purpose in substantially the same manner, and, in the case of clauses (i) and (ii), Operator shall not use such Third-Party Intellectual Property or such alternative prior to Owner obtaining a sufficient license thereto.

(c)     Work Product. The Parties hereby acknowledge and agree that, as between them, Owner shall own all right, title and interest in and to all Intellectual Property, regardless of format, created or produced in the performance of the O&M Services or the Decommissioning Services by Operator and its Affiliates if the cost of such creation or development is a Pass-Through Expenditure (collectively, "Work Product"), all of which shall, to the fullest extent under Copyright law, be considered works made for hire. For the avoidance of doubt, Work Product shall not include any Intellectual Property created or produced (A) prior to the Effective Date or (B) outside the performance of the O&M Services or the Decommissioning Services. To the extent that ownership in any Work Product does not automatically vest in Owner, Operator does hereby transfer and assign, and shall cause its Affiliates to transfer and assign, and shall use commercially reasonable efforts to cause any of its or their Subcontractors to transfer and assign, all right, title and interest in, to and under such Work Product and any Intellectual Property therein to Owner, and to execute all documents and take all actions requested by Administrator to transfer and record such ownership. Notwithstanding the foregoing, Owner acknowledges that nothing in this Agreement is intended to prevent Operator from independently developing, researching, or distributing any products or offerings similar to but separate from and not based on, nor constituting, Work Product, and Operator acknowledges that nothing in this Agreement is intended to prevent Owner from developing, researching, or distributing any products or offerings similar to but separate from and not based on, nor constituting, any such items developed, researched or distributed by Operator.

(d)     License of Owner Intellectual Property. Subject to the terms and conditions of this Agreement, Owner hereby grants, and shall cause its Affiliates to grant, to Operator and its Affiliates a fully paid-up, royalty-free, non-exclusive, non-transferable, sub-licensable (only to Subcontractors), limited license and sublicense under the Owner Intellectual Property and, to the extent sub-licensable without the need to obtain third-party consent or pay any fees, Owner Licensed Intellectual Property, during the Term, to: (i) use, sell, offer for sale, export or import any product, service or apparatus and practice any method, and (ii) use, reproduce, distribute, perform, display, execute and create derivative works, in the case of each of clause (i) and (ii), solely as necessary for Operator and its Affiliates to perform their obligations pursuant to this Agreement. The use of Owner Licensed Intellectual Property shall be subject to the applicable license terms governing the use of such Intellectual Property. To the extent any Owner Licensed Intellectual Property cannot be licensed to Operator or its Affiliates (or can only be licensed subject to third-party consent or the payment of fees), their Subcontractors for any reason, and where such Owner Licensed Intellectual Property is reasonably required for the performance of this Agreement, then Operator or its Affiliates, their Subcontractors shall promptly obtain their own third-party license for the relevant Intellectual Property or any reasonably equivalent Intellectual Property, and, provided that Owner approved in writing the procurement of such required replacement license (including the cost and expense associated therewith), Owner shall bear the cost and expense of such required replacement licenses.

CONFIDENTIAL

**Section 13.2**   Proprietary Information.

(a)   <u>Confidentiality Obligation</u>.

(i)   Subject to the remainder of this Section 13.2 (*Proprietary Information*), any and all written, recorded or oral Facility Information furnished or made available in connection with this Agreement, or that constitutes Work Product, shall be deemed Owner's Confidential Information, with respect to which Operator shall be deemed to be the receiving Party and Owner shall be deemed to be the disclosing Party. Operator's Confidential Information includes Confidential Information pertaining to Operator Intellectual Property or Subcontractor Intellectual Property, or to Operator's policies and strategies. Confidential Information shall not include any of the foregoing that: (A) is when furnished, or thereafter becomes, available to the public other than as a result of a disclosure by the receiving Party or its Representatives; (B) is already in the possession of or become available to the receiving Party or its Representatives on a non-confidential basis from a source other than the disclosing Party or its Representatives; provided, that to the knowledge of the receiving Party or its Representatives, as the case may be, such source is not and was not bound by an obligation of confidentiality to the disclosing Party or its Representatives; or (C) the receiving Party or its Representatives can demonstrate has been independently developed without a violation of this Agreement.

(ii)   Subject to the remainder of this Section 13.2 (*Proprietary Information*), each receiving Party shall, and shall cause its Representatives to, (A) keep strictly confidential and take reasonable precautions to protect against the disclosure of all Confidential Information of the disclosing Party, and (B) use all Confidential Information of the disclosing Party solely for the purposes of performing its obligations under the Transaction Documents and not for any other purpose; provided, that:

(A)   a receiving Party may disclose Confidential Information of the disclosing Party to those of its Representatives who need to know such information for the purposes of performing the receiving Party's obligations under this Agreement if, to (i) counterparties and prospective counterparties to Subcontracts, Fuel Contracts and Facility Contracts and their respective Representatives who need to know such information in connection with an existing or proposed Subcontract, Fuel Contract or Facility Contract, (ii) any lender or prospective lenders and its Representatives, and (iii) any insurer in connection with a policy of insurance required pursuant to this Agreement, in each case of the foregoing (i) through (iii) solely to the extent required and for the purposes of the receiving Party's obligations under this Agreement, and only if, prior to being given access to such Confidential Information, such Representatives are informed of the confidentiality thereof and the requirements of this Agreement and are obligated to comply with the requirements of this Agreement;

(B)   the foregoing shall not limit any rights or licenses granted under Article 13 (*Intellectual Property; Proprietary Information*); provided that the licensee shall treat any Confidential Information included in such license in a manner consistent with this Section 13.2 (*Proprietary Information*) and in any event with the same care as it would treat its own comparable information, acting reasonably; and

CONFIDENTIAL

(C)     each Party shall be responsible for any breach of this Agreement by its Representatives.

(b)     Permitted Disclosures.

(i)     Subject to the terms of this Section 13.2 (*Proprietary Information*), each receiving Party may disclose Confidential Information of the disclosing Party to a duly authorized Governmental Body where required to do so by Applicable Law. None of the Parties shall have any liability whatsoever to the other Party in the event of any unauthorized use or disclosure by a Governmental Body of any Confidential Information of another Party to the extent such disclosure was required by Applicable Law and was in accordance with the requirements of this Section 13.2 (*Proprietary Information*).

(ii)     Subject to the terms of this Section 13.2 (*Proprietary Information*), each Party may disclose Confidential Information of the other Party to the extent necessary to comply with any subpoena or order of any Commonwealth Court or other judicial entity having jurisdiction over the receiving Party, or in connection with a discovery or data request of a party to any proceeding before any of the foregoing.

(c)     Ownership and Return of Information. Subject to the remainder of this Section 13.2 (*Proprietary Information*), Confidential Information shall be and remain the property of the Party disclosing it. Nothing in this Agreement shall be construed as granting any rights in or to Confidential Information to the Party or Representatives receiving it, except the right to use it in accordance with the terms of this Agreement. Notwithstanding the foregoing, the Parties and Administrator shall have the right to retain copies of Confidential Information, subject to the confidentiality obligations in this Section 13.2 (*Proprietary Information*).

(d)     Public Information Disclosure Requirements-Related Obligations.

(i)     Operator acknowledges and agrees that any documents or other materials relating to this Agreement in Owner's or Administrator's possession may be considered public information subject to disclosure in accordance with applicable Public Information Disclosure Requirements. Operator shall then have the opportunity to either consent to the disclosure or assert its basis for non-disclosure and claimed exception under Applicable Law to Owner or Administrator within the time period specified in the notice issued by Owner or Administrator, which such time period shall be no less than two (2) Business Days unless otherwise required by Applicable Law. Notwithstanding the foregoing, Operator shall monitor requests for disclosure issued by Owner or Administrator and related proceedings, make any filings or submit any applicable responses in connection thereto on a timely basis, and notify Owner and Administrator of any documents or portions of documents that may be exempted from disclosure (including by marking as "CONFIDENTIAL"). Owner or Administrator may make filings or submit responses of its own concerning possible disclosure; provided, however, that if Operator provides notice that certain documents or portions of documents may be exempted from disclosure, then Owner and Administrator shall reasonably cooperate with Operator in such contest solely to the extent, in Owner's or Administrator's respective counsel's reasonable opinion, such cooperation would not cause Owner or Administrator to violate Applicable Law.

CONFIDENTIAL

(A)    Subject to Section 13.2(d)(i) (*Proprietary Information -- Public Information Disclosure Requirements-Related Obligations*) above, by entering this Agreement, Operator consents to, and expressly waives any right to contest, the provision by Owner or Administrator to Owner's or Administrator's counsel of all or any part of any documents or materials in Owner's or Administrator's possession in accordance with the Public Information Disclosure Requirements. Owner or Administrator shall have no responsibility or obligation for Operator's failure to respond or to respond timely to any request for disclosure in accordance with the Public Information Disclosure Requirements, and other than the obligations of Owner or Administrator expressly stated hereunder and subject to Section 13.2(d)(i) (*Proprietary Information -- Public Information Disclosure Requirements-Related Obligations*) above, Owner or Administrator shall not be required, except where required under Applicable Law, to wait for a response before making a disclosure or otherwise taking action under the Public Information Disclosure Requirements.

(B)    Under no other circumstances shall Owner or Administrator be responsible or liable to Operator or any other party as a result of disclosing any such documents or materials, including materials marked "CONFIDENTIAL", where the disclosure is required by Applicable Law or by an order of court.

(ii)    Nothing contained in this Section 13.2(d) (*Proprietary Information – Public Information Disclosure Requirements-Related Obligations*) shall modify or amend requirements and obligations imposed on Owner or Administrator by the Public Information Disclosure Requirements, and the provisions of the Public Information Disclosure Requirements shall control to the extent of a conflict with the procedures under this Agreement or Owner's or Administrator's obligations with respect to Confidential Information. Owner or Administrator shall not advise a submitting party or Operator as to the nature or content of documents or materials that may be entitled to protection from disclosure under the Public Information Disclosure Requirements, as to the interpretation thereof, or as to relevant definition (e.g., "trade secret").

(iii)    In the event of any proceeding or litigation concerning the disclosure of any documents or other materials in accordance with the Public Information Disclosure Requirements to third-parties, subject to the other provisions of this Section 13.2(d) (*Proprietary Information – Public Information Disclosure Requirements-Related Obligations*), Owner's or Administrator's sole involvement shall be as a stakeholder retaining the material until otherwise ordered by a Commonwealth Court or other court or authority having jurisdiction. Operator shall be responsible for prosecuting or defending any action, acting on its own behalf, concerning such documents or materials at its sole expense and risk; provided, however, that Owner or Administrator may intervene or participate in the litigation in such manner as it deems necessary or desirable.

**Section 13.3**  Data Security.

(a)    Cybersecurity Breaches. Operator shall comply with, and shall use commercially reasonable efforts to ensure that all Operator Related Parties and all Subcontractors comply with all Contract Standards and all requirements of Applicable Law regarding data security, cyber security and information security in respect of the Facility Information and related Information Systems. Operator shall promptly notify, and shall use commercially reasonable

CONFIDENTIAL

measures to ensure that all Operator Related Parties and Subcontractors promptly notify, Administrator and PREB (in writing) of any material Cybersecurity Breaches or any other material losses or theft of any data of which it has knowledge. At Administrator's direction, Operator shall (i) perform an analysis of the cause, (ii) remedy any Cybersecurity Breach including notification of consumers or government entities when required by Applicable Law, and (iii) cooperate fully with any civil or criminal authority in any investigation or action relating to such breach or attempted breach.

(b)      Cybersecurity Program. Without limiting the foregoing, Operator shall: (A) establish and maintain reasonable and appropriate organizational, administrative, physical and technical measures in place to maintain the security of and to protect the internal and external integrity of the Facility Information and related Information Systems against any unlawful or unauthorized use, processing, destruction, loss, alteration, disclosure, theft or access (including to any data or information contained in or stored on such systems); (B) establish and maintain backup, security and disaster recovery measures to safeguard the Facility Information and related Information Systems; (C) limit the risk of introducing or knowingly permitting the introduction of any virus, worm, bomb, Trojan horse, trap door, stop code or other harmful code, timer, clock, counter or other limiting design, instruction or routine, device, feature or function into the Facility Information and related Information Systems; and (D) require security audits, at a frequency consistent with industry standards, to assess and confirm compliance with this Section 13.3 (*Data Security*), (including using reputable third-party vendors to perform, penetration testing, cybersecurity audits and vulnerability assessments) and requires taking prompt measures to remedy any gaps that may be identified. Operator shall provide a summary of the security program as well as a copy of any written audit reports and remedial measures to Administrator and PREB, for their information to the extent not prohibited by Applicable Law. Any security audit information is Confidential Information of Owner, and neither Party shall disclose such security audit information without the consent of the other Party.

## Article 14
## EVENTS OF DEFAULT; REMEDIES

**Section 14.1**   Events of Default by Operator. Each of the following shall constitute an event of default by Operator (an "Operator Event of Default"):

(a)      Involuntary Bankruptcy. An involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of Operator or Guarantor or its debts, or of a substantial portion of its respective assets, under the Bankruptcy Code or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Operator or Guarantor or for a substantial portion of its assets, and, in any such case, such proceeding or petition shall continue undismissed for a period of sixty (60) or more days or an order or decree approving or ordering any of the foregoing shall be entered;

(b)      Voluntary Bankruptcy. Operator or Guarantor shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under the Bankruptcy Code, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in Section 14.1(a) (*Events of Default by Operator – Involuntary Bankruptcy*), (iii) apply for or consent to the appointment of a receiver,

CONFIDENTIAL

trustee, custodian, sequestrator, conservator or similar official for Operator or Guarantor or for a substantial portion of its respective assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(c)    <u>Failure to Provide or Maintain the Guarantee</u>. Operator shall fail to provide or maintain in full force and effect the Guarantee, which failure shall not be cured in a manner acceptable to Administrator within five (5) Business Days following receipt of written notice thereof;

(d)    <u>Failure to Perform a Material Obligation</u>. Operator shall fail to perform any material obligation, covenant, term or condition under this Agreement or Guarantor shall fail to perform any material obligation, covenant, term or condition under the Guarantee (in each case other than a payment obligation as provided in Section 14.1(e) (*Events of Default By Operator – Failure to Pay*)), which failure shall not be cured within sixty (60) days following receipt of written notice thereof by Administrator detailing the relevant failure and proposed cure; <u>provided</u>, <u>however</u>, that as long as Operator or Guarantor, as the case may be, is diligently attempting in good faith to cure such failure and it is reasonably expected that such failure is curable, then Operator or Guarantor, as the case may be, shall have an additional thirty (30) days to cure such default; <u>provided</u>, <u>further</u>, that any failure to perform which is not curable shall not be deemed an Operator Event of Default if (i) within sixty (60) days following receipt of written notice thereof, Operator or Guarantor shall have diligently and in good faith taken measures to prevent such failure to perform from recurring and (ii) such failure to perform which is not curable is not a recurring failure for the same issue as a prior failure to perform that has previously (A) occurred and (B) not been deemed an Operator Event of Default;

(e)    <u>Failure to Pay</u>. Except with respect to Failure to Pay Penalties (which are addressed in clause (k) below), Operator or Guarantor shall fail to pay any undisputed amount required to be paid by Operator under this Agreement or by Guarantor under the Guarantee, which failure shall not be cured within sixty (60) days following written notice thereof by Administrator; <u>provided</u> that if such payment relates to a Pass-Through Expenditure, an Operator Event of Default shall not be deemed to have occurred if sufficient funds for such payment are not available in the relevant Service Account;

(f)    <u>False or Inaccurate Representation or Warranty</u>. Any representation or warranty of Operator under this Agreement or any other document delivered in connection herewith or of Guarantor under the Guarantee shall prove to have been false, inaccurate or misleading in any material respect when made, and the legality of this Agreement or the Guarantee or the ability of Operator or Guarantor to carry out its obligations hereunder or thereunder shall thereby be materially and adversely affected, which condition shall not be cured within thirty (30) days following written notice thereof by Administrator;

(g)    <u>Failure to Obtain or Maintain Insurance</u>. Operator shall fail to obtain or maintain the Required Insurance specified in Section II of Annex XIII (*Insurance Specifications*), unless such failure is due to carrier insolvency or the fact that the Required Insurance is not available on commercially reasonable Terms (as defined in Section 10.2 (*Commercial Availability*)) but only for such period of time and to the extent specified in Section 10.2

(*Commercial Availability*) (in which case no failure shall be understood to have occurred), which failure shall not be cured within ten (10) Business Days following written notice thereof by Administrator;

(h)   <u>Change of Control</u>. A Change of Control of Operator that is not permitted by this Agreement or otherwise approved by Administrator in accordance with Section 21.6(c) (*Assignment and Transfer – Change of Control*) shall occur on or after the Effective Date;

(i)   <u>Illegal Transfer</u>. Operator shall enter into an agreement to, or shall assign, transfer, convey, lease, encumber or otherwise dispose of all or any portion of its rights or obligations under this Agreement other than (i) in accordance with the express terms of this Agreement and Applicable Law or (ii) with the consent of Administrator and PREB;

(j)   <u>Violation of Law</u>. Either (A) a court of competent jurisdiction shall have determined that Operator shall have violated any of the provisions of Article 3.2 of Act 2, (B) Operator shall be convicted by a court of competent jurisdiction, or (C) Operator shall enter a plea of *nolo contendere* with such court, in each case, resulting in a final, non-appealable judgment with respect to any of the crimes listed in Section 20.2(g)(i)(B) (*Representations and Warranties of Operator – Applicable Law Compliance*);

(k)   <u>Failure to Pay Penalties</u>. Operator or Guarantor shall fail to pay any one or more undisputed Penalties in the aggregate in excess of US$100,000 that are required to be paid by Operator under this Agreement or by Guarantor under the Guarantee, which failure shall not be cured within thirty (30) days following written notice thereof by Administrator (a "<u>Failure to Pay Penalties</u>"); or

(l)   <u>Failure to Meet Minimum Performance Threshold</u>. Following the Service Commencement Date, if Operator fails to meet the Minimum Performance Thresholds for two (2) consecutive Contract Years with respect to any of the following Incentives and Penalties standards: (i) availability and reliability, (ii) safety compliance, (iii) environmental compliance and (iv) decommissioning; <u>provided</u> that such failure to meet the Minimum Performance Thresholds shall not have been excused by a Force Majeure Event, a Forced Outage or Owner Fault (a "<u>Minimum Performance Threshold Default</u>").

**Section 14.2**   Termination for Operator Event of Default.

(a)   <u>Termination for Involuntary Bankruptcy, Voluntary Bankruptcy or Violation of Law</u>. Upon the occurrence of an Operator Event of Default under Section 14.1(a) (*Events of Default By Operator – Involuntary Bankruptcy*), Section 14.1(b) (*Events of Default By Operator – Voluntary Bankruptcy*) or Section 14.1(j) (*Events of Default By Operator – Violation of Law*), this Agreement shall immediately terminate without further action by Administrator, without need for a court decision or arbitral award confirming Administrator's right to terminate.

(b)   <u>Termination for Other Operator Event of Default</u>. Upon the occurrence of any other Operator Event of Default (and for so long as the same is continuing), Administrator may terminate this Agreement upon not less than one hundred twenty (120) days prior written notice to Operator, subject, to the extent required by Applicable Law, to the prior approval of PREB or the FOMB (if then in existence), without need for a court decision or arbitral award

CONFIDENTIAL

confirming Administrator's right to terminate; provided, however, that any such notice of termination with respect to an Operator Event of Default under Section 14.1(h) (*Events of Default By Operator – Change of Control*) must be given no later than thirty (30) days following Administrator's receipt of written notice from Operator of the occurrence of such Change of Control. If Administrator fails to give such notice to Operator within such thirty (30) day period, Administrator shall be deemed to have waived the Operator Event of Default with respect to such Change of Control and its termination rights with respect thereto (but not with respect to any subsequent Change of Control) shall expire and be of no further force or effect. For the avoidance of doubt, nothing in this Section 14.2 (*Termination for Operator Event of Default*) shall limit Operator's right to contest, pursuant to Article 15 (*Dispute Resolution*), whether an Operator Event of Default has occurred, or any of its other rights herein.

**Section 14.3**   Events of Default By Owner. Each of the following shall constitute an event of default by Owner (an "Owner Event of Default"):

(a)   Involuntary Bankruptcy. An involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of Owner or its debts, or of a substantial portion of its respective assets, under the Bankruptcy Code or other applicable insolvency statute or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Owner or for a substantial portion of its assets, and, in any such case, such proceeding or petition shall continue undismissed for a period of sixty (60) or more days or an order or decree approving or ordering any of the foregoing shall be entered; provided, however, that the pursuit by creditors of Owner of relief from the automatic stay extant pursuant to section 362(a) of the Bankruptcy Code in the current Title III Case for the purpose of seeking appointment of a receiver under applicable law shall not constitute an Owner Event of Default unless and until any such receiver is duly appointed;

(b)   Voluntary Bankruptcy. Owner shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under the Bankruptcy Code or other applicable insolvency statute (other than the current Title III Case), (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in Section 14.3(a) (*Events of Default By Owner – Involuntary Bankruptcy*), (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Owner or for a substantial portion of its respective assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(c)   Failure to Perform a Material Obligation. Owner shall fail to perform any material obligation, covenant, term or condition under this Agreement (other than a payment obligation as provided in Section 14.3(d) (*Events of Default By Owner – Failure to Pay Service Fee*) or Section 14.3(e) (*Events of Default By Owner – Failure to Pay Other Undisputed Amount*) or a failure to fund the Mobilization Account or Service Account, or as provided in Section 14.3(f) (*Events of Default By Owner – Failure to Fund Mobilization Account or Service Account*)), which failure shall not be cured within sixty (60) days following written notice thereof by Operator; provided, however, that as long as Owner is diligently attempting in good faith to cure such failure and it is reasonably expected that such failure is curable, then Owner shall have an additional thirty

CONFIDENTIAL

(30) days to cure such default; provided, further, that any failure to perform which is not curable shall not be deemed an Owner Event of Default if (i) within sixty (60) days following receipt of written notice thereof, Owner shall have diligently and in good faith taken measures to prevent such failure to perform from recurring and (ii) such failure to perform which is not curable is not a recurring failure for the same issue as a prior failure to perform that has previously (A) occurred and (B) not been deemed an Owner Event of Default;

(d)     Failure to Pay Service Fee. Owner shall fail to pay any undisputed Service Fees to be paid to Operator under this Agreement, which failure shall continue for thirty (30) days following written notice thereof by Operator;

(e)     Failure to Pay Other Undisputed Amount. Owner shall fail to pay any other undisputed amount required to be paid by Owner to Operator under this Agreement (other than as provided in Section 14.3(d) (*Events of Default By Owner – Failure to Pay Service Fee*)), which failure shall not be cured within sixty (60) days following written notice thereof by Operator;

(f)     Failure to Fund any Service Account. Owner shall fail (i) to initially fund any Service Account in an amount equal to the requisite funding for such Service Account pursuant to the then current applicable Budget(s) and in accordance with the other terms of this Agreement (including Section 7.6 (*Service Accounts*)) or (ii) to replenish any Service Account (other than the Reserve Account which is addressed in clause (iii) below) in an amount equal to at least one half (1/2) of the requisite funding for such Service Account pursuant to the then current applicable Budget(s) and in accordance with the other terms of this Agreement (including Section 7.6 (*Service Accounts*)) or (iii) to replenish the Reserve Account in accordance with the other terms of this Agreement (including Section 7.6(d)(ii) (*Service Accounts – Reserve Account*)), in each case of clauses (i), (ii) and (iii), which failure shall not be cured within five (5) Business Days following written notice thereof by Operator; or

(g)     False or Inaccurate Representation or Warranty. Any representation or warranty of Owner under this Agreement or any other document delivered in connection herewith shall prove to have been false, inaccurate or misleading in any material respect when made, and the legality of this Agreement or the ability of Operator to carry out its obligations hereunder shall thereby be materially and adversely affected, which condition shall not be cured within thirty (30) days following written notice thereof by Operator.

**Section 14.4**   Termination for Owner Event of Default. Upon the occurrence of an Owner Event of Default under Section 14.3 (*Events of Default By Owner*), Operator may terminate this Agreement upon not less than one hundred twenty (120) days prior written notice to Administrator, without need for a court decision or arbitral award confirming Operator's right to terminate; provided that upon the occurrence of an Owner Event of Default under Section 14.3(f) (*Events of Default By Owner – Failure to Fund any Service Account*) relating to funding of a Service Account, upon written notice from Operator, the Agreement shall terminate and, subject to Article 17 (*Demobilization*), Operator's obligation to perform the Mobilization Services, the O&M Services, the Decommissioning Services or the Demobilization Services, as applicable, shall cease, upon the earlier of (i) the date that is one hundred twenty (120) days following the date on which Administrator receives written notice from Operator, (ii) the date that is sixty (60) days following the date on which Administrator receives written notice from Operator that there is no funding in

the Mobilization Account, or (iii) the date that is sixty (60) days following the date on which Administrator receives written notice from Operator that there is no funding in any Service Account other than the Mobilization Account, in each case without need for a court decision or arbitral award confirming Operator's right to terminate. For the avoidance of doubt, nothing in this Section 14.4 (*Termination for Owner Event of Default*) shall limit Owner's right to contest, pursuant to Article 15 (*Dispute Resolution*), whether an Owner Event of Default has occurred, or any of its other rights herein. Owner agrees the automatic stay extant in the Title III Case pursuant to section 362(a) of the Bankruptcy Code shall not apply to the exercise by Operator of its termination rights or other remedies under this Section 14.4 (*Termination for Owner Event of Default*), Section 14.5 (*Additional Termination Rights*) or Section 14.6 (*Remedies Upon Early Termination*).

**Section 14.5**    Additional Termination Rights.

(a)    <u>Failure of Service Commencement Date Conditions</u>. As set forth in Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*), each of Administrator and Operator shall have the right to terminate this Agreement for failure to satisfy the Service Commencement Date Conditions, in accordance with and subject to the terms set forth in Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*) in all respects.

(b)    <u>Extended Force Majeure Event</u>. Each of Administrator and Operator shall have the right to terminate this Agreement upon not less than one hundred twenty (120) days' prior written notice to Operator or Administrator, respectively, in the event that a Force Majeure Event continues for a period in excess of eighteen (18) consecutive months and materially interferes with, delays or increases the cost of the Mobilization Services, the O&M Services, the Decommissioning Services or the Demobilization Services.

(c)    <u>Change in Regulatory Law</u>. Operator shall have the right to terminate this Agreement upon not less than one hundred twenty (120) days' prior written notice to Administrator in the event of a Change in Regulatory Law.

(d)    <u>Revocation of Procurement Manual</u>. Operator shall have the right to terminate this Agreement upon not less than two hundred seventy (270) days' prior written notice to Administrator in the event that the Procurement Manual is revoked and not replaced within such period by a procurement manual that is mutually agreed by the Parties.

**Section 14.6**    Remedies Upon Early Termination.

(a)    <u>Accrued and Unpaid Amounts</u>. In the event of an early termination of this Agreement for any reason, as of the effective date of such termination (i) Owner shall pay Operator any accrued and unpaid amounts required to be paid by Owner under this Agreement, including the Mobilization Service Fee, the Pass-Through Expenditures, the O&M Fixed Fee, and the Incentive Payment, in each case, as of the effective date of such termination and (ii) Operator shall pay Owner (A) any accrued and unpaid Penalties and (B) any penalties, fines or moneys incurred

CONFIDENTIAL

by Operator and owed to Governmental Bodies for violations of Applicable Law, including Environmental Law.

(b)     Pass-Through Expenditure; Demobilization Service Fee. In the event of an early termination of this Agreement for any reason (including pursuant to Section 14.2, (*Termination for Operator Event of Default*), Section 14.4 (*Termination for Owner Event of Default*) or Section 14.5 (*Additional Termination Rights*)), (i) Owner shall pay or reimburse Operator all Pass-Through Expenditure accruing after the date of such early termination that cannot reasonably be avoided by Operator and (ii) subject to all terms of Article 7 (*Compensation; O&M Budgets*), notwithstanding the termination of this Agreement for all other purposes, Operator shall complete the Demobilization Services for each Legacy Generation Asset promptly following such termination, and Owner shall pay Operator all amounts required to be made hereunder with respect to such Demobilization Services.

(c)     Termination Fee.

(i)     In the event this Agreement is (A) terminated, revoked, nullified, cancelled or otherwise rendered invalid by any duly enacted law of the Commonwealth, as determined by a final non-appealable judgment by a court of competent jurisdiction (a "Contract Nullification or Cancellation") or (B) terminated by Operator pursuant to Section 14.5(c) (*Additional Termination Rights – Change in Regulatory Law*), but only if such termination is as a result of the circumstances described in clauses (ii) or (iii) of the definition of "Change in Regulatory Law", Owner shall pay Operator the Operator Termination Fee set forth in Section I of Annex XIV (*Termination Fees – Operator Termination Fee*) (the "Operator Termination Fee"). For the avoidance of doubt, (x) Owner shall have no obligation to pay the Operator Termination Fee other than in the circumstances described in clauses (A) and (B) of the preceding sentence and (y) the "resolution" of this Agreement pursuant to Act 2 as described under Section 14.1(j) (*Events of Default by Operator - Violation of Law*) shall not be considered a Contract Nullification or Cancellation.

(ii)     In the event of an early termination of this Agreement by Administrator due to a Failure to Pay Penalties or a Minimum Performance Threshold Default, Operator shall pay Owner the amount set forth in Section II of Annex XIV (*Termination Fees – Owner Termination Fee*) (the "Owner Termination Fee"). For the avoidance of doubt, Operator shall have no obligation to pay the Owner Termination Fee other than in the event of an early termination of this Agreement by Administrator due to a Failure to Pay Penalties or a Minimum Performance Threshold Default.

(iii)     The Parties hereby acknowledge and agree that, notwithstanding anything to the contrary in this Agreement:

(A)     if this Agreement is (1) terminated due to a Contract Nullification or Cancellation, (2) terminated by Operator pursuant to Section 14.5(c) (*Additional Termination Rights – Change in Regulatory Law*) (but only if such termination is as a result of the circumstances described in clauses (ii) or (iii) of the definition of "Change in Regulatory Law"), Operator's damages would be difficult or impossible to quantify with reasonable certainty, and accordingly, the payment to Operator of the Operator Termination Fee (x) is a payment of

CONFIDENTIAL

liquidated damages (and not penalties), which is based on the Parties' estimate of damages Operator would suffer or incur, and (y) shall constitute Operator's sole and exclusive remedy for all monetary damages, costs, losses and expenses of whatever type or nature arising from or related to this Agreement due to the events described in clauses (1) and (2) of this sentence; provided, however, that the foregoing shall not limit Operator's right to receive any payments or reimbursements required to be made under any other provision of this Agreement with respect to any period prior to or after the termination of this Agreement; and

(B)    if this Agreement is terminated by Administrator due to a Failure to Pay Penalties or a Minimum Performance Threshold Default, Owner's damages would be difficult or impossible to quantify with reasonable certainty, and accordingly, the payment to Owner of the Owner Termination Fee (x) is a payment of liquidated damages (and not penalties), which is based on the Parties' estimate of damages Owner would suffer or incur, and (y) shall constitute Owner's sole and exclusive remedy for all monetary damages, costs, losses and expenses of whatever type or nature arising from or related to termination of this Agreement due to a Failure to Pay Penalties or a Minimum Performance Threshold Default.

(iv)    Each of Operator and Owner hereby irrevocably waives any right it may have to raise as a defense that the Owner Termination Fee and Operator Termination Fee, respectively, are excessive or punitive.

(d)    <u>Additional Remedies</u>. The Parties agree that (i) except as otherwise provided in this Agreement (including the sole and exclusive remedies set forth in Section 4.1(c) (*Mobilization Period Generally – Administrative Expense Treatment*), Section 4.8 (*Failure of Service Commencement Date Conditions*) and Section 14.6(c) (*Remedies Upon Early Termination – Termination Fee*)) in which cases the remedy specified in such provision shall be the sole remedy available and (ii) subject to the limitations set forth in Section 19.3 (Limitation on Liability), in the event that the Agreement is terminated early due to an Event of Default in accordance with the terms hereof, any Party may exercise any rights it has under this Agreement and under Applicable Law to recover damages, secure specific performance or obtain injunctive relief.

(e)    <u>Debarment</u>. Upon the termination of this Agreement pursuant to Section 14.2 (*Termination for Operator Event of Default*), Operator shall be disqualified from contracting with any Commonwealth Governmental Body for ten (10) years in accordance with Section 10(a)(15)(c) of Act 29.

## Article 15
## DISPUTE RESOLUTION

**Section 15.1**   Scope. Except as otherwise expressly provided in this Agreement, any dispute among the Parties arising out of, relating to or in connection with this Agreement or the existence, interpretation, breach, termination or validity thereof (a "<u>Dispute</u>") shall be resolved in accordance with the procedures set forth in this Article 15 (*Dispute Resolution*), which shall constitute the sole and exclusive procedures for the resolution of such Disputes (the "<u>Dispute Resolution Procedure</u>"), including as to the validity of any termination or effective date of any termination. Operator acknowledges and agrees that Administrator (or any Designated Person appointed by Administrator) shall be authorized to participate in or act for and on behalf of Owner

in any Dispute Resolution Procedure contemplated by this Article 15 (*Dispute Resolution*). For the avoidance of doubt, the Dispute Resolution Procedures set forth in this Agreement shall not apply to any dispute between a Party and PREB, which disputes shall be subject to resolution in accordance with Applicable Law. Notwithstanding anything to the contrary herein, in the event that Operator disagrees with a decision of PREB, nothing shall prejudice, limit or otherwise impair Operator's right to exercise its rights pursuant to Act No. 38 of June 30, 2017 and Section 6.5(c) of Act 57.

**Section 15.2**   Commencement of the Dispute Resolution Procedure.

(a)   Notice. If a Dispute arises, any Party may initiate the Dispute Resolution Procedure by giving a written notice of the Dispute to the other Party (a "Notice of Dispute"). The Notice of Dispute shall contain a brief statement of the nature of the Dispute, set out the relief requested and request that the Dispute Resolution Procedure of this Article 15 (*Dispute Resolution*) be commenced. Notwithstanding the foregoing, if either Party elects to proceed to litigation of a Technical Dispute pursuant to Section 15.4(e) (*Expert Technical Determination Procedure for Technical Disputes – Election*), then only the provisions of Section 15.6 (*Litigation as a Final Resort*) shall apply to any such dispute.

(b)   Tolling. Any limitation period imposed by this Agreement or by Applicable Law in respect of a Dispute shall be tolled upon the delivery of a Notice of Dispute pursuant to this Section 15.2 (*Commencement of the Dispute Resolution Procedure*) for the duration of any Dispute Resolution Procedure pursuant to this Article 15 (*Dispute Resolution*).

**Section 15.3**   Negotiation.

(a)   Generally. Upon receipt of a Notice of Dispute from a Party, the Parties shall refer the Dispute to the Designated Person of each Party. The Designated Persons shall negotiate in good faith and attempt to resolve the Dispute within thirty (30) days after the date on which the Notice of Dispute was issued, or such longer period as the Designated Persons may otherwise agree. All communications, negotiations and discussions pursuant to this Section 15.3 (*Negotiation*) shall be (i) confidential, (ii) without prejudice privileged, (iii) treated as compromise settlement discussions and negotiations and (iv) not used, offered or admissible as evidence in any subsequent proceeding without the mutual consent of the Parties. If the Dispute is an O&M Budget Dispute or Decommissioning Budget Dispute, then during the Negotiation Period the Designated Persons may agree to refer such Dispute to an Independent Expert appointed in accordance with the procedures set forth in Section 15.4(b)(i) (*Expert Technical Determination Procedure for Technical Disputes – Procedures*) for a non-final, non-binding determination.

(b)   Negotiation Period.

(i)   If the Dispute remains unresolved thirty (30) days after the Notice of Dispute is issued (or such longer period as Operator and Administrator may mutually agree in writing) (the "Negotiation Period"), then any Mobilization Service Fee Estimate Dispute, Mobilization Service Fee Dispute, Demobilization Service Fee Estimate Dispute, Demobilization Service Fee Dispute, Handover Checklist Dispute, Administrator Dispute, Service Fee Dispute, O&M Budget Dispute, Decommissioning Budget Dispute, Service Account Dispute, Disallowed

CONFIDENTIAL

Costs Dispute or Force Majeure Event Dispute (each a "Technical Dispute"), or any engineering or technical dispute Operator and Administrator mutually agree in writing is a Technical Dispute shall be referred to the Expert Technical Determination procedure set forth in Section 15.4 (*Expert Technical Determination Procedure for Technical Disputes*) for a final and binding determination.

(ii)    If the Dispute, other than a Technical Dispute, remains unresolved after the end of the Negotiation Period, then the Dispute shall proceed to mediation pursuant to Section 15.5 (*Mediation*), and if necessary, litigation pursuant to Section 15.6 (*Litigation as a Final Resort*), for a final and binding determination.

Section 15.4    Expert Technical Determination Procedure for Technical Disputes.

(a)    Generally. Any Technical Disputes unresolved within the Negotiation Period shall, subject to Section 15.4(e) (*Expert Technical Determination Procedure for Technical Disputes – Election*), be referred to an independent expert (the "Independent Expert") for a final and binding expert determination ("Expert Technical Determination"); provided that if an O&M Budget Dispute or Decommissioning Budget Dispute was referred to an Independent Expert pursuant to Section 15.3(a) (*Negotiation – Generally*), then the parties may agree to retain such Independent Expert or to appoint a new Independent Expert in accordance with the procedure set forth in Section 15.4(b)(i) (*Expert Technical Determination Procedure for Technical Disputes – Procedures*) to perform the Expert Technical Determination.

(b)    Procedures.

(i)    For the purposes of this Section 15.4 (*Expert Technical Determination Procedure for Technical Disputes*), the Independent Expert shall be a reputable Person or Persons possessing expert knowledge and experience for the Expert Technical Determination of the Technical Dispute in question and shall be independent of and impartial as among the Parties. Operator and Administrator shall, in the first instance, attempt to agree on an Independent Expert through their respective Designated Persons. If Operator and Administrator cannot so agree within ten (10) days after the end of the Negotiation Period, the Parties shall promptly (and in any event within five (5) Business Days) apply to the ICC International Centre for ADR (the "ICC") for the appointment of an Independent Expert in accordance with the ICC Rules for the Appointment of Experts and Neutrals.

(ii)    Once selected by Operator and Administrator, neither Party shall communicate independently with the expert, and all communications the Parties make with the Independent Expert must be simultaneously copied to all other Parties.

(iii)    The Independent Expert shall, in consultation with the parties, determine the procedure to be undertaken in the Expert Technical Determination. The Independent Expert shall determine the Technical Dispute within sixty (60) days after his or her appointment or as otherwise agreed by the Parties. This sixty (60) day time period may be extended by the Independent Expert or by the agreement of the Parties. A failure to determine the matter within sixty (60) days shall not be a ground to challenge any award or determination by the Independent Expert.

CONFIDENTIAL

(iv)    The determination by the Independent Expert on any Technical Dispute shall be final and binding on the Parties hereto, and Owner or Operator, as applicable, shall pay any amounts due to the other Party pursuant to such determination, together with interest pursuant to Section 21.7 (*Interest on Overdue Obligations*) (as applicable), within five (5) Business Days of the Independent Expert's determination. The costs of the Independent Expert shall be borne by Operator (and, for the avoidance of doubt, shall not be a Pass-Through Expenditure), to the extent that the Independent Expert resolves any dispute in Owner's favor, and by Owner, to the extent that the Independent Expert resolves any dispute in Operator's favor, or as determined by the Independent Expert if the dispute is not resolved entirely in favor of Owner or Operator. Notwithstanding any other provisions of this Article 15 (*Dispute Resolution*), enforcement of any determination of an Independent Expert may be sought by either of the Parties before any court of competent jurisdiction. To the extent permitted by law, any rights to appeal from or cause a review of any such determination by any Independent Expert are hereby waived by the Parties.

(c)    <u>Not an Arbitrator</u>. The Independent Expert is not an arbitrator and shall not be deemed to be acting in an arbitral capacity.

(d)    <u>Confidentiality</u>. The Parties agree that any Expert Technical Determination carried out pursuant to this Section 15.4 (*Expert Technical Determination Procedure for Technical Disputes*) shall be kept private and confidential, and that the existence of the Expert Technical Determination and any element of it (including the identity of the Parties, the identity of all witnesses and experts who may be called upon in the Expert Technical Determination, all materials created for the purposes of the Expert Technical Determination, all testimony or other oral submissions in the Expert Technical Determination, and all documents produced by a Party in connection with an Expert Technical Determination that were not already in the possession of the other Party) shall be kept confidential, except (i) with the consent of the Parties, (ii) to the extent disclosure may be lawfully required in *bona fide* judicial proceedings relating to the Expert Technical Determination, (iii) where disclosure is lawfully required by a legal duty; <u>provided</u>, <u>however</u>, that where a Party is required to produce confidential information pursuant to a legal duty it shall provide the other Party prompt written notice of such requirement and not object to any effort by the other party to intervene in any applicable legal proceedings to seek to prevent the confidential information from being produced and (iv) where such information is already in the public domain other than as a result of a breach of this clause. The Parties also agree not to use any information disclosed to them during the Technical Dispute for any purpose other than in connection with the Expert Technical Determination.

(e)    <u>Election</u>. Any Technical Dispute with a disputed value equal to or in excess of US$10 million will proceed to litigation pursuant to Section 15.6 (*Litigation as a Final Resort*) at the election of either Party at the time the Technical Dispute is initiated.

**Section 15.5**   Mediation.

(a)    <u>Generally</u>. If a Dispute, other than a Technical Dispute, remains unresolved after the Negotiation Period, either Operator or Administrator may refer the Dispute to mediation through a written notice of mediation (the "<u>Notice of Mediation</u>"). Each Party to this Agreement agrees that it may not initiate a civil action as provided in Section 15.6 (*Litigation as a Final*

CONFIDENTIAL

*Resort*) (other than provisional relief sought on an expedited basis) unless (i) the matter in question has first been submitted to mediation in accordance with the provisions of this Section 15.5(a) (*Mediation – Generally*) or (ii) such Party would be barred from asserting its claim in a civil action if it were required to submit to mediation pursuant to Section 15.3 (*Negotiation*).

        (b)    <u>Procedures</u>.

        (i)    The Parties shall, in the first instance, attempt to agree on a mediator through their respective Designated Persons. If the Parties cannot so agree within thirty (30) days after the Notice of Mediation is sent, either of the Parties may promptly apply to the ICC for appointment of a single mediator in accordance with the Mediation Rules of the International Chamber of Commerce (the "<u>Mediation Rules</u>"). Absent any written agreement to the contrary by the Parties, the mediator shall be an attorney or mediator authorized to practice law in the United States or the Commonwealth of Puerto Rico and shall be independent of and impartial as among the Parties. The mediator shall be paid for the mediation services, and shall be reimbursed for all reasonable and documented out-of-pocket costs incurred in carrying out the mediation duties hereunder, including the costs of consultants. All Fees-and-Costs of the mediation shall be shared equally by the Parties (and, for the avoidance of doubt, shall not be a Pass-Through Expenditure). The Parties shall request that the mediator schedule the mediation within thirty (30) days of the mediator's appointment, and shall comply with all procedures the mediator establishes for the conduct of the mediation. Absent any written agreement to the contrary by the Parties, if the Dispute is not resolved within ninety (90) days of the Notice of Mediation, the mediation shall be terminated.

        (ii)    For the avoidance of doubt, absent the written agreement of the Parties, the Mediation Rules shall not apply to any mediation carried out pursuant to this Section 15.5(b) (*Mediation – Procedures*). Rather, the reference to the ICC and the Mediation Rules above should be understood as referring solely to the designation of the ICC as an appointing authority to appoint a mediator pursuant to the procedures set forth in the Mediation Rules in the event the Parties are unable to agree on a mediator within the timeframe specified.

        (c)    <u>Confidentiality</u>. The Parties agree that any mediation carried out pursuant to this Section 15.5(b) (*Mediation – Procedures*) shall be kept private and confidential, and that the existence of the mediation and any element of it (including the identity of the Parties, the identity of all witnesses and experts who may be called upon at the mediation, all materials created for the purposes of the mediation, all testimony or other oral submissions at the mediation, and all documents produced by a Party in connection with a mediation that were not already in the possession of the other Party) shall be kept confidential, except (i) with the consent of the Parties, (ii) to the extent disclosure may be lawfully required in *bona fide* judicial proceedings relating to the mediation, (iii) where disclosure is lawfully required by a legal duty; <u>provided</u>, <u>however</u>, that where a Party is required to produce confidential information pursuant to a legal duty, it shall provide the other Party prompt written notice of such requirement and not object to any effort by the other Party to intervene in any applicable legal proceedings to seek to prevent the confidential information from being produced, and (iv) where such information is already in the public domain other than as a result of a breach of this clause. The Parties also agree not to use any information disclosed to them during the mediation for any purpose other than in connection with the mediation.

CONFIDENTIAL

**Section 15.6**   Litigation as a Final Resort.

(a)   <u>Civil Action</u>. In the event that the Parties fail to resolve any Dispute, other than a Technical Dispute, within ninety (90) days after the date the mediator is selected pursuant to the procedures set forth in Section 15.5(b) (*Mediation – Procedures*) (or such longer period as the Parties may mutually agree), either Party may initiate a civil action in the Commonwealth Court and in accordance with all applicable rules of civil procedure. In the event that either Party elects to immediately proceed to litigation of a Technical Dispute pursuant to Section 15.4(e) (*Expert Technical Determination Procedure for Technical Disputes –. Election*), either Party may initiate a civil action in the Commonwealth Court and in accordance with all applicable rules of civil procedure. The Parties acknowledge and understand that, to resolve any and all claims arising out of this Agreement, they may file a civil action, including actions in equity, in the Commonwealth Court. Owner and Operator each irrevocably consents to the exclusive jurisdiction of such court in any such actions or proceedings, waives any objection it may have to the jurisdiction of any such action or proceeding, as well as objections or defenses based on sovereign immunity. The Parties acknowledge and agree that the terms and conditions of this Agreement have been freely, fairly and thoroughly negotiated.

(b)   <u>Costs and Expenses</u>. Except as required by Operator's indemnity obligations under Section 19.1 (*Indemnification by Operator*), each Party shall bear its own costs and expenses in any Legal Proceeding where it is the named defendant or in any Legal Proceeding among the Parties (and, for the avoidance of doubt, such costs and expenses shall not be a Pass-Through Expenditure). Notwithstanding the foregoing, each Party retains its rights to bring any Legal Proceeding or to implead the other Party as to any matter arising hereunder.

**Section 15.7**   Waiver of Jury Trial. EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING BROUGHT UNDER THIS AGREEMENT. Each Party (i) certifies that no representative of any other Party has represented, expressly or otherwise, that such other Party would not, in the event of litigation, seek to enforce the foregoing waiver, and (ii) acknowledges that it and each other Party has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Agreement.

**Section 15.8**   Provisional Relief. Notwithstanding any other provision in this Agreement, no Party shall be precluded from initiating a proceeding in the Commonwealth Court for the purpose of obtaining any emergency or provisional remedy to protect its rights that may be necessary and that is not otherwise available under this Agreement, including temporary and preliminary injunctive relief, restraining orders and other remedies to avoid imminent and irreparable harm to provide uninterrupted electrical and other services or preserve the status quo pending the conclusion of such negotiation, mediation or litigation. The commencement of or participation in an action for provisional relief with regard to Technical Disputes shall not constitute a waiver of the requirements or procedures of Section 15.5 (*Mediation*).

**Section 15.9**   Continuing Obligations. The Parties agree that during the resolution of a Dispute pursuant to the Dispute Resolution Procedure, the Parties shall continue to perform their obligations under this Agreement; provided that such performance shall (i) be without prejudice

CONFIDENTIAL

to the rights and remedies of any of the Parties and (ii) not be read or construed as a waiver of a Party's right to claim for recovery of any loss, costs, expenses or damages suffered as a result of the continued performance of this Agreement.

## Article 16
## DECOMMISSIONING

**Section 16.1**   Notice and Approval for Retirement of Legacy Generation Assets and Commencement of Decommissioning Services.

(a)   <u>Generally</u>. After the Service Commencement Date (i) Administrator (acting on behalf of Owner and taking into account the Integrated Resource Plan, and in consultation with PREB and T&D Operator) may deliver to Operator a decommissioning notice to commence Decommissioning Services for one or more of the Legacy Generation Assets or (ii) in the event that Operator determines in accordance with Prudent Industry Practice and taking into account the Integrated Resource Plan, and in consultation with PREB and T&D Operator that, due to an Emergency Event, Extended Event or other critical developments at the applicable Legacy Generation Asset, all or a portion of the Legacy Generation Asset cannot continue to be safely operated and maintained, Operator may deliver to Administrator and PREB (with copy to Owner and T&D Operator) a request to commence Decommissioning Services for the applicable Legacy Generation Asset, which request Administrator and PREB shall approve or deny within thirty (30) days of receipt. The date on which Operator receives the notice referenced in clause (i) above or the date on which Operator receives the approval from Administrator and PREB referenced in clause (ii) above shall be the "<u>Decommissioning Notification Date</u>" for the respective Legacy Generation Asset. Operator shall not commence any Decommissioning Services under clause (ii) above until it has provided T&D Operator at least two (2) years advance written notice of the commencement of such Decommissioning Services, unless mandated by PREB to commence such Decommissioning Services on a specific earlier date.

(b)   <u>Decommissioning Plan</u>. No later than one hundred twenty (120) days after the Decommissioning Notification Date for a Legacy Generation Asset, Operator shall prepare and submit to Administrator and PREB (with copy to Owner and T&D Operator), for their review and approval, a decommissioning plan for such Legacy Generation Asset (the "<u>Decommissioning Plan</u>") consistent with the Decommissioning Plan outline set forth in Annex XV (*Decommissioning Plan*). The Decommissioning Plan shall provide for (i) the permitting, demolition, Decontamination, waste disposal and dismantling/or preparation for conversion to such other future use as Administrator and PREB may designate, as applicable, of the Legacy Generation Asset, and waste disposal, for achievement of end-state conditions within a prescribed time (<u>provided</u> that Operator does not have any obligation to perform Decommissioning Services after the expiration of the Term unless the Agreement is extended by Owner and Administrator to allow Operator to complete such services), (ii) the development of the Decommissioning Budget, as set forth in Section 16.2 (*Decommissioning Compensation*) below, (iii) reasonably acceptable arrangements to facilitate the transition of Operator Employees, who meet certain qualifications at such Legacy Generation Asset and whose positions will be eliminated after the completion of the Decommissioning Services, into new jobs or industries, including a training and/or severance plan (to be funded by Owner) for any Operator Employees not hired into a successor job or industry, which arrangements Operator, Owner and Administrator shall cooperate as needed to implement,

CONFIDENTIAL

and (iv) a timeline setting forth when Decommissioning Services shall be provided, including the date on which the Decommissioning Services shall commence (the "Decommissioning Commencement Date") and the date on which the Decommissioning Services for such Legacy Generation Asset shall be completed (the "Decommissioning Completion Date").

(c)     Out-of-Service Units. On or after the Service Commencement Date, Administrator (acting on behalf of Owner) may deliver to Operator a decommissioning notice to proceed regarding one or more of the Out-of-Service Units. Operator shall prepare the Decommissioning Plan for such Out-of-Service Unit in accordance with Section 16.1(b) (*Notice and Approval for Retirement of Legacy Generation Assets and Commencement of Decommissioning Services – Decommissioning Plan*).

**Section 16.2**     Decommissioning Compensation.

(a)     Decommissioning Budget. As part of Operator's Decommissioning Plan, Operator shall create a budget of the Pass-Through Expenditures required to perform the Decommissioning Services for the applicable Legacy Generation Asset, including monthly budgets of such expenditures and cash flows for each applicable Contract Year during which the Decommissioning Services are expected to be provided (such budget, as amended or adjusted from time to time, the "Decommissioning Budget"). Unless otherwise approved by PREB, such Decommissioning Budget shall not exceed the sum of all costs related to the performance of the O&M Services for such Legacy Generation Asset, including the O&M Fixed Fee Adjustment as set forth in Section I of Annex II (*Compensation – O&M Fixed Fee*), which shall be reflected in the amended Operating Budget as described in Section 7.3(e)(ii) (*O&M Budgets – Amendments to the Operating Budget*). Operator shall submit the Decommissioning Budget to Administrator and PREB (with copy to Owner) as part of the Decommissioning Plan, which Decommissioning Budget shall propose the basis and methodology to determine cost savings, including the Incentive and Penalty for Decommissioning Costs Efficiency set forth in Section III.C.1 of Annex II (*Compensation – Incentives and Penalties*). Within thirty (30) days following its receipt of the Decommissioning Budget, Administrator shall notify Operator whether the proposed Decommissioning Budget is compliant with Section 16.2(b) (*Decommissioning Compensation – Decommissioning Budget Policy*), and shall request, acting reasonably, any changes or modifications to the proposed Decommissioning Budget to conform the proposed Decommissioning Budget with Section 16.2(b) (*Decommissioning Compensation – Decommissioning Budget Policy*). Within ten (10) days following receipt of Administrator's request for changes or modifications, if applicable, Operator shall submit to Administrator a revised Decommissioning Budget including such changes or modifications requested by Administrator.

(b)     Decommissioning Budget Policy. The Decommissioning Budget shall be designed to be adequate in both scope and amounts to reasonably assure that Operator is able to carry out the related Decommissioning Services in accordance with the parameters promulgated by PREB for such Legacy Generation Asset, if applicable, and the Contract Standards. The Parties further acknowledge and agree that, from time to time, it may be necessary or appropriate to amend or otherwise adjust the Decommissioning Budget or the related Incentives and Penalties as a result of (i)Force Majeure Events, (ii) Owner Fault or (iii) additional requirements imposed by Owner, Administrator or any other Governmental Body after approval of the Decommissioning Budget,

CONFIDENTIAL

in the case of each of clauses (i) to (iii) which (A) have resulted (or are reasonably likely to result) in schedule delays or increased work scope or costs and (B) are not be attributable to Operator's gross negligence or willful misconduct. Operator shall provide notice to Administrator promptly following the occurrence of an event contemplated above and the Parties shall, in good faith and acting reasonably, consider necessary adjustments to the Decommissioning Budget or the related Incentives and Penalties. Notwithstanding the foregoing, any such adjustments shall be compliant with the then-applicable Rate Order.

(c)     Decommissioning Budget Disputes. The Parties hereby agree that, in the event that a dispute arises between Operator, Owner and Administrator in connection with a Decommissioning Budget submitted with the respective Decommissioning Plan (including proposed amendments thereto or the need for amendments thereto), the matter shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, a "Decommissioning Budget Dispute").

(d)     Decommissioning Payments. Owner shall pay Operator all Pass-Through Expenditures required to perform the Decommissioning Services and shall continue to pay the O&M Fixed Fee in full (subject to any applicable O&M Fixed Fee Adjustment) for the duration of the Term, notwithstanding the commencement of Decommissioning Services with respect to any Legacy Generation Assets prior to the end of the Term. Operator shall be entitled to earn an Incentive Payment or shall incur a Penalty based on Operator's performance of the Decommissioning Services in accordance with the Incentives and Penalties, as set forth in Section 7.1(c) (*Service Fee – Incentive and Penalties*).

(e)     Funding. Owner shall establish the Decommissioning Account in accordance with Section 7.6(c) (*Service Accounts – Decommissioning Account*).

## Article 17
## DEMOBILIZATION

**Section 17.1**   Demobilization Services.

(a)     Generally. Subject to Section 17.1(d) (*Demobilization Services – Demobilization Expiry Date*) and Section 17.3(c)(ii) (*Demobilization Period Compensation – Funding*), upon (i) Operator's receipt of a termination notice from Owner or Administrator's receipt of a termination notice from Operator, in each case under Article 14 (*Events of Default; Remedies*) or (ii) six (6) months prior to the expiry of the later of (A) the Initial Term or (B) the Extension Term (such date, the "Demobilization Commencement Date"), Operator, in addition to providing any remaining O&M Services and/or Decommissioning Services, as applicable, shall (1) perform the Demobilization Services specified in the Demobilization Plan, and (2) commence preparations for an orderly surrender of the Generation Sites and any remaining Legacy Generation Assets to Owner or Administrator (or their designee). In the event of an early termination of this Agreement pursuant to Article 14 (*Events of Default; Remedies*), Operator shall reasonably cooperate with Administrator during any procurement process to identify a successor operator.

(b)     Demobilization Plan. No later than thirty (30) days after the Demobilization Commencement Date, Operator shall prepare and submit to Administrator (with copy to Owner

CONFIDENTIAL

and PREB), for its information and approval, a detailed demobilization plan consistent with the Demobilization Plan outline set forth in Annex XVI (*Demobilization Plan*), which plan shall (i) in the event of the early termination of this Agreement, include reasonably acceptable arrangements to facilitate the transition of Operator Employees, who meet certain qualifications at such Legacy Generation Asset and whose positions will be eliminated after the completion of the Demobilization Services, into new jobs or industries, including (A) the possible hiring of Operator Employees by a successor operator and (B) a training and/or severance plan (to be funded by Owner) for any Operator Employees not hired into a successor job or industry, which arrangements Operator, Owner and Administrator shall cooperate as needed to implement, and (ii) provide for the transfer and handover of the rights and responsibilities with respect to the Generation Sites and any remaining Legacy Generation Assets back to Owner or to a successor operator upon the expiration or early termination of the Term (the "Demobilization Plan"). Regardless of whether the Demobilization Plan is prepared pursuant to clause (i) or (ii), the Demobilization Plan shall include a decommissioning report detailing (1) the status of each of the Legacy Generation Assets for which Decommissioning Services were or are being performed, (2) the condition of each of the Legacy Generation Assets in operation and (3) all notifications given pursuant to each, and retirements of, applicable permits with respect to each Legacy Generation Asset.

(c)     Successor Operator. In the event that the Demobilization Commencement Date occurs pursuant to clause 17.1(a) (*Demobilization Services – Generally*), Administrator, on behalf of Owner, shall initiate efforts, including such procurement process as may be required, to identify and select a successor operator as promptly as practicable. Operator shall have the right to submit a proposal in such procurement on the same basis as other proponents. For the avoidance of doubt, if this Agreement is terminated prior to the Service Commencement Date, the Demobilization Commencement Date shall not occur.

(d)     Demobilization Expiry Date. Operator shall have no obligation to continue performing any Demobilization Services as of the earlier of (i) the date which is twelve (12) months following the expiration or early termination of the Term and (ii) the date on which there are no funds available in the Demobilization Account, without a need for a court decision or arbitral award confirming Operator's right to terminate.

(e)     Surrender of the Legacy Generation Assets. Upon completion or the earlier expiration of the obligation to provide the Demobilization Services in accordance with this Article 17 (*Demobilization*), Operator and, if and to the extent Administrator requests, its Subcontractors shall peaceably leave and surrender any remaining Legacy Generation Assets to Owner or its designee in a condition consistent with Operator's responsibilities hereunder. For the avoidance of doubt, if the early termination of this Agreement pursuant to Article 14 (*Events of Default; Remedies*) occurs prior to the decommissioning of each and every Legacy Generation Asset, Operator shall surrender each remaining Legacy Generation Asset with a sufficient supply of Fuel to allow Owner or its designee to operate the applicable Legacy Generation Asset for one (1) month after the date of surrender.

**Section 17.2**   Termination Prior to Completion of Decommissioning. The Parties shall, immediately upon the early termination of this Agreement pursuant to Article 14 (*Events of Default; Remedies*) that occurs prior to the decommissioning of each and every Legacy Generation Asset, implement any arrangements contemplated by the Demobilization Plan, including

CONFIDENTIAL

arrangements relating to (i) the completion of any remaining Decommissioning Services currently being performed for a Legacy Generation Asset and that will not be completed by Operator; (ii) the possible hiring of Operator Employees by a successor operator; and (iii) the treatment of severance costs associated with any Operator Employees not hired by a successor operator. For the avoidance of doubt, any reasonable, properly incurred and ordinary course costs and expenses related to Operator Employees that are incurred pursuant to this Section 17.2 (*Termination Prior to Completion of Demobilization*) and covered by the then currently approved O&M Budget shall be Pass-Through Expenditures in accordance with Section 7.2 (*Pass-Through Expenditures*) and Section 7.3 (*O&M Budgets*).

**Section 17.3**   Demobilization Period Compensation.

(a)   <u>Generally</u>. As compensation for the Demobilization Services provided by Operator, Owner shall pay Operator the Demobilization Service Fee. The Demobilization Service Fee shall not be subject to any abatement, deduction, counterclaim or set-off of any kind or nature.

(b)   <u>Demobilization Service Fee</u>. The "<u>Demobilization Service Fee</u>" shall be an aggregate amount equal to (i) the hourly fully allocated cost rate for each category of Operator employee or Affiliate personnel providing Demobilization Services *multiplied by* (ii) the number of hours worked by each Operator employee or Affiliate personnel in such category providing Demobilization Services *plus* (iii) ten percent (10%) of the product of (i) and (ii), *plus* (iv) all other reasonable and documented costs and expenses incurred by Operator (without markup for Operator profit) that are necessary and reasonable in the course of providing the Demobilization Services and/or implementing the Demobilization Plan, including the cost of any Subcontractors providing Demobilization Services.

(c)   <u>Funding</u>.

(i)   Owner shall establish one or more accounts from which Owner shall draw funds from time to time to pay Operator the Demobilization Service Fee (collectively, the "<u>Demobilization Account</u>").

(ii)   Promptly after the Demobilization Commencement Date (and in any event within five (5) Business Days), Operator shall deliver to Administrator an estimate of the anticipated Demobilization Service Fee for the following two (2) months. Within ten (10) days of delivery of such estimate, and prior to and as a condition to the commencement of any Demobilization Services, Administrator shall provide Operator evidence reasonably satisfactory to Operator that an amount equal to the sum of the anticipated Demobilization Service Fee for the following two (2) months, has been funded in the Demobilization Account. Prior to the end of each month during the period in which Operator performs the Demobilization Services, Operator shall deliver to Administrator an estimate of the anticipated Demobilization Service Fee for the two (2) months. No later than the eleventh (11th) Business Day of each month during the period in which Operator performs the Demobilization Services, the Demobilization Account shall be replenished so as to maintain a balance in the Demobilization Account at the end of each calendar month equal to the sum of the anticipated Demobilization Service Fee for the subsequent two (2) months, and so on subsequently until the Demobilization Services conclude.

CONFIDENTIAL

(iii)     In the event a Dispute arises between Operator and Administrator in connection with Operator's estimate of the anticipated Demobilization Service Fee, the matter shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, a "Demobilization Service Fee Estimate Dispute").

(d)     Invoices.

(i)     On or prior to the tenth (10th) day of each month during which Operator is performing the Demobilization Services, Operator shall submit to Administrator for its review and approval a monthly invoice describing in detail the prior calendar month's Demobilization Services and the corresponding Demobilization Service Fee for such prior calendar month. All invoices shall comply with the requirements set forth in Section 9.2(c) (*Anti-Corruption and Sanctions Laws – Policies and Procedures*).

(ii)     Operator shall provide promptly to Administrator such additional supporting documentation evidencing the provision of the Demobilization Services, if any, including evidence of the payment of any Subcontractor whose fees are included in the Demobilization Service Fee, and the calculation of the Demobilization Service Fee related thereto, as Administrator may reasonably request and as may be required by Applicable Law. To the extent necessary for Administrator to complete its review of the applicable invoice, upon Administrator's reasonable request such additional supporting documentation shall include any relevant Confidential Information. Administrator shall promptly advise Operator of any disputed invoice amounts, and all such disputes which Operator and Administrator are unable to resolve shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, a "Demobilization Service Fee Dispute").

(iii)     Payments of undisputed amounts under any invoice shall be due within thirty (30) days of Administrator's receipt of such invoice. Owner's sole responsibility with respect to all invoices shall be payment of undisputed amounts and shall not include review of any invoice.

(e)     Audits. At any time and from time to time during and until the expiration of six (6) years following the end of the period during which Operator performs the Demobilization Services, Administrator may, upon reasonable prior notice, Audit (or cause to be Audited) the books and records of Operator or any Subcontractor in connection with any requests for payment of the Demobilization Service Fee, together with the supporting vouchers and statements, and the calculation of the Demobilization Service Fee. Subject to the dispute resolution provisions in Article 15 (*Dispute Resolution*), each payment made by Owner hereunder shall be subject to subsequent adjustment. Following the determination that any such payment adjustment is required, the Party required to make payment shall do so within thirty (30) days of the date of such determination.

CONFIDENTIAL

### Article 18
### FORCE MAJEURE EVENTS

**Section 18.1**   Notice; Mitigation.

(a)   <u>Notice</u>. The Party claiming a Force Majeure Event (the "<u>Claiming Party</u>") shall notify the other Party in writing (with copy to Administrator and PREB), on or promptly after the date it first becomes aware of such Force Majeure Event, followed within five (5) Business Days by a written description of (i) the Force Majeure Event and the cause thereof (to the extent known), (ii) the date the Force Majeure Event began and its estimated duration, (iii) the manner in which and the estimated time during which the performance of the Claiming Party's obligations hereunder shall be affected and (iv) mitigating actions that the Claiming Party plans to take in order to reduce the impact of the Force Majeure Event; <u>provided</u> that the Claiming Party's failure to promptly notify the other Party shall not preclude the Claiming Party from obtaining relief with respect to the Force Majeure Event to the extent the other Party has not been prejudiced by the Claiming Party's delay to provide prompt notice.

(b)   <u>Mitigation</u>. Whenever a Force Majeure Event shall occur, the Claiming Party shall, as promptly as reasonably possible, use commercially reasonable efforts to mitigate or eliminate the cause therefor, reduce costs resulting therefrom, mitigate and limit damage to the other Party and resume full performance under this Agreement.

(c)   <u>Burden of Proof</u>. The Claiming Party shall bear the burden of proof as to the existence and impact of the Force Majeure Event, and shall furnish promptly in writing (if and to the extent available to it) any additional documents or other information relating to the Force Majeure Event reasonably requested by the other Party. While the Force Majeure Event continues, the Claiming Party shall give notice to the other Party before the first day of each succeeding month updating the information previously submitted with respect to the nature, cause, impact and potential duration of the Force Majeure Event pursuant to this Section 18.1 (*Notice; Mitigation*). The Parties hereby agree that, in the event that a Dispute arises between the Parties in connection with whether and to the extent an event, circumstance or condition constitutes a Force Majeure Event, or whether such Force Majeure Event continues, the matter shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, a "<u>Force Majeure Event Dispute</u>").

(d)   <u>Notice of Cessation of Force Majeure Event</u>. Upon the cessation of a Force Majeure Event, including a determination by the Independent Expert that a Force Majeure Event no longer exists, the Claiming Party shall (i) promptly (but in any event within five (5) Business Days) provide notice to the other Party and (ii) promptly thereafter resume compliance with this Agreement.

**Section 18.2**   Relief.

(a)   <u>Generally</u>. If and to the extent a Force Majeure Event interferes with, delays or increases the cost of, a Party's performance of its obligations under this Agreement, and such Party has given timely notice and description as required by Section 18.1 (*Notice; Mitigation*), such Party shall be excused from performance and any associated Events of Default, except to the

CONFIDENTIAL

extent contemplated in Section 18.2(c) (*Relief – Extended Event*). In the event Operator is the party claiming the Force Majeure Event, Operator shall be entitled to request appropriate adjustments to the O&M Budgets or the Incentives and Penalties in accordance with Section 7.4 (*O&M Budget Policy*).

(b)    Limitations. The occurrence of a Force Majeure Event shall not excuse or delay the performance of (i) a Party's obligation to pay amounts previously accrued and owing under this Agreement, including any earned but unpaid Service Fees, (ii) Owner's obligation to continue to pay all Owner Payments and to deposit and make funds available for Operator's use in the Service Accounts and the Insurance Proceeds Account in accordance with Article 7 (*Compensation; O&M Budgets*) and/or other applicable terms of this Agreement and (iii) any obligation hereunder not affected by the occurrence of the Force Majeure Event.

(c)    Extended Event. In addition to all other relief pursuant to this Agreement, including under Section 4.8(c) (*Failure of Service Commencement Conditions – Effect of Force Majeure Events or Owner Fault*) and Section 7.4 (*O&M Budget Policy*), if and to the extent a Force Majeure Event continues for a period in excess of one hundred twenty (120) consecutive days and materially interferes with, delays or increases the cost of the O&M Services in accordance herewith (an "Extended Event"), without limiting the rights of either Party under Section 14.5(b) (*Additional Termination Rights – Extended Force Majeure Event*), and a Party has given timely notice and detailed and documented description as required by Section 18.1 (*Notice; Mitigation*), Administrator and Operator shall negotiate in good faith to determine whether modifications to the Incentive Payment, in accordance with Section III of Annex II (*Compensation – Incentives and Penalties*) or other provisions of this Agreement are appropriate under the circumstances; provided any such modification (i) shall not be effective until Administrator has obtained, at the cost of Owner or Administrator, a Tax Opinion and a Reliance Letter with respect to any such modification and (ii) shall be subject to approval by PREB in accordance with Applicable Law.

## Article 19
## INDEMNIFICATION

**Section 19.1**    Indemnification by Operator.

(a)    Generally. Subject to the limitations on liability set forth in this Section 19.1 (*Indemnification by Operator*), Section 19.3 (*Limitation on Liability*), Section 19.4 (*Insurance and Other Recovery*), Section 19.5 (*Liability Limitation for Certain Damages*) and Section 19.6 (*Additional Liability Limitation for Certain Damages*), Operator shall indemnify, defend and hold harmless Owner, Administrator and their respective Affiliates and Representatives (each, including Owner, an "Owner Indemnitee"), from and against (and pay the full amount of) any and all Losses incurred by an Owner Indemnitee to the extent arising or resulting from, in each case, as determined by a final and non-appealable judgment by a court of competent jurisdiction: (i) any breach by Operator of any representation or warranty of Operator in this Agreement that has a material adverse effect on (x) Operator's ability to perform its obligations under this Agreement in respect of the Legacy Generation Assets or (y) the performance or the cost of performance by any Party of its obligations under this Agreement or (ii) the gross negligence or willful misconduct of Operator Indemnitees in connection with the performance of Operator's obligations under this Agreement, except, in each case of the foregoing, as otherwise provided in Section 5.9(a)(iv)

CONFIDENTIAL

(*Environmental, Health and Safety Matters – Pre-Existing Environmental Conditions*), where the applicable standard shall be either the Pre-Existing Contamination Liability Standard or the Pre-Existing Noncompliance Liability Standard. Operator's indemnification obligations hereunder shall not be limited by any coverage exclusions or other provisions in any insurance policy maintained by Operator which is intended to respond to such events. In the event that any Losses are incurred by an Owner Indemnitee in connection with Section 5.9(a)(iv) (*Environmental, Health and Safety Matters – Pre-Existing Environmental Conditions*), then Operator's liability for such Owner Indemnitee's Losses shall be reduced by the amount of the Penalty paid or owed, if any, with respect to the environmental compliance category in Section III of Annex II (*Compensation – Incentives and Penalties*), if such Penalties arose as a result of the same conduct that led to Owner Indemnitee's Losses.

(b)    Limitations. Notwithstanding the foregoing, Operator shall not be required to reimburse or indemnify any Owner Indemnitee for any Losses to the extent caused by or due to (i) Owner Fault, (ii) a Force Majeure Event, other than to the extent caused by the gross negligence or willful misconduct of any Operator Indemnitee in responding to such Force Majeure Event, (iii) gross negligence or willful misconduct of any Owner Indemnitee, (iv) any matter for which Owner expressly indemnifies Operator pursuant to Section 19.2 (*Indemnification by Owner*), (v) events or circumstances arising prior to the Service Commencement Date, in each case as determined by a final and non-appealable judgment by a court of competent jurisdiction or (vi) any Pre-Existing Environmental Condition (except as set forth in Section 5.9(a)(iv) (*Environmental, Health and Safety Matters – Pre-Existing Environmental Conditions*)).

(c)    Notice, Defense and Survival. An Owner Indemnitee shall promptly notify Operator in writing pursuant to Section 21.2 (*Notices*) of the assertion of any claim against it for which it is entitled to be indemnified hereunder, and Operator shall have the right to assume the defense of the claim in any Legal Proceeding and to approve any settlement of the claim, such approval not to be unreasonably withheld, delayed or conditioned. For the avoidance of doubt, any Fees-and-Costs associated with Operator defending Owner Indemnitees pursuant to this Section 19.1 (*Indemnification by Operator*) shall be Pass-Through Expenditures, except to the extent Operator's liability to pay such Fees-and-Costs is determined by a final and non-appealable judgment by a court of competent jurisdiction. The indemnification provisions in this Section 19.1 (*Indemnification by Operator*) are (i) for the protection of Owner Indemnitees only and shall not establish, of themselves, any liability to any Person not party to this Agreement and (ii) shall survive termination of this Agreement.

**Section 19.2**    Indemnification by Owner.

(a)    Generally. Subject to the limitations on liability set forth in this Section 19.2 (*Indemnification by Owner*), Section 19.3 (*Limitation on Liability*), Section 19.4 (*Insurance and Other Recovery*), Section 19.5 (*Liability Limitation for Certain Damages*) and Section 19.6 (*Additional Liability Limitation for Certain Damages*), Owner shall indemnify, defend and hold harmless Operator and the Equity Participants and its and their respective Affiliates and Representatives (each, including Operator, an "Operator Indemnitee"), from and against (and pay the full amount of) any and all Losses incurred by an Operator Indemnitee to the extent arising or resulting from, in each case, as determined by a final and non-appealable judgment by a court of competent jurisdiction: (i) any breach by Owner or Administrator of any of its respective

CONFIDENTIAL

representations or warranties in this Agreement that has a material adverse effect on the Legacy Generation Assets or on the performance or the cost of performance by any Party of its respective obligations under this Agreement; (ii) any failure by Owner or Administrator to perform its obligations under this Agreement or resulting from any Owner Fault; (iii) claims of any nature relating to the Legacy Generation Assets, Owner's operation thereof or any matter in the nature of the services to be provided by, or any other obligations imposed on, Operator hereunder, in each case based on events or circumstances to the extent arising prior to the Service Commencement Date; (iv) the gross negligence or willful misconduct of Owner Indemnitees in connection with this Agreement; (v) other than as expressly set forth in Section 5.5 (*Labor and Employment; Employee Benefits*), claims brought by Owner's or its Affiliates' former, current or future employees with respect to the non-payment or underfunding of benefits under Owner's pension plans, the PREPA Retirement System or any other employee benefit plans of Owner; (vi) claims brought against Operator by a Person not party to this Agreement in connection with the Legacy Generation Assets or Operator's performance of the O&M Services, including (A) for loss of profits or revenues or special, exemplary, punitive, indirect or consequential damages (except to the extent arising out of fraud or intentional misrepresentation of any Operator Indemnitee), or (B) to the extent such claims are for Losses that would cause Operator's total liability to all Persons (including Owner Indemnitees) under or in connection with this Agreement in aggregate to exceed the amount of any applicable limitation of liability set forth in Section 19.3 (*Indemnification – Limitation on Liability*); (vii) claims brought against Operator in connection with the T&D System or the performance by the T&D Operator of its obligations under the T&D O&M Agreement; (viii) Pre-Existing Environmental Conditions, except to the extent of an exacerbation of such Pre-Existing Environmental Conditions to the extent caused by the gross negligence or willful misconduct of any Operator Indemnitee; or (ix) all claims brought against Operator after the Effective Date by any creditor or other Person in connection with or related to the Title III Case.

(b)      Limitations. Owner's indemnification obligations hereunder shall not be limited by any coverage exclusions or other provisions in any insurance policy maintained by Owner which is intended to respond to such events. Notwithstanding the foregoing, other than with respect clauses (vi), (vii), (viii) and (ix) of Section 19.2(a) (*Indemnification by Owner – Generally*), to which the following statement shall not apply, Owner shall not be required to reimburse or indemnify any Operator Indemnitee for any Losses to the extent caused by or due to: (i) a Force Majeure Event, other than to the extent caused by the gross negligence or willful misconduct of any Owner Indemnitee in responding to such Force Majeure Event, (ii) any matter for which Operator expressly indemnifies Owner pursuant to Section 19.1 (*Indemnification by Operator*), in each case as determined by a final and non-appealable judgment by a court of competent jurisdiction or (iii) any Delay Liquidated Damages payable by Operator under Section 4.8(a) (*Failure of Service Commencement Date Conditions – Remedy for Delay of Service Commencement Date Conditions*) of this Agreement. Other than with respect to clause (vi) of Section 19.2(a) (*Indemnification by Owner – Generally*), Owner shall not be required to reimburse or indemnify any Operator Indemnitee for any Losses to the extent caused by or due to the gross negligence or willful misconduct of any Operator Indemnitee.

(c)      Notice, Defense and Survival. An Operator Indemnitee shall promptly notify Owner in writing pursuant to Section 21.2 (*Notices*) of the assertion of any claim against it for which it is entitled to be indemnified hereunder, and Owner shall have the right to assume the defense of the claim in any Legal Proceeding and to approve any settlement of the claim, such

approval not to be unreasonably withheld, delayed or conditioned. Any amount payable by Owner to any Operator Indemnitee pursuant to this Section 19.2 (*Indemnification by Owner*) that remains unsatisfied for a period of sixty (60) days shall be treated as a Pass-Through Expenditure; provided, however, that the foregoing shall not limit Owner's ability to contest whether such payment is due. The provisions in this Section 19.2 (*Indemnification by Owner*) (i) are for the protection of Operator Indemnitees only and shall not establish, of themselves, any liability to any Person not party to this Agreement and (ii) shall survive termination of this Agreement.

**Section 19.3** Limitation on Liability. Notwithstanding anything contained in this Agreement to the contrary:

(a) Operator General Limitations.

(i) Except as set forth in Section 19.3(b) (*Limitation on Liability – Gross Negligence; Willful Misconduct*), Operator's liability to Owner Indemnitees or any other Person under or in connection with this Agreement, including under Section 19.1 (*Indemnification by Operator*) and including for Disallowed Costs, shall be limited to US$5 million in the aggregate for Losses occurring in any Contract Year; and US$20 million in the aggregate for all Losses during the Term.

(ii) From the Effective Date until the end of the second (2nd) Contract Year, Operator shall not be liable for any Loss for which an Owner Indemnitee is entitled to be indemnified pursuant to Section 19.1 (*Indemnification by Operator*) unless and until the aggregate amount of such Losses in such Contract Year exceeds US$1 million (as adjusted on a Pro Rata basis for a partial Contract Year), in which event Operator shall then be liable for all Losses in excess of US$1 million (as adjusted on a Pro Rata basis for a partial Contract Year), subject to the limitation on liability set forth in Section 19.3(a) (*Limitations on Liability – Operator General Limitations*).

(iii) From the beginning of the third (3rd) Contract Year until the end of the Term, Operator shall not be liable for any Loss for which an Owner Indemnitee is entitled to be indemnified pursuant to Section 19.1 (*Indemnification by Operator*) unless and until the aggregate amount of such Losses in such Contract Year exceeds US$500,000 (as adjusted on a Pro Rata basis for a partial Contract Year), in which event Operator shall then be liable for all Losses in excess of US$500,000 (as adjusted on a Pro Rata basis for a partial Contract Year), subject to the limitation on liability set forth in Section 19.3(a) (*Limitations on Liability – Operator General Limitations*).

(iv) For the avoidance of doubt, Operator shall not be liable to Owner Indemnitees to the extent Owner is determined, by a final and non-appealable judgment by a court of competent jurisdiction, to have acted or refrained from acting in accordance with the terms of this Agreement.

(v) The limitations on liability set forth in this Section 19.3(a) shall not apply to Operator's obligation to pay Delay Liquidated Damages (if any).

CONFIDENTIAL

      (b)    <u>Gross Negligence; Willful Misconduct</u>.

      (i)    Notwithstanding anything to the contrary in this Agreement, Operator's liability to Owner Indemnitees or any other Person for any Losses attributable to any Operator Indemnitee's gross negligence or willful misconduct as set forth in this Agreement, including under Section 19.1 (*Indemnification by Operator*) or with respect to any Disallowed Costs attributable to Operator Indemnitee's gross negligence or willful misconduct, shall be limited to:

      (A)    US$15 million for all Losses occurring in each Contract Year for each of the first five (5) Contract Years;

      (B)    US$20 million for all Losses occurring in each Contract Year for each subsequent Contract Year, and

      (C)    a total maximum of US$20 million in the aggregate for all Losses during the Term.

      (D)    The limitations on liability set forth in this Section 19.3(b)(i) shall not apply to Operator's obligation to pay Delay Liquidated Damages (if any).

      (ii)    If any liability for Losses is attributable in part to gross negligence and in part to negligence, then such liability shall be apportioned such that the portion of the Loss attributable to negligence shall be subject to the limitation on liability set forth in set forth in Section 19.3(a)(i) (*Limitations on Liability – Operator General Limitations*).

      (c)    <u>No Administrator Liability</u>. Administrator shall not be liable to Operator Indemnitees under this Agreement.

    **Section 19.4**   Insurance and Other Recovery.

      (a)    <u>Generally</u>. The amount of any Losses that are subject to indemnification, compensation or reimbursement under this Agreement shall be reduced by the amount of any insurance proceeds and any indemnity, contribution or other similar payment actually received by Owner Indemnitee or Operator Indemnitee, as applicable, in respect of such Losses or any of the events, conditions, facts or circumstances resulting in or relating to such Losses ("<u>Third-Party Payments</u>"). If an Owner Indemnitee or Operator Indemnitee, as applicable, receives any Third-Party Payment with respect to any Losses for which it has previously been indemnified (directly or indirectly) by an Indemnifying Party, Owner Indemnitee or Operator Indemnitee, as applicable, shall promptly (and in any event within five (5) Business Days after receiving such Third-Party Payment) pay to the Indemnifying Party an amount equal to such Third-Party Payment or, if it is a lesser amount, the amount of such previously indemnified Losses. Owner Indemnitee or Operator Indemnitee, as applicable, shall use commercially reasonable efforts to recover under insurance policies or indemnity, contribution or other similar agreements other than this Agreement for any Losses to the same extent such Party would if such Losses were not subject to indemnification, compensation or reimbursement hereunder.

CONFIDENTIAL

(b)     Subrogation of Claims. If a Party makes any indemnity payment for any Losses suffered or incurred by an Owner Indemnitee or Operator Indemnitee, as applicable, pursuant to the provisions of this Article 19 (*Indemnification*), such indemnifying Party shall be subrogated, to the extent of such payment, to all rights and remedies of the Owner Indemnitee or Operator Indemnitee, as applicable, to any insurance benefits or other claims of the Owner Indemnitee or Operator Indemnitee, as applicable, with respect to such Losses and with respect to the matter giving rise to such Losses.

**Section 19.5**   Liability Limitation for Certain Damages. TO THE FULLEST EXTENT PERMITTED BY LAW, NEITHER OPERATOR INDEMNITEES NOR OWNER INDEMNITEES SHALL BE LIABLE, WHETHER IN CONTRACT, INDEMNITY, TORT (INCLUDING NEGLIGENCE, GROSS NEGLIGENCE AND STRICT LIABILITY) OR OTHERWISE, FOR ANY LOSS OF PROFITS OR REVENUES (OTHER THAN COMPENSATION DUE BY OWNER TO OPERATOR UNDER THIS AGREEMENT), OR ANY SPECIAL, EXEMPLARY, PUNITIVE, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES WHICH ARISE FROM, RELATE TO OR ARE CONNECTED WITH THIS AGREEMENT OR THE PERFORMANCE OF OR FAILURE TO PERFORM THEIR RESPECTIVE OBLIGATIONS HEREUNDER EXCEPT FOR CLAIMS OF FRAUD OR INTENTIONAL MISREPRESENTATION OR CLAIMS BROUGHT AGAINST OPERATOR BY A PERSON NOT PARTY TO THIS AGREEMENT IN CONNECTION WITH THE LEGACY GENERATION ASSETS OR OPERATOR'S PERFORMANCE OF THE O&M SERVICES.

**Section 19.6**   Additional Liability Limitation for Certain Damages.

(a)     OWNER AND ADMINISTRATOR UNDERSTAND THAT OPERATOR MAY BE PROVIDING O&M SERVICES THAT:

(i)     AS OF THE SERVICE COMMENCEMENT DATE, INCORPORATE OR ARE RELIANT UPON ASSETS (INCLUDING THE LEGACY GENERATION ASSETS) THAT ARE IN A CONDITION REQUIRING REPAIRS OR IMPROVEMENTS; AND

(ii)     INCORPORATE OR ARE RELIANT UPON INFORMATION, SYSTEMS, DATA OR INSTRUCTIONS THAT HAVE BEEN, ARE OR ARE TO BE PROVIDED BY OWNER OR THIRD PARTIES.

(b)     AS SUCH, OWNER AND ADMINISTRATOR ACKNOWLEDGE AND AGREE THAT, EXCEPT TO THE EXTENT ARISING OR RESULTING FROM THE NEGLIGENCE (INCLUDING GROSS NEGLIGENCE) OR WILLFUL MISCONDUCT OF OPERATOR INDEMNITEES IN CONNECTION WITH THIS AGREEMENT, OPERATOR INDEMNITEES SHALL HAVE NO LIABILITY HEREUNDER FOR ANY DATA PROCESSING DEFECT, ERROR, DEFAULT, DELAY OR LOSSES ARISING AS A RESULT OF ANY PROCESSING DEFICIENCY, INACCURACY, ERROR OR OMISSION TO THE EXTENT CAUSED BY A THIRD PARTY OR BY INFORMATION, SYSTEMS, DATA OR INSTRUCTIONS PROVIDED BY A THIRD PARTY, OWNER, ADMINISTRATOR OR THEIR RESPECTIVE REPRESENTATIVES.

CONFIDENTIAL

## Article 20
## REPRESENTATIONS AND WARRANTIES

**Section 20.1**   Representations and Warranties of Owner. Owner hereby represents and warrants to Operator that:

(a)   Existence and Powers. Owner is a limited liability company and a governmental instrumentality of the Commonwealth duly organized, validly existing and in good standing under the laws of the Commonwealth. Owner has the required corporate power and authority to enter into this Agreement, carry out its obligations hereunder and consummate the transactions contemplated hereby. Administrator has the required corporate power and authority to carry out its obligations under this Agreement and on behalf of Owner, including the power and authority to bind Owner with respect to any matter contemplated under this Agreement.

(b)   Due Authorization and Binding Obligation. The execution and delivery by Owner of this Agreement, the performance by Owner of its obligations hereunder and the consummation by Owner of the transactions contemplated hereby have been duly and validly authorized and approved by the required corporate or other similar action on the part of Owner. This Agreement has been duly and validly executed and delivered by Owner, and (assuming due authorization, execution and delivery by Operator) this Agreement constitutes a legal, valid and binding obligation of Owner enforceable against Owner in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, moratorium or similar Applicable Law affecting creditors' rights generally and by general equity principles.

(c)   No Conflicts. Neither the execution, delivery or performance by Owner of this Agreement, nor the consummation of the transactions contemplated hereby shall: (i) result in a material violation or breach of, or material default under, any provision of the organizational documents of Owner; (ii) result in a violation of, or give any Governmental Body the right to challenge any of the transactions contemplated hereby under, any Applicable Law applicable to Owner; (iii) (A) result in a violation or breach of, (B) constitute a default under, (C) result in the acceleration of or create in any party the right to accelerate, terminate or cancel or (D) require the consent of any other Person under, any material contract to which Owner is a party; or (iv) result in the creation or imposition of any Lien on any properties or assets of Owner.

(d)   No Consents. No consent, declaration or filing with, or notice to, any Governmental Body is required by or with respect to Owner in connection with (i) the execution and delivery of this Agreement or (ii) the performance by Owner of its obligations hereunder, except (A) such as have been duly obtained or made and (B) in the case of clause (ii), for those Governmental Approvals to be obtained after the Effective Date but before the Service Commencement Date.

(e)   No Litigation. There is no action, suit or other proceeding, at law or in equity, before or by any court or Governmental Body pending against Owner or, to Owner's knowledge, threatened against Owner, which if determined adversely against Owner would reasonably be expected to materially and adversely affect (i) the validity or enforceability of this Agreement or (ii) the performance by Owner or Operator of their respective obligations hereunder.

CONFIDENTIAL

(f)    <u>No Legal Prohibition</u>. There is no Applicable Law in effect on the date hereof that would prohibit the execution, delivery or performance by Owner of this Agreement and the transactions contemplated hereby.

(g)    <u>Title III Approval</u>. No approval of the Title III Court is required for Owner to enter into this Agreement. Owner's entry into, and the Parties' performance of, this Agreement, constitutes use or enjoyment by Owner of its revenue-producing property within the meaning of section 305(3) of PROMESA.

(h)    <u>Facility Contracts</u>. To Owner's knowledge and except as otherwise disclosed to Operator, (i) each material Facility Contract is in full force and effect and was procured in accordance with applicable Commonwealth law, (ii) there are no pending claims by or against any counterparty to a material Facility Contract, (iii) neither Owner nor any counterparty to a material Facility Contract is in default of its obligations under any material Facility Contract and (iv) Operator is permitted to administer and perform Owner's obligations under each material Facility Contract on Owner's behalf.

(i)    <u>Operation of Legacy Generation Assets</u>. Without limiting any other representations or warranties set out herein, from the Effective Date to the Service Commencement Date, Owner has, except as otherwise permitted by this Agreement or required by Applicable Law (including requirements related to the Title III Case), operated the Legacy Generation Assets in the ordinary course.

(j)    <u>Pre-Existing Environmental Conditions</u>. As of the Service Commencement Date, after commercially reasonable inquiry, Owner is not aware of material Pre-Existing Environmental Conditions on or at the Generation Sites which have not been disclosed to Operator pursuant to the Baseline Environmental Study.

(k)    <u>Accuracy of Fuel Contracts</u>. As of the Effective Date, to the best of Owner's knowledge, each of the Fuel Contracts listed on Annex XVII, including (a) all executed versions, amendments or other material documents that modify or waive any party's rights or obligations thereunder, and (b) all written instructions, notifications, and nominations issued thereunder that relate to the current fiscal year and any subsequent fiscal years, in ease case, have been provided to Operator.

**Section 20.2**    Representations and Warranties of Operator. Operator hereby represents and warrants to Owner that:

(a)    <u>Existence and Powers</u>. Operator is a limited liability company duly organized, validly existing and in good standing under the laws of Puerto Rico, and is qualified to do business and in good standing in the Commonwealth. Operator has the required corporate power and authority to enter into this Agreement, carry out its obligations hereunder and consummate the transactions contemplated hereby.

(b)    <u>Due Authorization and Binding Obligation</u>. The execution and delivery by Operator of this Agreement, the performance by Operator of its obligations hereunder and the consummation by Operator of the transactions contemplated hereby have been duly and validly authorized and approved by the required corporate or other similar action on the part of Operator.

CONFIDENTIAL

This Agreement has been duly and validly executed and delivered by Operator, and (assuming due authorization, execution and delivery by Owner) this Agreement constitutes a legal, valid and binding obligation of Operator enforceable against Operator in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, moratorium or similar Applicable Law affecting creditors' rights generally and by general equity principles.

(c)     No Conflicts. Neither the execution, delivery or performance by Operator of this Agreement, nor the consummation of the transactions contemplated hereby shall: (i) result in a material violation or breach of, or material default under, any provision of the organizational documents of Operator; (ii) result in a violation of, or give any Governmental Body the right to challenge any of the transactions contemplated hereby under, any Applicable Law applicable to Operator; (iii) (A) result in a violation or breach of, (B) constitute a default under, (C) result in the acceleration of or create in any party the right to accelerate, terminate or cancel or (D) require the consent of any other Person under, any material contract to which Operator is a party; or (iv) result in the creation or imposition of any Lien on any properties or assets of Operator.

(d)     No Consents. No consent, declaration or filing with, or notice to, any Governmental Body is required by or with respect to Operator in connection with (i) the execution and delivery of this Agreement or (ii) the performance by Operator of its obligations hereunder, except (A) such as have been duly obtained or made and (B) in the case of clause (ii), for those Governmental Approvals to be obtained after the Effective Date but before the Service Commencement Date.

(e)     No Litigation. There is no action, suit or other proceeding, at law or in equity, before or by any court or Governmental Body pending against Operator or, to Operator's knowledge, threatened against Operator, which if determined adversely against Operator would reasonably be expected to materially and adversely affect (i) the validity or enforceability of this Agreement or (ii) the performance by Operator or Owner of their respective obligations hereunder.

(f)     No Legal Prohibition. There is no Applicable Law in effect on the date hereof that would prohibit the execution, delivery or performance by Operator of this Agreement and the transactions contemplated hereby.

(g)     Applicable Law Compliance.

(i)     None of Operator or its subsidiaries or, when acting on behalf of Operator or its subsidiaries, any director, officer, manager, administrator or employee of Operator or its subsidiaries or, in connection with this Agreement or the O&M Services or the Decommissioning Services, any Affiliates of Operator has:

(A)     violated, conspired to violate, aided and abetted the violation of any Anti-Corruption Laws or committed any felonies or misdemeanors under Articles 4.2, 4.3 or 5.7 of Act No. 1-2012, known as the Organic Act of the Office of Government Ethics of Puerto Rico, any of the crimes listed in Articles 250 through 266 of Act 146-2012, known as the Puerto Rico Penal Code, any of the crimes typified in Act 2, or any other felony that involves misuse of public funds or property, including the crimes mentioned in Article 6.8 of Act 8-2017, known as

137

CONFIDENTIAL

the Act for the Administration and Transformation of Human Resources in the Government of Puerto Rico;

(B)    failed to comply at any time with the Anti-Corruption Laws and any other Applicable Law that prohibit corruption and regulate criminal acts involving public functions or public funds applicable to Operator under state, Commonwealth or federal law, or solely with respect to Operator, failed to furnish a Sworn Statement; or

(C)    been convicted of offenses against public integrity, as defined in the Puerto Rico Penal Code, or of embezzlement of public funds, or has been found guilty of any such type of offense in the courts of the Commonwealth, the courts of the United States or any court of any jurisdiction.

(ii)    Operator has not, directly or indirectly, made or received, and shall not make or receive, any payments in connection with this Agreement or the O&M Services or the Decommissioning Services in order to illegally or improperly to obtain business or other rights.

(iii)    Operator is not aware that it is being investigated as part of a criminal or civil process by any law enforcement or regulatory authority in connection in any way with the Anti-Corruption Laws or any criminal laws or regulations.

(iv)    None of Operator, its subsidiaries, Parent Company or any directors, officers or employees of any thereof is (A) a Person, or is a Person owned or controlled by a Person (a "Sanctioned Person"), with whom dealings are restricted or prohibited by, or are sanctionable under, any economic sanctions or trade restrictions administered or enforced by the U.S. government (including the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State or the Bureau of Industry and Security of the U.S. Department of Commerce), the United Nations Security Council, the European Union or Her Majesty's Treasury or any other authority with jurisdiction over Operator, its subsidiaries or its Affiliates (collectively, "Sanctions") or (B) located, organized or resident in a country or territory with which dealings are broadly restricted, prohibited or made sanctionable under any Sanctions (currently, the Crimea, Cuba, Iran, North Korea and Syria) (each, a "Sanctioned Country"). Operator and its subsidiaries have not violated and have not engaged in any conduct sanctionable under Sanctions. There are not now, nor have there been within the past five (5) years, any formal or informal proceedings, allegations, investigations or inquiries pending, expected or, to the knowledge of the Parent Company, threatened against the Parent Company, Operator, its subsidiaries, or any of their respective officers or directors concerning violations or potential violations of, or conduct sanctionable under, any Sanctions.

(v)    No official or employee of Owner has a direct or indirect economic interest in Operator's rights under this Agreement in accordance with the provisions of Act 2, which Operator herein certifies it has received a copy of, read, understood and complied with at all times prior to the execution of this Agreement and shall subsequently comply with it in its entirety.

CONFIDENTIAL

(vi)     Operator does not represent particular interests in cases or matters that imply conflicts of interest, or of public policy, between Owner and the particular interests it represents.

(h)     <u>Accuracy of Information</u>. All of the information relating to Operator or any of its Affiliates delivered by or on behalf of Operator to Owner and Administrator in connection with the execution of this Agreement was true, accurate and complete in all material respects when delivered.

(i)     <u>Ability to Perform Obligations</u>. Except as contemplated elsewhere in this Agreement, including in Article 2 (*Purpose; Effective Date; Term*), Article 4 (*Mobilization Period*) and Article 7 (*Compensation; O&M Budgets*), Operator has the required authority, ability, skills, access to funds, technical support and capacity to perform all its obligations with respect to the O&M Services and the Decommissioning Services and all of its other obligations under this Agreement, all in accordance with the Transaction Documents and assuming each of Owner's and Administrator's performance of its obligations in accordance with the terms of this Agreement and the Transaction Documents. Operator acknowledges that it has been provided with a complete copy of the Consent Decree (including its appendices and attachments) at least thirty (30) days prior to the Effective Date, and has the required authority, ability, skills, access to funds, technical support and capacity to meet the requirements of the Consent Decree relating to its obligations under this Agreement.

(j)     <u>Knowledge of Requirements</u>. Operator has knowledge in all material respects of all legal requirements, Applicable Law, and business and engineering practices that must be followed in performing its obligations under this Agreement.

(k)     <u>No Litigation with Owner</u>. Neither Operator nor any of its shareholders or its or their Affiliates are involved in any litigation, arbitration or claim against Owner, Administrator, AAFAF or the FOMB.

(l)     <u>Representation in FOMB Certification</u>. The information included in the Contractor Certification Requirement, as included in Appendix C of the FOMB's Contract Submission Questionnaire dated November 16, 2022 (the "<u>Certification</u>"), completed by Operator, is complete, accurate and correct as of the date thereof. Without limiting the foregoing in any way, Operator acknowledges and agrees that Administrator, in consultation with the FOMB, shall have the right to declare this Agreement null and void in the event of any misrepresentation, or inaccuracy of falseness with respect to a material fact in the Certification.  In addition, Administrator, after disclosure to and consultation with the FOMB, may provide in its discretion an opportunity to the Operator to attempt to cure any such such misrepresentation, or inaccuracy of falseness in the Certification and Administrator, after disclosure to and consultation with the FOMB, shall have the discretion to determine whether any such cure is acceptable.  In the event that Administrator declares this Agreement null and void in  the event of any misrepresentation, or inaccuracy of falseness with respect to a material fact in the Certification,  Operator shall have the obligation to reimburse immediately to Owner or the Commonwealth, as applicable, any amounts, payments or benefits received from Owner or the Commonwealth under this Agreement.

CONFIDENTIAL

**Article 21**
**MISCELLANEOUS**

**Section 21.1**  Fees and Expenses. Except as otherwise expressly provided in this Agreement, all costs and expenses incurred, including fees and disbursements of counsel, financial advisors and accountants, in connection with the negotiation and execution of this Agreement shall be borne by the Party incurring such costs and expenses; provided, however, that, in the event this Agreement is terminated in accordance with its terms, the obligation of each Party to bear its own costs and expenses shall be subject to any rights of such Party arising from a breach of this Agreement by the other Party prior to such termination.

**Section 21.2**  Notices. All notices or other communications to be delivered in connection with this Agreement shall be in writing and shall be deemed to have been properly delivered, given and received (a) on the date of delivery if delivered by hand during normal business hours of the recipient during a Business Day, otherwise on the next Business Day, (b) on the date of successful transmission if sent via email (with return receipt) during normal business hours of the recipient during a Business Day, otherwise on the next Business Day, or (c) on the date of receipt by the addressee if sent by a nationally recognized overnight courier or by registered or certified mail, return receipt requested, if received on a Business Day, otherwise on the next Business Day. Such notices or other communications must be sent to each respective Party at the address, email address set forth below (or at such other address, email address as shall be specified by a Party in a notice given in accordance with this Section 21.2 (*Notices*)):

If to Owner:                              Puerto Rico Electric Power Authority
                                          PO BOX 364267
                                          San Juan, Puerto Rico 00936-4267
                                          Attention: Chief Executive Officer – Josué Colón Ortiz
                                          Telephone: (787) 521-4663
                                          Email: director_ejecutivo@prepa.com


                                          with copies to:


                                          Administrator
                                          PO BOX 42001
                                          San Juan, Puerto Rico 00940-2001
                                          Attention: Executive Director – Fermín E. Fontanés Gómez
                                          Telephone: (787) 722-2525 Ext. 15330
                                          Email: Fermin.Fontanes@p3.pr.gov and
                                          Administrator@p3.pr.gov

                                          *And*

                                          PREB
                                          268 Avenida Muñoz Rivera
                                          Edificio World Plaza
                                          Piso 7, Suite 704

CONFIDENTIAL

<div style="margin-left:40%">

Hato Rey, Puerto Rico 00918
Attention: President - Edison Avilés Deliz
Telephone: (787) 523-6262
Email: eavilesdeliz@energia.pr.gov

</div>

If to Administrator:                    Administrator
                                        PO BOX 42001
                                        San Juan, Puerto Rico 00940-2001
                                        Attention: Executive Director – Fermín E. Fontanés Gómez
                                        Telephone: (787) 722-2525 Ext. 15330
                                        Email: Fermin.Fontanes@p3.pr.gov and
                                        Administrator@p3.pr.gov

                                        with copies to:

                                        Genera PR LLC
                                        954 Ponce de Leon Ave.,
                                        Miramar Plaza, Suite 400
                                        San Juan, Puerto Rico 00907
                                        Attention: General Counsel
                                        Email: legal@genera-pr.com

If to Operator:                         Genera PR LLC
                                        954 Ponce de Leon Ave.,
                                        Miramar Plaza, Suite 400
                                        San Juan, Puerto Rico 00907
                                        Attention: General Counsel
                                        Email: legal@genera-pr.com

                                        with copies to:

                                        Administrator
                                        PO BOX 42001
                                        San Juan, Puerto Rico 00940-2001
                                        Attention: Executive Director – Fermín E. Fontanés Gómez
                                        Telephone: (787) 722-2525 Ext. 15330
                                        Email: Fermin.Fontanes@p3.pr.gov and
                                        Administrator@p3.pr.gov

**Section 21.3** Amendments. Neither this Agreement nor any provision hereof may be changed, modified, amended or waived, except by written agreement duly executed by the Parties. Any such amendment shall not be effective until (i) to the extent required by Applicable Law, approved by PREB and the FOMB (if then in existence) and (ii) Administrator has obtained a Tax

CONFIDENTIAL

Opinion and a Reliance Letter, at the cost of Owner or Administrator, with respect to any such amendment. Wherever this Agreement requires the Parties to use good faith, reasonable, commercially reasonable or other efforts to amend the terms of this Agreement, Operator shall not be deemed to be in breach of such requirement as a result of its insistence that such amendment not adversely affect Operator's compensation under, or its return on investment or other economic interests with respect to, this Agreement, except to the extent such adverse effect results solely from inflation or the imposition of a Tax or an increase in Taxes of general application.

Section 21.4   Entire Agreement. This Agreement, together with the Annexes and Exhibits attached hereto, constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes any and all prior oral or written agreements, understandings, proposals, representations or warranties relating to this Agreement. Without limiting the generality of the foregoing, this Agreement shall completely and fully supersede all other understandings and agreements among the Parties with respect to such transactions, including those contained in the RFP, the Proposal by Operator or its Affiliate and any amendments or supplements to the RFP or the Proposal.

Section 21.5   Relationship of the Parties. Nothing in this Agreement is intended to create, or shall be deemed or construed as creating, any partnership, joint venture or other legal entity, or give rise to any fiduciary duty, among the Parties. Except as otherwise expressly provided in this Agreement, no Party shall have the authority or right, or hold itself out as having the authority or right, to assume, create or undertake any obligation of any kind whatsoever, express or implied, on behalf of or in the name of any other Party, except as expressly provided herein. No provision in this Agreement shall result in Operator or any of its employees, Subcontractors, agents or Representatives being considered an employee, contractor or Representative of Owner. Operator shall be an independent contractor and shall be responsible for and have control over the performance of the O&M Services hereunder, subject to the standards set forth in this Agreement. Nothing in this Agreement shall be interpreted to create a relationship of co-employer between Owner and Operator or Administrator and Operator as to the employees of Operator or any of its respective subcontractors, nor to make Operator an alter ego or a successor employer of Owner.

Section 21.6   Assignment and Transfer.

(a)    By Operator. Operator shall not assign, transfer, convey, lease, encumber or otherwise dispose of its rights or obligations under this Agreement or related to the O&M Services or the Decommissioning Services without the prior written consent of Administrator, which consent shall not be unreasonably withheld, delayed or conditioned, and to the extent required by Applicable Law, PREB or other Governmental Bodies; provided, however, that Operator may, without the prior written consent of Administrator:

(i)    assign or otherwise dispose of any of its rights and obligations hereunder to an Affiliate of Operator so long as: (A) such Affiliate is (1) a Controlled direct or indirect subsidiary of the Parent Company, (2) reasonably capable of discharging the duties and obligations of Operator hereunder and (3) assumes in writing all of Operator's obligations hereunder; and (B) such assignment is otherwise permitted under, and in compliance with, Applicable Law; and

(ii)      assign solely its rights to payment under this Agreement to one, and only one, trust, trustee, bank, paying agent, financial entity or other Person or company for the purposes of any bona fide financing or in order to facilitate the making of any such payment.

Any such consent given in one instance shall not relieve Operator of its obligation to obtain the prior written consent of Administrator to any further assignment. Any assignment of this Agreement that is approved by Administrator shall require the assignee of Operator to assume the performance of and observe all obligations, representations and warranties of Operator under this Agreement, and no such assignment shall relieve Guarantor of any of its obligations under the Guarantee. The consent to any assignment, transfer or conveyance shall not operate to release Operator in any way from any of its obligations under this Agreement unless such consent specifically provides otherwise. Any amendments to this Agreement requested by a potential assignee or transferee of Operator shall be submitted to and approved by the board of directors of Administrator pursuant to Section 10(a)(19) of Act 29.

(b)      By Owner. Owner shall not assign, transfer, convey, lease, encumber or otherwise dispose of its rights or obligations under this Agreement without the prior written consent of Operator; provided, however, that Owner may, without the prior written consent of Operator, assign or otherwise dispose of any of its rights and obligations hereunder: (i) to Administrator; (ii) with prior approval of Administrator, to a newly-created subsidiary of PREPA to which the Legacy Generation Assets are contributed or otherwise transferred; or (iii) with prior approval of the FOMB (if then in existence and to the extent such approval is required by Applicable Law), to another Governmental Body if such assignee assumes, and is reasonably and legally, operationally and financially capable of discharging, the duties and obligations of Owner hereunder.

(c)      Change of Control. Nothing contained in the foregoing shall be deemed to prohibit or limit, whether accomplished through a single transaction or a series of related or unrelated transactions and whether accomplished directly or indirectly, transfers of direct or indirect ownership interests in Operator by any Equity Participant or its beneficial owner(s) to any Person; provided that if any such transfer results in a Change of Control of Operator, the approval of Administrator (not to be unreasonably withheld, conditioned or delayed) shall be required for any such transfer.

Section 21.7   Interest on Overdue Obligations. Except as otherwise provided herein, all amounts due hereunder, whether as fees, damages, credits, revenue, charges or reimbursements, that are not paid when due shall bear interest at the Overdue Rate, on the amount outstanding from time to time, and all such interest accrued at any time shall, to the extent permitted by Applicable Law, be deemed added to the amount due, as accrued.

Section 21.8   Waivers. Either Operator or Administrator may, at any time, (i) extend the time for the performance of any of the obligations or other acts of the other Party, (ii) waive any inaccuracies in the representations and warranties of the other Party contained herein or (iii) waive compliance by the other Party with any of the agreements or conditions contained herein to the extent consistent with Applicable Law. No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in a written instrument executed and delivered by the Party so waiving. No waiver by any Party of any breach of this Agreement shall operate or be

CONFIDENTIAL

construed as a waiver of any preceding or subsequent breach, whether of a similar or different character, unless expressly set forth in such written waiver. Neither any course of conduct or failure or delay of any Party in exercising or enforcing any right, remedy or power hereunder shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy or power hereunder, or any abandonment or discontinuance of steps to enforce such right, remedy or power, or any course of conduct, preclude any other or further exercise thereof or the exercise of any other right, remedy or power.

Section 21.9   Severability. If any term or provision of this Agreement is invalid, illegal or incapable of being enforced in any situation or in any jurisdiction, such invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of any other term or provision hereof or the offending term or provision in any other situation or any other jurisdiction, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon any such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible, in a mutually acceptable manner, in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

Section 21.10  Survival. The rights and obligations of the Parties pursuant to this Section 21.10 (*Survival*), Article 13 (*Intellectual Property; Proprietary Information*), Article 15 (*Dispute Resolution*), Article 17 (*Demobilization*), Article 19 (*Indemnification*), Section 21.2 (*Notices*) and Section 21.15 (*Governing Law*) shall survive the expiration or termination of this Agreement. No expiration or early termination of this Agreement shall (i) limit or otherwise affect the respective rights and obligations of the Parties accrued prior to the date of such termination (including Owner's obligation to pay Operator for Pass-Through Expenditures accruing prior to such termination pursuant to Section 7.2 (*Pass-Through Expenditures*) and Section 7.6 (*Service Accounts*)) or (ii) preclude any Party from impleading any other Party in any Legal Proceeding originated by a third party as to any matter occurring during the Term.

Section 21.11  No Third-Party Beneficiaries. Unless specifically set forth herein, this Agreement is exclusively for the benefit of the Parties and shall not provide any third parties with any remedy, claim, liability, reimbursement, cause of action or other rights.

Section 21.12  Remedies.

(a)    Cumulative and Non-Exclusive Remedies. Except as otherwise provided in this Agreement, any and all remedies herein expressly conferred upon a Party shall be deemed cumulative with and not exclusive of any other remedy expressly conferred hereby, and the exercise by a Party of any one such remedy shall not preclude the exercise of any other such remedy.

(b)    Irreparable Damage and Harm. Except where sole and exclusive remedy(ies) are identified herein with respect to any provision, act or omission that do not include specific performance or injunctive relief: The Parties agree that irreparable damage and harm would occur in the event that any provision of this Agreement were not performed in accordance with its terms and that, although monetary damages may be available for such a breach, monetary

CONFIDENTIAL

damages would be an inadequate remedy therefor. Accordingly, each of the Parties agrees that, in the event of any breach or threatened breach of any provision of this Agreement by such Party, the other Party shall be entitled to an injunction or injunctions, specific performance and other equitable relief to prevent or restrain breaches or threatened breaches hereof and to specifically enforce the terms and provisions hereof. A Party seeking an order or injunction to prevent breaches of this Agreement or to enforce specifically the terms and provisions hereof shall not be required to provide, furnish or post any bond or other security in connection with or as a condition to obtaining any such order or injunction, and each Party hereby irrevocably waives any right it may have to require the provision, furnishing or posting of any such bond or other security. In the event that any Legal Proceeding should be brought in equity to enforce the provisions of this Agreement, each Party agrees that it shall not allege, and each Party hereby waives the defense, that there is an adequate remedy available at law.

**Section 21.13** Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall be deemed to be one and the same agreement or document. A signed copy of this Agreement transmitted by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original executed copy of this Agreement for all purposes.

**Section 21.14** Office of the Comptroller. Owner agrees to file this Agreement with the Comptroller of the Commonwealth promptly after its execution and to provide Operator with evidence of its filing within fifteen (15) days following the Effective Date. The Parties acknowledge and agree that the obligations and considerations under this Agreement shall not be enforceable until this Agreement shall have been registered with the Office of the Comptroller of the Commonwealth as provided by Act No. 18 of the Legislative Assembly of Puerto Rico, enacted on October 30, 1975.

**Section 21.15** Governing Law. This Agreement and all matters, claims, controversies, disputes, suits, actions or proceedings arising out of or relating to this Agreement and the negotiation, execution or performance of this Agreement or any of the transactions contemplated hereby, including all rights of the Parties (whether sounding in contract, tort, common or statutory law, equity or otherwise) in connection therewith, shall be interpreted, construed and governed by and in accordance with, and enforced pursuant to, the internal laws of the Commonwealth (excluding any conflict of laws rule or principle which might refer such interpretation to the laws of another jurisdiction), except where the federal supremacy clause requires otherwise.

**Section 21.16** Commonwealth Obligations. THE OBLIGATIONS OF OWNER AND ADMINISTRATOR UNDER THIS AGREEMENT SHALL NOT BE DEEMED OBLIGATIONS OF THE COMMONWEALTH OR ANY INSTRUMENTALITY OF THE COMMONWEALTH OTHER THAN OWNER AND ADMINISTRATOR.

**Section 21.17** PREB Authority. Notwithstanding anything to the contrary herein, but without affecting Operator's remedies in the event of a Change in Regulatory Law, no provision of this Agreement shall be interpreted, construed or deemed to limit, restrict, supersede, supplant or otherwise affect, in each case in any way, the rights, responsibilities or authority granted to PREB under Applicable Law with respect to the Legacy Generation Assets, Owner or Operator.

CONFIDENTIAL

**Section 21.18**  Non-Recourse. Notwithstanding anything that may be expressed or implied in this Agreement or any document, agreement, or instrument delivered contemporaneously herewith except for the Guarantee, each Party, by its acceptance of the benefits of this Agreement, covenants, agrees and acknowledges that no Persons other than the Parties shall have any obligation hereunder and that it has no rights of recovery hereunder against, and no recourse hereunder or under any documents, agreements, or instruments delivered in connection with this Agreement (unless and to the extent such Person is expressly a party to such other agreement, document or instrument) or in respect of any oral representations made or alleged to be made in connection herewith or therewith shall be had against, any former, current or future director, officer, agent, Affiliate, manager, assignee, incorporator, controlling Person, fiduciary, Representative or employee of any former, current, or future general or limited partner, manager, stockholder or member of any Party (or any of their successors or permitted assignees) or any Affiliate thereof or against any former, current or future director, officer, agent, employee, Affiliate, manager, assignee, incorporator, controlling Person, fiduciary, Representative, general or limited partner, stockholder, manager or member of any of the foregoing, whether by or through attempted piercing of the corporate veil, by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other Applicable Law, or otherwise.

**Section 21.19**  Commonwealth Support Provisions. With a view toward fostering a positive and constructive relationship between Operator and the applicable Government Bodies, Operator shall:

(a)  Ratepayer Savings. No later than 90 days after the end of each Contract Year, provide a summary (derived from the periodic reports otherwise provided to Administrator by this Agreement) to T&D Operator of Operator's calculation of the fuel and operational savings, which summary shall clearly show Operator's calculations of the savings created by Operator activities in the prior Contract Year. This summary shall provide T&D Operator with the information necessary to take such savings into account when proposing applicable electricity rates for PREB approval. Operator shall assist T&D Operator in developing strategies to use such savings to lower the applicable electricity rates. Operator will make copies of such summary available to the Administrator, PREB, and FOMB.

(b)  Employee Benefits and Protections. Offer employment to fulltime plant Owner Employees in the manner set forth in Section 4.2(g) (*Operator Responsibilities – Employment Offers*) of this Agreement, and provide such Hired Former Employees of Owner with the following additional protections: (i) his or her job will be guaranteed for a minimum period of two (2) years, and (ii) Hired Former Employees of Owner may only be separated from the position during such period of two (2) years if he or she engages in behavior that warrants dismissal or constitutes just cause under Act 80 of May 30, 1970, as amended.

(c)  Limits on Subcontracts. Disclose to Administrator information related to any Affiliate of Operator that proposes to participate in any procurement relating to subcontracting of services to be provided under this Agreement in a manner consistent with Section 11.4 (*Disclosure Related to Operator Affiliates*) of this Agreement. Operator shall make commercially reasonable efforts to ensure that a company established under the Commonwealth of Puerto Rico or a company that has a significant presence in the Commonwealth of Puerto Rico are included in the procurement process for materials and services under this Agreement.

146

(d)     <u>Local Workforce Prioritization</u>. Use commercially reasonable efforts to select a company established under the Commonwealth of Puerto Rico or a company that has a significant presence in the Commonwealth of Puerto Rico as its Material Subcontractors.

(e)     <u>Enhanced Transparency</u>. No later than ninety (90) days following each Contract Year, provide to Administrator an annual report for the Administrator to make available to the Legislative Assembly, which report shall include a summary of the Operator's operational performance for such prior Contract Year and expectations for the upcoming Contract Year. From time to time, Operator shall provide such information as Administrator may reasonably request pursuant to Section 21.19(e), which requests Operator acknowledges and accepts, shall also include those on behalf of another Governmental Body.

(f)     <u>Agreement</u>. Parties may seek to extend this Agreement only in conformity with the terms of Section 2.3(b) (*Term – Extension*) of this Agreement. For the avoidance of doubt, Administrator's approval of such extension pursuant to Section 2.3(b) (*Term – Extension*) of this Agreement shall be provided only following a decision of the Administrator's Board of Directors in accordance with Act 29 and Act 120. This Agreement shall be deemed a PREPA Transaction subject to the requirements of Act 120.

*[Signature page follows]*

**IN WITNESS WHEREOF**, Owner, Administrator and Operator each has caused this Agreement to be duly executed as of the day and year first above written.

**PUERTO RICO ELECTRIC POWER
AUTHORITY, solely in its capacity as OWNER**

By: _____

Name: Fernando Gil Enseñat

Title: Chairman of the board

By: _____

Name: Jose A. Colón-Ortiz

Title: Executive Director

**PUERTO RICO PUBLIC-PRIVATE
PARTNERSHIPS AUTHORITY, solely in its
capacity as ADMINISTRATOR**

By: _____

Name: Fermín E. Fontanes

Title: Executive Director

*[Signature Page to Legacy Gen O&M Agreement]*

**CONFIDENTIAL**

**GENERA PR LLC, solely in its capacity as OPERATOR**

By: _____

Name: Christopher Guinta

Title: Chief Financial Officer

**Acknowledged for purpose of the references to Management Co in this Agreement:**

**GENERA MANAGEMENT LLC, solely in its capacity as MANAGEMENT CO**

By: _____

Name: Christopher Guinta

Title: Authorized Signatory

*[Signature Page to Legacy Gen O&M Agreement]*

CONFIDENTIAL

**Annex I**

**Legacy Generation Assets**

| Legacy Generation Asset | Operational Classification | Out-of-Service Unit |
|---|---|---|
| Aguirre Steam Unit 1 | Baseload Unit | |
| Aguirre Steam Unit 2 | Baseload Unit | |
| Aguirre GT Unit 1 | Peaking Unit | Yes |
| Aguirre GT Unit 2 | Peaking Unit | |
| Aguirre CC 1 – Steam | Baseload Unit | |
| Aguirre CC 1 – Combustion | Baseload Units | |
| Aguirre CC 2 – Steam | Baseload Unit | Yes |
| Aguirre CC 2 – Combustion | Baseload Units | Yes |
| Cambalache Unit 1 | Peaking Unit | Yes |
| Cambalache Unit 2 | Peaking Unit | |
| Cambalache Unit 3 | Peaking Unit | |
| Costa Sur Unit 1 | Baseload Unit | Yes |
| Costa Sur Unit 2 | Baseload Unit | Yes |
| Costa Sur Unit 3 | Baseload Unit | Yes |
| Costa Sur Unit 4 | Baseload Unit | Yes |
| Costa Sur Unit 5 | Baseload Unit | |
| Costa Sur Unit 6 | Baseload Unit | |
| Costa Sur GT Unit 1 | Peaking Unit | Yes |
| Costa Sur GT Unit 2 | Peaking Unit | Yes |
| Culebra Unit 1 | Emergency Unit | |
| Culebra Unit 2 | Emergency Unit | |
| Culebra Unit 3 | Emergency Unit | |
| Mayaguez Unit 1 | Peaking Unit | |
| Mayaguez Unit 2 | Peaking Unit | |
| Mayaguez Unit 3 | Peaking Unit | |
| Mayaguez Unit 4 | Peaking Unit | |
| Palo Seco Unit 1 | Baseload Unit | |
| Palo Seco Unit 2 | Baseload Unit | Yes |
| Palo Seco Unit 3 | Baseload Unit | |
| Palo Seco Unit 4 | Baseload Unit | |
| Palo Seco CT Unit 1-1 | Peaking Unit | |
| Palo Seco CT Unit 1-2 | Peaking Unit | |
| Palo Seco CT Unit 2-1 | Peaking Unit | |
| Palo Seco CT Unit 2-2 | Peaking Unit | |
| Palo Seco CT Unit 3-1 | Peaking Unit | |
| Palo Seco CT Unit 3-2 | Peaking Unit | |
| Palo Seco MobilePacs | Peaking Unit | |
| San Juan Unit 1 – Steam | Baseload Unit | Yes |
| San Juan Unit 2 – Steam | Baseload Unit | Yes |

**CONFIDENTIAL**

| Legacy Generation Asset | Operational Classification | Out-of-Service Unit |
|---|---|---|
| San Juan Unit 3 – Steam | Baseload Unit | Yes |
| San Juan Unit 4 – Steam | Baseload Unit | Yes |
| San Juan CC 5 - Gas | Baseload Unit | |
| San Juan CC 5 - Steam | Baseload Unit | |
| San Juan CC 6 - Gas | Baseload Unit | |
| San Juan CC 6 – Steam | Baseload Unit | |
| San Juan Unit 7 - Steam | Baseload Unit | |
| San Juan Unit 8 – Steam | Baseload Unit | |
| San Juan Unit 9 – Steam | Baseload Unit | |
| San Juan Unit 10 – Steam | Baseload Unit | Yes |
| Daguao CT Unit 1 | Peaking Unit | |
| Daguao CT Unit 2 | Peaking Unit | |
| Yabucoa CT Unit 1 | Peaking Unit | |
| Yabucoa CT Unit 2 | Peaking Unit | |
| Jobos CT Unit 1 | Peaking Unit | |
| Jobos CT Unit 2 | Peaking Unit | |
| Vega Baja CT Unit 1 | Peaking Unit | |
| Vega Baja CT Unit 2 | Peaking Unit | |
| Vieques Unit 1 | Emergency Unit | |
| Vieques Unit 2 | Emergency Unit | |

CONFIDENTIAL

## Annex II

## Compensation

## I.    O&M Fixed Fee

### A.    O&M Fixed Fee Amounts

Subject to the O&M Fixed Fee Adjustment (as defined below), the O&M Fixed Fee payable to Operator in each Contract Year as compensation for the performance of the O&M Services pursuant to Article 7 (*Compensation; O&M Budgets*) shall be as follows:

| Contract Year | O&M Fixed Fee* |
|:---:|:---:|
| 1 | US$22.5 million x CPI Factor |
| 2 | US$22.5 million x CPI Factor |
| 3 | US$22.5 million x CPI Factor |
| 4 | US$22.5 million x CPI Factor |
| 5 | US$22.5 million x CPI Factor |
| 6 | US$22.5 million x CPI Factor** |
| 7 | US$22.5 million x CPI Factor** |
| 8 | US$22.5 million x CPI Factor** |
| 9 | US$22.5 million x CPI Factor** |
| 10 | US$22.5 million x CPI Factor** |

---

\*    The O&M Fixed Fee for any Contract Year containing more or less than three hundred and sixty-five (365) calendar days shall be automatically increased or decreased (as applicable) on a Pro Rata basis.

\*\*    The O&M Fixed Fee for specified years is subject to adjustment in accordance with the below.

### B.    Adjustments to O&M Fixed Fee upon Decommissioning or Removal from Scope of Services

Commencing in Contract Year 6, the O&M Fixed Fee for any of Contract Year 6 through Contract Year 10 shall be subject to an O&M Fixed Fee Adjustment in the event that (i) Operator has begun or begins to perform Decommissioning Services with respect to a Legacy Generation Asset; or (ii) one or more Legacy Generation Assets has been or is removed from the scope of O&M Services, permanently or indefinitely, in each case, pursuant to Section 2.3 (*Term*); provided, however, that notwithstanding anything in this Agreement to the contrary, the O&M Fixed Fee shall not be reduced below US$5 million. For the avoidance of doubt, there shall be no O&M Fixed Fee Adjustment in Contract Year 1 through Contract Year 5 as a result of Operator beginning to provide Decommissioning Services with respect to a Legacy Generation Asset or a Legacy Generation Asset being removed from the scope of O&M Services.

Any O&M Fixed Fee Adjustment shall be effective as of the date (such date, an "Adjustment Date") on which (i) Operator commences Decommissioning Services with respect to a Legacy Generation Asset, or (ii) a Legacy Generation Asset is removed from the scope of the O&M Services pursuant to Section 2.3 (*Term*); provided, however, that if the event described in clause (i) or (ii) occurs prior to the first day of Contract Year 6, then the Adjustment Date with respect to such event shall be the first day of Contract Year 6.

CONFIDENTIAL

Following an Adjustment Date, the O&M Fixed Fee payable for a given Contract Year shall be the Adjusted O&M Fixed Fee.

The "Adjusted O&M Fixed Fee" shall be calculated in accordance with the following formula:

**Adjusted O&M Fixed Fee = OFF – the aggregate of all O&M Fixed Fee Adjustments for Legacy Generation Assets which are permanently out of service, are being or have been decommissioned, or are indefinitely out of service without an active full remediation plan,**

where:

- *OFF* = The applicable O&M Fixed Fee for a given Contract Year, as set forth in Section I.A. (*O&M Fixed Fee Amounts*) above;

- *O&M Fixed Fee Adjustment* = OFF x AR; and

- *AR* = The applicable ratio corresponding to the percentage of the O&M Fixed Fee allocated to each Legacy Generation Asset which are being or have been decommissioned, as set forth in the tables below:

| Legacy Generation Asset | Applicable Ratio (AR) |
|---|---|
| Aguirre Steam Unit 1 | 11.27% |
| Aguirre Steam Unit 2 | 11.27% |
| Aguirre GT Unit 1 | 0.05% |
| Aguirre GT Unit 2 | 0.53% |
| Aguirre CC 1 – Steam | 2.40% |
| Aguirre CC 1 – Gas | 5.01% |
| Aguirre CC 2 – Steam | 0.05% |
| Aguirre CC 2 – Gas | 0.05% |
| Cambalache Unit 1 | 0.05% |
| Cambalache Unit 2 | 2.07% |
| Cambalache Unit 3 | 2.07% |
| Costa Sur Unit 1 | 0.05% |
| Costa Sur Unit 2 | 0.05% |
| Costa Sur Unit 3 | 0.05% |
| Costa Sur Unit 4 | 0.05% |
| Costa Sur Unit 5 | 10.27% |
| Costa Sur Unit 6 | 10.27% |
| Costa Sur GT Unit 1 | 0.05% |
| Costa Sur GT Unit 2 | 0.05% |
| Mayaguez Unit 1 | 1.38% |
| Mayaguez Unit 2 | 1.38% |
| Mayaguez Unit 3 | 1.38% |

CONFIDENTIAL

| | |
|---|---|
| Mayaguez Unit 4 | 1.38% |
| Palo Seco Unit 1 | 2.13% |
| Palo Seco Unit 2 | 0.05% |
| Palo Seco Unit 3 | 5.41% |
| Palo Seco Unit 4 | 5.41% |
| Palo Seco GT Unit 1-1 | 0.53% |
| Palo Seco GT Unit 1-2 | 0.53% |
| Palo Seco GT Unit 2-1 | 0.53% |
| Palo Seco GT Unit 2-2 | 0.53% |
| Palo Seco GT Unit 3-1 | 0.53% |
| Palo Seco GT Unit 3-2 | 0.53% |
| Palo Seco MobilePac 1 | 0.68% |
| Palo Seco MobilePac 2 | 0.68% |
| Palo Seco MobilePac 3 | 0.68% |
| San Juan Unit 1 – Steam | 0.05% |
| San Juan Unit 2 – Steam | 0.05% |
| San Juan Unit 3 – Steam | 0.05% |
| San Juan Unit 4 – Steam | 0.05% |
| San Juan CC 5 – Gas | 4.01% |
| San Juan CC 5 – Steam | 1.50% |
| San Juan CC 6 – Gas | 4.01% |
| San Juan CC 6 – Steam | 1.50% |
| San Juan Unit 7 – Steam | 2.50% |
| San Juan Unit 8 – Steam | 2.50% |
| San Juan Unit 9 - Steam | 0.05% |
| San Juan Unit 10 - Steam | 0.05% |
| Daguao GT Unit 1 | 0.53% |
| Daguao GT Unit 2 | 0.53% |
| Yabucoa GT Unit 1 | 0.53% |
| Yabucoa GT Unit 2 | 0.53% |
| Jobos GT Unit 1 | 0.53% |
| Jobos GT Unit 2 | 0.53% |
| Vega Baja GT Unit 1 | 0.53% |
| Vega Baja GT Unit 2 | 0.53% |
| Total | 100.00% |

**II.**     **Not used**

**III.**     **Incentives and Penalties**

    **A.**     **General.**

In each Contract Year, Operator shall be (i) eligible to receive financial incentive compensation in the form of an Incentive Payment or (ii) subject to potential Penalty, in each case, based on Operator's performance in providing the O&M Services and/or the Decommissioning

Services, as applicable, with respect to the performance categories described in this Section III of Annex II (*Compensation – Incentives and Penalties*); <u>provided</u> that no Incentive Payment shall be paid to, and no Penalty shall be incurred by, Operator during the Mobilization Period or the Demobilization Period. Following any O&M Fixed Fee Adjustment, the maximum Incentive Payment that Operator is entitled to earn for such Contract Year(s) shall be correspondingly subject to Pro Rata reduction.

Upon the occurrence and continuation of any Force Majeure Event (other than a Force Majeure Event that is a *Forced* Outage), Operator and Administrator shall negotiate in good faith adjustments or modifications to the relevant categories of Incentives and Penalties, as applicable, which shall apply during the duration of such Force Majeure Event.

Certain categories of *Incentives* and Penalties include minimum standards of performance that Operator must meet, as set forth in Section III.B of Annex II (*Compensation – Incentives and Penalties – O&M Services Categories*) (each, a "<u>Minimum Performance Threshold</u>"). Failure to meet one or more Minimum Performance Thresholds may trigger a "<u>Minimum Performance Threshold Default</u>" pursuant to Section 14.1(l) (*Events of Default by Operator – Failure to Meet Minimum Performance Threshold*).

All Incentives and *Penalties* for any Contract Year containing more or less than three hundred and sixty-five (365) calendar days shall be automatically increased or decreased (as applicable) on a Pro Rata basis.

### B.    O&M Services Categories

To incentivize Operator to meet certain targets in performing the O&M Services, Operator shall be evaluated in six (6) categories: (i) Operation Cost Efficiency, (ii) Equivalent Availability Factor (EAF), (iii) Safety Compliance, (iv) Environmental Compliance, (v) Reporting Obligations and (vi) Fuel Savings, as described in this Section III.B of Annex II (*Compensation – Incentives and Penalties – O&M Services Categories*). For each Contract Year, the maximum amount payable by Owner to Operator based on the aggregate sum of (a) the amounts payable to Operator with respect to the following five (5) incentive categories described below, (i) Operation Cost Efficiency, (ii) Equivalent Availability Factor (EAF), (iii) Safety Compliance, (iv) Environmental Compliance and (v) Fuel Savings, for all applicable Legacy Generation Assets *minus* (b) the amount of any Penalties (the sum of (a) and (b), the "<u>Aggregate I&P Amount</u>"), shall be an amount equal to US$100 million (the "<u>Annual Incentive Cap</u>"); <u>provided</u>, <u>however</u>, that to the extent that the Aggregate I&P Amount accrued for any Contract Year exceeds the Annual Incentive Cap, the amount of such accrued excess shall be carried over into subsequent Contract Years and shall be payable by Owner to Operator to the extent that the accrued Aggregate I&P Amount in any subsequent Contract Year is less than the Annual Incentive Cap for such Contract Year.

### 1.    Operation Cost Efficiency

The applicable Operating Budget for each Contract Year shall be the benchmarks for determining Operator's cost efficiency in such Contract Year, subject to adjustments for Force Majeure Events and Owner Fault. Operator shall receive an O&M Incentive Payment based on a

CONFIDENTIAL

percentage of the total amount of cost savings achieved by Operator in the delivery of the O&M Services as compared to the approved Operating Budget.

Measurement Parameter: Actual expenditures as a percentage (%) of the approved Operating Budget, where actual savings equal the Operating Budget minus actual expenditures.

| Criteria: | |
|---|---|
| >95% but <99% | Operator receives 50% of the actual savings |
| >90% but ≤95% | Operator receives 50% of the actual savings |
| >85% but ≤90% | Operator receives 50% of the actual savings |
| ≤85% | Operator receives 50% of the actual savings |

For each Contract Year, the maximum O&M Incentive Payment payable to Operator under the Operation Cost Efficiency category shall be subject to the Annual Incentive Cap, which shall be subject to Pro Rata reduction following any O&M Fixed Fee Adjustment.

## 2.    Equivalent Availability Factor (EAF)

The overall annual Equivalent Availability Factor (as defined below) targets and Minimum Performance Threshold (Capacity and Heat Rate) value for Baseload Units and for Peaking Units shall be established pursuant to Section 5.22 (*O&M Services – Annual Performance Test*). The Annual Performance Test shall be performed within ninety (90) days from the Service Commencement Date and during the first thirty (30) days of each Contract Year thereafter. The agreed to Annual Performance Test will provide a baseline for Capacity and Heat Rate, which results Operator shall consider when proposing Equivalent Availability Factor targets, including factoring in planned maintenance. Operator shall submit proposed Equivalent Availability Factor targets and Minimum Performance Thresholds to PREB for its review and approval; provided that if PREB does not respond within thirty (30) days following its receipt of such results and proposed targets, PREB shall be deemed to have no objection to such results and proposed targets. Operator shall provide to Administrator a monthly report and an annual report of the Equivalent Availability Factors in accordance with the North American Electric Reliability Corporation' Generation Availability Data System protocols.

To the extent Operator's overall annual Equivalent Availability Factor for a Contract Year exceeds the Equivalent Availability Factor referenced above, Operator shall receive a graduated O&M Incentive Payment, and to the extent it falls below the targets referenced above, Operator shall be subject to an O&M Penalty, in each case, subject to a maximum cap as described below. The Equivalent Availability Factor shall be automatically adjusted for excusable events including Force Majeure Events and Owner Fault.

As used in this Section III of Annex II (*Compensation – Incentives and Penalties*), "Equivalent Availability Factor" shall be defined in accordance with IEEE 762-2006, *IEEE Standard Definitions for Use in Reporting Electric Generating Unit Reliability, Availability, and Productivity ("IEEE 762-2006")* as:

**CONFIDENTIAL**

$$EAF = \frac{(AH-EPDH-EUDH)}{PH} \times 100\%$$

where:

- AH = Available Hours
- EPDH= Equivalent Planned Derated Hours
- EUDH = Equivalent Unplanned Derated Hours
- PH = Period Hours or number of hours that the Legacy Generation Asset was in active state

As used in this Section III of Annex II (*Compensation – Incentives and Penalties*), the aforementioned terms have the meanings ascribed to them in IEEE 762-2006.

The actual calculated Equivalent Availability Factor percent for each asset for a Contract Year in a category (Baseload Units and Peaking Units) shall be weighted that Contract Year by the ratio of its Tested Capacity to the total Tested Capacity for the category for that Contract Year to arrive at the overall Equivalent Availability Percent for that category of generation units for purposes of the Incentives and Penalties.

<u>Measurement Parameter</u>: Equivalent Availability Factor for Baseload Units

| Criteria: | |
|---|---|
| **>5%** **above Performance Target** | Operator receives an Incentive Payment of US$*15 million* |
| **>2.5% but ≤5%** **above Performance Target** | Operator receives an Incentive Payment of US$*10 million* |
| **>0% but ≤2.5%** **above Performance Target** | Operator receives an Incentive Payment of US$*5 million* |
| **≤Performance Target** | Operator pays a Penalty of US$*5 million* |

<u>Measurement Parameter</u>: Equivalent Availability Factor for Peaking Units

| Criteria: | |
|---|---|
| **>10%** **above Performance Target** | Operator receives an Incentive Payment of US$*15 million* |
| **>5% but ≤10%** **above Performance Target** | Operator receives an Incentive Payment of US$*10 million* |
| **>0% but ≤5%** **above Performance Target** | Operator receives an Incentive Payment of US$*5 million* |
| **≤ Performance Target** | Operator pays a Penalty of US$*5 million* |

For each Contract Year, the maximum aggregate O&M Incentive Payment payable to Operator with respect to the parameters of the Equivalent Availability Factor category shall be

CONFIDENTIAL

subject to the Annual Incentive Cap, which shall be subject to Pro Rata reduction following any O&M Fixed Fee Adjustment.

> Minimum Performance Threshold for Equivalent Availability Factor Category: The Minimum Performance Threshold for the annual Equivalent Availability Factor for the applicable Legacy Generation Assets for the Baseload Units and for the Peaking Units shall be established pursuant to Section 5.22 (*O&M Services – Annual Performance Test*), subject to adjustments for Force Majeure Events and Owner Fault. Failure by Operator to achieve either Minimum Performance Threshold in two (2) consecutive Contract Years shall trigger a Minimum Performance Threshold Default pursuant to Section 14.1(l) (*Events of Default by Operator – Failure to Meet Minimum Performance Threshold*).

### 3. Safety Compliance

Operator shall receive an O&M Incentive Payment based on its performance for each Contract Year with respect to the safety compliance targets described below, which, for the avoidance of doubt, shall also include the performance of O&M Services by Operator's subcontractors. If, during any Contract Year, Operator performs below the relevant targets, Operator shall be subject to an O&M Penalty, as described below.

Measurement Parameter: OSHA Lost Time Incidents (LTI)

| Number of LTI Incidents: | |
|---|---|
| **3 or less** | Operator receives an Incentive Payment of US$***10,000*** |
| **Between 3 and 5** | Operator receives an Incentive Payment of US$***5,000*** |
| **>5** | Operator pays a Penalty of US$***100,000*** |

Measurement Parameter: OSHA Recordable Injury or Illness (I&I)

| Number of I&I Incidents: | |
|---|---|
| **0** | Operator receives an Incentive Payment of US$***10,000*** |
| **Between 1 and 3** | Operator receives an Incentive Payment of US$***5,000*** |
| **>3** | Operator pays a Penalty of US$***100,000*** |

Measurement Parameter: OSHA Fatality or Severe Injury

| Number of Fatalities or Severe Injuries: | |
|---|---|
| **0** | Operator receives an Incentive Payment of US$***10,000*** |
| **≥1** | Operator pays a Penalty of US$***100,000*** |

For each Contract Year, the maximum aggregate O&M Incentive Payment payable to Operator shall be subject to the Annual Incentive Cap and the maximum aggregate O&M Penalty

that Operator may incur shall be US$100,000, in each case with respect to parameters of the Safety Compliance category described herein, and in each case which shall be subject to Pro Rata reduction following any O&M Fixed Fee Adjustment.

> Minimum Performance Threshold for Safety Compliance Category: The payment of penalties by Operator on any of the safety compliance measurement parameters in two (2) consecutive Contract Years shall trigger a Minimum Performance Threshold Default pursuant to Section 14.1(l) (*Events of Default by Operator – Failure to Meet Minimum Performance Threshold*).

### 4.    Environmental Compliance

Operator shall receive an O&M Incentive Payment based on its performance with respect to the environmental target described below. If, during any Contract Year, Operator performs below the relevant target, Operator shall be subject to an O&M Penalty, as described below.

Measurement Parameter: Violation of Consent Decrees and/or Notice of Violations (NOVs)

| Number of Violations or NOVs: | |
|---|---|
| 0 | Operator receives an Incentive Payment of US$**10,000** |
| >1 | Operator pays a Penalty of US$**25,000** (for each violation or NOV) |

For each Contract Year, the maximum aggregate O&M Incentive Payment payable to Operator shall be US$100,000 and the maximum aggregate O&M Penalty that Operator may incur shall be US$100,000, in each case with respect to parameters of the Environmental Compliance category described herein, and in each case which shall be subject to Pro Rata reduction following any O&M Fixed Fee Adjustment.

> Minimum Performance Threshold for Environmental Compliance Category: The payment of an O&M Penalty by Operator under the Environmental Compliance category for two (2) consecutive Contract Years shall trigger a Minimum Performance Threshold Default pursuant to Section 14.1(l) (*Events of Default by Operator – Failure to Meet Minimum Performance Threshold*).

### 5.    Reporting Obligations

In accordance with Section 5.14(c)(iii) (*Information – Information Access*) and Section 7.1(d) (*Service Fee – Reporting Obligation Charge*), Operator shall be subject to a charge based on its timeliness in responding to a reasonable request for information from Administrator. For every fifteen (15) sequential days during which Operator fails to provide a response to Administrator, Operator shall pay a penalty of US$100,000 (the "Reporting Obligation Charge").

CONFIDENTIAL

For each Contract Year, the maximum aggregate Reporting Obligation Charge that Operator may incur shall be US$1 million, and in each case which shall be subject to Pro Rata reduction following any O&M Fixed Fee Adjustment, and in each case which shall be subject to Pro Rata reduction following any O&M Fixed Fee Adjustment.

## 6. Fuel Optimization

(a)     Operator shall receive a "Fuel Optimization Payment" of fifty percent (50%) of any Actual Fuel Savings achieved during the relevant Contract Year.

(b)     Operator shall prepare, and shall include in the Incentives and Penalties Report submitted pursuant to Section 7.1(c)(ii) (*Service Fee – Incentives and Penalties*), a detailed report (the "Fuel Optimization Report") (A) demonstrating actual realized savings in Fuel Costs achieved during such Contract Year for each Legacy Generation Asset as a result of any Fuel Cost Savings Initiatives pursued or implemented by Operator ("Actual Fuel Savings"), which shall be calculated pursuant to the Fuel Optimization Plan and based on the applicable assumptions in the then current approved budget (e.g., output, dispatch, Heat Rate, fuel costs, etc.), and be an amount equal to the difference between the budgeted cost and the actual cost of the relevant budget items and (B) setting out Operator's calculation of the Fuel Optimization Payment. The Fuel Optimization Report shall comply with, and all Fuel Cost Savings Initiatives shall be implemented in compliance with, the requirements set forth in Section 9.2(c) (*Anti-Corruption and Sanctions Laws – Policies and Procedures*).

(c)     For the purpose of being able to determine Actual Fuel Savings and the corresponding Fuel Optimization Payment for any Contract Year that commences after one or more Fuel Cost Savings Initiatives have been implemented or are otherwise already accounted for in the relevant Budget, the Budgets for such Contract Year(s) shall include an addendum setting forth hypothetical budget allocations for the Fuel Costs that would be incurred in the absence of the Fuel Cost Savings Initiatives (for example (A) the cost of operation on diesel or heavy fuel oil of all Legacy Generation Assets that operated on diesel or heavy fuel oil as of the Effective Date and (B) the cost of transportation, testing and storage based on the fuel sources and transportation and storage methods utilized by Owner as of the Effective Date), and the Actual Fuel Savings shall be calculated by reference to such hypothetical budget allocations. The detailed methodologies for calculating Actual Fuel Savings and the Fuel Optimization Payment pursuant to this Section III.B.6(c) of Annex II (*Compensation – Incentives and Penalties – Fuel Optimization*) shall be included in the Fuel Optimization Plan. If the Parties have not agreed on the foregoing addendum within thirty (30) days of the commencement of any applicable Contract Year, either Party may submit such disagreement for resolution by an Independent Expert for an Expert Technical Determination in accordance with Section 15.4 (*Expert Technical Determination Procedure for Technical Disputes*).

## C.     Decommissioning Services Categories

To incentivize Operator to meet certain targets in performing the Decommissioning Services with respect to a Legacy Generation Asset, Operator shall be evaluated in accordance with the Decommissioning Costs Efficiency category, as described in this Section III.C of Annex II (*Compensation – Incentives and Penalties – Decommissioning Services Categories*).

**CONFIDENTIAL**

## 1.    Decommissioning Costs Efficiency

Prior to the commencement of Decommissioning Services for any Legacy Generation Asset, Operator shall propose a Decommissioning Budget and a timeline as part of its proposed Decommissioning Plan, in accordance with Section 16.1 (*Notice and Approval for Retirement of Legacy Generation Assets and Commencement of Decommissioning Services*). Upon completion of such Decommissioning Services, as agreed by Operator, Administrator and PREB:

- If (i) Operator's actual expenditures are consistent with or exceed the estimates included in the applicable Decommissioning Budget and (ii) Operator successfully completes the applicable Decommissioning Services on or before relevant Decommissioning Completion Date, no Incentive Payment shall be applicable.

- If (i) Operator's actual expenditures are below the estimates included in the applicable Decommissioning Budget and (ii) Operator successfully completes the applicable Decommissioning Services on or before relevant Decommissioning Completion Date, Operator shall be eligible to receive a Decommissioning Incentive Payment consisting of a percentage of the actual cost reduction as compared to the estimates included in the applicable Decommissioning Budget (subject to a maximum cap).

- Operator shall use reasonable efforts to perform the Decommissioning Services within the applicable Decommissioning Budget.

<u>Measurement Parameter</u>: Actual expenditures as a percentage (%) of the approved Decommissioning Budget, where actual savings equal the Decommissioning Budget minus actual expenditures.

| Criteria: | |
|---|---|
| **>95% but <99%** | Operator receives 50% of the actual savings |
| **>90% but ≤95%** | Operator receives 50% of the actual savings |
| **>85% but ≤90%** | Operator receives 50% of the actual savings |
| **≤85%** | Operator receives 50% of the actual savings |

For each Contract Year, the aggregate Decommissioning Incentive Payment payable to Operator under the Decommissioning Costs Efficiency category for all applicable Legacy Generation Assets shall be subject to the Annual Incentive Cap.

If the Decommissioning Services with respect to a Legacy Generation Asset are not completed by the applicable Decommissioning Completion Date, then Operator shall be subject to a Decommissioning Penalty consisting of one million dollars ($1,000,000) for each week, or for any portion of a week on a Pro Rata basis, by which the completion of the Decommissioning Services is delayed past the applicable Decommissioning Completion Date, up to a maximum of fifteen million dollars ($15,000,000) in the aggregate across all Legacy Generation Assets and Generation Sites.

**CONFIDENTIAL**

> <u>Minimum Performance Threshold</u>: In the event Operator (i) exceeds the costs and expenses included in the applicable Decommissioning Budget and/or (ii) fails to complete the Decommissioning Services before the Decommissioning Completion Date for any two (2) Legacy Generation Assets, Administrator (on behalf of Owner) may, in its sole discretion, engage an independent third party to perform any future Decommissioning Services with respect to any Legacy Generation Assets without either Party incurring, or becoming liable for, the payment of any penalty, premium or termination fee.

CONFIDENTIAL

## Annex III

## Baseline Environmental Study

[To be provided during Mobilization Period.]

CONFIDENTIAL

## Annex IV

**[Reserved]**

CONFIDENTIAL

## Annex V

## Communications Plan

### 5.1    Communications Guiding Principles

The Operator will ensure that its communications plan covers four key principles.

- Transparent, Open, and Consistent Communications.
    - Operator shall create and sustain an open dialogue with members of the public, stakeholders, government officials and relevant elected leaders and the media.
    - The Operator will share facts, data, and updates in real-time with fact-based communications.

- Teamwork and Collaboration.
    - Operator shall work closely with stakeholders including P3A, PREB, PREPA, T&D Operator, PR Legislature, Central Office for Recovery Reconstruction and Resiliency ("COR3"), Puerto Rico Department of Natural Resources ("PRDRNA") , Federal Emergency Management Agency ("FEMA"), PR Emergency Management Agency ("PREMA", Occupational Safety and Health Administration ("OSHA"),  U.S. Environmental Protection Agency ("EPA") and others to communicate openly and completely regarding status updates, improvements, and challenges facing Legacy Generation Assets operations and decommissioning.

- Building Strong Community Partnerships with a Good Neighbor Program.
    - Operator shall reflect its commitment to serving Puerto Rico's energy needs via its actions and through teamwork to deliver its results and facts to the stakeholders. The Communication Plan shall also include providing opportunities to hear direct feedback from the community which are vital to building trust and strengthening relationships with T&D Operator customers and the general public.

- Local Talent and Local Resources.
    - Operator shall partner with a trusted local public affairs agency for surge support and engage local talent and local resources. This shall include a local, respected, and credible Spanish speaking spokesperson that will always be available and will convey messages in a truthful and complete manner. Local resources should also include contracting local technical, video production, graphic design, and other consultants as needed to support communications requirements.

### 5.2    Communications Team

Operator shall assemble a well-structured, unified corporate affairs department. The corporate affairs department shall handle day-to-day operations, as well as manage crisis situations. This team must be available during normal business hours – and importantly be ready on a 24/7/365 basis during an issue or crisis to provide rapid response communications and services. This will ensure transparent, accurate, and timely communications during normal operations and during crises.

CONFIDENTIAL

Members of the corporate affairs team shall frequently and proactively engage with members of the community, media, and local legislators, as well as P3A, PREB, PREPA and T&D Operator and other key stakeholders.

Operator shall ensure that it has a team of five or more full time employees that will also include two executive Vice President positions:

- VP, Communications
  - Serving as an on-the-record spokesperson for the company growing relationships with reporters, both local and (if necessary) mainland, in Spanish and English. This individual shall oversee the messaging for all public-facing materials and engagements, media relations, digital and social media and employee communications.

- VP, External Affairs
  - Shall oversee government relations, stakeholder engagement, and community outreach. Additionally, the External Affairs VP and team will oversee the Operator's island-wide Employee Ambassador Program and philanthropic partnerships.

  - Both individuals will have fluency in Spanish and English and be full-time residents of Puerto Rico. Each position shall hold FEMA NIMs certification and disaster relief training to ensure they are prepared for any potential adverse incidents on the island. These positions will report directly to senior management of Operator to ensure streamlined and real-time communications.

Operator shall be well-positioned in Washington DC to support P3A's and the Operator's federal engagement when necessary. The Operator will engage a national public affairs firm with offices in DC and New York that has strong national media and political relationships and extensive crisis management experience.

Operator will also partner with a trusted local public affairs and advertising agency for surge support and engage local talent and local resources as needed.

## 5.3     Communications Services

Operator needs to develop a system-wide set of standard operating procedures and a communications playbook. It will apply to all possible scenarios and challenges and will have sections that are included in the Generation Emergency Response Plan. The Operator shall develop key metrics that will be shared with management, P3A and other relevant stakeholders on a quarterly basis that will include a) government relations scorecard, b) positive traditional and social media reports, c) corporate reputation surveys and d) annual community and social responsibility reports.

Operator's communications program shall focus on two audiences:

***External***

- LUMA – T&D Operator

CONFIDENTIAL

- PREPA – Generation Owner

- Media (local and international)

- Puerto Rican Government

- Federal Government, including EPA, U.S. Department of Energy ("DOE"), U.S. Department of Justice ("DOJ"), US Congress, OSHA, EPA and others.

- Regulators – PREB, PRDNR, and others.

- Local Community Organizations

- Local Communities around Legacy Generation Assets

*Internal*

- Management and employees

- Labor unions

- System Contractors, Sub-Contractors and Vendors

- Suppliers

**5.4    Key Components of Communications Plan**

The communications plan needs to incorporate the following key components:

1. ***Communications Coordination Center***

   Operator shall establish a Communication Coordination Center ("CCC"), which shall serve as the hub for all incoming and outgoing communications. The CCC will monitor the landscape, develop tactics, and execute communications plans daily. The CCC shall handle message development, research, content creation, digital communications, and rapid response. This structure will be particularly effective in the event of an operational crisis or weather emergency, in which the Center could be activated by the Generation Incident Commander to serve as a the "nerve center" to manage rapid response. Operator shall house its communications team – including Operator staff and communications contractors – at or nearby the CCC for accessibility and constant communication. This may include housing, lavatories, connectivity, and food services.

2. ***Facts-Based, Strategy-Based, Day-to-Day & Proactive Communications***

   These communications shall focus on day-to-day updates regarding the Legacy Generation plants and associated systems, details on scheduled maintenance, and information regarding operational upgrades and system modifications.

3

CONFIDENTIAL

Operator shall develop appropriate public information campaigns about the company, its mission, and how it will effectively operate Puerto Rico's Legacy Generation plants and systems.

In addition to operational updates, internal components of these communications shall be made to its workforce – such as effectively communicating benefits programs to employees and internal channels.

Communications will be through a series of public-facing, easily digestible materials and services that may include press releases, fact sheets, press conferences, interactive content, and social media-based communications- both in English and Spanish.

3. *Crisis and Emergency Communications*

These communications shall respond to and position Operator in the event of an adverse event – ranging from weather incidents such as a hurricane or earthquake, to an operational, worst-case scenario, such as an explosion, leak, or cybersecurity threat in accordance with the Generation Emergency Response Plan. These communications shall be:

Factual, succinct, and transparent to help educate and inform the public in times of crisis.

Operator's CCC shall be activated in accordance with the Generation Emergency Response Plan to function as a rapid response "nerve center" for all of Operator's incoming and outgoing communications in the event of a crisis.

These communications will also respond to any adverse reputational events and misinformation to ensure that the company is well represented and media and the public have the facts directly from the Operator.

4. *Transitionary Communications*

The intent of these communications will be to announce the decommissioning of Legacy Generation Assets and/or the use of temporary power units during a transition.

Communications must explain the rationale to decommission the asset (operational challenges, lower efficiency, etc.), the use of temporary power units if needed as well as timing.

These communications will also be important for the internal audience, including organized labor, as the decommissioning and commissioning of assets will likely impact certain jobs while creating others.

5. *Individual Generation Units*

In addition to a detailed system-wide road map, the communications team will develop customized communications plans for each individual Legacy Generation Asset division, tailoring it to local dynamics and its unique features and challenges.

- o San Juan Power Plant Division

4

CONFIDENTIAL

o   Costa Sur Power Plant Division

o   Palo Seco Power Planet Division

o   Gas and Cambalache Power Plant Division

o   Aguirre and Combined Power Plant Division

To help facilitate community-based external communications and relations in each division, Operator shall establish an Employee Ambassador Program, in which the Operator will identify and train one or more employees in each division to serve as a representative for the public and local community.

Ambassadors shall coordinate directly with the Operator's External Affairs team, leading local engagement, attending local government meetings and other public-facing events. This role shall also oversee small community forums each month to hear directly from customers and stakeholders.

The Employee Ambassador Program should be used to deliver communications to the community on retirement, maintenance, and other challenges with each of the legacy generation units.

6. *Employee Communications*

Employee communications is complex, labor intensive and requires complete integration with Human Resources.

Engaging with and constant communication with employees shall be a foundational aspect of this approach. The Operator has an obligation to keep employees informed and to ensure that employees feel part of the new team.

Operator shall create and maintain an internal platform utilizing all available communications channels to ensure streamlined communication with all team members, available in both Spanish and English.

There will also be a channel for employees to directly communicate with management and coworkers. The internal platform should also include all relevant corporate communications and operational-related updates.

7. *Workforce Communications*

Communications with the workforce, particularly regarding organized labor and contract negotiations, are highly complex and contain both internal and external components. Transparent communications with all parties, including the union, are essential.

All workforce communications shall be crafted in adherence with federal, commonwealth, and local labor regulations, and must highlight the key facts regarding proposed contracts, including economic benefits, healthcare, retirement savings and so forth.

CONFIDENTIAL

Transitory communications around retiring assets shall also require close coordination with organized labor.

8. ***Stakeholder Communications***

Regular communication with all stakeholders is critical. Everyone involved should receive consistent messaging that aligns with the overall strategy and operational goals.

The Employee Ambassador Program explained above as well as the Good Neighbor Program are both key to local community engagement, including stakeholders. All stakeholders shall be invited to participate in the regularly held roundtables to hear updates directly from the company and provide real-time feedback, ask questions, raise concerns, etc.

Stakeholders shall also receive detailed newsletter updates and frequent communications regarding operational updates, and any investments being made to strengthen legacy assets.

9. ***Customer & General Public Communications***

Operator shall develop a user-friendly digital platform/Operator website that must allow customers and the general public access to real-time information and ensure widespread awareness. Operator shall keep the P3A informed of any and all significant communications prior to being sent or posted.  The platform shall be a "one-stop-shop" to communicate with all key constituencies, including the following:

o   It shall serve as the clearinghouse for all news and updates regarding the Legacy Generation Assets, including updates on maintenance, the retirement schedule, and outages.

o   In the case of an adverse or Generation Emergency event, the CCC shall be equipped as the go-to source for media, stakeholders, and members of the public to get the latest updates on outages, receive Operator's statements, and learn more about what may have caused the incident and its expected impact.

In addition to this platform, Operator shall also utilize both traditional and social media channels to rapidly deploy information to consumers and stakeholders. This includes:

o   Statements to media and public

o   Regular update columns in local news sources

o   Frequent interviews with local radio and tv stations to provide updates on the state of the power generation system, answer questions

o   Engaging regularly on social media, pushing out information via Twitter, Facebook, YouTube, and other platforms, as well as responding to consumer and media inquiries through these channels

CONFIDENTIAL

     o   Publishing a regular newsletter, either bimonthly or monthly, to provide all the updates in one centralized location, in addition to the digital platform/Operator website

## 5.5    Operator Website

Operator's public website shall be equipped as the go-to source for media, stakeholders, and members of the public to get the latest updates on power plant outages, receive Operator's statements, and learn more about what may have caused the incident and its expected impact.

To help convey key messages and educate both members of the public and stakeholders, Operator must create and publish detailed, yet easily digestible public-facing communications materials. Materials will be developed and modified for day-to-day and proactive, crisis, and transitionary communications. This includes, but must not be limited to:

- Fact Sheets
- Frequently Asked Questions (FAQs)
- Myth v. Fact Sheets
- Informational One Pagers
- Digital Infographics & Share Graphics (for social media, digital advertisements)

For example, when the time comes for a legacy asset to be decommissioned, a brief Fact Sheet or FAQ document could be used to explain why Operator is taking said action and how it could affect or benefit consumers. Alternatively, during a weather-related emergency and in accordance with the Generation Emergency Response Plan, the use of Infographics and Share Graphics could convey key points through social media and other digital channels to quickly and succinctly, inform members of the public and stakeholders.

CONFIDENTIAL

## Annex VI

## Organizational Conflict of Interest Policy

**GENERA PR LLC**

**"OPERATOR"**

**Organizational Conflict of Interest Policy**

**Version 1**

**January 24, 2023.**

# Table of Contents

1.0   Introduction ...................................................................................................................3

2.0   OCI Avoidance Plan and Procedures ..........................................................................4

3.0   OCI Identification and Avoidance/Mitigation ...............................................................6

4.0   Additional Considerations .........................................................................................11

5.0   Appendix A ................................................................................................................13

6.0   Appendix B ................................................................................................................14

7.0   Appendix C ................................................................................................................15

8.0   Appendix D ................................................................................................................18

9.0   Appendix E ................................................................................................................26

# 1.0  INTRODUCTION

It is the policy of Genera PR LLC ("Genera" or "Operator") to comply fully with all laws and regulations governing its operations and to conduct its business affairs in a highly ethical manner. Further, it is the policy of Genera to avoid organizational conflicts of interest ("OCIs") in the conduct of its business and to mitigate any such conflicts that might arise to the satisfaction of the Puerto Rico Public- Private Partnerships Authority ("P3" or "Administrator") and the Puerto Rico Central Office for Recovery, Reconstruction and Resiliency ("COR3").  Given this commitment, Genera is sensitive to the possibility that an actual, potential, or apparent OCI could arise, either in connection with, or as a result of, its performance of the Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement (the "O&M Agreement"), specifically in connection with procurement and contract administration activities for Facility Contracts where Genera is acting as the agent of PREPA Genco, LLC ("Owner").  Consistent with our corporate policies and our commitment to ethical business conduct, Genera has developed the following plan to avoid, mitigate, and/or neutralize apparent, potential or actual OCIs for Facility Contracts during its performance of the O&M Agreement.

## 1.1 Purpose & Scope

The purpose of this OCI Policy ("Policy" or "Plan") is to set forth the policies and procedures by which Genera will identify and mitigate potential, apparent and actual OCIs that arise in connection with Genera's performance of the O&M Agreement related to Facility Contracts.  In this Policy, Genera will describe how it will endeavor to: (a) identify and evaluate potential OCIs as early in the procurement process as possible; (b) prevent the existence or appearance of conflicting roles that might bias Genera's judgment; (c) avoid, neutralize, or mitigate significant potential conflicts before contract award; (d) provide unbiased, impartial and objective advice and assistance; (e) prevent the existence of conflicting roles that could result in impaired objectivity; and (f) prevent unfair competition and advantage.

Genera's Policy is intended to ensure compliance with all applicable laws and regulations, including but not limited to Act No. 2 of the Legislative Assembly of Puerto Rico (enacted January 4, 2018) and the applicable provisions of the U.S. Office of Management and Budget Uniform Guidance at 2 C.F.R. Part 200 (the "Uniform Guidance").  It is also intended to ensure compliance with the P3's Guidelines for the Evaluation of Conflicts of Interest and Unfair Advantages in the Procurement of Public-Private Partnership Contracts, dated December 19, 2009.  Finally, this Policy is guided by the standards and concepts set forth at Subpart 9.5 of the Federal Acquisition Regulation ("FAR"), 48 C.F.R. Chapter 1.

This Policy shall be incorporated by reference into the Procurement Manual, described at Section 4.2(p) "*Procurement Manual*" of the O&M Agreement.  In addition, capitalized terms in this Policy shall have the meaning set forth in the O&M Agreement, unless otherwise indicated.

## 1.2 Roles and Responsibilities

As stated in the Uniform Guidance, "[o]rganizational conflict of interest means that because of relationships with a parent company, affiliate, or subsidiary organization, [an] entity is unable or appears to be unable to be impartial in conducting a procurement action involving a related organization."  As such, this Policy describes the policies and procedures that Genera will implement for Facility Contracts (1) when it is aware that an

Affiliate is likely to participate as a competitor in a procurement, and (2) when it is required to administer (on behalf of Owner) a Facility Contract in which an Affiliate is the contractor.  Genera is committed to conducting procurements and administering contracts in a manner designed to identify actual, potential or apparent conflicts as early as possible.  When an actual, potential or apparent OCI is identified, Genera will act to diligently protect the transparency and fairness of the procurement and contract administration processes.  As set forth below, this will most often be accomplished through the retention of an independent third party.

NFEnergia LLC, an Affiliate of Genera, currently owns and operates a micro fuel handling facility in San Juan that provides natural gas to Owner pursuant to a Fuel Sale and Purchase Agreement.  Moreover, there are other potential procurements for the sale and delivery of Liquified Natural Gas ("LNG") that Affiliates of Genera may decide to pursue.  Therefore, on and after the Service Commencement Date, a 3PPO, as designated by the P3 Authority, will be responsible for conducting procurement activities and contract administration activities as described in the Procurement Manual in accordance with the procedures detailed in Appendix D.

The 3PPO will also be required to store such information in physical and electronic locations that are inaccessible to Genera employees and the employees of Genera's Affiliates.  These physical and electronic files will be made available for inspection at any time by P3 and COR3 upon their request.

Genera's Chief Compliance Officer ("CCO") will be responsible for administering, monitoring, reporting and ensuring compliance with this Policy, among other responsibilities. The CCO will not directly participate in procurement or contract administration functions but will be aware of, all relevant procurement and contract administration plans and actions.  The CCO will provide a quarterly update to P3 and COR3 regarding Genera's compliance with the Policy, to include identifying any violations (with corrective actions taken) and areas for improvement.

### 1.3 Applicability

This OCI Policy shall apply to all Genera employees, officers, agents, and consultants assigned to work under the O&M Agreement, with particular application to the employees within the Procurement & Contracting Group ("P&C Group"). The Policy will become effective on the Service Commencement Date and shall continue to apply for the entire duration of the O&M Agreement as may be updated from time to time in accordance with the Procurement Manual.

## 2.0   OCI AVOIDANCE PLAN AND PROCEDURES

### 2.1 Procedures for reporting of all actual/apparent OCI

All Genera employees, Contractors, and Subcontractors are responsible for reporting actual or apparent OCIs to Genera's CCO.
The report should include the following information:

   A.  identification number or name of the procurement or contract;
   B.  a description of the apparent or actual OCI identified;
   C.  names of Contractors, Subcontractors and employees involved;

    D.   any other relevant information related to the OCI;

    E.   mitigation measures taken prior to notification; and

    F.   date filed and name(s) of the reporting entity.

*See Appendix A for the prescribed format for such reports.*

Once reported, the information will be reviewed by the CCO or designee, logged into the OCI open log form, and referred to the P&C Group for investigation or other action, as appropriate. If an investigation is performed, the P&C Group will determine if there is an apparent or actual OCI. If such an OCI is identified, then Genera will proceed with mitigation steps as appropriate.  The P3 Authority will be notified of the outcome of all investigations.

## 2.2 Monitoring and Compliance

The P&C Group, will be responsible for monitoring compliance with this Plan. The CCO will be responsible for overseeing and providing advice related to compliance with this Plan and engaging Legal and other groups as required.

A log of all reported OCI's will be maintained by the P&C Group.

*The OCI log format is attached as Appendix B.*

## 2.3 Plan Records

The vendor file or bid process documentation, including any required by this Plan, is maintained by the P&C Group whether the procurement is performed by Genera independently or with the assistance of the 3PPO. If an investigation is performed, documentation of the investigation will be maintained by the CCO, with a copy of the investigation report and the final determination provided to the P&C Group.

## 3.0   OCI IDENTIFICATION AND AVOIDANCE/MITIGATION

### 3.1 Identification of OCI

Organizational Conflicts of Interest may arise when, because of other activities or relationships, a person is unable or potentially unable to render impartial assistance or advice under the contract, or the person's objectivity in performing the contract work is or might be otherwise impaired, or a person has unequal access to information that could result in an unfair competitive advantage.

**Types of OCIs that may arise when Genera conducts procurements on behalf of PREPA include the following:**

**A. Impaired objectivity**

Impaired objectivity arises where a contractor is unable, or potentially unable, to provide impartial and objective assistance or advice due to other relationships, contacts, or circumstances. This would include circumstances where a contractor's work under one contract could entail it evaluating itself through an assessment of performance under another contract or through an evaluation of proposals.  For example, impaired objectivity might become an issue if Genera was evaluating proposals, and one of those proposals was from Parent Company, and appropriate mitigation techniques were not implemented.

**B. Unequal access to information**

Unequal access to information occurs when a contractor has access to nonpublic information as part of its performance under another contract and where that information may provide the contractor (or its affiliates) with a competitive advantage in a later competition. For example, if Company A is selected to perform work for Genera and proprietary information from other companies will be provided to Company A in the performance of the Scope of Work for Genera that will provide Company A competitive advantage over its competitors, then an OCI exists, and mitigation actions are required.

**C. Biased ground rules**

Biased ground rules can arise where a contractor, as part of its performance of work under a contract, has in some sense set the ground rules for another contract. This OCI rule intends to prevent a contractor from influencing requirements or review criteria that provide an unfair advantage to the contractor over potential competitors.

Given Genera's operational requirements related to the development of the statements of work and specifications as PREPA's agent, there is risk of biased ground

rules where Parent Company or an Affiliate intends to or competes for a PREPA contract. Accordingly, mitigation actions discussed below in paragraph 3.2 and throughout this Plan are appropriate to identify, avoid, and/or neutralize any such unfair advantage to Affiliates in the procurement of goods and services for PREPA.

## 3.2 Mitigation of OCIs

### A. Impaired Objectivity

To reduce the risk of impaired objectivity in Genera procurement activities, the following mitigation measures may be implemented by Genera:

1. excluding any "impaired" Contractor or Subcontractor from the procurement;
2. changing the scope of the contract and re-bidding;
3. installing a firewall;
4. transitioning the procurement to the 3PPO;
5. using anonymized identifiers the 3PPO, in its discretion, presents Genera with technical questions during the course of a procurement[1]; and
6. increasing involvement of the 3PPO in oversight.

### B. Unequal access to information

To reduce the risk of unequal access to information in Genera procurement activities, the following mitigation measures will be implemented by Genera:(i) establishing a firewall, security measures, or procedures that effectively limit the flow of "Competitively Sensitive" labeled information between the personnel who have access to such nonpublic information, and the personnel that would benefit from the "Competitively Sensitive" labeled information; and (ii) sharing the information with all competing offerors to avoid or mitigate any potential competitive advantage.

### C. Biased ground rules

To reduce the risk that any procurement could contain biased ground rules in Genera procurement activities, the following mitigation measures will be implemented:

1. Genera will recuse itself from procurements that involve Parent Company or an Affiliate, and instead use a 3PPO established by the P3 Authority. Genera will identify, avoid and/or mitigate actual or potential conflicts of interest concerns and issues as early in the procurement process as possible. If it is known that a Parent Company or an Affiliate, or subsidiary will participate in the competitive bid, Genera will refer the procurement to the 3PPO. Genera

---

[1] All technical questions from the 3PPO and responses from Genera will be made in writing, and placed in the procurement file.

employees will not contact colleagues at affiliated entities to inquire if they would be interested in competing for future award.

2. Genera will exclude any Affiliate or Parent Company from participating as a prime contractor or subcontractor in any procurement process in which the 3PPO was not engaged.

3. When the 3PPO is controlling a procurement, the 3PPO will set the evaluation criteria, and may pose questions to Genera, as appropriate, to inform the 3PPO's decision-making.

4. Any bid protests for PREPA procurements involving allegations of unmitigated biased ground rules will be reviewed by the P3 Authority, consistent with its oversight responsibilities under the O&M Agreement.

   Further, all RFx's will be reviewed by the 3PPO before release to help ensure that there are no biased technical specifications, unless Genera provides a reasonable justification that such measure is inapplicable or inappropriate under the specific circumstances.

The P3 Authority will periodically review open PREPA solicitations for biased ground rules, consistent with its oversight responsibilities under the O&M Agreement and the Procurement Manual and shall work with Genera to promptly address any issues with as little disruption to the procurement as possible.

D. In addition to the mitigation activities above, Genera will obtain an annual independent audit (by an auditor chosen by Genera and approved by the P3 Authority) of the following:

1. Compliance with this Policy and with the Procurement Manual requirements related to OCI mitigation (as changed from time to time) (e.g., market research, solicitation content, proposals received and evaluations thereof, etc.)

2. Proper management of OCI process (e.g., errors, observations, limitations on competition)

3. The auditor will propose corrective action and/or recommend revisions to processes to address any material issues identified that relate to the OCI Mitigation.

4. A copy of the audit report will be provided to the Executive Director of the P3 Authority, or their designee.

### 3.3 Procedures for identifying, avoiding, or mitigating actual or apparent OCIs *prior to* the initiation of a procurement process

A. **Impaired Objectivity & Biased Ground Rules**

Under the O&M Agreement, Genera is responsible for undertaking procurement activities related to the operation of PREPA's Legacy Generation Assets.

To prevent the existence of conflicting roles that might bias Genera's judgment and to prevent any unfair competitive advantage, a 3PPO will be used for all procurements where a Parent Company or Affiliate has formally expressed interest

in participating, for example, via responses to public notices, vendor qualifications, or requests for information. Genera may also use the 3PPO as a mitigation measure whenever deemed appropriate by the CCO. In accordance with this Plan, the 3PPO will be inserted into the procurement process as early as practicable when needed to mitigate an actual or apparent OCI. In executing this role when needed, the 3PPO will assume control of the procurement and take the actions necessary to mitigate the OCI, as defined in the 3PPO Framework document (Exhibit D hereto). No Affiliate or Parent Company will be allowed to participate as a prime contractor or subcontractor in any procurement process in which the 3PPO was not engaged, if required, as set forth in the 3PPO Framework.

As further provided below and in the 3PPO Framework, the 3PPO will be responsible for, among other matters, independently reviewing and approving the contracting strategy established by Genera and any tender documents prepared by Genera (and other parties as appropriate), including specifications, work statements, and scope, to avoid any unfair competitive advantage to an Affiliate or Parent Company or any bias in favor of an Affiliate or Parent Company. The 3PPO will also be responsible for evaluating bids and issuing an award determination to Genera using anonymous identifiers. For any actual disputes in which a Parent Company or Affiliate is involved as either a bidder or contractor, the 3PPO will fulfill all duties otherwise performed by Genera as set forth in the Procurement Manual.

Additional actions to mitigate the risk of biased ground rules are provided in section 3.2.C above.

**B. Unequal access to information**

To avoid or mitigate the risk of unfair advantage, any of the following mitigation strategies may be considered:

**1. Firewalls**

a. Genera employees are prohibited from sharing any non-public "Competitively Sensitive" labeled information related to PREPA's fuel and Legacy Generation Assets with employees who lack proper authorization, proponents, or Contractors, including those from a Parent Company or Affiliate. Provided, however, that nothing in this provision or Policy shall preclude executives of Parent Company and/or Affiliate who have managerial responsibility for Genera from accessing Confidential Information needed to perform their roles and legal responsibility except to the extent labeled as Competitively Sensitive and then only until the tender documents (RFx Package) becomes public and unless otherwise authorized;

b. Any employee or entity that may have an OCI based on unequal access to information (including employees from Affiliates) should be under a non-disclosure requirement, firewalled as appropriate, or excluded from the procurement process if the OCI cannot be adequately mitigated.

c.  "Seconded Employees" from Affiliates or Parent Company must disclose any actual or apparent OCI and are required to sign Non-Disclosure Agreements, and abide by firewalling procedures, as appropriate.

## 2.  Organizational/Physical/Geographic Separation

Organizational, physical, and/or geographic separation between Genera and an Affiliate or Parent Company will be established to reduce the risk of inadvertent disclosures.  Such separation will include the following considerations:

a.  The degree of the organizational, physical, or geographic separation, if any, that already exists between Genera and Affiliates or Parent Company (for example, work areas separate from other business segments and work in a controlled-access facility, precluding access by other contract or proposal teams).
b.  The degree to which there is separate management responsibility for the two conflicted groups of employees.
c.  The degree to which there are separate accounting/financial systems and controls for the two conflicted groups of employees: and
d.  The degree to which there are separate IT systems or controls for document storage/access.

## 3.  Non-Disclosure Agreements ("NDAs")

NDAs will be established in appropriate circumstances to ensure that affected employees understand their obligations with regard to proprietary and competitively sensitive information.  In situations where NDAs may be utilized, Genera and, where appropriate, the 3PPO shall consider:

a.  Who will be responsible for determining if NDAs are necessary (normally carried out by CCO and as appropriate, the 3PPO);
b.  Who will be responsible for overseeing NDAs (normally carried out by CCO and, as appropriate, the 3PPO);
c.  The actual or apparent OCI that requires the NDA, including the specific information that is covered by the terms of the NDA; and
d.  Storage and management of executed NDAs (will be kept by Procurement and, as appropriate, the 3PPO as part of the bidding or vendor file).

*The form of NDA is included as Appendix C hereto.*

### 3.4 Procedures for identifying, avoiding, or mitigating actual or apparent OCIs *after* the initiation of a procurement process

In the event an actual or apparent OCI is identified after the procurement process has begun, and a 3PPO is conducting the procurement process, then the 3PPO will conduct an investigation and determine mitigation steps, as appropriate (See Appendix D).

If the procurement process is not being conducted by a 3PPO, then the CCO is responsible for conducting an investigation and determining the appropriate mitigation steps, subject to the P3 Authority's review as set forth in the Procurement Manual. CCO investigations will also be included in a quarterly report to the P3 Authority (see Attachment D, section B, paragraph 25), as part of Genera's reporting requirements under the Procurement Manual.

## 4.0   ADDITIONAL CONSIDERATIONS

### 4.1 Selection and Operation of the 3PPO

P3 Authority will award and oversee the 3PPO contract.  The 3PPO Framework attached as "Exhibit D" describes how the 3PPO will independently perform procurement activities, providing full transparency and objectivity to the process.

### 4.2 Increased Monitoring/Oversight of Conflicted Work by an Independent Party

If a Parent Company or Affiliate is awarded a contract after a 3PPO conducts the procurement process described above (and as further provided in Appendix D), Genera and the 3PPO will perform the management, direction, and monitoring of the contractor during performance of the awarded agreement as set forth in section B.19 of Appendix D. Contract administration duties performed by Genera will be supported by documentation and subject to audit. Genera will provide a quarterly report on significant contract administration issues to the P3 Authority as part of its reporting obligations under the Procurement Manual. (See Attachment D, section B, paragraph 19, subparagraph e.)

### 4.3 Discipline for Noncompliance

Violations of this Plan shall be reported to the individual's immediate manager and to the CCO. Engaging Legal and other groups leaders may be required. Appropriate administrative and/or disciplinary action will be taken for violations, up to and including termination. Additionally, violations may subject an employee to criminal liability under applicable laws.

### 4.4 Emergency

In case of an emergency, the entirety of the Policy or some of its provision may be waived by P3 in accordance with the Emergency procedures set forth in the Procurement Manual.

### 4.5 Request and Approval for Conflict-of-Interest Exceptions

In cases where the OCI or apparent OCI cannot be sufficiently avoided, neutralized, or mitigated, Genera may submit a written request for an exception in accordance with the Procurement Manual.

## 5.0   APPENDIX A

### *Organizational Conflict of Interest Reporting Document*

**Name of person(s) reporting:** _____

**Date actual or apparent OCI identified:** _____

**Date Genera notified:** _____

**Identification No. or name of RFP or Contract:** _____

Mitigation measures taken prior to notification:

_____

_____

_____

**Description of the Actual or Apparent Organizational Conflict of Interest (OCI):**

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**Names of Contractors, Subcontractors, Genera, and/or Luma employees involved:**

_____

_____

_____

**Any other relevant information related to the OCI or apparent OCI:**

_____

_____

_____

## 6.0   APPENDIX B

*Open OCI Report Log*

| Date filed | Id # / Name of RFP/ Contract | Status Comments |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

*Reported and Logged OCIs will remain in this list from the time they are identified until their resolution*

## 7.0   APPENDIX C

### CONFIDENTIALITY AGREEMENT

I, _____ **[insert name]**, acknowledge that Genera PR, LLC, a Puerto Rico Limited Liability Company, ("**DISCLOSER**"), acting on behalf of Puerto Rico Electrical Power Authority ("PREPA") has provided me with Confidential Information (as defined below) respecting its businesses, products and undertakings present and future, and hereby acknowledge and agree that:

A.   I am completing this Confidentiality Agreement due to the following actual or apparent conflict of interest:

_____
_____;
and

B.   My employment, consulting agreement, or position as an officer, director of, or ownership interest in or other affiliation with DISCLOSER creates a relationship of confidence and trust between myself and DISCLOSER with respect to all confidential information disclosed to me by, or on behalf of, DISCLOSER or otherwise acquired, created, discovered, developed, learned or made known by, or to, me during the course of my employment or consulting agreement with DISCLOSER; and

C.   "**Confidential Information**" includes, without limitation, information related to the DISCLOSER's procurement of or contract for any good or service, the DISCLOSER's past, present or future need for or evaluation of any good or service, the DISCLOSER's funding, budgets, specifications, requirements, strategies, deliberations, evaluations, judgments, discussions, potential markets, suppliers, vendors or contractors, in each case as related to any past, present or future procurement or contract for any good or service, but does not include information which is: (i) now or in the future publicly available other than through my own actions, provided however that where any part of such information is publicly available but a compilation of information which includes such part is not publicly available then such compilation shall be treated as Confidential Information hereunder; (ii) made available to me from a source which is not prohibited from disclosing such information to me by a legal, contractual or fiduciary obligation; or (iii) as shown by documentary evidence, already in my possession at the time of disclosure to me.

In consideration of the payment of $_____ to me by DISCLOSER, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, I hereby acknowledge and agree by the execution of this Confidentiality Agreement (the "**Agreement**") as follows:

**I.  Confidentiality**

1.  Both during the term of my employment or consulting agreement with DISCLOSER and for a twelve-month period after its termination:

    a.  I will keep in strictest confidence and trust all Confidential Information known to me;

    b.  I will not use, divulge, disclose or communicate, either directly or indirectly, in any manner whatsoever, any Confidential Information, or anything relating to it, to any party, including but without limitation to the DISCLOSER's affiliates, without the written consent of the DISCLOSER's Chief Compliance Office ("CCO"); and

    c.  I will use all reasonable and prudent efforts to keep the Confidential Information confidential and to protect and safeguard such information from misuse, loss, theft, publication, disclosure, destruction, or the like.

2.  In the event that I am required to disclose Confidential Information, pursuant to any applicable law or regulation, or to any government or governmental department, ministry, board, commission, agency, court, securities commission, or stock exchange having jurisdiction, I shall disclose such information as I am legally required to disclose and shall use all reasonable efforts to obtain confidential treatment for any information so disclosed. In addition, I shall, to the extent permitted by law, promptly provide notice of the required disclosure to the management of DISCLOSER setting out the requirements and circumstances surrounding the required disclosure and any other relevant information.

    Notwithstanding the other provisions of this Agreement, and in compliance with section 1225 of the Disaster Recovery Reform Act of 2018, I acknowledge and agree that no language in this Agreement is intended to prohibit compliance with authorized audits or internal reviews by the Government of Puerto Rico, Federal grant making agencies, or the Comptroller General of the United States.  Consistent with the Procurement Manual, this provision does not restrict or change Genera's existing rights and/or obligations to provide certain governmental entities (i.e., COR3, PREPA, the Federal grant making agency, DHS Office of Inspector General, the Comptroller General of the United States, or their authorized representatives) the right of access to any documents, papers, or other records of Genera which are directly pertinent to a Federal award, in order to make audits, examinations, excerpts and transcripts.

3.  Upon request by DISCLOSER, I will promptly deliver to DISCLOSER all documents, notes, drawings, specifications, programs, and data and other materials of any nature that contain Confidential Information and I will in no way retain or take with me any of the foregoing or any reproduction of any of the foregoing or any Confidential Information.

**II.  General**

1.  I understand and agree that in the event of a breach or a threatened breach by me of any of the provisions of this Agreement, DISCLOSER, in addition to and not in limitation of any other rights, remedies or damages available to it at law or in equity, shall be entitled to an injunction and/or an order of specific performance, in order to prevent or to restrain any such breach or threatened breach by me or any other persons directly or indirectly acting for or on behalf of myself.

2.  This Agreement contains the entire agreement between me and DISCLOSER with respect to the issues addressed herein.  Except in respect of any prior non-disclosure or confidentiality agreement, assignment, or confirmation of assignment of Inventions or Works entered into by me, it supersedes any and all other agreements, either oral or in writing, between me and DISCLOSER with respect to the issues addressed.  DISCLOSER and I both acknowledge that no representations, inducements, promises or agreements, oral or otherwise, have been made by any party, or anyone acting on behalf of any party, which are not embodied in this Agreement.

3.  This Agreement shall be governed by, interpreted, and construed in accordance with the laws of the Commonwealth of Puerto Rico.

4.  This Agreement may not be modified by oral agreement, or course of conduct, but only by an agreement in writing signed by an authorized officer of DISCLOSER and me.

**I FREELY AND VOLUNTARILY ACKNOWLEDGE AND AGREE THAT I HAVE HAD THE OPPORTUNITY TO OBTAIN LEGAL ADVICE WITH RESPECT TO THIS AGREEMENT AND HAVE CAREFULLY READ AND CONSIDERED THE PROVISIONS OF THIS AGREEMENT AND HAVING DONE SO, AGREE THAT THE PROVISIONS OF THIS AGREEMENT ARE FAIR AND REASONABLE AND ARE REASONABLY REQUIRED FOR THE PROTECTION OF DISCLOSER.**

_____          _____
        Dated                                Signature


                                   _____
                                   Please Print Name
                                   (In addition, initial each page on the bottom left corner)

ACCEPTED BY AND AGREED TO:

[*DISCLOSER*]

By_____

## 8.0   APPENDIX D

### GENERA OCI MITIGATION PLAN

As provided more fully below, Genera will employ multiple means to timely avoid, mitigate, and/or neutralize actual or apparent Organizational Conflicts of Interest ("OCIs"), including, in appropriate circumstances (as outlined below), the use of a Third-Party Procurement Office (the "3PPO") under the leadership of a third party that has appropriate expertise and independence from Genera.

To ensure independence, the P3 Authority will select the 3PPO with reasonable input from Genera.  This document provides the process by which the 3PPO will conduct procurements that involve a Parent Company or Affiliate.  Capitalized terms not otherwise defined herein have the meaning ascribed to such terms in the O&M Agreement. This Mitigation Plan, as it may be modified or supplemented from time to time, is incorporated into the Procurement Manual as an integral part thereof, but does not change or supersede existing requirements under the Procurement Manual and remains subject thereto.

### 3PPO PROCUREMENT PROCESS FRAMEWORK
### A.  Procurement Process Framework

    a.  Tenders will be based on the projects required to be implemented as part of, among others:

        i.  Procurement of any new or replacement, or modifications, amendments, renewals and extensions of any Facility Contract (including Capital Spare Parts and Spare Parts, but excluding Operator-funded capital improvements that do not involve the installation of equipment that becomes a part of the system at a Legacy Generation Asset;

        ii.  procurement of any new or replacement, or modifications, amendments, renewals and extensions of any Fuel Contracts;

        iii.  projects that may be required by other plans, of, or applicable to, Genera, approved by PREB, as applicable.

    b.  Thus, Genera's role in developing the scope and requirements for tenders, will be based on priorities as established by Genera to execute its obligations under the O&M Agreement, and in accordance with PREB approvals.

    c.  The process to prepare the tender, including without limitation, to determine the scope of work must follow the Procurement Manual, as updated from time to time.

    d.  Except to the extent addressed below, the steps set out in the Procurement Manual shall continue to apply to tenders, as applicable.

### B. Process

1. Procurement Strategy

    a. When Genera is required to procure services and/or materials on behalf of the Owner, a procurement process as defined in the Genera Procurement Manual will be followed. To initiate the process, Genera will review requirements and determine a procurement strategy including the definition of required timelines for the particular tender documents for review and acceptance by the 3PPO.

    b. The procurement strategy will consider how work should be procured (i.e., scope of work, bundling of activities, etc.), type of contract (i.e., lump-sum or other) and what method of procurement should be used (i.e., RFP, etc.). During the development of this strategy, the potential for OCI will be evaluated, and mitigation measures taken if appropriate.

    The nature of the work and potential OCI concerns (Parent Company or Affiliate is more or less likely to be a potential Proposer/Bidder), will help determine which work will require additional mitigation to avoid an OCI. This may include how the Tender Preparation (next step) is developed. For instance, if a Genera Affiliate will be a Proposer/Bidder on the work, the development of the Tender Preparation (Step 2 below) and Tender Documents (Step 3 below) will be developed by the 3PPO. If asked by the 3PPO, Genera may provide reasonable input to the 3PPO for the 3PPO's consideration as needed to support the development consistent with Genera's existing contractual obligations.

2. Tender Preparation

    a. As described in Step 1 above, Genera or the 3PPO will prepare the tender documents that set forth the program and technical requirements for the project based on the planning documents above. Tender documents will include:

        i. Scope of Work

        ii. Standards (which will be Genera Engineering and Construction standards or based on typical industry practices where no Genera standards are available)

The 3PPO will explore the value of creating a set of standard technical specifications for frequently procured goods and services.

3. Sourcing Strategy

    a. Genera or the 3PPO will prepare the tender documents ("RFx Packages") that set forth the commercial and proposal-related requirements for the project based on the Scope of Work and Standards, including, without limitation:

        i. Commercial requirements (bonding, payment schedules based on milestones, etc.)

        ii. Proposal/bid requirements, schedules, etc.

        iii. Evaluation criteria

    b. If the tender documents are prepared by the 3PPO, the 3PPO will set evaluation criteria, but may pose questions to Genera, as appropriate, to inform the 3PPO's decision-making.

    c.  After preparation, all RFx Packages will be reviewed and approved by the 3PPO, consistent with the planning documents described above.

**4.**  Request for Interest ("RFI")/Request for Qualifications ("RFQ")

    a.  If the tender documents are prepared by the 3PPO,

        i.  the 3PPO will issue a combined RFI/RFQ to Genera's pre-qualified Vendors and advertise publicly (i.e., published twice in a general circulation newspaper and posted in Genera's website) to gather a list of companies that may participate in the resulting tender.

        ii.  If, upon publication, Genera has any concern about the tender requirements, Genera and the 3PPO will follow the review process below (Section C), and the 3PPO may withdraw, revise, or supplement the RFI/RFQ.

    b.  If the tender documents are prepared by Genera,

        i.  Genera will issue a combined RFI/RFQ to Genera's pre-qualified Vendors (using Power Advocate or similar) and advertise publicly (i.e., published twice in a general circulation newspaper and posted in Genera's website) to gather a list of companies that may participate in the resulting tender.

    c.  The combined RFI/RFQ will:

        i.  request the submittal by Proponents/Bidders of specific qualifications in accordance with the nature of the prospective project; provide potential Proponents/Bidders an opportunity to identify ambiguous, unrealistic, and unduly restrictive requirements; and establish how potential Proponents/Bidders will be evaluated (e.g., competency, safety, prior work experience, financial health, capacity, independence, and other relevant factors for the scope of work);

        ii.  disclose that, if an Affiliate or Parent Company formally responds to the RFI/RFQ, the procurement will be managed by the 3PPO.
The RFI/RFQ will also explain that if an Affiliate or Parent Company formally responds to the RFI/RFQ, but no Affiliate or Parent Company submits an offer, Genera will manage the evaluation, contract award, and post-award contract administration; and will not disclose proposal information to Affiliates or Parent Company;

        iii.  require that Affiliate or Parent Company identify themselves as such on the cover page of their response and that the substantive content of the Affiliate or Parent Company's submittal be separated from the cover page and be secured (security mechanisms to be determined jointly with 3PPO) until further instructions are provided; and

        iv.  require any Proponents/Bidders disclose if an Affiliate or Parent Company is part of its bid team (as subcontractor, partner or otherwise).

**5.**  Proposer/Bidder Pre-Qualification

    a.  The RFI/RFQ responses will be reviewed and evaluated based on criteria established in the RFI/RFQ.

    b.  When an Affiliate or Parent Company responds to an RFI/RFQ, as identified in the cover page of its submittal, the 3PPO will assume control of the review and evaluation process and will be the exclusive party to access the submittals.

c.   In such case, based on the results of its evaluation, the 3PPO will establish a list of pre-qualified Proposers/Bidders.

d.   If no Affiliate or Parent Company responds to the RFI/RFQ, Genera will perform the review and evaluation process and establish a list of pre-qualified Proposers/Bidders.

e.   Only pre-qualified Proponents/Bidders may participate in the resulting tender.

**6.   Single Source Situations**

a.   As part of the process for exceptions to competitive bidding, pursuant to the Procurement Manual, Genera will prepare a justification for single sourcing when required.

b.   If the single sourcing involves an Affiliate or Parent Company, Genera will submit the request to the 3PPO for its review and approval.  The 3PPO will provide its evaluation, findings, conclusions and recommendation for approval or rejection to P3A and Genera.

c.   For all single sourcing, approval from P3A will be requested as defined in the Genera Procurement Manual.

d.   If P3A approves the single-source recommendation to an Affiliate or Parent Company, 3PPO will implement the recommendation consistent with the Procurement Manual.

**7.   Tender Final Review**

a.   When the final pre-qualified Proponents/Bidders list includes an Affiliate or Parent Company, the RFx Package will be finalized and approved by the 3PPO (with further consultation with P3A as appropriate) prior to posting.

b.   When the final pre-qualified Proponents/Bidders list does not include an Affiliate or Parent Company, the RFx Package will be finalized and approved by Genera.

**8.   Tender Posting**

a.   The 3PPO or Genera, as appropriate, will issue the RFx Package to pre-qualified Proponents/Bidders.

b.   The tender will notify all eligible Proponents/Bidders when an Affiliate or Parent Company is among the list of pre-qualified bidders.  In such circumstances, the tender will also state that where the OCI Policy is available and that any objection to the RFx Package's requirements will be waived unless timely raised in accordance with the RFx Package's requirements.

The tender will also notify eligible Proponents/Bidders that, if no Affiliate or Parent Company submit an offer, Genera will manage the evaluation, contract award, and post-award contract administration; and will not disclose proposal information to Affiliates or Parent Company.

c.   Genera will require confirmation from all bidders that they intend to propose/bid or not propose/bid on the tender at least 1 week before closure.  A proponent/bidder will be ineligible to participate in the tender of it does not confirm its intention to bid at least 1 week before closure.

**9.   RFx Clarifications**

If an Affiliate or Parent Company is among the list of pre-qualified bidders, the 3PPO will receive and respond to any questions and clarification requests from Proponents/Bidders. The 3PPO will coordinate with P3A and Genera, as appropriate, to provide accurate and

responsive answers to clarification requests. Any coordination with Genera regarding questions and clarification requests will be in writing, will use anonymized identifiers to avoid identifying the requesting competitor, and both the 3PPO inquiry and Genera's written response will be placed in the procurement file.

10. **Process for Tender Evaluation, Award and Execution without Affiliate or Parent Company's Participation (without 3PPO engagement)**

If no Affiliate or Parent Company confirms its intention to bid, then Genera will complete the procurement/bid evaluation and award process without 3PPO involvement and will manage the contracting process through execution and administer the contract as contemplated in the PM.

11. **Process for Tender Evaluation and Award with Affiliate or Parent Company's Participation**

Upon receipt of confirmation of intention to propose/bid by an Affiliate or Parent Company, Proponents/Bidders will be directed to deliver proposals directly to the 3PPO, and the 3PPO shall comply with the requirements of the Procurement Manual, as applicable, and as complemented by the following process which shall also apply thereto.

12. **Review Process**

   a. The 3PPO will assign each Proposer/Bidder an anonymized identifier for use in any follow-up technical or commercial questions with Genera. If the 3PPO presents Genera with any technical or commercial questions, the question to Genera and the response from Genera will be documented in the procurement file.

   b. If, upon review, the 3PPO finds that no Affiliate or Parent Company submitted a proposal/bid (despite confirming its intention to do so), then the 3PPO will transfer all bids back to Genera and Genera will complete the evaluation and award process and will manage the contracting process through execution and administer the contract as contemplated in the Procurement Manual, without further reference to this Policy.

13. **Commercial Evaluation**

Where the tender contemplated a trade-off of cost and non-cost evaluation factors, the 3PPO will conduct and document its commercial evaluation according to the tender rules specified in the RFx Package and the evaluation criteria specified therein (Step 3, Sourcing Strategy).

14. **Technical Evaluation**

   a. The 3PPO will conduct the technical evaluation according to the tender rules specified in the RFx Package and the evaluation criteria specified in Step 3, Sourcing Strategy. In its review of technical proposals, the 3PPO may consult with Genera as appropriate (using the anonymized identifier if needed) to verify that proposals/bids meet the requirements set forth in the RFx Package and the Sourcing Strategy (e.g., specification interpretation, alternative features, new options, confirmation of capability, etc.). Genera shall have established a Consultation Team to liaise with the 3PPO. The Consultation Team will be required to keep all aspects of said consultation in strict confidence.

b.  If the 3PPO presents Genera with any technical or commercial questions, the question
to Genera and the response from Genera will be documented in the procurement file.

**15.** Shortlist Presentations

The 3PPO will determine if any proposal/bid submittal is non-responsive, materially
deviates from the scope of work or other technical requirements or is non-compliant with
the RFx Package requirements and the Sourcing Strategy.  The 3PPO may request,
coordinate, and attend presentations by Proponents/Bidders and thereafter summarize
the evaluation all in order to assist the 3PPO in making an award decision.

**16.** Select Awardee

The 3PPO will identify its recommended awardee, based on the criteria set forth in the
Sourcing Strategy.

**17.** Prepare Bid Award Document

The 3PPO will document its evaluation, findings, and conclusions (including the scoring
given to each Proponent/bidder, the basis therefor, and any notes regarding variations
and potential noncompliance).  The 3PPO will transmit its recommendation to P3A along
with a summary of the evaluation and the basis for award. P3A will notify Genera of the
award along with a summary of the evaluation and the basis for award using the
anonymized identifiers.

**18.** Approve Bid Evaluations and Award Authorization

a.  If Genera believes the 3PPO's recommendation is inconsistent with applicable law,
the O&M Agreement, the terms of the RFx, or the Sourcing Strategy, Genera will
advise P3A, and the 3PPO of its concerns within 2 business days of receipt of the
notice, which will trigger the Review Process set forth below (Section C).

b.  After review, and the close of the 2-day objection period, Genera will provide notice of
award.

c.  Genera may shorten the award period by, any time within the 2-day objection period,
notifying the 3PPO and P3A in writing that it has no concerns with the 3PPO's
recommendation.

**19.** Review and Approve Contract

a.  If award will be to an Affiliate or Parent Company, the 3PPO will prepare the contract
using existing contract templates.  If the award will not be to an Affiliate or Parent
Company, Genera will prepare the contract using its existing contract templates.

b.  If the 3PPO prepared the contract, after negotiation with the contractor, the final
recommended contract will be transmitted to P3A by the 3PPO.

c.  P3A will provide the final recommended contract to Genera for signature and award.

d.  Where award is made to an Affiliate or Parent Company, the post-award contract
management, direction, and monitoring of contractor activity, in keeping with the
awarded agreement and Genera's obligations under the O&M Agreement, will occur
as follows:

1.  Activities performed by Genera supported by documentation subject to audit:

    i. Progress reviews;

    ii. Commissioning acceptance;

    iii.    Safety and environmental compliance oversight; and

    iv.    Day-to-day management.

2. Activities performed by Genera only after pre-approval by the 3PPO (all activities must be documented and are subject to audit):
   i. Contractor performance evaluations; and

   ii. Other contract administration responsibilities specifically identified in writing by 3PPO either prior to the signing of the contract, or afterwards. For the avoidance of doubt, it is understood that daily operational coordination on items such as maintenance, nominations, and other similar items impacting the Generation Assets will be handled by LUMA and Genera pursuant to their arrangements and procedures.

3. Activities performed by the 3PPO:
   i. Any activities for which the 3PPO denies Genera's request for pre-approval;

   ii. Review, approve, and administer payments to Affiliates or Parent Company; and

   iii.    Contract changes and circumstances that involve a relief event, supervening event, or change request (technical, schedule, or cost), or other objective determinations with respect to the Affiliate or Parent Company's performance of, or compliance with contract requirements. In the case of a relief event, supervening event, or change request, the procedures in section 21 below will apply. For the avoidance of doubt, it is understood that daily operational coordination on items such as maintenance, nominations, and other similar items impacting the Generation Assets will be handled by LUMA and Genera pursuant to their arrangements and procedures.

e. To mitigate against impaired objectivity by Genera in the performance of any contract awarded to an Affiliate or Parent Company, the 3PPO and Genera will collaborate without limitation in providing a quarterly report, as part of Genera's reporting requirements under the O&M Agreement and Procurement Manual, on the contracted work progress, issues, and risks of all contracts awarded to an Affiliate or Parent Company.  The report will specifically identify procurements where OCI mitigation measures have been implemented. This report will also identify any subjective evaluations or oversight of the contractor that should be managed by the 3PPO. The report will be provided to the Executive Director of the P3 Authority, or their designee.

**20.** Changes or Supervening Events

a. In the case of a relief event, supervening event, or change request (i.e., technical, schedule, or cost) where a 3PPO is being utilized to help mitigate real or apparent OCI's:

      i. The contractor will prepare the request for relief or change in accordance with the Procurement Manual and the contract, and provide to Genera and the 3PPO.

      ii. Before any request (including Change Orders) is approved, the 3PPO will review the request and decide whether to accept the request, request further information, or to reject the request.  The 3PPO may consult with Genera as the 3PPO deems necessary.  The 3PPO will notify Genera of its decision concerning such a request.

      iii. If Genera does not concur with the 3PPO's decision, then Genera and the 3PPO will follow the Review process below (Section C).

b. The contractor will only be entitled to relief or changes that were permitted by the contract and accepted by the 3PPO or determined through the Review Process set forth below.

## C. Review Process

Management of the Review Process described below is a 3PPO responsibility, in all instances where the 3PPO assumes control of the procurement or contract administration activity.

Review Process:

a. If Genera does not concur with the 3PPO's findings and decisions, then Genera will notify the 3PPO in writing the reasons it does not concur.

b. The 3PPO and P3A will review the decision, considering Genera's concerns. The 3PPO and P3A may seek additional information from Genera in the course of their review.

c. Within 15 business days of receiving the notice of nonconcurrence from Genera, the 3PPO will issue the final decision, which will be documented and transmitted to the P3A and Genera. Genera and the 3PPO will implement the decision with due regard for project objectives and schedule.

## 9.0   APPENDIX E

### APPROVAL & REVISION HISTORY

### 9.1 OCI Policy Revision History

| Revision No. | Nature of Revision | Genera Approval Date | P3A Approval Date |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

CONFIDENTIAL

## Annex VII

## Mobilization Plan

Operator shall complete the Mobilization Services in a timely manner and as soon as practical. To achieve an efficient and orderly mobilization of Operator's capabilities and to allow the commencement of the Operation Phase, Operator must pursue the following elements as part of its Mobilization Plan:

- Engage in stakeholder outreach in accordance with the Communications Plan

- Recruit and hire personnel in accordance with the Recruitment and Hiring Plan

- Identify and onboard subcontractors

- Plan and implement information technology systems and tools

- Review applicable permits and compliance obligations

- Evaluate and maintain inventory and coordinate with T&D Operator

- Develop plans/procedures for various aspects of operation (including O&M Plans, Emergency Response Plans, O&M Procedures, Operator Training Programs, among others)

- Identify and complete items listed on the Handover Checklist and report on status every two (2) weeks to the P3A

- Plan for and achieve key milestones

- Develop a Communications Plan that works to create a well-orchestrated and consistent message to Operator's employees regarding expectations

- Develop a fuel savings strategy related to Fuel Contracts, including management of Fuel Contract related decisions during the Mobilization Period

## 7.1   Mobilization Process

Upon commencement of the Mobilization Phase, the Operator's transition teams shall begin working towards completing the critical path activities identified in this Mobilization Plan. Team leaders will be drawn from Operator's pool of experienced managers. A number of these professionals will also be designated to serve as senior leadership for the Operator after the Service Commencement Date and will need to move to Puerto Rico on a permanent basis, to the extent that they are not already residents.

The overall Mobilization Plan has been divided into four primary workstreams.

General Mobilization Management
Operational Takeover
Functional Takeover
Staffing Approach

CONFIDENTIAL

These are not distinct workstreams with clear separation between them, but rather they indicate the general focus of activities that will gradually evolve as Operator arrives on site in Puerto Rico and begins their initial Mobilization Services.

### 7.1.5 *Stakeholder Outreach*

1. *Meet with PREPA Area Leads*

During the first month of the Mobilization Period, functional leads from Operator shall meet with their counterparts within PREPA to discuss and review all existing processes, contracts, and systems. The Operator functional leads, along with Operator's global partners, will then analyze the existing financial management infrastructure by referencing industry norms and practices. The outcome of these analyses will determine what aspects of the existing financial management plan can be retained or extended, and what new infrastructure or systems need to be put in place.

*Meet with officials from applicable unions, including UTIER and UEPI*

Operator shall establish professional relationships with the unions that represent employees to ensure long-term success. Building and maintaining such relationships at all levels of the organization must begin during the early Mobilization Period. Operator should schedule regular and recurring meetings with officials from the unions and the Operator operational management teams early and often to build trust and enhance transparency and communication. Additionally, Operator should hold regular and recurring meetings between site management and site union stewards as part of the initial outreach process and on an ongoing basis.

### 7.1.6 *Personnel & Training*

Operator's recruitment, staffing, and training plan is critical to the success of the Legacy Generation Assets and is vital for generation reliability and ultimately customer satisfaction. To this end, Operator must perform the following:

1. *Recruit and Screen Existing PREPA Employees*

The Operator shall interview and recruit all Operators and Maintenance Technicians from the existing PREPA workforce to the extent they wish to continue to work in the power plants. Recruitment should focus on these skilled employees and must involve thorough communication of the multi-skilling philosophy and its advantages, trying to recruit and retain as much expertise from the PREPA staff as possible.

*Staffing Philosophy, Goals, and Training and Development*

If the operator recruitment and staffing plan is based on a multi-skilled workforce strategy, the plan is dependent upon training employees to achieve cross-functional skills. Training and employee development is a key building block to the success of this strategy and thus, investment in time and resources will be made to execute the strategy. Plant Training Coordinators ("PTCs") shall be recruited and staffed in each plant organization,

CONFIDENTIAL

along with additional training resources staffed on the power Plant Technical Services team. The PTCs should coordinate all the needed training for their respective power plant(s) while the training staff from the technical services team should serve as both instructors and as coordinators of Subcontractors who can offer some of the required training classes.

*Maintenance Philosophy and Working with Puerto Rico-Based Subcontractors for Corrective Maintenance*

Maintenance Technician positions shall be filled in by recruiting existing PREPA technicians and communicating the operations and maintenance philosophies including multi-skilling.

*Positions in Revised Organization*

The operations staffing plan shall include interviewing existing PREPA operations employees primarily (and filling in any voids with hires outside of PREPA) for the following job classifications:

- Leadership positions include Plant Manager, Operations Manager, Maintenance Manager, Operations Team Supervisor, Maintenance Supervisor, Manager of Outage and Projects, Engineering Manager, Technical Support Services Manager

- Plant Operator

- Auxiliary Operator

- Combustion Turbine Technician

- Maintenance Technician

- Contract Resource Coordinator

- Planner

- Engineer

- Project Manager

- Implementation Manager

Additionally, staffing shall be substantially completed prior to Commencement of Operations. The last day of PREPA operations will be simultaneous with shifts of Operator employees to ensure a seamless turnover of duties with a goal of no disruptions in service. During the two weeks prior to commencement of services, overlap of rotating shift workers will take place on multiple occasions to support orientation for selected employees.

## 7.1.7   *Subcontractor Identification & Onboarding*

During the Mobilization Period, representatives from Operator's Supply Chain team shall evaluate existing procedures and systems to evaluate the subcontractor base and to determine opportunities

CONFIDENTIAL

for consolidation and/or cross-over with Operator existing Subcontractors; benchmark pricing and other relevant commercial terms against industry standards to identify potential areas of cost savings; perform in-depth contract review for compliance with existing Operator policies; meet with critical Subcontractors to establish relationships; and ensure they have the correct level of local support for continuity of operations. Various Subcontractors may be used across multiple work streams to assist with the mobilization Period activities.

- *Meet with potential O&M Subcontractors who could perform corrective maintenance activities for the Legacy Generation Assets*

Operator may work with several on-island Subcontractors to perform much of the corrective maintenance at the Legacy Generation Assets. This work must be contracted via the approved Procurement Manual procedures.

### 7.1.8 *Information Technology*

The scope and schedule of Operator's IT group shall be driven by new systems and processes and may represent a degree of change that requires a structured, well-defined multi-year time frame for implementation. The primary critical path activities that determine the schedule for the IT transition program are as follows:

1. *Plan and integrate for implementation a fleet-wide Computerized Maintenance Management System ("CMMS").*

The CMMS will drive and manage disciplined work management processes across all Legacy Generation Assets for preventive and corrective maintenance.

2. *Begin implementation with Operator's IT partners to establish the necessary enterprise-wide workflow IT tools to enable operation, maintenance, inventory control, event reporting and tracking, employee development/training and human performance improvement/safety.*

As part of the IT Mobilization Period, Operator's IT's team, with the support of global partners, must assess PREPA's IT function and environments to understand people, processes, and technologies.

### 7.1.9 *Permit and Compliance Reviews*

Operator shall review permitting and other relevant documentation provided to it, including information regarding the Consent Decree and State Implementation Plan. Based on this information, Operator will prepare an initial compliance matrix which will include permit requirements, timelines, reporting elements, and priorities. As part of the Mobilization Services, Operator shall assess the current level of compliance and structure in place to adhere to the requirements set forth by the Consent Decree and SIP, with focus in key areas such as air compliance, Clean Water Act, SPCC, EPCRA/CERCLA, and general program administration. Any gaps identified will be addressed.

CONFIDENTIAL

Operator has an existing compliance management system which may be utilized to manage and track the actions associated with compliance requirements. Staffing requirements shall be identified and aligned with the expectations of the Consent Decree and the SIP and with the expertise needed to ensure proper compliance with all regulatory matters identified. Operator may seek to engage with a third-party specialist to aid in this aspect of the mobilization effort and to assist in training and transitioning the management of compliance matters to the various HSSEQ staff.

### 7.1.10  *Inventory*

Operator shall evaluate existing processes and solutions for materials management, inventory, and warehousing with the goal to develop a streamlined best-in-class solution for the existing operations. Evaluations should consider existing infrastructure suitability, current inventory levels and industry stocking and storage recommendations. This includes identifying necessary consumables, spare parts, Capital Spares and equipment needed for the first 12 months of operation. Further, during the Mobilization Period, an inventory of temporary on-site office space, trailers and storage containers shall be conducted.

Operator shall also have a fuels team in place, with shadowing/overlap with the PREPA fuels office intentionally performed to assure no issues with fuel inventories, orders, or deliveries. The fuel inventory will adequately match a dispatch schedule and long-term dispatch projections provided by the T&D System Operator.

### 7.1.11  *Coordination with T&D System Operator*

Operator shall understand its relationship to the T&D System Operator. Operator shall:

- Participate in any and all system planning meetings with the T&D System Operator during the Mobilization Period to ensure Operator is in proper position to support the T&D System Operator;

- Engage in strategic outreach with the T&D System Operator to identify opportunities for greater efficiencies potentially in fuel for vehicles (by Generation Operator to T&D System Operator), vehicles and equipment usage and to address such opportunities in the Shared Services Agreement, should the parties agree on the value of such;

- Establish a robust outage planning schedule with the T&D System Operator and other relevant organizations; and

- Coordinate with the T&D System Operator and PREPA and any other relevant organization to develop analyses on and registrars of historical expenditures of Legacy Generation Assets.

### 7.1.12  *Review and Evaluate Applicable Plans and Procedures*

As part of its operational take-over plan, Operator shall review and evaluate the existing Emergency Response Plan including disaster recovery, business continuity and any related plans

for consistency with applicable laws and best management standards and conduct a gap assessment. Where any gaps are identified, Operator shall develop an action plan to address such deficiencies and present its Legacy Generation Emergency Response Plan for review and approval to Administrator and PREB.

Operator shall establish training programs and develop a drill schedule to test the efficacy of the programs and ensure all personnel are informed and prepared to respond to situations described under such plans. Additionally, Operator shall form site or team-level safety teams and train them on the Safety and Hazardous Materials Procedures Manual.

## 7.2    Approach to Interacting with Spanish-Speaking Workforce

The organizational charts in Exhibit 2 of the Proposal include designations for those key personnel that are Spanish speakers.

## 7.3    Handover Checklist

Operator shall maintain and manage the Handover Checklist continually based on the following form but revised as applicable for the unique characteristics of each Legacy Generation Asset. These updates shall include reporting checklist items that have been completed, as well as identify any checklist items that might have emergent issues or problems that need to be escalated for resolution. In addition, if any new emergent items are identified that are not currently known, they must be proposed to be added to the Handover Checklist to be reviewed with Administrator.

| | PRELIMINARY HANDOVER CHECKLIST ITEM | REQUIRED FOR [OPERATIONS PHASE]? (Y/N) | COMPLETED? (Y/N) |
|---|---|---|---|
| ☐ | Staffing completed | | |
| ☐ | Orientation to Genera PR completed (includes detailed role and responsibility training) | | |
| ☐ | Skill assessment completed | | |
| ☐ | Training and development plans created | | |
| ☐ | Training commenced (program in place) | | |
| ☐ | Site/department procedures exist and are in use, including applicable Emergency Response Plans and fuel supply operations and maintenance procedures applicable to the site | | |
| ☐ | New procedures created (if applicable) | | |

6

CONFIDENTIAL

| | PRELIMINARY HANDOVER CHECKLIST ITEM | REQUIRED FOR [OPERATIONS PHASE]? (Y/N) | COMPLETED? (Y/N) |
|---|---|---|---|
| ☐ | New personnel trained on site/department procedures | | |
| ☐ | Review of applicable contracts | | |
| ☐ | Existing contracts either remain in place, renewed, or new contracts are entered | | |
| ☐ | Meet with contractor partners and prepare to support operation and maintenance | | |
| ☐ | Work management system in place | | |
| ☐ | Project teams in place, planning items 4+ weeks out | | |
| ☐ | Work plans in place for first 4 weeks | | |
| ☐ | Introductory meeting with Plant Technical Services lead and the Pod Manager supporting the specific plant | | |
| ☐ | Plant Manager and Pod Manager agreed on and formed project teams | | |
| ☐ | Permits reviewed with PREPA functional area leads | | |
| ☐ | Risk assessments reviewed with PREPA functional area leads and updated | | |
| ☐ | Permits reviewed and deconstructed with HSSEQ support | | |
| ☐ | Current compliance status reviewed with HSSEQ support | | |
| ☐ | Permits reviewed with regulators | | |
| ☐ | Established DOA from PREPA to Genera PR and reassign account access where applicable | | |
| ☐ | Filed authorized signatory filings | | |

CONFIDENTIAL

| | PRELIMINARY HANDOVER CHECKLIST ITEM | REQUIRED FOR [OPERATIONS PHASE]? (Y/N) | COMPLETED? (Y/N) |
|---|---|---|---|
| ☐ | Communication established with LUMA dispatch (agree to initial Agreed Operating Procedures set in the Gridco-Genco Operating Agreement) | | |
| ☐ | Jointly, with LUMA, agree to the requirements and procedures for the Annual Performance Test and heat rate testing for each unit and provide such to PREB for review | | |
| ☐ | Review and agree with LUMA the dispatch schedule for first 4 weeks and ready to support | | |
| ☐ | Fuel inventory adequate for dispatch schedule | | |
| ☐ | Fuel delivery schedule adequate to match long-term dispatch projection | | |
| ☐ | Site/team spare parts/inventory reviewed with PREPA counterpart | | |
| ☐ | Inventory is understood and support continued operation | | |
| | Begin the process for transitioning FCC licences for all radios | | |
| ☐ | Identified all necessary consumables, spare parts and capital spares needed for first 12 months of operation and communicated them to Owner and to PREB | | |
| ☐ | Established communication with potential site-level union officials | | |
| ☐ | Site or team level safety team formed and trained on Safety and Hazardous Materials Procedures Manual | | |
| ☐ | Genera PR and PREPA functional area leaders agreed handover is ready | | |

8

CONFIDENTIAL

## 7.4     Key Milestones

The mobilization process is expected to start immediately on the Effective Date and is expected to continue for 22 weeks. The following Gantt chart or similar document shall provide the key milestones for each scope of work ("week(s)" signifies the number of weeks or the applicable milestone activity displayed).

Within the first week, Operator's functional area leads shall meet with PREPA counterparts in Puerto Rico, consisting of virtual and multi-day, face-to-face meetings. During this time, Operator shall ensure that required insurance coverage is in place; review, revise, and send O&M and fuel procedures to the Administrator and PREB for approval; and update as needed the Safety Hazardous Procedures Manuals for each asset. Additionally, Operator shall begin working with the T&D System Operator, to ensure integration of the applicable Generation Emergency Response Procedures with the System Emergency Response Procedures.

Operator shall then begin recruiting existing PREPA employees, communicate Operator information and philosophies, and establish a recruiting team. Operator must schedule meetings with applicable unions and potential O&M Subcontractors who could perform some of the corrective maintenance activities for the Legacy Generation Assets.

Operator shall commence detailed planning for projects included in the initial work plan. This phase will consist of project and outage teams and determining unit outage requirements and any outage/derate work in coordination with the T&D System Operator.

Operator shall commence planning and integration for implementation of a fleet-wide CMMS, issue RFPs for power plant corrective maintenance and negotiate maintenance service agreements and make offers for positions in the Operator's organization.

Operator shall initiate a targeted training and qualification process on applicable topics and skills, utilizing Subcontractors when necessary.

In the last seven weeks, Operator shall begin implementation with IT Subcontractors to establish the necessary enterprise-wide workflow IT tools to enable operation, maintenance, inventory control, event reporting and tracking, employee development/training, and human performance improvement/safety.

CONFIDENTIAL



| Task | | 2022 | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Week 0 | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | Week 14 | Week 15 | Week 16 | Week 17 | Week 18 | Week 19 | Week 20 | Week 21 | Week 22 |
| 1- Meet with PREPA Counterparts | 1-A | ■ | | | | | | | | | | | | | | | | | | | | | | |
| | 1-B | | ■ | | | | | | | | | | | | | | | | | | | | | |
| | 1-C | | | | | | | | | | | | | | | | | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| | 1-D | | | | | | | | | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | | | | | |
| | 1-E | | | | | | | | | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | | | | | |
| 2- Recruitment & Screening of PREPA Existing Employee | 2-A | | ■ | | | | | | | | | | | | | | | | | | | | | |
| | 2-B | | | ■ | ■ | | | | | | | | | | | | | | | | | | | |
| | 2-C | | | | | ■ | ■ | ■ | ■ | ■ | ■ | | | | | | | | | | | | | |
| 3- Meeting with Union Officers | 3-A | | ■ | ■ | ■ | | | | | | | | | | | | | | | | | | | |
| 4- Meet with Potential O&M Subcontractors | 4-A | ■ | ■ | ■ | ■ | ■ | | | | | | | | | | | | | | | | | | |
| 5- Commence Detailed Planning | 5-A | | | ■ | | | | | | | | | | | | | | | | | | | | |
| | 5-B | | | | ■ | ■ | ■ | | | | | | | | | | | | | | | | | |
| | 5-C | | | | | | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| | 5-D | | | | | | | | | | | | | | | | | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| 6- Kick off Planning and Integration | 6-A | | | ■ | ■ | ■ | | | | | | | | | | | | | | | | | | |
| 7- Issue RFPs | 7-A | | | | | ■ | ■ | ■ | ■ | ■ | | | | | | | | | | | | | | |
| 8- Hire Employees | 8-A | ■ | ■ | ■ | ■ | ■ | ■ | | | | | | | | | | | | | | | | | |
| 9- Assessment of Abilities and Skills | 9-A | | | | | | | | | | | | | ■ | ■ | ■ | ■ | | | | | | | |
| 10- Initiate Targeted Training | 10-A | | | | | | | | | | | | | | | | | | | | ■ | ■ | ■ | ■ |
| 11- Begin Implementation of IT Subcontractors | 11-A | | | | | | | | | | | | | | | | | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| 12 - Establish recurring meetings with Grid Operator (LUMA) | 12-A | | | | ■ | | | | | | | | | | | | | | | | | | | |
| | 12-B | | | | | | | | | | | | | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| | 12-C | | | | | | | | | | | | | | | | | | | | | | | |
| 13 - Update Communication Plan | 13-A | | | | | | | | | | | | | | | | | | | | ■ | ■ | ■ | ■ |
| 14 - Review and Revise as needed the Invoice Review and Approval Process Manual | 14-A | | | | | | | | | | | | | | | | | ■ | ■ | ■ | ■ | ■ | ■ | ■ |

This time frame will further involve work with the T&D System Operator to revise the two-year major maintenance schedule; an update to the Communications Plan, and revisions of the Invoice Review and Approval Process Manual, as needed and in accordance with the approved SOP's.

In addition, Operator must focus on three additional key items that are important to a successful Mobilization Period, which are:

- Build capacity for outage and project planning teams on site who are prepared to execute various plans;

**CONFIDENTIAL**

- Plan for and implement a day one acknowledgment, providing information to employees and the public on the mobilization, thanking employees for their work leading up to the mobilization, and celebrating the path forward for the people of Puerto Rico.

CONFIDENTIAL

## Annex VIII

**PREPA-Genco-Hydroco Operating Agreement**

**CONFIDENTIAL**

---

### PUERTO RICO PREPA-GENCO-HYDROCO OPERATING AGREEMENT

**dated as of**
**_____, 202[●]**

**THE PUERTO RICO ELECTRIC POWER AUTHORITY**
as Owner of the T&D System,

**[PREPA GENCO, LLC]**
as Owner of the Legacy Generation Assets,

**[PREPA HYDROCO, LLC]**
as Owner of the Hydropower Assets,

**LUMA ENERGY SERVCO, LLC**
as T&D Operator,

**and**

**THE PUERTO RICO PUBLIC-PRIVATE PARTNERSHIPS AUTHORITY**
as Administrator

---

CONFIDENTIAL

# TABLE OF CONTENTS

Page

Article 1 Definitions; Interpretation..................................................................................2
Section 1.1      Definitions.......................................................................................................2
Section 1.2      Interpretation; Construction. .........................................................................10

Article 2 Effective Date; Term; AGENT DESIGNATION.................................................11
Section 2.1      Effective Date .................................................................................................11
Section 2.2      Term................................................................................................................11
Section 2.3      Agent Designation. .........................................................................................12

Article 3 Budgets and Accounts ...................................................................................12
Section 3.1      Generation Budget Preparation .....................................................................12
Section 3.2      Generation Budget Amendments ...................................................................16
Section 3.3      Funding of Accounts and Payment of Expenditures Generally.........................16
Section 3.4      Genco O&M Charges......................................................................................17
Section 3.5      Genco Fuel Costs ...........................................................................................19
Section 3.6      Hydropower Costs ..........................................................................................20

Article 4 Dispatch; Ownership, Operation And Maintenance Of Interconnection
Facilities; Records; Metering; Ancillary Services; Decommissioning; Agreed Operating
Procedures........................................................................................................................20
Section 4.1      Dispatch .........................................................................................................21
Section 4.2      Ownership, Operation and Maintenance of Interconnection Facilities ................21
Section 4.3      Records and Information..................................................................................21
Section 4.4      Metering..........................................................................................................22
Section 4.5      Ancillary Services ...........................................................................................22
Section 4.6      Decommissioning ...........................................................................................22
Section 4.7      Agreed Operating Procedures ........................................................................22

Article 5 Indemnification ...............................................................................................23
Section 5.1      Indemnification ...............................................................................................23

Article 6 Termination .....................................................................................................23
Section 6.1      Termination .....................................................................................................23

Article 7 Representations and Warranties....................................................................23
Section 7.1      Representations and Warranties......................................................................23
Section 7.2      Compliance with Applicable Law .....................................................................24

Article 8 Miscellaneous .................................................................................................24
Section 8.1      Notices............................................................................................................24
Section 8.2      Amendments ...................................................................................................25
Section 8.3      Entire Agreement ............................................................................................26
Section 8.4      Assignment and Transfer .................................................................................26
Section 8.5      Severability .....................................................................................................26
Section 8.6      Survival ...........................................................................................................26

**CONFIDENTIAL**

Section 8.7     Counterparts ..................................................................................27
Section 8.8     Governing Law ...............................................................................27
Section 8.9     PREB Actions .................................................................................27
Section 8.10    FOMB Powers .................................................................................27
Section 8.11    Joinder ............................................................................................27


Annex I    –    Form of Interconnection Agreement
Annex II   –    Form of Agreed Operating Procedures
Annex III  –    Form of Joinder Agreement

iv

CONFIDENTIAL

## PUERTO RICO PREPA-GENCO-HYDROCO OPERATING AGREEMENT

This PUERTO RICO PREPA-GENCO-HYDROCO OPERATING AGREEMENT (this "Agreement") is made and entered into as of [●], 2023 by and among: (i) the Puerto Rico Electric Power Authority ("PREPA"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), created under Act No. 83 of the Legislative Assembly of Puerto Rico, enacted on May 2, 1941, as amended, known as the "Puerto Rico Electric Power Authority Act"; (ii) [*PREPA Genco LLC*] ("Genco"), a public limited liability company and governmental instrumentality of the Commonwealth, created under Act No. 164 of the Legislative Assembly of Puerto Rico, enacted on December 16, 2009, as amended, known as the "Puerto Rico General Corporations Act" ("Act 164"); (iii) [*PREPA Hydroco LLC*] ("Hydroco"), a public limited liability company and governmental instrumentality of the Commonwealth, created under Act 164; (iv) LUMA Energy ServCo, LLC, in its capacity as "Operator" pursuant to the T&D O&M Agreement (as defined below) ("T&D Operator"), a limited liability company organized under the laws of the Commonwealth; and (v) the Puerto Rico Public-Private Partnerships Authority ("Administrator" and, together with PREPA, Genco, Hydroco and T&D Operator, the "Parties" and each, a "Party"), a public corporation of the Commonwealth, created under Act No. 29 of the Legislative Assembly of Puerto Rico, enacted on June 8, 2009, as amended, known as the "Public-Private Partnership Authority Act" ("Act 29"). Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in Article 1.

## RECITALS

**WHEREAS**, PREPA owns and leases the transmission and distribution system and related facilities, equipment and other assets related to the transmission and distribution system in which PREPA has an ownership or leasehold interest (the "T&D System");

**WHEREAS**, PREPA underwent a reorganization pursuant to which PREPA: (a) (i) created Genco, a wholly-owned subsidiary of PREPA; and (ii) transferred to Genco all of its thermal generation plants and the fuel contracts, assets and personnel related thereto (the "Legacy Generation Assets"), including those transferred to Genco pursuant to the Genco Capital Contribution Agreement; (b) (i) created Hydroco, a wholly-owned subsidiary of PREPA; and (ii) transferred to Hydroco all of its hydroelectric generating units, the public irrigation facilities and the assets related thereto (the "Hydropower Assets"), including those transferred to Hydroco pursuant to the Hydroco Capital Contribution Agreement; and (c) transferred out of PREPA to a wholly-owned subsidiary of PREPA certain other assets unrelated to the T&D System, the Legacy Generation Assets or the Hydropower Assets;

**WHEREAS**, as a result of such reorganization and associated transfers, (a) Genco owns the Legacy Generation Assets and (b) Hydroco owns the Hydropower Assets;

**WHEREAS**, PREPA, Administrator and T&D Operator have entered into that certain Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement, dated as of June 22, 2020 (as amended, modified or supplemented from time to time in accordance with its terms, the "T&D O&M Agreement"), pursuant to which T&D Operator (a) took over the operation and management of the T&D System, including certain administrative, managerial and

1

CONFIDENTIAL

operational services, on June 1, 2021 and (b) assumed the role as T&D System operator, including (i) managing control center operations, including generation scheduling and economic/reliable T&D System dispatch; (ii) balancing the supply and demand of electricity, including reacting to changes in demand in real time, adjusting generation dispatch to be in balance with demand and maintaining the T&D System at safe operating levels in accordance with Prudent Utility Practices (as defined in the T&D O&M Agreement) and the System Operation Principles; (iii) conduct T&D System planning activities; (iv) develop and implement reliability standards appropriate for the conditions in the Commonwealth; and (v) manage a transparent, equitable and open generator interconnection process;

**WHEREAS**, Genco, Administrator and the Person selected by the partnership committee established by Administrator (as defined below) on July 13, 2020 pursuant to Section 5 of Act No. 120 of the Legislative Assembly of Puerto Rico, enacted on June 21, 2018, as amended, known as the "Puerto Rico Electric System Transformation Act" and the provisions of Act 29 ("Genco Operator") expect to enter into that certain Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement (as amended, modified or supplemented from time to time in accordance with its terms, the ("Generation O&M Agreement"), pursuant to which Genco Operator would take over the operation and maintenance of the Legacy Generation Assets, including certain administrative, managerial and operational services;

**WHEREAS**, prior to Genco Operator taking over the operation and maintenance of the Legacy Generation Assets pursuant to the Generation O&M Agreement, Genco will continue to be responsible for the operation and maintenance of the Legacy Generation Assets;

**WHEREAS**, Hydroco will be responsible for the operation and maintenance of the Hydropower Assets; and

**WHEREAS**, given that the Legacy Generation Assets and the Hydropower Assets have been split from the T&D System such that (a) each of the T&D System, the Legacy Generation Assets and the Hydropower Assets are owned by separate corporate entities and (b) each of the T&D System, the Legacy Generation Assets and the Hydropower Assets are operated and maintained by separate corporate entities, the Parties wish to coordinate certain matters with respect to the Legacy Generation Assets and the Hydropower Assets.

**NOW THEREFORE**, in consideration of the mutual covenants, representations, warranties and agreements contained herein and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties covenant and agree as follows:

## Article 1

## DEFINITIONS; INTERPRETATION

**Section 1.1    Definitions**. As used in this Agreement, the following capitalized terms have the respective meanings set forth below.

"Act 164" has the meaning set forth in the introductory paragraph.

"Act 29" has the meaning set forth in the introductory paragraph.

CONFIDENTIAL

"Administrator" has the meaning set forth in the introductory paragraph.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly, including through one or more intermediaries, Controls, is Controlled by or is under common Control with such Person.

"Agreed Operating Procedures" has the meaning set forth in Section 4.7, and includes any Agreed Operating Procedures entered into on or before the Effective Date between T&D Operator and PREPA, as the case may be, with respect to the Legacy Generation Assets or the Hydropower Assets, respectively, as may be updated or amended from time to time.

"Agreement" has the meaning set forth in the introductory paragraph.

"Ancillary Services" has the meaning set forth in Section 4.5.

"Applicable Law" means any foreign, national, federal, state, Commonwealth, municipal or local law, constitution, treaty, convention, statute, ordinance, code, rule, regulation, common law, case law or other similar requirement enacted, adopted, promulgated or applied by any Governmental Body, including any Environmental Law, PROMESA and any order issued by the Title III Court, in each case applicable to the Parties.

"Budget Allocation Meeting" has the meaning set forth in Section 3.1(b)(i).

"Budgets" has the meaning set forth in Section 3.1(b)(i).

"Business Day" means any day that is not a Saturday, a Sunday or a day observed as a holiday by either the Commonwealth or the United States federal government.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601 et seq.

"Commonwealth" has the meaning set forth in the introductory paragraph.

"Consent Decree" means the Consent Decree between PREPA and the United States of America (through the United States Department of Justice and the EPA), as entered by the United States District Court for the District of Puerto Rico on March 19, 1999 in Civil Action No. 93-2527(CCC), as modified on September 9, 2004, and as may be further modified in the future, including any successor consent decree thereto.

"Control", "Controlled by" and similar expressions mean the power, directly or indirectly, to direct or cause the direction of the management and policies of a Person (other than an individual), whether through the ownership of outstanding share capital (or equivalent interest), by contract or otherwise. Without limiting the foregoing, a Person shall be deemed to Control another Person (a) if such Person has directly or indirectly designated a majority of the board of directors (or equivalent governing body) of such other Person or (b) if such Person has the direct or indirect power, whether through ownership of outstanding share capital (or equivalent interest), by contract or otherwise, to designate a majority of the board of directors (or equivalent governing body) of such other Person.

CONFIDENTIAL

"Dispatch" means the scheduling and control, directly or indirectly, manually or automatically, by T&D Operator of the generation of the Generation Units at each Legacy Generation Asset or Hydropower Asset in order to increase or decrease the electrical energy delivered to the T&D System in accordance with the System Operation Principles and the applicable Agreed Operating Procedures.

"Effective Date" has the meaning set forth in Section 2.1.

"Electricity" means the electrical energy, capacity and Ancillary Services available from one or more of the Legacy Generation Assets or one or more of the Hydropower Assets.

"Environmental Law" means (a) any law, statute, ordinance, code, rule, regulation, order, writ, injunction, decree, ruling, determination, award, standard, permit or variance of any Governmental Body, or any binding agreement with any Governmental Body, and (b) any consent order or decree, settlement agreement or other similar agreement between PREPA, Genco and/or Hydroco and the Puerto Rico Department of Natural and Environmental Resources, EPA, the United States Department of Justice, or other relevant Governmental Body, in each case having the force of law and applicable from time to time, relating to (i) the conservation, protection, pollution, contamination or remediation of the environment or natural resources, (ii) any Hazardous Material, including investigation, study, remediation or abatement of such Hazardous Material, (iii) the storage, treatment, disposal, recycling or transportation of any Hazardous Material or (iv) human health or safety. For the avoidance of doubt, Environmental Law includes the Consent Decree.

"EPA" means the United States Environmental Protection Agency.

"Fiscal Year" means the period from July 1 through June 30 of the following year. Any computation made on the basis of a Fiscal Year shall be adjusted on a Pro Rata basis to take into account any Fiscal Year of less than 365/366 days.

"FOMB" means the Financial Oversight and Management Board for Puerto Rico.

"Fuel Charge Adjustment" means the applicable cost recovery rate provision, as approved by PREB from time to time pursuant to Applicable Law.

"Fuel Costs" means the costs and expenses related to fuel incurred by Genco which PREB approves for recovery from monies collected through the Fuel Charge Adjustment, net of any proceeds received by or on behalf of Genco from the sale of fuel.

"Genco" has the meaning set forth in the introductory paragraph and is subject to Section 1.2(d).

"Genco Accounts Funding Notice" has the meaning set forth in Section 3.3(a).

"Genco Budget" means, for any given Fiscal Year, the budget of (a) the non-fuel expenditures required to operate and maintain the Legacy Generation Assets and to provide the Genco Decommissioning Services for such Fiscal Year, together with the projected budget for the following two (2) Fiscal Years, in each case including monthly budgets of such expenditures and

CONFIDENTIAL

cash flows, and (b) any Genco Operator Fees, as such budget may be amended or adjusted from time to time with the approval of PREB; provided that in the event the amounts in clauses (a) and (b) for a given Fiscal Year have not been finalized in accordance with Section 3.1(d)(iii) by July 1 of such Fiscal Year, the applicable approved Genco Budget for the immediately preceding Fiscal Year (as the same may have been amended) shall remain in effect as a default budget until such time as the applicable Genco Budget for such Fiscal Year is so finalized; provided, further, that any such default budget shall be compliant with the then-applicable Rate Order.

"Genco Budget Notice" has the meaning set forth in Section 3.1(d)(ii).

"Genco Capital Contribution Agreement" means [that certain capital contribution agreement entered into on or prior to the Effective Date between PREPA and Genco pursuant to which PREPA transferred to Genco the Legacy Generation Assets].

"Genco Decommissioning Services" means the permitting, demolition, decontamination and dismantling or preparation for conversion, as applicable, of any of the Legacy Generation Assets, for waste disposal and for achievement of end-state conditions within a prescribed time, all of which, including costs, has been approved by PREB.

"Genco Fuel Account" has the meaning set forth in Section 3.5(b)(i).

"Genco Fuel Account Deposit" means, as of a given day (not more than two (2) Business Days before the date of the applicable Genco Accounts Funding Notice) in any given month, the amount required to replenish the Genco Fuel Account so as to maintain on such day an aggregate funding level in the Genco Fuel Account and the Other Genco Fuel Accounts equal to the sum of the forecasted Fuel Costs as approved by PREB for the subsequent two (2) months (which amount shall be the minimum working capital level that is required for purposes of this Agreement), taking into account all funds on deposit in the Genco Fuel Account and the Other Genco Fuel Accounts as of such day. For the avoidance of doubt, if at any time during the Term the forecasted Fuel Costs as approved by PREB for one (1) or more of the subsequent two (2) months do not exist, then the forecasted Fuel Costs as approved by PREB for the most recent prior one (1) month shall be used.

"Genco Interconnection Facilities" means all assets, equipment and facilities located on Genco's side of each Interconnection Point, installed, operated and maintained by or on behalf of Genco for the purpose of interconnecting each Legacy Generation Asset to the T&D System, as further described in the LGA Interconnection Agreement.

"Genco Operating Account" has the meaning set forth in Section 3.4(b)(i).

"Genco Operating Account Deposit" means, as of a given day (not more than two (2) Business Days before the date of the applicable Genco Accounts Funding Notice) in any given month, the amount required to replenish the Genco Operating Account so as to maintain on such day an aggregate funding level in the Genco Operating Account, the Other Genco Operating Accounts, the Hydroco Operating Account and the Other Hydroco Operating Accounts equal to the sum of the then-approved Genco Budget and Hydroco Budget for the subsequent two (2) months, taking into account all funds on deposit in the Genco Operating Account, the Other Genco

CONFIDENTIAL

Operating Accounts, the Hydroco Operating Account and the Other Hydroco Operating Accounts as of such day.

"Genco Operator" has the meaning set forth in the Recitals and is subject to Section 1.2(d).

"Genco Operator Effective Date" has the meaning set forth in Section 1.2(d).

"Genco Operator Fees" means the maximum amounts for fixed and incentive compensation available Genco Operator in a given Fiscal Year pursuant to the Generation O&M Agreement.

"Generation Budget" means, for any given Fiscal Year, the combination of the Genco Budget and the Hydroco Budget for such Fiscal Year.

"Generation O&M Agreement" has the meaning set forth in the Recitals.

"Generation Pass-Through Expenditures" means the costs and expenses (without markup for profit) incurred by or on behalf of Genco or Hydroco in the course of providing Electricity, including the costs and expenses incurred under this Agreement.

"Generation Unit" means each of the individual combustion or gas turbine generator units, steam turbine generator units and hydropower or irrigation generator units of each Legacy Generation Asset or each Hydropower Asset.

"Governmental Body" means any U.S. federal, state, Commonwealth, regional, municipal or local legislative, executive, judicial or other governmental board, agency, authority, commission, bureau, administration, court, instrumentality or other duly authorized body, including PREB and the FOMB (if then in existence), other than PREPA, Genco and Hydroco, and, in its capacity as such under this Agreement, Administrator, or any official thereof having jurisdiction with respect to any subject of this Agreement.

"Hazardous Material" means: (a) any waste, substance, object or material deemed hazardous under Environmental Law, including "hazardous substances" as defined in CERCLA and "hazardous waste" as defined in RCRA and any local counterpart law; (b) any oil or petroleum product, lead-based paint, per- or polyfluoroalkyl substances or polychlorinated biphenyl; and (c) any other pollutant, contaminant, material, substance or waste that has deleterious or hazardous properties and that is listed, defined or is subject to regulation under any Environmental Law.

"Hydroco" has the meaning set forth in the introductory paragraph.

"Hydroco Account Funding Notice" has the meaning set forth in Section 3.3(b).

"Hydroco Budget" means, for any given Fiscal Year, the budget of the non-fuel expenditures required to operate and maintain the Hydropower Assets and to provide the Hydroco Decommissioning Services for such Fiscal Year, together with the projected budget for the following two (2) Fiscal Years, in each case including monthly budgets of such expenditures and cash flows, as such budget may be amended or adjusted from time to time with the approval of

CONFIDENTIAL

PREB; underlined provided that in the event the amounts above for a given Fiscal Year have not been finalized in accordance with Section 3.1(d)(iii) by July 1 of such Fiscal Year, the applicable approved Hydroco Budget for the immediately preceding Fiscal Year (as the same may have been amended in accordance with this Agreement) shall remain in effect as a default budget until such time as the applicable Hydroco Budget for such Fiscal Year is so finalized; provided, further, that any such default budget shall be compliant with the then-applicable Rate Order and to the extent it is not so compliant such default budget shall be reduced so as to be compliant with the then-applicable Rate Order.

"Hydroco Budget Notice" has the meaning set forth in Section 3.1(c)(ii).

"Hydroco Capital Contribution Agreement" means [that certain capital contribution agreement entered into on or prior to the Effective Date between PREPA and Hydroco pursuant to which PREPA transferred to Hydroco the Hydropower Assets].

"Hydroco Decommissioning Services" means the permitting, demolition, decontamination and dismantling or preparation for conversion, as applicable, of any of the Hydropower Assets, for waste disposal and for achievement of end-state conditions within a prescribed time, all of which, including costs, has been approved by PREB.

"Hydroco Interconnection Facilities" means all assets, equipment and facilities located on Hydroco's side of each Interconnection Point, installed, operated and maintained by or on behalf of Hydroco for the purpose of interconnecting each Hydropower Asset to the T&D System, as further described in the Hydropower Interconnection Agreement.

"Hydroco Operating Account" has the meaning set forth in Section 3.6(b)(i).

"Hydroco Operating Account Deposit" means, as of a given day (not more than two (2) Business Days before the date of the applicable Hydroco Account Funding Notice) in any given month, the amount required to replenish the Hydroco Operating Account so as to maintain on such day an aggregate funding level in the Hydroco Operating Account and the Other Hydroco Operating Accounts equal to the then-approved Hydroco Budget for the subsequent two (2) months, taking into account all funds on deposit in the Hydroco Operating Account and the Other Hydroco Operating Accounts as of such day.

"Hydropower Assets" has the meaning set forth in the Recitals.

"Hydropower Cost" has the meaning set forth in Section 3.6(a).

"Hydropower Interconnection Agreement" means that certain interconnection agreement to be entered into on or about the Effective Date between PREPA and Hydroco with respect to the interconnection of the T&D System and the Hydropower Assets substantially and in all material respects in the form of Annex I.

"Initial Generation Budget" means the Generation Budget approved by PREB or certified by the FOMB and effective from July 1, 2023, through June 30, 2024, which Initial Generation Budget is consistent with the applicable Rate Order then in effect.

"Interconnection Agreements" means the LGA Interconnection Agreement and the Hydropower Interconnection Agreement.

"Interconnection Facilities" means the Genco Interconnection Facilities, the Hydroco Interconnection Facilities and the T&D Interconnection Facilities, as the case may be.

"Interconnection Point" means, (a) with respect to each Legacy Generation Asset, the physical demarcation point between the applicable Genco Interconnection Facilities, on the one hand, and the applicable T&D Interconnection Facilities, on the other hand, where Electricity from such Legacy Generation Asset is delivered or made available to the T&D System, and (b) with respect to each Hydropower Asset, the physical demarcation point between the applicable Hydroco Interconnection Facilities, on the one hand, and the applicable T&D Interconnection Facilities, on the other hand, where Electricity from such Hydropower Asset is delivered or made available to the T&D System. The Interconnection Points are further described in the LGA Interconnection Agreement and the Hydropower Interconnection Agreement.

"Joinder Agreement" has the meaning set forth in Section 8.11.

"Legacy Generation Assets" has the meaning set forth in the Recitals.

"LGA Interconnection Agreement" means that certain interconnection agreement to be entered into on or about the Effective Date between PREPA and Genco with respect to the interconnection of the T&D System and the Legacy Generation Assets substantially and in all material respects in the form of Annex I.

"Lien" means any and every lien, pledge, security interest, claim, mortgage, deed of trust, lease, charge, option, right of first refusal, easement or other real estate declaration, covenant, condition, restriction or servitude, transfer restriction under any encumbrance or any other restriction or limitation whatsoever, including mechanics', materialmen's, laborers' and lenders' liens.

"Losses" has the meaning set forth in Section 5.1(a).

"O&M Charge" has the meaning set forth in Section 3.4(a).

"Other Genco Fuel Accounts" has the meaning set forth in Section 3.5(b)(i).

"Other Genco Operating Accounts" has the meaning set forth in Section 3.4(b)(i).

"Other Hydroco Operating Accounts" has the meaning set forth in Section 3.6(b)(i).

"Other PREPA Budgets" has the meaning set forth in Section 3.1(b)(i).

"Party" or "Parties" has the meaning set forth in the introductory paragraph.

"Person" means any individual (including the heirs, beneficiaries, executors, legal representatives or administrators thereof), firm, corporation, company, association, partnership,

CONFIDENTIAL

limited partnership, limited liability company, joint stock company, joint venture, trust, business trust, unincorporated organization or other entity or a Governmental Body.

"PREB" means the Puerto Rico Energy Bureau, also known as the *Negociado de Energia de Puerto Rico*, an independent body created under Act No. 57 of the Legislative Assembly of Puerto Rico, enacted on May 27, 2014, as amended, known as the "Puerto Rico Energy Transformation and RELIEF Act".

"PREB Actions" has the meaning set forth in Section 8.9.

"PREPA" has the meaning set forth in the introductory paragraph.

"PREPA Fuel Account" means the fuel account established by PREPA pursuant to Section 7.5(e)(i)(B) of the T&D O&M Agreement.

"PREPA Generation Expenditures Account" means the account established by PREPA pursuant to Section 7.5(e)(i) of the T&D O&M Agreement solely for purposes of funding O&M Charges and Hydropower Costs pursuant to this Agreement.

"Pro Rata" and similar expressions mean an adjustment to a cost, payment or other amount due over a period of time to account for it accruing over only a portion of such period.

"PROMESA" means the Puerto Rico Oversight, Management and Economic Stability Act enacted on June 30, 2016 (P.L. 114-187).

"Rate Order" means any rate order reflecting determinations and directives of, and requirements established by, PREB through its review of a Rate Order Modification Request and the subsequent rate review proceeding.

"Rate Order Modification Request" means any application submitted from time to time, or as otherwise required by Applicable Law or ordered by PREB, by T&D Operator to PREB requesting a change in customer rates or charges.

"RCRA" means the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq.

"System Operation Principles" means the operation principles conditionally approved by PREB on June 1, 2021, and available on T&D Operator's website at https://lumapr.com/, as may be amended from time to time in accordance with Applicable Law, including any operation procedures established in connection therewith, as may be amended from time to time.

"T&D Budget" has the meaning set forth in Section 3.1(b)(i).

"T&D Interconnection Facilities" means all assets, equipment and facilities located on PREPA's side of each Interconnection Point, installed, operated and maintained by or on behalf of PREPA for the purpose of interconnecting each Legacy Generation Asset or each Hydropower Asset to the T&D System, as further described in the applicable Interconnection Agreement.

"T&D O&M Agreement" has the meaning set forth in the Recitals.

"T&D Operator" has the meaning set forth in the introductory paragraph.

"T&D System" has the meaning set forth in the Recitals.

"Term" has the meaning set forth in Section 2.2.

"Title III Case" means PREPA's case under Title III of PROMESA in the U.S. District Court.

"Title III Court" means the U.S. District Court presiding over the Title III Case.

"United States" or "U.S." means the United States of America.

**Section 1.2     Interpretation; Construction.**

(a)     Headings. The table of contents and titles and headings to articles and sections herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement. Except as otherwise indicated, all references in this Agreement to "Articles", "Sections" and "Annexes" are intended to refer to Articles and Sections of this Agreement and Annexes to this Agreement.

(b)     Annexes. The Annexes referred to herein shall be construed with and as an integral part of this Agreement to the same extent as if they were set forth verbatim herein. In the event of an irreconcilable conflict, discrepancy, error or omission, the following descending order of precedence will govern: (i) this Agreement, (ii) the System Operation Principles, (iii) the applicable Agreed Operating Procedure, and (iv) the applicable Interconnection Agreement, unless, and then only to the extent that, PREB specifically provides otherwise.

(c)     Construction. For purposes of this Agreement: (i) "include", "includes" or "including" shall be deemed to be followed by "without limitation"; (ii) "hereof", "herein", "hereby", "hereto" and "hereunder" shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (iii) "extent" in the phrase "to the extent" shall mean the degree to which a subject or other item extends and shall not simply mean "if"; (iv) in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including"; (v) "dollars" and "$" shall mean United States Dollars; (vi) the singular includes the plural and vice versa; (vii) reference to a gender includes the other gender; (viii) "any" shall mean "any and all"; (ix) "or" is used in the inclusive sense of "and/or"; (x) reference to any agreement, document or instrument means such agreement, document or instrument as amended, supplemented and modified in effect from time to time in accordance with its terms; (xi) reference to any Applicable Law means such Applicable Law as amended from time to time and includes any successor legislation thereto and any rules and regulations promulgated thereunder; and (xii) reference to any Person at any time refers to such Person's permitted successors and assigns.

CONFIDENTIAL

(d)    <u>Genco and Genco Operator</u>. Notwithstanding anything to the contrary contained in this Agreement: (i) all references to Genco Operator in Articles 1 through 8 (other than <u>Section 8.11</u> which shall be effective as of the Effective Date) shall not be effective until the date ("<u>Genco Operator Effective Date</u>") on which (A) Genco Operator and the Parties have executed and delivered the Joinder Agreement pursuant to <u>Section 8.11</u> and (B) Genco Operator is authorized to begin providing operation, maintenance and related services for the Legacy Generation Assets pursuant to the Generation O&M Agreement; and (ii) where there is a reference in this Agreement to "Genco and Genco Operator" or "Genco or Genco Operator" such reference (other than such reference in <u>Section 2.2</u>) shall be deemed to be a reference only to "Genco Operator" effective as of the Genco Operator Effective Date.

(e)    <u>Days, Months and Years</u>. In this Agreement, (i) all references to days herein are references to calendar days, unless specified as Business Days, (ii) all references to months herein are references to calendar months, unless specified otherwise, and (iii) all references to years herein are references to calendar years, unless specified otherwise.

(f)    <u>Accounting Principles</u>. All accounting and financial terms used herein, unless specifically provided to the contrary, shall be interpreted and applied in accordance with then generally accepted accounting principles in the United States, consistently applied.

## Article 2
## EFFECTIVE DATE; TERM; AGENT DESIGNATION

**Section 2.1    Effective Date**. This Agreement shall become effective on the date that it is executed by the Parties (the "<u>Effective Date</u>"), by which execution the Parties acknowledge and agree that the following conditions have been satisfied:

(a)    receipt by the Parties of a resolution adopted by the board of directors of Administrator, in form and substance reasonably acceptable to PREPA, Genco, Hydroco and T&D Operator, authorizing the execution, delivery and performance by Administrator of this Agreement and the transactions contemplated hereby;

(b)    receipt by the Parties of approval from PREB, in form and substance reasonably acceptable to Administrator, PREPA, Genco, Hydroco and T&D Operator, approving the form and substance of this Agreement, the Agreed Operating Procedures and the Interconnection Agreements; and

(c)    receipt by the Parties of approval from the relevant Governmental Body(ies), in form and substance reasonably acceptable to Administrator, PREPA, Genco, Hydroco and T&D Operator, approving the reorganization of PREPA, including the formation of Genco and Hydroco.

**Section 2.2    Term**.

(a)    This Agreement shall remain in full force and effect from the Effective Date through the date on which all the Legacy Generation Assets and Hydropower Assets have been decommissioned, unless earlier terminated in accordance with the terms hereof (such period of time, the "<u>Term</u>").

CONFIDENTIAL

(b)　　If all of the Legacy Generation Assets have been decommissioned and one or more of the Hydropower Assets remains operational, then this Agreement shall continue in effect and the Parties shall amend this Agreement to reflect the removal of Genco and Genco Operator as parties to this Agreement and such other changes as may be necessary and mutually acceptable to the Parties. If all of the Hydropower Assets have been decommissioned and one or more of the Legacy Generation Assets remains operational, then this Agreement shall continue in effect and the Parties shall amend this Agreement to reflect the removal of Hydroco as a party to this Agreement and such other changes as may be necessary and mutually acceptable to the Parties.

(c)　　If the T&D O&M Agreement is terminated, then unless T&D Operator assigns all of its rights and obligations under this Agreement to a Person other than PREPA and is relieved of all such obligations and liabilities, PREPA shall assume all of the rights and obligations of T&D Operator under this Agreement and T&D Operator shall be relieved of all such obligations and liabilities. If the Generation O&M Agreement is terminated, then unless Genco Operator assigns all of its rights and obligations under this Agreement to a Person other than Genco and is relieved of all such obligations and liabilities, Genco shall assume all of the rights and obligations of Genco Operator under this Agreement and Genco Operator shall be relieved of all such obligations and liabilities.

**Section 2.3　　Agent Designation**. T&D Operator will act as agent for PREPA under this Agreement in accordance with the T&D O&M Agreement. At such time as the Generation O&M Agreement is executed and becomes effective, Genco Operator will act as agent for Genco under this Agreement in accordance with the Generation O&M Agreement. If at any time (a) more than one Person is operating and maintaining the Legacy Generation Assets, or (b) more than one Person is operating and maintaining the Hydropower Assets, then, in each case, the Parties shall amend this Agreement to reflect such changes as may be necessary and mutually acceptable to the Parties.

## Article 3
## BUDGETS AND ACCOUNTS

**Section 3.1　　Generation Budget Preparation**.

(a)　　<u>Generally</u>.

(i)　　If the Effective Date occurs in Fiscal Year 2023, then the Initial Generation Budget shall be used. If the Effective Date occurs after Fiscal Year 2023, then the then-approved Generation Budget shall be used. Thereafter, for any Fiscal Year in which a rate adjustment approved by PREB pursuant to a Rate Order Modification Request enters into effect, the Generation Budget used in connection with obtaining such rate adjustment shall be used.

(ii)　　Except as provided in <u>Section 3.1(a)(i)</u>, the Generation Budget shall be prepared in accordance with the budget preparation process described in <u>Section 3.1(b)</u>, <u>Section 3.1(c)</u> and <u>Section 3.1(d)</u>.

CONFIDENTIAL

(b)   Budget Allocation Meeting.

(i)   Except as provided in Section 3.1(a)(i), for any Fiscal Year in which there is a single base rate covering each of the T&D System and related assets, the Legacy Generation Assets and the Hydropower Assets, Administrator, T&D Operator, Hydroco, PREPA, Genco and Genco Operator, shall no later than one hundred twenty-five (125) days prior to the commencement of the relevant Fiscal Year meet, to determine the allocation of such base rate and the resulting revenues among the non-generation budgets T&D Operator must prepare pursuant to the T&D O&M Agreement (collectively, the "T&D Budget"), the Genco Budget, the Hydroco Budget and the budgets for PREPA and its subsidiaries other than Genco and Hydroco (the "Other PREPA Budgets" and, together with the Genco Budget, Hydroco Budget and T&D Budget, the "Budgets"), which allocation shall be proportionate to, and consistent with, the cost allocation among the Budgets in the applicable Rate Order (such meeting, the "Budget Allocation Meeting"). For the avoidance of doubt, for any Fiscal Year in which there is a Budget Allocation Meeting, T&D Operator, Hydroco, PREPA, Genco and Genco Operator shall prepare and propose Budgets that are consistent with, and based on, the amount of funds allocated to each of the Budgets consistent with the terms of this Section 3.1(b).

(ii)   If, during the Budget Allocation Meeting for a Fiscal Year, T&D Operator, Hydroco, PREPA, Genco and Genco Operator are unable to reach agreement on the allocation of the base rate among the Budgets for such Fiscal Year, then Administrator shall, within five (5) days of the Budget Allocation Meeting, determine the final allocation of the base rate among the Budgets for such Fiscal Year; provided that such determination shall be proportionate to, and consistent with, the cost allocation among the Budgets in the applicable Rate Order.

(iii)   If after the Budget Allocation Meeting is held for a Fiscal Year pursuant to this Section 3.1(b) but before the start of such Fiscal Year the load forecast on which the allocation of the base rate was based changes, then Administrator, T&D Operator, Hydroco, PREPA, Genco and Genco Operator shall, as promptly as practicable, meet to determine the allocation of the base rate based on the new load forecasts among the Budgets, which allocation shall be proportionate to, and consistent with, the cost allocation among the Budgets in the applicable Rate Order.

(c)   Hydroco Budget Preparation.

(i)   Except as provided in Section 3.1(a)(i) and subject to the requirements of Section 3.1(b), for any Fiscal Year, Hydroco shall prepare the proposed Hydroco Budget for such Fiscal Year and, no later than one hundred fifteen (115) days prior to the commencement of the relevant Fiscal Year, submit to Genco and Genco Operator the proposed Hydroco Budget for such Fiscal Year. Upon receipt by Genco and the Genco Operator of the proposed Hydroco Budget, Genco and Genco Operator shall, acting reasonably, review the proposed Hydroco Budget to ensure compliance with the budget allocation of the base rate determined pursuant to Section 3.1(b) for such Fiscal Year.

(ii)   If Genco or Genco Operator reasonably believes the proposed Hydroco Budget does not comply with the budget allocation of the base rate determined pursuant to Section 3.1(b) for such Fiscal Year, then Genco and Genco Operator shall notify Administrator,

13

CONFIDENTIAL

with copy to Hydroco, in writing of such potential non-compliance ("Hydroco Budget Notice"), which potential non-compliance shall be addressed as set forth in Section 3.1(d)(iii).

        (d)    Genco Budget Preparation.

        (i)    Except as provided in Section 3.1(a)(i) and subject to the requirements of Section 3.1(b), for any Fiscal Year, Genco and Genco Operator shall prepare the proposed Genco Budget for such Fiscal Year, consolidate such proposed Genco Budget with the proposed Hydroco Budget prepared in accordance with Section 3.1(c) and, no later than one hundred five (105) days prior to the commencement of the relevant Fiscal Year, submit to T&D Operator the proposed Generation Budget for such Fiscal Year.

        (ii)    No later than ninety (90) days prior to the commencement of the Fiscal Year, T&D Operator shall submit to Administrator (A) the Generation Budget provided by Genco and Genco Operator pursuant to Section 3.1(d)(i) and (B) the T&D Budget, which proposed budgets T&D Operator shall have consolidated prior to their delivery to Administrator pursuant to Section 7.3(a) of the T&D O&M Agreement. If T&D Operator believes the proposed Generation Budget provided by Genco and Genco Operator to T&D Operator for consolidation with the T&D Budget does not comply with: (I) the applicable Rate Order, (II) any PREB-approved directive or requirement applicable to Hydroco, Genco or PREPA, (III) Applicable Law or (IV) the budget allocation of the base rate determined pursuant to Section 3.1(b) for such Fiscal Year, then T&D Operator, acting reasonably, may deliver to Administrator, with copy to Hydroco, Genco and Genco Operator, a written explanation of the potential issues with the proposed Generation Budget ("Genco Budget Notice"), which potential non-compliance shall be addressed as set forth in Section 3.1(d)(iii).

        (iii)    Once Administrator has received the proposed Generation Budget and the proposed T&D Budget, Administrator shall review the budgets to ensure compliance with the applicable Rate Order. Within forty-five (45) days following its receipt of such budgets, Administrator shall notify T&D Operator, Hydroco, Genco and Genco Operator whether the proposed budgets are compliant with the applicable Rate Order, and shall request, acting reasonably, any changes or modifications to the proposed budgets to conform the proposed budgets with the applicable Rate Order. In the event that a Hydroco Budget Notice or a Genco Budget Notice was delivered to Administrator, then Genco and Genco Operator, T&D Operator and, if applicable, Hydroco shall, as promptly as practicable, and, in any event, within the thirty (30) day period following receipt by Administrator of the proposed budgets, meet with Administrator and collaborate in good faith to resolve any differences with respect to the proposed budgets to ensure compliance with the applicable Rate Order, provided that if Administrator, Genco and Genco Operator, T&D Operator and, if applicable, Hydroco, collaborating in good faith cannot resolve any such differences with respect to the proposed budgets to ensure compliance with the applicable Rate Order, then any of Genco and Genco Operator, T&D Operator and, if applicable, Hydroco can seek resolution before PREB of any such differences with respect to the proposed budgets. For the avoidance of doubt, unless otherwise directed by PREB, in no event shall T&D Operator, Genco and Genco Operator or Hydroco seek resolution before PREB of any differences with

CONFIDENTIAL

respect to the proposed Generation Budget prior to meeting with Administrator as required by Section 3.1(d)(iii).

  (e)  PREB Rate Proceedings.

    (i)  Notwithstanding anything to the contrary contained in Section 3.1(c) or Section 3.1(d), for any Fiscal Year in which the proposed Generation Budget or the proposed T&D Budget requires a rate adjustment to be approved by PREB, T&D Operator shall have the right, at its sole discretion, to submit the proposed Generation Budget or the proposed T&D Budget for such Fiscal Year, together with a Rate Order Modification Request, directly to PREB rather than to Administrator.

    (ii)  If T&D Operator plans to submit to PREB a Rate Order Modification Request which contemplates modifications to the Generation Budget, then T&D Operator shall provide written notice to Genco and Genco Operator at least sixty (60) days prior to the date on which it plans to submit such Rate Order Modification Request and, upon receipt of such notice, Genco and Genco Operator shall cooperate in good faith with T&D Operator and Administrator to prepare a proposed Generation Budget to be included in or otherwise form the basis of such Rate Order Modification Request. Genco and Genco Operator shall provide reasonable further support to T&D Operator through any applicable proceedings arising in connection with the Rate Order Modification Request, including providing any information requested by PREB that is within its possession or control.

    (iii)  In the event that the Rate Order Modification Request that T&D Operator plans to submit to PREB pursuant to Section 3.1(e)(ii) contemplates modifications to the Hydroco Budget portion of the Generation Budget, Genco and Genco Operator shall (A) notify Hydroco as soon as practicable upon receipt of notice from T&D Operator of the contemplated Rate Order Modification Request and (B) collaborate with Hydroco in the preparation of the Hydroco Budget portion of the proposed Generation Budget to be included in or otherwise form the basis of such Rate Order Modification Request. Hydroco shall further support T&D Operator (and Genco and Genco Operator in supporting T&D Operator) through any applicable proceedings arising in connection with the Rate Order Modification Request.

    (iv)  For the avoidance of doubt, any such Rate Order Modification Request shall be prepared and undertaken in accordance with the relevant requirements set forth under Applicable Law.

    (v)  For the avoidance of doubt, nothing in this Agreement shall be construed to prohibit Genco and Genco Operator or Hydroco from soliciting an audience with PREB at any applicable proceedings arising in connection with the Rate Order Modification Request or otherwise in order to advocate for any positions it may have with respect to the Genco Budget or Hydroco Budget portion of the Generation Budget, as applicable. The Parties shall appear before PREB as may be requested by PREB in any proceedings arising in connection with a Rate Order Modification Request.

CONFIDENTIAL

### Section 3.2    Generation Budget Amendments.

(a)    Genco Budget Amendments.

(i)    If in any Fiscal Year, Genco or Genco Operator becomes aware that Genco's expenditures for such Fiscal Year are expected to exceed the Genco Budget for such Fiscal Year, then (A) Genco and Genco Operator shall notify T&D Operator and Administrator of the expected shortfall, (B) T&D Operator shall notify PREB of the expected shortfall and (C) as promptly as practicable, Genco and Genco Operator shall prepare and submit to PREB, with copy to T&D Operator and Administrator, the proposed amendments to the Genco Budget and Generation Budget, which amendments must be consistent with the applicable Rate Order and shall require and be subject to approval by PREB.

(ii)    Notwithstanding anything to the contrary contained in this Section 3.2(a), in the event that PREB takes any action or issues any order that could result in a change in the portion of rates that relate to the Legacy Generation Assets, then Genco and Genco Operator shall, as promptly as practicable, prepare and submit to PREB, with copy to T&D Operator and Administrator, the proposed amendments to the Genco Budget, which amendments must be consistent with the applicable Rate Order and shall require and be subject to approval by PREB.

(b)    Hydroco Budget Amendments.

(i)    If in any Fiscal Year, Hydroco becomes aware that Hydroco's expenditures for such Fiscal Year are expected to exceed the Hydroco Budget for such Fiscal Year, then (A) Hydroco shall notify T&D Operator, Administrator, Genco and Genco Operator of the expected shortfall, (B) T&D Operator shall notify PREB of the expected shortfall, (C) as promptly as practicable, Hydroco shall prepare and submit to Genco and Genco Operator, with copy to T&D Operator and Administrator, the proposed amendments to the Hydroco Budget, which amendments must be consistent with the applicable Rate Order, and (D) as promptly as practicable, Genco and Genco Operator shall prepare and Genco and Genco Operator and Hydroco shall submit to PREB, with copy to T&D Operator and Administrator, the proposed amendments to the Genco Budget (which shall be based solely on incorporating the proposed amendments to the Hydroco Budget submitted by Hydroco to Genco and Genco Operator pursuant to Section 3.2(b)(i)(C)), which amendments must be consistent with the applicable Rate Order and shall require and be subject to approval by PREB.

(ii)    Notwithstanding anything to the contrary contained in this Section 3.2(b), in the event that PREB takes any action or issues any order that could result in a change to the portion of rates that relate to the Hydropower Assets, then Hydroco shall, as promptly as practicable, prepare and submit to PREB, with copy to T&D Operator and Administrator, the proposed amendments to the Hydroco Budget, which amendments must be consistent with the applicable Rate Order and shall require and be subject to approval by PREB.

### Section 3.3    Funding of Accounts and Payment of Expenditures Generally.

(a)    Genco Accounts. Beginning in the month in which the Effective Date occurs and for each month thereafter, (i) no later than the fifth (5th) Business Day of each month,

Genco and Genco Operator shall provide T&D Operator with written notice (the "Genco Accounts Funding Notice") of the Genco Operating Account Deposit and the Genco Fuel Account Deposit for the relevant month, together with (A) supporting calculations showing the individual components of the Genco Operating Account Deposit and the Genco Fuel Account Deposit and (B) a certification that the calculation of the Genco Operating Account Deposit and the Genco Fuel Account Deposit is complete and accurate and (ii) no later than the eleventh (11th) Business Day of each month, T&D Operator shall deposit into (A) the Genco Operating Account an amount equal to the Genco Operating Account Deposit for the relevant month and (B) the Genco Fuel Account an amount equal to the Genco Fuel Account Deposit for the relevant month; provided that if, in any given month, Genco or Genco Operator has failed to deliver to T&D Operator the Genco Accounts Funding Notice required by clause (i) of this Section 3.3(a), then T&D Operator shall have no obligation to deposit all or any portion of (1) the Genco Operating Account Deposit into the Genco Operating Account for such month and (2) the Genco Fuel Account Deposit into the Genco Fuel Account for such month. Notwithstanding anything to the contrary contained in this Agreement, (I) in no event shall T&D Operator be required to transfer into: (x) the Genco Operating Account more than the aggregate amount of funds deposited into the PREPA Generation Expenditures Account available for reimbursement of Generation Pass-Through Expenditures under the T&D O&M Agreement and O&M Charges and Hydropower Costs under the then-approved Genco Budget and Hydroco Budget, respectively; and (y) the Genco Fuel Account more than the aggregate amount of funds deposited into the PREPA Fuel Account and available for reimbursement of fuel supply expenses under the T&D O&M Agreement and the forecasted Fuel Costs as approved by PREB, and (II) in no event shall T&D Operator be obligated to make up or fund any underage.

(b)     Hydroco Account. Beginning in the month in which the Effective Date occurs and for each month thereafter, (i) no later than the fourth (4th) Business Day of each month, Hydroco shall provide Genco and Genco Operator with written notice (the "Hydroco Account Funding Notice") of the Hydroco Operating Account Deposit for the relevant month, together with (A) supporting calculations showing the individual components of the Hydroco Operating Account Deposit and (B) a certification that the calculation of the Hydroco Operating Account Deposit is complete and accurate, and (ii) no later than the twelfth (12th) Business Day of each month, Genco and Genco Operator shall deposit into the Hydroco Operating Account an amount equal to the Hydroco Operating Account Deposit for the relevant month; provided that if, in any given month, Hydroco has failed to deliver to Genco and Genco Operator the Hydroco Account Funding Notice required by clause (i) of this Section 3.3(b), then Genco and Genco Operator shall have no obligation to deposit all or any portion of the Hydroco Operating Account Deposit into the Hydroco Operating Account for such month. Notwithstanding anything to the contrary contained in this Agreement, in no event shall Genco and Genco Operator be required to transfer into the Hydroco Operating Account more than the aggregate amount of funds deposited into the Genco Operating Account, and in no event shall Genco or T&D Operator be obligated to make up or fund any underage.

**Section 3.4     Genco O&M Charges**.

(a)     Payment of O&M Charges. Genco shall pay all of its non-fuel costs and expenses, including any Genco Operator Fees payable to the Genco Operator under the Generation O&M Agreement, to the extent the Generation O&M Agreement has been executed, incurred in

the course of operating and maintaining the Legacy Generation Assets (irrespective of Dispatch or the Electricity delivered or made available by Genco) and performing the Genco Decommissioning Services that are consistent with the then-approved Genco Budget (each such cost or expense, an "O&M Charge").

        (b)      Genco Operating Account.

        (i)      On or prior to the Effective Date, Genco shall establish an operating account relating to the Legacy Generation Assets and the Hydropower Assets (the "Genco Operating Account") into which T&D Operator shall deposit anticipated O&M Charges and Hydropower Costs from time to time in accordance with Section 3.3(a) and this Section 3.4(b) and from which Genco and Genco Operator shall withdraw funds from time to time only to (A) pay O&M Charges, (B) fund one or more operating accounts established by Genco which Genco and Genco Operator shall use only to pay O&M Charges ("Other Genco Operating Accounts"), and/or (C) fund the Hydroco Operating Account in accordance with Section 3.6(b)(ii).

        (ii)      As of the Effective Date, T&D Operator shall deposit into the Genco Operating Account an amount equal to the anticipated O&M Charges and Hydropower Costs for the following month, based on the then-approved Generation Budget.

        (iii)      Neither Genco nor Genco Operator shall withdraw funds from the Genco Operating Account or the Other Genco Operating Accounts other than for Genco or Genco Operator to pay O&M Charges or, in the case of the Genco Operating Account, to fund the Hydroco Operating Account or one or more of the Other Genco Operating Accounts. Neither Genco nor Genco Operator shall withdraw funds from the Genco Operating Account or the Other Genco Operating Accounts to pay O&M Charges other than for Genco or Genco Operator to pay O&M Charges that are Generation Pass-Through Expenditures.

        (c)      Reporting Requirements.

        (i)      Simultaneous with each withdrawal of funds from the Genco Operating Account or the Other Genco Operating Accounts, Genco or Genco Operator shall provide Administrator, with copy to T&D Operator, with written notice of such withdrawal, including a summary of the O&M Charges being paid.

        (ii)      Not later than nine (9) Business Days following the end of each month, Genco or Genco Operator shall provide Administrator, with copy to T&D Operator, with (A) a full accounting setting forth in reasonable detail the O&M Charges and Hydropower Costs actually incurred and paid using the funds transferred into the Genco Operating Account or the Other Genco Operating Accounts during the prior month and (B) a written certification that all such O&M Charges are Generation Pass-Through Expenditures.

CONFIDENTIAL

**Section 3.5     Genco Fuel Costs.**

(a)     <u>Payment of Fuel Costs</u>. Genco shall pay all of its Fuel Costs.

(b)     <u>Genco Fuel Account</u>.

(i)     On or prior to the Effective Date, Genco shall establish a fuel account (the "<u>Genco Fuel Account</u>") into which T&D Operator shall deposit anticipated Fuel Costs from time to time in accordance with <u>Section 3.3(a)</u> and this <u>Section 3.5(b)</u> and from which Genco or Genco Operator shall withdraw funds from time to time only to (A) pay Fuel Costs and/or (B) fund one or more fuel accounts established by Genco which Genco and Genco Operator shall use only to pay Fuel Costs ("<u>Other Genco Fuel Accounts</u>").

(ii)     As of the Effective Date, T&D Operator shall deposit into the Genco Fuel Account an amount equal to the anticipated Fuel Costs for the following month, based on the forecasted Fuel Costs as approved by PREB, which amount shall be the minimum working capital level contemplated by Section 7.5(e)(ii) of the T&D O&M Agreement.

(iii)     Neither Genco nor Genco Operator shall withdraw funds from the Genco Fuel Account or the Other Genco Fuel Accounts other than for Genco or Genco Operator to pay Fuel Costs or, in the case of the Genco Fuel Account, to fund one or more of the Other Genco Fuel Accounts. Neither Genco nor Genco Operator shall withdraw funds from the Genco Fuel Account or the Other Genco Fuel Accounts to pay Fuel Costs other than for Genco or Genco Operator to pay Fuel Costs that are Generation Pass-Through Expenditures.

(c)     <u>Reporting Requirements</u>.

(i)     Simultaneous with each withdrawal of funds from the Genco Fuel Account or the Other Genco Fuel Accounts, Genco or Genco Operator shall provide Administrator, with copy to T&D Operator, with written notice of such withdrawal, including a summary of the Fuel Costs being paid.

(ii)     Not later than nine (9) Business Days following the end of each month, Genco or Genco Operator shall provide Administrator, with copy to T&D Operator, with (A) a full accounting setting forth in reasonable detail the Fuel Costs actually incurred and paid using the funds transferred into the Genco Fuel Account or the Other Genco Fuel Accounts during the prior month and (B) a written certification that all such Fuel Costs are Generation Pass-Through Expenditures.

(iii)     Genco and Genco Operator shall prepare and submit to T&D Operator such information and documents as T&D Operator may reasonably request in order for T&D Operator to comply with PREB rate filing requirements, including pricing information and fuel inventory. Genco and Genco Operator shall provide such documents and information to T&D Operator at such times as such Parties may mutually agree, but in no event later than seven (7) Business Days prior to the time T&D Operator is required to file such documents or information with PREB.

CONFIDENTIAL

### Section 3.6    Hydropower Costs.

(a)    <u>Payment of Hydropower Costs</u>. Hydroco shall pay all of its non-fuel costs and expenses incurred in the course of operating and maintaining the Hydropower Assets (irrespective of Dispatch or the Electricity delivered or made available by Hydroco) and performing the Hydroco Decommissioning Services that are consistent with the then-approved Hydroco Budget (each such cost or expense, a "<u>Hydropower Cost</u>").

(b)    <u>Hydroco Operating Account</u>.

(i)    On or prior to the Effective Date, Hydroco shall establish an operating account relating to the Hydropower Assets (the "<u>Hydroco Operating Account</u>") into which Genco and Genco Operator shall deposit anticipated Hydropower Costs from time to time in accordance with <u>Section 3.3(b)</u> and this <u>Section 3.6(b)</u> and from which Hydroco shall withdraw funds from time to time only to (A) pay Hydropower Costs and/or (B) fund one or more operating accounts established by Hydroco which Hydroco shall use only to pay Hydropower Costs ("<u>Other Hydroco Operating Accounts</u>").

(ii)    On the day immediately following the Effective Date, Genco and Genco Operator shall deposit into the Hydroco Operating Account an amount equal to the anticipated Hydropower Costs for the following month, based on the then-approved Hydroco Budget.

(iii)    Hydroco shall not withdraw funds from the Hydroco Operating Account or the Other Hydroco Operating Accounts other than to pay Hydropower Costs or, in the case of the Hydroco Operating Account, to fund one or more of the Other Hydroco Operating Accounts. Hydroco shall not withdraw funds from the Hydroco Operating Account or the Other Hydroco Operating Accounts to pay Hydropower Costs unless such Hydropower Costs are Generation Pass-Through Expenditures.

(c)    <u>Reporting Requirements</u>.

(i)    Simultaneous with each withdrawal of funds from the Hydroco Operating Account or the Other Hydroco Operating Accounts, Hydroco shall provide Administrator, with copy to T&D Operator, with written notice of such withdrawal, including a summary of the Hydropower Costs being paid.

(ii)    Not later than eight (8) Business Days following the end of each month, Hydroco shall provide Administrator, with copy to T&D Operator, with (A) a full accounting setting forth in reasonable detail the Hydropower Costs actually incurred and paid using the funds transferred into the Hydroco Operating Account or the Other Hydroco Operating Accounts during the prior month and (B) a written certification that all such Hydropower Costs are Generation Pass-Through Expenditures.

**Article 4**
**DISPATCH; OWNERSHIP, OPERATION AND MAINTENANCE OF**

CONFIDENTIAL

### INTERCONNECTION FACILITIES; RECORDS; METERING; ANCILLARY SERVICES; DECOMMISSIONING; AGREED OPERATING PROCEDURES

**Section 4.1    Dispatch**.

(a)    <u>Legacy Generation Assets</u>. T&D Operator is authorized to Dispatch, and Genco and Genco Operator shall comply with T&D Operator's Dispatch of, the Generation Units at the Legacy Generation Assets in accordance with the System Operation Principles and the applicable Agreed Operating Procedures.

(b)    <u>Hydropower Assets</u>. T&D Operator is authorized to Dispatch, and Hydroco shall comply with T&D Operator's Dispatch of, the Generation Units at the Hydropower Assets in accordance with the System Operation Principles and the applicable Agreed Operating Procedures.

**Section 4.2    Ownership, Operation and Maintenance of Interconnection Facilities**.

(a)    <u>Genco Interconnection Facilities</u>. Genco shall own and Genco and Genco Operator shall operate and maintain the Genco Interconnection Facilities in accordance with the LGA Interconnection Agreement, the System Operation Principles and the applicable Agreed Operating Procedures. Neither Genco nor Genco Operator shall make any changes to the Genco Interconnection Facilities other than Genco or Genco Operator making changes in accordance with the LGA Interconnection Agreement.

(b)    <u>Hydro Interconnection Facilities</u>. Hydroco shall own, operate and maintain the Hydroco Interconnection Facilities in accordance with the Hydropower Interconnection Agreement, the System Operation Principles and the applicable Agreed Operating Procedures. Hydroco shall not make any changes to the Hydroco Interconnection Facilities other than in accordance with the Hydropower Interconnection Agreement.

(c)    <u>T&D Interconnection Facilities</u>. PREPA shall own and T&D Operator shall operate and maintain the T&D Interconnection Facilities in accordance with the System Operation Principles and the applicable Interconnection Agreement and Agreed Operating Procedures. PREPA shall not make any changes to the T&D Interconnection Facilities other than in accordance with the applicable Interconnection Agreement.

**Section 4.3    Records and Information**.

(a)    <u>Records</u>. Each Party shall create, maintain and make available for examination by the other Party all records and other data with respect to the operation and maintenance of the Legacy Generation Assets, the Hydropower Assets and the Interconnection Facilities, as the case may be, or as otherwise may be required for the administration and performance of this Agreement, in each case, in accordance with the applicable Agreed Operating Procedures.

(b)    <u>Information</u>. Genco and Genco Operator shall: (i) provide T&D Operator with such information, data and assistance as may be reasonably necessary or appropriate for T&D Operator to perform its obligations (including with respect to any PREB rate or other proceeding

CONFIDENTIAL

or requirement) under this Agreement; and (ii) from time to time, as and when requested by T&D Operator, execute and deliver, or cause to be executed and delivered, all such documents and instruments and take, or cause to be taken, all such reasonable actions, as may be reasonably necessary for T&D Operator to perform its obligations under this Agreement.

Section 4.4    **Metering**.

(a)    <u>Legacy Generation Assets</u>. All Electricity from the Legacy Generation Assets delivered or made available by Genco or Genco Operator at the applicable Interconnection Point shall be measured by meters and metering devices operated, maintained, tested and read in accordance with the LGA Interconnection Agreement and the applicable Agreed Operating Procedures.

(b)    <u>Hydropower Assets</u>. All Electricity from the Hydropower Assets delivered or made available by Hydroco at the applicable Interconnection Point shall be measured by meters and metering devices operated, maintained, tested and read in accordance with the Hydropower Interconnection Agreement and the applicable Agreed Operating Procedures.

Section 4.5    **Ancillary Services**. Genco, Genco Operator and Hydroco shall, in accordance with the System Operation Principles and the applicable Agreed Operating Procedures, provide such ancillary services as T&D Operator may request from time to time pursuant to the applicable Agreed Operating Procedures (the "<u>Ancillary Services</u>").

Section 4.6    **Decommissioning**.

(a)    <u>Legacy Generation Assets</u>. Genco and Genco Operator, shall be responsible for all Genco Decommissioning Services. Genco or Genco Operator shall, in accordance with the System Operation Principles, notify T&D Operator of the expected commencement of any Genco Decommissioning Services.

(b)    <u>Hydropower Assets</u>. Hydroco shall be responsible for all Hydroco Decommissioning Services. Hydroco shall, in accordance with the System Operation Principles, notify T&D Operator of the expected commencement of any Hydroco Decommissioning Services.

Section 4.7    **Agreed Operating Procedures**. Hydroco, T&D Operator, Genco and Genco Operator shall use commercially reasonable efforts to negotiate, finalize and execute individual operating procedures for each Legacy Generation Asset and each Hydropower Asset that is not subject to Agreed Operating Procedures as of the Effective Date substantially and in all material respects in the form of <u>Annex II</u> or otherwise as the applicable Parties may otherwise mutually agree (the "<u>Agreed Operating Procedures</u>") as promptly as practicable and, in any event, within thirty (30) days after the Effective Date.

CONFIDENTIAL

## Article 5
## INDEMNIFICATION

**Section 5.1    Indemnification**.

(a)    <u>Generally</u>. No Party shall be responsible for any direct or indirect losses, damages, costs, expenses, liabilities, interest, deficiencies, awards, judgments, fines, assessments, penalties, forfeitures, obligations, deposits, taxes, costs, expenses, or other charges of any kind incurred ("<u>Losses</u>") by another Party in connection with their obligations pursuant to the terms of this Agreement, except to the extent such Losses are a direct result of (i) the gross negligence or willful misconduct of a Party or any of such Party's Affiliates or any of their respective directors, officers, employees, representatives, agents, contractors, subcontractors or suppliers or (ii) any failure to comply with the terms of this Agreement.

(b)    <u>Waiver of Consequential Damages</u>. In no event shall any Party or any Affiliate thereof or any of their respective directors, officers, employees, agents, contractors, subcontractors or suppliers be liable to any other Party or any Affiliate thereof or any of their respective directors, officers, employees, agents, contractors, subcontractors or suppliers for any indirect, consequential, punitive, special, incidental or exemplary losses or damages (including for lost profits or lost business opportunity), whether such liability arises in contract, tort or otherwise.

## Article 6
## TERMINATION

**Section 6.1    Termination**.

(a)    <u>Generally</u>. Termination of this Agreement shall occur only upon: (i) expiration of the Term of this Agreement as provided in <u>Section 2.2</u>; or (ii) mutual written agreement of the Parties.

(b)    <u>Discharge of Obligations</u>. Termination of this Agreement shall not discharge any Party from any obligation it owes to the other Parties under this Agreement by reasons of any transaction, loss, cost, damage, expense or liability which shall occur or arise (or the circumstances, events or basis of which shall occur or arise) prior to termination. It is the intent of the Parties hereby that any such obligation owed (whether the same shall be known or unknown at termination or whether the circumstances, events or basis of the same shall be known or unknown at termination) shall survive termination. Any indebtedness by one Party to another Party pursuant to this Agreement shall be considered payable within ninety (90) days of the termination of this Agreement.

## Article 7
## REPRESENTATIONS AND WARRANTIES

**Section 7.1    Representations and Warranties**. Each Party represents and warrants to each other Party as of the Effective Date as follows:

(a)    <u>Existence and Powers</u>. Such Party (i) is qualified to do business and is in good standing in the Commonwealth and (ii) has the required corporate power and authority to

CONFIDENTIAL

enter into this Agreement, carry out its obligations hereunder and consummate the transactions contemplated hereby.

(b)     Due Authorization and Binding Obligation. The execution and delivery of this Agreement, the performance of its obligations hereunder and the consummation of the transactions contemplated hereby have been duly and validly authorized and approved by the required corporate or other similar action on its part. This Agreement has been duly and validly executed and delivered by such Party, and (assuming due authorization, execution and delivery by the other Parties) this Agreement constitutes a legal, valid and binding obligation of such Party enforceable against such Party in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, moratorium or similar Applicable Law affecting creditors' rights generally and by general equity principles.

(c)     No Conflicts. Neither the execution, delivery or performance of this Agreement, nor the consummation of the transactions contemplated hereby will: (i) result in a material violation or breach of, or material default under, any provision of the organizational documents of such Party; (ii) result in a violation of, or give any Governmental Body the right to challenge any of the transactions contemplated hereby under, any Applicable Law applicable to such Party; (iii) (A) result in a violation or breach of, (B) constitute a default under, (C) result in the acceleration of or create in any party the right to accelerate, terminate or cancel or (D) require the consent of any other Person under, any material contract to which such Party is a party; or (iv) result in the creation or imposition of any Lien on any properties or assets of such Party.

(d)     No Consents. No consent, declaration or filing with, or notice to, any Governmental Body is required by or with respect to such Party in connection with (i) the execution and delivery of this Agreement or (ii) the performance of its obligations hereunder, except as have been duly obtained or made.

(e)     No Legal Prohibition. There is no Applicable Law in effect on the date hereof that would prohibit the execution, delivery or performance by such Party of this Agreement and the consummation of the transactions contemplated hereby.

Section 7.2    Compliance with Applicable Law. Each Party agrees that in the performance of its obligations under this Agreement it shall comply with all Applicable Laws.

### Article 8
### MISCELLANEOUS

Section 8.1    Notices. All notices or other communications to be delivered in connection with this Agreement shall be in writing and shall be deemed to have been properly delivered, given and received (a) on the date of delivery if delivered by hand during normal business hours of the recipient during a Business Day, otherwise on the next Business Day, (b) on the date of successful transmission if sent via email (with return receipt) during normal business hours of the recipient during a Business Day, otherwise on the next Business Day, or (c) on the date of receipt by the addressee if sent by a nationally recognized overnight courier or by registered or certified mail, return receipt requested, if received on a Business Day, otherwise on the next Business Day. Such notices or other communications must be sent to each respective Party at the address or email

CONFIDENTIAL

address set forth below (or at such other address or email address as shall be specified by a Party in a notice given in accordance with this Section 8.1).

| | |
|---|---|
| If to PREPA: | [_____]<br>[_____]<br>Attention: [____]<br>Telephone: [____]<br>Email: [____] |
| If to Genco: | [_____]<br>[_____]<br>Attention: [____]<br>Telephone: [____]<br>Email: [____] |
| If to Hydroco: | [_____]<br>[_____]<br>Attention: [____]<br>Telephone: [____]<br>Email: [____] |
| If to T&D Operator: | LUMA Energy ServCo, LLC<br>PO Box 364267<br>San Juan, PR 00936-4267<br>Attention: [____]<br>Telephone: [____]<br>Email: [____] |
| If to PREB: | [Puerto Rico Energy Bureau<br>World Plaza Building<br><br>268 Munoz Rivera Avenue<br>San Juan, Puerto Rico 00918<br>Attention: Edison Aviles Deliz<br>Telephone: (787) 523-6262<br>Email: eavilesdeliz@jrsp.pr.gov |
| If to Administrator: | Administrator<br>PO Box 42001<br>San Juan, Puerto Rico 00940-2001<br>Attention: Executive Director – Fermín E. Fontanés Gómez<br>Telephone: (787) 722-2525 Ext. 15330<br>Email: Fermin.Fontanes@p3.pr.gov and<br>Administrator@p3.pr.gov |

**Section 8.2    Amendments**. This Agreement may be amended or modified from time to time only by the written agreement of all the Parties. Each such instrument shall be reduced to writing and shall be designated on its face an "Amendment" or an "Addendum" to this Agreement.

CONFIDENTIAL

Notwithstanding anything to the contrary contained in this Agreement, the Parties agree that nothing in this Agreement shall (a) be or be deemed to be an amendment to the T&D O&M Agreement or once executed, the Generation O&M Agreement, or (b) result in Genco, Genco Operator or Hydroco being or being deemed to be third-party beneficiaries under the T&D O&M Agreement.

Section 8.3    **Entire Agreement**. This Agreement, together with the Annexes attached hereto, constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes any and all prior oral or written agreements, understandings, proposals, representations or warranties relating to the subject matter, other than the T&D O&M Agreement and the Generation O&M Agreement. Without limiting the generality of the foregoing, this Agreement shall completely and fully supersede all other understandings and agreements among the Parties with respect to such transactions. The Parties agree that nothing in this Agreement shall amend or modify in any respect (a) the T&D O&M Agreement or the rights and obligations of Administrator, T&D Operator and PREPA thereunder or (b) the Generation O&M Agreement or the rights and obligations of Administrator, Genco Operator and Genco thereunder.

Section 8.4    **Assignment and Transfer**. No Party shall assign, transfer, convey, lease, encumber or otherwise dispose of its rights or obligations under this Agreement without the prior written consent of the other Parties, which consent shall not be unreasonably withheld, delayed or conditioned, and to the extent required by Applicable Law, PREB. Any attempt by a Party to assign, transfer, convey, lease, encumber or otherwise dispose of its rights or obligations under this Agreement without the prior written consent of Administrator and, to the extent required by Applicable Law, PREB, shall be void. If as part of the reorganization of PREPA ownership of the T&D System is assigned by PREPA to a Person, then the Parties shall amend this Agreement to recognize the rights and obligations of such Person under this Agreement and such other changes, in each case, as may be necessary and mutually acceptable to the Parties. This Agreement shall be binding upon, inure to the benefit of and be enforceable by the Parties and their respective successors and permitted assigns.

Section 8.5    **Severability**. If any term or provision of this Agreement is invalid, illegal or incapable of being enforced in any situation or in any jurisdiction, such invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of any other term or provision hereof or the offending term or provision in any other situation or any other jurisdiction, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon any such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible, in a mutually acceptable manner, in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

Section 8.6    **Survival**. The rights and obligations of the Parties pursuant to this Section 8.6, Section 8.1 and Section 8.8 shall survive the expiration or termination of this Agreement. No expiration or termination of this Agreement shall (a) limit or otherwise affect the respective rights and obligations of the Parties accrued prior to the date of such termination or (b) preclude any Party from impleading any other Party in any legal proceeding originated by a third party as to any matter occurring during the Term. The rights and obligations of the Parties

CONFIDENTIAL

pursuant to <u>Article 5</u> shall survive the expiration or termination of this Agreement for a period of twelve (12) months following the expiration or termination of this Agreement.

**Section 8.7    Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall be deemed to be one and the same agreement or document. A signed copy of this Agreement transmitted by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original executed copy of this Agreement for all purposes.

**Section 8.8    Governing Law**. This Agreement and all matters, claims, controversies, disputes, suits, actions or proceedings arising out of or relating to this Agreement and the negotiation, execution or performance of this Agreement or any of the transactions contemplated hereby, including all rights of the Parties (whether sounding in contract, tort, common or statutory law, equity or otherwise) in connection therewith, shall be interpreted, construed and governed by and in accordance with, and enforced pursuant to, the internal laws of the Commonwealth (excluding any conflict of laws rule or principle which might refer such interpretation to the laws of another jurisdiction), except where the federal supremacy clause requires otherwise.

**Section 8.9    PREB Actions**. The Parties hereby acknowledge and agree that to the extent PREB (a) is not permitted under Applicable Law to carry out its rights, duties and obligations under this Agreement ("<u>PREB Actions</u>"), or (b) ceases to be an entity of the government of the Commonwealth, the related PREB Actions shall automatically become the rights, duties and obligations of Administrator, unless otherwise provided by Applicable Law.

**Section 8.10    FOMB Powers**. For the avoidance of doubt, nothing in this Agreement shall constitute a limitation on, or waiver by, the FOMB (if then in existence) of any of the FOMB's rights or powers, including those rights or powers relating to the preparation and approval of budgets under PROMESA.

**Section 8.11    Joinder**. On the date that the Generation O&M Agreement is executed, [Genco/Administrator] shall cause Genco Operator to execute and deliver to the Parties the joinder agreement to this Agreement in the form attached hereto as <u>Annex III</u> (the "<u>Joinder Agreement</u>"). Within [three (3) Business Days] following receipt of the Joinder Agreement executed and delivered by Genco Operator, each of the Parties shall execute and deliver to the other Parties the Joinder Agreement. Effective upon the execution and delivery of the Joinder Agreement by Genco Operator and all of the Parties, Genco Operator shall become a "Party" to this Agreement and will have all of the rights and will be subject to all of the obligations of Genco Operator under and in accordance with the terms and conditions of this Agreement.

*[Signature page follows]*

CONFIDENTIAL

**IN WITNESS WHEREOF**, PREPA, Genco, Hydroco, T&D Operator and Administrator each has caused this Agreement to be duly executed as of the day and year first above written.

**PREPA**

By:     _____

Name:   _____

Title:  _____

**GENCO**

By:     _____

Name:   _____

Title:  _____

**HYDROCO**

By:     _____

Name:   _____

Title:  _____

**T&D OPERATOR**

By:     _____

Name:   _____

Title:  _____

**CONFIDENTIAL**

**PUERTO RICO PUBLIC-PRIVATE
PARTNERSHIPS AUTHORITY,
solely in its capacity as ADMINISTRATOR**

By: _____

Name: _____

Title: _____

**CONFIDENTIAL**

## Annex I

### Form of Interconnection Agreement

**Annex II**

**Form of Agreed Operating Procedure**

**Annex III**

**Form of Joinder Agreement**

[●], [●]

This Joinder Agreement (the "<u>Joinder Agreement</u>") is entered into as of the date first written above by the undersigned (the "<u>Joining Party</u>") in accordance with Section 8.11 of the Puerto Rico PREPA-Genco-Hydroco Operating Agreement, dated as of [●], 2023 (as amended, restated or supplemented from time to time, the "<u>Agreement</u>") among PREPA, Genco, Hydroco, T&D Operator and Administrator. Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

1.   <u>Joinder</u>. By executing and delivering this Joinder Agreement, the Joining Party hereby: (i) acknowledges that it has read and understands the terms of the Agreement and has been afforded the opportunity to ask questions concerning the Agreement; (ii) ratifies and agrees to be bound by all of the terms, provisions and conditions contained in the Agreement, as if the Joining Party were an original party thereto; and (iii) makes, as of the date of this Joinder Agreement, all of the representations and warranties set forth in <u>Article 7</u> (*Representations and Warranties*) of the Agreement (all such representations and warranties being incorporated herein by reference). Upon the execution of this Joinder Agreement by Joining Party and the acceptance of this Joinder Agreement by PREPA, Genco, Hydroco, T&D Operator and Administrator by execution and delivery of the signature page hereto, the Joining Party will become and be treated for all purposes of the Agreement as Genco Operator, and will have all of the rights and be subject to all of the obligations of Genco Operator under the Agreement.

2.   <u>Supplemental Notice Information</u>. The information in this <u>paragraph 2</u> of the Joinder Agreement shall be deemed to amend and supplement <u>Section 8.1</u> of the Agreement to add the following notice information for Genco Operator:

If to Genco:                    [_____]
                                [_____]
                                Attention: [____]
                                Telephone: [____]
                                Email: [____]

                                with copy to:

Genco Operator:                 [_____]
                                [_____]
                                Attention: [____]
                                Telephone: [____]
                                Email: [____]

If to Genco Operator:           [_____]
                                [_____]
                                Attention: [____]

Annex III of
32

Telephone: [____]
Email: [____]

3.  <u>Counterparts</u>. This Joinder Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall be deemed to be one and the same agreement or document. A signed copy of this Joinder Agreement transmitted by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original executed copy of this Joinder Agreement for all purposes.

4.  <u>Governing Law</u>. This Joinder Agreement and all matters, claims, controversies, disputes, suits, actions or proceedings arising out of or relating to this Joinder Agreement and the negotiation, execution or performance of this Joinder Agreement or any of the transactions contemplated hereby, including all rights of the Parties (whether sounding in contract, tort, common or statutory law, equity or otherwise) in connection therewith, shall be interpreted, construed and governed by and in accordance with, and enforced pursuant to, the internal laws of the Commonwealth (excluding any conflict of laws rule or principle which might refer such interpretation to the laws of another jurisdiction), except where the federal supremacy clause requires otherwise.

*[Signature page follows]*

CONFIDENTIAL

     **IN WITNESS WHEREOF**, each of the undersigned has caused this Joinder Agreement to be duly executed as of the day and year first above written.

                          **[●], as Genco Operator**

                          By: _____

                          Name: _____

                          Title: _____

Accepted: As of the day and year first above written

**PUERTO RICO PUBLIC-PRIVATE PARTNERSHIPS AUTHORITY, solely in its capacity as ADMINISTRATOR**

By: _____

Name: _____

Title: _____

**PREPA**

By: _____

Name: _____

Title: _____

**GENCO**

By: _____

Name: _____

Title: _____

**HYDROCO**

By: _____

Name: _____

CONFIDENTIAL

Title: _____

**T&D OPERATOR**

By: _____

Name: _____

Title: _____

CONFIDENTIAL

## Annex IX

### Scope of Services

*This Annex IX (Scope of Services) is designed to set forth certain O&M Services in addition to those contained in Article 5 (O&M Services) of the main body of the Agreement, certain of which O&M Services shall also apply to the performance of the Decommissioning Services, Mobilization Services and Demobilization Services. This Annex IX (Scope of Services) is not intended, nor should it be deemed, to be an exclusive list of O&M Services. However, the Agreement, including this Annex IX (Scope of Services), absent subsequent changes agreed to by the Parties, sets forth the entire scope of O&M Services to be provided pursuant to the Agreement, with the exception of the services provided pursuant to the Shared Services Agreement until such time as Operator begins to provide such services. Capitalized terms used but not defined in this Annex IX (Scope of Services) have the respective meanings set forth in the Agreement. All obligations of Operator set forth herein shall be performed in accordance with and are subject to the requirements of the main body of the Agreement.*

I.    <u>Legacy Generation Assets Operation and Maintenance Services.</u>

A.    <u>General</u>. Operator shall be responsible for all management, operation, maintenance, repair and other related services with respect to the Legacy Generation Assets, subject to the terms and conditions of the Agreement, including (1) day-to-day operation and maintenance (including any major maintenance) services, including operation of the Legacy Generation Assets to generate electricity and deliver it into the T&D System; (2) identifying, justifying and managing any required maintenance capital expenditures; (3) providing routine inspections of the Legacy Generation Assets; (4) providing annual operating tests (the Annual Performance Test) of the Legacy Generation Assets in coordination with T&D Operator; (5) establishing appropriate and customary safety work rules and practices; (6) developing an operation and maintenance training program; (7) provisioning, storing and maintaining the inventory of spare and consumable parts, including Capital Spare Parts, for the Legacy Generation Assets; (8) establishing and maintaining a computerized maintenance management system for the Legacy Generation Assets; (9) performing scheduled and emergency maintenance, repair and replacement of equipment, including any balance of plant equipment, painting, and cleaning, among others; (10) managing Planned Outages, Unplanned Outages and Forced Outages and restoration of power supply to the transmission grid; (11) coordinating business continuity and emergency planning and storm restoration and recovery in coordination with T&D Operator; (12) procuring and managing water or auxiliary power supply, as applicable; (13) maintaining and repairing fuel and water systems, including tanks, pumps, filters, and piping, as required; (14) procuring and managing the delivery and quality testing of fuel; (15) liaising with the T&D Operator or any of their assignees or successors regarding dispatch, dispatch planning and related T&D system matters and providing required information; (16) interfacing with and providing reports to regulators including PREB and with environmental compliance agencies such as the EPA, the Puerto Rico Department of Natural and Environmental Resources, the Occupational Safety and Health Administration and others, as may be required; (17) obtaining, complying with and maintaining licenses, permits, consents and the Consent Decree, as necessary; (18) providing periodic reports regarding programmed and non-programmed operations, maintenance, repairs, services and modifications performed and to be performed; (19) preparing for and assisting in, or subcontracting for and

1

CONFIDENTIAL

overseeing, the decommissioning of the relevant plants as outlined in the Integrated Resource Plan (including any future integrated resource plans) in coordination with PREPA/the T&D Operator, Owner and PREB; (20) participating in emergency planning and drills led by the T&D Operator, as needed; (21) conducting emergency planning and drills independent of T&D Operator; (22) assisting with the transition of the plants to third parties or to new uses (synchronous condensers, etc.) to the extent certain of the plants are removed from the O&M Agreement and (23) developing and maintaining a good neighbor program.

B.    Day-to-Day Operation. Operator shall be responsible for the day-to-day safe operation of the Legacy Generation Assets, including start-up, load adjustments, active follow-up of operating parameters and alarms, and shut-down of the plants or units thereof as directed by the T&D Operator and in accordance with Operator's Operations and Maintenance Procedures.

C.    Compliance with PREPA-Genco-Hydroco Operating Agreement. As agent for Owner, Operator shall perform its obligations under the PREPA-Genco-Hydroco Operating Agreement, including the System Operation Principles and the Agreed Operating Procedures included therein, and shall coordinate with T&D Operator, as agent for PREPA, as required thereunder, including by fulfilling the T&D Operator's instructions with regards to generation dispatch and other obligations set forth in the System Operation Principles and the Agreed Operating Procedures, in order to effectively and safely supply the T&D System with requested electric generation and other services.

D.    Engineering Activities. Operator shall be responsible for engineering activities related to the safe operation and reliability of the Legacy Generation Assets, including: (1) analyses related to, and maintenance of records and standards for design and engineering, design standards, construction standards and related information, plant performance, reliability analysis, root cause analysis, equipment ratings and needs assessment; (2) managing an effective environmental, health and safety program; and (3) maintenance of an environmental, health, safety, regulatory compliance program and the documentation thereof.

E.    Maintenance of Technical Documentation. Operator shall be responsible for maintenance of revisions to all drawings, specifications, construction manuals, equipment diagrams and other technical documentation related to the Legacy Generation Assets.

F.    Fuel. Operator shall be responsible for procuring, transporting and managing the delivery and quality testing of Fuel, including natural gas, diesel (number 2 fuel oil) and number 6 fuel oil (including logistics, fuel testing and storage tank management), and approving invoices, as applicable and in accordance with existing and future fuel contract requirements, as an agent for Owner.

G.    Planning, Environmental and Regulatory. Operator shall be responsible for (1) compliance with Environmental Law (including the Consent Decree), including emissions monitoring, recordkeeping, and reporting; (2) maintenance of documentation, timely submission of applications for permits and approvals, and acquisition of permits, approvals, and Easements as required for the Legacy Generation Assets operations; and (3) compliance with applicable regulatory and legislative requirements subject to operating constraints and Prudent Industry Practice. In performing these services and any other services under the Agreement, nothing shall

require, or shall be construed as requiring, Operator to act as legal counsel to, or to provide legal advice or representation to, Owner.

H.   <u>Legal Services</u>. Operator shall be responsible for (1) day-to-day legal responsibilities relating to the O&M Services, Decommissioning Services and Demobilization Services, in coordination with Owner and Administrator in accordance with processes set forth in this Annex IX (*Scope of Services*); (2) management of the Existing Litigation and any claims, lawsuits, litigation or similar proceedings arising from and after the Service Commencement Date, (3) collaborating with the T&D Operator to prepare, present, and defend current or future rate cases or other regulatory or legal matters as they relate to the Agreement, as well as preparing, presenting, and defending any non-compliance with local legislative requirements. In performing these services and any other services under this Agreement, nothing shall require, or shall be construed as requiring, Operator to act as legal counsel to, or to provide legal advice or representation to, Owner. For the avoidance of doubt, the responsibility for tax and securities law related advice as it relates to the Legacy Generation Assets will remain with Owner and Owner will continue to retain its own advisors to provide such services.

I.   <u>Insurance and Claims</u>. Operator shall maintain the appropriate level of insurance as to cover claims that arise after executing the Agreement and following the Service Commencement Date, consistent with Prudent Industry Practices and with the requirements of the Agreement. As part of the Mobilization Plan, Operator shall develop a comprehensive insurance program, to be reviewed and approved by Administrator, which approval shall not be unreasonably withheld, delayed or conditioned. The insurance program shall be provided to PREB for its knowledge. Operator shall be responsible for preparing and submitting insurance claims (including claims that may have arisen prior to the Effective Date and/or the Service Commencement Date) on behalf of Owner as well as keeping Administrator timely informed of such claims processes.

J.   <u>Subcontracting</u>. Operator shall evaluate opportunities for the subcontracting of any specific activities associated with this Annex IX (*Scope of Services*) that shall provide greater efficiencies and value to the operation of the Legacy Generation Assets and seek to implement such activities within budget and regulatory constraints and in accordance with the Agreement.

K.   <u>Good Neighbor</u>. Operator shall conduct community outreach events (e.g., volunteer events, charitable contribution events, etc.) by region on a quarterly basis. All complaints received by PREB that are attributable to the Legacy Generation Assets shall be promptly resolved to PREB's reasonable satisfaction no later than thirty (30) Business Days after Operator receives notification of such complaint from PREB. Operator shall provide Administrator written quarterly reports with respect to any complaints received and Operator's resolution of such complaints.

L.   <u>Other</u>. Operator shall be responsible for other activities necessary, appropriate or advisable to operate and maintain the Legacy Generation Assets in accordance with the Contract Standards, including cooperation, as specified in the Agreement, during Operator's performance of the O&M Services, Decommissioning Services, Mobilization Services and Demobilization Services under the Agreement, with third parties providing services to Owner with respect to Owner's provision of electric generation services, <u>provided</u> Owner shall impose similar obligations on such third parties to also cooperate with Operator.

CONFIDENTIAL

II.     Asset Management and Maintenance Services.

A.     General. Operator shall be responsible for managing and maintaining all assets of the Legacy Generation Assets, including machinery, equipment, structures, improvements and condition assessment of the components of the Legacy Generation Assets, including the following: (1) development and implementation of asset management strategies and risk management and mitigation for combined technical performance, life cycle cost, safety and regulatory compliance; (2) real estate management, including of Easements, leases and agreements; (3) fleet and equipment management; (4) materials and services procurement in accordance with the process required by Applicable Law and inventory management; (5) Legacy Generation Assets security in accordance with Applicable Law and to protect the Legacy Generation Assets from vandalism, terrorism or other acts; (6) business continuity and emergency preparedness and planning; (7) warehousing of on and off-island capital and other spare parts and consumables; (8) fuel procurement, management and testing services; and (9) training and licensing, as applicable, of operators and maintenance technicians.

B.     Inventory Control. Operator shall, consistent with the Contract Standards, the Agreement and this Annex IX (*Scope of Services*): (1) maintain an inventory of fuel, equipment, spare parts, capital spare parts, materials and supplies (appropriate for day-to-day operations and Emergencies), and shall maintain and document an inventory control program; (2) purchase, maintain and store inventory in a manner also consistent with the Legacy Generation Assets policies and procedures adopted from time to time by Operator and provided in writing to Owner and Administrator and the Legacy Generation Emergency Response Plan; and (3) complete, on an agreed-upon cycle count basis, a physical inventory and a condition assessment of the equipment, spare parts, materials and supplies.

C.     Necessary Equipment and Systems. Operator shall, consistent with the Contract Standards, the Agreement and this Annex IX (*Scope of Services*), determine, acquire, deploy and maintain tools, equipment and Information Systems necessary to perform all O&M Services, Decommissioning Services, Mobilization Services and Demobilization Services under the Agreement.

D.     Information Technology. Operator shall, consistent with the Contract Standards, the Agreement and this Annex IX (*Scope of Services*), be responsible for (1) providing information technology systems maintenance support and improvements in accordance with cybersecurity requirements that support network and day-to-day activities; and (2) developing and maintaining a business continuity plan in the event of natural, man-made or cyber-attack incidents. Operator shall periodically provide Administrator (with copy to PREB) and the T&D Operator managed Energy Control Center the most current versions of the business continuity plan.

III.    Government, Community and Media Relations.

A.     General. Operator shall be responsible for (1) conducting government, community and media relations with respect to the management, operation and maintenance of the Legacy Generation Assets in accordance with the Communications Plan set forth in Annex V (*Communications Plan*) to the Agreement; and (2) staffing public events and presenting

4

CONFIDENTIAL

workshops, seminars and similar activities during normal business hours, evenings, weekends and holidays.

B.    Communications. It is the Parties' intention that, to enable Operator to effectively communicate with the government officials regarding Legacy Generation Assets matters, Operator shall have direct responsibility for media and other public communications on all matters related to the Legacy Generation Assets, including communications with public officials, regulators and local municipalities and counties regarding storm preparation, management, coordination and response, programs and complaints and related matters. Accordingly, Operator shall determine all communications policies and procedures relating to its provision of O&M Services, Decommissioning Services, Mobilization Services and Demobilization Services under the Agreement in accordance with the Communications Plan set forth in Annex V (*Communications Plan*) to the Agreement. Nevertheless, Operator agrees that (1) during Emergency Operating Conditions as defined and described in the Operations and Maintenance Procedures inclusive of major events (e.g., Forced Outages and Declared Emergency or Major Disaster) or (2) if it takes actions in Operator's capacity as Operator, that could be reasonably be expected to have broader impacts on public safety and/or public health, Operator shall endeavor to keep Owner, Administrator and T&D Operator, and, as appropriate, other local, state, and federal government entities, informed and act in consultation with Owner, Administrator and T&D Operator. These communications shall be made in accordance with the Operations and Maintenance Procedures and the Communications Plan set forth in Annex V (*Communications Plan*) to the Agreement. Furthermore, Operator agrees that during a Declared Emergency or Major Disaster, Operator shall have certain responsibilities under the T&D Operator's incident command system.

C.    Government Relations. Operator shall be responsible for coordinating, conducting and formulating communications with municipal, local, state and federal representatives and organizations relating to operation and maintenance of the Legacy Generation Assets and provision of generation-related services by Operator, including PREB, in accordance with the Communications Plan set forth in Annex V (*Communications Plan*) to the Agreement. For the avoidance of doubt, Operator's responsibilities hereunder shall not include any matters related to PREPA's debt obligations, including any obligations pursuant to federal tax or securities laws.

IV.    Testing, Reports and Records.

A.    Annual Performance Test. Operator shall be responsible for conducting the Annual Performance Test for each Legacy Generation Asset, in coordination with the T&D Operator, Administrator and PREB, in accordance with the PREPA-Genco-Hydroco Operating Agreement. Each Annual Performance Test shall determine the Tested Capacity and Heat Rate for each Legacy Generation Asset for the current Contract Year. Operator shall document the results of such Annual Performance Test in accordance with Section IV.B(c) below, and shall promptly submit such results to Administrator, T&D Operator and PREB.

B.    Other Reports and Records as Requested by Administrator. Operator shall be responsible for (1) preparing a monthly operations report; (2) producing and delivering to Administrator information as Administrator may reasonably request to determine Operator's performance under the Agreement; and (3) developing and maintaining a comprehensive document management program with records storage, retention and destruction guidelines and

CONFIDENTIAL

procedures, in accordance with applicable Commonwealth and federal guidelines and regulations, and as otherwise provided for under the Agreement.

V.    <u>Finance and Accounting Services.</u>

A.    <u>General</u>. Operator shall be responsible for all finance, accounting, budgeting, longer-term financial forecasting and treasury operations related to the Legacy Generation Assets, including the implementation of the activities set forth in Sections V.A through V.E of this Annex IX (*Scope of Services*). In the exercise of the responsibilities described in this Annex IX Section V (*Scope of Services—Finance and Accounting Services*), Operator may utilize Owner's existing accounting system.

B.    <u>Accounting and Reporting</u>. Operator shall be responsible for accounting and reporting operations including the following activities:

1.    Maintenance of a complete and separate set of financial and accounting records relating to the O&M Services, Decommissioning Services, Mobilization Services and Demobilization Services, in accordance with GAAP and other applicable standards (including with FERC's Uniformed System of Accounts, the 1974 Puerto Rico Electric Power Authority Trust Agreement and other accounting best practices);

2.    Maintenance of a general ledger and all subledgers in accordance with Applicable Law regarding accounts necessary to support the preparation of monthly financial statements and management reports for Operator;

3.    On a monthly basis until the expiration or earlier termination of the Mobilization Period, provision of budget to actuals analyses to explain the month's results with explanations;

4.    Analysis of all accounts within the Operating Budget, Fuel Budget and Decommissioning Budget, on a plant by plant and monthly basis, providing variance analysis of and explanations for both actual period-to-period variances (on a quarterly basis) and budget versus actual variances (on a monthly basis) to the extent reasonably requested by Administrator;

5.    (i) Performance of all accounting and reporting functions necessary to support the Legacy Generation Assets operations; (ii) the maintenance of the fixed assets records in accordance with PREB and other applicable regulatory or accounting requirements and (iii) performance of all reporting and recordkeeping functions necessary in connection with the performance and completion of the Decommissioning Services for the Legacy Generation Assets, including Operator's recommendations to commence Decommissioning Services for a Legacy Generation Asset, if any;

6.    Separate accounting and reporting that may be required from time to time for any federal and Commonwealth grants received by Owner to the extent reasonable prior notice of any such grants obtained is provided to Operator;

7.    Provision of accounting memorandum documenting procedures used in creating journal entries related to the Legacy Generation Assets;

CONFIDENTIAL

8.      Accounting for and documenting the costs and revenues resulting from Operator's performance under the Agreement in accordance with GAAP and any other applicable accounting requirements as determined necessary by Administrator (including in accordance with FERC's Uniformed System of Accounts, the 1974 Puerto Rico Electric Power Authority Trust Agreement, and other accounting best practices, as applicable) in compliance with Section 6.3 (*Reporting: Audits*) of the main body of the Agreement;

9.      Reconciliations (including bank account reconciliations), which shall be performed monthly, quarterly or annually based on the risk associated with the account being reconciled, in each case (i) if the month in which the reconciliation is being performed is a quarter-ending month (other than December), by the end of the subsequent month or (ii) if the month in which the reconciliation is being performed is a non-quarter ending month or December, within forty-five (45) days after the end of such month; and

10.      Beginning in the first year of the Agreement, preparation from time to time as requested by PREB, but no less frequently than every three (3) years, of a depreciation study, the goal of which is to determine consolidated annual depreciation accrual rates for preparation of financial statements and factors that relate to the fair and timely recovery of capital invested in the Legacy Generation Assets.

C.      <u>Budgeting and Financial Forecasting</u>. Operator shall be responsible for budgeting and longer-term financial forecasting operations, including the following activities:

1.      Preparing and monthly monitoring of budgets necessary for operating expenses for the services provided by Operator under the Agreement;

2.      Update the Fuel Budget on a quarterly basis to comply with Section 7.3(f) (*O&M Budgets – Quarterly Adjustments to Fuel Budget*) of the main body of the Agreement;

3.      Analyzing monthly and year-to-date budget to actual variances, and explanations thereof and formulating financial projections based on the variance analyses;

4.      Analyzing expenditure projections for the annual or multi-year period beyond the period of actual results;

5.      Preparing and delivering costs budget input data for the annual budgeting processes, the Integrated Resource Plan and Owner's and Administrator's other long-range financial planning processes; and

6.      Risk management operations consistent with enterprise risk management practices covering the potential risks involved in the conduct of the O&M Services, Decommissioning Services, Mobilization Services and Demobilization Services including the following activities: (i) managing counterparty credit risk, (ii) managing commodity market risk, and (iii) conducting a risk management program.

D.      <u>Auditing</u>. Operator shall be responsible for auditing operations, including the following activities:

CONFIDENTIAL

1. Internal audit function to perform annual risk assessment related to the Legacy Generation Assets for the purpose of developing the appropriate risk-based annual audit plan as well as performing financial, regulatory and third-party contract compliance and operational audits and reviews, including review of the associated internal controls, based on the results of the annual risk assessment and associated annual audit plan;

2. Provision of all necessary information and assistance to Owner's external auditors in connection with their audit of the financial statements and underlying financial records maintained by Operator related to the services provided under the Agreement; and

3. Provision of copies of, and reasonable access to, the risk based annual audit plan referenced in Section V.D.1 of this Annex IX (*Scope of Services – Finance and Accounting Services – Auditing*); and the right of Administrator to inspect, during normal business hours and upon reasonable prior notice, internal audit reports and recommendations of Operator and management responses thereto; it being agreed, however, that the foregoing information shall be deemed to be confidential and shall therefore not be used by Owner or Administrator except with respect to any fraudulent conduct or willful misconduct identified in such reports and recommendations.

E. <u>Other</u>. Any other accounting and finance related activities necessary or advisable to support the operation and maintenance of the Legacy Generation Assets as Administrator may request from time to time, including:

1. Provision of information and data (both financial and operational) to support Owner's financing activities and the administration of Owner's and its Affiliates' debt service and required disclosure requirements;

2. Provision of assistance (including provision of information and data (both financial and operational)) to Owner and Administrator in connection with the preparation of reports and other documents to satisfy Owner's reporting requirements including: quarterly and annual (year-end) financial reporting; monthly and annual federal agency reporting requirements; PREB reporting requirements, Budget Reconciliation Act of 2017 and other federal and Commonwealth stimulus or funding program reporting requirements; Department of Energy reporting requirements; and filings relating to the O&M Services, Decommissioning Services, Mobilization Services and Demobilization Services in compliance with Applicable Law, and in accordance with Section 6.3 (*Reporting: Audits*) of the main body of the Agreement; and

3. Record keeping in compliance with Applicable Law.

VI. <u>Emergency Response.</u>

A. <u>Curtailments and Shutdowns</u>. If the generation of electricity through the Legacy Generation Assets is temporarily reduced, curtailed or shut down for any reason (except to the extent such reduction, curtailment or shut down is directed by T&D Operator pursuant to a T&D or load reduction directive), Operator shall, with due consideration of its responsibility for safety and plant reliability, as promptly as possible, advise Owner, Administrator and T&D Operator (and other Stakeholders as defined in the Legacy Generation Emergency Response Plan) as to the nature, reason and probable duration thereof and the expected effect thereof on the operation of

CONFIDENTIAL

the Legacy Generation Assets. Such notices shall be given as provided in this Annex IX (*Scope of Services*). Any announcement concerning such events made to the public or the media shall be made by Operator in accordance with the provisions of the Legacy Generation Emergency Response Plan and Section III of this Annex IX (*Scope of Services*).

B.    <u>Implementation of the Legacy Generation Emergency Response Plan</u>. Operator shall jointly develop with T&D Operator (in consultation with Administrator and subject to PREB approval), and implement, a Legacy Generation Emergency Response Plan that addresses, disaster recovery and emergency response and restoration, and all necessary emergency response, business continuity, reporting and communication functions relating to the Legacy Generation Assets, and coordinating such plans with any applicable plans of Owner, Administrator, T&D Operator and other service providers for business continuity and disaster recovery, including response, reporting and public communications relating to storms, other unusual weather occurrences and other Emergencies as follows, including the following activities:

1.    (i) Timely reporting to such Governmental Bodies as may be necessary, appropriate or advisable of such emergency conditions including timely regular updates as to the courses of action taken in response thereto or in anticipation thereof and progress made in responding to such emergency conditions and (ii) periodic reporting to Administrator of such emergency conditions as necessary or appropriate to permit Administrator to exercise proper Oversight of Operator's response to emergency conditions;

2.    Weather monitoring and mobilization of Operator or Subcontractor's workforce in connection with anticipated storms and other electric generation emergencies;

3.    Media, fire, police and government coordination (municipal, state and federal);

4.    Facility condition monitoring;

5.    Reporting to Administrator of the condition of each Legacy Generation Asset after a Forced Outage, Declared Emergency or Major Disaster, and the repairs and replacements, if any, needed to restore each such Legacy Generation Assets to pre-emergency conditions;

6.    Repair and replacement of damaged components of the Legacy Generation Assets, including due to Forced Outages or Declared Emergencies or Major Disasters; <u>provided</u> that to the extent the reasonable and documented costs and expenses required to perform such repairs or replacements would result in the Pass-Through Expenditures with respect to O&M Services for any Contract Year to exceed the O&M Budget for such Contract Year, such repairs or replacements shall require Administrator approval;

7.    Employee and public safety activities;

8.    At the request of Administrator, restoration of the Legacy Generation Assets to pre-emergency conditions; and

CONFIDENTIAL

9.      Conducting periodic drills, including as required by Applicable Law and in accordance with the PREPA-Genco-Hydroco Operating Agreement.

VII.   <u>Maintenance.</u>

A.      <u>Generally</u>. Operator shall perform all normal and ordinary maintenance (including any major maintenance) of all property constituting the Legacy Generation Assets, including machinery, structures, and electrical system components, keep the Legacy Generation Assets in operational condition and repair, in a neat and orderly condition and in accordance with the Contract Standards. This provision includes the machinery/tools used for the daily operation of the Legacy Generation Assets. Operator shall provide or make provisions for all labor, materials, supplies, equipment, spare parts, consumables and services that are necessary for the normal and ordinary maintenance (including any major maintenance) of the Legacy Generation Assets consistent with Contract Standards and their vehicle/machinery assets and conduct predictive, preventive and corrective maintenance of the Legacy Generation Assets as required by the Contract Standards.

B.      <u>Maintenance Logs</u>. Operator shall keep maintenance logs in accordance with the Contract Standards, which shall be available for review by Administrator.

C.      <u>Safety and Security</u>. Operator shall maintain the Legacy Generation Assets with due regard for employee and public health and safety at least consistent with Contract Standards, including the following:

1.      Establishing and prioritizing workplace safety initiatives, including systematically evaluating all Legacy Generation Assets sites to identify and address any immediate safety issues;

2.      Taking reasonable precautions in the performance of the O&M Services, Decommissioning Services, Mobilization Services and Demobilization Services for the health and safety of all persons working at the Legacy Generation Assets, to prevent employee injury, damage, injury or loss to the Legacy Generation Assets and to other Legacy Generation Assets property;

3.      Establishing and enforcing all reasonable safeguards for health and safety and protection, including fencing, posting danger signs and other warnings against hazards and applicable safety laws and regulations;

4.      Giving all notices and complying with all Applicable Law relating to the health and safety of persons or property or their protection from damage, injury or loss;

5.      Designating qualified and responsible employees whose duty shall be the supervision of health and safety, the prevention of fires, accidents spills, explosions and high energy piping failures and the coordination of such activities as shall be necessary with federal and local officials;

6.      Designing and implementing cybersecurity measures in accordance with Contract Standards and in the manner specified and subject to the provisions set forth in the main body of the Agreement; and

7.      Developing and maintaining a physical security program in accordance with application regulations/law for the protection of the Legacy Generation Assets critical infrastructure, other assets and persons.

CONFIDENTIAL

## Schedule 1 to Annex IX

## Safety and Hazardous Materials Procedures Manual Outline

**GENERA PR LLC: Outline of Safety HAZMAT Procedures Manual**

- Genera PR Safety and Environmental Commitment
- Assignment of Roles and Responsibilities
- Coordination with Other Service Providers
- Community Awareness and Engagement
- Engagement with Regulatory Agencies
- Regulations and Consensus Standards
  - OSHA
  - NFPA
  - EPA
  - DOT
  - Puerto Rico Territory
  - Local
- Definitions
- Hazard Identification and Management/Mitigation
- Work Permits
- Incident Reporting, Investigation, and Recordkeeping
- Health, Safety, and Environmental Training
- Audits and Inspections
- Hearing Conservation
- Hazard Communication
- Contractor Safety
- Emergency Response and Business Continuity
- Fire Protection, Prevention, and Response / NFPA59A
- Hearing Conservation
- Respiratory Protection
- Electrical and Arc Flash Safety / NFPA70E
- Hazardous Materials
  - List of Materials (including Quantities)
  - Reporting Requirements
  - Storage and Handling
  - Containment / Spill Control
  - Security
  - Fire Protection
  - Transport
  - Accidental Release
    - Emergency Contacts
    - Response
    - Recovery
  - Threats

12

**CONFIDENTIAL**

- ▪ Natural Disasters
- ▪ Terrorism
- o Disposal / Waste Characterization / Waste Management
- Lead & Asbestos
- Personal Protective Equipment
- Machinery and Machine Guarding
- Safety Signs & Tags
- Control of Hazardous Energy (lock-out-tag-out)
- Confined Space Entry
- Walking and Working Surfaces
- Working at Heights / Fall Protection
- Powered Industrial Trucks
- Management of Change
- Document Control
- Appendix
  - o Forms
  - o Checklists
  - o Templates
  - o Drawings
  - o Area Studies

CONFIDENTIAL

## Annex X

### Operator Employment Requirements

Prior to commencing employment with Operator (or any affiliate thereof), all prospective employees will be expected to comply with the following requirements:

1)    Prospective employees will be required to apply for candidacy in accordance with Operator's applicant processes, including applying to job requisitions within Operator's applicant tracking system and participating in any associated screening/assessment or interview processes.

2)    Candidates shall be evaluated for prospective employment with Operator based on their prior experience, education and/or training in conjunction with the requirements for the role as posted in the applicable job description. Candidates may also be asked to participate in associated interview conversations with the Operator's Talent Acquisition team or affiliated 3rd-party HR as part of their selection process.

3)    Prospective employees who are selected for employment will be required to undergo a criminal background check, which may also include verifications of education and prior employment and pre-employment drug testing.

4)    Prospective employees of Operator will be required to comply with the company's policies regarding vaccination against COVID-19 and will be required to provide proof of COVID vaccination prior to commencement of employment.

5)    Prospective employees who are selected for employment will also be required to provide documentary evidence of their authorization to work in Puerto Rico, and their continued employment with Operator will remain contingent upon maintaining such work authorization (in accordance with applicable laws).

6)    Prospective employees who are selected for employment will be required to enter into an employment agreement with Operator (or its affiliate). Such agreement will set forth the individual employment terms for such prospective employee, including without limitation, title, employment commencement date, probationary period, location of employment, and compensation details (including base salary, additional discretionary bonus eligibility, etc.). Such employment agreement will also contain other terms and conditions of employment that apply to all Operator employees, including affirmations to comply with all Operator policies and procedures, acknowledgement of "at will" employment relationship, and agreement to comply with Operator's policies regarding providing notice, confidentiality, protective covenants, arbitration, and other miscellaneous terms.

7)    Prospective employees who are selected for employment will also be required to complete all associated tax forms and other associated payroll and benefit information to ensure they can commence employment and be paid by Operator in accordance with all applicable laws (including being subject to reporting of income and tax withholding as applicable).

CONFIDENTIAL

8)    As part of their onboarding process, prospective employees will also be required to acknowledge receipt of all other Operator policies and procedures, including without limitation, Operator's Code of Conduct and Employee Handbook, anti-bribery & anti-corruption policies, policies regarding the protection of confidential information, insider trading policies, gifts & entertainment policies, social media policies and conflict of interest policies. In addition, their continued employment with Operator will be contingent upon continued adherence to such policies and procedures.

9)    Certain employees of Operator, depending on their role, may also be required to submit to and/or participate in specific training, certification courses, and/or other related processes in compliance with applicable laws or regulations. Such employees will be notified of such requirements, if applicable, as part of Operator's application and candidate selection process. Operator has identified 98 critical plant-level positions; a listing of Operator's current Critical Employee Positions is listed in the table below. The critical position counts shown by plant include:

| Operator's Critical Employee Positions | | |
|---|---|---|
| Site | Headcount | Critical Positions |
| **San Juan Plant** | | |
| | 2 | Electrician /Instrument and Controls Technician |
| | 4 | Shift Supervisor |
| | 8 | Control Room Operator |
| | 1 | Work Control Center Supervisor |
| | 2 | Laboratory Workers |
| **Total Critical Employee Positions for San Juan Plant** | 17 | |
| **Palo Seco Plant** | | |
| | 2 | Electrician /Instrument and Controls Technician |
| | 4 | Shift Supervisor |
| | 4 | Control Room Operator |
| | 2 | Work Control Center Supervisor |
| | 1 | Laboratory Workers |
| | 4 | Peaker Operator |
| **Total Critical Employee Positions for Palo Seco Plant** | 17 | |
| **Aguirre Plant** | | |
| | 2 | Electrician /Instrument and Controls Technician |
| | 4 | Shift Supervisor |
| | 8 | Control Room Operator |

CONFIDENTIAL

| Operator's Critical Employee Positions | | |
|---|---|---|
| Site | Headcount | Critical Positions |
| | 2 | Work Control Center Supervisor |
| | 4 | Laboratory Workers |
| **Total Critical Employee Positions for Aguirre Plant** | 20 | |
| **Costa Sur Plant** | | |
| | 2 | Electrician /Instrument and Controls Technician |
| | 4 | Shift Supervisor |
| | 4 | Control Room Operator |
| | 2 | Laboratory Workers |
| | 1 | Work Control Center Supervisor |
| **Total Critical Employee Positions for Costa Sur Plant** | 13 | |
| **Cambalache Plant** | | |
| | 2 | Shift Supervisor |
| | 8 | Combustion Turbine Technician |
| | 1 | Work Control Center Supervisor |
| **Total Critical Employee Positions for Cambalache Plant** | 11 | |
| **Mayaguez Plant** | | |
| | 2 | Shift Supervisor |
| | 8 | Combustion Turbine Technician |
| **Total Critical Employee Positions for Mayaguez Plant** | 10 | |
| **Peakers** | | |
| | 2 | Operations Supervisor |
| | 8 | Combustion Turbine Technician |
| **Total Critical Employee Positions for Mayaguez Plant** | 10 | |
| **Grand Total** | 98 | |

CONFIDENTIAL

**Schedule 1 to Annex X**

**Owner Employee Interview Plan**

It is expected that the vast majority of plant Operators and Maintenance Technicians will come from the existing Owner workforce. Recruitment will focus on plant skilled employees and will involve the multi-skilling philosophy, trying to recruit and retain as much expertise from the Owner's current staff as possible.

Operator shall offer employment to existing fulltime plant Owner Employees who were employed and in good standing as of June 30, 2022; provided that such employees complete and satisfy customary background checks.

Operator shall give priority in hiring to any other Owner Employee who meets Operator's stated requirements for employment.

Existing employees will not be required to apply on-line. Employees may not be guaranteed a position to remain in their existing role.

Offers of employment shall remain open for a period of thirty (30) Business Days. Any such offer that is accepted within such thirty (30) Business Day period shall thereafter be irrevocable until the Service Commencement Date.

The Operator shall provide a detailed schedule for the interview plan upon Service Commencement.

CONFIDENTIAL

## Annex XI

### Mobilization Hourly Fully Allocated Rates

The amounts of the Mobilization Hourly Fully Allocated Rates are shown in the chart below.

| Employee Category | Hourly Rates (US$) |
| --- | --- |
| Information & Technology | 430 |
| Human Resources – Systems | 370 |
| Human Resources – Human Capital | 440 |
| Human Resources – FTEs | 405 |
| Contractor Project Management | 420 |
| Finance – Operations | 420 |
| Regulatory | 440 |
| Permitting | 477 |
| Legal | 712 |
| Communications | 375 |

CONFIDENTIAL

## Annex XII

### Pass-Through Expenditures

Pass-Through Expenditures shall be the types of reasonable and documented costs and expenses incurred and documented by Operator in the course of providing O&M Services, Decommissioning Services, Mobilization Services and Demobilization Services (without markup for Operator profit) or otherwise performing its obligations hereunder, except to the extent any such reasonable and documented costs and expenses are determined to be Disallowed Costs in the manner set forth in Section 7.7 (*Disallowed Costs*) of the main body of the Agreement. For purposes of the Agreement, including this Annex XII (*Pass-Through Expenditures*), any reference to "incurred under" a Budget, "covered by" a Budget, "included in" a Budget or similar phrases shall include any costs and expenses related to a line item set forth in such Budget and any materials or services procured in connection therewith. For the avoidance of doubt, costs and expenses incurred by Operator prior to the Effective Date shall not be deemed to be Pass-Through Expenditures. Capitalized terms used but not defined in this Annex XII (*Pass-Through Expenditures*) have the respective meanings set forth in the Agreement.

Except as otherwise provided in the Agreement, Pass-Through Expenditures shall include the following items:

1. wages, salaries, bonuses, employer contributions and premium payments relating to pension, retirement and employee medical plans (including employer contributions for Hired Former Employees of Owner that elect to continue participating in Owner's defined benefit retirement plan), employer contributions and premium payments relating to workmen's compensation, non-occupational disability and other mandatory employment related insurance and taxes, vacation, sick leaves and other mandatory leaves with pay, overtime and meal period compensation and associated benefits, severance and other post-employment benefits incurred by Operator in performing the O&M Services, the Decommissioning Services, Mobilization Services and Demobilization Services, excluding any such costs resulting from noncompliance by Operator with wage and hour, discrimination, wrongful dismissal or with any other applicable labor or employment related legislation, as well as the costs of defending such claims if such claims are found to be true by a final non-appealable judgment or administrative determination by a court of competent jurisdiction or other Governmental Body (including costs arising out of or related to additional compensation, damages, penalties, court costs and attorney's fees but excluding, for the avoidance of doubt, any costs incurred by Operator, including defense related costs, which are incurred at the direction or with the consent of Administrator);

2. costs incurred and documented by Operator in performing the O&M Services, Decommissioning Services, Mobilization Services and Demobilization Services, including costs of all subcontracted and seconded employees, costs and expenses of all goods and services (including all materials, supplies, spare parts, vehicles, equipment rental, other transportation, freight, purchased services, training, Subcontractor costs, employee per diems, administrative costs such as dues, subscriptions, meals, office supplies, postage, rent, utilities and other costs), repair and maintenance costs, and the costs (including fees)

1

incurred or payable with respect to banking services and accounts, cash management, leases, equipment rentals, easements, licenses, permits, consents and similar instruments;

3.      costs incurred with respect to professional services, including legal, engineering, accounting, financial, auditing, information technology, telecommunication and other contracted services;

4.      costs incurred with respect to the security of physical assets, information technology, operational technology and processes;

5.      claims, lawsuits, litigations, Losses, fines, penalties, reasonable and documented costs and expenses, judgments, liens, settlements, appeals, disbursements and similar expense (including reasonable and documented fees of external counsel; provided that Operator shall not be required to provide documentation that would waive any privilege between Operator and its external counsel), incurred in connection with the performance of the O&M Services and the Decommissioning Services, to the extent such fines, penalties, or other similar payments or charges have not been imposed as a result of Operator's violation of Applicable Law other than circumstances that arise out of violations or circumstances that arose prior to the Effective Date, or are otherwise subject to an indemnity from Owner to Operator under this Agreement;

6.      costs related to Forced Outages, Force Majeure Events and Owner Fault;

7.      costs associated with the Legacy Generation Emergency Response Plan, and the other Services Documentation required under the Agreement;

8.      any Tax related to Owner-owned, leased or licensed assets or revenues, and costs incurred in connection with any tax audits of Owner;

9.      any Commonwealth sales or use taxes (including the additional taxes of Sections 4210.01 and 4210.02 of the Puerto Rico Internal Revenue Code of 2011 (PRIRC)), municipal sales or use taxes, Commonwealth excise taxes, municipal license taxes, municipal excise taxes, and any other Taxes imposed by the Commonwealth, a municipality or any other Governmental Body on Owner or Operator, if Operator is acting on behalf of Owner pursuant to the Agreement, to the extent that Owner becomes subject to the payment of such taxes; provided that any (i) income taxes imposed on Operator by the PRIRC or Act 29, or (ii) other taxes imposed on Operator as a result of the establishment of its operations in the Commonwealth or the continuation thereof (including sales and use taxes and excise taxes on goods or services that are not required to be acquired by Operator on behalf of Owner for the performance of the O&M Services and the Decommissioning Services under the Agreement) shall not be Pass-Through Expenditures;

10.     any municipal construction excise taxes related to construction work performed by Operator in connection with the O&M Services and the Decommissioning Services;

11.     costs to obtain and maintain in effect Required Insurance, including premium, claims and deductible payments;

**CONFIDENTIAL**

12.    costs incurred in connection with Intellectual Property, including licensing of Intellectual Property for use in connection with this Agreement;

13.    costs incurred in connection with data security, including the implementation, operation and maintenance of a cybersecurity program;

14.    costs incurred in connection with Operator's performance serving in the role of the operator of the Legacy Generation Assets, including the services set forth in Section I.C of Annex IX (*Scope of Services*) to the Agreement;

15.    costs of compliance with PREB or other applicable regulatory requirements to which Owner or Operator is subject;

16.    costs incurred in connection with branding and customer and public communications;

17.    costs incurred in connection with Owner's community service programs and community engagement, including the services and resolution of complaints pursuant to Section I.K of Annex IX (*Scope of Services*) to the Agreement;

18.    costs incurred in connection with the administration and performance of the Facility Contracts including as required by Section 5.2 (*Facility Contracts*) in the main body of the Agreement;

19.    Fuel Costs incurred pursuant to approved and executed fuel supply agreements for the Legacy Generation Assets; and,

20.    stipulated penalties under the Consent Decree or any similar arrangement that may be entered into in the future.

CONFIDENTIAL

## Annex XIII

### Insurance Specifications

I.      Operator shall purchase and maintain, on Owner's behalf, the following insurance coverage for the benefit of Owner from the Service Commencement Date and for the remainder of the Term thereafter, without limitation:

A.      property damage, business interruption coverage and extra expense coverage for the all Legacy Generation Assets covering direct damage from all perils (subject to standard and reasonable exclusions imposed by insurers), which shall, among other things, (i) comply with any requirements resulting from a Legacy Generation Asset's receipt of federal funding and (ii) provide at least US$550 million in coverage or the minimum amount of property insurance required in connection with the Legacy Generation Asset's receipt of federal funding, whichever is greater; provided that coverage shall have no more than a US$2 million per occurrence deductible;

B.      primary and excess general liability insurance of not less than US$75 million per occurrence and in the aggregate with a primary general liability deductible or self-insured retention of no more than US$ 1 million;

C.      cyber insurance with limits of not less than US$20 million, and a deductible or self-insured retention of no more than US$1 million, for first and third-party losses, liabilities, judgments, settlements, lawsuits, regulatory actions, remediation and other costs or damages arising out of or resulting from any Cybersecurity Breach relating to the operation of the Legacy Generation Assets or non-compliance with Applicable Law relating to privacy or data protection, including coverage for breach response costs, PCI-DDS assessments, ransomware and denial of service, property damage and business interruption, and extra expense, as well as third-party claims and investigations arising out cyber incidents, including any negligent or otherwise wrongful acts or omissions by Operator or any employee or agent thereof;

D.      pollution legal liability insurance covering third-party bodily injury, property damage and other losses caused by pollution during the Term with limits of not less than US$5 million per occurrence and US$25 million in aggregate; provided that coverage shall include environmental cleanup, remediation, transportation and disposal;

E.      boiler and machinery insurance with at least US$200 million in limits per accident, with repair and/or replacement included; at least US$10 million in debris removal limits; and at least US$5 million in additional extra expense limits; provided that coverage shall (i) be comprehensive and (ii) cover boilers, pressure vessels, electrical machines including air conditioning, refrigeration equipment, electrical apparatus and electronic data processing equipment including production machines;

F.      commercial auto insurance, providing at least US$10 million in coverage per accident for liability, medical payments, and physical damage;

CONFIDENTIAL

G.      crime insurance providing limits of at least US$10 million in coverage per incident and in the aggregate, and covering employee dishonesty, forgery or alteration, dissolution of assets, computer fraud fund transfer, theft of client property, and credit card coverage;

H.      builder's risk/installation floater insurance covering losses arising out of Operator's and or Operator's subcontractors' construction, maintenance or repairs to the infrastructure of any Legacy Generation Asset, including capital expenditures pursuant to the Agreement; provided that limits for such coverage for each project shall be in amounts consistent with market practice and the magnitude of each construction project;

I.      to the extent not duplicative of other insurance coverage obtained in accordance with this Annex XIII (*Insurance Specifications*), protective liability insurance for Owner's contractors with a limit of not less than US$2 million per occurrence, including coverage for bodily injury and/or property damage claims arising out of negligent acts or omissions of independent contractors or subcontractors of Operator;

J.      management liability/Employment Practices Liability ("EPL")/fiduciary liability coverage, initially including at least US$25 million in wrongful acts coverage for Owner and directors and officers of Owner, and US$5 million in fiduciary liability and EPL coverage; the requirement for $25 million in wrongful acts coverage will only be in place until Administrator determines that $65 million in coverage becomes available on commercially reasonable terms; and

K.      business travel accident insurance, providing at least US$150,000 in coverage per accident and at least US$3 million in aggregate limits.

Operator shall be listed as an additional named insured on all aforementioned coverages, and Operator shall provide evidence of coverage through additional insured endorsements on or before the Service Commencement Date. Moreover, all the aforementioned coverages shall apply on a primary and non-contributory basis.

II.     In addition to and separate from the foregoing, Operator shall maintain, on its own behalf, the following insurance coverage from the Service Commencement Date and for the remainder of the Term thereafter, without limitation:

A.      Commonwealth of Puerto Rico's Workmen's Compensation Insurance (as required by the Workmen's Compensation Act 45-1935 of the Commonwealth of Puerto Rico), employer's liability insurance and all other employee required insurance; and

B.      fiduciary liability insurance, providing limits not less than US$1 million per claim and in the aggregate; the $1 million limit shall only apply until such time as Operator's plan asset values increase and support a higher coverage amount; Operator shall continue to increase the coverage amount from the $1 million as plan asset values increase until such time as plan asset values support a coverage amount of $5 million; and

C.      professional liability insurance, with limits of not less than US$5 million per occurrence and US$5 million in the aggregate, covering work performed by any architects, engineers, project managers, construction managers or other professional consultants

CONFIDENTIAL

pursuant to the Agreement. In addition, any architects, engineers or other consultants engaged by Operator with respect to any construction project undertaken by Operator pursuant to the Agreement shall maintain separate coverage with limits of not less than the completion cost of the construction project undertaken. When any policies purchased pursuant to this paragraph are renewed or replaced, the retroactive date in any new or replacement policy shall coincide with or precede the start of work in connection with the Agreement and any claims-made policy that is not renewed shall have an extended reporting period of at least six years.

CONFIDENTIAL

**Annex XIV**

**Termination Fees**

I.  <u>Operator Termination Fee</u>

| Contract Year | Operator Termination Fee |
|:---:|:---:|
| **1** | US$45,000,000 |
| **2** | US$45,000,000 |
| **3** | US$45,000,000 |
| **4** | US$45,000,000 |
| **5** | US$45,000,000 |
| **6** | US$45,000,000 |
| **7** | US$45,000,000 |
| **8** | US$45,000,000 |
| **9** | US$45,000,000 |
| **10** | US$45,000,000 |

II.  <u>Owner Termination Fee</u>

| Contract Year | Owner Termination Fee |
|:---:|:---:|
| **1** | US$45,000,000 |
| **2** | US$45,000,000 |
| **3** | US$45,000,000 |
| **4** | US$45,000,000 |
| **5** | US$45,000,000 |
| **6** | US$45,000,000 |
| **7** | US$45,000,000 |
| **8** | US$45,000,000 |
| **9** | US$45,000,000 |
| **10** | US$45,000,000 |

CONFIDENTIAL

## Annex XV

### Decommissioning Plan

The Decommissioning Services shall include Mobilization, Stabilization, Staffing Support, and Demolition.  Plants to be decommissioned will be determined in accordance with the Generation O&M Agreement. PREB will approve the final decommissioning plan proposed by the Operator, as well as the budget and timeline. Post PREB approval the Operator will implement and execute the PREB approved plan.

Preparing for successful decommissioning includes planning for transition of the associated human resources. The PREB approved decommissioning plan will allow for targeted personnel training and communication that will facilitate optimal employment transition opportunities.

Post plan approval decommissioning services will generally consist of:

- Asset Assessment
- Mobilization of resources
- Engagement with local communities and other government agencies, and the media
- Stabilization: Determine which Legacy Generation Assets require stabilization before other activities proceed; identify, negotiate and modify environmental permits as needed for stabilization and as relevant; demolition stages; identify waste remediation activities; negotiate terms with agencies and assign consultant and existing personnel to first-year activities
  - Create a safe work environment at the Legacy Generation Assets
  - Identify key areas around the Legacy Generation Assets, that may need to be placed in a safe shutdown condition
  - Develop HSSEQ management plans for stabilization and monitoring the plans Stabilization may include the beginning of longer-term remediation activities that may extend to demolition and operations

- Staffing Support: Contract for staffing support for HSSEQ activities during the stabilization phase to ensure that adequate resources will be available during Demolition activities
  - The majority of personnel supporting the Decommissioning Services will be Operator's employees and contract personnel.

- Demolition: Develop HSSEQ management plans for activities, monitoring the activities, and following HSSEQ processes activities for safe work
  - Currently Operator understands that the PREB will approve the standards to which decommissioning will be done to.

CONFIDENTIAL

## Annex XVI

## Demobilization Plan

### 1      Development of a Demobilization Plan

Operator shall develop a Demobilization Plan. The Demobilization Plan shall enable the seamless, safe, and effective transfer of the Legacy Generation Assets to Owner, Administrator, or their successor operator, or custody of a decommissioned Legacy Generation Asset for future use. The Operator's principal objective shall be to complete any demobilization activities in the time frame and on the terms that are most suitable to Owner and Administrator in a way that will achieve an orderly handover or return of the Legacy Generation Assets. The Demobilization Plan shall address:

- Preparation of required reports
- Transition of operating employees
- Transfer of operations and maintenance knowledge
- Coordination for transfer of environmental approvals
- Review of applicable contracts

### 1.1     *Demobilization Process*

Operator shall formulate an approach to demobilization that will transfer either operation of the Legacy Generation Assets to Owner, Administrator or their successor operator, or the custody of a site that has been decommissioned and is ready for further use consistent with the long-term objectives of Owner and Administrator. The approach and scope of work for the demobilization shall vary depending on the nature of the activity at the assets at the time of demobilization.

### 1.2     *Required Reports*

Upon receiving the notice of Demobilization, Operator shall arrange for meetings between its management and permitting teams and those for the Owner, Administrator and the successor operator to agree upon and make arrangements to share and transfer any operating procedures and important documentation. The steps shall include familiarizing the successor operator with all of the inventory and related records that are necessary to realize an orderly transition, or a summary of the decommissioned site, particularly including any areas of the property that may be subject to long-term restrictions on use or other similar covenants that run with the land as a result of the remediation aspects of the decommissioning process.

Prior to meetings with Administrator, Owner or any projected successor, Operator shall prepare reports detailing the status of all Generation Assets and Legacy Generation Sites, their condition and all notifications related to the transfer or, or notices required by Governmental Approvals required for the operation of the Legacy Generation Sites.

CONFIDENTIAL

### 1.3    *Transition of Operator Employees*

The Demobilization Plan shall include a process for assisting employees with either transitioning to a new position elsewhere in the workforce or retraining for those employees whose jobs will be eliminated by the Operator demobilization. This plan shall also provide options for qualifying employees to sign on with any successor operator or to receive severance and training upon termination. Specifically, Operator, throughout the term of the O&M Agreement, shall establish an approach to multi-skilling of the workforce in order to maximize the potential for transition to the successor operator, to other power plants, or other industry opportunities. Operator shall work with union representation and adhere to local labor laws throughout the transition process. Operator shall place heavy emphasis on communication, focusing on timing, messaging, and respecting the various elements of the transition process, including, among others, benefits coordination, severance planning, and placement services.

Operator shall have a Labor Relations team as part of a larger demobilization team to focus on reviewing workforce background and facilitating employee transition. Along with the Operations team, the Labor Relations team shall be involved in any needed orientation of employees of the Owner, Administrator or the successor operator with respect to the operation of the equipment to ensure a smooth and efficient handover of responsibilities. This team shall also explore and be knowledgeable about opportunities for re-training of employees who will lose their jobs as a result of the termination and the demobilization.

### 1.4    *Transfer of Operations and Maintenance Know-How*

Operator shall transfer operations and maintenance know-how of the Legacy Generation Sites to any new operator or to Owner. This process shall entail meetings to review and confer about important topics such as maintenance philosophy, the roles and uses of subcontractors in the operation and maintenance of the plants. Operator shall seek to facilitate the continued operation of the Legacy Generation Assets in an orderly manner that minimizes impacts to the efficient operation of the units from the transition. To the extent that the Legacy Generation Assets are no longer in operation and have been decommissioned already, Operator shall assist Owner and Administrator in realizing the maximum value from the sale of any equipment, assets or supplies remaining at the site that are no longer needed for the Legacy Generation Assets. Operator shall be guided by an understanding of the remaining useful lifetime of other Legacy Generation Assets and use such information to determine whether employees, equipment and supplies can be efficiently transitioned to those other sites. The functional area leads from Operator shall review the information with the functional area leads of the successor operator, assigning and completing action items as necessary to assure a smooth and thorough transition.

### 1.5    *Coordinate Transfer of Environmental Approvals*

Functional leads from Operator shall meet with representatives of Administrator, Owner or the designee to identify and review all Governmental Approvals and set out a course of action to transfer the Governmental Approvals to Administrator, Owner, or the designee as the permittee or co-permittee on the permits. This effort shall entail joint meetings with the regulators to discuss the transition. Where the demobilization involves a Legacy Generation Asset for which operation and decommissioning has been completed, Operator shall review with Owner, Administrator or

CONFIDENTIAL

their successor operator the nature and extent of any obligations that the remaining permits or regulations require and how to achieve closure under these permits or regulatory programs. Operator may engage a subcontractor and/or legal support team to assist with the process of transferring such responsibilities and all related documentation to the Owner, Administrator or their successor operator.

### 1.6    *Review of Applicable Contracts*

The Operator shall meet with their counterparts from Administrator, Owner or the designee to review the key contracts and discuss their assignment or termination. To the extent that the Administrator, Owner or the designee may want to maintain any of these contracts, then Operator shall work to obtain agreement for the transfer of such contract to the new counterparty. Operator shall work with the Owner, Administrator or successor operator to ensure that the key responsibilities under the transferrable contracts have been identified and will be fulfilled after the transfer as well as an orderly closing out and transferring over of invoicing responsibilities, and transferring of all electronic and paper records. The Operator and all parties involved shall be aware of and work towards a set date for transfer so that all third parties can be aware of the appropriate points of contact moving forward and to ensure that settlement of all outstanding balances has occurred before such date.

## 2    **Scope and Estimated Costs**

Demobilization costs and durations are dependent upon the size of the site, number of units, technology of the units and the remediation needs of the site. Operator shall submit its estimate for all sites to be demobilized, whether they are smaller sites that may take just a few months to larger sites that may take longer, after taking into account any environmental remediation needed and transfer of any permits.

### 2.1    *Handover and Relocation of Equipment, Vehicles, or Other Materials*

Prior to any handover, Operator shall verify that all equipment has undergone the required inspections and/or maintenance procedures and shall inventory and locate all spare parts existing at the time of demobilization. Operator shall consolidate and prepare the transfer of all documentation for the equipment, including operating manuals (OEM and Operator produced O&M procedures), inspection records, certifications, maintenance history, compliance records, permits, and registrations, among others. Operator shall ensure the smooth transition of any existing warranties, warranty claims, and service agreements to Owner, Administrator or its successor operator. For equipment, vehicles, or other materials existing at a Legacy Generation Asset that was, or was in the process of being decommissioned, Operator shall work with the Owner, Administrator, or successor operator to transfer them for repurposing at other Legacy Generation Assets in order to preserve the best value for the customer, or to work with the Owner, Administrator, or successor operator to arrange for the liquidation of these items in a manner that would help Owner to realize the greatest amount of proceeds from their sale. For situations where such equipment or associated activities are in use at Legacy Generation Assets that remain in operation at the time of demobilization, Operator shall ensure that they are part of the operations to be transferred to Owner, Administrator or its successor operator.

CONFIDENTIAL

## 2.2    *Waste Disposal and Site Remediation*

Operator shall assess all Legacy Generation Assets for signs of contamination during initial inspections to determine the need for stabilization. Where evidence of contamination is found, environmental subcontractors shall be engaged to formally investigate the type and extent of contamination, propose remediation activities and to work with the relevant agencies to execute those activities, resulting in closure of the issues to the extent appropriate for the area remediated. Operator shall make efforts such that many of these activities would at least be underway and, in some cases, completed by the time of demobilization. In the event that these tasks have not been completed by the time of demobilization, the demobilization efforts shall focus on the transfer of these responsibilities to the successor operator. Operator shall ensure that the successor operator is aware of the status and nature of the remediation and the associated requirements so that the successor operator can continue the remediation activities. During the demobilization process, Operator shall take an inventory of existing fuels, liquids, tanks, chemicals and hazardous materials at the site, ensure proper labeling and storage, and coordinate with the successor operator for the safe transfer of all such materials. For any regulated substances that are not part of the materials to be transferred, they shall be reused if possible and, if not, arrangements for their disposal or treatment shall be made at authorized locations. All transfers of fuel and disposal of hazardous material shall be carried out in compliance with applicable federal and Puerto Rico regulations, at a minimum. Management and disposition of asbestos, PCB or other potentially dangerous materials shall be addressed during either the stabilization or the decommissioning phases for any Legacy Generation Assets that are no longer in operation at the time of demobilization.

## 2.3    *Communications and Engagement*

Operator shall use its corporate affairs department to frequently and proactively engage with members of the community, media, and local legislators, as well as PREPA and T&D Operator and other key stakeholders ahead of and during the Demobilization Period.

Operator shall regularly engage with the public regarding its plans for the Legacy Generation Assets and progress of those plans once launched. Operator shall execute this work through a local firm with connections to the affected communities and their leaders.

CONFIDENTIAL

## Annex XVII

## Fuel Contracts

| Counterparty Name | Products To Be Supplied | Contract Expiration Date | Extension Option |
|---|---|---|---|
| Puma Energy Caribe, LLC | Residual No. 6 Fuel Oil | October 30, 2022 | Yes |
| Novum Energy Trading Inc. | Light Distillate No. 2 Fuel Oil | November 17,  2022 | Yes |
| Naturgy | LNG | September 30, 2032 | Yes |
| NFEnergia LLC | LNG | June 2024 | Yes |

CONFIDENTIAL

## Exhibit A

## Form of Guarantee Agreement

THIS GUARANTEE AGREEMENT (the "Guarantee") is made and entered into as of this **[·]** day of **[·]**, 20**[23]** by and among: (i) **[·]** ("Guarantor"), a **[·]** organized under the laws of **[·]**; and (ii) the Puerto Rico Electric Power Authority ("Owner" and, together with Guarantor, the "Parties" and each a "Party"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, created by Act No. 83 of the Legislative Assembly of Puerto Rico, enacted on May 2, 1941.

## RECITALS

**WHEREAS**, Owner, the Puerto Rico Public-Private Partnerships Authority ("Administrator"), a public corporation of the Commonwealth of Puerto Rico, created by Act No. 29 of the Legislative Assembly of Puerto Rico, enacted on June 8, 2009 and **[·]** ("Operator"), a **[·]** organized under the laws of **[·]**, have entered into the Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement (as amended, modified or supplemented from time to time in accordance with its terms, the "O&M Agreement"), whereby Operator has agreed to provide the O&M Services and the Decommissioning Services for the Legacy Generation Assets in accordance with the terms of the O&M Agreement;

**WHEREAS**, Guarantor **[indirectly]** owns **[·]**% of the equity interests of Operator; and

**WHEREAS**, Owner and Administrator shall enter into the O&M Agreement only if Guarantor guarantees the performance by Operator of all of Operator's responsibilities and obligations, including amounts payable by, and the covenants and agreements of, Operator under the O&M Agreement, but in all cases subject to the limitations set forth herein, including Section 3.10 (*Limitation on Liability*) (all such obligations and responsibilities, the "Obligations") as set forth in this Guarantee.

**NOW THEREFORE**, in order to induce the execution and delivery of the O&M Agreement by Owner and Administrator and in consideration thereof, Guarantor agrees as follows:

## ARTICLE 1
### DEFINITIONS; INTERPRETATION

**Section 1.1    Definitions**

Capitalized terms used but not defined herein shall have the respective meanings set forth in the O&M Agreement.

**Section 1.2    Interpretation; Construction**

(a)    Headings. Articles, titles and headings to sections herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Guarantee. Except as otherwise indicated, all references in this Guarantee to "Articles" and "Sections" are intended to refer to Articles and Sections of this Guarantee.

1

CONFIDENTIAL

(b)   <u>Construction</u>. For purposes of this Guarantee: (i) "include", "includes" or "including" shall be deemed to be followed by "without limitation"; (ii) "hereof", "herein", "hereby", "hereto" and "hereunder" shall refer to this Guarantee as a whole and not to any particular provision of this Guarantee; (iii) "extent" in the phrase "to the extent" shall mean the degree to which a subject or other item extends and shall not simply mean "if"; (iv) in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including"; (v) "dollars" and "US$" shall mean United States Dollars; (vi) the singular includes the plural and vice versa; (vii) reference to a gender includes the other gender; (viii) "any" shall mean "any and all"; (ix) "or" is used in the inclusive sense of "and/or"; (x) reference to any agreement, document or instrument means such agreement, document or instrument as amended, supplemented and modified in effect from time to time in accordance with its terms; (xi) reference to any Applicable Law means such Applicable Law as amended from time to time and includes any successor legislation thereto and any rules and regulations promulgated thereunder; and (xii) reference to any Person at any time refers to such Person's permitted successors and assigns.

(c)   <u>Days and Time</u>. All references to days herein are references to calendar days, unless specified as Business Days, and, unless specified otherwise, all statements of or references to a specific time in this Guarantee are to Atlantic Standard Time.

(d)   <u>Accounting Principles</u>. All accounting and financial terms used herein, unless specifically provided to the contrary, shall be interpreted and applied in accordance with then generally accepted accounting principles in the United States, consistently applied.

(e)   <u>Negotiated Agreement</u>. The Parties have participated jointly in the negotiation and drafting of this Guarantee with the benefit of competent legal representation, and the language used in this Guarantee shall be deemed to be the language chosen by the Parties to express their mutual intent. In the event that an ambiguity or question of intent or interpretation arises, this Guarantee shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provisions hereof.

(f)   <u>Payments</u>. All payments required to be made by Guarantor hereunder shall be made in dollars.

## ARTICLE 2
## <u>REPRESENTATIONS AND WARRANTIES</u>

**Section 2.1**   **Representations and Warranties of Guarantor**. Guarantor hereby represents and warrants that:

(a)   <u>Existence and Powers</u>. Guarantor is a [•] duly organized, validly existing and in good standing under the laws of [•]. Guarantor has the required corporate power and authority to enter into this Guarantee, carry out its obligations hereunder and consummate the transactions contemplated hereby.

2

CONFIDENTIAL

(b)     <u>Due Authorization and Binding Obligation</u>. The execution and delivery by Guarantor of this Guarantee, the performance by Guarantor of its obligations hereunder and the consummation by Guarantor of the transactions contemplated hereby have been duly and validly authorized and approved by the required corporate or other similar action on the part of Guarantor. This Agreement has been duly and validly executed and delivered by Guarantor, and (assuming due authorization, execution and delivery by Owner) this Guarantee constitutes a legal, valid and binding obligation of Guarantor enforceable against Guarantor in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, moratorium or similar Applicable Law affecting creditors' rights generally and by general equity principles.

(c)     <u>No Conflicts</u>. Neither the execution, delivery or performance by Guarantor of this Guarantee, nor the consummation of the transactions contemplated hereby shall: (i) result in a material violation or breach of, or material default under, any provision of the organizational documents of Guarantor; (ii) result in a violation of, or give any Governmental Body the right to challenge any of the transactions contemplated hereby under, any Applicable Law applicable to Guarantor; (iii) (A) result in a violation or breach of, (B) constitute a default under, (C) result in the acceleration of or create in any party the right to accelerate, terminate or cancel or (D) require the consent of any other Person under, any material contract to which Guarantor is a party; or (iv) result in the creation or imposition of any Lien on any properties or assets of Guarantor.

(d)     <u>No Consents</u>. No consent, declaration or filing with, or notice to, any Governmental Body is required by or with respect to Guarantor in connection with (i) the execution and delivery of this Guarantee or (ii) the performance by Guarantor of its payment or other obligations hereunder, except such as have been duly obtained or made.

(e)     <u>No Litigation</u>. There is no action, suit or other proceeding, at law or in equity, before or by any court or Governmental Body pending against Guarantor or, to Guarantor's knowledge, threatened against Guarantor, which if determined adversely against Guarantor would reasonably be expected to materially and adversely affect (i) the validity or enforceability of this Guarantee or (ii) the performance by Guarantor of its respective obligations hereunder.

(f)     <u>No Legal Prohibition</u>. There is no Applicable Law in effect on the date hereof that would prohibit the execution, delivery or performance by Guarantor of this Guarantee and the transactions contemplated hereby.

(g)     <u>Consent to Agreements</u>. Guarantor is fully aware of the terms and conditions of the O&M Agreement.

(h)     <u>Consideration</u>. The Guarantee is made in furtherance of the purposes for which Guarantor has been organized, and the assumption by Guarantor of its obligations hereunder shall result in a material benefit to Guarantor.

**ARTICLE 3**
<u>GUARANTEE COVENANTS</u>

**Section 3.1     Guarantee to Owner.** Subject to Section 3.10 (*Limitation on Liability*), Guarantor hereby absolutely, presently, irrevocably and unconditionally guarantees to Owner the full and prompt payment and performance when due of the Obligations, including each and all of

the payments required to be credited or made by Operator under the O&M Agreement to, or for the account of, Owner, as the case may be, when the same shall become due and payable pursuant to this Guarantee. Notwithstanding the unconditional nature of Guarantor's obligations as set forth herein, Guarantor shall have the right to assert the defenses provided in Section 3.4 (*Defenses, Set-Offs and Counterclaims*) against claims made under this Guarantee.

### Section 3.2   Right of Owner to Proceed Against Guarantor.

(a)   <u>Generally</u>. This Guarantee shall constitute a guarantee of payment and performance and not of collection, and Guarantor specifically agrees that in the event of a failure by Operator to pay or perform any Obligation guaranteed hereunder, subject to any notice and cure periods under the O&M Agreement, Owner shall have the right to proceed firstly and directly against Guarantor under this Guarantee and without proceeding against Operator or exhausting any other remedies against Operator which Owner may have.

(b)   <u>No Conditions for Enforcement</u>. Without limiting the foregoing, Guarantor agrees that it shall not be necessary, and that Guarantor shall not be entitled to require, as a condition of enforcing the liability of Guarantor hereunder, that Owner:

(i)   file suit or proceed to obtain a personal judgment against Operator or any other person that may be liable for the Obligations or any part of the Obligations;

(ii)   make any other effort to obtain payment or performance of the Obligations from Operator other than providing Operator with any notice of such payment or performance as may be required by the terms of the O&M Agreement or required to be given to Operator under Applicable Law;

(iii)   foreclose against or seek to realize upon any security for the Obligations; or

(iv)   exercise any other right or remedy to which Owner or Administrator is or may be entitled in connection with the Obligations or any security therefor or any other guarantee thereof, except to the extent that any such exercise of such other right or remedy may be a condition to the Obligations of Operator or to the enforcement of remedies under the O&M Agreement.

(c)   <u>Unexcused Failure; Single Full Performance</u>. Upon any unexcused failure by Operator in the payment or performance of any Obligation and the giving of such notice or demand, if any, to Operator and Guarantor as may be required in connection with such Obligation and this Guarantee, the liability of Guarantor shall be effective and shall immediately be paid or performed. Notwithstanding Owner's right to proceed directly against Guarantor and subject to Section 3.10 (*Limitation on Liability*), Owner (or any successor) shall not be entitled to more than a single full payment from Guarantor or Operator or performance of the Obligations in regard to any breach or non-performance thereof.

CONFIDENTIAL

### Section 3.3    Guarantee Absolute and Unconditional.

(a)    <u>Generally</u>. The obligations of Guarantor hereunder are absolute, present, irrevocable and unconditional and shall remain in full force and effect until Operator shall have fully discharged the Obligations in accordance with their respective terms and conditions and, except as provided in Section 3.4 (*Defenses, Set-Offs and Counterclaims*), shall not be subject to any counterclaim, set-off, deduction or defense (other than full and strict compliance with, or release, discharge or satisfaction of, such Obligations) based on any claim that Guarantor may have against Operator, Owner, Administrator or any other person. Without limiting the foregoing, the obligations of Guarantor hereunder shall not be released, discharged or in any way modified by reason of any of the following (whether with or without notice to, knowledge by, or further consent of, Guarantor):

(i)    the extension or renewal of this Guarantee or the O&M Agreement up to the specified term of each agreement;

(ii)    any exercise or failure, omission or delay by Owner or Administrator in the exercise of any right, power or remedy conferred on Owner or Administrator, as the case may be, with respect to this Guarantee or the O&M Agreement except to the extent such failure, omission or delay gives rise to an applicable statute of limitations defense with respect to a specific claim;

(iii)    any permitted transfer or assignment of rights or obligations under the O&M Agreement or under any other Transaction Document by any party thereto, or any permitted assignment, conveyance or other transfer of any of their respective interests in the O&M Agreement or in, to or under any of the Transaction Documents;

(iv)    any permitted assignment for the purpose of creating a security interest or mortgage of all or any part of the respective interests of Owner or any other person in any Transaction Document or in any of the Legacy Generation Assets;

(v)    any renewal, amendment, change or modification in respect of any of the Obligations or terms or conditions of any Transaction Document;

(vi)    any failure of title with respect to all or any part of the respective interests of any person in any of the Legacy Generation Assets;

(vii)    the voluntary or involuntary liquidation, dissolution, sale or other disposition of all or substantially all the assets, marshaling of assets and liabilities, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, moratorium, arrangement, composition with creditors or readjustment of, or other similar proceedings against or affecting Operator or Guarantor, or any of the property of either of them, or any allegation or contest of the validity of this Guarantee or the O&M Agreement in any such proceeding (it being specifically understood, consented and agreed to that, to the extent permitted by Applicable Law, this Guarantee shall remain and continue in full force and effect and shall be enforceable against Guarantor to the same extent and with the same force and effect as if any such proceeding had not been instituted and as if no rejection, stay, termination, assumption or modification has occurred

CONFIDENTIAL

as a result thereof, it being the intent and purpose of this Guarantee that Guarantor shall and does hereby waive all rights and benefits which might accrue to it by reason of any such proceeding);

(viii)   except as permitted by Section 4.1 (*Maintenance Of Corporate Existence*), Section 4.2 (*Guarantor Reports*) or the O&M Agreement, any sale or other transfer by Guarantor or any Affiliate of any of the capital stock or other interest of Guarantor or any Affiliate in Operator now or hereafter owned, directly or indirectly, by Guarantor or any Affiliate, or any change in composition of the interests in Operator;

(ix)   any unexcused failure on the part of Operator for any reason to perform or comply with any agreement with Guarantor;

(x)   the failure on the part of Owner to provide any notice to Guarantor which is not required to be given to Guarantor pursuant to this Guarantee and to Operator as a condition to the enforcement of Obligations pursuant to the O&M Agreement;

(xi)   any failure of any party to the O&M Agreement to mitigate damages resulting from any default by Operator or Guarantor under the O&M Agreement;

(xii)   the merger, consolidation or amalgamation of any party to the O&M Agreement into or with any other person, or any sale, lease, transfer, abandonment or other disposition of any or all of the property of any of the foregoing to any person;

(xiii)   any legal disability or incapacity of Operator or Guarantor with respect to the O&M Agreement; or

(xiv)   the fact that entering into the O&M Agreement by Operator or Guarantor was invalid or in excess of the powers of such party.

(b)   Recovery of Money Due or Owing. Should any money due or owing under this Guarantee not be recoverable from Guarantor due to any of the matters specified in Section 3.3(a) (*Guarantee Absolute and Unconditional - Generally*), then, in any such case, such money, together with all additional sums due hereunder, shall nevertheless be recoverable from Guarantor as though Guarantor were principal obligor in place of Operator pursuant to the terms of the O&M Agreement and not merely a guarantor and shall be paid by Guarantor forthwith subject to the terms of this Guarantee.

(c)   Scope. Notwithstanding anything to the contrary expressed in this Guarantee, nothing in this Guarantee shall be deemed to amend, modify, clarify, expand or reduce Operator's rights, benefits, duties or obligations under the O&M Agreement.

Section 3.4   **Defenses, Set-Offs and Counterclaims**. Notwithstanding any provision contained herein to the contrary, Guarantor shall be entitled to exercise or assert any and all legal or equitable rights or defenses which Operator may have under the O&M Agreement or under Applicable Law (other than bankruptcy or insolvency of Operator and other than any defense which Operator has expressly waived in the O&M Agreement or Guarantor has expressly waived in Section 3.5 (*Waivers by Guarantor*) or elsewhere hereunder), and the obligations of Guarantor

6

CONFIDENTIAL

hereunder are subject to such rights, defenses, counterclaims, set-offs or deductions which Operator is permitted to assert pursuant to the O&M Agreement, if any.

**Section 3.5    Waivers by Guarantor**. Guarantor hereby unconditionally and irrevocably waives:

(a)    notice from Owner of its acceptance of this Guarantee;

(b)    notice of any of the events referred to in Section 3.3 (*Guarantee Absolute and Unconditional*), except to the extent that notice is required to be given as a condition to the Obligations or the enforcement of remedies under the O&M Agreement;

(c)    to the fullest extent lawfully possible, all notices that may be required by statute, rule of law or otherwise to preserve intact any rights against Guarantor, except any notice to Operator required pursuant to the O&M Agreement or Applicable Law as a condition to any Obligation or the enforcement of remedies under the O&M Agreement;

(d)    to the fullest extent lawfully possible, any statute of limitations defense based on a statute of limitations period which may be applicable to guarantors (or parties in similar relationships) which would be shorter than the applicable statute of limitations period for the underlying claim;

(e)    any right to require a proceeding first against Operator;

(f)    any right to require a proceeding first against any person or the security provided by or under the O&M Agreement, except to the extent the O&M Agreement specifically requires a proceeding first against any person (except Operator) or security;

(g)    any requirement that Operator be joined as a party to any proceeding for the enforcement of any term of the O&M Agreement;

(h)    the requirement of, or the notice of, the filing of claims by Owner or Administrator in the event of the receivership or bankruptcy of Operator; and

(i)    all demands upon Operator or any other person and all other formalities the omission of any of which, or delay in performance of which, might, but for the provisions of this Section 3.5 (*Waivers by Guarantor*), by rule of law or otherwise, constitute grounds for relieving or discharging Guarantor in whole or in part from its absolute, present, irrevocable, unconditional and continuing obligations hereunder.

**Section 3.6    Payment of Costs and Expenses**. Guarantor agrees to pay Owner and Administrator on demand all Fees-and-Costs incurred by or on behalf of Owner in successfully enforcing by Legal Proceeding observance of the covenants, agreements and obligations contained in this Guarantee against Guarantor, other than the Fees-and-Costs that Owner or Administrator incurs in performing any of its obligations under the O&M Agreement where such obligations are a condition to performance by Operator of its Obligations.

**Section 3.7    Subordination of Rights**. Guarantor agrees that any right of subrogation or contribution which it may have against Operator as a result of any payment or performance hereunder is hereby fully subordinated to the rights of Owner and Administrator hereunder and under the O&M Agreement and that Guarantor shall not recover or seek to recover any payment made by it hereunder from Operator until Operator and Guarantor shall have fully and satisfactorily paid or performed and discharged the Obligations giving rise to a claim under this Guarantee.

**Section 3.8    Separate Obligations; Reinstatement.**

(a)    <u>Separate Obligations</u>. The obligations of Guarantor to make any payment or to perform and discharge any other duties, agreements, covenants, undertakings or obligations hereunder shall: (i) to the extent permitted by Applicable Law, constitute separate and independent obligations of Guarantor from its other obligations under this Guarantee; (ii) give rise to separate and independent causes of action against Guarantor; and (iii) apply irrespective of any indulgence granted from time to time by Owner.

(b)    <u>Reinstatement</u>. Guarantor agrees that this Guarantee shall be automatically reinstated if and to the extent that for any reason any payment or performance by or on behalf of Operator is rescinded or must be otherwise restored by Owner, whether as a result of any proceedings in bankruptcy, reorganization or similar proceeding, unless such rescission or restoration is pursuant to the terms of the O&M Agreement or Operator's enforcement of such terms under Applicable Law.

**Section 3.9    Term**. Subject to Section 3.10 (*Limitation of Liability*) this Guarantee shall remain in full force and effect from the date of execution and delivery hereof until all of the Obligations of Operator have been fully paid and performed.

**Section 3.10    Limitation on Liability**. Notwithstanding anything herein or otherwise to the contrary, the aggregate liability of Guarantor under or with respect to this Guarantee with respect to all matters whatsoever or howsoever arising, including where arising from gross negligence and willful misconduct of Operator, any Operator Indemnitee or Guarantor, and regardless of any other rights and remedies that Owner or Administrator may have against Operator under the O&M Agreement, under Applicable Law or otherwise, shall in no event exceed US$45,000,000.00 in respect of the payment and performance by Guarantor of the Obligations, collectively. Without limiting the foregoing, to the fullest extent permitted by law, in no event shall Guarantor be liable, whether in contract, indemnity, tort (including negligence, gross negligence and strict liability) or otherwise, for any loss of profits or revenues, special, exemplary, punitive, indirect, incidental or consequential damages which arise from, relate to or are connected with this Guarantee or the performance of or failure to perform the Obligations except for claims of fraud or intentional misrepresentation.

### ARTICLE 4
<u>GENERAL COVENANTS</u>

**Section 4.1    Maintenance Of Corporate Existence**

(a)    <u>Consolidation, Amalgamation, Merger, Sale or Transfer</u>. Guarantor covenants that during the term of this Guarantee it shall maintain its corporate existence, shall not

CONFIDENTIAL

dissolve or otherwise dispose of all or substantially all of its assets and shall not consolidate or amalgamate with or merge into another entity or permit one or more other entities to consolidate or amalgamate with or merge into it unless the successor is Guarantor; provided, however, that Guarantor may consolidate or amalgamate with or merge into another entity, or permit one or more other entities to consolidate or amalgamate with or merge into it, or sell or otherwise transfer to another entity all or substantially all of its assets as an entirety and thereafter dissolve if the successor entity (if other than Guarantor) (i) is acceptable to Owner, acting reasonably, (ii) assumes in writing all the obligations of Guarantor hereunder and (iii) delivers to Owner an opinion of counsel to the effect that its obligations under the Guarantee are legal, valid, binding and enforceable subject to applicable bankruptcy and similar insolvency or moratorium laws.

(b)    Continuance of Obligations. If a consolidation, amalgamation, merger or sale or other transfer is made as permitted by this Section 4.1 (*Maintenance Of Corporate Existence*), the provisions of this Section 4.1 (*Maintenance Of Corporate Existence*) shall continue in full force and effect and no further consolidation, amalgamation, merger or sale or other transfer shall be made except in compliance with the provisions of this Section 4.1 (*Maintenance Of Corporate Existence*). No such consolidation, amalgamation, merger or sale or other transfer shall have the effect of releasing the initial Guarantor from its liability hereunder unless a successor entity has assumed responsibility for this Guarantee in accordance with this Section 4.1 (*Maintenance Of Corporate Existence*).

**Section 4.2    Guarantor Reports**. While this Guarantee is outstanding, Guarantor shall assist Operator in delivering to Administrator the reports required pursuant to Section 8.2 (*Guarantor Reports*) of the O&M Agreement.

**Section 4.3    Assignment**. Except as permitted pursuant to Section 4.1 (*Maintenance Of Corporate Existence*), Guarantor shall not assign, transfer, convey, lease, encumber or otherwise dispose of its rights or obligations under this Guarantee without the prior written consent of Administrator, which consent shall not be unreasonably withheld, delayed or conditioned.

**ARTICLE 5**
MISCELLANEOUS

**Section 5.1    Consent to Jurisdiction**. Any dispute between the Parties arising out of, relating to or in connection with this Guarantee or the existence, interpretation, breach, termination or validity thereof shall be resolved in accordance with the procedures set forth in Article 15 (*Dispute Resolution*) of the O&M Agreement as if it were a Dispute, *mutatis mutandis*; provided that, for the avoidance of doubt, Guarantor hereby irrevocably: (i) agrees that any Legal Proceeding related to this Guarantee or to any rights or relationship between the Parties arising therefrom (other than any negotiation between the Parties in accordance with Section 15.3 (*Negotiation*) of the O&M Agreement) shall be solely and exclusively initiated and maintained in the Commonwealth Court; (ii) consents to the jurisdiction of the Commonwealth Court in any such Legal Proceeding; (iii) waives any objection which it may have to the laying of the jurisdiction of any such Legal Proceeding in the Commonwealth Court; and (iv) waives its right to a trial by jury in any Legal Proceeding in the Commonwealth Court.

**Section 5.2   Notices**. All notices or other communications to be delivered in connection with the Guarantee shall be in writing and shall be deemed to have been properly delivered, given and received (i) on the date of delivery if delivered by hand during normal business hours of the recipient during a Business Day, otherwise on the next Business Day, (ii) on the date of successful transmission if sent via email (with return receipt) during normal business hours of the recipient during a Business Day, otherwise on the next Business Day, or (iii) on the date of receipt by the addressee if sent by a nationally recognized overnight courier or by registered or certified mail, return receipt requested, if received on a Business Day, otherwise on the next Business Day. Such notices or other communications must be sent to each respective Party at the address, email address set forth below (or at such other address, email address as shall be specified by a Party in a notice given in accordance with this Section 5.2 (*Notices*)):

| | |
|---|---|
| If to Owner: | Puerto Rico Electric Power Authority |
| | [•] |
| | [•] |
| | Attention: [•] |
| | Telephone: [•] |
| | Email: [•] |
| | |
| | with a copy to: |
| | |
| | Administrator |
| | [•] |
| | [•] |
| | Attention: [•] |
| | Telephone: [•] |
| | Email: [•] |
| | |
| If to Guarantor: | [•] |
| | [•] |
| | [•] |
| | Attention: [•] |
| | Telephone: [•] |
| | Email: [•] |

**Section 5.3   Amendments**. Neither this Guarantee nor any provision hereof may be changed, modified, amended or waived except by written agreement duly executed by the Parties. To the extent required by Applicable Law, any such amendment shall not be effective until approved by the FOMB (if then in existence) and PREB.

**Section 5.4   Entire Agreement**. This Guarantee constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes any and all prior oral or written agreements, understandings, proposals, representations or warranties relating to this Guarantee. Without limiting the generality of the foregoing, this Guarantee shall completely and fully supersede all other understandings and agreements among the Parties with respect to such

transactions, including those contained in the RFP, the Proposal by Operator or its Affiliate and any amendments or supplements to the RFP or the Proposal.

**Section 5.5**     **Interest on Overdue Obligations**. Except as otherwise provided herein, all amounts due hereunder, whether as fees, damages, credits, revenue, charges or reimbursements, that are not paid when due shall bear interest at the Overdue Rate, on the amount outstanding from time to time, and all such interest accrued at any time shall, to the extent permitted by Applicable Law, be deemed added to the amount due, as accrued.

**Section 5.6**     **Waivers**. Either Guarantor or Owner may, at any time, (a) extend the time for the performance of any of the obligations or other acts of the other Party, (b) waive any inaccuracies in the representations and warranties of the other Party contained herein or (c) waive compliance by the other Party with any of the agreements or conditions contained herein. No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in a written instrument executed and delivered by the Party so waiving. No waiver by any Party of any breach of this Guarantee shall operate or be construed as a waiver of any preceding or subsequent breach, whether of a similar or different character, unless expressly set forth in such written waiver. Neither any course of conduct or failure or delay of any Party in exercising or enforcing any right, remedy or power hereunder shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy or power hereunder, or any abandonment or discontinuance of steps to enforce such right, remedy or power, or any course of conduct, preclude any other or further exercise thereof or the exercise of any other right, remedy or power.

**Section 5.7**     **Survival**. The rights and obligations of the Parties pursuant to Section 5.1 (*Consent to Jurisdiction*), Section 5.2 (*Notices*) and Section 5.12 (*Governing Law*) shall survive the expiration or termination of this Guarantee. No expiration or early termination of this Guarantee shall (i) limit or otherwise affect the respective rights and obligations of the Parties accrued prior to the date of such termination or (ii) preclude any Party from impleading any other Party in any Legal Proceeding originated by a third-party as to any matter occurring during the term of this Guarantee.

**Section 5.8**     **Severability**. If any term or provision of this Guarantee is invalid, illegal or incapable of being enforced in any situation or in any jurisdiction, such invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of any other term or provision hereof or the offending term or provision in any other situation or any other jurisdiction, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon any such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Guarantee so as to effect the original intent of the Parties as closely as possible, in a mutually acceptable manner, in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

**Section 5.9**     **Remedies**

        (a)     <u>Cumulative and Non-Exclusive Remedies</u>. Except as otherwise provided in this Guarantee, any and all remedies herein expressly conferred upon a Party shall be deemed

CONFIDENTIAL

cumulative with and not exclusive of any other remedy expressly conferred hereby, and the exercise by a Party of any one such remedy shall not preclude the exercise of any other such remedy.

(b)    Irreparable Damage and Harm. The Parties agree that irreparable damage and harm would occur in the event that any provision of this Guarantee were not performed in accordance with its terms and that, although monetary damages may be available for such a breach, monetary damages would be an inadequate remedy therefor. Accordingly, each of the Parties agrees that, in the event of any breach or threatened breach of any provision of this Guarantee by such Party, the other Party shall be entitled to an injunction or injunctions, specific performance and other equitable relief to prevent or restrain breaches or threatened breaches hereof and to specifically enforce the terms and provisions hereof. A Party seeking an order or injunction to prevent breaches of this Guarantee or to enforce specifically the terms and provisions hereof shall not be required to provide, furnish or post any bond or other security in connection with or as a condition to obtaining any such order or injunction, and each Party hereby irrevocably waives any right it may have to require the provision, furnishing or posting of any such bond or other security. In the event that any Legal Proceeding should be brought in equity to enforce the provisions of this Guarantee, each Party agrees that it shall not allege, and each Party hereby waives the defense, that there is an adequate remedy available at law.

**Section 5.10   Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall be deemed to be one and the same agreement or document. A signed copy of this Guarantee transmitted by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original executed copy of this Guarantee for all purposes.

**Section 5.11   Office of the Comptroller**. Owner agrees to file this Guarantee with the Comptroller of the Commonwealth promptly after its execution and to provide Guarantor with evidence of its filing within fifteen (15) days following the execution of this Guarantee. The Parties acknowledge and agree that the obligations and considerations under this Guarantee shall not be enforceable until this Guarantee shall have been registered with the Office of the Comptroller of the Commonwealth as provided by Act No. 18 of the Legislative Assembly of Puerto Rico, enacted on October 30, 1975.

**Section 5.12   Governing Law**. This Agreement and all matters, claims, controversies, disputes, suits, actions or proceedings arising out of or relating to this Guarantee and the negotiation, execution or performance of this Guarantee or any of the transactions contemplated hereby, including all rights of the Parties (whether sounding in contract, tort, common or statutory law, equity or otherwise) in connection therewith, shall be interpreted, construed and governed by and in accordance with, and enforced pursuant to, the internal laws of the Commonwealth (excluding any conflict of laws rule or principle which might refer such interpretation to the laws of another jurisdiction), except where the federal supremacy clause requires otherwise.

**Section 5.13   COMMONWEALTH OBLIGATIONS**. THE OBLIGATIONS OF OWNER UNDER THIS AGREEMENT SHALL NOT BE DEEMED OBLIGATIONS OF THE COMMONWEALTH OR ANY INSTRUMENTALITY OF THE COMMONWEALTH OTHER THAN OWNER.

CONFIDENTIAL

**IN WITNESS WHEREOF,** Guarantor has caused this Guarantee to be duly executed as of the day and year first above written.

[*GUARANTOR*]

By: _____

Name:

Title:

Accepted and agreed by:

**PUERTO RICO ELECTRIC POWER
AUTHORITY**

By: _____

Name:

Title:

1

CONFIDENTIAL

**Exhibit B**

**Form of Reliance Letter**

_____, 2023

Puerto Rico Thermal Generation Facilities Operation and Maintenance
Agreement dated as of _____, 2023

Ladies and Gentlemen:

In connection with the execution of the Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement dated as of _____, 2023 by and among the Puerto Rico Electric Power Authority, the Puerto Rico Public-Private Partnerships Authority, and _____ (the "Agreement") we have delivered our legal opinion relating to the impact of the Agreement on the federal income tax status of interest on bonds issued by the Authority, its Affiliates, and other Governmental Bodies (the "Bonds"), dated the date hereof and addressed to the Financial Oversight and Management Board. Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Agreement.

You may rely on said opinion as though the same were addressed to you. No attorney-client relationship has existed or exists between any addressee of this letter and our firm in connection with the Agreement or the Bonds or by virtue of this letter.

Very truly yours,

1

CONFIDENTIAL

**Exhibit C**

**Form of Sworn Statement**

**SWORN STATEMENT**

**ACT 2-2018**

I, _____, of legal age, single/married, _____ and resident of the _____, hereby solemnly swear:

1.      That my personal status is the one stated above.

2.      That I hold the position of _____ _____ (hereinafter referred to as the "Company") organized as a _____ under the laws of _____ with the Federal Identification No_____.

3.      That I am authorized to represent the Company and all of its partners and owners for purposes of this affidavit.

4.      That neither the Company nor any of its presidents, vice-presidents, directors, managers, executive directors or members of its Board of Directors, or persons that fulfill similar tasks, have been convicted of, nor have they pleaded guilty to, any of the crimes in Article 6.8 of Puerto Rico Act No. 8-2017, as amended, known as the "Act for the Management and Transformation of the Human Resources of the Government of Puerto Rico" or for any of the crimes listed in Puerto Rico Act No. 2-2018, known as the "Anti-Corruption Code for a New Puerto Rico".

5.      No commissions or bonuses have been paid, in cash or in kind, and there is not commitment for the future payment of any such commissions or bonuses to any public official, employee or any former public official that participated in the negotiations and transactions contemplated by the Company's agreement with _____ while working for the Government of Puerto Rico.

6.      That neither the Company nor any of its presidents, vice-presidents, directors, managers, executive directors or members of its Board of Directors, or persons that fulfill similar tasks have any conflicts of interest in acting as the Operator of the Legacy Generation Assets.

7.      That everything stated above is true to the best of my knowledge, information and belief and thus, to make it public I sign this declaration in _____, this _____ day of _____, 20____.

By:_____
Name:
Title:

Affidavit No. _____

**CONFIDENTIAL**

Sworn and subscribed before me by _____, of the personal circumstances stated above, in his/her capacity as _____ of _____; who is personally known to me or whom I have identified pursuant the following form of identification: _____, this ____ day of _____, 20___.

CONFIDENTIAL

**Exhibit D**

**Form of Tax Opinion – Effective Date**

_____, 202__

Ladies and Gentlemen:

We have served as tax counsel to the Federal Oversight and Management Board for Puerto Rico ("FOMB") with respect to the Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement dated as of ___, 2023 (the "Agreement") by and among the Puerto Rico Electric Power Authority (the "Authority"), as owner, the Puerto Rico Public-Private Partnerships Authority, as administrator (the "Administrator"), and [•] ("Operator" and, together with Authority and Administrator, the "Parties"). Pursuant to the terms of the Agreement, Operator shall provide management, operation, maintenance, repair and other related services for the Authority's base-load generation plants and combustion turbine peaking plants (the "Legacy Generation Assets"). The Authority, its Affiliates, and other Governmental Bodies currently have outstanding obligations the interest on which is excluded from gross income for federal income tax purposes (the "Existing Bonds"). On the date of issuance of each of the bond issues comprising the Existing Bonds, the respective bond counsel for each such issuance delivered an opinion (each an "Approving Opinion") that interest on the related Existing Bonds is excluded from gross income for federal income tax purposes under Section 103 of the Internal Revenue Code (the "Code"). Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Agreement.

This opinion is being delivered in accordance with Section 2.2(b)(viii) (*Effective Date – Conditions to Execution*) of the Agreement.

In rendering the opinion set forth herein, we have reviewed (i) the Agreement, including the exhibits thereto, (ii) the Facility Contracts in effect as of the date hereof, (iii) the opinion of Sargent and Lundy or another nationally recognized engineering firm acceptable to the Parties, dated _____, 202_, which sets forth, among other things, the reasonably expected weighted average economic life of the Legacy Generation Assets, and (iv) such other opinions, certificates and documents as have been provided to us by the Authority and others in connection with the Agreement. We have also relied upon the facts set forth in the representations made by the Parties to the Agreement and such other documents and opinions to the extent we deemed necessary to render the opinions set forth herein. Sections 4.4 (*Governmental Approvals and Tax Matters*) and 4.5 (*Conditions Precedent to Service Commencement Date*) of the Agreement contain Service Date Conditions and Commencement Date Government Approvals (collectively, the "Conditions") that must be satisfied or obtained in order for the Service Commencement Date to occur. In rendering the opinion set forth herein, we have assumed that the Conditions are either mere formalities or that the likelihood that the Conditions will not be satisfied or obtained is remote. We have also assumed that the Service Commencement Date will occur on or before [•]. We have not undertaken an independent audit or investigation of the matters set forth in any of the foregoing and our opinion assumes the accuracy of the information and any conclusions set forth therein and compliance with any covenants and directions set forth in said documents, including the Agreement.

CONFIDENTIAL

In addition, the Code and the Revenue Procedure (as defined below), impose certain requirements that must be met subsequent to the issuance and delivery of the Existing Bonds and subsequent to the execution of the Agreement for interest on the Existing Bonds thereon to be and remain excluded from gross income for federal income tax purposes. Noncompliance with such requirements could cause the interest on the Existing Bonds to be included in gross income for federal income tax purposes retroactive to the date of issue of each issue of the Existing Bonds.

Section 103 of the Code provides generally that interest on a "private activity bond" is not excluded from gross income. Section 141 of the Code, in part, provides that a private activity bond is an obligation issued as part of an issue that meets the private business tests. Under the private business tests, bonds are treated as private activity bonds if the issue of which those bonds are a part satisfy both the private business use test and the private security or payment test. The private business use test is met if more than 10 percent of the proceeds of an issue are used in the trade or business of a nongovernmental person ("private business use"). Under Treasury regulation section 1.141-3, private business use can result from the use of the facilities financed by the issue, including as a result of a lease of such property to a nongovernmental person or a management contract with respect to such property. The private security or payment test is generally met if the payment of the principal of, or the interest on, more than 10 percent of the proceeds of an issue is (under the terms of such issue or any underlying arrangement) directly or indirectly: (A) secured by any interest in property used or to be used for a private business use, or payments in respect of such property, or (B) to be derived from payments (whether or not to the issuer) in respect of property, or borrowed money, used or to be used for a private business use.

Under Treasury regulation section 1.141-3(b)(4), a management contract with respect to financed property may result in private business use of that property, based on all of the facts and circumstances. The regulations provide that a management contract with respect to financed property generally results in private business use of that property if the contract provides for compensation for services rendered with compensation based, in whole or in part, on a share of net profits from the operation of the facility, or if the service provider is treated as the lessee or owner of financed property for federal income tax purposes.

Treasury regulation section 1.141-3 defines a management contract as a management, service, or incentive payment contract between a governmental person and a service provider under which the service provider provides services involving all, a portion of, or any function of, a facility. For example, a contract for the provision of management services for an entire hospital, a contract for management services for a specific department of a hospital, and an incentive payment contract for physician services to patients of a hospital are each treated as a management contract.

In Revenue Procedure 2017-13 (the "Revenue Procedure") the Internal Revenue Service provided a safe harbor under which a management contract can be treated as not resulting in private business use. The Revenue Procedure refers to the governmental owner of the related facilities as the "qualified user" and the manager or operator as the "service provider." Under the Revenue Procedure, a management contract that satisfies the following conditions shall not be treated as resulting in private business use:

CONFIDENTIAL

(1)     The payments to the service provider under the contract must be reasonable compensation for services rendered during the term of the contract. "Compensation" includes payments to reimburse actual and direct expenses paid by the service provider and related administrative overhead expenses of the service provider.

(2)     The contract must not provide to the service provider a share of net profits from the operation of the managed property. Compensation to the service provider shall not be treated as providing a share of net profits if no element of the compensation takes into account, or is contingent upon, either the managed property's net profits or both the managed property's revenues and expenses (other than any reimbursements of direct and actual expenses paid by the service provider to unrelated third parties) for any fiscal period. For this purpose, the elements of the compensation are the eligibility for, the amount of, and the timing of the payment of the compensation. Incentive compensation is not treated as providing a share of net profits if eligibility is determined by the service provider's performance in meeting one or more standards that measure quality of services, performance or productivity.

(3)     The contract must not, in substance, impose upon the service provider the burden of bearing any share of net losses from the operation of the managed property.

(4)     The term of the contract, including all renewal options must not be greater than the lesser of 30 years or 80 percent of the weighted average reasonably expected economic life of the managed property.

(5)     The qualified user must exercise a significant degree of control over the use of the managed property. This control requirement is met if the contract requires the qualified user to approve the annual budget of the managed property, capital expenditures with respect to the managed property, each disposition of property that is part of the managed property, rates charged for the use of the managed property, and the general nature and type of use of the managed property (for example, the type of services).

(6)     The qualified user must bear the risk of loss upon damage or destruction of the managed property (for example, due to force majeure).

(7)     The service provider must agree that it is not entitled to and shall not take any tax position that is inconsistent with being a service provider to the qualified user with respect to the managed property. For example, the service provider must agree not to claim any depreciation or amortization deduction, investment tax credit, or deduction for any payment as rent with respect to the managed property.

(8)     The service provider must not have any role or relationship with the qualified user that, in effect, substantially limits the qualified user's ability to exercise its rights under the contract, based on all the facts and circumstances. A service provider shall not be treated as having a role or relationship prohibited by this provision if: (a) no more than 20 percent of the voting power of the governing body of the qualified user is vested in the directors, officers, shareholders, partners, members, and employees of the service provider, in the aggregate; (b) the governing body of the qualified user does not include the chief executive

3

officer of the service provider or the chairperson (or equivalent executive) of the service provider's governing body; and (c) the chief executive officer of the service provider is not the chief executive officer of the qualified user or any of the qualified user's related parties.

Based upon our review of the foregoing documents, and assuming the accuracy of the information and certifications, and compliance with the covenants, representations, and directions set forth therein, and assuming compliance with the terms of the Agreement, we are of the opinion that neither the Agreement nor any provision thereof, nor the performance by each Party to the Agreement of its respective obligations thereunder (including Operator's administration of the Facility Contracts), adversely affects the exclusion from gross income of interest on the Existing Bonds of the Authority, its Affiliates or another Governmental Body for federal income tax purposes under Section 103 of the Code. In the event that the Service Commencement Date does not occur on or before [•], this opinion shall be redelivered in final form as of the Service Commencement Date, subject to any necessary adjustments taking into account the later date.

This opinion is limited to the specific matter addressed herein and shall not be construed as confirming or restating the Approving Opinions. We have not been engaged to, nor have we undertaken to, determine whether the interest on the Existing Bonds continues to qualify as of this date for exclusion from gross income for federal income tax purposes. Accordingly, we express no opinion on such matter.

This opinion is delivered as of the date hereof and relates solely to the Internal Revenue Code and Treasury regulations as in effect on the date hereof. We disclaim any obligation to advise you or any other person of developments of law or fact covered by this opinion that may occur after the date hereof, including any amendments made subsequent to the date hereof to the documents described above. Furthermore, we express no opinion as to any federal, state or local tax law consequences with respect to the Existing Bonds, or the interest thereon, if any action is taken with respect to the Agreement or the proceeds thereof upon the advice or approval of other counsel.

This opinion is being delivered by us as tax counsel to the FOMB in connection with the Agreement and may not be relied upon by any other person, or used or reproduced for any other purpose, without our prior written consent.

Sincerely,


Nixon Peabody LLP

CONFIDENTIAL

**Exhibit E**

**Form of Commonwealth Certifications**

Operator, for itself and Parent Company (if Operator is a partnership under the Puerto Rico Internal Revenue Code), represents that as of the Effective Date (i) neither it nor Parent Company has any outstanding debts for unemployment insurance, temporary disability (workmen's compensation), or chauffeur's social security with the Department of Labor and Human Resources of the Commonwealth, income taxes with the Department of Treasury of the Commonwealth or real or personal property taxes with the Municipal Revenues Collection Center ("CRIM") or (ii) it or Parent Company have a payment plan in place with respect to any outstanding debt for the foregoing items and have complied therewith.

Operator shall deliver to Owner prior to the Effective Date a copy of its Certificate of Incorporation, Certificate of Organization and Certificate of Authorization to do Business in Puerto Rico issued by the Puerto Rico Department of State, as applicable.

Operator shall also obtain and deliver to Owner, in each case dated no earlier than sixty (60) days prior to the Effective Date, the following:

(i)      a copy of Operator's Merchant's Registration Certificate (Form SC 2918);

(ii)     a Certificate of Good Standing issued by the Puerto Rico Department of State;

(iii)    a certification issued by the Puerto Rico Treasury Department indicating that Operator and Parent Company (if Operator is a Partnership under the Puerto Rico Internal Revenue Code) do not have any debts under any concept, including income tax, with the Commonwealth (Form SC 6096);

(iv)     a Puerto Rico Sales and Use Tax Filing Certification issued by the Puerto Rico Treasury Department reflecting that Operator has filed its Puerto Rico Sales and Use Tax returns for the last sixty (60) tax periods (Form SC 2942);

(v)      an all concepts debt certification issued by CRIM reflecting that Operator does not owe any taxes to CRIM with respect to real or personal property; and

(vi)     a certification issued by the Puerto Rico Child Support Administration for Operator reflecting that Operator is in compliance with the withholdings required to be made by employers under Applicable Law.

Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Puerto Rico Thermal Generation Operation and Maintenance Agreement dated _____.

By:_____
Name:
Title:

CONFIDENTIAL

## Exhibit F

### Form of Anti-Corruption Certifications

We certify under penalty of nullity that no public servant of Owner shall derive or obtain any benefit or profit of any kind from the contractual relationship which is the basis of this invoice. If such benefit or profit exists, the required waiver has been obtained prior to entering into the Agreement. The only consideration to be received in exchange for the delivery of goods or for the O&M Services provided is the agreed-upon price that has been negotiated with Owner or its Representatives. The total amount shown on this invoice is true and correct. The O&M Services have been rendered, and no payment has been received.

Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Puerto Rico Thermal Generation Operation and Maintenance Agreement dated _____.

By:_____
Name:
Title:

CONFIDENTIAL

## Exhibit G

### Form of Acknowledgement of Consent Decree

Operator represents and acknowledges that (i) transfer of the operations subject to the Consent Decree, which operations include provision of the O&M Services and Decommissioning Services for the relevant Legacy Generation Assets, is conditioned upon agreement by Operator to be subject to the obligations under the Consent Decree and the jurisdiction of the United States District Court for the District of Puerto Rico; (ii) at least thirty (30) days prior to the Effective Date, it has been provided with a complete copy of the Consent Decree (including its appendices and attachments) and (iii) it has the required authority, ability, skills, access to funds, technical support and capacity to meet the requirements of the Consent Decree relating to its obligations under the Puerto Rico Thermal Generation Operation and Maintenance Agreement dated _____ (the "Agreement").

Operator represents, acknowledges and agrees that:

(i)     it shall be subject to the obligations under, and become a signatory to, the Consent Decree;

(ii)     it shall be subject to the jurisdiction of the United States District Court for the District of Puerto Rico in connection with the Consent Decree;

(iii)     to assist Owner in taking all necessary steps to make Operator a signatory to the Consent Decree or to obtain any needed U.S. District Court approval;

(iv)     to provide to each person, firm, corporation, contractor, or subcontractor hired to perform any requirement of the Consent Decree (including its attachments or appendices) a copy of all sections of the Consent Decree (including its attachments and appendices) relevant to the employment of the person, firm, corporation, contractor, or subcontractor;

(v)     to condition all contracts or subcontracts entered into upon performance of the requirement(s) in conformity with the terms of the Consent Decree (including its attachments and appendices); and

(vi)     to require that each such person, firm, corporation, contractor, or subcontractor provide written notice of the Consent Decree to all subcontractors hired to perform any portion of any requirement of the Consent Decree.

By: _____
Name:
Title:

1

CONFIDENTIAL

**Exhibit H**

**Form of Consent to Federal Funding**

[•], 2023

[Name of Government Official]
[Government Official's Position]
[Name of Federal Agency]

**Re:     Consent to Federal Funding**

To whom it may concern,

Reference is made to that certain Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement dated as of [•] (as amended, modified or supplemented from time to time in accordance with its terms, the "O&M Agreement") among (i) [*PREPA Genco LLC*] ("Owner"), a [public limited liability company and governmental instrumentality of the Commonwealth of Puerto Rico, created under Act No. 83 of the Legislative Assembly of Puerto Rico, enacted on May 2, 1941], (ii) the Puerto Rico Public-Private Partnerships Authority ("Administrator"), a public corporation of the Commonwealth of Puerto Rico, created by Act No. 29 of the Legislative Assembly of Puerto Rico, enacted on June 8, 2009 ("Act 29") and (iii) [•] ("Operator"), a [•] organized under the laws of [•]. Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the O&M Agreement.

Reference is also made to the faculties and rights vested upon the Administrator by virtue of: (i) Section 10(d) of Act 29, which provides that "the [Administrator], with the assistance of the Partnering Government Entity [(as defined thereunder)] and the [Puerto Rico Fiscal Agency and Financial Advisory Authority], shall oversee the performance and compliance of the Contractor under the Partnership Contract"; (ii) (a) Section 5(b) of Act No. 120 of the Legislative Assembly of Puerto Rico, enacted on June 21, 2018 ("Act 120"), which provides that the Administrator "is hereby designated as the sole Governmental Entity authorized to and responsible for (1) implementing the public policy on PREPA Transactions [(as defined thereunder)] conducted in accordance with this Act…" and (b) Section 5(d) of Act 120, which provides that "[u]pon the consummation of any PREPA Transaction, the [Energy] Commission shall assist the [Administrator] in supervising the performance and compliance of the Contractor with the Partnership or Sales Contract, in accordance with Section 10(d) of [Act 29]"; and (iii) Section 6.2(a)(v) (*Rights and Responsibilities of the Administrator* – Generally) of the O&M Agreement, which provides that Administrator shall "exercise Oversight in relation to Operator's performance of its obligations [thereunder], including performance of the O&M Services [(as defined thereunder)]."

Puerto Rico's Legacy Generation Assets (as defined in the O&M Agreement) are owned by Owner, who shall retain the exclusive right to receive amounts from all Federal Funding for the same, and pursuant to the terms of the O&M Agreement, Operator shall provide the O&M Services for the Legacy Generation Assets. Pursuant to Section 5.8(c) (*Federal Funding – Agent* Designation) of the O&M Agreement, Administrator and Owner hereby consent that Operator

1

**CONFIDENTIAL**

shall act as agent of Owner (and any permitted transferee thereto) in connection with any requests for federal funds for, or actions related to the federal funding of, the Legacy Generation Assets submitted to **[Name of Federal Agency]**.

Sincerely,

PUERTO RICO ELECTRIC POWER
AUTHORITY

PUERTO RICO PUBLIC PRIVATE
PARTNERSHIPS AUTHORITY

_____

_____

Name
Title:

Name
Title: