## **Exhibit M**

FUEL LINE LENDER PSA



**GOVERNMENT OF PUERTO RICO**
PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY

**Municipal Secondary Market Disclosure Information Cover Sheet
Municipal Securities Rulemaking Board (MSRB)
Electronic Municipal Market Access System (EMMA)**

**Additional / Voluntary Event-Based Disclosure**

THIS FILING RELATES TO ALL OR SEVERAL SECURITIES ISSUED BY THE ISSUER, OR ALL OR SEVERAL SECURITIES OF A SPECIFIC CREDITOR:

Issuer's Name: <u>Puerto Rico Electric Power Authority</u>

Other Obligated Person's Name (if any): _____

Nine-digit CUSIP number(s): <u>745268 and 74526Q</u>

**TYPE OF INFORMATION PROVIDED:**

A.  ☐ Amendment to Continuing Disclosure Undertaking
B.  ☐ Change in Obligated Person
C.  ☐ Notice to Investor Pursuant to Bond Documents
D.  ☐ Communication from the Internal Revenue Service
E.  ☐ Bid for Auction Rate and Other Securities
F.  ☐ Capital or Other Financing Plan
G.  ☐ Litigation / Enforcement Action
H.  ☐ Change of Tender Agent.  Remarketing Agent or Other On-going Party
I.  ☐ Derivative or Other Similar Transaction
J.  ☒ Other Event-Based Disclosures: <u>Fuel Line Lender Plan Support and Settlement Agreement.</u>

I represent that I am authorized by the issuer, obligor or its agent to distribute this information publicly.

*/s/ Nelson J. Pérez Méndez*
Nelson J. Pérez Méndez
Puerto Rico Fiscal Agency and Financial Advisory Authority,
    as Fiscal Agent for the Commonwealth and its instrumentalities

Dated: December 1, 2022

Roberto Sánchez Vilella (Minillas) Government Center, De Diego Ave. Stop 22, San Juan, PR 00907  |  PO Box 42001, San Juan, PR 00940-2001

📞 787.722.2525       ✉ contact@aafaf.pr.gov       🖥 aafaf.pr.gov

PUERTO RICO ELECTRIC POWER AUTHORITY

NOTICE OF VOLUNTARY FILING

FUEL LINE LENDER PLAN SUPPORT AND SETTLEMENT AGREEMENT

Pursuant to orders of the United States District Court for the District of Puerto Rico presiding over the debt restructuring case of the Puerto Rico Electric Power Authority ("PREPA") under Title III of the Puerto Rico Oversight, Management, and Economic Stability Act, the Financial Oversight and Management Board for Puerto Rico (the "FOMB") and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") entered into mediation regarding a potential settlement of, among other things, PREPA's indebtedness under certain agreements pursuant to which PREPA was loaned funds to purchase fuel (the "Fuel Line Loans") by certain parties (collectively, the "Fuel Line Lenders").

On December 1, 2022, the FOMB and the Fuel Line Lenders executed a Plan Support and Settlement Agreement (the "FLL PSA").

A copy of the FLL PSA is attached hereto as Exhibit A.

Dated: December 1, 2022

**THIS NOTICE IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A TITLE III PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE INCORPORATED INTO PROMESA SECTION 301. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND PROVISIONS OF PROMESA.**

**EXHIBIT A**

**FLL PSA**

*EXECUTION VERSION*

**THIS PLAN SUPPORT AND SETTLEMENT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A PLAN OF ADJUSTMENT FOR PURPOSES OF PROMESA, SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE OR OTHERWISE.   ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF PROMESA AND THE BANKRUPTCY CODE.   NOTHING CONTAINED IN THIS AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

**THIS PLAN SUPPORT AND SETTLEMENT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS.**

## PLAN SUPPORT AND SETTLEMENT AGREEMENT

This Plan Support and Settlement Agreement (together with the exhibits attached hereto, which include, without limitation, the Term Sheet (as defined herein) attached hereto as **Exhibit A**, as each may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, the "**Agreement**") dated as of December 1, 2022 is entered into by and among: (i) the Financial Oversight and Management Board for Puerto Rico (the "**FOMB**"), as Title III representative of the Puerto Rico Electric Power Authority ("**PREPA**") and (ii) all of the holders of the Fuel Line Loans (as defined herein), as identified on **Annex A**, as such holders may change from time to time in accordance with Section 5(e) (collectively, the "**Fuel Line Lenders**", and each individually, a "**Fuel Line Lender**").  This Agreement collectively refers to FOMB and the Fuel Line Lenders as the "**Parties**" and the FOMB and each Fuel Line Lender individually as a "**Party**."

## RECITALS

**WHEREAS**, PREPA is the borrower of $700,877,093.58 (the "**FLL Prepetition Claim Amount**") in principal amount of loans and other financial accommodations (including interest accrued through July 2, 2017) pursuant to (i) the Credit Agreement dated May 4, 2012, by and among PREPA, Scotiabank de Puerto Rico, and certain lenders (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Scotia Line**"), and (ii) the Trade Finance Facility Agreement, dated July 20, 2012, by and between PREPA and Citibank, N.A. (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Citi Line**," and together with the Scotia Line, the "**Fuel Line Facilities**," and the loans and advances issued under each, collectively, the "**Fuel Line Loans**").

1

**WHEREAS**, as of the date hereof, the total outstanding principal amount of Fuel Line Loans that are beneficially owned by each Fuel Line Lender is set forth on their respective signature pages hereto.

**WHEREAS**, on June 30, 2016, the Puerto Rico Oversight, Management, and Economic Stability Act was signed into law by the President of the United States (P.L. 114-187, "**PROMESA**").

**WHEREAS**, PROMESA established the FOMB and provided the FOMB with certain powers over the finances and restructuring process with respect to the Commonwealth of Puerto Rico and its instrumentalities as provided for in PROMESA, and the FOMB has designated PREPA as a Covered Territorial Instrumentality (as defined in PROMESA).

**WHEREAS**, on July 2, 2017, the FOMB filed a Title III petition on behalf of PREPA (the "**Title III Case**") with the United States District Court for the District of Puerto Rico (the "**Title III Court**").

**WHEREAS**, the FOMB is the Title III representative of PREPA in the Title III Case pursuant to PROMESA section 315(b).

**WHEREAS**, on July 9, 2019, the Fuel Line Lenders filed a complaint and adversary proceeding [Adv. Pro. No. 19-00396] (the "**Priority Litigation**") against the FOMB, PREPA, the Puerto Rico Fiscal Agency and Financial Advisory Authority ("**AAFAF**"), and U.S. Bank National Association, in its capacity as trustee for certain power revenue bonds and power revenue refunding bonds issued and outstanding pursuant to the Trust Agreement, dated as of January 1, 1974, as amended, amended and restated, supplemented or otherwise modified from time to time, between PREPA and U.S. Bank National Association (the "**Trust Agreement**"), asserting, among other things, that the Fuel Line Loans constitute "Current Expenses" under the Trust Agreement and have priority over PREPA's bondholders.

