## Schedule 7(b)

**Plan Summary**

**Summary of Key Components of the Plan of Adjustment**

Except for Administrative Expense Claims and Professional Claims, which are not classified and do not vote on the Plan, all Claims are divided into classes under the Plan. Under the Bankruptcy Code, a plan may place a claim in a particular class only if such claim is substantially similar to the other claims of such class. Under Section 301(e) of PROMESA, in determining whether claims are "substantially similar" to one another, the Oversight Board shall consider whether such claims are secured and whether such claims have priority over other claims. The following table shows the classes of claims against the Debtor, the approximate estimated claim amount, and the approximate percentage return or range of percentage returns proposed to be paid to the holders of claims in each class.

The amount a creditor may actually recover and the form of consideration a creditor may receive are dependent upon, among other things, the outcome of the Amended Lien & Recourse Challenge, as described in Section I of this Disclosure Statement. The amount a creditor may actually recover could vary materially from the summary below. The Ad Hoc Group believes that Series B Bonds are worth substantially less than their stated amount due to what they assert are off-market terms and purported lack of covenants and remedies.

| Claim | Class | Estimated Claim Amount | Approx. Recovery (%) | Form of Consideration |
|---|---|---|---|---|
| Settling Bondholder Claims | Class 1 | $74,900,593.18 | 100.00% if Oversight Board wins recourse and lien counts<br>50.00% if Oversight Board loses lien counts but wins recourse counts, or loses both | Pro rata shares of: Cash deposited in Sinking Fund, Series B Bonds, CVI |
| Non-Settling Bondholder and Non-Settling Monoline Claims | Class 2 | [$7,565,470,824.09][89] | [0.21]% if Oversight Board wins lien and recourse counts<br>[46.49]% if Oversight Board wins lien counts but loses recourse counts<br>[51.53]% if Oversight Board loses both lien and recourse counts [90] | Pro rata shares of: (i) Cash deposited in Sinking Fund, (ii) Series B Bonds, (i) if there is a Deficiency Claim, General Unsecured Claim Recovery, and/or (ii) if Class 2 votes to accept the Plan and PREPA Revenue Bonds are recourse solely to |

[89]   This number represents the remaining asserted Bond Claims. The Allowed amount of Non-Settling Bondholder and Non-Settling Monoline Claims will be determined following the Amended Lien & Recourse Challenge Final Resolution.

[90]   Certain bondholders have argued that PREPA is required under PROMESA to pay to creditors more than the $5.68 billion currently contemplated under the Plan. If these

| Claim | Class | Estimated Claim Amount | Approx. Recovery (%) | Form of Consideration |
|---|---|---|---|---|
| | | | | the Sinking Fund, CVI |
| Pension Claim | Class 3 | $3.955 billion[91] | 86% (of Petition Date claim amount) | Cash, Series B Bonds |
| Fuel Line Loan Claims | Class 4 | $700,887,093.58 | 84.00–100.00%[92] | Series A Bonds, additional Series A Bonds or Cash, Remaining New Bonds |
| National Insured Bond Claims | Class 5 | $836,145,928.13 | 71.65%[93] | Series B Bonds |
| National Reimbursement Claim | Class 6 | [244,728,681.25][94] | 20.00% | Series B Bonds |

creditors prevail on their argument, recoveries for Non-Settling Bondholders could exceed those provided in the chart.

[91]   This represents the estimated present value of cash payments to be made by PREPA to the PREPA ERS under the PREPA ERS Regulations as of the Petition Date.  Accounting for payments made to SREAEE during the case, this amount has come down to $3.622 billion.

[92]   The Ad Hoc Group asserts the Fuel Line Lenders are receiving at least $61,324,709 in consummations costs, professional fees, and interest accrual per the terms of the Fuel Line Lender PSA in addition to their base recovery of 84%. The Ad Hoc Group also asserts this amount does not include amounts for the continued accrual of interest on the Series A Bonds through an Effective Date beyond July 1, 2023, up to one year of total interest accrual.

[93]   The Ad Hoc Group asserts National is receiving $97,943,887.64 in consummation and structuring costs, as well as receiving additional recoveries on its reimbursement claim per the terms of the National PSA in addition to its base recovery of 71.65%.  The Ad Hoc Group also asserts this amount does not include amounts for the continued accrual of the National Reimbursement Claim in the event of an Effective Date beyond July 1, 2023, or the National pro rata share of the contemplated Interim Charge.

[94]   Pursuant to the Oversight Board's proposed settlement of the National Reimbursement Claim, the Oversight Board proposes to allow the National Reimbursement Claim in the

| Claim | Class | Estimated Claim Amount | Approx. Recovery (%) | Form of Consideration |
|---|---|---|---|---|
| General Unsecured Claims | Class 7 | $800,000,000.00[95] | 0.10–100.00% | General Unsecured Claim Recovery[96] |
| Vitol Claim | Class 8 | $41,457,382.88 | 0.05–50.00% | General Unsecured Claim Recovery |
| Assured Insured Interest Rate Swap Claims | Class 9 | [TBD][97] | [0.21–51.53]% | Treatment provided to Class 2 |
| Ordinary Course Customer Claims | Class 10 | $235,309 | 100.00% | Cash |
| Eminent Domain/Inverse Condemnation Claims | Class 11 | $2,437,556 | **If payment in full is required:** 100.00%[98] | Cash |
| | | | **If Claims are dischargeable:** 0.10-100.00% | General Unsecured Claim Recovery |
| Federal Claims | Class 12 | $16,859,577 | **If payment in full is required pursuant to PROMESA Section 304(h):** 100.00%[99] | Treatment required by PROMESA Section 304(h) |
| | | | **If payment in full is not required:** 0.10–100.00% | General Unsecured Claim Recovery |

---

amount of $244,728,681.25 (which will be the accrued amount of this claim as of July 1, 2023).  This number may be higher in the event the Effective Date is beyond July 1, 2023.

[95]     For an explanation of the Oversight Board's estimate, see Section II.B.8.

[96]     The General Unsecured Claim Recovery is payable from the GUC Trust Assets, which are comprised of (a) the Avoidance Action Proceeds, (b) the GUC New Bonds, if any, and (c) the GUC CVI.

[97]     The Oversight Board reserves the right to object to the Assured Insured Interest Rate Swap Claims.

[98]     The Plan provides that Eminent Domain/Inverse Condemnation Claims shall receive their *pro rata* share of the General Unsecured Claim recovery.  If the Court declines in the Confirmation Order to confirm the Plan due to such treatment, the treatment shall automatically convert, without further action from the Debtor, such that such Holders will receive 100% of the unpaid balance of their claims in Cash unless (a) the Debtor appeals the Court's denial of the Plan's treatment of such Claims as General Unsecured Claims, (b) such appeal is ultimately successful, and (c) a Final Order is entered holding that such claims can be Impaired.

[99]     If a Federal Claim is required to be paid in full pursuant to section 304(h) of PROMESA, the holder of such claim will receive a 100% recovery.  Otherwise, the holder will receive its Pro Rata Share of the General Unsecured Claim Recovery.

| Claim | Class | Estimated Claim Amount | Approx. Recovery (%) | Form of Consideration |
|-------|-------|------------------------|----------------------|------------------------|
| Convenience Claims | Class 13 | Unknown | 100.00%[100] | Cash |
| Section 510(b) Subordinated Claims | Class 14 | Unknown | 0.00% | N/A |

Below is a chart setting forth in detail the potential recoveries to Settling Bondholders, Non-Settling Bondholders and Non-Settling Monolines, Fuel Line Lenders, National, holders of General Unsecured Claims, and Vitol based on different outcomes with respect to the Amended Lien and Recourse Challenge. The chart also illustrates the number of excess New Bonds that may remain after all allowable claims have been paid in full. At Reorganized PREPA's discretion, such bonds either would be deemed to have not been issued by Reorganized PREPA, or would be issued and distributed to the PREPA or the PREPA PayGo Trust.

[*Chart Begins on Following Page*]

---

[100] If Convenience Claims exceed the Convenience Cap of $1,000,000.00, holders of Allowed Convenience Claims shall receive their Pro Rata Share of the Convenience Cap.

**PREPA Plan of Adjustment Illustrative Recoveries[1]**

| FOMB wins on Lien Counts and Recourse Counts | | FOMB wins on Lien Counts and Loses on Recourse Counts | | FOMB loses on Lien Counts[2] and Recourse Counts | |
|---|---|---|---|---|---|
| Settling Bonds | 100% | Settling Bonds | 50% | Settling Bonds | 50% |
| Non-Settling Bonds | 0.21% | Non-Settling Bonds | 46.49% | Non-Settling Bonds | 51.53% |
| National[3] | 71.65% | National | 71.65% | National | 71.65% |
| FLLs[3] | 100.00% | FLLs | 84.00% | FLLs | 84.00% |
| GUCs | 100.00% | GUCs | 46.49% | GUCs* | 0.10%+ |
| Vitol | 50.00% | Vitol | 23.25% | Vitol* | 0.05%+ |
| PREPA PayGo Trust | $698.23m | PREPA PayGo Trust | $0 | PREPA PayGo Trust | $0 |
| Excess New Bonds | $2.22b | Excess New Bonds | $0 | Excess New Bonds | $0 |

\* Non-zero recovery to recipients of GUC Trust proceeds to reflect recoveries on account of avoidance action proceeds.

