# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17-BK-4780-LTS<br><br>(Jointly Administered) |

**RESPONSE OF THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD OF PUERTO RICO TO THE STATUS REPORT REGARDING DISCOVERY DISPUTES OF THE AD HOC GROUP OF PREPA BONDHOLDERS, U.S. BANK NATIONAL ASSOCIATION ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., AND SYNCORA GUARANTEE, INC.**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19- BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**To the Honorable United States Magistrate Judge Judith Gail Dein:**

Pursuant to the Court's *Order Regarding Discovery Dispute* [ECF No. 3352] (the "<u>Dispute Order</u>"), the Financial Oversight and Management Board for Puerto Rico (the "<u>Oversight Board</u>"), as the sole Title III representative of the Puerto Rico Electric Power Authority ("<u>PREPA</u>") pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("<u>PROMESA</u>"),[2] for itself and on behalf of PREPA, respectfully submits this response to the *Status Report Regarding Discovery Disputes of the Ad Hoc Group of PREPA Bondholders, U.S. Bank National Association, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and Syncora Guarantee Inc.* [ECF No. 3360] (the "<u>Status Report</u>") filed by the Ad Hoc Group of PREPA Bondholders (the "<u>Ad Hoc Group</u>")[3], Assured Guaranty Corp. ("<u>AGC</u>"), Assured Guaranty Municipal Corp. ("<u>AGM</u>," and together with AGC, "<u>Assured</u>"), and Syncora Guarantee Inc. ("<u>Syncora</u>," and collectively with the Ad Hoc Group and Assured, the "<u>Bondholders</u>") regarding the discovery disputes between the Bondholders and the Oversight Board, PREPA, and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("<u>AAFAF</u>").

## PRELIMINARY STATEMENT

1. The Bondholders' approach to discovery in this case has been marked by unreasonable demands and timelines. The Oversight Board has sought to work cooperatively to

---

[2] PROMESA is codified at 48 U.S.C. §§ 2101-2241.

[3] The Ad Hoc Group consists of certain funds and accounts managed or advised by Blackrock, Franklin Advisers, Inc.; GoldenTree Asset Management LP; Invesco Advisers, Inc.; Nuveen Asset Management, LLC; Taconic Capital Advisors L.P.; and Whitebox Advisors LLC. The Oversight Board notes that Taconic Capital Advisors L.P. and Whitebox Advisors LLC are also the sole members Ad Hoc Committee of National Claim Assignees.

propose options for narrowing the Bondholders' extraordinarily broad and burdensome Requests[4] so that meaningful confirmation-related discovery can occur.

2. Until very recently, the Bondholders have consistently refused to meaningfully engage with the Oversight Board, favoring instead a path aimed at obtaining Court intervention as soon as possible. The Oversight Board expected the Bondholders would take a more realistic, collaborative approach following the Court's issuance of the Dispute Order. However, in the Status Report, the Bondholders grossly mischaracterize the Oversight Board's positions and approaches, including accusing the Oversight Board of engaging in "rope-a-dope" to "avoid meaningful document discovery." Overheated rhetoric is not a substitute for substance and hardly conducive to an efficient discovery process, particularly one that must proceed on the schedule approved by the Court.

3. The Oversight Board responds to each of the issues raised by the Bondholders in the order presented in the Status Report.

**I.      Background**

4. While the Bondholders spend several pages discussing several of their thirty-four Requests, the Status Report claims there are discovery disputes only as to Request Nos. 1 and 4.[5]

---

[4] The "Requests" refers to the *Joint Request of the Ad Hoc Group, Assured, Syncora, and the Trustee for the Production of Documents*, attached as Exhibit B to the *Joint Informative Motion of the Ad Hoc Group of PREPA Bondholders, U.S. Bank National Association, Assured Guaranty Corp., Assured Guaranty Municipal Corp., Syncora Guarantee Inc., the Financial Oversight and Management Group for Puerto Rico, and the Puerto Rico Fiscal Agency and Financial Advisory Authority Regarding Discovery Dispute* [ECF No. 3347] (the "Joint Informative Motion"), and "Request No. __" refers to an individual request therein.

