# EXHIBIT 1

Tel. 787-226-4555

Claim # 177404

PO Box 2956 Carolina P.R.

00984-2956

10-25-2021

[Stamp: Illegible – OCT
26, 2021 PM 2:55]

To whom it may concern,

I, Mr. José A. Figueroa Sierra, with claim number 177404, do not agree with my claim being reclassified, as the Electric Power Authority directly exposed us to asbestos without any type of protection for an undefined time. Even the very Secretary of Justice of Puerto Rico sent a letter to Atty. Jesús Hernández Sánchez on April 04, 2016 where he commented and stated that PREPA had incurred in a criminal case. I am attaching a copy of it. On June 30, 2008, the House of Representatives made its report regarding the House Resolution 5661, of which I am attaching a copy. It also included medical diagnoses of pulmonary conditions as a result of the removal of asbestos in my place of work. I therefore request that my case files be reviewed and reassessed. Documents are being sent today Monday, October 25, 2021, since they were received on Thursday, October 21, 2021.

*Certified to be a correct and true translation from the source text in Spanish to the target language English.*
*10 / APRIL / 2023 – PHILLIP BERRYMAN ATA-certified Spanish-English #432118*
*By Targem Translations Inc.*

Yours sincerely,

[Signature]

José A. Figueroa Sierra

*Certified to be a correct and true translation from the source text in Spanish to the target language English.*
*10 / APRIL / 2023 – PHILLIP BERRYMAN ATA-certified Spanish-English # 432118*
*By Targem Translations Inc.*

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO / TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS PARA EL DISTRITO DE PUERTO RICO

Fill in this information to identify the case (Select only one Debtor per claim form). /
Llene esta información para identificar el caso (seleccione solo un deudor por formulario de reclamación).

| | | | |
|---|---|---|---|
| ☐ | Commonwealth of Puerto Rico<br>El Estado Libre Asociado de Puerto Rico | Case No. 17-bk-03283 | Petition Date:<br>May 3, 2017 |
| ☐ | Puerto Rico Sales Tax Financing Corporation (COFINA)<br>La Corporación del Fondo de Interés Apremiante de Puerto Rico | Case No. 17-bk-03284 | Petition Date:<br>May 5, 2017 |
| ☐ | Puerto Rico Highways and Transportation Authority<br>La Autoridad de Carreteras y Transportación de Puerto Rico | Case No. 17-bk-03567 | Petition Date:<br>May 21, 2017 |
| ☐ | Employees Retirement System of the Government of the<br>Commonwealth of Puerto Rico<br>El Sistema de Retiro de los Empleados del Gobierno del Estado<br>Libre Asociado de Puerto Rico | Case No. 17-bk-03566 | Petition Date:<br>May 21, 2017 |
| ☒ | Puerto Rico Electric Power Authority<br>La Autoridad de Energía Eléctrica de Puerto Rico | Case No. 17-bk-04780 | Petition Date:<br>July 2, 2017 |
| ☐ | Puerto Rico Public Building Authority<br>El Autoridad de Edificios Públicos de Puerto Rico | Case No. 19-bk-05523 | Petition Date:<br>Sept 27, 2019 |

Modified Official Form 410 / Formulario Oficial 410 Modificado

# Proof of Claim / Evidencia de reclamación

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a Title III case. Do not use this form to make a request for payment of an administrative expense, other than a claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9). Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy or subject to confidentiality on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

Lea las instrucciones antes de completar este formulario. Este formulario está diseñado para realizar una reclamación de pago en un caso en virtud del Título III. No utilice este formulario para solicitar el pago de un gasto administrativo que no sea una reclamación que reúna los requisitos para ser tratada con prioridad administrativa conforme al Título 11 § 503(b) (9) del U.S.C. Ese tipo de solicitud debe realizarse de conformidad con el Título 11 § 503 del U.S.C.

Quienes presenten la documentación deben omitir o editar información que reúna los requisitos para ser tratada con privacidad o confidencialidad en este formulario o en cualquier otro documento adjunto. Adjunte copias editadas de cualquier otro documento que respalde la reclamación, tales como pagarés, órdenes de compra, facturas, balances detallados de cuentas en funcionamiento, contratos, resoluciones judiciales, hipotecas y acuerdos de garantías. **No adjunte documentos originales,** ya que es posible que los documentos adjuntos se destruyan luego de analizarlos. En caso de que los documentos no estén disponibles, explique los motivos en un anexo.

Fill in all the information about the claim as of the Petition Date.

Complete toda la información acerca de la reclamación a la fecha en la que se presentó el caso.

| Part 1 / Parte 1 | Identify the Claim / Identificar la reclamación |
|---|---|

**1. Who is the current creditor?**

**¿Quién es el acreedor actual?**

Jose A. Figueroa Sierra

Name of the current creditor (the person or entity to be paid for this claim)
Nombre al acreedor actual (la persona o la entidad a la que se le pagará la reclamación)

Other names the creditor used with the debtor   Jose A. Figueroa Sierra
Otros nombres que el acreedor usó con el deudor

*Certified to be a correct and true translation from the source text in Spanish to the target language English.*
*10 / APRIL / 2023 – PHILLIP BERRYMAN ATA-certified Spanish-English #432118*
*By Targem Translations Inc.*

| | |
|---|---|
| **12. Is this claim subject to a right of setoff?**<br><br>¿La reclamación está sujeta a un derecho de compensación? | ☐ No / No<br>☒ Yes. Identify the property / Sí. Identifique el bien: ___  Subject to financial compensation |
| **13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?**<br><br>¿La reclamación, total o parcial, cumple los requisitos para ser tratada como prioridad administrativa conforme al Título 11 § 503(b)(9) del U.S.C.? | ☐ No / No<br>☒ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the Petition Date in these Title III case(s), in which the goods have been sold to the debtor in the ordinary course of such debtor's business. Attach documentation supporting such claim.    $___<br><br>Sí. Indique el importe de la reclamación que surge del valor de cualquier bien recibido por el deudor dentro de los 20 días anteriores a la fecha de inicio en estos casos del Título III, en el que los bienes se han vendido al deudor en el transcurso normal de los negocios del deudor. Adjunte la documentación que respalda dicha reclamación. |

**Part 3 / Parte 3:**      **Sign Below / Firmar a continuación**

| | |
|---|---|
| The person completing this proof of claim must sign and date it. FRBP 9011(b).<br><br>If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.<br><br>La persona que complete esta evidencia de reclamación debe firmar e indicar la fecha. FRBP 9011(b).<br><br>Si presenta esta reclamación de manera electrónica, la FRBP 5005(a)(2) autoriza al tribunal a establecer normas locales para especificar qué se considera una firma. | *Check the appropriate box / Marque la casilla correspondiente:*<br><br>☒ I am the creditor. / Soy el acreedor.<br>☐ I am the creditor's attorney or authorized agent. / Soy el abogado o agente autorizado del acreedor.<br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004. / Soy el síndico, el deudor o su agente autorizado. Norma de quiebra 3004.<br>☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005. / Soy el garante, fiador, endosante u otro codeudor. Norma de quiebra 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>Comprendo que una firma autorizada en esta *Evidencia de reclamación* se considera como un reconocimiento de que al calcular el importe de la reclamación, el acreedor le proporcionó al deudor crédito para todo pago recibido para saldar la deuda.<br><br>I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.<br><br>He leído la información en esta *Evidencia de reclamación* y tengo motivos razonables para suponer que la información es verdadera y correcta.<br><br>I declare under penalty of perjury that the foregoing is true and correct. / Declaro bajo pena de perjurio que lo que antecede es verdadero y correcto.<br><br>Executed on date / Ejecutado el _____ (MM/DD/YYYY) / (DD/MM/AAAA)<br><br>Signature / Firma  *José A. Figueroa Sierra*<br><br>Print the name of the person who is completing and signing this claim / Escriba en letra de imprenta el nombre de la persona que completa y firma esta reclamación:<br><br>Name  Jose A. Figueroa Sierra<br>    First name / Primer nombre    Middle name / Segundo nombre    Last name / Apellido<br><br>Title / Cargo  Retired<br>Company / Compañía  PREPA<br>    Identify the corporate servicer as the company if the authorized agent is a servicer.<br>    Identifique al recaudador corporativo como la compañía si el agente autorizado es un recaudador.<br><br>Address / Dirección  P.O. Box 2956<br>    Number / Número    Street / Calle<br>Carolina    P.R.    00984-2956<br>City / Ciudad    State / Estado    ZIP Code / Código postal<br><br>Contact phone / Teléfono de contacto (787)226-4555 Email / Correo electrónico mtorres170610@gmail.com |

