## EXPERT TESTIMONY – RAMÓN LUIS NIEVES, ESQ.

### on behalf of:

## PUERTO RICO INSTITUTE FOR COMPETITIVENESS AND SUSTAINABLE ECONOMY (ICSE-PR)

**Q. State your name.**

Ramón-Luis Nieves.

**Q. State your business mailing address.**

Ave. Hostos #430, Urb. El Vedado, Hato Rey, PR, 00918.

**Q. State your educational background.**

- LL.M. Energy Law (candidate, May 2023), Vermont Law and Graduate School
- J.D., University of Puerto Rico Law School, 2000
- B.A., Cum Laude, Sociology, University of Puerto Rico-Río Piedras, 1996

**Q. Describe your professional experience and qualifications.**

I have worked as an attorney since 2001: more than two decades of professional experience in banking and financial institution law, energy law and policy, legislation and government affairs, regulatory matters, notarial law, contract law, real estate, consumer law, litigation, and appellate practice.

After several years working as a trial attorney (2001-2004), I was retained as vice president and in-house counsel of R&G Financial Corporation, a publicly traded financial institution (2004-2010).

In 2012, I was elected senator for the District of San Juan, Puerto Rico. During my tenure in the Senate of Puerto Rico (2013-2016), I had the privilege of serving as

26    Chairman of the Committee on Energy, as well as the Committee on Banking,

27    Insurance, and Telecommunications.

28       While in the Senate, I championed legislation for energy reform (Act No. 57-

29    2014), which created the Puerto Rico Energy Bureau (PREB), as well as new

30    mandates for P.R.E.P.A. and the energy sector. I sponsored Act No. 22-2016, which

31    reformed and/or eliminated energy subsidies; included legislative mandates in Act

32    No. 4-2016 to prohibit political intervention in P.R.E.P.A. and sponsored Act No. 133-

33    2016 to facilitate net metering and authorize microgrids and community-shared

34    solar.

35       As an advisor to senator Eduardo Bhatia Gautier, I collaborated in the drafting

36    of Act No. 17-2019, the Puerto Rico Energy Public Policy Act, as well as Act No. 258-

37    2018, to authorize the organization of electric cooperatives in Puerto Rico.

38       As a senator, and from the private sector, I have helped shape most energy

39    legislation enacted in Puerto Rico since 2013. As an advisor to nonprofits, I procured

40    the first certifications for community-controlled microgrids before the PREB.

41       I am a frequent speaker and commentator on energy issues – both in local and

42    U.S. national media. In 2017, a subcommittee of the U.S. Congress invited me to

43    testify regarding the state of the energy grid in the aftermath of Hurricane María.

44    On May 4, 2022, I provided testimony to the Finance Committee of the House of

45    Representatives regarding P.R.E.P.A.'s debt.

46

47

48    The following are some of my op-eds published in recent years:

49    •    *In the wake of hurricane destruction, Biden is supporting Puerto Rico's*
50    *clean energy transition*, The Hill (January 26, 2023)

52    •    *The community effort to bounce back from Puerto Rico's eight-month*
53    *blackout*, The Hill (September 30, 2018)

55    •    *'America's Greece' and its Insolvent Energy Utility*, Utility Dive (April
56    11, 2017)

58    •    *Puerto Rico needs a New Energy Grid (not just repairs to the old one)*,
59    The Hill (October 1, 2017)

61    •    *Privatizing Puerto Rico's energy utility could be Whitefish 2.0*, The Hill
62    (February 5, 2018)

64    Currently, I am pursuing an Energy Law LLM from Vermont Law and

65    Graduate School (May 2023). My final research project will review the development,

66    potential and challenges of implementing Puerto Rico's energy policy.

67    The following are my bar admissions:

68    • Commonwealth of Puerto Rico - January 2001
69    • U.S. District Court - District of Puerto Rico – January 2002
70    • U.S. Court of Appeals 1st Circuit – March 2001
71    • U.S. Supreme Court – June 2006
72    • Licensed notary public – December 2001

74    These are some of the energy-related organizations for which I have served as

75    a member:

76    • Energy Bar Association – (2022-present)
77    • Council of State Governments (CSG) - National Board Member / Henry Toll
78      Fellow / Energy & Environment Committee (2013-2016)
79    • Southern States Regional Energy Board (2013-2016)
80    • Puerto Rico Manufacturers Association - Committee on Energy (2018-2019)
81

82  **Q. State whether you have previously testified or presented before the Title III Court**

83  **and list the occasions.**

84  No.

85  **Q. State on whose behalf you are testifying before the Title III Court.**

86  I am testifying on behalf of the Puerto Rico Institute for Competitiveness and

87  Sustainable Economy (ICSE-PR).

88  **Q. List the documents you considered for your testimony.**

89  A. Second Amended Plan of Adjustment for the Puerto Rico Electric Power

90  Authority (P.R.E.P.A.) and all associated schedules (February 26, 2023).

91  B. Disclosure Statement for Second Amended Title III Plan of Adjustment for

92  P.R.E.P.A. and all associated exhibits. (February 26, 2023)

93  C. Integrated Resource Plan (I.R.P.)

94  D. Final Resolution and Order – In re: Integrated Resource Plan, Case No. CEPR-

95  AP-2018-0001 (August 24, 2020)

96  E. All documents, statutes and secondary sources cited in the footnotes to this

97  report/testimony.

98  **II. Expert testimony**

99  **Q. Describe the purpose of your direct testimony.**

100  The purpose of my testimony is to show that the Second Amended Plan of

101  Adjustment (SAPOA) for P.R.E.P.A. runs counter to Puerto Rico's energy public

102  policy.

103     In preparing this testimony, I have relied on my general knowledge, research,

104     training, experience, and expertise.

105     My work on this matter is ongoing. I may review additional materials or

106     conduct further analysis. I reserve the right to update, refine, or revise this testimony

107     as appropriate.

108     **Q. Is it your opinion that the Plan is compatible with the public policy concerning**

109     **Electric Energy Transformation as mandated by Act No. 17-2019?**

110     To answer this question, we must first discuss the origins of P.R.E.P.A. The

111     purpose of creating P.R.E.P.A. in 1941 (as the Puerto Rico Water Resources

112     Authority)[1] was precisely to raise funds for the development of electric infrastructure

113     through its independent, bond-issuing authority.

114     We will also look at the energy policy mandates that emerged from Act No. 57-

115     2014 and Act No. 17-2019: Puerto Rico's current energy policy.

