UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>   as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>   Debtors.[1] | PROMESA<br>Title III<br><br>No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>   as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>   Debtor. | PROMESA<br>Title III<br><br>No. 17-BK-4780-LTS<br><br>(Jointly Administered) |

**DEBTOR'S OPENING EXPERT REPORT AND DISCLOSURES**

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as the sole Title III representative of the Puerto Rico Electric Power Authority ("PREPA" or the

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19- BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

"Debtor"), pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2] respectfully submits its opening expert report and disclosures in support of confirmation of the *Modified Second Amended Title III Plan of Adjustment of the Puerto Rico Electric Power Authority* [ECF No. 3296] (as it may be amended, modified, or supplemented, the "Plan"),[3] and in accordance with accordance with paragraphs 3 and 24 of the *Amended and Restated Order Establishing, Among Other Things, Procedures and Deadlines Concerning Objections to Confirmation and Discovery in Connection Therewith* [ECF No. 3305] (the "Confirmation Procedures Order") and Federal Rules of Civil Procedure 26(a)(2)(A) and 26(a)(2)(C).

1. Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), and consistent with the witness identified in paragraph 1 of *Debtor's Identification of Expert Witnesses* [ECF No. 3394] (the "Expert Identification"), attached hereto as **Exhibit A** is the opening expert report of Glenn R. George. Supporting documents and information related to this expert report not already uploaded to the Plan Depository will be made available in a separate confidential folder in the Plan Depository.

2. Pursuant to Federal Rule of Civil Procedure 26(a)(2)(C), and further consistent with the witnesses identified in paragraph 2 of the Expert Identification, Debtor herein provides the following information for its witnesses who do not need to provide a written report:

    a. **David Brownstein, Managing Director at Citigroup, Inc.** The subject matters on which Mr. Brownstein may testify include: (i) a description of the structure and terms of the New Bonds and CVI to be issued pursuant to the Plan; (ii) the impact of the New Bonds'

---

[2] PROMESA is codified at 48 U.S.C. §§ 2101–2241.

[3] Capitalized terms not defined herein shall have the meanings ascribed to them in the Plan.

2

terms on the Plan's feasibility under PROMESA § 314(b)(6); (iii) the consistency of the New Bonds and CVI to be issued pursuant to the Plan with PREPA's fiscal plan under PROMESA § 314(b)(7); (iv) the negotiation of the National PSA and the Fuel Line Lender PSA, including the benefits of those settlements; and (v) the basis for the releases and professional fees provided in connection with those settlements in the Plan.

As to topic (i), Mr. Brownstein is expected to testify concerning the structure and terms of the New Bonds (that is, the Series A Bonds, Series B-1 Bonds, and Series B-2 Bonds) and the CVI. This testimony is expected to address, among other things, the benefits redounding to PREPA from the terms of the New Bonds and the CVI, including the benefits of the limited default structure and the lack of any receiver remedy, as well as the benefits provided by the terms of the New Bonds and the CVI to holders of those instruments. In particular with respect to the CVI, Mr. Brownstein is expected to testify about the circumstances in which the CVI could be triggered, the rationale behind including the CVI in the Plan, and its potential upside to its holders. Mr. Brownstein will base this testimony on his review and understanding of the New Bonds and the CVI, his personal participation in, or supervision of, communications between and among advisors to the Oversight Board, and his significant expertise and experience in the municipal bond market and this and other Title III restructurings, as well as cases under chapter 9 of the Bankruptcy Code. Further, particularly with respect to the CVI, Mr. Brownstein's testimony will be based on his understanding of certain considerations taken into account in the development of the CVI.

As to topic (ii), Mr. Brownstein is expected to testify concerning the effect the New Bonds' provisions on the Plan's feasibility. Mr. Brownstein is expected to testify the New Bonds are projected to be paid in full before their respective final maturity dates and that the limited events of

3

default and remedies in the New Bonds, along with other provisions, help to mitigate any risk that PREPA will default on the New Bonds and the protection afforded to holders of the New Bonds.

