# EXHIBIT A

# Reorg®

2023-05-02 22:36:31

## Puerto Rico

# PREPA Experts Highlight Chasm Between Bondholders, Oversight Board Over Revenue Capacity, Rate Affordability, Capex Needs

Tue 05/02/2023 18:09 PM

*Relevant Documents:*
Bondholders
PREPA / Oversight Board
SREAEE
UTIER
Environmental / Community Groups

The PROMESA oversight board and bondholders' experts shed stark light on how far apart the board and the public utility's bondholders are over rate affordability, the utility's capacity to generate additional revenues to pay creditors, and its capital expenditure needs in reports filed on the path toward a Puerto Rico Electric Power Authority plan of adjustment confirmation hearing this summer.

The PREPA plan and disclosure statement propose to restructure PREPA's liabilities principally through an issuance of $5.68 billion of new bonds to fund partial recoveries on creditors' claims. In addition to $8.26 billion in outstanding PREPA revenue bonds, plus approximately $218 million in prepetition accrued interest on such bonds, PREPA estimates $700.9 million in fuel line loan claims and projects approximately $246 million to $4.9 billion (with an estimate of $800 million) in general unsecured claims.

Under the proposed plan, PREPA's future payments of principal and interest on the new bonds would be funded, over an expected 35-year period, by generating additional net revenues through imposition of a legacy charge to PREPA's customers comprising (i) an additional monthly flat fee for customers' connection to PREPA's power grid and (ii) additional volumetric charges based on electricity consumption on a per-kilowatt-hour basis. The oversight board determined the legacy charge by developing a view of what it deems affordable for PREPA's customers. Based on that analysis, the oversight board says that an affordable and sustainable legacy charge will generate only $5.68 billion in additional net revenues, measured as of the effective date of the plan.

The bondholders target what they characterize as "inaccurate and unreasonable" calculations and assumptions by the oversight board that, if "corrected," could raise PREPA's additional revenue capacity by hundreds of millions and keep rates affordable.

The oversight board's expert says the proposed legacy charge, in addition to funding future debt service payments, "appropriately" addresses a projected $2.425 billion capex shortfall over a 27-year period, which translates into a net present value of $887 million, and a fixed cost under-recovery caused by future rate increases that adds up to an NPV of $812 million. The remaining legacy charge revenue "represents the estimated upper bound of revenues available for creditors," according to the expert.

PREPA's employee retirement system, known as SREAEE, and the utility's main union, known as UTIER, filed expert reports in support of their opposition to confirmation of what they maintain is an "unfeasible" plan of adjustment.

The parties head into a string of scheduled depositions of debtor representatives by bondholder counsel that are kicking off Wednesday, May 3, when oversight board chairman David Skeel is slated to be deposed.

**PREPA Bondholders**

1

As an initial matter, the bondholders – the ad hoc group of PREPA bondholders, Assured Guaranty and Syncora Guarantee – ask the Title III court to permit them to file unredacted versions of the report, which would reveal information underlying assumptions and conclusions and would benefit all interested parties and the general public. Barring an agreement to that effect with the oversight board, the bondholders intend to seek a Title III court ruling that the redacted material is not entitled to confidential status or protection pursuant to the plan depository protective order. The court temporarily granted the oversight board's sealing request pending determination of the issue.

Nevertheless, the redacted reports reveal various perceived deficiencies or inaccurate assumptions underlying the oversight board's calculations. Broadly, the bondholder experts conclude that the oversight board "understates the amount of revenues PREPA can generate to repay creditors."

Maureen Chakraborty, managing principal at Analysis Group and one of the four experts for the bondholders, concludes that the oversight board's methodology for calculating the additional net revenues PREPA could collect from customers to repay creditors is based on a number of "inaccurate and unreasonable" assumptions and calculations.

Correcting for "demonstrable problems" in the oversight board's calculations "significantly increases the amount of additional net revenues that PREPA can reasonably collect while remaining well within" the oversight board's "own view of what is affordable for PREPA's customers," according to Chakraborty.

