**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re: | |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | PROMESA Title III |
| as representative of | Case No. 17-BK-3283 (LTS) |
| THE COMMONWEALTH OF PUERTO RICO *et al.*, | (Jointly Administered) |
| Debtors.[1] | |

| | |
|---|---|
| In re: | |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | PROMESA Title III |
| as representative of | Case No. 17-BK-4780 (LTS) |
| PUERTO RICO ELECTRIC POWER AUTHORITY, | (Jointly Administered) |
| Debtor. | |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION TO EXCLUDE EXPERT TESTIMONY OF MARK SHANKWEILER**

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT .......... 1

BACKGROUND .......... 4

JURISDICTION AND VENUE .......... 6

ARUGMENT .......... 6

I. Mr. Shankweiler Is Unqualified to Provide Opinion Regarding GUC Pool Estimate .......... 7

II. Mr. Shankweiler Improperly Relied on Opinions of PREPA's and Oversight Board's Attorneys .......... 9

III. Mr. Shankweiler's Testimony Will Be Inadmissible Legal Opinion .......... 12

IV. Oversight Board Cannot Use Privilege Claims to Prevent Scrutiny of Mr. Shankweiler's Opinion .......... 13

CONCLUSION .......... 16

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Beck's Off. Furniture & Supplies, Inc. v. Haworth, Inc.*,
Nos. 95-4018, 95-4029, 1996 WL 466673 (10th Cir. Aug. 16, 1996) ....................................10

*Berry v. City of Detroit*,
25 F.3d 1342 (6th Cir. 1994) ....................................................................................................8

*Fed. Deposit Ins. Corp. v. Galan-lvarez*,
No. 12-1029 (PAD), 2018 WL 11417749 (D.P.R. June 25, 2018)..........................................15

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
649 B.R. 381 (D.P.R. 2023), *motion to certify appeal denied* (D.P.R. May 3, 2023) ................................................................................................................................6

*Learning Care Grp., Inc. v. Armetta*,
No. 3:13-cv-1540 (VAB), 2016 WL 3248178 (D. Conn. June 12, 2016) ................................9

*Levin v. Dalva Bros., Inc.*,
459 F.3d 68 (1st Cir. 2006).........................................................................................................7

*Nieves-Villanueva v. Soto-Rivera*,
133 F.3d 92 (1st Cir. 1997).......................................................................................................13

*Noel v. City of New York*,
No. 15-cv-5236-LTS, 2023 WL 3170430 (S.D.N.Y. Apr. 28, 2023).................................8, 12

*Nook v. Long Island R.R. Co.*,
190 F.Supp.2d 639 (S.D.N.Y. 2002)..........................................................................................9

*Perez-Garcia v. P.R. Ports Auth.*,
874 F. Supp. 2d 70 (D.P.R. 2012)..............................................................................................7

*Rivera-Cruz v. Latimer, Biaggi, Rachid & Godreau, LLP*,
No. 04-2377 (ADC), 2008 WL 2446331 (D.P.R. June 16, 2008) ..........................................12

*Sec. & Exch. Comm'n v. Rio Tinto PLC*,
No. 17-cv-7994 (AT) (DF), 2021 WL 2186433 (S.D.N.Y. May 28, 2021) ............................15

*Tokio Marine & Fire Ins. Co. v. Grove Mfg. Co.*,
958 F.2d 1169 (1st Cir. 1992).....................................................................................................8

*Vadala v. Teledyne Indus., Inc.*,
44 F.3d 36 (1st Cir. 1995).........................................................................................................14

*Vargas v. Laguer*,
No. 14-1597 (CVR), 2017 WL 1230303 (D.P.R. Mar. 24, 2017) ........................................7, 8

*Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Assoc.*,
No. 2:08-CV-1448 JCM (RJJ), 2011 WL 743748 (D. Nev. Feb. 23, 2011)...........................10

**Statutes**

28 U.S.C. § 1391 ........................................................................................................................6

**Other Authorities**

Wright & Miller, 29 Fed. Prac. & Proc. Evid. § 6264.3 (2d ed. 2020)...........................................7

Fed. R. Civ. P. 26(b)(4)(C)(ii)-(iii) ......................................................................................15

Fed. R. Civ. P. 30(b)(6)...............................................................................................................6

Fed. R. Evid. 702 ............................................................................................................ *passim*

To the Honorable United States District Judge Laura Taylor Swain:

Pursuant to Federal Rules of Evidence 702, 401, and 402 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Official Committee of Unsecured Creditors (the "Committee") hereby moves to exclude the expert testimony of Mark Shankweiler to be offered by the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") in support of its *Modified Second Amended Plan of Adjustment for the Puerto Rico Electric Power Authority* (Dkt. 3296).

