**<u>Exhibit 1</u>**

Page 1

1

2    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF PUERTO RICO
3    Case No. 17-BK-3283-LTS
     -----------------------------------------x
4    In re:

5    THE FINANCIAL OVERSIGHT AND MANAGEMENT
     BOARD FOR PUERTO RICO,
6
     as representative of
7
     THE COMMONWEALTH OF PUERTO RICO, et al.,
8
                              Debtors.
9    -----------------------------------------x
     Case No. 17-BK-4780-LTS
10   -----------------------------------------x
     In re:
11
     THE FINANCIAL OVERSIGHT AND MANAGEMENT
12   BOARD FOR PUERTO RICO,
13   as representative of
14   THE PUERTO RICO ELECTRIC POWER AUTHORITY,
15                           Debtor.
     -----------------------------------------x
16                         May 22, 2023
                           9:06 a.m.
17
18        VIDEOTAPED DEPOSITION of MARK
19   SHANKWEILER, held at the offices of
20   Proskauer Rose LLP, located at 11 Times
21   Square, New York, New York 10036, before
22   Anthony Giarro, a Registered Professional
23   Reporter, a Certified Realtime Reporter and
24   a Notary Public of the State of New York.
25

Page 2

```
 1
 2      A P P E A R A N C E S :
 3
        KRAMER LEVIN NAFTALIS & FRANKEL LLP
 4       Attorneys for the Ad Hoc Group of PREPA
         Bondholders
 5       2000 K Street NW, 4th Floor
         Washington, D.C. 20006
 6
        BY:  JANE TOMIC, ESQ.
 7           jtomic@kramerlevin.com
             (via Zoom)
 8
 9      CADWALADER, WICKERSHAM & TAFT LLP
         Attorneys for Assured Guaranty Corp. and
10       Assured Guaranty Municipal Corp
         200 Liberty Street
11       New York, New York 10281
12      BY:  ZACK SCHREIBER, ESQ.
             zack.schreiber@cwt.com
13
14
        QUINN EMANUEL URQUHART & SULLIVAN, LLP
15       Attorneys for Syncora Guarantee, Inc.
         Pennzoli Place,
16       711 Louisiana Street, Suite 500
         Houston, Texas 77002
17
        BY:  CAMERON KELLY, ESQ.
18           cameronkelly@quinnemanuel.com
19
        PAUL HASTINGS LLP
20       Attorneys for Official Committee of
         Unsecured Creditors
21       N.E. 100, 1170 Peachtree Street NE
         Atlanta, Georgia 30309
22
        BY:  WILLIAM WHITNER, ESQ.
23           kwhitner@paulhastings.com
             (via Zoom)
24
25
```

Page 3

```
 1
 2     A P P E A R A N C E S (Cont.)
 3
       PAUL HASTINGS LLP
 4      Attorneys for Official Committee of
        Unsecured Creditors
 5      200 Park Avenue
        New York, New York 10166
 6
       BY:  LUC DESPINS, ESQ.
 7          lucdespins@paulhastings.com
            ALEX BONGARTZ, ESQ.
 8          alexbongartz@paulhastings.com
            SHLOMO MAZA, ESQ.
 9          shlomomaza@paulhastings.com
            (via Zoom)
10
11     O'MELVENY & MYERS LLP
        Attorneys for AAFAF
12      7 Times Square
        New York, New York 10036
13
       BY:  NICOLE MOLNER, ESQ.
14          nmolner@omm.com
15
       PROSKAUER ROSE LLP
16      Attorneys for the Financial Oversight and
        Management Board as Representative for
17      PREPA
        70 West Madison Street, Suite 3800
18      Chicago, Illinois 60602
19     BY:  ASHLEY WERINGA, ESQ.
            aweringa@proskauer.com
20
21     PROSKAUER ROSE LLP
        Attorneys for Official Committee of
22      Unsecured Creditors
        1 International Place
23      Boston, Massachusetts 02110
24     BY:  LAURA STAFFORD, ESQ.
            lstafford@proskauer.com
25
```

Page 4

1

2    A P P E A R A N C E S (Cont.)

3

4    WEIL, GOTSHAL & MANGES LLP
       Attorneys for National Public Finance
5      Guarantee Corporation
       767 5th Avenue
6      New York, New York 10153
7    BY:  COREY BRADY, ESQ.
           corey.brady@weil.com
8          (via Zoom)

9

10   WACHTELL, LIPTON, ROSEN & KATZ
       Attorneys for Fuel Line Lenders
11     51 West 52nd Street
       New York, New York 10019
12
     BY:  ANGELA HERRING, ESQ.
13         AKHerring@wlrk.com
           (via Zoom)
14

15

16

17

18   ALSO PRESENT:
19     BOB RUDIS, Videographer
       BILL CRADDOCK, Concierge Tech (via Zoom)
20     ROCIO VALENTIN (via Zoom)
       SCOTT MARTINEZ (via Zoom)
21

22

23

24

25

Page 5

1

2              THE VIDEOGRAPHER:  Good

3     morning.  We are going on the record

4     at 9:06 a.m. on May 22nd, 2023.

5     Please note that the microphones are

6     sensitive and may pick up whispering

7     and private conversations.  Please

8     mute your cell phones at this time.

9     Audio and video recording will

10    continue to take place unless all

11    parties agree to go off the record.

12              This is Media Unit 1 of the

13    video-recorded deposition of Mark

14    Shankweiler, taken by counsel for

15    the Official Committee of Unsecured

16    Creditors, in the matter, In Re:  The

17    Financial Oversight and Management

18    Board for Puerto Rico, et al., filed

19    in the United States District Court

20    for the District of Puerto Rico, Case

21    No. 17-BK-3283-LTS.  The location of

22    this deposition is Proskauer Rose

23    LLP, 11 Times Square, New York, New

24    York.

25              My name is Robert Rudis.  I

Page 6

                        MARK SHANKWEILER

1

2      am the videographer.  The court

3      reporter is Anthony Giarro.  And we

4      represent the firm Veritext Legal

5      Solutions.

6             I'm not related to any party

7      in this action, nor am I financially

8      interested in the outcome.

9             If there are any objections

10     to proceeding, please state them at

11     the time of your appearance.  All

12     appearances will be noted in the

13     stenographic record.

14            Will the court reporter

15     please swear in the witness?

16   M A R K   S H A N K W E I L E R, after

17   having first been duly sworn by a Notary

18   Public of the State of New York, was

19   examined and testified as follows:

20    EXAMINATION BY

21    MR. DESPINS:

22       Q      Good morning, Mr.

23   Shankweiler.

24       A      Good morning.

25       Q      We've met before.  My name

                              MARK SHANKWEILER

1

2    is Luc Despins.  And I represent the

3    creditors' committee.

4                    Unfortunately, I have to

5    read this short statement.  So if you can

6    bear with me, it's a confidentiality

7    requirement.

8                    MR. DESPINS:  So the speech

9         is, some of the exhibits and the

10        topics we cover today may involve

11        confidential information as defined

12        by the plan depository protective

13        order.  Under paragraph 19 of the

14        amended confirmation procedures

15        order, Docket No. 3305, discussion of

16        confidential information is subject

17        to the plan depository protective

18        order.  In accordance with

19        paragraph 19, all parties

20        participating in or attending this

21        deposition must sign the protective

22        order, available on the plan

23        depository protective order.  If

24        anyone in attendance has not signed

25        that order, please do so, or you may

Page 8

                        MARK SHANKWEILER

1

2        be in violation of the protective

3        order.

4         Q        So let's begin.

5                    I assume you've been deposed

6     several times before today?

7         A        I have not.  This is my

8     first deposition.

9                    THE VIDEOGRAPHER:  I

10       apologize.  May I just move this

11       microphone?  I thought the taking

12       party would be on this side.  Thank

13       you.  Pardon me for interrupting.

14        Q        So I asked you before, have

15    you ever been deposed?  And the answer

16    was no?

17        A        Correct.

18        Q        So let me just go through

19    the very basic rules of the road

20    regarding depositions.  There always has

21    to be a verbal response.  So, for

22    example, nodding of the head is not going

23    to work, unless you actually verbally

24    respond.  If there are questions that are

25    not clear, please feel free to ask me to

Page 9

1                   MARK SHANKWEILER

2    clarify.  Unless the question or your

3    counsel opposes -- interposes an

4    objection based on privilege, she can

5    interpose the objection.  But you still

6    must answer the question.

7                   In addition to that, here,

8    you're wearing two hats.  So one is

9    you're a 30(b)(6) witness for the entire

10   board, for the board.  And I will also

11   ask you questions about your personal

12   knowledge.  So we need to probably

13   establish some kind of -- to make sure

14   there's no confusion.  So I will ask you

15   to your personal knowledge, did you look

16   at this, did you look at that.  Then

17   you're talking for your personal

18   knowledge only, otherwise you're talking

19   about as a 30(b)(6) witness on behalf of

20   the board.  Is that clear?

21        A         Understood.

22                  MR. DESPINS:  If we can post

23        Exhibit 1 which is the deposition

24        notice.

25                  (The above-referred-to

Page 10

```
 1                     MARK SHANKWEILER
 2      document was marked as Exhibit 1 for
 3      identification, as of this date.)
 4            MS. STAFFORD:  For purposes
 5      of the Exhibit Share, it might need
 6      to be in the Exhibit Share, Veritext
 7      Exhibit Share folder.
 8            THE CONCIERGE TECH:
 9            Counsel, I'm working on
10      getting it up on the screen in
11      Exhibit Share.  Exhibit Share runs
12      particular documents.  It's spinning.
13      It looks like it's now in that
14      folder.
15            MR. BONGARTZ:  I selected
16      Exhibit 1, and I labeled it
17      Exhibit 1.  But when the stamp was
18      attached to it, it says Exhibit 2
19      now.  I'm not sure why that is.
20            THE CONCIERGE TECH:  I think
21      what was happening is we were both
22      trying to introduce it.  Usually, I'm
23      introducing it as the attorneys were.
24      Did you want to do it by yourself?
25            MR. BONGARTZ:  I was going
```

Page 11

1                    MARK SHANKWEILER

2      to do it myself.  But if you've done

3      it already, I just don't know how to

4      undo the exhibit number now.

5                    THE CONCIERGE TECH:  I'll

6      fix that.

7                    MR. BONGARTZ:  Thank you.

8      Q          So, Mr. Shankweiler, I'll

9   draw your attention to page 7 of Exhibit.

10   On top, there is Deposition Topic No. 1.

11                    Do you see that where it

12   says, "The estimated value range of

13   potential values in cap applicable to

14   general unsecured claims"?

15      A          Yes.

16      Q          And you see towards the

17   bottom of the response, it says, "Subject

18   to general objections, the oversight

19   board will designate Mark Shankweiler to

20   testify regarding this topic"?

21      A          I do.

22                    MS. STAFFORD:  I just want

23      to note for the record that it's

24      subject to both the general

25      objections and the specific

Page 12

                           MARK SHANKWEILER

1

2    objections that were noted.

3              MR. DESPINS:  Yes.  Okay.

4        Q      So that's the first one, the

5    30(b)(6).

6              Then in addition to that,

7    you -- the board offered a preliminary

8    list of witnesses, dated March 11th,

9    2023.  We'll show that to you in a

10   second.

11             MR. DESPINS:  And it's

12        Deposition Exhibit 2.

13             (The above-referred-to

14        document was marked as Exhibit 2 for

15        identification, as of this date.)

16             MS. STAFFORD:  Do you mind,

17        actually, if I just mark his too with

18        Exhibit 1, Exhibit 2?  Just so that

19        he doesn't get confused.

20             MR. DESPINS:  Sure.

21             MR. BONGARTZ:  For the

22        technician, I would like to label

23        this next exhibit, Exhibit 2 when I'm

24        going to introduce it.  I just want

25        to make sure it doesn't conflict --

Page 13

                         MARK SHANKWEILER

1

2        now it says Exhibit 3 here.  I don't

3        know if you can fix that on your end,

4        because otherwise --

5                  THE CONCIERGE TECH:  As I

6        was trying to fix it, it's actually

7        not letting me doing it.  We may be

8        doing it at the same time here.

9                  MR. BONGARTZ:  You want me

10       to stop?

11                 MR. DESPINS:  Yes, because

12       we don't want to be confused with

13       exhibit numbers.  That will be a

14       recipe for disaster.  So let's fix

15       that and give the technician control

16       over the exhibits.

17                 MS. STAFFORD:  I think

18       normally, people have been saying --

19       I have been asking the concierge, can

20       I bring up this exhibit?

21                 MR. BONGARTZ:  Okay.  So can

22       you bring up this exhibit, which is

23       Exhibit 2, in the folder?

24                 THE CONCIERGE TECH:  It

25       looks like it's just hanging for me.

Page 14

```
 1                    MARK SHANKWEILER
 2       If you have no issues introducing
 3       them, then maybe I'll just let you do
 4       it for now.
 5                    MR. BONGARTZ:  The problems
 6       my exhibit numbers start with 2
 7       because for some reason, Exhibit 1
 8       was taken.  I don't know why that is
 9       the case.  It's probably because we
10       were trying to do it at the same
11       time.  So if I proceed, every exhibit
12       will be one exhibit number higher.
13                    THE CONCIERGE TECH:  When it
14       introduces and the shows the number,
15       you can edit that number.  So you
16       could go back and --
17                    MR. BONGARTZ:  Now we have
18       two Exhibit 2s.  That's the problem
19       because the first exhibit, which I
20       labeled No. 1, showed up as No. 2 on
21       the screen.  So I was hoping you
22       could fix that on your end.  So I
23       will proceed with Exhibit 2 now.
24          Q        So Exhibit 2, I draw your
25       attention to page 4, subparagraph 8.
```

Page 15

1                    MARK SHANKWEILER
2                    And it says that
3    "Mr. Shankweiler may provide testimony
4    showing the reasonableness of the
5    assumptions made with respect to the
6    estimated total amount of allowed
7    unsecured creditors against the debtor."
8                    You see that?
9         A         I do.
10        Q         So I wanted you to have
11   this, so that we set the framework of
12   your testimony.
13        A         Understood.
14        Q         So let's go with a bit of
15   background first.
16                   What economic degrees do you
17   have?
18        A         I have a bachelor of science
19   in music education from West Chester
20   State College in Pennsylvania.  I have a
21   postgraduate degree from Muhlenberg
22   College in Allentown, Pennsylvania.  And
23   that would be the academic --
24        Q         Postgraduate degree in what?
25        A         That would be in business

Page 16

                              MARK SHANKWEILER

1    administration and accounting.

2         Q        Do any of these degrees

3    relate to bankruptcy or restructuring

4    issues?

5         A       No.

6         Q        Do you have any legal

7    training?

8         A       No.

9         Q        Have you ever testified as

10   an expert?

11        A       No.

12        Q        Have you ever published any

13   article or treaties regarding bankruptcy

14   or restructuring?

15        A       No.

16        Q        We will use today during the

17   deposition, the terms estimation or

18   estimating allowable claims.

19                 Do you have an understanding

20   of what that means?

21        A       Yes.

22        Q        So could you describe for me

23   what you understand that to mean?

24        A       Well, my understanding of

Page 17

1                    MARK SHANKWEILER
2    that is that obviously, estimation is
3    coming up with an estimate.  And
4    allowable claims would be those claims
5    that would be allowed pursuant to a plan
6    of reorganization.
7         Q        But who would make the
8    determination of which claim is allowed
9    and for what amount?
10                  MS. STAFFORD:  Objection,
11       legal conclusion.
12        A        Who would make that
13   determination?  I would imagine that's
14   based on the provisions of the plan of
15   reorganization.
16        Q        What I meant is, is the
17   court making that determination, what
18   claims get allowed or does somebody else
19   do that?
20        A        I think it would be the
21   court.  But I don't know.
22        Q        But when you're giving
23   testimony today as to an estimate of
24   allowed claims, do you understand that
25   you are attempting to predict what a

Page 18

MARK SHANKWEILER

1

2    court or the bankruptcy court or the

3    district court in this case would allow

4    the claims at?

5        A       Yes.

6        Q       And what expertise do you

7    have on that topic of attempting to

8    determine what a court would allow claims

9    at?

10       A       So I've been in the

11   restructuring practice since the early

12   1990s.  Each one of the cases that we've

13   had, whether it be debtor or creditor,

14   involved claims estimation in order to

15   determine what value would be available

16   for creditors down the waterfall.

17               And the number of cases that

18   I've been involved with, again, where

19   we've had to deal with the claims

20   estimation process is really what I

21   believe gives me the expertise to be able

22   to evaluate and estimate claims.

23       Q       I see.

24               And how do you go about --

25   now I want to talk about you personally.

Page 19

1                    MARK SHANKWEILER

2                    How do you go about

3    determining how a particular claim would

4    be -- should be estimated at, what the

5    court would ultimately allow that?   How

6    do you go about doing that?

7         A         One of the first things you

8    would do is to evaluate a proof of claim,

9    review the proof of claim, determine

10   whether or not that proof of claim is

11   consistent with the books and records of

12   the company, reconcile the proof of claim

13   to the books and records, evaluate the

14   details that are included in a proof of

15   claim to determine if there's sufficient

16   support and then work through the

17   reconciliation process to determine

18   whether or not it's a valid claim.

19        Q         I understand.

20                  And how do you do that

21   process when the books and records don't

22   reflect an amount owed to the creditor?

23        A         So you would have to

24   evaluate -- again, going back to the

25   proof of claim -- understanding what kind

Page 20

1                    MARK SHANKWEILER

2   of supporting documents there are and

3   work with the company and/or the

4   company's advisors to establish whether

5   or not the claim is valid, Number One,

6   and then to establish what a range of

7   that claim might be.

8        Q        When you mentioned the

9   company's advisors, what type of advisors

10  are you referring to?

11       A        So PREPA has a number of

12  advisors, including outside counsel,

13  which is Diaz & Vazquez.  They have

14  accountants.  They have other

15  professionals that while they may not be

16  PREPA's advisors, that have knowledge

17  about certain claims.  So it's that

18  family of advisors that we would work

19  with in order to evaluate a claim.

20       Q        I'm sorry.  I didn't hear

21  the -- you said outside counsel.

22                Which outside counsel did

23  you mention?

24       A        Diaz & Vazquez, as well as

25  as Corretjer.

1                    MARK SHANKWEILER

2       Q        And did you didn't mention

3   Proskauer.

4       A        Oh.  I'm sorry.  Proskauer

5   as well.  Thank you.  That's evident

6   since they're here.

7                MS. STAFFORD:  Just to be

8       here, we're not PREPA's counsel.

9       We're counsel to the board.

10      A        That's right.

11      Q        And what about O'Neill &

12  Borges?

13      A        I didn't really have any

14  real interaction with O'Neill.

15      Q        So these law firms you were

16  mentioning before are PREPA's lawyers as

17  opposed to the board's lawyers?

18      A        They are retained by PREPA

19  over the years to deal with the

20  litigation and normal course legal work

21  for PREPA, on behalf of PREPA.

22                (The above-referred-to

23      document was marked as Exhibit 3 for

24      identification, as of this date.)

25      Q        I would direct you to

Page 22

1                    MARK SHANKWEILER

2    page 9, paragraph E and in particular,

3    the sentence that reads, "In connection

4    therewith, Mr. Shankweiler will discuss

5    the reasonableness of the assumptions

6    made with respect to the estimated total

7    amount of allowed general unsecured

8    claims asserted against PREPA which is

9    800 million."

10                   You see that sentence?

11        A        I do, yes.

12        Q        Are you the one, the person

13   who made the determination that the

14   amount was 800 million?

15        A        Can you rephrase that

16   question?

17        Q        Sure.

18                   You know that there is an

19   estimate of general unsecured claim of

20   800 million?

21        A        Correct.

22        Q        And the question is, what --

23   is this a number that you determined?

24        A        It's a number that based on

25   our review of all the claims in our

Page 23

1                    MARK SHANKWEILER

2    estimation of the value of the claims,

3    yeah, me and -- my team and I came up

4    with.

5        Q        Can you take me through the

6    process you and your team followed to

7    come up with that $800 million estimate?

8        A          Sure, absolutely.

9                   The process included, I mean

10   initially, what you receive as a claims

11   register.  We obtained all the proofs of

12   claim that were in the claims register.

13   We verified the categorization of the

14   proofs of claim.  We looked at the

15   categorization, reviewed the claims to

16   determine what categories and confirm the

17   validity of the categorization of the

18   claims.  We then looked at the support

19   for the claims.

20                   And based on the support

21   that was provided, conferred with,

22   oftentimes, Diaz & Vazquez in order to

23   help us adjust any of the asserted claims

24   to what a reasonable expectation of that

25   claim should be.  We objected to claims

Page 24

1                    MARK SHANKWEILER

2    which were invalid.  We transferred

3    claims to ADR which resulted in an

4    adjustment to the asserted claim amount,

5    based on what a settlement amount was

6    determined.  And that settlement amount

7    was done in conjunction with PREPA's

8    counsel, as well as the -- just review of

9    the actual detail of the claim in order

10   to come up with what a reasonable claim

11   is.

12              But we looked through detail

13   to determine if that claim had already

14   been satisfied.  And that would be based

15   on payment history information that was

16   provided by PREPA and LUMA and through

17   conversations with PREPA's employees as

18   it relates to some of the relatively

19   large claims that were captured or

20   incorporated or included in the general

21   unsecured claims category.

22        Q        There's a lot of meat in

23   there.  Let me try to unpack some of

24   this.

25              You mentioned categorization

Page 25

1                    MARK SHANKWEILER

2    of claims and whether sufficient

3    categorization was accurate?

4         A       Yes.

5         Q       What did you mean by that

6    categorization?

7         A       When a claim is filed, Kroll

8    will identify the category of claim --

9    we'll call that the initial

10   categorization -- will review the claim

11   to determine if there is a secondary or

12   tertiary category that we should

13   categorize it as in order to determine

14   whether or not it's a true -- that is

15   consistent, that the categories that

16   Kroll has defined it as -- is consistent

17   with the actual proof of claim.

18        Q       Such as unsecured versus

19   secured or something like that?

20        A       At a highest level, it would

21   be whether it's an unsecured claim versus

22   a secured claim, whether there's

23   priority.  At a secondary level, it would

24   be whether it's a bond claim, whether

25   it's a customer claim, whether it's a

Page 26

1                    MARK  SHANKWEILER

2    union  claim,  whether  --

3                    MS.  STAFFORD:   Is  someone

4       not  muted?

5       A         Whether  it  is  a  litigation

6    claim  as  an  example.   So  those  are  like

7    the  secondary  sort  of  categorizations

8    that  we  would  have  --  that  we  would  have

9    then  gone  down  to.

10                    MR.  DESPINS:   There's

11       somebody  that  should  mute  their

12       phone.   I  don't  know  who  that  is.

13                    THE  WITNESS:   The  person

14       with  the  allergies.

15                    MR.  DESPINS:   That's  putting

16       it  nicely.

17       Q         And  you  also  mentioned  that

18    you  --  not  you  personally,  but  that

19    claims  were  objected  to?

20       A         Yes.

21       Q         And  so  can  you  tell  me  about

22    that?   What  I'm  really  interested  in  is,

23    have  claims  been  objected  to  on  the

24    merits  of  such  claim  in  contrast  with

25    duplicates  or  amends,  superseded  and  all

Page 27

                           MARK SHANKWEILER

1
2    that -- you understand those terms --

3    duplicate?

4        A        Understood, yes.  So the

5    claims oftentimes were objected to,

6    obviously, aside from the duplicates, the

7    amends.  I know that we looked at claims.

8    We objected to claims based on the

9    classification.  If they identify a claim

10   as a priority claim, we would object to

11   that.  To the extent that there were

12   claims that through our review of the

13   books and records, we identified amounts

14   which are actually paid.

15                  So we would object to a

16   claim as being partially paid, only to

17   the extent that we had records for

18   those -- that portion of the claim that

19   was paid.

20                  As it relates to claims,

21   which were not necessarily related for

22   which PREPA had no liability, we objected

23   to those claims.  Those are examples of

24   the types of claims that we objected to

25   or the reasons that we would have

Page 28

1                    MARK SHANKWEILER

2    objected to a particular claim based on

3    our review.

4        Q        So not you personally, but

5    the board has objected to claims based on

6    no liability.

7                    Can you give me more detail

8    on that?

9        A        So an example, if we are

10   reviewing a claim and identify that claim

11   as being related to, as an example, the

12   Commonwealth or to some other non-PREPA

13   entity, based on the detail of that,

14   that's a no liability claim.

15       Q        Understood.

16                    So you mentioned priority,

17   satisfied claims, claims based on no

18   liability because another entity is

19   liable, rather than PREPA.

20                    Any other objections on the

21   merits that you -- that hasn't been filed

22   yet?

23       A        I think those are the

24   general categories of the claims that

25   we've objected to so far.

Page 29

1                       MARK SHANKWEILER

2        Q        On a scale of one to ten,

3    where would you say that you are on the

4    process of getting rid of claims that you

5    believe are overstated or that should be

6    disallowed with ten being completed and

7    one being no progress?

8        A        I know that we've filed

9    about 50 or so objections.  I know that

10   we've objected to approximately half of

11   the claims that were asserted.  I know

12   that there are still a number of large

13   claims that are in the process of -- that

14   we're in the process of evaluating and

15   objecting to.

16               On a scale of one to ten,

17   you know, it all depends on what the

18   measurement is, whether it's number of

19   claims or just value of claims.

20       Q        But just to be clear, I was

21   asking you to focus on claims that are

22   overstated or should be disallowed.

23               Claims probably asserted

24   against PREPA should be disallowed or

25   overstate where are you on that process

Page 30

1                    MARK SHANKWEILER
2    on a scale of one to ten?
3                    MS. STAFFORD:   Objection to
4       form.
5       A        I think from a dollar
6    perspective that are overstated, there's
7    going to be -- we were probably -- it's
8    hard for me to put an estimate on it.
9    But clearly, I would imagine we're at
10   least, you know, halfway, 60 percent
11   there.   But there are a number of large
12   claims.
13      Q        But have you objected to any
14   claims that were overstated?
15      A        Yes.   I believe we did, yes.
16   Those claims, yes, we have.
17      Q        And claims that should be
18   disallowed that are properly asserted
19   against PREPA but should be disallowed,
20   have you objected to those?
21      A        Sure.
22      Q        Can you give me an example?
23      A        Sure.   We received -- as an
24   example, one of the claims came in at
25   $1.1 million.   We were able to confirm

Page 31

                              MARK SHANKWEILER

1

2    with PREPA that they only had outstanding

3    invoices for 100,000 or 120,000.  So that

4    is an example of a type of claim which

5    was overstated.  And we objected to a

6    portion of that claim.

7         Q        And you obtained a ruling to

8    that effect from the court?

9         A        I would have to -- I don't

10   know if that was actually an order was --

11   I don't know if that objection actually

12   is still pending or whether it was

13   actually ruled on.

14        Q        But your testimony is that

15   an objection was filed on that ground?

16        A        Absolutely.

17        Q        The term PPOA, does that

18   ring a bell?  Do you understand those

19   acronyms?

20        A        I do.

21        Q        What do they stand for?

22        A        Power purchase operating, an

23   operating agreement.

24        Q        Have you objected to any of

25   those claims?

Page 32

                    MARK SHANKWEILER

1
2      A        I don't believe we have as
3  yet.
4      Q        By the way, when were you
5  retained?  When was BRG retained to
6  handle the claims process at PREPA?
7      A        We were retained, I believe
8  it was in June of 2019.
9      Q        What's the total amount of
10  asserted claims against PREPA as of now?
11      A        I believe it's -- total
12  amount is around 27 or $28 billion.
13      Q        I didn't ask the right
14  question.
15              What is the total amount of
16  asserted claims in the general unsecured
17  class?  Ballpark.
18      A        Ballpark, okay, my God.
19  This is like -- I'm having a brain
20  freeze.  Sorry.  For general unsecured --
21      Q        Sorry to interrupt.
22              But compared to the
23  800 million that you're estimating, that
24  is your estimate of a universe of claims,
25  what is that universe, ballpark, asserted

Page 33

1                    MARK SHANKWEILER

2   amount?

3        A        I know the page it's on.

4   I'm just having a problem just trying to

5   recollect what that is.  But it's higher

6   than $800 million.

7        Q        Good.

8        A        Yeah.

9        Q        Does the figure of

10  5.9 billion ring a bell?

11       A        It could, yes.  It sounds

12  reasonable.  But I just -- unfortunately,

13  I just can't remember.  I know where I

14  can find it.

15       Q        Got it.

16                In your 800 million

17  estimate, how did you handle claims that

18  were unliquidated?  Do you understand the

19  term unliquidated?

20       A        I do.

21       Q        So how did you handle those

22  claims?  So, for example, a litigation

23  claim that says you did all sorts of bad

24  things to me, an amount sought

25  unliquidated, how do you deal with that

Page 34

1                    MARK SHANKWEILER

2    proof of claim?

3               MS. STAFFORD:  Objection,

4      form.

5      A          So specifically as it

6    relates to litigation claims, we worked

7    with Diaz & Vazquez who have experience

8    with the litigation actions that PREPA is

9    involved with or that were asserted

10   against PREPA.  They were able to

11   identify the nature -- first of all, they

12   had the case files.  All the case files

13   were provided to Diaz & Vazquez or at

14   least most of them.  When I say all, my

15   understanding is that Diaz & Vazquez had

16   obtained the case files.  They would

17   evaluate the case files and come up with

18   a determination as to what in their legal

19   opinion the litigation claim would be

20   worth.  And so we relied on their

21   expertise, their legal expertise in order

22   to come up with a value for that

23   particular claim.

24      Q          So you get the input from

25   Diaz & Vazquez, put that in your model,

Page 35

1                    MARK SHANKWEILER
2    and that's part of the 800 million?
3         A        We incorporate Diaz &
4    Vazquez's estimates into our database,
5    our model.
6         Q        Which produces the
7    $800 million result?
8         A        Yes.
9         Q        And I asked you about
10   unliquidated claims.  And you pivoted to
11   litigation claims.
12                 So I want to make sure that
13   we were precise here in the sense there
14   are litigation claims where there's a set
15   amount asked -- PPOA claim -- saying I'm
16   owed 300 million for damages.  That's a
17   litigation claim, I would think, because
18   you're not consenting to that.  But
19   another one might say unliquidated.  So I
20   want to go back to unliquidated claims.
21                 What did you do with
22   unliquidated claims, and where would I
23   find that in your estimates?  So let's
24   ignore that last part of about where I
25   find it.

Page 36

                         MARK SHANKWEILER

1                         MARK SHANKWEILER

2                         So let's start with, what

3    did you do with unliquidated claims?

4                         MS. STAFFORD:   Objection,

5         form.

6         A         Again, to the extent that a

7    claim was filed and it was unliquidated,

8    first of all, there were numerous

9    unliquidated claims because it's just

10   what oftentimes happens as you know.  But

11   the more significant -- where we were

12   concerned with evaluating unliquidated

13   claims would be to the extent that there

14   might be a litigation claim that was

15   liquidated or was -- or which was

16   unliquidated, the process would be to the

17   extent that there was a case that was

18   identified with a proof of claim, we

19   would work with Diaz & Vazquez to make a

20   determination as to whether or not

21   there's a true claim.

22        Q         When you say a case, you

23   mean a case pending in Puerto Rico

24   somewhere?

25        A         In district court, the court

Page 37

1                        MARK SHANKWEILER

2    of first instance, things like that.

3         Q        Got it.  But let's assume

4    there's no case pending.

5                     So what was the process to

6    determine the estimate for that

7    particular claim that went into your

8    800 million estimate?

9                     MS. STAFFORD:  Objection,

10        form.

11        A        We would have evaluated

12   using the same process to determine --

13        Q        You mean Diaz & Vazquez?

14        A        Diaz & Vazquez and working

15   with, you know, our -- at the time, we

16   were still able to work with PREPA before

17   we switched to LUMA.  We did that but

18   principally working with Diaz and

19   Corretjer.

20        Q        We were still able to work

21   with PREPA before LUMA?  I'm not sure I

22   understand.

23        A        Sorry.

24        Q        You need to unpack that for

25   me.

Page 38

                        MARK SHANKWEILER

1

2      A          Sorry.  Well, as you know,

3   that PREPA transferred its transmission

4   distribution to LUMA.  And so we were

5   able to -- essentially pre-pandemic and

6   pre-transfer, we were able to work with

7   PREPA's employees, principally through

8   Diaz & Vazquez.  And once it was

9   transferred to LUMA, we were able to

10  speak with the LUMA employees, but it

11  just wasn't as frequent and as easy.  But

12  that's what I meant.

13     Q          Understood.

14                Going back to the

15  unliquidated claims, is it your testimony

16  that you or your team has reviewed each

17  and every unliquidated claims and

18  ascribed a value to it that is included

19  in your 800 million estimate?

20                MS. STAFFORD:  Objection,

21     form.

22     A          No.  It's not my testimony

23  that we reviewed each and every

24  unliquidated claim and included a value.

25     Q          Well, let me backtrack now.

Page 39

                        MARK SHANKWEILER

1                       Did your team review and
2
3    evaluate every claim that was filed,
4    unliquidated or not?
5        A        Our team went through and
6    confirmed the claims and types of claims
7    and evaluated the proof of claim for, I
8    would say, the vast majority, yes.  To
9    the extent that claims were transferred
10   in, we would evaluate those.  But, yes,
11   the majority of the claims, we would have
12   looked at a level to understand the
13   claim.
14       Q        So would it be fair to
15   say -- and please don't adopt my
16   characterization if you're not
17   comfortable with it -- but this was
18   mostly a top-down approach, meaning
19   starting with the largest claim, largest
20   categories of claim and going down,
21   rather than a bottoms-up where you review
22   each and every claim and ascribe the
23   value to those claims?
24                 MS. STAFFORD:  Objection,
25       form.

Page 40

1                    MARK SHANKWEILER

2       A          So our process started with

3    a bottoms-up approach to understand the

4    types of claims that were included in

5    each category.  We evaluated the claims

6    based on when we were working with Diaz &

7    Vazquez, for example, on the larger

8    claims or for the litigation claims as an

9    example.  We would have asked them to

10   focus on the largest litigation claims.

11                   But that's not solely what

12   we looked at.  We looked at even those

13   claims, which were identified, at least

14   in the claims register, as being zero.

15   And so we've looked at --

16       Q          Apologize.

17       A          So we looked at each one of

18   the claims.

19       Q          I'm a little bit confused

20   now because before, you said we did not

21   look at every claim and ascribed a value.

22   Now you're saying you looked at each one

23   of the claims.

24       A          So I think what I was

25   answering prior to this was whether we

Page 41

                              MARK SHANKWEILER

1

2    ascribed a value.  So we looked at each

3    one of the claims.  To the extent that we

4    felt that a claim had to be adjusted

5    based on a review, we adjusted it.  But

6    we did look at each one of the claims to

7    understand the nature of the claim and

8    make sure that it was -- to make sure

9    that it was reflected accurately in the

10   claims register.

11        Q        The $800 million estimate

12   ascribes a value for each claim filed or

13   not?

14        A        The $800 million that's

15   included in the register includes values

16   for each claim filed, plus a cushion, an

17   estimate of -- a cushion to the extent

18   that we felt that the claim could be

19   potentially higher than the amount

20   asserted.

21                 As an example, in reviewing

22   one of the claims, I believe it was a

23   class action claim, it was initially

24   identified as zero.  And in review of

25   that claim, we identified that that

Page 42

                        MARK SHANKWEILER

1

2    really should be $172 million asserted.

3    So that's an example of where we had

4    identified an unliquidated claim or a

5    zero dollar value claim, contacted Kroll,

6    had that modified, evaluated the claim

7    and have included in our

8    $800 million estimate, a value associated

9    with that claim.

