**Exhibit 1**

Page 1

```
 1
 2    IN THE UNITED STATES DISTRICT COURT
      FOR THE DISTRICT OF PUERTO RICO
 3    Case No. 17-BK-3283-LTS
      -----------------------------------------x
 4    In re:
 5    THE FINANCIAL OVERSIGHT AND MANAGEMENT
      BOARD FOR PUERTO RICO,
 6
      as representative of
 7
      THE COMMONWEALTH OF PUERTO RICO, et al.,
 8
                           Debtors.
 9    -----------------------------------------x
      Case No. 17-BK-4780-LTS
10    -----------------------------------------x
      In re:
11
      THE FINANCIAL OVERSIGHT AND MANAGEMENT
12    BOARD FOR PUERTO RICO,
13    as representative of
14    THE PUERTO RICO ELECTRIC POWER AUTHORITY,
15                         Debtor.
      -----------------------------------------x
16                      May 16, 2023
                        9:31 a.m.
17
18         VIDEOTAPED DEPOSITION of DAVID
19    BROWNSTEIN, held at the offices of Kramer
20    Levin Naftalis & Frankel LLP, located at 1177
21    Avenue of the Americas, New York, New York
22    10036, before Anthony Giarro, a Registered
23    Professional Reporter, a Certified Realtime
24    Reporter and a Notary Public of the State of
25    New York.
```

```
                                               Page 91
 1                 DAVID BROWNSTEIN
 2    you --
 3         Q       Let me try it a different
 4    way.  I don't want you to answer a
 5    question you don't understand.
 6                 What information, if any,
 7    did you provide to board members
 8    concerning proposals to the fuel line
 9    lenders?
10         A       All proposals to and from
11    the fuel line lenders were reviewed and
12    approved by the board.
13         Q       How many rounds of
14    back-and-forth proposals and
15    counterproposals were there?
16                 MR. MERVIS:  I think I have
17         to instruct the witness not to answer
18         that question on the basis of
19         mediation confidentiality.
20         Q       You plan to testify at the
21    confirmation hearing, do you not, that
22    the fuel line lenders' settlement is
23    reasonable; correct?
24         A       Yes.
25         Q       So I'm just trying to get at
```

Page 93

1               DAVID BROWNSTEIN

2       puts the mediators into the mix,

3       which is not, I don't think -- we

4       won't do that.  And you asked the

5       question about how many proposals

6       went back and forth.  And I think

7       that that process is -- that process

8       does get into mediation privilege.  I

9       realize that some of these are

10      judgment calls.  And people can

11      disagree.  But that's where I'm

12      landing.

13              MR. MADDEN:  Maybe to cut to

14      the chase, if I were to ask

15      additional questions about the

16      process as between the oversight

17      board and the fuel line lenders and

18      mediation that led to the agreement

19      to the fuel line lenders' PSA, is it

20      fair to say you'll instruct the

21      witness not to answer those process

22      questions?

23              MR. MERVIS:  Probably.  But

24      I can think, for example, of a -- and

25      I don't mean to play -- so, for

Page 94

1              DAVID BROWNSTEIN
2        example, you know, who was this
3        negotiation counterpart, I think
4        that's fair.  But there's a place.
5        There's a line; right?  It's not
6        necessarily a bright line.  One
7        bright line, I will say, in terms of
8        what went back and forth, yeah, that,
9        I'm going to instruct not to answer.
10      Q        You've already told me who
11  your counterparts are.  So I'll move on.
12              Mr. Brownstein, what
13  benefits, if any, does the fuel line
14  lenders' PSA provide to PREPA?
15              MR. MERVIS:  Just note my
16      objection to the form.  But you can
17      answer.
18      A        As I said previously,
19  without that, without knowing what amount
20  we were going to be paying them and
21  whether, in fact, they were -- which
22  means whether they were entitled to
23  priority, we wouldn't have been able to
24  make an offer to the bondholders that
25  took the wallet we have available and put

```
                                            Page 133

 1                    DAVID BROWNSTEIN
 2        Q         And what was the nature of
 3   your involvement in that process?
 4        A         I worked with the board and
 5   Proskauer to negotiate the agreement we
 6   have with National and the document that
 7   we executed with them.
 8        Q         And with whom did you
 9   principally interact on the National
10   side?
11        A         I guess I would have to say
12   Trish would have been my primary contact.
13        Q         And what's Trish's full
14   name, if you know?  If you don't recall
15   right now, that's okay.
16        A         She just retired.  So I'm
17   trying to forget her.  I didn't really
18   mean that second part.  But I can't tell
19   you why -- hold on.
20        Q         We'll come back to it.
21        A         No, no, no.  I have to find
22   it, or I'll kill myself.  Ferrari.
23        Q         When did negotiations toward
24   the National PSA began?
25        A         During mediation.
```

