**UNITED STATES DISTRICT COURT**
**DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br>et al.,<br><br>       Debtors. | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>       Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 4780-LTS |

**NOTICE OF FILING OF PROPOSED ORDER AND JUDGMENT
CONFIRMING MODIFIED SECOND AMENDED TITLE III PLAN OF
ADJUSTMENT OF THE PUERTO RICO ELECTRIC POWER AUTHORITY**

**PLEASE TAKE NOTICE** that, on March 1, 2023, the Financial Oversight and

Management Board for Puerto Rico (the "Oversight Board"), as sole Title III representative of the

Puerto Rico Electric Power Authority ("PREPA" or the "Debtor") pursuant to section 315(b) of

the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[1] filed the

*Modified Second Amended Title III Plan of Adjustment of the Puerto Rico Electric Power Authority*

[Case No. 17-4780, ECF No. 3296] (the "PREPA Plan").

---

[1]   PROMESA is codified at 48 U.S.C. §§ 2101-2241.

**PLEASE TAKE FURTHER NOTICE** that, attached hereto as **Exhibit A** is the proposed *Order and Judgment Confirming Modified Second Amended Title III Plan of Adjustment of the Puerto Rico Electric Power Authority* (the "Proposed Order").

**PLEASE TAKE FURTHER NOTICE** that all documents filed in these Title III cases are available (a) free of charge by visiting https://cases.ra.kroll.com/puertorico/ or by calling +1 (844) 822-9231, and (b) on the Court's website at http://www.prd.uscourts.gov, subject to the procedures and fees set forth therein.

[*Remainder of Page Left Intentionally Blank*]

Dated: June 5, 2023
      San Juan, Puerto Rico

Respectfully submitted,

*/s/ Martin J. Bienenstock*

Martin J. Bienenstock (*pro hac vice*)
Paul V. Possinger (*pro hac vice*)
Ehud Barak (*pro hac vice*)
Daniel Desatnik (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900
*Attorneys for the Financial Oversight and
Management Board as representative for the
Debtor*

*/s/ Hermann D. Bauer*

Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel: (787) 764-8181
Fax: (787) 753-8944

*Co-Attorneys for the Financial Oversight and
Management Board as representative for the
Debtor*

**<u>EXHIBIT A</u>**

Proposed Order

**UNITED STATES DISTRICT COURT**
**DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br>et al.,<br><br>      Debtors. | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>      as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>      Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 4780-LTS |

**ORDER AND JUDGMENT CONFIRMING**
**MODIFIED SECOND AMENDED TITLE III PLAN OF ADJUSTMENT OF THE**
**<u>PUERTO RICO ELECTRIC POWER AUTHORITY</u>**

## TABLE OF CONTENTS

**Page**

1.  Confirmation of the PREPA Plan .................................................................. 2

2.  Objections ...................................................................................................... 3

3.  Findings/Conclusions..................................................................................... 3

4.  Litigation Resolution .................................................................................... 7

5.  PREPA Plan Settlements Approved ............................................................. 8

6.  Dismissal of Fuel Line Lender Priority Action............................................ 8

7.  Implementation of the PREPA Plan ............................................................. 8

8.  Enforceability of New Debt Instruments ..................................................... 9

9.  Legacy Charge and Remaining Legacy Charge............................................ 9

10. PREB Approval of Legacy Charge ............................................................... 9

11. Operational Restructuring............................................................................. 9

12. Administrative Expense Bonds.................................................................... 10

13. Avoidance Actions....................................................................................... 10

14. Funding, Costs, and Expenses of the Avoidance Actions Trust ................. 11

15. Indemnification of Avoidance Actions Trustee and Board. ........................ 11

16. The GUC Trust ............................................................................................ 12

17. Funding, Costs, and Expenses of the GUC Trust. ...................................... 13

18. Indemnification of GUC Trustee and Board............................................... 13

19. The PREPA PayGo Trust............................................................................. 14

20. Funding, Costs, and Expenses of the PREPA PayGo Trust ....................... 15

21. Act 106 Defined Contribution Accounts .................................................... 15

22. Maintenance of Pension............................................................................... 15

23. No Action ..................................................................................................... 16

24. Government Action ...................................................................................... 16

25. Oversight Board Consent Pursuant to PROMESA Section 305................. 17

26. Binding Effect.............................................................................................. 18

27. Cancellation of Notes, Instruments, Certificates, and Other Documents ......................... 18

28. Rejection or Assumption of Remaining Executory Contracts and Unexpired
    Leases........................................................................................................... 20

29. Insurance Policies ........................................................................................ 21

i

| 30. | Rejection Damage Claims | 22 |
| 31. | Payment of Cure Amounts | 22 |
| 32. | Setoff | 22 |
| 33. | Delivery of Distributions | 23 |
| 34. | Distribution Agent | 25 |
| 35. | Securities Laws Exemption | 25 |
| 36. | Acceleration of National Insured Bonds | 26 |
| 37. | Distributions to Holders of Disputed Claims | 27 |
| 38. | No Amendments to Proofs of Claim | 27 |
| 39. | Conditions to Effective Date | 28 |
| 40. | Administrative Claim Bar Date | 28 |
| 41. | Professional Compensation and Reimbursement Claims | 29 |
| 42. | Fuel Line Lender PSA Creditor Amounts | 30 |
| 43. | National PSA Fees | 31 |
| 44. | Eminent Domain/Inverse Condemnation Claims. | 31 |
| 45. | Discharge and Release of Claims and Causes of Action | 32 |
| 46. | Releases by the Debtor and Reorganized Debtor | 34 |
| 47. | Release and Exculpation Provisions | 34 |
| 48. | Complete Satisfaction, Discharge, and Release. | 34 |
| 49. | Preclusion from Assertion of Claims Against the Debtor. | 35 |
| 50. | Injunction Related to Discharge of Claims | 36 |
| 51. | Releases by Holders of Claims | 37 |
| 52. | Exculpation | 38 |
| 53. | Injunction | 40 |
| 54. | Supplemental Injunction | 40 |
| 55. | Term of Existing Injunctions or Stays | 41 |
| 56. | Prosecution of Claims | 42 |
| 57. | Indemnification and Reimbursement Obligations | 42 |
| 58. | Compliance with Tax Requirements | 42 |
| 59. | Documents and Instruments | 43 |
| 60. | Oversight Board Termination and Post-Confirmation Powers | 44 |
| 61. | Post-Confirmation Fiscal Plans and Budgets Remain Subject to Oversight Board's Sole Discretion | 44 |

62.     Post-Confirmation Powers and Duties ................................................................ 44

63.     Non-Impairment of New Bonds, Refunding Bonds and CVI ............................... 45

64.     Reversal/Stay/Modification/Vacatur of Order .................................................... 46

65.     Retention of Jurisdiction .................................................................................... 46

66.     Conflicts Among Documents .............................................................................. 47

67.     Modifications ...................................................................................................... 47

68.     Provisions of Plan and Order Nonseverable and Mutually Dependent .............. 48

69.     Governing Law .................................................................................................... 48

70.     Applicable Non-bankruptcy Law ........................................................................ 48

71.     Notice of Order .................................................................................................... 49

72.     No Waiver ............................................................................................................ 49

Exhibit A PREPA Plan ................................................................................................... 1

Exhibit B Form of Notice ............................................................................................... 1

Exhibit C Preempted Laws ............................................................................................. 1

The Puerto Rico Electric Power Authority ("PREPA" or the "Debtor"), by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as Title III representative of the Debtor pursuant to PROMESA Section 315(b), having proposed and filed with the United States District Court for the District of Puerto Rico (the "Court") the *Modified Second Amended Title III Plan of Adjustment of the Puerto Rico Electric Power Authority*, dated March 1, 2023 (Docket Entry No. 3296 in Case No. 17-4780)[1] (as amended, supplemented, or modified prior, at, or subsequent to the Confirmation Hearing as set forth in this Order through the date hereof, including the Plan Supplement, and as may be amended, supplemented, or modified pursuant to Section 313 of PROMESA, the "PREPA Plan" through the date hereof);[2] and the Court having entered, pursuant to, *inter alia*, section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017(b), after due notice and a hearing, an order, dated March 3, 2023 (Docket Entry No. 3304) (the "Disclosure Statement Order"), (i) approving the adequacy of the information set forth in the Disclosure Statement, (ii) establishing procedures for the solicitation, voting, and tabulation of votes with respect to the PREPA Plan, (iii) approving the forms of ballots, master ballots, and election notices used in connection therewith, and (iv) approving the form of notice of the Confirmation Hearing; and the Court having entered the *Third Amended and Restated Order Establishing, Among Other Things, Procedures and Deadlines Concerning Objections to Confirmation and Discovery in Connection Therewith,* dated May 31, 2023 (Docket Entry No.

---

[1]  All docket entry references are to entries in Case No. 17-4780 unless otherwise indicated.

[2]  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the PREPA Plan, the Disclosure Statement Order, the Confirmation Brief (each as defined herein), the New Master Indenture, or the *Findings of Fact and Conclusions of Law Regarding Confirmation of Modified Second Amended Title III Plan of Adjustment of the Puerto Rico Electric Power Authority* (the "Findings of Fact and Conclusions of Law"), (Docket Entry No. _____), as applicable.  A composite copy of the PREPA Plan is annexed hereto as Exhibit A.

1

3565); and the following documents having been filed by the Debtor, the Fuel Line Lender PSA

Creditors, and National in support of or in connection with confirmation of the PREPA Plan:

    (a)  [To be updated with list of filed declarations, plan supplements, confirmation brief and

        reply, and other confirmation-related documents when filed]

and objections to confirmation of the PREPA Plan having been interposed by certain parties, as

reflected on the docket of the PREPA Title III Case and/or on the record of the Confirmation

Hearing; and each of the objections having been resolved, overruled, or withdrawn at, prior to, or

subsequent to the Confirmation Hearing;[3] and the Court having held the Confirmation Hearing

commencing on July 17, 2023; with the appearances of all interested parties[, including members

of the public selected by the Court,] having been noted in the record of the Confirmation Hearing;

and after full consideration of the record of the Commonwealth Title III Case, the PREPA Title III

Case, and relevant adversary proceedings, including, without limitation, motions, applications and

orders in each of such cases, the foregoing documents, and the evidence admitted and arguments

of counsel at the Confirmation Hearing; and after due deliberation and good and sufficient cause

appearing therefor, it is hereby

**ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT**:

    1.    <u>Confirmation of the PREPA Plan</u>.  The PREPA Plan shall be, and hereby is,

CONFIRMED pursuant to Section 314(b) of PROMESA.  The documents contained in the Plan

Supplement are authorized and approved.   The confirmed PREPA Plan, as amended,

supplemented, or modified by the revisions made prior, at, or subsequent to the Confirmation

---

[3]  All opposition submissions are also listed as part of the Court's Findings of Fact and
Conclusions of Law.

Hearing, as set forth in this Order as well as in the composite copy attached hereto as <u>Exhibit A</u>, includes the Plan Supplement, as amended, supplemented, or modified.

2.    <u>Objections</u>.  All objections, responses to, and statements and comments, if any, in opposition to or inconsistent with the PREPA Plan hereby are, OVERRULED and DENIED in their entirety.  All withdrawn objections are deemed withdrawn with prejudice.

3.    <u>Findings/Conclusions</u>.  The findings of fact and conclusions of law set forth in the Court's Findings of Fact and Conclusions of Law are incorporated herein as though set forth in full.   Notwithstanding such incorporation, the following summarizes certain of the Court's determinations:

(A)    Pursuant to PROMESA, on July 2, 2017, PREPA commenced its Title III case with this Court in accordance with the requirements of Title III of PROMESA. The commencement of this case vested the Court with exclusive jurisdiction over the case and all property of PREPA, wherever located.  The Debtor formulated, duly solicited, and now seeks confirmation of a plan of adjustment in accordance with federal law.

(B)    This Order is a final order intended to be binding on all parties in interest, and shall not be subject to collateral attack or other challenge in any other court or other forum, except as permitted under applicable law.  Confirmation of the PREPA Plan includes the discharge of all claims provided therein to be discharged, and pursuant to Section 4 of PROMESA, such discharge shall prevail over any general or specific provisions of territory laws, rules, and regulations.  Pursuant to PROMESA Section 4, to the extent not previously ruled preempted pursuant to an order of the Title III Court, all laws (or portions thereof) of the Commonwealth of Puerto Rico, other than budgets certified by the Oversight Board, that are inconsistent with PROMESA and that affect the Debtor or Reorganized PREPA, are preempted including the laws or sections of the laws set forth in Exhibit A to the Findings of Fact and Conclusions of Law.  Such preempted laws include, without limitation, laws that provide for PREPA employee pensions and other pension-related benefits to the extent inconsistent with the treatment of the Claim of PREPA ERS under the PREPA Plan (except as set forth in paragraph 19 hereof with respect to the Government's ability to alter the funding structure for distributions), including provisions that would prohibit the enrollment of Active PREPA ERS Participants and subsequently hired employees of PREPA in the defined contribution plan for Commonwealth employees under Act 106-2017.  All non-federal laws to the extent they are inconsistent with the transactions contemplated by the PREPA Plan and that affect the Debtor or Reorganized

3

PREPA are unenforceable.  Without in any way limiting the foregoing, (a) the Commonwealth laws preempted by PROMESA are listed on **Exhibit C** hereto and (b) all litigation in which any Government Party is a defendant, over whether Commonwealth law listed on **Exhibit C** hereto is preempted by PROMESA shall be dismissed, with prejudice, as of the PREPA Effective Date and the parties thereto shall provide the Oversight Board prompt notice of such dismissal.  For the avoidance of doubt, the non-inclusion of a payment obligation arising from a valid law in a certified fiscal plan or budget is not a basis for disallowance of such obligation to the extent the claim arising therefrom otherwise satisfies the requirements for allowance of a claim under the relevant provisions of the Bankruptcy Code.

(C)     The Court shall retain jurisdiction to enforce the terms hereof and of the PREPA Plan and the New Bonds, Refunding Bonds and the CVI, in accordance with their terms to ensure compliance with the PREPA Plan and to adjudicate claims arising therefrom, including rights to specific performance.

(D)     At the time of issuance and delivery of the New Bonds, Refunding Bonds and the CVI, Reorganized PREPA is hereby directed to cause to be stamped or written on each of such instruments a legend substantially as follows:

> DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO PURSUANT TO 11 U.S.C. §§ 944(b) AND 1123 TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE [___] DAY OF [_____], 2023.

(E)     Pursuant to PROMESA, including Section 4 thereof, as well as sections 944[4] and 1123 of the Bankruptcy Code, and in accordance with this Order and the

---

[4]   Section 944(b)(3) requires the Court, as a condition to providing a discharge, to determine the validity of obligations imposed under a plan of the debtor and of any provision made to pay or secure payment of such obligations. 11 U.S.C. § 944(b)(3). *See generally In re City of Stockton, Cal.*, 526 B.R. 35, 49-50 (Bankr. E.D. Cal. 2015) ("The structure of the federal-state relationship . . . regarding restructuring of municipal debt is dictated by the U.S. Constitution. . . . [T]he Supremacy Clause operates to cause federal bankruptcy law to trump state laws, including state constitutional provisions, that are inconsistent with the exercise by Congress of its exclusive power to enact uniform bankruptcy laws" (*citing Ass'n of Retired Emps. of the City of Stockton v. City of Stockton, Cal. (In re City of Stockton, Cal.)*, 478 B.R. 8, 14-16 (Bankr. E.D. Cal. 2012); U.S. Const. art. VI, cl. 2; *Int'l Bhd. of Elec. Workers, Local 2376 v. City of Vallejo, Cal. (In re City of Vallejo, Cal.)*, 432 B.R. 262, 268-70 (E.D. Cal. 2010) (additional citations omitted)). As set forth in the leading bankruptcy treatise, "[t]he requirement of a court determination of validity is extra assurance for those who might be skittish about the nature of the bonds being issued . . . . It has the added feature of removing any doubt concerning the matter, because the determination of the court on that issue should be binding in the future." 6

PREPA Plan, the Court determines that the New Bonds, the CVI, and the covenants by PREPA, including, without limitation, the covenants set forth in Articles XIX.H, J, K, and L of the PREPA Plan, for the benefit of the holders of the New Bonds and CVI as provided in the Master Trust Indenture, or this Order, as applicable, constitute valid, binding, legal and enforceable obligations of PREPA and Reorganized PREPA under Puerto Rico, New York, and federal law.

(F)     Reorganized PREPA is an independent public corporation and instrumentality of the Commonwealth of Puerto Rico, separate from the Commonwealth and any other instrumentality thereof.

(G)     Upon the Effective Date, Reorganized PREPA shall have all legal and equitable right, title, and interest in the Legacy Charge Revenues and the Remaining Legacy Charge Revenues which, except as granted in the New Master Indenture and in this Order, shall be free and clear of all liens, claims, encumbrances, and other interests of any party.

---

Alan N. Resnick & Henry J. Sommer, Collier On Bankruptcy § 944.03[1][b] (16th ed. 2013). *See, e.g.*, Amended Order and Judgment Confirming Third Amended Plan of Adjustment of the Puerto Rico Sales Tax Financing Corporation, dated February 5, 2019, and *Amended Memorandum of Findings of Face and Conclusions of Law in Connection with Confirmation of the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation,* dated February 5, 2019, ¶174 ("Confirmation of the Plan constitutes a judicial determination and, pursuant to section 4 of PROMESA and sections 944, 1123, and 1125 of the Bankruptcy Code as incorporated by section 301 of PROMESA, the terms of these Findings of Fact and Conclusions of Law shall prevail over any general or specific provision of territory law, State law or regulation that is inconsistent therewith and be full, final, complete, conclusive, and binding and shall not be subject to collateral attack or other challenge in any court or other forum, except as permitted under applicable law"); Order Confirming Third Amended Plan for the Adjustment of Debts of the City of San Bernardino, California, as Modified by the Court, dated February 7, 2017, ¶ 22 ("In accordance with Section 944(a) and notwithstanding any otherwise applicable law, upon the occurrence of the Effective Date, the terms of the Plan and this Confirmation Order shall be binding upon . . . ."); Order Confirming Eighth Amended Plan for the Adjustment of Debts of the City of Detroit, dated November 12, 2014, ¶ 86 ("[I]n accordance with section 944(a) of the Bankruptcy Code and notwithstanding any otherwise applicable law, upon the occurrence of the Effective Date, the terms of the Plan and this Order shall be binding upon, and inure to the benefit of . . . ."); Findings of Fact, Conclusions of Law, Order Confirming the Chapter 9 Plan of Adjustment for Jefferson County, Alabama, dated November 6, 2013, ¶ 37, ("Pursuant to Bankruptcy Code sections 1123(a), 1123(b), and 944(a), as well as general principles of federal supremacy, the provisions of this Confirmation Order, the Plan, and related documents or any amendments or modifications thereto shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.").

(H)     The New Master Indenture, upon the issuance of the New Bonds and CVI, grants a continuing first-priority lien and continuing first-priority security interest in all of Reorganized PREPA's legal and equitable right, title, and interest in and to the Trust Estate to the New Master Trustee, wherever located and whether now existing or hereafter arising to the fullest extent permitted under applicable law for the benefit of the holders of the New Bonds (and their successors and assigns), which is hereby (i) deemed automatically perfected as of the Effective Date, subject only to Liens and security interests permitted under the New Master Indenture, (ii) valid, binding, perfected, and enforceable against all Persons having claims of any kind in tort, contract, or otherwise against Reorganized PREPA or its assets irrespective of whether such Persons have notice of such lien or security interest, without any further act or agreement by any entity, without any further act or agreement by any Person, and shall remain in full force and effect until the Secured Obligations (as defined in Section 2.01(i) of the New Master Indenture) have been paid or satisfied in full in accordance with their terms, (iii) not subject to recharacterization or equitable subordination for any purposes whatsoever, and (iv) not constitute preferential transfers or fraudulent conveyances under PROMESA or any applicable non-bankruptcy law, and (v) "closed," such that no debt, other than Refunding Bonds, may be issued pursuant to the New Master Indenture, and shall remain in full force and effect until the New Bonds, Refunding Bonds and CVI have been paid or satisfied in full in accordance with their terms.

(I)     The Legacy Charge Revenues and the Remaining Legacy Charge Revenues do not and will not constitute, nor will they be deemed to be "available resources" or "available revenues" of the Commonwealth, as that term is used in the Puerto Rico Constitution (whether construed pursuant to the Spanish or English version of the Puerto Rico Constitution).

(J)     Reorganized PREPA's sole and exclusive ownership of the Legacy Charge Revenues and the Remaining Legacy Charge Revenues will not be affected in any way by the manner of or control over collection; any person who collects or holds the Legacy Charge Revenues and the Remaining Legacy Charge Revenues shall do so on behalf of Reorganized PREPA, and no entity that collects or holds the Legacy Charge Revenues and the Remaining Legacy Charge Revenues shall have any legal or equitable right, title, or interest in or to the Legacy Charge Revenues and the Remaining Legacy Charge Revenues other than Reorganized PREPA, as provided in the New Master Indenture.

(K)     The covenants and agreements of Reorganized PREPA will constitute adequate protection for the property interests of Reorganized PREPA and the Holders of the New Bonds, Refunding Bonds and CVI in the Trust Estate.

(L)     The New Bonds, Refunding Bonds and CVI are not "Tax Supported Debt," as defined and set forth in the Government of Puerto Rico's Debt Management Policy adopted pursuant to the Commonwealth Plan.

6

(M)     Upon execution by all parties thereto, as appliable, the Definitive Documents, including, without limitation, the New Master Indenture, the New Bonds and the CVI, shall (i) have been duly and lawfully authorized by PREPA and Reorganized PREPA, and (ii) be in full force and effect and valid and binding upon PREPA and Reorganized PREPA and enforceable in accordance with their respective terms, except that enforceability of rights and remedies may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally or as to the availability of any particular remedy.

(N)     The PREPA Plan is consistent with the Fiscal Plan for PREPA certified by the Oversight Board on _____, pursuant to PROMESA Title II, as required by Section 314(b)(7) of PROMESA.

4.      <u>Litigation Resolution</u>.  For the reasons stated herein and in the Findings of Fact and Conclusions of Law, the provisions of the PREPA Plan constitute a good faith, reasonable, fair, and equitable compromise and settlement of the Claims and controversies resolved pursuant to the PREPA Plan, including, without limitation, the compromise and settlement of asserted and unasserted disputes concerning (a) the rights of holders of Fuel Line Loan Claims, including all disputes encompassed in the Fuel Line Lender Priority Action, (b) the rights of holders of National Claims, (c) the rights of the holder of the Vitol Claim, including the disputes set forth in the Vitol-SCC AP and the Law 458 Action, and (d) the rights of the Settling Bondholders, including the disputes set forth in the Amended Lien & Recourse Challenge, each as incorporated into the PREPA Plan, and the entry of this Order constitutes, to the extent required, approval of all such compromises and settlements pursuant to Bankruptcy Rule 9019 and sections 105(a) and 1123(b)(5) of the Bankruptcy Code.  Pursuant to this Order, and to the extent provided in the PREPA Plan, on the Effective Date, such compromises and settlements shall be binding upon the Debtor, all Creditors of the Debtor, and all other Entities and shall not be subject to collateral attack or other challenge of any kind (other than appeals), including in any other court or forum.

5.      <u>PREPA Plan Settlements Approved</u>.  The Court hereby approves the compromises and settlements embodied in the PREPA Plan as fair and reasonable and, as of the Effective Date of the PREPA Plan, authorizes and directs the consummation thereof.

6.      <u>Dismissal of Fuel Line Lender Priority Action</u>.  No later than ten (10) calendar days following the Effective Date, the Fuel Line Lender PSA Creditors shall file all appropriate notices, pleadings, or motions necessary to dismiss, with prejudice, the Fuel Line Lender Priority Action.

7.      <u>Implementation of the PREPA Plan</u>.  On and after the Effective Date, the Debtor, Reorganized PREPA, the Oversight Board as representative of PREPA and each of its respective authorized agents and representatives are authorized to (a) execute, deliver, file, or record such documents, contracts, securities, instruments, releases, and other agreements or documents, including, without limitation, those contained in the Plan Supplement, (b) make any and all distributions and transfers contemplated pursuant to, and as provided for in, the PREPA Plan and the Plan Supplement, (c) take such other actions as may be necessary to effectuate, implement, enforce, and further evidence the terms and conditions of the PREPA Plan, including, among other things, all such actions delineated in Article XVIII of the PREPA Plan, and (d) direct or instruct The Depository Trust Company, or such other person or entity necessary to distribute the New Bonds pursuant to the PREPA Plan and to implement, effectuate, or enforce  the terms of the National Trust and the related National Trust documentation.  Without in any way limiting the foregoing, on the Effective Date, the appropriate officers or representatives of the Debtor and Reorganized PREPA, as the case may be, and members of the boards of directors of the same, as applicable, are authorized, empowered, and directed to issue, execute, file, and deliver or record such documents, contracts, instruments, releases, and other agreements, including those contained in the Plan Supplement, contemplated by the PREPA Plan, and make, or cause to be made, any

and all distributions and transfers contemplated pursuant to, and as provided for in, the PREPA Plan and the Plan Supplement, in the name of and on behalf of the Debtor and Reorganized PREPA, as applicable.

8.      <u>Enforceability of New Debt Instruments</u>.  Pursuant to Bankruptcy Code section 944(b)(3), all debt instruments to be issued pursuant to the PREPA Plan, including, without limitation, the New Master Indenture and the New Bonds and CVI issued thereunder, will constitute, upon distribution thereof, valid legal obligations of the Debtor or Reorganized PREPA, as the case may be, that issues them, and any provision made to pay or secure payment of such obligation is valid.

9.      <u>Legacy Charge and Remaining Legacy Charge</u>.  On or prior to the Effective Date, the Legacy Charge shall be implemented by Reorganized PREPA or any qualified operator of the transmission and distribution system (including LUMA Energy) after approval by PREB, as detailed in Schedule B of the PREPA Plan and required by the New Master Indenture or such other Legacy Charge that complies with the Amendment Test.

10.     <u>PREB Approval of Legacy Charge</u>. On or prior to the Effective Date, PREB shall have provided any required approval of, the rates, fees, and/or charges, including the Legacy Charge, necessary to guarantee that Reorganized PREPA meets its obligations under the New Master Indenture.  PREB shall have approved a rate increase sufficient to meet Reorganized PREPA's obligations to the PREPA ERS, as provided in the PREPA Plan.

11.     <u>Operational Restructuring</u>.  Prior to, on, or as soon as practicable following the Effective Date, the Debtor and Reorganized Debtor, as applicable, shall be Operationally Restructured, including that PREPA shall, as required by the Fiscal Plan and applicable law: (a) take all necessary actions to complete ongoing efforts to transfer operation and maintenance of

existing PREPA generation assets to professional and independent private operators; (b) take all necessary actions to complete its operational restructuring as set forth in Article XVIII.G. of the PREPA Plan; and (c) maintain operation and maintenance contracts with private operators for the transmission and distribution system; provided, that such contracts shall not adversely impact the tax exemption on any outstanding Reorganized PREPA tax-exempt New Bonds or Refunding Bonds.

12.    <u>Administrative Expense Bonds</u>.  On the Effective Date, the Commonwealth shall, once authorized pursuant to budget resolution, purchase, and Reorganized PREPA shall sell, assign, transfer, and convey to the Commonwealth the Administrative Expense Bonds for Cash in an aggregate purchase price equal to the sum of the Administrative Expense Bonds Amount.

13.    <u>Avoidance Actions</u>.  The Avoidance Actions Trust shall include the Avoidance Actions, which shall be pursued solely for the benefit of holders of Allowed Claims in the Unsecured Claims Pool.  For the avoidance of doubt, holders of Allowed Claims in the Unsecured Claims Pool shall not be beneficiaries of any causes of action held by the Avoidance Action Trust other than the Avoidance Actions.  On the Effective Date, PREPA shall transfer the Avoidance Actions Trust Assets to the Avoidance Actions Trust and, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code, the Avoidance Actions Trust shall have the sole right, authority, and standing to prosecute, settle or otherwise dispose of the Avoidance Actions, including, without limitation, those set forth on Schedule A to the PREPA Plan, as of the Effective Date.  On a monthly basis, the Avoidance Actions Trustee shall distribute the Avoidance Actions Trust Assets consisting of unrestricted Cash on hand to the GUC Trust in accordance with Article XXIII.J of the PREPA Plan.  The Avoidance Actions may be transferred subject to certain liabilities, including, without limitation, all counterclaims and defenses to any such Avoidance

Actions, as provided in the PREPA Plan or the Avoidance Actions Trust Agreement.  Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar Tax, pursuant to section 1146(a) of the Bankruptcy Code.  Upon delivery of the Avoidance Actions Trust Assets to the Avoidance Actions Trust, PREPA, Reorganized PREPA, and its predecessors, successors and assigns, and each other Entity released pursuant to Article XXVII of the PREPA Plan shall be discharged and released from all liability with respect to the delivery of such distributions.

14.     Funding, Costs, and Expenses of the Avoidance Actions Trust.  On the Effective Date, the Avoidance Actions Trust shall be funded in an amount of one million dollars ($1,000,000).  No additional funding shall be provided to the Avoidance Actions Trust pursuant to the PREPA Plan.  The reasonable costs and expenses of the Avoidance Actions Trust, including the fees and expenses of the Avoidance Actions Trustee and its retained professionals, shall be paid from the Avoidance Actions Trust Assets.  Fees and expenses incurred in connection with the prosecution and settlement of any Avoidance Actions shall be considered costs and expenses of the Avoidance Actions Trust.

15.     Indemnification of Avoidance Actions Trustee and Board.  The Avoidance Actions Trustee, the Avoidance Actions Trust Board, the members of the Avoidance Actions Trust Board, and their respective firms, companies, affiliates, partners, officers, directors, members, employees, professionals, advisors, attorneys, financial advisors, investment bankers, disbursing agents and agents, and any of such Person's successors and assigns (each, an "Avoidance Actions Trust Indemnified Party"), shall not be liable to the Avoidance Actions Trust Beneficiaries for actions taken or omitted in their capacity as, or on behalf of, the Avoidance Actions Trustee or the Avoidance Actions Trust Board, as applicable, except those acts arising from their own willful

11

misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement by the Avoidance Actions Trust for fees and expenses in defending any and all actions or inactions in their capacity as, or on behalf of, the Avoidance Actions Trustee or the Avoidance Actions Trust Board, as applicable, except for any actions or inactions involving willful misconduct or gross negligence.  Any indemnification claim of an Avoidance Actions Trust Indemnified Party shall be satisfied solely from the Avoidance Actions Trust Assets and shall be entitled to a priority distribution therefrom, ahead of the Avoidance Actions Trust Interests and any other claim to or interest in the Avoidance Actions Trust Assets.  The Avoidance Actions Trust Indemnified Parties shall be entitled to rely, in good faith, on the advice of their retained professionals.  The foregoing indemnity in respect of any Avoidance Actions Trust Indemnified Party shall survive the termination of such Avoidance Actions Trust Indemnified Party from the capacity for which they are indemnified.

16.     The GUC Trust.  The GUC Trust shall include the GUC Trust Assets, consisting of the Avoidance Action Proceeds, the GUC New Bonds, if any, and the GUC CVI, which shall be distributed by the GUC Trustee to holders of Allowed Claims in the Unsecured Claims Pool in accordance with Article XXIV of the PREPA Plan.  On the Effective Date, PREPA shall transfer the GUC Trust Assets to the GUC Trust and the GUC Trust shall have the sole right, authority, and standing to receive and distribute the GUC Trust Assets in accordance with the PREPA Plan and the GUC Trust Agreement.  The GUC Trust Assets may be transferred subject to certain liabilities, as provided in the PREPA Plan or the GUC Trust Agreement.  Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar Tax, pursuant to section 1146(a) of the Bankruptcy Code.  Upon delivery of the GUC Trust Assets to the GUC Trust, PREPA, Reorganized PREPA, and its predecessors, successors and assigns, and

12

each other Entity released pursuant to Article XXVII of the PREPA Plan shall be discharged and released from all liability with respect to the delivery of such distributions.

17.   <u>Funding, Costs, and Expenses of the GUC Trust</u>.   On the Effective Date, the GUC Trust shall be funded in an amount of one million dollars ($1,000,000).   No additional funding shall be provided to the GUC Trust pursuant to the PREPA Plan.   The reasonable costs and expenses of the GUC Trust, including the fees and expenses of the GUC Trustee and its retained professionals, shall be paid from the GUC Trust Assets, including the fifty percent (50%) of the holder of the Allowed Vitol Claim's Pro Rata Share of the General Unsecured Claim Recovery not distributed to the Holder of the Allowed Vitol Claim pursuant to Article XI of the PREPA Plan, which shall be retained by the GUC Trust.   The GUC Trustee is authorized to use proceeds of the GUC Trust Assets to fund the GUC Trust, if necessary.

18.   <u>Indemnification of GUC Trustee and Board</u>.   The GUC Trustee or the individual(s) comprising the GUC Trustee, the GUC Trust Board, the members of the GUC Trust Board, and their respective firms, companies, affiliates, partners, officers, directors, members, employees, professionals, advisors, attorneys, financial advisors, investment bankers, disbursing agents and agents, and any of such Person's successors and assigns (each, an "<u>GUC Trust Indemnified Party</u>"), shall not be liable to the GUC Trust Beneficiaries for actions taken or omitted in their capacity as, or on behalf of, the GUC Trustee or the GUC Trust Board, as applicable, except those acts arising from their own willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement by the GUC Trust for fees and expenses in defending any and all actions or inactions in their capacity as, or on behalf of, the GUC Trustee or the GUC Trust Board, as applicable, except for any actions or inactions involving willful misconduct or gross negligence.   Any indemnification claim of an GUC Trust Indemnified Party shall be satisfied

solely from the GUC Trust Assets and shall be entitled to a priority distribution therefrom, ahead of the GUC Trust Interests and any other claim to or interest in the GUC Trust Assets.  The GUC Trust Indemnified Parties shall be entitled to rely, in good faith, on the advice of their retained professionals.  The foregoing indemnity in respect of any GUC Trust Indemnified Party shall survive the termination of such GUC Trust Indemnified Party from the capacity for which they are indemnified.

19.     <u>The PREPA PayGo Trust</u>.  On or prior to the Effective Date, PREPA shall establish the PREPA PayGo Trust in accordance with the PREPA Plan. The PREPA PayGo Trust shall be maintained for the purpose of reimbursing PREPA ERS on a quarterly basis, for payment of retirement benefits to Participants pursuant to the PREPA Plan. The PREPA PayGo Trust will be managed by an independent board of trustees whose members meet the independence, professionalism, experience, and qualification standards set forth in the PREPA PayGo Deed of Trust.  Any provision of the PREPA Plan or this Order notwithstanding, the Government of the Commonwealth of Puerto Rico shall have the right in its discretion, by legislative or executive action as applicable or appropriate, to alter the funding structure for distributions on account of the Claim of the PREPA ERS set forth in the PREPA Plan such that (a) Act 106 Retirement Board (the "<u>Act 106 Board</u>") may assume all administrative functions of the PREPA ERS, including processing of payment for the pension benefits to PREPA's retirees, (b) the PREPA PayGo Trust shall remit all funds and other assets in its possession to ERS for such purpose, (c) all payments by PREPA on account of the treatment of the Claim of the PREPA ERS under Section XXVI.B.2 of the PREPA Plan shall be made directly to ERS, and (d) the PREPA PayGo Trust shall be dissolved and have no further function or responsibility; *provided*, *however*, the obligation to fund

distributions on account of the claim of PREPA ERS under the PREPA Plan shall remain with Reorganized PREPA.

20. <u>Funding, Costs, and Expenses of the PREPA PayGo Trust</u>. On the Effective Date, the PREPA PayGo Trust shall be funded in an amount of one million dollars ($1,000,000). Reorganized PREPA shall make debt service payments with respect to the PREPA PayGo New Bonds Distribution and Excess New Bonds, if any, held by the PREPA PayGo Trust in accordance with the New Master Indenture. In addition, from and after the Fiscal Year in which the Effective Date occurs, Reorganized PREPA shall make, or cause to be made, annual contributions to the PREPA PayGo Trust in accordance with Article XXVI.B.2 of the PREPA Plan. No additional funding shall be provided to the PREPA PayGo Trust pursuant to the PREPA Plan.

21. <u>Act 106 Defined Contribution Accounts</u>. As of the Effective Date, new defined contribution accounts in the retirement plan established for Commonwealth employees under Act 106-2017 will be established for all Active PREPA ERS Participants (or at the sole discretion of the Oversight Board, in consultation with AAFAF, other defined contribution accounts that will be established by Reorganized PREPA on or as soon as practicable after the Effective Date), with minimum employee contributions of eight and one-half percent (8.5%) of their payroll in accordance with the contribution requirements of Act 106-2017. After the Effective Date, newly hired employees of Reorganized PREPA will also participate in the same defined contribution program. To the extent any provisions of Act 106-2017, Act 120-2018, or Act 17-2019 are inconsistent with such enrollment, such provisions are hereby preempted.

22. <u>Maintenance of Pension</u>. Before the tenth (10th) anniversary of the Effective Date, no Entity or Person acting for or on behalf thereof, shall (a) implement any existing or new legislation, or enter into any new collective bargaining agreements to create or increase any defined

15

benefit pension payment or obligation to current or future retirees from or related to any defined benefit plans over the benefits provided by the PREPA Plan, regardless of funding source, or (b) undo (in whole or in part) the PREPA Plan's eliminations of defined benefit plan accruals and cost of living adjustments for PREPA ERS Participants.

23. <u>No Action</u>. Pursuant to section 1142(b) of the Bankruptcy Code, the Debtor, or Reorganized PREPA, as the case may be, are directed, and no further action of the directors or officers of the Debtor shall be required to authorize the Debtor or Reorganized PREPA, as the case may be, to enter into, execute, deliver, file, adopt, amend, restate, consummate, or effectuate, as the case may be, the PREPA Plan, and any contract, instrument, or other document to be executed, delivered, adopted, or amended in connection with the implementation of the PREPA Plan, including, without limitation, the Plan Supplement.

24. <u>Government Action</u>. Upon entry of this Order and up to and including the satisfaction of the New Bonds, Refunding Bonds and CVI in accordance with their terms, (a) pursuant to Bankruptcy Code section 1142(b), PREPA and Reorganized PREPA, as the case may be, including, without limitation, any Entity or Person acting for or on behalf thereof, shall take any and all actions necessary to consummate the transactions contemplated by the PREPA Plan, including setting, implementing and enforcing the Legacy Charge, (b) PREPA and Reorganized PREPA, as the case may be, are authorized and directed, and the Government of the Commonwealth of Puerto Rico, Puerto Rico Department of Treasury and AAFAF, as applicable, are authorized, notwithstanding any requirements of Puerto Rico law, regulations, or executive orders to (i) execute any and all agreements necessary for the implementation of the PREPA Plan and to make any payments required thereunder, including, without limitation, the New Master Indenture and with respect to the New Bonds, Refunding Bonds and CVI issued thereunder, and

(ii) subject to the terms and provisions of the New Master Indenture, engage and contract with the New Master and the Consulting Engineer and Rate Consultant, and (c) no party, individual, official, or officer (elected or appointed), agency, or Entity shall enact, adopt, or implement any law, rule, regulation, or policy that (i) impedes, financially or otherwise, consummation and implementation of the transactions contemplated by the PREPA Plan, including, but not limited to, those contemplated pursuant to the New Master Indenture and the New Bonds and CVI issued thereunder, or (ii) frustrates, diminishes, or otherwise impairs the value of the Legacy Charge or the Remaining Legacy Charge (subject to the ability to alter the charge in accordance with the Amendment Test), or PREPA's ability to collect the Legacy Charge, or (iii) creates any inconsistency in any manner, amount or event between the terms and provisions of the PREPA Plan or a Fiscal Plan certified by the Oversight Board, each of which actions has been determined by the Oversight Board to impair or defeat the purposes of PROMESA.  To the maximum extent permitted by law, PREPA and Reorganized PREPA, including, without limitation, any Entity or Person acting for or on behalf thereof, are directed, and the Government of the Commonwealth of Puerto Rico, including, without limitation, any Entity or Person acting for or on behalf thereof, is authorized to take any and all actions necessary to consummate the transactions contemplated by the PREPA Plan.

25.    <u>Oversight Board Consent Pursuant to PROMESA Section 305</u>.    Pursuant to PROMESA Section 305, the Oversight Board consents to the entry of this Order, and, consistent with the PREPA Plan and in accordance with all applicable laws and authorities, consents to such Order requiring PREPA and Reorganized PREPA to take all acts necessary to carry out and satisfy all obligations and distributions set forth in the PREPA Plan.

26.    <u>Binding Effect</u>.  This is a full, final, and complete Order intended to be conclusive and binding on all parties in interest, is not intended to be subject to collateral attack in any other forum, and may only be challenged in accordance with applicable rules in this Court and appealed as provided in PROMESA and other applicable federal laws, rules, and jurisprudence, by (i) the Debtor, (ii) Reorganized PREPA, (iii) each Entity asserting claims or other rights against PREPA, including, without limitation, each holder of a PREPA Revenue Bond Claim and each holder of a beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer or otherwise) in respect of PREPA Revenue Bonds issued by the Debtor or with respect to any trustee, any collateral agent, any indenture trustee, any fiscal agent, and any bank that receives or holds funds related to such bonds, whether or not such claim or other rights of such Entity are impaired pursuant to the PREPA Plan and, if impaired, whether or not such Entity accepted the PREPA Plan, (iv) any other Entity or trust having standing, and (v) each of the foregoing's respective heirs, successors, assigns, trustees, executors, administrators, officers, directors, agents, representatives, attorneys, beneficiaries or guardians.

27.    <u>Cancellation of Notes, Instruments, Certificates, and Other Documents</u>.  Pursuant to Article XXIV.E.7 of the PREPA Plan, and except (a) as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the PREPA Plan, (b) for purposes of evidencing a right to distribution under the PREPA Plan, or (c) as specifically provided otherwise in the PREPA Plan (including any rejection of Executory Contracts or Unexpired Leases pursuant to Article XXI.A of the PREPA Plan), on the Effective Date, the PREPA Revenue Bonds and Fuel Line Facilities and all instruments and documents related thereto shall be deemed automatically cancelled, terminated and of no further force or effect against the Debtor without any further act or action under any applicable agreement, law, regulation, order or rule, with the

Debtor and the applicable trustee, paying agent or fiscal agent, as the case may be, having no
continuing obligations or duties and responsibilities thereunder and the obligations of the parties
to the Debtor under the PREPA Revenue Bonds Fuel Line Facilities and all instruments and
documents related thereto shall be discharged; provided, however, that, notwithstanding anything
contained in the PREPA Plan or herein to the contrary, the PREPA Revenue Bonds and Fuel Line
Facilities and such other instruments and documents shall continue in effect solely (i) to allow the
Distribution Agent to make any distributions as set forth in the PREPA Plan and to perform such
other necessary administrative or other functions with respect thereto, (ii) to allow holders of
Allowed PREPA Revenue Bond Claims, Allowed National Claims, and Allowed Fuel Line Loan
Claims to receive distributions in accordance with the terms and provisions of the PREPA Plan,
(iii) for any trustee, fiscal agent, agent, contract administrator or similar entity under all
instruments and documents related thereto, to perform necessary functions, including making
distributions, in accordance with the PREPA Plan, and to have the benefit of all the rights and
protections and other provisions of such instruments and documents, as applicable, and all other
related agreements, (iv) to set forth the terms and conditions applicable to parties to such
documents and instruments other than the Debtor, (v) as may be necessary to preserve any claims
under the respective Insurance Policies and related documents issued by a Monoline Insurer and
the Oversight Board shall request that PREPA and Reorganized PREPA use their reasonable
efforts to (1) maintain the existing CUSIP numbers for the PREPA Revenue Bonds insured by a
Monoline Insurer, and (2) take such other reasonable steps as may be necessary to preserve and
effectuate such Claims, or (vi) to allow National to exercise the redemption or call rights assigned
to National pursuant to the provisions of Article XX.D of the PREPA Plan.  Notwithstanding the
foregoing, and except as otherwise expressly provided in the PREPA Plan, such bonds or bond

documents that remain outstanding shall not form the basis for the assertion of any Claim against the Debtor or Reorganized PREPA, as the case may be.

28. <u>Rejection or Assumption of Remaining Executory Contracts and Unexpired Leases</u>. Pursuant to section 365(b)(2) of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA, and subject to the provisions of Articles XXI.F. and XXI.H of the PREPA Plan, all Executory Contracts and Unexpired Leases that exist between the Debtor and any Entity, and which have not expired by their own terms on or prior to the Confirmation Date, shall be deemed and are hereby rejected by the Debtor as of the Effective Date, except for any Executory Contract and Unexpired Lease (a) that has been assumed, assumed and assigned, or rejected pursuant to an order of the Title III Court entered prior to the Effective Date, (b) that is specifically designated as a contract or lease to be assumed or assumed and assigned, (c) that has been registered with the Office of the Comptroller of Puerto Rico or has been approved by the Oversight Board or authorized by the Title III Court, (d) that has been exempt from registration with the Office of the Comptroller of Puerto Rico pursuant to 2 L.P.R.A. § 97 and regulations promulgated pursuant thereto, (e) with the United States, or any of its agencies, departments or agents or pursuant to any federal program, (f) by or between any Commonwealth of Puerto Rico agencies, departments, municipalities, public corporations, or instrumentalities, unless specifically designated a contract to be rejected in the Plan Supplement, or (g) that contains any easement, license, or permit in favor of PREPA or Reorganized PREPA; <u>provided</u>, <u>however</u>, that the Debtor reserves the right to amend, on or prior to the Effective Date, such schedules to delete any Executory Contract and Unexpired Lease therefrom or add any Executory Contract and Unexpired Lease thereto, in which event such Executory Contract(s) and Unexpired Lease(s) shall be deemed to be, as the case may be, either rejected, assumed, or assumed and assigned as of the Effective

Date.  The Debtor shall serve (y) notice of any Executory Contract and Unexpired Lease to be assumed or assumed and assigned through the operation of Article XXI.A of the PREPA Plan, by including a schedule of such contracts and leases in the Plan Supplement and (z) notice of any Executory Contract and Unexpired Lease to be rejected through the operation of Article XXI.A of the PREPA Plan, by serving a separate notice to the relevant counterparties to such agreements. To the extent there are any amendments to such schedules, the Debtor shall provide notice of any such amendments to the parties to the Executory Contract and Unexpired Lease affected thereby. The listing of a document on the schedules to the Plan Supplement or in any separate notice shall not constitute an admission by the Debtor that such document is an Executory Contract and Unexpired Lease or that the Debtor has any liability thereunder.   Nothing herein shall impair any easement, license, or permit granted to PREPA by law or agreement.

29.   <u>Insurance Policies</u>.  Subject to the terms and provisions of Article XXI.H of the PREPA Plan, each of the Debtor's insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the PREPA Plan and shall be assumed as of the Effective Date; <u>provided</u>, <u>however</u>, that, such treatment shall not, and shall not be construed to, discharge or relieve any Monoline Insurer with respect to its respective obligations to holders of Claims under policies of insurance and applicable law and governing documents with respect thereto and <u>provided</u>, <u>further</u>, that no obligation to any Monoline Insurer is assumed and any Claim that such Monoline Insurer has is discharged and treated under the Plan. Except as otherwise provided in the Plan, on the Effective Date, PREPA shall, or shall cause the Bond Trustee, to deposit or cause the deposit of the applicable National Insurance Policies and any agreements, documents and instruments relating to coverage of the applicable National Insured Bond Claims into the National Trust. For the avoidance of doubt, nothing contained in this Order

21

or the PREPA Plan shall prejudice any subrogation, reimbursement, or similar rights of National against the National Trust or the assets thereof.

30.   <u>Rejection Damage Claims</u>.  If the rejection of an Executory Contract and Unexpired Lease by the Debtor hereunder results in damages to the other party or parties to such contract or lease, any claim for such damages, if not heretofore evidenced by a filed Proof of Claim, shall be forever barred and shall not be enforceable against the Debtor, or its properties or agents, successors, or assigns, including, without limitation, Reorganized PREPA, unless a Proof of Claim is filed with the Title III Court and served upon attorneys for the Oversight Board and Reorganized PREPA, as the case may be, on or before thirty (30) days after the later to occur of (i) the Effective Date, and (ii) the date of entry of an order by the Title III Court authorizing rejection of a particular Executory Contract and Unexpired Lease.

31.   <u>Payment of Cure Amounts</u>.  Any monetary amount required as a cure payment with respect to each prepetition Executory Contract and Unexpired Lease to be assumed pursuant to the PREPA Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash on the later to occur of (a) the Effective Date and (b) twenty  (20) Business Days of the occurrence of a Final Order setting forth the cure amount as to each executory contract or unexpired lease to be assumed or assumed and assigned, or upon such other terms and dates as the parties to such Executory Contracts or Unexpired Leases and the Debtor or Reorganized PREPA otherwise agree.

32.   <u>Setoffs</u>.  Except as otherwise provided in the PREPA Plan or in this Order, the Distribution Agent may, pursuant to applicable bankruptcy or non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the PREPA Plan on account thereof (before any distribution is made on account of such Claim by the Distribution Agent), the

claims, rights, and Causes of Action of any nature that the Debtor or Reorganized PREPA may

hold against the holder of such Allowed Claim; provided, however, that neither the failure to effect

such a setoff nor the allowance of any Claim pursuant to the PREPA Plan shall constitute a waiver

or release by the Debtor or Reorganized PREPA of any such claims, rights, and Causes of Action

that the Debtor or Reorganized PREPA may possess against such holder; and, provided, further,

that nothing contained herein or in the PREPA Plan limits the ability of any Creditor to effectuate

rights of setoff or recoupment preserved or permitted by the provisions of sections 553, 555, 559,

or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment; and, provided,

further, that nothing in this decretal paragraph or Article XXIV.J of the PREPA Plan shall affect

the releases and injunctions provided in Article XXVII of the PREPA Plan or this Order.

33.     Delivery of Distributions.

(a)     Delivery of Distributions Generally.  Subject to the provisions of Rule 9010 of the

Bankruptcy Rules, and except as provided in the PREPA Plan or herein, distributions and

deliveries to holders of Allowed Claims shall be made through DTC or at the address of each such

holder as set forth on the Schedules filed with the Court, unless superseded by the address set forth

on Proofs of Claim filed by such holders, or at the last known address of such holder if no Proof

of Claim is filed or if the Debtor has been notified in writing of a change of address; provided,

however, that initial distributions by the Distribution Agent for the benefit of holders of Allowed

PREPA Revenue Bond Claims shall be made to the Bond Trustee, as applicable, for such

obligation and the initial distribution by the Distribution Agent for the benefit of holders of

Allowed Fuel Line Loan Claims may be made by a trustee in accordance with the Fuel Line Lender

PSA; and, provided, further, that, except as otherwise provided herein, the Distribution Agent may

make distributions of Fuel Line Lender PSA Creditor Amounts to a party entitled thereto in a

manner mutually agreed upon between such party and the Distribution Agent.  Neither PREPA,

Reorganized PREPA nor any Distribution Agent, including the GUC Trustee, shall have any

obligation to recognize the transfer or, or the sale of, any participation in, any Claim that occurs

after the close of business on the Distribution Record Date, and shall be entitled for all purposes

to recognize and distribute only to those holders of Allowed Claims (including holders of Claims

that become allowed after the Distribution Record Date) that are holders of such Claims, or

participants therein, as of the close of business on the Distribution Record Date; provided,

however, that the New Bonds and CVI shall be transferable and transfers shall be recognized if

made in accordance with the terms and conditions of the New Master Indenture.  The Bond Trustee

for each such obligation (or such trustee's or fiscal agent's designee) shall, in turn, deliver the

distribution to holders in the manner provided for in the applicable governing documents.  The

Bond Trustee may conclusively rely upon the distribution instructions received from the Debtor,

Reorganized PREPA, or their respective agents with respect to the delivery of distributions in

accordance with the terms and provisions of the PREPA Plan, including the contra-CUSIP

positions and escrow positions established by the Debtor or its agents with DTC, and the Bond

Trustee shall close and terminate the original CUSIPs after making distributions in accordance

with the terms and provisions of the PREPA Plan and shall have no further distribution obligations

thereunder.  The Bond Trustee shall not be required to post any bond or surety or other security

for the performance of its duties, unless otherwise ordered or directed by the Title III Court.

Subject to any agreements to the contrary, the Bond Trustee shall only be required to make the

distributions and deliveries described in this decretal paragraph and the PREPA Plan and in

accordance with the terms of this Order, the PREPA Plan and such other governing document, and

shall have no liability for actions reasonably taken in accordance with the terms of this Order, the

24

PREPA Plan and such other governing document, or in reasonable reliance upon information provided to the Bond Trustee by the Debtor, Reorganized PREPA or their respective agents in accordance with the terms of this Order, the PREPA Plan or in connection with distributions to be made hereunder or thereunder, except for liabilities resulting from the gross negligence or willful misconduct of the Bond Trustee.

(b)    <u>Delivery of Distributions with Respect to National Insured Bonds</u>. Notwithstanding any other provision of the PREPA Plan or of this Order, (i) subject to the rights of the Bond Trustee, on the Effective Date, National shall receive, and the Distribution Agent shall disburse to National, or such other Entity as National may direct in its sole and absolute discretion, the National Plan Consideration in accordance with the terms and provisions of Article XX of the PREPA Plan in a manner mutually agreed upon by the Distribution Agent and National, and (ii) National shall have all right, title, and interest in the National Plan Consideration and shall manage the National Plan Consideration in its sole and absolute discretion subject to and in accordance with the provisions of the Plan, all applicable laws and regulations.

34.    <u>Distribution Agent</u>. Pursuant to Article I.A.73 of the PREPA Plan, the Distribution Agent shall be, as applicable, PREPA, Reorganized PREPA, the GUC Trustee, or such Entity or Entities designated by the Oversight Board, each of which is to make or to facilitate distributions in accordance with the provisions of the PREPA Plan and this Order.  Upon designation of any Distribution Agent other than PREPA, Reorganized PREPA, or the GUC Trustee, the Oversight Board shall file an informative motion with the Title III Court setting forth the name of the Distribution Agent designated.

35.    <u>Securities Laws Exemption</u>.  Pursuant to section 1145 of the Bankruptcy Code and/or Section 3(a)(2) of the Securities Act, the offering, issuance, and distribution of the New

Bonds and CVI pursuant to the terms of the PREPA Plan and this Order (and any subsequent offering of such securities, including, without limitation, pursuant to a case under Title VI of PROMESA) and any custodial trusts created pursuant to the PREPA Plan, shall be exempt from registration under the Securities Act and any state or local law requiring registration for the offer, issuance or distribution of securities, including, but not limited to, the registration requirements of Section 5 of the Securities Act and any other applicable state or federal law requiring registration and/or prospectus delivery or qualification prior to the offering, issuance, distribution, or sale of securities, and, pursuant to Section 2(b) of the Investment Company Act of 1940, as amended (the "Investment Company Act"), such custodial trusts, securities and interests shall be exempt from the provisions of the Investment Company Act.

36.     Acceleration of National Insured Bonds.  Notwithstanding any other provision of the PREPA Plan or this Order, to the extent that there are no outstanding payment defaults by National with respect to National Insured Bonds up to and including the Effective Date, the payment of the principal of the National Insured Bonds shall be accelerated as of the Effective Date, and such National Insured Bonds shall be due and payable from and after the Effective Date at the National Acceleration Price of one hundred percent (100%) of the principal amount thereof plus interest accrued thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) to the date of payment.  National shall have the right to pay the National Acceleration Price with respect to the National Insured Bonds at any time, and the holders of the National Insured Bonds and the trustee or fiscal agent (as applicable) shall be required to accept the same in satisfaction of National's obligations under the applicable National Insurance Policy with respect to such bonds, and, upon such payment, National's obligations under the applicable National Insurance Policy shall be fully satisfied and extinguished, notwithstanding any provision

26

of the applicable National Insurance Policy or other documents related to the National Insured Bonds.  For the avoidance of doubt, notwithstanding such acceleration, there shall be no acceleration of any payment required to be made under any National Insurance Policy unless National elects, in its sole and absolute discretion, to make such payment(s) on an accelerated basis.

37.    Distributions to Holders of Disputed Claims.  Notwithstanding any provision of the PREPA Plan or this Order to the contrary, and except as otherwise agreed by the relevant parties: (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order or the Claims have been Allowed or expunged.  At such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, Reorganized PREPA shall distribute to the holder thereof the distributions, if any, to which such holder is entitled under the PREPA Plan, in accordance with Article XXIV.D of the Plan.  To the extent the Distribution Agent or the Reorganized Debtor, as the case may be, retains any New Bonds or CVI on behalf of Disputed Claims holders, until such New Bonds or CVI are distributed, the Distribution Agent or the Reorganized Debtor, as the case may be, shall exercise voting or consent rights with respect to such obligations.

38.    No Amendments to Proofs of Claim/Objections to Claims.  As of the commencement of the Confirmation Hearing, a Proof of Claim may not be amended without the approval of the Title III Court.  For the avoidance of doubt, no Proof of Claim that has already been filed in the PREPA case can be amended in a manner that would be inconsistent with the Bar

Date Orders. With the exception of Proofs of Claim timely filed hereafter in respect of Executory

Contracts and Unexpired Leases rejected pursuant to this Order, any Proof of Claim filed on or

after the commencement of the PREPA Confirmation Hearing is hereby barred, and the Clerk of

the Court and the Debtor's Claims Agent are authorized to remove such Proofs of Claims from the

claims registry in the Title III Case.  Notwithstanding the provisions of Article XXV.A of the

PREPA Plan, (a) if a Claim that has been transferred pursuant to the terms and provisions of either

the ACR Order or the ADR Order is subsequently transferred back to the claims registry for

determination by the Title III Court, the period in which the Reorganized Debtor, by and through

the Oversight Board, or AAFAF, as the case may be, must file an objection to such Claim is

extended up to and including one hundred eighty (180) days from and after the date of such notice

transferring any such Claim back to the claims registry, and (b) within sixty (60) days of the date

hereof, in accordance with Section 204 of PROMESA, the Debtor or Reorganized PREPA, as the

case may be, shall deliver to the Oversight Board a copy of all files, documents, instruments and,

to the extent applicable, pleadings requested by the Oversight Board in connection with the

reconciliation of Claims, including, without limitation, Disputed Claims.

       39.    Conditions to Effective Date.  The PREPA Plan shall not become effective unless

and until the conditions set forth in Article XXXII.A of the PREPA Plan have been satisfied or

waived in accordance with the provisions set forth in Article XXXII.B of the PREPA Plan.

       40.    Administrative Claim Bar Date.  The last day to file proof of Administrative

Expense Claims shall be ninety (90) days after the Effective Date, after which date any

Administrative Expense Claim, proof of which has not been filed, shall be deemed forever barred,

and the Debtor and Reorganized PREPA shall have no obligation with respect thereto; provided,

however, that no proof of Administrative Expense Claim shall be required to be filed if such

Administrative Expense Claim (a) shall have been incurred (i) in accordance with an order of the
Court or (ii) with the written consent of the applicable Government Parties expressly granting such
Administrative Expense Claim, (b) is a Professional Claim, (c) is an Administrative Expense Claim
of the IRS for the payment of taxes incurred by the Debtor during the period from and after the
Petition Date, or (d) is the subject of a pending motion seeking allowance of an administrative
expense as of the entry of this Order.

41.    _Professional Compensation and Reimbursement Claims_.   All Entities awarded
compensation or reimbursement of expenses, including, without limitation, to the fullest extent
provided in respective letters of engagement or similar instruments or agreements, by the Title III
Court shall be paid in full, in Cash, in the amounts allowed by the Title III Court, including, without
limitation, all amounts previously awarded subject to holdbacks pursuant to orders of the Title III
Court, (a) within thirty (30) calendar days after the later to occur of (i) the Effective Date and (ii)
the date upon which the Title III Court order allowing such Claims is deemed to be a Final Order,
or (b) upon such other terms no more favorable to the claimant as may be mutually agreed upon
between such claimant and the Government Parties; provided, however, except as provided in the
PREPA Plan and this Order (including, without limitation, Article II.C of the PREPA Plan) and
this Order, each Professional must file its application for final allowance of compensation for
professional services rendered and reimbursement of expenses during the period up to but not
including the Effective Date within one hundred twenty (120) days following the Effective Date
or as otherwise provided in the _Third Amended Order Setting Procedures for Interim and Final_
_Compensation and Reimbursement of Expenses of Professionals_ (Docket Entry No. 20546 in Case
No. 17-3283) (the "Interim Compensation Order) or such later date as agreed to with the Fee
Examiner, and such application shall be subject to the procedures set forth in the Interim

Compensation Order.  Within forty-five (45) days following the submission of statements for services rendered and/or expenses incurred, the Reorganized Debtor shall pay compensation for professional services extended and reimbursement of expenses incurred by any of the Reorganized Debtor, the Oversight Board and their respective Professionals (to the extent of services rendered in connection with, arising from or relating to the Debtor or Reorganized Debtor) from and after the Confirmation Date in the ordinary course and without the need for Title III Court approval.

42.   <u>Fuel Line Lender PSA Creditor Amounts</u>.  Notwithstanding anything contained in the PREPA Plan or this Order to the contrary, to compensate the Fuel Line Lenders for their commitments, costs and expenses in connection with the settlements embodied in the PREPA Plan, including for the cost of negotiation, confirmation and consummation of the PREPA Plan and Fuel Line Lender PSA, each Fuel Line Lender PSA Creditor shall be entitled to receive on the Effective Date, in the form of either additional Series A Bonds or Cash, in the Oversight Board's sole discretion and not on account of their Allowed Claim, such Fuel Line Lenders PSA Creditors' (i) Pro Rata Share of the Fuel Line Lender PSA Creditors Consummation Amounts in consideration for their assistance in formulating the PREPA Plan, and (ii) Pro Rata Share of the Fuel Line Lender PSA Creditors Professionals' Reimbursement Amounts to compensate for the reasonable fees and expenses incurred in connection with the Title III Case and negotiating and executing the Fuel Line Lender PSA; <u>provided</u>, that ten percent (10%) of the Fuel Line Lender PSA Creditors Professionals' Reimbursement Amounts shall be allocated to the Fuel Line Lenders PSA Creditor of record as of the Agreement Effective Date (as defined in the Fuel Line Lender PSA) under the Fuel Line Citibank Facility and ninety percent (90%) of the Fuel Line Lender PSA Creditors Professionals' Reimbursement Amounts shall be allocated to the Fuel Line Lender PSA Creditors (party to the Fuel Line Lender PSA as of the Agreement Effective Date) under the Fuel Line Scotia

Facility (and pro rata among such Fuel Line Lender PSA Creditors). Each Fuel Line Lender PSA

Creditor shall also receive Series A Bonds or Cash, in the sole discretion of the Oversight Board,

in the face amount of interest at a rate of six percent (6%) per annum deemed to have accrued on

account of each holder's Pro Rata Share of Series A Bonds to be distributed pursuant to Article

VII.A(i) of the PREPA Plan, during a period equal to the shorter of (a) December 1, 2022 to the

Effective Date, and (b) one (1) year.

43.    National PSA Fees.  Notwithstanding anything contained in the PREPA Plan or this

Order to the contrary, to compensate National for the cost of negotiation, confirmation and

consummation of the PREPA Plan, National shall be entitled to receive on the Effective Date,

Series B Bonds or Cash, as elected in the Oversight Board's sole discretion (which election shall

be deemed to be Series B Bonds, unless the Oversight Board elects otherwise at or prior to the

commencement of the Confirmation Hearing), in the aggregate face amount equal to the sum of

(i) three percent (3%) times the Allowed National Insured Bond Claims to compensate for the

reasonable fees and expenses incurred by National in connection with the Title III Case and

negotiating and executing the National PSA and prosecution of approval of the Disclosure

Statement and Plan and (ii) two and eighty-six one hundredths percent (2.86%) times the Allowed

National Insured Bond Claims in consideration for the structuring of payments to be made to

holders of claims arising from or relating to the National Insured Bonds in accordance with the

National PSA.

44.    Eminent Domain/Inverse Condemnation Claims.  From and after the Effective

Date, (a) to the extent not modified prior thereto, the automatic stay pursuant to section 362 of the

Bankruptcy Code and the discharge injunction pursuant to Article XXVII of the PREPA Plan shall

be deemed modified in order to permit the holder of an Eminent Domain/Inverse Condemnation

31

Claim to (i) liquidate such Eminent Domain/Inverse Condemnation Claim in such holder's Eminent Domain Proceeding and (ii) cause the Clerk of the Court of First Instance to distribute to such Holder the amount of monies on deposit with the Court of First Instance with respect to the condemned property.  Upon the occurrence of a Final Order determining the validity and amount of just compensation attributable to an Eminent Domain/Inverse Condemnation Claim, the holder of an Allowed Eminent Domain/Inverse Condemnation Claim shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's unpaid balance of its Allowed Eminent Domain/Inverse Condemnation Claim, holder's Pro Rata Share of the General Unsecured Claim Recovery.

45.     Discharge and Release of Claims and Causes of Action.

(a)     Except as expressly provided in the PREPA Plan or herein, all distributions and rights afforded under the PREPA Plan are, and shall be deemed to be, in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims or Causes of Action against the Debtor and Reorganized Debtor that arose, in whole or in part, prior to the Effective Date, relating to the Title III Case, the Debtor or Reorganized Debtor or any of their respective Assets, property, or interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the PREPA Plan on account of such Claims or Causes of Action; provided, however, that, without prejudice to the exculpation rights set forth in Article XXVII of the PREPA Plan and decretal paragraphs 47–50 hereof, nothing contained in the PREPA Plan or this Order shall, nor shall it be construed, to be a grant of a non-consensual third-party release of the Fuel Line Lender PSA Creditors, National, and each of their respective Related Persons by any Creditors of the Debtor.  Upon the Effective Date, the Debtor and Reorganized PREPA shall be

deemed discharged and released from any and all Claims, Causes of Action and any other debts that arose, in whole or in part, prior to the Effective Date (including prior to the Petition Date), and Claims of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code and PROMESA Section 407, whether or not (a) a proof of claim based upon such Claim is filed or deemed filed under section 501 of the Bankruptcy Code, (b) such Claim is allowed under section 502 of the Bankruptcy Code and PROMESA Section 407 (or is otherwise resolved), or (c) the holder of a Claim based upon such debt voted to accept the PREPA Plan.

(b)     Except as expressly provided in the PREPA Plan or herein, all Entities shall be precluded from asserting any and all Claims against the Debtor and Reorganized PREPA, and each of their respective Assets, property, and rights, remedies, Claims or Causes of Action or liabilities of any nature whatsoever, relating to the Title III Case, the Debtor or Reorganized PREPA or any of their respective Assets and property, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the PREPA Plan on account of such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities.  In accordance with the foregoing, except as expressly provided in the PREPA Plan or herein, this Order shall constitute a judicial determination, as of the Effective Date, of the discharge and release of all such Claims, Causes of Action or debt of and against the Debtor and Reorganized PREPA pursuant to sections 524 and 944 of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA, and such discharge shall void and extinguish any judgment obtained against the Debtor or Reorganized PREPA and their respective Assets, and property at any time, to the extent such judgment is for all or part of a discharged Claim, debt or liability.

46.    <u>Releases by the Debtor and Reorganized Debtor</u>.  Except as otherwise expressly provided in the PREPA Plan or this Order, on the Effective Date, and for good and valuable consideration, each of the Debtor and Reorganized Debtor, the Distribution Agent and each of the Debtor's and Reorganized Debtor's Related Persons shall be deemed to have and hereby does irrevocably and unconditionally, fully, finally and forever waive, release, acquit, and discharge the Released Parties from any and all Claims or Causes of Action  the Debtor, Reorganized Debtor, and the Distribution Agent, or any of them, or anyone claiming through them, on their behalf or for their benefit, have or may have or claim to have, now or in the future, that are based upon, relate to, or arise out of or in connection with, in whole or in part, any act, omission, transaction, event, or other circumstance relating to the Title III Case, the Fuel Line Lender PSA, the National PSA, or the Debtor taking place or existing on or prior to the Effective Date, and/or any Claim, act, fact, transaction, occurrence, statement, or omission in connection with or alleged or that could have been alleged, including, without limitation, any such Claim, demand, right, liability, or cause of action for indemnification, contribution, or any other basis in law or equity for damages, costs, or fees.

47.    <u>Release and Exculpation Provisions</u>.  Except as otherwise provided in this Order, all release and exculpation provisions, including, but not limited to, those contained in Article XXVII of the PREPA Plan, are approved and shall be effective and binding on all Entities, to the extent provided therein.

48.    **<u>Complete Satisfaction, Discharge, and Release</u>.  Except as expressly provided in the PREPA Plan or this Order, all distributions and rights afforded under the PREPA Plan shall be, and shall be deemed to be, in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims or Causes of Action against PREPA and**

Reorganized PREPA that arose, in whole or in part, prior to the Effective Date, relating to the Title III Case, the Debtor or Reorganized Debtor or any of their respective Assets, property, or interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the PREPA Plan on account of such Claims or Causes of Action. Upon the Effective Date, the Debtor and Reorganized Debtor shall be discharged and released from any and all Claims, Causes of Action, and any other Debts that arose, in whole or in part, prior to the Effective Date (including prior to the Petition Date), and all Debts of the kind specified in Bankruptcy Code sections 502(g), 502(h), or 502(i), whether or not (a) a Proof of Claim based upon such Debt is filed or deemed filed under Bankruptcy Code section 501, (b) a Claim based upon such Debt is allowed under Bankruptcy Code section 502 (or is otherwise resolved), or (c) the Holder of a Claim based upon such Debt voted to accept the PREPA Plan; *provided*, for the avoidance of doubt, this Article XXVII.A.1 does not extend to or include any claims, rights, or defenses (whether ordinary or affirmative) of the Vitol Parties related to the Vitol-SCC AP preserved pursuant to the Vitol Settlement Agreement, and the Vitol Parties are not releasing and instead are expressly preserving, all of their claims, rights, or defenses related to the Vitol-SCC AP as provided in the Vitol Settlement Agreement.

49. **Preclusion from Assertion of Claims Against the Debtor.** All Entities are enjoined from asserting any and all Claims or other obligations, suits, judgments, damages, Debts, rights, remedies, Causes of Action, or liabilities, of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtor and Reorganized Debtor and each of their respective Assets, property and rights, relating to the

Title III Case, regardless of whether any property will have been distributed or retained pursuant to the PREPA Plan on account of such Claims or other obligations, suits, judgments, damages, Debts, rights, remedies, Causes of Action, or liabilities. In accordance with the foregoing, except as expressly provided in the PREPA Plan or this Order, this Order shall constitute a judicial determination, as of the Effective Date, of the discharge and release of all such Claims, Causes of Action, and Debt of or against the Debtor and the Reorganized Debtor pursuant to Bankruptcy Code sections 524 and 944, applicable to the Title III Case pursuant to PROMESA section 301, and such discharge shall void and extinguish any judgment obtained against the Debtor or Reorganized Debtor and their respective Assets, and property at any time, to the extent such judgment is for all or part of a discharged Claim, Debt, or liability. For the avoidance of doubt, this Article XXVII.A.2 does not extend to or include any claims, rights, or defenses (whether ordinary or affirmative) of the Vitol Parties related to the Vitol-SCC AP preserved pursuant to the Vitol Settlement Agreement, and the Vitol Parties are not releasing and instead are expressly preserving, all of their claims, rights, or defenses related to the Vitol-SCC AP as provided in the Vitol Settlement Agreement.

50.    **Injunction Related to Discharge of Claims**.  Except as otherwise expressly provided in Article XXVII of the PREPA Plan, this Order, or such other applicable Final Order of the Title III Court, all Entities who have held, hold, or may hold Claims or any other Debt or liability discharged or released pursuant to Article XXVII of the PREPA Plan or who have held, hold, or may hold Claims or any other Debt or liability discharged or released pursuant to Article XXVII of the PREPA Plan are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing, directly or indirectly, in any manner, any action or other proceeding (including, without limitation, any judicial, arbitral,

36

administrative, or other proceeding) of any kind on any such Claim or other Debt or liability that is discharged or released pursuant to the PREPA Plan against any of the Released Parties or any of their respective Assets or property, (b) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against any of the Released Parties or any of their respective assets or property on account of any Claim or other Debt or liability that is discharged or released pursuant to the PREPA Plan, (c) creating, perfecting, or enforcing any encumbrance of any kind against any of the Released Parties or any of their respective assets or property on account of any Claim or other Debt or liability discharged or released pursuant to the PREPA Plan, and (d) except to the extent provided, permitted, or preserved by Bankruptcy Code sections 553, 555, 556, 559, or 560 or pursuant to the common law right of recoupment, asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from any of the Released Parties or any of their respective assets or property, with respect to any such Claim or other Debt or liability discharged or released pursuant to the PREPA Plan. Such injunction shall extend to all successors and assigns of the Released Parties and their respective assets and property.

51.    **Releases by Holders of Claims**.  Notwithstanding anything contained in the PREPA Plan to the contrary, as of the Effective Date, for good and valuable consideration, each Holder of a Claim is deemed to have released and discharged the Debtor and the Reorganized Debtor from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtor, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtor (including

37

management, ownership, or operation thereof), the Debtor's in- or out-of-court restructuring efforts, intercompany transactions, the Title III Case, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the PREPA Plan, the Uninsured Bond Settlement Agreement, the Vitol Settlement Agreement, the Restructuring Transactions, the Fuel Line Lender PSA, the National PSA, or any contract, instrument, release, or other Definitive Documents, agreement, or document created or entered into in connection with the Disclosure Statement, or the PREPA Plan, the filing of the Title III Case, the pursuit of Confirmation, the pursuit of consummation, the administration and implementation of the PREPA Plan, including the issuance or distribution of securities pursuant to the PREPA Plan, or the distribution of property under the PREPA Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the PREPA Plan, the Restructuring Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the PREPA Plan.

52.   **Exculpation.**  Except as otherwise specifically provided in the PREPA Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Title III Case, the formulation, preparation, dissemination, negotiation, or filing of the Fuel Line Lender PSA, the National PSA, Disclosure Statement, the PREPA Plan, the Uninsured Bond Settlement Agreement, the Vitol Settlement Agreement, or any Restructuring Transaction, contract, instrument, release or other

Definitive Document, agreement, or document created or entered into in connection with the Disclosure Statement or the PREPA Plan, the filing of the Title III Case, the pursuit of Confirmation, the pursuit of consummation, the administration and implementation of the PREPA Plan, including the issuance of securities pursuant to the PREPA Plan, or the distribution of property under the PREPA Plan or any other related agreement, except for claims related to any act or omission determined in a Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the PREPA Plan. The Exculpated Parties have, and upon confirmation of the PREPA Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the PREPA Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the PREPA Plan or such distributions made pursuant to the PREPA Plan. For the avoidance of doubt, notwithstanding anything contained herein or in the PREPA Plan to the contrary, the PREPA Plan shall not, and shall not be construed to, release or exculpate, any payment obligation under the applicable National Insurance Policy, to any beneficial holder of National Insured Bonds, in accordance with its terms solely to the extent of any failure of such holder to receive the treatment provided to Holders of Claims in Class 5 (or any claims that National may have against a

beneficial holder of National Insured Bonds with respect to National's applicable obligations under the National Insurance Policies).

53.   **Injunction**.  As of the Effective Date, all Entities that hold, have held, or may hold a Released Claim released pursuant to Article XXVII of the PREPA Plan, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred, and enjoined from taking any of the following actions, whether directly or indirectly, derivatively, or otherwise, on account of or based on the subject matter of such discharged Released Claims: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding (including, without limitation, any judicial, arbitral, administrative, or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting, or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation owed to any Entity released under Article XXVII of the PREPA Plan; and (v) commencing or continuing in any manner, in any place of any judicial, arbitration, or administrative proceeding in any forum, that does not comply with or its inconsistent with the provisions of the PREPA Plan or this Order.

54.   **Supplemental Injunction**.  Notwithstanding anything contained herein or in the PREPA Plan to the contrary, except to the limited extent provided in the PREPA Plan, all Entities, including Entities acting on their behalf, who currently hold or assert, have held or asserted, or may hold or assert, any Released Claims against any of the Released Parties

40

based upon, attributable to, arising out of or relating to the Title III Case or any Claim against the Debtor, whenever and wherever arising or asserted, whether in the U.S. or anywhere else in the world, whether sounding in tort, contract, warranty, statute, or any other theory of law, equity or otherwise, are, and shall be deemed to be, permanently stayed, restrained and enjoined from taking any action against any of the Released Parties for the purpose of directly or indirectly collecting, recovering or receiving any payment or recovery with respect to any Released Claims arising prior to the Effective Date (including prior to the Petition Date), including, but not limited to:

(a)     Commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Released Claim against any of the Released Parties or the assets or property of any Released Party;

(b)     Enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

(c)     Creating, perfecting or enforcing any Lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

(d)     Except as otherwise expressly provided in the PREPA Plan or this Order, asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any such Released Claim;

(e)     Taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the PREPA Plan or this Order; provided, however, that the Debtor's compliance with the formal requirements of Bankruptcy Rule 3016 shall not constitute an admission that the PREPA Plan provides for any injunction against conduct not otherwise enjoined under the Bankruptcy Code

55.     Term of Existing Injunctions or Stays.  Unless otherwise provided in the PREPA Plan or this Order, all injunctions or stays in effect in the Title III Cases (pursuant to sections 105, 362, or 922 of the Bankruptcy Code or any order of the Title III Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the PREPA Plan or this Order)

shall remain in full force and effect through the Effective Date, except that each injunction imposed by a Court order shall remain in effect permanently unless the order specifies a termination date or event, in which case, the specification set forth in such order shall govern.  All injunctions or stays contained in the PREPA Plan or this Order shall remain in full force and effect in accordance with their terms.

56.  <u>Prosecution of Claims</u>.  Except as settled and released herein, from and after the Effective Date, the Avoidance Actions Trustee shall have the exclusive right and power to (a) litigate any and all of the Avoidance Actions and (b) compromise and settle such Avoidance Actions, upon approval of the Title III Court.  The net proceeds of any such litigation or settlement (after satisfaction of all costs and expenses incurred in connection therewith) shall be transferred to the Avoidance Actions Trust for distribution in accordance with the PREPA Plan and the Avoidance Actions Trust Agreement.

57.  <u>Indemnification and Reimbursement Obligations</u>.  For purposes of the PREPA Plan, (i) to the extent executory in nature, the obligations of the Debtor, including, without limitation, directors and officers insurance policies, to indemnify and reimburse its directors or officers that were directors or officers, respectively, on or prior to the Petition Date, shall be deemed assumed as of the Effective Date and (ii) indemnification obligations of the Debtor arising from conduct of officers and directors during the period from and after the Petition Date shall be Administrative Expense Claims; <u>provided</u>, <u>however</u>, that the Debtor and Reorganized Debtor shall not be responsible for any indemnification obligation, cost, or expense associated with the gross negligence, intentional fraud, or willful misconduct of their respective officers or directors.

58.  <u>Compliance with Tax Requirements</u>.  Any party issuing any instrument or making any distribution under the PREPA Plan shall comply with all applicable withholding and reporting

requirements imposed by any United States federal, state, or local tax law or tax authority, and all distributions under the PREPA Plan shall be subject to any such withholding or reporting requirements.  Except as provided above, each holder of an Allowed Claim that is to receive a distribution under the PREPA Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such holder by any governmental unit, including income, withholding, and other tax obligations, on account of such distribution.  Any party issuing any instrument or making any distribution under the PREPA Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such withholding tax obligations and, if any party issuing any instrument or making any distribution under the PREPA Plan fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder shall reimburse such party.  The Distribution Agent may require, as a condition to the receipt of a distribution (including the applicable trust certificates), that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder.  If the holder fails to comply with such a request within one year, such distribution shall be deemed an Unclaimed Distribution. PREPA may allocate all distributions made under the PREPA Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

59.    _Documents and Instruments_.  Each federal, state, commonwealth, local, foreign, or other governmental agency is hereby authorized and directed to accept any and all documents and instruments necessary or appropriate to effectuate, implement, or consummate the transactions contemplated by the PREPA Plan and this Order.

60.     <u>Oversight Board Termination and Post-Confirmation Powers</u>.  Neither the PREPA

Plan nor this Order shall change the duration of the Oversight Board's existence set forth in

PROMESA Section 209, and neither the PREPA Plan nor this Order shall alter any of the

Oversight Board's powers and duties under each title of PROMESA.  Until termination of the

Oversight Board pursuant to PROMESA Section 209, the Oversight Board may enforce the

PREPA Plan.  At all times, each party in interest may enforce PREPA Plan provisions for which

the party in interest has standing to enforce.

61.     <u>Post-Confirmation Fiscal Plans and Budgets Remain Subject to Oversight Board's

Sole Discretion</u>.  Nothing in the PREPA Plan and nothing in this Order (a) alters the powers of the

Oversight Board granted by Titles I and II of PROMESA, including its rights in its sole discretion,

to amend the certified PREPA Fiscal Plan and budget in effect on the Effective Date and to develop

and certify new fiscal plans and budgets at any times, (b) grants the government of Puerto Rico

any entitlement to any provisions in certified fiscal plans and budgets, or (c) grants the government

of Puerto Rico any rights and powers barred by PROMESA section 108(a).

62.     <u>Post-Confirmation Powers and Duties</u>.  Upon termination of the Oversight Board

pursuant to PROMESA Section 209, Reorganized PREPA or each Entity and Person acting on

behalf thereof, shall enforce the PREPA Plan and the transactions and obligations contemplated

therein and arising therefrom.  Each party in interest that would reasonably be prejudiced or injured

by lack of enforcement may enforce the PREPA Plan provision.  At no time prior or subsequent

to the termination of the Oversight Board shall any Entity or Person enact, implement, or enforce

any statute, resolution, policy, or rule reasonably likely, directly or indirectly, to impair the

carrying out of the PREPA Plan's payment provisions, covenants, and other obligations.  Pursuant

to Bankruptcy Code section 1142(b), PREPA, the Oversight Board (as PREPA's Title III

44

representative) and Reorganized PREPA, including, without limitation, any Entity or Person acting for or on their behalf, may take all acts necessary for the implementation and consummation of the PREPA Plan.  For the avoidance of doubt, neither LUMA Energy nor any qualified operator of the T&D system shall be liable for or required to perform any obligations of PREPA or Reorganized PREPA under the PREPA Plan, the Plan Supplement, or this Order that are outside the scope of its duties under its contracts with PREPA, Reorganized PREPA, or the Oversight Board.

63.    <u>Non-Impairment of New Bonds, Refunding Bonds and CVI</u>.  Until all obligations with respect to the New Bonds, Refunding Bonds and CVI have been paid or otherwise satisfied in accordance with their terms, no Entity or Person, shall take any action that would (a) limit or alter the rights vested in PREPA and Reorganized PREPA in accordance with the PREPA Plan and this Order to fulfill the terms of any agreements with the holders of the New Bonds, Refunding Bonds and CVI or (b) impair the rights and remedies of holders of New Bonds, Refunding Bonds or CVI.  Notwithstanding the foregoing, Reorganized PREPA and/or PREB, with the approval of the Oversight Board while in existence, may modify the fixed fee and volumetric charge that comprise the Legacy Charge in a manner that complies with Amendment Test.  No Entity or Person shall amend or seek to amend any aspect of the Legacy Charge unless (a) in compliance with the Amendment Test, (b) as needed to comply with the Interest Rate Covenant in accordance with [Section XIX.J] of the PREPA Plan and the New Master Indenture, or (c) to replace the Legacy Charge in accordance with [Section XIX.L] of the PREPA Plan.  Further, Reorganized PREPA shall take all necessary and appropriate action to maintain rates, separate from the Legacy Charge, sufficient to pay all operating expenses, including payments to the PREPA PayGo Trust on account of the Claim of the PREPA ERS, when due.

64.    <u>Reversal/Stay/Modification/Vacatur of Order</u>.  Except as otherwise provided in this Order or a subsequent order issued by this Court or a higher court having jurisdiction over an appeal of this Order or over a *certiorari* proceeding in respect of this Order, if any or all of the provisions of this Order are hereafter reversed, modified, vacated, or stayed by subsequent order of this Court, or any other court, such reversal, stay, modification, or vacatur shall not affect the validity or enforceability of any act, obligation, indebtedness, liability, priority, or lien incurred or undertaken by the Debtor or the Reorganized Debtor, as applicable, prior to the effective date of such reversal, stay, modification, or vacatur.   Notwithstanding any such reversal, stay, modification, or vacatur of this Order, any such act or obligation incurred or undertaken pursuant to, or in reliance on, this Order prior to the effective date of such reversal, stay, modification, or vacatur shall be governed in all respect by the provisions of this Order and the PREPA Plan.  To the extent not specifically reversed, modified, vacated, or stayed by an order of this Court or an appellate court, all existing orders entered in the Title III Cases remain in full force and effect.

65.    <u>Retention of Jurisdiction</u>.  Notwithstanding the entry of this Order or the occurrence of the Effective Date, subject to the terms and provisions of Article XXXV of the PREPA Plan, and except as otherwise provided in the PREPA Plan or herein, pursuant to sections 105, 945(a), and 1142(b) of the Bankruptcy Code, for the time necessary for the successful implementation of the PREPA Plan, this Court shall retain exclusive jurisdiction to the extent it has exclusive subject matter jurisdiction, and concurrent jurisdiction to the extent it has concurrent subject matter jurisdiction, over all matters arising under PROMESA, arising out of, and related to, the PREPA Title III Case to the fullest extent legally permissible, including, but not limited to, subject matter jurisdiction over (i) the matters set forth in Article XXXV of the PREPA Plan, (ii) enforcement by PREPA, Reorganized PREPA, and the Oversight Board of Act 17-2019 or similar Puerto Rico

statutes regarding the regulation of PREPA solely as needed to effectuate and maintain compliance with the PREPA Plan, (iii) setting, implementing, and enforcing the Legacy Charge and rate covenant and any amendments to the Legacy Charge and rate covenant, as well as PREB's authorization over the Legacy Charge and any amendments to the Legacy Charge, (iv) implementation of the operating expense and interest rate covenants and compliance by all subject parties with decretal paragraph 62of this Order, and (v) all matters arising from or related to the PREPA Plan, this Order, and the New Master Indenture including, without limitation, with respect to the payment of the New Bonds, Refunding Bonds, and CVI and the enforcement of the remedies set forth in the New Master Indenture to the fullest extent permitted by law.

66.     <u>Conflicts Among Documents</u>.  The provisions of the PREPA Plan and this Order shall be construed in a manner consistent with each other so as to effect the purpose of each; <u>provided</u>, <u>however</u>, that, in the event of any irreconcilable inconsistency (a) between the PREPA Plan and this Order, the terms and provisions of this Order shall govern and be deemed a modification of the PREPA Plan, (b) this Order and any other order in the Commonwealth Title III Case or the PREPA Title III Case (other than the Commonwealth Confirmation Order), the terms and provisions of this Order shall control, (c) the terms and provisions of the PREPA Plan and the New Master Indenture, the terms and provisions of the New Master Indenture shall govern; <u>provided</u>, <u>however</u>, that nothing contained herein is intended, nor shall be construed, to modify the economic terms of the PREPA Plan absent consent of the Oversight Board.

67.     <u>Modifications</u>.  Before substantial consummation of the PREPA Plan, the Oversight Board may modify the PREPA Plan at any time after entry of this Order, subject to any limitations set forth in the PREPA Plan (including consent rights) and any stipulation approved by this Court in connection with the PREPA Plan; <u>provided</u>, <u>however</u>, the circumstances warrant such

modification and the Court, after notice and a hearing, confirms such modified plan under the applicable legal requirements.  For the avoidance of doubt, the PREPA Plan shall not be modified except in accordance with Bankruptcy Code section 942 and the terms of this Order.

68.    <u>Provisions of Plan and Order Nonseverable and Mutually Dependent</u>.   The provisions of the PREPA Plan and this Order, including the findings of fact and conclusions of law set forth in the Findings of Fact and Conclusions of Law, are nonseverable and mutually dependent.

69.    <u>Governing Law</u>.  Except to the extent that other federal law is applicable, or to the extent that an exhibit to the PREPA Plan or any document to be entered into in connection with the PREPA Plan provides otherwise, the rights, duties, and obligations arising under the PREPA Plan shall be governed by, and construed and enforced in accordance with, PROMESA (including the provisions of the Bankruptcy Code made applicable under Section 301 of PROMESA) and, to the extent not inconsistent therewith, the laws of the Commonwealth of Puerto Rico giving effect to principles of conflicts of laws.

70.    <u>Applicable Non-bankruptcy Law</u>.  Pursuant to section 1123(a) of the Bankruptcy Code, as applicable to the PREPA Title III Case pursuant to PROMESA Section 301(a), the provisions of this Order and the PREPA Plan shall apply and be enforceable notwithstanding any otherwise applicable non-bankruptcy law.  The documents contained in the Plan Supplement and such other documents necessary or convenient to implement the provisions of this Order and the PREPA Plan (as such documents may be further, amended, supplemented, or modified and filed with the Court on or prior to the Effective Date), including, without limitation, the New Bonds, the CVI, and the New Master Indenture, provide adequate means for implementation of the PREPA Plan pursuant to section 1123(a)(5) of the Bankruptcy Code, and, as of the occurrence of

48

the Effective Date, shall constitute legal, valid, and binding obligations of Reorganized PREPA, and valid provisions to pay and to secure payment of the New Bonds and CVI, pursuant to section 944(b)(3) of the Bankruptcy Code, and be enforceable in accordance with their terms.

71.     <u>Notice of Order</u>.  In accordance with Bankruptcy Rules 2002 and 3020(c), as soon as reasonably practicable after the Effective Date, Reorganized PREPA shall serve notice of the entry of this Order and the occurrence of the Effective Date, substantially in the form attached as <u>Exhibit B</u> hereto, (a) to all parties in interest, by publication thereof once in each of (i) *El Nuevo Dia* (in Spanish), (ii) *Caribbean Business* (in English), (iii) *El Nuevo Herald* (in Spanish), (iv) *The New York Times* (in English), (v) *The Bond Buyer* (in English), (vi) *El Vocero* (in Spanish), and (vii) *Primera Hora* (in Spanish), and (b) to all parties who hold a Claim in the PREPA Title III Case, as well as the Creditors' Committee, the U.S. Trustee, any party filing a notice pursuant to Bankruptcy Rule 2002 in connection with the PREPA Title III Case, the Securities and Exchange Commission, the Internal Revenue Service, and the United States Attorney for the District of Puerto Rico.  Such notice is hereby approved in all respects and shall be deemed good and sufficient notice of entry of this Order.

72.     <u>No Waiver</u>.  The failure of this Order to include any provision of the PREPA Plan shall not diminish the effectiveness of such provision nor constitute a waiver thereof, as this Court is hereby confirming the PREPA Plan in its entirety.

Dated: _____
      San Juan, Puerto Rico               _____
                                          Laura Taylor Swain
                                          United States District Court Judge

49

**<u>Exhibit A</u>**

**PREPA Plan**

# UNITED STATES DISTRICT COURT
# DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al*.,<br><br>                   Debtors.[1] | PROMESA<br>Title III<br><br>No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>                   Debtor. | PROMESA<br>Title III<br><br>No. 17-BK-4780-LTS<br><br>(Jointly Administered) |

## MODIFIED SECOND AMENDED TITLE III PLAN OF ADJUSTMENT OF THE PUERTO RICO ELECTRIC POWER AUTHORITY

| | |
|---|---|
| **PROSKAUER ROSE LLP**<br>Eleven Times Square<br>New York, New York 10036<br>Telephone: (212) 969-3000<br>Facsimile: (212) 969-2900 | **O'NEILL & BORGES LLC**<br>250 Muñoz Rivera Ave., Suite 800<br>San Juan, PR 00918-1813<br>Telephone: (787) 764-8181<br>Facsimile: (787) 753-8944 |

*Attorneys for the Financial Oversight and Management Board as Representative for PREPA*

Dated: March 1, 2023

---

[1]   The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

# TABLE OF CONTENTS

**Page**

INTRODUCTION .......................................................................................................1

**ARTICLE I** DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION
OF TIME, GOVERNING LAW, AND OTHER REFERENCES....................................1
    A.      Defined Terms ................................................................................1
    B.      Rules of Interpretation ..................................................................26
    C.      Computation of Time ...................................................................27
    D.      Governing Law ...........................................................................27
    E.      Reference to Monetary Figures.....................................................27
    F.      Controlling Document ..................................................................27
    G.      Consent Rights ............................................................................27

**ARTICLE II** ADMINISTRATIVE AND PROFESSIONAL CLAIMS...........................28
    A.      Administrative Expense Claims......................................................28
    B.      Disallowance of Claims Filed After the Administrative Claim Bar Date ............28
    C.      Professional Compensation and Reimbursement Claims ....................28
    D.      Supporting Creditors' Fees ...........................................................29

**ARTICLE III** CLASSIFICATION OF CLAIMS ....................................................30
    A.      Classification of Claims................................................................30
    B.      Special Provision Governing Unimpaired Claims ...........................31
    C.      Elimination of Vacant Classes ......................................................31
    D.      Voting Classes; Presumed Acceptance by Non-Voting Classes.............31
    E.      Subordinated Claims ....................................................................31
    F.      Confirmation Pursuant to PROMESA Section 314 ...............................32
    G.      Confirmation Pursuant to Bankruptcy Code Section 1129(b) .............32

**ARTICLE IV** PROVISIONS FOR TREATMENT OF  SETTLING BONDHOLDER
CLAIMS (CLASS 1) ..............................................................................................32
    A.      Treatment of Class 1 Claims.........................................................32

**ARTICLE V** PROVISIONS FOR TREATMENT OF  NON-SETTLING
BONDHOLDER OR NON-SETTLING  MONOLINE CLAIMS (CLASS 2)................33
    A.      Treatment of Class 2 Claims.........................................................33

**ARTICLE VI** PROVISIONS FOR TREATMENT OF  PENSION CLAIM (CLASS 3) ..........34
    A.      Treatment of Class 3 Claims.........................................................34

**ARTICLE VII** PROVISIONS FOR TREATMENT OF  FUEL LINE LOAN CLAIMS
(CLASS 4) ..........................................................................................................35

i

    A.       Treatment of Class 4 Claims...................................................................................35

**ARTICLE VIII** PROVISIONS FOR TREATMENT OF  NATIONAL INSURED
BOND CLAIMS (CLASS 5)...................................................................35
    A.       Treatment of Class 5 Claims...................................................................................35

**ARTICLE IX** PROVISIONS FOR TREATMENT OF  NATIONAL
REIMBURSEMENT CLAIM (CLASS 6) ...............................................35
    A.       Treatment of Class 6 Claims...................................................................................35

**ARTICLE X** PROVISIONS FOR TREATMENT OF GENERAL UNSECURED
CLAIMS (CLASS 7) ..............................................................................36
    A.       Treatment of Class 7 Claims...................................................................................36
    B.       Election to be Treated as a Convenience Claim .....................................................36

**ARTICLE XI** PROVISIONS FOR TREATMENT OF VITOL CLAIM (CLASS 8) .................36
    A.       Treatment of Class 8 Claims...................................................................................36

**ARTICLE XII** PROVISIONS FOR TREATMENT OF ASSURED INSURED
INTEREST RATE SWAPS CLAIMS (CLASS 9)....................................37
    A.       Treatment of Class 9 Claims...................................................................................37

**ARTICLE XIII** PROVISIONS FOR TREATMENT OF ORDINARY COURSE
CUSTOMER CLAIMS (CLASS 10) .......................................................37
    A.       Treatment of Class 10 Claims.................................................................................37

**ARTICLE XIV** PROVISIONS FOR TREATMENT OF EMINENT
DOMAIN/INVERSE CONDEMNATION CLAIMS (CLASS 11) ...................................37
    A.       Treatment of Class 11 Claims.................................................................................37

**ARTICLE XV** PROVISIONS FOR TREATMENT OF FEDERAL CLAIMS (CLASS
12) .........................................................................................................38
    A.       Treatment of Class 12 Claims.................................................................................38

**ARTICLE XVI** PROVISIONS FOR TREATMENT OF CONVENIENCE CLAIMS
(CLASS 13) ...........................................................................................38
    A.       Treatment of Class 13 Claims.................................................................................38

**ARTICLE XVII** PROVISIONS FOR TREATMENT OF SECTION 510(b)
SUBORDINATED CLAIMS (CLASS 14) ..............................................38
    A.       Treatment of Class 14 Claims.................................................................................38

**ARTICLE XVIII** PROVISIONS FOR IMPLEMENTATION OF THE PLAN ........................39
    A.       Allowance of Claims...............................................................................................39
    B.       Releases, Injunction, and Exculpation ...................................................................39
    C.       Dismissal of Fuel Line Lender Priority Action.......................................................39
    D.       Effectuating Documents; Further Transactions ......................................................39

E.     Enrollment of Active PREPA ERS Participants in Act 106 Plan .......................... 40

F.     Legacy Charge ....................................................................................................... 40

G.     PREPA Operational Restructuring ......................................................................... 40

H.     Purchase and Sale of the Administrative Expense Bonds ...................................... 41

I.     Settlement of the National Claims .......................................................................... 41

**ARTICLE XIX** PROVISIONS REGARDING THE ISSUANCE AND
DISTRIBUTION OF THE NEW BONDS ......................................................................... 42

A.     Issuance and Distribution ....................................................................................... 42

B.     General Terms ......................................................................................................... 42

C.     Excess New Bonds ................................................................................................. 44

D.     Payment Provisions ................................................................................................ 44

E.     Security ................................................................................................................... 44

F.     Call Provisions ....................................................................................................... 45

G.     Accounts and Payment Waterfall ........................................................................... 46

H.     Key Covenants for New Bonds .............................................................................. 46

I.     Application of Moneys in Debt Service Fund ........................................................ 47

J.     Interest Rate Covenant ........................................................................................... 47

K.     No Rights of Acceleration ...................................................................................... 48

L.     Limited Default ....................................................................................................... 48

M.     Limited Remedies .................................................................................................. 48

N.     Additional Bonds and Refunding Bonds ............................................................... 49

O.     Force Majeure ......................................................................................................... 49

P.     Direct Right of Action ............................................................................................ 50

Q.     New Master Indenture ............................................................................................ 50

R.     Governing Law ....................................................................................................... 50

S.     Tax Exemption of the New Bonds .......................................................................... 50

T.     CVIs Not Tax Exempt ............................................................................................ 51

**ARTICLE XX** PROVISIONS REGARDING NATIONAL INSURED BONDS AND
TREATMENT OF NATIONAL INSURED BOND CLAIMS ........................................... 51

A.     National Commutation Treatment of National Insured Bond Claims ................... 52

B.     National Non-Commutation Treatment of National Insured Bond Claims ........... 52

C.     Acceleration of National Insured Bonds ................................................................ 53

D.     Assignment of Redemption Rights ......................................................................... 53

E.     Entitlement to Vote ................................................................................................. 54

F.     Improper Election .................................................................................................... 54

**ARTICLE XXI** TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES ............................................................................................................................. 54

A.     Rejection or Assumption of Executory Contracts and Unexpired Leases ............. 54

B.       Approval of Rejection or Assumption of Executory Contracts and
         Unexpired Leases ...................................................................................... 55
C.       Inclusiveness ............................................................................................... 55
D.       Cure of Defaults and Objections to Cure and Assumption ........................ 56
E.       Contracts and Leases Entered Into After the Petition Date ....................... 57
F.       Insurance Policies ....................................................................................... 57
G.       Rejection Damage Claims ........................................................................... 57
H.       Indemnification and Reimbursement Obligations ..................................... 57
I.       Nonoccurrence of Effective Date ............................................................... 57
J.       Reservation of Rights .................................................................................. 58

**ARTICLE XXII** GUC TRUST ............................................................................................ 58
A.       Execution of GUC Trust Deed of Trust ..................................................... 58
B.       Purpose of the GUC Trust ........................................................................... 58
C.       GUC Trust Assets ........................................................................................ 58
D.       Administration of the GUC Trust ............................................................... 58
E.       The GUC Trustee ......................................................................................... 59
F.       Role of the GUC Trustee ............................................................................. 59
G.       GUC Trustee's Tax Power for Reorganized PREPA ................................. 59
H.       Transferability of GUC Trust Interests ...................................................... 59
I.       Cash .............................................................................................................. 59
J.       Distribution of GUC Trust Assets .............................................................. 59
K.       Funding, Costs, and Expenses of the GUC Trust ...................................... 60
L.       Compensation of the GUC Trustee ............................................................. 60
M.       Retention of Professionals/Employees by the GUC Trustee ..................... 60
N.       Federal Income Tax Treatment of the GUC Trust ..................................... 60
O.       Dissolution of GUC Trust ........................................................................... 62
P.       Indemnification of GUC Trustee and Members of GUC Trust Board ........ 62

**ARTICLE XXIII** AVOIDANCE ACTIONS TRUST ........................................................... 63
A.       Execution of Avoidance Actions Trust Agreement .................................... 63
B.       Purpose of the Avoidance Actions Trust .................................................... 63
C.       Avoidance Actions Trust Assets ................................................................. 63
D.       Administration of the Avoidance Actions Trust ......................................... 63
E.       The Avoidance Actions Trustee .................................................................. 63
F.       Role of the Avoidance Actions Trustee ...................................................... 64
G.       Avoidance Actions Trustee's Tax Power for Reorganized PREPA ........... 64
H.       Transferability of Avoidance Actions Trust Interests ................................ 64
I.       Cash .............................................................................................................. 64
J.       Distribution of Avoidance Actions Trust Assets ....................................... 65

K. Funding, Costs, and Expenses of the Avoidance Actions Trust .............................65

L. Compensation of the Avoidance Actions Trustee .................................................65

M. Retention of Professionals/Employees by the Avoidance Actions Trustee...........65

N. Federal Income Tax Treatment of the Avoidance Actions Trust .........................65

O. Dissolution of Avoidance Action Trust ................................................................68

P. Indemnification of Avoidance Actions Trustee and Members of Avoidance Actions Trust Bond..............................................................................68

**ARTICLE XXIV** PROVISIONS GOVERNING DISTRIBUTIONS .......................................68

A. Appointment of Distribution Agent .....................................................................68

B. Distributions on Account of Claims Allowed as of the Effective Date...............69

C. Rights and Powers of Distribution Agent .............................................................69

D. Special Rules for Distributions to Holders of Disputed Claims ..........................69

E. Delivery of Distributions ......................................................................................70

F. Claims Paid or Payable by Third Parties ..............................................................73

G. Withholding and Reporting Requirements ...........................................................74

H. Time Bar to Cash Payments..................................................................................75

I. Distributions After Effective Date .......................................................................75

J. Setoffs ...................................................................................................................75

K. Allocation Between Principal and Accrued Interest.............................................75

L. Holder of Claim ....................................................................................................75

M. Exculpation ...........................................................................................................76

**ARTICLE XXV** PROCEDURES FOR RESOLVING DISPUTED CLAIMS...........................76

A. Objections to Claims and Prosecution of Disputed Claims .................................76

B. Estimation of Claims.............................................................................................77

C. Claims Administration Responsibilities ...............................................................77

D. Adjustment to Claims Without Objection.............................................................77

E. Extension of Claims Objection Bar Date..............................................................77

F. Authority to Amend Creditor List.........................................................................78

G. No Interest .............................................................................................................78

H. Disallowance of Claims ........................................................................................78

**ARTICLE XXVI** GOVERNANCE AND PROVISIONS REGARDING PREPA PAYGO TRUST AND PENSION SYSTEM.............................................................................78

A. Formation and Responsibilities of the PREPA PayGo Trust................................78

B. Funding of the PREPA PayGo Trust .....................................................................78

C. Management of PREPA PayGo Trust.....................................................................79

D. Non-Impairment Covenant ...................................................................................79

E. Maintenance of Pension ........................................................................................80

**ARTICLE XXVII** EFFECT OF CONFIRMATION OF THE PLAN .........................................80
    A.    Discharge and Release of Claims and Causes of Action .........................80
    B.    Releases by the Debtor and Reorganized Debtor ...................................81
    C.    Releases by Holders of Claims ...............................................................82
    D.    Exculpation ..............................................................................................82
    E.    Injunction ................................................................................................83
    F.    Non-Severability of Releases, Injunctions, and Exculpations ..............83
    G.    Reimbursement or Contribution .............................................................84
    H.    Release of Liens ......................................................................................84

**ARTICLE XXVIII** MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE
PLAN ...........................................................................................................................84
    A.    Modification of Plan ...............................................................................84
    B.    Revocation or Withdrawal ......................................................................84
    C.    Amendment of Plan Documents .............................................................85
    D.    No Admission of Liability ......................................................................85

**ARTICLE XXIX** CORPORATE GOVERNANCE AND MANAGEMENT OF
REORGANIZED DEBTOR ........................................................................................85
    A.    Corporate Action .....................................................................................85
    B.    Reorganized Debtor's By-Laws .............................................................86
    C.    Officers of Reorganized Debtor .............................................................86

**ARTICLE XXX** IDENTIFICATION OF CLAIMS IMPAIRED BY THE PLAN AND
NOT IMPAIRED BY THE PLAN ..............................................................................86
    A.    Impaired Classes .....................................................................................86
    B.    Unimpaired Classes .................................................................................86

**ARTICLE XXXI** CONDITIONS PRECEDENT TO CONFIRMATION OF THE
PLAN ...........................................................................................................................86
    A.    Conditions Precedent to Confirmation Date ..........................................86
    B.    Waiver of Conditions Precedent to Confirmation .................................89

**ARTICLE XXXII** CONDITIONS PRECEDENT TO THE EFFECTIVE DATE .....................89
    A.    Conditions Precedent to the Effective Date ...........................................89
    B.    Waiver of Conditions Precedent .............................................................90
    C.    Effect of Non-Occurrence of Conditions to Effective Date...................90

**ARTICLE XXXIII** PROVISIONS REGARDING COMMITTEE ............................................91
    A.    Dissolution of Committee .......................................................................91

**ARTICLE XXXIV** PROVISIONS REGARDING OVERSIGHT BOARD AND
COMPLIANCE WITH PROMESA .............................................................................91
    A.    Effect of Confirmation ...........................................................................91

B.      Ongoing Role of the Oversight Board ...................................................................91

C.      Preemption of Laws ............................................................................................91

**ARTICLE XXXV** RETENTION OF JURISDICTION .................................................................92

**ARTICLE XXXVI** MISCELLANEOUS PROVISIONS ..............................................................94

A.      Title to Assets .....................................................................................................94

B.      No Waiver ............................................................................................................94

C.      Supplemental Injunction .....................................................................................95

D.      Immediate Binding Effect ....................................................................................95

E.      Additional Documents .........................................................................................96

F.      Reservation of Rights ..........................................................................................96

G.      Successors and Assigns .......................................................................................96

H.      Post-Effective Date Fees and Expenses ................................................................96

I.      Securities Act Exemption ....................................................................................97

J.      Governing Law ...................................................................................................97

K.      Closing Case .......................................................................................................97

L.      Section Headings ................................................................................................97

M.      Document Retention ...........................................................................................97

N.      Service of Documents ........................................................................................97

O.      Term of Injunctions or Stays ..............................................................................98

P.      Entire Agreement ...............................................................................................99

Q.      Plan Supplement Exhibits ...................................................................................99

R.      Non-Severability ................................................................................................99

S.      Votes Solicited in Good Faith ..........................................................................100

T.      Waiver or Estoppel ..........................................................................................100

# INTRODUCTION

The Oversight Board, as the Title III representative of PREPA pursuant to PROMESA section 315(b), proposes this plan of adjustment pursuant to and in accordance with PROMESA Title III.

A discussion of PREPA's history, operations, and events leading to the commencement of PREPA's Title III Case, as well as a summary and analysis of the Plan, risk factors, and other related matters, is included in the Disclosure Statement. Other agreements and documents, which have been or will be filed with the Title III Court, are referenced in the Plan or the Disclosure Statement and are available for review.

## ARTICLE I

## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

### A.    Defined Terms

Capitalized terms used in the Plan shall have the meanings set forth in this Article I.A. Any term used in capitalized form that is not otherwise defined but that is used in PROMESA (and to the extent made applicable by PROMESA, the Bankruptcy Code, and the Bankruptcy Rules) shall have the meaning assigned to such term in PROMESA, the Bankruptcy Code, or the Bankruptcy Rules, as applicable and as modified by PROMESA.

1.    "*2022 Fiscal Plan Projections*" means the *30-Year Load Forecast with the Individual Effects of Three Drivers Causing Load Reduction* set forth at Exhibit 55 of the 2022 Fiscal Plan for PREPA certified by the Oversight Board on June 28, 2022.

2.    "*AAFAF*" means the Autoridad de Asesoría Financiera y Agencia Fiscal, a public corporation and instrumentality of the Commonwealth, whose name in English is the Puerto Rico Fiscal Agency and Financial Advisory Authority.

3.    "*ACR Order*" means that certain *Order (A) Authorizing Administrative Reconciliation of Claims, (B) Approving Additional Form of Notice, and (C) Granting Related Relief*, dated March 12, 2020 [Case. No. 17-BK-3283-LTS, ECF No. 12274].

4.    "*Active PREPA ERS Participant*" means a Participant who, as reflected in the records of PREPA ERS, is not receiving a pension or annuity as of the Effective Date.

5.    "*Additional Bonds*" means, if applicable, any bonds, notes, or other forms of indebtedness incurred by Reorganized PREPA other than the New Bonds and Refunding Bonds, which may be payable from Revenues, excluding during the applicable periods an amount up to Legacy Charge Revenues and Remaining Legacy Charge Revenues, as applicable.

6.    "*Administrative Claim Bar Date*" means, unless otherwise ordered by the Title III Court, the date established by the Title III Court and set forth in the Confirmation Order as the last

day to file proofs of Administrative Expense Claims pursuant to section 503(b) of the Bankruptcy Code, which date shall be no more than ninety (90) days after the Effective Date.

7. "*Administrative Expense Bonds*" means the Series B-2 Bonds to be issued by Reorganized PREPA pursuant to the Plan on the Effective Date and sold to the Commonwealth for payment of Allowed Administrative Expense Claims, which shall be in an aggregate original principal amount to be determined by the Oversight Board in its sole discretion, up to the Administrative Expense Bonds Amount.

8. "*Administrative Expense Bonds Amount*" means approximately $400,000,000, or such lower principal or original principal amount as determined by the Oversight Board at or prior to the Confirmation Hearing, in each case, which principal amount shall be subject to consultation rights of AAFAF.

9. "*Administrative Expense Claim*" means a Claim against the Debtor or its Assets constituting a cost or expense of administration of the Title III Case asserted or authorized to be asserted, on or prior to the Administrative Claim Bar Date, in accordance with Bankruptcy Code sections 503(b) and 507(a)(2) arising during the period up to and including the Effective Date.

10. "*ADR Order*" means that certain *Order (A) Authorizing Alternative Dispute Resolution Procedures, (B) Approving Additional Forms of Notice, (C) Approving Proposed Mailing, and (D) Granting Related Relief*, dated April 1, 2020 [Case No. 17-BK-3283-LTS, ECF No. 12576].

11. "*ADR Procedures*" means the alternative dispute resolution procedures authorized pursuant to the ADR Order.

12. "*Affiliate*" has the meaning set forth in Bankruptcy Code section 101(2) and PROMESA section 301(c)(1).

13. "*Allowed*" means, with respect to any Claim, such Claim or portion thereof (a) proof of which was filed on or before the applicable Bar Date or (b) if no Proof of Claim has been timely filed, which has been or hereafter is listed by the Debtor in the Creditor List and is not listed thereon as "disputed", "contingent", or "unliquidated," or (c) allowed pursuant to (i) Bankruptcy Code section 502(h), applicable to the Title III Case pursuant to PROMESA section 301, (ii) the terms of the Plan, or (iii) a Final Order; *provided*, *however*, that, with respect to any Claim described in clause (a) or (b) above, such Claim shall be considered Allowed only if, and to the extent that, no objection to the allowance thereof, or action to equitably subordinate or otherwise limit recovery with respect thereto, has been interposed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order, or as to which an objection has been interposed and such Claim has been allowed in whole or in part by a Final Order.  For purposes of determining the amount of an "Allowed Claim" with respect to distributions within a Class, there shall be deducted therefrom an amount equal to the amount of any, original issue discount not accrued as of the date immediately prior to the Petition Date and any claim that the Debtor may hold against the holder thereof, to the extent such Claim may be set off pursuant to applicable bankruptcy and non-bankruptcy law.  Notwithstanding anything to the contrary herein, (x) Claims allowed solely for the purpose of voting to accept or reject the Plan

pursuant to an order of the Title III Court shall not be considered Allowed hereunder unless otherwise specified herein or by order of the Title III Court, (y) for any purpose under the Plan, except with respect to amounts that are determined by a Final Order to be "just compensation" attributable in connection with the allowance of an Eminent Domain/Inverse Condemnation Claim and treatment thereof pursuant to the terms and provisions of Article XIV hereof, "Allowed" shall not include interest, penalties, or late charges arising from or relating to the period from and after the Petition Date, and (z) "Allowed" shall not include any Claim subject to disallowance in accordance with Bankruptcy Code section 502(d).

14.  "*Amended Lien & Recourse Challenge*" means the litigation styled *The Financial Oversight and Management Board for Puerto Rico v. U.S. Bank National Association*, Adv. Proc. No. 19-00391-LTS, currently pending in the Title III Court.

15.  "*Amended Lien & Recourse Challenge Final Resolution*" means either the entry of (a) a Final Order in the Amended Lien & Recourse Challenge or (b) a binding settlement agreement entered into among the parties to the Amended Lien & Recourse Challenge and approved by a Final Order.

16.  "*Amendment Test*" shall have the meaning given to it in Article XVIII.F of the Plan.

17.  "*Assets*" means, with respect to the Debtor, (a) all "property" of the Debtor, including, without limitation, such property as may be reflected on the Debtor's books and records and the Confirmation Order as of the Effective Date and (b) all Causes of Action, and any subsequent proceeds thereof, that have been or may be commenced by the Debtor or an authorized representative for the benefit of the Debtor and its Creditors, unless modified or released pursuant to the Plan or a Final Order.

18.  "*Assured*" means, collectively, Assured Guaranty Corp. and Assured Guaranty Municipal Corp.

19.  "*Assured Insured Interest Rate Swaps*" means (a) that certain *ISDA Master Agreement*, including its related *Schedule* and the *Credit Support Annex to the Schedule*, each dated as of April 18, 2007, by and between PREPA and JPMorgan Chase Bank, N.A., and a transaction entered into pursuant to such documents and reflected in that certain Swap Transaction confirmation dated April 27, 2007 with JPMorgan Ref. No. 2000005090781, insured by Assured pursuant to that certain Financial Guaranty Insurance Policy, #218491A-SWP, issued on May 3, 2007, and secured by PREPA's "Subordinate Obligations Fund" established and governed by the Trust Agreement; and (b) that certain *ISDA Master Agreement*, including its related *Schedule* and the *Credit Support Annex to the Schedule*, each dated as of April 18, 2007, by and between PREPA and UBS AG, and a transaction entered into pursuant to such documents and reflected in that certain Swap Transaction confirmation dated as of April 18, 2007 with UBS Ref: 37638915 and insured by Assured pursuant to that certain *Financial Guaranty Insurance Policy*, No. 208491B-SWP, dated as of May 3, 2007, and secured by PREPA's "Subordinate Obligations Fund" established and governed by the Trust Agreement.

20.  "*Assured Insured Interest Rate Swaps Claims*" means a Claim on account of the Assured Insured Interest Rate Swaps.

3

21. "*Assured Insured Interest Rate Swaps Claim Recovery*" means the treatment provided to Holders of Allowed Claims in Class 2.

22. "*Avoidance Actions*" means avoidance, recovery, and subordination actions identified on **Schedule A** hereto, as such **Schedule A** may be amended or modified up to and including the Effective Date, against any Entity that have been brought by or on behalf of the Debtor against an Entity under sections 510, 544, 545, 547, 548, 549, 550, 551, 552, or 553 of the Bankruptcy Code, applicable to the Title III Case pursuant to section 301 of PROMESA, or applicable non-bankruptcy law incorporated by Bankruptcy Code section 544.

23. "*Avoidance Action Proceeds*" means the net Cash consideration received by PREPA in connection with the Avoidance Actions.

24. "*Avoidance Actions Trust*" means the trust to be created on or prior to the Effective Date into which on the Effective Date shall be transferred the authority to litigate or compromise and settle the Avoidance Actions.

25. "*Avoidance Actions Trust Agreement*" means the agreement to be executed and delivered on or prior to the Effective Date providing for, among other things, the ongoing litigation of the Avoidance Actions.

26. "*Avoidance Actions Trust Assets*" means, collectively, the (a) Avoidance Actions and (b) any Cash held by the Avoidance Action Trustee from time to time.

27. "*Avoidance Actions Trust Beneficiaries*" means, collectively, the Holders of Claims in the Unsecured Claims Pool.

28. "*Avoidance Actions Trust Board*" means the three (3) member board appointed as of the Effective Date to govern the Avoidance Actions Trust, selected by the Oversight Board.

29. "*Avoidance Actions Trust Interests*" means the beneficial interests in the Avoidance Actions Trust allocated in accordance with the terms and provisions of the Plan to the General Unsecured Claim Recovery for the benefit of Holders of Claims in the Unsecured Claims Pool.

30. "*Avoidance Actions Trustee*" means the trustee appointed by the Avoidance Actions Trust Board, by a simple majority vote of such board, contemporaneously with the Effective Date in accordance with the terms and provisions of the Avoidance Actions Trust Agreement, including, without limitation, any successor thereto.

31. "*Ballot Date*" means the deadline(s) established by the Title III Court and set forth in the Disclosure Statement Order for the submission of ballots pursuant to the terms and provisions of the Plan, which shall be June 7, 2023, unless otherwise modified by the Title III Court.

32. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, to the extent applicable to the Title III Case pursuant to PROMESA section 301(a).

33.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as made applicable to the Title III Case pursuant to PROMESA section 310.

34.     "*Bar Date*" means the respective dates established by the Title III Court by which proofs of Claim must have been filed with respect to such Claims against the Debtor, pursuant to (a) the Bar Date Orders, (b) a Final Order of the Title III Court, or (c) the Plan.

35.     "*Bar Date Orders*" means the orders of the Title III Court establishing the dates by which proofs of Claim against the Debtor or its Assets must have been filed, including, but not limited to the (a) *Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof* [Case No. 17-BK-3283-LTS, ECF No. 2521], and (b) *Order (A) Extending Deadlines for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof* [Case No. 17-3283-BK-LTS, ECF No. 3160].

36.     "*Bond Collateral*" means the assets of PREPA, if any, subject to a valid, perfected, and enforceable prepetition security interest in favor of the Bond Trustee on account of the PREPA Revenue Bonds as determined pursuant to the Amended Lien & Recourse Challenge Final Resolution.

37.     "*Bond Trustee*" means U.S. Bank National Association, in its capacity as successor trustee under the Trust Agreement.

38.     "*Business Day*" means a day other than a Saturday, Sunday, or any other day on which commercial banking institutions in New York, New York and San Juan, Puerto Rico are required to close by law or executive order; *provided*, that for the purposes of the definition of Treasury Rate, Business Day shall also exclude, to the extent not already excluded, (i) a day on which commercial banks are required or authorized by law to be closed in the state, or (ii) a day on which The New York Stock Exchange is closed for the entire day or the federal reserve banks are closed.

39.     "*Cash*" means the lawful currency of the United States, including, but not limited to, bank deposits, checks representing good funds, and legal equivalents thereof.

40.     "*Causes of Action*" means all claims, actions, causes of action, rights to payment, choses in action, suits, Debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and cross claims (including, but not limited to, all claims for breach of fiduciary duty, negligence, malpractice, breach of contract, aiding and abetting, fraud, inducement, avoidance, recovery, subordination, and all Avoidance Actions) that are pending or may be asserted against any Person or Entity whether arising on or before the Effective Date, based in law or equity, including, but not limited to, under the Bankruptcy Code, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or

unsecured and whether asserted or assertable directly or derivatively, in law, equity, or otherwise and whether asserted or unasserted as of the Effective Date.

41. "*CBA Rejection Damages Claim*" means a Claim, if any, arising against PREPA from the rejection, pursuant to section 365(d) of the Bankruptcy Code, or pursuant to a settlement, of any Collective Bargaining Agreement, excluding any Claim against PREPA and/or PREPA ERS arising from PREPA's rejection of any Collective Bargaining Agreement with respect to retirement obligations, including Pension Claims, which are treated pursuant to Article III of the Plan.

42. "*Claim*" means any claim, as such term is defined in Bankruptcy Code section 101(5), against PREPA.

43. "*Claims Objection Bar Date*" means one hundred eighty (180) days following the Effective Date or such later date as may be approved by the Title III Court.

44. "*Claims Register*" means the official register of Claims maintained by the Solicitation Agents.

45. "*Class*" means a category of Holders of Claims under Bankruptcy Code section 1122(a).

46. "*Collective Bargaining Agreements*" means, collectively, the UEPI CBA and the UTIER CBA.

47. "*Commonwealth*" means the Commonwealth of Puerto Rico.

48. "*Commonwealth Constitution*" means the Constitution of the Commonwealth of Puerto Rico.

49. "*Confirmation*" means entry of the Confirmation Order on the docket of the Title III Case.

50. "*Confirmation Date*" means the date on which the Title III Court enters the Confirmation Order on the docket of the Title III Case within the meaning of Bankruptcy Rules 5003 and 9021.

51. "*Confirmation Hearing*" means the hearing(s) before the Title III Court under Bankruptcy Code section 1128 at which PREPA seeks entry of the Confirmation Order.

52. "*Confirmation Order*" means the order of the Title III Court confirming the Plan under PROMESA section 314, as the same may be subsequently amended, supplemented, or otherwise modified.

53. "*Convenience Cap*" means one million dollars ($1,000,000), the aggregate amount of consideration to be made available to Holders of Allowed Convenience Claims.

54. "*Convenience Claim*" means an Allowed General Unsecured Claim (a) that is equal to or less than ten thousand dollars ($10,000) or (b) the Holder of which, at such Holder's option, has elected to reduce the amount of such Allowed General Unsecured Claim to ten thousand dollars ($10,000) in accordance with terms and provisions set forth in Article XVI hereof; *provided*, *however*, that, notwithstanding the foregoing, a holder of multiple General Unsecured Claims that are in the aggregate greater than twenty thousand dollars ($20,000) may elect to reduce all such Claims to an aggregate amount of twenty thousand dollars ($20,000) and elect to have all such Claims receive treatment as Convenience Claims; and, *provided*, *further*, that the aggregate amount of consideration to be made available to Convenience Claims shall be the Convenience Cap, and, *provided*, *further*, that, in the event that such Convenience Cap is exceeded, Holders of Allowed Convenience Claims shall receive a Pro Rata Share of the Convenience Cap.

55. "*Creditor*" means any Entity holding an Allowed Claim against the Debtor or the Debtor's Assets or, pursuant to Bankruptcy Code section 102(2), against any other property of the Debtor, including, without limitation, a Claim against the Debtor of a kind specified in Bankruptcy Code section 502(g), 502(h), or 502(i), in each case, solely in such Entity's capacity as such.

56. "*Creditor List*" means the creditor list (together with all summaries, notes, and schedules) attached as Exhibit A to the *Notice of Filing of Creditor List for the Puerto Rico Electric Power Authority* [Case No. 17-BK-4780-LTS, ECF No. 520], pursuant to Bankruptcy Code sections 924 and 925, as such list, summaries, notes, or schedules have been or may be amended, restated, supplemented, or otherwise modified by PREPA.

57. "*Creditors' Committee*" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee in the Title III Case.

58. "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon PREPA's defaults under an Executory Contract or an Unexpired Lease assumed by PREPA under Bankruptcy Code section 365, other than a default not required to be cured pursuant to Bankruptcy Code section 365(b)(2).

59. "*CVI*" means, collectively, the securities to be issued on the Effective Date by Reorganized PREPA as described in Article XIX hereof and issued in accordance with the terms and conditions of the Plan, the Confirmation Order, and the New Master Indenture.

60. "*CVI Maturity Date*" means the date that is thirty-five (35) years after the Effective Date.

61. "*CVI Notional Amount*" means the sum of the GUC CVI, the Settling CVI, and the Non-Settling CVI.

62. "*CVI Redemption Price*" means the calculation of the present value of the outstanding CVI as of the applicable call date, which shall be the sum of the present values of equal annual installments of the outstanding CVI balance as of Fiscal Year end from the applicable call date to the final maturity of the CVI, discounted to the date of redemption of the CVI on an annual basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate plus two-percent (2.00%).

63. "*Debt*" shall have the meaning given to it in section 101(12) of the Bankruptcy Code.

64. "*Debt Service Fund*" means the fund held by the New Master Trustee into which Reorganized PREPA shall deposit Net Revenues in accordance with the Payment Waterfall.

65. "*Debtor*" means PREPA.

66. "*Deficiency Claim*" means an Allowed PREPA Revenue Bond Claim or an Allowed Assured Insured Interest Rate Swaps Claim held by a Non-Settling Bondholder or Non-Settling Monoline that is not a Secured Claim and constitutes an unsecured Claim against PREPA pursuant to section 506(a)(1) of the Bankruptcy Code, as determined by the Amended Lien & Recourse Challenge Final Resolution.

67. "*Definitive Documents*" means, collectively, the definitive documents and agreements contemplated by the Plan, including, without limitation, (a) the Disclosure Statement (including any amendments, modifications, and supplements thereto) and any documentation or agreements related thereto, which shall be reasonably satisfactory to the Required Fuel Line Lenders, (b) the Plan (including any amendments, modifications, and supplements thereto) and any documentation or agreements related thereto, which shall be not inconsistent with the Fuel Line Lender PSA and reasonably satisfactory to the Required Fuel Line Lenders, (c) the Confirmation Order, which shall be not inconsistent with the Fuel Line Lender PSA and reasonably satisfactory to the Required Fuel Line Lenders, (d) the New Master Indenture and documents or agreements related thereto, which shall be  not inconsistent with the Fuel Line Lender PSA and reasonably acceptable to the Required Fuel Line Lenders, (e) the form of bonds for the New Bonds, which shall be not inconsistent with the Fuel Line Lender PSA and reasonably acceptable to the Required Fuel Line Lenders, (f) the form of the CVI, (g) the PREPA PayGo Deed of Trust and documents or agreements related thereto, (h) the GUC Trust Deed of Trust and documents or agreements related thereto, (i) the Avoidance Actions Trust Agreement and documents or agreements related thereto, and (j) each other document that will comprise the Plan Supplement, in all cases except as otherwise set forth herein, the form and substance of which shall be acceptable to the Oversight Board in its sole and absolute discretion, and, with respect to the documents identified in subsections (a)–(e) and any other document referenced in the term "PREPA Definitive Documents" as defined in the National PSA, shall have terms and conditions consistent with the National PSA in all respects and otherwise be in form and substance reasonably satisfactory to National.

68. "*Determination*" shall have the meaning given to it in Article XIX.S of the Plan.

69. "*Disallowed*" means, with respect to any Claim, a Claim or any portion thereof that is not Allowed and (a) has been disallowed by a Final Order, (b) is designated as zero, contingent, disputed, or undisputed in the Creditor List and as to which no Proof of Claim or request for payment of an Administrative Expense Claim has been timely filed or deemed timely filed with the Title III Court, (c) has been withdrawn by agreement of the Debtor and the Holder thereof, or (d) has been withdrawn by the Holder thereof.

70.    "*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto, and approved by the Title III Court pursuant to Bankruptcy Code section 1125.

71.    "*Disclosure Statement Order*" means the order of the Title III Court approving the Disclosure Statement, which Disclosure Statement Order shall be in form and substance reasonably acceptable to the Required Fuel Line Lenders and National.

72.    "*Disputed*" means, with respect to any Claim, a Claim that is not yet Allowed, including (a) any Proof of Claim that, on its face, is contingent or unliquidated, (b) any Proof of Claim or request for payment of an Administrative Expense Claim filed after the Effective Date, applicable bar date, or the deadline for filing Proofs of Claim based on PREPA's rejection of Executory Contracts or Unexpired Leases, as applicable, and (c) any Claim that is subject to an objection or a motion to estimate, in each case that has not been withdrawn, resolved, or ruled on by a Final Order of the Title III Court.

73.    "*Distribution Agent*" means, as applicable, PREPA, Reorganized PREPA, the GUC Trustee, or such Entity or Entities designated by the Oversight Board, each of which is to make or to facilitate distributions in accordance with the provisions of the Plan.

74.    "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Oversight Board or the GUC Trustee, as applicable, on or after the Effective Date, upon which the Distribution Agent shall make distributions to Holders of Allowed Claims entitled to receive distributions under the Plan.

75.    "*Distribution Record Date*" means the Ballot Date or such other date established by a separate Final Order of the Title III Court, including the Confirmation Order; *provided*, *however*, that the "Distribution Record Date" shall not apply to any publicly held securities that will receive a distribution pursuant to the Plan through DTC.

76.    "*DTC*" means The Depository Trust Company.

77.    "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which all conditions precedent to the occurrence of the Effective Date set forth in Article XXXII.A of the Plan have been satisfied or waived in accordance with Article XXXII.B of the Plan.

78.    "*Election of Settlement Class Signature Page*" means the signature page attached to the Uninsured Bond Settlement Agreement, pursuant to which a Holder of PREPA Revenue Bond Claims may elect to be a Settling Bondholder by returning such completed signature page to the Oversight Board by the Settlement Offer Deadline and otherwise in accordance with the terms of the Uninsured Bond Settlement Agreement.

79.    "*Eminent Domain/Inverse Condemnation Claim*" means a Claim arising from or related to (a) an Eminent Domain Proceeding and a Final Order entered therein for an amount in excess of the amount deposited by the condemnor in accordance with the terms and provisions of 32 L.P.R.A. § 2907, including, without limitation, interest accrued with respect thereto or (b) an asserted inverse condemnation of property caused by an asserted taking of property for public use

9

by the Debtor without due process of law and without having received just compensation, including, without limitation, through the imposition of development restrictions or use limitations.

80. "*Eminent Domain Proceeding*" means a condemnation action or proceeding commenced by PREPA in the Court of First Instance in accordance with the terms and provisions of 32 L.P.R.A. § 2905 to obtain title to real property located on Puerto Rico.

81. "*Entity*" has the meaning set forth in Bankruptcy Code section 101(15).

82. "*Excess New Bonds*" means the Net Remaining New Bonds, if any, available for distribution, after making the distributions of Net Remaining New Bonds provided for by the Plan to (a) the GUC Trust, (b) Holders of Allowed PREPA Revenue Bond Claims or Holders of Assured Insured Interest Rate Swaps Claims that are a Settling Bondholder, and (c) Holders of Allowed Fuel Line Loan Claims.

83. "*Exchange Offer*" shall have the meaning given to it in Article XIX.S of the Plan.

84. "*Exculpated Party*" means, collectively, and in each case in its capacity as such: (a) PREPA; (b) the Oversight Board; (c) AAFAF; (d) the Creditors' Committee; (e) the Vitol Parties, <u>except</u> with respect to any claims related to the Vitol-SCC AP; (f) the Fuel Line Lender PSA Creditors; (g); National; (h) LUMA Energy; and (i) with respect to each of the foregoing, such Entity's current and former Related Persons.

85. "*Executory Contract*" means a contract or lease to which PREPA is a party that is subject to assumption, rejection, or assumption and assignment in accordance with Bankruptcy Code section 365, except as provided in PROMESA section 311.

86. "*Federal Claims*" means, collectively, any and all Claims of the United States of America, its agencies, departments or agents, including, without limitation, the United States Department of Housing and Urban Development, the United States Department of Homeland Security, the United States Environmental Protection Agency, and the United States Department of Labor.

87. "*Final Order*" means, as applicable, an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, re-argument, or rehearing has expired and as to which no appeal, petition for certiorari, remand proceeding, or other proceedings for a new trial, re-argument, or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial, re-argument, or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed or remanded in part or in full, with no further proceedings on remand, by the highest court to which such order was appealed, certiorari shall have been denied, or a new trial, re-argument, or rehearing shall have been denied or resulted in no modification of such order, and (ii) the time to take any further appeal, petition for certiorari, or move for a new trial, re-argument, or rehearing shall have expired; *provided*, *however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules, may be filed

relating to such order shall not prevent such order from being a Final Order, except as provided in the Federal Rules of Appellate Procedure, the Bankruptcy Rules, or the Local Bankruptcy Rules.

88. "*Findings of Fact and Conclusions of Law*" means the findings of fact and conclusions of law of the Title III Court entered in the Title III Case in connection with confirmation of the Plan in accordance with section 314 of PROMESA and section 1129 of the Bankruptcy Code, made applicable in the Title III Case in accordance with section 301 of PROMESA.

89. "*Fiscal Plan*" means a "Fiscal Plan" as defined in PROMESA section 5(10).

90. "*Fiscal Year*" means a fiscal year of PREPA, commencing on July 1st and concluding on June 30th the following calendar year.

91. "*Fuel Line Citibank Facility*" means the *Trade Finance Facility Agreement*, dated July 20, 2012, by and between PREPA and Citibank, N.A., as amended, amended and restated, supplemented, or otherwise modified from time to time.

92. "*Fuel Line Facilities*" means, collectively, the credit facilities extended to PREPA pursuant to the Fuel Line Scotia Facility and the Fuel Line Citibank Facility.

93. "*Fuel Line Lender Priority Action*" means the litigation styled *Cortland Capital Market Services LLC, et al., v. The Financial Oversight and Management Board for Puerto Rico, et al.*, Case No. 19-00396-LTS, currently pending in the Title III Court, in which the lenders of the Fuel Line Loans asserted, among other things, that the Fuel Line Loans constitute "Current Expenses" under the Trust Agreement and have priority over PREPA's bondholders.

94. "*Fuel Line Lender PSA*" means that certain *Plan Support and Settlement Agreement*, dated as of December 1, 2022, by and among the Oversight Board and the Fuel Line Lender PSA Creditors, as it may be amended, modified, or supplemented in accordance with the terms thereof.

95. "*Fuel Line Lender PSA Creditors*" means, collectively, the parties to the Fuel Line Lender PSA, other than the Oversight Board, as they may change from time to time in accordance with the Fuel Line Lender PSA.

96. "*Fuel Line Lender PSA Creditors Consummation Fees*" means consummation costs of fifteen million dollars ($15,000,000) to be paid to the Fuel Line Lender PSA Creditors.

97. "*Fuel Line Lender PSA Creditors Fees*" means, collectively, the Fuel Line Lender PSA Creditors Consummation Fees and the Fuel Line Lender PSA Creditors Professionals' Reimbursement Fees.

98. "*Fuel Line Lender PSA Creditors Professionals' Reimbursement Fees*" means reimbursement of up to eleven million dollars ($11,000,000) in documented professional fees incurred by the Fuel Line Lender PSA Creditors.

99. "*Fuel Line Loan Claim*" means a Claim on account of Fuel Line Loans or otherwise arising from or related to the Fuel Line Facilities (including interest accrued through the Petition Date).

100. "*Fuel Line Loans*" means the loans or advances made under the Fuel Line Facilities.

101. "*Fuel Line Scotia Facility*" means the *Credit Agreement*, dated May 4, 2012, by and among PREPA, Scotiabank de Puerto Rico, and certain lenders, as amended, amended and restated, supplemented, or otherwise modified from time to time.

102. "*General Unsecured Claim*" means any unsecured Claim against PREPA other than an Administrative Expense Claim, a Federal Claim, a Professional Claim, an Eminent Domain/Inverse Condemnation Claim (except as otherwise provided in Article XIV of the Plan), a Pension Claim, a Fuel Line Loan Claim, a PREPA Revenue Bond Claim (including a Deficiency Claim), a National Insured Bond Claim, a National Reimbursement Claim, a Vitol Claim, an Assured Insured Interest Rate Swaps Claim, a Secured Claim, an Ordinary Course Customer Claim, a Section 510(b) Subordinated Claim, or such other Claim determined by the Title III Court not to be an General Unsecured Claim. For the avoidance of doubt, each CBA Rejection Damages Claim shall be a "General Unsecured Claim."

103. "*General Unsecured Claim Recovery*" means the aggregate recovery by Holders of Claims in the Unsecured Claims Pool, payable from the GUC Trust Assets, comprised of (a) the Avoidance Action Proceeds, (b) the GUC New Bonds, if any, and (c) the GUC CVI.

104. "*Government Parties*" means collectively, (a) the Oversight Board, (b) PREPA, and (c) AAFAF.

105. "*Governmental Unit*" has the meaning set forth in Bankruptcy Code section 101(27).

106. "*Gross Remaining New Bonds*" means the Series B Bonds, if any, available for distribution after the Mandatory New Bonds Distribution and the GUC New Bonds Initial Distribution.

107. "*GUC CVI*" means CVI in the notional face amount equal to the Unsecured Claims Pool <u>minus</u> the <u>sum</u> of the (a) the amount of the Avoidance Action Proceeds as of the Effective Date and (b) face of amount of the GUC New Bonds.

108. "*GUC Initial New Bonds Recovery Percentage*" means fifty percent (50.0%).

109. "*GUC New Bonds*" means, collectively, the GUC New Bonds Initial Distribution and the GUC New Bonds Secondary Distribution.

110. "*GUC New Bonds Initial Distribution*" means the aggregate principal amount of Series B Bonds to be initially distributed to the GUC Trust for the benefit of Holders of Claims in the Unsecured Claims Pool, equal to the lesser of (a) the Unsecured Claims Pool <u>times</u> the GUC Initial New Bonds Recovery Percentage and (b) all GUC Remaining New Bonds.

12

111.    "*GUC New Bonds Secondary Distribution*" means the aggregate principal amount of Net Remaining New Bonds distributed to the GUC Trust for the benefit of Holders of Claims in the Unsecured Claims Pool, after the GUC New Bonds Initial Distribution, equal to the Unsecured Claims Pool <u>minus</u> the GUC New Bonds Initial Distribution <u>divided by</u> the Remaining Series B Bonds Claims Pool, which resulting fraction shall be <u>multiplied by</u> the Net Remaining New Bonds.

112.    "*GUC Remaining New Bonds*" means the Series B Bonds, if any, available for distribution after the Mandatory New Bonds Distribution.

113.    "*GUC Trust*" means an Entity to be established on or prior to the Effective Date for the benefit of Holders of Claims in the Unsecured Claims Pool, which Entity shall be a liquidating trust managed in accordance with the GUC Trust Deed of Trust.

114.    "*GUC Trust Assets*" means, collectively, (a) the Avoidance Action Proceeds, (b) the GUC New Bonds, if any, and (c) the GUC CVI.

115.    "*GUC Trust Beneficiaries*" means, collectively, the Holders of Claims in the Unsecured Claims Pool.

116.    "*GUC Trust Board*" means the three (3) member board appointed as of the Effective Date to govern the GUC Trust, selected by the Oversight Board.

117.    "*GUC Trust Deed of Trust*" means the deed of trust to be executed and delivered on or prior to the Effective Date providing for, among other things, the distribution of the General Unsecured Claims Recovery to the Holders of Claims in the Unsecured Claims Pool.

118.    "*GUC Trust Interests*" means the beneficial interests in the GUC Trust allocated in accordance with the terms and provisions of the Plan for the benefit of Holders of Claims in the Unsecured Claims Pool.

119.    "*GUC Trustee*" means the trustee appointed by the GUC Trust Board, by a simple majority vote of such board, contemporaneously with the Effective Date in accordance with the terms and provisions of the GUC Trust Deed of Trust, including, without limitation, any successor thereto.

120.    "*Holder*" means an Entity holding a Claim, except as provided in PROMESA section 301(c)(3).

121.    "*Impaired*" means a Claim that is not Unimpaired.

122.    "*Insurance Policies*" means, collectively, all of the Debtor's insurance policies, excluding any insurance policies issued by Monoline Insurers with respect to Insured PREPA Revenue Bonds.

123.    "*Insured PREPA Revenue Bonds*" means the PREPA Revenue Bonds insured pursuant to insurance policies issued by the Monoline Insurers.

124. "*Interest Rate Covenant*" shall have the meaning given to it in Article XIX.J of the Plan.

125. "*IRC*" means the United States Internal Revenue Code of 1986, as amended from time to time.

126. "*IRS*" means the Internal Revenue Service, an agency of the United States Department of Treasury.

127. "*Invited Bonds*" shall have the meaning given to it in Article XIX.S of the Plan.

128. "*Law 458 Action*" means the litigation styled *PREPA v. Vitol Inc. et al.*, Adv. Proc. No. 19-00453 in [Case No. 17-BK-3283-LTS].

129. "*Legacy Charge*" means the hybrid fixed monthly flat fee and volumetric charge by Reorganized PREPA to be included in Reorganized PREPA's rates, fees, and charges to its customers, as more fully described in **Schedule B** hereto, as such **Schedule B** may be amended or modified up to and including the Effective Date, to pay principal and interest on the New Bonds and any Refunding Bonds, in structure and amounts that do not delay or extend the Series A Bonds' or the Series B Bonds' expected repayment date and expected weighted average life as set forth in the Fuel Line Lender PSA or the National PSA, as applicable, and otherwise that are reasonably acceptable to the Required Fuel Line Lenders.

130. "*Legacy Charge Revenues*" means, during the applicable period, the portion, expressed in dollars, of all Revenues attributable to the Legacy Charge, as calculated by a Servicer and certified by an officer thereof to the New Master Trustee.

131. "*Lien*" has the meaning set forth in Bankruptcy Code section 101(37).

132. "*Local Bankruptcy Rules*" means the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Puerto Rico and, to the extent applicable to the Title III Case, the Local District Court Rules for the District of Puerto Rico, each as amended from time to time.

133. "*LUMA Energy*" means, collectively, LUMA Energy, LLC, a joint venture between Quanta Services and Canadian Utilities Limited, an ATCO Ltd. Company, and LUMA Energy ServCo, LLC, its subsidiary.

134. "*Mandatory New Bonds Distribution*" means the New Bonds to be issued pursuant to this Plan and distributed in accordance with the following provisions of the Plan: Article II.D; Article IV.A(ii); Article V.A(ii); Article VII.A(i); Article VIII.A; Article IX.A; Article XII.A; and Article XVIII.H.

135. "*Monoline Insurers*" means Assured, National, and Syncora.

136. "*National*" means National Public Finance Guarantee Corporation.

137. "*National Acceleration Price*" means, with respect to any National Insured Bond, a price equal to the outstanding principal amount of a National Insured Bond plus the accrued and

unpaid interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) as of the date of payment.

138. "*National Bondholder Election Form*" means the "Form of Election Notice for Holders of Claims in Class 5", a copy of which is attached to the Disclosure Statement Order.

139. "*National Certificates*" means, with respect to each National Trust that is formed for the benefit of the beneficial holders of National Insured Bonds, the certificate(s) or receipt(s) to be issued by such National Trust to beneficial holders of such National Insured Bonds that are deposited into the National Trust.

140. "*National Claims*" means, collectively, the National Insured Bond Claims and the National Reimbursement Claim.

141. "*National Commutation Consideration*" means a combination of some or all of the following, to be selected by National at National's sole discretion at or prior to the Plan Supplement Deadline: (i) some or all of a Holder's Pro Rata Share of the National Plan Consideration; (ii) a percentage, to be determined at National's sole discretion, of the amounts distributable to National in accordance with the terms and provisions of Article II.D.2 hereof; and (iii) Cash in an amount to be determined by National in its sole discretion.

142. "*National Commutation Treatment*" means the treatment set forth in Article XX.A of this Plan.

143. "*National Escrow Account*" means escrow accounts that may be formed, on or prior to the Effective Date, by PREPA, for the benefit of the beneficial holders of National Insured Bonds whose National Escrow Consideration is deposited therein, the terms of which shall be set forth in the Plan Supplement.

144. "*National Escrow Consideration*" means any or all of the New Bonds distributable on account of Allowed National Insured Bond Claims and any other consideration that may be selected by National, in National's sole and absolute discretion, at or prior to the Plan Supplement Deadline.

145. "*National Insurance Policies*" means the existing insurance policies, including secondary market insurance policies, initially issued by (a) MBIA Insurance Corporation and subsequently novated to National or (b) FGIC and subsequently novated to National, relating to the National Insured Bonds, together with any and all agreements and other documents related thereto.

146. "*National Insured Bonds*" means, collectively, the PREPA Revenue Bonds that are insured by National or any of its affiliates and listed on Exhibit C to the National PSA; *provided*, *however*, for the avoidance of doubt, "National Insured Bonds" shall not include any PREPA Revenue Bonds that National (a) satisfied all amounts due and owing thereunder and (b) sold, assigned, and transferred its interests and rights into certain third-party buyers.

147.     "*National Insured Bond Claims*" means, collectively, the Claims against PREPA arising from the National Insured Bonds; *provided*, for the avoidance of doubt, the National Insured Bond Claims shall not include the National Reimbursement Claim.

148.     "*National Non-Commutation Treatment*" means the treatment set forth in Article XX.B of this Plan.

149.     "*National Plan Consideration*" means the consideration distributable on account of Allowed National Insured Bond Claims.

150.     "*National PSA*" means that certain *Plan Support and Settlement Agreement*, dated as of January 31, 2023, by and among PREPA, the Oversight Board, and National, including any exhibits or schedules thereto, as it may be amended, modified, or supplemented in accordance with the terms thereof.

151.     "*National Reimbursement Claim*" means the Claim of National arising from the payments made by National after the Petition Date, and as they may continue to accrue up to, but not including, the Effective Date to holders of the National Insured Bonds on account of interest accrued on such bonds.  For the avoidance of doubt, the National Reimbursement Claim does not include any claims arising under PREPA Revenue Bonds that National sold, assigned, and transferred its interests and right in to certain third-party buyers.

152.     "*National Settlement*" means the settlement of all Claims, interests, and controversies among PREPA, the Oversight Board, and National, the terms of which are set out in the National PSA.

153.     "*National Trust*" means the trust(s) which may be formed, on or prior to the Effective Date, by PREPA, the sole cost and expense of which, including, but not limited to, the formation and maintenance of the trust(s) (including trustee fees and expenses), shall be satisfied from the assets of the National Trust, and for the benefit of beneficial holders of such National Insured Bonds, the terms of which shall be set forth in the Plan Supplement.

154.     "*National Trust Consideration*" means some or all of the New Bonds distributable on account of Allowed National Insured Bond Claims and any other consideration that may be selected by National, in National's sole and absolute discretion, at or prior to the Plan Supplement Deadline.

155.     "*Net Remaining New Bonds*" means the Series B Bonds, if any, available for distribution after the Mandatory New Bonds Distribution, the GUC New Bonds Initial Distribution, and the PREPA PayGo New Bonds Distribution.

156.     "*Net Revenues*" means Revenues minus Operating Expenses.

157.     "*New Bonds*" means, collectively, the Series A Bonds and Series B Bonds to be issued by Reorganized PREPA pursuant to the Plan on the Effective Date, having an aggregate original principal amount of approximately $5.68 billion.

16

158.    "*New Master Indenture*" means the master trust indenture to be executed and delivered on or prior to the Effective Date pursuant to which Reorganized PREPA shall issue the New Bonds and the CVI, and includes all of the terms and provisions in connection therewith, which shall not be inconsistent with the Fuel Line Lender PSA and the National PSA and shall be reasonably acceptable to the Required Fuel Line Lenders and National, as the same may be amended, supplemented, or modified from time to time in accordance with its terms and conditions, a form of which shall be filed twenty-one (21) days prior to the Ballot Date, and which shall also be attached to the Plan Supplement.

159.    "*New Master Trustee*" means the trustee or replacement trustee, as the case may be, appointed in accordance with the terms and conditions of the New Master Indenture; *provided*, that the initial New Master Trustee shall be reasonably acceptable to the Required Fuel Line Lenders and National.

160.    "*Non-Settling Bondholder*" means a Holder of PREPA Revenue Bond Claims that is not a Monoline Insurer that did not timely submit to the Solicitation Agent by the Settlement Offer Deadline the Election of Settlement Class Signature Page issued to such Holder.

161.    "*Non-Settling CVI*" means, (a) if the Non-Settling CVI Conditions are met, CVI in the notional face amount equal to the sum of the Remaining Disallowed Non-Settling Claims of all Holders of PREPA Revenue Bonds Claims that are a Non-Settling Bondholder or a Non-Settling Monoline as calculated in Article V.A(iv) of the Plan, or (b) if the Non-Settling CVI Conditions are not met, CVI in the notional face amount of zero dollars ($0.00).

162.    "*Non-Settling CVI Conditions*" means if (a) Class 2 votes to accept the Plan and (b) a Final Order is entered in the Amended Lien & Recourse Challenge determining that the PREPA Revenue Bonds are recourse solely to the Sinking Fund.

163.    "*Non-Settling Monoline*" means Assured and Syncora.

164.    "*Operating Expenses*" means all of Reorganized PREPA's reasonable and necessary current expenses of managing, operating, maintaining, repairing, and replacing Reorganized PREPA's electric utility system and providing customer service to users of such system and shall include, without limiting the generality of the foregoing, all administrative expenses, wages, salaries, benefits, insurance premiums and deductibles, expenses of preliminary surveys not chargeable to capital expenditures, engineering expenses relating to operation and maintenance, legal and other professional service expenses (including, without limitation, claims, judgments, losses, and damages), purchases of equipment, goods, and services, equipment rentals, project management costs, physical and data security expenses, permitting fees and expenses, banking and cash management expenses, any payment to pension, pension trust, or retirement funds (including, for the avoidance of doubt, payments made to the PREPA PayGo Trust), all expenses related to third party operation and maintenance contracts, and all other expenses required to be paid by Reorganized PREPA under the provisions of the definitive documentation governing the New Bonds, under its contractual obligations (including any and all fees and pass-through expense payable under the transmission and distribution contract, as well as under any other contracts relating to a "PREPA Transaction" as defined in Act 120-2018), or by law, or permitted by standard practices for public utility systems, plus maintenance of a reasonable

17

minimum balance of unrestricted cash consistent with PREPA's current practices as further provided in the New Master Indenture.

165. "*Operationally Restructured*" means the reorganization of PREPA, in accordance with the Commonwealth's and PREPA's certified Fiscal Plan, into separate and distinct legal entities, in a form and structure substantially similar to that set forth immediately below, with clearly divided assets, functions, and financial statements, or as otherwise agreed to by Reorganized PREPA, AAFAF, the Oversight Board, and LUMA Energy.



166. "*Ordinary Course Customer Claim*" means a Claim, other than a Disputed Claim, held by a customer of PREPA related to ordinary course customer matters, including a Claim related to overpayment of customer bills or customer deposits held by PREPA.

167. "*Oversight Board*" means the Financial Oversight and Management Board for Puerto Rico established pursuant to PROMESA section 101, as the Debtor's Title III representative in its Title III Case pursuant to PROMESA section 315(b).

168. "*Participant*" means a current, former, active, inactive, retired, or disabled employee who holds an accrued claim against PREPA ERS for one or more retirement benefits on account of being or having been a participant in PREPA ERS, together with its beneficiaries, if any.

169. "*Payment Waterfall*" shall have the meaning given to it in Article XIX.G of the Plan.

170. "*Pension Claim*" means the Claim of PREPA ERS on account of contributions owed (including amounts payable in the future) by PREPA to PREPA ERS to pay retiree pension benefits in accordance with the PREPA ERS Regulations, collective bargaining agreements, resolutions, and applicable law, including any Claim for rejection damages with respect to

PREPA's rejection of any pre-petition obligations to pay retiree pension benefits pursuant to any Executory Contract.

171. "*Person*" has the meaning set forth in Bankruptcy Code section 101(41).

172. "*Petition Date*" means July 2, 2017, the date on which the Title III Case was commenced.

173. "*Plan*" means this plan of adjustment, including the Plan Supplement and all exhibits, supplements, appendices, and schedules.

174. "*Plan Supplement*" means any compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan, including, among other documents, the New Master Indenture, the GUC Trust Deed of Trust, the Avoidance Actions Trust Agreement, the PREPA PayGo Deed of Trust, and the Schedule of Assumed Contracts and Leases which shall be filed with the Title III Court no later than the Plan Supplement Deadline, and additional documents filed with the Title III Court prior to the Effective Date as amendments to the Plan Supplement, each of which shall be consistent in all respects with, and shall otherwise contain, the terms and conditions set forth on the exhibits and schedules attached hereto, where applicable, and which shall not be inconsistent with the Fuel Line Lender PSA and the National PSA and shall be reasonably acceptable to the Required Fuel Line Lenders and National. The Plan Supplement shall be deemed incorporated into and part of the Plan as if set forth herein in full.

175. "*Plan Supplement Deadline*" means seven (7) days before the Ballot Date or such later date as may be approved by the Title III Court on notice to parties in interest.

176. "*PREB*" means the Puerto Rico Energy Bureau or its successor or designee.

177. "*PREPA*" means the Puerto Rico Electric Power Authority, a public corporation of the Commonwealth of Puerto Rico established pursuant to Act No. 83 of 1941, as amended.

178. "*PREPA ERS*" means the Puerto Rico Electric Power Authority Employee Retirement System, or by its Spanish name Sistema de Retiro de los Empleados de la Autoridad de Energía Eléctrica (the "SREAEE" by its Spanish acronym), the entity responsible for the administration and payment of PREPA's pension obligations, pursuant to the PREPA ERS Regulations.

179. "*PREPA ERS Priority Action*" means the litigation styled *Sistema de Retiro de Los Empleados de la Autoridad de Energia Electrica v. The Financial Oversight and Management Board for Puerto Rico, et al.*, Case No. 19-00405-LTS, currently pending in the Title III Court.

180. "*PREPA ERS Regulations*" means the regulations adopted by PREPA pursuant to PREPA's Resolution No. 200, adopted June 25, 1945, that provide for the governance, funding, and operation of PREPA ERS, as amended from time to time.

181. "*PREPA PayGo Deed of Trust*" means the deed of trust to be executed and delivered on or prior to the Effective Date, substantially in the form included in the Plan Supplement, providing for, among other things, the creation of the PREPA PayGo Trust and terms

19

for the deposit of funds by PREPA and withdrawal of monies to reimburse PREPA ERS for payment of benefits to Participants as adjusted by this Plan.

182. "*PREPA PayGo New Bonds Distribution*" means the aggregate principal amount of Series B Bonds to be initially distributed to the PREPA PayGo Trust for the benefit of PREPA ERS, equal to the product of (a) twenty percent (20.0%) times (b) the Gross Remaining New Bonds.

183. "*PREPA PayGo Trust*" means the reserve trust to be created in accordance with the terms and conditions hereof, which reserve trust shall be utilized to reimburse PREPA ERS on an annual basis for payment of retirement benefits to Participants as adjusted by this Plan.

184. "*PREPA Revenue Bond Claim*" means, other than the National Claims, a Claim against PREPA on account of any PREPA Revenue Bonds, including Insured PREPA Revenue Bonds, Uninsured PREPA Revenue Bonds, and insurance policies issued by the Monoline Insurers.

185. "*PREPA Revenue Bonds*" means bonds issued by PREPA pursuant to the Trust Agreement.

186. "*Pro Rata Share*" means with respect to Allowed Claims (i) within the same Class, the proportion that an Allowed Claim bears to the sum of all Allowed Claims within such Class, and (ii) among multiple Classes, the proportion that Allowed Claims in any such Class bears to the sum of the Allowed Claims in all such Classes.

187. "*Professional*" means an Entity: (a) whose compensation for services rendered prior to or on the Effective Date is subject to PROMESA sections 316 and 317, and (i) employed in the Title III Case by the Debtor (in the Debtor's sole discretion), (ii) employed in the Title III Case by the Oversight Board (in the Oversight Board's sole discretion) or AAFAF (in AAFAF's sole discretion), or (iii) employed in the Title III Case pursuant to a Final Order in accordance with Bankruptcy Code section 1103; or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to Bankruptcy Code section 503(b)(4).

188. "*Professional Claim*" means a Claim by a Professional seeking an award by the Title III Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under PROMESA sections 316 and 317.

189. "*PROMESA*" means the *Puerto Rico Oversight, Management, and Economic Stability Act*, Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. § 2101, *et. seq.*, as the same may be amended or modified.

190. "*Proof of Claim*" means a proof of Claim filed against PREPA in the Title III Case.

191. "*Qualified Operator*" shall have the meaning given to it in the New Master Indenture.

192. "*Refunding Bonds*" means, if applicable, any bonds or replacement financing incurred by Reorganized PREPA to refinance the (a) New Bonds or (b)(i) Refunding Bonds

20

incurred by Reorganized PREPA to refinance the Refunding Bonds described in the immediately preceding clause (a) or (ii) any such further refinancings of Refunding Bonds, as applicable, which Refunding Bonds shall be secured by Net Revenues up to the amount of the Legacy Charge Revenues, and right to receive such Net Revenues in each case up to the amount of the Legacy Charge Revenues pledged to secure the New Bonds, and otherwise be issued in accordance with the New Master Indenture; *provided*, that if any Series A Bonds are still outstanding when Refunding Bonds are issued, such Refunding Bonds shall (a) be subordinate in principal payment priority to the Series A Bonds, and (b) not in any way affect the terms of the Series A Bonds as set forth herein; *provided, further*, however, that any Refunding Bonds that refund Series A Bonds are not subject to the immediately preceding proviso.

193.    "*Related Persons*" means, with respect to any Entity (including for the avoidance of doubt, the Commonwealth, the Government Parties, and the Creditors' Committee), its predecessors, successors, and assigns (whether by operation of law or otherwise), and their respective current and former employees, managers, elected or appointed officials, directors, officers, board members, principals, members, equity holders (whether such interests are held directly or indirectly), partners, financial advisors, attorneys, accountants, investment bankers, consultants, agents, and professionals (including, without limitation, any and all Professionals retained by the Debtor, the Oversight Board, AAFAF, and the Creditors' Committee), or other representatives, nominees, or investment managers, each acting in such capacity, and any Entity claiming by or through any of them (including their respective officers, directors, managers, shareholders, partners, employees, members, and professionals), each in its respective capacity as such; *provided*, *however*, that "Related Persons" is not intended, nor shall it be construed, to include the Commonwealth.

194.    "*Released Claims*" means, collectively, (a) Claims and Causes of Action that arise in, are related to, or have been or could have been asserted against PREPA or its Assets in the Title III Case, including all Claims held by Participants, (b) Claims and Causes of Action that have been or could have been asserted by PREPA, the Oversight Board, and/or AAFAF (with respect to releases given by PREPA) and by Creditors (with respect to releases given by the Releasing Parties), (c) all Claims asserted by PREPA ERS in connection with the PREPA ERS Priority Action, and (d) Claims that otherwise arise from or relate to the Title III Case, the Plan, the Restructuring Transactions, and the compromises and settlements set forth herein; *provided, however*, that "Released Claims" is not intended to include, nor shall it have the effect of including, Claims or Causes of Action unrelated to the Debtor; *provided, further*, that "Released Claims" is not intended to release, nor shall it have the effect of releasing, any party from the performance of its obligations in accordance with the Confirmation Order or the Plan, including, without limitation, performance of obligations arising from or related to the New Bonds.

195.    "*Released Party*" means collectively, and in each case in its capacity as such: (a) PREPA; (b) the Oversight Board; (c) AAFAF; (d) the Vitol Parties, solely with respect to the Law 458 Action; (e) each Settling Bondholder that votes to accept the Plan; (f) the Fuel Line Lender PSA Creditors; (g) National; and (h) with respect to each of the foregoing, each of their respective current and former Related Persons.

196.    "*Releasing Parties*" means, collectively: (a) all Holders of Claims against the Debtor or their Assets who were entitled to vote on the Plan and voted to accept the Plan; (b) such

Holders' current and former Affiliates; and (c) with respect to the foregoing clauses (a) and (b), each such Entity's current and former Related Persons.

197.    "*Remaining Claim*" means, with respect to any Allowed Claim, the amount of such Allowed Claim <u>minus</u> the total Cash and face amount of New Bonds, if any, such Holder has received on account of such Allowed Claim, at the time the Remaining Claim is calculated.

198.    "*Remaining Disallowed Non-Settling Claim*" shall have the meaning given to it in Article V.A(iv) of the Plan.

199.    "*Remaining Legacy Charge*" means the fixed fee component of the Legacy Charge in place as of the Effective Date, from and after the Series B Bond Defeasance Date, through the CVI Maturity Date.

200.    "*Remaining Legacy Charge Revenues*" means, during the applicable period, the portion, expressed in dollars, of all Revenues attributable to the Remaining Legacy Charge, as calculated by Reorganized PREPA and certified by an officer thereof to the New Master Trustee.

201.    "*Remaining Net Revenues*" means the Net Revenues from and after the Series B Bond Defeasance Date through the CVI Maturity Date.

202.    "*Remaining Series B Bonds Claims Pool*" means, at the time immediately following the Mandatory New Bonds Distribution, the GUC New Bonds Initial Distribution, and the PREPA PayGo New Bonds Distribution, the <u>sum</u> of (a) the Remaining Claims of the Settling Bondholders, (b) the Remaining Claims of the Fuel Line Lenders, which shall be $112,141,934.97, and (c) the Unsecured Claims Pool <u>minus</u> the GUC New Bonds Initial Distribution.

203.    "*Reorganized Debtor*" or "*Reorganized PREPA*" means PREPA, from and after the Effective Date.

204.    "*Reorganized Debtor By-Laws*" means the by-laws of Reorganized PREPA, to the extent applicable, from and after the Effective Date.

205.    "*Required Fuel Line Lenders*" means the Fuel Line Lenders that beneficially own or control, in the aggregate, at least a majority in principal amount of the Fuel Line Loans beneficially owned or controlled, in the aggregate, by the Fuel Line Lenders at such time.

206.    "*Restructuring Transactions*" means the Debtor's restructuring, including, without limitation, the transactions described in this Plan.

207.    "*Retiree*" means a person who, as reflected in the records of PREPA ERS as of the Effective Date, receives a pension or annuity from PREPA ERS.

208.    "*Revenues*" means all moneys received by Reorganized PREPA, including the income derived by Reorganized PREPA from the sale of electricity generated or distributed, including, but not limited to, the Legacy Charge, any proceeds of use and occupancy insurance or any part thereof, and income from investments made by Reorganized PREPA, and including, for the avoidance of doubt, monies collected by LUMA Energy on Reorganized PREPA's behalf;

22

*provided*, *however*, that all funds from any federal or Commonwealth government grants, governmental appropriations, or government loans shall be deemed to not be Revenues for purposes of this definition and the New Master Indenture.

209.    "*Schedule of Assumed Contracts and Leases*" means the schedule of Executory Contracts and Unexpired Leases to be assumed by PREPA pursuant to the Plan, filed as part of the Plan Supplement, as may be amended by PREPA from time to time prior to the Confirmation Date.

210.    "*Section 103 Bond Counsel*" means with respect to PREPA or Reorganized PREPA, as the case may be, counsel providing services with respect to section 103 of the IRC.

211.    "*Section 510(b) Subordinated Claim*" means any Claim, to the extent determined pursuant to a Final Order, against the Debtor or its Assets arising from or relating to (a) rescission of a purchase or sale of an existing security of the Debtor or an Affiliate of the Debtor, (b) purchase, sale, or retention of such a security, or (c) reimbursement, indemnification, or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim.

212.    "*Secured Claim*" means a Claim:  (a) secured by a valid Lien on any of the Debtor's assets to the extent of the value of such collateral, as determined in accordance with Bankruptcy Code section 506(a); or (b) subject to a valid right of setoff pursuant to Bankruptcy Code section 553.

213.    "*Securities Act*" means the *Securities Act of 1933*, 15 U.S.C. §§ 77a–77aa, as amended, or any similar federal, state, or local law.

214.    "*Series A Bond Defeasance Date*" means the date on which the principal and interest owed on the Series A Bonds (and any Refunding Bonds issued pursuant to the New Master Indenture in order to refund any Series A Bonds) are irrevocably paid in full in Cash, or are otherwise deemed not to be outstanding in accordance with the terms of the New Master Indenture.

215.    "*Series A Bonds*" means the series of New Bonds known as the Series A Bonds to be distributed to the Holders of Allowed Fuel Line Loan Claims, with the principal terms as described in Article XIX, and otherwise issued in accordance with the terms and conditions of the Plan, the Confirmation Order, and the New Master Indenture.

216.    "*Series B Bond Defeasance Date*" means the date on which the principal and interest owed on the Series B Bonds (and any Refunding Bonds issued pursuant to the New Master Indenture in exchange for any Series B Bonds) are irrevocably paid in full in Cash, or are otherwise deemed not to be outstanding in accordance with the terms of the New Master Indenture.

217.    "*Series B Bonds*" means the series of New Bonds known as the Series B Bonds, consisting of the Series B-1 Bonds and Series B-2 Bonds, to be distributed pursuant to the Plan, which may be issued in the form of current interest bonds, capital appreciation bonds, convertible bonds, or convertible capital appreciation bonds, with the principal terms as described in Article XIX, and otherwise issued in accordance with the terms and conditions of the Plan, the Confirmation Order, and the New Master Indenture.

218.   "*Series B-1 Bonds*" means the series of New Bonds known as the Series B-1 Bonds to be distributed pursuant to the Plan as current interest bonds, with the principal terms as described in Article XIX, and otherwise issued in accordance with the terms and conditions of the Plan, the Confirmation Order, and the New Master Indenture.

219.   "*Series B-2 Bonds*" means the series of New Bonds known as the Series B-2 Bonds to be distributed pursuant to the Plan as convertible capital appreciation bonds, with the principal terms as described in Article XIX, and otherwise issued in accordance with the terms and conditions of the Plan, the Confirmation Order, and the New Master Indenture.

220.   "*Servicer*" means the Entity that is a Qualified Operator that operates PREPA's or Reorganized PREPA's transmission and distribution system and collects Revenues from time to time.

221.   "*Settlement Offer Deadline*" means February 24, 2023, at 5:00 p.m. (Eastern Standard Time), or such other date and time as determined by the Oversight Board in its sole discretion.

222.   "*Settling Bondholder*" means a Holder of Uninsured PREPA Revenue Bonds that is not a Monoline Insurer that timely submitted to the Solicitation Agent by the Settlement Offer Deadline the Election of Settlement Class Signature Page issued to such Holder pursuant to the Uninsured Bond Settlement Agreement.

223.   "*Settling CVI*" means CVI in the notional face amount equal to the sum of the Remaining Claims of all Holders of PREPA Revenue Bonds Claims that are a Settling Bondholder as calculated in Article IV.A(iv) of the Plan.

224.   "*Sinking Fund*" means the deposit account(s) held by the Bond Trustee which are subject to a perfected security interest in favor of the Bond Trustee, for the benefit of the holders of the PREPA Revenue Bonds.

225.   "*Solicitation Agent*" means Kroll Restructuring Administration LLC, the notice, claims, and solicitation agent retained by PREPA in the Title III Case by order of the Title III Court.

226.   "*Syncora*" means Syncora Guarantee Inc.

227.   "*Title III*" means Title III of PROMESA.

228.   "*Title III Case*" means the Title III case under PROMESA pending for PREPA in the Title III Court, captioned as *In re Financial Oversight & Management Board for Puerto Rico as representative of Puerto Rico Electric Power Authority* [Case No. 17-BK-4780-LTS (D.P.R.)].

229.   "*Title III Court*" means the United States District Court for the District of Puerto Rico or such other court having jurisdiction over the Title III Case.

230.   "*Treasury Rate*" means, with respect to any redemption date for the CVI, the yield to maturity of United States Treasury securities (excluding inflation indexed securities) with a

constant maturity (as compiled and published in the Federal Reserve Statistical Release H.15 (519) that has become publicly available not less than two (2) Business Days nor more than forty-five (45) calendar days prior to the redemption date (or, if such statistical release is no longer published, any publicly available source of similar market data)), most nearly equal to the period from the redemption date to the weighted average maturity date of equal annual installments of the outstanding CVI to be redeemed, as determined by an independent accounting firm, investment banking firm, or financial advisor retained by PREPA or the Commonwealth at PREPA's or the Commonwealth's expense; *provided*, *however*, that if the period from the redemption date to such maturity date is less than one (1) year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one (1) year will be used.

231. "*Trust Agreement*" means that certain Trust Agreement dated as of January 1, 1974, as amended, by and between PREPA and U.S. Bank National Association, as successor trustee.

232. "*UEPI CBA*" means that certain collective bargaining agreement between the Puerto Rico Electric Power Authority and the Union of Independent Professional Employees.

233. "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to PREPA of an intent to accept a particular distribution; (c) responded to PREPA's requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

234. "*Unexpired Lease*" means a lease of nonresidential real property to which PREPA is a party that is subject to assumption or rejection under Bankruptcy Code section 365, except as provided in PROMESA section 311.

235. "*Unimpaired*" is used to describe a Class of Claims that is unimpaired within the meaning of Bankruptcy Code section 1124.

236. "*Uninsured Bond Settlement Agreement*" means that certain settlement offer memorandum and settlement agreement, made to all Holders of Uninsured PREPA Revenue Bond Claims, describing the terms of the settlement offer being made to such Holders pursuant thereto, including the proposed treatment of PREPA Revenue Bond Claims pursuant to Article IV of the Plan, and distributing the Election of Settlement Class Signature Page, pursuant to which a Holder of Uninsured PREPA Revenue Bonds may accept the proposed classification and settlement for such Claim.

237. "*Uninsured PREPA Revenue Bond*" means a PREPA Revenue Bond that is not insured by a Monoline Insurer.

238. "*Unsecured Claims Pool*" means the sum of all Allowed Claims of Holders of:

(a) the General Unsecured Claims;

(b) the Vitol Claim;

(c)     the Deficiency Claims, if any; and

(d)     the Federal Claims, if any, which may be Impaired in accordance with Article XV of the Plan.

239.     "*UTIER CBA*" means that certain collective bargaining agreement between the Puerto Rico Electric Power Authority and the Workers Union of the Electric Power and Irrigation Industry.

240.     "*Vitol*" means Vitol Inc.

241.     "*Vitol Claim*" means the Claim against PREPA on account of the Vitol Settlement Agreement.

242.     "*Vitol Parties*" mean, collectively, Vitol and Vitol S.A.

243.     "*Vitol-SCC AP*" means the action styled *Special Claims Comm. v. Inspectorate America Corp.*, Adv. Proc. No. 19-00388 in [Case No. 17-BK-4780-LTS].

244.     "*Vitol Settlement Agreement*" means that certain *Settlement Agreement and Release* dated August 26, 2022, by and between the Oversight Board, Vitol, and Vitol S.A.

## B.    Rules of Interpretation

For purposes of the Plan: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (e) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to contradict the text; (g) unless otherwise specified herein, the rules of construction set forth in Bankruptcy Code section 102 shall apply; (h) references to docket numbers of documents filed in the Title III Case are references to the docket numbers under the Title III Court's CM/ECF system; (i) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation;" (j) any immaterial effectuating provisions may be interpreted by PREPA in such a manner that is consistent with the overall purpose and intent of the Plan, all without further notice to or action, order, or approval of the Title III Court or any other Entity; and (k) unless the context otherwise requires, any capitalized term used and not defined herein or elsewhere in the Plan that is defined in PROMESA or the Bankruptcy Code shall, if defined in PROMESA, have the meaning assigned to that term in

PROMESA or, if not defined in PROMESA, but defined in the Bankruptcy Code, shall have the meaning ascribed thereto in the Bankruptcy Code.

**C.      Computation of Time**

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

**D.      Governing Law**

Except to the extent that other federal law is applicable, or to the extent that an exhibit hereto or any document to be entered into in connection herewith provides otherwise, the rights, duties, and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, PROMESA (including the provisions of the Bankruptcy Code made applicable under PROMESA section 301) and, to the extent not inconsistent therewith, the laws of the Commonwealth of Puerto Rico, without giving effect to principles of conflicts of laws.

**E.      Reference to Monetary Figures**

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

**F.      Controlling Document**

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the Plan shall control.  In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control and be deemed a modification of the Plan; *provided*, *however*, that under no circumstances shall the Confirmation Order materially modify the economic terms set forth herein absent consent of the Oversight Board.

**G.      Consent Rights**

Notwithstanding anything herein to the contrary, any and all consent rights of the parties to the Fuel Line Lender PSA set forth in the Fuel Line Lender PSA with respect to the form and substance of (i) this Plan, (ii) all exhibits to the Plan, (iii) the Plan Supplement, and (iv) the Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and be fully enforceable as if stated in full herein.

Notwithstanding anything herein to the contrary, any and all consent rights of the parties to the National PSA set forth in the National PSA, including with respect to the form and substance of (i) this Plan, (ii) all exhibits to the Plan, (iii) the Plan Supplement, and (iv) the Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such

27

documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and be fully enforceable as if stated in full herein.

## ARTICLE II

## ADMINISTRATIVE AND PROFESSIONAL CLAIMS

In accordance with Bankruptcy Code section 1123(a)(1), made applicable to this Title III Case pursuant to PROMESA section 301(a), Administrative Expense Claims and Professional Claims have not been classified as voting Classes.

## A.     Administrative Expense Claims

On the later to occur of (i) the Effective Date and (ii) the date on which an Administrative Expense Claim shall become an Allowed Claim, the Reorganized Debtor shall (a) pay to each Holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Administrative Expense Claim or (b) satisfy and discharge such Allowed Administrative Expense Claim in accordance with such other terms no more favorable to the claimant than as may be agreed upon by and between the Holder thereof and the Reorganized Debtor; *provided*, *however*, that Allowed Administrative Expense Claims representing indebtedness incurred in the ordinary course prior to the Effective Date by the Debtor shall be paid in full and performed by the Reorganized Debtor in accordance with the terms and subject to the conditions of any agreement governing, investment evidencing, or other document relating to, such transactions; and, *provided*, *further*, that, if any such ordinary course expense is not billed, or a written request for payment is not made, within one hundred twenty (120) days after the Effective Date, such ordinary course expense shall be barred and the Holder thereof shall not be entitled to, or receive, a distribution pursuant to the Plan.

## B.     Disallowance of Claims Filed After the Administrative Claim Bar Date

After the Administrative Claim Bar Date, any Administrative Expense Claim, proof of which has not been filed, shall be deemed forever barred, and the Debtor and the Reorganized Debtor shall have no obligation with respect thereto; *provided*, *however*, that no proof of Administrative Expense Claim shall be required to be filed if such Administrative Expense Claim (a) shall have been incurred (i) in accordance with an order of the Title III Court or (ii) with the written consent of the applicable Government Parties expressly granting such Administrative Expense Claim, (b) is a Professional Claim, (c) is an Administrative Expense Claim of the IRS for the payment of taxes incurred by the Debtor during the period from and after the Petition Date, or (d) is the subject of a pending motion seeking allowance of an administrative expense.

## C.     Professional Compensation and Reimbursement Claims

All Entities awarded compensation, including, without limitation, to the fullest extent provided in respective letters of engagement or similar instruments or agreements, or reimbursement of expenses by the Title III Court shall be paid in full, in Cash, in the amounts allowed by the Title III Court (i) as soon as reasonably practicable following the later to occur of (a) the Effective Date and (b) the date upon which the Title III Court order allowing such Claims is deemed to be a Final Order or (ii) upon such other terms no more favorable to the claimant than

28

as may be mutually agreed upon between such claimant and the Government Parties; *provided*, *however*, that, except as provided herein, each Professional must file its application for final allowance of compensation for professional services rendered and reimbursement of expenses on or prior to the date that is one hundred twenty (120) days following the Effective Date. The Reorganized Debtor shall pay compensation for professional services extended and reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Title III Court approval.

From and after the Confirmation Date, any requirement that Professionals comply with PROMESA sections 316 and 317 in seeking compensation for services rendered after such date shall terminate, and PREPA may employ and shall pay any Professional without any further notice to or action, order, or approval of the Title III Court.

**D.    Supporting Creditors' Fees**

**1.    Fuel Line Lenders**

On the Effective Date, each Fuel Line Lender PSA Creditor shall receive, in the form of either additional Series A Bonds or Cash, in the Oversight Board's sole discretion, and not on account of their Allowed Claim, such Fuel Line Lenders PSA Creditors' (i) Pro Rata Share of the Fuel Line Lender PSA Creditors Consummation Fees in consideration for their assistance in formulating the Plan and (ii) Pro Rata Share of the Fuel Line Lender PSA Creditors Professionals' Reimbursement Fees to compensate for the reasonable fees and expenses incurred in connection with the Title III Case and negotiating and executing the Fuel Line Lender PSA; *provided*, that ten percent (10%) of the Fuel Line Lender PSA Creditors Professionals' Reimbursement Fees shall be allocated to the Fuel Line Lenders PSA Creditor of record as of the Agreement Effective Date (as defined in the Fuel Line Lender PSA) under the Fuel Line Citibank Facility and ninety percent (90%) of the Fuel Line Lender PSA Creditors Professionals' Reimbursement Fees shall be allocated to the Fuel Line Lender PSA Creditors (party to the Fuel Line Lender PSA as of the Agreement Effective Date) under the Fuel Line Scotia Facility (and pro rata among such Fuel Line Lender PSA Creditors).  The Fuel Line Lender PSA Creditor Fees compensate the Fuel Line Lender PSA Creditors for value received and constitute an essential component of the compromises and settlements embodied herein and are not severable from the other terms and provisions set forth herein.

On the Effective Date, each Fuel Line Lender PSA Creditor shall also receive Series A Bonds or Cash, in the sole discretion of the Oversight Board, in the face amount of interest at a rate of six percent (6.0%) per annum deemed to have accrued on account of each Holder's Pro Rata Share of Series A Bonds to be distributed pursuant to Article VII.A(i), during a period equal to the shorter of (a) December 1, 2022 to the Effective Date, and (b) one (1) year.

**2.    National**

On the Effective Date, National shall receive, in the form of an Allowed Administrative Expense Claim and not on account of its Allowed Claims, Series B Bonds or Cash, as elected in the Oversight Board's sole discretion (which election shall be deemed to be Series B Bonds, unless the Oversight Board elects otherwise at or prior to the commencement of the Confirmation

Hearing), in the aggregate face amount equal to the <u>sum</u> of (i) three percent (3.0%) <u>times</u> the Allowed National Insured Bond Claims to compensate for the reasonable fees and expenses incurred by National in connection with the Title III Case and negotiating and executing the National PSA and prosecution of approval of the Disclosure Statement and Plan and (ii) two and eighty-six one hundredths percent (2.86%) <u>times</u> the Allowed National Insured Bond Claims in consideration for the structuring of payments to be made to holders of claims arising from or relating to National Insured Bonds in accordance with the National PSA.  The fees and costs in this Article II.D.2 compensate National for value received and constitute an essential component of the compromises and settlements embodied herein and are not severable from the other terms and provisions set forth herein.

## ARTICLE III

## CLASSIFICATION OF CLAIMS

### A.      <u>Classification of Claims</u>

Except for the Claims addressed in Article II of the Plan, all Claims are classified in the Classes set forth below in accordance with Bankruptcy Code section 1122.  A Claim is classified in a particular Class only to the extent the Claim qualifies within the description of that Class and is classified in other Classes to the extent any portion of the Claim qualifies within the description of such other Classes.  A Claim also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent such is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

Claims are classified as follows:

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Settling Bondholder Claims | Impaired | Entitled to Vote |
| 2 | Non-Settling Bondholder and Non-Settling Monoline Claims | Impaired | Entitled to Vote |
| 3 | Pension Claim | Impaired | Entitled to Vote |
| 4 | Fuel Line Loan Claims | Impaired | Entitled to Vote |
| 5 | National Insured Bond Claims | Impaired | Entitled to Vote |
| 6 | National Reimbursement Claim | Impaired | Entitled to Vote |
| 7 | General Unsecured Claims | Impaired | Entitled to Vote |
| 8 | Vitol Claims | Impaired | Entitled to Vote |

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 9 | Assured Insured Interest Rate Swaps Claims | Impaired | Entitled to Vote |
| 10 | Ordinary Course Customer Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 11 | Eminent Domain/Inverse Condemnation Claims | Impaired | Entitled to Vote |
| 12 | Federal Claims | Impaired | Entitled to Vote |
| 13 | Convenience Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 14 | Section 510(b) Subordinated Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

**B.    Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect PREPA's rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claim.

**C.    Elimination of Vacant Classes**

Any Class of Claims that does not have a Holder of an Allowed Claim or a Claim temporarily Allowed by the Title III Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to Bankruptcy Code section 1129(a)(8).

**D.    Voting Classes; Presumed Acceptance by Non-Voting Classes**

An Impaired Class of Holders of Claims shall have accepted the Plan if the Plan is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class that have voted to accept or reject the Plan.  If a Class contains Claims eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, that Class shall be deemed to accept the Plan; *provided*, *however*, such Class will not be used as an Impaired accepting Class pursuant to Bankruptcy Code section 1129(a)(10).

**E.    Subordinated Claims**

The allowance, classification, and treatment of all Allowed Claims and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims in each Class in connection with any contractual, legal, and equitable

subordination rights relating thereto, whether arising under general principles of equitable subordination, Bankruptcy Code section 510(b), or otherwise. Pursuant to Bankruptcy Code section 510, the Oversight Board reserves the right to re-classify any Allowed Claim in accordance with any contractual, legal, or equitable subordination relating thereto.

## F.   Confirmation Pursuant to PROMESA Section 314

The Oversight Board shall seek Confirmation of the Plan pursuant to PROMESA section 314 with respect to any rejecting Class of Claims. The Oversight Board reserves the right to modify the Plan in accordance with Article XVIII of the Plan to the extent, if any, that Confirmation pursuant to PROMESA section 314 requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by PROMESA, the Bankruptcy Code, and the Bankruptcy Rules.

## G.   Confirmation Pursuant to Bankruptcy Code Section 1129(b)

In the event that any Impaired Class of Claims shall fail to accept, or be deemed to reject, the Plan in accordance with Bankruptcy Code section 1129(a), the Debtor reserves the right to (i) request that the Bankruptcy Court confirm the Plan in accordance with Bankruptcy Code section 1129(b) or (ii) amend the Plan (and any such amendment shall comply with the Fuel Line Lender PSA and the National PSA).

## ARTICLE IV

## PROVISIONS FOR TREATMENT OF
## SETTLING BONDHOLDER CLAIMS (CLASS 1)

## A.   Treatment of Class 1 Claims

On the Effective Date, the PREPA Revenue Bond Claims of each Settling Bondholder shall be deemed Allowed pursuant to the terms of the Uninsured Bond Settlement Agreement, and shall receive, in full consideration, satisfaction, release, settlement, and exchange of such Holder's Allowed PREPA Revenue Bond Claim, up to the full amount of such Holder's Allowed PREPA Revenue Bond Claim, unless such Holder agrees to a less favorable treatment, in the following order:

(i)     such Holder's Pro Rata Share of the funds deposited in the Sinking Fund, subject to the terms of the Trust Agreement;

(ii)    Series B Bonds in the face amount equal to the product of (A) fifty percent (50.00%) times (B) the amount of such Holder's Allowed PREPA Revenue Bond Claim minus (C) the amount distributed to such Holder pursuant to the immediately preceding clause (i);

(iii)   with respect to such Holder's Remaining Claim after the collective distributions are made pursuant to the immediately preceding clauses (i) and (ii): (A) forty percent (40.0%) of such Holder's Pro Rata Share of the Net Remaining New Bonds, if any, available for distribution to the Remaining Series B Bond Claims Pool; and (B) up to an additional sixty percent (60.0%) of such Holder's Pro Rata Share of the Net Remaining New Bonds, if any,

available for distribution to the Remaining Series B Bond Claims Pool, if and only if both (I) the face amount of the GUC New Bonds equals one hundred percent (100.0%) of the Unsecured Claims Pool and (II) the Remaining Claims of the Fuel Line Lenders described in Article VII.A(ii) of the Plan receive Net Remaining New Bonds in the face amount equal to one hundred percent (100.0%) of such Remaining Claims; and

(iv)   with respect to such Holder's Remaining Claim, if any, after the collective distributions are made pursuant to the immediately preceding clauses (i), (ii), and (iii), such Holder's Pro Rata Share of CVI along with all other Creditors of PREPA entitled to receive CVI pursuant to the Plan.

## ARTICLE V

## PROVISIONS FOR TREATMENT OF
## NON-SETTLING BONDHOLDER OR NON-SETTLING
## MONOLINE CLAIMS (CLASS 2)

### A.   <u>Treatment of Class 2 Claims</u>

On the Effective Date, each Non-Settling Bondholder or Non-Settling Monoline that is a Holder of an Allowed PREPA Revenue Bond Claim shall receive, in full consideration, satisfaction, release, and exchange of such Holder's Allowed PREPA Revenue Bond Claim, up to the full amount of such Holder's Allowed Claim, unless such Holder agrees to a less favorable treatment, in the following order:

(i)   such Holder's Pro Rata Share of the amounts in the Sinking Fund, subject to the terms of the Trust Agreement;

(ii)   if the Court determines the Bond Trustee has an Allowed Secured Claim in connection with the Amended Lien & Recourse Challenge, the lesser of (A) such Holder's Pro Rata Share of Series B Bonds in the face amount equal to the value of the Bond Collateral (as determined in connection with the Confirmation Hearing or any other appropriate proceeding), if any, <u>minus</u> the amount distributed to such Holder pursuant to the immediately preceding clause (i), and (B) such Holder's Pro Rata Share of the Series B Bonds available after the distributions of Series B Bonds are made pursuant to Article IV.A(ii);

(iii)   with respect to such Holder's Deficiency Claim that is a Remaining Claim, if any, after the collective distributions are made pursuant to the immediately preceding clauses (i) and (ii), such Holder's Pro Rata Share of the General Unsecured Claim Recovery; and

(iv)   if the Non-Settling CVI Conditions are met, each Holder shall receive, based on the amount of principal and interest accrued and unpaid through the Petition Date with respect to such Holder's PREPA Revenue Bonds <u>minus</u> the Cash distributions made to such Holder pursuant to the preceding clause (i) (the "<u>Remaining Disallowed Non-Settling Claim</u>"), such Holder's Pro Rata Share of CVI along with all other Creditors of PREPA entitled to receive CVI pursuant to the Plan.

33

# ARTICLE VI

## PROVISIONS FOR TREATMENT OF
## PENSION CLAIM (CLASS 3)

**A.**    <u>**Treatment of Class 3 Claims**</u>

From and after the Effective Date, in full consideration, satisfaction, release, and exchange of the Pension Claim held by PREPA ERS, Reorganized PREPA shall pay to the PREPA PayGo Trust, for the benefit of PREPA ERS, the amounts described in Article XXVI.B, sufficient to satisfy of Participants' claims against PREPA ERS to the extent described in this Article VI.

1.    <u>**Reimbursement of Benefit Payments by PREPA ERS to PREPA ERS Participants**</u>

a)    The PREPA PayGo Trust shall reimburse the PREPA ERS for retirement benefits paid and reasonable administrative costs (as determined by PREB to be subject to payment as part of the rate to be charged by PREPA to its customers) incurred in the prior Fiscal Year ending June 30; *provided*, that benefit payments for which PREPA ERS is entitled to reimbursement hereunder shall be limited to (i) benefits payable to any Participant who is a Retiree as of the Effective Date, without any further cost of living adjustments from and after the Effective Date, and (ii) benefits payable to Participants who are Active PREPA ERS Participants as of the Effective Date, (A) with benefit accruals frozen as of the Effective Date in the manner set forth in <u>**Schedule C**</u> hereto, and (B) not subject to any cost of living adjustments from and after the Effective Date.

b)    The contractual obligations of PREPA to PREPA ERS as of the Petition Date, including, without limitation, the obligation to pay employer contributions sufficient to fund benefits as set forth in the PREPA ERS Regulations, shall be rescinded or deemed rejected pursuant to section 365(a) of the Bankruptcy Code, and, other than the obligations set forth in this Article VI and Article XXVI.B, no further obligation of PREPA or Reorganized PREPA to PREPA ERS shall arise in connection with such rejection.

2.    <u>**Preemption**</u>

All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies that create, require, or enforce employee pension and other pension-related benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed Pension Claim hereunder, including any provisions that would prohibit the enrollment of Active PREPA ERS Participants and subsequently hired employees of PREPA in the defined contribution plan for Commonwealth employees under Act 106-2017 as set forth in Article XVIII, are preempted as inconsistent with PROMESA.

34

# ARTICLE VII

## PROVISIONS FOR TREATMENT OF
## FUEL LINE LOAN CLAIMS (CLASS 4)

**A.**   **Treatment of Class 4 Claims**

On the Effective Date, each Holder of an Allowed Fuel Line Loan Claim shall receive, unless such Holder agrees to a less favorable treatment, in full consideration, satisfaction, settlement, release, and exchange of such Holder's Allowed Fuel Line Loan Claim, up to the full amount of such Holder's Allowed Claim, in the following order:

(i)   Series A Bonds in the face amount equal to eighty-four percent (84.0%) of the amount of such Holder's Allowed Fuel Line Loan Claim; and

(ii)   with respect to such Holder's Remaining Claim after the collective distributions are made pursuant to the preceding clause (i), such Holder's Pro Rata Share of the Net Remaining New Bonds, if any, available for distribution to the Remaining Series B Bond Claims Pool.

# ARTICLE VIII

## PROVISIONS FOR TREATMENT OF
## NATIONAL INSURED BOND CLAIMS (CLASS 5)

**A.**   **Treatment of Class 5 Claims**

Subject to the terms and provisions of Article XX hereof, on the Effective Date, the National Insured Bond Claims shall be Allowed as set forth in Article XVIII.A herein, and shall receive, in full consideration, satisfaction, release, settlement, and exchange of the Allowed National Insured Bond Claims, unless National agrees to a less favorable treatment, Series B Bonds in the face amount equal to seventy-one and sixty-five one hundredths percent (71.65%) of the amount of the Allowed National Insured Bond Claims.

# ARTICLE IX

## PROVISIONS FOR TREATMENT OF
## NATIONAL REIMBURSEMENT CLAIM (CLASS 6)

**A.**   **Treatment of Class 6 Claims**

Subject to the approval of the settlement of the National Reimbursement Claim as set forth in Article XVIII.I of the Plan, on the Effective Date, National shall receive, in full consideration, satisfaction, release, settlement, and exchange of the Allowed National Reimbursement Claim, unless National agrees to a less favorable treatment, Series B Bonds in the face amount equal to twenty percent (20.0%) of the amount of the National Reimbursement Claim.  For the avoidance of doubt, if the National Reimbursement Claim is Allowed, it shall not be subject to Article XXVII.G.

35

# ARTICLE X

## PROVISIONS FOR TREATMENT OF
## GENERAL UNSECURED CLAIMS (CLASS 7)

**A.**    <u>Treatment of Class 7 Claims</u>

On the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive in full consideration, satisfaction, release, and exchange of such Holder's Allowed General Unsecured Claim, such Holder's Pro Rata Share of the General Unsecured Claim Recovery, up to the full amount of such Holder's Allowed Claim, unless such Holder agrees to a less favorable treatment.

**B.**    <u>Election to be Treated as a Convenience Claim</u>

Notwithstanding the provisions of Article X.A of the Plan, any Holder of (i) an Allowed General Unsecured Claim, other than a General Unsecured Claim that is a component of a larger General Unsecured Claim, portions of which may be held by such or any other Holder of an Allowed Claim, whose Allowed General Unsecured Claim is more than ten thousand dollars ($10,000), and who elects to reduce the amount of such Allowed General Unsecured Claim to ten thousand dollars ($10,000) and (ii) multiple Allowed General Unsecured Claims that are greater than twenty thousand dollars ($20,000) in the aggregate, and who elects to reduce the aggregate amount of such Allowed General Unsecured Claims to twenty thousand dollars ($20.000) shall, at such Holder's option, be entitled to receive, based on such Allowed General Unsecured Claim as so reduced, distributions pursuant to Article XVI hereof. Such election must be made on the Ballot and be received by the Oversight Board on or prior to the Ballot Date. Any election made after the Ballot Date shall not be binding upon PREPA unless the Ballot Date is expressly waived, in writing, by the Oversight Board; *provided*, *however*, that, under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

# ARTICLE XI

## PROVISIONS FOR TREATMENT OF
## VITOL CLAIM (CLASS 8)

**A.**    <u>Treatment of Class 8 Claims</u>

On the Effective Date, the Holder of the Allowed Vitol Claim shall receive in full consideration, satisfaction, release, settlement, and exchange of such Holder's Allowed Vitol Claim, fifty percent (50.0%) of the Holder's Pro Rata Share of the General Unsecured Claim Recovery, up to the amount equal to fifty percent (50.0%) of such Holder's Allowed Claim, unless such Holder agrees to a less favorable treatment.

36

## ARTICLE XII

## PROVISIONS FOR TREATMENT OF
## ASSURED INSURED INTEREST RATE SWAPS CLAIMS (CLASS 9)

**A.**     **Treatment of Class 9 Claims**

On the Effective Date, each Holder of an Allowed Assured Insured Interest Rate Swaps Claim shall receive in full consideration, satisfaction, release, and exchange of such Holder's Allowed Assured Insured Interest Rate Swaps Claim, such Holder's Pro Rata Share of the Assured Insured Interest Rate Swaps Claim Recovery, up to the full amount of such Holder's Allowed Claim, unless such Holder agrees to a less favorable treatment.

## ARTICLE XIII

## PROVISIONS FOR TREATMENT OF
## ORDINARY COURSE CUSTOMER CLAIMS (CLASS 10)

**A.**     **Treatment of Class 10 Claims**

On the Effective Date, each Holder of an Allowed Ordinary Course Customer Claim shall receive in full consideration, satisfaction, release, and exchange of such Holder's Allowed Ordinary Course Customer Claim, satisfaction of such Holder's Claim in the ordinary course of business, including that PREPA and Reorganized PREPA, as applicable, may retain any customer deposits in the ordinary course of business.

## ARTICLE XIV

## PROVISIONS FOR TREATMENT OF
## EMINENT DOMAIN/INVERSE CONDEMNATION CLAIMS (CLASS 11)

**A.**     **Treatment of Class 11 Claims**

From and after the Effective Date, (a) to the extent not modified prior thereto, the automatic stay extant pursuant to section 362 of the Bankruptcy Code and the discharge injunction pursuant to Article XXVII hereof shall be deemed modified in order to permit the Holder of an Eminent Domain/Inverse Condemnation Claim to (i) liquidate such Eminent Domain/Inverse Condemnation Claim in such Holder's Eminent Domain Proceeding and (ii) cause the Clerk of the Court of First Instance to distribute to such Holder the amount of monies on deposit with the Court of First Instance with respect to the condemned property.  Upon the occurrence of a Final Order determining the validity and amount of just compensation attributable to an Eminent Domain/Inverse Condemnation Claim, the Holder of an Allowed Eminent Domain/Inverse Condemnation Claim shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such Holder's unpaid balance of its Allowed Eminent Domain/Inverse Condemnation Claim, such Holder's Pro Rata Share of the General Unsecured Claim Recovery.  If the Court declines in the Confirmation Order to confirm the Plan due to such treatment, the treatment shall automatically convert, without further action from the Debtor, such that such Holders will receive 100% of the unpaid balance of their Eminent Domain /Inverse Condemnation Claims unless such

37

Holder agrees to a less favorable treatment, unless (a) the Debtor appeals the Title III Court's denial of the Plan's treatment of such Claims as General Unsecured Claims, (b) such appeal is ultimately successful, and (c) a Final Order is entered holding that Allowed Eminent Domain/Inverse Condemnation Claims may be Impaired.

## ARTICLE XV

## PROVISIONS FOR TREATMENT OF
## FEDERAL CLAIMS (CLASS 12)

**A.**   **Treatment of Class 12 Claims**

On the Effective Date, each Holder of an Allowed Federal Claim shall receive in full consideration, satisfaction, release, and exchange of such Holder's Allowed Federal Claim, the greater of (i) such Holder's Pro Rata Share of the General Unsecured Claim Recovery, up to the full amount of such Holder's Allowed Claim, and (ii) the treatment of such Allowed Federal Claims as required by section 304(h) of PROMESA, unless such Holder agrees to a less favorable treatment.

## ARTICLE XVI

## PROVISIONS FOR TREATMENT OF
## CONVENIENCE CLAIMS (CLASS 13)

**A.**   **Treatment of Class 13 Claims**

On the later of the Effective Date and the date such Allowed Convenience Claim becomes an Allowed Claim, or as soon thereafter as possible, the GUC Trustee shall pay to each Holder of an Allowed Convenience Claim, in Cash, from Reorganized PREPA, the full amount of such Allowed Convenience Claim, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Convenience Claim, unless such Holder agrees to a less favorable treatment.

## ARTICLE XVII

## PROVISIONS FOR TREATMENT OF
## SECTION 510(b) SUBORDINATED CLAIMS (CLASS 14)

**A.**   **Treatment of Class 14 Claims**

Section 510(b) Subordinated Claims shall not receive a distribution pursuant to the Plan and each Holder of an Allowed Section 510(b) Subordinated Claim shall be deemed to have rejected the Plan with respect to such Section 510(b) Subordinated Claims.

# ARTICLE XVIII

## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

**A.      Allowance of Claims**

For purposes of confirmation and consummation of the Plan and distributions to be made hereunder, unless otherwise Allowed pursuant to an order of the Title III Court, on the Effective Date: (a) the Fuel Line Loan Claims shall be deemed Allowed in the aggregate amount of $700,887,093.58, and not subject to challenge, objection, or revocation; (b) the Vitol Claims shall be deemed Allowed in the aggregate amount of $41,457,382.88; (c) the National Insured Bond Claims shall be Allowed in the aggregate amount equal to $836,145,928.13; (d) subject to the approval of the settlement between the Oversight Board and National with respect to the National Reimbursement Claim, the National Reimbursement Claim shall be Allowed in the aggregate amount equal to the payments made by National after the Petition Date and, as they may continue to accrue up to, but not including, the Effective Date to holders of the National Insured Bonds on account of interest accrued on such bonds; (e) each PREPA Revenue Bond Claim held by a Settling Bondholder shall be deemed Allowed in the aggregate amount equal to the principal amount of the PREPA Revenue Bonds held by such Holder as of the Settlement Offer Deadline plus interest accrued and unpaid on such PREPA Revenue Bonds through the Petition Date, which shall be in the aggregate amount of $74,900,593.18; and (f) each Assured Insured Interest Rate Swaps Claim shall be Allowed in an amount to be agreed upon between the Oversight Board and the Holder of such Claim; *provided*, that, if no agreement can be reached on the amount of the Assured Insured Interest Rate Swaps Claim to be Allowed, the Oversight Board and Holder of the Claim shall submit such dispute to the Title III Court (or other Person or Entity upon mutual agreement of the Oversight Board and Holder) to determine the amount of such Claim to be Allowed, which amount shall be determined in accordance with applicable law.

**B.      Releases, Injunction, and Exculpation**

The releases, injunctions, and exculpations provided in Article XXVII herein are integral to obtaining the value provided hereunder and constitute an essential component of the compromises reached and are not severable from the other provisions of this Plan.

**C.      Dismissal of Fuel Line Lender Priority Action**

No later than ten (10) days after the Effective Date, the Fuel Line Lender PSA Creditors shall file all appropriate notices, pleadings, and motions necessary to dismiss, with prejudice, the Fuel Line Lender Priority Action.

**D.      Effectuating Documents; Further Transactions**

On and after the Effective Date, PREPA, and the officers and members of the boards of directors and managers thereof, are authorized to and shall issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, and any other securities issued pursuant to the Plan in the name of and on behalf of PREPA, notwithstanding any requirements of Commonwealth law, regulations, or

39

executive orders, and without the need for any approvals, authorizations, or consents except for those expressly required under the Plan or otherwise required by PROMESA.

**E.     Enrollment of Active PREPA ERS Participants in Act 106 Plan**

As of the Effective Date, new defined contribution accounts in the retirement plan established for Commonwealth employees under Act 106-2017 will be established for all Active PREPA ERS Participants (or at the sole discretion of the Oversight Board, other defined contribution accounts that will be established by Reorganized PREPA on or as soon as practicable after the Effective Date), with minimum employee contributions of eight and one-half percent (8.5%) of their payroll in accordance with the contribution requirements of Act 106-2017. After the Effective Date, newly hired employees of Reorganized PREPA will also participate in the same defined contribution program. To the extent any provisions of Act 106-2017, Act 120-2018, or Act 17-2019 are inconsistent with such enrollment, such provisions are hereby preempted. AAFAF shall have consultation rights with respect to the enrollment of Active PREPA ERS Participants in the retirement plan established for Commonwealth employees under Act 106-2017 pursuant to this Article XVIII.E

**F.     Legacy Charge**

On or prior to the Effective Date, the Legacy Charge shall be implemented by the Reorganized Debtor or any qualified operator of the transmission and distribution system (including LUMA Energy), and approved by PREB, as detailed in **Schedule B** hereto and required by the New Master Indenture; *provided*, *however*, that, Reorganized PREPA and/or PREB, with the approval of the Oversight Board while in existence, can modify the fixed fee and volumetric charge that comprise the Legacy Charge in an economically neutral manner as set forth in the New Master Indenture, in structure and amounts that do not delay or extend the respective expected repayment date and expected weighted average life of the Series A Bonds and the Series B Bonds, and otherwise that are reasonably acceptable to the Required Fuel Line Lenders, and which shall not decrease the projected Revenues attributable to the Legacy Charge  as of the date of the amendment to the Legacy Charge (the "Amendment Test"). The Oversight Board as representative of the Debtor and/or Reorganized Debtor is authorized to take all actions necessary to enter into, implement, and enforce the Legacy Charge, and amendments thereto in accordance with this Article XVIII.F.

As required by the Plan, consistent with the PREPA Fiscal Plan, mandated by 11 U.S.C. § 1142(b) and the Confirmation Order, PREB shall approve and implement the Legacy Charge as required by §§ 6.3(p) and (q) of Act 17-2019 and the New Master Indenture (subject to its right, in accordance with the Amendment Test, to modify the fixed fee and volumetric charge that comprise the Legacy Charge in a neutral economic manner), until the New Bonds, Refunding Bonds (if any), and CVI are defeased in full or have expired in accordance with their terms and shall refrain from taking any actions that will frustrate, diminish, or otherwise impair the value of the Legacy Charge or PREPA's ability to collect the Legacy Charge.

**G.     PREPA Operational Restructuring**

Prior to, on, or as soon as practicable following the Effective Date, the Debtor and the Reorganized Debtor, as applicable, shall be Operationally Restructured, including that PREPA shall, as required by the Fiscal Plan and applicable law:

(a)      take all necessary actions to (i) complete the competitive procurement process for substantially all of PREPA's generation assets and (ii) complete ongoing efforts to transfer operation and maintenance of existing PREPA generation assets to professional and independent private operators; and

(b)      maintain operation and maintenance contracts with private operators for the transmission and distribution system; *provided*, that such contracts will not adversely impact the tax exemption on any outstanding Reorganized PREPA tax-exempt New Bonds, Refunding Bonds, or Additional Bonds.

## H.     Purchase and Sale of the Administrative Expense Bonds

On the Effective Date, in order to provide for payment of the Allowed Administrative Expense Claims, the Commonwealth shall purchase, and Reorganized PREPA shall sell, assign, transfer, and convey to the Commonwealth the Administrative Expense Bonds for Cash in an aggregate purchase price equal to the sum of the Administrative Expense Bonds Amount.

## I.     Settlement of the National Claims

Pursuant to sections 105(a) and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, the provisions of the National Settlement shall constitute a good-faith compromise and settlement among PREPA, the Oversight Board, and National of all Claims, Causes of Action, interests, and controversies among such parties, including all potential Claims, Causes of Action, interests, and controversies between PREPA, the Oversight Board, and National, and are in consideration of the value provided to PREPA by National pursuant to the National Settlement. The Plan shall be deemed a motion to approve the National Settlement as a good-faith compromise and settlement of all of the Claims, interests, Causes of Action and controversies described in the foregoing sentence pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, and entry of the Confirmation Order shall constitute the Title III Court's approval of the National Settlement, as well as a finding by the Title III Court that the National Settlement is in the best interests of PREPA, the Oversight Board, and Holders of Claims and is fair, equitable, and reasonable.

Pursuant to sections 105(a) and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, the treatment of the National Reimbursement Claim as set forth in this Plan is expressly conditioned upon the approval and effectiveness of the compromise and settlement between the Oversight Board, on behalf of PREPA, and National, with respect the National Reimbursement Claim, pursuant to which the National Reimbursement Claim is Allowed as set forth in Article XVIII.A of the Plan and shall receive the treatment described in Article IX.A of the Plan. If the Title III Court does not approve the settlement with National or determines the treatment of the National Reimbursement Claim does not comply with PROMESA for reasons including, without limitation, the Allowability and/or treatment of the National Reimbursement Claim, or the Title III Court finds the treatment of the National Reimbursement Claim constitutes unfair discrimination,

the settlement and the treatment of National's Claims shall, without further action, convert to a settlement of National's Claims that eliminates the obligation to issue Series B Bonds on account of the National Reimbursement Claim and all payments for debt service arising from, relating to, or on account of the National Reimbursement Claim; *provided*, that, in such circumstance, National shall have the option to forego all consideration under the National PSA, including the fees and expenses set forth in Article II.D.2, and, in exchange, receive the same treatment as another settling Class of Holders of PREPA Revenue Bonds Claims, so long as the settlement with such Class whose recovery National would receive was reached prior to the earlier to occur of (i) any substantive ruling on the claims and counterclaims asserted in the Amended Lien & Recourse Challenge that Holders of PREPA Revenue Bonds are secured by Revenues outside of the Sinking Fund, and (ii) an indication or a determination, either oral or written, at a hearing or otherwise, by the Title III Court that the Holders of PREPA Revenue Bonds are secured by Revenues outside of the Sinking Fund.

## ARTICLE XIX

## PROVISIONS REGARDING THE ISSUANCE AND DISTRIBUTION OF THE NEW BONDS

### A.  Issuance and Distribution

1.  New Bonds

The New Bonds shall be issued pursuant to the terms and provisions of the New Master Indenture and shall be distributed as set forth in the Plan.  The definitive documentation governing the New Bonds generally shall provide for the terms set forth herein, subject to the results of any election permitted by the Plan and other adjustments permitted or required by the Plan.

2.  CVI

The CVI will be issued pursuant to the terms and provisions of the New Master Indenture and shall be distributed as set forth in this Plan.  The definitive documentation governing the CVI generally shall provide for the terms set forth in the Plan.

### B.  General Terms

1.  New Bonds

On the Effective Date, Reorganized PREPA shall issue two series of New Bonds:  Series A Bonds and Series B Bonds, which Series B Bonds shall consist of two subseries.  The maturities, interest rates, and amortization schedules for the New Bonds, assuming the maximum original principal amount of New Bonds authorized to be issued pursuant to the Plan (approximately $5.68 billion) is issued, are attached hereto as **Schedule E**.

a)  *Series A Bonds*

Series A Bonds shall be issued in a principal amount sufficient to comply with the terms of the Fuel Line Lender PSA and Article VII hereof, which shall be approximately $650,000,000.

42

They shall have a final stated maturity of fifteen (15) years from the Effective Date, which final stated maturity date may be modified based on agreed upon covenants in the New Master Indenture and relating to the Legacy Charge, which final stated maturity date shall be acceptable to the Required Fuel Line Lenders, with an expected repayment of five (5) years from the Effective Date and an expected weighted average life of 2.89 years from the Effective Date, in each case based upon 2022 Fiscal Plan Projections. The Series A Bonds shall be issued on the Effective Date but shall accrue interest from the deemed issuance date of December 1, 2022 for purposes of the calculation of accrued interest; *provided*, *however*, the period for accrual of interest prior to the Effective Date shall not exceed one (1) year and that the interest accrued prior to the Effective Date shall be payable upon the Effective Date in the form of Series A Bonds or Cash, at the Oversight Board's sole discretion. From and after the stated maturity date, the Series A Bonds shall no longer accrue interest, although principal and accrued but unpaid interest outstanding shall continue to be paid. Series A Bonds shall bear interest at a rate of six percent (6.00%) per annum payable semi-annually in Cash.

      b)    *Series B Bonds*

The Series B Bonds shall be issued in a principal amount equal to the aggregate principal amount of New Bonds minus the aggregate principal amount of Series A Bonds. Series B Bonds shall have a final stated maturity of fifty (50) years from the Effective Date, with an expected repayment of thirty-five (35) years from the Effective Date based upon 2022 Fiscal Plan Projections, which is subject to change based on load projections in subsequent PREPA Fiscal Plans, as described further in the Disclosure Statement filed contemporaneously herewith. The Series B Bonds shall be dated as of the Effective Date. The Series B Bonds shall bear interest at rates that range from six percent (6.00%) per annum to six and seventy-five one-hundredths percent (6.75%) per annum. From and after the stated maturity date, the Series B Bonds shall no longer accrue interest, although principal outstanding shall continue to be paid.

Series B Bonds shall be issued in two subseries: Series B-1 Bonds; and Series B-2 Bonds. The Series B-1 Bonds will be current interest bonds and shall bear interest at a rate of six percent (6.00%) per annum payable semi-annually, with an expected repayment of thirty-four (34) years from the Effective Date and an expected weighted average life of 21.81 years from the Effective Date**,** in each case based upon 2022 Fiscal Plan Projections.

The Series B-1 Bonds have priority as to payments of principal over the Series B-2 Bonds. The Series B-1 Bonds shall be issued in the principal amount of approximately $4.63 billion.

The Series B-2 Bonds will be convertible capital appreciation bonds and shall bear interest at a rate of six and seventy-five one-hundredths percent (6.75%) per annum, accreting annually until July 1, 2028, at which point the Series B-2 Bonds shall convert to current interest bonds with interest payable semi-annually, with an expected repayment of thirty-five (35) years from the Effective Date, and expected weighted average life of 34.51 years from the Effective Date, in each case based upon 2022 Fiscal Plan Projections. The Series B-2 Bonds shall be issued in an amount equal to the Administrative Expense Bonds Amount with a maturity value of approximately $557,000,000 (with an assumed Effective Date of July 1, 2023 and an original principal value of approximately $400,000,000).

2.      <u>CVI</u>

On the Effective Date, Reorganized PREPA shall issue the CVI in the amount of the CVI Notional Amount with a zero percent (0.00%) coupon and a final maturity date of the CVI Maturity Date. Payments shall be made on the CVI only after the Series B Bond Defeasance Date has occurred, so long as the Series B Bond Defeasance Date occurs prior to the CVI Maturity Date. If the Series B Bond Defeasance Date occurs prior to the CVI Maturity Date, the CVI shall be payable from that portion of Net Revenues constituting the Remaining Legacy Charge Revenues deposited to the credit of the Debt Service Fund in accordance with the Payment Waterfall until the earlier of (a) the date on which the CVI Notional Amount has been paid in full and (b) the CVI Maturity Date.

On the CVI Maturity Date, any amount of principal outstanding on account of the CVI shall no longer be due and payable.

The CVI shall not carry any default rate of interest. The CVI will be issued in denominations to be specified in the New Master Indenture.

**C.      Excess New Bonds**

On the Effective Date, Reorganized PREPA shall, in its sole discretion, issue some, all, or none of the Excess New Bonds to the PREPA PayGo Trust. Any amount of Excess New Bonds that are available for distribution to the PREPA PayGo Trust, but that Reorganized PREPA determines to not issue to the PREPA PayGo Trust, shall be deemed to have not been issued, and the amount of New Bonds issued pursuant to the Plan shall be reduced on dollar-for-dollars basis by the aggregate principal amount of such unissued Excess New Bonds.

**D.      Payment Provisions**

Interest on the New Bonds shall be paid on the next January 1 or July 1 date following the Effective Date and each January 1 and July 1 thereafter until the earlier of the New Bonds (a) the respective stated maturity dates of the New Bonds or (b) their payment or satisfaction in full in accordance with their respective terms.

All unpaid principal on the New Bonds not paid when due, whether at or prior to final scheduled maturity date, shall remain outstanding and due and payable until paid in full. Interest shall not accrue on any outstanding obligations under the New Bonds after the New Bonds' respective stated maturity dates; only unpaid principal and unpaid interest accrued through the stated maturity shall be payable following the respective final stated maturity dates. Interest on the New Bonds will be computed on the basis of a 360-day year consisting of twelve 30-day months. The New Bonds shall not carry any default rate of interest.

**E.      Security**

1.      <u>New Bonds</u>

The New Bonds shall be secured by Reorganized PREPA's Net Revenues up to an amount equal to the Legacy Charge Revenues and the right to receive such Net Revenues up to an amount

equal to the Legacy Charge Revenues, as more particularly described in the New Master Indenture. For the avoidance of doubt, (i) the New Bonds shall not have a priority of payment senior to that of the Additional Bonds, provided, however, that the Revenues securing any Additional Bonds exclude during the applicable periods an amount up to the Legacy Charge Revenues and Remaining Legacy Charge Revenues, as applicable, and (ii) the Lien securing the New Bonds is not limited to the Net Revenues deposited in the Debt Service Fund.

        2.     <u>CVI</u>

The CVI shall be secured by Reorganized PREPA's Remaining Net Revenues up to an amount equal to the Remaining Legacy Charge Revenues and the right to receive such Remaining Net Revenues up to an amount equal to the Remaining Legacy Charge Revenues, as more particularly described in the New Master Indenture.

        3.     <u>Additional Bonds</u>

Reorganized PREPA may issue Additional Bonds payable from Revenues and the right to receive such Revenues. For the avoidance of doubt, the New Bonds shall not have a priority of payment senior to that of the Additional Bonds; *provided, however*, that the Revenues securing any Additional Bonds exclude during the applicable periods an amount up to the exclude during the applicable periods up to an amount Legacy Charge Revenues and Remaining Legacy Charge Revenues, as applicable. The Additional Bonds shall be subject to an additional bonds test, which shall be reasonably acceptable to the Oversight Board, the Required Fuel Line Lenders, and National, and documented in the New Master Indenture.

**F.**     **<u>Call Provisions</u>**

        1.     <u>New Bonds</u>

The New Bonds are subject to redemption prior to maturity, at the election or direction of Reorganized PREPA, in whole or in part (and, if in part, in an authorized denomination provided for under the New Master Indenture), on any date that is on or after ten (10) years following the Effective Date, upon thirty (30) days' prior written notice, at a redemption price equal to the principal amount thereof, plus accrued interest to the redemption date.

If less than all the New Bonds of a particular series are called for redemption prior to maturity, Reorganized PREPA will select the maturity or maturities of such series of the New Bonds to be redeemed, and DTC, on behalf of the New Master Trustee, will select the New Bonds within the same maturity of such series to be redeemed by means of a random lottery.

        2.     <u>CVI</u>

The CVI is subject to redemption prior to maturity, at the election or direction of Reorganized PREPA, in whole or in part (and, if in part, in an authorized denomination provided for under the New Master Indenture), on any date that is on or after ten (10) years following the Effective Date, upon thirty (30) days' prior written notice. The redemption price shall be equal to the CVI Redemption Price.

## G.   Accounts and Payment Waterfall

All Revenues shall be deposited in the "General Fund" held by Reorganized PREPA.  On the first Business Day of each month, Reorganized PREPA shall apply or transfer, as applicable, Revenues in the amounts and in the order of priority set forth in the New Master Indenture (the "Payment Waterfall"); *provided*, that the Payment Waterfall set forth in the New Master Indenture shall provide that Revenues will be (i) first, applied by Reorganized PREPA to the payment of Operating Expenses, (ii) second, transferred by Reorganized PREPA to the New Master Trustee for the payment of the New Master Trustee's fees and expenses not to exceed one hundred thousand dollars ($100,000) per year, and (iii) third, transferred to the New Master Trustee for deposit to the credit of the Debt Service Fund in an amount sufficient to pay debt service on all outstanding New Bonds, up to the amount of the Legacy Charge Revenues and, from and after the Series B Bond Defeasance Date and until the CVI Maturity Date, up to the amount of the Remaining Legacy Charge Revenues.  Any amounts remaining after such transfers and deposits will be used by Reorganized PREPA as set forth in the New Master Indenture.

For the avoidance of doubt, (i) the New Bonds shall not have a priority of payment senior to that of the Additional Bonds; *provided, however*, that the Revenues securing any Additional Bonds exclude during the applicable periods an amount up to the Legacy Charge Revenues and Remaining Legacy Charge Revenues, as applicable, and (ii) the Payment Waterfall in the New Master Indenture will reflect the application and transfer of Revenues pledged to the payment of debt service on Additional Bonds.

## H.   Key Covenants for New Bonds

The Definitive Documents, including the New Master Indenture and the Confirmation Order, shall contain customary terms, conditions, and covenants, including, without limitation, covenants by Reorganized PREPA that it shall, among other things:

1.      make reasonable best efforts to (a) continue to levy and collect rates, fees, and charges, including, but not limited to, the Legacy Charge and the Remaining Legacy Charge and (b) deposit Net Revenues collected from such rates, fees, and charges into the Debt Service Fund in accordance with the Payment Waterfall;

2.      take no action that would (a) limit or alter the rights vested in PREPA or Reorganized PREPA in accordance with the Plan and the Confirmation Order to fulfill the terms of any agreements with the holders of the New Bonds or the CVI or (b) limit or impair the rights and remedies of the holders of the New Bonds or the CVI;

3.      take all reasonable actions to cause the Series A Bonds and Series B Bonds to be tax-exempt to the extent permitted by law (including seeking any appropriate no-action, clearance determination, or favorable ruling from the IRS);

4.      do and perform all acts and things permitted by law and reasonably necessary or desirable to ensure that interest paid to holders of any federally tax-exempt New Bonds shall be and remain excludable from gross income for federal income tax purposes;

5.  not create any Lien, pledge, or charge on the Net Revenues up to the amount of the Legacy Charge Revenues, or right to receive the same, except in connection with issuance of Additional Bonds as permitted under the New Master Indenture; and

6.  not issue any Series A Bonds to any parties other than to be issued pursuant to this Plan and the Fuel Line Lender PSA.

## I.  **Application of Moneys in Debt Service Fund**

From and after the Effective Date, until the New Bonds, Refunding Bonds, and/or CVI have been paid, satisfied in full in accordance with their terms, or otherwise no longer deemed to be outstanding under the New Master Indenture, Reorganized PREPA shall deposit, in accordance with the Payment Waterfall, Net Revenues up to the amount of the Legacy Charge Revenues with respect to the New Bonds and up to the amount of the Remaining Legacy Charge Revenues with respect to the CVI to the credit of the Debt Service Fund.

The monies deposited into the Debt Service Fund shall be applied, to the extent available, as follows:

1.  New Bonds

-   *First*, to the payment of stated interest due and payable on the New Bonds;
-   *Second*, to the payment of principal on the Series A Bonds and any Refunding Bonds issued to refund the Series A Bonds until irrevocably paid in full in Cash or otherwise deemed not to be outstanding in accordance with the terms of the New Master Indenture; and
-   *Third*, to the payment of principal on the Series B Bonds and any Refunding Bonds (other than the Refunding Bonds described in *Second* above) until irrevocably paid in full in Cash or otherwise deemed not to be outstanding in accordance with the terms of the New Master Indenture.

2.  CVI

-   *Then*, to the payment of the CVI Notional Amount.

## J.  **Interest Rate Covenant**

Until the earlier of repayment of the Series A Bonds and the Series B Bonds or the final maturity of the Series A Bonds and the Series B Bonds, if, in any given year, the Net Revenues up to the amount of the Legacy Charge Revenues deposited in the Debt Service Fund are insufficient to pay the interest due and owing on the New Bonds in that Fiscal Year, Reorganized PREPA shall (and absent Reorganized PREPA's action, the New Master Trustee shall) (a) exercise its powers to the fullest extent of the law to implement an increase in the Legacy Charge sufficient to repay such interest due and payable on the New Bonds in the succeeding Fiscal Year and/or (b) initiate a rate case before PREB or any other proceeding to compel PREB to implement an increase in the Legacy Charge sufficient to pay such interest due and payable on the New Bonds in the succeeding

Fiscal Year (the "Interest Rate Covenant"). The New Master Trustee shall have the right to compel specific performance of the Interest Rate Covenant.

**K.    No Rights of Acceleration**

The New Bonds and the CVI shall not be subject to acceleration other than an acceleration of the New Bonds in connection with an insolvency proceeding (including under Title III of PROMESA).

**L.    Limited Default**

1.    New Bonds

There shall be no event of default on the New Bonds (prior to the stated final maturity date of the Series A Bonds, solely with respect to the Series A Bonds, and generally with respect to the Series B Bonds) for failure to pay scheduled debt service, so long as Reorganized PREPA (a) charges and employs its reasonable best efforts to (i) levy the Legacy Charge, (ii) collect Revenues generated by the Legacy Charge, and (iii) deposit the full amount of Net Revenues up to the amount of the Legacy Charge Revenues into the Debt Service Fund after providing for distributions made in accordance with the Payment Waterfall, and (b) complies with the Interest Rate Covenant.

2.    CVI

There shall be no event of default on the CVI so long as Reorganized PREPA takes reasonable actions to collect Revenues generated by the Remaining Legacy Charge and deposits the full amount of Net Revenues up to the amount of the Remaining Legacy Charge Revenues into the Debt Service Fund.

**M.    Limited Remedies**

Upon the occurrence of an event of default on the New Bonds or the CVI, the New Master Trustee's sole remedies shall be to: (a) seek enforcement of Reorganized PREPA's obligation to take reasonable measures to levy rates, fees, and charges, including, but not limited to, the Legacy Charge and the Remaining Legacy Charge and collect Revenues generated by the Legacy Charge and Remaining Legacy Charge and deposit Net Revenues up to the amount of the Legacy Charge Revenues with respect to the New Bonds and up to the amount of the Remaining Legacy Charge Revenues with respect to the CVI into the Debt Service Fund in accordance with the Payment Waterfall; and/or (b) prior to the Series A Bond Defeasance Date or the earlier of the Series B Bond Defeasance Date or Series B Bonds final maturity, as applicable, at the request of twenty-five percent (25.0%) or more of the Series A Bonds or the Series B Bonds, as applicable, enforce the Interest Rate Covenant. All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies that provide the "Right to Receivership Upon Default," codified at 22 L.P.R.A. § 207, are preempted as inconsistent with PROMESA. For

48

the avoidance of doubt, the Lien securing the New Bonds is not limited to the Net Revenues deposited in the Debt Service Fund.

**N.     Additional Bonds and Refunding Bonds**

Reorganized PREPA may issue Refunding Bonds to refund, refinance, or defease outstanding New Bonds authorized under the New Master Indenture. Such Refunding Bonds shall be secured by Net Revenues up to the amount of the Legacy Charge Revenues as more specifically set forth in the New Master Indenture.

Reorganized PREPA may issue Additional Bonds for any lawful purpose in accordance with the additional bonds test and the other terms of the New Master Indenture. Such Additional Bonds may be secured by Revenues as more specifically set forth in the New Master Indenture; *provided*, that the Revenues securing any such Additional Bonds exclude during the applicable periods an amount up to Legacy Charge Revenues and Remaining Legacy Charge Revenues, as applicable, while the New Bonds, any Refunding Bonds, or the CVI remain outstanding. For the avoidance of doubt, the New Bonds shall not have a priority of payment senior to that of the Additional Bonds; *provided*, *however*, that the Revenues securing any Additional Bonds exclude during the applicable periods an amount up to the Legacy Charge Revenues and Remaining Legacy Charge Revenues, as applicable.

**O.     Force Majeure**

1.     New Bonds

In the event of a federally-declared disaster as a result of a storm or other catastrophic event that disrupts Reorganized PREPA's operations such that Reorganized PREPA cannot collect Revenues necessary to cover Operating Expenses and deposit Net Revenues up to the amount of the Legacy Charge Revenues with respect to the New Bonds in accordance with the Payment Waterfall for a given Fiscal Year, Reorganized PREPA may elect, in its sole discretion, to defer up to two (2) consecutive semi-annual debt service payments.

For the avoidance of doubt, if Reorganized PREPA exercises such election, interest on the New Bonds will continue to accrue until paid. All deferred principal and interest on Series A Bonds impacted by such election shall be paid on or before the earlier of Series A Bonds final stated maturity date or the first scheduled payment date five (5) years after the end of the debt service deferral period. All deferred principal and interest on Series B Bonds impacted by such election shall be paid on or before the first scheduled payment date five (5) years after the end of the debt service deferral period. For the avoidance of doubt, the interest on the New Bonds that is deferred as a result of the force majeure election shall keep accruing even after the stated maturity of the Series B Bonds.

2.     CVI

In the event of a federally-declared disaster as a result of a storm or other catastrophic event that disrupts Reorganized PREPA's operations such that Reorganized PREPA cannot collect Revenues necessary to cover Operating Expenses and deposit Remaining Net Revenues up to the amount of the Remaining Legacy Charge Revenues with respect to the CVI into the Debt Service

49

Fund in accordance with the Payment Waterfall for a given Fiscal Year, Reorganized PREPA shall be under no obligation to make CVI payments for any shortfalls in Remaining Legacy Charge Revenues.

**P.    Direct Right of Action**

Pursuant to the New Master Indenture, and subject to such additional rights as provided therein, the New Master Trustee shall have a direct right of action to enforce the terms of the New Master Indenture, including, without limitation, with respect to funding deposits in the Debt Service Fund and seeking specific performance remedies for any breach of covenants in the New Master Indenture.

**Q.    New Master Indenture**

Provisions requiring the Legacy Charge to be added to bills issued by Reorganized PREPA to its customers to pay principal and interest on the New Bonds, make payments on the CVI, and governing, among other things, amendments of or supplements to the New Bonds, the CVI, or the New Master Indenture, events of default, remedies, priority of payments after default under the New Master Indenture, and defeasance under the New Master Indenture will be set forth in the New Master Indenture.  The New Master Indenture will be executed and delivered on or prior to the Effective Date.

**R.    Governing Law**

The New Master Indenture, and the New Bonds and CVI issued thereunder, as applicable, will be governed by the laws of the State of New York and, for certain limited matters, the laws of the Commonwealth, without giving effect to principles of conflicts of law.

**S.    Tax Exemption of the New Bonds**

In the event that the Government Parties obtain a ruling from the IRS (the "Determination") that certain features of the New Bonds will not prevent the issuance of all of the New Bonds on the Effective Date as tax-exempt obligations, any Holders of Claims or Entities receiving New Bonds pursuant to the Plan shall receive the benefit of such Determination in the form of tax-exempt New Bonds issued pursuant to the Plan with coupons for all maturities equal to the coupons on the tax-exempt New Bonds as set forth herein; *provided*, *however*, that such New Bonds shall be accompanied by the favorable opinion of Section 103 Bond Counsel that the interest, other than pre-issuance accrued interest, on such New Bonds is, in such counsel's opinion, excluded from gross income for purposes of U.S. federal income tax, Commonwealth income tax, and U.S. state and local income tax; *provided*, *further*, *however*, that, in the event that the Determination is obtained subsequent to the Effective Date, then the holders of the taxable New Bonds affected by such Determination (the "Invited Bonds") shall be invited to exchange such bonds for converted bonds (the "Exchange Offer") and, subject to the application of all reasonable expenses incurred by the Government Parties in connection with such Exchange Offer, the interest rate on the converted bonds shall be the same as the interest on Invited Bonds of the same type, interest rate, series and maturity; and, *provided*, *further*, that, such converted bonds shall be accompanied by the favorable opinion of Section 103 Bond Counsel that the interest, other than pre-issuance accrued interest, on such converted bonds, and on the Invited Bonds exchanged for such converted

bonds from the original date of delivery of such Invited Bonds so exchanged, is, in such counsel's opinion, excluded from gross income for purposes of U.S. federal income tax, Commonwealth income tax, and U.S. state and local income tax; and, *provided*, *further*, that, in the event that neither of the foregoing Determinations are obtained, the covenants to seek such Determinations shall terminate upon the earliest to occur of (1) within forty-five (45) days of the entry of the Confirmation Order, (2) notification by the IRS to the Commonwealth that IRS is unable to issue a favorable private letter ruling, closing agreement, or other type of IRS Determination with respect to the matters addressed by this subsection, and (3) the amendment of the New Master Indenture following receipt of a favorable Determination and consummation of an Exchange Offer.

**T.**     **CVIs Not Tax Exempt**

Any income received on account of the CVIs shall not be excluded from gross income for purposes of U.S. federal income tax, Commonwealth income tax, and U.S. state and local income tax.

## ARTICLE XX

## PROVISIONS REGARDING NATIONAL INSURED BONDS AND TREATMENT OF NATIONAL INSURED BOND CLAIMS

In the event that Classes 5 and 6 vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, and all National Insurance Policies and related agreements related to National Insured Bonds are in full force and effect, or have otherwise been fully performed by National, with no outstanding payment defaults by National with respect to such National Insured Bonds up to and including the Effective Date, then, notwithstanding any other provision of the Plan, on the Effective Date, Holders of Allowed National Insured Bond Claims shall receive the following treatments, which treatments shall be selected by National, in its sole and absolute discretion, at or prior to the Plan Supplement Deadline and be set forth on the National Bondholder Election Form; *provided*, *however*, that, for the avoidance of doubt, National Insured Bonds owned or held by National (by subrogation or otherwise) shall not be subject to the treatment elections set forth in this Article XX and, subject to the rights of the Bond Trustee, National shall receive the National Plan Consideration on account of such bonds; and, *provided*, *further*, that, subject to providing Holders of Allowed National Insured Bond Claims with the treatment or elections set forth in this Article XX and satisfying all such treatment or elections, National shall have all right, title, and interest in the National Plan Consideration and shall manage the National Plan Consideration in its sole and absolute discretion subject to and in accordance with all applicable laws and regulations; and, *provided*, *further*, that any calculations and/or payments to be made to a Holder based on, or in relation to, such Holder's Allowed National Insured Bond Claim pursuant to the options set forth in this Article XX will take into account any payments of principal and/or accrued interest already made to such Holder by National pursuant to the terms of the relevant National Insurance Policies, and such Holder shall not be compensated for any amounts already paid to such Holder pursuant to the terms of the relevant National Insurance Policies.

**A.**     <u>**National Commutation Treatment of National Insured Bond Claims**</u>

Each Holder of an Allowed National Insured Bond Claim shall have the option to elect on the National Bondholder Election Form to receive, on the Effective Date, the National Commutation Consideration, distributable by or at the direction of National, and, if elected, (i) the Holder thereof shall have no other or further rights under or with respect to the applicable National Insurance Policy or any National Trust or National Escrow Account, (ii) the Holder thereof shall not receive any payments from National under the National Insurance Policies on account of accrued and unpaid interest on and after, or, in the case of any capital appreciation bonds, the accreted value on and after, the Effective Date, and to the extent any accrued or accreted interest is paid to such Holder by National after such date, such amount shall be credited against the consideration such Holder, their successors, transferees, or assigns are otherwise entitled to receive as National Commutation Consideration, and (iii) National shall receive the National Plan Consideration distributable on account of the applicable Allowed National Insured Bond Claim. The National Insured Bonds of a Holder that timely and validly elects to receive the National Commutation Treatment or makes an improper election as described in Article XX.F hereof, shall be deemed cancelled on the Effective Date, and National's obligations under the applicable National Insurance Policies shall be fully and finally satisfied, released, and discharged.

**B.**     <u>**National Non-Commutation Treatment of National Insured Bond Claims**</u>

In the event that a Holder of an National Insured Bond Claim timely and validly elects on the National Bondholder Election Form to receive the National Non-Commutation Treatment in accordance with the provisions of Article XX.B and Article XX.F hereof, (i) National shall receive the National Plan Consideration distributable on account of the applicable Allowed National Insured Bond Claim, and (ii) such Holder shall receive one or more of the following treatments, at National's election, which election shall be exercised by National in its sole discretion at or prior to the Plan Supplement Deadline, and as detailed in the National Bondholder Election Form.

1.     <u>Custodial Trusts</u>

Such Holder of an National Insured Bond Claim shall (A) deposit, or be deemed to have deposited, among other things, such Holder's Pro Rata Share of the National Trust Consideration, the National Insured Bonds allocable to such electing Holder, and the related National Insurance Policies into the applicable National Trust, (B) be deemed to have received its Pro Rata Share of the National Trust Consideration and National Certificates in consideration therefor, and (C) have no recourse to National or the National Insurance Policies other than as provided for under the terms of the National Trust.

2.     <u>Escrow</u>

Such Holder of a National Insured Bond Claim shall deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the National Escrow Consideration in the National Escrow Account and such deposited National Escrow Consideration shall be held as security for National's obligations to the Holders of the National Insured Bonds whose National Escrow Consideration was deposited in the National Escrow Account under the National Insurance Policies.

3.      Payment of Accelerated Amounts

National shall receive the National Plan Consideration that would be otherwise allocable to such Holder of an Allowed National Insured Bond Claim and National shall fully and completely discharge its obligation to such Holder of an Allowed National Insured Bond Claim by paying on the Effective Date, in Cash, the amount thereof at the National Acceleration Price as of the date of payment.

4.      Alternative Treatment

The Oversight Board and National reserve the right to formulate an alternative election or implementation option with respect to the National Insured Bonds that is mutually acceptable to the Oversight Board and National, each in their respective sole discretion; *provided*, *however*, that any such alternative election or implementation option must be proposed, in writing, prior to the Plan Supplement Deadline.  Notwithstanding the foregoing, and for the avoidance of doubt, National may make different elections, with respect to different CUSIPs and different holders of National Insured Bonds.

**C.      Acceleration of National Insured Bonds**

Notwithstanding any other provision of the Plan, to the extent that there are no outstanding payment defaults by National with respect to National Insured Bonds up to and including the Effective Date, the payment of the principal of the National Insured Bonds shall be accelerated as of the Effective Date, and such National Insured Bonds shall be due and payable from and after the Effective Date at the National Acceleration Price of one hundred percent (100%) of the principal amount thereof plus interest accrued thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) to the date of payment.  National shall have the right to pay the National Acceleration Price with respect to the National Insured Bonds at any time, and the Holder of the National Insured Bonds and the trustee or fiscal agent (as applicable) shall be required to accept the same in satisfaction of National's obligations under the applicable National Insurance Policy with respect to such bonds, and, upon such payment, National's obligations under the applicable National Insurance Policy shall be fully satisfied and extinguished, notwithstanding any provision of the applicable National Insurance Policy or other documents related to the National Insured Bonds.  For the avoidance of doubt, notwithstanding such acceleration, there shall be no acceleration of any payment required to be made under any National Insurance Policy unless National elects, in its sole and absolute discretion, to make such payment(s) on an accelerated basis.

**D.      Assignment of Redemption Rights**

Notwithstanding any other provision of the Plan, to the extent permitted pursuant to applicable definitive documents and not inconsistent with the rights provided in accordance with the applicable National Insurance Policy, on the Effective Date, PREPA shall be deemed to have assigned to National any and all rights to redeem and call the National Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by National as if it were PREPA for such purpose.  Any amounts due in connection with any such redemption shall be equal to the lesser of the applicable redemption price and the National Acceleration Price.

### E.   Entitlement to Vote

Subject to the terms and provisions of the Disclosure Statement Order, (a) the solicitation of acceptances and rejections to the Plan by Holders of National Insured Bond Claims shall be made by the Oversight Board to National in accordance with the provisions of Section 301(c)(3) of PROMESA, applicable law and governing documents, and (b) the election to choose between the National Commutation Treatment as set forth in Article XX.A hereof and the National Non-Commutation Treatment as set forth in Article XX.B hereof shall be made by the beneficial Holders of the applicable National Insured Bonds on the National Bondholder Election Form; *provided*, *however*, that the form of the National Non-Commutation Treatment shall be selected by National in accordance with Article XX.B hereof.

### F.   Improper Election

If a Holder of an Allowed National Insured Bond Claim (1) fails to timely and validly elect the National Non-Commutation Treatment pursuant to Article XX.B hereof, or (2) submits an election for less than all of its National Insured Bond Claims in a particular class (in which case, such election shall be void and of no force or effect), such Holder shall be deemed to have elected to receive the National Commutation Treatment set forth in Article XX.A hereof with respect to such National Insured Bond Claims, to commute the applicable National Insurance Policies, to release and discharge National's obligations under such National Insurance Policies, and to receive distributions in accordance with Article XX.A hereof. In addition, the National Insured Bonds of a Holder of an Allowed National Insured Bond Claim that does not validly elect to receive the National Non-Commutation Treatment pursuant to clauses (1) or (2) above shall be deemed cancelled on the Effective Date, and National's obligations under the applicable National Insurance Policies shall be fully and finally satisfied, released, and discharged.

## ARTICLE XXI

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.   Rejection or Assumption of Executory Contracts and Unexpired Leases

Pursuant to Bankruptcy Code section 365(b)(2) and subject to the provisions of Article XXI.F and Article XXI.H hereof, all Executory Contracts and Unexpired Leases that exist between the Debtor and any Entity, and which have not expired by their own terms on or prior to the Confirmation Date, shall be deemed rejected by the Debtor as of the Effective Date, except for any Executory Contract or Unexpired Lease (a) that has been assumed, assumed and assigned, or rejected pursuant to an order of the Title III Court entered prior to the Effective Date, (b) that is specifically designated as a contract or lease to be assumed or assumed and assigned on the Schedule of Assumed Contracts and Leases to the Plan Supplement, (c) that has been registered with the Office of the Comptroller of Puerto Rico or has been approved by the Oversight Board or authorized by the Title III Court, (d) with the United States, or any of its agencies, departments, or agents pursuant to any federal program, (e) by or between any Commonwealth agencies, departments, municipalities, public corporations, or instrumentalities, unless specifically designated a contract to be rejected in the Plan Supplement, or (f) that contains any easement, license, or permit in favor of PREPA or Reorganized PREPA or necessary to PREPA's or

Reorganized PREPA's operations or assets; *provided*, *however*, that the Debtor reserves the right, on or prior to the Effective Date, to amend such schedules to delete any Executory Contract and Unexpired Lease therefrom or add any Executory Contract and Unexpired Lease thereto, in which event such Executory Contract(s) and Unexpired Lease(s) shall be deemed to be, as the case may be, either rejected, assumed, or assumed and assigned as of the Effective Date. The Debtor shall serve (y) notice of any Executory Contract and Unexpired Lease to be assumed or assumed and assigned through the operation of this Article XXI.A by including a schedule of such contracts and leases in the Plan Supplement and (z) notice of any Executory Contract and Unexpired Lease to be rejected through the operation of this Article XXI.A, by serving a separate notice to the relevant counterparties to such agreements. To the extent there are any amendments to such schedules, the Debtor shall provide notice of any such amendments to the parties to the Executory Contract and Unexpired Lease affected thereby. The listing of a document on the schedules to the Plan Supplement or in any separate notice shall not constitute an admission by the Debtor that such document is an Executory Contract and Unexpired Lease or that the Debtor has any liability thereunder.

Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by PREPA during the Title III Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by PREPA during the Title III Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

**B.      Approval of Rejection or Assumption of Executory Contracts and Unexpired Leases**

Entry of the Confirmation Order by the Title III Court shall constitute approval, pursuant to Bankruptcy Code sections 365(a) and 1123(b)(2), of the rejection, assumption, or assumption and assignment, as the case may be, of an Executory Contract and an Unexpired Lease pursuant to Article XXI.A of the Plan.

**C.      Inclusiveness**

Unless otherwise specified on the schedules to the Plan Supplement, each Executory Contract and Unexpired Lease listed or to be listed therein shall include any and all modifications,

amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such Executory Contract and Unexpired Lease, without regard to whether such agreement, instrument, or other document is listed on such schedule.

**D.** **Cure of Defaults and Objections to Cure and Assumption**

Except to the extent that different treatment has been agreed to by the non-Debtor party or parties to any Executory Contract and Unexpired Lease to be assumed or assumed and assigned pursuant to Article XXI.A of the Plan, the Debtor shall, pursuant to the provisions of Bankruptcy Code section 1123(a)(5)(G) and 1123(b)(2) and consistent with the requirements of Bankruptcy Code section 365, within at least twenty (20) days prior to the Confirmation Hearing, file with the Title III Court and serve by first class mail on each non-Debtor party to such Executory Contracts and Unexpired Leases to be assumed pursuant to Article XXI.A of the Plan, a notice, which shall list the cure amount as to each Executory Contract or Unexpired Lease to be assumed or assumed and assigned. The parties to such Executory Contracts and Unexpired Leases will have twenty (20) days from the date of service of such notice to file and serve any objection to the cure amounts listed by the Debtor. If there are any objections filed, the Title III Court shall hold a hearing on a date to be set by the Title III Court. **Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or assumption and assignment of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption or assumption and assignment.** Notwithstanding the terms and provisions of Article XXI.A of the Plan, the Debtor shall retain its rights to reject any of its Executory Contracts and Unexpired Leases that are subject to a dispute concerning amounts necessary to cure any defaults through the Effective Date.

Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by PREPA of the Cure Claim; *provided*, *however*, that nothing herein shall prevent PREPA from paying any Cure Claim despite the failure of the relevant counterparty to file such request for payment of such Cure Claim. PREPA also may settle any Cure Claim without any further notice to or action, order, or approval of the Title III Court. If there is any dispute regarding any Cure Claim, the ability of PREPA or any assignee to provide "adequate assurance of future performance" within the meaning of Bankruptcy Code section 365, or any other matter pertaining to assumption, then payment of such Cure Claim shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by PREPA and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cure Claims, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim (but, for the avoidance of doubt, not including Cure Claims) based upon Executory Contracts or Unexpired Leases that have been assumed in the Title III Case, including pursuant to the Confirmation Order, shall be deemed Disallowed**

and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Title III Court.

**E.      Contracts and Leases Entered Into After the Petition Date**

Contracts, leases, and other agreements entered into after the Petition Date by PREPA and any Executory Contracts and Unexpired Leases assumed by PREPA may be performed by PREPA in the ordinary course of its operations.

**F.      Insurance Policies**

Subject to the terms and provisions of Article XXI.H hereof, each of the Debtor's Insurance Policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan and shall be assumed as of the Effective Date; *provided*, *however*, that such treatment shall not, and shall not be construed to, discharge or relieve any Monoline Insurer with respect to its respective obligations to Holders of Claims under policies of insurance and applicable law and governing documents with respect thereto, as applicable, under this Plan.

**G.      Rejection Damage Claims**

If the rejection of an Executory Contract and Unexpired Lease by the Debtor hereunder results in damages to the other party or parties to such contract or lease, any Claim for such damages, if not heretofore evidenced by a filed Proof of Claim, shall be forever barred and shall not be enforceable against the Debtor, or its properties or agents, successors, or assigns, including, without limitation, the Reorganized Debtor, unless a Proof of Claim is filed with the Title III Court and served upon attorneys for the Oversight Board and Reorganized Debtor, as the case may be, on or before thirty (30) days after the later to occur of (i) the Confirmation Date, and (ii) the date of entry of an order by the Title III Court authorizing rejection of a particular Executory Contract and Unexpired Lease.

**H.      Indemnification and Reimbursement Obligations**

For purposes of the Plan, (i) to the extent executory in nature, the obligations of the Debtor, including, without limitation, directors and officers Insurance Policies, to indemnify and reimburse its directors or officers that were directors or officers, respectively, on or prior to the Petition Date, as the case may be, shall be deemed assumed as of the Effective Date, and (ii) indemnification obligations of the Debtor arising from conduct of officers and directors during the period from and after the Petition Date, as the case may be, shall be Administrative Expense Claims; *provided*, *however*, that, under no circumstances shall the Debtor or the Reorganized Debtor, as the case may be, be responsible for any indemnification obligation, cost, or expense associated with the gross negligence, intentional fraud, or willful misconduct of their respective officers or directors.

**I.      Nonoccurrence of Effective Date**

If the Effective Date does not occur, the Title III Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Executory Contracts and Unexpired Leases pursuant to Bankruptcy Code section 365(d)(4), unless such deadline(s) have expired.

## J.     Reservation of Rights

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtor, Reorganized Debtor, or any other party that any such contract or lease is in fact an Executory Contract and Unexpired Lease or that the Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtor or Reorganized Debtor shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## ARTICLE XXII

## GUC TRUST

## A.     Execution of GUC Trust Deed of Trust

On or before the Effective Date, PREPA and the GUC Trustee shall execute the GUC Trust Deed of Trust, and shall take all other necessary steps to establish the GUC Trust and the GUC Trust Interests therein, which shall be for the benefit of the GUC Trust Beneficiaries, whether their Claims are Allowed before, on, or after the Effective Date.  The GUC Trust Deed of Trust may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities do not affect the status of the GUC Trust as a "liquidating trust" for United States federal income tax purposes.

## B.     Purpose of the GUC Trust

The GUC Trust shall be established for the sole purpose of receiving and distributing the GUC Trust Assets in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the GUC Trust.

## C.     GUC Trust Assets

The GUC Trust shall consist of the GUC Trust Assets.  On the Effective Date, PREPA shall transfer all the GUC Trust Assets to the GUC Trust.  The GUC Trust Assets may be transferred subject to certain liabilities, as provided in the Plan or the GUC Trust Deed of Trust. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar Tax, pursuant to section 1146(a) of the Bankruptcy Code.  Upon delivery of the GUC Trust Assets to the GUC Trust, PREPA and its predecessors, successors and assigns, and each other Entity released pursuant to Article XXVII hereof shall be discharged and released from all liability with respect to the delivery of such distributions.

## D.     Administration of the GUC Trust

The GUC Trust shall be administered by the GUC Trustee according to the GUC Trust Deed of Trust and the Plan.  In the event of any inconsistency between the Plan and the GUC Trust Deed of Trust, the GUC Trust Deed of Trust shall govern.

E.    **The GUC Trustee**

If the GUC Trustee dies, becomes incapacitated, is terminated, or resigns for any reason, the GUC Trust Board shall designate a successor; *provided*, *however*, that under no circumstance shall the GUC Trustee be a director or officer with respect to any Affiliate of the GUC Trust.

F.    **Role of the GUC Trustee**

In furtherance of and consistent with the purpose of the GUC Trust and the Plan, and subject to the terms of the Confirmation Order, the Plan, and the GUC Trust Deed of Trust, and the oversight of the GUC Trust Board, the GUC Trustee shall, among other things, have the following rights, powers, and duties: (i) to hold the GUC Trust Assets for the benefit of the GUC Trust Beneficiaries, whether their Claims are Allowed on or after the Effective Date; (ii) to prepare and file (or cause to be prepared and filed), from and after the Effective Date, all tax and regulatory forms, returns, reports, and other documents required, or that the GUC Trustee otherwise deems appropriate with respect to the GUC Trust; (iii) to hold, manage, and timely distribute Cash obtained through the exercise of its power and authority to the GUC Trust Beneficiaries; and (iv) to not unduly prolong the duration of the GUC Trust.  In all circumstances, the GUC Trustee shall act in the best interests of all GUC Trust Beneficiaries and in furtherance of the purpose of the GUC Trust.  The GUC Trustee shall be obligated to provide prompt written responses to the Oversight Board's questions, from time to time, about the GUC Trust's progress in administering its Assets and distributions and its finances.

G.    **GUC Trustee's Tax Power for Reorganized PREPA**

From and after the Effective Date, the GUC Trustee shall prepare and file (or cause to be prepared and filed), on behalf of Reorganized PREPA, all tax returns or other tax information statements required to be filed with respect to the GUC Trust or that the GUC Trustee otherwise deems appropriate.

H.    **Transferability of GUC Trust Interests**

The GUC Trust Interests shall not be transferable or assignable except by will, intestate succession, or operation of law.

I.    **Cash**

The GUC Trustee may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code; *provided*, *however*, that such investments are investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

J.    **Distribution of GUC Trust Assets**

The GUC Trustee shall make distributions to Holders of Claims in the Unsecured Claims Pool in accordance with Article XXIV of the Plan.

**K.**     **Funding, Costs, and Expenses of the GUC Trust**

On or prior to the Effective Date, PREPA shall fund the GUC Trust on a one-time basis in an amount of one million dollars ($1,000,000). The reasonable costs and expenses of the GUC Trust, including the fees and expenses of the GUC Trust and its retained professionals, shall be paid out of the GUC Trust Assets, including the fifty percent (50.0%) of the Holder of the Allowed Vitol Claim's Pro Rata Share of the General Unsecured Claim Recovery not distributed to the Holder of the Allowed Vitol Claim pursuant to Article XI of the Plan, which shall be retained by the GUC Trust. The GUC Trustee shall be authorized to use proceeds of GUC Trust Assets to fund the GUC Trust, if necessary.

**L.**     **Compensation of the GUC Trustee**

The individual(s) serving as or comprising the GUC Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar roles, the payment of which shall not be subject to the approval of the Title III Court.

**M.**     **Retention of Professionals/Employees by the GUC Trustee**

Subject to the approval and consent of the GUC Trust Board, the GUC Trust may retain and compensate attorneys, other professionals, and employees to assist the GUC Trust Board on such terms as the GUC Trustee deems appropriate without Title III Court approval.

**N.**     **Federal Income Tax Treatment of the GUC Trust**

1.     <u>GUC Trust Assets Treated as Owned by Creditors</u>. For all United States federal income tax purposes, all parties (including, without limitation, the Debtor, the GUC Trustee, and the GUC Trust Beneficiaries) shall treat the transfer of the GUC Trust Assets to the GUC Trust as (1) a transfer of the GUC Trust Assets (subject to any obligations relating to those Assets) directly to the GUC Trust Beneficiaries, followed by (2) the transfer by such beneficiaries to the GUC Trust of the GUC Trust Assets in exchange for GUC Trust Interests. Accordingly, the GUC Trust Beneficiaries shall be treated for United States federal income tax purposes as the deemed grantors and owners of their respective share of the GUC Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

2.     <u>Tax Reporting</u>.

a)     The GUC Trustee shall prepare and file (or cause to be prepared and filed) tax returns for the GUC Trust treating the GUC Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this Article XXII.N. The GUC Trustee also will annually send to each Holder of a GUC Trust Interest a separate statement regarding the receipts and expenditures of the GUC Trust as relevant for U.S. federal income tax purposes and will instruct all such Holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such Holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns. The GUC Trustee shall also file (or cause to be filed) any other statement, return, or disclosure relating to the GUC Trust that is required by any Governmental Unit.

60

b)    The GUC Trustee shall then in good faith value all other GUC Trust Assets, and shall make all such values available from time to time, to the extent relevant, and such values shall be used consistently by all parties to the GUC Trust (including, without limitation, the Debtor, the GUC Trustee, and GUC Trust Beneficiaries) for all United States federal income tax purposes.

c)    Allocations of GUC Trust taxable income among the GUC Trust Beneficiaries shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the GUC Trust had distributed all its assets to the holders of the GUC Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the GUC Trust. Similarly, taxable loss of the GUC Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining GUC Trust Assets. The tax book value of the GUC Trust Assets for purpose of this paragraph shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the IRC, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

d)    Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the GUC Trustee of a private letter ruling if the GUC Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the GUC Trustee), the GUC Trustee shall (A) timely elect to treat any reserve for the GUC Trust Assets as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including the GUC Trustee and the GUC Trust Beneficiaries) shall report for United States federal, state, and local income tax purposes consistently with the foregoing.

e)    The GUC Trustee shall be responsible for payment, out of the GUC Trust Assets, of any taxes imposed on the trust or its Assets. In the event, and to the extent, any Cash retained on account of Disputed Claims insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such taxes may be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (ii) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts otherwise distributable by the GUC Trustee as a result of the resolution of such Disputed Claims.

3.    <u>Tax Withholdings by GUC Trustee</u>. The GUC Trustee may withhold and pay to the appropriate tax authority all amounts required to be withheld pursuant to the IRC or any provision of any foreign, state, or local tax law with respect to any payment or distribution to the holders of GUC Trust Interests. All such amounts withheld and paid to the appropriate tax authority (or placed in escrow pending resolution of the need to withhold) shall be treated as amounts distributed to such holders of GUC Trust Interests for all purposes of the GUC Trust Deed of Trust, and it being understood that any such amount withheld shall reduce the amount actually realized by the applicable holder upon distribution. The GUC Trustee shall be authorized to collect such tax information from the holders of GUC Trust Interests (including, without limitation, social

61

security numbers or other tax identification numbers) as in its sole discretion the GUC Trustee deems necessary to effectuate the Plan, the Confirmation Order, and the GUC Trust Deed of Trust. In order to receive distributions under the Plan, all holders of GUC Trust Interests shall be required to identify themselves to the GUC Trustee and provide tax information and the specifics of their holdings, to the extent the GUC Trustee deems appropriate in the manner and in accordance with the procedures from time to time established by the GUC Trustee for these purposes. This identification requirement generally applies to all holders of GUC Trust Interests, including those who hold their securities in street name. The GUC Trustee may refuse to make a distribution to any holder of a GUC Trust Interest that fails to furnish such information in a timely fashion, and until such information is delivered, and may treat such holder's GUC Trust Interests as disputed; *provided*, *however*, that, if such information is not furnished to the GUC Trustee within six (6) months of the original request to furnish such information, no further distributions shall be made to the holder of such GUC Trust Interest; and, *provided*, *further*, that, upon the delivery of such information by a holder of a GUC Trust Interest, the GUC Trustee shall make such distribution to which the holder of the GUC Trust Interest is entitled, without additional interest occasioned by such holder's delay in providing tax information; and, *provided*, *further*, that, if the GUC Trustee fails to withhold in respect of amounts received or distributable with respect to any such holder and the GUC Trustee is later held liable for the amount of such withholding, such holder shall reimburse the GUC Trustee for such liability (to the extent such amounts were actually distributed to such holder).

**O.**     **Dissolution of GUC Trust**

The GUC Trustee and the GUC Trust shall be discharged or dissolved, as the case may be, upon the earlier to occur of (i) all of the GUC Trust Assets have been distributed pursuant to the Plan and the GUC Trust Deed of Trust, and (ii) all distributions required to be made by the GUC Trustee under the Plan and the GUC Trust Deed of Trust have been made. Upon the dissolution of the GUC Trust, all remaining GUC Trust Assets, if any, shall be distributed to the PREPA PayGo Trust.

**P.**     **Indemnification of GUC Trustee and Members of GUC Trust Board**

The GUC Trustee or the individual(s) comprising the GUC Trustee, as the case may be, the GUC Trust Board, the members of the GUC Trust Board and their respective employees, agents, and professionals, shall not be liable to the GUC Trust Beneficiaries for actions taken or omitted in their capacity as, or on behalf of, the GUC Trustee or the GUC Trust Board, as applicable, except those acts arising out of their own willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement by the GUC Trust for fees and expenses in defending any and all actions or inactions in their capacity as, or on behalf of, the GUC Trustee or the GUC Trust Board, as applicable, except for any actions or inactions involving willful misconduct or gross negligence. Any indemnification claim of the GUC Trustee, the GUC Trust Board, the members of the GUC Trust Board, and the other parties entitled to indemnification under this subsection shall be satisfied solely from the GUC Trust Assets and shall be entitled to a priority distribution therefrom, ahead of the GUC Trust Interests and any other claim to or interest in such assets. The GUC Trustee, the GUC Trust Board, and the members of the GUC Trust Board shall be entitled to rely, in good faith, on the advice of their retained professionals.

# ARTICLE XXIII

# AVOIDANCE ACTIONS TRUST

**A.**     **Execution of Avoidance Actions Trust Agreement**

On or before the Effective Date, PREPA and the Avoidance Actions Trustee shall execute the Avoidance Actions Trust Agreement, and shall take all other necessary steps to establish the Avoidance Actions Trust and the Avoidance Actions Trust Interests therein, which shall be for the benefit of the Avoidance Actions Trust Beneficiaries, whether their Claims are Allowed before, on, or after the Effective Date.  The Avoidance Actions Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities do not affect the status of the Avoidance Actions Trust as a "liquidating trust" for United States federal income tax purposes.

**B.**     **Purpose of the Avoidance Actions Trust**

The Avoidance Actions Trust shall be established for the sole purpose of prosecuting the Avoidance Actions and distributing its assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Avoidance Actions Trust.

**C.**     **Avoidance Actions Trust Assets**

The Avoidance Actions Trust shall consist of the Avoidance Actions Trust Assets.  On the Effective Date, PREPA shall transfer all of the Avoidance Actions Trust Assets to the Avoidance Actions Trust.  The Avoidance Actions Trust Assets may be transferred subject to certain liabilities, as provided in the Plan or the Avoidance Actions Trust Agreement.  Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar Tax, pursuant to section 1146(a) of the Bankruptcy Code.  Upon delivery of the Avoidance Actions Trust Assets to the Avoidance Actions Trust, PREPA and its predecessors, successors and assigns, and each other Entity released pursuant to Article XXVII hereof shall be discharged and released from all liability with respect to the delivery of such distributions.

**D.**     **Administration of the Avoidance Actions Trust**

The Avoidance Actions Trust shall be administered by the Avoidance Actions Trustee according to the Avoidance Actions Trust Agreement and the Plan.  In the event of any inconsistency between the Plan and the Avoidance Actions Trust Agreement, the Avoidance Actions Trust Agreement shall govern.

**E.**     **The Avoidance Actions Trustee**

If the Avoidance Actions Trustee dies, becomes incapacitated, is terminated, or resigns for any reason, the Avoidance Actions Trust Board shall designate a successor; *provided*, *however*, that under no circumstance shall the Avoidance Actions Trustee be a director or officer with respect to any Affiliate of the Avoidance Actions Trust.

63

**F.      Role of the Avoidance Actions Trustee**

In furtherance of and consistent with the purpose of the Avoidance Actions Trust and the Plan, and subject to the terms of the Confirmation Order, the Plan and the Avoidance Actions Trust Agreement, and the oversight of the Avoidance Actions Trust Board, the Avoidance Actions Trustee shall, among other things, have the following rights, powers, and duties: (i) to hold, manage, convert to Cash, and timely distribute the Avoidance Actions Trust Assets to the GUC Trust, including prosecuting and resolving the Claims belonging to the Avoidance Actions Trust; (ii) to hold the Avoidance Actions Trust Assets for the benefit of the Avoidance Actions Trust Beneficiaries, whether their Claims are Allowed on or after the Effective Date; (iii) in the Avoidance Actions Trustee's reasonable business judgment, to investigate, prosecute, settle and/or abandon rights, Causes of Action, or litigation of the Avoidance Actions Trust; (iv) to prepare and file (or cause to be prepared and filed), from and after the Effective Date, all tax and regulatory forms, returns, reports, and other documents required, or that the Avoidance actions Trustee otherwise deems appropriate with respect to the Avoidance Actions Trust; (v) in the Avoidance Actions Trustee's reasonable business judgment, to control, prosecute, and/or settle on behalf of the Avoidance Actions Trust, objections to Claims on account of which the Avoidance Actions Trustee will be responsible; (vi) to hold, manage, and timely distribute Cash or non-Cash Avoidance Actions Trust Assets obtained through the exercise of its power and authority to the GUC Trustee; and (vii) to not unduly prolong the duration of the Avoidance Actions Trust.  In all circumstances, the Avoidance Actions Trustee shall act in the best interests of all Avoidance Actions Trust Beneficiaries and in furtherance of the purpose of the Avoidance Actions Trust.  The Avoidance Action Trustee shall be obligated to provide prompt written responses to the Oversight Board's questions, from time to time, about the Avoidance Action Trust's progress in administering its assets and distributions and its finances.

**G.      Avoidance Actions Trustee's Tax Power for Reorganized PREPA**

From and after the Effective Date, the Avoidance Actions Trustee shall prepare and file (or cause to be prepared and filed), on behalf of Reorganized PREPA, all tax returns or other tax information statements required to be filed with respect to the Avoidance Actions Trust or that the Avoidance Actions Trustee otherwise deems appropriate.

**H.      Transferability of Avoidance Actions Trust Interests**

The Avoidance Actions Trust Interests shall not be transferable or assignable except by will, intestate succession, or operation of law

**I.      Cash**

The Avoidance Actions Trustee may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code; *provided*, *however*, that such investments are investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

**J.**     **Distribution of Avoidance Actions Trust Assets**

The Avoidance Actions Trustee shall distribute to the GUC Trust, on a monthly basis, all unrestricted Cash on hand (including any Cash received from PREPA on the Effective Date), except (i) Cash reserved pursuant to the Avoidance Actions Trust Agreement to fund the activities of the Avoidance Actions Trust, (ii) such amounts as are allocable to or retained to pay reasonable incurred or anticipated expenses (including, but not limited to, any taxes imposed on or payable by the Avoidance Actions Trust in respect of the Avoidance Actions Trust Assets); *provided*, *however*, that the Avoidance Actions Trustee shall not be required to make a distribution pursuant to this Article XXIII.J if the aggregate, net amount of unrestricted Cash available for distribution (taking into account the above listed exclusions) is such that it would make the distribution impracticable as reasonably determined by the Avoidance Actions Trustee, with the consent of the Avoidance Actions Trust Board, in accordance with applicable law, and so long as such aggregate amount is less than one million dollars ($1,000,000).

**K.**     **Funding, Costs, and Expenses of the Avoidance Actions Trust**

On the Effective Date, the Avoidance Actions Trust shall be funded on a one-time basis in an amount of one million dollars ($1,000,000).  The reasonable costs and expenses of the Avoidance Actions Trust, including the fees and expenses of the Avoidance Actions Trustee and its retained professionals, shall be paid out of the Avoidance Actions Trust Assets.  Fees and expenses incurred in connection with the prosecution and settlement of any Avoidance Actions shall be considered costs and expenses of the Avoidance Actions Trust.  The Avoidance Action Trustee shall be authorized to use proceeds of trust assets to fund the Avoidance Action Trust, if necessary.

**L.**     **Compensation of the Avoidance Actions Trustee**

The individual(s) serving as or comprising the Avoidance Actions Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar roles, the payment of which shall not be subject to the approval of the Title III Court.

**M.**     **Retention of Professionals/Employees by the Avoidance Actions Trustee**

Subject to the approval and consent of the Avoidance Actions Trust Board, the Avoidance Actions Trust may retain and compensate attorneys, other professionals, and employees to assist the Avoidance Actions Trust Board on such terms as the Avoidance Actions Trustee deems appropriate without Title III Court approval.

**N.**     **Federal Income Tax Treatment of the Avoidance Actions Trust**

1.     Avoidance Actions Trust Assets Treated as Owned by Creditors.  For all United States federal income tax purposes, all parties (including, without limitation, the Debtor, the Avoidance Actions Trustee, and the Avoidance Actions Trust Beneficiaries) shall treat the transfer of the Avoidance Actions Trust Assets to the Avoidance Actions Trust as (1) a transfer of the Avoidance Actions Trust Assets (subject to any obligations relating to those Assets) directly to the Avoidance Actions Trust Beneficiaries, followed by (2) the transfer by such beneficiaries to the Avoidance Actions Trust of the Avoidance Actions Trust Assets in exchange for Avoidance

Actions Trust Interests. Accordingly, the Avoidance Actions Trust Beneficiaries shall be treated for United States federal income tax purposes as the deemed grantors and owners of their respective share of the Avoidance Actions Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

2.      Tax Reporting.

a)      The Avoidance Actions Trustee shall prepare and file (or cause to be prepared and filed) tax returns for the Avoidance Actions Trust treating the Avoidance Actions Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this Article XXIII.N. The Avoidance Actions Trustee also will annually send to each holder of an Avoidance Actions Trust Interest a separate statement regarding the receipts and expenditures of the Avoidance Actions Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such Holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns. The Avoidance Actions Trustee shall also file (or cause to be filed) any other statement, return, or disclosure relating to the Avoidance Actions Trust that is required by any Governmental Unit.

b)      The Avoidance Actions Trustee will then in good faith value all other Avoidance Actions Trust Assets, and shall make all such values available from time to time, to the extent relevant, and such values shall be used consistently by all parties to the Avoidance Actions Trust (including, without limitation, the Debtor, the Avoidance Actions Trustee, and Avoidance Actions Trust Beneficiaries) for all United States federal income tax purposes.

c)      Allocations of Avoidance Actions Trust taxable income among the Avoidance Actions Trust Beneficiaries shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Avoidance Actions Trust had distributed all its assets to the holders of the Avoidance Actions Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Avoidance Actions Trust. Similarly, taxable loss of the Avoidance Actions Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Avoidance Actions Trust Assets. The tax book value of the Avoidance Actions Trust Assets for purpose of this paragraph shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the IRC, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

d)      Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Avoidance Actions Trustee of a private letter ruling if the Avoidance Actions Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Avoidance Actions Trustee), the Avoidance Actions Trustee shall (A) timely elect to treat any reserve for the Avoidance Actions Trust Assets as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including the Avoidance Actions Trustee and the

66

Avoidance Actions Trust Beneficiaries) shall report for United States federal, state, and local income tax purposes consistently with the foregoing.

e)    The Avoidance Actions Trustee shall be responsible for payment, out of the Avoidance Actions Trust Assets, of any taxes imposed on the trust or its assets. In the event, and to the extent, any Cash retained on account of Disputed Claims insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such taxes may be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (ii) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts otherwise distributable by the Avoidance Actions Trustee as a result of the resolution of such Disputed Claims.

3.    <u>Tax Withholdings by Avoidance Actions Trustee</u>.  The Avoidance Actions Trustee may withhold and pay to the appropriate tax authority all amounts required to be withheld pursuant to the IRC or any provision of any foreign, state, or local tax law with respect to any payment or distribution to the holders of Avoidance Actions Trust Interests.  All such amounts withheld and paid to the appropriate tax authority (or placed in escrow pending resolution of the need to withhold) shall be treated as amounts distributed to such holders of Avoidance Actions Trust Interests for all purposes of the Avoidance Actions Trust Agreement, and it being understood that any such amount withheld shall reduce the amount actually realized by the applicable holder upon distribution.  The Avoidance Actions Trustee shall be authorized to collect such tax information from the holders of Avoidance Actions Trust Interests (including, without limitation, social security numbers or other tax identification numbers) as in its sole discretion the Avoidance Actions Trustee deems necessary to effectuate the Plan, the Confirmation Order, and the Avoidance Actions Trust Agreement.  In order to receive distributions under the Plan, all holders of Avoidance Actions Trust Interests shall be required to identify themselves to the Avoidance Actions Trustee and provide tax information and the specifics of their holdings, to the extent the Avoidance Actions Trustee deems appropriate in the manner and in accordance with the procedures from time to time established by the Avoidance Actions Trustee for these purposes. This identification requirement generally applies to all holders of Avoidance Actions Trust Interests, including those who hold their securities in street name.  The Avoidance Actions Trustee may refuse to make a distribution to any holder of a Avoidance Actions Trust Interest that fails to furnish such information in a timely fashion, and until such information is delivered, and may treat such holder's Avoidance Actions Trust Interests as disputed; *provided*, *however*, that, if such information is not furnished to the Avoidance Actions Trustee within six (6) months of the original request to furnish such information, no further distributions shall be made to the holder of such Avoidance Actions Trust Interest; and, *provided*, *further*, that, upon the delivery of such information by a holder of a Avoidance Actions Trust Interest, the Avoidance Actions Trustee shall make such distribution to which the holder of the Avoidance Actions Trust Interest is entitled, without additional interest occasioned by such holder's delay in providing tax information; and, *provided*, *further*, that, if the Avoidance Actions Trustee fails to withhold in respect of amounts received or distributable with respect to any such holder and the Avoidance Actions Trustee is later held liable for the amount of such withholding, such holder shall reimburse the Avoidance Actions Trustee for such liability (to the extent such amounts were actually distributed to such holder).

### O.     Dissolution of Avoidance Action Trust

The Avoidance Actions Trustee and the Avoidance Actions Trust shall be discharged or dissolved, as the case may be, upon the earlier to occur of (i) all of the Avoidance Actions Trust Assets have been distributed pursuant to the Plan and the Avoidance Actions Trust Agreement, (ii) the Avoidance Actions Trustee determines, with the consent of the Avoidance Actions Trust Board, that the administration of any remaining Avoidance Actions Trust Assets is not likely to yield sufficient additional Avoidance Actions Trust proceeds to justify further pursuit, including because the expense of administering the Avoidance Actions Trust so as to make a final distribution to its beneficiaries is likely to exceed the value of the Assets remaining in the Avoidance Actions Trust, and (iii) all distributions required to be made by the Avoidance Actions Trustee under the Plan and the Avoidance Actions Trust Agreement have been made.  Upon the dissolution of the Avoidance Actions Trust, all remaining Avoidance Action Trust Assets, if any, shall be transferred to the GUC Trust.

### P.     Indemnification of Avoidance Actions Trustee and Members of Avoidance Actions Trust Bond

The Avoidance Actions Trustee or the individual(s) comprising the Avoidance Actions Trustee, as the case may be, the Avoidance Actions Trust Board, the members of the Avoidance Actions Trust Board and their respective employees, agents, and professionals, shall not be liable to the Avoidance Actions Trust Beneficiaries for actions taken or omitted in their capacity as, or on behalf of, the Avoidance Actions Trustee or the Avoidance Actions Trust Board, as applicable, except those acts arising out of their own willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement by the Avoidance Actions Trust for fees and expenses in defending any and all actions or inactions in their capacity as, or on behalf of, the Avoidance Actions Trustee or the Avoidance Actions Trust Board, as applicable, except for any actions or inactions involving willful misconduct or gross negligence.  Any indemnification claim of the Avoidance Actions Trustee, the Avoidance Actions Trust Board, the members of the Avoidance Actions Trust Board, and the other parties entitled to indemnification under this subsection shall be satisfied solely from the Avoidance Actions Trust Assets and shall be entitled to a priority distribution therefrom, ahead of the Avoidance Actions Trust Interests and any other claim to or interest in such assets.  The Avoidance Actions Trustee, the Avoidance Actions Trust Board, and the members of the Avoidance Actions Trust Board shall be entitled to rely, in good faith, on the advice of their retained professionals.

## ARTICLE XXIV

## PROVISIONS GOVERNING DISTRIBUTIONS

### A.     Appointment of Distribution Agent

PREPA, Reorganized PREPA, the GUC Trustee, and/or the Solicitation Agent shall act as Distribution Agent or may employ or contract with other Entities, to act as the Distribution Agent or to assist in or make the distributions required by the Plan.  Any Distribution Agent appointed by PREPA or the GUC Trustee shall serve without bond.  Other than as specifically set forth in the Plan, the Distribution Agent shall make all distributions required to be made under the Plan.

Except as otherwise provided herein, all distributions under the Plan shall be made by the Distribution Agent.

**B.      Distributions on Account of Claims Allowed as of the Effective Date**

Except as otherwise provided herein, a Final Order, or as otherwise agreed to by PREPA and the Holder of the applicable Claim, on the first Distribution Date, the Distribution Agent shall make initial distributions under the Plan on account of Claims Allowed on the Effective Date or as soon as practicable thereafter, subject to PREPA's and Reorganized PREPA's right to object to Claims; *provided*, *however*, that Allowed Administrative Expense Claims with respect to liabilities incurred by PREPA in the ordinary course of its operations during the Title III Case or assumed by PREPA prior to the Effective Date shall be paid or performed in the ordinary course of its operations in accordance with the terms and conditions of any controlling agreements, course of dealing, course of operations, or industry practice; *provided*, *further*, that the Distribution Agent may make distributions of Fuel Line Lender PSA Creditor Fees to a party entitled thereto in a manner mutually agreed upon between such party and the Distribution Agent and to the extent the Fuel Line Lender PSA Creditor Fees shall be payable in Cash, such Fuel Line Lender PSA Creditor Fees shall be paid no later than ten (10) Business Days following the Effective Date; *provided*, *further*, that the Oversight Board will use reasonable efforts to distribute New Bonds through The Depository Trust Company.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date. Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim.

**C.      Rights and Powers of Distribution Agent**

      1.      Powers of the Distribution Agent

Except as may be provided otherwise hereunder, the Distribution Agent shall be empowered to (a) take all steps and execute all instruments and documents necessary to effectuate the Plan, (b) make distributions contemplated by the Plan, (c) comply with the Plan and the obligations thereunder, and (d) exercise such other powers as may be vested in the Distribution Agent pursuant to order of the Title III Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions of the Plan.

      2.      Fees and Expenses Incurred On and After the Effective Date

Except as otherwise ordered by the Title III Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on and after the Effective Date and any reasonable compensation and expense reimbursement claims, including, without limitation, reasonable fees and expenses of counsel, incurred by the Distribution Agent, shall be paid in Cash without further order of the Title III Court.

**D.      Special Rules for Distributions to Holders of Disputed Claims**

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties: (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order or the Claims have been Allowed or expunged. Any dividends or other distributions arising from property distributed to Holders of Allowed Claims in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims in such Class.

At such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, Reorganized Debtor shall distribute to the Holder thereof the distributions, if any, to which such Holder is then entitled under the Plan, together with any earnings that have accrued thereon (net of any expenses, including any taxes, relating thereto), but only to the extent that such earnings are attributable to the amount of the Allowed Claim. Such distribution, if any, shall be made as soon as practicable after the date that the order or judgement of the Title III Court allowing such Disputed Claim becomes a Final Order.

E.   **Delivery of Distributions**

1.   Timeliness of Distributions

Any distribution to be made pursuant to the Plan shall be deemed to be timely made if made within ten (10) Business Days after the date specified in the Plan. Whenever any distribution to be made under this Plan shall be due on a day other than a Business Day, such distribution shall instead be made, without interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due.

2.   Record Date for Distributions

Subject to the provisions of Bankruptcy Rule 9010, and except as provided in the Confirmation Order or herein, distributions and deliveries to Holders of Allowed Claims shall be made through DTC or at the address of each such Holder as set forth on the Schedules filed with the Court, unless superseded by the address set forth on Proofs of Claim filed by such Holders, or at the last known address of such Holder if no Proof of Claim is filed or if the Debtor has been notified in writing of a change of address; *provided*, *however*, that initial distributions by the Distribution Agent for the benefit of Holders of Allowed PREPA Revenue Bond Claims shall be made to the Bond Trustee, as applicable, for such obligation in accordance with the respective governing documents for such obligations. Neither PREPA nor any Distribution Agent, including the GUC Trustee, will have any obligation to recognize the transfer of, or the sale of any participation in, any Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those Holders of Allowed Claims (including Holders of Claims that become Allowed after the Distribution Record Date) that are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date; *provided*, *however*, that the New Bonds will be transferable and

transfers will be recognized if made in accordance with the terms and conditions of the New Master Indenture. PREPA and any Distribution Agent shall instead be entitled to recognize and deal for all purposes under the Plan with only those record Holders stated on the official Claims Register as of the close of business on the Distribution Record Date.

3.    Distribution Process

The Distribution Agent shall make all distributions required under the Plan, except that distributions to Holders of Allowed Claims governed by a separate agreement and administered by a Servicer shall be deposited with the appropriate Servicer, at which time such distributions shall be deemed complete, and the Servicer shall deliver such distributions in accordance with the Plan and the terms of the governing agreement. Except as otherwise provided herein, and notwithstanding any authority to the contrary, distributions to Holders of Allowed Claims, including Claims that become Allowed after the Effective Date, shall be made to Holders of record as of the Effective Date by the Distribution Agent or a Servicer, as appropriate: (1) to the address of such Holder as set forth in the books and records of the Debtor (or if the Debtor has been notified in writing, on or before the date that is ten (10) days before the Effective Date, of a change of address, to the changed address); (2) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, if no address exists in the Debtor's books and records, no Proof of Claim has been filed and the Distribution Agent has not received a written notice of a change of address on or before the date that is ten (10) days before the Effective Date; or (3) on any counsel that has appeared in the Title III Case on the Holder's behalf. The Debtor and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan.

4.    Foreign Currency Exchange Rate

Except as otherwise provided in a Final Order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

5.    De Minimis, Fractional, Undeliverable, and Unclaimed Distributions

(a)    *De Minimis and Fractional Distributions*. No distribution of (i) New Bonds shall be made by the Distribution Agent on account of an Allowed Claim if the amount to be distributed to the specific Holder of an Allowed Claim on the applicable Distribution Date has an economic value of less than $1,000.00 and (ii) Cash shall be made by the Distribution Agent on account of an Allowed Claim if the amount to be distributed to the specific Holder of an Allowed Claim on the applicable Distribution Date has an economic value of less than $100.00. No fractional New Bonds shall be distributed. Where a fractional portion of a New Bond otherwise would be called for under the Plan, the actual issuance shall reflect a rounding down to the nearest whole New Bond.

(b)     *Undeliverable Distributions.*  If any distribution to any Holder is returned to the Distribution Agent as undeliverable, no further distribution shall be made to such Holder unless and until the Distribution Agent is notified, in writing, of such Holder's then-current address.  Subject to the terms and provision of Article XXIV.E.5(c) of the Plan, undeliverable distributions shall remain in the possession of the Distribution Agent until such time as a distribution becomes deliverable.  All Entities ultimately receiving previously undeliverable Cash shall not be entitled to any interest or other accruals thereon of any kind.  Nothing contained in the Plan shall require the Distribution Agent to attempt to locate any Holder of an Allowed Claim.

(c)     *Reversion of Unclaimed Distributions.*  If (i) a check is sent, by the Distribution Agent to a Holder in respect of distributions and such check is not negotiated within one hundred twenty (120) days following the date on which such check was issued, or (ii) any other form of distribution to a Holder is otherwise undeliverable or that has become an Unclaimed Distribution, the Distribution Agent (or its duly authorized agent) shall, on or prior to the date that is one hundred eighty (180) days from (i) the Effective Date, with respect to all Allowed Claims as of the Effective Date, and (ii) the date that a distribution is made with respect to any Disputed Claim that becomes an Allowed Claim subsequent to the Effective Date, file a list with the Title III Court setting forth the names of those Entities for which distributions have been made hereunder that have not been negotiated or have been returned as undeliverable as of the date thereof.  Any Holder of an Allowed Claim on such list that does not identify itself and assert its rights pursuant to the Plan to receive a distribution within six (6) months from the date so listed shall have its entitlement to such undeliverable distribution discharged and shall be forever barred from asserting any entitlement pursuant to the Plan, against the Reorganized Debtor or the GUC Trustee, or their respective professionals, agents, or property, and any (1) Cash in the possession of the Distribution Agent or the trustee with respect to existing securities, as the case may be, shall be released to the Reorganized Debtor for use to discharge operating expenses of the Reorganized Debtor and (2) the New Bonds in the possession of the Distribution Agent with respect to existing securities, shall be released to the Reorganized Debtor for cancellation or deposit into the treasury of the Reorganized Debtor, as determined by Reorganized Debtor in its sole and absolute discretion.

6.     Surrender of Cancelled Instruments

As a condition to participation under this Plan, the Holder of a note, debenture, or other evidence of indebtedness of PREPA that desires to receive the property to be distributed on account of an Allowed Claim based on such note, debenture, or other evidence of indebtedness shall surrender such note, debenture, or other evidence of indebtedness to PREPA or its designee (unless such Holder's Claim will not be Impaired by the Plan, in which case such surrender shall not be required), and shall execute and deliver such other documents as are necessary to effectuate the

Plan; *provided*, *however*, that, if a claimant is a Holder of a note, debenture, or other evidence of indebtedness for which no physical certificate was issued to the Holder but which instead is held in book-entry form pursuant to a global security hold by DTC or other securities depository or custodian thereof, there shall be no requirement of surrender.  In PREPA's sole discretion, if no surrender of a note, debenture, or other evidence of indebtedness occurs and the Holder of a Claim does not provide an affidavit and indemnification agreement, in form and substance reasonably satisfactory to PREPA, that such note, debenture, or other evidence of indebtedness was lost, then no distribution may be made to such Holder in respect of the Claim based on such note, debenture, or other evidence of indebtedness.

7.  Cancellation of Notes, Instruments, Certificates, and Other Documents

Except (a) as provided in any contract, instrument, or other agreement or document entered into or delivered in connection with the Plan, (b) for purposes of evidencing a right to distribution under the Plan, or (c) as specifically provided otherwise in the Plan (including any rejection of Executory Contracts or Unexpired Leases pursuant to Article XXI.A hereof), on the Effective Date, the PREPA Revenue Bonds and Fuel Line Facilities and all instruments and documents related thereto will be deemed automatically cancelled, terminated, and of no further force or effect against the Debtor without any further act or action under any applicable agreement, law, regulation, order or rule, with the Debtor and the applicable trustee, paying agent, or fiscal agent, as the case may be, having no continuing obligations or duties and responsibilities thereunder and the obligations of the parties to the Debtor, as applicable, under the PREPA Revenue Bonds and Fuel Line Facilities and all instruments and documents related thereto shall be discharged; *provided*, *however*, that, notwithstanding anything contained herein to the contrary, the PREPA Revenue Bonds and Fuel Line Facilities and such other instruments and documents shall continue in effect solely (i) to allow the Distribution Agent to make any distributions as set forth in the Plan and to perform such other necessary administrative or other functions with respect thereto, (ii) to allow Holders of Allowed PREPA Revenue Bond Claims, Allowed National Claims, and Allowed Fuel Line Loan Claims to receive distributions in accordance with the terms and provisions of the Plan, (iii) for any trustee, agent, contract administrator, or similar entity under all instruments and documents related thereto, to perform necessary functions, including making distributions, in accordance with the Plan and to have the benefit of all the rights and protections and other provisions of such instruments and documents, as applicable, and all other related agreements, (iv) to set forth the terms and conditions applicable to parties to such documents and instruments other than the Debtor, or (v) as may be necessary to preserve any claims under the respective Insurance Policies and related documents issued by a Monoline Insurer.  Notwithstanding the foregoing, and except as otherwise expressly provided in the Plan, such bonds or bond documents that remain outstanding shall not form the basis for the assertion of any Claim against the Debtor or Reorganized Debtor, as the case may be.

F.  **Claims Paid or Payable by Third Parties**

1.  Claims Paid by Third Parties

A Claim shall be reduced in full, and such Claim shall be Disallowed without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Title III Court, to the extent that the Holder of such Claim receives payment in full on account

73

of such Claim from a party that is not the Distribution Agent.  To the extent a Holder of a Claim receives a distribution on account of such Claim and also receives payment from a party that is not the Distribution Agent on account of such Claim from the Distribution Agent, such Holder shall repay, return, or deliver any distribution held by or transferred to the Holder to the applicable Distribution Agent to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

2.    Claims Payable by Insurance Carriers

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of PREPA's Insurance Policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of PREPA's insurers agrees to satisfy in full a Claim, then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register by the Solicitation Agent without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Title III Court.

3.    Applicability of Insurance Policies

Except as otherwise provided herein, distributions to Holders of Allowed Claims shall be in accordance with the provisions of an applicable insurance policy.  Except as otherwise expressly provided herein, nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that PREPA or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## G.    Withholding and Reporting Requirements

Any party issuing any instrument or making any distribution under the Plan shall comply with all applicable withholding and reporting requirements imposed by any United States federal, state or local tax law or tax authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements.  Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such Holder by any Governmental Unit, including income, withholding and other tax obligations, on account of such distribution.  Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such Holder has made arrangements satisfactory to such issuing or distributing party for payment of any such withholding tax obligations and, if any party issuing any instrument or making any distribution under the Plan fails to withhold with respect to any such Holder's distribution, and is later held liable for the amount of such withholding, the Holder shall reimburse such party. The Distribution Agent may require, as a condition to the receipt of a distribution, that the Holder complete the appropriate Form W-8 or Form W-9, as applicable to each Holder.  If the Holder fails to comply with such a request within one year, such distribution shall be deemed an Unclaimed Distribution.  PREPA reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

## H.    Time Bar to Cash Payments

Checks issued by the Distribution Agent on account of Allowed Claims shall be null and void if not negotiated within one hundred twenty (120) days from and after the date of issuance thereof.  Requests for reissuance of any check shall be made directly to the Distribution Agent by the holder of the Allowed Claim with respect to which such check originally was issued. Any claim in respect of such a voided check shall be made on or before the later of (i) the first (1st) anniversary of the Effective Date or (ii) ninety (90) days after the date of issuance of such check, if such check represents a final distribution hereunder on account of such Claim.  After such date, all Claims in respect of voided checks shall be discharged and forever barred and the Distribution Agent shall retain all monies related thereto for the sole purpose of redistribution to Holders of Allowed Claims in accordance with the terms and provisions hereof.

## I.    Distributions After Effective Date

Distributions made after the Effective Date to Holders of Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made in accordance with the terms and provisions of Article XXIV.E of the Plan.

## J.    Setoffs

Except as otherwise provided in the Plan or in the Confirmation Order, the Distribution Agent may, pursuant to applicable bankruptcy or non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account thereof (before any distribution is made on account of such Claim by the Distribution Agent), the claims, rights, and Causes of Action of any nature that the Debtor or Reorganized Debtor may hold against the Holder of such Allowed Claim; *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor or Reorganized Debtor of any such claims, rights, and Causes of Action that the Debtor or the Reorganized Debtor may possess against such Holder; and, *provided*, *further*, that nothing contained herein is intended to limit the ability of any Creditor to effectuate rights of setoff or recoupment preserved or permitted by the provisions of Bankruptcy Code sections 553, 555, 559, or 560 or pursuant to the common law right of recoupment; and, *provided*, *further*, that nothing in this Article XXIV.J shall affect the releases and injunctions provided in Article XXVII of the Plan.

## K.    Allocation Between Principal and Accrued Interest

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated *first*, to interest accrued and unpaid as of the date immediately preceding the Petition Date, *second*, to the principal amount of the Claim (as determined for federal income tax purposes) and *third*, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts; *provided*, *however*, that the Debtor's or Reorganized Debtor's treatment of any distributions for its tax purposes will not be binding on any Creditor as to the treatment of such distributions for any regulatory, tax, or other purposes.

## L.    Holder of Claim

For all purposes of the Plan, including, without limitation, for purposes of distributions pursuant to the terms and provisions of this Article XXIV, the Holder of a Claim shall mean any Entity who, directly or indirectly, has investment power with respect to any Claim, which includes the power to dispose or to direct the disposition of such Claim; *provided*, *however*, that, solely with respect to Insured PREPA Revenue Bonds and Bankruptcy Code section 1126, the Holder of any Insured PREPA Revenue Bond Claims shall be determined in accordance with PROMESA section 301(c)(3) and any law or governing documents applicable to such Insured PREPA Revenue Bond Claims.

## M.    Exculpation

From and after the Effective Date, the Distribution Agent shall be exculpated by all Entities, including, without limitation, Holders of Claims and other parties in interest, from any and all claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Distribution Agent by the Plan or any order of the Title III Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct of such Distribution Agent.  No Holder of a Claim or other party in interest shall have or pursue any claim or cause of action against the Distribution Agent for making payments in accordance with the Plan or for implementing the provisions of the Plan.

## ARTICLE XXV

## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

## A.    Objections to Claims and Prosecution of Disputed Claims

Except with respect to Allowed Claims, and subject to the terms and conditions of the ADR Procedures and the ADR Order, the Reorganized Debtor, by and through the Oversight Board, shall object to, and shall assume any pending objection filed by the Debtor to, the allowance of Claims filed with the Title III Court with respect to which it disputes liability, priority or amount, including, without limitation, objections to Claims that have been assigned and the assertion of the doctrine of equitable subordination with respect thereto. All objections, affirmative defenses, and counterclaims shall be litigated to Final Order; *provided*, *however*, that the Reorganized Debtor, by and through the Oversight Board, shall have the authority to file, settle, compromise, or withdraw any objections to Claims, without approval of the Title III Court.  Unless otherwise ordered by the Title III Court, to the extent not already objected to by the Debtor, the Reorganized Debtor shall file and serve all objections to Claims as soon as practicable, but, in each instance, not later than the Claims Objection Bar Date.  Notwithstanding anything contained in the Plan to the contrary, on the Effective Date, any (i) PREPA Revenue Bond Claim or Fuel Line Loan Claim filed by any Entity for amounts due under existing securities and (ii) Proofs of Claim included on a schedule to the Plan Supplement, if any, shall be deemed satisfied and expunged and the Oversight Board shall instruct the Solicitation Agent, its court-appointed representative, to remove such Claims from the Claims Register maintained for the benefit of the Title III Court.

Except as otherwise provided herein, no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or PROMESA, or the Title III Court has entered a Final Order allowing such Claim.  For the avoidance of doubt, there is no requirement to

76

file a Proof of Claim (or move the Title III Court for allowance) to be an Allowed Claim under the Plan. **Except as otherwise provided herein, all Proofs of Claim filed after the Effective Date shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against PREPA or Reorganized PREPA, without the need for any objection by PREPA or Reorganized PREPA or any further notice to or action, order, or approval of the Title III Court.**

## B.    Estimation of Claims

Except with respect to Allowed Claims, on and after the Effective Date, and unless otherwise limited by an order of the Title III Court, including, without limitation, the ACR Order and the ADR Order, the Reorganized Debtor, by and through the Oversight Board, may at any time request the Title III Court to estimate for final distribution purposes any contingent, unliquidated or Disputed Claim pursuant to Bankruptcy Code section 502(c) regardless of whether the Debtor previously objected to or sought to estimate such Claim, and the Title III Court will retain jurisdiction to consider any request to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. Unless otherwise provided in an order of the Title III Court, in the event that the Title III Court estimates any contingent, unliquidated, or Disputed Claim, the estimated amount shall constitute either the allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Title III Court; *provided*, *however*, that, if the estimate constitutes the maximum limitation on such Claim, the Reorganized Debtor, by and through the Oversight Board, may elect to pursue supplemental proceedings to object to any ultimate allowance of such Claim; and, *provided*, *further*, that the foregoing is not intended to limit the rights granted by Bankruptcy Code section 502(j). All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and not necessarily exclusive of one another.

## C.    Claims Administration Responsibilities

Except as otherwise specifically provided in the Plan, after the Effective Date, PREPA shall have the sole authority: (1) to file, withdraw, or litigate to judgment, objections to Claims; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Title III Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Title III Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, PREPA shall have and retain any and all rights and defenses PREPA had immediately prior to the Effective Date with respect to any Disputed Claim.

## D.    Adjustment to Claims Without Objection

Any duplicate Claim or any Claim that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by PREPA without PREPA having to file an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim and without any further notice to or action, order, or approval of the Title III Court.

## E.    Extension of Claims Objection Bar Date

Upon motion by Reorganized PREPA to the Title III Court, Reorganized PREPA may request, and the Title III Court may grant, an extension to the Claims Objection Bar Date generally or with respect to specific Claims. Any extension granted by the Title III Court shall not be considered to be a modification of the Plan under PROMESA section 313.

## F.  Authority to Amend Creditor List

PREPA will have the authority to amend the Creditor List with respect to any Claim and to make distributions based on such amended Creditor List without approval of the Title III Court. If any such amendment to the Creditor List reduces the amount of a Claim or changes the nature or priority of a Claim, PREPA will provide the Holder of such Claim with notice of such amendment and such Holder will have twenty (20) days to file an objection to such amendment with the Title III Court. If no such objection is filed, the Distribution Agent may proceed with distributions based on such amended Creditor List without approval of the Title III Court.

## G.  No Interest

Unless otherwise specifically provided for herein or by order of the Title III Court, postpetition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

## H.  Disallowance of Claims

All Claims of any Entity from which property is sought by PREPA under Bankruptcy Code sections 550 or 553 or that PREPA alleges is a transferee of a transfer that is avoidable under Bankruptcy Code sections 544, 545, 547, 548, or 549 shall be Disallowed if: (a) the Entity, on the one hand, and PREPA, on the other hand, agree or the Title III Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned Bankruptcy Code sections; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

## ARTICLE XXVI

## GOVERNANCE AND PROVISIONS REGARDING PREPA PAYGO TRUST AND PENSION SYSTEM

## A.  Formation and Responsibilities of the PREPA PayGo Trust

On or prior to the Effective Date, PREPA shall take all necessary steps to establish the PREPA PayGo Trust, including, without limitation, by execution and delivery of the PREPA PayGo Deed of Trust.

## B.  Funding of the PREPA PayGo Trust

1.  Initial Funding

78

On the Effective Date, PREPA shall contribute, or cause to be contributed to the PREPA PayGo Trust, one million dollars ($1,000,000) to fund the initial administrative fees, costs, and expenses of the PREPA PayGo Trust.

      2.     <u>Ongoing Funding of the PREPA PayGo Trust</u>

Reorganized PREPA shall make debt service payments with respect to the PREPA PayGo New Bonds Distribution and Excess New Bonds, if any, held by the PREPA PayGo Trust in accordance with the New Master Indenture. In addition, from and after the Fiscal Year in which the Effective Date occurs, Reorganized PREPA shall make, or cause to be made, annual (but in no event later than September 30th following the conclusion of each Fiscal Year) contributions to the PREPA PayGo Trust such that:

      (a)    the combined payments on account of the PREPA PayGo New Bonds Distribution and Excess New Bonds and Cash payments under this Article XXVI.B.2 shall be sufficient for the PREPA PayGo Trust to reimburse PREPA ERS for retirement benefits paid and administrative expenses incurred in the prior Fiscal Year ending June 30 as set forth in Article VI.A.1, and

      (b)    the contribution in the immediately foregoing clause (a) shall be increased or limited such that, after such contribution, the PREPA PayGo Trust assets shall equal two (2) times the expected retirement benefits to be paid and administrative expenses to be incurred during the current Fiscal Year, with any resulting increase to the amount paid pursuant to the immediately foregoing clause (a) not to exceed fifty million dollars ($50,000,000) in a given Fiscal Year.

**C.**    **<u>Management of PREPA PayGo Trust</u>**

The PREPA PayGo Trust will be managed by an independent entity whose members shall meet the independence, professionalism, experience, and qualification standards set forth in the PREPA PayGo Deed of Trust.

**D.**    **<u>Non-Impairment Covenant</u>**

PREPA covenants herein, and will covenant in the PREPA PayGo Deed of Trust, for the benefit of all Participants that, with respect to payments and other obligations owed to PREPA ERS pursuant to the Plan, all such obligations shall remain in place and not otherwise be altered, modified, or amended until all such obligations have been satisfied in full in accordance with the provisions of the Plan and the Definitive Documents, enforceable by any and each of the Oversight Board, the PREPA PayGo Trust, and PREPA ERS and, with respect to any such provision, the PREPA PayGo Deed of Trust shall not be amended or modified by Reorganized PREPA except (i) with the express prior written consent of the Oversight Board (if in existence), and PREPA ERS, or (ii) pursuant to a new or re-opened Title III case for Reorganized PREPA and a confirmed new or modified, and effective, plan of adjustment.

### E.    Maintenance of Pension

Before the tenth (10th) anniversary of the Effective Date, both the Government of the Commonwealth of Puerto Rico and Reorganized PREPA, including, without limitation, by any Entity or Person acting for or on behalf thereof, shall not (a) implement existing legislation, enact new legislation, or enter into new collective bargaining agreements or other contracts to create or increase any defined benefit pension payment or obligation to current or future retirees from or related to any defined benefit plans over the benefits provided by the Plan, regardless of funding source, or (b) undo (in whole or part) the Plan's eliminations of defined benefit plan accruals and cost of living adjustments for PREPA ERS Participants.

## ARTICLE XXVII

## EFFECT OF CONFIRMATION OF THE PLAN

### A.    Discharge and Release of Claims and Causes of Action

#### 1.    Complete Satisfaction, Discharge, and Release

Except as expressly provided in the Plan or the Confirmation Order, all distributions and rights afforded under the Plan shall be, and shall be deemed to be, in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims or Causes of Action against PREPA and Reorganized PREPA that arose, in whole or in part, prior to the Effective Date, relating to the Title III Case, the Debtor or Reorganized Debtor or any of their respective Assets, property, or interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Causes of Action.  Upon the Effective Date, the Debtor and Reorganized Debtor shall be deemed discharged and released from any and all Claims, Causes of Action, and any other Debts that arose, in whole or in part, prior to the Effective Date (including prior to the Petition Date), and all Debts of the kind specified in Bankruptcy Code sections 502(g), 502(h), or 502(i), whether or not (a) a Proof of Claim based upon such Debt is filed or deemed filed under Bankruptcy Code section 501, (b) a Claim based upon such Debt is allowed under Bankruptcy Code section 502 (or is otherwise resolved), or (c) the Holder of a Claim based upon such Debt voted to accept the Plan; *provided*, for the avoidance of doubt, this Article XXVII.A.1 does not extend to or include any claims, rights, or defenses (whether ordinary or affirmative) of the Vitol Parties related to the Vitol-SCC AP preserved pursuant to the Vitol Settlement Agreement, and the Vitol Parties are not releasing and instead is expressly preserving, all of its claims, rights, or defenses related to the Vitol-SCC AP as provided in the Vitol Settlement Agreement.

#### 2.    Preclusion from Assertion of Claims Against the Debtor

All Entities shall be precluded from asserting any and all Claims or other obligations, suits, judgments, damages, Debts, rights, remedies, Causes of Action, or liabilities, of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtor and Reorganized Debtor and each of their respective Assets, property and rights, relating to the Title III Case, regardless of whether any property will have been distributed or

retained pursuant to the Plan on account of such Claims or other obligations, suits, judgments, damages, Debts, rights, remedies, Causes of Action, or liabilities.  In accordance with the foregoing, except as expressly provided in the Plan or the Confirmation Order, the Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge and release of all such Claims, Causes of Action, or Debt of or against the Debtor and the Reorganized Debtor pursuant to Bankruptcy Code sections 524 and 944, applicable to the Title III Case pursuant to PROMESA section 301, and such discharge shall void and extinguish any judgment obtained against the Debtor or Reorganized Debtor and their respective Assets, and property at any time, to the extent such judgment is related to a discharged Claim, Debt, or liability.  As of the Effective Date, and in consideration for the value provided under the Plan, each Holder of a Claim in any Class under this Plan shall be and hereby is deemed to release and forever waive and discharge as against the Debtor and Reorganized Debtor, and their respective Assets and property and all such Claims; *provided*, for the avoidance of doubt, this Article XXVII.A.2 does not extend to or include any claims, rights, or defenses (whether ordinary or affirmative) of the Vitol Parties related to the Vitol-SCC AP preserved pursuant to the Vitol Settlement Agreement, and the Vitol Parties are is not releasing and instead is expressly preserving, all of its claims, rights, or defenses related to the Vitol-SCC AP as provided in the Vitol Settlement Agreement.

3.      **Injunction Related to Discharge of Claims**

Except as otherwise expressly provided in this Article XXVII of the Plan, the Confirmation Order or such other Final Order of the Title III Court that may be applicable, all Entities who have held, hold, or may hold Claims or any other Debt or liability that is discharged or released pursuant to Article XXVII hereof or who have held, hold, or may hold Claims or any other Debt or liability that is discharged or released pursuant to Article XXVII hereof are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing, directly or indirectly, in any manner, any action or other proceeding (including, without limitation, any judicial, arbitral, administrative, or other proceeding) of any kind on any such Claim or other Debt or liability that is discharged or released pursuant to the Plan against any of the Released Parties or any of their respective Assets or property, (b) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against any of the Released Parties or any of their respective assets or property on account of any Claim or other Debt or liability that is discharged or released pursuant to the Plan, (c) creating, perfecting, or enforcing any encumbrance of any kind against any of the Released Parties or any of their respective assets or property on account of any Claim or other Debt or liability that is discharged or released pursuant to the Plan, and (d) except to the extent provided, permitted, or preserved by Bankruptcy Code sections 553, 555, 556, 559, or 560 or pursuant to the common law right of recoupment, asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from any of the Released Parties or any of their respective assets or property, with respect to any such Claim or other Debt or liability that is discharged or released pursuant to the Plan.  Such injunction shall extend to all successors and assigns of the Released Parties and their respective assets and property.

B.      <u>**Releases by the Debtor and Reorganized Debtor**</u>

**Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, and for good and valuable consideration, each of the Debtor and Reorganized Debtor, the Distribution Agent and each of the Debtor's and Reorganized Debtor's Related**

Persons shall be deemed to have and hereby does irrevocably and unconditionally, fully, finally, and forever waive, release, acquit, and discharge the Released Parties from any and all Claims or Causes of Action that the Debtor, Reorganized Debtor, and the Distribution Agent, or any of them, or anyone claiming through them, on their behalf or for their benefit, have or may have or claim to have, now or in the future, against any Released Party that are Released Claims or otherwise are based upon, relate to, or arise out of or in connection with, in whole or in part, any act, omission, transaction, event, or other circumstance relating to the Title III Case, the Fuel Line Lender PSA, the National PSA, or the Debtor taking place or existing on or prior to the Effective Date, and/or any Claim, act, fact, transaction, occurrence, statement, or omission in connection with or alleged or that could have been alleged, including, without limitation, any such Claim, demand, right, liability, or cause of action for indemnification, contribution, or any other basis in law or equity for damages, costs, or fees.

C.      **Releases by Holders of Claims**

Notwithstanding anything contained in this Plan to the contrary, as of the Effective Date, for good and valuable consideration, each Holder of a Claim is deemed to have released and discharged the Debtor and the Reorganized Debtor from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtor, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtor (including management, ownership, or operation thereof), the Debtor's in- or out-of-court restructuring efforts, intercompany transactions, the Title III Case, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Uninsured Bond Settlement Agreement, the Vitol Settlement Agreement, the Restructuring Transactions, the Fuel Line Lender PSA, the National PSA, or any contract, instrument, release, or other Definitive Documents, agreement, or document created or entered into in connection with the Disclosure Statement, or the Plan, the filing of the Title III Case, the pursuit of Confirmation, the pursuit of consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, the Restructuring Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

D.      **Exculpation**

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Title III Case, the formulation, preparation, dissemination, negotiation, or filing of the Fuel Line Lender PSA, the National PSA, Disclosure Statement, the Plan, the Uninsured Bond Settlement Agreement, the Vitol Settlement Agreement, or any Restructuring

Transaction, contract, instrument, release or other Definitive Document, agreement, or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Title III Case, the pursuit of Confirmation, the pursuit of consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.  For the avoidance of doubt, notwithstanding anything contained herein to the contrary, the Plan shall not, and shall not be construed to, release or exculpate, any payment obligation under the applicable National Insurance Policy, to any beneficial holder of National Insured Bonds, in accordance with its terms solely to the extent of any failure of such holder to receive the treatment provided to Holders of Claims in Class 5 (or any claims that National may have against a beneficial holder of National Insured Bonds with respect to National's applicable obligations under the National Insurance Policies).

E.      <u>Injunction</u>

As of the Effective Date, all Entities that hold, have held, or may hold a Released Claim that is released pursuant to this Article XXVII of the Plan, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred, and enjoined from taking any of the following actions, whether directly or indirectly, derivatively, or otherwise, on account of or based on the subject matter of such discharged Released Claims: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding (including, without limitation, any judicial, arbitral, administrative, or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting, or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation owed to any Entity released under Article XXVII hereof; and (v) commencing or continuing in any manner, in any place of any judicial, arbitration, or administrative proceeding in any forum, that does not comply with or its inconsistent with the provisions of the Plan or the Confirmation Order.

F.      <u>Non-Severability of Releases, Injunctions, and Exculpations</u>

Notwithstanding anything else contained in the Plan, the releases, injunctions, and exculpation provided in this Article XXVII are integral to obtaining the value provided hereunder

and constitute an essential component of the compromises reached and are not severable from the other provisions of this Plan.

**G.**      **Reimbursement or Contribution**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to Bankruptcy Code section 502(e)(1)(B), then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever Disallowed and expunged notwithstanding Bankruptcy Code section 502(j), unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

**H.**      **Release of Liens**

Except (a) with respect to the Liens securing the New Bonds and CVI, or (b) as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtor shall be fully released and discharged, and the Holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtor, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Debtor and its successors and assigns.

**ARTICLE XXVIII**

**MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**

**A.**      **Modification of Plan**

Subject to sections 104(j) and 313 of PROMESA and sections 942 and 1127(d) of the Bankruptcy Code, applicable to the Title III Cases pursuant to PROMESA section 301 of PROMESA, PREPA may alter, amend, or modify the Plan or the Exhibits at any time prior to or after the Confirmation Date but prior to the Effective Date; *provided*, that such alteration, amendment, or modification does not materially and adversely impact LUMA Energy, shall not be inconsistent with the Fuel Line Lender PSA or the National PSA, and shall be reasonably acceptable to the Required Fuel Line Lenders and National.  Subject to Article I.G hereof, a Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as altered, amended, or modified so long as the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim of such Holder.

**B.**      **Revocation or Withdrawal**

The Plan may be revoked or withdrawn prior to the Confirmation Date by the Oversight Board.  If the Plan is revoked or withdrawn prior to the Confirmation Date, or if the Plan does not become effective for any reason whatsoever, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claim by

the Debtor or any other Entity, or to prejudice in any manner the rights of the Debtor or any other Entity in any further proceeding involving the Debtor.

**C.      Amendment of Plan Documents**

From and after the Effective Date, the authority to amend, modify, or supplement the Plan Supplement, the exhibits and schedules to the Plan Supplement and the exhibits and schedules to the Plan, and any document attached to any of the foregoing, shall be as provided in such Plan Supplement, exhibits and schedules to the Plan Supplement, or exhibits and schedules to the Plan and their respective attachments, as the case may be.

**D.      No Admission of Liability**

The submission of this Plan is not intended to be, nor shall it be construed as, an admission or evidence in any pending or subsequent suit, action, proceeding, or dispute of any liability, wrongdoing, or obligation whatsoever (including as to the merits of any claim or defense) by any Entity with respect to any of the matters addressed in this Plan.

None of this Plan (including, without limitation, the exhibits and schedules hereto), or any settlement entered, act performed, or document executed in connection with this Plan: (i) is or may be deemed to be or may be used as an admission or evidence of the validity of any claim or of any wrongdoing or liability of any Entity; (ii) is or may be deemed to be or may be used as an admission or evidence of any liability, fault, or omission of any Entity in any civil, criminal, or administrative proceeding in any court, administrative agency, or other tribunal; (iii) is or may be deemed to be or used as an admission or evidence against Reorganized Debtor, the Debtor, or any other Entity with respect to the validity of any Claim.  None of this Plan or any settlement entered, act performed, or document executed in connection with this Plan shall be admissible in any proceeding for any purposes, except to carry out the terms of this Plan, and except that, once confirmed, any Entity may file this Plan in any action for any purpose, including, but not limited to, in order to support a defense or counterclaim based on the principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar, or reduction or any other theory of claim preclusion or issue preclusion or similar defense of counterclaim.

**ARTICLE XXIX**

**CORPORATE GOVERNANCE AND MANAGEMENT OF REORGANIZED DEBTOR**

**A.      Corporate Action**

On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the directors of the Debtor or Reorganized Debtor, including, without limitation, to the extent applicable, the authorization to issue or cause to be issued the New Bonds, the authorization to enter into the Definitive Documents, the adoption of Reorganized Debtor By-Laws, and the election or appointment, as the case may be, of directors and officers of Reorganized Debtor pursuant to the Plan, as applicable, shall be authorized and approved in all respects, in each case, in accordance with the New Master Indenture and the new corporate governance documents, as applicable, and without further action by any Entity under any other applicable law, regulation, order, or rule.  Other matters provided under the Plan involving the corporate structure of the

Reorganized Debtor, or corporate action by the Reorganized Debtor, shall be deemed to have occurred, be authorized, and shall be in effect in accordance with the New Master Indenture and the new corporate governance documents, as applicable, and without requiring further action by any Entity under any other applicable law, regulation, order, or rule.  Without limiting the foregoing, from and after the Confirmation Date, the Debtor and Reorganized Debtor shall take any and all actions deemed appropriate in order to consummate the transactions contemplated herein in accordance with the New Master Indenture, and the new corporate governance documents, as applicable.

**B.      Reorganized Debtor's By-Laws**

To the extent applicable, the by-laws of the Reorganized Debtor shall be amended as of the Effective Date to be consistent with the Plan, as applicable.

**C.      Officers of Reorganized Debtor**

The Reorganized Debtor's officers and governing directors will remain the same as of the Effective Date, unless disclosed otherwise in the Plan Supplement.

## ARTICLE XXX

## IDENTIFICATION OF CLAIMS IMPAIRED BY THE PLAN AND NOT IMPAIRED BY THE PLAN

**A.      Impaired Classes**

The Claims in Classes 1–9 and 11–12 are Impaired and receiving distributions pursuant to the Plan, and are therefore entitled to vote to accept or reject the Plan.  The Claims in Class 14 are Impaired and not receiving a distribution pursuant to the Plan and, therefore, Class 14 is deemed to have rejected the Plan.

**B.      Unimpaired Classes**

The Claims in Classes 10 and 13 are Unimpaired pursuant to the Plan, are deemed to have accepted the Plan, and are not entitled to vote to accept or reject the Plan.

## ARTICLE XXXI

## CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN

**A.      Conditions Precedent to Confirmation Date**

It shall be a condition precedent to Confirmation of the Plan that the following conditions shall have been satisfied or waived pursuant to Article XXXI.B of the Plan:

(a)      **Fiscal Plan Certification:**  The Oversight Board shall have certified a Fiscal Plan consistent with the Plan and shall have certified the submission

86

of the Plan, and any modifications to the Plan through the Confirmation Date, in accordance with PROMESA sections 104(j) and 313.

(b)    **Required Orders:**  The Title III Court shall have entered an order or orders (including, without limitation, the Disclosure Statement Order and the Confirmation Order in accordance with PROMESA section 314 and Bankruptcy Code section 1129, made applicable to the Title III Cases pursuant to PROMESA section 301) providing for the following:

(i)    Approving the Disclosure Statement as containing "adequate information" pursuant to Bankruptcy Code section 1125;

(ii)    Authorizing the solicitation of votes and elections with respect to the Plan;

(iii)    Determining that all votes and elections or deemed elections are binding and have been properly tabulated;

(iv)    Confirming and giving effect to the terms and provisions of the Plan, including the releases set forth in Article XXVII of the Plan;

(v)    Subject to Article XVIII with respect to the settlement of the National Claims, determining that the compromises and settlements set forth in the Plan are appropriate, reasonable, and approved and authorizing the transactions contemplated therein;

(vi)    Determining that all applicable tests, standards, and burdens in connection with the Plan have been duly satisfied and met by the Oversight Board, the Debtor, and the Plan;

(vii)    Determining the validity, priority, extent, and enforceability of the Lien asserted by the Bond Trustee;

(viii)    Determining the amount, if any, of the Deficiency Claim;

(ix)    Determining that PREB is required to approve the Legacy Charge as a rate, fee, and/or charge necessary to guarantee that Reorganized PREPA meets its obligations to holders of New Bonds;

(x)    Approving the documents in the Plan Supplement, and determining that such documents are valid and binding on parties with respect thereto; and

(xi)    Authorizing the Reorganized Debtor to execute, enter into, and deliver the documents in the Plan Supplement, and to execute, implement, and take all actions otherwise necessary or appropriate to give effect to the transactions contemplated by the Plan, and the documents in the Plan Supplement;

(xii)   Authorizing the Debtor to take all actions necessary to enter into, implement, and consummate the contracts, instruments, securities, releases, leases, indentures, and other agreements or documents created in connection with the Plan, including setting, implementing, and enforcing the Legacy Charge;

(xiii)  Decreeing that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

(xiv)   Authorizing the Debtor and Reorganized Debtor to:  (1) make all distributions and issuances as required under the Plan; and (2) enter into any agreements and transaction as set forth in the Plan Supplement;

(xv)    Authorizing the implementation of the Plan in accordance with its terms;

(xvi)   Determining the New Bonds, and the covenants by Reorganized PREPA, for the benefit of the holders of the New Bonds, as provided in the New Master Indenture or the Confirmation Order, as applicable, constitute valid, binding, legal, and enforceable obligations of Reorganized PREPA, under Puerto Rico, New York, and federal law;

(xvii)  Determining the CVI, and the covenants by Reorganized PREPA, for the benefit of the holders of the CVI, as provided in the New Master Indenture or the Confirmation Order, as applicable, constitute valid, binding, legal, and enforceable obligations of Reorganized PREPA, under Puerto Rico and federal law;

(xviii) Determining that the Lien on and security interest in the Net Revenues up to the amount of the Legacy Charge Revenues, and the right to receive Net Revenues up to the amount of the Legacy Charge Revenues, and all other provisions to pay the New Bonds, are valid, binding, legal, and enforceable;

(xix)   Determining that the Lien on and security interest in the Remaining Net Revenues up to the amount of the Remaining Legacy Charge Revenues, and the right to receive the Remaining Net Revenues up to the amount of the Legacy Charge Revenues, and all other provisions to pay the CVI, are valid, binding, legal, and enforceable;

(xx)    Determining that the Lien on and security interest in the Net Revenues up to the amount of the Legacy Charge Revenues shall be deemed automatically perfected on the Effective Date, subject only to Liens and security interests permitted under the New Master Indenture, and shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute

preferential transfers or fraudulent conveyances under PROMESA or any applicable non-bankruptcy law, to the fullest extent permitted by law;

(xxi)   Providing that no party, Person, or Entity shall enact, adopt, or implement any law, rule, regulation, or policy that impedes, financially or otherwise, consummation and implementation of the transactions contemplated by the Plan; and

(xxii)   Determining the Plan is consistent with the Debtor's Fiscal Plan and satisfies PROMESA section 314(b)(7).

(c)   **Form of Orders:**  The Confirmation Order and the Plan are each in form and substance acceptable to the Oversight Board and reasonably acceptable to the Required Fuel Line Lenders.

(d)   **PREB Approval:**  PREB shall have provided any required approval of the rates, fees, and charges, including the Legacy Charge, necessary to guarantee that Reorganized PREPA meets its obligations to holders of New Bonds.

(e)   **Confirmation Order:**  The Confirmation Order includes (i) determinations that all of the settlements and compromises contained in the Plan satisfy applicable standard Bankruptcy Code sections 365, 1123(b)(3), and 1129 and Bankruptcy Rule 9019, (ii) to the extent applicable, the releases, exculpations, and injunctions set forth in Article XXVII of the Plan, and (iii) the applicable provisions set forth in this Article XXXI; *provided*, that approval of the National Settlement with respect to the National Reimbursement Claim shall not be a condition to Confirmation of this Plan.

## B.   Waiver of Conditions Precedent to Confirmation

To the extent practicable and legally permissible, each of the conditions precedent Article XXXI.A hereof may be waived, in whole or in part, by the Oversight Board, with the consent of the Required Fuel Line Lenders with respect to conditions that directly impact their rights under the Plan or the Fuel Line Lender PSA (with such consent not to be unreasonably withheld).  Any such waiver of a condition precedent may be effected at any time by filing a notice thereof with the Title III Court executed by the Oversight Board.

## ARTICLE XXXII

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

## A.   Conditions Precedent to the Effective Date

It shall be a condition precedent to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article XXXII.B of the Plan:

1. **Fiscal Plan Certification:** The Oversight Board shall have determined that the Plan is consistent with the Debtor's Fiscal Plan and shall have certified the submission of the Plan, and any modifications to the Plan through the Confirmation Date, in accordance with PROMESA sections 104(j) and 313. The Fiscal Plan certified as of the Effective Date shall provide for payment of principal and interest with respect to the New Bonds as set forth herein.

2. **Confirmation:** All conditions precedent to Confirmation, including entry of the Confirmation Order, shall have been satisfied or waived pursuant to Article XXXI.B of the Plan.

3. **Final Order; No Injunction:** The Confirmation Order shall be a Final Order, and shall not be stayed in any respect.

4. **Authorizations:** All authorizations, consents, regulatory approvals, rulings, or documents, if any, that are necessary to implement and effectuate the Plan, including that PREB approves rates, fees, and charges necessary to guarantee that Reorganized PREPA meets its obligations to holders of New Bonds and the PREPA PayGo Trust, including the Legacy Charge, have been obtained or enacted or entered and not revoked or reversed.

5. **Execution of Documents; Other Actions:** All actions and all contracts, instruments, settlements, releases and other agreements or documents, including Definitive Documents, necessary to implement the terms and provisions of the Plan, including the Definitive Documents, are effected or executed and delivered, as applicable, are in full force and effect, and are in form and substance satisfactory to the Oversight Board.

6. **Plan Supplement:** The final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in a manner consistent in all material respects with the Plan, Fuel Line Lender PSA, and National PSA and shall be in form and substance acceptable to PREPA.

## B. **Waiver of Conditions Precedent**

The Oversight Board may waive any of the conditions to the Effective Date set forth in Article XXXII.A of the Plan at any time without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Title III Court, and without any formal action other than proceeding to confirm and consummate the Plan, with the consent of the Required Fuel Line Lenders with respect to conditions that directly impact their rights under the Plan or the Fuel Line Lender PSA (with such consent not to be unreasonably withheld); *provided*, that the Oversight Board must provide at least five (5) business days' notice to LUMA Energy prior to waiving any condition precedent to the Effective Date.

## C. **Effect of Non-Occurrence of Conditions to Effective Date**

If prior to the Effective Date, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Title III Court vacating the Confirmation Order, the

Plan will be null and void in all respects, and nothing contained in the Plan or Disclosure Statement shall: (a) constitute a waiver or release of any Claims or Causes of Action; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtor or any other Entity.

## ARTICLE XXXIII

## PROVISIONS REGARDING COMMITTEE

**A.**   **Dissolution of Committee**

On the Effective Date, the Creditors' Committee shall be (a) dissolved and be deemed to have satisfied all of its respective duties and obligations, and (b) released and discharged from any action or activity taken, or required to be taken, in connection with the Title III Case.  To the extent that, as of the date immediately prior to the Effective Date, the Creditors' Committee was a party to a contested matter or adversary proceeding in connection with the Title III Case or any objection to claim, from and after the Effective Date and to the extent not already a party thereto, the Reorganized Debtor shall be deemed to have assumed such role and responsibility in connection with such contested matter or adversary proceeding and, upon such assumption, the Creditors' Committee shall be relieved of any role, responsibility, or obligation with respect thereto.

## ARTICLE XXXIV

## PROVISIONS REGARDING OVERSIGHT BOARD AND COMPLIANCE WITH PROMESA

**A.**   **Effect of Confirmation**

Nothing in this Plan or the Confirmation Order shall discharge, substitute, alter, or otherwise modify the powers and responsibilities of the Oversight Board pursuant to PROMESA or the obligations of the Reorganized Debtor under PROMESA. From and after the Effective Date, the Reorganized Debtor shall continue to have all of its obligations pursuant to PROMESA, including, without limitation, the terms and conditions of Titles I and II thereof.

**B.**   **Ongoing Role of the Oversight Board**

Nothing in the Plan or the Confirmation Order shall discharge any or all obligations of each Debtor under PROMESA and, from and after the Effective Date, the Oversight Board's powers and responsibilities under PROMESA shall continue, and the Debtor's duties and obligations shall continue and be unaffected by the Plan and the consummation thereof.

**C.**   **Preemption of Laws**

As of the Effective Date, and to the extent not previously preempted pursuant to an order of the Title III Court, provisions of Commonwealth laws, rules, or regulations that affect PREPA or Reorganized PREPA and are inconsistent with PROMESA shall be preempted for the reasons, and to the extent, set forth in Exhibit "A" to the Findings of Fact and Conclusions of Law, such preempted laws, rules, and regulations include, without limitation, pursuant to Section 4 of

91

PROMESA, all laws, rules, and regulations (or such portions thereof) of the Commonwealth of Puerto Rico to the extent they give rise to obligations of the Debtor discharged or altered by the Plan and the Confirmation Order pursuant to PROMESA, and such discharge shall prevail over any general or specific provisions of territory laws, rules, and regulations, are preempted to the extent inconsistent with the Plan's discharge of the Debtor's obligations and all such laws shall not be enforceable to the extent they are inconsistent with the Plan's discharge of the Debtor's obligations or any of the transactions contemplated by the Plan.  Without in any way limiting the foregoing, (y) the Commonwealth laws preempted by PROMESA that affect the Debtor include, without limitation, those listed on **Schedule D** hereto for the reasons and to the extent set forth in Exhibit "A" to the Findings of Fact and Conclusions of Law, and (z) all litigation in which any Government Party is a defendant, over whether Commonwealth law listed on **Schedule D** hereto is preempted by PROMESA shall be dismissed, with prejudice, as of the Effective Date and the parties thereto shall provide the Oversight Board prompt notice of such dismissal.  For the avoidance of doubt, the non-inclusion of a payment obligation arising from a valid law in a certified Fiscal Plan or PREPA budget is not a basis for disallowance of such obligation to the extent the claim arising therefrom otherwise satisfies the requirements for allowance of a claim under the relevant provisions of the Bankruptcy Code.

# ARTICLE XXXV

# RETENTION OF JURISDICTION

The Title III Court shall retain all its exclusive and concurrent subject matter jurisdiction, as the case may be, over any matter arising under PROMESA, arising in or related to, the Title III Cases and the Plan, or that relates to the following:

1.    allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim not compromised or settled hereby, including the resolution of any request for payment of any Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims not compromised or settled hereby;

2.    resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which PREPA is party or with respect to which PREPA may be liable and to hear, determine, and, if necessary, liquidate, any Cure Claim, including pursuant to Bankruptcy Code section 365; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

3.    ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

4.    adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving PREPA or the Reorganized Debtor that may be pending on the Effective Date or brought thereafter;

5.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to PROMESA, the Plan, or orders entered by the Title III Court;

6.      enter and implement such orders as may be necessary or appropriate to execute, implement, consummate, or enforce the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Title III Case and (b) the Plan, the Confirmation Order, and any other contracts, instruments, securities, releases, indentures, and other agreements or documents created in connection with the Plan;

7.      adjudicate, decide, or resolve any cases, controversies, suits, disputes, or other challenges of any kind that may arise in connection with the consummation, interpretation, or enforcement of the Plan, the Confirmation Order, or any other contract, instrument, security, release, or other agreement or document that is entered into or delivered pursuant to the Plan or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents, including, for the avoidance of doubt, any issues relating to setting, implementing, and enforcing the Legacy Charge and rate covenant and any amendments to the Legacy Charge and rate covenant, as well as PREB's authorization over the Legacy Charge and any amendments to the Legacy Charge;

8.      approve any modification of the Plan or approve any modification of the Confirmation Order or any other contract, instrument, security, release, or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any order, the Plan, the Confirmation Order, or any other contract, instrument, security, release, or other agreement or document created in connection with the Plan or the Confirmation Order, or enter any order in aid of confirmation pursuant to Bankruptcy Code sections 945 and 1142(b), in such manner as may be necessary or appropriate to consummate the Plan;

9.      adjudicate, decide, or resolve any matters relating to PREPA's compliance with the Plan and the Confirmation Order consistent with Bankruptcy Code section 945;

10.     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any other contract, instrument, security, release, or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement, or the Confirmation Order, in each case, solely to the extent that any such document does not provide for another court or courts to have exclusive jurisdiction;

11.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to enforce or restrain interference by any Entity with consummation or enforcement of the Plan or the Confirmation Order;

12.     adjudicate any and all controversies, suits, or issues that may arise regarding the validity of any actions taken by any Entity pursuant to or in furtherance of the Plan or Confirmation Order, including, without limitation, issuance of the New Bonds, and enter any necessary or appropriate orders or relief in connection with such adjudication;

13.    determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, the Definitive Documents, or any other contract, instrument, security, release, other agreement, or document created in connection with the Plan, in each case, solely to the extent that any such document does not provide for another court or courts to have exclusive jurisdiction;

14.    enforce the New Bonds and the New Master Indenture, including, without limitation, the Interest Rate Covenant, or, in the event that the Title III Court declines such retention of jurisdiction or the Title III Case has been closed in accordance with the terms and provisions of PROMESA, the United States District Court for the District of Puerto Rico is hereby designated to enforce the New Bonds and the New Master Indenture, including, without limitation, the Interest Rate Covenant;

15.    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

16.    enter an order or final decree concluding or closing the Title III Case pursuant to Bankruptcy Code section 945(b);

17.    enforce and clarify any orders previously entered by the Title III Court in the Title III Case; and

18.    hear any other matter over which the Title III Court has jurisdiction under the provisions of PROMESA subject to any limits on the Title III Court's jurisdiction and powers under PROMESA sections 305 and 306.

## ARTICLE XXXVI

## MISCELLANEOUS PROVISIONS

### A.    Title to Assets

Except as otherwise provided in the Confirmation Order or this Plan, on the Effective Date, title to all Assets and properties of the Debtor encompassed by the Plan shall vest in the Reorganized Debtor, free and clear of all Liens (except the Liens granted pursuant to the Plan and Confirmation Order).

### B.    No Waiver

Notwithstanding anything to the contrary contained herein, the releases and injunctions set forth in the Plan shall not, and shall not be deemed to, limit, abridge or otherwise affect the rights of the Oversight Board, AAFAF, the Reorganized Debtor, the Fuel Line Lender PSA Creditors (consistent with the Fuel Line Lender PSA), or National (consistent with the National PSA) to enforce, sue on, settle or compromise the rights, claims, and other matters expressly retained by any of them.

## C.    Supplemental Injunction

Notwithstanding anything contained herein to the contrary, except to the limited extent provided in the Plan, all Entities, including Entities acting on their behalf, who currently hold or assert, have held or asserted, or may hold or assert, any Released Claims against any of the Released Parties based upon, attributable to, arising out of or relating to the Title III Case or any Claim against the Debtor, whenever and wherever arising or asserted, whether in the U.S. or anywhere else in the world, whether sounding in tort, contract, warranty, statute, or any other theory of law, equity or otherwise, shall be, and shall be deemed to be, permanently stayed, restrained and enjoined from taking any action against any of the Released Parties for the purpose of directly or indirectly collecting, recovering or receiving any payment or recovery with respect to any Released Claims arising prior to the Effective Date (including prior to the Petition Date), including, but not limited to:

1.    Commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Released Claim against any of the Released Parties or the assets or property of any Released Party;

2.    Enforcing, attaching, collecting, or recovering, by any manner or means, any judgment, award, decree, or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

3.    Creating, perfecting, or enforcing any Lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

4.    Except as otherwise expressly provided in the Plan or the Confirmation Order, asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any such Released Claim; and

5.    Taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan or the Confirmation Order, *provided*, *however*, that the Debtor's compliance with the formal requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for any injunction against conduct not otherwise enjoined under the Bankruptcy Code.

## D.    Immediate Binding Effect

Pursuant to Bankruptcy Code section 944(a), applicable to the Title III Cases pursuant to PROMESA section 301, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or any other provision, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding on any and all Holders of Claims and their respective successors and assigns, whether or not the Claim of any such Holder is Impaired under the Plan and whether or not such Holder has accepted the Plan.  The releases, exculpations, and settlements effected under the Plan shall be operative, and subject to enforcement by the Title III Court, from and after the Effective Date, including pursuant to the

injunctive provisions of the Plan. Once approved, the compromises and settlements embodied in the Plan, along with the treatment of any associated Allowed Claims, shall not be subject to collateral attack or other challenge by any Entity in any court or other forum. As such, any Entity that opposes the terms of any compromise and settlement set forth in the Plan must (a) challenge such compromise and settlement prior to confirmation of the Plan and (b) demonstrate appropriate standing to object and that the subject compromise and settlement does not meet the standards governing settlements under Bankruptcy Rule 9019 and other applicable law.

## E.    Additional Documents

On or before the Effective Date, the Oversight Board may file with Clerk of the Title III Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, the Fuel Line Lender PSA, and the National PSA. The Debtor and all Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest, from time to time, may prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

## F.    Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless the Title III Court shall enter the Confirmation Order. None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtor with respect to the Holders of Claims prior to the Effective Date. Except as expressly set forth herein, the rights and powers of the government of the Commonwealth under the Puerto Rico Constitution and PROMESA, including, without limitation, under PROMESA sections 303 and 305, are expressly reserved (subject to any limitation thereon imposed by the Puerto Rico Constitution, the U.S. Constitution or PROMESA), and nothing herein shall be deemed a waiver of any such rights and powers.

## G.    Successors and Assigns

Except as expressly provided otherwise in the Plan, the rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

## H.    Post-Effective Date Fees and Expenses

From and after the Effective Date, the Reorganized Debtor shall, in the ordinary course of business and without the necessity for any approval by the Title III Court, retain professionals and pay the reasonable professional fees and expenses incurred by the Reorganized Debtor related to implementation and consummation of the Plan without further approval from the Title III Court. Without limiting the foregoing, from and after the Effective Date, the Reorganized Debtor shall, in the ordinary course of business and without the necessity for any approval by the Title III Court, but in no event later than forty-five (45) days following the submission of invoices or statements with respect to the incurrence of fees and expenses to the Reorganized Debtor, pay the reasonable

and documented fees and reimburse the expenses of the Oversight Board and its professionals related to the implementation and consummation of the Plan and in connection with its duties and responsibilities pursuant to PROMESA and the terms and provisions of the Plan.

**I.**     **Securities Act Exemption**

Pursuant to Bankruptcy Code section 1145 and/or Securities Act section 3(a)(2), the offering, issuance, and distribution of the New Bonds and CVI pursuant to the terms hereof shall be exempt from registration under the Securities Act and any state or local law requiring registration for the offer, issuance or distribution of securities, including, but not limited to, the registration requirements of Securities Act section 5 and any other applicable state or federal law requiring registration and/or prospectus delivery or qualification prior to the offering, issuance, distribution, or sale of securities.

**J.**     **Governing Law**

Except to the extent that other federal law is applicable, or to the extent that an exhibit hereto or any document to be entered into in connection herewith provides otherwise, the rights, duties, and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, PROMESA (including the provisions of the Bankruptcy Code made applicable under section 301 of PROMESA) and, to the extent not inconsistent therewith, the laws of the Commonwealth of Puerto Rico, giving effect to principles of conflicts of laws.

**K.**     **Closing Case**

The Oversight Board shall, promptly upon the full administration of the Title III Cases, file with the Title III Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Title III Court. Notwithstanding the closing of the Title III Cases, the Title III Court shall retain jurisdiction of all of the matters set forth in Article XXXV of the Plan.

**L.**     **Section Headings**

The section headings contained in this Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan.

**M.**     **Document Retention**

From and after the Effective Date, the Reorganized Debtor may maintain documents in accordance with its standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtor.

**N.**     **Service of Documents**

All notices, requests to, demands, or other document(s) required by the Plan or the Confirmation Order to be served on or delivered to the Oversight Board, PREPA, or AAFAF to be effective shall be in writing including by facsimile transmission and unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in

the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

**PREPA or the Oversight Board**          Financial Oversight and Management
                                          Board for Puerto Rico
                                          268 Muñoz Rivera Ave, Suite 1107
                                          San Juan, PR 00918-1813
                                          Attn:  Executive Director

                                          – with a copy to –

                                          PROSKAUER ROSE LLP
                                          Eleven Times Square
                                          New York, NY 10036
                                          Attn:  Martin J. Bienenstock, Esq.
                                                 Paul V. Possinger, Esq.
                                                 Ehud Barak, Esq.
                                                 Daniel S. Desatnik, Esq.
                                          Tel:  (212) 969-3000
                                          Fax:  (212) 969-2900


**AAFAF**                                 Fiscal Agency and Financial Advisory Authority
                                          Roberto Sánchez Vilella (Minillas) Government Center
                                          De Diego Ave. Stop 22
                                          San Juan, Puerto Rico 00907

                                          – with a copy to –

                                          O'MELVENY & MYERS LLP
                                          Seven Times Square
                                          New York, NY 10036
                                          Attn:  John Rapisardi, Esq.
                                                 Peter Friedman, Esq.
                                                 Maria J. DiConza, Esq.
                                          Tel:  (212) 326-2000
                                          Fax:  (212) 326-2061


## O.     <u>Term of Injunctions or Stays</u>

**Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Title III Case (pursuant to Bankruptcy Code sections 105, 362, or 922 or any order of the Title III Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

## P.    Entire Agreement

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.  Notwithstanding the foregoing, the Fuel Line Lender PSA (other than the Term Sheet defined under and attached to the Fuel Line Lender PSA) shall continue to apply and remain in full force and effect according to its terms until the Effective Date, and the Plan does not supersede any rights or obligations otherwise arising under the Fuel Line Lender PSA (other than the Term Sheet defined under and attached to the Fuel Line Lender PSA) until the Effective Date.  Notwithstanding the foregoing, the National PSA shall continue to apply and remain in full force and effect according to its terms until the Effective Date, and the Plan does not supersede any rights or obligations otherwise arising under the National PSA until the Effective Date.

## Q.    Plan Supplement Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  Upon the filing of the Plan Supplement with the Clerk of the Title III Court, copies of the documents contained therein shall be made available upon written request to the Oversight Board's counsel at the address above or by downloading such documents from https://dm.epiq11.com/case/prepa/info or the Title III Court's website, available via PACER.  After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to the Oversight Board's counsel at the address    above    or    by    downloading    such    exhibits    and    documents    from https://dm.epiq11.com/case/prepa/info or the Title III Court's website, available via PACER. Unless otherwise ordered by the Title III Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control; *provided*, *however*, that with respect to the matters governed by the New Master Indenture, to the extent that any provisions of the Plan are inconsistent with the New Master Indenture, the New Master Indenture shall control.

## R.    Non-Severability

Except to the extent otherwise expressly specified in this Plan, if any term or provision of the Plan is held by the Title III Court to be invalid, void, or unenforceable, the Title III Court, in each case at the election of and with the consent of PREPA, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The provisions of the Plan, including its release, injunction, exculpation, and compromise provisions, are mutually dependent and non-severable. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan is:  (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the consent of PREPA; *provided*,

that any such deletion or modification must be consistent with (i) the Fuel Line Lender PSA with respect to provisions that directly impact the rights of the Fuel Line Lenders under the Plan and the Fuel Line Lender PSA and (ii) the National PSA with respect to provisions that directly impact the rights of National under the Plan and the National PSA; and (c) non-severable and mutually dependent.

## S.    Votes Solicited in Good Faith

Upon entry of the Confirmation Order, PREPA will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to Bankruptcy Code section 1125(e), PREPA and its agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or PREPA will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the securities offered and sold under the Plan and any previous plan.

## T.    Waiver or Estoppel

Each Holder of a Claim shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim should be Allowed in a certain amount, in a certain priority, secured, or not subordinated by virtue of an agreement made with PREPA or its counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers filed with the Title III Court prior to the Confirmation Date.

Respectfully submitted,

**PUERTO RICO ELECTRIC POWER AUTHORITY**, by and through the Financial Oversight and Management Board for Puerto Rico as its sole Title III representative

By: */s/ David A. Skeel*
Name:    David A. Skeel
Title:     Chairman

**<u>Schedule A</u>**

**Actions to be Transferred to the Avoidance Actions Trust**

**Actions to be Transferred to the Avoidance Actions Trust[1]**

| VENDOR NAME | ADVERSARY PROCEEDING NO. |
|---|---|
| Core Laboratories N.V. d/b/a Saybolt | 19-381 |
| Puerto Nuevo Security Guards, Inc. | 19-384 |

---

[1] The actions to be transferred to the Avoidance Actions Trust include, but are not limited to, the actions listed on this Exhibit.

**<u>Schedule B</u>**

**Legacy Charge**

| Term | Description[1] |
|---|---|
| Legacy Charge | The "Legacy Charge" shall consist, collectively, of all applicable Flat Fees and Volumetric Charges set at the levels for each customer class set forth in the Annex 1 attached hereto, subject to the Amendment Test and the modification provision set forth in the Plan, to be included in customer rates pursuant to the Plan and Confirmation Order. |
| | The Oversight Board reserves its rights and may amend the rates prior to the confirmation objection deadline, upon further discussion with PREB, LUMA Energy,[2] and AAFAF, in a manner that will provide similar recoveries to creditors to those provided for in the Plan. |
| Legacy Charge's Purpose | The Legacy Charge is collected to ensure sufficient cash flow required for PREPA's debt service on the New Bonds issued under the Plan. |
| Applicability | The Legacy Charge will be assessed on all of PREPA's customers, except where the Plan specifically exempts some or all of the Flat Fee or Volumetric Charge. The Legacy Charge will apply to existing and future classes of PREPA customers in use by PREPA and/or LUMA Energy, on behalf of PREPA, as modified subject to the Amendment Test set forth in the Plan. Annex 1 reflects certain categories of PREPA's customer base that will establish how each PREPA customer is charged the Legacy Charge, subject to the Amendment Test set forth in the Plan. |
| | Names and descriptions of certain existing rate classes established by PREPA, some of which may be referred to in Annex 1, are attached hereto as Annex 2. For the avoidance of doubt, any rate class that is subsequently created, any existing rate class currently having no customers but subsequently having customers, or any rate class otherwise not explicitly referenced in Annex 1 or Annex 2, will be subject to the Legacy Charge and will be classified in accordance with the Amendment Test and modification provision in the Plan. |
| Term | The Legacy Charge will become effective on the Effective Date of the PREPA Plan or as otherwise set forth in the Confirmation Order and shall remain in place until its termination on the later of (i) the maturity of the CVI and (ii) the full payment of the Series B Bonds. |

---

[1] All Capitalized terms not set forth herein shall have the meaning ascribed to such term in the Plan to which this Schedule B is attached.

[2] As used herein, "LUMA Energy" shall refer, collectively to LUMA Energy, LLC, a joint venture between Quanta Services and Canadian Utilities Limited, an ATCO Ltd. Company, or to LUMA Energy ServCo, LLC its subsidiary.

| Flat Fee | PREPA will charge a flat fee (the "<u>Flat Fee</u>"), incremental to any existing PREPA rates and fees, in the amount set forth for the applicable customer class on <u>Annex 1</u>, to each customer account each month unless the customer qualifies for an exemption from the Flat Fee.  The amount paid for the Flat Fee is assessed on a U.S. dollar basis, and is not linked to a customer's power consumption, but rather is assessed for each non-exempt customer being connected to the PREPA electricity grid. |
|---|---|
| Volumetric Charge | PREPA will charge a monthly fee (the "<u>Volumetric Charge</u>"), incremental to any existing PREPA rates and fees, in the amount set forth for the applicable customer class on <u>Annex 1</u>, based on each customer's monthly consumption of electricity.  Subject to the Amendment Test and modification provision set forth in the Plan, the Volumetric Charge will be assessed on a cents per-kilowatt hour basis for electricity supplied by PREPA during each billing cycle as follows:<br><br>• For each kWh (or fraction thereof) consumed, as measured by a meter read, during a given calendar month, ***up to and including*** the Volumetric Charge Threshold, in an amount equal to the applicable rate set forth in <u>Annex 1</u> hereto.<br><br>• For each kWh (or fraction thereof) consumed during a given calendar month, as measured by a meter read, that ***exceeds*** the Volumetric Charge Threshold, in an amount equal to the applicable rate set forth in <u>Annex 1</u> hereto. |
| Volumetric Charge Threshold | 500 kWh (the "<u>Volumetric Charge Threshold</u>"), subject to the Amendment Test. |
| Exemption | For a given billing cycle, PREPA will provide for an exemption from the Flat Fee and the Volumetric Charge corresponding to the monthly consumption at or below the Volumetric Charge Threshold, each as set forth in <u>Annex 1</u>, for residential customers who, during such billing cycle, are classified as LRS, RH3, or RFR (each, as defined in <u>Annex 2</u>).<br><br>Solely for purposes of assessing the Legacy Charge, the following customers will also be exempt from the Flat Fee and Volumetric Charge corresponding to the monthly consumption at or below the Volumetric Charge Threshold, each as set forth in <u>Annex 1</u>:<br><br>• Residential customers of PREPA whose Modified Adjusted Gross Income (MAGI) is below a certain threshold similar to the MAGI eligibility levels needed to qualify for Medicaid healthcare benefits in Puerto Rico. |

| | The criteria for any exemptions are subject to the Amendment Test and modification provision set forth in the Plan. |
|---|---|
| Billing | The Legacy Charge will be collected as part of the PREPA bill by PREPA's operator and servicer in the same manner the bills are currently collected. |
| Application of Legacy Charge Revenues | The increase in Net Revenues generated from inclusion of the Legacy Charge will, until full payment of the principal of the New Bonds, fund debt service on the New Bonds after payment of PREPA's Operating Expenses, as specified in the Plan. If repayment in full of the principal of the New Bonds occurs prior to maturity of the CVI, revenues from the Fixed Fee component of the Legacy Charge in place as of the Effective Date thereafter will fund distributions to holders of CVI until maturity of the CVI. |
| Modification | Modification of the Legacy Charge will be done if and only if the Amendment Test is complied with. |

## Annex 1

### (to Schedule B)

| | Fixed Fee ($/month) | Volumetric Charge (</=500 kWH, c/kWH) | Volumetric Charge (>500 kWH, c/kWH) |
|---|---|---|---|
| **RESIDENTIAL** | | | |
| RH3, LRS, RFR | $ - | - | 1.50 |
| GRS 111/112 (Subsidy-eligible) | $ - | - | 1.50 |
| GRS 111/112 (General) | $ 13 | 0.75 | 3.00 |
| **COMMERCIAL** | | | |
| GSS 211 | $ 16.25 | 1.50 | 3.00 |
| GSP 212 | $ 800 | 1.45 | 1.45 |
| GST 213 862 | $ 1,800 | 0.97 | 0.97 |
| **GOVERNMENT** | | | |
| GSS 211 | $ 20 | 1.45 | 2.90 |
| GSP 212 | $ 800 | 1.45 | 1.45 |
| GST 213 862 | $ 1,800 | 0.97 | 0.97 |
| **MUNICIPALITIES** | | | |
| GSS 211 | $ - | - | - |
| GSP 212 | $ - | - | - |
| GST 213 862 | $ - | - | - |
| **INDUSTRIAL** | | | |
| GSS 311 | $ 20 | 2.18 | 2.18 |
| GSP 312 | $ 800 | 2.18 | 2.18 |
| GST 313 | $ 1,800 | 1.45 | 1.45 |
| TOU-T 363 | $ 1,800 | 1.45 | 1.45 |
| LIS 333 | $ 1,800 | 1.45 | 1.45 |
| TOU-T 963 | $ 1,800 | 1.45 | 1.45 |

## Annex 2

(to Schedule B)

**PREPA Customer Segmentation**[1]

PREPA maintains a differentiated rate structure for its customers depending on their customer class. The descriptions below, in conjunction with any other categorization of customers currently utilized by PREPA, identify categories of PREPA's customer base that may be utilized in establishing how each PREPA customer is charged the Legacy Charge.

**Residential Classes**

1. GENERAL RESIDENTIAL SERVICE (GRS) - This rate shall apply to residential customers for domestic uses for a residence or apartment unless they fit into one of the other classes below. This rate may also apply to houses, apartments, and other structures which are primarily intended for residential purposes, where no more than two rooms in which the total connected load does not exceed 500 watts are used by tenant for business or professional purposes.

2. LIFELINE RESIDENTIAL SERVICE (LRS) - This rate shall apply to residential customers, who fulfill the Nutritional Assistance Program criteria, for all domestic uses for a residence or apartment.

3. RESIDENTIAL SERVICE FOR PUBLIC HOUSING PROJECTS (RH3) - This rate shall apply to residential customers of Public Housing Projects supported or subsidized in whole or in part by loans, grants, contributions or appropriations of the federal, state, or municipal governments.

4. RESIDENTIAL FIXED RATE FOR PUBLIC HOUSING UNDER OWNERSHIP OF THE PUBLIC HOUSING ADMINISTRATION (RFR) - The RFR Rate is established by according to the dispositions of Act 22-2016 and is granted to customers residing in a housing unit physically located within a public housing project owned by the Public Housing Administration for all domestic uses.

**Commercial and Industrial Classes**

1. GENERAL SERVICE AT SECONDARY DISTRIBUTION VOLTAGE (GSS) - This rate shall apply to any non-residential service with a load lower than 50 kVA. Also, it shall apply to temporary electric power service for limited use in streets, carnivals and others.

2. GENERAL SERVICE AT PRIMARY DISTRIBUTION VOLTAGE (GSP) - This rate shall apply to industrial customers and commercial customers. Service shall be rendered through a single point of connection and a single meter.

---

[1] PREPA rate book, as of May 2019. Accessible at: https://lumapr.com/wp-content/uploads/2021/07/Tariff-Book-Electric-Service-Rates-and-Riders-Revised-by-Order-05172019-Approved-by-Order-05282019.pdf.

3. GENERAL SERVICE AT TRANSMISSION VOLTAGE (GST) - This rate shall apply to commercial and industrial customers, connected to the transmission system, that have a demand of 250 kVA or greater, for general uses including motive power, heating, refrigeration, and incidental lighting of industries, hotels, and any other establishment.

4. TIME OF USE AT PRIMARY DISTRIBUTION VOLTAGE (TOU-P) - This rate shall apply to commercial and industrial customers with a demand of 1,000 kVA or greater, that: 1. Transfer load from the on-peak period to the off-peak period 2. Add load during the off-peak period 3. Remove load from the on-peak period

5. TIME OF USE AT TRANSMISSION VOLTAGE (TOU-T) - This rate shall apply to commercial and industrial customers with a demand of 1,000 kVA or greater, that: 1. Transfer load from the on-peak period to the off-peak period 2. Add load during the off-peak period 3. Remove load from the on-peak period

6. LARGE INDUSTRIAL SERVICE -115 kV (LIS) - This rate is exclusively for industries with a demand equal to 12,000 kW or higher, with a load factor equal to 80% or higher, and a monthly average power factor equal to 95% or higher.

7. GENERAL AGRICULTURAL SERVICE AND AQUEDUCT PUMPS OPERATED BY RURAL COMMUNITIES (GAS) - This rate applies to farmers and customers dedicated to raising animals. The service shall be provided for motive power, lighting, irrigation pumps, refrigeration and heating. Also, this rate applies to customers that operate pumps to supply aqueduct service exclusively in rural communities; incidental lighting related to this operation is permitted.

8. OUTDOOR SPORTS FIELD LIGHTING FOR PARKS WHERE ADMISSION RIGHTS ARE COLLECTED (LP-13) - This rate shall apply to sports fields where admission rights are collected having a connected load for outdoor illumination of 500 kilowatts or greater

9. CABLE TV POWER SUPPLIES (CATV) - This rate applies to all cable TV power supplies.

10. UNMETERED SERVICE FOR SMALL LOADS (USSL) - This rate shall apply to the services of the electric equipment installed on PREPA's pole or structures that operate 24 hours a day, except for that equipment for which PREPA has another rate available (for example: Cable TV).

11. POWER PRODUCERS CONNECTED AT PREPA BUS BAR - This rate shall apply to large power producers connected to the 230 kV bus bar that require PREPA's electric power service during startup, programmed maintenance, and outages of its generating equipment.

12. PUBLIC LIGHTING GENERAL (PLG) - This rate shall apply to the lighting of streets, ball parks and other parks of free admission, plazas, telephone booths, bus shelters, and traffic and police strobe lights.

## SCHEDULE C

**TERMS FOR MODIFICATION OF PREPA ERS OBLIGATIONS**

To avoid creating future pension liabilities and to stabilize the system for the benefit of future retirees and ratepayers, the PREPA ERS plan benefit accrual shall be frozen upon the Effective Date of the Plan of Adjustment (the "POA Effective Date").

Following is a summary of the terms of the Plan's freeze of further defined benefits of under the PREPA ERS.

The modifications listed herein modify the obligations of PREPA and any other government employer whose employees continue to participate in the PREPA ERS defined benefit plan to fund the benefits provided by PREPA ERS as established in regulations by the Governing Board of the Puerto Rico Electric Power Authority on July 1, 1945 and all subsequent amendments through the POA Effective Date, and are to be adhered to in the administration of PREPA ERS benefits by PREPA ERS. Administrative procedures not addressed below (such as rounding procedures in determining ages and service of participants) should be consistent with past practices.

PREPA employees participate under a defined benefit (DB) formula that is either supplemental to, or coordinated with, Social Security. This applies to all active participants of PREPA ERS ("Member" or "Members"), regardless of title or job classification or employer. Members will retain the benefits they have accrued up to and including the POA Effective Date; provided, however, that any future cost of living adjustments shall be eliminated pursuant to the POA, as any right to such future adjustments is not an accrued benefit and will not be an accrued benefit as of the POA Effective Date. Benefits accrued from and after the POA Effective Date shall be based on contributions and earnings in new segregated defined contribution retirement accounts under Act 106-2017 funded by employee contributions. As a result, employees will have the certainty that their contributions and investments will be safeguarded for the future, ensuring retirement security.

| Definitions | |
|---|---|
| **Covered Participants** | These terms pertain to the freeze of DB accruals of all active participants in PREPA ERS (including Mobilized Employees as described below) |
| **Retirement eligibility age** | Retirement Eligibility Age is the age at which a member may commence receipt of a monthly pension benefit. |
| **Retirement benefit** | The Retirement Benefit is the amount of benefit payable to a member each month. |
| **Creditable service** | Total of member and previous services that is credited for a pension. |
| **Mobilized Employees** | Former PREPA employees who have transferred or current PREPA employees who will transfer to Commonwealth instrumentalities in connection with a Public Private Partnership ("P3") transaction. Mobilized Employees shall only receive Creditable Service for periods of employment with the Commonwealth to the extent that such service is provided under applicable law, and then only through the POA Effective Date. |

| Average compensation | The average of the 3 highest annual base salaries, limited to $50,000 for members hired after 1/1/1993. |
|---|---|

| **Timing** | |
|---|---|
| **Freeze Date** | PREPA ERS pension benefit accrual freeze becomes effective upon the POA Effective Date |

| **Provisions of the proposal** | |
|---|---|
| **Treatment of accumulated employee contributions** | Participants retain a vested right to receive the accumulated employee contributions in accordance with the PREPA ERS plan document in lieu of the retirement, death, disability or termination benefits applicable under PREPA ERS. |
| **Retirement Eligibility prior to the Freeze Date** | Prior to the Freeze Date, participants will retain the following eligibility for retirement under PREPA ERS:<br>• Participants hired before January 1, 1993: Age 60 or attainment of 20 years of service<br>• Participants hired on or after January 1, 1993: Age 60 with 5 years of service, age 65, 20 years of service, or attainment of age 50 with 30 years of service |
| **Retirement Eligibility after the Freeze Date** | Beginning on the Freeze Date, participants will become eligible for retirement under PREPA ERS upon reaching the following age / service combinations:<br>• Participants hired before January 1, 1993:<br>   o Participants who have attained either Age 60 or 20 years of Creditable service as of the Freeze Date will be eligible to retire at any time.<br>   o Participants not having attained either age 60 or 20 years of Creditable service at the Freeze Date will be eligible to retire based on age at the Freeze Date based on the following table:<br><br>{{TABLE_A}}<br><br>• Participants hired on or after January 1, 1993:<br>   o Participants who have attained age 60 with 5 years of Creditable service, age 65, or 20 years of Creditable service at the Freeze Date will be eligible to retire at any time<br>   o All other participants will be eligible to retire once having either a) attained age 65 or b) the date the participant would have attained both i) 5 years of service assuming the freeze had not happened, and ii) the age based on the following table:<br><br>{{TABLE_B}} |

Table A:

| ▪ Attained Age at Freeze Date | ▪ Retirement Eligibility Age after Freeze Date |
|---|---|
| ▪ 57 and up | ▪ 61 |
| ▪ 56 | ▪ 62 |
| ▪ 55 and under | ▪ 63 |

Table B:

| ▪ Attained Age at Freeze Date | ▪ Retirement Eligibility Age after Freeze Date |
|---|---|

| | 57 and up | | 61 |
|---|---|---|---|
| | 56 | | 62 |
| | 55 and under | | 63 |

| | |
|---|---|
| **Elimination of minimum benefit** | The $180 monthly minimum benefit for participants will be eliminated for participants retiring on or after the Freeze Date. |
| **Elimination of use of sick leave to purchase credit towards a merit pension** | For separations of service or retirements occurring on or after the Freeze Date, Creditable service will be determined as of the Freeze Date and will not increase in the future. Prior to the Freeze Date, sick leave could be converted at retirement to service towards a merit annuity at a rate of 1 month for 15 days of accumulated sick leave time. After the Freeze Date, accumulated sick leave time will not be credited towards the pension benefit nor will any ability to purchase service be implemented. Applications to retire submitted prior to the plan confirmation date requesting application of sick time to purchase service will be honored. |
| **Bonus payments** | Summer and Christmas bonuses will be eliminated for retirements after the Freeze Date. One-time funeral bonus will be retained.<br><br>Bonus payments will not be impacted for retirements occurring prior to the Freeze Date. |
| **Employee Contributions** | Employee contributions to PREPA ERS plan will cease as of the Freeze Date. |
| **Implementation of Defined Contribution Accounts** | Mobilized employees will participate in the Commonwealth Defined Contribution (DC) accounts described under Act 106-2017 (Act 106). New DC accounts under a DC plan with the same provisions as Act 106 will be established for current PREPA employees. |
| **Elimination of Cost of Living Adjustments (COLAs)** | The COLAs that have been historically granted every three years will not be continued past the Freeze Date. Future COLAs will be eliminated. Previously granted COLAs will continue to be honored.<br><br>Benefits that have been previously increased by historic COLAs will not be reduced and COLAs prior to the Freeze Date will be honored. |
| **Death benefits** | Terminations due to death will receive a refund of accumulated employee contributions. |
| **Post Retirement Death Benefits** | For retirements occurring on or after the Freeze Date, the benefit will be payable as a lifetime annuity. If the participant elects at retirement to receive an annuity with a 30% survivorship benefit at the annuitant's death, the amount paid during the employee's lifetime will be the actuarial equivalent of the life annuity. The plan actuarial equivalence (i.e. mortality and interest rate) will be determined consistent with the determination of other optional forms of payment under the plan. |
| **Disability benefits** | Effective on the Freeze Date, participants who become disabled will be eligible to either:<br>  a. Receive a retirement benefit if the retirement eligibility criterion are otherwise met, |

| | |
|---|---|
| | b. Receive a deferred pension if over 10 years of service has been accrued (payable identically to the benefits owed a vested terminated member), or<br>c. Receive a refund of accumulated employee contributions |
| **Specific implications on Retirement Benefit** | Retirement benefits will continue unchanged from those currently provided by PREPA ERS until the Freeze Date. Provisions for retirements occurring after the Freeze Date are as follows:<br><br>a. Minimum benefits will no longer apply to future retirees.<br><br>b. The freeze eliminates the ability to purchase additional service using unused sick or vacation time or by other means. Applications to retire submitted prior to the POA Effective Date requesting application of sick or vacation time to purchase service will be honored.<br><br>c. Participants who were hired prior to January 1, 1993 who attained 25 years of Creditable Service as of the Freeze Date receive a life annuity equal to 2.5% of Average Compensation determined as of the Freeze Date times years of service at the Freeze Date (up to 30 years). If benefits are coordinated with Social Security, the benefit will be adjusted from ages 65 to 80 by reducing the benefit by $40 per each year of Creditable Service at the Freeze Date (up to 30 years).<br><br>d. Participants hired prior to January 1, 1993 who had not attained 25 years of Creditable Service as of the Freeze Date will receive a benefit of 1.5% of Average Compensation determined as of the Freeze Date per year of Creditable Service as of the Freeze Date plus an additional 0.5% of Average Compensation determined as of the Freeze Date per year of Creditable Service as of the Freeze Date beyond 20 years. If the commencement date of the member's benefit is prior to age 60, the benefit shall be the actuarial equivalent to the age 60 benefit.<br><br>e. Participants hired on or after January 1, 1993 who attained 30 years of service as of the Freeze Date will receive a benefit equal to 75% of the Average Compensation determined as of the Freeze Date. The 75% factor will be further reduced for retirements prior to age 55 are as follows:<br><br><table><tr><td>Age at retirement</td><td>Benefit Multiplier</td></tr><tr><td>50</td><td>62.5%</td></tr><tr><td>51</td><td>65.0%</td></tr><tr><td>52</td><td>67.5%</td></tr><tr><td>53</td><td>70.0%</td></tr><tr><td>54</td><td>72.5%</td></tr></table><br>f. Participants hired on or after January 1, 1993 who had not attained 30 years of Creditable Service as of the Freeze Date will receive a benefit of 1.5% of Average Compensation determined as of the Freeze Date per year of Creditable Service as of the Freeze Date plus an additional 0.5% of Average Compensation determined as of the Freeze Date per year of Creditable Service as of the Freeze Date beyond 20 years. If the commencement date of the member's benefit is prior to age 60, the benefit shall be the actuarial equivalent to the age 60 benefit. |

| Funding Structure | Pensions will continue to be paid from the current pension trust (i.e. PREPA ERS). The funding structure of PREPA ERS will shift from a funded model to pay-as-you-go (PayGo). PREPA ERS will be reimbursed for PayGo payments to the extent provided in the Plan with funds sufficient to do so that PREPA will contribute to a new trust to be established pursuant to the PREPA plan of adjustment (the "PREPA PayGo Trust"). The assets of the PREPA PayGo Trust will be held in trust for the sole benefit of PREPA ERS.<br><br>Assets in the PREPA Paygo Trust, including investment returns, will be used to reimburse the PREPA ERS for the annual PayGo and appropriate administrative expenses, to the extent PREPA ERS is entitled to such reimbursement under the POA. Any withdrawals from the PREPA Paygo Trust will require approval of the PREPA PayGo Trust Board of Trustees and shall only be used by PREPA ERS to fund the payment of PayGo made consistently with the DB plan as modified by the POA. |
|---|---|

## Negotiated benefits in addition to PREPA-ERS benefits

| Negotiated Benefit Description | Benefits will be paid to participants if their termination from active service at PREPA results from any of the following:<br>• Physical or mental disability<br>• Retirement or termination upon meeting age or service requirements of PREPA ERS<br>• Death of an active member<br><br>Benefits are only payable in a single instance and a participant who returns to work is not eligible to receive any additional benefit from these provisions |
|---|---|
| Negotiated Benefit Amount | • Retirement, disability or general passing: $7,000<br>• Death related to employment duties: $20,000<br>• Death related to employment duties specific to a Power Line Technician or in job positions specifically identified as eligible for special annual risk compensation: $50,000<br>• Physical disability resulting from employment duties: $8,000 |
| Impact of Freeze on Negotiated Benefit Amounts | One-time benefits described under this formula are not impacted by the pension freeze |

**<u>Schedule D</u>**

**List of Main Statutes Preempted by PROMESA**

## List of Main Statutes Preempted by PROMESA[1]

**Statutory Provisions Bondholder Rights and Remedies**

1. 22 L.P.R.A. § 207 (providing bondholders a right to receivership in certain circumstances)

2. 22 L.P.R.A. § 208 (providing bondholders certain rights and remedies against PREPA)

**Statutory Provisions Concerning Issuance and Terms of Bonds**

1. 22 L.P.R.A. § 195a-1(o), as amended by Act 17-2019, to require PREB approval of bond issuances under certain circumstances.

2. Act 101-2020 (providing AAFAF certain approval rights over bond issuances by Puerto Rico instrumentalities)

**Statutes Concerning Means of Implementation of the Plan**

1. 22 L.P.R.A. § 195a-1(u), as amended by Act 17-2019, to require PREB approval for, among other things, the sale or transfer of PREPA's property, and may include limitations on the creation of subsidiaries or trusts, or the taking of any actions or measures as are necessary or convenient to exercise PREPA's power granted under its enabling act.

**Statutes Concerning the Contribution in Lieu of Taxes and subsidies**

1. 22 L.P.R.A. § 212(b), to establish the Contribution in Lieu of Taxes (CILT) mechanism by which PREPA compensate municipalities.[2]

2. 22 L.P.R.A. § 814, to establish limitations to the future creation of any new electric power service subsidy, credit, or grant.[3]

**Statutes Concerning Retirement**

1. Act 106-2017 (to the extent it does not allow participants in the PREPA ERS to participate in the Act 106 defined contribution plan).

**Statutes enacted prior to PROMESA concerning the Restructuring of PREPA's debt**

---

[1] The statutes listed herein are preempted for the reasons and solely to the extent set forth in Exhibit "A" to the Proposed Findings of Fact and Conclusions of Law.

The Debtor reserves the right to amend this list prior to the entry of the PREPA Confirmation Order.

[2] This provision is preempted solely to the extent it could be interpreted to exempt municipalities from paying the Legacy Charge.

[3] This provision is preempted solely to the extent it could be interpreted to restrict the creation of a new subsidy for low-income customers relating to the Legacy Charge.

1. 22 L.P.R.A § 1054x-1 (establishing the procedure by which the PREB had to determine
   and review the transition charges and adjustment mechanisms).

2. 22 L.P.R.A § 1054b(q) (to the extent, if any, it provides PREB certain approval review
   and approval over PREPA bond issuances under Title III).

**<u>Schedule E</u>**

**Schedule of Cash Flow of New Bonds**

| FY (7/1) | # | Series A Bonds: Expected Cash Flows | | | |
|---|---|---|---|---|---|
| | | Beginning Principal | Principal | 6.000% Interest | Debt Service |
| Total | | | 650,069,869 | 112,597,686 | 762,667,555 |
| Expected Weighted Average Life | | | 2.89 | | |
| 2023 | | | | | |
| 2024 | 1 | 650,069,869 | 139,282,338 | 39,004,192 | 178,286,530 |
| 2025 | 2 | 510,787,531 | 134,434,574 | 30,647,252 | 165,081,826 |
| 2026 | 3 | 376,352,957 | 136,723,044 | 22,581,177 | 159,304,221 |
| 2027 | 4 | 239,629,913 | 139,842,087 | 14,377,795 | 154,219,882 |
| 2028 | 5 | 99,787,826 | 99,787,826 | 5,987,270 | 105,775,096 |
| 2029 | 6 | - | - | - | - |
| 2030 | 7 | - | - | - | - |
| 2031 | 8 | - | - | - | - |
| 2032 | 9 | - | - | - | - |
| 2033 | 10 | - | - | - | - |
| 2034 | 11 | - | - | - | - |
| 2035 | 12 | - | - | - | - |
| 2036 | 13 | - | - | - | - |
| 2037 | 14 | - | - | - | - |
| 2038 | 15 | - | - | - | - |
| 2039 | 16 | - | - | - | - |
| 2040 | 17 | - | - | - | - |
| 2041 | 18 | - | - | - | - |
| 2042 | 19 | - | - | - | - |
| 2043 | 20 | - | - | - | - |
| 2044 | 21 | - | - | - | - |
| 2045 | 22 | - | - | - | - |
| 2046 | 23 | - | - | - | - |
| 2047 | 24 | - | - | - | - |
| 2048 | 25 | - | - | - | - |
| 2049 | 26 | - | - | - | - |
| 2050 | 27 | - | - | - | - |
| 2051 | 28 | - | - | - | - |
| 2052 | 29 | - | - | - | - |
| 2053 | 30 | - | - | - | - |
| 2054 | 31 | - | - | - | - |
| 2055 | 32 | - | - | - | - |
| 2056 | 33 | - | - | - | - |
| 2057 | 34 | - | - | - | - |
| 2058 | 35 | - | - | - | - |

*Expected Cash Flows are based upon the rate structure and the 2022 Fiscal Plan Load Projections. Actual cash flows for the New Bonds may be faster or slower depending on future economic performance of the rate structure until the repayment of the New Bonds. If revenues are higher than projected, the principal would be redeemed sooner; if revenues are lower than projected, the principal would be redeemed later. Assumes the Effective Date of the Plan occurs July 1, 2023; if the Effective Date is a different date, the values in the above schedule will adjust accordingly. Assumes 1 year of interest accrual payable (for purposes of illustration only) in additional Series A Bonds that are being issued to the Fuel Line Lenders in accordance with the Fuel Line Lender PSA.

| FY | | Series B-1 Bonds (CIBs): Expected Cash Flows | | | |
|---|---|---|---|---|---|
| | | Beginning | | 6.000% | Debt |
| (7/1) | # | Principal | Principal | Interest | Service |
| Total | | | 4,633,295,712 | 6,064,444,233 | 10,697,739,945 |
| Expected Weighted Average Life | | | 21.81 | | |
| 2023 | | | | | |
| 2024 | 1 | 4,633,295,712 | - | 277,997,743 | 277,997,743 |
| 2025 | 2 | 4,633,295,712 | - | 277,997,743 | 277,997,743 |
| 2026 | 3 | 4,633,295,712 | - | 277,997,743 | 277,997,743 |
| 2027 | 4 | 4,633,295,712 | - | 277,997,743 | 277,997,743 |
| 2028 | 5 | 4,633,295,712 | 43,209,140 | 277,997,743 | 321,206,882 |
| 2029 | 6 | 4,590,086,572 | 108,661,992 | 275,405,194 | 384,067,186 |
| 2030 | 7 | 4,481,424,580 | 110,971,849 | 268,885,475 | 379,857,324 |
| 2031 | 8 | 4,370,452,731 | 113,612,428 | 262,227,164 | 375,839,591 |
| 2032 | 9 | 4,256,840,303 | 115,810,930 | 255,410,418 | 371,221,348 |
| 2033 | 10 | 4,141,029,374 | 115,758,445 | 248,461,762 | 364,220,207 |
| 2034 | 11 | 4,025,270,929 | 117,351,954 | 241,516,256 | 358,868,209 |
| 2035 | 12 | 3,907,918,975 | 119,483,148 | 234,475,139 | 353,958,287 |
| 2036 | 13 | 3,788,435,827 | 121,109,790 | 227,306,150 | 348,415,940 |
| 2037 | 14 | 3,667,326,037 | 123,032,985 | 220,039,562 | 343,072,548 |
| 2038 | 15 | 3,544,293,051 | 125,977,782 | 212,657,583 | 338,635,365 |
| 2039 | 16 | 3,418,315,269 | 127,409,043 | 205,098,916 | 332,507,959 |
| 2040 | 17 | 3,290,906,227 | 129,073,075 | 197,454,374 | 326,527,448 |
| 2041 | 18 | 3,161,833,152 | 134,816,656 | 189,709,989 | 324,526,645 |
| 2042 | 19 | 3,027,016,496 | 140,206,450 | 181,620,990 | 321,827,440 |
| 2043 | 20 | 2,886,810,046 | 145,907,044 | 173,208,603 | 319,115,646 |
| 2044 | 21 | 2,740,903,003 | 152,247,289 | 164,454,180 | 316,701,470 |
| 2045 | 22 | 2,588,655,713 | 159,246,368 | 155,319,343 | 314,565,711 |
| 2046 | 23 | 2,429,409,345 | 166,699,165 | 145,764,561 | 312,463,725 |
| 2047 | 24 | 2,262,710,180 | 174,814,271 | 135,762,611 | 310,576,882 |
| 2048 | 25 | 2,087,895,910 | 183,395,332 | 125,273,755 | 308,669,086 |
| 2049 | 26 | 1,904,500,578 | 192,746,471 | 114,270,035 | 307,016,505 |
| 2050 | 27 | 1,711,754,107 | 202,673,642 | 102,705,246 | 305,378,889 |
| 2051 | 28 | 1,509,080,465 | 212,639,959 | 90,544,828 | 303,184,787 |
| 2052 | 29 | 1,296,440,506 | 225,398,356 | 77,786,430 | 303,184,787 |
| 2053 | 30 | 1,071,042,150 | 238,922,258 | 64,262,529 | 303,184,787 |
| 2054 | 31 | 832,119,892 | 253,257,593 | 49,927,194 | 303,184,787 |
| 2055 | 32 | 578,862,299 | 268,453,049 | 34,731,738 | 303,184,787 |
| 2056 | 33 | 310,409,250 | 284,560,232 | 18,624,555 | 303,184,787 |
| 2057 | 34 | 25,849,019 | 25,849,019 | 1,550,941 | 27,399,960 |
| 2058 | 35 | - | - | - | - |

*Expected Cash Flows are based upon the rate structure and the 2022 Fiscal Plan Load Projections.
Actual cash flows for the New Bonds may be faster or slower depending on future economic
performance of the rate structure until the repayment of the New Bonds. If revenues are higher than
projected, the principal would be redeemed sooner; if revenues are lower than projected, the principal
would be redeemed later; Assumes the Effective Date of the Plan occurs July 1, 2023; if the Effective
Date is a different date, the values in the above schedule will adjust accordingly.

Series B-2 Bonds (CCABs): Expected Cash Flows

| FY (7/1) | # | Beginning Initial Value | Initial Value | Beginning Mat. Value | Maturity Value | Accreted Price | 6.750% Interest | Debt Service |
|---|---|---|---|---|---|---|---|---|
| Total | | | 400,001,449 | | 557,470,000 | | 1,110,261,274 | 1,667,731,274 |
| Expected Weighted Average Life | | | 34.51 | | | | | |
| 2023 | | 400,001,449 | - | 557,470,000 | - | 71.753 | - | - |
| 2024 | 1 | 400,001,449 | - | 557,470,000 | - | 76.678 | - | - |
| 2025 | 2 | 400,001,449 | - | 557,470,000 | - | 81.942 | - | - |
| 2026 | 3 | 400,001,449 | - | 557,470,000 | - | 87.566 | - | - |
| 2027 | 4 | 400,001,449 | - | 557,470,000 | - | 93.576 | - | - |
| 2028 | 5 | 400,001,449 | - | 557,470,000 | - | 100.000 | - | - |
| 2029 | 6 | 400,001,449 | - | 557,470,000 | - | 100.000 | 37,629,225 | 37,629,225 |
| 2030 | 7 | 400,001,449 | - | 557,470,000 | - | 100.000 | 37,629,225 | 37,629,225 |
| 2031 | 8 | 400,001,449 | - | 557,470,000 | - | 100.000 | 37,629,225 | 37,629,225 |
| 2032 | 9 | 400,001,449 | - | 557,470,000 | - | 100.000 | 37,629,225 | 37,629,225 |
| 2033 | 10 | 400,001,449 | - | 557,470,000 | - | 100.000 | 37,629,225 | 37,629,225 |
| 2034 | 11 | 400,001,449 | - | 557,470,000 | - | 100.000 | 37,629,225 | 37,629,225 |
| 2035 | 12 | 400,001,449 | - | 557,470,000 | - | 100.000 | 37,629,225 | 37,629,225 |
| 2036 | 13 | 400,001,449 | - | 557,470,000 | - | 100.000 | 37,629,225 | 37,629,225 |
| 2037 | 14 | 400,001,449 | - | 557,470,000 | - | 100.000 | 37,629,225 | 37,629,225 |
| 2038 | 15 | 400,001,449 | - | 557,470,000 | - | 100.000 | 37,629,225 | 37,629,225 |
| 2039 | 16 | 400,001,449 | - | 557,470,000 | - | 100.000 | 37,629,225 | 37,629,225 |
| 2040 | 17 | 400,001,449 | - | 557,470,000 | - | 100.000 | 37,629,225 | 37,629,225 |
| 2041 | 18 | 400,001,449 | - | 557,470,000 | - | 100.000 | 37,629,225 | 37,629,225 |
| 2042 | 19 | 400,001,449 | - | 557,470,000 | - | 100.000 | 37,629,225 | 37,629,225 |
| 2043 | 20 | 400,001,449 | - | 557,470,000 | - | 100.000 | 37,629,225 | 37,629,225 |
| 2044 | 21 | 400,001,449 | - | 557,470,000 | - | 100.000 | 37,629,225 | 37,629,225 |
| 2045 | 22 | 400,001,449 | - | 557,470,000 | - | 100.000 | 37,629,225 | 37,629,225 |
| 2046 | 23 | 400,001,449 | - | 557,470,000 | - | 100.000 | 37,629,225 | 37,629,225 |
| 2047 | 24 | 400,001,449 | - | 557,470,000 | - | 100.000 | 37,629,225 | 37,629,225 |
| 2048 | 25 | 400,001,449 | - | 557,470,000 | - | 100.000 | 37,629,225 | 37,629,225 |
| 2049 | 26 | 400,001,449 | - | 557,470,000 | - | 100.000 | 37,629,225 | 37,629,225 |
| 2050 | 27 | 400,001,449 | - | 557,470,000 | - | 100.000 | 37,629,225 | 37,629,225 |
| 2051 | 28 | 400,001,449 | - | 557,470,000 | - | 100.000 | 37,629,225 | 37,629,225 |
| 2052 | 29 | 400,001,449 | - | 557,470,000 | - | 100.000 | 37,629,225 | 37,629,225 |
| 2053 | 30 | 400,001,449 | - | 557,470,000 | - | 100.000 | 37,629,225 | 37,629,225 |
| 2054 | 31 | 400,001,449 | - | 557,470,000 | - | 100.000 | 37,629,225 | 37,629,225 |
| 2055 | 32 | 400,001,449 | - | 557,470,000 | - | 100.000 | 37,629,225 | 37,629,225 |
| 2056 | 33 | 400,001,449 | - | 557,470,000 | - | 100.000 | 37,629,225 | 37,629,225 |
| 2057 | 34 | 400,001,449 | 197,883,887 | 557,470,000 | 275,784,827 | 100.000 | 37,629,225 | 313,414,052 |
| 2058 | 35 | 202,117,562 | 202,117,562 | 281,685,173 | 281,685,173 | 100.000 | 19,013,749 | 300,698,922 |

*Expected Cash Flows are based upon the rate structure and the 2022 Fiscal Plan Load Projections. Actual cash flows for the New Bonds may be faster or slower depending on future economic performance of the rate structure until the repayment of the New Bonds. If revenues are higher than projected, the principal would be redeemed sooner; if revenues are lower than projected, the principal would be redeemed later. Assumes the Effective Date of the Plan occurs July 1, 2023; if the Effective Date is a different date, the values in the above schedule will adjust accordingly.

Both Series A and Series B Revenue Bonds: Expected Cash Flows

| FY (7/1) | # | Beginning Initial Value | Initial Value & CIB Par | Beginning Mat. Value | Mat. Value & CIB Par | Interest | Debt Service |
|---|---|---|---|---|---|---|---|
| Total | | | 5,683,367,030 | | 5,840,835,581 | 7,287,303,193 | 13,128,138,774 |
| Expected Weighted Average Life | | | 20.54 | | | | |
| 2023 | | 5,683,367,030 | | 5,840,835,581 | | | |
| 2024 | 1 | 5,683,367,030 | 139,282,338 | 5,840,835,581 | 139,282,338 | 317,001,935 | 456,284,273 |
| 2025 | 2 | 5,544,084,692 | 134,434,574 | 5,701,553,243 | 134,434,574 | 308,644,995 | 443,079,569 |
| 2026 | 3 | 5,409,650,118 | 136,723,044 | 5,567,118,669 | 136,723,044 | 300,578,920 | 437,301,964 |
| 2027 | 4 | 5,272,927,074 | 139,842,087 | 5,430,395,625 | 139,842,087 | 292,375,538 | 432,217,624 |
| 2028 | 5 | 5,133,084,988 | 142,996,966 | 5,290,553,538 | 142,996,966 | 283,985,012 | 426,981,978 |
| 2029 | 6 | 4,990,088,021 | 108,661,992 | 5,147,556,572 | 108,661,992 | 313,034,419 | 421,696,411 |
| 2030 | 7 | 4,881,426,029 | 110,971,849 | 5,038,894,580 | 110,971,849 | 306,514,700 | 417,486,549 |
| 2031 | 8 | 4,770,454,180 | 113,612,428 | 4,927,922,731 | 113,612,428 | 299,856,389 | 413,468,816 |
| 2032 | 9 | 4,656,841,752 | 115,810,930 | 4,814,310,303 | 115,810,930 | 293,039,643 | 408,850,573 |
| 2033 | 10 | 4,541,030,823 | 115,758,445 | 4,698,499,374 | 115,758,445 | 286,090,987 | 401,849,432 |
| 2034 | 11 | 4,425,272,378 | 117,351,954 | 4,582,740,929 | 117,351,954 | 279,145,481 | 396,497,434 |
| 2035 | 12 | 4,307,920,424 | 119,483,148 | 4,465,388,975 | 119,483,148 | 272,104,364 | 391,587,512 |
| 2036 | 13 | 4,188,437,276 | 121,109,790 | 4,345,905,827 | 121,109,790 | 264,935,375 | 386,045,165 |
| 2037 | 14 | 4,067,327,486 | 123,032,985 | 4,224,796,037 | 123,032,985 | 257,668,787 | 380,701,773 |
| 2038 | 15 | 3,944,294,500 | 125,977,782 | 4,101,763,051 | 125,977,782 | 250,286,808 | 376,264,590 |
| 2039 | 16 | 3,818,316,718 | 127,409,043 | 3,975,785,269 | 127,409,043 | 242,728,141 | 370,137,184 |
| 2040 | 17 | 3,690,907,676 | 129,073,075 | 3,848,376,227 | 129,073,075 | 235,083,599 | 364,156,673 |
| 2041 | 18 | 3,561,834,601 | 134,816,656 | 3,719,303,152 | 134,816,656 | 227,339,214 | 362,155,870 |
| 2042 | 19 | 3,427,017,946 | 140,206,450 | 3,584,486,496 | 140,206,450 | 219,250,215 | 359,456,665 |
| 2043 | 20 | 3,286,811,495 | 145,907,044 | 3,444,280,046 | 145,907,044 | 210,837,828 | 356,744,871 |
| 2044 | 21 | 3,140,904,452 | 152,247,289 | 3,298,373,003 | 152,247,289 | 202,083,405 | 354,330,695 |
| 2045 | 22 | 2,988,657,162 | 159,246,368 | 3,146,125,713 | 159,246,368 | 192,948,568 | 352,194,936 |
| 2046 | 23 | 2,829,410,794 | 166,699,165 | 2,986,879,345 | 166,699,165 | 183,393,786 | 350,092,950 |
| 2047 | 24 | 2,662,711,630 | 174,814,271 | 2,820,180,180 | 174,814,271 | 173,391,836 | 348,206,107 |
| 2048 | 25 | 2,487,897,359 | 183,395,332 | 2,645,365,910 | 183,395,332 | 162,902,980 | 346,298,311 |
| 2049 | 26 | 2,304,502,027 | 192,746,471 | 2,461,970,578 | 192,746,471 | 151,899,260 | 344,645,730 |
| 2050 | 27 | 2,111,755,556 | 202,673,642 | 2,269,224,107 | 202,673,642 | 140,334,471 | 343,008,114 |
| 2051 | 28 | 1,909,081,914 | 212,639,959 | 2,066,550,465 | 212,639,959 | 128,174,053 | 340,814,012 |
| 2052 | 29 | 1,696,441,955 | 225,398,356 | 1,853,910,506 | 225,398,356 | 115,415,655 | 340,814,012 |
| 2053 | 30 | 1,471,043,599 | 238,922,258 | 1,628,512,150 | 238,922,258 | 101,891,754 | 340,814,012 |
| 2054 | 31 | 1,232,121,341 | 253,257,593 | 1,389,589,892 | 253,257,593 | 87,556,419 | 340,814,012 |
| 2055 | 32 | 978,863,748 | 268,453,049 | 1,136,332,299 | 268,453,049 | 72,360,963 | 340,814,012 |
| 2056 | 33 | 710,410,699 | 284,560,232 | 867,879,250 | 284,560,232 | 56,253,780 | 340,814,012 |
| 2057 | 34 | 425,850,468 | 223,732,906 | 583,319,019 | 301,633,846 | 39,180,166 | 340,814,012 |
| 2058 | 35 | 202,117,562 | 202,117,562 | 281,685,173 | 281,685,173 | 19,013,749 | 300,698,922 |

*Expected Cash Flows are based upon the rate structure and the 2022 Fiscal Plan Load Projections. Actual cash flows for the New Bonds may be faster or slower depending on future economic performance of the rate structure until the repayment of the New Bonds. If revenues are higher than projected, the principal would be redeemed sooner; if revenues are lower than projected, the principal would be redeemed later. Assumes the Effective Date of the Plan occurs July 1, 2023; if the Effective Date is a different date, the values in the above schedule will adjust accordingly.

**<u>Exhibit B</u>**

**Form of Notice**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re: | PROMESA<br>Title III |
| THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO, | No. 17 BK 4780-LTS |
|      as representative of | (Jointly Administered) |
| PUERTO RICO ELECTRIC POWER AUTHORITY, | |
|      Debtor. | |

**NOTICE OF (A) ENTRY OF ORDER CONFIRMING MODIFIED SECOND AMENDED
TITLE III PLAN OF ADJUSTMENT OF THE PUERTO RICO ELECTRIC POWER
AUTHORITY PURSUANT TO TITLE III OF PROMESA AND (B) OCCURRENCE OF
THE EFFECTIVE DATE**

**TO CREDITORS AND OTHER PARTIES IN INTEREST:**

PLEASE TAKE NOTICE that, pursuant to an order, dated [  ], 2023 [ECF No. _____] (the "Confirmation Order"), the *Modified Second Amended Title III Plan of Adjustment of the Puerto Rico Electric Power Authority,* dated March 1, 2023 (as amended, supplemented, or modified, the "Plan"), was confirmed by the United States District Court for the District of Puerto Rico (the "Court"). Unless otherwise defined in this Notice, capitalized terms used herein shall have the meanings ascribed to them in the PREPA Plan and the PREPA Confirmation Order.

PLEASE TAKE FURTHER NOTICE that the Effective Date of the PREPA Plan occurred on _____ and the PREPA Plan was substantially consummated.

PLEASE TAKE FURTHER NOTICE that any party in interest wishing to obtain copies of the Confirmation Order, the PREPA Plan, and related documents should contact Kroll Restructuring Administration LLC, by telephone at (844) 822-9231 (toll free for U.S. and Puerto Rico) or (646) 486-7944 (for international callers), available 10:00 a.m. to 7:00 p.m. (Atlantic Standard Time) (Spanish available), or by email at puertoricoballots@primeclerk.com, or may view such documents by accessing either https://cases.ra.kroll.com/puertorico/ or the Court's website, https://www.prd.uscourts.gov/. Please note that a Public Access to Court Electronic Records (http://www.pacer.psc.uscourts.gov) password and login are needed to access documents on the Court's website.

PLEASE TAKE FURTHER NOTICE that, pursuant to Articles I.A.5 and II.B of the PREPA Plan and decretal paragraph 39 of the Confirmation Order, the deadline for filing proofs of or requests for payment of Administrative Expense Claims ("Administrative Expense Requests") is [_____], 2023; provided, however, that no proof of Administrative Expense Claim shall be required to be filed if such Administrative Expense Claim (a) shall have been incurred (i) in accordance with an order of the Court or (ii) with the written consent of the applicable

1

Government Parties expressly granting such Administrative Expense Claim, (b) is a Professional Claim, (c) is an Administrative Expense Claim of the IRS for the payment of taxes incurred by the Debtor during the period from and after the Petition Date, or (d) is the subject of a pending motion seeking allowance of an administrative expense as of the entry of this Order.

PLEASE TAKE FURTHER NOTICE that, all Administrative Expense Requests should be sent as follows:

(i)     by completing the electronic Proof of Claim on the Claims Agent's website at https://cases.ra.kroll.com/puertorico/EPOC-Index, or

(ii)    if delivered by first class mail, hand delivery, or overnight courier, at the following address: Commonwealth of Puerto Rico Claims Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232.

Administrative Expense Requests will be deemed timely filed only if **actually received** by Kroll Restructuring Administration LLC (the Debtor's Claims Agent) by **5:00 p.m. (prevailing Atlantic Time)** on [____], 2023 (the "Administrative Deadline"). The Administrative Expense Requests may **not** be delivered by facsimile, telecopy, or electronic mail transmission.

**PLEASE TAKE FURTHER NOTICE that, if you are required to file an Administrative Expense Request pursuant to Articles I.A.5 and II.B of the PREPA Plan and decretal paragraph 39 of the Confirmation Order and fail to do so by the Administrative Deadline, you will be forever barred, estopped, and enjoined from asserting such Administrative Expense Claim (and from filing an Administrative Expense Request with respect to such Administrative Expense Claim) against the Debtor and their property, and the Debtor and Reorganized Debtor will be forever discharged from any and all indebtedness or liability with respect to such Administrative Expense Claim.**

PLEASE TAKE FURTHER NOTICE that, pursuant to Article XXI.G of the PREPA Plan and decretal paragraph 29 of the Confirmation Order, if the rejection of an Executory Contract and Unexpired Lease by the Debtor results in damages to the other party or parties to such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof of Claim, shall be forever barred and shall not be enforceable against the Debtor, or their properties or agents, successors, or assigns, including, without limitation, the Reorganized Debtor, unless a proof of Claim is filed with the Court on or before thirty (30) days after the later to occur of (i) the Effective Date, and (ii) the date of entry of an order by the Court authorizing rejection of a particular Executory Contract and Unexpired Lease.

Dated: _____           /s/_____
      San Juan, Puerto Rico

                                   Martin J. Bienenstock (*pro hac vice*)
                                   Paul V. Possinger (*pro hac vice*)
                                   Ehud Barak (*pro hac vice*)
                                   Daniel S. Desatnik (*pro hac vice*)

2

**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

*Attorneys for the Financial Oversight and
Management Board as representative for the
Debtor*

/s/ _____

Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944

*Co-Attorneys for the Financial Oversight and
Management Board as representative for the
Debtor*

**<u>Exhibit C</u>**

**Preempted Laws**

C-2

## Exhibit C

### List of Main Statutes Preempted by PROMESA

**Statutory Provisions Bondholder Rights and Remedies**

1. 22 L.P.R.A. § 207 (providing bondholders a right to receivership in certain circumstances).

2. 22 L.P.R.A. § 208 (providing bondholders certain rights and remedies against PREPA).

**Statutory Provisions Concerning Issuance and Terms of Bonds**

1. 22 L.P.R.A. § 195a-1(o), as amended by Act 17-2019, to require PREB approval of bond issuances under certain circumstances.

2. 13 L.P.R.A. §§ 156b (Act 101-2020) (providing AAFAF certain approval rights over bond issuances by Puerto Rico instrumentalities).

**Statutes Concerning Means of Implementation of the Plan**

1. 22 L.P.R.A. § 195a-1(u), as amended by Act 17-2019, to require PREB approval for, among other things, the sale or transfer of PREPA's property, and may include limitations on the creation of subsidiaries or trusts, or the taking of any actions or measures as are necessary or convenient to exercise PREPA's power granted under its enabling act.

**Statutes Concerning the Contribution in Lieu of Taxes and Subsidies**

1. 22 L.P.R.A. § 212(b), to establish the Contribution in Lieu of Taxes (CILT) mechanism by which PREPA compensates municipalities.[1]

2. 22 L.P.R.A. § 814, to establish limitations to the future creation of any new electric power service subsidy, credit, or grant.[2]

**Statutes Concerning Employment and Retirement**

1. 22 L.P.R.A. §§ 9535–36 (Act 106-2017)
   - Section 9535 (to the extent it excludes PREPA ERS from the applicability of Act 106-2017 and the PayGo system created thereby).
   - Section 9536(q) (to the extent it excludes employees of PREPA from the definition of "Participants").
   - Section 9536(v) (to the extent it excludes PREPA ERS from the definition of "Retirement System").
2. 29 L.P.R.A. § 69(1)(d) and (1)(f) (to the extent that it prevents impairment or rejection

---

[1] This provision is preempted solely to the extent it could be interpreted to exempt municipalities from paying the Legacy Charge.

[2] This provision is preempted solely to the extent it could be interpreted to restrict the creation of a new subsidy for low-income customers relating to the Legacy Charge.

of collective bargaining agreements prior to and up to the Effective Date of the Plan).

**Statutes enacted prior to PROMESA concerning the Restructuring of PREPA's debt**

1.  22 L.P.R.A. § 1054x-1 (establishing the procedure by which PREB had to determine and review the transition charges and adjustment mechanisms).
2.  22 L.P.R.A. §§ 196(i), 1054x(b)(9) (providing that the approved rate must be sufficient to, among other things, satisfy bond requirements not cancelled as part of the securitization contemplated in Chapter IV of Act 4-2016 (the Puerto Rico Electric Power Authority Revitalization Act)).
3.  22 L.P.R.A. § 1054b(q) (to the extent, if any, it provides PREB certain approval review and approval over PREPA bond issuances under Title III).
4.  22 L.P.R.A. § 1071–1084 (Act 4-2016) (to the extent the Plan could be obligated to comply with Act 4-2016).
5.  22 L.P.R.A. § 192(a) (to the extent the Plan could be obligated to comply with Act 4-2016).
6.  22 L.P.R.A. § 196a(c)(8) (authorizing PREPA to establish, with PREB's approval, an invoice that includes the transition charge (as defined in Act 4-2016) and payment for debt not included in the transition charge).