IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>Debtors.[1] | PROMESA<br>Title III<br><br><br><br>Case No. 17 BK 3283-LTS<br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO<br><br>as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Debtor. | PROMESA<br>Title III<br><br><br><br>Case No. 17 BK 4780-LTS |

## FERNANDO VIÑAS MIRANDA OBJECTION TO THE CONFIRMATION OF THE PUERTO RICO ELECTRIC POWER AUTHORITY'S PLAN OF ADJUSTMENT

*[Space intentionally left blank]*

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations.)

**TO THE HONORABLE DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO**

**COMES NOW FERNANDO VIÑAS MIRANDA**, as party in interest pursuant to 11 U.S.C. § 1109, appearing *pro se* pursuant to 28 U.S.C. § 1654, and respectfully requests that the Court deny the confirmation of the Modified Second Amended Title III Plan of Adjustment of the Puerto Rico Electric Power Authority, ECF No. 3296 ("Plan of Adjustment").

## PRELIMINARY STATEMENT

1. FERNANDO VIÑAS MIRANDA is a party in interest in the Puerto Rico Electric Power Authority's ("PREPA") Title III Bankruptcy. See 11 U.S.C. § 1109(b).

2. FERNANDO VIÑAS MIRANDA is a resident of San Juan, Puerto Rico. Married and living in a single-family household of 2 people.

3. The question of who is a "party in interest" should be answered on a case-by-case basis. The definition is non-exhaustive. It generally refers to anyone with a financial stake or significant legal or practical stake in the outcome of bankruptcy. See, for example, Savage & Assocs. P.C. v. K&L Gates LLP (In re Teligent, Inc.), 640 F.3d 53 (2d Cir. 2011). That should mean anyone who will be significantly impacted.

4. **The Plan of Adjustment proposes to impose a Legacy Charge on the electric bills of residential and commercial customers for the next 35 years or more.**

   A. The cost of energy in PR doubles when accounting for necessary standby electric generation capacity.

As a residential customer my most recent electricity charge was billed at approximately 29 cents kilo watt hour for the amount of approximately $157. However, power outages force an additional unplanned expenditure on any family's budget. For example: In the four-day period from June 4th to June 7th, I have had to spend $300.00 on gas to fuel the stand-by generator in

2

my house.

What I beg the court to understand is that given the present deteriorated and unreliable state of PR's electric system, the cost of energy on the Island is not only what is paid to the utility but the additional cost to generate energy when the system is not in operating order which in my experience has averaged 170 hours per year over the past 5 years. This additional cost of electricity in PR is a constant contingency on all of the Island's residents, commerce, and industry, worsened by recurring weather conditions such heat waves, torrential rains and thunderstorms.

Given the high level of reliability in most US jurisdictions, the cost of stand-by energy generation is usually considered a discretionary expense in the US. That, however, is not the case in Puerto Rico. Most homes (even those at very low-income levels) have had to acquire some form of stand-by generation as a contingency to the low reliability of the electric power on the Island and sometimes even as the only alternative to preserve the life of bedridden relatives.

The situation is generalized in commerce and industry that has had to spend (not invest) capital to install stand by generation while some others (usually large enterprises) have opted to disconnect from the system and generate their own power. The capital expenditure decision to install stand-by generation comes at the expense of investments for the expansion or improvement of the business.

As a residential customer I had to acquire a second generator, after the first generator was burnt out during the Maria blackout. The second generator was acquired in December 2017 at an installed cost of $6,000.00. Annual maintenance expenses – excluding major repairs have averaged approximately $1,000. The cost of LPG per 100 pounds of gas has averaged $90.00.

3

Over the past 5 years the standby generator ran 850 hours (the guarantee expired at 500 hours). The table below – which can be supported by documents and receipts – shows that the cost of energy to my household doubles that which was billed by the electric utility.

|  | Run hrs | hrs per 100 lbs LPG tank | Tanks required | Cost | Cost of Runtime | Annual Cost |
|---|---|---|---|---|---|---|
| Use of Stand by Gen | 850 | 22 | 38.63636 | $ 90.00 | 3,477.27 | $ 695.45 |
| Stand by Generation |  |  |  | $ 6,000.00 |  | $ 1,200.00 |
| Maintenance |  |  |  |  |  | $ 1,000.00 |
| Annual Additional Energy Cost |  |  |  |  |  | $ 2,895.45 |
| Anuual Cost of energy PREPA |  |  |  |  | 182 | $ 2,184.00 |
| Total Cost |  |  |  |  |  | $ 5,079.45 |

The court could request a study to determine the effective cost of energy to PR, accounting for the required and installed standby generation capacity. In my case, the cost of energy is double that which is billed out by the utility. A $423 average monthly expenditure on electricity alone for a couple residing in San Juan, nearly 4 times the average paid by US households of $122 per month.

