## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>                       Debtors.[1] | PROMESA<br>Title III<br><br><br><br>Case No. 17 BK 3283-LTS<br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO<br><br>    as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>                      Debtor. | PROMESA<br>Title III<br><br><br><br>Case No. 17 BK 4780-LTS |

## SISTEMA DE RETIRO DE LOS EMPLEADOS DE LA AUTORIDAD DE ENERGÍA ELÉCTRICA'S OBJECTION TO PREPA'S PLAN OF ADJUSTMENT

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations.)

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .......................................................................................1

I.   FACTUAL BACKGROUND RELEVANT TO SREAEE ...........................................1

II.  PROCEDURAL BACKGROUND ...........................................................................4

III.  LEGAL STANDARD FOR CONFIRMATION ......................................................5

IV. ARGUMENTS ..........................................................................................................6

   A.   THE PLAN IMPERMISSIBLY CAUSES PREPA TO REJECT ITS PENSION
OBLIGATIONS. ..............................................................................................................8

     i.    Applicable Law for Rejection .................................................................9

     ii.   Rejection of SREAEE in the Plan of Adjustment ....................................12

     iii.  Application of the Rejection Standard ....................................................13

   B.   THE PLAN IS UNFAIRLY DISCRIMINATORY TOWARDS SREAEE AS A
CURRENT EXPENSE CLAIMANT. .............................................................................17

     i.    Applicable law to subordination and priorities .........................................17

     ii.   Applicable law to Equitable Distribution ..................................................18

     iii.  SREAEE is a creditor and is not treated as such under the Plan of Adjustment .......20

     iv.  Bond subordination to Current Expenses, which includes SREAEE.......................22

     v.   Current Expense Treatment of the Fuel Line Lenders ...............................24

   C.   THE PLAN IS CONTRARY TO LAW TO THE EXTENT THAT IT DOES NOT
APPLY A PROPER PREEMPTION ANALYSIS. ..........................................................26

     i.    Applicable law for preemption. ...............................................................26

     ii.   List of preemption clauses in the Plan under SREAEE class treatment. .................28

     iii.  Analysis of the laws and the lack of preemption. ....................................28

   D.   THE PLAN IS NOT FEASIBLE DUE TO THE MACROECONOMIC EFFECTS OF
THE LEGACY CHARGE..............................................................................................28

     i.    Applicable Definition of Feasibility..........................................................29

     ii.   Legacy Charge in the Plan of Adjustment .................................................29

     iii.  Impact of the Legacy Charge on Feasibility ............................................31

V.   CONCLUSION ........................................................................................................33

   RELIEF REQUESTED ................................................................................................34

## TABLE OF AUTHORITIES

**Federal Statutes**

11 U.S.C. § 1122...........................................................................................................22

11 U.S.C. § 1129(b)......................................................................................................20

11 U.S.C. § 365(a) .....................................................................................................9, 19

11 U.S.C. § 510(a) ........................................................................................................19

48 U.S.C. § 2103...........................................................................................................30

48 U.S.C. § 2141(b)(1)(C)............................................................................................15

48 U.S.C. § 2174(b) ...............................................................................5, 6, 9, 19, 29, 32, 37

**Federal Cases**

Allied Fin., Inc. v. WM Capital Partners 53, LLC (In re Allied Fin., Inc.),
   572 B.R. 45 (Bankr. D.P.R. 2017).............................................................................30

Arizona v. United States,
   567 U.S. 387 (2012) .................................................................................................29

Assured Guar. Corp. v. Garcia-Padilla,
   214 F. Supp. 3d 117 (D.P.R. 2016) ..........................................................................29

Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. Lasalle St. P'ship,
   526 U.S. 434 (1999) .................................................................................................20

Crosby v. Nat'l Foreign Trade Council,
   530 U.S. 363 (2000) .................................................................................................29

Goya de P.R., Inc. v. Santiago,
   59 F. Supp. 2d 274 (D.P.R. 1999) ............................................................................29

In re BanVest Capital Corp.,
   290 B.R. 443 (B.A.P. 1st Cir. 2003)..........................................................................10

In re Crystalin, L.L.C.,
   293 B.R. 455 (B.A.P. 8th Cir. 2003) ....................................................................10, 18

In re Fed.-Mogul Glob.,
   684 F.3d 355 (3d Cir. 2012) .....................................................................................31

In re Fin. Ove rsight & Mgmt. Bd.,
   637 B.R. 223 (D.P.R. 2022) ...........................................................................6, 7, 32, 33

In re FirstEnergy Solutions Corp.,
    945 F.3d 431 (6th Cir. 2019) .................................................................................11

In re Greate Bay Hotel & Casino, Inc.,
    251 B.R. 213(Bankr. D.N.J. 2000) ..................................................................22, 23

In re MF Glob. Holdings Ltd.,
    466 B.R. 239 (Bankr. S.D.N.Y. 2012)........................................................................9

In re Mirant Corp.,
    378 F.3d 511 (5th Cir. 2004) .............................................................................11, 12

In re Noranda Aluminum, Inc.,
    549 B.R. 725 (Bankr. E.D. Mo. 2016).................................................................10, 17

In re Ocean Blue Leasehold Prop. Ltd. Liab. Co.,
    414 B.R. 798(Bankr. S.D. Fla. 2009) .................................................................19, 20

In re Pilgrim's Pride Corp.,
    403 B.R. 413 (Bankr. N.D. Tex. 2009) ...............................................................11, 12

In re TM Vill., Ltd.,
    598 B.R. 851 (Bankr. N.D. Tex. 2019) ...............................................................10, 17

In re Tribune Co.,
    972 F.3d 228(3d Cir. 2020) ...............................................................................21, 22

In re Unbreakable Nation Co.,
    437 B.R. 189 (Bankr. E.D. Pa. 2010) .......................................................................22

Law Debenture Tr. Co. of N.Y. v. Tribune Media Co. (In re Tribune Media Co.),
    587 B.R. 606 (D. Del. 2018)....................................................................................20

Medtronic, Inc. v. Lohr,
    518 U.S. 470 (1996) ...............................................................................................31

N.L.R.B. v. Bildisco,
    465 U.S. 513 (1984) .........................................................................11, 12, 13, 15, 17

Norwest Bank Worthington v. Ahlers,
    485 U.S. 197 (1988). ..............................................................................................20

Official Comm. of Unsecured Creditors v. Dow Chem. Corp. (In re Dow Corning Corp.),
456 F.3d 668 (6th Cir. 2006) ................................................................................................21

RadLAX Gateway Hotel, LLC v. Amalgamated Bank,
    566 U.S. 639 (2012) ...........................................................................................................20

Rosselló Nevares v. Fin. Oversight & Mgmt. (In re Fin. Oversight & Mgmt. Bd.),
    330 F. Supp. 3d 685 (D.P.R. 2018). .....................................................................................6

Zante, Inc. v. Delgado (In re Zante, Inc.),
    467 B.R. 216 (D. Nev. 2012)..............................................................................................23

**Secondary Sources**

*Subordination agreement,* BLACK'S LAW DICTIONARY (11th ed. 2019) ................................18

**TO THE HONORABLE DISTRICT COURT:**

**COMES NOW** Sistema de Retiro de los Empleados de la Autoridad de Energía Eléctrica ("SREAEE") duly represented by the undersigned counsel and respectfully states as follows:

## PRELIMINARY STATEMENT

1. After five years on the sidelines of this process, SREAEE's assets and strengths are nearly depleted. Throughout this time, the Oversight Board, through and in collusion with other entities, have done everything in their power to dismantle the Puerto Rico Electric Power Authority ("PREPA") and, by extension, eliminate SREAEE. Nearing insolvency due to PREPA's failure to pay the actuarially determined contributions and the Oversight Board's insistence of eliminating all defined-benefit pension systems, SREAEE is faced with a restructuring process that aims to disregard its existence, treating it as a part of PREPA rather than the creditor it is. It is faced with extinction, where other creditors fight over the percentage of their return on investments. Meanwhile, in the background, the Oversight Board's plans to pay those returns will plunder what is left of Puerto Rico's already weak and stagnant economy. While one wouldn't know it to hear the parties in this case, the effects of the Plan of Adjustment will be catastrophic for Puerto Rico. This Court cannot allow the confirmation to go forward under those circumstances, particularly when PROMESA's own requirements are not met. The Plan of Adjustment does not meet the requirements under the law, and it is not feasible.

## I.     FACTUAL BACKGROUND RELEVANT TO SREAEE

2. SREAEE is a public pension trust created and maintained for the benefit of its active members and retirees as a separate entity from PREPA governed by its own Rules and Regulations. SREAEE is a defined benefit retirement system. It provides retirement, disability, and death benefits to PREPA employees and retirees. These benefits are

1

determined by defined benefit formulas. Thus, SREAEE is an independent fiduciary. It is a separate entity from PREPA, administered by a Board of Trustees. **The Rules and Regulations of the System specify the contributions payable by PREPA to maintain its sound actuarial funding**. **Exhibit 4:** ***José Fernández Opening Report***, **ECF 3415-1 at L. 66-73** (*Fernández Report*)**.**

3.  SREAEE was created through the Collective Bargaining Agreement ("CBA") executed by the Unión de Trabajadores de la Industria Eléctrica y Riego Inc. ("UTIER") and PREPA's precursor Autoridad de Fuentes Fluviales in 1942. In 1945, the Board of Directors of PREPA's precursor issued Resolution Number 200 of June 25, 1945, which approved and adopted the Retirement System as of July 1, 1945. **Exhibit 1:** ***PREPA Resolution Number 200***. It is important to note that, while SREAEE was created per the CBA, its continued existence is not contingent on said CBA. According to SREAEE's Rules and Regulations, the trust can be dissolved by PREPA's Governing Board only upon recommendation of SREAEE's Board of Trustees. **Exhibit 2:** ***SREAEE Rules and Regulations***.

