Page 1

1

2   IN THE UNITED STATES DISTRICT COURT
    FOR THE DISTRICT OF PUERTO RICO
3   Case No. 17-BK-3283-LTS
    -----------------------------------------x
4   In re:
5   THE FINANCIAL OVERSIGHT AND MANAGEMENT
    BOARD FOR PUERTO RICO,
6
    as representative of
7
    THE COMMONWEALTH OF PUERTO RICO, et al.,
8
                         Debtors.
9   -----------------------------------------x
    Case No. 17-BK-4780-LTS
10  -----------------------------------------x
    In re:
11
    THE FINANCIAL OVERSIGHT AND MANAGEMENT
12  BOARD FOR PUERTO RICO,
13  as representative of
14  THE PUERTO RICO ELECTRIC POWER AUTHORITY,
15                       Debtor.
    -----------------------------------------x
16                      May 10, 2023
                        9:33 a.m.
17
18        VIDEOTAPED DEPOSITION of SHEVA LEVY,
19  held at the offices of Kramer Levin
20  Naftalis & Frankel LLP, located at 1177
21  Avenue of the Americas, New York, New York
22  10036, before Anthony Giarro, a Registered
23  Professional Reporter, a Certified Realtime
24  Reporter and a Notary Public of the State
25  of New York.

Page 2

```
 1
 2     A P P E A R A N C E S :
 3
 4     KRAMER LEVIN NAFTALIS & FRANKEL LLP
        Attorneys for the Ad Hoc Group of PREPA
 5      Bondholders
        1177 Avenue of the Americas
 6      New York, New York 10036
 7     BY:  NATAN HAMERMAN, ESQ.
            nhamerman@kramerlevin.com
 8
 9     KRAMER LEVIN NAFTALIS & FRANKEL LLP
        Attorneys for the Ad Hoc Group of PREPA
10      Bondholders.
        2000 K Street NW, 4th Floor
11      Washington, D.C. 20006
12     BY:  MARK RUSSELL, ESQ.
            mrussell@kramerlevi.com
13
14     CADWALADER, WICKERSHAM & TAFT LLP
        Attorneys for Assured Guaranty Corp. and
15      Assured Guaranty Municipal Corp
        200 Liberty Street
16      New York, New York 10281
17     BY:  WILLIAM J. NATBONY, ESQ.
            bill.natbony@cwt.com
18          GILLIAN BURNS, ESQ.
            gillian.burnes@cwt.com
19
20
21
22
23
24
25
```

```
 1
 2    A P P E A R A N C E S (Cont.)
 3
 4    QUINN EMANUEL URQUHART & SULLIVAN, LLP
        Attorneys for Syncora Guarantee, Inc.
 5      51 Madison Avenue, 22nd Floor
        New York, New York 10010-1603
 6
      BY:  DEBRA O'GORMAN, ESQ.
 7           debraogorman@quinnemanuel.com
 8
      WEIL, GOTSHAL & MANGES LLP
 9      Attorneys for National Public Finance
        Guarantee Corporation
10      1395 Brickell Avenue, Suite 1200
        Miami, Florida 33131
11
      BY:  COREY BRADY, ESQ.
12           corey.brady@weil.com
             (via Zoom)
13
14    PAUL HASTINGS LLP
        Attorneys for Official Committee of
15      Unsecured Creditors
        N.E. 100, 1170 Peachtree Street NE
16      Atlanta, Georgia 30309
17    BY:  WILLIAM WHITNER, ESQ.
             kwhitner@paulhastings.com
18           ERIC STOLZE, ESQ.
             ericstolze@paulhastings.com
19
20    PAUL HASTINGS LLP
        Attorneys for Official Committee of
21      Unsecured Creditors
        2050 M Street NW
22      Washington, D.C. 20036
23    BY:  NICHOLAS A. BASSETT, ESQ.
             nicholasbassett@paulhastings.com
24           (via Zoom)
25
```

Page 4

```
 1
 2    A P P E A R A N C E S (Cont.)
 3
 4

 5    PAUL HASTINGS LLP
       Attorneys for Official Committee of
       Unsecured Creditors
 6     200 Park Avenue
       New York, New York 10166
 7
      BY:   SHLOMO MAZA, ESQ.
 8          (via Zoom)
 9
10    O'MELVENY & MYERS LLP
       Attorneys for AAFAF
11     7 Times Square
       New York, New York 10036
12
      BY:   MARIA BENITES, ESQ.
13          mbenitesgutierrez@omm.com
            GABRIEL OLIVERA, ESQ.
14          (via Zoom)
15
16    PROSKAUER ROSE LLP
       Attorneys for Official Committee of
17     Unsecured Creditors
       1 International Place
18     Boston, Massachusetts 02110
19    BY:   LAURA STAFFORD, ESQ.
20
21
22
23
24
25
```

Page 5

```
 1
 2    A P P E A R A N C E S (Cont.)
 3
      PROSKAUER ROSE LLP
 4     Attorneys for the Financial Oversight and
       Management Board as Representative for
 5     PREPA
       Eleven Times Square
 6     New York, New York 10036
 7    BY:  MARGARET A. DALE, ESQ.
            mdale@proskauer.com
 8          JULIA ALONZO, ESQ.
            (via Zoom)
 9          ELLIOT STEVENS, ESQ.
            (via Zoom)
10           HADASSA WAXMAN, ESQ.
            (via Zoom)
11
12
      PROSKAUER ROSE LLP
13     Attorneys for Financial Oversight and
       Management Board as Representative for
14     PREPA
       70 West Madison Street, Suite 3800
15     Chicago, Illinois 60602
16    BY:  PAUL POSSINGER, ESQ.
            ppossinger@proskauer.com
17          JORDAN SAZANT, ESQ.
            (via Zoom)
18
19
      MASLON LLP
20     Attorneys for U.S. Bank National
       Association, in its Capacity as Trustee
21     90 South Seventh Street, Suite 3300
       Minneapolis, Minnesota 55402
22
      BY:  JOHN DUFFEY, ESQ.
23          (via Zoom)
24
25
```

