## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| 12In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>                   Debtors.[1] | PROMESA<br>Title III<br><br><br><br>Case No. 17 BK 3283-LTS<br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO<br><br>    as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>                Debtor. | PROMESA<br>Title III<br><br><br>Case No. 17 BK 4780-LTS |

## UNION DE TRABAJADORES DE LA INDUSTRIA ELÉCTRICA Y RIEGO INC.'S OBJECTION TO PREPA'S PLAN OF ADJUSTMENT

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations.)

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ............................................................1

**I.   FACTUAL BACKGROUND** .....................................................1

A.   Historical Background PREPA and UTIER ......................................1

B.   Description of deterioration of UTIER membership and the CBA ...................3

**II.   PROCEDURAL BACKGROUND** ...............................................6

**III.   LEGAL STANDARD FOR CONFIRMATION** ..............................6

**IV.   ARGUMENTS** ....................................................................7

A.   THE PLAN OF ADJUSTMENT IMPERMISSIBLY CAUSES PREPA TO REJECT THE CBA. ..........................................................................7

B.   THE PLAN OF ADJUSTMENT IS UNFAIRLY DISCRIMINATORY TOWARDS UTIER AS A CURRENT EXPENSE CLAIMANT. .................................14

C.   THE PLAN OF ADJUSTMENT IS CONTRARY TO THE LAW TO THE EXTENT THAT IT PREEMPTS POLICE POWERS OF PUERTO RICO AND ANY LAW THAT CONFLICTS WITH ANY PART OF THE PLAN. ..................................20

D.   THE PLAN OF ADJUSTMENT IS CONTRARY TO LAW TO THE EXTENT THAT IT IMPOSES A RATE WITHOUT FOLLOWING THE PROCEDURES OF PUERTO RICO LAW. ..............................................................................27

E.   THE PLAN OF ADJUSTMENT IS NOT FEASIBLE....................................30

**V.   CONCLUSION** ...................................................................33

**RELIEF REQUESTED** ...................................................................34

## Federal Statutes

11 U.S.C. § 1129 ................................................................................................16, 23
11 U.S.C. § 1122 ....................................................................................................16
11 U.S.C. § 1123(a)(5) ...........................................................................................23
11 U.S.C. § 365(a). ..................................................................................................8
11 U.S.C. § 510(a) .................................................................................................15
48 U.S.C. § 2103 ..............................................................................................22, 25
48 U.S.C. § 2174(b) ...............................................6, 7, 14, 20, 26, 27, 30, 34

## Local Statutes

Act No. 26 of April 29, 2017 ...................................................................................4
Act No. 3 of January 23, 2017 .................................................................................3
Act No. 66 of June 17, 2014 ....................................................................................3
Act No. 8 of February 4, 2017 .................................................................................4
Act No. 83 of May 2, 1941 ......................................................................................1
P.R. Laws ann. tit. 22 § 1141 .................................................................................28
P.R. Laws ann. tit. 22 § 1054 .........................................................................27, 28, 29

## Federal Cases

Allied Fin., Inc. v. WM Capital Partners 53, LLC (In re Allied Fin., Inc.),
    572 B.R. 45 (Bankr. D.P.R. 2017) ..............................................................21, 25


Arizona v. United States,
    567 U.S. 387 (2012) .........................................................................................20


Assured Guar. Corp. v. Garcia-Padilla,
    214 F. Supp. 3d 117 (D.P.R. 2016) .............................................................21, 25


Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. Lasalle St. P'ship,
    526 U.S. 434 (1999) .........................................................................................15


Blue Cross & Blue Shield v. AstraZeneca Pharm. LP (In re Pharm. Indus. Average Wholesale),
    582 F.3d 156 (1st Cir. 2009) .......................................................................21, 25


Capron v. Office of the AG of Mass.,
    944 F.3d 9 (1st Cir. 2019) ...............................................................................21


Crosby v. Nat'l Foreign Trade Council,
    530 U.S. 363 (2000) ...................................................................................21, 25


Fin. Oversight & Mgmt. Bd. v. Pierluisi Urrutia (In re Fin. Oversight & Mgmt. Bd. for P.R.),
    634 B.R. 187 (D.P.R. 2021) ...............................................................................7

Goya de P.R., Inc. v. Santiago,
    59 F. Supp. 2d 274 (D.P.R. 1999) ........................................................................21

In re BanVest Capital Corp.,
    290 B.R. 443 (B.A.P. 1st Cir. 2003) ......................................................................8

In re Crystalin, L.L.C.,
    293 B.R. 455 (B.A.P. 8th Cir. 2003). .............................................................8, 14

In re Fed.-Mogul Glob.,
    684 F.3d 355 (3d Cir. 2012) ..........................................................................22, 26

In re Fin. Ove rsight & Mgmt. Bd.,
    637 B.R. 223 (D.P.R. 2022) ............................................................................7, 31

In re FirstEnergy Solutions Corp.,
    945 F.3d 431 (6th Cir. 2019) ..................................................................................8

In re Greate Bay Hotel & Casino, Inc.,
    251 B.R. 213 (Bankr. D.N.J. 2000) ...............................................................17, 20

In re Noranda Aluminum, Inc.,
    549 B.R. 725 (Bankr. E.D. Mo. 2016) ............................................................8, 14

In re Ocean Blue Leasehold Prop. Ltd. Liab. Co.,
    414 B.R. 798 (Bankr. S.D. Fla. 2009) .................................................................15

In re Pilgrim's Pride Corp.,
    403 B.R. 413, 422 (Bankr. N.D. Tex. 2009) ..........................................................9

In re TM Vill., Ltd.,
    598 B.R. 851 (Bankr. N.D. Tex. 2019) ...........................................................8, 13

In re Tribune Co.,
    972 F.3d 228 (3d Cir. 2020) ...........................................................................16, 20

In re Unbreakable Nation Co.,
    437 B.R. 189 (Bankr. E.D. Pa. 2010) .............................................................16, 20

Irving Tanning Co. v. Me. Superintendent of Ins. (In re Irving Tanning Co.),
    496 B.R. 644 (B.A.P. 1st Cir. 2013) .............................................................23, 26

Law Debenture Tr. Co. of N.Y. v. Tribune Media Co. (In re Tribune Media Co.),
    587 B.R. 606 (D. Del. 2018) ..................................................................15

Mass. Div. of Emp. & Training v. Bos. Reg'l Med. Ctr., Inc. (In re Bos. Reg'l Med. Ctr., Inc.),
    291 F.3d 111 (1st Cir. 2002) ...................................................................22

Medtronic, Inc. v. Lohr,
    518 U.S. 470 (1996) ..........................................................................22, 25

N.L.R.B. v. Bildisco,
    465 U.S. 513 (1984) ........................................................................8, 9, 11, 13

Norwest Bank Worthington v. Ahlers,
    485 U.S. 197 (1988). .........................................................................15

Official Comm. of Unsecured Creditors v. Dow Chem. Corp. (In re Dow Corning Corp.),
    456 F.3d 668 (6th Cir. 2006) .................................................................16

Puerto Rico v. Franklin Cal. Tax-Free Tr.,
    579 U.S. 115 (2016) ..........................................................................22

RadLAX Gateway Hotel, LLC v. Amalgamated Bank,
    566 U.S. 639 (2012) ..........................................................................15

Rosselló Nevares v. Fin. Oversight & Mgmt. (In re Fin. Oversight & Mgmt. Bd.),
    __330 F. Supp. 3d 685 (D.P.R. 2018).........................................................7

Wyeth v. Levine,
    555 U.S. 555 (2009) ..........................................................................21, 25

Zante, Inc. v. Delgado (In re Zante, Inc.),
    467 B.R. 216 (D. Nev. 2012)..................................................................17

**Secondary Sources**

BLACK'S LAW DICTIONARY (11th ed. 2019)................................................14, 15, 21

José I. Alameda & Alfredo González Martínez, "*Análisis de la Propuesta sobre Salarios y Beneficios Marginales a Empleados de la UTIER*". ........................................................4

*Pinceladas de Nuestra Historia,* AEEPR.com, https://aeepr.com/es-pr/historia ......................1

Puerto Rico Electric Power Authority,  https://www2.aeepr.com/aeepr2009/AEEES.ASP ......4

**TO THE HONORABLE DISTRICT COURT:**

**COMES NOW** Unión de Trabajadores de la Industria Eléctrica y Riego ("UTIER") duly represented by the undersigned counsel and respectfully states as follows:

### PRELIMINARY STATEMENT

1. After five years, the Puerto Rico Electric Power Authority ("PREPA") is no closer to recovery than it was in 2017. After hurricanes, earthquakes, public outcry, pandemic restrictions, PREPA's system is still in shambles, now in the hands of private operators. Puerto Rico's residents and PREPA's workers are suffering the consequences.

2. While the Oversight Board and most of the other parties involved are arguing over bonds and loans, the people of Puerto Rico are watching with fear and indignation. They know that what is decided here affects every aspect of their life. PREPA's restructuring must be seen as extremely influential in the success of the Commonwealth Plan. PREPA is the driving force of Puerto Rico's economy because electric power is necessary both for consumers and businesses alike.

3. UTIER objects to the confirmation of the Plan of Adjustment because it perpetuates the precarious situation of Puerto Rico; it hopes to destroy UTIER as a union; and it does not meet the basic legal requirements for confirmation.

