Page 1

1

2       IN THE UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF PUERTO RICO
3       Case No. 17-BK-3283-LTS
        -----------------------------------------x
4       In re:
5       THE FINANCIAL OVERSIGHT AND MANAGEMENT
        BOARD FOR PUERTO RICO,
6
        as representative of
7
        THE COMMONWEALTH OF PUERTO RICO, et al.,
8
                             Debtors.
9       -----------------------------------------x
        Case No. 17-BK-4780-LTS
10      -----------------------------------------x
        In re:
11
        THE FINANCIAL OVERSIGHT AND MANAGEMENT
12      BOARD FOR PUERTO RICO,
13      as representative of
14      THE PUERTO RICO ELECTRIC POWER AUTHORITY,
15                           Debtor.
        -----------------------------------------x
16                        May 4, 2023
                          9:38 a.m.
17
18          VIDEOTAPED DEPOSITION of WILLIAM
19      ZARAKAS, held at the offices of Kramer
20      Levin Naftalis & Frankel LLP, located at
21      1177 Avenue of the Americas, New York, New
22      York 10036, before Anthony Giarro, a
23      Registered Professional Reporter, a
24      Certified Realtime Reporter and a Notary
25      Public of the State of New York.

1
2     A P P E A R A N C E S :
3
4     KRAMER LEVIN NAFTALIS & FRANKEL LLP
       Attorneys for the Ad Hoc Group of PREPA
5      Bondholders
       1177 Avenue of the Americas
6      New York, New York 10036
7     BY:  NATAN HAMERMAN, ESQ.
            (via Zoom)
8           ALICE BYOWITZ, ESQ.
            (via Zoom)
9
      KRAMER LEVIN NAFTALIS & FRANKEL LLP
10     Attorneys for the Ad Hoc Group of PREPA
       Bondholders.
11     2000 K Street NW, 4th Floor
       Washington, D.C. 20006
12
      BY:  MATTHEW M. MADDEN, ESQ.
13          mmadden@kramerlevin.com
            JANE TOMIC, ESQ.
14          jtomic@kramerlevin.com
            SHIHKA GARG, ESQ.
15          (via Zoom)
            MARK RUSSELL, ESQ.
16          (via Zoom)
17    CADWALADER, WICKERSHAM & TAFT LLP
       Attorneys for Assured Guaranty Corp. and
18     Assured Guaranty Municipal Corp
       200 Liberty Street
19     New York, New York 10281
20    BY:  WILLIAM J. NATBONY, ESQ.
            bill.natbony@cwt.com
21          THOMAS J. CURTIN, ESQ.
            thomas.curtin@cwt.com
22          (via Zoom)
            ZACK SCHREIBER, ESQ.
23          zack.schreiber@cwt.com
24
25

```
 1
 2      A P P E A R A N C E S (Cont.)
 3
 4      QUINN EMANUEL URQUHART & SULLIVAN, LLP
         Attorneys for Syncora Guarantee, Inc.
 5       51 Madison Avenue, 22nd Floor
         New York, New York 10010-1603
 6
        BY:  KATE SCHERLING, ESQ.
 7           katescherling@quinnemanuel.com
 8      WEIL, GOTSHAL & MANGES LLP
         Attorneys for National Public Finance
 9       Guarantee Corporation
         1395 Brickell Avenue, Suite 1200
10       Miami, Florida 33131
11      BY:  COREY BRADY, ESQ.
             corey.brady@weil.com
12           (via Zoom)
13      PAUL HASTINGS LLP
         Attorneys for Official Committee of
14       Unsecured Creditors
         200 Park Avenue
15       New York, New York 10166
16      BY:  LUC A. DESPINS, ESQ.
             lucdespins@paulhastings.com
17           SHLOMO MAZA, ESQ.
             (via Zoom)
18           ALEXANDER BONGARTZ, ESQ.
             (via Zoom)
19
20
21
22
23
24
25
```

