# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>    Debtors.[1] | PROMESA<br>Title III<br><br><br><br>Case No. 17 BK 3283-LTS<br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO<br><br>    as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>    Debtor. | PROMESA<br>Title III<br><br><br><br>Case No. 17 BK 4780-LTS |

**REBUTTAL EXPERT DECLARATION OF MR. THOMAS SANZILLO IN SUPPORT OF THE UNIÓN DE TRABAJADORES DE LA INDUSTRIA ELÉCTRICA Y RIEGO, INC.'S OBJECTION TO THE CONFIRMATION OF THE PUERTO RICO ELECTRIC POWER AUTHORITY'S PLAN OF ADJUSTMENT**

*[Space intentionally left blank]*

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations.)

## I. Introductory Questions

**Q. State your name.**

Tom Sanzillo.

**Q. State on whose behalf you are testifying before the Title III Court.**

I am testifying on behalf of UTIER.

**Q. What additional information did you review in preparation of your rebuttal testimony?**

In addition to the materials reviewed in preparation for my direct testimony, I reviewed:

- Expert Testimony of Glenn George.
- Expert Testimony of Susan Tierney.
- Expert Testimony of Sebastian Edwards.
- Expert Testimony of Gary Strumayer.
- Expert Testimony of Maureen Chakraborty.
- Revenue Envelope and Legacy Charge Model.
- May 4, 2023 Deposition of William Zarakas.
- Cruces and Trebesch (2013) study cited in the Expert Testimony of Sebastian Edwards.
- March 2019 contract between New Fortress Energy and PREPA for the conversion of the San Juan power plant to natural gas and the delivery of natural gas to those units.
- Puerto Rico Energy Bureau Case NEPR-MI-2019-0016 regarding the interconnection of distributed generation to the grid.

**Q. What is the purpose of your rebuttal testimony?**

My rebuttal testimony addresses the following points:

- Both the Oversight Board and Bondholders' expert witnesses failed to accurately address the Oversight Board's underestimate of future fuel costs, which has a multi-billion dollar impact on the Revenue Envelope Model that both parties rely on.
- The Oversight Board's expert witness does not adequately support how the Revenue Envelope Model generates a Legacy Charge that comports with the Oversight Board's stated goals of not "(1) threatening the sustainability of PREPA as a functioning utility; (2) threatening the sustainability of the Puerto Rico economy; and/or (3) subjecting customers to undue hardship."
- The Bondholders' proposal regarding additional revenues that could be extracted from the system during the Plan of Adjustment period is not credible.
- The bonds are likely unratable, and a significantly greater haircut would be needed to ensure sustainable market access for the electrical system's unmet capital needs.
- In addition, I correct a mathematical error in my direct testimony.

## II. Rebuttal of Oversight Board Expert Witness Dr. Glenn George

**Q. In his Expert Testimony, Dr. George finds the fuel forecast underlying the Plan of Adjustment to be reasonable. Do you agree?**

No, I do not.

Dr. George correctly notes in his testimony that PREPA has historically underestimated its future fuel costs. Fuel for PREPA's grid is comprised of fuel oil, diesel oil, natural gas (LNG) and coal. Natural gas constitutes the largest component of the fuel mix. Over the last five years, fuel costs have ranged in actual cash amounts from $1,200 million to $2,090 million constituting 40% to

3

43 65% of annual expenses.[2] These wide variations occur due to historic volatility in oil and natural
44 gas prices.

45 Dr. George incorrectly concludes that the fuel forecast in the 2022 PREPA Certified Fiscal Plan,
46 which underlies the Plan of Adjustment, is conservative and reasonable. The forecast is neither,
47 for reasons which I explain below.

48 **Q. What is the basis for Dr. George's determination?**

49 Dr. George finds that, when comparing the fuel price forecast in the 2022 PREPA Certified Fiscal
50 Plan (which underlies the Plan of Adjustment) to a benchmark Energy Information Administration
51 forecast, that the Fiscal Plan's estimates of the future fuel oil and diesel costs components of the
52 fuel mix were lower than the EIA forecast.[3] If accurate this assumption would underestimate
53 expenses for these fuel sources and lead to an underestimation of the revenues needed to run the
54 system. Projected rates would be too low.

55 George finds that this otherwise troublesome projection is offset by the Fiscal Plan's natural gas
56 and coal forecasts, which he determines to be higher than the EIA forecast. Specifically, he finds
57 that the Fiscal Plan's natural gas forecast is 105% to 243% higher than the EIA forecast over the
58 period he considered.[4] Given that natural gas is the largest fuel source in Puerto Rico, if true the
59 overestimated natural gas forecast would compensate for the fuel and diesel oil deficits.

