## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>                       Debtors.[1] | PROMESA<br>Title III<br><br><br><br>Case No. 17 BK 3283-LTS<br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO<br><br>    as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>                       Debtor. | PROMESA<br>Title III<br><br><br>Case No. 17 BK 4780-LTS |

## UNION DE TRABAJADORES DE LA INDUSTRIA ELÉCTRICA Y RIEGO INC.'S OBJECTION TO PROPOSED CONFIRMATION ORDER

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations.)

**Table of Contents**

I.   PROCEDURAL BACKGROUND.......................................................................................1

II.   ARGUMENTS ...........................................................................................................1

  A.   THE CONFIRMATION ORDER IS UNCONSTITUTIONAL TO THE EXTENT
THAT AFFECTS THE DUE PROCESS RIGHTS OF THIRD PARTIES THAT ARE NOT
PARTICIPATING IN THE TITLE III CASE.........................................................................1

  B.   THE CONFIRMATION ORDER IS AN INSTRUMENT OF PROMESA, WHICH IS
A PRODUCT OF THE *INSULAR CASES* THAT SHOULD BE REPEALED. ..................10

III.   CONCLUSION ...........................................................................................................16

RELIEF REQUESTED.........................................................................................................16

# TABLE OF AUTHORITIES

**Constitutional Provisions**

U.S. Const. Art. IV ...................................................................................................15

U.S. Const. amend. V, XIV ..........................................................................................3

**Federal Statutes**

11 U.S.C. § 101(5). ......................................................................................................2
11 U.S.C. § 101(10)(A) ...............................................................................................2
11 U.S.C. § 101(12). ....................................................................................................2
11.U.S.C.§ 524(a)( .....................................................................................................2
11 U.S.C. § 944 ...........................................................................................................3
48 U.S.C. § 2101 et seq................................................................................... 10, 11

**Federal Cases**

Bd. of Regents v. Roth,
    408 U.S. 564 (1972) ...............................................................................................3


Civil Rights Cases,
    109 U.S. 3(1883) ..................................................................................................14


Downes v. Bidwell,
    182 U.S. 244 (1901) .............................................................................................15


Hodges v. United States,
    203 U.S. 1 (1906) .................................................................................................14


In re Galindez,
    514 B.R. 79 (Bankr. D.P.R. 2014) ..........................................................................4


In re Temsco NC Inc.,
    537 B.R. 108 (Bankr. D.P.R. 2015) ....................................................................3, 5


Matter of Intaco Puerto Rico., Inc.,
    494 F.2d 94 (1st Cir. 1974)...................................................................................4, 9


Matthews v. Eldridge,
    424 U.S. 319 (1976) ...............................................................................................3


Paging Network, Inc. v. Nationwide Paging, Inc. (In re Arch Wireless, Inc.),

534 F.3d 76 (1st Cir. 2008) ................................................................................6

Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship,
    507 U.S. 380 (1993) ..................................................................................5

Trump v. Hawaii,
    __138 S. Ct. 2392 (2018) ...........................................................................12

United States v. Monahan (In re Monahan),
    497 B.R. 642 (B.A.P. 1st Cir. 2013) ...............................................4, 5, 9

United States v. Vaello-Madero,
    142 S. Ct. 1539 (2022)(J. Gorsuch, concurring). .............................12, 13, 14, 15

United Student Aid Funds, Inc. v. Espinosa,
    559 U.S. 260 (2010) ...................................................................................4

Vicenty v. San Miguel Sandoval (San Miguel Sandoval),
    327 B.R. 493 (B.A.P. 1st Cir. 2005)...........................................................4, 9

**Secondary Sources**

Derdlim Rodríguez Malavé, *P.R.O.M.E.S.A.: Another Consequence of The Constitutionally
    Infirm Interpretation Of The Territorial Clause*, 54 REV. JUR. UIPR 413, 434 (2019-2020).
    ...........................................................................................................................16

Juan R. Torruella, *The Insular Cases: The Establishment of a Regime of Political Apartheid*,
    29:2 U. PA. J. INT'L L. 283 (2007)...............................................................12, 13

JUAN R. TORRUELLA, THE SUPREME COURT AND PUERTO RICO, THE DOCTRINE OF SEPARATE
    AND UNEQUAL (1985).....................................................................................12

**TO THE HONORABLE DISTRICT COURT:**

**COMES NOW** Unión de Trabajadores de la Industria Eléctrica y Riego  ("UTIER")
duly represented by the undersigned counsel and respectfully states as follows:

