## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors.[1] | PROMESA Title III<br><br>No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Debtor. | PROMESA Title III<br><br>No. 17-BK-4780-LTS |

## OBJECTION OF THE AD HOC GROUP OF PREPA BONDHOLDERS TO THE MODIFIED SECOND AMENDED TITLE III PLAN OF ADJUSTMENT OF THE PUERTO RICO ELECTRIC POWER AUTHORITY

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................. 1

BACKGROUND .................................................................................................... 3

    A.    The Trustee's And Bondholders' Claim ................................................ 3

    B.    The Previous Restructuring Agreements ................................................ 4

    C.    Mediation Fails To Restore A Consensual Resolution ........................... 7

    D.    The History Of The Plan And Disclosure Statement .............................. 8

    E.    The Plan's Proposed Treatment Of Creditors' Claims ........................... 9

    F.    Puerto Rico's Improving And Growing Economy ............................... 11

Summary of Objection ........................................................................................ 12

Objection ........................................................................................................... 14

I.    The Plan Is Not Confirmable Because PREPA Is Able To Pay Bondholders More ........................................................................................................... 14

    A.    The Oversight Board Understates Total Revenues That PREPA Can Generate Within Its Own "Affordability Threshold" .................. 18

    B.    The Oversight Board Understates Future Electricity Demand And The Revenues It Can Generate ....................................................... 21

        1.    The Oversight Board's Gross Load Forecast Depends On An Implausibly Pessimistic Macroeconomic Forecast ....................... 22

        2.    The Oversight Board's Net Load Forecast Uses Wildly Unrealistic, Top-Down Assumptions Identified In PREPA's 2022 Fiscal Plan ............................................................. 25

    C.    The Oversight Board Makes Unsupported Subtractions From PREPA's Revenue Envelope To Limit Funds Available For Bondholders ............................................................................ 32

    D.    The Oversight Board's Best Interest Analysis Is Wrong ...................... 36

II.    The Plan Is Not Confirmable Because Its Settlements Are Unreasonable, Should Not Be Approved, And Unfairly Discriminates Against Bondholders .................................................................................................. 39

    A.    Legal Standards ............................................................................. 39

    B.    The National Settlement Is Unreasonable And Unfairly Discriminatory ............................................................................. 40

        1.    The Settlement Of National's Bond Claim Is Unreasonable .................. 40

        2.    The Settlement Of National's Post-Petition-Interest Claim Is Contrary To Law, Unreasonable, And Should Not Be Approved ..................................................................... 41

|   |   | 3. | The Plan Treatment Of National's Claim Discriminates Unfairly Against Other Bondholders | 42 |
|---|---|---|---|---|
|   | C. |   | The Fuel Line Lenders Settlement Is Unreasonable And Unfairly Discriminatory | 42 |
|   |   | 1. | The Fuel Line Loans Do Not Have Payment Priority | 43 |
|   |   | 2. | The FLL PSA Should Be Rejected As Unreasonable Under Rule 9019 | 45 |
|   |   | 3. | The Plan's Treatment Of The Fuel Line Lenders' Claims Discriminates Unfairly Against Bondholders And Other Creditors | 48 |
|   | D. |   | The Plan's Treatment Of Pensions Claims Discriminates Unfairly Against Other Creditors | 50 |
| III. |   |   | The Plan Is Not Confirmable Because It Engineers Impaired Accepting Classes Through Impermissible Gerrymandering Of Classes | 50 |
|   | A. |   | Legal Standard | 50 |
|   | B. |   | National And Settling Bondholders Should Be Classified With Non-Settling Bondholders And Monolines | 51 |
|   |   | 1. | National | 52 |
|   |   | 2. | Settling Bondholders | 53 |
|   | C. |   | The Fuel Line Lenders And Vitol Should Be Classified With Other General Unsecured Creditors | 54 |
|   |   | 1. | Fuel Line Lenders | 54 |
|   |   | 2. | Vitol | 54 |
| IV. |   |   | The Plan Cannot Be Confirmed Because The New Bonds Indenture Is Unusually Restrictive On Rights And Remedies | 55 |
| V. |   |   | The Plan Cannot Be Confirmed Because It Was Not Proposed In Good Faith | 58 |
|   |   |   | CONCLUSION | 60 |

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re 110 Beaver Street*,
    244 B.R. 185 (Bankr. D. Mass 2000) ......................................................................................45

*In re Anderson*,
    173 B.R. 226 (Bankr. D. Col. 1993) .......................................................................................49

*In re Autterson*,
    547 B.R. 372 (D. Colo. 2016) .................................................................................................50

*In re Bos. Post Rd. Ltd. P'ship*,
    21 F.3d 477 (2d Cir. 1994) ......................................................................................................51

*In re Breitburn Energy Partners LP*,
    582 B.R. 321 (Bankr. S.D.N.Y 2018) .....................................................................................49

*In re C.P. Del Caribe, Inc.*,
    140 B.R. 320 (Bankr. D.P.R. 1992) ........................................................................................45

*In re City of Detroit*,
    524 B.R. 147 (Bankr. E.D. Mich. 2014) .................................................................................58

*In re Cooper*,
    3 B.R. 246 (Bankr. S.D. Cal. 1980) ........................................................................................49

*In re Dow Corning Corp.*,
    244 B.R. 634 (Bankr. E.D. Mich. 1999) .................................................................................53

*Earth Pride Organics, LLC v. Official Comm. of Unsecured Creditors of
    EarthPride Organics, LLC*,
    Bankr. No. 17-13816, 2021 WL 1553787 (Bankr. E.D. Pa. Apr. 20, 2021) ..........................49

*Fano v. Newport Heights Irrigation Dist.*,
    114 F.2d 563 (9th Cir. 1940) ..................................................................................................15

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
    360 F. Supp. 3d 65 (D.P.R. 2019).........................................................................................46

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
    637 B.R. 223 (D.P.R. 2022).....................................................................................................15

*Granada Wines, Inc. v. New England Teamsters & Trucking Industry Pension
    Fund*,
    748 F.2d 42 (1st Cir. 1984) ......................................................................................................51

iii

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*In re Greystone III Joint Venture*,
   995 F.2d 1274, 1279 (5th Cir. 1991) ....................................................52

*In re Hanish, LLC*,
   570 B.R. 4 (Bankr. D.N.H. 2017) ...................................................51, 52

*In re Hardeman Cnty. Hosp. Dist.*,
   540 B.R. 229 (Bankr. N.D. Tex. 2015)..................................................14

*In re Hermanos Torres Perez Inc.*,
   No. 09-cv-5585, 2011 WL 5854929 (Bankr. D.P.R. Nov. 21, 2011)................40, 49

*In re Hoffinger Indus., Inc.*,
   321 B.R. 498 (Bankr. E.D. Ark. 2005) .................................................49

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
   987 F.2d 154 (3d Cir. 1993).............................................................53

*In re Johns-Manville Corp.*,
   68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd on other grounds*,
   78 B.R. 407 (S.D.N.Y. 1987)...........................................................48

*In re Lernout & Hauspie Speech Prods., N.V.*,
   301 B.R. 651 (Bankr. D. Del. 2003) ...................................................49

*In re LTC Holdings, Inc.*,
   10 F. 4th 177 (3d Cir. 2021) ...........................................................42

*In re Northbelt, LLC*,
   630 B.R. 228 (Bankr. S.D. Tex. 2020) .................................................58

*In re Purdue Pharma, L.P.*,
   2023 WL 3700458 (2d Cir. 2023).......................................................50

*In re Snyders Drug Stores, Inc.*,
   307 B.R. 889 (Bankr. N.D. Ohio 2004) ...............................................49

*In re Taylor*,
   190 B.R. 413 (Bankr. D. Col. 1995) ...................................................48

*In re Tribune Co.*
   972 F.3d 228 (3d Cir. 2020)............................................................49

*UTIER, et al. v. Autoridad de Energia Electrica de Puerto Rico, et al.*,
   No. K-AC2016-0291 (Dec. 19, 2016) ..................................................47

## <u>TABLE OF AUTHORITIES—Continued</u>

**Page(s)**

*In re Wash. Mut., Inc.,*
  442 B.R. 314 (Bankr. D. Del. 2011) ...................................................39

**Statutes**

22 L.P.R.A. § 208 .....................................................................................56

11 U.S.C. § 101 ....................................................................................5, 55

11 U.S.C. § 502 .........................................................................................41

11 U.S.C. § 509 ...................................................................................41, 42

11 U.S.C. § 1122 .......................................................................................51

11 U.S.C. § 1123 ...................................................................39, 51, 55, 58

11 U.S.C. § 1129 ............................................................................. *passim*

PROMESA § 108 .......................................................................................37

PROMESA § 203 .......................................................................................37

PROMESA § 207 .......................................................................................37

PROMESA § 301 ............................................................................. *passim*

PROMESA § 314 ...............................................................13, 15, 36, 58

**Other Authorities**

Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11*,
  72 Am. Bankr. L.J. 227 (1998) .................................................49

Buchsbaum, Jesse, "Long-Run Price Elasticities and Mechanisms: Empirical
  Evidence from Residential Electricity Consumers,"
  Energy Institute Working Paper 331, 2022..................................30

Burke, Paul J. and Ashani Abayasekara, "The Price Elasticity of Electricity
  Demand in the United States: A Three-Dimensional Analysis,"
  The Energy Journal, Vol. 39, 2018 .............................................30

H.R. Rep. No. 94-686 (1975)....................................................................15

H.R. Rep. No. 114-602 (2016)..................................................................15

## <u>TABLE OF AUTHORITIES—Continued</u>

**Page(s)**

IMF, *Average Consumer Price Index for Puerto Rico 1980-2027*,
https://www.imf.org/en/Publications/WEO/weo-
database/2022/October/download-entire-database ...............................................16

Jacqueline L. Reck, et al., ACCOUNTING FOR GOVERNMENTAL & NONPROFIT
ENTITIES (18th ed. 2019)..........................................................................................47

*Joint Statements in Lieu of Conference Report on the Bankruptcy Code*,
124 Cong. Rec. H11,100 (Sept. 28, 1978); S17,417 (Oct. 6, 1978) .......................15

1999 1-Year Puerto Rico Community Survey .............................................................16

2021 5-Year Puerto Rico Community Survey .............................................................16

## INDEX OF EXHIBITS

| EXHIBIT | DATE | DOCUMENT DESCRIPTION |
|---|---|---|
| 1 | 05/30/2023 | Fiscal Matters: A Discussion on Expenditures & Revenues, Budget, Tax Compliance and Economic Indicators |
| 2 | 05/18/2023 | Puerto Rico Officials Tout Economic Turnaround as They Bring Annual Investment Conference to Wall Street, Reorg |
| 3 | 04/06/2017 | Puerto Rico Announces New Deal With PREPA Creditors, Estimates $2.2B Savings in Debt Service for 2018 Through 2022, Reorg |
| 4 | 05/03/2023 | Excerpted Deposition Transcript of David Skeel |
| 5 | 03/08/2022 | FOMB Statement re: Termination of 2019 RSA |
| 6 | 11/08/2022 | PREPA Proposal to Bondholder Group |
| 7 | 02/09/2023 | Governor Pierluisi Testimony before the Senate Comm. on Energy & Natural Resources |
| 8 | 03/13/2023 | Puerto Rico Reported 6% Jobless Rate in Jan. '23 Down vs. Jan. '22, NimB |
| 9 | 03/07/2023 | Omar Marrero, AAFAF JP Morgan Presentation, Fiscal & Economic Progress Update |
| 10 | 03/10/2023 | Puerto Rico Expects 2023 to be a Record Year for Tourism Industry (Translated), Debtwire |
| 11 | 03/06/2023 | FY'23 General Fund Net Revenue Reaches $6.549B Through January, Beating Projections by Nearly $1B, Reorg |
| 12 | 01/27/2022 | 2022 Commonwealth Fiscal Plan |
| 13 | 04/18/2022 | PREPA Obtains Approval of USD 454.4m in FEMA Allocations for Grid Modernization, Reorg |
| 14 | 09/07/2022 | LUMA Quarterly Funding Report |
| 15 | 02/16/2023 | Economic Activity Index Rebounds in December 2022 After YoY Skid, Reorg |
| 16 | 07/08/2022 | Puerto Rico's Economic Activity Index Exceeds Pre-Hurricane Levels, NimB |
| 17 | 05/26/2023 | Excerpted Deposition Transcript of Justin Peterson |
| 18 | 04/28/2023 | Expert Report of Maureen M. Chakraborty |
| 19 | 05/15/2023 | Rebuttal Report of Glenn R. George |
| 20 | 05/04/2023 | Excerpted Deposition Transcript of William Zarakas |

| EXHIBIT | DATE | DOCUMENT DESCRIPTION |
|---|---|---|
| 21 | 05/15/2023 | Expert Rebuttal Report of Maureen M. Chakraborty |
| 22 | 04/28/2023 | Expert Report of Sebastian Edwards |
| 23 | 05/24/2023 | Excerpted Deposition Transcript of Lucas Porter |
| 24 | 05/30/2023 | Excerpted Deposition Transcript of Joseline Navel Estrada |
| 25 | 04/28/2023 | Expert Report of Susan Tierney |
| 26 | March 2018 | Paul J. Burke & Ashani Abayesekara, The Price Elasticity of Electricity Demand in the United States: A Three-Dimensional Analysis |
| 27 | 10/17/2022 | Jess Buchsbaum, Long-Run Price Elasticities and Mechanisms: Empirical Evidence from Residential Electricity Consumers |
| 28 | 05/15/2023 | Rebuttal Expert Report of Susan Tierney |
| 29 | 06/07/2019 | Puerto Rico Integrated Resource Plan 2018-2019 |
| 30 | 05/25/2023 | Excerpted Deposition Transcript of Ellen Smith |
| 31 | 05/15/2023 | LUMA Annual Budgets Fiscal Years 2024-2026 (Schneider Deposition Exhibit 3) |
| 32 | 06/01/2023 | Excerpted Deposition Transcript of Corey Allen Schneider |
| 33 | 05/15/2023 | Expert Rebuttal Report of Thomas S. Terry |
| 34 | 05/11/2023 | Excerpted Deposition Transcript of Ojas Shah |
| 35 | 05/16/2023 | Excerpted Deposition Transcript of David Brownstein |
| 36 | 02/14/2019 | COFINA Restructured Sales Tax Bonds, Series 2019A |
| 37 | 05/18/2023 | Puerto Rico Aims to Woo Wall Street and Put Bankruptcy in Rearview Mirror |
| 38 | 05/12/2023 | Excerpted Deposition Transcript of Fernando Batlle |

**To the Honorable United States District Court Judge Laura Taylor Swain:**

Pursuant to paragraph 3 of the Court's May 31, 2023 *Third Amended and Restated Order Establishing, Among Other Things, Procedures and Deadlines Concerning Objections to Confirmation and Discovery in Connection Therewith* [ECF No. 3565], the Ad Hoc Group of PREPA Bondholders (the "Ad Hoc Group") respectfully submits this objection to confirmation of the Modified Second Amended Title III Plan of Adjustment of the Puerto Rico Electric Power Authority [ECF No. 3296] (the "Plan"), as further described in the Modified Second Amended Disclosure Statement [ECF No. 3297] (the "Disclosure Statement" or "DS").

## PRELIMINARY STATEMENT

1.      Just last month, at a widely attended investor conference, Governor Pedro Pierluisi trumpeted Puerto Rico's "stronger than ever" economy.  He and other government officials described the island's "significantly improved" financial condition, pointing to its 3.7% economic growth over the last fiscal year.  They reported that the Commonwealth today has its highest total workforce in over a decade and a record number of self-employed persons.  They further reported that unemployment is at "historically low levels," average and median hourly wages are "gradually increasing over time," and there has been a 37% increase in Commonwealth General Fund revenues since 2017, and a 17% decrease in General Fund operating expenses since 2016.[2]

2.      That reality of Puerto Rico's upward economic trajectory bears no resemblance to the dire forecasts and fearmongering the Financial Oversight and Management Board of Puerto Rico (the "Oversight Board") is providing in this Court to support its proposed cram down of an

---

[2] Ex. 37 (*Puerto Rico Aims to Woo Wall Street and Put Bankruptcy in Rearview Mirror*, BLOOMBERG (May 18, 2023)); Ex. 1 (*Fiscal Matters: A Discussion on Expenditures & Revenues, Budget, Tax Compliance and Economic Indicators*, PRNow (May 18-19, 2023), at https://emma.msrb.org/P21710987-P21315610-P21748038.pdf); Ex. 2 (*Puerto Rico Officials Tout Economic Turnaround as They Bring Annual Investment Conference to Wall Street*, REORG (May 18, 2023)).

aggressive plan of adjustment over the objection of PREPA's largest creditors. While prospective investors are being told—based on actual economic data—that it is a "new day in Puerto Rico," the Court hears only about threatened "death spirals" and looming disaster if PREPA's plan of adjustment is not confirmed *exactly* as the Oversight Board has designed and proposed it.

