# EXHIBIT 4

Page 1

```
 1
 2    IN THE UNITED STATES DISTRICT COURT
      FOR THE DISTRICT OF PUERTO RICO
 3    Case No. 17-BK-3283-LTS
      ------------------------------------------x
 4    In re:
 5    THE FINANCIAL OVERSIGHT AND MANAGEMENT
      BOARD FOR PUERTO RICO,
 6
      as representative of
 7
      THE COMMONWEALTH OF PUERTO RICO, et al.,
 8
                          Debtors.
 9    ------------------------------------------x
      Case No. 17-BK-4780-LTS
10    ------------------------------------------x
      In re:
11
      THE FINANCIAL OVERSIGHT AND MANAGEMENT
12    BOARD FOR PUERTO RICO,
13    as representative of
14    THE PUERTO RICO ELECTRIC POWER AUTHORITY,
15                        Debtor.
      ------------------------------------------x
16              May 3, 2023
                10:00 a.m.
17
18       VIDEOTAPED DEPOSITION of DAVID SKEEL,
19    held at the offices of Kramer Levin
20    Naftalis & Frankel LLP, located at 1177
21    Avenue of the Americas, New York, New York
22    10036, before Anthony Giarro, a Registered
23    Professional Reporter, a Certified Realtime
24    Reporter and a Notary Public of the State
25    of New York.
```

Page 86

1                    DAVID SKEEL
2         Q       What's your understanding of
3    the basis upon which the number was
4    increased by $280 million?
5         A       My understanding is the
6    basis was increased to incorporate a
7    settlement with National.
8         Q       So, in other words, the
9    board was proposing that PREPA could
10   issue an additional $280 million worth of
11   bonds in order to finance the National
12   settlement?
13        A       That is my understanding,
14   yes.
15        Q       Between December when the
16   first plan of adjustment was issued and
17   February 9th, did the board or its
18   advisors come to a different view about
19   how much was affordable for PREPA?
20        A       I don't remember.  The
21   affordability analysis is continuously
22   being refined.  But I don't remember
23   there being a new view.
24        Q       Let me make sure the
25   record's clear on that.

Page 95

1                DAVID SKEEL
2   agreement, an RSA with bondholders and
3   monolines in 2018 and then 2019?
4        A     Yes, I do.
5        Q     And the oversight board
6   agreed to -- I'll just call it the RSA.
7              Will you understand what I
8   mean?
9        A     Yes, what I call the 2019
10  RSA.
11       Q     Yes.
12             The board agreed to the 2019
13  RSA; right?
14       A     The board did agree.
15       Q     And the ad hoc group of
16  bondholders were a party to that RSA?
17       A     The ad hoc group were a
18  party, yes.
19       Q     And other monolines?
20       A     Other monolines, yes, were a
21  party.
22       Q     Forgive me if I asked you
23  this.
24             But you personally agreed to
25  the terms of that RSA?

Page 96

1                    DAVID SKEEL
2     A      I personally did agree.
3     Q      Did you believe at the time,
4 that agreement was in PREPA's best
5 interest?
6     A      At the time, I believed it
7 was in PREPA's best interest.
8     Q      And you believed that the
9 deal was affordable from the perspective
10 of PREPA and its rate payers?
11     A      At the time we signed it, I
12 believed it was affordable.
13     Q      Otherwise, you wouldn't have
14 agreed to it; right?
15     A      Yes.
16     Q      And you've said you are
17 driven by the requirements of PROMESA.
18          Did you consider that the
19 2019 RSA was consistent with the
20 requirements of PROMESA?
21     A      When we entered into the
22 requirements of PROMESA, I believed the
23 2019 RSA was consistent with them.
24     Q      The term sheet for that RSA
25 provided for an exchange ratio between a

