# EXHIBIT 17

Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF PUERTO RICO
 2
     - - - - - - - - - - - - - - - - - - - - x
 3     In Re:  THE FINANCIAL OVERSIGHT        :
       AND MANAGEMENT BOARD FOR PUERTO        :
 4     RICO,                                  : Case No.
                                              : 17-BK-3283-LTS
 5     as a representative of                 :
       THE COMMONWEALTH OF PUERTO RICO,       :
 6     et al.,                                :
                                              :
 7         Debtors.                           :
     - - - - - - - - - - - - - - - - - - - - x
 8     In Re:  THE FINANCIAL OVERSIGHT        :
       AND MANAGEMENT BOARD FOR PUERTO        :
 9     RICO,                                  : Case No.
                                              : 17-BK-4780-LTS
10     as a representative of                 :
       THE PUERTO RICO ELECTRIC POWER         :
11     AUTHORITY,                             :
                                              :
12         Debtor.                            :
     - - - - - - - - - - - - - - - - - - - - x
13
                                     Friday, May 26, 2023
14                                    Washington, D.C.
15          Confidential Subject to Protective Order
16
17   Videotaped Deposition of:
18                   JUSTIN PETERSON,
19   called for oral examination, pursuant to notice, at the
     law offices of Paul Hastings, LLP, 2050 M Street,
20   Northwest, Washington, D.C. 20036, before Christina S.
     Hotsko, RPR, CRR, of Veritext Legal Solutions, a Notary
21   Public in and for the District of Columbia, beginning at
          a.m., when were present on behalf of the respective
22   parties:
```

Page 96

1  you've had with the board and its advisors as part
2  of your role as a board member.
3          THE WITNESS: Understood.
4          MR. BASSETT: And I tried to be cognizant
5  of that by specifically asking for the facts
6  that --
7          MR. MERVIS: I understand. I just don't
8  want the substance of communications to come out.
9          THE WITNESS: So just -- will you repeat
10 the question?
11         MR. BASSETT: Sure.
12 BY MR. BASSETT:
13     Q. I said, so when you say that there are
14 more funds available to PREPA to pay bondholders,
15 what are all of the facts you are aware of that
16 support that position?
17     A. So one example -- I alluded to it
18 earlier -- is the amount of subsidy that PREPA
19 provides the Commonwealth and its municipalities.
20 Some of it is required by statute. It's still a
21 subsidy. Not all of it's required by statute.
22         I don't remember the number. It was -- I

Page 97

1  looked at it once, and it was substantial.  And
2  it's certainly represented in a number in and of
3  itself that would make a difference in trying to
4  get something done.  So that's one example.
5           Another example is the -- sort of the
6  notion of affordability is, in my view, made to
7  order, to pay as little as possible.  And there
8  hasn't been a rate -- when I say rate increase,
9  rate per kilowatt hour.  There hasn't been much of
10 a rate increase -- any rate increase.  I know it's
11 for more than a decade.  I don't know if it's two
12 decades.  Just like there's no toll road increases
13 ever.  Puerto Rico is the only place in the United
14 States where rates don't increase ever.
15          And meanwhile, everybody gets raises,
16 everybody gets Christmas bonuses, everybody's
17 pensions get topped off.  Everybody but the
18 bondholders get paid.  And I think it's unfair.
19     Q.   Are there any other facts other than
20 those two examples that support --
21     A.   Well, there's -- so there's the federal
22 money that I mentioned earlier.  I believe it's

Page 100

1  so that they don't have to pay -- again, it's the
2  only place in America where rates don't increase
3  and the municipalities don't have to pay for their
4  power service.  PREPA does.
5       Q.  You mentioned increasing rates.
6           Have you done any kind of analysis or
7  assessment of whether PREPA could increase rates
8  and, if so, by how much?
9       A.  Have I performed any analysis on my own?
10 No.
11      Q.  Have you had anybody perform any analysis
12 on your behalf?
