## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO *et al.*,<br><br>    Debtors.[1] | PROMESA Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>    Debtor. | PROMESA Title III<br><br>No. 17 BK 4780-LTS<br><br>(Jointly Administered) |

## THE PREPA BOND TRUSTEE'S JOINDER
## AND SUPPLEMENTAL OBJECTION TO CONFIRMATION OF
## PROPOSED PREPA TITLE III PLAN OF ADJUSTMENT

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's Federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico ("**Commonwealth**") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("**COFINA**") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("**HTA**") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("**ERS**") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("**PREPA**") (Bankruptcy Case No. 17 BK 04780-LTS) (Last Four Digits of Federal Tax ID: 3747).

**<u>TABLE OF CONTENTS</u>**

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND ........................................................................................................... 3

LEGAL STANDARDS GOVERNING CONFIRMATION ............................................ 9

JOINDER IN THE BONDHOLDER OBJECTIONS ..................................................... 9

OBJECTION ............................................................................................................... 10

I.     THE PLAN INCLUDES BONDHOLDER SETTLEMENTS THAT
VIOLATE THE COLLECTIVE, REPRESENTATIVE STRUCTURE OF
THE TRUST AGREEMENT ............................................................................ 10

     A.     The Trust Agreement's Exclusive Collective Action, Representative
Enforcement, and Pro Rata Distribution Requirements Prohibit the
Individualized Settlement of PREPA Bond Claims. .................................. 11

     B.     The Class 1 and National Settlements Do Not Comply with the Trust
Agreement's Collective Action, Representative Enforcement, and
Pro Rata Distribution Requirements. ........................................................ 13

     C.     The Arguments Made Thus Far in Defense of the Settlements Are
Without Merit. ......................................................................................... 15

II.     THE PLAN DOES NOT SATISFY PROMESA'S CONFIRMATION
STANDARDS .................................................................................................. 16

     A.     The Plan Does Not Comply with Section 1122(a)'s Classification
Requirements. .......................................................................................... 17

     B.     The Class 1 and Class 5 Plan Treatments Unfairly Discriminate
against Dissenting Class 2. ....................................................................... 19

     C.     The Proposed Competitive Pot Plan Violates Section 1129(a)(3)
Because It Improperly Seeks to Undermine the Collective Rights of
PREPA Bond Claims to Unified Representation and Pro Rata
Treatment. ............................................................................................... 22

     D.     Neither the Class 1 Settlement nor the National Settlement Should
Be Approved under Bankruptcy Rule 9019. ............................................. 24

     E.     The Plan Includes Impermissible Exculpations. ........................................ 26

     F.     The Plan Fails to Include an Adequate Means of Implementation for
Class 2. .................................................................................................... 28

     G.     The Plan Fails More Generally to Address Coherently the Post-
Effective Date Duties of the PREPA Bond Trustee or Provide a
Means for Payment. .................................................................................. 32

i

H.     The Court Should Not Permit the Plan's Effective Date to Occur Prior to the Issuance of a Final Order in the Amended Lien & Recourse Challenge. ................................................................... 34

III.    THE PROPOSED CONFIRMATION ORDER IS INADEQUATE. .................... 35

CONCLUSION ............................................................................................................. 35

## **TABLE OF AUTHORITIES**

**Cases**                                                                **Page(s)**

*Friedman v. Chesapeake & Ohio Ry. Co.*,
261 F. Supp. 728 (S.D.N.Y. 1966) ................................................................. 11

*Granada Wines, Inc. v. New England Teamsters & Trucking Indus. Pension Fund*,
748 F.2d 42 (1st Cir. 1984) ............................................................................ 17

*In re Am. Roads LLC*,
496 B.R. 727 (Bankr. S.D.N.Y. 2013) ........................................................... 11

*In re Autterson*,
547 B.R. 372 (Bankr. D. Colo. 2016) ............................................................ 17

*In re AWECO, Inc.*,
725 F.2d 293 (5th Cir. 1984) ......................................................................... 25

*In re Coastal Cable T.V., Inc.*,
709 F.2d 762 (1st Cir. 1983) .......................................................................... 22

*In re Enron Corp.*,
302 B.R. 463 (Bankr. S.D.N.Y. 2003) ........................................................... 11

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
360 F. Supp. 3d 65 (D.P.R. 2019) .................................................................. 25

*In re Healthco Int'l, Inc.*,
136 F.3d 45 (1st Cir. 1998) ............................................................................ 25

*In re High Voltage Eng'g Corp.*,
397 B.R. 579 (Bankr. D. Mass. 2008) ........................................................... 26

*In re Hotel Assocs. of Tucson*,
165 B.R. 470 (B.A.P. 9th Cir. 1994) ............................................................. 22

*In re Iridium Operating LLC*,
478 F.3d 453 (2d Cir. 2007) .......................................................................... 25

In *re Johns–Manville Corp.*,
843 F.2d 636, 649 (2d Cir.1988) ................................................................... 22

*In re Jorgensen*,
66 B.R. 104 (B.A.P. 9th Cir. 1986) ............................................................... 22

*In re Lernout & Hauspie Speech Prods., N.V.*,
301 B.R. 651 (Bankr. D. Del. 2003) .............................................................. 21

*In re LightSquared Inc.*,
513 B.R. 56 (Bankr. S.D.N.Y. 2014) ............................................................ 19

*In re Master Mortgage Invest. Fund, Inc.*,
168 B.R. 930 (Bankr. W.D. Mo. 1994) ......................................................... 28

*In re Mullins*,
633 B.R. 1 (Bankr. D. Mass. 2021) ................................................................. 9

*In re PTL Holdings LLC*,
2011 WL 5509031 (Bankr. D. Del. 2011) ..................................................... 28

*In re Quincy Med. Ctr., Inc.*,
2011 WL 5592907 (Bankr. D. Mass. 2011) .................................................. 28

*In re Tribune. Co.*,
972 F.3d 228 (3d Cir. 2020) ..................................................... 19, 20, 21, 22

*In re Tribune Co.*,
    464 B.R. 126 (Bankr. D. Del. 2011) ............................................................ 28
*In re Washington Mutual, Inc.*,
    442 B.R. 314 (Bankr. D. Del. 2011) ............................................................ 28
*In re Weber*,
    209 B.R. 793 (Bkrtcy. D. Mass. 1997) ........................................................ 22
*Jeffrey v. Desmond*,
    70 F.3d 183 (1st Cir. 1995) .......................................................................... 25
*Johns–Manville Corp.*,
    843 F.2d 636 (2d Cir.1988) .......................................................................... 22
*MeehanCombs Glob. Credit Opportunities Funds, LP v. Caesars Entm't Corp.*,
    80 F. Supp. 3d 507 (S.D.N.Y. 2015) ........................................................... 11
*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
    390 U.S. 414 (1968) ...................................................................................... 25

**Statutes**
11 U.S.C. § 943(b)(1) ......................................................................................... 9
48 U.S.C. § 2161 ........................................................................................... 9, 17
48 U.S.C. § 2170 ................................................................................................. 9
48 U.S.C. § 2172 ................................................................................................. 4
48 U.S.C. § 2174 ................................................................................................. 9
48 U.S.C. § 2174(b)(1) ....................................................................................... 9
11 U.S.C. § 1126 ............................................................................................... 30
11 U.S.C. § 105(a) ............................................................................................. 24
11 U.S.C. § 1122(a) ......................................................................... 2, 9, 17, 18
11 U.S.C. § 1123(a)(5) ...................................................................................... 28
11 U.S.C. § 1123(b)(3) ...................................................................................... 24
11 U.S.C. § 1129(a)(2) ........................................................................................ 9
11 U.S.C. § 1129(a)(3) ................................................................................... 9, 22
11 U.S.C. § 1129(a)(6) ........................................................................................ 9
11 U.S.C. § 1129(a)(8) ........................................................................................ 9
11 U.S.C. § 1129(a)(10) ...................................................................................... 9
11 U.S.C. § 1129(b) ...................................................................................... 19, 21
11 U.S.C. § 1129(b)(1) ........................................................................................ 9
11 U.S.C. § 1129(b)(2)(A) .................................................................................. 9
11 U.S.C. § 1129(b)(2)(B) .................................................................................. 9

**Other Authorities**
*Revised Model Simplified Indenture*,
    55 Bus. Law. 1115 (2000) ........................................................................... 11

U.S. Bank National Association—in its capacity as trustee (the "**PREPA Bond Trustee**") under the terms of that certain Trust Agreement dated as of January 1, 1974 (as amended and supplemented from time to time, the "**Trust Agreement**"),[2] pursuant to which the Puerto Rico Electric Power Authority ("**PREPA**") has issued certain Puerto Rico Electric Power Authority Power Revenue Bonds and Puerto Rico Electric Power Authority Power Revenue Refunding Bonds (together, the "**Bonds**"[3])—respectfully joins in the Bondholder Objections[4] as set forth herein and submits this supplemental objection to confirmation of the *Modified Second Amended Title III Plan of Adjustment of the Puerto Rico Electric Power Authority* [ECF No. 3296] (as it may be amended, the "**Plan**"), filed by the Financial Oversight and Management Board for Puerto Rico (the "**Oversight Board**"), as Title III representative of PREPA. In support of its joinder and supplemental objection (the "**PREPA Bond Trustee Objection**"), the PREPA Bond Trustee states as follows:

## PRELIMINARY STATEMENT

1.     In advance of the Disclosure Statement hearing on February 28, 2023, the Court posed a critical question directly related to the role and function of the PREPA Bond Trustee:

---

[2] References herein to the Trust Agreement are to the conformed version filed in *Fin. Oversight & Mgmt. Bd. for Puerto Rico v. U.S. Bank National Association as Trustee*, Adversary Proceeding No. 19-00391-LTS ("**Amended Lien & Recourse Challenge**"). (Joint Informative Mot., Ex. A, Adv. ECF No. 118.) References to "Adv. ECF No[s]." herein are references to the docket in Adversary Proceeding No. 19-00391-LTS.

