**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br><br>Debtor.[1] | PROMESA<br>Title III<br><br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Debtor. | PROMESA<br>Title III<br><br><br>No. 17 BK 4780-LTS |

**ASSURED GUARANTY CORP. AND ASSURED GUARANTY MUNICIPAL CORP.'S (I) OBJECTION TO MODIFIED SECOND AMENDED TITLE III PLAN OF ADJUSTMENT OF THE PUERTO RICO ELECTRIC POWER AUTHORITY AND RELATED PROPOSED ORDER AND (II) PARTIAL JOINDER TO OBJECTIONS OF THE AD HOC GROUP OF PREPA BONDHOLDERS TO THE MODIFIED SECOND AMENDED TITLE III PLAN OF ADJUSTMENT OF THE PUERTO RICO ELECTRIC POWER AUTHORITY**

---

[1]     The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481) (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474) (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808) (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686) (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747) and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................................................1

ARGUMENT .................................................................................................................................4

I.     THE CONFIRMATION PROCEEDING IS NOT RIPE. ....................................................4

     A.    The Plan's Confirmability Is Contingent On The Appeal Of The Summary
          Judgment Order..........................................................................................................4

     B.    The Plan's Confirmability Is Contingent On The Outcome Of The
          Counterclaims. ..........................................................................................................5

     C.    At A Minimum, The Plan Would Need To Be Amended To Provide For
          Its Fatal Contingencies..............................................................................................7

II.    THE PLAN FAILS TO SATISFY SECTION 314(B)(6) OF PROMESA,
     BECAUSE IT IS NOT FEASIBLE. ..................................................................................8

III.   THE PLAN'S TREATMENT OF ASSURED'S CLAIMS IS UNFAIRLY
     DISCRIMINATORY.........................................................................................................12

     A.    Legal Standard(s) ....................................................................................................12

     B.    There Is No Reasonable Basis For The Discrimination Against Assured
          (Broad Test). ............................................................................................................15

     C.    The Board Cannot Establish That The Plan Can Only Be Consummated
          By Discriminating Against Assured (Broad Test). .................................................19

     D.    Discrimination Against Assured Is Not in Good Faith (Broad Test)......................20

     E.    The Plan's Degree Of Discrimination Against Assured Is Not
          Proportionate (Broad Test). .....................................................................................22

     F.    The Plan Imposes A Materially Lower Percentage Of Recovery On
          Assured In Comparison to National (Markell Test). ..............................................23

     G.    The Plan Allocates Materially Greater Risk To Assured In Comparison To
          National (Markell Test)............................................................................................24

IV.   THE PLAN UNFAIRLY DISCRIMINATES IN FAVOR OF THE FUEL LINE
     LENDERS.........................................................................................................................25

     A.    The Plan Is Unfairly Discriminatory On Its Face (Markell Test).........................25

     B.    The Board Cannot Overcome The Presumption Of Unfair Discrimination
          (Markell Test). .........................................................................................................26

     C.    The Plan's Unfair Discrimination Fails the Broad Test..........................................27

V.    THE FUEL LINE LENDER SETTLEMENT SHOULD NOT BE APPROVED. ...........30

A.  Legal Standard For Approval of Settlement Agreements Under Fed. R.
Bankr. P. 9019.................................................................................................30

B.  The FLLs Have No Enforceable Priority Under A Plan.....................................32

C.  PREPA is Likely to Succeed in the Current Expense Litigation..........................32

D.  Litigation With The FLLs Is Not Complex And Will Not Cause Material
Expense Or Delay. .............................................................................................46

E.  The Paramount Interest Of The Creditors And A Proper Deference To
Their Reasonable Views Weighs Squarely Against Approval Of the Fuel
Line Lender Settlement.......................................................................................48

VI.  SECTION XXV.A OF THE PLAN IMPERMISSIBLY AUTHORIZES THE
"EXPUNGEMENT" OF PROOFS OF CLAIM, AND THEREFORE RENDERS
THE PLAN UNCONFIRMABLE UNDER PROMESA § 314(B)(1). ...........................49

VII.  THE PLAN IS UNCONFIRMABLE UNDER *GRANADA WINES*...............................51

VIII.  PROMESA IS AN UNCONSTITUTIONAL NON-UNIFORM BANKRUPTCY
LAW. ..................................................................................................................53

IX.  JOINDER AND RESERVATION OF RIGHTS.................................................................60

CONCLUSION..............................................................................................................60

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**<u>Cases:</u>**

*Ackerley Commc'ns of Mass., Inc. v. City of Cambridge*,
  135 F.3d 210 (1st Cir. 1998)..................................................................................59

*Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*,
  374 F.3d 23 (1st Cir. 2004) ...................................................................................55

*Am. United Mut. Ins. Co. v. City of Avon Park*,
  311 U.S. 138 (1940)...............................................................................................29

*Begier v. IRS*,
  496 U.S. 53 (1990)..................................................................................................18

*Bexar Cnty. Hops. Dist. v. Crosby*,
  160 Tex. 116, 122 (1959) .......................................................................................10

*B-Real, LLC v. Rogers*,
  405 B.R. 428 (M.D. La. 2009).................................................................................50

*Cash in a Flash v. Brown*,
  229 B.R. 739 (W.D. Tenn. 1999).............................................................................17

*City of Jacksonville v. Bankers Life Co.*,
  90 F.2d 141 (7th Cir. 1937) ..............................................................................6, 10

*CoFund II LLC v. Hitachi Cap. Am. Corp.*, No. 21-2078,
  2022 WL 1101576 (3d Cir. Apr. 13, 2022) ...........................................................42

*Dore Energy Corp. v. Prosp. Inv. & Trading Co. Ltd.*, No. 2:05 cv 1657,
  2010 WL 4068802 (W.D. La. Oct. 14, 2010)..........................................................35

*Earth Pride Organics, LLC v. Off. Comm. of Unsecured Creditors of Earth Pride
  Organics*, LLC, CA No. 20-4032, 2021 WL 1553787 (Bankr. E.D. PA. 2021) ....22

*Ecker v. Sw. Tampa Storm Sewer Drainage Dist.*,
  75 F.2d 870 (5th Cir. 1938) ...................................................................................10

*Fed. Deposit Ins. Corp. v. Casady*,
  106 F.2d 784 (10th Cir. 1939) ................................................................................10

*Fin. Oversight and Mgmt. Bd. For P.R. v. Cooperativa de Ahorro y Credito Abraham
  Rosa*, 41 F. 4th 29 (1st Cir. 2022)....................................................................7, 55

**Table of Authorities, Cont'd**

**Page(s):**

*Franklin Cal. Tax-Free Trust v. P.R.*,
  85 F. Supp. 3d 577 (D.P.R. 2015), *aff'd* 805 F.3d 322 (1st Cir. 2015), *aff'd* 579 U.S.
  115 (2016) .................................................................................................................55

*Gazelle v. MR 314 Fortaleza LLC*, Civ. No. 16-2500,
  2018 WL 1322155 (D.P.R. Mar. 12, 2018) ..................................................................7

*Goode v. Hagerty (In re Systems Impact, Inc.)*,
  229 B.R. 363 (Bankr. E.D. Va. 1998).........................................................................40

*Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. for P.R.*,
  939 F.3d 340 (1st Cir. 2019).............................................................................9, 10, 11

*Granada Wines, Inc. v. New England Teamsters & Trucking Indus. Pension Fund*,
  748 F.2d 42 (1st Cir. 1984) .....................................................................3, 51, 53, 55

*Hays v. Isaacs*,
  120 S.W.2d 737 (Ky. Ct. App. 1938) .........................................................................10

*Hotel Kingkade v. C.I.R.*,
  180 F.2d 310 (10th Cir. 1950) ...................................................................................35

*In re 110 Beaver St. P'ship*,
  244 B.R. 185 (Bankr. D. Mass 2000) .........................................................................31

*In re 222 Liberty Assoc.*,
  108 B.R. 971 (Bankr. E.D. Pa. 1990) .........................................................................16

*In re Anderson*,
  173 B.R. 226 (Bankr. D. Col. 1993) ...........................................................13, 22, 28

*In re Armstrong World Indus., Inc.*,
  348 B.R. 111 (D. Del. 2006)........................................................................................14

*In re ARN LTD. Ltd. P'ship*,
  140 B.R. 5 (Bankr. D.C. 1992) ...................................................................................16

*In re AWECO, Inc.*,
  725 F.2d 293 (5th Cir. 1984) ......................................................................................48

*In re Autterson*,
  547 B.R. 372 (Bankr. D. Col. 2016) .....................................................................21, 29

<u>Table of Authorities, Cont'd</u>

<u>Page(s):</u>

*In re Aztec Co.*,
107 B.R. 585 (Bankr. M.D. Tenn. 1989) ........................................................................13, 20

*In re Bank of New England Corp.*,
646 F.3d 90 (1st Cir. 2011) ........................................................................................40

*In re Barney & Carey Co.*,
170 B.R. 17 (Bankr. D. Mass. 1994) ............................................................................16

*In re Baskett*,
219 B.R. 754 (B.A.P. 6th Cir. 1998) .............................................................................11

*In re Biolitec*,
528 B.R. 261 (Bankr. D. N.J. 2014) ..............................................................................48

*In re Bos. Generating LLC*,
440 B.R. 302 (Bankr. S.D.N.Y. 2010) ...........................................................................40

*In re Bos. & Providence R. R. Corp.*,
673 F.2d 11 (1st Cir. 1982) ..........................................................................................31

*In re Breitburn Energy Partners LP*,
582 B.R. 321 (Bankr. S.D.N.Y 2018) ............................................................................22

*In re Bryson Properties, XVIII*,
961 F.2d 496 (4th Cir. 1992) ........................................................................................13

*In re Buttonwood Partners, Ltd.*,
111 B.R. 57 (Bankr. S.D.N.Y. 1990) .............................................................................15

*In re BWP Transp., Inc.*,
462 B.R. 225 (Bankr. E.D. Mich. 2011) .........................................................................14

*In re Cajun Elec. Power Coop., Inc.*,
230 B.R. 715 (Bankr. M.D. La. 1999) ...........................................................................9

*In re Cent. Med. Ctr., Inc.*,
122 B.R. 568 (Bankr. E.D. Mo. 1990) ...........................................................................8

*In re City of Columbia Falls*,
143 B.R. 750 (Bankr. D. Mont. 1992) ...........................................................................10

*In re City of Stockton, Cal.*,
526 B.R. 35 (Bankr. E.D. Cal. 2015) .............................................................................56

**Table of Authorities, Cont'd**

**Page(s):**

*In re Cooper*,
  3 B.R. 246 (Bankr. S.D. Cal. 1980) ...................................................22

*In re C.P. Del Caribe, Inc.*,
  140 B.R. 320 (Bankr. D. P.R. 1992).................................................31

*In re Creekside Landing, Ltd.*,
  140 B.R. 713 (Bankr. M.D. Tenn. 1992) ......................................19, 20

*In re Creekstone Apartments Assocs., L.P.*,
  168 B.R. 639 (Bankr. M.D. Tenn. 1994) ......................................20, 29

*In re DeLeo*,
  2022 WL 1072857 (Bankr. D. Me. April 8, 2022) ...............................15

*In re Deming Hosp., LLC*,
  2013 WL 1397458 (Bankr. D. N.M. 2013)................................19, 20, 28

*In re Dow Corning Corp.*,
  244 B.R. 696 (Bankr. E.D. Mich. 1999) ...........................................14

*In re Exide Techs.*,
  303 B.R. 48 (Bankr. D. Del. 2003) ...................................................47

*In re Fin. Oversight & Mgmt. Bd. For P.R.*,
  637 B.R. 223 (D.P.R. 2022).............................................................54

*In re Furlow*,
  70 B.R. 973 (Bankr. E.D. Pa. 1987) .................................................16

*In re GHR Cos.*,
  50 B.R. 925 (Bankr. D. Mass. 1985) .................................................31

*In re Granada Wines, Inc.*,
  26 B.R. 131 (Bankr. D. Mass. 1983) .................................................52

*In re Graphic Commc'ns, Inc.*,
  200 B.R. 143 (Bankr. E.D. Mich. 1996).......................................16, 19

*In re Hermanos Torres Perez Inc.*, No. 09-cv-5585,
  2011 WL 5854929 (Bankr. D.P.R. Nov. 21, 2011) .......................14, 19

*In re Hoff*, No. 21-01002-SWD,
  2023 WL 465704 (Bankr. W.D. Mich. Jan. 26, 2023) .........................33

**Table of Authorities, Cont'd**

**Page(s):**

*In re Hoffinger Indus., Inc.*,
   321 B.R. 498 (Bankr. E.D. Ark. 2005) ......................................................................22

*In re Johns-Manville Corp.*,
   68 B.R. 618 (Bankr. S.D.N.Y. 1986) *aff'd in part, rev'd on other grounds*, 78 B.R.
   407 (S.D.N.Y. 1987) ...................................................................................................13

*In re Key3Media Grp., Inc.*,
   336 B.R. 87 (Bankr. D. Del. 2005) .............................................................................48

*In re Kovich*,
   4 B.R. 403 (Bankr. W.D. Mich. 1980) ........................................................................13

*In re KV Discovery Solutions*,
   496 B.R. 330 (Bankr. S.D.N.Y. 2013) ........................................................................40

*In re Lapeer Aviation, Inc.*, Case No. 21-31500,
   2022 WL 7204871 (Bankr. E.D. Mich. 2022) ......................................................23, 26

*In re Lernout & Hauspie Speech Prods., N.V.*,
   301 B.R. 651 (Bankr. D. Del. 2003) ......................................................................14, 16

*In re Linens Holding Co.*, No. 08-10832,
   2009 WL 2163235 (Bankr. D. Del. June 12, 2009) .....................................................8

*In re Los Angeles Land & Investments, Ltd.*,
   282 F.Supp. 448 (D. Haw. 1968) ...........................................................................52, 53

*In re Marrs-Winn Co., Inc.*,
   103 F.3d 584 (7th Cir. 1996)  ......................................................................................11

*In re McMillen*, Adv. No. 09-6611-JB,
   2010 WL 2025610 (Bankr. N.D. Ga. Feb. 25, 2010)  .................................................50

*In re Miami Metals I, Inc.*,
   603 B.R. 531 (Bankr. S.D.N.Y. 2019) ........................................................................48

*In re Midway Invs., Ltd.*,
   187 B.R. 382 (Bankr. S.D. Fla. 1995) ........................................................................16

*In re Motors Liquidation Co.*,
   447 B.R. 198 (Bankr. S.D.N.Y. 2011) ..........................................................................8

*In re Murray Metallurgical Coal Holdings, LLC*,
   623 B.R. 444 (Bankr. S.D. Ohio 2021) .......................................................................15

**Table of Authorities, Cont'd**

**Page(s):**

*In re N. Mariana Islands Ret. Fund*, No. 12-00003,
    2012 WL 8654317 (D.N. Mar. Is. June 13, 2012) .................................................58

*In re Nutritional Sourcing Corp.*,
    398 B.R. 816 (Bankr. D. Del. 2008) ...................................................48

*In re Ozarowski*, Adv. No. 06-1245(RTL),
    2006 WL 3694547 (Bankr. D.N.J. Dec. 12, 2006) .................................................50

*In re Pariseau*,
    395 B.R. 492 (Bankr. M.D. Fla. 2008) ...................................................50

*In re Parkview Hosp.*,
    211 B.R. 619 (Bankr. N.D. Ohio 1997) ...................................................11

*In re PCH Assocs.*,
    949 F.2d 585 (2d Cir. 1991) ...................................................18

*In re Peabody Energy Corp.*, No. 4:17-CV-01053-AGF,
    2017 WL 1177911 (E.D. Mo. Mar. 30, 2017) .................................................41

*In re Pullum*,
    598 B.R. 489 (Bankr. N.D. Fla. 2019) ...................................................48

*In re Quigley Co.*,
    437 B.R. 102, 129 (Bankr. S.D.N.Y. 2010) ...................................................29

*In re Rede Energia S.A.*,
    515 B.R. 69 (Bankr. S.D.N.Y. 2014) ...................................................15

*In re Roqumore*,
    393 B.R. 474 (Bankr. S.D. Tex. 2008) ...................................................48

*In re Sea Trail Corp.*, No. 11-07370-8-SWH,
    2012 WL 5247175 (Bankr. E.D. N.C. Oct. 23, 2012) .........................................13

*In re Sea Trail Corp.*, No. 11-07370-8-SWH,
    2012 WL 5842912 (Bankr. E.D.N.C. Nov. 15, 2012) .........................................22

*In re Servisense.com*,
    382 F.3d 68 (1st Cir. 2004)...................................................33

*In re Skorich*,
    482 F.3d 21 (1st Cir. 2007)...................................................11

**Table of Authorities, Cont'd**

**Page(s):**

*In re Snyders Drug Stores, Inc.*,
307 B.R. 889 (Bankr. N.D. Ohio 2004)................................................19, 20

*In re Surma*,
504 B.R. 770 (Bankr. D.N.J. 2014) ...................................................9

*In re Taylor*,
190 B.R. 417 (Bankr. D. Col. 1995)....................................................47

*In re Tennis*,
232 B.R. 403 (Bankr. W.D. Mo. 1999).................................................15

*In re Tribune Co.*,
972 F.3d 228 (3d. Cir. 2020) ...................................................... *passim*

*In re Tribune Co.*,
472 B.R. 223 (Bankr. D. Del. 2012), *aff'd sub nom. In re Trib. Media Co.*, 587 B.R.
606 (D. Del. 2018) ................................................................ *passim*

*In re Weiss*,
251 B.R. 453 (Bankr. E.D. Pa. 2000) ..................................................16

*In re Westbank Holdings, LLC*, Case No. 22-10082,
2023 WL 3026739 (Bankr. E.D. La. Apr. 19, 2023)......................................23

*In re Woodmere Invs. Ltd. P'ship*,
178 B.R. 346 (Bankr. S.D.N.Y. 1995)..................................................9

*In re Zaleha*,
162 B.R. 309 (Bankr. D. Idaho 1993)...................................................7

*Jeffrey v. Desmond*,
70 F.3d 183 (1st Cir. 1995)..........................................................31

*Klinger v. Adams* Cnty. *School Dist. No. 50*,
130 P.3d 1027 (Colo. 2006)..........................................................33

*Librotex, Inc. v. Autoridad de Acueductos y Alcantarillados de Puerto Rico*,
138 D.P.R 938 (D. P.R. 1995) ........................................................27

*Matter of Foster Mortg. Corp.*,
68 F.3d 914 (5th Cir. 1995) .........................................................48

*Matter of Southeast Banking Corp.*,
93 N.Y.2d 178 (1999).................................................................40

**Table of Authorities, Cont'd**

**Page(s):**

*McLean, Koehler, Sparks & Hammond v. Schnepfe,*
    309 Md. 399 (1987) ...................................................................................33

*N.H. v. Me.,*
    532 U.S. 742 (2001), *reh'g denied,* 533 U.S. 968 (2001).........................55

*Old Southern Life Ins. v. Alabama Ins. Dept.,*
    503 So.2d 849 (Ala. App. 1986)...............................................................33

*People ex. rel Anderson v. Village of Bradley,*
    367 Ill. 301 (1937) ...................................................................................11

*Protective Comm. for Indep. Stockholders* of *TMT Trailer Ferry, Inc. v. Anderson,* 390
    U.S. 414 (1968)........................................................................................32

*Roman Cath. Bishop of Springfield v. City of Springfield,*
    724 F.3d 78, 89 (1st Cir. 2013)..................................................................5

*Rothschild v. Vill. of Calumet Park,*
    350 Ill. 330 (Ill. 1932) .............................................................................11

*Russello v. United States,*
    464 U.S. 16 (1983)...................................................................................42

*Seila Law LLC v. Consumer Fin. Prot. Bureau,*
    140 S. Ct. 2183 (2020) .............................................................................59

*Siegel v. Fitzgerald,*
    142 S.Ct. 1770 (2022)...............................................................................56

*Smith v. Boise City,*
    18 F. Supp. 385 (D. Idaho 1937) .............................................................10

*Stowe v. Bologna (In re Bologna),*
    206 B.R. 628 (Bankr. D. Mass. 1997) ......................................................10

