## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>The Financial Oversight and Management Board for Puerto Rico,<br><br>　　　as representative of<br><br>The Commonwealth of Puerto Rico, *et al.*,<br><br>　　　　Debtors.[1] | PROMESA<br>Title III<br><br>Case No. 17-3283-LTS<br><br>**Court Filing Relates Only to PREPA** |
| In re:<br><br>The Financial Oversight and Management Board for Puerto Rico,<br><br>　　as representative of<br><br>The Puerto Rico Electric Power Authority,<br><br>　　　　Debtor. | PROMESA<br>Title III<br><br>Case No. 17-4780-LTS<br><br>(Jointly Administered) |

## OBJECTION OF SYNCORA GUARANTEE, INC. TO THE MODIFIED SECOND AMENDED PLAN OF ADJUSTMENT OF THE PUERTO RICO ELECTRIC POWER AUTHORITY

---

[1]　The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ...........................................................................................1

RELEVANT FACTUAL BACKGROUND...........................................................................9

OBJECTION ......................................................................................................................15

A.  The Plan's Treatment of National's Bond Claims Is a Paradigmatic Example of
Unfair Discrimination That PROMESA and the Bankruptcy Code Prohibit ..........15

B.  The Plan Fails the Fair and Equitable Test .............................................................23

    1.  The Board Employs an Improper Fair and Equitable Analysis for
Determining Appropriate Creditor Recoveries.....................................................24

    2.  The Board's Affordability Assumptions are Fundamentally Flawed and
Not Entitled to Deference ......................................................................................35

        i.  The Board's Projections Are Litigation-Driven and Unreliable..............35

        ii.  The Oversight Board's Revenue Envelope and Legacy Charge
Projections that Underlie the Plan Are Unreasonable...............................37

    3.  The Court Should Consider the Oversight Board's Projected Revenues
From Just Days Before Filing The Plan Because They Are Not Introduced
for an Impermissible Purpose Under FRE 408 .....................................................41

C.  The Plan Is Not In the Best Interest of an Overwhelming Majority of PREPA's
Creditors...................................................................................................................44

RESERVATION OF RIGHTS ...........................................................................................51

CONCLUSION..................................................................................................................52

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>Cases</u>

*Adams v. Gissell*,
2022 WL 2387881 (D. Mass. Apr. 19, 2022) ..........................................................................42

*In re Barney & Carey Co.*,
170 B.R. 17 (Bankr. D. Mass. 1994) ...............................................................................16, 22

*Bragdon v. Abbott*,
524 U.S. 624 (1998).........................................................................................................28

*In re Camden Ordnance Mfg. Co. of Ark., Inc.*,
245 B.R. 794 (E.D. Pa. 2000) ..........................................................................................50

*Case v. L.A. Lumber Prods. Co.*,
308 U.S. 106 (1939).....................................................................................................24, 25

*Catullo v. Metzner*,
834 F.2d 1075 (1st Cir. 1987) ..........................................................................................42

*Cede & Co. v. Technicolor, Inc.*,
2003 WL 23700218 (Del. Ch. Dec. 31, 2003) ....................................................................37

*In re CGE Shattuck, LLC*,
254 B.R. 5 (Bankr. D.N.H. 2000) ....................................................................................20

*In re Charles St. Afr. Methodist Episcopal Church of Bos.*,
499 B.R. 66 (Bankr. D. Mass. 2013) .................................................................................16

*In re City of Detroit*,
504 B.R. 97 (Bankr. E.D. Mich. 2013) ..........................................................................30, 31

*In re City of Detroit*,
524 B.R. 147 (Bankr. E.D. Mich. 2014) .........................................................................34, 50

*City Trading Fund v. Nye*,
72 N.Y.S. 3d 371 (N.Y. Sup. Ct. 2018) .............................................................................36

*In re Corcoran Hosp. Dist.*,
233 B.R. 449 (Bankr. E.D. Cal. 1999) ...............................................................................27

*In re D&F Const. Inc.*,
865 F.2d 673 (5th Cir. 1989) ..........................................................................................24

*In re El Comandante Mgmt. Co., LLC*,
 2006 WL 3903592 (Bankr. D.P.R. Mar. 3, 2006) ................................................................18

*In re Exide Techs.*,
 303 B.R. 48 (Bankr. D. Del. 2003) ......................................................................................19

*Fano v. Newport Heights Irr. Dist.*,
 144 F.2d 563 (9th Cir. 1940) ...................................................................................25, 26, 27

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
 2022 WL 6949992 (D. P.R. Oct. 12, 2022) ........................................................................49

*In re Fin. Oversight & Mgmt. Bd. For Puerto Rico*,
 361 F. Supp. 3d 203 (D. P.R. 2019)....................................................................................49

*In re Financial Oversight & Mgmt. Bd.*,
 987 F.3d 173 (1st Cir. 2021) ...............................................................................................31

*In re Financial Oversight & Mgmt. Bd. for P.R.*,
 432 F. Supp. 3d 25 (D.P.R. 2020), *aff'd*, 954 F.3d 1 (1st Cir. 2020) ...................................34

*In re Financial Oversight & Mgmt. Bd. for Puerto Rico*,
 297 F. Supp. 3d 269 (D.P.R. 2018).....................................................................................33

*In re Financial Oversight & Mgmt. Bd. of Puerto Rico*,
 637 B.R. 223 (D.P.R. 2022)...........................................................................................*Passim*

*Granada Wines, Inc. v. New England Teamsters & Trucking Indus. Pension Fund*,
 748 F.2d 42 (1st Cir. 1984)..................................................................................................16

*In re Hardeman Cnty. Hosp. Dist.*,
 540 B.R. 229 (Bankr. N.D. Tex. 2015)............................................................................*Passim*

*In re Hermanos Torres Perez Inc.*,
 2011 WL 5854929 (Bankr. D.P.R. Nov. 21, 2011) ............................................................16

*In re Idearc, Inc .*,
 423 B.R. 138 (Bankr. N.D. Tex. 2009)................................................................................16

*In re Irving Tanning Co.*,
 496 B.R. 644 (B.A.P. 1st Cir. 2013) ....................................................................................43

*In re Jefferson Cnty.*,
 484 B.R. 427 (Bankr. N.D. Ala. 2012) ................................................................................30

*Kelley v. Everglades Drainage Dist.*,
 319 U.S. 415 (1943).................................................................................................26, 27, 28

iii

*In re Kennedy*,
 158 B.R. 589 (Bankr. D.N.J. 1993) ....................................................................24

*Lamar, Archer & Cofrin, LLP v. Appling*,
 138 S. Ct. 1752 (2018)......................................................................................28

*In re LightSquared Inc.*,
 513 B.R. 56 (Bankr. S.D.N.Y. 2014) ................................................................16

*In re Logistics Info. Sys., Inc.*,
 432 B.R. 1 (D. Mass. 2010) ..............................................................................43

*LongPath Cap., LLC v. Ramtron Int'l Corp.*,
 2015 WL 4540443 (Del. Ch. June 30, 2015)....................................................36

*Lorber v. Vista Irr. Dist.*,
 127 F.2d 628 (9th Cir. 1942) ......................................................................27, 31

*In re Mann Realty Assocs., Inc.*,
 2019 WL 4780937 (M.D. Pa. Sept. 30, 2019) ..................................................50

*Mercier v. Boilermakers Apprenticeship & Training Fund*,
 2009 WL 458556 (D. Mass. Feb. 10, 2009) .....................................................43

*In re Pine Lake Village Apartment Co.*,
 19 B.R. 819 (Bankr. S.D.N.Y. 1982)................................................................20

*In re Quigley Co., Inc.*,
 437 B.R. 102 (Bankr. S.D.N.Y. 2010) ..............................................................22

*In re Rivera Echevarria*,
 129 B.R. 11 (Bankr. D.P.R. 1991) ....................................................................22

*In re Salem Suede, Inc.*,
 219 B.R. 922 (Bankr. D. Mass. 1998) ..............................................................16

*In re Sandy Ridge Dev. Corp.*,
 881 F.2d 1346 (5th Cir. 1989) ..........................................................................24

*Traverse v. Gutierrez Co.*,
 2021 WL 3475723 (D. Mass. Aug. 6, 2021) .....................................................44

*United Steel Paper & Forestry Rubber Mfg. Allied Indus. v. Gov't of V.I.*,
 842 F.3d 201 (3d Cir. 2016)..............................................................................29

## **Statutes**

22 L.P.R.A. 196a(c) ...............................................................................................46, 27

iv

22 L.P.R.A. § 196(l) .................................................................................................47

22 L.P.R.A. § 207 ....................................................................................................46

22 L.P.R.A. § 208 ....................................................................................................47

11 U.S.C. § 901 .......................................................................................................31

11 U.S.C. § 943(b)(7) ..............................................................................................34

11 U.S.C. § 1123(a)(4) .............................................................................................15

11 U.S.C. § 1129(b) ...........................................................................................*Passim*

48 U.S.C. § 2174(b)(1) ............................................................................................15

PREPA's Authority Act ............................................................................................46

## Other Authorities

124 Cong. Rec. 32 (1978) ........................................................................................24

Fed. R. Evid. 408 ..............................................................................................*Passim*

*FOMB Statement* (March 8, 2022),
    https://drive.google.com/file/d/1TQqI5kZTVeHX0BEmRLa6GSFShVSnEgG
    9/view .......................................................................................................................11

*Hearing on H.R. 1670, H.R. 3083, H.R. 4311, H.R. 5009, H.R. 5267* .........................25

H.R. Rep. 95-595, 399-400 (1978) ..........................................................................26

H.R. Rep. No. 94-686 (1976) ...................................................................................26

John Patrick Hunt, *Taxes and Ability to Pay in Municipal Bankruptcy*, 91 WASH.
    L. REV. 515 (2016) ................................................................................................25

Lawrence P. King, *Municipal Insolvency: Chapter IX, Old and New; Chapter IX
    Rules¸* 50 AM. BANKR. L.J. 55, 64 (1976) ...............................................................26

*Memorandum from the City of San Bernardino City Manager's Office on
    Proposed Recovery Plan in Support of the Plan of Adjustment* 548 (May 18,
    2015), https://perma.cc/5K53-B9SM ....................................................................30

PREPA FOMB Proposal to Bondholder Group at 6-7 (Nov. 8, 2022),
    https://emma.msrb.org/P11641653-P11264323-P11690562.pdf ..............................5

*2022*, REORG (Jan. 18, 2022),
   https://app.reorg.com/v3#/items/intel/1869?item_id=166198 ................................................ 11

S. Rep. No. 95-989 (1978) ......................................................................................................... 26

Pursuant to the Court's *Third Amended and Restated Order Establishing, Among Other Things, Procedures and Deadlines Concerning Objections to Confirmation and Discovery in Connection Therewith*, dated May 31, 2023 (ECF No. 3565 in Case No. 17-4780-LTS) (the "Confirmation Procedures Order"), Syncora Guarantee, Inc. ("Syncora") hereby respectfully submits this objection to the *Modified Second Amended Title III Plan of Adjustment of the Puerto Rico Electric Power Authority*, dated March 1, 2023 (ECF No. 3296) (as may be amended, supplemented, or modified, the "Plan"), and respectfully states as follows:[2]

## PRELIMINARY STATEMENT

1.      After six years in bankruptcy, the Oversight Board has regrettably wasted its exclusive power by cynically proposing a discriminatory, unfair, and inequitable plan of adjustment for PREPA.  The Plan blatantly violates PROMESA and the Bankruptcy Code, yet the Oversight Board has dared the Court to deny its request because the only purported alternative to confirmation would be chaos for PREPA.  At bottom, the Oversight Board contends that if the opinions of its experts are not credited in all respects, it will be faced with a dilemma, because the Court would be disagreeing with what the Oversight Board thinks is appropriate—something unthinkable to this infallible representative of the debtor.  The Oversight Board's alleged dilemma is, in reality, a false narrative because of course its members have no experiential basis to judge PREPA's operations or financial wherewithal.  Rather, the Oversight Board has outsourced its judgment to paid consultants like McKinsey & Co. and Brattle Group, Inc., who took

---

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan, as applicable.  Reference to ECF numbers are to Case No. 17-4780-LTS unless otherwise noted.  Syncora joins, and incorporates by reference, as if fully set forth herein, the arguments set forth in the *Objection of the Ad Hoc Group of PREPA Bondholders' to the Modified Second Amended Title III Plan of Adjustment of the Puerto Rico Electric Power Authority* (ECF No. 3296).

indiscriminate instructions from counsel and are not entitled to any deference at all. Further, once

the Oversight Board realized that the Court was correct in noting that long-range projections are—

by definition—more like a game of "rings and sticks" than "a dart on a dartboard," the Oversight

Board moved the targets to suit its needs by adopting new thresholds or changing their projections

downward (or both), so as to give themselves desperately needed margin for error. Indeed,

whenever the bondholders' experts have demonstrated flaws in the Oversight Board's experts'

work, the Oversight Board adopts the same approach: Retaliate by imposing new assumptions or

announcing new targets to achieve the ideological result desired—to pay creditors as little as

possible. Nor is this hyperbole—it is the sworn testimony of one of the Oversight Board members.[3]

2.      No matter how superficially appealing it may seem to defer to the judgment of the

Oversight Board, the evidence does not support such deference in this case.[4] The facts will show

that minor adjustments to key assumptions fed by lawyers (or by consultants, after discussions

with lawyers)[5] would enable PREPA to generate substantial additional revenues while meeting its

goal of ensuring affordable electric power for all. If the Oversight Board continues to resist making

---

[3]    *See* Deposition Transcript of Justin Peterson, May 16, 2023 ("Peterson Dep. Tr."), at
163:3-6 (stating that Oversight Board's "affordability analysis has changed quite a bit, and it
consistently changes to suit . . . the ideology of where the Board is headed with its approach to
negotiation with creditors").

