**Natbony Declaration Exhibit 1**

Page 1

```
 1
 2    IN THE UNITED STATES DISTRICT COURT
      FOR THE DISTRICT OF PUERTO RICO
 3    Case No. 17-BK-3283-LTS
      ---------------------------------------x
 4    In re:
 5    THE FINANCIAL OVERSIGHT AND MANAGEMENT
      BOARD FOR PUERTO RICO,
 6
      as representative of
 7
      THE COMMONWEALTH OF PUERTO RICO, et al.,
 8
                            Debtors.
 9    ---------------------------------------x
      Case No. 17-BK-4780-LTS
10    ---------------------------------------x
      In re:
11
      THE FINANCIAL OVERSIGHT AND MANAGEMENT
12    BOARD FOR PUERTO RICO,
13    as representative of
14    THE PUERTO RICO ELECTRIC POWER AUTHORITY,
15                          Debtor.
      ---------------------------------------x
16                    May 3, 2023
                      10:00 a.m.
17
18        VIDEOTAPED DEPOSITION of DAVID SKEEL,
19    held at the offices of Kramer Levin
20    Naftalis & Frankel LLP, located at 1177
21    Avenue of the Americas, New York, New York
22    10036, before Anthony Giarro, a Registered
23    Professional Reporter, a Certified Realtime
24    Reporter and a Notary Public of the State
25    of New York.
```

```
                                              Page 118
 1                    DAVID SKEEL
 2       A        Why do I say it's an
 3   important piece?
 4       Q        Yes.
 5       A        Because National is one of
 6   the largest creditors.  All told, they're
 7   owed about a billion dollars when you
 8   consider all of their claims.  And as a
 9   result of this settlement, they are
10   agreeing to give up their -- they've
11   agreed to give up their claims, that they
12   were fully secured, that they were
13   entitled to not just 100 cents on the
14   dollar, but 100 cents plus accrued
15   interest.  They agreed to give all of
16   that up.  And they agreed to take
17   significantly less.  They agreed to
18   support the plan.  They agreed to vote in
19   favor of the plan, all of which are very
20   attractive benefits to us.
21       Q        Is the reorganization
22   contemplated by the plan unworkable in
23   the absence of the National settlement?
24                MR. FIRESTEIN:  Objection,
25      vague.
```

Page 154

1           DAVID SKEEL
2     Q      So will you understand who
3  I'm referring to when I say the fuel line
4  lenders?
5     A      Yes, I will.
6     Q      So with respect to the fuel
7  line lenders, what understanding do you
8  have as to the role of the fuel line
9  lenders in PREPA's current day-to-day
10 operations?
11    A      My understanding is they do
12 not currently have a role in operations.
13    Q      Do you know whether PREPA
14 ever purchased fuel or any other goods
15 directly from the fuel lines?
16    A      I don't know for sure.
17    Q      But they're lenders; right?
18    A      The original fuel line
19 lenders were lenders, yes.
20    Q      And they were providing
21 financing to buy fuel; correct?
22    A      I believe that is correct.
23    Q      Do you know whether PREPA
24 borrowed money from any other lenders to
25 buy goods and services?

Page 156

1         DAVID SKEEL
2    Q    But after the initial loans,
3  are you aware of any additional loans
4  that PREPA received from the fuel line
5  lenders?
6    A    Not that I'm aware of.
7    Q    So, for instance, are you
8  aware of any financing that PREPA
9  received from the fuel line lenders in
10 the last five years?
11   A    Not that I'm aware of, no.
12   Q    Have there been any
13 discussions that you're aware of about
14 the fuel line lenders providing funds to
15 PREPA from 2020 to the present?
16   A    Not that I'm aware of, no.
17   Q    Are you aware of any
18 discussions with the fuel line lenders
19 about them providing any financing to
20 PREPA in 2023?
21   A    Not that I am aware of, no.
22   Q    And what about beyond 2023?
23   A    We're still in 2023.
24   Q    Beyond 2023, have there been
25 any discussions -- I'm sorry.  After

Page 157

DAVID SKEEL

2023?

A	Could you state the whole question --

Q	I'll state the whole question. And my apologies. I don't mean to interrupt you. And we should both let each other finish.

Are you aware of any discussions with the fuel line lenders about PREPA borrowing funds after 2023?

A	No, I am not.

Q	Are you familiar with the fuel line lenders' current plan support agreement?

A	Yes, I am.

Q	Did you participate at all in negotiating the fuel line lenders' plan support agreement?

MR. FIRESTEIN: Objection, vague.

A	I did not directly negotiate, no.

Q	When you say you didn't directly negotiate, what role did you

Page 168

1               DAVID SKEEL
2    structure of the settlement.
3        Q     What was the benefit -- what
4    were the benefits that you believe that
5    the board and PREPA would have gotten by
6    entering into that settlement?
7        A     The benefits were that they
8    compromised their claim at less than 100
9    cents on the dollar.  And we thought it
10   was a pretty strong claim.  They are a
11   sizable claim that is now supportive of
12   the plan and will vote in favor of the
13   plan of adjustment and will not object to
14   the plan of adjustment.  And all of those
15   were attractive benefits.
16       Q     And can you identify what in
17   particular swayed the board to accept an
18   84 percent recovery rate?
19           MR. FIRESTEIN:  I think the
20       form of your question seeks
21       deliberative process.  I'll instruct
22       the witness not to answer.  He's
23       already told you what his
24       understanding was of it.  You can
25       reframe, if you wish.

