**Natbony Declaration Exhibit 4**

C410204



UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

| | |
|---|---|
| GRANADA WINES, INC., ) | |
| ) | |
| Appellant ) | |
| ) | No. 84-1518 |
| v. ) | |
| ) | |
| NEW ENGLAND TEAMSTERS AND ) | |
| TRUCKING INDUSTRY PENSION FUND, ) | |
| ) | |
| Appellee ) | |

ON APPEAL FROM THE ORDER OF
THE DISTRICT COURT (DATED MAY 17, 1984)
IN BANKRUPTCY APPEAL NO. 83-0417-MC

APPELLANT'S BRIEF

Robert M. Gargill
Charles L. Glerum
CHOATE, HALL & STEWART
60 State Street
Boston, MA 02109

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

```
                                    )
GRANADA WINES, INC.,                )
                                    )
            Appellant              )
                                    )    No. 84-1518
      v.                            )
                                    )
NEW ENGLAND TEAMSTERS AND           )
TRUCKING INDUSTRY PENSION FUND,     )
                                    )
            Appellee               )
                                    )
                                    )
```

APPELLANT'S BRIEF

Robert M. Gargill
Charles L. Glerum
CHOATE, HALL & STEWART
60 State Street
Boston, MA  02109

## TABLE OF CONTENTS

PAGE

STATEMENT OF ISSUES                                                1

STATEMENT OF CASE                                                  2

    1.  Nature of the Case                                     2

    2.  Prior Proceedings and Facts                            2

ARGUMENT                                                           9

    Summary of Argument                                        9

I.   THE REQUIREMENT OF THE MULTIEMPLOYER PENSION
    PLAN AMENDMENTS ACT THAT GRANADA PAY A PORTION
    OF THE UNDER-FUNDED CONDITION OF A PENSION PLAN
    IT DID NOT CREATE, CONTROL OR MANAGE, CONSTITUTES
    A TAKING OF PROPERTY IMPERMISSIBLE UNDER THE
    FIFTH AMENDMENT TO THE CONSTITUTION OF THE
    UNITED STATES.                                            11

A.   THE MPPA'S WITHDRAWAL LIABILITY PROVISIONS EFFECT
    A TAKING WITHOUT JUST COMPENSATION IN VIOLATION
    OF THE FIFTH AMENDMENT.                                   13

    1.  Under the Precedents Established By the
       Supreme Court Granada's Contractual Right
       to Limited Liability to the Pension Fund
       ConstitutesProperty for Purposes of the
       Fifth Amendment.                                      14

    2.  Application of the MPPAA Withdrawal Liability
       Provisions to Granada Constitutes a Taking
       Within the Meaning of the Fifth Amendment.            16

    3.  The Fifth Amendment Mandates that Granada
       Receive Just Compensation for the Property
       Taken Through Application of the MPPAA to
       Granada's Withdrawal from the Pension Plan.           19

B.   THE WITHDRAWAL LIABILITY PROVISIONS OF THE MULTI-
    EMPLOYER PENSION PLAN AMENDMENTS ACT OF 1980 VIOLATE
    GRANADA'S FIFTH AMENDMENT DUE PROCESS RIGHTS.             22

    1.  Application of the MPPAA to Granada's Invol-
       untary Withdrawal From the Pension Plan
       Violates Granada's Due Process Rights Under
       the Fifth Amendment to the Constitution.              23

2.   The Congressional Omission of Chapter 11 Re-
     organization From the Ambit of ERISA §4225's
     Limitation on Withdrawal Liability is
     Irrational and Arbitrary and thus Violative
     of the Fifth Amendment.                           28

II.   THE BANKRUPTCY CODE AND CONGRESS'S POLICY IN
      FAVOR OF REORGANIZATIONS REQUIRE, IN THESE
      CIRCUMSTANCES, THAT THE PENSION FUND'S
      CLAIM AGAINST GRANADA ON ACCOUNT OF WITHDRAWAL
      LIABILITY BE TREATED UNDER GRANADA'S PLAN ON
      THE SAME BASIS AS IT WOULD BE TREATED UNDER
      CHAPTER 7.                                        31

III.  SINCE GRANADA HAS UNDERGONE A LIQUIDATION
      WITHIN THE MEANING AND INTENT OF §4225(b)
      OF ERISA, THE PLAN PROPERLY PROVIDED FOR A
      DIVIDEND ON HALF THE WITHDRAWAL LIABILITY CLAIM.  34

IV.   SINCE THE PLAN TREATS THE PENSION FUND'S CLAIM
      FOR WITHDRAWAL LIABILITY AS A SEPARATE CLASS,
      DOES NOT DISCRIMINATE UNFAIRLY AGAINST IT, AND
      IS FAIR AND EQUITABLE, IT MAY PROVIDE FOR
      PAYMENT OF A DIVIDEND ON ONLY ONE HALF OF
      THAT CLAIM PURSUANT TO §1129(b) OF THE
      BANKRUPTCY CODE.                                  39

CONCLUSION                                              43

ii

INDEX TO CITED MATERIAL

| STATUTES | PAGE |
|---|---|
| Multi-Employer Pension Plan Amendment Act (PL 96-364) amending the Employment Retirement Income Security Act of 1974 ("ERISA") | 17,18,24 |
| ERISA §4225(a), 29 U.S.C. §1405(a) | 12,23,28 32 |
| ERISA §4225(b), 29 U.S.C. §1405(b) | 10,12,28, 32,35 |
| 29 U.S.C. §1391 | 11 |
| MPPAA §3(a)( 2) | 17, 24 |
| Bankruptcy Code | |
| 11 U.S.C. §1129(a) | 31,39 |
| 11 U.S.C. §1129(b) | 11,39 |

CASES

| | |
|---|---|
| Armstrong v. United States, 364 U.S. 40 (1960) | 13,16 |
| Arnett v. Kennedy, 416 U.S. 134 (1974) | 14 |
| Commissioner v. Brown, 380 U.S. 563 (1965) | 34 |
| Goldberg v. Kelly 397 U.S. 254 (1970) | 14 |
| Goldblatt v. Hempstead, 369 U.S. 390 (1962) | 13 |
| International Brotherhood of Teamsters v. Daniel, 439 U.S. 551 (1979) | 21,26 |
| Lynch v. United States, 292 U.S. 571 (1934) | 14 |
| Monongahela Navigation Co. v. United States, 148 U.S. 312 (1893) | 19,20 |
| Nachman Corp. v. Pension Benefit Guaranty Corp., 446 U.S. 359 (1980) | 18 |
| PBGC v. R.A. Gray & Co., 52 U.S.L.W. 4810 (1984) | 14,22,28 |
| Penn Central Transportation Co. v. New York City, 438 U.S. 104 (1978) | 13,14,15 16 |

Pennsylvania Coal Co. v. Mahon, 260 U.S. 393 (1922)     17,21

Portsmouth Co. v. United States, 260 U.S. 327 (1922)     18

United States v. Causby, 328 U.S. 256 (1946)     18

United States v. Cress, 243 U.S. 316 (1917)     18

United States v. General Motors Corp., 323 U.S. 373 (1945)     16

United States v. Pewee Coal Co., 341 U.S. 114 (1951)     20

United States v. Security Industrial Bank, 459 U.S.
70 (1982)     15

Usery v. Turner Elkhorn Mining Co. 428 U.S. 1 (1976)     22,23,26

Williamson v. Lee Optical Co., 348 U.S. 483 (1955)     23

Bartle v. Markson, 314 F. 2d 303 (2d Cir. 1963)     41

In Re Bildisco, 682 F. 2d 72 (3d Cir. 1982)     31

Peick v. Pension Benefit Guaranty Corp., 724 F. 2d 1247
(7th Cir. 1983), cert. pending No. 83-1246     15

Republic Industries v. Teamsters Joint Council, 718 F.
2d 628 (4th Cir. 1983) cert. pending No. 83-541     15

Textile Workers Pension Plan v. Standard Dye & Finishing,
725 F. 2d 843 (2nd Cir. 1984)     20,24

Washington Star Co. v. International Typographical Union     20,24
Negotiated Pension Plan, 729 F. 2d 1502 (D.C. Cir. 1984)

In Re Los Angeles Land & Investments, Ltd., 282 F. Supp.     41
448 (D. Haw. 1968) aff'd 447 F. 2d 1366 (9th Cir. 1971)

Peick v. Pension Benefit Guaranty Corp., 539 F. Supp.     11
1025 (N.D. Ill. 1982), aff'd 724 F. 2d 1247 (7th Cir.
1983) cert. pending No. 83-1246

In Re International Automated Machines, 13 B.R. 119     35
(Bkrcy. - N.D. Ohio, 1981)

In Re Sutherland, 3 Bankr. 420 (Bkrcy. - W.D. Ark. 1980)     40

Matter of Cott Corp., 26 B.R. 332 (Bkrcy. - D. Conn. 1982)     38

Matter of Food Fair, Inc., 14 B.R. 40 (Bkrcy. - S.D.N.Y.,     38
1981)

iv

Matter of Kessler, 23 B.R. 724 (Bkrcy. - S.D.N.W. 1982) 38

Matter of Martins Point Limited Partnership, 12 B.R. 721 41
(Bkrcy. - N.D.Ga. 1981)

Matter of Standard Cellulose & Novelty Co., Inc., 14 C.B.C. 35
63 (Bkrcy. - S.D.N.Y., 1977)

CONGRESSIONAL REPORTS

H.R. Rep. No. 95-595, 95th Cong. 1st Sess. 31
220 (1977), reprinted in 1978 U.S. Code Cong.
& Ad. News 5787, 6179.

