# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>          Debtors.[1] | PROMESA<br>Title III<br><br>No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>          Debtor. | PROMESA<br>Title III<br><br>No. 17-BK-4780-LTS<br><br>(Jointly Administered)<br><br>Re: ECF No. 3579 |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS,<br><br>          Movant,<br><br>    v.<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>          Respondent. | |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19- BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**DEBTOR'S OPPOSITION TO OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
<u>MOTION TO EXCLUDE EXPERT TESTIMONY OF MARK SHANKWEILER</u>**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ................................................................................................................... 3

ARGUMENT ........................................................................................................................ 7

I.    Mr. Shankweiler's Knowledge, Skill and Experience Qualify Him to Provide an
      Estimate of the General Unsecured Claims Pool for PREPA............................................ 7

II.   Mr. Shankweiler Properly Relied on Opinions of Counsel to the Oversight Board
      and PREPA and Any Opinion He Offers is Admissible..................................................... 11

III.  The Committee is Not Entitled to the Production of the Underlying Legal Analysis
      of the General Unsecured Claims Estimate ..................................................................... 17

CONCLUSION...................................................................................................................... 18

## **TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Alves v. Affiliated Care of Putnam, Inc.*,
No. 16-CV-1593 (KMK), 2022 WL 1002817 (S.D.N.Y. Mar. 30, 2022) ..............................14

*Beck's Office Furniture & Supplies, Inc. v. Haworth, Inc.*,
1996 WL 466673 (10th Cir. Aug. 16, 1996)..........................................................................16

*Berry v. City of Detroit*,
25 F.3d 1342 (6th Cir. 1994) ...................................................................................................8

*Campbell v. N.Y.C.*,
16-cv-8719 (AJN), 2021 WL 826899 (S.D.N.Y. Mar. 4, 2021).............................................14

*Coco Rico, LLC. v. Universal Ins. Co.*,
No. 21-1390, 2023 WL 3735108 (D.P.R. May, 30, 2023) ....................................................11

*Est. of Leavitt Rey v. Marrero Gonzalez*,
No. 16-2769, 2020 WL 4464467 (D.P.R. Aug. 4, 2020).........................................................5

*Ferrara & DiMercurio v. St. Paul Mercury Ins. Co.*,
240 F.3d 1 (1st Cir. 2001)......................................................................................................15

*Ford as Next Friend of Doe v. NCL Bahamas Ltd.*,
No. 17-CV-24404, 2019 WL 3937127 (S.D. Fla. June 4, 2019) ............................................5

*Insight Tech. Inc. v. Surefire, LLC*,
No. 04-CV-074-JD, 2005 WL 6001396 (D.N.H. Aug. 2, 2005) ....................................10, 11

*Marrero-Rolon v. Autoridad de Energia Electrica*,
Civ. No. 15-1167, 2018 WL 8805485 (D.P.R. Sept. 10, 2018).............................................15

*Noel v. N.Y.C.*,
No. 15-cv-5236-LTS, 2023 WL 3170430 (S.D.N.Y. Apr. 28, 2023)..................................8, 16

*Nook v. Long Island R.R. Co.*,
190 F. Supp. 2d 639 (S.D.N.Y. 2002).....................................................................................8

*Rivera-Cruz v. Latimer, Biaggi, Rachid & Godreau, LLP*,
No. 04-2377, 2008 WL 2446331 (D.P.R. June 16, 2008) ......................................................16

*Santos v. Posadas De Puerto Rico Assocs., Inc.*,
452 F.3d 59 (1st Cir. 2006).......................................................................................................8

ii

*Tokio Marine & Fire Ins. Co. v. Grove Mfg. Co.,*
   958 F.2d 1169 (1st Cir. 1992) .......................................................................8

*United States v. Hoffman*,
   832 F.2d 1299 (1st Cir. 1987) .....................................................................10

**STATUTES & RULES**

48 U.S.C. §§ 2101–2241 ...................................................................................1

11 U.S.C. § 502(a) ...........................................................................................17

11 U.S.C. § 1103 ..............................................................................................17

PROMESA § 301(a) .........................................................................................17

Fed. R. Civ. P. 24(a)(2)(C) ................................................................................1

Fed. R. Civ. P. 26(a)(2)(B) ................................................................................7

Fed. R. Civ. P. 26(a)(2)(C) ......................................................................5, 7, 18

Fed. R. Civ. P. 26(b)(4)(C)(ii)-(iii) ..................................................................17

To the Honorable United States District Court Judge Laura Taylor Swain:

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as the sole Title III representative of the Puerto Rico Electric Power Authority ("PREPA," or the "Debtor"), pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2] respectfully submits this opposition (the "Opposition") to the Official Committee of Unsecured Creditors' (the "Committee") *Motion to Exclude Expert Testimony of Mark Shankweiler* [ECF No. 3579][3] (the "Motion"), and respectfully states as follows:

## PRELIMINARY STATEMENT

1.   The universe of general unsecured claims in the PREPA Title III case is comprised of thousands of claims, many in telephone book numbers, aggregating well over $5 billion. Contrary to the Committee's premise that PREPA should have deluged the Court with claim objections, *see* Motion ¶ 1, PREPA has undertaken a rational process to estimate the maximum amount of allowable claims.  PREPA's approach is doable.  The Committee's approach is not.

