# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17-BK-4780-LTS<br><br>(Jointly Administered)<br><br>Re: ECF No. 3580 |
| UNIÓN DE TRABAJADORES DE LA INDUSTRIA ELÉCTRICA Y RIEGO,<br><br>Movant,<br><br>v.<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Respondent. | |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19- BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**DEBTOR'S OPPOSITION TO UTIER'S MOTION IN LIMINE TO EXCLUDE EXPERT
<u>TESTIMONY OF GLENN R. GEORGE</u>**

## <u>TABLE OF CONTENTS</u>

**<u>Page</u>**

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND .......................................................................................................... 3

LEGAL STANDARD .................................................................................................. 4

ARGUMENT ............................................................................................................... 7

I.     ALL ATTEMPTS TO EXCLUDE DR. GEORGE'S TESTIMONY FAIL BECAUSE THEY GO TO WEIGHT AND NOT ADMISSIBILITY.................................................. 9

     A.     Mere Disagreement Between Expert Witnesses Does Not Justify Exclusion ........ 9

     B.     The Sources and Methods Used by Dr. George Were Reliable, and Exclusion is Therefore Inappropriate.................................................................................. 11

CONCLUSION ........................................................................................................... 15

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<span style="font-variant:small-caps">CASES</span>

*58 Swansea Mall Dr., LLC v. Gator Swansea Prop.*,
  LLC, No. 15-13538-RGS, 2017 WL 9885338 (D. Mass. Sept. 20, 2017) ..............................5

*Bradley v. Sugarbaker*,
  809 F.3d 8 (1st Cir. 2015)........................................................................................................4

*City of Chi. v. Westchester Fire Ins. Co.*,
  No. 08 C 5535, 2010 WL 3516066 (N.D. Ill. Sept. 1, 2010)..................................................11

*Cox v. Zurn Pex, Inc. (In re Zurn Pex Plumbing Prods. Liab. Litig.)*,
  644 F.3d 604 (8th Cir. 2011) ....................................................................................................5

*Cusack v. BendPak, Inc.*,
  No. 4:17-cv-00003-DCN, 2018 WL 3939318 (D. Idaho Aug. 15, 2018)...............................11

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)...................................................................................................................5

*Feliciano-Hill v. Principi*,
  439 F.3d 18 (1st Cir. 2006)............................................................................................9, 10, 11

*Holbrook v. Lykes Bros. S.S. Co.*,
  80 F.3d 777 (3d Cir. 1996).......................................................................................................10

*In re Mushroom Direct Purchaser Antitrust Litig.*,
  No. 06-0620, 2015 WL 5767415 (E.D. Pa. July 29, 2015) ......................................................9

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999)...........................................................................................................4, 5, 6

*Lawes v. CSA Architects & Eng'rs LLP*,
  963 F.3d 72 (1st Cir. 2020).......................................................................................................6

*Lightfoot v. MXEnergy Elec., Inc. (In re MBS Mgmt. Servs., Inc.)*,
  690 F.3d 352 (5th Cir. 2012) ....................................................................................................5

*Marrero-Rolon v. Autoridad de Energia Electrica*,
  No. 15-1167 (JAG), 2018 WL 8805485 (D.P.R. Sept. 10, 2018) ............................................5

*Provanzano v. MTD Prods. Co.*,
  No. 15-11720-NMG, 2016 WL 6089685 (D. Mass. Oct. 17, 2016)........................................12

*Rivera Romero v. Inspira Behav. Care*,
   No. 16-2721 (CVR), 2020 WL 402274 (D.P.R. Jan. 23, 2020) ...........................................7, 8

*Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*,
   161 F.3d 77 (1st Cir. 1998)..............................................................................................12

*United States ex rel. Jones v. Brigham & Women's Hosp.*,
   678 F.3d 72 (1st Cir. 2012)................................................................................................6

*United States v. Brown*,
   415 F.3d 1257 (11th Cir. 2005) ........................................................................................5

*United States v. Martinez-Armestica*,
   846 F.3d 436 (1st Cir. 2017)..............................................................................................5

**STATUTES & RULES**

48 U.S.C. §§ 2101–2241 ...........................................................................................................1

PROMESA § 106(e) ...............................................................................................................1, 9

