**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17-BK-4780-LTS<br><br>(Jointly Administered)<br><br>Re: ECF No. 3580 |
| SISTEMA DE RETIRO DE LOS EMPLEADOS DE LA AUTORIDAD DE ENERGÍA ELÉCTRICA,<br>Movant,<br><br>v.<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br>Respondent. | |

---

[1]  The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19- BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**DEBTOR'S OPPOSITION TO SREAEE'S MOTION IN LIMINE TO EXCLUDE EXPERT
<u>TESTIMONY OF GLENN R. GEORGE</u>**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ................................................................................................. 2

LEGAL STANDARD ........................................................................................... 4

ARGUMENT ...................................................................................................... 6

I.    THE MOTION TO EXCLUDE DR. GEORGE'S TESTIMONY SHOULD BE
DENIED ................................................................................................. 6

    A.    SREAEE'S Challenges to Dr. George's Methodology Fail ................................. 9

    B.    Whether Dr. George Considered Additional Data Relied Upon by SREAEE's
Expert Is Not a Basis for Excluding His Testimony ............................................. 13

CONCLUSION .................................................................................................. 15

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*58 Swansea Mall Dr., LLC v. Gator Swansea Prop.*,
  LLC, No. 15-13538-RGS, 2017 WL 9885338 (D. Mass. Sept. 20, 2017) ..............................4

*Bradley v. Sugarbaker*,
  809 F.3d 8 (1st Cir. 2015).................................................................................................4

*Cox v. Zurn Pex, Inc. (In re Zurn Pex Plumbing Prods. Liab. Litig.)*,
  644 F.3d 604 (8th Cir. 2011) .............................................................................................5

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993).........................................................................................................4

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods.
  Litig.*,
  509 F. Supp. 3d 116 (D.N.J. 2020) ...................................................................................13

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999)...........................................................................................4, 5, 6, 12

*Lawes v. CSA Architects & Eng'rs LLP*,
  963 F.3d 72 (1st Cir. 2020)....................................................................................6, 13, 14

*Lightfoot v. MXEnergy Elec., Inc. (In re MBS Mgmt. Servs., Inc.)*,
  690 F.3d 352 (5th Cir. 2012) .............................................................................................4

*Marrero-Rolon v. Autoridad de Energia Electrica*,
  No. 15-1167 (JAG), 2018 WL 8805485 (D.P.R. Sept. 10, 2018).............................................5

*McBroom v. Ethicon, Inc.*,
  No. CV-20-02127, 2021 WL 2709292 (D. Ariz. July 1, 2021)...............................................13

*Provanzano v. MTD Prods. Co.*,
  No. 15-11720-NMG, 2016 WL 6089685 (D. Mass. Oct. 17, 2016)........................................11

*Rivera Romero v. Inspira Behav. Care*,
  No. 16-2721 (CVR), 2020 WL 402274 (D.P.R. Jan. 23, 2020) ..........................................6, 7

*Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*,
  161 F.3d 77 (1st Cir. 1998).............................................................................................11, 14

*Unión de Trabajadores de la Industria Eléctrica y Riego, Inc. v. Commonwealth
  of Puerto Rico, et al.*,
  Case No. 17-ap-229, ECF No. 225 ...................................................................................12

ii

*United States ex rel. Jones v. Brigham & Women's Hosp.*,
    678 F.3d 72 (1st Cir. 2012) ...........................................................................................5

*United States v. Brown*,
    415 F.3d 1257 (11th Cir. 2005) ....................................................................................5

*United States v. Martinez-Armestica*,
    846 F.3d 436 (1st Cir. 2017) .........................................................................................5

*Zurich Ins. Co. v. Sunday River Skiway Corp.*,
    No. 08-325, 2010 WL 1511495 (D. Me. Apr. 15, 2010) ........................................12

## STATUTES & RULES

48 U.S.C. §§ 2101–2241 ...................................................................................................1

Fed. R. Civ. P. 26(a)(2)(B) .............................................................................................3

Fed. R. Evid. 702 ............................................................................................... passim

**To the Honorable United States District Court Judge Laura Taylor Swain:**

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"),

as the sole Title III representative of the Puerto Rico Electric Power Authority ("PREPA," or the

"Debtor"), pursuant to Section 315(b) of the *Puerto Rico Oversight, Management, and Economic

Stability Act* ("PROMESA"),[2] respectfully submits this opposition (the "Opposition") to the

