# EXHIBIT 1

Page 1

1

2      IN THE UNITED STATES DISTRICT COURT
       FOR THE DISTRICT OF PUERTO RICO
3      Case No. 17-BK-3283-LTS
       -----------------------------------------x
4      In re:
5      THE FINANCIAL OVERSIGHT AND MANAGEMENT
       BOARD FOR PUERTO RICO,
6
       as representative of
7
       THE COMMONWEALTH OF PUERTO RICO, et al.,
8
                            Debtors.
9      -----------------------------------------x
       Case No. 17-BK-4780-LTS
10     -----------------------------------------x
       In re:
11
       THE FINANCIAL OVERSIGHT AND MANAGEMENT
12     BOARD FOR PUERTO RICO,
13     as representative of
14     THE PUERTO RICO ELECTRIC POWER AUTHORITY,
15                          Debtor.
       -----------------------------------------x
16                       May 3, 2023
                         10:00 a.m.
17
18          VIDEOTAPED DEPOSITION of DAVID SKEEL,
19     held at the offices of Kramer Levin
20     Naftalis & Frankel LLP, located at 1177
21     Avenue of the Americas, New York, New York
22     10036, before Anthony Giarro, a Registered
23     Professional Reporter, a Certified Realtime
24     Reporter and a Notary Public of the State
25     of New York.

Page 159

1                      DAVID SKEEL

2    recovery that it'll be receiving?  Do you

3    recall?

4         A       They will be receiving --

5    for their bond, they will be receiving

6    bonds.  And they are, in particular, A

7    Bonds.  They're called A Bonds.

8         Q       Series A Bonds?

9         A       Series A Bonds.

10        Q       And in addition to the

11   Series A Bonds, is there any other

12   compensation that the fuel line lenders

13   will be getting?

14        A       Fuel line lenders will be

15   getting interest during the period

16   between the settlement and confirmation

17   of the plan.  There is a possibility that

18   they will get additional recovery,

19   depending on what happens with the

20   ongoing litigation.  They also separately

21   are entitled to payment of fees, payment

22   of $15 million for what are called

23   consummation fees and $11 million for

24   what are referred to as professional or

25   reimbursement fees.

Page 161

1                        DAVID SKEEL

2    expected to pay out in 35 years.

3        Q        Now, were the Series A Bonds

4    offered to any other PREPA bondholders?

5        A        To my knowledge, the Series

6    A Bonds were not offered to other

7    bondholders.

8        Q        Why not?

9                 MR. FIRESTEIN:  Objection.

10        That calls for both deliberative

11        process, as well as privileged

12        communications between client and

13        counsel.  I instruct the witness not

14        to answer.

15        Q        Under the current PREPA plan

16    of adjustment, are there any other

17    bondholders or others that are receiving

18    Series A Bonds, other than the fuel line

19    lenders?

20        A        I believe only the fuel line

21    lenders receive or will receive Series A

22    Bonds.

23        Q        Now, you mentioned

24    professional reimbursement fees as one of

25    the items that the fuel line lenders may

Page 170

1                        DAVID SKEEL

2    we thought they were fairly strong

3    arguments.

4        Q       When you say that you took

5    litigation positions against those

6    arguments, what in particular suggested

7    to the board that they would no longer

8    take those positions and settle with the

9    PSA?

10               MR. FIRESTEIN:  It's the

11          same objection with respect to that

12          question.  You could ask him what he

13          thinks about that, but not the board

14          as a whole.

15        Q       Again, do you have a view as

16   to why the position with respect to

17   current expense that you opposed would

18   suddenly be not opposed?

19               MR. FIRESTEIN:  Object to

20          the form of the question.  You can

21          answer if you understand.

22        A       My basis for believing that

23   the settlement is a good settlement or an

24   important basis was a view that their

25   arguments are fairly strong and that

Page 171

```
                                    DAVID SKEEL
 1                            DAVID SKEEL
 2    given the strength of their arguments and
 3    the other benefits of the settlement, the
 4    settlement was in the best interest of
 5    PREPA and was a fully reasonable,
 6    desirable settlement.
 7                    MR. NATBONY:  Let's pull up
 8         on the screen, tab 23, please.  And
 9         this will be marked as Exhibit 19, I
10         believe.
11                    (The above-referred-to
12         document was marked as Exhibit 19 for
13         identification, as of this date.)
14                    MR. FIRESTEIN:  Do we get
15         hard copies of that one?
16                    MR. NATBONY:  Sure.
17                    MR. FIRESTEIN:  Thank you so
18         much.
19         A       Could I read the press
20    release?
21         Q       Sure.  Yes.
22                    MR. KIRPALANI:  Is there a
23         reason there's nothing showing on the
24         screen in the room?
25                    MR. FIRESTEIN:  There is
```

Page 238

1                    DAVID SKEEL

2      A        I do stand by that

3   statement.

