# EXHIBIT 2

Page 1

1

2   IN THE UNITED STATES DISTRICT COURT
    FOR THE DISTRICT OF PUERTO RICO
3   Case No. 17-BK-3283-LTS
    ------------------------------------------x
4   In re:
5   THE FINANCIAL OVERSIGHT AND MANAGEMENT
    BOARD FOR PUERTO RICO,
6
    as representative of
7
    THE COMMONWEALTH OF PUERTO RICO, et al.,
8
                        Debtors.
9   ------------------------------------------x
    Case No. 17-BK-4780-LTS
10  ------------------------------------------x
    In re:
11
    THE FINANCIAL OVERSIGHT AND MANAGEMENT
12  BOARD FOR PUERTO RICO,
13  as representative of
14  THE PUERTO RICO ELECTRIC POWER AUTHORITY,
15                      Debtor.
    ------------------------------------------x
16                  May 16, 2023
                    9:31 a.m.
17
18      VIDEOTAPED DEPOSITION of DAVID
19  BROWNSTEIN, held at the offices of Kramer
20  Levin Naftalis & Frankel LLP, located at 1177
21  Avenue of the Americas, New York, New York
22  10036, before Anthony Giarro, a Registered
23  Professional Reporter, a Certified Realtime
24  Reporter and a Notary Public of the State of
25  New York.

Page 89

1          DAVID BROWNSTEIN

2      Q          How long prior to execution

3   of the agreement that's Exhibit 91 did

4   those negotiations begin?

5      A          I don't recall.

6      Q          Do you know if it was days

7   or weeks or months?

8      A          It was either weeks or

9   months.

10      Q          Could it have been less than

11   a month?

12              MR. MERVIS:  Objection to

13      the form.

14              MS. SPILLANE:  Objection.

15      A          I don't recall.

16      Q          This is, I think, a yes, no

17   or I don't know question.

18              Was the mediation team

19   involved in negotiations leading to the

20   fuel line lenders' PSA?

21              MR. MERVIS:  Yeah.  I don't

22      see how that doesn't -- I'm going to

23      instruct him not to answer that

24      question.

25      Q          Did you discuss negotiations

```
                                              Page 91

 1                  DAVID BROWNSTEIN

 2    you --

 3         Q         Let me try it a different

 4    way.  I don't want you to answer a

 5    question you don't understand.

 6                   What information, if any,

 7    did you provide to board members

 8    concerning proposals to the fuel line

 9    lenders?

10         A         All proposals to and from

11    the fuel line lenders were reviewed and

12    approved by the board.

13         Q         How many rounds of

14    back-and-forth proposals and

15    counterproposals were there?

16                   MR. MERVIS:  I think I have

17        to instruct the witness not to answer

18        that question on the basis of

19        mediation confidentiality.

20         Q         You plan to testify at the

21    confirmation hearing, do you not, that

22    the fuel line lenders' settlement is

23    reasonable; correct?

24         A         Yes.

25         Q         So I'm just trying to get at
```

Page 92

DAVID BROWNSTEIN

1
2    the process of negotiating that agreement
3    as between the oversight board and the
4    fuel line lenders.
5              And so counsel's instructed
6    you not to answer a few questions
7    already.  There may be more such
8    instructions.  I just want to make clear
9    that you won't plan to testify at the
10   confirmation hearing as to information
11   concerning the negotiations that you're
12   being instructed not to testify to today.
13              MR. MERVIS:  I don't know
14       that it's for him to say.  But I
15       think that depending on what the
16       questions are -- let me put it this
17       way.  I think that the instructions
18       would certainly provide opponents of
19       the plan with a basis to make
20       arguments about not being allowed to
21       take discovery on certain things,
22       hard to deal with it in a vacuum.
23       But you asked him a particular
24       question about the involvement of the
25       mediators which I think that squarely

```
 1              DAVID BROWNSTEIN
 2      puts the mediators into the mix,
 3      which is not, I don't think -- we
 4      won't do that.  And you asked the
 5      question about how many proposals
 6      went back and forth.  And I think
 7      that that process is -- that process
 8      does get into mediation privilege.  I
 9      realize that some of these are
10      judgment calls.  And people can
11      disagree.  But that's where I'm
12      landing.
13              MR. MADDEN:  Maybe to cut to
14      the chase, if I were to ask
15      additional questions about the
16      process as between the oversight
17      board and the fuel line lenders and
18      mediation that led to the agreement
19      to the fuel line lenders' PSA, is it
20      fair to say you'll instruct the
21      witness not to answer those process
22      questions?
23              MR. MERVIS:  Probably.  But
24      I can think, for example, of a -- and
25      I don't mean to play -- so, for
```

Page 94

1               DAVID BROWNSTEIN

2      example, you know, who was this

3      negotiation counterpart, I think

4      that's fair.  But there's a place.

