# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

---------------------------------------------------------------------- x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al*.,

     Debtors.

PROMESA
Title III

Case No. 17-BK-3283 (LTS)

(Jointly Administered)

---------------------------------------------------------------------- x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of

PUERTO RICO ELECTRIC POWER AUTHORITY, *et al*.,

     Debtors.

PROMESA
Title III

Case No. 17-BK-4780 (LTS)

---------------------------------------------------------------------- x

## OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO CONFIRMATION OF MODIFIED SECOND AMENDED TITLE III PLAN OF ADJUSTMENT OF THE PUERTO RICO ELECTRIC POWER AUTHORITY

# TABLE OF CONTENTS

**Page**

Preliminary Statement ................................................................................................ 1

Background .................................................................................................................. 7

    I.     Brief Overview of New Bonds Waterfall Under Plan ................................. 7

    II.    Amended Lien & Recourse Challenge ...................................................... 9

Objection .................................................................................................................... 10

    I.     Legal Standard ......................................................................................... 10

    II.    Plan Should Not Be Confirmed as It Unfairly Discriminates Against Holders of General Unsecured Claims ...................................................... 11

        A.    Plan Unfairly Discriminates in Favor of Fuel Line Loan Claims ............ 12

            i.     *Fuel Line Loan Claims and General Unsecured Claims Have Same Priority and Same Rights Against PREPA* ............... 13

            ii.    *Plan Greatly Discriminates in Favor of Fuel Line Loan Claims as Compared to General Unsecured Claims* ................. 16

            iii.   *No Justification for Discrimination in Favor of Fuel Line Lenders* ............................................................................ 19

        B.    Plan Unfairly Discriminates in Favor of National's Claims .................. 23

            i.     *National's Claims Are, at Best, Unsecured Claims With No Greater Right to Payment Than General Unsecured Claims* ...... 23

            ii.    *Plan Greatly Discriminates in Favor of National's Claims as Compared to General Unsecured Claims* ............................... 24

            iii.   *No Justification for Discrimination in Favor of National* .......... 26

            iv.   *National Reimbursement Claim Should Be Disallowed in Its Entirety* .............................................................................. 30

            v.    *Fee Reimbursement and Structuring Fee* .................................... 34

            vi.   *Interim Charge* ......................................................................... 35

    III.   Plan Is Not In Best Interest of General Unsecured Creditors in Class 7 ............. 36

    IV.   Fuel Oil Litigation and Other Litigation Claims Should Be Transferred to Avoidance Actions Trust .................................................... 39

    V.    GUC Trust and Avoidance Actions Trust Should Not Be Approved in Their Current Form ................................................................. 40

    VI.   Proposed Dissolution of Committee on Effective Date Violates Section 1129(a) .......................................................................... 42

    VII.  Objections to Proposed Confirmation Order .................................... 44

i

Reservation of Rights............................................................................................................. 45

Conclusion ............................................................................................................................. 45

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Actrade Fin. Techs. Ltd.*,
 Case No. 02-16212 (ALG), 2009 Bankr. LEXIS 890 (Bankr. S.D.N.Y. Apr.
 13, 2009) ..................................................................................................................27

*Air Line Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co.*
  *(In re Ionosphere Clubs, Inc.)*,
 156 B.R. 414 (S.D.N.Y. 1993) aff'd, 17 F.3d 600 (2d Cir. 1994) ..........................36

*Am. United Mut. Life Ins. Co. v. City of Avon Park*,
 311 U.S. 138 (1940) ...............................................................................................17

*In re ASARCO LLC*,
 No. 05-21207, 2009 WL 8176641 (Bankr. S.D. Tex. June 5, 2009) .......................20

*In re Barney & Carey Co.*,
 170 B.R. 17 (Bankr. D. Mass. 1994) ......................................................................28

*In re Bearingpoint, Inc.*,
 No. 09-10691 (REG), 2009 Bankr. LEXIS 5045 (Bankr. S.D.N.Y. Dec. 22,
 2009) .......................................................................................................................41

*In re Block*,
 293 B.R. 290 (Bankr. D. R.I. 2003) ........................................................................30

*In re Chemtura Corp.*,
 439 B.R. 561 (Bankr. S.D.N.Y. 2010) ....................................................................43

*Citizens Bank & Trust Co. v. Riederer (In re Brooke Cap. Corp.)*,
 No. 08-22789-7, 2012 WL 4793010 (Bankr. D. Kan. Oct. 5, 2012) ......................15

*In re City of Detroit*,
 524 B.R. 147 (Bankr. E.D. Mich. 2014) ............................................................17, 36

*In re City of Stockton*,
 486 B.R. 194 (Bankr. E.D. Cal. 2013) ..............................................................35, 36

*City Sanitation, LLC v. Allied Waste Servs. of Mass., LLC (In re Am. Cartage,*
  *Inc.)*,
 656 F.3d 82 (1st Cir. 2011) .....................................................................................20

*In re DeLeo*,
 No. 21-20025, 2022 WL 1072857 (Bankr. D. Me. Apr. 8, 2022) ..........................18

*In re Delphi Corp.*,
   No. 05-44481 (Bankr. S.D.N.Y. Jan. 12, 2007)........................................................34

*In re Destileria Nacional, Inc.*,
   No. 20-01247 (ESL), 2021 WL 3177287 (Bankr. D.P.R. July 27, 2021) ...............................11

*In re DeWolfe*,
   494 B.R. 193 (Bankr. W.D.N.Y. 2013) ...................................................................38

*In re Dow Corning Corp.*,
   244 B.R. 696 (Bankr. E.D. Mich. 1999) ................................................................28

*In re EBHI Holdings, Inc.*,
   No. 09-12099 (MFW), 2010 Bankr. LEXIS 3062 (Bankr. D. Del. Mar. 18,
   2010) ....................................................................................................41

*In re Egolf*,
   102 B.R. 706 (Bankr. N.D. Ind. 1989)..................................................................31

*In re El Comandante Mgmt. Co., LLC*, No. 04-10938 (ESL), 2006 WL 3903592
   (Bankr. D.P.R. Mar. 3, 2006)...........................................................................12

*In re Env't Aspecs, Inc.*,
   235 B.R. 378 (E.D.N.C. 1999) .......................................................................15, 16

*Fleet Cap. Corp. v. Yamaha Motor Corp., U.S.A.*, No. 01 Civ. 1047 (AJP), 2002
   WL 31174470
    (S.D.N.Y. Sept. 26, 2002)..............................................................................15

*Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.)*,
   283 F.3d 159 (3d Cir. 2002)...........................................................................26

*Gowan v. Gardi (In re Gardi)*,
   273 B.R. 4 (Bankr. E.D.N.Y. 2002)....................................................................30

*Hargreaves v. Nuverra Env't Sols., Inc. (In re Nuverra Env't. Sols., Inc.)*,
   590 B.R. 75 (D. Del. 2018)............................................................................12

*In re Hermanos Torres Perez Inc.*,
   No. 09–05585 EAG, 2011 WL 5854929 (Bankr. D.P.R. Nov. 21, 2011) ...............................11

*Higgins v. Erickson (In re Higgins)*,
   270 B.R. 147 (Bankr. S.D.N.Y. 2001)..................................................................39

*In re Hill Wine Co.*,
   No. 14-10680, 2014 WL 2795169 ...................................................................17, 35

*Hiraldo v. Banco Popular de P.R. (In re Hiraldo)*,
   471 B.R. 676 (Bankr. D.P.R. 2012) ...................................................................39

*In re Innkeepers USA Trust*,
   442 B.R. 227 (Bankr. S.D.N.Y. 2010) ...............................................................29

*Int'l Asset Recovery v. Thomson McKinnon Sec. Inc.*,
   335 B.R. 520 (S.D.N.Y. 2005)............................................................................17

*Irving Tanning Co. v. Me. Superintendent of Ins.*,
   496 B.R. 644 (B.A.P. 1st Cir. 2013) ..................................................................11

*Jeffrey v. Desmond*,
   70 F.3d 183 (1st Cir. 1995)................................................................................19

*In re LightSquared Inc.*,
   513 B.R. 56 (Bankr. S.D.N.Y. 2014)..................................................................11

*In re Lion Capital Grp.*,
   49 B.R. 163 (Bankr. S.D.N.Y. 1985)..................................................................20

*Newman v. Stein*,
   464 F.2d 689 (2d Cir. 1972)...............................................................................26

*In re Nutritional Sourcing Corp.*,
   398 B.R. 816 (Bankr. D. Del. 2008) ..................................................................22

*Off. Comm. Of Unsecured Creditors v. Goold Electronics Corp.*,
   No. 93 C 4196, 1993 WL 408366 (N.D. Ill. Sept. 22, 1993)............................39

*In re Old Colony LLC*,
   476 B.R. 1 (Bankr. D. Mass. 2012) ...................................................................17

*In re Refco Inc.*,
   No. 05-60006 (RDD), 2006 Bankr. LEXIS 4914 (Bankr. S.D.N.Y. Dec. 14,
   2006) ...................................................................................................................41

*In re Remsen Partners, Ltd.*,
   294 B.R. 557 (Bankr. S.D.N.Y, 2003) ...............................................................22

*Resol. Tr.Corp. v. Best Prods. Co. (In re Best Prods. Co., Inc.)*,
   177 B.R. 791 (S.D.N.Y.1995).............................................................................19

*Robinson v. Nat'l Student Clearinghouse*,
   14 F.4th 56 (1st Cir. 2021).................................................................................20

*In re Santana*,
   480 B.R. 222 (Bankr. D.P.R. 2012) ...................................................................12

*The Candle Co. v. Mims (In re Moore)*,
  608 F.3d 253 (5th Cir. 2010) ................................................................39

*In re Trib. Co.*,
  972 F.3d 228 (3d Cir. 2020)............................................................12, 15

*United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assoc.*,
  484 U.S. 365 (1988).........................................................................17, 35

**Statutes**

11 U.S.C.
  § 502(b)(2) ........................................................................................5, 33
  § 506(b)..................................................................................................34
  § 1103..............................................................................................43, 44
  § 1109..............................................................................................43, 44
  § 1109(b)................................................................................................43
  § 1129......................................................................................10, 11, 44
  § 1129(a)(1).....................................................................................42, 43
  § 1129(a)(2).....................................................................................42, 43
  § 1129(a)(3).....................................................................................40, 43
  § 1129(b)..........................................................................................11, 12
  § 1129(b)(1)............................................................................................11

Bankruptcy Code section 1123(a)(7).....................................................40, 41

PROMESA § 314(b)(6) .............................................................................36

To the Honorable United States District Judge Laura Taylor Swain:

The Official Committee of Unsecured Creditors (the "Committee") respectfully files this objection (the "Objection") to confirmation of the *Modified Second Amended Title III Plan of Adjustment of the Puerto Rico Electric Power Authority* [Docket No. 3296] (the "Plan").[1]  In support of its Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.        The Plan is built on two interrelated pillars: (1) Reorganized PREPA's issuance of $5.68 billion of New Bonds and (2) the allocation of the New Bonds among various creditor groups pursuant to a complex waterfall.[2]  As detailed below, the allocation of the New Bonds is unfairly discriminatory, as it provides vastly superior treatment to the Fuel Line Lenders and National, as compared to holders of General Unsecured Claims ("General Unsecured Creditors"), even though the Fuel Line Lenders and National are unsecured creditors without any priority of payment over General Unsecured Creditors—and National may not even have any allowable unsecured claims at all.

2.        Instead of distributing the New Bonds *pro rata* among **all** allowed unsecured claims, the Plan incorporates two extremely rich "settlements" the Oversight Board reached with two sets of preferred unsecured creditors.  Under the settlement with the Fuel Line Lenders, the Fuel Line Lenders receive (a) allowed Fuel Line Loan Claims in the full asserted amount and (b) Series A Bonds in an aggregate amount equal to approximately **92.7%** of their allowed Fuel Line Loan Claims[3]—with the potential to receive additional Series B Bonds under certain

---

[1]     Capitalized terms used but not otherwise defined herein have the meanings set forth in the Plan or the Disclosure Statement.

[2]     Of course, the Plan also assumes that Reorganized PREPA will be able to fulfill its obligations under the New Bonds—*i.e.*, that the Plan is feasible.  The Committee does not object to the feasibility of the Plan, but reserves the right to do so in the event that the Oversight Board were to increase the amount of New Bonds to be issued to other constituencies under the Plan.

[3]     As detailed below, a portion of that recovery may be paid in cash (in the sole discretion of the Oversight Board).

circumstances (depending on the outcome of the Amended Lien & Recourse Challenge) for an aggregate recovery in excess of **100.0%**.

3.      Under the settlement with National, National receives (a) allowed National Insured Bond Claims in the full asserted amount and (b) Series B Bonds in an aggregate amount equal to approximately **83.3%** of its allowed National Insured Bonds Claims, plus additional interim payments (with the precise amount undisclosed).  Indeed, National's recovery percentage could even exceed **100.0%**, if this Court (or the First Circuit on appeal) ultimately determined that the amount of the Bondholders' unsecured net revenue claim is less than the full amount asserted by the Bondholders, or if the First Circuit were to determine on appeal—as the Committee has advocated—that the Bondholders have no additional recourse claim at all.  Thus, paradoxically, under the proposed National Settlement, the ***lower*** the allowed unsecured net revenue claim, the ***higher*** National's effective recovery percentage—including potentially more than payment in full—even though a lower allowed claim should reduce recoveries.[4]

4.      In stark contrast to the treatment of the Fuel Line Lenders and National, the Plan provides General Unsecured Creditors with Series B Bonds only to the extent such bonds remain available ***after*** the Fuel Line Lenders, National, and the Settling Bondholders have received their guaranteed recoveries.  Accordingly, the actual value of General Unsecured Creditors' recovery cannot be determined at this time, including because it depends on (a) the outcome of the Amended Lien & Recourse Challenge and (b) the aggregate allowed amount of General Unsecured Claims.  However, based on the Oversight Board's assumptions in its Disclosure Statement—including estimates for allowed General Unsecured Claims totaling $800 million and

---

[4]     For example, if the Court were to estimate the unsecured net revenue claim at half of the Bondholders' asserted claim amount, then National's recovery under the Plan (*i.e.*, $670.0 million) would far exceed the amount of its claims absent the National Settlement (*i.e.*, 50% of $836.1 million, or $418.1 million).

