# **Exhibit A**

```
                                              Page 83
 1              DAVID BROWNSTEIN
 2   bondholders?
 3              MS. SPILLANE:  Objection to
 4      form.
 5              MR. MERVIS:  Objection to
 6      the form.
 7      A       You have to know how much
 8   money you have available after that
 9   settlement or litigation, if you don't
10   have a settlement, in order to find a
11   settlement with the bondholders.
12      Q       Had the dispute between the
13   oversight board and the fuel line lenders
14   concerning the fuel line lenders'
15   asserted priority been resolved prior to
16   agreement to the 2019 RSA?
17      A       I don't recall.
18      Q       Are you aware of any
19   settlement between the oversight board
20   and the fuel line lenders, preceding the
21   agreement to the 2019 RSA?
22      A       No.  They were part of the
23   2019 RSA.  So all of it was developed in
24   one package.  But you had their
25   agreement.  So you didn't have the
```

Page 84

```
 1              DAVID BROWNSTEIN
 2    dispute issue to worry about, that they
 3    were litigating, and they would take
 4    money that belonged to the bondholders in
 5    the RSA because then we'd have to cancel
 6    the RSA.
 7         Q       And when you say they would
 8    take money that belonged to the
 9    bondholders, what do you mean by that?
10         A       If they won the litigation
11    and were entitled to first cash flow,
12    were they entitled to 100 cents on the
13    dollar, 100 cents plus accruals or not.
14    And if they were, that would mean based
15    on what we at the time believed we could
16    afford to pay wouldn't have enough money
17    to pay the bondholders what we would have
18    agreed to if we had done them first
19    without knowing the results on the fuel
20    lines.
21         Q       If the fuel line lenders in
22    the absence of a settlement were to
23    prevail in their priority litigation,
24    would that require PREPA to pay
25    additional sums in total creditor
```

```
                                            Page 85

 1                  DAVID BROWNSTEIN

 2   recoveries?

 3                  MS. SPILLANE:  Objection to

 4       form.

 5       A       No.  As I just said to you,

 6   it would have required that we not offer

 7   as much to the bondholders.

 8                  MR. MADDEN:  Tab 4 of the

 9       binder.

10                  (The above-referred-to

11       document was marked as Exhibit 91 for

12       identification, as of this date.)

13       Q       Mr. Brownstein, do you

14   recognize the agreement that begins on

15   page 5 of 32 of -- let me take a step

16   back.

17                  MR. MADDEN:  I didn't mark

18       this.  We're going to mark as Exhibit

19       91 a document that is Exhibit M to

20       the disclosure statement, dated

21       March 1, 2023.

22       A       Okay.

23       Q       And so my question was going

24   to be, Mr. Brownstein, do you recognize

25   the agreement that begins on page 5 of 32
```

Page 86

1                    DAVID BROWNSTEIN

2    of the PDF that is Exhibit 91?

3         A         Yes, sir.

4         Q         And what is it?

5         A         It's the plan support and

6    settlement agreement between the fuel

7    lines, the board and PREPA.

8         Q         And were you involved in

9    negotiating this agreement?

10        A         Yes.

11        Q         And what was the nature of

12   your involvement?

13        A         I'm not sure I understand

14   your question.

15        Q         How did you participate in

16   the negotiations that led to this

17   agreement?

18        A         Well, based on what the

19   board was comfortable doing, we

20   negotiated a settlement with the fuel

21   line lenders.  And then we assisted

22   Proskauer, who worked with Wachtell as

23   fuel line lender counsel, and the advisor

24   to the fuel line lenders to paper the

25   agreement that would look like what our

Page 370

DAVID BROWNSTEIN

1

2          priority; right?

3               A          Correct.

4               Q          And what do you anticipate

5          your testimony to be with respect to

6          those key benefits regarding the priority

7          of the fuel line lenders?

8                          MR. MERVIS:  Object to the

9               form.  But you could answer.

10              A          Again, as I said previously

11         today, the critical pieces, what we were

12         concerned about is since we have a

13         limited amount of funds available for

14         creditors, without knowing what the

15         amount is that we will be paying the fuel

16         lines, given we would be going into

17         litigation, we would either have to

18         reserve a significant amount of money for

19         the fuel lines until we knew, or we could

20         settle with them and, therefore, be able

21         to negotiate with the bondholders with

22         knowing what was the free cash flow

23         available for them.

