# Exhibit B

Page 117

1                    DAVID SKEEL

2       A        The difference between what

3    National recovers under the plan as it's

4    currently written and what the

5    non-settling bondholders and monolines

6    recover is meaningful.  Again, it would

7    depend on what the CVI possibility is.

8       Q        In the 2019 RSA that we

9    looked at, the other monolines, besides

10   National and the ad hoc group, the

11   bondholders all got the same exchange

12   rate; right?

13      A        I believe that is correct.

14      Q        Is it your view as a board

15   member that National's different

16   treatment from other bondholders and

17   monolines is necessary to PREPA's

18   reorganization?

19      A        I don't know whether -- I

20   would say necessary because that involves

21   speculation about different possibilities

22   for reorganization.  What I will say is,

23   it is an important piece of what we think

24   is a confirmable plan of adjustment.

25      Q        Why do you say that?

Page 118

1               DAVID SKEEL

2       A       Why do I say it's an

3    important piece?

4       Q       Yes.

5       A       Because National is one of

6    the largest creditors.  All told, they're

7    owed about a billion dollars when you

8    consider all of their claims.  And as a

9    result of this settlement, they are

10   agreeing to give up their -- they've

11   agreed to give up their claims, that they

12   were fully secured, that they were

13   entitled to not just 100 cents on the

14   dollar, but 100 cents plus accrued

15   interest.  They agreed to give all of

16   that up.  And they agreed to take

17   significantly less.  They agreed to

18   support the plan.  They agreed to vote in

19   favor of the plan, all of which are very

20   attractive benefits to us.

21      Q       Is the reorganization

22   contemplated by the plan unworkable in

23   the absence of the National settlement?

24               MR. FIRESTEIN:  Objection,

25        vague.

```
                                        Page 119

 1                      DAVID SKEEL

 2        A         That's very speculative.

 3   There are lots of different possible

 4   confirmable plans of adjustment.

 5        Q         Under the plan of

 6   adjustment, the National settlement is

 7   not offered to the other bondholders and

 8   monolines; correct?

 9                  MR. FIRESTEIN:  I'm sorry.

10        Let me just read the question.  I had

11        asked for realtime.  But I didn't get

12        one.

13                  MR. ORSECK:  I'll say it

14        again.

15        Q         Under the plan of

16   adjustment, the term of the National

17   settlement is not provided to the other

18   bondholders or monolines; correct?

19        A         That is correct.  The plan

20   of adjustment -- the current plan of

21   adjustment does not provide the same

22   terms for other monolines or bondholders.

23        Q         Was the same exchange rate

24   or the same deal reached with National

25   offered at some point to other
```

Page 167

1                    DAVID  SKEEL

2       bondholders;  right?

3                    MR.  NATBONY:   Yes.

4       A         There  is  --  there  are

5   reasons  why  the  fuel  line  lender  recovery

6   looks  like  what  --  looks  the  way  it

7   looks,  is  what  it  is.

8       Q         What  do  you  mean  by  that?

9       A         There  were  negotiations  that

10  led  to  the  agreement  with  the  fuel  line

11  lenders.   And  the  negotiations  were  very

12  much  specific  to  the  attributes  of  the

13  fuel  line  lenders'  claim,  which  is  quite

14  different  from  the  bondholders'  claim.

15  And  the  argument  that  the  fuel  line

16  lenders  made  was  that  they  were  entitled

17  to  current  expense  treatment.   And  they

18  were  entitled  to  100  cents  on  the  dollar.

19  And  they  had  a  number  of  reasons  for  that

20  argument.

21                    And  we  settled  it.   And  we

22  concluded  that  the  settlement  we  reached

23  was  appropriate,  given  the  arguments  that

24  they  had,  the  benefits  that  we  would  get

25  from  the  settlement  and  the  overall

Page 168

1                       DAVID SKEEL

2    structure of the settlement.

3         Q        What was the benefit -- what

4    were the benefits that you believe that

5    the board and PREPA would have gotten by

6    entering into that settlement?

