UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO et al.,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Debtor. | No. 17 BK 4780-LTS |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO POWER ELECTRIC AUTHORITY,<br><br>Plaintiff/Counterclaim-Defendant, | Adv. Proc. No. 19-00391-LTS |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

PUERTO RICO FISCAL AGENCY AND FINANCIAL
ADVISORY AUTHORITY, THE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS OF ALL TITLE III
DEBTORS, CORTLAND CAPITAL MARKET SERVICES,
SOLA LTD., SOLUS OPPORTUNITIES FUND 5 LP,
ULTRA MASTER LTD, ULTRA NB LLC, UNION DE
TRABAJADORES DE LA INDUSTRIA ELECTRICA Y
RIEGO INC., AND SISTEMA DE RETIRO DE LOS
EMPLEADOS DE LA AUTORIDAD DE ENERGIA
ELECTICA,

   Intervenor-Plaintiffs,

-v-

U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE,

   Defendant/Counterclaim-Plaintiff,
THE AD HOC GROUP OF PREPA BONDHOLDERS,
ASSURED GUARANTY CORP., ASSURED GUARANTY
MUNICIPAL CORP., NATIONAL PUBLIC FINANCE
GUARANTEE CORPORATION, AND SYNCORA
GUARANTEE, INC.,

   Intervenor-Defendants/Counterclaim-Plaintiffs.

ORDER CONCERNING BONDHOLDERS' UNSECURED NET REVENUE CLAIM ESTIMATION

APPEARANCES:
OF COUNSEL FOR
A&S LEGAL STUDIO, PSC
By:     Luis F. del Valle-Emmanuelli
434 Avenida Hostos
San Juan, PR 00918

PROSKAUER ROSE LLP
By:     Martin J. Bienenstock
        Ehud Barak
        Margaret Dale
        Jeffrey W. Levitan
        Michael T. Mervis
        Daniel S. Desatnik
        Elliot R. Stevens
Eleven Times Square
New York, NY 10036

        *and*

        Steven O. Weise
2029 Century Park East, Suite 2400
Los Angeles, CA 90067

        *and*

        Paul V. Possinger
70 West Madison, Suite 3800
Chicago, IL 60602

        *and*

        Jared M. DuBosar
2255 Glades Road, Suite 421 Atrium
Boca Raton, FL 33431

*Attorneys for the Financial
Oversight and Management Board
as Representative for PREPA*

CASILLAS, SANTIAGO & TORRES LLC
By:     Juan J. Casillas Ayala
        Israel Fernández Rodríguez
        Juan C. Nieves González
        Cristina B. Fernández Niggemann
PO Box 195075

TORO COLÓN MULLET P.S.C.
By:     Manuel Fernández-Bared
        Linette Figueroa-Torres
        Nayda Perez-Roman
P.O. Box 195383
San Juan, PR 00919-5383

KRAMER LEVIN NAFTALIS & FRANKEL
LLP
By:     Amy Caton
        Thomas Moers Mayer
        Alice J. Byowitz
1177 Avenue of the Americas
New York, New York 10036

        *and*

        Gary A. Orseck
        Matthew M. Madden
2000 K Street NW, 4th Floor
Washington DC 20006

*Counsel for the Ad Hoc Group of PREPA
Bondholders*

REICHARD & ESCALERA, LLC
By:     Rafael Escalera
        Sylvia M. Arizmendi
        Carlos. R. Rivera-Ortiz
255 Ponce de León Avenue
MCS Plaza, 10th Floor
San Juan, PR 00917-1913

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
By:     Susheel Kirpalani
        Daniel Salinas
        Eric Kay
51 Madison Avenue, 22nd Floor
New York, New York 10010-1603

*Counsel for Syncora Guarantee, Inc.*

CASELLAS ALCOVER & BURGOS P.S.C.
By:     Heriberto Burgos Pérez

San Juan, PR 00919

PAUL HASTINGS LLP
By:    Luc A. Despins
         Nicholas A. Bassett
         G. Alexander Bongartz
200 Park Avenue
New York, New York 10166

*Counsel to the Official Committee of*
*Unsecured Creditors*

MARINI PIETRANTONI MUÑIZ LLC
By:    Luis C. Marini-Biaggi
         Carolina Velaz-Rivero
250 Ponce de León Ave., Suite 900
San Juan, Puerto Rico 00918

O'MELVENY & MYERS LLP
By:    John J. Rapisardi
         Maria J. DiConza
         Gabriel L. Olivera
 7 Times Square
New York, NY 10036

         *and*

         Peter Friedman
1625 Eye Street, NW
Washington, DC 20006

         *and*

         Elizabeth L. McKeen
         Ashley M. Pavel
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660

*Attorneys for the Puerto Rico Fiscal Agency*
*and Financial Advisory Authority*

MCCONNELL VALDÉS LLC
By:    Nayuan Zouairabani
270 Muñoz Rivera Avenue, Suite 7
Hato Rey, Puerto Rico 00918

Ricardo F. Casellas-Sánchez
Diana Pérez-Seda
P.O. Box 364924
San Juan, PR 00936-4924

CADWALADER, WICKERSHAM & TAFT
LLP
By:    Howard R. Hawkins, Jr.
         Mark C. Ellenberg
         Casey J. Servais
         William J. Natbony
         Thomas J. Curtin
200 Liberty Street
New York, New York 10281

*Counsel for Assured Guaranty Corp. and*
*Assured Guaranty Municipal Corp.*

RIVERA, TULLA AND FERRER, LLC
By:    Eric A. Tulla
Rivera Tulla & Ferrer Building
50 Quisqueya Street
San Juan, PR 00917-1212

MASLON LLP
By:    Clark T. Whitmore
         Michael C. McCarthy
         John Duffey
         Jason M. Reed
90 South Seventh Street, Suite 3300
Minneapolis, MN 55402

*Attorneys for U.S. Bank National Association,*
*in its Capacity as Trustee*

ORTIZ MENDOZA & FARINACCI
FERNÓS, LLC
By:    Rafael A. Ortiz-Mendoza
Edificio Banco Cooperativo Plaza
623 Ponce de León Ave., Suite 701-B
San Juan, PR 00917-4820

*Co-counsel to SREAEE*

BUFETE EMMANUELLI, C.S.P.
By:    Rolando Emmanuelli-Jiménez

WACHTELL, LIPTON, ROSEN & KATZ
By:   Richard G. Mason
      Amy R. Wolf
      Emil A. Kleinhaus
      Angela K. Herring
      Michael H. Cassel
51 West 52nd Street
New York, New York 10019

*Attorneys for Cortland Capital Market
Services LLC, as Administrative Agent*

SIMPSON THACHER & BARTLETT LLP
By:    Nicholas Baker
425 Lexington Avenue
New York, New York 10017

*Attorneys for Cortland Capital Market
Services LLC, as Administrative Agent and
SOLA LTD, Solus Opportunities Fund 5 LP,
Ultra Master LTD and Ultra NB LLC*

Jessica E. Méndez-Colberg
      Zoé C. Negrón-Comas
P.O. Box 10779
Ponce, Puerto Rico 00732

*Counsel UTIER*
*Co-counsel to SREAEE*

LAURA TAYLOR SWAIN, United States District Judge

On March 22, 2023, the Court issued its *Opinion and Order Granting in Part and Denying in Part the Financial Oversight and Management Board for Puerto Rico's Motion for Summary Judgment and the Defendant's and Intervenor-Defendants' Cross-Motion for Summary Judgment* (Docket Entry No. 147)[2] (the "Summary Judgment Order").[3]  In the Summary Judgment Order, addressing cross-motions for summary judgment on Counts I-VII of the Oversight Board's *First Amended Complaint Objecting to Defendant's Claims and Seeking Related Relief* (Docket Entry No. 26) (the "FAC"), and Counts I & II of the counterclaim complaint included in the Bondholder Defendants'[4] *Defendant's and Intervenor-Defendants' Answer, Affirmative Defenses, and Counterclaims* (Docket Entry No. 47) (the "Defendants' Answer and Counterclaim Complaint"), the Court held, inter alia, that:

> (a) the Trust Agreement granted the Bondholders security interests only in moneys actually deposited to the Sinking Fund, Self-insurance Fund, Capital Improvement Fund, Reserve Maintenance Fund, and Construction Fund (as defined in the Trust Agreement); (b) the Bondholders have perfected their liens in the Sinking Fund, Self-insurance Fund, and Reserve Maintenance Fund, over which the Trustee has established control (as discussed below);[5] (c) the

---

[2]   Unless otherwise noted, all references herein to Docket Entry Nos. are references to Adversary Proceeding No. 19-00391.

[3]   All capitalized words used but not defined herein shall have the meanings ascribed to them in the Summary Judgment Order or in any specific document the Court is citing.

[4]   U.S. Bank National Association as Trustee (the "Trustee"), the Ad Hoc Group of PREPA Bondholders (the "Ad Hoc Group" or the "AHG"), Assured Guaranty Corp. and Assured Guaranty Municipal Corp. ("Assured"), National Public Finance Guarantee Corporation ("National"), and Syncora Guarantee Inc. ("Syncora," and together with the Trustee, Ad Hoc Group, and Assured, the "Bondholders" or the "Defendants").

[5]   The Court declined to address the Bondholders' possible perfection of their liens on the Capital Improvement Fund and Construction Fund, because the record before the Court provided no evidence from either party as to the form of the assets comprising those Funds and their custodial status, and means of perfection may vary with the form of the asset in question.  Subsequent to the ruling, the parties have attempted to work through those lien perfection issues, including with respect to the Reserve Maintenance Fund,

Bondholders have no security interest in the covenants and remedies
provided for by the Trust Agreement; but (d) based on PREPA's
payment and equitable relief covenants in the Trust Agreement, the
Bondholders have an unsecured claim (within the meaning of
11 U.S.C. § 101(5)(B)) to be liquidated by reference to the value of
future Net Revenues (as defined in the Trust Agreement) that would,
under the waterfall provisions of the Trust Agreement and
applicable nonbankruptcy law, have become collateral upon being
deposited in the specified funds and payable to the Bondholders over
the remainder of the term of the Bonds (the "Unsecured Net
Revenue Claim").

(Summary Judgment Order at 13-14 (emphasis added).)  The Court held that the value of the

Unsecured Net Revenue Claim must be determined "either consensually or through proceedings

under section 502 of the Bankruptcy Code."[6]  (Summary Judgment Order at 62, 70.)  The parties

have not reached consensus, and the Court now proceeds, after briefing and an evidentiary

hearing, to estimate the value of the Unsecured Net Revenue Claim.

The Court has subject matter jurisdiction of this matter pursuant to section 306(a)

of PROMESA.  48 U.S.C. § 2166(a).  The Court has considered carefully all the parties'

submissions,[7] and for the following reasons the Court's estimation of the value of the Unsecured

---

which Fund's inclusion as within the control of the Trustee was due to a misstatement by
the Oversight Board's counsel.

[6]     References herein to the provisions of Title 11 of the United States Code (the
"Bankruptcy Code") are to sections made applicable in these cases by section 301 of the
Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA").
48 U.S.C. § 2161.  The Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")
are made applicable in these Title III cases by section 310 of PROMESA.  48 U.S.C.
§ 2170.  PROMESA is codified at 48 U.S.C. section 2101 et seq.  References herein to
PROMESA section numbers are to the uncodified version of the legislation.

