UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>COMMONWEALTH OF PUERTO RICO et al.,<br><br>Debtors. [1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Debtors. | PROMESA<br>Title III<br><br>No. 17 BK 4780-LTS<br><br>(Jointly Administered) |

---

[1]  The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

| | |
|---|---|
| UNIÓN DE TRABAJADORES DE LA INDUSTRIA ELÉCTRICA Y RIEGO, INC., <br><br> Plaintiff, <br><br> v. <br><br> PUERTO RICO ELECTRIC POWER AUTHORITY; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as representative of PUERTO RICO ELECTRIC POWER AUTHORITY; PUERTO RICO PUBLIC PRIVATE PARTNERSHIP AUTHORITY; and GENERA PR LLC <br><br> Defendants. | Adv. Proc. No. 23-00045-LTS |

<u>ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION</u>

APPEARANCES:

BUFETE EMMANUELLI, C.S.P.
By:    Rolando Emmanuelli-Jiménez
         Jessica E. Méndez-Colberg
         Zoé C. Negrón-Comas
P.O. Box 10779
Ponce, Puerto Rico 00732

*Counsel for UTIER*

MARINI PIETRANTONI MUÑIZ LLC P.S.C.
By:    Luis C. Marini-Biaggi
250 Ponce de León Ave., Suite 900
San Juan, Puerto Rico 00918

DÍAZ & VÁZQUEZ LAW FIRM, P.S.C
By:    Arturo Díaz Angueira
290 Jesús T. Piñero Ave.
Oriental Tower, Suite 803
San Juan, PR 00918

O'MELVENY & MYERS LLP

By:    John J. Rapisardi
        Peter Friedman
        Maria J. DiConza
7 Times Square
New York, New York 10036

          *and*

        Elizabeth L. McKeen
By:
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660

          *and*

        Madhu Pocha
By:
1999 Avenue of the Stars, 8th Floor
Los Angeles, California 90067

*Attorneys for the Puerto Rico Fiscal Agency and Financial Advisory Authority, the Puerto Rico Electric Power Authority and the Puerto Rico Public-Private Partnership Authority*

O'NEILL & BORGES LLC
By:    Hermann D. Bauer
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813

PROSKAUER ROSE LLP
By:    Martin J. Bienenstock

       Paul V. Possinger
       Ehud Barak
       Jonathan E. Richman
       Margaret A. Dale
Eleven Times Square
New York, NY 10036

     *and*

By: Timothy W. Mungovan
   Laura E. Stafford
One International Place
Boston, MA 02110

*Attorneys for Defendant Financial Oversight and Management Board for Puerto Rico, in its own right and as representative for PREPA*

ECIJA SBGB LLC
By: Jorge A. Fernández-Reboredo
P.O. Box 363068
San Juan, PR 00936-3068

*Attorneys for Genera PR LLC*

LAURA TAYLOR SWAIN, United States District Judge

Before the Court is the *Motion for Preliminary Injunction* (Docket Entry No. 2 in Adv. Proc. No. 23-00045) [2] (the "Motion"), filed by Unión de Trabajadores de La Industria Eléctrica y Riego ("UTIER"). The Motion requests an order enjoining the implementation of the Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement dated as of January 24, 2023 (Docket Entry No. 2-1 and 17-1) (the "O&M Agreement") between the Puerto Rico Electric Power Authority ("PREPA") and Genera PR LLC ("Genera"). Under the terms of the O&M Agreement, Genera is scheduled to assume operation of PREPA's Legacy Generation Assets[3] on July 1, 2023. UTIER commenced the instant adversary proceeding against PREPA, the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), the Puerto Rico Public-Private Partnership Authority ("P3"), and Genera (collectively, "Defendants"), seeking a declaratory judgment that the O&M Agreement is null and void under Puerto Rico law (the First Claim for Relief),[4] and that the O&M Agreement is null and void for violating public order (the Second Claim for Relief).

The Court heard oral argument in connection with the Motion on June 28, 2023. (the "PI Hearing") (June 28, 2023 PI Hearing Transcript, the "PI Hearing Tr."). The Court has

---

[2] All docket entry references herein are to entries in Adversary Proceeding No. 23-00045 (the "Adversary Proceeding"), unless otherwise specified.

