UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

---------------------------------------------------------x

| | |
|---|---|
| In re: | PROMESA<br>Title III |
| THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO<br>RICO, | |
| as representative of | No. 17 BK 3283-LTS |
| THE COMMONWEALTH OF PUERTO RICO<br>et al., | (Jointly Administered) |
| Debtors.[1] | |

---------------------------------------------------------x

MEMORANDUM ORDER GRANTING VERIFIED MOTION OF NTT
DATA EAS, INC. FOR ALLOWANCE OF ADMINISTRATIVE EXPENSE CLAIM

Before the Court is the *Verified Motion of NTT DATA EAS, Inc. For Allowance of Administrative Expense Claim* (Docket Entry No. 19520 in Case No. 17-3283) (the "Motion"), filed by NTT DATA EAS, Inc. ("NTT DATA"). The Motion requests allowance of an administrative expense claim in the Title III case of the Commonwealth of Puerto Rico pursuant

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

to section 503(b)(1)(A) of the Bankruptcy Code, 11 U.S.C. § 503(b)(1)(A), and the "fundamental fairness" doctrine derived from Reading Co. v. Brown, 391 U.S. 471 (1968).

The Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), acting on behalf of the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico") under Title III of PROMESA, filed an objection to the Motion (Docket Entry No. 20541) (the "Objection"), and NTT DATA filed a reply in support of the Motion (Docket Entry No. 21279) (the "Reply").

The Court, which has subject matter jurisdiction of this action pursuant to section 306(a) of PROMESA, 48 U.S.C. § 2166(a), has carefully reviewed the papers submitted in connection with the Motion. For the following reasons, the Motion is granted and NTT's administrative claim is allowed in the amount of $176,713.20.

## BACKGROUND

Except as otherwise indicated, the following are undisputed facts alleged in NTT DATA's motion and reply papers, or drawn from documents cited therein or annexed thereto.

As early as 2008, NTT DATA began performing services for Puerto Rico's Environmental Quality Board ("EQB" and, together with NTT DATA, the "Parties"), an agency under the Department of Natural and Environmental Resources ("DNER"). (Reply ¶ 7.) On or about June 13, 2018, NTT DATA submitted a "Proposal for Consulting Services" ("Proposal") to EQB, directed to the attention of EQB's Executive Director, Tania Vazquez, Esq. ("Vazquez"). (Obj. Ex. A at 12.) In the Proposal for the "Continuance of Services for FY2019," NTT DATA details how it would continue the implementation of specific PeopleSoft Modules[2]

---

[2] Capitalized terms used herein to describe the terms of agreements have the meaning given to them in the relevant agreement.

and continue its Production Support Services for EQB's Financials and Human Capital Management applications. (Obj. Ex. A at 15.) The Proposal states that the Proposal was organized based on conversations NTT DATA had with EQB personnel. (Obj. Ex. A at 15.) The Proposal contains a Solution Overview section and provides a description of the requirements "as described by" EQB personnel. (Obj. Ex. A at 15.) The Solution Overview includes a chart entitled Detailed Scope of Support in which the total estimated hours were 4,400 (Obj. Ex. A at 19), and it indicates that EQB had requested NTT DATA to submit the Proposal and its scope of services. (Obj. Ex. A at 19.) In the Project Assumptions section that follows, the Proposal states that NTT DATA may shift hours among tasks to make the most efficient use of the time and budget allocated with no corresponding change to the total fixed price. (Obj. Ex. A at 21.)

On September 25, 2018, more than a year after the commencement of the Commonwealth's Title III case, NTT DATA and EQB entered into a contract entitled Professional Services Contract (the "Contract"), pursuant to which NTT DATA would, for the fiscal year 2018-2019 (ending June 30, 2019), provide support for the production and the enhancement of applications made by PeopleSoft, Inc. (Reply ¶ 7; Obj. Ex. A at 10.) The Contract was filed with the Commonwealth's Comptroller's Office. (Mot. ¶ 7.)

The Contract initially executed by the Parties (the "Original Contract") contained sections entitled "APPEAR", "LEGAL BASIS", "STATE", "TERMS AND CONDITIONS", and "SIGNATURE AND CLOSURE". (Obj. Ex. A at 1-11.) The "TERMS AND CONDITIONS" section of the Original Contract comprised 22 subparts ("ARTICLE I" through "ARTICLE XXII"). Article I stated that NTT DATA will provide consulting/professional services with all tasks described in the Proposal, and that the Proposal is incorporated into the

Contract. (Obj. Ex. A at 2.) Article II indicated that NTT DATA will, among other things, support the application software at the production stage and assist with the resolution of issues that may impact overall system functionality. (Obj. Ex. A at 2-3.) Pursuant to Article IV-Payment, NTT DATA was prohibited from billing more than 4,400 labor hours during the term of the Original Contract and EQB would not compensate (and NTT DATA was not allowed to bill) more than $445,142.00. (Obj. Ex. A at 4.) Article IV also contained a clause (the "May Not Exceed Clause") stating that "NTT DATA may not exceed the total amount to be paid nor the maximum number of hours to be billed nor the monthly estimate of billing." (Obj. Ex. A at 4.) Article XXII states that the effective date of the contract will be September 25, 2018, to June 30, 2019, and that EQB has full discretion to terminate the Contract by sending a written notification to NTT DATA. (Obj. Ex. A. at 10.)

