# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al*.,<br><br>    Debtors.[1] | PROMESA<br>Title III<br><br>No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17-BK-4780-LTS<br><br>(Jointly Administered) |

## DECLARATION OF DAVID M. BROWNSTEIN IN RESPECT OF CONFIRMATION OF THE CORRECTED FOURTH AMENDED TITLE III PLAN OF ADJUSTMENT OF THE PUERTO RICO ELECTRIC POWER AUTHORITY

---

[1]     The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19- BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

I, David Brownstein, hereby declare and state as follows:

1.      Since February 1, 2024, I have been a principal at BGC Partners Advisory LLC ("BGC"), a boutique restructuring advisory firm.

2.      Prior to joining BGC, I was a Managing Director in the municipal banking business at Citigroup Global Markets Inc. ("Citi").  Citi's Municipal Finance Department was consistently ranked as a top underwriter of municipal bonds and made commitments in excess of $20 billion over 20 years to provide both bridge and long-term funding as well as credit and liquidity facilities to Citi's municipal clients.

3.      I started at Citi as head of Municipal Derivatives.  When Municipal Derivatives was merged into Citi's Public Finance Department, I was named co-head and thereafter head of that department.  While I was in that role, I enjoyed the position in every year of being a top-three underwriter of municipal securities.  I also served as a credit officer of Citi, responsible for all municipal bridge loans and all forward delivery bond commitments (a type of financing that I discuss in more detail below).  I developed Citi's standardized forward delivery bond structure and executed, as lead banker or manager of bankers, a total of thirty-four (34) forward delivery bonds with a par amount exceeding $3.7 billion for municipal issuers.  I was also responsible for execution of all derivatives transactions with municipal issuers, which included forward swaps to lock-in market rates on future debt issuances with a total notional amount exceeding $30 billion.

4.      The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as the Title III representative of the Commonwealth, ERS, PBA, COFINA, HTA, and PREPA (collectively referred to as the "Debtors") pursuant to § 315(b) of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), retained Citi to serve as investment banker and financial advisor to the Oversight Board in connection with the Oversight Board's duties pursuant to PROMESA, including working with the Commonwealth and its

instrumentalities to create the necessary foundation for economic growth and to restore opportunity to the people of the Commonwealth. Through Citi's expertise in municipal finance, capital markets, restructurings, and infrastructure and utility finance, Citi assisted the Oversight Board in its efforts to restructure the Debtors' debts, restore their access to capital markets, and put the Debtors on the path to economic recovery. After Citi wound down its Municipal Finance Department in early 2024, the Debtors retained BGC as restructuring advisor to the Oversight Board.

5.     I was employed at Citi (or an affiliate of Citi) for more than 30 years and have worked in the municipal finance market for more than 40 years, serving as underwriter or advisor to over 200 municipal issuers of both "revenue" and "general obligation" bonds with a par amount in excess of $45 billion. In addition to a bachelor's degree from Beloit College, I hold a number of professional licenses from the Financial Industry Regulatory Authority. These include:

      (a) General Securities Principal, Series 24;
      (b) General Securities Representative, Series 7;
      (c) Municipal Securities Principal, Series 53; and
      (d) Municipal Securities Representative, Series 52.

6.     In 2008, I served as Chairman of the Municipal Executive Committee of the Securities Industry and Financial Markets Association ("SIFMA"). During that period, I assisted SIFMA in obtaining federal guidance so that municipal governments could restructure outstanding auction-rate securities that failed as a result of liquidity challenges facing the municipal market. For my work in this role during the financial crisis commencing in 2008, I received the SIFMA 2012 Honor Roll Award.

7.     Starting five years ago, I began to focus all of my attention on restructurings. I have been directly involved in assisting distressed governments, serving as a banker to Jefferson County, Alabama in connection with its 2013 sewer refinancing, and to Detroit, Michigan in

connection with its 2014 water and sewer debt restructuring.  These two debt restructurings were each a significant component of the total debt restructured as part of the largest bankruptcies in the history of the municipal market at the time.

8.      I have significant experience with the Debtors' Title III cases.  I was closely involved in the successful restructuring of COFINA's debt by the Oversight Board pursuant to the confirmed *Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [Case No. 17-bk-3284, ECF No. 561], as the Oversight Board's investment banker. COFINA's restructuring reduced COFINA's debt from approximately $17.6 billion to $12 billion in the largest confirmed municipal restructuring in U.S. history at the time and reduced debt service payments by over $17 billion.

9.      I was also closely involved with the Oversight Board's successful restructuring of the Commonwealth's debt pursuant to its plan of adjustment, serving as the Oversight Board's investment banker.  The Commonwealth's restructuring, as set forth in the confirmed *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority* [Case No. 17-bk-3283, ECF No. 19785], reduced the Commonwealth's, PBA's and ERS's debt from approximately $35 billion to approximately $7 billion, excluding the contingent value instruments, and reduced debt service payments, along with the COFINA restructuring by over $50 billion.  The Commonwealth's restructuring is and remains the largest confirmed municipal restructuring in U.S. history.

10.      I also played a significant part in HTA's restructuring, taking a lead role in all aspects of Citi's engagement, including negotiating the treatment of creditors and the settlements contained in various plan support agreements.  Among other things, I assisted the Oversight Board

in formulating financial aspects of the HTA plan of adjustment and the corresponding disclosure statement. *See Modified Fifth Amended Title III Plan of Adjustment of the Puerto Rico Highways and Transportation Authority* [Case No. 17-bk-3567, ECF No. 1404]. This restructuring resulted in a debt reduction from approximately $6.4 billion to $1.25 billion, with debt service savings of over $3 billion.

11.     In connection with PREPA's restructuring, I have taken a lead role in all aspects of Citi's engagement, including (i) reviewing PREPA's certified fiscal plans, (ii) in conjunction with other Oversight Board advisors, leading negotiations with claimholders regarding the provisions of the PREPA plan of adjustment, including the plan support agreements with National, the Fuel Line Lenders, and the Purchasers under the Forward Delivery Bond Purchase Agreement;[2] (iii) acting as the Oversight Board's principal negotiator with respect to most of the mediation in PREPA's case, (iv) crafting the bond structure reflected in the Plan and the New Master Indenture,[3] and (v) providing assistance to the Oversight Board in formulating financial aspects of the *Corrected Fourth Amended Title III Plan of the Puerto Rico Electric Power Authority* [ECF No. 4345] (as it may be amended, supplemented, or modified, the "Plan"). Since joining BGC, I have continued fulfilling these roles in connection with PREPA's restructuring.

12.     I submit this declaration (the "Declaration") in respect of confirmation of the Plan. My statements set forth in this Declaration are based on my personal knowledge, except where I

---

[2] Capitalized terms used but not defined herein have the meaning given to them in the Plan (as defined below) or the *Supplemental Disclosure Statement for Corrected Fifth Modified Third Amended Title III Plan of Adjustment of the Puerto Rico Electric Power Authority* [ECF No. 4171] ("Supplemental Disclosure Statement"), as applicable. ECF citations refer to Case No. 17-bk-4780 unless otherwise specified.

[3] The "New Master Indenture" refers to the *Master Trust Agreement* filed as Exhibit A to the *Notice of Submission of Plan Supplement and Plan Related Documents of the Puerto Rico Electric Power Authority* [ECF No. 4391].

reference specific documents or communications as the basis of my statements.  In those instances where I reference a specific document or communication, the specific document or communication either is not being offered to prove the truth of the matter asserted in the statement or, I am informed, is otherwise admissible because, for instance, it is a self-authenticating public record or can be otherwise authenticated and shown to be admissible.  Where my Declaration provides opinion testimony, in addition to the above, the opinions are based on (i) information shared with me by other members of my team working directly with me or under my supervision and direction during the course of our work for the Oversight Board, (ii) information of the type generally relied on in respect of similar issues by others who have similar experience and expertise in my field, such as information provided by the Oversight Board and its advisors, and other interested parties and their respective advisors, concerning the restructuring, and/or (iii) my experience in the municipal finance industry as described above.  If I were called upon to testify, I could and would testify competently as to the facts set forth herein.

13.     My testimony in this Declaration is broken into nine sections.  The first section details certain settlements incorporated in the Plan and other agreements into which PREPA has entered, including the Amended Fuel Line Lender PSA, the Amended National PSA, the Second Bond Settlement Agreement, and the Forward Delivery Bond Purchase Agreement (all as defined below), as well as why those settlements and agreements are beneficial to PREPA.  The second section describes the bonds to be issued pursuant to the Plan (the "Bonds"), including the bond structure and terms, and the structure and terms of the contingent value instruments ("CVIs") to be issued under the Plan.  The third section explains how the Bond and CVI structures mitigate the risk of PREPA's default, thereby increasing the stability of PREPA while still providing meaningful benefits to holders of the Bonds and CVIs.  The fourth section explains why the terms

of the Bonds and CVIs are fair and reasonable under the circumstances.  The fifth section explains a competing exit financing suggested, though not formally offered or proposed, by two of the non-settling Bondholders[4] and why it is not preferable to the transactions PREPA is currently contemplating.  The sixth section explains how the Plan is consistent with the certified fiscal plan for PREPA.  The seventh section explains why the exculpations and releases contained in the Plan are appropriate and necessary to the reorganization effectuated by the Plan.  The eighth section describes the consummation fees and professional fees provided for in the Plan and explains why they are reasonable and appropriate.  The ninth section contains a calculation of creditor recoveries under the Plan.

## I.     The Settlements and Other Agreements Embodied in the Plan Were Negotiated at Arms' Length and in Good Faith

14.     In my role as a senior restructuring advisor to and principal negotiator for the Oversight Board, I was intimately involved in the negotiations with various constituents concerning the Amended National PSA, the Amended Fuel Line Lender PSA, the Second Bond Settlement Agreement and the Forward Delivery Bond Purchase Agreement (all as defined below). I personally participated in negotiations and discussions concerning those settlements and agreements, and I am familiar with their terms.  In my opinion, and as described in more detail below, based on my participation in the negotiations concerning each of those settlements and agreements and my professional experience negotiating other complex restructuring transactions (as noted above), they are reasonable, arms' length settlements under the facts and circumstances presented.

---

[4] "Bondholders" refers to, collectively, GoldenTree Asset Management LP ("GoldenTree"), Assured Guaranty Corp., and Assured Guaranty Municipal Corp. (collectively, "Assured"), Syncora Guarantee, Inc., the Ad Hoc Group of PREPA Bondholders, and U.S. Bank National Association, as Trustee ("U.S. Bank").

### A.   Amended Fuel Line Lender PSA

15.     Following the entry of an order appointing a mediation team in PREPA's Title III case in April 2022, Case No. 17-bk-4780-LTS, ECF No. 2767, the Oversight Board engaged in mediation sessions under the guidance and direction of the Mediation Team.[5] Although a global agreement with all Bondholders was not achieved, with the involvement and/or knowledge of the Mediation Team, the Oversight Board negotiated directly with various constituencies, all in an effort to build support for a consensual restructuring of PREPA's debt. Eventually, those negotiations culminated in agreements with certain stakeholders.

16.     On December 1, 2022, the Oversight Board entered into a plan support agreement with the holders of the Fuel Line Loan Claims arising under the Fuel Line Credit Agreements[6] regarding the proposed treatment and settlement of the Fuel Line Loan Claims against PREPA. *See* Case No. 17-bk-4780-LTS, ECF No. 3297-13 (the "Initial Fuel Line Lender PSA"). I personally participated in the negotiation of the Initial Fuel Line Lender PSA and its subsequent amendment dated July 14, 2023 (the "Fuel Line Lender PSA Amendment" [ECF No. 4391-1], and the Fuel Line Lender PSA as amended, the "Amended Fuel Line Lender PSA"), and I am familiar with their terms.

---

[5] The "Mediation Team" is the mediation team led by Judge Shelley C. Chapman of the United States Bankruptcy Court for the Southern District of New York (now retired) as established by the *Order and Notice of Preliminary Designation of Mediation Team and Setting Deadlines for Objections to Membership* [Case No. 17-bk-4780-LTS, ECF No. 2767].

[6] The "Fuel Line Credit Agreements" are (i) the Credit Agreement dated May 4, 2012, by and among PREPA, Scotiabank de Puerto Rico, and certain lenders, and (ii) the Trade Finance Facility Agreement, dated July 20, 2012, by and between PREPA and Citibank, N.A., as memorialized in proofs of claim numbers 44342, 44358, 44378, 44388, 45816, 44378, 45816 filed against PREPA in this Title III Case, and as the same may have been amended or supplemented.

17.     I understand the Fuel Line Lenders provided financing to PREPA during a time when PREPA had limited liquidity so that PREPA could purchase fuel to continue operations and produce energy.  In return, the Fuel Line Lenders required, among other things, PREPA agree that the Fuel Line Loan Claims would be treated as "Current Expenses" under the Trust Agreement and, thus, paid before bondholders under the Trust Agreement.  I understand the Fuel Line Lenders filed a claim and commenced litigation against PREPA and the Bondholders, in which they argued the provisions of the Trust Agreement and PREPA's promises to treat the Fuel Line Loan Claims as "Current Expenses" give them a priority of payment, meaning that no creditors, including the Bondholders, could be paid until the Fuel Line Loan Claims are first paid in full.  *See, e.g.*, Adv. Proc. No. 19-ap-396-LTS, ECF No. 36 (the "Fuel Line Lender Complaint").  I also understand the Fuel Line Lenders asserted they are beneficiaries of the Trust Agreement as parties expressly named within the definition of "Current Expense" claims under that agreement.

18.     The Initial Fuel Line Lender PSA resolved the payment priority issues raised by the Fuel Line Lenders and the Fuel Line Loan Claims, and this resolution is maintained in the Amended Fuel Line Lender PSA.  In full satisfaction of the Fuel Line Loan Claims and in settlement of litigation regarding the alleged priority of such claims, the Initial Fuel Line Lender PSA provided that the Fuel Line Lenders would support a plan of adjustment providing them with Series 2023A Bonds (the "Series A Bonds") in an amount equal to eighty-four percent (84%) of their prepetition claim and certain fees.  Although the Fuel Line Lender PSA Amendment incorporated certain changes to the terms of the Series A Bonds discussed below in the Amended Fuel Line Lender PSA, it did not alter the amount of Series A Bonds the Fuel Line Lenders would receive under the agreement.  Like other creditors, under the Plan the percentage amount of the Fuel Line Lenders' recovery has the possibility of modestly increasing if the U.S. Court of Appeals

for the First Circuit both (i) reverses the Court's holding in the Amended Lien & Recourse Challenge that Bondholders are entitled to an unsecured recourse claim and (ii) holds instead that Bondholders' only claim is against their collateral.