**WHEREAS**, the FOMB, PREPA, AAFAF, and other defendants in the Priority Litigation filed motions to dismiss the Priority Litigation, which motions were terminated without prejudice on September 29, 2022 [Case No. 17-4780, ECF No. 3013].

**WHEREAS**, the Priority Litigation has been stayed since April 2, 2020.

**WHEREAS**, the Parties have engaged in good faith, arm's-length negotiations regarding the (i) consensual resolution of the Priority Litigation and (ii) principal economic terms of a proposed restructuring of the Fuel Line Loans to be implemented in a manner to be mutually agreed upon as set forth in the Term Sheet and in this Agreement.

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment with respect to a plan of adjustment for PREPA, including matters discussed in this Agreement.

**NOW, THEREFORE**, in consideration of the covenants herein, each Party, intending to be legally bound hereby, agrees as follows:

**Section 1.**     *Agreement Effective Date*.  This Agreement shall become effective and binding on each Party immediately upon the execution and delivery of counterpart signatures to this Agreement by each of the FOMB and a majority in number of the Fuel Line Lenders, beneficially owning or controlling, in the aggregate, at least two-thirds of the FLL Prepetition Claim Amount (the "**Agreement Effective Date**").

**Section 2.**     *Settlement*.  In settlement of the Fuel Line Lenders' asserted priority, rights and claims as set forth in the pleadings filed in the Priority Litigation and the Fuel Line Lenders' Proofs of Claim,[1] the Parties agree that the PREPA Title III plan of adjustment, (a) initially filed by the FOMB after the date hereof and each amendment, amendment and restatement, restatement, supplement or modification thereto that is filed by the FOMB after the date hereof, and (b) that becomes effective, shall, in every case, incorporate the terms of the restructuring of the Fuel Line Loans set forth on the term sheet attached hereto as **Exhibit A** (the "**Term Sheet**," and capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Term Sheet) and otherwise include terms and provisions (including, without limitation, conditions to effectiveness) reasonably satisfactory to the Fuel Line Lenders that beneficially own or control, in the aggregate, at least a majority in principal amount of the Fuel Line Loans beneficially owned or controlled, in the aggregate, by the Fuel Line Lenders at such time (the "**Required Lenders**") as supporting claimholders (collectively, the "**Plan**").

**Section 3.**     *Exhibits Incorporated by Reference*.  Each of the exhibits and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the exhibits.

**Section 4.**     *Covenants of the Parties*.

        (a)     Covenants of the FOMB.  The FOMB shall take, and use its best efforts to cause PREPA to take, all actions necessary to obtain, and shall not encourage any other person to, take any action which would, or would reasonably be expected to, impede or preclude the filing of the Plan and a related disclosure statement (the "**Disclosure Statement**"), the approval of the Disclosure Statement and the entry of a confirmation order with respect to the Plan (the "**Confirmation Order**") and the consummation, implementation and administration of the Plan, including the execution and delivery of all definitive documents required to implement the Plan, including an indenture or trust agreement governing the New Bonds (the "**Definitive Documents**"), provided that the Disclosure Statement, the Plan (and its consummation, implementation and administration) and the other Definitive Documents are consistent with the terms herein.  Such actions shall include, but not be limited to:  (i) filing the Plan and Disclosure Statement, in form and substance consistent with this Agreement and reasonably acceptable to the FOMB and the Required Lenders, with the Title III Court by December 9, 2022 or any later date as ordered by the Title III Court, subject to any subsequent amendments not inconsistent with this Agreement and reasonably satisfactory to the Required Lenders; (ii) prosecuting, in a timely and

---

[1] The "*Proofs of Claim*" are the proofs of claim filed by the Fuel Line Lenders on account of the Fuel Line Loans and filed at proofs of claim nos. 44342, 44358, 44378, 44388, 45816, 44378, 45816.

appropriate manner, the approval of the Disclosure Statement and proposed confirmation schedule contemplating a June 2023 confirmation hearing, and confirmation of the Plan; (iii) filing a Confirmation Order reasonably satisfactory to the Required Lenders; (iv) causing the effective date of the Plan (the "**Plan Effective Date**") to occur on or before December 1, 2023; (v) causing the Series A Bonds to be tax-exempt to the extent permitted by law (including seeking any appropriate no-action or clearance determination from the Internal Revenue Service); and (vi) refraining from directly or indirectly commencing or supporting (or continuing to prosecute) any action or proceeding (including in the Priority Litigation), or asserting any claim or objection, against any of the Fuel Line Lenders challenging their asserted priority, rights and claims as set forth in the pleadings filed in the Priority Litigation and the Fuel Line Lenders' Proofs of Claim.[2] The FOMB shall respond to reasonable requests from the advisors to the Fuel Line Lenders as to (x) the status and progress of the Title III Case, including, without limitation, progress in relation to the negotiations of the Plan and Definitive Documents and (y) the status of obtaining any necessary or desirable authorizations (including any consents) with respect to the Plan and Definitive Documents, from any competent judicial body, governmental authority, banking, taxation, supervisory or regulatory body.  The FOMB as representative of PREPA in the Title III Case shall not agree that Reorganized PREPA will provide a recovery to any creditor under the Plan that prevents satisfaction of the Term Sheet.

(b)     Covenants of the Fuel Line Lenders.  From and after the date hereof, provided that (i) this Agreement has not been terminated and (ii) none of the Disclosure Statement, the Plan or any of the Definitive Documents have been filed, amended or modified in a manner adverse to the Fuel Line Lenders and inconsistent with the provisions hereof, each of the Fuel Line Lenders, shall: (A) support (I) approval of the Disclosure Statement in accordance with section 1125 of the Bankruptcy Code, and (II) confirmation of the Plan in accordance with section 1129 of the Bankruptcy Code; (B) subject to receipt of the Disclosure Statement and other solicitation materials in respect of the Plan, as approved by the Title III Court, timely vote, or cause to be voted, all their claims to accept the Plan, in accordance with applicable orders of the Title III Court

---

[2] For the avoidance of doubt, nothing in this Agreement shall preclude the Fuel Line Lenders from asserting or defending their rights and claims — including as to their "Current Expense" priority status — in connection with Plan confirmation or in any adversary proceeding filed by any party (including Adv. Pro. No. 19-00391).  The Fuel Line Lenders shall thus be entitled to make submissions to the Title III Court in support of confirmation of the Plan and in connection with Adv. Pro. No. 19-00391, including submissions supporting their position that PREPA bondholders have at most a "net" revenue lien and claim and that the Fuel Line Lenders have enforceable priority rights vis-à-vis the PREPA bondholders.  Notwithstanding the foregoingwhile this Agreement remains effective and prior to the Termination Date, the Fuel Line Lenders shall not support Sistema de Retiro de los Empleados de la Autoridad de Energía Eléctrica ("**SREAEE**") or any other  third party in opposing confirmation of the Plan, or in seeking relief in Adv. Pro. No. 19-00405 or any appeal therefrom (or another adversary proceeding or appeal addressing the "Current Expense" priority status of the claims of SREAEE or any other third party), based on SREAEE's asserted "Current Expense" priority status under the Trust Agreement, provided that: (1) the FOMB, as the representative of PREPA in the Title III Case, shall waive any and all arguments that any claims, causes of action or positions of the Fuel Line Lenders are affected by any decision or order entered in litigation with SREAEE or any third party regarding the "Current Expense" priority, based on doctrines of issue preclusion, claim preclusion, law of the case or any similar doctrine; and (2) if the Termination Date occurs, the FOMB, as the representative of PREPA in the Title III Case, shall cooperate with the Fuel Line Lenders to set an expedited litigation schedule for disputes relating to the Fuel Line Lenders' "Current Expense" priority status to be heard on the merits, and to use reasonable best efforts to ensure that any appeals relating to the Fuel Line Lenders' "Current Expense" or priority status are heard by or at the same time as appeals relating to SREAEE's "Current Expense" priority status.  For the avoidance of doubt, the commitments shall survive termination of this Agreement.