1 The numbers in this exhibit are for illustrative purposes.  Neither the Oversight Board, PREPA, nor their respective advisors make any representations regarding the accuracy of these figures, which are subject in all respects to the terms of the Plan.  Claimholders should consult their own advisors regarding potential recoveries.  The above numbers are based on cash flow projected on the New Bonds and other consideration under the plan and do not account for whether the instruments will trade at their par value, which the Ad Hoc Group believes they will not.  Since no cash flow is currently projected under the CVI, recoveries on account of CVI distributions is not included.

2 Certain bondholders have asserted that, if they prevail on the Lien Counts in the Amended Lien & Recourse Challenge, their collateral would be worth more than what is provided to them under the Plan.  The Oversight Board disputes that contention.  Accordingly, for purposes of this illustration only, it is assumed that Bondholders' collateral if they prevail on the Lien Counts would be valued to be the same as the remaining Series B Bonds available for distribution.

3 In all scenarios reflected in the chart, National will also receive $97,943,887.64 in consummation and structuring costs, as well as receiving additional recoveries on its reimbursement claim per the terms of the National PSA, while the Fuel Line Lenders will receive $61,324,709 in consummations costs, professional fees, and interest accrual per the terms of the Fuel Line Lender PSA.  Since this consideration is not provided on account of their respective claims, but on account of other value provided, they are not incorporated into the above calculation of these creditors' respective recoveries on the par amount of their claims.  Moreover, the Fuel Line Lenders will; receive Series A Bonds which accrue up to 1 years' worth of interest from the date the Fuel Line Lender PSA is effective, payable in Series A Bonds or Cash.  Since the amount of interest is currently unknown, such amounts are not reflected in the Fuel Line Lenders' illustrative recoveries above.

The Debtor believes the Plan's contemplated restructuring is feasible and in the best interests of the Debtor's creditors.  If confirmation of the Plan were to be denied, the Debtor's options would be either (i) for the Oversight Board to propose an alternate Title III plan of adjustment or (ii) for the Title III Cases to be dismissed, in which event the automatic stay would be terminated and multi-party, multifaceted litigation would ensue (including litigation commenced by Bondholders and other parties against PREPA), as holders of claims compete for the limited resources available to pay those claims.

The following overview summarizes certain key components of the Plan. The overview is qualified in its entirety by the full text of the Plan.

### Fuel Line Lender PSA

On December 1, 2022, the Oversight Board, as PREPA's Title III Representative, and the Fuel Line Lenders entered into the Fuel Line Lender PSA, which generally resolves the Fuel Line Lenders' claims and asserted priority treatment as "Current Expenses" under the Trust Agreement and provides for the Fuel Line Lenders to support the Plan. Pursuant to the Fuel Line Lender PSA, the Fuel Line Lenders will be receiving Series A Bonds, which will be current interest bonds with a 6.0% coupon, at an exchange ratio of 84% of the Allowed Fuel Line Loan Claim (as defined in the Plan).

Series A Bonds shall have a final maturity of fifteen (15) years from the Effective Date, with an expected repayment of five (5) years from the Effective Date based on upon 2022 Fiscal Plan Projections. The Series A Bonds shall be issued on the Effective Date but shall accrue interest from the deemed issuance date of December 1, 2022 for purposes of the calculation of interest accrued; provided, however, the accrual of interest prior to the Effective Date shall be capped at one (1) year. Such interest shall be payable in either cash or in the form of additional Series A Bonds at the Oversight Board's discretion.

Additionally, the Fuel Line Lenders will be entitled to receive on account of their Remaining Claim[101] a Pro Rata Share of Net Remaining New Bonds, if any, available for distribution to the Remaining Series B Bond Claims Pool (each, as defined in the Plan). Finally, Fuel Line Lenders shall also receive certain consummation fees and professional fee reimbursement fees, in the amounts of $15,000,000 and up to $11,000,000, respectively, each of which shall be payable in either cash or in the form of additional Series A Bonds at the Oversight Board's discretion.

In exchange for such consideration, the Fuel Line Lenders have agreed to support confirmation of the Plan and, following the Effective Date, move to dismiss Adv. Pro. 19-00396 with prejudice.

### National Settlement

On January 31, 2023, the Oversight Board, as PREPA's Title III Representative, and National entered into the National PSA, which sets out the terms of the settlement of all Claims, interests, and controversies among PREPA, the Oversight Board, and National (the "National Settlement"). As a result of the National Settlement, National supports the Plan. The National Settlement's terms have been embodied in the Plan and the Debtor is seeking its approval pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code via entry of the Confirmation Order, which will include findings that, among other things, the National Settlement is in the best

---

[101] "*Remaining Claim*," as it pertains to the Fuel Line Loan Claims, shall mean the Allowed Fuel Line Loan Claim <u>minus</u> the amount of Series A Bonds received on account of the Allowed Fuel Line Loan Claim (except for Series A Bonds received, if any, on account of payment of accrued interest prior to the Effective Date).

interests of PREPA, its creditors, and other parties in interest, is fair and equitable, and is well within the range of reasonableness.

### Principal Terms of the National PSA

The National PSA, among other things, generally resolves National's claims arising from Bonds it owns or insures, and its Asserted Reimbursement Claim, and provides for National to support the Plan. Pursuant to the National PSA, National will be receiving Series B Bonds at an exchange ratio of 71.65% of the Allowed National Insured Bond Claim (as defined in the Plan). National will also be receiving Series B Bonds at an exchange ratio of 20.00% of the Allowed National Reimbursement Claim (as defined in the Plan).

Pursuant to the National PSA, the Oversight Board and PREPA shall use their reasonable best efforts to cause PREPA to file, or cause PREPA to request that LUMA Energy file, an application with PREB to obtain approval of the equivalent of a one cent ($0.01)/KWH volumetric charge from the effective date of the National PSA times the National Insured Bond Claims divided by the PREPA Revenue Bond Claims, which, subject to PREB approval, shall be implemented by PREPA and added to customers' bills during the period from approval thereof by PREB up to and including the Effective Date (the "Interim Charge").

Subject to necessary approvals from PREB, from the effective date of the National PSA to the Plan Effective Date, National shall receive its pro rata share of revenues generated the Interim Charge.[102] If, however, PREB approval is not obtained for the Interim Charge, PREPA shall not be obligated to make interim payments to National. Cumulative revenues received by National on account of the Interim Charge shall not exceed National's existing coupon on Bonds it owns and/or insures. If National receives revenues from the Interim Charge and the Plan is not confirmed nor consummated, the amounts received shall constitute a reduction of the distributions to be received by National under a future plan, settlement, litigated judgment, or other resolution of National's claims, without further order from the Court.

National shall also receive certain consummation fees and structuring fees, in the amounts of 3% and 2.86% of the Allowed National Insured Bond Claim payable in either cash or in the form of additional Series B Bonds at the Oversight Board's discretion.

If a CVI is offered to other holders of Bonds pursuant to the Amended Plan, National shall receive CVI on account of its Bond claim and payments there from equal to fifty percent (50%) of the recovery of such holders' pro rata share until such other holders recover seventy-one and eighty-six one hundredths percent (71.65%) of their Bond claims and thereafter shall share, on a pro rata basis, equally with such holders.

Unlike certain other non-litigating classes of creditors, National will not receive additional Series B Bonds if the Oversight Board prevails on the Lien Counts and/or Recourse Counts in the Amended Lien & Recourse Challenge. In other words, National shall not share in Gross

---

[102] The Oversight Board anticipates that only the portion of the Interim Charge required to compensate National's *pro rata* portion will be charged. Thus, the Interim Charge will be slightly under 0.1 c/kWh.

Remaining New Bonds, Net Remaining New Bonds, or Excess New Bonds, if any, distributed under the Plan.

In exchange for such consideration, National has agreed to support confirmation of the Plan.

Additionally, as further described below, pursuant to the National PSA, in connection with the Oversight Board's pursuit of confirmation of the Plan, the Oversight Board will seek approval of its proposed settlement with National of the National Reimbursement Claim.

### National Reimbursement Claim

In connection with the issuance of the Bonds, National issued certain municipal bond insurance policies, insuring the payment of principal and interest on the Bonds. In connection with the issuance of the insurance policies, PREPA entered into certain Bond insurance agreements with National, pursuant to which National asserts that PREPA agreed, to the extent that National made payments of principal and interest on or incurs any other costs with respect to the Bonds insured by PREPA, to reimburse National, with interest, for any and all such payments, and costs (i.e., the Asserted Reimbursement Claim).

Pursuant to the Oversight Board's proposed settlement of the National Reimbursement Claim, the Oversight Board proposes to allow the National Reimbursement Claim in the amount of $244,728,681.25 (which will be the accrued amount of this claim as of July 1, 2023), and provide the holder of such claim with Series B Bonds in a face amount equal to 20.0% thereof. The settlement of the National Reimbursement Claim avoids the risk that such claim could be allowed in full, including aspects that derive from payments of interest by National since the Petition Date, and secured by all net or gross revenues of PREPA, if the Oversight Board does not prevail in the Amended Lien & Recourse Challenge and the Court were to determine National is fully secured. This recovery amount reflects a deep discount on account of this claim, in fact the deepest discount on any claim against PREPA proposed in the Plan.