[5] Although the Status Report also states that the Court should not "further delay . . . consideration of" Request Nos. 2 and 6, the Status Report does not identify any specific disputes with respect to either request. Indeed, the Bondholders provided proposed search protocols for those Requests on March 28, and the Oversight Board is evaluating those proposed protocols.

Before turning to those disputes, however, the Oversight Board is compelled to correct the misleading record the Bondholders try to make.

5. The Bondholders state they first "served" the Requests on January 23, 2023 and argue the Oversight Board has had "more than two months" to consider them. Status Report ¶¶ 1, 33. As the Requests served in January were entirely related to confirmation, the Oversight Board was under no obligation to address them at that time, and informed the Bondholders of this by letter on February 8, 2023. Exhibit S (letter).[6] In response to the Bondholders' "informative motion" complaining about the Oversight Board's "refusal" to respond to the Requests,[7] the Oversight Board explained that besides being premature, the Requests were exceedingly broad and not targeted to discovery of information relevant to confirmation. *Response to Informative Motion of the Ad Hoc Group of PREPA Bondholders, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and Syncora Guarantee, Inc. Concerning the Government Parties' Refusal to Commence Plan Discovery* [ECF No. 3248] at 2-3. The Court then ruled the Oversight Board "need not respond to any discovery requests prior to the approval of the Disclosure Statement." *See Order Concerning Modifications to Proposed Discovery and Confirmation Schedule* [ECF No. 3284] at 2. But even before the Disclosure Statement was approved on March 3, 2023, the Bondholders ignored the overwhelmingly broad nature of the Requests and simply reissued them essentially word-for-word on March 1, 2023. Exhibit L. Notably, the Bondholders did not revise

---

[6] As the Bondholders did in their Status Report, the exhibits to this response are lettered sequentially to those assigned to the exhibits in the Joint Informative Motion and the Status Report for the sake of clarity.

[7] *See Informative Motion of the Ad Hoc Group of PREPA Bondholders, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and Syncora Guarantee, Inc. Concerning the Government Parties' Refusal to Commence Plan Discovery* [ECF No. 3219].

4

or narrow the Requests in any way, including by considering the filing of revised Plans on February 9, February 26, and March 1, 2023.

6. That the Requests are far too broad is beyond dispute. Not only do they purport to cover a 10 year period beginning January 1, 2013 (three and a half years before the Oversight Board came into existence), more than half of them (without even including subparts) seek "all" documents and communications for subjects as broad and vague as "the Plan or Disclosure Statement" (Ex. B, Request No. 6) or "presentations given to the FOMB or AAFAF concerning PREPA" (*id.*, Request No. 17). Heedless of the breadth and consequential burden of their Requests, the Bondholders have also sought production in impossible timelines. For example, in a letter accompanying the Requests, the Bondholders demanded the Oversight Board produce all documents responsive to their overbroad requests *within seven days*—the same timeframe set by the Court for the Oversight Board to serve its written responses and objections.[8] Exhibit C at 1.

7. Far from engaging in "rope-a-dope" that "avoids meaningful document discovery," the Oversight Board has directed the Bondholders to hundreds of documents uploaded to the Depository,[9] as well as to voluminous public sources where they could find the requested information (an investigation of which should have obviated the need for such requests in the first place).[10] Additionally, the Oversight Board has diligently sought further responsive documents to

---

[8] In their discovery-related correspondence with the Oversight Board, the Bondholders have also unilaterally imposed unreasonable deadlines, often of 24 hours. *See* Exhibit K at 4-5; Exhibit N at 4.

[9] The Disclosure Statement Depository was opened on January 2, 2023 and, pursuant to the Confirmation Procedures Order, converted to the Plan Depository and populated with additional confirmation-related documents on March 11, 2023.

[10] The Bondholders argue that the Oversight Board has "produced only 204 documents to creditors" that are not otherwise publicly available. Status Report ¶¶ 2, 12. But much of what the Bondholders request is publicly available or not in the Oversight Board's control, and it is more efficient to direct the Bondholders to these sources rather than undertake the burden and expense

5

the Requests, within the parameters communicated by the Oversight Board in its objections, by collecting and reviewing documents from its advisors who might have responsive information.