Modified Official Form 410        **Proof of Claim**        page 4

*Certified to be a correct and true translation from the source text in Spanish to the target language English.*
*10 / APRIL / 2023 – PHILLIP BERRYMAN ATA-certified Spanish-English # 432118*
*By Targem Translations Inc.*

| | |
|---|---|
| **8. How much is the claim?**<br><br>¿Cuál es el importe de la reclamación? | $ 500,000.00  **Does this amount include interest or other charges?**<br>¿Este importe incluye intereses u otros cargos?<br>☐ No / No<br>☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).<br>Sí. Adjunte un balance con intereses detallados, honorarios, gastos u otros cargos exigidos por la Norma de Quiebras 3001(c)(2)(A). |
| **9. What is the basis of the claim?**<br><br>¿Cuál es el fundamento de la reclamación? | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c). Limit disclosing information that is entitled to privacy, such as health care information.<br><br>Por ejemplo: Venta de bienes, préstamo de dinero, arrendamiento, prestación de servicios, lesiones personales u homicidio culposo, o tarjetas de crédito. Adjunte copias editadas de cualquier documento que respalde la reclamación conforme a lo exigido por la Norma de Quiebras 3001(c). Limite la divulgación de información que reúne los requisitos para ser tratada con privacidad, tal como información sobre atención médica. |

Direct exposure to the asbestos without protection and without any prior notice. This is due to the claim to the Electric Power Authority. As a result of this I suffer from damaged lungs, thyroid disease, asthma, high blood pressure and cardiac issues. The dismissed case # is KBP2005-1599.

| | |
|---|---|
| **10. Is all or part of the claim secured?**<br><br>¿La reclamación está garantizada de manera total o parcial? | ☑ No / No<br>☐ Yes. The claim is secured by a lien on property.<br>Sí. La reclamación está garantizada por un derecho de retención sobre un bien.<br><br>**Nature of property / Naturaleza del bien:**<br>☐ Motor vehicle / Vehículos<br><br>☐ Other. Describe:<br>Otro. Describir: _____<br><br>**Basis for perfection / Fundamento de la realización de pasos adicionales:** _____<br><br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>Adjunte copias editadas de documentos, si los hubiere, que demuestre la realización de pasos adicionales para hacer valer un derecho de garantía (por ejemplo, una hipoteca, un derecho de retención, un certificado de propiedad, una declaración de financiamiento u otro documento que demuestre que se ha presentado o registrado un derecho de retención.<br><br>**Value of property / Valor del bien:** $_____<br><br>**Amount of the claim that is secured /**<br>Importe de la reclamación que está garantizado: $_____<br><br>**Amount of the claim that is unsecured /**<br>Importe de la reclamación que no está garantizado: $_____<br>(The sum of the secured and unsecured amounts should match the amount in line 7.)<br>(La suma del importe garantizado y no garantizado debe coincidir con el importe de la línea 7.)<br><br>**Amount necessary to cure any default as of the Petition Date /**<br>Importe necesario para compensar toda cesación de pago a la fecha que se presentó el caso : $_____<br><br>**Annual Interest Rate (on the Petition Date)**<br>Tasa de interés anual (cuando se presentó el caso) _____ %<br>☐ Fixed / Fija<br>☐ Variable / Variable |
| **11. Is this claim based on a lease?**<br><br>¿Esta reclamación está basada en un arrendamiento? | ☑ No / No<br>☐ Yes. Amount necessary to cure any default as of the Petition Date.<br>Sí. Importe necesario para compensar toda cesación de pago a partir de la que se presentó el caso $_____ |

| Modified Official Form 410 | Proof of Claim | page 3 |
|---|---|---|

*Certified to be a correct and true translation from the source text in Spanish to the target language English.*
*10 / APRIL / 2023 – PHILLIP BERRYMAN ATA-certified Spanish-English #432118*
*By Targem Translations Inc.*

| 2. Has this claim been acquired from someone else? ¿Esta reclamación se ha adquirido de otra persona? | ☒ No / No <br> ☐ Yes. From whom? <br> Sí. ¿De quién? _____ |
|---|---|

| 3. Where should notices and payments to the creditor be sent? Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) ¿A dónde deberían enviarse las notificaciones al acreedor? Norma federal del procedimiento de quiebra (FRBP, por sus siglas en inglés) 2002(g) | Where should notices to the creditor be sent? ¿A dónde deberían enviarse las notificaciones al acreedor? | Where should payments to the creditor be sent? (if different) ¿A dónde deberían enviarse los pagos al acreedor? (En caso de que sea diferente) |
|---|---|---|
| | Jose A. Figueroa Sierra <br> Name / Nombre | Jose A. Figueroa Sierra <br> Name / Nombre |
| | PO Box 2956 <br> Number / Número   Street / Calle | PO Box 2956 <br> Number / Número   Street / Calle |
| | Carolina P.R.   00984-2956 <br> City / Ciudad   State / Estado   ZIP Code / Código postal | Carolina P.R.   00984-2956 <br> City / Ciudad   State / Estado   ZIP Code / Código postal |
| | 787-226-4555 // 787 679-3434 <br> Contact phone / Teléfono de contacto | 787-226-4555 // 787-679-3434 <br> Contact phone / Teléfono de contacto |
| | Mtorres170610@gmail.com <br> Contact email / Correo electrónico de contacto | Mtorres170610@gmail.com <br> Contact email / Correo electrónico de contacto |

| 4. Does this claim amend one already filed? ¿Esta reclamación es una enmienda de otra presentada anteriormente? | ☒ No / No <br> ☐ Yes. Claim number on court claims registry (if known) <br> Sí. Número de reclamación en el registro de reclamaciones judiciales (en caso de saberlo) _____ <br> Filed on / Presentada el _____ (MM/DD/YYYY) / (DD/MM/AAAA) |
|---|---|

| 5. Do you know if anyone else has filed a proof of claim for this claim? ¿Sabe si alguien más presentó una evidencia de reclamación para esta reclamación? | ☒ No / No <br> ☐ Yes. Who made the earlier filing? <br> Sí. ¿Quién hizo la reclamación anterior? _____ |
|---|---|

**Part 2 / Parte 2:** Give Information About the Claim as of the Petition Date
Complete toda la información acerca de la reclamación desde la fecha en la que se presentó el caso.

| 6. Do you have a claim against a specific agency or department of the Commonwealth of Puerto Rico? ¿Tiene una reclamación en contra de algún organismo o departamento especifico del Estado Libre Asociado de Puerto Rico? | ☐ No / No <br> ☒ Yes. Identify the agency or department and contact name. (A list of Commonwealth of Puerto Rico agencies and departments is available at: https://cases.primeclerk.com/puertorico/.) <br> Sí. Identifique el organismo o departamento y nombre del representante. (Una lista de agencias y departamentos del Estado Libre Asociado de Puerto Rico está disponible en: https://cases.primeclerk.com/puertorico/). <br><br> Electric Power Authority Case # 130187 |
|---|---|

| 7. Do you supply goods and / or services to the government? ¿Proporciona bienes y / o servicios al gobierno? | ☒ No / No <br> ☐ Yes. Provide the additional information set forth below / Sí. Proporcionar la información adicional establecida a continuación: <br><br> Vendor / Contract Number / Número de proveedor / contrato: _____ <br><br> List any amounts due after the Petition Date (listed above) but before June 30, 2017: <br> Anote la cantidad que se le debe después de la fecha que se presentó el caso (mencionados anteriormente), pero antes del 30 de junio de 2017 $ _____ |
|---|---|

Modified Official Form 410                    Proof of Claim                    page 2

[ILLEGIBLE TEXT]

*Certified to be a correct and true translation from the source text in Spanish to the target language English.*
*10 / APRIL / 2023 – PHILLIP BERRYMAN ATA-certified Spanish-English #432118*
*By Targem Translations Inc.*



**PATIENT NAME**   : FIGUEROA SIERRA, JOSÉ

**DATE OF STUDY**   : 1-13-2011.

**REF. PHYSICIAN**   : DR. BENJAMIN BETANCOURT

**ID NUMBER**   : 3154 – EVALUATE FOR POSSIBLE
RETROCARDIAC MASS

## MDCT SCAN OF THE THORAX WITHOUT IV CONTRAST

### PROCEDURE:
Thin axial images of the thorax were obtained with mediastinal and lung windows.

### FINDINGS:
There are no prior studies for comparison.
Lungs windows reveal no pulmonary nodules, consolidation or pleural effusion. Calcified pleural plaques are noted from prior asbestos exposure. No masses identified at the retrocardium. No mediastinal mass is identified. There is no pericardial effusion. Cardiac chambers appear normal in size.