116     I will also address an important "elephant in the room": the lack of willingness

117     of the Federal Oversight and Management Board (F.O.M.B.) to question the

118     legitimacy of the P.R.E.P.A. bonds issued during the years 2010-2013 – precisely the

119     period of the utility's financial collapse.

120     I.   THE STRUGGLE TO ENACT A "BOND LAW" FOR PUERTO RICO'S "LITTLE T.V.A."

---

[1] Pursuant to Act No. 57 of March 30, 1979, the Legislature of Puerto Rico changed the corporate name of the P.R.W.R.A. to the Puerto Rico Electric Power Authority (P.R.E.P.A.). Changing the utility's name made sense: by 1979, fossil fuel generation had displaced hydroelectric generation, which then represented a mere 2% of total energy generation in the Island.

121    Antonio S. Lucchetti is the father of public power in Puerto Rico. Born in Ponce,

122    Puerto Rico, 1888, Lucchetti obtained an engineering degree from Cornell University

123    in 1910. On that same year, Lucchetti started working for the government of Puerto

124    Rico, as an operator for the South Coast Irrigation Service created under the Public

125    Irrigation Act of 1908.

126    In 1926, the government of Puerto Rico created Utilization of the Water

127    Resources (U.W.R.) [Utilización de las Fuentes Fluviales, (U.F.F.)], as a division of

128    the local Commission of Interior. Lucchetti pushed for the creation of U.W.R. and, in

129    1926, became its first (and only) Engineer-Director.

130    Lucchetti worked tirelessly for 42 years to build and consolidate public power

131    for the People of Puerto Rico: from 1910 until his passing in 1952.

132    The Engineer-Director of the U.W.R. sought to create a government-owned,

133    interconnected, energy system. This, to further the economic development and social

134    objectives of Puerto Rico.

135    From the late 1920s to the 1930s, Lucchetti continued his efforts to consolidate

136    the energy systems on the Island into a single governmental entity. Modeled on the

137    Tennessee Valley Authority,[2] the Engineer-Director of U.W.R. proposed organizing a

---

[2] 16 U.S.C. § 831 et seq. The Tennessee Valley Authority (T.V.A.) "was created in 1933, one of the 'alphabet soup' projects championed by President Franklin Delano Roosevelt as a way to get a flagging country back on its feet during the Great Depression. [...] Care was taken in the act to ensure that power produced by TVA would be carefully distributed throughout the Valley to modernize rural communities and to encourage economic development—and that rates would always remain as low as feasible." Tennessee Valley Authority, *The TVA Act,* https://www.tva.com/about-tva/our-history/the-tva-act

EXPERT TESTIMONY – RAMÓN LUIS NIEVES, ESQ.
ICSE-PR

138     public corporation for the energy system of Puerto Rico. This, to circumvent the

139     budget and bond-issuing limitations of the central government of Puerto Rico imposed

140     by the Organic Act of Puerto Rico, the Jones Act of 1917. The road to create Puerto

141     Rico's first public corporation would prove to be a rocky and controversial political

142     fight.

143          Luccheti asked the U.S. Department of Interior to prepare a draft bill to create

144     the Puerto Rico Water Resources Authority. At the behest of Lucchetti, the draft bill

145     was prepared by counsel for the Department of Interior and the Public Works

146     Administration. The bill was submitted to the local legislature in 1938. The

147     legislation was considered, vetoed, and refiled without success several times, until

148     1940. Since the local legislature failed to create the proposed water resources

149     corporation, Lucchetti sought help elsewhere.

150          Congressman Leo Kocialskowsky (D-IL 8th) filed H. R. 8239 to create a Puerto

151     Rico Water Resources Authority (P.R.W.R.A.) by federal statute. [3] The bill was

152     introduced at the request of the Department of the Interior. [4] Secretary Harold Ickes

153     appeared before the congressional committee to support H. R. 8239. In his statement,

154     Ickes stated that, by 1940, public power served 50% of the Island. [5] Although the

155     public system basically served rural areas – for agricultural purposes – it also began

---

[3] H. R. 8239, 76th Cong. (3rd Sess. 1940).
[4] *Creating the Puerto Rico Water Resources Authority*, Hearings before the Committee on Insular
Affairs, House of Representatives, U.S. Congress, March 19-22, 25, 27-29, April 15, 16, 18 and 19,
1940, at 40.
[5] Id., at 11.

156  providing access to electricity in rural, poor, areas underserved by private energy

157  companies. [6] U.W.R. oversaw the process of rural electrification in Puerto Rico.

158       By 1935, there were no local funds available to add additional generation

159  capacity to the system. [7] Starting in 1935, federal aid granted under the auspices of

160  the Puerto Rico Reconstruction Administration (P.R.E.R.A.), helped double the public

161  system's generation capacity, as well as the local distribution network. [8]

162       According to Ickes and Lucchetti, the main reason for proposing the creation

163  of the P.R.W.R.A. was **financial**. [9] According to David Speck, assistant solicitor

164  general of the Department of the Interior, H. R. 8239 proposed basically "a **bond**

165  **law**".[10] The development of Puerto Rico's energy system could not continue depending

166  on occasional federal or local aid. Organizing P.R.W.R.A. as a public corporation

167  would allow it to finance its projects through

168  "corporate revenue bonds payable solely from the income of the corporate
169  enterprises. It would not be permitted to pledge the full faith and credit of the
170  people of Puerto Rico for the payment of its bonds, or to have access to the
171  taxing power of the Insular Government or any of its political subdivisions." [11]

172  Ickes further stated that

173  "The sections of the bill which provide for this means of financing the
174  enterprises of the [P.R.W.R.A.] are not new in any respect. They follow in
175  substance the provisions of State laws for State-wide and municipal corporate
176  agencies which have been enacted in recent years in nearly all of the States of

---

[6] Id.
[7] Id.
[8] Id.
[9] Id., at 11 and 19.
[10] Id., at 427.
[11] Id., at 12.