As to topic (iii), Mr. Brownstein is expected to testify concerning the consistency of the New Bonds to be issued pursuant to the Plan with the debt sustainability analysis set forth in PREPA's certified fiscal plan. Mr. Brownstein will base this testimony on a review of the Plan's terms regarding the Legacy Charge, the New Bonds, the CVI, and other financial obligations; a review of the fiscal plan's debt sustainability analysis; and his personal participation in, or supervision of, communications between and among advisors to the Oversight Board.

As to topics (iv) and (v), Mr. Brownstein is expected to testify concerning the National PSA and the Fuel Line Lenders PSA. Mr. Brownstein is expected to testify, to the extent consistent with mediation privilege, as to the nature of the negotiations that took place between the parties leading to those settlements, as well as the terms of the settlements, the benefits that they provide to PREPA, and the risks to PREPA were it to lose any of the disputes that are resolved through these settlements. Mr. Brownstein will also testify concerning the fees and other amounts proposed to be reimbursed or paid to National and the Fuel Line Lenders, as well as the releases provided for by the settlements and proposed to be effectuated by the Plan. Mr. Brownstein is also expected to testify the fees and other amounts proposed to be paid pursuant to these settlements are fair and reasonable in light of the obligations, responsibilities, and efforts undertaken by the proposed fee recipients, the relative magnitude of the fee payments compared to PREPA's overall debt, and the use and magnitude of such fees in comparable cases. Mr. Brownstein will base this testimony on his personal participation in the negotiation of the National PSA and the Fuel Line Lender PSA, his personal participation in, or supervision of, communications between and among advisors to the

Oversight Board, and his significant expertise and experience in the municipal bond market and with Title III restructurings.

More specifically, with respect to the Fuel Line Lenders PSA, Mr. Brownstein is expected to testify regarding the key benefits the Oversight Board took into account in approving the settlement, including, among other things, its resolution of the litigation filed by the Fuel Line Lenders regarding the asserted priority of the Fuel Line Lenders' claims. Regarding the release called for by the settlement, Mr. Brownstein may testify as to how such release's proposed terms provide flexibility for the Oversight Board to enter into subsequent settlements with other parties.

As to the National Settlement, Mr. Brownstein is expected to testify that its structure, including its use of a trust commutation, is consistent with other settlements approved by this Court in other Title III plan confirmations, as well as prior municipal bond structures in which Mr. Brownstein has been involved. Mr. Brownstein is also expected to testify about the key benefits the Oversight Board took into account in approving the National Settlement. Mr. Brownstein may also address the National Reimbursement Claim, including its particular features. Further, Mr. Brownstein may also testify about the work done by National's professional advisors relating to the structure of the Series B Bonds, and how such efforts provide a benefit to creditors who may enter into future settlements.

    b.    **Sheva Levy, Principal at Ernst & Young, LLP.** The subject matters on which Ms. Levy is expected to testify include: (i) the historical and recent contributions to, and funded status of, the pension system maintained for the employees of PREPA, the Sistema de Retiro de Empleados de la Autoridad de Energía Eléctrica ("SREAEE"), including the depletion of SREAEE's liquid assets, (ii) the estimated amount of contributions needed to fund the SREAEE pension benefits, prior to consideration of the reforms of the pension system set forth in PREPA's

5

Modified Second Amended Title III Plan of Adjustment (the "Plan") (iii) a description of the reforms of the pension system set forth in the Plan and the estimated amount of contributions needed to fund SREAEE pension benefits, as modified by the Plan, and (iv) an overview of the historical funding levels of the defined benefit retirement plans sponsored by the Commonwealth of Puerto Rico.