Using lower elasticity rates from the academic literature discussed in the report by another bondholder expert Dr. Susan Tierney, Chakraborty asserts that additional net revenues increase to $5.97 billion to $6.26 billion – or an increase of $290 million to $580 million over the amount calculated by the oversight board.

Regarding the legacy charge, Chakraborty concludes that, even accepting the oversight board's 6% share of wallet, or percentage of median household income devoted to power bills, that is an affordable electricity rate, solely for purposes of the report, the oversight board "understates the amount of revenues PREPA can generate to repay creditors."

The expert asserts that she subjected her calculations to the same considerations identified by the oversight board, including that PREPA's rates must at all times be affordable to its customers, enable PREPA's long-term sustainability and account for the effect that an additional increase in the price of electricity could have on the demand for electricity (an economic concept referred to as the elasticity of demand), taking into account consumer behavior and the availability of alternative energy sources such as solar power.

Chakraborty details seven primary "corrections" she made in arriving at a higher additional net revenue range than asserted by the oversight board including:

- Correcting the consumption level of the hypothetical residential customer;
- Correcting the "failure" to consider affordability in years beyond 2024;
- Correcting "unsupported" elasticity assumptions;
- Correcting the "failure" to capture more revenue from higher-earning residential customers;
- Correcting an "ad hoc approach" for estimating affordable rates for commercial and industrial customers;
- Correcting "unsupported" capex estimates; and
- Correcting the oversight board's "overly pessimistic" load projections.

The effect on additional net revenues from corrections of "select errors" is illustrated below:

2



Tierney, a senior advisor at Analysis Group, discusses purported flaws in the demand forecasts used by the oversight board and concludes that those forecasts understate the demand for electricity in future years. According to Tierney, the forecasts are based on unfounded and unreasonable assumptions related to the adoption of energy-efficiency measures, distributed generation (principally, rooftop solar panels) and electric vehicles by PREPA customers over the forecast period, which collectively "greatly underestimate[] PREPA's future sales of electricity."

Sebastian Edwards, a professor of business economics at the University of California Los Angeles, discusses other "overly pessimistic inputs" used to create the 2022 PREPA fiscal plan forecast.

Gary Strumeyer, president and CEO of Strumeyer Consulting LLC, examined the bondholders' argument that the proposed Series B-1 bonds (the plan's main source of consideration) are worth less than their stated amount due to their "off-market terms and purported lack of covenants and remedies." Strumeyer's mandate included evaluating the terms of the proposed Series B-1 bonds and assessing whether those bonds would trade below par.

"Put simply, the Series B-1 bonds differ markedly from any other municipal revenue bonds that I have evaluated during the course of my career, invariably in ways that make the Series B-1 bonds less attractive to investors," Strumeyer concludes.

Strumeyer states further that nonstandard terms increase the risk of nonpayment and decrease the value of the bonds for bondholders because (i) they provide minimal assurances that bondholders would receive interest and principal payments in a timely manner, if ever, (ii) they limit bondholders' rights and remedies should PREPA fail to meet its debt obligations and (iii) they provide substantially fewer protections for investors' interests than a typical municipal revenue bond.

"It is my opinion that, as a result, these bonds would likely trade at a substantial discount to par value, although the highly unusual nature of the Series B-1 bonds' terms and corresponding lack of market comparables makes it difficult, if not impossible, to determine a precise discount," Strumeyer concludes.

**Oversight Board**

3

The oversight board's expert witness Glenn R. George reviewed the "revenue envelope" and "legacy charge" models that the oversight board used to determine the legacy charge under the PREPA plan of adjustment that would pay for the $5.68 billion issuance of new bonds. George said he found no "material calculational errors" or divergence from general utility ratemaking practices and found the oversight board's approach "appropriate in reaching a rate that ensures PREPA's continuing operations and attempts to limit its loss of customers and future revenue needed to service debt."

George said the legacy charge revenue "represents the upper bound of cash which can reasonably be made available for debt repayment, given the already high burden on PREPA's ratepayers and PREPA's need to continue operations and modernize its system, among other requirements."