**PRELIMINARY STATEMENT**

1. Despite the fact that these cases began almost six year ago, the Oversight Board has yet to file any substantive objections to PREPA claims—much less obtain any rulings from this Court regarding the allowance of such claims. As a result, rather than knowing the actual allowed amount of unsecured claims asserted against PREPA, the Oversight Board is now trying to confirm the proposed plan of adjustment with an estimate of allowable unsecured claims. But the Oversight Board has every incentive to minimize the estimated amount of those claims: a lower estimate would create the appearance of an inflated recovery to the Committee's constituents. This is especially true and critical in light of the enormous recoveries the Oversight Board plans to provide to the Fuel Line Lenders and National.

2. The Oversight Board has estimated the total amount of allowed general unsecured claims asserted against PREPA will be approximately $800 million. This is far less than the $5,927 million of *asserted* general unsecured claims (*i.e.,* only 13.5% of the total). In support of this meager estimate, the Oversight Board has provided a single table that lists twelve categories of general unsecured claims, the amount asserted for each category, and three estimates for the total allowable claim amount: a "low," a "high," and an "adjusted estimated value." In less than a month's time, those estimates have swung widely without explanation, before settling on a

fixed "adjusted estimated value" that is wholly unsubstantiated. On February 9, 2023, those estimates ranged from $246 million to $4.87 billion (a 1,900% differential). Less than three weeks later, on March 1, 2023, they ranged from $305 million to $1.44 billion (a 470% differential). Within both of those ranges, the Oversight Board proffered a fixed, $800 million estimate for PREPA's plan of adjustment.

3. The Oversight Board has stated that the only explanation or justification for the Oversight Board's $800 million estimate will come from the expert testimony of Mark Shankweiler of Berkeley Research Group LLC ("BRG"). But Mr. Shankweiler's deposition made plain that he is wholly unqualified to opine on an estimated allowed amount of the unsecured claims asserted against PREPA. He lacks any meaningful experience or expertise that would permit him to render such an opinion, and the $800 million estimate is actually the work of PREPA's and the Oversight Board's lawyers (over which, of course, various privileges have been asserted). Mr. Shankweiler is a mere mouthpiece for the impermissible legal opinion of the Oversight Board, which is using Mr. Shankweiler as cover to propound a low-ball estimate for the claims of PREPA's unsecured creditors. Mr. Shankweiler must be precluded from providing any testimony in support of the plan of adjustment.

4. *First*, the Oversight Board cannot satisfy its burden to show that Mr. Shankweiler is an expert qualified to opine on the allowed amount of the estimated claims pool for general unsecured claims (Class 5) (the "GUC pool"). Although Mr. Shankweiler is a restructuring professional, he has no apparent experience relating to the allowance of claims filed against governmental entities, has never been qualified as an expert before (on this or any other topic, for that matter), has no relevant educational background, and has never published any articles or

treatises. Mr. Shankweiler also has no experience or ability to evaluate any litigation claim filed against PREPA, given that he lacks any legal training or experience.

5. *Second*, because he is unable to evaluate the legal aspects of the most significant claims asserted against PREPA, Mr. Shankweiler is forced to rely wholly upon the opinions of others to evaluate the allowed amount of those claims. In particular, Mr. Shankweiler relied so heavily on counsel, employees, and advisors for PREPA and the Oversight Board that it is hard to discern what part of the estimated valuation of the GUC pool was actually done by Mr. Shankweiler himself. This mere "parroting" of the opinions of another expert, without any separate analysis or inquiry, renders Mr. Shankweiler's opinion inadmissible.