10                And so that's the type of

11   process that we went on to ensure that we

12   captured value for even unliquidated

13   amounts or what was initially viewed as a

14   zero-dollar or recorded as a zero-dollar

15   value in the claims register.

16       Q       A lot of moving pieces.  We

17   have to be precise about this.

18                The fact that Kroll may have

19   indicated the claim is zero or somebody

20   at PREPA or in your organization ascribed

21   a zero value, that doesn't make that

22   claim an unliquidated claim.

23       A       Understood.

24       Q       So if I had the backup for

25   your $800 million estimate, I would see

Page 43

                         MARK SHANKWEILER

1    that every claim is spoken for with a

2    value ascribed so it?  That's my

3    question.  I want to be very precise

4    because to be candid, I think we've

5    gotten different answers to that

6    question.  This is very specific.

7                  MS. STAFFORD:  Objection,

8          form, and to the extent it

9          mischaracterizes his testimony.

10                 MR. DESPINS:  That's why

11         we're trying to clarify it.

12                 MS. STAFFORD:  Well, I think

13         you're mischaracterizing what he

14         previously testified to.

15                 MR. DESPINS:  That's why

16         he's going to clarify it.

17        Q         So can you help me

18   understand this?  Is there a line item

19   for every claim with a value ascribed to

20   that claim?

21        A         Is there a line item?

22        Q         In your analysis, it's not

23   only a one-pager; there must be some

24   backup?

Page 44

                    MARK SHANKWEILER

1

2        A        Yes.   There's a line item

3    for each one of the claims.

4        Q        And your team or you have

5    ascribed a value to each claim that has

6    been filed against PREPA?

7        A        Yes.

8        Q        And that would be reflected

9    in the backup to your analysis, your

10   $800 million estimate?

11       A        Yes.

12       Q        And going back to the issue

13   of unliquidated claims, for unliquidated

14   claims, those that have been filed as

15   unliquidated, your team has ascribed a

16   value for those claims in the

17   $800 million estimate?

18       A        There is value ascribed for

19   each claim.

20       Q        But you did that?   I'm

21   asking you and your team.

22                MS. STAFFORD:   Objection,

23       form.

24       A        We would have reviewed that

25   and looked at that claim to determine

Page 45

1                           MARK SHANKWEILER
2     whether or not it was, you know, ascribed
3     a value, yes.
4          Q        Do you believe that you have
5     the expertise -- and now it's you
6     personally and your team -- to estimate
7     the allowed amount of what you referred
8     to as litigation claims?
9          A        So me personally and my team
10    personally as it relates to valuation of
11    litigation claims, the answer is no.  But
12    we did not -- I mean we coordinated with
13    Diaz & Vazquez, who are experts in
14    evaluating litigation claims.  And we
15    used their advice as it relates to the
16    litigation claims.
17         Q        And without that advice, you
18    could not have come up with your
19    estimation of 800 million?
20                  MS. STAFFORD:  Objection,
21       form.
22         A        The estimate of
23    $800 million includes a category for
24    litigation claims which was based upon
25    Diaz & Vazquez's input.  So could you ask

Page 46

1                    MARK  SHANKWEILER

2    the question again?  I'm sorry.

3         Q        Without the Diaz & Vazquez

4    advice, you could not have come up with

5    your estimation of 800 million; isn't

6    that so?

7                    MS. STAFFORD:  Objection,

8         form.

9         A        Correct.

10        Q        Let's talk about the PPOA

11   claims, again, same acronym.

12        A        Yup.

13        Q        The asserted amount for

14   those claims is approximately

15   2.8 billion.  I'm not going to hold you

16   to the -- it could be 2.7, 2.9, but that

17   general amount, does that sound right?

18        A        I know that there's an

19   exhibit, the disclosure statement.  I

20   think it's Exhibit O.

21        Q        Yes.

22        A        And so rather than tax my

23   memory, could we maybe see that to see

24   what that is?

25        Q        Sure, absolutely.

Page 47

                            MARK SHANKWEILER

1

2       A        That's probably where I

3   should have looked.

4                (The above-referred-to

5       document was marked as Exhibit 4 for

6       identification, as of this date.)

7       Q        So that's Exhibit 4.

8       A        Yes.  Exhibit O.  I'm sorry.

9       Q        Have you had a chance to

10  look at it briefly on the question I just

11  asked you?

12      A        Yes.

13      Q        So what's the amount of

14  asserted claims for PPOA?

15      A        The amount of the asserted

16  claims for PPOA is $2.779 billion.

17      Q        And you see there are three

18  columns, obviously.  One is called

19  estimated low value; the other one is

20  estimated high value; and then there's

21  one in the middle called adjusted

22  estimated value.

23      A        Yes.

24      Q        I understand -- well, first,

25  let me make sure we're clear on this.

Page 48

MARK SHANKWEILER

1

2                   The estimated value low and

3       estimated value high, does that come from

4       Vazquez and -- Diaz & Vazquez?

5            A       No.

6            Q       It comes from where?

7            A       So we -- I believe that

8       there is an -- in the disclosure

9       statement also, there's a discussion of

10      the components of the PPOA claims.  And

11      so the -- and I believe that was on like

12      page 55 or so.  And so the estimation of

13      the PPOA claims, they were developed by

14      us based on our review of the claims, as

15      well as understanding of what's

16      permissible or -- when I say what's

17      permissible, it's really based on our

18      understanding of the components of the

19      claims and based on our review of the

20      PPOA contracts in consultation with both

21      Proskauer and Diaz & Vazquez as to what a

22      valid claim might be and so based on

23      inputs from -- as well as based on our

24      understanding of each one of the PPOA

25      circumstances, based on our conversations

Page 49

                    MARK SHANKWEILER

1    with folks in the project management

2    office down at PREPA.  So there is a

3    combination of things that went into the

4    estimation of this range of claims.

5         Q        But you reviewed the PPOA

6    agreements?  Is that what your testimony

7    is?

8         A        We reviewed the proof of

9    claims that were filed, the claims which

10   were asserted by the claimant and

11   reviewed portions of the PPOA contracts.

12        Q        And do you believe that you

13   have the expertise to determine what

14   claims may be allowed based on your

15   review of contracts?

16                 MS. STAFFORD:  Objection,

17       form.

18        Q        You personally now.

19        A        I would not have.  Me

20   personally, I would not feel comfortable,

21   and I don't think I have the expertise to

22   analyze a legal document and determine,

23   you know, whether or not an asserted

24   claim is a valid claim pursuant to a

Page 50

1                    MARK SHANKWEILER

2    contract.

3         Q        And that's where you rely on

4    Proskauer or Diaz & Vazquez; correct?

5         A        Correct.

6         Q        Do you recall a reference --

7    you referenced the disclosure statement

8    where there's a discussion?

9         A        Yes.

10        Q        Do you recall there's a

11   reference at one point to the fact that

12   the majority of the PPOAs contain a

13   provision explicitly prohibiting any

14   claim on account of lost profits?  Do you

15   remember that statement?

16        A        Yes.

17        Q        And did you verify that

18   yourself, whether that clause existed or

19   not, in the various contracts?

20        A        I reviewed -- I think it was

21   Clause 13.3.  And I did not verify in

22   each one of those personally, but I

23   understand that the team, either

24   Proskauer or my team did, yes.

25        Q        And do you know what

Page 51

                        MARK SHANKWEILER

1    adjustment in the estimated amount for a

2    particular PPOA was made based on the

3    presence or absence of such clause?

4    Because it says the majority, meaning

5    it's not all.  It's a majority; right?

6    So there are some that didn't have that

7    language.

8              So the question is, do you

9    recall what adjustment was made to the

10   estimated amount of the allowed claim of

11   that particular claimant based on the

12   presence or absence of such a provision

13   in the contract?

14             MS. STAFFORD:  Objection,

15      form.

16      A       So what we had done, we had

17   provided a similar adjustment.  Again,

18   there's three components.  I think what

19   we looked at when we saw a PPOA claim, we

20   reviewed the claim.  They had oftentimes

21   development costs.  They had lost profit.

22   And to the extent we couldn't identify

23   whether it was either of the two, it was

24   a damages claim.

Page 52

1                    MARK SHANKWEILER

2              As it relates to the lost

3    profits, we had discussions with Diaz &

4    Vazquez as to whether or not the contract

5    permitted -- whether a valid claim could

6    be asserted for lost profits.  As we

7    discussed, the PPOA contract did not

8    permit a claim related to lost profits.

9              Further, we understand in

10   our conversations with Diaz & Vazquez

11   that Puerto Rico Law does not -- would

12   not recognize a valid claim for lost

13   profits.  And that's, again, based on our

14   discussions with Diaz & Vazquez.

15              And so what we did is we

16   adjusted those claims -- claim amounts

17   for each one of the PPOAs that asserted a

18   lost profit component of the PPOA claim.

19   And so we provided -- we adjusted that.

20              On the low side, we assumed

21   that it would be zero.  But because a

22   number of these are in litigation, we

23   provided a high amount or a higher amount

24   of 30 percent, I believe it was.  So the

25   level of cushion in there for, you know,

Page 53

                          MARK SHANKWEILER

1

2      potential litigation, we wanted to make

3      sure that we would have something just to

4      make sure that there's sufficient

5      cushion.  But that's with regard solely

6      to the lost profit component.

7          Q        Understood.

8                   But you said that the

9      contracts did not allow for lost profit,

10     and I thought we talked about the fact

11     that the disclosure statement uses the

12     term majority.

13         A        Yes.

14         Q        Meaning some don't have that

15     clause; understood; correct?

16         A        I understand.

17         Q        So my question is, all

18     things being equal, two claimants, one

19     that has a contract with a prohibition on

20     lost profit, the other one silent on

21     that, what is the adjustment that was

22     made for that circumstance?

23                  MS. STAFFORD:  Objection,

24         form.

25         A        Again, the advice that was

Page 54

1                    MARK SHANKWEILER

2   provided by Diaz & Vazquez, regardless of

3   whether or not it contained a contractual

4   provision, putting that aside is that in

5   Puerto Rico, a lost profit claim would

6   not be considered a valid claim under

7   Puerto Rico Law.

8        Q        So, therefore, anyone

9   asserting a lost profit got a zero for

10  that?

11                MS. STAFFORD:  Objection,

12     form.

13       Q        On the low side?

14       A        On the low side.

15       Q        Now, you mentioned that all

16  of these are in litigation or something

17  like that?

18                MS. STAFFORD:  Objection,

19     form.

20       Q        What did you mean by -- you

21  referred to litigation.  So you'll

22  correct me.  But I thought it was that

23  given that all of these are in

24  litigation.

25                MS. STAFFORD:  Objection,

Page 55

1                    MARK SHANKWEILER

2        form.

3        Q        I may have misunderstood.

4    So please correct me.

5        A        So I think what I said is

6    that because certain of the PPOAs have

7    been in litigation, one of the reasons

8    that we provided a range or we adjusted

9    the lost profit components of that claim

10   between 0 and 30 was to provide a cushion

11   to the extent that any litigation that

12   might be being pursued would result in a

13   higher claim than what we would have

14   adjusted to on the low side for that

15   component.

16       Q        In what litigation were you

17   referring to there in your answer,

18   generally?

19                MS. STAFFORD:  Objection,

20       form.  Sorry.  Go ahead.

21       A        Generally, I know that in

22   reading the proof of claims, oftentimes,

23   you can see that there is -- the detail

24   provides that there's an adversary,

25   whether I'm using the correct legal term,

Page 56

1                    MARK SHANKWEILER

2    but there was a dispute.

3         Q        A dispute.

4         A        A dispute.  Maybe dispute is

5    a better term than litigation.

6         Q        Okay.  Fair enough.

7                  Have you or -- I'm sorry.

8                  I should say, has the board

9    objected to any of these PPOA claims to

10   date?

11        A        I don't believe as -- to

12   date, I don't believe they have.

13        Q        The part that I didn't cover

14   in Exhibit O is the middle column,

15   adjusted estimated value.

16                 Could you try to define that

17   for me?  I see the words.  I see what low

18   is.  I see what high is.

19                 But adjusted estimated

20   value, can you in your own terms explain

21   that?

22        A        Sure.  So if you go back to

23   the disclosure statement that talks about

24   the PPOA claims and the estimation

25   process for that, there's essentially

Page 57

1                         MARK SHANKWEILER

2    three components.  Again, it would be the

3    development costs.  It would be the lost

4    profit and the damages.

5                    Based on our conversations

6    with and our understanding of the law and

7    based on a review of -- I think there was

8    one PPOA claim that was in arbitration.

9    We viewed the -- we did not adjust the

10   development costs.  So for the

11   development costs, we generally allowed

12   those development -- allowed is not a

13   good term.  We didn't adjust the

14   asserted -- the portion of the claim,

15   which asserted development cost claim, we

16   did not adjust those.  So we're generally

17   allowing that as -- at the full claimed

18   value.

19                    For the lost profit, we

20   essentially came up with a range from 0

21   to 30 percent.  And for the damages

22   portion of the claim, we looked at the

23   type of claim, looked at the basis for

24   the claim and came up with an adjustment.

25   The midpoint that we came to here is

Page 58

                            MARK SHANKWEILER

1

2   essentially an amount that is based on

3   the -- just to provide sufficient

4   cushion, I think, in the estimation of

5   the PPOA claims.  So that's really how we

6   derived that.  It's really what our view

7   of the estimated value of that claim

8   would be based on the various inputs for

9   the 12 or 13 PPOA claims that we

10  reviewed.

11       Q        But you used the term

12  midpoint.

13                These are not midpoints?

14       A        No.  This is not a midpoint.

15       Q        You say for lost profit, we

16  essentially came up with a range from 0

17  to 30 percent?

18       A        Right.

19       Q        0 in the low side, 30 on the

20  high.  Again, I'm confused as to --

21       A        Sorry.

22       Q        -- in the middle column,

23  where is that 0 to 30 percent analysis

24  coming in?  Is it in the middle of the

25  column, is it elsewhere?

Page 59

1                    MARK SHANKWEILER

2        A        So the 0 would be the low.

3    The estimated value would be the high.

4    And we -- the adjusted estimated value

5    here would be based on our adjustments of

6    the low and high to come up with what we

7    felt was, you know, an appropriate value

8    based on the particulars of each one of

9    the claims.

10       Q        But how did you do that?

11       A        It was based on judgment.

12   And in order to provide sufficient

13   cushion, to ensure that there's

14   sufficient cushion in these claims.

15       Q        You mean your judgment?

16       A        I would say it's a

17   combination of judgment, which was -- I

18   mean there's plenty of people, you know,

19   our views, which we are informed by our

20   discussions with both Diaz & Vazquez and

21   Proskauer.

22       Q        That column, adjusted

23   estimated value, exists throughout this.

24                It doesn't apply only to

25   PPOA; correct?

Page 60

1                    MARK SHANKWEILER

2        A        Yup.

3        Q        So let's talk about other

4    categories; for example, the UTICE

5    arbitration award.  In this case, there's

6    no adjustment at all?

7                    MS. STAFFORD:  Objection,

8        form.

9        Q        Or there doesn't seem to be

10   a difference between the three columns;

11   am I correct?

12                   MS. STAFFORD:  Sorry.  The

13       UTICE litigation column?

14                   MR. DESPINS:  No.  Sorry.  I

15       was referring to the UTICE

16       arbitration awards.  There are two

17       UTICE lines.  I apologize.

18       Q        Let's start with the UTICE

19   arbitration award.

20                   So that number is constant?

21       A        Yes.

22       Q        Is 5,000,673 the award that

23   was received?

24       A        Based on our review of the

25   proof of claim, yes, that was the amount

Page 61

1                    MARK SHANKWEILER

2    of the award.  And we -- again, yes,

3    correct.  That's based on our

4    understanding of the award that was

5    provided in the arbitration.

6         Q         And let's go to line --

7    there are actually numbers.  So it's

8    easier if we refer to numbers.  Let's go

9    to line 5, UTICE litigation.

10        A         Yes.

11        Q         Asserted amount,

12   224,900,000.  And there's no low amount.

13        A         Correct.  That would be

14   zero.  So we probably should put zero in

15   there as opposed to the dash.

16        Q         And there is a high, which

17   is the full amount.

18                  What was the -- was that an

19   asserted amount, the 224 million and

20   change?

21        A         Yes.  That was asserted by

22   UTICE there.

23        Q         And tell me the process to

24   get from a high of 224, a low of zero,

25   and then you get what is a result of

Page 62

1                    MARK SHANKWEILER

2    11,000,245?

3        A        So the high claim, the

4    asserted amount here, the $224.9 million,

5    we reviewed the proof of claim.  We

6    evaluated the nature of the claim and

7    what their support was and determined

8    that there was no validity in that

9    particular claim because it was really

10   based, if you read the actual proof of

11   claim, on savings that were enjoyed by

12   PREPA related to the change in health

13   care plan during a period of time, 2008,

14   2009.  So it really reflected nothing

15   related to the actual claim that UTICE

16   asserted.

17              We also worked with Diaz &

18   Vazquez to obtain information from PREPA

19   related to the nature of this claim.  And

20   we were -- among other things, which

21   include comparisons of the health care

22   plans, which were changed, not only for

23   UTICE, but for the PREPA employees as a

24   whole.  We identified the number of UTICE

25   employees that would have been impacted,

Page 63

1                          MARK SHANKWEILER

2    understood the type of claim that they

3    were trying to assert here, understood --

4    we reviewed the -- I don't know if it was

5    an arbitration.  I think it may have been

6    an arbitration award that suggested that

7    PREPA was liable for any incremental

8    health care benefits that would have been

9    incurred by an UTICE member.  And then we

10   attempted to reach out to UTICE to have

11   them provide any substance or any detail,

12   supporting the $224 million claim or any

13   claim for that matter.  And we did not

14   hear anything back from them.

15                     And so at the end of the

16   day, based on our discussions with

17   PREPA's -- actually, with D&V and PREPA's

18   HR, focusing in looking at the comparison

19   of the plans and evaluating the number of

20   employees that could have been impacted

21   by this, we decided that we would, in

22   order to ensure that we would have

23   sufficient cushion to the extent that any

24   of these claims could be -- would be

25   valid claims against PREPA, we

Page 64

MARK SHANKWEILER

1
2       provided -- I believe it was a 5 percent

3       cushion or a 5 percent estimate, just to

4       cover any potential claims that could

5       arise.

6                       And I think at the end of

7       the day, it was -- it amounted to about

8       $22,000 per UTICE employee which is the

9       basis for the adjusted estimated value.

10          Q       But given that the lack of

11      the supporting documentation that you

12      mentioned and the fact that they refused

13      or did not provide it, why didn't you

14      object to that claim to get it

15      disallowed?

16          A       That would be a question I

17      can't answer.

18          Q       And I want to go back to the

19      issue I asked.  Exhibit O, if I obtain

20      the backup from your firm on this, in

21      every category from 1 through 12, it

22      would show the value assessed by your

23      firm, by you or your firm, for every

24      claim that fits in one of these 12

25      categories; correct?

Page 65

1                    MARK SHANKWEILER

2                MS. STAFFORD:  Objection,

3        form.

4        A       Yes.  Just to be clear,

5    could you repeat the question?  I just

6    want to make sure.

7        Q       Reviewing Exhibit O, if we

8    were to look at the backup that your firm

9    has for each of Categories 1 through 12,

10   would we find an assessed value by you or

11   your firm for every claim filed that fits

12   into one of these 12 categories?

13               MS. STAFFORD:  Objection,

14       form.

15       A       The answer is we have a

16   value for each one of the claims in our

17   records.  So, yes, there is a value for

18   each one of the claims.  To the extent,

19   however, that we felt that we -- there

20   were uncertainties as to what the

21   potential amount might -- to the extent

22   that we were concerned with -- when I say

23   concerned, to the extent that we wanted

24   to ensure that there was sufficient

25   cushion, we may have provided, just like

Page 66

MARK SHANKWEILER

1

2      an estimate for, you know, a cushion,

3      like an increase in the claim value if we

4      wanted to ensure that we had sufficient

5      cushion based on where we were in the

6      review of the claims.

7           Q        We may be like ships passing

8      each other in the night here.

9           A        We may.

10          Q        You answered there is an

11     assessed value for every claim.  I asked

12     you whether your firm determined an

13     assessed value for every claim.

14          A        Yes.  The answer is yes.  We

15     have an assessed value.

16          Q        So to be clear, this is not

17     just a proof of claim is filed, an X

18     amount, that's the file; in fact, each

19     claim has been reviewed and assessed a

20     value?

21               MS. STAFFORD:  Objection,

22        form, asked and answered.

23          A        We have a value assessed for

24     each one of the claims, yes.

25          Q        Has each claim been

Page 67

1                    MARK SHANKWEILER

2    reviewed?

3                    MS. STAFFORD:  Objection,

4         asked and answered.

5         A         Yes.  Each claim has been

6    reviewed.

7         Q         And assessed a value for

8    each?

9                    MS. STAFFORD:  Objection,

10        asked and answered.

11        A         Yeah.  A value was assessed

12    for each one of the claims.

13        Q         By you or your firm?

14                   MS. STAFFORD:  Objection,

15        asked and answered.  You can answer

16        again.

17        A         The answer is that we

18    reviewed each claim.  And we have

19    assessed a value.  There's an assessed

20    value for each one of the claims.

21        Q         But you see the difference

22    between there's an assessed value, and we

23    have assessed a value?  Do you see the

24    difference between those two points?

25                   MS. STAFFORD:  Objection,

Page 68

1                    MARK SHANKWEILER

2        asked and answered.  You can answer

3        it again.  But we're really getting

4        to the point of badgering him on a

5        question he's answered multiple

6        times.

7        A        There are a number of claims

8    which were immaterial that we may not

9    have gone through individually to assess

10   a value.  So to the extent that we would

11   have looked at the claim and determined

12   whether or not we had to specifically

13   assess a value, but we did look at the

14   values for all claims.  And there is a

15   value that was assessed for each one of

16   the claims that we're comfortable with.

17       Q        How did you determine

18   whether something was immaterial or

19   not --

20                 MS. STAFFORD:  Objection,

21       form.

22       Q        -- based on the dollar

23   amount asserted?

24       A        Yes.

25                 MR. DESPINS:  Why don't we

Page 69

1                    MARK SHANKWEILER

2        take a short break at this point.

3               THE VIDEOGRAPHER:  Off the

4        record at 10:31, marking the end of

5        Media Unit No. 1.

6               (A short recess was taken.)

7               THE VIDEOGRAPHER:  We are on

8        the record at 10:57.  This marks the

9        beginning of Media Unit No. 2.

10       Please proceed.

11        Q        Welcome back.

12        A        Thank you.

13        Q        So, Mr. Shankweiler, you

14   mentioned on several occasions before

15   that you received input from this firm

16   called Diaz & Vazquez?

17        A        Vazquez.

18        Q        Did you receive e-mails from

19   them --

20        A        Yes.

21        Q        -- containing their

22   recommendations?

23        A        We exchanged e-mails on the

24   claims that they were reviewing,

25   principally related to the litigation

Page 70

MARK SHANKWEILER

1

2    claims.  And when they sent us e-mails --

3    and when they sent us e-mails on those

4    claims, they would include memos that

5    would discuss the litigation claims, the

6    merits, the background and what a

7    proposed settlement amount would be or

8    what a proposed value of that claim would

9    be.  We also received e-mails.  We

10   receive e-mails from them as it relates

11   to the UTIER claims valuations for the

12   grievance claims.  We receive e-mails

13   from them with regard to their work in

14   evaluating the expropriation claims and

15   then sometimes just hey, how you doing

16   e-mails.

17       Q       What about the PPOA claims?

18   Did you consider those to be litigation

19   claims as well?

20       A       On the PPOA claims, we may

21   have received some e-mails from Diaz &

22   Vazquez on PPOA claims, but not that --

23   that was not necessarily related to the

24   estimation of the claims itself.  It was

25   related to, oftentimes, the background

Page 71

1                    MARK SHANKWEILER
2    because they're down in San Juan, because
3    they are generally at PREPA's offices
4    several times a week.  They are able to
5    get questions answered that we have and
6    that we've asked them to look into
7    because of their access.
8                    So we have received -- we
9    have received e-mails on PPOAs from Diaz
10   & Vazquez, but not as it relates to these
11   ranges, the estimated low, the estimated
12   high and the adjusted estimated value.
13   So it's input that we considered and
14   provided insights into us.
15       Q        So not on the merits of
16   those claims from a legal point of view,
17   you don't receive memos from them?
18                 MS. STAFFORD:  Objection,
19       mischaracterizes testimony.
20       A        So on the merits of the
21   claim, we did receive e-mails from
22   Eduardo Corretjer as it relates to
23   certain of the PPOA claims that he was --
24   his firm was responsible for representing
25   PREPA on.  And I believe on two or three

Page 72

1                    MARK SHANKWEILER

2    of those claims, he discussed the merits

3    of those PPOA claims.

4         Q       Is he with the Diaz firm?

5         A       He's a separate -- he is

6    retained separately by PREPA.  PREPA

7    retains a number of outside attorneys

8    like any big corporation.  So part of his

9    work was done in evaluating some of the

10   more complex litigation claims.

11        Q       So he provided you with

12   advice on the merits of claims that he

13   had been handling in litigation, pending

14   litigation?  Again, I don't want to

15   mischaracterize it.  You tell me.

16        A       Whether it was -- wherever

17   there were disputes, my understanding is

18   wherever there were disputes that

19   required outside counsel, litigation

20   counsel, then several, at least two, is

21   my recollection.  Two other PPOA claims

22   were handled by Mr. Corretjer.

23        Q       So that's two.

24                But then there's a whole

25   other universe of PPOA claims?

Page 73

                        MARK SHANKWEILER

1

2        A        Yes.

3        Q        And he didn't advise on the

4    merits of those, and neither did Vazquez?

5                 MS. STAFFORD:  Objection,

6        mischaracterizes testimony.

7        A        Again, as it relates to the

8    merits of certain components of the

9    claims, Diaz & Vazquez had a few based on

10   their understanding of the contracts,

11   based on their understanding of the

12   contract rejection provisions, based on

13   their understanding of Puerto Rican Law

14   as to whether or not a particular

15   component of a PPOA claim would be a

16   valid claim.

17                And so those are the types

18   of -- those are the type of conversations

19   that we had and the kind of advice that

20   we were looking -- the insights that we

21   wanted from Diaz & Vazquez.

22       Q        So Diaz & Vazquez advised

23   regarding the merits of the PPOA claims?

24   It's a yes or no.

25       A        Components of it, yes.

Page 74

1               MARK SHANKWEILER

2               MR. DESPINS:  For the

3     record, we're calling for the

4     production of those e-mails and

5     memos.

6               MS. STAFFORD:  Those will

7     not be produced.  They're subject to

8     common interest privilege.  We have a

9     common interest with PREPA in the

10    reconciliation of claims.

11              MR. DESPINS:  Okay.  We'll

12    deal with that later.

13     Q       Moving on back to No.

14  Exhibit, I think, 4, well, you have it in

15  front of you, which is the Exhibit O to

16  the disclosure statement.

17              There was a prior version of

18  this, was there not, that dates back to

19  December?  No.  Sorry.  February.  Sorry.

20  Let me clarify my question.

21              The board filed a disclosure

22  statement prior to this version of the

23  disclosure statement; right?  It filed

24  something in December of 2022?  Does that

25  ring a bell?

Page 75

1                    MARK SHANKWEILER

2       A        I think I remember that,

3    yes.

4       Q        Do you recall that that

5    version of the disclosure statement

6    announced that the estimation of the

7    unsecured claims was also $800 million?

8       A        I don't recall.

9                MS. STAFFORD:  This is going

10       to be Exhibit 5?

11                MR. DESPINS:  Can we make it

12       Exhibit 5?  It should be.

13                MR. BONGARTZ:  Yes.  We can

14       make it Exhibit 5.

15                (The above-referred-to

16       document was marked as Exhibit 5 for

17       identification, as of this date.)

18       Q        So do you see on page 26,

19    which is the second page of Exhibit 5 --

20       A        I do.

21       Q        -- a category called general

22    unsecured claims, Class 5?

23       A        I do.

24       Q        Estimated claim amount,

25    800 million?

Page 76

1                    MARK SHANKWEILER

2       A       I do.

3       Q       So does that refresh your

4    recollection?

5       A       I mean, I guess, if -- it

6    looks like, you know, this was filed on

7    December 16th, '22.  And I will -- I

8    guess I can stipulate that I trust you

9    that you're not going to give me

10   something that's not correct.

11      Q       My question is, does this

12   refresh your recollection about an

13   $800 million estimate at that time?

14      A       Yes.

15      Q       And did you provide that

16   estimate at that time?

17      A       We had provided a range of

18   estimates over the course of, you know, I

19   would say two years, refining these

20   amounts.  And the estimates that were

21   provided here I think were generally

22   consistent with what our expectations

23   would be in looking at what the estimated

24   claim amounts would be for the general

25   unsecured claims.

Page 77

1                    MARK SHANKWEILER

2       Q        So this is based on reports

3    you would have provided at that time?

4       A        We shared our reports with

5    Proskauer and had conversations on a

6    weekly basis.  So that's what this I

7    would presume be based on.

8                    MR. DESPINS:  So we call for

9         production of those reports as well.

10                   MS. STAFFORD:  Those are

11        also privileged.  And they won't be

12        produced.

13                   MR. DESPINS:  How are they

14        privileged again?

15                   MS. STAFFORD:  That's the

16        course of our ongoing work between

17        Shankweiler's firm and Proskauer in

18        relation to the development of an

19        estimate which is clearly work

20        product and clearly attorney-client

21        privilege.

22                   MR. DESPINS:  I hear you.

23                   Next exhibit.  6.

24                   (The above-referred-to

25        document was marked as Exhibit 6 for

Page 78

1                    MARK SHANKWEILER

2        identification, as of this date.)

3                    MR. DESPINS:  So that's

4        Exhibit 6.

5        Q        And I would ask you to look

6   at the last page of that, which is, I

7   guess, an earlier version of Exhibit O.

8   Does that ring a bell?

9        A        This is 6 over here.  So

10  we're looking at a low value of

11  $245 million.  Yeah.  I mean our numbers

12  and values change as we continue to do

13  work.

14       Q        So why is there not a middle

15  column there?  Do you know what middle

16  column I'm referring to?

17       A        I do understand what middle

18  column you are referring to.  I don't

19  know the answer to that.

20       Q        But you prepared that

21  Exhibit O that we're looking

22  at --right?-- which is Exhibit 6?

23                 MS. STAFFORD:  Objection,

24       foundation.

25       A        Yes.

Page 79

1                    MARK SHANKWEILER

2      Q          Why did you decide that

3   there was a need to add a middle column

4   to Exhibit O?

5                    MS. STAFFORD:  And I'd just

6        caution you not to reveal any

7        privileged information.

8                    THE WITNESS:  Sure.

9      Q          You could say that Proskauer

10  told you to do it.  That's fine.

11      A          No.  In the estimation of

12  any -- in determining any sort of range

13  of claims, you know, we took care to, you

14  know, build up to what we believed a low

15  estimate would be, a high estimate would

16  be, to the extent was asserted.

17                  And then we would have

18  wanted to come up with what we would

19  believe an adjusted estimated value would

20  be in order to ensure that there would be

21  sufficient cushion, whether it's just to

22  come up with -- you know, if you're

23  concerned that the lower value may be too

24  low based on your belief.  It's a

25  midpoint.  I think most ranges of claims

Page 80

                              MARK SHANKWEILER

1

2    would have midpoints.  They would have a

3    high, low and an estimated.  So that's

4    why we did it this way.

5         Q        But it's not a midpoint, to

6    be clear; right?

7         A        This is not a midpoint.

8         Q        I'm talking about the column

9    that's missing from this document that's

10   in the later version of Exhibit O is not

11   a midpoint between low and high, just to

12   be clear; right?

13        A        No.

14        Q        But it's interesting.  It

15   was not necessary for you to do that in

16   February, but it was necessary to do it

17   in March?

18             MS. STAFFORD:  Objection,

19       foundation.

20        A        I don't recall specifically

21   why we didn't have a middle column, an

22   adjusted estimated value column.

23        Q        Let's talk about the UTIER.

24   We're going back to Exhibit 4.

25                 And we're going to use

Page 81

```
 1                    MARK SHANKWEILER
 2   numbers, so that there's no confusion
 3   this time.  There's an Item Number 3,
 4   master claim UTIER grievances.  You see
 5   that line?
 6        A       I do.
 7        Q       And how is it that the high
 8   amount for that item was reduced from the
 9   asserted amount to a different lower
10   amount, 264,000,379?  I'm asking you --
11   sorry for toggling between two exhibits.
12   So there are two Exhibit Os, not to be
13   confused.  One is dated March 1st, the
14   other one is dated February 9th.
15                And so if you follow the
16   same line, UTIER grievances, on the high
17   amount, you see for February 9th was the
18   asserted amount.  And now the high is 264
19   which is much less than the asserted
20   amount.  So what happened there?
21        A       So I believe what we were
22   doing here, as it relates to these
23   particular grievance claims, I think it
24   was -- I think for most of these, in
25   fact, for all of these in the earlier
```

Page 82

1                     MARK SHANKWEILER

2   version, other than for the UTIER damages

3   claim, we asserted the -- or we included

4   the asserted amount as a high estimate,

5   only because we continued to evaluate the

6   claims.

7                     And so that's why when I

8   think on the most recent one, which is

9   filed on March 1st, Exhibit 4, it's just

10  reflecting what our estimate of the claim

11  would be versus the asserted amount.

12  And, again, I don't know the specific

13  reason why we were using the asserted

14  amount versus what our estimates were

15  between these two items.  I don't recall.

16      Q       But it's not like UTIER

17  communicated to you that their maximum

18  amount would be 264379?

19      A       No.

20      Q       So you have your own

21  internal high exposure, regardless of

22  what the claimant is asserting?

23      A       Yes.  And that's

24  reflected -- that's reflected on

25  Exhibit 4, line 3.

Page 83

MARK SHANKWEILER

1

2      Q        And then you proceed to

3   reduce those in your adjusted?

4      A        Yes.   In this instance, I

5   believe what we did is we took the

6   midpoint for that UTIER grievance claim

7   between the low and the high.

8      Q        Why take the midpoint?   What

9   was the rationale for that?

10     A        Well, the rationale is that

11  we were comfortable with our low

12  estimate.   And we think -- if there's --

13  based on our judgment, if we were able to

14  justify a low and looked at estimating

15  what the high is, but because the

16  uncertainties, we would have adjusted

17  that, we would have taken the midpoint

18  there just based on -- just to provide a

19  value or based on our judgment because we

20  didn't think that necessarily -- there

21  were arguments for both the low and the

22  high.

23     Q        And, by the way, those

24  grievances are governed by Puerto Rico

25  Law; correct?

Page 84

1                    MARK SHANKWEILER

2                    MS. STAFFORD:   Objection,

3        legal conclusion.

4        Q        Do you know?

5        A        I don't know the specific --

6    I don't know the answer to that.   I would

7    imagine, yes.

8        Q        Did you receive advice

9    from --

10       A        It's called Diaz & Vazquez,

11   D&V.

12       Q        Those guys?

13       A        Yes.

14                We -- yes.   We -- there was

15   a process.

16       Q        And Diaz & Vazquez provided

17   their input into the grievance claims,

18   input on the merits of those claims?

19       A        Yes, on the merits of the

20   claims.   But that was not only Diaz &

21   Vazquez, the process by which these

22   were -- just stepping back, UTIER

23   provided a proof of claim broken up

24   between No. 2, which was the UTIER

25   damages, and No. 3, the UTIER grievances.

Page 85

                    MARK SHANKWEILER

1

2    The UTIER grievances, they just had one

3    single claim amount with no supporting

4    values associated.  What they did have

5    and what Diaz & Vazquez was asked by

6    PREPA early -- in late 2019 to do was to

7    assist them in evaluating these claims.