Page 134

1                    DAVID BROWNSTEIN

2        Q         Early in mediation, middle

3   in mediation, toward the end?

4        A         Early to in the middle.

5        Q         Sorry?

6        A         Early to in the middle is

7   the best I can do for you.

8        Q         And was the mediation team

9   involved in those negotiations?

10                  MR. MERVIS:  That one, I'm

11        going to instruct the witness not to

12        answer that question.

13        Q         Did you discuss the

14   National -- do you need a break?

15        A         No.  Sorry.

16        Q         Did you discuss the National

17   negotiations directly with oversight

18   board members?

19        A         Yes.

20        Q         Did you update the oversight

21   board members on proposals to and from

22   National?

23        A         I think I said this before.

24   But just to be clear, no proposal was

25   made to National without board approval.

Page 141

1              DAVID BROWNSTEIN

2    at the 71.65 percent exchange ratio that

3    the oversight board offered and agreed to

4    with National?

5              MR. MERVIS:  Hold on.  I

6        object to the form.  You can answer.

7        A         Well, I unfortunately can't

8    answer because my responses are mediation

9    privileged.

10       Q         You can't answer without

11   revealing mediation privilege why the

12   oversight board in its plan of adjustment

13   did not offer to all PREPA bondholders

14   the same exchange ratio that it offered

15   and agreed to with National?

16       A         Correct.

17       Q         What is the basis on which

18   the settlement with National is in your

19   view reasonable when all PREPA

20   bondholders were being offered a

21   50 percent exchange ratio under the plan

22   of adjustment?

23              MR. MERVIS:  I object to the

24       form.  But answer if you're able to.

25       A         I'm unable to answer that

```
                                        Page 142
 1                DAVID BROWNSTEIN
 2   question as well.
 3        Q       The oversight board has
 4   disclosed that one of the subjects of
 5   your testimony at the confirmation
 6   hearing will be that the settlement the
 7   oversight board achieved with National is
 8   fair and reasonable; correct?
 9        A       Correct.
10        Q       What is the basis on which
11   you plan to testify that the National
12   settlement is fair and reasonable when
13   all PREPA bondholders were offered only a
14   50 percent exchange ratio under the plan
15   of adjustment?
16                MS. SPILLANE:  Objection to
17      form.
18                MR. MERVIS:  Object to the
19      form of the question.
20                You want to hear it back?
21                THE WITNESS:  No.  I
22      understand his question.
23        A       I just don't know how to not
24   say it's mediation privilege.  So I can
25   walk it through with you.
```

Page 149

                    DAVID BROWNSTEIN

1

2      Q         And I want to put aside for

3   the moment, the treatment of the settled

4   reimbursement claim that National has

5   under the PSA.

6      A         Okay.

7      Q         Just focusing on the

8   treatment under the PSA of National's

9   bond claim, were the two terms you just

10  described different than the ones that

11  were offered to all PREPA bondholders

12  under the plan of adjustment?

13            MR. MERVIS:  You mean the --

14      well, okay.  Objection to the form.

15      You mean the 50-cent?

16      Q         You just described a number

17  of things National agreed to, an exchange

18  ratio.

19      A         Yeah.  I hear you.

20      Q         The treatment of the CVI and

21  some other things.

22            Was that package of terms

23  the one that was offered to all PREPA

24  bondholders under the plan of adjustment?