PR residents, commerce and industry are already stretched to a limit regarding the cost of electric energy. Standby costs have to be added to the prices of all goods and services produced or delivered throughout the economy which results in pervasive inflationary pressure. It is widely documented that cost of energy and its availability is the third most important factor in site development process. PR is alarmingly uncompetitive.

Further increases in the cost of energy beyond a reasonable 10% (2.9 cents) energy surcharge would result in an inflationary spiral which would further destroy commerce, industry, and families (through migration). Based on projected demand per the last PREPA Fiscal Plan, such a charge would generate approximately $5.3 billion (on a Present Value Basis discounted at 6%). The 2.9 cent charge could be covered over time by the efficiency improvement of the

new energy infrastructure that would be built over the next 6 years and release its inflationary pressure on the PR economy.

B. No one requested citizens' permission to guarantee PREPA's debt beyond its liquidation as a viable operating entity.

I beg the court to understand that the contemplated charge to pay speculators hedge funds and monoline insurance companies – principal holders of PREPA bonds – cannot be equated to a legacy plant charge in US jurisdictions. The difference being that in those US jurisdictions a rational decision was taken to decommission inefficient energy generation plants and build new efficient facilities within the context of viable businesses. The transition was warranted because there were viable operations that compensated for the obsolete assets. In spite of the comparably minor price adjustments required, there was significant pushback from the citizenry. Compare that to a 20% or 30% increase in the cost of energy in PR

The situation at PREPA is different in that the entity is bankrupt beyond any turnaround potential. **The entity has generated negative cash flow for years, it generate losses. PREPA's generation assets are obsolete and new generation, transmission and distribution facilities will have to be built over the next six years, probably within the confines of PREPA's existing plant facilities and funded through US Federal Government appropriations.**

Corporations that are beyond any turnaround are liquidated on a daily basis at US Bankruptcy courts and their investors have to absorb the cost of their failed investments. Yet, in the case of Puerto Rico, because the corporation in question is a governmental entity, by some form of incomprehensible reasoning, the citizens are required to guarantee investments, acquired by speculators – who were fully aware of the major weaknesses of the entity – and who paid for

5

the bonds deeply discounted prices.

PREPA bondholders were not misled by the public corporation. Monoline insurers had direct access to the entity's management and even the disclosures of the corporation in its last public bond issue painstakingly described the fragile financial condition of the corporation. Monoline insurers knew the covenants in PREPA's bond indenture and failed to notify the Authority of the violation of covenants. Monoline Insurers also had access to the Reports of the Consulting Engineers who for years advised – although not forcefully enough – of the deteriorated and inadequate operating conditions of PREPA's electric assets. They failed to perform their job in a system where each party has to do its part to work for the system to work efficiently.

Hedge Fund investors took a calculated bet. It is based on the irrationality that PREPA's debt is guaranteed beyond its liquidation as a viable operating entity. PREPA was a PROJECT FINANCE STRUCTURE, and its projects were funded under the premise that the business would generate sufficient funds to repay the debt. Speculators, however, expect the legal system to force repayment of their holdings acquired at very deep discounts.

PROMESA was drafted in such a form that the principal amount originally invested by the bondholder cannot be considered in the determination of the ultimate recovery. However, if such an exercise were to be conducted by the court, it would show that the average price at which said bonds were acquired would be approximately 50% or the original issue amount. Speculators expect the US legal system to force repayment of their holdings by one of the poorest jurisdictions of the USA.

The people of Puerto Rico – me included - are being required to make whole on a guarantee which was purportedly and unilaterally granted by PREPA, whereas PREPA has no taxing nor power to grant such a citizen guarantee. Any surcharge to pay for PREPA's debt would amount

to a tax imposed on the people of Puerto Rico without the approval of the PR Legislature. PREPA provided guarantees that pertained **only to its existing business** and once the entity is determined to be unviable or defunct, there can be no recourse to the citizenry. The Guarantees were never meant to extend to perpetuity. No one requested my permission (and nor for that sake of any PR resident) to guarantee PREPA's debt beyond its liquidation as a viable operating entity.