4.  The fact that SREAEE is an entity independent from PREPA with its own assets was expressly recognized by the Puerto Rico Legislature in Act No. 34-2005.

5.  In addition, the SREAEE has been recognized as a *de facto* trust by the Puerto Rico courts, with an independent and full legal personality. **Exhibit 3:** ***UTIER v. PREPA***, **Civil No. SJ2015CV00100 at 2.** . Specifically, in 2015, it was held that the Board of Trustees of SREAEE is the entity charged with the administration of the pension system and that all the assets of the SREAEE exist for the sole benefit of active members, retired members, and beneficiaries and not for another purpose. **Id. at 8.** Additionally, the court held "that payments made by PREPA and individual employees and other income are deposited in accounts separate from the PREPA's accounts." **Id.**

6. SREAEE's Board of Trustees is responsible for its investment of assets and investment policy. Between 2003 and 2022, the average annual investment return of the SREAEE has been 7.25%. **Fernández Report at L. 75-77.**

7. SREAEE is governed by its own *Rules and Regulations*. Article 5 of the Rules and Regulations states that the fiduciary fund is **funded by the contributions made by PREPA**, PREPA's employees and investment income. In Section (2)(a) this article states that: "**On a monthly basis, or as frequently as agreed to by the Board of Trustees, [PREPA] shall contribute to the Fund created by these Regulations,** . . . **[PREPA] shall make another contribution which shall be referred to as accrued obligations contribution.**" **Exhibit 2:** *SREAEE Rules and Regulations*.**at 101 (emphasis added).**

8. In addition, in Section (2)(b) of Article 5 provides that "the Actuary shall determine the uniform percentage of the compensation of all members calculated to be required as contributions payable by [PREPA] to provide the benefits of the System to which members are normally entitled, in addition to the contributions payable by said members." **Id.** (emphasis added).

9. Furthermore, Section (2)(g) of Article 5 added that **"[PREPA] shall** contribute **all of the necessary Funds for the administrative expenses of the System." Id.** at 104 (emphasis added). Finally, Article 9 establishes PREPA's purpose with the creation of the retirement system, stating that **PREPA's "intention is to maintain the System so long as it continues to carry out the role and purposes for which it was created** . . . ." **Id. at 116** (emphasis added). However, PREPA has continuously failed to meet these obligations and SREAEE's collection efforts have been futile. Currently, SREAEE "has no assets to pay future benefits and is insolvent." **Fernández Report, at L. 79**. The principal reason for SREAEE's insolvency is PREPA's failure to make the required contributions to adequately fund the system. **Id.  at L. 93-96**.

3

10. PREPA has not paid the required contributions since July 2016 and had approximately $960.6 million in unpaid contributions by the end of February 2023. **Id. at L. 119-120.** As a result, SREAEE has suffered significant investment income losses, while the average annual investment return has been 8.07%. **Id. at L. 121-123.**

11. This situation worsened with the implementation of austerity measures that reduced PREPA's workforce and the privatization of PREPA's operations. In 2017, PREPA employed approximately 9,550 workers. By 2021, this number went down to approximately 5,411 workers. An additional reduction occurred when LUMA Energy, LLC and LUMA Energy ServCo, LLC (collectively and interchangeably "LUMA") assumed the control and operation of the Transmission and Distribution System pursuant to the *Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement* ("T&D OMA"). Moreover, in 2023, an additional privatizer, GENERA PR LLC ("GENERA"), came on the scene through the *Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement dated as of January 24, 2023 by an among the Puerto Rico Electric Power Authority as owner, the Puerto Rico Public-Private Partnerships Authority as Administrator and Genera PR LLC as Operator* ("LGA OMA"). The execution of the LGA OMA will inevitably result in the further displacement of PREPA's workforce.

12. This reduction of the workforce results in reduced employee contributions, increased pension payments and substantial refunds of contributions, among other issues.

## II.      PROCEDURAL BACKGROUND

13. After a long and unsuccessful Mediation process that allegedly continues to this day, on December 16, 2022, the Oversight Board, as representative of PREPA, filed the *Title III Plan of Adjustment of the Puerto Rico Electric Power Authority*, **ECF No. 3110**, and the *Disclosure Statement for Title III Plan of Adjustment of the Puerto Rico Electric Power*

*Authority*. **ECF No. 3111.** Most parties filed their objections to the disclosure statement. On February 9, 2023, the first amended versions were filed. **ECF No. 3200,  ECF No. 3201.** Supplemental objections followed. Another amended version was filed on February 21, 2023. **ECF No. 3245.** On February 26, 2023, another amendment was filed. **ECF No. 3278**. The next day it filed an amended disclosure statement. **ECF No. 3279.**

14. On February 28, 2023, this Court held a hearing on the approval of the disclosure statement. **ECF No. 3292.** Finally, the *Modified Second Amended Plan of Adjustment of the Puerto Rico Electric Power Authority* ("Plan of Adjustment"), **ECF No. 3296,** and the *Disclosure Statement for Modified Second Amended Plan of Adjustment of the Puerto Rico Electric Power Authority* ("Disclosure Statement"), **ECF No. 3297**, were filed on March 1st, 2023.[2]

15. On March 3rd, 2023, this Court approved the Disclosure Statement, **ECF No. 3304**, and established the procedures and deadlines for confirmation. **ECF No. 3305.** The procedural order suffered amendments. Pursuant to the *Third Amended and Restated Order establishing, among other things, procedures and deadlines concerning objections to confirmation and discovery in connection therewith* ("Procedural Order"), the parties have been engaged in rigorous discovery which ended on June 2nd, 2023. **ECF No. 3565.**

16. Pursuant to the Procedural Order, on June 5th, 2023, the Oversight Board filed its ("Proposed Confirmation Order"). **ECF No. 3587.** On June 7th, 2023, votes were cast for the confirmation of the Plan of Adjustment. Under the same deadlines, SREAEE hereby files its **Objection to the Confirmation of the Plan of Adjustment**.

### III.    LEGAL STANDARD FOR CONFIRMATION

17. Pursuant to Section 314 of PROMESA, the confirmation of a Plan of Adjustment requires meeting certain requirements. 48 U.S.C. § 2174(b). One of the requirements for

---

[2] As of the date of this filing, these are the most recent versions of the Plan of Adjustment and Disclosure Statement on the public docket, while the Claim Estimation Hearings revealed that the Oversight Board's data may result in a substantial change in the document. Thus, SREAEE reserves every right to amend and supplement this filing should subsequent amendments be filed.

confirmation is that "the debtor is not prohibited by law from taking any action necessary to carry out the plan . . . ." Id. § 2174(b)(3). Additionally, pursuant to Section 314(b) of PROMESA, one of the requirements for confirmation of a Plan of Adjustment is that it comply with the "the provisions of title 11, made applicable to a case under [PROMESA]." Id. § 2174(b)(1).

18. In addition, the Oversight Board must obtain "**any legislative, regulatory, or electoral approval necessary under applicable law in order to carry out any provision of the plan**." See Id. § 2174(b)(5)(emphasis added). This provision exists because, despite the extremely vast powers vested upon the Oversight Board, "**the Oversight Board has not been given power to affirmatively legislate.**" Rosselló Nevares v. Fin. Oversight & Mgmt. (In re Fin. Oversight & Mgmt. Bd.), 330 F. Supp. 3d 685,701 (D.P.R. 2018).

19. In addition to complying with existent law and obtaining enabling legislation, PROMESA requires the Oversight Board to present a Plan that is **feasible**.

> The Court has an independent duty to determine feasibility and to make specific findings of fact. **Under PROMESA, a plan of adjustment must be supported by financial projections that are "reasonable and demonstrate a probability that the debtor will be able to satisfy its obligations under the Plan."** . . . The core inquiry has been articulated as follows: "**Is it likely that the debtor, after the confirmation of the Plan of Adjustment, will be able to sustainably provide basic municipal services to the citizens of the debtor and to meet the obligations contemplated in the Plan without the significant probability of a default?**" In re Fin. Ove rsight & Mgmt. Bd., 637 B.R. 223, 302-03 (D.P.R. 2022)(citations and brackets omitted)(emphasis added).

20. As such, feasibility is a two prong inquiry: (1) whether the debtor will be able to satisfy its obligations under the Plan; and (2) whether the debtor will be able to provide the services it owes to the public. Id.

## IV.    ARGUMENTS

21. Under the Plan of Adjustment, SREAEE or "PREPA ERS" as the Oversight Board denominates it, is "the entity responsible for the administration and payment of PREPA's pension obligations, pursuant to the PREPA ERS Regulations." **ECF No. 3296 at 27.** Those

regulations are defined as "the regulations adopted by PREPA pursuant to PREPA's Resolution No. 200, adopted June 25, 1945, that provide for the governance, funding, and operation of PREPA ERS, as amended from time to time." **ECF No. 3296 at 27.**

22. Moreover, the Plan of Adjustment defines SREAEE's claim as **"on account of contributions owed** (including amounts payable in the future) **by PREPA to [SREAEE]** to pay retiree pension benefits . . . ." **ECF No. 3296 at 27**.