1

2    A P P E A R A N C E S  (Cont.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17   ALSO PRESENT:

18      MARCELO RIVERA, Videographer
        BRIAN SEPTON, Terry Group
19      BILL CRADDOCK, Concierge Tech (via Zoom)
        BOB BRASCH, Concierge Tech (via Zoom)
20      ROLANDO EMMANUELLI-JIMENEZ (via Zoom)
        ZOE NEGRON-COMAS (via Zoom)
21      JORDYN PAPERNY (via Zoom)
        SCOTT MARTINEZ (via Zoom)
22      JOSE FERNANDEZ (via Zoom)
        JESSICA MENDEZ-COLBERG (via Zoom)
23      RAFAEL ORTIZ MENDOZA (via Zoom)
        ANTOINETTE DeCAMP (via Zoom)
24      LIAW HUANG (via Zoom)

25

Page 211

1               SHEVA LEVY

2               MR. STOLZE:  I believe we

3       can pass the witness.

4               MS. DALE:  Is there anybody

5       else in the room who's going to ask

6       the witness any questions?  Is there

7       anybody on the phone who is going to

8       ask the witness some questions?

9               MS. COMAS:  Yes.

10              MS. DALE:  Who's that?

11              MS. COMAS:  For the record,

12      Zoe Negron in representation of UTIER

13      and the retirement system.

14              MS. DALE:  Hello.

15              MS. COMAS:  Hi.

16   EXAMINATION BY

17   MS. COMAS:

18      Q       Ms. Levy, I'm going to ask

19   you some questions about your work with

20   the Commonwealth pension system.

21              What was your role in the

22   Commonwealth pension-related matters?

23      A       I assisted the board in

24   determination of estimates of the

25   financial impact of the plan of

```
                                              Page 212
 1                     SHEVA LEVY
 2   adjustment on the Commonwealth plans.
 3   And I've been assisting with estimates
 4   related to PayGo costs under the
 5   Commonwealth fiscal plan.  And I have
 6   assisted with the estimation of costs
 7   associated with various other questions
 8   that have come up, including various
 9   bills that were proposed in the
10   legislature related to the Commonwealth
11   pension plans.
12        Q        And your role in PREPA
13   pension-related matters, is it the same?
14                 MS. DALE:  Object to the
15        form of the question.
16        A        Could you please rephrase
17   the question, please?
18        Q        You're also involved, as we
19   are seeing here, in pension-related
20   matters for PREPA as an advisor to the
21   oversight board; is that correct?
22        A        Yes.
23        Q        Could you describe your role
24   in that matter?
25        A        I've been estimating the
```

```
                                          Page 213

1                    SHEVA LEVY

2   potential financial impact of the

3   proposed changes under the plan of

4   adjustment to costs associated with the

5   PREPA pension system.

6        Q         From what you observed in

7   both of those processes, how does PREPA

8   ERS compare to the Commonwealth

9   retirement system?

10                 MS. DALE:  Object to the

11      form.

12       Q         For example, in terms of

13  structure, is the PREPA ERS different

14  from the Commonwealth's?

15       A         Could you rephrase the

16  question?

17       Q         I can try.

18                 Are you aware that PREPA ERS

19  is an independent trust?

20       A         I have heard that legal

21  position has been taken.

22       Q         Are you aware that PREPA ERS

23  is not part of PREPA?

24       A         Yes.

25       Q         Does that distinguish it
```

Page 214

1                      SHEVA LEVY

2    from the Commonwealth retirement system,

3    as far as you know?

4                  MS. DALE:  Objection to the

5          form.  I don't know what we're

6          talking about.

7          A       I was not given information

8    related to the legal prospective of the

9    Commonwealth plans.

10         Q       I'll move on.

11                 Did you have any role in the

12   preparation of PREPA's plan of

13   adjustment, the most recently filed

14   version?

15         A       Could you please be more

16   specific?

17         Q       Were you involved in the

18   development of the exhibits of the plan

19   of adjustment for PREPA regarding the

20   pension system?

21         A       Yes.

22         Q       Could you describe what

23   participation you had?

24         A       I was asked to review the

25   changes that were made under the

Page 215

1              SHEVA LEVY

2    Commonwealth plan of adjustment to the

3    Commonwealth pension plans and to

4    identify what the -- what changes to the

5    PREPA ERS pension plan would be

6    consistent with the changes made to the

7    Commonwealth pension plans.

8         Q        Why were you asked to do

9    that comparison?

10              MS. DALE:  What was your

11         understanding of the project?  Is

12         that a better way to put it?

13              MS. COMAS:  Yes.  I can

14         rephrase it that way.

15         Q        What was your understanding

16    of the purpose of that?

17         A        My understanding is that the

18    board wanted to treat the people in the

19    PREPA ERS pension plan in the same manner

20    that they treated the people in the

21    Commonwealth pension plans.

22         Q        Regarding the treatment of

23    the pension claim in the plan of

24    adjustment, did you have any role in

25    that -- in the drafting of that

Page 216

                              SHEVA LEVY

1

2    treatment?