### I.     FACTUAL BACKGROUND

### A.  Historical Background PREPA and UTIER

4. Electricity made its way to Puerto Rico in 1893 through private distributors that concentrated in urban areas.[2] In 1941, due to the explosive increase in demand for electricity, a public utility was created to address it.[3] Through Act No. 83 of May 2, 1941 ("Act 83"), the precursor to PREPA was established.[4] After the massive efforts to energize

---

[2] *Pinceladas de Nuestra Historia,* AEEPR.com, https://aeepr.com/es-pr/historia (last visit June 5, 2023).
[3] *Id.*
[4] *Id.*

most if not all of Puerto Rico, through Act No. 57 of May 30, 1979, PREPA as we know it was established, as an amendment to the name of its precursor in response to changes in the way electricity was managed by this time.[5] By 1981, PREPA had completed the consolidation of Puerto Rico's electric system.[6] Throughout its history, PREPA and its precursor energized the entire archipelago of Puerto Rico for the first time. This is PREPA's legacy. Today, PREPA is a public corporation, governed by Act 83, now the *Puerto Rico Electric Power Authority Act*.

5. For its part, UTIER was founded in the early 1940s, under PREPA's precursor. Since then, it has been one of the unions that represents PREPA's employees. Its members have been responsible for the operation and conservation aspect of PREPA. They have been responsible for the fieldwork of repairs, renovations, and improvements of PREPA property. **Exhibit 1: CBA, Art. III, § 1, .** UTIER also represents a branch of PREPA's retirees. Pursuant to its charter, UTIER's job is to protect and defend PREPA's workers, as well as negotiate collective bargaining agreements on their behalf. Even today, UTIER remains as the main labor union that represent PREPA's employees. UTIER's relationship with PREPA is defined in detail in its Collective Bargaining Agreement ("CBA"). Even though the latest enactment of the CBA has a lifespan lasting from August 2008 through August 2012, its Article L establishes that it will continue dictating the labor relations between PREPA and UTIER until a new collective bargaining agreement is negotiated and comes in effect. Since no new collective bargaining agreement has been negotiated and established, the CBA is still valid and binding. **Exhibit 1: CBA, Art. L.** The CBA was entered into by both PREPA and the UTIER, on behalf of the employees of PREPA. As such, it is a binding for both parties and dictates the labor relations that shall exist amongst

---

[5] *Id.*
[6] *Id.*

them. The CBA endowed UTIER's members with certain contractual rights, which they have relied on. Additionally, the CBA is the basis for PREPA's employees' retirement system. The CBA serves the unequivocally important purpose of maintaining and creating a peaceful working environment. **Exhibit 1: CBA, Declaration of Principles**. UTIER's CBA covers a wide range of topics, including vacation and sick days accrual and pay, employee classifications, job reclassifications, fringe benefits, etc. But it also includes noneconomic provisions regarding job stabilization and dispute resolution procedures, among others.

6. Furthermore, UTIER is cognizant and supportive of renewable energy goals. It is a founding member of the non-profit organization *Queremos Sol* ("We want sun"), which advocates for "a  sustainable, resilient and innovative energy system, based on clean renewable energy, distributed generation and endogenous resources."[7]

**B.  Description of deterioration of UTIER membership and the CBA**

7. Since 2014, the Government of Puerto Rico has been passing laws that water down the protections of UTIER's CBA: *Government of the Commonwealth of Puerto Rico Special Fiscal and Operational Sustainability Act*, Act No. 66 of June 17, 2014. ("Act 66")(alters the CBA by establishing a limit to the amount of vacation and sick days a UTIER member could accumulate and receive a monetary compensation for); *Act to Attend to the Economic, Fiscal, and Budget Crisis and to Guarantee the Functioning of the Government of Puerto Rico*, Act No. 3 of January 23, 2017 ("Act 3")(suspended all collective bargaining agreement provisions that were contrary to its clauses, suspended all non-economic clauses that had any economic impact, whether it be direct or indirect, on the corporation budget, eliminated monetary compensations, and imposed on public corporations the creation of a

---

[7] WE WANT SUN: SUSTAINABLE. LOCAL. CLEAN. (*available at* https://www.queremossolpr.com/project-4). This proposal advocates for an "affordable system, which promotes efficiency, assures equity, promotes  ample  public participation  and  the  development  of local  capacity through shared governance and transparency, while at the same time producing local wealth and ownership."

plan so employees would exhaust all excess vacation balance); *Administration and Transformation of the Human Resources of the Government of Puerto Rico Act*, Act No. 8 of February 4, 2017. ("Act 8")(made the Government the sole employer of all public employees, allowing it to consolidate services, eliminate those which it understands are no longer needed, create a unified system of job classifications, have a specific merit system applicable for all agencies and corporations, and facilitate the transfer or movement of employees between agencies, without regard to what agency or corporation an employee works for); *Fiscal Plan Compliance Act*, Act No. 26 of April 29, 2017 ("Act 26")(eliminated monetary compensation for excess vacation and sick days, alters the amount of days an employee can accrue of vacation or sick days to make it less, eliminated any and all monetary compensations, and set a time limit for the use of excess vacation or sick days. If these are not used by the established date, they will be lost)(collectively referred to as the "Austerity Laws"). The Austerity Laws were enacted in a way that modified existing rights under the CBA. The enactment of the Austerity Laws represented drastic and substantial impairments of the CBA, which rendered it **almost** useless. As of 2017, PREPA employed approximately 9,550 workers.[8] Of those 9,550 employees, approximately 6,775 belong to a labor union; of those, an estimate of 3,600 were affiliated to UTIER. As such, UTIER members played a fundamental role in PREPA's productivity. [9] Essentially, it was their labor that allowed PREPA to continue rendering its services. As of March 31, 2021, PREPA employed approximately 5,411 workers, a reduction due in no small part to the Austerity Laws which caused an exodus of workers and early retirements. Of those 5,411, around 3,132 were affiliated with UTIER.

---

[8] Puerto Rico Electric Power Authority, https://www2.aeepr.com/aeepr2009/AEEES.ASP (accessed July 10, 2017).

[9] José I. Alameda & Alfredo González Martínez, "*Análisis de la Propuesta sobre Salarios y Beneficios Marginales a Empleados de la UTIER*". This study reflected that that PREPA had suffered a significant and drastic loss of capital productivity from 2008 through 2017, but had been able to continue providing its service, due to the fact that labor production had gone up, with the UTIER members leading the productivity growth.

From 2008 to 2013, PREPA lost 10% of its workforce; from 2013 through 2020 (well before the transition to LUMA), PREPA lost an additional 35% of its workforce.

These dramatic cuts to workforce and to operating budgets had already had a noticeable impact on the reliability of the system by 2016, when consultants to the Puerto Rico Energy Bureau found, PREPA's generating fleet has deteriorated rapidly over the last two fiscal years with a dramatically increased percentage of time in forced outages"; "PREPA's operational spending has not been consistent with operation of a safe and reliable system since at least FY2014"; and "PREPA's reduced staffing levels appear to be leading to severe consequences for system safety, reliability, and operability." These warnings went unheeded. **Exhibit 2: Thomas Sanzillo Opening Report, ECF No. 3416-1 at 18-19** (*Sanzillo Opening*)**.**

8.  Then came the privatization of the Transmission and Distribution System ("T&D System") Operations. On June 1st, 2021, LUMA Energy, LLC and LUMA Energy ServCo, LLC (collectively and interchangeably "LUMA"), assumed the control and operation of the T&D System pursuant to the *Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement* ("T&D OMA"), which has a term of 15 years. Under the T&D OMA, PREPA still owns the T&D System, but LUMA, a private corporation, operates it, along with various other responsibilities. As a result, all of PREPA's employees that worked in the T&D System no longer work for PREPA. These employees had the alternative of transferring to another governmental agency, applying for employment in LUMA, remain in PREPA at an available position, or retire. Thus, UTIER remained with approximately 711 members. Moreover, on January 24, 2023, an additional privatizer came on the scene: GENERA PR LLC ("GENERA"). Through the *Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement dated as of January 24, 2023 by an among the Puerto Rico Electric Power Authority as owner, the Puerto Rico Public-Private Partnerships Authority as Administrator and Genera PR LLC as Operator* ("LGA OMA"). Under the LGA OMA, GENERA will assume full control of the generation functions and assets of PREPA. The execution of the LGA OMA will inevitably result in further displacement of PREPA's workforce and, consequently, UTIER's membership.

This reduction would likely leave UTIER holding a membership of on or around 200 workers. Neither PREPA nor GENERA have released any definitive numbers.

## II.      PROCEDURAL BACKGROUND

9. The *Modified Second Amended Plan of Adjustment of the Puerto Rico Electric Power Authority* ("Plan of Adjustment"), **ECF No. 3296,** and the *Disclosure Statement for Modified Second Amended Plan of Adjustment of the Puerto Rico Electric Power Authority* ("Disclosure Statement"), **ECF No. 3297**, were filed on March 1st, 2023.[10] Pursuant to the *Third Amended and Restated Order establishing, among other things, procedures and deadlines concerning objections to confirmation and discovery in connection therewith* ("Procedural Order"), the parties have been engaged in rigorous discovery. **ECF No. 3565.**

10. Pursuant to the Procedural Order, on June 5th, 2023, the Oversight Board filed the roposed Confirmation Order. **ECF No. 3587.** On June 7th, 2023, votes were cast for the confirmation of the Plan of Adjustment. Under the same deadlines, UTIER hereby files its **Objection to the Confirmation of the Plan of Adjustment**.