1
2     A P P E A R A N C E S (Cont.)
3
4     PAUL HASTINGS LLP
       Attorneys for Official Committee of
5      Unsecured Creditors
       N.E. 100, 1170 Peachtree Street NE
6      Atlanta, Georgia 30309
7     BY:   WILLIAM WHITNER, ESQ.
            (via Zoom)
8           ERIC STOLZE, ESQ.
            (via Zoom)
9
10    PAUL HASTINGS LLP
       Attorneys for Official Committee of
11     Unsecured Creditors
       2050 M Street NW
12     Washington, D.C. 20036
13    BY:   NICHOLAS A. BASSETT, ESQ.
            nicholasbassett@paulhastings.com
14
15
      SHEPPARD MULLIN RICHTER & HAMPTON LLP
16     Attorneys for the Ad Hoc Group of FGIC
       Noteholders
17     30 Rockefeller Plaza
       New York, New York 10112
18
      BY:   LAWRENCE LAROSE, ESQ.
19          llarose@sheppardmullin.com
            BENJAMIN GILBERT, ESQ.
20          bogilbert@sheppardmullin.com
21
22
23
24
25

Page 5

1
2      A P P E A R A N C E S (Cont.)
3
4
5      O'MELVENY & MYERS LLP
        Attorneys for AAFAF
6       7 Times Square
        New York, New York 10036
7
       BY:  GABRIEL OLIVERA, ESQ.
8           golivera@omm.com
            MARIA BENITES, ESQ.
9           mbenitesgutierrez@omm.com
            ELIZABETH McKEEN, ESQ.
10          (via Zoom)
            MARIA DiCONZA, ESQ.
11          (via Zoom)
12
       O'MELVENY & MYERS LLP
13      Attorneys for AAFAF
        610 Newport Center Drive, 17th Floor
14      Newport Beach, California 92660
15     BY:  ASHLEY PAVEL, ESQ.
            apavel@omm.com
16          (via Zoom)
17
       PROSKAUER ROSE LLP
18      Attorneys for the Financial Oversight and
        Management Board as Representative for
19      PREPA
        2029 Century Park E, Suite 2400
20      Los Angeles, California 90067
21     BY:  MICHAEL FIRESTEIN, ESQ.
            mfirestein@proskauer.com
22          (via Zoom)
23
24
25

Page 6

```
 1
 2     A P P E A R A N C E S (Cont.)
 3
 4
       PROSKAUER ROSE LLP
 5      Attorneys for the Financial Oversight and
        Management Board as Representative for
 6      PREPA
        Eleven Times Square
 7      New York, New York 10036
 8     BY:  MARGARET A. DALE, ESQ.
             EHUD BARAK, ESQ.
 9           NICOLE SWANSON, ESQ.
             (via Zoom)
10           MATTHEW SKRZYNSKI, ESQ.
             (via Zoom)
11           DANIEL DESATNIK, ESQ.
             (via Zoom)
12           JEFFREY LEVITAN, ESQ.
             (via Zoom)
13           JULIA ALONZO, ESQ.
             (via Zoom)
14           ELLIOT STEVENS, ESQ.
             (via Zoom)
15
16     PROSKAUER ROSE LLP
        Attorneys for Financial Oversight and
17      Management Board as Representative for
        PREPA
18      1001 Pennsylvania Avenue NW, Suite 600
        Washington, D.C. 20004
19
       BY:  MEE RINA KIM, ESQ.
20           PAUL POSSINGER, ESQ.
             (via Zoom)
21
22
23
24
25
```

Page 7

1
2     A P P E A R A N C E S (Cont.)
3
      MASLON LLP
4      Attorneys for U.S. Bank National
       Association, in its Capacity as Trustee
5      90 South Seventh Street, Suite 3300
       Minneapolis, Minnesota 55402
6
      BY:  JOHN DUFFEY, ESQ.
7
8
      WACHTELL, LIPTON, ROSEN & KATZ
9      Attorneys for Fuel Line Lenders
       51 West 52nd Street
10     New York, New York 10019
11    BY:  ANGELA HERRING, ESQ.
           (via Zoom)
12
13    ALSO PRESENT:
14        MARCELO RIVERA, Videographer
          BILL CRADDOCK, Concierge Tech
15        JAKE FRANKS, Concierge Tech
          CATHY KUNKEL (via Zoom)
16        ROCIO VALENTIN (via Zoom)
          ROLANDO EMMANUELLI-JIMENEZ (via Zoom)
17        ZOE NEGRON-COMAS, ESQ.(via Zoom)
          SCOTT MARTINEZ, AlixPartners
18        ERIC KAY (via Zoom)
          JULIA FRAYER (via Zoom)
19
20
21
22
23
24
25

Page 269

1                        WILLIAM ZARAKAS

2          participating or just observing.  And

3          in that moment, we let the noticing

4          parties know that we would be

5          participating.  We understood that

6          that would be communicated to the

7          board.