60 George emphasizes the importance of being conservative (i.e. on the high side) when estimating
61 future fuel costs and goes on to characterize the Fiscal Plan fuel forecast as reasonable.[5]

62 **Q. Why do you arrive at a different conclusion?**

---

[2] June 2018, June 2019, June 2020, June 2021, and June 2022 PREPA Monthly Reports to the Governing Board.
[3] George Declaration, p. 35.
[4] George Declaration, Appendix C.
[5] George Declaration, p. 35.

4

63  Dr. George's conclusion that the Fiscal Plan's natural gas forecast is higher than the EIA forecast
64  is based on an apples-to-oranges comparison. Dr. George incorrectly compares the EIA's forecast
65  of natural gas prices at the Henry Hub in Louisiana with the Fiscal Plan's natural gas forecast. The
66  EIA estimate is based on a point-of-sale price at the Henry Hub. The estimate in the Fiscal Plan is
67  based on the delivered natural gas price to the grid in Puerto Rico. The Fiscal Plan forecast
68  delivered price includes the Henry Hub spot price plus "current effective PREPA contract adders."[6]
69  For the current contract for liquefied natural gas (LNG) delivered to San Juan, the contract price
70  is: [7]

71      Delivered Price = 1.15 * (Henry Hub price) + $6.50/MMBTU

72  This is a fatal flaw in Dr. George's methodology as he seeks to construct an accurate assessment
73  of PREPA's natural gas budget.
74  In order to make an apples-to-apples price comparison, where PREPA's estimated fuel price
75  comports with an independent third-party source like the EIA, the EIA Henry Hub forecast needs
76  to be converted into a delivered price in Puerto Rico using this formula. Correcting for this error
77  actually means that PREPA understated its natural gas price forecast in every year except 2023
78  relative to the EIA.

79  **Q. What is the implication of this incorrect calculation?**
80  Given the size of PREPA's natural gas bill over the forecast period (ranging from $106 million to
81  over $500 million a year)[8], Dr. George's failure to include the natural gas contract price adders in
82  his analysis of the EIA prices is significant. His conclusion that the Fiscal Plan's fuel forecast is

---

[6] 2022 PREPA Certified Fiscal Plan, p. 156.
[7] Fuel Sale and Purchase Agreement between NFEnergia and Puerto Rico Electric Power Authority, March 2019, Exhibit C.
[8] I adjust the annual fuel cost projection in the Revenue Envelope Model to assume that 18% of the fuel bill is for natural gas, based on the current fiscal year to-date fuel expenditures (March 2023 PREPA Monthly Report).

5

83 reasonable is based on not including the adder to EIA prices. The difference between including
84 this adder versus not, given the amount of natural gas that PREPA consumes, amounts to an error
85 of about $1 billion (net present value) in his analysis over the period he considered.

86 **Q. If the EIA natural gas price forecast is corrected to include the Puerto Rico contract price**
87 **adders, what does this tell us about the Fiscal Plan's fuel price forecast?**

88 Once corrected, Dr. George's testimony supports the conclusion of my direct testimony that the
89 Fiscal Plan underestimates PREPA's future fuel costs. Using the numbers in Dr. George's Appendix
90 C and adjusting the LNG forecast to include the contract adder as described above, from FY 2024
91 to FY 2035, the Fiscal Plan's commodity price forecasts are lower than the benchmark EIA forecast
92 by 25-40% for fuel oil; 6-27% for diesel; and 7-16% for natural gas.

93 Applying the annual adjustments to the Fiscal Plan's annual fuel cost forecast for FY 2024 to FY
94 2035, I find that the PREPA Fiscal Plan underestimated fuel costs by 26% over this period, relative
95 to using the adjusted EIA 2022 forecast. This is a total of $2.9 billion in fuel costs not accounted
96 for in the Plan of Adjustment ($2.1 billion net present value). This is consistent with PREPA's
97 historic pattern of underestimating its fuel forecasts, as noted by Dr. George.

98 This likely underestimation of future commodity prices adds to the other dysfunctional financial
99 conditions identified in my direct testimony including the planned construction of a new natural
100 gas plant and the failure to meet the Fiscal Plan's renewable energy targets. These are factors that
101 increase PREPA's dependence on fossil fuels and crowd out the change to less expensive renewable
102 energy.