## I.     PROCEDURAL BACKGROUND

1. The *Modified Second Amended Plan of Adjustment of the Puerto Rico Electric Power
Authority* ("Plan of Adjustment"), **ECF No. 3296,** and the *Disclosure Statement for
Modified Second Amended Plan of Adjustment of the Puerto Rico Electric Power Authority*
("Disclosure Statement"), **ECF No. 3297**, were filed on March 1st, 2023.[2] Pursuant to the
*Third Amended and Restated Order establishing, among other things, procedures and
deadlines concerning objections to confirmation and discovery in connection therewith*
("Procedural Order"), the parties have been engaged in rigorous discovery. **ECF No. 3565.**

2. Pursuant to the Procedural Order, on June 5th, 2023, the Oversight Board filed its
("Proposed Confirmation Order"). **ECF No. 3587.** On June 7th, 2023, votes were cast for
the confirmation of the Plan of Adjustment. Under the same deadlines, UTIER hereby files
its **Objection to the Proposed Confirmation Order**.[3]

## II.     ARGUMENTS

**A. THE CONFIRMATION ORDER IS UNCONSTITUTIONAL TO THE EXTENT
THAT AFFECTS THE DUE PROCESS RIGHTS OF THIRD PARTIES THAT ARE
NOT PARTICIPATING IN THE TITLE III CASE.**

### i.     Applicable law for discharge and releases

3. PROMESA itself does not define many terms, but it incorporates Section 101 of the
Bankruptcy Code which contains various definitions. For example, the definition of
"claim" under the Bankruptcy Code is a:

---

[2] As of the date of this filing, these are the most recent versions of the Plan of Adjustment and Disclosure Statement
on the public docket, while the Claim Estimation Hearings revealed that the Oversight Board's data may result in
a substantial change in the document. Thus, UTIER reserves every right to amend and supplement this filing
should subsequent amendments be filed.
[3] In addition to the arguments set forth, UTIER objects to the Proposed Confirmation Order for the reasons stated
in the objections to the Plan of Adjustment filed by UTIER, **ECF No. 3705** and SREAEE**, ECF No. 3703.**

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured. 11 U.S.C. § 101(5).

4.  Moreover, the Code separately defines "debt" as a "liability on a claim". Id. § 101(12).

Therefore, claims and debts, while coextensive, are not exactly synonymous. Moreover,

regarding the discharge of debts, the Code states that:

A discharge in a case under this title—(1) voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any **debt** discharged . . . whether or not discharge of such debt is waived; (2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such **debt** as a personal liability of the debtor. . . Id. § 524(a)(emphasis added).

5.  From this language, the logical conclusion is that the discharge does not affect claims, but

debts. That is, once the debtor's liability for a claim is determined, that claim becomes a

debt and becomes dischargeable. The Code also establishes exceptions to discharge, but

these are contained in Section 523 which does not apply in Chapter 9 and was not

incorporated into PROMESA. Thus, the only possible exceptions to discharge must arise

from the Plan, Confirmation Order or Section 944 of the Code.

6.  Moreover, the Code generally defines a "creditor" as an "entity that has a claim against the

debtor **that arose at the time of or before the order for relief** concerning the debtor[.]"

Id. § 101(10)(A)(emphasis added).

7.  Moreover, PROMESA adopts Section 944 of the Bankruptcy Code which states:

(a) **The provisions of a confirmed plan bind the debtor and any creditor**, whether or not— (1) a proof of such creditor's claim is filed or deemed filed under section 501 of the title; (2) such claim is allowed under section 502 of this title; or (3) such creditor has accepted the plan.

(b) Except as provided in subsection (c) of this section, **the debtor is discharged from all debts as of the time when—(1) the plan is confirmed;**

2

(2) the debtor deposits any consideration to be distributed under the plan with a disbursing agent appointed by the court; and (3) the court has determined— (A) that any security so deposited will constitute, after distribution, a valid legal obligation of the debtor; and (B) that any provision made to pay or secure payment of such obligation is valid.

(c)The debtor is not discharged under subsection (b) of this section from **any debt**—(1) excepted from discharge by the plan or order confirming the plan; **or (2) <u>owed to an entity that, before confirmation of the plan, had neither notice nor actual knowledge of the case.</u>** <u>Id.</u> § 944 (emphasis added).

### ii. Due process rights

8. Under the U.S. Constitution, no one will be deprived of their property without due process. U.S. Const. amend. V, XIV. **The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner."** <u>Matthews v. Eldridge</u>, 424 U.S. 319, 333 (1976)(emphasis added). For that reason, due process is circumstantial.