3.       The Ad Hoc Group has been trying to compromise and consensually restructure PREPA's bond debt *for nine years*. Over that time, it reached a series of agreements with PREPA, the Commonwealth, and (most recently) the Oversight Board to do that on fair and reasonable terms. Bondholders repeatedly agreed to substantial reductions in PREPA's bond debt, extended periods for repaying reduced sums, and many other concessions. If honored and implemented, they would have set the stage years ago for PREPA's successful restructuring.

4.       But those agreements were *not* honored and implemented. Rather, in each instance the Government Parties reneged on their agreements, moved the goal posts (as one Oversight Board member aptly describes it), and demanded even greater concessions from bondholders without justification. The proposed PREPA Title III Plan of Adjustment ("Plan")—put forward on the heels of last year's termination of the 2019 RSA—is just the newest iteration of the Oversight Board's "how low can we go" strategy. That Plan's proposed payment to bondholders falls far below what the Board had just recently acknowledged was affordable. And even now, the Oversight Board has put the Court on notice that it is working on a 2023 PREPA Fiscal Plan that may provide it new excuses for rolling back creditor recoveries yet again.

5.       Ever since this plan process started, the Oversight Board has been back-filling a series of made-to-order justifications (as one Board member says) for these ever-lower recoveries. The Plan's centerpiece is a financial model purporting to compute exactly what PREPA can pay

creditors over the coming years.  The Oversight Board's financial advisors, taking their marching orders from litigation counsel, have skewed that analysis against creditors at every step.

6.     Among other things, the Board misapplies its own 6% share-of-wallet "affordability threshold" by: (i) assuming that Puerto Rico household incomes will not grow for decades (even just by inflation); (ii) overestimating median electricity consumption and thereby the median-income household's baseline electricity bill; (iii) omitting even to consider what additional payments are affordable to higher-income consumers; (iv) assuming implausible reductions in PREPA's future electricity sales by citing to aspirational statutory goals instead of on-the-ground realities; and (v) assuming *additional* implausible reductions in demand based upon an inflated "elasticity" effect of increased rates.  These are not battle-of-the-expert points.  They are flat-out errors.  The Oversight Board nevertheless leverages these baseless assumptions to assert that PREPA cannot pay creditors one cent more than the Plan would provide.  But correcting these one-sided assumptions and mistakes shows that, in fact, billions of additional dollars are available over the same 35-year timeframe the Oversight Board envisions for the Legacy Charge.

7.     A reasonable and realistic consensual resolution, based on facts not fear, remains the best path forward for the parties and the people of Puerto Rico.  Even now, at the eleventh hour and with a hard-fought confirmation hearing looming, the Ad Hoc Group hopes the Oversight Board will begin serious, open-minded negotiations.  But if it doesn't, the inescapable truth is that the proposed Plan is not confirmable.

## BACKGROUND

### A.     The Trustee's And Bondholders' Claim

8.     Bondholders provided PREPA billions of dollars to build and sustain its electric grid between 1974 and 2016 in reliance on a Trust Agreement that promised repayment of the bonds from PREPA's revenues.  The Trust Agreement also promised that PREPA would charge

its customers rates able to generate sufficient revenues to pay all of PREPA's Current Expenses (as defined by the Trust Agreement) and debt service.

9.      PREPA entered Title III on July 2, 2017, soon after the Oversight Board rejected PREPA's prepetition restructuring support agreement with bondholders and Fuel Line Lenders. The PREPA Bond Trustee filed a Proof of Claim (No. 18449) asserting that, as of the Petition Date, PREPA owed all bondholders approximately $8.48 billion: $8.26 billion in outstanding principal and $218 million in unpaid interest.  DS 71.  Excluding National Public Finance's $836 million claim and Settling Bondholders' $75 million in claims, PREPA owes $7.565 billion to Non-Settling Bondholders that constitute Class 2 under the Plan.  DS 29.

10.     The Oversight Board challenged the allowed amount and secured status of the Trustee's Claim.  *See* Adv. Proc. No. 19-391.  This Court held that the Trustee and bondholders have a perfected, secured claim only as to moneys credited to the Sinking Fund and certain other specified funds.  Adv. Proc. No. 19-391, ECF No. 147 at 13.  The Court further held that the Trustee and bondholders have an unsecured claim to net revenues that would have become collateral payable to them through their exercise of equitable remedies under the Trust Agreement and Authority Act.  *Id.* at 13-14.  On June 6-8, 2023, the Court held a hearing to estimate the allowed amount of bondholders' right to payment on that Unsecured Net Revenue Claim.[3]

**B.      The Previous Restructuring Agreements**

11.     Over the years, PREPA and certain bondholders reached agreements to consensually resolve PREPA's bond debt—largely based on bondholders' significant concessions

---

[3] The Ad Hoc Group respectfully disagrees that the PREPA Bond Trustee's and bondholders' security interests are limited only to existing moneys credited to certain specified accounts, and that bondholders and the Trustee lack a claim at law, under 11 U.S.C. § 101(5)(A), arising from their contractual right to PREPA's promised payments of principal and interest. The Ad Hoc Group intends to appeal these rulings at the earliest opportunity.  *See* Adv. Proc. No. 19-391, ECF No. 182 (denying interlocutory appeal).

and compromises to facilitate an efficient restructuring of that debt.  Each time, though, PREPA,

the Commonwealth, or the Oversight Board reneged, claiming (but never demonstrating) that

PREPA's ability to fund these agreements had disappeared.

12.    First, in 2015 and before PROMESA, initial restructuring discussions led to a deal

between PREPA, the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"),

certain PREPA bondholders, and the Fuel Line Lenders (the "Prepetition RSA").  DS 10, 109.  The

Prepetition RSA was intended to culminate in a consensual restructuring proceeding.  *Id.*  It would

have significantly reduced PREPA's debt by exchanging legacy bonds for new securitization

bonds at an exchange ratio equal to 85% of the legacy bonds' outstanding principal amount.

13.    Congress enacted PROMESA, in 2016, with specific provisions designed to allow

PREPA to restructure quickly under its Prepetition RSA.  DS 8-9.  But by the end of 2016, newly

elected Governor Ricardo Rosselló demanded additional bondholder concessions.  DS 135.  In a

continued, good-faith effort to compromise, bondholders agreed to amend the Prepetition RSA,

further reducing agreed-upon creditor recoveries by $1.5 billion.  *Id.*[4]

14.    Bondholders' hopes to move forward with that restructuring were thwarted again,

however, when the Oversight Board refused to certify the amended Prepetition RSA.   The

Prepetition RSA's resulting termination put PREPA on the precipice of default, and so the

Oversight Board filed PREPA's Title III petition on July 2, 2017.  DS 10-11, 135.

15.    A year later, in July 2018, after yet another round of negotiations, the Oversight

Board and Ad Hoc Group entered into a preliminary restructuring and support agreement.  DS 18.

After further discussions, in May 2019, the Oversight Board, AAFAF, the Ad Hoc Group, and

---

[4] *See also* Ex. 3 (*Puerto Rico Announces New Deal With PREPA Creditors, Estimates $2.2B Savings in Debt Service for 2018 Through 2022*, REORG (Apr. 6, 2017)).

Assured Guaranty Corp. executed a definitive Restructuring Support Agreement (the "2019 RSA"). Four months later, National and Syncora Guarantee ("Syncora") joined. DS 18, 180-81.

16.     Under the 2019 RSA, PREPA would have paid bondholders approximately $7.3 billion on their claims, as of an assumed effective date in June 2020, through Tranche A securitization bonds at a 67.5% exchange ratio and contingent Tranche B bonds at a 10% exchange ratio, plus post-RSA interest on the Tranche A amount. DS 19; ECF No. 1700 ¶ 54; ECF No. 1701 ¶ 2. That is, in the 2019 RSA, bondholders agreed, for the sake of reaching a consensual resolution, to forego an additional recovery relative to what PREPA had promised in the prepetition RSA. The Board agreed to impose a gradually increasing transition charge on PREPA customers to service that new debt. DS 19. Bondholders also made further concessions. In particular, they agreed to forgo any "true up" component on the transition charge, which under industry practice would have automatically increased if PREPA's revenues were insufficient to pay debt service. ECF No. 1426 ¶ 47. As Citigroup's David Brownstein, the Oversight Board's lead financial advisor, explained at the time, this was "unprecedented" and enormously beneficial to PREPA because it would have "shift[ed] the risk of low demand, resulting in reduced system revenues, from ratepayers to [bondholders]." *Id.*

17.     On May 10, 2019, the Oversight Board moved for approval of the 2019 RSA, representing that the 2019 RSA set "fair and reasonable" terms and would be "the foundation for a plan of adjustment for PREPA." ECF No. 1235 ¶¶ 1, 9, 50-51. Then-Executive Director of the Oversight Board, Natalie Jaresko, testified that the 2019 RSA was "in the best interests of PREPA." ECF No. 1428 ¶¶ 38, 39. Oversight Board Chairman David Skeel confirmed: When the Oversight Board signed the 2019 RSA, he believed it was affordable. Ex. 4 (Skeel Dep. Tr. 96).

18.     The uncertainty of the pandemic, however, caused the Oversight Board to obtain a series of stays of its settlement-approval motion.  *See* ECF Nos. 1235, 1992, 2006, 2111, 2120. For their part, for nearly four years, bondholders dutifully abided by the 2019 RSA's terms, refraining from seeking a receiver, pursuing other remedies, or objecting to issues in this case or to the confirmation of the Commonwealth's Title III plan.  The Oversight Board leveraged that peace and stability to solicit and maximize federal-funding commitments, obtain and negotiate privatization proposals for PREPA's operations, and consensually resolve the Commonwealth's Title III case.  Along the way, the Government Parties repeatedly reiterated support for the 2019 RSA.  For instance, on February 28, 2022, when the 2019 RSA would have provided bondholders over $8 billion, the Oversight Board publicly confirmed its determination to "move forward with the settlement set forth in the . . . [2019] RSA."  ECF No. 2735 ¶¶ 3, 20.

19.     Yet just ten days later, on March 8, 2022, Governor Pedro Pierluisi suddenly terminated the 2019 RSA, citing "rising inflation" and "significant surges in the price of crude oil" due to the war in Ukraine.  ECF No. 2747-2 at 1.  The Oversight Board joined in that abrupt about-face, supported the Governor's decision, and echoed his asserted reasons.[5]

### C.     Mediation Fails To Restore A Consensual Resolution

20.     After the Government Parties terminated the 2019 RSA, the Court ordered the parties into mediation.  ECF No. 2767 at 3.  Mediation proved fruitless, however, and was initially terminated in September 2022.  The Court ordered the parties back into mediation, and required the Oversight Board to file a plan of adjustment that it "believe[d] could be confirmable, taking into account the litigation risk and economic issues that are in dispute."  ECF No. 3013 at 4.

---

[5] *See* Ex. 5 (FOMB Statement (March 8, 2022)).

21.     While aspects of the parties' discussions remain confidential, the Oversight Board made public its November 8, 2022, proposal offering all creditors $7.8 billion, including a 71.65% recovery for bondholders (around $6.073 billion).  *See* Ex. 6 (PREPA Proposal to Bondholder Group, 7 (Nov. 8, 2022), https://emma.msrb.org/P11641653-P11264323-P11690562.pdf). Whether or not those figures provide evidence of what PREPA is required to pay by law under a confirmable plan, they demonstrate the simple fact that the Oversight Board had a very different view of PREPA's ability to pay creditors in November 2022 than what it filed in its plan a few weeks later.  It also demonstrates that the gap between the parties over what PREPA can afford is not that wide, notwithstanding the Oversight Board's resort to aggressive litigation.

### D.     The History Of The Plan And Disclosure Statement

22.     On December 16, 2022, the Oversight Board filed an initial version of PREPA's plan of adjustment (the "Initial Plan").  *See* ECF No. 3111.  The Initial Plan offered all PREPA creditors New Bonds with a face value of $5.4 billion.  *Id.* at 4.  Bondholders' portion, unless fully secured, was around $4.411 billion (*id.* at 24-25, 41), a $1.7 billion reduction from what the Oversight Board understood to be affordable a month earlier.[6]

23.     Just hours after filing the Initial Plan, the Oversight Board announced it reached a settlement in principle with National, a monoline insurer.  After finalization, the Oversight Board filed a First Amended Plan on February 9, 2023 (ECF No. 3200).  The Oversight Board separated National's claim from other bondholders' claims, and subdivided it into two separate classes—one for National's bond claim and another for its post-petition-interest, "reimbursement" claim. DS 29.  Solely to accommodate the National settlement, the First Amended Plan increased the

---

[6] Bondholders also no longer receive anything for *seven years* of accrued post-petition interest, amounting to well over $2 billion.

amount offered to creditors from $5.4 billion to $5.68 billion.  ECF No. 3200 at 17; *see also* Ex. 4 (Skeel Dep. Tr. 86).  The First Amended Plan provided no explanation for how the Oversight Board had determined that PREPA was now able to afford to pay creditors an additional $280 million.

24.     On March 1, 2023, the Oversight Board filed the Second Amended Plan and Disclosure Statement, which maintained creditor recoveries at $5.68 billion.  ECF Nos. 3296, 3297.  That amount is billions of dollars less than the recoveries PREPA had previously offered or agreed to pay bondholders and other creditors, and that the Oversight Board had deemed sustainable and affordable by PREPA only a few months earlier.

### E.     The Plan's Proposed Treatment Of Creditors' Claims

25.     Under the Plan, Non-Settling Bondholders and Monolines (Class 2) would receive a *pro rata* distribution, alongside general unsecured creditors, of approximately $4.63 billion in Series B-1 Bonds.  *See* DS 50, Ex. D.  Class 2's total recovery would amount to around $3.52 billion—or approximately 47% of what PREPA owed them on the petition date.  *Id.*[7]  That is well below what PREPA promised in the 2019 RSA, or what the Oversight Board determined that PREPA was able to pay them as recently as November 2022.

26.     By contrast, the Oversight Board has agreed to provide several creditors substantially more favorable treatment in exchange for supporting the deeply unpopular Plan:

27.     <u>National</u>.  Most recently, the Oversight Board and PREPA reached a settlement with National, whose bond claim is indistinguishable from other monolines' claims (and

---

[7] This estimated $3.52 billion recovery assumes the allowance of the PREPA Bond Trustee's Claim in its full amount.  If the Court were to disallow some portion of that Claim, including in the pending Section 502(c) proceeding, then Class 2's recovery would decrease further below from the amount that PREPA owed bondholders as of the petition date.

functionally equivalent to all bondholders claims). National is receiving substantially better treatment than similarly situated bondholders and other monolines. The Plan gives National's insured bond claim (Class 5) a 71.65% recovery paid through Series B Bonds. DS 29. Additionally, National's post-petition-interest reimbursement claim (Class 6) would receive a 20% recovery, also paid through Series B Bonds, which equates to an additional 5.9% of its prepetition bond claim. *Id.* And National also receives consummation and structuring fees totaling 5.86% of its Class 5 bond claim, DS 34, for a total recovery of approximately ***83.4%*** of its prepetition claim.

28.   Fuel Line Lenders. The Fuel Line Lenders are unsecured lenders to PREPA. Under the Plan, their claims (in Class 4) are granted first priority bonds and, at minimum, an ***84%*** recovery on their claims payable over just five years. DS 29. That preferential treatment is premised on the assumption that the Fuel Line Lenders' claims are Current Expenses under the Trust Agreement and have priority claims over Bondholders' claims. That assumption is without basis in the Trust Agreement, and the Oversight Board itself has long taken the position that the Fuel Line Lender claims are *not* Current Expenses because they are not necessary to the current operation of the system. Just like the bondholders' claims, the Fuel Line Lenders' claims are simply past-due debts, as evidenced by the fact that such outstanding claims have not been paid for years and PREPA still manages to generate power. Regardless, it does not fall to the Oversight Board to determine whether the Fuel Line Lenders' claims are Current Expenses or whether they have a rightful claim to payment priority. That is an intercreditor dispute for the creditors to settle themselves or for the Court to resolve through the pending Adversary Proceeding No. 19-396.