Page 113

1                 DAVID SKEEL
2   predict fuel prices.
3       Q      Did you think that inflation
4   in Puerto Rico was going to continue to
5   be a problem over the coming decades?
6       A      I didn't have a particular
7   prediction about inflation.
8       Q      And did you think that the
9   COVID-19 pandemic would persist over the
10   coming decades?
11       A      I would have thought that at
12   some point, the pandemic would end.
13       Q      You could put that aside.
14            The board has reached a PSA
15   with National; is that correct?
16       A      That is correct.
17       Q      What is National?
18       A      National is a monoline
19   insurer.
20       Q      Do you know from memory what
21   the terms of that settlement are in terms
22   of the exchange rate?
23       A      I know the basic terms, yes.
24       Q      I'll represent to you that
25   the exchange ratio is 71.65 percent.

Page 114

1              DAVID SKEEL
2            Does that sound correct to
3    you?
4        A     That is correct.
5        Q     And then there's some
6    additional fees that are called for to be
7    paid to National; right?
8        A     That is correct.
9        Q     Did you approve that
10   settlement?
11       A     I initially voted against
12   it.  And then I later approved it.
13       Q     What changed your mind?
14       A     What changed my mind was
15   that when considering the benefits of
16   that settlement and weighing it against
17   the burden of the settlement and the
18   risks created by the settlement, the
19   board as a whole had concluded that it
20   was a good settlement.  And I came to
21   agree with the board as a whole.
22       Q     Why did you initially vote
23   against it?
24       A     Initially, I weighed those
25   same costs and benefits of the

Page 115

1              DAVID SKEEL
2  settlement, put them together and
3  concluded that the costs were a little
4  bit greater than the benefits.
5       Q    Would you agree with me that
6  pursuant to the plan of adjustment, the
7  non-settling bondholders under all
8  scenarios recover less than
9  71.65 percent?
10      A    That is not accurate.
11      Q    What is inaccurate about it?
12      A    It's inaccurate -- well,
13  actually, let me correct that.  The
14  settling bondholders can recover more
15  than the non-settling bondholders cannot.
16  I stand corrected.
17      Q    And the non-settling
18  bondholders, when I say under all
19  scenarios, I mean litigation scenarios
20  and other scenarios identified in the
21  plan of adjustment.
22           Under all scenarios, the
23  non-settling bondholders recover less
24  than 71.65 percent; right?
25      A    On all the scenarios that

Page 116

1 DAVID SKEEL
2 are included in the current plan of
3 adjustment, yes, the non-settling
4 bondholders recover, yes.
5 And I'll just add one
6 qualification to that. I think it's
7 accurate, your statement is accurate.
8 But if the non-settling bondholders
9 vote -- if the class votes yes, they're
10 entitled to the CVI in the plan. So you
11 would have to figure out what the CVI
12 gives. But I think you're correct, that
13 it ends up -- under plausible
14 possibilities, I think it ends up being
15 less.
16 Q And the same is true for the
17 other monolines; Assured, for example,
18 under the plan obtains less than
19 71.65 percent?
20 A That is correct.
21 Q And the difference is not
22 trivial; it's a material difference,
23 isn't it?
24 MR. FIRESTEIN: Objection,
25 vague.

Page 117

1          DAVID SKEEL
2     A     The difference between what
3  National recovers under the plan as it's
4  currently written and what the
5  non-settling bondholders and monolines
6  recover is meaningful. Again, it would
7  depend on what the CVI possibility is.
8     Q     In the 2019 RSA that we
9  looked at, the other monolines, besides
10 National and the ad hoc group, the
11 bondholders all got the same exchange
12 rate; right?
13    A     I believe that is correct.
14    Q     Is it your view as a board
15 member that National's different
16 treatment from other bondholders and
17 monolines is necessary to PREPA's
18 reorganization?
19    A     I don't know whether -- I
20 would say necessary because that involves
21 speculation about different possibilities
22 for reorganization. What I will say is,
23 it is an important piece of what we think
24 is a confirmable plan of adjustment.
25    Q     Why do you say that?