13      A.  No.  I have looked at the record, which
14 shows that there's been no rate increase for
15 almost two decades.  I've looked at the facts
16 related to the subsidies I mentioned to you.  I've
17 read information related to all the federal money
18 that's been provided.  And I have -- without
19 getting into anything that I shouldn't, I've
20 looked at what I perceived to be and observed all
21 the omissions, oversights, as I said, in this sort
22 of made-to-order affordability analysis that

Page 101

1  Brattle did for the board.
2      Q.  Have you ever worked at a utility
3  provider?
4      A.  No.
5      Q.  Have you ever visited any of the
6  PREPA-owned generation facilities on the island?
7      A.  I don't think so.
8      Q.  Do you know how many generation plants
9  PREPA owns?
10     A.  No.
11     Q.  Do you know the average age of PREPA's
12 generation assets?
13     A.  It's old.
14     Q.  Beyond that?
15     A.  Not off the top of my head.
16     Q.  Do you know the approximate generation
17 mix in Puerto Rico, such as how much comes from
18 coal, natural gas, or renewables?
19     A.  Most of it comes from bunker fuel, coal,
20 really expensive, inefficient forms of energy.
21     Q.  Do you know the maximum generation
22 capacity that PREPA owns and PREPA can generate?

Page 110

1  PREPA, what would your view be at that point as to
2  what the bondholders are entitled to receive or
3  should receive under PREPA's plan of adjustment?
4          MR. MERVIS:  I object to the form.
5          THE WITNESS:  I think -- I think it's
6  engaging in hypotheticals to predict what they
7  will or won't do, what the judge will or won't do.
8  It's up to her.
9          I would maintain -- I would go back to
10 what I say in the first instance, which is that,
11 as a matter of principle and, in my view, the law,
12 contracts should be honored.  Bondholders should
13 be compensated.  Their return should be maximized
14 within, you know, a rational context of
15 affordability.
16         And for all the reasons I went through
17 earlier, I don't believe the plan of adjustment is
18 reflective of that.  I think the plan of
19 adjustment is reflective of an ideological desire
20 to pay bondholders as little as possible.
21 BY MR. BASSETT:
22     Q.  Mr. Peterson, you have a Twitter account,

Case:17-03283-LTS Doc#:24535-17 Filed:06/12/23 Entered:06/12/23 21:36:46 Desc:
Exhibit AHG Ex 17 2023-05-26 Excerpted Peterson_FULL Page 8 of 13

Page 112

1    A.   Yes.
2    Q.   And then there's a quote in the image of
3 a purported definition of bad faith.
4    A.   It comes from Wikipedia.
5    Q.   Okay.
6    A.   I just wanted to make sure I was clear on
7 sourcing.
8    Q.   Why did you send this tweet?
9         MR. MERVIS:  Okay.  I'm sure this isn't
10 going to be a problem, but I have the same
11 admonition, which is not to reveal the substance
12 of communications with board members or
13 advisors --
14        THE WITNESS:  Understood.
15        MR. MERVIS:  -- as part of your role as a
16 board member.
17        THE WITNESS:  Understood.
18        So I recognize the tweet.  I remember it.
19 I have held the view that the board's mode of
20 operating with PREPA bondholders has not been in
21 good faith.
22

Page 113

1  BY MR. BASSETT:
2      Q.  What's the basis for your view that the
3  board has not acted in good faith vis-a-vis the
4  bondholders?
5          MR. MERVIS:  Same admonition.
6          THE WITNESS:  The goalposts on numbers
7  have been moved again and again.  In my
8  estimation, based upon observations which, for the
9  reasons he states, I can't really get into, they
10 seem made to order, the affordability analysis.
11         And I very much think it's an ideological
12 process driven to pay as little as possible.  And
13 that's my opinion.  And it's informed by what I
14 just said.
15 BY MR. BASSETT:
16     Q.  Did you believe it was bad faith for the
17 Oversight Board to pursue the lien challenge?
18     A.  So bad faith -- bad faith, you know,
19 without reading the deposition [sic], when I think
20 of that, it's to purport or go through the motions
21 of doing something but really not trying to get it
22 done.  So as in go through the motions of trying

Page 163

1  THE WITNESS: I can't speak to motive.
2  What I meant when I said that was that the
3  affordability analysis has changed quite a bit,
4  and it consistently changes to suit what -- to
5  suit the ideology of where the board has headed
6  with its approach to negotiation with creditors.