[3] Holders of the Bonds, including beneficial holders thereof, shall be referred to herein as "**Bondholders**." Capitalized terms not otherwise defined herein have the meaning ascribed to them in the Plan or the *Disclosure Statement for the Modified Second Amended Title III Plan of Adjustment of the Puerto Rico Electric Power Authority* [ECF No. 3297] (the "**Disclosure Statement**" or "**DS**").

[4] The "**Bondholder Objections**" are the separate confirmation objections filed on this date by the Ad Hoc Group of PREPA Bondholders (the "**Ad Hoc Group**"), Syncora Guarantee, Inc. ("**Syncora**"), Assured Guaranty Corp., and Assured Guaranty Municipal Corp. (together with Assured Guaranty Corp., "**Assured**").

> [W]hether . . . the proposed Plan is patently unconfirmable because
> the Trust Agreement precludes individualized settlement of bond
> claims and non-pro rata distribution of consideration received in
> connection with the satisfaction of bond obligations.

(*Order Concerning Issues for Discussion at Feb. 28, 2023 Disclosure Statement Hr'g*, ECF

No. 3280.) The Court deferred ruling on this issue at the hearing, concluding that it could not

make a "proper decision" without further information and argument concerning the "Oversight

Board's justification for its classifications decisions" and the "construction of the trust agreement."

(Feb.28, 2023 Hr'g Tr. 149:15-21.)

2.      For the reasons set forth herein, the answer to the Court's question is unequivocally

"yes"—as the Plan does indeed violate the Trust Agreement and those violations render the Plan

unconfirmable.

3.      A number of discrete confirmation failures flow from the Plan's Class 1 and Class

5 "settlements," its disparate and unfavorable treatment of dissenting Class 2, and its disregard for

the role of the PREPA Bond Trustee as the collective representative of all Bondholders in the

ongoing Amended Lien & Recourse Challenge. These confirmation failures include:

     a.   misclassifications under section 1122(a) of the Bankruptcy Code;

     b.   unfair discrimination against a dissenting class in contravention of section
        1129(b);

     c.   the inclusion of settlements ineligible for approval under Bankruptcy Rule
        9019;

     d.   improper benefits for certain creditors, including releases and exculpations, for
        violations of the Trust Agreement;

     e.   a lack of a good faith in contravention of section 1129(a)(3); and

     f.   incoherent or incomplete provisions relating to the Plan's implementation in
        violation of section 1123(a)(5) as it relates to Class 2, including (i) the
        relationship between the timing of the Final Order in the Amended Lien &
        Recourse Challenge and the timing and amount of Plan distributions (without a
        Disputed Claims reserve), (ii) the intended roles of the GUC Trust relating to

Plan distributions, (iii) the relationship of Plan distributions to Class 2 insured Bondholders and Non-Settling Monolines,[5] and (iv) the post-Effective Date rights and duties of the PREPA Bond Trustee.

4.      Based on these objections and those set forth in the Bondholder Objections, the PREPA Bond Trustee respectfully requests that the Court deny confirmation of the Plan.

## BACKGROUND

5.      In September 2022, the Oversight Board filed its amended complaint in the Amended Lien & Recourse Challenge, challenging both the scope of the liens securing the Bonds and the allowable character of any unsecured deficiency claim by the PREPA Bond Trustee as set forth in its Master Proof of Claim No. 18449. (Am. Compl., Adv. ECF No. 26.) The Oversight Board identified the PREPA Bond Trustee as the sole legal representative of all Bondholders in its Amended Complaint (*id.* ¶ 11) and requested an expedited summary judgment schedule to address certain "gating issues" that the Oversight Board contended were impediments to the negotiation of a consensual treatment for the PREPA Bond claims in a Title III plan of adjustment (Adv. ECF Nos. 62, 63; *see also* Adv. ECF Nos. 11, 22). The Ad Hoc Group, Assured, and Syncora are intervenor-defendants in the Amended Lien & Recourse Challenge. (Adv. ECF No. 36.)

6.      At the same time, the Court mandated that the Oversight Board file a Title III plan of adjustment for PREPA and participate in mediation with the Ad Hoc Group, Assured, Syncora, and others. (*See, e.g.*, ECF Nos. 2748, 2767.) The PREPA Bond Trustee is currently an Additional Party in the Meditation process.

7.      The Oversight Board nominally complied with the Court's directive, filing the initial iteration of PREPA's Title III plan on December 16, 2022. (ECF No. 3110.) This plan—like its first amended version filed on February 9, 2023 and the Plan filed on March 1, 2023—did

---

[5] The "**Non-Settling Monolines**" are Assured and Syncora.

not provide for a unified treatment of all PREPA Bond claims with contingencies for outcomes in the Amended Lien & Recourse Challenge. Instead, it contemplated offering individualized "settlements" to subgroups of Bondholders while the Amended Lien & Recourse Challenge would continue to be litigated beyond the confirmation date, with the obvious effect of creating a competitive opt-out dynamic amongst Bondholders and Monolines by holding out the prospect of a different or more favorable individualized share of a limited "pot" without the delay and risks of the Amended Lien & Recourse Challenge.

8.      Under the Plan today (and its earlier iterations), the limited pot consists of new bonds and related contingent value instruments ("CVI") to be issued by the Reorganized PREPA on the Effective Date when the Bonds are to be cancelled.[6] The Oversight Board initially limited the size of the pot to $5.4 billion, but it has since increased it to $5.68 billion. The Oversight Board now vigorously asserts that no further additions to the pot can be made, despite doing so once already. This intransigence is backed by the exclusive power of the Oversight Board to propose or modify a Title III plan for PREPA. 48 U.S.C. § 2172.

9.      By the time the Oversight Board filed the initial iteration of PREPA's plan in December 2022, it had already committed significant portions of the pot to other parties.

---

[6] Two series of new bonds are proposed: Series A and Series B (the "**New Bonds**"). The Series B Bonds mature in 50 years and are nonrecourse obligations payable solely from a stream of Net Revenues derived from certain Legacy Charges, which the Oversight Board contends should be sufficient to pay the New Bonds over their term. The Series B Bonds are junior in right of principal payment to the Series A Bonds and do not accrue interest after maturity. The CVI is payable from the same stream of expected Legacy Charge-based Net Revenues but only if the Series B Bonds are paid in full before the CVI expires in 35 years. In some case the New Bonds are to be distributed directly to creditors and in some cases they are to be deposited into a GUC Trust and creditors are to receive units in the GUC Trust. A draft of the GUC Trust Agreement was filed as part of the Plan Supplement on May 31, 2023, including provisions making the GUC Trust Units non transferable and providing no rights for unitholders to elect to replace the GUC Trustee or GUC Board who the Oversight Board has the power to appoint.

Specifically, the Oversight Board struck a deal with the Fuel Line Lenders, which provides them approximately $650 million in Series A Bonds, and allocated another $400 million in Series B Bonds to the Commonwealth.[7] Taking these reductions into account, only approximately $4.6 billion is left to cover the remainder of the claims asserted by PREPA's prepetition creditors, which include over $8.4 billion in PREPA Bond claims and an estimated $800 million in claims held by PREPA's general unsecured creditors.

10.     The Oversight Board then set the Plan's competitive settlement dynamic in motion among the internal ranks of Bondholders and Monolines using individualized settlements and offers.

11.     **The Class 1 Settlement**. On January 27, 2023, the Oversight Board launched a settlement offer to every uninsured Bondholder without the involvement of the PREPA Bond Trustee or Court approval. This offer (if accepted) would settle the uninsured Bondholders' individual rights in the Amended Lien & Recourse Challenge for the Bonds held by those holders in exchange for the full allowance of their PREPA Bond claims and a less risky and potentially much higher percentage recovery in the form of pot assets.[8] Ultimately, less than 1% of the Bondholders (who in aggregate hold approximately $70 million in Bonds) accepted this offer before the February 23, 2023 deadline (the "**Settling Bondholders**"). (DS 49.)

12.     Upon acceptance of the Settlement Offer, the Plan places Settling Bondholders into Class 1 and promises them an initial distribution of Series B Bonds with a face value equal to 50%

---

[7] The Fuel Line Lenders' settlement and Plan treatment are the subject of separate objections in the Bondholder Objections in which the PREPA Bond Trustee joins and adopts herein as though set forth in full.