*Texas v. United States,*
    523 U.S. 296 (1998) ...................................................................................4

*Thomas v. Union Carbide Agric. Prods. Co.,*
    473 U.S. 568 (1985)....................................................................................4

*United States v. Stevens,*
    559 U.S. 460 (2010) .................................................................................59

**Table of Authorities, Cont'd**

**Page(s):**

*UTIER v. Autoridad de Energia Electrica de Puerto Rico,*
  Case No. K-AC2016-0291 (P.R. Court of First Instance, Dec. 19, 2016)..................34, 41, 42

*Venne v. Lenk (In re Lenk),*
  44 B.R. 814 (Bankr. W.D. Wis. 984) *aff'd*, 48 B.R. 867 (W.D. Wis. 1985) ..........................10

*Vickrey v. City of Sioux City,*
  104 F. 164 (Cir. Western Div. 1900) ...................................................................................10

*Weiss v. Weiss*, 91 Civ. 5115 (KMW) (MHD),
  1996 U.S. Dist. LEXIS 2471 (S.D.N.Y. Mar. 1, 1996) ...........................................................6

*Whole Woman's Health v. Hellerstedt,*
  136 S. Ct. 2292, 2319 (2016) ...............................................................................................59

*Wright v. Union Central Life Ins. Co.,*
  304 U.S. 502 (1938)..............................................................................................................56

**Statues and Other Authorities:**

U.S. CONST. art. I, § 8, cl, 4 ..............................................................................................53

PROMESA

  § 1(a) .................................................................................................................................57
  § 3(b) .................................................................................................................................58
  § 101(b) .............................................................................................................................57
  § 101(b)(1) .........................................................................................................................57
  § 301(a) ..............................................................................................................................50
  § 307(b)(1) ..........................................................................................................................55
  § 314(b)(1) ..........................................................................................................................50
  § 402 ..................................................................................................................................57
  § 405(b) ..............................................................................................................................57
  § 405(m) .............................................................................................................................57
  § 405(n) ..............................................................................................................................57
  § 407(a) ..............................................................................................................................57

11 U.S.C.

  § 502(a) ..............................................................................................................................50
  § 502(b) ..............................................................................................................................50

48 U.S.C.A. § 2174(b)(6)......................................................................................................8

19 L.P.R.A. § 2212(a)(52)(C) ..............................................................................................54

**Table of Authorities, Cont'd**

**Page(s):**

19 L.P.R.A. § 2267(a)(2) ..................................................................................54

22 L.P.R.A. § 206 ..........................................................................................38

22 L.P.R.A. § 206(e)(12) ...................................................................................9

22 L.P.R.A. § 208(a)(2) ..................................................................................10

31 L.P.R.A. § 3019 ..........................................................................................7

H.R. 4900 § 101, 114th Cong., 2d Sess. (2015-2016) ...................................57

162 CONG. REC. H3609 (daily ed. June 9, 2016) (statement of Rep. Ryan) ................................57

162 CONG. REC. H3630 (daily ed. June 9, 2016) (statement of Rep. Byrne) ...........................58

RESTATEMENT (THIRD) OF TRUSTS § 5 (2003) ..............................................10

RESTATEMENT (THIRD) OF TRUSTS § 5(k) (2003) ..........................................11

Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 AM.
BANKR. L.J. 227, 228, 249 (1998) ..................................................13, 14

Jacqueline L. Reck, et al., ACCOUNTING FOR GOVERNMENTAL & NONPROFIT
ENTITIES (18th ed. 2019) ...............................................................34

*National Pegs PREPA Settlement Recoveries Above 80% Amid Ongoing Look at
Strategic Alternatives Including Potential Sale*, REORG RESEARCH (Mar. 1, 2023),
https://app.reorg.com/v3#/items/intel/1869?item_id=207515 ...............................17

U.S. Gov't Accountability Off., GAO-18-160, *U.S. Territories Public Debt Outlook*, at
Highlights (Oct. 2017), avail. at https://www.gao.gov/products/gao-18-160 ......................57

MBIA Inc. Earnings Call Transcript (Mar. 1, 2023),
https://capedge.com/transcript/814585/2022Q4/MBI .........................................17

*Current Operating Expenses*, BLACK'S LAW DICTIONARY (11th ed.) ...............................35

*Operating Costs*, MACMILLAN DICTIONARY (2009-2023) .........................................36

Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (together, "Assured" or "Objectors") hereby submit this (I) objection (the "Objection") to the *Modified Second Amended Title III Plan Of Adjustment Of The Puerto Rico Electric Power Authority* (ECF No. 3296, including as amended, the "Plan")[2] and related proposed order (ECF No. 3587, the "Proposed Order") and (II) partial joinder in the *Objections of the Ad Hoc Group of PREPA Bondholders to the Modified Second Amended Title III Plan of Adjustment of the Puerto Rico Electric Power Authority* (the "Ad Hoc Group Objection") and respectfully state as follows:

**PRELIMINARY STATEMENT**

1.      As set forth in the Ad Hoc Group Objection, the Plan is fatally flawed and should not be confirmed, and Assured joins that objection to the extent set forth below.  While the Plan's defects raised in the Ad Hoc Group Objection are extensive and fatal, that objection is not exhaustive.  Assured therefore files this separate, supplemental objection to identify additional defects both in the Plan and in PROMESA itself that constitute additional reasons the Court should deny confirmation.

2.      At the threshold, this matter is not ripe.  Specifically, as the Oversight Board concedes, the Plan will not be confirmable if Assured and other bondholders succeed in their ultimate appeal of the Court's summary judgment order in the Amended Lien & Recourse Challenge (Adv. Proc. No.  19-391-LTS, ECF No. 147, the "Summary Judgment Order").  Furthermore, to the extent the Court views it as necessary to quantify Objectors' claims and other rights to PREPA's revenues as a precondition to determining the Plan's confirmability, such a quantification of Objectors' claims and other rights remains contingent on the outcome of

---

[2] Capitalized terms used in this Objection but not defined herein shall have the meanings ascribed to them in the Plan.  Unless otherwise indicated, references to ECF numbers in this Objection are to the docket in case number 17-BK-4780-LTS.

Objectors' unresolved counterclaims still pending in the Amended Lien & Recourse Challenge. Given these outstanding contingencies directly impacting the confirmability of the Plan, confirmation should be denied while the appeal of the Summary Judgment Order and the resolution of the counterclaims move forward. At a minimum, the Plan must be amended to account for these contingencies, including through the establishment of appropriate reserves.

3.      Second, and relatedly, the Plan in its current form is not feasible, as required by Section 314(b)(6) of PROMESA, because it relies on PREPA's unauthorized use of PREPA revenues that are held in trust for the benefit of bondholders. Furthermore, Objectors' rights as trust beneficiaries are not "claims" that could be discharged under the Plan, but rather constitute non-dischargeable property interests. As a result, PREPA's revenues may be used only in accordance with the governing Trust Agreement, and confirmation of the Plan must be denied to the extent it purports to provide for any other use.

4.      Third, the plan discriminates unfairly against Assured in violation of 11 U.S.C. § 1129(b) and is not fair and equitable, including because it provides vastly more favorable treatment to another, similarly situated monoline insurer, namely National.

5.      Fourth, the Plan discriminates unfairly against Assured and in favor of the lenders (the "FLLs") under the Fuel Line Facilities, and the settlement with those lenders should not be approved. The FLLs are, by their own admission, general unsecured creditors. They have no security for their claims, nor do they have any other basis for priority over PREPA's other creditors. Indeed, the FLLs have conceded that any subordination agreement (which does not exist) would not even be relevant to determining whether the Plan discriminates unfairly. Despite this, the FLLs' unsecured claims are being elevated to secured claims, and they are exclusively receiving a series of bonds that amortize more quickly than all other restructuring

bonds.  There is absolutely no basis to treat the FLLs more favorably than Assured, bondholders, or general unsecured creditors.

6.      Fifth, the FLL recoveries—which could total over 100% of the prepetition claim—are far beyond the range of reasonableness, and therefore should not be approved. Despite claiming that prepetition contracts are unenforceable and that payment of PREPA's debts would lead to a "death spiral," the Plan effectively gives the FLLs a par recovery for what is admittedly unsecured debt.  There is no basis for that recovery.  The FLL settlement is not tied to any litigation outcomes.  The FLLs' claims in the "Current Expense" litigation are meritless, the FLL claims are unsecured (even if they prevail in their litigation), the Current Expense litigation is not complex, and giving the FLLs an enormous windfall is not in the best interests of PREPA or its creditors.  If the FLLs lose in their litigation, then their claims would be reduced by hundreds of millions of dollars.  The FLL settlement should therefore not be approved.

7.      Sixth, Section XXV.A of the Plan purports to authorize the Oversight Board to expunge all proofs of claim asserting "PREPA Revenue Bond Claims" without any requirement that the Board file a claim objection, and without notice or a hearing.   This summary "expungement" process is at odds with creditors' fundamental right to file a proof of claim, and is in direct contravention of the express objection, notice, and hearing requirements set forth in Section 502 of the Bankruptcy Code.  As a result, the Plan fails to "compl[y] with the provisions of title 11 of the United States Code, made applicable to a case under this title by section 301 of this Act," rendering the Plan unconfirmable under Section 314(b)(1) of PROMESA.

8.      Seventh, the Plan's classification scheme violates the "strict" classification rule of *Granada Wines, Inc. v. New England Teamsters & Trucking Indus. Pension Fund*, 748 F.2d 42, 46 (1st Cir. 1984).  The original briefing in that case sheds new light on the issues it addressed, and confirms that it is the controlling interpretation of 11 U.S.C. § 1122 in the First Circuit.

9.      Finally, but most fundamentally, confirmation should be denied because PROMESA itself is an unconstitutional non-uniform bankruptcy law that fails to comply with the uniformity requirement of Article I, Section 8, clause 4 of the U.S. Constitution.

10.     For all of these reasons and the additional reasons set forth below and those joined by Assured in the Ad Hoc Group Objection, the Plan should not be confirmed.

## ARGUMENT

### I.     The Confirmation Proceeding Is Not Ripe.

11.     As an initial matter, the current confirmation proceeding is not ripe, and the Court lacks jurisdiction over the proceeding, because the Plan's confirmability is contingent on the outcome of uncertain future events that will not be resolved in advance of the confirmation hearing.  Issues are not ripe for adjudication where they "[rest] upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 581 (1985)).  Here, the confirmability of the Plan is contingent upon, among other things, (i) the outcome of the ultimate appeal of the Summary Judgment Order, and (ii) the outcome of Objectors' counterclaims currently pending in the Amended Lien & Recourse Challenge.

### A.     The Plan's Confirmability Is Contingent On The Appeal Of The Summary Judgment Order.

12.     In its Summary Judgment Order, the Court held that Objectors' perfected liens are limited to moneys in certain funds.  However, the Oversight Board itself has acknowledged that if that ruling were reversed and Objectors were instead found to have a continuing perfected lien on all of PREPA's revenues, then the Plan may be unable to meet the Bankruptcy Code's

cramdown standards and would therefore be unconfirmable.[3]   Indeed, in the Court's order

denying Objectors' motion for certification of an interlocutory appeal (Adv. Proc. No. 19-391-

LTS, ECF No. 182, the "Certification Order"), the Court expressly acknowledged that—as

conceded by the Oversight Board—at least some scenarios "following reversal on appeal might

render the plan unconfirmable." *See* Certification Order at 6.  The undisputed fact that the Plan's

confirmability is contingent on the outcome of the appeal means that the confirmation

proceeding is not currently ripe.  Thus, there exists no concrete case or controversy, as required

by the United States Constitution, and the Court accordingly lacks jurisdiction over the

confirmation proceeding pending the outcome of the ultimate appeal.  *Roman Cath. Bishop of*

*Springfield v. City of Springfield*, 724 F.3d 78, 89 (1st Cir. 2013) ("[ripeness] concerns whether

there is a sufficiently live case or controversy, at the time of the proceedings, to

create jurisdiction in the federal courts.").

**B.     The Plan's Confirmability Is Contingent On The Outcome Of The
Counterclaims.**

13.     In addition, Objectors' counterclaims in the Amended Lien & Recourse Challenge

are still actively being litigated.  The confirmability of the Plan is contingent on the outcome of

certain of these counterclaims, including any related appeals.  Specifically, in the Certification

Order, the Court stated that "estimation of the Unsecured Net Revenue Claim is crucial to the

Court's consideration of the PREPA Plan," presumably because the Court needs to know the

---

[3] *See, e.g.*, ECF No. 3297 (the "Disclosure Statement") at 45 ("To the extent the Series B Bonds are insufficient to
pay the Bond Trustee the value of its collateral, the Bond Trustee may argue at confirmation that PREPA is
obligated to issue additional Series B Bonds or otherwise provide for additional payment to the Bond Trustee not
currently contemplated by the Plan. In such circumstance, the Plan may not be confirmable or feasible without
material amendments.") *id.* at 352 (if "the Bond Trustee has a security interest in some or all of PREPA's revenues,
such revenues may not be available to [*sic*] distribution to PREPA's non-bondholder creditors. Under this scenario,
Non-Settling Bondholders may be entitled to a greater recovery than that provided under the Plan, and the Plan may
not be confirmable or feasible without material amendments.") Adv. Proc. No.  19-391-LTS ECF No. 172 ¶ 28
(asserting that "Plan is confirmable in a variety of litigation outcomes" on appeal, but acknowledging that some
outcomes on appeal may "necessitate a Plan overhaul or a new, from-scratch confirmation hearing.").

amount of Objectors' unsecured claim in order to determine whether the Plan is confirmable. *See* Certification Order at 6.  However, as the Court has also previously acknowledged, "many of [Objectors'] counterclaims '**assert alternative bases for an allowable claim**,'" some of which are "unrelated to . . . the Court's resolution of the lien scope and recourse issues" addressed in the Summary Judgment Order and the related estimation proceeding.  *See* Adv. Proc. No.  19-391-LTS, ECF No. 88 at 5 (emphasis added).  And  at least one counterclaim (Count IV) also asserts a property right that, although not a bankruptcy "claim," constitutes an additional, non-dischargeable right to PREPA's revenues.  In particular, the counterclaims that would need to be resolved on a final basis in order for the confirmation proceeding to be ripe include:

- **Counterclaim IV:  Breach of Trust**:  Objectors' Count IV seeks a declaration that PREPA acts as a trustee for bondholders, that PREPA is in breach of trust, and that Objectors are entitled to the equitable remedy of an "accounting."  As set forth in Section II below, Objectors' rights as trust beneficiaries are not merely bankruptcy "claims," and instead are non-dischargeable property interests.  Moreover, Objectors' accounting remedy is not subject to the "payment restrictions" or other limitations on liability posited in the Summary Judgment Order with respect to certain other remedies (*see*, *e.g.*, Summary Judgment Order at p. 60), including because limitations on recourse contained in bond documents do not apply to the accounting remedy,[4] and because trust provisions purporting to exculpate a trustee from liability do not protect a trustee, like PREPA, who commits an intentional or reckless breach of trust or who profits from a breach of trust.[5]  As such, Objectors' rights as trust beneficiaries, as enforced through Count IV, are distinct from, and in addition to, the Unsecured Net Revenue Claim.

- **Counterclaim V: *Dolo***:  Objectors' Count V seeks a declaration that PREPA is liable for *dolo*, a fundamental doctrine under Puerto Rico law

---

[4] *See, e.g.*, *City of Jacksonville v. Bankers Life Co.*, 90 F.2d 141 (7th Cir. 1937) ("If a municipality makes a wrongful diversion or misappropriation of the trust funds, the beneficiaries, that is, bondholders, . . . have the right to sue for their pro rata share thus diverted, . . . the theory being that by the conversion, **the city, not previously personally liable** . . . , because of its wrongful act, **becomes directly liable for the resulting loss to the bondholders.**") (emphasis added).

[5] *See, e.g.*, *Weiss v. Weiss*, 91 Civ. 5115 (KMW) (MHD), 1996 U.S. Dist. LEXIS 2471, at *73 (S.D.N.Y. Mar. 1, 1996) (holding that "the exculpation clause of the trust [did] not apply" where the trustee had profited from his breach of trust).

whereby a party that commits a deliberate breach of contract is liable for *all* damages originating from the breach of contract, not only those damages that were foreseeable. *See, e.g., Gazelle v. MR 314 Fortaleza LLC*, Civ. No. 16-2500, 2018 WL 1322155, at *6 (D.P.R. Mar. 12, 2018). Any "payment restrictions" or other limitations on liability posited in the Summary Judgment Order with respect to other remedies do not apply to PREPA's liability for *dolo*, because contractual limitations on liability for *dolo* are void under Puerto Rico law. *See* 31 L.P.R.A. § 3019 (providing that "[l]iability arising from [*dolo*] is demandable in all obligations" and that the "renunciation of the action to enforce it is void.").

- **Counterclaim VII: Takings Clause:** Objectors' Count VII seeks a declaration that Objectors have a claim for just compensation based on PREPA's taking of their property. To the extent Objectors' Takings claim is recognized, it will be non-dischargeable. *See Fin. Oversight and Mgmt. Bd. for P.R. v. Cooperativa de Ahorro y Credito Abraham Rosa,* 41 F. 4th 29, (1st Cir. 2022). And this non-dischargeable Takings claim could be at least in the full amount of the bonds.

14.    Therefore, if it is "crucial" for the Court to know the full amount of Objectors' claims and other rights to PREPA's property as a precondition to deciding confirmation, this crucial information remains unknowable until the counterclaims are resolved on a final basis.

C.    **At A Minimum, The Plan Would Need To Be Amended To Provide For Its Fatal Contingencies.**

15.    In view of the above contingencies that render the confirmation proceeding unripe, the only way that a plan could be confirmed at this time would be if it expressly provided for all relevant contingencies. Bankruptcy Courts have recognized that a plan needs to provide for its contingencies, particularly where the triggering of a contingency would violate the requirements of a confirmed plan. *In re Zaleha*, 162 B.R. 309, 317 (Bankr. D. Idaho 1993) (recognizing that a plan providing for contingent treatment of creditors may be approved "*. . . so long as all contingencies are provided for and no single contingency, if triggered, violates the requirements of a confirmed plan*.") (emphasis added). At a minimum, providing for contingencies would need to include, among other things, (i) providing for distribution of additional consideration to Objectors if they ultimately prevail on their argument that they hold a

continuing lien on all of PREPA's revenues, and/or for recognition or reinstatement of Objectors' existing, continuing lien; (ii) providing for additional distributions to Objectors in the event they prevail on their counterclaims; and (iii) providing that all PREPA revenues may only be used in accordance with the provisions of the Trust Agreement in the event Objectors prevail on their argument that all PREPA revenues are subject to a non-dischargeable trust.  Providing for contingencies would also include the setting aside of reserves to account for the additional distributions to which Objectors will be entitled if they prevail on the appeal of the Summary Judgment Order and/or on their counterclaims.[6]  Indeed, in the Certification Order, the Court already expressly acknowledged the need for a reserve to account for a possible reversal of the Court's Summary Judgment Order.  *See* Certification Order at 5 n.7 ("The Court has not yet considered what would constitute an 'appropriate reserve' under such circumstances.").

16.     Accordingly, confirmation should be denied on ripeness grounds unless the Plan is amended to adequately provide for all relevant contingencies and an appropriate reserve.

## II.     The Plan Fails to Satisfy Section 314(b)(6) Of PROMESA, Because It Is Not Feasible.

17.     PROMESA section 314(b)(6) requires the court to find that a plan is feasible as a precondition to confirmation.  48 U.S.C.A. § 2174(b)(6).  A plan fails to meet the feasibility requirement where the plan relies on assets that are not property of the debtor or of the estate, including funds held in trust for the benefit of non-debtor parties.  *See e.g.*, *In re Cent. Med. Ctr., Inc.*, 122 B.R. 568, 569 (Bankr. E.D. Mo. 1990) (plan was not feasible where it relied on bondholders' trust funds to pay administrative expenses and for working capital); *In re*

---

[6] *See, e.g.*, *In re Motors Liquidation Co.*, 447 B.R. 198, 215 (Bankr. S.D.N.Y. 2011) ("[I]f claims are disputed and not yet allowed (but have the potential to be allowed), reasonable measures must be taken to ensure that the required same treatment is received if and when they're allowed."); *In re Linens Holding Co.*, No. 08-10832, 2009 WL 2163235, at *9 (Bankr. D. Del. June 12, 2009) (confirming plan requiring establishment of disputed claims reserve that contained sufficient assets to pay the full asserted amount of each disputed claim, should such claim eventually become allowed).