[4]    The Oversight Board will predictably repeat the refrain that its judgment is beyond
reproach because its members are unpaid public servants who prioritize the interests of Puerto
Rico's citizens. This argument misses the mark. Paid or unpaid, people exhibit bias whenever
pursuing an agenda. Moreover, it is expected that anyone with power over PREPA's ratemaking
would prefer lower electricity rates for the electorate, even if they are appointed by members of
Congress. The Bankruptcy Code, however, requires testable objective evidence as a check on such
goal-oriented bias which can result even from unwitting human error.

[5]    Several important areas of inquiry about assumptions and bases for settlements were shut
down by counsel to the Oversight Board during discovery, citing deliberative process privilege.
To the extent the Oversight Board seeks to introduce testimony to justify those assumptions or
settlements, Syncora reserves all rights to seek preclusion of such evidence.

such adjustments, even when its assumptions are shown to be wrong, it is the Oversight Board (not the bondholders) who are leaving the Court with no choice but dismissal of PREPA's Title III case. The Oversight Board's 'my way or the highway' attitude of engaging with bondholders (and soon with the Court) is simply untethered to the true economic data, impartial analysis of that data, and the legal standards dictating objectively fair recompense for creditors. Rather than promote PROMESA's goals, the Oversight Board's tactics, if permitted, will negatively impact PREPA's access to capital markets for years to come. On the other hand, if the Court were to disagree with the Oversight Board's litigation expert on how much revenue PREPA could reasonably generate, the Oversight Board's financial advisor could "of course" design and structure additional bonds to be distributed.[6]

3.      In its present form, the Plan is not confirmable for several independent reasons. Among them, the Plan (i) violates section 1129(b)'s requirements that a plan of adjustment must be both fair and equitable and not unfairly discriminatory with respect to any dissenting class of creditors, (ii) relies upon flawed "made to order" projections with respect to how much revenues PREPA can generate, and (iii) fails to satisfy PROMESA's best interests of creditors test.

4.      *First*, the Plan discriminates unfairly against Syncora and other Non-Settling Monolines and Non-Settling Bondholders. In particular, the Plan treats creditors holding the same types of claims differently; namely, the Plan provides National Public Finance Guarantee Corporation ("National") with a substantially enhanced recovery on its bond claims in relation to the claims of similarly situated monolines, like Syncora, and bondholders at large. The Oversight Board may seek to justify the discrimination on the basis that the treatment afforded National is

---

[6]   *See* Deposition Transcript of David Brownstein, May 16, 2023 ("Brownstein Dep. Tr."), at 201:7-202:19, 209:8-16.

merely a "settlement," and the other monolines and bondholders chose not to settle.  This argument, however, does not withstand even a cursory reading of the Plan.  As an initial matter, the settlement and release of creditor rights through a plan of adjustment *is the treatment* that the Bankruptcy Code requires be offered to all similarly situated creditors, unless they consent otherwise as a class.  The Plan's terms are clear in this regard:  The treatment offered to National is materially better and is not offered to any other holder or insurer of bonds.  Indeed, National is provided treatment that is superior even to that provided to bondholders who litigate their claims *and win*.  The Chairman of the Oversight Board admitted as much in his deposition.  There is simply no escape-hatch for the Plan's patently unfair discrimination, and that dooms confirmation from the start.[7]

5.     Moreover, disguising preferential plan treatment as a "settlement" is impermissible under the Bankruptcy Code.  To conclude otherwise would render the prohibition on unfair discrimination a dead letter.  Undoubtedly, a debtor will almost always be able to settle with a single creditor (or subset of creditors) by offering an enhanced recovery to what other creditors would receive under a plan.  The debtor could then separately classify the claim in order to have an accepting impaired class and then justify the disparate treatment as a so-called settlement.  The protection against unfair discrimination contained in section 1129(b) is intended to prevent this type of misconduct and ensure equality of treatment for similar claims, unless the class receiving inferior treatment consents.

---

[7]     The Court will hear testimony that the National deal was supposed to jump-start momentum of gathering more bondholders to agree to the same treatment.  *See* Peterson Dep. Tr. at 149:15-151:9 ("I supported the fuel line lender deal and the National deal because it was my hope that it would create momentum for a global settlement."); *id.* at 206:9-16 ("Do you believe that PREPA can afford to give that same treatment [the National settlement] to all PREPA bondholders? . . . [A]: Yes.").

4

6.     Doubling down on the unlawful disparate treatment, the Oversight Board sweetens National's deal by providing it an additional 12% recovery, in the form of new bonds and/or cash. This additional consideration is on account of (i) professional fees incurred by National in negotiating a settlement for *itself*, (ii) a "structuring" fee for National to pay *its own* third-party liabilities, and (iii) reimbursement of National's payments of *post-petition interest* to its insureds, which is a payment that the Bankruptcy Code either disallows or subordinates.

7.     ***Second***, the Plan is not fair and equitable to Non-Settling Bondholders and Non-Settling Monolines, because the proposed recovery falls far below PREPA's objectively reasonable financial capacity (*i.e.*, affordability).  As a tacit admission that the Plan was never really designed to pay all that PREPA can reasonably afford to pay, the Oversight Board revealed its misapprehension of the law shortly after filing it:  "PROMESA Does Not Include an 'Affordability' Test."[8]  Instead, the Oversight Board posits that creditors should receive only what the Oversight Board deems sufficient in its certified fiscal plans and certified budgets—in the Oversight Board's sole discretion.

8.     Based upon the Oversight Board's data distortion and implausible projections, PREPA could only afford to issue $5.4 billion in new bonds under the initial version of the Plan filed in December 2022.  The Oversight Board contends that this was all PREPA can afford to pay

---

[8] *See Omnibus Reply of the Oversight Board in Support of the Urgent Motion of Puerto Rico Electric Power Authority for Order (I) Scheduling a Hearing to Consider Adequacy of Information Contained in Disclosure Statement, (II) Establishing Deadline for Filing Objections to the Disclosure Statement and Replies Thereto, (III) Approving Form and Manner of Notice Thereof, (IV) Establishing Document Depository Procedures in Connection Therewith, and (V) Granting Related Relief*, Dec. 22, 2022 ("Omnibus DS Reply") (ECF No. 2990) at ¶ 8 (stating that PROMESA does not include a requirement that PREPA pay the maximum it can pay creditors; rather, the "Oversight Board considers affordability along with multiple factors impacting PREPA and Puerto Rico"); *see also* Nov. 2, 2022 Hr'g Tr. at 22:9-11 ("[The Board's] not trying to save money.  It's not trying to pay less than it can pay to creditors who are absorbing some amount of losses. That's never been the Board's objective.").

5

its creditors over the next 50 years.  This is after public filings disclosed that the Oversight Board was prepared to pay nearly $2 billion more to bondholders *just weeks earlier*.[9]  No explanation was ever provided for the abrupt disappearance of this value.  Moreover, approximately one month after filing the initial plan of adjustment and related disclosure statement setting out the Oversight Board's analyses, the Oversight Board re-jiggered its figures again and magically found an additional $280 million in revenues to support its settlement with National.  Despite the purportedly rigorous analysis that the Oversight Board claims to have employed to develop the Plan, including precise creditor recovery levels and payment terms, the additional $280 million was tacked on to the Plan without any analysis or further study.[10]  Rather, the Oversight Board's advisors simply shuffled around PREPA's proposed rates and rate structure to make this additional revenue available.  No doubt a similar process was employed in the initial forecast designed to back-solve for an arbitrary cap on creditor recoveries that the Oversight Board deemed appropriate.

9.    While PROMESA vests significant authority in the Oversight Board, it does not permit the Oversight Board to impose haircuts by fiat in setting the amount of revenues available for creditors.  The Oversight Board conceives of the Court's role at the confirmation stage as nothing more than a rubber stamp because a plan of adjustment must be consistent with its certified fiscal plan, and the certified fiscal plan is supposedly impervious to any scrutiny.  If the Oversight Board were correct, one is left to wonder what was the purpose of the last six years.  The Oversight Board could have simply informed the parties of the output of its fiscal plan immediately following the petition date and proceeded to a confirmation hearing; the Court, for its part, would have been

---

[9]    *See* PREPA FOMB Proposal to Bondholder Group at 6-7, (Nov. 8, 2022), https://emma.msrb.org/P11641653-P11264323-P11690562.pdf.  Consideration of this evidence is appropriate and does not run afoul of Federal Rule of Evidence 408.  *See infra*, § B.3.

[10]    *See* Deposition Transcript of David Skeel, May 3, 2023 ("Skeel Dep. Tr."), at 85:5-87:17, 90:16-22.

required to restructure the debt in accordance with the Oversight Board's wishes. But as the Court has recognized throughout Puerto Rico's Title III cases, it has a vital role to play at the plan confirmation stage. Among other things, based upon the evidence adduced at confirmation, the Court must determine whether the Plan satisfies the standards for confirmation in accordance with section 314(b) of PROMESA. If the plan proponent chooses to invoke cramdown (something the Court has yet to encounter), then the Court must find that the plan is fair and equitable to, and does not discriminate unfairly against, any dissenting class or classes of creditors.

10.     Under PROMESA and Chapter 9 of the Bankruptcy Code, the "fair and equitable" requirement protects creditors from unlawful results while also ensuring that the municipal debtor can continue to operate. The standard requires a balancing of stakeholders' interests based on objective, testable criteria, not amorphous judgment calls made by the Oversight Board and its consultants. This balancing includes that a plan reasonably compensates and provides the best recovery for creditors under the circumstances while still enabling the debtor to provide effective, affordable services to its customers. To the extent the Plan attempts to pass this test, it fails. It clearly proposes to pay less than what PREPA can reasonably afford to pay under the circumstances. Put simply, the Oversight Board's projections and assumptions come (in one member's own words) from a "made to order" recovery model, and while the Oversight Board is entitled to project whatever it wants in its fiscal plans, it cannot use its power over fiscal plans to write creditors' legal rights out of existence.

11.     **Third**, the Plan is based upon flawed "made-for-litigation" projections prepared by the Oversight Board's advisors on instructions from counsel, not on any projections by PREPA's management as one might see in an ordinary business valuation case or even in Chapter 11. These made-for-litigation projections are the furthest thing from experiential assessments made by those

running PREPA for use and in the ordinary course of PREPA's business. As such, even in the absence of bias, they are not entitled to any deference that might typically be provided to management's financial projections. The flawed projections, which permeate the Plan, were designed to artificially depress bondholder recoveries and back into the Oversight Board's preordained sense of how much PREPA should repay its creditors. Indeed, one member of the Oversight Board stated as much in December 2022 in the wake of filing the initial version of the Plan: "[The Plan] was predicated on financial analysis produced to solve for a desired outcome—to pay *as little as possible*."[11] That statement has proven to be a sincere percipient explanation of the Oversight Board's motivation in filing and prosecuting the Plan. Indeed, that same Oversight Board member later candidly acknowledged that the affordability analysis has been a moving target that was ultimately driven by a desire to pay creditors as little as possible.[12]

12.    ***Finally***, the Amended Plan does not comply with PROMESA's best interests of creditors test, which requires that a plan of adjustment provide a better recovery than creditors would receive pursuing their available remedies under non-bankruptcy law and the Commonwealth constitution. Outside of bankruptcy, the bondholders have a robust set of statutory and contractual remedies designed to ensure that PREPA complies with its obligation to the greatest extent possible. These remedies include not only the power to seek specific performance of the covenants PREPA agreed to under the Trust Agreement, but also the appointment of a receiver vested with powers and authorities derived from a court order to enable PREPA to comply

---

[11]   *See Statement of Justin Peterson*, dated Dec. 16, 2022, available at https://drive.google.com/file/d/1_dGcLf64DJ7gwiA7_GFjPMdT9wwa7KIQ/view.

[12]   *See* Peterson Dep. Tr. at 163:3-6 (stating that Oversight Board's "affordability analysis has changed quite a bit, and it consistently changes to suit . . . the ideology of where the Board is headed with its approach to negotiation with creditors").

with its contractual and statutory obligations, including the requirement to set rates at a level that would allow PREPA to make required debt service on the outstanding bonds. The Oversight Board has acknowledged that PREPA has been mismanaged, operated inefficiently, and subject to political influence and whims. Indeed, early in the Title III case, the Oversight Board itself sought to appoint a chief transformation officer for PREPA. Given this history, a professional receiver would improve PREPA's operations and thereby enhance revenue generation and collection.

13.      Under PROMESA, the best interests test requires that the Court consider the interest of creditors in the aggregate, not those of individual creditors or a particular class of creditors. The PREPA bonds represent more than 80% of PREPA's legacy debts. Bondholders have tried repeatedly to restructure PREPA's indebtedness consensually. For over seven years, bondholders have waited to receive payment on their bonds. The bondholders' patience and willingness to restructure their claims have been rewarded with the government parties repeatedly reneging and re-trading their agreements. Now, the Oversight Board seeks to cram down an unfair, discriminatory, non-consensual restructuring over the bondholders' objections. The parties are aware of the difficulties they may encounter in pursuing non-bankruptcy remedies in Puerto Rico. Nonetheless, any such difficulties pale in comparison to the treatment they would receive under the Plan. The clear vote of an overwhelming proportion of creditors expected to reject the Plan reflects their belief that the pursuit of non-bankruptcy remedies provide a better alternative than the proposed treatment under the Plan. Accordingly, the Plan is not in the best interests of creditors when considered in the aggregate.