Page 169

1 DAVID SKEEL
2 Q With respect to you as a
3 voter on the -- let's start with this.
4 The board did vote and
5 approve the PSA for the fuel line
6 lenders; correct?
7 A Yes. The board did.
8 Q And in your view, what
9 argument presented by the fuel line
10 lenders in particular swayed you to
11 approve the PSA?
12 A I don't know that there was
13 a single argument that swayed me to vote
14 yes. I will say that they had and have a
15 couple fairly strong arguments for
16 current expense treatment that other
17 creditors didn't have. One of those
18 arguments is that they are specifically
19 mentioned in the trust indenture.
20 Another is that they claimed
21 that there are more than one contract
22 with PREPA where PREPA said that they are
23 current expense claimants. And we oppose
24 those arguments. And we took litigation
25 positions against those arguments. But

Page 174

1               DAVID SKEEL
2 agreement to vote yes, their agreement
3 not to object to the plan, all of which
4 are helpful to moving towards a
5 confirmable plan of adjustment.
6       Q      Would paying the fuel line
7 lenders a 50-cent recovery be more
8 affordable than what they're receiving
9 under the plan?
10       A      Every dollar less that you
11 pay is a dollar more attractive and more
12 affordable, yes.
13       Q      Are you aware of after
14 the -- of whether after the initial
15 financing from the fuel line lenders,
16 they ever provided PREPA with any bridge
17 financing or short-term financing or any
18 other additional financing?
19       A      I do not know.
20       Q      But sitting here today,
21 you're not aware of any; correct?
22       A      Sitting here today, I don't
23 recall additional funding, financing that
24 they provided.
25       Q      Are you aware of the

Page 175

1                     DAVID SKEEL
2  existence of any intercreditor agreements
3  between the fuel line lenders and the
4  bondholders?
5       A     I don't remember
6  intercreditor agreements, no.
7       Q     Now, you testified earlier
8  that the board had made some arguments
9  against the fuel line lenders' positions
10 with respect to their claims.  Do you
11 remember testifying to that?
12      A     I do remember, yes.
13            MR. NATBONY:  Can we bring
14    up tab 10?
15            (The above-referred-to
16    document was marked as Exhibit 20 for
17    identification, as of this date.)
18      Q     Have you seen this document
19 before?
20      A     I'm trying to figure out
21 what it is.
22      Q     Is it a memorandum --
23            MR. FIRESTEIN:  Hold on one
24    second.
25      Q     Finish your answer.

Page 336

1 DAVID SKEEL
2 top of the next page?
3 A Yes.
4 Q And then if you go on,
5 you'll see a couple of lines down,
6 there's a reference to
7 Citibank/Scotiabank lenders. Do you
8 understand that?
9 A Yes, I do.
10 Q Do you understand that to be
11 the fuel line lenders?
12 A I do, yes.
13 Q And then in the next
14 notwithstanding clause, you'll see
15 another reference to Citibank, Scotiabank
16 lenders. You see that?
17 A Yes, I do.
18 Q There's another
19 notwithstanding sentence after that. And
20 you'll see a reference to them after
21 that. Do you see that?
22 A Yes, I do.
23 Q When you said that you
24 thought that they had a strong argument
25 based on them being mentioned in the

Page 337

1 DAVID SKEEL
2 trust agreement, is this what you're
3 referring to?
4     A    I'm not sure. As I said
5 earlier, I'm not familiar with the
6 specific provisions of the trust
7 agreement.
8     Q    So you personally don't have
9 any understanding as to whether this
10 argument is a strong argument; right?
11     A    My understanding is based on
12 our conversations with our lawyers.
13     Q    I'd like to ask you some
14 additional questions about the National
15 settlement that we talked about
16 previously.
17     I don't think I asked you
18 these questions about both settlements
19 earlier when I was asking you about
20 communications you may have had with
21 others about the National settlement. I
22 was asking you those questions about the
23 fuel line lender settlement, but I'm now
24 going to ask about the National
25 settlement.

Page 341

1 DAVID SKEEL
2 completely secured. And they were
3 entitled to 100 cents on the dollar, plus
4 post-petition interest for the duration
5 of the case. And in return for the
6 settlement, they compromised that
7 argument and agreed to take the
8 71.65 percent.
9 And the other components of
10 the deal, they agreed to support the plan
11 to vote in favor of the plan. And by
12 reaching the deal with them, we took
13 roughly a billion dollars off the table.
14 So it was a very attractive settlement.
15 Q The settlement with National
16 was reached the end of January,
17 approximately, of this year; is that
18 right?
19 A I don't remember exactly
20 when it was. But it was sometime around
21 then.
22 Q And then sometime after
23 that, the court issued its summary
24 judgment decision in the lien challenge
25 litigation?

**C E R T I F I C A T I O N**

I, ANTHONY GIARRO, a Shorthand Reporter and a Notary Public, do hereby certify that the foregoing witness, DAVID SKEEL, was duly sworn on the date indicated, and that the foregoing, to the best of my ability, is a true and accurate transcription of my stenographic notes.

I further certify that I am not employed by nor related to any party to this action.

_____
ANTHONY GIARRO