Joint Explanation §5b, 126 Cong. Rec. S. 10111, 34,35
S. 10117 (Daily Ed., July 29, 1980).

P.B.G.C. Multiemployer Study Required by
P.L. 95-214 24

P.B.G.C. Recommendations to Congress for
Revising Multiemployer Plan Termination Insurance 28

ARTICLES

Soble, Bankruptcy Claims of Multi-employer 12
Pension Plans, 33 Labor L.J. 57, 60 (1982).

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

```
                                  )
                                  )
GRANADA WINES, INC.,              )
                                  )
                  Appellant       )   No. 15-1518
                                  )
v.                                )
                                  )
NEW ENGLAND TEAMSTERS AND         )
TRUCKING INDUSTRY PENSION FUND,   )
                                  )
                  Appellee        )
                                  )
```

APPELLANT'S BRIEF

STATEMENT OF ISSUES

1. Does the requirement of the Multiemployer Pension Plan
Amendments Act that Granada pay a portion of the under-funded
condition of a pension plan constitute a taking of property
impermissible under the Fifth Amendment to the Constitution of
the United States where Granda was did not create, control or
manage the plan, was not responsible for the under-funded condition
of the plan and was party to a contract which did not impose upon
it any such liability?

2. Does the Bankruptcy Code and the Congressional policy
reflected therein in favor of reorganizations require that the

Pension Fund's claim against Granada on account of withdrawal
liability be treated under Granada's Plan of Reorganization on
the same basis as it would be treated in a liquidation of Granada
under Chapter 7 where Granada is insolvent, the stockholders
recover nothing under the Plan, and the value of Granada's assets
alone is insufficient to permit payment of a 100% dividend on the
claims of its unsecured creditors?

3.    Where Granada is insolvent and its Plan of Reorgani-
zation provides for the prompt distribution to its creditors of
dividends aggregating more than the value of its assets, provides
nothing for its stockholders and contemplates that it is to
emerge from bankruptcy proceedings with but a few employees and
with assets resulting from the infusion of new capital by its new
stockholder, has Granada, in effect, undergone such a liquidation
as warrants the payment, under §4225(b) of ERISA, of a dividend
on only one-half of the Pension Fund's claim for withdrawal
liability?

4.    Did the District Court err as matter of law in not
holding that, since the Granada Plan of Reorganization treats the
withdrawal liability of the Pension Fund as a separate class,
does not unfairly discriminate against it, and is fair and equitable,
the Plan may provide for payment of a dividend on only one-half
of the Pension Fund's allowed claim pursuant to §1129(b) of the
Bankruptcy Code?

## STATEMENT OF THE CASE

1. Nature of the Case

This is an appeal by Granada Wines, Inc., Debtor in the Chapter 11 proceedings below ("Granada"), from the Memorandum and Order (App. p. 6)[1] of the District Court, dated May 17, 1984, in Bankruptcy Appeal No. 83-0417-Mc affirming the Order of the Bankruptcy Court contained in its Memorandum On Objection Of New England Teamsters & Trucking Industry Pension Fund To Confirmation Of Amended Plan Of Reorganization dated January 7, 1983 (App. p. 144). For the reasons set forth in that Memorandum (the "Memorandum"), the Bankruptcy Court ordered that under Granada's Amended Plan of Reorganization dated October 26, 1982 (the "Plan"), the New England Teamsters & Trucking Industry Pension Fund (the "Pension Fund") was entitled to receive the same percentage distribution on its claim in respect of withdrawal liability as the distributions to be made in respect of the claims of general unsecured creditors.

2. Prior Proceedings and Facts

On April 1, 1982 Granada filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. Prior thereto Granada was a distributor of alcoholic beverages, primarily wines (D.S. p.3; App. p. 27)[2]. During the course of the proceedings, however,

---

[1]  App. refers to the Appellant's Appendix filed herewith.

[2]  D.S. refers to the Amended Disclosure Statement (as supplemented by the Addendum thereto) included in the record on this Appeal.

it was unable to conduct normal business operations because of
the unavailability of appropriate financing.  Its post-petition
business activities consisted primarily of collecting its receiv-
ables and engaging in a very limited number of purchases and
sales.  Prior to the commencement of the proceedings it had
terminated all of its salesmen and truckers and all but one of
its warehousemen.  During the proceedings, it employed only its
chief executive officer, a secretary, an auditor and a warehouse-
man (D.S., p. 6; App. p. 30), all of whom subsequently left its
employ.  The termination of its salesmen and truckers, who were
covered by collective bargaining agreements with the Teamsters
Union, gave rise to the pre-petition claim for withdrawal liability
in the amount of $248,614 by the Pension Fund to which Granada
was obligated to make contributions under collective bargaining
agreements.  Generally, the withdrawal liability claim is a claim
asserted under the Multi-Employer Pension Plan Amendments Act (PL
96-364) ("MPPAA"), amending the Employee Retirement Income Security
Act of 1974 ("ERISA"), for Granada's allocable share of the
amount by which the Pension Fund, which was not controlled,
managed or created by Granada, is under-funded.

In the course of the proceedings it became apparent that
Granada was not capable of reorganization on a "stand alone" or
independent basis.  Even if it could retain its product lines,
principally from wineries such as Almaden Vineyards Inc. ("Almaden"),
those product lines were limited and Granada was no longer the

exclusive marketer of the products it distributed.  Its volume of
sales in the recent pre-petition past and its likely volume of
sales in the immediate future were not sufficient to cover the
costs of its own marketing, warehouse, distribution and adminis-
trative staff.  The company was insolvent (Tr., pp. 28 - 43 and
46 - 51; App. pp. 119-134 and 137-142; Findings and Order Confirming
Plan of Reorganization, p. 3; App. p. 89),[3] and its future as an
independent economic unit was at an end.

Normar Transport Corp., an affiliate of Whitehall Company
Ltd. ("Whitehall"), a wholesaler of alcoholic beverages, became
interested in acquiring Granada's business if it were possible
for Granada to retain the right to purchase and sell products of
Almaden.  To this end, it organized a subsidiary, Bilmar Inc., to
attempt to make that acquisition by funding a plan of reorganiza-
tion and, in the interim, it sought to provide working capital.
Until shortly prior to confirmation of Granada's Plan, conditions
were such that the Bankruptcy Court would not authorize any
significant borrowing that would permit Granada to purchase and
sell wines on the basis proposed by Bilmar.  That basis contem-
plated, among other things, Granada's move to new premises and
the performance by one or more of Whitehall and/or its affiliates
of Granada's sales, warehouse, distribution and various administra-
tive functions.

---

[3]   Tr. refers to the transcript of the proceedings of December 8,
1982, which is part of the record on appeal.

Shortly after the commencement of the proceedings, Granada's principal suppliers sought to terminate their relationships with Granada, and its principal supplier, Almaden, sought to have Granada liquidated.  Initially, these companies opposed doing business with a Granada owned by Bilmar or Whitehall.  For its part, Granada claimed that these suppliers were required to continue to sell goods to it.  This issue became the subject of litigation and while that litigation was pending Bilmar was able to formulate a Plan of Reorganization.  By virtue of the funds to be supplied by Bilmar under the Plan and Whiehall's commitments of future marketing efforts to those suppliers, Bilmar was able to persuade Granada's principal suppliers to continue to ship their products to Granada subsequent to confirmation of the Plan. On this basis the litigation was dismissed.

As ultimately developed, the Plan provided for the cancellation of all of Granada's outstanding stock and the acquisition by Bilmar of all of a new issue of Granada stock.  (Plan, p.9; App. p. 60).  Pre-confirmation stockholders were to receive nothing on account of their cancelled stock.  (Id.)  So far as is material to this Appeal, the Plan provided for a dividend of 30% on unsecured (Class Seven) claims, except that the Pension Fund was to receive 15% on the allowed amount of its claim in respect of withdrawal liability.  (Plan, pp.8-9; App. p. 59-60)  Thus, though this claim was included in Article II of the Plan in the category of Class Seven claims, which covered all pre-petition unsecured claims other than those referred to in the prior six

classes, in substance and effect the claim for withdrawal liability was treated in Article IV (d) (App. p. 59) of the Plan as a separate class from that of other unsecured creditors.