2.   The Committee seeks to exclude expert testimony from Mr. Mark Shankweiler ("Mr. Shankweiler"), who has overseen the team at Berkley Research Group ("BRG") responsible for handling the claims reconciliation process for PREPA.  In that capacity, Mr. Shankweiler has been a critical advisor to the Oversight Board during PREPA's Title III case since BRG's retention in June 2019.  Accordingly, Mr. Shankweiler was disclosed by the Oversight Board as a "hybrid" witness who may provide both fact and expert testimony pursuant to Rule 24(a)(2)(C). Notably,

---

[2]   PROMESA is codified at 48 U.S.C. §§ 2101–2241.

[3]   Docket references contained herein shall refer to the docket for Case No. 17-4780 unless otherwise specified.

1

the Committee does not seek to block Mr. Shankweiler from providing fact testimony.[4] Instead, relying largely on a series of quotes cherry-picked from Mr. Shankweiler's deposition testimony, the Committee contends Mr. Shankweiler's expert testimony should be excluded because (*i*) he is not qualified to be an expert, (*ii*) his testimony relies in part on legal analyses performed by the Oversight Board's and PREPA's attorneys, and he therefore lacks proper bases supporting his opinion, and (*iii*) the Oversight Board declined to produce communications between Mr. Shankweiler and attorneys for PREPA and the Oversight Board, which, according to the Committee, deprived it of insight into Mr. Shankweiler's opinions. Motion ¶¶ 4-7.  The Committee is wrong on all three points, and the Motion should be denied in its entirety.

3. *First,* Mr. Shankweiler is eminently qualified to opine on the estimated allowed amount of general unsecured claims against PREPA, regardless of whether he has previously testified as an expert (which, of course, is by no means a requirement to be qualified as an expert). As he testified at his deposition, he has extensive experience in the restructuring industry, including experience evaluating and valuing proofs of claim. That experience provided him the requisite expertise to provide a valuation of the general unsecured claims pool for PREPA.

4. *Second,* Mr. Shankweiler appropriately relied on legal analyses provided by counsel to the Oversight Board, as well as counsel to PREPA, in his evaluation of the estimated amount of the general unsecured claims pool for PREPA.  Relying on such analyses hardly renders Mr. Shankweiler's testimony "inadmissible legal opinion," as the Committee incorrectly asserts. As Mr. Shankweiler is not an attorney, it was appropriate for him to confer with counsel and rely

---

[4]      Although the Motion purports to seek to preclude Mr. Shankweiler from providing "any testimony in support of the plan of adjustment," Mot. ¶ 3, it only contests Mr. Shankweiler's potential expert testimony.  To the extent the Court precludes Mr. Shankweiler from testifying as an expert, the Oversight Board reserves the right to proffer Mr. Shankweiler as a fact witness at the Confirmation Hearing in accordance with the Debtor's Preliminary Witness List.

on assumptions provided by counsel to evaluate the general unsecured claims pool for PREPA. Mr. Shankweiler's analysis of the general unsecured claims pool was based not *solely* on the evaluation of counsel to the Oversight Board and PREPA, but on the risk adjustments he applied to each claims category to account for any uncertainties surrounding each claim based on his own expertise, after the BRG team's review of all the proofs of claim and supporting documentation.

5.      *Third,* although the Committee is entitled to understand the underlying facts, data, and assumptions that went into the analysis with respect to the evaluation of the general unsecured claims pool, it is not entitled to underlying legal analyses.  Those are properly protected by the attorney-client privilege.  Nor does the Committee require disclosure of such legal analyses to understand the bases for the Oversight Board's $800 million estimate of general unsecured claims, which was described at length in the Disclosure Statement (as defined below) and in Mr. Shankweiler's deposition testimony.

## **BACKGROUND**

6.      On December 16, 2022, the Oversight Board filed the *Title III Plan of Adjustment of the Puerto Rico Electric Power Authority* [ECF No. 3110]. The Oversight Board simultaneously filed the *Disclosure Statement for Title III Plan of Adjustment of the Puerto Rico Electric Power Authority* [ECF No. 3111] (as subsequently amended or modified, the "Disclosure Statement"). Among other things, the Disclosure Statement estimated the pool of general unsecured claims at $800 million.  *See* Disclosure Statement at 268.

7.      On February 3, 2023, the Committee filed the *Omnibus Objection of the Official Committee of Unsecured Creditors to (I) Disclosure Statement for Title III Plan of Adjustment of Puerto Rico Electric Power Authority and (II) Related Motions* [ECF No. 3186] (the "Committee Disclosure Statement Objection"), objecting to the Disclosure Statement on the basis that the

3

Disclosure Statement did not provide sufficient disclosure of the bases of the $800 million general unsecured claims estimate. Committee Disclosure Statement Objection at ¶ 5 ("The Disclosure Statement further fails to explain to general unsecured creditors the basis for capping their recoveries based on an estimate of $800 million in General Unsecured Claims."). To address the Committee Disclosure Statement Objection, in the *Disclosure Statement for Modified Second Amended Title III Plan of Adjustment of the Puerto Rico Electric Power Authority* [ECF No. 3297], beginning on page 55, the Oversight Board added approximately 3 pages of additional disclosure explaining how Mr. Shankweiler arrived at the $800 million general unsecured claims pool estimate, including detailed analyses of the primary adjustments made to the five largest claims categories in the $800 million general unsecured claims estimate.