Fed. R. Civ. P. 26(a)(2)(B) ....................................................................................................3, 4

Fed. R. Evid. 702 ................................................................................................................4, 5, 6

**To the Honorable United States District Court Judge Laura Taylor Swain:**

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"),

as the sole Title III representative of the Puerto Rico Electric Power Authority ("PREPA," or the

"Debtor"), pursuant to Section 315(b) of the *Puerto Rico Oversight, Management, and Economic*

*Stability Act* ("PROMESA"),[2] respectfully submits this opposition (the "Opposition") to the Unión

de Trabajadores de la Industria Eléctrica y Riego's ("UTIER") *Motion in Limi[n]e to Exclude*

*Expert Testimony of Glenn R. George* [ECF No. 3573][3] (the "Motion"), and respectfully states as

follows:

**PRELIMINARY STATEMENT**

1.      The Oversight Board intends to offer the expert testimony of Dr. Glenn George in

connection with PREPA's confirmation.  The Oversight Board appreciates that UTIER believes

PREPA's unmet capital needs and fragile infrastructure show PREPA cannot afford to allocate

additional charges to repay unsecured debt.  (*See* Mot. ¶ 25).  UTIER is certainly entitled to argue

at confirmation that creditors are being paid too much once PREPA's antiquated and inefficient

equipment is considered.  That, however, is a different issue than whether Dr. George's expertise

in the utility rate setting is admissible.  The setting of rates by public authorities is a complex

undertaking, and Dr. George's expertise in the process and knowledge of the relevant concerns is

certainly helpful.  UTIER's disagreement with Dr. George's reliance on the certified fiscal plan

and the fiscal plan's substance, does not render Dr. George's report inadmissible, especially in

view of PROMESA § 106(e).

2.      Among other things, Dr. George intends to testify the methodology used to

---

[2] PROMESA is codified at 48 U.S.C. §§ 2101–2241.

[3] Docket references contained herein shall refer to the docket for Case No. 17-4780 unless
otherwise specified.

determine the Revenue Envelope and the Legacy Charge was appropriate.[4]  Dr. George is well

qualified to offer these opinions.  Since he obtained his PhD in Public Policy from Harvard

University,[5] Dr. George has worked continuously for 28 years as an economic consultant, advisor,

and expert in the energy section.  His past work includes working on behalf of utility companies,

public utility commissions, investors, creditors, litigants, intervenors, and government agencies in

the arenas of utility ratemaking, cost recovery, and associated financial projections.

3.     UTIER has filed a limited motion to exclude the anticipated testimony of Dr.

George.  Likely recognizing Dr. George is well-qualified to offer the opinions expressed in his

initial report, UTIER does not challenge Dr. George's qualifications.  Beyond this, UTIER does

not challenge the majority of the opinions Dr. George gives in his report.  In fact, UTIER only

challenges three of Dr. George's opinions: (1) the reasonableness of the Fiscal Plan's (defined

below) fuel forecast; (2) the affordability analysis underlying the Revenue Envelope and Legacy

Charge; and (3) the ability of PREPA to continue to operate with the imposition of the Legacy

Charge.

4.     None of the challenges UTIER raises bears on admissibility.  Indeed, each

challenge advocates for the exclusion of Dr. George's testimony merely because UTIER's expert

disagrees with Dr. George.  Disagreement between expert witnesses can never serve as a basis to

exclude expert testimony.  This alone is fatal to UTIER's Motion.  But UTIER's Motion suffers

from additional defects.  It seeks to exclude expert testimony in view of Dr. George's (1) alleged

---

[4] The "Revenue Envelope" and "Legacy Charge" shall have the meaning ascribed to them in the
*Modified Second Amended Title III Plan of Adjustment of the Puerto Rico Electric Power
Authority* [ECF No. 3296] (as it may be amended, modified, or supplemented, the "Plan").

[5] Prior to his PhD, Dr. George received a bachelor's degree in mechanical engineering from Cornell
University and then a master's degree in business administration from the same university.

failure to consider certain variables, (2) unexpressed opinion as to the affordability analysis underlying the Legacy Charge, and (3) opinion that PREPA will be able to continue to operate with the imposition of the Legacy Charge.  These arguments do not go to whether Dr. George's anticipated testimony is admissible, but instead relate to the weight Dr. George's opinion will be given by the trier of fact.