Sistema de Retiro de los Empleados de la Autoridad de Energía Eléctrica's ("SREAEE") *Motion

in Limine to Exclude Expert Testimony of Glenn R. George* [ECF No. 3571][3] (the "Motion"), and

respectfully states as follows:

### PRELIMINARY STATEMENT

1.      The logical extension of SREAEE's Motion is that a court can never hear experts

espousing contrary conclusions because before trial it should exclude testimony of the expert

deploying the wrong principles.  Through the guise of a motion in *limine*, SREAEE presents to the

Court its (and its expert's) substantive disagreements with the conclusions of the Oversight

Board's expert, Dr. Glenn George.  Rather than rely on the adversarial process to make its case,

SREAEE seeks to exclude Dr. George's testimony on several bases, none of which meritoriously

challenges its admissibility, but if anything goes to its weight.

2.      *First*, SREAEE argues that Dr. George's methodology is unreliable and his

testimony inadmissible because it does not fully analyze the Legacy Charge's consistency with

certain principles of ratemaking introduced by Dr. George and does not employ a "scientific"

method.  *Second*, SREAEE argues that Dr. George's testimony is inadmissible because it fails to

account for different principles of ratemaking and other macroeconomic effects of the Legacy

---

[2]  PROMESA is codified at 48 U.S.C. §§ 2101–2241.

[3]  Docket references contained herein shall refer to the docket for Case No. 17-4780 unless
otherwise specified.

Charge relied upon by SREAEE's expert.

3.      The Court should see through these whisper thin attacks on the substance of Dr. George's testimony and deny the Motion.  SREAEE is wrong when it argues Dr. George's methodology is unreliable because he introduced certain principles of ratemaking but then failed to thoroughly analyze the Legacy Charge's consistency with each of them.  As Dr. George makes clear, those principles were merely one way by which he or the Court could analyze the reasonableness of the Legacy Charge and is not the methodology underlying his entire analysis.

4.      SREAEE also misstates the standard for admissibility when it suggests expert testimony is inadmissible unless the expert uses a "scientific" methodology.  Experts are not required to use particular methodologies or practices in coming to their conclusions.  Rather, the law requires only that expert testimony be evaluated based on reference to the particular field of the expert's "knowledge, skill, experience, training or education . . . ."  Fed. R. Evid. 702.

5.      SREAEE also is wrong when it faults Dr. George for not having relied on or analyzed *other* studies or data that SREAEE and its expert argue are relevant to the reasonableness of the Legacy Charge.  An expert's testimony is admissible if the expert relied on *sufficient* information of a kind an expert ordinarily would rely on or on their professional experience as a basis to reach conclusions, as Dr. George did.  Whether Dr. George should have accounted for other studies or data is a matter for the adversarial process—*i.e.*, competing testimony and cross-examination—and is not grounds for excluding his testimony.

## **BACKGROUND**

6.      On March 1, 2023, the Oversight Board filed the *Modified Second Amended Title III Plan of Adjustment of the Puerto Rico Electric Power Authority* [ECF No. 3296] (as it may be amended, modified, or supplemented, the "Plan").  Following submission of the Plan, and

2

as subsequently amended, the Court established a schedule and procedures relating to confirmation of the Plan, including a timeline for parties to file preliminary witness lists.  *See Third Amended and Restated Order Establishing, Among Other Things, Procedures and Deadlines Concerning Objections to Confirmation and Discovery in Connection Therewith* [ECF No. 3565] (the "Confirmation Procedures Order").

7.      Pursuant to the Confirmation Procedures Order, parties in interest seeking to proffer expert testimony at the confirmation hearing on the Plan were required to file opening expert disclosures by April 14, 2023 and opening expert reports on or before April 28, 2023. Confirmation Procedures Order ¶¶ 24-25.

8.      In accordance with the Confirmation Procedures Order, on April 14, 2023, the Debtor filed the *Debtor's Identification of Expert Witnesses* [ECF No. 3394] (the "Identification of Experts").  Therein, the Debtor identified that Dr. Glenn George may provide opinion testimony pursuant to Fed. R. Civ. P. 26(a)(2)(B).  Identification of Experts ¶ 1(a).