4      Q        How do you go about, Mr.

5   Skeel, deciding how to balance the need

6   to treat creditors fairly while also

7   reducing the debt to an amount that PREPA

8   can afford to pay?

9              MR. FIRESTEIN:  An

10      admonition.  Without getting into how

11      the deliberations take place, you can

12      answer his question by reference to

13      your general practice and how you

14      went about it.

15              THE WITNESS:  Thank you.

16      A        I think that the American

17   bankruptcy laws do a wonderful job of

18   guiding precisely that, that set of

19   trade-offs.

20      Q        Thank you, Mr. Skeel.

21              But I'm asking you how you

22   as the chairman of the oversight board go

23   about attempting to treat Puerto Rico's

24   creditors fairly while also reducing the

25   debt to an amount that PREPA can afford.

Page 250

1                    DAVID SKEEL

2    says, "The mediation process assisted the

3    oversight board in reaching deals with

4    two major creditor groups, the fuel line

5    lenders holding over $700 million in

6    unsecured claims and National Public

7    Finance Guarantee Corporation, a monoline

8    insurer of PREPA's revenue bonds and

9    holder of certain claims against PREPA."

10                   And then it goes on.

11                   Do you see that sentence?

12        A        I do see that sentence.

13        Q        Is it your testimony that

14   the mediation was involved in brokering

15   the settlement with National?

16                   MR. FIRESTEIN:   I'm going to

17        object and instruct on the grounds

18        that that invades first mediation

19        process and the communications that

20        would have occurred --

21                   MR. KIRPALANI:   No, sir.

22        You cannot use a reference to the

23        mediation process as a sword to

24        defend the good-faith of an unfairly

25        discriminatory settlement and then

```
                                              Page 251

 1                    DAVID SKEEL

 2         prevent me from asking about that.

 3                    MR. FIRESTEIN:  Who says

 4         that that's what the intention is

 5         going to be?  A mediation process

 6         includes not only involvement of the

 7         mediators, but also other

 8         directors --

 9                    MR. KIRPALANI:  Now you're

10         testifying.

11                    MR. FIRESTEIN:  If you're

12         going to make a statement, then I'm

13         going to tell you what I think.  If

14         you're going to tell me what I can't

15         do, I'm going to tell you why I can.

16                    MR. KIRPALANI:  I'm going to

17         tell you.  We're going to bring Mr.

18         Skeel back to answer this question if

19         you instruct him.

20                    MR. FIRESTEIN:  You could do

21         what you wish relative to that.

22                    MR. KIRPALANI:  That's fine.

23                    So just to be clear, you're

24         instructing the witness not to answer

25         a question about whether the
```

Page 252

                        DAVID SKEEL

1

2          mediation team was involved in the

3          settlement with National?

4                    MR. FIRESTEIN:   That's not

5          what the sentence says.

6                    MR. KIRPALANI:   I'm asking

7          you a question.

8                    MR. FIRESTEIN:   Yes.   The

9          answer is yes.

10         Q        Who at the oversight board

11    negotiated the settlement with National?

12         A        The primary negotiation was

13    done by our lawyers and financial

14    advisors.

15         Q        Were you involved yourself

16    in negotiating that settlement?

17         A        I was not involved in

18    directly negotiating, no.

19         Q        Under the plan of the

20    oversight board, non-settling

21    bondholders, even if they prevailed in

22    the adversary proceeding, they would do

23    worse than National under every scenario

24    contemplated by this plan; isn't that

25    correct?

Page 258

1                    DAVID SKEEL

2        Q        Absolutely.

3        A        Okay.

4        Q        Do you see that this offers

5    to pay Syncora 50 percent of the value of

6    their claim?

7        A        I do see that.

8        Q        Why wasn't Syncora Guarantee

9    offered the same treatment that National

10   is being offered on February 14th?

11                MR. FIRESTEIN:  Objection to

12       the extent that that gets to the

13       deliberative process and privileged

14       communications that would have

15       occurred between Mr. Skeel or other

16       representatives of the board.

17                MR. KIRPALANI:  I'll

18       withdraw the question to stop this.