5      There's a line; right?  It's not

6      necessarily a bright line.  One

7      bright line, I will say, in terms of

8      what went back and forth, yeah, that,

9      I'm going to instruct not to answer.

10     Q        You've already told me who

11  your counterparts are.  So I'll move on.

12              Mr. Brownstein, what

13  benefits, if any, does the fuel line

14  lenders' PSA provide to PREPA?

15              MR. MERVIS:  Just note my

16     objection to the form.  But you can

17     answer.

18     A        As I said previously,

19  without that, without knowing what amount

20  we were going to be paying them and

21  whether, in fact, they were -- which

22  means whether they were entitled to

23  priority, we wouldn't have been able to

24  make an offer to the bondholders that

25  took the wallet we have available and put

Page 95

1                    DAVID BROWNSTEIN
2    it on the table which is what our goal
3    was.
4         Q        Any other benefits to PREPA
5    from the fuel line lenders' PSA?
6                   MR. MERVIS:  Same objection.
7         A        I mean it's a settlement.
8    Every settlement's got the benefit of
9    eliminating litigation and moving on to
10   what PREPA's job is, which is, you know,
11   either a loan or with the operating
12   entities like LUMA and Genera, focusing
13   on what their job is supposed to be which
14   is to create a resilient system that's
15   sustainable for the public in Puerto
16   Rico.
17        Q        Any other benefits?
18                  MR. MERVIS:  Same objection.
19            Matt, I don't think you're going to
20            mind this.  The reason I'm objecting
21            is that, as you mentioned, he was a
22            30(b)(6) designee.  And I'm not sure
23            from your questioning whether we're
24            doing 30(b)(6) or his personal
25            knowledge.  So that's the basis for

Page 96

1              DAVID BROWNSTEIN

2          my objections to this.

3                  MR. MADDEN:  These questions

4          would go to both.  So he's both been

5          designated as a 30(b)(6) witness on

6          the subject to the fuel line lenders'

7          PSA.  He's also been identified by

8          the board's disclosures as someone

9          who expects to testify at the

10         confirmation hearing regarding the

11         benefits of the PSA.

12                 MR. MERVIS:  That's helpful.

13         Got it.

14      Q       So if you need me to

15   distinguish between the two capacities,

16   please let me know.  But for the purposes

17   of this question, I'm just trying to

18   exhaust your knowledge as to the benefits

19   of PREPA from the fuel line lenders' PSA.

20              So the question on the table

21   was, other than what you've just

22   identified, are there any other benefits?

23      A       The benefit I would suggest

24   to you of each settlement that we have

25   is, A, they stopped our litigation

Page 97

DAVID BROWNSTEIN

1
2       fighting with each of them.  But the
3       other benefit is it proves out from my
4       perspective that because we have them,
5       that's not why we did them, but that what
6       we are offering, we have sophisticated
7       institutional investors who have agreed
8       to a structure that we believe provides
9       the value that it provides, meaning we're
10      giving you a bond that at 6 percent is
11      worth par; right?
12                    And National concurs with
13      that, otherwise they would have not
14      accepted it in its form.  So everybody
15      cares about the same things from COFINA
16      to the Commonwealth.  We care about those
17      same things at the board, making sure
18      we're trying to create the most valuable
19      instrument for the bondholders.
20                    And I believe that the
21      markets have borne out that we did what
22      we said we would do in creating a strong
23      marketable instrument that provides the
24      value we said it provided at Citi on
25      behalf of the board.

Page 99

```
 1              DAVID BROWNSTEIN
 2       A        Our job stood the same job
 3  we did there for the benefit of the
 4  holders.  And I think we have proved out
 5  we have the best interest of everyone
 6  which is what the board cares about in
 7  making sure we aren't creating a problem
 8  bond that doesn't have market access at
 9  the rates we set.
10       Q        What are the risks to PREPA
11  if it were to lose the priority
12  litigation?
13              MS. SPILLANE:  Objection to
14     form.
15              MR. MERVIS:  Same.
16       A        Well, as I've said, if we
17  didn't have a settlement with them, we
18  couldn't settle with the bondholders
19  because we didn't know how much we had
20  available to pay the bondholders.  So the
21  risk is we'd be in litigation for a very
22  long time.
23       Q        Any other risks to PREPA if
24  it were to lose the priority litigation?
25              Let's take that back.
```

Page 125

1               DAVID BROWNSTEIN

2     what's in the indenture to be filed

3     tomorrow, is that you can't answer those

4     questions because it's not final?

5                    MR. MERVIS:  Object to the

6          form.