2

Unsecured Net Revenue Claims[5] totaling approximately $7.57 billion[6]—the Oversight Board estimates that allowed claims in the Unsecured Claims Pool would recover approximately **46.5%** of their claims.  Of course, that percentage will be lower if, as the Committee believes, the Oversight Board's estimate of $800 million in allowed General Unsecured Claims is grossly understated.[7]  The Committee has already detailed, in a separate motion seeking to exclude the testimony of the Oversight Board's "expert" on this claim estimate, that the Oversight Board's estimate is without basis.  Making matters even worse, the Series B Bonds to be received by General Unsecured Creditors are also qualitatively inferior to the Series A Bonds to be received by the Fuel Line Lenders, including as it relates to maturity (50 years vs. 15 years), expected repayment date (34 years vs. 5 years), and payment priority (principal on Series A Bonds is paid before principal on Series B Bonds).

5.       There is *no justification* for the grossly disparate treatment in favor of the Fuel Line Lenders and National.  The Fuel Line Loan Claims have no greater right to payment than General Unsecured Claims because they are no more entitled to "Current Expense"[8] status under the Trust Agreement than General Unsecured Claims.  And even if General Unsecured Claims are not entitled to Current Expense Priority (they are), the Fuel Line Lenders' Current Expense Priority could be enforced *only against the Bondholders*.  There is no legal basis for enforcing the Current Expense Priority against parties that did not sign the Trust Agreement, such as the hundreds of General Unsecured Creditors.

---

[5]    The Plan refers to the Unsecured Net Revenue Claims as Deficiency Claims.

[6]    PREPA's bond debt at its Petition Date was approximately $8.48 billion.  After removing $836 million on account of National's allowed claim under its settlement and $75 million in settling PREPA Revenue Bonds, the remaining Bondholders' claims total $7.57 billion.

[7]    Assuming allowed General Unsecured Claims in the current asserted amount of **$5.9 billion** (all of which are *prima facie* valid at this time because no merits objections have been filed to such claims), General Unsecured Creditors would only recover approximately **28.9%** (holding all other Plan assumptions constant).

[8]    This Objection will refer to the asserted payment priority as the "Current Expense Priority."

6.     The Oversight Board's contrived settlement of the Current Expense dispute cannot justify this unfair discrimination.  The "settlement" does not benefit PREPA by eliminating PREPA's litigation risk, because PREPA has no litigation risk: even if the Fuel Line Lenders prevailed in the Current Expense litigation, their recovery would come from the Bondholders.  Nor does it benefit any other creditors.  In fact, because there is only "one pot" of New Bonds available for all creditors, the Fuel Line Lenders' additional recovery directly *decreases* the recoveries of all other General Unsecured Creditors, even though the Bondholders are the only party against whom the Fuel Line Lenders have asserted a priority.

7.     National similarly has no greater right to payment than do General Unsecured Creditors.  As this Court recently explained, National is, at best an unsecured creditor as, other than its *de minimis* secured claim, it holds only:

> an unsecured claim . . . to be liquidated by reference to the value of future Net Revenues (as defined in the Trust Agreement) that would, under the waterfall provisions of the Trust Agreement and applicable nonbankruptcy law, have become collateral upon being deposited in the specified funds and payable to the Bondholders over the remainder of the term of the Bonds (the "Unsecured Net Revenue Claim").[9]

8.     Moreover, whatever priority rights National and the other Bondholders may believe they have under the Trust Agreement, any such priority is plainly not enforceable against General Unsecured Creditors that are not parties to the Trust Agreement.  If anything, it is General Unsecured Creditors that should be able to assert a payment priority over the Bondholders, both because General Unsecured Claims are entitled to Current Expense Priority and because General Unsecured Creditors have rights to be paid from PREPA's *gross* revenues

---

[9]     Lien & Recourse Decision (as defined below) at 13-14.  To be clear, the Committee reserves all rights in regard to the Unsecured Net Revenue Claim, including to argue on appeal that the Bondholders have no recourse against PREPA, other than to the funds on deposit in the Sinking Fund.

(and, for that matter, all PREPA assets) while the Bondholders have agreed that they have recourse only to PREPA's *net* revenues.

9.      The Oversight Board's entry into the National Settlement changes none of this.  In light of the Lien & Recourse Decision, it is now abundantly clear that, whatever the merits of that settlement when the parties entered into the National PSA on January 31, 2023, it is not reasonable today.[10]  Further highlighting the unreasonableness is the real possibility that National's ultimate recovery under the Plan may *exceed* **100%** of what would have been National's allowed Unsecured Net Revenue Claim absent the National Settlement.  Clearly, the Oversight Board should have negotiated for a "fiduciary out" that would have allowed it to terminate the National PSA in anticipation of the Court's ruling that the Bondholders are not fully secured and/or do not have Unsecured Net Revenue Claims in the full, asserted amount.

10.     Moreover, the Oversight Board's attempt to characterize the settlement of the National Reimbursement Claim as a "win" because it was settled at "only" 20% is highly disingenuous.  That claim is not a separate, contractual reimbursement claim against PREPA, but instead based, in its entirety, on National having become subrogated to the rights of holders of National Insured Bonds.  Because the National Reimbursement Claim reflects payments that National made to Bondholders on account of postpetition interest, such payments must be disallowed under section 502(b)(2) of the Bankruptcy Code as unmatured interest.  Providing National with a 20% recovery on account of an utterly meritless claim is patently unreasonable.

11.     In sum, the Plan unfairly discriminates against General Unsecured Claims in favor of the Fuel Line Loan Claims and National's claims.  And this unfair discrimination cannot pass muster under the cover of contrived "settlements."  If unfair discrimination between two

---

[10]     As discussed below, the National Settlement was never reasonable.

similarly creditor groups could be justified simply because of a "settlement," a plan proponent could always buy the votes of preferred creditors by offering them superior treatment.  This would undermine the Bankruptcy Code's fundamental principle of equal treatment of similarly situated creditors and would read the unfair discrimination test out of the Bankruptcy Code.

12.     In addition to unfair discrimination, the Plan also fails another basic confirmation requirement: the best interest test.  The Oversight Board's Best Interest Test Report ("BIR") assumes a receiver would be appointed and that the receiver would pay General Unsecured Claims only after paying Bondholders.  However, regardless of whether General Unsecured Claims qualify as Current Expenses, a receiver would prioritize—both as a legal and a practical matter—paying PREPA's operational expenses from gross revenues before paying debt service, resulting in General Unsecured Claims being paid in full outside of Title III.  And even if the receiver did not so prioritize payment of General Unsecured Claims, such claims would have to be paid because there is no automatic stay outside Title III.

13.     Finally, the Committee also objects to various other aspects of the Plan (as detailed below), including the following:

- The Fuel Oil Litigation and other litigation claims should be transferred to the Avoidance Actions Trust;

- The Committee should select two of the three board members for the GUC Trust and the Avoidance Action Trust;

- The Committee or a successor to the Committee (which may be the GUC Trust, provided the Committee has control over the selection of the GUC Trustee) should be in charge of objecting to General Unsecured Claims; and

- The Committee should not be dissolved on the Effective Date but remain in existence until any confirmation order has become a final order.

14.     For all these reasons, and as detailed below, the Plan should not be confirmed.

## BACKGROUND

15.     On March 1, 2023, the Oversight Board filed the Plan and the related disclosure statement [Docket No. 3297] (the "Disclosure Statement").  On March 3, 2023, the Court approved the Disclosure Statement and related solicitation procedures.  *See* Docket No. 3304.

16.     On June 2, 2023, the Committee filed a motion [Docket No. 3579] (the "Shankweiler Exclusion Motion") to exclude the testimony of the Oversight Board's expert on its estimate of allowed General Unsecured Claims, *i.e.*, Mr. Mark Shankweiler of BRG.[11]

### I.     Brief Overview of New Bonds Waterfall Under Plan[12]

17.     Distributions under the Plan are determined by a complex waterfall (the "New Bonds Waterfall") governing the allocation of $5.68 billion of New Bonds (in the form of Series A Bonds and Series B Bonds) to be issued by Reorganized PREPA.

18.     Waterfall Level 1: At the top of the New Bonds Waterfall are the Fuel Line Lenders, who stand to receive Series A Bonds with a face value of approximately **$650.1 million**, which represents **92.7%** of the Fuel Line Loan Claims (to be allowed in the full asserted amount of approximately $700.9 million).[13]

19.     Waterfall Level 2: At the next level of the New Bonds Waterfall, the Plan provides for other mandatory distributions, namely:

- distributions of Series B Bonds to National in the aggregate amount of approximately **$697.1 million**, which represents **83.3%** of the National Insured Bond Claims (to be allowed in the amount of approximately $836.1 million);[14]

---

[11]   The Committee also filed a motion [Docket No. 3580] to preclude David Brownstein of Citigroup and Oversight Board member David Skeel from testifying at the confirmation hearing as to matters on which they refused to answer questions in their depositions based on "mediation privilege" or attorney-client privilege.

[12]   The following overview is, by necessity, a simplified version of the actual allocation of New Bonds under the Plan.  This overview is qualified in its entirety by the applicable provisions in the Plan.

[13]   *See* Plan art. VII.A(i).  As discussed below, the Fuel Line Lenders are also entitled to additional recoveries that, under certain circumstances, bring their total recovery over 100%.  *See* Plan art. I.A.202, VII.A(ii).

[14]   *See* Plan art. VIII.A., IX.A.  In addition, under the National PSA, the Oversight Board agreed to use its reasonable best efforts to cause PREPA to impose an "Interim Charge" to fund interim payments to National for the period from the effective date of the National PSA (i.e., January 31, 2023) through the Effective Date of the

- distributions of Series B Bonds to the Settling Bondholders in the aggregate amount of approximately **$37.5 million**, which represents **50%** of such bondholders' Bond Claims;[15]

- distributions, if any, of Series B Bonds to Non-Settling Bondholders and Non-Settling Monolines to the extent their claims are determined to be secured beyond the amounts in the Sinking Funds (but subject to certain limitations);[16] and

- the issuance and sale of up to **$400 million** in Series B Bonds (*i.e.*, the Administrative Expense Bonds) to the Commonwealth.[17]

After the foregoing mandatory distributions, approximately **$3.9 billion** in Series B Bonds (*i.e.*, the GUC Remaining New Bonds) would remain available for distributions to other creditors.

20.     <u>Waterfall Level 3</u>: Under the Plan, the GUC Remaining New Bonds would be distributed to the GUC Trust for the benefit of holders of claims in the Unsecured Claims Pool, subject to a 50% recovery cap at this level of the waterfall.[18]  The Unsecured Claims Pool includes not only General Unsecured Claims, but also other unsecured claims, most notably any unsecured bond claims, as determined in the Amended Lien & Recourse Challenge (*i.e.*, the Deficiency Claims, if any).[19]  Assuming the estimated claim amounts set forth in the Disclosure Statement (including allowed General Unsecured Claims totaling $800 million and Deficiency

---

First Amended Plan.  The Interim Charge, which is subject to PREB approval, would be approximately 10% of 1 cent/kWh, as the National Insured Bond Claim (approximately $836.1 million) is approximately 10% of the PREPA Revenue Bond Claims (approximately $8.5 billion).  While the Committee is unable to quantify the size of these interim payments at this time, it is obvious that they will further increase National's aggregate recovery above 83.3%.

[15]   *See* Plan art. IV.A; Discl. Stmt. at 4.

[16]   *See* Plan art. V.A(ii).  Based on the Lien & Recourse Decision, the Non-Settling Bondholders and Non-Settling Monolines are secured only by the funds held in the Sinking Fund and certain related accounts.  The extent to which the Bondholders are secured in such related account is subject to ongoing proceedings.

[17]   *See* Plan art. XVIII.H.

[18]   Plan art. I.A.108, 110, 112, and 113; art. X.A.

[19]   Plan art. I.A.238.  The amount of any such Deficiency Claims is the subject of the Estimation Proceedings (as defined below) as well as subject to potential appeals.  Because holders of allowed General Unsecured Claims must share any Series B Bonds with other unsecured creditors, their recovery is also contingent on the allowed amount of such other claims, including any Deficiency Claims.

Claims totaling approximately $7.57 billion), holders of claims in the Unsecured Claims Pool

would recover approximately **46.5%** of their claims.[20]

21.    <u>Waterfall Level 4</u>:  Twenty percent of the remaining Series B Bonds (*i.e.*, the

Gross Remaining New Bonds) would be distributed to the PREPA PayGo Trust for the benefit of

PREPA ERS.[21]

22.    <u>Waterfall Level 5</u>:  Any remaining Series B Bonds (*i.e.*, the Net Remaining New

Bonds) would be distributed, on a *pro rata* basis, to supplement the recoveries of various creditor

groups, including the Fuel Line Loan Claims, the claims of Settling Bondholders and Settling

Monolines, and the remaining claims in the Unsecured Claims Pool.[22]

## II.    <u>Amended Lien & Recourse Challenge</u>

23.    On July 1, 2019, the Oversight Board commenced the Amended Lien & Recourse

Challenge to resolve two threshold legal issues concerning the Bondholders' legal entitlements.