24              Q          Thank you.

25                         Moving away from the

Page 371

1                    DAVID BROWNSTEIN

2    disclosure statement and moving towards

3    the fuel line lender settlement, under

4    that settlement, why are bondholders

5    entitled to interest accrual from

6    December 1, 2022 on the Series A Bonds?

7                    MR. MERVIS:  I object to the

8        form.

9        A       Well, you're asking why the

10   fuel line lenders as owners of the Series

11   A Bonds are entitled to one year's

12   accrued interest.

13       Q       Yes.

14       A       Okay.  And this is on the

15   new bonds so you understand; right?  That

16   there's a deemed issuance date on the

17   bonds, built into our cash flows already

18   is the cost of that one year's accrual.

19   If the settlement takes longer than a

20   year, they no longer receive additional

21   accrual.

22                    So the charge that you're

23   aware of that we're prepared to pay to

24   all creditors incorporates already, the

25   interest accrual from the deemed issuance

1            DAVID BROWNSTEIN

2   date.  The reason for the deemed issuance

3   date is, as I think you know, the fuel

4   lines are one of several creditors, but

5   one who has settled with the board who

6   have entered into several RSAs with us;

7   okay?  And those RSAs have been

8   terminated for various reasons.  The

9   issue is in getting creditors to agree

10  today to move forward with an RSA with

11  us.  They're looking to understand what

12  can keep the deal from closing and when

13  it can close and what the economic impact

14  to them of it not closing on that

15  schedule is.

16            So as part of the settlement

17  with National -- with the fuel line

18  lenders, we've agreed to give them a

19  deemed issuance date.  And if the bonds

20  are issued in less than one year or one

21  year exactly, they will get accrued

22  interest on those bonds, on the new

23  bonds.  If it's longer than one year, the

24  accrual stops.  It's not dissimilar,

25  although it is different, from the

1              DAVID BROWNSTEIN
2   National agreement where National will
3   receive one cent on its pro rata share of
4   their bonds.
5                So let me try and help you
6   think about this.  If there are 8 billion
7   of outstanding bonds, one cent on that
8   8 billion then divided by all the bonds,
9   multiplied by National's bonds is what
10  they'd be entitled to for up to 12
11  months, subject to approval of the
12  utility commission, PREB.
13      Q       So you view this as interest
14  on new bonds and not post-petition
15  interest; is that fair?
16      A       No.  The difference, as I
17  said, is that the interest on -- for
18  National is one cent.  It's not equal to
19  interest on the bonds, on the old bonds.
20      Q       I'm still on the fuel line
21  lenders.
22      A       I'm sorry.  I apologize.
23  Yes.  It's interest on the new bonds.
24      Q       Now, staying with the fuel
25  line lenders, I mean you're not going to

Page 374

```
 1              DAVID BROWNSTEIN
 2   dispute that they're receiving a higher
 3   recovery than the general unsecured
 4   creditors under the current proposed
 5   plan, are you?
 6       A       I am not.  They've settled,
 7   and the unsecureds have not.
 8       Q       Is that the singular
 9   justification for the difference in
10   treatment?
11              MR. MERVIS:  Objection to
12      the form of the question.
13              THE WITNESS:  So you want
14      him to re-ask it?
15              MR. MERVIS:  No.  If you
16      understand it, you can answer.
17       A       No.  But I'm telling you, so
18   they have a real settlement.  And it was
19   negotiated.  And we have a settlement
20   with them in National.  We don't have a
21   settlement with the GUCs.  I can't talk
22   about what has occurred with the GUCs in
23   terms of offers that have been made.
24   But, you know, that's the difference.
25       Q       So is there any other reason
```

Page 375

1             DAVID BROWNSTEIN

2    for the difference in the treatment,

3    other than the fact that one is a

4    settlement, and one hasn't been settled?

5                 MR. MERVIS:  Objection to

6        the form.

7        A       Yes.  Again, it was our

8    position that we have risk with the fuel

9    line lenders on priority.  And we don't

10   believe we have that risk with you.

11       Q       And that has to do with the

12   current expense?

13       A       Yes.

14       Q       Do you know if there's any

15   general unsecured creditors that have

16   current expense claims?

17       A       No, we don't.  We believe

18   there may be.  But we don't.

19       Q       Have you ever heard of a

20   company called General Unsecured Creditor

21   as I believe Cedarlake Capital?