7         A        The benefits were that they

8    compromised their claim at less than 100

9    cents on the dollar.  And we thought it

10   was a pretty strong claim.  They are a

11   sizable claim that is now supportive of

12   the plan and will vote in favor of the

13   plan of adjustment and will not object to

14   the plan of adjustment.  And all of those

15   were attractive benefits.

16        Q        And can you identify what in

17   particular swayed the board to accept an

18   84 percent recovery rate?

19                  MR. FIRESTEIN:  I think the

20        form of your question seeks

21        deliberative process.  I'll instruct

22        the witness not to answer.  He's

23        already told you what his

24        understanding was of it.  You can

25        reframe, if you wish.

Page 169

                         DAVID SKEEL

1

2    Q        With respect to you as a

3    voter on the -- let's start with this.

4              The board did vote and

5    approve the PSA for the fuel line

6    lenders; correct?

7    A        Yes.  The board did.

8    Q        And in your view, what

9    argument presented by the fuel line

10   lenders in particular swayed you to

11   approve the PSA?

12   A        I don't know that there was

13   a single argument that swayed me to vote

14   yes.  I will say that they had and have a

15   couple fairly strong arguments for

16   current expense treatment that other

17   creditors didn't have.  One of those

18   arguments is that they are specifically

19   mentioned in the trust indenture.

20             Another is that they claimed

21   that there are more than one contract

22   with PREPA where PREPA said that they are

23   current expense claimants.  And we oppose

24   those arguments.  And we took litigation

25   positions against those arguments.  But

Page 201

1                        DAVID SKEEL

2                  Are you able to look at this

3     trust agreement and point to me where

4     there is a current expense definition

5     that includes the fuel line lender

6     claims?

7                        MR. FIRESTEIN:  It's 124

8          pages.

9                        MR. NATBONY:  The

10          interrogatories said that it's in

11          there.  I'm asking him to point to

12          where it is.

13                        MR. FIRESTEIN:  The

14          interrogatory is a response made on

15          behalf of the entity.  You know the

16          difference between what someone's

17          personal knowledge is and what an

18          interrogatory response is.  And

19          putting a 124-page --

20                        MR. KIRPALANI:  You're

21          chewing up a lot of our time with

22          these speaking objections.

23                        MR. FIRESTEIN:  Can I tell

24          you, Susheel?  What's chewing up a

25          lot of our time is asking about

```
                                           Page 202
 1                      DAVID SKEEL
 2        questions pertaining to pleadings
 3        that were filed four years ago.
 4        We've gone through it over and over
 5        again.
 6                MR. NATBONY:  I'll rephrase
 7        the question.
 8        Q        Mr. Skeel, do you know where
 9   in the trust agreement, there is a
10   definition showing that the fuel line
11   lender expenses are current expenses?
12        A        I am not particularly
13   familiar with the terms of the trust
14   agreement.  So I would have difficulty
15   finding particular provisions.
16        Q        Are you aware whether in the
17   trust agreement, current expenses are
18   defined in a manner that makes
19   post-petition interest senior to
20   bondholder claims?
21                MR. FIRESTEIN:  Calls for a
22        legal conclusion, lacks foundation.
23        A        I don't know, one way or
24   another.
25        Q        Are you familiar at all
```

Page 203

                          DAVID SKEEL

1

2    whether -- strike that.

3                   MR. NATBONY:   Let's put that

4       aside.

5       Q        There's a current plan in

6    place for PREPA; correct?

7       A        That is correct.

8       Q        And under the plan, new

9    bonds are going to be issued by PREPA;

10   right?

11      A        That is correct.  New bonds

12   will be issued.

13      Q        Do you know whether under

14   that plan, bondholders have any recourse

15   to compel PREPA to pay back principal and

16   interest?

17                  MR. FIRESTEIN:   Calls for a

18      legal conclusion.

19      A        What do you mean by compel

20   creditors to pay back?

21      Q        Well, for instance, are you

22   familiar with the concept of an interest

23   rate covenant?