[7]     The Court has also received and reviewed, inter alia, the following pleadings: *SREAEE's
Substantive Opening Brief in Support of Estimation of the Unsecured Net Revenue Claim*
(Docket Entry No. 187) (the "SREAEE 502 Brief"); *UTIER's Substantive Opening Brief
for Estimation of the Unsecured Net Revenue Claim and Joinder to SRAEE's Substantive
Opening Brief* (Docket Entry No.188) (the "UTIER 502 Brief"); *Memorandum of the
Financial Oversight and Management Board for Puerto Rico in Support of Estimation of
Unsecured Net Revenue Claim* (Docket Entry No. 192) (the "FOMB 502 Brief"); *Joinder
of the Puerto Rico Fiscal Agency and Financial Advisory Authority to the Legal*

Net Revenue Claim as of July 3, 2017 (the "Estimation Date"),[8] is **$2,388,000,000.00**.

I.

PROCEDURAL BACKGROUND AND PRE-HEARING GUIDANCE ON CLAIM ESTIMATION

The factual background underlying this adversary proceeding is set forth in the Summary Judgment Order; the Court assumes readers' familiarity with that Order.  (See Summary Judgment Order at 14-19.)  In addition to the summarized holding above, the Court made the following statements in the Summary Judgment Order with respect to valuing the

---

*Arguments in the Memorandum of the Financial Oversight and Management Board for Puerto Rico in Support of Estimation of Unsecured Net Revenue Claim* (Docket Entry No. 195) (the "AAFAF 502 Joinder"); *Limited Joinder and Reservation of Rights of Intervenor-Plaintiff Official Committee of Unsecured Creditors in Support of Memorandum of Financial Oversight and Management Board for Puerto Rico in Support of Estimation of Unsecured Net Revenue Claim* (Docket Entry No. 196) (the "UCC 502 Joinder"); *The PREPA Bond Trustee's and PREPA Bondholders' Opening Brief in Support of their Proposed Estimation of their Unsecured Net Revenue Claim* (Docket Entry No. 197) (the "Defendants' 502 Brief"); *Motion to Inform and Reservation of Rights of the Ad Hoc Committee of National Claim Assignees* (the "AHC RoR") (Docket Entry No. 199 in Adv. Proc. No. 19-00391 and Docket Entry No. 3488 in Case No. 17-4780); *Limited Response of Fuel Line Lenders Concerning Estimation of Unsecured Net Revenue Claim* (Docket Entry No. 220) (the "FLL Response"); *SREAEE's Response Brief in Support of Estimation of the Unsecured Net Revenue Claim* (Docket Entry No. 221) (the "SREAEE Response"); *UTIER's Response Brief in Support of Estimation of the Unsecured Net Revenue Claim* (Docket Entry No. 223) (the "UTIER Response"); *Response to the Plaintiff's and Plaintiff-Intervenors' Opening Briefs in Support of their Proposed Estimation of the Unsecured Net Revenue Claim* (Docket Entry No. 225) (the "Defendants' Response"); *Response of the Financial Oversight and Management Board for Puerto Rico in Support of Estimation of Unsecured Net Revenue Claim [ECF No. 192]* (Docket Entry No. 226) (the "FOMB Response"); *Intervenor-Plaintiff Official Committee of Unsecured Creditors' Response Brief in Connection with Estimation of Unsecured Net Revenue Claim* (Docket Entry No. 230) (the "UCC Response"). Additionally, in response to the Court's *Order Concerning PREPA Trust Agreement* (Docket Entry No. 115), the Oversight Board and the Defendants filed an agreed-upon conformed trust agreement as Exhibit A to their *Joint Informative Motion Submitting Conformed Trust Agreement in Response to January 5, 2023 Order Concerning PREPA Trust Agreement [ECF No. 115]* (Docket Entry No. 118 Ex. A) (the "Trust Agreement").

[8]  The parties' experts have agreed that July 3, 2017, the date on which PREPA filed its Title III petition, is the appropriate reference date for claim estimation.  (See infra section II.D; see also 11 U.S.C. § 502(b).)

Unsecured Net Revenue Claim:

- By operation of the remedies of the Trust Agreement, providing the means to potentially generate moneys from outside of the liened Funds by a judgment for specific performance, and by virtue of section 101(5)(b) of the Bankruptcy Code, the Bondholders are entitled to a general unsecured claim. (Summary Judgment Order at 59.)

- In the event that the Bondholders obtained specific performance and a receiver raised rates to satisfy payment of the Bonds, the Revenues received would not be paid ahead of Current Expenses, **and the receiver would not have the freedom to charge rates that are not "reasonable"** ((TA § 502) 22 L.P.R.A. § 196(l)) or be completely untethered from the Trust Agreement—any such remedies and Revenues would still be subject to the payment restrictions and priorities of the Trust Agreement. (E.g., TA §§ 503, 506-507.) **Any equitable claim reduced to payment arising from the Trust Agreement must have no greater value than the value that could be achieved through the application of the equitable remedies to fulfill the Trust Agreement's unsecured covenant to pay the Bonds from the Net Revenues of the System.** (Summary Judgment Order at 60 (emphasis added).)

- **The value of the Unsecured Net Revenue Claim must be determined with reference to the value of Net Revenues that would, under the waterfall provisions of the Trust Agreement and applicable nonbankruptcy law, have become collateral upon being deposited in the specified funds and payable to the Bondholders over the remainder of the term of the Bonds.** Valuing the Unsecured Net Revenue Claim may also require accounting for the likelihood of payment of the Bondholders' claim in relation to claims higher up the Trust Agreement's payment waterfall. Cf. In re Hemingway Transp., Inc., 993 F.2d 915, 923 (1st Cir. 1993) (to value a contingent claim, the court discounts the claim's value to "reflect the uncertainty of the contingency"). In its reply, the Committee articulated a potential measure of the Bondholders' Unsecured Net Revenue Claim as "a right to payment in an amount equal to the present value of the future net revenues that PREPA may generate" or "what someone would pay now for the right to potentially receive net revenue payments from PREPA in the future, taking into account the enormous difficulties and legion of uncertainties affecting, and limiting, PREPA's ability to generate any such net revenues." (UCC Reply ¶ 24 (emphasis in original).) That said, the Court will not predetermine the method of valuation or the appropriate time at which valuation should be gauged before all parties can be heard from on the matter.

Accordingly, the unsecured portion of the Master PREPA Bond Claim is a general unsecured claim, the value of which must be determined hereafter, either consensually or through proceedings under section 502 of the Bankruptcy Code. (Summary Judgment Order at 61-62 (emphasis added).)

- Summary judgment with respect to Count I of the Defendants' Answer and Counterclaim Complaint, seeking a "Declaratory Judgment that Under the Trust Agreement the Trustee Has Recourse to the Sinking Fund and the Right to Obtain Specific Performance of Covenants to Fund the Sinking Fund, and in the Event of Default Has Recourse to All PREPA Revenues and Other Moneys[,]" is granted to the extent that the Court hereby declares that (i) the Defendants have recourse to the Sinking Fund, in which the Trustee has a valid, perfected lien, and (ii) the Defendants have recourse as to any deficiency **in the form of a general unsecured claim under section 101(5)(b) of the Bankruptcy Code arising from liquidation of the value of the Trust Agreement's equitable remedies related to specific performance**, and is denied in all other respects, without prejudice to proceedings to determine the amount of the unsecured claim. (Summary Judgment Order at 65-66 (emphasis added).)

The Court ordered the parties to return to mediation, and directed the parties to meet and confer and file a joint report addressing "the nature, scope, and scheduling of further proceedings that they may believe are necessary in connection with the further resolution of this adversary proceeding" and "what discovery issues, if any, remain to be resolved in light" of the Summary Judgment Order. (Summary Judgment Order at 70.)

After the Court issued the Summary Judgment Order, the Defendants filed the *Trustee's and PREPA Bondholders' Urgent Motion for Limited Clarification* (the "Reconsideration Motion") (Docket Entry No. 150), as well as a Court-ordered joint report, the *Amended Joint Informative Motion in Response to Summary Judgment Order* (the "Informative Motion") (Docket Entry No. 153). In the Reconsideration Motion, the Defendants sought "clarification" with respect to the phrase "over the remainder of the term of the Bonds," requesting that the Court either replace the phrase with "at any time" or omit the phrase

altogether.  (Clarification Mot. ¶ 1.)  On March 31, 2023, the Court issued its *Order (I) Denying*

*the Trustee's and PREPA Bondholders' Urgent Motion for Limited Clarification and the Urgent*

*Motion for Expedited Consideration Thereof, and (II) Setting Deadlines and Providing Relief*

*Concerning the Amended Joint Informative Motion in Response to Summary Judgment Order*

(Docket Entry No. 154) (the "Denial Order").  In the Denial Order, the Court denied the

Bondholders' request and directed the parties to file their "respective proposed procedures for

estimation along with their respective proposed timelines to accomplish estimation[.]"  (Denial

Order at 5.)  With respect to the Unsecured Net Revenue Claim, the Court stated:

- [T]he Court expects the parties to address the impact of the Trust Agreement, economic projections, relevant contingencies, and **any relevant bankruptcy and nonbankruptcy law** on the estimation of the claim. The Court will look to the parties to provide legal, factual, and methodological support for their valuation positions in any section 502 proceedings . . . .

(Denial Order at 4-5 (emphasis added).)  On April 13, 2023, the Court issued its *Order*

*Regarding Claim Estimation and Briefing* (Docket Entry No.168) (the "502 Hearing Order"),

setting a timeline and procedures for discovery and briefing with respect to a claim estimation

hearing.  (502 Hr'g Order ¶¶ 1-3.)  With respect to the Unsecured Net Revenue Claim, the Court

stated:

- **First, the Court rejects** Defendants' contention that estimation of the Unsecured Net Revenue Claim under section 502(c)(2) [of the Bankruptcy Code] is unnecessary, as well as **Defendants' contention that the proper measure of the Unsecured Net Revenue Claim is the face value of the Bonds**.  (See Defs. Proposal ¶¶ 13, 19.)  Defendants' disagreement with the holdings of the Summary Judgment Order is noted, and they may argue any such matter at the appropriate time on appeal.  As stated in the Summary Judgment Order, the Court will take into account for purposes of the section 502 determination the "payment restrictions and priorities of the Trust Agreement."  (Summary Judgment Order at 60 (emphasis in original).)  Defendants' proposed estimate(s) must address those matters. Second, in the [Informative Motion], the parties expressed

disagreement as to the meaning of the phrase "the term of the Bonds" as used in the Summary Judgment Order. (See Summary Judgment Order at 61.) Such disagreement led the Defendants to file the [Reconsideration Motion], which the Court thereafter denied. (Denial Order at 4-5.) Because further briefing of the parties' extreme and irreconcilable proffered definitions of the phrase "the term of the Bonds" would not be helpful to the Court, the Court provides the following guidance: the Court did not use the term simply to refer to the stated maturity date of each Bond. **Nor did the Court conclude that the Bonds have effectively no expiration because the ability to collect on the Bonds purportedly has no expiration**. Non-bankruptcy law imposes functional time constraints on the ability to collect on debts. When formulating their positions as to the remainder of the term of the Bonds, the Court advises the parties to consider the period of time during which the Bondholders would be in a position to realize legal or equitable relief in aid of recovery, taking into consideration any limitations imposed by the terms of the Trust Agreement as well as applicable non-bankruptcy law, such as relevant statutes of limitations and limitations on the collectability of judgments.