[3] Legacy Generation Assets are defined as "the base-load generation plants and combustion turbine peaking units listed on Annex I . . . in which [PREPA] has an ownership interest." (O&M Agreement at 1).

[4] While the Complaint references "federal law," the Motion does not rely on or address any federal claims. (Compl. at 23.)

considered carefully all the parties' submissions[5] and arguments and, for the following reasons, denies UTIER's Motion.

I.

BACKGROUND

The following facts, which are drawn from the parties' submissions, are undisputed. In 2018, the Puerto Rico Legislative Assembly passed the Puerto Rico Electric Power System Transformation Act, Act No. 120-2018 ("Act 120"), codified at 22 L.P.R.A. § 1111 et seq., which authorized and established the legal framework for the sale, disposition, and/or transfer of the assets, operations, and services of PREPA through a public-private partnership, in accordance with the Public-Private Partnership Act, Act No. 29-2009, 27 L.P.R.A. § 2601 et seq. ("Act 29"). (See Mot. ¶ 2; Opp. ¶ 10.)

On January 24, 2023, PREPA, the P3, and Genera executed the O&M Agreement. (See O&M Agreement at 1.) The O&M Agreement provides for Genera to assume operation, maintenance, and administration of the Legacy Generation Assets to generate electricity and deliver it to the transmission and distribution system, while PREPA retains ownership of the Legacy Generation Assets and transmission and distribution assets. (See id. at Art. 4.) Pursuant to Act 120, current PREPA employees will have various employment options including to (i) apply for employment with Genera, (ii) remain at PREPA if a position is available, or

---

[5] The written submissions comprise the *Complaint* (Docket Entry No. 1) (the "Complaint"); the *Declaration of Mr. Josué Mitjá González in Support of UTIER's Motion for Preliminary Injunction* (Docket Entry No. 2-2) (the "Mitjá González Decl."); *Defendants' Joint Opposition to Preliminary Injunction Motion* (Docket Entry No. 16) (the "Opposition"); the *Declaration of Ellen S. Smith in Support of Defendants' Joint Opposition to UTIER's Preliminary Injunction Motion* (Docket Entry No. 17); the *Reply to Defendants' Joint Opposition to UTIER's Preliminary Injunction Motion* (Docket Entry No. 25) (the "Reply"), and the *Declaration of José Rivera* (Docket Entry No. 25-3).

(iii) transfer to another government agency. (See Mot ¶¶ 16-18, Opp. ¶ 53.) See 22 L.P.R.A. § 1121.

UTIER is a union that represents PREPA employees. (See Mitjá González Decl. ¶ 3.) UTIER is party to a collective bargaining agreement (the "CBA") with PREPA, which provides for certain employment terms, conditions, and benefits for UTIER's members who are employed by PREPA. (See Mitjá González Decl. ¶ 3.) UTIER does not allege that PREPA would not continue to recognize the CBA with respect to employees who remain at PREPA.

On June 16, 2023, UTIER commenced this adversary proceeding against Defendants. (See Compl., Docket Entry No. 1.)

II.

DISCUSSION

Section 305 of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA") provides that: "notwithstanding any power of the court, unless the Oversight Board consents or the plan so provides, the court may not, by any stay, order, or decree . . . interfere with -- (1) any of the political or governmental powers of the debtor; (2) any of the property or revenues of the debtor; or (3) the use or enjoyment by the debtor of any income-producing property." 48 U.S.C.A. § 2165 (Westlaw through P.L. 118-6) (emphasis added). The Oversight Board consents to the Court's exercise of jurisdiction to adjudicate the substantive issues raised in the Motion pursuant to section 305 of PROMESA. (See Opp. ¶ 8 n.5.)

Defendants argue that UTIER lacks standing to assert its claims that are based on broad legal and public policy principles. Defendants further argue that, even if UTIER has standing, UTIER is not entitled to injunctive relief because UTIER has not demonstrated a likelihood of success on the merits of its claims, that it will face irreparable harm if the Motion is not granted, or that consideration of the public interest supports a preliminary injunction.

In light of the Oversight Board's expressed consent to the adjudication of the Motion before the Title III Court, the Court now turns to its analysis of the parties' arguments, beginning with the question of whether UTIER has Article III standing to assert its claims.