The Contract was amended for the first time on April 8, 2019 (the "First Amended Contract") and it contained the same sections, but the Terms and Conditions section was limited to one article: Article IV. (Obj. Ex. A at 25-27.) The First Amended Contract's version of Article IV did not contain a billable hour cap and all references to the hours cap were removed from it. (Obj. Ex. A at 26.) The May Not Exceed Clause was changed to read: "NTT DATA may not exceed the total amount to be paid . . . ." (Obj. Ex. A at 26.) The Contract was amended for the second time on June 18, 2019 (the "Second Amended Contract"), and it also contained the same sections, but the Terms and Conditions section was limited to Article IV and Article XXII - Effective Date of this Contract. (Obj. Ex. A at 28-30.) Article IV of the Second Amended Contract indicates that the "[p]arties agreed to add a cost of $66,000 in order to provide professional services and tasks described in the original contract. During the term of this Contract, EQB agrees to compensate NTT DATA the amended maximum amount of . . .

511,142.00 . . . ." (Obj. Ex. A at 29.) Additionally, Article IV's May Not Exceed Clause was changed to match the clause from the Original Contract: "NTT DATA may not exceed the total amount to be paid nor the maximum number of hours to be billed nor the monthly estimate of billing . . . ." (Obj. Ex. A at 29.) Although included in this version of the Contract, unlike Article IV, Article XXII – Effective Date of this Contract had no substantive revisions and had only minor formatting changes. (See Obj. Ex. A at 30.)

The Contract was amended for the final time on July 31, 2019 (the "Third Amended Contract"), and it contained the same number of sections as the Original Contract (APPEAR to SIGNATURE AND CLOSURE), but the Terms and Conditions section was limited to one article: Article XXII – Effective Date of this Contract. (Obj. Ex. A at 31-32.) Article XXII was amended to state that the period of performance was extended to December 31, 2019. (Obj. Ex. A at 31.) The following sentence was also added to Article XXII: "The funding level necessary to support a continuance of support for the staffing level and hourly rates accorded in the original contract will be adjusted by DNER to support the amended period of performance." (the "Adjustment Clause" (Obj. Ex. A at 32.)) The Third Amended Contract, like the earlier versions, was signed by EQB Executive Director Vazquez. (Obj. Ex. A at 11, 27, 30, 32.)

According to NTT DATA, by July 31, 2019, NTT DATA had already submitted invoices that totaled $509,280.75 out of the Second Amended Contract's revised cap of $511,142.00. (Reply ¶ 15.) According to the Commonwealth, by August 2019, EQB had made payments to NTT DATA that totaled $499,638.75. (Obj. ¶ 9; Obj. Ex. B.) EQB refused to pay the last five invoices, covering September 2019 to January 2020, which totaled $176,713.20, with labor hours totaling 1,830.15. (See Mot. at 2, 6, 10-19.) The description on each of the

contested invoices stated, "Continuance of Services for FY2019". (Mot. at 10-19.)

## DISCUSSION

NTT DATA seeks an order pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code and the fundamental fairness doctrine allowing an administrative expense claim in the amount of $176,713.20, the total of the unpaid invoices (the "Claim").[3]

Relying on section 503(b)(1)(A) of the Bankruptcy Code, NTT DATA asserts that the services it performed in excess of the Second Amended Contract's cap qualify for administrative expense priority because the services were beneficial to the Commonwealth, and that the Third Amended Contract's Adjustment Clause indicates that the Third Amendment abandoned the invoicing maximum altogether. (Reply ¶ 13.) Alternatively, NTT DATA argues that it is entitled to payment under the fundamental fairness doctrine, which has its origins in Reading Co. v. Brown, 391 U.S. 471 (1968). (Reply ¶ 29.) The Commonwealth objects to the Motion, arguing that the invoicing maximum was not abandoned, in that the Second Amended Contract's May Not Exceed Clause was not stricken from the final amended version of the contract. (Obj. ¶ 19). The Commonwealth also argues that the fundamental fairness doctrine only applies to situations involving tort-like harm. (Obj. ¶¶ 27, 29, 32.) Before the Court can address whether the services NTT DATA performed are entitled to administrative expense priority, the Court must first address whether the Commonwealth was obligated under the contract to compensate NTT DATA for the services performed.