19.     The Amended Fuel Line Lender PSA also provides for the Fuel Line Lenders to receive certain consummation fees in the amount of up to $15 million (the "FLL Consummation Costs"), and professional fee reimbursement in an amount of up to $11 million (the "FLL Professional Reimbursement"), each of which is payable either in cash or additional Series A Bonds.  The FLL Consummation Costs and FLL Professional Reimbursement are discussed in more detail in § VIII below.  Additionally, and as discussed in paragraph 76, the Fuel Line Lenders will receive a one-year interest accrual on their Series A Bonds.

20.     Under the Initial Fuel Line Lender PSA, the Fuel Line Lenders were to receive Series A Bonds with a final maturity of fifteen (15) years and an expected repayment of five (5) years based on the projections in the 2022 fiscal plan.  Following the Oversight Board's June 23, 2023 certification of the *2023 Certified Fiscal Plan for the Puerto Rico Electric Power Authority* (the "PREPA 2023 Fiscal Plan"), with its lower demand and revenue projections and higher cost projections compared to the prior year's fiscal plan, the Fuel Line Lenders agreed to enter into the Fuel Line Lender PSA Amendment on July 14, 2023.  The Fuel Line Lender PSA Amendment included a concession by the Fuel Line Lenders to extend the expected repayment from five (5) years to nine (9) years based on the projections in the PREPA 2023 Fiscal Plan.  The Fuel Line Lender PSA Amendment also made a series of changes to the permitted terms of the Series A Bonds and Series 2023B Bonds (the "Series B Bonds") under the New Master Indenture.

21.     I was closely involved in the negotiation of the Fuel Line Lender PSA, as well as the Fuel Line Lender PSA Amendment.  I understand that because those negotiations occurred

during the course of and in furtherance of the above-described mediation, the specifics of the negotiations that took place are confidential and inadmissible. However, based on my participation in the negotiations, I believe the parties and their advisors (both legal and financial) strenuously advocated for their respective positions. Moreover, the negotiations were at arms' length, and the terms agreed upon are, in my view, fair and reasonable.

22.   The Oversight Board, in approving the Initial Fuel Line Lender PSA and the Fuel Line Lender PSA Amendment, took into account a number of benefits it believed could be obtained through a settlement with the Fuel Line Lenders. Among other things, the Initial Fuel Line Lender PSA resolved the Fuel Line Lender Adversary Proceeding and the priority issues the Fuel Line Lenders have vigorously asserted since the commencement of this Title III case, eliminating the possibility the Fuel Line Lenders could fully prevail in their contention they are entitled to be paid in full before any other creditors can receive any recovery on account of their claims. Given the priority asserted by the Fuel Line Lenders, obtaining certainty about the amount of consideration to be provided to the Fuel Line Lenders is beneficial to PREPA in determining the amount of resources PREPA can make available for other claimholders. Further, absent the Initial Fuel Line Lender PSA, the Fuel Line Lenders' priority claim, if successful, would have arguably resulted in all cash flow for debt service going to their interest and principal for the full amount of their claim before any cash could be used to service the debts of Bondholders. The terms of the Series A Bonds agreed to by the Fuel Line Lenders in the Amended Fuel Line Lender PSA, however, provide the Fuel Line Lenders with this level of priority only as to their interest payments, after which the Series B Bonds (as discussed below) receive interest. It is only after scheduled interest on the Series A and Series B bonds have been paid that the Fuel Line Lenders receive payments on principal (in an amount that is discounted relative to the full amount of their claim).

23.     The Initial Fuel Line Lender PSA also required the Fuel Line Lenders to release any party-in-interest in PREPA's Title III case that could become liable on account of the Fuel Line Loans (as defined in the Plan), including as a result of asserted turnover rights.  These release provisions, which are maintained in the Amended Fuel Line Lender PSA, remove potential uncertainty the Oversight Board would have otherwise faced when entering into settlements with other parties, such as the Bondholders or a subset thereof, by allowing the Oversight Board to protect those other parties from any liability they may have engendered for receiving a recovery on account of their claims despite the Fuel Line Lenders not having been paid in full.  The Amended Fuel Line Lender PSA also requires the Fuel Line Lenders to support and vote in favor of the Plan.

24.     The Fuel Line Lender PSA Amendment retained and improved upon the benefits to PREPA under the Fuel Line Lender PSA by modifying them to comport with the lower demand and revenue projections contained in the PREPA 2023 Fiscal Plan.  The Fuel Line Lender PSA Amendment did not increase any of the Fuel Line Lenders' fees or expense reimbursements even though the Fuel Line Lenders were negatively impacted by the fact that the Initial Fuel Line Lender PSA was entered into before the certification of the 2023 PREPA Fiscal Plan, the certification of which delayed the schedule for confirmation relative to the schedule prior to such certification.

**B.     National Plan Support Agreement**

25.     On January 31, 2023, the Oversight Board and National Public Finance Guarantee Corporation ("National") entered into the National Plan Support Agreement (the "Initial National PSA"), which set out the terms of the settlement of all claims and controversies between PREPA and National and requires National to support a plan of adjustment containing certain terms.  I personally participated in the negotiation of and am familiar with the terms of the National PSA, as well as its subsequent amendments dated August 25, 2023 (the "First National PSA

Amendment") and October 10, 2023 (the "Second National PSA Amendment," and collectively, the "National PSA Amendments," and the National PSA as amended, the "Amended National PSA"). The Initial National PSA was an outgrowth of the offer presented to all bondholders and monoline insurers who participated in mediation, which offer was made public on December 18, 2022. *See* PREPA Electronic Municipal Market Access System Filing, Dec. 16, 2022, attaching "PREPA FOMB Proposal to Bondholder Group," dated Nov. 8, 2022 FOMB_PREPA 00000450 through FOMB_PREPA 00000487 (the "November Proposal"). National was the only bondholder or monoline insurer in mediation that did not reject the Oversight Board's offer and instead engaged with the Oversight Board within the framework of that offer.

26. The Amended National PSA, among other things, resolves National's claims arising from the PREPA revenue bonds it owns or insures, as well as the claim National has asserted for "reimbursement" relating to its postpetition payments to insured bondholders (the "National Reimbursement Claim"). Under the Initial National PSA, which was entered into prior to any decision in the Amended Lien & Recourse Challenge,[7] National agreed to support a plan that provided National with Series B Bonds (defined below) at an exchange ratio of 71.65% of the prepetition claim of National on account of the bonds it holds or insures.

27. Separately, the Initial National PSA also provided for National to receive Series B Bonds at an exchange ratio of 20.00% of the National Reimbursement Claim. The National Reimbursement Claim arises from post-petition payments of interest on account of certain

---

[7] The "Amended Lien & Recourse Challenge" is the litigation styled *The Financial Oversight and Management Board for Puerto Rico v. U.S. Bank National Associates*, Adv. Proc. No. 19-00391-LTS. It is my understanding that on June 26, 2023, the Title III Court entered an order ruling that the Bondholders hold an aggregate unsecured net revenue claim of $2,388,000,000.00 (the "Unsecured Net Revenue Claim"). For purposes of determining the Bondholders' percentage recovery under the Plan, any references in this Declaration to their "allowed claim" refers to such Bondholders' portion of the Unsecured Net Revenue Claim.

prepetition municipal bond insurance policies that National issued in connection with its PREPA bonds, insuring the payment of principal and interest on the PREPA bonds. National has asserted these agreements provide that, to the extent National makes payments of principal or interest with respect to any PREPA bonds insured by National, PREPA must reimburse National, with interest, for those payments. The National Reimbursement Claim was to be allowed in the amount of $244,728,681.25 (the accrued amount of the claim as of July 1, 2023) and, in the Initial National PSA, given a recovery equal to 20% of the allowed amount in Series B Bonds.

28.     The Initial National PSA also required the Oversight Board and PREPA to use their reasonable best efforts to cause PREPA to file a rate case with the Puerto Rico Energy Bureau ("PREB") to obtain approval of the equivalent proceeds of National's pro rata share of a one cent per kilowatt hour volumetric charge on PREPA's bills (the "Interim Charge") from the effective date of the National PSA. By the time of the subsequent amendment of the National PSA (discussed below) the Interim Charge had not yet been approved by PREB.

29.     Under the Initial National PSA, National was also entitled to receive consummation costs in an amount equal to 3% of National's PREPA bond claims (the "National Consummation Costs") and structuring fees in an amount equal to 2.86% of National's bond claims (the "National Structuring Fees"). These costs and fees were meant to compensate National for its costs and efforts taken to negotiate the National PSA, formulate the Plan, and structure payments to National's insured bondholders. For example, with respect to the drafting of the New Master Indenture, such efforts included, but are not limited to: (i) proposing a third prong of the Operation and Maintenance Covenant (§ 7.03(c)); (ii) including changes in the Replacement Legacy Charge[8]

---

[8] The "Legacy Charge" is the hybrid fixed monthly flat fee and volumetric charge that will be added to PREPA customers' bills, as set forth in Schedule B of the Plan. *See* Plan § 1.152. The

mechanism that addressed the need for economic neutrality of the Replacement Legacy Charge and methods to control such neutrality (§ 7.24(b)); and (iii) suggesting a clause to address partial payments by ratepayers (§ 7.25).[9]  Furthermore, under the Initial National PSA, National did not receive CVI-1.

30.      Following certification of the 2023 PREPA Fiscal Plan (and its lower demand and revenue projections relative to those in PREPA's fiscal plan for 2022), National agreed to enter into the First National PSA Amendment on August 25, 2023.  The purpose of the First National PSA Amendment was to, among other things, align National's recovery with the reduced debt sustainability analysis in the 2023 PREPA Fiscal Plan.  Following certification of the 2023 PREPA Fiscal Plan and to comply with that fiscal plan's new debt sustainability analysis, the overall consideration under the Plan was lowered from approximately $5.68 billion to approximately $2.5 billion.  Given the lower overall Plan consideration, PREPA did not have sufficient funds to pay the sums under the Initial National PSA while also providing all bondholders who had not entered into settlements with the Oversight Board (including the Bondholders) the opportunity to enter into the Second Bond Settlement Agreement (as defined below).  Accordingly, the Oversight Board determined to renegotiate the National PSA to provide a structure that enabled PREPA to have sufficient funds to offer all non-settling bondholders the opportunity to join the Second Bond Settlement Agreement.

31.      Pursuant to the First National PSA Amendment, National agreed to support a plan that provides it with a baseline recovery in an amount equal to 19.27% of its asserted claim, or

---

"Replacement Legacy Charge" mechanism provides the process by which PREPA may modify the Legacy Charge after the Effective Date, as outlined in the New Master Indenture.

[9] The section references refer to the relevant sections of the current New Master Indenture [ECF No. 4391-1].

68.2% of its allowed claim of $235,558,590.28 (the "National Baseline Recovery"), which is calculated to be National's share of its allowed claim estimated by the Title III Court in the Amended Lien & Recourse Challenge.  This resulted in National receiving a baseline recovery of approximately $161.1 million under the Amended National PSA, which represented a substantial reduction from the approximate amount of $599.1 million that National would have received under the initial iteration of the National PSA.  In addition, the First National PSA Amendment eliminated National's recovery on account of its Asserted Reimbursement Claim, as well as National's entitlement to an Interim Charge, the National Consummation Fees, and the National Structuring Fees.  Instead, the Amended National PSA provides that National will be entitled to a maximum reimbursement in the aggregate face amount of twenty million dollars ($20,000,000.00) to compensate it for the reasonable fees and expenses incurred by National in connection with the Title III case (the "National Professional Reimbursement").  As discussed in more detail below in § VIII, I believe the reimbursement set forth in the Amended National PSA is reasonable and appropriate for National's postpetition work and expenses that benefitted the Title III case.

32.     The Amended National PSA also provides that, apart from the National Baseline Recovery, National is entitled to receive (1) its share of approximately $20.8 million of the RSA Fee (as defined and discussed in § I.D., below), and (2) additional recovery from the RSA Fee that is contingent on the number of bondholders who join the Second Bond Settlement Agreement (also as defined and discussed in § I.D. below) and thus settle their claims against PREPA and support the Plan.  As discussed below, under the Second Bond Settlement Agreement, Bondholders that elected to join the Second Bond Settlement Agreement are entitled to receive an "Increased Bondholder Recovery" of 31.8% of their allowed claim and may be eligible to receive a share of the RSA Fee.  To the extent, however, that Bondholders did not elect to join the Second Bond

Settlement Agreement (and retained their appellate rights), the First National PSA Amendment provides the Increased Bondholder Recovery that would have been allocated to them will instead be reallocated to National (the "Remaining Second Bond Settlement Consideration"). The Amended National PSA also provides that National will receive the portion of the RSA Fee that is left undistributed if less than two-thirds of Bondholders elect to join the Second Bond Settlement Agreement (the "Excess RSA Fee") up to $599,098,557.00 (the "National Cap"), which is National's maximum recovery under the Amended National PSA. The National Cap is equal to what National would have been entitled to receive under the Initial National PSA, not including the National Reimbursement Claim, the National Consummation Costs, and the National Structuring Fees. The amounts included in determining whether National hits the National Cap are the National Baseline Recovery, National's pro rata share of the balance in the Sinking Fund, its share of the RSA Fee, and its contingent recovery from the Excess RSA Fee. Not included in the calculation of National's recovery for purposes of determining the National Cap are National's reimbursement of up to $20 million in fees or any recovery on account of CVI-1 or CVI-2, both of which National receives under the Amended National PSA.

33. As noted above, the Amended National PSA provides for National's recovery to change depending on how many PREPA bondholders joined the Second Bond Settlement Agreement. If all PREPA bondholders that had not previously entered into settlement agreements joined the Second Bond Settlement Agreement, National's recovery would have remained at the National Baseline Recovery. The fewer such bondholders that joined the Second Bond Settlement Agreement, the more National's recovery would increase until it reached the National Cap. National had the right to terminate the Amended National PSA for one week following the deadline for all PREPA bondholders that had previously not entered into settlements with PREPA to join

the Second Bond Settlement Agreement (the "Joinder Deadline").  Depending on the number of

Bondholders that joined the Second Bond Settlement Agreement by the Joinder Deadline (as

discussed in § I.D. below), approximately $425 million in Remaining Second Bond Settlement

Consideration and approximately $83 million in Excess RSA Fees was potentially available to

National under the Amended National PSA.