4

regarding solicitation of votes on the Plan, and not change or withdraw (or cause to be changed or withdrawn) any such accepting vote; and (C) following the Plan Effective Date, move to dismiss the Priority Litigation with prejudice.

(c)     <u>Mutual Covenants</u>.   Each of the Parties, severally and not jointly, covenants that:

(i)  Subject to the terms and conditions hereof, such Party shall support, and otherwise not encourage any other person to take any action which would, or would reasonably be expected to, breach or be inconsistent with the terms herein or impede or preclude the filing of the Plan, the administration of the Title III Case, the approval of the Disclosure Statement, and the entry of the Confirmation Order and the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents, provided that such Disclosure Statement, Confirmation Order and Plan (and its consummation, implementation and administration) and the other Definitive Documents are consistent with the terms herein and the Plan.

(ii) Such Party shall endeavor to avoid litigation of the Fuel Line Lenders' priority prior to the Title III Court's consideration of its settlement in the Plan.

(iii) Such Party will cooperate and negotiate with each other in good faith and exercise reasonable best efforts with respect to the pursuit, approval, negotiation, execution, delivery, and implementation of the Definitive Documents that effectuate the terms set forth in the Term Sheet consistent in all respects with this Agreement.

(iv) Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of adjustment for purposes of PROMESA, sections 1125 and 1126 of the Bankruptcy Code or otherwise.

(v)  Any such offer or solicitation will be made only in compliance with all applicable securities laws and provisions of PROMESA and the Bankruptcy Code, and will not be solicited until the Title III Court has approved the Disclosure Statement and related solicitation materials, and such Disclosure Statement and solicitation materials have been transmitted to parties entitled to receive same.

**Section 5.**     *Transfer of Claims and Interests*.

(a)     For the period commencing as of the Agreement Effective Date until the termination of this Agreement as to any Fuel Line Lender pursuant to the terms hereof, such Fuel Line Lender shall not sell, assign, transfer, or otherwise pledge or dispose of ("**Transfer**") any Fuel Line Loans beneficially owned by such Fuel Line Lender, or any participation, voting, consent or direction rights related to such Fuel Line Loans, or any replacement thereof with trust certificates identifiable by a unique CUSIP in accordance with Section 7, except such Transfer

may be made (i) if the transferee is a Fuel Line Lender at the time of the Transfer or (ii) if the transferee is not a Fuel Line Lender at the time of the Transfer, such transferee (a transferee pursuant to this clause (ii) or the immediately preceding clause (i), a "**Qualified Transferee**") (x) enters into engagement letters with the Fuel Line Lenders' advisors without deviation from the engagement terms already agreed with the existing Fuel Line Lenders, if not already a party thereto, and (y) delivers to counsel to the FOMB and counsel to the Fuel Line Lenders, at or prior to the consummation of the Transfer, the joinder attached hereto as **Exhibit B**, pursuant to which such transferee shall assume all rights (including, without limitation, the right to the Consummation Costs, but not the right to the Professional Fee Reimbursement) and obligations (including, without limitation, the obligation to pay its pro rata share of fees and expenses due under the Fuel Line Facilities) of such Fuel Line Lender transferor hereunder (and such transferee if not already a Fuel Line Lender, shall also be a "Fuel Line Lender" hereunder). To the extent a Transfer violates the provisions of this section, the Transfer shall be void *ab initio* and the applicable Fuel Line Loans and the Fuel Line Lender attempting the Transfer of the Fuel Line Loans shall continue to remain subject to the terms of this Agreement. This Agreement shall in no way be construed to preclude any of the Fuel Line Lenders from acquiring additional Fuel Line Loans; *provided* that any such acquired Fuel Line Loans shall automatically and immediately upon acquisition by a Fuel Line Lender be deemed subject to all terms of this Agreement.

(b)    Notwithstanding anything contained in this Agreement to the contrary, (i) a Fuel Line Lender may Transfer any right, title or interest in the Fuel Line Loans or any trust certificates identifiable by a unique CUSIP for which Fuel Line Loans are exchanged in accordance with Section 7 to a Qualified Marketmaker (as defined below), acting in its capacity as a Qualified Marketmaker, without the requirement that such Qualified Marketmaker be or become a Fuel Line Lender; *provided* that such Qualified Marketmaker subsequently Transfers such right, title or interest in the Fuel Line Loans to a Fuel Line Lender or a Qualified Transferee within the date that is thirty (30) days after such Qualified Marketmaker's acquisition of such right, title or interest; and (ii) to the extent that a Fuel Line Lender is acting in its capacity as a Qualified Marketmaker, it may Transfer any right, title or interest in the Fuel Line Loans that the Qualified Marketmaker acquires from a holder of the Fuel Line Loans that is not a Fuel Line Lender without the requirement that the transferee be or become a Fuel Line Lender.

(c)    "**Qualified Marketmaker**" means an entity that (i) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers debt securities such as the Fuel Line Loans or any trust certificates identifiable by a unique CUSIP for which Fuel Line Loans are exchanged in accordance with Section 7 or enter with customers into long and short positions in debt securities such as the Fuel Line Loans, in its capacity as a dealer or market maker in such Fuel Line Loans; (ii) is in fact regularly in the business of making a market in debt securities; and (iii) if transacting with respect to Fuel Line Loans or trust certificates identifiable by a unique CUSIP for which Fuel Line Loans are exchanged in accordance with Section 7, is registered with the Securities and Exchange Commission and Financial Institutions Regulatory Authority.

(d)    Any disclosures by any Fuel Line Lender to any other Party of its holdings of Fuel Line Loans shall be treated as confidential information by such other Party unless such other Party receives such information through other means that are not subject to a duty of

confidentiality.   The foregoing shall not prohibit the FOMB from disclosing the aggregate principal amount of Fuel Line Loans held by the Fuel Line Lenders collectively.

(e)     The Fuel Line Lenders as of the date hereof are listed on **Annex A** hereto, along with their current holdings of Fuel Line Loans under each of the Fuel Line Facilities. Fuel Line Lenders may be added or removed from this Agreement from time to time, in accordance with the terms of this Agreement upon delivery by counsel to the Fuel Line Lenders of a notice to the FOMB with an updated **Annex A**, and, in the case of the addition of a person to the Fuel Line Lenders who is not otherwise party to this Agreement, execution by such person of a joinder in the form of **Exhibit B** hereto and delivery of such joinder to counsel to the FOMB and counsel to the Fuel Line Lenders.