The Oversight Board will demonstrate at confirmation that the proposed settlement of the National Reimbursement Claim should be approved pursuant to Bankruptcy Code section 1123(b)(3)(A) and Bankruptcy Rule 9019. If the Court finds that such settlement does not satisfy the standard for approval of settlements, or otherwise finds that the proposed settlement and treatment of National's claims under the Plan renders the Plan unconfirmable, such finding shall not give rise to an event of termination for National under the National PSA, and the settlement and the treatment of National's claims shall, without further action, convert to a settlement of National's claims, as the case may be, that eliminates the obligation to issue Series B Bonds on account of the National Reimbursement Claim and any payments for debt service and any legal, consummation, or other fees arising from, relating to, or on account of the National Reimbursement Claim; provided, that in such circumstance, National will have the option to forego all consideration under the National PSA, including the fees and expenses set forth in Article II.D.2, and, in exchange, receive the same treatment as another settling Class of Holders of PREPA Revenue Bonds Claims, so long as the settlement with such class whose recovery National would receive was reached prior to the earlier to occur of (i) any substantive ruling on the claims and counterclaims asserted in the Amended Lien & Recourse Challenge that Holders of PREPA

Revenue Bonds are secured by Revenues outside of the Sinking Fund, and (ii) an indication or a determination, either oral or written, at a hearing or otherwise, by the Title III Court that the Holders of PREPA Revenue Bonds are secured by Revenues outside of the Sinking Fund.

### Forms of Consideration Under the Plan

The consideration to be distributed to creditors under the Plan consists of the following, each of which is described in detail below:

i.    monies deposited in the Sinking Fund;

ii.    Up to approximately $5.68 billion in New Bonds to be issued on the Effective Date;

iii.    the CVI, to be issued on the Effective Date in the notional amount of the sum of the GUC CVI, Settling CVI, and Non-Settling CVI;

iv.    The Avoidance Action Proceeds, consisting of the net cash consideration received by PREPA in connection with the Avoidance Actions; and

v.    cash flow as budgeted annually solely for payments to PREPA PayGo Trust on account of the Pension Claim.

### Overview of New Bonds to be Issued on the Effective Date

On the Effective Date, Reorganized PREPA shall issue two series of New Bonds—Series A Bonds and Series B Bonds.

Series A Bonds shall have a final maturity of fifteen (15) years from the Effective Date, with an expected repayment of five (5) years from the Effective Date based on upon 2022 Fiscal Plan Projections.  Series A Bonds shall bear interest at a rate of 6.00%, payable semi-annually in cash.  The Series A Bonds shall be issued on the Effective Date but shall accrue interest from the deemed issuance date of December 1, 2022 for purposes of the calculation of interest accrued; *provided*, *however*, the accrual of interest prior to the Effective Date shall not exceed one (1) year and that the interest accrued prior to the Effective Date shall be payable upon the Effective Date in the form of Series A Bonds or cash, at the Oversight Board's sole discretion.  The Series A Bonds will be issued in a principal amount sufficient to comply with the terms of the Fuel Line Lender PSA, which shall be approximately $650,000,000.

Series B Bonds shall have a final stated maturity of fifty (50) years from the Effective Date. The Series B Bonds shall be dated as of the Effective Date. Series B Bonds may be issued in the form of current interest bonds or convertible capital appreciation bonds and shall bear interest rates at a range of six percent (6.00%) to six and seventy-five hundredths percent (6.75%).

Series B Bonds shall be issued in two series: Series B-1 Bonds (Current Interest Bonds) and Series B-2 Bonds (Convertible Capital Appreciation Bonds). The Series B-1 Bonds will be current interest bonds and shall bear interest at a rate of six percent (6.00%) per annum payable semi-annually, with an expected repayment of no later than thirty-four (34) years from the Effective Date based on 2022 Fiscal Plan Projections, subject to change based on load projections

in subsequent PREPA Fiscal Plans. The Series B-1 Bonds have priority in principal repayment over the Series B-2 Bonds. Series B-1 Bonds shall be issued in the principal amount of approximately $4.63 billion.

Series B-2 Bonds will be convertible capital appreciation bonds and shall bear interest at a rate of six and seventy-five one-hundredths percent (6.75%) per annum, accreting annually until July 1, 2028, at which point the Series B-2 Bonds shall convert to paying interest semi-annually, with an expected repayment of thirty-five (35) years from the Effective Date based upon 2022 Fiscal Plan Projections, subject to change based on load projections in subsequent PREPA Fiscal Plans. The Series B-2 Bonds shall be issued in an amount equal to the Administrative Expense Bonds Amount, with a maturity value of approximately $557,000,000 (with an assumed Effective Date of July 1, 2023 and an original principal value of approximately $400,000,000).

Where Reorganized PREPA is obligated to distribute Series B Bonds pursuant to the Plan, other than the Administrative Expense Bonds, Reorganized PREPA shall distribute Series B-1 Bonds.

The New Bonds shall have an aggregate original principal amount of up to approximately $5.68 billion.[103] Series A Bonds shall be issued in a principal amount sufficient to comply with the terms of the Fuel Line Lender PSA. The Series B Bonds shall be issued in a principal amount equal to the above referenced principal amounts.

The New Bonds shall be secured by Reorganized PREPA's Net Revenues and the right to receive Net Revenues. All Revenues shall be deposited in the "General Fund" held by Reorganized PREPA. On the first business day of each month, Reorganized PREPA shall apply amounts in the following order of priority (the "Payment Waterfall"):

-   *First*, to the payment of Operating Expenses;

-   *Second*, to New Master Trustee fees and expenses not to exceed $100,000 per year;

-   *Third*, to the "Debt Service Fund" held by the New Master Trustee up to the amount of the Legacy Charge Revenues, and from and after the Series B Bond Defeasance Date and until the CVI Maturity Date, up to the amount of the Remaining Legacy Charge Revenues[104]; and

-   *Fourth*, to Reorganized PREPA for use as set forth in the New Master Indenture.

There shall be no event of default on the New Bonds (prior to stated final maturity of the Series A Bonds, solely with respect to the Series A Bonds, and generally with respect to the Series B Bonds) for failure to pay scheduled debt service so long as Reorganized PREPA (a) takes

---

[103] The Ad Hoc Group believes that PREPA can afford to issue substantially more than the $5.68 billion in New Bonds.

[104] "Remaining Legacy Charge" means the fixed fee component of the Legacy Charge in place as of the Effective Date, from and after the Series B Bond Defeasance Date, through the CVI Maturity Date.

reasonable actions to (i) charge and collect the Legacy Charge,[105] (ii) collect the Revenues generated by the Legacy Charge, and (iii) deposit the full amount of Net Revenues up to the amount of the Legacy Charge Revenues into the Debt Service Fund after providing for distributions made in accordance with the Payment Waterfall, and (b) complies with the Interest Rate Covenant.

With respect to each series of New Bonds, all debt service that is not paid when due, whether at or prior to final scheduled maturity, shall remain due and outstanding until paid in full and shall be paid. Interest shall not accrue on outstanding obligations under the New Bonds at the regular coupon rate after its respective stated maturity; only unpaid interest accrued prior to stated maturity and principal will be payable following the stated maturity if any remains outstanding at that time, although the Interest Rate Covenant would no longer apply.

A detailed description of the New Bonds to be issued pursuant to the plan can be found in Section VI.F of this Disclosure Statement.

### Overview of CVI to be Issued on the Effective Date

On the Effective Date, Reorganized PREPA shall issue the CVI with a 0.00% coupon, a final maturity date of thirty-five (35) years after the Effective Date, which shall only be payable if the New Bonds and any Refunding Bonds are paid in full prior to their expected 35 year repayment. Payments shall be made on the CVI only after the occurrence of the Series B Bond Defeasance Date, so long as such date occurs prior to the CVI Maturity Date. If the Series B Bond Defeasance Date occurs prior to the CVI Maturity Date, the CVI shall be payable from that portion of Net Revenues constituting the Remaining Legacy Charge Revenues deposited to the credit of the Debt Service Fund in accordance with the Payment Waterfall until the earlier of (a) the date on which the CVI Notional Amount has been paid in full and (b) the CVI Maturity Date. There shall be no event of default on the CVI so long as Reorganized PREPA takes reasonable actions to collect Revenues generated by the Remaining Legacy Charge and deposits the full amount of Net Revenues up to the amount of the Remaining Legacy Charge Revenues into the Debt Service Fund.

Because the New Bonds are only expected to be repaid in 35 years under the projections in the Certified Fiscal Plan, the CVI is "truly contingent" because it would only generate any payment if PREPA's realized load exceeds the Certified Fiscal Plan projections, and Legacy Charge Revenues remain after payment of operating expenses, notwithstanding the expiration of the Interest Rate Covenant.

---

[105] The Plan does not currently provide that PREPA's failure to charge and collect any rates other than the Legacy Charge is an event of default under the New Bonds. It does, provide, however, that PREPA covenants to "make reasonable best efforts to (a) continue to levy and collect rates, fees, and charges, including, but not limited to, the Legacy Charge and the Remaining Legacy Charge and (b) deposit Net Revenues collected from such rates, fees, and charges into the Debt Service Fund in accordance with the Payment Waterfall." Plan Art. XIX.H.1. The Oversight Board anticipates adding this provision to the New Master Indenture.