8. What the Oversight Board asked for from the Bondholders in order to continue locating and uploading potentially relevant and responsive documents—and which the Bondholders completely refused to entertain until the second meet and confer on March 24, 2023—was any willingness to narrow their exceedingly broad Requests. Indeed, it was not until after the Status Report was filed that the Bondholders sent, for the first time, proposed search terms, custodians, and time frames in a belated effort to narrow certain Requests. *See* Exhibit T (letter dated March 28, 2023). Despite the Bondholders' protests about the limited window for discovery, these proposed search terms were not received until March 28, four days following the March 24 meet and confer. And not surprisingly, the proposed time frames are much narrower than the expansive ten-year window originally sought in the Requests. While the Oversight Board welcomes the Bondholders' realization that several of their Requests are simply too broad to result in a meaningful exchange of information, there was no reason for it to come so late. The Oversight Board is currently analyzing the scope of the Bondholders' proposed search terms and the burden of any resulting search, but, where doing so would not be unreasonably burdensome, the Oversight Board is willing to review the search results and produce responsive non-privileged documents.

## II. The Bondholders' Document Requests

9. Federal Rule of Civil Procedure 26(b) limits discovery to information that is "relevant to any party's claim or defense" and "proportional to the needs of the case," considering,

---

of collecting and uploading them. For example, rather than upload these publicly available documens to the Plan Depository, the Oversight Board directed the Bondholders in Request No. 16 to AAFAF's website for PREPA's financial statements and to the website for the Puerto Rico Central Office of Recovery, Reconstruction and Resiliency for documents responsive to Request No. 25.

among other factors, "the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Further, during the Commonwealth's confirmation proceedings, the Court ordered parties "propounding discovery . . . to use their utmost good faith efforts to limit their requests to ones that target critical contested issues," so that "resources are not wasted." *See*, H'rg Tr. [Case No. 17-bk-3283, ECF No. 17379] at 15, 93 (July 14, 2021). The same guidance should apply here.

10. As has been demonstrated in three previous successful Title III confirmation proceedings, the Oversight Board acts in good faith towards creditors and other parties in interest to provide relevant information necessary to aid their determination of the confirmability of the Plan. But that process requires both sides to buy in, and, aside from some minor progress, the Bondholders have not done so.

11. <u>Dispute about Request No. 1</u>. As an initial matter, this Request is so broad that it subsumes many of the Bondholders' subsequent Requests within it. For a ten-year period, the Bondholders seek:

> All Documents concerning any analysis, forecast, projection, or estimate of (a) PREPA's ability to pay its legacy debt and other expenses, including the affordability or SOW of any rates or charges necessary for PREPA to do so; (b) PREPA's base and other rates for electricity; (c) PREPA's revenue requirements; (d) PREPA's electricity load; (e) PREPA's revenues, expenses, capital expenditures, cash flows, accounts receivables, or collections; (f) PREPA's debt sustainability or capacity; (g) PREPA's transition to renewable energy sources; (h) the theft of electricity from PREPA and its causes—and that were performed by or on behalf of, considered by, or provided or presented to, the FOMB, PREPA, or AAFAF, including in connection with the Plan, any settlement proposals considered, made, or received, the 2019 RSA or any other actual or proposed restructuring or plan-support agreement, the 2021, 2022, or 2023 Fiscal Plans, or at any other time—and with respect to all such analyses, forecasts, projections, or estimates:
>
> > a. All Documents concerning any underlying models, data inputs, and assumptions used to develop such analysis, forecast, projection, or estimate;
> >
> > b. All programs and models (showing any data adjustments and intermediate and final calculations, including code developed for analyses performed using

    statistical software packages), all input files used by these programs and models, and all output files generated by these programs and models, provided in a format and organization where all programs can be executed with minimal effort and with instructions for doing so;

   c. Documents sufficient to show the sources and citations for all the datasets and data inputs used to construct any such analysis, forecast, projection, or estimate.