No mediastinal adenopathies identified. Evaluation of the hilar region is limited without IV contrast.

Images of the upper abdomen are unremarkable. The adrenal glands are symmetric.

### IMPRESSION:

1. NO EVIDENCE OF RETROCARDIAC MASS.
2. CALCIFIED PLEURAL PLAQUES ARE NOTED FROM PRIOR ASBESTOS EXPOSURE.
3. NO CONSOLIDATION OR PLEURAL EFFUSION.

JUAN E. PEREZ MONTE, MD
NUCLEAR MEDICINE PHYSICIAN
DIAGNOSTIC RADIOLOGIST
DIPLOMATE OF THE ABNM AND ABR

THANKS FOR YOUR REFERRAL

1501 Betancourt Building  Fernandez Juncos Avenue, Suite 302, Santurce, PR  00738
P.M.B. 322, P.O. Box 7891, Guaynabo, PR  00970-7891
Tel. (787) 727-2738 • Fax (787) 728-2738

*Certified to be a correct and true translation from the source text in Spanish to the target language English.*
*10  / APRIL  / 2023 – PHILLIP BERRYMAN ATA-certified Spanish-English # 432118*
*By Targem Translations Inc.*

COMMONWEALTH OF PUERTO RICO

15th Legislative                                                           7th Ordinary
Assembly                                                                     Session

## HOUSE OF REPRESENTATIVES

June 30, 2008

## First Joint Report on

## House Resolution 5661

**TO THE HOUSE OF REPRESENTATIVES**

Your **Natural Resources, Conservation and Environment and Health Committees** of the **House of Representatives** of **Puerto Rico** submit to this Legislative Body this **First Joint Report** motivated by **House Resolution 5661**.

### SCOPE OF THE MEASURE

The purpose of **House Resolution 5661** is to order the Natural Resources, Conservation and Environment and Health Committees of the House of Representatives of Puerto Rico to conduct an investigation into the alleged use and contamination of asbestos in the facilities of the Puerto Rico Electric Power Authority.

The **first Public Hearing** held by the Natural Resources, Conservation and Environment Committee was held on **September 20, 2007**. The Puerto Rico Electric Power Authority (PREPA) and the Department of Health were summoned to this hearing, but they both excused themselves in writing. Former employees of PREPA participated in the hearing, and among the representatives of the group were:

**Atty. Jesús Hernández Sánchez** who was a senator from 1969-1977 and a member of the Labor Committee. He states that he participates as a private citizen because he has a lawsuit with the court. He points out that the Federal Government banned the use of asbestos in 1970, and this continued until 1980. The first case of contamination with this material occurred in 1999.

Asbestosis is a condition that is used to distinguish it from cancer. These symptoms can unfortunately appear up to 15 years later, according to some diagnoses made by the State Insurance Fund or the Industrial Commission.

Human Resources, Conservation and Environment Committee
First Joint Report
House Resolution 5661

According to Atty. Hernández Sánchez in his opinion, the Supreme Court of Puerto Rico in the case of Oriosola v. Superior 116DRR 485 of 1985, determined that the Insurance Fund Act could recommend cases where there is intent if the employer sends the employee to an area where there are "fumes" and the employer acts with gross negligence. It could be legislated in cases where the employer has knowledge of such circumstance, because if it does not have knowledge, then there is no intention, but if it does, then it can be a crime under the criminal code. The knowledge should be imparted to the weakest and most deprived party, the worker. Atty. Hernandez states that "he is here as a citizen to legislate and protect public and private workers. The large companies in this country are going to oppose it. You will have a great challenge in facing all these forces, but if you do it and achieve the legislation then you will become distinguished. In Puerto Rico there are no punitive damages, but they should exist in order to protect the weaker party, the worker. God willed for me to want to follow this route of continuing to defend the workers, which is why we have this lawsuit in court."

**Mr. Jorge Martínez**, a former employee of PREPA, submitted a written statement to this Committee where he informs that on behalf of himself and his family, he is grateful for the invitation to testify regarding House Resolution 5661 dated October 04, 2006 and filed by the honorable president of this legislative body, Hon. Aponte Hernández. All workers in Puerto Rico have to thank the President for his interest in and concern for the health of more than one million public and private employees who work day and night in the labor market of our enchanted island.

Mr. Jorge Martínez Garcia mentions in his statement that he is the father of two young girls, one 19 and the other 21, whom he had with his beloved wife Evelyn [redacted] López. He states that he is sick due to asbestos contamination during the time he worked at the Puerto Rico Electric Power Authority. He worked there from 1986 to 1996. His role was as a generator assistant working in the boilers of said public entity and while working at Palo Seco and Puerto Nuevo he worked in the turbine. His duties required him to get inside the boilers where he removed and put in asbestos, which is a heat insulating material. Other co-workers also worked in the boilers and were exposed to said contamination. **PREPA has known since the early 1980s that asbestos is a mineral that causes cancer and diseases such as asbestosis**. Mr. Martínez currently has a respiratory tract dysfunction and a bronchial asthma condition which causes him to be unable to breathe. He has to be given oxygen therapies and it greatly affects his ability to digest his food. According to Mr. Martínez, the obstruction is severe at the lung level. It is all related to asbestos contamination. While he worked while exposed to such contamination, he was not provided with equipment to protect him from the asbestos dust that filled their bodies, heads, and clothing. It was not until years later that he was provided with a mask to cover his nose and was never given a half or full face mask for protection. The clothes he wore to work were those he brought from home and he would then return home with contaminated clothing. Neither he nor his co-workers were ever told of the risks involved and it was not until 1989 or so that a lady by the name of Marta Disla came to give them some lectures on the damage caused by asbestos if they did not have protective equipment. He has had thyroid surgery, is currently thyroid-free and there is no one in his family with thyroid disease. He also had polyps removed from his colon six or seven years ago.

*Certified to be a correct and true translation from the source text in Spanish to the target language English.*
*10 / APRIL / 2023 – PHILLIP BERRYMAN ATA-certified Spanish-English # 432118*
*By Targem Translations Inc.*

Human Resources, Conservation and Environment Committee                    3
First Joint Report
House Resolution 5661

As mentioned in his statement, Mr. Martínez considers that this is an inhumane and even criminal act. If an employer knows that a worker is going to get sick, why would it send him to work at a contaminating site without protective equipment? It is incumbent upon the Puerto Rico Legislative Assembly to legislate to hold employers criminally and civilly liable when such a situation occurs. Mr. Martínez considers that in such a situation there is gross negligence on the part of the employer and there is also intent, because if it has prior knowledge that the worker is going to get sick, it should not send him to work in a contaminating place without protective equipment.

Other co-workers have died of cancer, while others are receiving treatment because they have cancer and contracted the disease due to asbestos contamination, which is a substance that produces cancer, i.e., it is carcinogenic. Cancer may develop 15, 20 or 25 years after the employee has been exposed to tiny asbestos fibers. Mr. Martínez says:

**"We go to our graves, we leave our children orphaned and our wife widowed, and those responsible are left laughing. That's enough. It is up to the legislative assembly to stop situations like this. If the legislative assembly does not act, it would be complicit in every tragedy, pain and death suffered by a worker. This committee must publicly condemn it when submitting its report."**

Mr. Martínez also reported that when he was a temporary employee he worked from 7am to 7pm. All of the co-workers continued working without any protection. Sometimes they were given a cloth, then the authorities came with cardboard muzzles. **(EXHIBIT #1)**

PREPA, in an agreement with UTIER, sent mobile buses to
conduct studies at the same Plant. They took urine samples, chest x-rays and a lung test that consisted of blowing through a machine and a pulmonary function test. PREPA never reported the results of these tests. After a while, PREPA and UTIER reached another agreement to conduct an epidemiological study and whoever got sick was sent to Mount Sinai Hospital.

In a letter sent to this Committee, Mr. Martínez states the following: "I was disabled by an accident at the Plant leading to disc problems and a nerve disorder. The State Insurance Fund granted me total disability. This is why I wound up with an obstruction in my lungs and Severe Bronchial Asthma, and due to being retired PREPA sends me to receive treatment under the Insurance Fund. What kind of compensation will I receive if I have already been granted total disability"?