177 the Union to provide a businesslike means of financing the acquisition and
178 improvement of comparable State and municipal public utilities." [12]
179

180 Congressman Richard J. Welch asked Ickes whether revenue bonds issued by

181 the P.R.W.R.A. would find a ready market. Ickes was confident that the future

182 development of the Island would guarantee a "sure and growing market for your

183 product, namely, power, which would yield a revenue sufficient to service the

184 bonds."[13] As the bill proposed, he added, "[y]ou have the right to make the rates high

185 enough to service your bonds". [14]

186 The Puerto Rico Legislature opposed passage of H. R. 8239. The Legislature

187 pointed out that the bill deprived the Public Service Commission – created by the

188 Organic Act of 1917 – from jurisdiction over energy rates in Puerto Rico. [15] They also

189 affirmed that the main object of the bill was to

190 "create a supergovernment in Puerto Rico with no supervision and answerable
191 neither to the Governor of Puerto Rico nor to the legislature of the Island. In
192 other words, the 'Authority' is free to do as it pleases and is responsible to no
193 one […]". [16]
194

195 Bolívar Pagán, resident commissioner of Puerto Rico, also opposed passage of

196 H. R. 8239. Pagán opposed granting the P.R.W.R.A. sole, unsupervised ratemaking

197 authority, instead of continuing the rate review process then performed by the Public

---

[12] Id.
[13] Id.
[14] Id.
[15] Id., at 238.
[16] Id.

198    Service Commission. [17] Also, he opposed that the Authority be empowered to issue

199    bonds "without limit and without securing the approval of anyone." [18]

200         Congress failed to act on H. R. 8239. But political change was on the horizon.

201                    II. THE "BOND LAW" – ACT NO. 83, 1941

202         A new political movement, the Partido Popular Democrático (Popular

203    Democratic Party), defeated the Republican-Socialist Coalition in the 1940 elections.

204    Luis Muñoz Marín, leader of the Partido Popular, became President of the Senate of

205    Puerto Rico. An ally of President Roosevelt, Muñoz Marín made substantial political

206    capital as the New Deal's point person in Puerto Rico.

207         Time was on Lucchetti's side. On May 2, 1941, the government of Puerto Rico

208    enacted the Puerto Rico Water Resources Authority Act. [19] Act No. 83 had basically

209    the same content and structure of H. R. 8239 – almost word-for-word - which intended

210    to create P.R.W.R.A. by federal law. Hence, the act creating the P.R.W.R.A. was

211    basically drafted by the U.S. government.

212         Contrary to previous acts (specifically Joint Resolution 36 of 1927 / Act No. 93

213    of 1938), this statute lacked any specific energy policy mandates or goals. [20] Act No.

---

[17] Id., at 397.

[18] Id.

[19] Act No. 83 of May 2, 1941, 22 L.P.R.A. § 191 et seq. Due to his fundamental role in the modernization and industrialization of Puerto Rico, some commentators incorrectly state that the P.R.W.R.A. was created under Governor Rexford Guy Tugwell. In fact, Act No. 83 was enacted under Governor Guy Swope. Tugwell was appointed Governor by Roosevelt months after the enactment of Act No. 83.

[20] Section 22a of the Act vaguely stated that the P.R.W.R.A. was created for the following purposes: the conservation of natural resources, the promotion of the general welfare, and the increase of commerce and prosperity.

EXPERT TESTIMONY – RAMÓN LUIS NIEVES, ESQ.
ICSE-PR

214    83 was a basic "bond law", as originally framed by counsel for the federal agencies in
215    1938.

216        P.R.W.R.A. was a self-regulated entity, with independent ratemaking
217    authority. Later, when it achieved full control of the Island's generation, distribution,
218    and transmission assets, it became a vertically integrated public monopoly, "with the
219    capacity to fully pass all operating costs to its customers, with absolutely no
220    incentives whatsoever to streamline its operations." [21]

221        As originally conceived by Lucchetti and counsel for the federal government,
222    Act No. 83 retained its identity and content as a "bond law": a legal mechanism
223    allowing P.R.W.R.A. to issue bonds on its own, with no intervention from the
224    Legislature or from the central government.

225        Soon after P.R.W.R.A. was created, Lucchetti and Governor Rexford Guy
226    Tugwell sought to acquire the remaining private energy companies operating on the
227    Island: Puerto Rico Railway Light & Power, Inc. (P.R.R.L.P.) and the Mayaguez Light
228    Power & Ice Co. (M.L.P.I.). [22] Tugwell met with President Roosevelt in Washington
229    D.C. and convinced him to use his war powers to order the expropriation of these
230    companies.[23] Roosevelt signed a letter to that effect during the meeting. P.R.R.L.P.
231    successfully challenged Rossevelt's order in federal court. [24] Later, in 1944, P.R.R.L.P.

---

[21] Sergio Marxuach, *Rethinking the Governance of State-Owned Enterprises in Puerto Rico*, 6 (2012) https://grupocne.org/wp-content/uploads/2012/01/2012_01_PolicyBrief_RethinkingGovernance.pdf
[22] EUGENIO LATIMER TORRES, HISTORIA DE LA AUTORIDAD DE ENERGÍA ELÉCTRICA, 404 (1997).
[23] Id.
[24] Puerto Rico Ry. Light & Power Co. v. United States, 131 F.2d 491 (1942).

EXPERT TESTIMONY – RAMÓN LUIS NIEVES, ESQ.
ICSE-PR

232  and M.L.P.I. were expropriated. The P.R.W.R.A.'s first ever bond issue – for

233  $20,000,00.00 – was used to finance the acquisition of both companies.[25]

234      In his memoirs, Governor Tugwell reflected on P.R.W.R.A.'s first bond issue:

235  "*I felt that the price we paid was outrageous*; but we had done our best. **That**
236  **it was a good investment, however, we had the assurance of the New York**
237  **bankers who loaned us the funds for the purchase as well as for extensions and**
238  **improvements [...] In fact, when we finally came to the point of paying too**
239  **much and borrowing under conditions and at rates calculated to please Wall**
240  **Street, we were suddenly regarded benignly by all the powers that be.** I had
241  thought that we ought to be castigated for the deal. But that did not happen.
242  There was not a word of criticism and a good deal of congratulation. *The people*
243  *of Puerto Rico would pay for it over a period of some twenty years in inflate*
244  *rates; but absolutely no one showed any concern over that.*" [26] (Emphasis
245  added).

246      The seeds of P.R.E.P.A.'s financial problems – which have led to the current

247  bankruptcy process – were sown since the creation of the public corporation, and its

248  first bond issue (1946).

249          III. P.R.E.P.A.'S COLLAPSE (OR HOW TO BANKRUPT A MONOPOLY)

250      It took four (4) decades for P.R.E.P.A. to achieve the full electrification of the

251  Island. This amazing achievement helped Puerto Rico support its aggressive

252  industrialization program, as well as profound social justice objectives for the people.