On topic (i), Ms. Levy is expected to testify about (a) the data provided by PREPA and SREAEE related to the number of eligible participants of SREAEE, including current employees of PREPA and former employees of PREPA who transferred to the Commonwealth as a result of PREPA's transactions with private operators ("Active Participants"), and retired former employees receiving monthly pension payments ("Retired Participants," and together with the Active Participants, the "Participants"), and the amount of their average annual benefit payments, (b) the accrual of benefits and cost of living adjustments under the terms of the regulations of SREAEE, and (c) SREAEE's financial status. On topic (i), Ms. Levy will base her testimony on, among other things, information received from, among others, SREAEE and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") and their respective advisors.

With regard to topic (ii), Ms. Levy is expected to testify regarding the estimated amount of contributions needed to fund the SREAEE pension benefits, prior to consideration of the reforms of the pension system set forth in the Plan. On topic (ii), Ms. Levy will base her testimony on, among other things, (a) information received from, among others, SREAEE and AAFAF and their respective advisors, and (b) the historical methods used by SREAEE's actuary to develop Actuarially Determined Contributions, as defined in the system actuary's reports.

With regard to topic (iii), Ms. Levy is expected to testify regarding (a) a summary of the Plan's pension reforms, including, among others, (1) the freeze of pension benefits as of the

6

effective date of the Plan (the "Effective Date") for Active Participants, (2) the elimination of the cost of living adjustments from and after the Effective Date for Participants, (3) the funding of the PREPA PayGo Trust, and (4) the provisions under the Plan which provide that SREAEE will remain active in the administration of SREAEE benefits and will be refunded from the PREPA PayGo Trust for payments made to Participants up to the amount of pension benefits, as modified by the Plan, and (b) the estimated amount of contributions needed to fund SREAEE pension benefits, as modified by the Plan. On topic (iii), Ms. Levy will base her testimony on, among other things, (a) information received from, among others, SREAEE and AAFAF and their respective advisors and (b) her understanding of the pension reform measures set forth in the Plan.

With regard to topic (iv), Ms. Levy is expected to testify as to the historical funded status of the defined benefit retirement plans sponsored by the Commonwealth of Puerto Rico. On topic (iv), Ms. Levy will base her testimony on, among other things, information received from, among others, AAFAF, Retiro, and their respective advisors.

      c.    **Juan Santambrogio, Managing Director at Ernst & Young, LLP.** The subject matters on which Mr. Santambrogio may testify include: (i) PREPA's payment obligations under the Plan as of its Effective Date, and (ii) whether on a forecasted basis PREPA has, or will have contemporaneously with the Effective Date of the Plan through the transactions contemplated thereby, sufficient liquidity or access to sufficient funding to satisfy its Effective Date obligations under the Plan.

On topic (i), Mr. Santambrogio is expected to testify the Plan provides for PREPA to make certain payments on the Effective Date, including payment of: (a) Allowed Administrative Expense Claims in cash; (b) certain amounts, in cash, to the GUC Trust, the Avoidance Actions Trust, and the PREPA PayGo Trust for their initial administrative fees, costs, and expenses; (c)

7

certain supporting creditors' fees to the Fuel Line Lender PSA Creditors and National in Cash or New Bonds; and (d) certain other payment obligations which may be necessary. On topic (i), Mr. Santambrogio will base his testimony on his knowledge of the financial obligations the Plan will require PREPA to satisfy.

On topic (ii), Mr. Santambrogio is expected to testify PREPA has or will have the resources and liquidity necessary to satisfy PREPA's Effective Date payment obligations under the Plan, and that such resources include: (a) PREPA's unrestricted cash on hand; (b) certain reimbursement funds from the Federal Emergency Management Agency ("FEMA") received or projected to be received by PREPA; and (c) proceeds from the sale of the Administrative Expense Bonds to the Commonwealth of Puerto Rico (the "Commonwealth") pursuant to the Plan. On topic (ii), Mr. Santambrogio will base his testimony on, among other things: (a) the analysis of PREPA's cash accounts; (b) provisions of the Plan providing for the sale of Administrative Expense Bonds to the Commonwealth and the ability of the Commonwealth to pay the purchase price for such bonds based on the current cash position of the Commonwealth and the financial projections in the certified Commonwealth fiscal plan; and (c) certain FEMA Public Assistance Determination Memoranda.

        d.      **Ojas Shah, Partner at McKinsey & Company.** The subject matters on which Mr. Shah may testify include the best interests test analysis annexed as Exhibit K to the Disclosure Statement.