In addition to raising revenue for debt repayment, the legacy charge also "appropriately considers the need for additional capital expenditures" and the "under-recovery of fixed costs due to lost revenues caused by higher rates." George added that the models on which the legacy charge is based are "broadly consistent with the principles of just and reasonable rates."

George said that when considering whether to impose higher rates to fund legacy debt payments, several extenuating factors must be considered, including that PREPA's customers already pay more for electricity than the average ratepayer in the U.S., while receiving "the lowest quality and least reliable service in the U.S. based on pertinent metrics." He asserted that higher electricity bills would likely incentivize adoption of rooftop solar, decreased consumption or non-payment of electricity bills.

The revenue envelope model defines the "upper bound of electricity affordability" for residential customers in Puerto Rico to be 6% of median household income, or $120 monthly. According to George, this amount is considered a "high energy burden," and he asserted that it would be imprudent to set a "share of wallet," or SOW, rate higher.

George also summarizes the oversight board's rationale for developing a fixed connection charge and a volumetric charge to generate revenue for the legacy charge and finds that **the net present value of the upper bound of incremental revenue estimate of $6.383 billion "represents the hypothetical maximum revenue" that could be generated given the affordability and price elasticity of demand limitations** (emphasis added). Further detail on the proposed rates can be found below:

4

| PREPA residential GRS 112 (General) electricity rate components | 2022 Fiscal Plan rates ($) | Revenue Envelope rates ($) |
|---|---|---|
| Median monthly household income | $2,000 | $2,000 |
| Median monthly residential volumetric consumption (kWh) | 425 | 425 |
| **Expected 2022 Fiscal Plan charges** | | |
| Customer charge (fixed charge) | $ 4.00 | $ 4.00 |
| Per kWh, <= 425 kWh per month | $ 0.0494 | $ 0.0494 |
| Per kWh, > 425 kWh per month | $ 0.0556 | $ 0.0556 |
| Fuel & purchased power | $ 0.1224 | $ 0.1224 |
| Contributions in lieu of taxes | $ 0.0071 | $ 0.0071 |
| Subsidies | $ 0.0155 | $ 0.0155 |
| ERS pension projections | $ 0.0240 | $ 0.0240 |
| Total bill (excluding debt repayment) | $ 96.81 | $ 96.81 |
| **Revenue Envelope Legacy Charge adders** | | |
| Fixed Charge adder | $ 0.00 | $21.00 |
| Per kWh, <= 500 kWh per month (Low Block Rate) | $ 0.00 | $ 0.0075 |
| Per kWh, > 500 kWh per month (High Block Rate) | $ 0.00 | $ 0.0300 |
| Total bill impact of Revenue Envelope adders | $ 0.00 | $ 24.19 |
| **Total monthly bill** | **$ 96.81** | **$ 121.00** |
| Total Fixed Charge | $ 4.00 | $ 25.00 |
| Total Volumetric Charge | $ 92.81 | $ 96.00 |
| **SOW** | **4.84%** | **6.05%** |

The revenue envelope model "appropriately" allocates some revenue to "prudent current and future expenses" that are not accounted for in PREPA's 2022 fiscal plan, according to George. Moreover, he opined that it would be "unreasonable and irresponsible for PREPA to allocate the entirety of the Revenue Envelope for the repayment of debt."

George said that the revenue envelope model estimates a total $2.425 billion shortfall in required capital expenditures beyond what is called for in the 2022 PREPA fiscal plan for the FY 2024 through FY 2051 period, which has a NPV of about $887 million. This is in addition to a $365 million capital expenditure shortfall over the next 10 years that has been identified by grid operator Luma Energy, according to the report. "For PREPA to continue operations, modernize its generation and T&D assets, and improve its services to ratepayers, additional funds for CapEx may be required in future. The potential existence of a T&D CapEx shortfall suggests that designating additional revenue for the Legacy Charge could be imprudent," George said. PREPA is expected to receive $14 billion in federal reconstruction funding following extensive damage to the electric system during 2017 hurricanes.