6. *Third*, Mr. Shankweiler's expert opinion should be excluded because it is founded upon legal opinion. Expert testimony comprised merely of legal conclusions is improper because it cannot properly assist the trier of fact. Mr. Shankweiler's opinion regarding the allowed amount of the litigation claims or other claims (such as the Power Purchase Operating Agreement ("PPOA") claims) where legal issues control the allowance is therefore inadmissible.

7. *Finally*, Mr. Shankweiler's opinion must be excluded because no support exists for it. Mr. Shankweiler has not provided an expert report explaining his conclusion or how he arrived at it. The documents that have been produced relating to the valuation of the GUC pool contain essentially no information. Mr. Shankweiler's deposition testimony provided nothing but mere generalities regarding how the estimated allowed amount of the GUC pool was calculated. And Mr. Shankweiler explained that the estimated allowed amount of many of the claims in the GUC pool came from memoranda and email correspondence from law firms, none of which have been produced by the Oversight Board.

8. For each of these reasons, Mr. Shankweiler should be precluded from testifying in support of the plan of adjustment.

**BACKGROUND**

9. On December 16, 2022, the Oversight Board filed the disclosure statement (PREPA Dkt. No. 3111) for the proposed *Title III Joint Plan of Adjustment of the Puerto Rico Electric Power Authority* (PREPA Dkt. No. 3110), specifying the GUC pool was $800 million. PREPA Dkt. 3111, at 26.

10. On February 9, 2023, the Oversight Board filed the disclosure statement for the first amended plan of adjustment. PREPA Dkt. No. 3201. This disclosure statement included an "estimation of general unsecured claims pool" table, which listed twelve categories of unsecured claims, and for each category listed the number of claims, the amount of claims asserted, and two estimated allowed amounts for each of the categories—one on the "low" end (totaling approximately $246 million) and one on the "high" end (totaling approximately $4.87 billion). *Id.*, Ex. O.

11. On March 1, 2023, the Oversight Board filed the disclosure statement for the second amended plan of adjustment. PREPA Dkt. No. 3297. In contrast to the table included with the prior disclosure statement, this version listed three estimated allowed amounts for the 12 categories of unsecured claims. *Id.*, Ex. O. In addition to a "low" estimated allowed amount ($305 million) and a "high" estimated allowed amount ($1.44 billion), the statement listed an "adjusted estimated value" for general unsecured claims totaling $773 million. *Id.* at Ex. O.

12. On March 11, 2023, the Oversight Board filed its preliminary list of witnesses to be offered in support of the plan of adjustment. PREPA Dkt. No. 3329. This list identified Mr. Shankweiler as a Managing Director at BRG, and stated, among other things, he "[m]ay provide

testimony showing the reasonableness of the assumptions made with respect to . . . the estimated total amount of allowed general unsecured claims asserted against the Debtor." *Id*. at 4.

13. On April 28, 2023, the Oversight Board filed its opening expert report and disclosures ("Expert Disclosure"). PREPA Dkt. No. 3418. The Expert Disclosure contains only two paragraphs regarding Mr. Shankweiler. The only support for Mr. Shankweiler's qualifications to serve as an expert is a single unsupported statement that he has "extensive experience in complex restructuring, including claims reconciliation and analysis." *Id*. at 10. The Expert Disclosure says nothing about valuing litigation claims, claims brought against governmental entities, claims brought against power companies, or claims brought against entities with union employees.

14. The Expert Disclosure indicated that Mr. Shankweiler would discuss "the reasonableness of the assumptions made with respect to (i) the estimated total amount of allowed general unsecured claims asserted against PREPA, which is $800 million." *Id*. at 9. Mr. Shankweiler's testimony would be based on "the review and analysis of the proofs of claim filed against PREPA by the Oversight Board, PREPA and their respective advisors, including but not limited to analysis of PPOA claims, UTIER grievance claims, litigation claims, the UITICE litigation claim, and employee claims." *Id*. at 9-10.

15. Aside from those two paragraphs, no report, affidavit, or other disclosures have been provided to support Mr. Shankweiler's credentials or opinion. Moreover, the Oversight Board directed the clerk remove the Expert Report from the docket (*see* PREPA Dkt. No. 3418), and no replacement document has been filed. As a result, notwithstanding the April 28, 2023 deadline set by the court for opening expert reports (PREPA Dkt. No. 3294 ¶ 25), there is currently no expert disclosure or report from the Oversight Board on the docket.