8    The support that UTIER provided was

9    50,000 pages of stuff in 28 boxes.  And

10   none of those documents had any values.

11              So we coordinated with Diaz

12   & Vazquez to establish a process by which

13   we would be able to build up to what a

14   potential value was of these UTIER

15   claims, these grievance claims.

16       Q        Thank you.

17                Still on UTIER, but moving

18   on now to the collective bargaining

19   agreement --

20       A        Okay.

21       Q        -- you know there's a

22   collective bargaining agreement with

23   UTIER; correct?

24       A        I do.

25       Q        And has that -- I'll refer

Page 86

                        MARK SHANKWEILER

1

2     to it to the CBA.  Has that CBA been

3     rejected?

4         A        I don't know.  I don't know

5     if it's been rejected or not.  I don't

6     believe so.

7         Q        If I look at your Exhibit O,

8     this one, Exhibit 4, but Exhibit O in

9     Exhibit 4, where would I find rejection

10    damage claims of UTIER arising out of a

11    potential rejection of the CBA?

12                 MS. STAFFORD:  Objection,

13        foundation.

14        A        The way we're approaching

15    the UTIER grievance claim damages is by

16    going through and looking at the

17    individual claims and valuing each,

18    whether the grievance claims that build

19    up to this number.  So we don't

20    specifically have contract rejection

21    damage claims incorporated in this

22    number.

23        Q        Is there any dollar amount,

24    estimated, at all on Exhibit O in any of

25    the Categories 1 through 12 for CBA

1                    MARK SHANKWEILER

2    rejection claims?

3                    MS. STAFFORD:  Objection,

4          foundation.  I think he's already

5          testified there hasn't been a

6          rejection.

7                    MR. DESPINS:  Okay.  Now

8          you're testifying.  That's not cool.

9                    MS. STAFFORD:  I'm just

10          pointing out the foundation issue

11          that I see here.

12                    MR. DESPINS:  No.  You're

13          testifying again.

14      A       Could you repeat the

15    question?

16      Q       If I'm looking at Exhibit O,

17    which is a page of Exhibit 4 and for this

18    deposition, is there any dollar amount

19    reflected in any of the Categories 1

20    through 12 for damages arising out of a

21    potential rejection of the collective

22    bargaining agreement, the CBA?

23                    MS. STAFFORD:  Same

24          objection.

25      A       So when we developed the

Page 88

1                    MARK SHANKWEILER
2   claim amount that is included in here for
3   line 3, what we did is we came up with
4   average values for each one of the
5   claims.  And based on the number of
6   claims that were filed in PREPA's offices
7   by UTIER, we then applied a cushion to
8   that for unknown claims that could arise
9   or other issues that could arise.
10                    So that is part of thinking
11  about what could potentially arise under
12  any contract rejection issues or
13  whatever, any additional claims that
14  could arise.  The amounts here are higher
15  than the true extrapolated amount of the
16  claims.
17      Q       So therefore, there is a
18  dollar amount built in under line --
19      A       3.
20      Q       -- 3 for rejection damage
21  claims?
22                    MS. STAFFORD:  Objection,
23      foundation.
24      A       We've provided a cushion for
25  any additional claims that could arise

Page 89

1                          MARK SHANKWEILER

2     that weren't captured through our

3     analysis and just simply extrapolating

4     the average dollar value of the claims

5     that we have had come up with.  So for

6     whatever those claims, whether it would

7     be a contract rejection, whether it would

8     be anything, there's cushion in there to

9     take that into account.

10        Q        What's that cushion,

11    ballpark again?  I'm not going to hold

12    you to a specific dollar.  But give me an

13    order of magnitude of your cushion.

14                MS. STAFFORD:   Objection.

15        A        So we came up with a range,

16    a low range and a high range.  And then

17    we applied a 50 percent cushion on top of

18    that.  So it was -- it was, again, based

19    on where we are or where I should say

20    that Diaz & Vazquez and PREPA is in their

21    review of these claims because there are

22    well over 10,000 individual cases that

23    are being reviewed.  And based on where

24    we are in that review, we want to provide

25    enough of a cushion to the extent that

Page 90

```
 1                    MARK SHANKWEILER
 2   something will come up and we would need
 3   to increase that amount.
 4       Q       Switching gears to other
 5   things, you're familiar with the term
 6   current expenses?  Does that ring a bell?
 7       A       Yes.
 8       Q       And what's your
 9   understanding of what that means in this
10   context?
11               MS. STAFFORD:  Objection,
12       form, legal conclusion.
13       A       So my understanding -- my
14   understanding of the term current expense
15   is -- well, again, it's a legal term.
16   It's included in the -- I know it's
17   included in the 1974 indenture.  And it
18   dictates what expenses should be paid
19   prior to the bonds getting payments is my
20   understanding.  But that's all I
21   really -- I don't know what it means from
22   a legal perspective, other than just
23   generally what it means.
24       Q       Understood.
25               Have you and your team
```

Page 91

1                    MARK SHANKWEILER

2    performed any work with respect to

3    determining which expense would be

4    considered current expenses?

5         A        We have not done any work to

6    determine which expense would be

7    considered a current expense, no.

8         Q        Are you aware that PREPA has

9    paid, post-bankruptcy, millions of

10   dollars to pre-petition creditors of

11   PREPA?

12        A        I am.

13        Q        And do you know the

14   approximate amount involved in here,

15   ballpark again?

16        A        I believe currently, it's

17   above 500 million, $550 million, maybe a

18   little higher, maybe 600.  I don't recall

19   specifically.

20        Q        And have you conducted any

21   work with respect to those payments?

22                 MS. STAFFORD:  And I just

23        want to object to the extent this is

24        outside the scope of his 30(b)(6)

25        testimony.  If he knows anything

Page 92

1                    MARK SHANKWEILER

2       personally, he can obviously answer.

3          Q        Go ahead.

4          A        Could you repeat the

5    question?

6          Q        And have you conducted any

7    work with respect to those payments?  And

8    the payments I'm referring to are the

9    payments made by PREPA, post-bankruptcy,

10   on account of pre-bankruptcy claims.

11                  MS. STAFFORD:  Same

12       objection.

13         A        Yes.

14         Q        And tell me what -- in what

15   context.

16         A        In the context of reviewing

17   a proof of claim that was actually filed

18   when we got to -- when we were retained

19   by the FOMB to start the claims

20   reconciliation process, it was

21   approximately a year -- it was

22   approximately two years after the filing.

23   And it was approximately one year after

24   the bar date for filing proofs of claim.

25                  And when we understood that

Page 93

                           MARK SHANKWEILER

1

2    there were payments that were made on

3    behalf of the pre-petition -- on account

4    of pre-petition invoices, we obtained

5    information from PREPA to determine

6    whether or not the proofs of claim

7    included invoices that might have been

8    paid.

9        Q        So if they're satisfied,

10   then you wouldn't pay twice?

11       A        That's the basis for some of

12   the objections that we had filed as

13   having been satisfied.

14                MR. DESPINS:  Why don't we

15        take this time, like a five-minute

16        break, because I think we're probably

17        done.

18                MS. STAFFORD:  Great.

19                MR. DESPINS:  But I just

20        want to confirm that.  So people can

21        stay put.  Really, it's going to be

22        no more than three or four minutes.

23                THE VIDEOGRAPHER:  Off the

24        record at 11:31.

25                (A short recess was taken.)

Page 94

1             MARK SHANKWEILER

2             THE VIDEOGRAPHER:  We are on

3     the record at 11:41.  Please proceed.

4             MR. DESPINS:  We have no

5     further questions.  Thank you very

6     much for your time, Mr. Shankweiler.

7             THE WITNESS:  Thank you.

8             MS. STAFFORD:  Before we go

9     off the record, does anyone else have

10    questions on the phone or in the

11    room?

12            MR. KELLY:  I'll be asking a

13    few questions.  And I think Jane

14    Tomic from Kramer Levin will have

15    some questions too.

16            MS. TOMIC:  Yes.

17            THE VIDEOGRAPHER:  Off the

18    record at 11:41.

19            (A short recess was taken.)

20            THE VIDEOGRAPHER:  We are on

21    the record at 11:42.  Please proceed.

22    EXAMINATION BY

23    MR. KELLY:

24       Q       Good morning, Mr.

25    Shankweiler.  My name is Cameron Kelly.

Page 95

1                    MARK SHANKWEILER
2    I'm with Quinn Emanuel.  We represent
3    Syncora Guarantee Incorporated.
4                    Do you know who Syncora is?
5         A       I do.
6         Q       They're, as you understand
7    it, a monoline insurer of PREPA bonds?
8         A       Correct.
9         Q       Now, I know Mr. Despins
10   talked a little bit about your
11   background.  But I just wanted to get a
12   little more clarity.
13                   So you've been in the
14   restructuring industry since the 1990s?
15        A       Since '92.
16        Q       How many formal bankruptcies
17   have you been involved in?
18        A       I don't know the exact
19   amount.  But over the 20 years, probably
20   more -- I can't -- 30, 40, not specific.
21        Q       Any as big as Puerto Rico?
22        A       Yes.
23        Q       And in those big
24   bankruptcies like Puerto Rico, what was
25   your role?

Page 96

                              MARK SHANKWEILER

1

2         A         It ranged from representing

3    creditors.   When I say -- let me rephrase

4    that.   As big as Puerto Rico with

5    $89 billion or $90 billion of claims.   So

6    I was looking at it relative to PREPA

7    with, yeah.

8         Q         That's fine.

9         A         So our role -- yes.   And

10   that would have been -- as an example,

11   EFIH, Energy Futures, our role would have

12   been representing -- I think it was

13   noteholders of secured lenders there.   So

14   it ranged from, you know, representing

15   banks to representing noteholders and

16   representing, in certain cases, debtors.

17        Q         And do you view your job

18   differently when you're representing a

19   debtor as opposed to a creditor

20   constituency or a bondholder

21   constituency?

22        A         I mean there's differences,

23   yes.

24        Q         Any that come to mind

25   immediately or an example, perhaps?

Page 97

MARK SHANKWEILER

1

2     A        Well, just as an example --
3  representing an unsecured creditors'
4  committee, as an example, you would be
5  challenging, you know, the analysis that
6  were prepared by the debtors.  And so
7  when you're representing the debtors,
8  obviously, you would be an advocate for
9  the debtors' position and doing a lot of
10  the analysis that would be reviewed by
11  somebody on the other side of the table.
12     Q        So is it fair to say when
13  you're representing creditors, you look
14  at whatever the debtors' estimates of
15  claims are with some skepticism?
16     A        Yes.
17     Q        Do you take that into mind
18  when you represent the debtors, that
19  level of skepticism?
20            MS. STAFFORD:  Objection,
21     form.
22     A        I think -- could you
23  rephrase that question again?
24     Q        Yes.
25            So if you're retained by a

Page 98

1                          MARK SHANKWEILER

2    debtor to evaluate claims against their

3    estate, do you take with you in that

4    evaluation, the same level of skepticism

5    of claims that you would when you're

6    representing creditors?

7         A        So it's -- it's a little bit

8    different because what you're trying to

9    do when we're representing the debtors,

10   we want to make sure that we can justify

11   the claims that have been asserted to

12   ensure that they're actually correctly

13   recorded and captured and to do that

14   reconciliation to ensure that ultimately,

15   the claims that have been asserted

16   against the debtors are valid claims.

17                   So that's a little bit

18   different because from the creditors'

19   side, you would say, well, what have you

20   done in order to evaluate, so that we're

21   comfortable with the work that you've

22   done.  And we would have access on --

23   when we're representing creditors, to

24   proofs of claim, et cetera, that would

25   have been filed in the case.  So there's

Page 99

1                    MARK SHANKWEILER

2    a differentiation.

3        Q         Okay.  Fair enough.

4                  Now, Mr. Despins touched on

5    this a little bit.

6                  The total asserted value

7    currently of unsecured claims against

8    PREPA is about 6 billion, 5.9 billion.

9    Do you recall that?

10       A         The total value of the

11   general unsecured claims?

12       Q         Yes, of the general asserted

13   unsecured claims.

14       A         Yes.

15       Q         You mentioned earlier that

16   BRG had gotten through about 60 percent

17   of the claims asserted against PREPA or

18   evaluated about 60 percent of them?

19                 MS. STAFFORD:  Objection,

20       mischaracterizes testimony.

21       A         I don't believe that that

22   was my testimony.  I think what I had

23   said -- I may have said -- I think

24   that's -- you know, to the extent that

25   we've come to a conclusion on all of the

Page 100

1                    MARK SHANKWEILER

2    claims, that's probably what I alluded

3    to.

4         Q        So just to clarify, you've

5    come to a conclusion about -- on about

6    60 percent of the claims?

7                    MS. STAFFORD:  Same

8         objection.

9         A         I think that's what I said.

10   If I think about it a little bit more, I

11   might want to refine that to a higher

12   amount.

13        Q        That's fine.

14                  But you also mentioned that

15   BRG in conjunction with other advisors

16   and the debtor have looked at every

17   claim; right?

18        A        Yes.

19        Q        And at least assessed an

20   initial value?

21        A        Yes.

22        Q        Now, when we were talking

23   about the 60 percent number or higher, if

24   you want to revise it, you said that

25   there was still some big claims

Page 101

1                    MARK SHANKWEILER

2    outstanding?

3         A       Yes.

4         Q       Do you have any sense of

5    what those bigger claims that are

6    outstanding are?

7         A       Yes.

8         Q       What are they, by type of

9    claim and amount?

10        A       So if I could refer to an

11   exhibit.

12        Q       Yes, of course.

13               MR. KELLY:  I'll just go

14      ahead and use the UCC's exhibit

15      because they're already there.

16        Q       I believe they're Exhibit --

17        A       4.

18        Q       -- 4.  That's right.

19   Exhibit 4.

20               The table on page 3.

21        A       Yes.

22               So could you repeat the

23   question so I'm answering correctly?

24        Q       Yes.

25               You said that you hadn't

Page 102

                            MARK SHANKWEILER

1

2     come to a final determination on some of

3     the larger claims.  And I asked if you

4     had any sense of what types of claims

5     those are and what their amounts were.

6               MS. STAFFORD:  Objection,

7          mischaracterizes the testimony.

8          A       So the claims that I know

9     that are still in the process of being

10    resolved, they're either objection or

11    reconciliation, would be the PPOA claim

12    category, the UTIER grievance claim

13    category and the UTICE litigation and

14    some of the litigation claims as far as

15    the larger components.  There's still

16    other -- the reconciliation process is

17    still ongoing with certain of the other

18    categories of claims which are not moving

19    the needle here with regard to the

20    adjusted estimated value.

21         Q       And by not moving the

22    needle, do you just mean they're smaller

23    in amount?

24         A       Smaller in amount, more

25    voluminous and smaller in amount.

1                    MARK SHANKWEILER

2        Q        If you could aggregate the

3    kind of -- if you had to aggregate the

4    value of those outstanding claims, what

5    would it be?

6        A        When you say outstanding

7    claims, what do you mean?

8        Q        The PPOA, the UTIER

9    grievance, the UTICE, the litigation

10   claims and those claims that aren't

11   moving the needle all together.

12                MS. STAFFORD:  Objection,

13      form.

14       A        So the value, are we talking

15   about the asserted amount?

16       Q        The asserted value.

17       A        The asserted value would be,

18   you know, close to $5 billion, I would

19   imagine just scanning this.

20       Q        Now, earlier, Mr. Despins

21   and you talked a little about the

22   adjusted estimated value.  That's the

23   middle column on Exhibit 4.

24       A        Yes.

25       Q        Now, at various points, you

Page 104

                         MARK SHANKWEILER

1

2   referred to the adjusted estimated value

3   as a midpoint; is that fair?

4        A        That's fair.

5        Q        But it's not a midpoint; is

6   that right?

7        A        It is not.

8        Q        So could you define what it

9   is a little more precisely, maybe?   I

10  know it has changed, or its effect has

11  changed in some of the categories.   But

12  how would you define it?

13                 MS. STAFFORD:  Objection,

14     form.

15       A        How would I define what?

16       Q        The adjusted estimated

17  value.

18       A        So the adjusted estimated

19  value is our best view of what the claims

20  amount would ultimately be allowed or

21  ultimately, you know, be allowed in the

22  bankruptcy by the court to come up with

23  what the general pool of unsecured claims

24  would be based on our analysis of the

25  individual categories of claims.

Page 105

MARK SHANKWEILER

1

2        Q        And what goes into that

3    view, the view of what would be allowed?

4        A        It's a number of things.  It

5    would be -- it would be -- it would

6    include our views as -- which are

7    informed by our discussions, our views,

8    which are informed by our analysis of the

9    proofs of claim, our views as it relates

10   to our analysis of the underlying

11   components of a lot of the claims that

12   were provided, our reconciliation of

13   claims, our objections to the claims that

14   were actually filed, our view of what

15   the -- or our understanding of what the

16   settlement amounts are -- have been

17   derived based on transferring certain

18   claims to ADR process as an example and

19   reviewing the litigation claims and

20   understanding what the risk assessed

21   value of those might be, to the extent

22   they might have been transferred to ADR.

23   So those types of things.

24       Q        So is it fair to say that it

25   changes, depending on the type of claim

Page 106

MARK SHANKWEILER

1

2     you're looking at?

3         A       Yes.  I think that's fair,

4     depending on -- even within each

5     category; could be different.

6         Q       And just clarifying for the

7     record, it being the adjusted estimated

8     value or how the adjusted estimated value

9     is determined?

10        A       Yes.

11        Q       Now, how does the adjusted

12    estimated value differ from the estimated

13    low value?

14        A       So in certain circumstances,

15    it doesn't.  And the adjusted estimated

16    value -- as an example, if we're taking a

17    look at the PPOA claim, we go through and

18    build what our low value of the claim is

19    based on, reviewing each one of the PPOA

20    claims and coming up with a value and

21    then as far as coming up with an adjusted

22    estimate, we know what the high claim

23    would be, we've developed what the low

24    estimate of that particular claim would

25    be.

```
                                              Page 107

 1                    MARK SHANKWEILER

 2                    And in this particular case,

 3    we took the midpoint to -- to take -- to

 4    provide a cushion to allow for any

 5    uncertainties or any additional claims

 6    that could arise because there are

 7    uncertainties with the result -- there

 8    are uncertainties related to the ultimate

 9    disposition of a particular claim.  So

10    that's what we did in this particular

11    instance.  Does that make sense?

12         Q        Yes.

13         A        Okay.

14         Q        I just want to drill down a

15    little bit more on the specific

16    difference between what the low estimate

17    is and what the adjusted estimated value

18    is.

19                    So are you removing

20    uncertainties, the uncertainties that you

21    mentioned when you're figuring out what

22    the low estimate is?

23                    MS. STAFFORD:  Objection,

24         form.

25         A        So when we're coming up with
```

Page 108

1                    MARK SHANKWEILER

2    a low estimate, our estimates are based

3    on advice from discussions with either

4    PREPA, our review of the individual proof

5    of claim, the advice of Proskauer or from

6    Diaz & Vazquez as it relates to the legal

7    nature of the -- or the viability -- not

8    the viability, but the ability to assert

9    the claim.  So that's what we would look

10   at in coming up with a low estimate.

11               So that's what we believe is

12   the appropriate value of a claim, taking

13   into account those things.  But we know

14   that the asserted amount is oftentimes

15   much higher.  And to the extent that

16   there is uncertainties with regard to

17   what the ultimate outcome would be if

18   this were to move into -- or to be

19   resolved via litigation, that's the type

20   of modifications that we were made to

21   come up with an adjusted estimated value

22   is.  So it's really to provide some

23   cushion about what our low estimate would

24   be to ensure that there's sufficient

25   cushion in estimating what the general

Page 109

1                    MARK SHANKWEILER

2    unsecured claims would be.

3         Q         So would it be fair to say

4    that the low estimate reflects a value in

5    which there are no uncertainties about

6    the validity or invalidity of a claim

7    based on the assumptions that PREPA's

8    other advisors have given you?

9                    MS. STAFFORD:   Objection,

10       form.

11        A         I think it would reflect

12   what -- a collective view in the more

13   complex proofs of claims, what the

14   expected amount of a defensible low value

15   would be.

16        Q         And then on the other end of

17   the spectrum, the high estimated value --

18        A         Right.

19        Q         -- how does that differ from

20   the adjusted estimated value?

21        A         So the high estimated value,

22   certain -- would represent -- could

23   represent, to the extent that we have

24   received a proof of claim that asserts a

25   certain value, or if we would receive

Page 110

1                    MARK SHANKWEILER

2    information from PREPA that calculated a

3    particular claim or a group of claims

4    that upon our review, we felt was not

5    necessarily appropriate or we felt that

6    it was either duplicative or included

7    certain claims that based on our

8    discussions with counsel were not

9    necessarily valid.  So those would

10   include those types of claims.  So we

11   would adjust down from the estimated high

12   value based on those types of carve-outs

13   that we would have.

14        Q        I want to talk about the

15   PPOA claims a little bit more.

16        A        Sure.

17        Q        Now, you and Mr. Despins

18   discussed that the claims kind of fall

19   into two categories:  Claims for lost

20   profits and claims for developmental

21   costs; is that fair?

22        A        There were three categories.

23   They also include claims for damages.

24        Q        Okay.

25                 Now, I think that you said

Page 111

                    MARK SHANKWEILER
1
2    that you discussed whether claims for
3    lost profits would be valid under the
4    PPOAs with D&V?
5         A         As well as with Proskauer.
6         Q         Did you undertake a similar
7    assessment process with respect to the
8    developmental cost?
9         A         So for the developmental
10   costs, we looked at -- yes is the answer.
11   We underwent a similar process.
12        Q         And how did you assess the
13   validity of claims for developmental
14   costs?
15        A         So the first thing that we
16   did is -- well, one of the things that we
17   did, not the first thing, we reviewed the
18   proof of claim.  We identified what they
19   had asserted as development costs.  We
20   had specific conversations with the
21   project management office, with folks,
22   with employees of PREPA and/or LUMA who
23   were actually involved in the process.
24   And we -- we tried to get -- we got a
25   sense for what the nature of the project

Page 112

                        MARK SHANKWEILER

1

2    was, where it was in its development.

3                    But at the end of the day,

4    the development costs are not necessarily

5    something that PREPA would have a view on

6    because those development costs are

7    oftentimes captured in the revenues that

8    they would ultimately earn once they get

9    to a completed PPOA.

10       Q        What do you mean PREPA

11   wouldn't have a view on them?

12       A        Oftentimes, they don't --

13   well, they would have a view.  They don't

14   have any support in their offices to

15   support the claims, the development

16   portion of their claim.

17       Q        PREPA wouldn't have

18   documents or --

19       A        PREPA has not invoiced for

20   these development costs.  So that's --

21   that's part of the process.

22       Q        Would that mean that there's

23   not a basis to object to those claims,

24   the developmental cost claims?

25                    MS. STAFFORD:  Objection,

Page 113

                              MARK SHANKWEILER

1

2        legal conclusion.

3           A       No.  That doesn't mean that

4    there is a basis not to object to certain

5    development cost claims.

6           Q       What does it mean if PREPA

7    doesn't -- isn't invoiced for these

8    developmental costs?  What does that mean

9    for the claim estimation process?

10          A       For the claim estimation

11   process,, it means that -- it means that

12   the -- what we're doing as it relates to

13   the development costs itself is we're not

14   adjusting those, at least initially, in

15   coming up with what our estimated value

16   would be based on -- based on the results

17   of an arbitration that we understand

18   relates to a PPOA where they had actually

19   allowed development costs or they had --

20   they hadn't adjusted -- the arbitration

21   panel hadn't adjusted down the

22   development costs.

23                   So when it comes to the

24   actual reconciliation of the development

25   costs, it still needs to be reconciled.

Page 114

MARK SHANKWEILER

1

2    But for purposes of coming up with an

3    adjusted estimated value, the process

4    would have to be to essentially validate

5    and get additional information from those

6    claimants to substantiate.  While they

7    include those in the proof of claim, they

8    haven't been necessarily validated by

9    PREPA.

10        Q       So are some of the

11   development costs -- let me rephrase

12   that.

13               Is the value of some of the

14   development cost claims subject to

15   arbitrations that are ongoing?

16        A       Could you repeat that?

17        Q       Is the value of some of the

18   development cost claims subject to

19   arbitrations that are ongoing?

20        A       I'm not aware of any

21   arbitrations that are currently ongoing.

22        Q       Now, you said you needed

23   additional information for the estimation

24   process for these developmental costs.

25               What type of additional

Page 115

                    MARK SHANKWEILER

1

2   information?

3        A        The way we identified the

4   development costs are just based on lists

5   that they have in the proof of claim or

6   what they had designated which really

7   doesn't have any support.  So the types

8   of support that you would expect to get

9   at that point would be invoices.  It

10  would be hours worked.  It would be

11  essentially the detail that supports

12  those development costs and whether or

13  not -- and we would have to -- we would

14  have to work with PREPA and/or LUMA's

15  office to make sure that those are in

16  line with what their understanding is.

17       Q        Now, just going to line 1 on

18  Depo Exhibit 4, the asserted PPOA claim

19  is -- it's about 2.8 billion; correct?

20       A        Yes.

21       Q        How much of that 2.8 billion

22  is attributable to development costs?

23       A        I'd have to review it.  But

24  it's not substantial.  It could be -- it

25  could be maybe $100 million, is my

Page 116

1                    MARK SHANKWEILER

2    recollection if I go back.  And there was

3    one -- there was one claim that asserted

4    close to -- I would say it's close to

5    $85 million in development costs.  But

6    those were really development fee costs.

7    So that's -- that's probably around

8    between, you know, around, give or take,

9    10 million.  It's maybe $100 million.  I

10   think so.

11        Q        So less than 10 percent?

12        A        I'd say that $100 million is

13   less.  But that's based on my

14   recollection.  I'm trying to remember

15   what it truly was.

16        Q        In terms of a percentage,

17   how far along in the process of

18   reconciling all the development cost

19   claims are you?

20        A        So because there are no

21   records at PREPA as it relates to these

22   costs, we can't reconcile those to the

23   company's books and records.

24        Q        Now, I want to talk about

25   the UTIER claim just a little bit more.

1                    MARK SHANKWEILER

2                    When you were first

3    assessing the claim, you determined that

4    there was insufficient documentation to

5    support the claim?

6         A         Yes.

7         Q         Was that a determination

8    that BRG made, that there was

9    insufficient documentation?

10        A         I think it was everyone's

11   assessment that there was insufficient

12   documentation.  So that was not solely

13   BRG.  That was Diaz & Vazquez, it was

14   Proskauer, it was PREPA.

15        Q         And we talked a little bit

16   about this earlier.

17                  But documentation was

18   eventually provided; right?

19        A         Documentation was provided.

20        Q         But that documentation

21   didn't provide much information in terms

22   of value of the claim; right?

23        A         Correct.  No value was

24   ascribed to any of the -- or to, you

25   know -- it may have it, but the vast

Page 118

1                    MARK SHANKWEILER

2    majority, 99 percent, my understanding is

3    zero value was ascribed to the support

4    that had been provided by UTIER.

5         Q         How did you go about putting

6    a value on these claims without that

7    support?

8         A         So, again, the process by

9    which a grievance claim is filed, my

10   understanding, based on discussions with

11   PREPA's labor relations and arbitration

12   office, is that UTIER claims that are

13   filed, grievance claims that are filed

14   never come with value, any value

15   ascribed.  It's the responsibility of

16   PREPA's arbitration office, essentially,

17   to review the claim and review their

18   records to come up with what the value of

19   that claim is, what the value of that

20   particular grievance claim would be.  And

21   that could include looking at employee

22   records, you know, whatever the claim is.

23   It's looking at whatever records they

24   have in their systems to substantiate the

25   value of that grievance claim and come to

Page 119

                              MARK SHANKWEILER

1       a settlement with regard to the value of

2       that claim with UTIER.

3                      So the value that we have

4       here represents a detailed analysis by

5       PREPA's employees who had been involved

6       with -- in the arbitration office for the

7       past two decades and going through that

8       process of assigning a specific value to

9       a claim that was provided to PREPA's

10      arbitration office and coming up with

11      that value based on the information that

12      was available to PREPA.

13          Q       Do you have an understanding

14      of how PREPA's labor relations office

15      came up with values for these claims

16      based on the documents that they had?

17          A       I have an overall

18      understanding.

19          Q       What is that understanding?

20          A       Again, to the extent that

21      they would have, as an example, a salary

22      or a vacation, a claim for lost vacation,

23      they would be able to go through and

24      determine what the hours or what the

Page 120

1                    MARK SHANKWEILER
2    salary level would be, determine whether
3    or not that employee took the vacations,
4    they would go through the HR records in
5    order to come up with a value of that.
6    And they would -- that's the way they
7    came up with the value for a particular
8    claim.
9                    To the extent that it was
10   for, you know, overtime work, it would be
11   a similar sort of -- a similar sort of
12   process.  The company would go out and
13   look at what the claim was, go into the
14   records and determine whether or not the
15   grievance claim was a valid grievance
16   claim and be able to answer UTIER with
17   regard to whether or not it was a valid
18   UTIER claim.  So that's an example.
19       Q       Now, some of these claims,
20   for instance, unpaid overtime or I think
21   there's mention in the disclosure
22   statement of unpaid Christmas bonuses,
23   calculating these claims sounds
24   mechanical; is that a fair term?
25       A       I think that's a fair term,

Page 121

1                    MARK SHANKWEILER

2    yes.

3         Q        Are any of the grievance

4    claims less mechanical to calculate?

5         A        Yes.

6         Q        Do you have any examples of

7    what those claims would be?

8         A        So yes.  It's oftentimes

9    what they call an outsourcing claim or a

10   proper unit invasion claim, whereby an

11   UTIER member might be able to assert a

12   claim because PREPA retained in an

13   emergency situation somebody to come in

14   and fix a transformer that blew up, or

15   they could have had somebody who didn't

16   have necessarily -- if they needed to

17   have services performed by an outside

18   third-party, if they didn't feel that

19   the -- or they didn't have the right

20   PREPA -- or UTIER employees to perform

21   that particular service.

22                  So in that instance, they

23   would have to determine whether or not

24   that service is actually performed and my

25   understanding is then go and look at the

Page 122

1                    MARK SHANKWEILER

2   associated records, what they were

3   actually paid to that third-party.  And

4   that involved not -- it involved numerous

5   departments within PREPA to come up with

6   what estimate would be.  So that's an

7   example of it's not just a mechanical,

8   this is what we paid you, this is what we

9   should have paid you pursuant to a

10  particular formula.

11       Q       So those claims would be

12  estimated by PREPA -- and I guess I'll

13  term it -- a collaborative process where

14  the labor relations office would talk to

15  different departments of PREPA to

16  determine how much one of the UTIER

17  employees would have been paid for doing

18  a job that was outsourced?  Am I getting

19  that right?

20       A       So internally, it was a

21  collaborative process, oftentimes between

22  legal, between distribution, between the

23  finance department.

24                And in order to come up with

25  what a potential value of what a

```
 1                    MARK SHANKWEILER
 2   potential particular claim would be,
 3   that's what the arbitration would have to
 4   do, is they would have to go out and
 5   gather the information to come up with
 6   what an assessed value of what a
 7   particular grievance claim would be.
 8        Q        And now at BRG, you would
 9   rely on that value in estimating a value
10   for the grievance claim; is that right?
11        A        So ultimately, yes.  That's
12   the ultimate answer.  We would have to
13   rely on the employees of PREPA who had
14   been involved in doing this over the past
15   two decades and had the experience of
16   that in coming up with a particular value
17   of what that grievance came would be,
18   yes.
19        Q        Would BRG or another PREPA
20   advisor perform any sort of independent
21   assessment of that value?
22        A        Yes.
23        Q        How would they perform an
24   independent assessment?
25        A        So Diaz & Vazquez was
```

Page 124

1                    MARK SHANKWEILER
2    intricately involved in the process.  And
3    so they were assisting PREPA employees in
4    just not necessarily capturing the actual
5    dollar values of those large or more
6    complex ones, but they were on the ground
7    in San Juan in PREPA's offices a day or
8    two, a week, whatever, and they would
9    review the process by which PREPA went
10   through.  I'm not sure if it was
11   everyone, but they provided -- they
12   provided oversight because as I may have
13   mentioned earlier, PREPA did retain or as
14   part of the retention of Diaz & Vazquez,
15   that was part of their charge, to help
16   resolve the UTIER claims.
17              So there was -- I know that
18   Diaz & Vazquez employees did go through,
19   evaluate the claims that were provided,
20   make sure that they agreed with the CBA
21   provisions, that they were valid claims
22   under the CBA provisions.  So it was a
23   concern.  It was a collaborative approach
24   to come up with what these claims should
25   be and the value of these claims should

Page 125

1                    MARK SHANKWEILER

2    be.

3         Q        Just going back to

4    Exhibit 4, the estimate table, the

5    estimated high value there is about

6    264 million?

7         A        Yes.

8         Q        What sort of uncertainties

9    is I think the word you've been using,

10   went into the high value of the grievance

11   claim?

12        A        So the grievance claims,

13   this actually represents -- there's

14   various components of the UTIER grievance

15   claims.  And what I was talking about was

16   only one -- I guess one section or one

17   group of the claims that Diaz & Vazquez

18   and PREPA was involved in evaluating.

19   There's another group of claims for the

20   UTIER group, which were essentially

21   developed by third-parties or by PREPA's

22   financial group, more the -- more what

23   you call the mechanical sort of -- the

24   mechanical sort of calculation of A minus

25   B equals C.  So the high value here

Page 126

MARK SHANKWEILER

1
2  includes certain claims or components of
3  claims that were -- well, let me step
4  back.
5          So the third-party claims or
6  the claims that were developed by PREPA,
7  which were the less complex ones, include
8  vacation license claims.  They include
9  reemployment claims.  They include what
10 we call the Christmas bonus claims and
11 what they call Hiato, those types of
12 claims.  And each one of those claims was
13 developed by either a third-party in the
14 case of the vacation license claims
15 and/or PREPA.  And the claims that they
16 developed were necessary for purposes of
17 disclosure purposes for the financial
18 reporting purposes in their audited
19 financial statements.  And so we -- part
20 of this $264 million represents the
21 analysis that were performed by the
22 non-arbitration portion of PREPA, as well
23 as third-parties who were involved in
24 estimating these claims for financial
25 reporting purposes.

```
                                              Page 127

 1                    MARK SHANKWEILER

 2        Q        When you say there were

 3   third-parties involved, you gave the

 4   example of the vacation license claims?

 5        A        Yes.

 6        Q        Are you referring to Diaz &

 7   Vazquez?

 8        A        No.

 9        Q        Or some other third-party?

10        A        No.  It would be another

11   third-party.

12        Q        Could you give an example of

13   who that third-party would be?

14        A        I believe it was Ankura.  I

15   think they're the ones who did the

16   vacation license analysis.

17        Q        So another PREPA advisor

18   professional?

19        A        I believe they were

20   retained, yes, by PREPA.

21        Q        I'd like to talk about the

22   UTICE litigation claim, if I could.

23        A        Sure.

24        Q        Now, that claim, there's an

25   asserted value of 225 million?
```

Page 128

                    MARK SHANKWEILER

1

2        A        Yes.

3        Q        Now, UTICE has a judgment

4    against PREPA already; is that right?

5        A        I don't know how to legally

6    define it.  But my understanding is that

7    an arbitration -- whether it was an

8    arbitration panel or a court, had found

9    that PREPA should have instructed

10   UTICE -- the UTICE union that it was

11   changing their health plan and secured

12   their approval and that because they

13   didn't secure the approval, it resulted

14   in a foot fault on the CBA.  And that's

15   what gave rise to the

16   $224.9 million claim.