25            MR. MERVIS:  That's a

```
                                        Page 150

 1              DAVID BROWNSTEIN

 2      different question.  That one, I

 3      object to the form.

 4      A        I'm not in a position to

 5   answer that.

 6      Q        You don't know whether

 7   that's the offer of settlement that was

 8   made pursuant to the plan of adjustment?

 9      A        No.  I am not prepared to

10   answer that, given mediation.

11              MR. MERVIS:  I agree with

12      it, at least the way it's phrased.

13              MR. MADDEN:  Maybe I'm

14      misspeaking.  I don't think my

15      question comes anywhere close to

16      mediation privilege.

17      Q        My question is just whether

18   the package of terms that you agreed to

19   with National on its bond claim, is that

20   the same or different from the offer of

21   settlement that was made to all PREPA

22   bondholders under the terms of the plan

23   of adjustment?

24      A        Right.  And what I'm saying

25   to you is, in my view, that answer to
```

Page 151

1                    DAVID BROWNSTEIN

2     that question incorporates things that

3     are mediation privilege.  So I can't

4     answer.

5          Q        I don't know how that could

6     be.  But we'll move on.

7          A        Okay.  You should talk to

8     your attorneys who have been involved in

9     mediation and ask them to explain why I

10    would be uncomfortable with it.

11         Q        I want to limit my question

12    to the terms of the National PSA.

13         A        I understand what you're

14    asking.

15         Q        Same answer?

16         A        Same answer.

17         Q        Under the terms of the

18    initial plan of adjustment that was

19    proposed the same day that the board

20    announced a settlement in principal with

21    National, you know the plan I'm talking

22    about in December?

23         A        Yes.

24         Q        Under the terms of that

25    December plan, could National have

```
                                            Page 210
 1                    DAVID BROWNSTEIN
 2    Brattle would have a view on?
 3        A        Correct.
 4        Q        Shifting topics, you refused
 5    to answer questions of Mr. Madden about
 6    the National settlement on the basis of
 7    mediation privilege.  Do you remember
 8    that?
 9                  MR. MERVIS:  Objection.
10        A        Yes.
11        Q        Mr. Brownstein, you don't
12    believe proposals that are made in
13    mediation are relevant to any issue in
14    the plan; correct?
15                  MR. MERVIS:  Objection to
16        the form.
17                  MS. SPILLANE:  Objection to
18        the form.
19        A        Can you ask that question
20    again?
21        Q        Yes.
22                  Do you think that proposals
23    that are made in mediation are relevant
24    to any issues concerning whether this
25    plan should be confirmed?
```

```
                                        Page 211

 1                    DAVID BROWNSTEIN

 2                    MR. MERVIS:  Same objection.

 3       A         I think that the challenge

 4   we have is that in order to properly

 5   answer those questions, I would need to

 6   be able to describe what happened in

 7   mediation.  And I don't know how to split

 8   the two.  I wish I could, so that we

 9   could come up with an answer to your

10   question.  I'm trying to avoid going out

11   of school on mediation which I really

12   need to be very cautious about.

13                    So if your question is, do

14   you think the offers that were made in

15   mediation impact what happens outside of

16   mediation, is that your question to some

17   extent?

18       Q         Let me try it a different

19   way.

20                    Do you agree that the plan

21   should be confirmed or not based on its

22   own terms without regard to what happened

23   in mediation?

24                    MR. MERVIS:  Objection to

25       the form.
```

Page 354

                        DAVID BROWNSTEIN

1

2       A         I'd say probably not.  There

3  have been discussions between Proskauer

4  and the GUCs attorneys away from me.

5       Q         Thank you.

6                 Let me hand you Exhibit 36,

7  only in the event that you want to refer

8  to it.  But I'm going to ask you

9  questions.  You may elect not to look at

10 it.

11                In here, it says that Mr.

12 Brownstein -- and for the record, that is

13 the debtors' opening expert report and

14 disclosures.

15                And I'm looking at page 4,

16 the second full paragraph where it

17 says, "As to Topics Romanette IV and

18 V" -- and those topics are identified on

19 the previous page 3 at the top --

20 negotiation of the National PSA, fuel

21 line lender PSA, including the benefits

22 and the basis for the releases and

23 professional fees provided in connection.