PREPA should be liquidated by the court. Its assets, rights of way and client base should be valued by the court, under a liquidation scenario, and such amounts required to be deposited at the court to be distributed among the existing debt holders including pensioners.

There are legal mechanisms in place that would enable the Commonwealth of Puerto Rico to constitute a new entity to take over the ownership of the electric system of the Island. A Government Trust could be enacted, endowed by a properly legislated energy surcharge, which as explained previously could generate approximately $5.3 billion to settle $10.3 billion in liabilities ($ 8.8 billion in debt and $1.5 billion in estimated pension liability).

5. Therefore, Fernando Viñas Miranda is a party in interest that "may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109(b).

## PROCEDURAL BACKGROUND

6. For over a decade, Puerto Rico's economy has been in trouble and, by 2016, its massive debt became unsustainable. On June 30, 2016, PROMESA was signed into law. 48 U.S.C. § 2101 et seq. It created Title III to allow the territory access to bankruptcy relief for its instrumentalities. On July 2, 2017, the Financial Oversight and Management Board for Puerto Rico ("Oversight Board") initiated a Title III case for PREPA. On December 16, 2022, the Oversight Board filed the first *Title III Plan of Adjustment of the Puerto Rico Electric Power*

7

*Authority*. This has been amended 3 times. The current version of the Plan of Adjustment was filed on March 1, 2023.

## LEGAL ARGUMENT

7. Section 314 of PROMESA has the requirements for the confirmation of a Plan of Adjustment. 48 U.S.C. § 2174(b).

   The Title III court shall confirm a plan of adjustment so long as certain requirements are met, including that: the debtor is not prohibited by law from taking any action necessary to carry out the plan; . . . any legislative, regulatory, or electoral approval necessary under applicable law in order to carry out any provision of the plan has been obtained, or such provision is expressly conditioned on such approval; . . . [and] the plan is feasible. Fin. Oversight & Mgmt. Bd. for P.R. v. Federacion de Maestros de P.R., Inc. (In re Fin. Oversight & Mgmt. Bd. for P.R.), 32 F.4th 67, 76 (1st Cir. 2022)(citation omitted).

8. The Plan of Adjustment is not feasible for the reasons stated in the expert declarations of Mr. Tom Sanzillo, ECF No. 3416; Dr. José I. Alameda Lozada, ECF No. 3417, Mr. Agustín Irizarry, ECF No. 3414.

9. "Under PROMESA, a plan of adjustment must be supported by financial projections that are 'reasonable and demonstrate a probability that the debtor will be able to satisfy its obligations under the Plan.'" In re Fin. Oversight & Mgmt. Bd., 637 B.R. 223, 302-03 (D.P.R. 2022).

10. This means asking: "Is it likely that the debtor, after the confirmation of the Plan of Adjustment, will be able to sustainably provide basic municipal services to the citizens of the debtor and to meet the obligations contemplated in the Plan without the significant probability of a default?" Id.

11. The Plan of Adjustment will affect Puerto Rico's economy and ratepayers, such as Fernando Viñas Miranda. Therefore, PREPA will not be able to generate enough revenue and comply with its obligations to creditors or to the people of Puerto Rico. Because of this, the Plan of Adjustment is not feasible.

## CONCLUSION

12. In conclusion, this Court should not confirm the Plan of Adjustment because it does not meet the requirements under PROMESA. Additionally, the confirmation of the Plan of Adjustment would cause great prejudice to Fernando Viñas Miranda and the people of Puerto Rico.

13. PREPA's restructuring is very important, because electric power is necessary both for consumers and businesses alike. It is the driving force of Puerto Rico's economy. If PREPA's restructuring becomes too burdensome on the people and businesses of Puerto Rico, it will affect any possibility of economic growth and development.

## RELIEF REQUESTED

**WHEREFORE**, Fernando Viñas Miranda respectfully requests that the Court take notice of the above stated and deny the confirmation of the Plan of Adjustment.

**I HEREBY CERTIFY** that on this same date I conventionally filed the foregoing with the Clerk of the Court. A copy of this document will be emailed to all case participants.

In San Juan Puerto Rico, this 9th day of June 2023.

Fernando Viñas Miranda
*Pro se*
Urb. Sagrado Corazón
Calle Santa Ursula # 1414
San Juan PR 00926
Fevinas@gmail.com
Tel:787.425.3695