23. Notwithstanding the fact that SREAEE is a creditor with its own legal personality, the Oversight Board intends to displace SREAEE, replacing it as recipient of PREPA's contributions with the PREPA PayGo Trust ("PayGo Trust"). The PayGo Trust is "[a] reserve trust to be created in accordance with the terms and conditions hereof, which reserve trust shall be utilized **to reimburse [SREAEE] on an annual basis for payment of retirement benefits to Participants as adjusted by this Plan**." ECF No. 3296 at 28 (emphasis added).

> From and after the Effective Date, in full consideration, satisfaction, release, and exchange of the Pension Claim **held by [SREAEE]**, Reorganized **PREPA shall pay to the PREPA PayGo Trust**, for the benefit of PREPA ERS, the amounts described in Article XXVI.B, **sufficient to satisfy of Participants' claims against [SREAEE]** to the extent described in this Article VI. **ECF No. 3296 at 42** (emphasis added).

24. As such, the "PayGo Trust shall **reimburse the [SREAEE] for retirement benefits paid** and reasonable administrative costs (as determined by PREB to be subject to payment as part of the rate to be charged by PREPA to its customers) incurred in the prior Fiscal Year . . . ." **ECF No. 3296 at 42** (emphasis added).

> [The] benefit payments for which [SREAEE] is entitled to reimbursement hereunder shall be limited to (i) benefits payable to any Participant who is a Retiree as of the Effective Date, without any further cost of living adjustments from and after the Effective Date, and (ii) benefits payable to Participants who are Active [SREAEE] Participants as of the Effective Date, (A) with benefit accruals frozen as of the Effective Date in the manner set forth in Schedule C hereto, and (B) not subject to any cost of living adjustments from and after the Effective Date. **ECF No. 3296 at 42.**

25. Therefore, under the Plan of Adjustment, the benefits for current and future System retirees and beneficiaries will be paid on a PayGo basis. In addition, the Plan of Adjustment includes changes in benefits, such as, (i) freezing accrued benefits for active members, (ii) changes in the eligibility requirements to commence pension benefits, (iii) the elimination of future pension increases every three years, and (iv) the elimination of the summer and Christmas bonuses for active members.  It also proposes a defined contribution plan for active employees for future service, but there would  be no employer contributions to the plan.

26. Furthermore, the Oversight Board increases the administrative burden on PREPA by adding another trust for no reasonable purpose. As explained by Ms. Sheva Levy in her deposition, the PayGo Trust will mean an additional administrative fee load of 3%. **Exhibit 5: *Transcript of Sheva Levy Deposition* at 127, Exhibit 52 at Appendix b** (*Levy Deposition*). This administrative fee load is defined as the "assumed administrative expenses to be paid from the trust as a percentage of benefit payments paid." %. **Id.** This refers to the "assumed costs of operating the plan." **Id.** However, SREAEE's administrative fee load is currently 0.1%, which means the added 2.9% responds to the creation of the PayGo Trust. **Id.  at 132, Exhibit 54 at 3.**

27. **As such, SREAEE does not have recovery under the Plan of Adjustment.** It will continue to pay benefits to retirees and be subject to the proposed reimbursement of the PayGo Trust for those disbursements. This overview is necessary to understand the following arguments related to the SREAEE's objection to the confirmation of the Plan of Adjustment.

## A. THE PLAN IMPERMISSIBLY CAUSES PREPA TO REJECT ITS PENSION OBLIGATIONS.

28. As previously stated, one of the requirements for confirmation is that "the debtor is not prohibited by law from taking any action necessary to carry out the plan . . . ." 48 U.S.C. §

2174(b)(3). However, the Plan of Adjustment violates applicable law for rejection of executory contracts.

### i.   Applicable Law for Rejection

29. Under the Bankruptcy Code, "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). This is subject to the *cum onere* principle, meaning "[a]n executory contract may not be assumed in part and rejected in part." In re MF Glob. Holdings Ltd., 466 B.R. 239, 241 (Bankr. S.D.N.Y. 2012) (citation omitted). "This principle prevents a party from using the power available under Bankruptcy Code section 365 to 'cherry pick' contractual terms by assuming those it finds favorable and freeing itself from others it finds unfavorable." Astria Health v. Cerner Corp. (In re Astria Health), 640 B.R. 758, 769 (Bankr. E.D. Wash. 2022) (footnotes omitted). "[T]**he estate representative is not allowed to use section 365(a) to rewrite or line-item veto the debtors' agreements but must assume or reject each on a wholesale basis with all existing benefits and burdens**." Id.(emphasis added). "To be sure, the *cum onere* principle is significant and imposes important **constraints on a bankruptcy estate representative's ability to manipulate the terms of prebankruptcy contracts using the power of assumption or rejection**." Id. at 770 (emphasis added).

30. Generally, "[u]nder a motion to assume or reject an executory contract, the only issue properly before a court is whether assumption or rejection of the subject contract is based upon a debtor's business judgment." In re BanVest Capital Corp., 290 B.R. 443, 447 (B.A.P. 1st Cir. 2003)(citations omitted). Thus, "[t]o satisfy the business judgment test, the debtor must show that the proposed course of action will be advantageous to the estate and the decision is based on sound business judgment." In re TM Vill., Ltd., 598 B.R. 851, 859 (Bankr. N.D. Tex. 2019)(citations omitted). Therefore, under this test, "the bankruptcy court should not interfere with [that] business judgment[,] except on a finding of bad faith

or gross abuse of their business discretion." In re Noranda Aluminum, Inc., 549 B.R. 725, 728 (Bankr. E.D. Mo. 2016)(quotation marks and citations omitted). However, the court may interfere "[i]f Debtor cannot show a benefit to the estate, [and] does not need to make a finding of bad faith or gross abuse of discretion." In re Crystalin, L.L.C., 293 B.R. 455, 464 (B.A.P. 8th Cir. 2003). Furthermore, although business judgment is the general standard to assume or reject executory contracts in bankruptcy, the courts have carved out an exception for unique contracts. See, for example, N.L.R.B. v. Bildisco, 465 U.S. 513 (1984) *superseded by statute*; In re Mirant Corp., 378 F.3d 511 (5th Cir. 2004).

31. In Bildisco, the Supreme Court considered that collective-bargaining contracts had a "special nature" and, therefore, "a somewhat stricter standard should govern . . . ." 465 U.S. at 525. Building on that, in Mirant, the Fifth Circuit determined that "[t]he nature of a contract for the interstate sale of electricity at wholesale is also unique." 378 F.3d at 525. Therefore, the court determined, the "[u]se of the business standard would be inappropriate in this case because it would not account for the public interest inherent in the transmission and sale of electricity." Id. In these cases, the appropriate standard is a balance of equities, not a business judgment test. See Bildisco, 465 U.S. at 527; Mirant, 378 F.3d at 525. See, also, In re FirstEnergy Solutions Corp., 945 F.3d 431, 453-54 (6th Cir. 2019).

> It would make no sense to limit application of a higher standard for rejection to just those cases where unfettered rejection is inconsistent with a federal statute or would encroach on the turf of a federal regulator. [We] can easily conceive of cases where rejection of a contract could have a significant impact upon, say, public health, such that its rejection should be allowed only after a more critical review by the court than is contemplated under the ordinary business judgment rule . . . . In re Pilgrim's Pride Corp., 403 B.R. 413, 424 (Bankr. N.D. Tex. 2009).

32. This means that, while it has not been addressed yet, other contracts may be entitled to the treatment provided by Bildisco and Mirant. Bildisco extended the balance of equities to collective bargaining agreements because they were of a special nature, 465 U.S. at 524, and citing "national labor policies of avoiding labor strife and encouraging collective

bargaining . . . ." <u>Pilgrim's</u>, 403 B.R. at 422. The analysis includes the provisions of the federal statutes involved, but centers on the underlying policies and their importance. <u>Mirant</u> further considered that "[t]he nature of a contract for the interstate sale of electricity at wholesale is also unique." 378 F.3d at 525. The Fifth Circuit in that case said: "Additionally*,* Congress found when it passed the [Federal Power Act] that the public has an interest in the transmission and sale of electricity. This includes the interest in the continuity of electrical service to the customers of public utilities." <u>Id.</u> Thus, the analysis was about underlying policy. While "<u>Bildisco</u> thus focused on the type of contract [and] <u>Mirant</u> turned on the effect of rejection on the public[,]" <u>Pilgrim's</u>, 403 B.R. at 423, they both considered the **underlying policies** of the executory contracts before the courts, in order to make their determination.