3         A        Could you rephrase the

4    question?

5         Q        Have you seen the plan of

6    adjustment?

7                  Let me start there.

8         A        Not in its entirety.

9         Q        Were you consulted on any of

10   the language included in the plan of

11   adjustment before its filing?

12        A        Yes.

13        Q        Were you consulted in the

14   language of what Class 3 for pension

15   claims would be?

16        A        I was asked to confirm that

17   the language in the plan of adjustment

18   was consistent with how I was

19   understanding the board wanted to treat

20   that class.

21        Q        Regarding --

22                 MS. COMAS:  Can we pull up

23      Exhibit 52?

24        Q        Can you go to -- hold on a

25   second.

Page 217

1                    SHEVA LEVY

2              MS. COMAS:  Can you scroll

3       down?  Thank you.  Up.  Thank you.

4       Q         Ms. Levy, can you explain to

5    me the difference between the two

6    scenarios in this exhibit?

7              MS. DALE:  Are you asking

8         for the difference between Column A

9         and Column B?

10             MS. COMAS:  Yes, I am.

11      A         Column A represents an

12   estimate of the actuarially determined

13   contributions under a number of different

14   assumptions and inputs as described in

15   this document prior to the application of

16   the provisions of the plan of adjustment

17   that is explained to me.

18             And then Column B represents

19   an estimate of the amounts that would be

20   reimbursed to PREPA ERS from the PREPA

21   PayGo trust, beginning in 2025 and on,

22   based on the provisions of the plan of

23   adjustment.  And in 2024, it includes an

24   amount needed to fund pension payments

25   until that first amount is provided to

Page 218

                           SHEVA LEVY

1    PREPA ERS in 2025.  And then the amounts

2    prior to 2024 represent my understanding

3    of what PREPA ERS has received from the

4    Years 2018 through 2023.

5         Q         Thank you.

6                   You said that what is Column

7    A, the claim estimation is based on what

8    the payment would be without the

9    provisions of the plan; is that correct?

10        A         The actuarially determined

11   contributions without the provisions of

12   the plan, yes.

13        Q         Is that the same as the

14   actuarial liability of PREPA ERS?

15        A         No.

16        Q         Could you explain the

17   difference, please?

18        A         The actuarial liability is

19   used to determine the actuarially

20   determined contribution.  The actuarially

21   determined contribution in part reflects

22   a portion of the unfunded actuarial

23   liability to be funded in a given year.

24        Q         Under this Column A also, do

Page 219

1                    SHEVA LEVY

2    these numbers reflect PREPA's

3    contribution debt?

4              MS. DALE:  Objection to the

5         form of the question.  If you

6         understand it, you could answer it.

7         A       I understand that PREPA ERS

8    has made a claim related to debt from

9    PREPA.  And Exhibit D is this Exhibit 52

10   identifies information that I relied on

11   from PREPA ERS to develop these

12   actuarially determined contributions in

13   Column A.  I'm sorry.  Appendix D, not

14   Exhibit D.

15       Q       Can we go to Appendix D on

16   the Exhibit Share?  If I'm understanding

17   on what here is Column B, actuarial

18   employee contribution, is that what

19   you're referring to?

20       A       No.

21       Q       What part of this appendix

22   is what was considered as part of that

23   debt that is claimed in the retirement

24   system?

25       A       My understanding is the

Page 220

1                    SHEVA LEVY

2    retirement system claims that the

3    actuarially determined contribution

4    should have been the amount that was

5    contributed to the trust.  And so

6    these -- these actuarially determined

7    contributions are developed to estimate

8    the claim on the basis that the ADC

9    represents the basis for the claim.

10       Q       So the actuarially

11   determined contribution would be the

12   employer contributions that the

13   retirement system is claiming?

14       A       For 2018 through the last

15   year of the last available Cavanaugh

16   Macdonald report, those are the amounts

17   that were determined by the system.

18                And then after that point in

19   time, those represent estimated

20   actuarially determined contributions,

21   based on -- I'm back on Column A of the

22   exhibit that we were looking at

23   originally.

24       Q       In determining the ADCs, are

25   unpaid contributions included in the

Page 221

1                          SHEVA LEVY

2      pension asset?

3           A        For the purpose of this,

4      with the exception of the -- in the

5      footnote regarding the prior year --

6      inclusion of the prior year ADC, these

7      ADC amounts in this exhibit assume that

8      prior -- yes, include prior year ADCs in

9      the plan assets.

10                     MS. COMAS:  Can we return to

11          the Column A on the beginning of the

12          exhibit?

13          Q        What is the impact on the

14     claim amount if the assets do not include

15     the unpaid contributions?

16                     MS. DALE:  If you know.

17          A        I don't think I have

18     information readily available to answer

19     that question.

20          Q        Would you be able to answer

21     in a general way if the claim would go up

22     or down?

23          A        No.

24          Q        Was that ever analyzed as

25     part of this exercise?

Page 222

1                        SHEVA LEVY

2        A        I was not asked to calculate

3    the claim on any other basis.

4        Q        Does that Column A claim

5    estimate include the administrative fee

6    load?

7        A        Not that I recall.

8        Q        Do you have an understanding

9    why it would be included?

10       A        My understanding is the

11   expected return on assets for the ADC is

12   assumed to be net of expenses.  And

13   therefore, my recollection is that it's

14   not included as an adjustment.

15       Q        What would be the impact of

16   having included it?

17       A        I don't know.

18       Q        Would you be able to say

19   generally if they would go up or down?

20       A        No.

21       Q        Was that ever part of your

22   analysis?