## III.      LEGAL STANDARD FOR CONFIRMATION

11. Pursuant to Section 314 of PROMESA, the confirmation of a Plan of Adjustment requires meeting certain requirements. 48 U.S.C. § 2174(b). One of the requirements for confirmation is that "the debtor is not prohibited by law from taking any action necessary to carry out the plan . . . ." Id. § 2174(b)(3). Additionally, pursuant to Section 314(b) of PROMESA, one of the requirements for confirmation of a Plan of Adjustment is that it comply with the "the provisions of title 11, made applicable to a case under [PROMESA]." Id. § 2174(b)(1). As such, one of the requirements for confirmation is that the Oversight Board obtains the necessary enabling legislation. That means "**any legislative, regulatory,**

---

[10] As of the date of this filing, these are the most recent versions of the Plan of Adjustment and Disclosure Statement on the public docket, while the Claim Estimation Hearings revealed that the Oversight Board's data may result in a substantial change in the document. Thus, UTIER reserves every right to amend and supplement this filing should subsequent amendments be filed.

or electoral approval necessary under applicable law in order to carry out any provision of the plan." See Id. § 2174(b)(5)(emphasis added). This concept necessarily includes all new legislation and/or amendments to statutes that are required to implement the provisions of the Plan of Adjustment. This provision exists because despite the extremely vast powers vested upon the Oversight Board, "**the Oversight Board has not been given power to affirmatively legislate.**" Rosselló Nevares v. Fin. Oversight & Mgmt. (In re Fin. Oversight & Mgmt. Bd.), 330 F. Supp. 3d 685,701 (D.P.R. 2018)(emphasis added). See, also, Fin. Oversight & Mgmt. Bd. for P.R. v. Pierluisi Urrutia (In re Fin. Oversight & Mgmt. Bd. for P.R.), 634 B.R. 187, 194 (D.P.R. 2021). PROMESA provides that a plan of adjustment **cannot be confirmed unless the Oversight Board obtains legislative, regulatory or electoral approval necessary under applicable law in order to carry out any provision of the plan or confirmation is expressly conditioned on such approval**." Pierluisi Urrutia, 634 B.R. at 194 (emphasis added)(citations and quotation marks omitted).

12. In addition to complying with existent law and obtaining enabling legislation, PROMESA requires the Oversight Board to file a Plan that is **feasible**. In re Fin. Ove rsight & Mgmt. Bd., 637 B.R. 223, 302-03 (D.P.R. 2022)(citations and brackets omitted)(emphasis added). As such, feasibility is a two prong inquiry: (1) whether the debtor will be able to satisfy its obligations under the Plan; and (2) whether the debtor will be able to provide the services it owes to the public. Id.

## IV.    ARGUMENTS

### A.  THE PLAN OF ADJUSTMENT IMPERMISSIBLY CAUSES PREPA TO REJECT THE CBA.

13. As previously stated, one of the requirements for confirmation is that "the debtor is not prohibited by law from taking any action necessary to carry out the plan . . . ." 48 U.S.C. § 2174(b)(3). However, the Plan of Adjustment violates the legal standards for contract

rejection in the CBA. **For this section of the Argument, UTIER also joins SREAEE's arguments in Section IV.A. of its Objection. See ECF No. 3703.**

### i.   Applicable Law for Rejection of the CBA

14. Under the Bankruptcy Code, "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Generally, the only issue before a court is whether assumption or rejection is based on business judgment. In re BanVest Capital Corp., 290 B.R. 443, 447 (B.A.P. 1st Cir. 2003). Thus, "[t]o satisfy the business judgment test, the debtor must show that the proposed course of action will be advantageous to the estate and the decision is based on sound business judgment." In re TM Vill., Ltd., 598 B.R. 851, 859 (Bankr. N.D. Tex. 2019)(citations omitted). Sound business judgment requires the voluntary and reasonable consideration of an arm's-length transaction.[11] Therefore, under this test, "a finding of bad faith or gross abuse of their business discretion . . ." negates it. In re Noranda Aluminum, Inc., 549 B.R. 725, 728 (Bankr. E.D. Mo. 2016)(quotation marks and citations omitted). The same is true "[i]f Debtor cannot show a benefit to the estate . . . ." In re Crystalin, L.L.C., 293 B.R. 455, 464 (B.A.P. 8th Cir. 2003).

15. Furthermore, although business judgment is the general standard to assume or reject executory contracts in bankruptcy, the courts have carved out an exception for unique contracts. See, for example, N.L.R.B. v. Bildisco, 465 U.S. 513 (1984)(on collective-bargaining agreements) *superseded by statute*. In Bildisco, the Supreme Court considered that collective-bargaining contracts had a "special nature" and, therefore, "a somewhat stricter standard should govern . . . ." Id. at 525. In these cases, the appropriate standard is a balance of equities, not a business judgment test. See Bildisco, 465 U.S. at 527. See, also, In re FirstEnergy Solutions Corp., 945 F.3d 431, 453-54 (6th Cir. 2019).

---

[11] *Arm's-Length*, Black's Law Dictionary (11th ed. 2019).

16. In <u>Bildisco</u>, the Supreme Court instructs a balance between "**the interests of the affected parties- the debtor, creditors and employees** . . . Nevertheless, the Bankruptcy Court must focus on the ultimate goal of Chapter 11 when considering these equities." 465 U.S. at 527 (emphasis added). In addition to establishing a different standard for the rejection of collective bargaining agreements, <u>Bildisco</u> imposes other burdens on the debtor:

> Before acting on a petition to modify or reject a collective-bargaining agreement, however, **the Bankruptcy Court should be persuaded that reasonable efforts to negotiate a voluntary modification have been made and are not likely to produce a prompt and satisfactory solution**. The NLRA requires no less. Not only is **the debtor-in-possession under a duty to bargain with the union** . . . but the national labor policies of avoiding labor strife and encouraging collective bargaining . . . generally **require that employers and unions reach their own agreements on terms and conditions of employment free from governmental interference**. The Bankruptcy Court need step into this process only if the parties' inability to reach an agreement **threatens to impede the success of the debtor's reorganization.** <u>Id.</u> at 526-27 (citations omitted)(emphasis added).

17. <u>Bildisco</u> considered "'**national labor policies of avoiding labor strife and encouraging collective bargaining'** [which] dictated that rejection be approved only after the parties attempted but failed to negotiate . . . (1) **if the contract was clearly burdensome**; and (2) **after** a balancing of the equities." <u>In re Pilgrim's Pride Corp.</u>, 403 B.R. 413, 422 (Bankr. N.D. Tex. 2009)(summarizing the *Bildisco* test)(emphasis added).

## ii.  UTIER's CBA and the Plan of Adjustment

18. The latest collective bargaining agreement between UTIER and PREPA ("CBA") is from the 2008-2012 period. However, it has an evergreen provision, which establishes that the CBA will continue in effect until a new collective bargaining agreement is negotiated. Because no new collective bargaining agreement has been negotiated, the CBA is still valid and binding. Some of the major areas covered by the CBA are vacation and sick leave accrual and pay, employee classifications, job reclassifications, fringe benefits, job stabilization, and dispute resolution procedures, among others.

19. Nonetheless, as previously discussed, the CBA has been modified to meet the requirements of the Austerity Laws. Act 66 established a limit to the amount of vacation and sick days a UTIER member could accumulate and receive monetary compensation for, displacing those provisions of the CBA. Act 3 suspended all collective bargaining agreement provisions that were contrary to its clauses and those clauses that had any economic impact on the employer's budget. Act 3 also extended the lifespan of applicable provisions of Act 66. Act 8 made the Commonwealth Central Government the sole employer of all public employees, allowing it to eliminate and consolidate services, uniform job classifications, establish a single merit system and facilitate the transfer of employees between agencies. Act 26 impaired, reduced or eliminated fringe benefits such as monetary compensation for excess vacation and sick days; number of vacation or sick days an employee can accrue; other monetary compensations; use of excess vacation or sick days.[12] While the text of the CBA remains intact, in practice, the CBA aligns with the Austerity Laws. This represents a drastic and substantial impairment of the CBA, that renders it **almost** useless.

20. Despite the foregoing, the Oversight Board plans to cause PREPA to reject the CBA. Article XXI of the Plan of Adjustment establishes that pursuant to Section 365(b)(2) of the Bankruptcy Code, all executory contracts "which have not expired by their own terms on or prior to the Confirmation Date, **shall be deemed rejected by the Debtor as of the Effective Date** . . . ." **ECF No. 3296 at 62** (emphasis added). As such, the "[e]ntry of the Confirmation Order by the Title III Court shall constitute approval . . . of the rejection . . . of an Executory Contract and an Unexpired Lease . . . ." **Id. at 63** The Disclosure Statement specifically references rejecting the CBA. Though it reflects that the CBA is modified by the austerity laws, including Act 26, the Oversight Board uses modification to align with

---

[12] It should be noted that UTIER filed an adversary proceeding before this Court to negate the effects of these Austerity Laws on the CBA and lost.