8                    MS. DALE:  It wasn't, but

9          thank you.

10      EXAMINATION BY

11      MS. COMAS:

12          Q        Mr. Zarakas, I only have a

13      few questions for you.  I know it's been

14      a very long day for you.

15                    My first question, it's been

16      a long trajectory.  Can we go back to the

17      beginning?

18                    The purpose of the revenue

19      envelope calculation is to determine the

20      maximum amount of revenue that can be

21      generated over the time of the adjustment

22      period.  Would that be a correct

23      statement?

24          A        Yes.

25          Q        And that is based on revenue

```
 1                    WILLIAM ZARAKAS
 2    generated only if the median household
 3    spent 6 percent of their income on
 4    electricity?
 5                    MS. DALE:  Objection to the
 6        form of the question.
 7                    THE WITNESS:  Answer?
 8                    MS. DALE:  Yes, if you
 9        understand.
10        A         Affordability or electricity
11    spending by the median income household
12    was part of the development of the
13    revenue envelope.
14        Q         Would that fact require that
15    this calculation be updated yearly based
16    on median income?
17        A         No.
18        Q         Why not?
19        A         We set the rate in the first
20    year based on that and don't change
21    the -- either the revenue envelope or the
22    legacy charge rate for the entire term.
23        Q         Is there a reason for that?
24        A         Yes.  The 6 percent is
25    considered -- is a policy measure.  It's
```

Page 271

1                    WILLIAM ZARAKAS

2    a threshold for energy poverty.  It's not

3    a long-term equilibrium that's sought.

4         Q        Regarding the revenue, you

5    and your team were in the process of

6    calculating it.

7                   Were you considering the

8    Commonwealth of Puerto Rico's fiscal plan

9    as well?

10        A        As it was used as the

11   backdrop for the PREPA fiscal plan, yes.

12        Q        Are you aware that the

13   Commonwealth's fiscal plan projects

14   decreasing real growth for the period of

15   the plan of adjustment for PREPA?

16        A        I believe so, yes.

17        Q        Would that increase -- do

18   you think it is likely for household

19   income to increase given that real growth

20   decline?

21                 Let me reformulate that.

22                 Given that there is a

23   projection of real growth decline

24   decrease, would it be likely for

25   household income to increase in the

Page 272

1                   WILLIAM ZARAKAS

2    period of the plan of adjustment?

3          A        Both are compatible.  They

4    both can work, yes.

5          Q        How?

6          A        Overall, economic activity

7    is projected to decline, as is population

8    and number of customers.  But the

9    remaining population and customers,

10   despite the decline in overall

11   population, could continue to have modest

12   adjustments to their household income.

13         Q        What would those modest

14   adjustments be based on?

15         A        The escalation rates that

16   are used for overall cost and wages

17   included in PREPA's fiscal plan.

18         Q        Moving to the PREPA 2022

19   fiscal plan, are you aware that the rates

20   projected are lowest in Fiscal Year 2024

21   versus the projections for Fiscal Year

22   2051?

23         A        Yes.

24         Q        Does that mean that as the

25   plan progresses, the share of wallet

Page 273

1                    WILLIAM ZARAKAS

2    might change based on the increasing

3    rate?

4         A        It might.

5                   MS. DALE:  Objection.  We're

6         talking now about the median income

7         residential household?

8                   MS. COMAS:  Yes.  That is

9         correct.

10                  MS. DALE:  Thank you.

11        Q        Was this considered in the

12   calculation for the revenue envelope?

13                  MS. DALE:  Objection to the

14        form of the question.  Was what

15        considered?

16                  MS. COMAS:  The possibility

17        that the affordable amount of -- the

18        affordable percentage of electricity

19        payment for a household would

20        increase in that period because the

21        rates are increasing.

22        A        Could you restate the second

23   part of your question there?

24        Q        Yes.

25                  Under the premise that the

Page 274

1                        WILLIAM ZARAKAS

2     rate would increase in the period of the

3     plan, was it considered that that

4     increase would also increase the burden

5     on the rate payer, i.e., the shared

6     wallet that they would be paying?