103 **Q. In addition to mischaracterizing PREPA's fuel forecast, are there other aspects of Dr.**
104 **George's testimony that you find unreasonable?**

| | |
|---|---|
| 105 | Yes. In addition to the fuel price issue, I find that Dr. George's testimony does not support the |
| 106 | notion that the Legacy Charge is affordable to non-residential customers. Dr. George's testimony |
| 107 | explains that the "revenue envelope" was calculated based on how much the median residential |
| 108 | customer could afford to pay in additional rates in FY 2024 before exceeding the 6% "share of |
| 109 | wallet" threshold. |
| 110 | After this exercise was conducted, the Oversight Board determined to reduce the fixed charge on |
| 111 | residential customers. In order to meet the revenue needed to cover debt service the Oversight |
| 112 | Board increased the charges on non-residential customers. Dr. George states, "These adjustments |
| 113 | seem appropriate to me to ensure the Legacy Charge is not unduly burdensome on those customers |
| 114 | who can least afford it."[9] |
| 115 | Dr. George offers no evidence that in fact the non-residential customers can afford the increased |
| 116 | burden. One of the goals of the Revenue Envelope Model evaluated by Dr. George's testimony, |
| 117 | according to Exhibit P of the Disclosure Statement ("Legacy Charge Derivation"), is to arrive at a |
| 118 | rate that "cannot exceed the conceptual upper bound of affordability, including … threatening the |
| 119 | sustainability of the Puerto Rico economy; and/or… subjecting customers to undue hardship." [10] |
| 120 | The Revenue Envelope Model in itself only considers affordability for the residential class. On |
| 121 | May 2nd, 2023, Mr. William Zarakas confirmed in his deposition that the team that developed the |
| 122 | Revenue Envelope Model did not consider the impact of the Legacy Charge on Puerto Rico's Gross |
| 123 | Domestic Product (GDP), private sector employment or business closures. This is particularly |
| 124 | inexplicable given the Commonwealth Fiscal Plan's projections of an unsustainable outlook for |
| 125 | Puerto Rico's economy, with a prolonged decline in real GDP forecasted from FY 2029 through |

---

[9] George Declaration, p. 28.
[10] Exhibit P of the Disclosure Statement, p. 4.

7

126 the end of the forecast period.[11,12] Dr. George similarly ignores the impact of rate increases on
127 commercial and industrial customers, giving no basis for his assertion that it was reasonable for
128 the Oversight Board to transfer a seemingly arbitrarily-determined cost from residential to non-
129 residential customers.

130 **Q. In addition to considering the sustainability of the economy and affordability to**
131 **customers, Exhibit P also states that the revenue envelope calculation aimed to arrive at a**
132 **rate that "does not threaten the sustainability of PREPA as a functioning utility."[13] How does**
133 **Dr. George's testimony address this issue?**

134 Dr. George fails to show that the Revenue Envelope Model comports with this other affordability
135 goal outlined in Exhibit P. Dr. George in fact acknowledges that there are unmet capital needs not
136 included in the Revenue Envelope Model. And he also makes the point to that the electrical system
137 is fragile and in need of substantial investment.[14]

138 The reality is that PREPA's electrical system is currently not financially sustainable. The evidence
139 provided by the experts generally shows the system to be costly and unreliable; customers are
140 defecting from it at record pace, as I will detail below. Mr. Zarakas explained in his deposition
141 that the team that created the Revenue Envelope Model did not evaluate whether the capital and
142 operating budgets would be sufficient to meet grid reliability goals. A system that provides life
143 threateningly poor service needs to be transformed, or at least firmly established on a path to
144 transformation, before one could even begin to argue that extracting more than $13 billion over
145 the next 35 years for Legacy debt payments (the actual, undiscounted cash needed to cover $5.68

---

[11] 2023 Commonwealth Certified Fiscal Plan, Volume II, p. 5.
[12] I find Dr. Chakraborty's argument that non-residential customers can afford to pay more uncompelling for the same reason.
[13] Exhibit P of the Disclosure Statement, p. 4.
[14] George Declaration, p. 4-7.

146  billion),[15] as the Oversight Board proposes, would not further undermine "the sustainability of
147  PREPA as a functioning utility."