9. There are three factors to consider in the determination of whether due process is met: (1) the private interest affected; (2) the risk of an erroneous determination due to the used process and the value of additional safeguards; and (3) the public interest alleged. <u>Id.</u> at 335. "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. When protected interests are implicated, the right to some kind of prior hearing is paramount." <u>Bd. of Regents v. Roth</u>, 408 U.S. 564, 569-70 (1972)(footnote omitted). "Constitutional due process encompasses not only the opportunity to be heard but **the opportunity to obtain adequate notice of the contemplated action**." <u>In re Temsco NC Inc.</u>, 537 B.R. 108, 119-20 (Bankr. D.P.R. 2015)(emphasis added).

10. An essential part of due process is adequate notice. Specifically, "[d]ue process requires notice 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'"

United Student Aid Funds, Inc. v. Espinosa, 559 U.S. 260, 272 (2010). See, also, United

States v. Monahan (In re Monahan), 497 B.R. 642, 651 (B.A.P. 1st Cir. 2013).

11. Evidently, "proceedings in bankruptcy cases are subject to the requirements of due

process under the Fifth Amendment to the United States Constitution." Vicenty v. San

Miguel Sandoval (San Miguel Sandoval), 327 B.R. 493, 506 (B.A.P. 1st Cir. 2005)(citation

omitted). "Thus, general principles limiting a creditor's rights in bankruptcy **give way when**

**the creditor has not received sufficient notice of the bankruptcy case.**" Id. at 506-07

(emphasis added)(citations omitted).

12. In the context of confirmation of a plan of adjustment by a bankruptcy court, and in

alignment with the Espinosa decision, courts have adopted the norm that the binding effect

of a confirmed plan requires that "the due process requirements of reasonable and actual

notice were satisfied." In re Galindez, 514 B.R. 79, 97 (Bankr. D.P.R. 2014). Therefore,

the confirmation of a plan "cannot be *res judicata* as to objections later raised by a creditor

if the creditor has not received adequate notice in the bankruptcy case." Vicenty, 327 B.R.

at 507. Nor can barring a creditor's claim be constitutionally sustained if the debtor has

caused the creditor to miss the proof of claim deadline. Id.

13. The First Circuit BAP has expressly stated that that "a creditor's **actual but generalized**

**knowledge of the pendency of a bankruptcy case** does not impose on the creditor the

burden of constantly inquiring of the court about possible bar dates." Vicenty, 327 B.R. at

508(citing Matter of Intaco Puerto Rico., Inc., 494 F.2d 94, 99 (1st Cir. 1974))(emphasis

added). In fact, "the First Circuit held that a creditor who was not given **formal notice of**

**the pendency of the bankruptcy or the developments in the case**, including the bar date

for claims, but had a generalized knowledge of the pendency of the case, was not barred

from filing its claim late." Vicenty, 327 B.R. at 508 (citing Intaco, 494 F.2d at 99)(emphasis

added). For instance, the First Circuit BAP has stated that due process adequate notice

requires a "**clear, open, and explicit statement of a secured creditor's treatment in [the plan] before the creditor's failure to object will be deemed implied acceptance**." In re Monahan, 497 B.R. at 652(emphasis added).

> The notice must be of such nature as **reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance**. But if with due regard for the practicalities and peculiarities of the case these conditions are met the constitutional requirements are satisfied. The purpose of statutorily requiring a debtor to list its creditors with their mailing addresses is to provide them with basic due process notice. It **is the debtor's burden to establish that the creditor received adequate notice**. Temsco, 537 B.R. at 120 (ellipsis and citations omitted)(emphasis added).

14. Whether there was reasonable notice requires evaluation of the circumstances, including "whether alleged inadequacies in the notice **prejudiced the creditor**. Another factor to consider is whether notice was given to the creditor **in time for it to take meaningful action** in response to the impending deprivation of rights." Id. (citations and quotation marks omitted)(emphasis added).

15. "If a creditor does not receive reasonable notice of a bankruptcy case and the particular bar dates**, then its claim cannot be constitutionally discharged**." Id. (citations omitted)(emphasis added).[4] Moreover, the Supreme Court has sustained that a notice such as "a bar date in a bankruptcy case should be **prominently announced and accompanied by an explanation of its significance**." Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 398 (1993)(emphasis added)(citation omitted).