29.   Settling Bondholders. Under the Plan, Settling Bondholders' claims (Class 1) are classified separately from Non-Settling Bondholders and receive different treatment. Specifically, Settling Bondholders receive between 50% and 100% recovery through pro rata shares of cash

deposited in the Sinking Fund, Series B Bonds, or Commonwealth Contingent Value Instrument ("CVI").  DS 28.  The Board provides no meaningful justification for why Settling Bondholders should be classified and treated differently than Non-Settling Bondholders.[8]

      **F.**    **Puerto Rico's Improving And Growing Economy**

30.      Counsel for the Oversight Board has taken to relentlessly warning the Court that paying bondholders any more than what is proposed in the Plan would "bleed PREPA dry," instigate a "death spiral," and trigger the Commonwealth's economic collapse.  None of this is supported by evidence.

31.      In fact, Puerto Rico's economy today bears little resemblance to 2017, when PREPA entered Title III, or to 2019, when PREPA agreed to the 2019 RSA.  Today, in the words of Governor Pierluisi, Puerto Rico has "entered a new era of economic progress and optimism," which is evident from a litany of positive economic indicators that have all "consistently been on the rise during the past two years" and show no sign of abating.[9]

32.      For instance, Puerto Rico's unemployment rate reached a historic low of 6% in January 2023.[10]  And its tourism industry has dramatically rebounded from COVID-19, and is leading other tourism destinations in North America and the Caribbean in its post-COVID-19 recovery.[11]  Recent tax receipts, which have time and again exceeded fiscal plan estimates and

---

[8] The Oversight Board and PREPA also reached a settlement with Vitol, whose claim lacks any distinguishing legal features from other unsecured claims. Vitol is a run-of-the-mill general unsecured creditor, who asserted a prepetition claim against PREPA and reached a settlement deliberately designed to create the Plan's first impaired accepting class.  *See* DS 192.  Under the Plan, Vitol's claim is classified separately (Class 8) and treated differently than other unsecured creditors without justification.  DS 30.

[9] Ex. 7 (Pierluisi Testimony before the Senate Comm. on Energy & Natural Resources, 1 (Feb. 9, 2023)).

[10] Ex. 8 (*Puerto Rico Reported 6% Jobless Rate in Jan. '23 Down vs. Jan. '22*, NIMB (Mar. 13, 2023)).

[11] Ex. 9 (AAFAF JP Morgan Presentation, slide 23 (Mar. 7, 2023)); Ex. 10 (*Puerto Rico Expects 2023 to be a Record Year for Tourism Industry* (Translated), DEBTWIRE (Mar. 10, 2023)).

prior-year collections, demonstrate the robust growth in economic activity.[12]   In March 2023, AAFAF estimated that the Commonwealth's General Fund revenues had increased by 37%, with tax revenues at their "highest ever" in Puerto Rico.[13]   And the Commonwealth still has over $84 billion in federal funds to deploy,[14] including $12 billion earmarked specifically for PREPA.[15] Year-over year economic growth is a robust 3.7%.[16]

33.    It is no surprise, therefore, that in December 2022 the Puerto Rico government's primary gauge of its economy, the Economic Development Bank-Economic Activity Index, rebounded sharply after several years of decline.[17]   These dramatic and sustained economic improvements stand in sharp relief to the doomsday predictions for Puerto Rico that still underpin the Commonwealth's and PREPA's certified fiscal plans, and form the basis of forecasts and projections the Oversight Board relies on to improperly circumscribe creditor recoveries.

## SUMMARY OF OBJECTION

34.    The Plan is not confirmable for three independently sufficient reasons, each of which comprises a set of related defects.  At bottom, the Plan is designed to pay bondholders as little as possible, while deploying legally untenable settlements to present an aura of support for

---

[12] Ex. 11 (*FY'23 General Fund Net Revenue Reaches $6.549B Through January, Beating Projections by Nearly $1B*, REORG (Mar. 6, 2023)).

[13] Ex. 9 (AAFAF JP Morgan Presentation, slides 13-14 (Mar. 7, 2023)).

[14] Ex. 12 (2022 Commonwealth Fiscal Plan at 36); *see also* Ex. 9 (AAFAF JP Morgan Presentation, slide 29 (Mar. 7, 2023)).

[15] Ex. 13 (*PREPA Obtains Approval of USD 454.4m in FEMA Allocations for Grid Modernization*. DEBTWIRE (Apr. 18, 2022)); Ex. 14 (LUMA Quarterly Funding Report 6-7 (Sept. 7, 2022)).

[16] Ex. 2 (*Puerto Rico Officials Tout Economic Turnaround as They Bring Annual Investment Conference to Wall Street*, REORG (May 18, 2023)).

[17] Ex. 15 (*Economic Activity Index Rebounds in December 2022 After YoY Skid*, REORG (Feb. 16, 2023)); *see* Ex. 16 (*Puerto Rico's Economic Activity Index Exceeds Pre-Hurricane Levels*, NIMB (July 8, 2022)).

this highly contentious, widely disputed Plan.  None of this reflects a good faith effort to restructure PREPA's debts in fairness to its creditors and in accordance with law.

35.     *First*, the Plan is not confirmable because it fails to provide bondholders and other creditors recoveries equal to what PREPA is able to pay, and therefore is neither fair and equitable to bondholders, 11 U.S.C. § 1129(b)(1), nor in the best interests of creditors, PROMESA § 314(b)(6).  The Plan vastly understates the revenues that PREPA could generate from charging rates that meet its own selected affordability threshold, relies on implausibly depressed forecasts of PREPA's future sales, and makes unsupported assumptions about additional capital expenditures and fixed costs that serve only to further drive down achievable creditor recovery.

36.     *Second*, the Plan is not confirmable because it depends on settlements that are contrary to law and unreasonable, and that should not be approved under Bankruptcy Rule 9019. In particular, it depends on a settlement with monoline insurer National Public Finance that unreasonably settles National's bond claim at terms not offered to other bondholders, and impermissibly settles National's (patently unenforceable) post-petition-interest claim before holders of underlying National-insured bonds are paid in full.  The Plan also depends on an audacious putative settlement of the Fuel Line Lenders' priority-and-subordination dispute *with bondholders*, a dispute that is not PREPA's or the Oversight Board's to settle, and certainly not (as here) using *bondholders'* rightful recoveries.  These settlements and the unfair discrimination they effect are explicable only as attempts to purchase impaired accepting classes to facilitate a cramdown of the vast majority of PREPA's creditors.

37.     *Finally*, the Plan is not confirmable because it is not proposed in good faith. Testimony has revealed the Oversight Board's Plan-supporting analyses are made-to-order, result-oriented fictions designed to justify paying bondholders and other creditors as little as the

Oversight Board thinks it can get away with.  Moreover, these analyses are adjustable at the

Oversight Board's whim, such as when the Oversight Board managed to discover $280 million in

additional available revenues to fund creditor recoveries just in time to facilitate its settlement with

National, or to discover nearly $2.5 billion in additional capital expenditures.  As the history of

agreements, proposals, and plans show, the Plan is just the latest gambit to change assumptions

and positions to forestall any reasonable resolution of PREPA's Title III.

## OBJECTION

### I.    The Plan Is Not Confirmable Because PREPA Is Able To Pay Bondholders More

38.    The Plan cannot be confirmed because, by any objective measure, it does not pay

PREPA's creditors what PREPA is able to pay them.  PREPA cannot discharge its debts, and exit

Title III, by doing anything less than that.  That confirmation requirement is a fundamental tenet

of bankruptcy law and PROMESA, without which municipal and territorial bankruptcies would

be lawless, pay-what-you-want charades lacking in meaningful creditor protections.

39.    One of those protections is that the Plan must be "fair and equitable" to each class

of claims or interests that is impaired by the Plan and has not accepted it, under 11 U.S.C.

§ 1129(b)(1) as made applicable to Title III by PROMESA § 301.  In municipal bankruptcies,

Section 1129(b)(1)'s fair-and-equitable criterion requires that a debtor provide its creditors all that

it is able to pay them.  *In re Hardeman Cnty. Hosp. Dist.*, 540 B.R. 229, 239 (Bankr. N.D. Tex.

2015); *see also* H.R. Rep. No. 94-686, at 33 (1975) (to be fair and equitable, "petitioner must

exercise its taxing power to the fullest extent possible for the benefit of its creditors").[18]

---

[18] Because prior Title III confirmations were largely consensual, the fair-and-equitable cramdown
requirement was not highly contested.  But, here, it is.  Importantly, § 1129(b)(1) *requires* a court to
determine if a plan is fair and equitable before confirming it.  11 U.S.C. § 1129(b)(1) ("[T]he court . . . shall
confirm the plan . . . *if* the plan . . . is fair and equitable . . . ." (emphasis added)).  And because PROMESA
expressly incorporates § 1129(b)(1), without any qualifying or modifying language, the full force of the
fair-and-equitable test applies in Title III.  *See* PROMESA § 301(a).

40.    Another important creditor protection, under PROMESA § 314(b)(6), is that a plan

must be "in the best interests of creditors, which shall require the court to consider whether

available remedies under the non-bankruptcy laws and constitution of the territory would result in

a greater recovery for the creditors than is provided by such plan."  That best-interests requirement

obligates a debtor to pay creditors at least as much as they could obtain outside of bankruptcy—

ensuring that the plan will make them no worse off.  *See Fano v. Newport Heights Irrigation Dist.*,

114 F.2d 563, 565-66 (9th Cir. 1940) (reversing confirmation of plan where debtor could raise

additional funds to pay creditors); *see also Joint Statements in Lieu of Conference Report on the*

*Bankruptcy Code*, 124 Cong. Rec. H11,100 (Sept. 28, 1978); S17,417 (Oct. 6, 1978).[19]

41.    The Oversight Board pays lip service to those legal obligations.  In explaining its

"Legacy Charge Derivation," for instance, the Oversight Board asserts it derived a Legacy Charge

to pay creditors first by determining the "notional maximum PREPA's rates could become"

without "exceed[ing] the conceptual upper bound of affordability." DS Ex. P.  But that is

demonstrably *not* what the Oversight Board actually did.  Rather, the Board's advisors and experts

concededly rely on unsupported assumptions and instructions from counsel that are invariably

designed to minimize PREPA's true ability to repay creditors.  As Board member Justin Peterson

---

[19] This Court held, in a different Title III case, that PROMESA's best-interests standard requires the Court
only to "consider" what creditors could achieve in the aggregate outside Title III, and "does not impose a
litmus test or establish a floor for creditor recoveries." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 637 B.R.
223, 311 (D.P.R. 2022) (emphasis omitted).  That is inconsistent with bankruptcy law and PROMESA's
text.  In PROMESA, Congress codified the best interest requirement that courts have developed in Chapter
9 cases, and directed that the "[t]he court shall confirm the plan if . . . the plan . . . [is] in the best interests
of creditors," a prerequisite that "shall require the court to consider" creditors' available recovery outside
of Title III.  PROMESA § 314.  The Court thus lacks discretion to confirm a plan that does not satisfy this
requirement.  *See* H.R. Rep. No. 114-602, pt. 1, at 116 (2016) ("[T]he federal judge must determine, among
other things, that the plan (1) is feasible and in the best interests of creditors." (emphasis added)).
Additionally, while the PROMESA best-interests test, like the Chapter 9 one, requires consideration of
creditors in the aggregate, because bondholders hold the majority of claims against PREPA, if bondholders
could recover more outside of Title III, the Plan fails the best-interests test.

revealed at his deposition, the Board's advisors have served up a "made to order" analysis that is *intended* "to pay as little as possible" to bondholders and other creditors.  Ex. 17 (Peterson Dep. Tr. 97).  Mr. Peterson is right.  The Plan simply erects a façade of dispassionate economic analysis, that hides an ends-driven agenda to push creditor recoveries as low as they can go.

42.    *First*, the Oversight Board understates by billions of dollars the revenue that PREPA could generate by proposing to charge rates *below* the Oversight Board's own "affordability threshold."  For example:

- The Oversight Board inexplicably directed its advisors to assume that **household income will not grow for more than three decades**, such that customers can afford to pay not a dollar more for electricity years from now than they can afford to pay today.  That economically indefensible instruction ignores that income growth and decreasing electricity consumption will persistently reduce customers' electricity bills as a share of their income.  It also ignores a history of income growth in Puerto Rico where, despite economic challenges, median income has grown 52.4% over the last 22 years (at an average cumulative growth rate of 1.9% per year).[20]

- The Oversight Board then compounds its error by focusing on the median-income household, overstating its monthly consumption of electricity, and thereby understating its "headroom" under the Oversight Board's own affordability threshold.

- It then applies its "affordability calculations" for the *median*-income household, without adjustment, to all *higher*-income households.  That is, the Oversight Board assumes that the 50% of households earning more than the median income can afford

---

[20] *See* 1999 1-year Puerto Rico Community Survey; 2021 5-year Puerto Rico Community Survey; IMF Inflation Data (IMF, Average Consumer Price Index for Puerto Rico 1980-2027, https://www.imf.org/en/Publications/WEO/weo-database/2022/October/download-entire-database.

to pay no more for electricity than the median-income household can.  It makes no attempt, for instance, to determine the optimal mix of volumetric and fixed charges that would cause wealthier households to pay higher rates for their typically higher consumption.  At the same time—and laudably so—the Oversight Board excuses nearly all households making *less* than the median income from paying any Legacy Charge at all, such that the median-income household is really the lowest-income household that would pay the charge.

- Finally, the Oversight Board does not attempt to determine what PREPA's commercial and industrial customers can afford to pay, but instead simply scales its determination of *residential* affordability onto those *non-residential* classes.

43.   *Second*, the Oversight Board applies the affordable rates it calculates to an unrealistic projection of PREPA's "load forecast" of future electricity sales.  Applying understated rates to understated sales has a compounding effect, further minimizing what PREPA can pay creditors.  No one disagrees that, over time, load is likely to decrease through improvements in energy efficiency, adoption of rooftop solar power generation, and other advances.  But the Oversight Board assumes a pace of decline that PREPA's own fiscal plan calls unrealistic when compared to its more rigorous "alternative forecast," which PREPA developed precisely to reality-check the flawed "base case" forecast that the Oversight Board instructed its advisors to rely on.

44.   *Finally*, after understating rates and sales to determine an as-low-as-possible amount of achievable new revenue, the Oversight Board then reserves $2.425 billion for hypothetical, unplanned capital expenditures.  Even though PREPA's certified fiscal plan already reflects the best-available projection of PREPA's future capital expenditures (from federal and non-federal funds), the Oversight Board brazenly tacks on billions of dollars in additional capital spending using unfounded, out-of-the-blue speculation—conveniently conjured up just before

17

filing the Plan—that current projections might fall short.  The Oversight Board further shaves away achievable creditor recoveries by overstating revenues needed to pay fixed costs, imposing unfounded assumptions to over-forecast pension contributions, and declining to charge municipal customers rates they concededly can afford to pay.

45.     At each and every step, the Oversight Board's analysis understates PREPA's true ability to pay its creditors.  The effect of these assumptions and errors is a Plan that is neither fair and equitable to creditors nor in their best interests—as demonstrated by creditors' overwhelming and emphatic rejection of it.  Bondholders would be substantially better off asserting their statutory and contractual rights through an independent, court-appointed receiver than by taking the Plan recovery being crammed down on them in the Oversight Board's world of make-believe.

### A.     The Oversight Board Understates Total Revenues That PREPA Can Generate Within Its Own "Affordability Threshold"

46.     The Board's ability-to-pay analysis purports to calculate the total additional revenues that PREPA could generate by charging what the Board describes as the "notional maximum rates" PREPA's customers can afford.  It starts by estimating how much a median-income household, consuming 425 kWh of electricity per month, would pay for that electricity in fiscal year 2024 at the rates forecasted in the Fiscal Plan.  Then it applies a share-of-wallet "affordability threshold" to cap the median-income household's maximum affordable monthly bill at 6% of its monthly income.  Finally, it determines the difference between the median-income household's estimated baseline electricity bill and maximum affordable bill—an amount that could be collected via new rates and charges without unduly burdening the median-income customer.

47.     Having estimated what it contends are the maximum affordable, incremental rates for a median-income household in fiscal year 2024, the Oversight Board applies those incremental rates to all residential customers (at all income levels), to all non-residential customers (with

subjective and proportional adjustments), and to the entirety of PREPA's 2022 Fiscal Plan forecast ending in fiscal year 2051. The resulting "Revenue Envelope" for paying creditors over 28 years has a present value of $6.38 billion, according to the Oversight Board's advisors. But a series of errors, assumptions, and self-serving instructions from the Oversight Board's counsel reduce the Revenue Envelope calculation by billions of dollars that PREPA could use to pay its creditors.