Case:17-03283-LTS Doc#:24535-4 Filed:06/12/23 Entered:06/12/23 21:36:46 Desc: Exhibit AHG Ex 04 2023-05-03 Excerpted Skeel_FULL Page 11 of 14

Page 168

1  DAVID SKEEL
2  structure of the settlement.
3  Q   What was the benefit -- what
4  were the benefits that you believe that
5  the board and PREPA would have gotten by
6  entering into that settlement?
7  A   The benefits were that they
8  compromised their claim at less than 100
9  cents on the dollar. And we thought it
10 was a pretty strong claim. They are a
11 sizable claim that is now supportive of
12 the plan and will vote in favor of the
13 plan of adjustment and will not object to
14 the plan of adjustment. And all of those
15 were attractive benefits.
16 Q   And can you identify what in
17 particular swayed the board to accept an
18 84 percent recovery rate?
19      MR. FIRESTEIN: I think the
20   form of your question seeks
21   deliberative process. I'll instruct
22   the witness not to answer. He's
23   already told you what his
24   understanding was of it. You can
25   reframe, if you wish.

Case:17-03283-LTS Doc#:24535-4 Filed:06/12/23 Entered:06/12/23 21:36:46 Desc:
Exhibit AHG Ex 04 2023-05-03 Excerpted Skeel_FULL Page 12 of 14

Page 214

1                    DAVID SKEEL
2     Syncora's contractual relationship with
3     PREPA?
4          A      No, I have not.
5          Q      Have you ever looked at
6     National's contractual relationship with
7     PREPA?
8          A      No.  I don't believe I have,
9     no.
10         Q      Do you have any basis to
11    say, one way or the other, whether
12    Syncora's rights with respect to PREPA
13    are any different than National's rights
14    with respect to PREPA?
15         A      I don't have a basis, no.
16         Q      Your emphasis on the word I
17    makes me think someone else might have a
18    basis.
19                Do you know who that person
20    might be?
21         A      Our lawyers may have a
22    basis.  I just don't know.
23         Q      But you don't yourself?
24         A      Sitting here today, no, I
25    don't.

Page 356

1 DAVID SKEEL
2 entitlement to recovery on account of its
3 claims, which are unsecured, other than
4 the approximately $17 million in the
5 sinking fund?
6     MR. FIRESTEIN: It's an
7   incomplete hypothetical.
8     MR. BASSETT: I'll strike
9   the question. I'll rephrase it.
10   Q    So assuming that the
11 National -- assuming that the summary
12 judgment decision is not overturned on
13 appeal, then National only has a secured
14 claim to the extent of the moneys in the
15 sinking fund; correct?
16   A    That is correct.
17   Q    Aside from that secured
18 claim, on account of whatever unsecured
19 claim National ends up having against
20 PREPA, would National have any greater
21 legal entitlement to recovery than other
22 general unsecured creditors?
23     MR. FIRESTEIN: Calls for a
24   legal conclusion, lacks foundation.
25   You can answer if you understand.

Page 357

1              DAVID SKEEL
2      A     National's deficiency claim
3  would be an unsecured claim with the same
4  status as general unsecured claims.
5      Q     So other than the likelihood
6  of that decision being overturned on
7  appeal, can you think of any reason why
8  National's claim is different than
9  general unsecured claims for purposes of
10 the 1129(b)1 analysis we talked about
11 earlier?
12     A     Subject to the same
13 qualifications.  If we're talking about
14 just not the secured portion, we're
15 talking about the deficiency claim, it
16 does seem to me that it has the same
17 stature as a general unsecured claim or
18 would.
19     Q     And it's also possible that
20 an appeal or -- you understand that it's
21 possible that the district court will
22 decide that bondholders have an unsecured
23 deficiency claim much lower than
24 $8.5 billion?
25     A     I understand that that is