7  It --
8  BY MR. KIRPALANI:
9  Q. But aren't you -- I'm sorry.
10  Aren't you part of the board,
11  Mr. Peterson?
12  A. Yes.
13  Q. And have you had any conversations with
14  Brattle about what you think Brattle should be
15  solving for when it's giving advice to the board?
16  MR. MERVIS: Hang on a second. Let me
17  just think about that one.
18  I'm okay with a yes or no answer to that
19  one, but please don't say anything more than that.
20  THE WITNESS: Could you repeat the
21  question?
22

Page 170

1  And what I'm trying to understand is, are
2  you speculating when you say if your goal is to
3  pay creditors as little as possible, or is that
4  really your belief as to what the proposed plan
5  does?
6        MR. BASSETT:  Object to form.
7        MR. MERVIS:  I object to the form.
8        THE WITNESS:  I believe it's designed to
9  pay as little as possible and, at the same time,
10 using PREPA -- excuse me, using Commonwealth funds
11 to top off PREPA pensions, to pay for
12 infrastructure projects using surpluses, to take
13 care of every stakeholder except bondholders.
14 BY MR. KIRPALANI:
15    Q.  We're going to come to that subject more
16 broadly in a bit.
17        Can I ask you to look at tab 1 in the
18 Quinn Emanuel binder that you should have with
19 you?
20        MR. KIRPALANI:  And I'm happy for the
21 concierge to put it up on the screen if she can do
22 that.

Case:17-03283-LTS Doc#:24535-17 Filed:06/12/23 Entered:06/12/23 21:36:46 Desc:
Exhibit AHG Ex 17 2023-05-26 Excerpted Peterson_FULL Page 12 of 13

Page 219

1  I asked why -- why his $2-1/2 billion of
2  CapEx suddenly appeared out of nowhere in our
3  projections, when that did recently.
4          And I don't -- on the inflation, I know
5  I've raised that with folks that, you know, are
6  part of the board.  I don't know that I've raised
7  it directly with Brattle.
8  BY MR. KIRPALANI:
9      Q.  You mentioned the roughly 2-1/2 billion
10 of CapEx accrual that, I think to use your phrase,
11 suddenly appeared.
12         In your view, did the board make a
13 mistake in not accruing that cost previously?
14         MR. MERVIS:  Hold on.  Okay.  I object to
15 the form.
16         Same admonition about not revealing
17 communications; but otherwise, you can certainly
18 say your view.
19         THE WITNESS:  Yeah -- well, I would say
20 on the face of it, when you're -- when you're in
21 the midst of negotiations and suddenly you have a
22 $2-1/2 billion expense which has never appeared

Case:17-03283-LTS Doc#:24535-17 Filed:06/12/23 Entered:06/12/23 21:36:46 Desc: Exhibit AHG Ex 17 2023-05-26 Excerpted Peterson_FULL Page 13 of 13

Page 220

1 before, on the face of it that's a mistake.
2          However, I've -- it was a mistake, in
3 other words, that -- that it wasn't there to begin
4 with and it was just part of this -- when I
5 referred before to goalposts moving, that's an
6 example.
7          But I would argue it's also -- in my
8 opinion, it's a mistake to have the accrual in the
9 first place because -- or to have it at that level
10 because the federal funding -- it ignores the
11 federal funding question.
12          And when I've asked about -- about that,
13 I mean, there's just -- okay, never mind.
14          MR. MERVIS: Yeah, just -- I don't want
15 you to --
16          THE WITNESS: Okay.
17          MR. MERVIS: Thank you.
18 BY MR. KIRPALANI:
19    Q. Have you, Mr. Peterson, satisfied
20 yourself that that new accrual of CapEx was an
21 honest mistake, or do you believe that it was
22 uncovered for a different purpose?