[8] Section 2 of the Settlement Agreement signed by each Class 1 member provides, among other things, that it is in settlement of the Parties' respective asserted rights and claims as set forth in the Amended Lien & Recourse Challenge. (Settlement Agreement Notice, Sched. 1 Ex. B. § 2, ECF No. 3171.)

of the full principal and accrued interest on their Bonds as of the Petition Date. If the Oversight Board fully prevails in the Amended Lien & Recourse Challenge following appeal, the Settling Bondholders stand to receive 100% of their full Bond claim in cash or Series B Bonds in a supplemental distribution. In marginal cases, Settling Bondholders would also receive more Series B Bonds if fewer Bondholders made the election to enter into the Class 1 Settlement. No matter the outcome, Settling Bondholders also receive CVI for any portion of their claim not otherwise covered by Series B Bond distributions.[9]

13.     In contrast, the Plan places uninsured Bondholders who did not accept the Oversight Board's settlement offer (the "**Non-Settling Bondholders**") into Class 2, together with the Non-Settling Monolines. The treatment for Class 2 varies significantly from that offered to Class 1. Claims belonging to the Non-Settling Bondholders are allowed only in the amount of (i) perfected Bond Collateral securing their Bonds plus (ii) a Deficiency Claim, in each case as ultimately determined by a Final Order in the Amended Lien & Recourse Challenge.[10] Only the amount of perfected Bond Collateral would be fully covered by Series B Bonds subject to the pot limitation. If the Oversight Board ultimately wins the lien portion of the Amended Lien & Recourse Challenge and a deficiency claim is allowed for 100% of the Bond claim, the Non-Settling Bondholders would still receive only an estimated 46.49% of their estimated Deficiency

---

[9] The Plan provides that Class 1 will receive a *pro rata* share of the amounts held in the Sinking Fund subject to the terms of the Trust Agreement, but this has been disregarded here because most or all of the funds in the Sinking Fund are subject to other superior rights under the Trust Agreement.

[10] The Court mostly rejected the secured claims of the PREPA Bond Trustee in a summary judgment ruling on March 22, 2023, in the Amended Lien & Recourse Challenge, and on June 6-8, 2023, the Court conducted an estimation hearing to potentially reduce the amount of the Deficiency Claim for all PREPA Bonds.

Claims in Series B Bonds due to the reduced size of the remaining pot.[11] (DS 29.) The Plan does not provide for any CVI to be distributable to Class 2 members other than a share of the GUC CVI.

14.     **The National Settlement**. On January 31, 2023, the Oversight Board finalized its plan support agreement with National (the "**National Settlement**"), one of the three Monolines (along with Assured and Syncora) for PREPA's Bonds. (DS 33.) The Monolines are successor insurers on various similar monoline insurance policies that have all been the subject of active claims during PREPA's Title III case.

15.     The Plan treats National's PREPA Bond claims in Class 5, but it treats Assured and Syncora's insured PREPA Bond claims in Class 2, along with the Non-Settling Bondholders. Class 5 grants National an allowed claim of $836,145,928 for the $815,250,000 in principal amount of PREPA Bonds owned or insured by National (DS Ex. N), slightly less than 10% of the outstanding PREPA Bonds. On account of its allowed claim, National would receive Series B Bonds equal to 71.65% or $599,098,557. (DS 29.) This pot allotment is not increased or decreased based upon the outcome of the Amended Lien & Recourse Challenge.

16.     In addition, outside of Class 5, National is to receive an additional $48,998,151 or 5.86% denominated as "consummation costs"—*i.e.*, repayment for its fees and expenses (2.86%)

---

[11] The Plan provides that Holders of Class 2 Deficiency Claims constituting Remaining Claims after other Class 2 distributions are to receive a pro rata share of the General Unsecured Claim Recovery. The "General Unsecured Claim Recovery" is defined as the aggregate recovery by Holders of Claims in the Unsecured Claims Pool, payable from the GUC Trust Assets, comprised of (a) the Avoidance Action Proceeds, (b) the GUC New Bonds, if any, and (c) the GUC CVI. The Plan elsewhere, however, states that the Deficiency Claim is to be determined in a Final Order in the Amended Lien & Recourse Challenge and that initial distributions by the Distribution Agent for the benefit of Holders of Allowed PREPA Revenue Bond Claims shall be made to the Bond Trustee, as applicable, for such obligation in accordance with the respective governing documents for such obligations. (Plan Def. of Amend Lien & Recourse Challenge Final Resolution, Art. XXIV.E.2.). No distributions to Class 2 are to occur while they are Disputed Claims, *i.e.*, at all times prior to a Final Order in the Amended Lien & Recourse Challenge. (Plan Art. XXIV.D.)

and compensation for the "structuring" of payments to be made under the Plan (3.00%). (DS
Ex. N.) This additional amount is payable at the option of the Oversight Board in Series B Bonds
further depleting the pot.[12]

17.     Appeals in the Amended Lien & Recourse Challenge are inevitable before there
will be a Final Order within the meaning of the Plan. However, a Final Order is not a clear
condition to either confirmation of the Plan or the Effective Date, and in any event, the Plan permits
the Oversight Board to waive all such conditions.[13] If the Plan's Effective Date occurs prior to a
Final Order in the Amended Lien & Recourse Challenge, the Plan provides that Class 2 Plan
distributions would be delayed as Disputed Claims for the duration of the appellate process. There
is no requirement in the Plan for the Distribution Agent to establish a disputed claims reserve to
protect the holders of Disputed Claims from the disproportionate allocation of Plan consideration
to Claims that are Allowed on the Effective Date. As a result, there are scenarios in which Series
A and Series B Bonds—that should go to the Non-Settling Bondholders and Non-Settling
Monolines in Class 2—would already have been distributed to other Classes. For example, the
First Circuit could determine on appeal that all of the available Series A and Series B Bonds must
be paid to the Bondholders on account of their lien rights ahead of the claims of other classes,
including the Fuel Line Lenders. Together, these provisions add discriminatory risks and costs to
Class 2 during the Amended Lien & Recourse Challenge that are not borne by other settling
classes.

---

[12] Additional objections have been made to the Plan's treatment of Class 4 Claims in the
Bondholder Objections in which the PREPA Bond Trustee joins.

[13] *See* Plan Art. XXXI.B.; *id.* Art. XXXII.B.

## LEGAL STANDARDS GOVERNING CONFIRMATION

18.     Section 314(b) of PROMESA—codified at 48 U.S.C. § 2174—sets forth the requirements for confirmation of a PROMESA Title III plan of debt adjustment. The requirements largely track the confirmation standards for municipalities under Chapter 9 of the Bankruptcy Code, including the requirement that the plan comply with certain corporate restructuring provisions of the Bankruptcy Code expressly adopted by PROMESA. *Compare* 11 U.S.C. § 943(b)(1), *with* 48 U.S.C. § 2174(b)(1). These provisions, listed in section 301(a) of PROMESA, include the classification requirements of section 1122, the confirmation requirements of section 1129(a)(2), (3), (6), (8), and (10), and the cramdown provisions of section 1129(b)(1), (b)(2)(A), and (b)(2)(B). 48 U.S.C. § 2161; *see also* 48 U.S.C. § 2170 (applying the Federal Rules of Bankruptcy Procedure to cases under PROMESA).

19.     Any violations of the above-listed Bankruptcy Code sections are thus violations of section 314(b) of PROMESA and a basis to deny confirmation. A more complete description of the legal standards for confirmation is set forth in the Bondholder Objections.

20.     The Oversight Board, as the plan proponent, bears the burden of proving that the requirements for confirmation are satisfied. *In re Mullins*, 633 B.R. 1, 3 (Bankr. D. Mass. 2021). In addition, the Court has an independent obligation to determine that the Plan meets all of the confirmation standards. *Id.*

## JOINDER IN THE BONDHOLDER OBJECTIONS

21.     Except to the extent otherwise noted or to the extent they are inconsistent with the positions of the PREPA Bond Trustee set forth herein, the PREPA Bond Trustee joins in the objections to confirmation of the Plan made in the Bondholder Objections, including on the grounds that the Plan unfairly discriminates, is not feasible, is not fair and equitable, is not in the best interest of creditors, was not proposed in good faith, and rests upon settlements that are

9

unreasonable and should not be approved.[14] The PREPA Bond Trustee adopts these arguments as its own and incorporates them herein.

22.     The supplemental confirmation objections set forth in the PREPA Bond Trustee Objection concern discrete infirmities in the Plan relating to the way it addresses the rights and duties of Bondholders, the Monolines, and the PREPA Bond Trustee under the Trust Agreement. Nothing herein is intended to limit or waive any objection set forth in the Bondholder Objections or any right or remedy of the PREPA Bond Trustee or any Bondholder in the Amended Lien & Recourse Challenge. All rights or remedies of the PREPA Bond Trustee and the Bondholders in the Amended Lien & Recourse Challenge, including any appeals thereof, are expressly reserved, and nothing herein should be construed as a waiver or admission with respect thereto.

## **OBJECTION**

## I.    **THE PLAN INCLUDES BONDHOLDER SETTLEMENTS THAT VIOLATE THE COLLECTIVE, REPRESENTATIVE STRUCTURE OF THE TRUST AGREEMENT**

23.     The Class 1 Settlement and Class 5 National Settlement embedded in the Plan violate the structure of Bondholder rights and remedies reflected in the Trust Agreement's collective action, representative enforcement, and pro rata distribution requirements. This structure is exclusive and expressly precludes individualized settlements and distributions contrary to the priorities and mechanisms set forth in the Trust Agreement. (*See* Trust Agreement §§ 208, 209, 805, 808, 809, 1102.)

---

[14] The PREPA Bond Trustee does not join in Assured's argument that PROMESA is an unconstitutional non-uniform bankruptcy law.