*Woodmere Invs. Ltd. P'ship,* 178 B.R. 346 (Bankr. S.D.N.Y. 1995) (plan that proposed to use postdefault rents collected by mortgagee to fund plan was not feasible where rents were not property of debtor's estate and there was no alternative funding for plan); *In re Surma*, 504 B.R. 770, 776 (Bankr. D.N.J. 2014) (finding a plan patently unconfirmable where such plan is premised on use and allocation of previously assigned rents); *see also In re Cajun Elec. Power Coop., Inc.*, 230 B.R. 715, 736 (Bankr. M.D. La. 1999) (finding plan did not satisfy feasibility requirement where plan proposed to transfer assets which were not property of the estate).

18.    Here, all of PREPA's revenues are held in trust for the benefit of bondholders. Specifically, PREPA acts as a trustee for bondholders for at least three distinct reasons.

19.    *First*, Section 601 of the Trust Agreement expressly provides that "**all moneys received by the Authority under the provisions of this Agreement** . . . **shall be held in trust**, [and] shall be applied only in accordance with the provisions of this [Trust] Agreement…" Trust Agreement § 601, Adv. Proc. No. 19-391-LTS, ECF No. 118-1 (the "Trust Agreement"). PREPA's obligation under Section 601 to hold all of its moneys in trust and its duty to apply all such moneys only in accordance with the Trust Agreement are consistent with the Authority Act itself, which gives PREPA the power, among other things, to issue resolutions establishing "the powers and duties of each trustee or trustees" related to an issuance of bonds. 22 L.P.R.A. § 206(e)(12); *see also* Trust Agreement (acknowledging that "the execution and delivery of this Agreement have been duly authorized by resolution of the Authority."). Indeed, the Authority Act is a "special law" that governs the "specific matter" of PREPA's ability to create trusts in connection with its bond issuances, and therefore governs the creation of the trust relationship established under Section 601. *See, e.g., Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. for P.R.*, 939 F.3d 340, 352 (1st Cir. 2019) (recognizing validity under Puerto Rico law of a trust created pursuant to a "special law" on a "specific matter").

20.    *Second*, the Authority Act authorizes bondholders to require PREPA and its board "to account as if they were the trustee of an express trust," thereby creating the equivalent of an express trust.  22 L.P.R.A. § 208(a)(2).  As recognized in the *Restatement of Trusts*, "[a] property arrangement is a trust as long as it **has the characteristics**, and **gives rise to <u>the rights and duties</u>**, the law recognizes as a trust."  RESTATEMENT (THIRD) OF TRUSTS § 5 (2003) (emphasis added).  Here, 22 L.P.R.A. § 208(a)(2) gives bondholders the rights of trust beneficiaries and PREPA the duties of "the trustee of an express trust."   The resulting "property arrangement" therefore has the "characteristics" of an express trust, and as such *is* an express trust.  This is in accordance with the well-established principle that a statute creates a trust if it manifests "an express legislative design to create a trust or **trust-type** relationship."  *Stowe v. Bologna (In re Bologna)*, 206 B.R. 628, 632 (Bankr. D. Mass. 1997) (emphasis added).[7]

21.    *Third*, independently of, but consistent with, both Section 601 of the Trust Agreement and Section 208(a)(2) of the Authority Act, a well-settled body of case law holds that where a municipal entity has a legal obligation to collect revenues and apply them to the payment of revenue bonds, that municipality acts as a trustee for the bondholders.[8]  Based on this

---

[7] *See also, e.g.*, *Venne v. Lenk (In re Lenk)*, 44 B.R. 814, 816 (Bankr. W.D. Wis. 1984) ("Courts will find a trust exists 'when a state statute defines the relationship as a trust, **when the relationship has the typical attributes of a trust** or when the contract expressly creates a trust.'") (emphasis added, citation omitted), *aff'd*, 48 B.R. 867 (W.D. Wis. 1985); *Gracia-Gracia*, 939 F.3d at 352  (recognizing a trust relationship created by Puerto Rico statute).

[8] *See, e.g., Fed. Deposit Ins. Corp. v. Casady*, 106 F.2d 784, 788 (10th Cir. 1939) (where town treasurer was required to deposit assessments in a separate special fund, "[t]he relation . . . thus created is that of an express trust created by law in which the city is the trustee and the bondholder the cestui que trustent."); *Ecker v. Sw. Tampa Storm Sewer Drainage Dist.*, 75 F.2d 870, 872-73 (5th Cir. 1935) (pledged assessments were trust funds that could not otherwise be applied by the municipality); *City of Jacksonville v. Bankers Life Co.*, 90 F.2d 141, 143 (7th Cir. 1937) ("The moneys pledged to secure [the bonds], the creation of which comes about by the collection of the assessments, constitute a trust fund pledged to the payment of all bonds, and the city in collecting and disbursing the same is a trustee charged with all the duties of such a fiduciary. . ."); *Vickrey v. City of Sioux City*, 104 F. 164, 166 (Cir. Western Div. 1900) ("[U]nder the provisions of the act . . . authorizing the issuance of the bonds, the city assumed the duty of creating and properly applying the sinking fund provided for in the act, and to that end was charged with the duty of levying the special assessments called for by the act, collecting the same, and making proper payment thereof to the bondholders. In these particulars the city is charged with a duty amounting to a trust."); *Smith v. Boise City*, 18 F. Supp. 385, 386 (D. Idaho 1937); *In re City of Columbia Falls*, 143 B.R. 750, 762 (Bankr. D. Mont. 1992); *Bexar Cnty. Hosp. Dist. v. Crosby*, 160 Tex. 116, 122 (1959); *Hays v. Isaacs*, 120 S.W.2d

---

-10-

long-established principle of municipal finance law, PREPA acts as a trustee with respect to its

bondholders.

22.     Importantly, Objectors' rights as trust beneficiaries are not mere bankruptcy

"claims"—they are non-dischargeable property interests.  *See*, *e.g.*, *Gracia-Gracia*, 939 F.3d at

347 (recognizing a distinction between "creditors who are owed damages" and trust beneficiaries

entitled to "the rightful return of their own assets" held in trust); *In re Skorich*, 482 F.3d 21, 25

(1st Cir. 2007) (equitable interests, including equitable interests in money, are not "claims," and

holders of such interests are not "creditors.").     A trust relationship is distinct from a

debtor/creditor relationship (*see*, *e.g.*, Restatement (Third) of Trusts § 5(k) (2003)), and trust

assets must be distributed to the trust beneficiaries and cannot be used to satisfy creditors'

"claims."  *See In re Marrs-Winn Co., Inc.*, 103 F.3d 584, 589 (7th Cir. 1996) ("trust proceeds can

only be distributed to trust beneficiaries, and not to the creditors of the bankruptcy estate."); *see*

*also In re Baskett*, 219 B.R. 754, 762 (B.A.P. 6th Cir. 1998) ("[W]hen prior to bankruptcy a

debtor served as trustee of an express trust, the debtor generally has no rights to the assets kept in

trust, and a trustee in bankruptcy must ***fork them over to the beneficiary***") (citing *In re Parkview*

*Hosp.*, 211 B.R. 619, 633 (Bankr. N.D. Ohio 1997)) (emphasis added).

23.     Here, Objectors' non-dischargeable trust interests render the Plan unfeasible.

Specifically, similar to the plan funding issues raised in *Central Medical* (cited above), the Plan

appears to rely on moneys held in trust for the benefit of bondholders to implement the proposed

Plan.  See, *e.g.* Disclosure Statement at Sections VI.D and E; Plan at Article XIX.K (Funding of

the GUC Trust); XX.K (Funding, Costs, and Expenses of the Avoidance Actions Trust); XXIII.B

---

737, 738 (Ky. Ct. App. 1938); *Rothschild v. Vill. of Calumet Park*, 350 Ill. 330, 339-40 (Ill. 1932) (money collected
by a municipality "constituted a trust fund and the village became a trustee of the money so collected for the use of
the holders of bonds. . . ."); *People ex. rel Anderson v. Vill. of Bradley*, 367 Ill. 301 (1937) (money collected by
village from special assessment constituted a trust fund and the village could not lawfully appropriate any part of
those funds to other uses).

(Funding of the PREPA PayGo Trust).  The Plan neither acknowledges nor provides for the possibility that these moneys are held in trust, or requires them to be used in accordance with the Trust Agreement.  The Oversight Board has therefore failed to satisfy the feasibility requirement of Section 314(b)(6), because the Plan is premised on PREPA's unauthorized use of moneys that are subject to a non-dischargeable trust arrangement.

**III.**     **The Plan's Treatment Of Assured's Claims Is Unfairly Discriminatory.**

24.     The Plan discriminates against Assured without a sufficient legal justification, including by providing Assured with a recovery that is far less than the recovery provided to a similarly situated monoline insurer, National, and by providing National with other benefits not provided to Assured.  Indeed, the Plan provides National with a recovery percentage estimated at no less than 83.34% (*plus* National's "pro rata share of revenues generated [from] the Interim Charge", *see* Disclosure Statement Order, Schedule 7(b)), ECF No. 3304, while providing a grossly disproportionate recovery percentage of 0.21 – 51.53% to Assured.  *See* Disclosure Statement § II.B.  Because Assured is part of a dissenting class, the Plan can be confirmed only if it satisfies the heightened "cramdown" requirements in Section 1129(b) (incorporated by PROMESA §§ 301, 314(b)), which require that the plan "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."

**A.**     **Legal Standard(s)**

25.     In order to confirm a plan of reorganization over the objection of a dissenting class, the plan proponent must demonstrate that the "plan does not discriminate unfairly . . . with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." § 1129(b)(1).  "Generally speaking, this standard ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated creditors. Thus, a plan

proponent may not segregate two similar claims or groups of claims into separate classes and provide disparate treatment for those classes." *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986) (citations omitted) *aff'd in part, rev'd on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987).

26.     Courts have developed two primary methods to determine whether a plan unfairly discriminates against a dissenting class.  Traditionally, courts have applied a broad four-factor test (the "Broad Test") to determine whether discrimination is unfair.  The test, which originated in *In re Kovich*, 4 B.R. 403, 407 (Bankr. W.D. Mich. 1980), "considers whether: (1) a reasonable basis for discrimination exists; (2) the debtor cannot consummate its plan without discrimination; (3) the discrimination is imposed in good faith; and (4) the degree of discrimination is directly proportional to its rationale." *In re Tribune Co.* 972 F.3d 228, 240-41 (3d. Cir. 2020) (citing *In re Aztec Co.*, 107 B.R. 585 (Bankr. M.D. Tenn. 1989)).  "When applying this test, a court must weigh the four factors by looking at all of the facts and circumstances of each individual case. . . .  [This] requires a 'totality of circumstances' type of analysis." *In re Sea Trail Corp.*, No. 11-07370-8-SWH, 2012 WL 5247175 at *8 (Bankr. E.D. N.C. Oct. 23, 2012) (quoting *In re Bryson Properties, XVIII*, 961 F.2d 496, 502 n. 9 (4th Cir. 1992)).  Ultimately, the burden rests with the plan proponent "to satisfy each of the four [] criteria." *In re Anderson*, 173 B.R. 226, 229 (Bankr. D. Col. 1993).

27.     Recently, however, some courts have abrogated the Broad Test in favor of a rebuttable presumption test proposed by Professor Bruce A. Markell (the "Markell Test") in an article published in the American Bankruptcy Law Journal.  *See Tribune Co.* 972 F.3d at 241 (citing Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 AM. BANKR. L.J. 227, 228, 249 (1998)).  Under the Markell Test, a presumption of unfair discrimination exists when there is:

> (1) a dissenting class; (2) another class of the same priority; and (3)
> a difference in the plan's treatment of the two classes that results in
> either (a) a materially lower percentage recovery for the dissenting
> class (measured in terms of the net present value of all payments),
> or (b) regardless of percentage recovery, an allocation under the
> plan of materially greater risk to the dissenting class in connection
> with its proposed distribution.

*Tribune Co.*, 972 F.3d at 241 (citing *In re Dow Corning Corp.*, 244 B.R. 696, 702 (Bankr. E.D.

Mich. 1999); Markell, *A New Perspective, supra*, at 242).

28.     Under the Markell Test, to overcome the presumption of unfairness based on a

materially lower percentage of recovery, the plan proponent must demonstrate that "outside of

bankruptcy, the dissenting class would similarly receive less than the class receiving a greater

recovery, or that the alleged preferred class had infused new value into the reorganization which

offset its gain." *In re BWP Transp., Inc.*, 462 B.R. 225, 231 (Bankr. E.D. Mich. 2011) (citing

*Dow Corning Corp.*, 244 B.R. at 702).   Likewise, to overcome the presumption of unfairness

based on a materially greater risk for a dissenting class, the plan proponent must demonstrate that

"such allocation was consistent with the risk assumed by parties before the bankruptcy."  *Id* at

232.  The plan proponent also bears the burden of establishing that its plan "comports with §

1129's requirements by a preponderance of the evidence."  *In re Armstrong World Indus., Inc.*,

348 B.R. 111, 122 (D. Del. 2006).

29.     Ultimately, "[t]he hallmarks of the various tests have been whether there is a

reasonable basis for the discrimination, and whether the debtor can confirm and consummate a

plan without the proposed discrimination." *In re Lernout & Hauspie Speech Prods., N.V.*, 301

B.R. 651, 660 (Bankr. D. Del. 2003).   In other words, a plan unfairly discriminates when

"creditors . . . with similar legal rights . . . receiv[e] materially different treatment under a

proposed plan without compelling justifications for doing so." *In re Hermanos Torres Perez*

*Inc.*, No. 09-cv-5585, 2011 WL 5854929, at *9 (Bankr. D.P.R. Nov. 21, 2011) (internal

quotation marks omitted).   Regardless of which test the Court ultimately applies,[9] the discrimination against Assured's claims cannot pass muster.

**B.    There Is No Reasonable Basis For The Discrimination Against Assured (Broad Test).**

30.    In confirmation proceedings, it is incumbent upon the plan proponent to demonstrate a reasonable basis for any discrimination against a dissenting class of creditors. While there may be limited circumstances where discrimination is reasonable, *see In re Rede Energia S.A.,* 515 B.R. 69, 105 (Bankr. S.D.N.Y. 2014) (discrimination in favor of Brazilian creditors was necessary to comply with Brazilian law); *In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990) (permitting discrimination between creditors secured by different collateral), many courts have consistently rejected attempts to discriminate between classes of unsecured creditors.[10]   *See In re Tennis*, 232 B.R. 403, 405 (Bankr. W.D. Mo. 1999) ("Many bankruptcy courts have refused to sanction discrimination where one class of unsecured creditors receives significantly more than another class of unsecured creditors holding substantially similar claims, even when practical reasons for the discrimination exist."); *In re Murray Metallurgical Coal Holdings, LLC*, 623 B.R. 444, 520 (Bankr. S.D. Ohio 2021) (observing the lower threshold for discrimination between classes of secured creditors because "[u]nlike unsecured claims, every secured claim is different.").

31.    Indeed, firmly established legal precedent provides that even the following arguments do not form a reasonable basis for discrimination against dissenting creditors:

---

[9] Courts in the First Circuit have not yet adopted a uniform test. *See In re DeLeo*, 2022 WL 1072857 at *6 (Bankr. D. Me. April 8, 2022). A small number of courts have also utilized a "mechanical" test and a "restrictive" test, however "[n]either of these tests appear to be widely adopted." *Tribune Co.*, 972 F.3d at 240.   In the interest of judicial economy, the Objectors do not advance arguments under these seldom used tests at this time, but reserve the right to do so in the future.

[10] For the avoidance of doubt, Assured's position is that it is fully secured, and Assured intends to appeal any conclusions in the Summary Judgment Order to the contrary.   However, given that the Summary Judgment Order currently remains in effect, Assured here discusses unfair discrimination as it relates to unsecured creditors.

(i) maintaining strong relations with trade creditors, *see In re ARN LTD. Ltd. P'ship,* 140 B.R. 5, 12 (Bankr. D.C. 1992); *In re Lernout & Hauspie Speech Prods., N.V.,* 301 B.R. 651, 661 (Bankr. D. Del. 2003); *In re Graphic Commc'ns, Inc.*, 200 B.R. 143 (Bankr. E.D. Mich. 1996); *In re Furlow*, 70 B.R. 973 (Bankr. E.D. Pa. 1987); (ii) pending litigation against the dissenting creditor, *see In re Weiss*, 251 B.R. 453, 465 (Bankr. E.D. Pa. 2000); and (iii) disputes regarding the amount of the dissenting creditor's claim, *see ARN LTD. Ltd. P'ship*, 140 B.R. at 13); *In re Midway Invs., Ltd.*, 187 B.R. 382, 392 (Bankr. S.D. Fla. 1995).   And here, none of these purported justifications for discrimination differentiate National from Assured in any event, because (i) PREPA has no ongoing "trade" relationship with National, which is a legacy bond insurer that generally no longer writes new insurance policies, and that is not proposing to do so with respect to any future PREPA bonds; (ii) the same litigation is pending against National as against Assured (*see* Adv. Proc. No.  19-391-LTS); and (iii) PREPA has the same disputes regarding the amount of National's claim that it has with Assured (*see id.*).

32.     Even in instances where separate *classification* may be acceptable, the plan proponent must still provide a sufficient rationale for any discrimination between the classes. *See In re Barney &* Carey *Co.*, 170 B.R. 17, 25 (Bankr. D. Mass. 1994) ("even if totally separate classification . . . were permissible, the unfair discrimination language of section 1129(b)(1) prohibits a debtor from proposing unreasonably different treatment between classes of similar claims."); *In re 222 Liberty Assoc.*, 108 B.R. 971, 990-93 (Bankr. E.D. Pa. 1990).

33.     Here, pursuant to the National PSA, the Plan created Classes 5 and 6, which provide a unique and favorable treatment for the "National Insured Bonds."  Specifically, the Plan provides National with a quantitatively greater recovery, including: (i) a fixed 71.65% recovery on its National Insured Bond Claims in the amount of $836,145,928.13, *see* Plan § VIII.A; (ii) a 3.0% recovery and 2.86% recovery on its National Insured Bond Claims for

"Consummation Costs" and "Structuring Fees," respectively, *see* Plan § II.D.2; (iii) 20% of the Allowed National Reimbursement Claim, estimated at $244,730,000 as of July 1, 2023 ($48,946,000.00 or 5.853% of the National Insured Bond Claims),[11] *see* Plan § IX.A; and (iv) a *pro rata* share of revenues generated from the Interim Charge, *see* Disclosure Statement, Schedule 7(b). As such, National is projected to recover no less than 83.34% of its National Insured Bond Claims.[12]

34.      The Board's attempt to justify National's higher fixed recovery, the "Consummation Costs," and the "Structuring Fees" by pointing to National's settlement of its asserted security interest in PREPA's revenues and its claimed right to appoint a receiver is unfounded. The fact that National may have settled its claims against PREPA—claims similar in nature to Assured's—provides no legal basis for discriminatory treatment. *See Cash in a Flash v. Brown*, 229 B.R. 739, 748 (W.D. Tenn. 1999) ("The fact that Debtors and Cash in a Flash have reached settlement agreements sheds little light on the question of whether Debtors have unfairly discriminated against their other unsecured creditors."). In fact, the Board has itself taken the position that "there is no basis for . . . holders or insurers of PBA-issued bonds . . . to

---

[11] The Plan recognizes the National Reimbursement Claim as a distinct claim from the National Insured Bond Claims, which may be appropriate to the extent the applicable insurance agreements do in fact include relevant reimbursement provisions. However, because the Plan does not separately recognize Assured's similar reimbursement claim, Assured here presents National's total recovery as a percentage of just the National Insured Bond Claims in order to facilitate an apples-to-apples comparison to Assured's recovery under the Plan.