14.      Syncora respectfully requests that the Court decline to confirm the Plan.

## **RELEVANT FACTUAL BACKGROUND**

15.      At the time PROMESA was enacted, PREPA had already entered the a restructuring support agreement with its largest creditors, the bondholders and Fuel Line Lenders,

which provided for a significant adjustment of PREPA's indebtedness (the "Prepetition RSA").[13]
Given this pre-existing agreement, PROMESA included specific provisions that were designed to
facilitate implementation of the Prepetition RSA's transactions with alacrity.[14] Despite this path
to an expeditious and economical restructuring envisioned by Congress, on July 2, 2017, the
Oversight Board filed a full-blown Title III case for PREPA, which, predictably, has resulted in a
morass of costly, time-consuming litigation, exactly what Congress was seeking to avoid in
PROMESA.

16.     Following the natural disasters that affected the Commonwealth after the Title III
filing, including the devastation of the Island and its electric grid caused by Hurricane Maria, the
Oversight Board and its creditors entered into a new restructuring support agreement (the "2019
RSA"), which included additional creditors that had not been parties to the Prepetition RSA.[15]

17.     On May 10, 2019, the Oversight Board moved for this Court's approval of the 2019
RSA.[16] The Oversight Board explained that the terms of the 2019 RSA were "eminently
reasonable," set "fair and reasonable" terms, and would be "the foundation for a plan of adjustment

---

[13]    *See Disclosure Statement for Title III Plan of Adjustment of the Puerto Rico Electric
Power Authority*, Dec. 16, 2022 (ECF No. 3111) (the "Disclosure Statement"), at § IV.B.1.

[14]    *See* PROMESA § 104(i)(3) (providing that a "voluntary agreement" reached prior to
May 18, 2016 is deemed to satisfy the certification requirements under PROMESA); *id.*
§ 601(g)(2) (providing a special process for Oversight Board authorization to implement voluntary
agreements with creditors under Title VI).

[15]    *See* Disclosure Statement § V.C.2. The 2019 RSA, among other things, "would have
provided parties to the 2019 RSA with Tranche A securitization bonds at an exchange ratio of
67.5% and contingent Tranche B securitization bonds at an exchange ratio of 10%." *Id.*

[16]    *See Joint Motion of Puerto Rico Electric Power Authority and AAFAF Pursuant to
Bankruptcy Code Sections 362, 502, 922, and 928, and Bankruptcy Rules 3012(A)(1) and 9019 for
Order Approving Settlements Embodied in the Restructuring Support Agreement and Tolling
Certain Limitations Period*, May 10, 2019 (ECF No. 1235) (the "9019 Motion").

for PREPA."[17]  The 9019 Motion remained pending, with the Oversight Board and Commonwealth Government expressing their continuing support as recently as February 2022,[18] and the Oversight Board reiterating its determination to "move forward with the settlement set forth in the . . . [2019] RSA."[19]

18.      Despite its many benefits, Governor Pedro Pierluisi terminated the 2019 RSA in March 2022.[20]  After years of supporting the 2019 RSA, the Oversight Board then abruptly changed course and backed the Governor's termination.[21]

19.      Following the termination of the 2019 RSA, the Court ordered the parties to mediation to facilitate  negotiations regarding the formulation of a plan of adjustment for PREPA, and appointed the Mediation Team to assist the parties in reaching a new agreement.[22]  After the parties failed to reach a mediated settlement during the initial phase of mediation, the Court ordered the parties back to mediation, and ordered the Oversight Board to file a plan "that it believes could be confirmable, taking into account the litigation risk and economic issues that are in dispute,"

---

[17]   *Id.* ¶¶ 1, 9, 50-51

[18]   *See Objection of Financial Oversight and Management Board for Puerto Rico to Urgent Motion of the Ad Hoc Group of PREPA Bondholders to Compel Mediation and Impose Deadlines for a PREPA Plan of Adjustment*, dated February 28, 2022 (ECF No. 2735) (the "FOMB Mediation Objection") at ¶ 20; *Oversight Board Outlines Next Steps for Taking Commonwealth Plan Effective by March 15 Deadline, Aims to Complete Restructuring of PREPA, HTA in 2022*, REORG (Jan. 18, 2022), https://app.reorg.com/v3#/items/intel/1869?item_id=166198.

[19]   FOMB Mediation Objection at ¶ 20.

[20]   *See AAFAF's Informative Motion Regarding Termination of PREPA RSA*, dated March 8, 2022 (Case No. 17-3283-LTS, ECF No. 20277-2 at 2).

[21]        *See      FOMB      Statement*,      (March      8,      2022), https://drive.google.com/file/d/1TQqI5kZTVeHX0BEmRLa6GSFShVSnEgG9/view.

[22]        *See Order and Notice of Preliminary Designation of Mediation Team and Setting Deadlines for Objections to Membership*, April 1, 2022 (ECF No. 2767) (the "Mediation Order") at 3.

adding that the plan should include "alternative provisions addressing proposed resolutions contingent on different outcomes of the disputed issues."[23]

20.      The Oversight Board, however, effectively ended mediation in favor of a litigation approach by challenging the liens and recourse rights of bondholders to PREPA's net revenues. In addition to contending that the bondholders' claims were unsecured, the Oversight Board also asserted that the bondholders unsecured claim was essentially worthless.

21.      Against this litigation backdrop, on December 16, 2022, the Oversight Board filed a non-consensual initial plan of adjustment and related disclosure statement, which included a proposed settlement with the Fuel Line Lenders as a purported impaired accepting class.  In agreeing to the Fuel Line Lenders' settlement, the Oversight Board did a 180-degree reversal and disavowed its earlier stated legal position that the claims of the Fuel Line Lenders were not current expenses entitled to be paid prior to the claims of the bondholders.[24]

22.      On February 9, 2023, the Oversight Board filed an amended plan of adjustment and accompanying disclosure statement.  The most significant change from the initial version of the plan was the disclosure of the terms of the Oversight Board's proposed settlement with National,

---

[23]      *See Order (A) Granting in Part and Denying in Part Urgent Motion of Financial Oversight and Management Board for Order (I) Establishing Schedule to Continue Negotiations During Litigation of Gating Issues Pursuant to Litigation Schedule and (II) Granting Related Relief and (B) Staying Certain Motions filed by PREPA Bondholders*, Sept. 29, 2022  (ECF No. 3013), at 4.

[24]      *See* the Oversight Board's *Memorandum of Law in Support of Motion Pursuant to Fed. R. Civ. P. 12(b)(6) to Dismiss Counts I and IV with Prejudice and either to Dismiss Counts II and III without Prejudice or Stay Counts II and III of Plaintiffs' Complaint,* Sept. 9, 2019 (Adv. Proc. No. 19-396, ECF No. 24), at 24 ("The Fuel Line Lenders' arguments relating to their supposed priority should also be rejected because they do not hold 'Current Expense' claims.").

which like Syncora, is one of the monolines that insured bonds issued by PREPA.[25]   In order to

implement the National Settlement, the amended plan created two (2) new classes of claims for

PREPA Revenues Bonds:   Class 5—The National Insured Bond Claims and Class 6—The

National Reimbursement Claim (collectively, the "National Claims").   *See* Plan. at § III.A.   Both

of these classes were artificially manufactured in an attempt to create a confirmable plan.

23.       The Plan deems the National Claims to be Allowed[26] in their full amount under the

Plan and provides the following treatment:   (i)   Series B Bonds (just like other holders of PREPA

Revenue Bond Claims) issued in the face amount equal to **71.65%** (*unlike* other holders of PREPA

Revenue Bonds Claims who are to receive no more than a **50%** recovery on their claims) of the

Allowed National Insured Bond Claims, **plus** (ii) Series B Bonds in the aggregate amount of

**5.86%** (*unlike* other holders of PREPA Revenue Bond Claims who receive none of this

consideration) of the Allowed National Insured Bond Claims, for a **total of 77.51%** of the Allowed

National Insured Bond Claims,[27] **plus** (iii) Series B Bonds in the face amount equal to twenty

---

[25]   Syncora insured approximately $100 million of PREPA bonds that have been fully
repaid by Syncora, as well as an additional approximate $77 million of PREPA bonds that continue
to accrue interest and be paid by Syncora.

[26]   The National Insured Bond Claims are Allowed in the aggregate amount equal to
$836,145,928.13, and the National Reimbursement Claim is Allowed in the aggregate amount
equal to the payments made by National after the Petition Date and, as they may continue to be
made up to, but not including, the Effective Date to holders of the National Insured Bonds on
account of interest accrued on such bonds. ***In other words, the National Reimbursement Claim
is for payment of post-petition interest on National Insured Bonds.***

[27]   The Oversight Board can also elect to pay this incremental 5.86% of the Allowed
National Insured Bond Claims in cash.   This 'gift with purchase' is purportedly to compensate
National for the reasonable fees and expenses incurred by it during the Title III Case and for the
structuring of payments to be made to holders of claims arising from or relating to National Insured
Bonds.   That's an almost ***$50 million payment*** going to a ***single creditor*** who at all times
negotiated exclusively ***for its own recovery***, which provided zero benefit to anyone else, let alone
an entire class of creditors.   To be clear, **Syncora has no objection to a holder of bond claims
receiving a 77.51% recovery as a good-faith settlement with PREPA**.   It does object, however,
to absurd postulates purporting to justify obvious discriminatory treatment that is unfair to all
similarly situated creditors.   Why doesn't the Oversight Board just admit it is paying **77.51%** to

percent (20.0%) of the amount of the National Reimbursement Claim (*unlike* other monoline insurers of PREPA Revenue Bond Claims) or approximately **5.9%** of the Allowed National Insured Bond Claim, for **a total of 83.4%** of the Allowed National Insured Bond Claims.[28]  *See* Plan §§ VIII.A., II.D.2., and IX.A., respectively.  The Oversight Board touted the National Settlement as progress towards confirmation but, in fact, it highlights the glaring deficiencies in the Plan and the lengths to which the Oversight Board has gone to litigate, rather than consensually restructure, PREPA's debts

24.     Unlike the premium treatment provided to the Fuel Line Lenders and National, the Plan offered a choice to Non-Settling Bondholders and Non-Settling Monolines to either: (i) release their claim against PREPA in exchange for a recovery of 50%, becoming part of a "settling class" or (ii) retain the right to litigate the secured status and recourse issues and receive the treatment given to a "non-settling" class.  If anyone in the "non-settling class" fully prevailed in the lien and recourse litigation, they would recover a maximum of 56% of their bond claim.  Alternatively, if the bondholders were unsuccessful in the ligation, their recoveries would be less than 1% of their claims.  *No explanation was provided as to why the same 77.51% given to National is not made available to similar creditors.*  It is no wonder that a minuscule amount of holders accepted the Oversight Board's contemporaneous 50-cent offer.  Inexplicably, a bondholder who fully succeeded on its litigation challenge would receive a maximum of 56%, approximately 2/3 of National's recovery with respect to the very same bond claim.

---

National on account of its National Insured Bond Claims plus an additional amount of post-petition interest on such claims?

[28] The Oversight Board estimates that 20% payment on the National Reimbursement Claim equals another approximate $50 million on top of the approximate $50 million in fees.

## **OBJECTION**

25.     This Court can confirm a plan on a non-consensual basis (*i.e.*, over the objection of a dissenting impaired class of creditors) only if, *inter alia*, the plan satisfies the "cramdown" requirements of 11 U.S.C. § 1129(b).  PROMESA requires, as a prerequisite for confirmation, that "the plan complies with the provisions of title 11 of the United States Code, made applicable to a case under this title by section 301 of this Act," which includes section 1129(b)(1).  PROMESA § 314(b)(1); 48 U.S.C. § 2174(b)(1).  Section 1129(b)(1) provides, in relevant part, that a court may confirm a plan only "if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1).  Thus, section 1129(b) authorizes confirmation of a plan over the dissenting vote of an impaired class only if the plan does not "discriminate unfairly" and is "fair and equitable."  The Plan fails each of these tests because it discriminates unfairly against Non-Settling Bondholders and Non-Settling Monolines and is also neither fair nor equitable to such creditors.

### A.     **The Plan's Treatment of National's Bond Claims Is a Paradigmatic Example of Unfair Discrimination That PROMESA and the Bankruptcy Code Prohibit**

26.     The Oversight Board's treatment of National's claims constitutes unfair discrimination against all other classes of rejecting bondholders, including Syncora and other members of the Non-Settling Monolines and Non-Settling Bondholder classes.  It is hornbook law that a plan may not treat similarly situated creditors differently, whether those creditors are classified together, *see* 11 U.S.C. § 1123(a)(4) (mandating that creditors of the same class receive the same treatment), or separately, *see* 11 U.S.C. § 1129(b)(1) (providing that a "cram down" plan may not discriminate unfairly among classes of similarly situated creditors).  Since the Plan

classifies holders of the same type of bonds separately, and certain of those classes of bond holders

have rejected the Plan, the Oversight Board must show compliance with section 1129(b)(1).

27.    The unfair discrimination standard prevents creditors "with similar legal rights

from receiving materially different treatment under a proposed plan without compelling

justifications for doing so." *In re Hermanos Torres Perez Inc.*, 2011 WL 5854929, at *9 (Bankr.

D.P.R. Nov. 21, 2011) (quoting *In re Idearc, Inc .,* 423 B.R. 138, 171 (Bankr. N.D. Tex. 2009));

*see also In re LightSquared Inc.*, 513 B.R. 56, 99 (Bankr. S.D.N.Y. 2014) ("The purpose of the

requirement is to ensure that a dissenting class will receive relative value equal to the value given

to all other similarly situated classes.").   "It is unfair discrimination for a plan proponent to pay

claims of equal, nonbankruptcy priority a different distribution by providing one class of creditors

with a more favorable distribution than a class of the same legal rank without a legitimate and

rational basis for the disparate treatment." *In re Salem Suede, Inc.*, 219 B.R. 922, 934 (Bankr. D.