The 30% dividend to other unsecured creditors was premised on the assumption that the Pension Fund would receive that dividend on only one-half of its withdrawal liability claim; that is, that it would be treated under the Plan as it would be treated in a liquidation. Had it been determined that the withdrawal liability claim had to be treated in the context of a Chapter 11 pari passu with the claims of other unsecured creditors, the assets and contracts of Granada would probably have been purchased in a Chapter 7 liquidation. An alternative Plan might have provided for less than a 30% dividend to unsecured creditors and the Pension Fund. However, such a Plan may have been incapable of being lawfully confirmed since such equal treatment would mean that unsecured creditors other than the Pension Fund would thereby receive less than they would have received in a Chapter 7 liquidation as a consequence of the clearly limited participation of the withdrawal liability claim in such a liquidation. (D.S., 14, 15; App. pp. 38, 39). This result would violate Bankruptcy Code § 1129(a)(7)(A).

As indicated in the Disclosure Statement and in the Addendum thereto, the Plan contemplated that Granada was to emerge from Chapter 11 without substantially all of its employees and would rely instead on the marketing, warehousing, distribution and administrative staff of its new affiliates. Indeed, one of the

reasons for the withdrawal by the Teamsters Union, which represented
most of Granada's former employees, of its objection to Granada's
rejection of the union contract and Granada's obligations there-
under to contribute to the Pension Fund was that Granada would
not be employing any "drivers or employees performing work that
was within the scope of the Union contract..." after confirmation.
(D.S., addendum, p.1; App. p. 85)

On December 2, 1982, and after it had participated in the
hearing on the Disclosure Statement and raised no objection to
the treatment of its claim for withdrawal liability, the Pension
Fund filed an Objection to Confirmation of the Plan. In pertinent
part, that Objection asserted that Granada had no legal justifica-
tion for providing in the Plan that the Pension Fund, in satisfaction
of its withdrawal liability claim, receive 15% of that claim in
satisfaction thereof while the other unsecured claimants received
30% of their allowed claims. Specifically, the Objection stated
that the 50% reduction of the withdrawal liability claim was not
proper pursuant to ERISA §4225(b), 29 U.S.C. §1405(b), since
Granada was not "undergoing liquidation or dissolution" within
the meaning of that provision.

A hearing was held on the Confirmation of Granada's Amended
Plan on December 8 and 10, 1982, and oral argument and testimony
were heard on the Pension Fund's Objection. On December 23,
1982, the Bankruptcy Court confirmed Granada's Plan of Reorganiza-
tion but expressly reserved a decision on the Fund's Objection.
On January 2, 1983, the Bankruptcy Court issued its Memorandum On

-8-

Objection Of New England Teamsters And Trucking Industry Pension
Fund To Confirmation Of Amended Plan Of Reorganization, finding
that "the Fund is entitled to receive the same distribution on
its claim as the other general unsecured creditors." Granada
sought leave to appeal that decision and such leave was granted
by the District Court which affirmed the Bankruptcy Court in its
Memorandum and Order of May 17, 1984. This appeal was then
taken.

ARGUMENT

Summary of Argument

It is respectfully submitted that the decision of the District
Court as reflected in its Memorandum and Order should be reversed
on a number of grounds.

First, the withdrawal liability provisions of the Multiemployer
Pension Plan Amendment Act of 1980 (MPPAA), as applied to Granada,
violate Granada's rights under the Fifth Amendment. Not only do
they effect a "taking" of Granada's property without just compen-
sation in violation of the Taking Clause of the Fifth Amendment,
they operate to vary the terms of Granada's collective bargaining
agreement by imposing on Grenada unavoidable and additional
contribution obligations beyond those bargained for in its contracts
and thereby violate Granada's due process rights under the Fifth
Amendment. Furthermore, the imposition of withdrawal liability
on an insolvent employer undergoing Chapter 11 reorganization is
both an irrational and arbitrary means of effectuating the legis-
lative purpose of the MPPAA, namely keeping pension funds healthy

-9-

by encouraging employers to join multiemployer plans.  Not only
does the imposition of withdrawal liability in the reorganization
situation actually frustrate, rather than further, the purposes
of the MPPAA, it also directly contravenes the Congressional
policy favoring reorganization under Chapter 11 by creating a
financial incentive to opt for liquidation or dissolution.

Second, even if the imposition of withdrawal liability on
Granada were constitutional, the District Court's decision that
Granada must pay a dividend on 100% of that liability undermines
the unambiguously expressed policy of Congress in favor of reor-
ganizations as distinguished from liquidations.  That policy
requires, in light of Granada's insolvency, the deficiency in the
recovery of the claims of other unsecured creditors and the fact
that Granada's pre-confirmation stockholders receive nothing,
that the limitation of the withdrawal liability as set forth in
ERISA Section 4225(b) should be applied as provided in the Plan.

Third, because of the nature of Granada's Plan of Reorganiza-
tion, in particular the fact that the assets of the corporation
were disposed of through a transaction which resulted in the full
value of Granada's assets being distributed to creditors who
received less than their full claim while stockholders received
nothing, the District Court and the Bankruptcy Court were clearly
erroneous in failing to find that in substance and effect the
Plan called for a liquidation of Granada.  By so failing to
recognize the Plan as a liquidation of Granada, the court ignored
the policy underlying ERISA Section 4225(b) which limits the
Pension Fund's recovery on its withdrawal liability claim.

-10-

Finally, since the Plan treats the Pension Fund's claim for withdrawal liability as a separate class, does not discriminate unfairly against that class and is fair and equitable to that class, the Plan's provision for payment of a dividend on only one-half of that withdrawal liability claim is both legal and permissible pursuant to Section 1129(b) of the Bankruptcy Code.

I.   THE REQUIREMENT OF THE MULTIEMPLOYER PENSION PLAN AMENDMENTS ACT THAT GRANADA PAY A PORTION OF THE UNDER-FUNDED CONDITION OF A PENSION PLAN IT DID NOT CREATE, CONTROL OR MANAGE CONSTITUTES A TAKING OF PROPERTY IMPERMISSIBLE UNDER THE FIFTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES.

The Multiemployer Pension Plan Amendments Act ("MPPAA") became law on September 26, 1980.  For purposes of this case, the most significant feature of MPPAA is the liability it imposes on employers who withdraw from multi-employer plans:  under MPPAA, "an employer that withdraws must immediately begin to pay a fixed and certain debt owed to the plan."  Peick v. Pension Benefit Guaranty Corporation, 539 F. Supp. 1025, 1033 (N.D. Ill. 1982), aff'd 724 F. 2d 1247 (7th Cir. 1983) cert. pending No. 83-1246. This debt represents the employer's share of the plan's "unfunded vested benefits" -- that is, the actuarial present value of vested benefit obligations minus the value of the plan's assets -- as calculated under one of four statutorily approved methods set forth at 29 U.S.C. §1391.  Id. at 1033-34.

The statute which determines the amount of such withdrawal liability, ERISA Section 4225, 29 U.S.C. §1405, provides for different withdrawal liabilities depending on whether the trans-

-11-

action is a sale (4225(a)) or a liquidation or dissolution (4225(b)).
Section 4225(a), by its terms, is inapplicable to employers
"undergoing reorganization under Title 11".  ERISA Section 4225(b),
29 U.S.C. §1405(b), provides, however, that in the case of an
"insolvent employer undergoing liquidation or dissolution" the
unfunded vested benefits allocable to that employer shall not
exceed (1) 50% of the unfunded vested benefits allocable to the
employer, plus (2) so much of the remaining 50% of the employer's
share of unfunded vested benefits as does not exceed a defined
net liquidation value of the employer.[4]  Under Section 4225(b),
"liquidation value" is the value of the employer's assets minus
its liabilities (not including any withdrawal liability imposed
under this section).  Soble, Bankruptcy Claims of Multiemployer
Pension Plans, 33 Labor L.J. 57, 60 (1982).

---

[4]   Section 4225 was added to ERISA by MPPAA.  Section 4225(b),
29 U.S.C. §1405(b), provides:

>     (b)  In the case of an insolvent employer undergoing liquida-
> tion or dissolution, the unfunded vested benefits allocable
> to that employer shall not exceed an amount equal to the sum
> of--
>
>         (1)  50 percent of the unfunded vested benefits allocable
>     to the employer (determined without regard to this
>     section), and
>
>         (2)  that portion of 50 percent of the unfunded vested
>     benefits allocable to the employer (as determined under
>     paragraph (1)) which does not exceed the liquidation or
>     dissolution value of the employer determined--
>
>             (A)  as of the commencement of liquidation or
>         dissolution, and
>
>             (B)  after reducing the liquidation or dissolution
>         value of the employer by the amount determined
>         under paragraph (l).

A.   THE MPPAA'S WITHDRAWAL LIABILITY PROVISIONS EFFECT
A TAKING WITHOUT JUST COMPENSATION IN VIOLATION
OF THE FIFTH AMENDMENT.