8.        On March 1, 2023, the Oversight Board filed the *Modified Second Amended Title III Joint Plan of Adjustment of the Puerto Rico Electric Power Authority* [ECF No. 3296] (as it may be amended, modified, or supplemented, the "Plan"). Following submission of the Plan, and as subsequently amended, the Court established a schedule and procedures relating to confirmation of the Plan, including a timeline for parties to file preliminary witness lists. *See Third Amended and Restated Order Establishing, Among Other Things, Procedures and Deadlines Concerning Objections to Confirmation and Discovery in Connection Therewith* [ECF No. 3565 (the "Confirmation Procedures Order")].

9.        Pursuant to the Confirmation Procedures Order, parties in interest seeking to proffer fact testimony at the confirmation hearing on the Plan were required to file preliminary fact witness lists setting forth "(a) the names of the witnesses that such party anticipates presenting at the Confirmation Hearing and (b) the topics for which the testimony of any such witness shall be offered." Confirmation Procedures Order ¶ 4.

10.     In accordance with the Confirmation Procedures Order, on March 11, 2023, PREPA filed its preliminary fact witness list. [ECF No. 3329] (the "Preliminary Witness List"). That list designated, among others, Mr. Shankweiler as a fact witness and explained that he may provide testimony:

> showing the reasonableness of the assumptions made with respect to (i) the estimated total amount of allowed general unsecured claims asserted against the Debtor, (ii) the estimated total amount of allowed eminent domain/inverse condemnation claims asserted against the Debtor, and (iii) the estimated total amount of allowed federal claims asserted against the Debtor.

Preliminary Witness List at 4. In addition, PREPA explained Mr. Shankweiler may also provide opinion testimony pursuant to Fed. R. Civ. P. 26(a)(2)(C)[5] and would "file the disclosure required for each such witness at the time expert witnesses are required to be disclosed." *Id.*

11.     Pursuant to the Confirmation Procedures Order, parties in interest seeking to proffer expert testimony at the confirmation hearing on the Plan were required to file opening expert disclosures by April 14, 2023 and opening expert reports on or before April 28, 2023. Confirmation Procedures Order ¶¶ 24-25.  In accordance with the Confirmation Procedures Order, on April 14, 2023, the Oversight Board filed the *Debtor's Identification of Expert Witnesses* [ECF No. 3394] (the "Identification of Experts").  Therein, the Debtor identified Mr. Shankweiler as a witness who may provide opinion testimony pursuant to Fed. R. Civ. P. 26(a)(2)(C).  Identification of Experts ¶ 2(e).

---

[5]     Fed. R. Civ. P. 26(a)(2)(C) governs the disclosure standards for "hybrid" witnesses, or witnesses who "provide both fact and opinion testimony based on their scientific, technical, or other specialized knowledge." *Ford as Next Friend of Doe v. NCL Bahamas Ltd.,* No. 17-CV-24404, 2019 WL 3937127, at *2 (S.D. Fla. June 4, 2019). Such witnesses are not required to submit expert reports. *Est. of Leavitt Rey v. Marrero Gonzalez*, No. 16-2769, 2020 WL 4464467, at * 1 (D.P.R. Aug. 4, 2020).

12.     Thereafter, on April 28, 2023, PREPA filed the *Debtor's Opening Expert Report
and Disclosures* [ECF No. 3418] (the "Opening Expert Disclosures").  Therein, PREPA explained
Mr. Shankweiler's may testify regarding:

> the claims reconciliation process undertaken by the Oversight
> Board, including, without limitation, the implementation of the
> ADR procedures and the status of outstanding claims as of the
> commencement of the hearing to consider confirmation of the plan
> of adjustment. In connection therewith, Mr. Shankweiler will
> discuss the reasonableness of the assumptions made with respect to
> (*i*) the estimated total amount of allowed general unsecured claims
> asserted against PREPA, which is $800 million; (*ii*) the estimated
> total amount of allowed eminent domain/inverse condemnation
> claims asserted against PREPA, which is between $2,437,556 up to
> $20,273,250; and (*iii*) the estimated total amount of allowed federal
> claims asserted against PREPA, which is $16,859,577.

*Id.* at 9.

13.     In addition, the Debtor explained Mr. Shankweiler will base such testimony on,
among other things:

> (a) the review and analysis of the proofs of claim filed against
> PREPA by the Oversight Board, PREPA and their respective
> advisors, including but not limited to analysis of PPOA claims,
> UTIER grievance claims, litigation claims, the UITICE litigation
> claim, and employee claims, as well as (b) Mr. Shankweiler's
> extensive experience in complex restructuring, including claims
> reconciliation and analysis.

*Id.* at 9-10.

14.     Pursuant to notice, the Committee took Mr. Shankweiler's deposition on May 22,
2023.  [ECF No. 3419].

15.     Pursuant to the Confirmation Procedures Order, the Debtor may "present the
testimony of any designated person by either the submission of a declaration of such person or use
of deposition testimony . . . ."  Confirmation Procedures Order ¶ 6.  Such declarations are to be
filed no later than June 26, 2023, and declarants must be available for cross-examination at the

6

Confirmation Hearing. *Id.* The Debtor intends to file a declaration for Mr. Shankweiler to serve as his direct testimony for the confirmation hearing on June 26, 2023, and Mr. Shankweiler will be present at the confirmation hearing for cross-examination.