5.    UTIER's Motion should be denied.

## **BACKGROUND**

6.    On March 1, 2023, the Oversight Board filed the Plan.  Following submission of the Plan, and as subsequently amended, the Court established a schedule and procedures relating to confirmation of the Plan, including a timeline for parties to file preliminary witness lists.  *See Third Amended and Restated Order Establishing, Among Other Things, Procedures and Deadlines Concerning Objections to Confirmation and Discovery in Connection Therewith* [ECF No. 3565] (the "Confirmation Procedures Order").

7.    Pursuant to the Confirmation Procedures Order, parties in interest seeking to proffer expert testimony at the confirmation hearing on the Plan were required to file opening expert disclosures by April 14, 2023 and opening expert reports on or before April 28, 2023. Confirmation Procedures Order ¶¶ 24-25.  In accordance with the Confirmation Procedures Order, on April 14, 2023, PREPA filed the *Debtor's Identification of Expert Witnesses* [ECF No. 3394] (the "Identification of Experts").  Therein, PREPA identified that Dr. Glenn George may provide opinion testimony pursuant to Fed. R. Civ. P. 26(a)(2)(B).  Identification of Experts ¶ 1(a).

8.    Specifically, PREPA identified that "Dr. George may provide testimony regarding (i) the methodology applied by the Oversight Board in determining the Legacy Charge incorporated in the Plan of Adjustment for the Puerto Rico Electric Power Authority (as it may be

3

amended, modified, or supplemented, the 'Plan'), (ii) the reasonableness of the Legacy Charge in balancing stakeholder interests and risks, and (iii) the consistency of the Legacy Charge and the methodology used to determine the Legacy Charge with principles of just and reasonable rates." *Id.*

9.      Thereafter, in accordance with the Confirmation Procedures Order, on April 28, 2023, PREPA filed the *Debtor's Opening Expert Report and Disclosures* [ECF No. 3418] (the "Opening Expert Reports"). Therein, the Debtor submitted the *Expert Report of Glenn R. George, MBA, PE, PhD* [ECF No. 3418-1] (the "George Report").

10.     On June 2, 2023, UTIER filed the Motion seeking to exclude the expert testimony of Dr. George.[6]

## **LEGAL STANDARD**

11.     Federal Rule of Evidence 702 governs the admission of expert testimony and permits experts qualified by their "knowledge, skill, experience, training, or education" to testify where their "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *see, e.g., Bradley v. Sugarbaker*, 809 F.3d 8, 16 (1st Cir. 2015). Rule 702 requires that "the testimony be (1) based upon sufficient facts or data, (2) the product of reliable principles and methods, and (3) that the witness apply the principles and methods reliably to the facts of the case." *Bradley*, 809 F.3d at 16 (quotation marks omitted).

12.     The Court has broad discretion to permit expert testimony. See *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999) ("[T]he law grants a district court the same broad latitude

---

[6] Dr. George also submitted a rebuttal expert report. *See Rebuttal Report of Glenn R. George, MBA, PE, PHD*, ECF No. 3504-3. UTIER has only moved to exclude Dr. George's anticipated testimony as it relates to the initial George Report.

when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination."). Where a court sits as factfinder, "[m]ost of the safeguards provided for in [*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)] are not as essential . . . ." *Lightfoot v. MXEnergy Elec., Inc. (In re MBS Mgmt. Servs., Inc.)*, 690 F.3d 352, 357-58 (5th Cir. 2012) (quotation marks omitted). Thus, a "cautious approach [to exclusion under *Daubert*] is even more warranted in a bench trial." *58 Swansea Mall Dr., LLC v. Gator Swansea Prop.*, LLC, No. 15-13538-RGS, 2017 WL 9885338, at *1 (D. Mass. Sept. 20, 2017) (citing *Cortes-Irizarry v. Corporacion Insular de Seguros*, 111 F.3d 184, 188 (1st Cir. 1997)).[7]