9.      Specifically, it identified that "Dr. George may provide testimony regarding (i) the methodology applied by the Oversight Board in determining the Legacy Charge incorporated in the Plan of Adjustment for the Puerto Rico Electric Power Authority (as it may be amended, modified, or supplemented, the 'Plan'), (ii) the reasonableness of the Legacy Charge in balancing stakeholder interests and risks, and (iii) the consistency of the Legacy Charge and the methodology used to determine the Legacy Charge with principles of just and reasonable rates." *Id.*

10.     Thereafter, in accordance with the Confirmation Procedures Order, on April 28, 2023, the Debtor filed the *Debtor's Opening Expert Report and Disclosures* [ECF No. 3418] (the "Opening Expert Reports").  Therein, the Debtor submitted the *Expert Report of Glenn R. George, MBA, PE, PhD* [ECF No. 3418-1] (the "George Report").

3

11.     On June 2, 2023, SREAEE filed the Motion seeking to exclude the expert testimony of Dr. George.[4]

## LEGAL STANDARD

12.     Federal Rule of Evidence 702 governs the admission of expert testimony and permits experts qualified by their "knowledge, skill, experience, training, or education" to testify where their "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702; *see, e.g., Bradley v. Sugarbaker*, 809 F.3d 8, 16 (1st Cir. 2015).  Rule 702 requires that "the testimony be (1) based upon sufficient facts or data, (2) the product of reliable principles and methods, and (3) that the witness apply the principles and methods reliably to the facts of the case." *Bradley*, 809 F.3d at 16 (quotation marks omitted).

13.     The Court has broad discretion to permit expert testimony.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999) ("[T]he law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination.").  Where a court sits as factfinder, "[m]ost of the safeguards provided for in [*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)] are not as essential . . . ." *Lightfoot v. MXEnergy Elec., Inc. (In re MBS Mgmt. Servs., Inc.)*, 690 F.3d 352, 357-58 (5th Cir. 2012) (quotation marks omitted).  Thus, a "cautious approach [to exclusion under *Daubert*] is even more warranted in a bench trial." *58 Swansea Mall Dr., LLC v. Gator Swansea Prop.*, LLC, No. 15-13538-RGS, 2017 WL 9885338, at *1 (D. Mass. Sept. 20, 2017) (citing *Cortes-Irizarry v.*

---

[4] Dr. George also submitted a rebuttal expert report.  ECF No. 3504-3.  SREAEE has only moved to exclude Dr. George's anticipated testimony as it relates to the initial George Report.

*Corporacion Insular de Seguros*, 111 F.3d 184, 188 (1st Cir. 1997)).[5]

14.     Rule 702 "'establishes a standard of evidentiary reliability'" for expert testimony regardless of whether the testimony concerns scientific, technical, or other specialized knowledge. *Kumho*, 526 U.S. at 149 (quoting *Daubert*, 509 U.S. at 589-90).  Where proffered expert testimony pertains to "specialized knowledge rather than scientific expertise, the 'expert's experience and training bear a strong correlation to the reliability of the expert's testimony.'"  *United States v. Martinez-Armestica*, 846 F.3d 436, 444 (1st Cir. 2017) (quoting *United States v. Jones*, 107 F.3d 1147, 1155 (6th Cir. 1997)); *see also* Fed. R. Evid. 702 Advisory Committee's Note to 2000 Amendments ("In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."); *Kumho*, 526 U.S. at 150 (in cases involving technical or other specialized knowledge, "the relevant reliability concerns may focus upon personal knowledge or experience").  Accordingly, "[i]f a witness relies primarily on experience, she must 'explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'"  *United States ex rel. Jones v. Brigham & Women's Hosp.*, 678 F.3d 72, 94 (1st Cir. 2012) (quoting Fed. R. Evid. 702 Advisory Committee's Note).

15.     Rule 702, however, concerns only admissibility; courts are not permitted to weigh the evidence, evaluate credibility, or choose between competing expert opinions to evaluate

---

[5] *See also Cox v. Zurn Pex, Inc. (In re Zurn Pex Plumbing Prods. Liab. Litig.)*, 644 F.3d 604, 613 (8th Cir. 2011) ("[t]he main purpose of *Daubert* exclusion is to protect juries from being swayed by dubious scientific testimony," so a "less stringent application of *Daubert* in bench trials" is appropriate); *United States v. Brown*, 415 F.3d 1257, 1268 (11th Cir. 2005) (*Daubert* has relaxed application to bench trials "where the judge is serving as factfinder and we are not concerned about 'dumping a barrage of questionable scientific evidence on a jury'" (citing *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1310 (11th Cir. 1999)); *Marrero-Rolon v. Autoridad de Energia Electrica*, No. 15-1167 (JAG), 2018 WL 8805485, at *2 (D.P.R. Sept. 10, 2018) (same).