19       Q        Why were other bondholders,

20   including Syncora Guarantee, only offered

21   50 cents when National was offered 70

22   cents?

23                MR. FIRESTEIN:  Same

24       objection and same instruction.  Let

25       me say it this way.  To the extent

Page 259

1                     DAVID SKEEL

2          that your answer is based on

3          communications that you've had with

4          counsel, I want you to not respond to

5          that question, or just identify it so

6          I can instruct if it's based on some

7          other basis.

8           A        Everything I know is through

9      communications with counsel.

10                   MR. FIRESTEIN:  On that

11         basis, I'll instruct.

12                   MR. KIRPALANI:  But not

13         everything you know is a request for

14         legal advice, is it?  Everything you

15         know from counsel could be facts from

16         other people.

17                   MR. FIRESTEIN:  It's on this

18         issue, is what he's saying.

19          Q        To your knowledge, though,

20     Syncora Guarantee -- the document says

21     what it says.  Nevermind.

22                   You're in the process of

23     writing a book, Mr. Skeel -- right? --

24     about Puerto Rico?

25          A        I am, yes.

Page 284

1                    DAVID SKEEL

2        A        I generally understand what

3    it provides.

4        Q        And what is your

5    understanding?

6        A        I'm tempted to ask you to

7    put the provision in front of me.  But it

8    is the --

9                 MR. FIRESTEIN:  Well, if you

10        want it, he'll give it to you.

11        A        If you do this one.  (b)1 is

12    the beginning of the provision that deals

13    with non-consensual confirmation of a

14    reorganization plan.  And (b)1 has the

15    requirements or the strictures that with

16    respect to a non-consenting class, the

17    plan is required to not discriminate

18    unfairly and to be fair and equitable,

19    and it choosers a little more language as

20    well.

21        Q        Do you have an

22    understanding, Mr. Skeel, what it means

23    for a plan to not discriminate unfairly

24    within Section 1129(b)1?

25        A        I have an understanding of

Page 285

1               DAVID SKEEL

2    the unfair discrimination requirement,

3    yes.

4        Q        What generally does that

5    mean?

6        A        Generally, what unfair

7    discrimination requirement means is that

8    similarly situated classes of creditors

9    cannot be treated dramatically

10   differently, unless there is a good

11   reason for different treatment.

12       Q        You said dramatically

13   differently.

14                They can be treated

15   differently; is that your understanding?

16                MR. FIRESTEIN:  No.  He said

17       what he said.

18       A        I would say significantly or

19   dramatically differently.

20       Q        You also say -- sorry.

21                The document says that you

22   also may provide testimony about facts

23   showing that, among other things, the

24   fuel line lender PSA and the National PSA

25   are reasonable.  Do you see that?

Page 286

                            DAVID SKEEL

1

2        A        Yes, I do.

3        Q        And this goes back to

4    testimony you provided earlier.  I'll ask

5    you more questions about it.

6                 But is it your intent, Mr.

7    Skeel, to testify that in your view, the

8    fuel line lender settlement is

9    reasonable?

10       A        Yes.  I believe the fuel

11   line lender settlement is reasonable.

12   And I am testifying that it is.

13       Q        And how about the National

14   settlement?

15       A        I also believe that the

16   National settlement is reasonable.

17                MR. LAROSE:  Could you put

18       back on the screen -- and I don't

19       know if you have, Mr. Skeel -- the

20       documents that were introduced

21       earlier today?

22       A        They're all here.

23       Q        I was going to direct your

24   attention just very briefly back to

25   Exhibits 3 and 4.

Page 296

                              DAVID SKEEL

1

2       creditors.  So, yes, it would include the

3       UCC and the creditors that the UCC

4       represents.

5            Q       What, if any, steps is the

6       board taking to try to reach a resolution

7       with the UCC?

8                         MR. FIRESTEIN:  I'm going to

9              object to that question and instruct

10             him.  The progress or discussions or

11             efforts towards settlement are not

12             admissible or appropriate, whether in

13             the mediation context or otherwise

14             under Rule 408.  I'll instruct him

15             not to answer the question.

16                        MR. BASSETT:  I disagree

17             with that entirely, plus he testified

18             to it earlier today without

19             objection.

20                        MR. FIRESTEIN:  Then reframe

21             your question.