7          A          I can't answer because I

8     don't -- I can't answer because I don't

9     know; right?  To this moment, I don't

10    know what changes are being made or not.

11    I know what discussions we've had on

12    things that could change.  But I don't

13    know whether they will be changed or not.

14                   MR. MADDEN:  And if I were

15         to ask the witness about discussions

16         about things that could change to the

17         indenture, am I correct that you

18         would instruct the witness not to

19         answer those questions, counsel?

20                   MR. MERVIS:  Yes.

21         Q          If you turn to page 28 of 32

22    of the PDF, it's the last page of the

23    term sheet, what are the consummation

24    costs covered here?

25         A          Well, one set of costs that

1                    DAVID BROWNSTEIN

2       we are paying, which isn't the

3       consummation cost, but it helps you

4       define it a little bit, is the

5       reimbursement for professional expenses

6       which does not include any costs for

7       litigation.

8                         As you probably know, we

9       don't pay someone to litigate with us or

10      against us, I should say.  So that's one

11      piece of this.  And the consummation

12      costs are simply for their participation

13      in negotiating a settlement which is

14      consistent with what we've done in other

15      cases.

16          Q       Focusing first on the

17      professional fee reimbursement, this

18      refers to documented professional fees.

19                      What does that mean?

20          A       They need to show us that

21      they're real fees.

22          Q       And why is that?

23          A       Because if they just tell us

24      they spent $11 million, what do we have

25      to back that up?  We're a governmental

Page 127

DAVID BROWNSTEIN

1
2    entity -- right? -- PREPA, who's paying
3    these bills.  You don't pay someone's
4    bill without the backup.  And that's been
5    the case historically as well.
6        Q        When you say the
7    consummation costs are simply for their
8    participation in negotiating a
9    settlement, what do you mean by that?
10       A        Well, they, as you know from
11   our discussions today, have been involved
12   since then in working with us as an
13   example on the indenture, trying to make
14   sure that everything we are doing creates
15   the value that people are going to
16   expect.  And that is taking a lot of
17   their time.
18              So as a party to the plan,
19   they are in a position to help us in
20   structuring issues and the like to make
21   sure we come up with the right
22   transaction for all involved.
23       Q        Will the fuel line lenders'
24   professional fees associated with
25   assisting with the indenture be

Page 128

1              DAVID BROWNSTEIN
2   reimbursable under the first category of
3   costs we discussed?
4              MR. MERVIS:  Objection to
5      the form.
6      A       I believe that estimated in
7   their -- I don't know the answer.  I
8   believe that it's possible that estimated
9   in their 11 million was some portion of
10  the fees, probably not for the indenture,
11  but for legal work in supporting us
12  through the plan.
13     Q       And then at the bottom of
14  the term sheet here, there's a category
15  for release.  You see that?
16     A       Uh-huh.
17     Q       What is the purpose of
18  including this lease in the agreement?
19     A       Well, releasing each other
20  or others?
21     Q       Fair point.  Let me try
22  again.
23              What benefit does the
24  oversight board gain from releasing the
25  fuel line lenders under this agreement?

```
                                          Page 133

 1                  DAVID BROWNSTEIN

 2        Q        And what was the nature of

 3   your involvement in that process?

 4        A        I worked with the board and

 5   Proskauer to negotiate the agreement we

 6   have with National and the document that

 7   we executed with them.

 8        Q        And with whom did you

 9   principally interact on the National

10   side?

11        A        I guess I would have to say

12   Trish would have been my primary contact.

13        Q        And what's Trish's full

14   name, if you know?  If you don't recall

15   right now, that's okay.

16        A        She just retired.  So I'm

17   trying to forget her.  I didn't really

18   mean that second part.  But I can't tell

19   you why -- hold on.

20        Q        We'll come back to it.

21        A        No, no, no.  I have to find

22   it, or I'll kill myself.  Ferrari.

23        Q        When did negotiations toward

24   the National PSA began?

25        A        During mediation.
```

Page 134

```
 1              DAVID BROWNSTEIN
 2     Q        Early in mediation, middle
 3  in mediation, toward the end?
 4     A        Early to in the middle.
 5     Q        Sorry?
 6     A        Early to in the middle is
 7  the best I can do for you.
 8     Q        And was the mediation team
 9  involved in those negotiations?
10              MR. MERVIS:  That one, I'm
11       going to instruct the witness not to
12       answer that question.
13     Q        Did you discuss the
14  National -- do you need a break?
15     A        No.  Sorry.
16     Q        Did you discuss the National
17  negotiations directly with oversight
18  board members?
19     A        Yes.
20     Q        Did you update the oversight
21  board members on proposals to and from
22  National?
23     A        I think I said this before.
24  But just to be clear, no proposal was
25  made to National without board approval.
```

Page 135

1                    DAVID BROWNSTEIN

2        Q        Did the oversight board

3    members -- strike that.