As detailed in the Oversight Board's first amended complaint,[23] the Oversight Board and the

Committee (as intervenor) seek rulings that the Bondholders (a) are secured only by moneys

currently deposited to the credit of the Sinking Fund and certain other funds and (b) have

recourse only to the net revenues actually deposited into the Sinking Fund and such other funds,

such that the Bondholders' claims are thus limited to their collateral.  The Court approved the

Committee's intervention as a co-plaintiff in that litigation by order dated October 12, 2023.[24]

---

[20]    While holders of allowed General Unsecured Claims are also entitled to other consideration under the Plan,
namely the Avoidance Actions Proceeds and the GUC CVI, the value attributable to such assets, as per the
Disclosure Statement is *de minimis*.  *See* Discl. Stmt. at 30 (indicating that, in the absence of any distribution of
Series B Bonds, the estimated recovery percentage for holders of General Unsecured Claims is 0.1%).

[21]    Plan art. I.A. 182.

[22]    *See* Plan art. VII.A(ii) and Plan art. I.A.111.  Under the final level of the waterfall (Waterfall Level 6), any
Series B Bonds remaining available after making all of the above distributions may be issued, in the sole
discretion of Reorganized PREPA, to the PREPA PayGo Trust.  *See* Plan art. I.A.82 and XIX.C.

[23]    *See* Docket No. 26 in Adv. Proc. No. 19-391 (LTS).

[24]    *See* Docket No. 40 in Adv. Proc. No. 19-391 (LTS).

24.     On March 22, 2023, the Court issued its summary judgment decision (the "Lien &
Recourse Decision"),[25] which held, among other things, that:

- the Trust Agreement granted the Bondholders security interests only in
  moneys actually deposited to the Sinking Fund, Self-insurance Fund,
  Capital Improvement Fund, Reserve Maintenance Fund, and Construction
  Fund (each as defined in the Trust Agreement); and

- the Bondholders have an unsecured claim to be liquidated by estimating
  the value of future Net Revenues (as defined in the Trust Agreement) that
  would, under the waterfall provisions of the Trust Agreement and
  applicable non-bankruptcy law, have become collateral upon being
  deposited in the specified funds and payable to the Bondholders over the
  remainder of the term of the Bonds (the "Unsecured Net Revenue Claim").

25.     On March 22, 2023, the Bondholders (joined, in part, by the Committee)
requested that the Court certify the Lien & Recourse Decision for immediate appeal to the Court
of Appeals for the First Circuit.  The Court denied the request by order dated May 3, 2023.[26]

26.     On April 13, 2023, the Court entered its order setting forth the discovery and
briefing schedule for estimating the Bondholders' Unsecured Net Revenue Claim (such
proceedings, the "Estimation Proceedings").[27]  After hearing expert testimony and oral argument
in the Estimation Proceedings on June 6 to 8, 2023, the Court took the matter under advisement.

## OBJECTION

## I.     Legal Standard

27.     To confirm the Plan, the Oversight Board must demonstrate that the Plan
complies with the confirmation requirements set forth in section 314 of PROMESA, which
include the applicable confirmation requirements set out in section 1129 of the Bankruptcy Code
and incorporated by section 301 of PROMESA.  As plan proponent, the Oversight Board "has
the burden of proving by a preponderance of the evidence that the [P]lan satisfies the applicable

---

[25]   *See* Docket No. 147 in Adv. Proc. No. 18-391 (LTS).
[26]   *See* Docket No. 182 in Adv. Proc. No. 19-391 (LTS) (the "Order Denying Interlocutory Appeal").
[27]   *See* Docket No. 168 in Adv. Proc. No. 19-391 (LTS).

requirements." *Irving Tanning Co. v. Me. Superintendent of Ins.*, 496 B.R. 644, 658 (B.A.P. 1st

Cir. 2013); *see also In re Destileria Nacional, Inc.*, No. 20-01247 (ESL), 2021 WL 3177287, at

*3 (Bankr. D.P.R. July 27, 2021) ("The plan proponent bears the burden of proving by a

preponderance of the evidence that the requirements of Section 1129 are satisfied.").

28.     The Plan put forth by the Oversight Board fails to satisfy several of the

confirmation requirements—most notably, that a plan (i) may not unfairly discriminate and (ii)

must be in the best interests of creditors.  Therefore, the Plan should not be confirmed.

**II.     Plan Should Not Be Confirmed as It Unfairly Discriminates Against Holders of
General Unsecured Claims**

29.     When a proposed plan is not accepted by all impaired classes, it can be confirmed

only if the plan satisfies the so-called "cram-down" requirements set forth in section 1129(b) of

the Bankruptcy Code.  Here, the class of General Unsecured Claims (Class 7) has voted to reject

the Plan, and, accordingly, section 1129(b) applies as to that class.

30.     In particular, under section 1129(b)(1) of the Bankruptcy Code, a non-consensual

plan can be confirmed only if it does "not discriminate unfairly . . . with respect to each class of

claims or interests that is impaired under, and has not accepted, the plan."  The unfair

discrimination standard prevents creditors "with similar legal rights from receiving materially

different treatment under a proposed plan without compelling justifications for doing so." *In re

Hermanos Torres Perez Inc.*, No. 09–05585 EAG, 2011 WL 5854929, at *9 (Bankr. D.P.R. Nov.

21, 2011); *see also In re LightSquared Inc.*, 513 B.R. 56, 99 (Bankr. S.D.N.Y. 2014) ("The

purpose of the requirement is to ensure that a dissenting class will receive relative value equal to

the value given to all other similarly situated classes.").

31.     Under the widely recognized test for unfair discrimination formulated by former

Bankruptcy Judge Bruce A. Markell, unfair discrimination is presumed where "there is (1) a

dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution." *In re Trib. Co*., 972 F.3d 228, 241 (3d Cir. 2020) (internal references omitted); *see also In re Santana*, 480 B.R. 222, 225 (Bankr. D.P.R. 2012) (citing Markell and concluding "it seems fairly clear that the unfair discrimination standard is intended to maintain equity among creditors of the same priority").

32.     When the presumption of unfair discrimination arises, "[t]he burden is on the debtor to show that unequal treatment between classes having the same priority does not constitute unfair discrimination." *In re El Comandante Mgmt. Co., LLC*, No. 04-10938 (ESL), 2006 WL 3903592, at *5 (Bankr. D.P.R. Mar. 3, 2006) (citation omitted); *Hargreaves v. Nuverra Env't Sols., Inc. (In re Nuverra Env't. Sols., Inc.)*, 590 B.R. 75, 80 (D. Del. 2018) ("Because the Plan was nonconsensual, Debtors had the burden of show[ing] that the plan meets the additional requirements of § 1129(b), including the requirements that the plan does not unfairly discriminate against dissenting classes and the treatment of the dissenting classes is fair and equitable.") (internal citations omitted).

A.     Plan Unfairly Discriminates in Favor of Fuel Line Loan Claims

33.     The Plan unfairly discriminates against General Unsecured Claims (Class 7) in favor of the Fuel Line Loan Claims (Class 4) by providing the Fuel Line Lenders with vastly superior treatment, even though the Fuel Line Loan Claims are unsecured claims with no payment priority over General Unsecured Claims.

   i.  *Fuel Line Loan Claims and General Unsecured Claims Have Same*
*Priority and Same Rights Against PREPA*

34. The Fuel Line Loan Claims are not secured, and the Fuel Line Lenders do not

assert otherwise.  Nor do the Fuel Line Loan Claims enjoy any payment priority over the General

Unsecured Claims.  This is so for, at least, two reasons.  First, the Fuel Line Loan Claims have

no greater right to payment than General Unsecured Claims because the Fuel Line Loan Claims

are no more entitled to Current Expenses status than General Unsecured Claims.  The Fuel Line

Loan's Current Expense priority is derived from the Trust Agreement's definition of "Current

Expense."[28]  There is nothing in that definition that applies uniquely to the Fuel Line Lenders,

and not to General Unsecured Creditors who have provided goods and/or services "reasonable

and necessary [for] maintaining, repairing, and operating [PREPA]'s System."[29]

35. Moreover, several of the Oversight Board's witnesses have testified that they have

done no analysis as to whether, and on what basis, the Fuel Line Loan Claims are distinguishable

from General Unsecured Claims.[30]  And while some of the Oversight Board's witnesses have

stated that they "understand" that the Trust Agreement specifically mentions the Fuel Line

Lenders, they have also conceded that they have not read the Trust Agreement and cannot point

---

[28] This Objection will refer to the asserted payment priority as the "Current Expense Priority."

[29] Trust Agreement § 101 [Docket No, 66-1 in Adv. Proc. No. 19-391 (LTS)].  In fact, the Bondholders and the Oversight Board have previously argued that the Fuel Line Loan Claims do not qualify as Current Expenses because the Fuel Line Lenders provided loans that were used to purchase fuel, but did not directly provide PREPA with fuel, and, thus, the Fuel Line Loan Claims are claims for debt, not claims for expenses.  This argument does not apply to General Unsecured Creditors, who directly provided the goods and/or services that are the basis of their claims.  Therefore, holders of such claims arguably have a ***stronger*** argument to Current Expense Priority than the Fuel Line Lenders.

[30] *See* Brownstein Dep. Tr. at 373:24 – 375:18; 380:9-20 (conceding that Brownstein does not know if general unsecured creditors have current expense claims and the reason for the difference in treatment is that the Fuel Line Lenders had settled); *id.* at 382:24 – 383:17 (stating that he is unaware if an analysis was done as to whether there are other current expense claims other than for the Fuel Line Lenders); Skeel Dep. Tr. at 322:20 – 323:3 (stating that he does not know whether current expense priority would give Fuel Line Lenders priority over unsecured creditors); *id.* at 329:10 – 330:2 (stating that he does not know whether the Board has done an analysis of whether any general unsecured claims, other than Fuel Line Lenders, qualify as a current expense).  Relevant pages of the Deposition of David Brownstein and the Deposition of David Skeel are attached as Exhibit A and Exhibit B hereto.

to any such provision.[31]  These statements seem intended to echo the Oversight Board's

arguments (advanced in its omnibus reply in support of the Disclosure Statement [Docket No.

3206] (the "Omnibus DS Reply")) that the Fuel Line Lenders are "expressly named in the Trust

Agreement."[32]  But the Fuel Line Lenders are **not** "named parties" to the Trust Agreement.

36.       While the Sixteenth Amendment to the Trust Agreements added a reference to the

Fuel Line Loans, it merely states that PREPA and the Bondholders will not challenge the Current

Expense status ***based solely on the Fuel Line Lenders not exercising remedies***.[33]  Nor does this

language form the "basis" of the Fuel Line Lenders' asserted priority.  As explained above, that

priority is based on the Trust Agreement's definition of Current Expenses, which applies to any

creditor that qualifies—not just the Fuel Line Lenders.  The Sixteenth Amendment and the other

agreements pointed to by the Oversight Board do not **establish** any priority in favor of the Fuel

Line Lenders.  They do not even ***acknowledge*** it—they merely limit the grounds on which

PREPA and the Bondholders may challenge that asserted priority.  More importantly, the

absence of similar agreements with General Unsecured Creditors in no way precludes such

creditors from asserting they are equally entitled to Current Expense Priority.  Indeed, the

Oversight Board has conceded that most, if not all, of the estimated $800 million in General

Unsecured Claims are Current Expenses.[34]

37.       Second, even if General Unsecured Claims are not entitled to Current Expense

Priority (they are), the Fuel Line Loan Claims would have no greater right to payment than

General Unsecured Claims.  The Current Expense dispute between the Fuel Line Lenders, the

---

[31]   *See* Ex. B, Skeel Dep. Tr. at 202:8-24 ("I am not particularly familiar with the terms of the trust agreement.").
[32]   Omnibus DS Reply ¶ 35.
[33]   *See* Sixteenth Supplemental Agreement to the Trust Agreement ¶ 1(B) [Docket No. 66-17 in Adv. Proc. No. 19-391 (LTS)].
[34]   *See Response of the Financial Oversight and Management Board for Puerto Rico in Support of Estimation of Unsecured Net Revenue Claim* ¶ 45 [Docket No. 226 in Adv. Proc. No. 19-391 (LTS)].  For the avoidance of doubt, the Committee disputes that $800 million is an accurate estimate of allowed General Unsecured Claims.

Oversight Board, and the Bondholders turns on, among other things, whether the Trust

Agreement creates a subordination agreement that can be enforced by the Fuel Line Lenders in

their favor even though they are not signatories to the Trust Agreement.  Even if the Fuel Line

Lenders had prevailed on that argument (absent the settlement under the Plan), they could have

enforced the Current Expense Priority **only against the Bondholders**.  There is no legal basis for

the Fuel Line Lenders to enforce the Current Expense Priority against other parties, such as the

hundreds of General Unsecured Creditors, who did not sign the Trust Agreement.  *See, e.g.*,

*Fleet Cap. Corp. v. Yamaha Motor Corp., U.S.A.*, No. 01 Civ. 1047 (AJP), 2002 WL 31174470,

at *32 (S.D.N.Y. Sept. 26, 2002) ("It is well-settled that a subordination agreement between two

parties to a transaction cannot **adversely** affect a third party without his or her consent.")