22       A       No.

23       Q       If there was a general

24   unsecured creditor that also had a

25   current expense claim, would they be

Page 376

```
1              DAVID BROWNSTEIN
2    treated similarly in your opinion to the
3    fuel line lenders?
4              MR. MERVIS:  Objection to
5       the form.
6       A       The answer is no.  We don't
7    have a settlement with them.  They didn't
8    negotiate a settlement.  And the answer
9    would be it depends on if they settle and
10   how that settlement works.  As you know,
11   there have been offers made.
12      Q       Now, is it your
13   understanding that the fuel line lenders
14   are expressly named in the trust
15   agreement?
16             MS. SPILLANE:  Objection to
17      form.
18      A       I believe what's named is
19   fuel purchases; right?
20      Q       Do you think that the trust
21   agreement references to the fuel line
22   lenders whether they're denominated by
23   some other name?
24             MS. SPILLANE:  Objection to
25      form.
```

Page 379

1               DAVID BROWNSTEIN

2                    MR. MERVIS:  I object to the

3          form.

4          Q        Are the general unsecured

5     creditors parties to the trust agreement?

6     Do you know?

7          A        Are they a separate party to

8     it?

9          Q        Yes.  Any party.

10                   MR. MERVIS:  Object to the

11         form.

12         A        What do you mean any party?

13         Q        Well, that's separate.  I'm

14    not sure what you mean by separate.  Take

15    out the word separate.

16                   Are the general unsecured

17    creditors, other than the -- are they

18    parties to the trust agreement?  Did they

19    sign?

20                   MR. MERVIS:  Object to the

21         form.

22         A        I don't believe so, no.

23         Q        Is it the board's position

24    that the trust agreement provides the

25    fuel line lenders with priority over

Page 380

```
 1              DAVID BROWNSTEIN
 2    other bondholders?
 3              MR. MERVIS:  Object to the
 4       form.
 5       A         What the board's position is
 6    there's a risk in litigation that they
 7    could win that claim.  And therefore,
 8    we're settling it.
 9       Q         And does that claim also
10    indicate -- is that claim also based on
11    the assertion that the fuel line lenders
12    have priority over other creditors that
13    are not bondholders?
14              MR. MERVIS:  I'm sorry.  One
15       second.  Yeah.  I object to the form.
16       A         Yes.  Now, again, as we
17    discussed a moment ago, it's possible
18    that some of the GUCs actually have
19    priority as well; right?  That's
20    information we don't have.
21       Q         Can you explain why?  If the
22    general unsecured creditors are not party
23    to the trust agreement, why the fuel line
24    lenders would have priority over those
25    general unsecured creditors?
```

Page 381

1              DAVID BROWNSTEIN

2                  MS. SPILLANE:   Object to

3      form.

4                  MR. MERVIS:   I object to the

5      form.

6      A        As I said, there's -- in the

7   indenture, it refers to fuel purchase.

8      Q        Should I take your response

9   to mean that it is the board's position

10  that the parties involved in fuel

11  purchases would have priority over any

12  other creditor?

13                 MS. SPILLANE:   Objection to

14     form.

15                 MR. MERVIS:   I object to the

16     form of the question.

17     A        If the determination is no

18  one has a lien, so everyone is parity,

19  provided that there is a risk, our

20  position isn't that they're entitled to

21  it.  Our position is that there's a risk

22  in litigation that they would win.  And

23  so therefore, we are prepared to settle

24  that claim.

25     Q        And that settlement includes

Page 382

                    DAVID BROWNSTEIN

1   giving them a higher priority than the

2   unsecured creditors; correct?

3                   MR. MERVIS:   I object to the

4       form.

5        A        Correct.

6        Q        Now, under the plan, does

7   the recovery for the fuel line lenders

8   come solely out of the recovery that

9   would have otherwise gone to the

10  bondholders?

11                  MS. SPILLANE:   Objection to

12      form.

13                  MR. MERVIS:   Object to the

14      form.

15       A        There is one pot of cash.

16  So it's not that it's only coming out of

17  the bondholders.  That pot is available

18  for the bondholders, the GUCs, the fuel

19  line lenders and anyone else who we have

20  an obligation to.  And therefore, it's

21  out of the pot in total, not out of just

22  the bondholders' share of the pot.