24      A        Yes, I am.

25      Q        And that's different than a

Page 321

DAVID SKEEL

1    that the fuel line lenders' argument,

2    that they are entitled to current expense

3    priority, would give them priority over

4    the claims only of the bondholders and

5    not other creditors?

6                MR. FIRESTEIN:  I'm sorry.

7        Hold on one second.  Lacks

8        foundation, calls for a legal

9        conclusion.  You can answer if you

10       know.

11       A       What I would say is I would

12   need more to the question.  It would give

13   them priority over the bondholders.  I

14   don't know that it would give them

15   priority over everybody.  It would depend

16   on who those other creditors are.

17       Q       Well, are you aware of any

18   basis on which the fuel line lenders

19   could claim priority over creditors,

20   other than the bondholders?

21                MR. FIRESTEIN:  Hold on.

22       I'm going to object to the question

23       and direct you that if your source of

24       information is anything other than

Page 322

1                    DAVID SKEEL

2          what you've communicated with your

3          lawyers, you could speak to that.  If

4          it's based on communications with

5          your lawyers, I'll instruct you not

6          to answer.  With that admonition, can

7          you answer the question?

8                    THE WITNESS:  I'm not sure.

9          A          Can you ask the question

10     again?

11         Q          The question was, I asked

12     you if you were aware of any basis on

13     which the fuel line lenders could claim

14     priority over creditors, other than the

15     bondholders.

16         A          What I could say is their

17     principal argument for special treatment

18     is their current expenses argument.  I

19     can't say more than that.

20         Q          You don't know whether that

21     current expense argument would give them

22     priority over creditors, other than the

23     bondholders?

24                    MR. FIRESTEIN:  Same

25          objection.

Page 323

1           DAVID SKEEL

2       A       I don't know the precise

3   parameters of how far that goes, no.

4       Q       You believe, Mr. Skeel,

5   that -- Professor Skeel that it's

6   reasonable that the fuel line lenders

7   receive a better recovery under the plan

8   than general unsecured creditors?

9       A       Well, I'm going to push back

10  a little bit on the terms of the question

11  because it is possible for the unsecured

12  creditors to be paid 100 cents on the

13  dollar, depending on happens in the

14  litigation.

15      Q       Assuming that the scenario

16  that we talked about earlier?

17      A       Full 8 and a half billion?

18      Q       Full 8 and a half billion

19  and $800 million in claims, in that

20  situation, it's reasonable in your view

21  for the fuel line lenders to receive a

22  higher recovery than unsecured creditors?

23      A       I do believe it's

24  reasonable, yes.

25      Q       How can you say that's

```
 1                    DAVID SKEEL
 2   reasonable without having an
 3   understanding of whether the fuel line
 4   lenders have any argument that they're
 5   entitled to priority over general
 6   unsecured creditors?
 7        A        I can say it relying on my
 8   lawyers.
 9              MR. FIRESTEIN:  Don't tell
10        them what you said, what they said to
11        you.  So if that's it, that's it.
12        A        I've been given enough
13   information about the settlement and the
14   strengths of the arguments on both sides
15   to be able to determine its
16   reasonableness in my view.
17        Q        But you're not able to tell
18   me without revealing communications with
19   counsel whether you're aware of any basis
20   for the fuel line lenders' position that
21   they have priority over general unsecured
22   creditors?
23        A        I've already said I don't
24   know all of the parameters of the current
25   expense, seniority that they've argued
```