(502 Hr'g Order at 4-5 (emphasis added).) The Court further directed the parties once more to return to mediation. (502 Hr'g Order ¶ 4.)

The Bondholders also filed a motion requesting immediate certification of the Summary Judgment Order to the Court of Appeals for the First Circuit (the "First Circuit"), seeking review of, inter alia, the ruling that the Master PREPA Bond Claim is not a secured claim with respect to all present and future revenues of PREPA. (See generally *Urgent Motion Requesting Certification of This Court's March 22, 2023 Summary Judgment Order for Immediate Appeal Pursuant to PROMESA § 306(e)(3)-(4)* (the "Defendants' Certification Motion") (Docket Entry No. 155).) The Defendants' Certification Motion was joined in part by the Official Committee of Unsecured Creditors (the "Committee"), which sought review based on its position that the Unsecured Net Revenue Claim is payable solely from special revenues and therefore the Bondholders are barred from recourse by section 927 of the Bankruptcy Code. (See generally *Intervenor-Plaintiff Official Committee of Unsecured Creditors' (A) Partial*

*Joinder in PREPA Bond Trustee's and PREPA Bondholders' Urgent Motion Requesting Certification of this Court's March 22, 2023 Summary Judgment Order for Immediate Appeal Pursuant to PROMESA § 306(e)(3)-(4) and (B) Request for Certification of Such Order Pursuant to PROMESA § 306(e)(3)-(4)* (the "UCC Certification Motion") (Docket Entry No. 167).)  In the certification motions, both the Bondholders and the Committee also argued that the Court should stay the estimation proceeding.  (UCC Cert. Mot. ¶ 7; Defs. Cert. Mot. ¶ 8.)

On May 3, 2023, the Court issued its *Order Denying Certification of the Court's March 22, 2023 Summary Judgment Order for Interlocutory Appeal* (Docket Entry No. 182) (the "Certification Denial Order").

On May 18, 2023, the Court issued its *Notice Concerning Section 502 Hearing and Omnibus Hearing* (Docket Entry No. 215), setting the dates for the claim estimation hearing.

On May 24, 2023, the Court issued its *Further Order Concerning Section 502 Hearing* (Docket Entry No. 234) (the "Further Order") directing the parties' expert witnesses to proffer their direct testimony for the hearing in the form of declarations.  (Further Order at 1.)

On May 30, 2023, the Court issued its *Order Regarding Procedures for the June 6-8, 2023 Claim Estimation Hearing* (Docket Entry No. 238) (the "502 Hearing Procedures Order"), defining the structure of the claim estimation hearing and topics to be addressed in the hearing.  In the order, the Court designated time for oral argument of specified issues and directed the parties to address certain issues in cross-examination of certain witnesses.  (502 Hr'g Procs. Order ¶¶ 5, 6(c).)

The following parties filed briefs and/or reservation of rights in connection with the 502 Hearing: Plaintiffs, Defendants, the Committee, the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), Cortland Capital Market Services LLC, as

Administrative Agent and SOLA LTD, Solus Opportunities Fund 5 LP, Ultra Master LTD, and

Ultra NB LLC (together, the "Fuel Line Lenders"), Sistema de Retiro de los Empleados de la

Autoridad de Energía Eléctrica ("SREAEE"); the Unión de Trabajadores de la Industria Eléctrica

y Riego, Inc. ("UTIER"); and BlackRock.[9]

From June 6-8, 2023, the Court held a hearing on claim (the "502 Hearing")

comprising: a day of opening statements and oral argument (June 6, 2023 502 Hearing

Transcript, the "June 6 Tr."), a day of cross-examination and redirect of certain witnesses whose

declarations were received in evidence (June 7, 2023 502 Hearing Transcript, the "June 7 Tr."),

and a day of closing argument (June 8, 2023 Hearing Transcript, the "June 8 Tr.").  The

following witnesses testified at the 502 Hearing: Mr. David Plastino on behalf of the Plaintiffs,

Dr. Maureen Chakraborty on behalf of the Defendants, Dr. Susan Tierney on behalf of the

Defendants, Mr. John Young on behalf of the Defendants, Ms. Julia Frayer on behalf of the

Committee, and Mr. Scott Martinez on behalf of the Committee.[10]

---

[9]     BlackRock Advisors, LLC and BlackRock Financial Management, Inc. (together
"BlackRock") filed a reservation of rights with respect to the current proposed PREPA
Plan.  (Docket Entry No. 3700 in Case No. 17-4780.)  BlackRock purports to reserve its
right to argue that, if the claim is estimated at less than full face value plus interest,
certain 2016 Bonds it holds should, by virtue of PREPA's financial distress at the time
they were issued, be analogized to postpetition Debtor-in-Possession financing and,
through application of the Court's equitable powers, be granted priority and paid in full,
even if the other outstanding PREPA Bonds are not.  The Court makes no limitation on
its claim estimation ruling to accommodate this purported reservation of rights and notes
that, in submissions raising this argument for consideration at the 502 Hearing that were
later withdrawn, BlackRock had identified no legal authority or contractual basis for the
treatment it sought.  (See Docket Entry No. 204.)

[10]    The Plaintiffs filed the *Declaration of David Plastino* (Docket Entry No. 282-1) (the
"Plastino Declaration").   The Defendants filed the following declarations: *Direct
Testimony Expert Declaration of Maureen M. Chakraborty, Ph.D.* (Docket Entry
No. 245-1) (the "Chakraborty Declaration); and Direct Testimony Expert Declaration of
Susan Tierney, Ph.D. (Docket Entry No. 245-2) (the "Tierney Declaration").  The
Committee filed the following declarations *Declaration of Julia Frayer Pursuant to
Order Regarding Procedures for the June 6-8, 2023 Claim Estimation Hearing* (Docket

II.

DISCUSSION

Section 502(a) of the Bankruptcy Code provides that: "A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects."  11 U.S.C.A. § 502(a) (Westlaw through P.L. 118-6).

Section 502(b) of the Bankruptcy Code provides that, subject to certain exceptions, if an objection to the claim is lodged: "the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount . . . ."  Id. § 502(b).

Section 502(c) of the Bankruptcy Code provides:

> (c) There shall be estimated for purpose of allowance under this section—
>
> > (1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case; or
> >
> > (2) any right to payment arising from a right to an equitable remedy for breach of performance.

Id. § 502(c).

A.     Applicable Law

1.     Procedures for Conducting a Claim Estimation Hearing Under Section 502(c) of the Bankruptcy Code

The Court's estimation methodology follows from the conclusions reached in the Summary Judgment Order and the Court's subsequent guidance, reproduced in relevant part above.  In brief, the system revenues from which PREPA has pledged to repay the Bonds are

---

Entry No. 243-1) (the "Frayer Declaration") and *Declaration of Scott R. Martinez Pursuant to Order Regarding Procedures for the June 6-8, 2023 Claim Estimation Hearing* (Docket Entry No. 243-2) (the "Martinez Declaration).

collectable only through certain subaccounts (a "Sinking Fund" and certain other funds) in which PREPA has given a security interest, those accounts are funded only after the payment of certain other obligations and expenses, and the Bondholders would have to use the equitable remedies of specific performance and appointment of a receiver in accordance with the Trust Agreement and statutory provisions (significantly, the Puerto Rico Electric Power Authority Act, Act No. 83-1941, codified at 22 L.P.R.A. §§ 191-240) to enforce PREPA's unsecured covenants to pay the Bondholders the net revenues in accordance with the payment provisions of the Trust Agreement. To estimate these rights to payment under Section 502(c) of the Bankruptcy Code, the Court considered evidence as to types and projections of future revenues and of other calls on the waterfall that would reduce the amounts payable to the accounts from which the Bondholders have a right to be paid, in order to arrive at an estimation of the Estimation Date value of the amounts likely to be available for Bondholder payment through these mechanisms.

Courts have recognized that "neither the Code nor the Federal Rules of Bankruptcy Procedure provides any procedures or guidelines for estimation, and a bankruptcy court has wide discretion in accomplishing it."  In re Chemtura Corp., 448 B.R. 635, 648 (Bankr. S.D.N.Y. 2011) (internal citations omitted).  "In estimating a claim, the bankruptcy court should use whatever method is best suited to the circumstances."  Addison v. Langston (In re Brints Cotton Mktg., Inc.), 737 F.2d 1338, 1341 (5th Cir. 1984) (internal cites and quotation omitted). Courts may employ a variety of means, including a "summary trial, a full-blown evidentiary hearing, or the review of pleadings and briefs followed by oral argument of counsel," In re AMR Corp., Case No. 11-15463 (SHL), 2021 WL 2954824, at *4 (Bankr. S.D.N.Y. 2021) (collecting cases), and have specifically recognized that it is often "inappropriate to hold time-consuming proceedings which would defeat the very purpose of 11 U.S.C. § 502(c)(1) to avoid undue

delay." In re Adelphia Bus. Sols., Inc., 341 B.R. 415, 432 (Bankr. S.D.N.Y. 2003) (citation

omitted). See also In re Lionel L.L.C., 2007 WL 2261539, at *5 (Bankr. S.D.N.Y. Aug. 3,

2007). "Thus, a truncated process under Section 502(c) 'has been found to be consistent with the

dictates of due process of law.'" In re AMR Corp., 2021 WL 2954824, at *4 (internal citations

omitted).

   Here, the Court solicited input from the parties (see, e.g., Docket Entry Nos. 162,

163) and adopted a process similar to the parties' proposals with briefing, discovery, and a three-

day hearing including oral argument and cross-examination, with few restraints on what the parties

could argue or present. (See, e.g., Docket Entry No. 168.) The Court considered carefully each

of the submissions and observed the demeanor and evaluated the credibility of the testifying

witnesses.

   2.  The Burden of Proof in a Claim Estimation Hearing Under Section 502(c)
      of the Bankruptcy Code

   Because the estimation of a claim is situated within the claim objection process,

some courts have looked to the burden of proof that governs the claim objection process when

addressing parties' burden of proof in estimation.[11] See, e.g., In re Loucheschi LLC, 471 B.R.

777, 779 (Bankr. D. Mass. 2012); In re FRG Ltd. P'ship, 121 B.R. 451, 456 (Bankr. E.D. Pa.

1990) (in holding that the allocation of the burden of proof in estimating a Rule 3018(a) claim

allowance is the same as in deciding objections to proofs of claim, the court stated that "[w]e

cannot imagine any reason for allocating the burdens of proof differently in a proceeding to

estimate claims than in a proceeding to finally determine the merits of a proof of claim. The

---

[11] The Court notes that burden of proof has not been addressed specifically in most
estimation cases, and it is not clear that the Court has to address evidentiary burden at all
in the context of an estimation hearing where the prediction of hypothetical outcomes is
committed to the Court's discretion.

estimation process is merely a microcosm of the ordinary claims-determination process."); In re
Benanti, No. 15-71018, 2018 WL 1801194, at *6 (Bankr. C.D. Ill. Apr. 13, 2018) (holding that
"the allocation of the burdens of proof in a proceeding to estimate a contingent claim [under
section 502(c)] is the same as a proceeding to determine the allowability of a claim.").  The First
Circuit has held that, in order to successfully challenge the prima facie validity of a proof of
claim, the objecting party must proffer "substantial evidence."  In re Hemingway Transp., Inc.,
993 F.2d 915, 925 (1st Cir. 1993); see also In re Nelson, 621 B.R. 542, 553 (B.A.P. 1st Cir.
2020).  Thus, for purposes of this estimation, the Plaintiffs were required, in the first instance, to
present substantial evidence "to overcome the presumption of validity" of the Bondholders'
claim that they are entitled to the full outstanding amount of the Bonds plus prepetition interest
in order to shift the burden to the Bondholders to "prove [their] claim."  In re Loucheschi LLC,
471 B.R. at 779.