A. <u>Standing</u>

This Court's jurisdiction is limited by Article III of the Constitution of the United States to the adjudication of "Cases" and "Controversies." <u>See</u> <u>Lyman v. Baker</u>, 954 F.3d 351, 360 (1st Cir. 2020) (citing <u>Hochendoner v. Genzyme Corp.</u>, 823 F.3d 724, 731 (1st Cir. 2016) (quoting U.S. Const. art. III, § 2, cl. 1)). "The heartland of constitutional standing is composed of the familiar amalgam of injury in fact, causation, and redressability." <u>Id.</u> (quoting <u>Hochendoner</u>, 823 F.3d at 731). As the United States Court of Appeals for the First Circuit has explained:

> An injury-in-fact is the invasion of a legally protected interest that is both "concrete and particularized" and "actual or imminent," as opposed to "conjectural or hypothetical." <u>Lujan [v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992)] (internal quotation marks omitted). Concreteness and particularity are two separate requirements. <u>See</u> <u>Spokeo, Inc. v. Robins</u>, [136 S. Ct. 1540, 1545 (2016)]. To be concrete, an injury must "actually exist"; it cannot be "abstract." <u>Id.</u> at 1548. For an injury to be "particularized," it must go beyond a "generalized grievance[ ]," <u>DaimlerChrysler Corp. v. Cuno</u>, [547 U.S. 332, 344, 348 (2006)] (citation omitted), to manifestly "affect the plaintiff in a personal and individual way," <u>Lujan</u>, [504 U.S. at 560 n.1]. Injuries that are too "widely shared" or are "comparable to the common concern for obedience to law" may fall into the category of generalized grievances about the conduct of government. <u>Becker v. Fed. Election Comm'n.</u>, 230 F.3d 381, 390 (1st Cir. 2000); <u>see</u> <u>Lance v. Coffman</u>, [549 U.S. 437, 442 (2007)].
>
> Causation is established by demonstrating a causal connection "between the injury and the conduct complained of," where the injury is "fairly . . . trace[able] to the challenged action of the defendant[,] and not . . . th[e] result [of] the independent action of some third party not before the court." <u>Lujan</u>, [504 U.S. at 560-61] (alterations in original) (quoting <u>Simon v. E. Ky. Welfare Rights</u>

>>Org., [426 U.S. 26, 41-42 (1976)]). Finally, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" Id. [at 561] (quoting Simon, [426 U.S. at 38, 43]).

Lyman, 954 F.3d at 360-61. See also Spokeo, 136 S. Ct. at 1547 (stating that, to demonstrate constitutional standing, a plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision).

"In addition to these Article III prerequisites, prudential concerns ordinarily require a plaintiff to show that his claim is premised on his own legal rights (as opposed to those of a third party), that his claim is not merely a generalized grievance, and that it falls within the zone of interests protected by the law invoked." Pagan v. Calderon, 448 F.3d 16, 27 (1st Cir. 2006). A plaintiff's invocation of public policy interests, absent more, is not sufficiently particularized, but instead constitutes a "generalized grievance." A "generalized grievance" that alleges an injury "which is 'shared in substantially equal measure by all or a large class of citizens,' does not justify the exercise of the court's jurisdiction." Nogueras Cartagena v. Maria Calderon, 150 F. Supp. 2d. 338, 343 (D.P.R. 2001) (quoting Warth v. Seldin, 422 U.S. 490, 499 (1975)). Injuries that are too "widely shared" or are "comparable to the common concern for obedience to law" may fall into the category of generalized grievances about the conduct of government. Becker, 230 F.3d at 390 (internal quotation omitted). Such prudential considerations are "not as inexorable as their Article III counterparts," Pagan, 448 F.3d at 27, but they can, as here, help in discerning whether an alleged injury properly falls within the sweep of Article III. Moreover, "[t]he standing inquiry is claim-specific: a plaintiff must have standing to bring each and every claim that she asserts." Katz v. Pershing, LLC, 672 F.3d 64, 71 (1st Cir.

2012) (citation omitted). Thus, the Court will assess UTIER's standing to bring each of the claims that is has asserted.

UTIER argues that it has standing to assert claims on behalf of itself and its membership by virtue of the imminent loss of its membership, and Defendants do not dispute that UTIER will lose members when many PREPA employees are hired by Genera or transferred to other government agencies. (See Reply ¶¶ 21-22.)