---

[3] Sections 503 and 507(a)(2) of the Bankruptcy Code are made applicable in these Title III cases by section 301(a) of PROMESA. See 48 U.S.C. § 2161(a).

The May Not Exceed Clause

The Court begins by addressing NTT DATA's argument that the Third Amended Contract vis-à-vis its Adjustment Clause abandoned the Second Amended Contract's May Not Exceed Clause. (Reply ¶ 13). NTT DATA contends that, because the Adjustment Clause provides that "[t]he funding level necessary to support a continuance of support for the staffing level and hourly rates accorded in the original contract will be adjusted by the DNER to support the amended period of performance," EQB/DNER specifically agreed to support the continued funding, including payment of the Claim. (Reply ¶ 13; Obj. Ex. A at 32.) The Court agrees.

Article 1233 of the Puerto Rico Civil Code provides that, "[i]f the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed. If the words should appear contrary to the evident intention of the contracting parties, the intention shall prevail." 31 L.P.R.A. § 3471. By signing the Third Amended Contract containing the Adjustment Clause, which clearly calls for the allocation of additional funds, EQB abandoned the May Not Exceed Clause, which was retained and amended for the Second Amended Contract. The Adjustment Clause expressly provides that the DNER obligated itself to adjusting the funding level (dollar cap) to the extent required to accommodate the staffing level (labor hour cap) so as to support the period of performance extended through December 31, 2019. (Obj. Ex. A at 32.) The Court thus finds that the Adjustment Clause leaves no doubt as to the intention of the Parties and therefore must be observed. See 31 L.P.R.A. § 3471. Furthermore, the Adjustment Clause is not inconsistent with the Second Amended Contract's May Not Exceed Clause insofar as the Second Amended

Contract spoke to work to be performed within the original term, and the Adjustment Clause specifically addresses the extended period of performance.

Even if the terms themselves are not clear, a reading that gives meaning to the Adjustment Clause of the Third Amended Contract is also supported by the circumstances of the Parties' entry into the Third Amended Contract and reasonable inferences as to their intent. It would not be reasonable to believe that the Parties contemplated that NTT DATA would perform five months of additional work without a modification of the cap. The Court must examine all the circumstances and acts of the Parties even if it seems that the Parties have expressed themselves in clear terms. See Banco Popular de P.R. v. Sucn. Talavera, 174 D.P.R. 686, 709, 2008 TSPR 132 (2008); Marina Ind. Inc. v. Brown Boveri Corp., 114 D.P.R. 64, 69 (1983). In order to judge the intention of the contracting parties, attention must principally be paid to their acts, contemporaneously with and subsequent to the contract. See 31 L.P.R.A. § 3472.

Here, EQB entered into the Third Amended Contract with the clear intention that NTT DATA would continue to perform services over an extended period of time, under circumstances in which billing in excess of the caps would be unavoidable and thus was entirely foreseeable. (Obj. Ex. A at 31-32.) In light of the amounts that had already been billed by and paid to NTT DATA at that point in time, the Parties must have reasonably expected that the extended period of performance would lead to billing in excess of the dollar and/or labor hour caps. The DNER was well aware that the cap was nearly reached by the time the Third Amended Contract was signed. (Obj. ¶ 9; Obj. Ex. B.)

The Third Amended Contract's reference to the pay structure of the Original Contract combined with the payment adjustment language shows that the Parties did not intend for the original cap to apply, but did intend to incorporate the rate structured established by the

Original Contract. (See Obj. Ex. A at 4, 24.) The Second Amended Contract provides a monthly rate computation, so it presented no danger of an open-ended claim against the Commonwealth for additional fees with no agreed-upon financial parameters. (See Obj. Ex. A at 29.) The Adjustment Clause is consistent with the Parties' reasonable expectation that additional services would be performed and compensated, and is consistent with Puerto Rico law requiring a specific prior governmental commitment to pay for services at a disclosed cost or rate. (See Obj. ¶ 18.) Thus, the Commonwealth has a contractual obligation to pay for the additional services.