34.     On December 9, 2023, I learned from Kroll that by the expiration of the Joinder

Deadline, approximately 43% of uninsured PREPA bondholders (including the Purchasers, as

defined below) had joined the Second Bond Settlement Agreement.  This result meant that

National was eligible to receive the amounts listed in paragraph 33 above.  Because these amounts,

plus National's baseline recovery of approximately $161.1 million, its pro rata share of the Sinking

Fund balance, and its approximately $20 million share of the RSA Fee, are larger than the National

Cap, National will receive consideration in an amount equal to, and not greater than, the National

Cap under the terms of the Amended National PSA.

35.     Like other settlements entered between the Oversight Board and various monoline

bond insurers in these Title III cases, the Amended National PSA also provides for the structuring

of payments for the PREPA bonds insured by National into a custodial trust structure, whereby

holders of PREPA bonds insured by National may agree to place their bonds in a custodial trust,

through which continued payments to those bondholders will be structured.  Given that the

distribution to National under the Plan will likely be made entirely in cash, National determined

not to pursue the custodial trust structure and instead sent its insured bondholders a notice offering

the election of either payment in full of all unpaid principal and interest on their PREPA bonds

that National insures on an accelerated basis, or the retention of their bonds and rights under the insurance policy in the ordinary course.  I do not know the current results of that offer.

36.     I was involved in the negotiation of the National PSA and the First and Second National PSA Amendments.  With respect to negotiations sessions I did not personally attend, I discussed what transpired with other Oversight Board advisors that did attend.  Although I do not disclose here the specifics of the negotiations that took place under the auspices of the Court-ordered mediation, I believe the parties and their advisors (legal and financial) actively participated and strenuously advocated for their respective positions.  I believe the Amended National PSA is the product of good-faith, arms'-length negotiations.

37.     In my view, there are a series of benefits under the settlement with National. Among other things, the Initial National PSA resolved the Amended Lien and Recourse Challenge with respect to all National's bond claims, totaling more than $836 million in principal amount and prepetition interest.  Notably, the Oversight Board approved the initial version of the National PSA in January 2023, prior to the Court's March 22, 2023 opinion in the Amended Lien & Recourse Challenge resolving the parties' summary judgment motions, as well as the Court's June 26, 2023 order determining the value of the Bondholders' Unsecured Net Revenue Claim.  Thus, at the time it was entered, the National PSA gave PREPA substantial certainty as to the amount of consideration that would have to be provided to a major PREPA bondholder, regardless of the results of any appeals of the Amended Lien & Recourse Challenge (because National agreed to waive its appellate rights), and provided the Oversight Board with the support of that major PREPA bondholder for the Plan.  Because National waived its appellate rights, the settlement with National also further reduced the risk that the substantial portion of PREPA bonds owned or insured by National could be found to be fully secured and required to be paid in full.  Notably, the offer that

was made to National in connection with the Initial National PSA was negotiated during mediation based upon the facts and circumstances that were available at that time. All bondholders and monoline insurers who participated in the mediation (including the Bondholders) could have done what National did by engaging the Oversight Board on its offer when it was made. *See* November Proposal.

38.     The First and Second National PSA Amendments enhanced the initial benefits to PREPA and provided significant additional benefits in light of the 2023 certification of the PREPA Fiscal Plan. National agreed to accept significant reductions in its baseline recovery, as well as to eliminate any recovery on the National Reimbursement Claim and certain fees. Its willingness to do so enabled the Oversight Board to extend the Second Bond Settlement Agreement to all PREPA bondholders who had not yet entered into a settlement agreement in an effort to broaden support for the Plan. The First and Second National PSA Amendments also took into account the possibility of costly and uncertain litigation with National regarding the enforceability of the Initial National PSA if the Oversight Board tried to terminate it. It was not clear the Oversight Board could terminate the deal, as the Initial National PSA was not conditioned on prior approval by the Title III Court.

**C.     The First Bond Settlement Agreement**

39.     On January 27, 2023, the Oversight Board made a settlement offer to all holders of uninsured Bonds (the "First Bond Settlement Agreement"). The terms of the First Bond Settlement Agreement were also offered to all PREPA monoline insurers. The First Bond Settlement Agreement sets out the terms of the settlement of all claims and controversies between any holders of uninsured PREPA bondholders who chose to join the First Bond Settlement Agreement and PREPA. I personally participated in the structuring of and am familiar with the terms of the First Bond Settlement Agreement.

40.     Pursuant to the First Bond Settlement Agreement, uninsured PREPA bondholders who joined by the February 24, 2023 deadline stated in the First Bond Settlement Agreement offer (the "First Settlement Bondholders") would receive cash or Series B-1 Bonds in the amount of 50% of their asserted claim, which includes their pro rata share of funds in the Sinking Fund.  As of the February 24, 2023 deadline for uninsured PREPA bondholders to join the First Bond Settlement Agreement, approximately 2,000 individual holders of approximately $75 million of uninsured bonds joined.

41.     The First Bond Settlement Agreement provided an opportunity for the Oversight Board to (i) offer an additional recovery available under the factual and legal circumstances at the time to all uninsured PREPA bondholders, (ii) get a material number of uninsured PREPA bondholders to resolve their claims against PREPA, and (iii) obtain the support of more uninsured PREPA bondholders for the Plan.  The offer was based upon the then-current status of the Amended Lien & Recourse Challenge.  At that time, the Corut had entered no opinions regarding either the Bondholders' lien rights or recourse.  The First Bond Settlement Agreement gave PREPA a degree of certainty as to the amount of consideration that would have to be provided to the First Settlement Bondholders, regardless of the outcome of that proceeding.

**D.     The Second Bond Settlement Agreement**

42.     On August 25, 2023, the Oversight Board entered into the Second Bond Settlement Agreement (the "Second Bond Settlement Agreement") with holders of over 37.5% of uninsured PREPA bonds.  The Second Bond Settlement Agreement sets out the terms of the settlement of all claims and controversies between those Bondholders, as well as any other Bondholders choosing to join the Second Bond Settlement Agreement (the "Second Settlement Bondholders") by a date certain.  I personally participated in the negotiation of and am familiar with the terms of the Second Bond Settlement Agreement.

43.     Pursuant to the Second Bond Settlement Agreement, Second Settlement Bondholders will receive a baseline recovery of 44.318% of their pro rata share of the $2.388 billion Unsecured Net Revenue Claim.  This amount consists of a "Base Bondholder Recovery" of 12.5% of the Unsecured Net Revenue Claim (which is available to all holders of allowed bond claims not party to any other settlement) *plus* an "Increased Bondholder Recovery" of 31.818% of the Unsecured Net Revenue Claim (which is available for all Bondholders that chose to join the Second Bond Settlement Agreement).  The Increased Bondholder Recovery is provided on account of the Second Settlement Bondholders' agreement to settle all of their asserted rights and claims against PREPA, including their agreement to waive their appellate rights in connection with the Amended Lien & Recourse Challenge.  The Second Bond Settlement Agreement also states Second Settlement Bondholders will receive a share of any remaining consideration under the Plan and both CVI-1 and CVI-2 (calculated based on their asserted claim).  Non-settling Bondholders that did not join the Second Bond Settlement Agreement (i) received the Base Bondholder Recovery, as well as CVI-1, and CVI-2 in an amount calculated based on their Unsecured Net Revenue Claim, and (ii) retained their litigation (including appellate) rights.  The Second Bond Settlement Agreement provided all PREPA bondholders and monoline insurers (including the Bondholders) with the option either to settle all their claims and causes of action against PREPA for an increased recovery, or to retain their litigation rights if they believe such rights are more valuable than the increased recovery provided for under the Second Bond Settlement Agreement.

44.     The Second Bond Settlement Agreement was open for all bondholders (except the First Settlement Bondholders) to join before Joinder Deadline, and all Second Settlement Bondholders were entitled to receive the increased recovery set forth therein.  It was also offered to all monoline insurers that had not previously settled with PREPA.  The first two-thirds of

PREPA bondholders to join the Second Bond Settlement Agreement by the Joinder Deadline were also entitled to receive their pro-rata share of a $210,040,000.00 fee referred to as the "RSA Fee."[10] As mentioned above, approximately 43% of uninsured PREPA bondholders joined the Second Bond Settlement Agreement, which resulted in all Second Settlement Bondholders receiving their pro-rata distribution of the RSA Fee.

45.     Under the terms of the Second Bond Settlement Agreement, five PREPA bondholders that participated in the formation of the Second Bond Settlement Agreement[11] will receive reimbursement of legal and professional fees up to a maximum of $30 million (the "RSA Reimbursement Costs").  Additionally, the Structuring Parties[12] will receive a structuring fee of 0.5224% of their asserted claim to be split pro-rata among the Structuring Parties (the "RSA Structuring Fee").  These costs and fees are further discussed in § VIII, below.

46.     I was involved in the negotiation of the Second Bond Settlement Agreement with the Purchasers.  Although I do not here disclose the specifics of the negotiations that took place under the auspices of the Court-ordered mediation, I believe the parties and their advisors (both legal and financial) actively participated and strenuously advocated for their respective positions.

---

[10] As discussed in more detail below in § VIII, the RSA Fee is compensation for, among other things, Second Settlement Bondholders exchanging their PREPA bonds for new bonds with a new Committee on Uniform Securities Identification Procedures ("CUSIP") number (which is an identification for many financial instruments, including municipal securities), and effectively locking those new bonds into compliance with the Second Bond Settlement Agreement pending the Effective Date.

[11] These bondholders are BlackRock Financial Management, Inc. ("BlackRock"), Whitebox Advisors, LLC ("Whitebox"), Taconic Capital Advisors L.P. ("Taconic"), Franklin Advisers, Inc. ("Franklin"), and Nuveen Asset Management, LLC ("Nuveen," and collectively with BlackRock, Whitebox, Taconic, and Franklin, the "Purchasers").

[12] The "Structuring Parties" are BlackRock, Whitebox, and Taconic.

I believe the Second Bond Settlement Agreement was the product of good-faith, arms'-length negotiations.

47.     The Second Bond Settlement Agreement provided another opportunity for the Oversight Board to offer an additional recovery, based upon the factual and legal circumstances prevailing at the time to all PREPA bondholders who had not previously settled their bond claims in exchange for those settling bondholders' agreement to settle their litigation and appeal rights and support the Plan.  This gave PREPA additional certainty as to the amount of consideration that would have to be provided to a large number of Bondholders and provided a structure and proposed recovery that could be offered to all Bondholders to garner even more support for the Plan.

### E.     The Forward Delivery Bond Purchase Agreement

48.     On August 25, 2023, the Oversight Board entered into the Forward Delivery Bond Purchase Agreement with the Purchasers.  On January 12, 2024, the Oversight Board and the Purchasers entered into the First Amendment to Forward Delivery Bond Purchase Agreement (the "Forward Delivery Bond Purchase Agreement Amendment").  I personally participated in the negotiation of the Forward Delivery Bond Purchase Agreement and the Forward Delivery Bond Purchase Agreement Amendment, and I am familiar with their terms.

49.     Before discussing the specifics of the Forward Delivery Bond Purchase Agreement, I will provide some background on the structure and terms of forward delivery bonds in general. Forward delivery bonds can provide a municipal issuer with a guaranteed fixed interest cost determined under current market conditions, effective in the future when the bonds are delivered. Forward delivery bonds are sold much like conventional bonds except that the settlement or delivery date is more than thirty (30) days after pricing.  In a forward delivery transaction, the underwriter agrees to sell, and the investor agrees to buy, bonds with maturities, coupons, and prices set on the sale date, but the underwriter's actual sale, and the investor's actual purchase,

does not take place until more than thirty (30) days after the agreement to see and buy is entered into. Once delivered, however, there is no distinction between a forward delivery bond and a bond that was not subject to a forward delivery agreement.

50.     Forward delivery bonds are an advantageous mechanism for tax-exempt issuers who wish to lock-in interest rates ahead of time. In every forward delivery bond transaction of which I am aware, the bonds were used to refund outstanding bonds that cannot be refunded in advance. The reason is that refunding bonds would be used to save money on outstanding debt, and therefore it is unlikely that they will not be delivered by the issuer as promised.

51.     Forward delivery bonds are priced at a premium over bonds sold for settlement or delivery within the typical two-week time period. This premium is comprised of an implied forward premium, a liquidity premium, and a premium for settlement risk. The forward premium represents the additional yield demanded by the investor as compensation for the lower interest income obtained by investing in short-term tax-exempt securities from the sale date until the delivery date. As explained below, this is necessary because the purchaser of a forward delivery bond has to ensure it has sufficient funds to make the purchase throughout the forward period (the period between the sale date and the date on which the bonds are delivered).

52.     The liquidity premium compensates the investor for its limited ability to sell the forward delivery bonds prior to settlement, *i.e.*, during the forward period. If the investor finds a buyer during the forward period, the investor would still be obligated to take delivery of the bonds at settlement, and only then could sell them to the new buyer for settlement after delivery. This is not the case with a traditional bond where the buyer could sell it days after the sale.

53.     The settlement premium compensates the investor for taking the risk that the issuer does not deliver the forward delivery bonds at settlement. In the case of PREPA, and as further

discussed below, no settlement premium is due:  if the Plan is not confirmed or if the Second Bond

Settlement Agreement is terminated, the Purchasers would receive no remuneration for having

already committed capital, taken an interest rate risk (in other words, that interest rates would rise

during the forward period relative to the rate agreed to on the sale dated), and ensured they have

sufficient liquidity up to the settlement date to pay for the bonds.  In addition, as is typical with a

forward delivery bond, the Forward Delivery Bond Purchase Agreement in this case severely

limits the Purchasers' rights to terminate the agreement.  This is in contrast to a traditional bond

purchase agreement, in which the underwriter (*i.e.*, the purchaser) has the right to terminate its

obligation to purchase under many circumstances that are thought of as traditional bond purchase

agreement "outs."  Such outs in traditional bond purchase agreements include a change in law, a

war, a banking moratorium, a material adverse change on behalf of the issuer , credit rating

changes, or other specified conditions precedent to settlement.  The Forward Delivery Bond

Purchase Agreement in this case has none of these termination rights.