(f)     In furtherance of the foregoing, the FOMB shall take, and use its reasonable best efforts to cause PREPA to take, all actions necessary to consent to assignments of the Fuel Line Loans in accordance with the Fuel Line Facilities and this Section 5, as applicable.

**Section 6.**     *Representations and Warranties*.

6.01.   <u>Mutual Representations and Warranties</u>.   Each Party hereby, severally and not jointly, represents and warrants to the other Parties that the following statements are true and correct as of the date hereof (or in the case of a Qualified Transferee that is not a Fuel Line Lender as of the date hereof, the date such Qualified Transferee becomes a Fuel Line Lender):

(a)     such Party has the legal right, power and authority to enter into this Agreement;

(b)     such Party is duly organized and validly existing and in good standing under the laws of the jurisdiction of its organization with full power and authority to execute and deliver, and to perform and observe the terms and provisions of, this Agreement; and

(c)     the execution, delivery, performance and observance of this Agreement by such Party (i) has been duly authorized by all necessary action on the part of such Party, does not and will not conflict with, or result in a violation of, any law applicable to it, and does not require it to obtain any permit, consent, approval, order or authorization of, or provide notice to or make a filing with, any court, governmental or regulatory agency or authority or other person or entity that has not been obtained, provided or made, as applicable, (ii) except to the extent modified, stayed or otherwise excused by PROMESA, (A) with respect to the FOMB, does not contravene, or constitute a default under, any provision of applicable law or regulation or of any agreement, judgment, injunction, order, decree or other instrument binding on the FOMB, as applicable and (B) with respect to each Party, do not and will not violate, conflict with, or result in the breach of any provision of its organizational or governance documents and (iii) does not and will not result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, any note, bond, mortgage, indenture, contract, agreement, lease, sublease, license, permit, franchise or other instrument or arrangement to which it is a party, which would materially adversely affect its

7

ability to carry out its obligations under and otherwise observe this Agreement or cause the occurrence of a Termination Event.

6.02.    Additional Representations of Fuel Line Lenders.  Each Fuel Line Lender severally and not jointly represents, warrants, and covenants to each other Party that the following statements are true, correct, and complete as of the date of this Agreement (or in the case of a Qualified Transferee that is not a Fuel Line Lender as of the date hereof, the date such Qualified Transferee becomes a Fuel Line Lender) (each of which is a continuing representation, warranty, and covenant): that it beneficially owns or has investment management responsibility for accounts that beneficially own Fuel Line Loans in the principal amount set forth on its respective signature page hereto or joinder to this Agreement in the form of **Exhibit B** (as applicable), which it would be entitled to vote in a plan solicitation, and that it has not sold, assigned, transferred, participated or otherwise pledged such Fuel Line Loans, or any voting, consent or direction rights related to such Fuel Line Loans, to any other person or entity, that would prevent or adversely affect in any way such Fuel Line Lender's performance of its obligations contained in this Agreement at the time such obligations are required to be performed, in each case, except as permitted by Section 5 of this Agreement.

**Section 7.**    *Conversion to Trust Certificates*.  The FOMB covenants to employ its reasonable best efforts to cause the exchange of the Fuel Line Loans beneficially owned by the Fuel Line Lenders for trust certificates identifiable by a unique CUSIP prior to January 31, 2023.  Any such replacement trust certificates shall remain Fuel Line Loans for all purposes of this Agreement and any holder thereof shall be bound by all applicable provisions of this Agreement.

**Section 8.**    *Amendments and Waivers*.  The terms and conditions of this Agreement, including any exhibits, annexes or schedules to this Agreement, may not be waived, modified, amended, or supplemented without the written consent of (a) the FOMB and (b) the Fuel Line Lenders that beneficially own or control, in the aggregate, at least two-thirds in principal amount of the aggregate amount of the Fuel Line Loans outstanding under the Fuel Line Facilities at such time; provided that, (i) if any material provision of the Term Sheet (or the Plan incorporating the Term Sheet) or of Sections 5 or 9 of this Agreement is materially amended, modified, supplemented or waived without the written consent of a Fuel Line Lender in a manner materially adverse to such Fuel Line Lender, then such Fuel Line Lender shall have the right to withdraw from this Agreement in accordance with Section 9.02(d) hereof and (ii) that any waiver, modification, amendment or supplement to this Section 8 shall require the written consent of the FOMB and each Fuel Line Lender.

**Section 9.**    *Termination*.

9.01.    Mutual Consent.  This Agreement may be terminated by the mutual consent of (a) the FOMB and (b) the Required Lenders.

9.02.    Termination Events.

(a)    This Agreement may be terminated by (x) the FOMB or (y) the Required Lenders, in each case upon five (5) business days' prior written notice delivered to the other aforementioned Parties after the occurrence of any of the following events (each, a

"**Termination Event**"); provided, however, that this Agreement may be terminated solely by the Required Lenders (and not the FOMB) upon the occurrence of the Termination Event set forth in clauses (ii), (iv), (v), (vii), (xi), (xii), (xiii) and (xiv) below, solely by the FOMB (and not the Fuel Line Lenders) upon the occurrence of the Termination Event set forth in clauses (vi) and (viii) below, and solely by a non-breaching Party (and not the other Parties) upon the occurrence of the Termination Event set forth in clause (i) below:

(i)  following the delivery of written notice thereof by a non-breaching Party, the occurrence of a material breach by any of the Parties of any of its obligations, representations, warranties, covenants or commitments set forth in this Agreement that is either unable to be cured or is not cured within five (5) business days following the delivery of such notice; provided that the FOMB cannot terminate this Agreement under this Section 9.02(a)(i) so long as the non-breaching Fuel Line Lenders (A) are more than one-half in number of the Fuel Line Lenders, (B) beneficially own or control, in the aggregate, at least two-thirds of the FLL Prepetition Claim Amount, and (C) the breaching Fuel Line Lender(s) or its successors do not file or prosecute a confirmation objection or other litigation that could render the Plan unconfirmable;

(ii)  the FOMB publicly disavows any of the terms set forth in this Agreement (including on the Term Sheet) or enters into, or publicly supports, a proposed transaction, disclosure statement, plan of adjustment, legislation, confirmation order or definitive documentation in connection therewith (by amendment or otherwise) materially inconsistent with such terms;

(iii)  the dismissal of the Title III Case;

(iv)  the determination by the FOMB (A) not to proceed with the transactions materially consistent with those contemplated by the Agreement or (B) to proceed with a transaction that would be materially inconsistent with the terms of, or the transactions contemplated by, this Agreement;

(v)  the Plan Effective Date does not occur on or before December 1, 2023;

(vi)  the Fuel Line Lenders cease to collectively beneficially own or control, in the aggregate, at least two-thirds of the FLL Prepetition Claim Amount;

(vii)  the FOMB directly or indirectly commences or supports (or continues to prosecute) any action or proceeding (including in the Priority Litigation), or asserts any claim or objection, against any of the Fuel Line Lenders challenging their asserted priority, rights and claims as set forth in the pleadings filed in the Priority Litigation and the Fuel Line Lenders' Proofs of Claim; provided, for the avoidance of doubt, any opposition by the FOMB to any priority asserted by SREAEE or any other entity shall not be a Termination Event;