**Overview of Legacy Charge**

**Legacy Charge**

PREPA's current rates are insufficient to provide for the repayment of legacy or restructured debts after payment of PREPA's operating expenses.  Accordingly, to provide sufficient Net Revenues to provide a source of repayment of the New Bonds to be issued by PREPA under the Plan, the Plan requires the Debtor to implement the Legacy Charge, which will be an additional charge to PREPA's current rates.

The Legacy Charge is comprised of two components, a fixed monthly flat fee (the "Flat Fee") and a volumetric fee ("Volumetric Charge"), set at levels for each customer class, to be included in customer rates pursuant to the Plan and Confirmation Order.  This hybrid structure accounts for important objectives, including providing proper recompense to PREPA's legacy creditors, while minimizing: (i) the strain of increased rates on low-income and vulnerable customers, (ii) revenue losses due to customers either reducing their electricity consumption or transitioning to alternative electricity supplies.  The Oversight Board reserves its rights and may amend the rates prior to the confirmation objection deadline, upon further discussion with PREB, LUMA Energy and AAFAF, in a manner that will provide similar recoveries to creditors to those provided for in the Plan.

The Legacy Charge will have different tiers that will be assessed for each of PREPA's existing customer classes based on various factors, such as a respective capacity to tolerate rate increases.  Solely for purposes of assessing the Legacy Charge, the Plan will also provide for the creation of one new exemption from the Flat Fee and a portion of the Volumetric Charge for other low-income residential customers not already falling within an exempted customer class (see below).

The increase in Net Revenues generated from inclusion of the Legacy Charge will fund debt service on the New Bonds after payment of PREPA's Operating Expenses, as specified in the Plan.  The Legacy Charge is calculated so that the increase in Net Revenues is projected to cover the debt issued under the Plan within 35 years. The Legacy Charge will remain in place for the later of (i) the maturity of the CVI[106] and (ii) payment in full of the Series B Bonds.  Because the increase in Net Revenues to be generated from the Legacy Charge is required by the Plan to pay debt service, and otherwise necessary to support repayment of the New Bonds issued under the Plan, the Oversight Board asserts that PREB is required under Puerto Rico law to approve the Legacy Charge rate increase, provided, that PREPA with the approval of PREB will be able to amend the Legacy Charge in an economically neutral manner subject to the Amendment Test (as defined in the Plan).  If repayment in full of the principal of the New Bonds occurs prior to the maturity of the CVI, revenues from the fixed fee component of the Legacy Charge in place as of the Effective Date thereafter will fund distributions to holders of CVI until the maturity of the CVI. Risks relating to the payment of New Bonds and CVI are discussed in Section VIII.

---

[106] The Legacy Charge that would support the CVI is limited to revenues from the Fixed Fee component of the Legacy Chare in place as of the Effective Date.

Application of the Legacy Charge: First, PREPA will charge the Flat Fee to all customers each month unless the customer qualifies for an exemption from the Flat Fee. The amount paid for the Flat Fee portion of the Legacy Charge is a connection charge assessed on each non-exempt customer connected to PREPA's electricity grid. Second, PREPA will charge a Volumetric Charge based on each customer's consumption of electricity supplied by PREPA. The Volumetric Charge will be assessed on a cents per-kilowatt hour basis, the amount of which will vary per customer class, for electricity consumed during each billing cycle. Mirroring PREPA's current rate structure, a different Volumetric Charge will be assessed for consumption at or below 500 kWh per month and for consumption above that level for all residential and certain commercial classes.[107] A detailed description of the derivation of the Legacy Charge structure is attached hereto as Exhibit P.

Customers eligible for an exemption from the Flat Fee will also be exempt from paying the Volumetric Charge up to 500 kWh of monthly metered consumption. If an exempt customer's utilization exceeds that threshold, that customer will be charged fifty percent of the Volumetric Charge applicable for such customer class for consumption above the threshold on a per-kilowatt hour basis.

The Debtor intends to provide a new exemption from the Flat Fee and the Volumetric Charge up to 500 kWh for certain customers. This exemption is intended to protect lower-income residential customers, which are the most vulnerable, from further burden. To ensure the most vulnerable customers are not overly strained by the Legacy Charge, PREPA will create a new exemption for qualifying low-income residential customers that are not enrolled in the Lifeline Residential Rate (*Servicio Residencial Especial*) (the LRS rate)[108] or the existing public housing subsidy rate (the RH3 and RFR rates)—the three rate classes that are also exempt and already receive certain subsidies. Residential customers of PREPA will qualify for this new exemption if their Modified Adjusted Gross Income (MAGI) is below a certain threshold similar to the MAGI eligibility levels needed to qualify for Medicaid healthcare benefits in Puerto Rico.[109] It is expected that the new exempt class will overlap with the three existing PREPA rate classes listed above that are exempt from the Legacy Charge, however, it will include additional customers that do not fall into existing exempt rate classes. The Oversight Board is developing a methodology for identifying and applying the specific criteria for the additional exemption from the Legacy Charge, as discussed in footnote 2 on page 4 of Exhibit P, that would not be burdensome to implement and will not change the projected cash flow derived from the Legacy Charge.

PREPA customers currently enrolled in one of PREPA's existing subsidy customer classes, such as those for the elderly, students, customers that depend on lifesaving medical equipment, customers with disabilities, and participants in the Puerto Rico Nutrition Assistance Program (Programa de Asistencia Nutricional), among others, will continue to receive their existing

---

[107] PREPA currently utilizes a 425kWh threshold.

[108] Customers who fulfill the criteria to enroll in the Nutritional Assistance Program are eligible to enroll in the LRS rate.

[109] It has not yet been determined how and how often MAGI threshold levels qualifying for an exemption will be monitored and when a customer no longer qualifies.

subsidies from PREPA without interruption and may or may not be exempt from the Legacy Charge depending on whether they fall within the exempted customer classes mentioned above.

The Legacy Charge will be collected as part of the PREPA bill by PREPA's operator and servicer in the same manner the bills are currently collected.

The level of Flat Fee and Volumetric Charge that different customer classes will incur to support payment of the New Bonds is set forth in the table below.  Notably, however, PREPA, with the approval of PREB, subject to the Amendment Test, will have the ability to modify the Flat Fee and Volumetric Charge provided that it will be done in an economically neutral manner, in structure and amounts that do not delay or extend the respective expected repayment date and expected weighted average life of the Series A Bonds and the Series B Bonds, and otherwise that are reasonably acceptable to the Required Fuel Line Lenders, and which will not decrease the projected revenues attributable to the Legacy Charge as of the date of the amendment to the Legacy Charge.[110]

**Legacy Charge Allocation**

| | Fixed Fee ($/month) | Volumetric Charge (</=500 kWH, c/kWH) | Volumetric Charge (>500 kWH, c/kWH) |
|---|---|---|---|
| **RESIDENTIAL** | | | |
| RH3, LRS, RFR | $ - | - | 1.50 |
| GRS 111/112 (Subsidy-eligible) | $ - | - | 1.50 |
| GRS 111/112 (General) | $ 13 | 0.75 | 3.00 |
| **COMMERCIAL** | | | |
| GSS 211 | $ 16.25 | 1.50 | 3.00 |
| GSP 212 | $ 800 | 1.45 | 1.45 |
| GST 213 | $ 1,800 | 0.97 | 0.97 |
| 862 | | | |
| **GOVERNMENT** | | | |
| GSS 211 | $ 20 | 1.45 | 2.90 |
| GSP 212 | $ 800 | 1.45 | 1.45 |
| GST 213 | $ 1,800 | 0.97 | 0.97 |

[110] The Legacy Charge will be assessed on all of PREPA's customers, except where the Plan specifically exempts some or all of the Flat Fee or Volumetric Charge.  While all rate classes are subject to the Legacy Charge, some may currently be "empty" classes that do not have any customers.  For the avoidance of doubt, any rate class not identified in the Plan or herein, any class not included in Annex 1 to Plan Schedule B (but included in Annex 2 to Plan Schedule B), any class that is subsequently created, or any existing but empty rate class that subsequently has customers, will be subject to the Legacy Charge and will be classified in a way that does not decrease the projected revenues attributable to the Legacy Charge, unless PREPA, with the approval of PREB, subject to the Amendment Test, will modify the Legacy Charge in an economically neutral manner, which shall not decrease the projected revenues attributable to the Legacy Charge.

| 862 | | | |
|---|---|---|---|
| **MUNICIPALITIES** | | | |
| GSS 211 | $ - | - | - |
| GSP 212 | $ - | - | - |
| GST 213 | $ - | - | - |
| 862 | | | |
| **INDUSTRIAL** | | | |
| GSS 311 | $ 20 | 2.18 | 2.18 |
| GSP 312 | $ 800 | 2.18 | 2.18 |
| GST 313 | $ 1,800 | 1.45 | 1.45 |
| TOU-T 363 | $ 1,800 | 1.45 | 1.45 |
| LIS 333 | $ 1,800 | 1.45 | 1.45 |
| TOU-T 963 | $ 1,800 | 1.45 | 1.45 |

## PREPA Customer Segmentation[111]

PREPA maintains a differentiated rate structure for its customers depending on their customer class. The descriptions below, in conjunction with any other categorization of customers currently utilized by PREPA, identify categories of PREPA's customer base that may be utilized in establishing how each PREPA customer is charged the Legacy Charge.