  12. The Oversight Board properly objected to this Request as overly board and unduly burdensome, among other things. *See* Exhibit F at 13. Even so, the Oversight Board directed the Bondholders to two folders on the Depository, each of which contain files responsive to this Request. *Id.* Several of the files are models prepared by the Oversight Board's advisors providing comprehensive information regarding, for example, how the Legacy Charge was calculated. As it did for many of the Requests, the Oversight Board also solicited its advisors and coordinated with other parties, such as LUMA, for responsive information.

  13. The Oversight Board has since identified additional responsive documents and has uploaded documents responsive to subparts 1(b), 1(c), 1(e), 1(f), and 1(g). *See* Exhibit U (March 31 letter). The Bondholders will not be satisfied. They have said during the meet and confers that they want "other" analyses, forecasts, and models using different assumptions and coming to different conclusions than those in the Plan. Yet such documents, to the extent they exist, are plainly not relevant to the confirmability of the Plan before the Court. At most, they relate to other possible plans that could have hypothetically been proposed up to a decade ago. But the Bankruptcy Code specifically states creditors do not need information "about any other possible or potential plan." 11 U.S.C. 1125; *see also In re Charles Street African Methodist Episcoal Church of Boston*, 578 B.R. 56, 97 (Bankr. D. Mass. 2017) ("'The 'plan' that must be filed in good faith means the plan that is under consideration, not prior plans in the case or prior iterations of the present plan."); *In re T-H New Orleans Ltd. P'ship*, 188 B.R. 799, 806 (E.D.La. 1995) ("The

8

plan need not be the best alternative for the creditor, but only one that is fair, equitable and feasible under the Code."). In any event, the only documents like that that exist are overwhelmingly privileged as they would have been prepared to support different proposals during the parties' mediation. Nevertheless, as the Oversight Board's March 31 letter indicates, the Oversight Board continues to provide non-privileged documents responsive to the specific subparts of Request No. 1.

14. Separately, the Bondholders raised for the first time at the March 24 meet and confer—and now repeat in the Status Report—their position that Request No. 1 also seeks communications in addition to responsive documents. Request No. 1 seeks "all Documents," and while the Bondholders defined "Documents" to also include, among other things, "Communications," the Oversight Board objected to this expansive definition. *See* Exhibit F at 9. Additionally, certain of their other Requests explicitly seek "Documents" and "Communications"; notably, Request No. 1 does not. The Oversight Board understandably took this to mean that the focus of Request No. 1 was *not* communications—especially in light of Request No. 6, which seeks "[a]ll Communications concerning the Plan or Disclosure Statement."

15. As it is doing in connection with other Requests, such as Request No. 5, the Oversight Board is willing to search communications when the Request is appropriately tailored to issues relevant to the confirmability of the Plan. But, as the Oversight Board explained to the Bondholders at the meet and confer, Request No. 1 is simply too broad as drafted to be amenable to any reasonable search. The examples provided by the Bondholders at the parties' meet and confers and in the Status Report show why a request for all "Communications" regarding analyses and forecasts over a ten year period is not relevant or proportional to the needs of this case. Requests for an individual Oversight Board member's communication with a non-party about

9

PREPA's debt capacity or electricity load forecast (*i.e.*, the hypothetical examples cited in the Bondholders' Status Report) asks the Oversight Board to undertake a burdensome review for something that is ultimately not relevant to the confirmability of the Plan before the Court. Such a search is not in keeping with the Court's approach of limiting confirmation discovery to "critical contested issues" so that "resources are not wasted." *See* H'rg Tr., at 15, 93 (July 14, 2021).

16. <u>Dispute about Request No. 4</u>. Request No. 4 seeks:

> All Documents concerning the actual or potential termination of the 2019 RSA, including all Communications concerning whether, when, or under what circumstances to terminate the 2019 RSA, and all Documents concerning the reasons to terminate (or not to terminate) the 2019 RSA.