Mr. Martínez submits to this Committee a letter dated May 28, 2008, received from the Puerto Rico Department of Labor and Human Resources, Occupational Safety and Health Administration (OSHA), in which said agency answers a series of questions that Mr. Martínez referred to it on this matter. The following are the questions and answers contained in the letter: **(Exhibit 6)**

Human Resources, Conservation and Environment Committee                                    4
First Joint Report
House Resolution 5661

a) Since when has OSHA been aware that asbestos causes cancer?

PR OSHA has been aware of the asbestos standard (1910.1001) since its date of adoption (February 01, 1978) and it states that one should avoid breathing dust containing asbestos fibers because it can cause severe damage to one's health. However, in 1971, OSHA (Federal Occupational Safety and Health Administration) enacted its first asbestos rule regarding adverse health effects in the workplace. As more information was received about the toxicity of asbestos, OSHA updated and amended said regulation. In 1975, OSGA decided to evaluate the scientific and medical data identifying asbestos as a human carcinogen and again updated the regulation with new measures.

b) Since when does OSHA notify the Electric Power Authority that asbestos causes cancer in its employees?

Act No. 16 of August 05, 1975, known as the Puerto Rico Occupational Safety and Health Act, establishes the basis for the development of PR OSHA.  Since the approval of the state plan in 1978, private sector and governmental employers have had to comply with all regulations adopted under it.

c) Since 2007, has the Electric Power Authority been fined for asbestos?

An inspection was performed on May 17, 2007, at the Electric Power Authority, San Juan Plant (inspection #307935171). In this investigation, a proposed penalty of $17,500.00 was issued for apparent asbestos regulation violations.

d) If OSHA is aware of asbestos deaths at Electric Power Authority plants?

PR OSHA is not aware of any employee deaths from asbestos exposure. You can contact the State Insurance Fund Corporation to verify whether deaths from asbestos exposure have been reported at the Electric Power Authority.


**Mr. Juan Sosa Fernández**, who worked 27 years as a welder, states to this Committee that he has difficulty with his respiratory tract. "We carried this poison into our homes and our children hugged us and became contaminated." After these talks, they began to use what they called dirty rooms and then clean rooms, but this was 10 years after starting work. He retired in March 2004. The process of working with asbestos went on until 1987. On January 16, 1990, a countless number of co-workers were relocated. That's when the cycle of working with asbestos was broken. "When it isn't seen, it goes unnoticed, and we were contaminated with the material through our hands. The assistants as well as the operators intook all that contamination. I know it is a scientific fact that an asbestos particle in a task at a height of six feet takes six hours to travel the distance. In an unventilated place it takes longer and you breathe it in."

*Certified to be a correct and true translation from the source text in Spanish to the target language English.*
*10 / APRIL / 2023 – PHILLIP BERRYMAN ATA-certified Spanish-English # 432118*
*By Targem Translations Inc.*

Human Resources, Conservation and Environment Committee                                    5
First Joint Report
House Resolution 5661

In 2000, an epidemiological study was conducted, and according to Dr. Levin of the New York Hospital, 89% of all patients had scarring in the lungs and respiratory problems. "We wound up with this. I have the papers in my house. I can't be exposed to chemicals, dust, or fumes. Ultimately, I have a case. Ultimately, there are no doctors here with expertise in this area and the cases have to be sent to the United States. Dr. Perdomo, the Secretary of Health, met with us. She is fully aware of Dr. Levin's studies and the results they yielded. They said that if some people wound up with the disease then they would pay for their treatment."

**Mr. Adrián Valle**, a former supervisor of PREPA, stated at the Committee's public hearing that he was in charge of a group of employees, a line supervisor, and a substation supervisor and that he worked for 10 years. His office is called Durotex. He states that the office also had asbestos, and he went to the plants to provide maintenance with his people. He retired and 12 years after he had retired he felt a lump under his arm. An examination was performed and it was a cancerous lymphoma. Mr. Valle said the following: "I went to the fund. There they sent me two doctors called Dr. Masin and Dr. Franco, and both determined that I had cancer. Because of my work my co-workers have died of cancer. I have a lymphoma between my heart and I had chemotherapy. I am receiving treatment at the Torre Hospital San Francisco and I still have cancer. I had to go into the areas of my employees. There are almost none left, as they have all died of cancer. I have been found to have four lymphomas. I'm going through all of this. The masks they gave us are what are used for painting, and they did not give us equipment. My last co-worker was 37 years old and I am still alive here fighting. Even other superiors who entered the sub-stations, and many other co-workers do not know their rights. They are already retired and do not know if they have conditions for this very reason."

**Mr. José Hernández**, a former employee, informed this Committee of the following: "I ask my cardiologist why I have had heart surgery and 4 bypasses. I am a welder, I retired in 1994 and they had not yet made masks mandatory. You can never fully remove the asbestos found in the rod coating. Anything that becomes fine powder is silica. Many of my co-workers have died, one of them was Pellot. I had problems with supervisors, as if I didn't do a task then they would threaten to kick me out. I feel sorry for my co-workers, as many of us are damaged. We are all down on our luck with asbestos. I went to the Fund and the doctor thought I was looking for money. I didn't go looking for money, I went looking for health. I would like to investigate Dr. Franco. He is a doctor that works for the Fund, the Aqueduct and Sewer Authority and the Electric Power Authority. He is the only toxicologist in Puerto Rico, and there is a conflict of interest. Who is going to give us justice? If I sleep on my side, I feel my lungs swell up. Co-workers have died from lung conditions."

**Mr. José Nadal** also stated the following in the public hearing: "I worked from 1972-1989 and I was incapacitated. I have been diagnosed with Chronic Obstructive Pulmonary Disease which has been certified by the State Insurance Fund. I am being treated for asthma. In 1972, for protection, we wore T-shirts as masks to work breaking up asbestos. I was a boiler assistant, and in 1989 they had not yet encapsulated the asbestos."

*Certified to be a correct and true translation from the source text in Spanish to the target language English.*
 *10  / APRIL  / 2023 – PHILLIP BERRYMAN ATA-certified Spanish-English #432118*
*By Targem Translations Inc.*

Case:17-03283-LTS   Doc#:18818-1   Filed:10/26/21   Entered:10/27/21 09:30:54   Desc:
Exhibit   Page 12 of 26

Human Resources, Conservation and Environment Committee                          6
First Joint Report
House Resolution 5661

**Mr. Víctor Morales Cedeño** informed this Committee of the following: "I worked for 23 years and there was no protection. Many residents were probably contaminated. At the last moment, PREPA began to provide plastic masks to prevent problems but when protection arrived, the damage had already been done. I have a respiratory tract problem. The Puerto Rico Testing company that performed tests on me and a co-worker of mine sent us to the Medical Center where Dr. Franco certified that I had my condition."

**Mr. Benito Ayala Pacheco** stated in the public hearing the following: "I started at PREPA in Aguirre working with asbestos. They sent me to Guayanilla for 2 years and then they sent me to Puerto Nuevo, Palo Seco. The Fund said I presented anomalies. I went to a private doctor and they said I had Leukemia. The protection was a cloth muzzle and nothing else. I would go home with the same clothing. Now I'm suffocating. My plates were taken away and lost and I had to take out others."

**Mr. José A. Otero** informed this Committee of the following: "I worked for PREPA for 28 years, most of them at the Puerto Nuevo Plant. I was a mechanic. They assigned us the duties and they deemed that if we were going to work with asbestos then we had to remove it. I worked in the boiler area and there was an asbestos smell. In 1988 I had a myocardial infarction. I retired in 2000. In 2002 I was called for an epidemiological study. I wound up with calcifications in my lungs, and my chest feels compressed. I am concerned that sooner or later it will affect us. In July 2003 we received the results of the asbestos epidemiological study."

**Mr. Carlos Benjamín Morales Ruiz**, a III-category bricklayer of the Puerto Rico Electric Power Authority, delivered to this Committee an affidavit before notary public Milagros Acevedo Colon, dated August 23, 1989, in which he declares that:

1. That my personal circumstances are as stated above.
2. That during the years 1981-1982 I worked with the Electric Power Authority as a bricklayer and together with 15 or 20 other co-workers we were instructed to work at the Palo Seco Plant in Toa Baja, and that we should take a low-bed truck. There were other temporary employees there who were assigned to do the work during the day. We were tasked with picking up material that was lying on the ground, which had fallen out of a boiler duct, and we had to wet it so that it would not blow away. The collection was done using shovels and the waste was disposed of in garbage barrels.
3. Once filled, the uncovered barrels were loaded onto the truck. Sometimes there were up to 20 or more barrels per trip, and one of the co-workers would guide it to a hole that had been made with a digger inside the same plant.
4. That hole was over 10 feet deep. You could see the seawater at the bottom, and it was about 20 or more feet in diameter. It was between the gas turbine and Highway #165. The hole was originally smaller, and as it filled up it was covered with sand. Another hole was opened up next to it with the digger that was there, which was operated by a co-worker who we nicknamed "Morovis."