253  P.R.E.P.A. helped most residents of Puerto Rico gain access to electricity.

254      But after several decades of growth and achievements, P.R.E.P.A. started

255  walking a dangerous road that would lead to its collapse.

---

[25] *Creating the Puerto Rico Water Resources Authority*, supra note 4, at 405.
[26] REXFORD G. TUGWELL, THE STRICKEN LAND: THE STORY OF PUERTO RICO, 345 (1946).

256    As previously stated, P.R.E.P.A. was created as a self-regulated entity. Legally,
257    its governing board was supposed to act as its regulator. In practice, the governing
258    board failed to properly exercise oversight over P.R.E.P.A. Over the years, critics of
259    P.R.E.P.A.'s board pointed out its lack of transparency, poor oversight over the
260    utility's performance and, in some cases, lack of knowledge about the energy industry.

261    Even though P.R.E.P.A. was an entity created by law, the Legislature failed to
262    exercise proper oversight over the public corporation. First, the complexity of energy
263    matters usually intimidated legislators. Generations of legislators would attest to
264    this experience: when a P.R.E.P.A. executive director or officer invoked the
265    "complexity" of any problem during a public hearing, the inquiry would usually end
266    just there. Throwing terms around like "wheeling", "net metering", or "integrated
267    resources plan" was enough to intimidate most legislators.

268    However, patronage was the most important factor which impeded proper
269    legislative oversight. The ability of any legislator to procure jobs for constituents at
270    P.R.E.P.A. was political currency. Generations of legislators would receive dozens –
271    even hundreds – of requests to either draft letters of recommendation or to place a
272    call to P.R.E.P.A. Salaries and benefits were usually higher at P.R.E.P.A. than in
273    other agencies of the government of Puerto Rico.

274   The Center for the New Economy effectively summarized the "rent-seeking"
275   behavior of several special interest groups at P.R.E.P.A. [27] Others are also added:
276   bondholders, employees, suppliers and contractors, politicians, subsidized
277   individuals, municipalities, and the central government itself.

278   In hindsight, perhaps the Puerto Rico Legislature of 1940 turned out to be
279   right. Decades later, P.R.E.P.A. became, as predicted,

280   "a supergovernment in Puerto Rico with no supervision and answerable
281   neither to the Governor of Puerto Rico nor to the legislature of the Island. In
282   other words, the 'Authority' is free to do as it pleases and is responsible to no
283   one [...]". [28]

284   IV. Puerto Rico's energy policy: Reasonable costs, non-discriminatory rates,
285   clean energy transition

286   To determine whether the SAPOA undermines Puerto Rico's current energy
287   policy, we must discuss the relevant sections of Act No. 57-2014, and Act No. 17-2019.

288   *A. Act No. 57-2014: the Puerto Rico Energy Transformation and RELIEF Act*

289   After decades attempting to craft a coherent, and mandatory, energy policy,
290   Act No. 57-2014 finally provided a clear and comprehensive policy for the People of
291   Puerto Rico:

292   "Section 1.2.- Declaration of the Public Policy on Electric Power. [29]

293   The transformation and [restructuring] of our electric power system are
294   essential to achieve the competitiveness and economic development of the

---

[27] Sergio Marxuach, *Restructuring Puerto Rico's Energy Sector*, 50-51 (August 22, 2005) https://grupocne.org/wp-content/uploads/2005/08/2005_01_RestructuringElectricitySector_PREPA_Paper.pdf For an update to this report, please see Sergio Marxuach, *A New Look at Puerto Rico's Electricity Sector* (January 2009) https://grupocne.org/wp-content/uploads/2009/01/2009_01_ANewLook_Electricity.pdf
[28] *Creating the Puerto Rico Water Resources Authority*, supra note 4, at 238.
[29] Original version of the statute, without amendments.

Commonwealth of Puerto Rico. For such reason, it is hereby declared as the public policy of the Commonwealth of Puerto Rico that:

(a) **The cost of the electric power generated, transmitted, and distributed in Puerto Rico shall be affordable, just, and nondiscriminatory for all consumers**;

[…]

(d) The implementation of strategies geared toward achieving efficiency in the generation, transmission, and distribution of electric power shall be sought in order to guarantee the availability and supply thereof **at an affordable, just, and reasonable cost**;

[…]

(g) The Island shall become a jurisdiction with diversified energy sources and high efficiency electric power generation. To achieve this, it shall be necessary to reduce our dependence on energy sources derived from fossil fuels, such as oil, and to develop short-, medium-, and long-term plans that allow us to establish a well-balanced and optimum energy portfolio for the electrical system of the Commonwealth of Puerto Rico;

(h) The maximum percentage of renewable energy that may be integrated and incorporated into Puerto Rico's electricity infrastructure in a safe and reliable manner and at a reasonable cost shall be identified and kept updated. Moreover, suitable technologies and locations shall also be identified to make such integration feasible in accordance with the best interest of the Commonwealth of Puerto Rico;

[…]

(m) Prices shall be based on the actual cost of the service provided, efficiency standards, or any other parameters recognized by government and nongovernmental organizations specialized in electric power service;

[…] (Emphasis added).

*B. Act No. 17-2019: the Puerto Rico Energy Public Policy Act*

326       The statute authorizing P.R.E.P.A.'s privatization, Act No. 120-2018 - the

327   *Puerto Rico Electric Power System Transformation Act* - ordered the drafting of a

328   new energy policy and regulatory framework for Puerto Rico.

329       The energy policy that emerged from an unprecedented process of collaboration

330   amongst multiple stakeholders – Act No. 17-2019, the *Puerto Rico Energy Public*

331   *Policy Act* – contained an ambitious mandate: an updated Renewable Portfolio

332   Standard (R.P.S.) of 100% by 2050. [30]

333       For the purposes of this testimony, the following are the relevant sections of

334   Act No. 17-2019:

335   • Section 1.4. — *Guiding Principles of the Puerto Rico Electrical System*.

336       The activities or functions related to the electric power service shall be
337   governed by the principles of efficiency, quality, continuity, adaptability,
338   impartiality, solidarity, and equality.

339       i) The efficiency principle compels the correct allocation and use of
340   resources **to guarantee that services are rendered at the lowest possible cost** and
341   that resources which compose the Electrical System are developed according to
342   the best industry practices; […] (Emphasis added)

343   • Section 1.5. — 2050 Energy Public Policy.