Mr. Shah is expected to testify that creditors of the Debtor will receive recoveries pursuant to the Plan, in the aggregate, in a percentage of their claims as of the date of the filing of the Title III case approximately within the range or greater than they would receive outside of Title III

utilizing the assumptions contained in the best interests test analysis, which are attached as Exhibit K to the Disclosure Statement.

Mr. Shah is expected to base this testimony on, among other things, (a) his review and understanding of the classification and treatment of claims under the Plan, (b) his review and understanding of the assumptions made in connection with the Debtor's best interests test analysis, which was prepared by McKinsey, including (i) the resource envelope available for all creditors of the Debtor, (ii) the amount of unsecured claims, and (iii) and the anticipated resolution of certain key legal issues which may require litigation outside of Title III, including the rates to be charged by PREPA, and (c) Mr. Shah's extensive experience serving as an advisor to the FOMB over the past several years and other experience in providing financial advisory services.

e. **Mark Shankweiler, Managing Director of Berkeley Research Group, LLC.** The subject matters on which Mr. Shankweiler may testify include the claims reconciliation process undertaken by the Oversight Board, including, without limitation, the implementation of the ADR procedures and the status of outstanding claims as of the commencement of the hearing to consider confirmation of the plan of adjustment. In connection therewith, Mr. Shankweiler will discuss the reasonableness of the assumptions made with respect to (*i*) the estimated total amount of allowed general unsecured claims asserted against PREPA, which is $800 million; (*ii*) the estimated total amount of allowed eminent domain/inverse condemnation claims asserted against PREPA, which is between $2,437,556 up to $20,273,250; and (*iii*) the estimated total amount of allowed federal claims asserted against PREPA, which is $16,859,577.

Mr. Shankweiler will base such testimony on, among other things, (a) the review and analysis of the proofs of claim filed against PREPA by the Oversight Board, PREPA and their respective advisors, including but not limited to analysis of PPOA claims, UTIER grievance

9

claims, litigation claims, the UITICE litigation claim, and employee claims, as well as (b) Mr. Shankweiler's extensive experience in complex restructuring, including claims reconciliation and analysis.

    f.  **William P. Zarakas, Principal at Brattle Group Inc.** The subject matters on which Mr. Zarakas may testify include: (i) the calculation of the Revenue Envelope; (ii) the derivation of Legacy Charge rates; and (iii) the estimation of the incremental revenues generated from the Legacy Charge which may be available to fund debt service on the New Bonds.

As to topic (i), Mr. Zarakas is expected to testify concerning the methodology employed to calculate the Revenue Envelope (as the term is defined in Exhibit P to the Disclosure Statement). Mr. Zarakas may testify about (a) the financial capacity of different segments of PREPA customers to pay for increases in electricity bills from PREPA; (b) the estimation of electricity bills for median income households in Puerto Rico in 2024; (c) rate design options (e.g., increases in fixed customer charges versus increases in volumetric rates) and their impact on revenue generation; (d) the increasing availability to consumers of substitutes to electricity from PREPA and their impact on estimates of the price elasticity of demand for electricity in Puerto Rico; and (e) the cash flow of incremental revenues produced by charging PREPA's customers higher fixed and volumetric rates.

Mr. Zarakas may base his testimony on, among other things, (a) his review of the load and revenue forecasts adopted by PREPA's fiscal plan certified on June 28, 2022 (the "2022 PREPA Fiscal Plan"); (b) his review of household income data in Puerto Rico; (c) his review of kilowatt-hour ("kWh") consumption by PREPA customers; (d) his review of mainland U.S. electric utility rates and rate design; (e) his review of relevant literature regarding behavior of electricity customers and the price elasticity of demand for electricity; (f) his overall experience providing

10

economic analyses in the retail electricity sector; and (g) his firm's discussions with the Oversight Board.