The revenue envelope model also takes into account a fixed-cost under-recovery over the 28-year period in an amount with a net present value of approximately $812 million. George explains that PREPA's fixed costs would remain materially constant whether consumption increases or decreases, and that consumption is expected to decrease as electricity costs rise. Applying the resources for the fixed-cost under-recovery as payment to PREPA's creditors "would be damaging for PREPA" and "would cause further deterioration of generation and T&D systems that are already in need of repairs and updates," according to George.

The remainder of revenue envelope resources, after accounting for capex and fixed-cost under-recovery, "represents the estimated upper bound of revenues available for creditors," because PREPA would be at risk of becoming unable to

5

operate if the utility is unable to cover its fixed costs or fund necessary capital investments to modernize its system, according to the report. George warned that devoting more revenue envelope funds for debt repayment "could potentially lead to a higher risk of system failure, higher risk of failure in implementing the Legacy Charge, and higher risk that the Puerto Rico Energy Board … would deny the request to approve the Legacy Charge." He added that creditors "might reasonably expect" to receive the remaining revenue envelope funds if these costs are covered and "the higher rates imposed by the Legacy Charge are still affordable for PREPA's customers, especially its most vulnerable ones."

The load forecast and fuel price forecast represent the two "most significant" risks underpinning the development of the proposed legacy charge, according to George.

The legacy charge's greater emphasis on the fixed charge than volumetric charge "insulates PREPA's creditors from the risk of receiving less debt repayment in a given year due to actual load falling short of forecast load," and the oversight board's proposed split between the fixed and volumetric components "is broadly consistent with approaches commonly applied in the industry in an effort to mitigate load forecast risk," George added.

George also finds the oversight board's fuel price forecasting methodology "reasonable and appropriate" and "broadly consistent with approaches commonly applied in the industry." The expert noted PREPA's history of underestimating fuel costs, including by 41% from FY 2018 through FY 2022, and asserted "it is appropriate to err on the side of overestimating, rather than underestimating, PREPA's fuel price forecasts."

**SREAEE**

The PREPA employee retirement system, known as SREAEE by its Spanish initials, filed a study by economist José Lozada finding that the PREPA plan is not feasible, because of the macroeconomic impact of implementing the legacy charge and its effect on Puerto Rico's economy.

Lozada asserts that Puerto Rico's economy "is not sustainable, and it has no competitiveness in the long term," and said his study and testimony will demonstrate that the legacy charge "will cause a downward economic spiral," as it will negatively impact consumers, production, employment, migration and commercial competitiveness.

The legacy charge "has a negative impact, not just for PREPA, but for the economy in general, since a decrease in the economic activity translates into less collections" for the commonwealth's general fund, according to Lozada.

Moreover, Lozada states that the payment of the commonwealth's restructured debt, pay-go pension payments and the transfers to the commonwealth trust fund, in addition to the effects of the legacy charge, render the commonwealth fiscal plan "unsustainable."

By 2031, the projected revenues destined for the payment of restructured debt, pay-go and the trust fund alone would range from 41.6% to 43.4%, meaning that there would be 60% to 57% available revenue to cover essential services, among the other expenses that need to be covered with the general fund, according to Lozada.

Imposing the legacy charge "makes all the assumptions established" in the commonwealth fiscal plan "unsustainable and with them the ability of the Commonwealth to pay debt service pursuant to its own plan of adjustment," Lozada concludes.

**UTIER**

UTIER, as PREPA's main union is known, submitted an expert declaration of Tom Sanzillo, financial analysis director at the Institute for Energy Economics and Financial Analysis, or IEEFA, in support of its objection to confirmation of the PREPA plan.

Sanzillo reiterates UTIER's position that the PREPA plan is not feasible and that it underestimates the future capital and

operational needs of the electrical system and overestimates the rate that the economy is able to support. Once these factors are taken into account, there is "no headroom" to support repayment of legacy debt at PREPA, according to Sanzillo.