16. On May 8, 2023, in response to the Committee's Rule 30(b)(6) deposition notice seeking testimony regarding "[t]he estimated value, range of potential values, and cap applicable to General Unsecured Claims," the Oversight Board designated Mr. Shankweiler to testify regarding that topic. Shankweiler Dep., Ex. 1, at 7.

17. The Committee took Mr. Shankweiler's deposition on May 22, 2023. Shankweiler Dep. Tr. (Exhibit 1).

**JURISDICTION AND VENUE**

18. The Court has subject-matter jurisdiction to consider this matter and the relief requested herein pursuant to PROMESA § 306(a).

19. Venue is appropriate in this District pursuant to PROMESA §§ 106(a) and 307(a) and 28 U.S.C. § 1391.

**ARUGMENT**

20. "Rule 702 of the Federal Rules of Evidence governs the admission of expert testimony." *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 649 B.R. 381, 425 (D.P.R. 2023), *motion to certify appeal denied*, (D.P.R. May 3, 2023) (quoting *Bradley v. Sugarbaker*, 809 F.3d 8, 16 (1st Cir. 2015)). "Rule 702 requires that the 'testimony be (1) based upon sufficient facts or data, (2) the product of reliable principles and methods, and (3) that the witness apply the principles and methods reliably to the facts of the case.'" *Id*. (*quoting Pagés-Ramírez v. Ramírez-Gonzalez*, 605 F.3d 109, 113 (1st Cir. 2010)) (internal quotations omitted). "When faced with a proffer of expert testimony, the district court must determine whether the expert witness is qualified and has specialized knowledge that will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Id*. (quoting *Bogosian v. Mercedes-Benz of N. Am., Inc.*, 104 F.3d 472, 476 (1st Cir. 1997)). "The trial court is given wide discretion

to admit or exclude expert testimony." *Id.* (citing *United States ex rel. Jones v. Brigham & Women's Hosp.*, 678 F.3d 72, 83 (1st Cir. 2012)).

21. "The proponent of the expert always bears the burden to show that his expert is qualified to testify competently regarding the matters he intend[ed] to address; [ ] the methodology by which the expert reach[ed] his conclusions is sufficiently reliable; and [ ] the testimony assists the trier of fact." *Vargas v. Laguer*, No. 14-1597 (CVR), 2017 WL 1230303, at *2 (D.P.R. Mar. 24, 2017) (citation and internal quotations omitted).

## I. MR. SHANKWEILER IS UNQUALIFIED TO PROVIDE OPINION REGARDING GUC POOL ESTIMATE

22. The Oversight Board cannot meet its burden to qualify Mr. Shankweiler as an expert in estimating the allowed amount of the GUC pool for PREPA. Every "party proffering a witness as an expert has the burden of laying a foundation that establishes the witness is qualified." Wright & Miller, 29 Fed. Prac. & Proc. Evid. § 6264.3 (2d ed. 2020) (citing *Apostol v. U.S.*, 838 F.2d 595, 599 (1st Cir. 1988) (excluding expert testimony where proponent did not meet burden of establishing expert's qualifications)).

23. Before a witness can offer expert testimony, the witness must first qualify as an expert "in a particular field" through the five bases enumerated in Rule 702—"knowledge, skill, experience, training, or education." *Perez-Garcia v. P.R. Ports Auth.*, 874 F. Supp. 2d 70, 74 (D.P.R. 2012). These bases are stand-ins for one main question—whether the expert has "'achieved a meaningful threshold of experience' in the given area." *Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 78 (1st Cir. 2006) (affirming exclusion of expert opinion due to insufficient experience in proffered area of expertise) (citations omitted).

24. The Oversight Board cannot not qualify Mr. Shankweiler as an expert capable of opining on the size of the GUC pool. First, there is nothing in the record to suggest that Mr.

Shankweiler is an expert in anything. He has never testified as an expert before (Shankweiler Dep. Tr. 16:10-12), nor has he ever been deposed. *Id*. at 8:4-8. Mr. Shankweiler's degrees do not relate to bankruptcy or restructuring issues (*id*. at 15:14-16:6), and he has never published any articles or treatises regarding restructuring. *Id*. at 16:13-16.