17       Q        That 224.9 million dollars,

18   PREPA has not been ordered to pay that to

19   UTICE, have they?

20       A        No; in fact, my

21   understanding of the arbitration is that

22   PREPA was responsible for paying the

23   difference between what the UTICE member

24   otherwise would have paid under the old

25   plan and had to pay under the new manner.

Page 129

1                    MARK SHANKWEILER

2      Q       I think the disclosure

3   statement refers to that as compensating

4   the employees for a loss of benefits.

5   Does that sound familiar?

6      A       Yes.

7      Q       PREPA's position is that

8   this claim should be worth zero.  Does

9   that sound right?

10                 MS. STAFFORD:  Objection,

11      form.

12      A       I think that -- I don't know

13   the answer to when you say PREPA.

14      Q       If we could just go back to

15   Exhibit 4, the UTICE litigation is on

16   line 5, estimated low value is zero.

17      A       Yes.

18      Q       What went into that

19   estimation?

20                 (Zoom distraction).

21      Q       What went into that

22   estimation, that estimation referring to

23   Exhibit 4, line 5, estimated low value of

24   zero?

25      A       So it was really, again,

Page 130

                    MARK SHANKWEILER

1

2    based on our review, what we had

3    attempted to do is we did reach out to

4    UTICE to say, hey, listen, you know,

5    there's no way that we can at PREPA

6    evaluate what the lost benefits or what

7    you might have paid related to the

8    certain health care benefits that you

9    otherwise would have received, without

10   having some sort of support from the

11   actual UTICE members.  And without that

12   support since nobody provided any

13   support, we ascribed a value of zero on

14   the low side.

15        Q        And then on the high side of

16   line 5, it's the full value of the

17   asserted claim, 224.9 million?

18        A        Yup.

19        Q        How do you get to that as

20   being the high value?

21        A        I think we just included as

22   an estimate of what the high value would

23   be because it was asserted.

24        Q        Do you have any sense of the

25   likelihood that that claim will

Page 131

MARK SHANKWEILER

1

2   ultimately be allowed in that amount,

3   224.9 million?

4        A       Well, I'm not an attorney.

5   But if I had to put my money on it, I

6   would bet that it would not be ever

7   allowed, $225 million, because there's no

8   basis for that claim.  And at that value

9   was really essentially -- it was

10   essentially --

11               (Zoom distraction)

12        A       Could you start back again?

13        Q       Yes.

14               The last question was, do

15   you have any sense of the likelihood that

16   the claim will ultimately be allowed in

17   that amount, 224.$9 million?

18        A       Yeah.  And I think my answer

19   was that based on the support that they

20   provided for that claim, I think it would

21   be highly unlikely.  But I'm not an

22   attorney.  So I don't have a legal view

23   of that.

24               And I think what I was

25   saying that if you go to the actual proof

Page 132

                    MARK SHANKWEILER

1  of claim, this claim essentially

2  represents the savings that PREPA enjoyed

3  when they switched from one plan to

4  another plan.  So that's the -- my

5  personal opinion.

6       Q       And I think before the

7  distraction, you said that there's no

8  basis for that claim being 2 --

9  approximately $225 million?

10      A       Well, there is a basis.  But

11  whether it's a valid basis or not, we

12  would argue that there is no -- that

13  amount is not -- it's not a valid basis

14  for a claim against PREPA.

15      Q       The adjusted estimated value

16  that you came up with is $11.2 million?

17      A       Yes.

18      Q       What went into that

19  $11.2 million estimation?

20      A       So what we did is we worked

21  with PREPA and their advisors to get

22  support, any support that might be

23  available to come up with what a

24  potential claim might be.  One of

Page 133

1                    MARK SHANKWEILER

2    those -- one of the obvious questions,

3    well, how many UTICE employees were there

4    in the 2008, 2009 time frame?  And the

5    answer was that there were about 500

6    employees.  And we then, based on the

7    information that had been provided to us,

8    evaluate the changes in the plan and

9    understand the potential magnitude.  Just

10   based on without looking at numbers,

11   because we didn't have any numbers to

12   look at, but we did have a comparison of

13   the -- of the health benefit provisions

14   or components, we then decided to, well,

15   if there is -- if there are claims that

16   could potentially come in from all 500 of

17   these employees, what would that

18   amount -- what would be a reasonable

19   amount to include in the plan as a

20   potential cushion for these types of

21   claims.

22                    So we looked at I think the

23   $11 million here that's included is --

24   translates into about 22 or $23,000 per

25   employee or per UTICE member.  And so we

Page 134

MARK SHANKWEILER

1
2      felt that that was, you know, sufficient
3      cushion to provide for any claim amount
4      that might arise from any UTICE member
5      who would assert this.
6                    But, again, when we asked
7      for specifics and for support for the
8      $224.9 million claim or any claim, they
9      didn't provide any estimates.  So that's
10     what we did to make sure that we had a
11     cushion.
12          Q       I want to talk about the
13     PREPA employee claims.
14          A       Yes.
15          Q       On Exhibit 4, that's line 6
16     with the asserted value of
17     14.834 million.
18          A       Yes.
19          Q       Now, what kind of claims are
20     these?
21          A       There's a bunch of different
22     categories of claims that are included in
23     this number.  Among other things, it
24     would be managerial sort of complaints.
25     It would include certain Christmas

Page 135

```
 1                    MARK SHANKWEILER
 2   bonuses.  It would include vacation
 3   license type of claims.  It would include
 4   promotional sort of issues.  Those are
 5   the types of claims that are included.
 6        Q        Are these claims duplicative
 7   of the UTICE claims?
 8        A        We did an analysis to see if
 9   there were any duplicative claims.  We
10   didn't identify any duplicative claims or
11   maybe 50, less than 50.  And I think we
12   would have at least identified those for
13   objection, if we haven't objected to
14   them.  But, again, it's very few.
15        Q        What percentage of the total
16   amount of employee claims would that 50
17   be?
18        A        I think it would be less
19   than 1 percent.
20        Q        The adjusted estimated value
21   of these employee claims is, it's about
22   $9 million, a little less than
23   $9 million; is that right?
24        A        Yes.
25        Q        How did you get to
```

Page 136

1                     MARK SHANKWEILER

2      estimating these claims at $9 million?

3           A        In this instance, it looks

4      as though due to uncertainties with

5      ultimately how some of these claims might

6      be resolved, we -- looks like we took a

7      midpoint between the low and the high

8      estimates.

9           Q        What went into ascribing

10     value to these claims?

11                   MS. STAFFORD:  Objection,

12          form.

13          A        So on the low end of the --

14     on the low end of the -- on the estimated

15     low value, we would have included what

16     the asserted amount of particular claims

17     are for a small subset of the total -- of

18     all the employee categories that are up

19     at the 14.8 million.  And the analysis --

20     those claims are really based on what

21     their -- for any claims that have been

22     asserted, which we haven't identified for

23     objection, which employee claims could be

24     objected to for certain reasons such as

25     if there's Puerto Rican laws that would

Page 137

1                    MARK SHANKWEILER

2  prohibit the payment of certain vacation

3  licenses or Christmas bonuses or things

4  like that.

5                    So when we looked at the

6  actual claims, at least for the low

7  amount here, the $2.5 million, is we're

8  including the asserted amount until

9  further analysis can be done by the HR

10  department to determine whether that's

11  actually going to be a valid claim.  But

12  that's the general nature of that.  And

13  it's pretty -- doesn't really impact the

14  overall bucket of claim value in any

15  event.

16      Q       I'd like to switch topics

17  just a little bit.

18                    I'd like to discuss the

19  inverse condemnation and eminent domain

20  claims that the plan provides for.  Are

21  you familiar with that estimation?

22      A       I am.

23      Q       Now, the disclosure

24  statement lists the estimated allowed

25  claim at $2.4 million.

Page 138

1                    MARK SHANKWEILER

2        A        Okay.

3        Q        Does that sound right?

4        A        I believe that was included

5    in the section of the claims estimation

6    and the disclosure statement.  It sounds

7    about right.

8        Q        Were you or was BRG involved

9    in that estimation?

10       A        Yes.

11       Q        How many claims comprise the

12   inverse condemnation, eminent domain

13   class of claims?

14       A        So the actual proofs of

15   claims that were filed that were

16   categorized as expropriation and inverse

17   condemnation claims were approximately 20

18   claims.

19       Q        What was the aggregate

20   asserted value of those claims, ballpark?

21       A        I think that would be about

22   the $20 million.

23       Q        So how was the

24   $2.4 million number reached?

25       A        So when we started our

Page 139

MARK SHANKWEILER

1
2    analysis of these expropriation claims,
3    we worked with Diaz & Vazquez to get
4    insights as to the types of -- what the
5    claims are, what they're comprised of and
6    what the -- again, what are the
7    components of the claim, what Puerto Rico
8    Law would really view as a valid
9    expropriation claim and trying to
10   understand how to come up with a true
11   value of what these claims might be.
12        Q        Similar to the general
13   unsecured claims, did you come up with an
14   estimated low value and an estimated high
15   value?
16        A        I think what we did here is
17   we worked with Diaz & Vazquez, again to
18   understand the components of the claim as
19   an example.  Certain of the claims can be
20   divided into, let's call it, true takings
21   claim and then damages associated with
22   the takings claim.  In certain
23   circumstances, the claims themselves were
24   what I'll call -- this is a term I
25   learned -- was extrajudicial claims which

Page 140

                         MARK SHANKWEILER

1

2    means that they weren't filed in the

3    expropriation court.  So the low value

4    here, based on -- based on our work with

5    Diaz & Vazquez, based on there looking at

6    the actual files and identifying whether

7    or not that was a true takings claim,

8    they -- that's how we came up with what

9    the -- that $2 million value was at the

10   time that we were evaluating that, what

11   we had isolated in those claims, in the

12   documents that Diaz & Vazquez looked at

13   for us.  That's what the true taking

14   claim portion was.

15                  Then for the other claims or

16   for up to the $20 million, that would

17   have been claims that were asserted in

18   their proof of claim that weren't

19   necessarily substantiated through a true

20   taking claim and were subject to dispute.

21        Q        The plan also provides for

22   the payment of federal claims?

23        A        It does.

24        Q        Was BRG involved in

25   estimating the amount of federal claims

```
 1                    MARK SHANKWEILER
 2   asserted against PREPA?
 3        A         BRG was involved in
 4   evaluating the claims and speaking with
 5   attorneys who are involved in reviewing
 6   those claims and potentially litigating,
 7   disputing those claims.
 8        Q         Do you know what the
 9   aggregate total asserted amount of
10   federal claims against PREPA is?
11        A         If I can refer to this, I
12   believe it was -- where is it?  I think
13   it's around 16 million.  I've just got to
14   look at it.  Oh.  It's not here because
15   it's not a general unsecured claim.  My
16   recollection, if we go to the disclosure
17   statement, I think it was around 16 to
18   $17 million, is my recollection.
19        Q         And in the disclosure
20   statement, I'll just represent that the
21   estimated allowed claim is $16.8 million.
22        A         Very close.
23        Q         Now, what types of claims
24   are in the federal claims class?
25        A         So these are three proofs of
```

1                    MARK SHANKWEILER

2    claim that were filed by the IRS.  And

3    the IRS filed these claims related to

4    certain payments that they made on

5    certain bond series that they were

6    responsible for paying a portion of the

7    interest.  And I think it was Build

8    America bonds or something like that.  I

9    can't remember the specific name of it.

10   But it represents payments that were made

11   by the IRS associated with certain bond

12   series.

13        Q       Are you aware of whether

14   these three proofs of claim by the IRS

15   are entitled to be paid in full?

16                MS. STAFFORD:  Objection,

17      legal conclusion.

18        A       I don't know the answer to

19   whether or not they're entitled to be

20   paid in full.

21        Q       Fair enough.

22                Do you know if any of these

23   federal claims are disputed?

24        A       My understanding is that

25   they are disputed, similar to -- just

Page 143

                        MARK SHANKWEILER

1

2      like the similar claims that have been

3      filed in other Title III entities.

4          Q        So the $16.8 million, that's

5      the estimated allowed claim.

6                   Do you anticipate that that

7      is the amount that will ultimately be

8      allowed on account of these federal

9      claims?

10         A        I don't know what the

11     ultimate allowed amount will be.

12         Q        Are there any uncertainties

13     associated with these federal claims like

14     we have talked about with other classes

15     of claims?

16         A        I know what the asserted

17     amount was.  I think it's pretty

18     specific.  I know that there's a process

19     that is ongoing with -- and I don't

20     recall which law firm it is -- in

21     negotiating with the IRS to resolve this

22     claim.

23         Q        Just give me one moment.

24     And hopefully, I'll be almost done soon.

25                   Are you aware of who the

Page 144

1                    MARK SHANKWEILER

2    fuel line lenders are?

3        A        Generally, yes.

4        Q        Who are they?

5        A        Well, they're a group of

6    claimants who provided loans to PREPA for

7    the purchase of fuel.

8        Q        Do you know how they're

9    classified under the proposed plan of

10   adjustment?

11       A        I know they're not general

12   unsecured claims.  I don't recall whether

13   they're secured claims or priority

14   claims.  I just can't recall.  So they're

15   either secured or priority, but I know

16   they're not general unsecured claims.

17       Q        Do you know why they're not

18   general unsecured claims?

19                MS. STAFFORD:  Objection,

20       legal conclusion.

21       A        I know that there was a

22   negotiation and a settlement reached.  I

23   don't know why specifically, they're not

24   determined to be unsecured claims.  But I

25   know that -- well, I believe that they've

Page 145

1                    MARK SHANKWEILER

2     always asserted that they were a secured

3     claim.

4          Q        Did BRG ever perform an

5     estimation of the fuel line lenders'

6     claims?

7          A        I know we looked at the fuel

8     line lenders' claims and looked at what

9     their asserted claim was.  But whether we

10    provided an estimation of that or not, I

11    think we looked at it and understand what

12    their claims were.  So I think their

13    asserted claims were based on the moneys

14    that they had actually advanced.

15         Q        Do you recall if the fuel

16    line lenders' claims was a current

17    expense claim?

18                   MS. STAFFORD:  Objection,

19         legal conclusion.

20         A        I believe they were one of

21    the only claimants that actually asserted

22    a current expense claim, if I remember

23    correctly.

24                   MR. KELLY:  Can we go off

25         the record?

Page 146

1                    MARK SHANKWEILER

2                    THE VIDEOGRAPHER:  Off the

3          record at 12:54.  This marks the end

4          of Media Unit No. 2.

5                    (A lunch recess was taken.)

6                    THE VIDEOGRAPHER:  We are on

7          the record at 13:46.  This begins

8          Media Unit No. 3.  Please proceed.

9          Q       Mr. Shankweiler, before we

10   went off the record for lunch, we were

11   talking a little bit about the fuel line

12   lenders.  Do you recall that?

13         A       I do.

14         Q       I had asked if PREPA or the

15   board or Proskauer had ever asked you to

16   assess the fuel line lenders' claim.

17         A       Yes.  I recall that

18   question.

19         Q       You said that we looked at

20   it and understand what their claims were.

21                 What do you mean you looked

22   at the fuel line lenders' claims?

23         A       Well, I know that they

24   asserted a claim for approximately

25   $700 million which my understanding is

1                    MARK SHANKWEILER

2    the principal amount of it.  We looked at

3    the interest.  I believe that was

4    included.  And so we looked at the

5    documents and were able to confirm the

6    amount or to calculate the amount of the

7    claim that they had asserted based on

8    those documents.

9         Q       Were the fuel line lenders'

10   claims included in your estimation of the

11   general unsecured claims asserted against

12   PREPA?

13        A       I don't recall if they were

14   specifically included in general

15   unsecured claims.  I don't recall.  I

16   just know that they're not there now.  So

17   they may have been at one time.  But I

18   don't recall.

19        Q       Were the fuel line lenders'

20   claims ever included in a draft of

21   Deposition Exhibit 4 that's Exhibit O to

22   the disclosure statement?

23        A       I don't recall.

24        Q       Now, before we went off the

25   record, you said that the fuel line

Page 148

                         MARK SHANKWEILER

1

2    lenders were the only parties to assert

3    current expense claims.

4        A        Based on my understanding

5    and our review.

6        Q        So you're saying that you're

7    not aware of any other creditors of PREPA

8    that have asserted they hold current

9    expense claims?

10       A        We reviewed the proofs of

11   claim that were filed.  We reviewed the

12   supplemental disclosures or the

13   supplemental exhibits that were filed

14   along with the proof of claims.  And we

15   didn't identify any other claimants that

16   had actually asserted a current expense

17   claim, other than the fuel line lenders.

18       Q        So to the best of your

19   knowledge, there have been no other

20   current expense claims asserted against

21   PREPA?

22       A        To the best of my knowledge.

23       Q        Has BRG undertaken any

24   analysis to determine if there will be

25   current expense claims asserted in the

Page 149

                         MARK SHANKWEILER

1

2    future?

3                   MS. STAFFORD:   Objection,

4        legal conclusion.

5        A       We weren't asked to do that

6    analysis.

7        Q       And at the beginning of your

8    deposition, Mr. Despins explained that

9    you were also the board's 30(b)(6)

10   designee.  Do you recall that?

11       A       Yes.

12       Q       I just want to stop and note

13   for the record that the bondholder

14   parties didn't receive notice that you

15   had been designated as the board's

16   30(b)(6).

17                But as the board's 30(b)(6),

18   are you aware of the board conducting any

19   analysis to determine whether additional

20   current expense claims will be asserted

21   against PREPA?

22       A       I'm not aware of any

23   analysis that has been conducted.

24       Q       Are you aware of any claims

25   against PREPA that have been asserted by

Page 150

1                    MARK SHANKWEILER

2    other governmental entities?

3        A        Yes.

4        Q        And let me specify.

5    Government entities of Puerto Rico.

6        A        I assume that's what you

7    meant, yes, is the answer.

8        Q        I was clarifying for my

9    mistake of not clarifying, but thank you.

10       A        I trusted you.

11       Q        Do you know the aggregate

12   amount of those claims?

13       A        So the aggregate amount of

14   the other governmental claims, they have

15   I believe -- if I can refer to --

16       Q        Yeah.  I'm not sure it's on

17   there.  But take a look.

18       A        It's probably not, no.  It's

19   not.

20       Q        Just a ballpark is fine.

21       A        So I know that there were

22   six claims that were filed by

23   municipalities, which I considered a

24   government agency, only because it's a

25   municipality.  And my recollection is

Page 151

1                    MARK SHANKWEILER

2     that those claims that were filed, those

3     were CILT claims.  The CILT claims that

4     were asserted by these six were -- my

5     recollection is maybe in the $150 million

6     range, if not more.  But the other

7     governmental agency claim that was filed

8     against PREPA was filed by PRASA.  And

9     that claim relates to a certain claims

10    for -- it's their water company.

11                  So there were certain claims

12    that were raised related to the amounts

13    that PREPA owed them under a water

14    contract, or to the best of my knowledge,

15    that's what it was related to.

16        Q        So to the best of your

17    knowledge, there's about 150 million in

18    CILT claims, plus the PRASA claim?

19        A        Yes.  That's the best of my

20    knowledge for the government claims.

21        Q        I won't hold you to any

22    numbers.

23        A        Thank you.

24        Q        Do you know if PREPA has

25    claims against any of these entities, the

1                    MARK SHANKWEILER

2    CILT entities or PRASA?

3        A        My understanding is that on

4    PRASA claim, that there was -- there

5    was -- I don't know if it was a claim.

6    But there was a dispute with regard to

7    the level of claim that -- or whether

8    there could be potential of any offsets

9    to the claim that PRASA was asserting.

10       Q        You're not aware of any

11   similar offsets related to the CILT

12   claims?

13       A        As it relates to the CILT

14   claims, my understanding is that there

15   are -- essentially, it's really an offset

16   of obligations that PREPA would owe to

17   that municipality for taxes.  And they

18   would -- it was in lieu of the taxes they

19   would provide them with electricity.  And

20   so that's like an offset.  It's a claim

21   against, you know...

22                MR. KELLY:  Mr. Shankweiler,

23       I think that's it for me.  Thank you

24       for your time.  I'll pass the

25       witness.

Page 153

1                    MARK SHANKWEILER

2    EXAMINATION BY

3    MS. TOMIC:

4        Q       Good afternoon.  It's Jane

5    Tomic from Kramer.  Hi, Mr. Shankweiler.

6    I just have a couple of follow-up

7    questions from earlier today.  Mr. Kelly

8    was just talking about offsets.  So I'll

9    start there.

10                   Are you aware of any other

11   categories of claims or specific claims

12   that you looked at that would potentially

13   be paid through offsets?

14                   MS. STAFFORD:  Objection,

15       form.

16       A       So other than the process is

17   a claim, which I believe was reduced, and

18   the CILT claims, which my understanding

19   is that the current CILT claims, those

20   all represent post-petition obligations

21   in that there are no existing or

22   remaining pre-petition obligations

23   related to the CILT claims.  I'm not

24   aware of any other claims as I sit here

25   today that would be paid via offset.

Page 154

1                    MARK SHANKWEILER

2          Q        So switching gears a little

3     bit, earlier this morning, one of the

4     first things that you were asked about by

5     Mr. Despins was the PPOA claims and

6     specifically, the lost revenue component

7     of those claims?

8          A        Yes.

9          Q        And there was a discussion

10    about the validity of those claims.  And

11    I believe you gave two numbers.  My

12    understanding of your testimony was that

13    these were numbers that discounted the

14    estimate based on the likelihood of

15    success for litigation of the lost

16    revenue claims; is that correct?

17         A        I think you said it better

18    than I did, but yes.

19         Q        So those two numbers I

20    believe were a 30 percent number and a 0

21    number.  And if we could pull up

22    Exhibit 4, page 3, it might help a little

23    bit.

24                   So I just wanted to go back

25    and clarify what you meant by these two

Page 155

1                    MARK SHANKWEILER

2    numbers to make sure that it was clear on

3    the record.

4                    So you said -- I believe you

5    said on the low end, you applied a zero

6    for these, the lost revenue component.

7    So does that mean that on this chart, the

8    estimated value low for line 1, that

9    reflects zero for the claims for the lost

10   revenue component?

11       A       The $65.6 million number in

12   the low estimate, I believe that's

13   correct.  That would include zero dollars

14   for any lost revenue components of the

15   claim.

16       Q       And then you also talked

17   about 30 percent and said that we

18   provided a high amount or a higher amount

19   of 30 percent and referred to it as a

20   cushion.  And I just wanted to clarify.

21                    Is that 30 percent reflected

22   in the estimated value high column or the

23   adjusted estimated value column?

24       A       So that would have been

25   included in our high estimate, the

Page 156

                         MARK  SHANKWEILER
1
2    30 percent there as a high estimate of
3    what that claim would potentially be --
4    what a valid claim would be worth.
5         Q         So that would have been
6    30 percent of the total of those lost
7    revenue claims --
8         A         Correct.
9         Q         -- was included?
10        A         Yes.
11        Q         So effectively, it was
12   discounted?  The lost revenue component
13   was discounted 70 percent; is that
14   accurate?
15        A         Correct, in the highest
16   amount.
17        Q         In the highest amount, yes.
18                  And then what was that
19   number or what was the number used in the
20   adjusted estimated value for the lost
21   revenue component claim?
22        A         In that case, it would be
23   the midpoint for that particular portion
24   of those claims.
25        Q         So in between 0 and

Page 157

1                    MARK SHANKWEILER

2    30 percent?

3         A         In between 0 and 30 percent.

4              MS. STAFFORD:   I just want

5         to remind you to let her finish

6         asking the question before you start

7         answering.

8              THE WITNESS:   Noted.

9         Q         And then for any of these

10   other categories of claims, so we have

11   the -- on the exhibit, we have other

12   categories of the general unsecured

13   claims, and they're numbered 1 through

14   12.

15              And my question is, did you

16   apply any percent discount based on an

17   analysis of the validity of claims in a

18   similar way to what we just talked about

19   with the PPOA and lost revenues to any

20   other category of claim?

21              MS. STAFFORD:   Objection,

22        form.

23        A         So if you look at line 4,

24   litigation with Vitol, there were

25   approximately 200 litigation claims.  And

Page 158

1                    MARK SHANKWEILER

2      to the extent that we didn't provide a

3      specific value based on our review of the

4      values that were provided for those

5      claims by Diaz & Vazquez as they

6      evaluated them for either transfer to ADR

7      or for estimation of the claims or that

8      they simply hadn't gotten the files as

9      the time of this report to evaluate based

10     on our review -- based on our review, we

11     assigned a value, or we risk assessed

12     some of the litigation claims that hadn't

13     been specifically provided a value by

14     D&V.  We assigned a risk adjustment, so

15     that we would -- we reduced the claim by

16     90 percent to come up with a 10 percent

17     value for those remaining claims,

18     litigation claims.

19         Q       And how did you come up with

20     the 90 percent number?

21         A       There were a number of ways.

22     We looked at the types of litigation

23     claims.  We looked at what the

24     estimates -- what the ultimate settlement

25     amounts were based on the work that Diaz

Page 159

                          MARK SHANKWEILER

1

2    & Vazquez had done for similar claims and

3    in certain -- for certain claims, just

4    understanding the nature of the claim and

5    wanting to ensure that there were --

6    there was going to be sufficient cushion

7    in the estimate to the extent that these

8    claims, which hadn't been resolved yet,

9    were actually provided some value.

10       Q        So to clarify, you reduced

11   the claim by 90 percent to come up with a

12   10 percent value for the remaining

13   litigation claims.

14                When you're talking about

15   this reduction, are you talking about in

16   a specific column on this table where

17   that's reflected?  Was that across the

18   board in all three of these?

19       A        So, again, we have a list of

20   all the litigation claims.  And we

21   identify those, which were actually --

22   those actually came up with, that

23   settlement values were provided that --

24   the settlement values were transferred to

25   ADR estimates which were provided based

Page 160

                        MARK SHANKWEILER

1

2    on analysis performed by D&V and reviewed

3    by us.

4                So to the extent that there

5    were any remaining claims, we assigned a

6    value to those, and I think at the end of

7    the day, there may have been 35 to 40

8    claims that hadn't at this point been

9    provided a value.  And so for those --

10   for those -- when I say hadn't been

11   provided a value, they hadn't been

12   reviewed and memos prepared by D&V.  We

13   assigned a value for the adjusted

14   estimated value of 10 percent for

15   those -- that population of litigation

16   claims.

17       Q       Turning back just briefly to

18   the PPOA claims and the lost revenue

19   component, earlier today, you had

20   testified that in conversations with Diaz

21   & Vazquez, you were told that Puerto Rico

22   Law would not recognize the valid claim

23   for lost profits, and you also talked

24   about the PPOA contracts not permitting a

25   claim for lost profits in connection with

Page 161

                    MARK SHANKWEILER

1
2    the decision to discount the estimate
3    based on the likelihood of success in
4    litigation for the lost revenue
5    component.
6                    Were the specific
7    percentages -- were there specific
8    percentages given to you -- I guess how
9    were those percentage -- more
10   specifically, how were those
11   percentages -- how did you come up with
12   those percentages?
13                   MS. STAFFORD:  Objection,
14       form.
15      A        So, again, understanding and
16   the guidance I was provided by both Diaz
17   & Vazquez, as well as Proskauer, related
18   to that category of the claim or that
19   component of the claim, we used -- we
20   looked at what we felt a reasonable value
21   would be, so that 30 percent was
22   judgmental, and in reviewing the level --
23   just based on -- based on the information
24   that we had, we felt that a 30 percent --
25   a 30 percent risk factor would be

1                    MARK SHANKWEILER

2    appropriate based on the size of the

3    claims and based on our understanding

4    that these are not valid claims, either

5    contractually or in the court, in the

6    Puerto Rican courts, just to provide

7    sufficient cushion.

8         Q        And when you're saying we in

9    that answer, we made a judgment call, who

10   is the we you're referring to

11   specifically?

12        A        That was -- that was -- you

13   know, we came up with a value.  And it

14   was including the conversations,

15   including my team and included

16   conversations with Proskauer.

17        Q        So was the actual percentage

18   something that BRG came up with based on

19   the information and conversations or was

20   that percentage given to BRG?

21                 MS. STAFFORD:  Objection,

22      form.

23        A        I think it was a consensus

24   as to -- you know, we came up with a --

25   we came up with an estimate that we

Page 163

1                    MARK SHANKWEILER

2   thought was reasonable based on our

3   conversations.

4        Q        So to clarify, when you're

5   saying we there, you're referring to?

6        A        BRG.

7        Q        Not just BRG or just BRG?

8        A        Well, I think that would

9   have been the group, I mean the group,

10  the consensus that came up with regarding

11  a 30 percent value based on what we had

12  discussed before, the likelihood of

13  success in asserting a lost profits

14  claim, but yet wanting to be conservative

15  enough to ensure that since these may or

16  may not still be contested and disputed

17  in the event that a court would find that

18  it would be a valid claim or potentially

19  a valid claim for lost profits, that we

20  would have sufficient reserve in the

21  claim estimate amount to account for that

22  uncertainty.

23       Q        And you mentioned wanting to

24  be conservative.

25                So in your view, were those

Page 164

1                    MARK SHANKWEILER

2    percentages, the adjusted estimated

3    value -- sorry.

4                    In your view, was the

5    30 percent cushion that you described a

6    conservative cushion?

7        A        Without really -- I don't

8    know ultimately what a court would find

9    if these types of claims go into

10   litigation.  Whether it's conservative --

11   I don't know how to define conservative.

12   It's sort of like subjective; right?  I

13   thought it was an appropriate number to

14   provide a reserve for any uncertainties

15   related to what could potentially happen

16   in court.

17       Q        Can you describe a little

18   bit about how why you thought it was an

19   appropriate number?

20       A        One of the cases that we

21   reviewed when it comes to the PPOA that

22   had lost revenue components was a KDC

23   case, KDC, which had -- which was a

24   master PPOA that was in arbitration.  So

25   that informed our opinion.

Page 165

MARK SHANKWEILER

And the result of that
arbitration award, they disallowed -- the
award that was allowed in the
arbitration, this disallowed any claim
related to the lost profits portion of
the claim that KDC had against PREPA.  So
that's really -- that was the case that
we read.  And that case is actually filed
in -- against PREPA.

And based on our discussions
with the attorneys at PREPA, we felt that
was an appropriate level, not too high,
not too low, but it felt that would be a
sufficient cushion to allow for potential
adverse rulings.

Q        In connection with the
claims estimation work BRG was doing, was
BRG asked to discount any claims back to
present value?

A        Could you repeat the
question, please?

Q        So in connection with the
claims estimation work BRG was doing, was
BRG asked to discount any claims back to

Page 166

                         MARK SHANKWEILER

1

2    present value?  I could give you an

3    example of what I mean if it's not clear.

4         A         So I understand your

5    question.

6                    No.  We weren't asked to

7    present value any claims or present value

8    any of the claims.

9         Q         I'm going to ask a little

10   bit more specifically here too, just for

11   the record.

12                   So we were talking about

13   lost revenue, the lost revenue component

14   of the PPOA claims.  And it's my

15   understanding that those claims are

16   paid -- are like future payment claims.

17   Do you understand what I mean by that?

18                   MS. STAFFORD:  Objection to

19        form.

20        A         I do.

21        Q         And how would you describe

22   like a future payment claim, how I just

23   used it?

24                   MS. STAFFORD:  Objection,

25        form.

Page 167

1                    MARK SHANKWEILER

2      A        So when you -- when we

3   reviewed the proofs of claim that were

4   filed by the PPOA claimants, their lost

5   revenue portion of the claim oftentimes

6   included a schedule of what their

7   potential revenues would be as they go

8   out 20 or 25 years, whatever the initial

9   term of that contract would be.  And then

10  my recollection is that oftentimes, in

11  certain circumstances, the claim that was

12  provided, I believe they may have

13  discounted it back to present value.

14      Q        So when you say they may

15  have discounted back to present value,

16  who is the they?

17      A        So by they, I meant the

18  claimant.

19      Q        The claimant.

20               So on the actual proof of

21  claim that they submitted, that the

22  claimant submitted, you believe there may

23  have been present value discounts created

24  there?

25      A        My recollection is that

Page 168

1                    MARK SHANKWEILER

2    certain of the claims may have provided a

3    present value discount.

4         Q         And was that something that

5    was clearly evident from the proof of

6    claim, like it was stated on the proof of

7    claim that that was done?

8         A         I don't recall the specific

9    verbiage.  But if you were to analyze the

10   actual proof of claim and look at the

11   calculation of the lost profits, I

12   believe at least in one instance, there

13   was a calculation where they calculated a

14   present value of the future revenue

15   streams that they were expecting under

16   that contract.

17        Q         And did BRG conduct any

18   analysis to see how many of the lost

19   profit claims on the proof of claims

20   documents did that type of analysis?

21                  MS. STAFFORD:  Objection,

22        form.

23        A         I don't think we

24   specifically looked at that to like come

25   up with a number or what this number did.

1                    MARK SHANKWEILER

2    But in our review of the lost profits

3    component of the claim, my recollection

4    is that that is what they otherwise would

5    have employed, that technique or that

6    calculation.

7         Q        And if that calculation was

8    present on a proof of claim that was

9    submitted and BRG was analyzing, the

10   number that you then inputted into your

11   estimation for the lost revenue

12   component, did you use the value that was

13   discounted for present value or did you

14   use the claim before it was discounted

15   for present value?

16                  MS. STAFFORD:   Objection,

17       form.

18        A        So the amounts that were

19   asserted, we will have looked -- we

20   looked at the -- we would have looked at

21   or included in our analysis, the 0 to

22   30 percent of the lost profit claim that

23   they had asserted.

24        Q        So just to clarify to make

25   sure I'm understanding, so BRG didn't

Page 170

                              MARK SHANKWEILER

1

2    conduct any analysis to calculate or to

3    discount a lost revenue claim component

4    of the PPOA claims back to present value;

5    is that correct?

6                   MS. STAFFORD:  Objection,

7         form.

8         A       That's correct.

9         Q       And you testified that some

10   of the proof of claims that were

11   submitted had -- or at least one of the

12   proof of claims that was submitted had

13   done an analysis where the claimant had

14   calculated the value of the lost revenue

15   component back to present value?

16        A       That's my recollection, that

17   the claimant would have included a

18   present value calculation.

19        Q       And then when BRG was

20   looking at the total amount for the lost

21   revenue component of claims in the -- in

22   its estimation, my question that I'm not

23   sure I understood the answer to earlier

24   was -- and it definitely was my fault for

25   not asking clearly -- is, would BRG have

Page 171

1                    MARK SHANKWEILER

2    or do you remember if BRG would have used

3    the proof of claims calculation that

4    discounted for present value in its -- in

5    BRG's estimation?

6                    MS. STAFFORD:  Objection,

7        form.

8        A        Yes.  We would have used the

9    discounted value, so long as that is a

10   component of the total asserted value,

11   yes.

12       Q        And you remember

13   specifically, there was just one proof of

14   claim, a discount of that nature that

15   discounted back to present value?

16                   MS. STAFFORD:  Objection to

17       form, asked and answered.

18       A        I believe so.  I mean I

19   think there may have been more.  But I

20   just can't recall the exact.  Going back,

21   you know, when we initially looked at

22   these, my recollection is that they did

23   oftentimes have those -- have those

24   discounted future cash flows in deriving

25   the number.  I just can't remember

Page 172

MARK SHANKWEILER

1

2    specifically, you know, which ones.

3        Q        Do you believe that it was

4    reasonable to not discount the lost

5    revenue claims back to present value?

6            MS. STAFFORD:  Objection,

7        form.

8        A        So yes.  In any claims

9    estimation as of the current day, you

10   would not be able to, you know, assume --

11   you would have to discount any -- you

12   would have to discount it back for

13   reasonable value of the claim.