24                It says, "Mr. Brownstein is

25 expected to testify to the extent

Page 355

1                    DAVID BROWNSTEIN
2    consistent with mediation privilege."
3                    I'd like to ask you, what
4    does that mean to you, consistent with
5    mediation privilege?
6         A        So as I believe it is set up
7    is any negotiations with creditors, any
8    proposals made to them, any responses we
9    receive from them in the mediation
10   process remain privileged.
11        Q        Thank you.
12                    And the mediation process,
13   is that when you're all together with the
14   mediator, does it include between
15   mediation sessions?  How do you define
16   mediation process?
17        A        It's while mediation is
18   ongoing.  So whether we're in a mediation
19   session or not is not germane to it.
20   We're in mediation.  We engage with the
21   other parties in rooms together with the
22   mediators and separately as we move
23   forward.
24        Q        So would that include
25   anytime before you actually get together

Page 356

1                    DAVID BROWNSTEIN

2    with the mediator for the first time?

3                    MR. MERVIS:  I object to the

4         form.

5         A        No.

6         Q        So would it be fair to say

7    that you believe the mediation process

8    would be from the first mediation until

9    either there is an impasse or a

10   settlement?

11                   MR. MERVIS:  Object to the

12        form.

13        A        Correct.

14        Q        And during that mediation

15   process, you believe that the privilege

16   applies as to negotiations, proposals,

17   counterproposals and other communications

18   between the mediating parties?

19        A        Correct.

20        Q        Now, you've invoked the

21   privilege several times this afternoon.

22                   Do you currently intend to

23   waive any of those privileges when you're

24   called to testify at a confirmation

25   hearing?

Page 366

```
                    DAVID BROWNSTEIN
 1
 2    that made economic sense for them.
 3         Q         And that's a benefit to
 4    PREPA?
 5         A         That's a benefit to our --
 6    to the entire means to get out of
 7    bankruptcy.
 8         Q         And these benefits, those
 9    three benefits would also be benefits
10    for -- to PREPA from the National PSA?
11         A         Yes.  Sorry.  I was talking
12    about both.  No.  National's case, not
13    with respect to the issue of getting to a
14    known recovery with them obviously.
15         Q         Now, in the same paragraph,
16    it says, "Mr. Brownstein will base this
17    testimony on his personal participation
18    in the negotiation of the National PSA
19    and fuel line lender PSA."
20              My question is, was that
21    negotiation as to either one of those
22    PSAs outside of the mediation context?
23         A         No.
24         Q         So is it your belief that
25    your personal participation in the
```

Page 367

1                 DAVID BROWNSTEIN
2    negotiation of those two PSAs would also
3    be encompassed by the mediation
4    privilege?
5                 MR. MERVIS:  Object to the
6        form.
7        A        Well, those agreements are
8    now in the public domain.
9        Q        Correct.
10       A        So it changes to some
11   extent, not in full, but what we could
12   talk about.  I mean the dialogue we had
13   with National along the way is something
14   I'd be concerned about.  The negotiations
15   of the agreement and the deliberations by
16   the board, I'd be concerned about.  But
17   explaining what the agreement is, is no
18   longer mediation privileged.  It's in the
19   public domain.
20       Q        Why would you be concerned
21   about the dialogue with National?
22                MR. MERVIS:  I object to the
23       form.
24       A        Well, again, as I said, this
25   is something we're going to have to talk

Page 368

```
 1                DAVID BROWNSTEIN
 2   with people about and get sign-offs on.
 3   I'm not going to make my own decision as
 4   to what we can and can't do without
 5   talking to people who also are impacted
 6   by it.
 7        Q       You also -- this disclosure
 8   indicates Mr. Brownstein will base his
 9   testimony on his personal participation
10   in or supervision of communications
11   between and among advisors to the
12   oversight board.
13                Are those communications all
14   encompassed by the mediation privilege in
15   your view?
16                MR. MERVIS:  Objection to
17      the form.
18        A       No.
19        Q       Which advisors do you refer
20   to in that disclosure?
21        A       Well, you'd be talking about
22   Ernst & Young, McKinsey and Brattle.
23   Those are the three other advisors to the
24   board.
25        Q       We spoke earlier about the
```

Page 407

1

2              C E R T I F I C A T I O N

3

4

5        I, ANTHONY GIARRO, a Shorthand Reporter

6    and a Notary Public, do hereby certify that

7    the foregoing witness, DAVID BROWNSTEIN, was

8    duly sworn on the date indicated, and that the

9    foregoing, to the best of my ability, is a

10   true and accurate transcription of my

11   stenographic notes.

12        I further certify that I am not employed

13   by nor related to any party to this action.

14

15

16

     _____

17              ANTHONY GIARRO

18

19

20

21

22

23

24

25