33. The test that replaces "business judgment" in these cases is "balance of equities". In <u>Bildisco</u>, the Supreme Court instructs a balance between "**the interests of the affected parties- the debtor, creditors and employees** . . . Nevertheless, the Bankruptcy Court must focus on the ultimate goal of Chapter 11 when considering these equities." 465 U.S. at 527 (emphasis added). In addition to establishing a different standard for the rejection of collective bargaining agreements, <u>Bildisco</u> imposes other burdens on the debtor:

> Before acting on a petition to modify or reject a collective-bargaining agreement, however, **the Bankruptcy Court should be persuaded that reasonable efforts to negotiate a voluntary modification have been made and are not likely to produce a prompt and satisfactory solution**. The NLRA requires no less. Not only is **the debtor-in-possession under a duty to bargain with the union** . . . but the national labor policies of avoiding labor strife and encouraging collective bargaining . . . generally **require that employers and unions reach their own agreements on terms and conditions of employment free from governmental interference**. The Bankruptcy Court need step into this process **only if the parties' inability to reach an agreement threatens to impede the success of the debtor's reorganization**. <u>Id.</u> at 526-27 (citations omitted)(emphasis added).

34. There is room under the <u>Bildisco</u> standard to extend the application of the balance of equities to other contracts where there are competing federal interests and similar underlying policies as with collective bargaining agreements.

### ii.  Rejection of SREAEE in the Plan of Adjustment

35. Under the Plan of Adjustment, the Oversight Board causes PREPA to reject its obligations to SREAEE, in Article VI(A)(1)(b):

> b) **The contractual obligations of PREPA to PREPA ERS** as of the Petition Date, including, without limitation**, the obligation to pay employer contributions sufficient to fund benefits as set forth in the PREPA ERS Regulations**, shall be rescinded or **deemed rejected pursuant to section 365(a) of the Bankruptcy Code**, and, other than the obligations set forth in this Article VI and Article XXVI.B, no further obligation of PREPA or Reorganized PREPA to PREPA ERS shall arise in connection with such rejection. **ECF No. 3296 at 42** (emphasis added).

36. The Disclosure Statement does not discuss this rejection in detail. However, it does discuss the rejection of UTIER's CBA as a means to dispose of PREPA's pension obligations. "The most significant obligation in the CBAs the Oversight Board seeks to modify is the requirement that PREPA maintain a fully funded pension system for Represented Employees and retired PREPA employees with ongoing retirement benefit accruals and periodic cost of living adjustments." **ECF No. 3297 at 88.** Additionally, the Disclosure Statement declares:

> The Oversight Board has engaged in negotiations with PREPA ERS and UTIER regarding the requirement in the CBAs and the PREPA ERS Regulations that PREPA continue to maintain the PREPA ERS as a defined benefit plan. If an agreement cannot be reached with respect to this, PREPA may need to reject the CBAs, and will impose pension reform measures as set forth in the Plan. **ECF No. 3297 at 93.**

37. However, SREAEE submits that these negotiations have not been in good faith given the Oversight Board's lack of meaningful engagement to find alternatives. **Exhibit 6:** *Declaration of José Rivera.*

38. The referenced negotiations have developed as follows. On August 9, 2022, the Oversight Board submitted the proposed pension reform to SREAEE. After the Board of Trustees and its advisors carefully evaluated the proposal, it decided to reject it. However, on November 17, 2022, SREAEE submitted its counterproposal and there was a brief conference on the matter with the parties' actuaries.[3] Nevertheless, at the time of this filing, the Oversight Board has not responded. SREAEE believes that the Oversight Board is concentrating on the elimination of PREPA's obligations under the CBA, to avoid negotiating with the Board of Trustees.

39. Additionally, the Oversight Board proposes to impose a new obligation structure upon SREAEE with the creation of the PayGo Trust and rejection of future pension obligations. Rather than continue paying employer contributions as PREPA was obligated to do prepetition, PREPA will be paying only the pension costs in the form of reimbursement for actual pensions. However, with regard to future pensions, PREPA will be washing its hands.

### iii.  Application of the Rejection Standard

40. As previously stated, SREAEE is a public pension system that was created through UTIER's CBA. Though later SREAEE was ratified by PREPA, and its defining characteristics were confirmed through legislative and judicial action, it is still the product of collective bargaining. The CBA created an obligation that PREPA has to all of its employees, whether or not they are members of the union. Additionally, SREAEE is an independent trust, run by its Board of Trustees. The Board of Trustees is composed of employees and retirees of PREPA, and it acts solely for the benefit of its members. **SREAEE is not a branch of PREPA, nor does it respond to PREPA**. Its members are

---

[3] SREAEE's counterproposal, similar to that of the Oversight Board, consists of a two-prong approach. Regarding the current pensions, SREAEE's proposal adheres to the PayGo structure, with the elimination of future increases every three years. However, it maintains a separate defined benefit pension system for active members as of June 30, 2023. **Exhibit 7:** *SREAEE Counter Proposal*.

elected, not appointed by PREPA. Much like a union, SREAEE is consistently engaged in the defense of its members. Additionally, as stated, SREAEE was initially a product of collective bargaining. Moreover, pursuant to PROMESA, part of the underlying policy is the adequate funding of Puerto Rico's public pension systems. See 48 U.S.C. § 2141(b)(1)(C). Thus, there is an underlying federal policy that protects public pension systems.

41. In view of the foregoing, the applicable standard is balance of the equities. The issues here are more akin to the rejection of a collective bargaining agreement than other executory contracts. Under the balance of equities, rejection of PREPA's pension obligations is unwarranted. To begin with, as shown above, the Oversight Board has not met the burden showing that it engaged in **reasonable, good faith negotiation to reach a voluntary modification of the pension system**. See Bildisco, 465 U.S. at 526. It is plain to see that the Oversight Board's intent has always been to reject the pension system, even their proposal in these negotiations is not distinguishable from the rejection in the Plan of Adjustment. With respect to SREAEE, the Oversight Board has never attempted to negotiate based on the unique characteristics of the pension system. On the contrary, it has been concerned only with recreating the results of the Commonwealth Plan of Adjustment.

42. In her deposition, Ms. Sheva Ley of Ernst & Young, who advises the Oversight Board on pension matters, was asked whether she had a role in the development of Exhibit G of the Disclosure Statement, marked as Exhibit 63, which contains the "Terms for Modification of PREPA ERS Obligations." **Levy Deposition at 127, Exhibit 65**. According to Ms. Levy, her role in the process of the Plan of Adjustment was to "review the changes that were made under the Commonwealth plan of adjustment to the Commonwealth pension plans and to identify what the—what changes to the PREPA ERS Pension Plan **would be consistent with the changes made to the Commonwealth pension plans**." **Id. at 214-**

14

**15**(emphasis added). Her understanding of the purpose of this assignment is that the Oversight Board wanted to "**treat the people** in the PREPA ERS in the same manner that they treated **the people** in the Commonwealth pension plans." **Id. at 215**(emphasis added). Ms. Levy expressed, with regard to Exhibit G, that she "reviewed this document to confirm that it was **consistent with my understanding of how the board wanted to reform the pension system.**" **Id. at 235** (emphasis added) When asked about specific provisions of the pension reform, Ms. Levy's answers reflected that **her only assignment was to ensure that it was consistent with the Commonwealth's reform**. Id. at 235-41.

43.  **As will be discussed in more detail below, this approach is unwarranted given the differences between the Commonwealth pensions and PREPA pensions**. Nonetheless, for the purpose of this section, it is sufficient to acknowledge that **the only goal of the Oversight Board is to make SREAEE the same as the Commonwealth ERS.** This is wholly inconsistent with a good faith negotiation based on the actual realities of SREAEE and PREPA. It is a one size fits all, take it or leave it, style of "negotiation" that is incompatible with good faith. Furthermore, as detailed below, SREAEE's counterproposal is viable, particularly if SREAEE is treated as a creditor, rather than strong-armed into accepting its own demise. **Fernández Report  at p. 13-14.**

44. Moreover, it is clear that the equities are skewed in favor of SREAEE in this matter, pursuant to the stricter applicable standard of Bildisco. See Bildisco, 465 U.S. at 527. In striking a balance between the interests of the debtor, creditors, and employees, while focusing on the goals of PROMESA which include adequate funding of the pension systems. Moreover, the prejudice it causes SREAEE far exceeds any possible benefits to PREPA or its creditors. **Thus, the balance of equities standard does not favor the rejection of the pension system and it should be denied.** Particularly when the Oversight Board has not met the **minimum** requirement of exhausting good faith negotiations.

45. Moreover, even under the laxer business judgment standard, the Oversight Board has not established that the rejection of the pension system "will be advantageous to the estate and the decision is based on sound business judgment." In re TM Vill., Ltd., 598 B.R. at 859 (Bankr. N.D. Tex. 2019)(citations omitted). **Sound business judgment requires the voluntary and reasonable consideration of an arm's-length transaction, which presupposes that the parties have roughly equal bargaining power**.[4] Thus, where the rejection provides minimal savings which barely affect PREPA, particularly given the continuing development of the "transformation" of PREPA, a finding of bad faith and gross abuse of business discretion is inevitable. See In re Noranda Aluminum, Inc., 549 B.R. at 728. Furthermore, the Oversight Board "**cannot show a benefit to the estate**, [therefore, this Court] does not need to make a finding of bad faith or gross abuse of discretion" to deny rejection. See In re Crystalin, L.L.C., 293 B.R. at 464 (emphasis added).

46. This is particularly true when the Court considers that PREPA's workforce is continuously decreasing as a result of the Oversight Board's own projects, including the T&D OMA and the LGA OMA. Conversely, the rejection of the pension system is more likely to cause a drastic increase in retirements before the effective date of the Plan of Adjustment, which will increase the costs of the PayGo Trust.