23       A        No.

24       Q        If we could go a little bit

25   lower on the exhibit to Footnote No. 4 --

Page 223

1                    SHEVA LEVY

2        A        Okay.

3        Q        -- where it says inside of

4    the parentheses, "ADC excludes cost of

5    funding underpayment of prior ADCs," can

6    you explain what that refers to?

7        A        Yes.

8        Q        Please explain.

9        A        Any receivable contributions

10   that are reflected on Appendix D related

11   to preplan of adjustment periods are

12   included in the plan assets, meaning they

13   are assumed to have already been

14   contributed.  And therefore, the

15   actuarially determined contribution

16   excludes the cost of funding that amount

17   prospectively.

18       Q        What would be the effect of

19   including those amounts, the impact?

20       A        I don't know.

21       Q        Would you be able to say

22   generally if it would go up or down?

23       A        I would expect it to go up.

24       Q        Can we move down to Appendix

25   E?

Page 224

1                        SHEVA LEVY

2        A        Yes.

3        Q        Thank you.

4                 In the third bullet in the

5    claim amount determination, if we could

6    zoom in on that, inside of that

7    parentheses where it says "including

8    receivable contributions as described in

9    Appendix D," you see that?

10       A        Yes.

11       Q        Can you explain what that

12   means?

13       A        It's my understanding that

14   PREPA ERS's actuary in developing the

15   actuary determined contributions included

16   in the plan assets receivable

17   contributions as described in Appendix D.

18   And those are the amounts that were

19   reflected in the years noted in that

20   bullet.

21       Q        Can you define receivable

22   contributions?

23       A        An amount that is expected

24   to be paid in the future.

25       Q        What would be the impact on

Page 225

1                    SHEVA LEVY
2    Column A estimates if the receivable
3    contributions were not included in the
4    asset?
5         A        I don't know.
6         Q        Would you be able to say
7    generally if it would go up or down?
8         A        With the exception of the
9    preplan of adjustment amounts, which I
10   said before would go up, I don't know.
11                 MS. COMAS:  I'm going to ask
12       to pull up Exhibit 53 and go down to
13       Exhibit 5 of this exhibit.
14        Q        You mentioned earlier that
15   you were not asked to calculate the claim
16   amount in any way, other than under the
17   Column A, ADC and, B, assumptions of the
18   plan of adjustment.
19                 Could you explain what the
20   purpose of the calculation of this
21   exhibit was?
22        A        This exhibit was developed
23   to help assess the costs beginning in
24   2024 of funding future PREPA ERS costs,
25   estimated based on the current plan asset

Page 226

```
 1                    SHEVA LEVY
 2   values under two scenarios.  One, if the
 3   prior year ADCs are funded immediately
 4   and, One, if they are funded gradually
 5   over time.
 6        Q        Thank you.
 7                 What is your understanding
 8   of why this -- let me rephrase the
 9   question.
10                 Why was that the case?
11                 MS. DALE:  Objection to the
12      form.
13        A        Could you rephrase the
14   question?
15        Q        What is your understanding
16   of why you were asked to prepare these
17   scenarios?
18        A        My understanding is that the
19   board was trying to assess the cost today
20   of freezing the ADC, of contributing the
21   ADC going forward.
22        Q        Why does this scenario not
23   include the debt in the assets?
24                 MS. DALE:  Sorry.
25      Ms. Negron, what was the question?
```

Page 227

1                     SHEVA LEVY

2        Q        Why does this scenario not

3    include the contribution debt in the

4    assets?

5                  MS. DALE:  Which scenario

6        are we talking about, please?

7        Exhibit 5?

8                  MS. COMAS:  Yes.  Exhibit 5.

9                  MS. DALE:  There's two

10       scenarios; right?  I'm confused as to

11       your question.

12                 MS. COMAS:  One second.  I'm

13       just revising my notes from this

14       statement.

15       Q        With regard to Scenario A of

16    Exhibit 5, why doesn't it include the

17    contribution debt?

18       A        That's the instructions I

19    was given and the request from my client

20    is to what numbers they wanted to see.

21       Q        With regard to Scenario B,

22    is that the same answer?

23       A        Yes.

24       Q        My clients, we're talking

25    about the oversight board?

Page 228

                              SHEVA LEVY

1

2      A        Correct.

3      Q        Thank you.

4               MS. COMAS:  We could put the

5      exhibit down.  Thank you.

6      Q        Regarding the PREPA PayGo

7   trust, were you involved in the

8   development of the funding structure for

9   the PREPA PayGo trust in the plan?

10     A        I was involved in

11  discussions where members of the board

12  discussed it.

13     Q        To questions of counsel

14  previously, you stated that the PayGo

15  trust would have a separate administrator

16  from PREPA ERS; is that correct?

17     A        Yes.

18     Q        Do you have an understanding

19  as to why?

20     A        The way it was explained to

21  me, there were plan-related

22  responsibilities that were different from

23  PREPA ERS's current responsibilities.

24  And it was contemplated that somebody

25  else would handle those responsibilities.

Page 229

1                    SHEVA LEVY

2        Q        Do you know what

3    responsibilities those were?

4                    MS. DALE:  This was

5          testified to earlier today.  But if

6          you can remember what you said,

7          please say it again.

8        A        Determining the amount of

9    contribution that needs to be made to the

10   PREPA PayGo trust based on the terms of

11   the plan of adjustment, reviewing the

12   amounts of reimbursements requested by

13   PREPA ERS for consistency with the

14   provisions of the plan of adjustment.

15   Those are the two that come to mind.

16       Q        Do you have an understanding

17   of why a separate administration is

18   necessary for those responsibilities?