Act 26 as grounds for rejection. **ECF No. 3297 at -8788.** For that purpose, the Disclosure Statement includes Exhibit Q, which contains an estimate of savings. **Id.** However, the Disclosure Statement clearly shows that the Oversight Board's main goal is to eliminate the Retirement System (SREAEE). **Id.** Although, the Oversight Board stated that it was "negotiating with UTIER to determine whether consensual modifications of their CBA can be reached" **Id. at 87**, it calls the obligations in the CBA as "unsustainable" and stated that PREPA would need to seek rejection if an agreement could not be reached. **Id. at 89.**

21. The referenced negotiations have developed as follows. In the process of Mediation, on August 9, 2022, the Oversight Board delivered a proposal for amendments to the CBA for the first time, to align the CBA with the prevalent labor provisions for other public employees and the pension reform described in the Plan of Adjustment.[13] Following multiple email correspondences by and among counsel, on April 23, 2023, UTIER approved a counter proposal to be made to the Oversight Board the following day. On May 30, 2023, the Oversight Board responded with its own counter proposal. On June 12, 2023, UTIER responded. Negotiations are seemingly ongoing.

### iii.  Application of the Rejection Standard

22. In view of the foregoing, the Oversight Board cannot cause PREPA to reject the CBA through the Plan of Adjustment. Because the executory contract in question is a collective bargaining agreement, in addition meeting the standard for the rejection, <u>Bildisco</u> imposes on PREPA, and the Oversight Board, the burden of persuading the Court that it engaged in **reasonable, good faith negotiation to reach a voluntary modification of the CBA**. <u>See</u> <u>Bildisco</u>, 465 U.S. at 526. PREPA is "**under a duty to bargain with the union** . . . ." <u>Id.</u> In the present case, there has not been a good faith effort to negotiate a reasonable

---

[13] UTIER required a Spanish Translation of the Oversight Board's proposals. Without this, UTIER's leaders would be unable to evaluate the proposal. On or around August 26, 2022, the translation was completed and agreed upon by counsel for both parties.

modification of the CBA. On the contrary, the Oversight Board has been adamant on unilaterally modifying the CBA and eliminating its two most vital elements: the safeguard for the pension system and the provisions for maintaining the CBA in absence of new negotiations. Moreover, even if this negotiation had been performed in good faith and reasonably expected to reach an agreement, the Court's intervention would not be warranted. It is clear that the "inability to reach an agreement **[in no way] threatens to impede the success of the [PREPA]'s reorganization**." Id. (emphasis added). The Oversight Board basically recognizes that the only part of the CBA that has any effect on PREPA's restructuring is the pension system. Nonetheless, this is an issue that UTIER submits that the Oversight Board needs to address with SREAEE. As such, UTIER also joins SREAEE's filing at **ECF No. 3703.** UTIER's position on the matter is that it will accept any agreement that the Oversight Board reaches with SREAEE and agree to modify the CBA to that effect. Therefore, the pension issue does not impede reaching an agreement with the Oversight Board, unless its only goal is to eliminate the CBA's pension clauses to facilitate the reform without the need to negotiate with SREAEE.

23. The CBA itself, particularly the duration of it which the Oversight Board takes issue with, has **no bearing on PREPA's ability to reorganize**. An examination of Exhibit Q of the Disclosure Statement shows that most of the modifications that the Oversight Board envisions as a result of the rejection of the CBA, are arbitrary and non-economic. **ECF No. 3297-17.** To begin with, most of the provisions of the CBA that allegedly produce monetary savings according to Exhibit Q are those that **have already been modified** by the Austerity Laws. **ECF No. 3297-17 at 4-5.** Moreover, even these savings would be based on a headcount that is quickly set for reduction. **ECF No. 3297-17 at 5.** The LGA OMA stands to reduce membership to around **200 workers**, which is less than half of the head count the Oversight Board uses in Exhibit Q. **ECF No. 3297-17 at 5.** The Oversight Board itself has

recognized this: "Were the Genco transition to occur, **these savings would reduce to a minimal amount as PREPA would be left with very few Represented Employees**." **ECF No. 3297 at 88 f.n. 118** (emphasis added).

24. Moreover, the elimination of the designated " Evergreen Clause" is completely arbitrary. **ECF No. 3297-17 at 6.** The mere act of keeping the CBA in effect through periods of impasse or inactive negotiations is not an economic burden to PREPA. On the other hand, it is a death sentence for UTIER and its remaining membership. Without the "Evergreen Clause" and considering the many restrictions PROMESA and the Plan of Adjustment impose upon PREPA, UTIER is left with no leverage to negotiate with PREPA as its employer. Such a modification would destroy the purpose of the union. The same is true of the "policies to increase staffing flexibility" found in Exhibit Q. **ECF No. 3297-17 at 7.** Providing "staffing flexibility" to a public utility that is being dismantled by the Oversight Board can hardly work in favor of rejection when it so clearly prejudices UTIER.

25. As such, it is clear that the Oversight Board has not met its burden of proof and the balance of equities are skewed in favor of UTIER in this matter, pursuant to the stricter applicable standard of <u>Bildisco.</u> <u>See Bildisco</u>, 465 U.S. at 527. In striking a balance between the interests of the debtor, creditors, and employees, while focusing on the goals of PROMESA, nothing in this case signals that the rejection of the CBA serves a purpose under PROMESA. Moreover, the prejudice it causes UTIER far exceeds any possible benefits to PREPA or its creditors. **Thus, the balance of equities standard does not favor the rejection of the CBA and it should be denied.**

26. Moreover, even under the laxer business judgment standard, the Oversight Board has not established that the rejection of the CBA "will be advantageous to the estate and the decision is based on sound business judgment." <u>In re TM Vill., Ltd.</u>, 598 B.R. at 859(citations omitted). **Sound business judgment requires the voluntary and**

reasonable consideration of an arm's-length transaction, which presupposes that the

parties have roughly equal bargaining power.[14] Thus, where the rejection provides

minimal savings which barely affect PREPA, particularly given the continuing

development of the "transformation" of PREPA, a finding of bad faith and gross abuse of

business discretion is inevitable. See In re Noranda Aluminum, Inc., 549 B.R. at 728.

Furthermore, the Oversight Board "cannot show a benefit to the estate, [therefore, this

Court] does not need to make a finding of bad faith or gross abuse of discretion" to deny

rejection. See In re Crystalin, L.L.C., 293 B.R. at 464 (emphasis added).

27. As previously noted, the amendments the Oversight Board hopes to achieve are arbitrary,

capricious, and purely ideological. **The Oversight Board's distaste for unions has been

duly noted, but it is not the basis for rejecting the CBA. This is not a business

judgment.**[15]

## B. THE PLAN OF ADJUSTMENT IS UNFAIRLY DISCRIMINATORY TOWARDS UTIER AS A CURRENT EXPENSE CLAIMANT.

28. As previously stated, one of the requirements for confirmation is that "the debtor is not

prohibited by law from taking any action necessary to carry out the plan . . . ." 48 U.S.C. §

2174(b)(3). Additionally, pursuant to Section 314(b) of PROMESA, one of the

requirements for confirmation of a Plan of Adjustment is that it comply with the "the

provisions of title 11, made applicable to a case under [PROMESA]." Id. § 2174(b)(1).

For this section of the Argument, UTIER also **joins** SREAEE's arguments in **Section IV.B.

of its Objection. See ECF No. 3703.**

### i.   Applicable law to subordination and priorities

---

[14] *Arm's-Length*, Black's Law Dictionary (11th ed. 2019).
[15] Perhaps if UTIER were allowed to negotiate with PREPA rather than through the Oversight Board it would have managed to reach a consensual agreement. However, much like everything else in PROMESA, the purpose seems to be to steamroll over the people who are truly affected by the process.

29. The Bankruptcy Code provides for distinct types of subordination. Among them, subordination by agreement. A contractual subordination agreement is enforceable "**to the same extent that such agreement is enforceable under applicable non-bankruptcy law**." 11 U.S.C. § 510(a) (emphasis added). A subordination agreement is defined as a "[f]ormal document that acknowledges a party's interest or claim is inferior to that of another party."[16] "Under the Bankruptcy Code, subordination commonly refers only to the priority of distribution. Several federal courts agree and interpret "subordination" in section 510(a) to only implicate the priority scheme in bankruptcy." In re Ocean Blue Leasehold Prop. Ltd. Liab. Co., 414 B.R. 798, 804 (Bankr. S.D. Fla. 2009)(citations omitted). "By subordinating its claim, a subordinated creditor agrees to lower its priority to below that of the senior creditor for purposes of distribution with respect to a particular transaction." Id. at 805. A court can ignore this only "as long as it is fair and equitable and **does not discriminate unfairly**." Law Debenture Tr. Co. of N.Y. v. Tribune Media Co. (In re Tribune Media Co.), 587 B.R. 606, 614 (D. Del. 2018)(emphasis added).

### ii.  Applicable law to Equitable Distribution

30. Section 1129(b) of the Bankruptcy Code permits cramdown of a plan of adjustment if "[it] **does not discriminate unfairly, and is fair and equitable**, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 566 U.S. 639, 641-42 (2012)(emphasis added).

> As to a dissenting class of impaired unsecured creditors, such a plan may be found to be "fair and equitable" only if the allowed value of the claim is to be paid in full or, in the alternative, if "the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,". Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. Lasalle St. P'ship, 526 U.S. 434, 441-42 (1999)(citations omitted). See, also, Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 202 (1988).

---

[16] *Subordination agreement,* BLACK'S LAW DICTIONARY (11th ed. 2019).