7          A       I think indirectly, but not

8     as part of the model.

9          Q       How would you say it was

10    considered?

11         A       Wages increasing, as well as

12    costs, might result in a higher or lower

13    affordability in the future or share of

14    wallet as you say.

15         Q       Questions of counsel

16    previously in reference to Exhibit P of

17    the disclosure statement, which is marked

18    as Exhibit 37 of this deposition, you

19    stated that part of the --

20                 MS. DALE:  Hold on.  Could

21         you just wait one second?  He just

22         wants to get the actual exhibit in

23         his hand.

24                 MS. COMAS:  Sure.

25                 MS. DALE:  We have it.

Page 275

```
 1                    WILLIAM ZARAKAS
 2        Thank you.
 3        Q         You stated in that moment
 4    that part of this calculation of the
 5    legacy charge was ensuring that PREPA
 6    would be sustainable; is that correct?
 7        A         Yes.
 8        Q         Do you consider that the
 9    plan of adjustment, as it is now, with
10    the legacy charge that we have now in the
11    plan, is sustainable for PREPA?
12        A         Feasible and sustainable.
13        Q         Do you base that conclusion
14    only on projections that are from PREPA's
15    fiscal plan?
16        A         PREPA's fiscal plan was used
17    in developing the revenue envelope.
18        Q         And the sustainability of
19    PREPA as you understand it is based on
20    the projections in the fiscal plan?
21        A         Yes.
22        Q         Was there any other data,
23    apart from the fiscal plan that you used?
24        A         For purposes of the costs
25    that PREPA would incur?
```

Page 276

1          WILLIAM ZARAKAS

2          Q          For purposes of determining

3      that this would be sustainable.  So, yes,

4      it includes the costs that PREPA would

5      incur.

6          A          Yes.  We looked at fixed and

7      volumetric charges that are charged

8      throughout the United States that was not

9      included in the PREPA fiscal plan.  And

10     we looked at both average bills

11     and percent increases around the United

12     States as well as for PREPA.

13         Q          Did you consider for that

14     analysis also the declines in Puerto

15     Rican's GDP in the Commonwealth fiscal

16     plan?

17         A          Only to the extent that it's

18     included in PREPA's fiscal plan.

19         Q          Are you aware that LUMA has

20     publicly expressed that the budgets that

21     have been certified by the board for 2023

22     and 2024 are not adequate or do not

23     completely fund their operations?

24         A          I'm aware that LUMA has

25     stated in a letter to the board that the

Page 277

1                    WILLIAM ZARAKAS

2    capital and operating expenditures for

3    the next several years are -- very well

4    might be higher than what's in the fiscal

5    plan.

6         Q        Based on those expressions,

7    is it possible that the system costs and

8    the revenue on the load model are

9    underestimated?

10        A        It is possible.

11        Q        What effect would that have

12   if they were underestimated?

13        A        Because we included or -- we

14   developed our rates in the first year.

15   And we don't change the rates over the

16   course of the plan.  The intention is

17   that there's some room for asymmetric

18   risk, the type of risk that you're

19   referring to.

20        Q        So for my understanding,

21   that would mean that the remaining

22   revenue would not be impacted greatly by

23   such an underestimation because the risk

24   is compensated?

25        A        It depends on the size of

Page 278

1                    WILLIAM ZARAKAS

2     the increases in costs.  So if there's

3     modest increases in cost, it could be

4     accommodated.  If there are major

5     increases in cost, it might not.

6          Q        Do you have like a figure in

7     mind for what would be a major increase?

8          A        We don't.

9          Q        Regarding the legacy charge

10    on Puerto Rico's economy, was there an

11    analysis on that when you were developing

12    the legacy charge?

13         A        Could you repeat that?

14         Q        Was there an analysis on

15    your part or on your team's part about

16    the effect that the legacy charge would

17    have on Puerto Rico's economy?

18         A        No.

19         Q        Was there an analysis on

20    whether it would have an impact on

21    private sector employment?

22         A        No.

23         Q        Was there an analysis on

24    whether it would have an impact on

25    business closures?

Page 279

1                    WILLIAM ZARAKAS

2         A        No.

3         Q        Is there a reason why these
4    were not considered?

5         A        No particular reason; more
6    so just the amount of workflow and
7    ability to complete work.

8         Q        To questions of counsel, you
9    were asked of the percentage of
10   population that is above the median
11   income.  You recall that?