148  **II. Rebuttal of Bondholders' Expert Witnesses Dr. Maureen Chakraborty and Dr. Susan**
149  **Tierney**

150  **Q. What is your overall opinion of the Bondholders' Expert Witnesses' testimonies?**

151  I find that their testimonies, as a whole, are divorced from the history and ongoing reality of Puerto
152  Rico's electrical system. Dr. Chakraborty pulls together the findings of several of the bondholder
153  witnesses, aggregating various "corrections" that the witnesses made to the Oversight Board's
154  Revenue Envelope Model in order to argue that there are billions of dollars of additional future
155  revenue available for bondholders.[16]

156  Two examples demonstrate the flaws in the Bondholders' Expert Witnesses' analysis.

157  **Q. Please describe the first example of the flaws in the bondholders' analysis.**

158  One of the "corrections" that Dr. Chakraborty makes is to the part of the Revenue Envelope Model
159  that calculates how much the Hypothetical Residential Customer can afford to pay in Fiscal Year
160  2024 without exceeding the 6% "share of wallet" threshold.

161  Dr. Chakraborty argues that the Hypothetical Residential Customer uses less electricity per month
162  than the Board assumed. This implies that their electric bill (consumption multiplied by the per
163  kWh rate) in FY 2024 will be lower than the Board assumed and there is therefore more revenue
164  that could be obtained without exceeding the "share of wallet" threshold. Extrapolating this to the
165  entire system Dr. Chakraborty identified another $1.5 to $3.3 billion in annual revenue that can
166  be used for debt service.[17]

---

[15] Exhibit D to Disclosure Statement ("LOAD FORECAST AND ILLUSTRATIVE CASH FLOW FOR NEW BONDS").
[16] Chakraborty Declaration, p. 14.
[17] Chakraborty Declaration, p. 29-34.

167 Implicit in this calculation is Dr. Chakraborty's assumption that the 2024 Rate accurately portrays
168 PREPA's expenses. It does not. In fact, as discussed in my direct testimony, the FY 2024 rate likely
169 substantially underestimates PREPA's fuel costs. Using the estimate derived in my direct testimony
170 of a $2 billion fuel bill (instead of $1.375 billion) translates into a Projected FY 2024 Rate that is
171 3.9 cents/kWh higher. When this is taken into account, that is when the fuel estimate is more
172 accurately assessed, the amount that is theoretically available to support the Legacy Charge is
173 substantially reduced, irrespective of whether Dr. Chakraborty or the Oversight Board's monthly
174 consumption estimate is more accurate.
175 And it is not just in FY 2024 that the fuel budget is likely underestimated. The Bondholders' Expert
176 Witnesses fail to properly account for the multibillion, multi-year fuel budget impacts that could
177 substantially offset their proposed "corrections." The failure by either the Oversight Board or the
178 Bondholders, both of whom rely on this Revenue Envelope Model as the basis for their Expert
179 Witnesses' testimonies, to evaluate a sensitivity to fuel prices –especially given PREPA's
180 longstanding history of underestimating fuel forecasts and failing to shift away from fossil fuels–
181 is unreasonable.
182 In general, Dr. Chakraborty and the Bondholders' Expert Witnesses do not consider any factors
183 that could push operational expenses higher and dismiss without consideration the various studies
184 that show that the federal investment is not sufficient for the grid (see my direct testimony for more
185 detail on both points).
186 **Q. What is the second example?**
187 The second example has to do with Dr. Chakraborty and Dr. Tierney's conclusion that more money
188 is available because future electricity sales will be higher than forecasted, as argued by Dr.
189 Tierney's testimony. Dr. Tierney argues that because (1) GDP growth will be higher than forecast,

10

190  (2) PREPA will fail to achieve its energy efficiency goals, (3) growth in distributed generation will
191  be lower, and (4) electric vehicle usage will grow faster than forecast, that therefore PREPA will
192  be selling more electricity in future years.[18] Dr. Tierney assumes that more electricity sold equals
193  more revenue available for debt service. That is only true if each kWh sold actually produces a
194  surplus. As a budgeting matter,[19] each new kwh sold under the existing regime actually produces
195  larger, not smaller deficits, if the utility can't cover the fuel bill.
196  In addition, the actual conditions are far more nuanced than Dr. Tierney's model. She is correct
197  that PREPA is likely to fail to meet its energy efficiency goals. This maintains a high dependence
198  on high cost fossil fuels– weakening the case for an available surplus.
199  However, I disagree that the uptake of Electric Vehicles is likely to be as aggressive as she outlines
200  and also disagree with her perspective that distributed generation will be lower than the Oversight
201  Board's forecast.