> [T]he fact that the creditor may be **generally aware** of the pending reorganization, does not of itself impose upon him an affirmative burden to

---

[4] It should be noted that:

> The Bankruptcy Code and Rules require a debtor to list all of its creditors so that these creditors are notified of key events in the bankruptcy proceeding that may affect their rights. The Bankruptcy Rules specify that known creditors must receive: (1) notice of deadlines for filing proofs of claims (bar date), Fed. R. Bankr. P. 2002(a)(7); (2) a copy of the reorganization plan, Fed. R. Bankr. P. 3017(d); (3) notice of the confirmation hearing, Fed. R. Bankr. P. 3017(d); and (4) the confirmation order, Fed. R. Bankr. P. 2002(f). In re Temsco NC Inc., 537 B.R. 108, 120-21 (Bankr. D.P.R. 2015)(citations and quotation marks omitted).

intervene in that matter and present his claim. **The creditor has a right to assume that proper and adequate notice will be provided before his claims are forever barred**. Paging Network, Inc. v. Nationwide Paging, Inc. (In re Arch Wireless, Inc.), 534 F.3d 76, 83 (1st Cir. 2008)(citations, ellipsis, brackets and quotation marks omitted)(emphasis added).

16. In summary, constitutional due process requires reasonable notice to creditors before their claims can be discharged. Generalized knowledge of the pendency of a case is not enough, there must be notice and it must be proper, adequate, and timely.

### iii. Description of the release and discharge provisions of the Confirmation Order

17. Paragraph 50 of the Proposed Confirmation Order states that "all **Entities** who have held, hold, or **may hold Claims** or any other Debt or liability discharged or released pursuant to Article XXVII of the PREPA Plan or who have held, hold, or **may hold Claims** or any other Debt or liability discharged or released pursuant to Article XXVII of the PREPA Plan are permanently enjoined, from and after the Effective Date, from . . ." pursuing such claims. **ECF No. 3587 at 44** (emphasis added).

18. Paragraph 53 of the Proposed Confirmation Order states that "all **Entities** that hold, have held **or in the future may hold** a Released **Claim** pursuant to **Article XXVII** of the PREPA Plan, are, and shall be, permanently, forever, and completely stayed, barred and enjoined from taking any . . . action, whether directly or indirectly, derivatively, or otherwise . . ." to pursue their claim. **ECF No. 3587 at 48** (emphasis added).

19. Paragraph 48 of the Proposed Confirmation Order states that

> all distributions and rights afforded under the PREPA Plan shall be, and shall be deemed to be, in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims or Causes of Action against PREPA and Reorganized PREPA **that arose, in whole or in part, prior to the Effective Date,** relating to the Title III Case, the Debtor or Reorganized Debtor or any of their respective Assets, property, or interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the PREPA Plan on account of such Claims or Causes of Action. **ECF No. 3587 at 34** (emphasis added).

20. As such, any claim that arises between this moment and the Effective Date of the Plan will be forever barred. However, those claimants that are affected will not know that their claims are barred until the Oversight Board provides notice of the occurrence of the Effective Date, **ECF No. 3587 at 191,** by which time it will be too late to save their claim. As such, there are people in Puerto Rico who are currently being deprived of claims and causes of action that they are not even aware of yet or that have not come into existence, regardless of the nature of these claims.

21. In addition to the applicable law, the City of Detroit's Chapter 9 Plan of Adjustment can be illustrative. In this area, it does not appear to be much different. In this case, the discharge provisions under the Effect of Confirmation of the Plan read as follows:

> 4. Discharge of Claims. a. Complete Satisfaction, Discharge and Release. **Except as provided in the Plan or in the Confirmation Order,** the rights afforded under the Plan and the treatment of Claims under the Plan will be in exchange for and in complete satisfaction, discharge and release **of all Claims arising on or before the Effective Date**, including any interest accrued on Claims from and after the Petition Date. **Except as provided in the Plan or in the Confirmation Order, Confirmation will, as of the Effective Date, discharge the City from all Claims or other debts that arose on or before the Effective Date,** and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (iii) the Holder of a Claim based
>
> on such debt has accepted the Plan. b. Discharge. In accordance with Section III.D.4.a, **except as expressly provided otherwise in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination, as of the Effective Date, of a discharge of all debts of the City**, pursuant to sections 524(a)(1), 524(a)(2) and 944(b) of the Bankruptcy Code, and such discharge will void any judgment obtained against the City at any time, to the extent that such judgment relates to a discharged debt; **provided that such discharge will not apply to** (i) debts specifically exempted from discharge under the Plan; and **(ii) debts held by an Entity that, <u>before the Confirmation Date</u>, <u>had neither notice nor actual knowledge</u>** of the Chapter 9 Case. **Exhibit 1 at 57** (emphasis added).