48.  <u>Household Income</u>.  At the instruction of the Oversight Board's counsel, its advisors assumed that median income will never grow, even just by the rate of inflation, over the next 35 years. That is, having determined incremental rates based on how much a median-income household could afford to pay for electricity in 2024, the Oversight Board never increases those incremental rates even just to keep pace with inflation (let alone to account for any real income growth above the inflation rate). The Legacy Charge Derivation thus implausibly assumes that a median-income household will be able to pay no more for electricity in 2051 than in 2024, as though median income will be unchanged nearly three decades from now. But as noted above, median income has grown 52.4% over the last two decades.

49.  The Oversight Board's assumption of stagnant income is inconsistent with PREPA's 2022 Fiscal Plan's own forecast that annual inflation will average 1.7% through fiscal year 2051. Accordingly, the Oversight Board's "affordability threshold," set at 6% of median monthly income, should increase as 2024 income levels climb. Assuming otherwise, economist Dr. Maureen Chakraborty explains, "effectively reduces the 'real' cost of the charge in each year," and reduces the Board's estimated present value of PREPA's Additional Net Revenues by ***$892 million***. Ex. 18 (Chakraborty Opening Rep. at 14 (Table 1) (ECF No. 3441-1)).

50.  After Dr. Chakraborty identified the Board's economically indefensible failure to account for decades of inflation, the Board belatedly defended its instruction to ignore income

19

growth as having been a purposeful decision to *reduce* the median-income household's electricity bills *below* the Board's 6% affordability threshold over time.  *See* Ex. 19 (George Rebuttal Rep. at 9-10 (ECF No. 3504-3)).  But the Board never says how much or how fast that reduction should be for the median-income household—much less for *higher*-income households, whose share of wallet is by definition less than 6% even in 2024.[21]  In any event, as Dr. Chakraborty's analysis shows, even if median income were forecasted to rise commensurate with inflation, the Board *still* would meet its newly stated goal to decrease electricity share-of-wallet over time, because electricity load, and therefore monthly consumption and bills, will steadily decrease in the future.

51.   <u>Consumption</u>.  The Oversight Board's estimate of the median-income household's baseline electricity bill, in fiscal year 2024, assumes it is being charged for monthly consumption of 425 kWh.  That assumption is unsupported.  Data from LUMA and the Census Bureau's Puerto Rico Community Survey (PRCS) show that a median-income household typically consumes far less than that—around 372 kWh per month.  Chakraborty Opening Rep. at 8.

52.   The Oversight Board overestimates monthly consumption because of a straightforward mathematical error—which its author, Brattle's William Zarakas, frankly acknowledges.  Zarakas calculated consumption by purporting to divide the median 2021 electricity bill by the fiscal year 2021 electricity rate—reasoning that a total bill divided by the per-unit price will equal the number of units (kWH) consumed.  But in making that calculation, Zarakas mismatched *calendar* year billing data (January-December) with the *fiscal year* average electricity rate (July-June). Ex. 20 (Zarakas Dep. Tr. 96-97).  Simply fixing that apples-to-oranges

---

[21] The Oversight Board and Commonwealth have at times denied that income growth is happening—or even possible.  They have pointed to temporary government-employee wage freezes, labor-cost budgets, and other supposed evidence of stagnant income.  But the Commonwealth's own data show otherwise.  Recently, Commonwealth officials touted that average and median hourly wages—the kind of income earned by median-income households—have been "gradually increasing over time." Ex. 1 (*Fiscal Matters*, *supra*, at 32).

error reduces the Board's monthly consumption estimate, thereby reducing the calculation of the median-income household's baseline electricity bill. And that, in turn, increases the incremental rates that can be charged within the Board's affordability threshold. *See* Ex. 21 (Chakraborty Rebuttal at 9 (ECF No. 3503-1)). Making just that one correction to the Board's analysis increases the Additional Net Revenues present value by nearly ***$3.28 billion***. *Id.* at 8.

53.    <u>Non-Residential Customers</u>.  The Oversight Board did not conduct any analysis of what non-residential customers—commercial, industrial, or governmental—can afford to pay. Ex. 20 (Zarakas Dep. Tr. 41). These non-residential customer classes contribute 56% of PREPA's total revenue. Chakraborty Opening Rep. at 41. Instead of doing any actual analysis of what these customers can afford, the Board premised its incremental rates and additional revenues on making a series of subjective and proportional adjustments to the affordability analysis it conducted on the (very different) median-income residential customer. What's affordable for a residential customer has very little, if anything, to do with what's affordable for a non-residential customer, and yet the Board's analysis makes no attempt to gauge that difference. Correcting the Oversight Board's analysis to account for what is affordable to PREPA's non-residential customers increases the Additional Net Revenues present value by between ***$471 million and $1.068 billion***. *Id.* at 12.

**B.    The Oversight Board Understates Future Electricity Demand And The Revenues It Can Generate**

54.    The Oversight Board directed its advisors to use load forecasts that are unsupportable because they make two key mistakes. For one thing, the Board applies implausibly dire forecasts for the future course of Puerto Rico's economy, which drive down PREPA's baseline (or "gross") load forecast. Those macroeconomic forecasts, generated by its consultant Dr. Andrew Wolfe, foretell a decades-long economic downturn in Puerto Rico at odds with (i) the Commonwealth Fiscal Plan's own projections about the positive effect of the reforms it intends to

implement; (ii) the economic evidence; and (iii) the Commonwealth government's repeated public statements about Puerto Rico's prospects for economic growth. Indeed, if Dr. Wolfe's doomsday prediction were borne out, Puerto Rico's unending economic slide would be without precedent in modern economic history. It should come as no surprise that Puerto Rico's actual results have consistently beaten the Board's deeply pessimistic, made-for-Title-III economic forecasts.

55. The Oversight Board then further depresses demand projections by instructing its advisors to conform their analyses to PREPA's *concededly unrealistic* "base case" net load forecast. But the entire premise of PREPA's base case net load forecast is that Puerto Rico *will* achieve reductions in electricity demand simply because those reductions are set forth in Puerto Rico law as statutory *targets*. The Oversight Board gave those instructions even though PREPA's 2022 Fiscal Plan *itself* provides a bottom-up, "alternative" load forecast that more realistically models future demand based on actual consumer behavior (as opposed to edict).

### 1. The Oversight Board's Gross Load Forecast Depends On An Implausibly Pessimistic Macroeconomic Forecast

56. The Legacy Charge Derivation is premised on a load forecast that starts with a "gross load" determination based on unreasonable and unreliable macroeconomic projections. Those projections would have it that Puerto Rico will suffer a nearly three-decade-long steady decline that would be "unprecedented in modern history." Ex. 22 (Edwards Opening Rep. ¶ 11 (ECF No. 3474-1)).

57. Flawed GNP Projection. The Board's consultant, Dr. Wolfe, uses a linear regression to project that Puerto Rico's GNP will experience a few years of growth followed by a long-term steady decline. *Id.* ¶ 29. Using historical data from FY1965 to FY2017, Wolfe predicts future GNP changes based on the assumption that the relationship between each of the independent variables (including previous year GNP growth, U.S. GDP growth, and other variables) and GNP

growth will remain constant for the next three decades.  *Id.* ¶¶ 30-36, 49.  The result is a projection that, starting in FY2023, Puerto Rico will have negative GNP growth *every year* through FY2051, at which point Puerto Rico's GNP will have declined by a total of 24 percent.  *Id.* ¶ 37.

58.     That analysis is based in large part on a flawed assumption that Puerto Rico's 22% GNP decline from FY2006 to FY2021 indicates a continuous and indefinite trend of *further* decline.  *Id.* ¶ 46. That is, that having suffered a significant economic decline, Puerto Rico must have nowhere to go but down.  But when Dr. Wolfe's GNP projection is compared with actual GDP data of 68 other countries or territories that experienced similar declines in GDP,[22] his ever-downward-trend projection stands out as an obvious outlier.  Edwards Opening Rep. ¶ 47.

59.     In addition to producing an implausible result, the methodology itself is unsound. For one thing, linear-regression-based economic forecasting is appropriate *only* in the short term. That is because the methodology is premised on the assumption that the mathematical relationship among variables (such as the effect of oil prices on GNP) will remain what they were in the past. *Id.* ¶¶ 12-13.  Such assumptions grow increasingly unfounded as the length of the projection period grows.  Here, Dr. Wolfe purports (incorrectly) to use his linear regression to predict economic growth for decades into the future—which is rejected by the academic literature in this area.  *Id.* ¶ 13.  In addition, Dr. Wolfe's exercise largely ignores that Puerto Rico is undertaking significant structural reforms that, according to the Fiscal Plan, will improve its economy.  *Id.* ¶ 55.[23]

60.     Wolfe's linear regression is also unreliable because it omits any consideration of a key driver of economic growth—labor—as an independent variable in its projection of the GNP

---

[22] That is, other countries or territories that experienced a cumulative drop in real GDP of 22% or more between any two years in a 30-year time span.  *Id.* ¶ 46.

[23] The Oversight Board does somewhat modify its projection to take account of incremental GNP growth in future years based on those reforms.  But these adjustments fail to resolve the problems caused by the model's fundamentally flawed assumptions.  *Id.* ¶¶ 39-40, 57.

trendline. *Id.* ¶¶ 58-59. This omission undermines the reliability of the regression because GNP is a measure of the total value of all goods and services produced in an economy, and the key inputs into the calculation of their value (via what economists refer to as the "production function") are capital stock *and labor*. *Id.*

61.    The Oversight Board's forecast further relies on several implausibly pessimistic assumptions about Puerto Rico's economic future unsupported by data and contrary to various economic indicators, including an implausible long-term decline in one of its key inputs (capital stock) that, "would be virtually unprecedented." Edwards Opening Rep. ¶¶ 61, 72, 75.

62.    In short, the Oversight Board's GNP projection uses an inappropriate methodology based on unreasonably pessimistic assumptions and unsupported omissions, to manufacture a facially implausible result that is not only evidently contrary to economic practice, but fails the straight-face test even to the lay person.[24]

63.    <u>The More Reasonable Solow Growth Model</u>. Dr. Edwards provides an alternative methodology to generate a more reasonable macroeconomic projection. Specifically, Dr. Edwards describes how the use of the well-established, and widely accepted methodology, the Solow Growth Model (the "<u>SGM</u>"), in combination with more reasonable (but still conservative) inputs, generates a significantly more optimistic future trajectory for GNP in Puerto Rico.

64.    Developed by a Nobel Prize winner and used in economic modeling and analysis around the world, the SGM projects Puerto Rico's GNP's future path by determining how much output (GNP) Puerto Rico's economy will be able to generate based on future available inputs. Edwards Opening Rep. ¶ 86. In short, the SGM (which Dr. Wolfe himself has used to generate

---

[24] The Board's macroeconomic forecast is also more pessimistic than the Commonwealth's own internal economic forecasts. Ex. 38 (Batlle Dep. Tr. 96-98).

growth projections for Puerto Rico) identifies, as inputs, three primary drivers of long-term economic growth: capital, labor, and total factor productivity ("TFP") (*i.e.*, advances in productivity). It then models them in a dynamic system[25] in which they can interact to project future GNP (the output). *Id.* ¶¶ 91-92.

65.    To apply the SGM, Dr. Edwards first determines the values of labor, capital, and TFP using inputs from the Oversight Board's model combined with several evidence-based conservative adjustments and assumptions. He calculates several inputs, including the human capital index (an education-based measure of worker efficiency), the number of workers, the capital stock (the level of capital in the economy), and TFP. *Id.* ¶ 100.

66.    The resulting projection shows a continuing and steady economic recovery in Puerto Rico between now and 2051, with GNP rising, on average, 0.4% annually, in sharp contrast to the Oversight Board's doomsday predictions. *Id.* ¶ 120.

### 2.    The Oversight Board's Net Load Forecast Uses Wildly Unrealistic, Top-Down Assumptions Identified In PREPA's 2022 Fiscal Plan

67.    Building off its downwardly biased "gross" load forecast, the Plan then creates a "net" load forecast that adjusts projections to account for energy efficiency measures, rooftop solar generation, and electric vehicles. The resulting net load forecast predicts an overall reduction of annual electricity sales by more than 50% through fiscal year 2051—with more than 80% of that decline coming from those three modifications. The Oversight Board admits, however, that PREPA's so-called Base Case load forecast "do[es] not fully capture the actual constraints and realities in Puerto Rico or the current state of current programs and plans in place to support these

---

[25] As opposed to the much less dynamic linear regression model, used by the Oversight Board, that depends on the blunt assumption that changes in GNP have no impact whatsoever on investment or capital growth in Puerto Rico.

assumptions." 2022 PREPA Fiscal Plan at 151 (ECF No. 3297-5). Indeed, as explained in Dr. Susan Tierney's expert report, the Base Case is flawed at every turn. The result is an implausible forecast that understates future demand—and therefore the future revenues available to pay bondholders.[26]

68. <u>Energy Efficiency (EE)</u>. The Base Case net load forecast used by the Oversight Board fails to consider what efficiency gains are likely or reasonable, and instead proceeds on the assumption that Puerto Rico will *in fact* reach a legislative target of a 30% reduction in load from efficiency gains by 2040. *See* 2022 PREPA Fiscal Plan at 152. LUMA and PREPA witnesses involved in creating the Base Case load forecast acknowledge that this aspirational goal is divorced from reality. Ex. 23 (Porter Dep. Tr. 17-18); Ex. 24 (Estrada Dep. Tr. 29-31). As Dr. Tierney explains "[r]ather than building out a forecast based on reasonable projections from the best available data, PREPA and FOMB . . . start with the conclusion . . . and then 'forecast' a line for getting from here to there." Tierney Opening Rep. at 20. This is not a reliable forecasting methodology. *Id.*

69. Not surprisingly, the Base Case net load forecast depends upon Puerto Rico achieving "implausible" results. *Id.* at 21. The energy efficiency gains forecast by the Oversight Board would require "widespread" and "rapid" adoption of energy efficient technologies, along with large-scale private investment and government subsidies. *Id.* at 21-22. This is not realistic. As the Oversight Board conceded in the 2022 PREPA Fiscal Plan itself, "there are currently no programs, implementation plans, or funding incentives in place to support an energy efficiency

---

[26] As Dr. Tierney explains, higher future load forecasts mean more electricity sales, which means more revenues that PREPA can use to cover fixed costs and more Legacy Charge revenues to pay creditors. Ex. 25 (Tierney Opening Rep. at 11 (ECF No. 3569-1)).

program." 2022 PREPA Fiscal Plan at 152. In fact, the Oversight Board has consistently failed to achieve its energy efficiency forecasts. Tierney Opening Rep. at 23.

70. Notably, the 2022 Fiscal Plan *itself* contains an "Alternative Forecast" that is, as the Oversight Board explains, "based on a bottom-up approach that uses the current situation in Puerto Rico as the starting point, that is not constrained by [legislative targets], [and] that incorporates the latest data available on current and future costs." 2022 PREPA Fiscal Plan at 151. This model appears to have been prepared by Oversight Board advisors, at the Board's direction, after the Board disagreed with the Base Case forecast. Ex. 24 (Estrada Dep. Tr. 40-41); Ex. 23 (Porter Dep. Tr. 78).

71. In this alternative forecast, the Oversight Board anticipates significantly lower load reductions, even accounting for the fact that, as Dr. Tierney concludes, it has "flaws that are biased toward a quicker adoption of energy efficiency than is reasonable to expect." Tierney Opening Rep. at 25. For example, it projects energy efficiency-related load reductions in fiscal year 2040 that are *45%* lower than in the Base Case. *Id.* Thus, the Oversight Board's own, more realistic forecast demonstrates the implausibility of the energy efficiency assumptions in the Base Case.

72. Distributed Generation (DG). The Oversight Board also reduces the load forecast to account for the deployment of distributed generation resources, primarily rooftop solar, forecasting a five-fold increase in load reductions from DG from fiscal year 2022 to 2051. 2022 PREPA Fiscal Plan at 153; Tierney Opening Rep. at 27. These assumptions are likewise unsupportable and, among other things, ignore the substantial barriers to solar adoption in Puerto Rico, such as cost, operational constraints, and the need for significant grid investment. Tierney Opening Rep. at 27-34. The Base Case implausibly implies that future distributed-solar-related demand reductions in Puerto Rico will be greater in the coming decades than have been forecasted

for *every* state on the U.S. mainland, including historical leaders like California that (unlike Puerto Rico) devoted substantial resources to supporting consumer adoption. *Id.* at 32-33. Dr. Tierney, by contrast, adopts the PREPA Fiscal Plan's Alternative Forecast of DG adoption, which gets to roughly the same solar penetration level as the Base Case, but via a more gradual trend.