A. **The Trust Agreement's Exclusive Collective Action, Representative Enforcement, and Pro Rata Distribution Requirements Prohibit the Individualized Settlement of PREPA Bond Claims.**

24.     No-action provisions in bond indentures generally limit the rights of individual bondholders to act alone in enforcing rights and remedies in derogation of the rights of larger bondholder groups and their trustee who hold rights for the collective benefit of all bondholders. Courts routinely apply them to limit litigation by minority bondholders that is inconsistent with the objectives of the appointed trustee or the majority of bondholders. *See, e.g.*, *MeehanCombs Glob. Credit Opportunities Funds, LP v. Caesars Entm't Corp.*, 80 F. Supp. 3d 507, 514 (S.D.N.Y. 2015); *Friedman v. Chesapeake & Ohio Ry. Co.*, 261 F. Supp. 728, 731 n.7 (S.D.N.Y. 1966) ("If . . . every holder of a bond or bonds were free to sue at will for himself and for others similarly situated, the resulting harassment and litigation would be not only burdensome but intolerable." (quotation marks omitted)). No-action provisions are enforceable in bankruptcy. *In re Am. Roads LLC*, 496 B.R. 727, 729–31 (Bankr. S.D.N.Y. 2013) ("[B]ankruptcy courts have routinely held that a party lacks standing to take an action in bankruptcy in violation of a 'no action' clause."); *see also In re Enron Corp.*, 302 B.R. 463, 477 (Bankr. S.D.N.Y. 2003).

25.     Section 808 of the Trust Agreement is a nonstandard "no-action-plus" provision that differs markedly from the no action provisions set forth in model indenture documents.[15] It provides substantial direct representative enforcement rights to groups of Bondholders, so long as they collectively hold in excess of 20% of the outstanding principal and act on behalf of all Bondholders. At the same time, it severely curtails the rights of individual Bondholders or smaller

_____

[15] *See Revised Model Simplified Indenture*, 55 Bus. Law. 1115, 1137–38 (2000) (providing example of standard no-action clause).

Bondholder groups to act independently or to take actions that are inconsistent with Trust Agreement's collective action and representative enforcement mechanism:

> It is understood and intended that, except as otherwise above provided, no one or more holders of the bonds hereby secured shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security of this Agreement, or to enforce any right hereunder except in the manner herein provided, that all proceedings at law or in equity shall be instituted, had and maintained in the manner herein provided and for the benefit of all holders of such outstanding bonds and coupons, and that any individual right of action or other right given to one or more of such holders by law is restricted by this Agreement to the rights and remedies herein provided.

(Trust Agreement § 808.)

26.   The collective action and representative enforcement principles of the Trust Agreement are further reflected in Section 809, which provides for representative actions by the PREPA Bond Trustee by providing that suits "instituted by the Trustee shall be brought in its name for the benefit of all" Bondholders, and in Section 805, which requires that post-Event of Default recoveries on the Bonds be distributed on a pro rata basis following acceleration, subject to certain conditions. (*Id.* §§ 805, 809, 1102.)

27.   The importance of the Trust Agreement's collective, representative structure of Bondholder rights and remedies has already been recognized in this case. In 2018, the Court held that an individual Bondholder—Pan American Grain Company—could not seek relief from the automatic stay to unilaterally pursue setoff of its PREPA Bond debt as an individualized remedy:

> Due to the collective structure of bondholder rights and remedies under the Operative Trust Agreement, and specifically because of the no-action clause of that agreement, which counsel have discussed, movant does not have standing to unilaterally bring proceedings to enforce collection upon its PREPA bonds. . . .
>
> Moreover, the no-action clause of the Trust Agreement requires that all proceedings in law or equity brought by individual PREPA bondholders be maintained for the benefit of all PREPA

bondholders. Nothing in the trust instrument or in bankruptcy law changes the powers of an individual bondholder under the Trust Agreement upon the issuer's entry into a bankruptcy proceeding. . . .

In effect, movant is asking this Court to create an additional noncontractual right to direct payment for certain PREPA bondholders. There is no legal basis for such a revision of a complex contractual arrangement to benefit a single bondholder that has no right to individual relief as against the issuer under the governing documents. Such relief would also be inequitable.

(Nov. 7, 2018 Hr'g Tr. 48:8–50:9, ECF No. 1014.)

28. Similarly, the Oversight Board relied critically upon the Trust Agreement's collective action and representative enforcement principles when it named the PREPA Bond Trustee as the sole defendant in the Amended Lien & Recourse Challenge, characterizing the PREPA Bond Trustee "as the legal representative of all PREPA Bondholders with respect to the subject matter of this proceeding." (Am. Compl. ¶ 11, Adv. ECF No. 26.)

> **B.   The Class 1 and National Settlements Do Not Comply with the Trust Agreement's Collective Action, Representative Enforcement, and Pro Rata Distribution Requirements.**

29. The Class 1 and National Settlements violate the restrictions imposed by the Trust Agreement in at least three ways.[16]

30. *First*, these settlements do not comply with the "exclusivity" rule reflected in Section 808, which requires that the rights of Bondholders be exercised collectively through the provisions of the Trust Agreement and not on an individualized basis. Because of this rule, Bondholders may not "enforce any right [in the Trust Agreement] except in the manner herein provided," and "any individual right of action or other right given to one or more of such holders

---

[16] It is undisputed that neither National nor the Settling Bondholders complied with the notice procedures set forth in Section 808 by providing notice to the PREPA Bond Trustee or asking it to take any action on its behalf with respect to the National Settlement.

by law is restricted by this Agreement to the rights and remedies herein provided." (Trust Agreement § 808.) The Settling Bondholders and National thus lacked the authority to cut their own individualized deals with respect to their PREPA Bond claims. Those claims are, and continue to be, part of the overall collective Bond claim held by the PREPA Bond Trustee on behalf of all Bondholders. They cannot be carved out of the Amended Lien & Recourse Challenge in the manner proposed by the Class 1 and National Settlements and their related treatments in the Plan.

31.     *Second*, the Class 1 Settlement and the National Settlement violate Section 808's rule against Bondholder action "in any manner whatever" that would "affect, disturb and prejudice the security of the Trust Agreement." (*Id.* § 808.) In the context of this Title III case and the pending Amended Lien & Recourse Challenge, the security of the Trust Agreement consists of the recoveries that the PREPA Bond Trustee is seeking, or may seek, to recover on behalf of all Bondholders, including bankruptcy plan recoveries in this Title III case and in the Amended Lien & Recourse Challenge. Through their respective settlements, the Settling Bondholders and National are improperly attempting to lock in individualized treatments for their Bond claims from the limited pot currently made available under the Plan without being subject to the outcome of the collective action specified by the Trust Agreement. In so doing, they have prejudicially impacted the amounts available to other Bondholders and Monolines in violation of Section 808.[17]

32.     *Third*, based upon the rulings of the Court to date (which could be worsened by the outcome of the Section 502(c) estimation process), the Class 1 Settlement and the National Settlement provide disproportionate consideration to the Settling Bondholders and National that

---

[17] Similarly, the extra plan compensation in the form of $50 million of Series B Bonds presumably contemplated by the National Settlement in lieu of cash also violates the equal distribution requirements of Section 805 of the Trust Agreement and the prior rights of the PREPA Bond Trustee.

does not comply with the pro rata distribution requirements contained in Section 805 of the Trust

Agreement or the other provisions of the Trust Agreement mandating *pari passu* treatment. The

Plan violates these provisions further by providing that Class 5 consideration is to be paid directly

to National, instead of going through the PREPA Bond Trustee as the representative of all

Bondholders. Moreover, there is no disputed claims reserve, so the Plan improperly seeks to

distribute the limited Plan pot to Settling Bondholders and National before a determination can be

made in the Amended Lien & Recourse Challenge about who should receive such consideration.

### C.    The Arguments Made Thus Far in Defense of the Settlements Are Without Merit.

33.    In connection with the Disclosure Statement hearing, National and the Oversight

Board advanced several arguments for why PREPA, the Settling Bondholders, and National were

not bound by the Trust Agreement. For example, National contended that its execution of the plan

support agreement does not equate to instituting a "suit, action or proceeding" within the meaning

of the first sentence of Section 808. (National Reply in Supp. of DS ¶¶ 12, 13, ECF No. 3244.)

Even assuming this were true (and it is not), National ignores the exclusive pro rata distribution

rules in the Trust Agreement. There is no doubt that the National Settlement was separately

negotiated in an effort to improve the collective treatment that National's PREPA Bond claims

might otherwise receive, which it did by locking up an individualized settlement for a

disproportionate piece of the pot.

34.    National and the Oversight Board also argued that such a broad reading of the Trust

Agreement's no-action clause would be bad policy that could undermine the ability of voting

beneficial Bondholders or their voting insurers to reach settlements beneficial to the bankruptcy

plan negotiation process. (*Id.* ¶ 15.) Section 808, however, differs from standard no-action clauses

in the broad scope of its prohibitions. Moreover, the Oversight Board should not be permitted to

induce violations of Section 808 in the Title III case while simultaneously using the representative status of the PREPA Bond Trustee to seek global rulings on the rights of all Bondholders in the Amended Lien & Recourse Challenge. Here, the Plan's broken and limited settlements with subgroups of Bondholders do not advance any policy of settlement because they do not move PREPA's Title III case toward a substantially consensual plan.