[12] *See also National Pegs PREPA Settlement Recoveries Above 80% Amid Ongoing Look at Strategic Alternatives Including Potential Sale*, REORG RESEARCH (Mar. 1, 2023), available at: https://app.reorg.com/v3#/items/intel/1869?item_id=207515 (last visited May 31, 2023) (Natbony Decl., Ex 7), ("National Public Finance Guarantee, or National, a subsidiary of MBIA, is positioned for recoveries totaling more than 80% under the proposed Puerto Rico Electric Power Authority plan of adjustment as the monoline insurer continues to explore potential strategic opportunities for the company that could include a sale, MBIA/National management said during a fourth-quarter earnings call this morning.") MBIA Inc. Earnings Call Transcript (Mar. 1, 2023), available at: https://capedge.com/transcript/814585/2022Q4/MBI (last visited May 31, 2023) (Natbony Decl., Ex 8), ("Tommy McJoynt: . . . Looking at the loss reserve as of 12/31 on the balance sheet, what recoveries does that bake in for PREPA? Does that reflect the plan of adjustment that was filed in mid-February? And if I'm looking at that plan, that recovery amounts to about $0.80 on the dollar to summarize it. Is that right? Anthony McKiernan: . . . I think the recovery if you put it all together is a bit higher than what you've described, but it's in the ballpark.").

receive preferential treatment in bankruptcy at the expense of other pre-petition unsecured creditors." *See Plaintiffs' Opposition To Rule 12(c) Motion For Judgment On The Pleadings Of PBA Funds, Assured, And QTCB Noteholder Group*, Adv. Proc. No. 18-149-LTS, ECF No. 88 at ¶ 1.

35.     Furthermore, the Plan's recognition of the National Reimbursement Claim as an additional source of recovery to National is a uniquely troubling form of discrimination against Assured. This claim arises from payments National has made to its insured bondholders due to PREPA's payment defaults under the Trust Agreement. The Disclosure Statement explains the basis for the National Reimbursement Claim by stating that "[i]n connection with the issuance of the [National Insurance Policies], PREPA entered into certain Bond insurance agreements with National, pursuant to which National asserts that PREPA agreed, to the extent that National made payments of principal and interest on or incurs any other costs with respect to the Bonds insured by PREPA, to reimburse National, with interest, for any and all such payments, and costs." *See* ECF No. 3297 at 35. However, Assured, as a monoline insurer, is also a party to similar "Bond insurance agreements" with PREPA. Yet the Board ignores Assured's entitlement to a reimbursement claim, which only serves to amplify the discrimination against Assured.[13]

36.     The Plan's recognition of the National Reimbursement Claim not only reflects unfair discrimination, but is also a clear violation of the Bankruptcy Code's central policy of equal treatment of similarly situated creditors. *See Begier v. IRS*, 496 U.S. 53, 58 (1990) ("Equality of distribution among creditors is a central policy of the Bankruptcy Code."); *In re PCH Assocs.*, 949 F.2d 585, 598 (2d Cir. 1991) (acknowledging "what is perhaps the

---

[13] *See e.g.*, *Supplemental Omnibus Reply Of The Puerto Rico Electric Power Authority To Objections To The (I) Adequacy Of The Disclosure Statement, (II) Relief Requested In The Disclosure Statement Motion, And (III) Relief Requested In The Confirmation Discovery Procedures Motion*, ECF No 3246 at ¶ 22 n.6, ECF No. 3246 (the Board focuses on its theory that "[u]insured bondholders have no rights to reimbursement" but fails to address the fact that Assured, too, holds reimbursement claims against PREPA).

predominant policy objective of a bankruptcy proceeding—equal treatment of similarly situated creditors."); *Hermanos Torres Perez Inc.*, 2011 WL 5854929, at *9 (a plan unfairly discriminates when "creditors . . . with similar legal rights . . . receiv[e] materially different treatment under a proposed plan without compelling justifications for doing so.").

37.     By acknowledging National's right to reimbursement and ignoring Assured's comparable right, the Plan further exacerbates the already substantial disparity in treatment between Assured and National despite the parties' fundamental similarities.

### C.     The Board Cannot Establish That The Plan Can Only Be Consummated By Discriminating Against Assured (Broad Test).

38.     To confirm the Plan, the Board must also demonstrate that it cannot treat the unsecured claims of Assured and National equally.  This, too, is a steep hill to climb, requiring strong evidence of the alleged necessity of the discriminatory treatment.  Confirmation of a plan must therefore be denied where "it appears it *may be possible* to draft a plan that would not discriminate." *In re Deming Hosp., LLC*, 2013 WL 1397458 at *6 (Bankr. D. N.M. 2013) (emphasis added).

39.     As a case in point, in *In re Snyders Drug Stores, Inc.*, 307 B.R. 889, 895-896 (Bankr. N.D. Ohio 2004), the bankruptcy court denied confirmation of the debtor's plan where the debtor failed to substantiate its theories that, absent favorable treatment, trade creditors would refuse to do business with the reorganized debtor.  A similar conclusion was reached in *In re Graphic Commc'ns, Inc.*, 200 B.R. 143 (Bankr. E.D. Mich. 1996), where the debtor could not demonstrate why the "plan cannot provide for more equal treatment" of the classes. *Id*. at 149.

40.     Furthermore, the mere fact that a favored creditor's preferential treatment was reached through a settlement with the debtor provides no independent basis for finding discrimination fair.  *See In re Creekside Landing, Ltd.*, 140 B.R. 713, 716 (Bankr. M.D. Tenn.

1992) (denying confirmation of a plan which provided a settling unsecured creditor a 40% recovery and an objecting unsecured creditor a 20% recovery).

41.     Here, the burden rests with the Board to demonstrate that there are no viable alternatives that provide for more equal treatment of Assured.  *See Deming Hosp.,* 2013 WL 1397458 at *6.  But the Board has not provided *any* evidence or credible justification to explain how providing National and Assured equal treatment would hinder the Plan's implementation or otherwise be impossible. *See also In re Aztec Co.*, 107 B.R. 585, 591 (Bankr. M.D. Tenn. 1989) (denying confirmation where "[n]othing in the record indicate[d] that the debtor *needs* to protect its relationship with [the favored creditors] to reorganize successfully.") (emphasis added).  In fact, confirmation has even been denied in much more plausible scenarios where the debtor sought to discriminate against general unsecured creditors and in favor of trade creditors.  *See In re Snyders Drug Stores, Inc.*, 307 B.R. 889, 895-896 (Bankr. N.D. Ohio 2004) and *In re Creekside Landing, Ltd.*, 140 B.R. 713, 716 (Bankr. M.D. Tenn. 1992).  As noted above, here, National is not a "trade" creditor and is providing no ongoing benefits to PREPA, such as by insuring future PREPA bond issuances.  Simply put, the Board has failed to substantiate any theory that discrimination between two similarly-situated bond insurers (Assured and National) is necessary to consummate the Plan.

### D.     Discrimination Against Assured Is Not in Good Faith (Broad Test).

42.     To impose the Plan upon Assured over its objection, the Board must also demonstrate that it is discriminating against Assured in good faith.  Under this factor, "it is relevant to consider whether the discrimination primarily preserves assets for or otherwise benefits the debtor, yet offers no corresponding benefit for creditors." *In re Creekstone Apartments Assocs., L.P.*, 168 B.R. 639, 645 (Bankr. M.D. Tenn. 1994); *see also In re Creekside Landing, Ltd.*, 140 B.R. 713, 716 (Bankr. M.D. Tenn. 1992) (denying confirmation where

discrimination benefited "the owners of the debtor with no corresponding benefit for general creditors."). Additionally, courts have also found a lack of good faith where "[t]he only reason for the discrimination is that the Debtor is trying to invent an impaired accepting class by gerrymandering classifications." *In re Autterson*, 547 B.R. 372, 399 (Bankr. D. Col. 2016).

43.    Here, the Plan's discrimination in favor of National only serves to benefit PREPA and National while providing no corresponding benefit to other creditors, including Assured. This fact is irrefutable based on the significant disparity in recoveries between National and Assured. Indeed, National is guaranteed a *baseline* fixed recovery of 71.65%, whereas the *most* optimistic recovery for Assured is a mere 51.53%. There is no logical basis for awarding National a recovery for settling litigation that might exceed what Assured would receive if it *won* its litigation against PREPA. This clear imbalance demonstrates that the discrimination in favor of National is primarily intended to gerrymander an accepting class. But in *In re Autterson*, the bankruptcy court specifically found a lack of good faith where "[t]he only reason for the discrimination is that the Debtor is trying to invent an impaired accepting class by gerrymandering classifications." *Id.* at 399. Similarly, here, the Board's creation of separate classes and preferential treatment for National is nothing but a transparent maneuver aimed at securing an accepting class, rather than a genuine attempt to provide fair treatment to similarly-situated creditors.[14] This further proves that the discrimination in favor of National lacks good faith.

---

[14] *See* Skeel Dep. Tr., 118:17-20  (Natbony Decl. Ex. 1) ("They [*i.e.* National] agreed to support the plan. They agreed to vote in favor of the plan, all of which are very attractive benefits to us."); Skeel Dep. Tr., 341:9-11 (Natbony Decl. Ex. 1) ("And the other components of the deal, they [*i.e.* National] agreed to support the plan to vote in favor of the plan."); Transcript of Deposition of Fernando Batlle, 267:25 – 268:18 (May 12, 2023) (Natbony Decl. Ex. 3) ("A: It's [*i.e.*, the National settlement] driven likely by the board's desire to -- within the same resource envelope as a term, the amount of dollars available for settling the claims, having more people be part of the process is better. . . . Q: Let me make sure I understand. Giving one monoline insurer a higher percentage recovery than all other monoline insurers, is it AAFAF's understanding that that increases the amount of people who will support the plan? I just want to make sure I understand your question. A: Well, it's another party that supports the plan right?").

E.   **The Plan's Degree Of Discrimination Against Assured Is Not Proportionate (Broad Test).**

44.     Finally, to discriminate against a dissenting class, the plan proponent must prove that the discrimination is in direct proportion to its rationale.  Here, however, the Board's discrimination against Assured is excessive, and the Board fails to show a clear connection between the proposed discrimination and any specific goal or outcome.  "Courts considering the issue of unfair discrimination have roundly rejected plans proposing grossly disparate treatment (50% or more) to similarly situated creditors, while at least two courts decided that unfair discrimination did not exist when the difference in recoveries was 4% or less."  *In re Tribune Co.*, 472 B.R. 223, 243 (Bankr. D. Del. 2012), *aff'd sub nom. In re Trib. Media Co.*, 587 B.R. 606 (D. Del. 2018); *In re Sea Trail Corp.*, No. 11-07370-8-SWH, 2012 WL 5842912 at *16 (Bankr. E.D.N.C. Nov. 15, 2012) ("Consistent with the Code's requirement for unfairness, courts often conclude that a plan is unfairly discriminatory when there is a large discrepancy in the percentage recovery between similarly situated creditors.").[15]

45.     When accounting for National's fixed recovery and additional benefits under the National PSA, National will recover no less than 83.34% of the National Insured Bond Claims. In contrast, the Objectors will only recover a range between 0.21% to 51.53% of their allowed claims depending on the outcome of their litigation against PREPA.  This difference far exceeds the thresholds established by the courts for acceptable discrepancies, as highlighted in the cases of *In re Snyders Drug Stores*, *In re Breitburn Energy Partners LP*, *In re Hoffinger Industries*, *In*

---

[15] Additionally, courts routinely deny confirmation where the difference in recovery between the favored creditor and the discriminated creditor is 30% or less.  *See In re Snyders Drug Stores, Inc.*, 307 B.R. 889 (Bankr. N.D. Ohio 2004) (6% delta); *In re Breitburn Energy Partners LP*, 582 B.R. 321 (Bankr. S.D.N.Y 2018) (7.44% delta); *In re Hoffinger Indus., Inc.*, 321 B.R. 498, 509 (Bankr. E.D. Ark. 2005) (10% delta); *In re Anderson*, 173 B.R. 226 (Bankr. D. Col. 1993) (14.2% delta); *Earth Pride Organics, LLC v. Off. Comm. of Unsecured Creditors of Earth Pride Organics, LLC*, CA No. 20-4032, 2021 WL 1553787 (Bankr. E.D. PA. 2021) (29% delta); *In re Cooper*, 3 B.R. 246 (Bankr. S.D. Cal. 1980) (30% delta).

*re Anderson*, *Earth Pride Organics*, and *In re Cooper*.  Therefore, the discrimination against Assured under the Plan cannot be justified as proportionate or fair.

      **F.**    **The Plan Imposes A Materially Lower Percentage Of Recovery On Assured In Comparison to National (Markell Test).**

      46.    Similarly, under the Markell Test, a plan that imposes a materially lower percentage on a dissenting class is a standalone basis for a finding of unfair discrimination.  As discussed above, "[c]ourts considering the issue of unfair discrimination have roundly rejected plans proposing grossly disparate treatment (50% or more) to similarly situated creditors". *Tribune Co.*, 472 B.R. at 243.  This is true even where the plan only "has the *potential* to result in materially lower percentage recovery" for the dissenting class.  *In re Lapeer Aviation, Inc.*, Case No. 21-31500, 2022 WL 7204871 at *8 (Bankr. E.D. Mich. 2022) (emphasis added); *see also In re Westbank Holdings, LLC*, Case No. 22-10082, 2023 WL 3026739 (Bankr. E.D. La. Apr. 19, 2023) (unfair discrimination where certain unsecured creditors were forced to prosecute their claims post-confirmation, while other unsecured creditors were paid in full).

      47.    When accounting for National's fixed recovery and additional benefits under the National PSA, National will recover no less than 83.34% of its National Insured Bond Claims.  In stark contrast, Assured will only recover a range of 0.21% to 51.53% of its allowed claims depending on the outcome of the Amended Lien & Recourse Challenge.  Under the Markell Test, the Court must consider the "potential" that Assured will receive just a .21% recovery. *Lapeer Aviation, Inc.*, 2022 WL 7204871 at *8.  This significant disparity in recovery clearly demonstrates that the Plan imposes a materially lower percentage of recovery on Assured and violates the principle of fair treatment of similarly situated creditors.

### G.    The Plan Allocates Materially Greater Risk To Assured In Comparison To National (Markell Test).

48.    Independently of any other factor, a plan discriminates unfairly if it allocates materially greater risk to a dissenting class versus a favored class.  This may be the case even "if the plan pays each class the same percentage recovery on its prepetition claims," which is not the case here.  *In re Tribune Company*, 472 B.R. 223, 242 (Bankr. D. Del. 2012).

49.    Here, the Plan impermissibly allocates greater risk to Assured than to National, because the Plan provides National with significant risk-mitigating benefits that Assured is not receiving, including: (i) an express finding that the National Insured Bonds have been accelerated, and that National can therefore satisfy its policy obligations by paying an "Acceleration Price" pursuant to the applicable provisions of the National Insurance Policies, *see* Plan § XX.C; (ii) the implementation of custodial trusts that will facilitate National's ability to continue making future payments under its policies while also receiving the benefit of the Plan consideration to help offset and partially satisfy those policy obligations, *see* Plan § XX.B.1; and (iii) an exculpation provision that exculpates National from further liability to the extent it resolves its legacy National Insurance Policies in accordance with the Court-approved procedures, *see* Plan §§ XVIII.B; XXVII.  These provisions significantly de-risk the treatment of the National Insured Bonds, including by providing certainty to National with respect to National's and its policyholders' respective rights and obligations under the National Insurance Policies.  Assured receives no comparable benefits under the Plan, meaning that Assured will be left to navigate its future obligations to its insured bondholders on an *ad hoc* basis without the clear legal guidance, Court-approved procedures, and exculpation from liability provided to National.  This increased uncertainty and risk that Assured will face as compared to National constitutes unfair discrimination.  *See Tribune Co.*, 972 F.3d at 241 (presumption of unfair

discrimination exists where, "regardless of percentage recovery, [there is] an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.").

## IV.     The Plan Unfairly Discriminates In Favor Of The Fuel Line Lenders.

50.     The Board asks this Court to approve a Plan that also provides the FLLs—the only Class 4 claimants—with a recovery consisting of secured bonds that will be at least 84% and as much as 100% of the face value of their claims,[16] while providing a grossly disproportionate recovery of 0.21–51.53% to claimants in Class 2, including Assured.  When factoring in the fees payable to the FLLs (which pursuant to the Plan are tied to prepetition claims) and interest accrual, the FLLs are receiving more than a 100% recovery.  However, the FLLs concede in their proofs of claim that they are unsecured creditors—they do not have priority over any other general unsecured creditor under the Bankruptcy Code or even under applicable non-bankruptcy law.  And yet, the Board proposes to elevate the FLLs' unsecured claims to secured status with potentially more than a par recovery, and the restructuring bonds that the FLLs will receive will amortize quickly (and thus will be paid before other bonds).  There is absolutely no legal justification for this handsome recovery over PREPA's other unsecured creditors.  The treatment of the FLLs is pure vote buying, and one that is entirely divorced from the Bankruptcy Code and the Board's statements about PREPA's ability to pay its debts.

### A.     The Plan Is Unfairly Discriminatory On Its Face (Markell Test).

51.     As discussed in Section III.A., under the Markell Test, a plan carries a presumption of unfair discrimination where there is (1) a dissenting class; (2) another class of the

---

[16] See Disclosure Statement, pp. 49-52 (disclosing that FLLs will receive 84% base recovery, plus 16% of additional bonds); id. at p. 32 n. 3 (disclosing additional fees and interest accrual).

same priority; and (3) a difference in the plan's treatment of the two classes that results in a materially lower percentage recovery for the dissenting class.  Here, Class 2 is a dissenting class, and the FLLs admit that they hold general unsecured claims, which are entitled to the same priority as Class 2 claims.[17]  The third prong of the Markell Test is also satisfied, given that the FLLs will receive a base recovery of 84%, and could receive 100%.  By contrast, Class 2 claims are estimated to recover .21%–46.49%, resulting in at minimum a 37.51% difference in recoveries between Classes 2 and 4.  Under the Markell Test, the Court must consider the "*potential*" that Assured, as a member of the unfavored and dissenting class, will receive the bare minimum—a .21% recovery.  *Lapeer Aviation, Inc.*, 2022 WL 7204871 at *8.  Accordingly, under Markell Test, the potential delta between the FLLs' recovery and the recovery available to general unsecured creditors is actually in the range of 37.51-99.79%.  The Plan therefore creates the potential for a 99.79% recovery difference for two classes of  the same priority—an undeniably, materially lower percentage recovery for Assured as compared to the FLLs.

B.     **The Board Cannot Overcome The Presumption Of Unfair Discrimination (Markell Test).**

52.     To overcome this presumption of unfair discrimination, the Board must demonstrate that (a) outside of bankruptcy, Class 2 claimants would similarly receive less than Class 4's potential 100% recovery, or (b) that the FLLs have infused new value into PREPA which offset its gain.  The Board has not and cannot make such a showing.

53.     Outside of these proceedings, the FLLs are general unsecured creditors with no enforceable priority over the bondholders.  *See infra* § V.C.  Their remedies generally include the right to accelerate their debts and demand payment from PREPA.  As counsel to the FLLs stated

---

[17] *See* Solus Claim No. 44342, Ultra Master Ltd. Claim No. 44358, Scotiabank Claim No. 44378, Ultra NB LLC Claim No. 44388, Sola Ltd. Claim No. 45816, available on Kroll's website at https://cases.ra.kroll.com/puertorico/Home-ClaimInfo.

at the June 6 hearing, the FLLs would attempt to obtain a money judgment if PREPA failed to

pay them outside of bankruptcy,[18] but that judgment would be subject to the temporal and other

limitations that the Board and AAFAF claim would apply to the bondholders' remedies.  Adv.

Proc. No. 19-391, ECF No. 192 ¶¶ 61-68.  Moreover, as the Board has argued, a judgment

creditor (such as the FLLs) would not have any right to obtain secured status due to *Librotex,*

*Inc. v. Autoridad de Acueductos y Alcantarillandos de Puerto Rico*, 138 D.P.R 938 (D. P.R.