Mass. 1998).   "The burden is on the Debtor to show that unequal treatment between classes having

the same priority does not constitute unfair discrimination."  *In re Barney & Carey Co.*, 170 B.R.

17, 25 (Bankr. D. Mass. 1994).   The First Circuit has held that "all creditors of equal rank with

claims against the same property should be placed in the same class."  *Granada Wines, Inc. v. New

England Teamsters & Trucking Indus. Pension Fund*, 748 F.2d 42, 46 (1st Cir. 1984) (quotation

marks omitted).   This Court has held, however, that the *Granada Wines* strict standard of

classification is inapplicable to Title III cases.  *See* Case No. 17-03283-LTS, Hearing Tr. at 77:12-

78:12, ECF No. 17379 (quoting *In re Charles St. Afr. Methodist Episcopal Church of Bos.*, 499

B.R. 66, 95 (Bankr. D. Mass. 2013)).   Syncora respectfully disagrees that *Granada Wines* is

inapplicable to this Title III case; nonetheless, there can be little doubt that the basic principles of

16

fairness and non-discriminatory treatment of similarly situated creditors remain applicable under PROMESA.

28.    The Oversight Board has conceded that National holds or insures PREPA Revenue Bond Claims that are no different from any of the other PREPA Revenue Bond Claims.  *See* Brownstein Dep. Tr. at 137:25-138:8 ("Q[:] And in that respect, is the National bond claim different in nature from the bond claim asserted by any other PREPA bondholder? . . . A[:] From the asserted bond claim, no, I don't believe so.").  Despite this concession, the Plan provides National a 77.51% recovery on its claims (and by the Oversight Board's own estimate, more than 83% recovery if the post-petition interest payment is approved), while it offers a 50% recovery to bondholders who agree to settle their claims under the Plan.  *See* Plan § VIII (Treatment of Class 5 Claims); *id.* § II.D.2 (Supporting Creditors Fees); *id.* § IV.A (Treatment of Class 1 Claims).  In addition, the Oversight Board arbitrarily sets 56% as the recovery cap for Non-Settling Bondholders and Non-Settling Monolines who litigate and *win* on both the recourse and lien issues. *Id.* § V.A.  Thus, the Plan proposes to pay National *more* in a supposedly good-faith settlement than Non-Settling Bondholders and Non-Settling Monolines can receive even if they win on every disputed issue.  *See* Skeel Dep. Tr. at 253:20-254:2 ("Q[:] In the adversary proceeding to have a secured claim that's fully recourse to PREPA under [the] plan [of the oversight board] Mr. Skeel, could that [non-settling] bondholder that succeeded in litigation do as well as National did under National's settlement?  A[:] No, they could not."); *see id.* at 113:14-116:20 (conceding that, under all scenarios under the Plan, National recovers more than the Non-Settling Bondholders and other monolines); *id.* at 116:21-117:7 ("The difference between what National recovers under the plan as it's currently written and what the non-settling bondholders and monolines recover is meaningful.").  Moreover, in addition to the relative *amount* of recovery, the Plan may also

discriminate unfairly with respect to the *form* of the distribution that Non-Settling Monolines, including Syncora, and Non-Settling Bondholders (*i.e.*, Holders of Class 2 Claims) will receive. Specifically, the Plan and its related Confirmation Order appear to provide that holders of Class 2 Claims will receive, on account of any unsecured portion of their claims, interests in the GUC Trust, which, under the Plan, are not transferable.[29]   Meanwhile, National and the Settling Bondholders stand to receive actual, transferable Series B Bonds (as well as CVIs for the latter).

29.     It is clear, then, that the treatment of National is materially different from the proposed treatment of others where National receives a much greater recovery than even the best-case scenario for Non-Settling Bondholders and Non-Settling Monolines, including Syncora. *See In re El Comandante Mgmt. Co., LLC*, 2006 WL 3903592, at *5 (Bankr. D.P.R. Mar. 3, 2006) ("Under the unfair discrimination test, the differentiated treatment of similar classes intended merely to induce acceptance by one class fails.") (internal quotation marks and citation omitted). And it is undisputed that National itself would receive less recovery under the Plan had it not settled. *See* Brownstein Dep. Tr. 152:25-153:11 ("Q[:] Had National not entered into a PSA with the oversight board, then in that scenario, under the terms of the initial plan of adjustment filed in December, would National have stood to recover more than 71.65 percent on its bond claim under any scenario covered by the plan? . . .  A[:] No."). This enormous difference in recovery plainly constitutes unfair discrimination unless it is justified by some legitimate difference in National's rights vis-a-vis the Non-Settling Bondholders and Non-Settling Monolines.

30.     No Board witness could identify any difference in National's rights against PREPA compared with Syncora's rights against PREPA. *See* Skeel Dep. Tr. at 214:10-25 ("Q[:] Do you

---

[29]     Plan Art. XXII.H ("Transferability of GUC Trust Interests").  Note, however, that the GUC Trust Agreement provides that distributions made by the GUC Trustee to the GUC Trust Beneficiaries shall be made in Cash.  *See* GUC Trust Agreement § 5.10.

have any basis to say, one way or the other, whether Syncora's rights with respect to PREPA are any different than National's rights with respect to PREPA?  A[:] I don't have a basis no.  Q[:] Your emphasis on the word I makes me think someone else might have a basis.  Do you know who that person might be? A[:] Our lawyers may have a basis.  I just don't know.  Q[:] But you don't yourself?  A[:] Sitting here today, no, I don't."); *id.* at 356:17-357:18 ("National's deficiency claim would be an unsecured claim with the same status as general unsecured claims. . . . If we're talking about just not the secured portion, we're talking about the deficiency claim, it does seem to me that it has the same stature as a general unsecured claim or would."); *id.* at 214:12-14 (stating that he is unable to say whether Syncora's rights with respect to PREPA are any different than National's rights with respect to PREPA).  As one would expect given the lack of any meaningful distinction, the 2019 RSA and the initial Title III plan treated National and Syncora identically. *See, e.g., id.* at 117:8-13 ("Q[:] In the 2019 RSA that we looked at, the other monolines, beside National and the ad hoc group, the bondholders all got the same exchange rate; right?  A [Mr. Skeel:] I believe that is correct.").

31.    The fact that there has been a settlement does not cure unfair discrimination.  If the mere existence of a settlement sufficed to justify treating one creditor (or minority group of creditors) differently than another, that exception would swallow the rule, allowing unfair discrimination with impunity.  A debtor would need only settle the claims with a particular creditor, put that creditor in its own class, have that creditor agree to vote to accept its proposed plan treatment, assert that the settlement itself somehow makes the creditor different, and then conclude there is supposedly is no unfair discrimination.  But entry into a plan support agreement does not authorize unfair discrimination and the Bankruptcy Code affords a debtor no such right. *See, e.g.*, *In re Exide Techs.*, 303 B.R. 48, 78-79 (Bankr. D. Del. 2003) (holding that a debtor must

meet the requirements of section 1129(b) to confirm the plan over the dissenting creditors notwithstanding the existence of a settlement); *In re Pine Lake Village Apartment Co.*, 19 B.R. 819, 830 (Bankr. S.D.N.Y. 1982) ("[Section] 1122(b) does allow for administrative convenience a separate class that is less than or reduced to a dollar amount approved by the court as reasonable and necessary.  This is the only exception expressed in the Code for separately designating unsecured claims.  Any other designation would have to comply with 11 U.S.C. § 1129(b)(1) that prescribes as a prerequisite for confirmation that 'the plan does not discriminate unfairly.'").  Simply put, parties cannot "avoid the requirements of the Bankruptcy Code by private agreement." *In re CGE Shattuck, LLC*, 254 B.R. 5, 11 (Bankr. D.N.H. 2000) ("If a plan opponent were permitted to use the promise of a discriminatory distribution on account of an allowed claim to obtain votes against a plan of reorganization, then presumably a plan proponent could use a similar scheme to secure votes in favor of a plan.  This Court will not allow opponents or proponents of a plan of reorganization to use creative drafting to circumvent the requirements of Chapter 11 of the Bankruptcy Code or controlling case law within this circuit."); *see also Pine Lake*, 19 B.R. at 831 ("The debtor may not ignore the rejection of its plan by the holder of a large unsecured deficiency claim simply because the debtor designated a specially preferred separate class of easily created trade creditors whose acceptances may be readily obtainable by offering them more than the disfavored deficiency claim holder.  Manifestly such treatment of unsecured claims is unfairly discriminatory within the meaning of 11 U.S.C. § 1129(b)(1).").

32.     The fact that other Title III Cases fairly employed plan support agreements does nothing to justify the blatant unfair discrimination here.  Those agreements created anchor tenants for the *entire* class's treatment, and thus did not create unfair discrimination, but rather *equal* treatment of similarly situated creditors.  Moreover, none of the other Title III plans of adjustment

approved in the jointly-administered Title III case, all of which included unanimous support from the applicable monoline insurers, included a distribution on account of monoline insurers making post-petition interest payments to their insureds. Here, in contrast, the National PSA created a privileged class of one on account of a baseline recovery on its pre-petition claim and a special post-petition tip. That renders the Plan unfairly discriminatory against similarly situated creditors like Syncora and, absent consent, non-confirmable as a matter of law.

33. Unlike the Commonwealth Title III case and plan of adjustment, this is not a situation where holders of PREPA Revenue Bonds have different risk profiles based upon the unique challenges to a particular series (or "vintage") of bonds. In the Commonwealth Title III case, the Oversight Board commenced actions with respect to specific series of bonds based upon legal challenges unique to those series of bonds. By contrast, the legal challenges that the Oversight Board has brought against the PREPA Bond Trustee and bondholders applies equally to *all* PREPA Revenue Bonds, including those held and insured by National. The Oversight Board offers no justification (let alone a convincing one) for the disparate treatment among identically-situated holders of PREPA Revenue Bond Claims based upon any unique attributes. National has no priority over Syncora; indeed, its claims are indistinguishable from Syncora's. The Oversight Board does not even attempt to argue otherwise, hoping that the Court will ignore this patent discrimination.

34. The Oversight Board simply bought National's support in order to present to the Court an accepting bondholder class. *See* Skeel Dep. Tr. at 118:5-20 ("And as a result of this settlement, [National is] agreeing to give up their—they've agreed to give up their claims, that they were fully secured, that they were entitled to not just 100 cents on the dollar, but 100 cents plus accrued interest. They agreed to give all of that up. And they agreed to take significantly

less.  They agreed to support the plan.  They agreed to vote in favor of the plan, all of which are

very attractive benefits to us."); Deposition Transcript of Fernando Battle, May 12, 2023 ("Battle

Dep. Tr."), at 267:20-269:6 ("So if I understand you correctly, the decision to give National a

higher percentage recovery under the amended plan of adjustment was based on bringing National

onboard to the plan?  I mean I wasn't part of those deliberations.  But that is my personal view of

why it was done.").  But "differentiated treatment of similar classes intended merely to induce

acceptance by one class fails."  *Barney & Carey Co.*, 170 B.R. at 25; *cf. In re Quigley Co., Inc.*,

437 B.R. 102, 127 (Bankr. S.D.N.Y. 2010) (upholding challenges to plan brought by non-settling

claimants, stating that the plan proponent "bought enough votes to assure that any plan would be

accepted").

35.      Moreover, PREPA has not shown that its plan of adjustment requires discrimination

in National's favor.  As a general matter, discrimination cannot be justified where it is unnecessary

for the debtor to reorganize successfully.  *In re Rivera Echevarria*, 129 B.R. 11, 13 (Bankr. D.P.R.

1991).  Here, PREPA has produced no evidence to suggest that a uniquely favorable deal for

National was necessary, as opposed to simply a tool to create an accepting bondholder class.  *See*

Skeel Dep. Tr. at 117:14-24 ("Q[:] Is it your view as a board member that National's different

treatment from other bondholders and monolines is necessary to PREPA's reorganization?  A[:] I

don't know whether—I would say necessary because that involves speculation about different

possibilities for reorganization.  What I will say is, it is an important piece of what we think is a

confirmable plan of adjustment.").  At bottom, no legal basis justifies the discriminatory treatment

among similarly situated bondholders and is not necessary to a successful reorganization.

36.      Of course, in order to avoid this fatal flaw in the Plan, PREPA could have (and

should have) offered the National treatment to all bondholders.  The evidence will show such

treatment remains eminently affordable, yet the Oversight Board simply chose not to do so.  *See* Peterson Dep. Tr. at 206:4-16 ("Q[:] What I'm asking is, sitting here today, there is a proposed plan of adjustment that provides a certain recovery level for National; isn't that true, Mr. Peterson? A[:] Yes.  Q[:] And my question is pretty simple: Do you believe that PREPA can afford to give that same treatment to all PREPA bondholders? . . .  A[:] Yes.").