The Fifth Amendment to the Constitution of the United States
not only prohibits the deprivation of property without "due
process of law," it also proscribes the "taking" of private
property for public use without the payment of just compensation
to the property owner.  As recognized by the Supreme Court in
Armstrong v. United States, 364 U.S. 40, 49 (1960), "the Fifth
Amendment's guarantee is designed to bar Government from forcing
some people alone to bear public burdens which, in all fairness
and justice, should be borne by the public as a whole."  While
the Supreme Court has been unable to develop any set formula for
determining when justice and fairness require that economic
injuries caused by public action be compensated by the government,
rather than remain disproportionately concentrated on a few
persons, it has identified several factors that have particular
significance when a Court is engaging in the ad hoc, factual
inquiry under the Taking Clause.  Goldblatt v. Hempstead, 369 U.S.
390, 594 (1962); Penn Central Transportation Co. v. New York City,
438 U.S. 104, 124 (1978).  A court should focus on the economic
impact of the regulation on the claimant, the extent to which the
regulation has interferred with distinct investment-backed expec-
tations, and the character of the governmental action.  Although
a "taking" may perhaps more readily be found when the interference
with property can be characterized as a physical invasion by

-13-

government, an interference arising from a public program adjusting
the benefits and burdens of economic life may also constitute a
"taking" in certain circumstances.  Penn Central Transportation Co.
v. New York City, 438 U.S. 104, 124 (1978).

    1.   Under the Precedents Established by the Supreme Court
        Granada's Contractual Right to Limited Liability
        to the Pension Fund Constitutes Property for Purposes
        of the Fifth Amendment.

The Supreme Court, in cases such as Arnett v. Kennedy,
416 U.S. 134 (1974) and Goldberg v. Kelly, 397 U.S. 254 (1970),
defined "property" for purposes of the Fifth Amendment broadly to
include rights which at common law would have been deemed contrac-
tual in nature.  Even more unequivocal on this point was the
Supreme Court's pronouncement in Lynch v. United States, 292 U.S.
571, 579 (1934), that under the Fifth Amendment, "valid contracts
are property, whether the obligor be a private individual, a
municipality, a State, or the United States."  In fact, if the
Supreme Court had doubted whether an employer's existing contrac-
tual provision limiting its pension fund contribution liability
was not a valid property interest for purposes of the Fifth
Amendment, it would not have decided the due process claim against
the MPPAA withdrawal liability provisions that was asserted in
PBGC v. R.A. Gray & Co., 52 U.S.L.W. 4819 (1984).

Granada was a party to a contract with the Union which
limited Granada's obligations in respect of the Pension Fund to
specific bargained for contributions for each of its employees
who were beneficiaries of that Pension Fund.  Granada's contrac-

tual right to a limited pension fund contribution
liability, part of the consideration for signing the collective
bargaining agreement with the Union, constitutes property protected
under the Taking Clause.

Several Circuit Courts of Appeal have erroneously interpreted
the Supreme Court's holdings in United States v. Security Industrial
Bank, 459 U.S. 70 (1982), and Penn Central Transportation Co. v.
New York City, 438 U.S. 104 (1978), as creating a dichotomy
between property rights, protected by the Taking Clause, and
contractual rights, not so protected.  See, e.g., Peick v. Pension
Benefit Guaranty Corp., 724 F. 2d 1247, 1276 (7th Cir. 1983),
cert. pending, No. 83-1246; Republic Industries v. Teamsters Joint
Council, 718 F. 2d 628, 639 (4th Cir. 1983), cert. pending, No.
83-541.  A close reading of the Supreme Court cases, however,
reveals that the Supreme Court continues to recognize contractual
rights bound up with the reasonable expectations of the claimant
as "property" within the meaning of the Fifth Amendment.  To be
sure, appellant's contractual right to retain funds it might have
otherwise had to contribute to the pension plan is a different
kind of property interest than that of an owner in fee simple of
real property.  However, neither logic nor case law supports the
proposition that such differences relegate Granada's interest
to something less than property.  Indeed, the Supreme Court has
explicitly recognized that governmental interference with contract
rights may constitute an unconstitutional taking.  See, e.g.,

-15-

agreements, thereby "taking" contract rights, the statute has
also effectively confiscated a substantial part of appellant's
assets.  Furthermore, the MPPAA has interfered with and, in fact,
completely frustrated the investment-backed expectations of
appellant with respect to pension plan liability.  As the Supreme
Court held in Pennsylvania Coal Co. v. Mahon, 260 U.S. 393,
(1922), a statute that substantially furthers important public
policies may so frustrate distinct investment-backed expectations
as to amount to a "taking".

While not every destruction of or injury to a property
interest by governmental action constitutes a "taking" in the
constitutional sense, an examination of the character of the
invasion demonstrates that a compensable taking has occurred
here.  The purpose underlying the withdrawal liability provisions
of the MPPAA was to lift the financial burden of financing the
multiemployer insurance program from PBGC, a public agency, and
place it on contributing employers, and not on all contributing
employers, but only those who withdrew from the Fund.[5]  See,
e.g., MPPAA Section 3(a)(2):

> it is desirable to replace the termination
> insurance program for multiemployer pension
> plans with an insolvency-based benefit protec-
> tion program that will ... contain program
> costs within reasonable limits.

---

[5]  After a withdrawing employer pays his share of the under-funding,
market conditions or changes in benefits may eliminate or mitigate
the under-funding with the result that employers who continue to
participate for a time may withdraw without liability.  That an
employer may have had to withdraw as a consequence of financial
problems and pay the liability which later may not exist only
aggravates the inequity of the MPPAA.

-17-

<u>Armstrong</u> v. <u>United States</u>, 364 U.S. 40 (1960)(contract rights of
materialmen  were taken by the government without just compensation).
As the Supreme Court has repeatedly emphasized, the term "property"
as used in the Taking Clause is not used in the "vulgar and
technical sense of the physical thing with respect to which the
citizen exercises rights recognized by law.  Instead, it denotes
the group of rights inhering in the citizen's relation to the
physical thing, <u>as the right to possess, use and dispose of it</u>
... The constitutional provision is addressed to <u>every sort of</u>
<u>interest</u> the citizen may possess." <u>United States</u> v. <u>General</u>
<u>Motors Corp</u>., 323 U.S. 373, 377-378 (1945) (emphasis added).
Appellant's right to possess, use or dispose of assets contrac-
tually sheltered from pension fund claims is clearly a property
interest worthy of protection under the Taking Clause.

     B.    <u>Application of the MPPAA Withdrawal Liability</u>
            <u>Provisions to Granada Constitutes a Taking</u>
            <u>Within the Meaning of the Fifth Amendment.</u>

     When one applies to the case at bar the factors enunci-
ated by the Supreme Court in <u>Penn Central Transportation Co.</u> v.
<u>New York City</u>, 438 U.S. 104, 124 (1978), as relevant in determining
whether there has been a Taking Clause violation, the conclusion
is inescapable that the MPPAA withdrawal liability provisions
effect a "taking" of appellant's property within the meaning of
that constitutional provision.  The challenged government regula-
tion has had an adverse economic impact on Granada.  Not only
has the statute destroyed the contractual limitations of liability
on which Granada relied in entering into its collective bargaining

-16-

In fact, the PBGC, in its report to Congress submitted on July 1, 1978, stated that if all troubled pension plans were to terminate, it could cost the insurance system about $4.8 billion to fund all plan benefits covered by Title IV's guarantee. Pension Benefit Guaranty Corporation, Multiemployer Study required by P.L. 95-214, at 2, 16, 139 (1978).  As the Supreme Court has stated in numerous cases, government actions that may be character-ized as acquisitions of resources to permit or facilitate public functions have often been held to constitute "takings".  See, e.g., United States v. Causby, 328 U.S. 256 (1946); Portsmouth Co. v. United States, 260 U.S. 327 (1922); United States v. Cress, 243 U.S. 316 (1917).  The MPPAA effects a taking of employer property by statute to relieve the financial burden on the govern-ment (and, indeed, unions) of meeting pension liabilities accrued by underfunded multiemployer plans.  Such governmental action is fairly characterized as an acquisition of resources to permit or facilitate the public function, under Title IV of ERISA, 29 U.S.C. §§ 1301-1381 (1976), of guaranteeing that vested retirement benefits will actually be received by employees and their benefi-ciaries.  Nachman Corp. v. Pension Benefit Guaranty Corp., 446 U.S. 359, 375 (1980).

Although one of the asserted purposes of the MPPAA is to discourage voluntary withdrawals from pension plans, the only justification for imposing withdrawal liability in the case of involuntary withdrawal due to insolvency is to buttress the income of the fund and relieve the pressure on the federal insur-ance system.

-18-

> The Fifth Amendment prevents the public from
> loading upon one individual more than his just
> share of the burdens of government, and says that
> when he surrenders to the public something more
> and different from that which is exacted from
> other members of the public, a full and just
> equivalent shall be returned to him.