16. On June 2, 2023, the Committee filed the Motion.

## ARGUMENT

**I.** **Mr. Shankweiler's Knowledge, Skill and Experience Qualify Him to Provide an Estimate of the General Unsecured Claims Pool for PREPA.**

17. Fully aware of Mr. Shankweiler's extensive bankruptcy and restructuring experience, the Committee nevertheless attempts to preclude him from proffering expert testimony regarding the allowed amount of general unsecured claims because, among other things, (*i*) Mr. Shankweiler "has never testified as an expert before;" (*ii*) his "degrees do not relate to bankruptcy or restructuring issues;" and (*iii*) "he has never published any articles or treatises regarding restructuring." Motion ¶ 24.[6] None of these alleged deficiencies precludes Mr. Shankweiler from qualifying as an expert.[7] To the contrary, Mr. Shankweiler's extensive experience in bankruptcy

---

[6] The Committee protests that "no report, affidavit, or other disclosures have been provided to support Mr. Shankweiler's credentials or opinion," Mot. ¶ 15, and notes that the Oversight Board requested the expert report submitted by its retained Rule 26(a)(2)(B) expert, Dr. Glenn George, be removed from the docket in order to resolve a confidentiality concern (*see* Opening Expert Disclosures). As an initial matter, the Committee's comments are factually incorrect—as described above, several pages of the Disclosure Statement were devoted to an explanation of the bases for the $800 million estimate to which Mr. Shankweiler will testify. Further, the expert report to which the Committee refers is completely irrelevant to the $800 million estimate to which Mr. Shankweiler will testify (and in any event, the Committee, as a signatory to the Protective Order (as defined in the Confirmation Procedures Order), is authorized to review Dr. George's report). Mr. Shankweiler has never filed an expert report and, as a Fed. R. Civ. P. 26(a)(2)(C) witness, was not required to do so.

[7] Notably, the Oversight Board's claims estimation expert in the Commonwealth, PBA, ERS, and HTA proceedings, Mr. Herriman, likewise lacked "degrees . . . relat[ing] to bankruptcy or restructuring issues" and also had not "published any articles or treatises regarding restructuring," but competently and without objection testified as to the potential allowed amount of general unsecured claims.

and restructuring, and specifically PREPA's Title III case, makes him highly qualified to provide expert testimony in this proceeding.

18.    "[T]here is no mechanical checklist for measuring whether an expert is qualified to offer opinion evidence in a particular field." *Santos v. Posadas De Puerto Rico Assocs., Inc.,* 452 F.3d 59, 63 (1st Cir. 2006).  "The test is whether, under the totality of the circumstances, the witness can be said to be qualified as an expert in a particular field through any one or more of the five bases enumerated in Rule 702–knowledge, skill, experience, training, or education." *Id.* at 63–64 (citing *United States v. Shay,* 57 F.3d 126, 132 (1st Cir. 1995).[8]

---

[8]    Contrary to the Committee's assertion, this is not a situation where an expert is testifying outside of their area of expertise, and therefore the cases the UCC relies on (Motion ¶ 25) are inapposite. For example, the Committee's reliance on *Noel v. N.Y.C.*, is erroneous. No. 15-cv-5236-LTS, 2023 WL 3170430, at *4 (S.D.N.Y. Apr. 28, 2023). In that case, the portion of the expert's testimony that was precluded was purely speculative and he "provided no information as to how he reached his conclusions," or otherwise did not "proffer any rational link between his experience and the speculations," when providing an opinion on city policy. *Id.*  Here, as described above, there is a clear link between Mr. Shankweiler's experience valuing claims and the testimony he will provide.  Likewise, in *Berry v. City of Detroit*, the Court held the witness lacked the relevant qualifications to be an expert in a criminal case, where the witnesses' testimony was to provide the basis for the jury to conclude the alleged failure to properly discipline police officers was the proximate cause of a shooting, where the witness himself received (i) no formal training, (ii) needed no formal qualifications to be deputy sheriff, and (iii) was fired twice during his two-year period as deputy. 25 F.3d 1342, 1348-49 (6th Cir. 1994). Moreover, the Committee's reliance on an excerpt from *Tokio Marine & Fire Ins. Co. v. Grove Mfg. Co.* is misplaced. 958 F.2d 1169, 1173-74 (1st Cir. 1992). In that case, the court found it was not an "abuse of discretion" to exclude the expert testimony with respect to how a crane was defective, where expert analysis required "considerable familiarity with the device itself; with how hydraulic cranes work and are operated; with crane design, manufacture and marketing; with applicable industry standards," and the expert (i) "never examined the crane involved in the accident in the present case, nor had he spoken to its operator," (ii) "never operated nor performed maintenance on a crane," (iii) "never designed cranes nor worked for a crane manufacturer," (iv) "no evidence of publication or in-depth study on the subject of cranes," (v) "conceded that he was not an expert in crane maintenance nor in crane operation," and (vi) "conceded that he was not an expert on load moment indicators, although he said he had 'knowledge about it.'" *Id.* at 1173-75.  Finally, *Nook v. Long Island R.R. Co.* is distinguishable because Mr. Shankweiler's analysis of the general unsecured claims is not "based on assumptions and speculation, without objective scientific, technical or factual foundation . . . ." 190 F. Supp. 2d 639, 642-43 (S.D.N.Y. 2002)