13.     Rule 702 "'establishes a standard of evidentiary reliability'" for expert testimony regardless of whether the testimony concerns scientific, technical, or other specialized knowledge. *Kumho*, 526 U.S. at 149 (quoting *Daubert*, 509 U.S. at 589-90). Where proffered expert testimony pertains to "specialized knowledge rather than scientific expertise, the 'expert's experience and training bear a strong correlation to the reliability of the expert's testimony.'" *United States v. Martinez-Armestica*, 846 F.3d 436, 444 (1st Cir. 2017) (quoting *United States v. Jones*, 107 F.3d 1147, 1155 (6th Cir. 1997)); see also Fed. R. Evid. 702 Advisory Committee's Note to 2000 Amendments ("In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."); *Kumho*, 526 U.S. at 150 (in cases involving technical or other specialized knowledge, "the relevant reliability concerns may focus upon personal knowledge or

---

[7] *See also Cox v. Zurn Pex, Inc. (In re Zurn Pex Plumbing Prods. Liab. Litig.)*, 644 F.3d 604, 613 (8th Cir. 2011) ("[t]he main purpose of Daubert exclusion is to protect juries from being swayed by dubious scientific testimony," so a "less stringent application of Daubert in bench trials" is appropriate); *United States v. Brown*, 415 F.3d 1257, 1268 (11th Cir. 2005) (Daubert has relaxed application to bench trials "where the judge is serving as factfinder and we are not concerned about 'dumping a barrage of questionable scientific evidence on a jury'" (citing *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1310 (11th Cir. 1999)); *Marrero-Rolon v. Autoridad de Energia Electrica*, No. 15-1167 (JAG), 2018 WL 8805485, at *2 (D.P.R. Sept. 10, 2018) (same).

experience"). Accordingly, "[i]f a witness relies primarily on experience, she must 'explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" *United States ex rel. Jones v. Brigham & Women's Hosp.*, 678 F.3d 72, 94 (1st Cir. 2012) (quoting Fed. R. Evid. 702 Advisory Committee's Note).

14.     Rule 702, however, concerns only admissibility; courts are not permitted to weigh the evidence, evaluate credibility, or choose between competing expert opinions to evaluate admissibility under *Daubert*. *Lawes v. CSA Architects & Eng'rs LLP*, 963 F.3d 72, 98 (1st Cir. 2020) (courts "must stop short of weighing the evidence, evaluating credibility, or unnecessarily picking sides in a battle between experts").  And although courts must evaluate the sufficiency of information underlying an expert's opinion, "Rule 702 does not demand that experts rely on all data that could be deemed relevant," because that inquiry "affect[s] the weight and credibility of [the] testimony" rather than its admissibility. Id. at 101-02 (citation omitted).

15.     For the same reason, "district courts must not 'unduly scrutinize[] the quality of the expert's data'" at the *Daubert* stage.  *Id.* at 99 (quoting *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013)). "[T]he mere 'existence of other methods of gathering facts does not mean that the facts [the expert] relied upon were insufficient'" or that the methods he or she employed were unreliable. *Lawes*, 963 F.3d at 104 (quoting *Packgen v. Berry Plastics Corp.*, 847 F.3d 80, 86-87 (1st Cir. 2017)).  Only "where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question" must the Court determine whether the testimony "has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho*, 526 U.S. at 149 (quoting *Daubert*, 509 U.S. at 592).

16.     Thus, "[a] review of the case law after Daubert shows that the rejection of expert

testimony is the exception, rather than the rule." *Rivera Romero v. Inspira Behav. Care*, No. 16-2721 (CVR), 2020 WL 402274, at *1 (D.P.R. Jan. 23, 2020).

## ARGUMENT

17.     The George Report analyzes the methodology applied by the Brattle Group ("Brattle") in determining the Legacy Charge supporting the Plan.  Specifically, Dr. George opines on (i) whether the Legacy Charge provides PREPA's creditors with reasonable recoveries on their claims given PREPA's need to continue its operations, as well as the burden on ratepayers and the Puerto Rico economy of increased rates; (ii) whether the methodology used by Brattle to determine the Legacy Charge is appropriate; and (iii) whether the design of the Legacy Charge is consistent with principles of just and reasonable rates.  (George Report ¶ 8).  To be clear, the Oversight Board is not submitting Dr. George' report as evidence the creditors' recovery satisfies confirmation requirements.  Rather, the report is submitted to help prove from a rate maker's perspective, the many factors to consider are appropriately balanced, one of which is whether creditors are treated fairly for ratemaking purposes.