admissibility under *Daubert*. *Lawes v. CSA Architects & Eng'rs LLP*, 963 F.3d 72, 98 (1st Cir. 2020) (courts "must stop short of weighing the evidence, evaluating credibility, or unnecessarily picking sides in a battle between experts"). And although courts must evaluate the sufficiency of information underlying an expert's opinion, "Rule 702 does not demand that experts rely on all data that could be deemed relevant," because that inquiry "affect[s] the weight and credibility of [the] testimony" rather than its admissibility. *Id.* at 101-02 (citation omitted).

16. For the same reason, "district courts must not 'unduly scrutinize[] the quality of the expert's data'" at the *Daubert* stage. *Id.* at 99 (quoting *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013)). "[T]he mere 'existence of other methods of gathering facts does not mean that the facts [the expert] relied upon were insufficient'" or that the methods he or she employed were unreliable. *Lawes*, 963 F.3d at 104 (quoting *Packgen v. Berry Plastics Corp.*, 847 F.3d 80, 86-87 (1st Cir. 2017)). Only "where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question" must the Court determine whether the testimony "has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho*, 526 U.S. at 149 (quoting *Daubert*, 509 U.S. at 592).

17. Thus, "[a] review of the case law after *Daubert* shows that the rejection of expert testimony is the exception, rather than the rule." *Rivera Romero v. Inspira Behav. Care*, No. 16-2721 (CVR), 2020 WL 402274, at *1 (D.P.R. Jan. 23, 2020).

## ARGUMENT

## I.  THE MOTION TO EXCLUDE DR. GEORGE'S TESTIMONY SHOULD BE DENIED.

18. Dr. George's expert report analyzes the methodology applied by the Brattle Group ("Brattle") in determining the Legacy Charge supporting the Plan. Specifically, Dr. George opines on (*i*) whether the Legacy Charge provides PREPA's creditors with reasonable recoveries on their

claims for rate-making purposes (not confirmation purposes) given PREPA's need to continue its operations, as well as the burden on ratepayers and the Puerto Rico economy of increased rates; (*ii*) whether the methodology used by Brattle to determine the Legacy Charge is appropriate; and (*iii*) whether the design of the Legacy Charge is consistent with principles of just and reasonable rates. (George Report ¶ 8.)

19.     Dr. George is currently a partner at Bates White, an economic consulting firm specializing in economic, financial, and econometric analysis. Dr. George has extensive experience as an economic consultant, advisor, and expert in the energy sector, with an ongoing focus on debt financing, financial modeling, and utility rate design. (*Id.* ¶ 2.) He has worked on behalf of utility companies, public utility commissions, investors, creditors, litigants, intervenors, and government agencies in the areas of utility ratemaking, cost recovery, and associated financial projections. (*Id.*) Dr. George also spent several years as Co-Head of the International Energy Capital Markets group at Nomura Securities, a Japanese securities firm, where he was responsible for originating, structuring, and underwriting fixed-income securities in the electric utility industry and in the broader energy sector globally. (*Id.*)

20.     As the George Report describes, Puerto Rico's electric grid is one of the least reliable and most expensive for customers among all U.S. states and territories, with PREPA customers receiving the lowest quality and least reliable service in the U.S. while also paying rates well above the U.S. average. (*Id.* ¶¶ 16-19.) PREPA requires substantial capital investments in its generation, transmission, and distribution assets, but its ability to do so is hindered by its debt burden, operational needs, and the already high burden on its customer base. (*See id.* ¶¶ 20-27 (discussing the factors leading to PREPA's high costs and poor service, including expensive fuel costs, historical underinvestment, and devastation from hurricanes); *Id.* ¶¶ 28-30 (discussing the

effects of PREPA's debt burden and the narrow margin for increasing rates on customers to service its debt, operational expenses, and capital expenses).)