22           Q       You testified just now and

23      earlier today that the board is making

24      efforts to develop consensus in support

25      of the plan.

```
 1                   DAVID SKEEL
 2    ask you a few more specific questions.
 3                   As you testified, there's
 4    several different components to it in
 5    terms of the new Series A Bonds being
 6    issued.  That was new Series A Bonds in a
 7    face amount of 84 percent of the fuel
 8    line lenders allowed claim; is that
 9    correct?
10         A        That is correct.
11         Q        Mr. Skeel, do you believe
12    that that's reasonable?
13         A        I do believe that that's
14    reasonable.
15         Q        That 84 percent exchange
16    rate, why is that reasonable to you in
17    your view?
18         A        In my view, the terms of the
19    settlement are reasonable because the
20    fuel line lenders had plausible claims
21    that they were entitled to current
22    expense treatment and entitled to payment
23    in full.  And by settling it, we were
24    able to resolve those claims at a lower
25    level than if they had successfully
```

Page 305

1                      DAVID SKEEL

2     litigated those claims.  And we also got

3     the benefit of substantial creditor

4     supporting the plan of adjustment.

5          Q          So you said you were able to

6     resolve those claims at a level lower

7     than that which they would have received

8     had they successfully litigated the

9     claims; correct?

10         A          That is correct.

11         Q          What do you understand the

12    fuel line lenders would have received in

13    terms of a percentage recovery on their

14    claims had they won that litigation?

15         A          They would have been paid in

16    full.

17         Q          Now, on the flip side, the

18    board obviously in that litigation, you

19    saw some of the briefing materials that

20    the board put together earlier, but the

21    litigation position the board had taken

22    was that the fuel line lenders were

23    incorrect in their arguments and should

24    not prevail in that litigation; right?

25         A          That is correct.  We took

Page 306

```
 1                    DAVID SKEEL
 2    the litigation position that they were
 3    not entitled to be paid in full.
 4        Q        So what is your
 5    understanding, if any, of what the fuel
 6    line lenders' recovery on account of
 7    their claims would be, had they lost that
 8    litigation?
 9                MR. FIRESTEIN:  Objection,
10        calls for speculation, if you know.
11        A        Well, I would have to
12    speculate about the context of that
13    recovery.  If it were under the plan of
14    adjustment that's currently on the table,
15    they would get the same recovery as
16    unsecured creditors get if they lost.
17        Q        So then in your view, the
18    84 percent recovery is a reasonable
19    landing point as between that downside
20    scenario and the 100 percent upside
21    scenario?
22        A        Yes.  It is, in my view, a
23    reasonable landing point.
24        Q        You testified earlier, I
25    think, that the Series A Bonds have a
```

Page 314

1                    DAVID SKEEL

2        A        That is correct.

3        Q        And do you believe that is

4    reasonable?

5        A        I believe that is

6    reasonable.

7        Q        Why is it reasonable to

8    provide the fuel line lenders with

9    interest on the bonds as of December 1st,

10   2022, given that those bonds have not

11   been issued yet?

12       A        That was an important part

13   of the deal for them, making the deal

14   work.  It's a small part, but a

15   non-trivial part of the deal.  And it

16   compensates them for what, in effect, are

17   their carrying costs.  They're locked up

18   in a sense from the time that they signed

19   this agreement.  And they don't know how

20   long it's going to take before a plan is

21   confirmed.  And it's giving them a

22   limited compensation for that.

23       Q        The fuel line lenders are

24   not secured, are they?

25       A        They will effectively be

Page 331

```
 1                      DAVID SKEEL
 2   considerations, are you aware of any
 3   reason why a fuel line lender's claim
 4   would have a greater legal entitlement to
 5   payment from PREPA as compared to another
 6   general unsecured claim that is also a
 7   current expense claim?
 8                 MR. FIRESTEIN:  I'm going to
 9         instruct him not to answer that
10         question.  You're expressly asking
11         for a legal conclusion.  It's clearly
12         invading attorney-client privilege
13         because you excluded his answer that
14         he gave you before.  So I don't know
15         how it could be anything but.
16                 MR. BASSETT:  I don't know
17         how he's able to sit here and testify
18         to the reasonableness of a settlement
19         if he's not able to explain the basis
20         for how he gets that.
21                 MR. FIRESTEIN:  You could
22         argue that sometime if you'd like.
23         But he's already articulated for you
24         what his reasonable basis is.
25         Q       You're not going to answer
```

Page 333

1                          DAVID SKEEL

2          reasons that the board entered into a

3          settlement.  I want to make sure that

4          you're doing that knowingly because

5          we're going to take that position.