4                    Did the oversight board

5    approve proposals to National by a vote?

6        A        Yes.

7        Q        At any point, did an

8    oversight board member vote against a

9    proposal to National?

10                    MR. MERVIS:  I think that

11        gets into deliberative process

12        privilege.

13                    MR. MADDEN:  I'm quite sure

14        it doesn't.  It's already been the

15        subject of testimony in the case.

16        You can instruct the witness if you'd

17        like.

18                    MR. MERVIS:  Fair enough.

19        I'm going to instruct him for the

20        moment.  I may withdraw my objection.

21                    MR. MADDEN:  Fair enough.

22        Understood.  I just want to make

23        sure.  Maybe we'll come back.

24                    MR. MERVIS:  Okay.

25        Q        If you look at Exhibit 92.

Page 136

                    DAVID BROWNSTEIN

1

2      A        Which one is that?

3      Q        That's, sorry, your tab 5.

4               MR. MERVIS:  Actually, Matt,

5      you can go ahead and re-ask that

6      question, if you want to.

7      Q        At any point, did an

8   oversight board member vote against a

9   proposal to National?

10     A        I have no -- I have no way

11  of knowing.  I'm sorry.

12     Q        Were you at the meetings

13  when the oversight board --

14     A        Absolutely.

15     Q        Let me finish the question.

16              Were you in attendance at

17  the meetings when the oversight board

18  voted on proposals to National?

19     A        Yes.

20     Q        And you just don't recall

21  how the members of the oversight board

22  voted?

23     A        No.

24     Q        If you look at the

25  settlement allowance -- excuse me -- the

Page 140

```
 1              DAVID BROWNSTEIN

 2              Before the break, we were

 3   talking about the exchange ratio in the

 4   National PSA; okay?

 5       A       Yes.

 6       Q       The 71.65 percent exchange

 7   ratio, that was not the exchange ratio

 8   that the oversight board offered to all

 9   PREPA bondholders under the plan of

10   adjustment; correct?

11       A       Correct.

12              MR. MERVIS:  Wait.

13       A       Under the plan of

14   adjustment.

15              MR. MERVIS:  I know.  Go

16       ahead.  You could answer the

17       question.

18       Q       The offer to all PREPA

19   bondholders under the plan of adjustment

20   was a 50 percent exchange ratio; correct?

21       A       Correct.

22       Q       Why did the oversight board

23   in the plan of adjustment not offer to

24   all PREPA bondholders the same

25   opportunity to settle their bond claims
```

Page 142

1              DAVID BROWNSTEIN

2    question as well.

3         Q         The oversight board has

4    disclosed that one of the subjects of

5    your testimony at the confirmation

6    hearing will be that the settlement the

7    oversight board achieved with National is

8    fair and reasonable; correct?

9         A         Correct.

10        Q         What is the basis on which

11   you plan to testify that the National

12   settlement is fair and reasonable when

13   all PREPA bondholders were offered only a

14   50 percent exchange ratio under the plan

15   of adjustment?

16              MS. SPILLANE:  Objection to

17       form.

18              MR. MERVIS:  Object to the

19       form of the question.

20              You want to hear it back?

21              THE WITNESS:  No.  I

22       understand his question.

23        A         I just don't know how to not

24   say it's mediation privilege.  So I can

25   walk it through with you.

Page 143

1                DAVID BROWNSTEIN

2                MR. MERVIS:  I have a

3        different problem with the question.

4        I think the witness feels like he

5        can't answer it as phrased because of

6        mediation privilege.  I think that's

7        either the answer, or I can talk to

8        him outside about why he's saying

9        that.  I think there is a fundamental

10       issue with the question.

11                MR. MADDEN:  I want to get

12       the question right.

13                MR. MERVIS:  I think asking

14       him why he thinks the settlement's

15       fair and reasonable, that's a

16       perfectly fair and appropriate

17       question.  It's the last part of your

18       question where you said when blah,

19       blah, blah, blah; right?  To me,

20       that's argumentative and is

21       actually -- it's a disconnect.

22                MR. MADDEN:  I understand

23       the objection.  I don't agree with

24       it.  So I'm okay with the question.