(emphasis added) (internal quotation marks and citations omitted); *see also Citizens Bank &*

*Trust Co. v. Riederer (In re Brooke Cap. Corp.)*, No. 08-22789-7, 2012 WL 4793010, at *17

(Bankr. D. Kan. Oct. 5, 2012) ("[g]enerally, a subordination agreement is not binding upon

persons who are not parties to the agreement") (subsequent history omitted).[35]

38.     Whatever the merits of the Fuel Line Lenders' asserted priority against the

Bondholders, that priority cannot impair the rights of General Unsecured Creditors, whose

perspective is the only one that matters for this inquiry.  *See In re Trib. Co.*, 972 F.3d at 242

("unfair discrimination is determined from the perspective of the dissenting class").  In sum, the

Fuel Line Loan Claims and General Unsecured Claims have the same priority with the same

rights to recovery from PREPA's assets, thus satisfying that prong of the Markell test.

---

[35]   The Committee takes no position on whether a subordination agreement between party A (PREPA) and party B
(the Bondholders) **in favor** of party C (the Fuel Line Lenders) can be enforced by party C.  There is no
authority, however, for the proposition that party A and party B can enter into a subordination agreement
**against** the interests of hundreds of non-parties (*i.e.*, the Committee's constituents).  *See generally*, *In re Env't
Aspecs, Inc.*, 235 B.R. 378, 397 (E.D.N.C. 1999) (differentiating between case where non-party "was the
creditor that benefitted from the agreement's terms" and case where "creditor who purportedly subordinated its
interests to the interests of another creditor, did not sign").

ii.  *Plan Greatly Discriminates in Favor of Fuel Line Loan Claims as Compared to General Unsecured Claims*

39.  Notwithstanding the foregoing, the Plan offers Fuel Line Lenders vastly superior treatment than it offers General Unsecured Creditors.  Under the Plan, the Fuel Line Lenders stand to receive a guaranteed, aggregate recovery of approximately **$650.1 million**, or more than **92.7%** of the Fuel Line Loan Claims.  In particular, the Fuel Line Lenders' recovery includes:

a.  Series A Bonds equal to 84% of their allowed Fuel Line Loan Claims, *i.e.*, approximately $588.7 million in Series A Bonds;[36]

b.  additional Series A Bonds or cash, in the sole discretion of the Oversight Board, equal to postpetition interest on the Series A Bonds at a rate of 6% for up to one year (or approximately $35.3 million);[37] and

c.  up to $26 million of additional Series A Bonds or cash (as determined by the Oversight Board in its sole discretion), comprised of (i) up to $11 million to reimburse the Fuel Line Lender PSA Creditors for their professional fees, and (ii) $15 million of consent fees, *i.e.*, the Fuel Line Lender PSA Creditors Consummation Fees.[38]

40.  In addition, the Fuel Line Lenders are also eligible to receive Series B Bonds equal to their Remaining Claim, which is approximately $112.1 million (or 16% of the allowed Fuel Line Loan Claims).[39]  Added to their guaranteed recovery, this incremental recovery means that the Fuel Line Lenders may recover up to **108.7%** of the Fuel Line Loan Claims, *i.e.*, their guaranteed recovery of 92.7% in the form Series A Bonds and/or cash plus an additional 16% recovery in the form of Series B Bonds.[40]

---

[36]  Plan art. VII.A.

[37]  Plan art. II.D.1.

[38]  *Id.*

[39]  Plan art. VII.A.  The precise amount of incremental Series B Bonds to be received by the Fuel Line Lenders depends on several contingencies, including the outcome of the Amended Lien & Recourse Challenge.

[40]  The Fuel Line Lender PSA provides that the amount of New Bonds to be received by the Fuel Line Lenders shall not exceed the allowed amount of Fuel Line Loan Claims (but not taking into account consummation costs and the professional fee reimbursement), which would translate into a maximum recovery of approximately 103.7%.  Discl. Stmt. Ex. M (Term Sheet).  However, the Plan does not appear to include a similar limitation.

41.     The law is clear that the quantification of the Fuel Line Lenders' recovery—and, therefore, the extent of the Plan's discrimination in their favor—must consider the entire consideration to be provided to the Fuel Line Lenders.  *See Am. United Mut. Life Ins. Co. v. City of Avon Park*, 311 U.S. 138, 144 (1940) (requisite finding that "compensation to be received by the fiscal agent was reasonable" could not be made "without passing on the worth of the aggregate of all the emoluments accruing to [the City's fiscal agent] as a result of consummation of the plan").  And in the Detroit bankruptcy, the bankruptcy court explained that, under the particular facts presented to it, even third party contributions "should be included in the recovery calculations" and that "City of Avon Park seems to require that result."  *In re City of Detroit*, 524 B.R. 147, 255 n.24 (Bankr. E.D. Mich. 2014).  If *Avon Park* requires inclusion in a recovery percentage of payments from third parties, it certainly requires inclusion of additional payments from the debtor itself, as PREPA is making to the Fuel Line Lenders.

42.     This is especially true here, because the Fuel Line Loan Claims are unsecured claims and thus not entitled to post-petition interest[41] or reimbursement of their professional fees.  *See Int'l Asset Recovery v. Thomson McKinnon Sec. Inc.*, 335 B.R. 520, 527 (S.D.N.Y. 2005) ("The general rule regarding post-petition interest is clear: unsecured or under-secured creditors are not entitled to post-petition interest on a pre-petition claim."); *In re Old Colony LLC*, 476 B.R. 1, 31-32 (Bankr. D. Mass. 2012) (case law from the First Circuit "strongly indicate the First

---

[41]  The Oversight Board is likely to argue that the Fuel Line Lenders are being compensated for the interest they would have received if the Plan was confirmed earlier, which is (somehow) different from their underlying recovery.  *See* Ex. A, Brownstein Dep. Tr. at 371:9-21 ("fuel line lenders as owners of the Series A Bonds are entitled to one year's accrued interest . . . on the new bonds").  Even if true, it does not make this any less discriminatory; General Unsecured Creditors are not receiving interest on their plan recovery to compensate for the delay in receiving that recovery.  Moreover, if this really is the purpose of the $35 million in postpetition interest, this, like other aspects of the Fuel Line Lenders' recovery, is contrary to black letter bankruptcy law under the Supreme Court's ruling in *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assoc.*, 484 U.S. 365 (1988), which precludes a creditor—secured or not—from receiving compensation for the time value of money during the case.  *See In re Hill Wine Co.*, No. 14-10680, 2014 WL 2795169, at *1 (Bankr. N.D. Cal. June 19, 2014 ("The argument that a secured creditor is entitled to the time value of money was put to rest by the Supreme Court in [*Timbers*].").  And this is especially true for unsecured creditors.

Circuit's view that, where the bankruptcy estate is unable to pay all other creditors in full, postpetition attorneys' fees are not allowable as part of an unsecured claim even where provided for in the underlying contract").[42]

43.     The Plan's treatment of the Fuel Line Loan Claims is far superior to—and, therefore, discriminates against—the treatment of General Unsecured Claims.  As noted above, based on the Oversight Board's current assumptions, General Unsecured Claims would recover approximately **46.5%** of their claims.  Of course, that recovery percentage would decrease if General Unsecured Claims are allowed in an aggregate amount greater than the Oversight Board's unsupported $800 million estimate.[43]  And, as the Committee demonstrated in the Shankweiler Exclusion Motion, the Oversight Board's $800 million claim estimate has no basis. Mr. Shankweiler's flawed estimate did not even include rejection damages claims in the event the collective bargaining agreement with UTIER is rejected, which could be sizeable.[44]

44.     The Fuel Line Lenders' recovery is also *qualitatively far superior* to the recovery offered to holders of General Unsecured Claims.  The Series B Bonds are of significantly lower quality (and, hence, come with greater risk) than the Series A Bonds to be distributed to the Fuel Line Lenders.  *See In re DeLeo*, No. 21-20025, 2022 WL 1072857, at *6 (Bankr. D. Me. Apr. 8, 2022) ("The point here is that risk matters when thinking about fairness and the balancing of debtor and creditor interests that must occur in any chapter 11 case.").  The Series A Bonds offer better terms on maturity (50 years vs. 15 years),[45] expected repayment date (34 years vs. 5

---

[42]   Moreover, the Fuel Line Lenders are not simply getting an allowed claim that includes their contractual attorneys' fees—they are getting full payment of those fees.

[43]   The Committee recognizes that the 46.5% recovery percentage may increase depending on the outcome of the Estimation Proceedings.  On the other hand, recoveries to other General Unsecured Claims would decrease to **0.01%** if the Bondholders prevail on their appeal of the Lien & Recourse Decision.  By contrast, the Fuel Line Lenders' recovery (other than the incremental Series B Bonds) is not subject to *any* contingencies.

[44]   Shankweiler Dep. Tr. at 86:7-22 [Docket No. 3579-1].  *See also* Discl. Stmt. Ex. O.

[45]   Plan art. XIX.B.1.

years),[46] and payment priority (principal on the Series A Bonds must be paid in full before any

principal can be paid on the Series B Bonds).[47]  In comparison to the Series B Bonds, the Series

A Bonds are practically a risk-free investment.

45.     In short, based on the estimates set forth in the Disclosure Statement, the Fuel

Line Lenders would receive approximately ***twice*** the recovery to be received by holders of

allowed General Unsecured Claims—a recovery that is not only in the form of superior bonds

(namely Series A Bonds), but also not subject to any contingencies (with the exception of certain

incremental Series B Bonds to be distributed to the Fuel Line Lenders at Level 5 of the New

Bonds Waterfall).  This grossly disparate treatment easily satisfies ***both*** of the two alternative

Markell prongs, *i.e.*, (a) a materially lower percentage recovery for the dissenting class or (b)

regardless of percentage recovery, an allocation of materially greater risk to the dissenting class.

### iii.     No Justification for Discrimination in Favor of Fuel Line Lenders

46.     In the Omnibus DS Reply, the Oversight Board argued that the Fuel Line

Lenders' treatment "is the result of a reasonable settlement of significant litigation risk" relating

to the Fuel Line Lenders' asserted Current Expense Priority.[48]  But the settlement with the Fuel

Line Lenders cannot justify the far superior treatment of the Fuel Line Loan Claims as compared

to General Unsecured Claims because it does not pass muster under Bankruptcy Rule 9019.[49]

Indeed, as shown below, the Current Expense dispute creates ***no*** litigation risk for PREPA.

47.     In the First Circuit, courts evaluate the reasonableness of a proposed settlement

pursuant to the four *Jeffrey* factors.  These factors are: (i) the probability of success in the

---

[46]   Plan art. XIX.B.1.
[47]   Plan art. XIX.I.1.
[48]   Omnibus DS Reply ¶ 35.
[49]   *See Resol. Tr.Corp. v. Best Prods. Co. (In re Best Prods. Co., Inc.)*, 177 B.R. 791, 794 n.4 (S.D.N.Y.1995)
       ("Irrespective of whether a claim is settled as part of a plan . . . or pursuant to separate motion under Bankruptcy
       Rule 9019, the standards applied by the Bankruptcy Court for approval are the same."), *aff'd*, 68 F.3d 26 (2d
       Cir.1995).

litigation being compromised; (ii) the difficulties, if any, to be encountered in the matter of

collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and

delay attending it; and (iv) the paramount interest of the creditors and a proper deference to their

reasonable views. *See City Sanitation, LLC v. Allied Waste Servs. of Mass., LLC (In re Am.

Cartage, Inc.)*, 656 F.3d 82, 92 (1st Cir. 2011) (citing *Jeffrey v. Desmond*, 70 F.3d 183, 185 (1st

Cir. 1995)).  The burden of proof is on the "settling parties [who] must set forth the facts in

sufficient detail that a reviewing court could distinguish it from mere boilerplate approval of the

trustee's suggestions." *In re Lion Capital Grp.*, 49 B.R. 163, 176 (Bankr. S.D.N.Y. 1985)

(quoting *In re Bos. & Providence R.R. Corp.*, 673 F.2d 11 (1st Cir. 1982)).

48.     The Oversight Board's settlement with the Fuel Line Lenders does not satisfy

these requirements.  Settlements make sense when each of the settling parties have litigation risk.

*See Robinson v. Nat'l Student Clearinghouse*, 14 F.4th 56, 60 (1st Cir. 2021) (court properly

considered "litigation risks for both sides"); *In re ASARCO LLC*, No. 05-21207, 2009 WL

8176641, at *32 (Bankr. S.D. Tex. June 5, 2009) (settlement was "fair taking into account the

various litigation risks on both sides").  But PREPA has no litigation risk, as there is no outcome

of the Current Expense dispute that affects PREPA.  As the Oversight Board's 30(b)(6) witness

Mr. Brownstein explained, if the Fuel Line Lenders were to prevail on their Current Expense

arguments, any extra recovery to the Fuel Line Lenders would come **from the Bondholders**, not

PREPA.[50]  Mr. Brownstein further testified that all of the money distributed under the Plan

comes from "one pot."[51]  PREPA, therefore, has no interest in how the money is allocated, and

whether the Fuel Line Lenders get more of that recovery than other creditors.

---

[50]   *See* Ex. A, Brownstein Dep. Tr. at 84:21-85-7 ("Q: If Fuel Line Lenders in the absence of a settlement were to
prevail in their priority litigation, would that require PREPA to pay additional sums in total creditor recoveries?
A: No.  As I just said to you, it would have required that we not offer as much to the bondholders.").

[51]   Ex. A, Brownstein Dep. Tr. at 382:7-23.  Revealingly, this testimony is contrary to the Oversight Board's own
arguments.  In its Omnibus DS Reply, the Oversight Board claimed its settlement with Fuel Line Lenders does

49.     The Fuel Line Lenders, on the other hand, *do* have litigation risk: if they were to litigate their Current Expense dispute with the Bondholders and prevail, they would be able to force the Bondholders to turn over a portion of their recovery.  But if they lost, they would receive the same recovery as all other General Unsecured Creditors.  In other words, in "settling" the Current Expense dispute, the Oversight Board paid to eliminate the Fuel Line Lenders' litigation risk, who are now receiving a guaranteed recovery between **92.7% and 108.7%** in the form of practically risk-free Series A Bonds that no other creditors are entitled to receive.