23       Q        Has the board done an

24  analysis as to whether there are any

Page 383

1              DAVID BROWNSTEIN

2   other current expense claims, other than

3   the fuel line lenders and what I had

4   mentioned earlier, potential GUC claims

5   for current expenses?

6              MR. MERVIS:  I object to the

7       form of the question.

8       A       The board has a consultant

9   who they work with on valuation of the

10  claims and determination as to whether

11  they're real claims or not.  That's a

12  separate firm.

13      Q       And does that include

14  categorizing them to determine whether or

15  not they're current expense claims?

16      A       I don't know the answer.  I

17  believe so.  But I don't know for sure.

18      Q       And who makes the

19  determination as to whether or not a

20  claim is a current expense claim?

21              MR. MERVIS:  Object to the

22      form.

23      A       I'm assuming the board's

24  consultant presents to the board each

25  claim for a consideration.

Page 384

                    DAVID BROWNSTEIN

1

2        Q        You don't know what the

3   factors are?  Based on your testimony, it

4   seems to me you don't know what the

5   factors are in making that determination.

6        A        No.

7        Q        Earlier, you touched on the

8   fact that perhaps, a current expense

9   claim from a GUC should be treated

10   similarly to a fuel line lender current

11   expense claim.  Did I understand that

12   correctly?

13        A        No.  That's not quite what I

14   said.  I said that they may be on a

15   priority claim.  I didn't say that they

16   would be or should be treated the same.

17        Q        From that, should I -- do I

18   understand that your position is that a

19   current expense would be a priority claim

20   of some form?

21        A        No.  I'm not saying that.

22        Q        Well, you said that it

23   should be treated -- a GUC with a --

24        A        If they have, again, a

25   priority claim that is a true priority

Page 386

1                  DAVID BROWNSTEIN

2        form.

3                  MS. SPILLANE:   Objection to

4        form.

5        A        What I would say to you is,

6   if you could show us it is a priority

7   claim, we'll consider it and think about

8   what we do about it.  But to date, we

9   haven't been provided anything, as far as

10  I know, that shows there's a priority

11  claim, not just that it's an unsecured

12  claim.  But it's a priority claim.

13       Q        And what I'm asking is, one

14  of the factors that you would evaluate,

15  maybe not exclusively, is in determining

16  whether it's a priority claim is whether

17  it's a current expense?

18                 MS. SPILLANE:   Objection to

19       form.

20       A        It is one of the factors.

21  But as you said, there's more to it than

22  being just a current expense.  That's not

23  the only reason the fuel lines have a

24  priority.  It's because it's a current

25  expense that says it has a priority.

Page 387

1                  DAVID BROWNSTEIN

2        Q        Let me talk briefly about

3    National and that PSA.

4                  Is it your understanding

5    that National has a contractual priority

6    over unsecured creditors under the trust

7    agreement or any other document?

8        A        At the time we settled with

9    National, there had been no ruling from

10   Judge Swain as to whether they had a

11   secured lien or not.  At that time, we

12   settled the claim with them as we were

13   prepared to do with others at the same

14   time.  And that included, you know,

15   settling the fact that they may have a

16   secured lien.

17       Q        Does that PSA with National

18   have a fiduciary out?

19                  MR. MERVIS:  Objection to

20       the form.  You could answer.

21       A        I don't believe so.  It has

22   outs in it.  But I don't believe it has a

23   fiduciary out.

24       Q        Do you know why it doesn't?

25                  MR. MERVIS:  Objection to

Page 388

1          DAVID BROWNSTEIN
2      the form.
3      A        Not every PSA has a
4  fiduciary out.  That simple.  There's
5  reasons to put one in.  We have outs.
6  They have outs here.  It's not a
7  fiduciary out.  If Judge Swain says that,
8  as you know, the reimbursement claim is
9  not a valid claim, they still have to
10  proceed.  They don't have an out.  We
11  don't have an out for that.  And if she
12  says that they are not -- well, there's
13  several outs and other provisions.  But
14  there isn't -- my recollection is there
15  isn't a fiduciary out in that agreement.
16      Q        Well, you just referenced
17  that Judge Swain, if she doesn't approve
18  the reimbursement claim, but that's just
19  one element of several elements of that
20  PSA, isn't it?
21      A        Yes, although they don't
22  get -- remember the reason that they gave
23  up their CVI was in part because they
24  were getting the reimbursement claim.
25  That doesn't step back in.  That deal, as