Page 328

```
 1                    DAVID SKEEL
 2      answered.
 3         Q       Has the board done any
 4   analysis of -- has the board or PREPA
 5   done any analysis of whether the fuel
 6   line lender claims, in fact, qualify as
 7   current expense claims?
 8                    MR. FIRESTEIN:  So, A, it's
 9         compound.  B, to the extent it's
10         directed at the board, it's the
11         deliberative process piece which is
12         not proper.  So start with the
13         compound piece.  You said the board
14         or PREPA.
15         Q       Has the board done any
16   analysis of whether the fuel line
17   lenders' claim qualify as current expense
18   claims?
19                    MR. FIRESTEIN:  You can
20         answer that question yes or no, if
21         you know.
22         A       Yes.  If the board is
23   defined as the board and its advisors,
24   yes.
25         Q       And I assume you're not
```

```
                                          Page 329

 1                    DAVID SKEEL

 2    going to be able to tell me the

 3    conclusion of that analysis?

 4         A         Correct.

 5         Q         Has PREPA, to your

 6    understanding, done any analysis of

 7    whether the fuel line lenders' claim

 8    qualify as current expense claims?

 9         A         I don't know.

10         Q         Has the board, to your

11    understanding, done an analysis of

12    whether any general unsecured claims,

13    other than the fuel line lender claims,

14    qualify as current expenses?

15                   MR. FIRESTEIN:  It's the

16       same yes-or-no question, if you know.

17         A         I don't know.

18         Q         Do you personally have any

19    understanding of whether claims within

20    the general unsecured claims pool also

21    qualify as current expenses?

22                   MR. FIRESTEIN:  If you know.

23         A         I do not know of a

24    particular claim that qualifies.  It is

25    possible that there is an unsecured claim
```

Page 330

```
 1                      DAVID SKEEL
 2    that qualifies in my view.
 3         Q        If there was another
 4    unsecured claim that qualifies as a
 5    current expense claim, is there any
 6    reason, to your knowledge, why a fuel
 7    line lender's claim would be entitled to
 8    better treatment than such other
 9    unsecured claim that is also a current
10    expense claim?
11                   MR. FIRESTEIN:  Lacks
12         foundation, calls for a legal
13         conclusion.  If your source of
14         information is anything other than
15         conversations you had with your
16         lawyers, you can speak to that if you
17         understand the question, otherwise I
18         would instruct you not to answer.
19         A        I'll just say that there are
20    other considerations that go in.
21    Settling a big claim is more attractive
22    than settling a small claim.  So I really
23    can't answer the question in the
24    abstract.
25         Q        Setting aside those other
```

Page 331

```
 1              DAVID SKEEL
 2   considerations, are you aware of any
 3   reason why a fuel line lender's claim
 4   would have a greater legal entitlement to
 5   payment from PREPA as compared to another
 6   general unsecured claim that is also a
 7   current expense claim?
 8              MR. FIRESTEIN:  I'm going to
 9       instruct him not to answer that
10       question.  You're expressly asking
11       for a legal conclusion.  It's clearly
12       invading attorney-client privilege
13       because you excluded his answer that
14       he gave you before.  So I don't know
15       how it could be anything but.
16              MR. BASSETT:  I don't know
17       how he's able to sit here and testify
18       to the reasonableness of a settlement
19       if he's not able to explain the basis
20       for how he gets that.
21              MR. FIRESTEIN:  You could
22       argue that sometime if you'd like.
23       But he's already articulated for you
24       what his reasonable basis is.
25    Q       You're not going to answer
```

Page 341

1                    DAVID SKEEL
2    completely secured.  And they were
3    entitled to 100 cents on the dollar, plus
4    post-petition interest for the duration
5    of the case.  And in return for the
6    settlement, they compromised that
7    argument and agreed to take the
8    71.65 percent.
9                    And the other components of
10   the deal, they agreed to support the plan
11   to vote in favor of the plan.  And by
12   reaching the deal with them, we took
13   roughly a billion dollars off the table.
14   So it was a very attractive settlement.
15       Q        The settlement with National
16   was reached the end of January,
17   approximately, of this year; is that
18   right?
19       A        I don't remember exactly
20   when it was.  But it was sometime around
21   then.
22       Q        And then sometime after
23   that, the court issued its summary
24   judgment decision in the lien challenge
25   litigation?