Here, the Plaintiffs, in their evidentiary submissions and presentation in
connection with the hearing, presented substantial evidence sufficient to meet their burden of
rebutting through expert testimony the prima facie validity of Bondholders' claim that they are
entitled to allowance of the Unsecured Net Revenue Claim in the full face value amount of the
outstanding Bonds plus outstanding prepetition interest, shifting the burden back to the
Bondholders in the estimation proceeding.  See In re Benanti, 2018 WL 1801194, at *1.  The
Court credits the testimony of the Oversight Board's expert Mr. David Plastino and his
estimation approach, including the assumptions he applied in reaching his opinion.  Mr. Plastino
has credibly predicted both that the net revenues which could be available to pay on the Bonds
would be substantially less than predicted by the Bondholders' expert and that significant risks
could have existed creating obstacles for a receiver seeking to maximize funds available for debt

service, including immediate needs to make capital expenditures on infrastructure to keep

PREPA operating and generating revenues well into the future.  The Bondholders "therefore had

the burden of proving the validity" of their claims by a "preponderance of the truncated evidence

presented at the hearing."[12]  In re FRG Ltd. P'ship, 121 B.R. at 456.  "Generally, a

preponderance of the evidence is that evidence which is of greater weight or more convincing."

In re Empresas Omajede Inc., 537 B.R. 63, 92 (Bankr. D.P.R. 2015) (internal citations omitted).

It was ultimately the Bondholders' "burden to prove the amount of [their] claim in the face of

evidence calling it into question."  In re Benanti, 2018 WL 1801194, at *12.

       3.     Applicable Legal Standard for Estimation of a Claim Under
              Section 502(c) of the Bankruptcy Code

         (a)     Standards

      "The goal of estimation is to reach a **reasonable valuation of the claim as of the**

**date of the bankruptcy filing**."  In re Texans CUSO Ins. Grp., LLC, 426 B.R. 194, 204 (Bankr.

N.D. Tex. 2010) (emphasis added) (citing Owens Corning v. Credit Suisse First Bos., 322 B.R.

719, 721-22 (D. Del. 2005)).  In Bittner v. Borne Chem. Co., Inc., the Third Circuit held that,

"Where there is sufficient evidence on which to base a reasonable estimate of the claim, the

---

[12]    The Bondholders, at the 502 Hearing, argued that the Plaintiffs are relying on affirmative defenses, and thus the burden of proof as to these defenses lies with the Plaintiffs.  (See June 6 Tr. 17:23-20:18).  The Bondholders are correct that, to the extent an objecting party bases an objection to the claim on an affirmative defense, the objecting party carries the burden of proof.  See In re Bavelis, 490 B.R. 258, 308 (Bankr. S.D. Ohio 2013).  However, unlike in the cases cited by the Bondholders, which did not involve claim estimation, the Plaintiffs are not relying on affirmative defenses to defeat the claim in its entirety; rather, the Plaintiffs make arguments (as do the Bondholders) as to how any relevant statute of limitations and the like should be considered in this estimation proceeding to appropriately value the claim, not to expunge it.  The Court therefore holds that, notwithstanding the questions of law presented to the Court by virtue of arguments made by both parties, the burden of persuasion is with the Bondholders and the affirmative defense burden does not apply here.

bankruptcy judge should determine **the value**.  In so doing, the court is bound by the legal rules

which may govern **the ultimate value of the claim**.   For example, when the claim is based on

an alleged breach of contract, the court must estimate its worth in accordance with accepted

contract law. . . .   However, there are no other limitations on the court's authority to evaluate the

claim save those general principles which should inform all decisions made pursuant to the

[Bankruptcy] Code."  691 F.2d 134, 135 (3d Cir. 1982) (emphasis added) (internal citation

omitted).  State law generally governs, and "claims are to be **valued** as of the petition date."

Owens Corning, 322 B.R. at 721-22 (emphasis added).

       Bankruptcy courts have wide discretion in estimating claims.  See In re Chemtura

Corp., 448 B.R. 635, 648 (Bankr. S.D.N.Y. 2011); In re Windsor Plumbing Supply Co. Inc.,

170 B.R. 503, 520 (Bankr. E.D.N.Y. 1994) ("In determining exactly how to estimate the value of

a claim, the bankruptcy court has broad discretion."); In re Woodruff, 600 B.R. 616, 637 (Bankr.

N.D. Ill. 2019) ("[W]hile the estimation of a contingent claim is a fact intensive analysis, the

manner in which that analysis is done is generally left to the discretion of the court.").  "The

court need not don the garb of the clairvoyant; rather, all that is required is a rough estimate."  In

re Thomson McKinnon Sec., Inc., 191 B.R. 976, 989 (Bankr. S.D.N.Y. 1996).  "An estimate

necessarily implies no certainty; it is not a finding or a fixing of an exact amount.  It is merely

the court's best estimate for the purpose of permitting the case to go forward and thus not unduly

delaying the matter."  In re Windsor Plumbing Supply Co., Inc., 170 B.R. at 521 (quoting In re

Nova Real Estate Inv. Tr., 23 B.R. 62, 66 (Bankr. E.D. Va. 1982)).  Courts do not need to make

traditional findings of fact in connection with estimation hearings.  See In re Chemtura Corp.,

448 B.R. at 640.  "An estimator of claims must take into account the likelihood that each party's

version might or might not be accepted by a trier of fact.  The estimated **value** of a claim is then

the **amount** of the claim diminished by probability that it may be sustainable only in part or not at all." Id. at 648.

(b)     Amount vs. Value

The Bondholders argue that it is inappropriate for the Court to discount their claim to present value. Their argument is based upon In re Oakwood Homes Corp., wherein the Court of Appeals for the Third Circuit held that Bankruptcy Code section 502(b)'s direction to "determine the amount" of objected-to claims "as of the date of the filing of the petition" does not require that all claims involving a stream of payments be discounted to present value. (Defs. 502 Br. ¶ 58 (citing 449 F.3d 588, 600-01 (3d Cir. 2006)).) They point out that, in Oakwood, the Third Circuit "noted that this language was ambiguous in light of the use of the word 'amount' rather than 'value.' '[W]here the Bankruptcy Code intends a court to discount something to present value, the Code clearly uses the term 'value, as of' a certain date.'" (Defs. 502 Br. ¶ 58 (citing 499 F.3d at 597).) The Bondholders argue that the amount of their claim is properly set at the face value of the outstanding Bond obligations (without future interest, as provided by section 502(b)(2) of the Bankruptcy Code) plus interest on the Bonds due and owing as of the July 3, 2017 Estimation Date, that, accordingly, the section 502(b)(2) disallowance of unmatured postpetition interest constitutes a reduction of the claim to present value, and that to further discount the claim to reflect the time value of the future stream of payments on the Bonds would constitute a forbidden double-discounting. The Bondholders point to the Third Circuit's statement that: "[W]hether a court applies § 502(b)(2) to disallow unmatured interest, or discounts the entire amount (i.e., principal plus interest) to present value—as long as the court performs only one such operation and not both, the result is the same." Oakwood, 499 F.3d at 600.

The concept is sound, but the Bondholders' application of it in this instance misapprehends this Court's guidance on how the claim is to be valued.  With respect to the use of the words "amount" vs. "value," the Bondholders argue that the allowed <u>amount</u> of a debt-bearing instrument should be (can only be) the "full face amount" of unpaid debt.  However, in the Summary Judgment Order, the Court did not hold that, based upon the terms of the Trust Agreement, the Bondholders have a claim amounting to the full face amount of the Bonds.  As can be seen in the Court's guidance to the parties, substantially reproduced above, the Court held that "the Defendants have recourse as to any deficiency in the form of a general unsecured claim under section 101(5)(b) of the Bankruptcy Code[13] arising from liquidation of the value of the Trust Agreement's equitable remedies related to specific performance," which "equitable claim reduced to payment arising from the Trust Agreement must have no greater value than the value that could be achieved through the application of the equitable remedies to fulfill the Trust Agreement's unsecured covenant to pay the Bonds from the Net Revenues of the System." (Summary Judgment Order at 60, 65-66.)  Further, the 502 Hearing Order explained that "the Court rejects Defendants' contention that estimation of the Unsecured Net Revenue Claim under section 502(c)(2) is unnecessary, as well as Defendants' contention that the proper measure of the Unsecured Net Revenue Claim is the face value of the Bonds."  (502 Hr'g Order ¶ 4.)

Counsel for the Bondholders correctly recognized that the Summary Judgment Order did not "make the bonds disappear."  (June 8 Tr. 76:4-5.)  Nor, by defining the claim entirely by what could be collected through the equitable remedies and collection waterfall

---

[13]     Section 101(5)(B) provides: "The term 'claim' means— . . . (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured."  11 U.S.C.A. § 101(5)(B) (Westlaw through P.L. 118-6).

provided by the Trust Agreement, did the Court in any way purport to render the Bonds

irrelevant.  As stated by counsel to the Committee at the 502 Hearing, the Unsecured Net

Revenue Claim "results from the exercise of equitable remedies": "[The Bondholders'] right to

payment is not the amount of principal and interest on the bond, but, as your Honor has said, it's

the value of a future stream of cash flows represented by net revenues that might be generated by

PREPA."  (June 8 Tr. 138:5-10.)

   In other words, the value of the claim is calculated by reference to, and is capped

by, the face amount of the financial undertaking in the Trust Agreement (subject to the

unmatured interest limitation of section 502(b)(2) of the Bankruptcy Code), but its basis is the

cumulative amount of payments the Court estimates could be recovered over time by the

Bondholders through a receiver's efforts to effectuate specific performance of PREPA's

undertaking to pay.  The Court estimates the economic value, as of the Estimation Date, of that

future stream of payments in determining the estimated value of the Unsecured Net Revenue

Claim.  That estimate will constitute the operative amount of the claim for purposes of these

Title III proceedings.