The Court has already considered, and rejected, UTIER's argument that its imminent loss of membership is a sufficient basis to establish standing to assert broad claims based on disagreements with various public policy principles in the context of PREPA's ability to enter into public-private partnerships and execute operation and maintenance agreements. UTIER v. Pierluisi-Urrutia (In re Fin. Oversight & Mgmt. Bd. for P.R.), 631 B.R. 571, 580-83 (D.P.R. 2021), *reconsideration denied*, Adv. Proc. No. 21-00041 (D.P.R. June 1, 2021) (Docket Entry No. 61 in Adv. Proc. No. 21-00041) (the "LUMA Opinion"). In that decision, the Court determined that UTIER lacked standing to challenge the validity of an operation and maintenance agreement between PREPA and the third-party private operator of PREPA's transmission and distribution assets, LUMA Energy, LLC and LUMA Energy ServCo, LLC ("LUMA"). Id. The First and Second Claims for Relief[6] in Adversary Proceeding No. 21-0041 (the "LUMA Action") are nearly identical to the First, Second, and Third Claims for Relief articulated in the instant Complaint. (Compare LUMA Amended Compl. ¶¶ 268-71, with Compl. ¶¶ 69-83.) In the LUMA Action, the Court held:

> Each of these allegations concerns disagreement with the Legislature's decisions with respect to Puerto Rico's energy policy,

---

[6] UTIER, and other plaintiffs, commenced the LUMA Action on April 20, 2021. The operative complaint can be found at Docket Entry Nos. 1 and 7 in Adv. Proc. No. 21-00041 (the "LUMA Amended Compl.").

> or harms that are widely shared by the people of Puerto Rico
> generally rather than to any of the UTIER [members] specifically.
> Such policy disagreements and broad allegations of societal harm
> due to government noncompliance with law are insufficient to
> support Article III standing. See Lujan, 504 U.S. at 575-76
> (explaining that "an injury amounting only to the alleged violation
> of a right to have the Government act in accordance with law was
> not judicially cognizable because assertion of a right to a particular
> kind of Government conduct, which the Government has violated
> by acting differently, cannot alone satisfy the requirements of Art.
> III without draining those requirements of meaning." (internal
> quotation and citation omitted)).

LUMA Opinion, 631 B.R. 571, 580-83 (D.P.R. 2021). In doing so, the Court noted that "[t]his aspect of UTIER's claim rests on more than UTIER's claims of loss of membership or contractual rights: UTIER challenge[s] the validity of the O&M Agreement based on broad legal and public policy principles and [UTIER] argue[s] that [the O&M Agreement] should not have been approved [by P3] and should not be implemented." Id.

At the PI Hearing, Defendants argued that there is a clear "disconnect between the claims and the nature of the harm that UTIER claims it will suffer." (PI Hearing Tr. 25:21-24). The point is well taken. First, as counsel for AAFAF noted, UTIER argues that the contract is leonine and violates public order because "all its clauses benefit Genera while virtually none benefit PREPA." (Mot. ¶ 13.) However, UTIER has failed to explain how an imbalance in the perceived benefits Genera receives under the O&M Agreement has any causal connection to the diminution of UTIER's membership. Second, although UTIER argues that the O&M Agreement "transfers control of 69% of PREPA's generation asset capacity […] by creating a monopoly in generation" and therefore is violative of Puerto Rico law (Mot. ¶ 4), the alleged impact on UTIER's membership arises generally from the government's decision to privatize the management of the legacy generation assets, not from the fact that, under the particular privatization scheme contemplated by the O&M Agreement, a substantial portion of the legacy

generation assets will all be managed by a single entity. The Court is persuaded that the injury asserted—loss of membership—flows from a fundamental disagreement with the public policy decision of PREPA and P3 to enter into the public-private partnership with Genera rather than from the alleged legal infirmities of the agreement with Genera.

For substantially the same reasons upon which the Court determined that UTIER lacked standing in the LUMA Action, UTIER's theories of standing are not viable here. The policy disagreements and broad allegations of societal harm due to government noncompliance with law proffered by UTIER are insufficient to support Article III standing. See Lujan, 504 U.S. at 575-76 (explaining that "an injury amounting only to the alleged violation of a right to have the Government act in accordance with law was not judicially cognizable because assertion of a right to a particular kind of Government conduct, which the Government has violated by acting differently, cannot alone satisfy the requirements of Art. III without draining those requirements of meaning." (internal quotation and citation omitted).)