Section 503(b)(1)(A) of the Bankruptcy Code

Finding that NTT DATA's work billed in excess of the Second Amended Contract's caps is compensable, the Court turns next to whether the obligations qualify as administrative expenses under section 503(b)(1)(A) of the Bankruptcy Code. That section provides, in relevant part, that "(a) [a]n entity may . . . file a request for payment of an administrative expense" and, "(b) [a]fter notice and a hearing, there shall be allowed administrative expenses . . . including—(1)(A) the actual, necessary costs and expenses of preserving the estate[.]" 11 U.S.C.A. § 503 (Westlaw through P.L.118-13).[4] Actual and necessary costs and expenses include those ordinarily incident to the operation of the debtor's "business" and includes goods and services from third-party contractors or vendors. See In re

---

[4] Although there is no "estate" in a Title III case, the First Circuit has held that, in the context of applying section 503(b)(1)(A) in a Title III case, the term "estate" should be understood to refer to "property of the debtor." See Union de Trabajadores de la Industria Eléctrica y Riego v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.), 7 F.4th 31, 38 (1st Cir. 2021).

Whistler Energy II, L.L.C., 931 F.3d 432, 443 (5th Cir. 2019). The benefit does not have to be substantial to qualify. See In re Energy Future Holdings Corp., 990 F.3d 728, 741 (3d Cir. 2021).

In the First Circuit, "a request for priority payment of an administrative expense pursuant to Bankruptcy Code § 503(a) may qualify if (1) the right to payment arose from a post-petition transaction with the debtor estate, rather than from a prepetition transaction with the debtor, and (2) the consideration supporting the right to payment was beneficial to the estate of the debtor." Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.), 536 F.2d 950, 954 (1st Cir. 1976). "When third parties are induced to supply goods or services to the debtor-in-possession pursuant to a contract that has not been rejected, the purposes of § 64(a)(1)[5] plainly require that their claims be afforded priority." Id. "The burden of proving entitlement to priority payment as an administrative expense . . . rests with the party requesting it." Woburn Assocs. v. Kahn (In re Hemingway Transp., Inc.), 954 F.2d 1, 5 (1st Cir. 1992) (citations omitted).

The factual record before the Court demonstrates that NTT DATA performed the obligations required of it under the Contract. Additionally, the Commonwealth has not pled that it did not receive "consideration supporting the claimant's right to payment beneficial to the debtor." In re Hemingway Transp., Inc., 954 F.2d at 5; see also In re Jeans.com, 491 B.R. 16, 24 (Bankr. D.P.R. 2013) ("The contract rate is typically presumed to set the reasonable value, but either party may offer evidence to prove a different reasonable value."). The Commonwealth

---

[5] Although In re Mammoth Mart interpreted § 64(a)(1) of the former Bankruptcy Act, "it ha[s] been held that 'the body of law that grew up interpreting § 64(a)(1) has value as precedent in interpreting 11 U.S.C. § 503(b)(1)(A).'" In re Chateaugay Corp., 102 B.R. 335, 354 (Bankr. S.D.N.Y. 1989) (quoting In re Peninsula Gunite, Inc., 24 B.R. 593, 594 (B.A.P. 9th Cir. 1982)); see also In re Fin. Oversight & Mgmt. Bd. for Puerto Rico, 481 F. Supp. 3d 60, n. 8 (D.P.R. 2020).

does not argue that NTT DATA did not perform under the Contract, nor does it argue that NTT DATA failed to provide the services outlined in the Proposal incorporated therein. The Contract called for NTT DATA's assistance at the production and troubleshooting stages of the implementations. (Obj. Ex. A at 3.) The Proposal outlined technical expertise NTT DATA would provide EQB in implementing modules and supporting EQB's existing PeopleSoft applications. (Obj. Ex. A at 15.)

According to the Proposal, EQB personnel communicated with NTT DATA about what EQB was looking for in the Contract and services, and the Proposal was designed with those wishes in mind. (Obj. Ex. A at 15.) These services were procured to obtain a benefit in the form of software implementations for one of the Commonwealth's agencies. (Obj. Ex. A at 15.) Furthermore, EQB requested that NTT DATA draft the Proposal concerning such services (services in which EQB sought and accepted for many years), and thus NTT DATA was induced to supply services pursuant to an unrejected contract. (Obj. Ex. A at 19.) The Court concludes that the performed services were beneficial to the Commonwealth and, because the services were contracted for and performed post-petition, NTT DATA has met its burden under section 503(b)(1)(A) of the Bankruptcy Code of demonstrating that it is entitled to an allowed administrative expense claim in the amount of its outstanding invoices. In light of this conclusion, the Court need not address NTT DATA's alternative argument brought under the fundamental fairness doctrine as to why the excess services are entitled to administrative expense priority treatment.

<u>Conclusion</u>

For the foregoing reasons, the Motion is granted, and NTT DATA's Claim is allowed as an administrative expense claim in the amount of $176,713.20. This Memorandum Order resolves Docket Entry No. 19520 in Case No. 17-3283.

SO ORDERED.

Dated: August 17, 2023

/s/ Laura Taylor Swain  
LAURA TAYLOR SWAIN  
United States District Judge