54.     Under prior versions of the Plan (including the plan initially solicited to PREPA's

creditors in March 2023), the primary form of consideration to be distributed to certain creditors

on account of their claims were Series B Bonds as structured under that version of the Plan.  On

February 3, 2023, certain of the objecting bondholders, including Assured, Syncora, and members

of the former Ad Hoc Group in place at the time (including GoldenTree and Invesco Advisers,

Inc.) issued a public statement (the "February 3 Letter") posted by U.S. Bank on the Electronic

Municipal Market Access ("EMMA") website asserting those Series B Bonds were "not market

securities," were "worth a fraction of the nominal amount that the Oversight Board purports to

offer to Bondholders," and were "illiquid" because they "did not think that any market participant

would want to buy bonds on [their] terms."  *See* February 3 Letter, at 2-3.  The Forward Delivery

Bond Purchase Agreement provides for the sale to the Purchasers of amended Series B Bonds for a par amount of cash. The primary difference between the two structures is the current forward delivery Series B Bonds to be sold to the Purchasers carry a 6.997% interest cost, as opposed to 6% for the Series B Bonds that the objecting Bondholders said were "worth only a fraction" of their stated value. Put differently, the main difference between the structure of the Series B Bonds the Bondholders so severely criticized as being "illiquid" and not something "any market participant would want to buy" and the Series B Bonds to be delivered under the Forward Delivery Bond Purchase Agreement is that the coupon on the latter is roughly 100 basis points higher.

55.     The Forward Delivery Bond Purchase Agreement permits the Oversight Board to distribute cash to all claimholders, including to general unsecured creditors and all PREPA bondholders (excluding the Fuel Line Lenders and the First Settlement Bondholders who elect to receive Series A or Series B Bonds). Such parties are benefited by being provided consideration in the form of a lump sum of cash, rather than receiving recovery in the form of bonds with uncertain market value at settlement that will pay out over the course of decades.

56.     In the original Forward Delivery Bond Purchase Agreement, the Purchasers were obligated to buy $1,632,433,097.00 in Series B Bonds. The Forward Delivery Bond Purchase Agreement Amendment, among other things, increased the amount of B Bonds to $1,886,292,470.00, which consists of the $1,632,433,097.00 in the original agreement (the "Initial Commitment") and an additional $253,859,373.00 in principal amount (the "Additional Commitment"). It is my understanding that the Additional Commitment is the result of updates made to the Revenue Envelope and Legacy Charge Model, developed by another advisor of the Oversight Board, to incorporate new information that advisor received.

57.     Under the Forward Delivery Bond Purchase Agreement and the Forward Delivery Bond Purchase Agreement Amendment, the Purchasers will receive certain fees and reimbursements.  Specifically, the Forward Delivery Bond Purchase Agreement provides: (1) the Purchasers will receive a Forward Delivery Bond Commitment Fee (the "Commitment Fee") of 4.25% of the principal amount of B Bonds (excluding any Series B Bonds issued to pay for fees); (2) the Structuring Parties will receive an "Exit Financing Structuring Fee" to be paid in cash in an amount equal to 3% of the principal of the Series B Bonds (excluding any Series B Bonds issued to pay for fees); and (3) the Structuring Parties will receive reimbursement (the "Forward Reimbursement Costs") of documented legal and/or professional fees incurred by the Purchasers in connection with PREPA's Title III case, up to a maximum equal to 1% of the principal of the Series B Bonds (excluding any Series B Bonds issued to pay for fees).  The Forward Delivery Bond Purchase Agreement Amendment provides: (1) the Commitment Fee, Exit Financing Structuring Fee, and Forward Reimbursement Costs in the Forward Delivery Bond Purchase Agreement are to be calculated based on the principal of the Initial Commitment; (2) the Commitment Fee will be lowered to 3% of the B Bond principal with respect to the Additional Commitment (which is equivalent to the 4.25% Commitment Fee on the Initial Commitment in terms of the ratio between the percentage of the fee and the length of the commitment); and (3) there will be no additional Exit Financing Structuring Fee or Forward Reimbursement Costs  with respect to the Additional Commitment.  These fees, and the reasons why I believe they are fair and reasonable under the circumstances of this case, are discussed further below in § VIII.

58.     The Forward Delivery Bond Purchase Agreement also includes a provision setting forth a "break-up" fee, to be calculated and owed only if PREPA terminates the Forward Delivery Bond Purchase Agreement and instead partakes in an alternative exit financing transaction.  In

such circumstances, the Purchasers are entitled to the difference, if positive, obtained by

subtracting (i) $1,886,292,470.00 from (ii) the hypothetical valuation of the Series B Bonds on the

first business day after secondary market trading on the Series B Bonds would have been reported

had the Series B Bonds been issued.  Such valuation, if necessary, would be conducted by a broker-

dealer with a municipal trading desk and experience trading Commonwealth securities.  No break-

up fee would be payable to the Purchasers if (a) PREPA terminates the Forward Delivery Bond

Purchase Agreement but does not enter into an alternative exit financing transaction or (b) if the

Series B Bonds are valued, pursuant to the above valuation methodology, at less than

$1,886,292,470.00.  It is not possible to know the magnitude of the break-up fee (if any) in

advance, as a calculation agent must first go through the valuation exercise described above.  In

my opinion, this break-up fee is reasonable because the Purchasers are reserving almost $1.9

billion in capital and taking on risk that interest rates will move against them during the forward

commitment period (as in fact they have done),[13] yet are still obligated to close at the end of that

period.  The break-up fee is designed to compensate the Purchasers for the actual economic value

they would be deprived of if the transaction is terminated in light of their capital commitment.

---

[13] Certain objecting Bondholders have criticized the Oversight Board for not conducting a "market
test" before entering into the Forward Delivery Bond Purchase Agreement.  There were, however,
practical impediments to the ability of the Oversight Board to do so.  For example, working under
a deadline to file an amended plan, the transaction was proposed during mediation and could not
be disclosed (or "shopped") to any other parties without the consent of the parties to mediation.  In
addition, as the Oversight Board and the mediation parties were negotiating, interest rates were
rising and projected to continue to climb.  Thus, the longer it took to lock in the forward sale
contractually, the higher the interest rate on the proposed financing was likely to be.  Indeed, in
the two weeks before the date that the Forward Delivery Bond Purchase Agreement was signed,
interest rates on the IHS Markit Municipal Bond AAA Curve (described later in this Declaration)
increased by 22 basis points.  By a month after signing, the IHS Markit Municipal Bond AAA
Curve had increased another 27 basis points, for an aggregate increase of 49 basis points in six
weeks.  The 6.997% interest rate on the Series B Bonds takes into account the increase in interest
rates that had already occurred as of the date of signing, along with the forward premium that is
necessary to execute on a forward delivery bond.

However, if the Plan is not confirmed, the Purchasers will receive no compensation whatsoever, including the Series B Bonds or any of the fees outlined above (including the break-up fee).

59.    I was involved in the negotiation of the Forward Delivery Bond Purchase Agreement and the Forward Delivery Bond Purchase Agreement Amendment with the Purchasers. I do not here disclose the specifics of the negotiations that took place under the auspices of the Court-ordered mediation, I believe the parties and their advisors (both legal and financial) actively participated and strenuously advocated for their respective positions.   I believe the Forward Delivery Bond Purchase Agreement was the product of good-faith, arms'-length negotiations. Although the Oversight Board's objective was to obtain a global settlement with all PREPA bondholders and monoline insurers, it was unfortunately not able reach a global consensus. Recognizing the imminent expiration of the Court's deadline to file a plan of adjustment, which had already been extended several times, the Oversight Board endeavored to reach a settlement with some of the less adversarial bondholders.   Specifically with respect to the discussions that resulted in the Forward Delivery Bond Purchase Agreement, the Oversight Board engaged in discussions with the Purchasers, after BlackRock initially proposed the idea of a forward delivery bond purchase.  Those discussions were the genesis of what ultimately became the transaction set forth in the Forward Delivery Bond Purchase Agreement.

60.    The Forward Delivery Bond Purchase Agreement provides many benefits to the PREPA restructuring.  It furthers the critical statutory mission of the Oversight Board that PREPA regain access to the credit markets at reasonable rates.  To achieve that goal, PREPA must be able to issue bonds that are perceived by investors as marketable.  In the prior iteration of PREPA's plan of adjustment, as I discussed above, certain opposing bondholders strenuously objected to the structure and terms of the Series B Bonds that were to be issued under that plan (many of which

are substantially similar to the structure and terms of the B Bonds being issued under the current Plan).  They even went so far as to publicly post the February 3 Letter criticizing those bonds.  *See* February 3 Letter.  In my view, by making these public criticisms, the objecting bondholders—many of whom are sophisticated market participants—could have negatively impacted the marketability of those Series B Bonds and diminished PREPA's ability to issue future debt using the same bond structure at reasonable rates.

61.     The Forward Delivery Bond Purchase Agreement addresses these concerns.  For one thing, assuming performance of the Forward Delivery Bond Purchase Agreement, those objecting creditors would no longer receive Series B Bonds as structured under either the prior or current Plan; they will instead receive cash.  Moreover, the willingness of the Purchasers—who are also sophisticated participants in the bond market, and who had been part of the group of bondholders objecting to the prior plan—to pay cash to purchase the Series B Bonds provides a strong signal to the market that the Series B Bonds are market instruments and that PREPA, as reorganized under the Plan, is a creditworthy entity.  Notably, it was one of the Purchasers who first approached the Oversight Board with the concept of buying the Series B Bonds as structured (including their limited rights and remedies, which are discussed below in § II.A.3) pursuant to what became the Forward Delivery Bond Purchase Agreement.

62.     The positive impact of this structure has been borne out, as the same parties who previously criticized the Series B Bonds with a 6% coupon as "illiquid" and "not market securities" now argue the Series A and Series B Bonds being issued under the Plan (collectively, the "New Bonds") have attractive terms, and several of them—GoldenTree and Assured—indicated their

desire to pay cash for bonds issued by PREPA, albeit bonds with a very different structure that is not advantageous to PREPA.[14]

63.    Second, as mentioned above, providing cash payments to certain creditors, particularly to PREPA's general unsecured creditors and other retail PREPA bondholders, will benefit those claimholders, who might not be in a position to wait decades to receive recovery on their claims, and who might find it difficult to sell the New Bonds (at least in the near term).

64.    Third, as with other forward delivery bonds, and as noted above, the Forward Delivery Bond Purchase Agreement significantly limits the Purchasers' right to terminate the agreement.  At settlement, the Purchasers are obligated to purchase the bonds so long as they are tax-exempt and exempt from registration such that they are free to trade.  In other words, the normal conditions to closing that are present in traditional bond purchase agreements are not present, and the Purchasers are obligated in nearly all circumstances to purchase the Series B Bonds.

65.    I view all of these benefits to PREPA as relevant to the pricing of the Series B Bonds, including the interest rates as well as the fees payable to the Purchasers and Structuring Parties in the Forward Delivery Bond Purchase Agreement.  I discuss the reasonableness of those fees and the Series B Bonds' interest rate in § VIII below.

---

[14] GoldenTree and Assured's indication of interest in potentially purchasing PREPA bonds is discussed in detail in § V, below.

## II. Description of Bonds to be Issued Pursuant to the Plan

66.     On the Effective Date of the Plan, the New Bonds will be issued in the aggregate principal amount of funded indebtedness of approximately $2.536 billion, comprised of $650 million in Series A Bonds and $1.886 billion in Series B Bonds.

67.     I am familiar with the consideration to be issued upon the Effective Date of the Plan and distributed under the Plan: (1) new debt issued by PREPA in the form of the New Bonds, and (2) the CVIs. I was intimately involved in the negotiations over and development of this consideration, including with the Fuel Line Lenders, National, and the Purchasers.

### A. The New Bonds

68.     The Plan provides for the issuance of New Bonds on the Effective Date in the form of two series: the Series A Bonds, and the Series B Bonds. The B Bonds will consist of two-subseries with different maturities: Series 2023B-1 Bonds (the "Series B-1 Bonds") and Series 2023B-2 Bonds (the "Series B-2 Bonds").

69.     The Series A Bonds will be issued in a principal amount sufficient to comply with the terms of the Amended Fuel Line Lender PSA, which is $650,069,869.00. The Series B Bonds will be issued in an aggregate principal amount equal to $1,886,292,470.00, split between (i) B-1 Bonds issued to the First Settlement Bondholders and the Purchasers, or distributed as Plan Consideration (as defined in the Plan), which bonds will be issued in the principal amount of $323,000,000.00 and will have a final stated maturity of seventeen (17) years from the Effective Date, and (ii) Series B-2 Bonds issued to the Purchasers or distributed as Plan Consideration, which bonds will be issued in the principal amount of $1,563,292,470.00, and will have a final stated maturity date of thirty-five (35) years from the Effective Date.

70.     The New Bonds have "turbo" redemption provisions. Unlike traditional revenue bonds with a stated principal amortization schedule, in a bond with turbo provisions, all collections

available for debt service (here, collections of the Legacy Charge, or the "Legacy Charge Revenues") are paid as specified in the turbo provision, in accordance with any payment priorities set forth in the New Master Indenture.  This feature can impact the amortization of the bond, such that the average or expected life will adjust faster or slower depending on how actual collections differ from projections.  In other words, should actual collections be greater than what was projected over time, the actual maturity of the bonds could be significantly shortened.

71.     The New Bonds also have an interest rate covenant (the "Interest Rate Covenant"), which provides that if Legacy Charge Revenues in a given fiscal year are insufficient to pay interest on the New Bonds, PREPA must implement an increase to the Legacy Charge that would allow PREPA to pay scheduled interest or be in default.  Before principal is paid on either the Series A or the Series B Bonds pursuant to the turbo provisions, interest must first be paid on both Series in parity.

72.     Although the Series A Bonds have a final stated maturity of 15 years from the Effective Date, due to the turbo feature they have an expected repayment of 9 years from the Effective Date based on the 2023 PREPA Fiscal Plan's projections of PREPA's collections. Likewise, the Series B-1 Bonds have a final stated maturity of 17 years from the Effective Date but, based on the 2023 PREPA Fiscal Plan projections, have an expected repayment of 13 years. The Series B-2 Bonds have a final stated maturity of 35 years from the Effective Date and, based on 2023 PREPA Fiscal Plan projections, have an expected repayment of 35 years.

1.      **The Payment Waterfall**

73.     All interest and principal payments on the New Bonds will be made from monies collected from the Legacy Charge.  I understand that other advisors of the Oversight Board designed the structure and amount of the Legacy Charge, and that is further explained in their

declarations, as well as in Exhibit I to the Supplemental Disclosure Statement.  I was not principally involved in the derivation of the Legacy Charge.[15]

74.     The New Master Indenture provides that all revenues collected from PREPA customers, including Legacy Charge Revenues, will be deposited into PREPA's General Fund. The Legacy Charge Revenues will then be transferred on a monthly basis into a separate account called the "Legacy Charge Revenue Fund," after which they will be applied by the Trustee to pay debt service on the New Bonds.  All other collections that are deposited into the General Fund are not subject to any lien or security interest created by the Plan.  Except for certain limited situations in response to a force majeure event (as discussed below), PREPA expenditures, including operating or capital expenses, cannot be paid out of Legacy Charge Revenues, and all Legacy Charge Revenues will be used to solely pay debt service on the New Bonds.

75.     Within three days after each transfer of Legacy Charge Revenues into the Legacy Charge Revenue Fund, the Legacy Charge Revenues will be applied by the Trustee in the following order: *first*, to the Trustee Expense Fund to reimburse the Trustee for expenses up to $100,000.00 for each fiscal year (the "Trustee Expense Cap"); *second*, to the Bonds Interest Subaccount of the

---

[15] Although I was not principally involved in the derivation of the Legacy Charge, I did provide advice and guidance to the Oversight Board's advisors at the Brattle Group who were responsible for deriving the Legacy Charge and the model upon which it is based.  In particular, I informed them that in order for PREPA to continue to have market access, the rates added to PREPA's base rate from which the Legacy Charge Revenues are generated could not increase annually by inflation.  This is necessary to leave capacity for PREPA's potential future financial needs, which, although currently unknown, could be significant in light of the unique circumstances faced by PREPA.  This includes, among other things, the dilapidated state of PREPA's assets (which federal funding may not be sufficient to address) and the risk of future hurricanes or other natural disasters. Additionally, if Legacy Charge rates are increased every year by an inflation factor, PREPA may not be able to issue additional debt in the future if it needed to, as that additional debt may not be affordable to PREPA's customers.  Furthermore, I am not aware of any municipal bonds, other than sales tax bonds (which are structured differently to the New Bonds), that have an inflation factor.

Bonds Debt Service Account, for payment of the amount of interest due on the next specified interest payment date plus any additional amount needed to cover shortfalls in interest payments from prior periods; *third*, to the Bonds Principal Subaccount of the Bonds Debt Service Account, for payment of the amount of principal due on the next specified principal payment date; *fourth*, to the Arbitrage Rebate Fund in an amount directed by a PREPA officer to comply with payments required to be made to the United States Department of Treasury; *fifth*, to the Bonds Turbo Redemption Subaccount of the Bonds Debt Service Account to be applied to not-yet-due payments of principal and interest on the New Bonds; and *sixth*, after the principal and interest on the New Bonds have been satisfied, to the CVI-1 Debt Service Account to be applied towards the payment of the CVI-1 (as further discussed below).

### 2.    The Series A Bonds

76.    The Plan provides that Reorganized PREPA will issue the Series A Bonds in the principal amount of approximately $650 million, to comply with the terms of the Fuel Line Lender PSA.  As I explained above, the terms of the Series A Bonds were agreed upon in negotiations with the Fuel Line Lenders through mediation and provide that interest on the Series A Bonds will be paid prior to interest on the Series B Bonds, only after which will principal payments on the Series A Bonds will be made.  Under the Amended Fuel Line Lender PSA, the Series A Bonds have accrued one year's interest since December 1, 2022; they will not accrue any further interest until issuance on the Effective Date.  From the Effective Date through the stated maturity date A Bonds will accrue interest at a rate of 6.00% per year.

77.    The Series A Bonds, like all the New Bonds, have turbo redemption provisions.  As provided in the Amended Fuel Line Lender PSA, the New Master Indenture provides any Legacy Charge Revenues deposited into the Turbo Redemption Subaccount of the Bonds Debt Service Account will first be used to satisfy the Series A Bonds in full before being applied to the turbo

provisions of the Series B Bonds.  This means that the Fuel Line Lenders will be paid off in full before any turbo payments to the Series B Bonds can be made.  However, because no deposits are made into the Turbo Redemption Subaccount until the scheduled interest payments for all the New Bonds have been satisfied (including any shortfalls from prior periods), the Series A Bonds will not receive turbo payments until after the Series B Bonds' current interest payments have been made and satisfied in full.

78.     Using the rate structure set forth in Schedule B to the Plan and the projections in the 2023 PREPA Fiscal Plan, the Series A Bonds will result in a total of approximately $817.6 million in debt service payments, consisting of approximately $650 million in principal and approximately $167.5 million in interest.  Expected annual payments are set forth in Schedule E to the Plan.

### 3.     The Series B Bonds

79.     The Series B-1 Bonds will be issued as current interest bonds (meaning that interest will be paid in cash pursuant to an agreed schedule), bearing interest at a rate of 6% per year payable semi-annually.  A small amount of the Series B-1 Bonds will be issued to the First Settlement Bondholders (if they choose not to receive cash) and the rest will be sold to the Purchasers or be distributed as part of the Plan Consideration in the event any of the Purchasers fail to purchase their allocated amount.

80.     The Series B-2 Bonds will be issued as current interest bonds, bearing interest at 7.125% annually payable semi-annually.  The Series B-2 Bonds will be issued to the Purchasers under the Forward Bond Purchase Agreement.  The Series B-1 Bonds have priority as to payments of principal over the Series B-2 Bonds.  Further, as I explained above, the Series B Bonds have turbo principal provisions, but the principal and interest of the Series A Bonds must be paid in full before turbo principal payments can be made on any of the Series B Bonds.

81.     Using the rate structure set forth in Schedule B to the Plan and the projections in the 2023 PREPA Fiscal Plan, the Series B Bonds will result in approximately $4.9 billion in debt service payments, consisting of approximately $1.9 billion in principal and $3 billion in interest. As with the Series A Bonds, whether actual collections exceed or trail behind the projections in the 2023 PREPA Fiscal Plan may impact timing of payment and amount of interest due on the Series B Bonds.  Legacy Charge Revenues would need to fall by an average of 9.65% per year starting at year 11 for the Series B Bonds not to pay in full by their stated maturity date.

**B.     The CVIs**

82.     The Plan also provides that, on the Effective Date, PREPA will issue CVIs, which certain claimholders will receive as part of the distribution under the Plan.  A CVI is a financial instrument that does not have scheduled payments, but that will pay only if certain events (*i.e.*, contingencies) occur.  I was asked by the Oversight Board to develop a structure for a CVI that would provide creditors additional payments if PREPA outperforms its revenue projections under the 2023 PREPA Fiscal Plan, and another CVI that would provide creditors additional payments if expenses were lower than projected under the 2023 PREPA Fiscal Plan.  Accordingly, there are two CVIs under the Plan, which collectively provide certain creditors potential upside payments.[16]

**1.     CVI-1**

83.     CVI-1 will be issued by PREPA on the Effective Date.  CVI-1 will have a 35-year final maturity date and will not bear interest.  CVI-1 will be payable only if the New Bonds (and any bonds issued to refund the New Bonds) are paid in full prior to their expected 35-year repayment date.  That will occur if, for example, actual electricity demand, and thus Legacy Charge

---

[16] As part of their consideration under the Plan, the Bondholders will receive both CVIs.  The Fuel Line Lenders will not receive either CVI, and the First Settlement Bondholders and general unsecured creditors (as members of Class 12 of the Plan) will not receive CVI-2.

Revenues, is higher over the course of the next 35 years than projected by the PREPA 2023 Fiscal Plan.  In that eventuality, CVI-1 will ensure that PREPA's claimholders who received CVI-1 will receive additional payments on their claims until CVI-1 reaches its final maturity date.

84.     CVI-1 is payable from and secured by what the Plan and the New Master Indenture call the "Remaining Legacy Charge Revenues," which are Legacy Charge Revenues resulting from the fixed component of the Legacy Charge collected by PREPA after the New Bonds are satisfied.  Only the fixed component of the Legacy Charge will continue to be collected after the New Bonds mature.  All Remaining Legacy Charge Revenues resulting from the fixed charge component will be paid to holders of CVI-1; no operating expenses or other costs are first applied to the Remaining Legacy Charge Revenues before they are used for debt service.

85.     Legacy Charge Revenues go through the payment waterfall that I explained above.  Legacy Charge Revenues will be deposited in a separate account, "the CVI Debt Service Account," only after the principal and interest on the New Bonds have been paid in full, through the CVI maturity date.

### 2.     CVI-2

86.     CVI-2 is designed to give PREPA's claimholders who receive it additional payments on account of their claims if PREPA realizes cost savings as a result of certain efficiencies from the operation of PREPA's generation assets by Genera PR, LLC ("Genera") and Genera earns an incentive payment under the terms of its operation and management agreement with PREPA (the "Genera O&M Agreement").  In such an eventuality, PREPA's share of cost savings is split (in accordance with a formula detailed below) with holders of the CVI-2.

87.     Under the terms of the Genera O&M Agreement, Genera is entitled to receive an annual fixed fee of $22.5 million, adjusted for inflation and, after the fifth year of the contract, for reductions in the scope of services (as adjusted, the "Genera Fixed Fee"), to operate PREPA's

generation system.  *See* Genera O&M Agreement, § 7.1(b)(iv).  Genera is also eligible to receive certain incentive payments (or, alternatively, is subject to certain penalties) depending on its performance in different areas.  In particular, Genera is eligible to receive incentive payments for actual savings associated with operation cost efficiency and fuel optimization ("Operation Cost Efficiency and/or Fuel Optimization Incentive Payment").[17]  If Genera is entitled to an Operation Cost Efficiency and/or Fuel Optimization Incentive Payment in any contract year as a result of "Actual Savings," as set forth in the Genera O&M Agreement, a payment may be triggered under CVI-2 in accordance with the formula discussed in the next paragraph.

88.     Once it is determined in any given fiscal year that Genera is owed an Operation Cost Efficiency and/or Fuel Optimization Incentive Payment, a calculation will be completed by a calculation agent to determine the amount due on the CVI-2.  This calculation will take fifty percent (50%) of the Actual Savings Genera achieved in the applicable contract year (from its Operational Cost Efficiency and/or Fuel Optimization Payment), subtract the fixed fee that the Genera O&M Agreement provides is due to Genera in that year, and multiply the remainder by fifty percent (50%).  If this calculation results in a positive number, PREPA will arrange for payment of such amount under the CVI-2 no later than eighteen (18) months following delivery by PREPA to the Trustee of a report setting forth the calculation of the amount due on the CVI-2, if any, for the preceding contract year.  *See Third Supplemental Trust Agreement* [ECF No. 4391-1], §§ 3.03, 3.05.

89.     CVI-2 will bear no interest.  CVI-2 will not generate payments after June 30, 2033 (which is the date on which the Genera O&M Agreement expires), except for any payments that

---

[17] Consistent with the Genera O&M Agreement, any savings related to federal programs or market conditions (*e.g.*, changes in the price of fuel) do not constitute Actual Savings and therefore do not trigger payments under the CVI-2.

have accrued or are due before June 30, 2033.  Payments will be made on the CVI-2 for a given

fiscal year only if the conditions triggering payment have been met in that fiscal year.

90.     As noted, the CVIs are designed to provide claimholders with an upside if the

Oversight Board's revenue and/or cost projections are proven wrong and there is more load and/or

greater cost savings than projected.

### III.   The Bond and CVI Structure Are Designed to Mitigate the Risk of Default or Adverse Impact of PREPA's Operations

91.     The Bond structure discussed above is tailored to both provide meaningful

recoveries to PREPA's creditors and mitigate the risk of PREPA's defaulting on the Bonds.

Limited risk of PREPA's default on the Bonds is helpful to ensure the Plan's feasibility.

92.     First, as I noted above, § 7.01 of the New Master Indenture provides that PREPA

has an Interest Rate Covenant with respect to the New Bonds, which provides that if Legacy

Charge Revenues in a given fiscal year are insufficient to pay interest on the New Bonds, PREPA

must implement an increase to the Legacy Charge that would allow PREPA to pay scheduled

interest on the Bonds.  Practically, PREPA would have to initiate a rate case before PREB to

implement such a rate increase.  The Interest Rate Covenant ensures that holders of New Bonds

are paid interest per the New Master Indenture through year 50 (subject to PREB's approval of

any rate increases needed to make such interest payments).  But the Interest Rate Covenant only

applies to the payment of *interest*, not principal.  Having only the Interest Rate Covenant, and not

a full rate covenant (covering principal) typical of revenue bonds, is beneficial to PREPA and its

rate payers because a full rate covenant would require PREPA to seek even higher rates from

PREB.  Based on projections, Legacy Charge Revenues would need to fall by 14.7% on average

per year starting at year 11 in order for the Interest Rate Covenant to be triggered.

93.     Second, § 11.01 of the New Master Indenture states that there will be **no** event of default for failure to pay principal or interest on the New Bonds as long as PREPA complies with the following conditions: (1) it uses its reasonable best efforts to levy the Legacy Charge and to collect and deposit the Legacy Charge Revenues in the appropriate accounts; and (2) it complies with the Interest Rate Covenant by seeking an increase of the Legacy Charge if the Legacy Charge Revenues are insufficient to cover interest payments on the schedule set forth in the Supplemental Trust Agreement.  Ensuring there is no event of default if the Legacy Charge Revenues are insufficient to cover projected principal payments (for example, if actual load is less than projected in the 2023 PREPA Fiscal Plan due to a reduction in users or because of a higher number of customers moving to distributed generation, among other reasons) bolsters the Plan's feasibility, including by protecting PREPA from costly and damaging enforcement remedies from holders of New Bonds.  It also ensures that whether a default occurs on the New Bonds is within PREPA's control and not driven by macroeconomic issues that are outside of PREPA's control.

94.     That is not to say that principal is not due under the terms of the Plan and the New Master Indenture.  Section 7.05 of the New Master Indenture includes a covenant that PREPA pay principal on the Bonds to the extent there are Legacy Charge Revenues available to do so, and § 7.24 requires PREPA to continue to charge and collect Legacy Charge Revenues while any portion of the Bonds is outstanding.  PREPA is required to levy the Legacy Charge and collect the Legacy Charge Revenues, which are subject to bondholders' security interest at all times and are not available for PREPA to use for operating expenses except in expressly defined, *force majeure* events, and for a limited time.  And, of course, if the Legacy Charge Revenues are higher than the amount forecast in Schedule E to the Plan (as based on the projections in the 2023 PREPA Fiscal Plan), such funds will go to pay down principal and interest amounts due on account of the turbo

structure explained above and will eventually trigger payments from CVI-1. Further, § 11.01 provides that no event of default will occur if PREPA fails to make a payment in accordance with the turbo redemption provisions of the New Bonds because it does not have available Legacy Charge Revenues to do so. However, should the Legacy Charge Revenues be sufficient to satisfy future interest and principal payments beyond those immediately due, PREPA must make those payments rather than use those revenues for another purpose. Accordingly, creditors are protected in a variety of ways.

95.    Third, even if a default occurs, the Plan and New Master Indenture provide for limited remedies. For example, the Plan and Indenture expressly prevent holders of New Bonds from seeking to appoint a receiver. This provides several benefits to PREPA, including the minimization of the disruption that would be caused by having a receiver displace the operators of PREPA. Were a receiver to be put in place, LUMA and Genera would each have a contractual right to terminate their respective contracts, which would put the ongoing transformation of PREPA at risk. That there is no receiver remedy for holders of the New Bonds protects PREPA and its ratepayers from that risk without, in my opinion, negatively impacting future market access for PREPA.

96.    The Plan and the New Master Indenture do, however, provide a significant remedy to holders of the New Bonds: upon an event of default, the trustee of the New Bonds is authorized to seek relief from the Title III Court or, if the Title III Court declines jurisdiction, the United States District Court for the District of Puerto Rico. Typically, in my experience, a trustee must first seek relief through the local court system, which can take a significant amount of time and resources. Here, holders of the New Bonds, through the Trustee, will be able to enforce their rights in federal district court, which is a valuable remedy from the bondholders' perspective. Notably,

this remedy was used in the bonds issued in connection with the Jefferson County, Alabama refinancing, as well as in the restructurings of the Commonwealth, COFINA, and HTA.

97.     Fourth, the New Master Indenture provides explicit covenants that PREPA will undertake to operate the electrical system in accordance with law and to maintain an efficient, operating system.  These covenants, which are referred to in the New Master Indenture as the "Operation and Maintenance Covenants," provide, among other things, that PREPA will charge and collect rates so that its revenues in each fiscal year will not be less than its operating expenses not taking into account Legacy Charge Revenues.  The New Master Indenture also provides that pursuant to the Operation and Maintenance Covenants, the Trustee may seek an order for specific performance following an event of default from the Title III Court or the United States District Court for the District of Puerto Rico.  The practical effect of the Operation and Maintenance Covenants from the perspective of holders of the New Bonds is that, should PREPA's revenues separate and apart from the Legacy Charge Revenues be insufficient to cover its operating expenses, PREPA will be required to adjust rates to collect additional revenues.  This gives holders of the New Bonds protection in the form of greater assurance PREPA will continue to operate and will remain adequately funded.

98.     Fifth, the New Master Indenture has specific *force majeure* provisions to mitigate the impact of a storm or other catastrophic event that would disrupt PREPA's operations.  These provisions provide PREPA with a limited right to use Legacy Charge Revenues for operating expenses for limited periods of time.  For example, upon the occurrence of certain events, PREPA may defer up to two consecutive debt service payments, use Legacy Charge Revenues to pay for operating expenses for up to 12 months, and/or reduce or eliminate the Legacy Charge from its customers' bills for up to 12 months.  Notwithstanding these provisions, should PREPA exercise

any of these options in response to a disaster, unpaid interest on the Bonds would continue to accrue and must be paid either by maturity for the Series A Bonds or within five years for the Series B Bonds. Thus, holders of the New Bonds would continue to accrue interest even if PREPA needed Legacy Charge Revenues to respond to a hurricane or some other catastrophic event.

99.    In sum, these provisions provide appropriate protections to holders of the New Bonds while limiting the risk of PREPA's default or disruption of its operations. The New Bonds' limited default structure, lack of a traditional rate covenant on principal, *force majeure* provisions, and limited remedies are, to my knowledge, unprecedented in municipal finance and make this structure particularly attractive from PREPA's perspective. I believe these provisions strike the appropriate balance of providing valuable protections to holders of the New Bonds without jeopardizing the feasibility of the Plan or PREPA's ability to provide electricity services to Puerto Rico residents. In particular, the inclusion of these terms makes an alternative exit-financing transaction without them untenable. Without all of the provisions set forth above that limit the risk of PREPA's default—including limiting holders of Series B Bonds' recourse to the Legacy Charge Revenues and the lack of a receiver remedy in an event of default[18]—PREPA will not be sufficiently protected.

## IV.    The Terms of the New Bonds and CVIs Were Negotiated at Arms' Length and are Beneficial to PREPA

100.    Based on my experience in municipal restructuring, as well as on the work I have done to date on the Commonwealth and related Title III cases, I believe the New Bonds have numerous unique and unprecedented provisions that make them particularly attractive to PREPA.

---

[18] Notably, as discussed further in § V below, both of these provisions are not included in the GoldenTree Indication of Interest defined in § V below. *See Joint Informative Motion of GoldenTree Asset Management LP, Assured Guaranty Corp., and Assured Guaranty Municipal Corp. Regarding Alternative Financing Terms* [ECF No. 4145], Ex. B at 6.

The willingness of the counterparties such as the Fuel Line Lenders, the First Settlement Bondholders, and the Purchasers to accept the New Bonds on these terms further underscores the reasonableness of those agreements from PREPA's perspective.

101.    The New Bonds' structure reflects the Oversight Board's desire to protect PREPA and its stakeholders in the situation where PREPA performs worse than projected.  On the other hand, the Plan structure also benefits PREPA's legacy creditors if PREPA outperforms.  In other words, it addresses the asymmetric risk PREPA faces where, if it issues more noncontingent debt than it can service, it could default on its obligations, overburden its ratepayers, or otherwise be hampered its ability to provide reliable, affordable service to Puerto Rico and its residents and businesses.

102.    While it is important to protect PREPA from future default and associated operational disruption, it was also important to put the CVIs in place to compensate PREPA's legacy creditors if PREPA outperforms the projections in the 2023 PREPA Fiscal Plan.  Contingent value instruments, in my experience, are also common in circumstances where creditors dispute the future value of an asset.  CVI-1's terms are within the general scope of contingent instruments utilized in other large, complex restructurings.  CVI-1 provides a mechanism that, on the one hand, ensures PREPA will not be obligated to pay more debt than it can afford, and, on the other hand, provides the holders of CVI-1 the chance to participate in the financial upside if projections are exceeded.  Thus, like the turbo structure of the New Bonds, CVI-1 provides an upside to its holders should actual load levels be greater than projected by the Oversight Board.  Given the importance of the services provided by PREPA to residents and businesses in the Commonwealth, CVI-1 (like the New Bonds) compensates all relevant stakeholders for the unique attributes of the New Bonds that mitigate consequences of default.

103.   CVI-2 similarly was negotiated at arms' length and is beneficial to all stakeholders. CVI-2 provides an additional mechanism that will ensure PREPA will not be obligated to pay more debt than it can afford, but provides yet more upside to PREPA's creditors if PREPA's financial position improves above the status quo.  Specifically, CVI-2, as discussed above, provides for the sharing of certain savings PREPA may obtain from efficiencies that Genera may generate under the Genera O&M Agreement.  Payments thus are triggered only if PREPA obtains certain Actual Savings that correspond to a monetary value, thus guaranteeing that payments under CVI-2 do not jeopardize PREPA's financial position.  At the same time, it allows PREPA's creditors to obtain a share of that upside equal to the benefit received by PREPA's ratepayers.  Based on the above, I believe that CVI-2 benefits all relevant stakeholders.  Both CVIs protect stakeholders if PREPA's projections are too conservative.

104.   Lastly, the structure of the New Bonds, as set forth in the New Master Indenture, allows for additional debt to be issued, should it be required and as capacity becomes available. In my experience, the debt burden of municipal bonds typically remains level over time to allow for additional debt to be issued in outer years.  Here, the New Bonds maintain a level of charge that does not exceed a 6% "share of wallet" for the year 2025, including by not increasing at the rate of inflation.[19]  Accordingly, while it is uncertain whether the Legacy Charge's impact on ratepayers' electricity share of wallet will decrease below 6% in the outer years, PREPA maintains its ability to issue additional debt in the outer years should there be capacity, and should such debt

---

[20] I understand that the Oversight Board is considering making clarifying and other limited modifications to the exculpation provisions in the Plan in response to certain objections.  I understand these modifications will, among other things, add the Commonwealth as an exculpated party under this provision, based on the significant contributions it has made to PREPA's Title III case.  These modifications do not alter my conclusions regarding the Plan's exculpation provisions as stated herein.

meet the requirements for additional debt issuances discussed below.  In my view, this is sensible from the perspective of the state of the PREPA system and its overall poor condition and PREPA's geographic location that could face additional catastrophic events in the future, while allowing PREPA to reenter the capital markets.

105.    PREPA's ability to incur additional debt is not at the expense of the holders of the New Bonds.  Section 2.05 of the New Master Indenture provides PREPA may not issue additional debt secured by a first-priority interest in the Legacy Charge Revenues except for "Refunding Bonds."  Such Refunding Bonds must be accompanied by various certifications, including that the new annual debt service be equal to or less than the then current annual debt service.  This test ensures that, although PREPA may issue additional debt, it cannot do so at the expense of holders of the New Bonds.

## V.    The Settlements and Agreements Entered Into by PREPA Are More Beneficial to PREPA and its Creditors as a Whole Than Any Proposed Alternatives.

106.    As mentioned above, GoldenTree and Assured filed with the Court an indication of interest to purchase bonds new bonds issued by PREPA (the "GoldenTree Indication of Interest"). I do not believe the GoldenTree Indication of Interest, if it were actually proposed to PREPA in concrete terms, would provide exit financing that is as beneficial to PREPA or its creditors as the Forward Delivery Bond Purchase Agreement at lower rates.

107.    As a preliminary matter, the underlying structure of the Forward Delivery Bond Purchase Agreement arose through mediation.  Numerous parties, determined by the Title III Court and the Mediation Team, were entitled to participate in the mediation.  As stated above, although I understand I am not permitted to discuss the specifics of the negotiations that took place relating to the Forward Delivery Bond Purchase Agreement, based on my participation in them I believe that they were conducted fairly and in good faith.  Had other parties to the mediation wished to

make and advocate for offers to purchase the Series B Bonds on terms that could provide benefits the same as or greater than those provided under the Forward Delivery Bond Purchase Agreement, I believe the Oversight Board would have considered them in good faith.  No such offers were made prior to the signing of the Forward Delivery Bond Purchase Agreement (or have been made since).

108.    The terms of the Forward Delivery Bond Purchase Agreement were made public on September 1, 2023.  At that time, any party in interest could have made a competing proposal to the Oversight Board or to me, as the Oversight Board's chief negotiator in the mediation.  Rather than do so, without any prior notice GoldenTree and Assured filed the GoldenTree Indication of Interest on the PREPA Title III docket on November 10, 2023, only a few days before the hearing on the Supplemental Disclosure Statement in connection with the Plan.

109.    I reviewed the GoldenTree Indication of Interest, as did the Oversight Board and its other advisors.  We determined that its terms were significantly inferior to those in the Forward Delivery Bond Purchase Agreement.

110.    First, under the GoldenTree Indication of Interest, GoldenTree, Assured, and any other non-settling bondholders who purchased bonds could continue to oppose the Plan.  This is in stark contrast to the Purchasers, who committed their support to the Plan.  I am not aware of any exit financing or backstop commitment where the purchasing parties actively oppose the underlying transaction or offering in question.  Moreover, if the Plan's implementation is dependent on backstop financing from parties that oppose the Plan, such backstop parties could attempt to leverage their position to delay or derail implementation of the Plan after it is confirmed, which would be contrary to PREPA's interest in this case.

111.     Second, the GoldenTree Indication of Interest contemplates bonds with a very different structure than the New Bonds to be issued under the Plan.  These differences prevent an "apples-to-apples" comparison of the GoldenTree Indication of Interest to the Forward Delivery Bond Purchase Agreement—put simply, the GoldenTree Indication of Interest is not indicating interest in purchasing the New Bonds that PREPA proposes to issue in the Plan, but rather different bonds that PREPA is not planning to issue.  For one thing, the GoldenTree Indication of Interest does not include the Plan's waiver of any receiver remedy .  A waiver of the receiver remedy is a fundamental requirement of the Oversight Board for any bonds to be issued pursuant to a PREPA restructuring, as a financing that could enable a creditor to petition for and obtain appointment of a receiver would put PREPA in unnecessary jeopardy in the future.

112.     The GoldenTree Indication of Interest also provides that the bonds issued in connection with that financing will have full recourse to PREPA, whereas the New Bonds under the Plan have limited recourse to the Legacy Charge Revenues.  Full recourse would give holders of bonds the right to take money PREPA needs to pay its expenses and could therefore interfere with its operations.  The limitation of recourse is thus an essential term of the New Bonds as well.  In fact, the bonds to be issued under the 2019 agreement to restructure PREPA's debt eliminated all recourse to PREPA, as it contemplated a securitization transaction in which the bond issuer was a special purpose entity, not PREPA.  It has always been extremely important for the Oversight Board that bonds issued under a plan only have limited recourse, and three major PREPA creditors (the Fuel Line Lenders, National, and the Purchasers) agreed to a structure with limited recourse and no receiver remedy.

113.     Contrary to the terms of the GoldenTree Indication of Interest, the Purchasers agreed in the Forward Delivery Bond Purchase Agreement to accept the terms of the New Bonds

as described in the Plan, without the right to renegotiate or modify these critical terms of the New Bonds. This was a critical benefit of the Forward Delivery Bond Purchase Agreement to PREPA, as it ensures that as long as PREPA undertakes to charge and collect revenues based on the Legacy Charge, its failure or inability to collect sufficient revenues to pay full debt service will not subject it to receivership and other remedies. Further, under the terms of the Forward Delivery Bond Purchase Agreement, the Purchasers agreed to accept all terms of the New Master Indenture; although they were given the right to make suggestions to alter those terms, the Oversight Board was not required to take any such suggestions.

114. Third, the GoldenTree Indication of Interest misrepresents the fees associated with the Forward Delivery Bond Purchase Agreement and purported savings from the Golden Tree Indication of Interest. When discussing total fees to the Purchasers, it inappropriately combines fees provided under the Second Bond Settlement Agreement—in particular, the RSA Reimbursement Costs and the RSA Structuring Fee discussed above in § I.D. above—with the fees set forth in the Forward Delivery Bond Purchase Agreement. More importantly, the GoldenTree Indication of Interest has a more expensive fee structure than the one provided for under the Forward Delivery Bond Purchase Agreement. For example, the GoldenTree Indication of Interest has both a 3% commitment fee and a 3% "backstop fee," with no explanation of what these fees are or how, if at all, they differ. Meanwhile, the Forward Delivery Bond Purchase Agreement contains a Commitment Fee at a maximum of 4.25%, and no "backstop fee." While the Forward Delivery Bond Purchase Agreement contains a 3% Exit Financing Structuring Fee, that fee cannot be compared to the "backstop fee" in the GoldenTree Indication of Interest, as the Exit Financing Structuring Fee compensates the Structuring Parties for putting together the transaction framework, structure, and documentation. Moreover, the GoldenTree Indication of

Interest's commitment fee of 3% is, as a practical matter, no smaller than the 4.25% Commitment

Fee to be paid to the Purchasers.  For the Purchasers, the forward commitment period was almost

one year – from the August 25, 2023 execution of the Forward Delivery Bond Purchase Agreement

to its expiration date of August 1, 2024.  The GoldenTree Indication of Interest provided for the

same expiration date, but it was only "proposed" (to the extent filing it on the docket without prior

discussion can be considered "proposed") after 3 months of that commitment period had elapsed.

Even then, it was not a binding commitment, but just an expression of interest that theoretically

could have matured into a commitment following negotiation and documentation.  As a result, the

commitment fee in the GoldenTree Indication of Interest was materially the same as the

Commitment Fee in the Forward Delivery Bond Purchase Agreement.

115.    In light of the various issues discussed above, the Oversight Board determined that

the financing proposal set forth in the GoldenTree Indication of Interest would not be to PREPA's

benefit, especially when compared to the terms in the Forward Delivery Bond Purchase

Agreement.  I agree with this assessment, based on my experience as the Oversight Board's chief

negotiator and my extensive experience with municipal restructurings.

116.    After the Disclosure Statement hearing, the Oversight Board had a telephonic

meeting with GoldenTree and Assured regarding the GoldenTree Indication of Interest.  While I

understand that I am not permitted to get into the details of these discussions as they were made

under the auspices of Court-ordered mediation, suffice it to say that the parties were unable to

resolve the matters discussed above.

**VI.     The Plan Is Consistent with PREPA's 2023 Certified Fiscal Plan**

117.    Based on my 7 years of working with the Oversight Board, I have a general,

businessman's understanding of PROMESA's provisions.

118.    Based on my review of the Plan and the PREPA 2023 Fiscal Plan, I believe that,
subject to the update I mention in § II above, the debt levels and other payment obligations under
the Plan are consistent with the debt sustainability analysis in the PREPA 2023 Fiscal Plan.

## VII.   The Releases Provided for in the Settlements and Contained in the Plan Are Appropriate and Necessary to the Reorganization

119.    The Plan contains limited releases necessary to the reorganization.  First, from and
after the Effective Date of the Plan, holders of claims are deemed to release their claims against
PREPA and any claims that might have arisen from PREPA's actions in connection with its
restructuring.  *See* Plan, Art. 30.C.  Notably, I understand holders of claims are not releasing any
claims they may hold against non-debtor third parties beyond the exculpation provisions in the
Plan, nor are they releasing any claims they may hold against any party (including PREPA) for
post-Effective Date obligations incurred pursuant to the Plan or its related documents.

120.    Second, the Plan (Art. 30.D) as currently drafted[20] provides for the exculpation of
the Oversight Board, AAFAF, PREPA, the UCC, Vitol Inc., Vitol S.A., the Fuel Line Lenders,
National, the Purchasers, LUMA Energy, LLC, LUMA Energy ServCo, LLC, and Genera PR,
LLC, from any liability they might otherwise have incurred in connection with PREPA's
restructuring, including the negotiation and execution of the Amended Fuel Line Lender PSA, the
Amended National PSA, the settlement with the Official Committee of Unsecured Creditors
appointed by the U.S. Trustee in PREPA's Title III case, and the Second Bond Settlement
Agreement.   In my experience in these Title III cases, this exculpation is consistent with

---

[20] I understand that the Oversight Board is considering making clarifying and other limited
modifications to the exculpation provisions in the Plan in response to certain objections.  I
understand these modifications will, among other things, add the Commonwealth as an exculpated
party under this provision, based on the significant contributions it has made to PREPA's Title III
case.  These modifications do not alter my conclusions regarding the Plan's exculpation provisions
as stated herein.

exculpation provisions included in prior Title III plans, and is necessary to protect all parties that helped resolve PREPA's Title III case. The exculpation provision in the Plan is limited so as not to exculpate actions that constitute actual fraud or gross negligence.

121. The releases and exculpation provisions described above are necessary to PREPA's reorganization as they protect actions taken by PREPA, the Oversight Board, and other parties to find a way for PREPA to exit Title III, and shield PREPA, the Oversight Board, and those other exculpated parties from lawsuits filed by dissatisfied creditors after the Plan goes effective. I believe that National, the Fuel Line Lenders, and the Second Settlement Bondholders would not have agreed to settle with the Oversight Board if they were not exculpated. I believe they see this term as part of the consideration under their respective settlements.

## VIII. Consummation and Reimbursement of Professional Fees

122. Consistent with the Amended Fuel Line Lender PSA, the Second Bond Settlement Agreement, the Forward Bond Purchase Agreement, and the Amended National PSA, the Plan provides for certain parties to each such agreement to receive certain consummation costs and the reimbursement of professional fees (all of which are described earlier in my Declaration and again directly below).

### A. Fees in the Amended Fuel Line Lender PSA

123. The Amended Fuel Line Lender PSA provides that the Fuel Line Lenders are to receive FLL Consummation Costs up to an amount of $15 million and FLL Professional Reimbursement in the amount of up to $11 million. These costs and reimbursements compensate the Fuel Line Lenders for costs incurred by them in negotiating the Fuel Line Lender PSA and formulating and supporting the Plan and related documents such as the New Master Indenture. The Fuel Line Lenders' contributions to the formulation and documentation of the New Master Indenture, as well as the supplemental indentures for the CVIs attached thereto, have been

significant, including numerous rounds of negotiation and revisions to those documents over the course of months. Since all New Bonds and CVIs issued under the Plan are subject to those indentures, the Fuel Line Lenders' contributions benefit all PREPA stakeholders. Their contributions include, but are not limited to (i) proposing a mechanism whereby holders of the New Bonds and PREPA have separate rate consultants to mediate disagreements about the calculation of the Replacement Legacy Charge (New Master Indenture § 7.24(c)); (ii) enhancements to the collateral package in the definition of "Trust Estate"; (iii) enhancements to the Interest Rate Covenant, including a 30 day reserve originating from excess collection (§ 7.01 (b)) and the measure of the determination of the Interest Rate Covenant by what is contained in PREPA's annual budget (§ 7.01 (a) (ii)); (iv) inclusion of conditions required for PREPA to issue additional indebtedness, leading to the current wording of § 2.05 and to the terms of a "*force majeure* event." The Fuel Line Lender group has members with extensive experience in the municipal market and were therefore able to further ensure that the terms of the New Master Indenture worked to help PREPA regain access to the capital markets.

### B. Fees in the Second Bond Settlement Agreement

124.    As discussed above, § 5.01(g) of the Second Bond Settlement Agreement provides for the Oversight Board to pay, either in cash or in Series B Bonds:  (*i*) the RSA Fee of $210,040,000.00 to be split *pro rata* among the up to two-thirds of Bondholders who join the Second Bond Settlement Agreement on or prior to the Joinder Deadline; (*ii*) the RSA Structuring Fee of 0.5224% of their asserted claim to be split *pro rata* among the Structuring Parties; and (*iii*) the RSA Reimbursement Costs, up to a maximum of $30 million, allocated among the Forward Bond Commitment Parties.

125.    The RSA Fee is being provided to the Second Settlement Bondholders to compensate them for exchanging their existing bonds for Series B Bonds with a new CUSIP that

will be subject to the terms of the Second Bond Settlement Agreement and that therefore might not be as liquid as the bonds bearing the original CUSIP. Bonds with the new CUSIP may trade at a price that is less than PREPA bonds not bearing the new CUSIP and not bound by the Second Bond Settlement Agreement, if they are tradeable at all. As such, Second Settlement Bondholders assume the risk of holding their Series B Bonds with the new CUSIP for an indefinite period while waiting for the Plan to be confirmed and go effective. The RSA Fee compensates such holders for assuming that risk.

126. Moreover, the RSA Fee provides compensation in consideration for increased risk and decreased liquidity for their Series B Bonds while the confirmation process is ongoing. Second Settlement Bondholders may face impediments to trading their Series B Bonds, in light of the transfer restrictions on the Bonds pursuant to the Second Bond Settlement Agreement's terms. In my view, the RSA Fee is reasonable compensation for this impact on the Series B Bonds' liquidity.

127. Likewise, the RSA Structuring Fee compensates the Structuring Parties for the significant time, energy, and resources spent on formulating and negotiating the Plan, as well as structuring a novel and complex Second Bond Settlement Agreement that other bondholders were able to benefit from by joining, without themselves having to expend such resources. And the RSA Reimbursement Costs compensate the Purchasers for fees incurred by their legal and financial advisors in connection with negotiating and documenting the Plan and the Second Bond Settlement Agreement. In my experience, such fees are customary in transactions of this size. Notably, the RSA Reimbursement Costs must be reasonable and summary invoices must be provided to the Oversight Board, which must approve them when reasonable prior to payment. None of the RSA Reimbursement Costs can be related to any litigation against PREPA or the Oversight Board that the Purchasers engaged in prior to entering into the Second Bond Settlement

Agreement.  In my opinion, the RSA Fee, the RSA Structuring Fee, and the RSA Reimbursement Costs are fair and reasonable for the postpetition work and fees undertaken by the stakeholders receiving them, given the circumstances of the Plan and the related operative agreements.

### C.    Fees in the Forward Delivery Bond Purchase Agreement

128.    As mentioned above in § I.E., the Forward Delivery Bond Purchase Agreement provides for the following fees and costs to be paid:  (*i*) the Commitment Fee in the amount of 4.25% of the Initial Commitment of Series B Bonds' principal and 3% of the Additional Commitment of Series B Bonds' principal, to be allocated among the Purchasers; (*ii*) the Exit Financing Structuring Fee in the amount of 3% of the Initial Commitment of Series B Bonds' principal to be split *pro rata* among the Structuring Parties; and (*iii*) Forward Reimbursement Costs at a maximum of 1% of the Initial Commitment of Series B Bonds' principal to be allocated among the Structuring Parties (collectively with the Commitment Fee and the Exit Financing Structuring Fee, the "Forward Fees").  The respective amounts of these fees are set forth below:

| Fee | Series B Bond (Exclusive of Fees) | Fee Amount | Fee Percentage on Series B Bonds (Exclusive of Fees) | Percentage of Series B Bond Principal |
|---|---|---|---|---|
| Commitment Fee (Initial Commitment) | $1,508,021,337 | $64,090,907 | 4.25% | 3.398% |
| Commitment Fee (Additional Commitment) | $246,465,411 | $7,393,962 | 3.00% | 0.392% |
| Exit Financing Structuring Fee | $1,508,021,337 | $45,240,640 | 3.00% | 2.398% |
| Forward Reimbursement Costs | $1,508,021,337 | $15,080,213 | 1.00% | 0.799% |

129.    For all of the Forward Fees, the principal amount of Series B Bonds used to calculate the relevant percentage excludes the principal amount of any Series B Bonds being used to pay the Forward Fees.  Further, and as noted above, per the Forward Delivery Bond Purchase Agreement Amendment, the Purchasers agreed to purchase those additional Series B Bonds with a Forward Commitment Fee of only 3% of the Additional Commitment and no other fee.  The lower percentage fee of 3% (as compared to 4.25% for the Initial Commitment of Series B Bonds to be issued in the Plan) is a result of the shorter commitment period between the signing of the Forward Delivery Bond Purchase Agreement Amendment and the projected Effective Date of the Plan (versus the longer period from the signing of the initial Forward Delivery Bond Purchase Agreement).  No Exit Financing Structuring Fee or Forward Reimbursement Costs are payable with respect to the Additional Commitment, as the terms of the purchase and structure of the transaction had already been negotiated.

### 1.    The Commitment Fee

130.    The Commitment Fee is to compensate the Purchasers for the costs of promising, approximately one year in advance, to purchase the B Bonds, including their obligation to provide for approximately $1.9 billion in funds necessary for such purchase and agreeing to be bound by the terms of the Forward Bond Purchase Agreement regardless of how the market moves prior to settlement.  This is a significant sum to earmark for use at an unknown time in the future, and the Purchasers face substantial opportunity costs in doing so.  They also take the risk that the transaction will not consummate, that the Plan will go effective without their financing, or that interest rates will climb, in which case the attractiveness of the agreement would diminish as compared to other investment opportunities.  Indeed, after the Purchasers entered into the Forward

Delivery Bond Purchase Agreement, interest rates did in fact grow, from 3.90% to 4.58% approximately two months later, according to the IHS Markit AAA Curve.[21]

131.   To provide comfort that the amount of the Commitment Fee was reasonable, I reviewed a list of rights offerings provided in connection with a large chapter 11 bankruptcy case. *See* "Rights Offering Comparables," Case No. 22-10760-DSJ [ECF No. 1345-1] (S.D.N.Y. Jan. 18, 2023).  In these rights offerings, various parties were offered the option to purchase new debt or equity pursuant to backstop transactions.  There were numerous differences between the transaction set forth in the Forward Delivery Bond Purchase Agreement and the rights offerings that I reviewed, such as how far in advance the purchaser was making a commitment, as rights offerings typically have materially less than one year of a forward commitment and do not involve the same level of market or operational risk.  However, the rights offerings that I reviewed, particularly for the purchase of new debt, were, in my view, an appropriate comparison given the lack of any transaction in the municipal bond market that are truly comparable to the transaction contemplated by the Forward Delivery Bond Purchase Agreement, because of, among other reasons, the unique terms of the Series B Bonds, the uniqueness of the Forward Delivery Bond Purchase Agreement, the unique magnitude of PREPA's restructuring, and the lack of any

---

[21] The IHS Markit Municipal Bond AAA Curve is a tax-exempt yield curve that consists of 5% General Obligation AAA debt, callable after 10 years, as a basis for reflecting movement in the municipal market.  IHS Markit Municipal Bond AAA Curve is publicly available, with its information posted on EMMA.  In connection with assessing appropriate rates on the Series B Bonds, I utilized the 30-year BBB MMD Index, which I believed to be a close proxy to the Series B Bonds when it comes to their market yields (even though the Series B Bonds will not be rated BBB at settlement).  However, the 30-year BBB MMD Index does not allow its data to be published, so for purposes of this Declaration, I also reviewed other indices, including the IHS Markit Municipal Bond AAA Curve.  All of the indices I reviewed show nearly identical market movements for the period in question, so I am confident that the rates reported here from the IHS Markit Municipal Bond AAA Curve are appropriate to use in evaluating the price of the Series B Bonds.

protection for the Purchasers if the Plan is not confirmed.  The Commitment Fee was well within the range of backstop fees for the transactions included on this list, especially given the fact that none of those other transactions required a year-long commitment.

132.    The reasonableness of the Commitment Fee is further evidenced by the lower amount of the commitment fee (3%, as compared to 4.25%) for the Additional Commitment.  The purpose of the Commitment Fee is to compensate the Purchasers in connection with costs incurred in connection with ensuring they had sufficient liquidity to purchase the Series B Bonds at closing, without knowing if or when the transaction will close.  Notably, the 3% Commitment Fee for the Additional Commitment was not preordained in the original iteration of the Forward Delivery Bond Purchase Agreement, and the Purchasers had the right of first refusal for any additional Series B Bonds.

### 2.    The Exit Financing Structuring Fee

133.    The Exit Financing Structuring Fee is meant to compensate the Structuring Parties for costs they incurred in devising, formulating, and negotiating the Forward Bond Delivery Purchase Agreement and related documents.  The uniqueness of the Forward Delivery Bond Purchase Agreement necessitated substantial effort on the part of the Structuring Parties that could not be replicated from prior transactions, either in the municipal restructuring framework or from other backstop transactions.  Moreover, by participating in the formulation of the Forward Delivery Bond Purchase Agreement, the Structuring Parties created a framework that provides financing for PREPA to exit Title III and distribute over $1.8 billion in cash to numerous creditor constituencies.  In my opinion, and based on my experience negotiating restructuring agreements for the other Debtors in the other Title III cases and in the municipal bond market more generally, I believe that the Exit Financing Structuring Fee is reasonable and appropriate compensation for the actions taken by the Structuring Parties.

### 3. The Forward Reimbursement Costs

134.     The Forward Reimbursement Costs provide further compensation in light of the substantial effort undertaken by the Structuring Parties in documenting the transaction.  As with fees for other parties who are entitled to legal fee reimbursements under the Plan, the Forward Reimbursement Costs are premised on such reimbursements being related to reasonable costs, and all fee submissions must be approved by the Oversight Board.  The Structuring Parties agreed that they would not receive any additional Forward Reimbursement Costs in connection with the Additional Commitment, even though I believe they did incur legal costs in connection with amending the Forward Delivery Bond Purchase Agreement.

135.     In sum, based on my experience negotiating restructuring agreements with respect to the other Debtors in the other Title III cases, and in light of the uniqueness of the Forward Delivery Bond Purchase Agreement and the work that will need to be done up to the Effective Date (including implementation and, potentially, appeal-related work), I believe that the Forward Fees are reasonable and appropriate compensation for the actions taken by the Purchasers and Structuring Parties.

### 4. Pricing of the Series B Bonds as Related to the Forward Fees

136.     As noted above, the Forward Delivery Bond Purchase Agreement's benefits to PREPA are relevant not only to the size of the Forward Fees, but also to the pricing of the Series B Bonds.  These factors must be considered holistically when evaluating the reasonableness of the Forward Fees and the 6.997% interest rate on the Series B Bonds.

137.     To start, the letter that was filed by certain Bondholders encouraging all Bondholders to vote against the then-operative plan was posted on EMMA on February 3, 2023. *See* February 3 Letter.  The bonds being offered under that version of the plan had a 6% interest rate.  On August 25, 2023, the Oversight Board and the Purchasers signed the Forward Delivery

Bond Purchase Agreement.  From February 3 to August 25, 2023 the IHS Markit Municipal Bond

AAA Curve[22] had increased by 74 basis points, or 0.74%.  This effectively increased the interest

rate on the Series B Bonds from 6% to 6.74% purely as a result of market changes.

138.    Next, because the Series B Bonds are forward delivery bonds, they must be priced

using the forward premium considerations discussed in § I.E.  Generally, in the municipal market,

forward premiums are between 5 and 6 basis points per month for the forward period, but they can

be anywhere within the range of 3 to 10 basis points per month depending on market conditions.

Factors that impact where the premium is set within that range are the yield curve,[23] the likelihood

of delivery on the forward settlement date, liquidity risk, and credit risk,[24] among other factors.  I

believe 5 basis points per month is appropriate here, given the facts and circumstances relating to

the Series B Bonds and to PREPA as the issuer.  Given the commitment made by the Purchasers

was a 12-month commitment, 5 basis points per month equates to an additional 60 basis points to

the total yield, which increased the effective interest rate on the Series B Bonds from 6.74% to

7.34%.  Notably, the final agreement was for a 7% interest rate, along with a 32 basis point cost

they were proposing as the Exit Financing Structuring Fee.  Combined, the Purchasers' offer is

---

[22] As I explained above, I believe the IHS Markit Municipal Bond AAA Curve is a reliable index for the purpose of evaluating changes in market yields.  In particular, I believe that this index is more accurate for municipal bonds than an index to U.S. Treasury bonds, since municipal bonds trade at a ratio to U.S. Treasury bonds.  All things being equal, if the municipal and U.S. Treasury bonds markets moved together, the municipal bond market would trade at a ratio of one minus the marginal tax rate.  However, this is not the case as the ratio has been at a low of 63.5% to a high of 253% (during COVID) since 1986.  This range in ratio shows that the U.S. municipal market does not move in lockstep with U.S. Treasury bonds, but moves with other related municipal factors (aside from the marginal tax rate).

[23] Here, the yield curve is the difference between a one-year rate on a municipal security in this case versus the rate on these bonds if they were a current delivery bond.

[24] In this context, "credit risk" refers to structural risks of the transaction over its life, *e.g.*, the risk of nonpayment on the Series B Bonds.

less than the 7.34% effective interest rate that I believe is appropriate forward interest rate for the Series B Bonds.  Accordingly, I believe the overall price of the Forward Delivery Bond Purchase Agreement is reasonable.  I further note that by October 26, 2023, two months following the signing of the Forward Delivery Bond Purchase Agreement, the 30-year Municipal BBB Bond Index had increased by an additional 73 basis points, or 0.73%, since August 25, 2023; none of that market increase is incorporated into the 7% interest rate on the Series B Bonds.

### D.   Fees in the Amended National PSA

139.    As mentioned above in § I.B., the Amended National PSA provides for National to receive the National Professional Reimbursement, which is an administrative expense claim for a maximum amount of $20 million as reimbursement for its professional and legal fees and expenses.  This sum reimburses National for the reasonable fees and expenses it incurred in connection with negotiating and executing the Initial National PSA and the Amended National PSA, as well as assisting with seeking the approval of the Plan.  To receive the National Reimbursement Costs, National must submit documentation summarizing its professional and legal fees and expenses, and the Oversight Board must approve them prior to any disbursement.[25]

### E.   Comparisons to Fees in Other Municipal Restructurings

140.    The fees and consummation costs outlined above are reasonable and consistent with fees and consummation costs that have been approved in the Commonwealth's, COFINA's, and HTA's Title III cases.  The below chart compares the ratio between bondholder claims and the plan support agreement-related fees for several prior Title III or Title VI restructurings:

---

[25] Prior to the First National PSA Amendment, the original National PSA included the distribution of consummation costs and structuring fees, which were equal to 3% and 2.86% of National's asserted claim, respectively.  Both of these fees were removed from the National PSA as part of the Oversight Board's renegotiation of that agreement through the First National PSA Amendment.

| | GO / PBA | ERS | HTA | CCDA | PRIFA | Total | PREPA |
|---|---|---|---|---|---|---|---|
| Total Claims (in millions) | $18,754 | $3,169 | $6,258 | $384 | $1,929 | $30,493 | $9,164[26] |
| Total Fees (in millions) | $461 | $75 | $180 | $19 | $67 | $801 | $282[27] |
| Fees as a Percent of Claims | 2.458% | 2.367% | 2.876% | 4.948% | 3.473% | 2.627% | 3.080% |

141.    With respect to the Forward Delivery Bond Purchase Agreement, however, I do not believe other municipal bond exit financing transactions are truly comparable, as this transaction is unique in the municipal market.  For example, although Barclays Capital Inc. ("Barclays") provided exit financing for the City of Detroit ("Detroit") in connection with Detroit's 2014 restructuring, the characteristics of that financing were markedly different from the terms of the transaction contemplated by the Forward Delivery Bond Purchase Agreement.  This is primarily due to the lack of a forward component in the Detroit transaction.  Barclays' bond financing for Detroit, issued by the Michigan Finance Authority, was not a forward delivery bond.  In 2014, while in bankruptcy, Detroit did two bridge financings that were refinanced within a year into long-term bonds sold to the market at market rates, and for immediate settlement at market rates on the date of sale.  The date of sale was within two weeks of delivery of the bonds.  In the municipal market, this is known as a "regular way settlement," as contrasted from a forward

---

[26] This includes the total amount of Fuel Line Lender and Bondholder claims.

[27] This includes: (1) the approximately $120 million of the portion of the RSA Fee distributed to Bondholders who signed onto the Second Bond Settlement Agreement by the Joinder Date, including the Purchasers, (2) the approximately $20 million share of the RSA Fee distributed to National, (3) the RSA Structuring Fee, (4) the RSA Reimbursement Costs, (5) the one-year interest accrual under the Amended Fuel Line Lender PSA, and (6) the fees under the Amended Fuel Line Lender PSA and the Amended National PSA.

delivery transaction.  Of these bridge financings, the first was done by Citi, and it was outstanding for eight months.  The second bridge financing, by Barclays, was done as debtor-in-possession ("DIP") financing.  It was issued on a floating rate and refinanced with bonds four months later.

142.    In both cases the bonds were sold to the market at then prevailing interest rates, were rated in the "A" rating category by Standard & Poor's, and included traditional outs provided to the underwriter (Citi and Barclays, respectively) at the time of sale.  The bridge loans were structured so that Citi and Barclays each were compensated for the loan out of the interest rate; for example, Barclays' loan was at LIBOR plus 250 basis points.  The bond fees were therefore for underwriting and distributing the bonds to the market on a current delivery basis.  As I have described above, the forward delivery market works quite differently than the bonds at issue in Barclays' exit financing for Detroit.

143.    Numerous additional differences between the Barclays exit financing and the Forward Delivery Bond Purchase Agreement exist.  For example, the bonds issued by Detroit contained numerous protections, including a debt service covenant, creation of a debt service reserve fund, and traditional conditions to closing, all of which are absent from the Series B Bonds here.  In addition, the revenue stream used to pay off the bonds issued by Detroit were income tax revenues, which typically pose less of a collection risk than a customer charge like the one that will generate the Legacy Charge Revenues.  Additionally, and as noted above, Barclays was the lender on the DIP facility that the exit financing was supposed to refinance (and had previously earned fees with respect to the DIP facility).  The two transactions, and in particular their fees, should thus be viewed together.  Accordingly, the fees paid to Barclays in the Detroit transaction are not an appropriate point of comparison for purposes of evaluating the Forward Delivery Bond Purchase Agreement.

144.    For similar reasons, although the Title III and Title VI restructurings discussed in paragraph 140 above are comparable for purposes of comparing their respective plan support agreements, they do not serve as comparable transactions for the Forward Delivery Bond Purchase Agreement or the relative risks of the New Bonds to be issued thereunder.  The mere fact that two municipal entities are located in the same geographic region is not, standing alone, a sufficient basis for comparison.   Prior bond restructurings in Puerto Rico have many of the same comparability issues as the Barclays exit financing in Detroit.  For example, in COFINA and HTA, the revenues backing the newly issued bonds—sales and use taxes and toll road revenues, respectively—came from stable sources without significant collection difficulties.  Comparisons between the value of these bonds on the one hand, and the Series B Bonds (once they are issued) on the other, are therefore irrelevant to an evaluation of the reasonableness of the New Bonds to be issued pursuant to the Plan.

## IX.    Calculation of Creditor Recoveries

145.    I have reviewed the Plan and the PREPA 2023 Fiscal Plan.  The Series A Bonds and Series B Bonds are both payable from the Legacy Charge Revenues.  The time within which they will be paid depends on PREPA's load and the number of customers on PREPA's grid over the ensuing years, among other things.  The PREPA 2023 Fiscal Plan provides forecasts of PREPA's load and other relevant matters.  Relying on the projections contained in the PREPA 2023 Fiscal Plan along with the cash flows set forth in Schedule E of the Plan, I have calculated that: (a) the A Bonds are projected to be paid in full in 9 years; and (b) the B Bonds are projected to be paid in full in 35 years.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.


Dated: February 12, 2024                                    /s/ *David Brownstein*
      New York, NY                                     David M. Brownstein