(viii)  any of the Fuel Line Lenders continues or attempts to continue the Priority Litigation against the FOMB or PREPA;

(ix)  the Title III Court enters an order (A) granting any relief that would impair the Parties' ability to perform their respective obligations under this Agreement in

9

any material respect, including, without limitation, denying confirmation of the Plan or (B) that is materially inconsistent with the Term Sheet;

(x)     the Title III Court approves either the *Motion of the Ad Hoc Group of PREPA Bondholders, Assured Guaranty Corp., Assured Guaranty Municipal Corp., National Public Finance Guarantee Corporation, and Syncora Guarantee, Inc. to Dismiss PREPA's Title III Case, or for Relief from the Automatic Stay to Enforce Their Right to a Receiver (Docket Entry No. 22291 in Case No. 17-3283 and Docket Entry No. 2973 in Case No. 17-4780)* or the *Motion of the Ad Hoc Group of PREPA Bondholders, Assured Guaranty Corp., Assured Guaranty Municipal Corp., National Public Finance Guarantee Corporation, and Syncora Guarantee, Inc. for Authorization to File a Combined Motion to Dismiss PREPA's Title III Case and Alternative Request for Relief from the Automatic Stay (Docket Entry No. 2971 in Case No. 17-4780)*;

(xi)     the Puerto Rico Energy Bureau ("**PREB**") denies the Transition Charge and the Title III Court does not require PREB to reverse its decision within sufficient time to allow the Plan Effective Date to occur on or before December 1, 2023;

(xii)    the Confirmation Order is reversed, dismissed, or vacated without the prior written consent of the Required Lenders and the Title III Court does not within ninety (90) days enter a revised order confirming the Plan reasonably acceptable to the FOMB and the Required Lenders;

(xiii)   the Disclosure Statement has not been approved on or before April 30, 2023; or

(xiv)    the Confirmation Order has not been approved by the Title III Court on or before August 31, 2023.

(b)     This Agreement shall automatically terminate on the Plan Effective Date.

(c)     The date on which this Agreement is terminated in accordance with the provisions of Section 9.01, Section 9.02(a) or Section 9.02(b) shall be referred to as the "**Termination Date**".  On the Termination Date, the provisions of this Agreement shall terminate, except as otherwise provided in this Agreement, unless the FOMB and the Required Lenders waive, in writing, the occurrence of the Termination Event giving rise to the occurrence of such Termination Date.  Notwithstanding (1) any Transfer of Fuel Line Loans in accordance with this Agreement or (2) the termination of this Agreement in accordance with its terms, the agreements and obligations of the parties in Section 10 (other than Section 10.03) and any confidentiality agreement in place prior to the date hereof between the FOMB and any Fuel Line Lender shall survive such Transfer and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.

(d)     If any material provision of the Term Sheet (or the Plan incorporating the Term Sheet) or of Section 5 or this Section 9 is materially amended, modified, supplemented or waived without the written consent of a Fuel Line Lender in a manner materially adverse to such Fuel Line Lender, such Fuel Line Lender shall have the right to withdraw from this

Agreement within five (5) business days of receiving notice of such amendment, modification, supplement or waiver by delivering notice of such withdrawal to counsel to the FOMB and counsel to the Fuel Line Lenders. Such withdrawal shall be effective two (2) business days after delivery of such notice of withdrawal (to the extent such amendment or withdrawal are not rescinded), whereupon this Agreement shall terminate solely as to such Fuel Line Lender and such Fuel Line Lender shall no longer be a Party hereto.

(e)     If at any time a Fuel Line Lender is no longer the beneficial owner of any Fuel Line Loans subject to this Agreement as a result of a Transfer that complies with Section 5 hereof, then this Agreement shall terminate solely as to such Fuel Line Lender, and such Fuel Line Lender shall no longer be a Party hereto unless and until such Fuel Line Lender subsequently becomes a beneficial owner of any Fuel Line Loans whereupon it will automatically be deemed to be a Fuel Line Lender under this Agreement.

(f)     No Party may terminate this Agreement upon a Termination Event if such Termination Event is the result of such Party unreasonably failing to perform or comply in any material respect with the terms and conditions of this Agreement; provided, however, that nothing in this Section 9 shall relieve any Party of liability for any breach or non-performance of this Agreement occurring prior to the Termination Date.

**Section 10.**     *Miscellaneous*.

10.01.  Entire Agreement.  This Agreement constitutes the entire agreement among the Parties with respect to the settlement of the Priority Litigation, the Plan, and the restructuring process contemplated herein and supersedes all prior oral or written agreements, statements, and acts among the Parties with respect thereto.  Notwithstanding the forgoing, to the extent a Fuel Line Lender entered into a confidentiality agreement with the FOMB prior to the date hereof, the terms of such confidentiality agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such confidentiality agreements.

10.02.  Only Express Releases.  No Party waives or releases any rights except as expressly provided herein.

10.03.  Further Assurances.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters specified herein, at their own expense, as may be reasonably appropriate or necessary, or as may be required by order of the Title III Court from time to time, to effectuate the terms of this Agreement.

10.04.  Headings.  The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern or limit any term or provision hereof.  Headings may aid in interpretation solely to the extent not inconsistent with express provisions of this Agreement.

10.05.  GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO

CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO ANY CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.  Each Party shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement in the Title III Court (or court of proper appellate jurisdiction) (the "**Chosen Court**"), and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the subject matter and personal jurisdiction of the Chosen Court; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Court; and (c) waives any objection that the Chosen Court is an inconvenient forum or does not have jurisdiction over any Party hereto.  If the Title III Court determines it lacks subject matter jurisdiction and the determination becomes final and no longer subject to appeal, the action shall be brought in the United States District Court for the Southern District of New York if it has subject matter jurisdiction, and otherwise brought in the New York Supreme Court in Manhattan.

10.06.  <u>Trial by Jury Waiver</u>.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

10.07.  <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

10.08.  <u>Rules of Construction</u>.  When a reference is made in this Agreement to a section or exhibit, such reference shall be to a section or exhibit, respectively, of or attached to this Agreement unless otherwise indicated.  Unless the context of this Agreement otherwise requires, (a) words using the singular or plural number also include the plural or singular number, respectively, (b) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement, (c) the words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," and (d) the word "or" shall not be exclusive and shall be read to mean "and/or."  "Writing," "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form, and any requirement that any notice, consent or other information shall be provided "in writing" shall include email.  Any reference to "business day" means any day, other than a Saturday, a Sunday or any other day on which banks located in New York, New York are closed for business as a result of federal, state or local holiday and any other reference to day means a calendar day.

10.09.  <u>Interpretation; Representation by Counsel</u>. This Agreement is the product of negotiations among the Parties and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Parties were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by

counsel and, therefore, waive the application of any law, regulation, holding or rule of construction (a) providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document or (b) any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel.

10.10. <u>Successors and Assigns; No Third Party Beneficiaries</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity, except as permitted herein.

10.11. <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered by electronic mail, courier, or registered or certified mail (return receipt requested) (and if by any method other than electronic mail, then with a copy by electronic mail) to the following addresses (or at such other addresses as shall be specified by like notice):

    (a)    if to the FOMB, to:

        Proskauer Rose LLP
        11 Times Square
        New York, NY 10036
        Attention: Martin Bienenstock, Paul V. Possinger, and Ehud Barak
        Email: mbienenstock@proskauer.com;
        ppossinger@proskauer.com; ebarak@proskauer.com

    (b)    if to the Fuel Line Lenders, to:

        Wachtell, Lipton, Rosen & Katz
        51 West 52nd Street
        New York, New York 10019
        Attention: Richard Mason and Stephanie Marshak
        Email: rgmason@wlrk.com; samarshak@wlrk.com

or such other address as may have been furnished by a Party to each of the other Parties by notice given in accordance with the requirements set forth above.  Any notice given by delivery, mail (electronic or otherwise), or courier shall be effective when received.

10.12. <u>Independent Analysis</u>.  Each Party confirms its decision to execute this Agreement has been based upon its independent assessment of documents and information available to it, as it has deemed appropriate.

10.13. <u>Waiver</u>.  Except as expressly provided herein, no Party shall be deemed to have waived any rights as a result of its entry into this Agreement, and, if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.

10.14. <u>Relationship Among Parties</u>.  Notwithstanding anything herein to the contrary, (a) the agreements, representations, warranties, liabilities, duties, and obligations of the Parties

under this Agreement are, in all respects, several and not joint and several, (b) no Party shall have any responsibility by virtue of this Agreement for any trading by any other entity; (c) no prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Agreement; (d) the Parties hereto acknowledge this Agreement does not constitute an agreement, arrangement or understanding with respect to acting together for the purpose of acquiring, holding, voting or disposing of any securities of PREPA and the Parties do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended; (e) none of the Parties shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities in any kind or form to each other; and (f) no action taken by any Party pursuant to this Agreement shall be deemed to constitute or to create a presumption by any of the Parties that the Parties are in any way acting in concert or as such a "group."

10.15.  _Specific Performance_.  Each of the Parties acknowledges that money damages are an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach of this Agreement, including, without limitation, an order of the Title III Court or such other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder. Notwithstanding anything contained in this Agreement to the contrary, specific performance and injunctive or other similar relief and the right to terminate this Agreement in accordance with the terms and provisions hereof shall be the sole and exclusive remedies for any breach of this Agreement by any Party (or any other person) and no Party (or any other person) shall be entitled to monetary damages for any breach of any provision of this Agreement.  For the avoidance of doubt, any consent right, termination right or withdrawal right provided to a Fuel Line Lender under this Agreement shall be cumulative to, and not in lieu of, any other consent right, termination right or withdrawal right provided to such Fuel Line Lender hereunder.  The Parties acknowledge and agree that the giving of notice of termination by any Fuel Line Lender in accordance with this Agreement shall not be a violation of the automatic stay; provided that nothing herein shall prejudice any rights to argue that the giving of notice of termination was not in accordance with the terms of this Agreement.

10.16.  _Severability and Construction_.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, in whole or in part, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible if the new agreement provides each Party with an economic outcome not materially adverse to its original economic outcome.  If the same economics are not reconstructed without material change, this Agreement shall terminate with each Party restored to its rights upon entering into this Agreement.

10.17.  _Public Disclosure_.  Any public filing of this Agreement, with the Title III Court or otherwise, that includes executed signature pages to this Agreement shall include such signature pages only in redacted form with respect to the Fuel Line Loans held by each Fuel Line Lender. For the avoidance of doubt, nothing in this Agreement absolves the Fuel Line Lenders from their duties to comply with Bankruptcy Rule 2019 and the Case Management Order in the Title III Case.

14

10.18.  <u>Settlement Discussions</u>.  This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties.  This Agreement is the product of the mediation ordered by the Title III Court on April 8, 2022, and all negotiations relating thereto are subject to the *Order Establishing the Terms and Conditions of Mediation (Docket Entry No. 2773 in Case No. 17-4780)*, as such order is amended, restated, supplemented, or otherwise modified from time to time.  In addition, pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

[*Remainder of page intentionally left blank.*]

**IN WITNESS WHEREOF**, the Parties have executed this Agreement on the day and year first above written.

Financial Oversight and Management Board for Puerto Rico

By: _____

Name:  Jaime A. El Koury

Title:   General Counsel

[Signature Page to Plan Support and Settlement Agreement]

**[FUEL LINE LENDERS' SINGATURE PAGES REDACTED]**

## **Exhibit A**

**Term Sheet**

**PLAN TERM SHEET**

*This Plan Term Sheet does not address all material terms that would be required in definitive documents and to consummate the transactions set forth in the Plan Support and Settlement Agreement (the "**PSA**" or the "**Agreement**"), to which this Plan Term Sheet is annexed, and this Plan Term Sheet, which terms shall be mutually agreed on by the Parties.  Nothing in this Plan Term Sheet shall constitute a binding commitment of any Party or constitute an admission or representation of any fact or circumstance or an admission of any liability or waiver of any right or claim.  Unless and until the execution of definitive documentation, the Parties shall retain their respective rights.  If executed, the terms of such definitive documentation will control.  This Plan Term Sheet is not  (nor shall it be construed as) an offer with respect to any securities or solicitation of votes for the acceptance of a plan of adjustment for purposes of PROMESA, sections 1125 and 1126 of the Bankruptcy Code or otherwise.*

*Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the PSA.*

| | |
|---|---|
| **CLAIM ALLOWANCE AND CLASSIFICATION** | ▪ The Fuel Line Lenders' claims will be deemed allowed (not subject to challenge, objection or revocation) in the FLL Prepetition Claim Amount and will collectively be treated as one class of claims, distinct from all other classes of claims, without any distinction in treatment as between the claims arising under the Scotia Line and the Citi Line. |
| **INTEREST ACCRUAL** | ▪ The Fuel Line Lenders shall be entitled to interest on the Series A Bonds to be issued to them under the Plan at the Exchange Ratio below, the accrual of which shall commence upon the Agreement Effective Date and continue through the Plan Effective Date, at a rate of 6.0% per annum; <u>provided</u>, the amount of interest accrued prior to the Plan Effective Date shall not exceed one (1) year of accrual.  The accrued interest hereunder shall be payable upon the Plan Effective Date in the form of additional Series A Bonds or cash, at the FOMB's sole discretion. |
| **EXCHANGE RATIO** | ▪ 84% of FLL Prepetition Claim Amount, to be paid in Series A Bonds. |
| **NEW BONDS** | ▪ Other than cash consideration paid on the Plan Effective Date, reorganized PREPA ("**Reorganized PREPA**") shall issue on the Plan Effective Date to PREPA's creditors only Series A Bonds, Series B Bonds, or other bonds as long as such other bonds (a) are subordinate in principal payment priority to the Series A Bonds, (b) do not in any way affect the terms of the Series A Bonds as set forth in this Term Sheet, and (c) are not secured by any collateral not pledged as security for the Series A Bonds. |
| **TRANSITION CHARGE** | ▪ Transition Charge means a hybrid connection charge and volumetric charge to be added to customers' bills to pay the New Bonds, in structure and amounts that do not change the Series A Bonds' expected repayment date and expected weighted average life as set forth herein, and otherwise that are reasonably acceptable to the Required Lenders. |
| **SERIES A BONDS** | ▪ Series A Bonds, which will be issued only to the Fuel Line Lenders, will have first priority of principal repayment following payment of accrued interest on all outstanding New Bonds. |

| | |
|---|---|
| | ▪ If unpaid at the Series A Bonds' Final Maturity, the Series A Bonds will remain outstanding until paid in full in cash, but will cease accruing interest as of the Series A Bonds' Final Maturity. |
| **SERIES B BONDS** | ▪ Series B Bonds shall be distributed to (a) holders of Fuel Line Loans in an amount up to the Remaining Claims of the Fuel Line Lenders and on the satisfaction of the conditions set forth below under Treatment Protections and (b) other creditors of PREPA. |
| | ▪ No principal shall be paid on the Series B Bonds until the Series A Bonds have been paid in full in cash.  Thereafter, Series B Bonds shall receive 100% of the Transition Charge revenues, which shall be applied first to interest due and owing, and second to principal. |
| | ▪ If unpaid at the Series B Bonds' Final Maturity, the Series B Bonds will remain outstanding until paid in full in cash, but will cease accruing interest as of the Series B Bonds' Final Maturity. |
| **FINAL MATURITY** | ▪ Series A Bonds:  15 year stated final maturity[1] (5 year expected repayment; 3 year expected weighted average life). |
| | ▪ Series B Bonds:  50 year stated final maturity (35 year expected repayment). |
| | Expected repayment periods are based on Fiscal Plan demand, customer data and rates included in the FOMB's November 8, 2022 proposal to the Fuel Line Lenders, subject to the Payment Waterfall. |
| **COUPON** | ▪ Series A Bonds:  6.00% cash interest |
| | ▪ Series B Bonds:  6.00% cash interest |
| **TAX TREATMENT** | ▪ Series A Bonds:  Tax-exempt |
| | ▪ Series B Bonds:  Tax-exempt |
| **CALL PROTECTION** | ▪ Series A Bonds:  Callable after 10 years at par |
| | ▪ Series B Bonds:  Callable after 10 years at par |
| **SECURITY** | ▪ The New Bonds shall be secured by, and paid solely from, Reorganized PREPA's net revenues, and the right to receive such net revenues, up to the amount of the Transition Charge revenues, in accordance with the Payment Waterfall.  For the avoidance of doubt, the New Bonds' liens and claims are not limited to the net revenues deposited in the Debt Service Fund. |
| **ACCOUNTS AND PAYMENT WATERFALL** | ▪ All revenues shall be deposited in the general fund held by Reorganized PREPA. |

---

[1] Subject to modification based on agreed upon covenants and Transition Charge, to be negotiated among the Parties.

|  | ▪ On the first business day of each month, Reorganized PREPA shall apply amounts in the following order of priority (the "**Payment Waterfall**"):<br><br>- *First*, to the payment of Operating Expenses;[2]<br><br>- *Second*, to the payment of New Bond trustee fees and expenses not to exceed $100,000 per year;<br><br>- *Third*, to the Debt Service Fund (as defined below) up to the amount of the Transition Charge revenues (to be distributed in accordance with the provisions hereof);<br><br>- *Fourth*, to the payment of capital expenditures;<br><br>- *Fifth*, to the payment of subordinate debt (if any); and<br><br>- *Sixth*, for general corporate purposes. |
|---|---|
| **DEBT SERVICE FUND** | ▪ From and after the Plan Effective Date, until the New Bonds have been paid or satisfied in full in accordance with their terms, Reorganized PREPA shall deposit, in accordance with the Payment Waterfall, monies up to the amount of the Transition Charge revenues to the credit of the "Debt Service Fund" which shall be held by the New Bond trustee.  Such monies deposited in the Debt Service Fund shall be applied, to the extent available, by the New Bond trustee:<br><br>- *First*, to the payment of stated interest due and payable on the New Bonds;<br><br>- *Second*, to the payment of principal on the Series A Bonds until repaid; and<br><br>- *Third*, to the payment of principal on the Series B Bonds. |
| **INTEREST RATE COVENANT** | ▪ Until the earlier of repayment of the Series A Bonds or the Final Maturity of the Series A Bonds, if, in any given year, the Transition Charge revenues deposited in the Debt Service Fund are insufficient to satisfy the interest due and owing on the New Bonds that fiscal year, Reorganized PREPA shall (and absent Reorganized PREPA's action, the New Bond trustee or a receiver on behalf of the New Bonds shall) (a) exercise its powers to the fullest extent of the law to implement an |

---

[2] "***Operating Expenses***" shall mean Reorganized PREPA's reasonable and necessary current expenses of maintaining, repairing and operating the system and shall include, without limiting the generality of the foregoing, all administrative expenses, insurance premiums, expenses of preliminary surveys not chargeable to capital expenditures, engineering expenses relating to operation and maintenance, legal expenses, any payment to pension, pension trust, or retirement funds, and all other expenses required to be paid by Reorganized PREPA under the provisions of the definitive documentation governing the New Bonds or by law, or permitted by standard practices for public utility systems, plus a reserve of up to two months of expenditures for the foregoing as reasonably estimated by Reorganized PREPA from time to time.

| | |
|---|---|
| | increase in the Transition Charge sufficient to repay such interest due and payable on the New Bonds in the succeeding fiscal year and/or (b) initiate a rate case before PREB or any other proceeding to compel PREB to implement an increase in the Transition Charge sufficient to repay such interest due and payable on the New Bonds in the succeeding fiscal year (the "**_Interest Rate Covenant_**"). |
| **PAYMENT DEFAULT** | ▪ There shall be no event of default on the New Bonds for failure to pay scheduled debt service prior to the Final Maturity, as applicable, so long as Reorganized PREPA (a) charges and employs its reasonable best efforts to collect revenues generated by the Transition Charge, and the full amount collected under the Transition Charge is deposited into the Debt Service Fund in accordance with the Payment Waterfall and (b) complies with the Interest Rate Covenant. |
| **REMEDIES** | ▪ Upon the occurrence of an event of default, the New Bond trustee's sole remedies shall be to:  (a) seek enforcement of Reorganized PREPA's obligation to take reasonable measures to collect revenues generated by the Transition Charge and deposit such monies received into the Debt Service Fund in accordance with the Payment Waterfall, and/or (b) prior to the Final Maturity, as applicable, at the request of 25% or more of the Series A Bonds, enforce the Interest Rate Covenant.<br><br>▪ The Plan and New Bond Indenture shall provide the "Right to Receivership Upon Default," codified at 22 L.P.R.A. § 207, is preempted and waived.  There shall be no right of acceleration under the New Bonds other than an acceleration in connection with an insolvency proceeding (including under Title III of PROMESA).<br><br>▪ The FOMB shall use reasonable best efforts to obtain PREB approval and court ordered protections for the Interest Rate Covenant and Reorganized PREPA's obligations to charge, collect, and pay Transition Charge revenues as provided herein.  For the avoidance of doubt, reasonable best efforts with respect to the foregoing sentence includes incorporating such protections in the draft Confirmation Order filed with the Title III Court. |
| **TREATMENT PROTECTIONS** | ▪ If the FOMB and PREPA prevail in, or agree to a settlement of, the litigation against PREPA's bondholders [Adv. Pro. No. 19-00391], and as a result there exist Series B Bonds to be issued under the Plan available for distribution in excess of Series B Bonds allocated for initial treatment of claims, the Remaining Claim[3] of the Fuel Line Lenders (which equals 16% of the FLL Prepetition Claim Amount) will receive such excess Series B Bonds on a pro-rata basis with the |

---

[3]  "**_Remaining Claim_**" means, with respect to any allowed claim, the amount of such allowed claim that is unpaid, after subtracting from the total amount of the allowed claim, the treatment, if any, such holder has received on account of such allowed claim at the time the Remaining Claim is calculated.

| | Remaining Claims of unsecured creditors of PREPA (including the Remaining Claims of any class of settling bondholders and pension claims); <u>provided</u> the Fuel Line Lenders shall not receive New Bonds exceeding the FLL Prepetition Claim Amount except as provided below for Consummation Costs and Professional Fee Reimbursement, as applicable. |
|---|---|
| **FEDERALLY-DECLARED DISASTERS** | ▪ In the event of a Federally-declared disaster as a result of a storm or other catastrophic event that disrupts Reorganized PREPA's operations such that Reorganized PREPA cannot collect Transition Charge revenue necessary to cover Operating Expenses and the debt service payable on the New Bonds for a given fiscal year, Reorganized PREPA may elect, in its sole discretion, to defer debt service on up to two (2) consecutive semi-annual debt service payments.<br><br>▪ For the avoidance of doubt, if Reorganized PREPA exercises such election, interest on the New Bonds will continue to accrete until paid. All deferred principal and interest related to such Series A Bonds impacted by such election shall be paid on or before the earlier of the Series A Bonds' Final Maturity or five (5) years after the end of such debt service deferral period. |
| **DEFINITIVE DOCUMENTATION** | ▪ The New Bonds shall be documented under an indenture or trust agreement on the terms set forth in the Agreement and this Term Sheet and otherwise on terms customary for transactions of this type, as negotiated among the Fuel Line Lenders, the FOMB and other prospective holders of Series B Bonds pursuant to the Plan, as appropriate, which terms shall be reasonably acceptable to the FOMB and the Required Lenders. Without limiting the foregoing, the New Bonds, when issued, shall be subject to an "additional bonds test" to be agreed upon among the Parties in the Definitive Documents. |

| **CONSUMMATION COSTS AND PROFESSIONAL FEE REIMBURSEMENT** | ▪ In consideration for the Fuel Line Lenders' assistance in formulating the plan of adjustment and to compensate for the reasonable fees and expenses incurred in negotiating and executing the Agreement, and definitively documenting such Agreement, the Fuel Line Lenders shall receive (a) consummation costs of $15 million and (b) reimbursement of up to $11 million in documented professional fees, payable upon the Plan Effective Date in the form of additional Series A Bonds or cash, at the FOMB's sole discretion.  The Consummation Costs will be payable pro rata to each Fuel Line Lender, including Qualified Transferees after they become Fuel Line Lenders in accordance with Section 5 of the Agreement.  The Professional Fee Reimbursement will be allocated as follows: 10% to the Fuel Line Lender of record as of the Agreement Effective Date (party to the PSA as of the Agreement Effective Date) under the Citi Line and 90% to Fuel Line Lenders (party to the PSA as of the Agreement Effective Date) under the Scotia Line (and *pro rata* among such Fuel Line Lenders).  For the avoidance of doubt, the Professional Fee Reimbursement will not be payable to Qualified Transferees. |
|---|---|
| **RELEASE** | ▪ The Parties shall release each other to the maximum extent permitted by law.  At the request of the FOMB, the Fuel Line Lenders shall release any other party in interest that may be liable on account of the Fuel Line Loans. |

## **Exhibit B**

**Form of Joinder**

# FORM OF JOINDER AGREEMENT

This Joinder Agreement (this "**Joinder Agreement**") to the Plan Support and Settlement Agreement (as amended, supplemented or otherwise modified from time to time, the "**Agreement**"), dated as of December 1, 2022 by and among: (i) the Financial Oversight and Management Board for Puerto Rico ("**FOMB**"), as Title III representative of the Puerto Rico Electric Power Authority ("**PREPA**"), and (ii) all of the holders of Fuel Line Loans, as identified on **Annex A** thereto and party thereto, as such holders may change from time to time in accordance with Section 5(e) thereof (collectively, the "**Fuel Line Lenders**"), is executed and delivered by [_____] (the "**Joining Fuel Line Lender**") as of _____, 202_.  Each capitalized term used herein but not defined herein shall have the meaning set forth in the Agreement.

1.  <u>Agreement to be Bound</u>.  The Joining Fuel Line Lender hereby agrees to be bound by all of the terms of the Agreement, including that the Joining Fuel Line Lender shall assume all rights (including, without limitation, the right to the Consummation Costs, but not the right to the Professional Fee Reimbursement) and obligations (including, without limitation, the obligation to pay its pro rata share of fees and expenses due under the Fuel Line Facilities) of a Fuel Line Lender under the Agreement.  The Joining Fuel Line Lender shall hereafter be deemed to be a "Fuel Line Lender" and a Party for all purposes under the Agreement, including for the avoidance of doubt with respect to any Fuel Line Loans held by the Joining Fuel Line Lender as of the date of this Joinder Agreement.

2.  <u>Representations and Warranties</u>.  With respect to the aggregate principal amount of Fuel Line Loans held by the Joining Fuel Line Lender, including upon consummation of Transfer of Fuel Line Loans to the Joining Fuel Line Lender, the Joining Fuel Line Lender hereby makes, as of the date hereof, the representations and warranties of the Fuel Line Lenders set forth in Sections 6.01 and 6.02 of the Agreement to each of the other Parties to the Agreement.

3.  <u>Governing Law</u>.  Section 10.05 of the Agreement is incorporated by reference as if set forth fully herein, except that any references to "Agreement" shall be replaced with references to Joinder Agreement.

\* \* \* \* \*

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Joining Fuel Line Lender has caused this Joinder Agreement to be executed as of the date set forth above.

**[NAME OF INSTITUTION]**

By: _____

Name: _____

Title: _____

Address:

Attention:

Email:

Principal amount of Fuel Line Loans beneficially owned by the Joining Fuel Line Lender, or beneficially owned by accounts for which the Joining Fuel Line Lender has investment management responsibility, which it would be entitled to vote on in a plan solicitation: $_____ (total)

$_____ (Citi Line)

$_____ (Scotia Line)

[Signature Page to Joinder to Preliminary RSA]

## Annex A

**List of Fuel Line Lenders**

**[REDACTED]**