## Residential Classes

1. GENERAL RESIDENTIAL SERVICE (GRS) - This rate shall apply to residential customers for domestic uses for a residence or apartment unless they fit into one of the other classes below. This rate may also apply to houses, apartments, and other structures which are primarily intended for residential purposes, where no more than two rooms in which the total connected load does not exceed 500 watts are used by tenant for business or professional purposes.

2. LIFELINE RESIDENTIAL SERVICE (LRS) - This rate shall apply to residential customers, who fulfill the Nutritional Assistance Program criteria, for all domestic uses for a residence or apartment.

3. RESIDENTIAL SERVICE FOR PUBLIC HOUSING PROJECTS (RH3) - This rate shall apply to residential customers of Public Housing Projects supported or subsidized in whole or in part by loans, grants, contributions or appropriations of the federal, state, or municipal governments.

4. RESIDENTIAL FIXED RATE FOR PUBLIC HOUSING UNDER OWNERSHIP OF THE PUBLIC HOUSING ADMINISTRATION (RFR) - The RFR Rate is established by according to the dispositions of Act 22-2016 and is granted to customers residing in a

---

[111] PREPA rate book, as of May 2019. Accessible at: https://lumapr.com/wp-content/uploads/2021/07/Tariff-Book-Electric-Service-Rates-and-Riders-Revised-by-Order-05172019-Approved-by-Order-05282019.pdf.

housing unit physically located within a public housing project owned by the Public Housing Administration for all domestic uses.

**Commercial and Industrial Classes**

1. GENERAL SERVICE AT SECONDARY DISTRIBUTION VOLTAGE (GSS) **-** This rate shall apply to any non-residential service with a load lower than 50 kVA.  Also, it shall apply to temporary electric power service for limited use in streets, carnivals and others.

2. GENERAL SERVICE AT PRIMARY DISTRIBUTION VOLTAGE (GSP) **-** This rate shall apply to industrial customers and commercial customers.  Service shall be rendered through a single point of connection and a single meter.

3. GENERAL SERVICE AT TRANSMISSION VOLTAGE (GST) **-** This rate shall apply to commercial and industrial customers, connected to the transmission system, that have a demand of 250 kVA or greater, for general uses including motive power, heating, refrigeration, and incidental lighting of industries, hotels, and any other establishment.

4. TIME OF USE AT PRIMARY DISTRIBUTION VOLTAGE (TOU-P) **-** This rate shall apply to commercial and industrial customers with a demand of 1,000 kVA or greater, that: 1. Transfer load from the on-peak period to the off-peak period 2. Add load during the off-peak period 3. Remove load from the on-peak period

5. TIME OF USE AT TRANSMISSION VOLTAGE (TOU-T) **-** This rate shall apply to commercial and industrial customers with a demand of 1,000 kVA or greater, that: 1. Transfer load from the on-peak period to the off-peak period 2. Add load during the off-peak period 3. Remove load from the on-peak period

6. LARGE INDUSTRIAL SERVICE -115 kV (LIS) **-** This rate is exclusively for industries with a demand equal to 12,000 kW or higher, with a load factor equal to 80% or higher, and a monthly average power factor equal to 95% or higher.

7. GENERAL AGRICULTURAL SERVICE AND AQUEDUCT PUMPS OPERATED BY RURAL COMMUNITIES (GAS) **-** This rate applies to farmers and customers dedicated to raising animals.  The service shall be provided for motive power, lighting, irrigation pumps, refrigeration and heating.  Also, this rate applies to customers that operate pumps to supply aqueduct service exclusively in rural communities; incidental lighting related to this operation is permitted.

8. OUTDOOR SPORTS FIELD LIGHTING FOR PARKS WHERE ADMISSION RIGHTS ARE COLLECTED (LP-13) **-** This rate shall apply to sports fields where admission rights are collected having a connected load for outdoor illumination of 500 kilowatts or greater

9. CABLE TV POWER SUPPLIES (CATV) **-** This rate applies to all cable TV power supplies.

10. UNMETERED SERVICE FOR SMALL LOADS (USSL) **-** This rate shall apply to the services of the electric equipment installed on PREPA's pole or structures that operate 24 hours a day, except for that equipment for which PREPA has another rate available (for example: Cable TV).

11. POWER PRODUCERS CONNECTED AT PREPA BUS BAR **-** This rate shall apply to large power producers connected to the 230 kV bus bar that require PREPA's electric power service during startup, programmed maintenance, and outages of its generating equipment.

12. PUBLIC LIGHTING GENERAL (PLG) **-** This rate shall apply to the lighting of streets, ball parks and other parks of free admission, plazas, telephone booths, bus shelters, and traffic and police strobe lights.

**Overview of Avoidance Action Trust**

PREPA has identified certain Avoidance Actions, listed on Exhibit L, which will be transferred to the Avoidance Actions Trust on the Effective Date.[112]  On or before the Effective Date, PREPA will enter into the Avoidance Actions Trust Agreement and establish the Avoidance Actions Trust.  The Avoidance Actions Trust Assets will consist of the Avoidance Actions and Cash held by the Avoidance Actions Trustee.  The Avoidance Actions Trust will be governed by a three-member board appointed as of the Effective Date, selected by the Oversight Board. This board will appoint the Avoidance Actions Trustee on or prior to the Effective Date.

The Avoidance Actions Trustee will have the power to litigate or compromise and settle the Avoidance Actions.  On a monthly basis, the Avoidance Actions Trustee will distribute to the GUC Trust all excess cash on hand, which will be a part of the General Unsecured Claim Recovery.

**Class Treatment and Potential Variation Based on Contingent Litigation**

PREPA is currently involved in various contested matters and adversary proceedings with parties such as the Bondholders and PREPA ERS.  Resolution of these proceedings, whether by decision or settlement, will have a material effect on certain creditors' recovery under the Plan. The following section first summarizes these proceedings and their individual significance, then

---

[112] The Oversight Board will disclose in a plan supplement whether certain avoidance actions, including what the UCC refers to as the "Fuel Oil Litigation" (Adv Proc. Nos. 19-00381, 19-00384), and other vendor actions, including Adv Proc. No. 19-00384, and/or their proceeds will be added to the Avoidance Action Trust.  If the Oversight Board determines to transfer such actions or their proceeds to the Avoidance Actions Trust, it would only serve to enhance the GUC recoveries disclosed in the Plan.  These avoidance actions are described in Part V on the Disclosure Statement.  While the Oversight Board will not undertake to value these actions (which would likely involve some estimation of the probability of success), the amount PREPA is seeking to avoid can be determined by reference to the complaint themselves.

describes the effect the outcomes of these proceedings will have on creditors' recovery under the Plan.

**Litigation Affecting Distributions Under the Plan**

*Amended Lien & Recourse Challenge*

The Oversight Board is currently litigating *The Financial Oversight and Management Board for Puerto Rico v. U.S. Bank Nat'l Ass'n*, Adv. Proc. No. 19-00391 (D.P.R. July 1, 2019) (the "Amended Lien & Recourse Challenge"), whereby the Oversight Board seeks to (i) disallow any secured claim held by the Bondholders beyond the funds actually deposited in the Sinking Fund (the "Lien Scope Counts"); and (ii) limit any potential recourse, secured or unsecured, to the monies deposited in the in the aforementioned funds (the "Recourse Counts").

If the Title III Court finds that the Bond Trustee's security interest and recourse is limited to the Sinking Fund, then PREPA may be able to satisfy the approximately $8.5 billion in asserted Bond claims by providing the monies currently in the Sinking Fund, thus greatly enhancing the recoveries of many of PREPA's other creditors.

If the Title III Court holds the security interest is limited in the manner described above, but that the Bond Trustee has an unsecured deficiency claim against PREPA for the amount not satisfied by the monies in the Sinking Fund, then such deficiency claim would share *pro rata* with PREPA's other General Unsecured Claims, significantly diluting such claimholders' recoveries.

Finally, if the Title III Court determines the Bond Trustee has a security interest in PREPA's present or future net or gross revenues, the Bondholders will receive Series B Bonds in a face amount equal to the value of their collateral, up to all Series B Bonds available for distribution under the Plan and subject to Series B Bonds provided to the Settling Bondholders. In addition, the Ad Hoc Group believes that the value of the Series B Bonds may be substantially less than their face amount because it insists they are not market securities. To the extent the Series B Bonds are insufficient to pay the Bond Trustee the value of its collateral, the Bond Trustee may argue at confirmation that PREPA is obligated to issue additional Series B Bonds or otherwise provide for additional payment to the Bond Trustee not currently contemplated by the Plan. In such circumstance, the Plan may not be confirmable or feasible without material amendments. Additionally, in this scenario, the Bond Trustee may also have an unsecured deficiency claim against PREPA, which claim, to the extent not satisfied by the issuance of Series B Bonds, would share *pro rata* with PREPA's other General Unsecured Claims.

*PREPA ERS Current Expense Litigation*

On October 30, 2019, PREPA ERS filed an amended complaint against PREPA and other parties seeking determinations that all amounts owed to it are "Current Expenses" under the Trust Agreement and must be paid before any further payments are made to the Bond Trustee or the Bondholders. PREPA ERS further argued it is a third party beneficiary of the Trust Agreement and the Trust Agreement constitutes a valid subordination agreement under the Bankruptcy Code.

PREPA ERS holds a significant claim against PREPA. Should the Title III Court find PREPA ERS's claims are a "Current Expense" and entitle them to repayment in full before Bond

claims receive any recovery, the distributions under the Plan may have to be amended, although the amount of overall consideration under the Plan could remain unchanged.

### *Fuel Line Lender Priority Action*

The Oversight Board, the Ad Hoc Group, the Monoline Insurers, the Bond Trustee, and the Fuel Line Lenders are currently litigating the Current Expense Adversary Proceeding, whereby the Fuel Line Lenders seek declarations that all amounts owed to them are "Current Expenses" under the Trust Agreement and subordination of the Bondholders' claims. The Oversight Board proposes to settle the Current Expense Adversary Proceeding

The Oversight Board has entered in the Fuel Line Lender PSA that settles the Fuel Line Lenders' claims against PREPA and the counts against PREPA in the Current Expense Adversary Proceeding as part of this Plan by giving the Fuel Line Lenders bonds that are senior to the bonds that all other creditors, including the Bondholders, will receive. Certain creditors have argued that this is an intercreditor dispute that the Oversight Board cannot settle. They also take issue with the amount and terms of the consideration. The Oversight Board believes that, because the claims are against PREPA, it can settle such claims against PREPA in the reasonable amount embodied in the Fuel Line Lender PSA. The Oversight Board further believes that, under the Trust Agreement, PREPA has discretion to determine which expenses constitute "Current Expenses" and can therefore be paid ahead of bondholders. The Ad Hoc Group contends the Bonds are payable before other creditors and that the Trust Agreement does not permit payment of the Fuel Line Lenders' claims prior to payment on the Bonds.

### Class Treatment Based on Litigation Outcomes

### *Settling Bondholder Claims*

Regardless of the outcome of the above-described proceedings, Settling Bondholders will receive from PREPA a stated recovery of 50.00% on their respective Allowed claims in the form of their *pro rata* share of the Sinking Fund and a distribution of Series B Bonds. However, the quantity of recovery on the remaining portions of their Allowed claims depends on the result of the Amended Lien & Recourse Challenge. If PREPA and the Oversight Board prevail on the Lien Scope Counts and Recourse Counts, then the Non-Settling Bondholders and Non-Settling Monolines' recovery may be limited to the Sinking Fund, and additional Series B Bonds may therefore be available for distribution to Settling Bondholders. In such a scenario, the Oversight Board currently anticipates Settling Bondholder Claims would be receive 100% recoveries in Series B Bonds. If, on the other hand, the Non-Settling Bondholders and Non-Settling Monolines prevail on some or all counts, then the Settling Bondholders will receive CVI in an amount equal to their remaining allowed claims.

### *Non-Settling Bondholder and Non-Settling Monoline Claims*

The Non-Settling Bondholders and Non-Settling Monolines' recovery is determined, in part, by the outcome of the Amended Lien & Recourse Challenge and whether they vote to accept the Plan provided, however that regardless of the outcome, Non-Settling Bondholders and Non-Settling Monolines will receive their *pro rata* share of the Sinking Fund.

If Non-Settling Bondholders prevail on the Recourse Counts, then any allowed unsecured deficiency claim will share, *pro rata*, in the General Unsecured Claim Recovery with all other holders of Claims in the Unsecured Claims Pool.

If Non-Settling Bondholders and Non-Settling Monolines prevail on the Lien Scope Counts, they will receive Series B Bonds in the face amount equal to the value of their collateral beyond amounts in the Sinking Fund, up to the amount of Series B Bonds available for distribution after distributions to the Settling Bondholders.

If Non-Settling Bondholders and Non-Settling Monolines vote to accept the Plan and the Oversight Board prevails on the Recourse Counts, they will receive CVI in the notional amount of such holder's Remaining Disallowed Non-Settling Claim, defined as the principal and interest accrued and unpaid on their PREPA Revenue Bond claim through the Petition Date, <u>minus</u> the cash from the Sinking Fund distributed to such holder.

### *Assured Insured Interest Rate Swap Claims*

The Assured Insured Interest Rate Swap Claims were to have received substantially the same treatment as settled bond claims under the 2019 RSA. The Assured Insured Interest Rate Swap Claims have the same priority, if any, as the PREPA Revenue Bond Claims, which the Oversight Board believes is the basis for the Plan's provisions affording the swap claims with the same treatment as the bond claims and for the related references in the Plan to the Amended Lien & Recourse Challenge. The outcome of the Amended Lien & Recourse Challenge, therefore, would impact their recoveries in the same manner it would impact holders of claims in Class 2.

### *Fuel Line Loan Claims*

To settle their claims, including their assertion of priority over the Bond Claims and assertion of entitlement to postpetition interest, the Fuel Line Lenders will receive treatment of (i) Series A Bonds in the face amount equal to 84.00% of their prepetition claim, (ii) Series A Bonds or cash, in the Oversight Board's discretion, in the face amount of interest deemed to have accrued on account of each holder's *pro rata* share of Series A Bonds to be distributed during a period equal to the shorter of December 1, 2022 through the Effective Date or one (1) year, and (iii) for the remaining 16.00% of their claim, a *pro rata* share of the Series B Bonds that remain after distribution of such bonds to National, Settling Bondholders, and Non-Settling Bondholders, initial distribution to the GUC Trust for the benefit of holders of claims in the General Unsecured Claims Pool up to 50.00% of their Allowed Claims, and the 20% distribution of the Net Remaining New Bonds to the PREPA PayGo Trust.

In exchange for their efforts in connection with consummation of their settlement and confirmation of a plan, and not on account of their claims, the Fuel Line Lenders shall receive the Fuel Line Lender PSA Creditors Fees, comprised of $15 million in consummation costs and up to $11 million in professional fee reimbursement.

### *General Unsecured Claims*

Much like recovery for the Non-Settling Bondholders and Non-Settling Monolines, recovery for General Unsecured Claims will vary materially based on the Amended Lien & Recourse Challenge's outcome.

If the Non-Settling Bondholders and Non-Settling Monolines prevail on all counts, holders of General Unsecured Claims will receive their *pro rata* share of the Series B Bonds available for distribution, if any, after distribution of such Bonds to the Settling Bondholders, National, Fuel Line Lenders, and Non-Settling Bondholders (up to the amount of the value of their collateral). If the Non-Settling Bondholders' collateral is determined to be the same or greater than the Series B Bonds available for distribution, holders of General Unsecured Claims will receive no New Bonds under the Plan, but will share on a *pro rata* basis in the proceeds of the Avoidance Action Trust and CVI.

If the Non-Settling Bondholders and Non-Settling Monolines lose on the Lien Scope Counts, but prevail on the Recourse Counts, then their deficiency claims will receive the General Unsecured Claim Recovery. This result would substantially dilute the recovery of other holders of General Unsecured Claims. The Oversight Board currently estimates General Unsecured Claims would receive Series B Bonds in the amount of approximately 46.49% of their claim in this scenario.

If the Non-Settling Bondholders and Non-Settling Monolines lose on all counts in the Amended Lien & Recourse Challenge, then holders of General Unsecured Claims will receive their *pro rata* share of the Series B Bonds up to 100% of their claim.[113]

In all events, holders of General Unsecured Claims will receive, payable from the GUC Trust, their *pro rata* share of the Avoidance Action Proceeds. They will also receive CVI in the notional amount of their remaining claim after distributions of Series B Bonds, if any.

---

[113] This assumes the amount of General Unsecured Claims is less than $3 billion. The Oversight Board currently estimates the amount of General Unsecured Claims at $800 million, with a low estimated value of approximately $300 million and a high estimated value of approximately $1.43 billion. *See* Section II.B.8. If the amount of General Unsecured Claims exceeds $3 billion, distributions to General Unsecured Claims would be made as follows: General Unsecured Claims will receive their *pro rata* share of the Series B Bonds up to 50% of their claim. Of the Series B Bonds that remain available for distribution thereafter, 20% of such bonds will go to the PREPA PayGo Trust. The remaining 80% of Series B Bonds will be shared pro rata among (i) the Remaining Claims of the holders of General Unsecured Claims, (ii) 40.00% of Settling Bondholders Remaining Claims, and (iii) the Remaining Claims of the Fuel Line Lenders. If and only if both (a) GUC New Bonds equal 100% of the Remaining Claims of the Unsecured Claims Pool and (b) 100% of the Remaining Claims of the Fuel Line Lenders are paid in full, Settling Bondholders will receive up to an additional 60% of their pro rata share of Net Remaining New Bonds, if any.

**Bondholder, Monoline, and Assured Insured Interest Rate Swap Exchange Offer**

PREPA is currently a party to two interest rate swaps, with JPMorgan Chase Bank N.A. and UBS AG as counterparties, with notional amounts of $169.53 million and $83.34 million respectively. Both swaps mature on July 1, 2029. Given that swap payments are calculated periodically, the estimated amount of such payments (including termination damages) is not presently ascertainable.

In order to allow holders of PREPA Revenue Bond Claims and Assured Insured Interest Rate Swap Claims to settle their Claims against PREPA, the Oversight Board provided each such holder with the opportunity to sign a settlement agreement by the expiration of the Exchange Offer Period (as defined below), pursuant to which such holder could agree to be treated as a Settling Bondholder or Settling Monoline, as appropriate, pursuant to the Plan. Any signing claimholder shall receive a contra-CUSIP in exchange for their current holdings. Any holder that did not sign and deliver the settlement agreement shall be treated as a Non-Settling Bondholder or Non-Settling Monoline, as appropriate, and will not be able to join the Settling Bondholder and Settling Monoline Class, unless the Oversight Board agrees to extend such deadline, but in no event will such deadline be extended after a ruling by the Title III Court on the Amended Lien & Recourse Challenge.

The Holder of Assured Insured Interest Rate Swaps Claims was also entitled to settle claims, rights, and remedies against PREPA arising under the swap agreements and applicable law (including, without limitation, claims arising under the Bankruptcy Code safe harbor provisions). The Holder of Assured Insured Interest Rate Swap Claims did not elect to settle such claims during the Exchange Offer Period and, accordingly, will receive the same treatment as Non-Settling Bondholders and Non-Settling Monolines under the Plan if such claims are Allowed.

The Oversight Board commenced the period within which the holders of uninsured PREPA Revenue Bond Claims can sign the settlement offer (the "Exchange Offer Period") on January 27, 2023, with the Exchange Offer Period concluding on February 24, 2023 at 5p.m. (ET). *See Notice of Distribution of Settlement Offer Notice to Uninsured Bondholders* [ECF No. 3171] ("Settlement Agreement Notice"). Each eligible holder received through The Depository Trust company ("DTC") a settlement offer notice, a settlement agreement, and settlement term sheet, pursuant to which such holder may become a Settling Bondholder under the Plan, and explaining, among other things, the proposed treatment of such holder's Claims if the holder signs the settlement agreement.[114]  During the Exchange Offer Period, 0.98% of eligible holders with claims totaling approximately $75 million signed the settlement agreement and elected to be treated as Settling Bondholders under the Plan. Any failure to deliver the signed agreement prior to the expiration of the Exchange Offer Period will prevents such holder from opting into the settlement class and from receiving the treatment that such class will receive if the Disclosure Statement is approved and the Plan is confirmed.

---

[114] Copies of these documents are included as exhibits to the Settlement Agreement Notice.

### Illustrative Distribution of New Bonds Under the Plan

For illustrative purposes only, the following summarizes the distributions of New Bonds under the Plan:

1. Approximately four-hundred million ($400,000,000), or such lower principal or original principal amount as determined by the Oversight Board at or prior to the Confirmation Hearing, in Series B Bonds will be sold to the Commonwealth at par for Cash to fund payments of Administrative Expense Claims.

2. Holders of Fuel Line Loan Claims will receive Series A Bonds in the amount of 84.00% of their Allowed Claim. The Series A Bonds will accrue up to 1 years' worth of interest from the date the Fuel Line Lender PSA is effective, payable in Series A Bonds or Cash. They will also receive Cash or Series A Bonds for the Fuel Line Lender Creditors Consummation Fees and Fuel Line Lender PSA Creditors Professionals' Reimbursement Fees. They will also get distributions on their Remaining Claim (16.00%) depending on the outcome, or favorable settlement, of the Amended Lien & Recourse Challenge (*see* #7 below).

3. National will receive 71.65% of the Allowed National Insured Bond Claim and 20.00% of the Allowed National Reimbursement Claim in Series B Bonds.

4. Settling Bondholders will receive between 50.00% of their Allowed Claim in Series B Bonds. They will also get distributions on their Remaining Claim depending on the outcome, or favorable settlement, of the Amended Lien & Recourse Challenge (*see* #7 below).

5. Non-Settling Bondholders and Non-Settling Monolines will receive Series B Bonds in accordance with their litigation recoveries. This could be nothing if they lose Lien Counts and Recourse Counts, or it could be up to all the Series B Bonds that remain available for distribution if they win the Lien Counts and the Court determines their collateral is worth as much as the Series B Bonds available for distribution after primary distributions to Settling Bondholders.[115] If the Non-Settling Bondholders and Non-Settling Monolines lose the Lien Counts but win on Recourse Counts, they will have a deficiency claim that will be treated the same as General Unsecured Claims.[116]

---

[115] Certain creditors have asserted the amount of Series B Bonds that Non-Settling Bondholders would receive could be more than the amount of Series B Bonds contemplated under this Plan (in which case this Plan may not be confirmable or feasible without material amendments).

[116] Holders of Assured Insured Interest Rate Swap Claims will receive the same treatment as Non-Settling Bondholders and Non-Settling Monolines.

6.  General Unsecured Claims will receive, up to 50.00% of their claim, the Series B Bonds that remain after distributions to the Fuel Line Lenders, National, the Settling Bondholders, and Non-Settling Bondholders and Non-Settling Monolines. They will also get distributions on their Remaining Claim (50.00%) depending on the outcome, or favorable settlement, of the Amended Lien & Recourse Challenge (*see* #7 below).

7.  If there are Series B Bonds remaining after paying General Unsecured Claims and Deficiency Claims (if any) up to 50.00% of their claims, then the PREPA PayGo Trust will get 20.00% of the Gross Remaining New Bonds.

8.  The other 80.00% of the Gross Remaining New Bonds will be shared ratably between the Remaining Claims of (i) General Unsecured Claims (50.00%), (ii) the Fuel Line Lenders (16.00%), and (iii) 40.00% of the Remaining Claims of the Settling Bondholders (*i.e.*, 20.00% (40.00% of 50.00%)).

9.  If and only if both (a) GUC New Bonds equal 100% of the Remaining Claims of the Unsecured Claims Pool and (b) 100% of the Remaining Claims of the Fuel Line Lenders are paid in full, Settling Bondholders will receive up to an additional 60% of their pro rata share of Net Remaining New Bonds, if any.

10. Excess New Bonds available after creditors recover fully on their Allowed Claims, shall either be deemed not to be issued by PREPA, or shall be issued and distributed to the PREPA PayGo Trust, at PREPA's discretion.



*This chart is for illustrative purposes only.  To the extent of any discrepancy between the chart and the Plan, the Plan shall govern in all respects

### Settlement of Outstanding Disputes

### Settlement of Outstanding Disputes with National

Pursuant to the terms of the National PSA, and in exchange for the consideration to be provided in the Plan, National agrees to settle, waive, release, and discharge all claims against PREPA, including, but not limited to, the following disputes (such disputes are summarized in Section V of this Disclosure Statement):

- Amended Lien & Recourse Challenge:

  o All counterclaims and affirmative defenses related to *The Financial Oversight and Management Board for Puerto Rico v. U.S. Bank Nat'l Ass'n*, Adv. Proc. No. 19-00391 (D.P.R. July 1, 2019).

  o Any other claims, theories, rights, and defenses related to, among other things, their proofs of claims and/or the Master PREPA Bond Claim, including, but not limited to, the scope of the asserted security interest in PREPA's property, assets, or revenues, whether the claims have recourse beyond moneys deposited to the credit of the Sinking Fund, and other asserted rights related to certain contractual covenants or statutory rights, including to seek appointment of a

receiver, an increase in PREPA's electricity rates, or the enforcement of collection of customers' bills.

- Motion to Appoint Receiver and Dismiss Title III Case:

  o Motion to Dismiss PREPA's Title III Case.

  o Any other motions, objections or joinders to these or such other motions or objections that may be filed related to the requested relief, including, but not limited to, seeking to lift the automatic stay, the appointment of a receiver at PREPA, and the dismissal of PREPA's Title III Case.

Pursuant to the terms of the Settlement Offer Memorandum, Settling Bondholders made various covenants, including a covenant not to take or encourage any other person to take any action which would reasonably be expected to impede the administration of the Title III Case or the confirmation or consummation of the Plan.

Settling Bondholders may only terminate the Settlement Agreement in limited circumstances.

**Settlement of Outstanding Disputes with Settling Bondholders**

Pursuant to the terms of the Settlement Offer Memorandum, and in exchange for the consideration to be provided in the Plan, the Settling Bondholders agree to settle, waive, release, and discharge all claims against PREPA, including, but not limited to, the following disputes (such disputes are summarized in Section V of this Disclosure Statement):

- Amended Lien & Recourse Challenge:

  o All counterclaims and affirmative defenses related to *The Financial Oversight and Management Board for Puerto Rico v. U.S. Bank Nat'l Ass'n*, Adv. Proc. No. 19-00391 (D.P.R. July 1, 2019).

  o Any other claims, theories, rights, and defenses related to, among other things, their proofs of claims and/or the Master PREPA Bond Claim, including, but not limited to, the scope of the asserted security interest in PREPA's property, assets, or revenues, whether the claims have recourse beyond moneys deposited to the credit of the Sinking Fund, and other asserted rights related to certain contractual covenants or statutory rights, including to seek appointment of a receiver, an increase in PREPA's electricity rates, or the enforcement of collection of customers' bills.

- Motion to Appoint Receiver and Dismiss Title III Case:

  o Motion to Dismiss PREPA's Title III Case.

  o Any other motions, objections or joinders to these or such other motions or objections that may be filed related to the requested relief, including, but not

limited to, seeking to lift the automatic stay, the appointment of a receiver at PREPA, and the dismissal of PREPA's Title III Case.

### Settlement of Outstanding Disputes with Fuel Line Lenders

Pursuant to the terms of the Fuel Line Lender PSA, and in exchange for the consideration to be provided in the Plan, if the Fuel Line Lenders vote to accept the Plan, they agree to settle, waive, release, and discharge all claims against PREPA and the Settling Bondholders, including the following disputes (such disputes are summarized in Section V.G.3 of this Disclosure Statement):

- *Cortland Capital Market Services LLC v. The Financial Oversight and Management Board for Puerto Rico*, Adv. Proc. No. 19-00396 (D.P.R. July 9, 2019).

- Any other claims or rights related to the Fuel Line Loans, including, but not limited to, the Fuel Line Lenders' asserted priority and seniority over the Bonds pursuant to any agreement.

### Settlement of Outstanding Disputes with Vitol

Pursuant to the terms of the Vitol Settlement Agreement, and in exchange for the consideration to be provided in the Plan, the following disputes in connection with Vitol will be compromised and settled pursuant to the Plan (such disputes are summarized in Section V.G.20-21 of this Disclosure Statement):

- Vitol's Releases:

  o Upon the effective date of the Plan, Vitol has agreed to release PREPA and the Oversight Board from any and all claims and causes of action arising out of or relating in any manner whatsoever to *PREPA v. Vitol Inc. et al.*, Adv. Proc. No. 19-00453 (D.P.R. Nov. 14, 2019).

  o For the avoidance of doubt, the Vitol Settlement Agreement expressly preserves any and all of Vitol's claims, rights, and defenses related to the avoidance action styled *Special Claims Comm. v. Inspectorate America Corp.*, Adv. Proc. No. 19-00388 in Case No. 17-bk-3283-LTS, D.P.R.

- PREPA's Releases:

  o Upon the effective date of the Plan, PREPA has agreed to release Vitol from any and all claims and causes of action arising out of or relating in any manner whatsoever to *PREPA v. Vitol Inc. et al.*, Adv. Proc. No. 19-00453 (D.P.R. Nov. 14, 2019).

  o For the avoidance of doubt, the Vitol Settlement Agreement expressly preserves any and all of PREPA's claims, rights, and defenses related to the avoidance action styled *Special Claims Comm. v. Inspectorate America Corp.*, Adv. Proc. No. 19-00388 in Case No. 17-bk-3283-LTS, D.P.R.

### Estimation of Allowed General Unsecured Claims

As described further herein, the Plan treats and discharges claims filed against PREPA, including a class of General Unsecured Claims.  While almost $6 billion of General Unsecured Claims have been filed against PREPA, claims reconciliation remains ongoing by the Debtor, the Oversight Board, and their professional advisors.  Attached hereto as **Exhibit O** is a table describing the asserted amounts of filed claims, as well as the Debtor's current low and high estimates for various categories of General Unsecured Claims and the current "Adjusted Estimated Value," reflecting the Debtor's reasonably best projection regarding the ultimate allowed amount of General Unsecured Claims for purposes of providing information to holders of General Unsecured Claims regarding their potential recoveries under the Plan.  Of course, as noted in Article VIII of this Disclosure Statement, the recovery for holders of General Unsecured Claims might be higher or lower depending on the actual amount of General Unsecured Claims ultimately allowed.  This uncertainty is unavoidable as the claim reconciliation process is ongoing.

As described further on Exhibit O, the Debtor's Adjusted Estimated Claim Value is approximately $800 million, with a low estimated value of approximately $300 million and a high estimated value of approximately $1.43 billion.  The differences between the estimates are attributable to six categories of General Unsecured Claims:  (a) PPOA rejection damages claims, (b) the grievances portion of UTIER's proof of claim, (c) litigation claims, (d) a litigation claim filed by UITICE, and (e) employee-related claims.

### PPOA Claims.

Almost $3 billion of the General Unsecured Claims pool has been asserted by 12[1] counterparties to terminated PPOAs agreements or master PPOAs, each of whom alleges millions of dollars (in certain cases, hundreds of millions) in damages relating to development costs, loss of profits that such claimants believe they would have been entitled to under each claimant's respective PPOA, and other damages.

The Oversight Board anticipates it will object to certain PPOA claims in advance of Plan confirmation.  To develop its estimates, the Debtor and its professional advisors have investigated and considered the viability of each of the three components of the PPOA claims.  The vast majority of the face value of such claims assert damages in the form of lost profits.  However, the Oversight Board believes the holders of PPOA claims are not entitled to claim any such damages because (i) each of the PPOAs was terminated in accordance with its terms and subject to provisions contained therein that prohibit the claimant from seeking additional damages upon termination, (ii) the majority of the PPOAs contain a provision explicitly prohibiting any claim on account of lost profits, and (iii) in any event, the claims do not provide information sufficient to substantiate a lost profits damages claim.  Section 13.3 of most of the PPOAs provides that "[n]otwithstanding anything to the contrary in this Agreement, neither Party . . . shall in any event be liable to the other Party . . . for claims . . . made by either Party for lost profits . . . ."  Accordingly, the Oversight Board's estimates heavily discount the lost profits component of the PPOA Claims,

---

[1]     Fourteen claims were filed by PPOA counterparties.  Two of them, filed by AES and Ecoelectrica, relate to ongoing contracts and have been resolved by the parties.

and eliminate such amounts in the low end of the estimate.  The Adjusted Estimated Value of the PPOA claims thus amounts to approximately $460 million, which includes an adjustment for the lost profits aspects of these claims.

### UTIER Grievances Claim

In addition to the contract damages claim, the UTIER POC asserts a claim in the amount of approximately $1.1 billion in damages related to grievances and other claims under the UTIER CBA.  Following the filing of the proof of claim, the Debtor requested additional information and supporting documentation from UTIER to support the asserted claim amount, and received approximately 50,000 physical documents relating to various grievances asserted, none of which included any valuation information or other supporting data.  The Debtor's professionals have been diligently reviewing the claims asserted in the documentation provided, with the assistance of the Debtor's employees who have significant experience mediating union claims.  That review has identified approximately 26,000 individual grievance claims.  Valuing these claims with reference to historical claim valuation data, the Debtor believes the UTIER grievances will be allowed in an Adjusted Estimated Value of approximately $230 million.

### Litigation Claims

Approximately 200 proofs of claim were filed against the Debtor on account of various litigations pending against PREPA, for an aggregate asserted total of approximately $545 million.  In conjunction with its local counsel, who have been responsible for representing PREPA in litigation since well before the filing of this Title III Case, the Debtor has been diligently reviewing the claims asserted in the various litigations and, based upon its understanding of the litigations asserted, as well as offers made or accepted with respect to the claims in this category that have been included within the ADR process, have estimated the Adjusted Estimated Value to be approximately $30 million.

### UITICE Litigation Claim

UITICE, one of the Debtor's previous employee unions, filed proof of claim number 80187, which asserts damages purportedly arising from modifications to PREPA's health benefits program for employees and retirees. PREPA and UITICE were parties to a collective bargaining agreement that, among other things, provided retired UITICE employees and their spouses "will receive the Comprehensive Health Program known as the AR Plan" and that the "rules and conditions" of the Health Benefits Program to be provided pursuant to the CBA "shall not be inferior to those currently in effect . . . or to the terms, conditions, and benefits negotiated in this agreement.  The provider network will be materially similar to the current network in case of any change." UITICE CBA, Art. XXV, § 4.  PREPA later altered the health insurance provider with similar coverage at a lower cost, recognizing savings of approximately $225 million.  UITICE challenged PREPA's action, and PREPA was later ordered to compensate retired members of UITICE for any loss of benefits they suffered, with such amount to be substantiated in a separate proceeding.  UITICE filed a proof of claim for the asserted amount of $225 million, attaching only

the judgment against PREPA as evidence in support of such amount.  PREPA disputes that UITICE's represented employees suffered any damages as coverage under the two health plans were substantially similar.  PREPA has therefore requested additional documentation from UITICE to support its asserted claim amount or to otherwise substantiate the loss of benefits incurred by its members.  Despite such requests, UITICE has to date not responded and has failed to provide any documentation to support its asserted claim amount.  PREPA intends to object to this claim and believes it should be reduced to $0 absent further documentary support for the alleged damages.  However, the Adjusted Estimated Claim value includes a reserve equating to an aggregate value of approximately $11 million, which equates to approximately $22,500 per UITICE employee.

## Employee Claims

Many PREPA employees have also asserted claims against PREPA in the aggregate amount of approximately $15 million, relating to various employment-related issues such as amounts allegedly owed on account of vacation pay, sick pay, Christmas Bonuses, and more. Many of these asserted amounts relate to amounts such employees believe they were entitled to earn above the amounts set forth in various Commonwealth laws, including, but not limited to, the amounts for fringe benefits such as Christmas Bonuses, sick pay, and vacation pay in, among others, Act 66-2014 and Act 26-2017.  The Debtor believes that some of these claimed amounts may be duplicative of UTIER's claim for damages under the UTIER CBA as asserted in Adversary Proceeding No. 17-00229, which was dismissed as to PREPA.  Accordingly, the low estimate for employee-related claims removes such asserted amounts, while the high estimate includes all asserted claim amounts.  The Debtor's current Adjusted Estimated Value is approximately $9 million.