17. As the Oversight Board explained during the March 24 meet and confer, the 2019 RSA and its termination are not relevant to confirmation of the Plan, which does not implement the 2019 RSA. Nor is it reasonable for the Oversight Board to perform searches for communications concerning "whether, when, or under what circumstances to terminate" the 2019 RSA, which are legal and/or deliberative discussions and therefore overwhelmingly privileged (if not entirely), as are documents "concerning the reasons to terminate (or not to terminate)." Thus, even if these documents were relevant to the confirmation of the Plan (which they are not), it is not "proportional to the needs of the case" nor in keeping with the goal of preserving resources to undergo such a search. In any event, the 2019 RSA itself restricts the use of any of its terms for any other purposes other than enforcing a party's remedies under the 2019 RSA (which, given the fact the 2019 RSA has been terminated, will never occur), so it is not clear what use the Bondholders propose to make of the 2019 RSA or the decision to terminate it here. *See Restructuring Support Agreement* [ECF No. 1235-1] at § 28. If, as Bondholders have signaled many times, they intend to use the terms of the 2019 RSA to prove they are legally entitled to a greater recovery in PREPA's Title III case, then Request No. 4 is not reasonably calculated to lead

10

to admissible evidence. Settlements and settlement proposals are not admissible for that purpose under Federal Rule of Evidence 408, and in any case, prior possible plans are not relevant to consideration of the Plan. Because Request No. 4 is not "target[ed] [to] critical contested issues," the Oversight Board's current response (*see* Ex. F at 15) is sufficient.

### III. Depositions of Oversight Board Members

18. The Oversight Board's position regarding the Bondholders' request to take, in the first instance, depositions of all seven members of the Oversight Board is the same as expressed in the Joint Informative Motion. As the Oversight Board explained in its March 7 letter to the Bondholders, the Oversight Board members serve without compensation and in a voluntary capacity. Exhibit D at 1. To preserve its resources and focus discovery on matters relevant to the confirmability of the Plan, the Oversight Board has offered David Skeel, Chairman of the Oversight Board, and Robert Mujica, Executive Director of the Oversight Board, both designated fact witnesses in support of the Plan, for deposition. Decisions relating to PREPA and the Plan are made by the Oversight Board as a whole and not by any individual member. It is therefore inappropriate and unnecessarily duplicative to depose all seven of the Oversight Board members in the first instance, especially when the Bondholders have not identified any information relevant and proportional to the needs of the case that could be garnered from any other Oversight Board member or representative other than Chairman Skeel and Director Mujica. *See Cloud v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 2021 WL 4477720, at *13 (N.D. Tex. Sept. 30, 2021) (denying plaintiff's request to depose all six Board members because plaintiff had not shown that taking six depositions would elicit testimony that was not unreasonably cumulative or duplicative of one another or what, if any, new information can be obtained from each deposition).

19. The Oversight Board did, however, offer to consider scheduling the deposition of other members of the Oversight Board following the depositions of Chairman Skeel and Director Mujica if the Bondholders could identify relevant additional knowledge any other member of the Oversight Board would have. *See* Exhibit D at 4; Exhibit L at 2-3. The Oversight Board remains willing to hold to this offer, but the Oversight Board does not agree with scheduling the depositions of all seven members of the Oversight Board (or four of the seven, as most recently proposed by the Bondholders), in addition to a multitude of its advisors, without any further information from the Bondholders as to the relevance of those further depositions to the confirmability of the Plan. Nor has the Oversight Board flatly ruled out making other members of the Oversight Board available for deposition, as it has consistently expressed to the Bondholders, should the Bondholders provide an explanation as to why those depositions would be relevant. *See* Exhibit D at 4; Exhibit L at 2-3.

### IV. Disclosure of Opinion Testimony

20. As the Bondholders conceded in the Joint Informative Motion, the majority of the parties' discussions about the Oversight Board's disclosure of potential Rule 26(a)(2)(C) witnesses in the Preliminary Fact Witness List[11] has been about the *timing* of disclosures, not whether these witnesses are properly designated as Rule 26(a)(2)(C) witnesses rather than Rule 26(a)(2)(B) witnesses. Notwithstanding the Bondholders' prior representation that they "believe that it may well turn out that the Oversight Board's refusal to serve expert reports violates Rule 26(a)(2)(B)" and that they could challenge such testimony at the confirmation hearing based on inadequate

---

[11] In the Preliminary Fact Witness List, the Oversight Board identified David Brownstein, Sheva Levy, Juan Santambrogio, Ojas Shah, Mark Shankweiler, and William P. Zarakas as witnesses who *may* also offer opinion testimony pursuant to Rule 26(a)(2)(C) (the "Challenged Witnesses"). Exhibit I at 3-4; *see* ECF No. 3329.

disclosure, the Bondholders now raise the issue as a "discovery dispute." *See* Joint Informative Mot. ¶ 36. While the Oversight Board does not believe this is a "discovery dispute" arising out of the Requests as envisioned by the Confirmation Procedures Order, in the interest of efficiency the Oversight Board will address the issue here.

21. Rule 26(a)(2)(B) requires expert reports where the witness is "retained or specially employed to provide expert testimony in the case" or "one whose duties as the party's employee regularly involve giving expert testimony." Fed. R. Civ. P. 26(a)(2)(B).[12] "In order to give the phrase 'retained or specially employed' any real meaning, a court must acknowledge the difference between a percipient witnesses who happens to be an expert and an expert who without prior knowledge of the facts giving rise to litigation is recruited to provide expert opinion testimony." *Downey v. Bob's Discount Furniture Holdings, Inc.*, 633 F.3d 1, 6 (1st Cir. 2011). Where "the expert is part of the ongoing sequence of events and arrives at his [opinion] during [those events], his opinion testimony is not that of a retained or specially employed expert . . . [i]f, however, the expert comes to the case as a stranger and draws the opinion from facts supplied by others, *in preparation for trial*, he reasonably can be viewed as retained or specially employed for that purpose, within the purview of Rule 26(a)(2)(B)." *Id.* at 7-8 (emphasis added) (citations omitted).

22. The Bondholders argue that all of the Challenged Witnesses "appear" to have been "retained . . . to provide expert testimony in the case" because they (or, more accurately, their employers) were "retained after the commencement of PREPA's Title III case." Status Report ¶ 27. But the Bondholders purposefully stretch the relevant "litigation" the Challenged Witnesses were allegedly "retained" for in order to have any argument at all. As the Court is fully aware,

---

[12] The Bondholders do not argue that any of the Challenged Witnesses were "one whose duties as the party's employee regularly involve giving expert testimony." Fed. R. Civ. P. 26(a)(2)(B).

13

"PREPA's Title III case" has been ongoing since July 2, 2017, when the Oversight Board filed the Title III petition. *See* ECF No. 1. It appears to be the Bondholders' position that any individual hired after the petition date who may go on to give opinion testimony, regardless of the individual's concurrent involvement in the non-litigation specific work of the Oversight Board, has been "retained or specially employed to provide expert testimony." This is an absurd reading of Rule 26(a)(2)(B) in the context of this case, and one at odds with this Court's prior ruling on the Oversight Board's designation of Rule 26(a)(2)(C) witnesses. *See* H'rg Tr. [Case No. 17-bk-3283, ECF No. 19028] at 68-70 (Nov. 1, 2021) (denying motion to exclude certain Rule 26(a)(2)(C) witnesses for failure to submit expert reports under Rule 26(a)(2)(B)).

23. Each of the Challenged Witnesses, and their respective employers, were retained long before the Oversight Board proposed the Plan and the related confirmation proceedings began.[13] And, during the course of their employers' retention, each of the Challenged Witnesses has been "part of the ongoing sequence of events" leading to the formulation of the Plan, and now is being put forth as fact witnesses in support of the Plan who may also give expert testimony based on their participation in those events. *See Downey*, 633 F.3d at 6. They were not "recruited to provide expert opinion testimony," nor are they coming to this case (*i.e.*, the Plan confirmation proceedings) as a "stranger" and "draw[ing] their opinion from facts supplied by others, *in preparation for trial*." *Id.* at 6, 7 (emphasis added). Where that is the case, the Oversight Board

---

[13] Indeed, in several cases, the Challenged Witnesses' employers were retained *before* PREPA's petition date, including Ernst & Young, LLP (Sheva Levy, Juan Santambrogio), retained as of February 15, 2017; McKinsey & Company (Ojas Shah), retained as of November 27, 2016; and Citigroup Global Markets Inc. (David Brownstein), retained as of January 27, 2017. Brattle Group Inc. (William P. Zarakas) and Berkeley Research Group, LLC (Mark Shankweiler) were retained as of March and June 2019, respectively.

will disclose any such experts in accordance with the schedule set forth in the Confirmation Procedures Order.

24. In addition, several of the Challenged Witnesses have previously provided testimony on similar topics in other successful Title III confirmation proceedings as Rule 26(a)(2)(C) witnesses. *See Debtors' Preliminary List of Witnesses to be Offered in Support of Confirmation of Plan of Adjustment* [Case No. 17-3283, ECF No. 17362] (identifying Ojas Shah, Juan Santambrogio, Sheva Levy, and David Brownstein as Rule 26(a)(2)(C) witnesses); *Debtors' Identification of Expert Witnesses* [Case No. 17-3567, ECF No. 1260] (identifying Ojas Shah and David Brownstein as Rule 26(a)(2)(C) witnesses). The Challenged Witnesses were not then, and are not now, Rule 26(a)(2)(B) witnesses required to submit expert reports.

25. Finally, the Bondholders argue that, even if the Challenged Witnesses are not required to submit expert reports, their Rule 26(a)(2)(C) disclosures should be due when expert witnesses must be identified under the Confirmation Procedures Order (April 14). Status Report ¶¶ 31-32. This is incorrect. Under the Confirmation Procedures Order, expert *reports* are due on April 28. Confirmation Procedures Order at 4. What is required by April 14 is that all parties file their opening expert disclosures, *i.e.*, the identity of the expert witnesses and a brief description of their expected testimony. *Id.*

26. Consistent with past practice, the Oversight Board intends to identify its Rule 26(a)(2)(B) witnesses on April 14, along with listing the Challenged Witnesses who, at that point, the Oversight Board believes may provide opinion testimony. On April 28, also consistent with past practice, the Oversight Board will file its Rule 26(a)(2)(B) expert reports and Rule 26(a)(2)(C) disclosures describing the "expert" portion of the hybrid testimony that will potentially be proffered by the Challenged Witnesses. *See Debtors Opening Expert Reports and Disclosures*

[Case No. 17-3283, ECF No. 18044] (concurrently submitting Rule 26(a)(2)(B) expert reports and Rule 26(a)(2)(C) expert disclosures). The Confirmation Procedures Order does not require otherwise.

\* \* \*

27. If the Bondholders are actually interested in making progress on discovery, they should work to narrow their overbroad document demands and explain the relevance of the documents and communications they seek. The Oversight Board continues to act in good faith as it has for the past six years. We remain available to discuss these and other issues with the Bondholders, and, if appropriate, welcome the opportunity to appear before the Court.

[*Remainder of Page Intentionally Left Blank*]

| | |
|---|---|
| Dated: March 31, 2023<br>New York, New York | */s/ Margaret A. Dale*<br><br>Martin J. Bienenstock<br>Margaret Dale<br>Paul V. Possinger<br>Ehud Barak<br>Michael T. Mervis<br>Daniel S. Desatnik<br>Elliot R. Stevens<br>(Admitted *Pro Hac Vice*)<br>**PROSKAUER ROSE LLP**<br>Eleven Times Square<br>New York, NY 10036<br>Tel: (212) 969-3000<br>Fax: (212) 969-2900<br><br>*Attorneys for the Financial*<br>*Oversight and Management Board*<br>*as representative for PREPA*<br><br>*/s/ Luis F. del Valle-Emmanuelli*<br><br>Luis F. del Valle-Emmanuelli<br>USDC-PR No. 209514<br>P.O. Box 79897<br>Carolina, Puerto Rico 00984-9897<br>Tel. 787.647.3503<br>Fax. N/A<br>dvelawoffices@gmail.com<br><br>Of Counsel for A&S Legal Studio, PSC<br>434 Avenida Hostos<br>San Juan, PR 00918<br>Tel (787) 751-6764/763-0565<br>Fax (787) 763-8260<br><br>*Co-Attorneys for the Financial*<br>*Oversight and Management Board*<br>*as Representative for PREPA* |