Human Resources, Conservation and Environment Committee                                7
First Joint Report
House Resolution 5661

5. Two or three of us would grab the full barrel and turn it over to drop the waste into the hole. Once emptied, the barrels were mounted onto the truck and taken back to the waste site to be refilled. This was done many times over, and we spent around three or four weeks working there.

6. For our convenience, every time we opened up a hole, before we started dumping waste, we would place a wooden ladder and on more than one occasion some of my co-workers or I would climb down the ladder to the bottom to pick up a barrel, a shovel or other objects that would fall in.

7. Sometimes, if any waste was left in the truck, it was picked up with the same shovel and with our hands. At other times we used our handkerchiefs for our noses, because when the asbestos dried it became a powder keg.

8. At no time was I warned that I would be working with asbestos. I did not know and was not advised about the damage that asbestos could cause to my health and that of my family.

9. I wore the usual work clothes to work there: an olive green shirt and pants with safety boots, leather gloves to move the barrels and a safety helmet with goggles. Some co-workers used them but others did not because we were never warned of the need to protect ourselves. While we were doing this work, routine work was being carried out at the Plant.

10. Each day when we returned to our work I noticed that during the night they had poured sand over the holes we had covered during the day.

11. At the end of each workday, many of us showered in the plant's bathrooms. There was no designated area or restrictions on the use of personal equipment.

12. Once the work of removing and burying the asbestos was completed, I was never medically assessed in relation to my participation in this work, nor was I trained in the proper handling of these toxins or equipped or protected to work.

13. The immediate supervisor and person in charge of the project was Mr. Elías Vega, and the person who signed the worksheet was the engineer Gilberto Félix Orta. The supervisor Domínguez came by in passing and stood "from afar" watching.

I swear that the foregoing is the truth and nothing but the truth, with nothing to be stated to the contrary, and I subscribe to this affidavit for all legal purposes.

In San Juan, Puerto Rico, on August 23, 1999.

The **Environmental Quality Board (EQB)** submitted a written statement in which they state that they regulate the handling of asbestos-containing materials through their Regulations for the Control of Atmospheric Contamination. Rule 422 of the aforementioned regulations stipulates as follows:

A. No person shall cause or permit the handling of asbestos-containing materials as defined in these Control Regulations without first having a permit from the Board and as required by Rule 204.

*Certified to be a correct and true translation from the source text in Spanish to the target language English.*
*10  / APRIL  / 2023 – PHILLIP BERRYMAN ATA-certified Spanish-English #432118*
*By Targem Translations Inc.*

Human Resources, Conservation and Environment Committee                                  8
First Joint Report
House Resolution 5661

B. Standards for granting approval to permits for the handling of asbestos during the removal, clearing or transfer of asbestos-containing materials, as well as the work of enclosing, encapsulating or repairing such materials.

1. A permit to handle asbestos-containing materials during the removal, clearing or transfer of asbestos-containing materials shall be granted if the applicant demonstrates to the satisfaction of the Board that:

a. The handling of the asbestos-containing material shall be capable of complying with all applicable rules and/or regulations.
b. All personnel working in the handling of asbestos-containing material must possess evidence that they have passed a course from a school and/or institution duly certified by the Board and must provide evidence that they appear on the Board's registry of certified asbestos handlers. The Board shall have available in the Program, its library and other distribution centers the list of schools and/or institutions to certify trained personnel.
c. Prior to starting the handling of asbestos-containing material, the person and/or persons responsible must submit to the Board a Work Plan thirty (30) days prior to the start of operations for the handling of asbestos-containing material, which shall contain, but not be limited to, the information contained in the guidelines provided by or any other applicable requirements established by the Board.

2. All handling of asbestos-containing material during the work of enclosing, encapsulating and/or repairing such material must be notified to the Board thirty (30) days in advance, except when it occurs as a result of an emergency or when permitted by a permit from the Board and/or APA. All encapsulation, enclosing and/or repairing of the material must be performed by personnel properly trained to work with asbestos-containing materials. Accreditation and evidence of registration with the Board must be attached.

Subject to these regulations, the Electric Power Authority has applied for multiple permits. The EQB details the permits applied for by PREPA in the last five years. **(EXHIBIT #2)**

The **Department of Labor and Human Resources (PRDLHR)** submitted an explanatory memorandum dated November 27, 2006, at the request of this Committee. They mention that in the workplace, the Constitution establishes and recognizes the right of all workers to be protected against safety and health risks. **The Department of Labor and Human Resources, through the Puerto Rico OSHA, is the agency in charge of enforcing labor protection and occupational safety and health laws. According to its provisions, the employer is obliged to provide each person it employs with a place free from risks that could cause physical harm or death to the worker**. The Puerto Rico Occupational Safety and Health Administration (PR OSHA) began its operations in 1978, following the creation of Act No. 16 of August 05, 1975, the Puerto Rico Occupational Safety and Health Act. The purpose of this Act is to ensure safe and healthy working conditions for every employee in Puerto Rico by authorizing the Secretary of Labor to prescribe and enforce the safety and health standards, rules and regulations developed and adopted, while assisting and encouraging employers and employees in their efforts to ensure safe and healthy working conditions, and providing for scientific research, information, education and training, and the development of statistics in the field of occupational safety and health.

Human Resources, Conservation and Environment Committee                                    9
First Joint Report
House Resolution 5661

Among the areas and departments of PR OSHA is the Inspections Department. The basic function of the Inspections Department is to enforce the mandate of the Law:
**"... to guarantee as far as possible to every employee in the Commonwealth of Puerto Rico safe and healthy working conditions...".**

These shall be required to conduct effective workplace inspections to determine whether employers are providing workplaces free from recognized hazards that are causing or are likely to cause death or physical harm to their employees, and complying with occupational safety and health standards, rules and regulations applicable to their workplaces.

In being aware of its importance for our labor peace and workers' health, the PRDLHR supports any investigation that will benefit the health of all workers.

The Department has an unwavering commitment to workers' safety and health and an indelible commitment to labor peace. For this reason, they understand that this measure could be an essential piece in workers' health and labor peace in this industry of vital importance to the people of Puerto Rico. The PRDLHR reiterates its willingness to comment on any measure that will benefit the working class.

The Committee held a **second public hearing** on **Thursday, January 17, 2008**, in which the Electric Power Authority (PREPA), the Department of Health, the UTIER and the Association of Retirees were summoned. Of the above, the PREPA and the Department of Health appeared.

The **Department of Health**, represented by Atty. Yaidy Santiago, informs that she makes her statement in the aspect of the Department of Health, but in her agency the doctor conducted a study for the UPR. She reports in her statement that asbestos is a carcinogen whose repeated exposure can cause a disease known as asbestosis which scars the lungs and reveals changes in chest X-rays. Symptoms include coughing, shortness of breath and

*Certified to be a correct and true translation from the source text in Spanish to the target language English.*
 *10  / APRIL  / 2023 – PHILLIP BERRYMAN ATA-certified Spanish-English # 432118*
*By Targem Translations Inc.*

Human Resources, Conservation and Environment Committee                              10
First Joint Report
House Resolution 5661

chest pain. Stopping exposure is the best way to stop the disease. Everything related to asbestos is regulated by the Occupational Safety and Health Administration (OSHA).

The presence of asbestos fibers in the environment constitutes a threat to health, since they do not evaporate in the air or dissolve in water. The fibers of these minerals can remain for long periods of time suspended in the air and be carried long distances by water and wind. The harmful effect of asbestos on health has been widely documented scientifically by the medical community and proven researchers in the field.

According to the literature, we are naturally exposed to low levels of asbestos from the air we breathe, especially those people residing in urban and/or industrial areas. If to this exposure we add that which may occur in the workplace, the risk which the employee is exposed to is undoubtedly greater. Considering that the Resolution alludes to the occupational environment, they recommend the participation of the Department of Labor and Human Resources in the proposed investigation.

Messrs. **Manuel Santiago and Orville M. Disdier**, also from the **Department of Health**, explained in the public hearing everything related to the epidemiological study. In 1996, the School of Public Health developed a research protocol, and the study commenced in October 2003. The study consisted of exposure to mercury and hydrazine. The study is a contract between the PREPA and the University. The population used were employees who had worked prior to 1987. These employees were invited to participate in the study.

The study explains what it consisted of and each participant received a copy of their results. Among the findings of 1555 employees, 1248 attended clinical studies and 93% completed all aspects of the study. As part of the conclusions, Dr. Levin states that there is a prevalence of abnormalities. Workers should continue a surveillance program. Employees with thoracic abnormalities should undergo further studies. Exposures should be eliminated, and the rate of abnormality in the pulmonary function test shows a higher risk among smokers.

The study is the first epidemiological study conducted on workers. 11% presented the presence of mercury, and it may be the case that they were exposed to both asbestos and mercury. Manifestations or symptoms are limited to 15 years. The criterion has been used since 1987.

At the time of the study, some objectives had already been established. The study arises at the request of the PREPA and the union. There is not enough information on conditions that are being studied. 13% means that there is abnormality in the lung, but it can not be determined in this type of study whether it can be associated with the employment. The study alerts us but does not establish whether they were rationed by the PREPA or by other factors. The Committee Chairman questioned at the public hearing whether the 13% <u>were referred for medical treatment, and the deponent stated that the school did not provide treatment because it was not the purpose of the study.</u> A physician who knows that a person has certain conditions has a legal obligation to notify the patient.

*Certified to be a correct and true translation from the source text in Spanish to the target language English.*
*10 / APRIL / 2023 – PHILLIP BERRYMAN ATA-certified Spanish-English # 432118*
*By Targem Translations Inc.*

Human Resources, Conservation and Environment Committee                                    11
First Joint Report
House Resolution 5661

At the individual level, each participant received their results in an activity where Dr. Levin presented her results. Each individual received their results. Dr. Levin was emphatic that this study was a first step. If you want to study a population then it should be for many years. We recommend that the study be continued. The type of study is descriptive. The study fulfills its purpose of generating hypotheses and questions. 1,168 employees completed all parts of the study. 10,786 letters were sent in a procedure carried out by the PREPA and 2219 responded upon first notification.

This Natural Resources, Conservation and Environment Committee requested additional information from the Department of Health regarding what additional questions or studies can be generated for further investigation.

On February 29, 2008, the **Department of Health** sent a written letter to this Committee indicating that the Department would like to inform the following regarding **questions or additional studies that could be conducted in order to offer continuity to the investigation into asbestos in workers of the Puerto Rico Electric Power Authority**:
As established during our statement, the conducted study was a descriptive one. It was possible to obtain specific estimators (frequency, averages, proportions and percentages) of the variables or characteristics studied. This provides an overview or description of the sociodemographic and clinical profile of the study population (in this case the workers studied). The study was one of high quality and with an excellent epidemiological design. Its results provide data never before obtained in this type of population, especially in the Puerto Rican population. But the main wealth of this, as of any descriptive study, lies in its capacity to generate questions and hypotheses. Examples of questions arising from the investigation are as follows:

1. **What is the proportion of workers who, despite no evidence of occupational exposure to asbestos, have lung abnormalities?**
2. **Is there a statistical association between working in generating plants and presenting clinical abnormalities related to hydrazine, asbestos or mercury? If so...**
3. **What is the attributable risk?**
4. **How do the proportion of workers who do not participate in the study differ in demographical, clinical and exposure terms? Why didn't they participate?**

Human Resources, Conservation and Environment Committee                                    10
First Joint Report
House Resolution 5661

These are just some of the many questions that the results of this descriptive study manage to provoke. The options for the next steps are varied but should be aimed at answering these and other possible questions. Perhaps **the most advisable is the development of an inferential study with a Case-Control design. Qualitative interviews could also be conducted with those who evidence clinical problems in order to obtain more information about their past exposures and lifestyles**.

*Certified to be a correct and true translation from the source text in Spanish to the target language English.*
*10 / APRIL / 2023 – PHILLIP BERRYMAN ATA-certified Spanish-English # 432118*
*By Targem Translations Inc.*

Human Resources, Conservation and Environment Committee                                12
First Joint Report
House Resolution 5661

The **Puerto Rico Electric Power Authority (PREPA)**, represented at the hearing by Atty. Ramón Rosado, Director of Labor Affairs, Mr. Juan F. Alicea, from the Environmental Planning area and Eng. Evelyn Parrilla, read a paper stating that asbestos is a mineral fiber that, mixed with other substances, was used in the construction of buildings and structures, and it is also an insulating material. Many different industries, including the Authority, used asbestos in their facilities because of its heat-resistant, durable and insulating properties. In the eighth decade of the 20th century, the Federal Occupational Safety and Health Administration (OSHA) revised its regulations and restricted employee exposure to asbestos fibers.

The Authority, in fulfilling its responsibility to protect its employees and comply with state and federal regulations, established a program to remove all asbestos-containing material from its facilities. A Permanent Comprehensive Agreement was established with the Electrical and Irrigation Industry Workers' Union (UTIER) to carry out removal, repair or cleaning of asbestos-containing insulating material. Among the agreements signed are the following:

- The Authority shall remove all insulating material and any other asbestos-containing material and replace it with material that complies with current legislation and regulations.
- The Authority shall comply with all agreements, stipulating that it shall not discriminate against workers, nor take disciplinary action, when they report situations that violate the safety and health standards herein.

In addition, the purchase of asbestos-containing material was prohibited. The asbestos content of insulating materials in pipes, boilers, turbines and electronic equipment was determined through sampling and laboratory tests. Suspicious buildings, structures and materials were also analyzed. Areas that tested positive for asbestos were identified.

A work plan was established, as required by OSHA, for the removal of asbestos-containing material. This plan specified the methodology to be followed to carry out the work safely.

Employees who could be exposed to asbestos during removal work, in addition to other maintenance and operational work at the generating plants and other departments, were included in the Program established. These employees were trained in the safe way of working, the risks associated with exposure and the requirements of applicable regulations. They were provided with all the personal protective equipment needed to perform their tasks safely, and were included in an annual medical examination program.

Environmental sampling was also carried out during the removal work to determine asbestos exposure levels and to evaluate the effectiveness of the established control, engineering and administrative methods. To perform the work of removing asbestos from buildings, walls or concrete structures, the Authority hired companies certified by the regulatory agencies.

In 1996 a stipulation was signed between the Authority and the UTIER to conduct an epidemiological study on possible asbestos exposure. This study covered active and retired employees who worked in the last fifteen years at the generating plants.

*Certified to be a correct and true translation from the source text in Spanish to the target language English.*
*10 / APRIL / 2023 – PHILLIP BERRYMAN ATA-certified Spanish-English # 432118*
*By Targem Translations Inc.*

Human Resources, Conservation and Environment Committee                                    13
First Joint Report
House Resolution 5661

A total of 10,786 retired employees who may have been exposed to asbestos were notified of the epidemiological study by registered letter. Of the above, only 1,248 people participated on a voluntary basis. 11% reflected abnormalities that could be associated with occupational tasks. Some of the participants filed their cases with the State Insurance Fund Corporation. The Authority, in fulfillment of its responsibility, continues with the follow-up process for these individuals.

Currently, all employees of the Authority who work in the generating plants and who, due to their tasks, may be exposed to any remaining material that may contain asbestos, continue in the Program and undergo annual medical examinations.

On the other hand, Article XLIV, Occupational Safety and Health, of the Collective Bargaining Agreement between the UTIER and the Authority establishes in its Section 1:

The Authority and the Union shall take the necessary and indispensable safety measures for the prevention of industrial accidents and occupational diseases in order to ensure, as far as possible, the physical and mental health of all workers covered by this Collective Bargaining Agreement.

In its Article 2, it stipulated as follows:

The Authority and the Union agree to create a Central Occupational Safety and Health Committee (hereinafter referred to as the Central Committee) comprised of the UTIER Safety and Health Secretary and a UTIER representative from each of the office, plant and field levels.

This Central Committee shall have the power to enact standards and rules on medical safety and health in order to prevent occupational accidents and diseases. These measures and standards shall be binding on both parties.

The PREPA mentions in its statement that in line with the foregoing, the Authority is committed to the safety and health of its employees, specifically those exposed to asbestos. Therefore, the Authority has no objection to any investigation that the House of Representatives deems appropriate in this regard.

At the public hearing, the deponents explained that prior to 1988 there was a table of contaminants with minimum restrictions, and basic protection measures were taken. As soon as a change would arise, the PREPA would make the changes in order to comply with the restrictions established by OSHA. Asbestos was used in generating plants and other areas.  Basically boiler areas. The platforms are open. Mr. Juan Alicea states that there are still areas of asbestos that are encapsulated and they are going to work on them little by little. They report that there is a trained group and the appropriate equipment, and it is already a basic routine. At the public hearing, he was asked whether those who work with the material currently receive any protection and whether they undergo any physical examination. Eng. Evelyn Parrilla states that they provide a respirator, filter with a battery that supplies air to the inside of the mask (the strictest half-face masks), decontamination chamber, an annual examination and they limit work time. The union preferred to hire a person to advise employees.

Human Resources, Conservation and Environment Committee                    14
First Joint Report
House Resolution 5661

This Natural Resources, Conservation and Environment Committee requested the following additional information from the **Puerto Rico Electric Power Authority (PREPA)**:

- Information on the exact date that the PREPA was notified of the new OSHA regulations and when the employees were given the protective equipment.
- When were letters of notification of the changes to the regulations sent?
- Information on evidence of purchase of safety equipment.
- Which were the private companies that carried out the removal of the contaminating material.
- Name of the person hired by the UTIER to advise employees.
- Additional time was given to provide evidence that all employees had been given the necessary safety equipment prior to undertaking the material removal process.
- A request was made for evidence of receipts for the purchase of such safety equipment.
- A request was also made for evidence that the employees were trained on the risks and hazards involved in working with the material.

On March 06, 2008, the **Puerto Rico Electric Power Authority (PREPA)** sent a written letter to this Committee stating that in accordance with the information provided by the Occupational Safety Division, the companies that worked in the removal of asbestos since 1989 are the following: J.R. Insulation, Central Insulation, Induchem Environmental Services (now Indultec), PROTECO, General Products, and DEMACO.

On the other hand, regarding the request for the exact date on which the Authority was notified of the new OSHA regulations, it should be noted that OSHA does not directly notify employers of changes in its regulations. The publication of or changes to federal regulations are notified through the Code of Federal Regulations (CFR). The Authority provided personal protective equipment in accordance with these regulations.

*Certified to be a correct and true translation from the source text in Spanish to the target language English.*
*10 / APRIL / 2023 – PHILLIP BERRYMAN ATA-certified Spanish-English # 432118*
*By Targem Translations Inc.*

Human Resources, Conservation and Environment Committee                          13
First Joint Report
House Resolution 5661

## CURRENT LEGAL FRAMEWORK OF THIS RESEARCH

Everything related to asbestos is regulated by the Occupational Safety and Health Administration (OSHA). The Puerto Rico Occupational Safety and Health Administration (PR OSHA) began its operations in 1978, following the creation of Act No. 16 of August 05, 1975, the Puerto Rico Occupational Safety and Health Act. The purpose of this Act is to ensure safe and healthy working conditions for every employee in Puerto Rico by authorizing the Secretary of Labor to prescribe and enforce the safety and health standards, rules and regulations developed and adopted, while assisting and encouraging employers and employees in their efforts to ensure safe and healthy working conditions, and providing for scientific research, information, education and training, and the development of statistics in the field of occupational safety and health.

Human Resources, Conservation and Environment Committee                    15
First Joint Report
House Resolution 5661

## FINDINGS

The Committees which **House Resolution 5661** referred to developed a Work Plan in order to comply with this investigative measure. **House Resolution 5661** orders in its Section 1 to conduct an investigation into the alleged use and contamination of asbestos in the facilities of the Puerto Rico Electric Power Authority.

These Commissions, in fulfillment of their duties, held two Public Hearings with the participation of the agencies and stakeholders mentioned in this report.

**Among the findings found after a weighted study of this measure, we can highlight the following:**

1. All the former employees who participated in this process expressed and feel that what has been done to them is an outrage.
2. The former employees question why, if the PREPA paid for an insurance policy, they were not referred to the State Insurance Fund for exposure to the asbestos contaminating material. They were only referred to the Accidents Fund.
3. It was established in the statements of the former employees that they did not wear any type of protection for working with such dangerous material, thus taking home asbestos residues impregnated in their clothing
4. It was established by the employees that they were not advised on the dangers of exposure to such material before starting the removal work.
5. Mr. Jorge Martínez, a former employee of the PREPA, said that his daughter is currently showing the same symptoms as himself, who worked for the PREPA for around 11 years.
6. A New Proposal for the Integration of the Agreements between the UTIER and the PREPA to Perform the Removal, Encapsulation, Installation and Cleaning of Insulation Material in the Generating Plants was established in 2001. **(EXHIBIT #3)**

7. Mr. Martínez brought his case before the Puerto Rico Industrial Commission and the latter resolved to order the administrator of the State Insurance Fund Corporation to evaluate and issue an Institutional Decision on Reactive Airways Dysfunction and Bronchial Asthma Syndrome, both related to asbestos exposure, as well as Severe Dysfunctional Obstructive Lung Disease and Severe Bronchial Asthma. **(EXHIBIT #4)**
8. **That the PREPA did not present evidence that they complied with providing the necessary safety equipment to all employees who were in contact with the material. In addition, the Corporation failed to provide evidence of the training provided to these employees before subjecting them to the process of cleaning and removal of asbestos in the work area.**

*Certified to be a correct and true translation from the source text in Spanish to the target language English.*
*10 / APRIL / 2023 – PHILLIP BERRYMAN ATA-certified Spanish-English # 432118*
*By Targem Translations Inc.*

Human Resources, Conservation and Environment Committee                                16
First Joint Report
House Resolution 5661

## Conclusions and Recommendations

After this analysis of having presented the findings outlined above, these Committees, in fulfillment of their ministerial duty established in Section 2 of House Resolution 5661, hereby submit to this Honorable Body the following recommendations:

1. The Department of Health recommends the development of an inference-type study with a Case-Control design. Qualitative interviews could also be conducted with those who present clinical problems in order to obtain more information about their past exposures and lifestyles.

2. A copy of said report shall be sent to the Secretary of Labor and the Secretary of Justice of Puerto Rico, so that they may evaluate and determine whether there is any violation of Current Federal or State Legislation and proceed to issue any ruling that may be appropriate in law.

In view of the foregoing, your **Natural Resources, Conservation and Environment and Health Committees** of the **House of Representatives of the Commonwealth of Puerto Rico**, recommend the approval of this **First Report** with its findings, conclusions and recommendations**.**

Respectfully submitted,

**Hon. José Luis Rivera Guerra Aguiló**                                              **Hon. Gabriel Rodríguez**
**Chairman**                                                                          **Chairman**
**Natural Resources, Conservation**                                                   **Health Committee**
**and Environment Committee**

Human Resources, Conservation and Environment Committee                                15
First Joint Report
House Resolution 5661

*Certified to be a correct and true translation from the source text in Spanish to the target language English.*
*10 / APRIL / 2023 – PHILLIP BERRYMAN ATA-certified Spanish-English # 432118*
*By Targem Translations Inc.*

Human Resources, Conservation and Environment Committee                                          4
First Joint Report
House Resolution 5661

   a)  Since when has OSHA been aware that asbestos causes cancer?

   PR OSHA has been aware of the asbestos standard (1910.1001) since its date of
adoption (February 01, 1978) and it states that one should avoid breathing dust containing
asbestos fibers because it can cause severe damage to one's health. However, in 1971,
OSHA (Federal Occupational Safety and Health Administration) enacted its first asbestos
rule regarding adverse health effects in the workplace. As more information was received
about the toxicity of asbestos, OSHA updated and amended said regulation. In 1975, OSGA
decided to evaluate the scientific and medical data identifying asbestos as a human
carcinogen and again updated the regulation with new measures.

   b)  Since when does OSHA notify the Electric Power Authority that asbestos causes
       cancer in its employees?

   Act No. 16 of August 05, 1975, known as the Puerto Rico Occupational Safety and
Health Act, establishes the basis for the development of PR OSHA.  Since the approval of
the state plan in 1978, private sector and governmental employers have had to comply with
all regulations adopted under it.

   c)  Since 2007, has the Electric Power Authority been fined for asbestos?

   An inspection was performed on May 17, 2007 at the Electric Power Authority, San
Juan Plant (inspection #307935171). In this investigation, a proposed penalty of $17,500.00
was issued for apparent asbestos regulation violations.

   d)  If OSHA is aware of asbestos deaths at Electric Power Authority plants?

   PR OSHA is not aware of any employee deaths from asbestos exposure. You can
contact the State Insurance Fund Corporation to verify whether deaths from asbestos
exposure have been reported at the Electric Power Authority.


   **Mr. Juan Sosa Fernández**, who worked 27 years as a welder, states to this
Committee that he has difficulty with his respiratory tract. "We carried this poison into our
homes and our children hugged us and became contaminated." After these talks, they began
to use what they called dirty rooms and then clean rooms, but this was 10 years after starting
work. He retired in March 2004. The process of working with asbestos went on until 1987.
On January 16, 1990, a countless number of co-workers were relocated. That's when the
cycle of working with asbestos was broken. "When it isn't seen, it goes unnoticed, and we
were contaminated with the material through our hands. The assistants as well as the
operators intook all that contamination. I know it is a scientific fact that an asbestos particle
in a task at a height of six feet takes six hours to travel the distance. In an unventilated place
it takes longer and you intake it."

Human Resources, Conservation and Environment Committee                    5
First Joint Report
House Resolution 5661

In 2000, an epidemiological study was conducted, and according to Dr. Levin of the New York Hospital, 89% of all patients had scarring in the lungs and respiratory problems. "We wound up with this. I have the papers in my house. I can't be exposed to chemicals, dust, or fumes. Ultimately, I have a case. Ultimately, there are no doctors here with expertise in this area and the cases have to be sent to the United States. Dr. Perdomo, the Secretary of Health, met with us. She is fully aware of Dr. Levin's studies and the results they yielded. They said that if some people wound up with the disease then they would pay for their treatment."

**Mr. Adrián Valle**, a former supervisor of PREPA, stated at the Committee's public hearing that he was in charge of a group of employees, a line supervisor, and a substation supervisor and that he worked there for 10 years. His office is called Durotex. He states that the office also had asbestos, and he went to the plants to provide maintenance with his people. He retired and 12 years after he had retired he felt a lump under his arm. An examination was performed and it was a cancerous lymphoma. Mr. Valle said the following: "I went to the fund. There they sent me two doctors called Dr. Masin and Dr. Franco, and both determined that I had cancer. Because of my work my co-workers have died of cancer. I have a lymphoma between my heart and I had chemotherapy. I am receiving treatment at the Torre Hosptial San Francisco Metropolitan and I still have cancer. I had to go into the areas of my employees. There are almost none left, as they have all died of cancer. I have been found to have four lymphomas. I'm going through all of this. The masks they gave us are what are used for painting, and they did not give us equipment. My last co-worker was 37 years old and I am still alive here fighting. Even other superiors who entered the sub-stations, and many other co-workers do not know their rights. They are already retired and do not know if they have conditions for this very reason."

**Mr. José Hernández**, a former employee, informed this Committee of the following: "I ask my cardiologist why I have had heart surgery and 4 bypasses. I am a welder, I retired in 1994 and they had not yet made masks mandatory. You can never fully remove the asbestos found in the rod coating. Anything that becomes fine powder is silica. Many of my co-workers have died, one of them was Pellot. I had problems with supervisors, as if I didn't do a task then they would threaten to kick me out. I feel sorry for my co-workers, as many of us are damaged. We are all down on our luck with asbestos. I went to the Fund and the doctor thought I was looking for money. I didn't go looking for money, I went looking for health. I would like to investigate Dr. Franco. He is a doctor that works for the Fund, the Aqueduct and Sewer Authority and the Electric Power Authority. He is the only toxicologist in Puerto Rico, and there is a conflict of interest. Who is going to give us justice? If I sleep on my side, I feel my lungs swell up. Co-workers have died from lung conditions."

**Mr. José Nadal** also stated the following in the public hearing: "I worked from 1972-1989 and I was incapacitated. I have been diagnosed with Chronic Obstructive Pulmonary Disease which has been certified by the State Insurance Fund. I am being treated for asthma. In 1972, for protection, we wore T-shirts as masks to work breaking up asbestos. I was a boiler assistant, and in 1989 they had not yet encapsulated the asbestos."

Human Resources, Conservation and Environment Committee                                6
First Joint Report
House Resolution 5661

**Mr. Víctor Morales Cedeño** informed this Committee of the following: "I worked for 23 years and there was no protection. Many residents were probably contaminated. At the last moment, PREPA began to provide plastic masks to prevent problems but when protection arrived, the damage had already been done. I have a respiratory tract problem. The Puerto Rico Testing company that performed tests on me and a co-worker of mine sent us to the Medical Center where Dr. Franco certified that I had my condition."

**Mr. Benito Ayala Pacheco** stated in the public hearing the following: "I started at PREPA in Aguirre working with asbestos. They sent me to Guayanilla for 2 years and then they sent me to Puerto Nuevo, Palo Seco. The Fund said I presented anomalies. I went to a private doctor and they said I had Leukemia. The protection was a cloth muzzle and nothing else. I would go home with the same clothing. Now I'm suffocating. My plates were taken away and lost and I had to take out others."

**Mr. José A. Otero** informed this Committee of the following: "I worked for PREPA for 28 years, most of them at the Puerto Nuevo Plant. I was a mechanic. They assigned us the duties and they deemed that if we were going to work with asbestos then we had to remove it. I worked in the boiler area and there was an asbestos smell. In 1988 I had a myocardial infarction. I retired in 2000. In 2002 I was called for an epidemiological study. I wound up with calcifications in my lungs, and my chest feels compressed. I am concerned that sooner or later it will affect us. In July 2003 we received the results of the asbestos epidemiological study."

**Mr. Carlos Benjamín Morales Ruiz**, a III-category bricklayer of the Puerto Rico Electric Power Authority, delivered to this Committee an affidavit before notary public Milagros Acevedo Colon, dated August 23, 1989, in which he declares that:

1. That my personal circumstances are as stated above.
2. That during the years 1981-1982 I worked with the Electric Power Authority as a bricklayer and together with 15 or 20 other co-workers we were instructed to work at the Palo Seco Plant in Toa Baja, and that we should take a low-bed truck. There were other temporary employees there who were assigned to do the work during the day. We were tasked with picking up material that was lying on the ground, which had fallen out of a boiler duct, and we had to wet it so that it would not blow away. The collection was done using shovels and the waste was disposed of in garbage barrels.
3. Once filled, the uncovered barrels were loaded onto the truck. Sometimes there were up to 20 or more barrels per trip, and one of the co-workers would guide it to a hole that had been made with a digger inside the same plant.
4. That hole was over 10 feet deep. You could see the seawater at the bottom, and it was about 20 or more feet in diameter. It was between the gas turbine and Highway #165. The hole was originally smaller, and as it filled up it was covered with sand. Another hole was opened up next to it with the digger that was there, which was operated by a co-worker who we nicknamed "Morovis."

*Certified to be a correct and true translation from the source text in Spanish to the target language English.*
*10 / APRIL / 2023 – PHILLIP BERRYMAN ATA-certified Spanish-English # 432118*
*By Targem Translations Inc.*



*Certified to be a correct and true translation from the source text in Spanish to the target language English.*
*10 / APRIL / 2023 – PHILLIP BERRYMAN ATA-certified Spanish-English # 432118*
*By Targem Translations Inc.*



*Certified to be a correct and true translation from the source text in Spanish to the target language English.*
*10  / APRIL  / 2023 – PHILLIP BERRYMAN ATA-certified Spanish-English # 432118*
*By Targem Translations Inc.*



| | |
|---|---|
| T | 718.384.8040 |
| W | TargemTranslations.com |
| E | projects@targemtranslations.com |
| A | 185 Clymer St. Brooklyn, NY 11211 |

**TRANSLATOR'S CERTIFICATE OF TRANSLATION**

Translat ion from: Spanish (Puerto Rico) into English (US)
TARGEM Translations Inc.

I, PHILLIP BERRYMAN, ATA-certified Spanish-English #432118, acting as translator at TARGEM Translations Inc., a NEW YORK City corporation, with its principal office at 185 Clymer Street, Brooklyn, NY, 11211, USA, certify that:

the English translated document is a true and accurate translation of the original Spanish and has been translated to the best of my knowledge.

Original Document Name: **Claim No. 177404 - ECF No 18818 (rev.)**

Signed this 10th day of April, 2023



*Phillip Berryman*

Phillip Berryman