344   It is hereby declared as public policy of the Government of Puerto Rico:

345   *1) Universal Access to Electric Power Service*

346       (a) **To guarantee that the cost of the electric power service in Puerto Rico be**
347   **affordable, just, reasonable, and nondiscriminatory for all consumers in Puerto**
348   **Rico.** When reviewing and approving the fees, rents, rates, and any other type

---

[30] Section 4.2 of Act No. 17-2019, the *Puerto Rico Energy Public Policy Act*, amended Section 2.3 of
Act. No. 82-2010, as amended, the *Public Policy on Energy Diversification by Means of Sustainable
and Alternative Renewable Energy in Puerto Rico Act*, to include a new R.P.S.: a 20% target of
renewables by 2022; 40% by 2025; 60% by 2040; and 100% by 2050.

349  of charge that an electric power company seeks to impose, **the Energy Bureau**
350  **shall evaluate the efforts made by the electric power company to maintain such**
351  **fees, rents, rates, and any other type of charge as close as possible to the twenty**
352  **cent ($0.20) per kilowatt-hour goal established in the Certified Fiscal Plan for**
353  **the Puerto Rico Electric Power Authority**. The Bureau shall be ultimately
354  responsible for ensuring that the fees, rents, rates, and any other type of charge
355  collected by the electric power company **are just and reasonable**, as well as
356  consistent with sound fiscal and operational practices which result in a reliable
357  service **at the lowest reasonable cost**; (Emphasis added).

358

359  *2) Electric Power Service Model*

360  […]

361  (e) To establish an Electrical System model that maximizes the use of the
362  energy resources available and that empowers the consumer to be part of the
363  energy resources portfolio through the adoption of energy efficiency strategies,
364  demand response, the installation of distributed generators, among others;

365  (f) To design an electric power grid that takes into account the development
366  and integration of community solar, wheeling, the creation of microgrids, and
367  electric cooperatives or energy cooperatives as alternatives and tools to
368  improve the access to renewable energy and the electric power grid's resilience
369  to natural disasters;

370  […]

371  *8) Distributed Energy, Energy Storage, and Technology Integration.*

372  (a) To ensure the integration of renewable energy into the Electrical System in
373  a safe and reliable manner and at a reasonable cost, as well as identify the
374  appropriate technologies and sites, such as closed sanitary landfills and
375  previously contaminated lands, that shall make such integration feasible in
376  accordance with the best interests of Puerto Rico; and ensure the
377  improvements necessary to achieve the metrics of the Renewable Portfolio
378  Standard pursuant to Act No. 82-2010 are made;

379  […]

380  *10) Customer Service, Participation, and Transparency.*

381  (a) To guarantee every consumer's right to receive a reliable, stable, and
382  excellent electric power service at a cost that is accessible, just, and reasonable,
383  a transparent and easy to understand bill, and a fast service response;

384  […]

385     Section 1.6. — Initial Objectives.

386     The goal of the energy public policy is to achieve, among others, the following

387     initial objectives:

388     […]

389         4) To make it feasible for energy service consumers to become prosumers
390         through programs such as the net metering program, the adoption of behind-
391         the meter generation systems, among other mechanisms currently available or
392         to be available in the future.

393     […]

394         7) To reduce and eventually eliminate electric power generation from fossil
395         fuels by integrating orderly and gradually alternative renewable energy while
396         safeguarding the stability of the Electrical System and maximizing renewable
397         energy resources in the short-, medium-, and longterm. For such purpose, a
398         Renewable Portfolio Standard is established in order to achieve a minimum of
399         forty percent (40%) on or before 2025; sixty percent (60%) on or before 2040;
400         and one hundred percent (100%) on or before 2050. [31]

401         8) To facilitate the interconnection of distributed generation to the electric
402         power grid through any available mechanism including, but not limited to,
403         distributed generation, renewable energy sources, net metering, and the use of
404         microgrids by implementing the mechanisms, strategies, and technologies
405         available in the electric power industry for such purposes.

406

407                       V. SAPOA AND PUERTO RICO'S ENERGY POLICY

408     For the purposes of this testimony, there are two main areas were SAPOA

409     severely contradicts and affects Puerto Rico's energy policy: the economic impact of

410     the proposed charges to energy customers to pay for P.R.E.P.A.'s legacy debt, and the

411     impact of these charges in the clean energy transition envisioned by the Island's

412     energy policy.

---

[31] Act No. 17-2019 amended Section 2.3. of Act No. 82-2010: *Renewable Portfolio Standard* (22 L.P.R.A. § 8124): 2015 to 2022 20.0%; 2023 to 2025 40.0%; 2026 to 2040 60.0%; 2041 to 2050 100.0%.

EXPERT TESTIMONY – RAMÓN LUIS NIEVES, ESQ.
ICSE-PR

413    According to the F.O.M.B., "The Plan proposes to cut P.R.E.P.A.'s more than

414    $10 billion of debt and other claims by almost half, to approximately $5.68 billion." [32]

415    Attempting to cut almost by half a controversial and substantial debt may be

416    perceived as a great achievement. But the devil is in the details of the SAPOA.

417    The SAPOA provides for most energy customers in Puerto Rico to pay a

418    "Legacy Charge" for a period of 35 years, 2025-2058. Let's examine SAPOA's

419    definition of the "Legacy Charge":

420    "Legacy Charge" means the hybrid fixed monthly flat fee and volumetric
421    charge by Reorganized PREPA to be included in Reorganized PREPA's rates,
422    fees, and charges to its customers, as more fully described on Schedule B
423    hereto, as such Schedule B may be amended or modified up to and including
424    the Effective Date, to pay principal and interest on the New Bonds and any
425    Refunding Bonds, in structure and amounts that do not delay or extend the
426    Series A Bonds' or the Series B Bonds' expected repayment date and expected
427    weighted average life as set forth in the Fuel Line Lender PSA or the National
428    PSA, as applicable, and otherwise that are reasonably acceptable to the
429    Required Fuel Line Lenders." [33]

430

431    The concept of a "Legacy Charge" is problematic. The so-called "Legacy

432    Charge" means that P.R.E.P.A. and its bondholders agree to burden present and

433    future energy customers with a charge not related to either capital improvements or

434    to cover operational costs. As discussed before, P.R.E.P.A. was created by a 1941

435    "bond law", designed expressly to raise capital for the construction, expansion, and

---

[32] F.O.M.B., *Oversight Board files amended proposed PREPA Plan of Adjustment: OVERSIGHT
BOARD FILES AMENDED PROPOSED PREPA PLAN OF ADJUSTMENT Ensures Plan of
Adjustment Remains Confirmable by The Court; Almost Half of Puerto Rico's Households Would be
Exempt From PREPA Legacy Charge up to Certain Level of Energy Consumption; Charge Subject to
Approval by Energy Regulator* (February 9, 2023)
https://drive.google.com/file/d/1IObIS1SXEzfLxcPEKqS_mFY-DHjJth4w/view
[33] SAPOA, Article I(A)(129).

436   improvements to Puerto Rico's energy grid. January 1974's trust agreement between

437   the utility and its bondholders is quite clear on the subject:

438   "WHEREAS, based upon surveys, estimates and recommendations, the
439   Authority has found and determined **that it is necessary and advisable to**
440   **provide funds for additional facilities for the generation, transmission and**
441   **distribution of electricity to serve the present and prospective demands upon**
442   **the System**, and has determined that it is necessary to increase its capacity to
443   issue revenue bonds secured as hereinafter provided to provide funds for the
444   foregoing purposes; and

446   WHEREAS, the Authority deems it advisable to make provision for the
447   issuance from time to time of revenue bonds on a parity with the bonds issued
448   initially under the provisions of this Agreement **for the purpose of paying all**
449   **or any part of the cost of any Improvements** (as defined herein); [...][34]
450   (Emphasis added).

452   Let's look at the definition of "Improvements" in the 1974 Trust Agreement:

453   "The word "Improvements" shall mean such improvements, renewals and
454   replacements of the System or any part thereof and such extensions and
455   additions thereto as may be necessary or desirable, in the judgment of the
456   Board, to keep the same in proper condition for the safe, efficient and economic
457   operation thereof and to integrate into the System unit or part thereof, and
458   shall include such electric power projects as may be authorized to be acquired
459   or constructed by the Authority under the provisions of the Authority Act and
460   such improvements, renewals and replacements of such properties and the
461   System and such extensions and additions thereto as may be necessary or
462   desirable for continuous and efficient service to the public, which shall be
463   financed in whole or in substantial part from the proceeds of bonds" [35]

465   What the SAPOA attempts to do is to turn the nature of P.R.E.P.A.'s 1941 act

466   as a "bond law" into a self-fulfilling prophesy. The so-called "Legacy Charge" of the

467   SAPOA is designed for the sole satisfaction of the bondholders – some who acquired

468   their bonds when P.R.E.P.A.'s was clearly insolvent, intending to make a "killing" on

---

[34] Statement on January 1, 1974, Trust Agreement – Puerto Rico Water Resources Authority.
[35] Id., Section 101.

469 a future restructuring such as SAPOA proposes. The "Legacy Charge" in no way helps

470 P.R.E.P.A. to perform "improvements" to Puerto Rico's electric grid, the main reason

471 why Lucchetti struggled to create a public corporation authorized to issue bonds.

472      Further, the F.O.M.B. admits on its Disclosure Statement the brutal impact of

473 the Legacy Charge on unsubsidized energy customers in Puerto Rico:

474      "Because **PREPA's current rates, <u>despite being among the highest in North</u>**
475      **<u>America</u>**, are insufficient to fund legacy debt service and PREPA's operating
476      expenses, the Legacy Charge will be included in PREPA's rates to allow for
477      sufficient Net Revenues to provide a source of repayment for the New Bonds
478      issued by PREPA under the Plan." [36]

479

480      This is a confusing, or perhaps cynical, statement from the F.O.M.B.: since

481 P.R.E.P.A.'s rates are among the highest in North America, they propose to raise

482 those rates even higher with the SAPOA. Have the proponents of the SAPOA

483 considered the impact of the Legacy Charges in the economic development of a

484 territory with a shrinking population, that lacks currently from a sustainable driver

485 of growth (other than the temporary influx of federal funds)? The SAPOA and its

486 disclosure lacks any analysis on the terrible impact of the "Legacy Charge" on the

487 economic and social development of Puerto Rico.

488      But it gets worse. This is one of the disclosed "risks" of the SAPOA:

489      "PREPA's collections may be worse than projected. Customer collections could
490      be lower than currently forecasted in the Certified Fiscal Plan. PREPA may
491      fail to collect or have difficulty collecting amounts due from its customers. If
492      PREPA is unable to collect amounts due from customers at the rates projected

---

[36] *Disclosure Statement for Second Amended Title III Plan of Adjustment for PREPA*, 5 (February 26, 2023)

EXPERT TESTIMONY – RAMÓN LUIS NIEVES, ESQ.
ICSE-PR

493    in the fiscal plan, the reduction in revenues could affect its ability to pay
494    expenses and debt service and deliver services." [37]
495

496    The "Legacy Charge" shall consist, "collectively, of all applicable Flat Fees and

497    Volumetric Charges" set at the levels for each customer class." [38] The SAPOA then

498    goes on to grant exemptions to the "Legacy Charge" to "for residential customers who,

499    during such billing cycle, are classified as LRS, RH3, or RFR". [39]

500    Perhaps the best intentions of the F.O.M.B. to be fair to low income individuals

501    ends creating discriminatory rates – contrary to Puerto Rico's energy policy. Although

502    one may sympathize with the F.O.M.B.'s intentions, we also must look at the facts.

503    The utility's customers classified as LRS, RH3, or RFR qualify for energy

504    subsidies, either locally legislated, or from programs of assistance from the U.S.

505    government. Granting a well intentioned exemption to these customer classes

506    discriminates against all nonsubsidized residential, commercial, and industrial

507    customers. In fact, these exemptions unfairly place higher burdens on the

508    nonsubsidized classes – contrary to Puerto Rico's energy policy which prohibits

509    discrimination in the imposition of rates and fees.

510    F.O.M.B. does not consider the impact of unfairly burdening nonsubsidized

511    players of Puerto Rico's economy – already burdened by the actions or inactions of the

512    government of Puerto Rico and the F.O.M.B. What is the potential impact of the

513    Legacy Charges on commercial and industrial customers? How will the Legacy

---

[37] Id., at 361.
[38] SAPOA, Schedule B (Legacy Charge).
[39] Id.

514   Charge impact job creation and economic development in Puerto Rico? The

515   proponents of the SAPOA are silent – maybe clueless – as to the answers to these

516   questions.

517       The F.O.M.B. unilaterally decided that they have the sole power under

518   PROMESA to tamper with Puerto Rico's energy policy – in this case the limitations

519   to create new energy subsidies in Act No. 22-2016. [40] The SAPOA states a very limited

520   and poor argument to justify preempting Puerto Rico's policy on energy subsidies:

521   "[t]his provision is preempted solely to the extent it could be interpreted to restrict

522   the creation of a new subsidy for low-income customers relating to the Legacy

523   Charge."

524       The provision of Act No. 22-2016 which F.O.M.B. intends to unilaterally

525   preempt was created for the purpose of protecting P.R.E.P.A.'s finances, blocking

526   future irresponsible subsidies that could burden the utility. PROMESA in no way

527   authorizes the F.O.M.B. to create subsidies on their own, with no legislative approval.

528   Although well intentioned, the F.O.M.B. pretends to abuse its authority creating

529   subsidies which are discriminatory to other consumer classes.

530       To add insult to injury, the F.O.M.B., P.R.E.P.A.'s managers and Governing

531   Board, as well as Luma Energy, have failed in making sure that government clients

532   (agencies and public corporations) pay up their substantial debts. While proposing

533   this burdensome "Legacy Charge" on its nonsubsidized customers, F.O.M.B. has done

---

[40] *List of Main Statutes Preempted by PROMESA* - 22 L.P.R.A. § 814, to establish limitations to the future creation of any new electric power service subsidy, credit, or grant."

EXPERT TESTIMONY – RAMÓN LUIS NIEVES, ESQ.
ICSE-PR

534   nothing to make sure that P.R.E.P.A./LUMA's government clients pay off their debts

535   – more than $200 million, until July 2022. [41]   F.O.M.B. must also disclose its efforts,

536   if any, to make sure that its subsidized customers are current on their payment plans

537   with P.R.E.P.A./LUMA. Before the enactment of Act No. 22-2016, thousands of

538   subsidized customers had outstanding debts that went uncollected by the utility.

539   These are all measures that the F.O.M.B. should have taken before attempting to

540   impose burdensome, discriminatory charges on most nonsubsidized customers.

541

542       VI. THE ELEPHANT IN THE ROOM: THE 2010-2013 ILLEGITIMATE BONDS

543       As with past versions of the Restructuring Support Agreement since 2015, the

544   SAPOA hides under a rug one of the fundamental problems of P.R.E.P.A.'s debt.

545       In 2010, P.R.E.P.A. authorized 8 bond issues in an amount close to $4 billion.

546   Another bond issue was done in 2012, for $650 million, and the last one, for $673

547   million, in 2013.

548       Since 2010, bondholders, the government of Puerto Rico, as well as their high-

549   paid consultants, had to be aware that P.R.E.P.A. would never be able to repay such

550   debts. The F.O.M.B. itself stated on an adversary complaint that P.R.E.P.A. was

551   technically insolvent by 2011:

552       "Since no later than fiscal year 2011, and possibly earlier than such time,
553       PREPA became dependent on debt to cover operating revenue shortfalls.
554       During this time, PREPA also was unable to fund infrastructure needed to
555       comply with current and anticipated regulation and to maintain safe and
556       reliable service to its ratepayers." [42]

---

[41] House Concurrent Resolution 356 (passed by the House of Representatives on November 10, 2022).
[42] Civil Case No. 17-04780-LTS, ¶42, https://reorg-research.com/pdf/2066548.pdf

557

558     If the utility was technically insolvent, why would the F.O.M.B. ignore its

559     responsibility to perform a comprehensive audit of the ten bond issues authorized in

560     2010, 2012 and 2013?

561     Some will argue that it's too late to question the facts and circumstances

562     surrounding the 2010-2013 bond issues. The negotiations and litigation over

563     P.R.E.P.A.'s debt have taken almost a decade to complete. But, for some reason,

564     F.O.M.B. decided not to address the questionable practices surrounding numerous

565     bond issues of this failed utility.

566     The F.O.M.B. has access to several studies questioning the legitimacy of

567     P.R.E.P.A.'s bond issues.

568     Perhaps one of the first of these studies was authorized by the local House of

569     Representatives in 2015. [43] The House Committee performed a comprehensive

570     analysis of the prospectus and financial statements related to all bond issues between

571     2000-2012, as well as the engineering reports required to issue the bonds.

572     As stated before, the 1974 Trust Agreement required that the funds raised

573     through bond issues were to be used for capital improvements of P.R.E.P.A.'s

574     infrastructure.

---

[43] *Informe Final de la Cámara de Representantes de Puerto Rico sobre la R. de la C. 1049,* Comisión de Pequeños y Medianos Negocios, Comercio, Industria y Telecomunicaciones (24 de junio de 2015) http://www.tucamarapr.org/dnncamara/Documents/Measures/52658e55-06a5-4eef-aea7-27da0ab0f984.pdf

575        The comprehensive House report concluded that, from the $12 billion raised by

576    P.R.E.P.A.'s bond issues between 2000-2012, only $2.7 billion were destined to capital

577    improvements. [44] The report goes on to explain that P.R.E.P.A. used $8.5 billion from

578    those bond issues to refinance debt and pay due interest. [45] Between 2007-2013, only

579    31% of the funds obtained through bond issues were actually used by P.R.E.P.A. for

580    capital improvements. [46] P.R.E.P.A. used most of the $12 billion obtained between

581    2000-2012 to, as the popular saying goes, "pay the Visa with the Mastercard".

582        The 2015 House report uncovered multiple irregularities from the "consulting

583    engineer" that, according to the 1974 Trust Agreement, had an important role to play

584    in the process of authorizing P.R.E.P.A.'s bond issues.

585        The F.O.M.B. authorized a comprehensive report on Puerto Rico debt from

586    Kobre & Kim. [47] The Kobre & Kim revealed several irregularities in the process of

587    issuing P.R.E.P.A.'s debt. For instance, the "consulting engineer" certified on his

588    2009-2013 reports that P.R.E.P.A.'s infrastructure was in good condition; that the

589    utility would receive sufficient revenue, and that P.R.E.P.A. would be able to perform

590    on a reserve of 120% for the payment of principal and interest of the bonds. [48]

---

[44] Id., at 13.
[45] Id.
[46] Carrie Sloan & Saqib Bhatti, *Wall Street's Power Grab in Puerto Rico*, ReFund America Project, 3 (May 25, 2017) https://acrecampaigns.org/wp-content/uploads/2020/04/WallStreetsPowerGrabinPuertoRico-May2017.pdf
[47]    Kobre    &    Kim,    *Special    Investigative    Report*,    122    (August    20,    2018) https://www.documentcloud.org/documents/4777926-FOMB-Final-Investigative-Report-Kobre-amp-Kim.html
[48] Id., at 135-137.

591    Obviously, the so-called "consulting engineer" was providing false information to

592    allow P.R.E.P.A. to incur significant debt.

593    Kobre & Kim's report shows how the utility misrepresented its financial

594    information and projections to do the bond issues. [49] P.R.E.P.A., of course, has already

595    admitted that, between 2011-2016, its rates were insufficient toe ven cover their

596    operational expenses. [50]

597    Pursuant to Act No. 97-2015, the government of Puerto Rico created the Puerto

598    Rico Commission for the Audit of Public Credit. This Commission authorized a report

599    on P.R.E.P.A.'s 2013 bond issue. [51] This report reveals several irregularities of this

600    bond issue, P.R.E.P.A.'s last.

601    P.R.E.P.A. fell victim to the irresponsible traffic of "toxic swaps". [52] The reports

602    reveal potential conflicts of interest among financial institutions and consultants.

603    Some institutions negotiated "interest rate swaps" for P.R.E.P.A., and later acted as

604    underwriters of bond issues to cause P.R.E.P.A. to pay them "termination penalties"

605    from those same swaps. [53] P.R.E.P.A. also fell victim to illegitimate "*scoop and toss*"

606    practices. [54] Financial institutions and consultants caused the utility to issue bonds

---

[49] Id.

[50] Id., at 141.

[51] Puerto Rico Commission for the Comprehensive Audit of the Public Credit, *Pre-audit Survey Report,* http://sptpr.net/wp-content/uploads/2016/10/Second-Interim-Pre-Audit-Report-on-2013-PREPA-debt-emission-con-anejos.pdf

[52] Sloan & Bhatti, supra note 46, at 7-8.

[53] Id., at 8.

[54] Id. at 5.

607    to refinance debt. [55] Entities providing counsel to P.R.E.P.A., or who underwrote

608    those bond issues, profited from the refinance of such debts. [56]

609    Who stood to profit in the process of allowing P.R.E.P.A. to dig itself into an

610    impossible $9 billion hole of debt? What was the role of credit rating agencies,

611    financial institutions, engineers, counsel, accounting firms, government officials,

612    regulators, in contributing to P.R.E.P.A.'s to collapse?

613    It is not too late to question the legitimacy of P.R.E.P.A.'s bonds issued between

614    2010-2013. The nonsubsidized customers of P.R.E.P.A., who stand to pay a

615    substantial "Legacy Charge" for 35 years if the SAPOA is finally approved, deserve

616    no less.

617    **Q. What consequences would the Plan have, if approved, on PR public policy on**

618    **energy? Would the Plan promote renewable and distributed energy?**

619    Does the SAPOA – and its 35-year "Legacy Charge" – help promote the

620    aggressive integration of renewables, as ordered by Act No. 17-2019 and the current

621    Integrated Resources Plan?

622    The aggressive integration of renewable power into Puerto Rico's energy

623    system is the main public policy objective of Act No. 17-2019. As previously stated,

624    Puerto Rico's R.P.S. includes aggressive mandates: a 20% target of renewables by

---

[55] *Informe Final de la Cámara de Representantes de Puerto Rico sobre la R. de la C. 1049,* supra note 43, at 19.
[56] Id., at 8-9.

625    2022; 40% by 2025; 60% by 2040, and 100% by 2050. Puerto Rico is yet to comply with

626    its current R.P.S.

627         The SAPOA fails to include any facts or analysis as to the potential impact of

628    the "Legacy Charge" on achieving the R.P.S. The SAPOA is silent on the analysis on

629    how residential solar PV net metering and grid defection from residential,

630    commercial, and industrial customers – discussed in the current I.R.P. [57] – may

631    impact expected revenues collected from the "Legacy Charge". Recently, LUMA

632    disclosed that 78,000 customers had already entered the net metering program:

633    54,000 customer connections to rooftop solar in 21 months, representing 330 MW

634    added to the grid. [58] Industry sources estimate that an average of 3,400

635    interconnections are being achieved monthly.

636         If grid defection and net metering, as well as the proposed exemption to already

637    subsidized customer classes, reduce PREPA's expected revenues from its "Legacy

638    Charge", who will end up paying the debt subject to the SAPOA? Will the F.O.M.B.

639    seek to impose any kind of "solar tax" – illegal under Act No. 17-2019 – or severely

640    limit net metering.

641         The failure of the SAPOA to answer those questions puts into question the

642    possibilities of full compliance with Puerto Rico's energy policy.

643
644

---

[57] Final Resolution and Order – In re: Integrated Resource Plan, Case No. CEPR-AP-2018-0001 (August 24, 2020)   https://aldia.microjuris.com/wp-content/uploads/2020/08/orden-y-resoluciocc81n-final-sobre-plan-integrado-de-recursos.pdf

[58] Anne Fischer, *Puerto Rico moves into seventh place for residential solar per capita*, PV Magazine (April 21, 2023)

EXPERT TESTIMONY – RAMÓN LUIS NIEVES, ESQ.
ICSE-PR

645                                    CONCLUSION

646          The SAPOA recognizes the jurisdiction of the energy regulator, the PREB, to

647    approve the "Legacy Charge". One of the "conditions precedent" of the SAPOA is that

648    "PREB is required to approve the Legacy Charge as a rate, fee, and/or charge

649    necessary to guarantee that Reorganized PREPA meets its obligations to holders of

650    New Bonds". [59] If the SAPOA is approved, PREB will then be in position to decide

651    whether it complies with Puerto Rico's energy policy.

652          Based on the abovementioned statements, it is my opinion that the Second

653    Amended Plan of Adjustment (SAPOA) for P.R.E.P.A. runs counter to Puerto Rico's

654    current energy policy.

655          **I declare under penalty of perjury pursuant to the laws of the United States of**
656    **America that the foregoing is true and correct to the best of my knowledge and belief.**
657
658    **Dated: April 28, 2023.**
659
660    _____
661    RAMÓN-LUIS NIEVES, ESQ.

---

[59] SAPOA, Article XXXI(A)(b)(ix), and Article XXXI(A)(d).

EXPERT TESTIMONY – RAMÓN LUIS NIEVES, ESQ.
ICSE-PR