As to topic (ii), Mr. Zarakas is expected to testify concerning the methodology employed to determine the Legacy Charge. Mr. Zarakas may testify about (a) how increasing PREPA rates may reduce the volume of PREPA kWh sales anticipated in the 2022 PREPA Fiscal plan; (b) how the reduced sales level may, in turn, affect the recovery of the fixed utility costs which were based on pre-rate increase level of sales; (c) how such fixed cost under-recovery needs to be deducted from the incremental revenues calculated under the Revenue Envelope; (d) how additional capital expenditures estimated by the Oversight Board advisors to cover federal funding cost-share requirements and other capital expenditure considerations need to be deducted from the incremental revenues calculated under the Revenue Envelope; (e) how deductions from the Revenue Envelope cash flow result in a revised cash flow and present value that could be available for other uses, such as debt service; (f) how Legacy Charge fixed and volumetric rates were determined to produce the revised present value of the same revised cash flow; and (g) how Legacy Charge rates were further modified, and the resulting cash flow and the present value increased slightly to ensure that lower-income and lower-usage customers do not pay a higher Legacy Charge on a blended per-kWh basis than do higher-income or higher-usage customers and to accommodate a settlement with National.

Mr. Zarakas may base his testimony on topic (ii) on, among other things, (a) his analysis of the economics of distributed generation options; (b) his analysis of price elasticity of demand for electricity; (c) his review of relevant data, including consumption and rates paid with respect to PREPA's residential, commercial, and industrial customers; (d) his overall experience

11

concerning economic analyses in the retail electricity sector; and (e) his experience in advising the Board, including discussions with the Board and its advisors.

As to topic (iii), Mr. Zarakas is expected to testify concerning the estimation of the incremental revenues that may be generated from implementation of the Legacy Charge rates to fund debt service on the New Bonds. Mr. Zarakas may base his testimony on topic (iii) on, among other things, (a) the derivation of Legacy Charge rates and the generation of incremental revenues that matches the present value of the Legacy Charge cash flow produced by application of those rates; and (b) the projected timing and amounts of those incremental revenues that may be generated from the Legacy Charge.

3. The Oversight Board reserves the right to amend the expert report and disclosures in accordance with the terms set forth in the Confirmation Procedures Order.

*[Remainder of Page Intentionally Left Blank]*

| | |
|---|---|
| Dated: April 28, 2023<br>New York, New York | Respectfully submitted,<br>*/s/ Margaret A. Dale*<br><br>Martin J. Bienenstock<br>Paul V. Possinger<br>Ehud Barak<br>Margaret A. Dale<br>Michael T. Mervis<br>Julia D. Alonzo<br>Laura Stafford<br>Javier F. Sosa<br>(Admitted *Pro Hac Vice*)<br>**PROSKAUER ROSE LLP**<br>Eleven Times Square<br>New York, NY 10036<br>Tel: (212) 969-3000<br>Fax: (212) 969-2900<br><br>*Attorneys for the Financial Oversight and Management Board, as representative for PREPA*<br><br>*/s/ Hermann D. Bauer*<br><br>Hermann D. Bauer<br>USDC No. 215205<br>**O'NEILL & BORGES LLC**<br>250 Muñoz Rivera Ave., Suite 800<br>San Juan, PR 00918-1813<br>Tel: (787) 764-8181<br>Fax: (787) 753-8944<br><br>*Co-Attorneys for the Financial Oversight and Management Board, as representative for PREPA* |

## CERTIFICATE OF SERVICE

      I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notifications of such filing to all CM/ECF participants in this case.

*/s/ Hermann D. Bauer*
Hermann D. Bauer