"The purpose of a bankruptcy proceeding is to provide a fresh start. This Plan of Adjustment is not a fresh start; it is the same old quagmire wrapped in different paper," Sanzillo concludes.

Aside from underestimating the need for future capital expenditures by billions of dollars, Sanzillo asserts that the plan does not provide sufficient detail to provide reasonable assurance that PREPA will have market access to meet those capital needs.

Asserting that future debt is "presumably enabled" by the additional bond provisions that will be spelled out in the new master trust agreement, Sanzillo states that leaving "critical questions regarding any future debt issuances to a document that does not exist is unreasonable."

Moreover, "it appears that existing creditors could have veto power" over the additional bonds, pointing to "contradictory" language in the plan and DS that "attempt[s] to clarify the critical question of the priority status" of additional bonds," says Sanzillo. He adds that a statement that the new bonds and additional bonds will be treated equally is contradicted by a statement that of the two instruments, the legacy debt is paid first from the legacy charge revenues.

"In essence, this would appear that the Legacy Debt has priority status, notwithstanding the statement to the contrary. This logical inconsistency which appears to subordinate any Additional Bonds to the Legacy Debt, if left unaddressed, is likely to be uncovered by any future diligence and weaken (if not preclude) future market access," Sanzillo asserts, adding that the non-default provisions of the legacy debt "further reduce the probability of future market access for additional capital expenditures."

**Environmental / Community Groups Coalition**

A group of environmental and community organizations filed an expert report by Agustin Irizarry-Rivera finding that the PREPA plan would undermine Puerto Rico's public policy goals that promote the rapid adoption of distributed renewable energy, a resilient electricity supply for the people of Puerto Rico and energy justice.

Irizarry-Rivera asserts that that the plan "fails to analyze, or willfully ignores," current rate of adoption of distributed energy and that the renewable energy adoption policy "is harmed by taxing the only renewable energy sector growing for the sake of paying an uninsured debt." He states that the fixed component of the proposed legacy charge "is designed to tax the adoption of residential solar energy and it penalizes net metering adoption of solar photovoltaic rooftop generation."

Irizarry-Rivera finds that PREPA's bondholders are experiencing a technological change they did not foresee. "Failure to foresee technological change while investing is not cause to change the bonds guarantee whether the bondholders' claims are secured or not," he reports. "Nor is it cause to tax the new technology as the proposed [PREPA plan] does."

He finds that the legacy charge would spur grid defection and increase the cost of electricity without improving the system's reliability.

The group filed a complaint against the Federal Emergency Management Agency and U.S. Department of Homeland Security in April over their plans to rebuild Puerto Rico's electric grid, asserting that the agencies failed to properly consider the environmental harm of the plans, opting instead to rebuild back to the "fossil fuel status quo."

This publication has been prepared by Reorg Research, Inc. or one of its affiliates (collectively, "Reorg") and is being provided to the recipient in connection with a subscription to one or more Reorg products. Recipient's use of the Reorg platform is subject to Reorg's Terms of Use or the user agreement pursuant to which the

recipient has access to the platform (the "Applicable Terms"). The recipient of this publication may not redistribute or republish any portion of the information contained herein other than with Reorg's express written consent or in accordance with the Applicable Terms. The information in this publication is for general informational purposes only and should not be construed as legal, investment, accounting or other professional advice on any subject matter or as a substitute for such advice. The recipient of this publication must comply with all applicable laws, including laws regarding the purchase and sale of securities. Reorg obtains information from a wide variety of sources, which it believes to be reliable, but Reorg does not make any representation, warranty, or certification as to the materiality or public availability of the information in this publication or that such information is accurate, complete, comprehensive or fit for a particular purpose. Recipients must make their own decisions about investment strategies or securities mentioned in this publication. Reorg and its officers, directors, partners and employees expressly disclaim all liability relating to or arising from actions taken or not taken based on any or all of the information contained in this publication. © 2023 Reorg. All rights reserved. Reorg® is a registered trademark of Reorg Research, Inc.

© Copyright 2012 - 2023