25. To the extent that Mr. Shankweiler is an expert in anything, that expertise does not render him able to opine on an estimated allowed amount of the GUC pool. An expert's qualifications must relate to the object of their testimony. *See, e.g.*, *Noel v. City of New York*, No. 15-cv-5236-LTS, 2023 WL 3170430 at *3 (S.D.N.Y. Apr. 28, 2023) (Swain, C.J.) (reiterating that "courts focus on whether there is a rational relationship between the expert's experience and the opinion rendered") (citations omitted). In other words, "[t]he issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994). But the only proffer from the Oversight Board to establish that Mr. Shankweiler is an expert is a single sentence in the Expert Disclosure stating that he has "extensive experience in complex restructuring, *including claims reconciliation and analysis*." PREPA Dkt. No. 3418, at 10 (emphasis added). During his deposition, Mr. Shankweiler claimed that he has "been in the restructuring practice since the early 1990s," and he has "had to deal with the claims estimation process." Shankweiler Dep. Tr. at 18:6-22. But at no point does the Oversight Board or Mr. Shankweiler explain how this experience would allow him to render an expert opinion on the area that will be the subject of his testimony: the *estimation* of the allowed amount of general unsecured claims in PREPA's restructuring. S*ee Tokio Marine & Fire Ins. Co. v. Grove Mfg. Co.*, 958 F.2d 1169, 1173-74 (1st Cir. 1992) (affirming exclusion of civil engineer's proposed expert testimony on mechanical engineering

matters); *Nook v. Long Island R.R. Co.*, 190 F.Supp.2d 639, 642-43 (S.D.N.Y. 2002) (Swain, J.) (excluding industrial hygienist's proposed testimony on medical diagnosis).

26. Mr. Shankweiler admits that his lack of legal expertise renders him and his team unable to evaluate many of the claims in the GUC pool. Mr. Shankweiler is not a lawyer, and has no legal training. Shankweiler Dep. Tr. at 16:7-9; *see also id*. at 131:21-23 ("I'm not an attorney. So I don't have a legal view of that."). Mr. Shankweiler conceded that neither he or his team have expertise in valuing litigation claims:

> Q: "Do you believe that you have the expertise . . . to estimate the allowed amount of what you referred to as litigation claims? A: So me personally and my team personally as it relates to valuation of litigation claims, the answer is no.

*Id*. at 45:4-11. Nor does Mr. Shankweilver have the ability to analyze whether a contractual claim is valid:

> I would not have. Me personally, I would not feel comfortable, and I don't think I have the expertise to analyze a legal document and determine, you know, whether or not an asserted claim is a valid claim pursuant to a contract.

*Id*. at 49:20-50:2. Because Mr. Shankweiler is not qualified to opine on the allowed amount of such claims, his testimony must be excluded. *Learning Care Grp., Inc. v. Armetta*, No. 3:13-cv-1540 (VAB), 2016 WL 3248178, at *7 (D. Conn. June 12, 2016) ("Mr. Cenatempo has no legal training whatsoever, and, thus, is unqualified to opine on matters of law.").

## II. MR. SHANKWEILER IMPROPERLY RELIED ON OPINIONS OF PREPA'S AND OVERSIGHT BOARD'S ATTORNEYS

27. Recognizing that he was not qualified to evaluate many of the claims in the GUC pool, Mr. Shankweiler instead simply parroted the opinions of others, especially the opinions of PREPA's and the Oversight Board's lawyers.

28. During his deposition, Mr. Shankweiler made plain that much of the valuation of the GUC pool was dictated by attorneys at Diaz & Vazquez (counsel to PREPA) and Proskauer (counsel to the Oversight Board). *See, e.g.*, Shankweiler Dep. Tr. 34:20-23 ("[W]e relied on their [Diaz & Vazquez] expertise, their legal expertise in order to come up with a value for that particular claim."); *id*. at 59:10-21 (stating that adjustment of allowed amounts was "informed by our discussions with both Diaz & Vazquez and Proskauer"); *id*. at 110:14-111:5 (stating that he relied on input from Diaz & Vazquez and Proskauer regarding the validity of PPOA claims for lost profits and developmental costs); *id*. at 123:19-124:2 (explaining that D&V was "intricately involved" in evaluating claims); *id*. at 160:17-161:17 (explaining that the discounts he applied for the PPOA claims was based on "the guidance I was provided by both Diaz & Vazquez, as well as Proskauer").

29. Mr. Shankweiler's wholesale reliance on the opinions of others is improper. "As courts have repeatedly held, and can be implied from rule 702, an expert cannot merely base his opinions upon the opinions of others without having an independent basis for his opinion." *Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Assoc.*, No. 2:08-CV-1448 JCM (RJJ), 2011 WL 743748, at *3 (D. Nev. Feb. 23, 2011); *see also Beck's Off. Furniture & Supplies, Inc. v. Haworth, Inc.*, Nos. 95-4018, 95-4029, 1996 WL 466673, at *7 (10th Cir. Aug. 16, 1996) (experts "may not merely parrot the opinions of other experts whose conclusions are not themselves in the record"). In fact, Mr. Shankweiler referred to Diaz & Vazquez as "experts" in evaluating litigation claims, Shankweiler Dep. Tr. at 45:11-14, and notes that he could not have come up with his $800 million estimation of the GUC pool without Diaz & Vazquez' input. *Id*. at 45:17-25.

30. The actual work of reviewing relevant documents to evaluate the claims was completed not by Mr. Shankweiler or his firm, but by these law firms. Mr. Shankweiler explained that for litigation claims, it was Diaz & Vazquez that would "obtain the case files," would "evaluate the case files" and would "come up with a determination as to what in their legal opinion the litigation claim would be worth." *Id*. 34:5-23. Those allowed amounts would then be directly incorporated into the $800 million estimate. *Id*. at 34:24-25:8. Mr. Shankweiler also explained how Diaz & Vazquez looked at documents "for us" to evaluate the inverse condemnation and eminent domain claims. *Id*. at 139:12-140:14.[2] Mr. Shankweiler's reliance on Diaz & Vazquez's opinion is especially suspect in light of that firm's deep and ongoing relationship with PREPA. Diaz & Vazquez was "retained by PREPA over the years to deal with the litigation and normal course legal work for PREPA on behalf of PREPA," *id*. at 21:15-21, and "they are generally at PREPA's offices several times a week." *Id*. at 70:17-71:7. In fact, Diaz & Vazquez is counsel to PREPA for "litigation actions that PREPA is involved with or that were asserted against PREPA." *Id*. at 34:5-10; *see also id*. at 84:8-20 (explaining that PREPA engaged Diaz & Vazquez to evaluate the grievance claims); *id*. at 124:13-16 ("PREPA did retain or as part of the retention of Diaz & Vazquez, that was part of their charge, to help resolve the UTIER claims.").

[2] Mr. Shankweiler's dependence on the opinions of others was not limited only to PREPA's and the Oversight Board's lawyers. Mr. Shankweiler explained that the valuation of certain claims was "essentially developed by third-parties or by PREPA's financial group," including vacation claims, reemployment claims, and Christmas bonus claims. Shankweiler Dep. Tr. at 125:12-127-20 (explaining, for example, that Ankura estimated the allowed amount of the vacation claims). Mr. Shankweiler also relied on PREPA employees to assign specific allowed amounts to particular grievance claims. *Id*. at 118:8-119:3; *see also id*. at 137:7-11 (explaining that for certain claims, "we're including the asserted amount until further analysis can be done by the HR department to determine whether that's actually going to be a valid claim"). But even for these, it was Diaz & Vazquez that was "intricately involved" in that process, in PREPA's office "a day or two a week," "evaluat[ing] the claims that were provided." *Id*. at 123:25-127:2. At no point did Mr. Shankweiler explain what role he or his firm had in valuing the grievance claims.

31. Mr. Shankweiler admitted that the estimate of the GUC pool was not the result of his own analysis, but instead arose from "a combination of judgment" among "plenty of people," including Diaz & Vazquez and Proskauer. *Id*. at 58:14-20. For example, when asked whether he had made a determination that there was insufficient documentation about the UTIER claim, Mr. Shankweiler said that "I think that was everyone's assessment that there was insufficient documentation. So that was not solely BRG. That was Diaz & Vazquez, it was Proskauer, it was PREPA." *Id*. at 115:7-21.

32. The same is true for the PPOA claims, which represent the largest category of the GUC pool ($2.78 billion) and the largest component of the adjusted estimated allowed amount of the GUC pool ($462 million). According to Mr. Shankweiler, the 83.4% discount to the PPOA claims was arrived out of a "consensus" out of conversations with Proskauer. *Id*. at 162:23-163:22; *see also id*. at 165:11-14 ("And based on our discussions with the attorneys at PREPA, we felt that was an appropriate level, not too high, not too low"). Mr. Shankweiler's lack of expertise thus led him to simply adopt counsel's opinions, thereby creating a "one-sided narrative of the evidence . . . which embodies the perspective of [Debtor's] attorneys." *Noel v. City of New York,* 2023 WL 3170430, at *4; *see also Rivera-Cruz v. Latimer, Biaggi, Rachid & Godreau, LLP*, No. 04-2377 (ADC), 2008 WL 2446331, at *5 (D.P.R. June 16, 2008) ("It is not the job of an expert to parrot the opinions of counsel, but to 'bring to the [trier of fact] more than the lawyers can offer in argument.'").

## III. MR. SHANKWEILER'S TESTIMONY WILL BE INADMISSIBLE LEGAL OPINION

33. Even if Mr. Shankweiler were able to rely on the opinions of PREPA's and the Oversight Board's lawyers in valuing the claims in the GUC pool—and as explained above, he cannot—such opinions would be inadmissible. Mr. Shankweiler's opinion is nothing more than

a collection of improper legal opinions regarding the allowed amounts of various claims asserted against PREPA, including litigation claims. *See, e.g.*, Shankweiler Dep. Tr. at 53:25-54:7; 110:24-111:5 (explaining that it was Diaz & Vazquez and Proskauer that concluded that a lost profit claim on the PPOAs would not be a valid claim under Puerto Rico law, regardless of whether a particular PPOA contained a provision prohibiting a claim for lost profits); *id*. at 140:24-141:7 ("BRG was involved in evaluating the claims and speaking with attorneys who are involved in reviewing those [federal] claims and potentially litigating, disputing those claims.").

34. The Oversight Board cannot use a purported expert to inject its own legal opinions regarding an estimate of the GUC pool. The First Circuit has recognized expert testimony comprised merely of legal conclusions cannot properly assist the trier of fact and is therefore inadmissible. *See, e.g.*, *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 100 (1st Cir. 1997) ("Expert testimony that consists of legal conclusions cannot properly assist the trier of fact in [understanding the evidence or determining a fact in issue] . . . ." (citation omitted)); Fed. R. Evid. 702(a) (requiring "the expert's scientific, technical, or other specialized knowledge" to "*help the trier of fact to understand the evidence or to determine a fact in issue*") (emphasis added); *see also Opinion and Order Denying UTIER's Motions to Exclude Expert Testimony*, at 13-14, 13 n.10, Adv. Proc. No. 17-00229-LTS, Dkt. No. 225 (stating legal issue before the court, *i.e.*, question of whether certain laws were *legally* reasonable and necessary, "is reserved for trier of fact" and if expert witnesses attempted "to offer such [] [legal] conclusions, their testimony would likely be inadmissible").

## IV. OVERSIGHT BOARD CANNOT USE PRIVILEGE CLAIMS TO PREVENT SCRUTINY OF MR. SHANKWEILER'S OPINION

35. Even if Mr. Shankweiler were entitled to rely on the opinions of PREPA's and the Oversight Board's lawyers in valuing the various claims in the GUC pool, his opinion would still

be inadmissible because the Oversight Board has refused to provide the materials that would allow the Committee to properly analyze and evaluate Mr. Shankweiler's opinion.

36. Under Rule 702, an expert opinion must be "the product of reliable principles and methods," and the expert must have "reliably applied the principles and methods to the facts of the case." To satisfy this reliability requirement, the expert's report must expressly "include the factual basis and the process of reasoning which makes the conclusion viable." *Vadala v. Teledyne Indus., Inc.*, 44 F.3d 36, 38 (1st Cir. 1995). Because Mr. Shankweiler did not prepare a report, the Committee has no way of understanding how Mr. Shankweiler (or the attorneys and advisors whose work he incorporated) came to their conclusions regarding an estimated allowed amount of the GUC pool. Mr. Shankweiler's explanation during his deposition of the "process" by which he and his "team followed to come up with the $800 million estimate" likewise contained nothing but vague generalities. *See, e.g.*, Shankweiler Dep. Tr. at 23:5-24:21.

37. During his deposition, Mr. Shankweiler explained that much of his analysis was based upon communications and memoranda provided by various attorneys. *See, e.g.*, *id*. at 69:23-70:9 (explaining that Diaz & Vazquez would send Mr. Shankweiler emails on litigation claims, which "would include memos that would discuss the litigation claims, the merits, the background and what a proposed settlement amount would be or what a proposed value of that claim would be"); *id*. at 160:11-12 (noting that Diaz & Vazquez prepared memos on certain claims); *see also id*. at 71:20-72:6 (explaining that he "did receive e-mails from Eduardo Corretjer as it relates to certain of the PPOA claims that he was -- his firm was responsible for representing PREPA on").

38. The Federal Rules are clear that such communication between attorneys and expert witnesses should be produced where such communications "identify facts or data that the

party's attorney provided and that the expert considered in forming the opinions to be expressed," or "identify assumptions that the party's attorney provided and that the expert relied on in forming the opinions to be expressed." Fed. R. Civ. P. 26(b)(4)(C)(ii)-(iii); *see also Sec. & Exch. Comm'n v. Rio Tinto PLC*, No. 17-cv-7994 (AT) (DF), 2021 WL 2186433, at *4 (S.D.N.Y. May 28, 2021) (quoting Fed. R. Civ. P. 26 Advisory Committee Notes to 2010 Amendment) ("[T]he intention is that 'facts or data' be interpreted broadly to require disclosure of any material considered by the expert, from whatever source, that contains factual ingredients."); *Fed. Deposit Ins. Corp. v. Galan-lvarez*, No. 12-1029 (PAD), 2018 WL 11417749, at *4 (D.P.R. June 25, 2018) (ordering the production of "the compilation of facts and data that . . . was prepared by the . . . attorneys and was provided to the expert to work on").

39. To date, the Oversight Board has refused to produce such materials, claiming that they are privileged. *See* Shankweiler Dep. Tr. at 74:1-10 (counsel for the Oversight Board stating that the advice Diaz & Vazquez provided regarding the merits of the PPOA claims "will not be produced"); *id*. at 77:8-12 (counsel for the Oversight Board stating that reports regarding the estimated claim amounts for the GUC pool "won't be produced"). Having refused to produce such documents, the Oversight Board cannot use Mr. Shankweiler as a conduit for its own unchallenged legal opinions regarding the GUC pool.

[*Remainder of page intentionally left blank*]

**CONCLUSION**

WHEREFORE the Committee respectfully requests the Court exclude the expert testimony of Mark Shankweiler offered in support of the proposed plan of adjustment, and grant the Committee such other relief as is just and proper.

Dated: June 2, 2023

*/s/ Luc A. Despins*

PAUL HASTINGS LLP
Luc A. Despins, Esq. *(Pro Hac Vice)*
G. Alexander Bongartz, Esq. *(Pro Hac Vice)*
200 Park Avenue
New York, New York 10166
Tel: (212) 318-6000
lucdespins@paulhastings.com
alexbongartz@paulhastings.com

Nicholas A. Bassett, Esq. (*Pro Hac Vice*)
875 15th Street, N.W.
Washington, D.C. 20005
Tel: (202) 551-1700
nicholasbassett@paulhastings.com

*Counsel to the Official Committee of Unsecured Creditors*

*/s/ Juan J. Casillas Ayala*

CASILLAS, SANTIAGO & TORRES LLC
Juan J. Casillas Ayala, Esq. (USDC - PR 218312)
Israel Fernández Rodríguez, Esq. (USDC – PR 225004)
Juan C. Nieves González, Esq. (USDC - PR 231707)
Cristina B. Fernández Niggemann, Esq. (USDC – PR 306008)
PO Box 195075
San Juan, Puerto Rico 00919-5075
Telephone: (787) 523-3434 Fax: (787) 523-3433
jcasillas@cstlawpr.com
ifernandez@cstlawpr.com
jnieves@cstlawpr.com
crernandez@cstlawpr.com

*Local Counsel to the Official Committee of Unsecured Creditors*