14       Q        So you said an estimation of

15   the current day, you would not be able to

16   assume, you would have to discount it

17   back for reasonable value of the claim.

18            Do you know why in this

19   case, you didn't or BRG didn't discount

20   for present value with respect to the

21   lost profit component of the PPOA claims?

22            MS. STAFFORD:  Objection to

23        form.

24       A        So our -- there's no

25   specific reason.  I think, as I sit here

Page 173

1                        MARK SHANKWEILER

2      today, that the claims are -- our view is

3      that the, you know, claims based on our

4      advice that for the lost profit claims

5      are, you know, not valid claims.

6                        So to the extent that they

7      are valid claims, we assigned at the high

8      end, 30 percent as a cushion.  We didn't

9      specifically go through and determine

10     whether or not, or we didn't specifically

11     go through and recalculate the lost

12     profits portion, applying what we felt a

13     reasonable discount factor should be.

14                        But what we did do is we

15     provided a range of claims that should --

16     depending on ultimately what the outcome

17     of any potential litigation would be

18     would capture a value that would provide

19     a sufficient cushion to establish a claim

20     value.

21          Q        And was that determination

22     that you just described where the

23     30 percent discount would capture any

24     present value discount a decision that

25     BRG made as part of its analysis and

Page 174

                              MARK SHANKWEILER

1
2    estimation?

3                    MS. STAFFORD:   Objection,

4         form.

5         A         So I mean we came up with a

6    range that we thought was a reasonable

7    value of potential -- potential exposure

8    or a potential obligation -- potential

9    claim that might come up without -- and

10   we didn't really specifically consider

11   the present valuing of a -- of a claim

12   for lost profits for a project.  That was

13   never even approved and got off the

14   ground or even developed.  So I don't

15   know if I answered your question.

16        Q         That answered it.  Thank

17   you.  Sorry.  I'm just taking a look at

18   my notes briefly.

19                   Earlier, we were discussing

20   future claims.

21                   Are you aware of any other

22   claims besides the -- that you analyzed

23   in connection with the claims estimation

24   that are also future claims --

25                   MS. STAFFORD:   Objection to

Page 175

1                    MARK SHANKWEILER

2        form.

3        Q        -- as we were discussing the

4    term earlier?

5        A        Could you define future

6    claims again, make sure that I understand

7    your question?

8        Q        Yes.

9                 So with respect to, for

10   example, the lost profit claims, those

11   would have been paid out year to year in

12   the future.  So my question is either

13   other claims that you looked at that

14   wouldn't have.

15       A        Not that I'm aware of.

16       Q        Not that you're aware of.

17   Thank you.

18                 Switching gears a little

19   bit, one of the other components of the

20   PPOA claims that you discussed today was

21   the development portion of them.

22                 Do you know what I'm talking

23   about when I say that, the development

24   portion --

25                 MS. STAFFORD:  Objection to

```
 1                    MARK SHANKWEILER
 2      form.
 3       Q        -- component?
 4       A        I do.
 5       Q        And it was my understanding
 6   from your testimony earlier that there
 7   was no discount applied to that component
 8   of the PPOA claims.  And by that
 9   component, I mean the development
10   component.
11       A        That's correct.
12       Q        And you explained a little
13   bit earlier about why that was.  So I'm
14   not going to ask you that again.
15                But one follow-up question I
16   did have on that same topic is, were
17   you -- are you aware, do you have any
18   sense of how many of the development
19   claims -- did you conduct any
20   investigation into the validity of the
21   development claims?
22                MS. STAFFORD:  Objection,
23      form.
24       A        Yes.
25       Q        As part of that
```

Page 177

1                      MARK SHANKWEILER

2    investigation, do you have any sense as

3    to how many of the power plants, subject

4    to the PPOA agreements, that are the

5    subject of these PPOA claims were never

6    developed at all or development was never

7    started?

8                      MS. STAFFORD:   Objection to

9        form.

10        A         So I understand based on the

11   PPOA claims that are included in this

12   estimate, development costs are part of

13   the overall process in negotiating,

14   coming up with plans, et cetera, to

15   propose to PREPA.  And so our

16   understanding is that as they go through

17   the development phase, that the PPOA

18   counterparties coordinate with PREPA in

19   coming up with what their designs are for

20   the project.

21                    And so there are development

22   costs that were incurred in conjunction

23   with that effort in order to get a PPOA

24   project approved.  And oftentimes -- my

25   understanding is that oftentimes, that

Page 178

1                    MARK  SHANKWEILER

2    included getting reports from PPOA to

3    understand what the process is as it

4    relates to the development of a project,

5    as it gets towards a commercial operation

6    or starting a construction, to determine

7    whether or not it's shovel ready to start

8    the construction phase of a project.  The

9    developing -- so the development costs

10   for these PPOA claims were likely

11   underway, otherwise they never would have

12   gotten off the ground.

13                   So there are costs that are

14   incurred.  The issue is that these are

15   not costs that they submit to PREPA to

16   have them reimburse them for the

17   development costs because that's part of

18   the responsibility of the PPOA

19   counterparty.  And they would earn those

20   development costs back once the project

21   was approved and they started earning

22   revenues under the PPOA.  That's the way

23   it was explained to me.  That's my

24   general understanding of the way these

25   projects are financed.

Page 179

                              MARK SHANKWEILER

1

2                    And so as it relates to --

3    as it relates to the development costs

4    itself, we had conversations with the

5    project management office, employees of

6    PREPA to determine whether or not the

7    development costs that they had included

8    made sense to them and could be validated

9    by them.

10                   And in many instances --

11   when I say in many instances, the answer

12   that we got from the project management

13   office when we reviewed these PPOA claims

14   was that they understood that in certain

15   circumstances that there were development

16   costs that were incurred because of the

17   number of years that they were going

18   through and exchanging plans and going

19   through the licensing or the regulatory

20   process in order to get approvals.

21                   And so that's -- you know,

22   each one of those -- each one of those

23   cases, each one of the claims that were

24   filed, we had these conversations with

25   PREPA's employees.  And so the

Page 180

```
 1                    MARK SHANKWEILER
 2   development costs that were included in
 3   there -- while we couldn't verify the
 4   actual amount of the development costs,
 5   we did get the sense that development
 6   costs were incurred in coming up with
 7   plans and in securing licenses.
 8               MS. TOMIC:  I think I'm
 9        almost done.  But if possible, could
10        we take a quick break off the record?
11        And I could touch base with attorneys
12        from Quinn and Cadwalader.
13               MS. STAFFORD:  Yes,
14        absolutely.
15               THE VIDEOGRAPHER:  Off the
16        record at 14:34.
17               (A short recess was taken.)
18               THE VIDEOGRAPHER:  We are on
19        the record at 14:46.
20        Q        I just have a couple of more
21   questions.  Then I will be done.
22               So going back to another
23   topic that you testified about early on
24   in the day was objections, and I believe
25   you said that -- or you testified that to
```

                        MARK SHANKWEILER

1

2   your knowledge, there are no objections

3   to the PPOA claims that had been

4   submitted yet; is that correct?

5        A        That's my understanding,

6   yes.

7        Q        And have you conducted any

8   analysis how the estimation would change

9   if PPOA objections were submitted?

10                MS. STAFFORD:  Objection to

11       form.

12       A        Could you repeat the

13  question?

14       Q        So from your -- I'll

15  rephrase it.

16                From your earlier testimony,

17  it sounded like you were anticipating

18  there being PPOA objections filed; is

19  that fair?

20       A        Correct.

21       Q        And have you done any

22  analysis or has BRG done any analysis of

23  how the estimation that BRG -- the claims

24  estimation that BRG calculated would

25  change if those anticipated PPOA

Page 182

1                    MARK SHANKWEILER

2    objections were submitted?

3                    MS. STAFFORD:  Objection to

4        form.

5        A         So I think the asserted

6    claim would still be the asserted claim.

7    Once an objection is filed, the process

8    starts for the ability to adjudicate that

9    claim and come to some sort of a

10   resolution.  And so absent the process

11   taking place, whether it be in either

12   ADR, whether it be in a court or

13   whatever, you know, venue that it would

14   have to be resolved, we don't have any

15   real view of what the ultimate outcome of

16   that would be.

17                    So I don't believe I would

18   be able to determine without that

19   happening, what any adjustments would be

20   to the current claims, just because you

21   file an objection.  The party can respond

22   to that.  So I don't think we would make

23   any objections until -- or any revisions

24   to the claims estimates until that played

25   out.

Page 183

1                    MARK SHANKWEILER

2      Q          And has BRG done any

3   analysis or had any discussions with the

4   board entities about the likelihood of

5   the anticipated PPOA objection success on

6   the merit?

7                   MS. STAFFORD:  Objection to

8        form.  I'm just going to caution you

9        not to reveal any privileged

10       information.

11     A          Not specifically, no.

12     Q          And then just finally,

13  earlier, I believe it was Exhibit 3, UCC

14  submitted the oversight board's expert

15  disclosures.

16                  Are you aware that in that

17  document, the board disclosed that you'll

18  be testifying at the confirmation

19  hearing?

20                  MS. STAFFORD:  Objection to

21       form.

22     A          So in Exhibit 3, am I aware

23  that I may testify at the confirmation

24  hearing?

25     Q          Yes.

Page 184

1                    MARK SHANKWEILER

2        A        So I believe I was aware

3    that I might be asked to testify at the

4    confirmation hearing, yes.

5        Q        And according to Exhibit 3,

6    the topics of your testimony or expected

7    testimony might include the -- you can

8    read them on page 9 --

9        A        Yes.

10       Q        -- the estimated total

11   amount of allowed general unsecured

12   claims against PREPA, the eminent domain

13   and inverse condemnation claims and the

14   estimated total amount of federal claims?

15       A        Yes.

16       Q        And is that consistent with

17   what topics you anticipate potentially

18   testifying about at the confirmation

19   hearing?

20       A        Yes.

21       Q        Are you aware of any other

22   topics that you might testify about at

23   the confirmation hearing, other than

24   those provided here on page 9 and 10 of

25   Exhibit 3?

Page 185

1                    MARK SHANKWEILER

2      A        I am not.

3                MS. TOMIC:  I think those

4      are all of my questions.  I'm not

5      sure if anyone else is doing any

6      questioning.  But that concludes the

7      questioning from Kramer Levin.

8                MS. STAFFORD:  I have just

9      one question if no one else has

10     anything else.

11   EXAMINATION BY

12   MS. STAFFORD:

13     Q        So earlier today -- I just

14   want to make sure that we have one thing

15   clear on the record.

16                So earlier today,

17   Mr. Despins asked you some questions

18   about the UTIER CBA and potential

19   rejection claims?

20     A        Yes.

21     Q        Have you been asked to

22   provide an estimation of the amount of a

23   rejection damages claim in the event that

24   the UTIER CBA is rejected?

25     A        No.

Page 186

1

2              MS. STAFFORD:  Thank you.

3        That's all.

4              THE VIDEOGRAPHER:  Anybody

5        on Zoom with questions?  This

6        concludes today's testimony given by

7        Mark Shankweiler as stipulated by all

8        parties.  The total number of media

9        units used was three and will be

10       retained by Veritext Legal Solutions.

11             Off the record at 14:53.

12       Thank you.

13                 (Time noted:  2:53 p.m.)

14

15             _____

               MARK SHANKWEILER

16

17

18    Subscribed and sworn to

19    before me on this _____day

20    of _____, 2023.

21

      _____
22             NOTARY PUBLIC

23

24

25

Page 187

```
 1
 2                       I N D E X
 3
 4               E X A M I N A T I O N
 5     EXAMINATION
 6     Mr. Despins            6
       Mr. Kelly            94
 7     Ms. Tomic            153
       Ms. Stafford         185
 8
 9                   E X H I B I T S
10
11     Exhibit              Description        Page
12     Exhibit 1            Notice of          10
                            Deposition
13
       Exhibit 2            List of witnesses  12
14
       Exhibit 3            Disclosures        21
15
       Exhibit 4            Exhibit O          47
16
       Exhibit 5            Disclosure         75
17                          statement
18     Exhibit 6            Disclosure         78
                            statement
19
20
                        R E Q U E S T S
21
22         Page                       Line
23         74                         2
24         77                         8
25
```

Page 188

1

2                    C E R T I F I C A T I O N

3

4

5          I, ANTHONY GIARRO, a Shorthand

6     Reporter and a Notary Public, do hereby

7     certify that the foregoing witness, MARK

8     SHANKWEILER, was duly sworn on the date

9     indicated, and that the foregoing, to the

10    best of my ability, is a true and accurate

11    transcription of my stenographic notes.

12          I further certify that I am not

13    employed by nor related to any party to

14    this action.

15

16

17

                     _____

18                     ANTHONY  GIARRO

19

20

21

22

23

24

25

Page 189

1
2                          ERRATA SHEET
              VERITEXT/NEW YORK REPORTING, LLC
3                       1-800-727-6396
4    330 Old Country Road      7 Times Square
     Mineola, New York 11501  New York, New
5    York 10036
6    NAME OF CASE:  In re:  the Financial
     Oversight and Management Board for Puerto
7    Rico, as Representative of the Commonwealth
     of Puerto Rico, et al.
8    DATE OF DEPOSITION: May 22, 2023
     NAME OF DEPONENT:  Mark Shankweiler
9    PAGE LINE (S)  CHANGE          REASON
     _____|_____|_____|_____
10
     _____|_____|_____|_____
11
     _____|_____|_____|_____
12
     _____|_____|_____|_____
13
     _____|_____|_____|_____
14
     _____|_____|_____|_____
15
     _____|_____|_____|_____
16
     _____|_____|_____|_____
17
     _____|_____|_____|_____
18
     _____|_____|_____|_____
19
     _____|_____|_____|_____
20
     _____|_____|_____|_____
21
                         _____
22                       MARK SHANKWEILER
23   SUBSCRIBED AND SWORN TO BEFORE ME
     THIS _____ DAY OF _____, 20__.
24
     _____  _____
25    (NOTARY PUBLIC)   MY COMMISSION EXPIRES:

**[& - 21]**

| & |
|---|
| **&**   2:3,9,14 3:11 |
| 4:4,10 20:13 |
| 20:24 21:11 |
| 23:22 34:7,13 |
| 34:15,25 35:3 |
| 36:19 37:13,14 |
| 38:8 40:6 |
| 45:13,25 46:3 |
| 48:4,21 50:4 |
| 52:3,10,14 |
| 54:2 59:20 |
| 62:17 69:16 |
| 70:21 71:10 |
| 73:9,21,22 |
| 84:10,16,20 |
| 85:5,12 89:20 |
| 108:6 117:13 |
| 123:25 124:14 |
| 124:18 125:17 |
| 127:6 139:3,17 |
| 140:5,12 158:5 |
| 159:2 160:21 |
| 161:17 |

| 0 |
|---|
| **0**   55:10 57:20 |
| 58:16,19,23 |
| 59:2 154:20 |
| 156:25 157:3 |
| 169:21 |
| **02110**   3:23 |

| 1 |
|---|
| **1**   3:22 5:12 |
| 9:23 10:2,16 |

10:17 11:10
12:18 14:7,20
64:21 65:9
69:5 86:25
87:19 115:17
135:19 155:8
157:13 187:12
**1-800-727-6...**
189:3
**1.1**   30:25
**10**   116:9,11
158:16 159:12
160:14 184:24
187:12
**10,000**   89:22
**100**   2:21
115:25 116:9
116:12
**100,000**   31:3
**10019**   4:11
**10036**   1:21
3:12 189:5
**10153**   4:6
**10166**   3:5
**10281**   2:11
**10:31**   69:4
**10:57**   69:8
**11**   1:20 5:23
133:23
**11,000,245**   62:2
**11.2**   132:17,20
**11501**   189:4
**1170**   2:21
**11:31**   93:24

**11:41**   94:3,18
**11:42**   94:21
**11th**   12:8
**12**   58:9 64:21
64:24 65:9,12
86:25 87:20
157:14 187:13
**120,000**   31:3
**12:54**   146:3
**13**   58:9
**13.3.**   50:21
**13:46**   146:7
**14.8**   136:19
**14.834**   134:17
**14:34**   180:16
**14:46**   180:19
**14:53**   186:11
**150**   151:5,17
**153**   187:7
**16**   141:13,17
**16.8**   141:21
143:4
**16th**   76:7
**17**   1:3,9 5:21
141:18
**172**   42:2
**185**   187:7
**19**   7:13,19
**1974**   90:17
**1990s**   18:12
95:14
**1st**   81:13 82:9

| 2 |
|---|
| **2**   10:18 12:12 |
| 12:14,18,23 |
| 13:23 14:6,20 |
| 14:23,24 69:9 |
| 84:24 132:9 |
| 140:9 146:4 |
| 187:13,23 |
| **2.4**   137:25 |
| 138:24 |
| **2.5**   137:7 |
| **2.7**   46:16 |
| **2.779**   47:16 |
| **2.8**   46:15 |
| 115:19,21 |
| **2.9**   46:16 |
| **20**   95:19 |
| 138:17,22 |
| 140:16 167:8 |
| 189:23 |
| **200**   2:10 3:5 |
| 157:25 |
| **2000**   2:5 |
| **20006**   2:5 |
| **2008**   62:13 |
| 133:4 |
| **2009**   62:14 |
| 133:4 |
| **2019**   32:8 85:6 |
| **2022**   74:24 |
| **2023**   1:16 5:4 |
| 12:9 186:20 |
| 189:8 |
| **21**   187:14 |

**[22 - 94]**

**22**   1:16 76:7
   133:24 189:8
**22,000**   64:8
**224**   61:19,24
   63:12 131:17
**224,900,000**
   61:12
**224.9**   62:4
   128:16,17
   130:17 131:3
   134:8
**225**   127:25
   131:7 132:10
**22nd**   5:4
**23,000**   133:24
**245**   78:11
**25**   167:8
**26**   75:18
**264**   81:18
   125:6 126:20
**264,000,379**
   81:10
**264379**   82:18
**27**   32:12
**28**   32:12 85:9
**2:53**   186:13
**2s**   14:18

**3**

**3**   13:2 21:23
   81:3 82:25
   84:25 88:3,19
   88:20 101:20
   146:8 154:22
   183:13,22
   184:5,25

   187:14
**30**   9:9,19 12:5
   52:24 55:10
   57:21 58:17,19
   58:23 91:24
   95:20 149:9,16
   149:17 154:20
   155:17,19,21
   156:2,6 157:2
   157:3 161:21
   161:24,25
   163:11 164:5
   169:22 173:8
   173:23
**300**   35:16
**30309**   2:21
**3283**   1:3 5:21
**330**   189:4
**3305**   7:15
**35**   160:7
**3800**   3:17

**4**

**4**   14:25 47:5,7
   74:14 80:24
   82:9,25 86:8,9
   87:17 101:17
   101:18,19
   103:23 115:18
   125:4 129:15
   129:23 134:15
   147:21 154:22
   157:23 187:15
**40**   95:20 160:7
**47**   187:15

**4780**   1:9
**4th**   2:5

**5**

**5**   61:9 64:2,3
   75:10,12,14,16
   75:19,22
   103:18 129:16
   129:23 130:16
   187:16
**5,000,673**   60:22
**5.9**   33:10 99:8
**50**   29:9 89:17
   135:11,11,16
**50,000**   85:9
**500**   2:16 91:17
   133:5,16
**51**   4:11
**5259**   188:17
**52nd**   4:11
**55**   48:12
**550**   91:17
**5th**   4:5

**6**

**6**   9:9,19 12:5
   77:23,25 78:4
   78:9,22 91:24
   99:8 134:15
   149:9,16,17
   187:6,18
**60**   30:10 99:16
   99:18 100:6,23
**600**   91:18
**60602**   3:18

**65.6**   155:11

**7**

**7**   3:12 11:9
   189:4
**70**   3:17 156:13
**700**   146:25
**711**   2:16
**74**   187:23
**75**   187:16
**767**   4:5
**77**   187:24
**77002**   2:16
**78**   187:18

**8**

**8**   14:25 187:24
**800**   22:9,14,20
   23:7 32:23
   33:6,16 35:2,7
   37:8 38:19
   41:11,14 42:8
   42:25 44:10,17
   45:19,23 46:5
   75:7,25 76:13
**85**   116:5
**89**   96:5

**9**

**9**   22:2 131:17
   135:22,23
   136:2 184:8,24
**90**   96:5 158:16
   158:20 159:11
**92**   95:15
**94**   187:6

**[99 - agency]**

**99** 118:2
**9:06** 1:16 5:4
**9th** 81:14,17

**a**

**a.m.** 1:16 5:4
**aafaf** 3:11
**ability** 108:8
  182:8 188:10
**able** 18:21
  30:25 34:10
  37:16,20 38:5
  38:6,9 71:4
  83:13 85:13
  119:24 120:16
  121:11 147:5
  172:10,15
  182:18
**above** 9:25
  12:13 21:22
  47:4 75:15
  77:24 91:17
**absence** 51:4
  51:13
**absent** 182:10
**absolutely** 23:8
  31:16 46:25
  180:14
**academic** 15:23
**access** 71:7
  98:22
**accordance**
  7:18
**account** 50:14
  89:9 92:10
  93:3 108:13

143:8 163:21
**accountants**
  20:14
**accounting**
  16:2
**accurate** 25:3
  156:14 188:10
**accurately** 41:9
**acronym** 46:11
**acronyms**
  31:19
**action** 6:7
  41:23 188:14
**actions** 34:8
**actual** 24:9
  25:17 62:10,15
  113:24 124:4
  130:11 131:25
  137:6 138:14
  140:6 162:17
  167:20 168:10
  180:4
**actually** 8:23
  12:17 13:6
  27:14 31:10,11
  31:13 61:7
  63:17 92:17
  98:12 105:14
  111:23 113:18
  121:24 122:3
  125:13 137:11
  145:14,21
  148:16 159:9
  159:21,22
  165:9

**ad** 2:4
**add** 79:3
**addition** 9:7
  12:6
**additional**
  88:13,25 107:5
  114:5,23,25
  149:19
**adjudicate**
  182:8
**adjust** 23:23
  57:9,13,16
  110:11
**adjusted** 41:4,5
  47:21 52:16,19
  55:8,14 56:15
  56:19 59:4,22
  64:9 71:12
  79:19 80:22
  83:3,16 102:20
  103:22 104:2
  104:16,18
  106:7,8,11,15
  106:21 107:17
  108:21 109:20
  113:20,21
  114:3 132:16
  135:20 155:23
  156:20 160:13
  164:2
**adjusting**
  113:14
**adjustment**
  24:4 51:2,10
  51:18 53:21

57:24 60:6
  144:10 158:14
**adjustments**
  59:5 182:19
**administration**
  16:2
**adopt** 39:15
**adr** 24:3
  105:18,22
  158:6 159:25
  182:12
**advanced**
  145:14
**adversary**
  55:24
**adverse** 165:16
**advice** 45:15,17
  46:4 53:25
  72:12 73:19
  84:8 108:3,5
  173:4
**advise** 73:3
**advised** 73:22
**advisor** 123:20
  127:17
**advisors** 20:4,9
  20:9,12,16,18
  100:15 109:8
  132:22
**advocate** 97:8
**afternoon**
  153:4
**agency** 150:24
  151:7

**[aggregate - anthony]**

**aggregate**
103:2,3 138:19
141:9 150:11
150:13
**agree** 5:11
**agreed** 124:20
**agreement**
31:23 85:19,22
87:22
**agreements**
49:7 177:4
**ahead** 55:20
92:3 101:14
**akherring** 4:13
**al** 1:7 5:18
189:7
**alex** 3:7
**alexbongartz**
3:8
**allentown**
15:22
**allergies** 26:14
**allow** 18:3,8
19:5 53:9
107:4 165:15
**allowable**
16:19 17:4
**allowed** 15:6
17:5,8,18,24
22:7 45:7
49:15 51:11
57:11,12
104:20,21
105:3 113:19
131:2,7,16

137:24 141:21
143:5,8,11
165:4 184:11
**allowing** 57:17
**alluded** 100:2
**amended** 7:14
**amends** 26:25
27:7
**america** 142:8
**amount** 15:6
17:9 19:22
22:7,14 24:4,5
24:6 32:9,12
32:15 33:2,24
35:15 41:19
45:7 46:13,17
47:13,15 51:2
51:11 52:23,23
58:2 60:25
61:11,12,17,19
62:4 65:21
66:18 68:23
70:7 75:24
81:8,9,10,17,18
81:20 82:4,11
82:14,18 85:3
86:23 87:18
88:2,15,18
90:3 91:14
95:19 100:12
101:9 102:23
102:24,25
103:15 104:20
108:14 109:14
131:2,17

132:14 133:18
133:19 134:3
135:16 136:16
137:7,8 140:25
141:9 143:7,11
143:17 147:2,6
147:6 150:12
150:13 155:18
155:18 156:16
156:17 163:21
170:20 180:4
184:11,14
185:22
**amounted** 64:7
**amounts** 27:13
42:13 52:16
76:20,24 88:14
102:5 105:16
151:12 158:25
169:18
**analysis** 43:23
44:9 58:23
89:3 97:5,10
104:24 105:8
105:10 119:5
126:21 127:16
135:8 136:19
137:9 139:2
148:24 149:6
149:19,23
157:17 160:2
168:18,20
169:21 170:2
170:13 173:25
181:8,22,22

183:3
**analyze** 49:23
168:9
**analyzed**
174:22
**analyzing**
169:9
**angela** 4:12
**ankura** 127:14
**announced**
75:6
**answer** 8:15
9:6 45:11
55:17 64:17
65:15 66:14
67:15,17 68:2
78:19 84:6
92:2 111:10
120:16 123:12
129:13 131:18
133:5 142:18
150:7 162:9
170:23 179:11
**answered**
66:10,22 67:4
67:10,15 68:2
68:5 71:5
171:17 174:15
174:16
**answering**
40:25 101:23
157:7
**answers** 43:6
**anthony** 1:22
6:3 188:5,18

**[anticipate - assessed]**

| | | | |
|---|---|---|---|
| **anticipate** | **approvals** | 45:2 117:24 | 57:14,15 61:11 |
| 143:6 184:17 | 179:20 | 118:3,15 | 61:19,21 62:4 |
| **anticipated** | **approved** | 130:13 | 62:16 68:23 |
| 181:25 183:5 | 174:13 177:24 | **ascribes** 41:12 | 79:16 81:9,18 |
| **anticipating** | 178:21 | **ascribing** 136:9 | 81:19 82:3,4 |
| 181:17 | **approximate** | **ashley** 3:19 | 82:11,13 98:11 |
| **anybody** 186:4 | 91:14 | **aside** 27:6 54:4 | 98:15 99:6,12 |
| **apologize** 8:10 | **approximately** | **asked** 8:14 35:9 | 99:17 103:15 |
| 40:16 60:17 | 29:10 46:14 | 35:15 40:9 | 103:16,17 |
| **appearance** | 92:21,22,23 | 47:11 64:19 | 108:14 111:19 |
| 6:11 | 132:10 138:17 | 66:11,22 67:4 | 115:18 116:3 |
| **appearances** | 146:24 157:25 | 67:10,15 68:2 | 127:25 130:17 |
| 6:12 | **arbitration** | 71:6 85:5 | 130:23 134:16 |
| **applicable** | 57:8 60:5,16 | 102:3 134:6 | 136:16,22 |
| 11:13 | 60:19 61:5 | 146:14,15 | 137:8 138:20 |
| **applied** 88:7 | 63:5,6 113:17 | 149:5 154:4 | 140:17 141:2,9 |
| 89:17 155:5 | 113:20 118:11 | 165:19,25 | 143:16 145:2,9 |
| 176:7 | 118:16 119:7 | 166:6 171:17 | 145:13,21 |
| **apply** 59:24 | 119:11 123:3 | 184:3 185:17 | 146:24 147:7 |
| 157:16 | 126:22 128:7,8 | 185:21 | 147:11 148:8 |
| **applying** | 128:21 164:24 | **asking** 13:19 | 148:16,20,25 |
| 173:12 | 165:3,5 | 29:21 44:21 | 149:20,25 |
| **approach** | **arbitrations** | 81:10 94:12 | 151:4 169:19 |
| 39:18 40:3 | 114:15,19,21 | 157:6 170:25 | 169:23 171:10 |
| 124:23 | **argue** 132:13 | **assert** 63:3 | 182:5,6 |
| **approaching** | **arguments** | 108:8 121:11 | **asserting** 54:9 |
| 86:14 | 83:21 | 134:5 148:2 | 82:22 152:9 |
| **appropriate** | **arising** 86:10 | **asserted** 22:8 | 163:13 |
| 59:7 108:12 | 87:20 | 23:23 24:4 | **asserts** 109:24 |
| 110:5 162:2 | **article** 16:14 | 29:11,23 30:18 | **assess** 68:9,13 |
| 164:13,19 | **ascribe** 39:22 | 32:10,16,25 | 111:12 146:16 |
| 165:13 | **ascribed** 38:18 | 34:9 41:20 | **assessed** 64:22 |
| **approval** | 40:21 41:2 | 42:2 46:13 | 65:10 66:11,13 |
| 128:12,13 | 42:20 43:3,20 | 47:14,15 49:11 | 66:15,19,23 |
| | 44:5,15,18 | 49:24 52:6,17 | 67:7,11,19,19 |

**[assessed - based]**                                    Page 6

67:22,23 68:15
100:19 105:20
123:6 158:11
**assessing** 117:3
**assessment**
111:7 117:11
123:21,24
**assigned**
158:11,14
160:5,13 173:7
**assigning** 119:9
**assist** 85:7
**assisting** 124:3
**associated** 42:8
85:4 122:2
139:21 142:11
143:13
**assume** 8:5
37:3 150:6
172:10,16
**assumed** 52:20
**assumptions**
15:5 22:5
109:7
**assured** 2:9,10
**atlanta** 2:21
**attached** 10:18
**attempted**
63:10 130:3
**attempting**
17:25 18:7
**attendance**
7:24
**attending** 7:20

**attention** 11:9
14:25
**attorney** 77:20
131:4,22
**attorneys** 2:4,9
2:15,20 3:4,11
3:16,21 4:4,10
10:23 72:7
141:5 165:12
180:11
**attributable**
115:22
**audio** 5:9
**audited** 126:18
**authority** 1:14
**available** 7:22
18:15 119:13
132:24
**avenue** 3:5 4:5
**average** 88:4
89:4
**award** 60:5,19
60:22 61:2,4
63:6 165:3,4
**awards** 60:16
**aware** 91:8
114:20 142:13
143:25 148:7
149:18,22,24
152:10 153:10
153:24 174:21
175:15,16
176:17 183:16
183:22 184:2
184:21

**aweringa** 3:19

**b**

**b** 9:9,19 12:5
91:24 125:25
149:9,16,17
187:9
**bachelor** 15:18
**back** 14:16
19:24 35:20
38:14 44:12
56:22 63:14
64:18 69:11
74:13,18 80:24
84:22 116:2
125:3 126:4
129:14 131:12
154:24 160:17
165:19,25
167:13,15
170:4,15
171:15,20
172:5,12,17
178:20 180:22
**background**
15:15 70:6,25
95:11
**backtrack**
38:25
**backup** 42:24
43:25 44:9
64:20 65:8
**bad** 33:23
**badgering** 68:4
**ballpark** 32:17
32:18,25 89:11

91:15 138:20
150:20
**bankruptcies**
95:16,24
**bankruptcy**
16:4,14 18:2
91:9 92:9,10
104:22
**banks** 96:15
**bar** 92:24
**bargaining**
85:18,22 87:22
**base** 180:11
**based** 9:4 17:14
22:24 23:20
24:5,14 27:8
28:2,5,13,17
40:6 41:5
45:24 48:14,17
48:19,22,23,25
49:15 51:3,12
52:13 57:5,7
58:2,8 59:5,8
59:11 60:24
61:3 62:10
63:16 66:5
68:22 73:9,11
73:12 77:2,7
79:24 83:13,18
83:19 88:5
89:18,23
104:24 105:17
106:19 108:2
109:7 110:7,12
113:16,16

**[based - brg]**

115:4 116:13
118:10 119:12
119:17 130:2
131:19 133:6
133:10 136:20
140:4,4,5
145:13 147:7
148:4 154:14
157:16 158:3,9
158:10,25
159:25 161:3
161:23,23
162:2,3,18
163:2,11
165:11 173:3
177:10
**basic** 8:19
**basis** 57:23
64:9 77:6
93:11 112:23
113:4 131:8
132:9,11,12,14
**bear** 7:6
**beginning** 69:9
149:7
**begins** 146:7
**behalf** 9:19
21:21 93:3
**belief** 79:24
**believe** 18:21
29:5 30:15
32:2,7,11
41:22 45:4
48:7,11 49:13
52:24 56:11,12

64:2 71:25
79:19 81:21
83:5 86:6
91:16 99:21
101:16 108:11
127:14,19
138:4 141:12
144:25 145:20
147:3 150:15
153:17 154:11
154:20 155:4
155:12 167:12
167:22 168:12
171:18 172:3
180:24 182:17
183:13 184:2
**believed** 79:14
**bell** 31:18
33:10 74:25
78:8 90:6
**benefit** 133:13
**benefits** 63:8
129:4 130:6,8
**best** 104:19
148:18,22
151:14,16,19
188:10
**bet** 131:6
**better** 56:5
154:17
**big** 72:8 95:21
95:23 96:4
100:25
**bigger** 101:5

**bill** 4:19
**billion** 32:12
33:10 46:15
47:16 96:5,5
99:8,8 103:18
115:19,21
**bit** 15:14 40:19
95:10 98:7,17
99:5 100:10
107:15 110:15
116:25 117:15
137:17 146:11
154:3,23
164:18 166:10
175:19 176:13
**bk** 1:3,9 5:21
**blew** 121:14
**board** 1:5,12
3:16 5:18 9:10
9:10,20 11:19
12:7 21:9 28:5
56:8 74:21
146:15 149:18
159:18 183:4
183:17 189:6
**board's** 21:17
149:9,15,17
183:14
**bob** 4:19
**bond** 25:24
142:5,11
**bondholder**
96:20 149:13
**bondholders**
2:4

**bonds** 90:19
95:7 142:8
**bongartz** 3:7
10:15,25 11:7
12:21 13:9,21
14:5,17 75:13
**bonus** 126:10
**bonuses** 120:22
135:2 137:3
**books** 19:11,13
19:21 27:13
116:23
**borges** 21:12
**boston** 3:23
**bottom** 11:17
**bottoms** 39:21
40:3
**boxes** 85:9
**brady** 4:7
**brain** 32:19
**break** 69:2
93:16 180:10
**brg** 32:5 99:16
100:15 117:8
117:13 123:8
123:19 138:8
140:24 141:3
145:4 148:23
162:18,20
163:6,7,7
165:18,19,24
165:25 168:17
169:9,25
170:19,25
171:2 172:19

**[brg - charge]**                                                    Page 8

173:25 181:22
181:23,24
183:2
**brg's**  171:5
**briefly**  47:10
160:17 174:18
**bring**  13:20,22
**broken**  84:23
**bucket**  137:14
**build**  79:14
85:13 86:18
106:18 142:7
**built**  88:18
**bunch**  134:21
**business**  15:25

**c**

**c**  2:2 3:2 4:2
125:25 188:2,2
**cadwalader**  2:9
180:12
**calculate**  121:4
147:6 170:2
**calculated**
110:2 168:13
170:14 181:24
**calculating**
120:23
**calculation**
125:24 168:11
168:13 169:6,7
170:18 171:3
**call**  25:9 77:8
121:9 125:23
126:10,11
139:20,24

162:9
**called**  47:18,21
69:16 75:21
84:10
**calling**  74:3
**cameron**  2:17
94:25
**cameronkelly**
2:18
**candid**  43:5
**cap**  11:13
**capture**  173:18
173:23
**captured**  24:19
42:12 89:2
98:13 112:7
**capturing**
124:4
**care**  62:13,21
63:8 79:13
130:8
**carve**  110:12
**case**  1:3,9 5:20
14:9 18:3
34:12,12,16,17
36:17,22,23
37:4 60:5
98:25 107:2
126:14 156:22
164:23 165:8,9
172:19 189:6
**cases**  18:12,17
89:22 96:16
164:20 179:23

**cash**  171:24
**categories**
23:16 25:15
28:24 39:20
60:4 64:25
65:9,12 86:25
87:19 102:18
104:11,25
110:19,22
134:22 136:18
153:11 157:10
157:12
**categorization**
23:13,15,17
24:25 25:3,6
25:10
**categorizations**
26:7
**categorize**
25:13
**categorized**
138:16
**category**  24:21
25:8,12 40:5
45:23 64:21
75:21 102:12
102:13 106:5
157:20 161:18
**caution**  79:6
183:8
**cba**  86:2,2,11
86:25 87:22
124:20,22
128:14 185:18
185:24

**cell**  5:8
**certain**  20:17
55:6 71:23
73:8 96:16
102:17 105:17
106:14 109:22
109:25 110:7
113:4 126:2
130:8 134:25
136:24 137:2
139:19,22
142:4,5,11
151:9,11 159:3
159:3 167:11
168:2 179:14
**certified**  1:23
**certify**  188:7,12
**cetera**  98:24
177:14
**challenging**
97:5
**chance**  47:9
**change**  61:20
62:12 78:12
181:8,25 189:9
**changed**  62:22
104:10,11
**changes**  105:25
133:8
**changing**
128:11
**characterizati...**
39:16
**charge**  124:15

**[chart - claims]**                                    Page 9

| | | | |
|---|---|---|---|
| **chart** 155:7 | 42:5,6,9,19,22 | 116:25 117:3,5 | 163:14,18,19 |
| **chester** 15:19 | 42:22 43:2,20 | 117:22 118:9 | 163:21 165:5,7 |
| **chicago** 3:18 | 43:21 44:5,19 | 118:17,19,20 | 166:22 167:3,5 |
| **christmas** | 44:25 48:22 | 118:22,25 | 167:11,21 |
| 120:22 126:10 | 49:25,25 50:14 | 119:3,10,23 | 168:6,7,10 |
| 134:25 137:3 | 51:11,20,21,25 | 120:8,13,15,16 | 169:3,8,14,22 |
| **cilt** 151:3,3,18 | 52:5,8,12,16,18 | 120:18 121:9 | 170:3 171:14 |
| 152:2,11,13 | 54:5,6 55:9,13 | 121:10,12 | 172:13,17 |
| 153:18,19,23 | 57:8,14,15,22 | 123:2,7,10 | 173:19 174:9 |
| **circumstance** | 57:23,24 58:7 | 125:11 127:22 | 174:11 182:6,6 |
| 53:22 | 60:25 62:3,5,6 | 127:24 128:16 | 182:9 185:23 |
| **circumstances** | 62:9,11,15,19 | 129:8 130:17 | **claimant** 49:11 |
| 48:25 106:14 | 63:2,12,13 | 130:25 131:8 | 51:12 82:22 |
| 139:23 167:11 | 64:14,24 65:11 | 131:16,20 | 167:18,19,22 |
| 179:15 | 66:3,11,13,17 | 132:2,2,9,15,25 | 170:13,17 |
| **claim** 17:8 19:3 | 66:19,25 67:5 | 134:3,8,8 | **claimants** |
| 19:8,9,10,12,15 | 67:18 68:11 | 137:11,14,25 | 53:18 114:6 |
| 19:18,25 20:5 | 70:8 71:21 | 139:7,9,18,21 | 144:6 145:21 |
| 20:7,19 22:19 | 73:15,16 75:24 | 139:22 140:7 | 148:15 167:4 |
| 23:12,14,25 | 76:24 81:4 | 140:14,18,20 | **claimed** 57:17 |
| 24:4,9,10,13 | 82:3,10 83:6 | 141:15,21 | **claims** 11:14 |
| 25:7,8,10,17,21 | 84:23 85:3 | 142:2,14 143:5 | 16:19 17:4,4 |
| 25:22,24,25 | 86:15 88:2 | 143:22 145:3,9 | 17:18,24 18:4 |
| 26:2,6,24 27:9 | 92:17,24 93:6 | 145:17,22 | 18:8,14,19,22 |
| 27:10,16,18 | 98:24 100:17 | 146:16,24 | 20:17 22:8,25 |
| 28:2,10,10,14 | 101:9 102:11 | 147:7 148:11 | 23:2,10,12,15 |
| 31:4,6 33:23 | 102:12 105:9 | 148:17 151:7,9 | 23:18,19,23,25 |
| 34:2,19,23 | 105:25 106:17 | 151:18 152:4,5 | 24:3,19,21 |
| 35:15,17 36:7 | 106:18,22,24 | 152:7,9,20 | 25:2 26:19,23 |
| 36:14,18,21 | 107:9 108:5,9 | 153:17 155:15 | 27:5,7,8,12,20 |
| 37:7 38:24 | 108:12 109:6 | 156:3,4,21 | 27:23,24 28:5 |
| 39:3,7,13,19,20 | 109:24 110:3 | 157:20 158:15 | 28:17,17,24 |
| 39:22 40:21 | 111:18 112:16 | 159:4,11 | 29:4,11,13,19 |
| 41:4,7,12,16,18 | 113:9,10 114:7 | 160:22,25 | 29:19,21,23 |
| 41:23,25 42:4 | 115:5,18 116:3 | 161:18,19 | 30:12,14,16,17 |

**[claims - class]**                                                    Page 10

| | | | |
|---|---|---|---|
| 30:24 31:25 | 86:10,17,18,21 | 134:19,22 | 158:12,17,18 |
| 32:6,10,16,24 | 87:2 88:5,6,8 | 135:3,5,6,7,9 | 158:23 159:2,3 |
| 33:17,22 34:6 | 88:13,16,21,25 | 135:10,16,21 | 159:8,13,20 |
| 35:10,11,14,20 | 89:4,6,21 | 136:2,5,10,16 | 160:5,8,16,18 |
| 35:22 36:3,9 | 92:10,19 96:5 | 136:20,21,23 | 162:3,4 164:9 |
| 36:13 38:15,17 | 97:15 98:2,5 | 137:6,20 138:5 | 165:18,19,24 |
| 39:6,6,9,11,23 | 98:11,15,16 | 138:11,13,15 | 165:25 166:7,8 |
| 40:4,5,8,8,10 | 99:7,11,13,17 | 138:17,18,20 | 166:14,15,16 |
| 40:13,14,18,23 | 100:2,6,25 | 139:2,5,11,13 | 168:2,19,19 |
| 41:3,6,10,22 | 101:5 102:3,4 | 139:19,23,25 | 170:4,10,12,21 |
| 42:15 44:3,13 | 102:8,14,18 | 140:11,15,17 | 171:3 172:5,8 |
| 44:14,16 45:8 | 103:4,7,10,10 | 140:22,25 | 172:21 173:2,3 |
| 45:11,14,16,24 | 104:19,23,25 | 141:4,6,7,10,23 | 173:4,5,7,15 |
| 46:11,14 47:14 | 105:11,13,13 | 141:24 142:3 | 174:20,22,23 |
| 47:16 48:10,13 | 105:18,19 | 142:23 143:2,9 | 174:24 175:6 |
| 48:14,19 49:5 | 106:20 107:5 | 143:13,15 | 175:10,13,20 |
| 49:10,10,15 | 109:2,13 110:3 | 144:12,13,14 | 176:8,19,21 |
| 52:16 55:22 | 110:7,10,15,18 | 144:16,18,24 | 177:5,11 |
| 56:9,24 58:5,9 | 110:19,20,23 | 145:6,8,12,13 | 178:10 179:13 |
| 59:9,14 63:24 | 111:2,13 | 145:16 146:20 | 179:23 181:3 |
| 63:25 64:4 | 112:15,23,24 | 146:22 147:10 | 181:23 182:20 |
| 65:16,18 66:6 | 113:5 114:14 | 147:11,15,20 | 182:24 184:12 |
| 66:24 67:12,20 | 114:18 116:19 | 148:3,9,14,20 | 184:13,14 |
| 68:7,14,16 | 118:6,12,13 | 148:25 149:20 | 185:19 |
| 69:24 70:2,4,5 | 119:16 120:19 | 149:24 150:12 | **clarify**  9:2 |
| 70:11,12,14,17 | 120:23 121:4,7 | 150:14,22 | 43:12,17 74:20 |
| 70:19,20,22,24 | 122:11 124:16 | 151:2,3,3,9,11 | 100:4 154:25 |
| 71:16,23 72:2 | 124:19,21,24 | 151:18,20,25 | 155:20 159:10 |
| 72:3,10,12,21 | 124:25 125:12 | 152:12,14 | 163:4 169:24 |
| 72:25 73:9,23 | 125:15,17,19 | 153:11,11,18 | **clarifying** |
| 74:10 75:7,22 | 126:2,3,5,6,8,9 | 153:19,23,24 | 106:6 150:8,9 |
| 76:25 79:13,25 | 126:10,12,12 | 154:5,7,10,16 | **clarity**  95:12 |
| 81:23 82:6 | 126:14,15,24 | 155:9 156:7,24 | **class**  32:17 |
| 84:17,18,20 | 127:4 133:15 | 157:10,13,17 | 41:23 75:22 |
| 85:7,15,15 | 133:21 134:13 | 157:25 158:5,7 | 138:13 141:24 |

**[classes - conclusion]**

| | | | |
|---|---|---|---|
| **classes** 143:14 | **combination** | **commission** | 156:12,21 |
| **classification** | 49:4 59:17 | 189:25 | 160:19 161:5 |
| 27:9 | **come** 23:7 | **committee** 2:20 | 161:19 166:13 |
| **classified** 144:9 | 24:10 34:17,22 | 3:4,21 5:15 7:3 | 169:3,12 170:3 |
| **clause** 50:18,21 | 45:18 46:4 | 97:4 | 170:15,21 |
| 51:4 53:15 | 48:3 59:6 | **common** 74:8,9 | 171:10 172:21 |
| **clear** 8:25 9:20 | 79:18,22 89:5 | **commonwealth** | 176:3,7,9,10 |
| 29:20 47:25 | 90:2 96:24 | 1:7 28:12 | **components** |
| 65:4 66:16 | 99:25 100:5 | 189:7 | 48:10,18 51:19 |
| 80:6,12 155:2 | 102:2 104:22 | **communicated** | 55:9 57:2 73:8 |
| 166:3 185:15 | 108:21 118:14 | 82:17 | 73:25 102:15 |
| **clearly** 30:9 | 118:18,25 | **company** 19:12 | 105:11 125:14 |
| 77:19,20 168:5 | 120:5 121:13 | 20:3 120:12 | 126:2 133:14 |
| 170:25 | 122:5,24 123:5 | 151:10 | 139:7,18 |
| **client** 77:20 | 124:24 132:24 | **company's** | 155:14 164:22 |
| **close** 103:18 | 133:16 139:10 | 20:4,9 116:23 | 175:19 |
| 116:4,4 141:22 | 139:13 158:16 | **compared** | **comprise** |
| **collaborative** | 158:19 159:11 | 32:22 | 138:11 |
| 122:13,21 | 161:11 168:24 | **comparison** | **comprised** |
| 124:23 | 174:9 182:9 | 63:18 133:12 | 139:5 |
| **collective** 85:18 | **comes** 48:6 | **comparisons** | **concern** 124:23 |
| 85:22 87:21 | 113:23 164:21 | 62:21 | **concerned** |
| 109:12 | **comfortable** | **compensating** | 36:12 65:22,23 |
| **college** 15:20 | 39:17 49:21 | 129:3 | 79:23 |
| 15:22 | 68:16 83:11 | **complaints** | **concierge** 4:19 |
| **column** 56:14 | 98:21 | 134:24 | 10:8,20 11:5 |
| 58:22,25 59:22 | **coming** 17:3 | **completed** 29:6 | 13:5,19,24 |
| 60:13 78:15,16 | 58:24 106:20 | 112:9 | 14:13 |
| 78:18 79:3 | 106:21 107:25 | **complex** 72:10 | **concludes** |
| 80:8,21,22 | 108:10 113:15 | 109:13 124:6 | 185:6 186:6 |
| 103:23 155:22 | 114:2 119:11 | 126:7 | **conclusion** |
| 155:23 159:16 | 123:16 177:14 | **component** | 17:11 84:3 |
| **columns** 47:18 | 177:19 180:6 | 52:18 53:6 | 90:12 99:25 |
| 60:10 | **commercial** | 55:15 73:15 | 100:5 113:2 |
| | 178:5 | 154:6 155:6,10 | 142:17 144:20 |

[conclusion - costs]                                    Page 12

145:19 149:4
**condemnation**
137:19 138:12
138:17 184:13
**conduct**   168:17
170:2 176:19
**conducted**
91:20 92:6
149:23 181:7
**conducting**
149:18
**conferred**
23:21
**confidential**
7:11,16
**confidentiality**
7:6
**confirm**   23:16
30:25 93:20
147:5
**confirmation**
7:14 183:18,23
184:4,18,23
**confirmed**   39:6
**conflict**   12:25
**confused**   12:19
13:12 40:19
58:20 81:13
**confusion**   9:14
81:2
**conjunction**
24:7 100:15
177:22
**connection**
22:3 160:25

165:17,23
174:23
**consensus**
162:23 163:10
**consenting**
35:18
**conservative**
163:14,24
164:6,10,11
**consider**   70:18
174:10
**considered**
54:6 71:13
91:4,7 150:23
**consistent**
19:11 25:15,16
76:22 184:16
**constant**   60:20
**constituency**
96:20,21
**construction**
178:6,8
**consultation**
48:20
**cont**   3:2 4:2
**contacted**   42:5
**contain**   50:12
**contained**   54:3
**containing**
69:21
**contested**
163:16
**context**   90:10
92:15,16

**continue**   5:10
78:12
**continued**   82:5
**contract**   50:2
51:14 52:4,7
53:19 73:12
86:20 88:12
89:7 151:14
167:9 168:16
**contracts**   48:20
49:12,16 50:19
53:9 73:10
160:24
**contractual**
54:3
**contractually**
162:5
**contrast**   26:24
**control**   13:15
**conversations**
5:7 24:17
48:25 52:10
57:5 73:18
77:5 111:20
160:20 162:14
162:16,19
163:3 179:4,24
**cool**   87:8
**coordinate**
177:18
**coordinated**
45:12 85:11
**corey**   4:7
**corey.brady**
4:7

**corp**   2:9,10
**corporation**
4:5 72:8
**correct**   8:17
22:21 46:9
50:4,5 53:15
54:22 55:4,25
59:25 60:11
61:3,13 64:25
76:10 83:25
85:23 95:8
115:19 117:23
154:16 155:13
156:8,15 170:5
170:8 176:11
181:4,20
**correctly**   98:12
101:23 145:23
**corretjer**   20:25
37:19 71:22
72:22
**cost**   57:15
111:8 112:24
113:5 114:14
114:18 116:18
**costs**   51:22
57:3,10,11
110:21 111:10
111:14,19
112:4,6,20
113:8,13,19,22
113:25 114:11
114:24 115:4
115:12,22
116:5,6,22

**[costs - depending]**

177:12,22
178:9,13,15,17
178:20 179:3,7
179:16 180:2,4
180:6
**counsel** 5:14
9:3 10:9 20:12
20:21,22 21:8
21:9 24:8
72:19,20 110:8
**counterparties**
177:18
**counterparty**
178:19
**country** 189:4
**couple** 153:6
180:20
**course** 21:20
76:18 77:16
101:12
**court** 1:2 5:19
6:2,14 17:17
17:21 18:2,2,3
18:8 19:5 31:8
36:25,25
104:22 128:8
140:3 162:5
163:17 164:8
164:16 182:12
**courts** 162:6
**cover** 7:10
56:13 64:4
**craddock** 4:19
**created** 167:23

**creditor** 18:13
19:22 96:19
**creditors** 2:20
3:4,22 5:16 7:3
15:7 18:16
91:10 96:3
97:3,13 98:6
98:18,23 148:7
**current** 90:6,14
91:4,7 145:16
145:22 148:3,8
148:16,20,25
149:20 153:19
172:9,15
182:20
**currently** 91:16
99:7 114:21
**cushion** 41:16
41:17 52:25
53:5 55:10
58:4 59:13,14
63:23 64:3
65:25 66:2,5
79:21 88:7,24
89:8,10,13,17
89:25 107:4
108:23,25
133:20 134:3
134:11 155:20
159:6 162:7
164:5,6 165:15
173:8,19
**customer** 25:25
**cwt.com** 2:12

**d**

**d** 187:2
**d&v** 63:17
84:11 111:4
158:14 160:2
160:12
**d.c.** 2:5
**damage** 86:10
86:21 88:20
**damages** 35:16
51:25 57:4,21
82:2 84:25
86:15 87:20
110:23 139:21
185:23
**dash** 61:15
**database** 35:4
**date** 10:3 12:15
21:24 47:6
56:10,12 75:17
78:2 92:24
188:8 189:8
**dated** 12:8
81:13,14
**dates** 74:18
**day** 63:16 64:7
112:3 124:7
160:7 172:9,15
180:24 186:19
189:23
**deal** 18:19
21:19 33:25
74:12
**debtor** 1:15
15:7 18:13

96:19 98:2
100:16
**debtors** 1:8
96:16 97:6,7,9
97:14,18 98:9
98:16
**decades** 119:8
123:15
**december**
74:19,24 76:7
**decide** 79:2
**decided** 63:21
133:14
**decision** 161:2
173:24
**defensible**
109:14
**define** 56:16
104:8,12,15
128:6 164:11
175:5
**defined** 7:11
25:16
**definitely**
170:24
**degree** 15:21
15:24
**degrees** 15:16
16:3
**department**
122:23 137:10
**departments**
122:5,15
**depending**
105:25 106:4

173:16
**depends** 29:17
**depo** 115:18
**deponent** 189:8
**deposed** 8:5,15
**deposition** 1:18
5:13,22 7:21
8:8 9:23 11:10
12:12 16:18
87:18 147:21
149:8 187:12
189:8
**depositions**
8:20
**depository** 7:12
7:17,23
**derived** 58:6
105:17
**deriving**
171:24
**describe** 16:23
164:17 166:21
**described**
164:5 173:22
**description**
187:11
**designate** 11:19
**designated**
115:6 149:15
**designee**
149:10
**designs** 177:19
**despins** 3:6
6:21 7:2,8 9:22
12:3,11,20

13:11 26:10,15
43:11,16 60:14
68:25 74:2,11
75:11 77:8,13
77:22 78:3
87:7,12 93:14
93:19 94:4
95:9 99:4
103:20 110:17
149:8 154:5
185:17 187:6
**detail** 24:9,12
28:7,13 55:23
63:11 115:11
**detailed** 119:5
**details** 19:14
**determination**
17:8,13,17
22:13 34:18
36:20 102:2
117:7 173:21
**determine** 18:8
18:15 19:9,15
19:17 23:16
24:13 25:11,13
37:6,12 44:25
49:14,23 68:17
91:6 93:5
119:25 120:2
120:14 121:23
122:16 137:10
148:24 149:19
173:9 178:6
179:6 182:18

**determined**
22:23 24:6
62:7 66:12
68:11 106:9
117:3 144:24
**determining**
19:3 79:12
91:3
**developed**
48:13 87:25
106:23 125:21
126:6,13,16
174:14 177:6
**developing**
178:9
**development**
51:22 57:3,10
57:11,12,15
77:18 111:19
112:2,4,6,15,20
113:5,13,19,22
113:24 114:11
114:14,18
115:4,12,22
116:5,6,18
175:21,23
176:9,18,21
177:6,12,17,21
178:4,9,17,20
179:3,7,15
180:2,4,5
**developmental**
110:20 111:8,9
111:13 112:24
113:8 114:24

**diaz** 20:13,24
23:22 34:7,13
34:15,25 35:3
36:19 37:13,14
37:18 38:8
40:6 45:13,25
46:3 48:4,21
50:4 52:3,10
52:14 54:2
59:20 62:17
69:16 70:21
71:9 72:4 73:9
73:21,22 84:10
84:16,20 85:5
85:11 89:20
108:6 117:13
123:25 124:14
124:18 125:17
127:6 139:3,17
140:5,12 158:5
158:25 160:20
161:16
**dictates** 90:18
**differ** 106:12
109:19
**difference**
60:10 67:21,24
107:16 128:23
**differences**
96:22
**different** 43:6
81:9 98:8,18
106:5 122:15
134:21

**[differentiation - earlier]**                                    Page 15

**differentiation**
99:2
**differently**
96:18
**direct** 21:25
**disallowed** 29:6
29:22,24 30:18
30:19 64:15
165:3,5
**disaster** 13:14
**disclosed**
183:17
**disclosure**
46:19 48:8
50:7 53:11
56:23 74:16,21
74:23 75:5
120:21 126:17
129:2 137:23
138:6 141:16
141:19 147:22
187:16,18
**disclosures**
148:12 183:15
187:14
**discount**
157:16 161:2
165:19,25
168:3 170:3
171:14 172:4
172:11,12,16
172:19 173:13
173:23,24
176:7

**discounted**
154:13 156:12
156:13 167:13
167:15 169:13
169:14 171:4,9
171:15,24
**discounts**
167:23
**discuss** 22:4
70:5 137:18
**discussed** 52:7
72:2 110:18
111:2 163:12
175:20
**discussing**
174:19 175:3
**discussion** 7:15
48:9 50:8
154:9
**discussions**
52:3,14 59:20
63:16 105:7
108:3 110:8
118:10 165:11
183:3
**disposition**
107:9
**dispute** 56:2,3
56:4,4 140:20
152:6
**disputed**
142:23,25
163:16
**disputes** 72:17
72:18

**disputing** 141:7
**distraction**
129:20 131:11
132:8
**distribution**
38:4 122:22
**district** 1:2,2
5:19,20 18:3
36:25
**divided** 139:20
**docket** 7:15
**document** 10:2
12:14 21:23
47:5 49:23
75:16 77:25
80:9 183:17
**documentation**
64:11 117:4,9
117:12,17,19
117:20
**documents**
10:12 20:2
85:10 112:18
119:17 140:12
147:5,8 168:20
**doing** 13:7,8
19:6 70:15
81:22 97:9
113:12 122:17
123:14 165:18
165:24 185:5
**dollar** 30:5
42:5,14,14
68:22 86:23
87:18 88:18

89:4,12 124:5
**dollars** 91:10
128:17 155:13
**domain** 137:19
138:12 184:12
**draft** 147:20
**draw** 11:9
14:24
**drill** 107:14
**due** 136:4
**duly** 6:17 188:8
**duplicate** 27:3
**duplicates**
26:25 27:6
**duplicative**
110:6 135:6,9
135:10

**e**

**e** 2:2,2 3:2,2 4:2
4:2 6:16,16
22:2 69:18,23
70:2,3,9,10,12
70:16,21 71:9
71:21 74:4
187:2,4,9,20,20
188:2
**earlier** 78:7
81:25 99:15
103:20 117:16
124:13 153:7
154:3 160:19
170:23 174:19
175:4 176:6,13
181:16 183:13
185:13,16

**[early - estimates]**

early 18:11
85:6 180:23
earn 112:8
178:19
earning 178:21
easier 61:8
easy 38:11
economic 15:16
edit 14:15
eduardo 71:22
education
15:19
effect 31:8
104:10
effectively
156:11
effort 177:23
efih 96:11
either 50:23
51:24 102:10
108:3 110:6
126:13 144:15
158:6 162:4
175:12 182:11
electric 1:14
electricity
152:19
emanuel 2:14
95:2
emergency
121:13
eminent 137:19
138:12 184:12
employed
169:5 188:13

employee 64:8
118:21 120:3
133:25 134:13
135:16,21
136:18,23
employees
24:17 38:7,10
62:23,25 63:20
111:22 119:6
121:20 122:17
123:13 124:3
124:18 129:4
133:3,6,17
179:5,25
energy 96:11
enjoyed 62:11
132:3
ensure 42:11
59:13 63:22
65:24 66:4
79:20 98:12,14
108:24 159:5
163:15
entire 9:9
entities 143:3
150:2,5 151:25
152:2 183:4
entitled 142:15
142:19
entity 28:13,18
equal 53:18
equals 125:25
errata 189:2
esq 2:6,12,17
2:22 3:6,7,8,13

3:19,24 4:7,12
essentially 38:5
56:25 57:20
58:2,16 114:4
115:11 118:16
125:20 131:9
131:10 132:2
152:15
establish 9:13
20:4,6 85:12
173:19
estate 98:3
estimate 17:3
17:23 18:22
22:19 23:7
30:8 32:24
33:17 37:6,8
38:19 41:11,17
42:8,25 44:10
44:17 45:6,22
64:3 66:2
76:13,16 77:19
79:15,15 82:4
82:10 83:12
106:22,24
107:16,22
108:2,10,23
109:4 122:6
125:4 130:22
154:14 155:12
155:25 156:2
159:7 161:2
162:25 163:21
177:12

estimated
11:12 15:6
19:4 22:6
47:19,20,22
48:2,3 51:2,11
56:15,19 58:7
59:3,4,23 64:9
71:11,11,12
75:24 76:23
79:19 80:3,22
86:24 102:20
103:22 104:2
104:16,18
106:7,8,12,12
106:15 107:17
108:21 109:17
109:20,21
110:11 113:15
114:3 122:12
125:5 129:16
129:23 132:16
135:20 136:14
137:24 139:14
139:14 141:21
143:5 155:8,22
155:23 156:20
160:14 164:2
184:10,14
estimates 35:4
35:23 76:18,20
82:14 97:14
108:2 134:9
136:8 158:24
159:25 182:24

**[estimating - expertise]**

**estimating**
16:19 32:23
83:14 108:25
123:9 126:24
136:2 140:25
**estimation**
16:18 17:2
18:14,20 23:2
45:19 46:5
48:12 49:5
56:24 58:4
70:24 75:6
79:11 113:9,10
114:23 129:19
129:22,22
132:20 137:21
138:5,9 145:5
145:10 147:10
158:7 165:18
165:24 169:11
170:22 171:5
172:9,14 174:2
174:23 181:8
181:23,24
185:22
**et** 1:7 5:18
98:24 177:14
189:7
**evaluate** 18:22
19:8,13,24
20:19 34:17
39:3,10 82:5
98:2,20 124:19
130:6 133:8
158:9

**evaluated**
37:11 39:7
40:5 42:6 62:6
99:18 158:6
**evaluating**
29:14 36:12
45:14 63:19
70:14 72:9
85:7 125:18
140:10 141:4
**evaluation** 98:4
**event** 137:15
163:17 185:23
**eventually**
117:18
**everyone's**
117:10
**evident** 21:5
168:5
**exact** 95:18
171:20
**examination**
6:20 94:22
153:2 185:11
187:5
**examined** 6:19
**example** 8:22
26:6 28:9,11
30:22,24 31:4
33:22 40:7,9
41:21 42:3
60:4 96:10,25
97:2,4 105:18
106:16 119:22
120:18 122:7

127:4,12
139:19 166:3
175:10
**examples** 27:23
121:6
**exchanged**
69:23
**exchanging**
179:18
**exhibit** 9:23
10:2,5,6,7,11
10:11,16,17,18
11:4,9 12:12
12:14,18,18,23
12:23 13:2,13
13:20,22,23
14:6,7,11,12,18
14:19,23,24
21:23 46:19,20
47:5,7,8 56:14
64:19 65:7
74:14,15 75:10
75:12,14,16,19
77:23,25 78:4
78:7,21,22
79:4 80:10,24
81:12 82:9,25
86:7,8,8,9,24
87:16,17
101:11,14,16
101:19 103:23
115:18 125:4
129:15,23
134:15 147:21
147:21 154:22

157:11 183:13
183:22 184:5
184:25 187:11
187:12,13,14
187:15,15,16
187:18
**exhibits** 7:9
13:16 81:11
148:13
**existed** 50:18
**existing** 153:21
**exists** 59:23
**expect** 115:8
**expectation**
23:24
**expectations**
76:22
**expected**
109:14 184:6
**expecting**
168:15
**expense** 90:14
91:3,6,7
145:17,22
148:3,9,16,20
148:25 149:20
**expenses** 90:6
90:18 91:4
**experience** 34:7
123:15
**expert** 16:11
183:14
**expertise** 18:6
18:21 34:21,21
45:5 49:14,22

[experts - focus]                                              Page 18

experts  45:13
expires  189:25
explain  56:20
explained
  149:8 176:12
  178:23
explicitly  50:13
exposure  82:21
  174:7
expropriation
  70:14 138:16
  139:2,9 140:3
extent  27:11,17
  36:6,13,17
  39:9 41:3,17
  43:9 51:23
  55:11 63:23
  65:18,21,23
  68:10 79:16
  89:25 91:23
  99:24 105:21
  108:15 109:23
  119:21 120:9
  158:2 159:7
  160:4 173:6
extrajudicial
  139:25
extrapolated
  88:15
extrapolating
  89:3

                    f

f  188:2
fact  42:18
  50:11 53:10

64:12 66:18
81:25 128:20
factor  161:25
  173:13
fair  39:14 56:6
  97:12 99:3
  104:3,4 105:24
  106:3 109:3
  110:21 120:24
  120:25 142:21
  181:19
fall  110:18
familiar  90:5
  129:5 137:21
family  20:18
far  28:25
  102:14 106:21
  116:17
fault  128:14
  170:24
february  74:19
  80:16 81:14,17
federal  140:22
  140:25 141:10
  141:24 142:23
  143:8,13
  184:14
fee  116:6
feel  8:25 49:21
  121:18
felt  41:4,18
  59:7 65:19
  110:4,5 134:2
  161:20,24
  165:12,14

173:12
figure  33:9
figuring  107:21
file  66:18
  182:21
filed  5:18 25:7
  28:21 29:8
  31:15 36:7
  39:3 41:12,16
  44:6,14 49:10
  65:11 66:17
  74:21,23 76:6
  82:9 88:6
  92:17 93:12
  98:25 105:14
  118:9,13,13
  138:15 140:2
  142:2,3 143:3
  148:11,13
  150:22 151:2,7
  151:8 165:9
  167:4 179:24
  181:18 182:7
files  34:12,12
  34:16,17 140:6
  158:8
filing  92:22,24
final  102:2
finally  183:12
finance  4:4
  122:23
financed
  178:25
financial  1:5,11
  3:16 5:17

125:22 126:17
  126:19,24
  189:6
financially  6:7
find  33:14
  35:23,25 65:10
  86:9 163:17
  164:8
fine  79:10 96:8
  100:13 150:20
finish  157:5
firm  6:4 64:20
  64:23,23 65:8
  65:11 66:12
  67:13 69:15
  71:24 72:4
  77:17 143:20
firms  21:15
first  6:17 8:8
  12:4 14:19
  15:15 19:7
  34:11 36:8
  37:2 47:24
  111:15,17
  117:2 154:4
fits  64:24 65:11
five  93:15
fix  11:6 13:3,6
  13:14 14:22
  121:14
floor  2:5
flows  171:24
focus  29:21
  40:10

[focusing - going]                                                      Page 19

| | | | |
|---|---|---|---|
| focusing   63:18 | 182:4 183:8,21 | futures   96:11 | given   54:23 |
| folder   10:7,14 | formal   95:16 | **g** | 64:10 109:8 |
| 13:23 | formula   122:10 | gather   123:5 | 161:8 162:20 |
| folks   49:2 | found   128:8 | gears   90:4 | 186:6 |
| 111:21 | foundation | 154:2 175:18 | gives   18:21 |
| follow   81:15 | 78:24 80:19 | general   11:14 | giving   17:22 |
| 153:6 176:15 | 86:13 87:4,10 | 11:18,24 22:7 | go   5:11 8:18 |
| followed   23:6 | 88:23 | 22:19 24:20 | 14:16 15:14 |
| follows   6:19 | four   93:22 | 28:24 32:16,20 | 18:24 19:2,6 |
| fomb   92:19 | frame   133:4 | 46:17 75:21 | 35:20 55:20 |
| foot   128:14 | framework | 76:24 99:11,12 | 56:22 61:6,8 |
| foregoing | 15:11 | 104:23 108:25 | 64:18 92:3 |
| 188:7,9 | frankel   2:3 | 137:12 139:12 | 94:8 101:13 |
| form   30:4 34:4 | free   8:25 | 141:15 144:11 | 106:17 116:2 |
| 36:5 37:10 | freeze   32:20 | 144:16,18 | 118:5 119:24 |
| 38:21 39:25 | frequent   38:11 | 147:11,14 | 120:4,12,13 |
| 43:9 44:23 | front   74:15 | 157:12 178:24 | 121:25 123:4 |
| 45:21 46:8 | fuel   4:10 144:2 | 184:11 | 124:18 129:14 |
| 49:18 51:16 | 144:7 145:5,7 | generally   55:18 | 131:25 141:16 |
| 53:24 54:12,19 | 145:15 146:11 | 55:21 57:11,16 | 145:24 154:24 |
| 55:2,20 60:8 | 146:16,22 | 71:3 76:21 | 164:9 167:7 |
| 65:3,14 66:22 | 147:9,19,25 | 90:23 144:3 | 173:9,11 |
| 68:21 90:12 | 148:17 | georgia   2:21 | 177:16 |
| 97:21 103:13 | full   57:17 61:17 | getting   10:10 | god   32:18 |
| 104:14 107:24 | 130:16 142:15 | 29:4 68:3 | goes   105:2 |
| 109:10 129:11 | 142:20 | 90:19 122:18 | going   5:3 8:22 |
| 136:12 153:15 | further   52:9 | 178:2 | 10:25 12:24 |
| 157:22 161:14 | 94:5 137:9 | giarro   1:22 6:3 | 19:24 30:7 |
| 162:22 166:19 | 188:12 | 188:5,18 | 38:14 39:20 |
| 166:25 168:22 | future   149:2 | give   13:15 28:7 | 43:17 44:12 |
| 169:17 170:7 | 166:16,22 | 30:22 76:9 | 46:15 75:9 |
| 171:7,17 172:7 | 168:14 171:24 | 89:12 116:8 | 76:9 80:24,25 |
| 172:23 174:4 | 174:20,24 | 127:12 143:23 | 86:16 89:11 |
| 175:2 176:2,23 | 175:5,12 | 166:2 | 93:21 115:17 |
| 177:9 181:11 | | | 119:8 125:3 |

**[going - identify]**

Page 20

137:11 159:6
166:9 171:20
176:14 179:17
179:18 180:22
183:8
**good** 5:2 6:22
6:24 33:7
57:13 94:24
153:4
**gotshal** 4:4
**gotten** 43:6
99:16 158:8
178:12
**governed** 83:24
**government**
150:5,24
151:20
**governmental**
150:2,14 151:7
**great** 93:18
**grievance**
70:12 81:23
83:6 84:17
85:15 86:15,18
102:12 103:9
118:9,13,20,25
120:15,15
121:3 123:7,10
123:17 125:10
125:12,14
**grievances** 81:4
81:16 83:24
84:25 85:2
**ground** 31:15
124:6 174:14

178:12
**group** 2:4
110:3 125:17
125:19,20,22
144:5 163:9,9
**guarantee** 2:15
4:5 95:3
**guaranty** 2:9
2:10
**guess** 76:5,8
78:7 122:12
125:16 161:8
**guidance**
161:16
**guys** 84:12

**h**

**h** 6:16 187:9
**half** 29:10
**halfway** 30:10
**handle** 32:6
33:17,21
**handled** 72:22
**handling** 72:13
**hanging** 13:25
**happen** 164:15
**happened**
81:20
**happening**
10:21 182:19
**happens** 36:10
**hard** 30:8
**hastings** 2:19
3:3
**hats** 9:8

**head** 8:22
**health** 62:12,21
63:8 128:11
130:8 133:13
**hear** 20:20
63:14 77:22
**hearing** 183:19
183:24 184:4
184:19,23
**held** 1:19
**help** 23:23
43:18 124:15
154:22
**herring** 4:12
**hey** 70:15
130:4
**hi** 153:5
**hiato** 126:11
**high** 47:20 48:3
52:23 56:18
58:20 59:3,6
61:16,24 62:3
71:12 79:15
80:3,11 81:7
81:16,18 82:4
82:21 83:7,15
83:22 89:16
106:22 109:17
109:21 110:11
125:5,10,25
130:15,20,22
136:7 139:14
155:18,22,25
156:2 165:13
173:7

**higher** 14:12
33:5 41:19
52:23 55:13
88:14 91:18
100:11,23
108:15 155:18
**highest** 25:20
156:15,17
**highly** 131:21
**history** 24:15
**hoc** 2:4
**hold** 46:15
89:11 148:8
151:21
**hopefully**
143:24
**hoping** 14:21
**hours** 115:10
119:25
**houston** 2:16
**hr** 63:18 120:4
137:9

**i**

**identification**
10:3 12:15
21:24 47:6
75:17 78:2
**identified**
27:13 36:18
40:13 41:24,25
42:4 62:24
111:18 115:3
135:12 136:22
**identify** 25:8
27:9 28:10

34:11 51:23
135:10 148:15
159:21
**identifying**
140:6
**ignore** 35:24
**iii** 143:3
**illinois** 3:18
**imagine** 17:13
30:9 84:7
103:19
**immaterial**
68:8,18
**immediately**
96:25
**impact** 137:13
**impacted** 62:25
63:20
**include** 62:21
70:4 105:6
110:10,23
114:7 118:21
126:7,8,9
133:19 134:25
135:2,3 155:13
184:7
**included** 19:14
23:9 24:20
38:18,24 40:4
41:15 42:7
82:3 88:2
90:16,17 93:7
110:6 130:21
133:23 134:22
135:5 136:15

138:4 147:4,10
147:14,20
155:25 156:9
162:15 167:6
169:21 170:17
177:11 178:2
179:7 180:2
**includes** 41:15
45:23 126:2
**including** 20:12
137:8 162:14
162:15
**incorporate**
35:3
**incorporated**
24:20 86:21
95:3
**increase** 66:3
90:3
**incremental**
63:7
**incurred** 63:9
177:22 178:14
179:16 180:6
**indenture**
90:17
**independent**
123:20,24
**indicated** 42:19
188:9
**individual**
86:17 89:22
104:25 108:4
**individually**
68:9

**industry** 95:14
**information**
7:11,16 24:15
62:18 79:7
93:5 110:2
114:5,23 115:2
117:21 119:12
123:5 133:7
161:23 162:19
183:10
**informed** 59:19
105:7,8 164:25
**initial** 25:9
100:20 167:8
**initially** 23:10
41:23 42:13
113:14 171:21
**input** 34:24
45:25 69:15
71:13 84:17,18
**inputs** 48:23
58:8
**inputted**
169:10
**insights** 71:14
73:20 139:4
**instance** 37:2
83:4 107:11
120:20 121:22
136:3 168:12
**instances**
179:10,11
**instructed**
128:9

**insufficient**
117:4,9,11
**insurer** 95:7
**interaction**
21:14
**interest** 74:8,9
142:7 147:3
**interested** 6:8
26:22
**interesting**
80:14
**internal** 82:21
**internally**
122:20
**international**
3:22
**interpose** 9:5
**interposes** 9:3
**interrupt** 32:21
**interrupting**
8:13
**intricately**
124:2
**introduce**
10:22 12:24
**introduces**
14:14
**introducing**
10:23 14:2
**invalid** 24:2
**invalidity**
109:6
**invasion**
121:10

**[inverse - law]**

**inverse** 137:19
138:12,16
184:13
**investigation**
176:20 177:2
**invoiced**
112:19 113:7
**invoices** 31:3
93:4,7 115:9
**involve** 7:10
**involved** 18:14
18:18 34:9
91:14 95:17
111:23 119:6
122:4,4 123:14
124:2 125:18
126:23 127:3
138:8 140:24
141:3,5
**irs** 142:2,3,11
142:14 143:21
**isolated** 140:11
**issue** 44:12
64:19 87:10
178:14
**issues** 14:2 16:5
88:9,12 135:4
**item** 43:19,22
44:2 81:3,8
**items** 82:15

**j**

**jane** 2:6 94:13
153:4
**job** 96:17
122:18

**jtomic** 2:7
**juan** 71:2 124:7
**judgment**
59:11,15,17
83:13,19 128:3
162:9
**judgmental**
161:22
**june** 32:8
**justify** 83:14
98:10

**k**

**k** 2:5 6:16,16
**katz** 4:10
**kdc** 164:22,23
165:7
**kelly** 2:17
94:12,23,25
101:13 145:24
152:22 153:7
187:6
**kind** 9:13 19:25
73:19 103:3
110:18 134:19
**know** 11:3 13:3
14:8 17:21
22:18 26:12
27:7 29:8,9,11
29:17 30:10
31:10,11 33:3
33:13 36:10
37:15 38:2
45:2 46:18
49:24 50:25
52:25 55:21

59:7,18 63:4
66:2 76:6,18
78:15,19 79:13
79:14,22 82:12
84:4,5,6 85:21
86:4,4 90:16
90:21 91:13
95:4,9,18
96:14 97:5
99:24 102:8
103:18 104:10
104:21 106:22
108:13 116:8
117:25 118:22
120:10 124:17
128:5 129:12
130:4 134:2
141:8 142:18
142:22 143:10
143:16,18
144:8,11,15,17
144:21,23,25
145:7 146:23
147:16 150:11
150:21 151:24
152:5,21
162:13,24
164:8,11
171:21 172:2
172:10,18
173:3,5 174:15
175:22 179:21
182:13
**knowledge**
9:12,15,18

20:16 148:19
148:22 151:14
151:17,20
181:2
**knows** 91:25
**kramer** 2:3
94:14 153:5
185:7
**kramerlevin....**
2:7
**kroll** 25:7,16
42:5,18
**kwhitner** 2:23

**l**

**l** 6:16
**label** 12:22
**labeled** 10:16
14:20
**labor** 118:11
119:15 122:14
**lack** 64:10
**language** 51:8
**large** 24:19
29:12 30:11
124:5
**larger** 40:7
102:3,15
**largest** 39:19
39:19 40:10
**late** 85:6
**laura** 3:24
**law** 21:15
52:11 54:7
57:6 73:13
83:25 139:8

**[law - looked]**                                                    Page 23

143:20 160:22
**laws** 136:25
**lawyers** 21:16
  21:17
**learned** 139:25
**legal** 6:4 16:7
  17:11 21:20
  34:18,21 49:23
  55:25 71:16
  84:3 90:12,15
  90:22 108:6
  113:2 122:22
  131:22 142:17
  144:20 145:19
  149:4 186:10
**legally** 128:5
**lenders** 4:10
  96:13 144:2
  145:5,8,16
  146:12,16,22
  147:9,19 148:2
  148:17
**letting** 13:7
**level** 25:20,23
  39:12 52:25
  97:19 98:4
  120:2 152:7
  161:22 165:13
**levin** 2:3 94:14
  185:7
**liability** 27:22
  28:6,14,18
**liable** 28:19
  63:7

**liberty** 2:10
**license** 126:8
  126:14 127:4
  127:16 135:3
**licenses** 137:3
  180:7
**licensing**
  179:19
**lieu** 152:18
**likelihood**
  130:25 131:15
  154:14 161:3
  163:12 183:4
**likely** 178:10
**line** 4:10 43:19
  43:22 44:2
  61:6,9 81:5,16
  82:25 88:3,18
  115:16,17
  129:16,23
  130:16 134:15
  144:2 145:5,8
  145:16 146:11
  146:16,22
  147:9,19,25
  148:17 155:8
  157:23 187:22
  189:9
**lines** 60:17
**lipton** 4:10
**liquidated**
  36:15
**list** 12:8 159:19
  187:13

**listen** 130:4
**lists** 115:4
  137:24
**litigating** 141:6
**litigation** 21:20
  26:5 33:22
  34:6,8,19
  35:11,14,17
  36:14 40:8,10
  45:8,11,14,16
  45:24 52:22
  53:2 54:16,21
  54:24 55:7,11
  55:16 56:5
  60:13 61:9
  69:25 70:5,18
  72:10,13,14,19
  102:13,14
  103:9 105:19
  108:19 127:22
  129:15 154:15
  157:24,25
  158:12,18,22
  159:13,20
  160:15 161:4
  164:10 173:17
**little** 40:19
  91:18 95:10,12
  98:7,17 99:5
  100:10 103:21
  104:9 107:15
  110:15 116:25
  117:15 135:22
  137:17 146:11
  154:2,22

164:17 166:9
  175:18 176:12
**llc** 189:2
**llp** 1:20 2:3,9
  2:14,19 3:3,11
  3:15,21 4:4
  5:23
**loans** 144:6
**located** 1:20
**location** 5:21
**long** 171:9
**look** 9:15,16
  40:21 41:6
  47:10 65:8
  68:13 71:6
  78:5 86:7
  97:13 106:17
  108:9 120:13
  121:25 133:12
  141:14 150:17
  157:23 168:10
  174:17
**looked** 23:14
  23:18 24:12
  27:7 39:12
  40:12,12,15,17
  40:22 41:2
  44:25 47:3
  51:20 57:22,23
  68:11 83:14
  100:16 111:10
  133:22 137:5
  140:12 145:7,8
  145:11 146:19
  146:21 147:2,4

**[looked - mark]** Page 24

153:12 158:22
158:23 161:20
168:24 169:19
169:20,20
171:21 175:13
**looking** 63:18
73:20 76:23
78:10,21 86:16
87:16 96:6
106:2 118:21
118:23 133:10
140:5 170:20
**looks** 10:13
13:25 76:6
136:3,6
**loss** 129:4
**lost** 50:14
51:22 52:2,6,8
52:12,18 53:6
53:9,20 54:5,9
55:9 57:3,19
58:15 110:19
111:3 119:23
130:6 154:6,15
155:6,9,14
156:6,12,20
157:19 160:18
160:23,25
161:4 163:13
163:19 164:22
165:6 166:13
166:13 167:4
168:11,18
169:2,11,22
170:3,14,20

172:4,21 173:4
173:11 174:12
175:10
**lot** 24:22 42:16
97:9 105:11
**louisiana** 2:16
**low** 47:19 48:2
52:20 54:13,14
55:14 56:17
58:19 59:2,6
61:12,24 71:11
78:10 79:14,24
80:3,11 83:7
83:11,14,21
89:16 106:13
106:18,23
107:16,22
108:2,10,23
109:4,14
129:16,23
130:14 136:7
136:13,14,15
137:6 139:14
140:3 155:5,8
155:12 165:14
**lower** 79:23
81:9
**lstafford** 3:24
**lts** 1:3,9 5:21
**luc** 3:6 7:2
**lucdespins** 3:7
**luma** 24:16
37:17,21 38:4
38:9,10 111:22

**luma's** 115:14
**lunch** 146:5,10

**m**

**m** 6:16 187:4
**made** 15:5 22:6
22:13 51:3,10
53:22 92:9
93:2 108:20
117:8 142:4,10
162:9 173:25
179:8
**madison** 3:17
**magnitude**
89:13 133:9
**mails** 69:18,23
70:2,3,9,10,12
70:16,21 71:9
71:21 74:4
**majority** 39:8
39:11 50:12
51:5,6 53:12
118:2
**make** 9:13
12:25 17:7,12
35:12 36:19
41:8,8 42:21
47:25 53:2,4
65:6 75:11,14
98:10 107:11
115:15 124:20
134:10 155:2
169:24 175:6
182:22 185:14
**making** 17:17

**management**
1:5,11 3:16
5:17 49:2
111:21 179:5
179:12 189:6
**managerial**
134:24
**manges** 4:4
**manner** 128:25
**march** 12:8
80:17 81:13
82:9
**mark** 1:18 5:13
6:1 7:1 8:1 9:1
10:1 11:1,19
12:1,17 13:1
14:1 15:1 16:1
17:1 18:1 19:1
20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1

**[mark - middle]**                                                    Page 25

| | | | |
|---|---|---|---|
| 71:1 72:1 73:1 | 150:1 151:1 | **maximum** | **member**  63:9 |
| 74:1 75:1 76:1 | 152:1 153:1 | 82:17 | 121:11 128:23 |
| 77:1 78:1 79:1 | 154:1 155:1 | **maza**  3:8 | 133:25 134:4 |
| 80:1 81:1 82:1 | 156:1 157:1 | **mean**  16:24 | **members** |
| 83:1 84:1 85:1 | 158:1 159:1 | 23:9 25:5 | 130:11 |
| 86:1 87:1 88:1 | 160:1 161:1 | 36:23 37:13 | **memory**  46:23 |
| 89:1 90:1 91:1 | 162:1 163:1 | 45:12 54:20 | **memos**  70:4 |
| 92:1 93:1 94:1 | 164:1 165:1 | 59:15,18 76:5 | 71:17 74:5 |
| 95:1 96:1 97:1 | 166:1 167:1 | 78:11 96:22 | 160:12 |
| 98:1 99:1 | 168:1 169:1 | 102:22 103:7 | **mention**  20:23 |
| 100:1 101:1 | 170:1 171:1 | 112:10,22 | 21:2 120:21 |
| 102:1 103:1 | 172:1 173:1 | 113:3,6,8 | **mentioned**  20:8 |
| 104:1 105:1 | 174:1 175:1 | 146:21 155:7 | 24:25 26:17 |
| 106:1 107:1 | 176:1 177:1 | 163:9 166:3,17 | 28:16 54:15 |
| 108:1 109:1 | 178:1 179:1 | 171:18 174:5 | 64:12 69:14 |
| 110:1 111:1 | 180:1 181:1 | 176:9 | 99:15 100:14 |
| 112:1 113:1 | 182:1 183:1 | **meaning**  39:18 | 107:21 124:13 |
| 114:1 115:1 | 184:1 185:1 | 51:5 53:14 | 163:23 |
| 116:1 117:1 | 186:7,15 188:7 | **means**  16:21 | **mentioning** |
| 118:1 119:1 | 189:8,22 | 90:9,21,23 | 21:16 |
| 120:1 121:1 | **marked**  10:2 | 113:11,11 | **merit**  183:6 |
| 122:1 123:1 | 12:14 21:23 | 140:2 | **merits**  26:24 |
| 124:1 125:1 | 47:5 75:16 | **meant**  17:16 | 28:21 70:6 |
| 126:1 127:1 | 77:25 | 38:12 150:7 | 71:15,20 72:2 |
| 128:1 129:1 | **marking**  69:4 | 154:25 167:17 | 72:12 73:4,8 |
| 130:1 131:1 | **marks**  69:8 | **measurement** | 73:23 84:18,19 |
| 132:1 133:1 | 146:3 | 29:18 | **met**  6:25 |
| 134:1 135:1 | **martinez**  4:20 | **meat**  24:22 | **microphone** |
| 136:1 137:1 | **massachusetts** | **mechanical** | 8:11 |
| 138:1 139:1 | 3:23 | 120:24 121:4 | **microphones** |
| 140:1 141:1 | **master**  81:4 | 122:7 125:23 | 5:5 |
| 142:1 143:1 | 164:24 | 125:24 | **middle**  47:21 |
| 144:1 145:1 | **matter**  5:16 | **media**  5:12 | 56:14 58:22,24 |
| 146:1 147:1 | 63:13 | 69:5,9 146:4,8 | 78:14,15,17 |
| 148:1 149:1 | | 186:8 | 79:3 80:21 |

Case:17-03283-LTS   Doc#:24406-1   Filed:06/02/23   Entered:06/02/23 18:28:53   Desc:
Exhibit 1 - Shankweiler Deposition Transcript   Page 216 of 236

[middle - new]                                                                      Page 26

103:23
**midpoint**  57:25
58:12,14 79:25
80:5,7,11 83:6
83:8,17 104:3
104:5 107:3
136:7 156:23
**midpoints**
58:13 80:2
**million**  22:9,14
22:20 23:7
30:25 32:23
33:6,16 35:2,7
35:16 37:8
38:19 41:11,14
42:2,8,25
44:10,17 45:19
45:23 46:5
61:19 62:4
63:12 75:7,25
76:13 78:11
91:17,17
115:25 116:5,9
116:9,12 125:6
126:20 127:25
128:16,17
130:17 131:3,7
131:17 132:10
132:17,20
133:23 134:8
134:17 135:22
135:23 136:2
136:19 137:7
137:25 138:22
138:24 140:9

140:16 141:13
141:18,21
143:4 146:25
151:5,17
155:11
**millions**  91:9
**mind**  12:16
96:24 97:17
**mineola**  189:4
**minus**  125:24
**minute**  93:15
**minutes**  93:22
**mischaracteri...**
72:15
**mischaracteri...**
43:10 71:19
73:6 99:20
102:7
**mischaracteri...**
43:14
**missing**  80:9
**mistake**  150:9
**misunderstood**
55:3
**model**  34:25
35:5
**modifications**
108:20
**modified**  42:6
**molner**  3:13
**moment**  143:23
**money**  131:5
**moneys**  145:13
**monoline**  95:7

**morning**  5:3
6:22,24 94:24
154:3
**move**  8:10
108:18
**moving**  42:16
74:13 85:17
102:18,21
103:11
**muhlenberg**
15:21
**multiple**  68:5
**municipal**  2:10
**municipalities**
150:23
**municipality**
150:25 152:17
**music**  15:19
**mute**  5:8 26:11
**muted**  26:4
**myers**  3:11

**n**

**n**  2:2 3:2 4:2
6:16 187:2,4,4
188:2
**n.e.**  2:21
**naftalis**  2:3
**name**  5:25 6:25
94:25 142:9
189:6,8
**national**  4:4
**nature**  34:11
41:7 62:6,19
108:7 111:25
137:12 159:4

171:14
**ne**  2:21
**necessarily**
27:21 70:23
83:20 110:5,9
112:4 114:8
121:16 124:4
140:19
**necessary**
80:15,16
126:16
**need**  9:12 10:5
37:24 79:3
90:2
**needed**  114:22
121:16
**needle**  102:19
102:22 103:11
**needs**  113:25
**negotiating**
143:21 177:13
**negotiation**
144:22
**neither**  73:4
**never**  118:14
174:13 177:5,6
178:11
**new**  1:21,21,24
2:11,11 3:5,5
3:12,12 4:6,6
4:11,11 5:23
5:23 6:18
128:25 189:2,4
189:4,4

**[nicely - office]**

| | | | |
|---|---|---|---|
| **nicely** 26:16 | 156:19 158:20 | 28:2,5,25 | 166:24 168:21 |
| **nicole** 3:13 | 158:21 164:13 | 29:10 30:13,20 | 169:16 170:6 |
| **night** 66:8 | 164:19 168:25 | 31:5,24 56:9 | 171:6,16 172:6 |
| **nmolner** 3:14 | 168:25 169:10 | 135:13 136:24 | 172:22 174:3 |
| **nodding** 8:22 | 171:25 179:17 | **objecting** 29:15 | 174:25 175:25 |
| **non** 28:12 | 186:8 | **objection** 9:4,5 | 176:22 177:8 |
| 126:22 | **numbered** | 17:10 30:3 | 181:10 182:3,7 |
| **normal** 21:20 | 157:13 | 31:11,15 34:3 | 182:21 183:5,7 |
| **normally** 13:18 | **numbers** 13:13 | 36:4 37:9 | 183:20 |
| **notary** 1:24 | 14:6 61:7,8 | 38:20 39:24 | **objections** 6:9 |
| 6:17 186:22 | 78:11 81:2 | 43:8 44:22 | 11:18,25 12:2 |
| 188:6 189:25 | 133:10,11 | 45:20 46:7 | 28:20 29:9 |
| **note** 5:5 11:23 | 151:22 154:11 | 49:17 51:15 | 93:12 105:13 |
| 149:12 | 154:13,19 | 53:23 54:11,18 | 180:24 181:2,9 |
| **noted** 6:12 12:2 | 155:2 | 54:25 55:19 | 181:18 182:2 |
| 157:8 186:13 | **numerous** 36:8 | 60:7 65:2,13 | 182:23 |
| **noteholders** | 122:4 | 66:21 67:3,9 | **obligation** |
| 96:13,15 | **nw** 2:5 | 67:14,25 68:20 | 174:8 |
| **notes** 174:18 | **o** | 71:18 73:5 | **obligations** |
| 188:11 | | 78:23 80:18 | 152:16 153:20 |
| **notice** 9:24 | **o** 46:20 47:8 | 84:2 86:12 | 153:22 |
| 149:14 187:12 | 56:14 64:19 | 87:3,24 88:22 | **obtain** 62:18 |
| **number** 11:4 | 65:7 74:15 | 89:14 90:11 | 64:19 |
| 14:12,14,15 | 78:7,21 79:4 | 92:12 97:20 | **obtained** 23:11 |
| 18:17 20:5,11 | 80:10 86:7,8 | 99:19 100:8 | 31:7 34:16 |
| 22:23,24 29:12 | 86:24 87:16 | 102:6,10 | 93:4 |
| 29:18 30:11 | 147:21 187:4 | 103:12 104:13 | **obvious** 133:2 |
| 52:22 60:20 | 187:15 188:2 | 107:23 109:9 | **obviously** 17:2 |
| 62:24 63:19 | **o'melveny** 3:11 | 112:25 129:10 | 27:6 47:18 |
| 68:7 72:7 81:3 | **o'neill** 21:11,14 | 135:13 136:11 | 92:2 97:8 |
| 86:19,22 88:5 | **object** 27:10,15 | 136:23 142:16 | **occasions** 69:14 |
| 100:23 105:4 | 64:14 91:23 | 144:19 145:18 | **offered** 12:7 |
| 134:23 138:24 | 112:23 113:4 | 149:3 153:14 | **office** 49:3 |
| 154:20,21 | **objected** 23:25 | 157:21 161:13 | 111:21 115:15 |
| 155:11 156:19 | 26:19,23 27:5 | 162:21 166:18 | 118:12,16 |
| | 27:8,22,24 | | |

**[office - particular]**                                          Page 28

119:7,11,15
122:14 179:5
179:13
**offices**  1:19
71:3 88:6
112:14 124:7
**official**  2:20 3:4
3:21 5:15
**offset**  152:15
152:20 153:25
**offsets**  152:8,11
153:8,13
**oftentimes**
23:22 27:5
36:10 51:21
55:22 70:25
108:14 112:7
112:12 121:8
122:21 167:5
167:10 171:23
177:24,25
**oh**  21:4 141:14
**okay**  12:3
13:21 32:18
56:6 74:11
85:20 87:7
99:3 107:13
110:24 138:2
**old**  128:24
189:4
**omm.com**  3:14
**once**  38:8 112:8
178:20 182:7
**ones**  124:6
126:7 127:15

172:2
**ongoing**  77:16
102:17 114:15
114:19,21
143:19
**operating**
31:22,23
**operation**
178:5
**opinion**  34:19
132:6 164:25
**opposed**  21:17
61:15 96:19
**opposes**  9:3
**order**  7:13,15
7:18,22,23,25
8:3 18:14
20:19 23:22
24:9 25:13
31:10 34:21
59:12 63:22
79:20 89:13
98:20 120:5
122:24 177:23
179:20
**ordered**  128:18
**organization**
42:20
**os**  81:12
**outcome**  6:8
108:17 173:16
182:15
**outs**  110:12
**outside**  20:12
20:21,22 72:7

72:19 91:24
121:17
**outsourced**
122:18
**outsourcing**
121:9
**outstanding**
31:2 101:2,6
103:4,6
**overall**  119:18
137:14 177:13
**oversight**  1:5
1:11 3:16 5:17
11:18 124:12
183:14 189:6
**overstate**  29:25
**overstated**  29:5
29:22 30:6,14
31:5
**overtime**
120:10,20
**owe**  152:16
**owed**  19:22
35:16 151:13
**own**  56:20
82:20

**p**

**p**  2:2,2 3:2,2
4:2,2
**p.m.**  186:13
**page**  11:9
14:25 22:2
33:3 48:12
75:18,19 78:6
87:17 101:20

154:22 184:8
184:24 187:11
187:22 189:9
**pager**  43:24
**pages**  85:9
**paid**  27:14,16
27:19 90:18
91:9 93:8
122:3,8,9,17
128:24 130:7
142:15,20
153:13,25
166:16 175:11
**pandemic**  38:5
**panel**  113:21
128:8
**paragraph**
7:13,19 22:2
**pardon**  8:13
**park**  3:5
**part**  35:2,24
56:13 72:8
88:10 112:21
124:14,15
126:19 173:25
176:25 177:12
178:17
**partially**  27:16
**participating**
7:20
**particular**
10:12 19:3
22:2 28:2
34:23 37:7
51:3,12 62:9

73:14 81:23
106:24 107:2,9
107:10 110:3
118:20 120:7
121:21 122:10
123:2,7,16
136:16 156:23
**particulars**
59:8
**parties** 5:11
7:19 125:21
126:23 127:3
148:2 149:14
186:8
**party** 6:6 8:12
121:18 122:3
126:5,13 127:9
127:11,13
182:21 188:13
**pass** 152:24
**passing** 66:7
**past** 119:8
123:14
**paul** 2:19 3:3
**paulhastings....**
2:23 3:7,8,9
**pay** 93:10
128:18,25
**paying** 128:22
142:6
**payment** 24:15
137:2 140:22
166:16,22
**payments**
90:19 91:21

92:7,8,9 93:2
142:4,10
**peachtree** 2:21
**pending** 31:12
36:23 37:4
72:13
**pennsylvania**
15:20,22
**pennzoli** 2:15
**people** 13:18
59:18 93:20
**percent** 30:10
52:24 57:21
58:17,23 64:2
64:3 89:17
99:16,18 100:6
100:23 116:11
118:2 135:19
154:20 155:17
155:19,21
156:2,6,13
157:2,3,16
158:16,16,20
159:11,12
160:14 161:21
161:24,25
163:11 164:5
169:22 173:8
173:23
**percentage**
116:16 135:15
161:9 162:17
162:20
**percentages**
161:7,8,11,12

164:2
**perform** 121:20
123:20,23
145:4
**performed** 91:2
121:17,24
126:21 160:2
**period** 62:13
**permissible**
48:16,17
**permit** 52:8
**permitted** 52:5
**permitting**
160:24
**person** 22:12
26:13
**personal** 9:11
9:15,17 132:6
**personally**
18:25 26:18
28:4 45:6,9,10
49:19,21 50:22
92:2
**perspective**
30:6 90:22
**petition** 91:10
93:3,4 153:20
153:22
**phase** 177:17
178:8
**phone** 26:12
94:10
**phones** 5:8
**pick** 5:6

**pieces** 42:16
**pivoted** 35:10
**place** 2:15 3:22
5:10 182:11
**plan** 7:12,17,22
17:5,14 62:13
128:11,25
132:4,5 133:8
133:19 137:20
140:21 144:9
**plans** 62:22
63:19 177:14
179:18 180:7
**plants** 177:3
**played** 182:24
**please** 5:5,7
6:10,15 7:25
8:25 39:15
55:4 69:10
94:3,21 146:8
165:22
**plenty** 59:18
**plus** 41:16
151:18
**point** 50:11
68:4 69:2
71:16 115:9
160:8
**pointing** 87:10
**points** 67:24
103:25
**pool** 104:23
**population**
160:15

**portion** 27:18
  31:6 57:14,22
  112:16 126:22
  140:14 142:6
  156:23 165:6
  167:5 173:12
  175:21,24
**portions** 49:12
**position** 97:9
  129:7
**possible** 180:9
**post** 9:22 91:9
  92:9 153:20
**postgraduate**
  15:21,24
**potential** 11:13
  53:2 64:4
  65:21 85:14
  86:11 87:21
  122:25 123:2
  132:25 133:9
  133:20 152:8
  165:15 167:7
  173:17 174:7,7
  174:8,8 185:18
**potentially**
  41:19 88:11
  133:16 141:6
  153:12 156:3
  163:18 164:15
  184:17
**power** 1:14
  31:22 177:3
**ppoa** 31:17
  35:15 46:10

47:14,16 48:10
48:13,20,24
49:6,12 51:3
51:20 52:7,18
56:9,24 57:8
58:5,9 59:25
70:17,20,22
71:23 72:3,21
72:25 73:15,23
102:11 103:8
106:17,19
110:15 112:9
113:18 115:18
154:5 157:19
160:18,24
164:21,24
166:14 167:4
170:4 172:21
175:20 176:8
177:4,5,11,17
177:23 178:2
178:10,18,22
179:13 181:3,9
181:18,25
183:5
**ppoas** 50:12
  52:17 55:6
  71:9 111:4
**practice** 18:11
**prasa** 151:8,18
  152:2,4,9
**pre** 38:5,6
  91:10 92:10
  93:3,4 153:22

**precise** 35:13
  42:17 43:4
**precisely** 104:9
**predict** 17:25
**preliminary**
  12:7
**prepa** 2:4 3:17
  20:11 21:18,21
  21:21 22:8
  24:16 27:22
  28:12,19 29:24
  30:19 31:2
  32:6,10 34:8
  34:10 37:16,21
  38:3 42:20
  44:6 49:3
  62:12,18,23
  63:7,25 71:25
  72:6,6 74:9
  85:6 89:20
  91:8,11 92:9
  93:5 95:7 96:6
  99:8,17 108:4
  110:2 111:22
  112:5,10,17,19
  113:6 114:9
  115:14 116:21
  117:14 119:13
  121:12,20
  122:5,12,15
  123:13,19
  124:3,9,13
  125:18 126:6
  126:15,22
  127:17,20

128:4,9,18,22
129:13 130:5
132:3,15,22
134:13 141:2
141:10 144:6
146:14 147:12
148:7,21
149:21,25
151:8,13,24
152:16 165:7
165:10,12
177:15,18
178:15 179:6
184:12
**prepa's** 20:16
  21:8,16 24:7
  24:17 38:7
  63:17,17 71:3
  88:6 109:7
  118:11,16
  119:6,10,15
  124:7 125:21
  129:7 179:25
**prepared** 78:20
  97:6 160:12
**presence** 51:4
  51:13
**present** 4:18
  165:20 166:2,7
  166:7 167:13
  167:15,23
  168:3,14 169:8
  169:13,15
  170:4,15,18
  171:4,15 172:5

**[present - protective]** Page 31

| | | | |
|---|---|---|---|
| 172:20 173:24 | 83:2 94:3,21 | **profit** 51:22 | 60:25 62:5,10 |
| 174:11 | 146:8 | 52:18 53:6,9 | 66:17 84:23 |
| **presume** 77:7 | **proceeding** | 53:20 54:5,9 | 92:17 108:4 |
| **pretty** 137:13 | 6:10 | 55:9 57:4,19 | 109:24 111:18 |
| 143:17 | **process** 18:20 | 58:15 168:19 | 114:7 115:5 |
| **previously** | 19:17,21 23:6 | 169:22 172:21 | 131:25 140:18 |
| 43:15 | 23:9 29:4,13 | 173:4 175:10 | 148:14 167:20 |
| **principal** 147:2 | 29:14,25 32:6 | **profits** 50:14 | 168:5,6,10,19 |
| **principally** | 36:16 37:5,12 | 52:3,6,8,13 | 169:8 170:10 |
| 37:18 38:7 | 40:2 42:11 | 110:20 111:3 | 170:12 171:3 |
| 69:25 | 56:25 61:23 | 160:23,25 | 171:13 |
| **prior** 40:25 | 84:15,21 85:12 | 163:13,19 | **proofs** 23:11,14 |
| 74:17,22 90:19 | 92:20 102:9,16 | 165:6 168:11 | 92:24 93:6 |
| **priority** 25:23 | 105:18 111:7 | 169:2 173:12 | 98:24 105:9 |
| 27:10 28:16 | 111:11,23 | 174:12 | 109:13 138:14 |
| 144:13,15 | 112:21 113:9 | **progress** 29:7 | 141:25 142:14 |
| **private** 5:7 | 113:11 114:3 | **prohibit** 137:2 | 148:10 167:3 |
| **privilege** 9:4 | 114:24 116:17 | **prohibiting** | **proper** 121:10 |
| 74:8 77:21 | 118:8 119:9 | 50:13 | **properly** 30:18 |
| **privileged** | 120:12 122:13 | **prohibition** | **propose** 177:15 |
| 77:11,14 79:7 | 122:21 124:2,9 | 53:19 | **proposed** 70:7 |
| 183:9 | 143:18 153:16 | **project** 49:2 | 70:8 144:9 |
| **probably** 9:12 | 177:13 178:3 | 111:21,25 | **proskauer** 1:20 |
| 14:9 29:23 | 179:20 182:7 | 174:12 177:20 | 3:15,21 5:22 |
| 30:7 47:2 | 182:10 | 177:24 178:4,8 | 21:3,4 48:21 |
| 61:14 93:16 | **produced** 74:7 | 178:20 179:5 | 50:4,24 59:21 |
| 95:19 100:2 | 77:12 | 179:12 | 77:5,17 79:9 |
| 116:7 150:18 | **produces** 35:6 | **projects** 178:25 | 108:5 111:5 |
| **problem** 14:18 | **product** 77:20 | **promotional** | 117:14 146:15 |
| 33:4 | **production** | 135:4 | 161:17 162:16 |
| **problems** 14:5 | 74:4 77:9 | **proof** 19:8,9,10 | **proskauer.com** |
| **procedures** | **professional** | 19:12,14,25 | 3:19,24 |
| 7:14 | 1:22 127:18 | 25:17 34:2 | **protective** 7:12 |
| **proceed** 14:11 | **professionals** | 36:18 39:7 | 7:17,21,23 8:2 |
| 14:23 69:10 | 20:15 | 49:9 55:22 | |

**[provide - really]**                                                    Page 32

| | | | |
|---|---|---|---|
| **provide** 15:3 | **provisions** | **q** | **raised** 151:12 |
| 55:10 58:3 | 17:14 73:12 | | **range** 11:12 |
| 59:12 63:11 | 124:21,22 | **question** 9:2,6 | 20:6 49:5 55:8 |
| 64:13 76:15 | 133:13 | 22:16,22 32:14 | 57:20 58:16 |
| 83:18 89:24 | **public** 1:24 4:4 | 43:4,7 46:2 | 76:17 79:12 |
| 107:4 108:22 | 6:18 186:22 | 47:10 51:9 | 89:15,16,16 |
| 117:21 134:3,9 | 188:6 189:25 | 53:17 64:16 | 151:6 173:15 |
| 152:19 158:2 | **published** | 65:5 68:5 | 174:6 |
| 162:6 164:14 | 16:13 | 74:20 76:11 | **ranged** 96:2,14 |
| 173:18 185:22 | **puerto** 1:2,5,7 | 87:15 92:5 | **ranges** 71:11 |
| **provided** 23:21 | 1:12,14 5:18 | 97:23 101:23 | 79:25 |
| 24:16 34:13 | 5:20 36:23 | 131:14 146:18 | **rather** 28:19 |
| 51:18 52:19,23 | 52:11 54:5,7 | 157:6,15 | 39:21 46:22 |
| 54:2 55:8 61:5 | 73:13 83:24 | 165:22 166:5 | **rationale** 83:9 |
| 64:2 65:25 | 95:21,24 96:4 | 170:22 174:15 | 83:10 |
| 71:14 72:11 | 136:25 139:7 | 175:7,12 | **reach** 63:10 |
| 76:17,21 77:3 | 150:5 160:21 | 176:15 181:13 | 130:3 |
| 84:16,23 85:8 | 162:6 189:6,7 | 185:9 | **reached** 138:24 |
| 88:24 105:12 | **pull** 154:21 | **questioning** | 144:22 |
| 117:18,19 | **purchase** 31:22 | 185:6,7 | **read** 7:5 62:10 |
| 118:4 119:10 | 144:7 | **questions** 8:24 | 165:9 184:8 |
| 124:11,12,19 | **purposes** 10:4 | 9:11 71:5 94:5 | **reading** 55:22 |
| 130:12 131:20 | 114:2 126:16 | 94:10,13,15 | **reads** 22:3 |
| 133:7 144:6 | 126:17,18,25 | 133:2 153:7 | **ready** 178:7 |
| 145:10 155:18 | **pursuant** 17:5 | 180:21 185:4 | **real** 21:14 |
| 158:4,13 159:9 | 49:25 122:9 | 185:17 186:5 | 182:15 |
| 159:23,25 | **pursued** 55:12 | **quick** 180:10 | **really** 18:20 |
| 160:9,11 | **put** 30:8 34:25 | **quinn** 2:14 | 21:13 26:22 |
| 161:16 167:12 | 61:14 93:21 | 95:2 180:12 | 42:2 48:17 |
| 168:2 173:15 | 131:5 | **quinnemanue...** | 58:5,6 62:9,14 |
| 184:24 | **putting** 26:15 | 2:18 | 68:3 90:21 |
| **provides** 55:24 | 54:4 118:5 | **r** | 93:21 108:22 |
| 137:20 140:21 | | | 115:6 116:6 |
| **provision** 50:13 | | **r** 2:2 3:2 4:2 | 129:25 131:9 |
| 51:13 54:4 | | 6:16,16 187:20 | 136:20 137:13 |
| | | 188:2 | |

**[really - registered]** Page 33

139:8 152:15
164:7 165:8
174:10
**realtime** 1:23
**reason** 14:7
82:13 172:25
189:9
**reasonable**
23:24 24:10
33:12 133:18
161:20 163:2
172:4,13,17
173:13 174:6
**reasonableness**
15:4 22:5
**reasons** 27:25
55:7 136:24
**recalculate**
173:11
**recall** 50:6,10
51:10 75:4,8
80:20 82:15
91:18 99:9
143:20 144:12
144:14 145:15
146:12,17
147:13,15,18
147:23 149:10
168:8 171:20
**receive** 23:10
69:18 70:10,12
71:17,21 84:8
109:25 149:14
**received** 30:23
60:23 69:15

70:9,21 71:8,9
109:24 130:9
**recent** 82:8
**recess** 69:6
93:25 94:19
146:5 180:17
**recipe** 13:14
**recognize**
52:12 160:22
**recollect** 33:5
**recollection**
72:21 76:4,12
116:2,14
141:16,18
150:25 151:5
167:10,25
169:3 170:16
171:22
**recommendat...**
69:22
**reconcile** 19:12
116:22
**reconciled**
113:25
**reconciliation**
19:17 74:10
92:20 98:14
102:11,16
105:12 113:24
**reconciling**
116:18
**record** 5:3,11
6:13 11:23
69:4,8 74:3
93:24 94:3,9

94:18,21 106:7
145:25 146:3,7
146:10 147:25
149:13 155:3
166:11 180:10
180:16,19
185:15 186:11
**recorded** 5:13
42:14 98:13
**recording** 5:9
**records** 19:11
19:13,21 27:13
27:17 65:17
116:21,23
118:18,22,23
120:4,14 122:2
**reduce** 83:3
**reduced** 81:8
153:17 158:15
159:10
**reduction**
159:15
**reemployment**
126:9
**refer** 61:8
85:25 101:10
141:11 150:15
**reference** 50:6
50:11
**referenced** 50:7
**referred** 9:25
12:13 21:22
45:7 47:4
54:21 75:15
77:24 104:2

155:19
**referring** 20:10
55:17 60:15
78:16,18 92:8
127:6 129:22
162:10 163:5
**refers** 129:3
**refine** 100:11
**refining** 76:19
**reflect** 19:22
109:11
**reflected** 41:9
44:8 62:14
82:24,24 87:19
155:21 159:17
**reflecting**
82:10
**reflects** 109:4
155:9
**refresh** 76:3,12
**refused** 64:12
**regard** 53:5
70:13 102:19
108:16 119:2
120:17 152:6
**regarding** 8:20
11:20 16:14
73:23 163:10
**regardless** 54:2
82:21
**register** 23:11
23:12 40:14
41:10,15 42:15
**registered** 1:22

| | | | |
|---|---|---|---|
| **regulatory** | 122:14 | **represent** 6:4 | **response** 8:21 |
| 179:19 | **relative** 96:6 | 7:2 95:2 97:18 | 11:17 |
| **reimburse** | **relatively** 24:18 | 109:22,23 | **responsibility** |
| 178:16 | **relied** 34:20 | 141:20 153:20 | 118:15 178:18 |
| **rejected** 86:3,5 | **rely** 50:3 123:9 | **representative** | **responsible** |
| 185:24 | 123:13 | 1:6,13 3:16 | 71:24 128:22 |
| **rejection** 73:12 | **remaining** | 189:7 | 142:6 |
| 86:9,11,20 | 153:22 158:17 | **representing** | **restructuring** |
| 87:2,6,21 | 159:12 160:5 | 71:24 96:2,12 | 16:4,15 18:11 |
| 88:12,20 89:7 | **remember** | 96:14,15,16,18 | 95:14 |
| 185:19,23 | 33:13 50:15 | 97:3,7,13 98:6 | **result** 35:7 |
| **relate** 16:4 | 75:2 116:14 | 98:9,23 | 55:12 61:25 |
| **related** 6:6 | 142:9 145:22 | **represents** | 107:7 165:2 |
| 27:21 28:11 | 171:2,12,25 | 119:5 125:13 | **resulted** 24:3 |
| 52:8 62:12,15 | **remind** 157:5 | 126:20 132:3 | 128:13 |
| 62:19 69:25 | **removing** | 142:10 | **results** 113:16 |
| 70:23,25 107:8 | 107:19 | **required** 72:19 | **retain** 124:13 |
| 130:7 142:3 | **reorganization** | **requirement** | **retained** 21:18 |
| 151:12,15 | 17:6,15 | 7:7 | 32:5,5,7 72:6 |
| 152:11 153:23 | **repeat** 65:5 | **reserve** 163:20 | 92:18 97:25 |
| 161:17 164:15 | 87:14 92:4 | 164:14 | 121:12 127:20 |
| 165:6 188:13 | 101:22 114:16 | **resolution** | 186:10 |
| **relates** 24:18 | 165:21 181:12 | 182:10 | **retains** 72:7 |
| 27:20 34:6 | **rephrase** 22:15 | **resolve** 124:16 | **retention** |
| 45:10,15 52:2 | 96:3 97:23 | 143:21 | 124:14 |
| 70:10 71:10,22 | 114:11 181:15 | **resolved** | **reveal** 79:6 |
| 73:7 81:22 | **report** 158:9 | 102:10 108:19 | 183:9 |
| 105:9 108:6 | **reporter** 1:23 | 136:6 159:8 | **revenue** 154:6 |
| 113:12,18 | 1:23 6:3,14 | 182:14 | 154:16 155:6 |
| 116:21 151:9 | 188:6 | **respect** 15:5 | 155:10,14 |
| 152:13 178:4 | **reporting** | 22:6 91:2,21 | 156:7,12,21 |
| 179:2,3 | 126:18,25 | 92:7 111:7 | 160:18 161:4 |
| **relation** 77:18 | 189:2 | 172:20 175:9 | 164:22 166:13 |
| **relations** | **reports** 77:2,4 | **respond** 8:24 | 166:13 167:5 |
| 118:11 119:15 | 77:9 178:2 | 182:21 | 168:14 169:11 |

170:3,14,21
172:5
**revenues** 112:7
157:19 167:7
178:22
**review** 19:9
22:25 24:8
25:10 27:12
28:3 39:2,21
41:5,24 48:14
48:19 49:16
57:7 60:24
66:6 89:21,24
108:4 110:4
115:23 118:17
118:17 124:9
130:2 148:5
158:3,10,10
169:2
**reviewed** 23:15
38:16,23 44:24
49:6,9,12
50:20 51:21
58:10 62:5
63:4 66:19
67:2,6,18
89:23 97:10
111:17 148:10
148:11 160:2
160:12 164:21
167:3 179:13
**reviewing**
28:10 41:21
65:7 69:24
92:16 105:19

106:19 141:5
161:22
**revise** 100:24
**revisions**
182:23
**rican** 73:13
136:25 162:6
**rico** 1:2,5,7,12
1:14 5:18,20
36:23 52:11
54:5,7 83:24
95:21,24 96:4
139:7 150:5
160:21 189:7,7
**rid** 29:4
**right** 21:10
32:13 46:17
51:6 58:18
74:23 78:22
80:6,12 100:17
101:18 104:6
109:18 117:18
117:22 121:19
122:19 123:10
128:4 129:9
135:23 138:3,7
164:12
**ring** 31:18
33:10 74:25
78:8 90:6
**rise** 128:15
**risk** 105:20
158:11,14
161:25

**road** 8:19
189:4
**robert** 5:25
**rocio** 4:20
**role** 95:25 96:9
96:11
**room** 94:11
**rose** 1:20 3:15
3:21 5:22
**rosen** 4:10
**rudis** 4:19 5:25
**ruled** 31:13
**rules** 8:19
**ruling** 31:7
**rulings** 165:16
**runs** 10:11

**s**

**s** 2:2 3:2 4:2
6:16 187:9,20
187:20 189:9
**salary** 119:22
120:2
**san** 71:2 124:7
**satisfied** 24:14
28:17 93:9,13
**savings** 62:11
132:3
**saw** 51:20
**saying** 13:18
35:15 40:22
131:25 148:6
162:8 163:5
**says** 10:18
11:12,17 13:2
15:2 33:23

51:5
**scale** 29:2,16
30:2
**scanning**
103:19
**schedule** 167:6
**schreiber** 2:12
**science** 15:18
**scope** 91:24
**scott** 4:20
**screen** 10:10
14:21
**second** 12:10
75:19
**secondary**
25:11,23 26:7
**section** 125:16
138:5
**secure** 128:13
**secured** 25:19
25:22 96:13
128:11 144:13
144:15 145:2
**securing** 180:7
**see** 11:11,16
15:8 18:23
22:10 42:25
46:23,23 47:17
55:23 56:17,17
56:18 67:21,23
75:18 81:4,17
87:11 135:8
168:18
**seem** 60:9

**[selected - silent]**                                          Page 36

| | | | |
|---|---|---|---|
| **selected** 10:15 | 23:1 24:1 25:1 | 117:1 118:1 | 188:8 189:8,22 |
| **sense** 35:13 | 26:1 27:1 28:1 | 119:1 120:1 | **shankweiler's** |
| 101:4 102:4 | 29:1 30:1 31:1 | 121:1 122:1 | 77:17 |
| 107:11 111:25 | 32:1 33:1 34:1 | 123:1 124:1 | **share** 10:5,6,7 |
| 130:24 131:15 | 35:1 36:1 37:1 | 125:1 126:1 | 10:11,11 |
| 176:18 177:2 | 38:1 39:1 40:1 | 127:1 128:1 | **shared** 77:4 |
| 179:8 180:5 | 41:1 42:1 43:1 | 129:1 130:1 | **sheet** 189:2 |
| **sensitive** 5:6 | 44:1 45:1 46:1 | 131:1 132:1 | **ships** 66:7 |
| **sent** 70:2,3 | 47:1 48:1 49:1 | 133:1 134:1 | **shlomo** 3:8 |
| **sentence** 22:3 | 50:1 51:1 52:1 | 135:1 136:1 | **shlomomaza** |
| 22:10 | 53:1 54:1 55:1 | 137:1 138:1 | 3:9 |
| **separate** 72:5 | 56:1 57:1 58:1 | 139:1 140:1 | **short** 7:5 69:2,6 |
| **separately** 72:6 | 59:1 60:1 61:1 | 141:1 142:1 | 93:25 94:19 |
| **series** 142:5,12 | 62:1 63:1 64:1 | 143:1 144:1 | 180:17 |
| **service** 121:21 | 65:1 66:1 67:1 | 145:1 146:1,9 | **shorthand** |
| 121:24 | 68:1 69:1,13 | 147:1 148:1 | 188:5 |
| **services** 121:17 | 70:1 71:1 72:1 | 149:1 150:1 | **shovel** 178:7 |
| **set** 15:11 35:14 | 73:1 74:1 75:1 | 151:1 152:1,22 | **show** 12:9 |
| **settlement** 24:5 | 76:1 77:1 78:1 | 153:1,5 154:1 | 64:22 |
| 24:6 70:7 | 79:1 80:1 81:1 | 155:1 156:1 | **showed** 14:20 |
| 105:16 119:2 | 82:1 83:1 84:1 | 157:1 158:1 | **showing** 15:4 |
| 144:22 158:24 | 85:1 86:1 87:1 | 159:1 160:1 | **shows** 14:14 |
| 159:23,24 | 88:1 89:1 90:1 | 161:1 162:1 | **side** 8:12 52:20 |
| **several** 8:6 | 91:1 92:1 93:1 | 163:1 164:1 | 54:13,14 55:14 |
| 69:14 71:4 | 94:1,6,25 95:1 | 165:1 166:1 | 58:19 97:11 |
| 72:20 | 96:1 97:1 98:1 | 167:1 168:1 | 98:19 130:14 |
| **shankweiler** | 99:1 100:1 | 169:1 170:1 | 130:15 |
| 1:19 5:14 6:1 | 101:1 102:1 | 171:1 172:1 | **sign** 7:21 |
| 6:23 7:1 8:1 | 103:1 104:1 | 173:1 174:1 | **signature** |
| 9:1 10:1 11:1,8 | 105:1 106:1 | 175:1 176:1 | 188:17 |
| 11:19 12:1 | 107:1 108:1 | 177:1 178:1 | **signed** 7:24 |
| 13:1 14:1 15:1 | 109:1 110:1 | 179:1 180:1 | **significant** |
| 15:3 16:1 17:1 | 111:1 112:1 | 181:1 182:1 | 36:11 |
| 18:1 19:1 20:1 | 113:1 114:1 | 183:1 184:1 | **silent** 53:20 |
| 21:1 22:1,4 | 115:1 116:1 | 185:1 186:7,15 | |

**similar** 51:18
111:6,11
120:11,11
139:12 142:25
143:2 152:11
157:18 159:2
**simply** 89:3
158:8
**single** 85:3
**sit** 153:24
172:25
**situation**
121:13
**six** 150:22
151:4
**size** 162:2
**skepticism**
97:15,19 98:4
**small** 136:17
**smaller** 102:22
102:24,25
**solely** 40:11
53:5 117:12
**solutions** 6:5
186:10
**somebody**
17:18 26:11
42:19 97:11
121:13,15
**soon** 143:24
**sorry** 20:20
21:4 32:20,21
37:23 38:2
46:2 47:8
55:20 56:7

58:21 60:12,14
74:19,19 81:11
164:3 174:17
**sort** 26:7 79:12
120:11,11
123:20 125:8
125:23,24
130:10 134:24
135:4 164:12
182:9
**sorts** 33:23
**sought** 33:24
**sound** 46:17
129:5,9 138:3
**sounded**
181:17
**sounds** 33:11
120:23 138:6
**speak** 38:10
**speaking** 141:4
**specific** 11:25
43:7 82:12
84:5 89:12
95:20 107:15
111:20 119:9
142:9 143:18
153:11 158:3
159:16 161:6,7
168:8 172:25
**specifically**
34:5 68:12
80:20 86:20
91:19 144:23
147:14 154:6
158:13 161:10

162:11 166:10
168:24 171:13
172:2 173:9,10
174:10 183:11
**specifics** 134:7
**specify** 150:4
**spectrum**
109:17
**speech** 7:8
**spinning** 10:12
**spoken** 43:2
**square** 1:21
3:12 5:23
189:4
**stafford** 3:24
10:4 11:22
12:16 13:17
17:10 21:7
26:3 30:3 34:3
36:4 37:9
38:20 39:24
43:8,13 44:22
45:20 46:7
49:17 51:15
53:23 54:11,18
54:25 55:19
60:7,12 65:2
65:13 66:21
67:3,9,14,25
68:20 71:18
73:5 74:6 75:9
77:10,15 78:23
79:5 80:18
84:2 86:12
87:3,9,23

88:22 89:14
90:11 91:22
92:11 93:18
94:8 97:20
99:19 100:7
102:6 103:12
104:13 107:23
109:9 112:25
129:10 136:11
142:16 144:19
145:18 149:3
153:14 157:4
157:21 161:13
162:21 166:18
166:24 168:21
169:16 170:6
171:6,16 172:6
172:22 174:3
174:25 175:25
176:22 177:8
180:13 181:10
182:3 183:7,20
185:8,12 186:2
187:7
**stamp** 10:17
**stand** 31:21
**start** 14:6 36:2
60:18 92:19
131:12 153:9
157:6 178:7
**started** 40:2
138:25 177:7
178:21
**starting** 39:19
178:6

**[starts - talk]**                                            Page 38

| | | | |
|---|---|---|---|
| **starts** 182:8 | **subjective** | **sullivan** 2:14 | **switched** 37:17 |
| **state** 1:24 6:10 | 164:12 | **superseded** | 132:4 |
| 6:18 15:20 | **submit** 178:15 | 26:25 | **switching** 90:4 |
| **stated** 168:6 | **submitted** | **supplemental** | 154:2 175:18 |
| **statement** 7:5 | 167:21,22 | 148:12,13 | **sworn** 6:17 |
| 46:19 48:9 | 169:9 170:11 | **support** 19:16 | 186:18 188:8 |
| 50:7,15 53:11 | 170:12 181:4,9 | 23:18,20 62:7 | 189:23 |
| 56:23 74:16,22 | 182:2 183:14 | 85:8 112:14,15 | **syncora** 2:15 |
| 74:23 75:5 | **subparagraph** | 115:7,8 117:5 | 95:3,4 |
| 120:22 129:3 | 14:25 | 118:3,7 130:10 | **systems** 118:24 |
| 137:24 138:6 | **subscribed** | 130:12,13 | **t** |
| 141:17,20 | 186:18 189:23 | 131:19 132:23 | **t** 187:4,9,20 |
| 147:22 187:17 | **subset** 136:17 | 132:23 134:7 | 188:2,2 |
| 187:18 | **substance** | **supporting** | **table** 97:11 |
| **statements** | 63:11 | 20:2 63:12 | 101:20 125:4 |
| 126:19 | **substantial** | 64:11 85:3 | 159:16 |
| **states** 1:2 5:19 | 115:24 | **supports** | **taft** 2:9 |
| **stay** 93:21 | **substantiate** | 115:11 | **take** 5:10 23:5 |
| **stenographic** | 114:6 118:24 | **sure** 9:13 10:19 | 69:2 83:8 89:9 |
| 6:13 188:11 | **substantiated** | 12:20,25 22:17 | 93:15 97:17 |
| **step** 126:3 | 140:19 | 23:8 30:21,23 | 98:3 107:3 |
| **stepping** 84:22 | **success** 154:15 | 35:12 37:21 | 116:8 150:17 |
| **stipulate** 76:8 | 161:3 163:13 | 41:8,8 46:25 | 180:10 |
| **stipulated** | 183:5 | 47:25 53:3,4 | **taken** 5:14 14:8 |
| 186:7 | **sufficient** 19:15 | 56:22 65:6 | 69:6 83:17 |
| **stop** 13:10 | 25:2 53:4 58:3 | 79:8 98:10 | 93:25 94:19 |
| 149:12 | 59:12,14 63:23 | 110:16 115:15 | 146:5 180:17 |
| **streams** 168:15 | 65:24 66:4 | 124:10,20 | **takings** 139:20 |
| **street** 2:5,10,16 | 79:21 108:24 | 127:23 134:10 | 139:22 140:7 |
| 2:21 3:17 4:11 | 134:2 159:6 | 150:16 155:2 | **talk** 18:25 |
| **stuff** 85:9 | 162:7 163:20 | 169:25 170:23 | 46:10 60:3 |
| **subject** 7:16 | 165:15 173:19 | 175:6 185:5,14 | 80:23 110:14 |
| 11:17,24 74:7 | **suggested** 63:6 | **swear** 6:15 | 116:24 122:14 |
| 114:14,18 | **suite** 2:16 3:17 | **switch** 137:16 | 127:21 134:12 |
| 140:20 177:3,5 | | | |

**[talked - time]** Page 39

**talked** 53:10
95:10 103:21
117:15 143:14
155:16 157:18
160:23
**talking** 9:17,18
80:8 100:22
103:14 125:15
146:11 153:8
159:14,15
166:12 175:22
**talks** 56:23
**tax** 46:22
**taxes** 152:17,18
**team** 23:3,6
38:16 39:2,5
44:4,15,21
45:6,9 50:23
50:24 90:25
162:15
**tech** 4:19 10:8
10:20 11:5
13:5,24 14:13
**technician**
12:22 13:15
**technique**
169:5
**tell** 26:21 61:23
72:15 92:14
**ten** 29:2,6,16
30:2
**term** 31:17
33:19 53:12
55:25 56:5
57:13 58:11

90:5,14,15
120:24,25
122:13 139:24
167:9 175:4
**terms** 16:18
27:2 56:20
116:16 117:21
**tertiary** 25:12
**testified** 6:19
16:10 43:15
87:5 160:20
170:9 180:23
180:25
**testify** 11:20
183:23 184:3
184:22
**testifying** 87:8
87:13 183:18
184:18
**testimony** 15:3
15:12 17:23
31:14 38:15,22
43:10 49:7
71:19 73:6
91:25 99:20,22
102:7 154:12
176:6 181:16
184:6,7 186:6
**texas** 2:16
**thank** 8:12 11:7
21:5 69:12
85:16 94:5,7
150:9 151:23
152:23 174:16
175:17 186:2

186:12
**therewith** 22:4
**thing** 111:15,17
185:14
**things** 19:7
33:24 37:2
49:4 53:18
62:20 90:5
105:4,23
108:13 111:16
134:23 137:3
154:4
**think** 10:20
13:17 17:20
28:23 30:5
35:17 40:24
43:5,13 46:20
49:22 50:20
51:19 55:5
57:7 58:4 63:5
64:6 74:14
75:2 76:21
79:25 81:23,24
82:8 83:12,20
87:4 93:16
94:13 96:12
97:22 99:22,23
100:9,10 106:3
109:11 110:25
116:10 117:10
120:20,25
125:9 127:15
129:2,12
130:21 131:18
131:20,24

132:7 133:22
135:11,18
138:21 139:16
141:12,17
142:7 143:17
145:11,12
152:23 154:17
160:6 162:23
163:8 168:23
171:19 172:25
180:8 182:5,22
185:3
**thinking** 88:10
**third** 121:18
122:3 125:21
126:5,13,23
127:3,9,11,13
**thought** 8:11
53:10 54:22
163:2 164:13
164:18 174:6
**three** 47:17
51:19 57:2
60:10 71:25
93:22 110:22
141:25 142:14
159:18 186:9
**time** 5:8 6:11
13:8 14:11
37:15 62:13
76:13,16 77:3
81:3 93:15
94:6 133:4
140:10 147:17
152:24 158:9

Case:17-03283-LTS Doc#:24406-1 Filed:06/02/23 Entered:06/02/23 18:28:53 Desc:
Exhibit 1 - Shankweiler Deposition Transcript Page 230 of 236

[time - understand]

Page 40

186:13
**times** 1:20 3:12
5:23 8:6 68:6
71:4 189:4
**title** 143:3
**today** 7:10 8:6
16:17 17:23
153:7,25
160:19 173:2
175:20 185:13
185:16
**today's** 186:6
**together**
103:11
**toggling** 81:11
**told** 79:10
160:21
**tomic** 2:6 94:14
94:16 153:3,5
180:8 185:3
187:7
**took** 79:13 83:5
107:3 120:3
136:6
**top** 11:10 39:18
89:17
**topic** 11:10,20
18:7 176:16
180:23
**topics** 7:10
137:16 184:6
184:17,22
**total** 15:6 22:6
32:9,11,15
99:6,10 135:15

136:17 141:9
156:6 170:20
171:10 184:10
184:14 186:8
**touch** 180:11
**touched** 99:4
**towards** 11:16
178:5
**training** 16:8
**transcription**
188:11
**transfer** 38:6
158:6
**transferred**
24:2 38:3,9
39:9 105:22
159:24
**transferring**
105:17
**transformer**
121:14
**translates**
133:24
**transmission**
38:3
**treaties** 16:14
**tried** 111:24
**true** 25:14
36:21 88:15
139:10,20
140:7,13,19
188:10
**truly** 116:15
**trust** 76:8

**trusted** 150:10
**try** 24:23 56:16
**trying** 10:22
13:6 14:10
33:4 43:12
63:3 98:8
116:14 139:9
**turning** 160:17
**twice** 93:10
**two** 9:8 14:18
51:24 53:18
60:16 67:24
71:25 72:20,21
72:23 76:19
81:11,12 82:15
92:22 110:19
119:8 123:15
124:8 154:11
154:19,25
**type** 20:9 31:4
42:10 57:23
63:2 73:18
101:8 105:25
108:19 114:25
135:3 168:20
**types** 27:24
39:6 40:4
73:17 102:4
105:23 110:10
110:12 115:7
126:11 133:20
135:5 139:4
141:23 158:22
164:9

| **u** |
|---|

**u** 187:20
**ucc** 183:13
**ucc's** 101:14
**ultimate** 107:8
108:17 123:12
143:11 158:24
182:15
**ultimately** 19:5
98:14 104:20
104:21 112:8
123:11 131:2
131:16 136:5
143:7 164:8
173:16
**uncertainties**
65:20 83:16
107:5,7,8,20,20
108:16 109:5
125:8 136:4
143:12 164:14
**uncertainty**
163:22
**under** 7:13
54:6 88:11,18
111:3 124:22
128:24,25
144:9 151:13
168:15 178:22
**underlying**
105:10
**understand**
16:24 17:24
19:19 27:2
31:18 33:18

37:22 39:12
40:3 41:7
43:19 47:24
50:23 52:9
53:16 78:17
95:6 113:17
133:9 139:10
139:18 145:11
146:20 166:4
166:17 175:6
177:10 178:3
**understanding**
16:20,25 19:25
34:15 48:15,18
48:24 57:6
61:4 72:17
73:10,11,13
90:9,13,14,20
105:15,20
115:16 118:2
118:10 119:14
119:19,20
121:25 128:6
128:21 142:24
146:25 148:4
152:3,14
153:18 154:12
159:4 161:15
162:3 166:15
169:25 176:5
177:16,25
178:24 181:5
**understood**
9:21 15:13
27:4 28:15

38:13 42:23
53:7,15 63:2,3
90:24 92:25
170:23 179:14
**undertake**
111:6
**undertaken**
148:23
**underway**
178:11
**underwent**
111:11
**undo** 11:4
**unfortunately**
7:4 33:12
**union** 26:2
128:10
**unit** 5:12 69:5,9
121:10 146:4,8
**united** 1:2 5:19
**units** 186:9
**universe** 32:24
32:25 72:25
**unknown** 88:8
**unliquidated**
33:18,19,25
35:10,19,20,22
36:3,7,9,12,16
38:15,17,24
39:4 42:4,12
42:22 44:13,13
44:15
**unpack** 24:23
37:24

**unpaid** 120:20
120:22
**unsecured** 2:20
3:4,22 5:15
11:14 15:7
22:7,19 24:21
25:18,21 32:16
32:20 75:7,22
76:25 97:3
99:7,11,13
104:23 109:2
139:13 141:15
144:12,16,18
144:24 147:11
147:15 157:12
184:11
**urquhart** 2:14
**use** 16:17 80:25
101:14 169:12
169:14
**used** 45:15
58:11 156:19
161:19 166:23
171:2,8 186:9
**uses** 53:11
**using** 37:12
55:25 82:13
125:9
**usually** 10:22
**utice** 60:4,13
60:15,17,18
61:9,22 62:15
62:23,24 63:9
63:10 64:8
102:13 103:9

127:22 128:3
128:10,10,19
128:23 129:15
130:4,11 133:3
133:25 134:4
135:7
**utier** 70:11
80:23 81:4,16
82:2,16 83:6
84:22,24,25
85:2,8,14,17,23
86:10,15 88:7
102:12 103:8
116:25 118:4
118:12 119:3
120:16,18
121:11,20
122:16 124:16
125:14,20
185:18,24

**v**

**vacation**
119:23,23
126:8,14 127:4
127:16 135:2
137:2
**vacations** 120:3
**valentin** 4:20
**valid** 19:18
20:5 48:22
49:25 52:5,12
54:6 63:25
73:16 98:16
110:9 111:3
120:15,17

**[valid - viability]**

| | | | |
|---|---|---|---|
| 124:21 132:12 | 71:12 78:10 | 156:20 158:3 | 48:4,4,21 50:4 |
| 132:14 137:11 | 79:19,23 80:22 | 158:11,13,17 | 52:4,10,14 |
| 139:8 156:4 | 83:19 85:14 | 159:9,12 160:6 | 54:2 59:20 |
| 160:22 162:4 | 89:4 99:6,10 | 160:9,11,13,14 | 62:18 69:16,17 |
| 163:18,19 | 100:20 102:20 | 161:20 162:13 | 70:22 71:10 |
| 173:5,7 | 103:4,14,16,17 | 163:11 164:3 | 73:4,9,21,22 |
| **validate** 114:4 | 103:22 104:2 | 165:20 166:2,7 | 84:10,16,21 |
| **validated** 114:8 | 104:17,19 | 166:7 167:13 | 85:5,12 89:20 |
| 179:8 | 105:21 106:8,8 | 167:15,23 | 108:6 117:13 |
| **validity** 23:17 | 106:12,13,16 | 168:3,14 | 123:25 124:14 |
| 62:8 109:6 | 106:18,20 | 169:12,13,15 | 124:18 125:17 |
| 111:13 154:10 | 107:17 108:12 | 170:4,14,15,18 | 127:7 139:3,17 |
| 157:17 176:20 | 108:21 109:4 | 171:4,9,10,15 | 140:5,12 158:5 |
| **valuation** 45:10 | 109:14,17,20 | 172:5,13,17,20 | 159:2 160:21 |
| **valuations** | 109:21,25 | 173:18,20,24 | 161:17 |
| 70:11 | 110:12 113:15 | 174:7 | **vazquez's** 35:4 |
| **value** 11:12 | 114:3,13,17 | **values** 11:13 | 45:25 |
| 18:15 23:2 | 117:22,23 | 41:15 68:14 | **venue** 182:13 |
| 29:19 34:22 | 118:3,6,14,14 | 78:12 85:4,10 | **verbal** 8:21 |
| 38:18,24 39:23 | 118:18,19,25 | 88:4 119:16 | **verbally** 8:23 |
| 40:21 41:2,12 | 119:2,4,9,12 | 124:5 158:4 | **verbiage** 168:9 |
| 42:5,8,12,15,21 | 120:5,7 122:25 | 159:23,24 | **verified** 23:13 |
| 43:3,20 44:5 | 123:6,9,9,16,21 | **valuing** 86:17 | **verify** 50:17,21 |
| 44:16,18 45:3 | 124:25 125:5 | 174:11 | 180:3 |
| 47:19,20,22 | 125:10,25 | **various** 50:19 | **veritext** 6:4 |
| 48:2,3 56:15 | 127:25 129:16 | 58:8 103:25 | 10:6 186:10 |
| 56:20 57:18 | 129:23 130:13 | 125:14 | 189:2 |
| 58:7 59:3,4,7 | 130:16,20,22 | **vast** 39:8 | **version** 74:17 |
| 59:23 64:9,22 | 131:8 132:16 | 117:25 | 74:22 75:5 |
| 65:10,16,17 | 134:16 135:20 | **vazquez** 20:13 | 78:7 80:10 |
| 66:3,11,13,15 | 136:10,15 | 20:24 23:22 | 82:2 |
| 66:20,23 67:7 | 137:14 138:20 | 34:7,13,15,25 | **versus** 25:18,21 |
| 67:11,19,20,22 | 139:11,14,15 | 36:19 37:13,14 | 82:11,14 |
| 67:23 68:10,13 | 140:3,9 155:8 | 38:8 40:7 | **viability** 108:7 |
| 68:15 70:8 | 155:22,23 | 45:13 46:3 | 108:8 |

**[video - yup]**

**video** 5:9,13
**videographer**
4:19 5:2 6:2
8:9 69:3,7
93:23 94:2,17
94:20 146:2,6
180:15,18
186:4
**videotaped**
1:18
**view** 58:6 71:16
96:17 104:19
105:3,3,14
109:12 112:5
112:11,13
131:22 139:8
163:25 164:4
173:2 182:15
**viewed** 42:13
57:9
**views** 59:19
105:6,7,9
**violation** 8:2
**vitol** 157:24
**voluminous**
102:25

**w**

**w** 6:16
**wachtell** 4:10
**want** 10:24
11:22 12:24
13:9,12 18:25
35:12,20 43:4
64:18 65:6
72:14 89:24

91:23 93:20
98:10 100:11
100:24 107:14
110:14 116:24
134:12 149:12
157:4 185:14
**wanted** 15:10
53:2 65:23
66:4 73:21
79:18 95:11
154:24 155:20
**wanting** 159:5
163:14,23
**washington** 2:5
**water** 151:10
151:13
**waterfall** 18:16
**way** 32:4 80:4
83:23 86:14
115:3 120:6
130:5 157:18
178:22,24
**ways** 158:21
**we've** 6:25
18:12,19 28:25
29:8,10 40:15
43:5 71:6
88:24 99:25
106:23
**wearing** 9:8
**week** 71:4
124:8
**weekly** 77:6
**weil** 4:4

**weil.com** 4:7
**welcome** 69:11
**went** 37:7 39:5
42:11 49:4
124:9 125:10
129:18,21
132:19 136:9
146:10 147:24
**weringa** 3:19
**west** 3:17 4:11
15:19
**whispering** 5:6
**whitner** 2:22
**wickersham**
2:9
**william** 2:22
**witness** 6:15
9:9,19 26:13
79:8 94:7
152:25 157:8
188:7
**witnesses** 12:8
187:13
**wlrk.com** 4:13
**word** 125:9
**words** 56:17
**work** 8:23
19:16 20:3,18
21:20 36:19
37:16,20 38:6
70:13 72:9
77:16,19 78:13
91:2,5,21 92:7
98:21 115:14
120:10 140:4

158:25 165:18
165:24
**worked** 34:6
62:17 115:10
132:21 139:3
139:17
**working** 10:9
37:14,18 40:6
**worth** 34:20
129:8 156:4

**x**

**x** 1:3,9,10,15
66:17 187:2,4
187:9

**y**

**yeah** 23:3 33:8
67:11 78:11
96:7 131:18
150:16
**year** 92:21,23
175:11,11
**years** 21:19
76:19 92:22
95:19 167:8
179:17
**york** 1:21,21,24
2:11,11 3:5,5
3:12,12 4:6,6
4:11,11 5:23
5:24 6:18
189:2,4,4,5
**yup** 46:12 60:2
130:18

**[zack - zoom]**                                        Page 44

| z |
|---|
| **zack**   2:12 |
| **zack.schreiber** |
|   2:12 |
| **zero**   40:14 |
|   41:24 42:5,14 |
|   42:14,19,21 |
|   52:21 54:9 |
|   61:14,14,24 |
|   118:3 129:8,16 |
|   129:24 130:13 |
|   155:5,9,13 |
| **zoom**   2:7,23 |
|   3:9 4:8,13,19 |
|   4:20,20 129:20 |
|   131:11 186:5 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.