47. Moreover, the Oversight Board's proposed reform imposes additional costs on PREPA. By creating the PayGo Trust and the bureaucracy to run it, rather than keeping SREAEE, the Plan of Adjustment adds a 3% administrative fee load. **Levy Deposition at 127, Exhibit 52 at Appendix b.** This increases the administrative burden on PREPA by adding another trust for no reasonable purpose. This administrative fee load is defined as the "assumed administrative expenses to be paid from the trust as a percentage of benefit payments paid." **Id. at 127.** This refers to the "assumed costs of operating the plan." **Id.** However,

---

[4] *Arm's-Length*, Black's Law Dictionary (11th ed. 2019).

SREAEE's administrative fee load is currently 0.1%, which means the added 2.9% responds to the creation of the PayGo Trust. **Id. at 132, Exhibit 54 at 3.**

48. The modifications the Oversight Board hopes to achieve are arbitrary, capricious, and purely ideological. Throughout the years of PROMESA's implementation, the Oversight Board has not been shy about its attitude towards defined benefit pension systems, **regardless of available funding**. This is even expressly included in the Plan of Adjustment. **ECF No. 3296** at 88. **This is a vendetta against defined benefit pension systems. This is not a business judgment tailored to PREPA and SREAEE.**

49. Lastly, it should be noted that the Oversight Board's proposal is not a complete rejection of the pension obligations but a modification of those obligations. With respect to current pensions, PREPA will be changing its obligations from an actuarially determined employer contribution to a reimbursement of pension costs. With respect to future pensions, PREPA will not assume any obligations. This is an improper cherry picking of obligations, which is not permissible under Section 365 of the Bankruptcy Code and imposition of obligations without the consent of the other party.

## B. THE PLAN IS UNFAIRLY DISCRIMINATORY TOWARDS SREAEE AS A CURRENT EXPENSE CLAIMANT.

50. As previously stated, one of the requirements for confirmation is that "the debtor is not prohibited by law from taking any action necessary to carry out the plan . . . ." 48 U.S.C. § 2174(b)(3). Additionally, pursuant to Section 314(b) of PROMESA, one of the requirements for confirmation of a Plan of Adjustment is that it comply with the "the provisions of title 11, made applicable to a case under [PROMESA]." Id. § 2174(b)(1).

### i. Applicable law to subordination and priorities

51. The Bankruptcy Code provides for distinct types of subordination. Among them, subordination by agreement. A contractual subordination agreement is enforceable "**to the same extent that such agreement is enforceable under applicable non-bankruptcy**

**law**." 11 U.S.C. § 510(a) (emphasis added). A subordination agreement is defined as a "[f]ormal document that acknowledges a party's interest or claim is inferior to that of another party."[5] "Under the Bankruptcy Code, subordination commonly refers only to the priority of distribution. Several federal courts agree and interpret "subordination" in section 510(a) to only implicate the priority scheme in bankruptcy." In re Ocean Blue Leasehold Prop. Ltd. Liab. Co., 414 B.R. 798, 804 (Bankr. S.D. Fla. 2009)(citations omitted). "By subordinating its claim, a subordinated creditor agrees to lower its priority to below that of the senior creditor for purposes of distribution with respect to a particular transaction." Id. at 805. A court can ignore this only "as long as it is fair and equitable and **does not discriminate unfairly**." Law Debenture Tr. Co. of N.Y. v. Tribune Media Co. (In re Tribune Media Co.), 587 B.R. 606, 614 (D. Del. 2018)(emphasis added).

### ii.  Applicable law to Equitable Distribution

52. Section 1129(b) of the Bankruptcy Code permits cramdown of a plan of adjustment if "[it] **does not discriminate unfairly, and is fair and equitable**, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 566 U.S. 639, 641-42 (2012)(emphasis added); 11 U.S.C. § 1129(b).

> As to a dissenting class of impaired unsecured creditors, such a plan may be found to be "fair and equitable" only if the allowed value of the claim is to be paid in full or, in the alternative, if "the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,". Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. Lasalle St. P'ship, 526 U.S. 434, 441-42 (1999)(citations omitted). See, also, Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 202 (1988).

53. "By incorporating the fair and equitable standard in § 1129(b) of the Code, Congress codified the 'absolute priority rule,' which provides that absent full satisfaction of a

---

[5] *Subordination agreement,* BLACK'S LAW DICTIONARY (11th ed. 2019).

creditor's allowed claims, no member of a class junior in priority to that creditor may receive anything at all on account of their claim or equity interest." Official Comm. of Unsecured Creditors v. Dow Chem. Corp. (In re Dow Corning Corp.), 456 F.3d 668, 672 (6th Cir. 2006)(citations omitted).

54. On the other hand, the unfair discrimination standard "ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes." In re Tribune Co., 972 F.3d 228, 240 (3d Cir. 2020)(citations omitted). There has been more than one approach to this test. See Id.

> The "mechanical" test prohibits all discrimination, that is, it requires that similarly situated creditors' recoveries be 100% *pro rata*. The "restrictive" approach narrowly defines unfair discrimination such that, in the absence of subordination, no disparate treatment of similarly situated creators would qualify . . . The "broad" approach is generally applied as a four-factor test . . . To determine whether the plan unfairly discriminates, the test considers whether: (1) a reasonable basis for discrimination exists; (2) the debtor cannot consummate its plan without discrimination; (3) the discrimination is imposed in good faith; and (4) the degree of discrimination is directly proportional to its rationale. Id. at 240-241 (citations, brackets, quotation marks, ellipsis and footnotes omitted).

55. In addition to the foregoing, there is the "rebuttable presumption" test. See Id. at 241.

> A rebuttable presumption of unfair discrimination exists when there is (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution. Under this test, a presumption of unfair discrimination may be overcome if the court finds that a lower recovery for the dissenting class is consistent with the results that would obtain outside of bankruptcy, or that a greater recovery for the other class is offset by contributions from that class to the reorganization. The presumption of unfairness based on differing risks may be overcome by a showing that the risks are allocated in a manner consistent with the prebankruptcy expectations of the parties. Id. (citations and quotation marks omitted).

56. Nonetheless, it should be noted that "the need for classes to be aligned correctly is a precursor to an effective assessment. A typical refrain in bankruptcy is that many plan

disputes in § 1129 begin as misclassifications under § 1122." Id. at 243(citations omitted).

Under Section 1122:

> (a) Except as provided in subsection (b) of this section, a plan may place a claim
> or an interest in a particular class only if such claim or interest is substantially
> similar to the other claims or interests of such class.
> (b) A plan may designate a separate class of claims consisting only of every
> unsecured claim that is less than or reduced to an amount that the court approves
> as reasonable and necessary for administrative convenience. 11 U.S.C. § 1122.

57. This section "does not expressly provide that 'substantially similar' claims may not be
placed in separate classes [nor] necessarily prohibit the placement of similar claims in
different classes. [However, c]lassification of claims by the debtor **must be reasonable**."
In re Unbreakable Nation Co., 437 B.R. 189, 200 (Bankr. E.D. Pa. 2010)(citations
omitted)(emphasis added).

58. While it is true that the plan proponent generally has considerable discretion in the
classification of claims, "that discretion is tempered by the caveat that a proponent **may
not classify similar claims differently in order to gerrymander an affirmative vote on
a reorganization plan**." In re Greate Bay Hotel & Casino, Inc., 251 B.R. 213, 224 (Bankr.
D.N.J. 2000)(citations and quotation marks omitted)(emphasis added).

59. "Separate classification of similar claims has been found to be permissible where the
classification is offered in good faith, does not foster an abuse of the classification system,
and promotes the rehabilitative goals of Chapter 11." Id. (citations omitted).
"Whether claims are "substantially similar" under 11 U.S.C. § 1122(a) is a question of fact
. . . ." Zante, Inc. v. Delgado (In re Zante, Inc.), 467 B.R. 216, 218 (D. Nev. 2012).

   **iii. SREAEE is a creditor and is not treated as such under the Plan of Adjustment**

60. As detailed above, under the Plan of Adjustment, SREAEE's claim is defined based on
**contributions owed by PREPA to SREAEE** to pay retiree pension benefits. **ECF No.
3296 at 27**. Nonetheless**, this is not the claim that SREAEE filed**. SREAEE's claim
includes PREPA's liability based on the following:

> The actuarially determined present value of future benefits ("total actuarial liabilities") is the measure of the amount as of a given date that would be sufficient to pay for all future benefits payable from the [SREAEE] for current active and inactive members assuming all actuarial assumptions are met. As of June 30, 2021, the total actuarial liabilities are **$4,459.5 million** according to the June 30, 2021, actuarial valuation report prepared by Cavanaugh Macdonald Consulting, assuming a discount rate of 5.75% per annum. The total actuarial liabilities of $4,459.5 million is the estimated claim by [SREAEE] to maintain the promised benefits under the current System without any changes or reforms. **Fernández Report, at L. 131-138** (emphasis added).

61. The Oversight Board is instead concerned with the bare minimum of covering current pensions with unilaterally imposed reductions. That is, instead of addressing what PREPA owes SREAEE, the creditor, the Plan of Adjustment only intends to cover the modified pensions of current retirees and practically eliminate SREAEE. **As such, SREAEE does not have recovery under the Plan of Adjustment.** It will continue to pay benefits to retirees and be subject to the proposed reimbursement of the PayGo Trust.

62. Notwithstanding the fact that **SREAEE is a creditor** with its own legal personality, the Oversight Board **intends to displace, reform, and eventually destroy SREAEE**. This treatment is illegal and unheard of even under bankruptcy proceedings. This Court should ask itself whether the Oversight Board would ever even consider imposing such reforms on any other creditor. Had the Oversight Board proposed any such treatment for another creditor, to eliminate a creditor to avoid paying its debt, SREAEE cannot fathom that this Court would not jump. Had the Oversight Board determined that the Ad Hoc Group or the Fuel Line Lenders did not deserve recovery and instead they would eliminate them, **this Plan of Adjustment would not be up for discussion.** Rather than treat **SREAEE as a creditor in its own right**, the Plan of Adjustment treats SREAEE as though it were an entity within PREPA or somehow comparable with the Commonwealth's pension systems over which the Oversight Board can unilaterally make decisions. **This is not the case.**

63. From the start, the Oversight Board has been concerned only with recreating the results of the Commonwealth Plan of Adjustment, which is unwarranted given the vast differences

between the pension systems involved. For example, in the Commonwealth's plan of adjustment, the Oversight Board included the Employees Retirement System ("ERS") as **the debtor in a Title III Plan**. Meanwhile SREAEE **is a creditor** in PREPA's Title III case**.**

64. Additionally, the pension reforms instituted in the Commonwealth's Title III plan were for **pension claimants as individuals.** This is so because the Teachers' Retirement System and the Judiciary's Retirement System **were not independent trusts or entities separate from their respective instrumentalities or the Commonwealth**. Therefore, these retirement systems **were not the creditors**, just parts of the debtor to be molded pursuant to the Commonwealth's reorganization. **These are incompatible situations.** The Plan of Adjustment does not pay SREAEE's claim as a creditor. The Plan of Adjustment imposes new obligations on SREAEE as a creditor, essentially liquidates it and adds intermediary entities to operate and oversee SREAEE's duties for additional costs. The proposed pension reform that the Oversight Board imposes through the Plan of Adjustment inevitably eliminates SREAEE, as its active members are unilaterally removed from the system.

### iv. Bond subordination to Current Expenses, which includes SREAEE.

65. On January 1, 1974, PREPA and U.S. Bank entered into the *Trust Agreement*, which provides for "the fixing, charging and collecting by [PREPA] of reasonable rates and charges for the use of the services and facilities furnished by the System **sufficient to provide for the payment of the expenses of [PREPA] incurred in the conservation, repair, maintenance** and operation of the System . . . ." **Exhibit 8:** *Trust Agreement,* **ECF No. 118-1 Exhibit A at 8** (*Trust Agreement*) (emphasis added). According to the *Trust Agreement,* recovery for bondholders is contingent on the *Current Expenses* getting paid in full. Pursuant to the *Trust Agreement*, PREPA's *Revenues* refer to "all moneys received by [PREPA] in connection with or as a result of its ownership or operation of the System,

22

including the income derived by [PREPA] from the sale of electricity generated or distributed by the System . . . ." **Trust Agreement at 36.** These *Revenues* would be applied to the *General Fund*, which was created by the *Trust Agreement.*

> [PREPA] covenants that, after the outstanding 1947 Indenture Bonds have been paid or provision has been made for their payment and the release of the 1947 Indenture, **all Revenues, other than income from investments made under the provisions of this Agreement, will be deposited** as received in the name of [PREPA] with a qualified depositary or depositaries **to the credit of the General Fund** and applied in accordance with the provisions of this Article. **Trust Agreement at 68** (emphasis added).

66. Pursuant to Section 505, the *General Fund* would be used first for the payment of PREPA's *Current Expenses*. **Trust Agreement at 70**. As such, under the *Trust Agreement* bondholders are entitled to payment only from *Net Revenues*, "**the amount of the excess of the Revenues for such period over the Current Expenses for such period**." **Trust Agreement at 28** (emphasis added). These would be transferred to the *Sinking Fund*.

67. The Trust Agreement defines Current Expenses as:

> The term "Current Expenses" **shall mean** [PREPA's] reasonable and necessary current expenses of maintaining, repairing and operating the System **and shall include,** without limiting the generality of the foregoing, all administrative expenses, insurance premiums, expenses of preliminary surveys not chargeable to Capital Expenditures, engineering expenses relating to operation and maintenance, fees and expenses of the Trustee, the 1947 Trustee, the Paying Agents and of the paying agents under the 1947 Indenture, legal expenses, **any payment to pension or retirement funds, and** all other expenses required to be paid by [PREPA] under the provisions of the 1947 Indenture, this Agreement or by law, or permitted by standard practices for public utility systems, similar to the properties and business of [PREPA] and applicable in the circumstances **but shall not include** . . . . **Trust Agreement at 23** (emphasis added).

68. Pursuant to the foregoing, *Current Expenses* **expressly include the payments to pension and retirement funds.** It should be noted that this language does not limit the status of *Current Expense* to **pension benefits,** but **payments to pension and retirement funds.** This means that it is not the pension beneficiaries but the retirement trust that is entitled to

23

this treatment. Pension and retirement funds are within the inclusive language of the definition of *Current Expenses*, and clearly precede the exclusionary language.

69. However, the Plan of Adjustment does not respect that priority or subordinate bond payment to the payment of *Current Expenses*, which is impermissible when the Plan of Adjustment also discriminates unfairly against SREAEE.

### v.  Current Expense Treatment of the Fuel Line Lenders

70. Pursuant to the Plan of Adjustment, the Fuel Line Lenders have achieved one of the highest recoveries among creditors. They "will receive (i) Series A Bonds **in the face amount equal to 84% of their Fuel Line Loan Claims**, and (ii) **for the remaining 16% of their Claims, a *pro rata* share of the Series B Bonds available . . . ."[6] ECF No. 3297 at 278** (emphasis added). This treatment is a direct result of the Fuel Line Lenders' PSA:

> On December 1, 2022, the Oversight Board, as PREPA's Title III Representative, and the Fuel Line Lenders entered into the Fuel Line Lender PSA, which generally resolves the Fuel Line Lenders' claims **and asserted priority treatment as "Current Expenses" under the Trust Agreement** and provides for the Fuel Line Lenders to support the Plan. Pursuant to the Fuel Line Lender PSA, **the Fuel Line Lenders will be receiving Series A Bonds, which will be current interest bonds with a 6.0% coupon, at an exchange ratio of 84% of the Allowed Fuel Line Loan Claim** (as defined in the Plan).
>
> Series A Bonds shall have a final maturity of fifteen (15) years from the Effective Date, **with an expected repayment of five (5) years from the Effective Date based on upon 2022 Fiscal Plan Projections. The Series A Bonds shall be issued on the Effective Date but shall accrue interest from the deemed issuance date of December 1, 2022** for purposes of the calculation of interest accrued; provided, however, the accrual of interest prior to the Effective Date shall be capped at one (1) year. Such interest shall be payable in either cash or in the form of additional Series A Bonds at the Oversight Board's discretion.
>
> **Additionally, the Fuel Line Lenders will be entitled to receive on account of their Remaining Claim a Pro Rata Share of Net Remaining New Bonds, if any, available for distribution to the Remaining Series B Bond Claims Pool** (each, as defined in the Plan). Finally, Fuel Line Lenders **shall also receive certain consummation fees and professional fee reimbursement fees, in the amounts of $15,000,000 and up to $11,000,000,** respectively, each

---

[6] It should be noted that, pursuant to the distributions shown in the Disclosure Statement, the PayGo Trust would not receive any distribution of the Series B Bonds, because the Oversight Board was only successful in the lien issue of the *Lien Challenge Adversary.* **ECF No. 3297 at 45.**

of which shall be payable in either cash or in the form of additional Series A Bonds at the Oversight Board's discretion.

In exchange for such consideration, **the Fuel Line Lenders have agreed to support confirmation of the Plan and, following the Effective Date, move to dismiss Adv. Pro. 19-00396 with prejudice**. ECF No. 3297 at **278 at 46** (emphasis added).

71. The Fuel Line Lenders are the only recipients of Series A bonds. This treatment clearly complies with the subordination of bond payments to the payment of *Current Expenses,* to the extent that the Fuel Line Lenders have asserted this claim and members of the Oversight Board has conceded that their argument is solid.[7]

72. As such, Fuel Line Lenders, a similarly situated creditor to SREAEE, receive at least an 84% recovery. Meanwhile, SREAEE does not recover on its claim. Instead, SREAEE receives the promise of reimbursement for its own payment to pensioners.

73. If SREAEE "received 84% of its total actuarial liabilities claim of approximately $4,459.5 million, [it] would be $3,746.0 million at a discount rate of 5.75%. Instead under the Plan of Adjustment's proposed treatment of the Retirement System, the System would receive a value of approximately $3,344.8 million." **See Fernández Report at L. 183-87**. **Even then, this value would not be recovered by SREAEE, it would be a reimbursement for PREPA's pension obligations which have already been paid out by SREAEE.** This means that SREAEE does not receive a distribution under the Plan of Adjustment. Meanwhile the "Pension Claim" is addressed as though it belongs only to current retirees and, even then, the disbursement will not occur pursuant to terms of the Plan of Adjustment, but as part of the operational expenses of PREPA through an additional entity. It should be noted that the pensioners were not included as a class of creditors, nor did they have the opportunity to vote on the Plan. This treatment is not only unfair and discriminatory

---

[7] SREAEE does not adopt any position at this time regarding whether the Fuel Line Lenders are in fact entitled to *Current Expense* treatment. This argument is limited to the unfair exclusion of SREAEE from the treatment of a *Current Expense* claimant. SREAEE reserves the right to raise any and all arguments that the Fuel Line Lenders are not *Current Expense* claimants.

compared to any other creditor and especially the Fuel Line Lenders, but it is also a determination that SREAEE is not entitled to payment within the Plan but rather will be subject to the same consistent risks of PREPA's lack of payment of pension expenses which it has suffered in the past.

74. Moreover, it should be noted that in the 2023 Certified Commonwealth Fiscal Plan, the Oversight Board includes a rate increase for legacy pension debt. Yet, this is not part of the Plan of Adjustment. Meanwhile, the Legacy Charge is part of the Plan of Adjustment. This results in two problems: (1) The payment of SREAEE's Pension Claim is subject to a rate increase that will not have the benefit of being a part of a confirmed plan, adding another layer of discrimination to the treatment of Class 3; and (2) The feasibility analysis of the Legacy Charge is incomplete and unreliable, because it does not consider the totality of the rate increases that the Oversight Board proposes to impose upon the people of Puerto Rico and its economy to comply with PREPA's restructuring.

## C. THE PLAN IS CONTRARY TO LAW TO THE EXTENT THAT IT DOES NOT APPLY A PROPER PREEMPTION ANALYSIS.

75. As previously stated, one of the requirements for confirmation is that "the debtor is not prohibited by law from taking any action necessary to carry out the plan . . . ." 48 U.S.C. § 2174(b)(3). However, the Plan of Adjustment violates the preemption doctrine.

### i. Applicable law for preemption.

76. Rooted in the Supremacy Clause of the United States Constitution, Congress has the power to preempt state law. See Arizona v. United States, 567 U.S. 387, 398-99 (2012). Thus, preemption is the name given to "certain circumstances, [where] federal law will take precedence over state regulation." Goya de P.R., Inc. v. Santiago, 59 F. Supp. 2d 274, 279 (D.P.R. 1999) (citations omitted). The Supreme Court has stated that preemption occurs in three circumstances: (1) express preemption, where there is an express provision of preemption; (2) field preemption, where Congress intended federal law to occupy the field;

26

and (3) conflict preemption, where there is a direct conflict between state and federal law. See Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372 (2000).

77. As such, "[p]reemption is a 'strong medicine,' that is not casually to be dispensed." Assured Guar. Corp. v. Garcia-Padilla, 214 F. Supp. 3d 117, 125 (D.P.R. 2016) (citations and quotation marks omitted). "It has long been the case that [the courts] sole task is to determine the intent of Congress,  and in so doing we have been mindful that Congress does not cavalierly pre-empt state-law causes of action . . . ." Blue Cross & Blue Shield v. AstraZeneca Pharm. LP (In re Pharm. Indus. Average Wholesale Price Litig.), 582 F.3d 156, 173 (1st Cir. 2009) (citations and quotation marks omitted).

78. Thus, Courts should **presume that preemption does not occur, unless the clear and manifest purpose of Congress is shown**. See Id. "When a challenge to a state law is raised on the basis of preemption, **a presumption exists that the state statute is valid**." Allied Fin., Inc. v. WM Capital Partners 53, LLC (In re Allied Fin., Inc.), 572 B.R. 45, 53 (Bankr. D.P.R. 2017)(citations omitted)(emphasis added). This means that the burden of establishing the preemptive effect of a federal statute rests on the movant.

79. PROMESA contains a supremacy clause which states "[t]he **provisions of this chapter** shall prevail over any general or specific provisions of territory law, State law, or regulation that is **inconsistent with this chapter.**" 48 U.S.C. § 2103 (emphasis added). However, **even where there is a finding of express preemption,** the courts **"must,** nonetheless, identify the domain **expressly pre-empted by the statutory language** . . . ." Medtronic, Inc. v. Lohr, 518 U.S. 470, 484 (1996) (emphasis added)(citations and quotation marks omitted).

80. PROMESA expressly preempts any state law that is inconsistent with its own terms. Therefore, before a state law can be deemed preempted by PROMESA, there must be an analysis regarding whether and how that state law is **inconsistent with PROMESA and**

**its provisions**, which is the domain expressly preempted. See Medtronic, 518 U.S. at 484.

Even though the Bankruptcy Code and PROMESA provide that a plan of adjustment may

preempt non-bankruptcy laws, this is also subject to the preemption doctrine analysis.  See

In re Fed.-Mogul Glob., 684 F.3d 355, 382 (3d Cir. 2012).

### ii.  List of preemption clauses in the Plan under SREAEE class treatment.

81. Pursuant to Schedule D of the Plan of Adjustment, includes as preempted by PROMESA

"Act 106-2017 (to the extent it does not allow participants in the PREPA ERS to participate

in the Act 106 defined contribution plan)." **ECF No. 3296-4 at 2**.

82. Moreover, it contains a broad preemption clause with regards to the Pension Claim. Under

Article VI, regarding the treatment of the pension claims, the Plan of Adjustment states:

> All provisions of the Commonwealth Constitution, Commonwealth
> statutes, executive orders, rules, regulations, and policies that create, require, or
> enforce employee pension and other pension-related benefits that are modified
> and/or preserved in whole or in part herein, to the extent inconsistent with the
> treatment of Allowed Pension Claim hereunder, including any provisions that
> would prohibit the enrollment of Active PREPA ERS Participants and
> subsequently hired employees of PREPA in the defined contribution plan for
> Commonwealth employees under Act 106-2017 as set forth in Article XVIII,
> are preempted as inconsistent with PROMESA. **ECF No. 3296 at 42**.

83. As such, the Oversight Board has included an extremely broad preemption clause that

applies to just about any text related to PREPA's pension obligations without even

identifying what those are.

### iii.  Analysis of the laws and the lack of preemption.

84. Through the Plan of Adjustment, the Oversight Board promotes a casual approach to

preemption that is incompatible with the doctrine. However, it has the burden of

establishing the preemptive effect of PROMESA on these specific laws. Because it has not

done so, the Plan of Adjustment violates the preemption doctrine.

## D.  THE PLAN IS NOT FEASIBLE DUE TO THE MACROECONOMIC EFFECTS OF THE LEGACY CHARGE.

85. As previously stated, under Section 314(b), In addition to complying with existent law and

obtaining enabling legislation, PROMESA requires the Oversight Board to present a Plan

that is **feasible**. 48 U.S.C. § 2174(b)(6).

### i.  Applicable Definition of Feasibility

86. This Court has provided a specific definition of feasibility under PROMESA:

> The Court has an independent duty to determine feasibility and to make
> specific findings of fact. **Under PROMESA, a plan of adjustment must be**
> **supported by financial projections that are "reasonable and demonstrate a**
> **probability that the debtor will be able to satisfy its obligations under the**
> **Plan."** Additionally, as in [C]hapter 9, a PROMESA debtor, as a government
> entity, must show that it is "probable that the debtor can both pay post-petition
> debt and provide future public services at the level necessary to its viability as
> a territory." The core inquiry has been articulated as follows: "**Is it likely that**
> **the debtor, after the confirmation of the Plan of Adjustment, will be able**
> **to sustainably provide basic municipal services to the citizens of the debtor**
> **and to meet the obligations contemplated in the Plan without the significant**
> **probability of a default?**" In re Fin. Ove rsight & Mgmt. Bd., 637 at 302-
> 03(citations and brackets omitted)(emphasis added).

87. As such, feasibility is a two prong inquiry: (1) **whether the debtor will be able to satisfy**

**its obligations under the Plan**; and (2) **whether the debtor will be able to provide the**

**services it owes to the public**. Id.

### ii.  Legacy Charge in the Plan of Adjustment

88. The Plan of Adjustment includes a Legacy Charge for the purpose of ensuring "sufficient

cash flow required for PREPA's debt service on the New Bonds issued under the Plan."

**ECF No. 3296-2 at 2.** It consists of "all applicable Flat Fees and Volumetric Charges set

at the levels for each customer class set forth . . . ." **ECF No. 3296-2 at 2.** Thus, the Legacy

Charge includes a Flat Fee, "incremental to any existing PREPA rates and fees . . . [which]

is not linked to a customer's power consumption, but rather is assessed for each non-exempt

customer being connected to the PREPA electricity grid." **ECF No. 3296-2 at 3.** It also

includes a Volumetric Charge "incremental to any existing PREPA rates and fees . . . based

on each customer's monthly consumption of electricity." **ECF No. 3296-2 at 3.** This is

assessed on the basis of cents per kilowatt hour (c/kWh) and depends on whether the threshold of 500 kWh. **ECF No. 3296-2 at 3.** Pursuant to Annex 1 of Schedule B of the Plan of Adjustment, the numbers vary depending on the classification of the customer sector. **ECF No. 3296-2 at 5.**

89. The Legacy Charge Derivation contained in Exhibit P of the Disclosure Statement establishes that "[t]he Legacy Charge was designed to incorporate many economic and societal considerations . . . ." **ECF No. 3297-16 at 2.** These considerations include: (1) residential affordability; elasticity; comparables and precedent; cost of service; projected capital expenditures and costs; and debt repayment. **ECF No. 3297-16 at 2-3.**

90. Regarding the first two considerations, Exhibit P declares:

> <u>Residential Affordability</u>. **The large number of low-income households in Puerto Rico means that many PREPA residential customers have limited or no ability to afford higher rates without sacrificing other necessities.**
> <u>Elasticity</u>. As discussed in detail below**, higher rates**, and the resulting higher bills for customers, **ultimately induce customers to reduce their consumption of electricity from PREPA** (including notably by using electricity generated by solar PV installed at their premise), **"cut the cord" from the grid entirely either through taking full responsibility for their electricity generation or even out-migrating from Puerto Rico**. Whenever customers decrease their consumption, **the remaining customers must shoulder higher shares of the electric system's fixed costs**. . . . **ECF No. 3297-16 at 2** (emphasis added).

91. As such, Exhibit P recognizes that affordability and elasticity are important issues in the concoction of the Legacy Charge.

> The Oversight Board derived the Legacy Charge in light of the **Oversight Board's goal of ensuring PREPA's rates are sustainable in the long-term and affordable for PREPA's consumers.** Any increase in PREPA's rates, including the Legacy Charge, cannot exceed the conceptual upper bound of affordability: the total rate that PREPA customers can pay without (1) threatening the sustainability of PREPA as a functioning utility; (**2) threatening the sustainability of the Puerto Rico economy; and/or (3) subjecting customers to undue hardship**. . . . **ECF No. 3297-16 at 4** (emphasis added).

92. As such, the Oversight Board appears aware of the repercussions of the increase in rates. However, SREAEE submits that this awareness has not translated into execution.

93. In fact, in his deposition Mr. William Zarakas from Brattle Group, admitted that the impact of the Legacy Charge on GDP, private sector employment or business closures was not considered in the development of the Legacy Charge. **Exhibit 9:** *Transcript of William Zarakas Deposition* **at 276, 278-79** (*Zarakas Deposition*)**.** As such, there is no data in the derivation of the Legacy Charge regarding how these rate increases will impact the private sector and whether this will impair PREPA's ability to provide service, as well as affect the Commonwealth's ability to collect sufficient tax revenue to pay its own obligations. Of course, fewer customers than projected would require increasing the Legacy Charge on the remaining consumers, leading either to more cost cuts and worse service by the utility or even higher rates that force more customers to leave—neither is sustainable for the utility nor for Puerto Rico.

### iii. Impact of the Legacy Charge on Feasibility

94. It is important to remember, at every point in this proceeding, that Puerto Rico is a U.S. territory and, therefore, not a sovereign. As such, it has "no power to pursue an endogenous economic policy, as opposed to many independent countries within a framework of integration. Even the [Oversight Board] was a direct imposition of Congress, with little influence from the local government and legislature. Puerto Rico lacks economic sovereignty." **Exhibit 10: Dr. José I. Almeda Opening Report**, **ECF 3427-1 at 29** (*Alameda Opening*). Even the Oversight Board's rebuttal expert, Dr. Andrew Wolfe states that "[r]egional economies can experience long-term secular declines, particularly where there is outmigration." **Exhibit 11: Dr. Andrew Wolfe Rebuttal Report, ECF 3504-2 at 10** (*Wolfe Rebuttal)***.** This is further supported because regional economies, like Puerto Rico, lack access to international lenders to finance reforms. **Id. at 11.** "Puerto Rico is a region within the United States and not a sovereign nation. As such, comparing Puerto Rico to other nations . . . is inappropriate . . . ." **Id. at 9.**

31

95. That said, Puerto Rico has a fragile and weak economy that is vulnerable to macroeconomic imbalances and unable to address them. **Alameda Opening at 7**. Because Puerto Rico's economy is currently unsustainable and does not project growth, the Legacy Charge will have a severe negative impact on it. **Id. at 9.** Energy is a vital part of sustained economic growth. **Id. at 34.** Conversely, "increases in the kWh cost rising quicker than the (real or nominal) economic growth rate are not acceptable for Puerto Rico's economy." **Id. at 37** (*citing* Case No. 17-03283-LTS, ECF No. 7816, Brownstein Declaration).

96. In view of the foregoing, it is essential to determine a threshold cost per kWh, the level of electricity rates that would make economic growth become negative. **Id. at 38.** This threshold cost has been estimated to be between \$.012 and \$0.21 per kWh. **Id. at 39** (*citing, among others*, Case No. 17-04780-LTS, ECF No. 149-2, Wolfe Declaration). As such, anything above \$0.21 per kWh will undoubtedly lead to a steep economic decline, though Dr. Alameda maintains that this threshold cost is \$0.16. **Id**. **at 39.** This will affect the people of Puerto Rico and impact the Commonwealth's revenues, which in turn affects the debt service under the Commonwealth's own plan of adjustment. **Id. at 57-59, corrected at Exhibit 10a: ECF No. 3574-1** (*Alameda Corrections*)**.**

97. Accounting for the price elasticity as a result of the increased rates, demand for electricity in each sector will be negative. **Alameda Corrections at 2.**

> An increase in electricity rates increases the retail price of electricity for the various sectors, leading to a lower demand in kWh. This can be due to the price effect, replacement effect or energy conservation effect. Such lower demand affects the level of the real GNP and PREPA's revenues. The reduction of the real GNP is, in turn, affected by the shrinking population and the effect of a lower demand for energy. The ultimate effect falls upon net revenues to the General Fund. **Alameda Opening at 44.**

98. Moreover, "[t]he level of residential consumption is not only associated with the cost per kWh but also to the amount of customers and the population size in Puerto Rico." *Alameda Rebuttal Unredacted* at 20. In his *Rebuttal Testimony,* Dr. Wolfe recognizes that raising

rates can be unfeasible to the extent that residential customers, already facing a high Share of Wallet, would be inclined to leave Puerto Rico. **Wolfe Rebuttal at 22.** Part of Dr. Wolfe's analysis is precisely grounded in the ease of labor mobility in Puerto Rico that facilitates out migration. **Id. at 9.**

99. Additionally, "[t]aking all macroeconomic variables together coupled with all sectors (commercial, industrial, and residential), as a result of the *Legacy Charge*, PREPA's revenues will suffer in the long run. Including additional charges, PREPA's revenues can be expected to decrease from $4,100 million in 2023 to $2,484 million in 2040." **Exhibit 12: Dr. José I. Almeda Unredacted Rebuttal Report at 22**.

100.   In view of the foregoing, the Legacy Charge is unsustainable as it will affect Puerto Rico's ability to sustain any potential economic growth and impair the Commonwealth's ability to comply with its financial obligations while providing services to the people. Moreover, the factors that influence this economic debacle likewise affect PREPA's revenues. In particular, the issues related to population decrease will have a significant impact. To the extent that feasibility requires PREPA to remain sustainable and provide services while meeting debt payments, the Legacy Charge makes the Plan of Adjustment unfeasible. Additionally, the Legacy Charge threatens the feasibility of the Commonwealth's plan of adjustment and the health of Puerto Rico's economy.

## V.   CONCLUSION

101.   In conclusion, the Plan of Adjustment is not confirmable under Section 314(b) of PROMESA. As it stands, the Plan of Adjustment does not meet Section 314(b)(3) or (6). Additionally, it does not comply with the applicable sections of the Bankruptcy Code. The confirmation of this Plan of Adjustment will spell disaster for the people of Puerto Rico and prejudice SREAEE in ways that are unbecoming of the equitable and fair policies of bankruptcy.

## RELIEF REQUESTED

**WHEREFORE,** in view of the foregoing, the Court should deny the confirmation of the Plan of Adjustment and instruct the Oversight Board to return to the drawing board, with the idea of helping Puerto Rico emerge from its fiscal and energy crisis, without discriminating against its most vulnerable creditors.

**WE HEREBY CERTIFY** that on this same date we electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all participants and Standard Parties. A courtesy copy of this Motion will be delivered to the Court by email to SwainDPRCorresp@nysd.uscourts.gov as provided in *First Amended Standing Order.*

In Ponce, Puerto Rico, this 12$^h$ day of June 2023.



Ortiz Mendoza & Farinacci Fernós, LLC
Edificio Banco Cooperativo Plaza
623 Ponce de León Ave., Suite 701-B
San Juan, PR 00917-4820
Tel: 787-963-0404

*/s/ Rafael A. Ortiz-Mendoza*
Rafael A. Ortiz-Mendoza, Esq.
USDC-PR: 229103
rafael.ortiz.mendoza@gmail.com

*Co-counsel to SREAEE*



BUFETE EMMANUELLI, C.S.P.
P.O. Box 10779
Ponce, Puerto Rico 00732
Tel.: 787-848-0666
Fax: 787-841-1435

*/s/ Rolando Emmanuelli-Jiménez*
Rolando Emmanuelli-Jiménez, Esq.
USDC: 214105
rolando@emmanuelli.law

*/s /Jessica E. Méndez-Colberg*
Jessica E. Méndez-Colberg, Esq.
USDC: 302108
jessica@emmanuelli.law

*/s/ Zoé C. Negrón-Comas*
Zoé C. Negrón-Comas, Esq.
USDC: 308702
zoe@emmanuelli.law
*Co-counsel to SREAEE*