19       A        No.

20       Q        Were any other mechanisms

21   considered for the funding of the pension

22   reform?

23                   MS. DALE:  I guess you could

24         answer that yes or no.

25       A        Yes.

Page 230

1                           SHEVA LEVY

2       Q        Which ones?

3                MS. DALE:  I'm just going to

4       caution the witness that if

5       considerations about other mechanisms

6       that were considered for the funding

7       of pension reform were as a result of

8       communications with counsel and/or

9       the board in consultation with

10      counsel, then you should not -- I

11      would direct you not to answer those

12      questions because I think it would be

13      revealing either deliberative process

14      or potentially work product.  But if

15      you have knowledge of other

16      considerations that were thought

17      about that don't relate to either

18      counsel for those communications,

19      then you could answer the question.

20      A        I'm going to decline to

21   answer that question.

22      Q        I'm sorry.

23               Can you repeat?

24               MS. DALE:  She's not going

25      to answer that question because it

Page 231

1              SHEVA LEVY

2      relates to communications with

3      counsel.

4              MS. COMAS:  So the question

5      was which ones.  And that's what's

6      not going to be answered?

7              MS. DALE:  Yes.

8      Q       Did you analyze whichever

9   mechanisms were considered?

10     A       I don't recall.

11     Q       As part of the plan of

12  adjustment, the PayGo trust was created

13  for the sole benefit of PREPA ERS.

14              Do you understand what that

15  entails?

16              MS. DALE:  Object to the

17      form.

18     A       Could you rephrase the

19  question?

20     Q       What does it mean that the

21  PREPA PayGo trust is created for the sole

22  benefit of PREPA ERS?

23     A       My understanding is that the

24  trust was created to reimburse PREPA ERS

25  for pension payments in accordance with

Page 232

1                         SHEVA LEVY

2      the provisions of the plan of adjustment

3      and for no other purpose.

4           Q        Does the mechanism of the

5      PayGo trust presuppose that PREPA ERS

6      would pay the pension benefits first and

7      be reimbursed for them after?

8           A        That is my understanding.

9           Q        Do you have any

10     understanding why that is the way that

11     the mechanism was set up?

12          A        That was the preference of

13     the board.  I don't know that I have the

14     full picture of why they chose that --

15     why they chose that approach.

16          Q        Thank you.

17                   Regarding the reform of the

18     pension system, did you play a role in

19     the development of that pension reform?

20          A        Could you be more specific

21     as to which reform?

22          Q        The reform that's included

23     in the plan of adjustment.  Give me one

24     second.

25                   MS. COMAS:  I have a

Page 233

```
 1              SHEVA LEVY
 2     technical question for Exhibit Share
 3     usage.
 4              THE CONCIERGE TECH:  Sure.
 5              MS. COMAS:  If I want to
 6     mark an exhibit, I just move it to
 7     the marked exhibit folder?
 8              THE CONCIERGE TECH:  I have
 9     access to your private folder.  So if
10     you like, I'll just name the folder
11     and mark the next exhibit.
12              MS. COMAS:  Give me one
13     second to locate it.  The one that is
14     labeled Exhibit G, pension reform,
15     inside the Fernandez folder.
16              THE CONCIERGE TECH:  This
17     will be Exhibit 63.
18              (The above-referred-to
19     document was marked as Exhibit 63 for
20     identification, as of this date.)
21      Q      Have you ever seen this
22   document?
23              MS. DALE:  We're looking for
24     it.  We only have it on the screen.
25              MS. COMAS:  Okay.
```

```
 1                    SHEVA LEVY

 2              MS. DALE:  Yes.  I think we

 3       should access it here, I guess.  It's

 4       right there.  So I don't know to the

 5       extent that you want to manipulate

 6       this.

 7                  THE WITNESS:  I know which

 8       exhibit it is.

 9              MS. DALE:  We're going to

10       keep going.  So ask your question.

11       This is again Exhibit 63.

12       A       Can you repeat the question,

13   please?

14       Q       Do you recognize this

15   document?

16       A       Yes.

17       Q       Did you have any role in the

18   development of this document?

19       A       Yes.

20       Q       Could you describe that

21   role?

22       A       Yes.

23       Q       Let me rephrase that.

24               Please describe that role.

25       A       I reviewed this document to
```

Page 235

```
 1                    SHEVA LEVY
 2   confirm that it was consistent with my
 3   understanding of how the board wanted to
 4   reform the pension system.
 5        Q        When you say how the board
 6   wanted to reform the pension system, you
 7   mean to make it consistent with the
 8   Commonwealth pension system?
 9        A        As it relates to the amount
10   of -- what the individual plan
11   participants would receive, the
12   provisions that impact those amounts,
13   yes.
14        Q        Were you involved in any of
15   the provisions that affect the active
16   participants of PREPA ERS?
17        A        Like you said, I reviewed
18   those to confirm that they were
19   consistent with the Commonwealth pension
20   plans.
21                 MS. DALE:  Ms. Negron, when
22           it's convenient, we need to take a
23           break.  We've been going for about an
24           hour and almost 20 minutes.  So just
25           when it's convenient for you.
```

Page 236

1                    SHEVA LEVY

2              MS. COMAS:  I think now

3        would actually be a convenient time

4        if the witness needs a break.

5                    THE VIDEOGRAPHER:  The time

6        is 5:15 p.m.  We're going off the

7        record.

8                    (A short recess was taken.)

9                    THE VIDEOGRAPHER:  The time

10       is 5:26 p.m.  And we're back on the

11       record.

12       Q        Can we pull up the exhibit

13   again, Exhibit 63?  Can we go down to

14   page 3 of 6?

15       A        Yes.

16       Q        Ms. Levy, were you involved

17   in the development of the retirement

18   eligibility provisions of the proposal?

19                    MS. DALE:  Of the plan of

20       adjustment?

21                    MS. COMAS:  Of this exhibit.

22       A        I was involved in

23   identifying for the board which

24   provisions would be needed to mirror the

25   eligibility provisions under the

                         SHEVA LEVY

1

2    Commonwealth plan of adjustment.

3         Q         Can we go down to the next

4    page?  Do you see the row that says

5    "elimination of minimum benefit"?

6         A         Yes.

7         Q         Were you involved in the

8    development of that row?

9         A         I was involved in

10   identifying that this would be consistent

11   with how the Commonwealth plan of

12   adjustment treated the minimum benefit.

13        Q         Would the same be true for

14   the elimination of the use of sick leave

15   to purchase credit towards a merit

16   pension?

17        A         Yes.

18        Q         Would the same be true for

19   the row of bonus payments?

20        A         There was no funeral bonus

21   for the Commonwealth.  So the board

22   provided guidance on how to handle the

23   funeral bonus.  And then the same is true

24   with respect to the other aspects of that

25   row that I was -- I provided input on

Page 238

1                         SHEVA LEVY

2    provisions that would be consistent with

3    the Commonwealth plan of adjustment.

4         Q         Would the same be true for

5    the row of employee contributions?

6         A         Yes.

7         Q         The same be true for the row

8    of implementation of defined contribution

9    accounts?

10         A         Yes.

11         Q         What is your understanding

12    of the basis for implementing defined

13    contribution accounts?

14         A         Could you please rephrase

15    the question?

16         Q         What is your understanding

17    of why the exhibit implements defined

18    contribution accounts for mobilized

19    employees?

20                    MS. DALE:  Objection to the

21         form of the question.

22         A         My understanding is that

23    this is -- this treatment here of having

24    mobilized employees and PREPA employees

25    participate in the plan is consistent

Page 239

1                          SHEVA LEVY

2    with the treatment under the Commonwealth

3    plan of adjustment.

4         Q         Is the same true for the

5    elimination of cost of living

6    adjustments?

7         A         Yes.

8         Q         Is the same true for death

9    benefits?

10        A         Yes.

11        Q         Is the same true for post

12   retirement death benefits?

13        A         Yes.

14        Q         Is the same true for

15   disability benefits?

16        A         Yes.

17        Q         Thank you.

18                  Would you say that the basis

19   for establishing a defined contribution

20   plan for PREPA employees was to make it

21   consistent with the Commonwealth

22   retirement system?

23        A         That is what I was told.

24        Q         Is the same true of

25   eliminating all employer contributions to

Page 240

SHEVA LEVY

1
2    the retirement system?

3                    MS. DALE:   Objection to the
4        form of the question.

5        A          Could you please repeat the
6    question?

7        Q          The fact that PREPA will no
8    longer be providing employer
9    contributions to this defined
10   contribution plan, is that also based on
11   making it consistent with the
12   Commonwealth retirement system?

13       A          I'm not aware of PREPA
14   currently making contributions to any
15   defined contribution plan.  But the
16   provision of having only employees
17   contribute to the defined contribution
18   plan is consistent with the treatment
19   under the Commonwealth plan of
20   adjustment.

21       Q          What is your understanding
22   of why the board wanted to make PREPA ERS
23   consistent with the Commonwealth
24   retirement system?

25       A          I don't know.  That was

Page 241

1

2    their policy decision.

3                 MS. COMAS:  I have no

4        further questions.

5                 MS. DALE:  Does anybody else

6        want to question the witness on

7        rebuttal or -- I don't know.  More

8        questions for the witness?  Looks

9        like a no.  I think we could go off

10       the record then.

11                THE VIDEOGRAPHER:  The time

12       is 5:33 p.m.  We're going off the

13       record.

14                 (Time noted:  5:33 p.m.)

15

16            _____

                    SHEVA LEVY

17

18

19    Subscribed and sworn to

20    before me on this _____day

21    of _____, 2023.

22

23    _____
                NOTARY PUBLIC

24

25

REDACTED

PRELIMINARY - FOR DISCUSSION

# PREPA Pension Claim and Recovery

January 27, 2023



Note: PREPA ERS liquid assets are depleting.  Unaddressed, available funds may be less than expected benefit payments within a year.

Pre-Decisional | Privileged and Confidential Draft | Analysis subject to Material Change | Subject to FRE Rule 408

**Exhibit 0052**
5/10/2023

## Exhibit G

SUMMARY OF PENSION REFORM

Exhibit
0063
5/10/2023

## TERMS FOR MODIFICATION OF PREPA ERS OBLIGATIONS

To avoid creating future pension liabilities and to stabilize the system for the benefit of future retirees and ratepayers, the PREPA ERS plan benefit accrual shall be frozen upon the Effective Date of the Plan of Adjustment (the "POA Effective Date").

Following is a summary of the terms of the Plan's freeze of further defined benefits of under the PREPA ERS.

The modifications listed herein modify the obligations of PREPA and any other government employer whose employees continue to participate in the PREPA ERS defined benefit plan to fund the benefits provided by PREPA ERS as established in regulations by the Governing Board of the Puerto Rico Electric Power Authority on July 1, 1945 and all subsequent amendments through the POA Effective Date, and are to be adhered to in the administration of PREPA ERS benefits by PREPA ERS. Administrative procedures not addressed below (such as rounding procedures in determining ages and service of participants) should be consistent with past practices.

PREPA employees participate under a defined benefit (DB) formula that is either supplemental to, or coordinated with, Social Security. This applies to all active participants of PREPA ERS ("Member" or "Members"), regardless of title or job classification or employer. Members will retain the benefits they have accrued up to and including the POA Effective Date; provided, however, that any future cost of living adjustments shall be eliminated pursuant to the POA, as any right to such future adjustments is not an accrued benefit and will not be an accrued benefit as of the POA Effective Date. Benefits accrued from and after the POA Effective Date shall be based on contributions and earnings in new segregated defined contribution retirement accounts under Act 106-2017 funded by employee contributions. As a result, employees will have the certainty that their contributions and investments will be safeguarded for the future, ensuring retirement security.

| Definitions | |
| --- | --- |
| **Covered Participants** | These terms pertain to the freeze of DB accruals of all active participants in PREPA ERS (including Mobilized Employees as described below) |
| **Retirement eligibility age** | Retirement Eligibility Age is the age at which a member may commence receipt of a monthly pension benefit. |
| **Retirement benefit** | The Retirement Benefit is the amount of benefit payable to a member each month. |
| **Creditable service** | Total of member and previous services that is credited for a pension. |
| **Mobilized Employees** | Former PREPA employees who have transferred or current PREPA employees who will transfer to Commonwealth instrumentalities in connection with a Public Private Partnership ("P3") transaction. Mobilized Employees shall only receive Creditable Service for periods of employment with the Commonwealth to the extent that such service is provided under applicable law, and then only through the POA Effective Date. |

| Average compensation | The average of the 3 highest annual base salaries, limited to $50,000 for members hired after 1/1/1993. |
| --- | --- |

| **Timing** |
| --- |
| **Freeze Date** | PREPA ERS pension benefit accrual freeze becomes effective upon the POA Effective Date |

| **Provisions of the proposal** |
| --- |

| **Treatment of accumulated employee contributions** | Participants retain a vested right to receive the accumulated employee contributions in accordance with the PREPA ERS plan document in lieu of the retirement, death, disability or termination benefits applicable under PREPA ERS. |
| --- | --- |
| **Retirement Eligibility prior to the Freeze Date** | Prior to the Freeze Date, participants will retain the following eligibility for retirement under PREPA ERS:<br>• Participants hired before January 1, 1993: Age 60 or attainment of 20 years of service<br>• Participants hired on or after January 1, 1993: Age 60 with 5 years of service, age 65, 20 years of service, or attainment of age 50 with 30 years of service |
| **Retirement Eligibility after the Freeze Date** | Beginning on the Freeze Date, participants will become eligible for retirement under PREPA ERS upon reaching the following age / service combinations:<br>• Participants hired before January 1, 1993:<br>   o Participants who have attained either Age 60 or 20 years of Creditable service as of the Freeze Date will be eligible to retire at any time.<br>   o Participants not having attained either age 60 or 20 years of Creditable service at the Freeze Date will be eligible to retire based on age at the Freeze Date based on the following table:<br><br>{TABLE1}<br><br>• Participants hired on or after January 1, 1993:<br>   o Participants who have attained age 60 with 5 years of Creditable service, age 65, or 20 years of Creditable service at the Freeze Date will be eligible to retire at any time<br>   o All other participants will be eligible to retire once having either a) attained age 65 or b) the date the participant would have attained both i) 5 years of service assuming the freeze had not happened, and ii) the age based on the following table:<br><br>{TABLE2} |

Table 1 (within Retirement Eligibility after the Freeze Date):

| ▪ Attained Age at Freeze Date | ▪ Retirement Eligibility Age after Freeze Date |
| --- | --- |
| ▪ 57 and up | ▪ 61 |
| ▪ 56 | ▪ 62 |
| ▪ 55 and under | ▪ 63 |

Table 2 (within Retirement Eligibility after the Freeze Date):

| ▪ Attained Age at Freeze Date | ▪ Retirement Eligibility Age after Freeze Date |
| --- | --- |

|  | | |
|---|---|---|
|  | ▪ 57 and up | ▪ 61 |
|  | ▪ 56 | ▪ 62 |
|  | ▪ 55 and under | ▪ 63 |

| | |
|---|---|
| **Elimination of minimum benefit** | The $180 monthly minimum benefit for participants will be eliminated for participants retiring on or after the Freeze Date. |
| **Elimination of use of sick leave to purchase credit towards a merit pension** | For separations of service or retirements occurring on or after the Freeze Date, Creditable service will be determined as of the Freeze Date and will not increase in the future.  Prior to the Freeze Date, sick leave could be converted at retirement to service towards a merit annuity at a rate of 1 month for 15 days of accumulated sick leave time.  After the Freeze Date, accumulated sick leave time will not be credited towards the pension benefit nor will any ability to purchase service be implemented.  Applications to retire submitted prior to the plan confirmation date requesting application of sick time to purchase service will be honored. |
| **Bonus payments** | Summer and Christmas bonuses will be eliminated for retirements after the Freeze Date.  One-time funeral bonus will be retained.<br><br>Bonus payments will not be impacted for retirements occurring prior to the Freeze Date. |
| **Employee Contributions** | Employee contributions to PREPA ERS plan will cease as of the Freeze Date. |
| **Implementation of Defined Contribution Accounts** | Mobilized employees will participate in the Commonwealth Defined Contribution (DC) accounts described under Act 106-2017 (Act 106).  New DC accounts under a DC plan with the same provisions as Act 106 will be established for current PREPA employees. |
| **Elimination of Cost of Living Adjustments (COLAs)** | The COLAs that have been historically granted every three years will not be continued past the Freeze Date.  Future COLAs will be eliminated.  Previously granted COLAs will continue to be honored.<br><br>Benefits that have been previously increased by historic COLAs will not be reduced and COLAs prior to the Freeze Date will be honored. |
| **Death benefits** | Terminations due to death will receive a refund of accumulated employee contributions. |
| **Post Retirement Death Benefits** | For retirements occurring on or after the Freeze Date, the benefit will be payable as a lifetime annuity.  If the participant elects at retirement to receive an annuity with a 30% survivorship benefit at the annuitant's death, the amount paid during the employee's lifetime will be the actuarial equivalent of the life annuity. The plan actuarial equivalence (i.e. mortality and interest rate) will be determined consistent with the determination of other optional forms of payment under the plan. |
| **Disability benefits** | Effective on the Freeze Date, participants who become disabled will be eligible to either:<br>    a.   Receive a retirement benefit if the retirement eligibility criterion are otherwise met, |

| | b.  Receive a deferred pension if over 10 years of service has been accrued (payable identically to the benefits owed a vested terminated member), or<br><br>c.  Receive a refund of accumulated employee contributions |
|---|---|
| **Specific implications on Retirement Benefit** | Retirement benefits will continue unchanged from those currently provided by PREPA ERS until the Freeze Date.  Provisions for retirements occurring after the Freeze Date are as follows:<br><br>a.  Minimum benefits will no longer apply to future retirees.<br><br>b.  The freeze eliminates the ability to purchase additional service using unused sick or vacation time or by other means.  Applications to retire submitted prior to the POA Effective Date requesting application of sick or vacation time to purchase service will be honored.<br><br>c.  Participants who were hired prior to January 1, 1993 who attained 25 years of Creditable Service as of the Freeze Date receive a life annuity equal to 2.5% of Average Compensation determined as of the Freeze Date times years of service at the Freeze Date (up to 30 years).  If benefits are coordinated with Social Security, the benefit will be adjusted from ages 65 to 80 by reducing the benefit by $40 per each year of Creditable Service at the Freeze Date (up to 30 years).<br><br>d.  Participants hired prior to January 1, 1993 who had not attained 25 years of Creditable Service as of the Freeze Date will receive a benefit of 1.5% of Average Compensation determined as of the Freeze Date per year of Creditable Service as of the Freeze Date plus an additional 0.5% of Average Compensation determined as of the Freeze Date per year of Creditable Service as of the Freeze Date beyond 20 years.  If the commencement date of the member's benefit is prior to age 60, the benefit shall be the actuarial equivalent to the age 60 benefit.<br><br>e.  Participants hired on or after January 1, 1993 who attained 30 years of service as of the Freeze Date will receive a benefit equal to 75% of the Average Compensation determined as of the Freeze Date.  The 75% factor will be further reduced for retirements prior to age 55 are as follows:<br><br>{{TABLE}}<br><br>f.  Participants hired on or after January 1, 1993 who had not attained 30 years of Creditable Service as of the Freeze Date will receive a benefit of 1.5% of Average Compensation determined as of the Freeze Date per year of Creditable Service as of the Freeze Date plus an additional 0.5% of Average Compensation determined as of the Freeze Date per year of Creditable Service as of the Freeze Date beyond 20 years. If the commencement date of the member's benefit is prior to age 60, the benefit shall be the actuarial equivalent to the age 60 benefit. |

| Age at retirement | Benefit Multiplier |
|---|---|
| 50 | 62.5% |
| 51 | 65.0% |
| 52 | 67.5% |
| 53 | 70.0% |
| 54 | 72.5% |

| Funding Structure | Pensions will continue to be paid from the current pension trust (i.e. PREPA ERS). The funding structure of PREPA ERS will shift from a funded model to pay-as-you-go (PayGo). PREPA ERS will be reimbursed for PayGo payments to the extent provided in the Plan with funds sufficient to do so that PREPA will contribute to a new trust to be established pursuant to the PREPA plan of adjustment (the "PREPA PayGo Trust"). The assets of the PREPA PayGo Trust will be held in trust for the sole benefit of PREPA ERS.

Assets in the PREPA Paygo Trust, including investment returns, will be used to reimburse the PREPA ERS for the annual PayGo and appropriate administrative expenses, to the extent PREPA ERS is entitled to such reimbursement under the POA. Any withdrawals from the PREPA Paygo Trust will require approval of the PREPA PayGo Trust Board of Trustees and shall only be used by PREPA ERS to fund the payment of PayGo made consistently with the DB plan as modified by the POA. |
|---|---|

## Negotiated benefits in addition to PREPA-ERS benefits

| Negotiated Benefit Description | Benefits will be paid to participants if their termination from active service at PREPA results from any of the following:<br>• Physical or mental disability<br>• Retirement or termination upon meeting age or service requirements of PREPA ERS<br>• Death of an active member<br><br>Benefits are only payable in a single instance and a participant who returns to work is not eligible to receive any additional benefit from these provisions |
|---|---|
| Negotiated Benefit Amount | • Retirement, disability or general passing: $7,000<br>• Death related to employment duties: $20,000<br>• Death related to employment duties specific to a Power Line Technician or in job positions specifically identified as eligible for special annual risk compensation: $50,000<br>• Physical disability resulting from employment duties: $8,000 |
| Impact of Freeze on Negotiated Benefit Amounts | One-time benefits described under this formula are not impacted by the pension freeze |