31. "By incorporating the fair and equitable standard in § 1129(b) of the Code, Congress codified the 'absolute priority rule,' which provides that absent full satisfaction of a creditor's allowed claims, no member of a class junior in priority to that creditor may receive anything at all on account of their claim or equity interest." Official Comm. of Unsecured Creditors v. Dow Chem. Corp. (In re Dow Corning Corp.), 456 F.3d 668, 672 (6th Cir. 2006)(citations omitted).  On the other hand, the unfair discrimination standard "ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes." In re Tribune Co., 972 F.3d 228, 240 (3d Cir. 2020)(citations omitted). There has been more than one approach to this test. See Id.

32. Nonetheless, it should be noted that "the need for classes to be aligned correctly is a precursor to an effective assessment. A typical refrain in bankruptcy is that many plan disputes in § 1129 begin as misclassifications under § 1122." Id. at 243 (citations omitted). Under Section 1122:

> (a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.
> (b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience. 11 U.S.C. § 1122.

33. This section "does not expressly provide that 'substantially similar' claims may not be placed in separate classes [nor] necessarily prohibit the placement of similar claims in different classes. [However, c]lassification of claims by the debtor **must be reasonable**." In re Unbreakable Nation Co., 437 B.R. 189, 200 (Bankr. E.D. Pa. 2010)(citations omitted)(emphasis added). While it is true that the plan proponent generally has considerable discretion in the classification of claims, "that discretion is tempered by the caveat that a proponent **may not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan**." In re Great Bay Hotel &

Casino, Inc., 251 B.R. 213, 224 (Bankr. D.N.J. 2000)(citations and quotation marks omitted)(emphasis added). "Separate classification of similar claims has been found to be permissible where the classification is offered in good faith, does not foster an abuse of the classification system, and promotes the rehabilitative goals of Chapter 11." Id. (citations omitted). "Whether claims are "substantially similar" under 11 U.S.C. § 1122(a) is a question of fact . . . ." Zante, Inc. v. Delgado (In re Zante, Inc.), 467 B.R. 216, 218 (D. Nev. 2012).

### iii.  UTIER as a creditor and treatment under the Plan

34. UTIER filed a proof of claim for $2,330,016,476.25. **POC No. 52867**. Under the Plan of Adjustment, UTIER has been incorporated into the General Unsecured Claim ("GUC"), including the rejection damages for the CBA. The definition of the GUC expressly excludes the Pension Claim and the Fuel Line Loan Claim. **ECF No. 3296 at 20.** GUCs are treated pursuant to Article X, in Class 7. **Id. at 44.** Exhibit O of the Disclosure Statement includes the estimation of the GUC pool. **ECF No. 3297-15.** UTIER's claims in the estimation is divided into two: (1) "Master Claim – UTIER Damages" asserted in the amount of $1,205,492,250; and (2) "Master Claim – UTIER Grievances" asserted in the amount of $1,124,524,226. **Id.** However, none of the allowed estimations include the damages claim, while the amounts for the grievances are reduced to between $193,879,148 and $264,379,148. **Id.** According to the Disclosure Statement, "[t]he Oversight Board is in the process of evaluating the validity of [the grievance] claim. However, PREPA does not have the ability to satisfy a claim of this magnitude in full, even if only allowed at a small fraction of the asserted amount." **ECF No. 3297 at 88.** Regarding the grievances, the Disclosure Statement also declares they "have been diligently reviewing the claims asserted in the documentation provided [and] identified approximately 26,000 individual grievance claims. Valuing these claims with reference to historical claim valuation data, the Debtor

17

believes the UTIER grievances will be allowed in an Adjusted Estimated Value of approximately $230 million." **Id. at 69.**

### iv. Bond subordination to Current Expenses, which includes UTIER.

35. On January 1, 1974, PREPA and U.S. Bank entered into the *Trust Agreement*, which provides for "the fixing, charging and collecting by [PREPA] of reasonable rates and charges for the use of the services and facilities furnished by the System **sufficient to provide for the payment of the expenses of [PREPA] incurred in the conservation, repair, maintenance and operation of the System** . . . ." **Exhibit 3: *Trust Agreement, ECF No. 118-1 Exhibit A at 8** (*Trust Agreement*) (emphasis added). According to the *Trust Agreement,* recovery for bondholders is contingent on the *Current Expenses* getting paid in full. These Current Expenses are defined as PREPA's "**reasonable and necessary current expenses of maintaining, repairing and operating the System** . . . ." **Trust Agreement at 23** (emphasis added). Among those reasonable and necessary expenses of the administration, operation, and maintenance of PREPA are the salaries and benefits of employees, such as vacation and sick leave, and retirement and pension benefits. Such current expenses are vital for PREPA as the main and sole distributor of the electric service in Puerto Rico. PREPA's employees have been the cornerstone of PREPA's services, keeping the island energized despite the  shambled state of the electric system's infrastructure.

36. Therefore, adequate remuneration and compliance with the CBA is not only reasonable, but necessary to guarantee the permanence and loyalty of PREPA's employees before, during and after the Title III process. Moreover, PREPA's employees have and continue to perform high risk jobs that expose them to danger daily, to ensure the continuity of the operations of the only source of electric energy service in a territory that is suffering its worst fiscal, political and economic crisis in history. The unmistakable language of the

*Trust Agreement* created a priority right for UTIER's members that took the form of a benefit in the priority of their payments as current expenses.

37. The language of the *Trust Agreement* subordinates the payment to bondholders and concurrently creates a priority for *Current Expenses*. Outside of the Title III context, both PREPA and a hypothetical receiver would have had to respect this priority before paying bonds. Therefore, subordination is enforceable. However, the Plan of Adjustment does not respect that priority or subordinate bond payment to the payment of *Current Expenses*, which is impermissible when the Plan of Adjustment also discriminates unfairly against UTIER.

**v. Misclassification of UTIER different from other Current Expense Claimants**

38. Pursuant to the Plan of Adjustment, the Fuel Line Lenders have achieved one of the highest recoveries among creditors. They "will receive (i) Series A Bonds **in the face amount equal to 84% of their Fuel Line Loan Claims**, and (ii) **for the remaining 16% of their Claims, a *pro rata* share of the Series B Bonds available** . . . ." **ECF No. 3297 at 278** (emphasis added). This treatment is a direct result of the Fuel Line Lenders' PSA "which generally resolves the Fuel Line Lenders' claims **and asserted priority treatment as 'Current Expenses' under the Trust Agreement** . . . ." **Id.** (emphasis added). The Fuel Line Lenders are the only recipients of Series A bonds. This treatment clearly complies with the subordination of bond payments to the payment of *Current Expenses,* to the extent that the Fuel Line Lenders have asserted this claim.[17]

39. On the other hand, while SREAEE does not receive the same treatment as the Fuel Line Lenders, it is classified separately from other unsecured creditors for similar reasons as the Fuel Line Lenders. Both parties assert *Current Expense* status. UTIER does as well.

---

[17] UTIER does not adopt any position at this time regarding whether the Fuel Line Lenders are in fact entitled to *Current Expense* treatment. This argument is limited to the unfair exclusion of UTIER from the treatment of a *Current Expense* claimant. UTIER serves right to raise any and all arguments that the Fuel Line Lenders are not *Current Expense* claimants.

40. In the contentious restructuring support agreement process, UTIER joined SREAEE's arguments of *Current Expense* status based on the previously described language in the *Trust Agreement.* Based on the same language that the Fuel Line Lenders and SREAEE rely on to distinguish their claims, UTIER should be classified separately.

41. Creditor classes need to be aligned correctly as a precursor to an effective assessment of whether a plan of adjustment complies with the equitable standards of the Bankruptcy Code. See In re Tribune Co., 972 F.3d at 243. While there is no express requirement for substantially similar claims to be placed in different classes, it must be reasonable to do so. In re Unbreakable Nation Co., 437 B.R. at 200. Classification must be made in good faith, without abusing the system. In re Greate Bay Hotel & Casino, Inc., 251 B.R. at 224.

42. Any argument that excludes labor expenses from operating expenses requires no response. It is impossible to separate the cost of labor from the cost of administrating, operating, and maintaining any business, while other expenses are debatable, such as perhaps financing of oil. As such, it deserves treatment that is substantially similar to Fuel Line Lenders, and it deserves to be classified separately just like SREAEE. The distinction is **unreasonable.**

## C. THE PLAN OF ADJUSTMENT IS CONTRARY TO THE LAW TO THE EXTENT THAT IT PREEMPTS POLICE POWERS OF PUERTO RICO AND ANY LAW THAT CONFLICTS WITH ANY PART OF THE PLAN.

43. As previously stated, one of the requirements for confirmation is that "the debtor is not prohibited by law from taking any action necessary to carry out the plan . . . ." 48 U.S.C. § 2174(b)(3). However, the Plan of Adjustment violates the preemption doctrine.

### i.   Applicable law for preemption.

44. Rooted in the Supremacy Clause of the United States Constitution, Congress has the power to preempt state law. See Arizona v. United States, 567 U.S. 387, 398-99 (2012). Thus, preemption is the name given to "certain circumstances, [where] federal law will take precedence over state regulation." Goya de P.R., Inc. v. Santiago, 59 F. Supp. 2d 274, 279

(D.P.R. 1999) (citations omitted).[18] The Supreme Court has stated that preemption occurs in three circumstances: (1) express preemption, where there is an express provision of preemption; (2) field preemption, where Congress intended federal law to occupy the field; and (3) conflict preemption, where there is a direct conflict between state and federal law. See Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372 (2000).  See, also, Allied Fin., Inc. v. WM Capital Partners 53, LLC (In re Allied Fin., Inc.), 572 B.R. 45, 52-53 (Bankr. D.P.R. 2017) (citations omitted). See, also, Capron v. Office of the AG of Mass., 944 F.3d 9, 20-21 (1st Cir. 2019). The Supreme Court stated that a preemption question must be guided by two cornerstones:

> **First, the purpose of Congress is the ultimate touchstone in every pre-emption case. Second,** in all pre-emption cases, and particularly in those in which Congress has legislated in a field which the States have traditionally occupied, we **start with the assumption** that the historic police  powers of the States **were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.** Wyeth v. Levine, 555 U.S. 555, 565 (2009) (citations, quotation marks, ellipsis and brackets omitted)(emphasis added).

45. As such, "[p]reemption is a 'strong medicine,' that is not casually to be dispensed." Assured Guar. Corp. v. Garcia-Padilla, 214 F. Supp. 3d 117, 125 (D.P.R. 2016) (citations and quotation marks omitted). "It has long been the case that [the courts] sole task is to determine the intent of Congress,  and in so doing we have been mindful that Congress does not cavalierly pre-empt state-law causes of action . . . ." Blue Cross & Blue Shield v. AstraZeneca Pharm. LP (In re Pharm. Indus. Average Wholesale Price Litig.), 582 F.3d 156, 173 (1st Cir. 2009) (citations and quotation marks omitted).

46. Thus, Courts should **presume that preemption does not occur, unless the clear and manifest purpose of Congress is shown**. See Id "When a challenge to a state law is raised on the basis of preemption, **a presumption exists that the state statute is valid**." Allied

---

[18] Black's Law Dictionary defines preemptive effect as the principle "that a federal law can **supersede or supplant** any **inconsistent** state law or regulation." *Preemption*, BLACK'S LAW DICTIONARY (11th ed. 2019)(emphasis added).

Fin., Inc., 572 B.R. at 53 (citations omitted)(emphasis added). This means that the burden of establishing the preemptive effect of a federal statute rests on the movant.

47. PROMESA contains a supremacy clause which states "[t]he **provisions of this chapter** shall prevail over any general or specific provisions of territory law, State law, or regulation that is **inconsistent with this chapter.**" 48 U.S.C. § 2103 (emphasis added). However, **even where there is a finding of express preemption,** the courts **"must,** nonetheless, identify the domain **expressly pre-empted by the statutory language** . . . ." Medtronic, Inc. v. Lohr, 518 U.S. 470, 484 (1996) (emphasis added)(citations and quotation marks omitted). This provision cannot be interpreted in such a broad manner as to preempt any and all state laws. PROMESA expressly preempts any state law that is inconsistent with its own terms. Therefore, before a state law can be deemed preempted by PROMESA, there must be an analysis regarding whether and how that state law is **inconsistent with PROMESA and its provisions**, which is the domain expressly preempted. Id.

48. Furthermore, PROMESA and the Bankruptcy Code have the effect of field preemption, but it is **with respect to the restructuring proceedings for municipalities and territories**. See Puerto Rico v. Franklin Cal. Tax-Free Tr., 579 U.S. 115 (2016); Mass. Div. of Emp. & Training v. Bos. Reg'l Med. Ctr., Inc. (In re Bos. Reg'l Med. Ctr., Inc.), 291 F.3d 111 (1st Cir. 2002). Nonetheless, the preemptive effect remains subject to the same analysis of the doctrine stated above. See, for example, Pacific Gas & Elec. Co. v. California ex rel. Cal. Dep't of Toxic Substances Control, 350 F.3d 932, 937 (9th Cir. 2003).

49. While the Bankruptcy Code and PROMESA provide that a plan of adjustment may preempt non-bankruptcy laws, this is also subject to the preemption doctrine analysis and **refers specifically to claims and obligations arising from the non-bankruptcy laws rather than the laws themselves**. See In re Fed.-Mogul Glob., 684 F.3d 355, 382 (3d Cir. 2012).

22

50. For example, in <u>Irving Tanning Co. v. Me. Superintendent of Ins. (In re Irving Tanning</u> <u>Co.)</u>, 496 B.R. 644 (B.A.P. 1st Cir. 2013), the First Circuit BAP adopted the position that 11 U.S.C. § 1123(a)(5) can preempt state law, but eventually concluded that the preemptive scope of this section did not extend to the laws in question, held that the proposed plan violated applicable non-bankruptcy law and did not confirm. In this case, the BAP set out a comprehensive analysis of preemption in these cases.

> **However,** for this very reason, § 1123(a)(5) also **reads like a debtor's license to rewrite the law to its liking—in ways far outside the comfort zone inhabited by the unobjectionable staples of chapter 11 plans and, more to the point, <u>beyond what Congress can plausibly have intended.</u>** Freedom from regulation, from taxation, from the laws of property and contract: these and many other horrible imaginings, **preemptive effects <u>that Congress cannot plausibly have intended</u>, might be justified as conferring an advantage needed to implement a plan.** Therefore, when they have acknowledged the preemptive effect of § 1123(a)(5), **courts have routinely hastened to add, as do we, that it is not unbounded.**  <u>Irving Tanning Co.</u>, 496 B.R. at 663 (citations and quotation marks omitted)(emphasis added).

51. Therefore, the First Circuit BAP concluded that even when express preemption operates, including the preemption of Section 1123, a traditional preemption analysis is necessary to determine the scope of preemption. The First Circuit BAP's analysis can be summarized as follows: (1) First, a plan must comply with applicable non-bankruptcy laws that are not preempted by the Bankruptcy Code. <u>See Id.</u> at 660. Second, where there is preemption, we must determine its scope and limits. The preemption should be limited to what is **adequate and sufficient** for the implementation of the Plan, no more or less. Therefore, the preemptive scope cannot be insufficient **nor superfluous**. <u>See Id.</u> at 663-64. Third, there are certain situations where the preemptive effect cannot operate. For example: (1) state laws concerned with protecting public health, safety, or welfare, cannot be preempted; and (2) state laws that define and protect the property rights of third parties cannot be preempted. <u>See Id.</u> at 64. This list is not exhaustive.

### ii.  Laws preempted in the Plan of Adjustment

23

52. Pursuant to Schedule D of the Plan of Adjustment, the following are some of the "Main

Statutes Preempted by PROMESA":

**Statutory Provisions Concerning Issuance and Terms of Bonds**
1. 22 L.P.R.A. § 195a-1(o), as amended by Act 17-2019, to require PREB
approval of bond issuances under certain circumstances.
2. Act 101-2020 (providing AAFAF certain approval rights over bond issuances
by Puerto Rico instrumentalities)

**Statutes Concerning Means of Implementation of the Plan**
1. 22 L.P.R.A. § 195a-1(u), as amended by Act 17-2019, to require PREB
approval for, among other things, the sale or transfer of PREPA's property, and
may include limitations on the creation of subsidiaries or trusts, or the taking of
any actions or measures as are necessary or convenient to exercise PREPA's
power granted under its enabling act.

· · · · · · · ·

**Statutes enacted prior to PROMESA concerning the Restructuring of
PREPA's debt**
1. 22 L.P.R.A § 1054x-1 (establishing the procedure by which the PREB had to
determine and review the transition charges and adjustment mechanisms).
2. 22 L.P.R.A. § 1054b(q) (to the extent, if any, it provides PREB certain
approval review and approval over PREPA bond issuances under Title III).
**ECF 3296-4 at 2** (bold in the original)(footnotes omitted).[19]

53. Most of these "preempted statutes" refer specifically to the powers of Puerto Rico agencies

that are **not** the Title III Debtor in this case. For instance, Schedule D expects to preempt

any instance of Puerto Rico law that requires PREB approval before PREPA can act. It also

eliminates the corresponding processes for the approval or rates and transition charges. It

also hopes to deprive AFFAF from its approval roles.

54. Moreover, the Plan of Adjustment contains preemption clauses in other areas. Under

Article VI, regarding the treatment of the pension claims, the Plan of Adjustment states:

All provisions of the Commonwealth Constitution, Commonwealth
statutes, executive orders, rules, regulations, and policies that create, require, or
enforce employee pension and other pension-related benefits that are modified
and/or preserved in whole or in part herein, to the extent inconsistent with the
treatment of Allowed Pension Claim hereunder, including any provisions that

---

[19] In the footnotes, the Oversight Board states that these statutes are preempted only "for the reasons and to the
extent set forth in . . . Proposed Findings of Fact and Conclusions of Law." ("FFCL") **ECF 3296-4 at 2 f.n. 1.** As
the FFCL are not yet part of the docket, UTIER will make its arguments relying only on the Plan of Adjustment
and the Disclosure Statement, reserving the right to supplement these arguments with the information provided in
the FFCL.

would prohibit the enrollment of Active PREPA ERS Participants and subsequently hired employees of PREPA in the defined contribution plan for Commonwealth employees under Act 106-2017 as set forth in Article XVIII, are preempted as inconsistent with PROMESA. **ECF No. 3296 at 42**.

55. As such, the Oversight Board has included an extremely broad preemption clause that applies to just about any text related to PREPA's pension obligations without even identifying what those are.

### iii.  Analysis of the laws and the lack of preemption

56. As previously discussed, preemption takes place when a federal law displaces a state law. See Goya, 59 F. Supp. 2d at 279. There are three kinds of preemption: (1) express preemption; (2) field preemption; and (3) conflict preemption. See Crosby, 530 U.S. at 372. **However, "[p]reemption is a 'strong medicine,' that is not casually to be dispensed."** Garcia-Padilla, 214 F. Supp. 3d at 125 (citations and quotation marks omitted)(emphasis added). There is a presumption **against** preemption. Blue Cross & Blue Shield, 582 F.3d at 173; Allied Fin., Inc., 572 B.R. at 53. Through the Plan of Adjustment, the Oversight Board promotes a casual approach to preemption that is incompatible with the doctrine. However, it has the burden of establishing the preemptive effect of PROMESA on these specific laws.

57. The laws in question are not laws that create financial obligations. They are laws that relate directly to the police powers of PREB and AFFAF. These agencies have been delegated the powers to supervise PREPA, based on their respective expertise. PREB, specifically, is a key actor for PREPA's restructuring because it is the entity with the most specialized knowledge of the utility and its operators. We have to assume that these police  powers are not preempted. Wyeth, 555 U.S. at 565. PROMESA's express preemption clause cannot be interpreted so broadly as to allow the Oversight Board to eliminate them. The scope of PROMESA's supremacy clause is only for laws that are inconsistent with it. See 48 U.S.C. § 2103; Medtronic, 518 U.S. at 484. Therefore, before the laws in Schedule D can be deemed preempted by PROMESA, there must be an analysis regarding whether and how

25

they are **inconsistent with PROMESA**. It should be noted that **nothing** in these laws is inconsistent with PROMESA.

58. While it is true that a plan of adjustment may preempt non-bankruptcy laws, this is also subject to the preemption doctrine analysis and **refers specifically to claims and obligations arising from the non-bankruptcy laws rather than the laws themselves**. See In re Fed.-Mogul Glob., 684 F.3d at 382. The laws included in Schedule D cited above **do not create claims or obligations.** They provide government agencies with powers that were delegated by the Legislative Assembly. Allowing this preemption would be akin to letting the Oversight Board rewrite the laws to its liking, which is "**far outside the comfort zone inhabited by the unobjectionable staples of [plans of adjustment] and, more to the point, beyond what Congress can plausibly have intended."** In re Irving Tanning Co., 496 B.R. at 663 (emphasis added). The Plan of Adjustment still has to comply with non-bankruptcy law. See Id. at 660. For example, state laws concerned with protecting public health, safety, or welfare, cannot be preempted. See Id. at 64. This definitely includes all laws related to PREB, making it the regulator responsible for PREPA.

59. However, in an attempt to circumvent the requirements of PROMESA, particularly obtaining the necessary regulatory approvals under Section 314(b)(5) as discussed below, the Oversight Board executes an improper preemption of state laws. With no preemption analysis to speak of, the Oversight Board declares PREB's powers preempted and creates the legally inconsistent situation where it can decide not to comply with PROMESA's requirements for confirmation by eliminating laws. This interpretation undermines the coherence and predictability of the legal and regulatory framework surrounding PREPA's rates, while allowing the Oversight Board to execute powers it was not granted under PROMESA.

60. In view of the foregoing, the preemption of the statutes is contrary to law and unwarranted. If anything, the Oversight Board's "preemption" reflects its **lack of enabling legislation for the implementation of the Plan of Adjustment**, as discussed below.

### D. THE PLAN OF ADJUSTMENT IS CONTRARY TO LAW TO THE EXTENT THAT IT IMPOSES A RATE WITHOUT FOLLOWING THE PROCEDURES OF PUERTO RICO LAW.

61. As previously stated, one of the requirements for confirmation is that "the debtor is not prohibited by law from taking any action necessary to carry out the plan . . . ." 48 U.S.C. § 2174(b)(3). However, the Plan of Adjustment violates the requirements of ratemaking in Puerto Rico. Additionally, pursuant to Section 314(b) of PROMESA, one of the requirements for confirmation of a Plan of Adjustment is that it comply with the "the provisions of title 11, made applicable to a case under [PROMESA]." 48 U.S.C. § 2174(b)(1). This includes, for example, Section 1129(a)(6) of the Bankruptcy Code which states that "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor **has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval**." 11 U.S.C. § 1129(a)(6)(emphasis added). Moreover, one of the requirements for confirmation is that the Oversight Board obtains the necessary enabling legislation. That means "**any legislative, regulatory, or electoral approval necessary under applicable law in order to carry out any provision of the plan**." See Id. § 2174(b)(5)(emphasis added).

#### i.   Applicable law of electric utility ratemaking and setting

62. Pursuant to the Puerto Rico law, the PREB has the duty to strive for "the goal of reducing and stabilizing energy costs permanently, controlling volatility in the price of electricity in Puerto Rico . . . ." P.R. Laws ann. tit. 22 § 1054b(f). It establishes the general obligation of electric power service companies to ensure that "[e]very rate or charge required or collected for any service provided or to be provided, and the rules adopted by every electric power

service company regarding the provision of such services **shall be just, reasonable**, and nondiscriminatory[.]" Id. § 1054t (b)(emphasis added).

63. Additionally, Puerto Rico's energy public policy includes a twenty cent ($0.20) per kilowatt-hour goal, Id. § 1141d(1)(a), and the policy "[t]o guarantee that the cost of the electric power service in Puerto Rico be affordable, just, reasonable, and nondiscriminatory for all consumers in Puerto Rico." Id. It also reiterates that rates should be "just and reasonable, as well as consistent with sound fiscal and operational practices which result in a reliable service **at the lowest reasonable cost**[.]" Id. (emphasis added). The initial objectives of the law also include: "To establish the elements necessary for the People of Puerto Rico to attain their goal of having a new Electrical System with **rates below twenty cents per kilowatt-hour ($0.20/ kWh)** and clean, modern, and reliable energy which shall **serve as the basis for the Island's sustainable economic development**." Id. § 1141e (emphasis added). This indicates that, under the applicable ratemaking process, the PREB is tasked with setting the **lowest** possible rate to keep the operations.

64. In view of the foregoing, PREB was charged with the rate review process. Id. § 1054x(a). As part of its obligations, the PREB "**shall** ensure that all rates are **just and reasonable** and **consistent with sound fiscal and operational practices** that provide for a **reliable and adequate service** at **the lowest reasonable cost**." Id. (emphasis added). "[PREB] shall be in charge of **following the process established herein to review and approve the electric power service companies' proposed rate reviews**." Id. § 1054x(a)(emphasis added). The established process states that, unless reviewed by PREB, rates shall remain in effect for PREPA and its successors in accordance with law. Id. § 1054x(b).

> During any rate review process, **the burden of proof shall lie on the requesting electric power service company** to show that the proposed rate is just and reasonable, consistent with sound fiscal and operational practices that provide for a safe and adequate service at the lowest reasonable cost. The requesting electric power service company shall submit all the information requested by the [PREB] . . . . Id. (emphasis added).

28

65. For a rate modification, Puerto Rico law states that the request **shall** be filed with PREB.

Id. § 1054x(c). "The request shall state the grounds for the modification, the effect of such

modification on the revenues and expenditures of the requestor, and any other information

requested by the [PREB] through regulations or resolution." Id.

> Any modification to a rate proposed, whether to increase or decrease the same,
> **shall** undergo a discovery and a **public hearing process** to be held by the
> [PREB] to determine whether the proposed change is just and reasonable and
> consistent with sound fiscal and operational practices that provide for a reliable
> and adequate service, at the lowest reasonable cost. The [PREB] **shall** provide
> an opportunity to **allow the participation of ICPO, the Energy Public Policy
> Program, the citizens, and interested parties in the process**. Id. (emphasis
> added).

66. Moreover, upon the conclusion of this process, PREB will issue its determination which

"**shall** be duly grounded and comply with all the safeguards of the due process of law

applicable to the final determinations of administrative agencies." Id. § 1054x(f). Puerto

Rico law also establishes the rate approval process for the imposition of transition charges,

which requires PREB approval. Id. § 1054x-1. Additionally, PREB has the authority to

approve restructuring bond issuances. Id.

### ii. Legacy Charge in the Plan of Adjustment

67. According to the Disclosure Statement, "the Oversight Board asserts that **PREB is
required under Puerto Rico law to approve** the Legacy Charge rate increase, provided,
that PREPA with the approval of PREB will be able to amend the Legacy Charge in an
economically neutral manner . . . ." **ECF No. 3297 at 52** (emphasis added)**. Among the
Conditions Precedent for confirmation is that this Court enters an order "Determining that
PREB **is required to approve** the Legacy Charge as a rate, fee, and/or charge necessary to
guarantee that Reorganized PREPA meets its obligations to holders of New Bonds . . . ."
**ECF No. 3297 at 342** (emphasis added). It also includes "PREB shall have provided any
required approval of the rates, fees, and charges, including the Legacy Charge, necessary

to guarantee that Reorganized PREPA meets its obligations to holders of New Bonds."

**ECF No. 3297 at 344-345.** The Oversight Board expects this Court to force the PREB to

approve the Legacy Charge in order to fund the Plan of Adjustment. However, it does not

have, nor has it stated it would formally seek that approval.

### iii. The Plan of Adjustment requires a rate increase without regulatory approval.

68. In view of the foregoing, to the extent that the Plan of Adjustment imposes a Legacy Charge

on the people of Puerto Rico, it forces PREPA to violate Puerto Rico law. The Legacy

Charge has not been the subject of PREB approval. In the alternative, the Plan lacks

enabling legislation and/or regulatory approval. While the Oversight Board includes

language to the effect of conditioning the Legacy Charge on PREB approval in the Plan, it

simultaneously asks this Court to force PREB to authorize the Legacy Charge and proposes

to preempt PREB's powers to approve these charges. Moreover, it does not provide any

alternative in the case that the Legacy Charge is not approved by PREB. This is also an

issue of feasibility, as the Legacy Charge is the only revenue that the Oversight Board

proposes for the payment of the distributions. Without PREB approval, the Plan of

Adjustment simply cannot be confirmed.

## E. THE PLAN OF ADJUSTMENT IS NOT FEASIBLE.

69. As previously stated, under Section 314(b), In addition to complying with existent law and

obtaining enabling legislation, PROMESA requires the Oversight Board to present a Plan

that is **feasible**. 48 U.S.C. § 2174(b)(6).

### i. Applicable Definition of Feasibility

70. This Court has provided a specific definition of feasibility under PROMESA:

> The Court has an independent duty to determine feasibility and to make
> specific findings of fact. **Under PROMESA, a plan of adjustment must be
> supported by financial projections that are "reasonable and demonstrate a
> probability that the debtor will be able to satisfy its obligations under the
> Plan."** Additionally, as in [C]hapter 9, a PROMESA debtor, as a government
> entity, must show that it is "probable that the debtor can both pay post-petition

debt and provide future public services at the level necessary to its viability as a territory." The core inquiry has been articulated as follows: "**Is it likely that the debtor, after the confirmation of the Plan of Adjustment, will be able to sustainably provide basic municipal services to the citizens of the debtor and to meet the obligations contemplated in the Plan without the significant probability of a default?**" <u>In re Fin. Ove rsight & Mgmt. Bd.</u>, 637 at 302-03(citations and brackets omitted)(emphasis added).

71. As such, feasibility is a two prong inquiry: (1) **whether the debtor will be able to satisfy its obligations under the Plan**; and (2) **whether the debtor will be able to provide the services it owes to the public**. <u>Id.</u>

### ii.  The Plan of Adjustment will not allow PREPA to provide adequate electrical service

72. The Plan of Adjustment includes a Legacy Charge for the purpose of ensuring "sufficient cash flow required for PREPA's debt service on the New Bonds issued under the Plan." **ECF No. 3296-2 at 2.** It consists of "all applicable Flat Fees and Volumetric Charges set at the levels for each customer class set forth . . . ." **ECF No. 3296-2 at 2.** Thus, the Legacy Charge includes a Flat Fee, "incremental to any existing PREPA rates and fees . . . [which] is not linked to a customer's power consumption, but rather is assessed for each non-exempt customer being connected to the PREPA electricity grid." **ECF No. 3296-2 at 3.**  It also includes a Volumetric Charge "incremental to any existing PREPA rates and fees . . . based on each customer's monthly consumption of electricity." **ECF No. 3296-2 at 3.** This is assessed on the basis of cents per kilowatt hour (c/kWh) and depends on whether the threshold of 500 kWh. **ECF No. 3296-2 at 3.** Pursuant to Annex 1 of Schedule B of the Plan of Adjustment, the numbers vary depending on the classification of the customer sector. **ECF No. 3296-2 at 5.** Historically, PREPA has been unable to execute the necessary operational reforms and transformations to provide reliable electricity. The system is currently unreliable and unaffordable, with rates over 26 cents per kWh, which is more than

twice the average rate in U.S. jurisdictions.[20] Imposing additional rate increases will continue to create obstacles for the transformation of PREPA,[21] has an adverse effect on electricity demand and will inevitably lead to another crisis in debt service payments. **Sanzillo Opening at 14-16**.

73. "The more that rates are raised above what is economically sustainable, the more this will replicate all of the same dynamics described above that have encouraged the system to cut operating needs and reduce capital investment." **Id. at 20**. To the extent that the Legacy Charge makes it impossible for PREPA to raise sufficient revenues to meet its debt obligations and invest in the necessary capital expenditures, it is unfeasible pursuant to the first prong of the feasibility test. That is, the Plan of Adjustment and the Legacy Charge impede PREPA from providing the electric service it owes the public. Moreover, it suspends any possibility of progress for the transition to renewables which would benefit PREPA's customers by creating a reliable and affordable system looking to the future.[22]

74. The Plan of Adjustment underestimates future operating costs, particularly with regard to fuel. Thus, rates will increase regardless of the Legacy Charge, leading to higher elasticity that negatively impact revenue and PREPA's ability to provide service.

### iii.  The Plan of Adjustment is not supported by reasonable financial projections and will not allow PREPA to satisfy its obligations under the Plan.

75. Moreover, the calculation of the Legacy Charge and the sustainability of the Plan of Adjustment are based on unrealistic assumptions in the 2022 Certified Fiscal Plan ("Fiscal

---

[20] It should be noted this is way above the threshold cost that has been set forth by other experts such as Andrew Wolfe and José Alameda. **Exhibit 4: Dr. José I. Almeda Opening Report**, **ECF 3427-1 at 38-39.**

[21] UTIER **does not** refer to transformation in the sense the Oversight Board defines it. True transformation is the transition to renewable energy, through a comprehensive public model of distributed solar grids.

[22] Moreover, the Plan of Adjustment does not include any metrics or definition of what it means to be a "functioning utility" as Exhibit P names it. **ECF No. 3297-16 at 4.** In his deposition, Mr. Zarakas acknowledged that reliability targets in the T&D OMA have not been met and that the lack of improvement in reliability in the last few years might be due to lack of capital and operational resources. However, this was not addressed in developing the Legacy Charge and deciding if it would allow PREPA to provide functional service. **Exhibit 5: Transcript of William Zarakas Deposition at 287-88.**

Plan").[23] **Sanzillo Opening at 6-8.** "All of these assumptions combine to produce an expense forecast and therefore a forecasted rate that is unreasonably low, presenting a more optimistic picture than is warranted of rate affordability, even in the absence of any debt service." **Sanzillo Opening at 8**.

76. However, even under these unrealistic assumptions, the Plan of Adjustment is not feasible. While the Fiscal Plan establishes a "sustainable" range of debt levels from $2.44156 billion to $5.61 billion, the Plan of Adjustment issues $5.68 billion for Legacy Debt and $2.425 billion for capital expenditures.[24] The total of new debt in the Plan of Adjustment amounts to $8.11, which is significantly higher than the range the Oversight Board declared sustainable in the Fiscal Plan. ." **Sanzillo Opening at 8**. Thus, the Plan of Adjustment issues new debt beyond what would be feasible under the Oversight Board's assumptions.

77. In view of the foregoing, the Plan of Adjustment is not feasible for the payment of its obligations. The Legacy Charge is the only source of revenue for the payment of legacy debt, while the current rates may not cover the necessary capital expenditures. Moreover, PREPA will not have reasonable market access to meet those capital needs. **Sanzillo Opening at 13**. This is the result of the subordination of future debt to the new bonds, as well as the non-default provisions of said bonds. **Sanzillo Opening at 14, 22-24**. As such, the second prong of feasibility is not met either. "A poorly managed, expensive, and unreliable grid stands no chance of producing a stable revenue stream for bondholders and attempting to impose a Legacy Charge on this system will only exacerbate the dysfunction." **Sanzillo Opening at 22**.

## V. CONCLUSION

[23] It should be noted that in the Claim Estimation Hearings, the Oversight Board revealed that new LUMA data may result in a substantial change in the certified fiscal plan. This will likely align with Mr. Sanzillo's critique of the unrealistic assumptions described herein. Thus, UTIER reserves every right to amend and supplement this filing should subsequent amendments be filed.

[24] This amount which represents unmet capital needs is almost certainly too low. A more accurate number would the $6.4 billion as estimated by Puerto Rico's Department of Housing. **Sanzillo Opening at 11.**

78. In conclusion, the Plan of Adjustment is not confirmable under Section 314(b) of PROMESA. As it stands, the Plan of Adjustment does not meet Section 314(b)(3), (5) or (6). Additionally, it does not comply with the applicable sections of the Bankruptcy Code. The confirmation of this Plan of Adjustment will spell disaster for the people of Puerto Rico and prejudice UTIER in ways that are unbecoming of the equitable and fair policies of bankruptcy.

<div align="center">

**RELIEF REQUESTED**

</div>

**WHEREFORE,** in view of the foregoing, the Court should deny the confirmation of the Plan of Adjustment and instruct the Oversight Board to return to the drawing board, with the idea of helping Puerto Rico emerge from its fiscal and energy crisis, without discriminating against its most vulnerable creditors.

**WE HEREBY CERTIFY** that on this same date we electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all participants and Standard Parties. A courtesy copy of this Motion will be delivered to the Court by email to SwainDPRCorresp@nysd.uscourts.gov as provided in *First Amended Standing Order.*

In Ponce, Puerto Rico, this 12th day of June 2023.



BUFETE EMMANUELLI, C.S.P.
P.O. Box 10779
Ponce, Puerto Rico 00732
Tel.: 787-848-0666
Fax: 787-841-1435

*/s/ Rolando Emmanuelli-Jiménez*
Rolando Emmanuelli-Jiménez, Esq.
USDC: 214105
rolando@emmanuelli.law

*/s/ Jessica E. Méndez-Colberg*
Jessica E. Méndez-Colberg, Esq.
USDC: 302108
jessica@emmanuelli.law

*/s/ Zoé C. Negrón-Comas*
Zoé C. Negrón-Comas, Esq.
USDC: 308702
zoe@emmanuelli.law

*Counsel to UTIER*