12        A        Yes.

13        Q        You recall it was around
14   45 percent of the population?

15        A        Yes.

16        Q        To my understanding, that
17   45 percent of the population under the
18   current legacy charge would have the same
19   rate as any other residential
20   non-subsidized or subsidy eligible
21   customer; is that correct?

22        A        Yes.

23        Q        And I recall -- you can
24   correct me if I'm wrong -- you mentioned
25   that there was not a consideration of

Page 280

1                    WILLIAM ZARAKAS

2     having a different rate for a higher

3     income household.  Does that sound

4     correct?

5          A        Yes.

6          Q        Is there a reason that was

7     not considered?

8          A        Yes.

9          Q        Could you tell me what that

10    reason was?

11         A        Sure.  I think it was a

12    matter of a -- a combination of board

13    policy.  But also, it's a relatively

14    unused discriminatory rate setting method

15    that is really not used very much, if at

16    all, in the United States.

17         Q        That was going to be my

18    follow-up question because you mentioned

19    you have experience in other rate making

20    processes.

21                   So would having different

22    rates for higher income customers be

23    considered not standard?

24                   MR. MADDEN:  Objection to

25         form.

Page 281

1                    WILLIAM ZARAKAS
2                    MS. COMAS:  I should
3       rephrase that.
4       Q        Would it be considered
5    standard to have a different rate for
6    higher income customers?
7                    MR. MADDEN:  Same objection.
8                    MS. COMAS:  Can he answer?
9                    MS. DALE:  He can.  He's
10      just thinking about it.
11      Q        Do you need me to rephrase,
12   sir?
13      A        No.  I'm okay.  I am aware
14   of only one place in the United States
15   where it is even being considered.
16      Q        Thank you.
17                    During your prior testimony,
18   you defined price elasticity -- and
19   you'll correct me if I get this wrong --
20   as the response of customers to increase
21   in price.
22      A        I couldn't hear the end of
23   your question.
24      Q        You defined price elasticity
25   as the response of customers to increases

Page 282

```
 1                    WILLIAM ZARAKAS
 2    in price.  Does that sound correct?
 3         A       Yes.
 4         Q       In general, what factors are
 5    considered for that price elasticity
 6    analysis?
 7                    MS. DALE:  Objection to the
 8         form.
 9         A       Could you be a little more
10    explicit in your question?
11         Q       Would specific be like by
12    sector or is there a reference?
13                    MS. DALE:  I didn't hear
14         your question.  I'm sorry, counsel.
15                    MS. COMAS:  The witness
16         asked me to be more specific.  But
17         I'm wondering if what would be more
18         helpful is for me to be specific in
19         terms of sector or if the general
20         question that needs to be more
21         specific.
22         A       When you said factors, I
23    wasn't sure what you meant by that.
24         Q       What are some elements of
25    the analysis --
```

Page 283

1                    WILLIAM ZARAKAS
2              MS. DALE:   Objection.
3      Q         -- for price elasticity?
4              MS. DALE:   Sorry to speak
5      over you.   Objection to form.
6      A         In determining the price
7    elasticity of demands that we used, we
8    looked at studies that have been done,
9    both going back sometime, as well as
10   studies that have been a little more
11   current to help us understand recent
12   additions or incremental effects on price
13   elasticity.
14     Q         To questions from counsel
15   regarding whether you did a separate
16   affordability analysis for the population
17   of residential customers that is above
18   the median income, if I recall, you
19   answered no; is that correct?
20     A         That's correct.
21     Q         Was there a separate
22   analysis of price elasticity for that
23   population?
24     A         No.
25     Q         Is it possible that there

Page 284

1              WILLIAM ZARAKAS

2      would be differences in the results of

3      that analysis?

4          A        We didn't segment the price

5      elasticity of demand by segments within a

6      class.  To your question, higher income,

7      higher usage customers very well might

8      have higher price elasticities of demand.

9      But we did not look at income levels in

10     determining price elasticities of demand.

11         Q        But you've mentioned just

12     now that they might have higher

13     elasticity, the higher income population?

14         A        Yes.

15         Q        Would you be able to explain

16     why that is?

17         A        Yes.  Some of the -- price

18     elasticity of demand is driven by your

19     ability to access substitutes.  And

20     higher income customers tend to be able

21     to access more substitutes; for example,

22     they would be able to put photovoltaics

23     on their roofs and put storage batteries

24     in their house as well.

25         Q        Would it be an accurate

1            WILLIAM ZARAKAS
2    inference that placing a higher rate on a
3    higher income household could lead to
4    higher elasticity?
5                MS. DALE:  Objection to form
6        to the hypothetical.  But if you can
7        answer it.
8        A       I think the answer is that
9    higher prices on higher income customers
10   might lead to more defection from using
11   PREPA.
12       Q       Thank you.
13               Are you aware of how long
14   PREPA has been operating under certified
15   fiscal plans for PROMESA?
16       A       Could you say the last part
17   again?  I'm sorry.
18       Q       For PROMESA, are you aware
19   of how many years PREPA has been
20   operating under certified fiscal plans
21   for PROMESA, the law?
22       A       I don't know if I know the
23   answer to that question.
24       Q       As part of your analysis,
25   did you study any prior fiscal plans,

1                    WILLIAM ZARAKAS

2    other than the 2022 fiscal plan?

3         A         We looked at several fiscal

4    plans, yes.

5         Q         Can you remember which one?

6         A         I believe we looked at 2020

7    and 2021 as well.

8         Q         When you looked at those

9    fiscal plans, were you able to observe

10   the indices for reliability?

11        A         We looked at reliability

12   through other data sources.

13        Q         What data sources?

14        A         ITripoli and EIA, I believe.

15   I'm sorry.  It's not iTripoli.  It's EEI,

16   Edison Institute.

17        Q         Based on that review, would

18   you say it's accurate that PREPA has not

19   met projections for system reliability

20   improvements in the past few years?

21                  Let me rephrase that

22   question.

23                  Would you say that in those

24   time periods that you studied, PREPA has

25   met reliability improvement goals, to

Page 287

1                    WILLIAM ZARAKAS

2    your knowledge?

3         A        The data sources that I just

4    talked about don't talk about PREPA

5    goals.  It talks about PREPA performance.

6    But you just prompted me to realize that

7    there were some targets in the LUMA

8    contract.  And I believe those targets

9    have not been met, either by LUMA or

10   PREPA before LUMA.

11        Q        You mentioned that the

12   sources that you did consult were

13   performance, not goals; is that correct?

14        A        Correct.

15        Q        Could you see any

16   improvement in performance in those

17   sources?

18        A        No.

19        Q        Could this lack of

20   improvement be due to operational

21   resources?

22                 MS. DALE:  Objection to the

23      form.  You can answer.

24        A        I'm not sure what you mean

25   by operational resources.

Page 288

1                    WILLIAM ZARAKAS

2       Q        I'll rephrase.

3                Is it possible that the lack

4   of improvement in reliability performance

5   is due to a lack of funding for

6   operational processes?

7       A        There's a difference in

8   terminology.  Operational improvements

9   are an expense item versus a capital

10  item.  So I'm just not sure I understand

11  your question.

12      Q        Let me clarify that.

13               The costs for improving

14  reliability, are those capital

15  expenditures?

16      A        In part, yes.

17      Q        They are not operational

18  expenses?

19      A        Also some operational

20  expenditures.

21      Q        So I will ask the question

22  for both things.

23               Could the lack of funding

24  for capital expenditures be causing this

25  lack of improvement in performance?

Page 289

1                    WILLIAM ZARAKAS

2       A        It could.  We did not study

3    that.  But it could.

4       Q        And is the same true for

5    lack of funding for operational

6    expenditures?

7       A        It could.  Again, we did not

8    study that.

9       Q        Since you did not study it,

10   I'm going to assume the answer to this is

11   the same.

12               Did the revenue envelope

13   consider the costs of meeting those

14   reliability improvements?

15      A        Only to the extent that it's

16   included in the fiscal plan.

17               MS. COMAS:  That is the

18       extent of my questions.  Thank you

19       very much.

20               MS. DALE:  Anybody else have

21       any other questions for the witness?

22               MR. MADDEN:  I have brief

23       follow-up.  But I'll let anyone else

24       go first.  I'll be very brief.

25    FURTHER EXAMINATION BY