202  **Q. What is Dr. Tierney's view of future electric vehicle sales, and why do you believe that**
203  **electric vehicle sales are likely to be lower than she estimates?**

204  Dr. Tierney finds the Oversight Board's Alternative Forecast to present a "more reasonable"
205  projection of EV penetration.[20] I believe the Alternative Forecast likely overstates electric vehicle
206  uptake. The Alternative Forecast "incorporates consumer sentiment and evaluates energy grid
207  readiness through PREPA's SAIDI and SAIFI [grid reliability index] scores."[21] The statement
208  implies that the electric vehicle forecasts assumes the grid reliability improvements projected in
209  the Fiscal Plan.

---

[18] Tierney Declaration, p. 14-39.
[19] As a practical matter, in the past, PREPA has dealt with this reality by converting financial deficits into operational deficits– that is, by cutting other aspects of the budget, such as maintenance. In the future, this pattern is likely to continue, with the possibility as well that PREPA could divert cash from the Legacy Charge to cover the deficit, which would constitute an event of Default under the Plan of Adjustment.
[20] Tierney Declaration, p. 38-39.
[21] 2022 PREPA Certified Fiscal Plan, p. 154-155.

11

210  The Alternative Forecast is undermined by the facts that: (1) Puerto Rico has failed to achieve
211  previous SAIDI and SAIFI goals set by the Board;[22] (2) LUMA is not spending sufficiently to meet
212  current reliability goals in the Fiscal Plan;[23] and (3) the team that created the Revenue Envelope
213  Model did not evaluate whether the capital and operating budgets would be sufficient to meet grid
214  reliability goals.[24] Dr. Tierney also does not explain how an organization that cannot meet either
215  its efficiency or renewable energy goals will somehow manage to improve its reliability
216  performance. Given that the Alternative Forecast appears to be based on meeting grid reliability
217  targets, I find its projection of electric vehicle penetration to be overstated. Why would households
218  that are installing solar and storage systems at a record pace (see below) trust the grid for their
219  transportation needs? Further, it is unclear how or whether the Alternative Forecast takes into
220  account the need for additional investment in charging infrastructure.[25]

221  **Q. What is Dr. Tierney's view of the growth of distributed generation (rooftop solar) in**
222  **Puerto Rico, and why do you disagree?**

223  Dr. Tierney's assertion that the Oversight Board's load forecast assumes "unprecedented"[26]
224  increases in rooftop solar is contradicted by the current reality of the solar market in Puerto Rico.
225  The most recent data shows that Puerto Rico just experienced 54% year-over-year growth in
226  distributed generation.[27] This is, in fact, far higher than the forecast assumed by the Board, which
227  starts with annual growth of about 16% and tapers off to about 1.6% by FY 2051.[28] While the

---

[22] The August 2018 Fiscal Plan set a 5-year goal of achieving "reliability performance in line with mainland US utility median performance," as measured by SAIDI and SAIFI indices (August 2018 PREPA Certified Fiscal Plan, p. 42).
[23] See my direct testimony at p. 19-20.
[24] Deposition of Mr. William Zarakas held on May 4, 2023.
[25] https://www.theweeklyjournal.com/business/slow-progress-in-electric-car-sales-in-puerto-rico/article_b029898a-c83a-11ea-84ce-a7295efed566.html; https://www.elnuevodia.com/english/news/story/transition-to-electric-cars-in-puerto-rico-is-full-of-obstacles/.
[26] Tierney Declaration, p. 26.
[27] LUMA filing in Puerto Rico Energy Bureau Case NEPR-MI-2019-0016, April 23, 2023, shows that grid-connected distributed generation capacity increased 54% from April 2022 to March 2023.
[28] Revenue Envelope Model, p. 178-182.

12

228 current growth rate of 54% per year is obviously not sustainable through 2051 (the market will be
229 saturated before that), the Oversight Board's near-term forecast clearly underestimates the growth
230 of distributed generation.

231 **Q. What is your conclusion regarding the Bondholders' Expert Witnesses' load forecast?**

232 When these factors are considered, it is clear that any adjustment that might be needed to the load
233 forecast in the Revenue Envelope Model is unlikely to translate into the incremental revenue
234 increases that either Dr. Chakraborty or Dr. Tierney wish for.

235 **Q. Beyond these specific critiques, what is your assessment of the Bondholders' Expert**
236 **Witnesses'overall assertion about the level of revenue available for debt service?**

237 It is worth taking a step back from the Revenue Envelope spreadsheet model to understand the
238 context of what the Bondholders are proposing. Figure 1 of Dr. Chakraborty's testimony shows
239 that the Bondholders believe that PREPA can afford $13.4 billion in New Bonds, instead of $5.68
240 billion in New Bonds, or 2.35 times greater.

241 What would be the rate implications of such a proposal? We estimate that the resulting
242 Bondholders' Legacy Charge for non-exempt customers starts at 8 cents/kWh and grows to 12
243 cents/kWh by FY 2051.[29] In reality, the charge would need to be even higher to compensate for
244 the loss of load (through grid defection, migration, and business closures) that such a charge would
245 provoke. Adding this to the Fiscal Plan's projected electric rates would immediately put rates for
246 non-exempt customers above 30 cents/kWh and above 40 cents/kWh by 2035 (or sooner given the

---

[29] I estimate that 45% of Puerto Rico's residential customers will be exempted, based on the current percentage of the population enrolled in Medicaid. Assuming that these customers consume slightly less than average (350 kWh per month rather than 420 kWh per month), they account for 16% of total sales. I then divide the annual revenues projected from the Legacy Charge in Appendix D to the Disclosure Statement by the forecast sales to non-exempt customers. This average rate is then multiplied by 2.35 to scale it to the Bondholders' proposal.

13

247 Fiscal Plan's underestimation of fuel costs). This is 50% to 100% above previous thresholds set
248 for affordability. I find this result to not be credible.
249 If this were scaled to another state, it would be equivalent to arguing that middle class residents
250 and small business owners in, for example, New York, could afford to pay above 103 cents/kWh
251 for a system that cannot reliability keep the lights on.[30]

252 **III.   Rebuttal of Bondholders' Expert Witnesses Mr. Sebastian Edwards and Mr. Gary**
253 **Strumayer**

254 **Q. What is your assessment of Mr. Strumayer's analysis regarding the terms and conditions**
255 **for the New Bonds, as set forth in the proposed Plan of Adjustment?**
256 I concur with Mr. Strumayer that the bond terms and conditions in the Plan of Adjustment contain
257 unusual provisions that are likely to result in the bonds trading below par. However, I do not find
258 this to be an argument for strengthening the rights of creditors, as implied by Mr. Strumayer's
259 testimony.

260 **Q. Why do you arrive at a different conclusion?**
261 The reason that the bond structure in the Plan of Adjustment departs so fundamentally from
262 standard bond agreements is based on how the Oversight Board and its advisors weighed the
263 various economic and financial factors facing PREPA. These experts are trying to balance a low
264 or no growth economy, a declining population with limited incomes, a hurricane prone
265 environment, a grid in severe disrepair, high and volatile electric rates, a weak political structure,
266 hostility toward regulation, unstable management and oversight, a contentious budget climate and

---

[30] The median household income in New York state is $75,157, versus $21,967 in Puerto Rico. (US Census Bureau).

14

267 union and retiree opposition with standards regarding default, repayment, affordability, and
268 recovery rates.[31]

269 The result of trying to weigh all the factors and construct a bond deal that meets basic standards
270 have failed. My conclusion is that *any* debt deal that involves repayment of Legacy Debt through
271 rate increases will likely be unratable. The objective factors outlined during this proceeding
272 outweigh even the herculean effort reflected in the Plan of Adjustment to construct a responsible
273 bond offering.

274 **Q. What is your assessment of Mr. Edwards' argument that imposing too large of a haircut**
275 **on Bondholders will raise PREPA's future borrowing costs?**

276 Mr. Edwards arguments are largely theoretical, whereas the set of credit factors facing PREPA are
277 specific and do not fit well into existing academic modeling.

278 Mr. Edwards tell us that the size of the haircut has a direct impact on the duration of restricted or
279 prohibited market access.[32] This will not apply in PREPA's case. The principal study (Cruces and
280 Trebesch, 2013) relied upon by Edwards examines sovereign debt. Puerto Rico is not a sovereign.
281 It can and does rely upon the United States Treasury for financial support for a substantial amount,
282 but not all, of its capital needs to rebuild the system.

283 PREPA's post-bankruptcy investment outlook will be assisted substantially if LUMA can convert
284 the $14 billion in federal money and any additional federal funds into a strong working asset.
285 While annual budgets will still see upward pressure on rates as operational and capital needs are

---

[31] In a prior declaration to the Court in support of the 2019 RSA, Oversight Board witness David Brownstein cited the Oversight Board's objectives as follows: "any recovery by PREPA's creditors had to be secondary to the Commonwealth's overall economic recovery"; "protect the Commonwealth and PREPA ratepayers by stabilizing rates and providing as much transparency and certainty as possible in future expected energy costs"; "fostering a healthy economic outlook for the future of the utility"; "reducing PRPEA's debt obligations"; and "not … agree to a restructuring that would negatively impact Transformation of PREPA." (Brownstein Declaration, p. 10-11, Case No. 17-BK-03283-LTS, Doc # 7816, July 2, 2019).
[32] Edwards Declaration, p. 69-70.

286 more rationally considered, a more modern, reliable system should improve investment
287 opportunities. The improved investment opportunity is not limitless but constricted by the same
288 economic factors discussed throughout this testimony.
289 So, if the Legacy Charge and Plan of Adjustment are rejected in favor of a plan which settles the
290 debt with no rate impact then going forward the substantial federal support should be credit
291 positive at least to support future, more modest debt issuances.
292 **Q. What other factors are distinct about Puerto Rico's bankruptcy and access to capital**
293 **markets?**
294 Another unique aspect of PREPA has been its ability to effectively borrow during the bankruptcy
295 period. PREPA issued a contract to New Fortress Energy in 2019 for the upgrading of the San Juan
296 Power Plant to convert it from diesel fuel to a dual use diesel and natural gas. The plan included a
297 multi-year gas supply arrangement with New Fortress. The contract provided for the payment of
298 the natural gas volumes delivered by New Fortress as well as monthly payments of $833,333.34
299 to repay New Fortress's upgrades of the units.[33] PREPA effectively borrowed during bankruptcy
300 by agreeing to repay the San Juan construction costs as part of its natural gas supply contract.[34]
301 **Q. What, in your view, would be the consequences for PREPA's future market access of NOT**
302 **imposing a much more substantial haircut on the Legacy Debt?**
303 As stated in my direct testimony, PREPA will need to issue additional debt ("Additional Bonds")
304 to cover the unmet capital needs of the system going forward, including an unfunded amount
305 needed to complete the grid reconstruction. Under the proposed Plan of Adjustment, such

---

[33] Fuel Sale and Purchase Agreement between NFEnergia and Puerto Rico Electric Power Authority, March 2019, Section 12.1.

[34] Cruces and Trebesch discuss the concept of partial market access. Although they do not clearly define it, they use one standard to offer as example. The authors state that a transaction that provides a "net transfer from a private foreign creditor" might constitute partial market access (p. 21). Whether this example would meet the authors' definition is uncertain.

306 Additional Bonds will be subordinate to the repayment of Legacy Debt. PREPA's ability to issue
307 Additional Bonds will also likely be impacted if Puerto Rico is unable to pay debt service on the
308 Legacy Debt and continues carrying unpaid debt service on its books, per the unusual default
309 provisions described by Mr. Strumayer and in my direct testimony.
310 Considering these nuances, unless a settlement is arrived at with no rate impact, PREPA will be
311 saddled with a debt deal that is unaffordable and therefore unsustainable. The financial dysfunction
312 that this will perpetuate – lack of funds for operational needs, customers defecting from the system,
313 and unpaid debt service remaining on the books of the utility, among other problems – will itself
314 impede market access. What is actually needed is to give Puerto Rico the fresh start required to
315 become a going concern.

## IV. Conclusions

316 

317 **Q. Is there anything that you need to correct from your direct testimony?**
318 Yes. At p. 8 of my direct testimony, I incorrectly added $5.68 billion (a discounted cost of future
319 debt payments) to $2.425 billion (the Board's undiscounted estimate of future capital expenditures
320 needs). I should have used a discounted estimate of future capital expenditures, which would be
321 less than $2.425 billion. This does not change either of the conclusions of this part of my testimony:
322 (1) the amount of debt proposed by the Plan of Adjustment (both for Legacy Debt and Additional
323 Bonds) is still outside the range of the Debt Sustainability Analysis of the Fiscal Plan; and (2) the
324 Plan of Adjustment significantly underestimated the unmet capital expenditure needs of the
325 system, which other analysis have put at approximately $6 billion (undiscounted).

326 **Q. What is the conclusion of your rebuttal testimony?**
327 It might be possible to extract more money from a spreadsheet model, but not from Puerto Rico's
328 actually existing electrical system and economy– with its high and volatile fuel costs, ongoing

17

329 failure to meet reliability and affordability targets, low income customer base, weak economic
330 outlook, vulnerability to hurricanes and weak regulatory structure.

331 Essentially it is difficult to measure any fundamental improvement made by PREPA since
332 PROMESA was enacted and the Oversight Board appointed. PREPA does not have a credibly
333 balanced budget where recurring revenues cover recurring expenses. There is no transparent
334 system to measure progress on revenue and expenditure initiatives. In 2018, the Oversight Board
335 set 5-year goals that included achieving rates below 20 cents/kWh (driven by a substantial
336 reduction in fuel and purchased power costs) and grid reliability metrics consistent with the U.S.
337 average. Today rates are above 26 cents/kWh and grid reliability metrics are comparable to or
338 worse than they were pre-hurricane Maria.[35]

339 The Oversight Board and Bondholders' failure to grapple with this reality undermines their
340 analysis. Specifically, they fail to appreciate the impact of the ongoing excessive dependence on
341 fossil fuels on the electrical system budget. The need to substantially reduce fossil fuel dependency
342 is, according to 2022 PREPA Certified Fiscal Plan, at the core of the financial challenge that
343 PREPA faces. The historic difficulty of achieving a transformation to renewable energy and the
344 political pressures operating against it mean that there will be no chance of generating the cash
345 surpluses necessary to pay for legacy debt. A high priced, fossil fuel dependent electricity system
346 will contribute to Puerto Rico's weak economic outlook. Starving the system of capital and
347 operational spending means that basic reliability standards cannot be met, which is a red flag not
348 only to residential customers but also to manufacturers. The Oversight Board and Bondholders fail
349 to appreciate the rate at which the public is installing rooftop solar and storage in response to the
350 deteriorating grid.

---

[35] See p. 14 of my direct testimony and p. 24 of the August 2018 PREPA Certified Fiscal Plan.

18

351  The Expert Witnesses for the Oversight Board and Bondholders have addressed some of the
352  problems, but none grabbed hold of the problem clearly and concisely. PREPA, and LUMA and
353  Genera as its operators will continue to find it difficult if not impossible to make ends meet on a
354  day to day operational basis. The slow or no growth economy consigns PREPA and the Island to a
355  difficult future. Here, past performance is an indicator of the future. The Plan of Adjustment and
356  proposed Legacy Charge is unrealistic. A clear comprehensive plan is available.

357  **Q. What are your recommendations?**

358  IEEFA's plan provides a reasonable settlement for bondholders, employees, retirees, consumers,
359  businesses. It also is one that does not place any further burden on currently unaffordable electricity
360  rates.

361  As discussed in IEEFA's October 2019 letter[36] to the Puerto Rico legislature such a plan would: 1)
362  reimburse those bondholders who hold insured bonds; 2) repay bondholders from a fund supported
363  by a group of underwriters that benefited from PREPA's issuances but who nevertheless supplied
364  inadequate diligence as outlined in the Oversight Board's Investigative report prepared by Kobre
365  and Kim; 3) establish a final recovery rate that amounts to the sum of Items 1 and 2; 4) Use some
366  amount of the fund to bring the pension fund into actuarial alignment and to insure that any small,
367  resident of Puerto Rico bondholder be compensated 100% for their bonds; 5) Establish clear
368  liability building upon Kobre and Kim's investigative research and make criminal and civil
369  referrals as appropriate; 6) Appoint an independent private sector inspector general to insure that
370  the IRP is implemented and that PREPA, LUMA or their predecessors are supported in creating an

---

[36] https://ieefa.org/wp-content/uploads/2019/10/Letter_to_the_Legislative_Assembly_Regarding_Restructuring_Agreement_for_PREPA_October_2019.pdf.

371 effective and ethical organization to complete the grid rebuild and run an operation that controls

372 costs and rates.

373 As a financial proposition, IEEFA's plan utilizes the $14 billion as substantial core funding to

374 rebuild the grid. The balance of the cash needed to complete the job can be raised through: 1)

375 Additional federal dollars; 2) Additional Bond issuances, if possible; or 3) Innovative financing

376 techniques like that described above in the New Fortress Energy contract for the San Juan plant.

377 The Plan of Adjustment will fail for all the reasons cited in my testimony and that of others. The

378 plan IEEFA proposes gives PREPA and its predecessors a chance to start fresh.

379 **I declare under penalty of perjury pursuant to the laws of the United States of America that**

380 **the foregoing is true and correct to the best of my knowledge and belief.**

381 Dated: May 15, 2023.

382 *[signature]*

383 _____

384 Thomas Sanzillo