22. Pursuant to the text cited above, the Proposed Confirmation Order will result in a permanent injunction on all post-petition claims or causes of action that arose post-petition and prior

to the Effective Date, which is yet undetermined. Any such claim or cause of action would be permanently enjoined, regardless of whether the cause of action is known or has been claimed in court or otherwise.

### iv. Analysis of injunction constitutionality

23. This language is so broad that it may include causes of action that parties are unaware they have in their favor. It is so absurd that if, on the day before the Effective Date, a person is injured by the negligence of PREPA, and they file their case within the applicable statute of limitations, this case would be barred. Unlike the Commonwealth Plan of Adjustment, the exceptions to this rule for gross negligence, intentional fraud, and willful misconduct appear to be missing. This is further aggravated by the binding effect of the Confirmation Order, which extends to all parties in interest, not just creditors.

24. Under PROMESA and the Bankruptcy Code, a confirmed plan would only bind the debtor and its creditors, those who are related to the case and have prepetition claims. However, the Confirmation Order binds parties in interest, which extends to people who do not necessarily have any connection or knowledge of the case and whose claims may have arisen post-petition. Additionally, the discharge could only affect debts. Moreover, it could not affect debts owed to entities that did not receive notice or have actual knowledge of the case before the Plan's confirmation. In this way, the Plan's effect is much broader than the law. This result is patently unfair and laughs in the face of all due process rights.

25. That said, under the principles of constitutional due process, the Confirmation Order cannot constitutionally discharge claims of non-creditors that did not receive adequate notice **before** the confirmation of the Plan. Adequate notice here has been discussed in the First Circuit and it has been held that "a creditor's **actual but generalized knowledge of the pendency of a bankruptcy case** does not impose on the creditor the burden of

**constantly inquiring of the court about possible bar dates**.” <u>Vicenty</u>, 327 B.R. at 508

(<u>citing Intaco</u>, 494 F.2d at 99)(emphasis added).

26. Which means to say that, even though all of Puerto Rico has some sense of the fact that

there is a Title III case pending, this does not impose on anyone the duty to check and make

sure that they are not affected by it. The duty to provide **formal notice** lies, in this case,

with the Oversight Board. <u>Vicenty</u>, 327 B.R. at 508 (<u>citing Intaco</u>, 494 F.2d at 99)(emphasis

added). This requires a “clear, open, and explicit statement”. <u>In re Monahan</u>, 497 B.R. at

652. Without such notice, a party’s claim cannot be constitutionally discharged.

Consequently, the permanent injunction cannot apply to them. The injunction has no basis

outside of the discharge and release provisions of the Plan, and it suffers from the same

lack of adequate notice as the Plan and the discharge. Therefore, it cannot constitutionally

bar a party from exercising their rights forever.

27. Additionally, as discussed above, PROMESA and the Bankruptcy Code provide for a

confirmation order to bind **creditor,** not just any party or persona outside of bankruptcy.

Moreover, these same provisions discharge debts and claims, which do not include post-

petition obligations or liabilities. Thus, the Proposed Confirmation Order contains a release

and discharge language that is far out of the bounds of the provisions of discharge under

PROMESA and the Bankruptcy Code.

28. Moreover, the discharge of post-petition obligations would be  inconsistent with the

underlying principles of PROMESA. The purpose of any bankruptcy process is to allow a

financially distressed debtor to rehabilitate, without unfairly prejudicing creditors and

claimants. In the case of municipalities under Chapter 9 and territorial instrumentalities

under PROMESA, the purpose it to restructure their debts so they can continue providing

public services to its citizens. Discharging post-petition obligations exceeds what is

reasonable, as it would allow the debtor to continue incurring new obligations and liabilities

without taking on the responsibility of fulfilling them. Essentially, it is giving the covered debtor a blank check to incur in conduct that results in liabilities without repercussions, knowing that upon the entrance of judgment the confirmation order will release it.

29. Furthermore, it is essential to remember that while subject to Title III, the debtor continues to operate as usual. The continuation of services necessarily includes the acquisition of new obligations, as these are inevitable in the conduct of business. Additionally, post-petition actions create pos-petition liabilities for negligence, or other illicit conduct. There is no clear statutory authority to extend the releases and discharges of bankruptcy this far. To do so would be an abuse of the Court's powers in equity and contrary to the exceptional nature of bankruptcy remedies.

30. In view of the foregoing, the Proposed Confirmation Order should not be adopted by this Court.

## B.  THE CONFIRMATION ORDER IS AN INSTRUMENT OF PROMESA, WHICH IS A PRODUCT OF THE *INSULAR CASES* THAT SHOULD BE REPEALED.

31. For over a decade, Puerto Rico's economy has been in a steep decline. As a result, the Commonwealth defaulted on much of its debt and was running on crippling deficits. Consequently, the Commonwealth made drastic cuts to government spending, including mass layoffs and radical pension reforms for public employees. By 2016, the Commonwealth's massive debt became unsustainable, and it lost access to financial markets.

32. On June 30, 2016, the President of the United States signed the PROMESA into law. 48 U.S.C. § 2101 *et seq*. Congress enacted PROMESA pursuant to Article IV, Section 3 of the Constitution of the United States, which provides Congress the power to dispose of and make all needful rules and regulations for territories ("Territories Clause"). Id. § 2121(b)(2). PROMESA has two main components: (1) the imposition of the Oversight

Board and (2) the creation of Title III to allow the territory and its instrumentalities access to bankruptcy relief.

33. Publicly, the purpose of PROMESA was to tackle the fiscal emergency in Puerto Rico through the institution of "comprehensive approach to Puerto Rico's fiscal, management and structural problems and adjustments . . . involving independent oversight and a Federal statutory authority for the Government of Puerto Rico to restructure debts in a fair and orderly process." Id. § 405(m)(4).

34. Thus, the statute provided for the establishment of a non-elected seven-member (7) Oversight Board for Puerto Rico with the purpose of providing a method for the island to achieve fiscal responsibility and access to the capital markets. Id. at § 101(b)(1). The Oversight Board was given sole discretion to designate any territorial instrumentality as a covered entity subject to the requirements of PROMESA. Id. § 2121(d)(1)(A). It may also require the Governor to submit budgets and monthly or quarterly reports regarding a covered territorial instrumentality and designate any covered territorial instrumentality to be included in the Commonwealth Budget. Id. § 2121(d)(1)(B). Under PROMESA, Congress allowed the Oversight Board the power to review and annul legislation, 48 U.S.C. § 2144; and approve and control fiscal plans and budgets. Id. § 2141-2143. It alone can commence Title III cases and file a plan of adjustments. Id. § 2175. It has veto power over budgets, id. § 2142, bonds, id. §2147, and legislation. Id. §2144(a)(1), (5). Pursuant to PROMESA, the Oversight Board has the exclusive authority to initiate Title III cases and propose plans of debt adjustment. Id. §§ 2164(a); 2172(a).

### i. Insular Cases

35. In 1898, the United States invaded Puerto Rico. To make matters worse, the Supreme Court imposed the ignominious colonial judicial doctrine of the *Insular Cases*. [5] These cases embodied and legitimized the colonial relationship between the United States and Puerto Rico. Such cases determined that Puerto Rico is an unincorporated territory, which belongs to, but is not part of, the United States. Therefore, Puerto Rico's residents required different treatment from residents of the continental United States. These cases "stand at par with *Plessy v. Ferguson* in permitting disparate treatment by the government of a discrete group of citizens."[6] See, also, United States v. Vaello-Madero, 142 S. Ct. 1539 (2022)(J. Gorsuch, concurring).

> The concept that the Bill of Rights and other constitutional protections against arbitrary government are inoperative when they become **inconvenient or when expediency dictates otherwise** is a very dangerous doctrine and **if allowed to flourish would destroy the benefit of a written Constitution** and undermine the basis of our Government. See Reid, 345 U.S. at 14 footnotes omitted)(emphasis added).

36. "[T]he time has come to recognize that the *Insular Cases* rest on a rotten foundation." Vaello-Madero, 142 S. Ct. at 1557 (J. Gorsuch, concurring). The day has come for the Court to squarely overrule them. See Id. Even if the *Insular Cases* were wholly unrelated to this case, which they are not, this Court has "the opportunity to make express what is already obvious: [The *Insular Cases* were] gravely wrong the day [they were] decided . . . [and have] no place in law under the Constitution." Trump v. Hawaii, 138 S. Ct. 2392, 2423 (2018)(citation omitted)(overruling *Korematsu* even though it "ha[d] nothing to do with [the] case . . . ."). While these words were uttered by this Court in relation to the also infamous case of *Korematsu v. United States*, they hold true in this context. The subjugation

---

[5] Among others, *DeLima v. Bidwell*, 182 U.S. 1, 200 (1901); *Goetze v. United States*, 182 U.S. 221, 221-22 (1901); *Dooley v. United States*, 182 U.S. 222, 236 (1901); *Armstrong v. United States*, 182 U.S. 243, 244 (1901); *Downes v. Bidwell*, 182 U.S. 244, 287 (1901); *Huus v. New York & Porto Rico S.S. Co.*, 182 U.S. 392, 397 (1901); *Dorr v. United States*, 195 U.S. 138, 148 (1904).
[6] Juan R. Torruella, The Supreme Court and Puerto Rico, The Doctrine of Separate and Unequal 3 (1985). *See, also,* Juan R. Torruella, *The Insular Cases: The Establishment of a Regime of Political Apartheid*, 29:2 U. Pa. J. Int'l L. 283, 286 (2007).

of a whole class of people under racially motivated colonial rule is "morally repugnant",
see Id., and should be overruled.

37. The judicial doctrine of the *Insular Cases* determined that Puerto Rico is not a foreign
country in relation to the United States, but an unincorporated territory, which belongs to,
but is not part of, the United States, and to which only a few fundamental constitutional
rights of the Federal Constitution apply. That imposed the abhorrent condition of the
deprivation of fundamental human rights upon the Puerto Rican People that is contrary to
binding international law,[7] and the democratic principles the United States flaunts before
the international community. The *Insular Cases* show the United States as an empire with
complete control over its colonial subjects in Puerto Rico.

38. The *Insular Cases* reflect outdated theories of imperialism and racial inferiority.[8] Initially,
the issue arose to answer the question of whether a tax law complied with the Constitution,
but:

> To answer the question whether the Act complied with the Constitution,
> **the Court resolved that it first had to decide whether the Constitution
> applied *at all* in Puerto Rico.** Ultimately, a fractured set of opinions
> emerged. Employing arguments similar to those advanced by Professors
> Langdell and Thayer, Justice Brown saw things in the starkest terms. Applying
> the Constitution made sense in contiguous territories inhabited only by people
> of the same race, or by scattered bodies of native Indians. **But it would not do
> for islands inhabited by alien races, differing from us in religion, customs,
> laws, methods of taxation, and modes of thought**. There, Justice Brown
> contended, the administration of government and justice, according to Anglo-
> Saxon principles, may for a time be impossible. On his view, the Constitution
> should reach Puerto Rico only if and when Congress so directed. Vaello-
> Madero, 142 S. Ct. at 1553 (J. Gorsuch, concurring)(emphasis added)(italics in
> the original)(citations and quotation marks omitted).

---

[7] "This Constitution, and the laws of the United States which shall be made in pursuance thereof; **and all treaties
made, or which shall be made, under the authority of the United States, shall be the supreme law of the
land**; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the
contrary notwithstanding." U.S. Const. Article VI (emphasis added).
[8] *See* Torruella, *The Insular Cases*, *supra* note 7, at 286-287.

39. Thus, the *Insular Cases* stand for the notion that the **alien races** that inhabited Puerto Rico were too different to live under the principles of the United States Constitution. See Downes v. Bidwell, 182 U.S. 244, 287 (1901) (emphasis added). The result was for Congress to "keep a Territory, like a disembodied shade, in an intermediate state of ambiguous existence for an indefinite period." Vaello-Madero, 142 S. Ct. at 1554 (J. Gorsuch, concurring)(citations and brackets omitted). Moreover, the decision engrafted "a colonial system such as exists under monarchical governments." Id. (citations omitted). Furthermore, the subjugation of a people without representation, echoes the badges and incidents of slavery in the United States forbidden by the U.S. Constitution.[9]

40. Under the Territories Clause and the *Insular Cases*, Puerto Rico continues to be a colony inhabited by millions of second-class American citizens who do not have the same political or economic rights as the resident citizens of the states. Puerto Rico is subject to the will of Congress and the Federal Government, although its resident citizens cannot vote in federal elections, do not have federal representatives with a vote in Congress, receive discriminate treatment in federal funding and are in numerous ways unable to exercise any sovereignty that would allow them to develop their economy and society. Rather than amend the Bankruptcy Code to include Puerto Rico and other territories in Chapter 9, Congress called upon its extraordinary and violent powers pursuant to the *Insular Cases* to pass new legislation which would only allow Puerto Rico to reorganize its debts under the conditions unilaterally established by an unelected board with powers superior to its own Government. As this case and many others show, the Board is currently the deciding voice over law and public policy in Puerto Rico, circumventing the elected Government in practically all fundamental issues.

---

[9] See *Civil Rights Cases*, 109 U.S. 3, 4, 3 S.Ct. 18, 27 L.Ed. 835 (1883) and *Hodges v. United States,* 203 U.S. 1, 27 S.Ct. 6, 51 L.Ed. 65 (1906).

41. Thus, this Court can and should overrule the morally repugnant interpretation given by this Court to the Territories Clause in the *Insular Cases*. This interpretation was wrongly decided and has dragged on for over a century keeping Puerto Rico's resident citizens in the throes of colonialism. The colonial status of Puerto Rico and the racist determinations of the *Insular Cases* do not reflect the contemporary political standards of civil and human rights under international law.

42. As Justice Gorsuch recently expressed:

> **The flaws in the Insular Cases are as fundamental as they are shameful**. Nothing in the Constitution speaks of "incorporated" and "unincorporated" Territories. Nothing in it extends to the latter only certain supposedly "fundamental" constitutional guarantees. **Nothing in it authorizes judges to engage in the sordid business of segregating Territories and the people who live in them on the basis of race, ethnicity, or religion.**
>
> The Insular Cases can claim support in academic work of the period, **ugly racial stereotypes**, and the theories of social Darwinists. But they have no home in our Constitution or its original understanding. Vaello-Madero, 142 S. Ct. at 1554 (J. Gorsuch, concurring)(emphasis added)(citations omitted).

### ii. PROMESA should be declared unconstitutional.

43. Because the *Insular Cases* should be repealed, PROMESA should go with them.

44. PROMESA was enacted by Congress pursuant to its plenary powers under Article IV of the U.S. Constitution, which states that "Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States." U.S. Const. Art. IV, §2, cl. 1. This constitutional provision was further interpreted by the Supreme Court in the racist and infamous *Insular Cases*, which established a distinction between incorporated and unincorporated territories based on race. See Downes v. Bidwell, 182 U.S. 244, 287 (1901). PROMESA "revives the notion of

absolute congressional micromanagement over the territories as possessions of the United States."[10]

45. For the foreseeable future, PREPA's Plan of Adjustment is the biggest battle raging between the people of Puerto Rico and the Oversight Board. The reason for this is the proposal of the Legacy Charge in the Plan of Adjustment for the sole purpose of paying legacy debt. The Plan of Adjustment hopes to deprive Puerto Rico's elected and public officials of any say in the imposition of this Legacy Charge which will have widespread consequences throughout the economy and cause mayhem for individuals, businesses, and the government alike. Some experts assure us that the Plan of Adjustment will bring about a downward economic spiral and land the Commonwealth back in bankruptcy.

46. This fight is the direct consequence of the colonial relationship propped up by the Territories Clause and the *Insular Cases,* which have been channeled through PROMESA and the imposition of a nearly all-powerful Oversight Board. Thus, PROMESA, to the extent that it imposes the Oversight Board rather than allow Puerto Rico bankruptcy relief similar to that of other entities is broadly and patently discriminatory on the basis of the unconstitutional foundations of the *Insular Cases*. Thus, once again, UTIER calls for its repeal.

## III.  CONCLUSION

47. In conclusion, the Court should not adopt the Proposed Confirmation Order. Additionally, the *Insular Cases* should be repealed; PROMESA should be declared unconstitutional; and the Oversight Board should be abolished once and for all.

### RELIEF REQUESTED

**WHEREFORE,** in view of the foregoing, the Court should deny confirmation.

---

[10] Derdlim Rodríguez Malavé, *P.R.O.M.E.S.A.: Another Consequence of The Constitutionally Infirm Interpretation Of The Territorial Clause*, 54 REV. JUR. UIPR 413, 434 (2019-2020).

**WE HEREBY CERTIFY** that on this same date we electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all participants and Standard Parties. A courtesy copy of this Motion will be delivered to the Court by email to SwainDPRCorresp@nysd.uscourts.gov as provided in *First Amended Standing Order.*

In Ponce, Puerto Rico, this 12th day of June 2023.



**BUFETE EMMANUELLI, C.S.P.**
P.O. Box 10779
Ponce, Puerto Rico 00732
Tel.: 787-848-0666
Fax: 787-841-1435

*/s/Rolando Emmanuelli-Jiménez*
Rolando Emmanuelli-Jiménez, Esq.
USDC: 214105
rolando@emmanuelli.law

*/s/Jessica E. Méndez-Colberg*
Jessica E. Méndez-Colberg, Esq.
USDC: 302108
jessica@emmanuelli.law

*/s/ Zoé C. Negrón-Comas*
Zoé C. Negrón-Comas, Esq.
USDC: 308702
zoe@emmanuelli.law

*Counsel to UTIER*