73. <u>Electric Vehicles (EV)</u>. Finally, the Oversight Board increases the gross load forecast for the adoption of electric vehicle usage. But even this adjustment is downwardly biased. The Oversight Board understated net load by "arbitrarily assuming that load growth resulting from increased adoption of electric vehicles will abruptly halt in 15 years." Tierney Opening Rep. at 35; *see also* Ex. 24 (Estrada Dep. 31-32). As Dr. Tierney shows, PREPA's Base Case forecast for EV adoption rises sharply through 2038, but then immediately flatlines for the indefinite future. In other words, the Oversight Board assumes that no one will switch to an electric vehicle after 2038, which is ridiculous. By contrast, PREPA's Alternative Forecast, used by Dr. Tierney, continues to project EV-growth after 2038, resulting in load increases that are 68% higher than the Base Case by 2050. Tierney Opening Rep. at 38.

74. <u>More Reasonable Net Load Forecasts</u>. Dr. Chakraborty performed a series of analyses using more reasonable load projections, including the Oversight Board's own more reasonable (though still flawed) Alternative Forecast. When corrected, available net revenues present value ranged from ***$5.75 billion to $6.24 billion***, approximately $70 million to $500 million more than the Oversight Board's amounts. Specifically, Dr. Chakraborty calculated the net revenues that would be generated under three sets of load forecasts from Dr. Tierney's report:

75. Dr. Chakraborty used a net load forecast based on the 2022 Fiscal Plan's Alternative Forecast. While that forecast is still downwardly biased, it is more appropriate than the aspirational Base Case the Legacy Charge Model uses. As Dr. Tierney explains, the

Alternative Forecast is the more reasonable of the two because it is "premised on a pace for the future adoption of energy efficiency measures, distributed generation, and electric vehicles that captures the current situation in Puerto Rico, is not constrained by targets in legislation, and incorporates the latest cost data." Tierney Opening Rep. at 12. Making this adjustment alone results in an additional *$70 million* in net revenues. *See* Chakraborty Opening Rep. at Ex. 17.

76.     Dr. Chakraborty also estimated additional net revenues using a second and third set of forecasts prepared by Dr. Tierney, which both combine assumptions in the Alternative Forecast with updated macroeconomic projections. For these forecasts, Dr. Tierney first calculated new projections of gross load by applying Dr. Edwards's two macroeconomic scenarios into PREPA's regression models.[27] *See* Tierney Opening Rep. at 39-40. Then, she modified those gross load forecasts to adjust for the Alternative Forecast's assumptions about energy efficiency, distributed generation, and electric vehicles. *Id.* These adjustments result in a projected *$250 million to $560 million* in additional net revenues. *See* Chakraborty Opening Rep. at Ex. 17.

77.     <u>Elasticity</u>.     The Oversight Board also reduces the revenues available for bondholders by downwardly adjusting demand to account for the so-called elasticity effect—*i.e.*, the amount by which the Oversight Board believes demand will fall in response to rate increases. *See* DS Ex. P 5-6. As Dr. Tierney explains, the elasticity effects assumed by the Oversight Board are substantially higher than the academic consensus, unsupported by the two academic papers on which the Board relies, and refuted by PREPA's own prior load-forecasting assumptions. Tierney Opening Rep. at 6-7. This causes the Oversight Board to overstate how much rate increases would suppress demand, understating the revenues available to pay bondholders.

---

[27] One scenario is based on Dr. Edwards's SGM projection and the other one is based on the Oversight Board's own analysis from the 2022 Commonwealth Fiscal Plan Economic Outlook Model (including a COVID-19 income adjustment).

78.     The Oversight Board estimates both short- and long-run elasticities for various customer classes.  In the short run, the Board assumes all customer classes have an elasticity of -.0.2.  In order words, for every 1 percent increase in PREPA's volumetric rates, consumption falls in the short-run by 0.2 percent.  In the long run, the Oversight Board estimates elasticities ranging from -0.68 for certain government, municipal, and commercial rate classes to -1.7 for all residential customers and certain governmental, municipal, and commercial rate classes.

79.     For its long-run elasticity estimates, the Board relied on two academic papers.  It started by deriving baseline elasticity rates from Burke and Abayasekara (2018).[28]  *Id.* at 46-48.  It then used a graduate student's unpublished working paper, Buchsbaum (2022),[29] which focused solely on residential customers in Northern and Central California, to calculate a supposed "Incremental Solar PV effect" on elasticity of elasticity demand.  The Board made similar adjustments for non-residential customer classes, and then calculated rounded "'Long Run Elasticity Factors' by customer classes as a specified percentage of general residential customers' long-term elasticity."  Tierney Opening Rep. at 48.

80.     These estimates are not supported by the studies on which the Board relies.  First, neither the Board nor its experts provide any basis for concluding that it is a well-accepted and reliable methodology to start with one study's estimate of elasticity, but then layer on top a substantial, "incremental" solar-adoption-based elasticity effect.  The Board's advisor testified this

---

[28] Ex. 26 (Burke, Paul J. and Ashani Abayasekara, "The Price Elasticity of Electricity Demand in the United States: A Three-Dimensional Analysis," The Energy Journal, Vol. 39, 2018 (hereafter "Burke and Abayasekara (2018)"), FOMB_PREPA 00020208 - FOMB_PREPA 00020243, https://doi.org/10.5547/01956574.39.2.pbur).

[29] Ex. 27 (Buchsbaum, Jesse, "Long-Run Price Elasticities and Mechanisms: Empirical Evidence from Residential Electricity Consumers," Energy Institute Working Paper 331, 2022 (hereafter "Buchsbaum (2022)"), FOMB_PREPA 00022518 - FOMB_PREPA 00022589, https:// haas.berkeley.edu/wp-content/uploads/WP331.pdf).

"incremental" analysis was intended to account for the change in elasticities during the time periods of the Burke and Abayaserkara and Buchsbaum studies, but could not explain how that possibly justified a *70% increase* in residential price elasticity (from -1.0 to -1.7). That is all the more perplexing because the two studies' time periods' substantially overlap (2003 to 2015 versus 2008 to 2020) and that both "considered periods during which solar PV panels were available substitutes for price-sensitive consumers." Ex. 28 (Tierney Rebuttal Rep. at 9 (ECF No. 3569-2)).

81.    Second, the Board unreasonably relied on Buchsbaum's unpublished working paper to estimate the size of any incremental solar PV effect on price elasticity. Among other things, Buchsbaum emphasized (Ex. 27 at 4-5) that his findings were "specific to the geography and climate in this northern and central California sample," which is markedly different than Puerto Rico's. Moreover, his findings relied on "atypical data and methodology" that wasn't peer-reviewed or published. Tierney Opening Rep. at 49. Crucially, Buchsbaum *expressly disclaimed* the very kind of "Incremental Solar PV Effect" on elasticity that the Oversight Board nevertheless ascribes to him. Indeed, Buchsbaum could hardly have been clearer that he found "[c]onsumers are largely *unresponsive* to prices in their adoption of solar or energy efficiency programs."[30]

82.    The Board's resulting long- and short-run elasticity estimates are more negative than the weight of academic literature would support. Dr. Tierney's review of that literature concluded that: (1) the Board's long-run residential elasticity estimate is "more negative (i.e., produces a more negative effect in suppressing electrical demand) than the findings in nine of the ten academic studies that Dr. George reviewed"—with Buchsbaum's working paper being the only outlier, Tierney Rebuttal Rep. at 5; and (2) only two out of the eight short-run elasticity estimates listed by Dr. George "were more negative than the -0.2 estimate used by FOMB," *id.* at 11.

---

[30] Ex. 27 (Buchsbaum, *supra*, at 44 (emphasis added)).

83.     The Board's elevated elasticity estimates are also inconsistent with its gross load forecasting.  Dr. Tierney's review of the underlying models concluded that they assume "**no** short-term elasticity for any of the forecasted customer types."  Tierney Opening Rep. at 51-52 (emphasis added).   Indeed, PREPA's own Integrated Resource Plan acknowledges that it considered the effect prices have on demand but concluded that prices "were found not to have a strong historical correlation to demand and explanatory power."  Ex. 29 (2019 IRP, Section 3.1.3); *see also id.* ("sustained high retail rates *could* change customer behavior," but residential "is traditionally a sector with low response to changes in retail rates" (emphasis added)).

84.     Using Dr. Tierney's corrected elasticity estimates that are in line with those available in the academic literature, *see* Tierney Opening Rep. at 50-51; Tierney Rebuttal at 10-11, Dr. Chakraborty prepared two corrected analyses, concluding this increases the amount of Additional Net Revenues present value by between ***$290 million to $580 million***, *see* Chakraborty Opening Rep. at 50-51, Table 1.

### C.     The Oversight Board Makes Unsupported Subtractions From PREPA's Revenue Envelope To Limit Funds Available For Bondholders

85.     Having first calculated a $6.38 billion "Revenue Envelope," the Board then reduces it by (1) the present value of an additional $2.425 billion for capital expenditures that are not contemplated in PREPA's certified 2022 fiscal plan (*see* Ex. 20 (Zarakas Dep. Tr. 212)), and (2) an additional $812 million in present value that the Oversight Board contends PREPA must reserve to pay for fixed costs that it says will otherwise not be paid for because of the demand-suppressing elasticity effect of higher rates.  These reductions are unfounded.

86.     Capital Expenditures.  The Legacy Charge model reduces the revenues available for creditors by $2.425 billion in capital expenditures *over and above* what is already projected and budgeted for in PREPA's 2022 Fiscal Plan.  This is unreasonable for three reasons.

87.     *First*, and as a threshold matter, the Oversight Board does not explain why these capital expenditures, "if they are truly necessary to keep PREPA a 'viable operational entity,' were not contemplated or provided for under the 2022 Fiscal Plan certified in June 2022," (Tierney Opening Rep. at 58)—and instead, as Dr. Tierney observes, have somehow "become evident only as part of [the Board's] analysis of how much of PREPA's potential future revenues can be used to fund creditor recoveries under the Plan." *Id.* at 59.   Tellingly, Ellen Smith, a utility consultant for the Commonwealth's P3 Authority, testified that LUMA's capital forecasts, which are used in PREPA's 2022 Fiscal Plan, are sufficient. *See, e.g.*, Ex. 30 (Smith Dep. Tr. 93, 104, 122).

88.     *Second,* the Legacy Charge Model assumes an additional $50 million in annual capital expenditures from 2024 to 2033 for PREPA's cost-sharing obligations necessary to obtain funding from FEMA and other federal agencies for various projects.   But there is no reason the model must account for these expenditures given that PREPA and other government officials have stated these costs would be covered by the Department of Housing and Urban Development and other grants. *See* Tierney Opening Rep. at 60; Tierney Rebuttal Rep. at 23-24.

89.     The Oversight Board relies on a letter from LUMA's lawyers, noting the *potential* for shortfalls in federal matching funds, to justify this portion of its additional capital expenditures. In a brief it submitted to PREB, however, LUMA asked PREB *not* to require LUMA to budget for insufficient matching funds, noting that PREB has acknowledged the government's commitment that "matching funds are to be derived from sources outside of electric rates."   Ex. 31 (Schneider Dep. Ex. 3 at 20).   LUMA further argued that it did not have a "prudent or available means" to "quantify" any potentially missing matching funds "that the Government of Puerto Rico is tasked with securing." *Id.* at 21; *see also* Ex. 32 (Schneider Dep. Tr. 48). There is simply no reliable basis for assuming this $50 million in additional annual capital expenditures.

33

90.     *Third*, from 2034 to 2051, the Oversight Board includes an additional $92 to $125 million per year in capital based on a statistical analysis by McKinsey.  This analysis is divorced from the reality or the practice of how actual utility professionals prepare capital expenditure forecasts.  On its face, the forecast is unreliable because capital expenditure forecasts for utilities almost never go beyond even five years because, as utility consultant Smith explained, "the view of the accuracy of such forecast[s] is . . . not great."  Ex. 30 (Smith Dep. Tr. 142).

91.     Further, forecasts are based on a detailed assessment of a utility's specific assets and their needs, as both Smith and LUMA's 30(b)(6) designee made clear.  Ex. 30 (Smith Dep. Tr. 139-42); Ex. 32 (Schneider Dep. Tr. 28-31).  But the McKinsey analysis performs a statistical analysis comparing PREPA's capital expenditures to those of a random assortment of other U.S. utilities.  After purporting to control for differences in length of network, number of customers, and electricity delivered, the remaining difference is assumed to be a shortfall in PREPA's capital expenditures.  But that's just not the asset-focused analysis that utility professionals perform; they would never simply compare their capital expenditures needs to other utilities and call it a day.  Ex. 32 (Schneider Dep. Tr. 39-40).  There are just too many other differences between utilities to perform such a simplistic analysis, as both Dr. Tierney and utility professional Smith testified.  Tierney Rebuttal Rep. at 20-23; Ex. 30 (Smith Dep. Tr. 145-51).

92.     <u>Fixed Costs</u>.  Based on the Board's faulty elasticity and load inputs, *see supra* ¶¶ 67-84, the Board projects that declining electricity sales caused by increasing rates will lead to a revenue shortfall to cover existing fixed costs, compromising PREPA's ability to use additional revenues to pay debt.  It therefore deducts future revenues at a present value of $812 million from the Revenue Envelope for that hypothetical shortfall.  But, as Dr. Chakraborty demonstrates, fixing

the Oversight Board's elasticity and other inputs as described above leads to an additional ***$290 to $580 million*** of revenues available to pay creditors.  Chakraborty Opening Rep. at 13.

93.     <u>Pensions</u>.  The Oversight Board also departs from the Fiscal Plan in adopting the assumption generated by Sheva Levy of EY, one of the Board's advisors, that PREPA will need to make pension contributions with a present value of $3.4 billion.  DS 81.  Her analysis overstates the necessary contribution level for two reasons, however, as set forth in the expert rebuttal report of pension actuary Thomas Terry.  *See* Ex. 33 (Terry Rebuttal Rep.) (ECF No. 3569-3).  First, Levy's contributions calculation assumes, without any factual basis, a 3% administrative expense for running the pension system, despite a historical 0.1% administrative expense.  *Id.* at 15-18.  That inflates the necessary contributions by approximately $100 million.  Second, Levy assumes that PREPA's Employee Retirement System (ERS) does not earn any return on loans it makes to participants.  *Id.* at 29-30.  That inflates the necessary contributions by another $85 million.  *Id.*

94.     <u>Municipal Customers</u>.  The Plan also fails to pay creditors all PREPA can by giving a free pass to Puerto Rico's municipalities.  Under the Plan's proposed Legacy Charge, municipal customers would *pay nothing* toward satisfying PREPA's bonds and other obligations.  *See* Plan Sched. B at Annex 1 (blank Legacy Charge for all "municipalities").

95.     That isn't because municipalities *can't* contribute.  They can.  The Oversight Board's own model shows that nearly $600 million in additional revenues could be generated from municipalities through fiscal year 2051, with a present value of $256.9 million.  RE & LC Model, "Municipal Classes" worksheet, row 116 (Plan Depository Doc. No. 235394).  PREPA inexplicably proposes to collect *none* of that available revenue from municipalities to help pay its

existing debts.  That is simply a gift to municipal customers, at bondholders' and other creditors' expense, and contrary to the confirmation requirements.[31]

### D.    The Oversight Board's Best Interest Analysis Is Wrong

96.    In order for a Plan to be confirmed, it must be in the best interest of creditors.  That is, the Oversight Board must prove that the Plan will result in a "greater recovery for the creditors" than would be provided under non-bankruptcy law outside of Title III.  PROMESA § 314(b)(6).

97.    The Oversight Board has submitted a Best Interest Analysis with its Disclosure Statement as Exhibit K.  ECF No. 3297-11 ("BIA").  The Oversight Board's counsel instructed its advisor, McKinsey, to model the revenues that a receiver could cause PREPA to generate if this case were dismissed.  Based on that analysis, the Oversight Board provided two scenarios.  In Scenario 1, the government somehow succeeds in entirely blocking a receiver from increasing electricity rates.  *Id.* at App'x 1.  In Scenario 2, according to McKinsey, a receiver would generate between $3.6 and $5.0 billion in Net Revenues to pay PREPA's creditors.  *Id.*

98.    The Oversight Board's analysis relies on a series of implausible instructions from counsel, and a very different financial model than what it uses to derive the Legacy Charge Derivation (or, for that matter, the net-revenues-under-a-receiver model it deployed in the Section 502(c) claim estimation proceeding).  Nor does the Board answer Dr. Chakraborty's analysis that PREPA can afford to pay billions more than the Plan provides (inside or outside of Title III).

99.    "Scenario 1."  It is not surprising that bondholders do better under the Plan than they would under McKinsey's Scenario 1.  That scenario assumes a world in which the

---

[31] For various reasons, PREPA's contribution-in-lieu of taxes (CILT) obligation to its municipal customers is not an impediment to assessing a Legacy Charge on those customers.  In fact, the Plan expressly seeks to preempt the CILT statutes to the extent that they would impose any such impediment.  *See* Plan Sched. D at 2 (listing CILT statutes among those preempted by PROMESA).

Commonwealth successfully prevents a court-appointed receiver, operating pursuant to PREPA's Authority Act, from ever raising electricity rates *at all*.  The Board asserts that "the Commonwealth may be permitted to exercise legislative and/or police power to establish a cap on electricity rates," and otherwise act to limit any rate increases.  There is no legal foundation for Scenario 1's legal assumption—in the Trust Agreement, Authority Act, or elsewhere.  No existing law bars a court-appointed receiver from increasing rates as needed to sustain PREPA's operations and pay debt service.  It is speculation to think that the government would take arbitrary actions to prevent a receiver from exercising his statutory responsibilities.  In any event, such hypothetical roadblocks violate PROMESA's anti-moratorium-law provision, the Takings Clause, and the Contracts Clause.  *See* AHG Br. ¶¶ 9-26, Adv. Proc. No. 19-391, ECF No. 225.[32]

100.    "Scenario 2."  The second scenario correctly assumes that a receiver would be able to increase rates to pay PREPA's expenses and debts, but understates the net revenues that would be available at between $3.6 and $5.0 billion.  This low-ball analysis is premised on self-serving and unsupportable instructions from the Oversight Board's counsel.  A few examples:

101.    *First*, the Oversight Board assumes that PREPA's private operators, LUMA and Genera, would terminate their contracts if a receiver took control of PREPA, causing PREPA to

---

[32] In its motion in limine seeking to bar evidence contrary to the 2022 Fiscal Plan, ECF No. 3581, and with AAFAF at the estimation hearing, the Oversight Board has asserted that the Oversight Board's non-bankruptcy authority under Titles I and II of PROMESA might allow them to block a receiver from raising rates.  The Ad Hoc Group will further address this issue in response to the motion, but this position is unsupported.  Congress did not provide the Oversight Board the power to restructure or refuse to pay debts in Title II; the only way debts can be restructured is through Titles III and VI.  If the Oversight Board could simply choose, in a fiscal plan, to prohibit PREPA from paying its debts, then Title III would be unnecessary.  That is confirmed by PROMESA § 203(d)(2)(A), which authorizes the Oversight Board to reduce only "nondebt expenditures" through the Title II budgeting process.  AAFAF also suggested, at the estimation hearing, that PROMESA § 207 might provide a source of authority to reduce debt payments, but that section refers only to placing limits on *issuing* new debt or *redeeming* debt before it is due.  Finally, even if the Oversight Board had the authority prevent the payment of lawful debts, PROMESA § 108 would limit that authority to actions by the legislature and the governor, not by court-appointed receivers.

lose (a) a $115 million termination fee to LUMA, (b) $90 million in demobilization costs for LUMA, (c) $750 million in grant money provided by the Commonwealth, (d) annual projected cost savings from more efficient operations, and (e) reductions in bad-debt expenses caused by more effective and rigorous collection efforts.  But there is no actual record evidence that LUMA or Genera would terminate, or that a receiver could not either retain them or bring in new private operators.  In fact, the Best Interest Analysis model itself assumes and budgets for a receiver to retain or hire private operators to run PREPA. *See* Best Interest Analysis Model, at spreadsheet "2. Cash Flow," row 105 ("Receiver's fees (inclusive of new operator fees).") (Plan Depository Doc. No. 235384).  Dispatching the flawed (and evidently half-hearted) assumption that LUMA and Genera would quit, and keeping the projected efficiencies associated with their work, increases creditor recoveries under "Scenario 2" of McKinsey's model by about $1.4 to $1.5 billion.

102.    *Second*, the Oversight Board mistakenly assumes that Cobra's post-petition expenses working for PREPA will be paid for in full out of PREPA's revenues.  But Cobra's expenses are expected to be paid, at least in part, from federal funds.  *See Cobra Acquisitions LLC's Motion to Lift Stay Order*, Case No. 17-4780, ECF No. 3507, ¶ 1.  Making that correction increases the recovery, under "Scenario 2," by about ***$433 million***.  Correcting other errors and mistaken assumptions likewise increase available creditor recoveries outside of Title III.

103.    *Third*, the Oversight Board assumes the same $2.425 billion in additional capital expenditure that it applies in the Legacy Charge Derivation. Ex. 34 (Shah Dep. Tr. at 208-10). Again, however, this additional capital expenditure figure ignores PREPA's actual methodology for forecasting future capital needs.  *See supra* ¶¶ 86-91.  Excluding this unsupported sum from the best-interests analysis increases creditor recovery outside Title III by $107 to $300 million.

104.    *Fourth*, the Best Interest Analysis uses pension estimates (Ex. 34 (Shah Dep. Tr. 219-20)) that, as discussed above (*supra* ¶ 93), are overstated.

105.    *Fifth*, McKinsey's Best Interest Analysis assumes that a receiver would charge only volumetric fees and no fixed fees, which increases the demand-reducing elasticity effect.  Ex. 34 (Shah Dep. Tr. 200).  But there's no reason a receiver could not charge fixed fees, in whole or in part, much like the Oversight Board proposes to do with its Legacy Charge.  This is unlike the heavily fixed Legacy Charge proposed by the Oversight Board, *see supra* ¶ 42, and the Oversight Board offers no explanation for the disconnect in its two plan-supporting models.

## II.    The Plan Is Not Confirmable Because Its Settlements Are Unreasonable, Should Not Be Approved, And Unfairly Discriminates Against Bondholders

### A.    Legal Standards

106.    Bankruptcy Code Section 1123(b)(3) states that a plan may provide for "the settlement or adjustment of any claim or interest."  11 U.S.C. § 1123(b)(3)(A).  To approve a settlement under Bankruptcy Rule 9019, the Court "must determine whether the compromise is fair, reasonable, and in the best interest of the estate."  *In re Wash. Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) (internal quotation marks omitted).

107.    If not approved, then the Plan's disparate treatment of different classes of unsecured creditors violates 11 U.S.C. § 1129(b)(1), incorporated by PROMESA §§ 301, because a plan cannot "discriminate unfairly . . . with respect to each class of claims or interests that is impaired under, and has not accepted the plan."  A plan unfairly discriminates when "creditors and equity interest holders with similar legal rights . . . receiv[e] materially different treatment under a proposed plan without compelling justifications for doing so."  *In re Hermanos Torres Perez Inc.*, No. 09-cv-5585, 2011 WL 5854929, at *9 (Bankr. D.P.R. Nov. 21, 2011).

### B.     The National Settlement Is Unreasonable And Unfairly Discriminatory

108.     The Plan seeks Court approval of the National Settlement on the ground that it is "in the best interests" of PREPA, the Oversight Board, and Holders of Claims and "fair, equitable and reasonable."  Second Am. Plan § XVIII.I.  The National Settlement, however, is far from fair, equitable, and reasonable.  It does not pass muster under Bankruptcy Rule 9019.

### 1.     The Settlement Of National's Bond Claim Is Unreasonable

109.     *First*, National receives allowed claims in the full amounts asserted and recoveries up to 77.51%.  *See* Amended Plan at §§ VIII.A, II.D.2.  In contrast, the Plan gives other bondholders and monolines Series B Bonds in an amount equal to 50% of the outstanding amount owing, if the claimant agrees to settle, or, up to a 56% recovery if the claimant succeeds on all counts in the lien and recourse litigation.  *See, e.g.*, Ex. 35 (Brownstein Dep. Tr. 147-48).

110.     *Second*, National is receiving a considerably greater recovery than the Non-Settling Bondholders—even if bondholders succeed on both the recourse and lien issues.[33]  In other words, National is receiving more under the settlement than what the Board believes is PREPA's greatest possible exposure in the lien and recourse litigation.  That is patently unreasonable and unfair.

111.     *Third*, National will receive a 2.86% structuring fee plus a 3.0% consummation fee. Second Am. Plan § II.D.2. The structuring fee, however, relates to payments that National makes to holders of claims arising from or relating to National Insured Bonds and has nothing to do with PREPA.  In other Title III cases, such consummation fees were paid to majority groups of creditors who significantly contributed to a substantially consensual plan.  That is not the case here.  Rather,

---

[33] Ex. 4 (Skeel Dep. Tr. 113-117) (conceding that, under all scenarios under the Amended Plan, National recovers "meaningful[ly]" more than the non-settling bondholders and other monolines).

National negotiated only for itself, exacerbating a highly contentious confirmation process. National should not be rewarded for those efforts with additional fees.

**2.    The Settlement Of National's Post-Petition-Interest Claim Is Contrary To Law, Unreasonable, And Should Not Be Approved**

112.    There are two additional, independent deficiencies in the National Settlement that warrant rejecting at least the National Reimbursement Claim.

113.    *First*, reimbursing National for post-petition payments to its insureds is impermissible payment of post-petition interest under Bankruptcy Code Section 502(b)(2) because a claim is not permissible if it "is for unmatured interest." *See* Ex. 35 (Brownstein Dep. Tr. 154) ("The reimbursement claim is strictly post-petition interest claims.").

114.    Moreover, the Oversight Board's entire premise behind the Plan is that PREPA is not solvent, and therefore any amounts paid in respect of postpetition interest are done so in settlement of a creditor's assertion that it has a secured claim.  There is no plausible argument that somehow National has a superior claim for a settlement on its postpetition interest than other bondholders have, given that the legal basis for the claims is identical.

115.    Indeed, the Board has stated that payment of post-petition interest to National, but not similarly situated monolines and bondholders, is entirely a function of the settlement.  Ex. 35 (Brownstein Dep. Tr. 114-15) (no other bondholders receive interest accrual).  Thus, payment of a settlement on postpetition interest to National, while not making (or even offering) the same payment to other identically situated bondholders, constitutes unfair discrimination.

116.    *Second*, the Plan violates Bankruptcy Code Section 509(c) by providing payment of the National Reimbursement Claim before holders of the underlying National Insured Bonds are paid in full.  Under Section 509(c), where an entity is *co-liable* with the debtor for a creditor's claim, and the entity obtains a right to reimbursement from the debtor based on its payment to the

creditor on account of the liability, the entity is subordinated to the creditor until such creditor is paid in full. *See, e.g.*, *In re LTC Holdings, Inc.*, 10 F. 4th 177, 186 (3d Cir. 2021).

117.    National argues that it is not receiving reimbursement from PREPA as a co-obligor under its bonds, but rather based on direct contractual rights against PREPA.  *See* National Reply to DS Objections ¶ 17 (ECF No. 3244).  But there is no exception in Section 509(c) for supposedly "direct" contractual claims.  A reimbursement claim is subject to subordination regardless of whether the claim arises under the same agreement of the primary claim or a separate agreement. Neither the Oversight Board nor National have offered any support for the proposition that the plain meaning of section 509(c) should be disregarded when a reimbursement claim purportedly arises under a separate agreement.  The Oversight Board and National acknowledge that the National Reimbursement Claim is, in fact, a reimbursement claim.  Such claims are subject to subordination until the primary creditor receives payment in full on account of its claim.

### 3.    The Plan Treatment Of National's Claim Discriminates Unfairly Against Other Bondholders

118.    The Ad Hoc Group adopts and incorporates by reference Syncora's explanation that National's discriminatorily favorable treatment, compared to other bondholders (and, in Syncora's case, other monolines), renders the Plan not confirmable.  The Ad Hoc Group also adopts and incorporates by reference the Ad Hoc Committee of National Claim Assignees' explanation that the National Settlement further discriminates unfairly against the holders of identical claims assigned to them by National, the exclusion of which from the National settlement demonstrates that settlement's true purpose is solely to obtain National's support for the Plan.

### C.    The Fuel Line Lenders Settlement Is Unreasonable And Unfairly Discriminatory

119.    A centerpiece of the Plan is the Fuel Line Lenders' Plan Support Agreement (the "FLL PSA"), in which the Oversight Board purports to settle the Fuel Line Lenders' adversary-

proceeding allegations that their claims have priority over supposedly subordinated bondholder claims.[34]  That litigation presents an *intercreditor* dispute.  The Fuel Line Lenders' priority-and-subordination allegations are entirely about whether they stand ahead of, beside, or behind bondholders to receive whatever creditors get.  It has nothing to do with how much PREPA must distribute in the aggregate to those in line, or with anyone's rights against PREPA, which the Board's lead advisor on the FLL PSA concedes.  *See* Ex. 35 (Brownstein Dep. Tr. 81-83).

120.    The Oversight Board cannot simply declare the winner of an intercreditor dispute, call that a "settlement" with its chosen victor, and thereby purchase an accepting class *using the losing creditors' money*.  The FLL PSA would do exactly that.  That deeply prejudicial vote-buying gambit should be rejected under Bankruptcy Rule 9019 as contrary to law, unreasonable, and not a good-faith settlement of claims for PREPA's own benefit.

121.    Underneath the veneer of settlement, it is clear that the Plan's hugely favorable treatment of the Fuel Line Lenders' unsecured claim "discriminate[s] unfairly" against bondholders and other unsecured claimants in violation of the confirmation requirement in 11 U.S.C. § 1129(b)(1) (incorporated into Title III by PROMESA § 301).

### 1.    The Fuel Line Loans Do Not Have Payment Priority

122.    The Fuel Line Lenders made unsecured loans, between May 2012 and August 2014, purportedly to finance PREPA's fuel purchases (but also other things[35]).  Amended Complaint, Adv. Proc. No. 13-396, ECF No. 36, ¶¶ 23, 50.  Their refusal to extend those loan facilities, or

---

[34] *Cortland Capital Market Services LLC v. Fin. Oversight & Mgmt. Bd. of P.R.*, Adv. Proc. No. 19-396.

[35] PREPA's audited financial statements state, for instance, that "fuel line" loans from the Citi facility funded the construction of a liquified natural gas facility, and that "fuel line" loans from the Scotia facility were used to free up funds so that PREPA could repay Citi's line of credit.  Adv. Proc. No. 19-391, ECF No. 260-2 (2021 PREPA Audited Financial Statements), at 57-58.

waive default, is what initially forced PREPA to begin a restructuring process before PROMESA.[36]

Now in Title III, the Fuel Line Lenders assert a $701 million claim on their unsecured debt. Their

loan terms don't give them any security interest, or priority over PREPA's other unsecured debts.

123.    The Fuel Line Lenders nevertheless assert that their unsecured loans must be repaid

before bondholders can recover anything on any unsecured portions of their bonds. They make

that argument even though it is undisputed that bondholders never agreed with the Fuel Line

Lenders to subordinate their debt. Rather, the Fuel Line Lenders contend they are third-party

beneficiaries of the Trust Agreement between PREPA and the PREPA Bond Trustee, because the

Trustee agreed that, each month, revenues would flow into a Sinking Fund for debt service only

after PREPA had paid necessary Current Expenses. According to the Fuel Line Lenders, the

unpaid principal and interest on their loans meets the Trust Agreement's definition of a Current

Expense, and so results in a bankruptcy claim to which bondholders' claims are subordinated.

124.    In July 2019, the Fuel Line Lenders filed an adversary proceeding seeking to

subordinate the bonds to the fuel line loans. Bondholders moved to dismiss, and the Oversight

Board intervened in the subordination claim to join that motion. The Oversight Board explained

that the Fuel Line Lenders' priority and subordination claims "clearly," "certainly," and

"manifestly" fail "as a matter of law and fact." FOMB Mot. to Dismiss, Adv. Proc. No. 13-396,

ECF No. 54 at 7, 15, 18, 26. Motions to dismiss the Fuel Line Lenders' complaint were fully

briefed and scheduled for a hearing, until the pandemic led to a series of stays. As recently as

September 2022, the Oversight Board was still advocating for outright dismissal of the Fuel Line

Lenders' priority-and-subordination claims. ECF No. 2956 ¶¶ 6-7, 42.

---

[36] Kobre & Kim, *Final Investigative Report*, The Financial Oversight & Management Board for Puerto
Rico, at 127 (Aug. 20, 2018), Case No. 17-3283, ECF No. 4014-1.

125.    On December 2, 2022, however, the Oversight Board announced the FLL PSA, (DS Ex. M).  It agreed to the Fuel Line Lenders' full claim amount, and to award that claim favored, priority treatment over all other unsecured claims (including bondholders').  Specifically, the Fuel Line Lenders would recover at least 84% of their allowed claim through exclusive-to-them Series A Bonds enjoying first priority to principal repayment out of Legacy Charge proceeds, expected repayment in just five years, and a stated final maturity of only 15 years—much greater and quicker recoveries than now-subordinated bondholders would get via Series B Bonds.  In exchange for this favorable treatment—and the corresponding *unfavorable* treatment of bondholders—the Fuel Line Lenders unsurprisingly pledged their full-throated support the proposed Plan.

## 2.    The FLL PSA Should Be Rejected As Unreasonable Under Rule 9019

126.    The FLL PSA is not a proper or reasonable settlement because the litigation it purports to resolve isn't PREPA's to settle.  The Fuel Line Lenders' assertion of priority over bondholders, and the subordination of bondholders' claims to theirs, is an intercreditor dispute that does not affect the size of any claim on PREPA's revenues.  Bondholders' claims cannot be subordinated to the Fuel Line Lenders' claims—wholly at bondholders' expense—without their agreement or this Court's ruling that doing so complies with the relevant non-bankruptcy law (contrary to the Oversight Board's stated position that it "manifestly" does not).

127.    The Oversight Board has the burden to demonstrate that "the compromise is in the best interest of the estate."  *In re 110 Beaver Street*, 244 B.R. 185, 187 (Bankr. D. Mass 2000) (citing *In re C.P. Del Caribe, Inc.*, 140 B.R. 320 (Bankr. D.P.R. 1992)).  A proposed settlement must be rejected if it "falls below the lowest point in the range of reasonableness" considering "(i) the probability of success in the litigation being compromised; (ii) the difficulties, if any, to be encountered in the matter of collection [of the disputed funds]; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay attending it; and, (iv) the paramount

45

interest of the creditors and a proper deference to their reasonable views." *In re Fin. Oversight &*
*Mgmt. Bd. for P.R.*, 360 F. Supp. 3d 65, 75 (D.P.R. 2019) (citations omitted).

128.    The first three considerations do not apply here because the Oversight Board's
purported settlement of an intercreditor dispute has nothing to do with PREPA's litigation success,
collection risk, or burdens.  From PREPA's perspective, it makes no difference whether the Fuel
Line Lenders or bondholders win that litigation.  Nor is there anything for PREPA to collect.  And
any litigation complexities—which are absent in the fully briefed adversary proceeding—would
not fall on PREPA but rather on the dueling Fuel Line Lenders and bondholders.

129.    The Oversight Board's lead advisor and negotiator on the FLL PSA confirmed all
of this.  Ex. 35 (Brownstein Dep. Tr. 84-85, 101).  The Plan would distribute $5.68 billion in New
Bonds to bondholders, Fuel Line Lenders, and other unsecured creditors.  PREPA has no stake in
whether the Fuel Line Lenders' get $701 million of those New Bonds (100% recovery),
$589 million (84%), or $0.  All that would change is how much remains for other creditors.

130.    The only relevant consideration here, then, is the "paramount interest" of creditors
who are *not* parties to the FLL PSA, and whose "reasonable views" deserve "deference."  *In re*
*Fin. Oversight & Mgmt. Bd.,* 360 F. Supp. 3d at 75 (internal quotation marks omitted).  Here, the
creditors who would pay for the Board's settlement overwhelmingly object to it.  That is not
surprising, seeing as the Fuel Line Lenders' priority-and-subordination allegations are, *by the*
*Board's own telling*, meritless and precluded by squarely applicable precedent and the Trust
Agreement's clear terms.  Bondholders and other creditors cannot legally be compelled to give up
their rightful recoveries from PREPA under a one-sided "settlement" orchestrated by the Oversight
Board, which has no stake in the matter, simply to manufacture support for its proposed Plan.

131.    Even if the probability of litigation success, collection risk, or complexities are relevant, each cuts against settlement approval.  As for probable litigation outcomes, bondholders incorporate by reference their and the Oversight Board's briefs on motions to dismiss the Fuel Line Lenders' complaint.  Adv. Proc. No. 13-396, ECF Nos. 54, 55, 79, 80.  Briefly stated: (1) Loan debt—no matter what it funds[37]—is not itself a current operating expense under the Trust Agreement, PREPA's annual budgets, PREPA's financial statements, or fundamental accounting principles[38]; (2) past due principal and interest on defaulted loans are not monthly Current Expenses under the Trust Agreement, which does not morph PREPA's unpaid debts or expenses into priority bankruptcy claims[39]; (3) the Fuel Line Lenders, non-parties to the Trust Agreement, cannot turn that contract into a subordination agreement in their favor; and (4) a Puerto Rico court conclusively rejected priority-and-subordination arguments based on the Trust Agreement and indistinguishable from the Fuel Line Lenders' arguments, *see UTIER, et al. v. Autoridad de Energia Electrica de Puerto Rico, et al.*, No. K-AC2016-0291 (Dec. 19, 2016).[40]

---

[37] *See, e.g.*, *Erste Europaische Pfandbriefund Kommunalkreditbank v. City of San Bernardino,* Adv. Proc. No. 15-01004-MJ, ECF No. 34 at 21 (May 11, 2015 Hr'g Tr.) (Bankr. C.D. Cal. 2015) (holding, in a Chapter 9 bankruptcy case, that pension obligation bonds financing San Bernardino's pension obligations did not thereby obtain the legal status and treatment of the underlying pension obligations themselves).

[38] Trust Agreement (Adv. Proc. No. 19-391, ECF No. 118-1) § 101 ("Current Expenses" are PREPA's "reasonable and necessary current expenses of maintaining, repairing and operating the System") § 504 (capping Current Expenses at amounts in annual budgets); PREPA 2021 Audited Financial Statements (Adv. Proc. No. 19-391, ECF No. 260-2) at 24-25, 55 (distinguishing between expenses and liabilities; identifying fuel line loans as long-term debt); Jacqueline L. Reck, et al., ACCOUNTING FOR GOVERNMENTAL & NONPROFIT ENTITIES 426 (18th ed. 2019) ("Operating expenditures are those incurred for governmental operations. Excluded from consideration are capital outlays and repayment of debt principal.").

[39] As the Oversight Board has explained to this Court, "even if the Fuel Line Facilities could have once been considered Current Expenses when they were originally issued, they are now long past-due, and cannot possibly continue to be considered Current Expenses."  ECF No. 1486 ¶ 55.

[40] A certified translation of the *UTIER* decision is available at Adv. Proc. No. 19-391. ECF No. 224-2.

47

132.     There is no conceivable "collection risk" to PREPA here, or litigation complexities associated with an adversary proceeding that has been fully briefed on motions to dismiss for years. In any event, the mere expediency of dispatching complex or troublesome litigation is not a sufficient basis for settlement approval. *In re Taylor*, 190 B.R. 413, 417 (Bankr. D. Col. 1995).

### 3.      The Plan's Treatment Of The Fuel Line Lenders' Claims Discriminates Unfairly Against Bondholders And Other Creditors

133.     Once the Oversight Board's preferential treatment of the Fuel Line Lenders is properly rejected for not being reasonable or in good faith, it necessarily follows that the Plan cannot be confirmed. The Plan would award the Fuel Line Lenders in Class 4 at least an 84% (up to 100%) recovery on their unsecured debt in first-priority, Series A Bonds with a five-year expected amortization of principal and 15-year stated final maturity. Bondholders in Class 2 would get only a 47% recovery on the unsecured portion of their debt in the form of second-priority Series B Bonds with a 35-year expected repayment and 50-year stated final maturity. In short, under the Plan, PREPA will take much longer to pay bondholders much less than the Fuel Line Lenders. There is no justification for that starkly different treatment of unsecured debt claims.

134.     To confirm a plan of adjustment over the objection of the bondholders' dissenting class, the Oversight Board has the burden to demonstrate that the "plan does not discriminate unfairly . . . with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1). That prohibition of unfair discrimination against dissenting classes requires "that a dissenting class will receive relative value equal to the value given to all other similarly situated classes." *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987).

135.    Short of the Fuel Line Lenders actually prevailing on their meritless priority-and-subordination allegations against bondholders, their unsecured debt claims are—at best[41]—similarly situated to the unsecured portion of bondholders' debt claims.  Yet the discrimination between their Plan treatments is substantial.  The Fuel Line Lenders' *minimum* 84% recovery is nearly 40 percentage points different than bondholders' *maximum* 46.5% recovery.  That disparity is leaps and bounds higher than what other courts have found to unfairly discriminate.[42]

136.    Courts take different approaches to unfair discrimination, but "[t]he hallmarks" are "whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination." *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 660 (Bankr. D. Del. 2003).[43]

137.    As discussed above, there is no reasonable basis for the Oversight Board to pick the winner of an intercreditor dispute, and thus no "compelling justification" for differential

---

[41] The Ad Hoc Group reserves all rights with respect to whether the Fuel Line Lenders have priority over bondholder claims, including to argue that bondholders in fact have priority over the Fuel Line Lenders.

[42] *See In re Snyders Drug Stores, Inc.*, 307 B.R. 889, 892 (Bankr. N.D. Ohio 2004) (6 percentage point difference); *In re Breitburn Energy Partners LP*, 582 B.R. 321, 351 (Bankr. S.D.N.Y 2018) (7.44 percentage point difference); *In re Hoffinger Indus., Inc.*, 321 B.R. 498, 509 (Bankr. E.D. Ark. 2005) (10 percentage point difference); *In re Anderson*, 173 B.R. 226, 228 (Bankr. D. Col. 1993) (14.2 percentage point difference); *Earth Pride Organics, LLC v. Official Comm. of Unsecured Creditors of EarthPride Organics, LLC*, Bankr. No. 17-13816, 2021 WL 1553787, at *2 (Bankr. E.D. Pa. Apr. 20, 2021) (29 percentage point difference); *In re Cooper*, 3 B.R. 246, 249 (Bankr. S.D. Cal. 1980) (30 percentage point difference).

[43] An emerging preferred test is professor and former bankruptcy judge Bruce Markell's, which establishes a rebuttable presumption of unfair discrimination when there is "(1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution." *In re Tribune Co.* 972 F.3d 228, 241 (3d Cir. 2020) (relying on Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 Am. Bankr. L.J. 227, 228, 249 (1998)).  The Markell test is easily satisfied here:  Bondholders are a dissenting class, Fuel Line Lenders have (at best) the same priority to payment, and bondholders would get a materially lower percentage recovery *and* bonds that carry a greater risk.  No compelling justification for that material discrimination rebuts the presumption that it is unfair and precludes confirmation.

49

treatment. *In re Hermanos Torres Perez Inc.*, No. 09-cv-5585, 2011 WL 5854929, at *9 (Bankr. D.P.R. Nov. 21, 2011). The Oversight Board could propose, confirm, and consummate a plan no matter the outcome of that litigation, which has been ready for decision since late 2019. The only effect of allowing that dispute to proceed is that the Oversight Board would likely lose the Fuel Line Lenders' ill-gotten "yes" vote once their preferential treatment has been taken away.

### D.     The Plan's Treatment Of Pensions Claims Discriminates Unfairly Against Other Creditors

138.     Another class of creditors that receives more than its fair share is the Retirement System. The Disclosure Statement claims it receives an 86% recovery, but its actual recovery percentage is closer to 95% after accounting for errors in the Oversight Board's calculations. *See* Terry Rebuttal Rep. at 18. No other class of creditors receives such a generous recovery, and the pension system possesses no unique legal rights to justify this relative windfall. PREPA receives no unique benefits from paying retirees these underfunded benefits, and there is no justification to burden either ratepayers or other creditors by doing so. The Commonwealth's coffers are full, and if the welfare of PREPA retirees is an economic concern for the island as a whole, then the Commonwealth, not other creditors, should provide any necessary assistance directly.

## III.   The Plan Is Not Confirmable Because It Engineers Impaired Accepting Classes Through Impermissible Gerrymandering Of Classes

### A.     Legal Standard

139.     The Bankruptcy Code (as incorporated by PROMESA) requires that "[i]f a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan [must have] accepted the plan." 11 U.S.C. § 1129(a)(10). A debtor cannot "gerrymander an affirmative vote." *In re Purdue Pharma, L.P.*, 2023 WL 3700458, at *24 (2d Cir. 2023). "[T]he separation of similar claims can only be justified by a legitimate reason." *Id.* The entity proposing the plan bears the burden of justifying the classification. *In re Autterson*, 547 B.R. 372, 397-98 (D. Colo. 2016).

**B.**     **National And Settling Bondholders Should Be Classified With Non-Settling Bondholders And Monolines**

140.     Under Bankruptcy Code Section 1122(a), a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in it.  PROMESA § 301 incorporates section 1122 into Title III cases and adds the additional gloss that in determining "whether claims are 'substantially similar' for the purpose of section 1122 . . . the Oversight Board shall consider whether such claims are secured and whether such claims have priority over other claims."  PROMESA § 301(e).   In *Granada Wines, Inc. v. New England Teamsters & Trucking Industry Pension Fund*, 748 F.2d 42 (1st Cir. 1984), the First Circuit took a strict approach to classification determinations, holding that "all creditors of equal rank with claims against the same property should be placed in the same class."  *Id.* at 46 (stating that "[s]eparate classifications for unsecured creditors are only justified where the legal character of their claims is such as to accord them a status different from the other unsecured creditors").

141.     In the Commonwealth Title III case, the Court stated its view that PROMESA provided the Oversight Board with flexibility when classifying claims.[44]  Notwithstanding this flexibility, the main commandment of section 1122—"thou shall not gerrymander" classes for purposes of creating an impaired accepting class—undoubtedly applies to Title III cases.  *See, e.g.*, *In re Bos. Post Rd. Ltd. P'ship*, 21 F.3d 477, 483-84 (2d Cir. 1994) (holding that "approving a plan that aims to disenfranchise the overwhelmingly largest creditor through artificial classification is simply inconsistent with the principles underlying the Bankruptcy Code"); *In re Hanish, LLC*, 570 B.R. 4, 16 (Bankr. D.N.H. 2017) (surveying the split in circuits on the interpretation of section

---

[44] *See* DS Hr'g Tr. 80, Case No. 17-3283, ECF No. 17379 ("[T]he Court finds no basis to import the *Granada Wines* strict classification principle into PROMESA.").  The Ad Hoc Group respectfully disagrees with the Court's holding that the strict classification rule in *Granada Wines, Inc. v. New England Teamsters & Trucking Industry Pension Fund*, 748 F.2d 42 (1st Cir. 1984), is not binding here.  DS Hr'g Tr. 146-47.

1122, and holding there "is one clear rule to which all courts adhere—thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan").

142.    Unlike the Commonwealth plan, the proposed classification here reeks of gerrymandering in a transparent attempt to artificially create an impaired accepting class.  The Plan purports to contain four separate classes of impaired creditors, including two separate classes of National impaired claims, but each class breaks the cardinal rule against gerrymandering.

### 1.    National

143.    Notwithstanding that National, as the holder/insurer of PREPA revenue bond claims, has the same rights against PREPA as compared with the other Bondholders (especially the other monolines), the Amended Plan nonetheless seeks to create two separate classes for PREPA bond claims: Class 5—the National Insured Bond Claims and Class 6—The National Reimbursement Claims.  *See* ECF No. 3296 at 30 (Second Am. Plan. at § III.A).[45]

144.    Notably, this separate classification and disparate treatment is not because of any distinguishable legal characteristics between National's claims and those of other bondholders and monolines.  The only basis the Board provides for separate classification is that National agreed to vote for the plan—*i.e.*, "in order to gerrymander an affirmative vote on a reorganization plan"— which flies in the face of the Bankruptcy Code.  *Hanish*, 570 B.R. at 16 (quoting *In re Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991)).  And, notwithstanding the flexibility that

---

[45] *See* Ex. 4 (Skeel Dep. Tr. 214) ("Q: Do you have any basis to say . . . whether Syncora's rights with respect to PREPA are any different than National's rights with respect to PREPA?  A [Mr. Skeel:] I don't have a basis no."); *id.* at 356-357 ("National's deficiency claim would be an unsecured claim with the same status as general unsecured claims.…If we're talking about just not the secured portion, we're talking about the deficiency claim, it does seem to me that it has the same stature as a general unsecured claim or would."); Ex. 35 (Brownstein Dep. Tr. 137-38) (responding "no, I don't believe so" when asked whether the "National bond claim [is] different in nature from the bond claim asserted by any other PREPA bondholders").

PROMESA provides in classifying claims, it also is impermissible under PROMESA when classification is done for the illicit purpose of manufacturing an impaired accepting class.

145.    Moreover, any disparate treatment between holders of insured bonds relates *solely* to the treatment that the particular monoline will provide to its insureds (*e.g.*, communication and terminal payment, creation of a trust to receive and distribute principal and interest payments to insureds, etc.).  Indeed, from the Debtor's perspective, holders of insured claims, irrespective of monoline insurers, and uninsured claims, are indistinguishable—except that, in the Debtor's own words, "National settled its secured claims in exchange for, among other things, a special custodial trust structure.  The other monolines have not settled their secured claims."  ECF No. 3206 ¶ 31. Any monoline "sweeteners," as to structure of the monoline payments to its insureds, however, are specific to each monoline and not part of the plan treatment of the monolines' claims.

### 2.    Settling Bondholders

146.    Like National, Settling Bondholders have the same legal claim against PREPA that Non-Settling Bondholders do.  But, once again, the Oversight Board excises Settling Bondholders from the bondholder class and provides them preferential treatment in exchange for voting for the Plan.  The Board provides no justification for separate classification beyond the decision to settle. While a debtor is permitted to settle with claimants *within* a class, *see In re Dow Corning Corp.*, 244 B.R. 634, 669 (Bankr. E.D. Mich. 1999), creating a *separate* class for claims that have *no* distinguishing characteristic is gerrymandering, plain and simple.  *See, e.g.*, *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 159 (3d Cir. 1993) ("[E]ach class must represent a voting interest that is sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed.  Otherwise, the classification scheme would simply constitute a method for circumventing . . . 11 U.S.C. § 1129(a)(10).")

53

### C.   The Fuel Line Lenders And Vitol Should Be Classified With Other General Unsecured Creditors

#### 1.   Fuel Line Lenders

147.   The Fuel Line Lenders hold claims indistinguishable from other unsecured creditors, but the Plan grants them an outsized recovery, at the expense of other unsecured creditors.  That outsized recovery is *only* because the Fuel Line Lenders settled with the Board and said they would for the Plan.  Ex. 4 (Skeel Dep. Tr. 168).  So even if the Board were permitted to settle bondholders' intercreditor dispute with the Fuel Line Lenders, separately classifying them solely to secure their affirmative vote for confirmation is impermissible gerrymandering.[46]

#### 2.   Vitol

148.   Vitol filed a proof of claim for $41.5 million for PREPA's failure to pay pursuant to fuel-supplier contracts.  DS 192.  After litigation, the Court allowed Vitol's claim, and the Oversight Board appealed.  DS 193; Adv. Proc. No. 19-00453, ECF No. 82.  But, then the Oversight Board settled with Vitol, withdrawing its appeal, and separately classified Vitol in Class 8 where it receives much different treatment than other unsecured creditors in Class 7.  DS 30, 193-94.

149.   Although the settlement agreement is for the *full* amount of Vitol's claim, it dictates that under the Plan, Vitol will receive only 50% of what other unsecured creditors will receive on their allowed claims (up to $20 million).  DS, Ex. B at 2.  There is no meaningful justification or legitimate business reason for why Vitol—a run-of-the-mill general unsecured creditor—is treated differently than general unsecured creditors.  And the same economic result could have much more readily been achieved if the Oversight Board had allowed Vitol's claim at 50% of the agreed-upon

---

[46] The Ad Hoc Group joins Assured's confirmation objections relating to the Fuel Line Lenders settlement, and resulting unfair discrimination and gerrymandering.

amount and placed it in the same class as other unsecured creditors, or placed Vitol in the general

unsecured class with a lower recovery, as permitted by 11 U.S.C. § 1123(a)(4).

150.    The only plausible reason for Vitol's disparate treatment is that this complex

settlement structure was constructed to impermissibly gerrymander an impaired accepting class.

If the classification of Vitol is proper, the bar on gerrymandering would be toothless, because any

debtor could settle with a subset of a larger creditor group by allowing the subset's claims in full

and adjusting the percentage of recovery to manufacture an impaired accepting class.

**IV.    The Plan Cannot Be Confirmed Because The New Bonds Indenture Is Unusually
Restrictive On Rights And Remedies**

151.    The Series B-1 Bonds that bondholders and most other creditors would receive

contain unusual terms that may unnecessarily depress their payment prospects.

152.    <u>Limited Remedies & No Disincentive to Default</u>: Most egregiously, and for no

legitimate reason, bondholders must give up "any rights that could arise in any Bankruptcy

Proceeding to any unsecured claim based on any equitable rights of performance" including any

"claim that could arise under 11 U.S.C. § 101(5)(B)." Master Indenture § 11.03 (ECF No. 3509-1).

That is, if PREPA manages to deny the holders of Series B-1 Bonds a bankruptcy claim based on

a straightforward right to payment on those Bonds, then the Master Indenture would also deny

those holders any right to payment based on their equitable remedies.  The Oversight Board's

evident goal is to try to close off avenues of potential recovery should PREPA ever default.

153.    That is just one example, moreover, where the Master Indenture appears to render

PREPA's covenants illusory and unenforceable—effectively inviting future default.  For instance,

the New Trustee is (with certain exceptions) authorized to enforce covenants only upon an Event

of Default (and even then only upon certain conditions, *see* Master Indenture § 11.03).  But upon

any Event of Default, the First Supplemental Indenture eviscerates the Series B-1 bondholders'

ability to invoke remedies that would otherwise be available. Specifically, at § 6.02, it restricts the Trustee's enforcement of bondholders' right to two "sole remedies" relating to the imposition, collection and deposit of the Legacy Charge and its revenues.[47] Series B-1 bondholders thus would lack any effective mechanisms to enforce other covenants that those two remedies do not address.[48]

154.   To make matters worse, the Indenture also requires bondholders to waive other critical remedies.[49]   In addition to the above, bondholders would lack *any* recourse against the PREPA or its property (other than the Trust Estate) even when "the Authority breaches [its] covenants or obligations" (§ 2.02) and could not seek the appointment of a receiver under Puerto Rico law (§ 11.03).  The Series B-1 Bonds also stop paying interest on overdue amounts at maturity (*see* First Supplemental Indenture § 4.02(a) (ECF No. 3509-2)).[50]  When coupled with the bonds' limited remedies, this further incentivizes payment delay and default.

155.   <u>Uncertain Liens</u>.  Further, while the Board may assert that it has addressed the risk of default by granting bondholders security interests in Legacy Charge Revenues, the scope of that lien is unclear.  For example, this Court has suggested that Puerto Rico law may not permit a lien to reach future revenues (Summary Judgment Op., Adv. Proc. No. 19-391, ECF No. 147 at 42),

---

[47] Compounding this problem, Section 11.01 limits what is an Event of Default under the Series B-1 bonds, making it difficult even to establish that any such Event has occurred.  Namely, it provides that there will be no Event of Default for failure to pay interest or principal so long as the Authority "(A) charges and employs its reasonable best efforts to (1) levy the Legacy Charge, (2) collect the revenues generated by the Legacy Charge, and (3) deposit the full amount of the Legacy Charge Revenues in accordance with Section 5.04 of this Trust Agreement, and (B) complies with the Interest Rate Covenant."

[48] To take an extreme example, while Section 7.17 of the Master Indenture restricts PREPA's ability to sell its System, this covenant is apparently not enforceable, leaving bondholders vulnerable to the possibility that PREPA will transfer its entire System to a new governmental entity without effective remedy.

[49] The Ad Hoc Group also objects to the proposed preemption of various bondholder rights, remedies and protections set forth on Exhibit B to the Plan and Exhibit C to the Confirmation Order, including the preemption of the right to specific performance set forth in 22 L.P.R.A. § 208.

[50] Again, this is limited to Bonds issued under the Plan, but is not required to be the case for other bonds issued under the Master Indenture.

which means that other PREPA creditors may argue that the New Bonds lack any priority claim on the Legacy Charge Revenue generated after confirmation in a future Title III proceeding.

156.    <u>No Rate Covenant for Principal</u>.  In contrast to the typical power revenue bond— which contains a covenant requiring an issuer to set utility rates sufficiently high to cover debt service—the New Bonds lack any covenant that would ensure Legacy Charge rates are sufficient to pay down the principal on the bonds.  As the Board's own financial advisor has explained "the omission of a security structure that ensures timely repayment (either with a coverage requirement and/or a true up mechanism)" alone "in municipal debt instruments is, to [his] knowledge, unprecedented." Brownstein Decl., ECF No. 1426 ¶ 47.

157.    <u>Replacement of the Legacy Charge</u>:  The Master Indenture also contains a provision that permits the elimination of the revenue stream supporting the bonds.  It contemplates that PREPA can *replace* the Legacy Charge, with PREB approval, so long as a rate consultant says the change is economically neutral.  *See* § 7.24(b)(i)(4).  That provision is ripe for abuse and should be removed in its entirety.[51]

---

[51] If retained, protections should be included to provide external verification that the replacement rate will be revenue neutral and not approved based on manipulated projections.  For example, COFINA's indenture also permits replacement of the sales tax revenue stream securing its bonds, only if, among other things, at least two rating agencies confirm ratings will not be downgraded and be no lower than A2/A (or equivalent) after substitution. *See* Ex. 36 (COFINA Indenture), at A-21 (defining "Substitution Requirements").  While this Master Indenture requires that PREPA or PREB to deliver written confirmation the bonds will not be downgraded, that only applies *if* the bonds are rated and sets no minimum rating requirement.

Furthermore, while Section 7.24(c) of the Master Agreement purports to give 25% of the Series B-1 bondholders the right to direct the Trustee to challenge a proposed replacement of the Legacy Charge, this is not one of the "sole remedies" listed in Section 6.02 of the First Supplement Agreement, which overrides the Master Indenture and limits the bondholders' remedies upon an Event of Default.  The indentures should make clear that this right exists both before and after an Event of Default, as well as to grant similar challenge rights to CVI holders even while the Bonds are outstanding.

The Ad Hoc Group has other, more specific, issues that it hopes to work out.  For example, the Master Indenture lacks effective controls on the potential diversion of Legacy Charge Revenues, confuses the relative priority of Bond series, and contains concerning ambiguities regarding the Interest Rate Covenant.

## V.     The Plan Cannot Be Confirmed Because It Was Not Proposed In Good Faith

158.    The Oversight Board did not propose the Plan in good faith as is required under
Bankruptcy Code Section 1129(a)(3).  *See also* PROMESA §§ 301(a), 314(b)(1).  This lack of
good faith provides an additional, independent, basis for denying confirmation.

159.    The "good faith" requirement for plan confirmation "generally requires that the
plan be proposed with honesty and good intentions . . . and that the plan proponent deal with its
creditors in a manner that is fundamentally fair."  *In re City of Detroit*, 524 B.R. 147, 248 (Bankr.
E.D. Mich. 2014).  Ultimately, the good faith standard "speaks more to the *process* of plan
development than to the content of [the] plan."  *In re Northbelt, LLC*, 630 B.R. 228, 277 (Bankr.
S.D. Tex. 2020) (emphasis added).

160.    The Oversight Board's process has been "ideological" and "designed to pay as little
as possible" to bondholders.  Ex. 17 (Peterson Dep. Tr. 110, 113, 170).  The Plan is premised on a
"made-to-order" affordability analysis by the Oversight Board's professionals (largely, Brattle),
applying irrational assumptions, some mandated by the Oversight Board.  *Id.* at 100-01.  As Board
member Justin Peterson observed, this "affordability analysis has changed quite a bit, and it
consistently changes to suit . . . the ideology of where the board has headed with its approach to
negotiation with creditors."  *Id.* at 163.

161.    In its effort to pay creditors as little as possible, the Oversight Board directed Brattle
to apply certain assumptions, regardless of logic or underlying data.  For example, the Oversight
Board "instructed" Brattle not to grow median income by inflation for purposes of calculating
residential affordability, while the rate of inflation *was* included in the cost forecasts in PRPEA's
fiscal plan. Ex. 20 (Zarakas Dep. Tr. 80-82).  Similarly, it "instructed" Brattle to deduct $2.425
billion in additional capital expenditures from available revenues, *id.* at 213, effectively ignoring
both the capital expenditure budget in the fiscal plan and the *approximately $12 billion* of federal

funding that has been given to, or earmarked for, PREPA.[52]  The Oversight Board also instructed
Brattle to account for pension costs significantly higher than those in the fiscal plan and use the
Base Case load forecast, rather than the higher, alternative load forecast. *Id.* at 103, 141-142.

162.   The Oversight Board's engineering of its affordability analysis to fit its desired
outcome is evident by the revisions to that analysis when it finalized the National Settlement.  The
initial plan in December 2022 proposed that PREPA would issue new bonds totaling
approximately $5.4 billion.  Thereafter, the Board settled with National and came up with an
additional $280 million of bonds that PREPA suddenly could afford.  To that end, the Board
instructed Brattle to adjust its model to increase the amount of available revenues, and dictated
that the increase be derived from raising the model's non-residential volumetric rates.  *Id.* at 242.
Brattle then *worked backwards* from the additional revenues needed to fund the National
settlement to determine how much PREPA could increase those rates.  *Id.* at 246.  Armed with a
coincidentally updated affordability analysis, the Board filed a revised plan in February 2023 that
provided for $5.68 billion of bonds issued and supported by forecasted future remaining revenues.

163.   The Oversight Board's manipulation of its affordability analysis and indeed, the
entire plan process, was fundamentally unfair to the substantial majority of PREPA's bondholders
who were not offered the National sweetheart deal.  At least one Board member believes that "the
board's mode of operating with PREPA bondholders has not been in good faith."  Ex. 17 (Peterson
Dep. Tr. 112).  Magically conjuring additional revenues for the National settlement reeks of bad
faith.  At bottom, a plan proponent demonstrates its good faith through honest intentions, rigorous
analysis of available data, and realistic projections designed to provide reasonable recompense to

---

[52]  Ex. 17 (Peterson Dep. Tr. 219-220) ("[W]hen you're in the midst of negotiations and suddenly you have
a $2 ½ billion expense which has never appeared before, on the face of it that's a mistake. . . . it wasn't
there to begin with"; *id.* at 220 ("[T]he accrual. . . ignores the federal funding question.").

creditors while allowing the municipal debtor to provide efficient services to its customers.  The Oversight Board has done none of those things here, and its manipulation of creditor recoveries will do nothing to help PREPA regain access to the capital markets.

## RESERVATION OF RIGHTS AND JOINDER

164.    The Ad Hoc Group reserves its right to supplement or amend this Objection in advance of, or in connection with, the confirmation hearing and in the event that the Plan or its underlying analysis or support is further modified or supplemented.  The Ad Hoc Group joins and incorporates by reference Syncora's confirmation objection and Assured's confirmation objection I.C, II, III, IV, and VI.[53]

## CONCLUSION

165.    The Court should deny confirmation of the proposed plan of adjustment.

---

[53] The Ad Hoc Group hereby incorporates by reference the entirety of its separate Confirmation Order Objections.  Nothing herein is intended to constitute a waiver of, or otherwise affect, any objections or arguments raised in the Confirmation Order Objections, or that may be raised at the confirmation hearing, and all such objections and arguments are expressly preserved.

We hereby certify that, on this same date, we electronically filed the foregoing with the
clerk of the Court using the CM/ECF system, which will notify the attorneys of record.


Dated:  San Juan, Puerto Rico
         June 12, 2023

**TORO COLÓN MULLET P.S.C.**

*/s/ Manuel Fernández-Bared*
Manuel Fernández-Bared
USDC-PR No. 204,204
P.O. Box 195383
San Juan, PR 00919-5383
Tel.: (787) 751-8999
Fax: (787) 763-7760
E-mail: mfb@tcm.law

*/s/ Linette Figueroa-Torres*
Linette Figueroa-Torres
USDC-PR No. 227,104
E-mail: lft@tcm.law

*/s/ Nayda Perez-Roman*
Nayda Perez-Roman
USDC–PR No. 300,208
E-mail: nperez@tcm.law

*Counsel for the Ad Hoc Group of PREPA
Bondholders*

**KRAMER LEVIN NAFTALIS &
FRANKEL LLP**

*/s/ Amy Caton*
Amy Caton*
Thomas Moers Mayer*
Alice J. Byowitz*
1177 Avenue of the Americas
New York, New York 10036
Tel.: (212) 715-9100
Fax: (212) 715-8000
Email:  acaton@kramerlevin.com
        tmayer@kramerlevin.com
        abyowitz@kramerlevin.com

Gary A. Orseck*
Matthew M. Madden*
Ralph C. Mayrell*
2000 K Street NW, 4th Floor
Washington D.C., 20006
Tel: (202) 775-4500
Fax: (202) 775-4510
Email:  gorseck@kramerlevin.com
        mmadden@kramerlevin.com
        rmayrell@kramerlevin.com

*Admitted Pro Hac Vice*

*Counsel for the Ad Hoc Group of PREPA
Bondholders*