35.     The proponents of the settlements further argued that every Bondholder retains the right to sell its PREPA Bonds and that the National Settlement and related Plan terms are nothing more than a sale in substance. (Feb. 28, 2023 Hr'g Tr. 140.) This argument makes no sense because National has no right to sell the Class 5 Bonds that it insures without the consent of the underlying Bondholders. Here, the Class 5 Bonds remain outstanding just like the other PREPA Bonds. The only difference is that National and the Oversight Board reached an agreement to disproportionately dedicate a percentage of the pot to National in consideration for National's vote and their mutual abandonment of the limitations in the Trust Agreement.

36.     Finally, the Oversight Board and National argued that the Trust Agreement (including its no-action provision) is irrelevant because it is going to be cancelled in the Title III plan process. (PREPA's DS Supplemental Omnibus Reply at 14-16, Dkt. No. 3246.) This position, however, puts the cart before the horse by assuming that the Oversight Board may confirm a Plan that fails to meet PROMESA's confirmation standards.

## II.     THE PLAN DOES NOT SATISFY PROMESA'S CONFIRMATION STANDARDS

37.     A set of confirmation infirmities flow directly from the Plan's reliance on the impermissible Class 1 Settlement and the National Settlement. These infirmities are exacerbated by the Plan's unfair, incomplete, and sometimes incoherent treatment of the remaining Non-Settling claims in Class 2 and the ongoing role of the PREPA Bond Trustee in connection with the Plan's implementation.

16

A.     **The Plan Does Not Comply with Section 1122(a)'s Classification Requirements.**

38.     Section 301 of PROMESA incorporates the requirement that creditor claims be classified in a proposed plan in accordance with section 1122(a) of the Bankruptcy Code. 48 U.S.C. § 2161. Section 1122(a) provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." The First Circuit has instructed that substantially similar claims should be classified together, even though section 1122(a) does not expressly require it. *Granada Wines, Inc. v. New England Teamsters & Trucking Indus. Pension Fund*, 748 F.2d 42, 46-47 (1st Cir. 1984). While this Court has previously concluded that *Granada Wines*' rule was not explicitly imported into PROMESA (Hearing Tr. 77:12–78:12, Case No. 17-03283-LTS, ECF No. 17379),[18] the Court clearly has discretion under section 1122(a) to require that the classification of PREPA Bond claims be made on a legitimate basis consistent with applicable law and the purposes of Title III.

39.     Section 1122(a) requires that the separate classification of substantially similar claims (let alone the division of a unified claim) must have an appropriate business or economic justification, and there can be none where the prospective class is based entirely on settlement rights that do not exist. *See In re Autterson*, 547 B.R. 372, 397 (Bankr. D. Colo. 2016) ("[T]he Court will place the burden on the plan proponent to justify any separate classification of substantially similar claims, if a party in interest objects on gerrymandering grounds." (quotation marks omitted)).

40.     Here, the Plan violates section 1122(a) in multiple ways. *First*, the Plan separates Bond claims held by uninsured Bondholders into Class 1 and Class 2 based solely on whether the

---

[18] The PREPA Bond Trustee does not concede that the *Granada Wines* is inapplicable.

individual Bondholders agreed to the Oversight Board's offer to settle their portion of the Amended Lien & Recourse Challenge with respect to their Bonds. This separate classification is improper under section 1122(a) because it lacks any legitimate basis. The Settling Bondholders—whose claims fall into Class 1—had no individual right to settle any portion of the Amended Lien & Recourse Challenge; indeed, such a right is expressly precluded by the collective action requirements of the Trust Agreement, including Section 808's no-action clause. As a result, the Plan's Class 1 designation lacks any basis or justification sufficient to satisfy section 1122(a). All uninsured Bonds should get the same plan recovery as agreed in the Trust Agreement's collective action, representative enforcement, and pro rata distribution provisions, and they all should be counted in the same class, without exception.[19]

41.     *Second*, the Plan separates insured Bond claims into Class 2 and Class 5 without justification. Claims for Bonds insured by Assured and Syncora fall into the former class, while claims for Bonds insured by National are placed into the latter. The only proffered basis for this inconsistent classification is the National Settlement, but that settlement does not satisfy section 1122(a) for the same reason that the Class 1 Settlement does not: like the Settling Bondholders in Class 1, National has no individual right to settle any portion of the Amended Lien & Recourse Challenge—and therefore its improper efforts to settle its "share" of that action do not provide a legitimate basis under section 1122(a) to classify its insured PREPA Bond claims separately from those of Assured and Syncora.[20]

---

[19] For mechanical reasons related to simplifying distributions to insured bondholders, courts have permitted or required insured bonds to be separately classified (while maintaining equivalent economic recovery against the debtor for both the insured and uninsured classes), but this consideration is not relevant to Class 1.

[20] The PREPA Bond Trustee joins in the arguments made in the Bondholder Objections that these classifications were also part of an improper gerrymandering effort.

B.      **The Class 1 and Class 5 Plan Treatments Unfairly Discriminate against Dissenting Class 2.**

42.     The Plan also violates Title III's prohibition against unfair discrimination. Section 1129(b) of the Bankruptcy Code, as incorporated into Title III, protects dissenting classes of creditors from receiving discriminatory plan consideration relative to other classes by including an express cramdown requirement prohibiting "unfair discrimination." *In re LightSquared Inc*., 513 B.R. 56, 99 (Bankr. S.D.N.Y. 2014). Here, Class 2 has rejected the Plan and is impaired, making it eligible for cramdown protection against unfair discrimination. The Bondholder Objections correctly argue that the proposed treatment of PREPA Bonds in Class 1 and Class 5 presumptively discriminates against the treatment in Class 2 for the same type of PREPA Bond claim and that there is no justification for the discrimination.[21]

43.     In *In re Tribune. Co.*, 972 F.3d 228, 242–45 (3d Cir. 2020), the Third Circuit upheld confirmation of a chapter 11 plan over the "unfair discrimination" objection of a class of senior noteholders who argued that the plan did not absolutely implement the terms of its subordination agreement with certain other creditors who were included within other accepting classes. The Third Circuit concluded on narrow facts that the complex plan could be confirmed without precisely adhering to the terms of the subordination agreements, where the deviation was very small. *Id.* In its analysis, the court identified eight principles that courts should apply when examining unfair discrimination, which can be summarized as follows:

> 1)      "A subordination agreement does not need to be enforced to the letter in the case of a cramdown, and subordinated amounts may be allocated to other classes not entitled outside bankruptcy to benefit from subordination

---

[21] The Bondholder Objections also explain why the treatment provided to the Class 4 Fuel Line Loan Claims also results in unfair discrimination, and the PREPA Bond Trustee joins in that argument.

19

          agreements as long as that allocation is not presumptively unfair (and, if so, the presumption is not rebutted)";

2)      "[U]nfair discrimination applies only to classes of creditors (not the individual creditors that comprise them)";

3)      "[U]nfair discrimination is determined from the perspective of the dissenting class";

4)      Classes should be aligned correctly to permit comparison;

5)      The analysis should be done as of the time of the unfair discrimination analysis using net present value of payments and allocation of risk;

6)      Adjust total plan distributions to pro rata percentage comparisons applying any applicable subordinations;

7)      Determine whether to presume unfair discrimination by determining whether there is a materially lower percentage recovery for the dissenting class or a materially greater risk to the dissenting class in connection with the proposed distributions; and

8)      Determine whether the plan proponent can overcome the rebuttable presumption of unfair discrimination.

*Id.* at 242-44.

44.    Applying the *Tribune* analysis here ineluctably leads to the conclusion that the Plan materially and unjustifiably discriminates against Class 2 relative to Classes 1 and 5. Based upon the Court's summary judgment ruling in the Amended Lien & Recourse Challenge and prior commitments of the pot, the highest recovery that Class 2 can receive is 46.49%, even if there is a Final Order that finds the unsecured Deficiency Claim held by the PREPA Bond Trustee is allowed in the full amount of the principal and interest owing on the PREPA Bonds as of the Petition Date. Both Classes 1 and 5 will receive a significantly higher percentage recovery based upon the current rulings of the Court. National, for example, would receive 71.65% of its insured Bonds, plus an additional 5.86% of cash or Series B Bonds. The Settling Bondholders in Class 1 could possibly get 100% of their claims covered in Series B Bonds, which is impossible for the members of Class 2 as there are not enough Series B Bonds available under any scenario.

45.    Moreover, the discriminatory treatment of Class 2 is further reflected in the potentially indirect nature of the Plan distributions to Class 2 based upon a Deficiency Claim. (*See*

*supra* n.11.) If Class 2 Deficiency Claims are only entitled to receive units in the GUC Trust, as opposed to Series B Bonds, the units to be received (according the current draft of the GUC Trust Agreement) are non-transferable and the GUC Trust would be controlled by an unnamed Oversight Board appointee without any meaningful right of unitholder representation. This twice removed status and added layer of expense and delay are unfair and should not be permitted.

46.     Although Section 1129(b)'s unfair discrimination requirement does not require the absolute application of subordination agreements, as confirmed in *Tribune*, the pro rata distribution provisions of the Trust Agreement and the Bondholder-to-Bondholder agreement to accept the priorities of payment set forth in the Trust Agreement remain determinative as to what is fair and how much disparity in the timing, quantity, and quality of the plan consideration, if any, should be tolerated. This case goes beyond classes of unsecured claims being generally of the same level; it instead involves identical claims subject to collective action and representative enforcement provisions and an express understanding about how holders of such claims would share recoveries on an equal footing.

47.     The Trust Agreement's parity terms undermine any conceivable justification for the obvious discriminatory treatment of Class 2. National, like the Settling Bondholders in Class 1, had no right to settle its "share" of Amended Lien & Recourse Challenge and to pocket the consideration. The discrimination is entirely gratuitous and is not needed to achieve a confirmable plan. *See In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 660 (Bankr. D. Del. 2003) ("The hallmarks of the various [unfair discrimination] tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination."). The National Settlement was not even offered to other

21

Bondholders or to Assured and Syncora. Accordingly, the Oversight Board cannot overcome the *Tribune* presumption that the discrimination here is "unfair" and therefore prohibited.

C.    **The Proposed Competitive Pot Plan Violates Section 1129(a)(3) Because It Improperly Seeks to Undermine the Collective Rights of PREPA Bond Claims to Unified Representation and Pro Rata Treatment.**

48.    Under Section 1129(a)(3) of the Bankruptcy Code, made applicable by PROMESA § 301, a bankruptcy plan must be proposed in good faith. Good faith is not defined in the Code, and courts have differed about whether the requirement pertains to the way a plan is proposed or encompasses a broader substantive requirement. What courts generally consider is whether "there exists a reasonable likelihood that the plan will achieve a result consistent with the objective and purposes of the Bankruptcy Code." *In re Weber*, 209 B.R. 793, 797 (Bkrtcy. D. Mass. 1997) (internal quotation marks omitted); *see also In re Coastal Cable T.V., Inc.,* 709 F.2d 762, 764 (1st Cir. 1983) (noting that there must be a relation between a restructuring plan and the purposes that the restructuring statute was designed to serve).

49.    In making this determination, courts look to whether the debtor has proposed a plan with "honesty and good intentions and with a basis for expecting that a reorganization can be effected." *In re Johns–Manville Corp*., 843 F.2d 636, 649 (2d Cir.1988) (quotations omitted); *see also In re Jorgensen,* 66 B.R. 104, 109 (B.A.P. 9th Cir. 1986) ("Good faith requires a fundamental fairness in dealing with one's creditors."). Further, plans that are proposed with mechanisms to create artificially impaired accepting classes have been denied confirmation for not being proposed in good faith. *In re Hotel Assocs. of Tucson,* 165 B.R. 470, 475 (B.A.P. 9th Cir. 1994).

50.    The Bondholder Objections to confirmation include lack of good faith, and the PREPA Bond Trustee joins in that broader objection. Here, the PREPA Bond Trustee makes an additional objection based on section 1129(a)(3) that is premised on the Oversight Board's pattern of disregard for the collective action, representative enforcement, and pro rata distribution

22

provisions of the Trust Agreement, as reflected in the impermissible Class 1 Settlement and National Settlement discussed above.

51.     The Plan's bad faith is further revealed in its putative treatment of the Disputed Claims of the PREPA Bond Trustee and Class 2 Bondholders during the inevitable Amended Lien & Recourse Challenge litigation and appeals occurring after confirmation. The Plan implies in several places that the Amended Lien & Recourse Challenge will proceed to a Final Order and that this disposition will be used to distribute the limited pot of Series B Bonds. It does so by defining the Amended Lien & Recourse Challenge, Bond Collateral, and Deficiency Claim in terms of needing a "Final Order," but this limitation is used inconsistently in a manner that is highly unfair to Class 2. A Final Order is not required in order for the Plan to become confirmed or for the Effective Date to occur or for distributions to move forward for other Classes of Allowed Claims. The only real effect is to designate Class 2 as Disputed Claims that get no distributions during the pendency of Amended Lien & Recourse Challenge.[22] In light of the large relative size of the Class 2 and the inevitable appeals, this targeted adverse treatment cannot be squared with the requirements of good faith. This alone fails to meet the requirement to propose Title III plans in good faith, and the Court should not confirm the Plan.

---

[22] To the extent that the Class 2 Plan treatment is construed to require Class 2 Creditors to become subject to the GUC Trust instead of receiving a share directly of the General Unsecured Creditor Recovery assets, the Plan is even more discriminatory because, among other disadvantages, the GUC units are generally nontransferable and the Bondholders as unit holders would be given no effective representation in the selection of the GUC Trustee and GUC Board.

**D.** **Neither the Class 1 Settlement nor the National Settlement Should Be Approved under Bankruptcy Rule 9019.[23]**

52.     The Plan expressly requires a confirmation order providing that settlements are deemed approved under Bankruptcy Rule 9019 to the extent applicable. (*See* Plan Art. XXXI.A(e).) In Article XXXVI.D, the Plan provides that the failure of any party to raise a timely Bankruptcy Rule 9019 objection to any settlement in the Plan is forever enjoined.

53.     Article XX.I further provides that Bankruptcy Rule 9019 protects the National Settlement as follows:

> Pursuant to sections 105(a) and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, the provisions of the National Settlement shall constitute a good-faith compromise and settlement among PREPA, the Oversight Board, and National of all Claims, Causes of Action, interests, and controversies among such parties, including all potential Claims, Causes of Action, interests, and controversies between PREPA, the Oversight Board, and National, and are in consideration of the value provided to PREPA by National pursuant to the National Settlement. The Plan shall be deemed a motion to approve the National Settlement as a good-faith compromise and settlement of all of the Claims, interests, Causes of Action and controversies described in the foregoing sentence pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, and entry of the Confirmation Order shall constitute the Title III Court's approval of the National Settlement, as well as a finding by the Title III Court that the National Settlement is in the best interests of PREPA, the Oversight Board, and Holders of Claims and is fair, equitable, and reasonable.

54.     It is well settled that Rule 9019 sets out the procedure for a court to approve the compromise of a claim of uncertain value belonging to the estate or claim being made against the estate with the idea of maximizing value available for creditors. Such settlements between the debtor and a creditor must be "fair and equitable" and are not supposed to elevate the settling

---

[23] This objection and many others apply equally to the Fuel Line Lender settlement, which is addressed in the Bondholder Objections in which the PREPA Bond Trustee joins.

creditor's priority for distributions under the Bankruptcy Code. *See In re Iridium Operating LLC*,

478 F.3d 453, 455 (2d Cir. 2007). In *Protective Comm. for Indep. Stockholders of TMT Trailer*

*Ferry, Inc. v. Anderson*, 390 U.S. 414, 424, 441 (1968), the Supreme Court held that a settlement

approved as part of a reorganization plan must be "fair and equitable" to all creditors. The Fifth

Circuit has interpreted that decision to require compliance with the priority scheme whenever a

bankruptcy court approves a settlement that entails the distribution of estate assets to creditors,

whether as part of or before the confirmation of a Chapter 11 plan. *In re AWECO, Inc.*, 725 F.2d

293, 298 (5th Cir. 1984). In *Iridium*, the Second Circuit constructed a narrow exception to the

requirement of strict compliance with bankruptcy payment priorities, noting that "whether a

settlement's distribution plan complies with the Bankruptcy Code's priority scheme will often be

the dispositive factor." 478 F.3d at 464.

55.     In the First Circuit, a motion to approve a compromise or settlement with the estate

pursuant to Bankruptcy Rule 9019 requires a court generally to assess whether the proposed

settlement falls below "the lowest point in the range of reasonableness." *In re Fin. Oversight &*

*Mgmt. Bd. for Puerto Rico*, 360 F. Supp. 3d 65, 75 (D.P.R. 2019) (quotation marks omitted). In

doing so, the courts in the First Circuit consider, among other factors:

> (i) the probability of success in the litigation being compromised;
> (ii) the difficulties, if any, to be encountered in the matter of
> collection; (iii) the complexity of the litigation involved, and the
> expense, inconvenience and delay attending it; and, (iv) the
> paramount interest of the creditors and a proper deference to their
> reasonable views in the premise.

*Jeffrey v. Desmond*, 70 F.3d 183, 185 (1st Cir. 1995); *see also In re Healthco Int'l, Inc.*, 136 F.3d

45, 50 (1st Cir. 1998) (considering the "probability of success were the claim to be litigated," "a

reasonable accommodation of the creditors' views regarding the proposed settlement," and "the

experience and competence of the fiduciary proposing the settlement"). The *Jeffrey* factors are not

25

exclusive, and courts also often consider the public policy considerations of the settlement. *In re High Voltage Eng'g Corp.*, 397 B.R. 579, 601-02 (Bankr. D. Mass. 2008).

56. Here, neither the Class 1 settlement nor the National Settlement qualify for approval under Bankruptcy Rule 9019 for two reasons. *First*, there is nothing in the First Circuit's jurisprudence surrounding Bankruptcy Rule 9019 that allows a debtor to pay estate consideration to a creditor for entering into a legally ineffective settlement of ongoing litigation, which the creditor lacked the authority to settle. Paying estate consideration for a plan vote coupled with misclassification of the settled claim is not a real settlement covered by Bankruptcy Rule 9019.

57. *Second*, the disparate consideration is in clear violation of the Bankruptcy Code's priority scheme because National is subject to the equal distributive intercreditor agreements in the Trust Agreement, and the National Settlement, according to David Skeel, dedicates more Series B Bonds to National for its Class 5 Bonds than would be possible for all of the Bond claims. (Skeel Dep. Tr. 119-22.) It is not fair and equitable to the Non-Settling Bondholders, Assured, and Syncora, and therefore cannot be approved.

58. Here, *Jeffrey*'s fourth factor ("the paramount interests of creditors") looms large, in that the paramount interest of creditors requires that the Oversight Board negotiate a global Bond claim settlement that can be accomplished in a manner consistent with the collective action, representative enforcement, and pro rata distribution provisions of the Trust Agreement. Accordingly, the Court should deny approval of the Class 1 Settlement and the National Settlement under Bankruptcy Rule 9019.

### E. The Plan Includes Impermissible Exculpations.

59. The Plan provides exculpation in favor of National, other named settling parties (including the Fuel Line Lenders), and a nonspecific set of Entities consisting of their respective

present and former Related Persons.[24]

60.     In Article XXVII.D, the Oversight Board protects National, the Fuel Line Lenders,

and their Related Persons as Exculpated Parties, as follows:

> Except as otherwise specifically provided in the Plan, no Exculpated
> Party shall have or incur, and each Exculpated Party is released and
> **exculpated from any Cause of Action for any claim related to
> any act or omission in connection with, relating to, or arising out
> of, the Title III Case, the formulation, preparation,
> dissemination, negotiation, or filing of the Fuel Line Lender
> PSA, the National PSA,** Disclosure Statement, the Plan, the
> Uninsured Bond Settlement Agreement, the Vitol Settlement
> Agreement, or any Restructuring Transaction, contract, instrument,
> release or other Definitive Document, agreement, or document
> created or entered into in connection with the Disclosure Statement
> or the Plan, the filing of the Title III Case, the pursuit of
> Confirmation, the pursuit of consummation, the administration and
> implementation of the Plan, including the issuance of securities
> pursuant to the Plan, or the distribution of property under the Plan
> or any other related agreement, except for claims related to any act
> or omission that is determined in a Final Order to have constituted
> actual fraud or gross negligence, but in all respects such Entities
> shall be entitled to reasonably rely upon the advice of counsel with
> respect to their duties and responsibilities pursuant to the Plan. **The
> Exculpated Parties have, and upon completion of the Plan shall
> be deemed to have, participated in good faith and in compliance
> with the applicable laws with regard to the solicitation of votes
> and distribution of consideration pursuant to the Plan and,
> therefore, are not, and on account of such distributions shall not
> be, liable at any time for the violation of any applicable law, rule,
> or regulation governing the solicitation of acceptances or
> rejections of the Plan or such distributions made pursuant to the
> Plan.**

61.     This exculpation would insulate all Exculpated Parties from claims that they

violated the Trust Agreement or otherwise took actions inconsistent with its terms. Such an

exculpation is completely inappropriate for a plan that is not substantially consensual. In this

---

[24] The PREPA Bond Trustee joins in the broader objections to the scope of the release and
exculpation provisions of the Plan set forth in the Bondholder Objections and underscores here
specific releases and exculpations related to National and the Fuel Line Lenders.

context, exculpations must be limited to estate professionals and fiduciaries. "[A] party's exculpation is based upon its role or status as a fiduciary." *In re PTL Holdings LLC*, 2011 WL 5509031, \*12 (Bankr. D. Del. 2011). Accordingly, "courts have permitted exculpation clauses insofar as they 'merely state[ ] the standard to which . . . estate fiduciaries [a]re held in a chapter 11 case.'" *Id.* (quoting *In re Washington Mutual, Inc.*, 442 B.R. 314, 350 (Bankr. D. Del. 2011) (alterations in original). "That fiduciary standard, however, applies only to estate fiduciaries." *Washington Mutual*, 442 B.R. at 350; s*ee also In re Tribune Co.*, 464 B.R. 126, 189 (Bankr. D. Del. 2011) (holding that exculpation provision must "exclude non-fiduciaries").

62. Neither National nor the Fuel Line Lenders are estate professionals or fiduciaries. National simply entered into a self-serving plan support agreement, which violates the Trust Agreement's collective action, representative enforcement, and pro rata distribution provisions. The Fuel Line Lenders secured a settlement with the Oversight Board that purports to give them priority over the Bonds, which is not the Board's right to give. These are not appropriate bases for exculpation. *See In re Master Mortgage Invest. Fund, Inc.,* 168 B.R. 930, 934–38 (Bankr. W.D. Mo. 1994) (considering any identity of interest between the debtor and released party, the contribution of the released party to the reorganization, the necessity of the proposed injunction, any agreement by a substantial majority of creditors, and whether the plan will pay the claims of the affected classes); *see also In re Quincy Med. Ctr., Inc.*, 2011 WL 5592907 (Bankr. D. Mass. 2011) (summarizing and agreeing with past decisions using *Master Mortgage*).

63. Moreover, the limiting language with respect to National's monoline obligations is inadequate and overbroad.

**F.   The Plan Fails to Include an Adequate Means of Implementation for Class 2.**

64. Under section 1123(a)(5) of the Bankruptcy Code, as incorporated into PROMESA, a proposed Title III Plan must provide an adequate means of implementation. Here, the Plan only

provides an adequate means of implementation for favored classes, and it leaves a series of unfair, incomplete, or incoherent provisions for unfavored Class 2.

65.    As discussed above, the Oversight Board seeks confirmation and the right to have the Plan become effective prior to a Final Order in the Amended Lien & Recourse Challenge. During the post-Effective Date period, Class 2 claims would be Disputed Claims ineligible for distributions, and the Oversight Board would be free to distribute Series B Bonds (and other Plan consideration) to other Allowed Claims without a disputed claims reserve. Given the overwhelming size of Class 2, a disputed claims reserve is essential to protect Bondholders in the event that they ultimately prevail in the Amended Lien & Recourse Challenge.[25]

66.    Also missing from the Plan with respect to the Monoline insurance policies issued by the Non-Settling Monolines in Class 2 is a custodial trust or other mechanism to combine the cash flow from the Plan consideration distributable to Insured Bondholders in Class 2 with post-Effective Date Monoline insurance policy payments. The Oversight Board simply lumps Non-Settling Monolines with Non-Settling Bondholders in Class 2 with no provision for how the Series B Bonds issued under the Plan relate to the ongoing Monoline insurance policies.

67.    PREPA purchased the Monoline insurance for the Insured Bonds in Class 2 and has an obligation to provide a consistent treatment for those Insured Bonds including both Plan distributions and preserved Policy rights. The Plan fails to account for this in multiple ways.

68.    *First*, the Plan does not clearly indicate who will receive plan distributions: the Monoline Insurer or the underlying holder of Insured Bonds.

69.    Art. XXIV.L of the Plan provides:

---

[25] As discussed below, the Court should prohibit the Plan Effective Date from occurring before a Final Order is entered in the Amended Lien & Recourse Challenge.

For all purposes of the Plan, including, without limitation, for purposes of distributions pursuant to the terms and provisions of this Article XXIV, the Holder of a Claim shall mean any Entity who, directly or indirectly, has investment power with respect to any Claim, which includes the power to dispose or to direct the disposition of such Claim; provided, however, that, solely with respect to Insured PREPA Revenue Bonds and Bankruptcy Code section 1126, the Holder of any Insured PREPA Revenue Bond Claims shall be determined in accordance with PROMESA section 301(c)(3) and any law or governing documents applicable to such Insured PREPA Revenue Bond Claims.

This provision could be construed to provide that the underlying Insured Bondholders are to receive all of the Class 2 distributions on account of their Allowed PREPA Revenue Bond Claims (as defined in the Plan). Alternatively, it could also be construed to defer to the Monoline Insurance Agreements (defined below) to resolve that issue without any mechanism in place for resolution. In any event, there is no provision in the Plan to address the relationship of distributions of Series B Bonds or the payments thereon with the rights of Holders of Insured Bonds under their Policies.

70.    *Second*, the Plan is also unclear about the post-Effective Date status of the Monoline insurance policies insuring Class 2 PREPA Bonds. Section XXIV excludes "Insurance Policies" and related documents issued by a Monoline Insurer from the general cancellation of contracts on the Effective Date, but there is a drafting error because the definition of Insurance Policies excludes all Monoline insurance policies arguably leaving them and "related documents" within the cancellation provision. Likewise, the only other provision purporting to preserve Class 2 Monoline Insurance rights (Article XXI.F) only excludes them from the operation of the provision assuming other types of Insurance Policies as executory contracts:

Subject to the terms and provisions of Article XXI.H hereof, each of the Debtor's Insurance Policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan and shall be assumed as of the Effective Date; provided, however, that such treatment shall not, and shall not be construed to, discharge or relieve any Monoline Insurer with respect to its respective obligations to Holders of Claims under policies of

30

insurance and applicable law and governing documents with respect thereto, as applicable, under this Plan.

71.     *Third*, the Plan does not coherently provide for a post-Effective Date Monoline Insurance claims process for Insured Bonds subject to Class 2. The PREPA Bond Trustee (in its capacity as trustee, paying agent, or fiscal agent) is currently required pursuant to the relevant Monoline insurance policies and certain agreements with PREPA (the "**Monoline Insurance Agreements**") to submit claims to Assured and Syncora under the terms of the their Monoline insurance policies before each scheduled payment date and to make distributions of those amounts to the Holders of their Insured Bonds. Assured and Syncora are third-party beneficiaries to the relevant Monoline Insurance Agreements. The Monoline Insurance Agreements further provide subrogation and assignment rights to Assured and Syncora with respect to their respective policy payments. Article XXIV of the Plan fails to coherently address the post-Effective Date status of the Monoline Insurance Agreements with the PREPA Bond Trustee or the claims process. Article XXIV.E.7 provides:

> Except … as specifically provided otherwise in the Plan … , on the Effective Date, the PREPA Revenue Bonds and Fuel Line Facilities and all instruments and documents related thereto will be deemed automatically cancelled, terminated, and of no further force or effect against the Debtor without any further act or action under any applicable agreement, law, regulation, order or rule, **with the Debtor and the applicable trustee, paying agent, or fiscal agent, as the case may be, having no continuing obligations or duties and responsibilities thereunder**; *provided*, *however*, that, notwithstanding anything contained herein to the contrary, the PREPA Revenue Bonds and Fuel Line Facilities and such other instruments and documents shall continue in effect solely (i) to allow the Distribution Agent to make any distributions as set forth in the Plan and to perform such other necessary administrative or other functions with respect thereto, (ii) to allow Holders of Allowed PREPA Revenue Bond Claims, Allowed National Claims, and Allowed Fuel Line Loan Claims to receive distributions in accordance with the terms and provisions of the Plan, (iii) **for any trustee, agent, contract administrator, or similar entity under all instruments and documents related thereto, to perform**

31

**necessary functions, including making distributions, in accordance with the Plan and to have the benefit of all of the rights and protections and other provisions of such instruments and documents, as applicable, and all other related agreements**, **(iv) to set forth the terms and conditions applicable to parties to such documents and instruments other than the Debtor, or (v) as may be necessary to preserve any claims under the respective Insurance Policies and related documents issued by a Monoline Insurer.** Notwithstanding the foregoing, and except as otherwise expressly provided in the Plan, such bonds or bond documents that remain outstanding shall not form the basis for the assertion of any Claim against the Debtor or Reorganized Debtor, as the case may be.

72.     As applied to the Monoline Insurance Agreements for Class 2 Insured Bonds, this provision is incomplete and incoherent. It not only uses a definition of Insurance Policies that excludes Monoline insurance policies, but it also apparently relieves PREPA of all of its obligations under the Monoline Insurance Agreements, while at the same time preserving the duties of the PREPA Bond Trustee to perform "necessary functions," whatever that means. This provision likewise fails to indicate who is obligated to pay for the ongoing performance of post-Effective Date duties that the Plan preserves. The Oversight Board should be required to include a sensible custodial trust arrangement for the treatment of Class 2 Insured Bonds as part of its duty to provide an adequate means of implementation.

> **G.     The Plan Fails More Generally to Address Coherently the Post-Effective Date Duties of the PREPA Bond Trustee or Provide a Means for Payment.**

73.     Article XXIV.E.7 is a one-size-fits-all cancellation provision that fails to adequately describe what continuing rights and duties of the PREPA Bond Trustee, in that or some related capacity, will survive and on what terms. It raises, but leaves unanswered, numerous questions about what happens after the Effective Date. Rather than parse each deficiency, the PREPA Bond Trustee proposes the following paragraph to replace Article XXIV.E.7 as it relates

to the PREPA Bond Trustee, the Trust Agreement, and any related documents and instruments,

including those relating to Monoline insurance for the PREPA Bonds[26]:

> Notwithstanding anything in the Plan or the Confirmation Order to
> the contrary, and subject to prior entry of a Final Order in the
> Amended Lien & Recourse Challenge and any related order of the
> Title III Court on remand if applicable, then on the Effective Date
> thereafter, (i) the Trust Agreement and PREPA Revenue Bonds will
> be deemed automatically cancelled and terminated as against the
> Debtor expressly subject to the preservation of all rights of any
> Insured Bondholder as against any Non-Settling Monoline Insurer
> with respect to any monoline insurance applicable thereto, and
> subject to Article XX herein and the elections made thereunder with
> respect to the National Insured Bonds, (ii) the PREPA Bond Trustee
> in all capacities under the Trust Agreement and any related
> documents and instruments, including with respect to any Monoline
> insurance policies for the PREPA Revenue Bonds, shall be
> discharged and released of all duties under the Trust Agreement, the
> PREPA Revenue Bonds, and any Monoline Insurance Agreements,
> except for (a) the retention and distribution of collateral consistent
> with the outcome of the Amended Lien & Recourse Challenge in
> accordance with the Trust Agreement, including in the Sinking
> Fund, in each case subject to its charging lien rights, (b) the
> distribution of Series B Bonds and CVI or other Plan consideration
> to Bondholders and/or Monoline Insurers in accordance with the
> written instructions of the Distribution Agent, subject to payment of
> the PREPA Bond Trustee's reasonable fees and expenses incurred
> in connection therewith, the preservation of its charging lien rights
> and exculpation in an order of the Court in form and substance
> satisfactory to the PREPA Bond Trustee. With respect to the
> National Insurance Policies, the PREPA Bond Trustee in its capacity
> as such or in any related paying agency or fiscal agency shall
> cooperate with the Reorganized PREPA and National in the
> implementation of Article XX hereunder, subject to payment of its
> fees and expenses and indemnity reasonably acceptable to the
> PREPA Bond Trustee. Absent a new agreement with any Non-
> Settling Monoline, the PREPA Bond Trustee shall have no duty to
> make monoline insurance claims after the Effective Date and each
> Non-Settling Monoline Insurer shall be responsible for making bond
> insurance payments to Bondholders directly in the amounts and at
> the times set forth in their respective Monoline Insurance policies.
> The Debtor and the Distribution Agent agree to cooperate with the

---

[26] Nothing herein is intended to compromise or limit any objection to confirmation or any
position of the PREPA Bond Trustee in the Amended Lien & Recourse Challenge.

> PREPA Bond Trustee in the surrender and cancelation of PREPA
> Bonds at DTC, (including the provision of post Effective Date
> distributions through DTC) and with the distribution of any Series
> B Bonds of CVI though DTC, and that all reasonable fees and
> expense of the PREPA Bond Trustee in connection therewith shall
> be paid by the Reorganized PREPA. All rights, privileges, and
> protections of the PREPA Bond Trustee under the Trust Agreement
> as against the holders of PREPA Revenue Bonds shall remain in full
> force and effect. Subject to the foregoing rights, privileges, and
> protections, the PREPA Bond Trustee is and shall remain authorized
> to pursue any appeal of this Order or any order entered in the
> Amended Lien & Recourse Challenge.

74.     To be clear, however, even if the foregoing language is included to the satisfaction
of the PREPA Bond Trustee, the Plan remains unconfirmable for the other reasons identified herein
and in the Bondholder Objections, and the PREPA Bond Trustee reserves the right to object to
confirmation of the Plan based upon such deficiencies and further reserves all rights relating to the
preservation of all liens and rights of the Bondholders and the PREPA Bond Trustee in any Final
Order resolving the Amended Lien & Recourse Challenge.

**H.     The Court Should Not Permit the Plan's Effective Date to Occur Prior to the
Issuance of a Final Order in the Amended Lien & Recourse Challenge.**

75.     As indicated above, the Plan currently gives the Oversight Board the discretion to
proceed not only to confirmation but also to the Effective Date before a Final Order is entered in
the Amended Lien & Recourse Challenge. Thus, if the Plan is confirmed, the PREPA Bond Trustee
and Bondholders may be forced to seek an emergency stay to prevent a serious misallocation of
the Plan consideration while the First Circuit reviews the Court's decisions about the Bond
Collateral and Deficiency Claim estimation. Depending on the outcomes of those appeals, the
confirmation order may need to be changed to deny confirmation, to alter the amount of required
plan consideration, or to distribute it differently in accordance with the First Circuit's
determinations. Instead of setting the stage for costly and burdensome emergency motion practice,
it would be more appropriate for the Court to require that the Plan's Effective Date cannot occur

until thirty (30) days after entry of a Final Order in the Amended Lien & Recourse Challenge, absent further order from the Court following notice and hearing for good cause shown by the Oversight Board or the Reorganized PREPA.

## III.   THE PROPOSED CONFIRMATION ORDER IS INADEQUATE.

76.     Separately, the PREPA Bond Trustee has objected to the form of the proposed Confirmation Order. All objections to the form of the confirmation order shall be deemed incorporated and made part of the PREPA Bond Trustee Objection for all purposes.

### CONCLUSION

77.     For the reasons stated herein and in the Bondholder Objections, the PREPA Bond Trustee respectfully requests that the Court find the Plan unconfirmable.

We hereby certify that, on this same date, we electronically filed the foregoing with the clerk of the Court using the CM/ECF system, which will notify the attorneys of record. Respectfully submitted, In San Juan, Puerto Rico, today June 12, 2023.

**RIVERA, TULLA AND FERRER, LLC**

By: */s/Eric A. Tulla*
Eric A. Tulla, USDC-DPR No. 118313
Rivera Tulla & Ferrer Building
50 Quisqueya Street
San Juan, PR 00917-1212
Tel: (787)753-0438
Fax: (787)767-5784
Email: etulla@riveratulla.com

**MASLON LLP**

By: */s/Clark T. Whitmore*
Clark T. Whitmore (admitted *pro hac vice*)
Michael C. McCarthy (admitted *pro hac vice*)
John T. Duffey (admitted *pro hac vice*)
Jason M. Reed (admitted *pro hac vice*)
90 South Seventh Street, Suite 3300
Minneapolis, MN 55402
Telephone: 612-672-8200
Facsimile: 612-642-4800
Email: clark.whitmore@maslon.com
        mike.mccarthy@maslon.com
        john.duffey@maslon.com
        jason.reed@maslon.com

**ATTORNEYS FOR U.S. BANK NATIONAL ASSOCIATION, IN ITS CAPACITY AS TRUSTEE**