1995), Adv. Proc. No. 17-155-LTS, ECF 123-1.  *Id.*  There is no scenario in which, outside of

these proceedings, the FLLs would be entitled to full payment ahead of the bondholders or to

elevate their unsecured claims to secured status, let alone a significant difference in recoveries.[19]

54.     Even more problematic for the FLLs is the fact that the settlement provides no

new value to PREPA—the FLLs are not contributing any new money to PREPA through the

settlement, the Plan, or as part of any exit financing.[20]  As such, the treatment of the FLLs is

unfairly discriminatory and cannot be rebutted under the Markell Test.[21]

## C.     The Plan's Unfair Discrimination Fails the Broad Test.

55.     Even if the Court were to consider applying the Broad test, there is no reasonable

basis to justify the difference in recoveries as between the FLLs and PREPA's bondholders.

---

[18] *See* Transcript of Claim Estimation Hearing, at 100:20-22, Case No. 19-391-LTS, (June 6, 2023).

[19] The Board has cited to section 705 of the Trust Agreement as a basis to pay judgments ahead of bondholders.  The FLLs would not fall within the scope of that provision, as it is limited to judgments arising from "all lawful claims and demands for labor, materials, supplies or other objects." Trust Agreement § 705.

[20] *See* generally Disclosure Statement, Exhibit M (Fuel Line Lender PSA); Skeel Dep. Tr.156:7-157:12 (Natbony Decl., Ex. 1).

[21] Indeed, it bears emphasis that, unlike the bondholders, the FLLs actually *did not* provide PREPA with any rescue financing from 2015 and thereafter. The Board is effectively punishing the parties that helped PREPA to avoid default, while rewarding the lenders that the Board's independent investigator found were actually responsible for PREPA's liquidity problems.  *See* Kobre & Kim, "Final Investigative Report", The Financial Oversight & Management Board for Puerto Rico, August 20, 2018, https://drive.google.com/file/d/19-lauVo3w9MPS03xYVe0SWhQin-Q6FEf/view, p. 127 (last visited June 12, 2023)  ("It was these lines of credit—specifically, PREPA's inability to repay a $700 million fuel purchase facility that matured in July 2014, combined with the banks' refusal to waive such inability as a designated event of default or to extend the maturity of the facility—that eventually forced PREPA . . . [to] begin the debt restructuring process.").

To satisfy the Broad Test, the Board must demonstrate: (1) a reasonable basis for discrimination exists; (2) the debtor cannot consummate its plan without discrimination; (3) the discrimination is imposed in good faith; and (4) the degree of discrimination is directly proportional to its rationale.  The Plan fails the Broad test for the reasons articulated below.

### 1. There Is No Reasonable Basis For The Discrimination Against Assured (Broad Test).

56.    There is no reasonable basis for the Plan's favorable treatment of the FLLs. The Board has acknowledged that PREPA has no ongoing "trade" relationship with the FLLs.  *See*, Transcript of Deposition of David Brownstein 273:23 – 276:17; 281:10 – 282:4 (May 16, 2023) ("Brownstein Dep. Tr.") (Natbony Decl., Ex. 2).

57.    Nor is settlement of the FLLs' ongoing litigation with Assured and the Bondholders a sufficient basis for the Plan's discrimination against Class 2 claimants.  The mere fact that the FLLs' favorable treatment was reached through a settlement with the debtor provides no independent basis for finding discrimination fair.  *See supra* ¶ 40.  The Board can offer no reasonable basis to support its unfairly favorable treatment of Class 4 claims at the expense of all other unsecured claimants, and that alone is enough under the Broad Test.  *In re Anderson*, 173 B.R. at 229.

### 2. The Board Cannot Establish That The Plan Can Only Be Consummated By Discriminating Against Class 2 (Broad Test).

58.    Confirmation of a plan must be denied where "it appears it may *be possible* to draft a plan that would not discriminate."  *In re Deming Hosp., LLC*, 2013 WL 1397458 at *6 (Bankr. D. N.M. 2013) (emphasis added).  The burden rests with the Board to demonstrate that there are no viable alternatives that provide for more equal treatment of Assured.  *See Deming Hosp.,* 2013 WL 1397458 at *6.  However, the Board has plenty of alternatives here.  The Board easily could provide the FLLs with the same treatment as other unsecured creditors.  The Board

could also reserve the FLL recoveries subject to resolution of the intercreditor dispute between the bondholders and FLLs. The Board has therefore failed to meet its burden, and it cannot demonstrate that there are no other alternatives to the Plan's discriminatory treatment of Assured.

### 3. Discrimination In Favor Of The FLLs Is Not in Good Faith (Broad Test).

59. To impose the Plan upon Class 2 over its objection, the Board must also demonstrate that it is discriminating in good faith. Under this factor, "it is relevant to consider whether the discrimination primarily preserves assets for or otherwise benefits the debtor, yet offers no corresponding benefit for creditors." *In re Creekstone Apartments Associates, L.P.*, 168 B.R. 639, 645 (Bankr. M.D. Tenn. 1994). In the instant case, the Plan's discrimination in favor of the FLLs offers no benefit to the general creditor body or even to PREPA. In fact, the Board has admitted that the only "benefit" of providing the FLLs with superior treatment is a vote in favor of the Plan.[22] This is pure vote buying.[23]

60. Further, as discussed in Section V, the Board's treatment of the FLL claims is premised on the treatment of those claims as a "Current Expense" under the Trust Agreement, but the FLL claims are not "Current Expenses," and in any event the Trust Agreement gives no enforceable priority to "Current Expenses." *See infra* § V.C.1 and 2. As such, there is no good faith basis for the Board's creation of separate classes and preferential treatment for the FLLs.

---

[22] *See* Skeel Dep. Tr.168:7-15 (Natbony Decl., Ex. 1) ("A: The benefits [of settling with the FLLs] were that they compromised their claim at less than 100 cents on the dollar. And we thought it was a pretty strong claim. They are a sizable claim that is now supportive of the plan and will vote in favor of the plan of adjustment and will not object to the plan of adjustment. And all of those were attractive benefits.").

[23] *See In re Quigley Co.*, 437 B.R. 102, 129 (Bankr. S.D.N.Y. 2010) (denying confirmation because the plan "was proposed in bad faith since it was designed to achieve acceptance through a tainted vote"); *In re Autterson*, 547 B.R. 372, 399 (Bankr. D. Col. 2016) (finding a lack of good faith where "[t]he only reason for the discrimination is that the Debtor is trying to invent an impaired accepting class by gerrymandering classifications."); *Am. United Mut. Ins. Co. v. City of Avon Park*, 311 U.S. 138, 147 (1940) (municipal bankruptcy plan unconfirmable "where one creditor [is] obtaining some special favor or inducement [to support the plan] not accorded the others, whether that consideration moved from the debtor or from another.").

4.  **The Plan's Degree Of Discrimination Against Assured Is Not Proportionate (Broad Test).**

61.  Finally, to discriminate against a dissenting class, the plan proponent must prove that the discrimination is in direct proportion to its rationale.  Here, however, the Plan's discrimination against Assured and other Class 2 claimants is excessive, and the Board fails to show a clear connection between the proposed discrimination and any specific goal or outcome. Courts considering "the issue of unfair discrimination have roundly rejected plans proposing grossly disparate treatment (50% or more) to similarly situated creditors . . . ."  *In re Tribune Co.*, 472 B.R. 223, 243 (Bankr. D. Del. 2012), *aff'd sub nom. In re Trib. Media Co.*, 587 B.R. 606 (D. Del. 2018).

62.  The recovery available to Class 2 creditors sits within a massive range of .21% -- 51.53%.  Even at the lowest end of the range of potential discrepancies in treatment, courts routinely deny confirmation where the difference in recovery between the assenting creditor and the discriminated creditor is 30% or less.  *See* n.15, *supra*.  The difference here far exceeds the thresholds established by the courts for acceptable discrepancies.  *See supra* § III.E.  Moreover, the qualitative difference in recoveries—including interest accrual on Series A bonds and a favorable amortization schedule for those bonds—is undeniably material.

63.  As a result, the Board has failed to meet its burden under either the Markell Test or the Broad Test.  The Plan discriminates unfairly in favor of the FLLs and should not be confirmed.

V.  **The Fuel Line Lender Settlement Should Not Be Approved.**

A.  **Legal Standard For Approval of Settlement Agreements Under Fed. R. Bankr. P. 9019**

64.  In addition to failing the tests for "unfair discrimination," the FLL settlement also fails the test for approval of settlements under Federal Rule of Bankruptcy Procedure 9019

("Rule 9019").  Under Rule 9019, the bankruptcy court must "assess and balance the value of the

claim that is being compromised against the value to the estate of the acceptance of the

compromise proposal." *In re GHR Cos.*, 50 B.R. 925, 931 (Bankr. D. Mass. 1985).   In

conducting this assessment, courts in the First Circuit consider:  "(i) the probability of success in

the litigation being compromised; (ii) the difficulties, if any, to be encountered in the matter of

collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and

delay attending it; and, (iv) the paramount interest of the creditors and a proper deference to their

reasonable views in the premise." *Jeffrey v. Desmond*, 70 F.3d 183, 185 (1st Cir. 1995).  The

Court's consideration of these factors "should demonstrate whether the compromise is fair and

equitable, and whether the claim the debtor is giving up is outweighed by the advantage to the

debtor's estate." *Id.*  at 185.  In evaluating a settlement, the court must ensure that "*all aspects* of

the reorganization are fair and equitable."  *In re Bos. & Providence R. R. Corp.*, 673 F.2d 11, 12

(1st Cir. 1982).

65.    It is the Oversight Board's burden to supply evidence of reasonableness and

"demonstrate that the compromise is in the best interests of the estate."  *In re 110 Beaver St.

P'Ship*, 244 B.R. 185, 187 (Bankr. D. Mass 2000) (citing *In re C.P. Del Caribe, Inc.*, 140 B.R.

320 (Bankr. D. P.R. 1992)).   If the settlement falls above the median of possible litigation

outcomes, then it cannot be approved under Bankruptcy Rule 9019. *110 Beaver St. P'ship*, 244

B.R. at 196; *see also* Transcript of Hearing at 21:14-22:11, *In re City of Detroit, Mich.*, Case No.

13-53846, ECF No. 2521 (Bankr. E.D. Mich. Jan. 16, 2014) ("*City of Detroit*") (finding that 67

percent recovery was "just too high a price to pay for the city to put this issue behind it. It is

higher than the highest reasonable number").

**B.**   **The FLLs Have No Enforceable Priority Under A Plan.**

66.    As an initial matter, based on the admissions of the FLLs and the Board, there is

no reason for PREPA to provide the FLLs with the preferential treatment embodied in the FLL

settlement.  The FLLs conceded:  "**Section 510(a) is overridden in the context of a proposed**

**plan. . . .**"  Case No. 17-4780-LTS ECF No. 3205 ¶ 18 (emphasis added).  By the FLLs' own

admission, then, PREPA could render any priority based on a subordination agreement

unenforceable merely by filing a plan that does not recognize that subordination agreement. *Id.*

Moreover, the Board claims that the Trust Agreement is unenforceable and will be rejected by

the Board.  *See* Transcript of Claim Estimation Hearing at 23:20-21, Adv. Proc. No. 19-391-LTS

(June 6, 2023).  Both parties have therefore conceded that the FLLs have no enforceable rights in

bankruptcy that could form the basis for preferential treatment of the FLLs.

**C.**   **PREPA is Likely to Succeed in the Current Expense Litigation**

67.    Even if subordination agreements were not generally unenforceable under a plan,

there is no relevant subordination agreement or other form of priority here.  The FLLs have

admitted in their proofs of claim that they are general unsecured creditors.  *See, e.g.*, Scotiabank

Claim No. 44378  (Box 10), Solus Claim No. 44342 (Box 10) (available on Kroll's website at

https://cases.ra.kroll.com/puertorico/Home-ClaimInfo).  The only source of the FLLs' claim to

priority is the Trust Agreement entered into between the bond trustee and PREPA—the same

Trust Agreement that the Board asserted is a "dead document" once a Title III case was

commenced.[24]  And this claim to priority depends on the FLL claims being Current Expenses,

within the meaning of the Trust Agreement, which they are not.  A court evaluating a proposed

settlement must "compare the terms of the compromise with the likely rewards of litigation."

---

[24] *See, e.g.*, Transcript of Claim Estimation Hearing at 23:20-21, Case No. 19-391-LTS, (June 6, 2023); Transcript
of Omnibus Hearing  at 25:10, Adv. Proc. No. 19-391, ECF No. 23 (Feb. 28, 2023) (stating that the Trust
Agreement is "a dead document").

*Protective Comm. for Ind. Stockholders* of *TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968). Courts must "canvass the issues and [determine] whether the settlement falls below the lowest point in the range of reasonableness." *In re Servisense.com*, 382 F.3d 68, 71-72 (1st Cir. 2004). Given the extremely low likelihood that the FLLs would prevail in the Current Expense litigation, there is no reason for the Board or anyone else to settle with them on favorable terms.

### 1. The Fuel Line Loans Are Not Current Expenses.

68.     The bondholders have explained in great detail why the fuel line loans are not Current Expenses, and reference is hereby made to their prior pleadings. Adv. Proc. No. 19-396-LTS, ECF Nos. 55, 80. Section 101 of the Trust Agreement defines "Current Expenses" to include "the Authority's reasonable and necessary <u>current</u> *expenses* of maintaining, repairing and operating the System." Trust Agreement § 101 (emphasis added).

69.     *First,* this defined term applies only to *expenses*, not debts. Those terms are not interchangeable.[25] *See In re Hoff*, No. 21-01002-SWD, 2023 WL 465704, at *4 (Bankr. W.D. Mich. Jan. 26, 2023) ("[A]n expense (revealed in the income statement as such) is not the same as a debt (typically reflected on a balance sheet) . . . Expenses, if unpaid, may give rise to debts, but the two are conceptually distinct."). An expense is an "expenditure of money" and a "specific outlay or disbursement of funds." *Klinger v. Adams Cnty. School Dist. No. 50*, 130 P.3d 1027, 1031-32 (Colo. 2006).[26] By contrast, a liability includes "any kind of debt, either absolute or contingent, express, or implied." *Old Southern Life Ins. v. Alabama Ins. Dept.*, 503 So.2d 849, 850 (Ala. App. 1986). That is, a liability or debt is an amount that is *owed* by the debtor.

---

[25] *McLean, Koehler, Sparks & Hammond v. Schnepfe*, 309 Md. 399, 409 (1987).

[26] An "expenditure" is the "act or process of paying out; disbursement." *Id.* at 1031.

70.     In interpreting the Trust Agreement, a Puerto Rico court drew this same exact

distinction between expenses and debts:

> PREPA acknowledged the importance of directing the income from the System
> deposited into the general fund to the payment of its <u>current expenses,</u> including
> the contributions to its employee's retirement plans, before paying the bonds
> that would be issued. . . . section 505 of the Trust Agreement does not
> contemplate a priority in favor of the plaintiffs <u>in the payment of the debts</u> that
> PREPA may have with the retirement system.

*UTIER v. Autoridad de Energia Electrica de Puerto Rico,* Case No. K-AC2016-0291, at 71-72

(P.R. Court of First Instance, Dec. 19, 2016) ("*UTIER*") (emphasis in original). [27]  The Court

thus clearly distinguished between Current Expenses and <u>debts</u>, with the latter not being payable

under section 505.  Indeed, PREPA lists its debts separately from its expenses in its audited

financial statements.[28]  This is also the accounting practice for governmental and non-profit

entities:  "repayment of debt principal" is "*excluded from consideration*" as a governmental

operating expense.[29]

71.     Even assuming for the sake of argument that the fuel line loans actually *financed*

current operating expenses, the loans bear all of the hallmark features of a debt:   an

unconditional promise to repay the debt,[30] accrual of interest,[31] and remedies upon a payment

default.[32]  And, the credit facilities themselves *identify the loan advances as debts*.[33]  That is

---

[27] A certified translation of the *UTIER* decision is filed at Adv. Proc. No. 19-391-LTS, ECF No. 224-2.

[28] *See* PREPA Audited Financial Statements 2021, at p. 24-25 (including separate line items for liabilities and expenses), 55 (listing notes payable as long-term debts) (Adv. Proc. No. 19-391-LTS, ECF No. 260-2).

[29] *See, e.g.,* Jacqueline L. Reck, et al., Accounting for Governmental & Nonprofit Entities (18th ed. 2019), at 427, available at https://9afi.com/storage/daftar/nDqPKxIOx8i5uXm9KF9biYYQ9TfngumoLtT19lDz.pdf (last visited June 12, 2023).

[30] *See* Scotiabank Credit Agreement, Adv. Proc. No. 17-232-LTS, ECF No. 26-1, § 2.04, 2.06); Citibank Trade Facility § 2.05, Adv. Proc. No. 17-232-LTS, ECF No. 26-2.

[31] Scotiabank Credit Agreement, Adv. Proc. No. 17-232-LTS, ECF No. 26-1, § 2.09; Citibank Trade Facility, Adv. Proc. No. 17-232-LTS, ECF No. 26-2, § 2.08.

[32] Scotiabank Credit Agreement Art. VIII, Adv. Proc. No. 17-232-LTS, ECF No. 26-1.

precisely why PREPA's auditors have recorded the loans as long-term debts on PREPA's financial statements.[34]

72.     *Second*, even if debt service on the loans qualified as an expense (which it does not), it would still not qualify as *current operating expenses*.  BLACK'S LAW DICTIONARY (11th ed.  2019) (operating expenses are "also termed current expense").  Operating expenses generally include "ordinary, *recurring* expenses" that are incurred to maintain or operate the system, but exclude extraordinary expenses.  *See Dore Energy Corp. v. Prosp. Inv. & Trading Co. Ltd.*, No. 2:05 cv 1657, 2010 WL 4068802, at *7 (W.D. La. Oct. 14, 2010) (emphasis added).  An operating expense "must arise in the normalcy of the particular business" and "it must be customary and of frequent occurrence in the type of business involved."  *Hotel Kingkade v. C.I.R.*, 180 F.2d 310, 312 (10th Cir. 1950).[35]  The Trust Agreement draws this same distinction between ordinary and extraordinary non-recurring expenses.  Trust Agreement § § 504, 505, 512, 512B, 507(h), 516.  Here, the fuel line loans are not recurring, usual expenses:  principal is payable in a lump sum by a stated maturity date.  More fundamentally, PREPA does not buy fuel from the FLLs—they provide absolutely no goods to PREPA.

73.     The purpose of a loan is irrelevant to determining the true nature of that obligation.  Indeed, similar attempts to merge a debt with a refinanced expense or liability have previously been rejected by courts.  *See* Transcript of Hearing at 21, *Erste Euroaische Pfandbriefund Kommunalkreditbank v. City of San Bernardino,* Adv. Proc. No. 15-01004-MJ,

---

[33] Scotiabank Credit Agreement, Adv. Proc. No. 17-232-LTS, ECF No. 26-1, § 2.06(e); *id.* Ex. B ("This Note shall not be deemed to constitute a debt or obligation of the Commonwealth of Puerto Rico or any of its municipalities or other political subdivisions *other than the Borrower . . .*"); Citi Trade Facility § 2.05(b).   Scotia also conceded in its proof of claim that the loans are debts.  *See*  Scotiabank Claim No. 44378, Addendum ¶  7.

[34] *See* Audited Financial Statements for FY 2021 at 55 (Adv. Proc. No. 19-391-LTS, ECF No. 260-2); *see also id* at 58.

ECF No. 34 (Bankr. C.D. Cal. May 11, 2015) ("*San Bernardino*") (rejecting arguments that pension obligation bonds were entitled to same treatment as pensions, even though those bonds refinanced the City's pensions).  That is especially true where, as here, the new obligation has *different payment terms* from the refinanced obligation.  *Id.*  The FLLs have never proffered evidence demonstrating that each loan advance had the same payment terms as the fuel invoices, including specifically default interest provisions, longer-term maturity dates, and acceleration provisions.  Thus, even if the fuel line loans actually paid for current expenses,[36] that in "no way" made the loans "equivalent to" the actual current expenses "in terms of the repayment obligation." *San Bernardino* at 20-21.

74.     FOMB Chairman David Skeel testified that he believed that the FLLs had a "strong" claim to getting paid 100 cents on the dollar because the FLLs are specifically referenced in the Current Expense definition.  *E.g.*, Transcript of Deposition of David Skeel  at 169 (May 3, 2023) ("Skeel Dep. Tr.") (Natbony Decl. Ex. 1).  But when Mr. Skeel was presented with the definition of Current Expenses (which does not actually include the loans as Current Expenses), Skeel admitted he was "not familiar" with the definition. *See*  Skeel Dep. Tr. at 336-37  (Natbony Decl. Ex. 1).

75.     Unable to find support for their arguments in the Trust Agreement, the FLLs also cite extrinsic documents to which the bond trustee is not a party. *See* Adv. Proc. No. 19-396-LTS, ECF No. 62 ¶¶  13-18, 60.  None of those documents support the FLLs' arguments.  *See*

---

[35] *Operating Costs*, MACMILLAN DICTIONARY (2009-2023),
https://www.macmillandictionary.com/us/dictionary/american/operating-costs (last visited June 12, 2023 ("the *usual expenses* involved in running a business . . .").

[36] The audited financial statements disclose that the loans were not exclusively used to purchase fuel oil.  The Citi loan's purpose was to finance construction of a LNG facility, while the Scotia loan's purpose was to free up funds *to pay existing lines of credit*.  2021 Audited Financial Statements at 57-58 (Adv. Proc. No. 19-391-LTS, ECF No. 260-2.

Adv. Proc. No. 19-396 ECF No. 80 § IV 55 ¶ ¶ 65-75.[37]  For example, the credit agreements and certificates of determination simply include covenants that <u>PREPA</u> would treat the loans as Current Expenses, *subject to bankruptcy and moratorium laws*.[38]  That is just an unsecured promise, no different from the other prepetition promises that the Board claims it has the power to breach in bankruptcy.[39]  All of the documents cited by the FLLs merely involve a covenant by PREPA, but no agreement from the bondholders that the loans are Current Expenses.  PREPA cannot unilaterally alter the terms of the Trust Agreement through ancillary agreements, and such documents cannot deprive signatories to the Trust Agreement of their rights thereunder.

76.     *Third,* Current Expenses include only the "*current expenses*" of operating the system.  Trust Agreement § 101 (emphasis added).  The term does not include past-due expenses that are not needed to keep the system running *today*.  As the Oversight Board stated:  "even if the Fuel Line Facilities could have once been considered Current Expenses when they were originally issued, they are now long past-due, and *cannot possibly continue to be considered Current Expenses*."  Case No. 17-4780-LTS, ECF No 1486, ¶ 44 (emphasis added).

77.     The Board has now reversed its position and remarkably claims that "PREPA has discretion to determine which expenses qualify as current expenses and are paid first at any

---

[37] The opinion letters do not save the FLLs' arguments.  In *Detroit*, the Court concluded that the "City is reasonably likely to succeed on its challenges to the collateral agreement [related to certain swaps] under the Gaming Act and the Bankruptcy Code," even though the swaps had opinion letters attesting to the validity of the liens securing the swaps under Michigan's gaming law.  *See City of Detroit* at 11, 18-19.

[38] *E.g.*, Scotiabank Credit Agreement § 3.02, Adv. Proc. No. 17-232-LTS, ECF No. 26-1 (treatment "*subject to applicable bankruptcy*, insolvency, reorganization, *moratorium or other laws affecting creditors' rights*").

[39] The DIP order cited by the FLLs granted the DIP loan super-priority over all creditors under section 364 of the Bankruptcy Code.  *See* Case No. 17-3283-LTS, ECF No. 2545 ¶ 7. The FLLs do not have court ordered priority. The order also makes clear that nothing therein "prejudices the right of any party to argue . . . that a prepetition claim is or is not a Current Expense or . . . *constitutes a determination on such issue.*"  *Id.* ¶ 9 (emphasis added); *see also* Case No. 17-4780, ECF No. 1486 at n. 29.

time."  Case No. 17-3283-LTS, ECF No. 23517, ¶ 39.   The FLLs advance a similar argument.[40]

PREPA lacks that discretion.  The Board and FLLs cite a preamble in the Trust Agreement,

which merely states that under the Authority Act, PREPA has control over its expenses and

undertakings.   *See id.* (citing Trust Agreement at p.1).[41]   However, this Court held that the

preambles are modified by the words "as follows" in the Trust Agreement.   *See* Summary

Judgment Order at 27, 36;  *see also* Trust Agreement at 11-12.   And, "as follows," the Trust

Agreement modifies PREPA's rights to incur and pay current expenses and undertakings.[42]  *See,*

*e.g.*, Trust Agreement §§ 504 (revisions to budget and payment of excess Current Expenses

require consent of trustee-approved Consulting Engineer); 505 (limiting payment to expenses

that are "reasonable and necessary" to maintain the System "in an efficient and economical

manner" and solely to amounts budgeted); Art. V &VII (including limitations on various

undertakings).[43]   Other provisions "as follows" also specify the sources from which non-current

expenses and liabilities are paid.   *See id.* §§ 401, 405, 507(h), 512, 512A, 512B, 516.   PREPA

therefore does not have unfettered discretion over its expenses and their sources of payment.

---

[40] *See* Transcript of Claim Estimation Hearing at 122-23, Case No. 19-391-LTS (June 6, 2023).

[41] The irony is not lost on Assured that the Board and FLLs are now relying on the preambles in the Trust Agreement to support their arguments.  As the FLLs previously stated, " [p]refatory language in a contract is generally incapable of overriding specific operative language in the body of that contract."  *See* Adv. Proc. No. 19-391-LTS, ECF No. 93   ¶ 18.   Even the most generous application of "has control over its expenses and undertakings" would not include the power to deem *any payment obligation* as a "current expense" (or not).  Yet, this is precisely the reading that is necessary to support the FLLs' argument.

[42] While the Authority Act granted PREPA certain powers referenced in the whereas clause cited by the Board and FLLs (including with respect to expenses and undertakings), PREPA was also authorized to enter into bond agreements that prescribe the "disposition of the entire gross or net revenues . . . . including pledging all or any part thereof to secure the bonds."  22 L.P.R.A. § 206.  PREPA also was authorized to limit its undertakings.  *See id.* Thus, the powers referenced in the whereas clause that the Board cites are not dispositive.  PREPA had the power to restrict the disposition of its revenues and limit undertakings, and it did so in Articles IV, V, VII, and XI of the Trust Agreement.

[43] Pursuant to the Eighteenth Supplemental Agreement, section 505 temporarily permitted PREPA to transfer monies in the General Fund to the Capital Improvement Fund to pay for costs of improvement.  That demonstrates that PREPA does not have unilateral authority to deem anything a current expense.

78.     Assured and other bondholders have already explained at length why the loans are no longer current.  *See* Adv. Proc. No. 19-396, ECF Nos. 80 ¶¶ 61-74; 55 § II.  As noted in Assured's prior submissions, the Trust Agreement is clear that an expense must be *current when PREPA pays it*.  Adv. Proc. No. 19-396, ECF Nos. 55, 80.  Indeed, Current Expenses are determined by what is reasonable and necessary in the fiscal year when the funds are to be spent, and not by looking to prior fiscal years when the expense was incurred.  *Id.*

79.     Underscoring that the fuel line loans are not reasonable and necessary expenses *today*, PREPA has continued to operate and purchase fuel notwithstanding the non-payment of the loans.[44]  The Board has also conceded that the FLLs are not financing PREPA's operations today, have not offered to finance PREPA's operations in the future, and therefore their loans are irrelevant to the expenses incurred in the current period.[45]  Thus, payments on the fuel line loans "*cannot possibly* be considered 'reasonable and necessary current expenses of maintaining, repairing and operating the System' *today*."  Case No. 17-4780-LTS, ECF No 1486 ¶ 44 (emphasis added).[46]

## 2.     The FLLs Have No Enforceable Priority Under Nonbankruptcy Law.

80.     Even if the fuel line loans qualified as Current Expenses (which they do not), the FLLs do not have an agreement that gives them priority over the bondholders, let alone over

---

[44] *See* Brownstein Dep. Tr. at 281-82  (Natbony Decl., Ex. 2) ("Q:   And PREPA has been able to operate without paying down that debt, isn't that true? A: PREPA has been able to operate without paying any of its debt . . . Including the debt to the fuel lines.").

[45] *See* Transcript of Brownstein Dep. Tr.. at 273-5  (Natbony Decl., Ex. 2)  ("Q: Do you have any understanding as to what the role is of the FLLs in PREPA current day-to-day operations?  A:  They do not have one");  Skeel Dep. Tr.at 156-57 (Natbony Decl. Ex. 1) ("Q:…[W]hat understanding do you have as to the role of the FLLs in PREPA's current day-to-day operations? A: My understanding is they do not currently have a role in operations.").

[46] The Trust Agreement is also clear that non-current expenditures and debts incurred to finance PREPA's operations are paid *after* debt service.  *See, e.g.*, Trust Agreement § 507 ("[A]ny balance remaining after making the deposits under clauses (a) through (h) above may be used for any lawful purpose of the Authority.").  The FLLs' credit agreements make clear that their treatment is subject to the terms and conditions of the Trust Agreement. *E.g.*, Scotiabank Credit Agreement § 2.14, Adv. Proc. No. 17-232-LTS, ECF No. 26-1.

general unsecured creditors.  Section 510(a) of the Bankruptcy Code—which the FLLs concede

is "overridden in the context of a proposed plan"—provides that a "subordination agreement is

enforceable in a case under this title to the same extent that such agreement is enforceable under

applicable nonbankruptcy law."  11 U.S.C. § 510(a).  A subordination agreement requires: "(1)

[a] common debtor, (2) a junior creditor *who agrees to be subordinate*, and (3) a senior creditor

who acquires priority."  *Goode v. Hagerty (In re Systems Impact, Inc.)*, 229 B.R. 363, 369

(Bankr. E.D. Va. 1998) (holding there was no personal agreement to constitute a subordination

agreement).  Clear and precise language is required to enforce subordination.  *See, e.g.*, *In re

Bos. Generating LLC*, 440 B.R. 302, 319 (Bankr. S.D.N.Y. 2010) (waivers of rights under

subordination agreements "must be clear beyond peradventure"); *Matter of Southeast Banking

Corp.,* 93 N.Y.2d 178, 185 (1999) (holding that to be enforceable, a subordination provision

must "make absolutely clear" that subordinated creditor agreed to subordinate its claims to all

entitlements, including disallowed claims).[47]  Section 505 is not a payment priority provision and

even if it was, any priority granted to the FLLs would be void under the Trust Agreement.

a)      *The FLLs Do Not Have Payment Priority.*

81.      The FLLs have never executed a subordination agreement where the *Trustee and

bondholders* explicitly agreed to subordinate their claims to the FLLs.[48]  David Skeel admitted

---

[47] The definition of Current Expense does not reference any interest, let alone post-petition interest regardless of whether it is allowed in bankruptcy. Moreover, treatment of the loans as a Current Expense was expressly made subject to bankruptcy law.  *See* Scotia Credit Agreement § 2.14., Adv. Proc. No. 17-232-LTS, ECF No. 26-1.  As such, even if the FLLs had priority (which they do not), they have no entitlement to collect on disallowed interest prior to payment to the bondholders or any other creditors.  Clear and precise language is required to be able to collect such disallowed claims from junior creditors, and here there is none. *See, e.g.*, *In re Bank of New England Corp.*, 646 F.3d 90 (1st Cir. 2011) (where indenture failed to include customary language from Davis Polk—a law firm that represented Citibank as a fuel line lender—used in other indentures for collection of postpetition interest, senior noteholders had no entitlement to collect interest prior to payment of junior claims); *In re KV Discovery Solutions*, 496 B.R. 330, 336 (Bankr. S.D.N.Y. 2013).

[48] The FLLs have previously attempted to advance a "course of dealing" theory for a subordination agreement.  The bondholders addressed this argument in their briefing in Adv. Proc. No. 19-396-LTS and refer this Court to those pleadings.  The fact that the  FLLs have to rely on that theory demonstrates that there is no subordination agreement here.

that he was not aware of any intercreditor agreements between the FLLs and the bondholders.[49]

No such agreement exists.

82.    Assured has already briefed these issues, and refers the Court to those pleadings
for more detailed arguments.  *See* Adv. Proc. No. 19-396 ECF No. 55, 80.  As noted in those
pleadings, section 505 is *not* a payment priority provision and it is not even a covenant to pay *all*
Current Expenses.  PREPA's covenant in section 505 to use moneys in the General Fund first for
the payment of Current Expenses cannot be read as a covenant to pay **all** Current Expenses
when, in the very next clauses, PREPA covenanted not to pay Current Expenses in excess of an
amount which "**is** reasonable and necessary" or in excess of the amount provided in "the Annual
Budget," subject only to yet another requirement that the FLLs and Board cannot satisfy:
uncontrollable and unforeseen conditions that occurred **during this fiscal year** that require their
expenses to be paid from the General Fund.[50]

83.    Notably, the Puerto Rico Court of First Instance held that section 505 is *not* a
payment priority provision.  In *UTIER*, PREPA's union challenged the constitutionality of
Act 4-2016, claiming that the imposition of a transition charge to pay PREPA's revenue
bondholders violated the union's alleged payment priority rights as Current Expense claims
under the Trust Agreement.  *UTIER* at 69-70.  The court rejected the union's claims to priority,[51]

---

[49] *See* Skeel Dep. Tr.at 174-75 (Natbony Decl. Ex. 1).

[50] Notably, the FLLs had requested that PREPA provide them with an opinion that all "of PREPA's current and
future bondholders *have agreed* and will be notified that payment of Current Expenses of the Authority *rank senior
to payment of debt service of said bonds*."   *See* Resolution 3815 at p. 4 (emphasis added) (Adv. Proc. No. 17-00232,
ECF 26-4).  **That opinion was never delivered.**   *See generally* Nixon Peabody Letter, Adv. Proc. No. 19-396-LTS,
ECF No. 36-6, (expressing no opinion that the bondholders agreed that payment of Current Expenses "rank senior to
payment of debt service" on the bonds and acknowledging that a court could determine that the loans are not Current
Expenses).

[51] The FLLs claim that *UTIER* focused solely on whether Act 4-2016 was constitutional, and that the law was
upheld because the union was not a third party beneficiary.  Transcript of Claim Estimation Hearing at 123-24, Adv.
Proc. No. 19-391-LTS (June 6, 2023).  While the Court did rule that the union was not a third party beneficiary (a
ruling that applies equally to the FLLs), it also held that Act 4-2016 did not impair the union's priority rights
because they had none under the Trust Agreement.  *See UTIER* at 2, 69-72.

finding that "the purpose of the trust ***was not to establish a priority for payment of PREPA's***

***possible debts*** with respect to current expenses, but to establish that PREPA's obligations would

be paid with the income deposited in the general fund and inform bondholders of such fact." *Id.*

at 70-71 (emphasis added).  The Court held that section 505 "*does not contemplate a priority* in

favor of the plaintiffs *in the payment of the debts* that PREPA may have with the retirement

system." *Id.* at 72 (emphasis added).  The Board agrees with this interpretation of *UTIER*.  Adv.

Proc. 19-405-LTS, ECF No. 53 at p. 6; ECF No. 35 at pp. 18-19; FLL PSA § 4, n. 2, 9(a)(vii)

(permitting the Board to challenge the unions' alleged priority and prohibiting FLLs from

interfering with that challenge).

84.    The words "subordinate," "junior," or "priority" are not mentioned in Section

505.  By contrast, Section 516 has that precise language ***in favor of the bonds***.  *See* Trust

Agreement §§ 516(a), (c).  Where language is used in one section of a contract, but not in other

sections, the absence of that language is deemed intentional.  *See Russello v. United States*, 464

U.S. 16, 23 (1983).

85.    Article V also does not "provide a specific remedy to demand performance of the

obligations agreed to by PREPA, such as payment of its current expenses." *UTIER* at 72.  There

is no "turnover" or reverse waterfall mechanism in Article V that would require the bondholders

to apply monies they receive to the loans if they remain unpaid.  Those are critical and standard

subordination provisions.[52]  Thus, if PREPA paid its bondholders before paying the FLLs, the

FLLs would have no claims against the bondholders for a purported breach of contract.[53]

---

[52] *See CoFund II LLC v. Hitachi Cap. Am. Corp.*, No. 21-2078, 2022 WL 1101576 at *2 (3d Cir. Apr. 13, 2022));
*see also In re MPM Silicones LLC*, 596 B.R. 416, 423 (S.D.N.Y. 2018).

[53] Similarly, there is no reverse waterfall mechanism that the FLLs could enforce.  By contrast, sections 512, 512A,
and 512B provide such a mechanism *if the bonds are not paid*.

86.     The Board has conceded that the "Trust Agreement **does not constitute a subordination agreement creating a payment priority system**." Case No. 17-4780-LTS, ECF No. 1486 ¶ 36 (the "Trust Agreement does not create a payment priority system in favor of Current Expense claimholders"). *Id.* And, as the Board correctly recognized, a subordination agreement "is an agreement *between creditors*," and here there is no such agreement between the bondholders and the FLLs. *Id.* (emphasis in original). *Id.* ¶¶ 37-38.

87.     Unable to point to any specific provisions that grant them priority, the FLLs and Board have claimed that the bondholders conceded that they are subordinate to the FLLs. That is false. The relevant language cited by those parties stated that the FLLs would only be paid ahead of the bondholders if (i) the FLLs demonstrated that they are a Current Expense *and (ii) the Court determined that the bondholders have a gross pledge. See* Transcript of Omnibus Hearing at 136, Case No. 17-3283-LTS, ECF No. 24404  (Feb. 1, 2023).[54] The Court held that the bondholders do <u>not</u> have a gross pledge, and counsel to the ad hoc group made clear on the record that the bondholders intended to challenge the FLLs' claims to priority. By contrast, the record is replete with concessions from the Board that there is no enforceable priority in favor of the FLLs, and that the Trust Agreement is not a subordination agreement. *See, e.g.,* Case No. 17-4780-LTS, ECF No. 1486 ¶¶ 36-51.[55]

88.     The FLLs also lack standing to enforce the Trust Agreement, because they are not third party beneficiaries. *See* Adv. Proc. No. 19-396-LTS, ECF No. 55, 80. The FLLs now

---

[54] Notably, this Court had asked counsel to the ad hoc group if that statement would apply if the bondholders had a net revenue pledge. Counsel to the ad hoc group responded: "No, your Honor. That's the point I wanted to make. **If your Honor were to rule we had a gross revenue pledge** and that they had -- that they constituted 'current expenses,' the document provides **a consent to the release of the gross revenue pledge** to pay current expenses. . . . No remedy that we are seeking will foreclose his ability to prove that he is a current expense, **in which case if we have a gross revenue pledge**, he will be paid out ahead of us." *Id.* at 136-37 (emphasis added).

[55] The Board continues to make these arguments in the SREAEE adversary proceeding. Adv. Proc. 19-405-LTS, ECF No. 53 at p. 6; ECF No. 35 at pp. 18-19.

claim that this issue is irrelevant because PREPA is enforcing the agreement.  That ignores the posture of the Current Expense litigation that is purportedly being settled:  the FLLs *as plaintiffs* sought to declare their rights under the Trust Agreement.  Therefore, the FLLs' failure to demonstrate that they are third party beneficiaries continues to be fatal to the Current Expense litigation.

89.     The FLLs also point to a number of other documents to which the bondholders are not parties.  Assured has already addressed those documents in prior pleadings and refers this Court to its prior submissions.  *See* Adv. Proc. No. 19-396, ECF No. 55, 80.

> b)     *The FLLs' Alleged Priority Rights Are Void Under the Trust Agreement.*

90.     Not only do the FLLs lack contractual priority, the Trust Agreement makes abundantly clear that PREPA had no authority to grant that priority.  Section 1102 of the Trust Agreement provides that nothing in the Trust Agreement shall be construed as permitting "the creation of a lien upon **or a pledge of the Revenues** other than the lien and pledge created or permitted by this Agreement."  Trust Agreement § 1102 (emphasis added).  This Court has held that a "pledge" under the Trust Agreement is an unsecured promise to *dedicate* Revenues to the payment of the bonds.  *See* Summary Judgment Order, at p. 36 ("Here, reading the Trust Agreement as a whole, it unambiguously *embodies a pledge (i.e., a promise)*[56] to pay the amounts owing on the Bonds from Net Revenues . . ."); *id.* at 40 (referencing pledge in context of a payment obligation).  The Court further held that the pledge extends beyond the lien granted under the Trust Agreement.  *Id.* at 60-61.  Thus, the Court has interpreted the term "pledge" under the Trust Agreement as an unsecured promise to pay Revenues to a debt.

---

[56] Assured intends to appeal this Court's interpretation of the term "pledge" in the Trust Agreement.  Nevertheless, this Court's ruling (if not reversed) applies to the Trust Agreement, including with respect to the Fuel Line Facilities.

91.     PREPA did not have authority to pledge Revenues to pay senior debt, and indeed, section 1102 bars *any* pledge of "Revenues" other than the pledges authorized under the Trust Agreement.  Trust Agreement § 1102.   PREPA is only authorized under the Trust Agreement to issue three types of debt and to pledge Revenues in support thereof:  (i) the Bonds; (ii) liquidity facilities that support the Bonds (which are *pari passu* with the Bonds); and (iii) Subordinate Obligations.  *See* Trust Agreement § § 701, 712, 516, 1102.  Only those obligations may have a pledge of Revenues, subject to the terms of the Trust Agreement.  Improperly elevating the status of the FLLs' claims to a Current Expense is no more than a *promise* to pay debt service on the loans from Revenues in the General Fund, ahead of the Bondholders.  PREPA lacked authority to treat the FLLs' loans as Current Expenses—*i.e.* to effectively pledge Revenues to pay the FLLs as senior debt.  Trust Agreement § 1102. Accordingly, any such pledge is null and void *ab initio*, and the FLLs are not entitled to priority.

92.     The FLLs themselves acknowledged that an amendment to the Trust Agreement was necessary to obtain priority.  Specifically, in the 2016 RSA, the FLLs requested that the Current Expense definition be amended to specifically include the fuel line facilities as Current Expenses *and* to include the FLLs as third party beneficiaries to the Trust Agreement.[57]  As the Board's witnesses confirmed, none of those amendments were effectuated because the 2016 RSA was terminated.[58]  Clearly, the FLLs recognized that such an amendment was necessary.[59]

---

[57] *See* 2016 RSA, Adv. Proc. No. 19-391, ECF No. 190-11 Annex D, Schedule III ( requiring "Closing Date Trust Agreement Amendments" that would provide that the fuel line loans "shall constitute 'Current Expenses' . . . relative to PREPA's power revenue bonds . . and shall be paid prior to any payment of the Bonds . . . . *The foregoing shall be set forth in an amendment to the Trust Agreement executed by persons holding or controlling at least 60% of the Bonds prior to the closing of the Restructuring Transactions* . . .").

[58] *See* Brownstein Dep. Tr. at 288-89   (Natbony Decl., Ex. 2).

[59] The FLLs have repeatedly cited to the pre-Title III RSAs and forbearance agreements as evidence that they would have received a par recovery outside of bankruptcy and that they had seniority over the bondholders. *See, e.g.*, Adv. Proc. No. 17-232-LTS, ECF No. 24, ¶ 21 (citing RSA as evidentiary basis for claims that FLLs had "priority rights under the Trust Agreement");  Case No. 17-3283-LTS, ECF No. 9068, ¶¶ 40-44 (citing 2014-15 forbearance

93.     The Board has likewise conceded that an amendment to the Trust Agreement was required to give the FLLs priority.  As the Board stated, "any seniority could be taken away at any time by PREPA and a majority of Bondholders, the only parties that are required to consent to an amendment to the Trust Agreement."[60]  Case No 17-4780-LTS, ECF No. 1486 ¶ 48. Further, "PREPA acting alone cannot make the fuel line lender claims senior to the bonds, or amend the definition of Current Expenses to include things that are not Current Expenses under the Trust Agreement."  *Id.* ¶ 54.  And, as the Board correctly recognized, the FLLs' argument would lead to absurd results under the Trust Agreement, because it would permit PREPA to unilaterally subordinate the bondholders to "limitless amounts of long-term debt" simply by labeling that debt as a Current Expense.  *Id.* ¶ 53.[61]

94.     PREPA lacked authority to unilaterally give the lenders any priority, and the FLLs have no such priority.  PREPA and the bondholders are therefore highly likely to succeed in the Current Expense litigation.

### D.     Litigation With The FLLs Is Not Complex And Will Not Cause Material Expense Or Delay.

95.     The third Rule 9019 factor[62] also weighs heavily against the FLL settlement, because the FLL litigation is not complex and will not cause any material expense or delay. Where reduction in cost and delay is the "only factor that weighs in favor of approving the

---

agreements and RSA as evidentiary basis for payment priority, noting that bondholders would receive a less than par recovery while FLLs received 100 cents); *see also* Adv. Proc. No. 19-396-LTS, ECF No. 62.

[60] For the reasons set forth herein, this Court's ruling as to the meaning of the term "pledge" in the Summary Judgment Order means that <u>all</u> bondholders would have to consent, because section 1102 bars *any* pledge of "Revenues."  Trust Agreement § 1102.  Moreover, even if section 1102's proviso did not apply, far more than a majority is required to effectuate an amendment to the Trust Agreement.  *Id.*

[61] If one were to accept that any debt that financed a Current Expense would qualify as a Current Expense *and* that the Board is correct that capital improvements qualify as Current Expenses, then all of the bonds would be Current Expenses.  Indeed, PREPA was authorized to issue bonds for any of its corporate purposes and to fund critical infrastructure projects.  *See* Trust Agreement §§ 208, 209.  PREPA did issue bonds for those purposes.  *E.g.*, Series EEE Official Statement at 8, *available at* https://emma.msrb.org/ER735613.pdf (last visited June 12, 2023).

[62] The second factor—difficulties in collection—is not relevant here.

settlement," this factor does "not outweigh the other factors" and does "not form a sufficient basis for approval of the settlement." *In re Exide Techs.*, 303 B.R. 48, 71 (Bankr. D. Del. 2003). Indeed, the "terms of any settlement require some more reasonable basis than expediency and the desire to terminate complex and troublesome litigation." *In re Taylor*, 190 B.R. 417 (Bankr. D. Col. 1995).

96.     The litigation the FLL PSA purports to resolve is not complex.  The Current Expense litigation involves *purely legal issues of contract interpretation* that can be decided on the papers.  The parties have already submitted extensive briefing, which is complete.  Consequently, this Court is well-situated to resolve the dispute without any material delay or inconvenience to the parties. Moreover, the Current Expense Litigation is an intercreditor dispute, which the Board cannot unilaterally settle.[63]  The cost to PREPA is therefore minimal.  The only defendants on the subordination claims brought by the FLLs are the Trustee, Bondholders, and Monolines—*not* PREPA or the Oversight Board.[64]  And those claims are about where each creditor group stands in line for payment, not how much PREPA must pay those creditors in total.   PREPA could simply step aside, reserve any amounts subject to the intercreditor dispute, and allow the creditors to adjudicate those issues.[65]  That is precisely what the Board did for the HTA intercreditor dispute.  *See* CW Plan, Art. 63.2.  Plan confirmation could proceed entirely without this settlement, and as such there is no risk of undue delay.[66]

---

[63] As when the FLLs objected to the 2019 RSA, "[t]he Oversight Board should not be permitted to compromise or release the particularized objections and claims of the FLLs." ECF No. 1700 at 67-68.

[64] Moreover, the Court *denied* the Board full participation rights on the subordination counts of the Current Expense litigation, and thus the Board does not have authority to settle those claims.  *See* Adv. Proc. 19-396, ECF No. 59.

[65] *See, e.g.*, Third Amended Plan of Reorganization,  *In re Energy Future Holdings Corp.*, Case No. 14-10979, ECF No. 9374 at 64 (Bankr. D. Del. Aug. 23, 2016) (requiring establishment of reserve if final and non-appealable order in intercreditor dispute was not issued prior to effective date).

[66] Assured notes that the proposed confirmation order states that the Plan shall not be construed as granting third party releases in favor of the FLLs.  Proposed Confirmation Order ¶  47(a).  To the extent that the Plan does provide for any non-consensual releases, Assured objects to those releases.

E.    **The Paramount Interest Of The Creditors And A Proper Deference
To Their Reasonable Views Weighs Squarely Against Approval Of
the Fuel Line Lender Settlement.**

97.    The fourth Rule 9019 factor—the "paramount interest of creditors"—has been

described as a major factor when considering whether to approve a settlement. *In re Meyer*, 105

B.R. 920, 926 (Bankr. D. Minn. 1989). In deciding this factor, the "basic question for the court"

is whether the settlement is in the "best interest of the estate and its creditors." *In re Dalen*, 259

B.R. 586, n.25 (Bankr. W.D. Mich. 2001). Protecting the best interests of creditors necessarily

includes consideration of the proposed settlement's fairness to the *non-settling* creditors.[67] In

weighing the views of the creditors, courts have considered not only their position on whether

the settlement is appropriate, but (1) the degree to which creditors object;[68] (2) the size of the

claims pool represented by the objectors;[69] and (3) the overall posturing of the creditor body with

respect to the settlement.[70]

98.    Here, the FLL settlement is not in the paramount interest of creditors. The FLL

settlement seeks to resolve an intercreditor dispute, providing the FLLs with an enormous

windfall at the expense of other creditors. Moreover, the FLLs' proposed recoveries do not

reflect any likely litigation outcomes, as explained above. The Board's own witnesses have

admitted that the real benefit to the settlement is that the FLLs will support the Board's plan of

---

[67] *See, e.g., In re AWECO, Inc.*, 725 F.2d 293, 298 (5th Cir. 1984); *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 837 (Bankr. D. Del. 2008) ("[N]ot only does this Court need to afford paramount consideration to the interests of creditors, that consideration should focus particularly on the fairness of a settlement *to those parties who did not partake in the settlement*."); *In re Biolitec*, 528 B.R. 261, 270 (Bankr. D. N.J. 2014); *In re Miami Metals I, Inc.*, 603 B.R. 531, 536 (Bankr. S.D.N.Y. 2019).

[68] *In re Roqumore*, 393 B.R. 474, 480 (Bankr. S.D. Tex. 2008).

[69] *In re Pullum*, 598 B.R. 489, 496 (Bankr. N.D. Fla. 2019) ("it would be improper for the Court to disregard [the] objections" of "an overwhelming amount of the unsecured debt, so this factor weighs against approval of the settlement. . ."); *In re Key3Media Grp., Inc.*, 336 B.R. 87, 97 (Bankr. D. Del. 2005) (giving proper deference to objecting parties representing the largest independent claimholders in the proceeding)

[70] *Matter of Foster Mortg. Corp.*, 68 F.3d 914, 918 (5th Cir. 1995) ("we believe a bankruptcy court should consider the amount of creditor support for a compromise settlement as a "factor bearing on the wisdom of the compromise," as a way to show deference to the reasonable views of the creditors")

-48-

adjustment.  However, the Board has stated that it believes its objective is to reduce PREPA's

debt to sustainable levels.[71]  That objective is inconsistent with a settlement that gives the FLLs

an enormous windfall and potentially no haircut on their claims.

99.     Furthermore, the FLL settlement is opposed by the overwhelming majority of

PREPA's creditors, including the vast majority of PREPA's bondholders, PREPA's union, and

the official committee of unsecured creditors.  The Court should give proper deference to the

overwhelming objections of the creditor body.

100.     Because all of the Rule 9019 factors weigh against the FLL settlement, the FLL

settlement embodied in the Plan should be denied.

## VI.     <u>Section XXV.A Of The Plan Impermissibly Authorizes The "Expungement" Of Proofs Of Claim, And Therefore Renders The Plan Unconfirmable Under PROMESA § 314(b)(1).</u>

101.     Section XXV.A of the Plan provides that "Notwithstanding anything contained in

the Plan to the contrary, on the Effective Date, any (i) PREPA Revenue Bond Claim . . . filed by

any Entity for amounts due under existing securities and (ii) Proofs of Claim included on a

schedule to the Plan Supplement, if any, shall be deemed satisfied and expunged and the

Oversight Board shall instruct the Solicitation Agent, its court-appointed representative, to

remove such Claims from the Claims Register maintained for the benefit of the Title III Court."

It is not entirely clear whether Assured's proofs of claim, filed in its capacity as a bond insurer,

are intended to be included in the term "PREPA Revenue Bond Claim."[72]  *See* Claim Numbers

29020 and 31087 (together, the "<u>Proofs of Claim</u>"),   (available on Kroll's website at

---

[71] *See* FOMB Press Release (Sept. 6, 2022), *available at*
https://drive.google.com/file/d/1XJ61kMLDLDo6vzDfW0NnNttpnWuDGQhJ/view  (last visited June 12, 2023).

[72] The Plan defines "*PREPA Revenue Bond Claim*"  to mean, "other than the National Claims, a Claim against PREPA on account of any PREPA Revenue Bonds, including Insured PREPA Revenue Bonds, Uninsured PREPA Revenue Bonds, and insurance policies issued by the Monoline Insurers."  *See* Plan § I.A.184.

https://cases.ra.kroll.com/puertorico/Home-ClaimInfo).    To the extent Section XXV.A is intended to authorize the Board to expunge or otherwise resolve Assured's Proofs of Claim without even being required to object to them, however, Section XXV.A is at odds with the procedures required by the Bankruptcy Code with respect to the allowance of claims.

102.    Specifically, Section 502(a) of the Bankruptcy Code expressly provides that "[a] claim . . ., proof of which is filed under section 501 of this title, is **deemed allowed, unless a party in interest . . . objects**." 11 U.S.C. § 502(a) (emphasis added). Here, no objection has been filed to Assured's Proofs of Claim, so the Bankruptcy Code currently dictates that those Proofs of Claim are deemed allowed. Section 502(b) in turn provides that "**if such objection to a claim is made**, the court, **after notice and a hearing**, shall determine the amount of such claim . . . ." 11 U.S.C. § 502(b) (emphasis added). The Bankruptcy Code therefore mandates that the Board is required to file a claim objection, and that Assured is entitled to "notice and a hearing" with respect to that objection, before any determination is made as to the allowance or disallowance of Assured's Proofs of Claim. Indeed, courts have repeatedly recognized that the right of creditors to file a proof of claim and to have it adjudicated in accordance with the Bankruptcy Code's mandated procedures is "fundamental" to the bankruptcy process.[73]

103.    Moreover, Section 314(b)(1) of PROMESA permits a plan to be confirmed only if it "complies with the provisions of title 11 of the United States Code, made applicable to a case under this title by section 301 of this Act."    PROMESA § 314(b)(1). Section 502 of the Bankruptcy Code is incorporated into Title III (*see* PROMESA § 301(a)), and Section XXV.A

---

[73] *See, e.g.*, *In re Ozarowski*, Adv. No. 06-1245(RTL), 2006 WL 3694547, at *6 (Bankr. D.N.J. Dec. 12, 2006) ("The Bankruptcy Code views the right to file a proof of claim as a fundamental right of creditors.") *In re McMillen*, Adv. No. 09-6611-JB, 2010 WL 2025610, at *2 (Bankr. N.D. Ga. Feb. 25, 2010) (quoting *B-Real, LLC v. Rogers*, 405 B.R. 428, 432 (M.D. La. 2009)) ("The right of a creditor to file a proof of claim is explicit and fundamental to the proper administration of a bankruptcy case, and courts are 'wary of any ruling that impinges on a creditor's right to follow the procedural provisions of the Bankruptcy Code.'") *In re Pariseau*, 395 B.R. 492, 495 (Bankr. M.D. Fla. 2008) ("One of the core fundamentals in bankruptcy is a creditor's right to file a proof of claim.").

does not "comply" with Section 502.  Therefore, Section XXV.A, as well as any other provisions of the Plan or Proposed Order that purport to "expunge" proofs of claim without following the procedures mandated by Section 502, render the Plan unconfirmable.[74]

## VII.   The Plan Is Unconfirmable Under *Granada Wines*.

104.   In *Granada Wines, Inc. v. New England Teamsters & Trucking Indus. Pension Fund*, 748 F.2d 42, 46 (1st Cir. 1984), the First Circuit held that "the general rule regarding classification is that 'all creditors of **equal rank** with claims against the **same property** should be placed in the same class" (emphasis added).   In connection with approval of the Commonwealth's disclosure statement, this Court concluded that *Granada Wines* did not apply under PROMESA, because "although the objecting parties here contend that Granada Wines effectively represents the First Circuit's interpretation of the phrase 'substantially similar,' that phrase does not appear anywhere in that opinion."  *See* Transcript of Commonwealth Disclosure Statement Hearing, 77:23-78:2,  Case No. 18-3283-LTS, ECF No. 17379, (July 14, 2021).  On that basis, the Court concluded that "the passage of the Granada Wines opinion that is at issue here is not an interpretation of section 1122 in Chapter 11 cases, but, rather, represents the importation of a classification rule from Chapter X of the Bankruptcy Act into the First Circuit's Chapter 11 jurisprudence."  *Id.* at 78:4-9.

---

[74] The Oversight Board may attempt to justify Section XXV.A based on a theory that Assured's Proofs of Claim are somehow duplicative of other proofs of claim, such as the master proof of claim filed by the bond trustee.  However, whether or not Assured's Proofs of Claim are duplicative of other proofs of claim is precisely the sort of issue that would need to be adjudicated in a "hearing" following a claim objection, and after Assured has received "notice" that the Oversight Board is objecting to its Proofs of Claim on that basis.  Although no such objection is currently before the Court, Assured notes that its Proofs of Claim are clearly not duplicative of the bond trustee's proof of claim in important respects, including because Assured asserts claims based on its insurance agreements with PREPA.  As set forth in Section III.B *supra*, these separate claims of Assured under its insurance agreements include the right to be reimbursed or otherwise compensated for losses under its policies, and the Plan already recognizes a similar claim arising from National's insurance agreements in the form of the National Reimbursement Claim.  Given that the Plan recognizes the National Reimbursement Claim as being separate and distinct from the National Insured Bond Claims, the Board cannot realistically argue that Assured's claims under its insurance agreements, as reflected in the Proofs of Claim, are "duplicative" of Assured's claims on its insured bonds.

105.    Objectors have now obtained the original briefing from *Granada Wines*, however,

which indicates that Section 2.c of the case is in fact an interpretation of Section 1122.

Specifically, the issue in *Granada Wines* was whether, in view of Section 1123(a)(4)'s

requirement that all claims in a class receive the "same treatment,"[75] the debtor could provide a

lower recovery to an ERISA pension fund's withdrawal liability claim, notwithstanding that the

debtor's plan had placed that claim in the same class as all other unsecured claims.  The debtor

argued that although the plan had nominally placed the pension claim in the same class as other

unsecured claims, *substantively* the pension claim was in a different class, *because* Section

1122(a) of the Bankruptcy Code permits only "substantially similar" claims to be placed in the

same class, and *because* the pension claim was not "substantially similar" to other unsecured

claims.  In this context, the debtor expressly argued that Section 1122(a) was a codification of *In*

*re Los Angeles Land & Investments, Ltd.*, 282 F.Supp. 448 (D. Haw. 1968):

> [§ 1123(a)(4)] . . . must be read together with § 1122(a), which
> requires that claims be placed in the same class only if they are
> 'substantially similar.'  This standard is a codification of case law
> current at the time the Bankruptcy Code was passed and therefore
> pre-Code cases are relevant to an analysis of its effect . . . Such a
> case is *In re Los Angeles Land & Investments, Ltd.*, 282 F. Supp.
> 448 (D. Haw. 1968), *aff'd* 447 F.2d 1366 (9th Cir. 1971), in which
> the court determined that unsecured creditors may be divided into
> separate classes where the legal character of their claims is such as
> to accord them a status different from other unsecured claims.  In
> this case, the Pension Fund's different treatment in a chapter 7
> rather than a chapter 11 is such a difference in legal character that
> requires separate classification.[76]

---

[75] Notably, although it is clear from the bankruptcy court decision affirmed in *Granada Wines* that Section
1123(a)(4) of the Bankruptcy Code governed the First Circuit's conclusion that the pension fund's claim needed to
receive the same treatment as other unsecured claims in its class, Section 1123(a)(4) is never cited or quoted in the
First Circuit's opinion.  *See In re Granada Wines, Inc.*, 26 B.R. 131, 134 (Bankr. D. Mass. 1983)  ("The Pension
Fund has a general unsecured claim and the debtor is not permitted to unfairly discriminate against a member of the
unsecured class. 11 U.S.C. § 1123(a)(4).").  The fact that Section 1122 is likewise not expressly cited or quoted in
the First Circuit's opinion therefore does not prevent *Granada Wines* from being a case about Section 1122.

[76] *See* Brief of Appellant, *Granada Wines, Inc. v. New England Teamsters and Trucking Industry Pension Fund*,
Case No. 84-1518 (1st Cir. July 31, 1984), at p. 41 (Natbony Decl., Ex. 4).

106.    The question before the First Circuit was therefore whether, *under Section 1122(a)*, the pension claim was not "substantially similar" to other unsecured claims, such that as a *legal* matter it had to constitute a separate class, even if not designated as such under the plan. The First Circuit rejected the debtor's argument that the pension claim was not "substantially similar" to other unsecured claims based on the case of which the debtor had argued Section 1122(a) was a codification, namely *Los Angeles Land*, stating that "'all creditors of equal rank with claims against the same property should be placed in the same class.'" *Granada Wines*, 748 F.2d 42 at 46. (quoting *Los Angeles Land*, 282 F.Supp. at 453).   The First Circuit's analysis therefore took place in the context of a dispute over the meaning of Section 1122(a), and based on the assumption that Section 1122 is a codification of *Los Angeles Land*.

107.    As such, *Granada Wines* is the controlling interpretation of Section 1122 in this Circuit.  The Plan's classification scheme is illegal under that controlling precedent, including because it classifies (i) bond claims with the same security and priority separately in Classes 1 and 2, and (ii) general unsecured claims separately, including in Classes 3, 4, 7, 8, and 10.

**VIII.   PROMESA Is An Unconstitutional Non-Uniform Bankruptcy Law.**

108.    Finally, in addition to the above reasons that the Plan should not be confirmed because of defects in the Plan itself, it should also not be confirmed for the more fundamental reason that PROMESA itself is an unconstitutional non-uniform bankruptcy law.  Specifically, Congress's power to enact bankruptcy laws is set forth in, and limited by, Art. I, § 8, cl. 4 of the U.S. Constitution (the "Bankruptcy Clause"), which provides that Congress shall have the power "to establish . . . uniform Laws on the subject of Bankruptcies throughout the United States." U.S. CONST. art. I, § 8, cl, 4.  The Bankruptcy Clause requires all bankruptcy laws passed by Congress to be "uniform."

109.     Objectors recognize that the Court previously concluded in connection with
confirmation of the Commonwealth plan that "PROMESA does not violate the uniformity
requirement of the Bankruptcy Clause of the Constitution of the United States" (*In re Fin.
Oversight & Mgmt. Bd. for P.R.*, 637 B.R. 223, 254-55 (D.P.R. 2022)), but the Court's
uniformity ruling in the Commonwealth case has since been superseded by other authorities and
events.  For example, in the Amended Lien & Recourse Challenge, Objectors took the position
that PROMESA is not a "bankruptcy" law enacted pursuant to the Bankruptcy Clause, because
Congress instead invoked article IV, section 3 of the U.S. Constitution (the "Territories Clause")
in enacting PROMESA.  *See, e.g.*, Adv. Proc. No. 19-391-LTS, ECF No. 67 ¶ 133 n.23; ECF
No. 91 ¶ 69 n.21.  However, the Court rejected Objectors' argument, and instead held in its
Summary Judgment Order that PROMESA gives the Oversight Board the status of a "trustee in
bankruptcy."  *See* Summary Judgment Order at p. 49 (applying to the Oversight Board 19
L.P.R.A. § 2267(a)(2), which gives a "lien creditor . . . priority over unperfected security
interests"); *see also* 19 L.P.R.A. § 2212(a)(52)(C) (defining "Lien creditor" to include "a trustee
in bankruptcy").  Absent a future reversal of the Summary Judgment Order, that holding
necessarily means that PROMESA is a "bankruptcy" law subject to the uniformity requirement
of the Bankruptcy Clause.

110.     Moreover, the Oversight Board is now judicially estopped from arguing that
PROMESA is not a bankruptcy law, because it argued in the Amended Lien & Recourse
Challenge that the Oversight Board qualified as a "trustee in bankruptcy" on account of its
powers under PROMESA.  *See*, *e.g.*, Adv. Proc. No. 19-391-LTS ECF No. 89 ¶ 105; ECF No.
104 ¶ 41 (referring to the Oversight Board as a "bankruptcy trustee").  Having prevailed on its

position that PROMESA is a bankruptcy law giving the Oversight Board the powers of a "bankruptcy trustee," the Oversight Board is now estopped from taking a contrary position.[77]

111.   In any event, the Oversight Board also conceded in its briefing in *Fin. Oversight and Mgmt. Bd. for P.R. v. Cooperativa de Ahorro y Credito Abraham Rosa,* 41 F. 4th 29 (1st Cir. 2022) that PROMESA was enacted pursuant to Congress's "bankruptcy power."[78]   The First Circuit adopted that view, concluding that because the Board had "point[ed] to the fact that the bankruptcy laws themselves claim an express toehold in the text of the Constitution," namely "Clause 4 of Article I, Section 8, [which] expressly authorizes Congress to establish 'uniform

---

[77] *See, e.g., N.H. v. Me.*, 532 U.S. 742, 749 (2001), *reh'g denied*, 533 U.S. 968 (2001) (holding that judicial estoppel "'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase'") (citation omitted) *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.,* 374 F.3d 23, 33-36 (1st Cir. 2004) (holding that litigant was judicially estopped from advancing new arguments where the party's new argument was inconsistent with its original arguments and a court accepted the original position).  To the extent the Oversight Board argues that PROMESA is a "local" rather than federal bankruptcy law, any such "local" bankruptcy law would be preempted by 11 U.S.C. § 903 and would also be void under the Contracts Clause.  *See Franklin Cal. Tax-Free Trust v. P.R.*, 85 F. Supp. 3d 577 (D.P.R. 2015), *aff'd* 805 F.3d 322 (1st Cir. 2015), *aff'd* 579 U.S. 115 (2016).  Furthermore, PROMESA operates far outside the borders of Puerto Rico, as evidenced by the fact that it threatens to impair the debts of Objectors and other creditors located in the U.S. mainland.  Indeed, PROMESA does not even require the Title III proceedings themselves to be held in Puerto Rico, and instead permits them to be held in "the district court for [any] jurisdiction in which the Oversight Board maintains an office that is located *outside the territory*."  *See* PROMESA § 307(b)(1) (emphasis added).  This unique venue provision has been particularly harmful to Objectors, as it served as a basis for the Court's conclusion that Objectors are not protected by the First Circuit's "strict" standards for claims classification as set forth in *Granada Wines, Inc. v. New England Teamsters & Trucking Indus. Pension Fund*, 748 F.2d 42 (1st Cir. 1984).  *See* Transcript of Commonwealth Disclosure Statement Hearing at 80:6-12  Case No. 18-3283-LTS, ECF No. 17379 (July 14, 2021); Transcript of PREPA Disclosure Statement Hearing, 146:24-147:12, Case No. 18-3283-LTS, ECF No. 24404  (Feb. 28, 2023).

[78] *See, e.g., Brief For Debtors-Appellees/Cross-Appellants* at 2, *Fin. Oversight and Mgmt. Bd. for P.R. v. Cooperativa de Ahorro y Credito,* Case No. 22-1119 (1st Cir. April 1, 2022), (Natbony Decl., Ex. 5) (defending PROMESA's ability to discharge claims based on the fact that "the Constitution grants Congress the bankruptcy power") *id.* at 20 (defending PROMESA's ability to discharge claims based on the fact that "**Article I, Section 8, clause 4 of the Constitution** grants Congress bankruptcy power to discharge claims") *id.* at 29 (defending PROMESA's ability to discharge claims based on the fact that "[t]he constitution grants Congress the bankruptcy power to legislate the discharge of debts"); *Reply Brief For Debtors-Appellees/Cross-Appellants* at 1, *Fin. Oversight and Mgmt. Bd. for P.R. v. Cooperativa de Ahorro y Credito,* Case No. 22-1119 (1st Cir. April 22, 2022) (Natbony Decl., Ex. 6) defending PROMESA's ability to discharge claims based on "the bankruptcy power the Constitution grants Congress") *id.* at 3 ("**When the Commonwealth later commenced a Title III case, however, the bankruptcy power** authorized Congress to discharge those and other unsecured obligations without payment in full.") (emphasis added) *id.* at 7 ("**The operation of the bankruptcy power on appellees'** prepetition, unsecured claims does not violate the Fifth Amendment . . . .").

Laws on the subject of Bankruptcies,'" the First Circuit was required to "consider the relationship between the Takings Clause and the bankruptcy laws." *Id.* at 41-42.

112.   And the Board also concedes in the Proposed Order that PROMESA constitutes an "exercise by Congress of its exclusive power to enact uniform bankruptcy laws." *See* Proposed Order ¶ 3(E) n.4 (quoting *In re City of Stockton, Cal.*, 526 B.R. 35, 49-50 (Bankr. E.D. Cal. 2015)).

113.   As such, there is no longer any serious dispute that PROMESA is a "bankruptcy law" subject to the Bankruptcy Clause.

114.   Indeed, as the Supreme Court reaffirmed just last year, the language of the Bankruptcy Clause is "broad," encompassing "nothing less than 'the subject of the relations between [a] debtor and his creditors.'" *Siegel v. Fitzgerald*, 142 S.Ct. 1770, 1778 (2022) (quoting *Wright v. Union Central Life Ins. Co.*, 304 U.S. 502, 513-14 (1938)). PROMESA is indisputably a law that addresses the subject of the relations between a debtor (here, PREPA), and its creditors (including Objectors). The fact that Congress purported to enact PROMESA pursuant to its authority under the Territories Clause therefore does not diminish the applicability of the Bankruptcy Clause, because "Congress cannot evade the 'affirmative limitation' of the uniformity requirement by enacting legislation pursuant to other grants of authority." *Siegel*, 142 S.Ct. at 1779 (citation omitted). That clear statement by the Supreme Court last year supersedes this Court's prior conclusion that Congress could evade the uniformity requirement by purporting to enact PROMESA under the Territories Clause.

115.   Moreover, the uniformity requirement of the Bankruptcy Clause "does not permit arbitrarily geographically disparate treatment of debtors." *Siegel*, 142 S.Ct. at 1780 (holding unconstitutional a bankruptcy law that applied only to Alabama and North Carolina). PROMESA violates this uniformity requirement of the Bankruptcy Clause, because PROMESA

applies only to Puerto Rico, not to any other territory, state, or governmental debtor. Indeed,

PROMESA's official title is "*Puerto Rico* Oversight, Management, and Economic Stability Act,"

highlighting the fact that PROMESA applies only to Puerto Rico. *See* PROMESA § 1(a).

Consistent with PROMESA's official title, many provisions of the statute expressly apply only to

Puerto Rico.[79]   And the statute also contains congressional findings and a statement of

congressional purpose focused exclusively on Puerto Rico's fiscal situation as the justification for

enacting the law. *Id.* § 405(m)-(n).[80]

116.   Congress thus provided Puerto Rico alone with access to the unique debt

restructuring process in PROMESA, notwithstanding that Puerto Rico was not the only similarly

situated territory facing fiscal difficulties at the time of PROMESA's enactment. In particular,

other U.S. territories, including the United States Virgin Islands ("USVI"), the Northern Mariana

Islands, and Guam, were experiencing significant financial distress around the time of

PROMESA's enactment, and as such were sufficiently similarly situated to Puerto Rico that, at a

minimum, these other territories would have needed to be included within the scope of

PROMESA in order for there to be any realistic argument that PROMESA might qualify as a

"uniform" bankruptcy law.[81]   If Objectors had held debts issued by any of these other distressed

---

[79] *See, e.g.*, PROMESA § 101(b)(1) (establishing an Oversight Board only for Puerto Rico); *id.* § 402 (stating that "[n]othing in this Act shall be interpreted to restrict Puerto Rico's right to determine its future political status"); *id.* § 405(b) (creating an automatic stay of certain actions "against the Government of Puerto Rico" or "property of the Government of Puerto Rico"); *id.* § 407(a) (providing creditors with certain protections against transfers of "property of any territorial instrumentality of Puerto Rico" and rights of recovery against the transferee).

[80] PROMESA's legislative history further underscores PROMESA's unique focus on Puerto Rico. Earlier versions of the statute authorized territories other than Puerto Rico to establish oversight boards, but Congress removed those provisions before enacting PROMESA, demonstrating Congress's intent for Puerto Rico to be the sole territory with access to PROMESA's debt-adjustment procedures. *Compare* PROMESA § 101(b), *with* H.R. 4900 § 101, 114th Cong., 2d Sess. (2015-2016).   Similarly, legislators involved in PROMESA's enactment emphasized that PROMESA was focused on providing bankruptcy relief to Puerto Rico. *See, e.g.*, 162 CONG. REC. H3609 (daily ed. June 9, 2016) (statement of Rep. Ryan) ("What this bill will do is allow Puerto Rico to restructure its debts and set up an oversight board that will oversee this process.").

[81] For example, the debt-to-GDP ratio in the USVI grew to 72% by 2015, with "economic uncertainty and looming government pension fund insolvency" creating concerns about debt repayment. *See* U.S. Gov't Accountability Off.,

territories, their liens would not have been subject to avoidance under the Bankruptcy Code and their claims would not have been subject to discharge in bankruptcy, which instead are harms uniquely inflicted on Objectors through PROMESA's enactment with respect to Puerto Rico.

117.    Moreover, Congress provided Puerto Rico alone with access to the unique debt restructuring process in PROMESA, notwithstanding that other municipalities "throughout the United States" are subject to Chapter 9's different procedural and substantive standards.  As one example, PROMESA uniquely establishes an "Oversight Board" with exclusive powers to develop fiscal plans.  The Oversight Board has wielded those unique powers to Objectors' detriment, even to the extent of seeking to preclude Objectors' ability to challenge the economic assumptions underlying the Plan and central to its confirmability.  *See*, *e.g.*, ECF No. 3581.  And the potential plans that could be proposed under Title III are limited to those consistent with the fiscal plans certified by the Board in the exercise of its partially unreviewable authority.  *See*, *e.g.*, PROMESA §§ 314(b)(7); 106(e).  PROMESA thus treats Puerto Rico differently than all other territories and all other governmental debtors subject to Chapter 9.

118.    In a section of PROMESA entitled "Uniformity" (*see* PROMESA § 3(b), the "PROMESA Uniformity Provision"), Congress affirmatively acknowledged that PROMESA was a non-uniform bankruptcy law ripe for invalidation.  *See* PROMESA § 3(b).  Specifically, the PROMESA Uniformity Provision recognizes that a court might "hold[] invalid . . .

---

GAO-18-160, *U.S. Territories Public Debt Outlook*, at Highlights (Oct. 2017), avail. at https://www.gao.gov/products/gao-18-160. Guam's debt-to-GDP ratio reached 44% in the same timeframe, with "risk[s]" presented by "large unfunded pension[s] and other . . . liabilities." *Id.*  And as reflected in Exhibit 7 to the *Expert Report of Sebastian Edwards* (ECF No. 3424-2), since 2003 the Northern Mariana Islands have suffered a greater economic decline than Puerto Rico's.  Indeed, in 2012 the Northern Mariana Islands Retirement Fund sought bankruptcy relief, but its case was dismissed because, as an instrumentality of a territorial government, it lacked bankruptcy eligibility.  *In re N. Mariana Islands Ret. Fund*, No. 12-00003, 2012 WL 8654317 (D.N. Mar. Is. June 13, 2012).  The Fund's case illustrates the acute need for bankruptcy relief by governmental units in territories other than Puerto Rico in the period preceding PROMESA's enactment.  *See also See* 162 CONG. REC. H3630 (daily ed. June 9, 2016) (statement of Rep. Byrne) ("[W]e heard testimony from the representatives of two other territories, who told us that they are concerned that their territories are sliding in the same direction as Puerto Rico's").

provision[s] of th[e] Act or the application thereof on the ground that the provision[s] fail[] to treat similarly situated territories uniformly." *Id.*

119.    The PROMESA Uniformity Provision also purports to provide a mechanism for PROMESA to be extended to other territories by court order in the event it would otherwise be found to be an unconstitutional non-uniform bankruptcy law, but this aspect of the Uniformity Provision is ineffective and unenforceable for numerous reasons.

120.    First, any attempt to extend PROMESA to other territories could not be effectuated by a court order, and instead would require legislative action, because courts have no authority to rewrite a statute, even when invited to do so by Congress.[82]

121.    Second, Congress cannot cure the uniformity problem by directing a court to extend PROMESA to other territories that *may* request the establishment of an oversight board but that, unlike Puerto Rico, are not *required* to have an oversight board.  Even if a court could rewrite the statute in that manner (and it cannot), the uniformity violation would remain, because PROMESA would still treat Puerto Rico differently than all other territories.

122.    Third, even if a court could permissibly extend PROMESA to other territories, a uniformity problem would persist, because state municipalities would be subject to the fundamentally different process provided by Chapter 9.

123.    The ultimate significance of the PROMESA Uniformity Provision is therefore to highlight PROMESA's non-uniformity—not to save PROMESA from invalidation.

---

[82] *See, e.g.*, *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2211 (2020) (A court's "only instrument" for remedying a constitutional defect in a statute is a "blunt one": it has the "negative power to disregard an unconstitutional enactment" but cannot "re-write" the law.) *Whole Woman's Health v. Hellerstedt,* 136 S. Ct. 2292, 2319 (2016) ("A severability clause is not grounds for a court to devise a judicial remedy . . . that entail[s] quintessentially legislative work."); *United States v. Stevens*, 559 U.S. 460, 481 (2010) (Courts have no authority to "rewrite" a law "to conform it to constitutional requirements."); *Ackerley Commc'ns of Mass., Inc. v. City of Cambridge*, 135 F.3d 210, 216 (1st Cir. 1998) (declining to enforce severability clause out of "respect" for separation of powers).

**IX.**     **Joinder And Reservation Of Rights.**

124.    Assured hereby joins in and incorporates by reference the substance of the arguments set forth in the Ad Hoc Group Objection, other than any portions addressing a settlement or potential settlement with National.  Assured refers the Court to its own objections relating to the National settlement as set forth herein.  Assured reserves the right to amend or supplement this Objection, and to raise additional objections at the Confirmation Hearing.

## CONCLUSION

For the reasons set forth herein, confirmation of the Plan should be denied.

Dated:  New York, New York
         June 12, 2023

CASELLAS ALCOVER & BURGOS P.S.C.    CADWALADER, WICKERSHAM & TAFT LLP

By: /s/ Heriberto Burgos Pérez

Heriberto Burgos Pérez
USDC-PR 204809
Ricardo F. Casellas-Sánchez
USDC-PR 203114
Diana Pérez-Seda
USDC-PR 232014
P.O. Box 364924
San Juan, PR 00936-4924
Telephone: (787) 756-1400
Facsimile:  (787) 756-1401
Email:  hburgos@cabprlaw.com
        rcasellas@cabprlaw.com
        dperez@cabprlaw.com

*Attorneys for Assured Guaranty Corp. and Assured Guaranty Municipal Corp.*

By: */s/ Howard R. Hawkins, Jr.*

Howard R. Hawkins, Jr.*
Mark C. Ellenberg*
Casey J. Servais*
William J. Natbony*
Thomas J. Curtin*
200 Liberty Street
New York, NY 10281
Telephone:  (212) 504-6000
Facsimile:  (212) 504-6666
Email:  howard.hawkins@cwt.com
        mark.ellenberg@cwt.com
        casey.servais@cwt.com
        bill.natbony@cwt.com
        thomas.curtin@cwt.com

* Admitted *pro hac vice*

*Attorneys for Assured Guaranty Corp. and Assured Guaranty Municipal Corp.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I filed this document electronically with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to all parties of record in the captioned case.

At New York, New York, 12th day of June , 2023.

By: _/s/ Howard R. Hawkins, Jr._
Howard R. Hawkins, Jr.*
* Admitted pro hac vice