### B.    The Plan Fails the Fair and Equitable Test

37.    The Oversight Board does not apply the "fair and equitable" standard that has been developed in municipal bankruptcies over the last 75 years.  This standard requires a municipal debtor to demonstrate that the plan of adjustment is providing creditors with reasonable recompense under the circumstances by maximizing revenues to the extent possible while also enabling the debtor to continue to provide effective services to its customers.  *In re Hardeman Cnty. Hosp. Dist.*, 540 B.R. 229, 239 (Bankr. N.D. Tex. 2015).  Thus, the statutory framework of "fair and equitable" requires a balancing of the interest of creditors along with other stakeholders. The Oversight Board fails to engage in the appropriate analysis based upon concrete, empirical and reliable data.  Instead, the Oversight Board employed a made-to-order recovery model, created by the Oversight Board's hired advisors, upon instructions from counsel.  As a result, the projections underpinning the Plan are not entitled to the deference that would usually attach to management projections prepared in the ordinary course of business.  As an Oversight Board member acknowledged, its "affordability analysis" was a result-driven exercise designed to provide creditors with the smallest recovery possible.  Peterson Dep. Tr. at 163:3-6 (stating that Oversight Board's "affordability analysis has changed quite a bit, and it consistently changes to suit . . . the ideology of where the Board is headed with its approach to negotiation with creditors").

1.    The Board Employs an Improper Fair and Equitable Analysis for
Determining Appropriate Creditor Recoveries

38.    The Plan is not "fair and equitable" to the impaired Non-Settling Monolines and

Non-Settling Bondholders Classes.  The relevant statutory provision states that "the condition that

a plan be fair and equitable with respect to a class **includes** the following requirements," listing

several such requirements.  11 U.S.C. § 1129(b)(2) (emphasis added).  Under the Bankruptcy Code

(and as a matter of common usage), the term "includes" is "not limiting," but open ended.  *Id.*

§ 102(3).  Courts have accordingly recognized that the "fair and equitable" provision goes beyond

the specific requirements listed in section 1129(b)(2).  At bottom, "compliance with the

requirements of section 1129(b)(2) does not assure that the plan is fair and equitable.  Instead, this

section merely sets minimum standards that a plan must meet, and does not require that every plan

not prohibited be approved."  *In re Sandy Ridge Dev. Corp.*, 881 F.2d 1346, 1352 (5th Cir. 1989)

(internal quotation marks and citation omitted).[30]

39.    The term "fair and equitable" has a well-settled and congressionally approved

meaning in the context of Chapter 9 of the Bankruptcy Code, whereby a plan is fair and equitable

only if the municipality maximizes its revenue, including through taxation, for the benefit of

creditors.  This requirement applies equally under PROMESA.

---

[30]    *See also, e.g.*, *In re D&F Const. Inc.*, 865 F.2d 673, 675 (5th Cir. 1989) (vacating order
confirming plan that was neither fair nor equitable with respect to secured construction lender,
even if requirements of section 1129(b) were satisfied, where plan barred lender's exercise of
foreclosure rights, required negative amortization for 12 years, and deferred substantially all
repayment of principal for 15 years); *In re Kennedy*, 158 B.R. 589, 599 (Bankr. D.N.J. 1993)
(noting that the legislative history shows that Congress purposely left the "fair and equitable" rule
somewhat amorphous in order to "avoid statutory complexity" and to "preserve judicial
application of certain fundamental pre-Code factors to insure fair and equitable treatment of
dissenting classes") (internal quotation marks and citation omitted); 124 Cong. Rec. 32, 407 (1978)
(acknowledging that "many of the factors interpreting 'fair and equitable' . . . were omitted from
the House amendment to avoid statutory complexity because they would undoubtedly be found by
a court to be fundamental to 'fair and equitable' treatment of a dissenting class").

40.     The Supreme Court has long recognized that "fair and equitable," as used in the
bankruptcy context, "are words of art" given meaning through "judicial interpretations." *Case v.
L.A. Lumber Prods. Co.*, 308 U.S. 106, 115 (1939).  The Bankruptcy Act—the precursor to the
modern-day Bankruptcy Code—prohibited confirmation of a plan that was not "fair and
equitable," regardless of whether creditors consented to their treatment.  *Id.* at 114.  The
Bankruptcy Code, which replaced the Bankruptcy Act in 1978, incorporated the "fair and
equitable" requirement for plan confirmation, but only with respect to impaired dissenting classes
of claims or interests.  *See* 11 U.S.C. § 1129(b)(1).

41.     Congress repeatedly included the "fair and equitable" language with the express
purpose of ensuring that a municipality would maximize taxation to the extent reasonably possible
for the benefit of creditors.  In the original Bankruptcy Act, the legislative history shows that
Congress recognized that a fair and equitable plan is one that "reasonably conforms to the ability
of the political subdivision to pay."[31]  The legislative history, including the well-established
understanding that a plan must include taxing to the extent reasonably possible, is described in
detail in John Patrick Hunt, *Taxes and Ability to Pay in Municipal Bankruptcy*, 91 WASH. L. REV.
515 (2016).

---

[31]     *Hearing on H.R. 1670, H.R. 3083, H.R. 4311, H.R. 5009 and H.R. 5267 Before the
House Committee on the Judiciary*, 73rd Cong. 1, 23 (1933) ("Upon the filing of the petition the
court after notice to creditors, is required to examine the plan.  If the court determines (1) that it
has been accepted by 75 percent of the creditors affected, (2) ***that it is equitable***, (3) ***that it
reasonably conforms to the ability of the political subdivision to pay***, (4) that it does not
discriminate against any class of creditors, and (5) the subdivision has ample power and authority
to perform the terms and conditions of the plan, an order will be entered confirming the plan and
it thereupon becomes binding upon the political subdivision and all of its creditors.") (emphasis
added); *id.* at 175 (U.S. Attorney General Homer Cummings defining "equitable" as "fairly based
upon the reasonable capacity of the taxing district to pay"); *id.* at 168 ("[H]aving contracted a
debt,—having  promised to pay a debt,—the court can force the municipality to levy whatever
taxes are necessary to pay the debt.").

42.     In 1976, the House Report on the legislative amendments to Chapter IX of the Bankruptcy Act confirmed Congress's understanding: "Fair and equitable has additional consent in Chapter IX. ***The petitioner must exercise its taxing power to the fullest extent possible for the benefit of its creditors***. *Fano v. Newport Heights Irr. Dist.*, 144 F.2d 563 (9th Cir. 1940). The court must find that the amount proposed to be paid under the plan was all that the creditors could reasonably expect under the circumstances. In addition, the fact that the vast majority of security holders may have approved a plan is not the test of whether that plan satisfies the statutory standard (of fairness). The former is not a substitute for the latter; they are independent. . . . Other case law that surrounds the fair and equitable doctrine in Chapter IX is retained in the bill." H.R. Rep. No. 94-686, at 33 (1976), *reprinted in* 1976 U.S.C.C.A.N. 539, 571, 1975 WL 12383 (emphasis added).

43.     Similarly, when adopting Chapter 9 of the Bankruptcy Code in 1978, the House Report stated that "it is expected that the court will be guided by standards set forth in *Kelley v. Everglades Drainage Dist.*, 319 U.S. 415 (1943) and *Fano v. Newport Heights Irrigation Dist.*, 114 F.2d 563 (9th Cir. 1940)." H.R. Rep. 95-595, 399-400, 1978 U.S.C.C.A.N. 5963, 6465. The Senate Report also stated: "Creditors must be provided, under the plan, the going concern value of their claims. The going concern value contemplates a 'comparison of revenues and expenditures taking into account the taxing power and the extent to which tax increases are both necessary and feasible' and is intended to provide more of a return to creditors than the liquidation value if the city's assets could be liquidated like those of a private corporation." S. Rep. No. 95-989, at 113 (1978) (quoting Lawrence P. King, *Municipal Insolvency: Chapter IX, Old and New; Chapter IX Rules*¸ 50 Am. Bankr. L.J. 55, 64 (1976)).

44.     The cases that Congress cited and relied upon in describing the requirement to tax "to the fullest extent possible" confirm the point.  In *Fano v. Newport Heights Irrigation Dist.*, the Ninth Circuit upheld the reversal of confirmation of a plan, finding that the plan was not fair and equitable where there was an insufficient showing that taxes could not be raised to pay creditors. 114 F.2d at 565-66.  The court in *Fano* explained that "we are unable to find any reason why the tax rate should not have been increased sufficiently to meet the District's obligations or way it can be said that the plan is 'equitable' and 'fair' and for the 'best interest of the creditors' with no sufficient showing that the taxing power was inadequate to raise the taxes to pay them."  *Id.*; *see also Lorber v. Vista Irr. Dist.*, 127 F.2d 628, 639 (9th Cir. 1942) (applying the fair and equitable test by considering "whether or not the amount to be received by the bondholders is all that they can reasonably expect in the circumstances," which required the trial court to make findings to support a conclusion that "the payments provided for in the plan of composition are *all that the District is reasonably able to pay in the circumstances*") (internal quotation marks omitted and emphasis added).

45.     In its Omnibus DS Reply, the Oversight Board previously argued that *Fano* is a case "more often distinguished than applied," ¶ 48, but Congress specifically cited *Fano*, not any case supposedly distinguishing it.  In addition, the Oversight Board did not—and cannot—dispute that *Fano* held exactly what Congress cited it for: that to approve a plan, the petitioner must exercise its taxing power to the fullest extent possible for the benefit of its creditors.  As to the one case the Oversight Board cites as supposedly distinguishing *Fano*, *see id.*, it recognized that the court *should* examine "whether the debtor could, in fact, raise taxes sufficient to pay the bondholders in full," but "found that the debtor . . . could not raise taxes sufficient to pay more to Class 5."  *In re Corcoran Hosp. Dist.*, 233 B.R. 449, 461 (Bankr. E.D. Cal. 1999).  Here, PREPA

plainly can reasonably raise rates without compromising service to its customers.  Indeed, the Plan contemplates raising rates so the question is whether the Oversight Board's contemplated rate increase complies with the fair and equitable standard.

46.     In the other case that the House Report cites, *Kelley v. Everglades Drainage District*, the Supreme Court reversed an appellate decision that had affirmed confirmation of a municipal bankruptcy plan, holding that the court must consider "probable future revenues available for the satisfaction of creditors."  319 U.S. at 420.  In *Kelley*, "[a]ppropriate facts" to consider on remand included past tax revenues, current rates, and the present assessed value of property, as well as "the probable effect on future revenues of a revision in the tax structure . . . , the extent of past tax delinquencies, and any general economic conditions of the District which may reasonably be expected to affect the percentage of future delinquencies." *Id.* at 420-21.  Thus, the Supreme Court held unequivocally that the ability to raise revenues by increasing taxes was relevant to plan confirmation.

47.     These cases are dispositive because Congress adopted their interpretation of "fair and equitable," repeating that language in the statute, while knowing and approving of that interpretation.  It is a fundamental principle of statutory construction that when "judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well." *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998); *see also, e.g.*, *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1762 (2018) ("When Congress used the materially same language in § 523(a)(2), it presumptively was aware of the longstanding judicial interpretation of the phrase and intended for it to retain its established meaning.").  This

canon is especially strong here given that there is no need to guess whether Congress was aware or approved of the case law—Congress cited it expressly in the House Report.

48.     This standard is not only embedded in the history of the term "fair and equitable," but it also reflects the Contracts Clause limitations that would apply to PREPA outside of the bankruptcy context.  Under the Contracts Clause, the government may not impair contractual obligations unless doing so is "reasonable and necessary to serve [an] important public purpose." *United Steel Paper & Forestry Rubber Mfg. Allied Indus. v. Gov't of V.I.*, 842 F.3d 201, 210 (3d Cir. 2016).  This limitation is consistent with the "fair and equitable" limitation, whereby creditors must be paid to the extent possible.  To be sure, the Contracts Clause does not apply to federal legislation or federal court decisions, including this Court's decision on plan confirmation.  *See In re Financial Oversight & Mgmt. Bd. of Puerto Rico*, 637 B.R. 223, 290-91 (D.P.R. 2022).  Thus, the Contracts Clause does not prevent Congress from enacting bankruptcy legislation that would allow municipalities to disclaim their contractual obligations, regardless of whether doing so is necessary.  But it would be extraordinary for Congress to give municipalities unfettered ability to ignore their contracts, and thereby undermine the Contracts Clause with impunity.  This Court should not assume that Congress did so in PROMESA, where there is nothing in the text or history of the statute to suggest such an extreme result.

49.     Moreover, in the years since the passage of the Bankruptcy Act and Bankruptcy Code, the "fair and equitable" standard in the Chapter 9 context remains as described in its legislative history and *Fano*—the debtor must pay all that it is reasonably able to pay to creditors in an impaired dissenting class.  For instance, in *Hardeman County*, the court looked at whether the plan "reasonably compensates and provides the best recovery for Creditors in the circumstances and the ***maximum that the Debtor is able to pay*** while maintaining its mission of

continuing to provide [services to the County] and its needy inhabitants."  540 B.R. 229 at 239 (emphasis added).  *Hardeman* ultimately confirmed the plan where "[n]o viable alternative to the Plan exists that will resolve the Debtor's insolvency and provide a greater recovery to the objecting and rejecting Creditors . . . ." *Id.* at 240; *see also id.* at 242 ("[T]he credible evidence at the Confirmation Hearing is that the Debtor is not in a position to raise taxes because of property values and economic conditions; and ***the taxpayers of the county are already paying the maximum the taxpayers will permit***.") (emphasis added).  While the Oversight Board previously cited *Hardeman*, Omnibus DS Reply at ¶ 49, for the proposition that "the Debtor must be allowed to retain sufficient funds with which to operate, make necessary improvements, and maintain its facilities," *Hardeman*, 540 B.R. at 239, that is not in dispute here.  Syncora agrees that PREPA should retain sufficient funds to operate effectively, but that does not mean that PREPA can refuse to set rates at a level that achieves that goal while also maximizing recovery for bondholders.

50.    Indeed, confirmed plans often include an increase in rates or taxes.  Jefferson County, Alabama's bankruptcy, which, at the time of filing, was the largest municipal bankruptcy in U.S. history, was resolved with a plan that contemplated increased municipal sewer rates.  *See* Chapter 9 Plan of Adjustment for Jefferson County, Alabama at 96-102, *In re Jefferson Cnty.*, 484 B.R. 427 (Bankr. N.D. Ala. 2012) (No. 11-05736-TBB) (calling for significant initial increases in sewer rates, followed by four annual increases of 7.89%, subject to adjustment).  Another municipal bankruptcy (Central Falls, Rhode, Island) likewise included tax increases in its confirmed plan.  *See* Hunt, *supra* 25, at 559, n.263.  And in another large Chapter 9 bankruptcy, San Bernardino, California, the plan called for tax increases in connection with its plan of adjustment.  *See Memorandum from the City of San Bernardino City Manager's Office on Proposed Recovery Plan in Support of the Plan of Adjustment* 548 (May 18, 2015),

30

https://perma.cc/5K53-B9SM (calling for renewal of temporary sales tax, utility user tax increases, and property transfer tax increase).[32]

51.     This consistent recognition that an approved plan requires taxing to the extent possible applies fully in the context of PROMESA.  In PROMESA, as a condition of confirmation, the plan must comply with (*inter alia*) Section 1129(b)(1), which contains the "fair and equitable" requirement.  That is exactly what Congress did for municipal bankruptcies by incorporating Section 1129(b)(1) into Chapter 9.  *See* 11 U.S.C. § 901.  Thus, there is no legal basis to treat Section 1129(b)(1) as meaning something different in the context of PROMESA than in the context of a Chapter 9 bankruptcy.

52.     This Court has not yet undertaken an in-depth examination of the contours of the "fair and equitable" standard in the PROMESA context, but it has concluded that the Commonwealth plan satisfied the test where it "provide[d] all holders of Claims in the Rejecting Class with what they can reasonably expect to receive under the circumstances of the Title III Cases."  *See Financial Oversight & Mgmt. Bd. of Puerto Rico*, 637 B.R. at 283.  That test is consistent with the approach discussed above.  *See, e.g.*, *Lorber*, 127 F.2d at 639; *see also In re Financial Oversight & Mgmt. Bd.*, 987 F.3d 173, 181-82 (1st Cir. 2021) ("The entry of a plan of adjustment is inherently such an equitable proceeding. . . . [N]othing about the codification of the

---

[32]     In the Detroit bankruptcy, the court also expressly looked to taxes in deciding that the city's prepetition efforts to address its debts were adequate.  The court relied on the facts that the city had "increas[ed] the City's corporate tax rate, work[ed] to improve the City's ability to collect taxes, and increas[ed] lighting rates."  *In re City of Detroit*, 504 B.R. 97, 188 (Bankr. E.D. Mich. 2013).  The court found that any further increase in taxes was not feasible: "There really is no choice here.  There are no viable alternatives to this plan that will solve the City's problems and at the same time pay more to classes 14 and 15 to obtain their support."  *Id.* at 262; *see also id.* at 219 ("There is no more money available for creditors in the City's already tight budget projections.  Every dollar is accounted for in providing necessary services, implementing the necessary [reinvestment and restructuring initiatives], and in meeting plan obligations."); *id.* at 121 ("The City cannot legally increase its tax revenues.").

31

factors a court must consider when confirming a reorganization plan disturbs this underlying equitable nature."). To put it another way, creditors can reasonably expect to receive what the law for over 80 years has recognized they would receive in a plan of adjustment: reasonable revenue enhancements through taxation and rate-setting to the fullest extent possible for the benefit of creditors.

53.     As explained in the next section, the Plan fails to meet the fair and equitable standard. The Oversight Board's "affordability analysis" is marked by bias and was a result-driven exercise. It was designed not to provide creditors with as much as they can reasonably expect to receive under the circumstances but as little as possible.

54.     While PREPA and the Oversight Board have suggested that PROMESA created some different standard on this issue, that suggestion lacks any textual support. If Congress wanted a standard other than the well-established one for applying Section 1129(b)(1), it would not have incorporated—without limitation—Section 1129(b)(1) into PROMESA.

55.     PREPA and the Oversight Board also provide no basis for their radical argument that in deciding whether to confirm the Plan, this Court cannot question the Oversight Board's determination of what PREPA can afford to pay. They argue that because the fiscal plan includes a debt sustainability analysis, and because this Court does not have jurisdiction to consider challenges to the fiscal plan, this Court must defer to the Oversight Board's debt sustainability determination. To be clear, this argument would apply not only to PREPA rates but to *any* inquiry into whether PREPA can afford to pay more to bondholders, as any such inquiry would concern the fiscal plan. Even though the Oversight Board made it unequivocally clear in previous proposals that PREPA can afford significantly more than it currently claims, this Court would be forced to accept the Oversight Board's about-face now. This approach would completely undermine the

plan confirmation process, giving the Oversight Board carte blanche to dispense with creditor rights. Under the Oversight Board's theory of its statutory authority, Title III and the Court are unnecessary appendages to a restructuring. Its view and opinions as to creditor recoveries are absolute and not subject to challenge by creditors or the Court.

56. There is nothing in PROMESA to suggest such a radical and lawless approach. PREPA and the Oversight Board's argument rests on a fundamental misunderstanding of the statutory language. PROMESA states that "[t]here shall be no jurisdiction in any United States district court to review challenges to the Oversight Board's certification determinations under this Act." PROMESA § 106(e). But Syncora is not challenging the certification of the Fiscal plan. Rather, it is challenging the plan of adjustment, over which this Court *has* jurisdiction. *Id.* § 306(a). The fact that this Court lacks jurisdiction to consider challenges to the fiscal plan itself does not mean that anything the Oversight Board says in the fiscal plan must be accepted as true for *other* matters over which this Court *does* have jurisdiction. *See In re Financial Oversight & Mgmt. Bd. for Puerto Rico*, 297 F. Supp. 3d 269, 284 (D.P.R. 2018) (describing the Oversight Board's complete authority over fiscal plan determinations, contrasting that with the role of the Court in Title III cases and noting that "[u]nder PROMESA's statutory framework, it is only at the plan confirmation stage that the Court determines whether a proposed plan of adjustment complies with, among other things, the provisions of Title 11 of the United States Code which have been made applicable to these cases by Section 301 of PROMESA and the relevant provisions of PROMESA").

57. Contrary to PREPA's suggestion, this would not require the Court to change the fiscal plan or interfere with governmental functions. PREPA does not have an unfettered right to have a plan of adjustment confirmed. Instead, it may be confirmed only if it meets *all* of the

requirements set forth in PROMESA, only one of which is that the plan must be consistent with the fiscal plan.  *See* PROMESA § 314(b).  If the Oversight Board cannot or will not adopt a fiscal plan that allows PREPA to satisfy the other, independent requirements for confirmation—including the "fair and equitable" requirement—then the plan of adjustment cannot be confirmed, a result that is fully consistent with PROMESA and that does not require any improper interference from this Court.  Indeed, the Court has already found that the statutory requirement that a plan of adjustment be consistent with the certified fiscal plan does not divest the Court of its independent obligation to ensure that the other confirmation requirements under PROMESA and the Bankruptcy Code are satisfied.  *See Order Denying Debtors' Motion in Limine in Respect of Evidence Concerning Whether the Proposed Plan of Adjustment Is Consistent with the Certified Fiscal Plan* (Case No. 17-3283, ECF No. 20146).

58.     Finally, PREPA caricatures Syncora's position as requiring this Court to ignore "the provision of effective public services."  Omnibus DS Reply at ¶ 43.  The Court should reject this strawman argument.  Syncora, of course, recognizes that a Title III plan (like a Chapter 9 plan) must in all circumstances be "feasible."  PROMESA § 314(b)(6); 11 U.S.C. § 943(b)(7); *see also, e.g.*, *In re City of Detroit*, 524 B.R. 147, 219 (Bankr. E.D. Mich. 2014).  And Syncora, like other creditors, wants PREPA to be operated in an effective and efficient manner so it is able to provide services to consumers and generate sufficient revenues to meet all of its obligations.  Indeed, this Court has recognized that PROMESA requires a holistic approach in which the obligation of the Title III debtor to meet the needs of the Commonwealth residents must be balanced with the obligation to "provide proper recompense to creditors."  *See In re Financial Oversight & Mgmt. Bd. for P.R.*, 432 F. Supp. 3d 25, 30 (D.P.R. 2020), *aff'd*, 954 F.3d 1 (1st Cir. 2020).  The Oversight Board advocates, however, that this Court engage in no such balancing, but rather total

34

abdication—in conflict with the text of PROMESA, the intent of Congress, and uniform case law. Syncora respectfully requests that the Court reject the Oversight Board's rule by fiat approach and decline to confirm the Plan.

2. <u>The Board's Affordability Assumptions are Fundamentally Flawed and Not Entitled to Deference</u>

59.    The Oversight Board fails to carry its burden of demonstrating that the bondholders cannot reasonably expect to receive more under the circumstances, or that PREPA cannot afford to pay more to the bondholders (while still charging reasonable and affordable rates and accommodating low-income residents).

*i.    The Board's Projections Are Litigation-Driven and Unreliable*

60.    As an initial matter, the projections underlying the Plan are not entitled to deference.  They were not prepared by PREPA's management; they were prepared by Brattle Group—retained outside consultants to the Oversight Board who take instructions from the Oversight Board's counsel.  The projections concerning PREPA's affordable level of revenues, therefore, are quintessential made-for-litigation projections designed to achieve the pre-ordained lower recovery that the Oversight Board wants to realize, rather than the recovery that would be expected based on independent empirical data.  *See* Peterson Dep. Tr. at 146:16-21 ("[M]y view is that we should be maximizing creditor return within a rational context of affordability and that we should not be guided by a construct that allows us to pay as little as possible and to use litigation as a tool to achieve that.").

61.    Importantly, these projections were not made in the ordinary course of PREPA's business.  *See, e.g.*, Deposition Transcript of William Zarakas, May 4, 2023 ("<u>Zarakas Dep. Tr.</u>"), at 80:8-12 (explaining how the board, "typically, through counsel" (Proskauer) provided instructions with respect to certain analyses); Battle Dep. Tr. at 224:22-225:6, 275:13-15

(answering "yes" when asked whether it is true that "AAFAF would not have prepared that [affordability] analysis, but for the instruction it got from counsel" and explaining that his "understanding is that this was prepared as part of the preparation for the litigation process"); Deposition Transcript of Sheva Levy, May 10, 2023 ("Levy Dep. Tr."), at 72:3-5, 51:10-14, 52:9-53:9, 56:10-57:13, 60:17-22, 62:2-4, 70:21-23, 89:2-13, 94:10-13 (explaining how assumptions were prescribed by the Board and confirming that the reasonableness thereof was not independently tested by Ms. Levy); Brownstein Dep. Tr. at 206:2-14 ("Well, the board ultimately determines them [the cash flows].  They are presented what is available to meet the criteria that they're trying to meet from the other consultants."); Skeel Dep. Tr. at 230:13-16, 232:14-24, 233:25-234:5 (explaining that (i) he, as chairman of the Oversight Board, is unaware of whether LUMA was involved in preparing the projections that underlie the plan of adjustment or whether PREPA takes the board's projections; (ii) the preparation rate structure for purposes of PREPA's plan of adjustment was done by the board's advisors, primarily Brattle Group; and (iii) he is unaware of whether PREPA uses the projections prepared by the board's advisors in the ordinary course of business).  Indeed, a member of the Board confirmed that "the board delegate[d] to the Brattle Group the decision over what's affordable for PREPA."  *See* Peterson Dep. Tr. at 215:9-216:18 ("Q.[:] Did the board delegate to the Brattle Group the decision over what's affordable for PREPA? . . .  A. In effect it has, yes. . . .  Q. And when you say in effect it has, why do you say that? . . .  A. I mean, they appeared on the scene and they presented the analysis, and that became the basis for what we're doing.").  Consequently, they are not entitled to the deference that a Court would ordinarily provide to management's projections. *See City Trading Fund v. Nye*, 72 N.Y.S. 3d 371, 383-84 (N.Y. Sup. Ct. 2018) ("While projections relied upon by analysts and advisors can be considered material, that is only the case if those projections were generated by management in

the ordinary course of business.  By contrast, third-party projections that are independent from ordinary management assessments, such as those at issue here, regardless of whether they are publicly available (here, they were, but for a price), are not considered material.  They are of trivial value given all of the other information disclosed to the shareholder."); *see also LongPath Cap., LLC v. Ramtron Int'l Corp.*, 2015 WL 4540443, at *11 (Del. Ch. June 30, 2015) (quoting *Cede & Co. v. Technicolor, Inc.*, 2003 WL 23700218 at *7 (Del. Ch. Dec. 31, 2003), *revised* (July 9, 2004), *aff'd in part, rev'd in part,* 884 A.2d 26 (Del. 2005)) ("When management projections are made in the ordinary course of business, they are generally deemed reliable.  By corollary, projections prepared outside of the ordinary course do not enjoy the same deference.").

62.     David Brownstein of Citigroup, the lead negotiator for the Oversight Board, conceded that he understood the Court's reference to "rings and sticks" at the Urgent Status Conference[33] to mean there are ranges of numbers that could be correct and that projecting how much revenues PREPA can reasonably generate is not an exact science, but rather a judgment call; Citigroup also acknowledged that if the Court were to disagree with Brattle Group's view on how much revenues could reasonably be generated, Citigroup could "of course" design and structure additional bonds.  *See* Brownstein Dep. Tr. at 201:7-202:19, 209:8-16.

> ii.     *The Oversight Board's Revenue Envelope and Legacy Charge Projections that Underlie the Plan Are Unreasonable*

63.     The Oversight Board's counsel instructed its outside consultants to deploy assumptions they had used in calculating affordability projections, including with respect to the

---

[33]     *See* Transcript of Hearing Held on May 8, 2023 (the "Urgent Status Conference"), at 20:18-24 (Judge Swain: "So it seems to me that in a negotiation we're working with rings and sticks, as opposed to darts and a particular place in the dartboard, which is the only dartboard. There's got to be some degree of an area, of an ability to imagine an outcome that is consistent with sustainability goals, that isn't necessarily the precise figure down to two decimal points.").

revenue envelope, share of wallet ("SOW"), and the legacy charge that is used to pay the new

bonds issued under the Plan.  The Oversight Board's assumptions and projections, however, are

untethered to reality.  Indeed, the entire calculation of SOW is derived from the Hypothetical

Residential Customer, which is a fictional person who makes only $24,000 (median income as of

2021) yet consumes 425 kWh (which does not correlate to what someone making $24,000/year

consumes).  *See Disclosure Statement for Modified Second Amended Plan of Adjustment of the*

*Puerto Rico Electric Power Authority*, dated March 1, 2023, at pp. 1018 ("The maximum

volumetric charge under the Revenue Envelope calculation was therefore set so that the resulting

electric bill would be affordable, in the first year of implementation, for non-exempt households

with assumed [median] income of $24,000, monthly volumetric consumption of 425 kWh, and

using the rates in the 2022 Fiscal Plan as the baseline, where affordability is defined as a maximum

total electricity bill not above 6% of total income."); Zarakas Depo. Tr. 104:2-105:12 (explaining,

under the Board's own standard for affordability, how Puerto Rico's median income household in

Fiscal Year 2024 can afford to pay up to $120/month for electricity, which is 6% of the monthly

income of a household that makes $24,000 and uses 425 kWh of electricity).

64.     The Oversight Board, through its hired advisors, set the Hypothetical Residential

Customer's income by reference to "Median Monthly Household Income."  It did not use,

however, the most current household income data available and only grew income through 2019

and then kept it flat for the next 40 years—effectively deflating their median income forecast,

which results in an actual decrease of true or "real" share of wallet, .  *See Expert Report of Maureen*

*M. Chakraborty, PHD*, dated April 28, 2023 ("Chakraborty Opening Report"), ¶ 13 ("In reality,

nominal median household income in Puerto Rico has been growing and was approximately

$14,412 in 1999, $18,314 in 2009, and $20,269 in 2018.  I show that if the Board were to conduct

its affordability calculation each year through 2058 and properly take into account reasonable assumptions of wage growth just driven by inflation alone, then, Additional Net Revenues would be $6.59 billion, an increase of $910 million over the amount calculated by the Board."). The Oversight Board's SOW calculation then uses "Hypothetical Residential Customer's Monthly Bill," which significantly overstates kWh consumption for the *median* income earning household. *Id.* ¶ 12.

65.    Moreover, in its SOW calculation for the Hypothetical Residential Customer typical monthly bill, the Oversight Board based its calculations on *unsubsidized* households (i.e., thereby driving the consumption number up) and a "Median Monthly Household Income" that includes fully subsidized households (i.e., thereby driving the median income down). *Id.* ¶ 32. Using a monthly 425 kWh level of consumption along with a corresponding $24,000 median income level in creating the Hypothetical Residential Customer artificially skews the monthly consumption number higher than it really is in order to create an artificial cap on the price per kWh to achieve a monthly usage that is "affordable" (i.e., 6% SOW). In reality, a customer making $24,000 only consumes 372 kWh, which means the price per kWh can be higher and remain equally "affordable" at the Oversight Board's chosen 6% SOW calculation. *Id.* ¶ 12, 46.

66.    The elasticity estimations are equally flawed. The elasticity assumptions factored into the Oversight Board's model do not account for different elasticity effects on different customer classes and are not supported by academic studies on elasticity, including the academic studies upon which the Oversight Board purports to rely. *Id.* ¶ 84; *Expert Report of Susan Tierney, PHD*, dated April 28, 2023, ¶ 79 ("Elasticity effects in the use of electricity differ by customer type."). Indeed, the Oversight Board has conceded that its SOW methodology has no rational application to commercial, industrial, manufacturing, or governmental ratepayers. *See* Zarakas

Dep. Tr. at 41:22-25 ("Q[:] And was there any corresponding affordability test applied to non-residential PREPA customers? A[:] No."); *id.* 208:3-7 ("Q[:] Are you aware of any academic study that performs an analysis like this to determine appropriate rates for non-residential customer classes? A[:] No."); *id.* at 241:12-242:24 ("Q[:] So what I'm asking is whether -- what, if any, material changes to the model transpired between the version in late 2022 and the version disclosed in February 2023? . . . A[:] Two changes that I'm aware of, one was a change from the $13 -- the $16 charge, fixed charge for residential to 13. The other was an increase in volumetric charges to accommodate the National deal.   Q[:] What was the increase in volumetric charges to accommodate the National deal? A[:] Each individual charge?   Q[:] Did the volumetric charges go up, down or stay the same?  A[:] Up.   Q[:] Was that across all rate classes or only some? A[:] Only some.   Q[:] And did you determine, you meaning Brattle, determine the amount by which volumetric charges would go up to accommodate the National deal?   A[:] At the direction methodologically of the board.   Q[:] And what was the methodological direction provided to you by the board?  A[:] I believe it was to increase non-residential volumetric charges.")

67.    For the foregoing reasons, even using the Oversight Board's own SOW Calculation method to set the level of "affordability," the proposed rates are based on fundamentally flawed calculations designed for litigation purposes by the Oversight Board's advisors.  *See Chakraborty Opening Report*, ¶ 11 ("[E]ven accepting the Board's 6% share of wallet solely for purposes of this Report, I conclude that the Board understates the amount of revenues PREPA can generate to repay creditors.").  As Dr. Chakraborty's expert reports make plain, PREPA can afford to pay additional consideration to bondholders while still remaining under the Oversight Board's 6% SOW threshold.  The best evidence that the Oversight Board did not undertake a rigorous affordability analysis, but rather made up the numbers that suited its ligation agenda, is the

40

National Settlement, which was paid for (through an additional approximate $280 million in new bonds) by simply lifting rates for non-residential customers without even re-running any "affordability" analysis. *See* Skeel Dep. Tr. 85:18-25 (answering "I don't remember" to the question of whether "the board conduct[ed] a new analysis of affordability, elasticity and capital requirements to revise the amount of bonds it felt it could issue" in order to finance the National settlement). At bottom, the Oversight Board's affordability analysis was made to order, driven by an ideological desire to pay bondholders as little as possible. *See* Peterson Dep. Tr. at 113:6-14 (stating of the Oversight Board's affordability analysis that "[t]he goalposts on numbers have been moved again and again. In my estimation, based upon observations . . . they seem made to order, the affordability analysis. And I very much think it's an ideological process driven to pay as little as possible. And that's my opinion.").

3.  The Court Should Consider the Oversight Board's Projected Revenues From Just Days Before Filing The Plan Because They Are Not Introduced for an Impermissible Purpose Under FRE 408

68.   The Oversight Board takes issue with any creditor's reference to proposals made during mediation, even if they were subsequently disclosed publicly and are not being offered for any impermissible purpose. This evidence, however, is highly relevant to the factual findings and conclusions of law the Court is being asked by the Oversight Board to make, including good faith, fairness, equity, and non-discriminatory treatment. *See* Proposed Confirmation Order ¶ 1 (proposing the PREPA plan be confirmed "pursuant to 314(b) of PROMESA," which requires, among other things, that a plan be feasible and in the best interest of the creditors and fair and equable and not discriminate unfairly with respect each dissenting impaired class); *id.*¶ 4 ("[T]he provisions of the PREPA Plan constitute a good faith, reasonable, fair and equitable compromise and settlement of the Claims and controversies resolved pursuant the PREPA Plan. . . ."); *id.* ¶ 5

(proposing that the Court approve "the compromises and settlements embodied in the PREPA Plan as fair and reasonable. . . .").

69.     The First Circuit has explained that Rule of Evidence 408[34] is intended to promote "'**nonlitigious solutions to disputes**.'" *Catullo v. Metzner*, 834 F.2d 1075, 1078 (1st Cir. 1987) (emphasis added). The rule is not breached by reference to and admission of evidence related to publicly disclosed economic offers the Oversight Board made to bondholders that are being offered to prove not that the terms of those offers determine the value of bondholders' claims, but the Oversight Board's retaliative motive[35] and bias against organized bondholders.

70.     Just days before launching the Plan's aggressive cramdown strategy, the Oversight Board disclosed a much higher level of projected revenues and lower capital expenditure estimates as reasonable and feasible. For reasons that remain unknown, the Oversight Board picked one

---

[34]   Rule 408. Compromise Offers and Negotiations

(a) Prohibited Uses. Evidence of the following is not admissible — on behalf of any party — either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:

> (1) furnishing, promising, or offering — or accepting, promising to accept, or offering to accept — a valuable consideration in compromising or attempting to compromise the claim; and

> (2) conduct or a statement made during compromise negotiations about the claim — except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.

(b) Exceptions. The court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Fed. R. Evid. 408.

[35]   *See Adams v. Gissell*, 2022 WL 2387881, at *4 (D. Mass. Apr. 19, 2022), report and recommendation adopted, No. CV 20-11366-PBS, 2022 WL 16702407 (D. Mass. Aug. 24, 2022) (introducing evidence from settlement negotiations was permissible to establish a plaintiff's motives for judicial filing).

bondholder (National), for whom the Oversight Board would stand by its view of the recoveries

that could be reasonably generated—indeed, the Oversight Board did not even have to run a new

affordability analysis to ink the National deal.[36]

71.     For the remainder of the bondholders, however, whether or not they were involved

in any negotiations, the Oversight Board embarked on an unprecedented campaign of scare tactics

and vexatious litigation that would offer steep discounts from what it was simultaneously agreeing

in principle to provide to National.  The projected revenues embraced by the Oversight Board as

reasonable at all times prior to filing the Plan—whether in the 2019 RSA or the public disclosures

surrounding the failed mediation efforts—point to one truth about the Plan: it was not proposed in

good faith, but as a  retaliatory measure[37] and a litigation bullying tactic.[38]  For this reason, the

very *proposal* of the Plan (together with the Oversight Board's attempt to use coercive unapproved

solicitations with retail bondholders to accept just 50 cents on the dollar for their claims) cannot

meet the good faith requirement of section 1129(a)(3).  *See In re Irving Tanning Co.*, 496 B.R.

644, 660 (B.A.P. 1st Cir. 2013) (holding that the focus of this sub-section is the manner in which

a plan is proposed).

---

[36]     Skeel Dep. Tr. at 85:5-87:17, 90:16-22 (acknowledging that the $280 million increase in the amount of new bonds was to finance the National Settlement and being unable to recall whether, prior to such increase, the board conducted a new affordability analysis or came to a "new view" as to how much PREPA could afford); *id.* 122:2-4 ("So today, our view is that offering those terms [in the National Settlement] to everyone could not be affordable.")

[37]     *See Mercier v. Boilermakers Apprenticeship & Training Fund*, 2009 WL 458556, at *6 n.11, 19 (D. Mass. Feb. 10, 2009) (admitting evidence of settlement communications for the purpose of establishing a plaintiff's retaliation claim arising from the defendants' conduct in response to the plaintiff's wrongful termination claim).

[38]     *See In re Logistics Info. Sys., Inc.*, 432 B.R. 1, 8-9 (D. Mass. 2010) (recognizing that evidence from settlement negotiations could be properly admitted under Rule 408(b) to establish a litigant's unlawful "state of mind").

72.     The Court knows too well the history of failed negotiations, the request of the Oversight Board for additional time to respond to bondholder data requests, and the lack of responses to those requests, all of which culminated in the sudden revelation of an aggressive 50-cent cramdown plan that would be 'anchored' by just a few chosen 'winners' (only one of whom is a bondholder) who the Oversight Board paid a premium to in exchange for support—namely, National and the Fuel Line Lenders.

73.     Finally, to the extent the Oversight Board changes its litigation posture from its ill-conceived argument that "fair and equitable" does not require a municipal bond issuer to pay what it can reasonably and objectively afford to pay, it may simply urge the Plan *is* all PREPA can afford to pay.  In that event, the evidence of the publicly disclosed offer would be admissible to prove the Oversight Board's state of mind, i.e., that it does not actually believe the Plan provides all that is reasonably affordable.  This would be consistent with the admissible testimony of one member of the Oversight Board, who explained that the Plan's draconian haircuts represent ideology, not anything else.[39]  The evidence is admissible to prove that point.[40]

### C.    The Plan Is Not In the Best Interest of an Overwhelming Majority of PREPA's Creditors

74.     As currently proposed, the Plan does not satisfy the "best interest of creditors" test under PROMESA § 314(b)(6) because it does not provide creditors a better alternative than dismissal of the Title III case.  Section 314(b) of PROMESA requires that a plan of adjustment be

---

[39]    Peterson Dep. Tr. at 163:3-6 (stating that Oversight Board's "affordability analysis has changed quite a bit, and it consistently changes to suit . . . the ideology of where the Board is headed with its approach to negotiation with creditors").

[40]    *See Traverse v. Gutierrez Co.,* 2021 WL 3475723, at *18 (D. Mass. Aug. 6, 2021) (recognizing that evidence of settlement communications could be admitted under Rule 408(b) to establish the "ulterior motive" element of an abuse of process claim).

both "feasible and in the best interest of creditors, which shall require the court to consider whether available remedies under non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan. . . ." PROMESA § 314(b)(6). Specifically, "PROMESA's best interests test requires the Court only to consider whether creditors of each Debtor *in the aggregate* receive an equal or greater recovery on their Claims pursuant to the Plan than they would outside of Title III if the Debtor's Title III case were dismissed and creditors exercised their remedies." *Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 637 B.R. at 311 (emphasis in original). This analysis, therefore, relies on numerous assumptions, including "(i) estimates of the resources that would be available for debt service, which requires an assessment of available cash, revenues, and operating expenses in the absence of a confirmed plan of adjustment; (ii) the outstanding creditor obligations due and payable that would exist outside of Title III; and (iii) the priority in which creditor claims would be paid outside of Title III, which in certain circumstances requires consideration of assumptions regarding the potential outcome of litigation matters." *Id.* Notably, PROMESA's best interest test modifies the requirement for municipal proceedings under section 943(b) of the Bankruptcy Code, requiring that the court consider whether "available non-bankruptcy law and constitution of Puerto Rico would result in a greater recovery for creditors than the plan" and not solely whether a better alternative is available. *See id.* at 310.

75.    Here, the Plan does not provide PREPA's creditors—the overwhelming majority of whom are bondholders—with an aggregate recovery greater than they would receive outside of Title III following dismissal of these cases. *See Hardeman Cnty.*, 540 B.R. at 241 (finding that the plan is in the best interests of creditors because it provided "creditors, as a whole, with a better alternative than dismissal" of the cases).

76.   *First*, the aggregate of creditors is made up of bondholders, who hold approximately 80 percent of PREPA's prepetition debt.  The bondholders have distinct rights from general unsecured creditors and specific performance remedies that exist outside of Title III, including the contractual ability to add revenues to the Sinking Fund, the ability to appoint an independent receiver to oversee PREPA's operations, and the ability of the receiver to raise rates for the purpose of generating revenues for deposit in the Sinking Fund such that PREPA meets its revenue requirements.  *See* Trust Agreement §§ 502, 804, 808.

77.   The Oversight Board acknowledges the bondholders' special remedies in its Best Interest Report for PREPA, stating in its assumption provisions that "a court is likely to find the Bondholders have a right to receiver appointed under 22 L.P.R.A. § 207."  *See Best Interest Test Report for PREPA*, Appendix 1, Assumptions, filed by the Oversight Board on January 27, 2023 (ECF No. 3169-2) (the "Best Interest Test Report").  The bondholders' rights are also codified under Puerto Rican law, which independently requires PREPA to meet its obligations to bondholders.  PREPA's Authority Act, as amended, requires PREPA to collect revenues "that are sufficient . . . for the payment of the principal of and interest on its bonds, and for fulfilling the terms and provisions of the agreements entered into with or for the benefit of purchasers or holders of any bonds of [PREPA] and other creditors."  Act 33-2019 § 24 (amending Section 5 of the Authority Act).[41]  The Authority Act also gives bondholders the right to enforce PREPA's statutory

---

[41]   Further, PREB is required to approve a rate that "(i) is sufficient to guarantee the payment of principal, interest, reserves, and all other requirements of bonds [and] (ii) complies with the terms and provisions of the agreements entered into with or in benefit of buyers or holders of any bonds or other financial obligations of the Authority." 22 L.P.R.A. 196a(c); *see also* Act 57-2014 § 6.3(p), as restated by Act 17-2019 § 5.10 (providing that PREB has the duty to "[e]nsure that the powers and authorities exercised by PREB over the Authority, its successor, or the transmission and distribution network Contractor, energy companies and any natural or juridical person that has benefited or may benefit from Puerto Rico's electrical system, including those related to rate review or approval, guarantee that the Authority meets its obligations to

and contractual obligations "by mandamus or other suit, action, or proceeding at law or in equity."

22 L.P.R.A. § 208.

78.     Thus, as an initial matter, upon dismissal of the Title III cases, the bondholders have

a contractual right to accelerate the full amount of the debt, $8.5 billion, as immediately due and

payable.[42]  *See Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 637 B.R. at 311 (recognizing creditor

obligations due and payable outside of Title III as a key assumption in the best interest analysis).

To collect this amount, PREPA's bondholders are entitled to numerous specific performance

remedies outlined above, including the immediate appointment of an independent receiver with

the ability to raise rates in a more efficient manner, free of political influence, and with the goal of

allowing PREPA to meet its obligations to creditors.  These rights are not merely protected by

contract outside of Title III, but also by legislation, which requires PREPA to generate revenues

in a sufficient amount to provide for the payment of its bonds.  22 L.P.R.A. § 196(l).[43]

79.     ***Second***, the Best Interest Test Report incorporates a series of assumptions that

disregard any meaningful benefits that a receiver may generate upon dismissal.  In its Best Interest

---

bondholders.")  The Oversight Board has conceded to this.  *See, e.g.,* Disclosure Statement at 366
("PREB, however, does have the responsibility under Puerto Rico law to exercise its power over
rates to ensure PREPA recovers all operational and maintenance costs (Act 57-2014 § 6.25(b)) and
meets its obligations to bondholders (Act 17-2019 § 6.3(p)).").

[42]   Syncora acknowledges that the Court has yet to rule on the appropriate estimation of
the bondholders' claim against PREPA.  For purposes of this analysis, Syncora assumes that the
bondholders' claim will be estimated for allowance at the full amount outstanding (approximately
$8.5 billion).  In any event, if the bondholders' claims are estimated for allowance in any amount
greater than approximately $3 billion, it would constitute a majority of the outstanding claims in
the case.  The Plan provides that if all bondholders accepted the plan, their recovery would be 50%
or approximately $4.2 billion in the aggregate.

[43]   And, as noted above, PREB is obligated to approve rates that comply with the bond
documents.  *See* 22 L.P.R.A. § 196a(c).  *See also* Act 57-2014 § 6.3(p) as restated by Act 17-2019
§ 5.10.

Test Report, the Oversight Board assumes, among other things, that a receiver would face contract termination from LUMA, load defection in response to rate increases, and political uncertainty. *See* Best Interest Test Report, at \*5, 9-10, Appendix 2 (ECF No. 3169-2).  The Best Interest Test Report, however, includes no analysis of the many benefits that a receiver may provide over PREPA, such as the ability to generate increased efficiencies in PREPA's operations, optimal rate design, independence from politics, or financing necessary for capital expenditures.

80.      Instead, the assumptions were provided primarily, if not solely, by the Oversight Board's advisors, and appear made-to-order for the contested confirmation proceeding.  For example, when questioned on these assumptions, Oversight Board Chairman David Skeel was unable to simply recall who prepared the Best Interest Test Report, let alone its contents.  *See* Skeel Dep. Tr. at 229:7-10 ("A [Skeel:] I actually don't know.  Yeah.  I don't know.  I did not prepare it.").  And, Ojas Shah, a partner of McKinsey and declarant for the Best Interest Test Report, was unable to provide a viewpoint or reason for why certain assumptions were provided, stating that McKinsey relied solely on the advice of legal counsel for a variety of key assumptions, such as the LUMA contract termination upon appointment of a receiver—all without speaking to anyone at LUMA or PREPA.  *See* Deposition Transcript of Ojas Shah Dep. Tr. ("Shah Dep. Tr."), at 78:2-22 ("Q[:] You mentioned that one of the assumptions is that LUMA would no longer continue in this environment; right? ("A[:] That is true. . . . That was an assumption from counsel at the time of preparing this analysis, yes.").  Thus, the Best Interest Test Report does not grapple with, much less even consider, any benefits or value that a receiver would bring to bondholders in the event that the Title III cases were dismissed, other than a simple increase in rates.  Instead, the Best Interest Test Report relies on a series of assumptions, cooked up by counsel, with little factual support.

81.    **Lastly**, neither the proposed Plan nor the Best Interest Test Report enumerate significant benefits that creditors currently receive under the Plan, which would be forfeited in the event of dismissal.  Notably, unlike prior confirmed plan of adjustments in Puerto Rico's Title III cases, the currently proposed Plan is far from consensual.  As the record demonstrates, PREPA's Plan does not "avoid the pitfalls of delay, litigation costs, and uncertainty by implementing [a] consensual agreement reached by the major stakeholders. . ." as did previous Title III cases.  *See, e.g.*, *In re Fin. Oversight & Mgmt. Bd. For Puerto Rico*, 361 F. Supp. 3d 203, 217 (D.P.R. 2019) ("The COFINA Plan represents a consensual resolution of complicated and expensive litigation that presented serious issues that had been raised well before the commencement of COFINA's Title III case");  *Fin. Oversight and Mgmt. Bd. for Puerto Rico*, 637 B.R. at 277 (noting that the Plan achieves "consensus from at least 15 major parties"); *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 2022 WL 6949992, at *18 (D.P.R. Oct. 12, 2022) (noting that "[t]he Oversight Board has worked to develop consensus with creditors and to evaluate HTA's current and future financial circumstances."); *see also* Peterson Dep. Tr. at 149:15-151:9 ("I supported the fuel line lender deal and the National deal because it was my hope that it would create momentum for a global settlement.").  Instead, the Plan is contested on nearly every basis by PREPA's largest stakeholder group, the bondholders, and, unlike other Title III cases, it is already faced with significant litigation costs both at the confirmation hearing and in the lien and recourse litigation.  *See Fin. Oversight & Mgmt. Bd. For Puerto Rico*, 361 F. Supp. 3d 203, 246 (reasoning that "[t]he alternative to the Plan is protracted litigation in the Adversary Proceeding, which could lead to an all-or-nothing recovery for either the Commonwealth or COFINA . . . [e]ven if one side to the litigation were to prevail in this Court, litigation costs would skyrocket, and it could be months, if not years, before a court issues a final, unappealable order resolving who is entitled to the SUT

Revenues.").  Critically, in the other Title III cases, the Court did not face challenges to the best interest test (which considers creditors in the aggregate) by a majority of the particular debtor's creditors.  Rather, unlike here, where a substantial majority of creditors oppose confirmation, the Court addressed challenges from small rump groups of creditors pursuing their own parochial interests.  Consequently, the best interest analysis should take into account the views of creditors who are voting with their feet on their preference for non-bankruptcy alternatives to the Plan.  *Cf. In re Mann Realty Assocs., Inc.*, 2019 WL 4780937, at *8 (M.D. Pa. Sept. 30, 2019) ("[C]reditors are the 'best judge of their own interests.'") (quoting *In re Camden Ordnance Mfg. Co. of Ark., Inc.*, 245 B.R. 794, 802 (E.D. Pa. 2000)).

82.     Additionally, the Plan is a far cry from those previously approved in municipality proceedings, such as *In re Detroit*, where the court found that the creditor body would lose significant benefits in the event of dismissal, including substantial impairment to recoveries, a loss of significant non-debtor settlement contributions, and potential enhanced credit ratings.  *See City of Detroit*, 524 B.R. at 217-18 (E.D. Mich. 2014).  Unlike in *In re Detroit*, here no such benefits exist under the Plan.  The Commonwealth of Puerto Rico is making no contributions to PREPA that would be lost upon dismissal, and the Oversight Board has provided no projected increase in credit ratings.  *See* Skeel Dep. Tr. at 212:17-23 ("Q[:]  Have you done anything to explore the possibility of obtaining other funding sources to fund PREPA's plan?  A[:]  I have not taken concrete steps to pursue other forms of non-PREPA, non-federal funding sources of funding.").  Instead, it is the Plan itself that would impair the recoveries for the majority of bondholders by projecting recoveries in the range of 0%-9% under two sets of scenarios.  *See Best Interest Test Report for PREPA*, at *10 (ECF No. 3169-2).  Thus, PREPA's bondholders are not faced with a consensual Plan that provides a greater recovery and a better alternative than dismissal, and

therefore, the Plan as currently proposed does not satisfy PROMESA' s best interest of creditors' test.

## <u>RESERVATION OF RIGHTS</u>

83.     Syncora reserves all rights to supplement or amend this Objection in advance of, or in connection with, the confirmation hearing in the event additional information comes to light or the Plan is further modified or supplemented.  Nothing herein shall be or is intended to be a waiver by Syncora of any right, objection, argument, claim or defense in connection with any matter, including matters involving the Plan, all of which are expressly reserved.   The foregoing reservation includes the constitutionality of PROMESA, as applied to this title III case.

Document   Page 59 of 60

## **CONCLUSION**

WHEREFORE, Syncora respectfully requests that the Court deny confirmation of the Plan,

and provide Syncora such other and further relief as the Court deems appropriate.

DATED:  June 12, 2023

Respectfully submitted,

REICHARD & ESCALERA

**By :**   */s/ Rafael Escalera*
**Rafael Escalera**
USDC No. 122609
escalera@reichardescalera.com

**Sylvia M. Arizmendi**
USDC-PR 210714
arizmendis@reichardescalera.com

**Carlos R. Rivera-Ortiz**
USDC-PR 303409
riverac@reichardescalera.com

255 Ponce de León Avenue
MCS Plaza, 10th Floor
San Juan, Puerto Rico 00917-1913

QUINN   EMANUEL   URQUHART   &
SULLIVAN, LLP

**Susheel Kirpalani** (*pro hac vice*)
susheelkirpalani@quinnemanuel.com

**Daniel Salinas**
USDC-PR 224006
danielsalinas@quinnemanuel.com

**Eric Kay** (*pro hac vice*)
erickay@quinnemanuel.com

**Kate Scherling** (*pro hac vice*)
katescherling@quinnemanuel.com

51 Madison Avenue, 22nd Floor
New York, New York 10010-1603

*Co-Counsel for Syncora Guarantee, Inc.*

### CERTIFICATE OF SERVICE

I hereby certify that on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel for the parties of record.

*/s/Carlos R. Rivera-Ortiz*
USDC-PR 303409