Monongahela Navigation Co. v. United States, 148 U.S. 312, 325
(1893). Clearly, the $248,614 of withdrawal liability assessed
against Granada is more than its just share of the government's
burden of guaranteeing actual receipt by employees of vested
benefits in underfunded pension plans. Granada has already paid
all or a claim has been made for all that it was obligated to pay
under the collective bargaining agreement. Granada has thus been
forced to surrender something more from that exacted from other
employers, who must only meet their contractual contribution
obligations. Granada is forced to surrender more than employees
and unions whom the MPPAA saves harmless from any responsiblity
and accountability in protecting employee pensions. It is irra-
tional and grossly inequitable that the burden of underfunded
pension plans should be borne by employers forced to withdraw
from plans because of financial disaster and not as well by
unions and employees and the public as a whole. Therefore, this
Court should hold that the MPPAA withdrawal liability provisions
have effected a taking of appellant's property for which there
must be just compensation.

3.   The Fifth Amendment Mandates that Granada
     Receive Just Compensation for the Property
     Taken Through Application of the MPPAA to
     Granada's Withdrawal from the Pension Plan.

The Fifth Amendment does not allow simply an approximate

-19-

compensation, but requires a full and perfect equivalent for the
property taken. Monongahela Navigation Co. v. United States,
148 U.S. 312, 326 (1893); United States v. Pewee Coal Co., 341
U.S. 114, 117 (1951). Appellant's involuntary withdrawal from
the pension plan gave rise to a $248,614 withdrawal liability
above and beyond that which appellant had contractually agreed
with the Teamsters Union to contribute to the Fund. Furthermore,
there is no merit to the contention of two Circuit Courts that
employers, at the time withdrawal liability is assessed against
them, have already received full compensation in the form of
employee services. See, e.g., Washington Star Co. v. Inter-
national Typographical Union Negotiated Pension Plan, 729 F. 2d
1502, 1510 (D.C. Cir. 1984); Textile Workers Pension v. Standard
Dye Finishing, 725 F. 2d 843, 857 (2nd Cir. 1984) cert. den.
sub nom Sibley, Lindsay & Curr Co. v. Bakery Confectionary, 52
U.S.L.W. 3920. Those courts reasoned that the unfunded liability
incurred by withdrawing employers is equal to the bargained-for
benefits, in the form of employee services, already received by
them in exchange for their promises to fund pension benefits.
However, it is simply incorrect to view pension benefits as the
quid pro quo for employee services. Employees' services are
provided only in part in exchange for an entitlement to pension
benefits. The employer is required to give up much more than
pension contributions to obtain those services. The employer
must provide, inter alia, wages, training, health and accident

-20-

benefits, and vacation time.  In return, the employer bargains
for more than just the receipt of services.  He bargains for a
return on the investment he made in training the employee in the
form of a commitment to the employer for a certain amount of
time.  He also bargains for stability and continuity in his
employment relationships.  However, when the employer is forced
to withdraw from a pension plan because of a financial crisis
requiring reorganization, sale, or closing, not only does he not
receive a significant part of the benefits for which he bargained,
he also incurs an additional obligation to fund the difference
between the amount of benefits promised by the Pension Fund
trustees and that which can be realistically funded by his contrac-
tually determined employer contributions.  The Supreme Court
itself has noted that potential pension benefits are, "a relatively
insignificant part of an employee's total and indivisible compensa-
tion package."  International Brotherhood of Teamsters v. Daniel,
439 U.S. 551, 560 (1979).

The Fifth Amendment does not simply require some compensation
when property is taken for a public purpose.  Rather, the Fifth
Amendment demands that the compensation be a full and perfect
equivalent for the property taken.  "A strong public desire to
improve the public condition is not enough to warrant achieving
the desire by a shorter cut than the constitutional way of paying
for the change."  Pennsylvania Coal Co. v. Mahon, 260 U.S. 393,
416 (1922).  The federal pension insurance system may be in a
precarious financial state.  Congress may wish to reduce the
burden on the federal budget of buttressing underfunded pension

-21-

funds. Congress may believe that the costs of guaranteeing benefits at a level set by trustees rather than at a level corresponding to employers' contract-based expectations may be borne more easily by withdrawing employers such as appellant than by overburdened taxpayers. But those Congressional concerns do not allow this Court to ignore past precedents construing the Taking Clause to the end that the desire to improve the public condition is, indeed, achieved by a shorter cut than the constitutional way of paying for the change. This Court must recognize the danger of permitting Congress, in the guise of "regulation", to confiscate significant portions of Granada's and other withdrawing employers' assets for that purpose without providing just compensation. Therefore, this Court should hold that the MPPAA withdrawal liability provisions violate the Taking Clause of the Fifth Amendment.

> B.   THE WITHDRAWAL LIABILITY PROVISIONS OF THE MULTIEMPLOYER PENSION PLAN AMENDMENTS ACT OF 1980 VIOLATE GRANADA'S FIFTH AMENDMENT DUE PROCESS RIGHTS.

Application of the MPPAA to vary the terms of appellant's collective bargaining agreement with the Teamsters Union violates the Due Process Clause of the Fifth Amendment. While the principles embodied in the Fifth Amendment's Due Process Clause are not coextensive with prohibitions existing against state impairments of pre-existing contracts, see PBGC v. R.A. Gray & Co., 52 U.S.L.W. 4810 (1984), it is clear that arbitrary and irrational legislation which impairs private contract rights cannot withstand judicial scrutiny under the Due Process Clause. Usery v. Turner Elkhorn

-22-

Mining Co., 428 U.S. 1 (1976). The MPPAA imposes on Granada an obligation to pay for unfunded benefits upon withdrawal from the multiemployer pension plan, notwithstanding that its collective bargaining contract imposes no such liability. While Congress is given wide latitude in the area of national economic policy to adopt legislation adjusting the burdens and benefits of economic life, such legislation must be supported by a legitimate legislative purpose furthered by rational means. Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15 (1976); Williamson v. Lee Optical Co., 348 U.S. 483, 487-488 (1955). It is submitted that application of the MPPAA to Granada's involuntary withdrawal violates Granada's due process rights and that the failure of Congress to include reorganization under Chapter 11 of the Bankruptcy Code as a basis for exemption from the operation of the MPPAA withdrawal liability provisions (ERISA, §4225(a)) is irrational and arbitrary and thus violative of the Fifth Amendment.

    1.   Application of the MPPAA to Granada's Involuntary Withdrawal From the Pension Plan Violates Granada's Due Process Rights Under the Fifth Amendment to the Constitution.

Application of the MPPAA to vary the pension benefit provision of Granada's existing collective bargaining agreement with the Teamsters Union implicates the Due Process Clause of the Fifth Amendment. The MPPAA withdrawal liability provisions, as applied to the facts of this case, are irrational and arbitrary and therefore cannot survive due process scrutiny. Usery v. Turner Elkhorn Mining Co., 428 U.S. 1 (1976). Congress' chosen solutions to the problems posed by multiemployer pension plans

are, with respect to the case at bar, irrational and arbitrary
solutions to the problems identified and are thus constitutionally
impermissible.

In enacting the MPPAA, Congress sought to eliminate the
financial incentives to voluntary withdrawal from pension plans
and to shift the financial burden of supplementing the Pension
Fund's income from the federal government to withdrawing employers.
See, e.g. MPPAA § 3(a)(2); P.B.G.C., Multi-employer study required
by P.L. 95-214, at pp. 2, 16, 139 (1978).  Congress reasoned that
the withdrawal liability provisions were a rational means of
allocating the cost of providing funds in excess of negotiated
contributions to multiemployer plans whose future pension commit-
ments had only been partially funded by employer contributions,
albeit funded at the level accepted by the employees and their
representatives and required by contract.  Congress also reasoned
that such costs were properly imposed on withdrawing employers
because, at the time of withdrawal, they had already received the
benefit of employees' services and thus should be liable for the
unfunded vested benefits of such employees.  See, e.g. Textile
Workers Pension v. Standard Dye & Finishing, 725 F. 2d 843, 849,
857 (2d Cir. 1984); Washington Star Co. v. International Typo-
graphical Union Negotiated Pension Plan, 729 F. 2d 1502, 1505,
1510 (D.C. Cir. 1984).

However, such reasoning is irrational on two grounds.
First, the withdrawal liability imposed by the MPPAA is totally
unrelated to both the existence and the amount of a given fund's

-24-

liability for unfunded vested benefits.  The underfunding is a
product of factors wholly outside the control of the contributing
employer.  It is attributable to benefit levels, set by trustees,
that bear no reasonable relation to the aggregate amount of
employer contributions required to be made under present collective
bargaining agreements and those contributions expected to be made
in the future.  Similarly, under MPPAA a fund may manipulate
interest rates or increase benefit levels prior to an anticipated
withdrawal, voluntary or involuntary, and thereby increase the
withdrawing employer's withdrawal liability and, in effect,
require that employer to fund benefit improvements for the remain-
ing plan participants.  Imposition of non-negotiated, uncontracted-
for liability on such an irrational and arbitrary basis cannot
withstand judicial scrutiny.

Second, the share of the Fund's unfunded vested benefits
"allocated" to withdrawing employers is not limited to or even
reasonably related to the under-funding attributable to the
vested benefits due to the employers' own employees.  Nor is it
rationally related to the value of employee services already
received by such employers in exchange for pension benefits that
have vested at the time of withdrawal.  As heretofore noted,
Pension benefits comprise only a small part of an employee's
total compensation, particularly with respect to industries
characterized by mobile employment and strict vesting requirements.
The Supreme Court itself has recognized that in the context of
multiemployer plans, potential pension benefits are a relatively

-25-

insignificant part of an employee's total and indivisible compensa-
tion package.

> Only in the most abstract sense may it be said
> that an employee "exchanges" some portion of his
> labor in return for these possible benefits...
> His decision to accept and retain covered employ-
> ment may have only an attenuated relationship, if
> any, to perceived investment possibilities of a
> future pension. Looking at the economic realities,
> it seems clear that an employee is selling his
> labor primarily to obtain a livelihood, not making
> an investment.

International Brotherhood of Teamsters v. Daniel, 439 U.S. 551,
560 (1979).

Imposing on withdrawing employers liability for unfunded
vested benefits on the theory that such liability is the quid pro
quo for employee services already received is clearly arbitrary
and grossly inequitable in the case of involuntary withdrawal by
insolvent employers such as Granada. This is particularly so
where unions and their members bear no share of the responsibility
for such under-funding.

Moreover, in the case of Granada, an insolvent employer
forced to cease business operations, terminate employees and
withdraw from the plan, it is manifestly evident that it has not
and never will receive the full benefit for which it bargained.
Imposition of withdrawal liability on Granada simply cannot be
justified as the quid pro quo for benefits already received.
Therefore, the instant case is plainly distinguished from the
situation presented in Usery v. Turner Elkhorn Mining Co., 428
U.S. 1 (1977), in which the Supreme Court upheld a statute requiring
coal companies to pay black lung benefits to former employees.

In Turner, liability was properly characterized as an actual cost of an employer's own business.  Furthermore, it could fairly be said that liability was directly related to benefits actually received by the employer from the specific employee compensated and to injuries actually caused by working conditions over which the particular employer had control.

In contrast, appellant had no control over pension plan underfunding.  Neither did appellant have within its control a means of changing its conduct so as to avoid withdrawal liability.  In fact, the only means available to appellant to control pension benefit liability was to limit such liability through negotiations with the Teamsters Union and the resulting collective bargaining contract.  The MPPAA withdrawal liability provisions, however, have operated to undermine even that limited control by varying the terms of appellant's contract.  The Due Process Clause of the Fifth Amendment requires, at the very least, that burdens imposed on a select group of individuals bear some reasonable relation to benefits actually received.  Furthermore, the legislative purpose of supplementing pension fund incomes by allocating the additional costs of employee's pension benefits to those who have profited from such employee's services must be furthered by non-arbitrary, rational means.  Application of the MPPAA to appellant's involuntary withdrawal from the pension plan clearly cannot meet this Due Process requirement.  Accordingly, this Court should hold that the MPPAA withdrawal liability provisions violate the Due Process Clause of the Fifth Amendment.

-27-

2.   <u>The Congressional Omission of Chapter 11 Reorgani-
     zations From the Ambit of ERISA §4225's Limitation
     on Withdrawal Liability is Irrational and Arbitrary
     and thus Violative of the Fifth Amendment.</u>

One of the primary problems Congress identified under
ERISA was that the statute encouraged employer withdrawals from
multi-employer plans.  Congress was concerned that the entire
burden of supplying the additional funds needed to provide employees
with benefits at the level set by the trustees, which were far in
excess of that which could reasonably be funded by contractually
determined employer contributions, would fall on the federal
insurance system.  To avoid this potential financial burden and
to further more effectively the purposes of ERISA, <u>e.g.</u> ensuring
that employees receive anticipated retirement benefits, Congress
enacted MPPAA.  By virtue of the withdrawal liability provisions
of that Act, Congress has successfully placed the financial
burden of underfunded plans on withdrawing employers, created a
financial disincentive to voluntary withdrawal, and protected
remaining employers against increased costs arising from <u>voluntary</u>
withdrawals.  <u>PBGC</u> v. <u>R.A. Gray & Co.</u>, 52 U.S.L.W. 4810 (1984).
The fact that the MPPAA withdrawal liability provisions were
primarily aimed at employers who withdrew <u>voluntarily</u> from pension
plans as a cost-saving move is evidenced by the provisions limiting
withdrawal liability in the case of sale, liquidation or dissolution
(ERISA, §4225), obvious instances of involuntary withdrawal.
<u>Also</u>, <u>see</u> PBGC, <u>Recommendations to the Congress for Revising Multi-
employer Plan Termination Insurance</u>, at 16 (February, 1979).  It

-28-

was certainly rational for Congress to conclude that the operation
of the withdrawal liability provisions as a disincentive to
withdrawing would be ineffective in the case of involuntary
withdrawals.  Similarly, imposition of withdrawal liability in
the case of an insolvent employer would be an irrational means of
effectuating the purposes of the MPPAA -- guaranteeing employees
their retirement benefits by encouraging employers to continue to
participate in plans.  But conspicuously absent from the MPPAA is
a provision limiting withdrawal liability in the case of an
insolvent employer undergoing reorganization under Chapter 11 of
the Bankruptcy Code.  Indeed, the limitation on withdrawal liability
in the case of sales contained in ERISA § 4225(a) is expressly
made inapplicable to reorganizations.  The failure of Congress to
limit withdrawal liability in reorganization situations, particu-
larly those characterized by the employer's insolvency, renders
the application of the MPPAA to such situations irrational and
arbitrary, and thus violative of the Due Process Clause of the
Fifth Amendment.

In the case at bar, appellant filed a petition for reorgani-
zation under Chapter 11 of the Bankruptcy Code on April 1, 1982.
Because of appellant's severely distressed financial condition,
it was forced to cease normal business operations and terminate
all but four of its employees.  The termination of its truckers
and salesmen, who were covered by collective bargaining agreements
with the Teamsters Union, gave rise to the claim for withdrawal
liability by the Pension Fund in the amount of $248,614.  Granada

-29-

did not withdraw from the pension plan voluntarily and therefore
had no opportunity to conform its conduct so as to avoid withdrawal
liability. Furthermore, if Congress was concerned with creating
financial disincentives to withdrawal in enacting the MPPAA, its
effectiveness to that end was non-existent in the case of appellant's
forced withdrawal. Penalizing insolvent employers and their
unsecured creditors for involuntarily withdrawing from pension
plans is not a rational means of ensuring that pension funds
remain healthy and employers continue to join or participate in
multiemployer pension plans. In fact, by penalizing employers
undergoing reorganization, the MPPAA creates an additional incentive
for employers, apart from the threat of withdrawal liability for
voluntary withdrawals, to decline to join multiemployer plans in
the future.

Yet the irrationality and arbitrariness of Congress' failure
to limit the withdrawal liability of employers, such as Granada,
undergoing reorganization, goes even further. Not only does the
MPPAA's assessment of full liability in reorganization situations
bear no relationship to the purposes of that Act, it also frustrates,
and, in fact, directly contravenes the unambiguous Congressional
policy favoring the reorganization of insolvent companies evidenced
in the Bankruptcy Code. Ironically, if that "bias" in favor of
reorganizations were recognized by a limitation of withdrawal
liability in a case such as the use at bar, where the creditors
receive less than full payment and the stockholders receive
nothing under the Plan (and thus cannot benefit from the limitation),

the purposes of the MPPAA would at least be served by the opportunity
for resumed participation in the plan which such reorganization
makes possible at some future time.  In such circumstances, to
insist on a formal liquidation as a condition to limiting the
withdrawal liability is both irrational and counter-productive.

II.   THE BANKRUPTCY CODE AND CONGRESS'S POLICY IN FAVOR OF REORGANI-
      ZATIONS UNDER CHAPTER 11 REQUIRE, IN THESE CIRCUMSTANCES,
      THAT THE PENSION FUND'S CLAIM AGAINST GRANADA ON ACCOUNT OF
      WITHDRAWAL LIABILITY BE TREATED UNDER GRANADA'S PLAN ON THE
      SAME BASIS AS IT WOULD BE TREATED UNDER CHAPTER 7.

The Bankruptcy Code of 1978, 11 U.S.C. §§101-151326, enacted
November 6, 1978, provides two major avenues of relief for corporate
debtors:  a liquidation proceeding under Chapter 7 and a proceeding
under Chapter 11 which is primarily intended for reorganization
but which may be and often is availed of for liquidation through
the medium of a plan of reorganization.  The policy of Congress,
unambiguously reflected in the Bankruptcy Code, favors reorganization.
This policy is based on the well-recognized fact that "[i]t is
more economically efficient to reorganize than to liquidate,
because it preserves jobs and assets." In re Bildisco, 682 F.2d
72, 77 (3d Cir. 1982) aff'd sub nom NLRB v. Bildisco & Bildisco,
52 U.S.L.W. 4270 (1984), quoting H.R. Rep. No. 95-595, 95th Cong.
1st Sess. 220 (1977), reprinted in 1978 U.S. Code Cong. & Ad.
News 5787, 6179.  Moreover, experience under the old Bankruptcy
Act demonstrated that creditors recover larger portions of their
claims in reorganization proceedings than in straight liquidation
proceedings.  682 F.2d at 77 n.6.  To assure, however, that
reorganizations under chapter 11 are not misused, Congress provided,
in §1129(a)(7)(A), that:

-31-

The court shall confirm a plan only if all of the following requirements are met:

. . .

(7)  With respect to each class--

    (A)  each holder of a claim or interest of such class

        (i)  has accepted the plan; or

        (ii)  will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under Chapter 7 of this title on such date;

. . .

Thus, absent achieving the very difficult task of securing acceptance of a plan by each and every creditor in a class of creditors, the plan must provide that each creditor receive under the plan as much as it would receive under Chapter 7, if the plan is to be capable of confirmation.

As previously discussed, ERISA section 4225 provides for different withdrawal liabilities depending upon whether the withdrawal is the result of a sale (4225(a)) or a liquidation or dissolution (§ 4225(b)).  In the latter case, the withdrawal liability claim is limited to 50% of the unfunded vested benefits attributable to the employer plus so much of the remaining 50% as does not exceed a defined net liquidation value.  However, if a pension fund is to be treated under the plan of reorganization of an insolvent debtor on the same basis as other unsecured creditors, while under Chapter 7 it would receive a dividend on only half its claim, plans proposing to give all unsecured creditors dividends

-32-

approximating their pro-rata share of the estimated liquidation
value of the debtor's assets would be incapable of confirmation,
since all unsecured creditors other than the pension fund would
receive more in a Chapter 7 case. Thus, in many cases of insolvent
debtors where there is a claim for withdrawal liability and other
unsecured creditors are to receive less than full payment under
the plan, a construction of Section 4225(b) of ERISA to require
pari passu treatment of the withdrawal liability claim with other
unsecured claims would raise a bar to confirmation of a plan of
reorganization under § 1129(a)(7)(A). Such an outcome cannot
have been the intent of Congress. Where the debtor is insolvent
and under a reorganization plan other unsecured creditors receive
less than full payment on their claims and stockholders receive
nothing on their stock interests, the policy considerations which
give rise to the § 4225(b) limitations of liability are served
and that section should be applied to permit the participation of
the pension fund only to the extent of one-half its claim for
withdrawal liability. In adopting the limitation, Congress
obviously was moved by the impact of withdrawal liability on
other parties in interest. If the impact of withdrawal liability
which prevails in a reorganization is characteristic of the
impact in a liquidation, there is no reason to treat the two
situations differently as far as the limitation of the liability
is concerned. In such circumstances, which are present in this
case, logic and reason dictate that Congress intended that the
Pension Fund would only have a claim for 50% of the withdrawal

-33-

liability. Such an interpretation of §4225(b) is not only logical and reasonable but also is necessary to avoid what would otherwise be a substantial conflict between the MPPAA and the Bankruptcy Code and a thwarting of Congressional purpose. It is unquestionably within the discretion of this Court to interpret and apply the MPPAA to avoid a conflict with the Bankruptcy Code, particularly when that application honors the concern of Congress in adopting the limitation on withdrawal liability. See, e.g., Commissioner v. Brown, 380 U.S. 563, 571 (1965).

III. GRANADA HAS UNDERGONE A LIQUIDATION WITHIN THE MEANING AND INTENT OF §4225(b) OF ERISA AND THEREFORE THE PLAN PROPERLY PROVIDED FOR A DIVIDEND ON HALF THE WITHDRAWAL LIABILITY CLAIM.

Even if this Court is unwilling to over-rule the District and Bankruptcy Courts' failure generally to apply ERISA §4225(b) to a Chapter 11 plan in the circumstances above set forth, it is clear that both lower courts committed reversible error in not determining that Granada has undergone a liquidation within the meaning and intent of ERISA Section 4225(b).

Both lower courts should not have interpreted the word "liquidation" in that statute or the term "wind up" referred to in the Senate Committee Report[6] with respect to that statute so narrowly as to exclude from the ambit of those words the facts prevailing with respect to Granada in this matter simply because Granada was not undergoing a Chapter 7 "liquidation". Courts have noted in cases involving ERISA and the old Bankruptcy Act that:

---

[6] Joint Explanation §5b, 126 Cong. Rec. §10111, §10117, (Daily Ed., July 29, 1980).

> [t]he meaning of a term in another context in other
> legislation is inappropriate to the construction of the
> term in the Bankruptcy Act.  The latter has its own
> purposes in achieving societal good.  It has its own
> policy and the objects of Congress' concerns in such
> Act are not necessarily at one with the objects of
> Congressional solicitude in another.

In Re International Automated Machines, 13 B.R. 119, 121 (Bkrcy.-

N.D. Ohio 1981), quoting Matter of Standard Cellulose & Novelty Co.,

Inc., 14 C.B.C. 63 (Bkrcy.-S.D.N.Y. 1977).  Such consideration

is applicable to the Bankruptcy Code.  Simply stated, the Court

may properly and should construe the word "liquidation" in §4225(b),

as commented on in the Senate Committee Report, broadly and

flexibly to fulfill the unambiguous Congressional policy favoring

reorganization.

There is no question but that Granada was insolvent within

the meaning of §4225(b)[7] (Tr. pp. 28-43 and 46-51; App. pp 120-135

and 138-143; Finding and Order Confirming Plan of Reorganization,

p. 3, App. p. 89).  Thus the only issue with respect to §4225(b)

is whether Granada is "undergoing liquidation or dissolution,"

through and in connection with the Plan.  As a matter of statutory

construction and Congressional intent, it plainly is.

The aforesaid Senate Committee Report on the ERISA §4225(b)

limitation states, "to qualify for this rule, an insolvent employer

need not undergo a formal liquidation or dissolution.  It must,

however, be insolvent and wind up its business affairs."  Joint

---

[7]   For purposes of Section 4225(b), an employer is insolvent "if
the liabilities of the employer, including withdrawal liability
under the plan (deterimined without regard to subsection (b) of
this section), exceed the assets of the employer determined as of
the commencement of the liquidation or dissolution)[.]"  §4225(d),
29 U.S.C. §1405(d).

-35-

Explanation §5b, 126 Cong. Rec. S. 10111, S. 10117 (Daily Ed.,
July 29, 1980). The Granada that commenced the Chapter 11 pro-
ceeding and that was indebted to the Pension Fund has, for all
intents and purposes, been liquidated and has wound up its business.
The Granada which has emerged from the Chapter 11 proceedings
pursuant to the Plan is a corporation with entirely new stock, a
new stockholder, a new management and new premises. It no longer
has its own salesman, warehousemen, truckers or administrative
staff. That it emerged with the name "Granada" and certain of
the assets of the old Granada was the result of what in reality
was a purchase of those assets by Bilmar from the creditors of
Granada for a price equal to what was paid to creditors under the
Plan.

What was in reality an asset transaction was accomplished in
the form of a stock transaction under the Plan because initially
it was thought that the latter approach might preserve contractual
relationships with certain suppliers and because Granada believed
in good faith and until it was too late to change the form of the
transaction that the Pension Fund had accepted the reorganization
plan's treatment of the withdrawal liability claim. That turned
out not to be the case in both respects. To the extent that the
new Granada was able to maintain those relationships it did so on
the basis of the new consideration and commitments coming from
the new owner. That the form of the transaction would create the
problem represented by the Pension Fund's Objection herein was
not contemplated because of actions of the Pension Fund itself.

At the time of the hearing on the Disclosure Statement, attended by counsel to the Pension Fund, no objection was made to the Plan's provision with respect to withdrawal liability. Indeed, the Pension Fund had requested that the Plan be clarified to show that its unsecured claims other than its withdrawal liability claim be treated pari passu with the claims of other unsecured creditors. That change was incorporated in the Plan and the Disclosure Statement which, in a number of places, referred expressly to the withdrawal liability claim and provided that it specifically would be treated on the same basis as in a liquidation as that term is used in ERISA §4225(b). (See, e.g., D.S. pp. 20, 26; App. pp. 44, 50 and Plan pp.3, 8, 9; App. pp. 55, 59 and 60) Had the Pension Fund objected to such treatment at that time, before solicitation of the Plan's acceptance, there would have been time within which to change the form of the transaction to avoid the Pension Fund's Objection that was subsequently filed a day or two prior to the hearing on confirmation and after the Plan had been accepted.

Despite all the relevant facts establishing the presence of a liquidation in the creation of a new corporate entity, as are reflected in the disclosure statement, the courts below failed to find a liquidation in this situation by opting for a narrow and formalistic definition of that word. It is respectfully submitted that, in taking this approach, the lower courts ignored the policy underlying ERISA §4225(b). What made legitimate and equitable the limitation on the Pension Fund's recovery as set forth in that Section were the undisputed facts that after a

-37-

distribution of the fair value of the Granada assets to creditors, with the Pension Fund participating on the 50% basis, other creditors received less than 100% of their claims and the stockholders of the debtor company received nothing.  If the assets of the corporation are disposed of under those circumstances and distributed with that resulting deficiency, the Pension Fund's participation should be limited as provided in Section 4225(b). To allow a greater participation would permit what were known to be massive claims on account of under-funded pension funds[8] to unfairly eat up assets available for satisfaction of, and thereby dilute the value of, the claims of other unsecured creditors. These policy considerations, operational in the case at bar, are the same which caused Congress to enact §4225(b).  Since the full value of the assets of Granada have been distributed to creditors who are still receiving less than 100% of their claims even though the Pension Fund participates on the limited basis provided in Section 4225(b), since no assets of value have been distributed to or held for the benefit of Granada's stockholders, and since the new Granada is an entity with new stock, new employees, a new stockholder and new management, the aforesaid policy considerations should have been honored by the lower courts and the basic nature of this liquidation recognized.

---

[8]  Examples of such massive claims are Matter of Kessler, 23 B.R. 724 (Bkrcy. - S.D.N.Y., 1982)($4,347,640.19); Matter of Cott Corp., 26 B.R. 332 (Bkrcy. - D. Conn., 1982)($2,281,767.00); Matter of Food Fair, Inc. 14 B.R. 40 (Bkrcy. - S.D.N.Y., 1981) ($4,000,000.00).

-38-

IV.   SINCE THE PLAN TREATS THE PENSION FUND'S CLAIM FOR WITHDRAWAL
      LIABILITY AS A SEPARATE CLASS, DOES NOT DISCRIMINATE UNFAIRLY
      AGAINST IT, AND IS FAIR AND EQUITABLE, IT MAY PROVIDE FOR
      PAYMENT OF A DIVIDEND ON ONLY ONE-HALF OF THAT CLAIM PURSUANT
      TO §1129(b) OF THE BANKRUPTCY CODE.

Granada's reorganization plan treats the Pension Fund differently

from other unsecured creditors by providing the payment under the

Plan of a dividend on only one-half of the Pension Fund's with-

drawal liability claim.  Essentially the Fund is treated as a

seperate class.  As noted above, this treatment is the same as

would be accorded in a Chapter 7 liquidation except that on the

facts of this case that 15% recovery is more than the Pension

Fund would have received in a Chapter 7 liquidation.  For this

reason, the provision meets the test of §1129(a)(7) of the Bankruptcy

Code even if the Pension Fund is deemed to have rejected the

Plan.  Moreover, even if the Pension Fund, as a class, is deemed

to have rejected the Plan, the Plan may and should be confirmed

pursuant to §1129(b) of the Code.  That section provides in

pertinent part as follows (emphasis added):

>     (b)(1)  Notwithstanding section 510(a) of this title,
> if all of the applicable requirements of subsection (a) of
> this section other than paragraph (8) are met with respect
> to a plan, the court, on request of the proponent of the
> plan, shall confirm the plan notwithstanding the requirements
> of such paragraph if the plan does not discriminate unfairly,
> and is fair and equitable, with respect to each class of
> claims or interests that is impaired under, and has not
> accepted, the plan.
>
>     (2) For the purpose of this subsection, the condi-
> tion that a plan be fair and equitable with respect to a
> class includes the following requirements:

                        .  .  .

(B)  With respect to a class of unsecured claims--

    (i)  the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; <u>or</u>

    (ii)  <u>the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property.</u>

Contrary to the Bankruptcy Court's ruling, the Plan does not unfairly discriminate against the Pension Fund with respect to its withdrawal liability claim.  Indeed, for purposes of a Chapter 11 plan where creditors are to receive less than 100% of their allowed claims and stockholders are to receive nothing, it is reasonable to classify a withdrawal liability claim separately from other unsecured claims, and, in fact, in those circumstances, that separate treatment is  required by Section 1129(a)(7)(A)(ii) of the Bankruptcy Code.  As previously discussed, that Section raises to a level of critical importance the question of what a creditor would receive in a Chapter 7 liquidation.  If different unsecured creditors would be treated differently in a Chapter 7 liquidation, that difference provides a basis for separate classi-fication and different treatment of such creditors.  <u>See</u> <u>e.g.</u>, <u>In Re Sutherland</u>, 3 Bankr. 420 (Bkrcy. - W.D. Ark. 1980).  In short, a difference in the legal characteristics of claims in a Chapter 7 case, which is relevant to a reorganization plan by virtue of § 1129(a) (7)(A)(ii), provides a basis for fairly dis-criminating between those creditors.  ERISA Section 4225(b), which provides that the withdrawal liability claim would receive

-40-

less than the other unsecured creditors in a liquidation, is the basis for both such a separate classification and the resulting discrimination between the withdrawal liability claim and the claims of other unsecured creditors in light of the requirements of Section 1129(a)(7)(A)(ii).  Moreover, that discrimination is manifestly not unfair under §1129(b) because it is so mandated by those sections of ERISA and the Bankruptcy Code.

Since the Pension Fund's withdrawal liability claim is a separate class which is not the subject of unfair discrimination, §1123(a)(4) cited by the Bankruptcy Court (Memorandum, p. 5, App. p 148) is inapplicable.  That section, which mandates similar treatment for members of the same class, must be read together with §1122(a), which requires that claims be placed in the same class only if they are "substantially similar."  This standard is a codification of case law current at the time the Bankruptcy Code was passed and therefore pre-Code cases are relevant to an analysis of its effect.  Matter of Martins Point Limited Partnership, 12 BR 721, 725 (Bnkrcy - N.D. Ga., 1981).  Such a case is In Re Los Angeles Land & Investments, Ltd., 282 F. Supp. 448 (D. Haw. 1968), aff'd 447 F.2d 1366 (9th Cir. 1971), in which the court determined that unsecured creditors may be divided into separate classes where the legal character of their claims is such as to accord them a status different from other unsecured claims.  In this case, the Pension Fund's different treatment in a chapter 7 rather than a chapter 11 is such a difference in legal character which requires separate classification.  See

-41-

Bartle v. Markson. 314 F. 2d 303 (2d Cir. 1963)(Subordinated
claims put in different classes.)

     Practically, as well as legally, a separate classification
of the Pension Fund's withdrawal liability claim is required.
Since the Pension Fund will receive a dividend on only half the
withdrawal liability claim in a liquidation, it is unlikely ever
to vote against a reorganization in which it would receive a
dividend on 100% of its claim, whether or not that reorganization
is otherwise in the best interests of unsecured creditors.   To
protect the rights of the other unsecured creditors from being
out-voted in such a situation by the large withdrawal liability
claim that has different and conflicting interests, the withdrawal
liability claim should be placed in a separate class as it was,
for all intents and purposes, by Granada.  See Plan Article
IV(d); App. p. 59.

     Since the Pension Fund's withdrawal liability claim should
be and in substance was in a separate class, the only remaining
issue is whether the claim's treatment by the Plan is fair and
equitable.  A determination as to that issue must be made in
accordance with Section 1129(b)(2) of the Bankruptcy Code.
Clause B of that Section (set forth above) provides that a Plan
is fair and equitable with respect to a class of unsecured creditors
who reject the plan if the holder of any junior claim or interest
would not receive or retain any property on account of such
junior claim or interest.  That is the situation in the case at
bar.  Since no claim junior to the Pension Fund is receiving
anything on its claims or interests and the Pension Fund is

-42-

getting at least what it would get in a Chapter 7 liquidation,
there is no basis on which it can be said that the Plan is unfair
or inequitable to it or unfairly discriminates against it.  Thus,
even if the Pension Fund's withdrawal liability claim, treated as
a separate class, is deemed to have rejected the Plan by virtue
of the Objection, the payment provided for in that Plan is permis-
sible and the Plan should be confirmed.

It should be noted that the foregoing analysis and, in
particular, the application of Section 1129(b)(2)(B) to this
situation, does not mean that in every Chapter 11 case a pension
fund withdrawal liability claim will be required to participate
only to the extent of one half the claim.  Under most Chapter 11
plans, existing stockholders will retain an interest even though
unsecured creditors may receive less than 100% on their claims.
In such cases, treatment of the withdrawal liability claim on the
same basis as would occur in a Chapter 7 liquidation would not be
fair and equitable under Section 1129(b).  Further, it should be
noted that such cases where stockholders continue to participate
post-confirmation do not involve liquidations as this case does.

CONCLUSION

For all of the reasons set forth above, the Appellant Granada
respectfully requests this Court to reverse the decisions of the
District and Bankruptcy Courts and order either that the MPPAA as
applied in this situation to Granada is unconstitutional or that
the withdrawal liability claim of the Pension Fund be paid a

dividend on only one-half its allowed claim as provided in the
Plan.

By its attorneys

Charles L. Glerum

Robert M. Gargill
Charles L. Glerum
CHOATE, HALL & STEWART
60 State Street
Boston, Massachusetts  02109
(617) 227-5020

Dated: 7/31/84

-44-