19.     Here, the Committee's attempt to identify a gap in Mr. Shankweiler's experience and skill set by selectively quoting Mr. Shankweiler's deposition fails.  Motion ¶ 25.  Mr. Shankweiler testified at his deposition as to his extensive real-world experience in estimating claims.  For example, Mr. Shankweiler explained that he has been in the restructuring industry since 1992, and in that time, has been involved in 30 or 40 formal bankruptcy cases. Deposition of M. Shankweiler [ECF No. 3579-1] ("Shankweiler Dep. Tr.") at 95:13-20.  He testified as to his experience in other similarly large bankruptcy cases, including Energy Future Holdings. *Id.* 95:23-96:12. As Mr. Shankweiler explained, in "[e]ach one of the cases that we've had, whether it be debtor or creditor, involved claims estimation in order to determine what value would be available for creditors down the waterfall. . .  [T]he number of cases that I've been involved with, again, where we've had to deal with the claim estimation process is really what I believe gives me the expertise to be able to evaluate and estimate claims."  *Id.* 18:6-22. And, Mr. Shankweiler further testified about the process he personally used to determine the amount of the estimated general unsecured claims pool.  *See id.* 18:24-20:7.[9]

---

[9]     For example, Mr. Shankweiler testified:

"One of the first things you would do is to evaluate a proof of claim, review the proof of claim, determine whether or not that proof of claim is consistent with the books and records of the company, reconcile the proof of claim to the books and records, evaluate the details that are included in a proof of claim to determine if there's sufficient support and then work through the reconciliation process to determine whether or not it's a valid claim." Shankweiler Dep. Tr. 19:7-18.

"The process included, I mean initially, what you receive as a claims register. We obtained all the proofs of claim that were in the claims register. We verified the categorization of the proofs of claim. We looked at the categorization, reviewed the claims to determine what categories and confirm the validity of the categorization of the claims. We then looked at the support for the claims. And based on the support that was provided, conferred with, oftentimes, Diaz & Vasquez in order to help us adjust any of the asserted claims to what a reasonable expectation of that claim should be. We objected to claims which were invalid. We transferred claims to ADR which resulted in an adjustment to the asserted claim amount, based on what a settlement amount determined. And that settlement amount was done in

20.     Mr. Shankweiler also has significant formal training in restructuring issues.  For example, Mr. Shankweiler holds a degree in Accounting and Business Administration from Muehlenberg College.  He has also been certified as a Certified Insolvency and Restructuring Advisor and a Certified Public Accountant.[10]  M. Shankweiler CV, available at https://www.thinkbrg.com/people/mark-shankweiler/ and attached hereto as **Exhibit A**.

21.     Notwithstanding Mr. Shankweiler's extensive bankruptcy and restructuring experience and training, the Committee nevertheless contends his lack of a degree in bankruptcy and restructuring or prior experience testifying as an expert should preclude his testimony here. But these are of course not prerequisites for qualifying as an expert.  *See United States v. Hoffman*, 832 F.2d 1299, 1310 (1st Cir. 1987) ("Expertise is not necessarily synonymous with a string of academic degrees or multiple memberships in learned societies.").[11]  Notably, the Committee nowhere identifies exactly what restructuring and bankruptcy degrees it is looking for and whether they exist.  We are unaware of degrees in claim estimation.  Similarly, it does not take a degree to understand that bankruptcy law does not allow postpetition interest on unsecured claims. Courts in the First Circuit are in accord.  For example, in *Insight Technology Inc.,* the court overruled a

---

conjunction with PREPA's counsel, as well as the – just review of the actual detail of the claim in order to come up with what a reasonable claim is. But we looked through detail to determine if that claim had already been satisfied. And that would be based on payment history information that was provided by PREPA and LUMA and through conversations with PREPA's employees as it relates to some of the relatively large claims that were captured or incorporated or included in the general claims category. *Id.* at 23:5-25:21.

[10]     Mr. Shankweiler's certifications are currently inactive.

[11]     Indeed, prior testifying experience cannot be a requirement to qualify as an expert. Otherwise, no new expert could ever qualify as an expert witness. *See Insight Tech. Inc. v. Surefire, LLC,* No. 04-CV-074-JD, 2005 WL 6001396, at *2 (D.N.H. Aug. 2, 2005) (court overruled a motion to exclude expert testimony where one expert at issue had never testified as an expert before).

motion to exclude expert testimony where movants alleged the purported expert, among other things, did not have a Ph.D. degree and had never testified as an expert before.  2005 WL 6001396, at *2. The court overruled the motion holding movant "cite[d] no support for its theories that expert witnesses must have Ph.D. degrees and that only those who are 'professional' expert witnesses are qualified to testify. Those theories are meritless."  *Id*.  Similarly in *Coco Rico, LLC,* the District Court of Puerto Rico denied the plaintiff's motion *in limine*, where the opponents of the motion openly conceded the relevant expert had only testified once in a deposition in the past four (4) years. *Coco Rico, LLC. v. Universal Insurance Co.,* No. 21-1390, 2023 WL 3735108, at *5 (D.P.R. May, 30, 2023).  In overruling the motion, the court held there is no "requirement under Rule 702 or any other legal authority requiring that an expert witness have testified in a certain number of cases before being able to testify as an expert in court."  *Id.*

22.    Accordingly, the Committee's argument is meritless.  Mr. Shankweiler has no knowledge or expertise gap – he has direct experience with claim estimation sufficient to qualify him as an expert in these proceedings.

## II.    **Mr. Shankweiler Properly Relied on Opinions of Counsel to the Oversight Board and PREPA and Any Opinion He Offers is Admissible.**

23.    The Committee alleges Mr. Shankweiler "parroted the opinions of others, [in the development of the estimate of the general unsecured claims pool,] especially the opinions of PREPA's and the Oversight Board's lawyers."  Motion ¶ 27.  In so arguing, the Committee highlights only the instances in Mr. Shankweiler's deposition where he describes how he and his team at BRG relied on the legal assumptions provided by either counsel to PREPA or the Oversight Board to assist in his evaluation of certain general unsecured claims filed against PREPA.  *Id.* ¶ 28.  On that basis, the Committee contends Mr. Shankweiler's testimony should be disregarded either because he is repeating the legal opinions of the Oversight Board's and PREPA's counsel,

*id.* ¶ 5, or because his testimony will be "merely . . . legal conclusions." *Id.* ¶ 6.

24.     But the Motion simply disregards Mr. Shankweiler's extensive testimony explaining the processes he and his team personally undertook to evaluate the general unsecured claims for PREPA, after receiving input from counsel on the legal merits of the claims. *See generally* Shankweiler Dep. Tr. 23:5-25:21; 27:4-28:3; 39:1-40:15. Specifically, Mr. Shankweiler explained: (i) BRG obtained all proofs of claim asserted against PREPA; (ii) BRG reviewed all of the claims to determine the claim category and then confirmed the validity of the categorizations; (iii) BRG reviewed the support provided in the proof of claims; (iv) based on the support provided in the proof of claim, BRG conferred with counsel to PREPA or the Oversight Board "to adjust any of the asserted claims to what a reasonable expectation of that claim should be," and (v) based on their own review of the claims and the input they received from counsel, Mr. Shankweiler and his team assigned a range of values and an adjusted estimated value for each category of claims. *Id*. at 22:5-25; 23:2-21; 79-80:13; 105:2-23. BRG then modified the claim amounts to account for any uncertainties surrounding the claims "to ensure that there's sufficient cushion in estimating what the general unsecured claims would be," based on Mr. Shankweiler's experience in reviewing and estimating total claims asserted against a debtor. *Id.* at 108:11-109:2.

25.     Indeed, Mr. Shankweiler testified at his deposition as to how this process developed estimates for three of the largest categories of unsecured claims: claims arising from certain power purchase operating agreements ("PPOAs"); a claim asserted by UITICE, one of PREPA's primary labor unions, arising out of an arbitration award; and claims asserted by UTIER, another of PREPA's primary labor unions, arising out of grievances. For example, with respect to PPOA-related claims—nearly all of which assert PPOAs that are the subject of litigation in Commonwealth courts—Mr. Shankweiler testified that he understands from consultation with

counsel to PREPA that, to the extent the claims asserted lost profits, those assertions were unlikely to be valid under Puerto Rico law. *Id.* at 52:9-19. On the basis of that advice, Mr. Shankweiler testified he and his team adjusted the claim amounts for the PPOAs that asserted a lost profits claim to a low estimate of zero dollars, but, on the basis of Mr. Shankweiler's expertise in claims reconciliation, included a reserve to account for the possibility that a PPOA claimant might successfully substantiate a lost profits claim. *Id.* at 52:9-25 ("On the low side, we assumed that it would be zero. But because a number of these are in litigation, we provided a high amount or a higher amount of 30 percent."); *See also id.* at 161:15-162:2 ("[U]nderstanding and the guidance I was provided by both Diaz & Vasquez, as well as Proskauer, related to that category of the claim . . . we looked at what we felt a reasonable value would be, so that 30% was judgmental . . . we felt that a 30% risk factor would be appropriate . . . .").

26.    As another example, with respect to the UITICE litigation claim, which asserted claims arising out of modifications to PREPA's medical plan for retirees, Mr. Shankweiler testified he and his team consulted Diaz & Vasquez to help "obtain information from PREPA related to the nature" and underlying basis of the UITICE litigation claim. *Id.* at 62:17-24. Mr. Shankweiler understood that the UITICE claim could potentially be estimated at zero because UITICE failed to provide any documentation to substantiate its claim. Based on his discussions with Diaz & Vazquez, as well as his own professional judgment, Mr. Shankweiler and his team applied a five percent (5%) adjustment to the claim "to cover any potential claims that could arise" from the medical plan modifications. *Id.* 62:17-64:5.

27.    Further, with respect to the UTIER grievance claims, Mr. Shankweiler testified his initial analysis of the claim was that it did not include documentation sufficient to substantiate UTIER's assertion of over $1 billion in alleged grievance claims. *Id.* 85:2-10 ("The UTIER

grievances, they just had one single claim amount with no supporting values associated. . . . The support that UTIER provided was 50,000 pages of stuff in 28 boxes…And none of those documents had any values."). He and his team then "coordinated with Diaz & Vasquez to establish a process by which we would be able to build up to what a potential value was of these UTIER claims, these grievance claims." *Id.* 85:11-15. PREPA's arbitration office has reviewed approximately 50% of the filed grievance claims and determined a settlement value for each of the grievance claims by reviewing whatever records they had access to that substantiated each claim.[12] *Id.* 118:8-119:3. BRG and Diaz and Vasquez would then review the settlement values for the grievance claims provided by PREPA's arbitration office, because the process was a "collaborative approach to come up with what these claims should be and the value of these claims should be . . ." *Id.* 123:8-125:2. Thus, to account for any uncertainties surrounding the settlement value of the UTIER grievance claims, BRG included a cushion in the estimate of the UTIER grievance claims that was comprised of extrapolations of the "average dollar value of the [grievance] claims." *Id.* 88:24-89:9; 88:2-9 ("[W]hat we did is we came up with average values for each one of the claims. And based on the number of claims that were filed in PREPA's offices by UTIER, we then applied a cushion to that for unknown claims that could arise or other issues that could arise").

28.     Relying on counsel to evaluate claims asserting breaches of contract, pending litigations or union grievances was entirely appropriate and necessary.[13] As the Committee and

---

[12]     The claims reconciliation process remains ongoing, including review of the remaining grievance claims.

[13]     In fact, courts routinely allow experts to rely on legal assumptions. *See e.g.*, *Campbell v. N.Y.C.*, 16-cv-8719 (AJN), 2021 WL 826899, at *3 (S.D.N.Y. Mar. 4, 2021) (holding "damages" expert was entitled to assume liability to calculate damages and reliance on an assumption provided by counsel does not otherwise create the expert's testimony to be "unreliable nor does it usurp the jury's role of applying the law to facts," where "damages" expert relied on assumptions from counsel relating to the underlying facts of the matter to calculate the extent of damages owed.); *Alves v. Affiliated Care of Putnam, Inc.,* No. 16-CV-1593 (KMK), 2022 WL 1002817, at

Mr. Shankweiler acknowledge, Mr. Shankweiler and his team are not attorneys.  As such, to prepare an accurate estimate of such claims, they needed to rely on counsel for "a determination as to what in their legal opinion the litigation claim would be worth . . . [a]nd [] relied on their . . . legal expertise in order to come up with a value for that particular claim."  *See* Shankweiler Dep. Tr, 34:16-23.

29.     Such reliance on assistance of counsel is not improper and does not render inadmissible any potential expert testimony Mr. Shankweiler may provide.[14]  Indeed, the District Court for Puerto Rico has found that an expert's reliance on information by counsel is proper so long as the expert does not "blindly" rely on the information.  *See Marrero-Rolon v. Autoridad de Energia Electrica*, Civ. No. 15-1167, 2018 WL 8805485, at *3 (D.P.R. Sept. 10, 2018) (denying the plaintiff's motion to exclude expert testimony on the ground that he allegedly "blindly relied on information provided by defense counsel" because "the record suggest[ed] that [the expert] conduct[ed] an extensive review of relevant documents").

30.     That is precisely the case here.  Contrary to the Committee's assertion, Mr. Shankweiler and his team did not "blindly" adopt counsels' analysis or leave this process solely to the attorneys.  *See* Shankweiler Dep. Tr. 41:2-10 ("we looked at each one of the claims.  To the extent that we felt that a claim had to be adjusted based on a review, we adjusted it.  But we did look at each one of the claims to understand the nature of the claim and make sure that it was . . .

---

*8 (S.D.N.Y. Mar. 30, 2022) (applying *Campbell* and holding same).  Any potential expert testimony Mr. Shankweiler may offer would not be drawn to the propriety of certain legal conclusions, but rather to his analysis and estimation of the GUC pool.  Such testimony is clearly admissible.

[14]     If anything, "when an expert relies on the opinion of another, such reliance goes to the weight, not to the admissibility of the expert's opinion."  *Ferrara & DiMercurio v. St. Paul Mercury Ins. Co.*, 240 F.3d 1, 9 (1st Cir. 2001).

reflected accurately in the claims register."). Mr. Shankweiler testified he and his team completed

an "extensive review" of all the relevant documents with respect to the $800 million general

unsecured claims estimate. Mr. Shankweiler and his team received all the proofs of claim asserted

against PREPA and the corresponding supporting documentation and reviewed each and every

one. *See id.* 22:24-24-21. Based on their review of the details of the claim, Mr. Shankweiler and

his team came up with a reasonable value of what the claims should be and conferred with counsel

only to the extent legal assistance was required in the analysis (which is entirely appropriate). *Id.*

Indeed, Mr. Shankweiler had an independent basis for the opinions that were incorporated in his

estimate of the GUC pool.[15] *Cf.* Motion ¶ 29 (citing *Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l

Assoc.*, No. 2:08-CV-1448 JCM (RJJ), 2011 WL 743748, at *3 (D. Nev. Feb. 23, 2011)).  Thus,

the Committee's assertion that the "actual work of reviewing relevant documents to evaluate the

claims was completed not by Mr. Shankweiler or his firm, but by these law firms" wholly ignores

the evidence on the record.  Motion ¶ 30.

---

[15]     As such, the Committee's reliance on *Rivera-Cruz v. Latimer, Biaggi, Rachid & Godreau,
LLP*, No. 04-2377, 2008 WL 2446331, at *5 (D.P.R. June 16, 2008) is misguided.  In that case,
the expert blindly relied on information provided verbally by counsel despite possessing clearly
contradictory evidence.  *Id.*  Likewise, in *Beck's Office Furniture & Supplies, Inc. v. Haworth,
Inc.*, the court held it "was an abuse of discretion" to allow an expert to testify where he admitted
the report he relied on was unreliable and that he otherwise did not complete an individual
valuation.  Nos. 95-4018, 95-4029, 1996 WL 466673, *1, *7-8 (10th Cir. Aug. 16, 1996).  And,
*Noel* offers no support because Mr. Shankweiler did not provide a "one-sided narrative" that is
"devoid of any explanation as to how his experience and expertise lead him to" the general
unsecured claims pool estimate. 2023 WL 3170430, at *4. Mr. Shankweiler testified he has
substantial prior experience with claims evaluation because "each one of the cases," he has been
on, which includes approximately 30 to 40 bankruptcy cases, involved the claims estimation
process. Shankweiler Dep. Tr. 18-10:22; 95:18-20.  Mr. Shankweiler took the legal advice he
received from counsel and used that advice and his experience and expertise to provide high, low,
and adjusted estimated values for each category of claims.  Thus, Mr. Shankweiler's experience
allowed him to separately evaluate the general unsecured claims pool and his testimony did not
just "embody the perspective" of counsel to PREPA and the Oversight Board.

16

III.   **The Committee is Not Entitled to the Production of the Underlying Legal Analysis of the General Unsecured Claims Estimate.**

31.    Finally, the Committee's contention that Mr. Shankweiler's opinion is inadmissible "because the Oversight Board has refused to provide the materials that would allow the Committee to properly analyze and evaluate Mr. Shankweiler's opinion" is likewise baseless.  Motion ¶ 35.

32.    As the Committee itself acknowledges, it is black letter law that the Committee is allowed to know what facts, data, and assumptions were used in Mr. Shankweiler's estimation of the general unsecured claims. *See* Fed. R. Civ. P. 26(b)(4)(C)(ii)-(iii); Motion ¶ 38 ("The Federal Rules are clear that such communications between attorneys and expert witnesses should be produced where such communications 'identify facts or data that the party's attorney provided and that the expert considered in forming the opinions to be expressed,' or 'identify assumptions that the party's attorney provided and that the expert relied on in forming the opinions to be expressed.'").  The Oversight Board has disclosed those facts, data, and assumptions in the Disclosure Statement and in discovery, and has produced Mr. Shankweiler to further testify regarding those facts, data and assumptions.  It will also ensure that those facts, data, and assumptions are identified in Mr. Shankweiler's direct testimony. The Committee is not, however, entitled to the privileged documents and communications on which those assumptions are based.  Mr. Shankweiler did not waive any applicable privilege during his deposition, nor will he do so in his declaration, which will form the basis for Mr. Shankweiler's direct testimony at the confirmation hearing.

33.    Significantly, the Committee does not represent any individual creditors in their individual capacities.  In fact, the Committee, as a party in interest, has standing to object to claims pursuant to Bankruptcy Code sections 502(a) and 1103, made applicable by PROMESA section 301(a).  The Committee certainly does not represent unallowable claims.  It should have the same

17

concerns as PREPA to make sure unallowable claims are not compensated under the plan of adjustment.

34.     The Committee's complaint that Mr. Shankweiler did not tender an expert report and "the Committee has no way of understanding how Mr. Shankweiler (or the attorneys and advisors whose work he incorporated) came to their conclusions regarding an estimated allowed amount of the GUC pool" (Motion ¶ 36) is similarly unavailing.  As the Committee is well aware, the Debtor designated Mr. Shankweiler as a potential Fed. R. Civ. P. 26(a)(2)(C) witness, and neither that rule, nor the Confirmation Procedures Order requires Mr. Shankweiler to file an expert report.  Indeed, as described above, the Oversight Board has already provided several pages in the Disclosure Statement explaining the bases for the $800 million estimate.

35.     The Committee deposed Mr. Shankweiler on May 22, 2023.   During that deposition, the Committee asked as many questions as it pleased to understand the facts, assumptions, and legal conclusions reached by counsel to PREPA and the Oversight Board, as well as the underlying processes to reach the general unsecured claims estimate.  The Committee deposed Mr. Shankweiler for approximately two hours, and it neglected to ask questions regarding the specific legal assumptions provided by counsel.  The Committee cannot now try to get a second bite at the apple to make up for their mistake by attempting to evade attorney-client privilege to get answers to questions they failed to ask.

## **CONCLUSION**

The Committee fails to establish cause to justify the relief sought in the Motion and for the foregoing reasons the Court should deny the Motion.

*[Remainder of page left intentionally blank]*

Dated: June 13, 2023
New York, New York

Respectfully submitted,
*/s/ Margaret A. Dale*

Martin J. Bienenstock
Paul V. Possinger
Ehud Barak
Margaret A. Dale
Laura Stafford
(Admitted *Pro Hac Vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Attorneys for the Financial Oversight and
Management Board, as Title III representative
for PREPA*

*/s/ Hermann D. Bauer*

Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel: (787) 764-8181
Fax: (787) 753-8944

*Co-Attorneys for the Financial
Oversight and Management Board, as Title III
representative for PREPA*

19

## CERTIFICATE OF SERVICE

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notifications of such filing to all CM/ECF participants in this case.

*/s/ Hermann D. Bauer*
Hermann D. Bauer