18.     Dr. George is currently a partner at Bates White, an economic consulting firm specializing in economic, financial, and econometric analysis.   Dr. George has extensive experience as an economic consultant, advisor, and expert in the energy sector, with an ongoing focus on debt financing, financial modeling, and utility rate design.  (*Id.* ¶ 2).  He has worked on behalf of utility companies, public utility commissions, investors, creditors, litigants, intervenors, and government agencies in the areas of utility ratemaking, cost recovery, and associated financial projections.  (*Id.*)  Dr. George also spent several years as Co-Head of the International Energy Capital Markets group at Nomura Securities, a Japanese securities firm, where he was responsible for originating, structuring, and underwriting fixed-income securities in the electric utility industry

and broader energy sector globally.  (*Id.*)

19.     As the George Report describes, Puerto Rico's electric grid is one of the least reliable and most expensive for customers among all U.S. states and territories, with PREPA customers receiving the lowest quality and least reliable service in the U.S. while also paying rates well above the U.S. average.  (*Id.* ¶¶ 16-19).  PREPA also requires substantial capital investments in its generation, transmission, and distribution assets, but its ability to do so is hindered by its debt burden, operational needs, and the already high burden on its customer base.  (*See id.* ¶¶ 20-27 (discussing the factors leading to PREPA's high costs and poor service, including expensive fuel costs, historical underinvestment, and devastation from hurricanes); *id.* ¶¶ 28-30 (discussing the effects of PREPA's debt burden and the narrow margin for increasing rates on customers to service its debt, operational expenses, and capital expenses)).

20.     Within this context, and given his experience, Dr. George analyzed the Oversight Board's approach in designing the Legacy Charge that attempts to maximize recoveries to PREPA's legacy creditors.  Dr. George concluded that the Oversight Board's approach for deriving the Legacy Charge and reliance on the Revenue Envelope (a calculation of the upper bound of incremental revenues that could be generated) was logical and reasonable.  (*See id.* ¶¶ 36-42 (concluding that the Revenue Envelope effectively establishes the upper bound of affordability for a typical PREPA residential customer's monthly electricity bill and is based upon reasonable assumptions); *id.* ¶¶ 43-68 (concluding that the Legacy Charge rate design balances the need to raise additional revenues while mitigating the reduction in sales due to rate increases)).  Additionally, Dr. George concluded that the Legacy Charge Model, which was used to calculate the Legacy Charge rates, was methodologically sound and the Legacy Charge rates would generate $5.68 billion in net present value terms.  (*See id.* ¶¶ 85-92 (concluding further that the Legacy

Charge rates are appropriately tailored to account for the circumstances and ability to pay of different classes of customers)).

21.     As best as the Oversight Board can discern, it appears UTIER seeks to exclude Dr. George's testimony because the George Report (1) is at odds with the opinions of UTIER's expert; and (2) allegedly offers opinions without sufficient support.  For the reasons discussed below, UTIER's limited challenges are without merit.[8]

## I.     ALL ATTEMPTS TO EXCLUDE DR. GEORGE'S TESTIMONY FAIL BECAUSE THEY GO TO WEIGHT AND NOT ADMISSIBILITY

### A.     <u>Mere Disagreement Between Expert Witnesses Does Not Justify Exclusion.</u>

22.     Each of UTIER's arguments impermissibly contends that Dr. George's anticipated testimony should be excluded because UTIER's expert disagrees with Dr. George.  This "battle of the experts" argument may go to the weight the trier of fact will ultimately assign to an expert's testimony, but it does not present a sufficient basis to exclude expert testimony.

23.     As the First Circuit has stated, "[t]he mere fact that two experts disagree is not grounds for excluding one's testimony."  *Feliciano-Hill v. Principi*, 439 F.3d 18, 25 (1st Cir.

---

[8] UTIER also argues Dr. George's testimony should be excluded because it is impermissibly based on PREPA's 2022 Fiscal Plan (the "<u>Fiscal Plan</u>").  (*See* Motion ¶ 16).  It appears that UTIER is specifically seeking to challenge the Oversight Board's instruction to Dr. George "that [] [PROMESA] imposes the 2022 Fiscal Plan regardless of other parties' objections."  (*Id.* ¶ 16 (quoting George Report at 9)).  This argument fails for two reasons.  First, the fact that Dr. George was provided instructions to make certain assumptions is not a basis to exclude his anticipated testimony.  Indeed, "[c]ourts have found that most contentions that expert assumptions are unfounded go to the weight, not the admissibility, of the testimony, and a district court has discretion . . . to determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony."  *In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06-0620, 2015 WL 5767415, at *6 (E.D. Pa. July 29, 2015) (citation omitted).  Second, this argument appears to attack the validity of the Fiscal Plan itself.  However, as explained in *Debtor's Motion in Limine to Exclude Evidence Challenging Oversight Board's Certification Determinations*, ECF No. 3581 (the "<u>Debtor's Motion in Limine</u>"), PROMESA § 106(e) expressly bars judicial review of the Oversight Board's certification decisions.  *See generally* Debtor's Motion in Limine.

2006).   In *Feliciano-Hill*, for example, the party seeking exclusion argued a doctor's expert testimony should be excluded because it differed from the expert opinion of the moving party and because the expert's "report did not 'cite[] medical authorities and w[as] based on 'experience' and general knowledge." *Id.*   Affirming the district court's denial of a motion to exclude the expert, the First Circuit reasoned that mere disagreement between competing experts is not a basis for excluding one expert.   "Even if we were to assume that [the moving party's expert] was somehow more qualified than [than the other expert] . . . the district court could not have excluded [the expert's] testimony on that ground alone." *Id.*; *see also Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996) ("[W]itnesses may be competent to testify as experts even though they may not, in the court's eyes, be the 'best' qualified. Who is 'best' qualified is a matter of weight upon which reasonable jurors may disagree.").

24.   Examining each purported flaw UTIER identified in the George Report proves every challenge UTIER has raised goes to the weight of Dr. George's anticipated testimony—not its admissibility.   First, UTIER argues the Fiscal Plan's fuel forecast "fails to include a significant material component to EIA prices, which is the correct natural gas contract price[] adders." (Motion ¶ 18).   The basis for UTIER's argument derives entirely from the opinion of its expert, Mr. Thomas Sanzillo, who generally opines that the Energy Information Agency ("EIA") prices fail to account for the cost of fuel delivery to Puerto Rico.   (*Id.* ¶¶ 19-21).   Put differently, UTIER does not challenge the methods underlying the George Report, but instead asks the Court to exclude Dr. George's anticipated testimony because he advances an opinion contrary to UTIER's expert.   That is not a sufficient basis to exclude an expert witness's testimony.   *See, e.g.*, *Feliciano-*

10

*Hill*, 439 F.3d at 25.[9]

25.      UTIER's other purported issues with the George Report, and by extension Dr. George's anticipated testimony, suffer from the same fatal flaw.  The next challenge UTIER mounts against the George Report is that it "does not support the notion that the Legacy Charge is affordable to non-residential customers, despite affirming so."  (Motion ¶ 23).  UTIER's only basis for suggesting an affordability analysis for non-residential customers is necessary seemingly comes from the anticipated testimony of Mr. Sanzillo.  (*See id.* ¶ 24 (implying that an affordability analysis as to commercial and industrial customers is mandatory because Mr. Sanzillo faults Dr. George for "ignor[ing] the impact of rate increases on commercial and industrial customers . . . ." (quoting Rebuttal Report of Thomas Sanzillo at 8:132))).  Finally, UTIER appears to argue the George Report fails to adequately establish the Legacy Charge will permit the future sustainability of PREPA as a going concern, Mot. ¶ 25, while Mr. Sanzillo opines the Legacy Charge will threaten PREPA's existence as functioning utility.  But again, the law is well-settled that Mr. Sanzillo's belief regarding the Legacy Charge's impact on PREPA's operations does not justify the exclusion of Dr. George's anticipated testimony.  *See, e.g.*, *Feliciano-Hill*, 439 F.3d at 25; *see also supra* ¶ 23 n. 9 (collecting cases).

**B.     The Sources and Methods Used by Dr. George Were Reliable, and Exclusion is Therefore Inappropriate**

26.      UTIER's arguments fail for additional reasons. First, as to the fuel forecast

---

[9]*See also Cusack v. BendPak, Inc.*, No. 4:17-cv-00003-DCN, 2018 WL 3939318, at *11 (D. Idaho Aug. 15, 2018) (denying motion to exclude expert opinion "simply because it differs from other expert opinions" and reasoning "this is a classic battle of the experts which must play out at trial before a jury where cross-examination and exploration can take place."); *City of Chi. v. Westchester Fire Ins. Co.*, No. 08 C 5535, 2010 WL 3516066, at *5 (N.D. Ill. Sept. 1, 2010) ("The 'battle of the experts' the City attempts to engage in with its motion to exclude Dr. Stringfellow is more properly undertaken at trial in pitting Dr. Stringfellow's and Professor Geiger's opinions against each other.").

argument, the George Report concludes "PREPA's fuel price forecasting methodology is reasonable and appropriate in the context within which it is used." (George Report ¶ 111). In reaching this conclusion, Dr. George compared the fuel price forecasts in the 2022 Fiscal Plan against forecasts for analogous fuel types from the 2022 US EIA Annual Energy Outlook ("AEO"). (*Id.* ¶ 107; *see also id.* at Appendix C). The comparison showed PREPA's forecasts were higher than EIA's forecasts for liquified natural gas ("LNG") and coal and lower than the forecasts for residual fuel oil and diesel. (*Id.* ¶ 107). After noting that natural gas was PREPA's most-used fuel source in 2021, Dr. George concluded a slightly higher LNG price forecast is conservative—but conservatism is appropriate under these circumstances because underestimation of fuel costs would increase the burden borne by ratepayers and therefore impact affordability. (*Id.* ¶ 108).

27.    UTIER does not attack the sources or methods underpinning the George Report's opinion of the Fiscal Plan's fuel forecasting, and to the contrary, Mr. Sanzillo relies on many of the same fuel price indices. UTIER's principal attack on Dr. George's opinion regarding fuel forecasting is that it fails to consider certain contract adders that Mr. Sanzillo believes are necessary to forecast fuel prices. (Motion ¶¶ 16-22). But, "failure to consider particular variables or to use certain methods is not fatal to an expert's testimony." *Provanzano v. MTD Prods. Co.*, No. 15-11720-NMG, 2016 WL 6089685, at *2 (D. Mass. Oct. 17, 2016); *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998) ("As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process—competing testimony and active cross-examination[.]" (citation omitted)). Put differently, UTIER will have the opportunity to cross examine Dr. George regarding his opinion regarding the reasonableness of the Fiscal Plan's fuel forecasts, but wholesale exclusion of Dr. George's anticipated testimony is improper simply because Dr. George might have relied on

different variables than Mr. Sanzillo.

28.     Next, UTIER argues the George Report does not consider whether the Legacy
Charge is affordable to non-residential customers, "despite affirming so." (Motion ¶ 23).  This
misstates the George Report.  Dr. George analyzed the reasonableness of the principles underlying
the Revenue Envelope and Legacy Charge.  The only affordability analysis encompassed in these
models is the affordability of electricity for a typical *residential* PREPA customer, *i.e.*, the median
income household in Puerto Rico.  (*See, e.g.*, George Report ¶ 39).  In other words, Dr. George
offers no opinion regarding the affordability of the Legacy Charge for non-residential PREPA
customers, but rather the George Report opines on whether the Revenue Envelope and Legacy
Charge "diverge[s] from the practices generally applied in the field of utility ratemaking." (*Id.* ¶
13).  To the extent UTIER challenges the reliability of the George Report because it does not offer
such an opinion, UTIER will have ample opportunity to cross-examine Dr. George on that topic.[10]

29.     Finally, UTIER claims "Dr. George states that the revenue envelope calculation
aimed to arrive at a rate that 'does not threaten the sustainability of PREPA as a functioning
utility.'" (Motion ¶ 25 (quoting Rebuttal Report of Mr. Thomas Sanzillo at 8:132)).  And then it
faults Dr. George for allegedly failing to demonstrate the Revenue Envelope and Legacy Charge
"comports with this additional affordability goal." (*Id.* ¶ 25).

30.     In making this argument, UTIER does not reference any opinion of Dr. George's,
but instead partially quotes Exhibit P of the *Disclosure Statement for Second Amended Title III*

---

[10] To the extent UTIER is suggesting that any expert analysis regarding the reasonableness of
utility rates charged to commercial and industrial customers must include an affordability analysis,
UTIER's argument fails.  Noticeably absent from UTIER's Motion is any scientific evidence,
studies, or academic literature supporting the notion that electric utility companies are required to
conduct an affordability analysis on all customer classes when determining appropriate rates (or
portions of rates, such as the Legacy Charge).

*Plan of Adjustment of the Puerto Rico Electric Power Authority*, ECF No. 3279.  *See Legacy Charge Derivation*, ECF No. 3279-16 at 4 ("Any increase in PREPA's rates, including the Legacy Charge, cannot exceed the conceptual upper bound of affordability: the total rate that PREPA customers can pay without [, among other things,] . . .  threatening the sustainability of PREPA as a functioning utility . . . .").

31.     Nonetheless, the George Report recognizes that when the Oversight Board estimated the Revenue Envelope, it "took into consideration a number of factors, including customers' willingness and ability to pay higher rates, and the future sustainability of PREPA as a going concern."  (George Report ¶ 32).  And the George Report's analysis of the Revenue Envelope considers the future revenues PREPA will have to generate because of the reduced consumption caused by the higher Legacy Charge rates, *i.e.*, the effect of the price elasticity of demand.  (*Id.* ¶ 78).  The George Report expressly recognizes the Legacy Charge will cause PREPA customers to reduce their consumption, which in turn will result in decreased future revenues.  (*Id.*).  To ensure that PREPA will still have sufficient revenues to meet its fixed and variable operating costs, Dr. George opines it was reasonable for the Revenue Envelope to be reduced by the net present value of approximately $812 million.  In other words, the George Report recognizes the imposition of the Legacy Charge will reduce PREPA's revenues due to customers' reduced consumption, and accounts for this by reducing the Revenue Envelope such that PREPA will be able to raise rates to cover future operating costs in the future.[11]  Thus, contrary to UTIER's

---

[11] *See, e.g.*, George Report ¶ 78 ("The Revenue Envelope Model anticipates that PREPA will need to address Fixed Cost Underrecovery due to the effect of the price elasticity of demand (*i.e.*, reduced consumption caused by the higher Legacy Charge rates). PREPA's variable costs will decline with a reduction in consumption, but PREPA's fixed costs would remain materially constant whether consumption increases or decreases. PREPA's fixed costs would then be spread over a smaller revenue base. With declining sales as a result of increased rates, PREPA would have less revenue available to pay for its fixed costs, including for example fixed operation and

assertion, the George Report does consider how the Legacy Charge will impact PREPA's ability to cover its operating expenses.  To the extent UTIER disagrees with Dr. George's conclusions, it will have an opportunity to cross-examine Dr. George on the subject.  Exclusion of Dr. George's anticipated testimony, however, is not warranted.

## **CONCLUSION**

32.      For the foregoing reasons, the Court should deny the Motion.


*[Remainder of Page Intentionally Left Blank]*

---

maintenance [] expenses. This necessitates a marginal increase in rates to cover the underrecovered portion of fixed costs and ultimately to meet PREPA's original revenue requirement as defined in the 2022 Fiscal Plan.").

Dated: June 13, 2023
New York, New York

Respectfully submitted,

/s/ Margaret A. Dale

Martin J. Bienenstock
Paul V. Possinger
Ehud Barak
Margaret A. Dale
Michael T. Mervis
Julia D. Alonzo
Laura Stafford
Javier F. Sosa
(Admitted *Pro Hac Vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

*Attorneys for the Financial Oversight and
Management Board, as representative for
PREPA*

/s/ Hermann D. Bauer

Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944

*Co-Attorneys for the Financial
Oversight and Management Board, as
representative for PREPA*

16

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notifications of such filing to all CM/ECF participants in this case.

*/s/ Hermann D. Bauer*
Hermann D. Bauer