21.     Within this context, and given his experience, Dr. George analyzed the Oversight Board's approach in designing a Legacy Charge that attempts to maximize recoveries to PREPA's legacy creditors in light of the burden such a charge would impose on Puerto Rico's ratepayers and its broader economy.  Dr. George concluded the Oversight Board's approach for deriving the Legacy Charge and its reliance on the Revenue Envelope (a calculation of the upper bound of incremental revenues that could be generated) was logical and reasonable.  (*See id.* ¶¶ 36-42 (concluding that the Revenue Envelope effectively establishes the upper bound of affordability for a typical PREPA residential household's monthly electricity bill and is based upon reasonable assumptions); *id.* ¶¶ 43-68 (concluding that the Legacy Charge rate design balances the need to raise additional revenues while mitigating the reduction in sales due to rate increases).) Additionally, Dr. George concluded that the Legacy Charge Model, which was used to calculate the Legacy Charge rates, was methodologically sound and the Legacy Charge rates would generate $5.68 billion in net present value terms.  (*See id.* ¶¶ 85-92 (concluding further that the Legacy Charge rates are appropriately tailored to account for the circumstances and ability to pay of different classes of customers).)

22.     Dr. George further concluded that the Legacy Charge is consistent with the principles of just and reasonable rates, which he explained are rates which allow the utility to be compensated for prudently incurred costs and the opportunity to earn a return on and of reasonably invested capital.  Dr. George noted that one way to determine whether rates are just and reasonable was to judge them against the eight "attributes of a sound rate structure" articulated by James C. Bonbright in his work *Principles of Public Utility Rates*, and Dr. George concluded that the Legacy

Charge presented no violation of any of the Bonbright principles or any divergence from practices generally applied in the field of utility ratemaking.  (*See id.* ¶¶ 93-98.)  Finally, Dr. George concluded that the Legacy Charge was appropriately calibrated to account for upside and downside risks, including by accounting for inherent uncertainties in the load, fuel price, and revenue forecasts that were incorporated into the Revenue Envelope and Legacy Charge Model.  (*See id.* ¶¶ 100-14.)

23.     SREAEE asserts Dr. George's testimony should be excluded because (*i*) Dr. George does not include an analysis of every one of the Bonbright principles when concluding that the Legacy Charge rates were just and reasonable and his analysis was not the product of a "scientific" method; and (*ii*) Dr. George fails to account for the principles propounded by Karl. R. Rábago and Radina Valova, two authors who SREAEE claims "updated" the Bonbright principles and for certain alleged macroeconomic effects of the Legacy Charge.  SREAEE is wrong in every respect. And in any event, SREAEE's arguments all go to the weight of Dr. George's opinions, not their admissibility.

**A.     SREAEE's Challenges to Dr. George's Methodology Fail.**

24.     SREAEE first argues that Dr. George "failed to demonstrate that the ratemaking principle [of just and reasonable rates] was tested or objectively assessed in the design of the Legacy Charge" and "he never expresses in a clear manner whether the eight individual attributes were met." (Mot. ¶ 18.)  SREAEE appears to contend that, because Dr. George referenced certain principles which assisted his evaluation, he was then required to "conduct a thorough analysis that includes all elements" (*id.* ¶ 23) and failure to do so renders his testimony unreliable.  SREAEE

cites no cases for this proposition.[6]  Even if such an analysis were required, SREAEE's arguments nevertheless fail because they go, if at all, to the weight that should be given to Dr. George's testimony, and not to its admissibility.

25.     SREAEE's argument fails at the first instance by misrepresenting Dr. George's incorporation of the Bonbright principles into his report.  SREAEE spends more than half its motion discussing the Bonbright principles and the extent to which Dr. George addressed each factor, arguing that Rule 702 requires a "thorough analysis" of "all elements laid out in the proposed methodology."  (*E.g.*, Mot. ¶¶ 22-23.)  But Dr. George never presents the Bonbright principles as the methodology underlying his entire analysis of the Legacy Charge and its supporting models.  Rather, Dr. George is clear that, *in addition to* all the other analysis he provides regarding the sound methodology underlying the Legacy Charge and its supporting models, the Legacy Charge also comports with the Bonbright principles.

26.     Indeed, in his discussion regarding whether the Legacy Charge was consistent with the principles of just and reasonable rates, Dr. George explained that "the concept of 'just and reasonable rates' has been left open to interpretation, oftentimes before legal or regulatory bodies" and is "typically informed by evidence and testimony submitted by stakeholders." (George Report ¶ 93.)  He further explained that the concept has been defined as rates "which allow the utility to be compensated for prudently incurred costs and the opportunity to earn a return on and of reasonably invested capital."  (*Id.*)  Dr. George then analyzed the constraints the Oversight Board faced when estimating the Legacy Charge, including the poor status of PREPA's assets, customer affordability, price elasticity of demand, and the recovery of unaccounted for current and future

---

[6] Indeed, other than cases setting out the relevant legal standard, SREAEE does not cite a single case in support of any of its arguments.

costs.  (*Id.*)  Taken together, Dr. George concluded that the Legacy Charge attempts to sustain PREPA without losing PREPA's customers while also producing cash flow for PREPA's creditors. (*Id.* ¶ 95.)

27.     Dr. George then states that "*one way* of determining whether utility rates are just and reasonable" is to judge them against eight "attributes of a sound rate structure," devised by James C. Bonbright, which are intended to help regulators determine whether utility rates appropriately balance the interests of ratepayers with those of the utility company itself.  (*Id.* ¶ 96 (emphasis added).)  Dr. George thus concludes that, based upon his review of the Revenue Envelope and Legacy Charge Model, there was no violation of any of the Bonbright principles or "any divergence from practices generally applied in the field of utility ratemaking."  (*Id.* ¶ 97.)

28.     As is evident from the George Report, the Bonbright principles were introduced as merely one method by which Dr. George, or the Court, could judge whether the Legacy Charge complies with the concept of "just and reasonable rates."  As such, the *admissibility* under Rule 702 of Dr. George's expert opinions—which include far more analysis than simply whether the Legacy Charge complies with the concept of "just and reasonable rates"—has nothing to do with the extent of his analysis of the individual Bonbright principles.  *See Provanzano v. MTD Prods. Co.*, No. 15-11720-NMG, 2016 WL 6089685, at *2 (D. Mass. Oct. 17, 2016) ("[F]ailure to consider particular variables or to use certain methods is not fatal to an experts testimony." (citing *Cummings v. Standard Register Co.*, 265 F.3d 56, 65 (1st Cir. 2001)); *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998) ("As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process—competing expert testimony and active cross-examination[.]" (citation omitted)).  The rest of SREAEE's analysis regarding the sufficiency of Dr. George's engagement with each

specific Bonbright principle is likewise irrelevant to the question of whether his testimony is admissible under Rule 702.  (*See* Mot. ¶¶ 27-32.)

29.     SREAEE also argues that the George Report is inadmissible because it "lacks any scientific methodology," "falls short of the scientific validity required by Rule 702," and "[lacks] all scientific merit."  (Mot. ¶¶ 15, 22, 24.)  But Rule 702 does not require scientific knowledge and methods (even assuming Dr. George's analysis of the Legacy Charge and its supporting models is not "scientific").  Rather, it permits experts qualified by their "knowledge, skill, experience, training, or education" to testify if their "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  Dr. George need not use a "scientific" method to render his testimony admissible.  *See Unión de Trabajadores de la Industria Eléctrica y Riego, Inc. v. Commonwealth of Puerto Rico, et al.*, Case No. 17-ap-229, ECF No. 225 (rejecting challenges to the "scientific validity" of the expert's conclusions and for not employing "scientific" methodology); *Zurich Ins. Co. v. Sunday River Skiway Corp.*, No. 08-325, 2010 WL 1511495, at *13 (D. Me. Apr. 15, 2010) ("[I]t is not necessary that [expert] opinions be based on any particular 'scientific method.'"); *see also Kumho*, 526 U.S. at 147-49 (*Daubert* makes no relevant "distinction between 'scientific' knowledge and 'technical' or 'other specialized' knowledge" because "any such knowledge might become the subject of expert testimony"; Rules 702 and 703 grant "latitude to all experts, not just to 'scientific' ones," on the basis of their knowledge and experience in a discipline).

30.     Relying on his extensive training and experience in the field, Dr. George analyzed the Revenue Envelope and Legacy Charge Model, including the methodology employed by the Oversight Board in determining the Legacy Charge, the methodology and assumptions underlying the model itself, the data, documents, and related academic literature supporting that methodology,

and the extent to which the Legacy Charge accounts for known and unknown risks, and concluded that the Legacy Charge represents the upper bound of cash which can reasonably be made available for debt repayment while being consistent with the principles of just and reasonable rates.  Dr. George's analysis does not turn on whether the Legacy Charge was consistent with the Bonbright principles, nor does admissibility under Rule 702 hinge on employing a "scientific" method. SREAEE's arguments to the contrary are without merit.

### B. Whether Dr. George Considered Additional Data Relied Upon by SREAEE's Expert Is Not a Basis for Excluding His Testimony.

31.     SREAEE next argues that Dr. George fails to account for the more recent work of Karl. R. Rábago and Radina Valova, two authors who SREAEE alleges "updated" the Bonbright principles "to adapt utility rates to what is fair and reasonable in our times."  (Mot. ¶ 19.)  Dr. George's failure to consider the work of Rábago & Valova, according to SREAEE, renders his methodology "incomplete and unreliable" under Rule 702.  (Mot. ¶¶ 18-20.)  Clearly, SREAEE is simply attempting to convince the Court in advance of trial to side with its expert and not Dr. George.  That is an inappropriate use of a motion in *limine*.

32.     Not surprisingly, SREAEE does not cite a single case to support this proposition. With good reason:  courts have consistently held that Rule 702 does not require that "experts rely on *all* data that could be deemed relevant."  *See Lawes*, 963 F.3d at 101 (emphasis added); *id.* at 102 (no authority to support conclusion that expert's "testimony was unreliable merely because there were perhaps other relevant sources he did not consider"); *see also McBroom v. Ethicon, Inc.*, No. CV-20-02127, 2021 WL 2709292, at *3 (D. Ariz. July 1, 2021) ("Nothing in Rule 702 or *Daubert* 'requires an expert to consider every single article on a topic in order to be admitted as an expert.'" (citation omitted)); *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Litig.*, 509 F. Supp. 3d 116, 194 (D.N.J. 2020) ("There is [no] requirement that

an expert review every single study in the relevant body of literature."). "Sufficiency is the benchmark for an expert's data under [Rule 702]," *Lawes*, 963 F.3d at 101 (quotation marks omitted), and SREAEE has not shown that any alleged failure to consider additional studies or variables renders Dr. George's information insufficient.

33.     Whether the work of Rábago & Valova presents factors which Dr. George should have considered in his analysis goes to the weight of his testimony, not its admissibility.  SREAEE unwittingly supports this position by extensively citing to Dr. Alameda's expert report to argue that Dr. George should have taken Rábago & Valova's work into account.  The relevance of their work to Dr. George's expert report is fundamentally a question for the adversarial process, *i.e.*, competing expert testimony (like Dr. Alameda's) and cross-examination, and is not grounds for the exclusion of Dr. George under Rule 702.  *See Ruiz-Troche*, 161 F.3d at 85.

34.     Finally, again citing Dr. Alameda, SREAEE argues that Dr. George's expert opinions should be excluded because his opinions "overlook[] the potential macroeconomic effects of the Legacy Charge" and "lack[] the analysis of customer affordability, socio-economic variations, and impacts on different income groups."  (Mot. ¶¶ 33, 36.)  However, the George Report does address these issues.  In particular, it discusses at length the affordability calculations underlying the Legacy Charge and its impacts on consumers at different income levels.  (*See, e.g.*, George Report ¶¶ 36-42, 60.)  But even if Dr. George's report had not addressed these issues, these arguments go to the weight of Dr. George's opinions and are not grounds for exclusion.  *See Lawes*, 963 F.3d at 108 (concluding that alleged weaknesses identified in the expert's report went to the weight of the expert's opinions, not their admissibility).  SREAEE's reliance on Dr. Alameda's arguments regarding the alleged deficiencies of the Legacy Charge and Dr. George's analysis, (Mot. ¶ 33), make it abundantly clear that SREAEE is improperly cloaking a substantive

14

disagreement with Dr. George's conclusions as a motion in *limine*.

## **CONCLUSION**

35.     For the foregoing reasons, the Court should deny the Motion.


*[Remainder of Page Intentionally Left Blank]*

Dated: June 13, 2023
New York, New York

Respectfully submitted,

*/s/ Margaret A. Dale*

Martin J. Bienenstock
Paul V. Possinger
Ehud Barak
Margaret A. Dale
Michael T. Mervis
Julia D. Alonzo
Laura Stafford
Javier F. Sosa
(Admitted *Pro Hac Vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

*Attorneys for the Financial Oversight and
Management Board, as representative for
PREPA*

*/s/ Hermann D. Bauer*

Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944

*Co-Attorneys for the Financial
Oversight and Management Board, as
representative for PREPA*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notifications of such filing to all CM/ECF participants in this case.

*/s/ Hermann D. Bauer*
Hermann D. Bauer