6                    MR. FIRESTEIN:  Okay.  I

7          reject that characterization.  The

8          question that was posed of him was

9          what are the legal reasons for why it

10         is that you would do something.  That

11         question in its form has -- is

12         absolutely directed at

13         attorney-client communication because

14         he has testified at some length today

15         about the reasons why he thinks the

16         settlements are fair or not fair or

17         reasonable or not reasonable.

18                    MR. KIRPALANI:  We will see

19         if that's sufficient.

20                    MR. FIRESTEIN:  I agree with

21         that.

22                    MR. BASSETT:  I join in the

23         objection.  He testified earlier that

24         he understands that in determining

25         whether or not a plan is fair and

Page 334

DAVID SKEEL

1
2      reasonable, a creditor's legal

3      entitlements have to be considered.

4      He also testifies that he believes

5      the settlements are reasonable.  If

6      he's not able to provide the basis

7      for how he gets there using those

8      underlying principals, how can he

9      offer that testimony?

10             MR. FIRESTEIN:  That's not

11     true.  He can offer facts.  And

12     lawyers are empowered to use those

13     facts and apply the law to them.  And

14     that's what lawyers do.  And that's

15     what you'll hear at confirmation.  A

16     witness is not obligated to give you

17     facts and his legal opinion on

18     things.

19      Q      Mr. Skeel, what facts are

20  you aware of that entitle the fuel line

21  lenders to a greater recovery than

22  general unsecured creditors?  What facts

23  are you aware of?

24      A      Facts that I'm aware of are

25  that the fuel line lenders had a

Page 335

1                    DAVID SKEEL

2    particularly strong claim to current

3    expense treatment because they're named

4    in the -- explicitly in the trust

5    agreements.  And they have contracts with

6    PREPA that describe them as entitled to

7    current expense treatment.

8         Q       Let's look at the trust

9    agreement.  That was introduced earlier,

10   Exhibit 22.

11               You said they are named in

12   the trust agreement.  I'm going to direct

13   your attention to the definition of

14   current expenses which I believe -- it's

15   on page 20 of the document at the bottom.

16   I don't know if that's different from the

17   PDF.  Let me know when you're there.

18        A       I am there.

19        Q       Now, can you show me -- if

20   you go to the second page of that lengthy

21   definition, there are a series of

22   sentences that begin with the language,

23   "Notwithstanding the foregoing or

24   anything herein to the contrary."

25               Do you see where I am on the

Page 340

1                   DAVID SKEEL

2                   THE VIDEOGRAPHER:  The time

3        is 5:27 p.m.  We're going off the

4        record.

5                   (A short recess was taken.)

6                   THE VIDEOGRAPHER:  The time

7        is 5:42 p.m.  And we're back on the

8        record.

9        Q        Before we broke, we were

10   talking about the National settlement.

11                  As you testified earlier

12   today, National is receiving on account

13   of its claim Series B bonds equal to

14   71.6 percent of its claim; is that right?

15       A        That's right.

16   71.65 percent.

17       Q        And is that 71.65 percent

18   exchange rate reasonable in your view?

19       A        In my view, it's reasonable,

20   yes.

21       Q        And why do you believe it's

22   reasonable?

23       A        I believe it's reasonable

24   because when we entered the settlement,

25   National had an argument that they were

Page 341

1                    DAVID SKEEL

2      completely secured.  And they were

3      entitled to 100 cents on the dollar, plus

4      post-petition interest for the duration

5      of the case.  And in return for the

6      settlement, they compromised that

7      argument and agreed to take the

8      71.65 percent.

9                    And the other components of

10     the deal, they agreed to support the plan

11     to vote in favor of the plan.  And by

12     reaching the deal with them, we took

13     roughly a billion dollars off the table.

14     So it was a very attractive settlement.

15         Q        The settlement with National

16     was reached the end of January,

17     approximately, of this year; is that

18     right?

19         A        I don't remember exactly

20     when it was.  But it was sometime around

21     then.

22         Q        And then sometime after

23     that, the court issued its summary

24     judgment decision in the lien challenge

25     litigation?

Page 342

1                      DAVID SKEEL

2        A        That is correct.

3        Q        Have you -- strike that.

4                 Do you believe that sitting

5    here today, in light of the decision

6    issued by the court, concerning the

7    narrow scope of National's lien that the

8    National settlement is still reasonable?

9        A        I think it was a very

10   reasonable -- it is a reasonable

11   settlement.  We settled it at a time when

12   we didn't know what the outcome of

13   that -- of that litigation is.  And I

14   think it was a very sensible settlement.

15       Q        And at the time you settled

16   it, that litigation was ongoing; right?

17       A        It was ongoing, yes.

18       Q        And when you entered into

19   the settlement, you knew that the

20   litigation would continue; right?

21       A        We knew that -- we knew it

22   would continue.  It had been argued.  And

23   it would continue.

24       Q        Does the National settlement

25   contain any kind of fiduciary out or

Page 344

1                    DAVID SKEEL

2     it.  And I don't believe that the court's

3     decision has changed that fact.  It still

4     was reasonable when we made it.

5          Q       Well, the court's decision

6     drastically changes the scope of the

7     bondholders' security interest, including

8     National, as compared to what they were

9     arguing in the litigation; right?

10         A       It does, although there are

11    still some open variables.  There's still

12    the possibility that it will be appealed.

13    And the extent of the bondholders' claim

14    is -- is not yet clear.  There still are

15    open issues in the litigation.

16         Q       And because of the open

17    issues that remain in litigation today,

18    it's your view that the National

19    settlement, as it is set forth in the

20    National PSA and in the plan, remains

21    reasonable?

22         A       I believe it is a reasonable

23    settlement, yes.

24         Q       In addition to the

25    71.65 percent exchange rate of the Series

Page 345

1                    DAVID SKEEL

2    C bonds, the National settlement also

3    entitles National to a 3 percent fee

4    reimbursement, which I believe is

5    approximately 25.1 million, as stated in

6    the disclosure statement; is that your

7    understanding?

8         A        My understanding is there is

9    a 3 percent consummation fee as part of

10   the agreement.

11        Q        You said it's a 3 percent

12   consummation fee is how you would refer

13   to it?

14        A        I believe that's right,

15   yeah.  And there's a 2.86 percent

16   structuring fee.

17        Q        And the 3 percent

18   consummation fee, that's reasonable in

19   your view?

20        A        It is reasonable in my view.

21        Q        What's the basis for that

22   statement?

23        A        The basis for that statement

24   is it's -- these fees are consistent with

25   fees that the court has approved in other

Page 346

1              DAVID SKEEL

2    Puerto Rico Title IIIs.  And it is

3    consistent with fees generally that

4    are -- that are allowed in Chapter 11

5    cases as well in my view.

6         Q        And do you view that fee as

7    compensating National for something?

8         A        Which fee are we talking

9    about?

10        Q        The consummation fee of

11   3 percent.

12        A        The consummation fee

13   includes compensation for professionals'

14   fees as part of it, yes.

15        Q        But are they receiving that

16   fee on account of some value that they

17   have provided -- that National has

18   provided to PREPA; is that your

19   understanding?

20        A        It is -- it's primarily a

21   reimbursement-based fee.  But they are --

22   they're receiving it because of their

23   contributions to the case and to the

24   benefits that they've provided us as part

25   of -- part of the settlement.

Page 347

1                   DAVID SKEEL

2       Q        What are those contributions

3   and benefits?

4       A        So this is shifting fees to

5   the structuring fee.  The kinds of

6   contributions that are included in that

7   include their involvement in structuring

8   the bond indenture, the new bonds that --

9   new bond indenture that will be put in

10  place, the new bonds that will be part of

11  that.  It also includes them committing

12  to support the plan, to vote in favor of

13  the plan and in my view, the public good

14  that they provide as a result of all

15  that.

16      Q        So you switched to the

17  structuring fee?

18      A        Yeah.

19      Q        What value or benefits did

20  National provide in order to justify the

21  3 percent consummation fee that we were

22  talking about before?

23      A        I think part of that is some

24  of the same benefits.  But the focus of

25  the fee is primarily on reimbursing

Page 348

```
 1                    DAVID SKEEL
 2   attorneys' fees and professionals' fees.
 3        Q        National is also receiving
 4   what's called an interim charge which is
 5   I think a tenth of a cent per kilowatt
 6   hour during the pendency of PREPA's case;
 7   is that correct?
 8                  MR. FIRESTEIN:  You could
 9      restate your question.
10        Q        Are you familiar with
11   something that has been referred to as an
12   interim charge that National is also
13   receiving out of the settlement?
14        A        Yes.  I'm familiar with the
15   interim charge.
16        Q        And do you believe that's
17   reasonable?
18        A        I believe that is
19   reasonable, yes.
20        Q        What is the basis for that
21   interim charge?
22        A        The interim charge, which I
23   believe is National's pro rata share of
24   1 percent, which would work out to I
25   believe roughly one-ninth of 1 percent,
```