25       Q        So let me just ask it one

Page 144

                    DAVID BROWNSTEIN

1       more time.  If your answer is you can't
2       tell me the answer, then that will be
3       your testimony.
4                    What is the basis on which
5       you believe the National settlement is
6       fair and reasonable, given that all PREPA
7       bondholders were offered only a
8       50 percent exchange ratio under the plan
9       of adjustment?
10                   MS. SPILLANE:  Objection to
11          form.
12                   MR. MERVIS:  Same objection.
13          A        Based on your question, I
14      can't answer it due to mediation
15      privilege; okay?  If you broke it into
16      pieces, there would be things I could
17      say.
18                   MR. MADDEN:  And given the
19          witness's response, counsel, do you
20          instruct him not to provide the
21          answer?
22                   MR. MERVIS:  No.  I don't
23          know.  I'd have to confer with him.
24          I hear what he's saying.  I imagine

Page 145

```
 1              DAVID BROWNSTEIN
 2       that I will agree with him as to his
 3       reason.  But I haven't heard what the
 4       reason is yet.
 5              MR. MADDEN:  Let's take a
 6       break.
 7              THE VIDEOGRAPHER:  The time
 8       is 12:13 p.m.  And we're going off
 9       the record.
10              (A short recess was taken.)
11              THE VIDEOGRAPHER:  The time
12       is 12:16 p.m.  And we're back on the
13       record.
14       Q      The pending question -- and
15   I'm just asking if your answer has
16   changed over the break -- is, what is the
17   basis on which you believe the National
18   settlement is fair and reasonable, given
19   that all PREPA bondholders were offered
20   only a 50 percent exchange ratio under
21   the plan of adjustment?
22              MR. MERVIS:  So I still do
23       object to the form.  And, again, I
24       have no issue with the first part of
25       the question.  But based on the
```

Page 146

                    DAVID BROWNSTEIN

1              conference that we had, I actually --

2              I think what he had in mind was

3              correct, and I will instruct him not

4              to answer that question.

5         Q         Is it your understanding

6    that there are PREPA bondholders for whom

7    the only offer the settlement that has

8    been made to them is the one under the

9    plan of adjustment?

10        A         Correct.

11        Q         In fact, there are thousands

12   of such bondholders; correct?

13        A         I don't know that.

14        Q         There are many such

15   bondholders in number?

16        A         I don't have that

17   information.

18        Q         For the bondholders who are

19   not involved in mediation and for whom

20   the only offer of settlement they've ever

21   received from the oversight board is the

22   one in the plan of adjustment, how does

23   it make it fair and equitable to them

24   that National was offered and agreed to a

Page 147

```
 1              DAVID BROWNSTEIN
 2   71.65 percent exchange ratio?
 3              MS. SPILLANE:  Objection to
 4        form.
 5              MR. MERVIS:  I object to the
 6        form of the question.
 7              MR. MADDEN:  Let me try it
 8        again.
 9        Q       Given that there are
10   bondholders who have only received an
11   offer of settlement from the oversight
12   board, that's the one in the plan of
13   adjustment, which was a 50 percent
14   exchange ratio, how is the agreement with
15   National to a 71.65 percent exchange
16   ratio on its bond claim fair and
17   reasonable?
18              MS. SPILLANE:  Objection to
19        the form.
20              MR. MERVIS:  Objection to
21        the form.
22        A       What I would tell you is
23   that there's a settlement with National
24   to deal with all the potential
25   litigation.  And so the settlement pays
```

Page 148

```
 1              DAVID BROWNSTEIN
 2   them more than it pays other creditors
 3   who can vote for or against the plan.
 4       Q      Were all PREPA bondholders'
 5   claims subject to that pending
 6   litigation?
 7              MR. MERVIS:  I object to the
 8      form.
 9       A      Well, I don't believe --
10   first of all, I don't believe that the
11   other creditors, other than the monoline
12   insurers and potential secondary market
13   purchasers of those bonds, have a
14   reimbursement claim.
15              Second, what National
16   accepted were two additional things.
17   One, that they would not receive a CVI
18   and, Two, that in the event there was
19   excess cash flow that would have gone to
20   settling bondholders through the flow of
21   funds in the plan, they will only receive
22   50 percent on the dollar of what is
23   available to them until the other
24   accepting bondholders get to the same
25   recovery that they have.
```

```
                                              Page 149

 1                    DAVID BROWNSTEIN

 2        Q         And I want to put aside for

 3   the moment, the treatment of the settled

 4   reimbursement claim that National has

 5   under the PSA.

 6        A         Okay.

 7        Q         Just focusing on the

 8   treatment under the PSA of National's

 9   bond claim, were the two terms you just

10   described different than the ones that

11   were offered to all PREPA bondholders

12   under the plan of adjustment?

13                  MR. MERVIS:  You mean the --

14      well, okay.  Objection to the form.

15      You mean the 50-cent?

16        Q         You just described a number

17   of things National agreed to, an exchange

18   ratio.

19        A         Yeah.  I hear you.

20        Q         The treatment of the CVI and

21   some other things.

22                  Was that package of terms

23   the one that was offered to all PREPA

24   bondholders under the plan of adjustment?

25                  MR. MERVIS:  That's a
```

Page 150

```
 1              DAVID BROWNSTEIN
 2      different question.  That one, I
 3      object to the form.
 4      A        I'm not in a position to
 5   answer that.
 6      Q        You don't know whether
 7   that's the offer of settlement that was
 8   made pursuant to the plan of adjustment?
 9      A        No.  I am not prepared to
10   answer that, given mediation.
11                 MR. MERVIS:  I agree with
12      it, at least the way it's phrased.
13                 MR. MADDEN:  Maybe I'm
14      misspeaking.  I don't think my
15      question comes anywhere close to
16      mediation privilege.
17      Q        My question is just whether
18   the package of terms that you agreed to
19   with National on its bond claim, is that
20   the same or different from the offer of
21   settlement that was made to all PREPA
22   bondholders under the terms of the plan
23   of adjustment?
24      A        Right.  And what I'm saying
25   to you is, in my view, that answer to
```

Page 152

1              DAVID BROWNSTEIN

2    achieved greater than a 71.65 percent

3    recovery on its bond claim had it not

4    settled with the oversight board?

5              MS. SPILLANE:  Objection to

6         the form.

7              MR. MERVIS:  Object to the

8         form.

9         A       I'm sorry.  I need you to

10   ask the question again.

11        Q       Sure.

12              Had National not entered

13   into a PSA with the oversight board under

14   the terms of the initial plan of

15   adjustment filed in December, would

16   National have stood to recover more than

17   71.65 percent on its bond claim?

18              MS. SPILLANE:  Objection to

19        form.

20              MR. MERVIS:  Objection to

21        the form.

22        A       I think I understand.  But

23   can you say it one more time?

24        Q       Sure.

25              Had National not entered

```
                                          Page 153

 1                  DAVID BROWNSTEIN

 2     into a PSA with the oversight board, then

 3     in that scenario, under the terms of the

 4     initial plan of adjustment filed in

 5     December, would National have stood to

 6     recover more than 71.65 percent on its

 7     bond claim under any scenario covered by

 8     the plan?

 9               MS. SPILLANE:   Same

10        objection.

11        A        No.

12        Q        What is the nature of

13     National's settled reimbursement claim?

14        A        National has a separate

15     contract with PREPA under which they are

16     entitled to reimbursement for payments

17     made to bondholders that is separate from

18     the bond claim itself.  That's why it's

19     called the reimbursement claim.

20               And while clearly, we're

21     settling on that at 20 cents on the

22     dollar which means there's both risk for

23     us and risk for them as to whether

24     they're entitled to that claim.

25        Q        And the payments that
```

Page 154

```
 1                 DAVID BROWNSTEIN
 2   National has made to bondholders and for
 3   which it seeks reimbursement, does that
 4   comprise principal and interest on the
 5   insured bonds?
 6        A        I'm sorry.  You need to
 7   break that up.
 8        Q        Okay.
 9                 Do the sums for which
10   National seeks reimbursement from PREPA
11   include principal it's paid to its
12   insured on account of PREPA bonds?
13        A        No.  The reimbursement claim
14   is strictly post-petition interest
15   claims.
16        Q        Understood.  I'm trying to
17   skip ahead.
18                 There's a clause in here
19   that begins, "Provided however" under
20   reimbursement claim.  This is on page 35
21   of the National PSA.  Do you see that?
22        A        I see, "Provided further."
23   Is it above that or below that?
24        Q        It's above that.  There's
25   another underlined, "Provided, however."
```

Page 364

                    DAVID BROWNSTEIN

 1

 2        Q         And you're also going to

 3    testify as to the terms of the

 4    settlements?

 5        A         Yes.

 6        Q         And that's just going to be

 7    the terms that we've seen in these

 8    documents before the PSAs?

 9                  MR. MERVIS:   Objection to

10       the form.

11        A         Well, it'll be on those, the

12    bond documents, which will be released

13    hopefully tomorrow morning, by tomorrow

14    and other documents that were part of the

15    overall settlements.

16        Q         And you're also going to

17    discuss the benefits that they provide to

18    PREPA?

19        A         Correct.

20        Q         Let's just focus as to the

21    fuel line lenders' PSA.  At those

22    settlements, I -- I took away from your

23    testimony that it was putting an end to

24    the litigation, was the first benefit.  I

25    also heard that the second benefit was it

Page 365

1              DAVID BROWNSTEIN

2     was able -- it allowed you to define the

3     universe of payments so you would know

4     what else was available to settle with

5     other parties; is that fair?

6              MR. MERVIS:  I object to the

7         form.

8         A         Yes.  That's fair.

9         Q         Thank you.

10              Is there a third point that

11    you would describe as a benefit to the

12    settlement with the fuel line lenders?

13        A         Well, I did describe that

14    the fuel lines are a sophisticated

15    institutional investor who has a lot of

16    experience with municipal bonds.  And

17    they, as well as National, who is also a

18    sophisticated investor with significant

19    experience in municipal bonds, both had

20    to conclude in order to sign on that the

21    bonds we were offering them would meet

22    the criteria that they would need, so

23    that they who aren't long-term investors

24    in municipal bonds would be able to sell

25    them at -- into the market at a value

Page 366

1                    DAVID BROWNSTEIN
2    that made economic sense for them.
3         Q        And that's a benefit to
4    PREPA?
5         A        That's a benefit to our --
6    to the entire means to get out of
7    bankruptcy.
8         Q        And these benefits, those
9    three benefits would also be benefits
10   for -- to PREPA from the National PSA?
11        A        Yes.  Sorry.  I was talking
12   about both.  No.  National's case, not
13   with respect to the issue of getting to a
14   known recovery with them obviously.
15        Q        Now, in the same paragraph,
16   it says, "Mr. Brownstein will base this
17   testimony on his personal participation
18   in the negotiation of the National PSA
19   and fuel line lender PSA."
20                 My question is, was that
21   negotiation as to either one of those
22   PSAs outside of the mediation context?
23        A        No.
24        Q        So is it your belief that
25   your personal participation in the

Page 369

1                    DAVID BROWNSTEIN

2    benefits for the fuel line lenders'

3    settlement, as well as the National

4    settlement.

5                    Here, you indicate on the

6    following paragraph that Mr. Brownstein

7    is expected to testify regarding the key

8    benefit that the oversight board took

9    into account.

10                   Are those the same as the

11   three items that we discussed previously

12   with respect to the PSAs or are they

13   different?

14       A       Those are the basic ones,

15   you know, I need to think about what

16   other ones we were talking about

17   previously and see whether they're

18   valuable enough to include or not.  But

19   those are the three basic ones.

20       Q       And that would include --

21   reading on, that would include the

22   benefits that the oversight board took

23   into account with respect to its

24   resolution of the litigation filed by the

25   fuel line lenders, regarding the

```
                                              Page 370

 1                 DAVID BROWNSTEIN

 2   priority; right?

 3        A        Correct.

 4        Q        And what do you anticipate

 5   your testimony to be with respect to

 6   those key benefits regarding the priority

 7   of the fuel line lenders?

 8                 MR. MERVIS:  Object to the

 9        form.  But you could answer.

10        A        Again, as I said previously

11   today, the critical pieces, what we were

12   concerned about is since we have a

13   limited amount of funds available for

14   creditors, without knowing what the

15   amount is that we will be paying the fuel

16   lines, given we would be going into

17   litigation, we would either have to

18   reserve a significant amount of money for

19   the fuel lines until we knew, or we could

20   settle with them and, therefore, be able

21   to negotiate with the bondholders with

22   knowing what was the free cash flow

23   available for them.

24        Q        Thank you.

25                 Moving away from the
```

1                   DAVID BROWNSTEIN

2       disclosure statement and moving towards

3       the fuel line lender settlement, under

4       that settlement, why are bondholders

5       entitled to interest accrual from

6       December 1, 2022 on the Series A Bonds?

7                   MR. MERVIS:  I object to the

8          form.

9          A       Well, you're asking why the

10      fuel line lenders as owners of the Series

11      A Bonds are entitled to one year's

12      accrued interest.

13         Q       Yes.

14         A       Okay.  And this is on the

15      new bonds so you understand; right?  That

16      there's a deemed issuance date on the

17      bonds, built into our cash flows already

18      is the cost of that one year's accrual.

19      If the settlement takes longer than a

20      year, they no longer receive additional

21      accrual.

22                  So the charge that you're

23      aware of that we're prepared to pay to

24      all creditors incorporates already, the

25      interest accrual from the deemed issuance

Page 372

1           DAVID BROWNSTEIN
2   date.  The reason for the deemed issuance
3   date is, as I think you know, the fuel
4   lines are one of several creditors, but
5   one who has settled with the board who
6   have entered into several RSAs with us;
7   okay?  And those RSAs have been
8   terminated for various reasons.  The
9   issue is in getting creditors to agree
10  today to move forward with an RSA with
11  us.  They're looking to understand what
12  can keep the deal from closing and when
13  it can close and what the economic impact
14  to them of it not closing on that
15  schedule is.
16          So as part of the settlement
17  with National -- with the fuel line
18  lenders, we've agreed to give them a
19  deemed issuance date.  And if the bonds
20  are issued in less than one year or one
21  year exactly, they will get accrued
22  interest on those bonds, on the new
23  bonds.  If it's longer than one year, the
24  accrual stops.  It's not dissimilar,
25  although it is different, from the

Page 373

1          DAVID BROWNSTEIN

2   National agreement where National will

3   receive one cent on its pro rata share of

4   their bonds.

5               So let me try and help you

6   think about this.  If there are 8 billion

7   of outstanding bonds, one cent on that

8   8 billion then divided by all the bonds,

9   multiplied by National's bonds is what

10  they'd be entitled to for up to 12

11  months, subject to approval of the

12  utility commission, PREB.

13      Q       So you view this as interest

14  on new bonds and not post-petition

15  interest; is that fair?

16      A          No.  The difference, as I

17  said, is that the interest on -- for

18  National is one cent.  It's not equal to

19  interest on the bonds, on the old bonds.

20      Q        I'm still on the fuel line

21  lenders.

22      A        I'm sorry.  I apologize.

23  Yes.  It's interest on the new bonds.

24      Q        Now, staying with the fuel

25  line lenders, I mean you're not going to

Page 375

```
 1              DAVID BROWNSTEIN
 2  for the difference in the treatment,
 3  other than the fact that one is a
 4  settlement, and one hasn't been settled?
 5              MR. MERVIS:  Objection to
 6     the form.
 7       A      Yes.  Again, it was our
 8  position that we have risk with the fuel
 9  line lenders on priority.  And we don't
10  believe we have that risk with you.
11       Q      And that has to do with the
12  current expense?
13       A      Yes.
14       Q      Do you know if there's any
15  general unsecured creditors that have
16  current expense claims?
17       A      No, we don't.  We believe
18  there may be.  But we don't.
19       Q      Have you ever heard of a
20  company called General Unsecured Creditor
21  as I believe Cedarlake Capital?
22       A      No.
23       Q      If there was a general
24  unsecured creditor that also had a
25  current expense claim, would they be
```

Page 376

```
 1                 DAVID BROWNSTEIN
 2    treated similarly in your opinion to the
 3    fuel line lenders?
 4                 MR. MERVIS:  Objection to
 5        the form.
 6        A        The answer is no.  We don't
 7    have a settlement with them.  They didn't
 8    negotiate a settlement.  And the answer
 9    would be it depends on if they settle and
10    how that settlement works.  As you know,
11    there have been offers made.
12        Q        Now, is it your
13    understanding that the fuel line lenders
14    are expressly named in the trust
15    agreement?
16                 MS. SPILLANE:  Objection to
17        form.
18        A        I believe what's named is
19    fuel purchases; right?
20        Q        Do you think that the trust
21    agreement references to the fuel line
22    lenders whether they're denominated by
23    some other name?
24                 MS. SPILLANE:  Objection to
25        form.
```

Page 387

```
 1              DAVID BROWNSTEIN

 2      Q        Let me talk briefly about

 3   National and that PSA.

 4               Is it your understanding

 5   that National has a contractual priority

 6   over unsecured creditors under the trust

 7   agreement or any other document?

 8      A        At the time we settled with

 9   National, there had been no ruling from

10   Judge Swain as to whether they had a

11   secured lien or not.  At that time, we

12   settled the claim with them as we were

13   prepared to do with others at the same

14   time.  And that included, you know,

15   settling the fact that they may have a

16   secured lien.

17      Q        Does that PSA with National

18   have a fiduciary out?

19               MR. MERVIS:  Objection to

20      the form.  You could answer.

21      A        I don't believe so.  It has

22   outs in it.  But I don't believe it has a

23   fiduciary out.

24      Q        Do you know why it doesn't?

25               MR. MERVIS:  Objection to
```

Page 388

1              DAVID BROWNSTEIN

2        the form.

3        A          Not every PSA has a

4   fiduciary out.  That simple.  There's

5   reasons to put one in.  We have outs.

6   They have outs here.  It's not a

7   fiduciary out.  If Judge Swain says that,

8   as you know, the reimbursement claim is

9   not a valid claim, they still have to

10  proceed.  They don't have an out.  We

11  don't have an out for that.  And if she

12  says that they are not -- well, there's

13  several outs and other provisions.  But

14  there isn't -- my recollection is there

15  isn't a fiduciary out in that agreement.

16       Q          Well, you just referenced

17  that Judge Swain, if she doesn't approve

18  the reimbursement claim, but that's just

19  one element of several elements of that

20  PSA, isn't it?

21       A          Yes, although they don't

22  get -- remember the reason that they gave

23  up their CVI was in part because they

24  were getting the reimbursement claim.

25  That doesn't step back in.  That deal, as