50.     From the perspective of the Oversight Board and PREPA, this makes a lot of sense, as removing the Fuel Line Lenders' risk through a contrived settlement ensures that the Fuel Line Lenders will support the Plan.  And, because the "settlement" changes only the allocation of creditor recoveries, PREPA has no reason not to "pay" to eliminate the Fuel Line Lenders' litigation risk.  In fact, the Oversight Board's witness has acknowledged that obtaining the Fuel Line Lenders' support for the plan was a key consideration.[52]  But this argument cannot

---

not harm General Unsecured Creditors because the Fuel Line Loan Claims "can receive more than bond claims based on their seniority arguments, and although that would cause the bond claims to be paid less than the Committee's constituency of unsecured claims, the bond claims can receive in settlement more than the other general unsecured claims because the bond claims settlement also entails settling their claim to a security interest in all future, unearned revenues."  Omnibus DS Reply ¶ 36.  The Oversight Board thus concedes that the Committee is right as a legal matter, and that the recovery of General Unsecured Creditors cannot be harmed by its settlement of whether the Fuel Line Lenders can enforce the asserted subordination agreement against the Bondholders.  But if the Bondholders, because of the "bonds claim settlement," are starting with a higher recovery, then some portion of that recovery can be given to the Fuel Line Lenders and, *voila*, the Fuel Line Lenders' recovery has not come at the expense of General Unsecured Claims.  The problem with this argument is that it is not true.  There is no "bond claims settlement"—certainly not one that can fund the Fuel Line Lenders' recovery— and the Oversight Board's convoluted argument is simply a messy, *post hoc* rationalization.  In fact, when the Fuel Line Lender PSA was announced, there were no settling Bondholders, yet the Fuel Line Lenders' recovery is guaranteed.  As a point of fact, only about $70 million of bonds opted in to the settlement, which should be the final nail in the coffin of this argument: ***the Fuel Line Lenders' recovery is not, and never was, funded out of Bondholders' recovery***, which is—as the Oversight Board seems to have conceded—how subordination agreements work.  And the testimony of the Oversight Board's own witness that there is just "one pot" gives away the game as well, as it cannot be reconciled with the Oversight Board's arguments in its Omnibus DS Reply.

52     *See* Ex. B, Skeel Dep. Tr . at 168:7-15 (explaining that, in addition to the purported benefit to PREPA of a settlement at less than 100%, the Fuel Line Loan Claims "are a sizable claim that is now supportive of the plan and will vote in favor of the plan of adjustment and will not object to the plan of adjustment.  And all of those were attractive benefits.").

carry the day for the Oversight Board.  Unfair discrimination between two similarly situated creditor groups cannot be justified on the basis that the plan proponent desires to obtain the support of the settling creditor group.  Otherwise, a plan proponent could always buy the votes of preferred creditors by offering far superior treatment to such "settling" creditors, rendering the unfair discrimination protection a nullity.

51.     This is also why the settlement with the Fuel Line Lenders fails the final prong of the Rule 9019 analysis—the paramount interest of creditors.  "Other than an assessment of the merits," the paramount interests of creditors "is the most important consideration."  *In re Remsen Partners, Ltd.*, 294 B.R. 557, 566 (Bankr. S.D.N.Y, 2003).  The focus of this inquiry is the impact of a compromise on non-settling parties.  "[N]ot only does this Court need to afford paramount consideration to the interests of creditors, but that consideration should focus particularly on the fairness of a settlement to those parties who did not partake in the settlement."  *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 837 (Bankr. D. Del. 2008).  Accordingly, courts should not approve a settlement that "serves the interests of" its proponents but "is not in the interests of" other creditors.  *Id*. at 838.

52.     The Oversight Board has not identified a single benefit of this settlement to any creditor other than the Fuel Line Lenders.  Just the opposite, the settlement directly and significantly harms General Unsecured Creditors by effectively subordinating them to the Fuel Line Loan Claims (through the New Bonds Waterfall), even though there is no legal basis to do so (regardless of any Current Expense Priority).  Furthermore, the Fuel Line Loan Claims are not being paid from the recovery allocated to the Bondholders, as would be required under a subordination agreement, because, under the New Bonds Waterfall, (a) there is only "one pot" of New Bonds and (b) Series B Bonds are being made available to creditors (including General Unsecured Creditors) only after the Fuel Lien Lenders have received their Series A Bonds.  This

22

means that the Fuel Line Lenders' recovery directly *decreases* the recovery available to holders

of other General Unsecured Claims even though any recovery to which the Fuel Line Lenders

may be entitled based on any Current Expense Priority must come solely from the Bondholders.

In other words, the Oversight Board obtained the Fuel Line Lenders' support for the Plan by

eliminating the Fuel Line Lenders' litigation risk, and used other creditors' money to do so, even

though the Fuel Line Lenders do not have any priority against those other creditors.

53.    For all these reasons, the settlement with the Fuel Line Lenders should not be

approved, and, accordingly, that settlement cannot justify the grossly disparate treatment

between the Fuel Line Loan Claims and General Unsecured Claims.

B.    Plan Unfairly Discriminates in Favor of National's Claims

54.    As detailed below, the Plan also unfairly discriminates as between General

Unsecured Claims (Class 7) and National's claims (Classes 5 and 6).  National's claims receive

vastly superior treatment under the Plan as compared to General Unsecured Claims, even though

(a) National's claims are, at best, unsecured and (b) National's unsecured claims have no greater

right to payment than General Unsecured Claims (and are likely even junior to General

Unsecured Claims).

i.    *National's Claims Are, at Best, Unsecured Claims With No Greater Right
to Payment Than General Unsecured Claims*

55.    This Court recently held that, with the exception of a *de minimis* claim secured by

the Sinking Fund and funds in certain related accounts, the Bondholders hold only unsecured

claims for future net revenues that would have been deposited into those accounts (*i.e.*, the

Unsecured Net Revenue Claim).[53]  Thus, National is, for all practical purposes, no more than an

---

[53]    Lien & Recourse Decision at 13-14.

unsecured creditor, and, as the Oversight Board's witness has acknowledged, there is no basis to differentiate between National's unsecured deficiency claim and General Unsecured Claims.[54]

56.    Further, for the reasons detailed above, whatever priority rights National and the other Bondholders may believe they have under the Trust Agreement, any such priority would plainly not be enforceable against General Unsecured Creditors that are not party to the Trust Agreement.[55]  Indeed, as discussed below, it is the Bondholders' claims that have a lower priority right to payment than General Unsecured Claims because General Unsecured Creditors have rights to be paid from PREPA's **gross** revenues while the Bondholders have agreed that they have recourse, at most, only to PREPA's **net** revenues.

57.    For all these reasons, as relevant to the Markell test, National's unsecured claims give it no greater right to payment than holders of General Unsecured Claims.

      ii.    *Plan Greatly Discriminates in Favor of National's Claims as Compared to General Unsecured Claims*

58.    Under the Plan, National would receive a guaranteed, aggregate recovery of approximately **$697 million**,[56] which represents more than **83%** of the National Insured Bond Claims (to be allowed in the full, asserted amount of principal and prepetition accrued interest, or approximately $836.1 million).  In particular, National would receive:

      a.    a distribution in Class 5 in the form of Series B Bonds equal to 71.65% of the allowed National Insured Bond Claims, *i.e.*, approximately $599.1 million in Series B Bonds;[57]

---

[54]    Ex. B, Skeel Dep. Tr. at 357:2-18 ("National's deficiency claim would be an unsecured claim with the same status as general unsecured claims. . . .  If we're talking about just not the secured portion, we're talking about the deficiency claim, it does seem to me that it has the same stature as a general unsecured claim or would.").

[55]    The Plan implicitly acknowledges this fact, as it provides for *pari passu* treatment of General Unsecured Claims in Class 7 and the Deficiency Claim of the Non-Settling Bondholders and Non-Settling Monolines in Class 2— all of whom share on a *pro rata* basis in the General Unsecured Claim Recovery.

[56]    As discussed below, this amount does not include the Interim Charge, which only further increases National's recovery percentage.

[57]    *See* Plan art. VIII.A.  The National Insured Bond Claims would be allowed under the Plan in the full asserted amount of approximately $836.1 million.  *See id.* art. XVIII.A.

    b.    a distribution in Class 6 in the form of Series B Bonds equal to 20% of the allowed National Reimbursement Claim, *i.e.*, approximately $48.95 million in Series B Bonds;[58] and

    c.    additional Series B Bonds or cash (in the discretion of the Oversight Board) equal to (i) 3% of the National Insured Bond Claim (*i.e.*., approximately $25.1 million), as a reimbursement of National's fees and expenses, and (ii) 2.86% of the National Insured Bond Claim (*i.e.*., approximately $23.9 million), as a so-called "structuring" fee.[59]

***None of National's recovery depends on the outcome of the Amended Lien & Recourse***

***Challenge (including any appeals of the Lien & Recourse Decision)***.

59.    In addition to the Plan recoveries, the Oversight Board also agreed under the National PSA to use its reasonable best efforts to cause PREPA to impose an "Interim Charge" on PREPA ratepayers to fund interim payments to National for the period from the effective date of the National PSA (*i.e.*, January 31, 2023) through the Effective Date of the First Amended Plan.[60]  The precise amount of these interim payments is not known at this time, but it is obvious that they would ***further increase National's aggregate recovery percentage above 83%***.

60.    National's recovery percentage may increase even further.  The above calculations assume that National Insured Bond Claim is approximately $836.1 million (*i.e.*, the amount at which it would be allowed under the National Settlement).  However, depending on the outcome of the Estimation Proceeding, this unsecured claim may very well end up being

---

[58]    Plan art. IX.A.  According to the Disclosure Statement, the Oversight Board estimates that the National Reimbursement Claim is approximately $244.7 million (assuming the effective date of the Plan occurs on July 1, 2023).  Discl. Stmt. at 35.  That amount will increase over time, as and when National makes payments to bondholders under its monoline insurance policies.  Thus, if the effective date occurs after July 1, 2023 (which is a certainty, given that the confirmation hearing is scheduled to commence on July 17, 2023), the distribution on account of the National Reimbursement Claim will exceed $244.7 million, and, accordingly, the amount of Series B Bonds to be distributed would be higher than $48.95 million.

[59]    Plan art. II.D.2.

[60]    *See* National PSA § 6.2 [Docket No. 3297-14].  The "Interim Charge" (which is subject to PREB approval) would be approximately 10% of 1 cent/kWh, as the National Insured Bond Claim (approximately $836.1 million) is approximately 10% of the PREPA Revenue Bond Claims (approximately $8.5 billion).  *See* Discl. Stmt. at 34.

significantly less than such amount (without any corresponding reduction in distributions to

National under the Plan), possibly leading to an effective recovery percentage greater than 100%.

61.     In short, based on the estimates set forth in the Disclosure Statement, National's

guaranteed recovery is estimated at approximately *twice* the recovery offered to holders of

allowed General Unsecured Claims (*i.e.*, 46.5%), whose recovery will be even lower if the

Oversight Board's claims estimate prove wrong.  This grossly disparate treatment easily satisfies

*both* of the two alternative Markell prongs, *i.e.*, (a) a materially lower percentage recovery for

the dissenting class or (b) regardless of percentage recovery, an allocation of materially greater

risk to the dissenting class.[61]

### iii.     No Justification for Discrimination in Favor of National

62.     Notwithstanding that National has no greater rights than General Unsecured

Creditors, the Oversight Board has entered into a settlement with National that provides National

with far superior treatment to general unsecured creditors.  That settlement cannot provide a

justification for the discriminatory treatment because that settlement is simply not reasonable.

63.     A bankruptcy court considers the reasonableness of a settlement in light of the

facts and circumstances at the time of approval—*not* the time the parties first entered into their

agreement.  *See, e.g.*, *Newman v. Stein*, 464 F.2d 689, 696 (2d Cir. 1972) ("In any event,

evaluation of the propriety of a settlement requires realistic consideration of facts which affect

the ultimate likelihood of success, and it would be inappropriate for a reviewing court to freeze

matters as of the moment at which the parties entered into an agreement and ignore subsequent

developments which either reinforce or undermine the original decision to settle"); *Fry's Metals,*

*Inc. v. Gibbons (In re RFE Indus., Inc.),* 283 F.3d 159, 165 (3d Cir. 2002) ("Because the

---

[61]    And this would still be the case even if one were to limit National's recovery to its recovery in Class 5 only, *i.e.*,
71.65%.

situation has changed drastically since Gibbons first negotiated the Settlement, the bankruptcy

court should examine the Martin factors in light of the present circumstances."); *In re Actrade*

*Fin. Techs. Ltd.*, Case No. 02-16212 (ALG), 2009 Bankr. LEXIS 890, at *8 (Bankr. S.D.N.Y.

Apr. 13, 2009) ("Other cases have similarly concluded that courts should consider changed

circumstances between the date of a motion for approval of a settlement and the hearing on the

reasonableness of the settlement.").

64.     Whatever the merits of the National Settlement may have been when the

Oversight Board entered into National PSA on January 31, 2023, the current facts and

circumstances make clear that the National Settlement is not reasonable.[62]  Since the parties

entered into the National Settlement, the Court has issued its Lien & Recourse Decision, which

determined that, as a matter of law, National does not have a fully secured claim and that its

claims are almost entirely unsecured and its unsecured claims enjoy no greater rights than

General Unsecured Claims.[63]  Even if the Court were to accept the Oversight Board's argument

that National is receiving only 71.65% on its bond claims and ignore the Interim Charge and the

recovery on the National Reimbursement Claim, that recovery by itself is unreasonable.  As has

been made public, the Oversight Board offered the Bondholders 71.65% before the Lien &

Recourse Decision was issued—which means that, according to the Oversight Board, the Lien &

Recourse Decision had no impact on what would be a reasonable settlement of the value of

National's claims.[64]

65.     The unreasonableness of the National Settlement is further emphasized by the real

possibility that National's ultimate recovery under the Plan may ***exceed* 100%** of its Unsecured

---

[62]    As discussed below, the National Settlement was never reasonable.
[63]    In fact, and as explained below, the Bondholders' claims are *lower* in priority than General Unsecured Claims.
[64]    Further illustrating this is the fact that the Settling Bondholders were offered significantly less than the 71.65% (and, really, more) offered to National—an offer that, for obvious reasons, did not remain available after the Lien & Recourse Decision.

Net Revenue Claim absent the National Settlement.  For example, if the Court were to determine

in the Estimation Proceedings that the Unsecured Net Revenue Claims should be allowed only at

half of the Bondholders' asserted claim amount, then National's recovery under the Plan (*i.e.*,

$697.1 million) would far exceed its Unsecured Net Revenue Claim absent the National

Settlement (*i.e.*, 50% of $836.1 million, or $418.1 million).[65]  The Oversight Board ignored its

legal obligation to reevaluate the settlement in light of the significant legal and factual

developments in this case—but that means the Court must now do it.

66.     Moreover, the National Settlement was also unreasonable at the time the

Oversight Board entered into the National PSA.  At that time, the Court had ***not*** yet ruled on the

Amended Lien & Recourse Challenge, and the Oversight Board and the Committee were

pressing the argument that the Bondholders had ***no*** claim beyond the *de minimus* amount of their

collateral.  It was thus very possible that the Court was going to accept the argument that the

Bondholders have no recourse against PREPA at all.  Yet, the Oversight Board chose to settle

---

[65]  Mr. Skeel has explained that the National Settlement benefits the Oversight Board (and PREPA) through
National's agreement to vote in favor of the Plan.  *See* Ex. B, Skeel Dep. Tr. at 118:17-20 ("They [*i.e.* National]
agreed to support the plan.  They agreed to vote in favor of the plan, all of which are very attractive benefits to
us.").  And Mr. Fernando Batlle made this point even more explicitly, saying that, in his view, the purpose of
the National Settlement was to obtain National's consent to the Plan.  *See* Batlle Dep. Tr. at 267:20-269:6
(relevant pages of the Deposition of Fernando Batlle are attached as Exhibit C).  These explanations echo the
Oversight Board's arguments, advanced in its "Supplemental DS Reply," [Main Case Docket No. 23588], that
the National Settlement justifies disparate treatment because of the "contribution it makes to PREPA's
reorganization."  Supplemental DS Reply ¶ 22.  In support, the Oversight Board cites *Victory Park Credit
Opportunities, LP v. VPR Liquidation Tr.*, 539 B.R. 305, 315 (W.D. Tex. 2015).  In that case, the favored
creditor had waived its uncontested deficiency claim in exchange for immediate payment from sale proceeds.
The court explained that this benefitted all other creditors (as it decreased the claims pool) and, "in exchange for
providing that benefit," the creditor received different treatment.  *Id.* at 315.  This case does not stand for the
proposition that an unreasonable settlement, or a discriminatory plan, can be approved simply because it
advances reorganization.  Just the opposite, "[p]ursuant to the unfair discrimination test, differentiated treatment
of similar classes intended merely to induce acceptance by one class fails."  *In re Barney & Carey Co.*, 170
B.R. 17, 25 (Bankr. D. Mass. 1994) (as modified) (internal citations and quotation marks omitted); *see also In
re Dow Corning Corp.*, 244 B.R. 696, 701-03 (Bankr. E.D. Mich. 1999) (rejecting unfair discrimination test that
asks "whether the discrimination is necessary to confirm the plan" and adopting criticism of the "necessity
element" as "fatally flawed").  This makes sense.  If unfair discrimination between two similarly situated groups
of creditors could be justified simply because it allows the plan proponent to obtain the support of the settling
creditor group, a plan proponent could always buy the votes of preferred creditors by offering far superior
treatment to such "settling" creditors.  This would undermine the Bankruptcy Code's fundamental principle of
equal treatment of similarly situated creditors.

with National by providing them a recovery of more than 83% on a claim that may not even

exist, without insisting on a "fiduciary out" in the National PSA.

67.    Courts will not approve a decision made by the debtor or trustee that "prohibits

the Debtors from taking action consistent with their fiduciary obligations." *In re Innkeepers*

*USA Trust*, 442 B.R. 227, 235 (Bankr. S.D.N.Y. 2010).  Specifically in the context of a

restructuring support agreement, a provision that "curtails [the] effectiveness" of a fiduciary out

demonstrates that such decision was not made with due care. *Id.* at 235 (finding debtors lacked

"honest interest in exercising due care" where debtors agreed to restriction on acting consistent

with fiduciary obligations).  "For this reason, restructuring support agreements ***must contain a***

***'fiduciary out'*** that releases the debtor from its obligations under the agreement if the obligations

the agreement imposes are inconsistent with its fiduciary duties."[66]

68.    As noted, the National PSA was signed on January 31, 2023—*i.e.*, the day before

oral arguments on the Amended Lien & Recourse Challenge.  It was obviously foreseeable then

that the Court would issue a ruling significantly undermining National's legal position, both as it

relates to their alleged secured claim and the alleged unsecured full-recourse claim.  This is, of

course, exactly what happened: the Court rejected the Bondholders' argument that they were

fully secured and, moreover, limited any deficiency claim to the value of future net revenues that

would have become the Bondholders' collateral upon being deposited in the specified funds.  It

was, therefore, patently unreasonable, even at the time, for the Oversight Board to enter into an

agreement that did not account for this foreseeable outcome by including a "fiduciary out" that

would have allowed the Oversight Board to terminate the National PSA in the event that the

Court finds that the Bondholders are not fully secured and/or do not have an unsecured

---

[66]    *Other Plan-Confirmation Issues and Beyond*, 41st Annual Lawrence P. King and Charles Seligson, Workshop
on Bankruptcy & Business Reorganization (Sept. 12, 2015) (emphasis added).

deficiency claim in the full, asserted amount.[67]  Yet one of the Oversight Board's witnesses could not even say if the National Settlement included a fiduciary out, while another summarily dismissed the importance of such a clause.[68]

       *iv.*     *National Reimbursement Claim Should Be Disallowed in Its Entirety*

69.     The unreasonableness of the National Settlement is also demonstrated by the proposed allowance and treatment of the National Reimbursement Claim.  As an initial matter, the Court should deny the settlement of the National Reimbursement Claim because the Oversight Board has not carried its burden of providing a "detailed justification" of the settlement, including a "detailed analysis of the expected value of this litigation" together with a "statement [on] the probability of success on the merits" and a "discussion of the applicable case precedents."  *Gowan v. Gardi (In re Gardi)*, 273 B.R. 4, 9 (Bankr. E.D.N.Y. 2002).  The purpose of the analysis is to provide the court some "indication of how the proposed number was arrived at."  *In re Block*, 293 B.R. 290, 292-93 (Bankr. D. R.I. 2003) (it is insufficient to "reveal[] only that the compromise figure was a negotiated sum").

70.     To date, no party has articulated the legal or factual basis for the National Reimbursement Claim, nor has any party submitted any briefing or case law in this regard.  The Oversight Board has offered no analysis beyond the conclusory, and exceedingly brief, description of the issue in the Disclosure Statement.[69]  Because the Oversight Board has not "put before the Court [anything] that would indicate the amount of the settlement is based upon any

---

[67]   To be clear, even if the National Settlement was reasonable on January 21, 2023 (it was not), it is, separately, unreasonable now in light of the current facts and circumstances.

[68]   *See* Ex. B, Skeel Dep. Tr. at 342:24 – 343:8 (could not say whether National Settlement included a fiduciary out); Ex. A, Brownstein Dep. Tr. at 387:17 – 388:15 (explaining absence of fiduciary out and stating "[n]ot every PSA has a fiduciary out.  That simple.").

[69]   *See* Discl. Stmt. at 33-35.

type of assessment of the relative merits of the parties' conflicting claims," *In re Egolf*, 102 B.R. 706, 711 (Bankr. N.D. Ind. 1989), the Court should deny the settlement on that basis alone.

71.     Furthermore, the limited record that National and the Oversight Board have provided conclusively demonstrates that the proposed settlement is unreasonable and bears no relationship to any "dispassionate and analytical evaluation of [the] conflicting claims, risks and rewards." *In re Egolf*, 102 B.R. at 711.  Contrary to National's assertions, the National Reimbursement Claim is ***not*** a contractual reimbursement claim separate from the National Insured Bond Claims, but instead is based, in its entirety, on National having become subrogated to the rights of (*i.e.*, stepped into the shoes of) holders of National Insured Bonds (to the extent National paid principal and interest to such Bondholders under the applicable insurance policies). In other words, the National Reimbursement Claim is simply a claim by National on account of the National Insured Bonds, and, as a result, it must be treated as part and parcel of National's bond claim, not a separate claim.

72.     The two sets of insurance agreements[70] that purportedly form the basis for the National Reimbursement Claim could not be clearer that National's rights are in the nature of subrogation.  Under the first set of these agreements (the "MBIA Insurance Agreements"), PREPA and the Trustee agreed for the benefit of National that:

> (1) they recognize that to the extent [National] makes payments, directly or indirectly (as by paying through the Trustee), on account of principal of or interest on the [National Insured Bonds], [National] will be **subrogated** to the rights of the owners of such Bonds to receive the amount of such principal and interest from [PREPA], subject to the limitations on the application of [PREPA's] Revenues as set forth in the Trust Agreement, and

---

[70]   As discussed below, there are two sets of insurance agreements related to the National Insured Bonds.  One set relates to insurance policies originally issued by MBIA Insurance Corporation but subsequently reinsured to National, and the other set relates to insurance policies originally issued by Financial Guaranty Insurance Company but subsequently novated to National.

(2) [PREPA] will **accordingly** pay to [National] the amount of such
principal and interest . . . with interest thereon as provided in the Trust
Agreement and in the [National] Insured Bonds, but only from the
sources and in the manner provided herein and therein for the payment
of principal of and interest on the Insured Bonds to the owners thereof,
and will otherwise treat [National] as the owner of such rights to the
amount of such principal and interest.

MBIA Insurance Agreement § 1(vi) (emphasis added).[71]  As is readily apparent, clause (1) above

establishes that National is subrogated to the rights of holders of National Insured Bonds to the

extent it make payments of principal and interest on the National Insured Bonds, while clause (2)

describes the effect of that subrogation, namely that PREPA will "accordingly" pay to National

the amount of principal and interest paid by National to such bondholders.  Nothing in the MBIA

Insurance Agreements gives National an independent reimbursement right against PREPA.

73.    Under the second set of insurance agreements (the "FGIC Insurance

Agreements"), PREPA and the Trustee agreed that:

[National] shall, to the extent it makes payment of principal or interest
on the [National] Insured Bonds, become **subrogated** to the rights of the
recipients of such payments in accordance with the terms of the Bond
Insurance Policy . . . . Notwithstanding anything in this authorizing
document or the [National] Insured Bonds to the contrary, the Trustee
[*i.e.*, U.S. Bank, N.A.] shall make payment of such past due interest and
past due principal directly to [National] to the extent that [National] is a
subrogee with respect thereto.

FGIC Insurance Agreement § 3(c) (emphasis added).[72]  Again, as with the MBIA Insurance

Agreements, National is subrogated to the rights of holders of National Insured Bonds to the

extent it makes payments of principal and interest on the National Insured Bonds.  Moreover, to

the extent that National becomes so subrogated, the Trustee (not PREPA) is required to pay such

principal and interest to National.[73]

---

[71]   A sample copy of an MBIA Insurance Agreement is attached as Exhibit D.
[72]   A sample copy of an FGIC Insurance Agreement is attached as Exhibit E.
[73]   Under the FGIC Insurance Agreements, PREPA agreed "to pay or reimburse" National for any and all charges,
fees, costs, and expenses that National may reasonably pay or incur in connection with certain events. Ex. E,

74.     Once the foregoing is understood, two things become clear.  First, the recovery "on account of" the National Reimbursement Claim is not separate from the recovery on account of the National Insured Bond Claim (*i.e.*, National's claim based on the National Insured Bonds), but it is merely additional consideration on account of the same claim.  Accordingly, for purposes of evaluating the total consideration received by National on account of the National Insured Bond Claim, the distribution "on account of" the National Reimbursement Claim must be considered as well.

75.     Second, to the extent the National Reimbursement Claim relates to National having paid principal on the National Insured Bonds after PREPA's petition date, such principal payments are already subsumed in National's claim on account of the National Insured Bonds.  And to the extent the National Reimbursement Claim seeks reimbursement for National having paid postpetition interest on the National Insured Bonds, such interest payments must be disallowed under section 502(b)(2) as unmatured interest, as National cannot have any greater rights than the holders of the National Insured Bonds (and such holders are clearly not entitled to postpetition interest because the PREPA Revenue Bonds are undersecured).

76.     For these additional reasons, the Committee submits that the National Settlement is unreasonable and, accordingly, cannot serve as a justification for gross disparity in treatment between General Unsecured Claims and the claims of National.[74]

---

FGIC Insurance Agreement § 11.  This expense reimbursement provision, however, cannot serve as a basis for the National Reimbursement Claim either.  While the foregoing expense reimbursement provision also covers "any advances or payment made by [National] to cure an Event of Default of [PREPA] under the Trust Agreement as to the [National] Insured Bonds," the payment of principal and interest by National does not fall within the scope of this clause.  In fact, such payment does <u>not</u> cure a payment default under the National Insured Bonds or the Trust Agreement, as the amount paid by National remains due and owing by PREPA (with National as subrogee thereof).  This point is expressly stated elsewhere in the FGIC Insurance Agreement:  "In determining whether a payment default has occurred or whether a payment on the [National] Insured Bonds has been made under the Trust Agreement, no effect shall be given to payment made under the Bond Insurance Policy."  Ex. E, FGIC Insurance Agreement § 4(a).

[74]     Recognizing the infirmities of this argument, the Oversight Board and National agreed that if the Court denies approval of the National Settlement as it relates to the National Reimbursement Claim (including because it

v.    *Fee Reimbursement and Structuring Fee*

77.    As with the consent fees to be paid to the Fuel Line Lenders, the approximately

$49 million in fee reimbursement and structuring fees to be paid to National are plainly part of

National's aggregate consideration that must be considered in evaluating the discriminatory

treatment of National's claims as compared to General Unsecured Claims (none of which, to be

clear, are receiving any such fees under the Plan).

78.    But these fees also further demonstrate that the National Settlement is inherently

unreasonable.  National is an unsecured or undersecured creditor, and, as such, is plainly not

entitled to reimbursement of its professional fees.  In fact, only fully secured creditors may

include reasonable professional fees as part of their claim.  *See* 11 U.S.C. § 506(b).

79.    Moreover, the so-called "structuring" fee is also not defensible.  As courts have

noted, "alternative transaction fees and the like" are not appropriate where the recipient is "so

imbedded in the capital structure already that they did not need further incentive to make their

proposal."  *See* Hr'g Tr. 118:10-18, *In re Delphi Corp.*, No. 05-44481 (Bankr. S.D.N.Y. Jan. 12,

2007) [Docket No. 7118].  Here, National is no stranger to the case, nor is it contributing new

money to support PREPA's reorganization that would help fund recoveries to other stakeholders,

or taking on any other risk.  Nor is National part of any larger group of creditors, and its deal has

not contributed to a largely consensual plan.  Instead, National simply agreed to a settlement of

its prepetition claims at a minimal discount and to support a plan consistent with that settlement,

while enjoining a variety of other forms of consideration to "sweeten the pot."  National's 2.86%

"structuring fee" is also impermissible, as it relates to an internal issue as between National and

its policyholders that has nothing to do with PREPA, namely the commutation elections.

---

gives rise to unfair discrimination), National would not be entitled to receive any distribution on account of the
National Reimbursement Claim, but such denial would not otherwise affect the National Settlement.

###### vi. Interim Charge

80.     As noted, under the National PSA, the Oversight Board agreed to use its

reasonable best efforts to cause PREPA to impose an Interim Charge to fund interim payments to

National for the period from the effective date of the National PSA (*i.e.*, January 31, 2023)

through the Effective Date of the Plan.[75]  While the Interim Charge is technically not paid under

the Plan, it must be taken into account in determining National's aggregate recovery, for all the

reasons already discussed above.

81.     The Oversight Board contends that it is not asking the Court to approve the

Interim Charge, which it describes as a "settlement prior to the [effective date], and not as

treatment under a plan."[76]  Therefore, according to the Oversight Board, the Interim Charge is

outside the Court's jurisdiction.  As an initial matter, this strains the bounds of credulity.  It is

hard to take seriously that a payment agreed to in a "plan support agreement" with National is,

somehow, not part of the plan's consideration to National.  Is the Oversight Board's position that

the Interim Charge is a gift?  A payment to National for its vote?[77]

82.     More importantly, while the Court may not be able to unwind pre-Plan payments,

those payments are absolutely relevant to the Court's consideration of the National PSA, and the

Plan into which it is incorporated.  *See In re City of Stockton,* 486 B.R. 194, 199-200 (Bankr.

E.D. Cal. 2013) (noting that "unconstrained settlements" are "perhaps nefarious" and that

"evidence of untoward settlements" is relevant to determination of whether chapter 9 plan

---

[75]   *See* National PSA § 6.2.
[76]   Supplemental DS Reply ¶ 39.
[77]   The Oversight Board's 30(b)(6) witness testified that the Interim Charge is a "carrying cost fee for the fact that
the plan will not be confirmed and go effective immediately."  Ex. B, Skeel Dep. Tr. at 348:22-349:4.  As noted
above, the Supreme Court has flatly prohibited the payment of such carrying costs as compensation for delay
caused by bankruptcy (*i.e.*, the time value of money).  *See In re Hill Wine Co., LLC,* 2014 WL 2795169, at *1
(Bankr. N.D. Cal. June 19, 2014 ("The argument that a secured creditor is entitled to the time value of money
was put to rest by the Supreme Court in [*Timbers*].").  And this is especially true for unsecured creditors.

discriminates unfairly, is fair and equitable, has been proposed in good faith, and is proposed by any means forbidden by law).

83.    Further, the *Stockton* court was concerned with "one-off" settlements and payments for which the municipal debtor had not sought approval; the court explained that those payments were, nonetheless, still relevant at confirmation.  But the Interim Charge is not a "one-off" payment; it is clearly part of the overall National Settlement, which the Court is being asked to approve in connection with the Plan.  The Oversight Board cannot pick and choose which elements of the settlement it wants the Court to consider.  The Board's refusal to quantify the Interim Charge, and its absurd contention that this recovery is not on account of National's claim, is deeply concerning, and raises questions of the purpose of the payment and, relatedly, the good faith of granting it.  And if the Interim Charge cannot be approved, the National PSA itself cannot be approved.  *See Air Line Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 430 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994) ("[S]ince the Settlement Agreement is a global settlement of all the claims, it is not possible to vacate only [part of it.]  The appropriate inquiry is whether the Settlement Agreement in its entirety is appropriate for the [] estate.").

## III.    Plan Is Not In Best Interest of General Unsecured Creditors in Class 7

84.    The Plan cannot be confirmed because it is not in the best interest of creditors, which, under Title III, requires consideration of what creditors would have received outside of bankruptcy.  Under section 314(b)(6) of PROMESA, the Plan must be "in the best interest of creditors, which shall require the court to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan."  PROMESA § 314(b)(6).  *See also In re City of Detroit*,

524 B.R. at 212-13 (comparing "best interests" tests in chapter 9 and chapter 11 of Bankruptcy

Code).

85.     The Oversight Board's BIR (attached as Exhibit K to the Disclosure Statement)

purports to establish that, outside of Title III, General Unsecured Claims in Class 7 would

receive no recovery at all.  This outcome assumes that Bondholders would be paid before

General Unsecured Claims.[78]  But that assumption is wrong.  As the Committee has previously

explained,[79] to ensure PREPA's continued and sustainable operation a receiver would pay (or

would have no choice but to pay) all obligations incurred in connection with operating PREPA's

business, regardless of a label of "Current Expense."  All such expenses, therefore, represent

expenses that would be paid, either as a matter of law or as a practical matter, before any

payment of net revenues to Bondholders.

86.     Indeed, the Oversight Board agreed with this in its own briefs, explaining that "if

an expense is necessary to preserve operations, whether it is technically a Current Expense or

not, the receiver would have to pay it."[80]  Separately, the Oversight Board has also argued in the

Estimation Proceedings that the estimated $800 million in allowed General Unsecured Claims

*are* Current Expenses, entitled to payment before Bondholders.[81]  These positions, obviously, are

diametrically opposed to the assumption in the BIR.  The Committee submits that the correct

---

[78]   *See* BIR at 7 [Docket No. 3297-11].
[79]   *See Intervenor-Plaintiff Official Committee of Unsecured Creditors' Response Brief in Connection with
       Estimation of Unsecured Net Revenue Claim* ¶ 46 [Docket No. 230 in Adv. Proc. No. 19-391 (LTS)].
[80]   *See Memorandum of the Financial Oversight and Management Board for Puerto Rico in Support of Estimation
       of Unsecured Net Revenue Claim* ¶ 41.[Docket No. 192 in Adv. Proc. No. 19-391 (LTS)].
[81]   *See Response of the Financial Oversight and Management Board for Puerto Rico in Support of Estimation of
       Unsecured Net Revenue Claim* ¶ 45 [Docket No. 226 in Adv. Proc. No. 19-391 (LTS)].  For the avoidance of
       doubt, the Committee does not concede that $800 million is an appropriate estimate of the allowable General
       Unsecured Claims.  And, as demonstrated by Shankweiler Exclusion Motion, the Oversight Board has not
       established a basis for that estimate, which departs from the well-established rule that claims are *prima facie*
       valid unless and until that presumption is rebutted.

approach is the one taken in the Estimation Proceedings, under which General Unsecured Claims

would be paid in full outside of bankruptcy.[82]

87.     The Lien & Recourse Decision mandates the same result.  In its decision, the

Court determined that the Bondholders have no lien on any of PREPA's revenues, gross or net,

unless and until those revenues are actually deposited into the various specified accounts.[83]  The

Court also held that, while the Bondholders' right to payment is not limited to its perfected

collateral, it *is* limited by the Bondholders' own agreement that they would be paid only from net

revenues (including net revenues generated by the exercise of their equitable remedies).[84]  In

other words, the Court has determined that, as a matter of contract, the Bondholders have agreed

that they have access only to PREPA's ***net*** revenues.[85]

88.     General Unsecured Creditors have made no such agreement.  ***All*** allowed General

Unsecured Claims, therefore, are entitled to be paid from PREPA's ***gross*** revenues—from all

PREPA assets, for that matter—except to the extent those gross revenues are subject to a

properly perfected lien, which, as the Court has held, they are not.  *See In re DeWolfe*, 494 B.R.

193, 196 (Bankr. W.D.N.Y. 2013) ("bankruptcy jurisprudence requires that unsecured creditors .

. . enjoy a distribution from estate property that is not subject to a valid and enforceable lien").

Moreover, because there is no automatic stay outside of bankruptcy, all General Unsecured

Creditors would have all available rights to enforce their claims, including judgments and

judgment liens on ***all*** of PREPA's gross revenues and other assets—a right the Bondholders

simply do not have.

---

[82]   As discussed in the next section, Bondholder claims have a lower priority right to payment than ***all*** General
    Unsecured Claims because General Unsecured Creditors have rights to be paid from PREPA's ***gross*** revenues
    while the Bondholders have agreed that they have recourse only to PREPA's ***net*** revenues
[83]   *See* Lien & Recourse Decision at 13.
[84]   *See id.*
[85]   To be clear, the outcome of the Estimation Proceedings—which goes to the likely amount of those net revenues
    in the future—has no impact on this fact.

89.    Finally, the Oversight Board's challenges to the Bondholders' asserted liens and the non-recourse nature of the PREPA Revenue Bonds would, of course, also exist outside of the Title III process.  Thus, the Bondholders cannot escape these challenges outside of Title III.

90.    For all these reasons, the Plan is not in the best interests of the hundreds of General Unsecured Creditors in Class 7.

## IV.    **Fuel Oil Litigation and Other Litigation Claims Should Be Transferred to Avoidance Actions Trust**

91.    "The purpose of the trustee's avoiding powers is simply to foster the equal distribution of a debtor's assets among its general non-priority creditors."  *Hiraldo v. Banco Popular de P.R. (In re Hiraldo)*, 471 B.R. 676, 686 (Bankr. D.P.R. 2012) (citation omitted); *see also Higgins v. Erickson (In re Higgins)*, 270 B.R. 147, 153 (Bankr. S.D.N.Y. 2001) (avoidance actions are "designed not to benefit a debtor but to protect the rights of general unsecured creditors").  This is why "any property the trustee recovers becomes estate property and is divided pro rata among all general creditors."  *The Candle Co. v. Mims (In re Moore)*, 608 F.3d 253, 260 (5th Cir. 2010).[86]  The Plan violates this fundamental principle of bankruptcy law.

92.    As the Court is aware, the Committee, together with the Special Claims Committee, has brought litigation against certain of PREPA's fuel oil suppliers and laboratories alleging that they had, among other things, breached contracts with PREPA and overcharged PREPA for fuel oil and laboratory services (the "Fuel Oil Litigation").[87]  In addition, the Oversight Board has identified numerous Vendor Payments that are potentially recoverable

---

[86]    For the same reason, courts are generally opposed to allowing DIP lenders to take control of avoidance actions. *See, e.g., Off. Comm. Of Unsecured Creditors v. Goold Electronics Corp.,* No. 93 C 4196, 1993 WL 408366, at *3-4 (N.D. Ill. Sept. 22, 1993) (vacating DIP financing order to the extent that the order granted the lender a security interest in the debtor's preference actions).

[87]    Discl. Stmt. at 256.

under various avoidance theories.[88]  All of these actions should be transferred to the Avoidance Actions Trust.

**V.      GUC Trust and Avoidance Actions Trust Should Not Be Approved in Their Current Form**

93.      The Committee also objects to certain provisions related to the GUC Trust and the Avoidance Actions Trust that do not comply with (a) the good faith requirement of section 1129(a)(3) of the Bankruptcy Court and (b) the requirement of section 1123(a)(7) of the Bankruptcy Code that the selection of the GUC Trustee and the Avoidance Actions Trustee be "consistent with the interests of creditors . . . and with public policy."  Contrary to the requirements of the Bankruptcy Code, the Oversight Board seeks to prevent the Committee and its constituents from controlling the GUC Trust Board, the Avoidance Actions Trust Board, and the respective trustees—*i.e.*, the entities that will administer assets for the benefit of General Unsecured Creditors.

94.      Under the current structure, neither the Committee nor any general unsecured creditors have any input in the selection of the GUC Trustee or the Avoidance Actions Trustee. Instead, in both instances, the Oversight Board selects all three members of the respective trust boards, which, in turn, select the respective trustees.[89]  This structure stands in stark contrast to the standard practice in large reorganization cases where the creditors' committee appoints (or at least has consent rights over the appointment of) the trustee that administers a trust established for the benefit of general unsecured creditors.[90]  Consistent with this well-established practice

---

[88]   Discl. Stmt. at 256-57.

[89]   *See Plan Supplement and Plan Related Documents of the Puerto Rico Electric Power Authority* [Docket No. 24387] (the "PREPA Plan Supplement"), Ex. A., GUC Trust Agreement §§ 2.5, 7.4(b); Ex. B, Avoidance Actions Trust Agreement §§ 2.5, 7.7(b).

[90]   *See, e.g.*, *Talen Energy Supply, LLC*, Case No. 22-90054 (MI) (Bankr. S.D. Tex. Dec. 14, 2022) [Docket No. 1722] (GUC trustee appointed by creditors' committee); *LSC Communications, Inc.*, Case No. 20-10950 (SHL) (Bankr. S.D.N.Y. Feb. 24, 2021) [Docket No. 1246] (litigation trustee designed by creditors' committee); *BJ Services, LLC*, Case 20-33627 (Bankr. S.D. Tex. Sept. 11, 2020) [Docket No 647] (liquidation trustee selected

40

and section 1123(a)(7) of the Bankruptcy Code,[91] the Committee, as the statutory fiduciary for

General Unsecured Creditors, should be able to select at least two members of the GUC Trust

Board and the Avoidance Actions Trust Board, respectively, as was the case under the

Commonwealth plan of adjustment.[92]  Allowing a party that has no economic stake in the

administration of these trusts (*i.e.*, the Oversight Board) is neither in the interest of creditors nor

consistent with public policy.

95.     Permitting the Committee to appoint at least two board members so is also

important for another reason: the proposed confirmation order [Docket No. 3587] (the "Proposed

Confirmation Order") would grant the GUC Trustee the right to exercise voting or consent rights

with respect to the New Bonds or CVI's transferred into the GUC Trust.  Proposed Confirmation

Order ¶ 37.  It would be entirely inappropriate for an entity over which neither the Committee

nor General Unsecured Creditors have any control to exercise such rights on their behalf.

96.     Moreover, consistent with customary practice in large reorganization cases and in

accordance with section 1123(a)(7) of the Bankruptcy Code, the Committee or its designee

(which may be the GUC Trustee, assuming the Committee appoints two of the three members of

---

by creditors' committee); *JCK Legacy Company*, Case No. 20-10418 (MEW) (Bankr. S.D.N.Y. Sept. 25, 2020)
[Docket No. 879-1] (GUC trustee selected by creditors' committee).

[91]   *See also In re Bearingpoint, Inc.*, No. 09-10691 (REG), 2009 Bankr. LEXIS 5045, at *14-15 (Bankr. S.D.N.Y.
Dec. 22, 2009) (finding that, as the liquidating trust will be overseen by an advisory board comprising two
members of the creditors' committee, the plan satisfies Bankruptcy Code section 1123(a)(7)); *In re EBHI
Holdings, Inc.*, No. 09-12099 (MFW), 2010 Bankr. LEXIS 3062, at *10-11 (Bankr. D. Del. Mar. 18, 2010)
(finding that "[t]he Liquidating Trust Committee that oversees the Liquidating Trustee will be comprised of
members appointed by the Creditors' Committee.  The Plan therefore complies with section 1123(a)(7) of the
Bankruptcy Code, as appropriate for a liquidating plan, in a manner consistent with the interests of creditors and
equity security holders and public policy."); *In re Refco Inc.*, No. 05-60006 (RDD), 2006 Bankr. LEXIS 4914,
at *17-18 (Bankr. S.D.N.Y. Dec. 14, 2006) (finding that appointment of the plan administrator by the official
creditors' committees satisfied Bankruptcy Code section 1123(a)(7)).

[92]   In addition, as currently drafted, the Avoidance Actions Trust Agreement would allow the Oversight Board to
select the initial members of the Avoidance Actions Trust Board "at any time," *see* PREPA Plan Supplement,
Ex. B, Avoidance Actions Trust Agreement § 7.7(a), even though, pursuant to the Plan, such members must be
appointed as of the Effective Date.  Because—in the event of any conflict between the Avoidance Actions Trust
Agreement and the Plan—the Avoidance Actions Trust Agreement controls, that agreement should be clarified
so that the appointment of the initial board members must occur on or before the Effective Date.

41

the GUC Trust Board) should be authorized to control the claims objection and reconciliation process with respect to claims of its constituency, *i.e.*, General Unsecured Claims. Neither the Oversight Board nor PREPA have any economic interest or incentive in expeditiously managing that process. In this regard, the post-confirmation experience with respect to the claims reconciliation process in the Commonwealth case speaks volumes, as does the fact that, six years into this case, the Oversight Board has yet to object to any PREPA claims on the merits.

97.     Finally, the GUC Trust and the Avoidance Actions Trust are each funded only in the amount of $1 million.[93] The Committee submits that such funding is inadequate to meet the costs of administering the GUC Trust and the Avoidance Actions Trust—and this is especially true when considering the scope of the Fuel Oil Litigation, which, as discussed above, should also be transferred into the Avoidance Actions Trust. The proposed $1 million in initial funding is a mere fraction of the initial funding of the avoidance actions trust established under the Commonwealth plan, which provided for $15 million in initial funding. While the GUC Trustee and the Avoidance Actions Trustee may each use proceeds of GUC Trust Assets and Avoidance Actions, respectively, to fund the expenses of the respective trusts, this does not eliminate the need for adequate initial funding until such proceeds have been realized. This concern is particularly acute in the case of the Avoidance Actions Trust, which will need to investigate and prosecute Avoidance Actions in order to generate proceeds.

## VI.     Proposed Dissolution of Committee on Effective Date Violates Section 1129(a)

98.     Under section 1129(a)(1) of the Bankruptcy Code, a plan must comply "with the applicable provisions of this title." Subsection (a)(2) imposes the same requirement on the plan proponent. The Plan proposes to dissolve the Committee as of the Effective Date, with

---

[93]    *See* PREPA Plan Supplement, Ex. A., GUC Trust Agreement § 2.3(b); Ex. B, Avoidance Actions Trust Agreement § 2.3.

Reorganized PREPA deemed a stand-in for the Committee in any contested matter or adversary

proceeding.[94]  This violates sections 1103 and 1109 of the Bankruptcy Code and, therefore,

violates the confirmation requirements of sections 1129(a)(1) and (a)(2), and also implicates

subsection (a)(3), which requires that the "plan has been proposed in good faith."

99.     The Committee is a statutory fiduciary, and its powers and obligations are

delineated in section 1103 of the Bankruptcy Code.  As a statutory fiduciary, the Committee is

entitled to appear and be heard on any issue.  11 U.S.C. § 1109(b).  No provision of chapter 9 or

chapter 11 of the Bankruptcy Code limits an official committee's appellate rights or requires that

the duties of an official committee cease upon confirmation of a plan.

100.     *In re Chemtura Corp.*, 439 B.R. 561, 612-13 (Bankr. S.D.N.Y. 2010), addressed

this precise issue.  In that case, the plan proposed to dissolve the official equity committee on the

effective date of the plan, thereby mooting its appellate standing.  Judge Gerber found that this

provision was inappropriate because it would deny the committee its section 1109 standing and

"[i]f plan proponents or supporters intended to deprive the Equity Committee of appellate

standing, it would raise issues under Code sections 1129(a)(1), (2) and (3)."  *Id.* at 613.

101.     This rationale is particularly applicable here.  As the Court has recognized, the

"estimation of the Unsecured Net Revenue Claim is crucial to the Court's consideration of the

PREPA Plan."[95]  And the Court denied the Committee's motion for an interlocutory appeal of

the Lien & Recourse Decision on the basis that, among other things, the Committee would have

the ability to appeal such decision comprehensively and simultaneously with an appeal of the

confirmation order:

> By awaiting the relatively brief time between now and the time for
> completion of the litigation of this adversary proceeding and appeal of

---

[94]   Plan art. XXXIII.A.
[95]   Order Denying Interlocutory Appeal at 6.

> any confirmed plan of confirmation—in the event that a plan is
> confirmed—Movants are merely in the **same position** as that of the
> general creditor body.  Appeals will most efficiently be handled
> **comprehensively**—based upon final orders—and **simultaneously**, rather
> than piecemeal.[96]

In other words, this Court has already recognized that the Committee will have the ability to

appeal the Lien & Recourse Decision as well as any order confirming the Plan.

102.    Moreover, the proposed dissolution of the Committee in the PREPA case departs

from the corresponding provisions in the Commonwealth and HTA plans of adjustment, both of

which provided that the Committee will be dissolved only after the confirmation order becomes a

final order, including through all appeals.[97]  It is fair, therefore, to ask why this provision is

absent from PREPA's proposed Plan, especially in light of the extensive post-confirmation

litigation on critical issues that all parties, and the Court, fully expect.

103.    The Court should reject the Oversight Board's attempt to eliminate the

Committee's statutory appellate rights, and the Committee should not be dissolved until all

appeals have been exhausted, just like in the prior plans in these Title III cases.  Dissolving the

Committee on the Effective Date is contrary to sections 1103 and 1109 of the Bankruptcy Code,

rendering the Plan unconformable under section 1129.

## VII.   Objections to Proposed Confirmation Order

104.    For all the reasons above, the Committee objects to any order approving the Plan

as it stands.  However, if the Court were to confirm the Plan, the Proposed Confirmation Order

should be revised to address the following issues and infirmities, among others:

- The Effective Date of the Plan should be contingent on a final, non-appealable,
  resolution of the Amended Lien & Recourse Challenge.  Alternatively, the
  Proposed Confirmation Order should provide that any delay in resolving appeals

---

[96]   Order Denying Interlocutory Appeal at 8 (emphasis supplied).
[97]   The confirmation orders in those cases also provided that the Committee would be entitled to defend
applications for allowance of compensation and reimbursement of expenses of its professionals, a provision
absent from PREPA's proposed Plan.

will not give rise to equitable mootness.  Either way, the Committee's appellate rights should be expressly preserved.

- The Proposed Confirmation Order should clarify that (i) General Unsecured Creditors will receive interests in the GUC Trust (as opposed to direct distributions of New Bonds and GUC CVIs), while (ii) Non-Settling Bondholders and Non-Settling Monolines will receive their New Bonds and CVIs directly, rather than as interests in the GUC Trust.[98]

## RESERVATION OF RIGHTS

105.    The Committee reserves the right to, among other things, (i) amend or supplement this Objection in the event the Oversight Board files an amended plan, (ii) join in any objection to the Plan filed by any other party in interest, (iii) raise additional objections not incorporated herein, and (iv) raise the arguments made herein, and additional arguments, in connection with confirmation, and any objection thereto, of the Plan (or any other plan of adjustment filed in this Title III case).

106.    Further, the Committee reserves the rights to assert additional objections to the Proposed Confirmation Order, including, without limitation, any proposed findings of fact and conclusions of law to be incorporated into the proposed order.  Failure to object to a provision of the proposed findings of fact and conclusions of law (once filed) does not waive any objection to the same or similar provision in the Proposed Confirmation Order, regardless of whether such objection is made herein or elsewhere, including, without limitation, at the confirmation hearing.

## CONCLUSION

107.    For all the reasons set forth in this Objection, the Committee submits that the Plan should not be confirmed.

---

[98]    The Committee is aware that the Trustee and the Bondholders have similarly argued that they should receive direct distributions of New Bonds and CVIs.  *See* Trustee's Conf. Order Obj. ¶ 8 [Docket No. 3709] and Ad Hoc Group Conf. Order. Obj. ¶ 40 [Docket No. 3716].  The Committee believes that this structure best reflects the different needs and realities of bond claimants as compared to General Unsecured Creditors, and will also avoid future conflicts that could arise if two groups of very different creditor types, with very different financial sophistication, needs, incentives, considerations, and capabilities, were forced to "share" one GUC Trust.

WHEREFORE, the Committee respectfully requests that the Court deny the Plan and grant such other relief as is just and proper.

Dated: June 15, 2023                    By:  _/s/ Luc A. Despins_

PAUL HASTINGS LLP
Luc A. Despins, Esq. (*Pro Hac Vice*)
G. Alexander Bongartz, Esq. (*Pro Hac Vice*)
Shlomo Maza (*Pro Hac Vice*)
200 Park Avenue
New York, New York 10166
Telephone:  (212) 318-6000
lucdespins@paulhastings.com
alexbongartz@paulhastings.com
shlomomaza@paulhastings.com

*Counsel to the Official Committee of Unsecured Creditors*

By:  _/s/ Juan J. Casillas Ayala_

CASILLAS, SANTIAGO & TORRES LLC
Juan J. Casillas Ayala, Esq. (USDC - PR 218312)
Israel Fernández Rodríguez, Esq. (USDC - PR 225004)
Juan C. Nieves González, Esq. (USDC - PR 231707)
Cristina B. Fernández Niggemann, Esq. (USDC - PR 306008)
PO Box 195075
San Juan, Puerto Rico 00919-5075
Telephone: (787) 523-3434 Fax: (787) 523-3433
jcasillas@cstlawpr.com
ifernandez@cstlawpr.com
jnieves@cstlawpr.com
crernandez@cstlawpr.com

*Local Counsel to the Official Committee of Unsecured Creditors*