Page 342

```
 1                    DAVID SKEEL
 2       A        That is correct.
 3       Q        Have you -- strike that.
 4                Do you believe that sitting
 5    here today, in light of the decision
 6    issued by the court, concerning the
 7    narrow scope of National's lien that the
 8    National settlement is still reasonable?
 9       A        I think it was a very
10    reasonable -- it is a reasonable
11    settlement.  We settled it at a time when
12    we didn't know what the outcome of
13    that -- of that litigation is.  And I
14    think it was a very sensible settlement.
15       Q        And at the time you settled
16    it, that litigation was ongoing; right?
17       A        It was ongoing, yes.
18       Q        And when you entered into
19    the settlement, you knew that the
20    litigation would continue; right?
21       A        We knew that -- we knew it
22    would continue.  It had been argued.  And
23    it would continue.
24       Q        Does the National settlement
25    contain any kind of fiduciary out or
```

Page 343

                        DAVID SKEEL

1
2    other provision that would allow the
3    board to either get out of the deal or
4    restructure it in light of the court's
5    ruling?
6         A        I don't remember whether
7    there were -- whether there were
8    provisions of that sort or not.
9         Q        Also, do you have any
10   understanding of whether the board could
11   get out of the deal today, if it wanted
12   to based on the new facts before it,
13   including the decision the court has
14   issued?
15        A        I would have to look at the
16   agreement to read through the various
17   provisions and conditions in the
18   agreement.  So sitting here today, I
19   don't know what the precise details are.
20        Q        Well, do you believe the
21   board has a duty to reevaluate the
22   reasonableness of this settlement in
23   light of the court's decision?
24        A        I believe that the
25   settlement was reasonable when we made

Page 344

1                      DAVID SKEEL

2      it.  And I don't believe that the court's

3      decision has changed that fact.  It still

4      was reasonable when we made it.

5          Q      Well, the court's decision

6      drastically changes the scope of the

7      bondholders' security interest, including

8      National, as compared to what they were

9      arguing in the litigation; right?

10         A       It does, although there are

11     still some open variables.  There's still

12     the possibility that it will be appealed.

13     And the extent of the bondholders' claim

14     is -- is not yet clear.  There still are

15     open issues in the litigation.

16         Q       And because of the open

17     issues that remain in litigation today,

18     it's your view that the National

19     settlement, as it is set forth in the

20     National PSA and in the plan, remains

21     reasonable?

22         A       I believe it is a reasonable

23     settlement, yes.

24         Q       In addition to the

25     71.65 percent exchange rate of the Series

Page 347

DAVID SKEEL

1

2       Q       What are those contributions

3    and benefits?

4       A       So this is shifting fees to

5    the structuring fee.  The kinds of

6    contributions that are included in that

7    include their involvement in structuring

8    the bond indenture, the new bonds that --

9    new bond indenture that will be put in

10   place, the new bonds that will be part of

11   that.  It also includes them committing

12   to support the plan, to vote in favor of

13   the plan and in my view, the public good

14   that they provide as a result of all

15   that.

16      Q       So you switched to the

17   structuring fee?

18      A       Yeah.

19      Q       What value or benefits did

20   National provide in order to justify the

21   3 percent consummation fee that we were

22   talking about before?

23      A       I think part of that is some

24   of the same benefits.  But the focus of

25   the fee is primarily on reimbursing

Page 348

1                       DAVID  SKEEL

2    attorneys' fees and professionals' fees.

3          Q       National is also receiving

4    what's called an interim charge which is

5    I think a tenth of a cent per kilowatt

6    hour during the pendency of PREPA's case;

7    is that correct?

8                   MR.  FIRESTEIN:  You could

9       restate your question.

10         Q       Are you familiar with

11   something that has been referred to as an

12   interim charge that National is also

13   receiving out of the settlement?

14         A       Yes.  I'm familiar with the

15   interim charge.

16         Q       And do you believe that's

17   reasonable?

18         A       I believe that is

19   reasonable, yes.

20         Q       What is the basis for that

21   interim charge?

22         A       The interim charge, which I

23   believe is National's pro rata share of

24   1 percent, which would work out to I

25   believe roughly one-ninth of 1 percent,

Page 349

1                    DAVID SKEEL

2    is kind of a carrying cost fee for the

3    fact that the plan will not be confirmed

4    and go effective immediately.  And so

5    it's a payment to them for the delay, in

6    effect.

7         Q        And National is not entitled

8    to post-petition interest; correct?

9         A        National is -- as things

10   stand now, if the district court's lien

11   decision is upheld, if it's appealed,

12   National would not be entitled to

13   post-petition interest.

14        Q        And you're saying if that

15   was appealed successfully, they could be

16   entitled to post-petition interest?

17        A        Potentially, yes.

18        Q        I want to talk about the

19   reimbursement claim which you provided

20   some testimony on earlier.  I want to try

21   to find what I wrote down about your

22   testimony.

23                 I believe you said you

24   characterized the National reimbursement

25   claim as a contractual obligation owed by

Page 350

1                    DAVID SKEEL

2    PREPA to pay National for moneys that it

3    paid to bondholders, post-petition, has

4    interest on the bonds; is that correct?

5         A       I would just say the amounts

6    paid post-petition to bondholders that

7    National insured.

8                    MR. FIRESTEIN:  Before you

9       ask your next question, I have a

10       technical issue.

11       Q       The amounts paid

12    post-petition, those are interest

13    payments; correct?

14       A       It is primarily interest

15    payments.  I don't know whether there are

16    other components of that or not.

17       Q       And I think the way you

18    characterized this earlier, your words

19    that you think that National had a

20    plausible argument, that they were

21    entitled to payment on their

22    reimbursement claim, but not a strong

23    argument?

24       A       In my view, they had a

25    plausible argument, but not -- it was

Page 356

1              DAVID SKEEL

2   entitlement to recovery on account of its

3   claims, which are unsecured, other than

4   the approximately $17 million in the

5   sinking fund?

6              MR. FIRESTEIN:  It's an

7      incomplete hypothetical.

8              MR. BASSETT:  I'll strike

9      the question.  I'll rephrase it.

10     Q      So assuming that the

11  National -- assuming that the summary

12  judgment decision is not overturned on

13  appeal, then National only has a secured

14  claim to the extent of the moneys in the

15  sinking fund; correct?

16     A      That is correct.

17     Q      Aside from that secured

18  claim, on account of whatever unsecured

19  claim National ends up having against

20  PREPA, would National have any greater

21  legal entitlement to recovery than other

22  general unsecured creditors?

23              MR. FIRESTEIN:  Calls for a

24      legal conclusion, lacks foundation.

25      You can answer if you understand.

Page 357

1                        DAVID SKEEL

2          A          National's deficiency claim

3     would be an unsecured claim with the same

4     status as general unsecured claims.

5          Q          So other than the likelihood

6     of that decision being overturned on

7     appeal, can you think of any reason why

8     National's claim is different than

9     general unsecured claims for purposes of

10    the 1129(b)1 analysis we talked about

11    earlier?

12         A          Subject to the same

13    qualifications.  If we're talking about

14    just not the secured portion, we're

15    talking about the deficiency claim, it

16    does seem to me that it has the same

17    stature as a general unsecured claim or

18    would.

19         Q          And it's also possible that

20    an appeal or -- you understand that it's

21    possible that the district court will

22    decide that bondholders have an unsecured

23    deficiency claim much lower than

24    $8.5 billion?

25         A          I understand that that is

Page 358

1                    DAVID SKEEL

2    possible, yes.

3         Q        And you understand that it's

4    possible that following an appeal to the

5    1st Circuit, the 1st Circuit could

6    determine that National does not have and

7    the bondholders do not have any recourse;

8    correct?

9         A        That is possible, yes.

10        Q        In fact, depending upon the

11   outcome of the claim estimation process

12   pending before the district court, it's

13   possible that National's settlement could

14   generate a recovery for National that is

15   in excess of its allowed claim?

16        A        You're going to have to say

17   that question again.  I didn't follow it.

18        Q        To the extent that the -- to

19   the extent the district court were to

20   determine that the bondholders'

21   deficiency claim is, let's say, only half

22   of the asserted amount, which is 8 and a

23   half billion, then National's claim would

24   only be half of its asserted amount as

25   well; correct?