   (c) <u>Valuation as of the July 3, 2017 Estimation Date</u>

   Certain opinions, briefs, and plans of adjustment (including the current proposed

PREPA Plan) have perhaps not in practice observed the clear distinctions between "amount" and

"value" drawn by the Third Circuit, while others have drawn certain distinctions.  An earlier

Third Circuit holding, in <u>Bittner v. Borne Chem. Co.</u>, stated that at an estimation proceeding the

"bankruptcy judge should determine the value" of the claim.  691 F.2d at 135.  The Bankruptcy

Court for the Southern District of New York held that an estimation determines the "estimated

value of a claim" which is the "amount of the claim diminished by probability that it may be

sustainable only in part or not at all."  <u>In re Chemtura Corp.</u>, 448 B.R. at 648.  Most helpfully,

the Honorable Barbara J. Houser, then the Chief Judge of the Bankruptcy Court for the Northern

District of Texas, has put forward the following definition, which the Court adopts as its goal in

the estimation process: "**a reasonable valuation of the claim as of the date of the bankruptcy**

**filing.**" In re Texans CUSO Ins. Grp., LLC, 426 B.R. at 204 (emphasis added).

        (d)      No Double-Discounting

        As explained above and in the Summary Judgment Order, the Unsecured Net

Revenue Claim will be determined by quantifying the cumulative amounts of net revenues that

the Court estimates could be channeled through the Sinking Fund and Specified Funds through

use of the equitable remedies provided for under the Trust Agreement.  Because the revenue

stream would necessarily be paid out over time, the Court will also apply an appropriate present

value factor in determining the estimated value of the Unsecured Net Revenue Claim.  The

Bondholders are correct that it would be improper to impose a double discount by present-

valuing a claim whose amount is determined solely by the terms of an interest-bearing debt

instrument whose unmatured interest has already been disallowed pursuant to section 502(b)(2)

of the Bankruptcy Code.  The Court takes this concern very seriously and has considered

carefully the Bondholders' argument that discounting for present value as part of the process of

quantifying the Unsecured Net Revenue Claim would constitute double-counting.  However, the

concern is inapposite here.  With respect to valuing the Unsecured Net Revenue Claim, the

Bondholders confuse their theory of their claim with the claim as defined by the Summary

Judgment Order and the Court's subsequent statements as to the nature of the estimation process,

as quoted above.

        As explained above, the Unsecured Net Revenue Claim will be valued based upon

an estimated revenue stream.  That revenue stream is not determined by the face value of the

Bonds and a stated interest rate.[14]  Accordingly, to avoid a windfall to the Bondholders, the

application of a present value factor to the projected future net revenue stream is appropriate.

4.   Choice of Law and Relevance of Statutes of Limitations

(a)   New York vs. Puerto Rico Law

The parties disagree as to whether New York or Puerto Rico law governs the

equitable remedies provided by the Trust Agreement.  Section 804 of the Trust Agreement

(Enforcement of remedies) provides that the Trustee may enforce its rights and the Bondholders'

rights under applicable laws or under the Trust Agreement by "such suits, actions or special

proceedings" either for "the appointment of a receiver as authorized by the Authority Act or for

the specific performance of any covenant or agreement contained" in the Trust Agreement.  (TA

§ 804.)  The Oversight Board, citing section 1301 of the Trust Agreement, argues that these

remedies are governed by New York law.  (See June 6 Tr. 51:15-20, 52:13-17, 53:18-20; FOMB

502 Br. ¶ 23.)  Section 1301 provides that: "The laws of the Commonwealth of Puerto Rico shall

govern the construction of this [Trust] Agreement, except that the rights, limitations of rights,

immunities, duties and obligations of the Trustee shall be governed by the laws of the State of

New York."

The Oversight Board argues that section 1301 should be read to mean that the

---

[14]   With this in mind, the Bondholders' argument that the claim is not contingent because
there is no dispute as to liability or amount (the amount being the full face value of the
claim), is inapposite.  (Defs. 502 Br. ¶ 52.)  The Bondholders' arguments might pertain to
a circumstance where the amount of the claim was set by the Court at face value.  Here,
however, Court has stated clearly that it is not estimating the claim under
section 501(c)(1) of the Bankruptcy Code (estimating a contingent claim), but instead
under section 501(c)(2) (right to payment arising from equitable remedies).  Accordingly,
the value of the estimated claim is entirely determined by the contingencies that would
reasonably affect the ability of PREPA or a receiver to generate and pay over net
revenues, which, when run through the payment waterfall of the Trust Agreement, would
be rendered collateral upon deposit into the Sinking Fund and Specified Funds.

Trustee's remedies are governed by New York law.  (See June 6 Tr. 51:15-20, 52:13-17,
53:18-20; FOMB 502 Br. ¶ 23.)  Under New York law, a money judgment is a prerequisite to
obtaining a receiver, and money judgments are presumed to be paid and satisfied after the
expiration of twenty years after the last written acknowledgment or voluntary payment made by
the judgment creditor.  See N.Y. C.P.L.R. §§ 211(b), 5228.  The Oversight Board contends that
receiver-directed payments through the waterfall provisions would not constitute written
acknowledgements or voluntary payments by PREPA, and therefore that a receiver would
remain in place for no more than twenty years.  (See June 6 Tr. 69:12-19; FOMB 502 Br. ¶ 23
n.10.)  The Bondholders argue, among other things, that section 1301 selects New York law to
govern only the Trustee's obligations as a trustee and the Trustee's protections against liability in
carrying out such obligations, and that Puerto Rico law governs the rights and obligations of the
parties, including the appointment and powers of a receiver.  (See June 6 Tr. 63:16-25, 64:1;
Defs. Resp. ¶ 14.)  The Court finds the Bondholders' arguments more persuasive for the
following reasons.

>        Because the laws of Puerto Rico govern the construction of the Trust Agreement,
the Court must look to Puerto Rico law when interpreting the contractual terms of the Trust
Agreement.  Article 1233 of the Puerto Rico Civil Code provides that, "[i]f the terms of a
contract are clear and leave no doubt as to the intentions of the contracting parties, the literal
sense of its stipulations shall be observed. If the words should appear contrary to the evident
intention of the contracting parties, the intention shall prevail." 31 L.P.R.A. § 3471.  The Court
finds the language of section 1301 to be clear in stating that Puerto Rico law governs the parties'
rights and remedies in enforcing the terms of the contract and that New York trustee law governs
the Trustee's rights and obligations as a trustee.

To the extent that the section is considered ambiguous, the same interpretation would result.  When construing a contract under Puerto Rico law, the stipulations "should be interpreted in relation to one another, giving to those that are doubtful the meaning which may appear from the consideration of all of them together."  31 L.P.R.A. § 3475; see also Rishell v. Med. Card Sys., Inc., 982 F. Supp. 2d 142, 153 (D.P.R. 2013); Entact Servs., LLC, 526 F. Supp. 2d 213, 221-22 (D.P.R. 2007).  In light of the Trust Agreement's various references to the Authority Act, particularly in section 804, which speaks of the appointment of a receiver "as authorized by the Authority Act," even if the stand-alone meaning of section 1301 were unclear, section 1301's language read in the context of the agreement as a whole points to its invocation of New York law as governing only the rights, limitations of rights, immunities, duties and obligations of the Trustee in that capacity.  Thus, the Court holds that Puerto Rico law governs the equitable remedies provided by the Trust Agreement and rejects the Oversight Board's contention that New York law imposes procedural and temporal limits on the projected revenues that can be taken into consideration in estimating the value of the Unsecured Net Revenue Claim.

(b)   Puerto Rico Statute of Limitations

The Oversight Board also argues that, if Puerto Rico law governs the PREPA-Bondholder relationship, 31 L.P.R.A. section 5294, in light of the case F.D.I.C. v. Talleres Industriales De P.R., supplies a fifteen-year statute of limitations for both bringing an action and enforcing an action, including equitable actions, that would apply to the duration of an order appointing a receiver.  (See June 6 Tr. 54:15-21, 55:9-11, 56:9-18; FOMB 502 Br. ¶ 25 (citing Civ. No. 87-1484(JP), 1994 WL 577882 (D.P.R. Oct. 18, 1994).)  The Oversight Board therefore argues that a receiver's appointment could last for no more than fifteen years.  The Bondholders, on the other hand, argue that 31 L.P.R.A section 5294 only governs the time to commence an

enforcement action, and that it has nothing to do with the duration of a receiver's power to set and collect rates once appointed.  (See June 6 Tr. 65:22-25, 66:1-3; Defs. Resp. ¶ 16.)  The Bondholders contend that 22 L.P.R.A section 207 allows a receiver to remain in place until all amounts due on the Bonds are paid.  (See June 6 Tr. 39:19-21, 41:1-5, 13-14, 44:8-17, 65:19-24; Defs. Resp. ¶ 16.)

> The Court is not persuaded by the Oversight Board's argument that section 5294 imposes a strict fifteen-year time limit on the duration of a receivership.  Indeed, the Court has found, and the parties have cited, no legal basis for the proposition that an order under 22 L.P.R.A section 207 appointing a receiver would require a money judgment triggering the applicability of 31 L.P.R.A section 5294.  Thus, as Puerto Rico supplies the substantive law governing the estimation of the claim, no party has identified a statute of limitations that specifically limits the potential duration of a receivership.

> B.  Estimating the Unsecured Net Revenue Claim

> 1.  Defining the Unsecured Net Revenue Claim

> After hearing extensive argument from all parties on how to properly define the Bondholders' claim, the Court defines the Unsecured Net Revenue Claim for the purposes of estimation as the Bondholders' right to payment in an amount equal to the present value, as of the Estimation Date, of the future revenues (net of operating and other expenses properly payable before service of the Bond debt) that a receiver could reasonably and foreseeably have directed to the Sinking Fund and Specified Funds in carrying out specific performance of PREPA's undertakings, set forth in the Trust Agreement, as to the application of System Revenues.

> Here, both the Oversight Board and the Bondholders undertook to project net revenues that would become available over time, beginning from the July 3, 2017 Estimation Date and looking forward, for application to the reduction of the outstanding Bond debt through

the specific Funds in which the Bondholders have a security interest.  Mr. Plastino and Dr.

Chakraborty utilized competing methodologies to calculate the projected incremental revenue a

receiver could reasonably raise by charging rate increases to residential, commercial, and

industrial customers.  In particular, Dr. Chakraborty's calculation was based on a volumetric

charge rate using a load forecast model created by Dr. Susan Tierney.  The load forecast model

contemplated various factual assumptions and data points to determine the earliest available year

when the Unsecured Net Revenue Claim could be paid in full.  Mr. Plastino's model was based

on a formula that used a fixed charge rate to determine rate increases that all customers would

pay over time.  Mr. Plastino created system analyses that include calculations from FY 2018-

2118 (100 years) (Plastino Decl. Ex. A, App. 3-1) and Dr. Chakraborty created system analyses

that included calculations from FY 2018-2069 (51 years) (Chakraborty Decl. Ex. C6A).

2.    Scope of Equitable Remedies Under the Bonds

At the 502 Hearing, the Bondholders' expert Dr. Chakraborty stated that she

extended her analysis for fifty-one years because it would "theoretically capture the length of a

term of a long-term bond."  (June 7, 2023 Hr'g Tr. 128:21.)  Of course, under each of the several

scenarios Dr. Chakraborty presented, the Bonds were fully paid within that time.  (June 7

Tr. 128:25-129:2.)  Dr. Chakraborty acknowledged that the Bonds were trading at a high yield-

to-maturity of 10.3% as of July 2017 because of the market's assessment of a heightened risk of

non-payment, but disagreed with using this yield-to-maturity as a present value discount rate in

the estimation process in the absence of an adjustment for the expected risk of default to properly

reflect the cost of capital; instead, Dr. Chakraborty added together the yield as of 2017 on a

BAA-rated bond and a "risk premium to reflect the fact that under receivership, the credit rating

of PREPA would be higher than a BAA-rated bond[,]" arriving at a 5.05% discount rate.  (June 7

Tr. 100:5-14, 108:1-15.)[15]  Despite the nuances and perhaps philosophically divergent views

expressed with respect to the use of yield-to-maturity for discounting or not in this instance,[16] it

appears more likely that Dr. Chakraborty's disagreement with factoring the risk of default into

the discount rate for the Bonds stems from her assumption that full payment on the Bonds was an

inevitability.

Dr. Chakraborty's assumption of predictable full payment appears to rest to a

significant extent on predicate assumptions that (a) appointment of a receiver would have been

an inevitability, and (b) a receiver in Puerto Rico would be not be bound by constraints imposed

on PREPA by the Authority Act, including the requirement to charge "just and reasonable rates"

and to bring rate cases before the Puerto Rico Energy Bureau ("PREB") for approval.  See, e.g.,

22 L.P.R.A. § 196.  Her starting point was based not upon an analysis of the Bonds and the

realities faced by Puerto Rico that would have affected collection on the Bonds, but rather the

instruction of counsel "to assume that the receiver would be able to raise rates" without

functional constraint.  (June 7 Tr. 97:24-98:4, 99:14-20.)  The failure to account for

contingencies that could impede collection undermines all of the Bondholders' projections.

---

[15]     Mr. Plastino arrived at his proposed present value discount rate by considering the cost of
debt for several other regulated mainland electric utilities.  (See Plastino Decl. Ex. A
¶ 28.)  While Mr. Plastino described this comparison as yielding a "conservatively low"
rate, Ms. Frayer persuasively argued that both experts' proposed rates were
inappropriately low for valuing the claim, based upon her "last two and a half decades
working on these issues, and knowledge of what is appropriate for cost-to-capital for an
island utility, for what kind of returns investors might be able to get in lieu of investing in
an instrument that's composed of these types of risky cash flows[.]"  (June 7 Tr. 194:24-
195:4.)

[16]     The Court also puts aside the parties' dispute as to whether Dr. Chakraborty arrived at her
calculations by referencing data that was only available in 2023.  (See, e.g., June 7
Tr. 100:21-101:19.)

      (a)    <u>Swift and Unbridled Appointment of a Receiver Was Not
Inevitable as of the Estimation Date</u>

Responding to the Court's guidance, the parties have proposed valuations of the
equitable remedies for specific performance available under the Trust Agreement.  The
Bondholders and Oversight Board have both assumed the swift appointment of a receiver as an
inevitability, but have not convinced the Court that this would necessarily be the case.  A
receiver would not be appointed in a vacuum without any opposition or litigation, and the Court
explicitly instructed the parties to account for the impact of actual foreseeable risks and
impediments arising from "any relevant bankruptcy and nonbankruptcy law on the estimation of
the claim."  (Denial Order at 4.)  The Committee and its expert Ms. Frayer have pointed to
several of these contingencies, as has AAFAF.  The extreme and unlikely speed with which the
Oversight Board accounts for a receiver's appointment was assumed by the Oversight Board in
order to give the Bondholders the benefit of the doubt wherever possible (FOMB 502 Br. ¶ 27),
but the Committee, UTIER, and SREAEE have aptly noted that the benefit of the doubt in equity
is not deserved where the Bondholders assert that their desired receiver would not be bound
by equitable restraints and considerations.  As explained below, the Court has, in reaching its
estimate, taken into account a factor that recognizes the risk that the parties' experts'
assumptions that a receiver could be in place and channeling the projected net revenue amounts
into Bondholder payments within as little as twelve to eighteen months could be, in a
word, wrong.

      (b)    <u>A Receiver Would Have No Greater Powers than PREPA</u>

Further, and importantly, a receiver would operate subject, once appointed, to
legal constraints.  It would not have, as the Committee characterized them, "superpowers"—
instead, as stated by counsel to the Oversight Board and AAFAF, a receiver would step into the

shoes of PREPA and have "no greater powers" but would instead be "bound by the same laws and agreements as PREPA" and would have "to live as AAFAF has and as the government has in applicable non-bankruptcy law under the Board."  (June 6 Tr. 28:2-3, 94:13-14.)

In the Summary Judgment Order, the Court, acknowledging the terms of the Authority Act, stated that a receiver could charge only "reasonable" rates (Summary Judgment Order at 60), but the Bondholders have read this statement out of the Order as something the Court "posited" or "suggested."  (Defs. 502 Br. ¶¶ 34, 42.)  Alternatively, the Bondholders read the requirement to set "just and reasonable" rates solely to mean rates sufficient to pay their debts and read out any responsibility to the citizenry.  (Defs. 502 Br. ¶ 34 n.6 (asserting a "lack of legal impediments to the receiver increasing rates as necessary to pay the debt").)  The Court now states clearly, for the avoidance of doubt, that, if appointed pursuant to 22 L.P.R.A. § 207, a receiver would be subject to the rest of the Authority Act, including section 196 thereof, which includes no exceptions relating to the party in control of PREPA's operations and provides that:

> [PREPA] shall offer and provide services at the lowest reasonable cost, through **just and reasonable rates**, consistent with sound fiscal and operational practices that provide for a reliable, adequate, and nondiscriminatory service that is consistent with the protection of the environment, as well as nonprofitable, and focused on citizen participation and its customers. . . . .
>
> **Its undertakings as a public corporation shall be characterized by** efficiency, the promotion of renewable energy use, energy conservation, and efficiency, excellence in customer service, and the **conservation and protection of the economic and environmental resources of Puerto Rico**.  PREPA shall be responsible for acting consistent with the public policy on energy of the Commonwealth of Puerto Rico, the public interest, and for **complying with all the applicable rules and regulations of the Energy Commission and CEPPO**. . . .  **PREPA shall be required to coordinate any necessary efforts with the Commission, CEPPO, and any other entity or person to achieve the purposes of §§ 191-217 of this title and of any statute related to the public policy on energy of Puerto Rico** . . . .

The remedies available by law to require the Authority's compliance with the mandates of §§ 191-217 of this title, the well-being of Puerto Rico, and the protection of customers shall not be limited in any way. [PREPA] is hereby granted and shall have and may exercise all rights and powers necessary or convenient to carry out the aforementioned purposes, including (but without limiting the generality of the foregoing) the following: . . . .

(d) complete control and supervision of any undertaking built or acquired by it, including the power to determine the nature of and the need to incur all expenditures and the manner in which such expenditures shall be incurred, authorized, and defrayed; Provided, **That all actions of PREPA's management and employees and its Governing Board shall be subject to the provisions of the Government Ethics Act, and its highest fiduciary duties with the People of Puerto Rico**. . . . .

**(l) PREPA shall be responsible for providing reliable electric power, contributing to the general well-being and sustainable future of the People of Puerto Rico, maximizing benefits, and minimizing the social, environmental, and economic impact. It shall offer and provide services <u>at the lowest reasonable cost, through just and reasonable rates</u>, consistent with sound fiscal and operational practices that provide for a reliable, adequate, and nondiscriminatory service that is consistent with the protection of the environment, as well as nonprofitable, and focused on citizen participation and its customers.**

22 L.P.R.A. § 196 (emphasis added).

The Bondholders argue that, under section 207 of the Authority Act, an appointed receiver of PREPA's undertakings that "enter[s] into and take[s]" control of such undertakings "deems" what is "reasonable," to the exclusion of any other limitations in the Authority Act simply because a receiver would be appointed pursuant to "a different section of the Authority Act[.]" (Defs. 502 Br. ¶ 42, 44.) This is a misreading of the statute; there is nothing in the text of the Authority Act that exempts a receiver acting in PREPA's stead from PREPA's mandates under the Authority Act and the Bondholders have presented no reasonable argument that a Puerto Rico court would attempt to abrogate such fundamental obligations of PREPA in any

order appointing a receiver.  The relevant portion of the Authority Act's receivership provision

provides in pertinent part that, following appointment of a receiver of the undertakings:

> (b) **The receiver so appointed shall** forthwith, directly or by his
> agents and attorneys, enter into and upon and **take possession of
> such undertakings** and each and every part thereof, and may
> exclude the Authority, its Board, officers, agents, and employees
> and all persons claiming under them, wholly therefrom **and shall**
> have, hold, use, operate, **manage**, and control the same and each and
> every part thereof, **and, in the name of the Authority or otherwise,
> as the receiver may deem best, shall exercise all the rights and
> powers of [PREPA] with respect to such undertakings as
> [PREPA] itself might do**.  Such receiver shall maintain, restore,
> insure, and keep insured, such undertakings and from time to time
> shall make all such necessary or proper repairs as such receiver may
> deem expedient, **shall establish, levy, maintain, and collect such
> rates, fees, rentals, and other charges in connection with such
> undertakings as such receiver may deem necessary, proper and
> reasonable**, **and shall collect and receive all income and revenues
> and deposit the same in a separate account and apply the income
> and revenues so collected and received in such manner as the
> court shall direct**.

22 L.P.R.A. § 207(b) (emphasis added).

    The receivership remedy provided by the Authority Act is a powerful tool,

certainly.  But any receiver would be constrained to manage and control PREPA's undertakings

"as the Authority itself might do" and apply income and revenues in such manner as an

appointing "court shall direct[.]"  Id.  The Bondholders have provided no legal basis for their

contention that the equitable considerations, requirements to set the lowest reasonable cost, and

fiduciary duties established by the Authority Act would not bind the receiver as well.

    Finally, the Bondholders suggest that the distinction is without a difference

because, under Dr. Chakraborty's calculations, and because it is improper for the Court to

consider anything except the unimpeded best-case scenario, PREPA will be creating a

remarkable excess of net revenues within a few years.  (See, e.g., Defs. 502 Br. ¶ 34 n.6.)  As

explained below, the Court finds Mr. Plastino's methodology persuasive.  Nor does the Court

find credible the Bondholders' hypothesis that a receiver would immediately have been able to

revolutionize PREPA and achieve never-before-seen synergies.  And, as explained above, the

Bondholders' assumption that the existence of equitable duties would be immaterial to a court

appointing a receiver in equity is erroneous.

> (c)  A Receiver Would Have Faced Extreme and Possibly Successful
> Opposition Were it to Attempt to Proceed as the Bondholders
> Contemplate

The Court instructed the parties "to address the impact of the Trust Agreement,

economic projections, relevant contingencies, and **any relevant bankruptcy and**

**nonbankruptcy law** on the estimation of the claim."  (Denial Order at 4 (emphasis added).)  The

parties were free, even after the Court provided subsequent guidance, to argue that different

factors should predominate, and the Court did not foreclose any argument to that effect.

However, at the 502 Hearing, the Bondholders not only denied, at least some of

the time, that a receiver would be required to behave equitably, but stated, incorrectly, that the

Court had directed the parties that the existence of PROMESA should not be considered when

estimating the claim.  (June 8 Tr. 72:14-20 ("It is clearly not what the Court had in mind when it

set up this estimation hearing, and so we need to treat this estimation as if PROMESA did not

exist and as if the Board did not exist. We are supposed to look at what a receiver would be able

to accomplish in a non-bankruptcy environment with respect to the collection of net revenues

under the trust agreement.  That is our mission here.").)  Counsel to Assured stated: "This is

about what a receiver, acting under the trust agreement, would have been able to accomplish

without the Board being around."  (June 8 Tr. 80:11-13.)

But the Oversight Board <u>was</u> around, and PROMESA, enacted well in advance of

the July 3, 2017 Estimation Date, is a relevant law that would have affected what rates could

have been charged and net revenues collected thereafter.

The Bondholders have also urged the Court to ignore efforts that would have
certainly been undertaken under Act 2-2017, the law authorizing AAFAF to enforce compliance
with fiscal plans enacted by the Oversight Board, characterizing any potential such <u>legal
challenges</u> as "lawless behavior."  (June 8 Tr. 124:24.)  As counsel to AAFAF noted at the 502
Hearing: "when you get the receiver in place, the receiver steps into the shoes of PREPA, no
greater powers. What does that mean? That means the receiver has to live as AAFAF has and as
the government has in applicable non-bankruptcy law under the Board. And the Board gets to set
a budget every year."  (June 6 Tr. 28:1-6.)  The Court notes, in addition, that many unsuccessful
attempts have been made to evade compliance with the Oversight Board's certified fiscal plans.
Several other legal risks were discussed that the Court cannot ignore, including the effect of a
prepetition moratorium act,[17] which, by limiting dedication of funds, might have crippled the
channeling of net revenues, the only revenues to which the Bondholders are entitled, into
payment accounts in accordance with the Trust Agreement.  (FOMB Resp. ¶ 32.)  Importantly,
government action limiting revenue generation, or mandating capital expenditures, could have
depressed or eliminated entirely net revenue cash flow that could be directed to Bond payments.
In other words, the risk is not only that payment to the Bondholders would be proscribed, the risk
is also that, for legitimate and legal reasons, net revenues would not be generated.

Any receiver would also have been required to litigate lengthy and contentious

---

[17]     In 2018, this Court held that the Puerto Rico Financial Emergency and Fiscal
Responsibility Act (Act No. 5-2017) (the "Amended Moratorium Act") was not
preempted by PROMESA, despite section 303(1) of PROMESA's requirement that
"territory" moratorium laws may not bind creditors nonconsensually.  (<u>See</u> Docket Entry
No. 156 in Adv. Proc. No. 17-00159 (the "Moratorium Order") at 31-36.)  <u>See</u> 48 U.S.C.
§ 2163(1).  The Amended Moratorium Act authorized the Governor of Puerto Rico to
declare a state of emergency and prioritize payment of "essential services" over "covered
obligations."  (Moratorium Order at 7-8.)

rate cases before Puerto Rico Energy Bureau, which it would not necessarily win.  The concept

that the main or sole priority of PREB would be, or is statutorily mandated to be, to meet Bond

payment obligations (as the Bondholders urge (Defs. 502 Br. ¶ 44)) is contradicted by, for one, a

2015 resolution, wherein PREC[18] denied a rate increase requested by National[19] because the

information presented was "mostly focused on PREPA's obligations to its bondholders and

creditors, which does not provide the complete information of PREPA's operational condition."

Resolution, No. CEPR-QR-2015-0002, available at

https://energia.pr.gov/en/dockets/?docket=cepr-qr-2015-0002.  The Court finds no reason to

believe that the priorities imposed by the Authority Act would have changed after the Estimation

Date and notes that PREC stated, closer in time to the July 3, 2017 Estimation Date, that

"Raising PREPA's rates sufficiently to pay the principal and interest currently due on that debt

would burden Puerto Rico's economy intolerably."  (UCC Resp. ¶ 26 (quoting PREC Ruling,

dated Jan. 10, 2017 ¶ 17 (filed at Docket Entry No. 1707-7 in Case No. 17-4780)).)

Accordingly, the effect of, inter alia, the Oversight Board's discretionary

budgeting authority and public policy with respect to PREPA's obligation to update its aging

infrastructure are proper factors for consideration in estimating the claim.  Any factor that

reasonably could have affected the claim's value as of the Estimation Date is proper for

consideration in estimating the claim.  The Bondholders can argue that legal challenges to

---

[18]    The Puerto Rico Energy Commission ("PREC") became the Puerto Rico Energy Bureau
("PREB") and was consolidated with other governmental entities under the Public
Service Regulatory Board.

[19]    National Public Finance Guarantee Corporation ("National") is a monoline insurer of
insured Bonds and a defendant in this adversary proceeding.  After National entered into
a plan support agreement with the Oversight Board as sole Title III representative of
PREPA, this Court stayed this adversary proceeding and certain other matters with
respect to National pending further order of the Court.  (See Docket Entry No. 148.)

placing a receiver or to the receiver's exercise of authority would have been unsuccessful, but the

Court will not ignore their likelihood, and the Bondholders cannot make the risk of any

challenge's success improper for consideration by calling it "lawless."

        (d)      The Bondholders Have Not Supported their Prediction that a
                     Receiver Would (or Could) Take the Actions Necessary to Pay the
                     Bonds in Full

        As noted above, the Bondholders argue that there would not have been any legal

or practical impediments to the receiver increasing rates as necessary to pay the Bonds.  (Defs.

502 Br. ¶ 34 n.6.)  However, Mr. John Young, the Bondholders' expert on receiverships,

presented a very different picture, one contradictory to the assumptions underlying

Dr. Chakraborty's projections.  Mr. Young presented a picture of a receiver bound to consider all

stakeholders, pay all debts, and take reasonable steps towards those goals in conformance with

applicable law.  Furthermore, in response to thorough questioning by the Oversight Board,

AAFAF, and the Committee, Mr. Young acknowledged a complete lack of familiarity with the

legal and practical circumstances of PREPA and Puerto Rico, except to say that "the components

of expense of all the utilities are basically the same."  (June 7 Tr. 174:3-4.)

        The relevant gravamen of Mr. Young's testimony was that he did not know what

powers a court order appointing a PREPA receiver could or could not grant, legally or

practically.  At the same time, Mr. Young's testimony concerning his tenure as the receiver of

the Environmental Services Department of Jefferson County, Alabama, shows that in his actual,

and unfortunately unsuccessful, efforts to keep the department out of bankruptcy, he did not take

the radical actions or achieve the remarkable efficiencies of the Bondholders' hypothetical

receiver.   Despite being unconstrained by a regulator such as PREB and the obligation to bring

rate cases, Mr. Young testified that he adopted a gradual and responsible approach based upon

affordability concerns that did not result in an immediate turnaround.  (June 7 Tr. 162:25-

164:14.)  Rather than serving at the behest of one constituency, a responsible receiver would, in

Mr. Young's words, "develop a plan, and prioritize where the current resources go, and

hopefully generate enough future resources to meet all its obligations."  (June 7 Tr. 168:11-13.)

Mr. Young's testimony, as was illustrated by a helpful chart used by the

Committee at closing, substantially undermined Dr. Chakraborty's projections by countering her

assumptions of an entirely unrestrained receiver, or a receiver who would act without restraint

even in the absence of regulatory strictures.  (June 8 Tr. 52:7-54:4, 55:16-56:22.)

The effect of these contradictions and unknowns in connection with the potential

ability of a receiver to raise rates meaningfully and at the rapid pace posited by Dr. Chakraborty

renders the Bondholders' scenarios manifestly unlikely and unreasonable.  Given the dire

financial condition of PREPA at the time of the Title III filing and the circumstances surrounding

the appointment, installation, and subsequent herculean tasks necessary to achieve the required

outcomes, the Court is not persuaded PREPA would <u>ever</u> have generated sufficient net revenues

to pay off the Bonds in a reasonably foreseeable time frame—much less in five years as was

proffered in Dr. Chakraborty's most unrestrained model.  Accordingly, the Bondholders have

failed to support their proposed claim estimation by a preponderance of the evidence.

(e)   <u>A Receiver May Not Have Been in Place Forever</u>

Although the Authority Act implies that a receiver appointed under 22 L.P.R.A.

section 207 can remain in place for as long as the debts on the Bonds are due, the Court notes,

and considers generally in connection with its estimation determination, the possibility that a

Puerto Rico court might have imposed some form of temporal limit.  <u>See, e.g.</u>, <u>In re Pac. Gas &</u>

<u>Elec. Co.</u>, 295 B.R. 635, 642-43 (Bankr. N.D. Cal. 2003) (court limited its predictions as to what

a judge or jury might have concluded from the evidence presented where application of the

parties' legal theories to the unique facts of the case went beyond the reported cases).  A Puerto

Rico court would ultimately have discretion and control over the degree to which, and how, an

equitable remedy could be deployed to serve the interests of the Bondholders and the people of

Puerto Rico.  See, e.g., Irizarry Rivera v. WEUC FM. 88.9, JPE2000-0119, 2004 WL 2419011,

at *5 (P.R. Cir. Aug. 25, 2004) (stating, with respect to a contract that did not have a fixed term

but provided that it would continue until further notice, that "We are of the opinion that, in these

circumstances, the Tribunal [lower court] could fix a limit for the obligation, and validate its

termination[].")

        The possibility that a court might have imposed a temporal limit on the tenure of a

receiver is heightened by the fact that the entire purpose of the enforcement of the equitable

remedy of a receiver in this scenario is to satisfy a debt, which, as discussed above, is only one of

the objectives imposed upon PREPA or any receiver by the Authority Act.  The Court considers

this possibility in estimating the Unsecured Net Revenue Claim, and notes that is well within its

discretion to do so.

(f)    Conclusions With Respect to a Hypothetical Receiver

        For the reasons stated above, the Court concludes that the Bondholders' experts

have failed to accord the appropriate weight to the legal and practical risks attendant upon the

appointment of a receiver and the ability of a receiver to ever—under the confines of the Trust

Agreement and Authority Act, or in the responsible performance of its duties—raise rates

sufficiently to pay off the Bonds in full.  The Bondholders objected to the Oversight Board's

expert's valuation of the majority of these risks at 1% or less as being arbitrary, overstated, and

double-counted.  (Defs. Resp. ¶ 52.)[20]  Mr. Plastino explained that, by including a one-percent

---

[20]    The Court attaches no significance to the Oversight Board's non-inclusion of these
factors in the filed PREPA Best Interest Test (which was taking very different
considerations into account in connection with confirmation requirements for the

factor for such risks in his computations, he was identifying as important considerations, rather

than quantifying, such risks, because the occurrence of any of them could materially, if not

wholly, eliminate Bondholder recoveries.  (See FOMB 502 Br. ¶ 62.)  The Court's incorporation

of relevant risks and contingencies into the estimation of a claim need not be precise: "An

estimate necessarily implies no certainty; it is not a finding or a fixing of an exact amount."  In re

AMR Corp., 2021 WL 2954824, at *4 (citations omitted).  "The estimated value of a claim is

then the amount of the claim diminished by probability that it may be sustainable only in part or

not at all."  In re Chemtura Corp., 448 B.R. at 648.

The Oversight Board has further argued that the Unsecured Net Revenue Claim

"should be discounted based on the [risks] unique to PREPA and not modeled into PREPA's

revenues and expenses nor included in the present value discount[.]"  (FOMB 502 Br. ¶ 62.)

Accordingly, the Court has separated out the risks discussed above, and has considered and

disagrees with each of the Bondholders' counterarguments, including that risks have been

double-counted, and indeed believes that both the Bondholders and the Oversight Board have

significantly understated the challenges and limitations that a receiver would face in being

appointed and effecting the changes urged by the Bondholders as inevitable.

The Court, having considered thoroughly the record, the parties' arguments, and

its knowledge of the legal and experiential contours of Puerto Rico's debt crisis, takes the risks

of legal and Oversight Board and other government action impediments to a receiver's net

revenue production efforts into account in estimating the value of the Unsecured Net Revenue

Claim by applying a significant—but nonetheless conservative—flat 20% reduction to the

---

proposed plan of adjustment), and applies its own independent analysis.  (See, e.g., Defs.
Resp. ¶ 9 (citing Docket Entry No. 23412).)

computed present value of the Unsecured Net Revenue Claim to reflect the material uncertainties that a receiver would be appointed, could act as the Bondholders propose under the Trust Agreement and Authority Act or any order issued by a Puerto Rico court, or would adopt the views of and take the actions urged by the Bondholders if appointed.

C.  The Court's Value Estimate is Based on a One Hundred-Year Projection of Receiver Activity and Net Revenue Collections

Even putting aside the possibility that a court in Puerto Rico would impose some form of temporal limit on a receivership, the Court finds that much uncertainty exists as to years far into the future, and therefore the Court does not find it proper to entertain extensive speculation as to net revenue forecasts beyond the one hundred years for which Mr. Plastino has provided calculations.[21]  See, e.g., In re Oldco M Corp., 438 B.R. 775, 787 (Bankr. S.D.N.Y. 2010) (discussing United States v. LTV Corp. (In re Chateaugay Corp.), 944 F.2d 997 (2d Cir. 1991)), in which court indicated that costs underlining administrative expense claims under section 503 of the Bankruptcy Code that are not "merely speculative" can be estimated under section 502(c)); see also In re Pac. Gas & Elec. Co., 295 B.R. at 643 (acknowledging that, because the court's decision in estimation depended on its predictions as to future circumstances, court found the process too uncertain and therefore limited its predictions).  The Oversight Board has argued that looking to models utilizing projections of more than twenty-five years may be excessively speculative, and additionally noted that in an ordinary business case under Chapter 11 predicting beyond five years is seen as too speculative.  (See June 8 Tr. 42:6-8, 19-22, 43:7-15.)  The Bondholders' expert, Dr. Chakraborty, testified that fifty years

---

[21]  Mr. Plastino has provided projected Bondholder recoveries spanning FY 2018-FY 2118 (Plastino Decl. Ex. A, App. 3-1), Dr. Chakraborty provided forecasts spanning FY 2018-FY 2069 (Chakraborty Decl. Ex. C6A).

theoretically captures the length of a term of a long-term bond and that modeling past fifty years would have meant going beyond the maturity of such a bond.  (See June 7 Tr. 128:20-24.)

The Court finds that, in light of the many assumptions, risks, and variables the parties' experts have sought to account for in order to arrive at reasoned forecasts, calculating beyond fifty years is significantly speculative.  It is uncertain, so far into the future, what PREPA's cash flow would be, and whether PREPA would, across that time period, evade impact from major natural disasters or other critical disruptions including fundamental changes to energy consumption, political structure, and the island's economic stability.

Importantly, the Bondholders, and their experts, have not convinced the Court that PREPA, as it existed on the July 3, 2017 Estimation Date, would ever have succeeded in paying off the Bonds.  However, the Court will give the Bondholders the benefit of an appropriately contingency-adjusted valuation based on twice Dr. Chakraborty's fifty-year length of a long-term bond—Mr. Plastino's one hundred-year net revenue forecast, from FY 2018-FY 2118.

D.   Value of the Unsecured Net Revenue Claim as of the Petition Date

The Owens Corning court stated: "The Court's task at this juncture is to decide how well the expert witnesses have accorded appropriate weight to the various factors discussed above.  In undertaking this comparative assessment, however, I prefer to avoid specific mathematical calculations: since mathematical precision cannot be achieved in the prediction being undertaken, it is important that we not pretend to have achieved mathematical accuracy."  322 B.R. at 725.  These remarks capture well the challenge at hand and the appropriate approach to quantifying the estimate.

At the 502 Hearing, the Court heard testimony from witnesses proffered by the Oversight Board, the Bondholders, and the Committee.  (See June 7 Tr.)  The Oversight Board presented the testimony of Mr. David Plastino, an economist who specializes in valuation and

financial econometrics.  (Plastino Decl. Ex. A ¶ 2.)  The Bondholders presented the testimony of

Dr. Maureen Chakraborty, an economist who specializes in economics, finance, accounting, and

valuation.  (Chakraborty Decl. ¶ 1.)  The Committee presented the testimony of Ms. Julia Frayer,

an economist who specializes in conducting economic analyses and evaluations of infrastructure

assets.  (Frayer Decl. ¶ 2.)  While additional witnesses testified at the 502 Hearing, Mr. Plastino,

Dr.  Chakraborty, and Ms. Frayer were the expert witnesses who had formulated holistic

estimation models and proffered comparative assessments to defend certain disparities

among them.

Although the methodologies employed by each of the experts to develop their

models are divergent in some respects, there are several key areas where Mr. Plastino,

Dr. Chakraborty, and Ms. Frayer agree.  These points of agreement provide the Court with a

sufficient analytical framework to estimate the Unsecured Net Revenue Claim.  The experts

agree that the claim should be valued as of the Estimation Date.  (Plastino Decl. ¶ 3; Chakraborty

Decl. ¶ 3.)  The estimation should be "forward-looking" and only rely on information reasonably

available as of the Estimation Date.  (June 7 Tr. 63:5-9, 72:18-22.)  While the experts disagree

on whether a fixed charge, volumetric charge, or a blend of the two charges should be applied by

way of supplement to address the liability on the outstanding Bonds, the experts agree that a rate

increase formula is necessary to project the incremental revenue a receiver could reasonably

raise from changes in the amounts charged to residential, commercial, and industrial customers.

(Plastino Decl. Ex. 1 ¶¶ 35-36; Chakraborty Decl. ¶ 7.)  Mr. Plastino and Dr. Chakraborty

generally agree that expenses[22] detailed in the 2017 PREPA Fiscal Plan[23] should be deducted from the revenues PREPA could have reasonably collected from incremental rate increases. (June 7 Tr. 38:2-5; Chakraborty Decl. ¶ 8.)  Mr. Plastino and Dr. Chakraborty both extend PREPA's revenue and expense projections to estimate future streams of cash flows a receiver may be able to recover.  (Plastino Decl. Ex. A, App. 3; Chakraborty Decl. App. C3.)  Lastly, the calculations conducted by the experts include a discount rate to be applied to the future streams of cash flow.  (Plastino Decl. ¶ 28; Chakraborty Decl. ¶¶ 16-17.)  Dr. Chakraborty applies a 5.05% discount rate and Mr. Plastino applies a 6.5% discount rate.  (June 7 Tr. 46:6-13, 100:5-8.)  Ms. Frayer agrees that a discount rate should be applied; however, she suggests that a higher discount rate in the range between 8.46% to 16.65% is appropriate.[24]  (June 7 Tr. 194:18-20, 198-199; Frayer Decl. ¶ 9.)

The Court has determined, after consideration of the evidence and expert testimony, that Mr. Plastino's model is the most appropriate model as it contemplates a net revenue stream that is set to be derived and paid through a method that should be relatively affordable for ratepayers, reflects the impact of system maintenance and improvements that will

---

[22]    While the experts debate the exact costs of certain operational expenses, capital expenses, and the definition of Current Expenses, the Court need not settle these issues in the context of claim estimation.  Mr. Plastino and Dr. Chakraborty provide sensitivity analyses that contemplate scenarios ranging from no payment to full payment of capital expenses associated with long-term operational capacity (i.e., the financing the Aguirre Offshore Gas Plant ("AOGP")). (Plastino Decl. Ex. 1, App. 3-1; Chakraborty Decl., Figure 1.)  The record contains sufficient evidence to identify appropriate estimates of operational expenses for consideration in the Court's Section 502(c) determination.

[23]    (Plastino Decl. Ex. 3.)

[24]    The discount rate selected by the Court is not based on Ms. Frayer's analysis.  Rather, the Court's conclusion is drawn from evidentiary submissions and testimony identifying market rates at the relevant time for securities with similar risk profiles that were compiled by a consultant as reasonable guideposts for a discount rate to be applied to the projected future streams of cash flows a receiver may be able to recover.

be required to keep the system generating revenues over a lengthy period, and includes a present

value discount factor for the time value of money and general market perceptions of risk.  The

Court is not persuaded, however, that the discount rates proposed by Dr. Chakraborty (5.05%)

and Mr. Plastino (6.5%) are adequate.  Ms. Frayer provided persuasive testimony and evidentiary

support for a finding that the discount rates proposed would be "unrealistic" given PREPA's

financial distress and the existing market conditions in 2017.  (June 7 Tr. 198:19-25, 199:1-15,

19-25.)  Additionally, Ms. Frayer pointed to contemporaneous data from similarly situated

Caribbean islands with investor-owned electric utilities to show that a rational investor would

have had explored "other opportunities" for investment given PREPA's significant risk profile.

(June 7 Tr. 199:1-15, 19-25.)  In sum, the discount rates proposed by Dr. Chakraborty and Mr.

Plastino do not adequately represent certain economic risk factors associated with the projected

cashflows that could be generated by ratepayers.  While the Court declines to adopt the discount

rates proffered by Dr. Chakraborty and Mr. Plastino, the record does not support Ms. Frayer's

proposed discount rate in the range of 8.46% to 16.65%,[25] as a reasonable substitution.  The

Court instead concludes that a discount rate of 7% should be applied to determine the present

value of the net revenue cash flow projected out over the 100-year period.  That discounted cash

flow, using Dr. Plastino's base-case incremental revenues over a period of one hundred years and

a discount rate of 7%, would be $2,985,000,000.00 before Dr. Plastino's placeholder reduction

of 4% for additional types of risks.  (Plastino Decl. Ex. A, App. 3-1.)

   Having determined that a receiver would likely have faced significant legal

opposition and regulatory roadblocks (supra section II.B.2), the Court notes that the statistical

models proffered by the Oversight Board, the Bondholders, and the Committee do not

---

[25]  (Frayer Decl. ¶ 9.)

adequately account for these additional risk factors that could impair the receiver's ability to carry out certain duties.  Dr. Plastino's computations reflect them only as part of a 4% placeholder reduction and the others do not treat them at all.  The Court, as explained above, finds a 20% reduction for risk of success in achieving the projected cash flow through the actions of a receiver and other equitable remedies appropriate.  Accordingly, the Court will apply an additional 20% reduction for risks associated with the appointment of a receiver.

|  | CUMULATIVE CASH FLOW, USING 7% DISCOUNT RATE | AFTER ADDITIONAL 20% REDUCTION |
|---|---|---|
| **FY 2018 – FY 2118** | $2,985 million | $2,388 million |

Accordingly, the Court's estimation of the value of the Unsecured Net Revenue Claim is **$2,388,000,000.00**.

E.      Conclusion

For the above stated reasons, the Court estimates the value of the Unsecured Net Revenue Claim as **$2,388,000,000.00**.


SO ORDERED.

Dated: June 26, 2023

  /s/ Laura Taylor Swain   
LAURA TAYLOR SWAIN
United States District Judge