Specifically, UTIER lacks standing to assert its claims that: (ii) the O&M Agreement is a private vertical monopoly in violation of Act 120 because it "transfers control of 69% of PREPA's generation asset capacity" (Mot. ¶ 4), and (iii) the O&M Agreement is a leonine contract "contrary to public order" because "all its clauses benefit Genera while virtually none benefit PREPA" (Mot. ¶ 13).

Accordingly, UTIER has not established that is has standing to pursue the claims against Defendants upon which it seeks preliminary injunctive relief.

B. Preliminary Injunction

Even if the Court were to accept that UTIER has standing to sue on the basis of the asserted claims, UTIER has failed to demonstrate its entitlement to an injunction. "To obtain

a preliminary injunction, the plaintiffs bear the burden of demonstrating (1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest." Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003) (citing McGuire v. Reilly, 260 F.3d 36, 42 (1st Cir. 2001)).

UTIER's primary assertion of irreparable harm arises from decreased union membership.[7] Defendants argue, and UTIER does not dispute, that the expected decrease in union membership will not leave UTIER defunct. UTIER can continue to operate, collect membership dues from its remaining members, and provide representation services to its remaining members despite the disassociation of certain PREPA employees as a result of the O&M Agreement. To the extent that shrinkage of its membership impairs its ability to cover its financial obligations, such injury is remediable by way of damages. Grievances that are clearly remediable through payment of money do not, in and of themselves, support a finding of irreparable harm. See Vaquería Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 485 (1st Cir. 2009). See also NACM-New England, Inc. v. Nat'l Ass'n of Credit Mgmt., Inc., 927 F.3d 1, 5 (1st Cir. 2019). To demonstrate that it will suffer irreparable harm in the absence of a preliminary injunction, UTIER must proffer evidence sufficient to establish a likelihood that the execution of the O&M Agreement would prevent UTIER from being made whole if it eventually prevails in an action for economic damages associated with unlawful actions by Defendants that result in the diminution of UTIER's membership. UTIER has not done so.

Furthermore, UTIER commenced this action and initiated this motion practice on

---

[7] UTIER clarified its position at the PI Hearing, explaining that UTIER is asserting claims on behalf of itself, as an organization, insofar as the O&M Agreement decreases its membership and impairs UTIER's ability to fulfill its purpose.

June 16, 2023, mere days before the O&M Agreement is scheduled to be implemented. (See Compl. See also Mot.) The uncontroverted Smith Declaration details the immediate economic and safety risks to PREPA and the people of Puerto Rico should the O&M Agreement, a critical operation and maintenance agreement that is the product of years of public negotiation by government parties and various stakeholders, be abruptly terminated with a few days' notice. (See Smith Decl. ¶¶ 22-25.) Defendants argue, and the Court agrees, that UTIER's undue delay in seeking injunctive relief undercuts its argument that the union is in imminent risk of irreparable harm. See, e.g., Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 163 (1st Cir. 2004) (finding that plaintiffs were not entitled to injunctive relief based, in part, on the procedural posture of the case and plaintiffs' undue delay seeking injunctive relief).[8] Accordingly, the Court concludes that, even if UTIER had standing to assert its claims, UTIER has failed to proffer evidence sufficient to demonstrate irreparable harm. Without satisfying each element of the four-prong analysis of the preliminary injunction standard, UTIER cannot meet its burden to obtain an injunction.

D. Remaining Preliminary Injunction Factors and Party Arguments

The Court need not address the remaining factors of the preliminary injunction standard, or the parties' additional arguments in light of the Court's determinations that UTIER lacks standing to assert its claims and has failed to sustain its burden on the issue of irreparable harm.

---

[8] UTIER's argument that its delay was justified because Genera did not engage it in discussions of the impact of the transaction is unpersuasive.

III.

CONCLUSION

For the foregoing reasons, the Motion is denied. This Order resolves Docket Entry No. 2 in Adv. Proc. No. 23-00045.

SO ORDERED.

Dated: June 29, 2023

    /s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge